LANGSAM STEVENS SILVER & HOLLAENDER LLP
65 South Main Street, Suite B102
Pennington, NJ 08534
Tel.    (856)727-0315
By:    John J. McDermott, Esq.
       (jmcdermott@lssh-law.com)

GIBBS & BRUNS, LLP
1100 Louisiana Street, Suite 5300
Houston, TX 77002
Tel.    (713) 650-8805
By:    Kathy D. Patrick, Esq.
       (kpatrick@gibbsbruns.com)
       Anthony N. Kaim, Esq.

LANGSAM STEVENS SILVER & HOLLAENDER LLP
1818 Market Street, Suite 2430
Philadelphia, PA 19103
Tel.    (856) 732-3260
By:    Larry D. Silver, Esq.
       (lsilver@lssh-law.com)

*Attorneys for Occidental Chemical Corporation*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## NEWARK VICINAGE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 2:22-cv-07326 |
| | ) | |
| v. | ) | **OCCIDENTAL CHEMICAL** |
| | ) | **CORPORATION'S BRIEF IN SUPPORT** |
| ALDEN LEEDS, INC., *et al.* | ) | **OF MOTION TO INTERVENE AND FOR** |
| | ) | **EXTENSION OF TIME TO COMMENT ON** |
| Defendants. | ) | **PROPOSED CONSENT DECREE** |
| | ) | |
| | ) | |
| _____ | ) | |

## TABLE OF CONTENTS

I.    **INTRODUCTION**................................................................................................ 5

II.   **BACKGROUND TO OXYCHEM'S REQUEST TO INTERVENE** ............................ 7

III.  **ARGUMENT FOR INTERVENTION AND EXTENSION OF TIME** ........................ 13

   A.  **OxyChem is Entitled to Intervene as of Right.** ............................................... 14

   B.  **OxyChem Should Be Granted Permissive Intervention.** ................................ 20

   C.  **An Extension of Time to Comment on the Proposed Consent Decree is Necessary.** .. 21

IV.  **CONCLUSION** .............................................................................................. 22

**TABLE OF AUTHORITIES**

*Cases*

*City of Emeryville v. Robinson*, 721 F.3d 1251 (9th Cir. 2010) _____ 15

*Columbia Falls Al. Co., LLC*  v. *Atl. Richfield Co.*, No. 18-131-M-DWM, 2021 WL 3769886 (D. Mont. Aug. 25, 2021) _____ 17

*E.I. DuPont de Nemours & Co. v. United States*, 460 F.3d 515 (3d Cir. 2006) _____ 10

*El Paso Natural Gas Co., LLC v. United States*, 390 F. Supp. 1025 (D. Ariz. 2019) _____ 18

*In re Acushnet River & New Bedford Harbor*, 712 F. Supp. 1019 (D. Mass. 1989) _____ 10

*New Jersey Dep't of Env't Prot. v. Am. Thermoplastics Corp.*, 974 F.3d 486 (3d Cir. 2020) __ 11

*Smith Land & Improv. Corp. v. Celotex Corp.*, 851 F.2d 86 (3d Cir. 1988) _____ 15

*Transtech Indus., Inc.* v. *A & Z Septic Clean*, 798 F. Supp. 1079 (D.N.J. 1992) _____ 15

*United States v. Acton Corp.*, 131 F.R.D. 431 (D.N.J. 1990) _____ 14, 15

*United States v. Aerojet Gen. Corp.*, 606 F.3d 1142 (9th Cir. 2010) _____ 14-16, 18

*United States v. Albert Inv. Co.*, 585 F.3d 1386 (10th Cir. 2009) _____ 15, 17

*United States v. Alcan Aluminum, Inc.*, 25 F.3d 1174 (3d Cir. 1994) _____ 15, 19

*United States* v. *Charter Int'l Oil Co.*, 83 F.3d 510 (1st Cir. 1996) _____ 12

*United States v. City* of *Glen Cove*, 221 F.R.D. 370 (E.D.N.Y. 2004) _____ 17

*United States v. Union Elec. Co.*, 64 F.3d 1152 (8th Cir. 1995) _____ 16, 17, 19

*United States v. W.R. Grace & Co.-Conn.*, 185 F.R.D. 184 (D.N.J. 1999) _____ 15

*Waste Mgm't of Pa., Inc.* v. *City of York*, 910 F. Supp. 1035 (M.D. Pa. 1995) _____ 16

*Statutes*

42 U.S.C. § 9613_____ 18

42 U.S.C. § 9613(f)(1) _____ 14, 16

42 U.S.C. § 9613(i)_____ 22

42 U.S.C. § 9622_____ 11

42 U.S.C. § 9622(d)(2)(B) _____ 18

42 U.S.C. § 9622(e)(3)(C) _____ 21, 22

***Other Authorities***

132 Cong. Rec. H9563 (daily ed. Oct. 8, 1986) _____ 11

132 Cong. Rec. S14,903 (daily ed. Oct. 3, 1986) _____ 11

Administrative Settlement Agreement and Order on Consent for Remedial Design in the Matter of: Operable Unit Two of the Diamond Alkali Superfund Site In and About Essex, Hudson, Bergen and Passaic Counties, New Jersey, *available at* https://semspub.epa.gov/work/02/453915.pdf (last visited December 23, 2022)_____ 7

