# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
### NEWARK VICINAGE

|  |  |
|---|---|
| | ) |
| | ) Hon. Madeline Cox Arleo |
| | ) Hon. Magistrate Leda D. Wettre |
| UNITED STATES OF AMERICA, | ) |
| | ) Civil Action No. 2:22-cv-07326 (MCA- |
| Plaintiff, | ) LDW) |
| | ) |
| v. | ) **SMALL PARTIES GROUP** |
| | ) **SETTLING DEFENDANTS'** |
| ALDEN LEEDS, INC., *et al.*, | ) **RESPONSE TO OCCIDENTAL** |
| | ) **CHEMICAL CORPORATION'S** |
| Defendants. | ) **MOTION TO INTERVENE AND** |
| | ) **REQUEST FOR AN EXTENSION OF** |
| | ) **TIME TO COMMENT ON THE** |
| | ) **PROPOSED CONSENT DECREE** |
| | ) |
| | ) |
| | ) |

19927229.3

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ....................................................................... iii

INTRODUCTION ................................................................................1

BACKGROUND ..................................................................................3

ARGUMENT ......................................................................................8

    I.     OxyChem's Motion to Intervene Should Not Be Allowed to Foster Delay in the CD Review and Approval Process ...................................9

    II.    The Court Should Disregard OxyChem's Premature and Meritless Arguments Concerning the CD and the Allocation ...........................10

CONCLUSION .................................................................................18

19927229.3

## <u>TABLE OF AUTHORITIES</u>

## CASES

*Beauregard, Inc. v. Sword Servs. LLC*, 107 F.3d 351 (5th Cir. 1997) ..................... 9

*Diamond Shamrock Chems. Co. v. Aetna Cas. & Surety Co.*, 609 A.2d 440 (N.J. Super. App. Div. 1992) ..................................................................................... 3

*Diamond Shamrock Chems. Co. v. Aetna Cas. & Surety Co.*, No. C-3939-84 (N.J. Super. Ct. Chancery Div. Apr. 12, 1989) ............................................................ 3

*Flagler Inv. Marietta, LLC v. Multibank 2009 1 Cre Venture, LLC*, 633 Fed. App'x 747 (11th Cir. 2015)............................................................................................. 12

*Jones v. Clinton*, 206 F.3d 811 (8th Cir. 2000) ...................................................... 11

*Kalamazoo River Study Grp. v. Rockwell Int'l Corp.*, 274 F.3d 1043 (6th Cir. 2001) ......................................................................................................................... 16-17

*N.J. Dep't of Env't Prot. v. Occidental Chem. Co.*, No. ESX-L9868-05 (Super. Ct. N.J. Dec. 12, 2013) ........................................................................................... 3

*Occidental Chem. Corp. v. 21st Century Fox*, No. 2:18-cv-11273 (D.N.J.) ......... 3-6

*PMC, Inc. v. Sherwin-Williams Co.*, 151 F.3d 610 (7th Cir. 1988) ...................... 16

*Sallah for Om Glob. Inv. Fund LLC v. Bgt. Consulting, LLC*, No. 16-81483-civ, 2017 WL 11626215 (S.D. Fla. Aug. 29, 2017) ................................................... 11-12

*United  States v. Cornell Dubilier Elecs., Inc.*, No. 12-cv-5407 (D.N.J.) ........... 9-10

*United States v. Acton Corp.*, 733 F. Supp. 869 (D.N.J. 1990) ......................... 15-16

*United States v. Air Prods. & Chems., Inc.*, No. 2:13 cv-06695 (D.N.J. Mar. 14, 2014) ................................................................................................................... 15

*United States v. Albert Inv. Co., Inc.*, 585 F.3d 1386 (10th Cir. 2009)............... 9-10

*United States v. Atlas Lederer Co.*, 494 F. Supp. 2d 629 (S.D. Ohio 2005) ...........14

*United States v. BP Amoco Oil PLC*, 277 F.3d 1012 (8th Cir. 2002) .............. 13-14

*United States v. BP Amoco Oil PLC*, No. Civ. 4-99-10671, 2000 WL 35503251 (S.D. Iowa Sept. 29, 2000)..........................................................................................14

