# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
### NEWARK VICINAGE

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Hon. Madeline Cox Arleo |
| Plaintiff, | ) | |
| | ) | Civil Action No. 2:22-cv-07326 |
| | ) | |
| v. | ) | **PHARMACIA LLC'S BRIEF** |
| | ) | **IN SUPPORT OF MOTION** |
| | ) | **TO INTERVENE** |
| ALDEN LEEDS, INC.; et al., | ) | |
| | ) | Return Date: February 21, 2023 |
| Defendants. | ) | Oral Argument Requested |
| | ) | |

John F. Gullace, Esq.
Bryan P. Franey, Esq.
Danielle N. Bagwell, Esq.
MANKO, GOLD, KATCHER & FOX, LLP
Three Bala Plaza East, Suite 700
Bala Cynwyd, PA  19004
(484) 430-5700
jgullace@mankogold.com
bfraney@mankogold.com
dbagwell@mankogold.com

*Attorneys for Intervenor Pharmacia LLC*

## <u>TABLE OF CONTENTS</u>

I.    EXECUTIVE SUMMARY ................................................................................1

II.   PHARMACIA'S PROTECTED INTERESTS ...................................................3

    A.    Pharmacia's Interest In The EPA-Sponsored Allocation ..........................4

    B.    Pharmacia's Interest In The Passaic Consent Orders .............................10

    C.    Pharmacia's Interest In The Equitable Allocation Of Claims
        In The OxyChem Litigation ....................................................................12

    D.    Pharmacia's Interest In Avoiding Inconsistent Allocations ....................13

III.  DISCUSSION OF PHARMACIA'S RIGHT TO INTERVENE ....................15

    A.    Pharmacia Is Entitled To Intervention As Of Right ................................16

        1.    Pharmacia's motion to intervene is timely. .....................................18

        2.    Pharmacia has sufficient interests in the litigation. .........................20

        3.    Pharmacia's interests will be affected by the entry of
            the Consent Decree. ..........................................................................23

        4.    Pharmacia's interests are not adequately represented
            by an existing party in the litigation. ................................................26

    B.    In The Alternative, The Court Should Grant Pharmacia
        Permissive Intervention. ..........................................................................27

IV.   CONCLUSION .............................................................................................29

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## Cases

*Brody By and Through Sugzdinis v. Spang*,
  957 F.2d 1108 (3d Cir. 1992) ...........................................................................17

*Continental Casualty Co. v. SSM Grp., Inc.*,
  No. 94-7789, 1995 WL 422780 (E.D. Pa. July 13, 1995) ...........................28, 29

*Donaldson v. United States*,
  400 U.S. 517 (1971)....................................................................................17, 20

*Donovan v. United Steelworkers of Am., AFL-CIO*,
  721 F.2d 126 (3d Cir. 1983) ...............................................................................18

*Kleissler v. United States Forest Service*,
  157 F.3d 964 (3d Cir. 1998) ...............................................................................24

*Mountain Top Condo. Ass'n v. Dave Stabbert Master Builder, Inc.*,
  72 F.3d 361 (3d Cir. 1995) .................................................................................18

*Pennsylvania. v. Atlantic Richfield Co.*,
  No. 09–cv–913, 2009 WL 2971483 (M.D. Pa. Sept. 16, 2009).................*passim*

*Pennsylvania v. Rizzo*,
  530 F.2d 501 (3d Cir. 1976) ...............................................................................18

*In re Tutu Water Wells CERCLA Litig.*,
  326 F. 3d 201 (3d Cir. 2003) ..............................................................................15

*U.S. v. Cannons Eng'g Corp.*,
  899 F.3d 79 (1st Cir. 1990)..................................................................................15

*U.S. v. W.R. Grace & Co.-Conn.*,
  185 F.R.D. 184 (D.N.J. 1999)...................................................................17, 20, 22

*United States v. Acton Corp.*,
  131 F.R.D. 431 (D.N.J. 1990)....................................................................*passim*

ii

*United States v. Aerojet Gen. Corp.*,
 606 F.3d 1142 (9th Cir. 2010) ............................................................19, 23, 25, 26

*United States v. Albert Inv. Co., Inc.*,
 585 F.3d 1386 (10th Cir. 2009) ..............................................................23, 25, 26

*United States v. Alcan Aluminum, Inc.*,
 25 F.3d 1174 (3d Cir. 1994) ...........................................................................17, 23

*United States v. City of Glen Cove*,
 221 F.R.D. 370 (E.D.N.Y. 2004).............................................................................21

*United States v. ExxonMobil Corp.*,
 No. 1:07-cv-00060, 2007 WL 4563490 (D.N.H. Dec. 20, 2007)......................25

*United States v. Pesses*,
 No. 90-654, 1994 WL 741277 (W.D. Pa. Nov. 7, 1994)............................15, 16

*United States v. Union Elec. Co.*,
 64 F.3d 1152 (8th Cir. 1995) ....................................................................*passim*

**Statutes**

42 U.S.C. § 9607 ....................................................................................................4, 13

42 U.S.C. § 9613 ....................................................................................................*passim*

**Other Authorities**

87 Fed. Reg. 78710 (Dec. 22, 2022) ...........................................................................7

88 Fed. Reg. 2133 (Jan. 12, 2023) ............................................................................19

Federal Rule of Civil Procedure 24 .................................................................*passim*

7C Charles Alan Wright *et al.*, Federal Practice and Procedure (3d ed.
 1986) ...................................................................................................................18

7C Charles Alan Wright *et al.*, Federal Practice and Procedure (3d ed.
 2022). ...................................................................................................................28

## <u>PHARMACIA LLC'S BRIEF IN SUPPORT OF MOTION TO INTERVENE</u>

Pharmacia LLC ("Pharmacia" or "Intervenor") moves to intervene as of right pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") § 113(i), 42 U.S.C. § 9613(i) and Federal Rule of Civil Procedure 24(a)(2) or, in the alternative, for permissive intervention pursuant to Federal Rule of Civil Procedure 24(b).  Pharmacia intervenes to protect Pharmacia's rights and interests with respect to entry of the Consent Decree filed by the United States on December 16, 2022.

