ANDREW W. KEIR
LAURA J. ROWLEY
SCOTT BAUER
U.S. Department of Justice
Environment and Natural Resources Division
Environmental Enforcement Section
P.O. Box 7611, Ben Franklin Station
Washington, D.C.  20044-7611
(202) 532-5107

ALEX SILAGI
Assistant United States Attorney
District of New Jersey
United States Attorney's Office
970 Broad Street, 7th Floor
Newark, New Jersey 07102
(973) 353-6001

*Counsel for Plaintiff United States of America*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )     Civil Action No.  2:22-cv-07326 |
| | ) |
| ALDEN LEEDS, INC., *et al.* | ) |
| | ) |
| Defendants. | ) |
| | ) |
| PASSAIC VALLEY | ) |
| SEWERAGE | ) |
| COMMISSIONERS, *et al.,* | ) |
| | ) |
| Intervenors. | ) |
| | ) |

## MEMORANDUM IN SUPPORT OF UNITED STATES OF AMERICA'S
## MOTION TO ENTER CONSENT DECREE

# TABLE OF CONTENTS

TABLE OF CONTENTS ....................................................................................... i
TABLE OF AUTHORITIES ............................................................................ iii
INTRODUCTION ............................................................................................... 1
BACKGROUND ................................................................................................. 5

I.   CERCLA ................................................................................................... 5

II.   OU2 AND OU4, THE 17-MILE LOWER PASSAIC RIVER AS PART OF THE DIAMOND ALKALI SUPERFUND SITE ........................................ 6

   A.   SITE HISTORY .................................................................................... 6

   B.   OU2 ........................................................................................................ 8

   C.   OU4 ...................................................................................................... 10

   D.   PRPS FOR OU2 AND OU4 ............................................................... 11

      1.   Occidental Chemical Corporation ................................................ 11

      2.   Other PRPs ...................................................................................... 13

      3.   Relative Responsibility Among PRPs for Settlement Purposes ............... 13

   E.   ENFORCEMENT EFFORTS TO DATE ........................................... 15

   F.   THE ALLOCATION ............................................................................ 16

   G.   THE SETTLEMENT PROCESS ....................................................... 19

   H.   THE AMENDED COMPLAINT AND PROPOSED (MODIFIED) CONSENT DECREE ........................................................................... 24

ARGUMENT ................................................................................................... 26

III.   LEGAL STANDARD ........................................................................... 26

IV.   THE COURT SHOULD ENTER THE CONSENT DECREE ................... 27

   A.   THE CONSENT DECREE IS FAIR .................................................. 27

      1.   The Consent Decree is Procedurally Fair .................................... 28

      2.   The Consent Decree is Substantively Fair ................................... 30

   B.   THE CONSENT DECREE IS REASONABLE ................................. 33

   C.   THE CONSENT DECREE ADVANCES THE GOALS OF CERCLA ....... 34

   D.   THE PUBLIC COMMENTS PROVIDE NO BASIS FOR REJECTING THE CONSENT DECREE ........................................... 36

      1.   The Public is Being Adequately Compensated ........................... 37

      2.   The United States Modified the Proposed Consent Decree in Response to Certain Comments from OxyChem; OxyChem's Remaining Comments are

Incorrect, Irrelevant, and Do Not Provide a Basis for Rejecting the modified proposed Consent Decree .................................................................. 38

    i.    The AlterEcho Allocation is Neither an NBAR nor Binding ................. 41

    ii.    The AlterEcho Allocation Does Not Encroach on the Court's Authority under CERCLA Section 113(f)(1) ....................................................... 42

    iii.    Contribution Protection is Legal and Appropriate ................................ 42

    iv.    The Settlement is not Collusive. ........................................................... 43

    v.    OxyChem's Comments Supported by Purported Expert Opinions Fail to Demonstrate that the Allocation is Arbitrary, Capricious, and Devoid of a Rational Basis ....................................................................................... 45

E.    THE UNITED STATES IS DISCLOSING AN ALLEGATION OF AN ETHICS VIOLATION AGAINST DAVID BATSON; THE DISCLOSURE DOES NOT ALTER THE UNITED STATES' REQUEST THAT THE COURT ENTER THE CONSENT DECREE. .............................................................................. 47

CONCLUSION ............................................................................................................... 50

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*55 Motor Avenue Co. v. Liberty Industrial Finishing Corp.,*
  332 F. Supp. 2d 525 (E.D.N.Y. 2004) ................................................................. 28

*Citizens for a Better Environment v. Gorsuch,*
  718 F.2d 1117 (D.C. Cir. 1983) ........................................................................... 35

*Diamond Shamrock Chems. Co. v. Aetna Cas. & Sur. Co.,*
  258 N.J. Super. 167, 609 A.2d 440 (App. Div. 1992), *certif. denied,*
  134 N.J. 481, 634 A.2d 528 (1993) ........................................................ 11, 12, 13

*Emhart Industries, Inc. v. U.S. Dept. of the Air Force, et al.,*
  988 F.3d 511 (1st Cir. 2021) ............................................................................... 14

*Environmental Transportation Sys., Inc. v. ENSCO, Inc.,*
  969 F.2d 503 (7th Cir. 1992) ............................................................................... 39

*Girsh v. Jepson,*
  521 F.2d 153 (3d Cir. 1975) ................................................................................ 34

*Maxus Energy Corp. v. United States,*
  898 F. Supp. 399 (N.D. Tex. 1995) ..................................................................... 13

*New Jersey Dep't. of Environmental Prot. v. Occidental Chemical Corp.,*
  Docket No. ESX-L9868-05 (N.J. Super. Ct. Law. Div. July 19, 2011) ................... 12

*New Jersey Turnpike Authority v. PPG Industries, Inc.,*
  197 F.3d 96 (3d Cir. 1999) .................................................................................. 12

*New York v. Next Millennium Realty, LLC,*
  2016 WL 11189177 (E.D.N.Y. June 1, 2016) ....................................................... 30

*New York v. Next Millennium Realty, LLC,*
  2016 WL 11189972 (E.D.N.Y. Feb. 9, 2016) ................................................. 39, 40

*Nw. Environmental Defense Ctr. v. United States Army Corps of Engineers,*
  2019 WL 2372591 (D. Or. June 5, 2019) ............................................................. 49

*Seggos v. Datre,*
  2019 WL 13180721 (E.D.N.Y. 2019) ................................................................... 27

*State of New York v. Air-Flo Mfg. Co.*,
  2004 WL 1563081 (W.D.N.Y. June 3, 2004) ....................................................... 6, 26

*In re Tutu Water Wells CERCLA Litigation*,
  326 F.3d 201 (3d Cir. 2003) ............................................................................. passim

*United States v. Akzo Coatings of America, Inc.*,
  949 F.2d 1409 (6th Cir. 1991) ............................................................................ 35, 46

*United States v. BASF-INMONT Corp.*,
  819 F. Supp. 601 (E.D. Mich. 1993) ......................................................................... 26

*United States v. BP Amoco Oil PLC*,
  277 F.3d 1012 (8th Cir. 2002) ................................................................................... 43

*United States v. Cannons Engineering Corp.*,
  899 F.2d 79 (1st Cir. 1990) ............................................................................... passim

*United States v. Cannons Engineering Corp.*,
  720 F. Supp. 1027 (D. Mass. 1989), *aff'd*,
  899 F.2d 79 (1st Cir. 1990) ................................................................................ 28, 29

*United States v. Charter International Oil Co.*,
  83 F.3d 510 (1st Cir. 1996) ...................................................................................... 34

*United States ex rel. Cherry Hill Convalescent, Ctr., Inc. v. Healthcare Rehab Systems, Inc.*,
  994 F. Supp. 244 (D.N.J. 1997) ................................................................................ 50

*United States v. City of Fort Lauderdale*,
  81 F. Supp. 2d 1348 (S.D. Fla. 1999) ....................................................................... 26

*United States v. Clark*,
  333 F. Supp. 2d 789 (E.D. Wis. 2004) ..................................................................... 49

*United States v. Cornell-Dubilier Electronics, Inc.*,
  2014 WL 4978635 (D.N.J. Oct. 3, 2014) ............................................................. 33, 34

*United States v. Davis*,
  11 F. Supp. 2d 183 (D.R.I. 1998), *aff'd*,
  261 F.3d 1 (1st Cir. 2001) ........................................................................................ 46

*United States v. GenCorp, Inc.*,
  935 F. Supp. 928 (N.D. Ohio 1996) ............................................................ 14, 30, 44, 45

*United States v. Grand Rapids, Michigan*,
  166 F. Supp. 2d 1213 (W.D. Mich. 2000) ................................................................. 45

*United States v. Hooker Chem. & Plastics Corp.,*
    776 F.2d 410 (2d Cir. 1985) ................................................................. 26

*United States v. IMC Eastern Corp.,*
    627 F. Supp. 3d 166 (E.D.N.Y. 2022) ............................................ passim

*United States v. Kramer,*
    19 F. Supp. 2d 273 (D.N.J. 1998) ................................................... passim

*United States v. Occidental Chemical Corp.,*
    200 F.3d 143 (3d Cir. 1999) ........................................................... 25, 27

*United States v. Rohm & Haas Co.,*
    721 F. Supp. 666 (D.N.J. 1989) ................................................ 28, 34, 46

*United States v. Southeastern Pennsylvania Transportation Auth.,*
    235 F.3d 817 (3d Cir. 2000) ........................................................... passim

*Walsh Securities, Inc. v. Cristo Property Mgmt., Ltd.,*
    7 F. Supp. 2d 523 (D.N.J. 1998) ............................................................ 50

## Statutes

5 U.S.C. § 571 .......................................................................................... 16

18 U.S.C. § 207(a)(1) ......................................................................... 48, 49

18 U.S.C. § 216 ....................................................................................... 49

42 U.S.C. § 9604(e) ................................................................................. 29

42 U.S.C. § 9605 ....................................................................................... 7

42 U.S.C. § 9613(f)(2) ............................................................................ 16

42 U.S.C. § 9613(g)(2) ............................................................................ 24

42 U.S.C. § 9622(e)(3) ....................................................................... 41, 42

42 U.S.C. §§ 9606, 9607, 9613 ................................................................. 1

42 U.S.C. §§ 9606, 9607(a) .................................................................... 24

42 U.S.C. §§ 9606, 9607(a), 9613(f)(2) ................................................... 2

## Regulations

5 C.F.R. § 2641.105(a) ............................................................................ 49

## **Rules**

Fed. R. Civ. P. 54(b) ............................................................................................ 5

## **Other Authorities**

87 Fed. Reg. 78710 (2022) ............................................................................... 2, 4

88 Fed. Reg. 2133 (2023) .................................................................................... 2

New Jersey Executive Order No. 40 (1983) ....................................................... 7

## INTRODUCTION

This case is only one part of EPA's multi-decade cleanup and enforcement effort for the Diamond Alkali Superfund Site ("Site").  This ongoing cleanup and enforcement effort began when dioxin contamination from the former Diamond Alkali facility at 80 Lister Avenue in Newark (the "Diamond Alkali facility") was first discovered in 1983.  Intervenor Occidental Chemical Corporation ("OxyChem" or "OCC") is the corporate successor to the CERCLA liability arising from the Diamond Alkali facility, and therefore "as a matter of law … OxyChem may be held liable for CERCLA response costs flowing from [Diamond Alkali's] operation of the Lister Plant."  *Occidental Chem. Corp. v. 21st Century Fox Am., et al.*, Civil Action No. 18-11273, ECF No. 1105 at 4 (Order Granting in Part Defs.' Motion for Summary Judgment).

