# Exhibit 3

## RESPONSIVENESS SUMMARY

United States' Motion to Enter Consent Decree,
*United States v. Alden Leeds, Inc. et al.*, Civil Action No. 22-7326 (D.N.J.)

## RESPONSIVENESS SUMMARY

On December 16, 2022, the United States of America lodged a Consent Decree with the United States District Court for the District of New Jersey in Civil Action No. 2:220-cv-7326 to resolve claims of the United States against the Settling Defendants under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended ("CERCLA"), 42 U.S.C. §§ 9601 *et seq.*

Consistent with 28 C.F.R. § 50.7, on December 22, 2022, the Department of Justice published a notice of lodging of the proposed Decree in the Federal Register and invited the public to submit comments on the settlement for a period of 45 days. *See* 87 Fed. Reg. 78710-11. The United States published a subsequent notice in the Federal Register on January 12, 2023, extending the comment period through March 22, 2023, for a total of 90 days. *See* 88 Fed. Reg. 2133.

The United States received 53 public comments.[1] *See* Exhibit 2, Declaration of Andrew Spohn ("Spohn Decl.") at ¶ 14. The comments from persons other than Occidental Chemical Corporation are addressed in Responsiveness Summary ("RS") Sections identified below as RS 1 through RS 8.

Occidental Chemical Corporation ("OxyChem" or "OCC") submitted legal and technical comments totaling 777 pages, with more than 24,000 pages of supporting exhibits. These comments are addressed in RS 9 through RS 131 below.

Copies of the public comments are found at Exhibits 9-11. The United States redacted potentially personal identifiable information of commenters to comply with the Privacy Act of 1974, 5 U.S.C. § 552a. This included any commenter's home street address, personal phone number, and personal email address. Business addresses, phone numbers and email addresses were not redacted.

---

[1] To provide a grace period for commenters, the United States considers any comments received by March 24, 2023, to be timely. The United States received approximately 31 emails and letters expressing views about the proposed Consent Decree after March 24, 2023. These untimely communications were generally consistent with certain timely comments. *See* Spohn Decl. ¶¶ 3-4. Thus, these untimely communications are addressed in the summary below, although they are not included in Exhibits 9-11.

FORMAT OF THE RESPONSIVENESS SUMMARY OF PUBLIC COMMENTS
SUBMITTED BY PERSONS OTHER THAN
OCCIDENTAL CHEMICAL CORPORATION

The United States organized the comments by submitter (as depicted in the
topic headings), consolidated the text of like-kind comments, and summarized them
in bold italics, referencing the individual comments by Bates numbers. The United
States' responses to the comments appear in regular (not bold italics) font.

## RS 1. *Comments Concerning the Proposed $150 Million Settlement Amount*

*The proposed settlement amount of $150 million is insufficient because the
estimated cost of cleanup at the Diamond Alkali Superfund Site is more
than $1.89 billion. Entry of the proposed Decree would result in the
financial burden of the cleanup being passed on to taxpayers, small
businesses, and municipalities rather than those responsible for the
pollution. This sends the message that pollution is acceptable if the
polluter pays a small fine.*

Applicable Comments:
ALCD-PUBCOM_0000001 (Public); ALCD-PUBCOM_0000003 (Charles); ALCD-
PUBCOM_0000005 (Belisle); ALCD-PUBCOM_0000009 (D'Angelo Smith); ALCD-
PUBCOM_0000011 (Saggio); ALCD-PUBCOM_ 0000013 (Amico Smith); ALCD-
PUBCOM_0000014 (Kuenzler); ALCD-PUBCOM_0000016 (Bain); ALCD-
PUBCOM_0000018 (Wilkinson); ALCD-PUBCOM_0000019 (Rosario); ALCD-
PUBCOM_0000022 (Fell); ALCD-PUBCOM_0000024 (Sette); ALCD-
PUBCOM_0000026 (Harrington); ALCD-PUBCOM_0000028 (Brady); ALCD-
PUBCOM_0000032 (Morris); ALCD-PUBCOM_0000034 (Wagner); ALCD-
PUBCOM_0000035 (O'Donnell); ALCD-PUBCOM_0000038 (Lillo); ALCD-
PUBCOM_0000040 (Fisher); ALCD-PUBCOM_0000042 (Kit); ALCD-
PUBCOM_0000044 (Klown); ALCD-PUBCOM_0000045 (Harden); ALCD-
PUBCOM_0000046 (Affatato); ALCD-PUBCOM_0000050 (Rottenberg); ALCD-
PUBCOM_0000052 (Tillman); ALCD-PUBCOM_0000054 (Unger); ALCD-
PUBCOM_0000056 (Organic Sun Market); ALCD-PUBCOM_0000059 (Pereaux
Interior Design); ALCD-PUBCOM_0000062 (Diamond Cycle); ALCD-
PUBCOM_0000065 (Paw Couture Pet Grooming); ALCD-PUBCOM_0000068
(Silva); ALCD-PUBCOM_0000071 (Kessler); ALCD-PUBCOM_0000077 (Mattson);
ALCD-PUBCOM_0000079 (Raya); ALCD-PUBCOM_0000081 (Casa De Flora Bar);
ALCD-PUBCOM_0000084 (Krafty Hair Kreation Studio); ALCD-
PUBCOM_0000087 (Robinson); ALCD-PUBCOM_0000090 (unsigned); ALCD-
PUBCOM_0000093 (Fazliogli); ALCD-PUBCOM_0000096 (Franklin); ALCD-
PUBCOM_0000186 (Riga)

**Response**: As discussed in the Memorandum in Support of United States of America's Motion to Enter Consent Decree ("Mem. in Supp."), the $150 million settlement amount is based on the Settling Defendants' fair share of responsibility for the cleanup of the Lower Passaic River. The United States hired a third party neutral, AlterEcho, to perform a site-specific allocation that would help it make settlement decisions. *See* Mem. in Supp. § II.F. Using the AlterEcho allocation as a starting point, the United States calculated the share of the Tiers 3-5 parties as 3.88%. The $150 million settlement amount is the product of multiplying 3.88% by the combined estimated costs of the OU2 remedy and the OU4 interim remedy, plus a 100% premium to account for possible cost overruns. *See id.* § II.G. The settlement amount also includes the Settling Defendants' fair share – 3.88% – of EPA's past costs at the time of the negotiation[2] and an amount as consideration for closing out an existing administrative order. *See id.*

Moreover, the $150 million payment in the proposed Decree is not the first and will not be the last or final payment by responsible parties for cleanup of the Passaic River. The process resulting in the AlterEcho Allocation Recommendation Report was a site-specific allocation that EPA, at its discretion, sponsored as part of its overall enforcement strategy for the Site. *See* Mem. in Supp. § II.F. EPA will continue to pursue responsible parties for the cost of cleanup and the performance of cleanup work, and it may also settle with additional responsible parties. *See* Mem. in Supp. § IV.A.2. This enforcement strategy is consistent with CERCLA's design, which is to ensure that the parties responsible for the contamination "bear the costs and responsibility" of their actions. *See In re Tutu Water Wells CERCLA Litig.*, 326 F.3d 201, 206 (3d Cir. 2003). One of the many tools at EPA's disposal as part of this enforcement strategy is a consent decree to resolve liability of smaller contributors of pollution. *See id.* The proposed Decree furthers these goals by recovering significant funds for remediation and resolving the liability of numerous minor contributors of pollution at the Site.

One commenter suggested that the $150 million settlement amount will be directed toward EPA past costs and administrative expenses instead of being used for cleanup of the Passaic River. *See* ALCD-PUBCOM_0000050. First, EPA's costs and expenses incurred in connection with a Superfund site, known as "response costs," are costs that are essential to cleaning up the Site. *See United States v. Hardage*, 982 F.2d 1436, 1441-44 (10th Cir. 1992). EPA's "response costs" include "oversight costs," i.e., costs EPA incurs in overseeing a PRP's performance of work, but also includes costs of EPA performing cleanup work itself (e.g., investigatory work related to site listing, or additional work if PRPs refuse to perform work, perform

---

[2] No premium is needed with respect to past costs because these costs have already been spent and are, therefore, fixed.

poorly, or fail to respond to emergency situations). *See id.*; 42 U.S.C. § 9601(25). For example, at this Site, EPA performed a Remedial Investigation and Focused Feasibility Study to expedite cleanup of the lower 8.3 miles while a group of PRPs continued to perform the Remedial Investigation and Feasibility Study for the 17 miles. *See* Exhibit 4, Declaration of Alice Yeh ("Yeh Decl.") ¶¶ 10, 11. EPA's costs are included in the estimated total cost of the cleanup, which was used in calculating the amount to be paid by the Settling Defendants. *See* Mem. in Supp. § II.G. Next, the Decree specifies that the total amount paid by Settling Defendants will be deposited by EPA in the Special Account to be retained and used to conduct or finance response actions at or in connection with the Diamond Alkali Site. *See* ECF No. 283, Consent Decree, ¶ 8.

In addition, EPA has previously recovered costs in several settlements, and most recently, has received $78,887,099.53 for its claims in the bankruptcy of Maxus Energy Corporation. *See* Yeh Decl. ¶ 64. That disbursement has been placed in the Site's special account for use at the Diamond Alkali Site.[3] *See id.*

### RS 2. *Comments Concerning the Parties to the Proposed Settlement*

***The proposed settlement includes over 80 parties, but more than 100 entities have been identified as responsible for pollution of the Passaic River. All parties responsible for pollution should pay their fair share for the cost of cleanup.***

Applicable Comments:
ALCD-PUBCOM_0000003 (Charles); ALCD-PUBCOM_0000005 (Belisle); ALCD-PUBCOM_0000009 (D'Angelo Smith); ALCD-PUBCOM_ 0000013 (Amico Smith); ALCD-PUBCOM_0000014 (Kuenzler); ALCD-PUBCOM_0000018 (Wilkinson); ALCD-PUBCOM_0000022 (Fell); ALCD-PUBCOM_0000024 (Sette); ALCD-PUBCOM_0000026 (Harrington); ALCD-PUBCOM_0000028 (Brady);  ALCD-PUBCOM_0000032 (Morris); ALCD-PUBCOM_0000035 (O'Donnell); ALCD-PUBCOM_0000038 (Lillo); ALCD-PUBCOM_0000040 (Fisher); ALCD-PUBCOM_0000042 (Kit); ALCD-PUBCOM_0000044 (Klown); ALCD-PUBCOM_0000046 (Affatato); ALCD-PUBCOM_0000050 (Rottenberg); ALCD-PUBCOM_0000056 (Organic Sun Market); ALCD-PUBCOM_0000059 (Pereaux Interior Design); ALCD-PUBCOM_0000065 (Paw Couture Pet Grooming); ALCD-PUBCOM_0000068 (Silva); ALCD-PUBCOM_0000071 (Kessler); ALCD-PUBCOM_0000077 (Mattson); ALCD-PUBCOM_0000079 (Raya); ALCD-PUBCOM_0000081 (Casa De Flora Bar); ALCD-PUBCOM_0000084 (Krafty Hair Kreation Studio); ALCD-PUBCOM_0000087 (Robinson); ALCD-PUBCOM_0000090

---

[3] "Special Account" means the special account, within the Hazardous Substance Superfund, established for the Diamond Alkali Superfund Site by EPA under Section 122(b)(3) of CERCLA, 42 U.S.C. § 9622(b)(3).

(unsigned); ALCD-PUBCOM_0000093 (Fazlioglli); ALCD-PUBCOM_0000096 (Franklin); ALCD-PUBCOM_0000186 (Riga)

**Response**: After review of the Allocation Recommendation Report, EPA identified parties that were eligible to participate in the proposed Decree. *See* Mem. in Supp. § II.G. Those parties not eligible for this settlement, and therefore not included in the proposed Decree, are not escaping liability. EPA expects to pursue more settlements, litigation, or issue orders to ensure that remaining PRPs pay their share or perform cleanup work. *See id.* § IV.A.2.

Moreover, EPA has broad discretion in structuring CERCLA settlements, and its "decisions on whether and with whom to settle are not subject to judicial review." *United States v. Atlas Minerals & Chems., Inc.*, 851 F. Supp. 639, 653 (E.D. Pa. 1994); *see also United States v. Davis*, 261 F.3d 1, 23 (1st Cir. 2001). Neither the public nor the Court may determine how a lawsuit should be structured if the ultimate compromise is reasonable. *See United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 84 (1st Cir. 1990) (exhorting district courts to avoid "second-guessing the Executive Branch," particularly "where the cards have been dealt face up and a crew of sophisticated players, with sharply conflicting interest, sit at the table"); *United States v. Rohm & Haas Co.*, 721 F. Supp. 666, 681 (D.N.J. 1989) (noting that settlements resulting from "informed, arm's-length bargaining by the EPA . . . in conjunction with the Department of Justice" are presumptively valid). Here, the proposed Decree resulted from arm's-length negotiations between the United States and the 82 Settling Defendants. The final settlement reflects each party's assessment of the relative strengths and weaknesses of their respective claims, defenses, and any potential counterclaims, counterpoised by the parties' interests in resolving this matter and avoiding litigation.

*RS 3. Comments Expressing Concern that Entry of the Proposed Decree Will Delay Cleanup of the Passaic River*

***Entry of the proposed Decree and/or litigation over the Decree will cause major delays in cleanup of the Passaic River.***

Applicable Comments:
ALCD-PUBCOM_0000009 (D'Angelo Smith); ALCD-PUBCOM_0000014 (Kuenzler); ALCD-PUBCOM_0000018 (Wilkinson); ALCD-PUBCOM_0000019 (Rosario); ALCD-PUBCOM_0000022 (Fell); ALCD-PUBCOM_0000032 (Morris); ALCD-PUBCOM_0000035 (O'Donnell); ALCD-PUBCOM_0000045 (Harden); ALCD-PUBCOM_0000049 (Agresta); ALCD-PUBCOM_0000052 (Tillman); ALCD-PUBCOM_0000071 (Kessler); ALCD-PUBCOM_0000081 (Casa De Flora Bar); ALCD-PUBCOM_0000084 (Krafty Hair Kreation Studio); ALCD-PUBCOM_0000186 (Riga)

**Response**: Several commenters expressed concern, without providing an underlying rationale, that entry of the proposed Decree will delay cleanup at the Site. Other commenters cited litigation over the proposed Decree as slowing down cleanup of the Passaic River. However, the proposed Decree will facilitate, not delay, cleanup of the Lower Passaic River. Work that will advance implementation of the cleanup at the River proceeded uninterrupted during the time that AlterEcho performed the allocation, as well as during the negotiations for the proposed Decree. *See* Yeh Decl. ¶ 23. OxyChem is currently performing the remedial design for OU2 and OU4. *See* Yeh Decl. ¶ 23.; Exhibit 5, Declaration of Diane Sharkey ("Sharkey Decl.") ¶ 18. The United States anticipates that remedial action for OU2 will move forward when the remedial design for OU2 is done. *See* Yeh Decl. ¶ 23. EPA issued its Record of Decision selecting the cleanup for OU2 in March 2016, and OxyChem started the remedial design for the remedy in September 2016 with its signature on the Administrative Settlement Agreement and Order on Consent for Remedial Design (CERCLA Docket No. 02-2016-2021). *See* Yeh Decl. ¶ 23. EPA issued its Record of Decision selecting the interim cleanup for OU4 in September 2021. OxyChem started the remedial design for the remedy in March 2023 with its signature of a Notice of Intent to Comply with the Unilateral Order for Remedial Design (CERCLA Docket No. 02-2023-2011) issued by EPA. *See* Sharkey Decl. ¶ 18. In addition to having cleanup work performed directly by PRPs at the Site, the availability of settlement funds will allow EPA to pay for cleanup work when it determines that doing so will advance the cleanup in an efficient and effective manner. *See* Yeh Decl. ¶ 65.

### *RS 4. Comments Questioning Whether the Proposed Decree Complies with the Legal Requirements of CERCLA*

***The proposed Decree does not comply with CERCLA because it did not follow the appropriate process for cost recovery or recouping "damages." The proposed Decree is deficient because the allocation used to calculate the settlement amount is contrary to CERCLA's structure. The proposed Decree does not adequately address environmental justice issues on the Passaic River. The proposed Decree is deficient because it does not contain adequate information on the harm that the proposed Decree is intended to address. It was difficult to submit public comments.***

Applicable Comments:
ALCD-PUBCOM_0000009 (D'Angelo Smith); ALCD-PUBCOM_0000014 (Kuenzler); ALCD-PUBCOM_0000019 (Rosario); ALCD-PUBCOM_0000022 (Fell); ALCD-PUBCOM_0000035 (O'Donnell); ALCD-PUBCOM_0000038 (Lillo); ALCD-PUBCOM_0000052 (Tillman); ALCD-PUBCOM_0000054 (Unger); ALCD-PUBCOM_0000059 (Pereaux Interior Design); ALCD-PUBCOM_0000071 (Kessler); ALCD-PUBCOM_0000073 (Larry G); ALCD-PUBCOM_0000074 (Dresdner); ALCD-PUBCOM_0000079 (Raya); ALCD-PUBCOM_0000081 (Casa De Flora Bar); ALCD-

PUBCOM_0000084 (Krafty Hair Kreation Studio); ALCD-PUBCOM_0000186 (Riga)

**Response**: Many commenters expressed concern that the proposed Decree did not follow the Superfund process but did not elaborate on the basis for this concern.[4] To the contrary, the proposed Consent Decree is consistent with CERCLA. CERCLA encourages settlements and avoiding litigation with 82 responsible parties via a settlement avoids the cost of time- and resource-consuming litigation, which takes time and money away from the cleanup. *See* United States' Memorandum in Support of Motion to Enter the Consent Decree at pp. 5-6 (citing *United States v. IMC E. Corp., et al.*, 627 F. Supp. 3d 166, 173 (E.D.N.Y. 2022)). The proposed Decree was subject to notice and comment for a total of 90 days, 60 days longer than is typical. The settlement embodied in the proposed Decree is the result of good-faith, arm's-length bargaining between the United States and the 82 Settling Defendants. *See* Mem. in Supp. § IV.A.1.

Several commenters raised concerns about AlterEcho's allocation. One commenter expressed concern that EPA should use the court system, not a contractor, to ensure that polluters pay their fair share. *See* Exhibit 11 at ALCD-PUBCOM_0000079. However, as discussed in further detail below in RS 10, RS 11, and RS 12, the United States based the proposed Decree, in part, on a recommended allocation of responsibility that was conducted by AlterEcho as a third-party neutral. That Allocation Recommendation Report was only the starting point for negotiations with the Settling Defendants. The proposed Decree only becomes effective upon consideration and approval by the Court. *See* ECF No. 283, Consent Decree ¶¶ 5, 7, 14, 23. A judicial act is required to animate the terms of the settlement. One commenter raised these same concerns by providing an op-ed that the Mayor of North Haledon wrote for the New Jersey Spotlight News. *See* Exhibit 11 at ALCD-PUBCOM_0000186. The op-ed recites several points addressed above or that OxyChem makes in its comments, addressed in detail below.

Several commenters expressed concern that contamination of the Passaic River is an environmental justice issue. The Decree will fund and expedite cleanup at the Site, *see* Yeh Decl. ¶ 65, which will enable EPA to continue addressing longstanding pollution and alleviating the burden on communities disproportionately affected by pollution. Funding and implementing the cleanup will advance environmental justice goals in this area. Carrying out the settlement embodied in the proposed Decree is another element of EPA's site strategy and consistent with Executive

---

[4] One commenter suggested that the Decree was the result of political donations in exchange for escaping corporate responsibility. *See* Exhibit 11 at ALCD-PUBCOM_0000073. The commenter offered no evidence in support of this statement and the United States is unaware of any evidence to support that assertion.

Order 12898, which directs federal agencies to achieve environmental justice by identifying and addressing, as appropriate, adverse human health or environmental effects on minority and low-income populations, to the greatest extent practicable and permitted by law.  *See* Exec. Order No. 12898, 59 Fed. Reg. 7,629 (Feb. 11, 2014).  Moreover, EPA has a strong community presence through decades of extensive outreach including through the long-standing Passaic River Community Advisory Group (CAG).  *See* Record of Decision Lower 8.3 Miles of the Lower Passaic River Part of the Diamond Alkali Superfund Site, at Section 3, "Highlights of Community Participation," pp. 6-9 (available at https://semspub.epa.gov/work/02/396055.pdf); Record of Decision for an Interim Remedy in the Upper 9 Miles of the Lower Passaic River Study Area OU4 of the Diamond Alkali Superfund Site, at Section 3, "Highlights of Community Participation," pp. 7-10 (available at https://semspub.epa.gov/work/02/630399.pdf).  Additionally, EPA has alerted the public about New Jersey's fish consumption advisories, convened workgroup meetings with a broad range of stakeholders to discuss ongoing and future uses of the Lower Passaic River to inform remedy selection, and provided technical assistance grants to non-profit groups to assist the community in interpreting EPA's technical documents.  *See* Record of Decision Lower 8.3 Miles of the Lower Passaic River Part of the Diamond Alkali Superfund Site, at Section 3, "Highlights of Community Participation," pp. 7-8.  For both OU2 and OU4, EPA developed Community Involvement Plans, identified communities with environmental justice characteristics, and considered their preferred methods of communication, and other community-specific concerns as part of EPA's outreach.[5]

Another commenter expressed concern that the proposed Decree does not provide adequate information on the harms that the Decree proposes to address, details on the extent of the harm, and other scientific and technical information.  *See* Exhibit 11 at ALCD-PUBCOM_0000074-75.  The proposed Consent Decree is neither intended nor required to include a fulsome explanation of harm posed by hazardous substances at the Site.  Nevertheless, it contains a short summary of the lengthy Site history, consistent with the purpose of the document, which is to memorialize the settlement agreement between the United States and the Settling Defendants.  *See* ECF No. 283, Consent Decree, at pp. 3-6.  Separate from the Consent Decree, EPA has produced volumes of scientific and technical information documenting the extent of contamination in the Lower Passaic River and the risks that the contamination poses to human health and the environment, and making that information available to the public has long been a priority for EPA.  *See* Yeh Decl.

---

[5] See https://semspub.epa.gov/work/02/538469.pdf;
https://semspub.epa.gov/work/02/638470.pdf

¶ 15.  EPA maintains two public websites with information about the Site, including the Site Profile Page,  www.epa.gov/superfund/diamond-alkali and www.ourpassaic.org, through which EPA updates the community, and the public at large, concerning activities at the Site with scientific and technical information as well as legal and enforcement developments.  EPA also works closely with the CAG.  *See* Record of Decision Lower 8.3 Miles of the Lower Passaic River Part of the Diamond Alkali Superfund Site, at Section 3, "Highlights of Community Participation," pp. 6-9 (available at https://semspub.epa.gov/work/02/396055.pdf); Record of Decision for an Interim Remedy in Upper 9 Miles of the Lower Passaic River Study Area OU4 of the Diamond Alkali Superfund Site, at Section 3, "Highlights of Community Participation," pp. 7-10 (available at https://semspub.epa.gov/work/02/630399.pdf).  In a recent example of EPA's commitment to the community, the Region 2 Administrator joined the CAG and hosted a special community workshop for a regional communication strategy to support communities during the Superfund cleanup of the Lower Passaic River.  *See* Yeh Decl. ¶ 15.

One commenter expressed concern about their difficulty in being able to submit a public comment.  *See* Exhibit 11 at ALCD-PUBCOM_0000054-55.  As discussed above, the Department of Justice posted notice of the proposed Decree in the Federal Register and provided a mailing and an e-mail address for comments in accordance with its normal procedures.  *See* 87 Fed. Reg. 78710-11; 88 Fed. Reg. 2133.

### *RS 5. Comment from the Mayor of North Haledon*

***The Mayor of the Borough of North Haledon submitted a comment expressing concern that the settlement amount is too low in light of the overall cost of cleanup and that polluters, not taxpayers, should pay for the cleanup of the Passaic River.  See Exhibit 11 at ALCD-PUBCOM 0000007. The comment states that "[a]llowing the polluters to pay only a fraction of the clean-up costs would not only be unfair to the taxpayers and the Passaic community, but it would also send a message that polluting the environment is acceptable as long as the polluter is willing to pay a small fine," which would encourage other companies to pollute. See id. The comment also expressed concern that the settlement is with some of the polluters of the Passaic River.  See id. at ALCD-PUBCOM 0000008.***

Applicable Comments:
ALCD-PUBCOM_0000007 (Mayor of the Borough of North Haledon)

**Response**:  The United States responded to similar concerns in RS 1 and RS 2, above.

*RS 6.* *Comments from the Borough of Hasbrouck Heights, the Borough of East Rutherford, and the Passaic Valley Sewerage Commission*

*The Borough of Hasbrouck Heights, the Borough of East Rutherford, and the Passaic Valley Sewerage Commission submitted similar comments on the proposed Decree, summarized and addressed below.*

*The Borough of Hasbrouck Heights stated in its comment that it does "not have a basis to either object to or endorse the proposed Consent Decree and/or the underlying allocation on which it was based," but expressed concern that entry of the proposed Decree will result in "undue exposure to future liability both in alleged environmental response costs and costs of defense" for it and similarly situated municipalities based on litigation OxyChem has initiated against the Borough of Hasbrouck Heights and others. See Exhibit 11 at ALCD-PUBCOM_0000098. It further notes that OxyChem has expressed this intention, "as threatened in the full-page advertisement place by it in the Washington Post on Sunday, March 5, 2023". See Exhibit 11 at ALCD-PUBCOM_0000099. The Borough of Hasbrouck Heights urged EPA to enter into discussions with it concerning a de minimis settlement that would provide contribution protection. See Exhibit 11 at ALCD-PUBCOM_0000100-101.*

*While not a public comment, the Borough of East Rutherford submitted a copy of a resolution passed on March 21, 2023, strongly objecting to entry of the proposed Decree. See Exhibit 11 at ALCD-CORRS-0000098; ALCD-CORRS-0000101. In a series of Whereas clauses, the resolution expressed that the Borough of East Rutherford has been named in OxyChem's contribution and cost recovery lawsuit and that the Borough of East Rutherford is a member municipality of Passaic Valley Sewerage Commission. See Exhibit 11 at ALCD-CORRS-0000100. The resolution further states that the proposed settlement releases the Settling Parties from future cleanup costs "even if evidence demonstrates that their share of liability should be greater" which places an inequitable burden on other parties, including the Borough of East Rutherford, and which it believes will result in increased costs to the Borough of East Rutherford and its taxpayers. See Exhibit 11 at ALCD-CORRS-0000100-101.*

*The Passaic Valley Sewerage Commission ("PVSC"), a public agency of the State of New Jersey that operates the fifth-largest wastewater treatment facility in the United States, submitted a comment stating that although it has concerns, the proposed Decree is fair, reasonable and consistent with the purposes of CERCLA. See Exhibit 11 at ALCD-PUBCOM_0000103. PVSC notes that the share of CERCLA response costs being paid by the Settling Defendants is "significant and correctly reflects the conclusion under the protocol employed by EPA's expert allocator that Occidental Chemical*

10

*Corporation bears 99.9% of the responsibility for response costs, and that it is difficult to credibly claim that the $150 million being paid" by the Settling Defendants is below a reasonable amount of their collective share of responsibility. See Exhibit 11 at ALCD-PUBCOM_0000104.*

*PVSC did however express the concern that unless the United States also enters into a consent decree with PVSC and its 48 municipal constituent members (MCMs) that share PVSC's funding obligations, the public could be exposed to catastrophic monetary risk which they cannot satisfy due to lack of resources, because the covenant not to sue and contribution protection in the proposed consent decree shift the risk of liability from the Settling Defendants onto PVSC and, by extension, the taxpayers. See Exhibit 11 at ALCD-PUBCOM_0000104. PVSC's comment encouraged the United States to negotiate a consent decree with PVSC that could be entered concurrently with the proposed Decree. See Exhibit 11 at ALCD-PUBCOM_0000105.*

*PVSC expressed that "[o]ther than the problem of PVSC and the MCMs remaining exposed to excessive joint and several liability risk from the absence of its own consent decree, PVSC believes the lodged Consent Decree is fair, reasonable, and consistent with the purposes of CERCLA." See id.*

Applicable Comments:
ALCD-PUBCOM_0000098 (Borough of Hasbrouck Heights); ALCD-CORRS-0000098 (Borough of East Rutherford); PUBCOM_0000103 (Passaic Valley Sewerage Commission)

**Response**: While the United States understands and is sensitive to the concerns expressed in these comments, to the extent these entities seek to encourage EPA and DOJ to engage in negotiations, public comment is not the avenue for municipalities to request negotiation of a consent decree, nor do such requests provide a reason for the Court to deny entry of the proposed Decree. As the First Circuit has held:

> In the CERCLA context, the government is under no obligation to telegraph its settlement offers, divulge its negotiating strategy in advance, or surrender the normal prerogatives of strategic flexibility which any negotiator cherishes…. So long as it operates in good faith, the EPA is at liberty to negotiate and settle with whomever it chooses.

*Cannons Eng'g Corp.*, 899 F.2d at 93. The decision not to invite non-parties to the negotiating table does not render the Decree procedurally unfair. *United States v. Cornell-Dubilier Elecs.*, Civil Action No. 12-5407 (JLL), 2014 WL 4978635, at *5

11

(D.N.J. Oct. 3, 2014) (citing *Cannons Eng'g Corp.*, 899 F.2d at 84; *Grand Rapids*, 166 F. Supp. 2d at 1221).

However, as noted above, EPA does expect to pursue more settlements, litigation, or issue orders to ensure that remaining PRPs pay their share or perform cleanup work. *See* Mem. in Supp. § IV.A.2; *see also infra* RS 76. While the United States and the public entities have not been able to reach a settlement yet, the United States continues to believe that PVSC and the municipalities are situated to provide in-kind services for the implementation of the OU2 and OU4 remedies. *See id.*

Finally, regarding East Rutherford's generalized concern that the Settling Defendants will be released from future cleanup costs "even if evidence demonstrates their share of liability should be greater," as discussed throughout the Responsiveness Summary, the United States has carefully evaluated the comments received during the public comment period and made several adjustments to the proposed Consent Decree. *See* Mem. in Supp. § II.H. As shown in the Responsiveness Summary and Motion to Enter, the consideration paid by the Settling Defendants is fair.

### RS 7. *Comment from Dr. Benjamin Chavis*

*Dr. Benjamin Chavis, the President and Chief Executive of the National Newspaper Publishers Association and the former Executive Director and CEO of the NAACP, and Alliance for a Superfund Action Partnership (ASAP), submitted a comment opposing the proposed Decree. See Exhibit 11 at ALCD-PUBCOM_0000181. Dr. Chavis opposes the settlement because it "requires no actual cleanup work by the settling companies, further delaying the environmental justice that has been decades in waiting." Dr. Chavis also asserts that the settlement amount is too low in light of the overall cost of cleanup and suggests that the settlement funds will cover EPA's past and future administrative and oversight costs. See Exhibit 11 at ALCD-PUBCOM_0000182. Dr. Chavis further indicated that the proposed settlement is deficient because it is the product of an EPA-led allocation, which is contrary to CERCLA, and that allocation is a power held only by courts. See Exhibit 11 at ALCD-PUBCOM_0000183. Finally, Dr. Chavis critiques the policy implications of providing contribution protection to the Settling Parties because it disincentivizes voluntary cleanups by responsible parties who cannot sue others also responsible for pollution. See Exhibit 11 at ALCD-PUBCOM_0000183.*

Applicable Comments:
ALCD-PUBCOM_0000181 (Letter from Dr. Benjamin Chavis); ALCD-PUBCOM_0000147 (Testimony of Dr. Benjamin Chavis before U.S. Senate

regarding the Superfund Reform Act of 1994); ALCD-PUBCOM_0024519 (Letter from Neil Ackerman)

**Response**: The United States responded to similar concerns above in RS 1, RS 3, and RS 4.

In addition, contrary to Mr. Chavis's suggestion, the proposed settlement is not an EPA-led allocation.  As described in more detail in response to OxyChem's similar comment, *see infra* RS 10, RS 16, RS 17, the proposed Decree is the settlement of claims by the United States under Sections 106 and 107 of CERCLA, based in part on an underlying allocation which the Court may approve so long as that allocation is not "arbitrary, capricious, and devoid of a rational basis," *United States v. Se. Pa. Transp. Auth. (SEPTA)*, 235 F.3d 817, 824 (3d Cir. 2000), and so long as the Court determines the proposed consent decree is fair, reasonable, and consistent with the goals of CERCLA.

Furthermore, the proposed settlement does not disincentivize voluntary cleanup by providing contribution protection to the settling parties.  Typically, a PRP that makes a payment to resolve its CERCLA liability or agrees to perform a Superfund cleanup, under a settlement with the United States, receives contribution protection.  The terms of CERCLA itself, Section 113(f), provides parties with this incentive to resolve their liability and receive contribution protection.  One of the policies underlying Section 113(f) is to encourage PRPs to settle with the United States in order to receive this finality and protection from other PRPs.  This opportunity is generally available at Superfund sites.  This particular settlement should not discourage anyone from volunteering to perform or fund cleanups at other sites.  *See Cannons Eng'g Corp.*, 899 F.2d at 90-91; *IMC E. Corp.*, 627 F. Supp. 3d at 177.

## RS 8.  *Comments Supporting Entry of the Proposed Decree*

*Comments supporting the proposed Decree are individually summarized and jointly responded to below.*

*The Meadowlands Regional Chamber of Commerce, which represents the Greater Meadowlands Region and has close to 1200 member companies, submitted a comment in support of the proposed Decree.  See Exhibit 11 at ALCD-PUBCOM_0000195.  The comment states that the proposed Decree "has generated a significant financial commitment from responsible parties otherwise deemed to have been minor contributors to the pollution in the river" and "represents a major step forward in cleanup of the river and should further support revitalization of the region and its business and*

*economic interests." See id. The comment supports entry of the proposed settlement without further delay, which "would not serve the interests of the region." Id.*

*The New York and New Jersey Baykeeper ("Baykeeper") submitted a comment supporting entry of the proposed Decree and recognizing EPA's commitment towards addressing the rightful concerns of the public and communities along the Passaic River. See Exhibit 11 at ALCD-PUBCOM_0000400. The comment states that the proposed Decree "for a sum of $150 million among eighty-five of the PRPs deemed responsible for a smaller fraction of the contamination, relative to the primary PRP, will help move the work along for both sides" because the PRPs can pay their fair share for the contamination and EPA can apply funds towards cleanup efforts, moving the cleanup plan forward on behalf of the communities that have suffered as a result of the pollution. See Exhibit 11 at ALCD-PUBCOM_0000400.*

*The Baykeeper comment expresses that EPA "has put decades of research and investigation into determining who the polluters of the Passaic River are and to what extent each company is implicated" and that the Settling Parties "are still paying their share [which] falls in line with the goals of the Superfund law and the intent of the EPA, on behalf of the communities along the Passaic, to ensure that all PRPs pay for this historic remediation effort and not those harmed by the pollution each PRP has been identified as contributing." See Exhibit 11 at ALCD-PUBCOM_0000401.*

*Further, the Baykeeper comment states that communities along the Passaic River have been "barred from meaningful access and denied the immense ecological, economic and recreational benefits that come with a remediated, healthy Passaic River" and that "there is no excuse to prolong this injustice any longer." Exhibit 11 at ALCD-PUBCOM_0000401. Baykeeper "support[s] EPA in their efforts and believe[s] that they will do what is in the best interest of the process and allow them to do their work expeditiously." Exhibit 11 at ALCD-PUBCOM_0000402.*

*The SPG, which includes: (1) SPG parties that are parties to the Consent Decree; (2) Nokia of America Corporation, Pharmacia LLC, the Public Service Electric and Gas Company, The Sherwin-Williams Company, and Conopco, Inc., which participated in an underlying allocation but were not included in the settlement; and (3) SPG parties that were not invited to participate in the allocation or the settlement, submitted 204 pages of comments and technical reports in support of the proposed Decree. See Exhibit 9 at ALCD-PUBCOM_0024315-518. The SPG's comment states that "[n]otwithstanding the constant efforts of [OxyChem] (most recently*

14

*through court filings and media advertisements) to avoid responsibility for cleaning up a river that it is primarily responsible for polluting with dioxin and other contaminants, this settlement is fair and reasonable, and the United States should promptly move for entry of the [Consent Decree]." Id. at ALCD-PUBCOM_0024315.*

*The SPG's comment is comprised of four parts: (1) Background; (2) discussion of why the Diamond Alkali Superfund Site is overwhelmingly a dioxin site; (3) discussion of why OxyChem is primarily responsible for remediation of the Lower Passaic River because it contributed almost all of the dioxin in the river and added to all other contaminants of concern; and (4) discussion of why the proposed Decree includes a premium that mitigates the impact of potential challenges to specific allocation calculations or party findings. See Exhibit 9 at ALCD-PUBCOM_0024316-32. Notably, the SPG asserts that in addition to the $150 million due under the proposed Decree, the Settling Parties previously paid more than $160 million in response costs at the Site under prior settlement agreements with the United States for which the settling parties would release potential contribution claims under the Decree. See Exhibit 9 at ALCD-PUBCOM_0024331-32. The SPG submitted a report by Dr. Linda S. Birnbaum, Exhibit 9 at ALCD-PUBCOM_0024344-477, D. Michael Johns, Ph.D. (Relative Risks of OU2 Contaminants of Concern & Comparison with OU4), Exhibit 9 at ALCD-PUBCOM_0024479-499, and Betsy Ruffle (Relative Risks of OU2 Contaminants of Concern and Comparison with OU4), Exhibit 9 at ALCD-PUBCOM_0024501-18, in support of the proposed Decree.*

Applicable Comments:
ALCD-PUBCOM_0000195 (Meadowlands Regional Chamber of Commerce); ALCD-PUBCOM_0000400 (New York and New Jersey Baykeeper); ALCD-PUBCOM_0024315 (SPG)

**Response**: As described in the accompanying Motion to Enter the Proposed Consent Decree, the United States is moving to enter the proposed Decree because it is fair, reasonable, and in the public interest by being consistent with the goals of CERCLA. These comments recognize and support that conclusion, and the Baykeeper's comment further recognizes EPA's long commitment to the cleanup of the Diamond Alkali Superfund Site, including the Lower Passaic River.

