# Exhibit 5

## Declaration of Diane Sharkey

United States' Motion to Enter Consent Decree,
*United States v. Alden Leeds, Inc. et al.*, Civil Action No. 22-7326 (D.N.J.)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action No. 2:22-cv-07326 (MCA) (LDW) |
| ALDEN LEEDS, INC., *et al.* | ) | |
| Defendants. | ) | |
| PASSAIC VALLEY SEWERAGE COMMISSIONERS, *et al.,* | ) | |
| Intervenors. | ) | |

**DECLARATION OF DIANE SHARKEY (SALKIE)**

I, DIANE SHARKEY[1], in accordance with 28 U.S.C. § 1746, declare as follows:

1.    I submit this Declaration in support of the United States' Motion to Enter Consent Decree.

2.    I am a physical scientist at the United States Environmental Protection Agency ("EPA"), Region 2. I am presently employed as an EPA Remedial Project Manager ("RPM") in the Passaic/Hackensack/ Newark Bay Remediation Branch of Region 2's Superfund and Emergency Management Division.

---

[1] My legal last name is Sharkey. On many documents associated with the Diamond Alkali Superfund Site, however, my name appears as Diane Salkie, and that is the name used for my government email address.

3.       In my role as an RPM, I work on all aspects of Superfund site response actions undertaken by EPA pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA" or "Superfund"), 42 U.S.C. § 9601, *et seq.*, and I implement the National Contingency Plan, 40 C.F.R. Part 300. I have been the RPM for Operable Unit 4 ("OU4") of the Diamond Alkali Superfund Site ("Site") since 2018.

4.       I have been employed at the EPA since 1998 and have worked in the EPA Region 2 Superfund/CERCLA Program for more than 13 years overseeing and performing environmental investigation and cleanup activities. During my employment with EPA, I have taken numerous courses and seminars for the purpose of enhancing the skills related to my duties as an RPM at EPA. I have a Bachelor of Science degree in environmental science from Cook College, Rutgers University.

5.       I have worked as an RPM on the Site, focusing on the upper 9 miles of the Lower Passaic River, since March 2018. Among other duties, I am responsible for planning and managing the technical activities performed by contractors to advance the cleanup of the upper 9 miles, completing the Record of Decision for an interim remedy, overseeing the remedial design of the upper 9 miles conducted by Occidental Chemical Corporation ("OxyChem"), through related company Glenn Springs Holdings, Inc., a subsidiary of Occidental Petroleum Corporation, and communicating with public stakeholders on the progress of the cleanup of the upper 9 miles.

1

6.      I am familiar with records and files in EPA's possession relating to the Diamond Alkali Superfund Site. I either have personal knowledge of the matters stated herein or have reviewed documents in EPA's files relating to these matters created and maintained in the regular course of its business activities.

**Site Background**

7.      The Diamond Alkali Superfund Site includes a 17-mile stretch of the tidal Passaic River from the Dundee Dam to Newark Bay, referred to as the Lower Passaic River Study Area ("LPRSA") which is contaminated with hazardous substances including, but not limited to, dioxin, polychlorinated biphenyls ("PCBs"), mercury, dichlorodiphenyltrichloroethane ("DDT") and its breakdown products, copper, dieldrin, lead and polyaromatic hydrocarbons ("PAHs").

8.      EPA is addressing the cleanup of the Site through four operable units. Operable Unit 4, also known as the LPRSA, is the 17-mile stretch of the Passaic River from the Dundee Dam to Newark Bay, and as such encompasses the lower 8.3 miles of the LPRSA, which is separately known as Operable Unit 2. *See* Record of Decision for an Interim Remedy in the Upper 9 Miles of the Lower Passaic River Study Area OU4 of the Diamond Alkali Site ("OU4 ROD"),[2] pp. 1-2.

**OU4 Investigatory Background and Actions**

9.      In 2002, EPA commenced a remedial investigation and feasibility study ("RI/FS") of OU4. In 2004, a group of potentially responsible parties known as the Cooperating Parties Group ("CPG") entered into an administrative settlement

---

[2] The OU4 ROD is available at https://semspub.epa.gov/work/02/630399.pdf.

2

agreement under Section 122(h) of CERCLA with EPA in which members of the

CPG agreed to provide funds for EPA's performance of the 17-mile LPRSA RI/FS.[3]

That settlement agreement was amended in 2005 and 2007, adding more parties.[4]

In May 2007, certain members of the CPG entered into an Administrative

Settlement Agreement and Order on Consent ("2007 ASAOC") with EPA in which

those parties agreed to take over the performance of the RI/FS for the 17-mile

LPRSA under EPA oversight.[5]  The 2007 ASAOC was subsequently amended to add

additional parties.

