# Exhibit 6

## Declaration of Michael Sivak

United States' Motion to Enter Consent Decree,
*United States v. Alden Leeds, Inc. et al.*, Civil Action No. 22-7326 (D.N.J.)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

_____

UNITED STATES OF AMERICA,　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　　　Plaintiff,　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　v.　　　　　　　　　　　　　)　　　Civil Action No.  2:22-cv-07326
　　　　　　　　　　　　　　　　　　)　　　(MCA) (LDW)
ALDEN LEEDS, INC., *et al.*　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　　　Defendants.　　　　　)
　　　　　　　　　　　　　　　　　　)
PASSAIC VALLEY　　　　　　　　　　)
SEWERAGE　　　　　　　　　　　　　)
COMMISSIONERS, *et al.,*　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　　　Intervenors.　　　　　)
_____)

**<u>DECLARATION OF MICHAEL SIVAK</u>**

I, Michael Sivak, hereby make the following declaration pursuant to 28

U.S.C. § 1746:

1. I submit this Declaration in support of the United States' Motion to Enter

Consent Decree.

2. I am a Life Scientist/Branch Supervisor at the United States

Environmental Protection Agency ("EPA"), Region 2. I am presently employed as

the Manager of the Passaic, Hackensack, and Newark Bay Remediation Branch of

Region 2's Superfund and Emergency Management Division. In this position, I

oversee EPA's work at many Superfund sites located at or near Newark Bay and/or

the Passaic and Hackensack Rivers.

3. I have been employed by EPA as a Life Scientist since May 9, 1999. Prior to working at EPA, I worked as a toxicologist for the Maryland Department of the Environment from 1996 to 1999 and in the consulting field from 1989 to 1996.

4. I earned a bachelor's degree in chemistry from the Pennsylvania State University in 1989 and a Master of Science from the University of Pittsburgh's Graduate School of Public Health in 1994. During my employment with EPA, I have taken numerous courses and seminars for the purpose of enhancing the skills related to my duties as a risk assessor/toxicologist and as a manager.

5. Before becoming a branch supervisor at EPA, I was an EPA risk assessor for over 12 years. During this time, I provided human health risk assessment and toxicological expertise on over 80 Superfund remedial and removal sites. I was the co-chair of EPA's Risk Inhalation Workgroup that in 2009 developed the national guidance document, "Risk Assessment Guidance for Superfund Volume I: Human Health Evaluation Manual (Part F, Supplemental Guidance for Inhalation Risk Assessment" (EPA-540-R-070-002, OSWER 9285.7-82). I was one of the original co-chairs of the OSWER Human Health Risk Assessment Forum (OHHRRAF), a group of EPA Superfund and RCRA risk assessors assembled to promote dialogue, consistency, innovation and training in all matters of human health risk assessment. Since approximately 2011, I have been the OHHRAF representative to EPA's National Remedy Review Board, providing human health risk assessment and toxicological expertise to ensure national consistency with national guidance and policy and regulation in these areas at dozens of complex sites across the

country. I have also served as an ad hoc member of EPA's Contaminated Sediment Technical Advisory Group, providing human health and toxicological expertise on complex sediments sites, ensuring these sites consider human health risk assessment consistent with national guidance, policy and regulation.

6. I have worked as a supervisor on the Diamond Alkali Superfund Site ("Site") since May 2015. Among other duties, I am responsible for overseeing the planning and management of all aspects of the Site cleanup. I oversaw the issuance of two Records of Decision ("RODs") for the Lower Passaic River portion of the Site – the 2016 ROD for the Lower 8.3 miles and the 2021 ROD for an interim remedy in the upper 9 miles of the Lower Passaic River Study Area. I am currently overseeing the remedial design work related to the Lower Passaic River portion of the Site. I also oversee investigation and cleanup work on all other aspects of the Site, including the Newark Bay Study Area and the former facility located at 80-120 Lister Avenue, in Newark, New Jersey.[1] I am familiar with records and files in EPA's possession relating to the Diamond Alkali Superfund Site. I either have personal knowledge of the matters stated herein or have reviewed documents in EPA's files relating to these matters created and maintained in the regular course

_____

[1] EPA has not yet selected a remedial action, *i.e.* cleanup plan, for the Newark Bay Study Area, which is Operable Unit 3 of the Site. OxyChem, under an administrative order on consent with EPA, performed a remedial investigation and is currently performing a feasibility study for the Newark Bay Study Area. As for the status of the cleanup of the former facility, which is Operable Unit 1 of the Site, under EPA oversight OxyChem performed the cleanup selected in the 1987 Record of Decision, which is an interim remedy. EPA is currently looking at technologies that can be considered for a final cleanup plan.

of its business activities.

## Risk Assessment and the Site Cleanup Process

7. CERCLA, commonly known as the Superfund law, was enacted by Congress on December 11, 1980. Among other things, this law provides broad federal authority to clean up uncontrolled or abandoned hazardous waste sites as well as accidents, spills, and other emergency releases of pollutants and contaminants into the environment.

