# Exhibit 7

## Declaration of Christopher M. Wittenbrink, J.D.

United States' Motion to Enter Consent Decree,
*United States v. Alden Leeds, Inc. et al.*, Civil Action No. 22-7326 (D.N.J.)

Declaration of Chris Wittenbrink                                      January 29, 2024

## Declaration of Chris Wittenbrink

1.   I, Chris Wittenbrink, hereby make the following declaration pursuant to 28 U.S.C. § 1746.

2.   I have been retained through my firm, CR Consulting, Inc. ("CRC"), by the U.S. Department of Justice, Environmental & Natural Resources Division ("DOJ") to assist it in evaluating the Allocation Recommendation Report, Dec. 2020, ("Allocation Recommendation Report") prepared by AlterEcho under contract to the U.S. Environmental Protection Agency ("EPA").  As part of my retention, DOJ has asked me to provide a declaration addressing aspects of the Allocation Recommendation Report in connection with the DOJ's preparation and submittal of the Proposed Consent Decree for Operable Unit 2 and Operable Unit 4 of the Diamond Alkali Superfund Site, Essex, Hudson, Passaic and Bergen Counties, New Jersey.

3.   My services to the DOJ are based on my extensive experience, training and education.  I am an attorney with an undergraduate degree in environmental biology.  I have conducted forensic historical analyses and allocation analyses for CERCLA and state-lead environmental sites on more than forty different engagements.  I have served as a mediator on allocation issues for multi-party sites.  I was prequalified to serve as an allocator in the EPA's Allocation Pilot Program.  My opinions are provided to a reasonable degree of certainty in the field of allocation.  I reserve the right to supplement this declaration and expand or modify my opinions based on a review of additional material as it becomes available. My curriculum vitae is attached as Appendix A.  Materials supporting this declaration are footnoted herein. I am being compensated at my standard rate of $350 per hour.

4.   The methodologies by which response costs for environmentally impaired sites are allocated are typically founded on generally accepted and standardized allocation principles and criteria.  These principles are the product of case law, agency guidance and policy statements, and trends in settlement/ADR practice.  The industry application of generally accepted allocation principles and criteria is beneficial for all parties involved in or affected by environmental cleanup programs, since they streamline the resolution of allocation disputes and thereby quicken the pace and cost-effectiveness of privately-funded cleanups.  These principles include the concepts of internal consistency, adherence to conventional allocation practice and the capability of reproduction by third parties of calculated allocation percentages.

5.   The scope of my retention in this matter was to assist the DOJ in evaluating critical comments received from Occidental Chemical Corporation ("OxyChem") on the Allocation Recommendation Report.  To conduct this analysis I was provided limited materials including the Allocation

Declaration of Chris Wittenbrink                                    January 29, 2024

Recommendation Report and attachments, access to an on-line document repository containing non-confidential allocation supporting documents and public comments on the proposed Consent Decree, and other publicly available documents.  I did not have access to any allocation process-related documents such as position papers or confidential communications between the allocator and the participating allocation parties.

6.    My opinions herein are informed from review of that available record.  This includes comments submitted to the DOJ from OxyChem in opposition to the proposed settlement and entry of the Proposed Consent Decree.[1]  OxyChem's comments address multiple topics including legal, technical and allocation-related issues.  In support of its comments, OxyChem included 600 pages of declarations from twelve experts in various areas. My declaration does not address all of the comments and issues raised by OxyChem.  I do address allocation issues raised by OxyChem which I have specifically discussed with DOJ as summarized below.

7.    In the course of my review and assistance to the DOJ, CRC recreated a version of the AlterEcho allocation database based upon information provided in the Allocation Recommendation Report and attachments thereto.  This database assisted me in the review of comments provided by OxyChem.

8.    In the context of OxyChem's comments, my review generally focused on whether, in my experience, the AlterEcho allocation methodology is consistent with allocation practice.  Because I did not participate in the allocation process or review the entire file of allocation materials, I cannot opine on certain issues such as whether the AlterEcho Allocation Recommendation Report results are appropriate; that other allocation approaches could not be applied; or otherwise endorse the Allocation Recommendation Report's formula and results.

## Summary of Opinions

9.    My opinions reflected herein are summarized below.  A more complete discussion of these topics is provided in the remainder of this declaration.

a.    The AlterEcho Allocation's reliance on risk (i.e., toxicity) is consistent with allocation factors applied at other sites;

b.    The DOJ/EPA adoption of the Alternative Allocation methodology is reasonable, taking into account application of equitable factors;

---

[1] OxyChem Comments to the Proposed Consent Decree, Mar. 22, 2023.

Declaration of Chris Wittenbrink                                    January 29, 2024

     c.      AlterEcho's Relative Risk Number ("RRN") allocation factor reflects its quantification of risk information.  This approach is not inconsistent with allocation practice;

     d.      The Attenuation Factor applied by AlterEcho is unnecessary in the Alternative Allocation approach.  The Alternative Allocation results excluding the Attenuation Factor are identical to the results achieved when the Attenuation Factor is applied;

     e.      In applying the Alternative Allocation approach, revised estimates of OxyChem's dioxin releases do not have a material impact on the allocation results;

     f.      The allocation process used at the Site is consistent with allocation processes used at other sites.  Modifications or changes to the allocation process, such as increased page limits for allocation party submittals, can be appropriate where additional information may be helpful in the allocation process; and

     g.      Allocation tiers are commonly used where the relative allocation shares between parties do not reflect substantive differences and often apply in situations where allocation information is limited.