Record of Decision for an Interim Remedy in the Upper 9 Miles of the Lower Passaic River Study Area, OU4 of the Diamond Alkali Superfund Site ("OU4 ROD") at 48, 62 ($441 million), *available at* https://semspub.epa.gov/work/02/630399.pdf (last visited December 22, 2022) _____ 13

Record of Decision, Lower 8.3 Miles of the Lower Passaic River Part of the Diamond Alkali Superfund Site (Mar. 3, 2016) ("OU2 ROD") at 52, 79 ($1.38 billion), *available at* https://semspub.epa.gov/work/02/396055.pdf (last visited December 22, 2022)_____ 13

***Rules***

Federal Rule of Civil Procedure 24(a) _____ 14, 15, 17

Federal Rule of Civil Procedure 24(b)_____ 20

## I.      INTRODUCTION

The United States admits that Occidental Chemical Corporation ("OxyChem") never polluted the Passaic River. Though its sole source of liability is a merger with Diamond Shamrock Chemicals Company ("DSCC"), OxyChem has never shirked its fair share of responsibility. OxyChem has for decades stepped forward to lead the cleanup of the Passaic River. Beginning in the 1980s and through voluntary agreements since then, OxyChem has been a leader in assessing and addressing the presence of hazardous substances in the river, including substances for which OxyChem has no responsibility and others existing in the river decades *before* the plant at 80-120 Lister Avenue in Newark was acquired by DSCC's predecessor, the former Diamond Alkali Company.  As recently as January, OxyChem stepped forward with an enormously valuable offer to design and implement the "interim" remedy for Operable Unit 4 ("OU4"), at a cost EPA estimates to be $441 million.

Critical to OxyChem's efforts has been a right Congress provided through the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), to seek and obtain contribution from others who bear responsibility for pollution they caused and that parties like OxyChem did not cause. Had EPA accepted OxyChem's offer to perform the OU4 interim remedy and agreed not to impair OxyChem's rights to seek contribution from other parties whom the United States *admits* are liable for *all* the pollution in the river, the cleanup of OU4 would be well advanced by now and additional progress on Operable Unit 2 (where OxyChem is already designing the remedy) would also be underway.

But the United States spurned OxyChem's offers of voluntary cooperation. Rather than abide the Court's assessment of the Defendants' liability as CERCLA requires, EPA selected a former EPA employee—and a favored EPA contractor—to conduct an involuntary, unauthorized,

and deeply-flawed "allocation" process that EPA pre-ordained to assign an overwhelming (and unsupportable) allocation to OxyChem. EPA now offers its so-called "allocation" in evidence—which CERCLA squarely prohibits—urging the Court to rely on it, instead of the Court's own judgment, to authorize the United States to let scores of major, polluting Defendants out for a "minor" share of the costs for which they are jointly and severally liable. To this the United States has added a prohibited sweetener: an agreement to confiscate OxyChem's existing and future contribution claims against Defendants—claims that do not belong to the United States, but to OxyChem alone.

By law, EPA is prohibited from conducting any purportedly "binding" allocation and prohibited from offering in evidence any allocation it conducts. Yet EPA here violates both prohibitions. Relying on a factually and legally flawed allocation that is not credible, based on parties' submissions about their own liability that have never been subjected to the rigors of evidence, due process, or cross-examination, EPA seeks to assign a ridiculous 99.9% of the responsibility for the river's cleanup to OxyChem—contradicting its own Records of Decision and subsequent studies finding:

- Ubiquitous contamination in the river by *eight* contaminants of concern (COCs), 6 of which are substances for which OxyChem has no alleged liability;

- A century's worth of pollution by other companies and decades of contamination of the Passaic River *before* the Diamond Alkali Company even acquired the Lister Plant;

- More than 24,000 pounds of mercury and 6,000 pounds of PCBs in the river's sediments in Operable Unit 2, none of which are attributable to OxyChem; and,

- That OxyChem itself is not the sole source of two other COCs, dioxin and DDT.

OxyChem has long cooperated voluntarily with EPA. But EPA's actions now leave OxyChem no choice but to intervene in this case to protect its own rights and the public interest. EPA's actions are contrary to law. They violate OxyChem's constitutional and statutory rights. And they are emphatically not in the public interest. Rather than advance the remedies, EPA's actions have delayed the cleanup and will impede its progress. The United States cannot be trusted to adequately represent OxyChem's interest in this matter. And the Federal Rules give OxyChem a clear and present right to intervene in this action. For all these reasons, and those stated below, OxyChem must and should be permitted to intervene.

Finally, because of the gravity of the issues, and the scope and number of settlements involved in the proposed Consent Decree, the Court should grant an extension of time—from the current 45 days to 90 days—to comment on the proposed decree.