*United States v. Cannons Eng'g Corp.*, 899 F.2d 79 (1st Cir. 1990) .....................14

19927229.3

*United States v. Cassidy Painting Inc.*, 1:19 cv-18472 (D.N.J. Nov. 22, 2019) .....15

*United States v. Charles George Trucking, Inc.*, 34 F.3d 1081 (1st Cir. 1994)..15-16

*United States v. Chevy Chase Chevrolet*, No. CIV.A. 05-1222, 2005 WL 7143184 (W.D. Pa. Nov. 15, 2005) ...................................................................................14

*United States v. Davis*, 261 F.3d 1 (1st Cir. 2001) ....................................................14

*United States v. DiBiase*, 45 F.3d 541 (1st Cir. 1995)........................................... 8-9

*United States v. Keystone Sanitation Co., Inc.*, No. 1:CV-93-1482, 1996 WL 33410106 (M.D. Pa. Apr. 29, 1996) ..................................................................14

*United States v. Kramer*, 19 F. Supp. 2d 273 (D.N.J. 1998) ...........................15, 17

*United States v. NCR Corp.*, No. 10-C-910, 2011 WL 1321365 (E.D. Wis. Apr. 4, 2011) ........................................................................................................................14

*United States v. Occidental Chem. Corp.*, 200 F.3d 143 (3d Cir. 1999).......... 13-14

*United States v. Rohm & Haas Co.*, 721 F. Supp. 666 (D.N.J. 1989)..............14, 17

*United States v. Serafini*, 781 F. Supp. 336 (M.D. Pa. 1992).................................14

**STATUTES**

42 U.S.C.A. § 9613 ....................................................................................1, 8, 13

42 U.S.C.A. § 9622 ...............................................................1, 6-7, 10-11, 13

**RULES AND REGULATIONS**

Fed. R. Civ. P. 24 ................................................................................................8, 9

28 C.F.R. § 50.7 ..........................................................................................7, 10, 11

**OTHER AUTHORITY**

2 Superfund & Brownfields Cleanup § 22:17 .........................................................1

19927229.3

## <u>INTRODUCTION</u>

The consent decree ("CD") that the United States lodged with the Court is the culmination of years of effort by the U.S. Environmental Protection Agency ("EPA") and the settling parties to forge a settlement. EPA worked within statutory and constitutional bounds and its mandate to develop an appropriate remedy for the Lower Passaic River and to assign responsibility among dozens of potentially responsible parties ("PRPs") through a four-year-long process leading to the Allocation Recommendation Report referenced in the CD and over a year of settlement negotiations. The Small Parties Group of settling defendants ("SPG Settling Defendants") will show that the settlement, which includes a payment of $150 million, representing a significant premium over settling defendants' overall responsibility, is "fair, reasonable, and consistent with CERCLA's goals." *In re Tutu Water Wells CERCLA Litig.*, 326 F.3d 201, 207 (3d Cir. 2003); *see* 42 U.S.C.A. §§ 9613(j)(2), 9622(d)(1)(A), (i).

Many years of government action and private litigation have established that one party—Occidental Chemical Corporation ("OxyChem")—is overwhelmingly responsible for the costs of cleaning up the contamination of the Lower Passaic River. The EPA sponsored Allocation Recommendation Report concludes that OxyChem is 99.9% responsible for those costs.

1

OxyChem has filed a Motion to Intervene, seeking to participate in the course of these proceedings concerning the CD.  ECF No. 34.  The SPG Settling Defendants respond to OxyChem's Motion in order to request that any intervention granted to OxyChem be limited so it does not unreasonably delay the Court's review of the CD through, for example, burdensome and inapposite discovery and evidentiary hearings, *accord* ECF No. 84, and to address the misleading and prejudicial rhetoric that permeates OxyChem's Brief in Support of Motion to Intervene, *see* ECF No. 34-1.

OxyChem has had ample time to do the right thing by agreeing to perform the remedy or, at the very least, by cooperating with EPA and private parties in the allocation and settlement processes that led to the CD.  Instead, OxyChem has chosen litigation and delay.  The Motion to Intervene makes clear that OxyChem plans to do in this proceeding what it has done for decades: (1) disavow responsibility for contaminating the river by blaming corporate predecessors (although they are one and the same), other parties, and other contaminants even as its own willful conduct and dioxin pollution predominate; and (2) spend its resources trying to delay EPA's efforts and disrupt settlements that will help facilitate cleanup of the river.