## I.    <u>EXECUTIVE SUMMARY</u>

The United States filed a Complaint in this action against 85 defendants on December 16, 2022 (Doc. 1) (the "EPA Action"), and on that same day, filed a Consent Decree by which the United States proposes to resolve its claims against those 85 defendants (the "Settling Parties").  (Doc. 2-1) (the "EPA Settlement"). Pharmacia is neither named in the Complaint, nor a party to the proposed Consent Decree, but the proposed Consent Decree, and the proceedings before the Court concerning the proposed Consent Decree, could impact specific rights and obligations of Pharmacia, depending upon future decisions by the Court. Pharmacia's interests are not adequately represented by the current parties to this action.

Pharmacia moves to intervene to protect its interests in a number of areas. First, Pharmacia participated in an allocation sponsored by the United States ("U.S.") Environmental Protection Agency's ("EPA") (the "EPA Sponsored Allocation") that is being relied upon by EPA to settle with some but not all of the participants in the EPA Sponsored Allocation (Doc. 2-1 at p. 6). The EPA Sponsored Allocation has many shortcomings, and the Court would benefit from Pharmacia's perspective on its results. Second, the United States proposes to terminate two consent orders and agreements between Pharmacia, the United States and the Settling Parties related to the subject matter of the proposed EPA Settlement (the "Passaic Consent Orders")[1] (Doc. 2-1 at ¶¶ 16 & 17). Because termination of these Passaic Consent Orders will impact Pharmacia's legal interests, the Court should allow it to participate as a party. Third, Pharmacia is also a defendant in the ongoing parallel litigation in this Court brought by Occidental Chemical Company ("OxyChem") against most of the Settling Parties in the EPA Action, plus approximately fifty additional defendants and third-party defendants sued by OxyChem (the "OxyChem Litigation"). Resolution of this

---

[1] Specifically, the Passaic Consent Orders are the 2007 Administrative Settlement agreement and Order on Consent for a Remedial Investigation/Feasibility Study ("RI/FS AOC") and the 2012 Administrative Settlement Agreement and Order on Consent for a time-critical removal action at river mile 10.9 ("RM 10.9 AOC"), both of which are defined in the Consent Decree filed by the United States. (Doc. 2-1 at p. 4).

action could potentially impact the OxyChem Litigation, and by extension Pharmacia's legal rights.  Lastly, Pharmacia faces the very real risk of inconsistent allocations of responsibility between the EPA Sponsored Allocation, the EPA Settlement, the Court's equitable allocation in the OxyChem Litigation, and other allocations used at various times among the parties, which will affect Pharmacia's share of billions of dollars in cleanup costs for the Lower Passaic River Study Area ("LPRSA"), also known as Operable Units ("OUs") 2 and 4 of the Diamond Alkali Superfund Site (the "Site").

## II.   **PHARMACIA'S PROTECTED INTERESTS**

In the 1950s and 1960s, OxyChem's legal predecessor, the Diamond Alkali Company (collectively "OxyChem") intentionally discharged highly-toxic dioxin directly into the Passaic River from its chemical plant at 80 and 120 Lister Avenue in Newark, New Jersey, for financial gain.  Because OxyChem knew its discharges broke the law, it systematically concealed its actions.  The magnitude of OxyChem's illegal discharges first came to light in 1983, when dioxin was discovered on OxyChem's property and the surrounding community.  The Diamond Alkali Superfund Site was added to the National Priorities List by EPA in 1984.  Subsequently, Pharmacia and over 100 other parties received General Notice Letters ("GNLs") from EPA in the mid-1990s at the request of OxyChem, advising them of their potential liability for the investigation and remediation of

contamination in the LPRSA.  On March 30, 2016, EPA again notified over 100 parties that they had been identified as potentially responsible parties ("PRPs") under Section 107(a) of CERCLA for the Diamond Alkali Superfund Site, including OxyChem, Pharmacia, the Passaic Valley Sewerage Commissioners ("PVSC"), and several municipalities including the City of Newark, Borough of East Newark, Town of Harrison, and Town of Kearny (collectively, the "Municipalities").  Notwithstanding decades of legal maneuvering by OxyChem, time-and-again, OxyChem has been found to be the party predominantly responsible for the contamination of the LPRSA.

### A.     Pharmacia's Interest In The EPA-Sponsored Allocation

In 2017, EPA encouraged OxyChem and the other companies that had received notifications they may be potentially responsible parties ("GNL recipients") to participate in the EPA Sponsored Allocation to be conducted by a third-party neutral to allocate responsibility among them for OU2 of the Diamond Alkali Superfund Site (*i.e.,* the lower 8.3 miles of the LPRSA).  Pharmacia was among the first parties to agree to participate.  OxyChem declined to participate. The EPA Sponsored Allocation was to serve as the first phase of a two-phase settlement process between EPA and the parties who participated in the allocation, with the second phase being allocation-based settlements with EPA.  The companies participating in the EPA Sponsored Allocation requested that EPA

4

include PVSC in the allocation process, but EPA refused and affirmatively excluded PVSC and Municipalities that had received GNLs from participating in the EPA Sponsored Allocation.