The instant case, resolving claims under Sections 106, 107, and 113 of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended ("CERCLA"), 42 U.S.C. §§ 9606, 9607, 9613, concerns the share of responsibility for 82 parties (the "Settling Defendants") for two parts of the Site: Operable Unit 2 ("OU2") and Operable Unit 4 ("OU4").  Based in part on the results of an allocation sponsored by EPA and conducted by a neutral to add fairness and transparency to the settlement process, EPA concluded these 82 parties, the Settling Defendants in this action, bear only a relatively minor share of the responsibility for OU2 and OU4.  After reviewing the Allocation Recommendation Report and considering how to use it as a basis for cashout settlements, the United States made meaningful substantive adjustments to the recommended allocation

shares of the Settling Defendants to increase the fairness to non-settling parties, maximize the recovery and account for the risk of entering a settlement before the cleanup is implemented.

The settlement, memorialized in the proposed modified Consent Decree, requires the Settling Defendants to pay $150 million of the response costs for the cleanup of OU2 and OU4.  In exchange, the United States will provide the Settling Defendants with a covenant not to sue or take administrative action under Sections 106 and 107(a) of CERCLA, relating to OU2 and OU4, as well as statutorily authorized contribution protection under Section 113(f)(2) of CERCLA, for releases of hazardous substances from the facilities in Appendix A of the Consent Decree. ECF No. 283 at ¶¶ 13-14, 23; 42 U.S.C. §§ 9606, 9607(a), 9613(f)(2). The settlement captures the Settling Defendants' fair share of responsibility for OU2 and OU4. *See* Exh. 4, Declaration of Alice Yeh ("Yeh Decl.") ¶ 60.

In December 2022, the United States lodged the original Consent Decree and gave notice in the Federal Register soliciting public comments for a total of 90 days. 87 Fed. Reg. 78710, 88 Fed. Reg. 2133.  Also in December 2022, EPA made almost 700,000 pages of documents supporting the settlement available on its public website.  *See* Yeh Decl. ¶ 62.  The United States received 53 comments.  *See* Exh. 2, Declaration of Andrew Spohn ("Spohn Decl.") ¶ 14.  Several comments expressed support for the cleanup of the Passaic River, and a desire that potentially responsible parties ("PRPs"), and not the public, fund that cleanup.  *See* Exh. 3, Responsiveness Summary ("RS"), RS 2, 8.  OxyChem, which had declined EPA's

invitation to participate in the allocation, filed hundreds of pages of comments, primarily objecting to the allocation that was the foundation for the settlement. *See infra* § IV.D. After a careful review and evaluation of all comments, the United States concluded that modifications of the settlement were appropriate to ensure that the Consent Decree is fair, reasonable, and consistent with the goals of CERCLA. *See* ECF No. 272 at 2. After making the changes and obtaining the assent and signatures from the Settling Defendants on the modified Consent Decree, the United States filed it with this Court on January 17, 2024. *See* ECF No. 283. The United States will not seek public comment on the modified Consent Decree, as the changes are a direct response to the public comments previously submitted.

The Court should enter this Consent Decree because, as described below, it is fair, reasonable, and consistent with the goals of CERCLA. When the United States crafts a CERCLA settlement that is based on an underlying allocation, that allocation must be rational. *See In re Tutu Water Wells CERCLA Litigation*, 326 F.3d 201, 207 (3d Cir. 2003); *United States v. Se. Pa. Transp. Auth. (SEPTA)*, 235 F.3d 817, 823 (3d Cir. 2000). Here, the underlying allocation was rational because it was based on judicial precedent and customary allocation practice, applying site specific factors such as the mass and relative degree of toxicity of contributed waste, and the equitable distribution of responsibility for contaminants not attributable to any of the allocation parties. *See id*; *see also* Yeh Decl. at ¶ 45; Exh. 7, Declaration of Chris Wittenbrink (Wittenbrink Decl.) ¶¶ 9, 13-15.

3

The settlement addresses the Settling Defendants' liability for OU2 and OU4 of the Site and is consistent with the vast amount of information on releases of hazardous substances into the Passaic River, and responsibility for those releases, as well as the risks to human health and the environment posed by the releases of hazardous substances into the Passaic River. *See* Yeh. Decl. at ¶¶ 39, 62, 63; Exh. 6, Declaration of Michael Sivak ("Sivak Decl.") ¶¶ 33-43.

The subject of the United States' solicitation for public comments was the proposed Consent Decree. *See* 87 Fed. Reg. 78710 ("The publication of this notice opens a period for public comment on the Consent Decree.") In response to that solicitation, Intervenor OxyChem offered prolific comments, but the comments consist primarily of highly dense, specific technical criticisms and attacks on the allocation. OxyChem opted out of the allocation, and later brought these comments to the United States. The United States has nevertheless fully met any obligation to consider and respond to all these comments on, *inter alia*, the allocation, *see* Exh. 3, Responsiveness Summary ¶¶ 9 – 131, even though most do not raise facts or considerations relevant to whether the Consent Decree is fair, reasonable, and consistent with the goals of CERCLA. *See* ECF No. 283, ¶ 42. The Consent Decree, while built upon the rational foundation of the allocation, is a distinct instrument. To reach the settlement in the Consent Decree, the United States and Settling Defendants negotiated multiple substantive adjustments to the allocation's recommendations. *See infra* § II.G. The allocation recommends that the Settling Defendants bear approximately 2 percent of the responsibility for the cleanup of

OU2.  *See* Yeh Decl. ¶ 57.  But, as a result of the adjustments, under the proposed

Consent Decree, the Settling Defendants will pay approximately 8 percent of the

estimated cost to implement the cleanup of OU2 and OU4.[1]  *See id.*

If this Court enters it, the modified Consent Decree will resolve the United

States' allegations in the Amended Complaint that Defendants are liable under

Sections 106, 107, and 113 CERCLA, for injunctive relief, response costs incurred

and to be incurred in connection with OU2 and OU4 of the Site, and declaratory

judgment.  *See* Amended Complaint, ECF No. 282. For the reasons set forth in this

brief, supported by declarations and a Responsiveness Summary addressing the

public comments, the United States respectfully requests that the Court sign and

enter the modified proposed Consent Decree as a final judgment under Federal Rule

54(b) of Civil Procedure.

## BACKGROUND

### I.    CERCLA

In 1980, Congress enacted CERCLA to "ensure the cleanup of the nation's

hazardous waste sites."  *In re Tutu Water Wells CERCLA Litig.*, 326 F.3d 201, 206

(3d Cir. 2003); *see also* Sivak Decl. at ¶¶ 7-10.  In addition to its broad remedial

purpose, CERCLA was designed to ensure that the parties responsible for the

contamination "bear the costs and responsibility" of their actions.  *See In re Tutu

Water Wells*, 326 F.3d at 206. A goal of the statute is to encourage early settlement

---

[1] $150 million is approximately 8% of the estimated cost of the cleanup remedies for OU2 and OU4 ($1.84 billion).  The $1.84 billion is an estimate and the actual cost of implementing the remedies could be higher or lower.  As explained below, the $150 million includes a "premium" of 100% to account for the risk of cost overruns.

and minimize litigation.  *See United States v. IMC E. Corp., et al.*, 627 F. Supp. 3d

166, 173 (E.D.N.Y. 2022).  The overarching public policy in favor of settlements is

particularly strong under CERCLA and where, as here, "a government actor

committed to the protection of the public interest has pulled the laboring oar in

constructing the proposed settlement."  *United States v. Cannons Eng'g Corp.*, 899

F.2d 79, 84 (1st Cir. 1990); *see also New York v. Air-Flo Mfg. Co.*, No. 02-CV-762S,

2004 WL 1563081, at *1 (W.D.N.Y. June 3, 2004).  EPA may pursue a variety of

types of settlements to resolve its CERCLA claims, including consent decrees

providing for PRPs to contribute to cleanup costs, or to undertake cleanup activities

themselves.  *See id.*

## II.    OU2 AND OU4, THE 17-MILE LOWER PASSAIC RIVER AS PART OF THE DIAMOND ALKALI SUPERFUND SITE

### A.  SITE HISTORY

In 1983, as part of EPA's National Dioxin Strategy, the Diamond Alkali

facility was sampled for dioxin, which, along with other hazardous substances, was

found at the facility, at other properties in the area, and in samples collected from

the Lower Passaic River, which borders the facility.  *See* Yeh Decl. ¶¶ 6, 7.

The Diamond Alkali Superfund Site is so named because of the (extremely

dangerous) conditions discovered in the soil and groundwater at the Diamond Alkali

facility from the disposal of dioxin (specifically, 2,3,7,8-Tetrachlorodibenzo-p-dioxin

a.k.a. "2,3,7,8-TCDD").  Of the contaminants of concern in OU2 and OU4 that pose a

risk to human health and the environment, 2,3,7,8-TCDD is the most potent and

toxic by an overwhelming margin.  *See* Sivak Decl. ¶¶ 49-52.  In 1983, sampling

6

results revealed high concentrations of dioxin at the Diamond Alkali facility. The facility was evacuated, secured and guarded 24 hours a day. *See* OU1 ROD, Present Status, page 13, available at https://semspub.epa.gov/work/02/83052.pdf. In response to the sampling results showing the 2,3,7,8-TCDD contamination at the former Diamond Alkali facility, in 1983, the Governor of New Jersey issued an executive order authorizing the New Jersey Department of Environmental Protection to engage in emergency measures "necessary in order to fully and adequately protect the health, safety and welfare of the citizens" of New Jersey. *See* Yeh Decl. ¶ 7 (citing New Jersey Executive Order No. 40, 1983). EPA and NJDEP initiated several emergency response actions including securing the Lister Avenue property, covering the exposed soils to prevent migration, and addressing dioxins found on nearby properties through excavation, vacuuming, and other means. *See id*. With the issuance of a Record of Decision ("ROD") for OU1, EPA began the decades-long remediation efforts to address the 2,3,7,8-TCDD and other hazardous substances on the property at the Diamond Alkali facility, and released into the Passaic River by Diamond Alkali. *See id*. ¶¶ 6, 8.

In 1984, EPA listed the Site on the EPA Superfund Program's National Priorities List ("NPL"), established under Section 105 of the CERCLA, 42 U.S.C. § 9605. *See* Yeh Decl. ¶ 6. Like all Superfund sites, this Site is defined by the areal extent of contamination and while the Diamond Alkali facility was the first area to be addressed, EPA subsequently investigated how the contamination spread to the Lower Passaic River and Newark Bay. *See* Sivak Decl. ¶ 11.

The river portion of the Site flows through Essex, Hudson, Passaic, and Bergen counties, including through multiple communities with environmental justice concerns. *See* Yeh Decl. ¶ 6. So that EPA can manage its investigation and cleanup, the Site is currently divided into the following four operable units:

- OU1 is the Lister Avenue plant (the former Diamond Alkali Company facility), and an adjacent parcel at 120 Lister Avenue. *See* Yeh Decl. ¶ 6.

- OU2 is the lower 8.3 miles of the Lower Passaic River Study Area ("LPRSA"). *See id.* ¶ 6.b.

- OU3 is the Newark Bay Study Area. *See id.* ¶ 6.c. EPA has not yet selected a remedial action for OU3. *See* Sivak Decl. ¶ 6, n.1.