RESPONSES TO OCCIDENTAL CHEMICAL CORPORATION'S
("OXYCHEM'S") COMMENTS

OxyChem submitted legal and technical comments totaling 777 pages, with more than 24,000 pages of supporting exhibits.  OxyChem's comments are summarized by topic, with responses, below in RS 9 through RS 131.

**RS 9.** *OxyChem Comment Section I.A.-L. (Executive Summary) (pp. 1-16): OxyChem summarizes its comments here in this section.*

**Response**: This is a summary of the arguments set forth in the comments.  The United States responds to specific arguments below, and therefore a response to this summary is unnecessary.

**RS 10.** *OxyChem Comment Section II.A (p. 17): OxyChem argues that EPA lacks authority to "impose a binding allocation" under CERCLA. OxyChem makes several points in Section II.A. of its comments. The specific points are summarized and responded to below.*

**Response**: EPA has not "impose[d] a binding allocation" in this matter.  Rather, the United States has proposed a Consent Decree for the Court to review and approve. Because the proposed Consent Decree requires Court review and approval, EPA has not bound any party to this proposed settlement.  That is, like all consent decrees, the material terms of the settlement do not take effect unless and until the Court approves the Consent Decree and enters it as a final judgment.  *See* ECF No. 283, Consent Decree ¶ 5 ("'Effective Date' means the date upon which the Court's approval of this Consent Decree is recorded on its docket.").  Hence, EPA has not "imposed" a settlement; a judicial act is required to animate the terms of the settlement.

The settlement is also not a "binding allocation."  It is based, in part, on the non-binding allocation of responsibility that was conducted by AlterEcho as a third-party neutral.  That site-specific allocation was a voluntary process, and AlterEcho's Allocation Recommendation Report is not binding on anyone, including the United States.  The United States, for example, did not adhere strictly to AlterEcho's allocation findings, but used them only as a starting point for the second phase of the settlement process (with the AlterEcho allocation being the first phase).  *See* Mem. in Supp. at § II.G.; Yeh Decl. ¶ 54.  In that second phase, the United States reviewed AlterEcho's Allocation Recommendation Report, identified PRPs that they deemed eligible to participate in a cashout settlement, and negotiated a settlement with those parties that were willing to participate.  *See id*.

No party was compelled to participate in the allocation process or in the proposed settlement.  Ten PRPs, including OxyChem, did not participate despite having been invited.  *See* Yeh Decl. ¶¶ 26, 34.  Some parties participated in the allocation

process but chose not to participate in the settlement, and some parties participated in the allocation process but were not offered the opportunity to participate in this settlement.[6] *See* Yeh Decl. ¶ 26. Further, the settlement is not the allocation; the settlement amount represents a much higher collective share of responsibility for the Settling Defendants than the sum of the shares AlterEcho recommended for the Settling Defendants in the Allocation Recommendation Report. *See* Mem. in Supp. at § II.G.

Ultimately, OxyChem misunderstands when a "binding allocation" occurs. OxyChem states incorrectly that this matter arises under Section 113(f) of CERCLA. That section allows a PRP that has incurred response costs to sue other PRPs for contribution. *See* 42 U.S.C. § 9613(f). When a PRP brings a Section 113(f) claim against other PRPs, the court may allocate response costs among the liable parties and the court's allocation decision would be binding on the parties just as any final order would bind litigants. Here, the United States is not bringing a Section 113(f) action; it is seeking a court-approved settlement that would resolve the United States' claims under Sections 106 and 107 of CERCLA against the Settling Defendants in exchange for a payment of $150 million. *See infra* RS 12.

*RS 11.*　　　*OxyChem Comment Section II.A (p. 17): OxyChem, in a continuation of the comment above, argues that EPA may not sponsor an allocation; that the only mechanism by which EPA may perform or sponsor an allocation is by performing an NBAR under Section 122€(3) of CERCLA.*

**Response**: Contrary to OxyChem's assertions, the Allocation Recommendation Report is not a NBAR as that term is used in Section 122(e)(3) of CERCLA. Section 122(e)(3) of CERCLA states,

> "The President shall develop guidelines for preparing nonbinding preliminary allocations of responsibility. In developing these guidelines the President may include such factors as the President considers relevant, such as: volume, toxicity, mobility, strength of evidence, ability to pay, litigative risks, public interest considerations, precedential value, and inequities and aggravating factors. When it would expedite settlements under this section and remedial action, the President may, after completion of the remedial investigation and feasibility study, provide a nonbinding preliminary allocation of

---

[6] In addition, one PRP did not participate in the allocation but did join the proposed Consent Decree. And certain PRPs that had earlier resolved their liability for OU2 through administrative cashout settlements joined the proposed Consent Decree to resolve their liability for OU4. *See* Yeh Decl. ¶ 26.

> responsibility which allocates percentages of the total cost of response
> among potentially responsible parties at the facility."

There are several differences between an NBAR and the allocation supporting the proposed settlement in this case. Among other things, NBARs are performed by EPA itself and are done at an earlier stage in the cleanup process, i.e., when the remedial investigation and feasibility study (RI/FS) are completed. *See* Interim Guidelines for Preparing Nonbinding Preliminary Allocations of Responsibility, 56 Fed. Reg. 19919 (May 16, 1987) (NBAR Guidance) (available at https://www.epa.gov/enforcement/guidance-preparing-nonbinding-preliminary-allocations-responsibility-nbar). In contrast, here the allocator is a neutral third-party, and the allocation was prepared much later in the cleanup process -- after the RI/FS and after EPA selected a remedy for OU2 of the Site.

Moreover, OxyChem's discussion of NBARs is misplaced because the NBAR provision in Section 122(e)(3) of CERCLA (which itself is not mandatory) does not apply to this action. OxyChem argues, incorrectly, that this proposed cashout settlement arises from Section 122 of CERCLA. It does not. Section 122 of CERCLA governs agreements to perform response actions (i.e., cleanup settlements). *See, e.g., In re Acushnet River & New Bedford Harbor Proc. re Alleged PCB Pollution ("Acushnet IV")*, 712 F. Supp. 1019, 1033–34 (D. Mass. 1989) (noting Section 122 "reach[es] cleanup settlements"). The proposed settlement, however, does not require the Settling Defendants to perform cleanup work; it requires them to pay money to resolve the United States' claims under Section 106 and 107(a) of CERCLA. Accordingly, on its face, the NBAR provision in Section 122(e)(3) of CERCLA does not apply here.[7]

Although the United States is settling CERCLA claims, the Government's authority to enter into the proposed Consent Decree is derived not from CERCLA, but from long-established inherent authority of the Attorney General to conduct and resolve litigation involving the United States. As observed in *United States v. Hercules, Inc.*,

> the Attorney General has exclusive authority and plenary power to
> control the conduct of litigation in which the United States is involved,
> unless Congress specially authorizes an agency to proceed without the
> supervision of the Attorney General.

---

[7] Even if this settlement arose from Section 122 of CERCLA, an NBAR would not have been required. 42 U.S.C. § 9622(e)(3) ("When it would expedite settlements under this section…the President *may*, … provide a nonbinding preliminary allocation of responsibility….") (emphasis added).

*See* 961 F.2d 796, 798 (8th Cir. 1992); *see also Halbach v. Markham*, 106 F. Supp. 475, 480 (D.N.J. 1952) (same), *aff'd*, 207 F.2d 503 (3d Cir. 1953). Nothing in Section 122 of CERCLA "limit[s] the Attorney General's plenary authority over the control and conduct of litigation in which the United States is a party." *Hercules, Inc.*, 961 F.2d at 799. Thus, OxyChem is wrong to say that Section 122 limits the United States' authority to conduct and resolve litigation involving the payment of response costs under Section 107 of CERCLA. By extension, even if NBARs were necessary for EPA to resolve claims under Section 122, which they are not, the authority of the United States to propose consent decrees of this nature based on allocations would not be confined to the limited NBAR procedure set forth in Section 122(e)(3) of CERCLA. *See, e.g.*, RS 12.

**RS 12.    *OxyChem Comment Section II.A (p. 17): Only a federal district court can determine the proper allocation of CERCLA liability in a contribution claim under Section 113 of CERCLA.***

**Response**: The proposed consent decree is a settlement of the United States' claim against the Settling Defendants under Section 107(a) of CERCLA. Section 107(a) of CERCLA imposes joint and several liability on PRPs. The Third Circuit recognizes the United States' right to settle the liability of PRPs based on an underlying measure of comparative fault, so long as that measure is rational. *See In re Tutu Water Wells CERCLA Litigation*, 326, F.3d 201, 207 (3d Cir. 2003) (affirming district court's decision to enter consent decree with an underlying allocation of fault percentages based on volume and toxicity of the parties' contamination); *United States v. Se. Pa. Transp. Auth. (SEPTA)*, 235 F.3d 817, 824 (3d Cir. 2000).

OxyChem incorrectly conflates the United States' case under Section 107 of CERCLA with a contribution litigation between PRPs under Section 113(f)(1) of CERCLA. Subsection 113(f)(1) of CERCLA, which OxyChem relies on, governs the resolution only of contribution claims: "In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate." (emphasis added). Likewise, the case cited by OxyChem, *Beazer East v. Mead Corp.*, 412 F.3d 429 (3d Cir. 2005), concerned the resolution by the court of a contribution claim between private parties under Section 113 of CERCLA, not the settlement of a claim by the United States under Section 107 of CERCLA. Subsection 113(f)(1) of CERCLA is inapplicable here and therefore does not bar the United States from proposing a settlement based, in part, on a non-binding allocation performed by a third-party neutral.[8]

---

[8]    Under OxyChem's theory of how Section 113(f)(1) limits the United States' authority to settle claims under Section 107, the United States would be unable to settle with anyone at a multi-PRP site if such a settlement arises from EPA and

In addition, OxyChem's argument ignores the Court's role in reviewing the Consent Decree and considering whether it should be approved. EPA cannot unilaterally impose this settlement; judicial approval is required. And many courts have approved CERCLA consent decrees based on site-specific allocations (not NBARs) like AlterEcho's Allocation Recommendation Report. *See generally* Mem. in Supp. at §§ III, IV.

**RS 13.** *OxyChem Comment Section II.A (p. 17): OxyChem argues CERCLA authorizes EPA to conduct only nonbinding allocations, through the NBAR process, explicitly limiting the effect of those nonbinding allocations by making them inadmissible and depriving the Court of subject matter jurisdiction to review them. 42 U.S.C. § 9622(e)(3). Thus, EPA has no authority to use or offer the results of the Allocation Recommendation Report to support the proposed Consent Decree.*

**Response**: As discussed at length in responses to comments elsewhere, CERCLA does not restrict EPA from sponsoring the process that resulted in the Allocation Recommendation Report, and that report is not an NBAR. *See, e.g.*, RS 11, 12, 15, 16. Furthermore, the United States is asking the Court to review and approve the settlement memorialized in the proposed Consent Decree, not the Allocation Recommendation Report as a standalone document.

**RS 14.** *OxyChem Comment Section II.A (p. 17): EPA's ability to arbitrate claims is limited to situations where the total response costs for the site do not exceed $500,000. 42 U.S.C. § 9622(h)(2).*

**Response**: OxyChem's reference to 42 U.S.C. § 9622(h)(2)'s cost cap in arbitrations is misplaced because EPA did not arbitrate a claim in this case. As noted above, this is a cashout settlement under the inherent authority of the Attorney General, not a cleanup or administrative settlement under Section 122 of CERCLA. *See* RS 10, 11. EPA and the Department of Justice engaged in settlement negotiations to resolve the United States' claims under Sections 106 and 107 of CERCLA against

---

DOJ's analysis of the PRPs' respective shares of liability for response costs. Consider a hypothetical Superfund site with two known PRPs: Jack and Jill. Assume both PRPs disposed of 50 kg of dioxin at the site, and the United States proposes to settle with Jack for half of the estimated remediation costs based on a simple volumetric split. Under OxyChem's theory, the Court cannot approve such a settlement because the Court did not perform the allocation itself. Such an outcome would prevent the government from recouping cleanup costs via negotiated settlements. Instead, all cost recovery claims regarding multi-party sites would require litigation and judicial findings, which would hamstring the Superfund Program and consume scarce judicial and governmental resources.

the Settling Defendants, and the proposed settlement is now before the Court for its review and approval.

**RS 15.** *OxyChem Comment Section II.A (pp. 17-18): OxyChem argues that only a court, not EPA, can allocate costs.*

**Response**: As noted above, the case cited by OxyChem, *Beazer East v. Mead Corp.*, 412 F.3d 429 (3d Cir. 2005), concerned the resolution by the court of a contribution claim between private parties under Section 113 of CERCLA, not the settlement of a claim by the United States under Section 107 of CERCLA. *See* RS 10, 11. The settlement by the United States of a claim under Section 107 of CERCLA, based in part on an underlying allocation, is governed by cases such as *In re Tutu Water Wells CERCLA Litigation*, 326, F.3d 201, 207 (3d Cir 2003) and *United States v. Se. Pa. Transp. Auth. (SEPTA)*, 235 F.3d 817, 824 (3d Cir. 2000). These cases demonstrate that the Court may approve a proposed consent decree between the United States and PRPs based on an underlying allocation so long as that allocation is not "arbitrary, capricious, and devoid of a rational basis." *SEPTA*, 235 F.3d at 824, and so long as the Court determines the proposed consent decree is fair, reasonable, and consistent with the goals of CERCLA.

**RS 16.** *OxyChem Comment Section II.B.1-3 (pp. 18-23): OxyChem argues that prior attempts to amend CERCLA demonstrate that EPA lacks authority to sponsor an allocation process. It notes that in 1994 and again in 1999, Congress failed to pass amendments to CERCLA that would have authorized it to conduct allocations and make an allocation report admissible in court proceedings, and argues that the failure of these amendments confirms that EPA exceeded its authority here.*

**Response**: The AlterEcho allocation process substantially differs from the allocation schemes proposed in the Superfund Reform Act of 1994 ("SRA")[9] and the Recycle America's Land Act of 1999 ("RALA")[10] in both scope and effect. Accordingly, OxyChem's suggestion that EPA's lack of authority is evident from Congress's rejection of the SRA and the RALA is misplaced. Put simply, those bills have no bearing on the proposed Consent Decree.

---

[9] Superfund Reform Act of 1994, S. 1834, 103d Cong. (1994) (as introduced, Feb. 7, 1994), *available at* https://www.congress.gov/bill/103rd-congress/senate-bill/1834/text/is?s=3&r=93 (last visited January 28, 2024).

[10] Recycle America's Land Act of 1999, H.R. 1300, 106th Cong. (1999) (as introduced, Mar. 25, 1999), *available at* https://www.congress.gov/bill/106th-congress/house-bill/1300/text (last visited January 28, 2024).

The AlterEcho allocation process is a *non-binding*, site-specific allocation that EPA, at its discretion, sponsored as part of its overall enforcement strategy for the Site. The SRA and RALA would have authorized wholly different allocation schemes.

Unlike the AlterEcho allocation process, the allocation schemes proposed in the SRA and the RALA were *mandatory* and would have fundamentally changed how almost every CERCLA cost recovery case is carried out. The SRA would have imposed a *mandatory* allocation scheme by which EPA would have been required to convene allocations for *all* multi-PRP sites.[11] The failure of the SRA in Congress means that EPA is not *required* to perform an allocation for the Site; it does not mean that EPA lacks the discretion or ability to sponsor an allocation where appropriate for a particular site.

Similar to the SRA, the RALA would have imposed a *mandatory* scheme in which EPA would have been *required* to initiate an allocation by filing cost recovery actions under Section 107 for all sites (1) not subject to consent decree or administrative order as of March 25, 1999; and (2) where the estimated costs for response actions exceed $2 million.[12] Had the RALA passed, the Diamond Alkali Site likely would have been subject to this mandatory allocation scheme, which would have required the United States to file a complaint in the U.S. District Court prior to performing the allocation, and would have empowered the court to oversee the allocation.[13] The RALA would also have given EPA the discretion to perform allocations for sites not encompassed by the mandatory program, but, those

---

[11] *See* Superfund Reform Act of 1994, S. 1834, 103d Cong. § 408 ("Section 122 of the Act (42 U.S.C. 9622), is amended— (a) by striking out subparagraph (e)(3)"); *id*. § 409 (proposing Section 122a(a), "Allocation at Multi-Party Facilities" – "Scope").

[12] Recycle America's Land Act of 1999, H.R. 1300, 106th Cong. § 311 (proposing new Section 131(b), "Allocation" – "Eligible Response Action") (proposing new Section 131(c)(1), "The President shall initiate an allocation … for each eligible response action by filing a cost recovery and declaratory judgment action under section 107…").

[13] *See id.* § 311 (proposing new Section 131(c)(1), providing that the "President shall initiate an allocation … by filing a cost recovery and declaratory judgment action … in the district court of the United States in the district in which [the] release occurs," and new Section 131(c)(3), providing that, "[u]pon the filing of the action referred to in paragraph (1), the court shall have jurisdiction to ensure that a fair and equitable allocation of liability is undertaken …").

discretionary allocations may also have been subject to the same complaint-first procedure.[14]

Here, on the other hand, by sponsoring a *non-binding*, site-specific allocation, EPA is neither advancing nor employing a mandatory allocation scheme.[15] In fact, EPA has previously acknowledged that a mandatory allocation scheme, like the ones proposed in the SRA and RALA, would be inefficient and a poor use of agency resources.[16] Unlike the SRA and RALA schemes, the AlterEcho allocation process and this proposed Consent Decree will not affect how every CERCLA cost recovery case is carried out.

Even if the AlterEcho allocation process were similar to the SRA and the RALA allocation schemes, that still would not "confirm[] that EPA exceeded its authority." Exh. 10, OxyChem Comment II.B., p. 18. Although OxyChem does not say so expressly, its comment relies on the "rejected proposal rule," a principle of statutory construction that holds courts may infer from Congress's rejection of a bill or amendment that a similar interpretation is excluded when interpreting a statute. *See* William N. Eskridge, Jr., *Interpreting Legislative Inaction*, 87 Mich. L. Rev. 67,

---

[14] *See id.* (proposing new Section 131(d), "Discretionary Allocation Process," which provided that "[n]otwithstanding subsection (a)(1), the President may initiate an allocation under this section for any response action").

[15] *See* Jon Niermann, *Alternative Dispute Resolution in CERCLA Settlement*, 17 J. Envtl. L. & Litig. 389, 403-04, 409-10 (2002) ("Each allocation method [i.e., (1) litigation; (2) allocation by formula; (3) binding arbitration for small cost recovery claims; (4) non-binding arbitration; (5) S*RA-style non-binding allocation*; (6) NBARs; (7) mediation; and (8) negotiation] may offer distinct benefits or limitations depending on the circumstances of a particular CERCLA action. […] [A] particular method is not appropriate in and of itself; it may be appropriate only in the context of particular circumstances. Nevertheless, *in any given CERCLA action, some alternative or combination of alternatives will be most appropriate, and the appropriate methods tend to be those more commonly associated with ADR*, namely, arbitration, *allocation*, and mediation.") (emphasis added) (internal citations omitted).

[16] *See Hearing on S. 8, Superfund Cleanup Acceleration Act of 1997, Before the S. Comm. on Environment and Public Works*, 105th Cong. (1997) 69, 82 (statement of Carol Browner, Administrator, EPA), available at https://www.congress.gov/105/chrg/CHRG-105shrg46587/CHRG-105shrg46587.pdf. ("Based on this experience, EPA cannot support a mandatory allocations process at every multi-party site. … Based on our experience with allocating and our allocation pilot projects, we believe that legislation should reduce transaction costs by promoting settlements and encouraging contribution allocation of costs among settling parties through a flexible, nonprescriptive process that makes effective use of available "orphan share" funding.")

85 (1988). However, the Supreme Court has expressed hesitation in applying this canon of statutory interpretation. *Pension Benefit Guar. Corp. v. LTV Corp.,* 496 U.S. 633, 650 (1990) (stating that legislative proposals are "a particularly dangerous ground on which to rest an interpretation of a prior statute" because a bill can be proposed or rejected for any number of reasons); *United States v. Price,* 361 U.S. 304, 313 (1960) (noting that the "[t]he views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one."). Courts have not established a clear standard for the rejected proposal rule, but the Court has stressed that Congress must have been aware of and deliberated over the precise issue at hand. *See Bob Jones Univ. v. United States,* 461 U.S. 574, 600–01 (1983) (applying the rejected proposal rule because legislative history showed that Congress debated the precise issue and rejected 13 bills on this issue); *Monell v. Dept of Social Services,* 436 U.S. 658, 664-83, 690–95 (1978) (refusing to apply the rejected proposal rule because legislative history showed that Congress rejected multiple bills on separate grounds, unrelated to the issue at hand).

The SRA and the RALA exemplify the problems with the "rejected proposal rule." During the legislative process, Congress did not debate the precise issue of whether EPA has the authority to sponsor an allocation, and it is uncertain why the SRA and RALA ultimately failed to become law.[17] This Court is not bound by the rejected proposal rule and should not place any weight on the SRA and RALA's legislative history.

### *RS 17.    OxyChem Comment Section II.B.4 (pp. 23): OxyChem argues that allocations delay cleanups.*

**Response**: OxyChem refers to criticism of the SRA to suggest that a mandatory allocation performed by EPA would delay cleanup work at a site. Here, EPA did not perform the allocation, and the allocation is not binding, as discussed at length in responses to comments elsewhere. *See, e.g.*, RS 10-13. EPA sponsored an allocation process, which was performed by AlterEcho, a third-party neutral. Cleanup work at the Diamond Alkali Superfund Site proceeded uninterrupted during the time that AlterEcho performed the allocation, as well as during the negotiations for the proposed Consent Decree. As the party who has been performing response work, OxyChem is aware of this. *See* Yeh Decl. ¶ 23 (OxyChem performing OU2 and OU4 RD); Sharkey Decl. ¶ 18 (OxyChem performing RD for OU4). The United States

---

[17] *See* James E. Satterfield, *High Hopes and Failed Expectations: The Environmental Record of the 103d Congress*, Environmental Law Reporter Comment Vol. 25 Iss. 2 at p. 10091-94 (1995) (noting that the SRA "never even reached the Senate floor because senators were waiting for the House to act" on its related bill, HR 3800, which was facing significant political pushback on non-allocation provisions, like preserving retroactive liability, implementing national cleanup standards, and insurance funding.)

anticipates that remedial action for OU2 will move forward when the remedial design for OU2 is done. EPA issued its Record of Decision selecting the cleanup for OU2 in March 2016, and OxyChem started the remedial design for the remedy in September 2016 with its signature on the Administrative Settlement Agreement and Order on Consent for Remedial Design (CERCLA Docket No. 02-2016-2021). *See* Yeh Decl. ¶ 23.  EPA issued its Record of Decision selecting the interim cleanup for OU4 in September 2021. OxyChem started the remedial design for the remedy in March 2023 with its signature on a Notice of Intent to Comply with the Unilateral Order for Remedial Design (CERCLA Docket No. 02-2023-2011) issued by EPA.  *See* Sharkey Decl. ¶ 18.

*RS 18.*　　　*OxyChem Comment Section II.B.5 (pp. 23): Due Process Rights are Implicated when EPA conducts a binding allocation.*

**Response**: OxyChem states that the AlterEcho allocation process implicates and contravenes its constitutional due process rights, making the proposed Consent Decree wholly improper and *ultra vires*. In support of this, OxyChem quotes a statement from EPA Administrator Browner discussing the potential use of administrative law judges to perform binding allocations, and the concern that binding allocations performed by administrative law judges implicate due process rights.

As noted in response to other comments, the AlterEcho allocation was a process performed by a third party neutral, and not an administrative law judge.  The Allocation Recommendation Report is not binding on anyone; it served as a starting point for the second phase of the settlement process, in which the United States reviewed the Allocation Recommendation Report and associated information, identified PRPs that were eligible to participate in a cashout settlement, and negotiated a settlement with those who were eligible and willing to participate. Further, the United States did not adopt the Allocation Recommendation Report wholesale; in formulating the settlement the United States decided not to use certain factors that AlterEcho had applied, and added a significant premium before arriving at the $150 million settlement amount.  *See* Mem. in Supp. at § II.G.

As discussed at length in responses to comments elsewhere, EPA is not seeking to impose a binding allocation.  *See, e.g.*, RS 10. Rather, the United States, on behalf of EPA, has proposed, for the Court's review and approval, a Consent Decree that would resolve the United States' cost recovery claims under Section 107 of CERCLA against the Settling Defendants in exchange for a payment of $150 million in response costs.  Like all consent decrees, the material terms of the settlement do not take effect unless and until the Court approves the Consent Decree and enters it as a final judgment.  *See, e.g.*, ECF No. 283, Consent Decree ¶ 5 ("'Effective Date' means the date upon which the Court's approval of this Consent Decree is recorded

on its docket.").  Therefore, this is not an administrative action that implicates OxyChem's due process rights.  A judicial act is required to animate the key terms of the settlement.  This Court has granted OxyChem's motion to intervene in this judicial case, and so there is no deprivation of its due process rights.  Moreover, the United States further departed from the Allocation Recommendation Report after it received and reviewed public comments by removing three initial settling parties from the settlement.  *See* ECF No. 285.  The United States now moves to enter a consent decree, ECF No. 283, that differs from the one it lodged with this Court in December 2022, ECF No. 2-1.

**RS 19.**     *OxyChem Comment Section II.C (pp. 24-25): OxyChem argues that EPA cannot "justify its unauthorized process" under the ADR Act.*

**Response**: OxyChem states that EPA's settlement process failed to comply with the Administrative Dispute Resolution Act ("ADR Act"), noting that the Allocation Recommendation Report states that it was conducted "pursuant to the provisions of the ADR Act."  *See* Allocation Recommendation Report p. 18, Exh. 12 at ARR0018.  OxyChem's criticism is misplaced. First, contrary to OxyChem's comment, EPA did not use the ADR Act to "justify" or provide a basis of authority for the AlterEcho allocation. Rather, the ADR Act applied to the AlterEcho allocation because the process used by AlterEcho was a "dispute resolution proceeding" under 5 U.S.C. §571(6) of the Act. The ADR Act helped ensure that the ADR professionals working on the allocation followed certain standards relating to confidentiality and that confidentiality of certain communications that took place during the allocation process.  *See* Revised Work Plan for the Allocation, pp. 5-6, Exhibit E to Allocation Recommendation Report, ARR0117, 122-23. Confidentiality is necessary for the success of any ADR process[18] and here allowed participating allocation parties to be open and forthcoming with the AlterEcho allocation team.  *See* OU2 Allocation Confidentiality Agreement, Exhibit F to Allocation Recommendation Report, ARR0132-37.  OxyChem also cites to an EPA Administrative Law Judge ADR-related web page which indicates that a mediation process should be accepted by all parties.  The AlterEcho allocation was not a mediation and was not characterized as

---

[18] *See* "Confidentiality Protection in a Federal Alternative Dispute Resolution Proceeding, Quick Reference Guide," available at www.epa.gov/sites/default/files/2018-04/documents/confidentiality_protection_in_a_federal_adr_proceeding.pdf (Oct. 11, 2017) ("Confidentiality is a critical component of a successful ADR process. Guarantees of confidentiality allow parties to speak openly without the fear that statements made during the ADR process will be disclosed to others. . . . [T]he ADR Act provides confidential protection to oral and written communications made during a federal ADR proceeding.").

such when the PRPs were invited to participate. The ADR Act contemplates a wide range of processes "including, but not limited to, conciliation, facilitation, mediation, [and] factfinding…" among others. 5 U.S.C. §571(3). The process led by AlterEcho was more in the realm of fact finding because it was intended to produce a report that could assist in a subsequent negotiation process.

With respect to the allocation itself, participation was voluntary and the results were non-binding.  *See* RS 10. As noted in response to other comments, the Allocation Recommendation Report did not represent a final resolution; it served as a starting point for the second phase of the settlement process, in which the United States reviewed AlterEcho's Allocation Recommendation Report, identified PRPs that were eligible to participate in a cashout settlement, and negotiated a settlement with those that were eligible and willing to participate. Yeh Decl. ¶¶ 57, 59.  The Allocation Recommendation Report noted this, stating "[c]onduct of the Allocation is the first phase of a two (2) phase ADR facilitated settlement process to obtain future cash-out and work party settlements between EPA and the Allocation Parties. The first phase (Phase 1) is the allocation conducted by Allocator David Batson. The second phase (Phase 2) is subsequent negotiations between the Allocation Parties and EPA utilizing the Allocator's recommendation regarding the equitable allocation of responsibility among the Allocation Parties."  Exh. 12, Allocation Recommendation Report p. 6, ARR006.

OxyChem also notes, as it did in other portions of its comments, that the Recycle America's Land Act of 1999 post-dated the ADR Act, as evidence that EPA lacked authority under the ADR Act.  As noted above, EPA did not rely on the ADR Act for "authority" to sponsor the allocation, and RALA has no bearing on the settlement proposed in the Consent Decree.  *See* RS 16.

Next, OxyChem alleges that EPA violated the ADR Act by making OxyChem an "involuntary" party to the allocation and by having AlterEcho occupy "two conflicting roles" in the allocation. But OxyChem was not an involuntary party; it voluntarily chose not to participate in the allocation. The ADR Act does not contemplate a concept like an involuntary party.  A "party" under the Act is one that has chosen to participate in the proceeding.  5 U.S.C. §571(10).  It is not unusual for some but not all persons with an interest in a matter to choose to enter into a dispute resolution process that is covered by the ADR Act and, indeed  the Act does incorporate the concept of "nonparty participants." While that term is not defined in the Act, it is found in the confidentiality provisions, 5 U.S.C. §574(a)(1) and (e), and reflects the reality that there are sometimes interested persons that are not a party to a dispute resolution proceeding that falls under the authority of the Act. Therefore, OxyChem's choice not to participate does not somehow exempt the process from application of the ADR Act.

In addition, AlterEcho did not occupy a "conflicting role" because, as explained in response to comments elsewhere, *see* RS 73, AlterEcho acted as a neutral, third-party allocator reviewing all available information and recommending shares based on that information. Moreover, and as noted above, the allocation was merely the first phase in a settlement process that culminated in negotiations between the Settling Defendants and the United States and the proposed settlement that requires this Court's approval before becoming effective. AlterEcho did not serve as a neutral in the second phase of the settlement process.

OxyChem also argues that EPA was not able to "release[e] the allocation report to the public without the consent of OxyChem." This is not correct. Under the ADR Act it is the parties, not the non-parties, whose ADR communications (such as the allocation report) are protected as confidential and cannot be disclosed without consent. *See* 5 U.S.C. § 574(b).

Finally, the ADR Act, 5 U.S.C. 572(b)(4), did not bar EPA from moving forward with the allocation once OxyChem decided not to participate in it. Rather, that section of the statute states that "[a]n agency shall consider not using a dispute resolution proceeding if . . . the matter significantly affects persons or organizations who are not parties to the proceeding." Here, EPA complied with the statute by considering whether to move forward with the allocation once it was clear that OxyChem would not participate. *See* Yeh Decl. ¶ 38. However, given that no party would agree to perform the entirety of the remedial work, EPA needed a strategy for addressing the large number of parties it considered liable at the Site. *See* Yeh Decl. ¶ 38.  The PRPs had begun to perform an allocation themselves on several occasions but those efforts failed. *See* Yeh Decl ¶ 26.  Therefore, EPA decided that – despite OxyChem's non-participation – it had sound reasons for moving forward with the allocation, in keeping with EPA's enforcement strategy for the Site and CERCLA's preference for settlements, and sufficient information to do so.  *See* Yeh Decl. ¶ 38.

**RS 20.**  *OxyChem Comment Section III.A (p. 25): OxyChem argues the proposed settlement has multiple fatal procedural flaws. The proposed settlement improperly relies on a third-party allocation process that violated CERCLA.*

**Response**: OxyChem summarizes certain aspects of the proposed Consent Decree, then concludes that "EPA's process was seriously flawed in many ways and cannot be reconciled with the requirements that CERCLA imposes. The proposed settlement should therefore be rejected."

Here, OxyChem does not specify the "many" ways in which the proposed Consent Decree is flawed, nor which requirements of CERCLA it believes are unreconcilable with the proposed Consent Decree. Because OxyChem provides more detailed

comments elsewhere, the United States incorporates its responses to all of OxyChem's other comments herein.  *See* RS 9-19, 21-131.

*RS 21.       OxyChem Comment Section III.A.1 (pp. 26): EPA improperly used a private contractor rather than performing the preliminary allocation itself.*

**Response**: This comment is based upon the assumption that AlterEcho's Allocation Recommendation Report was a "nonbinding preliminary allocation of responsibility" or "NBAR" under Subsection 122(e)(3) of CERCLA. It is not.

OxyChem also implies that the AlterEcho allocation can be only one of two things: either a binding allocation, or an NBAR.  *See* RS 10, 11.  This is also not the case.

Based on the incorrect assumption that the AlterEcho allocation was an NBAR, OxyChem states that EPA improperly delegated its authority by allowing a private contractor to perform the "nonbinding preliminary allocation of responsibility."

First, as discussed in responses to comments elsewhere, *see* RS 10, 11, the proposed Consent Decree is a cashout settlement under the inherent authority of the Attorney General, not a cleanup settlement under Section 122 of CERCLA.  As such, the NBAR provision in Subsection 122(e)(3) does not apply to this settlement. Even if Section 122(e)(3) applied, it does not mandate that EPA perform an NBAR. 42 U.S.C. § 9622(e)(3) ("When it would expedite settlements under this section…the President *may*, … provide a nonbinding preliminary allocation of responsibility….") (emphasis added).

Next, there are several differences between EPA's NBAR process, described in EPA guidance, and the AlterEcho allocation process. *See* Interim Guidelines for Preparing Nonbinding Preliminary Allocations of Responsibility, 56 Fed. Reg. 19919 (May 16, 1987) (NBAR Guidance) (available at https://www.epa.gov/enforcement/guidance-preparing-nonbinding-preliminary-allocations-responsibility-nbar); *see, e.g., United States v. BP Amoco Oil PLC*, 277 F.3d 1012, 1016–17 (8th Cir. 2002) (EPA performed an NBAR and supported its settlement with a sworn statement from an EPA employee explaining EPA's allocation methodology).  Here, the AlterEcho allocation was performed by a third-party neutral hired by EPA, and EPA was not involved in various aspects of the allocation.  And EPA guidance also contemplates that NBARs would be conducted much earlier in the cleanup process — during the remedial investigation and feasibility study for the site.  NBAR Guidance at 19919.  The AlterEcho allocation process started much later, after EPA had selected the remedial action for OU2. Furthermore, the guidance explains that EPA only provides the numerical results of an NBAR to the PRPs; PRPs do not receive a detailed explanation of the NBAR results.  *Id.* at 19921.  In contrast, PRPs that participated in the AlterEcho

allocation received a copy of the entire Allocation Recommendation Report, along with the attachments to the report, when AlterEcho issued it in December 2020, and EPA made those documents available to the public when the proposed Consent Decree was lodged in the Court.

The allocation process was not an NBAR under Subsection 122(e)(3) of CERCLA; it was acceptable and appropriate for EPA to retain a third-party allocator, AlterEcho, to perform the allocation.

*RS 22.*     *OxyChem Comment Section III.A.1 (p. 27): The United States has "repeatedly recognized – including in the proposed consent decree itself – that [AlterEcho] indeed conducted a nonbinding preliminary allocation of responsibility."*

**Response**: EPA has described the allocation, accurately, as a non-binding allocation performed by a third-party neutral. The AlterEcho allocation is not an NBAR.  Notably, if EPA decides to prepare an NBAR, EPA guidance requires it to "notify PRPs of that fact in writing as early as is feasible."  NBAR Guidance at 19920.  Because EPA never conducted an NBAR for the Site, EPA never issued such a notice to the PRPs.