10.    In July 2017, the CPG proposed an adaptive management approach for

evaluating an interim cleanup plan for the sediment in the upper 9 miles of OU4.

In reviewing this proposal, EPA consulted with the Contaminated Sediment

Technical Advisory Group and National Remedy Review Board, two national groups

of EPA experts charged with examining remedies for national consistency and

ensuring that EPA's most complex Superfund sites are appropriately investigated

and managed in accordance with risk management principles.  EPA also consulted

with the New Jersey Department of Environmental Protection, the National

Oceanic and Atmospheric Administration, the United States Fish and Wildlife

Service and the Passaic River Community Advisory Group.

11.    In October 2018, EPA directed the CPG to evaluate an interim cleanup

---

[3] *See* https://semspub.epa.gov/work/02/99861.pdf.
[4] *See* https://semspub.epa.gov/work/02/92084.pdf;
https://semspub.epa.gov/work/02/99862.pdf.
[5] *See* https://semspub.epa.gov/work/02/99864.pdf.

(adaptive management) approach for source control in the upper 9 miles of the LPRSA through a Feasibility Study ("FS"), that is, a cleanup that would address contaminated sediments, located in the upper 9 miles of the river, acting as ongoing sources of contamination to the 17-miles LPRSA. Under EPA oversight and approval, the CPG completed the Remedial Investigation Report for the full 17-mile LPRSA and a comprehensive Feasibility Study Report that evaluated four remedial alternatives for an interim cleanup, in addition to the no action alternative.

12.    In April 2021, based on the RI/FS, EPA issued a Proposed Plan for OU4.[6] The Proposed Plan described the remedial alternatives, with different interim remedial footprints, evaluated by EPA to address sediments acting as sources of contamination in the upper 9 miles, of the LPRSA and identified the preferred remedial alternative. *See* OU4 Proposed Plan at pp. 15-24, 30-32.  The Proposed Plan was subject to public comment and comments received were addressed by EPA in a Responsiveness Summary attached to the Record of Decision. OU4 ROD, *supra* n.2, Appendix 5, PDF pp. 289-347.

13.    In September 2021, EPA issued the OU4 ROD, *supra* n.2, selecting an interim remedy for the LPRSA. At the time the interim remedy was selected, additional information that was required to select a final remedy for OU4, such as final risk-based cleanup goals, was not available. Therefore, EPA made the decision to move forward with an interim action to address source areas in the upper 9 miles.

---

[6] *See* OU4 Proposed Plan, https://semspub.epa.gov/work/02/609883.pdf.

14.     Based on OU4 RI/FS activities and risk assessments, EPA determined that the primary human health and ecological risk drivers for the upper 9 miles of the LPRSA are dioxins and total PCBs, and these contaminants are the focus of the OU4 interim remedy, with mercury, DDT (and its breakdown products), PAHs, dieldrin, copper, and lead also identified as contaminants of concerns ("COCs"). *See* OU4 ROD, *supra* n.2, pp. 14-15, 36-37. The OU4 interim remedy, which will complement the OU2 remedy, generally involves targeted dredging and capping in areas of the upper 9 miles with elevated concentrations of dioxins and PCBs, offsite disposal of dredged material, and other measures such as institutional controls. *See* OU4 ROD, *supra* n.2, Description of Selected Remedy, p. ii, Section 4.2, Basis for Interim Remedy, p. 12.

15.     The interim remedy selected by EPA, and with which the State of New Jersey concurs, is intended to minimize the potential for future in-river dredging. *See* Upper 9-Mile Source Control Interim Remedy Feasibility Study, Appendix J, FS Meeting #1 Meeting Minutes (PDF pp. 723-24) and FS Meeting #26 Meeting Minutes (PDF pp. 819-23)[7] ("NJDEP notes they would like this interim remedy to be a final remedy in the river, that it would meet risk-based goals and be memorialized in a Final ROD. NJDEP notes after this interim remedy, they do not want additional remediation work to be needed in the upper nine miles of the LPRSA.") ("DEP said the reduction in timeline to meet future risk-based goals is also important and they want to see this action as a one time in-river action.")

---

[7] *See* https://semspub.epa.gov/work/02/625207.pdf.

16.     EPA expects that the interim remedy, which includes the cleanup of areas with elevated concentrations of contaminants (*e.g.*, dioxins and PCBs), will result in expedited recovery of the river. If the remedial work on the upper 9 miles takes place at the same time as the cleanup of the lower 8.3 miles, the infrastructure constructed for the lower 8.3 miles (such as a dewatering facility or storage areas) may be used for the upper 9 miles cleanup, resulting in cost efficiencies for parties conducting the remedial action, and the disruption to the river ecology and the many communities along the river could be minimized. The interim cleanup for the upper 9 miles does not alter the previously selected cleanup for the lower 8.3 miles of the river.