8. CERCLA investigations and cleanups follow, to the extent practicable, the National Oil and Hazardous Substances Pollution Contingency Plan (more commonly known as the National Contingency Plan or "NCP"), promulgated pursuant to Section 105 of CERCLA, 42 U.S.C. § 9605, codified at 40 C.F.R. Part 300, et seq., including all amendments thereto. The NCP provides the guidelines and procedures to respond to releases and threatened releases of hazardous substances, pollutants, or contaminants.

9. In addition to EPA's authority to undertake response actions, under CERCLA Section 104, potentially responsible parties may, under a settlement with EPA or the United States, conduct certain response actions in accordance with CERCLA Section 122, if EPA determines that the action will be done properly and promptly.

10. CERCLA authorizes two kinds of response actions: 1) actions taken to address releases or threatened releases requiring prompt response (short-term removals), and 2) actions that permanently and significantly reduce the risks

associated with releases or threatened releases of hazardous substances that are serious, but not so urgent as to require an immediate response (long-term remedial response actions). Long-term remedial response actions can be conducted only at sites listed on EPA's National Priorities List (NPL), which is the list of the sites that are a priority for EPA to address, among the known releases or threatened releases of hazardous substances, pollutants, or contaminants throughout the United States. The Diamond Alkali Site, which includes the Lower Passaic River, is one such site and as noted above, is listed on the NPL.

11. A "site" is not limited by property boundaries, but includes the location of a release or releases of hazardous substances and wherever such hazardous substances have come to be located.[2] Like all Superfund sites, the Diamond Alkali Site is defined by the areal extent of contamination, so while the Diamond Alkali facility was the first area to be addressed, EPA investigated how the contamination spread to the Lower Passaic River and Newark Bay. The geographic extent of the Diamond Alkali Site and the cleanup are defined by the presence of dioxin and other contaminants of concern ("COCs")[3] released from the Diamond Alkali facility

---

[2] *See* EPA, Clarifying the Definition of "Site" Under the National Priorities List, https://semspub.epa.gov/work/HQ/174025.pdf  (May 1996)

[3] Three terms are used to describe lists of chemicals identified in the human health and ecological risk assessment processes. Contaminants of potential concern, COPCs, are chemicals evaluated in the human health risk assessment; contaminants of potential ecological concern (COPECs) are evaluated in the ecological risk assessment; and contaminants of concern (COCs) are those COPCs and COPECs identified in the Record of Decision as contributing unacceptable levels of risk. "Chemicals" may also be used instead of "contaminants".

that was operated by OxyChem's predecessor.  It is not a given that in the absence of the Diamond Alkali operations and releases, the Lower Passaic River, on its own, would have been listed on the NPL or if so, what remedial action would be appropriate.

12. After a site is listed on the NPL, EPA (or the state, if it is acting as lead agency) or a potentially responsible party ("PRP") with oversight provided by EPA performs a remedial investigation and feasibility study ("RI/FS") for the site as a whole, or for an operable unit of the site, which is a discrete portion of the site. The investigation and cleanup of a site can be divided into a number of operable units, depending on the complexity of the problems associated with the site.

13. During an RI/FS or focused feasibility study, the lead agency (EPA or the state) either gathers or oversees the PRP(s)'s gathering of information to support and inform its evaluation of which cleanup option (remedial alternative), if any, is most appropriate for a given site or operable unit. In general, the RI serves as the mechanism for collecting data to characterize site conditions, determine the nature of the waste, assess risk to human health and the environment, and conduct treatability testing to evaluate the potential performance and cost of the treatment technologies that are being considered. The RI provides an element of the scientific and legal basis for identifying a remedial action under CERCLA and identifies contaminants and the exposure pathways that would need to be addressed by the remedial action.

14. In characterizing the site or operable unit, the lead agency or PRP

identifies the source of contamination, potential routes of migration, and current and potential human and ecological receptors, which are organisms, such as humans or animals, which come into contact with environmental contamination through normal activities. As will be explained in more detail throughout this declaration, this is the point in the process at which the lead agency or PRP conducts a baseline risk assessment that estimates what risks the site or operable unit poses now and would pose in the future if no cleanup action were taken. The risk assessment identifies the chemicals that are present at unacceptable levels (which are called the contaminants of concern, or "COCs" in the ROD), the contaminated media where the COCs are found, and how people or ecological receptors are exposed to them. COCs typically have differing levels of toxicity and risk depending on the type of receptor (e.g., ecological receptors and human health receptors). In the Superfund remedy selection process, EPA separately evaluates ecological risk[4], cancer risk to humans, and non-cancer human health risks, and EPA may take remedial action based on any of those discrete risk profiles.

15. EPA's remedy selection process is site-specific and uses the human health and ecological risks posed by a Superfund site to determine whether or not a remedial action is warranted. If the risks are determined to exceed acceptable levels as defined in the NCP, then a feasibility study ("FS") is conducted to evaluate alternatives to mitigate the unacceptable risks to within acceptable levels. In the

---

[4] For the sake of simplicity, in this declaration, the term "risk" is used for human health cancer risks, human health non-cancer hazards/risks, and ecological hazards/risks.