### Overview of AlterEcho Allocation Approach

10.  EPA intended the AlterEcho Allocation among potentially responsible parties ("PRPs") for OU2 to serve as the basis for cash out settlements for eligible parties and the identification of parties deemed to be work-parties to perform the OU2 remedial action.[2]  EPA's original plan for the allocation contemplated that parties responsible for the release of dioxins, furans, or PCBs would be excluded from the allocation process.  However, after discussions with the PRPs, EPA agreed to move forward with an allocation that included all private PRPs.  The PRPs included in the allocation analysis are referred to as the Allocation Parties ("APs").[3]  There were both participating APs and non-participating APs (e.g., OxyChem).

11.  The allocation process resulted in the analysis of available information including investigative reports, AP related/produced documents and other historical information.  Based on this allocation information, within the framework for the allocation process, AlterEcho determined/estimated the relative ranking of APs taking into account the APs' nexus to the Contaminants of Concern ("COCs") released to the OU2 sediments.

---

[2] U.S. EPA letter, Sep. 18, 2017.
[3] The AlterEcho allocation defines Allocation Party as: "One of seventy-nine (79) entities identified by EPA as a potentially responsible party for Operable Unit 2 of the Diamond Alkali Superfund Site (the Site) and issued a General Notice Letter for one or more particular facility location…", Allocation Recommendation Report, p. 5.

Declaration of Chris Wittenbrink                                    January 29, 2024

12. AlterEcho determined that the COCs driving the remedial action are best assessed based upon the relative risk each COC contributed to the Site. In order to assess the relative risk between COCs, AlterEcho used common allocation factors based on available information.

13. CERCLA allocations often consider various equitable factors. Some equitable factors are commonly referred to as the Gore Factors.[4] The Gore factors are as follows:

> i. The ability of the parties to demonstrate that their contribution to a discharge, release or disposal of a hazardous waste can be distinguished;
> ii. The amount of the hazardous waste involved;
> iii. The degree of toxicity of the hazardous waste involved;
> iv. The degree of involvement by the parties in the generation, transportation, treatment, storage or disposal of the hazardous waste;
> v. The degree of care exercised by the parties with respect to the hazardous waste concerned, taking into account the characteristics of such hazardous waste; and
> vi. The degree of cooperation by the parties with federal, state or local officials to prevent any harm to the public health or the environment.

14. AlterEcho's allocation considered and applied the Gore factors to various levels of importance. For example:

a.      Ability to distinguish releases of COCs – the allocation model assessed each AP as to its nexus and release of COCs based on multiple considerations including nature of operations, material use and handling, proximity, etc.;

b.      Amount of COCs – the Allocation model estimated the mass of each COC released or contributed by each AP;

c.      Toxicity – the Allocation model considered toxicity as reflected in the risk each COC contributes to the Site. AlterEcho's analysis resulted in the development of the allocation-specific Relative Risk Number ("RRN") allocation factor. The RRN incorporated measurements of risk reflected in human health (non-cancer) risk, human cancer risk, and environmental risk;

d.      Degree of Involvement – AlterEcho's allocation did not specifically reference this factor, but noted its allocation is among PRPs who operated or owned facilities adjacent to/or otherwise contributed discharges to the Passaic River waterway;

e.      Care – AlterEcho's allocation incorporated the allocation factor of "culpability" related to the manner in which a party conducted its activities resulting in releases to the Site including the care used with regard to material handling, storage and disposal. For purposes of the proposed settlement,

---

[4] *Envtl. Transp. Sys., Inc. v. ENSCO, Inc.*, 969 F2d 503, 508 (7th Cir. 1992).

Declaration of Chris Wittenbrink                                    January 29, 2024

EPA and DOJ have elected not to use AlterEcho's culpability factor in support of the Proposed Consent Decree;

      f.        Cooperation – AlterEcho considered "cooperation" as a factor in its allocation analysis. As with the culpability factor, EPA and DOJ elected not to use AlterEcho's cooperation factor in support of the settlement.

15. The result of the AlterEcho allocation analysis is an allocation framework and output that incorporates the risk and mass of COCs. As discussed below, the RRN risk-based AlterEcho allocation factor is based on risk assessments underlying OU2 and OU4 investigations. OxyChem alleges that a risk-based allocation is inappropriate and that, in its opinion, alternative allocation factors and approaches are more appropriate.

16. In the main, a site allocation may rely on a number of approaches or factors, thus there is no single approach that is mandated or necessary. Courts typically reference allocations' use of equitable factors, but do not prescribe specific factors or formulas be adopted. The allocation among PRPs is an intensely site-specific analysis that takes into consideration facts and information for that particular site. OxyChem asserts other allocation models are better suited for the Site (e.g., per capita based on Remedial Goal exceedances, or cost causation applying a Site wide polygon analysis). OxyChem did not provide an alternative allocation with corresponding allocation shares, but instead pointed to approaches which appear to favor its positions based on available Site facts. Nonetheless, approaches such as the one reflected in the Allocation Recommendation Report, incorporating the Gore factors including toxicity, are acceptable.