## II.     BACKGROUND TO OXYCHEM'S REQUEST TO INTERVENE

On September 30, 2016, OxyChem entered into an Administrative Settlement Agreement and Order on Consent for Remedial Design ("2016 ASAOC"),[1] under which OxyChem agreed to design (and fund the costs of designing) the remedy for Operable Unit 2 ("OU2") of the Lower Passaic River.  *See* Dkt. 2-1 (Proposed Consent Decree) at 5. This includes performing a predesign investigation; developing plans for project management, remedial design work, and sitewide monitoring; and executing three distinct remedial designs: preliminary, intermediate, and final.  In its Record of Decision for OU2 (OU2 ROD), EPA identified eight COCs that drove its remedy selection: dioxins and furans, polychlorinated biphenyls (PCBs), mercury, DDT, copper, dieldrin,

---

[1] Administrative Settlement Agreement and Order on Consent for Remedial Design in the Matter of: Operable Unit Two of the Diamond Alkali Superfund Site In and About Essex, Hudson, Bergen and Passaic Counties, New Jersey, *available at* https://semspub.epa.gov/work/02/453915.pdf (last visited December 23, 2022).

polyaromatic hydrocarbons (PAHs), and lead. According to EPA, "data shows elevated concentrations of COCs are ubiquitous in sediments of the lower 8.3 miles, bank to bank."[2] The United States has previously admitted OxyChem did not itself pollute the Passaic River[3]; the sole alleged basis for OxyChem's liability is its merger with the former Diamond Shamrock Chemicals Company ("DSCC") more than *sixteen years* after that company ceased operating an agricultural chemicals plant at 80-120 Lister Avenue in Newark. No party alleges the Lister Plant has any responsibility for six of the COCs that drive the OU2 remedy nor is there any allegation that the Lister Plant is the sole source of two other COCs, dioxins/furans and DDT.

In the 2016 ASAOC, EPA again confirmed the OU2 remedy was selected to address over a dozen hazardous substances, beyond the dioxins and DDT for which OxyChem is alleged to be partially liable.[4] EPA also stated that "[d]ata show that, between RM 0 and RM 8.3, surface sediments in the navigation channel are as highly contaminated as those in the shoals, based on median concentrations . . . . In other words, data show that elevated concentrations of COCs are ubiquitous in surface sediments of the lower 8.3 miles[.]"[5] OxyChem has submitted the Pre-Final

---

[2] *See* OU2 ROD §5.3 (Sediment Conceptual Site Model).

[3] *See* Ex. A (News Release from Region 02, *EPA Secures $165 Million Agreement with Occidental Chemical to Conduct the Work Needed to Start the Cleanup of the Lower Eight Miles of the Passaic River* (Oct. 5, 2016)) (acknowledging that "Occidental Chemical Corporation did not directly discharge pollution into the Passaic River" and that its "legal responsibility" arises from the merger with DSCC).

[4] *See* 2016 ASAOC ¶ 11 (Findings of Fact) ("The sediments of the Lower Passaic River contain hazardous substances, including, but not limited to, cadmium, copper, lead, mercury, nickel, zinc, polyaromatic hydrocarbons ('PAHs'), dieldrin, bis (2-ethylhexyl) phthalate, polychlorinated biphenyls ('PCBs'), dichlorodiphenyl-trichloroethane ('DDT'), polychlorinated dibenzo-p-dioxins ('PCDDs') including 2,3,7,8-tetrachloro-dibenzo-p-dioxin ('2,3,7,8-TCDD'), polychlorinated dibenzofurans ('PCDFs'), 2,4-dichlorophenoxy acetic acid ('2,4-D'), 2,4,5-trichlorophenoxy acetic acid ('2,4,5-T'), and 2,4,5-trichlorophenol ('2,4,5-TCP').").

[5] OU2 ROD § 5.3 (Sediment Conceptual Site Model).

(95%) Remedial Design to EPA. EPA originally estimated the design work under the 2016 ASAOC would cost $165 million. Even though OxyChem reached out to numerous Defendants to set up a meeting to discuss their participation in the Remedial Design, only a small number of Defendants attended the meeting, and none has performed or funded any Remedial Design work in OU2.

Despite the lack of cooperation, and the undisputed fact that OxyChem was not (and could never be) responsible for anything approaching 100% of the costs to respond to the hazardous substances in OU2, OxyChem agreed to step up and fund the costs for the Remedial Design. OxyChem was able to make this commitment *because* it had a right under CERCLA to seek contribution from other parties who were also responsible. This was, in fact, Congress's intent in amending CERCLA to provide contribution rights to performing parties: it incentivizes them to perform first and shifts to those parties the costs to pursue contribution from other responsible parties, thus advancing the progress of EPA-selected remedies and relieving the United States of the response and litigation costs to compel performance by others. As Congress authorized, in 2018, OxyChem attempted to recoup some of the costs by instituting a contribution action in this Court, *Occidental Chemical Corporation* v. *21st Century Fox America, Inc.*, *et. al.*, C.A. No. 2:18-cv-11273 (D.N.J.) ("OxyChem Contribution Action"). In that action, OxyChem seeks contribution from many of the Defendants and other potentially responsible parties, as well as a declaratory judgment regarding those parties' liability for future response costs at the Site. By Order dated July 31, 2019, this Court denied dismissal of OxyChem's contribution claims and sustained its right to seek a declaratory judgment for future response costs owed by the Defendants. *See* OxyChem Contribution Action, ECF No. 647 (Order on Motions to Dismiss).