The Court should view the positions in OxyChem's Motion to Intervene for what they are—those of a corporation that will say and do anything to avoid

19927229.3

responsibility for a nearly $2 billion Superfund site cleanup, including ignoring the very statutory provisions that govern these proceedings—and decline to allow OxyChem to unreasonably delay and disrupt this important settlement.

## BACKGROUND

The Diamond Alkali Superfund Site (the "Site") comprises four operable units ("OUs") located in and along the Lower Passaic River. *See* ECF No. 2-1 at 10. The Site was listed on the National Priorities List in 1984, shortly after dioxin—one of the most toxic substances known to humankind—was discovered at 80-120 Lister Avenue in Newark, New Jersey. *See* ECF No. 2-1 at 3-4. OxyChem, through its predecessors,[1] manufactured chemicals, including Agent Orange, at its Lister Avenue facility and directly discharged dioxin (a byproduct of its operations) to the Passaic River. Decades later, the Site remains the subject of intense federal and state

---

[1] *See, e.g.*, *Diamond Shamrock Chems. Co. v. Aetna Cas. & Surety Co.*, No. C-3939-84 (N.J. Super. Ct. Chancery Div. Apr. 12, 1989) (unpublished) (finding that OxyChem's predecessor directly discharged dioxin to the river); *Diamond Shamrock Chems. Co. v. Aetna Cas. & Surety Co.*, 609 A.2d 440 (N.J. Super. App. Div. 1992) (finding that OxyChem's actions were egregious, even by the standards of the 1950s and 1960s); *N.J. Dep't of Env't Prot. v. Occidental Chem. Co.*, No. ESX-L9868-05, Consent Judgment (Super. Ct. N.J. Dec. 12, 2013) (concluding that OxyChem is the undisputed legal successor by merger to Diamond Shamrock Chemicals Company and that OxyChem is responsible for the liabilities of the original Diamond Shamrock Corporation, ultimately leading to settlement); *see also* ECF No. 1105 at 4-5 in *Occidental Chem. Corp. v. 21st Century Fox*, No. 2:18-cv-11273 (D.N.J.) (filed June 30, 2018) (Sept. 11, 2020, Letter Order concluding that OxyChem is the successor to Diamond Shamrock Chemicals Company).

agency focus due to the continued presence of dioxin.  *See* ECF No. 2-1 at 5; Allocation Rep. at 14, semspub.epa.gov/src/document/02/609904.

In 2016, EPA selected a bank-to-bank dredge and cap remedy for the contaminated sediments in OU2, which comprises the lower 8.3 miles of the Lower Passaic River.   U.S. E.P.A. Record of Decision, Lower 8.3 Miles of the Lower Passaic River Part of the Diamond Alkali Superfund Site (Mar. 3, 2016), semspub.epa.gov/src/document/02/396055; *see* ECF No. 2-1 at 5.  Shortly thereafter, EPA identified PRPs for OU2, including OxyChem and the defendants in this case, among others.  In 2017, EPA exercised its discretion to sponsor and supervise an allocation process, retaining a neutral allocator to evaluate and determine the relative share of responsibility for each PRP invited to participate by means of an EPA-approved methodology.  ECF No. 2-1 at 6.

Although EPA invited it to do so, OxyChem declined to participate in the allocation, spurning its opportunity to cooperate with EPA and almost all other PRPs.  *See* Letter from Eric J. Wilson, U.S. E.P.A., to Marcia E. Backus, Occidental Petroleum Corp., at 3 (Nov. 28, 2017), semspub.epa.gov/work/02/518289.pdf. Instead, eight months after EPA initiated the allocation, OxyChem chose to sue over one hundred parties, including most of the defendants named in the CD ("Settling Defendants"), for contribution to past and future costs of remediating OU2, among

19927229.3

other relief. *See* ECF No. 1 in *Occidental Chem. Corp. v. 21ˢᵗ Century Fox*, No. 2:18-cv-11273 (D.N.J.) (filed June 30, 2018) ("OxyChem's Litigation").