In May 2019, EPA approved an allocation methodology developed by the allocator (the "EPA-Approved Allocation Methodology") which was predicated on the risk-based conclusions drawn by EPA in the OU2 Record of Decision and included, among other things, the calculation and distribution of absent/unassigned shares (e.g., PVSC, the Municipalities, over-looked parties, and orphan shares) on a *pro rata* basis, an equitable adjustment for culpability, and an equitable adjustment for cooperation.  In December 2020, a Final Allocation Recommendation Report was issued assigning relative allocation shares to parties that participated in the EPA Sponsored Allocation as well as a limited number of companies that did not participate, including OxyChem.[2]  Under the EPA-Approved Allocation Methodology, which applied a risk-weighted, mass-based approach based on the allocator's determination of each party's mass contribution to OU2 sediments of each of the eight contaminants of concern ("COCs") identified by EPA, Pharmacia was assigned an allocation share of 0.0157%, and

---

[2] The EPA Sponsored Final Allocation Recommendation Report can be found at: semspub.epa.gov/src/document/02/609904.

**OxyChem was allocated a share of 99.9396%**.[3]  Under the EPA-Approved

Methodology, Pharmacia's share of responsibility would be even less if both OU2

and OU4 had been addressed in the allocation using consistent methodologies.

Even though Pharmacia was assigned a share of only 0.0157%, the EPA

Sponsored Allocation significantly overstated Pharmacia's share both in absolute

terms and relative to the Settling Parties, because it (a) did not include parties with

substantial shares of responsibility such as PVSC; and (b) premised nearly all of

Pharmacia's share of responsibility on a hypothetical overland fate and transport

pathway to the river, based upon scientifically indefensible assumptions,

notwithstanding abundant factual information in the allocation record to the

contrary (the "OFT Calculation").  Ignoring the extensive site-specific information,

including data, provided by EPA and Pharmacia, the allocator arbitrarily, and

without any scientific basis, skewed the OFT Calculation to manufacture a

distinction between Pharmacia and the Settling Defendants.  On the basis of this

unsupportable OFT Calculation, EPA has excluded Pharmacia from the current

round of settlement discussions and designated Pharmacia a "work party."  Even

with this greatly flawed OFT Calculation, Pharmacia's share still came out to be

only 0.0157% under the EPA-Approved Allocation Methodology.

---

[3] *See* EPA Sponsored Final Allocation Recommendation Report at Attachment K.

Although Pharmacia has made numerous settlement overtures to EPA, and has made two settlement offers, thus far, EPA has not responded to those settlement offers. EPA has inexplicably identified Pharmacia (0.0157%), Nokia (0.0281%), PSEG (0.00043%), PMC Global (0.0038%), and five governmental entities that EPA prohibited from participating in the allocation (PVSC, the City of Newark, the City of East Newark, the City of Harrison, and the City of Kearny), as work parties to implement the remedy, with OxyChem, for the entirety of the LPRSA (OU2 and OU4), which EPA projects will cost an additional $1.82 billion. (87 Fed. Reg. 78710 (Dec. 22, 2022)).

Pharmacia participated in the allocation's three-year process at great expense and with the assurance and agreement from EPA that the allocation would be used as the basis for settlements with all of the allocation parties. EPA is now poised to settle with fewer than all of the allocation parties "based on" the EPA Sponsored Allocation.[4]  Pharmacia has a significant interest in ensuring that the EPA

---

[4] Notice of Lodging of Proposed Consent Decree in Federal Register, 87 Fed. Reg. 78710 (Dec. 22, 2022) "***EPA sponsored an allocation process***, which involved hiring a third party neutral to perform an allocation. The process concluded in December 2020 with a Final Allocation Recommendation Report that recommends relative shares of responsibility for each allocation party's facility or facilities evaluated in the allocation. After review of the Final Allocation Recommendation Report, EPA identified the parties who were eligible to participate in the proposed Consent Decree. ***Based on the results of the allocation, the United States concluded that*** the Settling Defendants, individually and collectively, are responsible for a minor share of the response costs incurred and to be incurred at or in connection with the cleanup of Operable Unit 2 and Operable Unit 4, for

Sponsored Allocation is applied fairly to all parties who participated in the process and not used to settle out just some parties and then be dispensed with by EPA. Even though Pharmacia was assigned a share of only 0.0157%, Pharmacia will show in this action, and in the parallel OxyChem Litigation, that the EPA Sponsored Allocation got Pharmacia's share wrong. The allocator significantly overstated Pharmacia's share both in absolute terms and relative to the Settling Parties.

Moreover, at least one Settling Party failed to disclose up-to-date sampling data to the allocator. If the most current data had been used by the allocator, this Settling Party would have had an allocation share greater than Pharmacia.[5] Furthermore, the parties to the allocation specifically requested that PVSC, which had also received a GNL from EPA, be included in the allocation, but EPA refused. PVSC's share would have been ten times higher than Pharmacia's and,

---

releases from the facilities identified in the proposed Consent Decree." (emphasis added).

[5] Kearny Smelting & Refining collected soil samples at its facility located at 936 Harrison Avenue, Kearny, New Jersey on November 15, 2019. The results of the soil sampling revealed a maximum PCB concentration at the shallowest depth interval sampled of 46,400 mg/kg. This data was available a full year before the allocator issued the Final Allocation Recommendation Report. Had this data been submitted to the allocator, Kearny Smelting & Refining should have the second highest allocation share among the participating allocation parties at 0.074% using the EPA-Approved Allocation Methodology.

under the allocator's alternative allocation methodology, Pharmacia was forced to assume a significant portion of PVSC's absent share.[6] The one clear message from the EPA Sponsored Allocation is that there is one party that should bear responsibility for the cleanup of the LPRSA – OxyChem.

The distinctions drawn by EPA between Pharmacia and the Settling Parties to exclude Pharmacia from the EPA Settlement are based upon unsupportable assumptions contradicted by data, a misleading tiering system, and in at least one case, omitted information. Parties with an allocation share of a hundredth of one percent, and parties with shares of thousandths of a percent or less are indistinguishable considering OxyChem was allocated a share of 99.9396%, particularly when the uncertainties and errors baked into the EPA Sponsored Allocation are considered.[7] The only clear conclusion from the EPA Sponsored Allocation is that OxyChem is the one party responsible for the vast majority of the

---

[6] Based on COC estimates of mass contributed by PVSC contained in Appendix O of the Final Allocation Recommendation Report, if PVSC had been permitted to participate in the allocation, it would be the party with by far the second largest allocation share – a share that would be ten times larger than Pharmacia's share under the EPA-Approved Allocation Methodology.