- OU4 is the LPRSA, which is the 17-mile tidal reach of the Passaic River from Newark Bay to Dundee Dam near Garfield, New Jersey, including the lower 8.3 miles of the LPRSA. *See* Yeh Decl. ¶ 6.d.

The Consent Decree resolves the liability of the Settling Defendants for OU2 and OU4.[2] ECF No. 283, ¶ 6.

### B. OU2

EPA originally approached the full 17-mile LPRSA as a single study area and entered into a settlement agreement with PRPs to perform the Remedial Investigation and Feasibility Study. *See* Yeh Decl. ¶¶ 10, 11. However, early data raised particular concerns about contamination in the lower 8.3-mile portion. *See*

---

[2] Certain Settling Defendants resolved their liability for OU2 in a prior administrative settlement; therefore, these Settling Defendants are resolving their liability for OU4 only through the proposed Consent Decree. *See* ECF No. 283, ¶ 6.

*id.* ¶ 11.  For that reason, EPA conducted an Agency-funded Remedial Investigation

and Focused Feasibility Study, which showed that 90% of the volume of

contaminated sediments is found in the lower 8.3 miles of the LPRSA and that

those sediments are a major source of contamination to the rest of the LPRSA and

Newark Bay, largely due to sediment transport and mixing caused by the tidal

nature of the Lower Passaic River.[3]  *See id.*  As a result, EPA selected a cleanup

remedy to address contaminated sediments in the lower 8.3 miles of the river while

the comprehensive study of the 17-mile LPRSA continued.  *See id.* ¶ 12.

On March 3, 2016, EPA issued a ROD[4]  setting forth its selected remedy for

OU2.  *See* Yeh Decl. ¶ 16.  The remedy will include, among other things, an

engineered cap to be constructed bank-to-bank over the river bottom of the lower 8.3

miles.  *See id.*  To avoid increasing the potential for flooding and to accommodate

the Congressionally-authorized navigation channel in the 1.7 miles of the river

closest to Newark Bay, the river will be dredged to various depths before the cap is

installed, with the dredged material disposed of offsite.  *See id.*

In the OU2 ROD, EPA found many hazardous substances in sediments in the

lower 8.3 miles but identified eight contaminants of concern ("COCs") that pose the

greatest potential risks to human health and the environment: dioxins/furans,

---

[3] Tidal action and other forces have distributed (and continue to redistribute)
contaminated sediments throughout the Lower Passaic River.  This is particularly
true of the lower 8.3 miles, where fine-grained sediments readily bind to
contaminants of concern ("COCs") and daily tides resuspend and transport
contaminated sediments.  As a result, dioxin, PCBs and other COCs are found
throughout the entirety of the lower 8.3 miles. *See* Medine Decl. ¶¶ 9, 14-15, 20-24.
[4] The OU2 ROD is available at https://semspub.epa.gov/work/02/396055.pdf.  The
OU4 ROD is available at https://semspub.epa.gov/work/02/630399.pdf.

PCBs, mercury, DDT (and its breakdown products), PAHs, dieldrin, copper, and

lead. Based on EPA's human health and ecological risk assessments, of those eight

COCs, dioxins/furans are responsible for as much as 81% to 94% of the risks,

relative to the risks the other COCs pose. *See* Yeh Decl. ¶ 16. PCBs are responsible

for as much as 5% to 16% of the risks. *See id*. The estimated cost of the remedy for

OU2 is $1.38 billion. *See id*. OxyChem, under an administrative settlement

agreement and order on consent, is performing, under EPA oversight, the remedial

design for the remedial action selected in the ROD for OU2. *See id*. ¶ 23.

### C.  OU4

In September 2021, EPA issued the OU4 ROD with an interim remedy for

the upper 9 miles of the LPRSA. *See* Exh. 5, Declaration of Diane Sharkey

("Sharkey Decl.") ¶ 13. Based on remedial investigation activities, the feasibility

study, and risk assessments for OU4, the primary human health and ecological risk

drivers for the upper 9 miles of the LPRSA are dioxins and total PCBs. *See id*. ¶ 14.

These contaminants are the focus of the OU4 interim remedy, which will involve the

targeted dredging and capping of sediment source areas (or, colloquially, "hot

spots") in the upper 9 miles with elevated concentrations of dioxins and PCBs, to

prevent those sediments from contaminating other parts of the LPRSA. *See id*. The

interim remedy also involves the offsite disposal of dredged material and other

measures such as institutional controls. *See id*. Other contaminants of concern

that are present in OU4 are the same as those in OU2: mercury, DDT (and its

breakdown products), PAHs, dieldrin, copper, and lead. *See id*. ¶ 7. The OU4

interim remedy and the OU2 remedy are consistent with each other and address

the risks posed by the releases of contaminants into the Lower Passaic River.  *See*
*id.* ¶¶ 14, 16.

The OU4 interim remedy will immediately reduce contamination in the
sediments of the upper 9 miles, and accelerate recovery of the water column and the
areas of the sediment bed outside the remediation area and reduce biota exposure to
contaminants.  *See* Sharkey Decl. ¶ 27.  The interim remedy will be followed by a
period of response and recovery assessment monitoring to evaluate the response of
the Lower Passaic River.  *See id.* ¶ 19.  Based on evaluation of the long-term
monitoring data, EPA will assess the need for additional action(s) to achieve final
cleanup.  *See id.* ¶ 19.  The estimated cost of the OU4 remedy is $441 million.  *See*
*id.* ¶ 24.

### D.  PRPS FOR OU2 AND OU4

#### 1.  Occidental Chemical Corporation

OxyChem's corporate predecessor, Diamond Alkali, manufactured phenoxy
herbicides, including Agent Orange for the Vietnam War, at the Diamond Alkali
facility, which is OU1 of the Site.  The purpose of Agent Orange was to defoliate
jungles in Vietnam, "to permit detection of enemy forces and a clear line of fire."
*Diamond Shamrock Chems. Co. v. Aetna Cas. & Sur. Co.*, 258 N.J. Super. 167, 242,
609 A.2d 440, 477 (App. Div. 1992), *certif. denied*, 134 N.J. 481, 634 A.2d 528 (1993).
It is unsurprising that 2,3,7,8-TCDD, the dioxin byproduct of manufacturing a
chemical *intended* to kill plant life, is more toxic to human health and the
environment than other contaminants found in sediments in the Lower Passaic
River.  Unfortunately, rather than handle its waste with care, Diamond Alkali's

waste disposal practices were appalling, even in the context of their time. *See id.* at 183, 448 (describing a policy of "'dumping everything' into the Passaic River").

The details of Diamond Alkali's misconduct that resulted in the devastating environmental harm that is this Superfund Site are well known after having been the subject of much litigation that created an extensive record. The State of New Jersey established that OxyChem is jointly and severally liable for all costs it incurred for the Diamond Alkali Site under the Spill Act, New Jersey's environmental protection act that resembles CERCLA in its purpose. *See New Jersey Dept. of Env. Prot., et al. v. Occidental Chem. Corp., et al.*, Superior Court of New Jersey Law Division – Essex County, Docket No. ESX-L9868 (PASR) Order Partially Granting Plaintiff's Motion for Partial Summary Judgment Against Occidental Chem. Corp., Maxus Energy Corp. and Tierra Solutions, Inc., copy found at ECF No. 84-2; *New Jersey Tpk. Auth. v. PPG Indus., Inc.*, 197 F.3d 96, 105 (3d Cir. 1999) (the Spill Act resembles CERCLA).

The Superior and appellate courts in New Jersey decided that the Diamond Alkali facility's insurer need *not* provide coverage for the liability at the Site. *Diamond Shamrock Chems. Co. v. Aetna Cas. & Sur. Co.*, 258 N.J. Super. 167, 180, 609 A.2d 440, 446 (App. Div. 1992), *certif. denied*, 134 N.J. 481, 634 A.2d 528 (1993). In that case, former plant employees testified "concerning Diamond's waste disposal policy" of releasing waste into the Passaic River. *Id.* at 447-48. The court described its decision as "disarmingly simple," stating that the record showed "Diamond intentionally and knowingly discharged hazardous pollutants with full awareness of

their inevitable migration to and devastating impact upon the environment . . . .
[T]he insuring agreements did not cover losses resulting from Diamond's deliberate
and willful course of misconduct." *See id*. at 454-55. The 2,3,7,8-TCDD and other
toxic byproducts generated by OxyChem's predecessor Diamond Alkali, in
conjunction with the dumping of its waste material into the river, explains the large
amount of 2,3,7,8-TCDD found in OU2 and OU4, and created the Diamond Alkali
Superfund Site, one of the largest and most expensive Superfund sites in the
nation.[5]

### 2.  Other PRPs

Starting in the 1990s, EPA worked on identifying other facilities that
released or potentially released hazardous substances into the river. *See* Yeh Decl.
¶ 14. EPA has notified over 100 other parties of their potential responsibility for
releases of hazardous substances into the river. *See id.* Frequently, EPA
investigated parties in response to requests from OxyChem and/or its indemnitor,
which often did its own investigation and provided EPA the results. *See id.*

### 3.  Relative Responsibility Among PRPs for Settlement Purposes

When a Superfund site like this one involves many PRPs, it may be difficult
or impractical for EPA to either litigate with them all or settle in a manner that
would have many or all parties performing the cleanup. Often, PRPs cooperate

---

[5] Separately, OxyChem's indemnitor failed to establish that the United States is
liable for its manufacture of Agent Orange and resulting disposal of dioxin and
other contaminants, because the United States did not control or participate in the
waste disposal decisions by personnel at the Diamond Alkali facility. *See Maxus
Energy Corp. v. United States*, 898 F. Supp. 399, 408 (N.D. Tex. 1995).

among themselves to allocate their relative responsibility and determine which will

perform and which will help finance the remedy.  *See, e.g.*, *United States v.*

*GenCorp, Inc.*, 935 F. Supp. 928, 930-31 (N.D. Ohio 1996) (group of fourteen PRPs,

including OxyChem, engaged in voluntary non-binding arbitration to allocate site

costs and perform remedial activities, then settled with other PRPs).  A cooperative

process may result in settlements where one or a few PRPs implement the remedy,

while other PRPs provide a percentage of financing to support the cleanup or pay a

lump sum to cash out their liability for response costs.  *See id.* at 931.  Other times,

one or a few PRPs will step up to perform the cleanup at this Site, and those PRPs

will then pursue other PRPs in contribution settlements or litigation.  *See Emhart*

*Indus., Inc. v. U.S. Dept. of the Air Force, et al.*, 988 F.3d 511, 517 (1st Cir. 2021).

Either of these approaches can serve the policies underlying CERCLA and EPA's

goal of site cleanup.  *See In re Tutu Water Wells*, 326 F.3d 201, 206 (3d Cir. 2003)

("CERCLA provides the EPA with a 'variety of tools for achieving … cleanup'").

Neither happened at this Site.  *See* Yeh Decl. ¶¶ 24, 26.