Moreover, past practice demonstrates that consent decrees can be based on settlements that arise from allocations conducted outside of the limited NBAR process.  *See* RS 10-16; Mem. in Supp. § III.

*RS 23.*     *OxyChem Comment Section III.A.1 (pp. 27-28): The United States incorrectly suggests that the AlterEcho allocation process can be justified by the ADR Act. Congress specifically provided in CERCLA the strictly limited way in which EPA is authorized to conduct a nonbinding preliminary allocation of responsibility to facilitate settlement.  42 U.S.C. § 9622(e)(3)(A).  EPA cannot circumvent the statutory restrictions CERCLA places on such allocations by using the general grant to all federal agencies of the ability to use ADR processes in regulatory proceedings.*

**Response**: As noted in responses to comments elsewhere, the AlterEcho allocation is not an NBAR, and the United States had no need to, nor did it, "justify" the AlterEcho allocation with the ADR Act.  *See supra* RS 19.  The proposed Consent Decree is a cashout settlement of the United States' claims under Sections 106 and 107 of CERCLA against the Settling Defendants.  The authority for the settlement is found under the inherent authority of the Attorney General; the settlement is not a cleanup settlement under Section 122 of CERCLA.  As such, the NBAR provision in Subsection 122(e)(3) that provides EPA the option to carry out an NBAR, does

not explicitly apply to the subject matter of this settlement. Moreover, contrary to OxyChem's allegation and as noted in responses to comments elsewhere, the allocation was not a binding factor used in the negotiation of a cashout settlement. The allocation, and the settlement discussions, were voluntary. Because those settlement discussions were voluntary, it was not necessary for OxyChem to participate. *See* RS 10. Had EPA halted the allocation and settlement process due to OxyChem's refusal to participate, that would have enabled "[o]ne recalcitrant hold-out [to] singlehandedly stymie the efficiency gains CERCLA is meant to facilitate through early settlement and minimization of litigation." *United States v. IMC E. Corp.*, 627 F. Supp. 3d 166, 174 (E.D.N.Y. 2022).

**RS 24.**    *OxyChem Comment Section III.A.1 (p. 28): The only authority EPA has to conduct a nonbinding preliminary allocation for settlement purposes is the NBAR process under Section 122 of CERCLA. 42 U.S.C. § 9622(e)(3)(A)*

**Response**: Section 122 of CERCLA governs settlements in which PRPs agree to perform cleanup work. The proposed Consent Decree is a cashout settlement. The United States' authority to enter into the proposed Consent Decree is not derived from Section 122 of CERCLA, but rather from long-established inherent authority of the Attorney General to conduct and resolve litigation involving the United States. *See* RS 11. As the court observed in *United States v. Hercules, Inc.*,

> the Attorney General has exclusive authority and plenary power to control the conduct of litigation in which the United States is involved, unless Congress specially authorizes an agency to proceed without the supervision of the Attorney General.

*See* 961 F.2d 796, 798 (8th Cir. 1992); *see also Halbach v. Markham*, 106 F. Supp. 475, 480 (D.N.J. 1952), *aff'd*, 207 F.2d 503 (3d Cir. 1953). Section 122 of CERCLA, however, "does not clearly and unambiguously limit the Attorney General's plenary authority over the control and conduct of litigation in which the United States is a party." *Hercules*, 961 F.2d at 799. Thus, there is no basis for OxyChem's argument that Section 122 limits the United States' authority to conduct and resolve litigation involving the payment of response costs under Section 107 of CERCLA. Therefore, the authority of the United States to propose consent decrees of this nature based on allocations is not constrained by the limited (and optional) NBAR procedure described in Section 122(e)(3) of CERCLA.

***RS 25.***     ***OxyChem Comment Section III.A.2 (p. 28): EPA improperly treated the allocation process as binding and mandatory. The proposed Consent Decree is procedurally invalid because EPA treated the Allocation Recommendation Report as effectively binding, because the Report states EPA "has committed to use the Allocator's recommended shares of relative responsibility among the Allocation Parties as the primary factor in its future negotiations."***

**Response**: The full quote from the Allocation Recommendation Report is: "While neither EPA nor the Allocation Parties are bound by the results of the Allocation, EPA has committed to use the Allocator's recommended shares of relative responsibility among the Allocation Parties as the primary factor in its future negotiations in Phase 2 with the goal of reaching agreement with the Allocation Parties on future cash-out and work party settlements." Exh. 12, Allocation Recommendation Report p. 6, ARR006.

This quote makes clear that the Allocation Recommendation Report is not binding, and that EPA committed only to use it as a primary factor in its negotiations. However, a commitment to negotiate is not a commitment to settle, and EPA agreed to a settlement only after it thoroughly evaluated the Allocation Recommendation Report, then negotiated all the factors that resulted in the terms reflected in the proposed Consent Decree. As noted in responses to comments elsewhere, the settlement in the proposed Consent Decree is different from the Allocation Recommendation Report. *See* Mem. in Supp. § II.G. The Consent Decree the United States initially lodged with the Court in December 2022 contained important deviations from the Allocation Recommendation Report and the revised Consent Decree lodged with the Court in January 2024 contains still further deviations from the Allocation Recommendation Report. Accordingly, the Allocation Recommendation Report was not a mandatory, binding document.

***RS 26.***     ***OxyChem Comment Section III.A.2 (p. 28): The proposed Consent Decree implements the improper commitment to follow the Allocation Recommendation Report's conclusions, adopting without variation the results of the report. EPA's decision cannot be squared with CERCLA's NBAR provision, and the only entity that can conduct a binding allocation is a court, which is prohibited from considering an NBAR.***

**Response**: This comment echoes earlier comments. The United States did not adopt without variation the Allocation Recommendation Report's conclusions. It made several important changes to reach the proposed settlement. *See* Mem. in Supp. § II.G. The Allocation Recommendation Report is not an NBAR, nor does the NBAR provision of CERCLA prevent the United States from resolving its claims against the Settling Defendants in this manner. *See* RS 10, 11. Finally, this was

not a binding allocation, and this proposed settlement resolves the claims by the
United States under Sections 106 and 107 of CERCLA; this is not a contribution
action under Section 113, and the settlement will not be effective unless this Court
approves it. *See id.*

**RS 27.       *OxyChem Comment Section III.A.3 (p. 29): EPA improperly
treated the AlterEcho allocation as mandatory because parties who
did not participate were assigned a share.***

**Response**: The AlterEcho allocation process was not mandatory, and EPA did not
treat it as mandatory.  As EPA explained in 2018:

> The OU2 allocation process is not mandatory. . . . EPA issued a letter
> dated September 18, 2017 to 80 potentially responsible parties (PRPs)
> inviting those parties to participate in the allocation. Some of the parties
> have declined to do so . . . . That EPA's contractor AlterEcho, after
> consideration of the facts through the allocation, will assign a share to
> all 80 PRPs invited to participate does not make participation in the
> allocation process mandatory.

*See* Exh. 12, Letter from Juan Fajardo to David Mandelbaum (May 1, 2018).
Attachment A, Allocation Recommendation Report, ARR0070.  EPA, on several
occasions, invited OxyChem to participate in the AlterEcho allocation process, but
OxyChem declined.  *See* Yeh Decl. ¶¶ 30, 37.  This was its right, but as EPA
explained, the allocation would nonetheless proceed, in the hopes of reaching fair
and reasonable settlements with willing parties as part of EPA's enforcement
framework.  *See* Yeh Decl. ¶¶ 27, 38; *see also infra* RS 76, RS 77.  Continuing the
allocation process served the design of CERCLA, which Congress intended to
encourage settlements and minimize enforcement costs. *United States v. BASF
Corp.*, 990 F. Supp. 907, 912 (E.D. Mich. 1998).  Congress also intended that non-
settlors should bear the risk of increased liability in a government enforcement
action.  *United States v. GenCorp, Inc.*, 935 F. Supp. 928, 933 (N.D. Ohio 1996).
Had EPA instead halted the allocation, that would have enabled "[o]ne recalcitrant
hold-out [to] singlehandedly stymie the efficiency gains CERCLA is meant to
facilitate through early settlement and minimization of litigation." *United States v.
IMC E. Corp.*, 627 F. Supp. 3d 166, 174 (E.D.N.Y. 2022).  Such a result would have
frustrated the goals of CERCLA and impeded EPA's enforcement efforts at the Site.

There is nothing untoward about conducting a non-binding CERCLA cost allocation
to recommend shares, including for parties that choose not to participate in the
allocation.  In fact, OxyChem and other responsible parties participated in such an
allocation in connection with the Fields Brook Superfund Site in Ohio.  *See
GenCorp*, 935 F. Supp. at 930-31.  There, the participating parties negotiated
settlements with several non-participating parties based on the allocation.  *Id.*  The

participating parties then sought the district court's approval of those settlements as "fair, reasonable and satisfy[ing] the requirements of CERCLA[.]" *Id.* at 931-932. ADM, a non-settling party, objected, arguing that the settlements could result in it bearing a disproportionate share of the response costs at the site. The district court disagreed. It explained: "ADM's concerns do not warrant any change in the proposed order. ADM chose not to participate in the arbitration process . . . . It has every right to make such decisions. However, absent a strong showing of potential unfair prejudice to ADM, it should not be permitted to imperil the progress of those who chose to move this mass of litigation toward a conclusion." *Id.* at 933.

At the Fields Brooks site, where OxyChem previously decided to participate in an allocation, it supported the resulting settlement over the objections of a non-participant, as did the court. Here, OxyChem made a tactical decision not to participate in the allocation, despite its knowledge of both the statutory framework and the fact that AlterEcho would recommend an equitable share of responsibility for it regardless of whether OxyChem participated. *See* Yeh Decl. ¶ 34. While OxyChem had the right to opt-out of the AlterEcho allocation process, exercising that right does not bar the United States and other parties from entering into fair and reasonable settlements based on the allocation. *See GenCorp*, 935 F. Supp. at 933; *c.f.*, *United States v. Grand Rapids, Michigan*, 166 F. Supp. 2d 1213, 1221 (W.D. Mich. 2000) ("Intervenors' failed strategy is no indication that the settlement process itself was unfair.")

**RS 28.**    *OxyChem Comment Section III.A.3 (p. 29): The Allocation Recommendation Report punished OxyChem for not participating by assigning it a cooperation score of zero.*

**Response**: The United States is asking the Court to approve the proposed Consent Decree, not the Allocation Recommendation Report. One of the ways in which the proposed settlement differs from the Allocation Recommendation Report is that the United States decided not to apply the "cooperation and culpability" factor used by AlterEcho in calculating the shares recommended in the Allocation Recommendation Report. *See* Mem. in Supp. § II.G. Neither the cooperation nor the culpability factor played a role in the settlement. *See id*.

**RS 29.** *OxyChem Comment Section III.A.3 (pp. 29-30; see also pages 7 and 23): The United States should have accepted OxyChem's prior settlement offers instead of proposing this cashout Consent Decree with the Settling Defendants, which is contrary to the goals of CERCLA*

**Response**:  First, as discussed in the Memorandum in Support of the United States' Motion to Enter the Consent Decree, the proposed Consent Decree is fair, reasonable, and advances the goals of CERCLA.

Second, so long as it operates in good faith, the United States is at liberty to negotiate and settle with whomever it chooses.  *See United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 93 (1st Cir. 1990).  And the United States is under no obligation to negotiate with and settle with every party simultaneously.  *See Best Foods v. Aerojet-Gen. Corp.*, No. 1:89-CV-503, 2000 WL 1238910, at \*9 (W.D. Mich. Aug. 24, 2000) (citing *Cannons*, 899 F.2d at 93).  No party has the right to compel the United States to settle with it on its own terms.  *See Grand Rapids, Mich.*, 166 F. Supp. 2d at 1221–22.  Where the United States declines to do so, such decisions are within the sound discretion of the United States and are not indicative of unfairness.  *See id.*; *see also* Mem. in Supp. § IV.A.1.; *infra* RS 36.

Finally, the Comment does not accurately portray the scope of OxyChem's settlement offers with respect to the performance of the OU2 and OU4 remedies, and neglects to mention the many terms and conditions that OxyChem attached to its offers.  *See The United States of America's Response to Occidental Chemical Corporation's Motion to Intervene*, ECF No. 84, at 5.

**RS 30.** *OxyChem Comment Section III.B.1-2 (pp. 30-33): The proposed settlement is not supported by any adequate record. Congress has prohibited the use of NBARs to support contested consent decrees. The United States has no rational basis or administrative record to support the proposed consent decree. Specifically, OxyChem argues that the consent decree is flawed because there is no record of the payment amounts of each settling party, and because certain confidential documents underlying the Final Allocation Report were not made public. OxyChem argues that disclosing the Final Allocation Report but not the confidential underlying documents violates the ADR Act.*

**Response**: As discussed at length in responses to comments elsewhere, the AlterEcho allocation is not an NBAR.  *See* RS 11, 13.  Nothing bars the Court from reviewing the AlterEcho allocation to the extent it deems necessary to evaluate the proposed Consent Decree.  Even if the AlterEcho allocation were an NBAR (it is

not), the Court could still consider EPA's description of allocation and its results. *See* Yeh Decl. ¶¶ 42-53, 57; *see also United States v. BP Amoco Oil*, No. CIV. 4-99-10671, 2000 WL 35503251, at *6 n.5 (S.D. Iowa Sept. 29, 2000), aff'd sub nom. *United States v. BP Amoco Oil PLC*, 277 F.3d 1012 (8th Cir. 2002) ("The Court acknowledges it has no jurisdiction to directly review the NBAR prepared by the EPA. The NBAR is relevant to this Court's review, however, to the extent [the EPA declarant] relies on specific NBAR factors in justifying the United States final allocation of fault.") (citation omitted).

In addition, a proposed consent decree is not required to be supported by an administrative record. As described in responses to comments elsewhere, *see* RS 30, RS 91, a proposed consent decree is not a final agency action and not subject to any statutory provisions that require review to be based upon an administrative record. The proposed Consent Decree, which is well supported by a wealth of information, *see* Yeh Decl. ¶ 62, is the settlement of the claims set forth in the United States' Amended Complaint, ECF No. 282, and is subject to judicial review and approval.

The proposed settlement is based in part on a rational assessment of comparative fault as set forth in the Allocation Recommendation Report, which has been made publicly available. Certain documents shared with the allocator (a third party neutral) in confidence, such as position briefs and expert reports, have not been disclosed to the United States, the public or this Court. *See* Yeh Decl. ¶ 40 and n.47. This is because they were ADR confidential communications that, pursuant to the ADR Act, cannot be disclosed without permission of the parties or unless certain circumstances are met that have not been met here. *See* 5 U.S.C. § 574. Nevertheless, the United States concluded, after its review of the Allocation Recommendation Report and supporting documentation that it had enough information to move forward with negotiating the proposed settlement. Based on the same publicly available record, there is enough information to allow the Court to determine if the Consent Decree is fair, reasonable, and in the public interest. *See* Mem. in Supp. § IV.

Finally, while the proposed Consent Decree is a collective settlement that does not disclose the amount to be paid by each Settling Defendant, CERCLA contains no such requirement. The $150 million represents the collective fair share for all Settling Defendants, who are jointly and severally responsible for the payment. *See GenCorp*, 935 F. Supp. at 935, n.6 (CERCLA settlement was fair, reasonable, and met requirements of CERCLA without disclosure of individual payment amounts of settling parties (including OxyChem)).

**RS 31.** **OxyChem Comment Section IV (pp. 33-35). EPA has no authority to extinguish OxyChem's contribution claims.**

**Response**: In this section, OxyChem makes four arguments, summarized and responded to below.

**RS 32.** **OxyChem Comment Section IV, Argument 1 (pp. 33-34): CERCLA does not authorize the United States to settle or bar OxyChem's own statutory contribution claims.**

**Response**: The United States' use of a contribution protection provision in the proposed Consent Decree, ECF No. 283, § XI., ¶ 23(c), is authorized by Section 113(f)(2) of CERCLA. OxyChem's interpretation of Section 113(f)(2) is flawed. Courts have consistently ruled that CERCLA authorizes the United States to use contribution protection provisions to facilitate settlement and insulate settling PRPs from future contribution claims. *See SEPTA*, 235 F.3d at 822-23 (affirming a district court's holding that settlers were protected from contribution claims by a non-settler); *United States v. Colo. & E. R.R. Co.*, 50 F.3d 1530, 1537 (10th Cir. 1995) ("[A] PRP who has entered into a judicially approved settlement with the United States may not be held liable for contribution to another PRP if the contribution claim concerns matters addressed in the settlement"); *Akzo Coatings of Am., Inc. v. Am. Renovating*, 842 F. Supp. 267, 271 (E.D. Mich. 1993) ("The settler need not fear that a later contribution action by a non-settlor [following a settlement with the government] will compel them to pay additional money to extinguish their liability"). In turn, non-settling PRPs risk getting left with the remaining cleanup costs without any recourse against the early settlers. Though potentially unfavorable to non-settling PRPs, like OxyChem, Congress intended and authorized this outcome to achieve CERCLA's goal of promoting settlement. *See Cannons Eng'g Corp.*, 899 F.2d at 92 ("Congress plainly intended non-settlors to have no contribution rights against settlors regarding matters addressed in settlement").

The United States' use of contribution protection in this case falls squarely within its authority under Section 113(f)(2).[19] Contribution protection provisions are upheld if they generally adhere to the principles of comparative fault and reflect the

---

[19] Note, by entry of the Consent Decree, the United States is not seeking contribution from OxyChem or any other non-settling PRP, as OxyChem's comment seems to suggest. Instead, the proposed Consent Decree seeks to resolve the United States' claims against the Settling Defendants for injunctive relief under Section 106, and cost recovery under Section 107(a) of CERCLA. In turn, the proposed Consent Decree provides the Settling Defendants with protection against contribution claims by other PRPs that have been or would be brought under Section 113 of CERCLA.

parties' fair share of contribution. *United States v. Charter Int'l Oil Co.*, 83 F.3d 510, 520 (1st Cir. 1996); *Cannons Eng'g Corp.*, 899 F.2d at 85, 88. Here, the proposed Consent Decree provides Settling Defendants with protection against contribution claims at or in connection with OU2 and OU4. The proposed Consent Decree reflects the Settling Defendants' fair share of contribution. *See* Mem. in Supp. §§ II.F., II.G. IV.A.2.

This well-accepted interpretation and application of Section 113(f)(2) does not conflict with Section 113(f)(1), as OxyChem suggests. Section 113(f)(1) provides, in relevant part, that the court may allocate response costs among liable parties when resolving contribution claims. However, court allocation under Section 113(f)(1) does not apply in this case brought by the United States under Sections 106 and 107, and non-settling parties will "remain potentially liable for the amounts not received by the government through settlement" when a settling PRP receives contribution protection under Section 113(f)(2).[20] Congress has never stated or considered[21] anything to the contrary.

*RS 33.*      *OxyChem Comment Section IV, Argument 2 (p. 34): The contribution provision of the proposed Consent Decree raises serious constitutional concerns.*

**Response**: OxyChem errs in arguing that the contribution protection provision of the proposed Consent Decree raises constitutional concerns. When it enacted Section 113 (the sole means of seeking contribution under CERCLA),[22] Congress included both Subsection 113(f)(1), which authorizes actions for contribution, and Subsection 113(f)(2), which protects parties that settle with the United States from contribution actions. *See Cannons Eng'g Corp.*, 899 F.2d at 92; *see also United States v. BP Amoco Oil*, No. CIV. 4-99-10671, 2000 WL 35503251, at \*4 (S.D. Iowa Sept. 29, 2000), *aff'd sub nom. United States v. BP Amoco Oil PLC*, 277 F.3d 1012 (8th Cir. 2002). Because Congress expressly limited contribution in Section 113 of CERCLA, contribution protection under Section 113(f)(2) does not implicate any constitutionally protected interest, *see Cannons Eng'g. Corp.*, 899 F.2d at 92 & n.6, and is not an unconstitutional taking. *See BP Amoco*, 277 F.3d at 1017-18.

---

[20] H.R. REP. NO. 99-253(III), at 19 (1985), reprinted in 1986 U.S.C.C.A.N. 3038, 3042; *see* 42 U.S.C. § 9613(f)(2).

[21] OxyChem cites to the SRA of 1994 and RALA of 1999 to support its argument. However, those bills are not instructive here, as noted in RS 16.

[22] Section 113(f) replaced the judicially created right to contribution under Section 107(a) of CERCLA that courts had construed prior to 1986. *Matter of Reading Co.*, 115 F.3d 1111, 1119 (3d Cir. 1997), *abrogation on other grounds recognized by E.I. DuPont De Nemours & Co. v. United States,* 460 F.3d 515, 518 (3d Cir. 2006).

Furthermore, the Consent Decree and its terms have not deprived OxvChem of procedural due process. The public, including OxyChem, was given a 90-day notice and comment period. *See* 87 Fed. Reg. 78710-11; 88 Fed. Reg. 2133. The United States has carefully reviewed all public comments, including OxyChem's, and, where appropriate, has modified the Consent Decree in response. In addition, it has provided written responses to all of OxyChem's comments herein. This Court granted OxyChem's motion to intervene and OxyChem will be able to file a brief in opposition to the proposed Consent Decree if it so chooses. Finally, the proposed Consent Decree will not become final unless this Court approves it. If approved by this Court, the present settlement, requires no payment or obligation from OxyChem. OxyChem retains all of its rights to defend itself in any future enforcement actions brought by the United States involving this Site.

### RS 34.    *OxyChem Comment Section IV, Argument 3 (pp. 34-35): The contribution protection provision of the proposed Consent Decree violates CERCLA's basic requirements of procedural and substantive fairness.*

**Response**: OxyChem's argument that the contribution protection provision of the proposed Consent Decree is procedurally and substantively unfair is misplaced. As noted above and explained in the Memorandum in Support of the United States' Motion to Enter, the contribution protection provision reflects that the Settling Defendants are paying their fair share of response costs. *See* Mem. in Supp. §§ II.F – II.H; RS 33. OxyChem had numerous opportunities to participate in the allocation process. Moreover, the United States offered the PRPs, private and public, opportunities to settle their liabilities for OU2 and OU4 by entering into a consent decree for the performance and/or funding of the cleanups for OU2 and OU4. Such a settlement would have provided the settling party(ies) with not only contribution protection for themselves, but also with the right to seek contribution from other PRPs that have not settled their liabilities for OU2 and OU4 of the Site. Any argument about the unfair effects of the contribution protection provision should be addressed to Congress, not the courts.

### RS 35.    *OxyChem Comment Section IV, Argument 4 (p. 35): OxyChem argues that the contribution protection provision of the proposed Consent Decree bars only claims by other PRPs under Section 113(f)(2) of CERCLA.*

**Response**: The language of Paragraph 23(c) of the proposed Consent Decree is clear: "each Settling Defendant is entitled, as of the Effective Date, to protection from contribution actions or claims as provided by Section 113(f)(2) of CERCLA, or as may be otherwise provided by law, for the "matters addressed" in this Consent Decree." ECF No. 283, ¶ 23(c).

**RS 36.**    *OxyChem Comment Section V, (pp. 35-37): The proposed consent decree was equivalent to a collusive settlement.*

**Response**: OxyChem argues that the proposed consent decree is improper because it is "equivalent to a collusive settlement." In OxyChem's view, the proposed consent decree is "collusive" because the "vast majority" of the potential liability was assigned to a single party that did not participate in the settlement process.

First, OxyChem suggests that it was excluded from the allocation, but it was OxyChem's decision not to participate, as it indicates elsewhere in its comments. EPA made substantial efforts to convince OxyChem to participate in the allocation. *See* Yeh Decl. ¶¶ 26, 27, 30, 34, 36, 37, 41. Those steps include, *inter alia*, (i) EPA told OxyChem that EPA intended to hire a third-party allocator to support EPA's expected offers of cashout settlements to additional parties, (ii) after receiving feedback from OxyChem and other PRPs, EPA met in August 2017 with OxyChem and other PRPs to hear their views on a potential allocation, (iii) when OxyChem refused to participate in AlterEcho's allocation, both EPA and AlterEcho told OxyChem that it was in each party's best interest to participate in the process, and (iv) EPA met with and provided a detailed written response to OxyChem to try to convince it to join the allocation, but OxyChem still declined. *See id.* These steps go well beyond what courts have considered fair to nonsettlers. *Cf. Cannons Eng'g Corp.*, 899 F.2d at 86-87, 93 (noting US does not have to let PRPs join settlement group or warn PRPs of consequences of rejecting settlement).

Second, OxyChem argues that, because it refused to participate, the allocation must have been collusive for two reasons. OxyChem first argues incorrectly that the allocation was collusive because AlterEcho's factual record had "evidentiary gaps." Specifically, OxyChem argues that the allocator "rel[ied] on historical data from a prior lawsuit—the Spill Act case—where most of the participating PRPs had never produced any documents or testimony." Yet OxyChem admits in this same comment that the allocator relied on much more than just data from the Spill Act case. OxyChem notes that AlterEcho allowed the Participating Allocation Parties (PAPs) to submit additional information ("over 700,000 pages"), and that EPA also provided 130,000 pages. This additional information from EPA included facts gathered from EPA's own years of investigation, much of which had been provided by OxyChem, or Maxus – OxyChem's indemnitor – and Tierra (parties whose liability for the Site also arises from the Diamond Alkali facility), in the first instance. *See* Yeh Decl. ¶¶ 14, 39.

OxyChem next argues that the settlement was collusive because the proposed Consent Decree would cut off OxyChem's right to seek contribution. However, the settlement provides contribution protection because it is a legally-supported,

common protection afforded to settling parties. *See supra* RS 32-RS 34. The fact that a settlement includes contribution protection is not evidence of collusion.

In essence, OxyChem has no evidence of collusion. Boiled down, OxyChem argues that, because it opted out of the allocation, the allocation is per se unfair. Were that argument true, it would hand control over the resolution of this case to OxyChem. The United States does not, nor would it be fair to, halt its efforts to pursue a settlement simply because a PRP chooses to sit out the process. And no court has held that procedural fairness requires a settling defendant or a sovereign plaintiff to "protect" nonsettlors against the consequences of their own decisions not to participate, including the chance that recalcitrants will face disproportionate liability. *In re Tutu Water Wells*, 326 F.3d at 208; *SEPTA*, 235 F.3d at 825. *See also Grand Rapids, Mich.*, 166 F. Supp. 2d at 1221 ("Even if Intervenors had been excluded from the settlement, such exclusion would not indicate procedural unfairness. CERCLA does not require the EPA to open all settlement offers to all PRPs.").

### *RS 37.    OxyChem Comment Section VI.A. (introduction) (p. 37): The proposed consent decree is inconsistent with CERCLA's goals and public policy.*

**Response**: The United States' Memorandum in Support of its Motion to Enter the proposed Consent Decree explains why the proposed Consent Decree (ECF No. 283) is fair, reasonable, and consistent with the goals of CERCLA, which is the standard for entry of a consent decree.

### *RS 38.    OxyChem Comment Section VI.A.1 (37-40): The proposed consent decree does not clean up the Lower Passaic River. When the implementation of a remedy has not yet begun, EPA consistently reaches settlements with parties who commit to perform 100% of the work.*

**Response**: As explained in United States' Memorandum in Support of its Motion to Enter the proposed Consent Decree, this is a cashout settlement. Mem. in Supp., Argument, Section IV.B. EPA anticipates the money will be used for the cleanup of OU2 and OU4. Exhibit 4, Declaration of Alice Yeh ("Yeh Decl.") ¶ 58. Further, the amount of money recovered will offset the amount that other PRPs will need to pay toward the cleanup. *See* CERCLA Section 113(f)(2).

OCC incorrectly suggests that this settlement deviates from an enforcement "mandate," in that it is not a "Remedial Design/Remedial Action ("RD/RA") Consent

Decree," requiring settling defendants to perform 100% of the work.[23] In its efforts to ensure that responsible parties pay for or perform CERCLA response actions (i.e. the "polluter pays" principle), EPA is not required to pursue only one option, that is, RD/RA consent decrees:  while obtaining cleanup by PRPs is an important EPA goal, that can be accomplished via a consent decree or a unilateral order, or if the response action is a removal (which would include remedial design), an administrative order on consent. *See, e.g., "*Enforcement First for Remedial Action at Superfund Sites" (September 2002), https://www.epa.gov/enforcement/guidance-enforcement-first-remedial-action-superfund-sites; "Enforcement First for Removal Actions" (August 2011), https://www.epa.gov/sites/default/files/2013-10/documents/enf-first-removal.pdf. For situations where EPA deems the PRP or PRPs able to fund, but not perform, the cleanup, EPA might pursue a cashout settlement. *See* "Guidance on Administrative Response Costs Settlements under Section 122(h) of CERCLA and Administrative Cashout Settlements with Peripheral Parties under Section 122(h) of CERCLA and Attorney General Authority" (September 1988), https://www.epa.gov/sites/default/files/2013-11/documents/guide-adres-rpt.pdf.

In general, after EPA issues a Record of Decision memorializing its selected remedial action (cleanup) for a Superfund site, a PRP and EPA may negotiate an RD/RA consent decree. EPA has long maintained a model RD/RA consent decree, issued jointly by EPA and DOJ, on its website; it is an agreement for one or more parties to design and implement the selected remedy. If a PRP agrees to sign a

---

[23] Note that the table on page 39 of OxyChem's comment contains several errors. Among other things 1) EPA conducted a removal action, not a remedial action, at the Michelin Powerhouse Site (https://cumulis.epa.gov/supercpad/CurSites/csitinfo.cfm?id=0204594), and 2) the remedy at the Cornell-Dubilier Electronics Superfund Site was not 80% funded through settlements. Rather, Cornell-Dubilier Electronics, Inc. ("CDE"), the primary responsible party for the CDE Site, entered into a consent decree with the United States in which it admitted to judgment for $367 million, or 80% of the estimated total response costs and natural resource damages amount, of which all but $1.11 million was to be paid from the proceeds of its ongoing insurance recovery efforts; the actual recovery of the balance was contingent on the outcome of those insurance recovery efforts. *United States v. Cornell-Dubilier Elecs., Inc.*, Case. No. 12-5407 (JLL), 2014 WL 4978635, at *3, *12  (D.N.J. Oct. 3, 2014). While CDE's insurance recoveries were substantial, the total amounts recovered did not total to 80% of Site costs, and EPA will use over $100 million in federal funding under the Bipartisan Infrastructure Law to complete the cleanup of that site. *See* https://www.tapinto.net/towns/south-plainfield/sections/government/articles/152m-in-federal-funding-earmarked-for-remediation-of-south-plainfield-based-superfund-site (Feb. 14, 2023).

straightforward RD/RA consent decree and perform the remedy selected by EPA, typically there would then be no need for the United States to do further settlements, and the performing PRP would pursue contribution claims. There may be exceptions in such a scenario, in that the United States may settle with specially situated PRPs such as "ability to pay" parties, or "de minimis" and/or "de micromis" parties. In fact, the EPA/DOJ model RD/RA consent decree includes a waiver of claims against such parties by the settling defendant(s).  *See* "Issuance of 2021 Comprehensive Environmental Response, Compensation, and Liability Act Model Remedial Design/Remedial Action Consent Decree and Statement of Work" [https://www.epa.gov/system/files/documents/2021-08/rdra-cd-sow-mod-2021-mem-final.pdf](https://www.epa.gov/system/files/documents/2021-08/rdra-cd-sow-mod-2021-mem-final.pdf). In this case, no PRP made an offer to enter into a consent decree to perform the entirety of the OU2 and OU4 remedial actions. Yeh Decl. ¶ 24; *c.f.* RS 29 and Mem. in Supp. at page 15 & n. 6. Therefore, EPA proceeded with its enforcement strategy, which had been transparent to all PRPs, that included the AlterEcho allocation process. See Yeh Decl. ¶¶ 27-38. And, consistent with its "enforcement first" policy, EPA issued a unilateral administrative order ("UAO") to OxyChem directing it to design the interim remedy for OU4.  Exhibit 5, Declaration of Diane Sharkey ("Sharkey Decl.") ¶ 18.

**RS 39.**    *OxyChem Comment Section VI.A.2 (p. 41-43): The proposed Consent Decree fails to hold polluters accountable; the settlement does not meet the criteria for a de minimis settlement under Section 122(g) of CERCLA.*

**Response**: The proposed Consent Decree holds the Settling Defendants accountable for their share of the pollution for OU2 and OU4 of the Site. As discussed in RS 38, consistent with the "polluter pays" principle, the United States seeks to have PRPs, and not taxpayers, perform the cleanup or pay for the costs of the cleanup. As noted in other Responses to Comments and the Memorandum in support of the United States' motion to enter the proposed Consent Decree, this settlement arises from the inherent authority of the Attorney General to settle the United States' claims.  RS 11, RS 21, RS 23, and RS 24; Mem. in Supp., Argument, Section IV.D.2.i. While this settlement does not arise from a specific subsection of Section 122 of CERCLA, it is nonetheless consistent with the statute. Mem. in Supp., Argument, Section IV.D.2.i.

*RS 40.*    *OxyChem Comment Section VI.A.3 (pp. 43-44): The proposed Consent Decree undermines important public policies. Congress passed CERCLA with goals of expediting cleanups and holding polluters accountable. Public policies include promoting voluntary cleanups, advancing environmental justice, encouraging settlements, saving taxpayer funds, and minimizing litigation. This settlement "inverts the settled structure, crippling the twin engines CERCLA created: voluntary performance [of the cleanup] and contribution claims."*

**Response**: The United States disagrees with the characterization of "voluntary performance and contribution claims" being the "twin engines" of CERCLA. The statute provides the United States with many enforcement options. One option is to negotiate an RD/RA consent decree (described above in RS 38), where one or more PRPs agree to implement the remedy selected by EPA in a ROD. This remains an enforcement option for this Site and has been part of EPA's settlement framework from the start. *See* Yeh Decl. ¶¶ 20-27. EPA also has the option to pursue cashout settlements with parties that have a limited ability to pay, or that bear a relatively small share of responsibility for the contamination at a Site, and this might occur before or after an RD/RA consent decree. Finally, EPA has other enforcement options, such as entering into administrative orders on consent for remedial design work and issuing unilateral administrative orders. *See* RS 38. If the Court finds that the settlement is fair, reasonable, and consistent with the goals of the statute, which is the standard for entry of a consent decree, then the Court should approve and enter the proposed Consent Decree.  *See* Mem. in Supp., Argument, Section III.

*RS 41.*    *OxyChem Comment Section VI.A.3.a (44-45): The proposed Consent Decree will discourage voluntary cleanup and early settlement.*

**Response**: This settlement is specific to this Site, and it is not possible to know whether or how it will impact enforcement at other Superfund sites. Nothing about this settlement changes the ability of a PRP at another site to enter into a settlement with the United States to perform the cleanup and then seek contribution from other PRPs. Moreover, this settlement should encourage parties, particularly minor contributors, to seek early settlements of their CERCLA liability. Finally, the standard for entry of a consent decree is whether it is fair, reasonable, and consistent with the goals of the statute.

***RS 42.     OxyChem Comment Section VI.A.3.b (pp. 45-47): The proposed Consent Decree will not minimize litigation and shifts substantial liability for the cleanup to the public.  OxyChem states that it is not liable for certain hazardous substances found at the Site, and therefore municipalities and PVSC will have pay to clean up those hazardous substances.***

**Response**: As set forth in the memorandum in support of the motion to enter, this settlement is not the only part of EPA's efforts to recover costs and have PRPs perform cleanup work at the Site. *See* Mem. in Supp., Background, Section II.B-E. Under CERCLA and caselaw interpreting the statute, the harm at OU2 and OU4 of Site is indivisible and cannot be apportioned, meaning that PRPs are jointly and severally liable for the full amount of the cleanup. For purposes of settlement only, AlterEcho was able to allocate proposed shares of responsibility among the PRPs. The Settling Defendants are paying their fair share of cleanup costs, based in part on the Allocation Recommendation Report and the additional elements the United States negotiated. *See* Mem. in Supp., Background, Section II.G. Non-settling PRPs, including OxyChem, remain liable for cleanup of the Site and future costs incurred by the United States.