17.     EPA estimates that the interim remedy will result in a 92% reduction in the surface weighted average concentration ("SWAC") for dioxin and an 82% reduction in SWAC for PCBs, and will remove approximately 387,000 cubic yards of contaminated sediment across 96 acres. *See* OU4 ROD, *supra* n.2, p. 67.

18.      On March 2, 2023, EPA issued Unilateral Order for Remedial Design (CERCLA Docket No. 02-2023-2011) ("OU4 RD UAO") under Section 106 of CERCLA to OxyChem directing it to perform the remedial design for the interim remedy under EPA oversight.[8]  On March 10, 2023, OxyChem submitted to EPA a notice of intent to comply with the OU4 RD UAO.

19.     The $441 million estimated cost of the OU4 interim remedy, set forth in the OU4 ROD, *supra* n.2, includes the costs of the interim remedy remedial

---

[8] *See* https://semspub.epa.gov/work/02/642227.pdf.

design/remedial action and long-term monitoring that will lead to a final record of decision. Following implementation of the interim remedy, approximately 3 years of post-remedy sampling will be performed to confirm the interim remedy is functioning as intended. Following that, long-term monitoring/operation and maintenance sampling will occur for approximately 10 years, and building upon the data collected, a remedial investigation ("RI") workplan will be developed to identify any additional sampling, beyond the data already collected, needed to characterize the upper 9 miles, including sediment, surface water and biota data. An RI, including a human health and an ecological risk assessment will be performed. If unacceptable risk is identified, a feasibility study or focused feasibility study ("FS" or "FFS") will be performed, as required by CERCLA. Throughout this process, modelling, including contaminant fate and transport modelling and bioaccumulation modelling, using models that have already been completed, will be performed so that EPA can project how long it will take for the sediment to reach risk-based preliminary remediation goals ("PRGs") which will be developed during the remedial design for the interim remedy, and this information will inform EPA's selection of a final remedy for OU4. These steps would be followed by issuance of a proposed plan, a public comment period, and issuance of a final record of decision for OU4.

20.    Illustrating both the complexity of the Lower Passaic River, and the extensive body of data available, EPA has conducted or overseen the following list of investigations related to OU2 and OU4 spanning 26 years, which is the most

thorough in my experience as an RPM:

- 1995 – Remedial investigation sampling program

- 1999-2001– Ecological sampling plan programs

- 2000 - Sediment collection program

- 2004 - Sediment coring for dredging pilot project

- 2005 - Sediment bed erosion tests (Sedflume and Gust Microcosm)

- 2005–2007 - High-resolution sediment coring program

- 2005 - Small-volume water column sampling program

- 2006 - Low-resolution sediment coring program

- 2007–2008 - Beryllium-7-bearing sediment collection program

- 2007 through 2012 - Single- and multi-beam bathymetric surveys

- 2008 - Tributary, CSO, and SWO sampling program

- 2008 - Low-resolution sediment coring program

- 2009–2010 - Benthic and surface sediment sampling program

- 2009–2010 - Physical water column monitoring program

- 2009–2010 - Fish community and tissue collection surveys

- 2010 - High-flow water column suspended solids sampling

- 2010 - Habitat identification survey

- 2010 - Summer/fall avian community survey

- 2011–2013 - Small-volume chemical water column monitoring program

- 2011–2013 - High-volume chemical water column monitoring program

- 2011 - Caged bivalve study

- 2011–2012 - RM 10.9 characterization sampling

- 2012 - Background benthic sediment sampling

- 2012 - Background fish tissue survey

- 2012 - Low-resolution supplemental sediment sampling program

8

- 2013 - Low-resolution supplemental sediment sampling program

- 2019 – 2022 - Current conditions sampling program –16 chemical water column monitoring sampling events and 6 physical water column monitoring events

- 2019 – 2021 - Current conditions sampling program – 2 rounds of biota sampling

- 2019 – Bathymetry survey

- 2021 – Post-tropical storm Ida Bathymetry survey

21.     Results of these investigations can be found at the EPA website http://www.ourpassaic.org/ or in the administrative records for OU2 and OU4 of the Diamond Alkali Site, which can be found at www.epa.gov/superfund/diamond-alkali.