FS, remedial action objectives are developed, and each remedial action objective is associated with an unacceptable risk identified at the site. This effort clearly links the chemicals, media, and exposures that are associated with unacceptable risk to a goal, or objective, of the remedial action. A preliminary remediation goal ("PRG"), which is a numerical performance metric, is then identified to demonstrate when the remedial action objective has been achieved. A preliminary remediation goal is the concentration of a chemical in an exposure area that results in a level of risk that is protective of human health and the environment.

16. The FS portion of the RI/FS also involves the identification and detailed evaluation of potential remedial alternatives, i.e. different options for cleaning up a site. The alternatives are evaluated against the NCP evaluation criteria and compared with each other to gauge their relative performance. Each alternative that makes it to this stage of the analysis, with the exception of the required "No Action" alternative, should be protective of human health and the environment and compliant with applicable or relevant and appropriate requirements ("ARARs"), which are federal or state laws or standards that apply specifically to or are developed to address problems sufficiently similar to the situation being addressed. The remedial alternatives include various technologies that can meet the objectives of the remedial action and achieve the PRG for the remedial action objectives.

17. When the FS stage is complete, the lead agency identifies its preferred alternative for a site or operable unit and presents it to the public in a Proposed Plan. The Proposed Plan briefly summarizes the alternatives studied in the detailed

analysis phase of the RI/FS, highlighting the key factors that led to identifying the preferred alternative. The Proposed Plan, as well as the RI/FS and the other information that forms the basis for the lead agency's response selection, is made available for public comment in the administrative record file. The lead agency must also provide opportunity for a public meeting at this stage.

18. Following receipt of public comments, the lead agency selects and documents the remedy selection decision in a Record of Decision ("ROD"). The ROD documents the remedial action plan for a site or operable unit and serves the following three basic functions: 1) it certifies that the remedy selection process was carried out in accordance with CERCLA and, to the extent practicable, with the NCP; 2) it describes the technical parameters of the remedy, specifying the methods selected to protect human health and the environment including treatment, engineering, and institutional control components, as well as cleanup levels; and 3) it provides the public with a consolidated summary of information about the site and the chosen remedy, including the rationale behind the selection.

## Superfund Risk Assessments, Generally

19. As explained on EPA's website, "EPA considers risk to be the chance of harmful effects to human health or to ecological systems resulting from exposure to an environmental stressor [which is] . . . any physical, chemical, or biological entity that can induce an adverse effect in humans or ecosystems."[5] Superfund risk

_____

[5] EPA, About Risk Assessment, https://www.epa.gov/risk/about-risk-assessment#whatisrisk (last visited Dec. 7, 2023).

assessment generally consists of two types: human health and ecological. Human health risk assessment looks at carcinogenic and non-carcinogenic, also called systemic, risks to human health, such as reproductive, kidney, neurological or developmental effects. Ecological risk assessment looks at risks to fish, birds, mammals, and other organisms such as those that may live in sediment, e.g. benthic organisms. Such risks include mortality, reduction in growth, reproductive impairment, and bioaccumulation of chemicals in organisms.

**Human Health Risk Assessment**

20. EPA issued risk assessment guidance in 1989 that discusses how to conduct a human health risk assessment for a Superfund site: "Risk Assessment Guidance for Superfund Volume I Human Health Evaluation Manual (Part A)."[6]  In 2001, EPA issued supplemental guidance that standardized the reporting of information in the risk assessment: "Risk Assessment Guidance for Superfund Volume I Human Health Evaluation Manual (Part D, Standardized Planning, Reporting, and Review of Superfund Risk Assessments)."[7]

21.  EPA's risk assessment guidance sets forth a four-step process to conduct a human health risk assessment. The four parts of a human health risk assessment are: (1) a data evaluation called hazard identification, (2) an exposure assessment,

---

[6] EPA, "Risk Assessment Guidance for Superfund Volume I Human Health Evaluation Manual (Part A), https://www.epa.gov/sites/default/files/2015-09/documents/rags_a.pdf

[7] EPA, Risk Assessment Guidance for Superfund Volume I Human Health Evaluation Manual (Part D, Standardized Planning, Reporting, and Review of Superfund Risk Assessments), https://semspub.epa.gov/work/HQ/175137.pdf

(3) a toxicity assessment, and (4) a final risk characterization. At the most basic

level, risk is a function of exposure and toxicity, which means that the amount of

risk is directly related to the intensity of exposure to a given chemical and the level

of toxicity associated with each chemical.

22. Hazard identification is the first step and involves reviewing all

environmental data collected during the Superfund RI, which as described above is

the major data collection step in EPA's process to delineate the contamination and

determine how a site should be cleaned up. During the hazard identification step,

risk assessors identify the nature and extent of contamination to come up with a list

of chemicals present at the site and focus that list of chemicals to those that require

further evaluation in the risk assessment because they are the most likely to

present an unacceptable human health risk. The screening process used to create

the focused list of chemicals, the COPCs, includes considering the chemicals: that

are detected most frequently in each part of the environment that can contain

contaminants, such as soil, sediment, surface water, or fish/crab tissue; that are

found at the highest concentrations or levels; and that are the most toxic or have

the greatest potential to cause adverse health effects.