17. The AlterEcho Allocation provides two allocation alternatives to assess the relative shares of the APs: the Protocol Allocation; and the Alternative Allocation. As noted above, the DOJ/EPA determined that the Proposed Consent Decree is appropriately based on AlterEcho's Alternative Allocation approach, modified by excluding the allocation factors culpability and cooperation.

18. The Protocol Allocation is based on the methodology set out at the beginning of the allocation process (i.e., the protocol). The formula, inputs and calculations were designed prior to the collection of data and input into the allocation model.

19. The Alternative Allocation approach was developed by AlterEcho after the completion of the Protocol Allocation analysis. It addressed what AlterEcho perceived as the potential inequitable

Declaration of Chris Wittenbrink                                    January 29, 2024

outcome caused by the pro rata redistribution of the "orphan share"[5] where one party's share is substantially larger than other parties based on the toxicity of dioxin/furan.  Instead, AlterEcho's Alternative Allocation allocates responsibility for the orphan share of each COC among APs which contributed that specific COC.[6]  This approach can be referred to as an intra-COC allocation.  The intra-COC allocation calculates the relative share for all APs who contributed a given COC, e.g., PCBs, then assigns any PCB orphan share to APs with nexus to PCB's.  The effect of the intra-COC allocation approach is to eliminate the impact of COC-specific "orphan" shares on different COC contributing APs.  For example, APs with nexus to only PCBs are not assigned orphan shares for non-PCB releases.

20.  The Alternative Method, like the Protocol Method, assigns 100% of the responsibility among the Allocation Parties.

### Relative Risk Numbers (RRNs)

21.  The AlterEcho allocation model applies two primary allocation factors: 1) the amount, (i.e., COC mass); and 2) the toxicity, (i.e., COC relative risk, captured by the RRN).  The COC mass is an estimate of COCs released from a facility to the Site.  The RRN is Site-specific equitable factor based on Site risk information.

22.  The risk of COCs was a primary consideration of EPA when evaluating the Site and the corresponding remedial activities, including the Record of Decision ("ROD"), along with eligibility for possible settlements.[7]  The EPA/DOJ initially proposed to use the allocation process for mid-tier parties and to exclude parties that released dioxins or PCBs.[8]  The initial intent to exclude certain APs is based on the disproportionate risks attributed to dioxin and PCBs which collectively comprise over 96% of all Site allocation risks based on the Allocation Recommendation Report RRN.

---

[5] Orphan share is typically a reference to an allocation share associated with a known party that is unable to pay its obligation through bankruptcy, dissolution, etc. As used by EPA, It does not refer to an unknown or unattributable source of hazardous substances. (See, e.g., Orphan Share Superfund Reform Questions and Answers, EPA, Jan. 2001, p. 10).

[6] Allocation Recommendation Report, pg. 28-29.

[7] See, e.g., 1) OU2 RS/FFS Appendix D: Risk Assessment, Table 3-6, 3-7; 2) OU2 ROD, March 2016, p. 29- 30.; 3) OU2 ROD Tables 21, 22, 23a and 23b; 4) OU2 ROD p. 38.; 5) OU2 ROD, Responsiveness Summary, p. 38-39.; 6) EPA letter to PRPs, Re: Notice regarding Next Steps Including Initial Cash Out Settlement, Mar. 30, 2017; 7) EPA letter to PRPs, Re: Allocation for Operable Unit 2 Remedial Action, Sep. 18, 2017; 8) OU4 HHRA Risk Characterization, July 2017, p. 8-3 – 8-11.; 9) OU4 LPRSA Baseline Ecological Risk Assessment, Jun. 17, 2019, p. 745 – 756.; 10) EPA letter to M. Anderson, Re: Admin. Settlement Agreement for OCC, Sep. 28, 2016, https://semspub.epa.gov/src/document/02/453914.

[8] See, e.g., EPA letter, Sep. 18, 2017.

Declaration of Chris Wittenbrink                                    January 29, 2024

23. OxyChem, through its experts' declarations, suggest the proper allocation methodology should look only at exceedances of Preliminary Remedial Goals ("PRGs") or Remedial Goals ("RGs"). Under this concept, all COCs would be of equal weighting. Essentially this proposed concept would result in a per capita, or modified per capita allocation, wherein each COC bears equal responsibility and may possibly be adjusted based on estimates of COC mass.

24. A per capita allocation in this matter does not reflect actual differences in how COCs impact the overall consideration of Site remedy and Site risk. For example, the overall share of human health cancer risk from ingestion of fish and crab tissue for dioxins is approximately 80% - 90%.[9] When looking at an allocation model that takes into consideration relevant information, excluding COC risks for the Site would omit a key metric for allocation.

25. The AlterEcho allocation, determining risk as a relevant allocation factor, compiled risk assessment data into what it refers to as the RRN. The RRN takes the average risk for three risk categories: 1) Human health (non-cancer) risk; 2) Human cancer risk; and 3) environmental risk.[10]

26. The RRN is a weighting factor applied to the COC mass. The RRN is applied to the allocation model by multiplying the RRN by the estimated COC mass. The RRN weighting factor thus modifies the COC mass. This is sometimes referred to as a modified volume, (although mass and volume are not the same, both are metrics used to measure the quantity of materials).

27. Volume and modified volume (or mass) are common allocation metrics for distinguishing between parties. The use of these metrics in this matter appears to relate to the available historical information and is therefore logical, as they are based on quantifiable or estimable data.