In April 2021, the EPA announced plans to expand the cleanup to include an interim, non-final remedy for nine additional miles of the river. *See* Dkt. 2-1 at 5. The EPA estimates that it will cost $441 million to implement that *interim* plan, bringing the total net present value cost of cleaning the Passaic River to at least $1.8 billion—the most expensive private-party cleanup in the history of the Superfund program. OxyChem once again stepped up and offered to pay for the *entirety* of the remedial design and interim remedy for OU4 on the condition that OxyChem remain free to pursue contribution from the 100+ other responsible parties who should pay their fair shares.[6] Had the EPA accepted OxyChem's January 2022 offer, the work on the Passaic River would already be well on its way.

Contradicting Congress's intent, EPA apparently decided that OxyChem should not be allowed to pursue such contribution against the Defendants. Instead, EPA refused OxyChem's $441 million offer to perform the interim remedy in OU4 in favor of settling with other responsible parties in both OU2 and OU4, purporting to give them a full covenant not to sue for liability in the process. According to the terms of the settlements, Defendants will pay a "minor" portion of the EPA-estimated $1.38 billion cost of the work in OU2 and $441 million in OU4, while performing none of it. *See* Dkt. 2-1 (Proposed Consent Decree) at 5-6. They would also be granted a Consent Decree that would (without statutory authority or due process) purport to bar and extinguish OxyChem's right to contribution against the Defendants not just for the Remedial Design of OU2, which OxyChem is performing, but also for the OU2 Remedial Action, and the Remedial Design/Remedial Action ("RD/RA") interim response for OU4, the nine-mile stretch of the Lower Passaic River Study Area upstream of OU2. *See id*. at 5, 15 ¶ 23.

---

[6] *See* Ex. B (Jan.13, 2022 OxyChem Letter to EPA); Ex. C (Jun. 27, 2022 OxyChem Letter to EPA).

The settlements proposed by the United States upend Congress's carefully crafted CERCLA remedies, which anticipated that EPA would settle with major responsible parties for the *full* cost of clean-up—or for the completion of actual work—and then allow those major settlers to bring contribution cases:

> The theory underlying Superfund's liability scheme was, and is, that the Government should obtain the full costs of cleanup from those it targets for enforcement, and *leave remaining costs to be recovered in private contribution actions* between settling and nonsettling parties.

132 Cong. Rec. S14,903 (daily ed. Oct. 3, 1986) (statement of SARA floor manager Sen. Stafford), *quoted in E.I. DuPont de Nemours & Co. v. United States*, 460 F.3d 515, 537 (3d Cir. 2006) (emphasis added), *vacated on other grounds*, 551 U.S. 1129 (2007).  Section 122 of CERCLA, 42 U.S.C. § 9622, was "designed to facilitate settlement negotiations to expedite *effective site cleanup by private parties . . . .*" 132 Cong. Rec. H9563 (daily ed. Oct. 8, 1986) (Statement of Conf. Comm. Chair. Rep. Dingell), *quoted in In re Acushnet River & New Bedford Harbor*, 712 F. Supp. 1019, 1034 n.26 (D. Mass. 1989). EPA's action in rejecting OxyChem's offer to perform, in favor of letting other parties avoid full responsibility by making "minor" cash payments, also contradicts EPA's prior assurances to the public that, "the private PRPs responsible for the release of dioxins, furans and/or PCBs will *perform* the OU2 remedial action. . . ."[7]

In contrast with CERCLA's design, the proposed settlements allow responsible parties to pay admittedly "minor" amounts to settle their massive, joint and several liability without any agreement to get the work done, all while depriving parties who are likely to do the work of their statutory right to pursue contribution actions. The Complaint and proposed Consent Decree, *i.e.*, all the papers the United States has filed in support of the settlements, offer no basis for the fairness

---

[7] *See* Ex. D (Sept. 18, 2017 Letter from E. Wilson, EPA Region 2) (emphasis added).

of that demonstrably unfair result. Nor could they. The Third Circuit has time and again made clear that the two major policy goals underlying CERCLA are to "promote the timely cleanup of hazardous waste sites" and to "ensure that the costs of such cleanup efforts [are] borne by those responsible for the contamination." *New Jersey Dep't of Env't Prot. v. Am. Thermoplastics Corp.*, 974 F.3d 486, 489 (3d Cir. 2020). Yet, with this proposed Consent Decree, the United States sends the message that companies are better off denying for years their responsibility for Superfund clean-ups (as Defendants have done) than cooperating and performing the necessary work (as OxyChem has done), because performance will be *penalized* later with an effort to cut off their contribution rights. Courts have rightly regarded such an effort as irrational and not in the public interest:

> In addition, the government has a serious disincentive to collude with later settlors to cut off the rights of prior settlors just to extract a higher second-round settlement in a single clean-up proceeding. It is the government that is the repeat player in the world of CERCLA clean-ups. Should the government develop a reputation for cheating early settlors, that would deter settlements in later clean-ups (and reduce the amounts early-round settlors are willing to pay) and hence, in the long run, hurt the government's interests.