OxyChem's repudiation of the allocation process was consistent with its historic lack of cooperation with other PRPs and EPA at the Site. *See, e.g.*, ECF No. 2-1 at 4 (explaining that EPA had to issue a Unilateral Administrative Order for Removal Response Activities against OxyChem to perform activities at River Mile 10.9 although other PRPs cooperated on that phase of remediation). OxyChem's recent self-proclaimed "enormously valuable," ECF No. 34-1 at 5, offer to design and implement a remedy for OU4—a thinly veiled attempt to derail the settlement now before this Court in order to preserve its contribution claims—was also in keeping with its past practice of sowing discord at the Site. *See* ECF No. 2100-1 at 2 in OxyChem's Litigation (conditioning the offer on assurance that "[t]he United States will take no action to impair or bar OxyChem's contribution claims against the other responsible parties for work OxyChem is undertaking to perform, including, without limitation, in any settlement the United States reaches with any other party"); ECF No. 1943 in OxyChem's Litigation (demonstrating that OxyChem's offer came only after it learned that the Settling Defendants had reached an agreement in principle with EPA); ECF No. 1943-1 in OxyChem's Litigation (same).

5

OxyChem's Litigation was still in its early stages when, in December 2020, after a four-year allocation process, the Allocation Recommendation Report was issued. Having considered all eight contaminants of concern ("COCs") identified in the ROD, the Allocation Recommendation Report concluded that OxyChem is responsible for more than 99% of the response costs associated with OU2. Att. K to Allocation Rep., semspub.epa.gov/src/document/02/609904. The result of the allocation is supported by the fact that OxyChem is responsible for nearly all of the dioxin—the most toxic COC—and most of the DDT in the Lower Passaic River. *See* Allocation Rep. at 29, semspub.epa.gov/src/document/02/609904; OxyChem's Facility Data Report in Att. J to the Allocation Rep., semspub.epa.gov/src/document/02/609904.

Based on the commonality of COCs and sources, EPA also applied the findings of the Allocation Recommendation Report for OU2 to OU4. ECF No. 2-1 at 6. EPA used the allocation to guide its negotiations with the Settling Defendants, reaching a settlement for the entire seventeen-mile Lower Passaic River Study Area ("LPRSA") comprising those OUs. ECF No. 2-1 at 6; *see* Att. G to Allocation Rep., § 3.1(c), (d), semspub.epa.gov/src/document/02/609904; 42 U.S.C.A. § 9622.

In the CD, the eighty-five Settling Defendants, including the SPG Settling Defendants, agreed to pay $150 million to the United States. In addition to the significant sums they have already expended at the Site, the $150 million settlement far exceeds these parties' allocated responsibility for the Lower Passaic River

19927229.3

relative to that of OxyChem.[2]   ECF No. 2-1 at 11; *see* Att. K to Allocation Rep., semspub.epa.gov/src/document/02/609904.   In addition to providing funds, the culmination of this settlement process will advance the cleanup of the Site by allowing EPA to turn its full attention to ensuring that OxyChem finally undertakes the work necessary to remediate the contamination for which it is responsible.

The Department of Justice ("DOJ"), on behalf of EPA, lodged the CD with the Court on December 16, 2022, and posted it for public comment on December 22, 2022.   ECF No. 2-1; Notice of Lodging of Proposed Consent Decree, 88 Fed. Reg. 2,133 (Jan. 12, 2023); Notice of Lodging of Proposed Consent Decree, 87 Fed. Reg. 78,710 (Dec. 22, 2022); *see* 42 U.S.C.A. § 9622(d)(2)(B); 28 C.F.R. § 50.7. On December 23, 2022, OxyChem moved to intervene in this case.[3]   ECF No. 34.

---

[2]   Although, as OxyChem admits, the Settling Defendants are funding over 8% of the estimated costs of remediation pursuant to the CD, ECF No. 34-1 at 13, the allocation determined that they are responsible for less than 1% of the contamination.   The funds Settling Defendants will pay pursuant to the CD are in addition to significant amounts they have already expended for the Site, including work on the RI/FS and RM 10.9 removal, for which collective study and removal costs exceed the $150 million settlement amount. (Although it originally participated in the RI/FS, OxyChem ceased participating in 2012. *See* ECF No. 2091-2 in OxyChem's Litigation.)