[7] Nonetheless, EPA issued a Notice of Potential Liability and Notice of Consent Decree Negotiations to a handful of parties, including Pharmacia, in March 2022, stating that Pharmacia has been identified by the EPA as a work party for the OU2 and OU4 cleanups and that Pharmacia should participate, jointly and severally, with OxyChem in the $1.82 billion cleanup of the LPRSA, ostensibly premised upon the tiering of the EPA Sponsored Allocation.

contamination of the LPRSA (99.94%), and all other participants in the allocation are individually and collectively "minor" or immaterial.

To use the EPA Sponsored Allocation for the benefit of some participants and not others would be "unfair, unreasonable, [and] inconsistent with the purposes of CERCLA." (Plaintiff's Notice of Lodging describing standard for not approving EPA Settlement (Doc. 2 at 1-2)).

### B.    Pharmacia's Interest In The Passaic Consent Orders

Pharmacia joined a group of approximately 70 GNL recipients organized as the Cooperating Parties Group ("CPG") to conduct a Remedial Investigation and Feasibility Study ("RI/FS") of the LPRSA pursuant to an Administrative Order on Consent with EPA (the "RI/FS AOC").[8]  OxyChem withdrew from the CPG in 2012.  The remaining members of the CPG, including Pharmacia, have a collective share of liability under the EPA Sponsored Allocation of less than 0.07%.  The RI/FS is nearing completion pursuant to the terms of the RI/FS AOC, but has not yet been completed, and has cost, including administrative costs, in excess of $200 million.

---

[8] Consent Decree (Doc. 2-1) at p. 4 ("WHEREAS, in May 2007, certain members of the CPG entered into an Administrative Settlement Agreement and Order on Consent ("2007 ASAOC") with EPA in which those parties agreed to take over the performance of the RI/FS for the 17-mile LPRSA under EPA oversight. The 2007 ASAOC was subsequently amended to add additional parties.").

In 2012, EPA advised the members of the CPG that a time critical removal action was necessary at River Mile 10.9 of the LPRSA ("RM 10.9").[9] Accordingly, in 2012, after OxyChem refused to participate in the investigation and remediation of RM 10.9 and withdrew from the CPG, the remaining members of the CPG, including Pharmacia, entered into an Administrative Order on Consent with EPA to perform the removal action at RM 10.9 (the "RM 10.9 AOC"). EPA issued a Unilateral Order to OxyChem to participate and cooperate with the CPG at RM 10.9, but OxyChem and its indemnitors did not participate in the removal action undertaken by the other CPG members, including Pharmacia, at a cost in excess of $26 million. EPA's Record of Decision for OU4 of the LPRSA provides that the remaining tasks at RM 10.9 will be wrapped into the future OU4 interim remedial action covering river miles eight to seventeen, but the RM 10.9 AOC currently remains in effect. However, the proposed EPA Settlement at issue in this case finds that "EPA has determined that the work required by the River Mile 10.9 ASAOC has been completed, except for continuing obligations set forth below in Section VIII (Prior Administrative Orders)." (Doc. 2-1 at p. 4).

---

[9] Consent Decree (Doc. 2-1) at p. 4 ("WHEREAS, in June 2012, EPA and certain members of the CPG entered into a settlement agreement to remove approximately two feet of sediment from the eastern bank of the Passaic River at River Mile 10.9 and cap that area ("River Mile 10.9 ASAOC"). In that same period, EPA issued a Unilateral Administrative Order for Removal Response Activities to OCC [OxyChem], which required OCC [OxyChem] to perform certain activities at River Mile 10.9 and to cooperate with the signatories of the River Mile 10.9 ASAOC.").

The proposed EPA Settlement terminates the RI/FS AOC and RM 10.9 AOC, with various caveats and pre-requisites. (Consent Decree (Doc. 2-1) at ¶¶ 16 & 17). Pharmacia is a party to both Passaic Consent Orders and has an interest in their termination. The termination of the Passaic Consent Orders appears to be a positive development, but Pharmacia nonetheless has a right to participate in any proceeding that might modify or clarify what tasks under the Passaic Consent Orders remain, how those tasks will be funded, and whether tasks are being shifted to other stages of the remediation of OU2 and OU4. Pharmacia is entitled to a seat at the table to protect its interests with regard to the termination of the Passaic Consent Orders to which Pharmacia is a signatory.

### C. Pharmacia's Interest In The Equitable Allocation Of Claims In The OxyChem Litigation

The Settling Parties who are defendants in the OxyChem Litigation (which accounts for nearly all of the Settling Parties) argue that the OxyChem Litigation sounds in contribution and, if the OxyChem Litigation is litigated to conclusion by the parties, it will result in an equitable allocation among all the parties by the Court. The Settling Defendants further maintain that the consent decree lodged by the U.S., if entered by the Court, will, pursuant to 42 U.S.C. § 9613(f)(2), afford the Settling Defendants contribution protection and prevent the Court from including them in any future equitable allocation of contribution shares.

OxyChem has consistently taken an opposing view that CERCLA cannot bar OxyChem's existing rights of contribution being pursued in the OxyChem Litigation and that, to the extent OxyChem possesses claims against the Settling Defendants under Section 107 of CERCLA, such claims are unaffected by the contribution protection conferred by EPA through the EPA Settlement.  (*See* OxyChem Brief in Support of Motion to Intervene (Doc. 34-1)).  OxyChem's position is that the OxyChem Litigation must inevitably lead to an equitable allocation of the costs of conducting the LPRSA cleanup.

Pharmacia has a significant interest in this action and its potential impact on the equitable allocation of contribution shares sought by OxyChem in the OxyChem Litigation, and is entitled, as a matter of right, to intervene in this proceeding to protect its interests in an equitable allocation in the OxyChem Litigation.