     After selection of the remedy for OU2, EPA pursued an enforcement approach

designed to ensure an effective and timely implementation of the cleanup for OU2,

as well as a fair process for managing the large number of PRPs.  That approach

required decisions regarding which parties might appropriately be considered for

performance or financing of the work, and which might appropriately be considered

for cashout settlements.  *See* Yeh Decl. ¶ 21.  Given that the parties themselves had

not reached an agreement among themselves and had abandoned an allocation that

they had started, EPA proposed to hire a third-party neutral to perform an allocation of the private party PRPs to aid it in identifying parties that should perform and/or finance the OU2 cleanup and parties whose relative responsibility was small enough that they should be eligible for a cashout settlement. *See id.* ¶ 26. EPA initially intended to limit the process to allocating responsibility among so-called "middle tier" parties, i.e., those parties not associated with dioxins, furans, or PCBs, because parties associated with dioxins, furans, or PCBs would likely be "work parties." *See id.* ¶ 28. However, in response to feedback from the PRPs, EPA expanded the scope of the allocation to include all private noticed parties. *See id.* The United States was hopeful that OxyChem would join the allocation, but it declined to do so. *See id.* ¶ 34. Instead, OxyChem initiated litigation against over 100 other PRPs, which has been ongoing simultaneous with the EPA-sponsored allocation and settlement process. *See id.* ¶ 36; *Occidental Chemical Corporation v. 21st Century Fox America, et al.*, Civil Action No. 18-11273 (D.N.J.).[6]

### E. ENFORCEMENT EFFORTS TO DATE

While simultaneously studying the Site and selecting cleanup actions for OU2 and OU4, the United States has filed proofs of claim when PRPs file for

---

[6] In its comments, OxyChem misleadingly claims that it "made an offer to perform the entire OU2 and OU4 remedies just as CERCLA contemplates, requiring only that EPA would follow CERCLA by not purporting to settle away OxyChem's statutory contribution claims." Exh. 10, OxyChem Comments at 23. In truth, OxyChem has never made a tangible offer to perform the OU2 remedy. Its offer letter dated June 27, 2022, to which OxyChem's comment alludes, merely proposed to negotiate a series of agreements with OxyChem *"and other work parties"* to implement the OU2 and OU4 remedies. *See* ECF No. 110-3. This offer is nebulous and conditional, including upon the cooperation of other unidentified parties; it is not a real offer by OxyChem to perform the OU2 remedy.

bankruptcy and has reached administrative cashout settlements with certain minor PRPs. *See* Yeh Decl. ¶ 64. In 2016, United States filed proofs of claim and, along with OxyChem and other PRPs, sought to maximize the recovery for the Diamond Alkali Site in the bankruptcy of Maxus Energy Corporation, OxyChem's indemnitor. Through the Maxus bankruptcy proceeding, EPA has recovered approximately $78.8 million. *See id.* To date, these enforcement efforts have recovered over $116 million that will reduce the liability of all other PRPs at the Site. *See id.*; 42 U.S.C. § 9613(f)(2); *Cannons Eng'g Corp.*, 899 F.2d at 92. These monies have been placed in EPA's site-specific special account for the Site and are used to fund response actions at the Diamond Alkali Site. *See* Yeh Decl. ¶ 64.

## F.  THE ALLOCATION

To assist with making decisions regarding additional settlements with PRPs, EPA sponsored the AlterEcho allocation, which involved hiring a third-party neutral (AlterEcho) to perform a site-specific allocation. *See* Yeh Decl. ¶¶ 31-34. AlterEcho conducted the allocation as an alternative dispute resolution process under the ADR Act of 1996, 5 U.S.C. Section 571 et seq., and relevant state authorities. *See* Yeh Decl. ¶ 42. The participating allocation parties had numerous opportunities to provide input, including submitting factual information, position briefs, responsive briefs, and expert reports. The participating allocation parties also provided comments to AlterEcho on various documents. *See id.* EPA worked with AlterEcho throughout the allocation process to accommodate various developments, including providing increases on the page limitations of material that the parties could submit. *See id.* ¶ 43. And EPA submitted material to

16

AlterEcho from its files, including documents EPA obtained over four decades of investigation and enforcement at the Site.  *See id*. ¶ 39.

The AlterEcho allocation resulted in the assignment of shares of responsibility for OU2 to 79 PRPs and included a total of 92 facilities.  *See id*. ¶ 44. Of the 79 PRPs with facilities evaluated ("allocation parties"), 69 participated in the allocation process ("participating allocation parties"), and the remaining 10, including OxyChem, did not.  *See id*.

The AlterEcho allocation assigned shares of responsibility among the allocation parties totaling up to 100%.  *See id*.

The shares were calculated through a process with the following steps:

1. <u>How much of each COC was discharged historically by each facility?</u>  The allocation team considered four pathways to determine how much of each COC each facility discharged to the river and reached the sediments historically.  These pathways included direct discharges, transport over land, and through the historic and current sewer systems.

2. <u>How much of each COC is still present in the river sediment, and who is responsible?</u>  For each facility, the allocation team used a formula to calculate how much of each COC each facility released that remains in the river sediments currently, after the mix of natural forces (such as tides and storms) and human activities (such as dredging and vessel wakes) moved contaminated sediments into and out of the river over time.

   The allocation team then employed two different methods to proportionally distribute the unattributed mass of COCs (masses found in river sediments but not attributed to one of the allocation parties, which AlterEcho termed contributions from "Orphan Parties") among the allocation facilities. The method relevant to this settlement is the "alternative" method.  *See infra* § II.G.  The alternative method distributed the unattributed mass of COCs on a COC-by-COC basis.  For example, a party whose facility only discharged PCBs was only assigned a share of the unattributed PCB contamination.  If a party's facility contributed both mercury and copper but no PCBs, that party was assigned a share of the unattributed mercury and unattributed copper contamination, but not assigned a share of the unattributed PCBs.

3. <u>How much responsibility does each allocation facility bear for each COC?</u>
   Next the allocator calculated each facility's relative responsibility (COC share) for the total mass of each COC currently in the river sediments.

4. <u>How much harm does each facility's COCs pose to humans and the environment?</u>  Next, for each COC, the allocation team multiplied the COC shares calculated in Step 3 by the Relative Risk Number for the COC.  The Relative Risk Number for each COC is an allocation factor calculated by AlterEcho using site-specific information about risk from the OU2 and OU4 risk assessments.  It combines the human health cancer risk, human health noncancer hazard, and ecological hazard associated with each COC into a single measure of environmental harm relative to the other COCs.  The products of these calculations, for each facility, were summed to establish the facility base scores.

5. <u>Has the allocation party been cooperative or not?</u>  The allocation team then adjusted each facility base score by applying a cooperation factor and a culpability factor.  (As explained below, *infra* § II.G, the cooperation and culpability factor were not adopted for this settlement.)

6. <u>Did the allocation party have more than one facility?</u>  For each allocation party, the adjusted base scores for all its evaluated facilities were added to produce the party's base score.

7. <u>What was each allocation party's final share?</u>  The allocation team then calculated each allocation party's percentage share by adding up all allocation parties' base scores, dividing each allocation party's base score by that sum, and then multiplying by 100.

8. <u>Where did each allocation party fall with respect to the others?</u>  Finally, the allocation team established allocation tiers by grouping allocation parties along natural breaks in their percentage shares.

*See* Yeh Decl. ¶ 45 (citing Allocation Recommendation Report at 19-34 (Exh. 12 at

ARR0019-34) (describing the allocation methodology)).

   The process concluded in December 2020 when AlterEcho issued its

Allocation Recommendation Report, recommending relative shares of responsibility

for each allocation party's facility or facilities evaluated in the allocation.  *See id.* ¶

47.  The Allocation Recommendation Report offers two sets of results distributing

the relative shares of responsibility: the "protocol" method and the "alternative"
method, based on the two approaches the allocation team employed for distributing
the unallocated ("orphan") shares of COCs.  *See id.* ¶ 45.b.ii.  The Allocation
Recommendation Report also proposed five allocation "tiers," which are grouping of
PRPs with similar levels of responsibility.  Tier 1 is comprised of one party:
Intervenor OxyChem.  Tier 2 includes two parties: Intervenors Nokia and
Pharmacia.  Tier 3 includes 8 or 9 parties, depending on whether one considers the
protocol method or the alternative method, and Tiers 4 and 5 include 63 or 62
parties, again, depending on the calculation method.  *See id.* ¶¶ 45.h, 48.  Five
parties were not assigned to any tier and were given zero shares of liability because
AlterEcho did not find a nexus between the parties' facilities and COCs in river
sediments.  *See id.* at ¶ 48.

G.  THE SETTLEMENT PROCESS

Based on a careful review of the Allocation Recommendation Report, the
United States identified parties from Tiers 3, 4, and 5 that were eligible to
participate in the Consent Decree for the facilities evaluated in the allocation.
Based on the results of the allocation, the United States concluded that the Settling
Defendants, individually and collectively, are responsible for a minor share of the
response costs incurred and to be incurred at or in connection with the cleanup of
OU2, for releases from the facilities identified in the proposed Consent Decree.  In
doing so, the United States used the results of the alternative method for its
analysis; it also elected not to use the "culpability and cooperation" factors in
developing a settlement position, because those factors are somewhat subjective.

19

These changes, which reflect a conservative approach that maximized settlement recovery from these parties, and other adjustments made during negotiations are described below.

The United States then determined that it would also be appropriate to extend the settlement to include OU4. Due to the tidal nature of the 17-mile LPRSA, releases of COCs into the River have been carried up and down the LPRSA. *See* Exh. 8, Declaration of Allen Medine ("Medine Decl.") ¶ 20; Yeh Decl. ¶ 55. The OU2 allocation considered releases of contaminants from allocation facilities all along the 17 miles of the LPRSA, not just to the lower 8.3 miles that comprise OU2. *See* Yeh Decl. ¶ 55. Finally, the OU4 interim remedy is intended to complement the OU2 remedy, with the two working together to address the human health and ecological risk posed by contamination in the LPRSA. *See* Sharkey Decl. ¶ 14; Sivak Decl. ¶¶ 10, 18, 33-43.

After determining which parties would be eligible to settle, the United States determined the total costs on which the settlement amount would be based, including past EPA costs and future response costs for OU2 and OU4. Next, the United States proceeded to negotiate over a period of approximately 18 months with the Settling Defendants for the Consent Decree. The Settling Defendants ultimately accepted the settlement embodied in the Consent Decree, which incorporates these elements:

- First, the United States decided to use the alternative method as a starting point for the settlement, instead of the protocol method. *See* Yeh Decl. ¶ 57.a.

- Next, the United States decided not to adopt the cooperation and culpability adjustments that AlterEcho had applied to each facility's base score (see Step 4, above, *supra* § II.F.). While "cooperation and culpability" is a factor commonly considered in allocations among private parties to resolve claims among themselves under Section 113 of CERCLA, the United States concluded that weighing these factors can be somewhat subjective and that a settlement that did not take those factors into account would be more equitable to all parties and maximize recovery. Importantly, removing the "cooperation and culpability" factor meant that no party was deemed "culpable" for declining to participate in the allocation, or for intentional acts or omissions (such as the intentional releases of 2,3,7,8-TCDD into the river by OxyChem's predecessor). Nor were parties deemed "cooperative" for a decision to participate in the allocation or to perform early cleanup actions, investigatory or design work. *See* Yeh Decl. ¶ 57.b.

- The decisions described above resulted in a distribution of allocated shares as follows:

| Alternative Method Calculation without Cooperation/Culpability Factors | | |
|---|---|---|
| **Allocation Party** | **Tier** | **Share** |
| Occidental Chemical Corp. | 1 | 85.07% |
| Nokia-Lucent Technologies and Pharmacia LLC | 2 | 11.01% |
| *Tiers 1 & 2 Subtotal* | | *96.08%* |
| Tiers 3-5 (Excluding PSE&G, a Tier 3 party that was not invited to settle) | 3, 4 & 5 | 3.88% |

*See* Yeh Decl. ¶ 57.c.