***RS 43.     OxyChem Comment Section VI.B (p. 47): The proposed settlement relies on a fatally flawed allocation of liability***

**Response:** Responses to specific sub-arguments are set forth below.

***RS 44.     OxyChem Comment Section VI.B.1.a (p. 47-48): EPA set ground rules for the allocation that arbitrarily pre-determined its outcome; EPA arbitrarily determined that PRPs associated with just two of the eight COCs would be judged more harshly.***

**Response:** The allocation methodology is consistent with the remedial actions selected for OU2 and OU4, which were based on the risks (i.e., toxicity and exposure) to human health and the environment.  During EPA's remedy selection process, the OU2 and OU4 human health and ecological risk assessments identified dioxin as the most significant risk-driver and PCBs as the next most significant risk-driver for the Lower Passaic River. The OU2 risk assessment (OU2 Record of Decision[24] (ROD) at page 29, 30) and the OU4 risk assessment (OU4 ROD[25] at p. 30, and Tables 7-5a and 7-6a) found that: 1) for human health cancer risk, dioxin

---

[24] https://semspub.epa.gov/work/02/396055.pdf
[25] https://semspub.epa.gov/work/02/630399.pdf

contributes approximately 68% to 94% of the risk, PCBs contribute approximately 5% to 30%, and the other COCs contribute a combined 3% or less; 2) for human health non-cancer hazards, dioxin and PCBs combined to contribute more than 96% of the hazard. The text of the OU2 ROD as well as the OU2 ROD's responsiveness summary explain that dioxins and PCBs are the primary COCs, due to the human health and ecological risks associated with them. *See, e.g.,* OU2 ROD at pp. 28-30; OU2 ROD, Appendix V, Responsiveness Summary at p. 38; *see also* Exhibit 6, Declaration of Michael Sivak ("Sivak Decl.") ¶ 43. The allocation included an allocation factor called Relative Risk Numbers (RRNs) that assign dioxin 84% and PCBs 13% of the environmental harm caused by COCs. *See* Methodology for Determination of the Relative Rank of OU2 Contaminants of Concern for the Purpose of Allocation (Attachment A to Allocation Protocol [which is Attachment H to Allocation Recommendation Report]) [*hereinafter* "RRN Method"] at pages 18-19 (Exh. 12 at ARR0336-37). While it was known that dioxins and PCBs posed the greatest risk, the results of the allocation were not pre-determined in part because the allocation was also based on mass of contaminants released by the facilities, which AlterEcho calculated based on information submitted as part of the allocation as well as data assumptions made by AlterEcho. *See* Allocation Recommendation Report, pp. 19-22 (Exh. 12 at ARR0019-22); *see* Exhibit 7, Declaration of Chris Wittenbrink ("Wittenbrink Decl.") ¶ 21.

**RS 45.** *OxyChem Comment Section VI.B.1.b (pp. 48-49): A Fair Allocation Would Be Cost-Driven and Assign Shares to All COCs*

**Response:** This comment contains three arguments, which are addressed separately below.

**RS 46.** *OxyChem Comment Section VI.B.1.b, Argument 1 (pp. 48-49): The allocation should have considered what portions of the costs of the OU2 RA are attributable to each individual COC. Because individual chemicals would result in the need for the same remedy across OU2, using a risk-based approach is not an appropriate way to allocate liability for the remedy.*

**Response:** The framework of the AlterEcho allocation is reasonable and based on judicial precedent, customary allocation practice, and commonly used allocation factors such as the mass and toxicity of each contaminant of concern.[26] The

---

[26] "The process, standards, and procedures used for conduct of the allocation were established consistent with judicial precedent and customary allocation practice, including analysis of site-specific circumstances and application of appropriate

existence of other potential allocation frameworks and factors, including the options that OxyChem identifies, does not undermine the reasonableness of the AlterEcho allocation framework. Memo. in Supp., Argument, Section IV.D.2; *see also* Wittenbrink Decl. ¶ 16 (allocation "approaches such as the one reflected in the Allocation Recommendation Report, incorporating the Gore factors including toxicity, are acceptable"). In addition, the allocation methodology is consistent with the remedial actions selected for OU2 and OU4, which were based on the risks (i.e., toxicity and exposure) to human health and the environment. EPA did not evaluate potential remedies for the Lower Passaic River in the absence of dioxin, so the comment's claim that individual COCs would result in the same remedy is speculative, hypothetical, and beside the point. After all, EPA discovered and added the Diamond Alkali Site to the Superfund National Priorities List due to the dioxin contamination at and from 80-120 Lister Avenue. *See* NPL Site Narrative, https://semspub.epa.gov/work/02/363440.pdf; OU1 ROD, pages 1-2 (background), 22-23 (risks presented at Site including releases of TCDD to river) https://semspub.epa.gov/work/02/83052.pdf. Moreover, the Lower Passaic River is part of the Site because the areal extent of the dioxin contamination from 80-120 Lister Avenue extends to the River. *See* OU2 ROD, Decision Summary, pages 1, 3-4 (describing Site, listing of Site on NPL, and study of contamination from Lister Avenue as part of Site investigation).

**RS 47.** *OxyChem Comment Section VI.B.1.b, Argument 2 (pp. 49): The OU2 ROD selected the dredge and cap remedy to address all COCs, not just dioxin and PCBs. Each of the 8 COCs independently poses an "unacceptable risk" and must be cleaned up.*

**Response:** OxyChem's comment suggests that in selecting a capping remedy, EPA signaled that it was treating all COCs equally. Based on that premise, the comment argues that the allocation should have treated all COCs equally, despite the fact that dioxin is the most toxic COC in the Lower Passaic River and the largest source of health risk and environmental harm. *See* Sivak Decl. ¶¶ 43, 47-50, 58. But OxyChem's suggested allocation approach would be inequitable. To a large extent, dioxin drives the risks to human health and the environment that are addressed by the remedies selected for OU2 and OU4. *Id.* Risks from PCBs are also significant, although lower than the risks from dioxin. *See* Sivak Decl. ¶¶ 37, 43, 47-50, 58. The human health and ecological risk assessments for OU2 and OU4 considered the toxicity of each COC and exposure, including the concentration of

---

equitable factors, including the nexus between the waste contribution of each Allocation Party's and the scope of remedial requirements, the relative degree of toxicity of contributed wastes, and the equitable distribution of orphan [*i.e.*, unallocated] shares." Allocation Recommendation Report at page 18 (Exh. 12 at ARR0018).

each COC in the River.  Based on those analyses, EPA identified dioxin (and to a lesser extent, PCBs) as the most significant risk-driver for the Lower Passaic River.  *See* Sivak Decl. ¶ 43. Treating all the COCs equally in an allocation would ignore the significance that dioxin has for the health of the River and the need to clean up the River.

*RS 48.*    *OxyChem Comment Section VI.B.1.b, Argument 3 (pp. 49): The AlterEcho allocation ignored EPA's risk and cost conclusions that are built into the Remedial Goals and the related cleanup costs.*

**Response:**  The allocation did not ignore the conclusions of EPA's risk assessments; rather, the allocation used the conclusions of EPA's risk assessments to derive the Relative Risk Numbers for the COCs.  Allocation Recommendation Report p. 32 (Exh. 12 at ARR0032).  By building on EPA's risk assessments, AlterEcho's Relative Risk Numbers account for the toxicity and exposure of each COC. *See* RRN Method at page 3 (Exh. 12 at ARR0321).  As described in the RRN Method, to calculate the Relative Risk Numbers, AlterEcho started with the EPA's calculation in the OU2 risk assessments (*see* Sivak Decl. ¶¶ 33-41) of each COC's percent contribution to cancer risk and non-cancer risks. RRN Method at pp. 3-4 (Exh. 12 at ARR0321-22). Next, AlterEcho updated them to incorporate more recent data from OU4. RRN Method at page 6-7 (Exh. 12 at ARR0324-25). If values were not presented in a ROD, AlterEcho used the exposure assumptions presented in the OU2 and OU4 ROD to calculate cancer risks and non-cancer risks. RRN Method at page 6 (Exh. 12 at ARR0324). Finally, AlterEcho averaged the risks posed by each COC to human health (cancer), human health (non-cancer), and ecological health to create the Relative Risk Numbers. RRN Method at page 4 (Exh. 12 at ARR0322); *see also* Sivak Decl. ¶ 47.

In simplest terms, to allocate responsibility among the parties, AlterEcho calculated the mass of each COC that each facility released to the River and then applied weighting factors – called the "Relative Risk Numbers" – to those masses. Allocation Recommendation Report at p. 32 (Exh. 12 at ARR0032). OxyChem's comments ignore the fact that the allocation's relative risk factors were not a risk assessment at all. AlterEcho is very clear that "[w]hile this approach relies on the human health and ecological risk assessments performed for OU2 of the Site, it is not a risk assessment in itself." RRN Method at p. 3 (Exh. 12 at ARR0321). Rather, the Relative Risk Numbers incorporate the relative toxicity for the COCs and in particular, show that dioxin contributes the majority of the environmental harm in the Lower Passaic River, with PCBs contributing the next highest amount of harm. RRN Method at p. 18 (Exh. 12 at ARR0336). The Relative Risk Numbers are how the allocation takes toxicity and exposure into account. RRN Method at page 3 (Exh. 12 at ARR0321); *see* Wittenbrink Decl. ¶¶ 14, 15, 21.

As described in RS 47 above, the OU2 and OU4 risk assessments identify dioxin as contributing the majority of the risk to the Lower Passaic River, with PCBs contributing the next highest risk. OU2 ROD[27] at p. 29, 30; OU4 ROD[28] at p. 30, and Tables 7-5a and 7-6a. Because the Relative Risk Numbers are based on the risk assessments, they too indicate that dioxin is the largest contributor to the environmental harm, with PCBs contributing the next highest environmental harm. RRN Method at page 18 (Exh. 12 at ARR0336).

The comment asserts that EPA's preliminary remediation goals already take risk into account. A preliminary remediation goal is the concentration of a chemical in an exposure area that results in a level of risk that is protective of human health and the environment. Sivak Dec., ¶ 15. For OU2, EPA established preliminary remediation goals for four out of the eight COCs: 2,3,7,8-TCDD, Total PCBs, mercury, and Total DDT. OU2 ROD, pp. 42-43; OU2 ROD, Appendix II Tables, at Table 25. EPA used the preliminary remediation goals to evaluate whether the four remedial alternatives in the OU2 Focused Feasibility Study would meet the Long-Term Effectiveness and Permanence criterion, one of the nine criteria established under CERCLA for remedy selection. OU2 ROD, pp. 62-66. The OU2 preliminary remediation goals became final remediation goals when EPA issued the OU2 ROD (OU2 ROD at p. 44). The OU2 remedy is being designed in part to meet the four remediation goals. August 2023 Design Criteria Report by OxyChem at page 2-3.[29]

In sum, for the Lower Passaic River, EPA used remediation goals not for cost allocation but rather to select remedies and evaluate remedy effectiveness after implementation.  For this cost allocation, AlterEcho developed the Relative Risk Numbers, discussed above, which are based on and consistent with the conclusions of the OU2 and OU4 risk assessments. *See* Allocation Recommendation Report, pages 31-32 and RRN Method (Exh. 12 at ARR0031-0032, ARR0315-0338).

The comment argues that because EPA set remediation goals for all COCs, no single COC can drive a remedy. First, the comment is incorrect. EPA only set remediation goals for dioxin, 2,3,7,8-TCDD, Total PCBs, mercury, and Total DDT (see above).  Second, to the extent OxyChem argues for a per capita allocation based on the existence of remediation goals for all COCs, such an allocation would ignore the differing impacts of dioxin and other COC on the consideration of the risks and the remedy.  Wittenbrink Decl. ¶¶ 23-24.  Excluding COC risks for the Site would omit a key metric for allocation.  *Id.* ¶ 24.

---

[27] https://semspub.epa.gov/work/02/396055.pdf
[28] https://semspub.epa.gov/work/02/630399.pdf
[29] https://sharepoint.ourpassaic.org/Public%20Documents/Lower%208mi%20OU2%2010 0PD%20Design%20Criteria%20Report-Aug2023%20DRAFT.pdf

*RS 49.        OxyChem Comment Section VI.B.1.c. (pp. 49-52): Dioxins cannot be fairly attributed more than half of the remedial costs.*

**Response:**  This comment contains four arguments, which are addressed separately below.

*RS 50.        OxyChem Comment Section VI.B.1.c, Argument 1 (pp. 49-50, 52): The total cost of the remedy is dominated by COCs other than dioxins, and dioxins are not categorized as a main remedy driver in any of the RD components; some remedial costs (such as "navigational dredging") are not risk-based at all.*

**Response:** The comment that dioxins are not the main cost driver for any of the remedial design components is not accurate because it does not account for how dioxins drove the decision-making underlying remedy selection and design, as illustrated in some examples below:

- For OU2 and OU4, the consequence of cap failure is the breakthrough of COCs, including dioxin, from under the cap to the river ecosystem above the cap. Exhibit 4, Declaration of Alice Yeh ("Yeh Decl.") ¶ 19. Given the high toxicity of dioxin (*see* Sivak Decl. ¶ 43), the consequences of dioxin breakthrough to human health and the environment are particularly serious, so that, throughout the design, EPA in its oversight role was concerned that the cap had to be designed with a high level of conservatism (e.g., the cap will have to be thicker and contain more additives to bind to the COCs to prevent them from breaking through the cap). Yeh Decl. ¶ 19.

- As required by the Resource Conservation and Recovery Act (RCRA) and state laws, all landfills have chemical concentration criteria governing their acceptance of wastes. Yeh Decl. ¶ 18. While sediment dredged from the Lower Passaic River is not likely to be categorized as hazardous under RCRA, dioxin concentrations present in the sediment to be dredged "may significantly influence disposal options for specific facilities with acceptance limits for dioxin containing waste." April 2019 Sediment Waste Characterization Report by OxyChem at page 5-1.[30] Because only a limited number of landfills will accept these wastes, the presence of dioxins and furans in dredged sediments will likely increase the cost of disposal. *See* Yeh Decl. ¶ 18.

- The presence of dioxin may also drive up transportation costs, due to the need to ship OU2 and OU4 dredged materials farther away. New Jersey solid

---

[30]

https://sharepoint.ourpassaic.org/Public%20Documents/Lower%208.3mi%20Sediment%20Waste%20Characterization%20Report%20Rev%202%202019-04-18.pdf

waste landfills cannot accept construction materials impacted with dioxins,[31] which means that those materials will need to be shipped farther away for disposal, at greater cost.

- Although the OU2 pre-design investigation found that sediment dredged from OU2 is not likely to be RCRA characteristically hazardous, the OU2 TODP provides for the possibility that waste characterization sampling during the remedial action might indicate the presence of hazardous waste that contains underlying hazardous constituents (UHC), such as dioxin. TODP, pages 3-3 to 3-4. Such material is not suitable for direct land disposal and must be treated at an approved facility prior to disposal. *See* OU2 ROD, Section 9.1.6.2 at p. 49; *see also* OU2 RI/FFS Appendix G, Dredged Material Management Assessments, Section 2.1.[32] Currently, thermal treatment is the only technology known to be able to treat sediments that contain dioxin as a UHC to the applicable standards. *Id.*[33] The ash generated by this treatment system can be disposed at a RCRA Subtitle C landfill. *Id.* These are further limitations to disposal of dredged material containing dioxin that could drive up remedial costs.

- The high cost of analyzing dioxin samples increases the cost of sampling that will be conducted during and after the remedial action. OU2 RI/FFS Appendix H, Cost Estimates at page 5-2.[34] The cost of analyzing dioxin in sediments, water and biota samples is several times higher than that of the other COCs. *Id.*[35] . The OU2 design builds in sampling events throughout the years of remedial action to ensure that the construction is performed with as little environmental disruption as possible. *See* August 2023 OU2 Basis of

---

[31] *See* OU2 Transportation and Off-Site Disposal Plan (TODP) (OCC 2023) at Section 1.3, Page 1-4. https://sharepoint.ourpassaic.org/Public%20Documents/Lower%208mi%20OU2%20100PD%20Transportation%20and%20Off-Site%20Disposal%20Plan%20TODP-Feb2023%20DRAFT.pdf

[32] https://semspub.epa.gov/work/02/703642.pdf at p. 1367.

[33] Congress of United States, 1991. "Dioxin Treatment Technologies." Office of Technology Assessment. OTA-BP-O-93. Washington, DC: U.S. Government Printing Office.

[34] https://semspub.epa.gov/work/02/703642.pdf at p. 1701.

[35] OU2 RI/FFS Appendix H, Cost Estimates at page 5-2 indicates that the cost of analyzing "Pesticide" samples is slightly higher than the cost of analyzing dioxin samples. https://semspub.epa.gov/work/02/703642.pdf at p. 1701. But the "Pesticide" category includes multiple types of pesticides, including DDT and dieldrin.

Design Report by OxyChem at pages 12-1 to 12-2.[36] Such sampling is standard for sediment remedies and will also be required for the OU4 interim remedy. *See* OU4 ROD at p. 45. After the cap is installed, decades of sampling will be required to ensure remedy effectiveness. *See* OU2 ROD, Decision Summary, Section 12, pp. 79-80, 83, 90; and OU4 ROD at pp. 45-46.

- With respect to the OU4 interim remedy for the upper 9 miles of the Lower Passaic River, dioxin is plainly a driver of remedial costs. Surface and subsurface areas with elevated concentrations of dioxin and/or PCBs are the primary source of risks to human health and the environment. Exhibit 5, Declaration of Diane Sharkey ("Sharkey Decl.") ¶ 14; *see also* OU4 ROD, Section 7.1.4, page 29, Section 7.2.2, page 34, and Section 7.3, page 36. The interim remedy specifically targets those areas for dredging and capping. *See* Sharkey Decl. ¶ 14.

- The comment's reference to "navigational dredging" is assumed to be related to the component of the OU2 remedy that calls for sufficient dredging to allow for the continued use of the Congressionally-authorized navigation channel in the 1.7 miles of the river closest to Newark Bay. The dredging in the 1.7 miles of the river closest to Newark Bay is a legally required part of installing the cap — the component of the OU2 remedy that most directly mitigates the risks caused by the COCs. *See* OU2 ROD, Section 10.2, page 61 and Section 14, paged 94-95. Thus, contrary to the comment, this dredging work is related to the risks posed by dioxin and the other COCs.

**RS 51.**    *OxyChem Comment Section VI.B.1.c, Argument 2 (pp. 50-51): The presence of PCBs and the other ROD COCs would require the same remedy (a bank-to-bank dredge and cap) even if there were no dioxin in the River.*

**Response:** EPA did not evaluate what a remedy for the Lower Passaic River would look like in the absence of dioxin, so the comment is speculative and hypothetical. As discussed above, the risk assessments conducted for OU2 and OU4 both identified dioxin (and to a lesser extent, PCBs) as the most significant risk-driver for the Lower Passaic River. *See* Sivak Decl. ¶ 43. Further, the geographic extent of the Diamond Alkali Site and the cleanup are defined by the presence of dioxin and other COCs released from the Diamond Alkali facility that was operated by OxyChem's predecessor. *See* OU2 ROD, Decision Summary, page 1. It is not a given that in the absence of the Diamond Alkali operations and releases, the Lower

---

[36]

https://sharepoint.ourpassaic.org/Public%20Documents/Lower%208mi%20OU2%2010 00PD%20Basis%20of%20Design%20Report-Aug2023%20DRAFT.pdf

Passaic River would have been listed on the NPL or if so, what remedial action
would be appropriate. Sivak Decl. ¶ 11.

**RS 52.**    *OxyChem Comment Section VI.B.1.c, Argument 3 (p. 51): EPA
practice at other sites supports the conclusion that OU2 would need to
be remediated without the presence of 2,3,7,8-TCDD and even at lower
concentrations of the other COCs.*

**Response:**  EPA's remedy selection process is site-specific (Sivak Decl. ¶ 15) so
that broad generalizations on EPA's practices at other sites cannot be responded to
without more information than was provided in the comments. Similarly, the
threshold question of whether the Lower Passaic River, on its own, would have been
eligible for adding to the NPL, had the releases from the Diamond Alkali facility to
the river not occurred, requires speculation.

**RS 53.**    *OxyChem Comment Section VI.B.1.c, Argument 4 (p. 51): The
allocation method discussed in Trinity Industries, Inc. v. Greenlease
Holding Co., 903 F.3d 333 (3d Cir. 2018) is a fairer approach, which if
used at a Site would start by comparing EPA's Remedial Goals to the
concentrations of COCs in the Passaic, and then where a COC exceeds
a Remedial Goal, would conclude that section is to be remediated.
Under this approach, dioxins, PCBs, mercury, and DDx all exceed
remedial goals in almost every part of OU2, with dioxins contributing
to less than a quarter of total exceedances.*

**Response:**  As noted in the Allocation Recommendation Report (at page 6) "the
Allocation is the first phase of a two (2) phase ADR facilitated settlement process to
obtain future cash-out and work party settlements between EPA and the Allocation
Parties." Exh. 12 at ARR0006.  The Allocation Recommendation Report served as a
starting point for the second phase of the settlement process, in which the United
States reviewed AlterEcho's Allocation Recommendation Report and other
information, identified PRPs that were eligible to participate in a cashout
settlement, and negotiated a settlement with those who were eligible and willing to
participate.  *See* Yeh Decl. ¶¶ 54-57.

The framework of the allocation conducted by AlterEcho is rational and based on
judicial precedent and commonly used allocation factors such as mass and toxicity.
Mem. in Supp., Argument, Section IV.D.2; *see also* Wittenbrink Decl. ¶¶ 13-16. The
existence of other potential allocation frameworks does not mean that the AlterEcho
allocation framework is not rational.  CERCLA cost allocation is a site-specific
endeavor and the Lower Passaic River is very different from the Superfund site at
issue in *Trinity Industries, Inc. v. Greenlease Holding Co.*, 903 F.3d 333 (3d Cir.

2018). Here, the AlterEcho allocation is consistent with well-established CERCLA cost allocation factors and with the conclusions in EPA's OU2 and OU4 risk assessments. *See* RS 62 and RS 63. Given the conditions in the Lower Passaic River and the stark differences in the risks posed by dioxin and PCBs compared to the other COCs, allocating responsibility and settling liability for response costs based on risk is a fair and reasonable approach.

**RS 54.** *OxyChem Comment Section VI.B.2.a (p. 53): AlterEcho's Methodology is replete with fundamental errors and faulty premises (VI.B.2.a. – p 53).*

**Response:** Responses to sub-comments are set forth below.

**RS 55.** *OxyChem Comment Section VI.B.2.a.i (pp. 53-57): AlterEcho's Allocation ignores other known sources of dioxin. EPA-funded and peer-reviewed scientific studies establish multiple sources of dioxin.*

**Response:** The allocation does not ignore sources of dioxin other than Diamond Alkali: it identifies historical dioxin contributions from allocation parties Givaudan, 21st Century Fox, Benjamin Moore, Stanley Black and Decker, Atlas Refining and PPG. Allocation Recommendation Report, Attachment L (Facility Data Computation Sheets), Exh. 12 at ARR2408, ARR2415, ARR2015, ARR2124, ARR2805, ARR2087, ARR2660. However, based on the supporting data in the allocation, those facilities contributed miniscule amounts of dioxin compared to OCC's predecessor, Diamond Alkali. *See* Allocation Recommendation Report at page 29 (Exh. 12 at ARR0029). AlterEcho's conclusions about the large amount of dioxin released from the Diamond Alkali facility are consistent with that facility's history of discharges of process waste into the river: "Diamond intentionally and knowingly discharged hazardous pollutants with full awareness of their inevitable migration to and devastating impact upon the environment." *Diamond Shamrock Chemicals Co. v. Aetna Cas. & Sur. Co*, 258 N.J. Super. 167, 197; 609 A.2d 440, 454-55 (N.J. Superior Ct., App. Div. 1992), *certif. denied*, 134 N.J. 481, 634 A.2d 528 (1993). In particular, the court described "[o]verwhelming evidence" that Diamond knew about releases of dioxin from the plant, and migration to other areas. *Id.*, 258 N.J. Super. at 213; 609 A.2d at 463. Prior to 1956, it was Diamond's policy that all waste products were released into the River. *Id.*, 258 N.J. Super. at 183; 609 A.2d at 447-448. After 1956, some, but not all, portions of the facility were connected to the PVSC trunk sewer line; Diamond intentionally did not connect the building where it manufactured the dioxin-generating 2,4-D and 2,4,5-TCP. *See id.* at 183-184; 447-448.

The dioxin signal from the year 2000 presented in Garvey, et. al. (2011), discussed in the comment, is approximately 20 times smaller than the dioxin signal from the 1950s to 1960s presented in Garvey, et. al. (2011) that is attributable to Diamond Alkali's historical releases. The comment speculates that the discharge is attributable to Givaudan because Givaudan had a stormwater discharge permit. Given the information about Givaudan's manufacturing process, including the small scale of hexachlorophene (HCP) production in 1947-1949 (Givaudan Facility Data Report at Appendix A-1 (Exh. 12 at ARR1103)), and its use of pre-purified 2,4,5-TCP to manufacture G-11 (*see* Facility Data Report at pp. 3, 4 (Exh. 12 at ARR1071, ARR1072)), the observation that the facility had a permitted stormwater outfall does not provide the causal link that the comments argue for. *See also* RS 110 below.

The supporting documents considered by AlterEcho in its evaluation of Givaudan include the 2017 HDR study described in the comment, and 2012 and 2016 analyses by Anchor QEA and Givaudan, respectively. On the one hand, the 2017 HDR study (Exh. 13.30 (PAS-00129882)) indicated that the mixtures of dioxins and furans measured in the Lower Passaic River sediment can be determined by blending the concentrations of dioxins and furans from the Diamond Alkali facility, the Givaudan facility and background concentrations. On the other hand, the 2012 Anchor QEA analysis (Exh. 13.10 (PAP-00180504-PAP-00180551)) showed that the fingerprint of dioxin in Passaic River sediments at a highly dioxin-contaminated mudflat at River Mile 10.9 did not match the fingerprint of dioxin from a waste cell on the Givaudan property. Additionally, the 2016 Givaudan analysis (Exh. 13.17 (PAP-00345186-PAP-00345216)) showed that the chemical fingerprint of the dioxin found at the Givaudan property is unique and was not observed in Lower Passaic River sediments. Further, the supporting documents considered in the allocation also contain information about dioxin concentration data from Givaudan's operations, raw materials, and products. *See* data summarized in Givaudan Facility Data Report Appendices A-1 (Hexachlorophene Production Volume 1947-1984), A-2 (TCDD Concentrations Detected in 2,4,5-TCP Feedstock) and A-3 (TCDD Concentrations in Hexachlorophene) (Exh. 12 at ARR1103-1105); *see also* Facility Data Report (Exh. 12 at ARR1053-1101), citing PAP-00168698 (Exh. 13.05) ("G-11 from 2,4,5-Trichlorophenol Tech Experimental Results from Plant Runs" dated 12/8/78), PAP-00174267 (Exh. 13.09) (Givaudan letter to NJDEP on use of 2,4,5-TCP to prepare HCP dated 5/25/83), PAS-00048073 (excerpted as Exh. 13.28) at PAS-00048133-48136 (Givaudan 104e response of 10/26/83; PAP-00170543 (Exh. 13.08) ("NIOSH Dioxin Registry Site Visit Report of Givaudan Corporation" dated March 1990). *See also* RS 110 below. In sum, AlterEcho had the information that was necessary to assess the extent to which the Givaudan facility generated and released dioxin and the other COCs through the pathways that were considered in

the allocation. The Allocation Recommendation Report reflects the outcome of AlterEcho's consideration of that information.

**RS 56.** **OxyChem Comment Section VI.B.2.a.ii (pp. 57 – 61): In Addition to Givaudan, Ashland Inc. and Clean Earth of New Jersey, Inc. are among other, known dioxin contributors.**

*This comment contains two sub-arguments:*

*i) The comment states that the allocation did not calculate scores for Ashland's Drew Chemical facility and the Clean Earth of North Jersey facility.*

*ii) The comment states: Givaudan, BASF, Benjamin Moore, PPG Industries and Sherwin Williams all conducted operations associated with dioxin formation. It is widely understood that waste incineration involving burning organic material in the presence of chlorine results in dioxins and several settling defendants' sites were equipped with an incinerator. Of the 92 sites evaluated in the Allocation Recommendation Report, only a few have been sampled for the presence of dioxins—even when there is evidence that dioxin-associated compounds were used, stored, or produced at those sites. Even including sites that Mr. Batson did not consider, only 19 sites in the Passaic area have been tested for dioxins (including the Diamond Site).*

**Response:**

i) The comments about Ashland's Drew Chemical facility and the Clean Earth of North Jersey facility are irrelevant to the cashout settlement because Ashland and Clean Earth of North Jersey were not evaluated in the allocation and are not parties to the cashout settlement. The cashout settlement resolves the liability of 82 potentially responsible parties for certain specified facilities based in part on the allocation. Ashland's Drew Chemical facility and the Clean Earth of North Jersey facility are not part of this cashout settlement, and OCC's ability to pursue such parties is unaffected by this settlement.

ii) Responses to OCC's facility-specific comments pertaining to Givaudan, BASF, Benjamin Moore and PPG are provided in response to Appendix A of OCC's Comments. *See* RS 109-RS 112, RS 93-RS 94, RS 95-RS 101, RS 121 and RS 122-RS 123. Sherwin Williams is not a Settling Defendant under the modified Consent Decree (ECF No. 283), so the portion of the comment that relates to Sherwin

Williams is not relevant to the United States' analysis of the modified Consent Decree.

Regarding facilities equipped with incinerators, the allocation relied on sampling data and for incinerators, there were no sampling results in the supporting documents to the allocation that could be used in the pathway calculations, and the comments offer no quantitative data either.

In response to the comment that 18 properties out of 92 evaluated in the allocation had dioxin data:

- First, based on Figure 8 of the Bock declaration, to which this Comment cites in support, OCC's consultant has identified 17 facilities with dioxin data *other than the Diamond Alkali facility*.
- Second, the comment incorrectly asserts that these 17 facilities were all evaluated by AlterEcho. In fact, 9 of them[37] were either not evaluated in the allocation or were operated by companies that are not parties to the cashout settlement, so the settlement does not affect OCC's ability to pursue them for cost recovery or contribution.
- Finally, with respect to the 8 facilities identified in the Bock declaration that are relevant to this cashout settlement: (a) responses to comments on how Benjamin Moore, Givaudan and PPG were evaluated in the allocation with respect to dioxin are provided in RS 55 above and in RS 95, RS 110-RS 112, and RS 122 below, (b) Sherwin Williams is not a Settling Defendant under the modified Consent Decree, and (c) for the remaining four facilities, the information provided in the comments either (i) has already been considered in the allocation (21st Century: OxyChem Ex. B-6 (Exh. 14.23 to the Motion to Enter) is summarized in PAP-00353333 (Exh. 13.18)) or (ii) is not facility-specific (Celanese, Okonite, Covanta).[38]

---

[37] (1) America Modern Metals, (2) Bayonne Barrel & Drum, (3) Central Steel Drum, (4) Clean Earth, (5) Drew Chemical Corp., (6) Marcal Paper Mills, Inc, (7) MSLA 1B (Keegan Landfill), (8) MSLA 1D (Kearny Landfill), and (9) Nokia (f/k/a Alcatel-Lucent).

[38] Celanese: Dr. Bock's reference, Hart Crowser 2001, cites to ourPassaic.org web site database, which has no facility-specific data. Okonite: Dr. Bock's reference, ENSR 2008, documents an OU4 RI/FS LPR sediment sampling event which was not facility-specific. Covanta: OxyChem Ex. B-74 (Exh. 14.24 to the Motion to Enter) is an Excel spreadsheet that does not mention Covanta (or American Ref-Fuel Co).

*RS 57.*    *OxyChem Comment Section VI.B.2.b (p. 61): AlterEcho's risk-based approach ignores all other factors affecting the remedy, contradicting EPA's own findings and pre-determining the allocation outcome.*

**Response:** Responses to specific arguments in sub-comments are below.

*RS 58.*    *OxyChem Comment Section VI.B.2.b.i (pp. 61-62): AlterEcho uses risk numbers to pre-determine the outcome.*

**Response:**  This comment contains three arguments, which are addressed separately below.

*RS 59.*    *OxyChem Comment Section VI.B.2.b.i, Argument 1 (pp. 61-62): Under AlterEcho's approach, dioxins are all that matters. The settling parties could have dumped as much PCBs, DDT, lead, mercury, copper, dieldrin or PAHs as they wanted into the Passaic River as long as it was not dioxin. The allocation's use of Relative Risk Numbers means that the allocation method is skewed from the outset to allocate a vast majority of response costs to OCC. Under the allocation methodology, if every settling party's non-dioxin contribution were multiplied or divided by a million, there would be no significant change in the outcome of the allocation, which is unreasonable.*

**Response:** As discussed in RS 48 above, the allocation's Relative Risk Numbers are rooted in and entirely consistent with the OU2 and OU4 risk assessments' conclusion that dioxin is the most significant risk-driver for the Lower Passaic River. Moreover, the comment is incorrect in stating that discharges of the other COCs did not matter, because the allocation assigned shares and tiers of responsibility to parties that discharged PCBs, DDT, lead, mercury, copper, dieldrin and PAHs to the river. Allocation Recommendation Report at pages 18-19 (Exh. 12 at ARR0018-0019). Some of the parties in the allocation who discharged, among other COCs, relatively large amounts of PCBs were assigned sufficiently large shares of responsibility that AlterEcho placed them in "Tier 2" (*see* Attachment Q (Exh. 12, Part 20) at ARR3239-3241), and the United States did not include them in this cashout settlement. This belies the commenter's argument that parties' non-dioxin discharges could have been multiplied or divided by a million without significantly impacting the allocation.

Furthermore, neither EPA, nor AlterEcho, skewed, or sought to skew, the allocation. Because the potentially responsible parties had failed several times to perform their own allocation, EPA offered to sponsor an allocation by a third-party

58

neutral to aid it in identifying parties that should perform and/or finance the OU2 cleanup and parties of responsibility so small in relation to the other PRPs that they should be eligible for a cashout. Exhibit 4, Declaration of Alice Yeh ("Yeh Decl.") ¶ 26. The allocation was performed by a third-party, hired by EPA, after informing OCC and the other private PRPs and providing those parties an opportunity to meet the allocator. *See* RS 77 below. The allocation was not binding and was not imposed by EPA, but rather, it was performed only after a sufficient number of private PRPs agreed to participate. Yeh Decl. ¶ 26. Only now, after having elected not to participate in the allocation, does OCC weigh in on how the allocation should have been conducted. OCC's refusal to participate in the allocation does not mean the allocation was unfair or skewed. OCC was provided with several opportunities to reconsider its decision not to participate, even after the allocation was underway.[39] Because OCC elected not to participate, AlterEcho assigned additional resources to the allocation team to ensure that OCC was evaluated fairly in the allocation process. *See* Attachment E (Revised Work Plan) at page 3 (Exh. 12 at ARR0120).

**RS 60.**      *OxyChem Comment Section VI.B.2.b.i, Argument 2 (pp. 61-62): The allocation's assumptions contradict EPA's statements and policy, and ignore foundational facts about the OU2 remedy.*

*The commenter asserts that:*

- *After over a hundred years of heavy industrial pollution, the Passaic would need to be remediated even if there were no dioxins in it;*

- *Different parts of the river have different levels of contamination— some chemicals are widespread, while others are concentrated. The remedy considers the special impact of different chemicals, but the allocation does not;*

- *Cleanup costs are not attributable to the risk of any specific chemical; and*

- *Parts of the cost are not attributable to risk at all: Dredging the navigation channel is not needed to reduce risk, but rather to allow commercial use of the river and for flood control purposes.*

---

[39] *See, e.g.*, Eric Wilson November 2017 letter to OCC, https://semspub.epa.gov/work/02/518289.pdf

**Response:**

- As discussed above, the question of whether the Lower Passaic River would have been listed as a (separate) Site on the NPL if it had not been heavily contaminated with dioxin and other contaminants from the Lister Avenue facility requires speculation. See the United States' response to Section VI.B.1 of OCC's comments, in particular RS 46, RS 51, and RS 52.

- The COCs are all distributed bank-to-bank in the lower 8.3 miles, which is why the OU2 remedy relies on a bank-to-bank cap to isolate the COCs. *See* OU2 ROD at page 12; Yeh Decl. ¶ 16. The OU4 interim remedy targets areas in the upper nine miles where surface sediments have elevated concentrations of dioxin and PCBs for dredging and capping, as well as subsurface sediments with elevated concentrations of dioxin and PCBs and the potential for erosion, because they are the primary source of risks to human health and the environment (Sharkey Decl. ¶ 14), which is entirely consistent with AlterEcho's use of Relative Risk Numbers.

- See the United States' response to Section VI.B.1.c of OCC's comments (RS 50 above) for a discussion of how dioxin influenced the cleanup costs.

- See the United States' response to Section VI.B.1.c of OCC's comments (RS 50 above) for a discussion of the component of the OU2 remedy related to dredging in the navigation channel in the lower 1.7 miles of the Lower Passaic River.


*RS 61.*     *OxyChem Comment Section VI.B.2.b.i, Argument 3 (pp. 61-62): Batson's risk-based approach is contrary to law, contrary to EPA's findings, and does not support any conclusion that it represents an accurate or equitable allocation of costs as the statute requires. It should never have been used and it is no evidence that the amount of the settlement in total, or for the individual parties released, bears a reasonable relationship to the liability being settled.*


**Response**: AlterEcho's risk-based allocation is consistent with well-established CERCLA cost allocation factors (*See* Mem. In Supp., Argument, Sections IV.A.2 and IV.D.2; Exhibit 7, Declaration of Chris Wittenbrink ("Wittenbrink Decl.") ¶¶ 13-14) and with the conclusions of EPA's risk assessments for OU2 and OU4 (*see* RS 48, RS 53, RS 59). Given the conditions in the Lower Passaic River, discussed above, and the stark differences in the risks posed by dioxin, PCBs, and the other COCs, allocating responsibility and settling liability for response costs based on risk is a fair and reasonable approach. *See* Mem. In Supp., Argument, Sections IV.A.2 and

IV.B; *see also* Wittenbrink Decl. ¶ 24 ("When looking at an allocation model that takes into consideration relevant information, excluding COC risks for the Site would omit a key metric for allocation.").