22.     In the proposed Consent Decree, EPA agreed to issue a notice of completion of the 2007 ASAOC, subject to continuing record retention obligations and payment of the final bill for Future Response Costs under the 2007 ASAOC, after the Settling Defendants make the settlement payment required by the Consent Decree, and the following tasks required by the 2007 ASAOC are completed and approved by EPA: (a) the summary reports for the current conditions monitoring program sampling events, using data collected through April 15, 2022; (b) the post-Hurricane Ida bathymetric survey report, using data collected through January 5, 2022; (c) the bioaccumulation model including calibration, documentation, peer review if necessary, and response to, and incorporation of, EPA comments. *See* Consent Decree, ECF No. 283, ¶ 16.  These tasks have been completed. The bioaccumulation model, completed in December 2022, will be used

9

to develop risk-based remediation goals for the final ROD. EPA conditionally

approved the Remedial Investigation Report in June 2021, meaning that EPA had

sufficient data to characterize the nature and extent of contamination for the entire

17-mile Lower Passaic River Study Area; in December 2022, EPA gave its final

approval of the Remedial Investigation Report.

**OU4 Estimated Costs**

23.     Because EPA had not yet issued the Proposed Plan or the ROD

selecting the OU4 interim remedy when the cashout negotiations began, the

negotiations incorporated the estimated cost of the most-costly alternative under

consideration as of that time which was $460 million. The costs changed somewhat

as the alternatives were developed. The OU4 Proposed Plan, issued on April 14,

2021, evaluated three alternatives with costs ranging from $412 million to $468

million. *See* OU4 Proposed Plan, *supra* n.6, pp. 15-24.

24.     The estimated cost of the OU4 interim remedy selected in the OU4

ROD is $441 million (OU4 ROD, *supra* n.2, Table 12-1, PDF pp. 142-44), which is

$19 million less than what EPA incorporated when it calculated the proposed

settlement amount.

25.     In consideration for closing out the 2007 ASAOC, EPA incorporated a

payment component based on its estimate of the costs associated with completing

the additional work described in Consent Decree ¶ 16:  developing the RI workplan,

performing the RI including human health and ecological risk assessments,

performing modeling, developing risk-based PRGs, and if called for, performing the

10

FS or FFS. EPA included an estimated amount for these additional tasks in its calculation of the proposed settlement amount.

26.     EPA did not include a cost component for potential future work associated with a remedial design/remedial action cleanup to address any remaining unacceptable risk to human health and the environment under the final ROD for the LPRSA; at this time, that would be speculative.

27.     EPA anticipates that the OU4 interim remedy will immediately reduce contamination in the sediments of the upper 9 miles and accelerate recovery of the water column and the areas of the sediment bed outside the remediation area and reduce biota exposure to contaminants.

28.     The cost estimate of the interim remedy used for the settlement includes 30 years of long-term monitoring, which is approximately 20 years longer than the time estimated to elapse until the issuance of the ROD selecting the final remedy for OU4. OU4 ROD, *supra* n.2, Table 12-1, PDF pp. 142-44.

29.     The OU4 interim remedy cost estimate includes costs associated with the following post-interim remedy implementation:

a.     The remedial design cost includes update and refinement of numerical models.

b.     Costs for annual operation, maintenance, and monitoring ("OMM") are assumed to begin in Year 5 (at the completion of construction), and extend for 30 years after construction is complete.

c.     Periodic costs are assumed to begin in Year 5 (at the completion of

11

construction), and extend for 30 years after construction is complete. Periodic costs include surface water sampling and biota sampling.

      d.      Seven cap monitoring events are included.

      e.      Six bathymetric survey events are included.

      f.      One initial post-interim remedy completion surface sediment sampling event, consisting of 400 locations, is included. Costs are based on full analytical suite, quality assurance samples, data validation, equipment, facilities, labor, and expenses.

      g.      Six potential additional surface sediment sampling events, consisting of 200 locations each, otherwise based on the same assumptions as the initial sediment sampling event, are included.

*See* Upper 9-Mile Source Control Interim Remedy Feasibility Study, Appendix G, PDF pp. 648-59.[9]

      30.      Cost estimates include direct capital costs and an OMM contingency of 25 percent (15 percent of scope contingency and 10 percent of bid contingency).

      31.      Present worth values of capital costs incurred after Year 0 and annual OMM costs are based on application of a 7 percent discount rate, per EPA guidance. *See* A Guide to Developing and Documenting Cost Estimates During the Feasibility Study (PDF) (76 pp, 770 K) OSWER 9355.0-75, July  2000.[10]

---

[9] *See* https://semspub.epa.gov/work/02/625207.pdf.
[10] *See* https://semspub.epa.gov/work/HQ/174890.pdf.

I declare, under penalty of perjury, that the foregoing is true and correct. Executed

on January 29, 2024.

DIANE SHARKEY
Digitally signed by DIANE
SHARKEY
Date: 2024.01.29 16:08:34 -05'00'

_____

Diane Sharkey
Remedial Project Manager
United States Environmental Protection Agency

13