23. Exposure assessment is the second step. In this step, risk assessors

identify all populations currently or reasonably expected to be present in the future

at the site, such as adult and child residents, commercial and industrial workers,

people who fish or crab for subsistence or recreationally, and people who use the site

for recreation. Risk assessors also identify pathways of exposure or potential

11

exposure in this step, which may include, for example, subsistence or recreational ingestion of fish or crab tissue, dermal contact with soil or sediment while recreating, or incidental ingestion of surface water while swimming.

24. Toxicity assessment is the third step. The human health risk assessment evaluates cancer and non-cancer health effects, which include developmental, reproductive, liver, kidney, and all other health effects. The toxicity values provide a benchmark or comparison value against which EPA can evaluate the exposure at a site or operable unit, to assess the potential for adverse health effects as a result of site exposure. EPA issued guidance in 2003 ("Human Health Toxicity Values in Superfund Risk Assessments" [8]) that identifies a hierarchy of sources to obtain both cancer toxicity values and non-cancer toxicity values for hazardous substances.

25. Risk characterization is the fourth and final step in the human health risk assessment process. In this step, the risk assessors combine information from the hazard identification, exposure assessment and toxicity assessment (i.e., the chemicals that required further evaluation, the populations currently exposed and that may be exposed in the future, and the cancer and non-cancer toxicity of each chemical) to present a quantitative numerical representation of risk for each chemical at a site. This section of the risk assessment also includes a robust discussion of the uncertainty in each step of the process, in order to define the confidence in the risk estimates. For example, if toxicity values were not available

---

[8]EPA, "Human Health Toxicity Values in Superfund Risk Assessments"
https://www.epa.gov/sites/default/files/2015-11/documents/hhmemo.pdf

for certain chemicals, the risk assessors would note that uncertainty in the toxicity assessment and would document that the uncertainty creates an underestimation of risk.

26. For cancer effects, the risk is presented as a probability of additional incidences of cancer within a population that is exposed under the same conditions as presented in the Exposure Assessment (described above in Paragraph 23). For example, a cancer risk may be presented as 4 in 10,000, which means that 4 additional incidences of cancer are potentially expected, above those cancers that would be identified without any site-related exposure, when people are exposed under the scenario described in the exposure assessment. Section 300.430(e)(2)(i)(A)(2) of the National Oil and Hazardous Substances Pollution Contingency Plan ("NCP"), which contains CERCLA's implementing regulations, identifies the risk range that guides EPA in establishing cleanup goals. Generally, action is not warranted when cancer risks are below 1 in 1 million ($10^{-6}$), whereas action generally would be warranted when cancer risks are greater than 1 in 10,000 ($10^{-4}$). When risks are within this range, action is typically not needed, but may be taken if site-specific circumstances, such as sensitive populations at risk, warrant the action.

27. For non-cancer effects, the potential for adverse health effects is presented as a number, which represents a ratio of the level of exposure expected at the site compared to the maximum level of exposure that can occur without adverse health effects. That number is known as a hazard quotient. A hazard quotient above

13

1 indicates a level of exposure at the site that could lead to adverse health risks, while a hazard quotient equal to or below 1 indicates a level of exposure at which no adverse health effects would be expected. The potential for adverse health effects increases as the hazard quotient increases.

28. The cancer risks from each chemical for each exposure pathway are then added. The result is the aggregate cancer risk to a population from a given chemical across all potential exposure pathways. Separately, the same summation is done for non-cancer risks.

## Ecological Risk Assessment

29. EPA developed guidance for conducting ecological risk assessments in 1998, "Guidelines for Ecological Risk Assessment"[9], which identifies a three-step process to evaluate potential risks to ecological receptors such as benthic organisms (organisms that live in sediment), fish, birds, and mammals. The three-step process includes (1) problem formulation, (2) analysis, and (3) risk characterization.

30. Problem formulation, the first step, is a qualitative evaluation of contaminant release, migration, and fate. The goal is to understand how the contaminant moves from the source to an ecological organism, whether the concentration, or amount, of the contamination declines (for example, through dilution) through this process, how the ecological organism comes into contact with the chemical, what the impacts are to the organism, what are known ecological

---

[9] EPA, "Guidelines for Ecological Risk Assessment",
https://www.epa.gov/sites/default/files/2014-11/documents/eco_risk_assessment1998.pdf

effects of the contaminants, and what are contaminants of potential ecological concern ("COPECs"), which are those chemicals that are most likely to be associated with adverse impacts to ecological organisms.