Attenuation Factor

28. AlterEcho applied an allocation factor it refers to as the Attenuation Factor which it describes as follows: "[T]he percentage of attenuation of all COCs that remained in OU2 sediments following the actions of natural processes and human activities that diminished their mass from when they may have originally reached OU2 sediments."[11]

29. At its root, the Attenuation Factor is AlterEcho's mathematical effort to explain the different results between two distinct methods for calculating the mass of COCs: Method 1 - AlterEcho's estimated mass of COCs released from the AP facilities as determined by the allocation analysis; and

---

[9] *See*, <u>e.g.</u>, OU2 RI/FFS Appendix D, Risk Assessment, Table 3-6.
[10] See Allocation Recommendation Report, Appendix H, Attachment A – Methodology for Determination of the Relative Rank of OU2 Contaminants of Concern for the Purpose of the Allocation.
[11] Allocation Recommendation Report, p. 29.

Declaration of Chris Wittenbrink                                    January 29, 2024

Method 2 - EPA's estimated mass of COCs measured in OU2 sediments through sampling and statistical analysis.

30. The following is a simplified explanation of the Attenuation Factor determination and application using common language in lieu of the formulaic terms used and developed by AlterEcho.[12] The Attenuation Factor ["A%"] was calculated based on the ratio of the Method 2 measurement of dioxin/furan in the OU2 sediments and Method 1 estimated APs' release of dioxin/furan. AlterEcho provides the following:

$$A\% = \frac{\text{COC Mass Method 2}}{\text{COC Mass Method 1}} = \frac{38 \text{ kg}}{3764.0051 \text{ kg}} = 0.0100956$$

31. Having determined the value of its Attenuation Factor, AlterEcho then multiplies the Attenuation Factor by each AP's estimated mass of COCs released (i.e., Attenuation Factor adjusted AP mass). All COCs are applied the same Attenuation Factor which was developed using dioxin/furan estimates. The effect is to reduce AlterEcho's estimated COC mass released by the APs by 99%. The difference between the Attenuation Factor adjusted AP mass and the EPA measured mass is designated as the "orphan share" in AlterEcho's Allocation Recommendation Report. A more accurate description of the term orphan share as used here by AlterEcho is the unattributed mass.[13]

32. Next, AlterEcho's allocation calculates each AP's share of the orphan share. The allocated orphan share is added to each AP's individual adjusted mass to determine its total attributed mass.

33. OxyChem alleges the Attenuation Factor developed by AlterEcho is flawed and its use is inappropriate.[14] I am not opining as to whether the Attenuation Factor is flawed or otherwise in error.

34. However, the application of the Attenuation Factor under the Alternative Method allocation approach is unnecessary because it has no effect on the resulting allocated shares. Since the Alternative Method allocates any COC-specific orphan share only to those parties with a nexus to that COC, it is unnecessary to account for the difference between the EPA's estimated Site mass and AlterEcho's estimated AP release mass. The application of the two approaches is demonstrated below. First, Table 1 below shows the calculations of OxyChem's AP Base Score excluding application of the Attenuation Factor. Second, beneath Table 1, in Figure 1 is a screen capture taken from the Allocation

---

[12] The use of common language is intended to provide an overview and simplified understanding of formulaic expressions which can be difficult to conceptualize. See Allocation Recommendation Report p. 29 – 32 for AlterEcho's discussion.

[13] See footnote 5 supra for the definition of orphan share.

[14] See, e.g., OxyChem Comments to the Proposed Consent Decree, Mar. 22, 2023, p. 69., Declarations of M. Bock, p. 15., M. Harris, p. 6., R. Olian, p. 13., T. Saba, p. 2.

Declaration of Chris Wittenbrink                                    January 29, 2024

Recommendation Report – Alternative Calculation - Attachment K showing AlterEcho's calculated AP Base Score for OxyChem applying its Attenuation Factor adjustment.

Table 1
**Alternative Method – OxyChem Detail**
Calculation of Alternative Allocation Base Score Excluding Attenuation Factor

| COC | [A]<br>Total Cmass (TCmass) | [B]<br>COC Total Pathway Cmass | [C]<br>[B ÷ A]<br>Percent Share by COC | [D]<br>RRN | [E]<br>[C × D]<br>AP Base Score |
|---|---|---|---|---|---|
| Copper | 276,960.25 | 51.58 | 0.018624% | 0.69 | 0.000129 |
| Lead | 288,577.67 | 162.51 | 0.056314% | 0.01 | 0.000006 |
| Mercury | 4,322.53 | 2.61 | 0.060381% | 0.95 | 0.000574 |
| HPAHs | 4,346,388.50 | 185.41 | 0.004266% | 0.05 | 0.000002 |
| LPAHs | 3,012,835.14 | 58.55 | 0.001943% | 0.01 | 0.000000 |
| PCBs | 20,066.54 | 120.2 | 0.599007% | 12.87 | 0.077092 |
| DDx | 2,516.93 | 1,938.72 | 77.027172% | 1.37 | 1.055272 |
| Dieldrin | 1.27 | 0.14 | 11.023622% | 0.13 | 0.014331 |
| Dioxins/Furans | 3,729.82 | 3,729.71 | 99.997051% | 83.92 | 83.917525 |
| **Total** | | | | | 85.064930 |

Figure - 1

| Alternative Calculation | | | |
|---|---|---|---|
| Allocation Party | AP Base Score | AP Adjusted Base Score | Allocation Share |
| Occidental Chemical Corp. | 85.0647157 | 170.1294314 | 0.929393785 |

[Screen Capture - Allocation Recommendation Report – Alternative Calculation - Attachment K]

35.  As demonstrated Table 1 and Figure 1 above, looking specifically at OxyChem, the application of the Attenuation Factor, under the Alternative Method, is unnecessary as the final AP Base Score is the same using both approaches.  The OxyChem AP Base Score in Table 1 is 85.0649 excluding the Attenuation Factor and 85.0647 in the Allocation Recommendation Report applying the Attenuation Factor.  The 0.0002 difference is due to rounding.  This same analysis can be performed for any AP.