*United States* v. *Charter Int'l Oil Co.*, 83 F.3d 510, 518 n. 11 (1st Cir. 1996).

As responsible parties, and consistent with the preserved right of contribution in the 2016 ASAOC, Defendants are properly subject to a contribution claim by OxyChem pursuant to CERCLA. Entry of the proposed Consent Decree threatens OxyChem's right to seek contribution from Defendants. Through its pleading in intervention, OxyChem seeks to challenge the substantive and procedural fairness of the proposed Consent Decree and preserve its rights to contribution. OxyChem should be allowed to intervene and to demonstrate why the terms of the proposed consent decree are not procedurally or substantively fair.

### III.   ARGUMENT FOR INTERVENTION AND EXTENSION OF TIME

OxyChem is a necessary party to this action entitled to intervene as of right and, in any event, this Court should allow OxyChem to intervene in this action to oppose it.

Plaintiff the United States alleges that dozens of companies own or operate individual facilities "from which there have been releases or threatened releases of one or more hazardous substances" into the Passaic River. Dkt. 1 (Complaint) ¶ 2. The United States also seeks a judgment declaring that, with certain exceptions, each of the Defendants is "liable for *all* unreimbursed response costs . . . incurred by the United States" in two EPA-designated cleanup areas of the Passaic River, OU2 and OU4. *Id.* ¶ 37 (emphasis added). Yet, simultaneously the United States also urges the Court to permit some of those same Defendants to settle their liability for an amount the United States itself characterizes as a "minor" part of the total costs of the clean-up.  Dkt. 2-1 (Proposed Consent Decree) at 6.  "Minor" is an overstatement: for clean-ups projected to cost at least $1.821 billion,[8] net present value, EPA will let scores of jointly-and-severally liable Defendants out for a grand total of $150 million—or only about 8.2 % of costs—leaving the remaining 91.8 % to be borne by OxyChem and a handful of others. *Id.* at 11. The Complaint does not allege or identify *any rationale* for this allocation. Nor could it, given the abundant evidence showing Defendants' responsibility is anything but "minor."

In addition, the proposed Consent Decree, if approved, would have direct and dramatic effects on OxyChem's contribution rights against the Defendants by purporting—without

---

[8] Record of Decision, Lower 8.3 Miles of the Lower Passaic River Part of the Diamond Alkali Superfund Site (Mar. 3, 2016) ("OU2 ROD") at 52, 79 ($1.38 billion), *available at* https://semspub.epa.gov/work/02/396055.pdf (last visited December 22, 2022); Record of Decision for an Interim Remedy in the Upper 9 Miles of the Lower Passaic River Study Area, OU4 of the Diamond Alkali Superfund Site ("OU4 ROD") at 48, 62 ($441 million), *available at* https://semspub.epa.gov/work/02/630399.pdf (last visited December 22, 2022).

Constitutional or statutory authority—to eliminate those contribution rights. The United States wants to grant the Defendants full protection from OxyChem's current contribution case and potential future contribution cases, thus preventing this Court from fulfilling its statutory duty to "allocate response costs among liable parties using such equitable factors as the court determines are appropriate." *Compare id.* at 15 ¶ 23, *with* 42 U.S.C. § 9613(f)(1). Not only that, but with these proposed settlements, the United States seeks to protect polluters from paying their full and fair shares of the costs to clean up pollution they caused, and that OxyChem did not cause, in the Passaic River. If approved, EPA's settlements will *not only delay*—indeed, have already considerably delayed—the remediation of the river, but *will also allow* major polluters, some of whom appear to have withheld material evidence about their role in polluting the river, to avoid paying their fair share of the cleanup, granting them full immunity from the consequences of their actions—including statutory liability in contribution *to* OxyChem for costs OxyChem alone has incurred and will incur to clean up Defendants' releases of hazardous substances. To say that the proposed Consent Decree is a sweetheart deal for most of the companies that polluted the Passaic River is an understatement.

### A.  OxyChem is Entitled to Intervene as of Right.

OxyChem easily satisfies all four requirements of the nearly identical tests for intervention as of right under CERCLA and Federal Rule of Civil Procedure 24(a). CERCLA provides:

> In any action commenced under this Act … in a court of the United States, any person may intervene as a matter of right when such person claims an interest relating to the subject of the action and is so situated that the disposition of the action may, as a practical matter, impair or impede the person's ability to protect that interest, unless the President or the State shows that the person's interest is adequately represented by existing parties.