[3]   OxyChem also requested that the Court extend the public comment period on the CD to ninety days.   ECF No. 34-1.   Because EPA has already extended the comment period to March 22, 2023, 88 Fed. Reg. 2,133, there is no need for the Court to do so.

19927229.3

## **ARGUMENT**

Intervention is a threshold procedural mechanism for determining the extent of the movant's interest in litigation such that the movant is entitled to party status notwithstanding that it is not a named plaintiff or defendant.  *See* Fed. R. Civ. P. 24(c) (requiring that a motion to intervene "state the grounds for intervention and be accompanied by a pleading that sets out the claim or defense for which intervention is sought"); 42 U.S.C.A. § 9613(i) (setting out the standards for intervention in CERCLA matters).  The SPG Settling Defendants take no position on OxyChem's request to intervene.  Nevertheless, OxyChem's intervention should not be allowed to unreasonably delay this settlement process, which is intended to advance the cleanup of the Lower Passaic River.  *See United States v. DiBiase*, 45 F.3d 541, 546 (1st Cir. 1995).

Additionally, the SPG Settling Defendants respectfully request that the Court disregard arguments in OxyChem's brief in support of its Motion to Intervene, which are both irrelevant to the relief it requests and meritless.  These arguments reflect misleading rhetoric that OxyChem has advanced for decades to avoid full responsibility for the contamination and cleanup of the Lower Passaic River.  *See supra* note 1.

19927229.3

I.   **OxyChem's Motion to Intervene Should Not Be Allowed to Foster Delay in the CD Review and Approval Process.**

Although the SPG Settling Defendants take no position generally on OxyChem's request to intervene, should the Court grant OxyChem's motion, the SPG Settling Defendants reserve the right to seek appropriate limitations on OxyChem's ability as an intervenor to delay the settlement that the United States and these eighty-five parties have spent more than five years to reach. *See* ECF No. 84 (identifying two likely avenues by which OxyChem may attempt to delay this proceeding—seeking discovery and requesting evidentiary hearings). In no event should OxyChem be allowed to use its status as intervenor to unreasonably slow or halt the very settlement process that is intended to advance the cleanup of the Lower Passaic River. *See DiBiase*, 45 F.3d at 546 ("[S]ettlements reduce excessive litigation expenses and transaction costs, thereby preserving scarce resources for CERCLA's real goal: the expeditious cleanup of hazardous waste sites.").

Both intervention as of right and permissive intervention may be appropriately limited by "conditions or restrictions responsive among other things to the requirement of efficient conduct of the proceedings." *United States v. Albert Inv. Co., Inc.*, 585 F.3d 1386, 1396 (10th Cir. 2009) (quotation marks omitted); *see* Fed. R. Civ. P. 24 Advisory Committee Notes to 1966 amend.; *Beauregard, Inc. v. Sword Servs. LLC*, 107 F.3d 351, 352 n.2 (5th Cir. 1997) (noting that "virtually any condition may be attached to a grant of permissive intervention"); *see, e.g.*, ECF No.

9

13 in *United States v. Cornell-Dubilier Elecs., Inc.*, No. 12-cv-5407 (D.N.J.) (ordering that a party might intervene "solely for the purpose of filing a brief and presenting oral argument (if argument is requested by the Court) in opposition to a Motion by the United States to Enter the Consent Decree").  In the CERCLA context, "when interested parties are allowed to intervene, they are not given the right . . . to thwart reasonable settlement agreements."  2 Superfund & Brownfields Cleanup § 22:17.

For example, although non-settling parties like OxyChem have attempted to disrupt the CERCLA settlement process in the past with requests to take discovery or to conduct burdensome evidentiary hearings, "[t]he district court has the ability to lessen any potential delay by denying [such requests]."  *Albert Inv. Co., Inc.*, 585 F.3d at 1396; *accord* ECF No. 84 (setting out the United States' opposition to any attempt by OxyChem to seek discovery or an evidentiary hearing in this proceeding).  This is consistent with the purpose of a CD proceeding, which is to determine whether the settlement is fair, reasonable, and consistent with CERCLA. *See In re Tutu Water Wells*, 326 F.3d at 207-08.