### D.  <u>Pharmacia's Interest In Avoiding Inconsistent Allocations</u>

The EPA Settlement is "based on" an allocation that assigned a share of 0.0157% to Pharmacia.  The amount that EPA is proposing to recover from the Settling Defendants "based on" the EPA Sponsored Allocation is fair and reasonable *only if* OxyChem is more than ninety percent responsible per the EPA Sponsored Allocation, but not if the allocation OxyChem sought in 2012 for RM 10.9 is used, not if the allocation used among the RI/FS AOC parties is used, not if

13

the allocation used among the RM 10.9 parties is used, and certainly not if the allocation theory postulated by OxyChem in the OxyChem Litigation is used. If the Court adopts one of these other allocations in the OxyChem Litigation, the Settling Parties' settlement amount does not represent their fair and equitable share, and the EPA Settlement would be "unfair, unreasonable, [and] inconsistent with the purposes of CERCLA." (Plaintiff's Notice of Lodging describing standard for not approving EPA Settlement (Doc. 2 at 1-2)). Pharmacia should be permitted to protect its interests in this action, as resolution of it may impact the ultimate resolution of "who pays what" for the Passaic cleanup.

The threat of inconsistent allocations is not a predicament of Pharmacia's own making. Pharmacia has consistently cooperated with EPA and participated in the EPA Sponsored Allocation. This is not a circumstance where Pharmacia has refused to negotiate with EPA, but rather a circumstance where, thus far, EPA has not engaged Pharmacia in good faith settlement discussions premised upon the EPA Sponsored Allocation, as agreed among EPA, Pharmacia and the other participants in the EPA Sponsored Allocation several years ago. Counsel has been periodically advised that EPA will discuss settlement with Pharmacia after it has lodged the Consent Decree. While Pharmacia is hopeful that good faith discussions with EPA will start imminently, thus far EPA has not responded to either of two settlement offers from Pharmacia.

14

## III.   DISCUSSION OF PHARMACIA'S RIGHT TO INTERVENE

When the United States moves for entry of the Consent Decree, this Court will determine whether the settlement is "reasonable, fair and consistent with the purposes that CERCLA is intended to serve." There are both procedural and substantive aspects of this review. To "measure procedural fairness, a court should ordinarily look to the negotiation process and attempt to gauge its candor, openness, and bargaining balance." *U.S. v. Cannons Eng'g Corp.*, 899 F.3d 79, 86 (1st Cir. 1990); *In re Tutu Water Wells CERCLA Litig.*, 326 F. 3d 201, 207 (3d Cir. 2003). As to substantive fairness, courts must: 1) inquire as to whether the decree is consistent both with the Constitution and with the mandate of Congress; 2) assure itself that the terms of the decree are fair and adequate; and 3) inquire whether the settlement is reasonable. *United States v. Pesses*, No. 90-654, 1994 WL 741277 at *5 (W.D. Pa. Nov. 7, 1994); *Cannons*, 899 F.3d at 85. "Substantive fairness introduces into the equation concepts of corrective justice and accountability; a party should bear the cost of harm for which it is legally responsible. ***The terms of the consent decree must be based upon a rational measure of apportioning liability and determining comparative fault***." *Pesses*, 1994 WL 741277 at *6 (emphasis added) (internal quotation marks omitted).

"In considering whether to approve a consent decree, the court must conduct an independent evaluation of the evidence relied upon in relation to the agreements

reached and must eschew any rubber stamp approval of it." *Id.* at *5.  The

proponents of the consent decree must "develop and present an adequate record

which enables the court to evaluate the proposed decree in light of the evidence

relied upon and the evidence discarded; the questions addressed by the agency and

those by-passed; the choices open to the agency and those made." *Id.* (internal

quotation marks omitted).  Pharmacia is entitled to intervene in this proceeding as

of right so that it can participate meaningfully to protect its interests which are

directly implicated by the Consent Decree.

### A.     <u>Pharmacia Is Entitled To Intervention As Of Right</u>

CERCLA Section 113(i) provides:

> In any action commenced under this chapter … in a court
> of the United States, any person may intervene as a
> matter of right when such person claims an interest
> relating to the subject of the action and is so situated that
> the disposition of the action may, as a practical matter,
> impair or impede the person's ability to protect that
> interest, unless the President or the State shows that the
> person's interest is adequately represented by existing
> parties.

42 U.S.C. § 9613(i).  CERCLA provides for intervention in terms nearly identical

to those of Fed. R. Civ. P. 24(a)(2), thus Federal Rule of Civil Procedure 24(a)(2)

provides a concurrent right to intervene, and the test applied to motions to

intervene is similar under either statute.  *See* Fed. R. Civ. P. 24(a)(2) ("On timely

motion, the court must permit anyone to intervene who: claims an interest relating

16

to the property or transaction that is the subject of the action, and is so situated that

disposing of the action may as a practical matter impair or impede the movant's

ability to protect its interest, unless existing parties adequately represent that

interest."); *United States v. Alcan Aluminum, Inc*., 25 F.3d 1174, 1180 (3d Cir.

1994) ("§ 113's language mirrors the language in Federal Rule of Civil Procedure

24(a)"); *see also Pennsylvania. v. Atlantic Richfield Co*., No. 09–cv–913, 2009 WL

2971483 at *2 (M.D. Pa. Sept. 16, 2009) ("The language in § 113(i) is nearly

identical to Rule 24(a)(2) and courts have applied the same test to determine if

intervention is proper under either of these statutes").  Generally, to intervene as a

matter of right, a party must have a "significantly protectable interest" in the

outcome of the litigation.  *Donaldson v. United States*, 400 U.S. 517, 531 (1971).