- Next, in its calculation of an appropriate total cost against which to calculate the settlement amount, the United States included a "premium" — an additional amount to account for the possibility of cost overruns since the remedies for OU2 and OU4 have not yet been implemented and the settlement is based on estimated costs. The United States applied a premium of 100% for both OU2 and OU4 estimated remedial action costs (but not to EPA's past costs). *See* Yeh Decl. ¶ 57.d.

- Finally, as depicted below, the settlement amount reflects an additional payment by the Settling Defendants in exchange for completion of an already existing administrative order on consent. *See* Yeh Decl. ¶¶ 56, 57.e.

| How the Settlement Amount was Calculated | |
|---|---|
| OU2 & OU4 estimated cost of the remedial actions (including remedial designs) | $1.84 billion (including $1.38 billion for OU2 and $460 million[7] for OU4) |
| OU2 & OU4 estimated cost of the remedial actions (including remedial designs) + 100% premium | $3.68 billion |
| EPA's past costs for OU2 & OU4 | $50 million |
| Total OU2 & OU4 costs = OU2 & OU4 estimated cost of the remedial actions (including remedial designs) + 100% premium + EPA's past costs for OU2 & OU4 | $3.73 billion |
| Tiers 3-5 Combined Share: (excluding parties not invited to settle) | 3.88% |
| Total OU2 & OU4 costs * 3.88% share: | $144,724,000 |
| Total OU2 & OU4 costs * 3.88% + Additional payment re. existing admin. order: | $150,000,000 |

After considering all of these factors, the parties agreed to a payment of $150 million by the Settling Defendants.

Thus, the "settlement" embodied in the Consent Decree is not identical to the Allocation Recommendation Report. Rather, the Allocation Recommendation Report was the starting point for negotiations and the resulting settlement. The funds recovered through this settlement, if the Court enters it, combined with funds already recovered through the other settlements and bankruptcy claims described above, would bring the United States' recovery to approximately 14% of the total costs incurred by EPA for OU2 and OU4, plus estimated future costs to be incurred for OU2 and OU4 combined. *See* Yeh Decl. ¶ 61. As noted above, the proposed Consent Decree is only one part of EPA's multi-decade cleanup and enforcement effort.

---

[7] This estimate has since been refined to $441 million. *See* Sharkey Decl. ¶ 24.

### H. THE AMENDED COMPLAINT AND PROPOSED (MODIFIED) CONSENT DECREE

On December 16, 2022, the United States filed a complaint and lodged the Consent Decree with this Court. On January 17, 2024 the United States filed an Amended Complaint. *See* ECF No. 282. The United States alleges in the Amended Complaint that the Settling Defendants are liable under Sections 106 and 107(a) of CERCLA, 42 U.S.C. §§ 9606, 9607(a), for injunctive relief and response costs incurred by the United States relating to OU2 and OU4. *See id.* ¶¶ 36-45. The United States also seeks declaratory relief in the Amended Complaint under Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2), that the Settling Defendants' liability will be binding in subsequent actions. *See id.* ¶ 40. The Consent Decree, if entered, would resolve these claims in the Amended Complaint.

In the Consent Decree, the 82 Settling Defendants agree to pay $150 million in cleanup costs. *See* ECF No. 283, ¶ 7. The Settling Defendants are jointly and severally liable for this payment. *See id.* at ¶ 11. Certain Settling Defendants had previously resolved their liability for OU2, and so were not evaluated in the allocation, but are participating in the Consent Decree to resolve their liability for OU4. *See id.* at pp. 5-6, ¶ 6.

The Consent Decree includes covenants not to sue related to OU2 and OU4 under Sections 106 and 107(a) of CERCLA, as well as statutorily authorized contribution protection under Section 113 of CERCLA. *See* ECF No. 283, at ¶¶ 13, 23. Contribution protection shields Settling Defendants from contribution claims by PRPs who have settled or been found liable and may therefore seek costs from other

PRPs; settlements with the United States under CERCLA typically include

contribution protection for matters addressed in the settlement. *United States v.*

*Occidental Chemical Corporation*, 200 F.3d 143, 147 (3d Cir. 1999).

Based on its evaluation of the public comments it received on the settlement,

the United States determined that some modifications to the Consent Decree lodged

on December 16, 2022, were appropriate. The modifications include the removal of

three parties from the settlement and from the Amended Complaint: Kearny

Smelting & Refining, Conopco, Inc., and The Sherwin-Williams Company. After

examining OxyChem's comments with respect to these parties, the United States

determined that these parties should be removed from this settlement so that it can

further evaluate whether or how to settle with them. In addition, the proposed

modified settlement adds a reservation of the United States' rights. Specifically, it

reserves the right to pursue the Settling Defendants for liability "for performance of

response actions or for the reimbursement of response costs" if the costs in

connection with the remedial actions for OU2 and OU4 exceed $3.68 billion. *See*

ECF No. 283, at ¶ 15(f).[8] This result fairly recognizes that the Settling Defendants

are paying a 100% premium in the settlement but mitigates the risk to the public if

the cost of implementing the OU2 and OU4 remedy exceeds twice the estimated

cost. It is also fair to the remaining PRPs since the statutorily authorized

contribution protection provided under Section 113 of CERCLA in Paragraph 23 of

the proposed Consent Decree would not apply above $3.68 billion.

---

[8] *Cf*, ECF No. 283, at ¶¶ 6, 13 (regarding covenants for 2018 Settling Agreement
Parties and 2021 Settlement Agreement Parties).

## ARGUMENT

### III.   LEGAL STANDARD

A district court should enter a consent decree if the decree is fair, reasonable, and consistent with the principles of CERCLA.  *United States v. Se. Pa. Transp. Auth. (SEPTA)*, 235 F.3d 817, 823 (3d Cir. 2000) (citing *United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 85 (1st Cir. 1990)).  The standard for the Court's review "is not whether the settlement is one which the court itself might have fashioned, or considers as ideal, but whether the proposed decree is fair, reasonable, and faithful to the objective of" CERCLA.  *United States v. Kramer*, 19 F. Supp. 2d 273, 280 (D.N.J. 1998) (quoting *Cannons Eng'g Corp.*, 899 F.2d at 84) (remaining citations omitted).

Approval of a consent decree is committed to the trial court's sound discretion, which should be exercised in light of the strong policy favoring voluntary settlements of litigation.  *See United States v. Hooker Chem. & Plastics Corp.*, 776 F.2d 410, 411 (2d Cir. 1985); *State of New York v. Air-Flo Mfg. Co.*, No. 02-CV-762S, 2004 WL 1563081, at *1 (W.D.N.Y. June 3, 2004) ("[T]he usual federal policy favoring settlements is even stronger in the CERCLA context.").  Ultimately, a court reviewing a proposed settlement must either accept or reject its terms, rather than tinker with them.  *United States v. City of Fort Lauderdale*, 81 F. Supp. 2d 1348, 1350 (S.D. Fla. 1999) (citing *United States v. BASF-INMONT Corp.*, 819 F. Supp. 601, 608 (E.D. Mich. 1993)).  While a court should not rubber stamp a CERCLA settlement, it is neither required nor encouraged to conduct a trial on the merits.

*See United States v. IMC E. Corp. et al.*, 627 F. Supp. 3d 166, 173 (E.D.N.Y. 2022)

(citing *Seggos v. Datre*, 2019 WL 13180721, at *2 (E.D.N.Y. 2019)).

Where, as here, a settlement is based in part on an allocation, the law in the

Third Circuit is clear: a district court should enter the consent decree as long as the

underlying "measure of comparative fault on which the settlement is based is not

'arbitrary, capricious, and devoid of a rational basis'." *SEPTA*, 235 F.3d at 824.

This is true "whether or not [a district court] would have employed the same

method" to allocate the shares of responsibility among the PRPs. *See In re Tutu

Water Wells CERCLA Litig.*, 326, F.3d 201, 207 (3d Cir. 2003) (affirming district

court's decision to enter consent decree with an underlying allocation of fault

percentages based on volume and toxicity of the parties' contamination). The Third

Circuit recognizes that Congress made a deliberate policy choice of encouraging

settlements. *See SEPTA*, 235 F.3d at 825 (citing *United States v. Occidental Chem.

Corp.*, 200 F.3d 143, 150 n.8 (3d Cir. 1999)). As a result of this policy choice,

settlements are to be approved even where the cleanup has yet to be performed and

costs are estimated rather than certain, and even where the contribution protection

provided might leave some non-settling parties with the potential to pay more than

their fair share. *See id.* at 825; *Cannons Eng'g Corp.*, 899 F.2d at 83, 94.

## IV.     THE COURT SHOULD ENTER THE CONSENT DECREE

### A.  THE CONSENT DECREE IS FAIR

A decree is fair if it is both procedurally and substantively fair. *E.g., United

States v. Kramer*, 19 F. Supp. 2d 273, 283–84.

1.  The Consent Decree is Procedurally Fair

"Procedural fairness considers the openness, candor, and bargaining balance of the settlement process," with a particular eye to whether the settlement involved "informed, arm's-length bargaining." *Id.* at 283-84 (citations omitted).  A settlement is presumed valid if it results from "informed, arms-length bargaining by the EPA, an agency with the technical expertise and the statutory mandate to enforce the nation's environmental protection laws, in conjunction with the Department of Justice . . . ." *United States v. Rohm & Haas Co.*, 721 F. Supp. 666, 681 (D.N.J. 1989) (citations omitted).  A court may consider whether there was formal discovery or "other information-sharing procedures that provided the parties with adequate information." *55 Motor Ave. Co. v. Liberty Indus. Finishing Corp.*, 332 F. Supp. 2d 525, 530 (E.D.N.Y. 2004).

The settlement embodied in the Consent Decree is procedurally fair because it is the result of good-faith, arm's-length bargaining between the United States and the Settling Defendants.  *See United States v. Cannons Eng'g Corp.,* 720 F. Supp. 1027, 1035 (D. Mass. 1989) ("The presumption in favor of settlement is particularly strong where a consent decree has been negotiated by the Department of Justice on behalf of a federal administrative agency 'specially equipped, trained or oriented in the field' … EPA is such an agency.") (internal citations omitted).  Extensive formal discovery has taken place in cases arising from the same facts and the United States has been gathering information about the Site over close to four decades

from information requests, investigations, studies, and other submissions.[9]  In

addition, a four-year allocation process was conducted by a third party neutral, that

collected, reviewed, and analyzed 700,000 pages of information, including

information obtained by EPA under its investigatory authority, *see* 42 U.S.C. §

9604(e).  All private noticed parties, including OxyChem, were invited to participate

in the allocation.  *See Cannons*, 720 F. Supp. at 1040.  Those that chose to

participate had many opportunities for submission of additional information and

arguments, before AlterEcho issued the Allocation Recommendation Report that

provided the United States with enough information upon which to form the

starting point of negotiations with the parties it deemed eligible for a cashout

settlement.  *See* Yeh Decl. ¶ 34-36, 42, 43, 59.   Experienced counsel represented the

parties on both sides during negotiations that lasted for approximately 18 months,

following the United States' review of the Allocation Recommendation Report.