### RS 62. OxyChem Comment Section VI.B.2.b.ii, Argument 1 (pp. 63-64): AlterEcho invents risk numbers that contradict EPA's.

**Response:** While a Superfund cost allocation may consider risk, Superfund risk assessment and Superfund cost allocation are separate exercises and disciplines. Risk assessment performed as part of a Superfund remedial investigation has a different purpose than the Relative Risk Numbers (RRNs) developed by AlterEcho for use in the allocation. As part of the Superfund remedy selection process, risk assessments answer the questions: What are the current risks now, and what are the risks in the future, if no remedial action is taken? If those risks are above acceptable limits as defined in the NCP, then a feasibility study is prepared to identify and evaluate methods to reduce the unacceptable risks to within acceptable levels. *See* Exhibit 6, Declaration of Michael Sivak ("Sivak Decl.") ¶ 15. Superfund risk assessments identify the chemicals that are present at unacceptable levels (the contaminants of concern, or "COCs"), the contaminated media where the COCs are found, and how people or ecological receptors are exposed to them. *See* Sivak Decl. ¶ 14. COCs typically have differing levels of toxicity and risk depending on the type of receptor (e.g. ecological receptors, human health receptors). *Id.* In the Superfund remedy selection process, EPA separately evaluates ecological risk, cancer risk to humans, and other human health risks, and EPA may take remedial action based on any of those discrete risk profiles. *Id.*

In contrast, AlterEcho developed the RRNs as factors to aid in allocating shares of responsibility for response costs. RRN Method at page 3 (Exh. 12 at ARR00321); Yeh Decl. ¶ 49. For the allocation, AlterEcho calculated the RRNs (as further described in RS 48) by combining EPA's ecological and human health risk estimates for the sole purpose of quantifying each allocation party's share of responsibility. *See* Allocation Recommendation Report, pages 31-32 and RRN Method (Exh. 12 at ARR00031-0032 and ARR0315-0338). In Superfund risk assessment, risk estimates are not combined in this way. Sivak Decl. ¶ 53. But AlterEcho's use of RRNs as a weighting factor applied to the COC masses is logical for an allocation related to this Site (*see* Wittenbrink Decl. ¶¶ 25-27), where one COC, dioxin, is such a significant source of the risks posed to human health and the environment. *See* responses RS 44, RS 47, RS 48; *see also* Mem. In Supp., Argument, Section IV.D.2.

This section of OxyChem's comments includes a second argument, which is addressed separately below.

*RS 63.*       *OxyChem Comment Section VI.B.2.b.ii, Argument 2 (p. 63):  The allocation concludes that dioxins make up nearly 90% of danger to human health in the Passaic, which is inconsistent with EPA's risk assessments.*

**Response**: The allocation RRNs indicate that dioxin contributes approximately 84% of the environmental harm to the Lower Passaic River, with PCBs contributing approximately 13% and the rest of the COCs contributing a total of approximately 3%. *See* RRN Method, pages 18-19 (Exh. 12 at ARR0336-0337). The OU2 and OU4 risk assessments found that 1) for human health cancer risk, dioxin contributes approximately 68% to 94% of the risk, PCBs contribute approximately 5% to 30%, and the other COCs contribute a combined 3% or less; 2) for human health non-cancer hazards, dioxin and PCBs combined to contribute more than 96% of the hazard. *See* OU2 ROD[40] at page 29, 30 and OU4 ROD[41] at p. 30, and Tables 7-5a and 7-6a. Similarly, the ecological risk assessments concluded that dioxin and PCBs contribute most significantly to the ecological risk at OU2 and OU4. *See* OU2 ROD at page 38 and OU4 ROD at page 35. Thus, the RRNs are generally consistent with the conclusions of the OU2 and OU4 risk assessments.

*RS 64.*       *OxyChem Comment Section VI.B.2.b.ii(a) (p. 64-66): The allocation only considers current risk and disregards future risk.*

**Response**: As the comments acknowledge, the OU2 and OU4 risk assessments were developed in accordance with EPA guidance that requires consideration of both current and potential future risks. Sivak Decl. ¶ 55. The RRN Method (Exh. 12 at ARR0315-0338) outlines the process used to develop the RRNs. *See* RS 48.  To calculate the RRNs, AlterEcho used the cancer risks and non-cancer risks presented in the OU2 and OU4 ROD, or if values were not presented in a ROD, AlterEcho used the exposure assumptions presented in the OU2 and OU4 ROD to calculate cancer risks and non-cancer risks. RRN Method at page 6 (Exh. 12 at ARR0324). The risk values and exposure assumptions presented in the OU2 and OU4 RODs (*see* OU2 ROD, pages 24-26, OU4 ROD, pages 25-27), and used by AlterEcho to develop the RRNs, considered both current and future risks. *See* Sivak Decl. ¶ 55. Therefore, the allocation, through the RRNs, did consider both current and future risks.

---

[40] https://semspub.epa.gov/work/02/396055.pdf

[41] https://semspub.epa.gov/work/02/630399.pdf

**RS 65.        *OxyChem Comment Section VI.B.2.b.ii(b) (p.66-67): The allocation ignores the risk of dioxin-like PCBs. The allocation uses total TEQ to generate dioxin RRNs.***

**Response**: As the comments acknowledge, the OU2 and OU4 risk assessments were developed in accordance with EPA guidance that recommends evaluation of dioxin-like PCBs. *See* Sivak Decl. ¶ 56. The risk assessments were able to do this because the vast majority of the data used in the risk assessments were collected by EPA or under EPA oversight following an EPA-approved Quality Assurance Project Plan, which required that samples be analyzed for dioxin and PCB congeners so that dioxin-like PCBs could be evaluated. *Id*. The information and data that were available to AlterEcho for use in the allocation were collected for various and different purposes and under analytical methods that have changed over the decades. *Id*. The vast majority of PCB concentration data available to the allocator were in terms of PCB Aroclor mixtures, which does not allow for evaluation of dioxin-like PCBs. *Id*.   Given the available data, AlterEcho's approach to establishing the RRN for PCBs was rational.

**RS 66.        *OxyChem Comment Section VI.B.2.b.ii(c) (p. 67-68): The allocation should not have included crab consumption in its relative risk calculations, since only fish consumption was used to develop remedial goals, and the allocator should have used a different method to combine the crab consumption risk and the fish consumption risk.***

**Response**: In its remedy selection process, EPA considered both fish and crab consumption as pathways through which humans are exposed to the COCs in the OU2 and OU4 risk assessments. *See* Sivak Decl. ¶ 36; s*ee also* OU2 ROD at page 22 and OU4 ROD at page 24. To set the remediation goals for dioxin and PCBs, EPA identified sediment concentrations that are protective for people who consume fish, as well as sediment concentrations that are protective for people who consume crab.  The sediment concentration that was more protective (the lower of those two values) which as noted in the comment, was the value based on fish consumption, was identified as the concentration that was protective of both fish and crab.   *See* Sivak Decl. ¶ 36.  That the RRNs included crab consumption is consistent with how OU2 remediation goals were set, as those took into account both fish and crab consumption in protecting for both.

The comment also argues, based on risk assessment guidance, that the allocator should have used a different method to combine the crab consumption risk and the fish consumption risk. As discussed in RS 62 above, allocation is different from risk assessment. And the approach to combine the crab consumption risk and the fish

63

consumption risk endorsed by the comment would not have a significant impact on the combined percentage share of the Settling Defendants. Exhibit 4, Declaration of Alice Yeh ("Yeh Decl.") ¶ 50.  Therefore, even if the method endorsed by the comment had been used, the results of the allocation would be substantially the same.

**RS 67.** *OxyChem Comment Section VI.B.2.b.ii(d) (p. 69): The RRNs used in the allocation were calculated based on incremental risk, which is contrary to EPA risk assessment guidance.*

**Response**: As discussed in RS 62 above, AlterEcho developed the RRNs for the sole purpose of quantifying each allocation party's share of responsibility, not for risk assessment. AlterEcho's use of RRNs as a weighting factor applied to the COC masses is logical for an allocation related to this site (*see* Wittenbrink Decl. ¶¶ 25-27).  To calculate the RRNs, AlterEcho used the "incremental" risk, i.e. the risk not attributable to background risks. *See* RRN Method at pp. 5-7 (Exh. 12 at ARR0323-0325). By subtracting out the contributions from background sources, the allocation focused on the COC contributions from the allocation parties' facilities, as evidenced by the description of incremental risk provided in the RRN Method at page 7 (Exh. 12 at ARR0325) ("Background hazard and risk results were subtracted from OU2 results, yielding incremental (**site-related**) [line-of-evidence] results . . . .") (emphasis added).  This is consistent with the purpose of the allocation, which was to develop relative shares of responsibility among the allocation parties.

**RS 68.** *OxyChem Comment Section VI.B.2.c (pp. 69-76): AlterEcho uses a made-up "attenuation factor" that contradicts basic science and EPA findings and gives every settling defendant a 99% discount. The attenuation factor makes 99% of the settling parties' contamination disappear. The allocation attenuation factor contradicts the COC halftime analysis in EPA's Focused Feasibility Study for OU2.*

**Response:** OCC's comments regarding the attenuation factor used by AlterEcho are irrelevant to the cashout settlement because AlterEcho's attenuation factor does not impact the shares assigned to the allocation parties under AlterEcho's Alternative Method (Wittenbrink Decl. ¶¶ 34-35), which the United States used as a starting point for its settlement negotiations that ultimately led to the proposed Consent Decree (ECF No. 283). *See* Mem. In Supp., Background, Section II.G. The Alternative Method equitably distributes any "unallocated shares" of COCs only to parties who are responsible for those COCs.  *See* Allocation Recommendation Report, pages 28-29 (Exh. 12 at ARR0028-0029). A consequence of the Alternative Method is that it cancels out the attenuation factor and renders it irrelevant. *See* Wittenbrink Declaration ¶ 34 ("application of the Attenuation Factor under the Alternative Method allocation approach is unnecessary because it has no effect on

the resulting allocated shares."). Under the Alternative Method, each allocation party is assigned a COC-specific share based on its release of such COC relative to the other allocation parties. Allocation Recommendation Report, pages 28-29 (Exh. 12 at ARR0028-0029). As a result, 100% of the responsibility for each COC is assigned to the allocation parties (Wittenbrink Decl. ¶ 20), regardless of any potential arguments about attenuation or contributions from sources that are were not evaluated in the allocation.  In sum, the attenuation factor has no impact on the results of the allocation under the method that is relevant to the proposed Consent Decree.

### RS 69.    *OxyChem Comment Section VI.B.3 (pp. 76-77): The AlterEcho Report's methodology unjustly allocates a supermajority of responsibility to OxyChem by treating the Lister Plant and OxyChem differently from other sites and PRPs*

**Response:** The allocation methodology applied to all the facilities in the allocation and not just OxyChem's facility. The COC(s) released into the River and the amount of the COC(s) released varied by facility, but the methodology used to evaluate the responsibility for those releases was applied consistently. *See* Yeh Decl. ¶ 45. The Lister Plant is unique because of its responsibility for the dioxin now in the River. *See* RS 55. An allocation that seeks to assign fair shares of responsibility cannot ignore the role that dioxin plays in the human health and ecological risks that the remedies for OU2 and OU4 seek to address.

To accomplish EPA's goal of having responsibility allocated in a just and transparent fashion, AlterEcho solicited input and incorporated suggestions from the participating allocation parties as well as EPA on the allocation methodology and many other aspects of the allocation process. *See* Yeh Decl. ¶¶ 29, 32, 35.  EPA invited all private parties whose facilities would be evaluated in the allocation to participate in the allocation, but ten parties, including OCC, did not participate. Yeh Decl. ¶¶ 26, 30.  If those parties had participated, they would have had the same opportunity that the participating parties did to comment on how the allocation would be performed. Nonetheless, EPA and AlterEcho worked to ensure that the interests and concerns of non-participating allocation parties were taken into account in the allocation. *See* Yeh Decl. ¶ 40.

The comment acknowledges that AlterEcho recognized the importance of interpreting similar evidence consistently for all of the facilities in the allocation, a principle that is incorporated into the Allocation Protocol. The allocation process established by AlterEcho provided participating allocation parties multiple opportunities to review not only their own facility calculations but also those of all other facilities, so that all of those parties, in addition to the AlterEcho team, could ensure consistency in the application of the allocation methodology, including the

Allocation Protocol. Allocation Guide, Attachment G to Allocation Recommendation Report, Section 4.1.c, pages 7-8 (Exh. 12 at ARR0145-46). The inclusion of such opportunities for participation generally adheres to typical allocation processes. Wittenbrink Decl. ¶ 41. Because OCC elected not to participate, AlterEcho assigned additional resources to the allocation team to ensure that OCC was evaluated fairly in the allocation process. *See* Attachment E (Revised Work Plan) at page 3 (Exh. 12 at ARR0120). For OCC and the nine other parties that did not participate, AlterEcho assigned additional resources to the allocation team to perform independent reviews of allocation calculations for their facilities. *See* Yeh Decl. ¶ 40.

Given the large number of facilities in the allocation (92) and the wide variety of data, information and reports provided for each facility (totaling almost 700,000 pages of documents), a small number of inconsistencies is not unexpected, as discussed in the responses to specific sub-arguments below. However, overall the responses show that most of the inconsistencies did not change the Settling Defendants' eligibility for the modified Consent Decree (ECF No. 283).

### RS 70.     *OxyChem Comment Section VI.B.3.a (pp. 77-78): AlterEcho's treatment of historic fill is arbitrary, capricious, unfair, and disregarded the allocation's commitment to ensure consistency in its application of inferences.*

**Response:** The allocation team took into account that a number of the facilities evaluated were located on property containing historic fill, "as designated and/or defined by the State of New Jersey, or as accepted by the State of New Jersey (subject to review for relevancy for the specific facility by the Allocator)." Allocation Protocol (Attachment H), page 5 (Exh. 12 at ARR0310); Allocation Recommendation Report, page 22 (Exh. 12 at ARR0022). Historic fill, as this term is used by NJDEP, is material that did not originate on a property but was deposited there to raise the area's elevation, was contaminated prior to being deposited on the property, and is not connected with operations at the facility.[42] Pursuant to NJDEP policy, parties are typically not responsible for contamination existing in historic fill on their property so long as the fill has not eroded and they have not disturbed the fill. *See* Allocation Recommendation Report, page 22 (Exh. 12 at ARR0022). The allocation methodology in the Allocation Recommendation Report notes the goal of "equitable treatment between those facility properties containing historic fill and those without historic fill," and describes how AlterEcho planned to handle facilities

---

[42] For more information on New Jersey policy regarding historic fill, *see* NJDEP, Site Remediation Program, "Historic Fill Material Technical Guidance", April 29, 2013, Version 2.0 available at
https://www.nj.gov/dep/srp/guidance/srra/historic_fill_guidance.pdf

located on historic fill. *Id.* "For sites located completely on historic fill as determined by the allocation team, soil concentrations were utilized if the selected concentration (mg/kg) of copper, lead, or mercury exceeded the concentrations 1,200 mg/kg, 10,000 mg/kg, or 3.7 mg/kg, respectively, determined from NJDEP-approved historic fill numbers from local sites not included in this allocation . . . ." *Id.* "If a site was partially located or not located on historic fill, the highest, shallowest soil concentration was used, regardless of where it was collected." *Id.* Attachment C to the Allocation Recommendation Report (Exh. 12 at ARR0086-95) contains NJDEP maps denoting the location of historic fill on the allocation party facility locations.

The comment about how background contamination and historic fill were treated in Overland Fate and Transport calculations for the 21st Century Fox (Montrose Chemical), STWB (Hilton Davis) and Benjamin Moore facilities is incorrect.[43] The Overland Fate and Transport calculations for these three facilities were all performed in accordance with the Allocation Protocol. For facilities located completely on historic fill (as determined by AlterEcho), the selected maximum copper, lead and mercury soil concentrations were used in Overland Fate and Transport calculations if they were higher than the NJDEP-approved historic fill numbers and if they were located on exposed soil that could have been carried by "overland flow," that is, precipitation or flooding, to the Passaic River. Allocation Recommendation Report at pages 21-23 (Exh. 12 at ARR0021-23); *see also* RS 96 and RS 131 below.

- 21st Century Fox (Montrose Chemical) and Benjamin Moore are located completely on historic fill, and the allocation did not calculate copper, lead and mercury discharges via Overland Fate and Transport for those facilities, because maximum concentrations of those COCs were lower than NJDEP-approved historic fill numbers. Facility Data Computation Sheets for 21st Century Fox and Benjamin Moore (Exh. 12 at ARR2013-14, ARR2123).

- STWB (Hilton Davis) is located completely on historic fill, and the allocation did not calculate a lead contribution via the Overland Fate and Transport pathway for the facility because the maximum lead concentration was lower than the NJDEP-approved historic fill number. *See* RS 131 below. For copper and mercury, the maximum concentrations were higher than the NJDEP-approved historic fill numbers, but those data points were collected from soil under pavement, *id.*, so they were not used because they were not in exposed

---

[43] The comment also references the Sherwin Williams facility, but Sherwin Williams is not a Settling Defendant under the modified Consent Decree. As a result, the portion of the comment that relates to Sherwin Williams is not relevant to the United States' analysis of the modified Consent Decree.

soil that could have been carried by precipitation or flooding to the Passaic River, consistent with the allocation methodology.

As to how background concentrations and historic fill were treated in Overland Fate and Transport calculations for the Diamond Alkali facility, which is located on historic fill, AlterEcho calculated a mercury contribution via the Overland Fate and Transport pathway for the facility, because the maximum mercury concentration was higher than the NJDEP-approved historic fill number. Occidental Chemical Corp Facility Data Computation Sheets (Exh. 12 at ARR2581). This is consistent with the allocation methodology. *See* Allocation Recommendation Report at page 22 (Exh. 12 at ARR0022). However, for copper and lead, the Allocation Recommendation Report does not explain why copper and lead contributions via the Overland Fate and Transport pathway were calculated for the facility, even though maximum copper and lead concentrations were lower than the NJDEP-approved historic fill numbers. Occidental Chemical Corp Facility Data Computation Sheets (Exh. 12 at ARR2581). This could have been because there was evidence of erosion or soil disturbance, some other undisclosed reason, or it could have been an oversight. Yeh Decl. ¶ 52. Nevertheless, the resulting copper and lead base scores that were added to the other base scores to produce Diamond Alkali's overall base score were 0.0001285 (represented as 1.285E-4) and 0.0000056 (5.631E-6), respectively. Occidental Chemical Corp Facility Data Computation Sheets (Exh. 12 at ARR2577). The Diamond Alkali facility's overall base score was 85.06, and nearly all of that score (83.92) is attributable to dioxin releases. *Id.* The copper and lead base scores, 0.000129 and 0.000005 respectively, *id.*, were such insignificant contributors to that overall base score that they may as well have been zero. Therefore, even if this was an oversight on the part of AlterEcho, these values did not have any effect on OCC's share in the allocation.

### RS 71.    *OxyChem Comment Section VI.B.3.b-c (p. 78-86): Cooperation and culpability factors*

**Response:** As explained in its Memorandum in Support of the Motion to Enter, the United States did not use the cooperation and culpability factors in its settlement. *See* Mem. In Supp., Background, Section II.G. Therefore, this comment does not affect the United States' analysis of the proposed Consent Decree (ECF No. 283).

*RS 72.*        *OxyChem Comment Section VI.B.3.d (p. 86): AlterEcho was*
        *biased and inconsistent in its inferences with respect to site*
        *operations.*

**Response:** This comment cross-references OxyChem's facility-specific comments in
Appendix A, which are addressed in detail below in RS 93 through RS 131.  As a
general matter, OCC's comments do not demonstrate that the AlterEcho allocation
was biased against OCC.  *See* Wittenbrink Decl. ¶ 43 ("Based on my review of the
Allocation Recommendation Report and the supporting record, I did not see bias or
collusion").

*RS 73.*        *OxyChem Comment Section VI.B.3.e (pp. 86-88): Every court that*
        *has considered Batson's allocations has criticized his methodology*
        *and rejected his conclusions.*

***The comment cites two cases in which, according to OxyChem, "Batson was
retained by private parties to provide expert testimony regarding proposed
allocations," and "the district courts in those cases . . . criticized that
methodology and rejected his conclusions." See El Paso Nat. Gas Co., LLC v.
United States, 390 F. Supp. 3d. 1025 (D. Ariz. 2019); Columbia Falls
Aluminum Co., LLC v. Atlantic Richfield Co., No. 18-cv-131, 2021 WL
3769886 (D. Mon. Aug. 25, 2021). The comment asserts that these two
decisions describe "the same critical flaws in Batson's methodology that are
present here."***

**Response:** At the outset, OxyChem incorrectly conflates Mr. Batson's role in *El
Paso* and *Columbia* with AlterEcho's role in this matter.[44] In both prior cases,
private PRPs retained Mr. Batson to support those parties' CERCLA cost recovery
and contribution claims against adverse PRPs. In this matter, AlterEcho served as
a neutral. Rather than assist one party to prevail over another, AlterEcho presided
over a dispute resolution proceeding and in that role sought to construct a
reasonable and equitable allocation of responsibility among the PRPs to help EPA
identify parties that would be eligible for cash-out and work party settlements
between EPA and the Allocation Parties. *See* Allocation Recommendation Report at
pages 6-7 (Exh. 12 at ARR0006-07); Allocation Guide (Attachment G), Sections 3,
7.5-7.6, pages 4, 16-17 (Exh. 12 at ARR0142, ARR0154-55).

---

[44] The AlterEcho team working on the allocation included a cadre of technical
experts in addition to Mr. Batson. Allocation Recommendation Report,
Attachment E at pages 13-14 (Exh. 12 at ARR0130-31); *see also* Exhibit F to the
Yeh Decl., AlterEcho Team for Passaic River OU2 Allocation (Oct. 2017) (handout
presented by AlterEcho to PRPs at the October 13, 2017, meeting describing roles
and expertise of AlterEcho allocation team members).

More importantly, AlterEcho used a more complex methodology than that used by Mr. Batson in those cases. In *El Paso*, for example, Mr. Batson allocated responsibility between his client, El Paso, and the defendant PRP for costs associated with a uranium mine. Mr. Batson analyzed each party's respective percentage of responsibility based on the volume of uranium-contaminated soil each party moved during each of three phases of mining. 390 F. Supp. 3d. at 1050. Similarly, in *Columbia Falls*, Batson analyzed the two PRPs' waste disposal and production volumes at an aluminum smelting site. *See* 2021 WL 3769886 at *47. Those methodologies were based on volumetric splits, which differ from AlterEcho's analysis here that considered not only each party's contribution of COCs to OU2 sediments but also weighted the findings by the Relative Risk Number allocation factor (discussed above in RS 44 and RS 48) that accounted for the relative environmental harm that each COC posed to human health and the environment, among other factors. Indeed, the court in *El Paso* stated that a toxicity (i.e., risk-based) assessment did not apply to that mining site because "only one type of contaminant" was present—uranium. *Id.* at 1053. And the court in *Columbia Falls* made an important comment that applies well to AlterEcho's methodology here: the court recognized, as AlterEcho did here, that an allocation should "distinguish between toxicity of waste streams by each party." *Columbia Falls Aluminum Co.*, 2021 WL 3769886, at *48.

Further, given Mr. Batson's different role and methodology in those cases, the courts' conclusions as to his performance as an expert witness are not relevant to his work as a neutral allocator here. Consider, for example, the fact-dependent reasons that the courts did not rely on Mr. Batson's expert witness work in the prior cases. In *El Paso*, Mr. Batson's analysis relied on data provided by El Paso's other expert (i.e., the expert tasked with finding out what digging the parties performed) and rested on legal assumptions consistent with El Paso's litigation position (e.g., that the other PRP was liable as a mine operator during certain phases of mining). *Id.* at 1050-52. The court did not accept Batson's analysis largely because the court disagreed with El Paso's other expert and rejected El Paso's legal positions. *Id.* at 1053-54. Likewise, in *Columbia Falls*, the court found Mr. Batson's analysis "reasonable and relevant" in some respects but ultimately apportioned the majority of the site costs to the plaintiff (Mr. Batson's client) for other reasons, including that a contract between the parties, which the court found to be "the most important allocation factor," showed the parties' intent "to allocate more responsibility to [plaintiff] than [defendant]." 2021 WL 3769886, at *49, *52, 54. These conclusions have no bearing on AlterEcho's allocation here, in which Batson acted as a neutral, had no obligation to accept one party's factual or legal assumptions over any other party's, and performed a markedly different analysis of a complex site with dozens of parties that participated and COCs of varying degrees of toxicity.

**RS 74.**    *OxyChem Comment Section VI.B.3.f (pp. 88 -90): Batson was unqualified and ineligible to allocate liability at the Lower Passaic River.*

**Response:** The comment asserts, again, that Mr. Batson is unqualified because his analyses have been criticized by other courts. The United States responds to that point in RS 73 above. In addition, Mr. Batson's resume (OxyChem Ex. 48 (Exh. 14.01 to the Motion to Enter)), shows that he is qualified to perform CERCLA allocations and has significant experience in that field. According to his resume, Mr. Batson has served as an allocation expert or allocation consultant in at least another six matters. *Id.* at 2.

> His activities in these cases involve mediation and <u>the design and implementation of effective allocation processes</u> including, as requested by the parties, <u>the submittal of an allocation report based upon analysis of relevant evidence</u> that may include no records, only oral testimony, or a vast quantity of records requiring establishment of an interactive document repository. <u>His allocation activities routinely involve determinations of legal and equitable considerations as required to address issues of divisibility of harm pursuant to CERCLA</u> and other authorities, search of public and private records, identification of PRPs, and determination of party nexus regarding comingled waste streams providing little or no basis for association of contamination with individual sources.

*Id.* at 1 (emphasis added). Based on his extensive work in the field, Mr. Batson was clearly qualified to conduct the allocation for the Diamond Alkali Site. *See also* Exhibit F to the Yeh Decl., AlterEcho Team for Passaic River OU2 Allocation (Oct. 2017) (Mr. Batson has "served as an allocation specialist, convening neutral, and mediator at more than 50 hazardous waste sites").

The comment also alleges that Mr. Batson was "ineligible" to conduct an allocation in this case because in 2004 he "mediated PRP group organization and funding agreements" for this Site, and "supported PRP search activities and mediation selection of allocation consultant." On that basis, the comment suggests that Mr. Batson improperly "adjudicated" this matter. However, OxyChem's comment misstates Mr. Batson's and AlterEcho's role in this case. The AlterEcho allocation was not an "adjudication." As discussed in RS 10 above, it was a non-binding allocation of responsibility that was conducted by AlterEcho as a third-party neutral. It was a voluntary process, and AlterEcho's Allocation Recommendation Report is not binding on anyone. *See supra* RS 10.

Finally, the comment asserts that Mr. Batson acted unethically by claiming to "represent" OxyChem, after it refused to participate. But AlterEcho did not

advocate for any party in this allocation. As explained in RS 73 above, AlterEcho acted as a neutral, third-party allocator. OxyChem's characterizations to the contrary are misplaced.

**RS 75.** *OxyChem Comment Section VI.B.4 (p. 90): The AlterEcho Report does not provide an accurate estimate of harm caused by settling defendants.*

**Response:** This comment cross-references the facility-specific comments in Appendix A, which are addressed in detail below in RS 93 through RS 131. As described in the United States' Memorandum in Support of the Motion to Enter, the proposed Consent Decree (ECF No. 283) is fair and reasonable based on the allocation as applied by EPA, along with other supporting information. *See* Mem. in Support, Argument, Section IV.

**RS 76.** *OxyChem Comment Section VII.A (pp. 91-92): The proposed consent decree is improper because the Batson process arbitrarily excluded PVSC and municipalities.*

**Response:** EPA did not arbitrarily exclude PVSC and the local municipalities from the allocation, but determined after careful consideration that including public entities would not serve the main stated purpose of the allocation — identifying parties that would be eligible for a cash-out and work party settlements. *See* Allocation Recommendation Report at pages 6-7 (Exh. 12 at ARR0006-07); Exhibit 4, Declaration of Alice Yeh ("Yeh Decl.") ¶ 33.

Moreover, as EPA explained to the allocation parties in its January 5, 2018 letter, PVSC and the four municipalities (Newark, East Newark, Harrison, and Kearny) that EPA noticed as potentially responsible parties are uniquely positioned to provide in-kind services which differentiates them from the private potentially responsible parties. Allocation Recommendation Report, Attachment A (Exh. 12 at ARR0062). In its September 18, 2017 letter to the parties invited to participate in the allocation, EPA stated that it "has initiated discussions with PVSC and the municipalities about substantial contributions that, collectively, they might make to the OU2 remedy." *See* September 18, 2017 letter, EPA Letters to Allocation Parties (Attachment A) (Exh. 12 at ARR0038-58); *see also* January 5, 2018 letter to Allocation Parties (Attachment A) (Exh. 12 at ARR0061-62). Consistently, OCC has prepared remedial design work that identified PVSC property as the location for the siting and construction of an upland processing facility that will be used for

processing sediment dredged from OU2 and OU4.  *See*, *e.g.*, August 2023 OU2 Basis of Design Report by OxyChem at page 5-1.[45]

In March 2022, EPA issued a notice of liability letter to PVSC and the four municipalities, notifying them that they should participate in the performance of the remedies selected for OU2 and OU4 through the contribution of in-kind services. *See* March 2, 2022 EPA letter[46] at page 4 (explaining that "[w]hile PVSC and the municipalities were not part of the allocation, EPA and DOJ have notified those parties that they should participate in the performance of the remedies selected for the LPRSA through the contribution of in-kind services."). Following that notice letter, PVSC and the municipalities, and four other parties that EPA identified as work or financing/funding parties, participated in a convening conflict resolution process conducted by a third party neutral retained by EPA. *See* May 31, 2022 EPA letter[47] at page 1.

The settlement process is ongoing, including the cashout settlement, negotiations with PVSC and the four municipalities, and discussions with other parties. Yeh Decl. ¶ 33. As EPA has consistently explained in letters dating back to 2017 describing its enforcement approach for the River, EPA expects this multi-pronged approach to yield parties who will perform the work, parties who will contribute in-kind services and parties who will contribute funding to implement the OU2 and OU4 remedies. *Id.*

**RS 77.     *OxyChem Comment Section VII.B (93-94): The proposed consent decree is improper because EPA arbitrarily changed the rules of the allocation after OxyChem opted out of the process.***

**Response:** OxyChem complains about the natural consequences of its own decision not to participate in the allocation. EPA invited all the private PRPs to participate in the allocation, including OxyChem. Allocation Recommendation Report, Attachment A (Exh. 12 at ARR0038 and ARR0051). On October 13, 2017, EPA hosted a meeting at its New York City offices regarding the allocation. *Id.* (Exh. 12 at ARR0039 and ARR0059). Most parties attended in person, but OxyChem opted to attend via conference call. Yeh Decl. ¶ 31. On October 19, 2017, EPA met with OxyChem and encouraged it to participate in the allocation both at that meeting

---

[45]

https://sharepoint.ourpassaic.org/Public%20Documents/Lower%208mi%20OU2%20100PD%20Basis%20of%20Design%20Report-Aug2023%20DRAFT.pdf
[46] https://semspub.epa.gov/work/02/628479.pdf
[47] https://semspub.epa.gov/work/02/628994.pdf

and in a follow-up letter. *See* November 28, 2017 EPA letter[48] at page 5. OxyChem declined.  As described below, once the allocation was underway, EPA repeatedly asked OxyChem to participate and kept OxyChem informed of EPA's efforts to address participants' comments and concerns about the allocation framework. Yeh Decl. ¶ 37. OxyChem never accepted any of EPA's repeated invitations to participate. *Id.*

By declining to participate, OxyChem forwent the opportunity to comment on how the allocation would be performed. From EPA's first allocation work plan (June 2017), the allocation process provided all the private PRPs with the opportunity to participate in the design of the allocation (*See* Exhibit G to the Yeh. Decl., Work Plan for Task Order #096 Diamond Alkali-Lower Passaic River Allocation, June 2017 at page 3), consistent with typical allocation practice. *See* Exhibit 7, Declaration of Chris Wittenbrink ("Wittenbrink Decl.") ¶ 41. If OxyChem had chosen to participate in the allocation, it could have influenced the design of the allocation and voiced its concerns to the allocator and the other participants. *See* Yeh Decl. ¶ 37.

For context, EPA first started communicating with the PRPs about an EPA-sponsored allocation in 2017. In letters dated March 2017 and May 2017, EPA informed all the PRPs, <u>including OxyChem</u>, that EPA intended to use the services of a third-party allocator with the expectation of offering cashout settlements to PRPs not associated with the release of dioxins/furans or PCBs into the Lower Passaic River — so-called "middle tier" parties. *See* Yeh Decl. ¶ 27-28. After receiving feedback from various parties, <u>including OCC</u>, EPA hosted a large, in-person meeting in its New York offices on August 28, 2017 for the PRPs. Yeh Decl. ¶ 27; Allocation Recommendation Report, Attachment A (Exh. 12 at ARR0038). OxyChem attended. Yeh Decl. ¶ 27. The August 2017 meeting provided the PRPs with an opportunity to share their views on EPA's framework for implementation of the OU2 remedy, including EPA's intention to sponsor an allocation among some of the PRPs. Allocation Recommendation Report, Attachment A (Exh. 12 at ARR0038). At that August 2017 meeting, EPA reiterated its intention to initiate negotiations with OxyChem and other major PRPs for the implementation and funding of the remedy for OU2. Yeh Decl. ¶ 27.

During the August 2017 meeting, many parties provided their thoughts and feedback. *See* Allocation Recommendation Report, Attachment A (Exh. 12 at ARR0038). Several parties argued that the allocation should be expanded to include all noticed parties – not just the "middle tier," but also the major PRPs as well as PVSC and the four noticed municipalities. *Id.* In a September 18, 2017 letter to all of the private PRPs, <u>including OxyChem</u>, EPA notified the PRPs that, after careful

---

[48] https://semspub.epa.gov/work/02/518289.pdf

consideration, the Agency had concluded that transparency and fairness would be served by having one allocation for all the private PRPs, not just some of the PRPs as EPA had originally intended. *Id.*

On October 13, 2017, EPA hosted a meeting of all private PRPs at its New York City offices to initiate the allocation. Yeh Decl. ¶ 31. OxyChem attended via conference call. *Id.* After making an introduction, EPA left the meeting, and the AlterEcho allocation team discussed the allocation process with the private PRPs. *Id.* By that time, EPA had expanded the scope of the allocation process to include all OU2 private PRPs. *See* AlterEcho's contractual work plan dated June 2017 (Exhibit G to Yeh Decl. at page 2).

On October 19, 2017, EPA met with OxyChem to address some questions and concerns OxyChem had about the allocation and to underscore EPA's view that allocation and negotiation – not litigation – was the best approach to resolving liability for OU2. *See* November 28, 2017 EPA letter[49]. On November 28, 2017, EPA sent OxyChem a letter with detailed, written responses to its questions and again encouraged OxyChem to participate "actively and fully" in the allocation. *Id.* at page 5. But OxyChem still declined to participate. *See* Yeh Decl. ¶ 36-37.

From the beginning of the allocation process, EPA provided opportunities for parties to participate in the allocation to increase the chances of reaching EPA's stated goal of identifying parties that would be eligible for cashout settlements. Yeh Decl. ¶ 35. The participating parties were invited to submit data, information, and position papers as well as to provide input on the allocation methodology, the allocation process, and the database design, along with draft data reports and the draft allocation recommendation report. *Id.* Such participation generally adheres to typical allocation processes. *See* Wittenbrink Decl. ¶ 41.

For budget estimation purposes, all of EPA's allocation work plans provide estimates of the average amount of time that AlterEcho would be expected to spend communicating with the participating allocation parties, and the maximum number of pages of documents that AlterEcho would be expected to review. Yeh Decl. ¶ 41. During the allocation process, the participating allocation parties expressed concerns to AlterEcho (and sometimes EPA directly) about those estimates being insufficient. *Id.*; *see also* Allocation Recommendation Report, Attachment A (Exh. 12 at ARR0059, ARR0061, ARR0063, ARR0068, ARR0071). On three occasions, EPA expanded AlterEcho's budget in response to such concerns. Yeh Decl. ¶ 41.

In letters dated November 28, 2017, January 5, 2018, and February 16, 2018, EPA wrote to all of the OU2 private PRPs, <u>including OxyChem</u>, informing them of EPA's first budget expansion (in March 2018) to add more time for AlterEcho to

---

[49] https://semspub.epa.gov/work/02/518289.pdf

communicate with participating allocation parties and more pages of documents for AlterEcho to review. Allocation Recommendation Report, Attachment A (Exh. 12 at ARR0059, ARR0061, ARR0063). In June 2018, OxyChem filed its first contribution lawsuit, *Occidental Chemical Corp. v. 21st Century Fox Am., et al.*, Case No. 2:18-cv-11273 (D.N.J.), cementing its decision to opt-out of the allocation.