31. The second step focuses on analysis and includes two main activities: characterization of exposure, and characterization of ecological effects. These activities involve: a quantitative evaluation of contaminant release, migration, and fate of each COPEC and a characterization of exposure pathways and receptors; and a measurement or estimation of exposure point concentrations for the COPECs. The outcome of this step is an understanding of the receptor and exposure and the relationship between the two.

32. The third and final step is risk characterization, which includes measurement or estimation of both current and future adverse effects, identification of those COPECs most likely to be associated with ecological impacts, and evaluation of the level of certainty, or confidence, in the risks that are estimated. Unlike human health risk assessment, the ecological risk assessment focuses only on non-cancer effects to the environment and not on cancer endpoints, and considers ecological population impacts and not effects on an individual within the population.

## Risk Assessments for the Diamond Alkali Site

### Human Health Risk Assessment for OU2 and OU4 of the Diamond Alkali Site

33. Consistent with EPA guidance, a baseline human health risk assessment ("BHHRA") was completed for Operable Unit 2 ("OU2") and Operable Unit 4

("OU4") of the Diamond Alkali Site.[10] A BHHRA is developed to assess risks under a "baseline" condition, i.e., absent any remedial action. In each case, the risk assessors executed the four steps described in Paragraphs 21 to 25 above. In the hazard identification step, the risk assessors selected COPCs to be further evaluated in the BHHRA. These chemicals included: contaminants considered to be the most bioaccumulative, i.e. those which accumulate as they move up the food chain, from organisms that live in the sediment, to fish, birds and mammals that eat those organisms, to people who eat the fish, birds and mammals; contaminants most persistent in the environment; and contaminants most toxic to people, when considering their frequency of detection and those detected at the highest levels. In each case, the COPCs for both OU2 and OU4 were identified as dioxin/furans, PCBs, several pesticides, polyaromatic hydrocarbons ("PAHs") and several metals.

34. For the OU2 and OU4 HHRA, the exposure assessment for each operable unit identified adults (over 18 years), adolescents (7 to 18 years) and young children (under 7 years) exposed to COPCs as a result of catching and consuming fish or crab. Other scenarios such as people using the river for recreation were also evaluated in the OU4 HHRA.

35. In each BHHRA, the toxicity assessment included a summary of the cancer toxicity values used in the assessment along with the source of the information. EPA has determined that dioxins and PCBs, along with other COPCs,

---

[10] OU2 ROD at pages 21-34 and OU4 ROD at pages 23-31.

have carcinogenic potential. The toxicity values for these chemicals were selected following the toxicity hierarchy identified in the EPA guidance document referenced above in Paragraph 24.

36. The toxicity assessment in each BHHRA also included a summary of the non-cancer toxicity values and the source of the toxicity information for mercury, PCBs and dioxins/furans and other COPCs. The non-cancer health effects of total PCBs include effects on the immune system and eyes, and the effects for dioxins/furans include dermal, developmental, immunological and reproductive impacts. Risk assessors use dioxin toxicity equivalence factors (TEFs) to evaluate dioxins/furans (TCDD TEQ [D/F]) and dioxin-like PCBs (TCDD TEQ [PCBs]), which are PCBs that have chlorine atoms in positions that allow them to act similar to dioxins, based on the approach published in 2005 by the World Health Organization.[11] . To set the remediation goals for dioxin and PCBs, EPA identified sediment concentrations that are protective for people who consume fish and sediment concentrations that are protective for people who consume crab. The sediment concentration that was more protective (the lower of those two values, namely the value based on fish consumption) was identified as the concentration that was protective of both fish and crab consumption.[12]

37. The risk associated with ingestion of fish and crab was greater than the 1

---

[11] EPA, "Recommended Toxicity Equivalence Factors (TEFs) for Human Health Risk Assessments of 2,3,7,8-Tetrachlorodibenzo-p-dioxin and Dioxin-Like Compounds", https://rais.ornl.gov/documents/dioxin_tef.pdf

[12] OU2 ROD at Table 25 https://semspub.epa.gov/work/02/396055.pdf

in 10,000 ($10^{-4}$) cancer risk that typically would warrant remedial action at a site or operable unit, as set forth in the NCP. For OU2[13], the primary contributors to the excess cancer risk are dioxins/furans and dioxin-like PCBs (approximately 81 percent for fish consumption and approximately 94 percent for crab consumption), and PCBs (approximately 16 percent for fish consumption and approximately 5 percent for crab consumption). The other COPCs combined contributed approximately 3 percent to the excess cancer risk for fish consumption and approximately 1 percent to the excess cancer risk for crab consumption. For OU4[14], the primary contributors to the excess risk are dioxins/furans and dioxin-like PCBs (approximately 68 percent for fish consumption and approximately 77 percent for crab consumption) and PCBs (approximately 30 percent for fish consumption and approximately 20 percent for crab consumption). The other COPCs combined contributed approximately 2 percent to the excess cancer risk for fish consumption and approximately 10 percent to the excess cancer risk for crab consumption.