Declaration of Chris Wittenbrink                                              January 29, 2024

### Dioxin from the Diamond Alkali (Lister Ave) Facility

36.  OxyChem's comments opine that the AlterEcho-estimate of dioxin released from the Diamond Alkali facility overstates the actual dioxin mass released.  I have not independently assessed the accuracy of AlterEcho's or OxyChem's estimates.  However, assuming OxyChem's expert, Michael Bock's various estimates of the mass of dioxin released are correct, OxyChem's proposed revisions have no material impact on the Alternative Method allocation results as demonstrated below.

37.  Based on AlterEcho's Allocation Recommendation Report analysis, six APs have a nexus to the release of dioxin/furans.  OxyChem is attributed over 99.99%.  Givaudan is attributed approximately .003% of dioxin released.  The remaining four APs together are attributed essentially a zero value.[15]  The total estimated mass of dioxin and the corresponding relative share are provided below in Table 2.  Multiplying the percent of dioxin released by the RRN score for dioxin (83.92) provides the individual allocation party RRN Score share for dioxin.

---

[15] The Allocation Report Attachment L – Facility Computation Sheets provide AlterEcho's estimated COC mass for each facility.  Four facilities' mass of dioxin are shown with non-zero values:  21st Century (0.00012 kg dioxin/furan); Atlas Refining (.000028 kg dioxin/furan); Benjamin Moore (.0000054 kg dioxin/furan); and Stanley Black & Decker (0.0006 kg dioxin/furan).  These four AP's estimated releases appear to have been rounded to zero by AlterEcho.

Declaration of Chris Wittenbrink                                    January 29, 2024

Table 2
**Alternative Method Dioxin Allocation**

| Allocation Party | [A]<br>Dioxin Released<br>(Total Cmass) | [B]<br>[A] ÷ ∑ [A]<br>Percent of<br>Dioxin Released | [C]<br>[B] × 83.92<br>RRN Score Dioxin<br>Share |
|---|---|---|---|
| OxyChem | 3729.82 | 99.997% | 83.918 |
| Givaudan | 0.10 | 0.003% | 0.002 |
| Other APs | 0.000753 | 0.000% | 0.00002 |
| **Total** | **3729.92** | **100.000%** | **83.920** |

When the allocation is revised to adopt the OxyChem's various estimates of dioxin mass, the relative

share of dioxin mass and the RRN Scores are as follows:

Table 2a
**Alternative Method Dioxin Allocation - Bock Opinion 4 - Method 1**

| Allocation Party | [A]<br>Dioxin Released<br>(Total Cmass) | [B]<br>[A] ÷ ∑ [A]<br>Percent of<br>Dioxin Released | [C]<br>[B] × 83.92<br>RRN Score Dioxin Share |
|---|---|---|---|
| OxyChem | 376.95 | 99.973% | 83.898 |
| Givaudan | 0.10 | 0.027% | 0.022 |
| Other APs | 7.53E-04 | 0.000% | 0.000167684 |
| **Total** | **377.05** | **100.000%** | **83.920** |

Table 2b
**Alternative Method Dioxin Allocation - Bock Opinion 4 - Method 2 High End**

| Allocation Party | [A]<br>Dioxin Released<br>(Total Cmass) | [B]<br>[A] ÷ ∑ [A]<br>Percent of<br>Dioxin Released | [C]<br>[B] × 83.92<br>RRN Score Dioxin Share |
|---|---|---|---|
| OxyChem | 223 | 99.955% | 83.882 |
| Givaudan | 0.10 | 0.045% | 0.038 |
| Other APs | 7.53E-04 | 0.000% | 0.000283394 |
| **Total** | **223.10** | **100.000%** | **83.920** |

Declaration of Chris Wittenbrink                                              January 29, 2024

Table 2c
**Alternative Method Dioxin Allocation - Bock Opinion 4 - Method 2 Low End**

| Allocation Party | [A]<br>Dioxin Released (Total Cmass) | [B]<br>[A] ÷ ∑ [A]<br>Percent of Dioxin Released | [C]<br>[B] × 83.92<br>RRN Score Dioxin Share |
|---|---|---|---|
| **OxyChem** | 62 | 99.838% | 83.784 |
| **Givaudan** | 0.10 | 0.161% | 0.135 |
| **Other APs** | 7.53E-04 | 0.001% | 0.001018109 |
| **Total** | 62.10 | 100.000% | 83.920 |

As summarized above, OxyChem's proposed changes[16] to the estimated mass of dioxin released to the Site (ranging from 377 kg to 62 kg), do not materially alter the Alternative Allocation results because OxyChem's estimated mass of dioxin released is substantially larger than other APs.