42 U.S.C. § 9613(i).  Similarly, Fed. R. Civ. P. 24(a) provides:

> On timely motion, the court must permit anyone to intervene who:

(1) is given an unconditional right to intervene by a federal statute; or

(2) claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

"Because of their similarity, courts apply essentially the same test when determining whether to grant an application for intervention under both Rule 24(a) and § 113(i)." *United States v. Alcan Aluminum, Inc.*, 25 F.3d 1174, 1181 (3d Cir. 1994) (vacating trial court's denial of motion to intervene).[9] Thus, under CERCLA § 113(i), "[a]n applicant can intervene as of right where":

(1) the application for intervention is timely; (2) the applicant has a sufficient interest in the litigation; (3) the interest may be affected or impaired, as a practical matter by the disposition of the action; and (4) the interest is not adequately represented by an existing party in the litigation.

*Alcan Aluminum, Inc.*, 25 F.3d at 1181 (citations omitted). OxyChem satisfies all four requirements.

*First*, the application for intervention is timely. It is made only days after the case was filed.

*Second*, a non-settling PRP, such as OxyChem, has a sufficient interest in the consideration of a Consent Decree between the United States and other PRPs. *See United States v. Acton Corp.*, 131 F.R.D. 431, 433 (D.N.J. 1990); *United States v. Aerojet Gen. Corp.*, 606 F.3d 1142 (9th Cir. 2010) (reversing denial of intervention in CERCLA consent decree action); *United States v. Albert Inv. Co.*, 585 F.3d 1386 (10th Cir. 2009); *United States v. W.R. Grace & Co.-Conn.*, 185 F.R.D.

---

[9] The "one difference" between the two standards is that under Rule 24 the burden of proving all four parts of the test falls on the applicant, whereas under § 113(i) the existing parties must show the applicant's interest is being adequately represented in order to prevent intervention. *Alcan Aluminum, Inc.*, 25 F.3d at 1181 n.9. This distinction is of no significance in the present case: Regardless of who carries the burden, as OxyChem explains, *see infra* p. 18, it is clear that OxyChem and its interests are not adequately represented in this suit.

184, 186 (D.N.J. 1999). That conclusion is compelled by the "unambiguous" text of § 113, which confers a right to intervene on "any person" who "claims an interest" in the litigation, should the disposition of the action "impair or impede" that interest, without any restriction on intervention by non-settling PRPs. *Acton Corp.*, 131 F.R.D. at 433; *see also United States v. Union Elec. Co.*, 64 F.3d 1152, 1165 (8th Cir. 1995). CERCLA confers a non-settling PRP a statutory right to contribution from other PRPs. *See* 42 U.S.C. § 9613(f)(1). While OxyChem certainly disputes whether § 113(f) allows the EPA to eliminate contribution rights by settling with other PRPs, *see, e.g.*, *Waste Mgm't of Pa., Inc.* v. *City of York*, 910 F. Supp. 1035, 1036 (M.D. Pa. 1995)[10] and *Transtech Indus., Inc.* v. *A & Z Septic Clean*, 798 F. Supp. 1079, 1090 (D.N.J. 1992),[11] the proposed Consent Decree unambiguously purports to cut off OxyChem's contribution rights. It therefore "directly affect[s] [non-settling PRPs'] interest in maintaining their right to contribution." *Aerojet*, 606 F.3d at 1150; *Union Elec. Co.*, 64 F.3d at 1166-67; *see also City of Emeryville v. Robinson*, 721 F.3d 1251, 1259 (9th Cir. 2010) (contribution claim alleged to be "subject to extinction pursuant to CERCLA §113(f)(2) … is a significant protectable interest warranting an order allowing third parties, in that case non-settling potentially responsible parties

---

[10] Holding that contribution protection under CERCLA Section 122 is "necessarily limited to claims for costs incurred *by the United States Government*…such settling party is not entitled to protection against claims by non-settling parties who…have independently incurred costs in cleaning up a Superfund site." *Waste Mgm't of Pa., Inc.*, 910 F. Supp. at 1036 (emphasis original).

[11] Explaining that awarding contribution protection for "[s]ettlement payments of $4.9 million for clean-up costs exceeding $100 million would do little to further the goal of allocating responsibility among parties who were in fact responsible, and of allocating responsibility equitably and proportional to the amount of harm done by each party . . . . Moreover, to interpret the agreement to absolve defendants of responsibility for additional clean-up actions costing ten times more than that amount, defies the goal of encouraging parties to unilaterally engage in clean-up operations." *Transtech Indus., Inc.*, 798 F. Supp. at 1090 (quoting *Smith Land & Improv. Corp. v. Celotex Corp.*, 851 F.2d 86, 90 (3d Cir. 1988) ("[I]f a fair apportionment of the expense is not assured, it is unlikely that one party will undertake remedial action promptly when it could simply delay, awaiting a legal ruling on the contribution liability to other responsible parties.")).