## II.   The Court Should Disregard OxyChem's Premature and Meritless Arguments Concerning the CD and the Allocation.

With its Motion to Intervene, OxyChem offers a host of arguments that are premature, irrelevant to the standard for intervention, legally unsupported, and misleading.  In a cursory manner and with a dearth of citation to legal authority,

OxyChem challenges the constitutionality and operation of CERCLA, the terms of a CD to which it is not a party, and the validity of an allocation in which it declined to participate.  *See* ECF No. 34-1.  The Court should disregard these arguments.  If granted intervenor status, OxyChem may raise these issues at a later point in these proceedings, and SPG Settling Defendants will refute them at that time.

The Court does not yet have occasion to consider these or other gratuitous contentions made by OxyChem.  The substantive and procedural fairness of the CD, the reasonableness of its terms, and its consistency with CERCLA are topics of the Court's inquiry into the United States' motion for entry of the CD—a motion that has yet to be filed and cannot be filed until the public comment and review process is complete.  *See* 88 Fed. Reg. 2,133; 87 Fed. Reg. 78,710; 42 U.S.C.A. § 9622(d); 28 C.F.R. § 50.7; *In re Tutu Water Wells*, 326 F.3d at 207.

Additionally, with the motion to intervene pending, OxyChem is not a party to this proceeding and thus may not address the merits of the CD in a court filing.[4] *See Sallah for Om Glob. Inv. Fund LLC v. Bgt. Consulting, LLC*, No. 16-81483-civ, 2017 WL 11626215, at *1 (S.D. Fla. Aug. 29, 2017) ("[A]ll of these substantive arguments are premature and being made by a party who has no[] standing to assert them."); *Jones v. Clinton*, 206 F.3d 811, 811-12 (8th Cir. 2000) (concluding that a

---

[4]  Regardless of the outcome of its motion to intervene, OxyChem could, like all non-parties and members of the public, submit comments on the CD to EPA.  *See* 88 Fed. Reg. 2,133.

person not named in the action and not granted intervenor status has insufficient interest to seek relief); *Flagler Inv. Marietta, LLC v. Multibank 2009 1 Cre Venture, LLC*, 633 Fed. App'x 747, 750 (11th Cir. 2015) (noting that a person or entity is not a party "until its motion to intervene [is] granted").

In addition to being premature, OxyChem's arguments concerning the validity and fairness of the CD and the allocation contain incorrect and prejudicial points of fact and law.

Most glaringly, OxyChem states that "the United States admits that [OxyChem] never polluted the Passaic River" and that the United States "*admits*" that "other parties . . . are liable for *all* the pollution in the river." ECF No. 34-1 at 5 (emphasis in original). These assertions strain credulity, flying in the face of mountains of information to the contrary. OxyChem concedes that it is liable for response costs for the Lower Passaic River based on its assumption of liability from predecessors for its facility at 80-120 Lister Avenue. *See* ECF No. 34-1 at 5, 8. Although the name is different, OxyChem is legally the same corporate entity that intentionally polluted the river for decades, as this and other courts have already decided. *See supra* note 1. OxyChem, as the successor in interest to the Diamond Alkali entities, is not only liable for the contamination from the 80/120 Lister Avenue Facility, it is also primarily responsible for the remediation costs for the Lower Passaic River per EPA's sponsored allocation report.

12

OxyChem devotes a significant amount of its brief to complaining that approval of the CD will unlawfully (perhaps even unconstitutionally) and unfairly eliminate its right to contribution from the Settling Defendants. *See* ECF No. 34-1 at 6-7, 9, 12, 16 n.10, 17, 20. These suggestions, too, border on the absurd. The plain language and history of CERCLA, along with a wealth of decisions from jurisdictions across the country, make clear that EPA may afford early settlors, such as the Settling Defendants, contribution protection from the federal government and private parties alike. *See* 42 U.S.C.A. § 9613(f)(2) ("A person who has resolved its liability to the United States . . . in an administrative or judicially approved settlement shall not be liable for claims for contribution regarding matters addressed in the settlement."); *accord* 42 U.S.C.A. § 9622(h)(4); *United States v. BP Amoco Oil PLC*, 277 F.3d 1012, 1021 (8th Cir. 2002) (explaining that contribution protection is "reasonable and consistent with the underlying policies and goals of CERCLA because it prevents duplicate liability and encourages cooperation with the government, thereby serving the goals of efficient and effective environmental cleanup and regulation"); *accord United States v. Occidental Chem. Corp.*, 200 F.3d 143, 150 n.8 (3d Cir. 1999) (discussing Congress's creation of contribution protection to encourage settlement). "By providing contribution protection to