A motion to intervene should be granted where: (1) the application for

intervention is timely; (2) the applicant has a sufficient interest in the litigation;

(3) the interest may be affected or impaired, as a practical matter by the disposition

of the action; and (4) the interest is not adequately represented by an existing party

in the litigation.  *See Brody By and Through Sugzdinis v. Spang,* 957 F.2d 1108,

1115 (3d Cir. 1992); *United States v. Acton Corp*., 131 F.R.D. 431, 433 (D.N.J.

1990); *U.S. v. W.R. Grace & Co.-Conn*., 185 F.R.D. 184, 186 (D.N.J. 1999).

Pharmacia meets each requirement, and the Court should grant Pharmacia's motion

to intervene.

### 1.  Pharmacia's motion to intervene is timely.

Determining whether a motion to intervene is timely requires an analysis of all of the facts and circumstances surrounding the proceedings.  "The question for determining the timeliness of the motion to intervene is whether existing parties may be prejudiced by the delay in moving to intervene, not whether the intervention itself will cause the nature, duration, or disposition of the lawsuit to change."  *United States v. Union Elec. Co.,* 64 F.3d 1152, 1159 (8th Cir. 1995).  The Court must consider "(1) the stage of the proceedings when the movant seeks to intervene; (2) possible prejudice caused to other parties by delay; and (3) the reason for delay."  *Donovan v. United Steelworkers of Am., AFL-CIO*, 721 F.2d 126, 127 (3d Cir. 1983) (citing *Pennsylvania v. Rizzo*, 530 F.2d 501, 506 (3d Cir. 1976)).  "In determining whether an application for intervention as of right is timely, . . . '[s]ince in situations in which intervention is of right the would-be intervenor may be seriously harmed if he is not permitted to intervene, courts should be reluctant to dismiss a request for intervention as untimely . . . .'"  *Mountain Top Condo. Ass'n v. Dave Stabbert Master Builder, Inc*., 72 F.3d 361, 369 (3d Cir. 1995), citing 7C Charles Alan Wright *et al*., Federal Practice and Procedure § 1916, at 424 (3d ed.1986).

Here, there should be no question Pharmacia's motion to intervene is timely – the Consent Decree was signed on behalf of the Plaintiff on December 15, 2022

18

and lodged with the Court on December 16, 2022.  (Doc. 2-1).  Furthermore,

Plaintiff's Notice of Lodging filed with the Court advised the Court that the United

States will be publishing the Consent Decree in the Federal Register and will then

provide the public with a 45-day period to submit comments (Doc. 2).  The United

States then agreed to extend the public comment period by an additional 15 days.

(Doc. 41 at 2).  Finally, on January 12, 2023, the United States further extended the

public comment period by an additional 30-days to March 22, 2023.  (88 Fed. Reg.

2133 (Jan. 12, 2023)).  The Plaintiff United States further advised the Court that

the U.S. would not make a decision on whether to proceed with seeking the

Court's approval of the Consent Decree until EPA had reviewed and responded to

the public comments.  (Doc. 2).  "***Accordingly, the United States requests that the***

***Court take no action on the proposed Consent Decree at this time***."  *Id.*

(emphasis in original).  Pharmacia's intervention will not delay the proceedings.

*See United States v. Aerojet Gen. Corp*., 606 F.3d 1142, 1149 (9th Cir. 2010)

(holding applicants acted promptly and the motion to intervene was timely where

the applicants moved to intervene "within a span of four months.").  Other than the

filing of the Complaint (Doc. 1), the Plaintiff's Notice of Lodging (Doc. 2) and the

proposed Consent Decree (Doc 2-1) on December 16, 2022, no other litigation

events material to the Court's evaluation of the Consent Decree have occurred in

this matter as of the date of this Motion to Intervene. Thus, Pharmacia's motion for intervention is timely.

### 2.     Pharmacia has sufficient interests in the litigation.

A party should be permitted to intervene where it has "a significantly protectable interest." *Donaldson*, 400 U.S. at 542. This requires an interest which is "direct, as opposed to tangential or collateral" and also "substantial and legally protectable." *W.R. Grace*, 185 F.R.D. at 189. Here, Pharmacia has four significantly protectable, direct interests that will be affected by entry of the Consent Decree: (1) the fair and even-handed use and application of the EPA Sponsored Allocation in settlement decisions among ***all*** of the parties that participated in the EPA Sponsored Allocation; (2) the Consent Decree's proposed termination of the Passaic Consent Orders to which Pharmacia is a party; (3) the equitable allocation of contribution claims by the Court in the OxyChem Litigation; and (4) the risk of wildly inconsistent allocations in the different proceedings and their impact on whether the proposed EPA Settlement is fair, reasonable and consistent with the purposes of CERCLA. EPA is drawing imaginary distinctions between parties with more than $2 billion of past and future environmental remediation costs at stake.

In *United States v. Acton*, the United States District Court for the District of New Jersey held that a non-settling PRP's interest in contribution is sufficient to

sustain intervention to oppose a consent decree under both CERCLA and Federal Rule of Civil Procedure 24(a)(2).  131 F.R.D. 431 (D.N.J. 1990); *see also, United States v. City of Glen Cove*, 221 F.R.D. 370, 373 (E.D.N.Y. 2004) (stating that in *Acton*, the District of New Jersey "held that a non-settling PRP's interest in contribution is sufficient to sustain intervention . . . .").  In *Acton*, the government argued the non-settlors did not have a legally protected interest because the interest alleged was merely economic and contingent rather than direct and protected.  The court rejected the government's position, holding "Section 113(f)(1) of CERCLA vests in 'any person' the right to seek contribution 'from any other person who is liable or potentially liable. . . during or following any civil action [under CERCLA].'  The fact that the [non-settlors] may later lose their right of contribution against the settling defendants once the consent decree has been approved does not make the right contingent at present."  131 F.R.D. at 434.  Accordingly, the court held non-settlors' statutory right to contribution that might be extinguished if the consent decree were approved was a legally protected interest.  *Id*.