Counsel for the parties had many discussions and exchanged multiple offers

between the spring of 2021 and August 2022 regarding the settlement amount and

---

[9] This includes the ongoing contribution litigation over which this Court presides, *Occidental Chemical Corp. v. 21st Century Fox Am., Inc., et al.*, Civil Action No. 2:18-cv-11273-MCA-LDW and the prior litigation brought by NJDEP under the Spill Act and other legal authorities.  *See New Jersey Dept. of Env. Prot., et al. v. Occidental Chem. Corp., et al.*, Superior Court of New Jersey Law Division – Essex County, Docket No. ESX-L9868 (PASR) Order Partially Granting Plaintiff's Motion for Partial Summary Judgment Against Occidental Chem. Corp., Maxus Energy Corp. and Tierra Solutions, Inc., copy found at ECF No. 84-2.  OxyChem's comments include several arguments based on the fruits of that discovery. OxyChem and its proxies have also used FOIA to take informal discovery of EPA and DOJ concerning the AlterEcho allocation and this settlement.  *See* ECF No. 249 at 2 (explaining the United States has received 23 FOIA requests related to Consent Decree as of September 1, 2023).

the settlement terms.  The Consent Decree was reviewed and approved by officials

with authority to do so at EPA and the Department of Justice.  It made sense that

only the parties the United States identified as eligible for a cashout settlement at

this time participated in the negotiation of this Consent Decree as the settlement

framework provides that other parties will be addressed differently during later

stages.  *See* Yeh Decl. ¶¶ 38, 47, 54.  OxyChem — one of the PRPs that was not

included in this settlement — has intervened and opposes it.  However, the fact that

an objecting PRP was not included in the settlement discussions does not impact

the procedural fairness.  *See United States v. IMC E. Corp. et al.*, 627 F. Supp. 3d

166, 174 (E.D.N.Y. 2022) (citing *Next Millennium Realty, LLC*, 2016 WL 11189177,

at *4).  Otherwise, one recalcitrant hold-out PRP "could single handedly stymie the

efficiency gains CERCLA is meant to facilitate through early settlement and

minimization of litigation."  *See id.*; *United States v. GenCorp, Inc.*, 935. F. Supp.

928, 933 (a PRP who chooses not to participate in allocation or settlement should

not be permitted to imperil the progress of those who move litigation toward

conclusion).

### 2.  The Consent Decree is Substantively Fair

The settlement is also substantively fair.  A settlement is substantively fair if

it embraces the "concepts of corrective justice and accountability" by requiring the

legally responsible parties to bear the cost of the harm.  *Kramer*, 19 F. Supp. 2d at

285 (citing *United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 87 (1st Cir. 1990)).

Courts have considered allocations underlying CERCLA settlements in the context

of substantive fairness.  In *SEPTA*, four rail companies had owned and operated the

Paoli Rail Yard Superfund Site that was contaminated with PCBs. *See SEPTA*, 235
F.3d at 820-21. EPA lodged a settlement with three of the four defendants, after
allocating responsibility based upon each PRP's years of ownership and operation.
*Id.* at 820-22. The district court found the consent decree substantively fair and
entered the consent decree over the objections of the non-settling party. The Third
Circuit upheld that decision because the method of allocating was rational, not
arbitrary and capricious. *See id.* at 823-26.

Similarly, in *In re Tutu Water Wells*, the Third Circuit applied the same
standard and logic – that "as long as the measure of comparative fault on which the
settlement terms are based is not arbitrary, capricious, and devoid of a rational
basis, the district court should uphold it" – to find that a consent decree was
substantively fair. *See* 326 F.3d at 207. In that case, the allocation underlying the
settlement was based on several factors including the volume and toxicity of the
contaminants the PRPs had contributed to the Site, as well as the degree of each
PRP's cooperation. *See id.* at 206. The district court entered the consent decree
over objections to the allocation by non-settling parties, and the Third Circuit
affirmed. *See id.* at 206-10. The First Circuit, in one of the most relied upon cases
for the standard of review for CERCLA settlements, has provided further insight
into how a district court should review a settlement for substantive fairness:

> Even accepting substantive fairness as linked to comparative
> fault, an important issue still remains as to how comparative
> fault is to be measured. There is no universally correct approach.
> It appears very clear to us that what constitutes the best measure
> of comparative fault at a particular Superfund site under
> particular factual circumstances should be left largely to the

> EPA's expertise. Whatever formula or scheme EPA advances for measuring comparative fault and allocating liability should be upheld so long as the agency supplies a plausible explanation for it, welding some reasonable linkage between the factors it includes in its formula or scheme and the proportionate shares of the settling PRPs… the chosen measure of comparative fault should be upheld unless it is arbitrary, capricious, and devoid of a rational basis.

*See United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 87 (1st Cir. 1990).

Under the Consent Decree, the Settling Defendants will pay $150 million toward the overall estimated cleanup costs for OU2 and OU4 of the Diamond Alkali Superfund Site. *See* ECF No. 283, at ¶ 7. This settlement amount represents the collective fair share of the Settling Defendants, based on the Allocation Recommendation Report as adjusted by EPA to increase the fairness to non-settling parties, which reflects a rational method of allocating percentages of responsibility among the PRPs. *See In re Tutu Water Wells*, 326 F.3d at 206. In consultation with the participating allocation parties and EPA, AlterEcho developed a methodology based on factors that are commonly used in CERCLA allocations, and then adhered to typical allocation processes in conducting the allocation. *See generally* Wittenbrink Decl. ¶¶ 13-16, 41-44. As noted above, the United States' use of the Allocation Recommendation Report was the starting point for negotiations.[10] From

---

[10] If the United States had calculated the settlement amount by merely adding up the recommended shares for the Settling Defendants under the alternative method in the Allocation Recommendation Report and using the same estimated cleanup costs of $1.84 billion plus $50 million in EPA past costs, then the Settling Defendants would be paying approximately $36 million in total. *See* Yeh Decl. ¶ 59. Instead, using the Allocation Recommendation Report as a starting point, making adjustments thereto, *see supra* §§ II.G, II.H., the Settling Defendants are paying the $150 million negotiated by the United States in the Consent Decree.

there, the parties negotiated at arm's length for about 18 months before reaching an agreement.  *See supra* § II.G.  All of these considerations justify the conclusion that the Settling Defendants are bearing the cost of the harm for which they are responsible and a significant premium.  *See Cannons Eng'g Corp.*, 899 F.2d at 87; *IMC E. Corp.*, 627 F. Supp. 3d at 177 (approving cashout settlement with minor party paying 100% premium on share of responsibility).

The Consent Decree is just one step in the United States' efforts to ensure that parties responsible for the pollution in the river will shoulder the costs of the cleanup, rather than the public.  As noted above, if approved, the money recovered under the Consent Decree, combined with money previously recovered through bankruptcies, administrative orders, and administrative settlements, will amount to approximately 14% of the estimated costs for OU2 and OU4 (assuming no cost overruns or cost savings).  The United States intends to pursue more settlements, issue administrative orders, or instigate litigation with other PRPs to recover the remaining cleanup costs and ensure that the remaining cleanup work is performed. The proposed settlement is procedurally and substantively fair.

## B.  THE CONSENT DECREE IS REASONABLE

The court examines several factors when reviewing a proposed settlement for reasonableness.  These include the decree's likely effectiveness as a vehicle for achieving the cleanup and whether the public is satisfactorily compensated for response costs.  *United States v. Cornell-Dubilier Elecs., Inc.*, Civ. Act. No. 12-5407 (JLL), 2014 WL 4978635, at *9 (D.N.J. Oct. 3, 2014); *Cannons Eng'g Corp.*, 899 F.2d at 89–90.  In addition, the court reviews the relative strength of the parties'

33

litigating positions against the risks and delays that would result from further litigation. *E.g.*, *Cornell-Dubilier Elecs.*, 2014 WL 4978635, at *11 (citing *Cannons Eng'g Corp.*, 899 F.2d at 90; *Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975); *Rohm & Haas Co.*, 721 F. Supp. at 680)). The reasonableness inquiry is pragmatic and does not require precise calculations. *Kramer*, 19 F. Supp. 2d at 286–87 (quoting *United States v. Charter Int'l Oil Co.*, 83 F.3d 510, 521 (1st Cir. 1996)).

As a cashout settlement, the Consent Decree is effective for advancing the cleanup, because it brings in funds that will be placed in a site-specific "Special Account" to be "retained and used to conduct or finance response actions at or in connection to the Site." *See* ECF No. 283, ¶ 8. This will reduce the responsibility of the non-settling PRPs. It also avoids lengthy, expensive, and complex litigation with 82 parties. The Consent Decree also meets the goal of compensating the public for response costs. Even though the Consent Decree doesn't recover all response costs, it recovers the fair share from the Settling Defendants, and doesn't preclude the United States from pursuing the remaining response costs or cleanup from other PRPs through more settlements, orders, or litigation. And finally, the proposed Consent Decree, if entered, will save the parties from expensive and protracted litigation.

## C. THE CONSENT DECREE ADVANCES THE GOALS OF CERCLA

A primary objective of CERCLA is to ensure the "prompt and effective cleanup by responsible parties, while preserving both public finances and public health" by imposing the costs on those responsible parties. *Kramer*, 19 F. Supp. 2d at 289; *see also, e.g.*, *Cannons Eng'g Corp.*, 899 F.2d at 90–91. The statute favors

settlements to avoid the costs and delays inherent in litigation. *IMC E. Corp.*, 627 F. Supp. 3d at 177 ("[a]dditional litigation would only serve to expend more time and public money at the expense of remediating the current contamination"). The Consent Decree is consistent with those goals because it ensures that PRPs, and not the United States, will finance the cleanup of the Site, and the parties avoid the costs and delays of litigation. The United States expects that the money recovered under the Consent Decree will finance cleanup activities related to the Site.[11] The settlement also is consistent with the goals of CERCLA in that it reduces the burden of the associated contribution action between OxyChem and the settling parties. *Kramer,* 19 F. Supp. 2d at 289 ("By simplifying the remaining litigation . . . the public and the parties benefit from the 'saving of time and money that results from the voluntary settlement of litigation.'") (quoting *Citizens for a Better Env't v. Gorsuch,* 718 F.2d 1117, 1126 (D.C. Cir. 1983)). Moreover, the payment under the Consent Decree will reduce the non-settling PRPs' overall liability for cleanup costs associated with the Site by a considerable percentage. Finally, approval of the Consent Decree by the Court will further the goals of CERCLA by allowing the funds recovered to be put toward the cleanup right away. *See United States v. Akzo Coatings of Am., Inc.*, 949 F.2d 1409, 1436 n.25 (6th Cir. 1991) ("Weighing strongly

---

[11] Notably, even if the money recovered under the Consent Decree simply went into the general Superfund, the settlement still would be consistent with the goals of CERCLA. *Kramer*, 19 F. Supp. 2d at 289 (noting that the settlements at issue in that case "replenish the CERCLA Superfund and the New Jersey Spill Fund, which constitute limited public resources, enabling the funds to be used at other sites"). As noted above, in this circumstance, the monies recovered reduce the cleanup cost obligation of non-settling parties.

in favor of approval is the fact that the plan can be implemented immediately. Rejection of the plan would result in the expenditure of considerable time, money, and effort in litigation." (citation omitted)). The proposed Consent Decree is therefore consistent with CERCLA and in the public interest.

### D.  THE PUBLIC COMMENTS PROVIDE NO BASIS FOR REJECTING THE CONSENT DECREE

The United States has considered all the public comments it received on the proposed Consent Decree. The comments are attached at Exhibits 9-11. Some commentors expressed concern that the settlement does not recover the full cost of the cleanup and therefore leaves taxpayers exposed. *See* RS 1. Some commentors expressed support for the settlement. *See* RS 8. And finally, Intervenor OxyChem filed extensive public comments covering certain legal arguments regarding the proposed Consent Decree and allocation as well as extensive technical comments criticizing the underlying allocation. *See* RS 9-131 (responding to OxyChem public comments found in Exh. 10 at ALCD_PUBCOM_0000403 – 1179).