EPA expanded AlterEcho's budget two more times (in May 2019 and September 2019) to accommodate more communication with the allocator and more document pages to be submitted by the participating allocation parties. Yeh Decl. ¶ 41.  Again, such participation is typical in allocations (*see* Wittenbrink Decl. ¶ 41), and it is not uncommon for budgets and activities to increase in scope as allocations unfold. *See* Wittenbrink Decl. ¶ 42 ("This type of in-process modification is not unusual and reflects the necessary flexibility an allocation process must maintain to accommodate information as it is developed.").

**RS 78.** *OxyChem Comment Section VII.C (p. 95): The proposed consent decree is improper because AlterEcho lacked the information needed to perform a fair allocation.  The allocation relied on a single soil sample to represent a site's entire historical operational period.*

**Response:** The use of a single soil data point for the Overland Fate and Transport calculation was documented in the allocation methodology and applied to all of the facilities in the allocation. *See* Allocation Recommendation Report, page 22 (Exh. 12 at ARR0022). The Allocation Recommendation Report (at pages 21-22) reflects that AlterEcho considered suggestions from several participating allocation parties to calculate Overland Fate and Transport based on an averaging of sampling data. AlterEcho concluded, however, that the wide variation in sampling data available for each of the facilities made this approach inequitable. *Id.* Instead, AlterEcho selected a single data point for each facility that was determined to most appropriately represent the level of COC contamination at the facility. Allocation Recommendation Report at pp. 21-22 (Exh. 12 at ARR0021-22).  AlterEcho had sufficient data to calculate Overland Fate and Transport values using that approach.

**RS 79.** *OxyChem Comment Section VII.C.1 (pp. 95-96): AlterEcho planned the allocation around evidence that did not exist.*

**Response:** A common issue in developing allocations is the identification and evaluation of data gaps or lack of information. Wittenbrink Decl. ¶ 39.  Often information is not available for all parties or the information is otherwise incomplete. *Id.* Allocations often will address data gaps through the use of inferences based on what information is available. *Id.* The purpose of filling data gaps is to treat the parties of an allocation more fairly and not penalize parties for

76

which a lot of information is available that may otherwise be used against them – i.e., in order to avoid what is known as "good record bias." *Id.* That is precisely what happened in the AlterEcho allocation: the allocation used the available data and, where data were unavailable, applied logical inferences and assumptions based on professional judgment as well as consultation with the participating parties and technical experts that were part of the AlterEcho allocation team. Yeh Decl. ¶ 40; *see* also Allocation Protocol (Attachment H), pages 3-6 (Exh. 12 at ARR0308-0311), discussing approach to determining COC mass; AlterEcho Staff Bios (Exhibit F to Yeh Declaration).

A common tool employed by CERCLA allocators is "tiering," used to group similarly-situated parties in the same category. Wittenbrink Decl. ¶ 38. The use of tiers is most typical where the underlying allocation information is limited or is similar, resulting in largely indistinguishable differences between parties. *Id.* Often this occurs where historical forensics and factual information is largely drawn from inferences based on known facts, such as time period of operations, time period or era of industrial activities, standard manufacturing processes, etc. *Id.*

Here, AlterEcho's Allocation Recommendation Report provides groupings of allocation parties by tier. Wittenbrink Decl. ¶ 38. AlterEcho recognized that inconsistent availability of historical data had limited the usefulness of comparing the numerical allocation scores assigned to "similarly situated parties." Allocation Recommendation Report at p. 35 (Exh. 12 at ARR0035). Many parties' allocated shares differ by thousandths of a percent or less, which makes it difficult to draw meaningful distinctions between such parties. *See id.* (noting "uncertainty increasing with the diminution in the size of equitable share determinations"). With that in mind, AlterEcho then grouped the allocation parties into "five numerically significant tiers which signify Allocation Parties of similar responsibility within an acceptable level of certainty." *Id.* The United States considered these tiers in approaching its negotiation of the proposed cashout settlement. Yeh Decl. ¶ 54.

### RS 80.       *OxyChem Comment Section VII.C.2 (pp. 96-97): The settling parties excluded relevant evidence.*

**Response:** OxyChem first argues that the Settling Defendants' liability to the United States must be resolved through "adversarial litigation." As discussed below, OxyChem's preference for litigation is plainly contrary to the goals of CERCLA, which favors settlements to avoid litigation costs.

Next, OxyChem points to alleged failings on the part of Kearny Smelting, Sherwin-Williams, and Givaudan. Kearny Smelting and Sherwin-Williams are not Settling

Defendants under the modified Consent Decree (ECF No. 283). The United States'
responses to OxyChem's arguments concerning Givaudan are set forth below, in RS
109 through RS 112.

Finally, OxyChem argues that the proposed Consent Decree is "arbitrary and
capricious" and not founded on "substantial evidence." As discussed below, the
Administrative Procedure Act's ("APA's") "arbitrary and capricious" standard does
not apply here.[50]  Instead, consent decrees are reviewed to determine if they are
fair, reasonable, and in the public interest. Similarly, the "substantial evidence"
standard and the related case law cited by OCC are not applicable. *Safe Extensions
v. Federal Aviation Administration ("FAA")*, 509 F.3d 593 (D.C. Cir. 2007) followed
the standard in 49 U.S.C. § 46110(c), which provides that factual findings of the
FAA must be supported by substantial evidence. *Reefer v. Barnhart*, 326 F.3d 376
(3d Cir. 2003) and *Richardson v. Perales*, 402 U.S. 389 (1971), applied the
substantial evidence standard to factual findings of the Commissioner of Social
Security pursuant to 42 U.S.C. § 405(g). In these specific contexts, a substantial
evidence standard is required by statute.  In contrast, no CERCLA provision
requires that draft consent decrees be reviewed for substantial evidence.  Moreover,
the substantial evidence standard in the APA applies only to agency action,
findings, and conclusions reviewed on the record of an agency hearing provided by
statute, which again is not applicable in this case.  5 U.S.C. § 706(2)(E); *see Citizens
to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 414 (1971) (noting that the
substantial evidence standard applies only in "certain narrow, specifically limited
situations") (internal citations and quotations omitted).

**RS 81.**    *OxyChem Comment Section VII.C.3 (p. 97): The process was
designed to minimize relevant evidence of liability for everyone except
OxyChem. Unlike in litigation, where parties can highlight errors
and omissions in adversaries' evidence, in the allocation, AlterEcho
reviewed the evidence, the participating allocation parties were able
to correct errors; and they colluded to use their limited space to focus
liability on OCC.*

**Response:** The United States' settlement framework, including the allocation, is in
line with Congress' strong preference for settlements with responsible parties under
CERCLA to avoid spending resources on litigation rather than on cleanup. H.R.
Rep. No. 99-253, pt. 1, at 80 (1985), reprinted in 1986 U.S.C.C.A.N. 2835, 2862. As
the court noted in *United States v. Charter Inti Oil Co.*, 83 F.3d 510, 520 (1st Cir.

---

[50] If the "arbitrary and capricious" standard were applicable here, it would easily be
met for the same reasons that the Consent Decree is fair, reasonable, and in the
public interest. *See* Mem. in Supp., Argument, Section IV.

1996), "[p]erhaps mindful of the huge resources going into the transaction costs of CERCLA litigation, rather than to remediating the sites, Congress sought in SARA to encourage earlier resolutions by agreement." (internal citations omitted). These settlements serve to "reduce excessive litigation expenses and transaction costs, thereby preserving scarce resources for CERCLA's real goal: the expeditious cleanup of hazardous waste sites." *United States v. Dibiase*, 45 F.3d 541, 546 (1st Cir. 1995).

EPA intended for this allocation to take advantage of the large volume of available information about the PRPs at the Diamond Alkali Site. That information was provided by EPA and by the participating allocation parties, and was drawn from several sources, including:

- Information submitted by parties voluntarily to EPA, including information on other parties' responsibility, which included extensive information submitted by or on behalf of OxyChem;
- Responses to EPA's information requests issued under Section 104(e) of CERCLA;
- Evidence produced in previous litigation concerning the Site; and
- Additional information that the participating allocation parties submitted directly to AlterEcho during the allocation process.

*See* Yeh Decl. ¶¶ 39-40.

EPA intended this EPA-sponsored allocation to be a streamlined process, so that smaller PRPs with fewer resources would be able to participate alongside large PRPs without undue burden. *See, e.g.,* EPA letter dated February 16, 2018, Attachment A (Exh. 12 at ARR0063). EPA also intended the allocation to be an expedited process that would be completed in only one or two years; in contrast, some privately sponsored allocations take many years to complete. *Id.* EPA's goal was for the allocation to be completed before the OU2 remedial design was finished, so that the allocation results could be considered in potential remedial action consent decree negotiations. *Id.*; *see also* Yeh Decl. ¶ 29.

The allocation was not designed to advantage or disadvantage any allocation party, including OxyChem, over another. Yeh Decl. ¶ 29. To the contrary, EPA wanted the allocation to be a fair, transparent process and hoped the allocation would catalyze settlements and the cleanup of the River. *Id.*

As discussed in RS 77 above, EPA invited OxyChem to participate in the allocation on several occasions, but OxyChem steadfastly refused. As a result, OxyChem denied itself the opportunity to:

- contribute to the design of the allocation protocols, methodology and database;

79

- review its own and the Facility Data Reports of all other facilities in the allocation;
- review and comment on the draft Allocation Recommendation Report; and
- voice its concerns with every aspect of the allocation directly to AlterEcho and the other allocation participants.

*See* Yeh Decl. ¶ 37.

OxyChem's comments imply that because it refused to participate, the allocation could not have been fair and, therefore, EPA should not have used the allocation to facilitate settlements. Had EPA halted the allocation, that would have enabled "[o]ne recalcitrant hold-out [to] singlehandedly stymie the efficiency gains CERCLA is meant to facilitate through early settlement and minimization of litigation." *United States v. IMC E. Corp.*, 627 F. Supp. 3d 166, 174 (E.D.N.Y. 2022). Such a result would frustrate the goals of CERCLA and impede EPA's enforcement efforts at the Site. *See* Mem. in Supp., Argument, Sections IV.A.1, IV.C, and IV.D.2.iv.

AlterEcho designed the allocation to allow all of the participants to review their own Facility Data Reports <u>and all the other allocation parties' Facility Data Reports</u> so that they could highlight any errors or omissions. Yeh Decl. ¶ 40; *see also* Allocation Recommendation Report, page 18 (Exh. 12 at ARR0018); Allocation Guide (Attachment G), pages 7-8 (Exh. 12 at ARR0145-46). The participants could also submit position papers and responsive briefs addressing their responsibility <u>and the responsibility of other parties</u>. *See* Allocation Guide (Attachment G), pages 15-16 (Exh. 12 at ARR0153-54). The participants could also review and comment on the draft Allocation Recommendation Report to highlight errors or omissions and advance arguments about their own responsibility <u>and the responsibility of other parties</u>. *See* Allocation Guide (Attachment G), page 16 (Exh. 12 at ARR0154). Because OCC elected not to participate, AlterEcho assigned additional resources to the allocation team to ensure that OCC was evaluated fairly in the allocation process. *See* Attachment E (Revised Work Plan) at page 3 (Exh. 12 at ARR0120). In sum, the allocation procedures were fair to the allocation parties. And there is no evidence of collusion against OxyChem (*see* Wittenbrink Decl. ¶ 43) or any other party.

***RS 82.***    ***OxyChem Comment Section VII.D (pp. 97-98): The consent decree document certification is a sham because it allows for selective disclosure and does not require the parties to produce non-public documents that might be harmful.***

**Response:** The comment incorrectly states that parties were not required to provide non-public documents that might be harmful to them. In fact, the Allocation Guide required participating allocation parties to disclose relevant

documents, whether public or not,[51] that would have been relevant to a party's ownership, operation, and/or activities related to the facilities in the allocation. *See* Allocation Guide, which is Attachment G to the Allocation Recommendation Report at p. 5 (Exh. 12 at ARR0143); Certification Template, Attachment H to the Allocation Guide (Exh. 12 at ARR0285). There was no exception or loophole that allowed participating parties to not include documents that were "non-public" or could "harm" them. *Id.*

Additionally, the terms of the proposed Consent Decree (ECF No. 283) and 18 U.S.C. § 1001(a) provide layers of protection to ensure that the Settling Defendants submitted all relevant information to EPA and AlterEcho. First, under the terms of the Consent Decree, each Settling Defendant individually certifies that:

> to the best of its knowledge and belief after a good faith inquiry: . . . (b) it has fully complied and will fully comply with any and all EPA requests for information under Sections 104(e) and 122(e) of CERCLA, and Section 3007 of RCRA; and (c) (as to each Settling Defendant that participated in the allocation), it conducted a thorough, good faith search and provided information to AlterEcho consistent with the Allocation Guide that is part of the Final Allocation Recommendation Report, and certified to that effect consistent with the Allocation Guide.

Consent Decree ¶ 27. OxyChem's contention that Paragraph 27 "requires *only* that the party certify that it has 'provided information to AlterEcho consistent with the Allocation Guide'" is incorrect because Paragraph 27 also requires each party to certify that it has fully complied with any EPA information requests. Furthermore, the United States' covenant not to sue the Settling Defendants is expressly conditioned on "the veracity and completeness of the information provided to EPA and/or AlterEcho by each Settling Defendant relating to that Settling Defendant's facility(ies) identified in Appendix A." Consent Decree ¶ 14. If a Settling Defendant had concealed responsive information from EPA or the allocator, the covenant would be ineffective with respect to such party.

Second, 18 U.S.C. § 1001(a) makes it a crime to knowingly and willfully conceal material facts from an agent of the federal government in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States. This statute applies when parties conceal material facts in response

---

[51] Because EPA presumed the allocation would eventually be disclosed to the public, the parties were not required to submit such documents if they contained confidential business information.

to a federal agency's information requests[52] and when parties conceal material facts from non-government contractors, so long as federal funds are involved.[53]  Here, 18 U.S.C. § 1001(a) applies to both the Settling Defendants' responses to EPA information requests and their submittals to the allocator.

Finally, the Certification each participating allocation party was required to submit to AlterEcho ensured that the parties submitted documents and information that would be relevant to the allocation. *See* Certification Template, Attachment H to the Allocation Guide (Exh. 12 at ARR0285) which is Attachment G to the Allocation Recommendation Report) (certifying that, "consistent with the Guide [each participating party] has accurately disclosed to the Allocator non-confidential information identified in such search sufficient for the Allocator's use in preparing a Data Report regarding such Allocation Party's ownership, operation, and/or activities, including those of other persons or entities for which such Allocation Party has responsibility, regarding the above-enumerated facility.").  AlterEcho's allocation process was designed to help EPA identify parties that would be eligible for a cash-out and work party settlements between EPA and the Allocation Parties. *See* Allocation Recommendation Report at pages 6 & 7 (Exh. 12 at ARR0006-07). EPA intended this dispute resolution process to be more efficient than litigation, not to mirror discovery in litigation.  *See* Attachment A (Exh. 12 at ARR0063).

---

[52] *Bryson v. U.S.*, 396 U.S. 64, 70-71 (1969) ("Because there is a valid legislative interest in protecting the integrity of official inquiries, … we think the term 'jurisdiction' should not be given a narrow or technical meaning for purposes of Section 1001.  A statutory basis for an agency's request for information provides jurisdiction enough to punish fraudulent statements under [18 U.S.C. §] 1001") (internal citations omitted); *see United States v. Rodgers,* 466 U.S. 475, 479–80 (1984) (holding an agency has jurisdiction within the meaning of 18 U.S.C. § 1001 when it has authority to act upon the information).

[53] *See United States v. Waters*, 457 F.2d 805, 805 (3d Cir. 1972) (affirming lower court decision to convict a defendant for false statements made to a government contractor); *United States v. Munoz*, 392 F. Supp. 183, 186 (E.D. Mich. 1974), *aff'd*, 529 F.2d 526 (6th Cir. 1975) (holding that statements submitted to the non-government subcontractor were made in a matter within the "jurisdiction of an agency or department of the United States"); *United States v. Baker*, 626 F.2d 512, 514 (5th Cir. 1980) (convicting defendants that made false statements to a city receiving federal agency funding).

**RS 83.** *OxyChem Comment Section VII.D.1 (pp. 98-99): The Certification is a sham because there are no consequences for non-compliance. The certification was not made under penalty of perjury. The settlement cannot be "reopened" if a party provided inaccurate or incomplete information.*

**Response:** As discussed above, Paragraphs 14 and 27 of the Consent Decree (ECF No. 283) and 18 U.S.C. § 1001(a) provide adequate assurances and consequences. Even if 28 U.S.C. § 1746 is relevant to the certification in the proposed Consent Decree as OxyChem argues, in other cases in this District, the Court has accepted certifications that were not made under penalty of perjury when the certification "effectuates the intent and purpose contemplated by 28 U.S.C. § 1746." [54]  Here, 18 U.S.C. § 1001(a) does just that.  As noted above, 18 U.S.C. § 1001(a) imposes consequences for non-compliance, and thus effectuates the same general intent and purpose contemplated by 28 U.S.C. § 1746.  And, under Paragraph 14 of the Consent Decree, a Settling Defendant that failed to submit true and complete information to EPA or the allocator does not get the benefit of the United States' covenant not to sue.  *See also* Certification Template, attachment H to the Allocation Guide (Exh. 12 at ARR0285), which is attachment G to the Allocation Recommendation Report (certifying that, "consistent with the Guide [each participating party] has accurately disclosed to the Allocator non-confidential information identified in such search sufficient for the Allocator's use in preparing a Data Report regarding such Allocation Party's ownership, operation, and/or activities, including those of other persons or entities for which such Allocation Party has responsibility, regarding the above-enumerated facility.").

**RS 84.** *OxyChem Comment Section VII.D.2 (p. 99): The Certification is a sham because Sherwin-Williams and Givaudan withheld documents and got away with it.*

**Response:** see responses to sub-comments below.

---

[54] *See*, *e.g.*, *Scott v. Calpin*, No. 08-4810, 2012 WL 3019955, at *1 n.1 (D.N.J. July 24, 2012) ("Defendant's certifications are also problematic because they were not made under penalty of perjury. Instead, they read: I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statement made by me are knowingly false, I am subject to punishment. While there is authority to suggest that such a statement is insufficient to satisfy 28 U.S.C. § 1746, this Court is satisfied that this language effectuates the intent and purpose contemplated by 28 U.S.C. § 1746 such that it is substantially in the form proposed by statute, as required") (internal citations and quotation marks omitted).

*RS 85.*      *OxyChem Comment Section VII.D.2.a (pp. 99-100): Sherwin-Williams materially misrepresented facts and concealed material evidence for years despite an obligation to disclose them to EPA.*

**Response:** Sherwin Williams is not a Settling Defendant under the modified Consent Decree (ECF No. 283).  Therefore, this comment is not relevant to the United States' analysis of the modified Consent Decree.

*RS 86.*      *OxyChem Comment Section VII.D.2.b. – (pp. 100-101): Givaudan provided misleading information about its manufacturing processes and path for process contaminants to be discharged to the Passaic River.*

**Response:** This comment cross-references facility-specific comments in OxyChem's Appendix A, which are addressed in detail below in RS 109 through RS 112. Additionally, OxyChem's assertion that "the Certification is a sham with respect to all of the prospective settling parties [because i]t in no way ensures EPA has relevant, much less substantial, evidence to support its settlement decisions," is not accurate.  The United States' responses RS 82 and RS 83 above address that assertion.

*RS 87.*      *OxyChem Comment Section VIII.A (pp. 101-103): The Allocation addressed only OU2 – not OU4.*

**Response:** The settlement is distinct from the AlterEcho allocation.  While the settlement in the proposed Consent Decree (ECF No. 283) is based on the results of the allocation, EPA and DOJ made several choices to arrive at the settlement amount that distinguish the Consent Decree from the allocation. For example, as discussed in the Memorandum in Support of the Motion to Enter, in the settlement negotiation EPA and DOJ used AlterEcho's alternative method without adjusting the parties' base scores for cooperation and culpability. *See* Mem. in Supp., Background, Section II.G.

EPA and DOJ also decided that, while the allocation had been performed for OU2, the shares of responsibility assigned to the allocation parties are also appropriate for OU4 settlement purposes. The allocation included facilities along the 17-mile LPRSA, not just the lower 8.3 miles that comprise OU2. *See* List of Allocation Parties and Related Facilities (Attachment B) (Exh. 12 at ARR0075-84) and Facility Location and PVSC Sewer Maps (Attachment C) (Exh. 12 at ARR00087).  And the allocation considered releases of contaminants to the 17-mile Lower Passaic River, not just to the lower 8.3 miles. *See* Exhibit 4, Declaration of Alice Yeh ("Yeh Decl.")

¶ 55.  Because of the tidal nature of the LPRSA, those releases of COCs have been carried up and down the River. *See* Exhibit 8, Declaration of Allen Medine ("Medine Decl.") ¶¶ 24, 25. In other words, COC-contaminated sediments from various sources are now comingled and deposited throughout the 17-mile Lower Passaic River. *See* OU2 Remedial Investigation Report[55] at pages 4-38 and 4-40; *see also* Medine Decl. ¶ 24. In light of that fact, it is appropriate for the United States to apply the results of the OU2 allocation to resolve liability for OU4. Moreover, the OU4 interim remedy will complement the OU2 remedy, and the two remedies working together are meant to address the contamination causing the human health and ecological risks to the LPRSA. *See* OU4 ROD[56] at p. 12 and OU2 ROD[57] at p. 11.

More specific responses to this comment are provided in RS 88 and RS 89 below.

*RS 88.*　　　*OxyChem Comment Section VIII.B (pp. 103-104): The Operable Units and the Remedies Selected for Each Are Different and Not Interchangeable. EPA separated the 17-mile Lower Passaic River into two operable units, because those operable units are different. The river's shape, depths and related characteristics are not the same in the Lower 8 miles and the Upper 9 miles. As a result, sediments and contaminants bound to them move and settle differently in the Upper 9 miles than they do in the Lower 8 miles.*

**Response:** The United States agrees that the lower 8.3 miles of the Lower Passaic River has some different physical characteristics than the upper 9 miles. *See* OU4 ROD at page 16; *see also* Medine Decl. ¶ 20. Nevertheless, COCs discharged into the

---

[55] OU2 Remedial Investigation Report is available at https://semspub.epa.gov/work/02/703638.pdf. Page 4-38: "The contaminant histories obtained in this manner serve two important purposes. The first is to document the history of contaminant loads and the consistency of those loads across the Lower Passaic River." Page 4-40: "As mentioned previously, the observation that concentrations and trends through time for many contaminants are consistent from RM1.4 to RM12.6 forms the foundation for the geochemical understanding of the Lower Passaic River. Specifically, these observations can only be explained by a very hydrodynamically active river, where suspended solids are mixed over long distances prior to permanent deposition. This can be accomplished by either extensive mixing within the water column prior to deposition or by extensive settling and redeposition combined with water column mixing, repeatedly reworking settled solids."

[56] https://semspub.epa.gov/work/02/630399.pdf

[57] https://semspub.epa.gov/work/02/396055.pdf

lower 8.3 miles have been transported by tidal action and other forces to the upper 9 miles and COCs discharged into the upper 9 miles have been transported to the lower 8.3 miles. *See id.* ¶ 25. As a result, COC-contaminated sediments from various sources are now comingled and deposited throughout the 17-mile Lower Passaic River. *See id.* ¶ 24. In light of that fact, it is appropriate for the United States to apply the results of the OU2 allocation to resolve liability for OU4. *See id.* ¶ 20.

EPA's OU2 and OU4 RI Reports both document that the Lower Passaic River has a salt wedge that moves from Newark Bay north into the river and retreats back toward Newark Bay twice every day. OU2 ROD at p. 16 and OU4 ROD at pp. 16-17. That salt wedge erodes contaminated sediment from the bottom of the river and pushes it in a cloud that suspends and deposits sediments and contaminants in various locations in the river. OU4 ROD at p.18. Depending on river flows and other conditions, the salt wedge may be found anywhere from Newark Bay up to River Mile (RM) 14. OU4 ROD at p. 17; Medine Decl. ¶ 7. Under typical river flow conditions, the salt wedge and cloud of contaminated sediment can be found moving back and forth over a four-mile stretch between RM 2 and RM 10. OU2 ROD at p. 16 and OU4 ROD at p. 17; Yeh Decl. ¶ 13.

The comments assert that the salt front does not extend above RM 8 frequently and very rarely goes above RM 10. This is not consistent with the scientific findings of the OU2 and OU4 RI Reports, as well as the field data collected in the Lower Passaic River by independent researchers. *See* OU2 ROD at p. 16 and OU4 ROD at p. 17. Additionally, the extent of upstream transport in the system extends beyond the salt front. Medine Decl. ¶ 18. And, even if the salt front did go upstream of RM 8 only 1 in 5 days, as claimed in the comments, solids transport and contaminants clearly migrate from the lower 8.3 miles far upstream into the upper 9 miles as part of the continuum of flow in the LPR. Medine Decl. ¶ 16.

Observed sediment concentrations also show the effects of upstream transport from the lower 8 miles to the upper 9 miles, and vice versa. The OU2 RI Report describes five high-resolution sediment cores from RM1.4, RM2.2, RM7.8, RM11 and RM12.6 that were collected in such a way that they serve as historical records of where COCs discharged into the river were deposited in river sediments and at what concentrations. OU2 RI Report, pages 4-36 to 4-40. (https://semspub.epa.gov/work/02/703638.pdf) All five cores show similar trends and magnitudes of contaminant concentration despite the distances that separate them. For example, the historical record of dioxin concentrations in all five cores show a significant increase in dioxin concentrations in sediments deposited in the 1950s and 1960s, which coincides with the Diamond Alkali facility's period of peak production and discharge of dioxin into the river. OU2 RI/FFS Appendix A, Data Evaluation Report 3, page 3-7 (https://semspub.epa.gov/work/02/703640.pdf at PDF page 252). This shows that dioxin discharged in the lower 8.3 miles was carried

tidally into the upper 9 miles and back again, so that five sediment cores collected over 11 miles of river (3 cores in the lower 8.3 miles and 2 cores in the upper 9 miles) all displayed similar increases in dioxin concentrations. OU2 RI Report at page 4-40 (https://semspub.epa.gov/work/02/703638.pdf). All five cores also show a similar gradual decrease in dioxin concentrations in sediments deposited in the 1980s through 2000, after the Diamond Alkali facility stopped discharging dioxins into the river and the river slowly brought cleaner sediments in to dilute the previously high dioxin concentrations. OU2 RI/FFS Appendix A, Data Evaluation Report 3, p. 3-7 (https://semspub.epa.gov/work/02/703640.pdf at PDF page 252). The historical record of PCBs, which are attributable to industrial discharges into the Lower Passaic River, shows a similar increase in PCB concentrations in the 1950s and 1960s, and gradual decrease from the 1980s through 2000. OU2 RI/FFS Appendix A, Data Evaluation Report 3, pp. 3-19 to 3-20 (https://semspub.epa.gov/work/02/703640.pdf at PDF pp. 264-65). As depicted in the figure below, all five cores spanning the lower 8.3 miles and upper 9 miles show very similar trends and magnitudes of COC concentrations. OU2 RI/FFS Appendix A, Data Evaluation Report 3, p. 3-7 and Figure 3-6 (for dioxin) and page 3-19 and Figure 3-7a (for PCBs) [https://semspub.epa.gov/work/02/703640.pdf at PDF pp. 252 and 288 (dioxin) and pp. 264 and 289 (PCBs).

In sum, contaminants introduced in the lower 8.3 miles and in the upper 9 miles migrate both upstream and downstream, comingling in the sediments.  Medine Decl. ¶ 24.  As a result, contaminant sources both along the Lower 8.3 Miles and the Upper 9 Miles contribute to the contamination throughout the entire LPR, *id.*, which supports the application of the AlterEcho allocation to OU4.



*RS 89.        OxyChem Comment Section VIII.C (pp. 105-107): The lack of
estimable costs to remediate OU4 would preclude the District Court
from entering the proposed Consent Decree (VIII.C. – pp. 105-107). The
cost of additional work in OU4 cannot be estimated. EPA is no closer
to a final ROD for OU4 than it was in 2021, because the data gaps
that precluded selection of a final remedy still exist, and no reopener
is included in the Consent Decree to account for a cost overrun, or the
cost of the final remedy.*

**Response:** First, the cost estimate of $441 million in the OU4 ROD for the selected
interim remedy included estimated costs for certain long-term work at OU4 beyond
remediating sediment source areas, consisting of site model refinement, annual
operation, maintenance and monitoring including surface water, sediment and biota
sampling as well as cap monitoring. Exhibit 5, Declaration of Diane Sharkey
("Sharkey Decl.") ¶¶ 19, 28-29. EPA expects that the data collected from the

required long term sampling and monitoring will address data gaps and will be used to complete a final remedial investigation. *Id.* The cost estimate of the OU4 interim remedy also included the remedial design cost, which in turn included the cost for work to update and refine the numerical models that will be used to develop risk-based remediation goals for the ROD selecting the final remedy. *Id.*

Second, Paragraph 16 of the proposed Consent Decree (ECF No. 283) provides for EPA to issue a notice of completion of the Administrative Settlement Agreement and Order on Consent that EPA issued in May of 2007 ("2007 ASAOC"), under which the OU4 Remedial Investigation and Feasibility Study was performed, when payment of the proposed Consent Decree settlement amount has been made.[58] In consideration for closing out the 2007 ASAOC, the United States incorporated a payment component, based on EPA's estimate of costs associated with completing the additional site characterization, additional risk evaluation, and preparation of a final feasibility study, that will be needed for EPA to issue the final ROD for the river. Sharkey Decl. ¶ 25. This provision benefits OCC, which signed the 2007 ASAOC (though OCC has not participated in performing or funding work under the 2007 ASAOC since 2012, apart from paying a share of the CPG oversight bills).

Third, to guard against cost overruns, the amount that settling defendants would pay under the proposed Consent Decree is a collective share of a total number that consists of the estimated costs of the OU2 and OU4 remedies, with premiums of 100% applied to both. *See* Yeh Decl. ¶ 57; *see also* Mem. In Supp., Background, Section II.G.  The OU4 premium of 100% was applied to a cost of $460 million, which is higher than the $441 million estimated cost of the selected interim remedy. *See* Sharkey Decl. ¶¶ 23-24; *see also* Mem. In Supp., Background, Section II.G. This is because when the United States began negotiations on the proposed settlement, EPA had not yet issued the OU4 Proposed Plan or OU4 ROD, so the negotiations incorporated the estimated cost of the most-costly alternative being evaluated for the interim remedy.  *See* Sharkey Decl. ¶ 23.  This provides an additional guard against cost overruns for OU4, as well as for costs associated with a final remedy for OU4.

Fourth, in response to this and other comments, the modified Consent Decree now contains a "reopener" for costs overruns, in the form of an expanded Reservation of Rights from the United States' covenant for the Settling Defendants.  With the new reopener (Paragraph 15.f) the Reservation of Rights provides:

---

[58] However, the parties to the ASAOC remain subject to continuing record retention obligations and payment of the final bill for Future Response Costs, as defined in the 2007 ASAOC (and contingent on specific criteria). Consent Decree ¶ 17.

> The United States reserves, and this Consent Decree is without prejudice to, all rights against Settling Defendants, or an individual Settling Defendant, regarding their or its: . . . liability for performance of response actions or for the reimbursement of response costs if and to the extent the total combined response costs paid by EPA and/or any other person in connection with the remedial actions for OU2 (after September 30, 2016) and OU4 (after March 2, 2023) exceed $3.68 billion, as determined by EPA based on its review of appropriate documentation[.]

Under this provision, the United States may seek additional amounts from the Settling Defendants,[59] and other parties could seek contribution, if the combined costs of the remedial actions for OU2 and OU4 exceed $3.68 billion, *i.e.* twice the combined estimated costs for the OU2 remedy and the OU4 interim remedy.[60] Consent Decree ¶ 15.f; *see also* Mem. In Supp., Background, Section II.H.

Fifth, OxyChem argues that EPA is no closer to a final remedy for OU4 than it was in 2021, and that the interim remedy is necessarily interim because of data gaps that prevent EPA from selecting a final remedy. To support this argument, OCC quotes a presentation prepared by the CPG in 2017. However, OxyChem ignores that when the ROD for the OU4 interim remedy was issued in 2021, EPA had conditionally approved the Remedial Investigation Report, meaning that EPA had sufficient data to characterize the nature and extent of contamination for the entire 17-mile Lower Passaic River Study Area. Sharkey Decl. ¶ 22. Moreover the statement is simply inaccurate. Subsequent to the issuance of the OU4 ROD in 2021, the CPG conducted additional surface water sampling, collected bathymetry data, and completed the bioaccumulation model that will be used to develop risk-based remediation goals for the final ROD. *See Id.* In fact, the completion of the reports documenting these sampling events, and the completion of the bioaccumulation model were among the criteria in the proposed Consent Decree for EPA to issue a notice of completion. *See* Sharkey Decl. ¶ 22. With the finalization of the bioaccumulation model in December 2022 final risk-based goals are now closer to being developed. *See Id.*

---

[59] *Cf*, proposed Consent Decree (ECF No. 283), at ¶¶ 6, 13 (regarding covenants for 2018 Settling Agreement Parties and 2021 Settlement Agreement Parties).

[60] The $150 million settlement amount in the Consent Decree was calculated by applying a 100% premium to the estimated costs. *See* Yeh Decl. ¶ 57. That premium was applied to guard against cost exceedances up to double the amount of the combined estimated costs for the OU2 remedy and the OU4 interim remedy. *Id.* Accordingly, the reopener amount in Paragraph 15.f is twice the estimated combined costs of the remedial actions for OU2 and OU4.

Finally, EPA notes that OCC's characterization of the OU4 interim remedy as "EPA adopt(ing) the sequence proposed by the CPG" is incorrect. In the four years between 2017 (when EPA first began discussing the concept of an interim remedy with the CPG) and 2021 (when EPA issued the OU4 interim remedy ROD), EPA went through a rigorous process to evaluate the conceptual approach suggested by the CPG, and, working with NJDEP, develop it into a comprehensive interim cleanup. *See* Sharkey Decl. ¶¶ 10-17. The rigorous evaluation process also included consultation with EPA's national Contaminated Sediments Technical Advisory Group and National Remedy Review Board, two national groups of EPA experts charged with examining remedies for national consistency and ensuring that EPA's most complex Superfund sites are appropriately investigated and managed in accordance with risk management principles. *Id.* ¶ 10.  Under EPA oversight and approval, the CPG completed the Remedial Investigation Report for the full 17-mile LPRSA and a comprehensive Feasibility Study Report that evaluated four remedial alternatives in addition to the no action alternative. *Id.* ¶ 11.  With concurrence of NJDEP, EPA selected the alternative for OU4, after public comment, that will most effectively address the contaminated fine-grained source material, by dredging/capping sediment source areas in the upper 9-miles of the LRPSA. *See* Sharkey Decl. ¶¶ 12-15.

### RS 90.    *OxyChem Comment Section IX.A.1-3 (pp. 107-109): A proposed consent decree must be fair, reasonable, and consistent with CERCLA's goals.*

**Response:** This legal argument is addressed in the United States' Memorandum in Support of Motion to Enter. *See* Mem. In Supp., Argument, Section IV.

### RS 91.    *OxyChem Comment Section IX.B (pp. 109-110): A proposed consent decree cannot be arbitrary and capricious.*

**Response:** The applicable standard for a consent decree is whether the agreement is fair, reasonable, and consistent with the goals of the statute.  The "arbitrary and capricious" standard of review does not apply to a Court's review of a proposed consent decree. *See* footnote 50 above.  OxyChem cites two statutory sources for this standard, but neither apply.  First, 42 U.S.C. § 9613(j)(2), applies the arbitrary and capricious standard to an agency's "decision in selecting the response action."  The proposed Consent Decree (ECF No. 283) is a resolution of the Settling Defendants' liability for OU2 and OU4; it is not the selection of a CERCLA response action (cleanup remedy).

Second, OxyChem's citation to the Administrative Procedure Act ("APA") is inapplicable. The APA allows for final agency action to be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The proposed Consent Decree is not a final agency action. To begin, it is not "final" because it is a proposal that requires approval by this Court. The proposed Consent Decree is neither the "consummation" of the decision-making process or an action by which rights or obligations have been determined. *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997). The Consent Decree will only become final when approved by the Court. *See Nat'l Bus. Aviation Ass'n, Inc. v. Huerta*, 737 F. App'x 1, 3–4 (D.C. Cir. 2018) (holding that a proposed settlement agreement is not final and produces no direct and appreciable legal consequences until approved by a court). The second reason that the APA standard does not apply is that the approval of a consent decree is a judicial action, not an agency action. *See Home Builders Ass'ns of N. Cal. V. Norton*, 293 F. Supp. 2d 1, 5 (D.D.C. 2002) (holding that a consent decree is a judicial act, not an agency action under the APA); *United States v. Pac. Gas & Elec.*, 776 F. Supp. 2d 1007, 1020 (N.D. Cal. 2011) (a consent decree is not an agency action); *Turtle Island Restoration Network v. U.S. Dep't of Com.*, 834 F. Supp. 2d 1004, 1011 (D. Haw. 2011) (same), *aff'd on other grounds,* 672 F.3d 1160 (9th Cir. 2012). Therefore, the arbitrary and capricious standard does not apply to the settlement itself.