38. For OU2[15], the non-cancer risk values, or hazard index[16], for a child who eats fish or crab (the most sensitive receptor) were significantly above a hazard index of 1, which as explained in Paragraph 27 is the level of exposure at which no

---

[13] OU2 ROD at page 29 https://semspub.epa.gov/work/02/396055.pdf

[14] OU4 ROD at pages 29-30. https://semspub.epa.gov/work/02/630399.pdf

[15] OU2 ROD at pages 29-30.

[16] A hazard quotient is a chemical-specific ratio. A hazard index is the sum of all hazard quotients developed for the chemicals at a site or operable unit.

adverse health effects would be expected.[17] The results for an adult or an adolescent also were above a hazard index of 1. Dioxins/furans and PCBs contribute more than 98% of the risk. For OU4[18], the non-cancer health risks for the child who eats fish or crab (the most sensitive receptor) were significantly above a hazard index of 1.  The results for an adult or an adolescent also were above a hazard index of 1. Dioxins/furans and PCBs contribute more than 96% of the risk.

**Ecological Risk Assessment for OU2 and OU4 of the Diamond Alkali Site**

39.  A baseline ecological risk assessment ("BERA") was performed for OU2 and OU4 of the Diamond Alkali Site.[19] Both assessments followed the 3-step process described in Paragraphs 30 to 32.

40. The OU2 BERA used sediment samples collected from the top six inches of sediment, as well as fish and crab tissue samples. COPECs identified from these data included dioxin/furans, PCBs, DDx (the total of three types of DDT-like pesticides), dieldrin, PAHs, copper, lead, and mercury. The OU2 BERA[20] found that risks to organisms other than crabs that live in the sediments were highest for

---

[17] The NCP 300.430(e)(2)(i)(A)(1) states, "[f]or systemic toxicants, acceptable exposure levels shall represent concentration levels to which the human population, including sensitive subgroups, may be exposed without adverse effect during a lifetime or part of a lifetime, incorporating an adequate margin of safety." EPA guidance, "Rules of Thumb for Superfund Remedy Selection (EPA 540-R-97-013, OSWER 9355.69, 1997) defines this as a concentration associated with a hazard quotient of one.

[18] OU4 ROD Table 7-5a and Table 7-6a.

[19] OU2 ROD at pages 34-40 and OU4 ROD at pages 32-36

[20] OU2 ROD page 38.

dioxins, DDx, and PCBs. For crabs, dioxins and PCBs were found to contribute most significantly to the risk. Risks to fish were highest for copper, PCBs and dioxins. For fish-eating birds, dioxins contributed most substantially, while for mammals, dioxins, PCBs and mercury were the most significant contributors.

41. The OU4[21] BERA used sediment and fish data and identified the same COPECs as the OU2 BERA. The OU4 BERA found that risks to organisms other than crabs that live in the sediments were highest for dioxin and PCBs. For crab, dioxin and PCBs contributed most substantially to risk levels. Risks to fish were highest for dioxin and PCBs. For fish-eating birds, dioxin and DDx contributed the most significant risk. For mammals, DDx, dioxin and PCBs were the most significant contributors to risk.

**EPA's Use of Risk Assessment in Selecting the OU2 and OU4 Remedies**

42. The remedy selected in the ROD for OU2 addresses the risks associated with the contaminated sediments in the lower 8.3 miles of the Lower Passaic River. The interim remedy selected in the ROD for OU4 addresses sediment source areas, focusing on 2,3,7,8-TCDD and PCBs, within the upper 9 miles of the Lower Passaic River, after which the river will be monitored to assess response to the source removal action and recovery toward risk-based cleanup goals.

43. Those COPCs and COPECs identified in the risk assessments for OU2 and OU4 as posing the greatest risk are referred to as COCs in each ROD and are

---

[21] OU4 ROD Table 7-8

the primary focus of the cleanup. Dioxins and PCBs are the primary COCs, due to the human health and ecological risks associated with them. Of all the COCs in the Lower Passaic River, dioxin is the most toxic by far, and dioxin drives the risks to human health and the environment that are addressed by the remedies selected for OU2 and OU4.

## How Risk Assessments Differ from the AlterEcho Allocation

44. In 2017, EPA retained AlterEcho as a third-party neutral to perform an allocation that would assign non-binding shares of responsibility to the private parties notified by EPA as PRPs for the Lower Passaic River, and to determine relative groupings, or tiers, of responsibility. AlterEcho issued its Allocation Recommendation Report at the end of December 2020. The Allocation Recommendation Report recommends relative shares of responsibility for each allocation party's facility or facilities evaluated in the allocation.

45. To allocate responsibility among the allocation parties, AlterEcho calculated the mass of each COC that each facility released to the River and then applied factors – called the "Relative Risk Numbers" – to those masses.[22]

46. In the EPA Superfund risk assessment process, risk is the result of exposure to a contaminant and the toxicity of the contaminant; in other words, risk is a function of exposure and toxicity. The allocation is not a risk assessment at all.

---

[22] Allocation Recommendation Report at pp. 18-19 (ARR0018-19) ("The determination of an allocation share for each Allocation Party was made through an analysis of an Allocation Party's contribution of each COC to OU2 sediments, as weighted by the relative risk each COC poses to human health and the environment, and other relevant equitable factors.").