## Tiers and Data Gaps

38.  The Allocation Recommendation Report provides groupings of APs by tier.  Tiering in allocation practice is a common tool to group similarly-situated parties in the same category.  The use of tiers is most typical where the underlying allocation information is limited or is similar resulting in largely indistinguishable differences between parties.  Often this occurs where historical forensics and factual information is largely drawn from inferences based on known facts, such as time period of operations, time period or era of industrial activities, standard manufacturing processes, etc.  I have used tiering in many allocations.

39.  A common issue in developing allocations is the identification and evaluation of data gaps or lack of information.  Often information is not available for all parties or the information is otherwise incomplete.  Allocations often will address data gaps through the use of inferences based on what information is available.  The purpose of filling data gaps is to treat the parties of an allocation more fairly and not penalize parties for which more information is available that may be used against them – *i.e.*, in order to avoid what is known as "good record bias."  It is my understanding that OxyChem's position is that more historical information is available for its operations than other APs.  Thus, estimating allocation information metrics is appropriate where not doing so would penalize the party for

---

[16] Declaration of M. Bock, Mar. 22, 2023, see p 49.

Declaration of Chris Wittenbrink                                                    January 29, 2024

whom a more complete record is available.  This appears to be how AlterEcho approached limited data and data gaps in its allocation analysis.

### AlterEcho's Allocation Procedures

40.  The AlterEcho Allocation process included the development of Attachment G - Allocation Guide and Attachment H - Allocation Protocol to the Allocation Recommendation Report.  These two documents provide an overview of the steps AlterEcho recommends be taken in the development of the Site allocation.  These guides provide the participating APs, the Allocation Team, and DOJ/EPA a roadmap for the allocation process.

41.  While each allocation is performed taking into account site-specific considerations, the allocation in this matter adhered generally to typical allocation processes.  For example, as provided in the Allocation Guide, the participating APs were provided multiple opportunities for inputs in the allocation analysis process, including providing comments on allocation factors, facility data, and or other information the APs may consider relevant.

42.  In some instances, the participating APs identified areas where the allocation process may be insufficient to adequately achieve its stated goals.  For example, the limitation on the number of records or documents was believed to be too limited by the participating APs.  As a result, a request was made to increase the limits and some adjustments were made accordingly.  This type of in-process modification is not unusual and reflects the necessary flexibility an allocation process must maintain to accommodate information as it is developed.

43.  OxyChem's comments allege the allocation process shows bias or collusion against its interest.  OxyChem elected to decline participation in the allocation.  I have no knowledge if collusion or bias against OxyChem was present.  Based on my review of the Allocation Recommendation Report and the supporting record, I did not see bias or collusion.

Declaration of Chris Wittenbrink                                          January 29, 2024

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

January 29, 2024
Date


_____

Chris Wittenbrink

Appendix A

CV of C. Wittenbrink

**Christopher M. Wittenbrink, J.D.**
**President, CR Consulting, Inc.**
**Environmental Liability Management Consulting**

**(303) 906-2680 | chris@cr-consultinginc.com**

## Professional Profile

Mr. Wittenbrink is an expert in the evaluation and resolution of complex environmental disputes. His work focuses on the development, analysis and implementation of allocations of financial responsibility for environmental remediation projects. These engagements involve multiple aspects of CERCLA allocation practice including: forensic historical evaluations, potentially responsible party ("PRP") investigations, waste-in-database development, allocation modeling, cause/effect analysis, damages assessment, litigation support, alternative dispute resolution/mediation and expert testimony. Mr. Wittenbrink has provided allocation analyses in connection with over 50 matters for sites located throughout the United States. Mr. Wittenbrink is also a practicing attorney.

## Education

- B.A., Environmental, Population and Organismic Biology, University of Colorado, Boulder, Colorado, 1985
- J.D., University of Denver, Sturm College of Law, Denver, Colorado, 2006

## Prior Experience

Vice President, Advanced Analytical Solutions, Inc., Allocation and Environmental Consulting, 1992 – 2002

## Representative Allocation and Related Services Project Experience

Confidential Sediment Site.  Provide mediation and allocation services to PRP Group implementing the site remedy.  Two year allocation process included development of concept model, framework, supporting databases and final allocation among responsible parties.

Hobart Corporation, et al., v. The Dayton Power & Light Co., et al.  Provided expert witness testimony evaluating adverse parties' allocation models for a mixed-use disposal and salvaging operation Site.  An expert report was submitted addressing the application of site-specific facts and historical information to the proposed allocation models.  Deposition Sept. 2018.

Georgia Pacific v. NCR, et. al.  Provide expert testimony at deposition and two phases of trial regarding site nexus and waste volume analysis.  Expert testimony at deposition and trial evaluated historical forensic information to determine the role of parties in releasing hazardous substances contaminating river sediments.

Former Waste Oil Disposal Site.  Retained as a consulting expert for an ongoing allocation and data management assignment.  Work involves review and evaluation of applicable site-specific allocation factors and formulation of an allocation framework and model for use in mediation proceedings.

Closed Co-Disposal Site.  Consulting expert regarding all aspects of allocation for closed hazardous waste and MSW landfill including.   Issues addressed include forensic historical analysis, cost-causation based remedial considerations, and waste-in database analysis.  This engagement is ongoing.