(PRPs) to intervene as of right pursuant to Rule 24(a)(2)").  Moreover, because a non-settling PRP "may be held liable for the entire amount of response costs minus the amount paid in a settlement," a non-settling PRP's interest in the amount of any judicially approved settlement is "obvious." *Aerojet*, 606 F.3d at 1150.  "The larger the settlement amount, the smaller the remaining amount for which the non-settling PRPs may be liable." *Id.*

   *Third*, OxyChem's present contribution rights against Defendants and its pending declaratory judgment action seeking a fair and equitable allocation of responsibility for costs OxyChem incurs in the future—as well as OxyChem's potential contribution rights if it performs additional work at the Passaic River—are all property interests that "may be affected or impaired, as a practical matter by the disposition of the action."  The "threat of cutting off contribution rights of non-settling PRPs creates a direct and immediate interest on the part of the non-settling PRPs in the subject matter of the present litigation."  *United States v. City* of *Glen Cove*, 221 F.R.D. 370, 373 (E.D.N.Y. 2004) (granting motion to intervene), *quoting Union Elec. Co.*, 64 F.3d at 1166. This proposed Consent Decree "directly addresses the liability of the settling defendants"; if approved, Defendants have announced their plan to use it to claim OxyChem is "barred from seeking contribution" in the OxyChem Contribution Action already pending. *Compare Albert*, 585 F.3d 1398. Indeed, these defendants have represented to this Court that "[u]pon entry [of the consent decrees], settling parties would file a dispositive motion in this case on the basis of contribution protection for matters addressed in the consent decree."[12] The proposed Consent Decree greatly underestimates the Defendants' liability, and thus threatens to saddle non-settling

---

[12] Motion to Stay (Dkt.1943-3) at 5, *Occidental Chemical Corporation v. 21st Century Fox America, et al.*, Case No. 2:18-cv-11273-MCA-LDW (D.N.J.); Dkt.1943-1 at 2 ("Such a settlement would either obviate the need for this litigation in total, or at least significantly decrease the number of parties in the case and narrow the scope of the litigation, saving judicial and private party resources.").

PRPs like OxyChem with liability that vastly exceeds their own responsibility, all the while purporting to cut off their contribution rights.

EPA's impermissible offer and use of the Batson "allocation report" in this proceeding to try to justify the proposed Consent Decree violates CERCLA and directly injures OxyChem for another reason. CERCLA deprives EPA of any authority to adjudicate the responsibility of any party for response costs, *see* 42 U.S.C. § 9613 (vesting sole authority to adjudicate allocable shares of responsibility in the District Court), and prohibits EPA from offering in evidence—as it has done here—the result of any *non-binding* allocation of responsibility. *See* 42 U.S.C. § 9622(e)(3)(C) (a "nonbinding preliminary allocation of responsibility shall not be admissible as evidence in any proceeding, and no court shall have jurisdiction to *review* the nonbinding preliminary allocation of responsibility) (emphasis added). EPA's offer of the Batson report, and its attempt to impose by settlement its own view of an appropriate allocation of responsibility among the various parties, violates both provisions. CERCLA, in contrast, expressly protects OxyChem's right to be free from EPA's overreach of its authority in this way. This, too, is a protectable interest in the transaction that is the subject of this action—one OxyChem is entitled to intervene to protect.

OxyChem's interest in preventing the improper offer of the Batson report in evidence is compelling here. Not only does CERCLA prohibit EPA from offering the Batson allocation report in evidence, at least two courts have rejected allocations by David Batson that—like the one at issue here—inexplicably assigned wildly disproportionate responsibility to an opposing party. *See Columbia Falls Al. Co., LLC* v. *Atl. Richfield Co.*, No. 18-131-M-DWM, 2021 WL 3769886 at *47 (D. Mont. Aug. 25, 2021) (describing "parts of Batson's proposed methodology" as "questionable," including that his "allocation places the maximum cost burden on the opposing

party" and that there are "several things Batson's allocation [did] not consider"); *see also El Paso Natural Gas Co., LLC v. United States*, 390 F. Supp. 1025, 1049-52 (D. Ariz. 2019) (increasing the allocation share assigned to Batson's client by nearly 500% after rejected both Batson's allocation methodology and his application of that methodology, and remarking that portions of his approach were "largely unexplained" and without justification for assigning the opposing party "a supermajority of liability").

*Finally*, OxyChem's interest is not adequately represented by an existing party in the litigation. Indeed, the interests of the Defendants and the United States are directly opposed to those of OxyChem.  The settling PRPs want to minimize their share of liability and bar OxyChem from obtaining contribution. And the United States, "having invested substantially in the settlement negotiations, has an interest in securing approval of the decree," *Aerojet*, 606 F.3d at 1153; *Union Electric,* 64 F.3d at 1170.  It is axiomatic that the Government, which has crafted and put forward the very Consent Decree that OxyChem considers to be unfair and unreasonable does not represent OxyChem's interests. That the United States does not—and cannot—represent OxyChem's interests is also evident from the United States' willful and improper offer of the Batson report as a purported basis for the Court's review in considering the settlement. CERCLA flatly prohibits this, but no party to this action will enforce that prohibition if OxyChem is not permitted to intervene. Thus, OxyChem's interests in protecting its contribution rights, its right to a fair allocation based on proper and *admissible* evidence, and its interest in not being subjected to excessive liability are inherently at odds with the interests of the existing parties.

In sum, because "neither party represents the applicant's interests," *Alcan Aluminum, Inc.*, 25 F.3d at 1185 n.15, allowing OxyChem to intervene will ensure that the Court can evaluate the fairness of the proposed Consent Decree, as the United States and the Defendants have no incentive

to bring to the Court's attention the various ways in which the proposed Consent Decree would delay the clean-up of the Passaic River and work unfairness on OxyChem.