19927229.3

settling defendants, the government neither exceed[s] nor abuse[s] its authority."[5]

*BP Amoco Oil*, 277 F.3d at 1020.  EPA regularly settles with minor parties such as

the Settling Defendants, thereby providing them with contribution protection.[6]  *See,*

*e.g.*, *United States v. Rohm & Haas Co.*, 721 F. Supp. 666, 672 (D.N.J. 1989)

(discussing a CD providing de minimis settlors with contribution protection);

*Occidental Chem. Corp.*, 200 F.3d at 147 ("Some settlements between PRPs and

EPA . . . involve agreements to do work, while others are 'cash out' settlements in

which a party pays a portion of the past, or future, response costs in exchange for a

release from liability. In either case, settlements . . . typically include a covenant not

to sue and contribution protection for matters addressed in the settlement." (citation

omitted)); *United States v. Chevy Chase Chevrolet*, No. CIV.A. 05-1222, 2005 WL

7143184, at *10 (W.D. Pa. Nov. 15, 2005).

---

[5]   Contrary to OxyChem's allusions, private parties have no constitutionally protected property rights or interests in contribution claims. *See BP Amoco Oil PLC*, 277 F.3d at 1017-18; *United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 92 n.6 (1st Cir. 1990); *United States v. NCR Corp.*, No. 10-C-910, 2011 WL 1321365, at *4 (E.D. Wis. Apr. 4, 2011); *United States v. Atlas Lederer Co.*, 494 F. Supp. 2d 629, 640 (S.D. Ohio 2005); *United States v. BP Amoco Oil PLC*, No. Civ. 4-99-10671, 2000 WL 35503251, at *4-5 (S.D. Iowa Sept. 29, 2000); *see also United States v. Davis*, 261 F.3d 1, 28 (1st Cir. 2001); *United States v. Keystone Sanitation Co., Inc.*, No. 1:CV-93-1482, 1996 WL 33410106, at *7 (M.D. Pa. Apr. 29, 1996); *United States v. Serafini*, 781 F. Supp. 336, 339 (M.D. Pa. 1992).

[6]  OxyChem seems to suggest that it is an early or prior settlor compared to Settling Defendants. *See* ECF No. 34-1 at 12.  It is not.

That OxyChem itself has sought contribution protection from private party claims for this Site belies its arguments. *See, e.g.*, Letter from OxyChem to EPA (Jan. 13, 2022) (proposing that "EPA will provide to OxyChem a full covenant not to sue under section 106 and 107 of CERCLA and agree to full contribution protection for OxyChem for all response actions and response costs incurred by any person related to the upper 9 miles of the Upper Passaic River in Operable Unit 4"). On multiple occasions, OxyChem has obtained and benefited from contribution protection from private parties in exchange for settling with the United States. *See, e.g.*, *United States v. Cassidy Painting Inc.*, 1:19-cv-18472 (D.N.J. Nov. 22, 2019) (entering a consent decree among OxyChem and others); *United States v. Air Prods. & Chems., Inc.*, No. 2:13-cv-06695 (D.N.J. Mar. 14, 2014) (same).

Additionally, OxyChem incorrectly asserts that the allocation is inadmissible and unfair. Courts routinely review and consider the terms of underlying allocations to determine whether a rational basis supports a proposed consent decree. *See, e.g.*, *United States v. Kramer*, 19 F. Supp. 2d 273, 278-86, 289 (D.N.J. 1998) (examining the terms of an allocation report and concluding that it provided a rational basis to support entry of a proposed CERCLA consent decree); *United States v. Acton Corp.*, 733 F. Supp. 869, 871-73 (D.N.J. 1990) (concluding that it is not the court's place to conduct "a de novo examination of the liability allocation" and using an underlying allocation to determine the fairness of a proposed consent decree); *United*

15

*States v. Charles George Trucking, Inc.*, 34 F.3d 1081, 1088-89, 1091 (1st Cir. 1994) (embracing and approving the underlying allocation and allocation methodology in affirming the District Court's entry of a consent decree).