Similarly, in *Pennsylvania v. Atlantic Richfield Co*., No. 09-CV-913, 2009 WL 2971483 (M.D. Pa. Sept. 16, 2009) the court granted non-settling PRPs' motion to intervene where the consent decree gave the settling defendants contribution protection.  The court held the non-settling party had "a sufficient

interest in the outcome of the Consent Decree which may be affected or impaired. Specifically, if the Consent Decree is granted, [non-settlor] will be prevented from collecting any potential contribution from [settling defendant] should [settling defendant] later be found liable . . . ." *Id.* at *3; *see also, W.R. Grace,* 185 F.R.D. at 186 (holding that when addressing whether non-settling party had a "sufficient interest" in the litigation, "[m]ost cases applying this standard in the CERCLA context . . . have generally found that a non-settling PRP may intervene if it has an interest in a right of contribution from other PRPs which may be affected by the settlement.").

Courts from other jurisdictions that have addressed the issue have similarly held that a non-settlor's contribution right is, alone, an interest sufficient to warrant intervention pursuant to Rule 24(a)(2) and §113 of CERCLA. In *United States v. Union Elec. Co.*, 64 F.3d 1152, 1167 (8th Cir. 1995), the Eighth Circuit held that the entry of a consent decree which cuts off the right to contribution "creates a direct and immediate interest on the part of the non-settling PRPs in the subject matter of the [] litigation." *Id*. The court rejected the government's argument that a non-settling PRP's contribution interest was "speculative" or "too contingent" on a chain of events, holding "no finding of liability is required, nor assessment of excessive liability, before the contribution interest arises. Only the *recovery* on a contribution claim must await the outcome of this or further litigation, not the right

22

to bring such a claim." *Id*. Accordingly, the court held the potential intervenor need only be "identified as a PRP to support intervention." *Id*.; *see also United States v. Albert Inv. Co., Inc.,* 585 F.3d 1386, 1390 (10th Cir. 2009) (holding non-settling defendant "has an interest legally sufficient for intervention as of right" because it "has a present right to pursue the settling defendants, as fellow PRPs for contribution" and entry of the consent decree "will automatically cut off the right to seek contribution from the settling defendants . . . ."); *Aerojet Gen. Corp*., 606 F.3d at 1150 (holding "a non-settling PRP need not have first been found liable in order for the contribution interest to arise" and "join[ing] the Eighth and Tenth Circuits in holding that non-settling PRPs have a significant protectable interest in litigation between the government and would-be settling PRPs).

The above discussed cases granted intervention to non-settling parties solely because they had a protected interest in rights of contribution in another action, as is the case here where the Court in the OxyChem Litigation will undertake an equitable allocation of contribution shares. Here, however, as discussed above, Pharmacia has several additional, clear and "significantly protectable interests" at issue that equally justify its intervention in the EPA Action.

### 3.  Pharmacia's interests will be affected by the entry of the Consent Decree.

The third prong of the intervention test addresses whether the applicant's interests may be affected or impaired by the disposition of the litigation. *Alcan*, 25

F.3d at 1181.  Under this standard, there must be "a threat that the interest will be

impaired or affected, as a practical matter, by the disposition of the action."

*Kleissler v. United States Forest Service*, 157 F.3d 964, 969 (3d Cir. 1998).

Clearly, there will be an effect on the Passaic Consent Orders to which Pharmacia

is a party and which the proposed Consent Decree will terminate.  Pharmacia also

has a significant interest in avoiding inconsistent allocations (which would

materially impact the fairness of the EPA Settlement), the fair and equitable

application of the EPA Sponsored Allocation, and a well recognized interest in the

Court's equitable allocation of contribution shares in the OxyChem Litigation.

Any one of these four interests would be sufficient to justify Pharmacia's

intervention in the EPA Action.  For example, several courts have held that the

potential impact of a settlement on the contribution rights of a non-settlor are a

sufficient basis for granting intervention. *See Atlantic Richfield Co*., 2009 WL

2971483 at *3 (holding non-settling defendant "has a sufficient interest in the

outcome of the Consent Decree which may be affected or impaired" where "if the

Consent Decree is granted, [non-settling defendant] will be prevented from

collecting any potential contribution from [settling defendant] should [settling

defendant] later be found liable to [non-settling defendant]"); *Acton,* 131 F.R.D. at

436 (where "approval of [a] consent decree would eliminate altogether" a party's

"contribution claims against [a] settling defendant," the litigation "may impede or

impair" the interests of that party); *Albert Inv. Co.*, 585 F.3d at 1388 (holding non-settling defendant's "interest may be impeded by the disposition of [the] case" where "the consent decree directly addresses the liability of the settling defendants as to the cleanup [and] if the court approves the consent decree, [non-settling defendant] will be barred from seeking contribution from any of the settling defendants if [non-settling defendant] is later found liable in its own action with the government."); *Union Elec. Co.*, 64 F.3d at 1167 (holding because "disposition of the present litigation could bar or reduce the monetary value of the contribution claims of the prospective intervenors against the settling PRPs . . . [t]he prospective intervenors here therefore have a sufficient stake in the litigation to be allowed to intervene."); *Aerojet General Corp.*, 606 F.3d at 1152 (because "non-settling PRPs may be held jointly and severally liable for the entire amount of response costs minus the amount of the settlement . . . it is highly likely the amount [settling defendants] pay[] in settlement will affect the amount the non-settling PRPs ultimately have to pay . . . .").

A significant, protectable interest is also affected where EPA applies a formula or tiering to include some parties in a settlement and unfairly exclude others. *See United States v. ExxonMobil Corp.*, No. 1:07-cv-00060, 2007 WL 4563490 at *4 (D.N.H. Dec. 20, 2007) (holding non-settling defendant had presented "a protectable interest that may be impaired by entry of the Consent

Decree" where the defendant "challenges the fairness of the formula used by the EPA to rank the contribution interests of PRPs, and, correspondingly, used to determine eligibility of de minimis contributors to take part in the [settlement].").