After careful review and consideration that included consulting with experts, the United States concluded that a modification to the proposed Consent Decree was warranted as described above. *See supra* § II.H. The comments do not otherwise change the United States' conclusion that the proposed Consent Decree, as modified, is fair, reasonable, and consistent with the goals of CERCLA, and therefore the United States asks this Court to enter it. Below, the United States offers general responses to the comments, and in the attached Responsiveness

Summary provides comprehensive responses to the comments. *See* Exh. 3,

Responsiveness Summary ("RS").

### 1. The Public is Being Adequately Compensated

Several of the public commenters observed that the $150 million recovered

under the proposed Consent Decree is only a fraction of the full estimated cost of the

cleanups for OU2 and OU4. These commenters expressed a desire to hold polluters

accountable for the full cost of the cleanups and expressed concern that taxpayers

would be left with the burden if PRPs are not held accountable and required to pay

their fair share.

The United States provides a more detailed response to these comments in

the Responsiveness Summary. *See* RS 1. In short, however, the response to these

comments submitted by concerned citizens and local business owners is that the

United States agrees that PRPs, and not taxpayers, should pay for the cleanup of

OU2 and OU4. The proposed Consent Decree is only one part of a larger

enforcement effort that includes the selection and implementation of the cleanup

and identifying and pursuing PRPs for the payment or performance of the cleanup.

In this settlement, the Settling Defendants are paying their fair share of the

cleanup costs. *See supra* §§ II.F., II.G.

The $150 million settlement amount is based on the Settling Defendants'

responsibility for the cleanup of the Lower Passaic River, which costs were

estimated to be $1.89 billion (comprised of $1.38 billion for OU2, $460 million for

OU4 and $50 million in past costs incurred by EPA ).[12]  *See* Yeh Decl. ¶ 56; Sharkey

Decl. ¶ 23.  The settlement amount was developed by the United States considering

the recommended shares in the allocation using the approach less favorable to the

Settling Parties, and accounts for potential cost overruns and unforeseen needed

response actions.  *See supra* § II.G; *IMC E. Corp.*, 627 F. Supp. 3d at 177 (settling

defendant paying 100% premium on its share of responsibility in exchange for early

settlement meets the public interest). These Settling Defendants are paying their

fair share, while allowing the United States to avoid expending significant

resources that might otherwise be spent on litigation.  These are resources that are

being devoted to advancing the implementation of the cleanup and pursuing

additional cost recovery for the cleanup from other PRPs.

> 2. The United States Modified the Proposed Consent Decree in
> Response to Certain Comments from OxyChem; OxyChem's
> Remaining Comments are Incorrect, Irrelevant, and Do Not
> Provide a Basis for Rejecting the modified proposed Consent
> Decree.

Instead of participating in the allocation, where it would have had the

opportunity to voice its preferences, OxyChem declined the opportunity.  It waited

until the allocation process was complete and has now expressed its disagreement

with the allocation process and the proposed Consent Decree through 777 pages of

public comments.  *See* Exh. 10 at ALCD_PUBCOM_0000403 – 1179.

OxyChem's remonstrance is lengthy but not weighty.  Overall OxyChem's

arguments are meritless and do not show the Consent Decree to be unfair or

---

[12] For purposes of this settlement, the United States used an estimate for OU4 of
$460 million; the current estimate is $441 million.

unreasonable.[13]   Much of OxyChem's comments consist of attacks on the AlterEcho allocation; OxyChem claims it was improper, *ultra vires*, collusive, or arbitrary and capricious, or in the alternative that it is inadmissible and unreviewable by the Court.  As detailed in the Responsiveness Summary, the United States disagrees with these arguments in all respects, and concludes that the AlterEcho allocation is not arbitrary, capricious, or devoid of a rational basis.  *See In re Tutu Water Wells*, 326 F.3d at 207; *SEPTA*, 235 F.3d at 824; *Next Millennium Realty, LLC, 2016 WL 11189972, at *3.*

The crux of this matter is whether an allocation rooted in the mass of contaminants released by facilities, weighted by the risk to human health and the environment posed by individual contaminants, *i.e.*, a measure of toxicity and exposure concentration, is rational for the Lower Passaic River.  The United States submits that it is indeed rational, sound, and in keeping with judicial precedent by employing factors that courts consider in allocating costs among PRPs.  *See In re Tutu Water Wells*, 326 F.3d at 207; *SEPTA*, 235 F.3d at 823; Wittenbrink Decl. ¶ 13 (citing *Env't. Transp. Sys., Inc. v. ENSCO, Inc.*, 969 F.2d 503, 508 (7th Cir. 1992)).

OxyChem's comments allude to different allocation methods, not based on risk, which it argues are more suitable.  *See* RS ¶¶ 40-43.  An allocation not based on risk would ignore the significant differences in risks posed by the COCs in the river sediments.  The United States does not need to show that the allocation

---

[13] OxyChem raised a few facility-specific issues that warrant further consideration by the United States; they are addressed by the exclusion of three parties in the modified version of the Consent Decree that is currently before the Court.

underlying this settlement was the best or fairest method of allocating; the United States need only show that the allocation was not arbitrary, capricious, and devoid of a rational basis.  *See In re Tutu Water Wells*, 326 F.3d at 207; *SEPTA*, 235 F.3d at 823; *Cannons Eng'g Corp.*, 899 F.2d at 88 (EPA's use of volumetric ranking was reasonable despite non-settling PRPs' argument that it should have used relative toxicity); *Next Millennium Realty, LLC, 2016 WL 11189972, at *3*.  That burden having been met, *see supra* § IV.A.-C., we respectfully ask the Court to enter the Decree.

Finally, as described above, while the allocation is rational, it is also *not* the settlement memorialized in the proposed Consent Decree.  The settlement relied on the allocation as a starting point but reflects conscious choices by the United States and Settling Defendants that are independent of the allocation.  *See supra* § II.G. The settlement is consistent with the vast record of information developed over decades and in multiple cases litigated and tried.  *See supra* § II.D.  And importantly, the settlement is consistent with the EPA risk assessments, which conclude that dioxins and furans are responsible for 81-94% of the risk posed to human health and the environment, relative to other COCs, and that PCBs are responsible for 5-16% of that risk.  *See* Yeh Decl. ¶¶ 16, 49.

Of OxyChem's other arguments, only a few warrant a response in this Brief. Responses to the remainder are set forth separately in the Responsiveness Summary.

40

i. The AlterEcho Allocation is Neither an NBAR nor
   Binding

OxyChem devotes many of its comments to arguing that the Allocation

Report is (a) a "nonbinding preliminary allocation of responsibility" ("NBAR") under

Section 122(e)(3) of CERCLA, and therefore "inadmissible" before this Court; and

(b) impermissible because it is "binding."  The Allocation Report is neither an NBAR

nor is it binding.  The United States provides thorough responses to all OxyChem's

comments on this topic in the attached Responsiveness Summary.  *See* RS 10, 11,

13, 22, 24, 25, 26, 27, 30.  In sum, these responses explain that the proposed

Consent Decree is a cashout settlement under the inherent authority of the

Attorney General, not a cleanup settlement under Section 122 of CERCLA.  As

such, the NBAR provision in Subsection 122(e)(3) does not apply to this settlement.

*See* RS 21.  Nevertheless, the settlement is consistent with Section 122(e)(3) in that

the underlying allocation is based on some of the factors recommended in the

statute, including mass and toxicity. 42 U.S.C. § 9622(e)(3).

Ironically, although OxyChem devotes many pages of its comments to

arguing that the Allocation Recommendation Report is a "*nonbinding* preliminary

allocation of responsibility" (emphasis added), it simultaneously argues that the

Allocation Recommendation Report must be rejected because it impermissibly

imposes "binding" shares of liability.  *See* RS 11.  The Allocation Recommendation

Report does no such thing.  It is obviously not binding on any party, since certain

parties opted not to participate, and certain parties who did participate opted not to

be included in the settlement.  The settlement amount, based on the collective total

41

share of the Settling Defendants, doesn't require any individual party to pay a

specified amount and is approximately four times greater than the total

recommended for the Settling Defendants by the Allocation Recommendation

Report. *See* RS 10; *see also supra* n.10 (explaining that the settlement amount, if

based solely on the sum of the recommended shares for the Settling Defendants in

the Allocation Recommendation Report, as calculated under the "alternative

method" and using an estimated cleanup cost of $1.89 billion without applying a

premium would have been $36 million (not $150 million)).

      ii.   The AlterEcho Allocation Does Not Encroach on the
           Court's Authority under CERCLA Section 113(f)(1)

As discussed further in the Responsiveness Summary, the United States did

not usurp the district court's authority. *See* RS 12, 15. OxyChem confuses

provisions under Section 113 of CERCLA, governing contribution claims among

PRPs, with provisions applicable to the United States' cost recovery claims under

Section 107 of CERCLA, the claims being resolved by the proposed settlement.

Subsection 113(f)(1) of CERCLA is inapplicable here and does not govern the United

States' Section 107 settlement based, in part, on an allocation performed outside the

Court. *See* RS 12, 15 (citing *In re TuTu Water Wells*, 326 F.3d at 207).

      iii.  Contribution Protection is Legal and Appropriate

OxyChem's comments argue that the United States may not provide the

Settling Defendants "contribution protection." The United States' use of a

contribution protection provision in the proposed Consent Decree, ECF No. 283,

§ XI., ¶ 23(c), is authorized by Section 113(f)(2). As discussed in the Responsiveness

Summary, courts have consistently ruled that CERCLA authorizes the United States to use contribution protection provisions to facilitate settlement and insulate settling PRPs from future contribution claims. *See, e.g., SEPTA*, 235 F.3d at 822-23 (affirming a district court's holding that settlers were protected from contribution claims by a non-settler). In turn, non-settling PRPs face being held liable for the remaining cleanup costs without any recourse against the early settlers. Even if a settlement is arguably unfavorable to a non-settling PRP, Congress intended and authorized this outcome to achieve CERCLA's goal of promoting settlement. *See Cannons Eng'g Corp.*, 899 F.2d at 92 ("Congress plainly intended non-settlors to have no contribution rights against settlors regarding matters addressed in settlement.").

Finally, contrary to OxyChem's comment, the contribution provision of the Consent Decree does not raise "constitutional concerns." *See id.* at 92 n.6 ("There is no federal common law right to contribution . . . and hence, no deprivation of any constitutionally protected interest.") (internal citations omitted); *United States v. BP Amoco Oil PLC*, 277 F.3d 1012, 1017–18 (8th Cir. 2002) (finding contribution protection was not an unconstitutional taking because the non-settling party did not have a vested property interest to be taken).

### iv.  The Settlement is not Collusive.

OxyChem argues that the proposed Consent Decree is a "collusive" settlement because it "assigns" the majority of the responsibility for the cleanup to it, a non-settling party. This argument fails for three reasons. First, the *settlement*, which is separate and apart from the *allocation*, does not "assign" anything to

43

OxyChem.  In any enforcement action by the United States, OxyChem is free to challenge its liability at the Site and assert defenses provided by CERCLA.  Second, this was not a backroom deal; in negotiating the settlement, the United States relied as a starting point on a transparent allocation process that included all noticed PRPs, to which OxyChem was invited multiple times but chose not to participate.  Third, there is nothing untoward or out of the ordinary about a settlement based in part on a voluntary and non-binding CERCLA cost allocation that provides recommended shares of parties, including those of parties such as OxyChem that choose not to participate.