Case law has stated that where a settlement such as the proposed Consent Decree is based on an underlying allocation, that measure of comparative fault must be "rational" and cannot be "arbitrary, capricious, and devoid of a rational basis." *In re Tutu Water Wells CERCLA Litig.*, 326 F.3d 201, 207 (3d Cir. 2003). As discussed elsewhere in the memorandum in support of the United States' motion to enter, and other Responses to Comments, the Allocation Recommendation Report, which provided a starting point for negotiations that led to the settlement, has a rational basis and satisfies the highly deferential "arbitrary and capricious" standard. *See, e.g.*, RS 43, RS 46, RS 48, and RS 53; *see also* Mem. In Supp., Argument, Section VI.

Additionally, for the reasons explained in response RS 80 above, the substantial evidence standard does not apply.

**RS 92.**    *OxyChem Comment Section X (pp. 110-111): OxyChem requests that the public comments be filed with the court and be added to the "administrative record."*

**Response:** The proposed Consent Decree (ECF No. 283) is a settlement that, if approved, resolves a judicial case; it is not an "agency action" (see RS 91 above) and therefore does not require an administrative record. Nevertheless, the United States has filed the public comments and other materials in support of its request to

enter this settlement concurrently with this Responsiveness Summary and the motion to enter.

As explained above, neither 42 U.S.C. § 9613(j)(2) nor 5 U.S.C. § 706(2)(A) apply to this case. Therefore, the requirements in those statutes for review to be based upon an administrative record also do not apply. OxyChem cites no authority requiring a proposed consent decree to be reviewed based on an administrative record. Note that on December 22, 2022, the United States published the notice of lodging for the initial proposed Consent Decree. 87 Fed. Reg 78710. That notice included a URL[61] for an EPA website where the public can access the Allocation Recommendation Report and almost 700,000 pages of supporting documents. *See* Yeh Decl. ¶ 62.

---

[61] https://semspub.epa.gov/src/collection/02/SC41378 (last visited Dec. 18, 2023).

*Note: the Facility Data Reports referenced in many places below are in Attachment J to the Allocation Recommendation Report (Exh. 12, Parts 5-8, at ARR0362-ARR2003).  The Facility Data Computation Sheets referenced in many places below are in Attachment L to the Allocation Recommendation Report (Exh. 12, Parts 10-19, at ARR2007-ARR2872).*

**RS 93.**    *OxyChem Appendix A, Section 1.a (pp. 113-114) Regarding BASF Corporation, 50 Central Avenue, Kearny*

***The comments state that the allocation assigned a zero discharge of dioxin to all of BASF's discharge pathways, which OxyChem contends is inconsistent with evidence that BASF's operations "likely generated dioxin". The comments cite information including BASF's use, production, and incineration of dioxin precursors. The comments also describe BASF's predecessor, United Cork, as having cork manufacturing processes that "mirrored a pulp and paper manufacturing process that EPA has linked to dioxin formation".  The comments acknowledge that the allocation documents do not contain any data showing dioxin to be present at the facility, but state that the absence of data is not evidence that no dioxin exists at the facility.***

**Response**: The Allocation Recommendation Report relied on sampling data; and for the BASF facility, there were no sampling results that contain dioxin.  BASF Corporation Facility Data Report, p.12.[62]  The allocation did identify BASF's use of dioxin precursors (BASF Corporation Facility Data Report, pp. 4-9 and 12 (Exh. 12 at ARR0526-0531, ARR0534), but, again, dioxin has not been identified in sampling data from the facility.  Consistent with the available data and allocation methodology (Allocation Recommendation Report, pp. 20-22 (Exh. 12 at ARR0020-0022)), AlterEcho assigned zero dioxin discharges for the BASF pathways.  Notably, comments regarding the BASF facility did not include any data indicating the presence of dioxin or dioxin precursors at the BASF facility. The absence of any data

---

[62] While the allocation was based on data, not theoretical potential for a chemical to be present at a facility, if AlterEcho "determine[d] that a lack or the nature of available information does not allow an objective determination of the mass of a COC discharged from an facility, [they] may take additional measures to obtain relevant information," and also could estimate using assumptions such as: "(1) Standard operations of similar industrial facilities; (2) Changes in industrial operations over time; (3) Onsite fate and transport of COCs; and (4) Strength of available information." Allocation Protocol, p. 6 (Attachment H) (Exh. 12 at ARR0311).

showing dioxin to be present in the media at the BASF facility supports the conclusions in the Allocation Recommendation Report.

### RS 94.    *OxyChem Appendix A, Sections 1.b & 1.c (pp. 114-116), Regarding BASF Corporation, 50 Central Avenue, Kearny*

***The comments state that site operators at this facility discharged stormwater mixed with process wastewater to the Passaic River since 1870, dumped batches of cork directly into the river and discharged "contaminated water" into the river. According to the comments, prior to 1973, when BASF constructed an on-site treatment plant, spills, runoff and wastewater all flowed to the river. The comments also assert that BASF discharged to the Kearny Publicly Owned Treatment Works (POTW) which bypassed untreated wastewater to the Hackensack River.***

**Response**: While the comments refer to waste discharges from 1870 onwards, BASF and its corporate predecessor United Cork operated at the 50 Central Avenue location from 1936 until 1990, with BASF continuing to own the property until 2008. BASF Corporation Facility Data Report, pp. 1-3 (Exh. 12 at ARR0523-0535). Those are the time periods of releases of hazardous substances from the facility that are relevant to the allocation.

The comments refer to releases to the river from spills, runoff and wastewater, suggesting these were not evaluated, which is not so. The allocation did include information that BASF discharged wastewater directly to the Passaic River through two concrete pipes on the southern portion of the property, and as a result of occasional overflows of a sump and sewer system that provided primary treatment until 1989. BASF Corporation Facility Data Report, pp. 15-20 (Exh. 12 at ARR0537-0542).

Data in the allocation's supporting documentation show that BASF discharged wastewater containing lead, mercury and PAHs to the Kearny POTW. BASF Corporation Facility Data Computation Sheet (Exh. 12 at ARR2111). Because the wastewater from the BASF facility was discharged to the Kearny POTW, which occasionally bypassed to Newark Bay, the allocation did not calculate a discharge to the Lower Passaic River. BASF Corporation Facility Data Computation Sheet (Exh. 12 at ARR2110).

**RS 95.**　　　　*OxyChem Appendix A, Section 2.a (pp. 117-118), Regarding Benjamin Moore, 134 Lister Avenue, Newark*

***The comments describe the allocation as having identified low levels of dioxin in soil at Benjamin Moore, but not attributing it to the company. The comments state that the allocation overlooked that Benjamin Moore used raw materials and manufacturing processes that are known to produce PCBs and dioxins.***

**Response**: The allocation did not disregard the presence of dioxin and PCBs at the Benjamin Moore facility. The Benjamin Moore Facility Data Report (at pages 4-6 (Exh. 12 at ARR0554-56)) and Facility Data Computation Sheets (Exh. 12 at ARR2124) show that the allocation accounted for both dioxin and PCB concentrations in soil in the Overland Fate and Transport calculations. The maximum dioxin concentration in soil provided in the supporting documentation (0.0000093 ppm) was so low that the resulting Overland Fate and Transport contribution to the river was rounded to zero. *See* Benjamin Moore's Facility Data Computation Sheet (Exh. 12 at ARR2117). It did, however, result in the allocation team assigning Benjamin Moore a small amount of the unallocated share of dioxin. *Id.* at ARR2118-19. PCB data included a maximum soil concentration of 22.2 mg/kg. Benjamin Moore Facility Data Computation Sheets (Exh. 12 at ARR2124). Consistent with the allocation methodology, AlterEcho used that data point to calculate the PCB contribution from the Benjamin Moore facility via the Overland Fate and Transport pathway. *Id.* For the other pathways, consistent with the available data and the allocation methodology (Allocation Recommendation Report, pp. 20-22 (Exh. 12 at ARR0020-22)), AlterEcho assigned this facility no contributions of dioxins and PCBs.

**RS 96.**　　　　*OxyChem Appendix A, Section 2.b (p. 118), Regarding Benjamin Moore, 134 Lister Avenue, Newark*

***The comments assert that the allocation should not have assigned zero concentrations to copper, lead and mercury in soil in the Overland Fate and Transport pathway calculations, and that the following maximum concentrations should have been used: copper = 140 mg/kg, lead = 2,200 mg/kg, mercury = 11 mg/kg.***

**Response**: For the Overland Fate and Transport pathway, AlterEcho followed the allocation methodology to determine the appropriate concentration of each COC using surface soil data or shallow soil data. *See* Allocation Recommendation Report at p. 21(Exh. 12 at ARR0021). The methodology provided for use of deeper soil data,

"as deemed appropriate," if surface or shallow soil data were not available. *Id.* The allocation methodology also required AlterEcho to determine whether a facility was located completely on historic fill. *See* Allocation Recommendation Report at p. 22 (Exh. 12 at ARR0022). If the facility was completely located on historic fill, the maximum facility soil concentrations of copper, lead and mercury were only used if they exceeded the NJDEP-approved historic fill criteria of 1,200 mg/kg for copper, 10,000 mg/kg for lead or 3.7 mg/kg for mercury.[63] In contrast, if a facility was partially located, or not located, on historic fill, AlterEcho used the maximum facility soil concentrations regardless of where they were collected. Allocation Recommendation Report at p. 22 (Exh. 12 at ARR0022).

AlterEcho determined that the Benjamin Moore facility was located completely on historic fill and that Benjamin Moore's surface soil copper, lead and mercury concentrations were lower than the NJDEP-approved historic fill criteria. Benjamin Moore Facility Data Report at p. 10 (Exh. 12 at ARR0560) and Facility Data Computation Sheets, Exh. 12 at ARR2123.  Therefore, consistent with the allocation methodology, AlterEcho did not calculate Overland Fate and Transport contributions of copper, lead or mercury due to runoff from facility soils. Benjamin Moore Facility Data Computation Sheets, Exh. 12 at ARR2123-24. Note that AlterEcho did calculate Overland Fate and Transport contributions from runoff from pits, lagoons or basins as discussed in the response to the next comment below.

Further, the copper, lead and mercury concentrations identified in the comments were collected at greater depths than the concentrations identified by AlterEcho to calculate the Overland Fate and Transport contribution. The allocation identified maximum soil concentration of 63.8 mg/kg for copper, 139 mg/kg for lead and 0.63 mg/kg for mercury, which were all collected at a depth of 0.0 to 0.5 feet below ground.  PAP-00724492 (excerpted as Exh. 13.22) at PAP-00724513.  The comments, however, cite concentrations of 140 mg/kg for copper, 2,200 mg/kg for lead and 11 mg/kg for mercury, collected at a depth below ground of 7.5 to 8.0 feet for copper and mercury and 4.5 to 5.0 feet for lead. PAP00724492 (excerpted as Exh. 13.22) at PAP-00724574 for copper and mercury; *id.* at PAP-00724814 for lead. As discussed above, consistent with the allocation methodology, the allocation team used concentrations from surface soil to evaluate the Overland Fate and Transport

---

[63] Allocation Recommendation Report, p. 22 (Exh. 12 at ARR0022). As further discussed in Appendix H, Allocation Protocol, p.5 (Exh. 12 at ARR0310), "the migration of COCs deposited with historic fill as designated and/or defined by the State of New Jersey, or as accepted by the State of New Jersey (subject to review for relevancy for the specific facility by the Allocator), in undisturbed soils of a facility site via the natural flow of groundwater or rainwater will not be considered in determining the mass of a COC discharged from an Allocation Party facility."

pathway. Allocation Recommendation Report at p. 21 (Exh. 12 at ARR0021). If surface data or shallow data were not available, the allocation team would look to deeper soil data instead. *Id.* For the Benjamin Moore facility, surface soil data were available and were used by AlterEcho for comparison to NJDEP historic fill numbers.

### RS 97.    *OxyChem Appendix A, Section 2.c (pp. 118-119), Regarding Benjamin Moore, 134 Lister Avenue, Newark*

**The comments assert that the allocation did not properly account for Benjamin Moore's use of waste lagoons for latex paint and plant wash water, and the lagoons' contribution of COCs to the river.**

**Response**: Benjamin Moore's use of waste lagoons for latex paint and plant wash water is described in the Facility Data Report (at pp. 8-9) (Exh. 12 at ARR0558-59) for the Benjamin Moore facility, which describes that a lagoon was used onsite from 1954 to 1970 for the disposal of latex emulsion paint containing mercury, and refers to a lagoon visible in aerial photos in 1971. The amount disposed of, however, was unknown. *Id.* p. 9 (ARR0559). The lagoon system was used to dispose of the wash water used for cleaning latex paint production machinery. *Id.* p. 9 (ARR0559). As described in the Facility Data Report (at p. 9, ARR0559) the wash water contained very diluted latex paint and later became part of the stormwater retention system. The system consisted of two lagoons, one of which would be used until it filled up, at which time the second one was used while the first lagoon dried out via natural evaporation. *Id.* p. 9 (ARR0559). The solid material was then dug out with a backhoe and hauled away by truck. *Id.* p. 9 (ARR0559). AlterEcho calculated a separate Overland Fate and Transport contribution for the copper and lead releases via stormwater overflow from the lagoon system (*See* Facility Data Computation Sheets, Exh. 12 at ARR2125-26), using data from Benjamin Moore's extrapolation from an analysis of facility sewerage, documented in a 1980 letter (PAP-00238087 (Exh. 13.13) at PAP-00238098-099). The concentrations of copper (0.144 mg/kg) and lead (0.31 mg/kg) resulted in masses discharged that were so low that AlterEcho rounded them to zero. *See* Facility Data Computation Sheets, Exh. 12 at ARR2117, ARR2125.

Based on a typical paint recipe, the solid material in the lagoons was approximately 0.17% mercury. Benjamin Moore Facility Data Report at p. 9 (Exh. 12 at ARR0559). Phenol mercuric acetate was used as a mildewcide and bactericide during the 1950's and 1960's. Benjamin Moore terminated use of the lagoons in 1970. *Id.* No records were kept of the amount of the material pumped into the lagoon or the amount

carted away and the 1980 letter did not include an analysis of mercury in facility sewerage from which to extrapolate a lagoon concentration (PAP-00238087 (Exh. 13.13) at PAP-00238098-099). Therefore, AlterEcho did not calculate a mercury contribution via the Overland Fate and Transport pathway from the lagoons. Benjamin Moore Facility Data Computation Sheets, Exh. 12 at ARR2125.

### *RS 98.    OxyChem Appendix A, Section 2.d (pp. 119-120), Regarding Benjamin Moore, 134 Lister Avenue, Newark*

***The comments say that the allocation's direct discharge calculation did not include contaminant contributions from the Benjamin Moore facility's 14-inch discharge pipe and the Lockwood storm sewer and outfall, citing to a 1971 report of sludge and caustic wash water reaching the river via a sump pit; a 1978 spill of latex that mixed with snow and entered the storm drainage system and from there was pumped to the river; a 1986 release of yellow water soluble liquid; and a 1987 report of boiler blowdown reaching the river.***

**Response**: The Facility Data Report for the Benjamin Moore facility (at p. 13-16) (Exh. 12 at ARR0563-66) does discuss how the facility stormwater was managed, explaining that: a) it is located in an area of Newark that is served by a sewer line that contains no bypasses but connects directly to PVSC; b) the facility has a separate stormwater system that discharges to the river; and c) there is a 60-inch outfall to the river (part of the City of Newark stormwater system) on the eastern part of the Benjamin Moore property. Benjamin Moore was connected to a 10-inch outfall that was sealed sometime after 1961. Benjamin Moore Facility Data Report at p. 13 (Exh. 12 at ARR0563) (citing to PAP-00725041 (excerpted as Exh. 13.23) at PAP-00725052). At that time, the facility began using a stormwater retention basin to retain stormwater on-site rather than allowing it to enter the Passaic River. Benjamin Moore Facility Data Report at pp. 13-14 (Exh. 12 at ARR0563-64). A flood wall surrounds the facility and has been in place for some time (reportedly, since 1986). *Id.* at p. 14 (ARR0564). The Facility Data Report (at p. 14) discusses several flood events that could have caused stormwater to come in contact with COCs (copper, lead or mercury), and also notes the conditions observed in 1967, with pollutants entering the Lockwood Street storm sewer through eroded opening in the sanitary sewer walls. Benjamin Moore Facility Data Report at p. 16 (Exh. 12 at ARR0566). The allocation methodology provides for calculating releases via the Direct Discharge pathway based on information about discharges containing COCs (Allocation Recommendation Report, p.20 (Exh. 12 at ARR0020)), not reports of one-off releases with no data to show the nature of the release. With respect to the Benjamin Moore stormwater outfalls, and the Lockwood Street outfall, AlterEcho

concluded that neither was connected to any process on the property, and "the sole function of both systems is to discharge stormwater and any water that might collect within the property through rain, infiltration or flood." Benjamin Moore Facility Data Report, p. 13 (Exh. 12 at ARR0563). Therefore, the allocation did not include a contribution of COCs from the Benjamin Moore facility via the Direct Discharge pathway.

**RS 99.**    *OxyChem Appendix A, Section 2.e (pp. 120-121), Regarding Benjamin Moore, 134 Lister Avenue, Newark*

***The comments assert that AlterEcho's calculations did not include high levels of PCBs in building samples collected in Building 11 (concentrations over 9,000 ppm), which had floor drains that discharged to the facility's storm sewer system that in turn discharged to the river through a 14-inch pipe and the Lockwood storm sewer and outfall.***

**Response**: The Facility Data Report for the Benjamin Moore facility (at pp. 5-6) (Exh. 12 at ARR0555-56) contains an extensive discussion of Building 11, including the company's 1973 investigation of whether three drains in Building 11 could have contributed contamination to the river, and a 2019 site assessment. Based on that information, AlterEcho evaluated several potential sources of COC contributions from Building 11, such as a portable kettle cooling operation, a reactor cooling system, a sink in the laboratory, and leaks from a heat transfer system.  *See* Benjamin Moore Facility Data Report at pp. 5, 15 (Exh. 12 at ARR0555, ARR00565).  Based on its evaluation, AlterEcho concluded that no PCBs were discharged from Building 11 through the Direct Discharge pathway. Thus, the allocation calculations do not include a PCB contribution via that pathway. As discussed above, the allocation does include a PCB contribution via the Overland Fate and Transport pathway, using a maximum soil concentration of PCBs found in the supporting documents. Facility Data Computation Sheets, Exh. 12 at ARR2124.

**RS 100.**    *OxyChem Appendix A, Section 2.f (p. 121), Regarding Benjamin Moore, 134 Lister Avenue, Newark*

***The comments say that Benjamin Moore should have been assigned a higher culpability factor in the allocation, because of a variety of non-compliance examples listed in the comments.***

**Response**: As discussed in the Memorandum in Support of the Motion to Enter, EPA and DOJ did not use the cooperation and culpability factors to determine the relative responsibility of the Settling Defendants or the settlement amount in the

proposed Consent Decree (ECF No. 283). Therefore, this comment does not affect the United States' analysis of the proposed Consent Decree.

### RS 101.    *OxyChem Appendix A, Section 2.g (pp. 121-122), Regarding Benjamin Moore, 134 Lister Avenue, Newark*

***The comments assert that the allocation did not consider key documents related to concrete sampling results and capping of the facility due to PCB contamination; titanium dioxide storage at the facility and associated dioxin impurities; and pigment manufacturing processes and their production of PCBs and dioxins.***

**Response**: Several of the documents that the comments assert were not considered by AlterEcho were in fact included in the allocation and are cited in Benjamin Moore's Facility Data Report (e.g., OxyChem Ex. A-11 is allocation supporting document PAP-00725169,[64] OxyChem Ex. A-26 (Exh. 14.06 to the Motion to Enter) is PAP-00238237 (Exh. 13.14), and OxyChem Ex. A-27 (Exh. 14.07) is PAP-00238344 (Exh. 13.15)). The rest of the documents cited in the comments are either a) general publications that do not mention Benjamin Moore's manufacturing processes (e.g. OxyChem Exs. A-12, A-13, A-15, A-25 (Exhs. 14.02, 14.03, 14.04, and 14.05 to the Motion to Enter)) or b) materials that do not provide any data on dioxin or PCB concentrations that could be used in the allocation calculations (e.g. OxyChem Ex. A-29 (Exh. 14.08)).

### RS 102.    *OxyChem Appendix A, Section 3 (pp. 122-125), Regarding Conopco, Inc., 540 New York Avenue, Lyndhurst*

***The comments argue that the AlterEcho allocation is fatally flawed and unreliable with respect to Conopco, Inc. ("Conopco") because (1) the data upon which AlterEcho calculates the supposed discharged amounts is predicated on faulty premises; (2) AlterEcho does not account for the high probability that the Conopco facility is a source of dioxins and DDx; and (3) AlterEcho either ignored or did not have access to documents regarding the facility's connection to the storm sewer.***

**Response**: After a careful review and evaluation of all comments, Conopco is no longer a Settling Defendant under the modified Consent Decree (ECF No. 283).

---

[64] Exhibit A-11 to OxyChem's comments is subject to a protective order, so the United States is not providing either a copy of that document, or PAP-00725169, with this Responsiveness Summary.

Therefore, this comment is not relevant to the United States' analysis of the modified Consent Decree.

### RS 103.    OxyChem Appendix A, Section 4.a (pp. 125-127), Regarding EnPro Holdings, Inc., 900-1000 South 4th Street and 600 Cape May Street, Harrison

***The comments assert that the allocation did not consider a former dock area, which was contaminated with PCBs, as part of the Crucible Steel operations. The comments state the allocation did not include Crucible Steel's PCB, mercury, lead, copper and PAH discharges from its weapons manufacturing operations leading into and during World Wars I and II (1900 to 1947).***

**Response:**  The Facility Data Report for EnPro Holdings, Inc. (EnPro) (at pp. 2-3) (Exh. 12 at ARR0915-16), which holds the liability for former Crucible Steel Corporation (Crucible Steel) operations, does discuss the war years' production, including the British Shell Shop during World War II on a portion of the facility property referred to as the Spiegel property, and the production of ordnance at the Guyon property. The Spiegel property and the Guyon property together comprise the property where Crucible Steel operated. EnPro Facility Data Report at p. 1. (Exh. 12 at ARR0914) (Settling Defendant Teval holds the liability for the former Charles F. Guyon General Piping Company operations. *See* Teval Facility Data Report at p. 1 (Exh. 12 at ARR1959).) The dock area discussed in the comments is part of the Guyon property, which was sold by Crucible Steel in 1947. EnPro Facility Data Report at p. 1 (Exh. 12 at ARR0914) and Teval Facility Data Report at pp. 1, 7 (figure), 14 (figure), 15 (figure) (Exh. 12 at ARR1959, ARR1965, ARR1972, ARR1973). While not stated in the EnPro Facility Data Report, AlterEcho may have concluded that the PCBs at the dock area were associated with the operations of Guyon and thus were not attributable to Crucible Steel/Enpro. Note that PCB contamination associated with the Guyon property is discussed in the Teval Facility Data Report at pp. 8-10 (Exh. 12 at ARR1966-68).

### RS 104.    OxyChem Appendix A, Section 4.b (pp. 127-128), Regarding EnPro Holdings, Inc., 900-1000 South 4th Street and 600 Cape May Street, Harrison

***The comments report that EnPro did not provide a full set of sampling data for the facility. The comments provide the following maximum soil concentrations, which OxyChem argues should have been used in the calculation of EnPro's Overland Fate and Transport contribution: PCBs = 240 mg/kg (found in the dock area), mercury = 78 mg/kg (found in drain***

*pipes), copper = 2,300 mg/kg (uncited number), lead = 3,710 mg/kg (reported in Facility Data Report as highest value on Guyon property).[65] Using these maximum concentrations, the comments calculate that EnPro's historical discharge to the river should have been: PCBs = 210.48 kg, mercury = 71.38 kg, copper = 2,104.84 kg, lead = 3,395.20 kg. (The comments also propose a higher discharge amount for mercury of 503.33 kg in a footnote, based on a mercury concentration of 550 mg/kg in "site soil", for which a citation was not provided.)*

**Response**: AlterEcho's procedure for calculating the Overland Fate and Transport pathway is described in RS 96 above. AlterEcho determined that the EnPro facility was located completely on historic fill. EnPro Facility Data Report p. 9 (Exh. 12 at ARR0922). Therefore, consistent with the allocation methodology, AlterEcho did not calculate Overland Fate and Transport contributions of copper or lead, because their maximum surface soil concentrations of 432 mg/kg (copper) and 3,710 mg/kg (lead) were lower than the NJDEP-approved historic fill criteria of 1,200 mg/kg (copper) and 10,000 mg/kg (lead). EnPro Facility Data Computation Sheets, Exh. 12 at ARR2321. For mercury, the comments assert that AlterEcho should have used a 78 mg/kg sample to calculate Overland Fate and Transport. But that 78 mg/kg sample was collected from inside a pipe. OxyChem Comments, p. 126. It is not a soil sample, and use of the sample in the comments would have been inconsistent with the allocation methodology. Instead, AlterEcho used 10.2 mg/kg as the maximum soil concentration for mercury to calculate an Overland Fate and Transport contribution. EnPro Facility Data Computation Sheets, Exh. 12 at ARR2321.

**RS 105.    *OxyChem Appendix A, Section 5 (pp. 128-131), Regarding General Electric Company, 415 South 5th Street, Harrison (aka 400 South 5th Street)***

*The comments assert that the allocation only considered a quarter of the GE South 5th Street facility's total area of 12.75 acres, focusing on the part of the former facility now known as the Vo-toys removal site.*

---

[65] The comments erroneously state that AlterEcho identified a maximum lead concentration of 72,800 mg/kg and a maximum copper concentration of 432 mg/kg but attributed both to historic fill and did not rely on them for calculating a contribution via Overland Fate and Transport. The EnPro Facility Data Report, p. 10 (ARR0923), explains that the soil contamination data on the Spiegel property, which include these lead and copper data points, were not used in the calculation of Overland Fate and Transport because most of the property was paved, not because it was "attributed to historic fill" (it was not).

**Response**: The Facility Data Report for GE's South 5th Street facility (at p. 1) (Exh. 12 at ARR1053) described the facility as covering 12.75 acres. The Facility Data Computation Sheet for the facility (Exh. 12 at ARR2398) also gave its total area as 12.75 acres. The allocation methodology as described in the Allocation Recommendation Report (at p. 21) (Exh. 12 at ARR0021), tied the Overland Fate and Transport pathway calculation to an estimation of the amount of bare soil based on historic aerial photographs, site maps or text describing the percentage of buildings, structures, and pavement. Consistent with the methodology, the calculation for the GE facility was based on an estimate of the amount of unpaved area from which contaminated soil could have been transported to the Passaic River. GE South 5th Street Facility Data Computation Sheets, (Exh. 12 at ARR2398). For GE's South 5th Street facility, its Facility Data Computation Sheet (Exh. 12 at ARR2398) identified that the amount of unpaved area was estimated at 2.25 acres.

**RS 106.**    ***OxyChem Appendix A, Section 5.a (pp. 131-133), Regarding General Electric Company, 415 South 5th Street, Harrison (aka 400 South 5th Street)***

***The comments state that an illustration showing Thomas Edison pouring mercury into a vacuum pump to reenact the process for preparing the pumps contradicts AlterEcho's statement that mercury was not noted as a raw material in incandescent lamp manufacturing at the facility in its early years of operation. The comments note that after the facility switched to making radio tubes in 1929, mercury continued to be used. In 1942, RCA instructed its employees on reclaiming mercury by running water into a beaker and the comments observe that with human error, it cannot be assumed that the process prevented mercury discharge to the sewer. The facility was connected to the PVSC system in 1924 and was in the Bergen Street CSO district.***

**Response**: As reflected in the Facility Data Report for General Electric Company (GE) for the South 5th Street facility (at p. 4) (Exh. 12 at ARR1056), incandescent lamps were produced at the facility from 1882 to approximately 1929. While the Facility Data Report at p. 6 (Exh. 12 at ARR1058) reflects that mercury was not noted to be a raw material in incandescent lamp manufacturing at the 5th Street Facility, it also states that mercury pumps may have been used to create a vacuum in lamp bulbs during incandescent lamp production until 1896. Further, the Facility Data Report at pp. 6-7 (Exh. 12 at ARR1058-59) identified mercury as a COC used and detected at the facility, and AlterEcho calculated a mercury contribution via the

Overland Fate and Transport pathway. GE South 5th Street Facility Data Computation Sheets, Exh. 12 at ARR2398. AlterEcho did not calculate a mercury contribution via the PVSC pathway, primarily because of lack of mercury data for that pathway. *See* GE South 5th Street Facility Data Report p. 11 (Exh. 12 at ARR1063).

*RS 107.*    *OxyChem Appendix A, Section 5.b (pp. 133-134), Regarding General Electric Company, 415 South 5th Street, Harrison (aka 400 South 5th Street)*

***For the Overland Fate and Transport pathway, the comments assert that AlterEcho should have used a maximum mercury concentration in soil of 91.7 mg/kg collected at 3.5 to 4 feet deep or a mercury concentration of 80.3 mg/kg collected at 4 to 4.5 feet deep rather than the 3.4 mg/kg sample collected at 5.5 to 6 feet deep. The comments say that GE did not disclose to AlterEcho the higher mercury results, which were collected from Block 165 (not the Vo-toys location).***

**Response**: The mercury sampling results of 91.7 mg/kg and 80.3 mg/kg mentioned in the comments were collected in 2017 and 2018, respectively, at depths of 3.5 to 4.0 feet (OxyChem Ex. A-37 (Exh. 14.10 to the Motion to Enter) p. 2 of 6) and 4 to 4.5 feet (*id.* at p. 4 of 6), respectively. As shown in the images provided in the comments, both were collected from beneath buildings (OxyChem Ex. A-36 (Exh. 14.09 to the Motion to Enter) p. 15 of 232), and historically, the locations where those samples were collected also were under a structure (Building 40). OxyChem Comments p. 134. The GE Facility Data Computation Sheet (Exh. 12 at ARR2398) for the South 5th Street facility shows that AlterEcho selected the 3.4 mg/kg data point for use in the Overland Fate and Transport calculations, because it was the maximum concentration in soil at an exterior location. The allocation methodology describes that the Overland Fate and Transport calculation includes estimating the amount of contaminated bare soil at each facility that could have been carried by precipitation or flooding to the Passaic River. *See* Allocation Recommendation Report, p. 21 (Exh. 12 at ARR0021). Since the 91.7 mg/kg and 80.3 mg/kg of mercury mentioned in the comment were collected from areas that were under buildings, while the 3.4 mg/kg of mercury used in the allocation was from an exterior location, use of the latter is consistent with the allocation methodology.

*RS 108.    OxyChem Appendix A, Section 5.c (pp. 134-135), Regarding General Electric Company, 415 South 5th Street, Harrison (aka 400 South 5th Street)*

**The comments characterize the allocation's description of General Electric's culpability and cooperation as inadequate or incomplete, referring to GE's cleanup of the Vo-toys removal site and its dispute with the current owner/redeveloper of the property.**

**Response:** As discussed in the Memorandum in Support of the Motion to Enter, Background, Section II.G, EPA and DOJ did not use the cooperation and culpability factors to determine the relative responsibility of the Settling Defendants or the settlement amount in the proposed Consent Decree (ECF No. 283). Therefore, this comment does not affect the United States' analysis of the proposed Consent Decree.

*RS 109.    OxyChem Appendix A, Section 6.a (p. 136), Regarding Givaudan Fragrances Corp., 125 Delawanna Avenue, Clifton*

**The comments state that AlterEcho ignored EPA studies and peer-reviewed literature.**

**Response:** See the response above to Section VI.B.2.a of OxyChem's comments (RS 55) and to RS 110 below.

*RS 110.    OxyChem Appendix A, Section 6.b (pp. 136-138), Regarding Givaudan Fragrances Corp., 125 Delawanna Avenue, Clifton*

**The comments assert that Givaudan is a substantial 2,3,7,8-TCDD contributor and that Givaudan's hexachlorophene (HCP) and 2,4,5-trichlorophenol (2,4,5-TCP) processes would have resulted in 2,3,7,8-TCDD contamination.  The comments assert that Givaudan's 2,4,5-TCP manufacturing processes were ideal for 2,3,7,8-TCDD formation due to their alkaline and high-temperature nature. The comments characterize the allocation as having assumed that Givaudan's processes were acidic and low-temperature because the evidence on alkaline and high-temperature processes was either ignored or not provided to the allocator.**

**Response**: The allocation included supporting documents describing both alkaline/high-temperature (e.g., PAP-00168649 (Exh. 13.04), PAP-00169029 (Exh. 13.07)) and acidic/low-temperature (e.g., PAP-00168724 (Exh. 13.06), PAS-00048073 (excerpted as Exh. 13.28) at PAS-00048133, *id.* at PAS-00048294) processes for manufacturing HCP and 2,4,5-TCP. Contrary to the comments' claims that critical

documents concerning those manufacturing processes were not provided to AlterEcho, almost all of the documents cited in the comments were either included in whole or in part in the allocation or referenced and described therein (e.g., OxyChem Ex. A-44 (Exh. 14.15 to the Motion to Enter) is PAP-00168724 (Exh. 13.06); OxyChem Ex. A-43 (Exh. 14.14) is an attachment in PAP-00168649 (Exh. 13.04) at PAP-00168652; OxyChem Ex. A-40 (Exh. 14.11) is referenced and described in PAP-00168649 (Exh. 13.04); OxyChem Ex. A-41 (Exh. 14.12) is described in PAP-00170543 (Exh. 13.08); OxyChem Ex. A-42 (Exh. 14.13) is described in PAP-00168649 (Exh. 13.04)).

Further, the Facility Data Report for the Givaudan facility (at pages 2-3, 5-8) (Exh. 12 at ARR1070-71, ARR1073-76) describes Givaudan's use of 2,4,5-TCP from 1947 to 1983 as a raw material to manufacture HCP, including its short-lived program to manufacture 2,4,5-TCP. Also described are the sources from which Givaudan obtained 2,4,5-TCP and the steps taken to ascertain whether the 2,4,5-TCP contained 2,3,7,8-TCDD. *Id.* at pages 8-11 (Exh. 12 at ARR1076-79). AlterEcho summarizes data showing HCP production from 1947-1984, 2,3,7,8-TCDD detected in 2,4,5-TCP feedstock from 1970-1983, and 2,3,7,8-TCDD concentrations in HCP from 1970-1976. *See* Givaudan Facility Data Report, Appendices A-1, A-2 and A-3 (Exh. 12 at ARR1103-05). In short, AlterEcho had the information that was necessary to assess the extent to which the Givaudan facility generated and released dioxin and the other COCs through the pathways that were considered in the allocation.  The allocation report reflects the outcome of AlterEcho's consideration of that information.

### RS 111.        *OxyChem Appendix A, Section 6.c (pp. 138-140), Regarding Givaudan Fragrances Corp., 125 Delawanna Avenue, Clifton*

***The comments state that AlterEcho relied on information about Givaudan's production process from after the 1976 disaster in Seveso, Italy (i.e., after Givaudan implemented stricter quality controls around 2,3,7,8-TCDD) to incorrectly infer that there was little or no 2,3,7,8-TCDD in the millions of pounds of 2,4,5-TCP that Givaudan purchased much earlier for use in hexachlorophene (HCP) manufacturing.  The comments note that only four of the 130 documents that AlterEcho cites in its evaluation of the Givaudan facility are dated before the 1976 Seveso disaster.***

**Response**:  Contrary to the comments' claim that the allocation only considered 2,3,7,8-TCDD data dated after the 1976 Seveso disaster, the allocation's supporting documents, as summarized in Givaudan's Facility Data Report (Appendix A-2 and A-3, Exh. 12 at ARR1104-05), presented 2,3,7,8-TCDD data from 1970 on.  The

Givaudan Facility Data Report (pp. 8-11) (Exh. 12 at ARR1076-79) also refers to Givaudan's testing of the HCP manufactured at the facility from 1969 on.