Rather, the allocation incorporated the results of the OU2 and OU4 risk assessments. AlterEcho stated that "[w]hile this approach relies on the human health and ecological risk assessments performed for OU2 of the Site, it is not a risk assessment in itself."[23]

47. As described in the Allocation Protocol, to calculate the Relative Risk Numbers, AlterEcho started with EPA's calculation in the OU2 risk assessments of each COC's percent contribution to human health cancer risk, human health non-cancer risk and ecological risk.[24] Next, AlterEcho updated these values to incorporate more recent data from OU4.[25] Last, AlterEcho averaged the risks posed by each COC to human health (cancer), human health (non-cancer), and ecological health to create the Relative Risk Numbers used in the allocation.[26] AlterEcho calculated the Relative Risk Numbers for the sole purpose of determining each allocation party's share of responsibility, not for risk assessment.

48. In the allocation, the Relative Risk Numbers incorporate the relative toxicity for the COCs and in particular, as explained in more detail below, show that dioxin contributes the majority of the environmental harm in the Lower Passaic River, with PCBs contributing the next highest amount of harm. Each of

---

[23] Methodology for Determination of the Relative Rank of OU2 Contaminants of Concern for the Purpose of Allocation (Attachment A to Allocation Protocol [which is Attachment H to Allocation Recommendation Report]) [hereinafter "RRN Method"] at page 3 (ARR0321).

[24] Allocation Recommendation Report at p. 32 (ARR0032); *see also* RRN Method.

[25] RRN Method at pp. 6-7 (ARR0324-25).

[26] *Id.* at p. 4 (ARR0322).

the chemicals that are COCs for the Lower Passaic River can produce non-cancer impacts to human health (such as reproductive issues, developmental issues, or kidney problems) and some of those chemicals are known or suspected carcinogens. These chemicals can also produce adverse effects in ecological receptors, such as organisms that live in the sediment or feed in the sediment. Focusing only on the five COCs identified in the risk assessments as being associated with unacceptable risk, the table below shows the EPA-approved cancer toxicity factors and non-cancer toxicity factors have been peer-reviewed and are used in EPA-conducted and approved human health risk assessments at all Superfund sites. The toxicity values are found in Table A-3 in Attachment A to the Allocation Protocol (Attachment H to the Allocation Report) but were also used in the BHHRAs completed for OU2 and OU4.

| Chemical | Human Health Cancer Toxicity Factor | Human Health Non-Cancer Toxicity Factor |
| --- | --- | --- |
| DDx | | |
| DDD | 0.24 | 0.00003 |
| DDE | 0.34 | 0.0003 |
| DDT | 0.34 | 0.0005 |
| Dieldrin | 16 | 0.00005 |
| 2,3,7,8-TCDD | 150000 | 0.0000000007 |
| Mercury | (no cancer toxicity factor is available) | 0.0001 |
| PCBs | 2 | 0.00002 |

49. For the cancer toxicity factor, a larger number means that the chemical is more carcinogenic. However, for the non-cancer toxicity factor, a smaller number means that exposure to the chemical has a greater chance to result in an adverse health effect. As is clearly shown in the table, 2,3,7,8-TCDD is the most potent and

toxic of the five COCs associated with human health, and by an overwhelming margin. 2,3,7,8-TCDD poses the greatest risk to human health, relative to the other COCs.

50. The ecological effects from exposure to the COCs show a similar outcome. The information below from Table 4-12 in Appendix D of the OU2 Risk Assessment illustrates one of the sediment benchmarks (a chemical concentration in sediment associated with an adverse health effect for the organism living or feeding in the sediment) for the major COPECS identified in the BERA. The lower the benchmark value, the more toxic the chemical is to the receptors. The table shows that dioxin is the most toxic of these chemicals.

| Chemical | Sediment Benchmark (in units of parts per billion) |
|---|---|
| Copper | 32 |
| Lead | 30 |
| Mercury | 0.14 |
| Low Molecular Weight PAHs | 0.55 |
| High Molecular Weight PAHs | 1.7 |
| Dieldrin | 0.00083 |
| Total DDx | 0.0016 |
| Total PCBs | 0.035 |
| 2,3,7,8-TCDD | 0.0000032 |

51. As discussed above, the risk assessments are performed during the remedial investigation, once the nature and extent of contamination (what chemicals are present and where are they) and the fate and transport of contamination (how does the contamination move and where does it go) are identified. The risk assessments allow EPA to answer the questions, "What are the current risks now? What are the risks in the future if no remedial action is taken?"

24

If those risks are above acceptable limits as indicated in the NCP, then the feasibility study is developed to identify potential ways to mitigate, or reduce, the unacceptable risks to within acceptable levels.