Historical Unpermitted Landfill, New Jersey.  Development of allocation model for mediation process.  Project scope included development of historical information related to site operations and activities of regional businesses.

Former Paint Manufacturing Facility, Chicago, Illinois.  Provided expert report regarding the apportionment among site former and current owner/operators for a former paint facility. The apportionment opinion addresses the Supreme Court holding in Burlington Northern addressing reasonable approaches to apportionment.   Mr. Wittenbrink provided deposition testimony.  This matter was resolved before trial.

Cooper Drum Site, South Gate, California.  Selected to serve as a third-party neutral to the PRP group to allocate costs.  The developed mediation process contemplated an allocation questionnaire to supplement the lack of historical records or other information, review of party-position papers and development of recommendations on

an allocation among the group members.  The mediation process terminated when the group reached settlement outside the mediation framework.

<u>Evansville Greenway and Remediation Trust v. Southern Indiana Gas and Electric Co., Inc., et al.</u>  Developed an expert opinion regarding an allocation framework for the site among former customers and the site owner/operator.  The allocation framework looks at the contribution of materials containing certain contaminants driving remedial costs and the role of the parties in creating site conditions requiring cleanup.  Mr. Wittenbrink provided deposition testimony.  This matter settled before trial.

<u>Gulfco Marine Site, Brazoria County, Texas</u>.  On behalf of a PRP group, developed site nexus packages identifying previously unknown parties.  The development of this information included review of documents, interviews and independent identification of additional information.  Nexus packages were submitted to EPA for purposes of naming additional parties to enforcement orders.

<u>Palmer Barge Superfund Site, Freeport, Texas</u>.  This now closed barge repair facility formerly served customers along the Gulf Intracoastal Waterway.  As a result of operational activities the site was contaminated with metals, PAHs and other wastes in addition to waterway sediment contamination.  Services provided on behalf of a group of PRPs include research and development of PRP site nexus reports characterizing the known and potential scope of customer activities.

<u>EPC Eastside, Bakersfield, California</u>.  The site is a former disposal site for oil field exploration and production wastes as well as other industrial waste streams.  Mr. Wittenbrink and his staff developed a waste-in database identifying several hundred generator and transporter PRPs.  Utilizing this database, Mr. Wittenbrink developed a waste characterization analysis forming the basis of a site wide allocation.  These efforts have resulted in multiple settlements with PRPs totaling nearly $6 million to date.

<u>Cyprus Amax Minerals Co., et al., v. Tronox Inc., et al.</u>  Mr. Wittenbrink developed an allocation and expert report for this Site in Colorado.  The site comprised a former research and development facility used by the mineral extraction industry which was later redeveloped into an office and research park.  The site was subject to clean up after uranium mill tailings and other wastes were dispersed throughout the property by successive owner/operators.  The allocation analysis looks at the timing and manner the parties created and distributed contaminated tailings and other hazardous substances across the property and how those activities affected remedial costs.

<u>Public Service Company of Colorado v. Schrader Oil Company, et al.</u>  Developed an expert allocation report apportioning cost among parties who contributed hazardous substances to groundwater.  Certain contaminants, primarily petroleum products, were determined to be driving costs through increased mobilization of historic wastes, i.e.,

coal tar.  In addition construction activities on or near former historic operations contribute to releases of hazardous substances.  This matter settled prior to trial.

United States v. Halliburton Energy Services, Inc.    Mr. Wittenbrink and his staff developed a complex waste tracking and disposal database for multiple related sites.  These sites were formerly operated by Gulf Nuclear, Inc. and became contaminated with numerous forms and types of radioactive isotopes.  The database information has formed the basis of multiple settlements with PRPs and is used in ongoing allocation analyses.  Database information included such data as radioactive source activity level, shipping container type, source type (e.g., sealed source), etc.

Robert M. Friedland v. TIC – The Industrial Company, et al.  (and related state court cases) For this and related cases Mr. Wittenbrink developed allocation opinions and related expert reports based upon a cost causation approach wherein historical activities were correlated to impacted operable units and corresponding response costs.  This matter addressed site operations creating or otherwise contributing to acid mine drainage.

SESCO Transformer Site, San Angelo, Texas.    Comprehensive PRP search including document reviews and interviews of former employees, database development and de minimis settlement performed on behalf of a PRP Group.  This assignment included the review of approximately 750 boxes of operational records for relevant PRP-specific data.  In addition, interviews of former site employees were conducted to better define site operations, customers and other potential PRPs.  Based on the document review and interviews, information found in 250 boxes identifying about 500 parties was utilized to create a waste-in database and successful de minimis settlement with hundreds of small site contributors.  The allocation developed for non-de minimis parties was adopted by all participating parties during settlement negotiations.

Action Manufacturing Co., Inc., et al., v. Simon Wrecking Company, et al.  Developed a database and corresponding waste-in compilation on behalf of a PRP that transported materials to the site.  The database formed the basis of evaluating multiple parties relative role in contribution to site contamination.  Mr. Wittenbrink provided both deposition and trial testimony.

Lyondell Chemical Corporation, et al., v. Albemarle Corporation, et al.  Developed an allocation for of a group of generators whose waste was allegedly transported to the Turtle Bayou site.  The allocation analysis included the forensic review of historical records identifying company payments for disposal services and use of that information in the development of an allocation.  Mr. Wittenbrink provided deposition testimony in 2004 and 2006.