**B. OxyChem Should Be Granted Permissive Intervention.**

Even if OxyChem did not satisfy the requirements for intervention as of right (and it does) OxyChem should be granted permissive intervention for the same reasons under Fed. R. Civ. P. 24(b). As demonstrated above, the claims at issue here are not merely related to, but seek to *bar* claims for contribution that belong to OxyChem that are already pending in the OxyChem Contribution Action.

The United States admits its claims here are related to OxyChem's claims. When it filed this action, the United States conceded this case is "related to" the earlier and pending OxyChem Contribution Action. *See* Dkt. 1-1 (Civil Cover Sheet) § VIII (identifying the OxyChem Contribution Action as a "related case"). In the OxyChem Contribution Action, OxyChem has already sued nearly all of the same Defendants, for the same disposals and releases of hazardous substances, from the same facilities at issue in the United States' Complaint. In fact, this action has already been assigned to Judge Arleo in recognition of the two actions' many common issues. Given that OxyChem's contribution claims were already at issue in the OxyChem Contribution Action, and that the United States seeks without authority to bar those claims here—in a case where the United States did not join OxyChem as a party—leave to intervene should be granted

And there can be no genuine dispute that the two actions share common questions of law or fact, as is evident from the Defendants' assertion—in the OxyChem Contribution Action—that a ruling by this Court here can somehow be invoked to bar OxyChem's claims there. For both reasons, and for either, OxyChem must be granted intervention in this action to oppose the proposed Consent Decree.

20

### C.  An Extension of Time to Comment on the Proposed Consent Decree is Necessary.

OxyChem respectfully requests that the Court enter an Order extending the time within which persons not named as parties to the action, including OxyChem, may submit comments regarding the proposed Consent Decree to the Attorney General, pursuant to 42 U.S.C. § 9622(d)(2)(B), from 45 days to 90 days. *See* 42 U.S.C. § 9622(d)(2)(B) ("The Attorney General shall consider, and file with the court, any written comments, views, or allegations relating to the proposed judgment."). This extension of time is warranted because of the important public and private interests affected by the proposed Consent Decree and by its timing—the proposed Consent Decree was executed by the settling parties in September, but the United States waited until the height of the holiday season to lodge it with the Court.

Moreover, while certain materials important to evaluating the proposed Consent Decree were posted on EPA's website on the date of its lodging, EPA technical issues prevented the public from accessing all of those materials for days. The EPA's servers could not reliably process the various PDF documents posted, such that attempts to download those documents would often fail. Several of the PDFs, when downloaded, were corrupt files that could not be opened.

The proposed Consent Decree relates to a Superfund site for which final (in OU2) and interim (in OU4) remedial action is estimated by EPA to cost at least $1.8 billion, net present value,[13] and the proposed decree purports to settle with 85 parties in relation to even more sites for a mere $150 million.[14] The requested extension of time, which provides slightly more than one day to comment on a per-settling-party basis, and less on a per-site basis, is both reasonable and

---

[13] *See* Dkt. 2-1 (proposed Consent Decree) at 5 (stating that "[t]he estimated cost of the remedy for OU2 is $1.38 billion" and that "[t]he estimated cost of the interim remedy is $441 million").
[14] *See id*. at 114-45.

necessary to provide persons affected by the proposed Consent Decree a meaningful opportunity to comment.

## IV.    CONCLUSION

For the foregoing reasons, OxyChem requests that the Court grant its Motion to Intervene pursuant to CERCLA § 113(i), 42 U.S.C. § 9613(i), and Fed. R. Civ. P. 24 and (a) grant leave to file the accompanying Intervenor's proposed pleading submitted herewith and (b) enter an Order extending the time within which persons not named as parties to the action, including OxyChem, may submit comments to the Attorney General for filing with the Court pursuant to 42 U.S.C. § 9622(d)(2)(B), from 45 days to 90 days.

Dated:  December 23, 2022            Respectfully submitted,

                                    *John McDermott*
                                  John J. McDermott, Esq.
                                  (jmcdermott@lssh-law.com)
                                  LANGSAM STEVENS SILVER & HOLLAENDER LLP
                                  65 South Main Street, Suite B102
                                  Pennington, NJ 08534
                                  Tel.    (856) 727-0315

                                  GIBBS & BRUNS, LLP
                                  1100 Louisiana Street, Suite 5300
                                  Houston, TX 77002
                                  Tel. (713) 650-8805
                                  By:    Kathy D. Patrick, Esq.*
                                        (kpatrick@gibbsbruns.com)
                                        Anthony N. Kaim, Esq.*

                                  LANGSAM STEVENS SILVER & HOLLAENDER LLP
                                  1818 Market Street, Suite 2430
                                  Philadelphia, PA 19103
                                  Tel.    (215) 732-3255

By:     Larry D. Silver, Esq.*
        (lsilver@lssh-law.com)

*Attorneys for Occidental Chemical Corporation*

*Pro hac vice* application to be filed.