OxyChem's contentions regarding the fairness and reliability of the allocation wrongly assume that an allocation that assigns the bulk of responsibility to one party is necessarily flawed. When, as here, a neutral EPA-sponsored process based on voluminous data produces an accurate calculation of OxyChem's responsibility, the result alone is no basis to conclude that the allocation, and therefore the settlement, is unfair. Courts have upheld similar allocations among PRPs when the record supported it. *See, e.g.*, *PMC, Inc. v. Sherwin-Williams Co.*, 151 F.3d 610, 616 (7th Cir. 1988) (affirming the District Court's allocation of 100% of response costs to the defendant, despite the plaintiff's concession that it had dumped toxic waste at the site, because the plaintiff's spills "may have been too inconsequential to affect the cost of cleaning up significantly"); *Kalamazoo River Study Grp. v. Rockwell Int'l Corp.*, 274 F.3d 1043, 1048-49 (6th Cir. 2001) (affirming the District Court's decision to allocate zero response costs to the defendant where an association of paper manufacturers "released exponentially more PCBs into the Kalamazoo River than [defendant], so that [defendant's] release will have essentially no effect on the as yet-undetermined clean-up costs").

16

Moreover, OxyChem's unsupported suggestion that the proposed CD impermissibly and unjustly favors the Settling Defendants, *see* ECF No. 34-1 at 14, ignores a wealth of evidence and prior court findings establishing that OxyChem is primarily responsible for the most toxic contamination of the Lower Passaic River. *See supra* note 1. Although the 2016 ROD identifies eight COCs, dioxin is by far the most toxic and harmful to human health and the environment, and it was dioxin that formed the basis of EPA's selection of a remedy. *See* Record of Decision For The Lower Eight Miles of The Lower Passaic River 1, 29, 41 (Mar. 3, 2016), semspub.epa.gov/src/document/02/396055.

In sum, contrary to OxyChem's unfounded characterizations—and as the SPG Settling Defendants are prepared to establish when the Court reaches the merits of this case—the CD, supported by the underlying allocation, easily satisfies the requirement that a settlement be based on a rational estimate of the harm caused. *See Rohm & Haas Co.*, 721 F. Supp. at 687; *In re Tutu Water Wells*, 326 F.3d at 207 ("A consent decree only need be based on a rational determination of comparative fault, whether or not a district court would have employed the same method of apportionment." (quotation marks omitted)). EPA, the third-party neutral, and the SPG Settling Defendants faithfully observed required procedural protections during the allocation, which was conservative and erred in OxyChem's favor. *See also Kramer*, 19 F. Supp. 2d at 285 ("A most telling measure of substantive fairness is

17

the fact that the vast majority of participants followed through and ratified the non-binding allocation, with the advice of knowledgeable and experienced counsel.").

## **<u>CONCLUSION</u>**

For the foregoing reasons, the SPG Settling Defendants respectfully request that the Court disregard OxyChem's premature arguments concerning CERCLA, the CD, and the allocation and impose appropriate restrictions on OxyChem's intervention, to the extent granted, to prevent unreasonable delay in this matter.


Dated: January 17, 2023          Respectfully submitted,

                                 */s/ Jeffrey D. Talbert*
                                 **PRETI, FLAHERTY, BELIVEAU**
                                 **& PACHIOS, LLP**
                                 One City Center, PO Box 9546
                                 Portland, ME 04112
                                 Telephone: 207.791.3239
                                 Jeffrey D. Talbert, Esq. (Bar # 333512021)

19927229.3

## <u>CERTIFICATE OF SERVICE</u>

I, Jeffrey D. Talbert, hereby certify that on January 17, 2023, I caused a copy

of the foregoing document to be served via electronic filing on all counsel of record.


Dated: January 17, 2023                          /s/ Jeffrey D. Talbert
                                                 **PRETI, FLAHERTY, BELIVEAU**
                                                 **& PACHIOS, LLP**
                                                 One City Center, PO Box 9546
                                                 Portland, ME 04112
                                                 Telephone: 207.791.3239

19927229.3