Pharmacia has several, significant interests that will be impacted by EPA's proposed Consent Decree and the related proceedings in the EPA Action, any one of which would provide a sufficient basis for intervention.

### 4. Pharmacia's interests are not adequately represented by an existing party in the litigation.

Neither the government nor the settling defendants adequately represent the interests of Pharmacia.  Under Rule 24(a)(2), "persons seeking intervention need only carry a minimal burden of showing that their interests are inadequately represented by the existing parties," and "[i]n the CERCLA context, the burden rests with the government to demonstrate that [Pharmacia's] interests are sufficiently represented."  *Union Elec. Co.,* 64 F.3d at 1168; *Acton*, 131 F.R.D. at 433 (same); *Albert Inv. Co*., 585 F.3d at 1399 (same).  The Court must "compare the interests of proposed intervenors with the interests of current parties."  *Union Elec. Co*., 64 F.3d at 1169.

Pharmacia has an interest in avoiding inconsistent allocation results which would flow from the use of fundamentally different allocations and the possible resolution of all claims against the Settling Parties in the EPA Action that is not shared by the Settling Parties or EPA.  *See Aerojet General Corp*., 606 F.3d at

26

1153 (settling PRPs "wish to limit their share of liability and to bar the non-settling PRPs from obtaining contribution" and thus their "interests are directly opposed" to non-settling PRPs); *Atlantic Richfield*, 2009 WL 2971483 at *3 ("The government has an interest in optimizing reimbursement for cleanup costs and [settling defendant] has an interest in limiting their own liability.  It cannot be argued that either of these interests coincide with [non-settling defendant]").  No current party in the EPA Action adequately represents the interests of Pharmacia.

Pharmacia meets all four requirements for intervention as of right – timeliness, interest, impairment, and inadequate representation.  Accordingly, the Court should grant Pharmacia's motion for intervention pursuant to CERCLA § 113(i) and Rule 24(a)(2).

### B.   In The Alternative, The Court Should Grant Pharmacia Permissive Intervention.

In addition to being entitled to intervene as of right in this matter pursuant to CERCLA § 113(i) and F.R.C.P. 24(a)(2), Pharmacia should be allowed to intervene permissively under Federal Rule of Civil Procedure 24(b).  Rule 24(b) in relevant part provides for permissive intervention of parties "[u]pon timely motion" when the applicant "has a claim or defense that shares with the main action a common question of law or fact."  Additionally, the Court considers whether prejudice and delay would result from the intervention.  *Id.*

27

Even where a common claim or defense is not obvious, permissive intervention is appropriate where the intervenor has an economic interest at stake. *See* 7C Charles Alan Wright *et al*., Federal Practice and Procedure, § 1911 at 452 (3d ed. 2022) ("Permissive intervention may be permitted where the intervenor has an economic interest in the outcome of the suit."); *Continental Casualty Co. v. SSM Grp., Inc.,* No. 94-7789, 1995 WL 422780 at *5 (E.D. Pa. July 13, 1995) ("The court acknowledges that Movants' motivation for intervening is purely economic. Purely economic interests may, however, constitute grounds for intervention.").

Here, as set forth above, Pharmacia's motion is timely. Further, there clearly are common issues of law or fact. Pharmacia is seeking to intervene because it has numerous interests which will be impacted by entry of the Consent Decree including: the use and application by EPA of the EPA Sponsored Allocation to guide EPA's settlement decisions; the termination of the Passaic Consent Orders; the equitable allocation of contribution shares by the Court in the OxyChem Litigation; and consistent application of the EPA Sponsored Allocation. Resolution of these issues will affect Pharmacia's liability in a $1.82 billion cleanup. Pharmacia plainly has an economic interest in the outcome of the EPA Action.

Further, intervention would not cause undue prejudice or delay.  While "additional parties always take additional time," the Court should not deny a motion for intervention where the intervenor would "bring no extrinsic or collateral issues to this litigation."  *Continental Casualty*, 1995 WL 422780 at *6; *Union Elec.*, 64 F.3d at 1158-59.  As "[t]he goals of accuracy and fairness are served" by allowing Pharmacia to intervene and protect its interests, Pharmacia should be allowed to intervene pursuant to Rule 24(b).  *Continental Casualty*, 1995 WL 422780 at *6.

## IV.  <u>CONCLUSION</u>

EPA is poised to resolve the liability 85 parties for $150 million at a Site that EPA estimates it will cost an additional $1.82 billion to remediate.  As a non-settling party left to litigate with OxyChem (the party with 99.94% of the responsibility under the EPA Sponsored Allocation) Pharmacia clearly has several significant interests that will be affected by the EPA Action.  Pharmacia should be allowed to intervene as of right and participate fully in the EPA Action.

Respectfully submitted,

By: /s/ *John F. Gullace*

    John F. Gullace, Esq.
    Bryan P. Franey, Esq.
    Danielle N. Bagwell, Esq.
    MANKO, GOLD, KATCHER & FOX LLP
    Three Bala Plaza East, Suite 700
    Bala Cynwyd, PA 19004
    Telephone: (484) 430-5700
    Facsimile: (484) 430-5711

    *Attorneys for Intervenor Pharmacia LLC*

Dated:  January 20, 2023

## <u>CERTIFICATE OF SERVICE</u>

I, John F. Gullace, hereby certify that, on this date, I caused a copy of the

foregoing document to be served via electronic filing on all counsel of record.


Dated: January 20, 2023            /s/ John F. Gullace
                                   MANKO, GOLD, KATCHER & FOX, LLP
                                   John F. Gullace, Esq.
                                   Three Bala Plaza East, Suite 700
                                   Bala Cynwyd, Pennsylvania 19004
                                   (484) 430-5700
                                   jgullace@mankogold.com