In fact, OxyChem and other responsible parties participated in such an allocation in connection with the Fields Brook Superfund Site in Ohio.  *See United States v. GenCorp, Inc.*, 935 F. Supp. 928, 930-31, 931 n.6 (N.D. Ohio 1996).  There, the participating parties, including OxyChem, negotiated settlements with several non-participating parties based on their amounts of liability determined in the allocation and sought approval from the court.  *Id.* at 931-932.  Specifically, the movants sought a ruling that the settlements were "fair, reasonable and satisfy the requirements of CERCLA."  *Id.* at 931.  ADM, a non-settling party, objected, arguing that the settlements could result in it bearing a disproportionate share of the response costs at the site.  The district court disagreed.  It explained: "ADM's concerns do not warrant any change in the proposed order.  ADM chose not to participate in the arbitration process . . . . It has every right to make such decisions.  However, absent a strong showing of potential unfair prejudice to ADM, it should

44

not be permitted to imperil the progress of those who chose to move this mass of litigation toward a conclusion." *Id.* at 933.

Where OxyChem previously participated in an allocation, it supported the resulting settlement, as did the court. Here, OxyChem's tactical decision not to participate in the allocation does not bar the United States and other parties from pursuing fair and reasonable settlements based on it. *See id.*; *c.f.*, *United States v. Grand Rapids, Michigan*, 166 F. Supp. 2d 1213, 1221 (W.D. Mich. 2000) ("Intervenors' failed strategy is no indication that the settlement process itself was unfair.").

In sum, OxyChem offers no evidence of collusion. The proposed Consent Decree is not unfair, simply because OxyChem refused to participate. OxyChem has provided extensive comments and is now an intervening party in this case, so its arguments are being heard and considered. It would not be fair to the United States or any of the Settling Defendants to deny this settlement merely because one PRP voluntarily declined to participate. *See RS 36.*

   v. OxyChem's Comments Supported by Purported Expert Opinions Fail to Demonstrate that the Allocation is Arbitrary, Capricious, and Devoid of a Rational Basis

OxyChem has engaged twelve separate consultants to weigh in on the proposed Consent Decree and Allocation Recommendation Report and submitted a myriad of specific comments citing to these opinions. In 2022, a district court in the Second Circuit entered a CERCLA consent decree with two parties over strong objections, including purported expert opinions, by non-settling PRPs. In that case, the court explained, "that the Objecting PRP retained experts of its own who

45

reached different conclusions is inapposite here.  The court is not required nor encouraged to conduct a trial on the merits and a battle of the experts is precisely the type of probing judicial inquiry CERCLA was designed to avoid."  *United States v. IMC E. Corp.*, 627 F. Supp. 3d 166, 175 n.3 (E.D.N.Y. 2022).  It would defy logic for Congress to give EPA the tools and flexibility to resolve cases efficiently, only to have a full trial on the underlying decisions that support a settlement.  *See United States v. Rohm & Haas Co.*, 721 F. Supp. 666, 686 (D.N.J. 1989) ("[I]t is inconceivable that Congress, wishing to provide EPA with the statutory tools to make the most efficient use of its enforcement resources, would urge EPA to reach speedy settlements with *de minimis* parties but then require such settlements to be subject to *de maximis* judicial review."); *United States v. Davis*, 11 F. Supp. 2d 183, 191-92 (D.R.I. 1998), *aff'd*, 261 F.3d 1 (1st Cir. 2001) (stating "evidence need not be exhaustive or conclusive in order to determine whether a proposed settlement is substantively fair.  To hold otherwise would require that a case, first, be tried in order to decide whether it can be settled.  Such a requirement would be impractical and would frustrate CERCLA's objective"); *United States v. Akzo Coatings of Am., Inc.*, 949 F.2d 1409, 1424 (6th Cir. 1991) ("Ours should not be the task of engaging in a *de novo* review of the scientific evidence….The federal courts have neither the time nor the expertise to do so, and CERCLA has properly left the scientific decisions regarding toxic substance cleanup to the President's delegatee, the EPA administrator and his staff.").

OxyChem's comments attacking the allocation that underlies this settlement, supported by purported expert opinions, do not demonstrate that the settlement and underlying allocation are not rational. Rather, they offer observations that are irrelevant, incorrect, or simply suggest that the United States should have taken a different approach to allocation. In some instances, OxyChem's comments suggest errors on the part of the allocation team. Where such comments may have had merit, the United States responded with modifications to the proposed settlement. *See supra* § II.H. In all other instances, the United States provides responses to the comments that illustrate any potential error is harmless and irrelevant to the outcome of the allocation. OxyChem's set of public comments are nearly unprecedented in its volume, but so is the record of how the Diamond Alkali Superfund Site came to be polluted. Despite this massive record, OxyChem's comments fail to show that the Allocation Recommendation Report, which provides the foundation for the settlement, is not rational. *See* RS 9-131.

E.  THE UNITED STATES IS DISCLOSING AN ALLEGATION OF AN ETHICS VIOLATION AGAINST DAVID BATSON; THE DISCLOSURE DOES NOT ALTER THE UNITED STATES' REQUEST THAT THE COURT ENTER THE CONSENT DECREE.

As disclosed on January 31, 2024, on the docket for this case ("Disclosure"), in April 2023, an organization called Protect the Public's Trust ("PPT") sent a letter to the U.S. Office of Government Ethics, the Public Integrity Section of the U.S. Department of Justice, and the Office of Inspector General of the EPA. *See* Attachment A to Disclosure. The PPT letter alleges that, by working on the

allocation that underlies this Consent Decree, Mr. Batson violated 18 U.S.C.

§ 207(a)(1), which bars former federal government employees from:

> knowingly mak[ing], with the intent to influence, any
> communication to or appearance before any officer or employee of
> any department, agency, court, or court-martial of the United
> States or the District of Columbia, on behalf of any other person
> (except the United States or the District of Columbia) in
> connection with a particular matter--
> (A) in which the United States or the District of Columbia is a
> party or has a direct and substantial interest,
> (B) in which the person participated personally and substantially
> as such officer or employee, and
> (C) which involved a specific party or specific parties at the time
> of such participation,

*See id.* OxyChem raised similar allegations in an August 14, 2023, letter to the

Assistant Attorney General for DOJ's Environment and Natural Resources

Division, and Plaintiff's counsel responded to OxyChem by letter on November 13,

2023. *See* Attachments B, C to Disclosure. As explained in the November 13 letter,

Mr. Batson's work on the allocation that relates to the Consent Decree did not

violate 18 U.S.C. § 207(a)(1) because: (1) Mr. Batson's communications with the

United States during his work on the allocation team were not "on behalf of"

another person; (2) Mr. Batson was not communicating "with the intent to

influence" the United States; (3) the "particular matter" on which Mr. Batson

worked during his time with EPA is distinguishable from the matter that was the

subject of the allocation; and (4) Mr. Batson's work on the allocation was "acting on

behalf of the United States," and therefore excepted from the 18 U.S.C. § 207(a)(1)

prohibition. *See* Attachment C to Disclosure. For many of the same reasons, the

Director of the Ethics Office of the EPA Office of General Counsel has also

concluded that Mr. Batson did not violate Section 207, *see* Attachment D to Disclosure, a significant finding because "[t]he agency in which an individual formerly served has the primary responsibility to provide oral or written advice concerning a former employee's post-employment activities." 5 C.F.R. § 2641.105(a).

The undersigned counsels are not aware of any active investigation of Mr. Batson, but even if the government were to find that Mr. Batson had violated Section 207, that finding would not change the United States' conclusion that the Consent Decree is fair, reasonable, and consistent with CERCLA. If there were a violation, the potential consequences under the relevant statute would not require that AlterEcho's Allocation Recommendation Report be excluded. *See* 18 U.S.C. § 207(a)(1); 18 U.S.C. § 216. The Ethics in Government Act, which includes 18 U.S.C. §§ 207(a)(1) and 216, is intended to address corruption concerns about former government employees using knowledge of specific matters they obtained during their government service for the benefit of other parties involved in those same matters. *See United States v. Clark*, 333 F. Supp. 2d 789, 793 (E.D. Wis. 2004) (intent of Section 207(a) is to prevent an expert from "switching sides" and using knowledge gained as a public servant against the government). Here, Mr. Batson's work for AlterEcho was as a contractor for the United States, not for any specific Settling Defendant or Intervenor, so these corruption concerns are not present. *Cf. Nw. Env't Def. Ctr. v. United States Army Corps of Engineers*, No. 3:18-CV-00437-HZ, 2019 WL 2372591, at *6 (D. Or. June 5, 2019) (concluding expert's testimony on behalf of public-interest groups relating to a broad government program does not

49

implicate corruption concerns; thus even if expert's work fell within the scope of Ethics in Government Act, excluding it would serve neither the purpose of the Act nor the public interest).

This Court has the inherent authority to determine what steps, if any, are necessary to "preserve confidence in the fairness and integrity of judicial proceedings." *See Cherry Hill Convalescent, Ctr., Inc. v. Healthcare Rehab Sys., Inc.*, 994 F. Supp. 244, 248-49 (D.N.J. 1997).[14]  Mr. Batson, as part of the AlterEcho allocation team, was hired by the United States to serve as a third party neutral. OxyChem has submitted extensive, detailed comments criticizing the Allocation Recommendation Report, and the United States has evaluated their merits, made changes in response where warranted, and otherwise provided comprehensive responses. *See* Exh. 3, Responsiveness Summary.  The United States submits that the fairness and integrity of this judicial proceeding is intact, and this Court may evaluate this case on the merits and find that the Consent Decree meets the legal standard for entry.

## CONCLUSION

The proposed Consent Decree is fair, reasonable, and in the public interest. None of the comments raise any facts or considerations that undermine those conclusions, aside from comments that have been addressed by revisions to the

---

[14] This includes the inherent authority to stay this proceeding pending the result of any investigation, *see Walsh Sec., Inc. v. Cristo Prop. Mgmt., Ltd.*, 7 F. Supp. 2d 523, 526-27 (D.N.J. 1998), but that result is unwarranted because the United States is not aware of any active investigation Mr. Batson for violations of the Act.

Decree.  Consequently, the United States supports entry of the proposed settlement,

respectfully moves this Court to approve and enter the Revised Decree, and

requests that the Court sign the Decree at the signature block for the Court on page

21.  *See* ECF No. 283, p. 21.

Respectfully submitted,

TODD KIM
Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice
Washington, D.C.  20530


*/s/ Andrew W. Keir*
Andrew W. Keir, Trial Attorney
Laura J. Rowley, Senior Trial Attorney
Scott Bauer, Senior Counsel
Environmental Enforcement Section
Environment and Natural Resources Division
United States Department of Justice
P.O. Box 7611, Ben Franklin Station
Washington, DC 20044-7611
(202) 532-5107
andrew.w.keir@usdoj.gov


VIKAS KHANNA
First Assistant United States Attorney
District of New Jersey

Alex Silagi
Assistant United States Attorney
District of New Jersey
United States Attorney's Office
970 Broad Street, 7th Floor
Newark, New Jersey 07102
(973) 353-6001

OF COUNSEL:

Sarah Flanagan
Juan Fajardo
Kathryn DeLuca
Frances Zizila
Office of Regional Counsel
U.S. Environmental Protection Agency, Region II
290 Broadway
New York, NY 10007