### RS 112.    *OxyChem Appendix A, Section 6.d (pp. 140-141), Regarding Givaudan Fragrances Corp., 125 Delawanna Avenue, Clifton*

***The comments states that AlterEcho assigned Givaudan little or no dioxin in its wastewater discharge, stormwater runoff and process waste streams, due to a lack of concentration data, and that AlterEcho took Givaudan's representations at face value without supporting evidence, while on the same issues making negative inferences for the former Diamond Alkali facility (the source of OCC's liability). The comments assert that the Allocation Recommendation Report is biased against OCC and its treatment of Givaudan exemplifies this:  AlterEcho accepted Givaudan's claim that there was no TCDD in the water running off the stormwater pond, and AlterEcho took Givaudan's assertions about the sewer system and waste disposal at face value.  For the OCC facility, in contrast, AlterEcho chose to "invent" a figure for TCDD based on other samples, extrapolating from a single data point. The comments assert that AlterEcho also accepted that no 2,3,7,8-TCDD was released from Givaudan's 2,4,5-TCP production even though Givaudan did not have records of equipment decontamination, methods of collection, storage or disposal of waste, or records of off-site disposal, or records from which the total amount of wastes generated could be determined. The comments say that AlterEcho excluded the years during which Givaudan was producing 2,4,5-TCP from the dates of sewer discharge.***

**Response**: The comments compare two unalike issues and, on that basis, illogically conclude that the allocation was biased against OCC. Allocation supporting documents show that Givaudan's industrial wastewater was initially handled on-site, and by 1951, the facility was connected to the City of Clifton system that tied into the PVSC trunk line. Givaudan Facility Data Report at pp. 17-18 (Exh. 12 at ARR1085-86).  The Facility Data Report (at pp. 17-18) describes in detail Givaudan's retention system and stormwater runoff, based on an analysis of the allocation supporting documents (not just Givaudan's representations). In the Facility Data Computation Sheets for the Givaudan facility, both the PVSC pathway (measuring contributions though the Yantacaw Bypass, at Exh. 12 at ARR2412) and the Overland Fate and Transport pathway (measuring contributions though overland flow, at Exh. 12 at ARR2415) accounted for a dioxin component from the Givaudan facility. The comments' assertion that AlterEcho accepted

information at face value ignores the extensive documentation and review reflected in the Facility Data Report.

With respect to the calculations for the OCC facility at Lister Avenue, the comments may reflect the fact that OCC, having elected not to participate in the allocation, now takes issue with some of the allocation's conclusions. As discussed above in RS 59, RS 69, and RS 81, because OCC elected not to participate, AlterEcho assigned additional resources to the allocation team to ensure that OCC was evaluated fairly in the allocation process. *See* Attachment E (Revised Work Plan) at page 3 (Exh. 12 at ARR0120).

### *RS 113. OxyChem Appendix A, Section 7 (pp. 141-144), Regarding Kearny Smelting and Refining, 936 Harrison Avenue, Kearny*

***The comments provide documentation showing that sampling at the Kearny Smelting and Refining facility found maximum PCB concentrations in surface soil to be 46,400 mg/kg (collected at 3.5 to 4 feet bgs), as compared to the 11 mg/kg value used by AlterEcho (collected at 0 to 0.5 feet below ground surface), which the comments calculate would have resulted in 22,398.5 kg of PCBs being discharged historically from the facility to the river. The comments question why the data in question, which were generated in 2018-2019 and included in a Self-Implementing Cleanup Plan for PCBs prepared for Kearny Smelting and Refining in 2020, were not submitted to AlterEcho.***

**Response**: After a careful review and evaluation of all comments, Kearny Smelting and Refining is no longer a Settling Defendant under the modified Consent Decree (ECF No. 283). Therefore, this comment is not relevant to the United States' analysis of the modified Consent Decree.

### *RS 114. OxyChem Appendix A, Sections 8.a & 8.b (pp. 144-146), Regarding Legacy Vulcan Corporation/McKesson/Safety Kleen Envirosystems Company, 600 Doremus Avenue, Newark*

***The comments say that the culpability factor assigned to Legacy Vulcan is too low, citing testimony from former plant workers that Vulcan's practices and policies showed complete disregard for its impact on the Passaic River, which the comments state was not provided to AlterEcho.***

**Response**: As discussed in the Memorandum in Support of the Motion to Enter, EPA and DOJ did not use the cooperation and culpability factors to determine the relative responsibility of the Settling Defendants or the settlement amount in the

proposed Consent Decree (ECF No. 283). Therefore, this comment does not affect the United States' analysis of the proposed Consent Decree.

*RS 115.* *OxyChem Appendix A, Section 8.b (pp. 145-146), Regarding Legacy Vulcan Corporation/McKesson/Safety Kleen Envirosystems Company, 600 Doremus Avenue, Newark*

***The comments describe Vulcan's practices of discharging to drains connected to trenches leading to an on-site sewer that discharged directly to the river, and which was not subject to monitoring until 1972. The comments report that the allocation did not account for the following: from 1972 to 1975, the plant exceeded discharge limits applicable to discharges to the river, particularly for lead; since the plant was never connected to the PVSC system, for more than 20 years (1952 to 1975), the plant discharged untreated wastewater into the river; drains collected process water and connected to sewers or open trenches ending in three outfalls to the river; Vulcan pumped stormwater either directly or via the sewer system to the river during its operating period.***

**Response**: Contrary to the comments' assertions, the allocation did calculate a contribution via the Direct Discharge pathway of lead and PAHs from Vulcan to the river over its 23 years of operations, because the plant was not connected to the PVSC system (as described in Legacy Vulcan's Facility Data Report at p. 6 (Exh. 12 at ARR1325) and Facility Data Computation Sheets, Exh. 12 at ARR2527). The calculation was based on lead and PAH concentration data provided in the allocation's supporting documentation. Legacy Vulcan Facility Data Report at p. 4 (Exh. 12 at ARR1323) for lead, PAS-00010493 (excerpted as Exh. 13.24) at PAS-00010509 for PAHs termed "TOC"; and Legacy Vulcan Facility Data Computation Sheets, Exh. 12 at ARR2527.

*RS 116.* *OxyChem Appendix A, Sections 8.b & 8.c (pp. 146-147), Regarding Legacy Vulcan Corporation/McKesson/Safety Kleen Envirosystems Company, 600 Doremus Avenue, Newark*

***The comments assert that the discharge via the Overland Fate and Transport pathway was underestimated, because the following maximum soil concentrations should have been used in the calculations: lead = 3,100,000 mg/kg (allocation used 30,000 mg/kg); copper = 640,000 mg/kg (allocation used 8,400 mg/kg); mercury = 4,600 mg/kg (allocation used 23 mg/kg); PCBs = 430 mg/kg (allocation used 161 mg/kg).***

**Response**: As discussed in RS 96 above, consistent with the allocation methodology, for the Overland Fate and Transport pathway AlterEcho determined the appropriate concentration of each COC using surface soil data or shallow soil data. Allocation Recommendation Report p.21 (Exh. 12 at ARR0021). AlterEcho only used deeper soil data, as deemed appropriate, if shallow data were not available. *Id.*

AlterEcho evaluated Vulcan's responsibility separately from the responsibility of Safety-Kleen Envirosystems Co ("Safety-Kleen") and McKesson, as documented in separate Facility Data Reports and Facility Data Computation sheets. While the comments do not specify which of these two evaluations is the subject of this comment, EPA has concluded it is Safety-Kleen/McKesson, because the comments refer to the maximum values of lead, copper and mercury that AlterEcho used for that entity's evaluation, not Vulcan's. *Compare* Safety-Kleen/McKesson Facility Data Computation Sheets, Exh. 12 at ARR2738-39 (concentrations that the comments characterize as being used in allocation) *with* Legacy Vulcan Facility Data Computation Sheets, Exh. 12 at ARR2528-29 (concentrations used for this facility do not match those listed in the comments). In case the comments meant to refer to Vulcan as well, EPA notes that the allocation calculated the Overland Fate and Transport contributions for Vulcan using zero for copper, lead and mercury on the basis that NJDEP had concluded that the presence of those metals on the facility property was attributable to a previous operator, Balbach, that conducted smelting operations. Legacy Vulcan Facility Data Computation Sheets, Exh. 12 at ARR2528. The Facility Data Report for Legacy Vulcan (at p. 3) (Exh. 12 at ARR1322) also notes that Balbach filled the property with lead slag. For PCBs, the allocation used a shallow sample of 161 mg/kg (found at 0 to 0.5 feet deep) as the appropriate concentration for Vulcan's Overland Fate and Transport calculation, the same as for Safety-Kleen. Legacy Vulcan Facility Data Computation Sheets, Exh. 12 at ARR2529 and Safety Kleen/McKesson Facility Data Computation Sheets, Exh. 12 at ARR2739.

For Safety-Kleen, AlterEcho used the following values in the Overland Fate and Transport pathway: lead (30,000 mg/kg), copper (8,400 mg/kg), mercury (23 mg/kg) and PCBs (161 mg/kg). *See* Safety Kleen/McKesson Facility Data Computation Sheets, Exh. 12 at ARR2738-39. AlterEcho selected these because they were found in the shallowest sampling interval, the top six inches of soil. *Id.* In contrast, the value for PCBs (430 mg/kg) suggested in the comments was collected in the top one foot of soil (PAP-00365756 (excerpted as Exh. 13.19) at p. PAP-00365808), which is deeper. EPA was unable to identify references to the lead, copper and mercury values cited by the comments either in the allocation supporting documents, or the exhibits to the comments, and the comments do not describe the depth of those

samples. Note that the allocation calculated lead, copper and mercury contributions for Safety Kleen via the Overland Fate and Transport pathway (Safety Kleen/McKesson Facility Data Computation Sheets, Exh. 12 at ARR2738-39), despite the fact that those COCs were likely associated with the smelting and refining operations conducted prior to Safety-Kleen's use of the property. Safety Kleen/McKesson Facility Data Report at p. 10 (Exh. 12 at ARR1808).

**RS 117.** *OxyChem Appendix A, Section 9 (pp. 147-148), Regarding L3 Harris, Kingsland Road, River Road, Washington Road, Nutley*

***The comments state that the allocation undercounted the contribution of L3 Harris Corporation (Harris) via overland flow because the calculation used a maximum copper concentration in soil of 865 ppm for the Overland Fate and Transport pathway, but the allocation documents show a maximum concentration of 2,380 ppm.***

**Response**: As discussed in RS 96 above, consistent with the allocation methodology, for the Overland Fate and Transport pathway AlterEcho determined the appropriate concentration of each COC using surface soil data or shallow soil data. Allocation Recommendation Report p.21 (Exh. 12 at ARR0021). AlterEcho only used deeper soil data, as deemed appropriate, if shallow data were not available. *Id.* Additionally, the Overland Fate and Transport pathway was based on an estimation of areas of bare soil that could have been transported to the Passaic River by overland stormwater flow. *Id.* The copper concentration of 865 ppm that AlterEcho used in the Overland Fate and Transport calculation for L3 Harris was collected at a depth of 0 to 2 feet in soil in a location that could have been carried into the river via overland flow. PAP-00199201 (excerpted as Exh. 13.12) at pp. PAP-00199290-199291, PAP-00199312 and PAP-00199325. In contrast, the copper concentration of 2,380 ppm noted in the comment was collected at 0.5 to 1.0 feet, and the sampling location was within a drywell drum (not an area of soil). *Id.* at pp. PAP-00199292, PAP-00199316 and PAP-00199325.

**RS 118.** *OxyChem Appendix A, Section 10.a (pp. 148-149), Regarding Pitt-Consol, 191 Doremus Avenue, Newark*

***The comments assert that the allocation only calculated Pitt-Consol's direct discharges from 1955 to 1969 (instead of to 1980), and that from 1981 to 1986, Pitt-Consol's wastewater was discharged to PVSC, so AlterEcho omitted an entire decade of discharges which the comments conclude would have been directly discharged to the river. The comments assume that AlterEcho relied on the fact that a dam was built in 1969 to prevent***

*sanitary sewer overflow from entering the Roanoke storm sewer into which Pitt-Consol discharged to conclude Pitt-Consol direct discharges ended in 1969. The comments report that in 1972, PVSC inspected the sewer and found an illegal connection from Pitt-Consol to the storm sewer, and that in 1978, the City of Newark found that industrial waste continued to discharge from the Roanoke Avenue storm sewer because of a non-functioning regulator allowing wastewater to discharge to the river even during dry weather. The comments conclude that after 1969, Pitt-Consol continued discharging directly to the river 100% of the time.*

**Response**: AlterEcho calculated a contribution to the river via the Direct Discharge pathway for the Pitt-Consol facility from 1955 until 1969 based on supporting documentation that showed that as of 1969, a diversion had been placed in the Roanoke Avenue storm sewer to divert dry weather flow to the sanitary line, and that Pitt-Consol had connected to the PVSC sanitary line by 1972. Pitt-Consol Facility Data Computation Sheets, Exh. 12 at ARR2636. The Pitt-Consol Facility Data Report (at p. 15) (Exh. 12 at ARR1600) referred to a 1972 waste effluent survey submitted by Pitt-Consol to PVSC, signaling that the facility was connected to PVSC by that time.  Further, a 1974 diagram showed Pitt-Consol's connection to the PVSC sanitary sewer (PAS-00014428 (excerpted as Exh. 13.25) at PAS-00014575), and a 1977 letter from Pitt-Consol to PVSC discussed its wish to continue discharging to PVSC (*id.* at PAS-00014577-78).  Finally, the Facility Data Computation sheets for Pitt-Consol, Exh. 12 at ARR2636 included a reference to the 1972 connection to PVSC. Contrary to the comments' statements, Pitt-Consol's connection to the PVSC sewer line was to the sanitary line, which connects directly to the PVSC facility and is not subject to bypassing via a CSO outfall (in contrast to the storm sewer, a separate line). Pitt-Consol Facility Data Report at pp. 5-6 (Exh. 12 at ARR1590-91).

**RS 119.    OxyChem Appendix A, Section 10.a (pp. 149-150), Regarding Pitt-Consol, 191 Doremus Avenue, Newark**

*The comments say that even after the facility was connected to the PVSC system, direct discharges from Pitt-Consol to the river occurred in 1981-1986, citing one May 12, 1981 incident of an "unknown" red liquid released into the river from Pitt-Consol.*

**Response**: The Facility Data Report's description of one incident of a red liquid released to the river does not conflict with the conclusion that the Pitt-Consol facility was connected to the PVSC system, substantially eliminating its daily direct discharge into the river (*see* Pitt-Consol Facility Data Report at p. 15, 16 (Exh. 12 at

ARR1600, ARR1601)). The Facility Data Report (at p. 16) (Exh. 12 at ARR1601) describes one direct discharge of "unknown" red liquid having occurred on one day in 1981 (by dumping or illegal discharge). Further, without data or information about concentrations of COCs in the "unknown" red liquid, AlterEcho would have had no basis to include it in calculating Pitt-Consol's COC contribution to the Passaic River.

**RS 120.        *OxyChem Appendix A, Sections 10.a and 10.b (pp. 150-151), Regarding Pitt-Consol, 191 Doremus Avenue, Newark***

*The comments state that barium is a "marker chemical" for the Pitt-Consol facility, and co-located barium and PAH concentrations near the Roanoke Avenue CSO indicate a release of tar (containing PAHs) from the Pitt-Consol facility. The comments say that the allocation should have included mass calculations for high molecular weight PAH, dioxin, and PCB discharges, because of: 1) black tar material found in the sewer and attributed to Pitt-Consol; 2) "the potential for dioxin formation" due to Pitt-Consol production of cresylics and the presence of "dioxin-associated compounds"; and 3) Pitt-Consol's burning of 1,1,1-trichloroethane for heat recovery which "provided all the factors necessary for PCB formation". The comments state that the absence of data is not evidence that no dioxin exists at the facility.*

**Response**:

1)  Regarding PAHs (along with other COCs), the allocation did use sampling data provided in supporting documentation in calculating the contributions via the PVSC pathway (the 1984 effluent data described by the commenter) and the Direct Discharge pathway. *See* Pitt-Consol Facility Data Computation Sheet, Exh. 12 at ARR2635, ARR2636.

2) Regarding dioxin, as noted above, the allocation relied on sampling data, and for the Pitt-Consol facility, there are no sampling results showing detections of dioxin (PAS -00014428 (excerpted as Exh. 13.25) at PAS-00014559).

3) Regarding PCBs, four of the five citations (OxyChem Exs. A-58, A-59, A-61, A-62 (Exhs. 14.16, 14.17, 14.19, and 14.20 to the Motion to Enter) provided in the comments did not include dioxin or PCB concentration data. The fifth citation was a 1998 Preliminary Assessment report prepared for the Pitt-Consol facility that showed five surface soil samples with non-detected PCB results, no areas of concern designated due to PCBs, and a list of facility contaminants of concern in groundwater that did not include PCBs. OxyChem Ex. A-60 (Exh. 14.18 to the

Motion to Enter) at p. 25; *see also* PAP-00016298 (Exh. 13.01)[66] at pp. PAP-00016327-28 for non-detected PCB results, *id.* at PAP-00016333-34 (areas of concern and contaminants of concern).

EPA notes that high molecular weight PAHs and PCBs (along with other COCs) were accounted for in Pitt-Consol's discharge to the river via the Overland Fate and Transport pathway based on soil concentration data in the allocation's supporting documentation. Pitt-Consol Facility Data Computation Sheets, Exh. 12 at ARR2638, ARR2640.

### *RS 121.     OxyChem Appendix A, Section 11 (p. 151), Regarding PPG Industries, Inc., 29 Riverside Avenue, Newark*

***The comments state that the allocation should not have assigned PPG a zero discharge for the pre-PVSC time period, because PPG could not have discharged process waste to the sewers before the existence of PVSC's sewer system.***

**Response**: When PPG's predecessor Patton Paints began operations in 1902, the facility was connected to the sewer via the Delavan Avenue connector. PPG Facility Data Report at p. 16 (Exh. 12 at ARR1627); PAS-00044273 (excerpted as Exh. 13.26) at PAS-00044291.  Prior to 1924, it is probable that this sewer district discharged to the Passaic River. *See* PPG Facility Data Report at p. 4 (Exh. 12 at ARR1615) and Attachment O (May 2020 Koch Report) at pp. 25-26 (Exh. 12 at ARR2926-27).  After 1924, the Newark sewer system was connected to the PVSC system. PAS-00044273 (excerpted as Exh. 13.26) at PAS-00044292.  A PVSC report found that the Delavan Avenue connector was not subject to overflow events.  *See* PPG Facility Data Report at p. 16 (Exh. 12 at ARR1627).  However, the Allocation Recommendation Report did not explain why the allocation treated PPG's discharge as having gone to PVSC from 1902, when it began operations, to 1971.

To evaluate whether this potential issue would have changed the outcome of the allocation for PPG, EPA used information in PPG's Facility Data Computation Sheet to calculate a Direct Discharge contribution for PPG from 1902 to 1924. According to the PPG Facility Data Computation Sheet, Exh. 12 at ARR2656, there were no data for the POTW pathway, so the allocation used data from Sherwin Williams as a similar manufacturer of paint and paint products, consistent with the Allocation Protocol. Specifically, EPA used the following assumptions:

---

[66] PAP-00016298 (Exh. 13.01) is the same document as OxyChem Ex. A-60 (Exh. 14.18), though the pagination is different.

- discharge volume of 37.5 million gallons per year (which, according to PPG's Facility Data Computation Sheet (*Id.*), is approximately 50% of Sherwin Williams' discharge volume because the PPG's Facility Data Report found evidence that PPG's liquid wastes may have been hauled off site for disposal);
- Sherwin Williams' copper (0.26 mg/l), lead (0.53 mg/l) and mercury (0.0010 mg/l) discharge concentrations (Sherwin Williams Facility Data Computation Sheet, Exh. 12 at ARR2779); and
- PPG's years of discharge to the Newark sewer (1902 to 1924 which is 22 years).

Under this analysis, PPG's Direct Discharge pathway could have contributed 812 kg of copper, 1655 kg of lead and 3 kg of mercury historically to the Passaic River. Exhibit 4, Declaration of Alice Yeh ("Yeh Decl.") ¶ 53.

EPA recalculated PPG's allocation base score using these additions to PPG's Direct Discharge pathway masses, in addition to PPG's other COC contributions. Using the alternative method, EPA recalculated PPG's base score to be approximately 0.003 (approximately 10 times higher than PPG's original base score of 0.0004 in the allocation). *Id.*; *see also* Exhibit I to the Yeh Decl. In the Allocation Recommendation Report, the Tier 5 parties' base scores ranged from 0.0000001 to 0.002, while Tier 4 parties' base scores ranged from 0.003 to 0.057. *See* Attachment Q (Exh. 12, Part 20 at ARR3240-41) and Attachment K (Exh. 12, Part 9 at ARR2005-06).[67] Therefore, the higher concentrations found in the documents cited in the comments result in a base score that falls within Tier 4, so even using the comments' proposed numbers PPG would still be eligible for inclusion in the proposed cashout settlement.

---

[67] For Tier 4 parties: 1) In Attachment Q (ARR3240-41), the table labeled "Alternative Calculation" shows that the range of Tier 4 parties starts at Seton Company and ends at Atlantic Richfield; 2) In Attachment K (ARR2005-06), the table labeled "Alternative Calculation" shows that the "AP Base Score" (which is the Allocation Party Base Score without adjusting for cooperation/culpability) for Seton Company is 0.05681916 and for Atlantic Richfield is 0.003230858. Therefore, the range of base scores for Tier 4 is 0.003 to 0.057.

For Tier 5 parties: 1) In Attachment Q, the table labeled "Alternative Calculation" shows that the range of Tier 5 parties starts at Textron and ends at Elan Chemical; 2) In Attachment K, the table labeled "Alternative Calculation" shows that the "AP Base Score" for Textron is 0.002078673 and for Elan Chemical is 6.03177E-08 (or 0.0000000603177). Therefore, the range of base scores for Tier 5 is 0.002 to 0.0000001 (which is a rounding up of the Elan Chemical base score).

**RS 122.    *OxyChem Appendix A, Sections 11.a & 11.b (pp. 152-153),
Regarding PPG Industries, Inc., 29 Riverside Avenue, Newark***

***The comments assert that the allocation attributed high PCB
concentrations found on the PPG property to other companies that occupied
the property after PPG and discounted evidence of dioxin sampling on the
PPG property, but PPG's dyes, pigments and varnishes were sources of PCBs
and dioxins. The comments say that PPG used lead in manufacturing paint
at the facility.***

**Response**: AlterEcho did not overlook the use of metals in PPG's operations.  It is
discussed in PPG's Facility Data Report at pp. 12-14 (Exh. 12 at ARR1623-25).
Further, PPG's Facility Data Report on pp. 5-7 (Exh. 12 at ARR1616-18) stated that
no information in the available references showed that PPG used PCBs at the PPG
facility, although PCBs were found in facility soils. Therefore, PPG's Facility Data
Computation Sheets, Exh. 12 at ARR2659-60 show that rather than discounting or
ignoring PCBs and lead as alleged by the comments, the allocation accounted for
PCB and lead discharges from the PPG facility via Overland Fate and Transport.

Rather than discounting evidence of dioxin sampling on PPG property, the Facility
Data Report (at pp. 7-9) (Exh. 12 at ARR1618-20) summarized dioxin results from
soil sampling from 2011 and 2017 provided in the allocation's supporting
documentation. In fact, the comments cite investigative and laboratory reports with
the same data as that provided by the allocation's supporting documentation and
used in the allocation,[68] with the following differences:

1) for PCBs: the document cited in the comments (OxyChem Ex. A-64 (Exh.
   14.21 to the Motion to Enter), which is included in the allocation supporting
   documents as PAP-00305739 (excerpted as Exh. 13.16)) includes a 10 ppm
   PCB soil concentration at greater than 2 feet deep, while the allocation used
   a 5 ppm PCB surface soil concentration (0 to 1 foot deep) in the Overland
   Fate and Transport calculation (PPG Facility Data Computation Sheets, Exh.
   12 at ARR2660 (citing PAP-00305739 (excerpted as Exh. 13.16) at PAP-
   00305864)) consistent with the allocation methodology (see responses to
   comments above);

2) for dioxin: the document cited in the comments (OxyChem Ex. A-65 (Exh.
   14.22 to the Motion to Enter) at PDF p. 19) shows a 0.00245 ppm dioxin
   concentration on the *third floor* of Building 7, while the allocation used a
   0.00045655 ppm dioxin concentration in surface soils (0 to 0.5 foot deep) in

---

[68] The higher concentrations were not mentioned in the comments themselves;
rather, EPA identified the data points for PCBs and dioxin based a review of the
documents cited by the commenter.

the Overland Fate and Transport calculation consistent with the allocation methodology.  PPG Facility Data Computation Sheets, Exh. 12 at ARR2660 (citing PAP-00305739 (excerpted as Exh. 13.16) at PAP-00305871).

### RS 123.    *OxyChem Appendix A, Sections 11.a, 11.b. & 11.c (pp. 152-154), Regarding PPG Industries, Inc., 29 Riverside Avenue, Newark*

***The comments state that the allocation should not have assigned PPG zeros for the Direct Discharge pathway, citing evidence that 1) floor drains in the PPG facility that were used by PPG employees to dispose of materials led to the river; 2) employees reported disposing of process material directly into the river; and 3) there were seven outfalls to the river from PPG buildings. The comments say that the allocation overlooked a report of an employee dumping, and a fire that caused a tank to fail releasing its contents, and that AlterEcho assigned PPG a culpability factor that was too low.***

**Response**: PPG's Facility Data Report (at p. 19) (Exh. 12 at ARR1630) discussed the report of an employee dumping some material to the river, noting that the contents of the dumped material were unknown.  PPG's Facility Data Report (at p. 21) (Exh. 12 at ARR1632) also mentioned the fire, describing it as a significant event and noting that the resin did not reach the river. PPG's Facility Data Report (at p. 19) (Exh. 12 at ARR1630) summarized the conflicting evidence provided in the allocation's supporting documentation on whether building floor drains and outfalls to the river were used for process waste disposal. Some supporting documents described each building on PPG's property as having floor drains connecting to outfalls to the river along the bulkhead. PPG Facility Data Report at p. 19 (Exh. 12 at ARR1630) (citing PAS-00080124 (excerpted as Exh. 13.29) at PAS-00080135). Other supporting documents described or showed PVSC notes and employee affidavits stating that only one building had floor drains and the pipes along the bulkhead were connected to a water tank drain or compressor cooling water. PPG Facility Data Report at p. 19 (Exh. 12 at ARR1630) (citing PAP-00037394 (excerpted as Exh. 13.02) at PAP-00037438 and PAP-00037436; PAS-00044273 (excerpted as Exh. 13.26) at PAS-00044508; Exh. 13.20 at PAP-00402709-10; Exh. 13.21 (PAP-00402712)).  Given the conflicting evidence, AlterEcho's decision not to calculate a Direct Discharge contribution from PPG's floor drains and outfalls is reasonable.

Finally, EPA and DOJ did not use the cooperation and culpability factors to determine the relative responsibility of the Settling Defendants or the settlement amount in the proposed Consent Decree (ECF No. 283), as discussed in the Memorandum in Support of the Motion to Enter, Background, Section II.G.

*RS 124.*      *OxyChem Appendix A, Sections 12.a, 12.b & 12.c (pp. 154-157), Regarding Sequa Corporation and Sun Chemical Company, 185 Foundry Street, Newark*

***The comments assert that Sequa and Sun used PCBs in their operations, and that the PCBs were discharged through the sewer system into the river. The comments say that the allocation, relying on a 2016 paper prepared by Sequa, and a 1991 Responsible Party Summary prepared by NJDEP, dismissed any connection between Sequa or Sun and PCBs at the facility, because of mistaken assumptions that the PCBs may have been the result of historic fill or they may have been associated with an off-site source. The comments argue that use of a heat transfer system by both Sequa and Sun demonstrates a greater use of PCBs than is accounted for in the allocation. The comments provide the following PCB data: a swipe sample with a PCB concentration of 14 mg/ft2 and PCB concentrations in the boiler room of 4.6 ppm to 59 ppm.***

**Response**: AlterEcho evaluated Sequa and Sun separately, as these are two separate corporate entities. Sequa Facility Data Report, p. 1 (Exh. 12 at ARR1831); Sun Facility Data Report, pp. 1-2 (Exh. 12 at ARR1929-30). Sequa's corporate predecessor (then named Sun Chemical Corporation) operated from 1967 to 1986 (Sequa Facility Data Report, p. 1 (Exh. 12 at ARR1831)), and Sun operated from 1986 to 2003 (Sun Facility Data Report, pp. 1-2) (Exh. 12 at ARR1929-30), though cleanup activities conducted at the facility between 1986 and 2003 affected (shortened) the period of time for the Overland Fate and Transport pathway releases. Sun Facility Data Computation Sheets (Exh. 12 at ARR2828) (citing PAP-00120463 (excerpted as Exh. 13.03) at PAP-00120487).

The comments are correct that, while AlterEcho found that the facility is not located on historic fill (Sequa Facility Data Report, p. 4 (Exh. 12 at ARR1834); Sun Facility Data Report, pp. 8-10) (Exh. 12 at ARR1936-38), the Sequa Facility Data Report (at p. 4) (Exh. 12 at ARR1834) and Sun Facility Data Report (at p. 17) (Exh. 12 at ARR1945) described the determination by NJDEP, in a letter dated October 11, 1995, that attributed PCB contamination in soil to historic fill. The NJDEP letter (PAS-00044620 (excerpted as Exh. 13.27) at PAS-00045465) stated that off-site PCB contamination was attributable to historic fill (reportedly this was based on the distribution of elevated PCBs on the facility property and an adjacent property), and also described the deed restrictions (declaration of environmental restrictions) to be imposed on the Sequa facility property as being required due to historic fill. Adhering to the NJDEP determination, and in accordance with the allocation

methodology (see responses above), AlterEcho did not calculate a contribution via Overland Fate and Transport for the Sequa years of operation.

### RS 125.   *OxyChem Appendix A, Section 12.d (pp. 157-158), Regarding Sequa Corporation and Sun Chemical Company, 185 Foundry Street, Newark*

***The comments state that because AlterEcho concluded Sequa and Sun were not the source of PCBs, it concluded that PCBs could not have reached the Passaic River from the Sequa-Sun facility.***

**Response**: As noted in RS 124 above, AlterEcho evaluated Sequa and Sun separately. The allocation did include a PCB contribution for Sun from this facility for the period of 1986 to 1993 via the Overland Fate and Transport pathway. Sun Facility Data Computation Sheets, Exh. 12 at ARR2829. The Facility Data Computation Sheets for Sun, *id.*, showed that Sun's contribution via the Overland Fate and Transport pathway was calculated using a PCB concentration of 910 ppm and a seven-year period for Sun's first seven years of operation, resulting in 0.4 kg of PCBs historically discharged. Contrary to the comments' assertions, the Sun Facility Data Computation Sheet, *id.*, included a note specifying that historic fill was not a consideration for the purposes of this calculation.

### RS 126.   *OxyChem Appendix A, Section 12.d (p. 158), Regarding Sequa Corporation and Sun Chemical Company, 185 Foundry Street, Newark*

***The comments maintain that effluent from operations at the Sequa-Sun facility went through neutralization and then through a combined sewer to PVSC, and then to the Passaic River. The comments also note that the facility property flooded and refer to a 1978 release of red dye.***

**Response**: The allocation did not include any contribution for either Sequa or Sun via the PVSC pathway. The Facility Data Report for Sun (at p. 11) (Exh. 12 at ARR1939) explained that the drains at the Foundry Street complex that included the Sequa/Sun facility were connected to an industrial sewer line on Roanoke Avenue that received surface water run-off and industrial discharge from companies in the complex.  The industrial sewer on Roanoke Avenue connected to a sewer on Doremus Avenue, which flowed directly to the PVSC treatment works. *Id*. In 1969, the City of Newark constructed a "dam" in the Roanoake Avenue CSO outfall, at the foot of Roanoke Avenue, to increase flow to the PVSC treatment plant. *Id.*

The Facility Data Report for Sequa (at p. 5) (Exh. 12 at ARR1835) described that after the red dye release, PVSC performed an inspection and documented that the

facility was connected to the Roanoke Avenue combined sewer line, which in turn connected to the Doremus Avenue line. PVSC found that because of capacity in the Doremus Avenue line, the wastewater in the Roanoke line would sometimes overflow and reach the river. *Id.* Without data or information about concentrations of COCs in the red dye, however, AlterEcho would have had no basis to include it in calculating Sequa's COC contribution to the River.

**RS 127.**      *OxyChem Appendix A, Section 13 (pp. 158-163), Regarding Sherwin Williams, 60 Lister Avenue, Newark*

***The comments assert that Sherwin-Williams did not provide information about chemicals used in its production processes at the Lister Avenue facility, either in response to EPA's 1995 request for information, or to AlterEcho during the allocation process, whereas in discovery sought by the commenter (OCC) in its federal court action, Sherwin-Williams did provide information in September 2022, which shows that its operations involved substantial volumes of PCBs, mercury, DDT, lead, and copper, contradicting AlterEcho's conclusions. The comments argue that the United States accepted Sherwin-Williams' explanation that the information was not readily available at face value.***

**Response**: After a careful review and evaluation of all comments, Sherwin-Williams is no longer a Settling Defendant under the modified Consent Decree (ECF No. 283).  Therefore, this comment is not relevant to the United States' analysis of the modified Consent Decree.

**RS 128.**      *OxyChem Appendix A, Section 14.a (pp. 163-164), Regarding STWB Inc., 120 Lister Avenue, Newark*

***The comments state that the allocation should not have assigned STWB's 120 Lister Avenue facility a Direct Discharge contribution of zero, because: 1) of testimony that wastes from STWB operations went into the river; 2) there was a pipe through the bulkhead into the river; and 3) in the early 1960s, after its wastes caused issues in the sewers, STWB went back to discharging the wastes into the river.***

**Response**: STWB's Facility Data Report (at p. 8) (Exh. 12 at ARR1926) for its 120 Lister Avenue facility described that a portion of the wastewater generated from STWB's operations at the facility may have been discharged to the river in 1956-1958 and 1963-1971. The wastewater was characterized by the allocation's supporting documentation as containing sulfuric acid and copper salts, the latter in

trace amounts. *Id.* AlterEcho did not calculate a contribution via the Direct Discharge pathway because there were no data on contaminant concentrations in the discharge. *See* STWB 120 Lister Avenue Facility Data Report, p. 7-8 (Exh. 12 at ARR1915-16). Since the comments also did not provide any data on contaminant concentrations, EPA has no basis to recalculate STWB's Direct Discharge contribution.

### *RS 129. OxyChem Appendix A, Section 14.a (p. 164), Regarding STWB Inc., 120 Lister Avenue, Newark*

***The comments state that the allocation assigned STWB a culpability factor that was too low.***

**Response**: As discussed in the Memorandum in Support of the Motion to Enter, Background, Section II.G, EPA and DOJ did not use the cooperation and culpability factors to determine the relative responsibility of the Settling Defendants or the settlement amount in the proposed Consent Decree (ECF No. 283).

### *RS 130. OxyChem Appendix A, Section 14.b (p. 164-165), Regarding STWB Inc., 120 Lister Avenue, Newark*

***The comments state that STWB's manufacturing processes "could have produced PCBs or dioxins" because they "involved conditions favorable for PCB and dioxin generation."***

**Response**: As noted in several responses to comments above, the allocation relied on sampling data. For the STWB 120 Lister Avenue facility, there are no sampling results that contain dioxin and PCBs. STWB 120 Lister Avenue Facility Data Report, p. 1 (Exh. 12 at ARR1919). The comments also did not include any data that the allocation or EPA could have used.

### *RS 131. OxyChem Appendix A, Sections 14.c & 14.d (p. 165-166), Regarding STWB Inc., 120 Lister Avenue, Newark*

***The comments state that, although the allocation should have used the following contaminant concentrations in soil in STWB's Overland Fate and Transport calculations for the 120 Lister Avenue facility, the allocation did not use those numbers because they were below NJDEP's Residential Direct Contact Soil Remediation Standards: copper = 1,950 ppm; lead = 1,360 ppm; mercury = 5.9 ppm; PAHs = 100-400 ppm. The comments say that the allocation used a copper concentration of 1.85 mg/l in STWB's discharge to PVSC without citing supporting documentation.***

**Response**: The procedure for calculating the Overland Fate and Transport pathway is described in response to several comments above. AlterEcho determined STWB's 120 Lister Avenue facility property was located completely on historic fill as designated by NJDEP.  Facility Data Report at p. 6 (Exh. 12 at ARR1924).  Under the allocation methodology, for facilities located on historic fill AlterEcho only calculated Overland Fate and Transport contributions if the soil concentration that the allocation team identified for use exceeded 10,000 mg/kg for lead, 1,200 mg/kg for copper, or 3.7 mg/kg for mercury — i.e. the NJDEP-approved historic fill numbers. Allocation Recommendation Report, p. 22 (Exh. 12 at ARR0022).

For lead, the comments assert that AlterEcho should have calculated Overland Fate and Transport based on a soil concentration of 1,360 mg/kg.  But that concentration is far below the historic fill screening level of 10,000 mg/kg.  For copper and mercury, the data points cited in the comments were collected from soil under pavement (PAP-00194956 (Exh. 13.11) at PAP-00194971 and PAP-00194972), not bare soil.  As discussed above, such data were not appropriate inputs for the Overland Fate and Transport pathway under the Allocation Protocol.