52. The Relative Risk Numbers used in the allocation were developed by AlterEcho for a completely different purpose, and they were developed following a different method than the method used to conduct risk assessments. Since the COCs in sediments had been identified by the risk assessments, the allocation drew upon the information from the risk assessments and looked at what the relative contribution of each of the COCs, compared to the other COCs, was to the total risk identified for the river. The Relative Risk Numbers were used in the allocation to determine responsibility for contamination presently in the river, not to evaluate risk for the purpose of deciding whether a cleanup is warranted or what the appropriate cleanup would be.

53. For the allocation, AlterEcho calculated the Relative Risk Numbers by combining EPA's ecological and human health risk profiles for the sole purpose of quantifying each allocation party's share of responsibility. In Superfund risk assessment, risk profiles are not combined in this way. Adding together the human health cancer risk, human health non-cancer risk, and ecological risk would not be done as part of a risk assessment, which is focused on identifying unacceptable risks and informing remedy selection. The allocation is not a risk assessment and is not considering the same questions. In performing the allocation, AlterEcho was focused on recommending shares for the level of responsibility the allocation parties have

25

individually for the contamination that needs to be addressed.

54. The OU2 and OU4 risk assessments used data collected for the purpose of risk assessment while the allocation used data, results, and reports that were collected over decades and for various reasons and at the request or requirements of different agencies. Over the past few decades, analytical methods have become more sophisticated and increasingly sensitive, allowing for lower detection limits, reducing analytical inferences that might lead to results that are biased low or biased high, and improving the analytical instruments' ability to detect many different forms of dioxin. This is important because there are many different forms of dioxin and PCBs. Because the form influences the toxicity, identifying the presence and amount of the different forms allows for the risk assessment to characterize more accurately the risk from exposure to these different forms. The OU2 and OU4 HHRA and ERA did this.

55. The OU2 and OU4 risk assessments were developed in accordance with EPA guidance that requires consideration of both current and potential future risks. The risk estimates and exposure assumptions presented in the OU2 and OU4 ROD (OU2 ROD, pages 24-26, OU4 ROD, pages 25-27), and used by AlterEcho to develop the RRNs, considered both current and future risks.

56. The OU2 and OU4 risk assessments were developed in accordance with EPA guidance on defining the nature and extent of contamination that recommends evaluation of dioxin-like PCBs if there is reasonable basis for these chemicals to be present. The risk assessments were able to do this because the vast majority of the

26

data used in the risk assessments were collected by EPA or under EPA oversight following an EPA-approved Quality Assurance Project Plan, which required that samples be analyzed for the different forms of dioxin and PCBs so that dioxin-like PCBs could be evaluated. Conversely, the information and data that were available to AlterEcho for use in the allocation were collected for various and different purposes and under analytical methods that have changed over the decades. Thus, AlterEcho did not consistently have information about whether releases of dioxin from allocation facilities contained other forms of dioxin and/or dioxin-like PCBs. The vast majority of PCB concentration data available to the allocator was in terms of PCB Aroclor mixtures, which does not allow for evaluation of dioxin-like PCBs.

57. Another difference between the Relative Risk Numbers developed by AlterEcho for use in the allocation and a Superfund risk assessment is how background contributions are considered. EPA guidance for human health risk assessment does not recommend subtracting anthropogenic background concentrations (RAGS Part A), since "[o]mitting anthropogenic background chemicals from the risk assessment could result in the loss of important information for those potentially exposed." This makes sense, since the risk assessment is conducted to answer the question, "What are the risks from potential exposure?" and exposure includes exposure to background chemicals. On the other hand, the Relative Risk Number calculation in the allocation subtracted background risk to focus on site-related or "incremental" (risk without consideration of background)

risk.[27] Using the Relative Risk Numbers developed for the allocation, AlterEcho

factored into its evaluation of responsibility for each allocation party the risks for

each COC released from the allocation party's facility, relative to the other COCs

present in the sediment as a result of releases from all allocation parties.[28]

58. EPA's risk assessments for OU2 and OU4 are consistent with the

Relative Risk Numbers in that in both, dioxin is identified as the primary risk

driver, followed by PCBs, with the rest of the COCs contributing less risk by an

order of magnitude (or more) than dioxin and PCBs. The allocation Relative Risk

Numbers indicated that dioxin contributes approximately 84% of the environmental

harm to the Lower Passaic River, with PCBs contributing approximately 13% and

the rest of the COCs contributing a total of approximately 3%.

59. I declare, under penalty of perjury, that the foregoing is true and correct.

Executed on this 17th day of January 2024

MICHAEL SIVAK   Digitally signed by MICHAEL SIVAK
Date: 2024.01.17 17:45:15 -05'00'

_____

Michael Sivak
Life Scientist/Branch Supervisor
United States Environmental Protection Agency

_____

[27] *See* RRN Method at p. 6-7 (ARR0324-25).

[28] *See* Allocation Recommendation Report at pp. 18-19 (ARR0018-19) ("The determination of
an allocation share for each Allocation Party was made through an analysis of an Allocation
Party's contribution of each COC to OU2 sediments, as weighted by the relative risk each
COC poses to human health and the environment, and other relevant equitable factors.").