<u>United States of America v. Pharmacia Corporation and Solutia, Inc.</u>  On behalf of a site owner and operator, developed an allocation incorporating an analysis of contaminant pathways from multiple facilities to a common surface-water drainage area.  The allocation analysis also considered contaminant inputs via site landfills and industrial waste water discharge via sewers.

<u>Ninth Avenue Remedial Group v. Allis Chalmers, et al.</u>  For a group of waste generators, a waste-in database was developed to assess and support an allocation analysis.  Database criteria included time period of operations, volume extrapolation, and waste type characterization.  Mr. Wittenbrink testified at trial in April 2001.

<u>Gibson Refining Site.</u>  On behalf of a large and diverse group of waste generators, developed a large database of waste oil and contaminated soil shipments.  This PRP investigation included the interviews of the former site owner and operator.  The database has been designed to support the development of an allocation model that will be implemented for purposes of obtaining financial contribution toward site cleanup costs.

<u>Talache and St. Joe Tailings Site.</u>  On behalf of the current site owner, developed an expert report on allocation.  The allocation report apportions liability and costs to the parties based on their PRP class, ore production levels, time period of operations.  Mr. Wittenbrink provided trial testimony in Federal District court in September 2002 regarding the allocation of costs for the site.

<u>White Rock North Dump Site.</u>  On behalf of a site transporter in connection with a mediation proceeding, developed an allocation report apportioning responsibility among several classes of parties.  The allocation methodology considered time period of operations, waste-in volume extrapolations and analyses, cost causation and PRP class. This matter was settled successfully in the mediation process.

<u>MRE Waste Disposal Site.</u>  On behalf of a diverse PRP group, developed a waste-in database and volume-based allocation on historical disposal records.  Served as a neutral to the PRP group to hear and review PRP challenges to volume information and database issues.

<u>Coeur d'Alene Mining District.</u>  On behalf of a current and former owner and operator of various mining and mineral processing facilities, developed database and facts to support a basis for demonstrating the divisibility of harm and apportioning liability in a government cost recovery case.  The apportionment methodology considers ore production, type and location of discharge, and time period of alleged discharge contaminating river and lake sediments of the Coeur D'Alene River in Northern Idaho.

<u>Chevron Chemical Corporation v. Aceto Corporation.</u>  On behalf of a former site owner/operator, an allocation was developed based upon the time period of site operations and the contribution to contamination resulting in the incurrence of response costs.  The allocation apportioned costs among formulators and suppliers of a pesticide manufacturing facility.

<u>Chesapeake Utilities, Inc., v. GPU, Inc.</u>  For a former owner and operator developed an allocation and expert report addressing operations and contributions to contamination among successive site owner/operators for a former manufactured gas plant site.

<u>In Re: Combustion, Inc.</u>  For a former waste oil-processing site in Denham Springs, Louisiana, an allocation was developed among successive site owner/operators and generators based upon the cause and effect relationships of PCB-bearing materials and other "traceable" wastes at the site.  An expert report was developed and submitted to the court.  The case was settled prior to trial and deposition.

<u>Andritz-Sprout Bauer v. Beazer East, Inc.</u>  On behalf a former owner/operator, an allocation among successive owner/operators for an active industrial manufacturing complex in Muncy, Pennsylvania was developed.  An expert report was prepared and testimony was provided at deposition regarding an allocation among multiple owner/operators that considered:  the economic benefits derived from site remediation; the relative time periods of operation; material usage rates; production levels and various cause/effect relationships for distinct areas of site contamination.  The case settled during a subsequent mediation process that incorporated the allocation developed by Mr. Wittenbrink.

<u>Niagara Mohawk Power Corporation v. Jones Chemicals, Inc., et al</u>.  On behalf of a former site owner/operator, Mr. Wittenbrink developed an allocation among site owner/operators and arrangers. This site operated from the mid 1800's to present day resulting in PAH and BTEX contamination of river and harbor sediments.  Potential contaminant pathways include site runoff, sewer outfalls and spill events related to the transport of petroleum and related products via barge.

<u>Cabot Carbon v. Beazer East, Inc.</u>  For a former wood treatment and pine tar manufacturing facility in the Southeastern United States, Mr. Wittenbrink developed a rebuttal report concerning an allocation of groundwater remediation costs among multiple owner/operators.  The expert report addressed the proper methodology for developing a weighing factors matrix for using CERCLA §113 equitable factors.

<u>In Re:  Tulalip Landfill Superfund Site</u>.  On behalf of a diverse PRP group, an extensive analysis of an EPA-prepared database was conducted for purposes of developing an allocation among the parties.  The project results provided the basis for the development of a de minimis settlement with over 500 parties utilizing the de minimis

evidence packages.   Mr. Wittenbrink and his staff played a key role in providing allocation-based information to the EPA.  This cooperative relationship ultimately led to a final allocation and settlement.

## Publications:

An Allocator's Perspective on Burlington Northern—the Broadening Scope of "Reasonable Basis", ABA Superfund and Natural Resource Damages Litigation Committee Newsletter, Vol. 5, No. 1, March 2010. (http://www.abanet.org/environ/committees/superfundnatresdamages/newsletter/).

Wittenbrink, C.M. Cost Allocation Principles Applied at Environmental Cleanup Sites, EMCON Reporter, Vol. 5, No. 4, August 1998.