# Exhibit 10 Part 1

## Comments Submitted by OxyChem (Part 1): OxyChem Comments and Appendix A

United States' Motion to Enter Consent Decree,
*United States v. Alden Leeds, Inc. et al.*, Civil Action No. 22-7326 (D.N.J.)

**GIBBS & BRUNS LLP**
1100 Louisiana Street
Suite 5300
Houston, TX 77002

**LANGSAM STEVENS SILVER & HOLLAENDER LLP**
1818 Market Street
Philadelphia, PA 19103

**CLEMENT & MURPHY, PLLC**
706 Duke St.
Alexandria, VA 22314

March 22, 2023

The Honorable Todd Sunhwae Kim
Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530

> RE: Comments in Opposition to the Proposed Consent Decree in *United States v. Alden Leeds, Inc., et al.*, Civil Action No. 2:22-cv-07326, District of New Jersey; D.J. Ref. No. 90-11-3-07683/1

Dear Assistant Attorney General Kim:

On December 16, 2022, the Department of Justice lodged a proposed consent decree with the United States District Court for the District of New Jersey in *United States v. Alden Leeds, Inc., et al.*, Civil Action No. 2:22-cv-07326, District of New Jersey. The proposed consent decree purports to resolve the United States' claim against 85 defendants (the "settling defendants") under section 107(a) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. § 9607(a), relating to Operable Unit 2 ("OU2") and Operable Unit 4 ("OU4") of the Diamond Alkali Superfund Site (or the "Site"), along the Passaic River in New Jersey.[1] Pursuant to CERCLA Section 122(d)(2)(B), Occidental Chemical Corporation ("OxyChem") respectfully requests that the United States file these comments with the District Court in *Alden Leeds* without delay.

### OxyChem[2] Opposes the Settlement and Entry of the Proposed Consent Decree[3]

EPA acted arbitrarily and capriciously in choosing to pursue the proposed settlement—which will let 85 large, identified polluters write a check and walk away—and in rejecting

---

[1] On December 22, 2022, the Department of Justice ("DOJ") published a notice in the Federal Register opening a public comment period on the consent decree for a period of forty-five (45) days. 87 Fed. Reg. 78711 (Dec. 22, 2022). DOJ later extended the comment period by an additional forty-five (45) days, through March 22, 2023. *See* Notice of Lodging of Proposed Consent Decree Under the Comprehensive Environmental Response, Compensation, and Liability Act, 88 Fed. Reg. 2133, 2134 (Jan. 12, 2023) ("Notice").

[2] The terms "OxyChem," "Occidental," and "OCC," all refer herein to Occidental Chemical Corporation.

[3] OxyChem submits these comments in opposition to the proposed settlement filed on December 16, 2022 [Dkt. 2], in accordance with the DOJ's Notice. Unless otherwise noted herein, "Dkt." refers to docket entries in *United States v. Alden Leeds, Inc.*, Civil Action No. 22-cv-7326 in the United States District Court for the District of New Jersey (D.N.J.) ("*Alden Leeds*"). OxyChem requests that DOJ file these comments forthwith with the Court, as required by CERCLA Section 122, and that it include them in the administrative record of this proceeding.

ALCD-PUBCOM_0000403

OxyChem's comprehensive offers to perform the entire interim remedy in OU4 and its further offer of a series of agreements to implement the final remedy EPA selected for OU2.

EPA's actions cannot be reconciled with the public interest: they reflect a wholly irrational choice by EPA to favor cash for EPA's administrative and oversight costs over actual cleanup work that would benefit overburdened communities along the Passaic.

EPA's actions exceed the authority granted to it by Congress. They rest on an unauthorized attempt by EPA to adjudicate OxyChem's alleged liability for response costs, a function Congress permits only a court to perform.

The way EPA selected a set of favored companies for settlement, assigning overwhelming cleanup responsibility to OxyChem (including for chemicals for which it has *no* liability) and to the Passaic Valley Sewerage Commission (PVSC) (which transported the settling parties' wastes), was also arbitrary and capricious.

The settlement proposed in the consent decree does not require any settling party to perform work to clean up the Passaic River. This is wrong and violates EPA's repeated public commitment that parties responsible for pollution would perform the cleanup.

Important details necessary for the public (and an eventual reviewing court) to evaluate the settlement are cloaked in secrecy. EPA makes no commitment to use the funds received from the settlement for actual cleanup work. In fact, the sole disclosed use of settlement funds is EPA's stated intention to use at least $70 million to pay its own costs.

Also kept secret is how much each of the 85 large corporations is paying EPA, individually, for the right to walk away from the Passaic River cleanup.

A few things are clear. The settlement includes covenants by the United States not to sue the settling parties ever again related to OU2 and OU4, no matter what happens, "as well as contribution protection under section 113 of CERCLA."[4] This "contribution protection" seeks to bar OxyChem—the only party performing work in OU2—from continuing to seek reimbursement for costs it has incurred from polluters liable for releasing hazardous substances into that area of the river. Also clear: contrary to EPA guidance, the settlement "does not include reopeners for previously unknown conditions or information, or for cost overruns,"[5] even if it is later demonstrated that a party seriously misrepresented facts to EPA or EPA badly underestimated the remedial costs.

The proposed settlement is not fair, reasonable, or consistent with the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), the Administrative Procedure Act ("APA"), or the Administrative Alternative Dispute Resolution Act ("ADR Act"). It is the result of arbitrary and capricious actions by EPA, is based on highly-flawed, unreliable, unsound, and unscientific methodologies. It penalizes OxyChem unlawfully for exercising its statutory and constitutional rights.

EPA's actions have profoundly failed communities along the Passaic River. The United States should reject the proposed settlement. Any other result would fail to keep EPA's

---

[4] Notice at 2133.

[5] *Id.*

ALCD-PUBCOM_0000404

commitment to communities along the Passaic that polluters would perform the cleanup, not the public.

Respectfully submitted,

| | | |
|---|---|---|
| /s/ *Kathy D. Patrick* | /s/ *John J. McDermott* | /s/ *Erin E. Murphy* |
| Kathy D. Patrick | Larry Silver | Erin E. Murphy |
| kpatrick@gibbsbruns.com | lsilver@lssh-law.com | erin.murphy@clementmurphy.com |
| Anthony N. Kaim | John J. McDermott | C. Harker Rhodes IV* |
| akaim@gibbsbruns.com | jmcdermott@lssh-law.com | Harker.rhodes@clementmurphy.com |
| Ann Lebeck | **LANGSAM STEVENS SILVER** | **CLEMENT & MURPHY, PLLC** |
| alebeck@gibbsbruns.com | **& HOLLAENDER** | 706 Duke St. |
| **GIBBS & BRUNS LLP** | 1818 Market Street | Alexandria, VA 22314 |
| 1100 Louisiana Street | Philadelphia, PA 19103 | |
| Suite 5300 | | *Supervised by principals of the firm |
| Houston, TX 77002 | | who are members of the Virginia bar |

cc:  Laura J. Rowley, Senior Trial Attorney
Laura.rowley@usdoj.gov
Andrew W. Keir, Trial Attorney
Andrew.w.keir@usdoj.gov
U.S. Department of Justice
Environment and Natural Resources Division

3

# TABLE OF CONTENTS

Page

I.  Executive Summary ........................................................................................... 1

    A.  Background Relevant to Comments................................................... 1

    B.  EPA's Actions in Convening the Allocation Process Exceeded EPA's Authority........................................................................................... 2

    C.  EPA's Proposed Settlement Is Arbitrary and Capricious Because It Relies Solely on an Allocation Process That Exceeded EPA's Authority....................... 3

    D.  The Batson Report Cannot Support EPA's Exercise of Settlement Discretion and No Consent Decree Can Be Entered Based on It...................... 4

    E.  EPA's Settlement Is Arbitrary and Capricious Because It Discloses No Relationship Between the Amount Each Party Is Paying and the Respective Costs To Perform the Remedies in OU2 and OU4 ........................................... 6

    F.  EPA's Settlement Is Arbitrary and Capricious Because It Seeks Without Authority To Bar OxyChem's Claims for Contribution for Costs It Has Incurred and Will Incur................................................................................... 7

    G.  EPA's Reliance on the Batson Report Is Arbitrary and Capricious Because It Reveals a Collusive Settlement Dominated by the Settling Parties ............... 8

    H.  EPA's Reliance on the Batson Report To Justify Its Settlement Decision Is Arbitrary and Capricious Because Batson Is Unqualified To Conduct an "Allocation" of Costs and His Report Is Plagued With Serious Errors ............. 9

    I.  EPA Acted Arbitrarily in Refusing To Reevaluate the Proposed Settlement Based on Highly Relevant Evidence Certain Parties Withheld From or Misrepresented to Batson ................................................................................ 12

    J.  EPA's Actions Are Arbitrary and Capricious in Relying on the Batson Report To Release Claims for Response Costs in OU4 .................................... 13

    K.  EPA's Actions in Making the Allocation Report Public Were Arbitrary, Capricious, and Violate Due Process................................................................ 14

    L.  The United States Should Reject the Settlement Because the Administrative Record Contains No Basis on Which the Court Could Lawfully Enter the Proposed Decree.............................................................. 15

II.  The Proposed Settlement Improperly Attempts To Invade and Eviscerate the Judicial Allocation That CERCLA Requires................................................. 16

i

ALCD-PUBCOM_0000406

A.    EPA Has No Authority To Impose a Binding Allocation Under CERCLA ........................................................................................................... 17

B.    EPA's Lack of Authority Is Evident From Congress's Rejection of the Superfund Reform Act of 1994 and the Recycle America's Land Act of 1999.................................................................................................................. 18

    1.    Under Both Attempts To Amend CERCLA, EPA Would Have Been Authorized To Mandate an Allocation Process ........................... 18

    2.    Under Both Attempts To Amend CERCLA, an Allocation Report Like the Batson Report Would Have Been Admissible........................ 21

    3.    The SRA and RALA's Failure Reconfirmed Congressional Intent That EPA Should "Leave the Parsing of Exact Shares" to PRPs.......... 21

    4.    As Criticism of the SRA Noted, Mandatory Allocation Processes— Like the Batson Process—Delay Cleanups ........................................... 23

    5.    Due Process Rights Are Implicated When EPA Attempts To Conduct a Binding Allocation................................................................ 23

C.    EPA Cannot Justify Its Unlawful Process Under the ADR Act ........................ 24

III.    The Proposed Settlement Has Multiple Fatal Procedural Flaws.................................... 25

A.    The Proposed Settlement Improperly Relies on a Third-Party Allocation Process That Violated CERCLA ...................................................................... 25

    1.    EPA Improperly Used a Private Contractor Rather Than Performing the Preliminary Allocation Itself........................................ 26

    2.    EPA Improperly Treated the Batson Process as Binding ...................... 28

    3.    EPA Improperly Treated the Batson Process as Mandatory................. 29

B.    The Proposed Settlement Is Not Supported by Any Adequate Record............ 30

    1.    Congress Has Prohibited the Use of NBARs To Support Contested Consent Decrees.................................................................................... 30

    2.    The United States Has No Rational Basis or Administrative Record To Support the Proposed Consent Decree............................................. 31

IV.    EPA Has No Authority To Extinguish OxyChem's Contribution Claims................... 33

V.    The Proposed Consent Decree Is Improper Because It Was Equivalent to a Collusive Settlement...................................................................................................... 35

VI.    The Proposed Settlement Has Multiple Fatal Substantive Flaws................................. 37

ALCD-PUBCOM_0000407

A.  The Proposed Consent Decree Is Inconsistent With CERCLA's Goals and Public Policy .......................................................................................... 37

  1.  The Proposed Consent Decree Does Not Clean Up the Lower Passaic River................................................................................. 37

  2.  The Proposed Consent Decree Fails To Hold Polluters Accountable ................................................................................................ 41

  3.  The Proposed Consent Decree Undermines Important Public Policies .................................................................................................. 43

      a.  The Proposed Settlement Will Discourage Voluntary Cleanup and Early Settlements ................................................ 44

      b.  The Proposed Settlement Will Not Minimize Litigation— at the Passaic River or any Other Superfund Site—and Shifts Substantial Liability for the Cleanup to the Public ........ 45

B.  The Proposed Settlement Relies on a Fatally Flawed Allocation of Liability .................................................................................................. 47

  1.  EPA Set Ground Rules for the Allocation That Arbitrarily Pre-Determined Its Outcome ..................................................... 47

      a.  EPA Arbitrarily Determined That PRPs Associated With Just Two of the Eight COCs Would Be Judged More Harshly.................................................................................... 47

      b.  A Fair Allocation Would Be Cost-Driven and Assign Shares to *All* COCs ................................................................. 48

      c.  Dioxins Cannot Be Fairly Attributed More Than Half of the Remedial Costs ........................................................................ 49

  2.  Batson's Methodology Is Replete With Fundamental Errors and Faulty Premises ..................................................................... 53

      a.  Batson's Allocation Ignores Other Known Sources of Dioxin .................................................................................................. 53

          i.   EPA-Funded and Peer-Reviewed Scientific Studies Establish Multiple Sources of Dioxin............................. 53

          ii.  In Addition to Givaudan, Ashland Inc. and Clean Earth of New Jersey, Inc. Are Among Other, Known Dioxin Contributors ...................................................... 57

              (a) Ashland's Drew Chemical Site....................................... 58

iii

(b) Clean Earth Sites ............................................................ 59

b.  Batson's Risk-Based Approach Ignores All Other Factors
Affecting the Remedy, Contradicting EPA's Own Findings
and Pre-Determining the Allocation Outcome ........................ 61

i.  Batson Uses Risk Numbers To Pre-Determine the
Outcome ...................................................................... 61

ii.  Batson Invents Risk Numbers That Contradict
EPA's ............................................................................ 63

(a) Batson Ignores Future Risk by Using Estimated
Risks for 2009 ............................................................ 64

(b) Batson Gives PCB Parties a Discount by Ignoring
Dioxin-like PCBs ........................................................ 66

(c) Batson Incorrectly Used the Average of Two Risks
With Different Characteristics That Are Not
Averageable As-Is ........................................................ 67

(d) Batson Relies on Irrelevant "Incremental" Risk
Calculations That Give Polluters a Double
Discount .......................................................................... 69

c.  Batson Uses a Made-Up "Attenuation Factor" That
Contradicts Basic Science and EPA Findings and Gives
Every Settling Defendant a 99% Discount ............................... 69

i.  If Diamond Alkali's Contribution of Dioxin Was
Calculated Incorrectly, the Rest of the Allocation Is
Unusable ........................................................................ 71

ii.  Batson's "Attenuation" Factor is Obviously and
Provably Wrong ............................................................ 74

(a) EPA's Natural Recovery Calculations Disprove
Batson's Assumptions .................................................. 74

(b) Batson's Own Mass Calculations Contradict His
"Attenuation Factor" .................................................. 75

3.  The Batson Report's Methodology Unjustly Allocates a
Supermajority of Responsibility to OxyChem by Treating the Lister
Plant and OxyChem Differently From Other Sites and PRPs ............. 76

a.  Treatment of Historic Fill ........................................................ 77

b.  "Cooperation" Factor ................................................................ 78

iv

|  |  |  | i. | Cooperation Regarding the OU2 Remedy .................... 78 |
|--|--|--|----|----|
|  |  |  | ii. | Cooperation for Other Work ........................................ 80 |
|  |  | c. | | "Culpability" Factor .................................................... 81 |
|  |  |  | i. | Batson's 100% Culpability Factor to OxyChem Ignores That OxyChem Is Merely a Corporate Successor That Never Itself Polluted the Passaic River .......................................................................... 84 |
|  |  |  | ii. | Batson's 100% Culpability Factor to OxyChem Ignores That OxyChem Did Not Benefit From the Former Diamond Alkali Facility's Operations or Disposals ........................................................................ 85 |
|  |  | d. | | Interpretation of Evidence Regarding Site Operations ............. 86 |
|  |  | e. | | Every Court That Has Considered Batson's Allocations Has Criticized His Methodology and Rejected His Conclusions .... 86 |
|  |  | f. | | Batson Was Unqualified and Ineligible to Allocate Liability at the Lower Passaic River .......................................................... 88 |
|  | 4. | | | The Batson Report Does Not Provide an Accurate Estimate of Harm Caused by Settling Defendants .................................................... 90 |

VII. The Proposed Settlement Improperly Relies on a Third-Party Allocation That Was Procedurally Unfair ................................................................................................. 91

|  | A. | The Proposed Consent Decree Is Improper Because the Batson Process Arbitrarily Excluded PVSC and Municipalities ................................................ 91 |
|--|----|----|
|  | B. | The Proposed Consent Decree Is Improper Because EPA Arbitrarily Changed the Rules of the Batson Process After OxyChem Opted Out of the Process ...................................................................................................... 93 |
|  | C. | The Proposed Consent Decree Is Improper Because Batson Lacked the Information Needed To Perform a Fair Allocation ........................................... 95 |

|  |  | 1. | Batson Planned His Allocation Around Evidence That Did Not Exist ...................................................................................................... 95 |
|--|--|----|----|
|  |  | 2. | The Settling Parties Excluded Relevant Evidence ................................ 96 |
|  |  | 3. | The Process Was Designed To Minimize Relevant Evidence of Liability for Everyone Except OxyChem ................................................ 97 |

ALCD-PUBCOM_0000410

D.      The Consent Decree Document Certification Is a Sham Because It Allows for Selective Disclosure and Does Not Require the Parties To Produce Non-Public Documents That Might Be Harmful ...................................................... 97

        1.      The Certification Is a Sham Because There Are No Consequences for Non-Compliance .............................................................................. 98

        2.      The Certification Is a Sham Because Sherwin-Williams and Givaudan Withheld Documents and Got Away With It ..................... 99

                a.      Sherwin-Williams Materially Misrepresented Facts and Concealed Material Evidence for Years Despite an Obligation To Disclose them to EPA ......................................... 99

                b.      Givaudan Provided Misleading Information About Its Manufacturing Processes and Path for Process Contaminants To Be Discharged to the Passaic River ............ 100

VIII.   The Proposed Settlement's Application to OU4 Is Arbitrary and Capricious and Would Preclude the District Court's Entry of the Consent Decree ........................... 101

        A.      The Batson Process Addressed Only OU2—Not OU4 ................................... 101

        B.      The Operable Units and the Remedies Selected for Each Are Different and Not Interchangeable ........................................................................................ 103

        C.      The Lack of Estimable Costs To Remediate OU4 Would Preclude the District Court From Entering the Proposed Consent Decree ......................... 105

IX.     A Proposed Consent Decree Must Be Fair, Reasonable, and Consistent With CERCLA, and Cannot Be Arbitrary and Capricious ................................................. 107

        A.      A Proposed Consent Decree Must Be Fair, Reasonable, and Consistent With CERCLA's Goals ................................................................................... 107

                1.      Fairness ............................................................................................... 108

                2.      Reasonableness ................................................................................... 108

                3.      Consistency With CERCLA's Goals ................................................. 109

        B.      A Proposed Consent Decree Cannot Be Arbitrary and Capricious ................ 109

X.      Request for Inclusion in the Administrative Record ................................................. 110

ALCD-PUBCOM_0000411

## APPENDIX A

1.    BASF Corporation ............................................................................ 113

2.    Benjamin Moore & Co. ...................................................................... 116

3.    Conopco, Inc. ................................................................................... 122

4.    EnPro Holdings, Inc. ........................................................................ 125

5.    General Electric Company ................................................................ 128

6.    Givaudan Fragrances Corporation .................................................... 136

7.    Kearny Smelting & Refining ............................................................. 141

8.    Legacy    Vulcan    Corp./Safety-Kleen    Envirosystems
      Company/McKesson Corp. ................................................................ 144

9.    L3 Harris Corporation ...................................................................... 147

10.   Pitt-Consol Chemical Company ........................................................ 148

11.   PPG Industries Inc. .......................................................................... 151

12.   Sequa Corporation and Sun Chemical Company ............................... 154

13.   The Sherwin-Williams Company ("Sherwin-Williams") ................... 158

14.   STWB, Inc. ...................................................................................... 163

## APPENDIX B

1.    **Bock** Declaration ............................................................................ 177

2.    **Edlund** Declaration ......................................................................... 273

3.    **Farley** Declaration .......................................................................... 286

4.    **Harris** Declaration .......................................................................... 388

5.    **Menzie** Declaration ......................................................................... 429

6.    **Moffitt** Declaration .......................................................................... 479

7.    **Mugunthan** Declaration ................................................................... 518

8.    **Olian** Declaration ............................................................................ 554

9.    **Saba** Declaration ............................................................................. 577

10.   **Spadaro** Declaration ....................................................................... 653

11.   **Stradling** Declaration ...................................................................... 723

12.   **Voltaggio** Declaration ...................................................................... 761

ALCD-PUBCOM_0000412

## I.   Executive Summary

In its Notice, DOJ reported that EPA "sponsored an allocation process, which involved hiring a third-party neutral to perform an allocation" which "concluded in December 2020 with a Final Allocation Recommendation Report that recommends relative shares of responsibility for each allocation party's facility or facilities evaluated in the allocation,"[6] and:

> After review of the Final Allocation Recommendation Report, EPA identified the parties who were eligible to participate in the proposed Consent Decree. Based on the results of the allocation, the United States concluded that the Settling Defendants, individually and collectively, are responsible for a minor share of the response costs incurred and to be incurred at or in connection with the cleanup of Operable Unit 2 and Operable Unit 4, for releases from the facilities identified in the proposed Consent Decree.[7]

DOJ's statements are not accurate in key respects.

The allocation violated CERCLA, which requires that a *court*, not EPA, allocate response costs through an open judicial process that tests and determines the sufficiency of evidence.

Instead, the report was prepared by an unqualified, former EPA employee, David Batson ("Batson"), a lawyer and mediator with no scientific training or qualifications. Unlike a court, Batson used self-reported, unverified, secret submissions to do his work. Lacking scientific or technical expertise, Batson made stunning mathematical errors, misapplied scientific concepts, and disregarded EPA's own scientific findings. All of this led him to reach the seriously inaccurate—and scientifically unsupportable—conclusion that OxyChem should bear nearly 100% of the cleanup costs, including the costs to clean up chemicals it never produced.

The report pertains solely to OU2, the Lower 8.3 miles of the river (the "Lower 8"). It makes no credible, scientific, peer-reviewed, or even competent finding of parties' responsibility for response costs in the Lower 8.

The report makes no finding at all regarding responsibility for costs in OU4, the Upper Nine miles of the river (the "Upper 9"), where the final remedy has not been determined and its costs are not known.

EPA's actions exceed its authority and are arbitrary and capricious in many respects. The proposed settlement should be rejected.

### A.   Background Relevant to Comments

EPA has repeatedly acknowledged that "the Lower Passaic River has been a highly industrialized waterway, receiving direct and indirect discharges from numerous industrial facilities" since at least "the late 1800s."[8] So much discharge had occurred before 1900 that the

---

[6] Notice at 2133.

[7] *Id.* The December 28, 2020 Diamond Alkali Superfund Site OU2 Allocation Recommendation Report by David Batson, Esq. of AlterEcho is referred to herein as the "Batson Report."

[8] Unilateral Administrative Order for Remedial Design for Operable Unit 4, USEPA Region 2 CERCLA Docket No. 02-2023-2011 (Mar. 2, 2023) ("OU4 UAO"), at ¶ 7; Administrative Settlement Agreement and Order on Consent for Removal Action, in re: Lower Passaic River Study Area of the Diamond Alkali Superfund Site, Occidental

ALCD-PUBCOM_0000413

Passaic was delisted as a commercial fish source. By 1926, the United States declared the river's "fish life destroyed."

EPA issued its Record of Decision for Operable Unit 2 (OU2) in 2016.[9] In March 2016, EPA sent letters to over 100 parties it identified as potentially responsible ("PRPs") for polluting the lower 8.3 miles (the Lower 8) of the Lower Passaic River Study Area ("LPRSA"),[10] the "17-mile, tidal portion of the Passaic River," from River Mile ("RM") 0 "to Dundee Dam (RM 17.4), and its watershed, including the Saddle River (RM 15.6), Third River (RM 11.3) and Second River (RM 8.1)."[11] *See* **Ex. 1** (Mar. 31, 2016 EPA letter to General Notice Letter recipients) at 3 ("By this letter, we notify all the parties on the attached list of potential liability for the lower 8.3 miles.").

In May 2017, EPA notified certain private parties that it intended "to use the services of a third-party allocator" to assign shares of responsibility for OU2. *Id.* at 3; *see also* Dkt. 84-1 (Declaration of Alice Yeh, "Yeh Declaration") at 5, ¶ 13 ("EPA informed all the PRPs that had been noticed in 2016 that the Agency intended to use the services of a third-party allocator with the expectation of offering cash-out settlements to additional parties.").

On September 18, 2017, EPA notified the private party PRPs that, "the Agency has concluded that the allocation process should include *all* of the potentially responsible parties for OU2 apart from the PVSC [and four municipal parties.]"[12] To conduct that allocation on behalf of the agency, "EPA retained AlterEcho to perform an allocation for OU2 that would assign non-binding shares of responsibility to the OU2 PRPs (excluding the public entities), and determine relative groupings, or tiers, corresponding to the nature of the PRPs' impact on OU2 and the remedial action for OU2."[13]

David Batson ("Batson")—a former EPA employee retained at AlterEcho to perform the "allocation"— has no scientific or judicial expertise. Before his retirement from EPA, he served as an "ADR" specialist and mediator for PRP groups. Batson's lack of qualifications or expertise led him to make stunning scientific and mathematical errors. His report is not merely inaccurate and unreasonable, it is so seriously flawed that it would be arbitrary and capricious for the United States to rely on it in deciding to accept the settlement.

## B.    EPA's Actions in Convening the Allocation Process Exceeded EPA's Authority

---

Chemical Corporation and Tierra Solutions, Inc., Respondents (June 23, 2008) (Region 2, CERCLA Docket No. 02-2008-2020) § 10(a).

[9] On March 4, 2016, EPA issued its Record of Decision for the lower 8.3 miles of the Lower Passaic River. *See* U.S. EPA, Record of Decision for the Lower 8.3 Miles of the Lower Passaic River Part of the Diamond Alkali Superfund Site; Essex and Hudson Counties (Mar. 3, 2016), *available at* https://semspub.epa.gov/work/02/396055.pdf (last visited Mar. 3, 2023) (the "OU2 ROD").

[10] *See* List of Parties That Received the March 31, 2016 Notice of Potential Responsibility for the Lower 8.3 Miles of the Lower Passaic River, OU2 of the Diamond Alkali Site, https://semspub.epa.gov/work/02/457510.pdf (last visited March 3, 2023); OU2 ROD § 2 (Site History and Enforcement Activities) ("over 100 industrial facilities have been identified as potentially responsible for discharging contaminants into the river").

[11] *See* OU2 ROD § 1 (Site Name, Location and Brief Description).

[12] Batson Report at 38 (Sept. 18, 2017 letter from EPA to General Notice Letter recipients).

[13] *See* Dkt. 84-1 (Yeh Decl. at 5, ¶ 14).

ALCD-PUBCOM_0000414

No provision of the CERCLA, the APA, or the ADR Act authorizes EPA to open an administrative proceeding to determine how much responsibility private parties bear for response costs at OU2 and OU4.

Congress specifically denied EPA authority to allocate responsibility for response costs in CERCLA, 42 U.S.C. § 9613(f)(2), authorizing only a court to allocate liability for response costs. In fact, Congress twice rejected requests by EPA to amend the statute to expand its authority to allocate costs through out-of-court proceedings using so-called neutrals. *See* Recycle America's Land Act of 1999, H.R. 1300, 106th Cong. (1999); Superfund Reform Act of 1994, S. 1834, 103d Cong. (1994).

By conducting an unauthorized allocation of costs and seeking to make it binding through a consent decree, EPA exceeded its statutory authority. Congress did not authorize EPA to determine which parties were liable for cleanup costs or, as EPA has determined here, "[]that the Settling Defendants, individually and collectively, *are responsible for* a minor share of the response costs incurred and to be incurred in the cleanup of Operable Unit 2 and Operable Unit 4."[14]  *See* Parts II & III(A), *infra*.

### C.     EPA's Proposed Settlement Is Arbitrary and Capricious Because It Relies Solely on an Allocation Process That Exceeded EPA's Authority

CERCLA imposes stringent limits on EPA's use of allocations of responsibility. CERCLA authorizes EPA to engage *only* in a non-binding allocation of responsibility, the results of which are not admissible in evidence for any purpose. 42 U.S.C. § 9622(e)(3). These limitations on EPA's use of allocations of responsibility are not only emphatic, *see id.* at 42 U.S.C. § 9622(e)(3)(C) (providing that "no court shall have jurisdiction to review the nonbinding allocation of responsibility"), but have been reiterated by Congress—which has twice *refused* to amend CERCLA to permit EPA to employ an allocation process nearly *identical* to the one EPA retained Batson to conduct. *See* Superfund Reform Act of 1994, S. 1834, 103d Cong. (1994); Recycle America's Land Act of 1999, H.R. 1300, 106th Cong. (1999). *See also* Parts II(A)-(B) & III(A), *infra*.

The ADR Act does not expand this authority. EPA recognized this. In 1999—after the ADR Act was enacted—it went back to Congress and again sought an amendment to grant EPA the authority it desired to mandate agency (rather than in-court) allocations of responsibility for cleanup costs. Congress again refused. *See* Part II(B)-(C), *infra*.

OxyChem and several others chose—as was their right—not to participate in EPA's unauthorized, unlawful Batson process. Batson punished OxyChem severely for this. In a capricious, arbitrary way, Batson increased OxyChem's alleged liability for response costs by an enormous amount, not based on any scientific finding, but rather because OxyChem exercised its constitutional right to insist on the judicial allocation of costs CERCLA mandates. EPA's actions in permitting Batson to retaliate against OxyChem for a constitutionally protected act, and in then ratifying that punishment by adopting the resulting, punitive allocation as the basis for this proposed settlement, are arbitrary, capricious, and violate due process. *See* Part III(A)(3), *infra*.

---

[14] Notice at 2133 (emphasis added).

3

ALCD-PUBCOM_0000415

EPA pushed forward anyway, pursuing what EPA claimed was a "***non-binding allocation process***." EPA's actions in seeking to make this "non-binding process" binding through a consent decree exceed its authority and are arbitrary and capricious.

Equally arbitrary and capricious is EPA's claim that the process it announced as a non-binding allocation of responsibility of CERCLA response costs was not conducted under CERCLA, but rather was conducted under the ADR Act. EPA's attempt to provide authorization for this process under the ADR Act after the fact fails because no part of that statute authorizes this process, either. Contradicting the ADR Act, the process made OxyChem a nonconsensual participant, authorizing the so-called neutral—Batson—to "represent" OxyChem's interests[15] without its consent or knowledge. By definition, a *non-binding* process cannot thereafter be invoked to bind the parties—particularly those whom EPA had no power to *compel* to participate in it, such as OxyChem.

All of this violated the allocation protocol, again exceeded EPA's authority, deprived OxyChem of due process, and violated Article I and Article III of the Constitution. *See* Parts II(C) & III(A), *infra*.

### D.    The Batson Report Cannot Support EPA's Exercise of Settlement Discretion and No Consent Decree Can Be Entered Based on It

EPA's actions exceed its authority and violate Due Process, Article I and Article III of the Constitution. The same would be true of any effort by the United States to support entry of the proposed consent decree based on the Batson Report because:

- The report is inadmissible in evidence under CERCLA Section 122(e)(3)(c);

- To the extent EPA insists the Batson process was an ADR proceeding, Section 574 of the ADR Act does not permit any offer of an ADR Act report into evidence against a party (like OxyChem) whose alleged responsibility is the subject of that report; and

- Federal Rule of Evidence 408, which governs in any proceeding to seek entry of the proposed consent decree, prohibits the report's admission.

OxyChem notified EPA in writing at the outset that the proposed allocation process could not offer "the 'transparency and fairness' that EPA has 'consistently stated are of importance to the Agency.'"[16] In the same letter, OxyChem raised concerns that:

- "Allocation of costs is a judicial, not an administrative, function under CERCLA"[17];

- "Basic fairness requires that the equitable responsibility for these staggeringly large costs be ascertained carefully and with due process. As a matter of economics, single percentage inaccuracies in the allocation could shift millions of dollars in cost to parties who should not be required to bear them."[18];

---

[15] *See* Batson Report, Attachment E (Revised Work Plan for the Allocation) at 120 ("Occidental (OCC) not being a participating party as had been anticipated and OCC filing a lawsuit against [Participating Allocation Parties] have substantially increased the level of effort required of the Allocation Team, which will spend additional resources to ensure that *OCC is fairly represented in the allocation process…*" (emphasis added)).

[16] **Ex. 2** (Oct. 12, 2017 OxyChem letter to Eric Wilson, EPA) at 1.

[17] *Id.*

[18] *Id.* at 4.

4

- EPA lacked "adequate information from which to derive an equitable allocation of costs"[19];

- By focusing on only *two* of the eight chemicals of concern identified in the OU2 ROD, EPA had "inexplicably abandoned its own finding concerning the drivers" of the OU2 remedy[20]; and

- "[T]he process, as outlined thus far, will not (and cannot) arrive at a cost allocation which ensures that *all liable PRPs pay their fair share*."[21]

Even the companies that now support the settlement because it is so wildly and unfairly favorable to them expressed similar concerns about relying on the Batson process at the outset. The Small Parties Group ("SPG")—a misnamed group of 50, mostly large and multinational companies—and Benjamin Moore & Co. each wrote to EPA saying that EPA did not have statutory authority to conduct this process, could not ensure a full and fair assessment of liability, and was wrongly excluding the PVSC and municipal entities whose interests could be affected dramatically by it.

Specifically, though they now impermissibly offer AlterEcho and Batson's allocation as evidence of OxyChem's share of liability,[22] the SPG recognized then that "to be credible, . . . the allocation must be complete and comprehensive," writing that EPA's proposed process "leaves the relevancy of [] documents to be added/produced to be determined by each individual party producing said documents"; that "to insure that a level playing field is established, all key, relevant information must be collected before the allocation process commences so that no advantage is gained by a party due to the lack of sufficient information in EPA's database or the failure of a PRP to undertake a diligent inquiry and produce relevant documents"; and that "EPA has not identified all viable parties in this matter for the allocation of OU2"—including the Passaic Valley Sewerage Commission.[23]

Benjamin Moore & Co. ("Benjamin Moore")—now one of the settling defendants—warned EPA that it lacked statutory authority to conduct the process EPA proposed:

> There appears to be no statutory basis for the Batson allocation—which can be summed up as an EPA-improvised process for organizing certain information and allocating measures of OU2 responsibility in anticipation of a court-approved endorsement of settlement. But Congress has already mandated the process for an allocation in aid of settlement—a nonbinding preliminary allocation of responsibility ("NBAR")—in section 122(e)(3) of [CERCLA]. EPA issued guidelines for NBARs at 52 Fed. Reg. 19,919

---

[19] *Id.*

[20] *Id.* at 2; *see also id.* ("EPA has no scientific or administrative basis on which it can now abandon the findings of the ROD—after selecting the remedy—in favor of an allocation process that will apportion costs based on only three chemicals of concern, ignoring all other contaminants and PRPs in the process.").

[21] *Id.* at 5.

[22] *See* Jan. 23, 2023 SPG letter to Special Master Thomas P. Scrivo, Esq., Dkt. 2266 in Case 2:18-cv-11273-MCA-LDW in the United States District Court for the District of New Jersey (hereinafter the "Contribution Action") at 2 (contending that the Batson Report "confirms . . . that OxyChem should be responsible for the overwhelming share of the cleanup costs").

[23] *See* Ex. 3 (Jan. 30, 2018 SPG letter to Eric Wilson, USEPA) at 1, 3 & 4.

ALCD-PUBCOM_0000417

(May 28, 1987). Per the EPA's guidelines, an NBAR is intended only as an aid to settlement among those parties who participate and EPA, and not as a justification for a contested settlement. The very nature of an NBAR confirms its more limited purpose; an NBAR is a voluntary allocation process, the results of which (i) may be adjusted by the PRPs after preparation, and (ii) cannot be introduced in any court proceeding (including one for the entry of a consent decree).[24]

When the Batson Report is excluded from consideration, as it must be because Congress deprived any reviewing court of the power to consider it, 42 U.S.C. § 9622(e)(3), there is no factual basis to support the reasonableness of EPA's proposed settlement, which seeks to release 85 parties from joint and several liability for $1.82 billion for what EPA admits is a "minor" cash payment. *See* Part III(B), *infra*. And, even if the reviewing court could consider the Batson Report (it cannot) the report is so plagued with errors that it affords no basis at all on which to evaluate the reasonableness of the proposed settlement.

E.    **EPA's Settlement Is Arbitrary and Capricious Because It Discloses No Relationship Between the Amount Each Party Is Paying and the Respective Costs To Perform the Remedies in OU2 and OU4**

EPA has never disclosed to the United States or the public how much each party to the settlement is paying or how each party's payment reflects its alleged "share of responsibility" for OU4 as distinct from OU2.

EPA cannot disclose that information because EPA has no way to know whether any such relationship exists. The settlement is a bulk settlement. The amount each party is paying (and what they are paying for) have been concealed from the United States and from the public.

CERCLA requires the United States and, eventually, the reviewing court to assess whether a settling party's payment bears a reasonable relationship to the costs being resolved in the settlement. There is no basis on which the United States (or a court) can do that here. No party's individual payment is disclosed, nor is there any disclosure of what portion of any payment reflects responsibility for OU2 versus OU4, much less any disclosure of how each party's settlement payment purportedly bears a reasonable relationship to the $1.82 *billion* of liability for costs being released. *See* Part III(B)(2), *infra*.

The settlement does not require any settling party to perform any actual cleanup work at all and no part of its proceeds are dedicated to actual cleanup work. Instead, the only disclosed use for the settlement monies is to reimburse EPA for its administrative and oversight costs. Not a penny is dedicated to actual cleanup work.

This too is arbitrary and capricious. It contradicts 40 years of consistent EPA guidance— and CERCLA's intentional design—to secure voluntary settlements for large-scale cleanup work, leaving private parties free to litigate among themselves who is responsible for the costs. *See* Parts II(B)(3) & VI(A), *infra*.

---

[24] **Ex. 4** (Feb. 13, 2018 Benjamin Moore letter to Juan M. Fajardo, Esq., USEPA).

6

ALCD-PUBCOM_0000418

**F.    EPA's Settlement Is Arbitrary and Capricious Because It Seeks Without Authority To Bar OxyChem's Claims for Contribution for Costs It Has Incurred and Will Incur**

CERCLA Section 113(f)(2) provides that a person who has "resolved its liability *to the United States* . . . shall not be liable for claims for contribution regarding matters addressed in the settlement." 42 U.S.C. § 9613(f)(2) (emphasis added). CERCLA Section 113(f)(1), in contrast, provides that any person who incurs response costs itself "may seek contribution from any other person who is liable or potentially liable" for those costs. 42 U.S.C. § 9613(f)(1). In 2018, OxyChem invoked its statutory rights under CERCLA to seek a judicial allocation of response costs by the United States District Court.[25]

OxyChem—and *not* the United States—has incurred significant response costs under a September 2016 Administrative Settlement Agreement and Order on Consent (the "2016 ASAOC").[26] Pursuant to the 2016 ASAOC, OxyChem agreed to undertake the design of the EPA-selected remedy in OU2 on its own, but subject to the right to seek contribution from others responsible for the Passaic's pollution. EPA estimates the cost of this work to be $165 million. OxyChem has also incurred and continues to incur significant response costs (that the United States has not incurred) pertaining to the siting and design of an Upland Processing Facility (UPF) that must be built before the remedy can be implemented in OU2. OxyChem has also incurred, and is continuing to incur, costs pertaining to a recently-issued Unilateral Administrative Order requiring OxyChem to design the interim remedy for the upper nine miles of the Passaic River in OU4. EPA estimates the cost of this work to be $71 million. In the Contribution Action, OxyChem also sought—and the District Court sustained its right to pursue—a declaratory judgment for all response costs OxyChem might incur in the future.

In the first half of 2022, OxyChem made two more offers of response work that would have meant additional progress on *both* OU4 and OU2 before the end of that year:

- On January 13, 2022, OxyChem offered both to perform the remedial design and implement the interim remedy set out in the OU4 ROD,[27] at an EPA estimated cost of $441 million. In return, OxyChem asked that EPA not enter any cash-out settlement for OU4, but instead to allow *OxyChem* to pursue recoveries of costs. EPA did not accept, or even respond, to OxyChem's January 13, 2022 offer.

- In March and May 2022, EPA sent a letter to OxyChem and a few other companies, requesting "good faith offers" to implement the remedial actions for OU2 and OU4. OxyChem responded on June 27, 2022, *once again* offering to design and implement the interim remedy in OU4.[28] OxyChem also offered to implement the OU2 remedy through a series of agreements that would allow work to move forward as it was planned and designed.[29] EPA acknowledged receipt of OxyChem's offer, but never substantively responded.

---

[25] The Contribution Action is Case 2:18-cv-11273-MCA-LDW in the United States District Court for the District of New Jersey.

[26] *See generally* **Ex. 5** (Nov. 7, 2018 OxyChem letter to EPA Region 2).

[27] *See* **Ex. 6** (Jan. 13, 2022 OxyChem letter to EPA Region 2).

[28] *See* **Ex. 7** (Jun. 27, 2022 OxyChem letter to EPA Region 2) at 2.

[29] *Id.* at 2-3.

ALCD-PUBCOM_0000419

None of the costs OxyChem has incurred (or will incur) to respond to hazardous substances in the Site have been incurred by the United States. Every penny of costs for work OxyChem has performed has been incurred (and will be incurred) by OxyChem *alone*. The settling defendants therefore do *not* have "liability to the United States," 42 U.S.C. § 9613(f)(2), for response costs incurred by OxyChem; instead, the settling defendants are liable only *to OxyChem* for those costs.

By purporting to allocate liability for response costs incurred by OxyChem in its settlement, EPA exceeded the statutory limits of its authority under CERCLA.[30] The settlement term that purports to bar OxyChem's right to seek contribution for costs OxyChem has incurred and will incur, and that the United States has not incurred and will not incur because of work OxyChem itself has performed, exceeds the limits of CERCLA Section 113(f)(2) and—if approved—would be an unconstitutional taking of OxyChem's property.[31] *See* Part IV below.

### G.    EPA's Reliance on the Batson Report Is Arbitrary and Capricious Because It Reveals a Collusive Settlement Dominated by the Settling Parties

Lacking relevant expertise or independence, Batson allowed the participating parties to co-opt his "allocation" process to serve their own ends. The participating PRPs—who have now been rewarded with a proposed release of $1.82 billion in joint and several liabilities—were allowed to decide what information Batson would be allowed to consider. They determined what they would (and would not) disclose to him about their own operations and pollution of the Passaic River. They were allowed to "correct" his data sheets. He even allowed them to participate in the drafting of his so-called report, anonymizing their comments so there would be no way to trace where his reasoning stopped and theirs began. *See* Part V, *infra*.

The Batson Report was in no way an independent or accurate allocation of costs or a process that complied with the limits of EPA's authority under CERCLA. Quite the contrary: it is nothing more than a mediated agreement among some PRPs that another party—OxyChem—should bear the lion's share of the costs to clean up the river. To achieve that collusive end, the process that EPA permitted and that Batson implemented was contrived to overstate OxyChem's alleged responsibility for cleanup costs, while understating the liability of settling parties. *See* Part VI(B), *infra*. The report is nothing more than the settling parties' *ipse dixit*, rendered through the deeply-flawed, wildly-inaccurate report issued by Batson. The United States cannot rely on a

---

[30] *See e.g.*, *Akzo Coating of Am., Inc. v. Am. Renovating*, 842 F. Supp. 267, 271 (E.D. Mich. 1993) ("If defendants were permitted to settle with the government for part of the cleanup costs of a site, and then become immune from suit for contribution by private entities who paid for other cleanup costs, it would defeat the policy of CERCLA."); *United States v. Hardage*, 750 F. Supp. 1460, 1493 (W.D. Okla. 1990) ("CERCLA provides the United States with no authority to settle private party response cost claims.").

[31] The U.S. Chamber of Commerce has also expressed concerns about EPA granting settling defendants contribution protection from private parties—like OxyChem—who have themselves incurred response costs:

  By absolving select [potentially responsible parties ("PRPs")] of liability for contribution to other PRPs through settlement, the Agency disposes of the claims of absent parties. Depending on how it is employed, such a practice raises the potential for due process and takings issues, particularly in cases where absent parties may have strong claims against settling PRPs who bear considerable responsibility for contributing to the cleanup costs at issue. This practice amounts, in effect, to a protection racket, as the government may lack the legal authority to extinguish another person's claims for response costs under CERCLA.

Mar. 21, 2023 letter from U.S. Chamber of Commerce to Administrator Regan and Assistant Attorney General Kim, *available at* https://www.uschamber.com/assets/documents/230321_Comments_CERCLA_EPA_DOJ.pdf (last visited Mar. 21, 2023) (footnotes and quotation marks omitted).

8

ALCD-PUBCOM_0000420

captive, mediated report of a purported (but not actual or authorized) allocation of costs to accept a settlement that wrongly places nearly 100% of the responsibility on OxyChem. The United States should reject the settlement. *See* Parts III & VI, *infra.*

The process was separately arbitrary and capricious because it imposed no consequences on the participants for lack of candor or for outright misrepresentations. EPA permitted Batson to rely on sham "certifications" that provide no assurance that any settling party disclosed the full extent of its responsibility, a system so toothless that several parties gamed it to obtain settlements based on misrepresented or overtly concealed facts. Incredibly, the settlement also contains no provision permitting it to be reopened even if—as shown herein—a party has seriously misrepresented facts to the allocator or concealed material facts from him. *See* Part VII, *infra.*

### H.    EPA's Reliance on the Batson Report To Justify Its Settlement Decision Is Arbitrary and Capricious Because Batson Is Unqualified To Conduct an "Allocation" of Costs and His Report Is Plagued With Serious Errors

Given its fatal procedural flaws, it is hardly surprising that the Batson Report is plagued with fundamental errors, grave misstatements, and overreach. The report lacks scientific or analytic substance because David Batson is not a scientist, and his process was not a disinterested, independent, scientific process. Quite the contrary: it was a process designed and manipulated to reach the outcome the participating PRPs sought: an outsized, unsupportable assignment of nearly 100% of the responsibility to OxyChem.

By training and experience, Batson is unqualified to allocate the costs of environmental remedies. His lack of qualifications affords EPA no basis to rely on his work to draw any conclusions about the responsibility of individual parties to pay response costs—even assuming EPA had that authority, which it does not. *See* Part VI(B)(3)(f), *infra.*

The two courts that have considered Batson's purported allocations of costs and methodology in other cases have rejected his work, describing it as a result-driven process designed to increase the responsibility of one disfavored party over those Batson preferred or represented. *See* Part VI(B)(3)(e), *infra.*

The same is true here. Though directed by EPA to apply inferences consistently to all parties (including OxyChem) Batson does the opposite, picking and choosing the inferences he will apply to OxyChem and—in each case—choosing the one that will *increase* OxyChem's alleged share of responsibility. *See* Part VI(B), *infra.*

- **Where an inference would reduce OxyChem's liability, Batson ignores it.** In evaluating factors such as cooperation" and "culpability" Batson disregards EPA's finding that OxyChem itself never polluted the river and never mentions the extensive and consistent history of OxyChem's cooperation with EPA in OU2—the area of costs he is purporting to allocate. Conversely, he rewards the settling parties with cooperation points despite the fact they uniformly, and in writing, *refused* to perform any work on OU2.

- **Where an inference reduces the settling parties' responsibility, Batson does not apply the same inference to OxyChem.** In the case of contaminated historic fill, Batson *removes* consideration of historic fill when he assesses the settling parties' responsibility but does *not* remove it from OxyChem. This has the effect of assigning to OxyChem the responsibility to clean up chemicals in historic fill that there is no evidence the Diamond Alkali plant ever produced or used, such as mercury, lead, and copper.

9

- **Where Batson is unable to eliminate the settling parties' liability for contaminants they produced, he removes it**. Batson misapplies a settled scientific concept—attenuation—in a manner contrary to EPA's own scientific findings and guidance. Batson's made up "attenuation" reductions allow him to make 99% of the chemicals the settling defendants put in the Passaic River *vanish*. This unscientific attenuation alchemy whisks away the settling parties' responsibility for chemicals they produced, converting them to an "orphan" share—even though the "parents" responsible for those chemicals are, in fact, known and identified by Batson.

- **Batson uses his fictitious "orphan" share to make OxyChem pay to clean up chemicals it never produced**. Rather than making the parties who produced these chemicals pay to clean them up, Batson distributes this alleged (but not actual) "orphan share" ratably, shifting arbitrarily to OxyChem the costs to cleanup chemicals it never produced.

- **Batson contradicts EPA's scientific determinations in the OU2 ROD by assuming that a single chemical (dioxin) is responsible for 84% of cleanup costs**. This single assumption is the biggest factor that explains how Batson reached such an erroneous assignment of liability to OxyChem.  It is flatly wrong.  To make this assumption, Batson must ignore, minimize, or disregard EPA's findings that there are eight contaminants of concern, four with specific remedial goals, and two—dioxins and PCBs—whose producers would be expected to perform the remedy. Batson achieves his unscientific and unsupportable assignment of liability to OxyChem by assuming (contrary to EPA's findings and consistent position) that only dioxin matters to the cleanup. His report amounts to a tautology: only dioxin matters so dioxin bears all the costs.  But Batson's tautology is not true, either on the science or EPA's own Records of Decision.

- **Batson's "assessment" of OxyChem's share of dioxin responsibility is wrong because it relies on improper inferences from the absence of evidence**. Batson assumed that because the settling parties and EPA didn't *tell* him about other dioxin sources, there were none.  Batson was wrong.  OxyChem has made EPA aware of at least two significant, additional dioxin sources:  Clean Earth of New Jersey, Inc. ("Clean Earth") and Ashland LLC's Drew Chemical facility.  Neither was considered by Batson; both have significant responsibility for dioxins. Batson made a different evidence error about Givaudan Fragrances Corporation: He assumed Givaudan had presented to him all available information about its operations and discharges of dioxins.  Givaudan did not.

- **Batson finds that OxyChem—a company with an extensive record of *voluntary* cooperation—has cooperated *less* than any of the settling defendants**.  This ignores OxyChem's cooperation and minimizes the settling parties' refusal to cooperate, in any way, with the remedy in OU2.  In fact, the *sole* basis for Batson's refusal to credit OxyChem with cooperation is that it refused to participate in his unauthorized, unlawful allocation process.  Punishing a party for exercising its constitutional and statutory rights in this way is fundamentally unfair and deprived OxyChem of due process.

- **Batson assigns extreme culpability to OxyChem, ignoring EPA's finding that OxyChem itself never polluted the river and is liable as a bare successor to the Diamond Alkali Company**. Batson attempts to justify an extreme culpability finding against OxyChem by treating as OxyChem's *own* the acts of employees of the

10

Diamond Alkali that were committed decades *before* OxyChem bought the company's stock. Equally outrageous is that neither Batson nor EPA assigns similar, extreme culpability findings to parties whom the evidence shows destroyed documents, concealed material facts, and refused to cooperate with EPA.

These result-driven and inconsistently applied inferences violate the allocation protocol Batson was supposed to follow. They deprived OxyChem of due process and the rights it has to a judicial allocation of costs under CERCLA. It is arbitrary and capricious and fundamentally unfair for EPA to rely on Batson's analysis as the sole basis for its settlement decision, particularly given that the report makes assumptions and uses processes that are directly contrary to EPA's protocol and its own scientific findings. *See* Part VI(B), *infra.*

Apart from applying inferences inconsistently to similarly situated parties, Batson fails to apply accurately basic scientific standards, EPA's own scientific findings and guidance, or even simple arithmetic. The report is plagued with fundamental conceptual errors and math mistakes. For example, Batson mistakes parts per million for parts per billion, resulting in *a thousand-fold overstatement of OxyChem's alleged responsibility*. This, alone, requires rejecting the settlement.[32] And there are many others, some described below but in total too numerous to catalogue. *See* Part VI(B), *infra.*

The captive and collusive nature of the Batson process created other serious errors that individually and in combination caused Batson to seriously understate the responsibility of more than twenty parties for polluting the Passaic River. These errors vary, but all of them render unreliable Batson's "allocation" of costs to at least: BASF Corporation; Bath Iron Works; Benjamin Moore & Co.; Conopco, Inc.; EnPro Holdings, Inc.; General Electric Company; Givaudan Fragrances Corporation; ISP Chemicals LLC; Kearny Smelting & Refining; the parties at the 600 Doremus Avenue Site (Legacy Vulcan, LLC, McKesson Corporation, and Safety-Kleen Envirosystems Company); L3Harris Technologies, Inc.; Montrose Chemical; Noveon-Hilton Davis; Pitt-Consol Chemicals Company; PPG Industries, Inc.; Sequa Corporation/Sun Chemical Corporation; The Sherwin-Williams Company; and STWB Inc. *See* Parts V, VI(B), VII, & Appendix A *infra.*

OxyChem also uncovered significant evidence of responsibility on the part of parties EPA excluded from the process, including Ashland LLC ("Ashland") (for a Drew Chemical facility highly contaminated with dioxins) and Clean Earth of North Jersey, Inc. ("Clean Earth") (a company with a long history of environmental violations whose property is, likewise, highly contaminated with dioxins and PCBs). Batson's erroneous assumptions that he had all relevant information, and that he had all relevant parties before him, again render his report wholly unreliable. He did not know what he was measuring, all parties that contributed, or what their responsible actions had been. The *absence* of this relevant information does not provide any *substantial evidence* to support EPA's settlement decision. *See* Parts VI(B)(2)(a) & VII(C), *infra.*

Taken individually, or together, Batson's errors are stunning, and EPA would have discovered them had they taken the time to subject it to an independent peer-review, like all other credible science reports. Batson's report is wholly unreliable. It is fundamentally flawed. And it fails to demonstrate any rational relationship between the settling parties' alleged share of

---

[32] The Third Circuit reversed a district court allocation that made a similar error. *See Trinity Industries, Inc. v. Greenlease Holding Co.*, 903 F.3d 333, 358 (3d Cir. 2018) (vacating district court's allocation in CERCLA contribution action because "the District Court treated conceptually distinct units of measurement as equal").

11

responsibility and the (unknown and concealed) amount each of them is paying to settle their joint and several liability for $1.82 billion in cleanup costs. *See* Parts III(B) & VI(B), *infra*.

EPA's reliance on a report this fundamentally flawed as the sole basis to release 85 parties of joint and several liability for the $1.82 billion of joint and several liability for the cleanup of the Passaic River is arbitrary and capricious.

The United States cannot rely reasonably on a report with fundamental measurement and scientific errors like these. It would be arbitrary and capricious to do so. And the United States should not do so, when what is at stake is so serious. The settlement proposes to release 85 large, corporate parties from all liability to perform an essential, $1.82 billion cleanup of the Passaic River in historically overburdened communities. Furthermore, none of the settlement funds are dedicated to the actual cleanup of the river. Settlements are supposed to achieve results. No one from EPA or the settling parties has argued that this one does. Defending the non-peer reviewed, junk science in the Batson Report is wrong. Supporting the settlement is wrong. The United States should reject both.

## I.   EPA Acted Arbitrarily in Refusing To Reevaluate the Proposed Settlement Based on Highly Relevant Evidence Certain Parties Withheld From or Misrepresented to Batson

It is essential to note that Batson (an EPA consultant) had no power to compel the parties to turn over documents and evidence. He relied on the participating companies to provide him information and then took that information at face value. And his process (like the proposed settlement) imposed no penalties for parties that concealed information, destroyed documents, or misrepresented facts.

OxyChem did not believe that kind of informal process meets judicial standards. Accordingly, as Congress permitted, EPA initiated a CERCLA contribution action that would determine parties' responsibility for cost in court—as Congress mandated—with the benefits of due process and the ability to compel the production of evidence.

Through that court-supervised process, OxyChem has discovered substantial, highly-relevant evidence pertaining to the responsibility of certain companies included in EPA's proposed settlement.

Though OxyChem turned over this newly-discovered evidence to EPA, it was not considered in the Batson Report. The documents OxyChem uncovered show that several companies (whom the allocation report rewards for their alleged "cooperation" with EPA) have either willfully or negligently withheld from EPA critical information about their operations, their releases of hazardous substances, or their liability for response costs. Some examples:

- Givaudan Fragrances Corporation ("Givaudan") was once the *largest* U.S. producer of hexachlorophene—a product known to create 2,3,7,8-TCDD dioxin when manufactured in alkaline and high-temperature processes. It did not provide to EPA or Batson information about its Clifton-based, hexachlorophene manufacturing process that used *alkaline conditions* and *high temperatures*, a process Givaudan admits would generate 2,3,7,8-TCDD. Givaudan also misrepresented to EPA the existence of surface swales on its property that carried stormwater runoff over soils highly contaminated with dioxin to an outflow in the Passaic River. *See* Parts VI(B)(2)(a), VII(D)(2), & Appendix A, below.

12

ALCD-PUBCOM_0000424

- The Sherwin-Williams Company ("Sherwin-Williams"), a company with a $55+ billion market capitalization, cannot explain the disappearance of key documents EPA ordered it to retain and withheld over 33,000 pages of other documents —some going back as far as 1901—showing that its plant used enormous amounts of mercury, PCBs, DDT, and other chemicals it has for decades told EPA were never used. In just four years of its operations, Sherwin-Williams consumed thousands of pounds of the PCB mixture Aroclor-1254 and also regularly used and received DDT at its site (producing within one year's time over 200,000 pounds or gallons of "Pestroy," a pesticide with DDT as an active ingredient). *See* Part VII(D)(2) & Appendix A, below.

- Though obligated to do so, the Kearny Smelting & Refining Corporation ("Kearny Smelting") failed to forward to Batson recent and troubling sampling results that show PCB contamination at its site that is thousands of times higher than reflected in any of the sampling data it initially provided to Batson, and that would have made Kearny Smelting the largest PCB contributor under Batson's protocol. *See* Part VII(C)(2) & Appendix A, below.

OxyChem informed EPA of these serious errors on several occasions. Despite clear evidence that these parties had misrepresented facts, or have been unable to explain missing documents, or concealed relevant information about their pollution, an EPA lawyer shrugged it off, asserting this evidence "did not move the needle." OxyChem believes this evidence should be considered by the Court, as Congress intended, not swept under the rug by EPA because Batson never considered it.

A settlement decision that is not affected or altered by clear evidence of wrongful actions by a party that is about to obtain a $1.82 billion release of liability is arbitrary and capricious and obviously unfair. EPA's indifference to the actual *evidence* of parties' liability and responsibility can give the United States no confidence that EPA has exercised its settlement discretion honorably, fairly, or based on the evidence. What EPA has done is to find parties who will agree to pay it cash for EPA's administrative and oversight costs—and it has sold them a release for cash, in exchange.

This is wholly unsupportable. It violates EPA's environmental justice mandates, and it requires that the settlement be rejected because it raises a fundamental question: if EPA is prepared to ignore evidence of serious misconduct like this, what *else* has it ignored behind the veil of secrecy it lowered (and still maintains) to conceal how this settlement was negotiated?

## J.    EPA's Actions Are Arbitrary and Capricious in Relying on the Batson Report To Release Claims for Response Costs in OU4

It is separately arbitrary and capricious for EPA to propose releasing parties from liability to perform remedial work in OU4 because no record evidence exists—or can exist—based on the Batson Report to support this decision.

EPA retained Batson specifically and expressly to prepare an allocation report on shares of responsibility for OU2. EPA never notified OxyChem or the public that the Batson Report would evaluate responsibility for the costs to implement the interim remedy in OU4. When issued in December 2020, Batson's Report confirmed its stated objective was "to establish the relative equitable responsibility of certain parties for a portion of the costs of remediating Operable Unit 2 (OU2) of the Lower Passaic Diamond Alkali Superfund Site." Batson Report at 6.

In fact, Batson did *not* evaluate OU4 or purport to allocate costs for any remedy in that Operable Unit. His report was issued nine months *before* EPA issued its record of decision for an

13

interim remedy for the Upper Nine Miles of Operable Unit 4 (the Upper Nine).[33] That Record of Decision prescribes a fundamentally different interim remedy for the Upper Nine than for the Lower Eight in OU2, finding that the full costs to implement the remedy in OU4 are not yet known or even knowable.

Ignoring the limitations of the Batson Report, and the absence of *any* findings by him allocating costs for either the interim remedy in OU4 or the eventual final remedy, EPA's published notice in the Federal Register confirms the Batson Report is the sole basis on which it has included OU4 in the settlement proposed by the consent decree:

> After review of the Final Allocation Recommendation Report, EPA identified the parties who were eligible to participate in the proposed Consent Decree. Based on the results of the allocation, the United States concluded that the Settling Defendants, individually and collectively, are responsible for a minor share of the response costs incurred and to be incurred at or in connection with the cleanup of Operable Unit 2 and Operable Unit 4, for releases from the facilities identified in the proposed Consent Decree.[34]

Even if the Batson Report were authorized by Congress and reliable (it is neither), it is arbitrary and capricious and unlawful on both statutory and constitutional grounds for EPA to rely on it as the sole (or even as part of) the basis for EPA's decision to settle and release parties from responsibility for costs to implement remedies in OU4.

EPA's scientific findings confirm that the conditions, contamination, and hydrodynamics in the Upper Nine are markedly different from those in the Lower Eight, requiring a different—and interim—remedial approach rather than the permanent remedy contemplated for OU2. The Batson Report does not address or consider any of this, nor could it: Batson issued it before the *interim* remedy for the Upper Nine was selected, and the final remedy is not yet known.

The settlement must be rejected as to OU4. There is no basis on which the United States (or a court) could conclude that whatever amount the settling parties are paying that is attributed to the Upper Nine—an amount that EPA also fails to disclose—bears any reasonable relationship to the unknown amount of costs that will be incurred to build the interim and, eventually, the final remedy for the Upper Nine. *See* Part VIII, *infra*.

### K.    EPA's Actions in Making the Allocation Report Public Were Arbitrary, Capricious, and Violate Due Process

Two years after AlterEcho issued the Batson Report, the United States filed its complaint in December 2022 in *Alden Leeds*, seeking court approval of its $150 million proposed settlement with the 85 settling defendants. In and related to that filing, the United States made the Batson Report available for the first time to OxyChem and the public.

---

[33] EPA issued its Record of Decision for an Interim Remedy in the Upper 9 Miles of the [LPRSA] (the "OU4 ROD") in September of 2021. EPA estimated the cost to design and implement this interim remedy as $441 million but noted that the full costs to remedy contamination in the Upper Nine would not be known until after the interim remedy was constructed, operational, and could be evaluated for its effectiveness, at which point a final remedy—of unknown and currently unknowable cost—will be selected.

[34] Notice at 2133.

ALCD-PUBCOM_0000426

EPA's actions intentionally and wrongfully tarred OxyChem with an inaccurate and scientifically unsupported (and unsupportable) allocation of nearly 100% responsibility for the costs of the cleanup.

The United States' public dissemination of an *ex parte*, inadmissible, and wholly unreliable report to damage OxyChem in the public eye (and in the eyes of the reviewing court) was *exactly* what Congress prohibited in CERCLA Section 122(e)(3)(C).

EPA's actions in making the Batson Report public were arbitrary and capricious. They smack of a malicious attempt to deprive OxyChem of due process. OxyChem has a right under CERCLA to have the Court decide the fairness of the proposed settlement *without* considering the inadmissible report of a "non-binding allocation of responsibility" that Congress deprived the Court of jurisdiction to consider.

EPA's wrongful actions sought to foreclose OxyChem's unfettered exercise of its constitutional and statutory rights to a fair, transparent, evidence-based *judicial* allocation of responsibility that conforms to the requirements of due process. EPA's arbitrary and capricious actions in making the Batson Report public and in presenting it to the Court in support of the proposed settlement are an egregious violation of OxyChem's rights and a gross excess of EPA's authority. The United States should reject the settlement because EPA's actions have fundamentally tainted the process by which EPA seeks the settlement's approval. *See* Parts II, III, IV & V, *infra*.

EPA's actions in persisting with this settlement have also prompted significant public concern. The settlement creates enormous financial risks for the Passaic Valley Sewerage Commission, on which will fall every bit of the settling parties' responsibility if their payment proves insufficient. *See* Part VI(A), *infra*. The proposed settlement is also contrary to EPA's environmental justice mandates. Rather than making polluters pay, it will make the public pay, because OxyChem is *not* liable to pay for the costs to clean up hazardous substances that the settling parties disposed of through the PVSC sewer system. *See* Part VI(A)(2), *infra*.

The settlement is understandably opposed by many in the over-burdened communities around the Passaic River, all of whom have been left to wonder why EPA breached its promise to make polluters pay and is instead allowing them to write a check and walk away from their responsibility for a $1.82 billion cleanup. *See* Part VI(A)(2)-(3), *infra*.

EPA's actions to exceed its authority are of independent concern because an agency that fails to abide the limits of its authority acts lawlessly. And here, EPA's actions to reward with releases those who have refused to cooperate while punishing with excessive and unsupported liability the one party that *has* cooperated—OxyChem—will send a strong message to other parties, at other sites, that EPA cannot be trusted to respect contribution rights, a message that will deter the voluntary cleanups those rights were meant to incentivize. *See* Part VI(A)(3), *infra*.

L.    **The United States Should Reject the Settlement Because the Administrative Record Contains No Basis on Which the Court Could Lawfully Enter the Proposed Decree**

The United States is required to seek court approval for a settlement in which it seeks to bar the claims of other parties to pursue contribution. 42 U.S.C. § 9622(e).

In evaluating a proposed settlement, the Court is prohibited by law from considering any report from a non-binding allocation of responsibility. *See* CERCLA Section 122(e) and ADR

ALCD-PUBCOM_0000427

Act Section 573. Once stripped of that inadmissible matter, there is no basis on which the Court could conclude the settlement meets the standards required to enter the proposed consent decree.

Even if the Court could consider the Batson Report, and it cannot, the Batson Report is the sole basis EPA presents for its approval of the settlement. It is not sufficient to meet the standards required to allow the Court to conclude the settlement is reasonable, fair, or conforms to due process.

There is no possibility the settlement could or would be approved by the Court on this record. *See* Part IX, *infra.*

For all these reasons, and those stated in detail below, OxyChem respectfully submits that EPA's actions in respect to the settlement are and have been arbitrary, capricious, and exceed EPA's authority. They have deprived OxyChem of due process and violated Articles I and III of the Constitution.

The United States should decline to accept this settlement. It would be a waste of taxpayer resources—over and above the $4.5 million in taxpayer funding that EPA has already spent on this unauthorized process and deeply flawed result—to pursue it further.

## II.    The Proposed Settlement Improperly Attempts To Invade and Eviscerate the Judicial Allocation That CERCLA Requires

The proposed consent decree improperly seeks to evade and undermine the judicial allocation of liability that CERCLA mandates, replacing it with EPA's *sui generis,* seriously flawed, and *ultra vires* allocation process.

By its terms, the proposed decree effectively strips OxyChem of its statutory right to have a federal district court determine the proper allocation of CERCLA liability. EPA first acts arbitrarily and capriciously by relying on the Batson Report to assign shares of responsibility to all the potentially liable parties (whether or not they consented to that process). On that unlawful and unauthorized foundation, EPA then constructed a settlement with 85 liable parties to generate funding for EPA's own oversight costs—requiring no cleanup work in the process—all for what EPA admits is a "minor" fraction of the total cleanup costs. Not content to stop there, EPA again exceeds its authority by urging the Court to extinguish the right of any other party to seek contribution from those settling defendants, including for costs that private parties alone have incurred and that the United States has not (and never will) incur.

All of this is profoundly unfair and unreasonable. It is squarely contrary to CERCLA's text and its goals. And it is—without question—arbitrary and capricious.

16

ALCD-PUBCOM_0000428

## A.    EPA Has No Authority To Impose a Binding Allocation Under CERCLA

CERCLA's unambiguous statutory language authorizes only "the court"—not EPA—to "allocate response costs among liable parties using such equitable factors as the court deems are appropriate." 42 U.S.C. § 9613(f)(1). That statute permits only courts, not other actors or EPA, to conduct the necessary allocation. *See, e.g., Beazer East v. Mead Corp.*, 412 F.3d 429, 449 (3d Cir. 2005) (recognizing that CERCLA "places both the selection and weighing of equitable factors in the sound discretion of *the district court*" (emphasis added)). CERCLA provides no authority for EPA (or anyone else) to conduct any binding allocation of liability. To the contrary, CERCLA authorizes EPA to conduct only *nonbinding* allocations, through the NBAR process, explicitly limiting the effect of those nonbinding allocations by making them inadmissible "in any proceeding" and depriving the court of subject matter jurisdiction to review them. 42 U.S.C. §9622(e)(3). Congress's express and strictly limited authorization to EPA to conduct only *nonbinding* allocations, and the strict limitations on the use of nonbinding allocations, underscore that EPA has *no* authority to use or offer the results of Batson's allocation to impose the proposed consent decree EPA seeks here.

EPA's limited authority to conduct only preliminary, non-binding, non-admissible allocations is highlighted by similar restrictions on its ability to arbitrate claims. CERCLA allows arbitration to be used "as a method of settling" the United States' cost recovery claims only where "the total response costs for the facility concerned do not exceed $500,000 (excluding interest)." 42 U.S.C. § 9622(h)(2). EPA could not use arbitration to pursue settlement here because EPA-estimated response costs for remediating the Passaic River exceed *$1.82 billion*, far in excess of Congress's authorization for use of arbitration. But even if the costs at issue were less than $500,000, Congress permitted binding arbitration only where "all of the parties" consent. *See* 40 C.F.R. § 304.21(b)(1)(iii)-(iv). No such uniform consent occurred here. [35]

Congress has, in fact, twice refused requests by EPA to authorize it to conduct exactly the type of allocation it conducted here. In 1994 and again in 1999, EPA *sought* authorization from Congress to conduct broad allocations of responsibility using a process all but identical to the one it used here. *See* Part II.A, *infra* (discussing Superfund Reform Act of 1994, S. 1834, 103d Cong. (1994), and Recycle America's Land Act of 1999, H.R. 1300, 106th Cong. (1999)). On both occasions, Congress *rejected* EPA's request for this authority.

In sum, CERCLA's language on this point is clear and unambiguous: only the federal district court may determine the ultimate allocation of response costs. And even if the text were ambiguous (and it is not), CERCLA's legislative history confirms the point, explaining that Congress intended costs "to be recovered in private contribution actions between settling and nonsettling parties," not adjudicated by EPA through an unauthorized third-party allocation. Senate Conference Report (Oct. 3, 1986) (comments from Chairman Stafford of the Committee on Environment and Public Works); *see also United States v. Kramer*, 953 F. Supp. 592, 599 (D.N.J. 1997) (quoting brief by the United States recognizing that "the statutory scheme enacted by

---

[35] EPA's lack of authority to make a binding allocation of liability for response costs also contrasts starkly with the clear authority Congress gave other agencies, in other statutes, to conduct their own binding adjudications of liability. *See, e.g.*, 12 U.S.C. § 5563(a) (authorizing the CFPB "to conduct hearings and adjudication proceedings"); 43 U.S.C. § 2501 (authorizing the Secretary of the Interior and his delegates "to decide upon principles of equity and justice ... all cases of suspended entries of public lands and of suspended preemption land claims"); 50 U.S.C. § 4104(b) (authorizing Foreign Claims Settlement Commission "to receive, adjudicate according to law, and provide for the payment" of claims related to detention benefits).

ALCD-PUBCOM_0000429

Congress … clearly envisions … leav[ing] the parsing of exact shares to the parties who caused the harm" in subsequent litigation).

That understanding—that only a court, not EPA, can allocate costs—is consistent with Third Circuit precedent, which describes the equitable allocation of response costs under CERCLA as "a quintessentially judicial endeavor." *Beazer East*, 412 F.3d at 431-32, 445 (holding that referral of allocation to a magistrate judge over one party's objection was an "improper delegation" of the district court's "traditional adjudicatory function"). Like the magistrate judge whose decision was reversed in *Beazer East*, EPA here attempts to "resolve[] factual disputes going to one of the ultimate issues in the case—what share of … response costs should be borne by each of the responsible parties—and, in doing so, essentially tried part of the case." *Id.* at 431-32. Importantly, the existence of *de novo* review of the magistrate judge's conclusions could not cure the error in *Beazer East, see id.* at 444, and it cannot cure it here, either. The court itself, by law, is required to allocate response costs judicially in a proceeding that comports with due process. Accordingly, the District Court's eventual review of the proposed settlement here cannot cure EPA's improper attempt to authorize a third-party allocation and then make that allocation binding in a consent judgment that strips OxyChem of its contribution rights.

**B.    EPA's Lack of Authority Is Evident From Congress's Rejection of the Superfund Reform Act of 1994 and the Recycle America's Land Act of 1999**

In 1994 and again in 1999, Congress considered amending CERCLA to authorize an allocation process substantially similar to the Batson process and to make an allocation report from that process admissible in court proceedings. Both the Superfund Reform Act of 1994 ("SRA")[36] and the Recycle America's Land Act of 1999 ("RALA"),[37] failed to become law.[38] Their failure to pass Congress confirms that EPA exceeded its authority here.

**1.    Under Both Attempts To Amend CERCLA, EPA Would Have Been Authorized To Mandate an Allocation Process**

Through the SRA and RALA, EPA hoped to gain broad authority to convene allocations at multi-party Superfund sites to encourage settlements over litigation. In a section aptly named "Enhancement of settlement authorities," the SRA would have deleted CERCLA's NBAR

---

[36] Superfund Reform Act of 1994, S. 1834, 103d Cong. (1994). Other bills related to the SRA bill include H.R. 3800; H.R. 4916; and H.R. 4351. *See* Superfund Reform Act of 1994, H.R. 3800, 103d Cong. (as introduced, Feb. 3, 1994), *available at* https://www.congress.gov/bill/103rd-congress/house-bill/3800/text/ih (last visited Mar. 14, 2023); Superfund Reform Act of 1994, H.R. 4916, 103d Cong. (as introduced, Aug. 8, 1994), *available at* https://www.congress.gov/bill/103rd-congress/house-bill/4916/text (same); Superfund Liability Allocation Act of 1994, H.R. 4351, 103d Cong. (as introduced, May 5, 1994), *available at* https://www.congress.gov/bill/103rd-congress/house-bill/4351/text (same). None of these became law.

[37] Recycle America's Land Act of 1999, H.R. 1300, 106th Cong. (1999). A bill related to the RALA is S. 1090, which also never became law. *See* Superfund Program Completion Act of 1999, S. 1090, 106th Cong. (as introduced, May 20, 1999), *available at* https://www.congress.gov/bill/106th-congress/senate-bill/1090/text (last visited Mar. 17, 2023) (proposing new Section 122(n), "Fair Share Allocation," which stated, "PROCESS.—The President shall conduct an impartial fair share allocation of response costs at National Priority List facilities.").

[38] *See* John H. Cushman Jr., *Congress Forgoes Its Bid To Hasten Cleanup Of Dumps*, N.Y. TIMES, Oct. 6, 1994, at A1 ("In a setback for the Clinton Administration and its politics of environmental consensus-building, Congress today gave up the effort to rewrite the law that provides for cleaning up toxic waste dumps.").

ALCD-PUBCOM_0000430

provision, current Section 122(e)(3), 42 U.S.C. § 9622(e)(3),[39] including its limitations on when EPA may convene an allocation and on the effect and use of an NBAR. *See* 42 U.S.C. §§ 9622(e)(3)(A) (President may conduct NBAR only "[w]hen it would expedite settlements . . . and remedial action") & (C) (an NBAR is inadmissible in any proceeding; "no court shall have jurisdiction to review" it; and it "shall not constitute an apportionment or other statement on the divisibility of harm or causation").

The SRA would have authorized EPA-convened allocations for nearly all multiparty sites, with EPA deciding unilaterally which parties to include.[40]  No party would have been able to opt out.[41]  EPA would list third-party neutrals that, in its sole discretion, were considered "qualified,"[42] and if parties could not agree on one listed, EPA would choose the allocator itself.[43]  EPA would be "entitled to review all documents and participate in any phase of the allocation."[44]  The parties could negotiate among themselves an "allocation of shares," but if they could not, the allocator would prepare "a written report, with a nonbinding, equitable allocation of percentage shares."[45]  If EPA accepted the allocation, the allocation parties could offer to settle based on the assigned shares, and EPA would accept such an offer (with "appropriate premia") unless it determined acceptance would not be fair, reasonable, and in the public interest.[46]  This "enhancement" of EPA's settlement

---

[39] *See* Superfund Reform Act of 1994, S. 1834, 103d Cong. § 408 (as introduced, Feb. 7, 1994), *available at* https://www.congress.gov/bill/103rd-congress/senate-bill/1834/text/is?s=3&r=93 (last visited Mar. 14, 2023) ("Section 122 of the Act (42 U.S.C. 9622), is amended— (a) by striking out subparagraph (e)(3)").

[40] *See generally id.* § 409; *see also id.* (proposing new Section 122a(c)(2)(A), requiring Administrator to "notify those potentially responsible parties who will be assigned shares in the allocation process"); *id.* (proposing new Section 122a(c)(4)(B) ("the Administrator shall issue a final list of parties subject to the allocation process").

[41] *See id. generally.  See also Hearing on S. 1834 Before the Subcomm. on Superfund, Recycling, and Solid Waste Management of the S. Comm. on Environment and Public Works*, 103d Cong. 16 (1994) (statement of Carol Browner, Administrator, EPA) ("It is not a system that is entered because an individual PRP or group of PRPs asks for the system to be put in place; it is the first effort, if you will, to resolve the problem.  It is where the problem will be addressed as opposed to waiting for someone to ask to use the system."); *id.* at 403 (prepared statement of Hon. Tom Udall, Attorney General, State of New Mexico; On Behalf of the National Association of Attorneys General) ("[T]he Administration Bill includes a new provision establishing a detailed, mandatory procedure for allocating liability among two or more responsible parties.").

[42] *See* Superfund Reform Act of 1994, S. 1834, 103d Cong. § 409 (proposing new Section 122a(c)(2)(B), requiring Administrator "provide the notified potentially responsible parties with a list of neutral parties who . . . in his or her sole discretion, are qualified to perform an allocation").

[43] *See id.* (proposing new Section 122a(c)(3)(A), requiring Administrator to "select an allocator from the list provided to the parties if the parties cannot agree on a selection within 30 days").

[44] *See id.* (proposing new Section 122a(c)(6)).

[45] *See id.* (proposing new Section 122a(d)(1), providing that if "the allocation parties do not agree to a negotiated allocation of shares, the allocator shall prepare a written report, with a nonbinding, equitable allocation of percentage shares for the facility, and provide such report to the allocation parties and the Administrator").

[46] *See id.* (proposing new Section 122a(g)(1)).  The SRA's mandatory process was criticized for its unfairness and excessive grant of authority to EPA: "Trumpeted as a 'fair share' plan to eliminate the unfairness of the current liability system, [the SRA's proposed allocation plan] does nothing of the sort. . . . EPA is given enormous discretion over all critical issues and in most cases its judgment is not reviewable. Imagine the howls of protest you will soon receive if you put that into law?" *Hearing on S. 1834 Before the Subcomm. on Superfund, Recycling, and Solid Waste Management of the S. Comm. on Environment and Public Works*, 103d Cong. 453-54 (1994) (prepared statement of Benjamin F. Chavis, Jr., Executive Director, NAACP; On Behalf of the Alliance for a Superfund Action Partnership).

ALCD-PUBCOM_0000431

authority never became law.[47]

Under the RALA, EPA would have been authorized to initiate a mandatory allocation by filing a CERCLA Section 107 action, after which it would seek a stay of litigation "until 150 days after the issuance of an allocator's report."[48] Once EPA filed suit, the court would have jurisdiction "to ensure that a fair and equitable allocation of liability is undertaken by a neutral allocator selected by agreement of the parties, or by the court, under such process or procedures as are agreed to by the parties, or ordered by the court."[49] If EPA initiated an allocation, then no party could start an action for response costs or contribution that was related to the same response action, until "150 days after issuance of the allocator's report . . . ."[50] If an action or claim was already pending, it would be "stayed until 150 days after the issuance of the allocator's report . . . unless the court determines that a stay will result in manifest injustice."[51] Unless EPA rejected the allocation report, EPA would have been obliged to accept an allocation party's settlement offer made within 90 days after the allocator issued her report, if "the offer [was] based on the share of response costs specified by the allocator," and other terms were deemed acceptable.[52] Once the litigation moratorium or stay was lifted, EPA could go after "any potentially responsible party that ha[d] not resolved its

---

[47] Amendments to the SRA bill gave allocation parties increased rights, but the bill still failed. For example, an August 1994 version would have given parties more input into an allocator's selection. *See, e.g.*, *id.* (proposing new Sections 129(c)(6)(B)(i) and 129(e)(1), which would have allowed allocation parties to nominate at least some neutrals that would be considered for the allocator role); *id.* (proposing new Section 129(e)(4)(A), which would have given allocation parties more time than original version of bill to select allocator before EPA could itself determine who would act as allocator). It also provided penalties for false material statements. *See id.* (proposing new Sections 129 (j)(5) (regarding "false material statement or representation in the response to the subpoena or information or document request issued pursuant to subsection (i)," regarding allocator's information requests). The August 1994 version also would have given parties an ongoing option to settle (before the allocation report's issuance) by submitting a "private allocation proposal," subject to certain criteria, including that it be a "binding allocation of 100 percent" of costs and that it not "allocate any share of response costs *to any person who is not a signatory*." *See id.* (proposing new Sections 129(g)(1) & (2)) (emphasis added). These changes appear in substantially similar form in a September 30, 1994 version. *See* Superfund Reform Act of 1994, S. 1834, 103d Cong. §§ 408 & 409 (as reported to Senate, Sept. 30, 1994), *available at* https://www.congress.gov/bill/103rd-congress/senate-bill/1834/text/rs (last visited Mar. 14, 2023).

[48] Recycle America's Land Act of 1999, H.R. 1300, 106th Cong. § 311 (as introduced, Mar. 25, 1999), *available at* https://www.congress.gov/bill/106th-congress/house-bill/1300/summary/00 (last visited Mar. 16, 2023) (proposing new Section 131(c), "Allocation Process"); *see also id.* (proposing new Section 131(d)).

[49] *Id.* (proposing new Section 131(c)(3)). A later amendment of H.R. 1300 included a different grant of authority, stating, "For each eligible removal or remedial action, the President shall ensure that a fair and equitable allocation of liability is undertaken at an appropriate time by a neutral allocator selected by agreement of the parties under such process or procedures as are agreed to by the parties." *See* Recycle America's Land Act of 1999, H.R. 1300, 106th Cong. § 310 (as reported, Sept. 30, 1999), *available at* https://www.congress.gov/congressional-report/106th-congress/house-report/353 (last visited Mar. 17, 2023) (proposing new Section 131(d)). While that amendment imposed an additional criterion for an action's eligibility for allocation, it—like the version introduced—also gave EPA authority to "initiate an allocation . . . for any removal or remedial action at a facility listed on the National Priorities List . . . ." *Id.* (proposing new Section 131(c)); *see also* Recycle America's Land Act of 1999, H.R. 1300, 106th Cong. § 311 (as introduced, Mar. 25, 1999) (proposing new Section 131(d), which stated, "Notwithstanding subsection (a)(1), the President may initiate an allocation under this section for any response action.").

[50] Recycle America's Land Act of 1999, H.R. 1300, 106th Cong. § 311 (as introduced, Mar. 25, 1999) (proposing new Section 131(g)(1), "Moratorium on Litigation").

[51] *Id.* (proposing new Section 131(g)(2), "Stay").

[52] *Id.* (proposing new Section 131(n), "Settlements Based on Allocations").

ALCD-PUBCOM_0000432

liability to the United States following an allocation."[53] This effort at enhancing EPA's settlement authority also failed to become law.

EPA should have known from the SRA's and RALA's failures that it had no authority to assign OxyChem an allocation share, because OxyChem did not consent to the process. Its exceedance of authority is all the more striking because EPA's chosen allocator, Batson, claims he *drafted* the SRA bill.[54]

### 2. Under Both Attempts To Amend CERCLA, an Allocation Report Like the Batson Report Would Have Been Admissible

Both the SRA and RALA would also have expanded the permitted *use* and *effect* of an allocation report to allow its admission in court. *See* Superfund Reform Act of 1994, S. 1834, 103d Cong. § 409 (as introduced, Feb. 7, 1994) (proposing new CERCLA Section 122a(i)(3), "Admissibility of Allocator's Report," that would provide: "The allocator's report, subject to the rules and discretion of the court, *may be admissible solely for the purpose of assisting the court in making an equitable allocation of response costs among the relative shares of nonsettling liable parties.*" (emphasis added)); Recycle America's Land Act of 1999, H.R. 1300, 106th Cong. § 311 (as introduced, Mar. 25, 1999) (proposing new CERCLA Section 131(p), "Post-Settlement Litigation," that would provide: "In allocating response costs among persons determined by the court to be liable in such litigation, *the court may use the allocator's report as a basis for such allocation.*" (emphasis added)). Because Congress expressly considered, but refused to enact, either bill, the Batson Report's inadmissibility under 42 U.S.C. § 9622(e)(3)(C) is undeniable. Use of the Batson Report remains constrained under CERCLA and ADR law, and the United States and settling defendants have violated those laws by using it to support the proposed settlement.

### 3. The SRA and RALA's Failure Reconfirmed Congressional Intent That EPA Should "Leave the Parsing of Exact Shares"[55] to PRPs

Through the SRA and RALA, EPA desired greater allocation authority to reduce private litigation by giving EPA the power to conduct out-of-court allocations through which EPA would absolve settling parties of all future liability and then itself pursue non-settling parties for the remainder of the liability.

In hearings, EPA Administrator Carol Browner described the SRA bill as one that would "fundamentally . . . change the way Superfund works" and explained the proposed process:

> At every multi-party site where the EPA has taken action, an allocations process would be conducted by a neutral professional with Superfund expertise to recommend a share of responsibility for each identified PRP. Let me emphasize here that the Administration proposal relies on an informal process to perform these allocations. . . . Specifically, we believe an informal process managed by experienced allocators is preferable to the establishment of a formalistic, legalistic system based on Federal administrative law judges.

---

[53] *Id.* (proposing new Section 131(p), "Post-Settlement Litigation").

[54] *See Columbia Falls Aluminum Co. v. Atlantic Richfield Co.*, Case No. 9:18-cv-00131 (D. Mon.), ECF 82-1 at 6.

[55] *United States v. Kramer*, 953 F. Supp. 592, 599 (D.N.J. 1997) (explaining process as envisioned by CERCLA).

ALCD-PUBCOM_0000433

> Potentially responsible parties would be provided an opportunity to settle their liability to the United States based on the recommended allocation and obtain protection against future liability. Such parties also would have the opportunity to pay a premium and receive a settlement from the United States absolving them of future liability....
>
> *In order to greatly reduce ongoing private litigation, the United States would pursue non-settling parties to require site response activities, compel the payment of allocated shares, and recover expended funds....* Pursuing non-settlers will be difficult and costly in some cases, but it provides settling parties with the certainty that they can settle with the government for their share *and not concern themselves with going after other parties for contribution or being sued by other parties.*[56]

Although the RALA proposed a different allocation process,[57] it shared the same effect: both bills would have turned CERCLA's liability scheme on its head: mandating allocation, encouraging settlements from as many parties as possible based on allocated shares, and then having *EPA* pursue enforcement against the few remaining non-settling parties. This is precisely what the United States has pursued at the Passaic. But it is the *opposite* of how CERCLA liability should function. *See* October 3, 1986, Senate Conference Report, comments from Mr. Stafford, Chairman of the Committee on Environment and Public Works ("The theory underlying Superfund's liability scheme was, and is, that the Government should obtain the full costs of cleanup from those it targets for enforcement, and leave remaining costs to be recovered in private contribution actions between settling and nonsettling parties."); *see also United States v. Kramer*, 953 F. Supp. at 599. Testimony regarding the SRA bill acknowledged this:

> When Congress passed CERCLA in 1980, and reauthorized the statute in 1986, it decided to place the burden of allocating liability on the responsible parties themselves, rather than on EPA. Congress placed primary importance on achieving site clean-up, leaving allocation to be resolved later in contribution actions. *The allocation provision of the Administration Bill represents a reversal of that approach.*[58]

A report regarding the RALA is the same:

> Under current law, once EPA obtains the agreement from one or more parties to perform a cleanup, EPA plays no role in getting additional parties to contribute their fair share. Instead, the performing parties must file contribution claims against the recalcitrant parties.... Under new section 131 this situation is reversed.

---

[56] *Hearing on S. 1834 Before the Subcomm. on Superfund, Recycling, and Solid Waste Management of the S. Comm. on Environment and Public Works*, 103d Cong. 31 & 35 (1994) (statement of Carol Browner, Administrator, EPA) (emphasis added).

[57] *See generally* Recycle America's Land Act of 1999, H.R. 1300, 106th Cong. § 311 (as introduced, Mar. 25, 1999) (proposing new Section 131, "Allocation").

[58] *Hearing on S. 1834 Before the Subcomm. on Superfund, Recycling, and Solid Waste Management of the S. Comm. on Environment and Public Works*, 103d Cong. at 403-04 (prepared statement of Hon. Tom Udall, Attorney General, State of New Mexico; On Behalf of the National Association of Attorneys General) (emphasis added).

22

ALCD-PUBCOM_0000434

*See* H.R. Rep. 106-353, at 75 (1999). The SRA and RALA failed, and CERCLA's originally envisioned process stands. The proposed settlement contravenes this process and the United States should withdraw it.

### 4. As Criticism of the SRA Noted, Mandatory Allocation Processes—Like the Batson Process—Delay Cleanups

As testimony regarding the SRA observed, mandatory allocation processes such as the Batson process are also inconsistent with CERCLA goals because they *delay* cleanup:

> [The SRA] would place the burden of allocating liability largely on the Agency, and would generally require that allocation be completed before clean-up can begin. We are concerned that this burden will be a substantial one, and one that will drain EPA resources at the expense of the more important goal of getting sites cleaned up. We are also concerned that the allocation process will be a lengthy one that will further delay site clean-up.[59]

As one witness noted: "The Administration's allocation system adds a multi-year administrative cost allocation process to the current system which will further delay actual site remediation."[60]

Here, OxyChem made an offer to perform the entire OU2 and OU4 remedies just as CERCLA contemplates, requiring only that EPA would follow CERCLA by not purporting to settle away OxyChem's statutory contribution claims. EPA failed to respond to OxyChem's offer and instead proceeded with its own unauthorized, mandatory and binding allocation. As explained in more detail below, *see* Part III.A *infra*, EPA's actions at the Passaic have thus delayed cleanup efforts—just as the testimony regarding the SRA feared could occur.

### 5. Due Process Rights Are Implicated When EPA Attempts To Conduct a Binding Allocation

When the SRA was considered, some parties advocated for an amendment allowing EPA to conduct *binding* (not only mandatory) allocations. But the EPA Administrator herself explained that a binding allocation would raise constitutional issues, including due process concerns:

> The specific concern that we have about the binding proposals . . . is that they may require EPA to go to an almost quasi-judicial type of decision-making as it relates to the allocation. For example, we would perhaps be required to employ administrative law judges, of whom we currently have a very small number, approximately four or five. If we were to maintain the

---

[59] *Id.* (same). *See also id.* at 356-57 (statement of Hon. Tom Udall, Attorney General, State of New Mexico; On Behalf of the National Association of Attorneys General) ("the allocation procedure appears to be a very demanding one in terms of both time and agency resources and [ ] the result will be significant delay in achieving clean-up"); *id.* at 358 (statement of Benjamin F. Chavis, Jr., Executive Director, NAACP; On Behalf of the Alliance for a Superfund Action Partnership) (the Administration's proposal "will not expedite clean-up, and does not put public health first").

[60] *Id.* at 453 (prepared statement of Benjamin F. Chavis, Jr., Executive Director, NAACP; On Behalf of the Alliance for a Superfund Action Partnership); *see id.* (same) ("Using the Administration's own timetable, you can add up 3 years of searches, notifications, allocations, red tape, settlement talks, hearings, public comment, and who knows what else before you even have a final allocation of shares not even actual costs. It is still a pretty good system for lawyers, and it's not a bad system for those big businesses who have the records and time to wait for the process to finish. It's a horrendous system for everyone else.").

23

> clean-ups at the speed and with the increase that we want to see, we think it could take as many as 40 to 60 administrative law judges. What the Justice Department has told us is that with a binding scheme there are due process rights. There are Constitutional issues that arise in a binding scheme that don't arise in a nonbinding scheme.[61]
>
> . . .
>
> As I understand it, a binding system would be similar to, but not identical to, a judicial system, that in a binding system there are due process rights that have to be protected, and that that necessarily leads to some inflexibilities.[62]

Just as EPA's Administrator Browner acknowledged regarding informal but binding allocations, EPA's actions here (improperly treating the Batson process as binding) implicate (and contravene) OxyChem's constitutional due process rights, making the proposed settlement wholly improper and *ultra vires*.

## C.    EPA Cannot Justify Its Unlawful Process Under the ADR Act

Nor can EPA justify its unauthorized process here under the ADR Act.[63]

First, it is undisputed that OxyChem and multiple other liable parties did not consent to the painfully flawed process EPA proposed. *See* 5 U.S.C. §572(a) (authorizing ADR proceedings only "if the parties agree to such a proceeding"); *see also, e.g.*, EPA, *Alternative Dispute Resolution (ADR) by EPA's Administrative Law Judges*, https://www.epa.gov/alj/adr (last visited Mar. 9, 2023) ("The mediation process is initiated only if it is accepted by all parties."); EPA Policy on Alternative Dispute Resolution, 65 Fed. Reg. 81,858, 81,859-60 (Dec. 27, 2000) (recognizing that "[t]ypically, all aspects of [EPA] ADR are voluntary, including the decision to participate, the type of process used, and the content of any final agreement," and that ADR proceedings are meant to be "consensual methods of dispute resolution").

Second, EPA's second request for expanded authority to conduct allocations was made in 1999—*after* the ADR Act was enacted.[64]    That EPA felt it necessary to request such authority to use this process *after* the ADR Act was adopted confirms that EPA did *not* believe (until necessity became the mother of invention) that it had authority under the ADR Act to use the process it used here to allocate response costs, including by assigning costs to absent, non-consenting parties.

Finally, even if the ADR Act applied, EPA would have violated the ADR Act in two ways when it made OxyChem an involuntary *party* to the allocation. It assigned OxyChem a share of responsibility *ex parte*. And—without authority—it authorized AlterEcho (the assigned allocator) to occupy two conflicting roles, one as a purported neutral and the other as a purported (but not

---

[61] *Hearing on S. 1834 Before the Subcomm. on Superfund, Recycling, and Solid Waste Management of the S. Comm. on Environment and Public Works*, 103d Cong. 13 (1994) (statement of Carol Browner, Administrator, EPA) (emphasis added).

[62] *Id.* at 15 (same).

[63] The Batson Report states that, "The Allocation was conducted as an alternative dispute resolution (ADR) process pursuant to the provisions of the ADR Act of 1996, 5 USC 571, et seq., and relevant state authorities." *See* Batson Report at 18. No "relevant state authorities" are identified.

[64] Recycle America's Land Act of 1999, H.R. 1300, 106th Cong. (1999). *See also* Part II.B, *supra*.

24

actually authorized) "representative" of OxyChem's interests.[65]    Given OxyChem's non-participation, it was inappropriate for EPA to continue with an ADR process that would "significantly affect[] persons or organizations who are not parties to the proceeding." 5 U.S.C. §572(b)(4).  But EPA did so anyway.  Then, EPA compounded its arbitrary, capricious, and unauthorized actions by *releasing* the allocation report to the public without the consent of OxyChem, whom it had unilaterally made an involuntary party to it.  *See* **Ex. 8** (Sept. 11, 2018 letter from S. Flanagan (EPA) to D. Erickson (CPG common counsel)) ("The allocator will recommend a share for each allocation party, *regardless of whether that allocation party has chosen to participate*.  Ten parties, including [OxyChem], have chosen not to participate." (emphasis added)).  This action likewise violated § 574 of the ADR Act[66] and was arbitrary and capricious itself.

## III.    The Proposed Settlement Has Multiple Fatal Procedural Flaws

### A.    The Proposed Settlement Improperly Relies on a Third-Party Allocation Process That Violated CERCLA

The proposed consent decree is "[b]ased on the results of the allocation" conducted by David Batson and embodied in the December 2020 Batson Report.  *Notice of Lodging of Proposed Consent Decree Under the Comprehensive Environmental Response, Compensation, and Liability Act*, 87 Fed. Reg. 78,710, 78,710 (Dec. 22, 2022); *see* Dkt. 119-1 at 5 ("[T]he proposed settlement is based on [the Batson Report].").

The government relied on that allocation "to *conclude that the settling defendants are responsible for only a minor share of the response costs* incurred and to be incurred" for the cleanup of OU2 and OU4, 87 Fed. Reg. at 78,710 (emphasis added), leading to a proposed settlement under which the settling defendants will bear only a small fraction of the projected $1.82 billion in cleanup costs for the site—and, in the government's apparent view, will escape any further liability even if the settling defendants' actual responsibility is far greater or the actual cleanup costs are far higher.  *Id.* (noting that the proposed consent decree "includes covenants not to sue ... as well as contribution protection" and "does not include reopeners for previously unknown conditions or information, or for cost overruns").

EPA's process was seriously flawed in many ways and cannot be reconciled with the requirements that CERCLA imposes.  The proposed settlement should therefore be rejected.

---

[65] AlterEcho's assumption of these conflicting roles failed to conform to the definition of a "neutral" in the Act, 5 U.S.C. §571(9), and under applicable professional standards.  This independently violated OxyChem's due process and statutory rights.

[66] OxyChem meets the definition of a "party" to EPA's proceeding under ADR Act Section 571(10)(A) and (B), even though it did not participate voluntarily, because EPA *imposed* participation on OxyChem (without its consent) by identifying OxyChem as an "allocation party," *see* **Ex. 8** (Sept. 11, 2018 letter from S. Flanagan (EPA)), applying the allocation to OxyChem, and by authorizing AlterEcho to "represent" OxyChem's interests. [67] "Contrib. Dkt." refers to docket entries in the related contribution action, *Occidental Chemical Corporation v. 21st Century Fox America*, No. 18-cv-11273 (D.N.J.).

ALCD-PUBCOM_0000437

1. **EPA Improperly Used a Private Contractor Rather Than Performing the Preliminary Allocation Itself**

First, the process that EPA used to reach the proposed consent decree was flawed because the agency improperly delegated its authority and allowed a private contractor to perform the nonbinding preliminary allocation of responsibility on which the settlement was based, rather than performing that allocation itself. That approach was both contrary to CERCLA and arbitrary and capricious.

CERCLA specifies an exact process for developing a nonbinding preliminary allocation of responsibility: "When it would expedite settlements under this section and remedial action, *the President may*, after completion of the remedial investigation and feasibility study, *provide a nonbinding preliminary allocation of responsibility* which allocates percentages of the total cost of response among potentially responsible parties at the facility." 42 U.S.C. § 9622(e)(3)(A) (emphasis added). That is the only form of preliminary allocation that CERCLA authorizes or envisions, and the only one CERCLA allows EPA itself (rather than a court) to conduct. As the statute makes clear, a "nonbinding preliminary allocation of responsibility" (or "NBAR") is permissible only to expedite voluntary settlements with or among potentially responsible parties; otherwise, a court must perform the allocation, *see* 42 U.S.C. § 9613(f)(1), without considering any prior NBAR, *see id.* § 9622(e)(3)(C).

CERCLA also specifies how an NBAR should proceed. It authorizes *the President* (and by delegation, EPA) to conduct any "nonbinding preliminary allocation of responsibility." It does *not* allow non-government, private contractors to carry out that preliminary allocation. EPA has recognized this in its own guidelines, stating in plain terms that "the allocation itself should be made by federal employees," and private consultants should only "assist in the information gathering and assessment phase of the allocation process." *Superfund Program; Non–Binding Preliminary Allocations of Responsibility (NBAR)*, 52 Fed. Reg. 19,919, 19,919-20 (May 28, 1987); *see* 32 Cong. Rec. H9032-04 ("Due to the enforcement-sensitive nature of NBARs, *all such allocations must be prepared solely by Federal employees*." (emphasis added)).

EPA's decision to outsource the preliminary allocation here to a private party was both contrary to CERCLA and an arbitrary and capricious departure from EPA's own written policies. *See, e.g., FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (agency "may not ... depart from a prior policy *sub silentio* or simply disregard rules that are still on the books"); *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005) (recognizing that "[u]nexplained inconsistency" may demonstrate "an arbitrary and capricious change from agency practice"). These procedural flaws vitiate both the Batson Report itself and the proposed consent decree the government admits was "[b]ased on" that flawed allocation. 87 Fed. Reg. at 78,710; *see* Dkt. 119-1 at 5.

Apparently recognizing that the Batson allocation process cannot be reconciled with CERCLA's requirements, the government now suggests those requirements do not apply, because (the government says) the Batson Report "is not a 'nonbinding preliminary allocation of responsibility' ... as that term is used in Section 122(e)(3)." Dkt. 119-1 at 5 n.4. That suggestion goes nowhere. The only authority that CERCLA provides for EPA to conduct *any* kind of nonbinding preliminary allocation of responsibility is the provision that authorizes EPA (not third parties) to conduct an NBAR; in fact, that provision is the only place in CERCLA where the term "nonbinding" appears. *See* 42 U.S.C. §9622(e).

26

ALCD-PUBCOM_0000438

Contradicting its new, *post hoc* justification relying on the ADR Act, the United States has repeatedly recognized—including in the proposed consent decree itself—that Batson indeed conducted a nonbinding preliminary allocation of responsibility. It was so in the beginning, *see* E. Wilson letter 9/18/2017 to Allocation Parties ("EPA retained AlterEcho to perform an allocation for OU2 that would assign non-binding shares of responsibility to the OU2 PRPs (excluding the public entities), and determine relative groupings, or tiers, corresponding to the nature of the PRPs' impact on OU2 and the remedial action for OU2."). It remains so in the proposed consent decree. *See, e.g.*, Dkt. 2-1 at 6 (proposed consent decree explaining that Batson was retained "to perform an allocation that would assign non-binding shares of responsibility to the private parties identified by EPA"); Dkt. 84-1 at 5 (EPA declaration confirming that Batson was retained to "assign non-binding shares of responsibility"); Letter from EPA to OxyChem and Other PRPs (Mar. 2, 2022) (Batson "performed an allocation that assigned non-binding shares of responsibility to the private party PRPs"); Letter from Laura Rowley to Jeff Talbert re Batson Process and Cash-out Consent Decree (Jan. 13, 2022) (Batson was retained to "assign non-binding shares of responsibility to the private parties identified by EPA"); Letter from EPA to Occidental Chemical Corp. at 3 (Nov. 28, 2017) ("non-binding allocation process").

The government has confirmed that the Batson Report was intended to serve the same purpose that CERCLA specifies for all NBARs; namely, to expedite settlement and remedial action. 42 U.S.C. § 9622(e)(3)(A); *see, e.g.*, Batson Report at 38 (Sept. 18, 2017 letter from EPA to General Notice Letter recipients) (noting that the Batson Report was expected to "support[] potential additional cash-out settlements" and "lead to a consent decree in which [certain] parties agree to perform the OU2 remedial action"); Contrib. Dkt. 1179 at 6-7 (Batson Report was "expected to inform ... ongoing settlement discussions"); Contrib. Dkt. 1962 at 3 (recognizing that "consistent with the purpose that EPA announced for its allocation process, the parties have been engaged in active settlement negotiations based on the allocation").[67] The government cannot avoid the requirements of CERCLA by trying to call the Batson Report something other than what it plainly was, and EPA has no power to produce any nonbinding preliminary allocation of responsibility through a process other than the one that CERCLA provides. *See, e.g.*, *Nat'l Fed. of Indep. Bus. v. Dep't of Labor*, 142 S. Ct. 661, 665 (2022) ("Administrative agencies are creatures of statute. They accordingly possess only the authority that Congress has provided."); *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986) ("[A]n agency literally has no power to act ... unless and until Congress confers power upon it.").

So too for the suggestion that the Batson Report cannot be an NBAR because NBARs are "done at an earlier stage in the cleanup process" and "are performed by EPA itself." Dkt. 119-1 at 5 n.4. Nothing in CERCLA says that only "earlier" NBARs count as NBARs; on the contrary, the statute authorizes an NBAR at any time "after completion of the remedial investigation and feasibility study," whenever it "would expedite settlements under this section and remedial action." 42 U.S.C. §9622(e)(3)(A). As for the government's admission that NBARs must be "performed by EPA itself," Dkt. 119-1 at 5 n.4, that proves only that EPA *violated* CERCLA and its own regulations, not that the statute and its regulations do not apply.

Finally, the government's alternative suggestion that the Batson allocation process can be justified by the ADR Act, *see* Dkt. 84-1 at 9-10, is equally unavailing. Congress specifically provided in CERCLA the strictly limited way in which EPA is authorized to conduct a

---

[67] "Contrib. Dkt." refers to docket entries in the related contribution action, *Occidental Chemical Corporation v. 21st Century Fox America*, No. 18-cv-11273 (D.N.J.).

ALCD-PUBCOM_0000439

nonbinding preliminary allocation of responsibility to facilitate settlement. 42 U.S.C. §9622(e)(3)(A). EPA cannot circumvent the statutory restrictions CERCLA places on such allocations by using the general grant to all federal agencies of the ability to use ADR processes in regulatory proceedings. *See RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) ("It is a commonplace of statutory construction that the specific governs the general." (brackets omitted)). In any event, ADR is available only "if the parties agree to such proceeding," and OxyChem—which was assigned a massive and lopsided share of responsibility in the Batson allocation process—never agreed to that process. 5 U.S.C. §572(a); *see also* Letter of David G. Mandelbaum, Esq. to Juan M. Fajardo, Esq., EPA Region 2 at 2 (Feb. 13, 2018) ("Mandelbaum Letter") ("Benjamin Moore is not aware of any statutory provision or regulation that permits EPA to depart from an NBAR and develop an alternative *mandatory* settlement process. Absent such a basis, the Batson allocation is not authorized by the statute[.]").

In short, the only authority that EPA has to conduct a nonbinding preliminary allocation for settlement purposes is the NBAR process that CERCLA specifies. Instead of following that process, EPA delegated its responsibility to perform a preliminary allocation to a private party. That procedure was *ultra vires*, exceeding the agency's authority and transgressing the limits that CERCLA imposes, and an arbitrary and capricious departure from the agency's own guidelines to boot. As a result, both the Batson Report and the proposed settlement based on that procedurally invalid allocation are fatally flawed and must be rejected.

### 2. EPA Improperly Treated the Batson Process as Binding

The proposed consent decree is also procedurally invalid because EPA treated the Batson Report as effectively binding, rather than as the "nonbinding preliminary allocation of responsibility" that CERCLA contemplates. 42 U.S.C. §9622(e)(3)(A); *see also id.* §9622(e)(3)(C) (an NBAR "shall not constitute an apportionment or other statement on the divisibility of harm or causation"). While the Batson Report purports to be nonbinding (and while, as noted above EPA has repeatedly described it as a nonbinding allocation), EPA explicitly "committed to use the Allocator's recommended shares of relative responsibility among the Allocation Parties as a primary factor in its future negotiations."[68]

The proposed consent decree implements that improper prior commitment to follow the Batson Report's conclusions, adopting without variation Batson's allocation to assign the settling parties only a "minor share of the response costs," while placing practically all of the remaining $1.82 billion in liability on OxyChem.[69] EPA's decision to effectively treat the Batson Report as a final determination of the proper allocation of liability cannot be squared with CERCLA's command that preliminary allocations for settlement must be "non-binding," *see* 42 U.S.C. § 9622(e)(3)(A), (C), and that the only entity that can conduct a binding allocation of responsibility is a court, which is prohibited from even considering the reports. All of these issues exacerbate the problems with outsourcing to a private party a job that the statute assigns to EPA.

---

[68] Batson Report at 6.

[69] Dkt. 2-1 at 6; *see* Batson Report at 3240 (Attachment Q) (assigning OxyChem an allocation share of 99.97%).

ALCD-PUBCOM_0000440

### 3.    EPA Improperly Treated the Batson Process as Mandatory

The proposed consent decree is also procedurally flawed because EPA improperly treated participation in the Batson allocation process as mandatory, a decision that was deeply unfair and contrary to CERCLA. While the Batson Report describes participation in the allocation process as voluntary, the facts show otherwise. Rather than allowing parties to opt out, EPA directed Batson "to make an allocation to every noticed party" except for entities EPA itself excluded, "including the parties that neither consent to [the process] nor participate." Mandelbaum Letter at 2; *see* Dkt. 84-1 (explaining that the Batson Report "would assign shares of responsibility to all the private party OU2 PRPs," whether they participated in the process or not). That is, no party had any "ability to opt out of … this allocation." Mandelbaum Letter at 2; *see also id.* at 3 ("Benjamin Moore will participate in Mr. Batson's process if the process goes forward because it has no choice; Mr. Batson will assign a share to Benjamin Moore whether Benjamin Moore participates or not.").

Worse yet, the Batson Report (and the proposed consent decree based on that allocation) actively *penalized* OxyChem for choosing not to participate in that purportedly "voluntary" process. The Batson Report punished OxyChem for not participating in the unauthorized and unlawful Batson process by negating all of OxyChem's previous cooperation and voluntary cleanup efforts, giving it a cooperation score of *zero*. Report at 2586 (Attachment S). That is, rather than address the significant concerns with the process raised by OxyChem and others, *see, e.g.*, Letter from EPA to OxyChem at 2-3 (Nov. 28, 2017) (recognizing concerns with "the amount, veracity, and completeness of information" available for the allocation); Letter from OxyChem to EPA (Oct. 12, 2017) (explaining why the allocation process would not provide "transparency and fairness"); Mandelbaum Letter ("There appears to be no statutory basis for the Batson allocation."), EPA instead ignored the problem and exacted retribution against OxyChem by adopting an allocation that assigned additional liability to any entity that declined to "cooperate" in its flawed process. Nothing in CERCLA authorizes that seriously misguided approach or entitles the government to treat a decision not to participate in an *ultra vires* allocation as a basis for *increased* liability. OxyChem has a statutory right to pursue a contribution action in a federal district court. Its equitable share of responsibility cannot be increased because it stands on that right rather than compromising its claims in a supposedly voluntary (but actually involuntary) NBAR process.

Depriving OxyChem of any credit for its substantial past cooperation solely because it declined to participate in a supposedly voluntary allocation process unfairly minimizes the settling defendants' responsibility and maximizes OxyChem's, resulting in a settlement that does not remotely reflect "rational estimates of the harm each party has caused." *In re Tutu Water Wells*, 326 F.3d 201, 207 (3d Cir. 2003). OxyChem and its indemnitors have already performed hundreds of millions of dollars of voluntary cleanup work. OxyChem is presently performing the remedial designs of the remedies in OU2 and OU4 at a combined EPA-estimated cost of $236 million. And, as OxyChem has already informed EPA, OxyChem stands ready to handle *all* of the necessary cleanup in OU2 and OU4 as long as it can preserve its right to seek contribution from other responsible parties (as statutorily allowed under the *judicial* allocation process that CERCLA explicitly mandates, *see* 42 U.S.C. § 9613(f)(1)). Letter from OxyChem to EPA (June 27, 2022).[70]

---

[70] Notably, for at least a year after the Batson process began, EPA never informed OxyChem that the process was in any way intended to bar or would bar OxyChem's contribution claims. Ex. 5 (Nov. 7, 2018 OxyChem letter to EPA); *see also* Ex. 9 (Nov. 28, 2017 EPA letter to OxyChem) at 4 (purporting to "address [OxyChem's] concern that the

29

The government's apparent decision to ignore OxyChem's voluntary commitment to handle a nearly $2 billion clean-up, and instead treat OxyChem as if it had refused to accept any responsibility at all *solely* because OxyChem declined to participate in the unauthorized process that led to the Batson Report, is not only arbitrary and deeply unfair, but also squarely contrary to CERCLA's central goal of encouraging "voluntary cleanup actions." *E.I. DuPont de Nemours & Co. v. United States*, 508 F.3d 126, 135 (3d Cir. 2007).

## B.   The Proposed Settlement Is Not Supported by Any Adequate Record

### 1.   Congress Has Prohibited the Use of NBARs To Support Contested Consent Decrees

The United States readily acknowledges that the proposed consent decree is "[b]ased on the results of the allocation" conducted by Batson and embodied in the December 2020 Batson Report. *Notice of Lodging of Proposed Consent Decree Under the Comprehensive Environmental Response, Compensation, and Liability Act*, 87 Fed. Reg. 78,710, 78,710 (Dec. 22, 2022); *see* Dkt. 119-1 at 5 ("[T]he proposed settlement is based on [the Batson Report].")

But EPA's reliance on the Batson Report as a justification for judicial approval of the proposed consent decree is not permitted because the Batson Report is inadmissible and may not be considered by the reviewing court under 42 U.S.C. § 9622(e)(3)(C).

The effect of an NBAR (including the Batson Report) is prescribed by statute. It is "nonbinding"; it is "not admissible"; and it does not constitute a "statement on the divisibility of harm or causation":

> **(C)** Effect. The nonbinding preliminary allocation of responsibility shall not be admissible as evidence in any proceeding, and no court shall have jurisdiction to review the nonbinding preliminary allocation of responsibility. The nonbinding preliminary allocation of responsibility shall not constitute an apportionment or other statement on the divisibility of harm or causation.

42 U.S.C. § 9622(e)(3)(C). An NBAR is a tool for EPA to facilitate voluntary settlements among all liable parties at a site. But if that does not transpire, the NBAR is "*never, under any circumstances, admissible in any judicial or other proceeding.*" Oct. 3, 1986, Senate Conf. Report, comments of Mr. Stafford, chairman of the Committee on Environment and Pub. Works (emphasis added). Emphasizing the point, the statute deprives the court of *jurisdiction* to review it, and explicitly makes it inadmissible in any proceeding. When review of the proposed decree is stripped of the allocation report, as the law requires, nothing remains to support the proposed settlement.

Accordingly, EPA's primary basis for the proposed settlement is an allocation that exceeded its statutory authority and that the Court cannot—in any circumstances—review.

---

proposed allocation will 'come at the expense of OCC's legal rights to obtain contribution and cost recovery from all responsible PRPs'").

ALCD-PUBCOM_0000442

## 2.    The United States Has No Rational Basis or Administrative Record To Support the Proposed Consent Decree

Even if the Batson Report were admissible (and it is not), EPA has no rational basis or administrative record to support the proposed consent decree. Among other flaws, EPA has not disclosed how much each settling party has agreed to pay, if any. There is, in fact, no evidence that every party has actually paid into the settlement in exchange for the extraordinary, blanket release EPA proposes to shield them from a $1.82 billion liability. As far as the public and OxyChem know, some settling parties may have paid nothing, but may still receive a covenant not to sue and contribution protection.

EPA's disclosure of the Batson Report is not sufficient to provide substantial evidence of the reasonableness of the settlement. First, the Batson Report is inadmissible, and the reviewing court lacks subject matter jurisdiction to consider it, as discussed above. Second, EPA has disclosed no connection between Batson's allocation and the individual defendant settlement amounts to be paid. Instead, EPA wants the Court to approve an impermissible, bulk settlement with 85 liable companies. And EPA suggests that the reviewing court should find that the proposed settlement is fair and reasonable solely because EPA believes the Court should take EPA at its word. But "to permit meaningful judicial review, an agency must 'disclose the basis' of its action." *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2573 (2019). Even when an agency "exercises the discretion given to it by Congress, it must 'disclose the basis of its order' and 'give clear indication that it has exercised the discretion with which Congress has empowered it.'" *NLRB v. Metro. Life Ins. Co.*, 380 U.S. 438, 443 (1965) (internal quotations omitted).

No such basis exists here. No court can properly review a settlement in which the amounts to be paid by each party are not even disclosed. Nor can a court properly review a bulk settlement, unless the amount each party is paying is not disclosed so the Court can assess the reasonableness of that amount with reference to the ostensible justification for that amount.[71] "Substantive fairness requires that the terms of the consent decree are based on 'comparative fault' and apportion liability 'according to rational estimates of the harm *each party has caused*.'" *In re Tutu Water Wells*, 326 F.3d at 207 (emphasis added).[72] Batson's one-dimensional approach in which risk is a proxy for liability[73] ignores the importance of a comparative analysis of who caused the clean-up costs. "For every major remediation activity, then, the court should calculate how much of that activity *each party* was responsible for." *Trinity Industries, Inc. v. Greenlease Holding Co.*, 903 F.3d 333, 359

---

[71] In class actions, where the reasonableness of settlement must also be assessed by the court, the amounts "paid by the defendants are properly part of the settlement funds and should be known and disclosed at the time of the fairness of the settlement is considered." *In re General Motors Corp. Pick-Up Truck Fuel Tank Prods Liab. Litig.*, 55 F.3d 768, 802 (3d Cir. 1995) (*quoting* Manual for Complex Litig. (First) at §1.46).

[72] *Tutu Water Wells* effectively overruled *United States v. Kramer*, 19 F. Supp.2d 273 (D.N.J. 1998), where the Court approved a consent decree without disclosure of the amounts each settling party paid. *Kramer* is also distinguishable on its facts. In *Kramer*, all the participants, including the objecting party, agreed to the allocation process; a settlement process protocol was approved by the court and supervised by the Magistrate Judge; the allocation was conducted by private allocators chosen by the participants; and the governments (the United States and the State of New Jersey) did not participate in any way in or control the allocation, did not pay for it, did not set the ground rules, did not pick the neutrals, and were not available for consultation with the neutrals during the process." In *Tutu Water Wells*, unlike in the proposed settlement, the damage assessment was peer-reviewed. 326 F.3d at 205-06.

[73] "A Base Score was assigned to each Allocation Party facility (Facility BS) determined as the sum of the products of the COC Relative Risk Number ($COC_{RRN}$) and COC Relative Responsibility ($COC_{RR}$)." Batson Report, p. 31.

31

(3d. Cir. 2018) (emphasis added). The bulk treatment of *all* defendants, without disclosing what amount each defendant has paid, precludes any finding of substantive fairness.

The "comparative fault" analysis that *Tutu Water Wells* and *Trinity Industries* require is particularly important here, where there is no "reopener," unlike in *Kramer. Cf. United States v. Kramer*, 19 F. Supp. 2d 273, 289 (D.N.J. 1998) (consent decrees are subject to "reopener" if "the remedial actions are not protective of the human health or the environment"). If the remedy is not effective and costs are more than EPA anticipates, there will be no way to revisit the proposed consent decree. In this case, where the settling parties are supposedly paying a premium for the absence of a reopener, the requirement of a careful establishment of comparative fault is especially important.

In addition to concealing individual settlement amounts from the Court, EPA has compounded the problem by strategically withholding documents reflecting the back-and-forth negotiations that culminated in the Batson Report, including party comments on the draft report and expert reports submitted by parties. EPA seeks to justify this by claiming ADR confidentiality, but this creates two added problems. First, while ADR confidentiality may be acceptable where all liable parties consensually agree to the process and settlement, it is unworkable and impermissible when EPA seeks to bind parties like OxyChem that did not agree to participate. Second, as discussed in greater detail below, EPA has selectively disclosed only the Batson Report itself. EPA did not disclose to the Court that the report: a) was issued in a process that allowed interested parties to comment on it, in secret, in their own interests, b) allowed interested parties to participate in drafting the report itself, and c) required the allocator to anonymize their comments so that their fingerprints on the end result would be untraceable, cloaking all of this with a veil of neutral objectivity that was—in reality—nothing of the sort. The public and the Court must evaluate the proposed consent decree. They cannot do this meaningfully without a complete administrative record that allows examination of what each party has paid and how each party participated in drafting the report now invoked to grant them a blanket release.

EPA cannot simultaneously keep documents secret that belong in the administrative record while asking the Court to assess and rule, in a public proceeding, that the settlement was procedurally fair. Courts "cannot exercise their duty of review unless they are advised of the considerations underlying the action under review. . . . [T]he orderly functioning of the process of review requires that the grounds upon which the administrative agency acted *be clearly disclosed* and adequately sustained." *Cotter v. Harris*, 642 F.2d 700, 705 n.7 (3d Cir. 1981) (emphasis added) (*quoting SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943)). The Court cannot properly evaluate a decision based on an incomplete, partially-disclosed record, and neither can the public.

Assuming the ADR Act applies, EPA's actions in selectively disclosing only the report itself violate it.[74] EPA made OxyChem an involuntary party to the allocation process, *see* Part III(A) *supra*, authorizing Batson and AlterEcho (the ostensible ADR neutrals) to "represent" OxyChem's interests in the process without OxyChem's consent. This violated the ADR Act's requirement of neutrality. 5 U.S.C. § 573. Disclosure of the report also violated the ADR Act's confidentiality strictures. Under Section 574 of the Act, "a neutral in a dispute resolution proceeding shall not voluntarily disclose . . . any dispute resolution communication . . . unless (1) all parties to the dispute resolution proceeding and the neutral consent in writing." OxyChem, an involuntary party to the

---

[74] EPA's action would also, independently, violate Federal Rule of Evidence 408 if EPA wee to rely on the Batson Report in court. On its face, EPA's proposed decree appears to offer the report in evidence to prove the alleged liability of the settling parties and of OxyChem itself.

ALCD-PUBCOM_0000444

allocation, was never asked to and did not consent to the dissemination of the allocation report. EPA cannot circumvent the strictures of the ADR Act by disclosing the report *itself*, when EPA's hired neutral was prohibited from doing so.

In addition, fairness requires that the entire administrative record be disclosed. EPA has disclosed the Batson Report, marked "ADR Confidential," but has selectively and deliberately withheld documents regarding how the final settlement amounts were calculated, including whether there was any bargaining with or among the settling parties. This selective use of ADR confidentiality is unfair to the public and to OxyChem, in addition to depriving the Court of the entire record. "If partial waiver does disadvantage to the disclosing party's adversary by, for example, allowing the disclosing party to present a one-sided story to the court, the privilege will be waived as to all communications on the same subject." *Westinghouse Elec. Corp. v. Republic of the Philippines*, 951 F.2d 1414, 1426 n.12 (3d Cir. 1991); *see also In re Teleglobe Commc'n Corp.*, 493 F.3d 345, 361 (3d Cir. 1997) (noting that when assessing selective disclosure, the "touchstone is fairness" because parties should not be able to "take advantage of another by selectively disclosing otherwise privileged communications"); *V. Mane Fils, S.A. v. Int'l Flavors and Fragrances, Inc.*, 249 F.R.D. 152, 154-55 (D.N.J. 2008) ("where a party is attempting to gain an advantage or make offensive use through intentional [selective] disclosure, there must be a full subject matter waiver").

"According to federal common law, ... 'regard must be had to the double elements that are predicated in every waiver, *i.e.*, not only the element of implied intention, but also the element of fairness and consistency. . . . There is always also the objective consideration that when his conduct touches a certain point of disclosure, fairness requires that his privilege shall cease whether he intended that result or not. *He cannot be allowed, after disclosing as much as he pleases, to withhold the remainder.*'" *Harding v. Dana Transp., Inc.*, 914 F. Supp. 1084, 1092 (D.N.J. 1996) (*quoting* 8 J. Wigmore, Evidence in Trials at Common Law § 2327 at 636). Production of some documents marked "CONFIDENTIAL SETTLEMENT COMMUNICATION" requires the production of all documents relating to the settlement. *Mercury Indem. Co. of Am. v. Great N. Ins. Co.*, Civ. Action No. 19-14278 (MAS) (LHG), 2022 WL 844561, at *6 (D.N.J. Mar. 22, 2022).

Here, EPA has failed to produce the entire administrative record, making public only those documents it hopes will persuade the Court to approve the settlement, while not disclosing others under the guise of ADR confidentiality. EPA should produce the entire record. Selective disclosure is unfair to the public and OxyChem, and the Court cannot make a reasoned decision without disclosure of the remaining, relevant documents.

## IV.    EPA Has No Authority To Extinguish OxyChem's Contribution Claims

The mechanism that the proposed consent decree adopts to make binding EPA's flawed and unauthorized allocation is equally invalid. By its terms, the proposed consent decree proposes to eliminate OxyChem's contribution claims against the settling PRPs. *See* Dkt. 2-1 (Consent Decree) at ¶23. That proposed contribution bar—which seeks to make it impossible for OxyChem to obtain a judicial determination of the settling parties' proper share of liability—is inconsistent with CERCLA, constitutional guarantees, and basic fairness.

First, CERCLA does not authorize the United States to settle or bar OxyChem's own statutory contribution claims. CERCLA provides that a "person who has resolved its liability *to the United States* or a State in an administrative or judicially approved settlement shall not be liable for claims for contribution regarding matters addressed in the settlement." 42 U.S.C. § 9613(f)(2) (emphasis added). That language authorizes the United States to resolve a settling party's liability "to the United States," *not to other parties*. *Id.* As set out in detail above, OxyChem has incurred—

ALCD-PUBCOM_0000445

and will continue to incur—hundreds of millions of dollars of costs *itself* to respond to pollution by others. That makes those parties liable *to OxyChem* in contribution, not *to the United States*, because the United States has not incurred those costs at all.

The United States cannot circumvent the statute by expanding the "matters addressed in the settlement" to extinguish contribution claims for costs incurred by private parties. *Id.* To the contrary, that broad reading of § 9613(f)(2) would conflict with § 9613(f)(1), which expressly assigns *courts*—not the Executive Branch—the duty to "allocate response costs among liable parties using such equitable factors as the Court determines are appropriate." 42 U.S.C. § 9613(f)(1). Allowing the government to settle and thereby extinguish *other parties'* contribution claims for costs that they paid and that the United States did not pay under § 9613(f)(2) would deprive the courts of that statutorily-prescribed function, giving it to EPA instead. That is not the choice Congress made. *See Oceanic Steam Navigation Co. v. Stranahan*, 214 U.S. 320, 339 (1909) (the power to assign disputes to agency adjudication is "peculiarly within the authority of the legislative department"); *cf. West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022) ("Extraordinary grants of regulatory authority are rarely accomplished through 'modest words,' 'vague terms,' or 'subtle device[s].'"). In fact, Congress refrained at least twice from enacting proposals that would have amended CERCLA to explicitly allow a settlement with the United States to eliminate other parties' contribution claims. *See* Superfund Reform Act of 1994, S. 1834, 103d Cong. § 406 (as reported to Senate, Sept. 30, 1994) (proposing to amend 42 U.S.C. § 9613(f) to bar contribution actions "by other persons" and eliminate the right of contribution after a settlement with the United States); Recycle America's Land Act of 1999, H.R. 1300, 106th Cong. § 307 (as introduced, June 15, 1999) (proposing to amend 42 U.S.C. § 9613(f) to eliminate the right of contribution after a settlement with the United States under § 9622(g)).

Second, the proposed contribution bar raises serious constitutional concerns. By purporting to extinguish OxyChem's valuable contribution claims against the settling defendants, the proposed contribution bar amounts to an unconstitutional taking. *Cf.* 42 U.S.C. § 9657 (where an administrative settlement under § 9622 "has the effect of limiting any person's right to obtain contribution" and so "would constitute a taking without just compensation in violation of the fifth amendment . . . such limitation on the right to obtain contribution shall be treated as having no force and effect"). And by developing the settlement through a flawed and unlawful allocation process, EPA deprived OxyChem of the "opportunity to be heard at a meaningful time and in a meaningful manner" that due process requires. *Zinermon v. Burch*, 494 U.S. 113, 127 (1990).

Third, the proposed contribution bar violates CERCLA's basic requirements of procedural and substantive fairness. It is tainted by all the procedural defects of the Batson allocation process that led to the proposed consent decree, *see* Part III *supra*, whose result the proposed contribution bar seeks to immunize from any independent judicial allocation and decision in a future contribution suit. Tellingly, one party—Nokia—has recognized this, urging the Court to simply adopt the allocation as its own,[75] disregarding that Congress squarely deprived the Court of jurisdiction to review (much less adopt as its own) EPA's allocation. The proposed contribution bar also creates dramatic substantive unfairness, by seeking to permanently deprive OxyChem of a mechanism to obtain the judicial allocation of liability that CERCLA requires and thereby force the settling defendants to bear their true fair share of $1.82 billion in cleanup costs—effectively

---

[75] *See* Dkt. 94-1 at 2-3 ("To avoid inconsistent results, the Court should rule in this proceeding on the fairness of the USEPA-approved protocol methodology upon which the allocation was based and affirm that it applies to any subsequent equitable allocation by the Court concerning the Lower Passaic River, including the OxyChem Litigation.").

ALCD-PUBCOM_0000446

making permanent and binding an allocation that massively overburdens OxyChem and bears no reasonable relationship to actual responsibility. EPA should not proceed with any settlement that includes this deeply unfair provision.

Finally, by its terms, the contribution bar in the proposed consent decree purports to extinguish only OxyChem's contribution rights under § 9613(f)(2). To the extent EPA intends the contribution bar to also extinguish OxyChem's cost recovery claims under § 9607, that result cannot be reconciled with the plain language of § 9613(f)(2) or governing Supreme Court precedent. Any argument to the contrary would provide yet another reason to withdraw the proposed consent decree. *United States v. Atl. Rsch. Corp.*, 551 U.S. 128, 140 (2007) ("The settlement bar [in § 9613(f)] does not by its terms protect against cost-recovery liability under §107(a)."). In addition, OxyChem notes that the 2016 ASAOC explicitly reserves OxyChem's claims against other responsible parties to recover the response costs OxyChem has incurred and will incur in designing the OU2 remedy. *See* **Ex. 10** (2016 ASAOC) at ¶¶101, 103. To the extent the proposed contribution bar could be read to bar those claims, it is both unfair and unlawful for EPA to turn its back on the 2016 ASAOC and attempt to bar claims that the 2016 ASAOC explicitly preserves.

## V. The Proposed Consent Decree Is Improper Because It Was Equivalent to a Collusive Settlement

Given the flawed processes described above, it is not surprising that the proposed consent decree bears all the hallmarks of a collusive settlement—assigning the vast majority of the potential liability to a single defendant who did not participate in the settlement process. *See, e.g., United States v. Colorado,* 937 F.2d 505, 509 (10th Cir. 1991) (courts "must ensure that the agreement is not . . . a product of collusion"); *United States v. Cornell-Dubilier Elecs., Inc.,* 2014 WL 4978635, at *5 (D.N.J. Oct. 3, 2014) (settlement should receive "less deference from the Court" where the settling parties "do not harbor sharply conflicting interests"); *United States v. Hardy,* 1992 WL 439759, at *3 (W.D. Ky. Sept. 9, 1992) (the "exclusion of [PRPs] from the negotiation process raises questions of procedural fairness").

OxyChem warned EPA at the outset that the settling parties intended to use the process collusively to try to cut off OxyChem's right to seek contribution for costs it had incurred and that the United States had not incurred. *See* Nov. 7, 2018 letter from K. Patrick to S. Flanagan (noting an argument by SPG counsel that the Batson process is "intended to result in settlement with EPA that would result in contribution protection including from Occidental's claims" and a related SPG claim that the process might "result in Participating Allocation Parties receiving complete contribution protection, including from Occidental's claims here"). OxyChem also warned EPA that "EPA also lacks adequate information from which to derive an equitable allocation of costs. . . . . Many PRPs have not produced all relevant documents, or provided testimony from key witnesses. . . . It is a myth that there exists a complete discovery record. . . ."). Oct. 12, 2017 letter from M. Backus to E. Wilson.

The settling parties used these evidentiary gaps—and the design of the Batson process itself—to seize control of the allocation and use it to assign virtually all of the liability for the clean-up to a single absent party, OxyChem, By design, the Batson work plan was "based in part on existing information and contacts generated from previous attempts to develop a mutually

35

acceptable allocation of liability."[76]  This left the allocator to rely on historical data from a prior lawsuit—the Spill Act case—where most of the participating PRPs had never produced any documents or testimony.  Batson also allowed the Participating Allocation Parties (PAPs)[77] to "participate in the design of the allocation database" he would consider in performing his allocation,[78] a right they used to swamp the process in their own interests by submitting over 700,000 pages to the database as compared to just 130,000 pages received from EPA.[79]  PAPs were allowed to "comment on and correct the draft data reports produced under the previous contract."[80]  Incredibly, the process required that the "ERG Team . . . solicit from the PRPs participating in the allocation positions on *the drafting of the allocation* recommendation report."[81]  This was wildly improper, but the process was at pains to conceal the evidence of this, requiring ERG to record only "PAP *general* comments regarding the draft allocation recommendation report, *without attribution* to individual OU2 PAP comments."[82]

A settlement process like this, where the parties benefitting had an active role in selecting the evidence the allocator would consider, were afforded the opportunity to correct and tailor it collusively to implicate a single party, and were then involved in reviewing and drafting the

[76] *See* **Ex. 11** (Sept. 20, 2019 ERC Conflict Prevention and Resolution Services, Contract# 68HERH19D0033 Revised Work Plan and Pricing Estimate for Task Order Request #013 Diamond Alkali-Lower Passaic River Allocation) at Section 2.

[77] The term "PAP" means Participating Allocation Parties.  OxyChem and the PVSC, like others who chose not to participate (or whom EPA excluded from the process) were not offered an opportunity to correct data reports pertaining to them or to participate in drafting the allocation report that assigned significant responsibility to each of them.  This deprived non-participating parties of due process.  *Cf. Stone v. FDIC*, 179 F.3d 1368, 1374-76 (Fed. Cir. 1999) (*ex parte* communications that introduce new and material information to the deciding official violate due process); *see also Ward v. U.S. Postal Svc.*, 634 F.3d 1274, 1279 (2d Cir. 2011).  This is a serious violation not subject to the harmless error test.  *Ward*, 634 F.3d at 1279.  In a judicial allocation, in contrast, the Court does not consider evidence *ex parte* and each affected party is afforded the right to challenge the evidence against it.

[78] *Id.* at Section 3 ("Assumptions"), Task B ("Allocation Design and Production").

[79] At the time EPA released the Batson Report, it made "supporting factual documentation" available with Bates numbers up to PAP-00728783, indicating that well over 700,000 pages came from PAPs.  *See* Dkt. 84-1 (Yeh Decl.) ¶ 25.  Presumably, the PAPs provided to Batson *more* than 728,783 pages material, as EPA has not made public the PAPs' "position briefs and responsive briefs" from the Batson process.  *Id.* at ¶20.  *See also* **Ex. 12** (Work Plan; EPA Conflict Prevention and Resolution Services Contract; Contract # EP-W-14-020; Work Plan for Task Order #096; Diamond Alkali-Lower Passaic River Allocation) at Section 2 (maximum of 150,000 pages "will [be] reviewed and utilized to conduct the allocation," including 130,000 pages from EPA and 20,000 pages from PRPs); **Ex. 13** (Jul. 23, 2018 Revised Work Plan; EPA Conflict Prevention and Resolution Services Contract; Contract # EP-W-14-020; Work Plan for Task Order #096; Diamond Alkali-Lower Passaic River Allocation) at Section 2 (maximum of 290,000 pages of documents "will be reviewed and utilized to conduct allocation," including 130,000 pages from EPA and 160,000 from PRPs); **Ex. 14** (May 31, 2019 Revised Work Plan; EPA Conflict Prevention and Resolution Services Contract; Contract #EP-W-14-020; Work Plan for Task Order #096; Diamond Alkali-Lower Passaic River Allocation) at Section 2 (maximum of 506,000 pages of documents "will be reviewed and utilized to conduct the allocation," including 130,000 pages from EPA and 376,000 extra pages received from PRPs); **Ex. 11** (Sept. 20, 2019 ERC Conflict Prevention and Resolution Services, Contract# 68HERH19D0033 Revised Work Plan and Pricing Estimate for Task Order Request #013 Diamond Alkali-Lower Passaic River Allocation) at Section 3, Task B (maximum of 593,895 pages of documents "will be reviewed and utilized to conduct the allocation," including 130,000 pages from EPA and 413,895 pages received from PRPs and 50,000 pages to be received from PAPs).

[80] *See* **Ex. 11** (Sept. 20, 2019 ERC Conflict Prevention and Resolution Services, Contract# 68HERH19D0033 Revised Work Plan and Pricing Estimate for Task Order Request #013 Diamond Alkali-Lower Passaic River Allocation) at Section 5, Task B2 ("PRP Outreach").

[81] *Id.* at Section 5, Task B5 ("Allocation and Allocation Recommendation Report") (emphasis added).

[82] *Id.* (emphasis added).

36

resulting allocation report that effectively leaves OxyChem with approximately $1.82 billion in potential liability and no meaningful recourse, can only be described as procedurally unfair. Indeed, the process here was so flawed that it violated even the basic constitutional guarantee of procedural due process, denying OxyChem any "opportunity to be heard at a meaningful time and in a meaningful manner." *Zinermon,* 494 U.S. at 127; *see, e.g., Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 542 (1985).

## VI.    The Proposed Settlement Has Multiple Fatal Substantive Flaws

### A.    The Proposed Consent Decree Is Inconsistent With CERCLA's Goals and Public Policy

After decades of study and as the critical remedy implementation phase approaches, EPA now seeks to discharge forever the liability of nearly every party responsible for contaminating the Lower Passaic River in exchange for a "minor" cash payment.[83]

The proposed settlement accomplishes *nothing* in the way of actual cleanup work. It does not expedite cleanup of the river, or even require the settling parties to perform any work. It does not hold polluting corporations responsible, encourage voluntary cleanups, or minimize litigation. Instead, it does the opposite.

EPA's actions are arbitrary and capricious and profoundly unfair for many reasons, not least because they depart from the enforcement scheme developed over the 40 years since CERCLA's passage. That scheme, as designed by Congress, carefully aligns parties' incentives to accomplish Congress's goals in a manner consistent with important public policies by incentivizing voluntary performance and private litigation to recover costs, all of which saves taxpayers money. EPA's actions here *undermine* these goals and policies—not just at the Lower Passaic River but at Superfund sites across New Jersey and the United States.

#### 1.    The Proposed Consent Decree Does Not Clean Up the Lower Passaic River

CERCLA's primary goal is "to promote the timely cleanup of hazardous waste sites."[84] In 1986, Congress amended CERCLA to provide contribution rights for private parties who step up voluntarily, as OxyChem has done, to perform cleanup work. Contribution rights ensure "that the Government should obtain the full costs of cleanup from those it targets for enforcement and leave the remaining costs to be recovered in private contribution actions between settling and nonsettling parties."[85]

At the Lower Passaic River, timely cleanup will require a massive amount of work. The nearly-complete design of the OU2 remedy—itself a multi-year project being performed by OxyChem alone—is just the first step. Over the next 20 years, remediating the lower 17 miles of the river will require (1) construction of an Upland Processing Facility; (2) implementation of the OU2 remedy; (3) design of the interim remedy selected by EPA for OU4 (the "OU4 Interim Remedy"); (4) implementation of the OU4 Interim Remedy; and (5) selection, design, and

---

[83] Notice at 2133.

[84] *Trinity Indus.,* 903 F.3d at 348 (quoting *Burlington N. & Santa Fe Ry. Co. v. United States,* 556 U.S. 599, 602 (2009)).

[85] 132 Cong. Rec. S14,903 (daily ed. Oct. 3, 1986) (statement of SARA floor manager Sen. Stafford).

ALCD-PUBCOM_0000449

implementation of a final, risk-based remedy for OU4. Collectively, this series of projects is among the largest in the history of the Superfund program and is estimated to cost more than $1.82 billion.[86]

The proposed settlement requires *none* of this work to be performed or funded. Rather, the proposed consent decree will release all 85 settling parties from any further obligation in exchange for a cash payment of $150 million.[87] There are no reopeners if EPA's cost estimates prove wrong. There is no liability to pay the costs of the eventual, final remedy in OU4. And none of these settlement funds have been committed to funding the cleanup. Even if they were, a commitment from EPA to devote every dollar of the settlement to actual cleanup work (one EPA has not yet made) would be a negligible contribution toward completion of the work.

This is a staggering departure from EPA's longstanding—and statutorily mandated—approach to Superfund settlements, which prioritizes securing either *complete* performance or *all* costs of the cleanup.[88] EPA's authority to reach settlements at Superfund sites is granted by Congress, which directed EPA to reach settlements that "expedite effective remedial actions and minimize litigation," whenever such settlements are "practicable and in the public interest."[89] "Under CERCLA, the government is tasked with either obtaining the performance of remedial work by the responsible parties or seeking to ensure that the funds paid in response to a release or threatened release of hazardous substances are recovered through the liability scheme set forth in CERLCA."[90]

A survey of consent decrees entered at New Jersey Superfund sites since Congress passed CERCLA confirms this has been EPA's consistent approach—until now:

---

[86] Certain aspects of this work—in particular the final remedy for OU4—are not included in that total and have not yet been estimated.

[87] Notice at 2133–34.

[88] USEPA, 12/5/1984 Interim CERCLA Settlement Policy, at 3 ("The goal of the Agency in negotiating private party cleanup and in settlement of hazardous waste cases has been and will continue to be to obtain complete cleanup by the responsible parties, or collect 100% of the costs of the cleanup action.").

[89] 42 U.S.C. § 9622(a).

[90] *United States v. Alsol Corp.*, 2021 WL 1050373, at *3 (D.N.J. Mar. 19, 2021).

ALCD-PUBCOM_0000450

| YEAR | SITE | PERCENTAGE OF REMEDY COST FUNDED UNDER SETTLEMENT | REMEDY COMPLETED BEFORE CONSENT DECREE? | TYPE OF SETTLEMENT |
|---|---|---|---|---|
| 2015 | American Cyanamid Superfund Site | 100% | No | PRPs perform remedy |
| 1994 | Caldwell Trucking Superfund Site | 100% | No | PRPs perform remedy |
| 1990 | Lone Pine Landfill Superfund Site | 100% | No | PRPs perform remedy |
| 2006 | SJ Clothing Company / Garden State Cleaners Superfund Site | 100% | No | EPA cost recovery |
| 2014 | Cornell–Dubilier Superfund Site | 80% | Partial | EPA cost recovery |
| 1998 | Helen Kramer Landfill Superfund Site | 77% | Yes | EPA cost recovery |
| 2021 | Michelin Powerhouse Superfund Site | 75% | Yes | EPA cost recovery |
| 2021 | Unimatic Manufacturing Corp. Superfund Site | 50% | No | *de minimis* (inability to pay) |
| 1989 | Lipari Landfill Superfund Site | 4.4% | No | *de minimis* |

When remedy implementation at a site has not started, EPA has consistently reached settlements with parties who commit to performing or funding *100%* of the work. When the remedy has already been completed by the United States, EPA enters a "cost recovery" settlement with parties who agree to reimburse the government for *nearly* all costs the government incurred to complete the cleanup.

In 2016, OxyChem offered to perform the entire remedial design of OU2 at its own cost, subject to its contribution rights.[91] When OxyChem made that commitment, EPA assured OxyChem that implementation of the OU2 remedy would not deviate from the long-standing enforcement framework envisioned by Congress:

> [I]t is EPA's practice to pursue and enlist all viable PRPs in performing and or funding response work. For site-specific reasons, as well as timing, we believe that entering into an RD AOC with OxyChem as the sole performing party is the best way to move forward with the remedial design

---

[91] OxyChem is presently pursuing contribution from responsible parties, as permitted by CERCLA Section 113 and the 2016 ASAOC, in the District of New Jersey. To the extent EPA seeks to cutoff OxyChem's contribution rights that were preserved in this agreed settlement, it would be a breach of that agreement.

ALCD-PUBCOM_0000451

for OU2. We are not, however, deviating from our practice and remain committed to pursuing all the OU2 PRPs.[92]

More than a year ago, in January of 2022, OxyChem offered EPA another large-scale cleanup, proposing an early settlement in which it would design and implement EPA's OU4 Interim Remedy at a cost of $441 million.[93] At EPA's request, in June of 2022, OxyChem renewed its OU4 offer and made a further good faith offer to enter into a series of agreements to build the required sediment processing facility and implement the entire remedy in OU2.[94] OxyChem's offers fit precisely within the longstanding CERCLA enforcement scheme: had EPA accepted them, they would have achieved CERCLA's twin goals of expediting cleanup of the Lower Passaic River in a cleanup funded entirely by responsible parties—OxyChem and parties it pursues in contribution. Acceptance of OxyChem's offers would have achieved, in short, what the proposed settlement abandons entirely: timely, concrete cleanup work at the expense of private parties. If accepted, the work to design and implement the OU4 interim remedy would by now be well advanced.

EPA's own guidance confirms that where a settlement fails to secure a commitment to perform or fund the cleanup, there is no benefit to the public and EPA should not waste its time and the public's resources: "Entering into discussions for less than a substantial proportion of cleanup costs or remedial action needed at the site would not be an effective use of government resources."[95] When considering a settlement, EPA must ask: "What does the Government gain by settling this portion of the case? Does the settlement or its terms harm the remaining portion of the case? Will the Government have to expend the same amount of resources to try the remaining portion of the case? If so, why should the settlement offer be accepted?"[96]

Here, the answers to EPA's own guidance doom the settlement. The government is gaining reimbursement of its past oversight costs, but no actual cleanup work. The settlement harms the remaining portion of the case, rejecting a confirmed commitment to $1.82 billion of actual cleanup work by OxyChem in favor of a "minor" $150 million settlement to fund EPA's oversight. And those resources will necessarily be consumed by a lengthy fight over approval of this settlement, because the relief seeks to deprive OxyChem—the only party actually *performing* in OU2—of the contribution claims Congress granted to it to recover costs for the work OxyChem is performing. "Why should the settlement offer be accepted?" in these circumstances is the question the guidance asks. And the answer is plain: the public gains nothing by this settlement, so the United States should not accept it. The proposed settlement is exactly the kind of settlement that EPA guidance dictates is not worth the agencies' time and the public's resources to negotiate. Here, EPA has invested four years in a fruitless process, turning down extensive offers of actual clean-up *work* to gather up cash for its own oversight. EPA's illogical choice to pursue the proposed settlement that releases 85 parties (many of which are multi-billion-dollar, multi-national concerns) in return for *no* work and a "minor" cash payment is the definition of arbitrary and capricious. The United States should reject it.

---

[92] **Ex. 15** (Apr. 26, 2016 EPA letter to OxyChem).

[93] **Ex. 6** (Jan. 13, 2022 letter from C. Weiss to Administrator Garcia *et al.*).

[94] **Ex. 7** (Jun. 27, 2022 letter from C. Weiss to Administrator Regan *et al.*).

[95] 1984 Interim Settlement Guidance, at 5.

[96] 1984 Settlement Guidance at 12.

ALCD-PUBCOM_0000452

## 2.    The Proposed Consent Decree Fails To Hold Polluters Accountable

In conjunction with promoting timely cleanups, Congress's chief aim in enacting CERCLA was "to ensure that the costs of such cleanup efforts were borne by those responsible for the contamination."[97] "By placing the burden of clean-up and remediation on responsible parties, the statute is designed to make the party benefitting from the commercial activities creating the waste internalize the subsequent health and environmental costs of its activity into the cost of doing business." *United States v. Pesses*, 1994 WL 741277, at *6 (W.D. Pa. Nov. 7, 1994) (citing *FMC Corp. v. United States*, 29 F.3d 833, 840 (3d Cir. 1994)).

The proposed consent decree fails to hold polluters accountable. EPA intends to release 85 corporations that discharged to the Passaic River the *same chemicals being cleaned up*, releasing them from *all* liability (even for presently unknown costs) and requiring them to perform zero actual cleanup work.

EPA's actions here are emblematic of its Rube Goldberg approach to this settlement. Here, it seeks to bolt a *de minimis settlement* procedure and the protections of CERCLA Section 122(g) onto parties whose contributions are by no measure—including EPA's own—"minimal in comparison to other hazardous substances at the facility," as CERCLA Section 122(g) requires for a *de minimis* settlement. In awarding the benefits of a *de minimis* settlement to parties who do not remotely qualify for one under CERCLA, EPA is violating both the letter of the statute and its remedial goals.

A *de minimis* settlement under CERCLA § 9622(g) is a cash-out settlement in which responsible parties deemed by EPA to qualify as *de minimis* parties with respect to the contamination issue pay money to settle the United States' potential claims against them.[98] Those settlements, by definition, are the exception to EPA's approach to settlement at Superfund sites: "In negotiating with *de minimis* parties, the Regions should limit their efforts to low volume, low toxicity disposers who would not normally make a significant contribution to the costs of cleanup in any case."[99]

EPA again violates its own guidance.[100] The proposed settlement has all the hallmarks of a *de minimis* settlement but none of the required qualifying substance. Notable *de minimis* hallmarks in this settlement are:

- It cashes out the settling parties for an amount equivalent to a "minor" portion of the estimated remedy costs.

---

[97] *Trinity Indus.*, 903 F.3d at 348 (quoting *Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 602 (2009)).

[98] 42 U.S.C. § 9622(g).

[99] 1984 Settlement Guidance, p. 6.

[100] 1984 Settlement Guidance, p. 7 ("Substantial resources should not be invested in negotiations with *de minimis* contributors, in light of the limited costs that may be recovered, the time needed to prepare the necessary legal documents, the need for Headquarters review, potential *res judicata* effects, and other effects that *de minimis* settlements may have on the nature of the case remaining to the Government."). EPA deviated from this guidance by, among other things, paying at least *$4 million* to companies affiliated with Batson to perform the flawed "allocation process" that resulted in a settlement that represents just a "minor" fraction of the estimated cost of the remedies. *See* **Ex. 17** (compilation of EPA "Final Invoice Approval Summaries" for Batson process).

41

- It includes a provision waiving claims against other parties that is present in EPA's model consent decree for *de minimis* settlements, but not in its model consent decree for "enforcement first" settlements under § 122(a).

- The proposed settlement is unlike any of the settlements in the survey above—except the *de minimis* consent decree entered at the Lipari Landfill Superfund Site.

But the settlement has *none* of the required *substance* of a *de minimis* settlement, and EPA does not characterize it that way. EPA never claims the parties to this settlement qualify for the benefits of a *de minimis* settlement because it knows they do not qualify as *de minimis* under the statute. *See Arizona v. City of Tucson*, 761 F.3d 1005, 1013 (9th Cir. 2014) (before approving consent decree that would assign minimal liability to settling defendants, district court must "confirm that the settling parties are [in fact] *de minimis* contributors"). With the exception of the extended relief granted to prior cash-out parties, which OxyChem does not contest, not a single one of the 85 *new* settling parties are "low volume, low toxicity disposers" as Congress defined them in granting EPA the authority to enter into *de minimis* settlements.[101]

This is not just OxyChem's determination—it is EPA's. EPA selected these parties from among the *scores* of historical dischargers to the Lower Passaic River over the last 150 years, suing them as parties it alleges are "jointly and severally liable" under Section 107(a) of CERCLA, for discharging hazardous substances to the Passaic River.[102] EPA considers *all* of these parties to be large polluters, excluding every one of them from an earlier round of truly *de minimis* settlements. EPA's own studies show the Lower Passaic River's sediments are "ubiquitously"[103] contaminated with *many* hazardous substances, making it impossible to determine the exact cost each chemical contributes to the cleanup.[104] Accordingly, EPA initially followed the Superfund process to determine which of those many contaminants posed unacceptable risks—the "primary" risk drivers.[105] Relying on its own scientific analysis, rather than an outsourced consultant report, EPA identified "eight contaminants of concern that pose the greatest potential risks to human health and the environment: dioxins/furans, PCBs, mercury, DDT, PAHs, dieldrin, copper, and lead"[106] identifying four contaminants of concern with remedial goals in OU2 (dioxins/furans, PCBs, mercury, and DDT) and two contaminants of concern with remedial goals in OU4 (dioxins/furans and PCBs).[107] The settling parties discharged one or more of those highly toxic contaminants of concern, in large quantities, as even the deeply flawed Batson report acknowledges.

---

[101] 1984 Settlement Guidance, p. 6.

[102] Dkt. 1 ¶ 37.

[103] *See, e.g.*, OU2 ROD at 17 ("data show that elevated concentrations of COCs are ubiquitous in surface sediments of the lower 8.3 miles, bank to bank").

[104] *Id.* at 296 (page 38 of Appendix V, Responsiveness Summary) ("Remediating the lower 8.3 miles of the Lower Passaic River will address all of the hazardous contaminants in the sediments of this stretch of the river. There is no precise formula to evaluate how much the selection of the remedy, or the cost of the remedy, is directly attributable to any one hazardous contaminant.").

[105] *See, e.g.*, EPA, 2014 RIR at ES 2   ES 3; EPA, 2014 FFS, Appendix D: Risk Assessment, p. 3  2

[106] Dkt 2-1 at 5. *See* OU2 ROD at 14 ("EPA has identified many hazardous substances in the lower 8.3-mile sediments. The following eight COCs pose the greatest potential risks to human health and the environment in the lower 8.3 miles of the Lower Passaic River.").

[107] *See* OU2 ROD at 43 ("While all of the COCs . . . cause unacceptable risks . . . , risk-based [Preliminary Remediation Goals] were developed for dioxins, PCBs, mercury and Total DDx . . . ."); OU4 ROD at 3.

ALCD-PUBCOM_0000454

Notably, EPA's own analysis also shows that the discharges of hazardous substances from the settling parties' operations would have required the *exact same remedy*, even if dioxin were completely absent from the Lower Passaic River sediments and the Diamond Alkali plant had never existed.[108] The United States has long maintained that removing dioxins alone is not enough to restore the river's health. Nearly a decade ago, EPA and the US Army Corps of Engineers wrote to the New Jersey Department of Environmental Protection "(NJDEP") warning that a contemplated directive requiring the removal of dioxin in the Lower Passaic River "will not solve the environmental problems in the Passaic River since it does not address all of its contaminants and does not consider the entire EPA study area."[109] EPA concurred, writing that NJDEP's directive "focuses on a limited area, and on addressing only one hazardous substance. . . . Passaic River sediments are contaminated by many hazardous substances, including, but not limited to, dioxin, PCBs, PAHs, and heavy metals. *Removing 2,3,7,8 TCDD alone will not address the risks from other contaminants in the River. In fact, removing only the sediments contaminated with 2,3,7,8 TCDD may expose mercury and DDT, among other contaminants, which are present in deeper sediments . . . thereby replacing one problem with another . . .* In summary, the Directive is unacceptable and will not solve the environmental problems of the Passaic River since it does not address all of the contaminants that are causing the problems."[110]

EPA's actions in the proposed settlement are not just arbitrary and capricious and deeply unfair, they are wholly irrational. Even if EPA could legitimately ignore the trail of misrepresentations and wrongful conduct that plagued its allocation process here (and it cannot), EPA is *rewarding* large parties with the proposed settlement that releases them from all liability *before* the cleanup is performed, while penalizing the performing party, OxyChem, with the loss of its statutory contribution claims in the process. In so doing, EPA has abandoned its forty-year-long approach of "enforcement first" to a new approach—enforcement *last*.

### 3.    The Proposed Consent Decree Undermines Important Public Policies

In the 40 years since Congress passed CERCLA with the twin goals of expediting cleanups and holding polluters accountable, a carefully aligned structure of incentives has developed to achieve those goals while adhering to important public policies: promoting voluntary cleanups, advancing environmental justice, encouraging settlements, saving taxpayer funds, and minimizing litigation.

The results of EPA's unprecedented approach to this settlement are playing out in real-time at the Lower Passaic River. But Superfund settlements—particularly at sediment "mega-sites" like this one—are closely watched. As EPA has recognized: "settlements in such cases tend to become precedents in themselves, and are examined extensively by PRPs in other cases."[111]

The proposed settlement inverts the settled structure, crippling the twin engines CERCLA created: voluntary performance and contribution claims. By penalizing the *performing party* and releasing those who are not performing, the proposed settlement realigns the expectations and

---

[108] **Spadaro** Decl.

[109] December 1, 2005 letter from USACE District Engineer to NJDEP Commissioner at 1.

[110] Nov. 14, 2005 letter from A. Steinberg, Regional Administrator EPA Region 2 to NJDEP Commissioner Campbell.

[111] 1984 Settlement Guidance at 11.

43

ALCD-PUBCOM_0000455

incentives of responsible parties at Superfund sites throughout New Jersey and the United States, destroying the incentives Congress embodied in CERCLA.

### a.    The Proposed Settlement Will Discourage Voluntary Cleanup and Early Settlements

Congress meant to "'encourage settlements that would reduce the inefficient expenditure of public funds on lengthy litigation,'" *Mathes v. Century Alumina Co.*, 2008 WL 4693550, at *4 (D.V.I. Oct. 22, 2008) (quoting *In re Cuyahoga Equip. Corp.*, 980 F.2d 110, 119 (2d Cir. 1992)), and "to encourage voluntary cleanups," *id.* at *7. When a proposed decree seeks to bar contribution claims of a private party that voluntarily incurred costs, the decree counters CERCLA goals, by "deter[ing] private parties from undertaking any cleanup 'for fear of being 'stuck' with the full bill.'" *Id.* (quoting *Kelley v. Wagner*, 930 F. Supp. 293, 299 (E.D. Mich. 1996)).

To achieve its objectives of prompt cleanups paid for by private parties, not taxpayers, CERCLA adopts a "cleanup first, contribution later" approach. Since the 1980s, the United States has sought to fund response actions at Superfund sites through "enforcement first."[112] That is, the Government seeks to have private parties fund the cleanup rather than having the United States pay for the work with the Superfund and pursue cost recovery. To make this approach work, Congress amended CERCLA in 1986 to grant private parties the right to pursue contribution claims against other responsible parties and obtain a fair, equitable, and judicial allocation of the costs of response. Parties must be allowed to rely on ultimate reallocation of costs provided by way of contribution claims under section 113 of the statute, otherwise voluntary cleanups are at their own risk especially when—as here—they are cleaning up pollution caused by someone else. *See* Mar. 21, 2023 letter from U.S. Chamber of Commerce, *supra* note 31, at 2 ("Congress has on multiple occasions considered revising its approach under CERCLA but has elected to maintain an approach of joint and several liability combined with the ability of the government and PRPs to recoup the costs of cleanup of responsible parties. Both to ensure timely clean-up of polluted sites and ensure that the appropriate parties bear responsibility, it is critical that the EPA and DOJ enforce CERCLA consistent with the approach embodied in the law.").

The proposed settlement abandons this approach. The proposed consent decree threatens to cut off OxyChem's contribution rights against the Defendants, and to confiscate those claims so the *United States* can use them as settlement consideration to provide to the Defendants. It does so despite OxyChem's unparalleled cooperation with EPA in precisely the way CERCLA's enforcement scheme contemplates.

OxyChem has consistently acted promptly, decisively, and proactively to advance the cleanup of the Lower Passaic River. In fact, OxyChem is the "early settler" at this site. Before filing for bankruptcy, OxyChem's indemnitors performed nearly $700 million of work at the site—including nearly $170 million of work in the river (OU2 and OU4), nearly $88 million at 80-120 Lister Avenue (Operable Unit 1), and $40 million in Newark Bay (Operable Unit 3 (OU3)). Three months after its indemnitors' 2016 bankruptcy, OxyChem entered an Administrative Settlement and Order on Consent to design EPA's selected OU2 remedy. It has offered to enter into a second agreement to build an upland processing facility, required for remedial work, and is presently conducting the Remedial Investigation/Feasibility Study in OU3.

---

[112] September 2, 2002 USEPA Guidance Document, "Enforcement First for Remedial Actions at Superfund Sites" ("EPA has a longstanding policy to pursue 'enforcement first' throughout the Superfund cleanup process").

ALCD-PUBCOM_0000456

Notably, in January 2022 and June 2022, OxyChem offered to design and implement the OU4 remedy (and both the OU2 and the OU4 remedies through a series of sequential agreements) *if* the United States agreed not to bar its contribution claims. This was a reasonable request. It also aligned squarely with the text of CERCLA which both *grants* OxyChem the right to seek contribution when it incurs costs to perform remedial actions,[113] and does *not grant* EPA authority to bar contribution claims for costs incurred by private parties.[114]

No other party stepped up to do any of this work. OxyChem alone has performed it, at enormous cost, even though the evidence demonstrates OxyChem has no responsibility for six of the eight chemicals driving OU2's remedy. If EPA had accepted OxyChem's January 2022 offer to design and implement the OU4 interim remedy, or its offer to work on the entire remedy (both OU2 and OU4), that work would have begun months ago.

If the United States moves to confirm this settlement, EPA's actions will have fundamentally realigned the incentives of responsible parties and fundamentally altered the risks of voluntary performance. Under existing practice, "the government has a serious disincentive to collude with later settlors to cut off the rights of prior settlors just to extract a higher second-round settlement in a single clean-up proceeding. It is the government that is the *repeat* player in the world of CERCLA clean-ups. Should the government develop a reputation for cheating early settlors, that would deter settlements in later clean-ups (and reduce the amounts early-round settlors are willing to pay) and hence, in the long run, hurt the government's interests."[115]

EPA here abandons all of that, breaching its agreement with OxyChem[116] and undermining completely the limits on its own authority and the carefully constructed incentives Congress enacted in CERCLA. To state the obvious, *no rational party* will ever trust EPA to perform its commitments if it is permitted to *punish* the only performing party—OxyChem—with an unconstitutional taking of its contribution claims.

>    **b.    The Proposed Settlement Will Not Minimize Litigation—at the Passaic River or any Other Superfund Site—and Shifts Substantial Liability for the Cleanup to the Public**

An important policy underlying CERCLA is that polluters—not the public—should pay for Superfund cleanups. EPA emphasized this principle when selecting the remedy for the Lower Passaic River:

>    The Superfund program operates on the principle that polluters should pay for the cleanups, not taxpayers. The EPA searches for parties legally responsible for the contamination at sites that are placed on the Superfund

---

[113] 42 U.S.C. § 9613 (f)(1).

[114] *See* 42 U.S.C. § 9613(f)(2) (permitting a grant of contribution protection for "liability to the United States" where the government has incurred costs, but not for "liability to private parties" for contribution to costs they incurred that the United States did not incur).

[115] *U.S. v. Charter Int'l Oil Co.*, 83 F.3d 510, 518 n. 11 (1st Cir. 1996).

[116] *See* 2016 ASAOC at XVII ("Covenants by EPA") (in which the United States covenants not to sue or take administrative action against OxyChem "for the work performed under this Settlement Agreement and for the recovery of Future Response Costs."). Here, EPA is—by administrative action—quite literally "taking" OxyChem's $165 million contribution claim for performing the OU2 Remedial Design *and* its claim for Future Response Costs in violation of this agreement.

45

ALCD-PUBCOM_0000457

> list and seeks to hold those parties accountable for the costs of
> investigations and cleanups. Most of the work to-date to clean up the
> Passaic has been performed by parties responsible for the contamination.
> The EPA will pursue agreements to ensure that the cleanup work in the
> lower eight miles will be carried out and paid for by those responsible for
> the pollution as required by the Superfund law."[117]

The proposed settlement betrays this goal by shifting the cost of the cleanup to entities not included in the settlement, including PVSC and the municipal sewer operators. Those public entities face large exposures to liability because they own "facilities" and "arrange" for transportation of waste generated by other parties. Those "other parties" include the settling defendants. In their words:

> …many PRPs were connected to the PVSC system…Because many PRPs
> at this Site were tied to sewer systems (including the Municipalities'
> systems) that were linked to the PVSC, these PRPs' potential shares will
> necessarily depend on information and evidence inextricably related to
> PVSC and the Municipalities, among other things.[118]

The Batson allocation process—which excluded PVSC and the New Jersey municipalities—reiterates the settling parties' view of the enormity of the public entities' liability. As a result, the proposed settlement is premised on an enormous contribution of COCs to the Passaic River by those public entities. If the reviewing court determines this premise is a rational basis to approve the proposed decree, that determination will preclude the court from subsequently approving any settlement with PVSC and the Municipalities that does not adequately reflect the substantial discharges of COCs attributed to those public entities.

PVSC and the Municipalities are currently pursuing contribution claims against the settling defendants to ensure those defendants pay the full costs to clean up hazardous substances they released into the sewers. The EPA's proposed settlement would prohibit PVSC and the Municipalities from continuing to pursue those contribution claims. If approved, the proposed decree will leave the local government entities to pay the cost to clean up the pollution the settling defendants released through the sewers.

This is a critical outcome of the settlement because the settling parties are liable for the release of chemicals—such as PCBs—for which OxyChem has no liability at all. If the settling parties are permitted to settle for less than a full and fair share of the cost to remedy pollution they caused and transported through the sewers, and that OxyChem did not cause or transport, then the governmental entities will have to pay those costs because OxyChem is not liable for them.

But if the proposed settlement is approved, and the government entities' contribution claims are barred, then the government entities will be left to pay the costs to clean up the hazardous substances the settling parties released. And they will have to do it with taxpayer funds, because the settlement proceeds are being paid to the United States. They will not flow to the

---

[117] March 4, 2016 EPA Press Release. "EPA Finalizes Passaic River Cleanup, One of the Largest Superfund Projects in EPA History Will Protect Peoples [sic] Health and the Environment," *available at* https://www.epa.gov/archive/epa/newsreleases/epa-finalizes-passaic-river-cleanup-one-largest-superfund-projects-epa-history-will.html (last visited Mar. 20, 2023).

[118] **Ex. 18** (Oct. 24, 2017 letter from David R. Erickson to Eric Wilson, EPA Region 2) (emphasis added).

46

local government entities at all except as an inadequate "dollar credit" against the unsatisfied proportionate share of liability the settling parties otherwise would owe. And those sums cannot be recovered from OxyChem, either, because it has no liability at all for these contaminants. Thus, if the settling defendants are allowed to settle for these nominal sums, they—and EPA—will have effectively shifted to the taxpayers of New Jersey the enormous costs to clean up PCBs, mercury, lead, and other hazardous substances that the settling defendants put into the sewer and for which they are being released from all liability. *See, e.g.*, Randy George, *Polluters, not taxpayers, should pay for Passaic River cleanup,* New Jersey Spotlight News (Mar. 20, 2023) https://www.njspotlightnews.org/2023/03/nj-corporations-should-pay-for-passaic-river-cleanup/.

The proposed settlement sends a dangerous message to polluters and demonstrates an approach to enforcement that is contrary to EPA's environmental justice mandate. Many New Jersey communities located adjacent to the Lower Passaic River have significant low-income or marginalized populations and are overburdened as defined by New Jersey and federal laws regarding environmental justice. The proposed settlement violates EPA's 2021 mandate to "strengthen enforcement of violations" of "cornerstone" environmental laws in such communities.

### B.    The Proposed Settlement Relies on a Fatally Flawed Allocation of Liability

Even if EPA had authority to convene the Batson process and did so in a procedurally defensible manner, EPA's reliance on the Batson Report[119] and its fatally flawed allocation is arbitrary, capricious, and does not provide substantial evidence to support a decision by the United States to accept the settlement. Batson's allocation was doomed from the outset because of arbitrary ground rules that pre-determined the outcome. The flaws and inherent bias of the ground rules were compounded by Batson's erroneous and untrustworthy methodology—which is rife with mathematical errors, failure to follow basic science and EPA findings, and repetitive disregard of (or lack of access to) highly relevant evidence. The same flawed ground rules then allowed the settling parties to define the information they wanted Batson to consider, correct it, and comment on the drafting of his report, destroying his neutrality and rendering this a purely captive self-interested analysis by interested PRPs. To make sure these actions could not adequately be scrutinized by the reviewing court, EPA directed Batson to *anonymize* all comments he received, leaving the court with literally no way to assess the accuracy of what amounts to an *ipse dixit* by the PRPs through the mouth of Batson.

#### 1.    EPA Set Ground Rules for the Allocation That Arbitrarily Pre-Determined Its Outcome

##### a.    EPA Arbitrarily Determined That PRPs Associated With Just Two of the Eight COCs Would Be Judged More Harshly

EPA determined in advance that PRPs associated with two of the eight Contaminants of Concern (COCs)—dioxins/furans and PCBs—would be judged more harshly than others. PRPs

---

[119] *See* Dkt. 2-1 at 6 ("WHEREAS, the United States, upon review of the Final Allocation Recommendation Report, identified parties that were eligible for a cashout settlement for identified facilities."); Dkt. 84-1 (Yeh Decl.) at 11, ¶ 24 ("EPA and the [DOJ] reviewed the Allocation Report and determined that many parties should be eligible for cashout settlements for the facilities evaluated in the allocation, while others should be responsible for funding and/or implementing the remedy."); *see also id.* at 11, ¶ 25 (when the United States lodged the proposed consent decree, it made the allocation report public for the first time, along with "all of the supporting factual documentation").

47

associated with dioxins/furans and PCBs would become "work parties," while PRPs associated with the other six COCs would be offered cash-out settlements:

> Numerous parties at the August 28, 2017 meeting expressed concern regarding the financial burden that would be placed on PRPs that are not responsible for the release of dioxins, furans and/or polychlorinated biphenyls ("PCBs") into the Lower Passaic River if those parties are not given the opportunity to settle with the United States for their OU2 liability, as opposed to having to implement the remedial action for OU2. EPA appreciates those concerns. As we have stated, *we anticipate that with the help of the allocation process, EPA will be able to offer cash-out settlements to a number of the parties. Similarly, EPA's expectation that the private PRPs responsible for the release of dioxins, furans and/or PCBs will perform the OU2 remedial action has not changed.*[120]

EPA has not and cannot articulate a satisfactory reason for distinguishing between PRPs on this basis, and its decision to do so is arbitrary and capricious and fundamentally unfair. *See Nat'l Parks Conservation Ass'n v. EPA*, 803 F.3d 151, 158 (3d Cir. 2015) (arbitrary and capricious standard of review requires that "the EPA 'examined the relevant data and articulated a satisfactory explanation for its action, including a rational connection between the facts found and the choice made'"). The OU2 Record of Decision shows that there is no principled difference among COCs when it comes to the cleanup—they are *all* ubiquitous:

> The COCs tend to bind tightly to fine-grained sediment particles. Therefore, the highest concentrations of COCs tend to be found in areas that are predominantly comprised of fine-grained sediments, which, for the Lower Passaic River, are the lower 8.3 miles. ... *[S]ediment sampling data show that concentrations of COCs at levels that far exceed the remediation goals ... are found throughout the surface sediments (generally considered to be the top six inches) of the lower 8.3 miles, bank to bank.* Data further show that median concentrations of COCs in surface sediments of the lower 8.3 miles have remained almost unchanged in the last 18 years (1995-2013), indicating that additional time will not result in meaningful improvements in surface sediment conditions.[121]

There is no "rational connection between the facts found" in the OU2 ROD and EPA's "choice made" to offer settlement based solely on the COC for which the PRP is mostly closely associated.

### b.    A Fair Allocation Would Be Cost-Driven and Assign Shares to *All* COCs

The Third Circuit has endorsed a cost-based approach to allocation, which considers the extent to which each party's contributions contributed to the cost of the remedy. *See Trinity Indus.*, 903 F.3d at 359. Although Batson claims to be performing a "cost allocation,"[122] Batson never

---

[120] Batson Report at 38 (Sept. 18, 2017 letter from Eric Wilson, Deputy Director for Enforcement and Homeland Security, EPA Region 2 to the OU2 General Notice Letter recipients) (emphasis added).

[121] OU2 Record of Decision at 12 (emphasis added).

[122] Batson Report at 19.

ALCD-PUBCOM_0000460

allocates costs—he actually purports to allocate relative risks (using his own idiosyncratic relative risk numbers rather than EPA's from the ROD).

To allocate costs, Batson needed to consider the *actual cost* of the $1.38 billion OU2 remedy to determine what costs could be attributed to particular chemicals. EPA has answered this question definitively. *Each* of the 8 COCs poses an "unacceptable risk" to humans or animals and must be cleaned up. [123] In EPA's analysis, each COC is independently sufficient—even if one of the COCs vanished from the Passaic tomorrow, the river would still need to be remediated. The pervasiveness of COCs in sediments led EPA to conclude that "bank-to-bank remediation of the lower 8.3 miles is necessary to achieve protection of human health."[124] "Since individual chemicals would result in the need for the same remedy across OU2, using a risk-based approach is not an appropriate way to allocate liability for the remedy."[125]

Importantly, EPA's conclusion *already takes risk into account*. EPA's risk assessment processes calculated preliminary remediation goals that would protect human health and the environment.[126] The goals, which are based on both human health and ecological risk, determine the remedy and its cost.[127] Then, in the ROD, EPA selected a remedy to achieve *all* those goals; the selected remedy in the ROD must address *all* COCs, not just a single COC.[128] Similarly, no single COC can drive a remedy because EPA guidance and statutory obligations require the remedy to address each COC identified in the ROD. EPA's remedy was chosen to *achieve these risk-based goals for each COC identified in the ROD.*[129] And of any ROD COC is not remediated to its associated remedial goal (the acceptable level of risk for that particular COC), the remedy cannot be deemed completed.[130]

Batson's allocation ignores EPA's risk and cost conclusions—instead, Batson (incorrectly) re-calculates risk himself, even though the same risks are built into EPA's remediation goals and the related cleanup costs.

### c.    Dioxins Cannot Be Fairly Attributed More Than Half of the Remedial Costs

Applying the correct framework, dioxins simply *are not responsible* for most of the $1.38 billion in estimated remediation costs. COCs other than dioxin (including mercury and PCBs) are ubiquitous and exceed remediation goals throughout the Lower Passaic.[131] The total cost of the remedy is dominated by COCs other than dioxins: mercury dominates the cap design, and

---

[123]  *See* **Tarek Saba**, Ph.D., Exponent Decl. at ¶ 2 (all COCs in the river exceed their respective clean-up goals throughout OU2 and *all* drive the remedy costs).

[124]  OU2 ROD at 55.

[125]  **Harris** Decl., ¶ 15.

[126]  Appendix D Risk Assessment (2014); ROD at 165; **Thomas Voltaggio** Decl. at ¶¶ 18-19; **Carl Edlund** Decl. at ¶ 11.

[127]  *See* Declarations of **Thomas Voltaggio**, Voltaggio Consulting, former Superfund manager, EPA Region 3, and **Carl Edlund**, former Superfund manager, Region 6.

[128]  **Thomas Voltaggio** Decl. at ¶¶ 26-27; **Carl Edlund** Decl. at ¶¶ 13-19.

[129]  **Thomas Voltaggio** Decl. at ¶¶ 18-19, 26-32; **Carl Edlund** Decl. at ¶ 11.

[130]  **Thomas Voltaggio** Decl. at ¶¶ 18-19, 26-32; **Carl Edlund** Decl. at ¶¶ 13-19.

[131]  *See* **Philip Spadaro**, TIG Decl.; **Tarek Saba**, Ph.D., Exponent Decl. at, ¶ 3.

ALCD-PUBCOM_0000461

non-dioxins drive the cost of handling dredged sediments.[132]  Some remedial costs (such as navigational dredging), are not risk-based at all.[133]  When selecting a remedy, EPA considered three remedial approaches—all three of which would have achieved EPA's preliminary goals for dioxins. And one of the options would have met EPA's remedial goals for dioxins for *half the price*—but would not have achieved EPA's goals for **PCBs**:[134]

> Although, by the early 2060s, dioxin surface sediment concentrations are predicted to reach the interim remediation milestone . . . ***PCB surface sediment concentrations are not predicted to be reduced enough*** to achieve any other interim remediation milestones or remediation goals.

EPA's CERCLIS dataset (last updated in 2013) lists the maximum PCB concentrations at Superfund sediment sites across the country.  Compared to those sites, the Passaic River is among the top 10 PCB-contaminated sediment sites:[135]



The presence of PCBs and the other ROD COCs would require the same remedy (a bank-to-bank dredge and cap) even if there were no dioxin in the River.[136]  The ROD states that the remedy was developed considering all eight COCs and that the COCs *are* COCs because they exceed remediation goals.[137]  The maximum exceedance of RGs for *each* COC is *at least* 64 times the RG, and up to a maximum of 4,300,000 (Total 4,4'-DDx).[138]  For example, PCB concentrations in

---

[132] *See* **Tarek Saba**, Ph.D., Exponent Decl. at ¶ 20.

[133] *See* **Charles Menzie**, Exponent Decl.

[134] OU2 ROD at 75.

[135] https://www.epa.gov/superfund/superfund-data-and-reports

[136] **Spadaro** Decl. Opinion 1.

[137] **Spadaro** Decl. ¶¶ 10, 26; **Voltaggio** Decl.; **Edlund** Decl..

[138] Spadaro Decl. ¶ 26.

ALCD-PUBCOM_0000462

sediment are generally between 10-100 times the RGs. Therefore, almost all sediment in OU2 would still require remediation based solely on total PCB concentrations.[139]

EPA practice at other sites supports the conclusion that OU2 would need to be remediated without the presence of 2,3,7,8-TCDD and *even at lower concentrations of the other COCs*.[140]  At the Gowanus Canal Superfund Site, for example, the ROD identified 14 COCs, including PCBs, total HMW PAHs, and dieldrin, but *not* 2,3,7,8-TCDD. The remedy at Gowanus, which is also dredging and capping, is driven at least in part by the presence of PAHs.[141]  A similar result occurred at the Alcoa (Point Comfort)/Lavaca Bay Superfund Site, where mercury and PAH contamination drove a dredging remedy.[142]

The pervasiveness of pollution in the Passaic, and the unacceptable risks posed by *all 8 COCs*, makes Batson's risk-first analysis completely inappropriate. According to EPA, if a part of the river has concentrations of *any COC* above its remedial goals, the contaminated sediment needs to be removed and remediated, "capped" to prevent recontamination, or both. A comprehensive analysis of OU2 sediments shows that the entirety of the Passaic River OU2 would need to be remediated in a similar or substantially similar manner *even if 2,3,7,8-TCDD had not been found in sediments*, a conclusion EPA has practically admitted at other superfund sites.

---

[139] Spadaro Decl. ¶ 28. The same is true for nearly all the other COCs. Spadaro Decl. ¶ 29 (Mercury); ¶ 32 (Total 4,4'-DDx); ¶ 33 (copper and lead); ¶ 34 (all non-2,3,7,8-TCDD COCs). Concentrations of either dieldrin or PAHs would, alone, require remediation in at least some areas of OU2. Spadaro Decl. ¶ 30 (PAHs); ¶ 31 (Dieldrin).

[140] **Spadaro** Decl. Opinion 2.

[141] **Spadaro** Decl. ¶ ¶ 46, 47.

[142] **Spadaro** Decl. ¶¶ 49-50. Concentrations of COCs other than 2,3,7,8 TCDD have driven dredging and capping remedies at multiple other sites. *See* Spadaro Decl. ¶ 11 (PCBs); ¶ 12 (Mercury); ¶ 13 (PAHs); ¶ 14 (Total DDx); ¶15 (Copper); and ¶ 16 (Lead); *See also* Spadaro Decl. Tables 1-2.

51

ALCD-PUBCOM_0000463

In addition to incorporating risk, EPA's selected remedy also considers *non-risk* factors. The cost of the remedy "consists of several elements for which risk and harm of COCs have different implications for remediation."[143] Batson's risk-based allocation "treats the risks/harms of sediments for each of these remedial elements as the same when they are in fact very different."[144] Every remedial cost is unique—some address the risk of every COC, others are dominated by a specific COC, and other costs have very little to do with risk at all:[145]



Dioxins "are not categorized as a main remedy driver in any of the remedy design components."[146] The allocation method endorsed by *Trinity Industries* is a fairer cost-based approach. This allocation method starts by comparing EPA's remedial goals to the concentrations of COCs in each portion of the Passaic. Where a COC exceeds the remedial goal, that section of the river has to be remediated. Under this approach, dioxins, PCBs, mercury, and DDx all exceed remedial goals in almost every part of OU2, with dioxins contributing to less than a quarter of total exceedances.[147]

---

[143] **Menzie** Decl. Opinion 5.

[144] *Id.*

[145] Saba Decl. Figure 2.

[146] Saba Decl. at ¶ 23.

[147] *See* **Charles Menzie**, Exponent Decl.

ALCD-PUBCOM_0000464

2.    **Batson's Methodology Is Replete With Fundamental Errors and Faulty Premises**

a.    **Batson's Allocation Ignores Other Known Sources of Dioxin**

In his allocation, Batson concludes that Diamond Alkali alone contributed nearly one hundred percent of the 2,3,7,8-TCDD in the Passaic.[148] This conclusion flies in the face of well-established, EPA-funded, and peer-reviewed literature establishing other significant sources of TCDD contributions. Batson's failure to consider this evidence also renders his allocation extraordinarily unreliable; under Batson's methodology, if *any settling defendant* were responsible for even *two percent* of the 2,3,7,8-TCDD in the Passaic, its responsibility would be the same as *all settling defendants combined*.[149] This is nonsense.

i.    **EPA-Funded and Peer-Reviewed Scientific Studies Establish Multiple Sources of Dioxin**

In February of 2011, Edward A. Garvey and his colleagues at The Louis Berger Group presented, "Dioxin in the Passaic River (NJ): The Case for 2 Dioxin Sources," an EPA-funded study that found evidence of a second source of dioxin entering the Passaic. Garvey found an unexplained increase in dioxins around 2000 in the Passaic. The Garvey presentation identifies both the *location* and the *chemical signature* of this "unique dioxin pattern," which appeared around RM 11 or 12.6[150] and could be linked to "one of 2 [dioxin] patterns" observed in the 1960s.[151] This same analysis is attached to the 2014 OU2 Remedial Investigation Report.[152]

The Garvey presentation not only identified a second source of dioxins other than Diamond Alkali, it also provides compelling evidence of *who* the second source was. The 2000-era dioxin pattern identified by Garvey fits perfectly with evidence from the site of settling defendant Givaudan Fragrances Corporation ("Givaudan"). Givaudan had a permit to discharge stormwater from its site until *1999*, but provided *no evidence* to the allocator "related to discharge volumes, receiving water bodies, and monitoring requirements" for those discharges.[153]

---

[148] *See* Attachment L to Batson Report (in Allocation Facility Cmass Calculation, assigning OxyChem all 38 kg of dioxins/furans).

[149] Batson Report at 3240 (less than 2% allocated responsibility for settling parties).

[150] *See* **Ex. 19** (Edward A. Garvey et al., Dioxin in the Passaic River (NJ): The Case for 2 Dioxin Sources, Battelle Sixth International Conference on the Remediation of Contaminated Sediments, New Orleans, La., Feb. 10, 2011) at 6 (showing 2,3,7,8-TCDD amounts recorded in the sediments over time, in different locations within the River).

[151] *Id.* at 18; *see also id.* at 2 ("Although the information in this presentation has been funded by the USEPA, it does not necessarily reflect the views of the agency and no official endorsement should be inferred.").

[152] Data Evaluation Report No. 3: "Contaminant History as Recorded in the Sediments" (2014) [EPA Doc. ID 703640]. *See also* **Bock** Decl. at ¶ 38.

[153] Givaudan Facility Data Report at 22.

ALCD-PUBCOM_0000465

But that evidence exists. In *1999*, Givaudan pumped 135,500 gallons of water from its property into the stormwater system,[154] which then "discharge[d] into the Passaic River."[155] Around that same time, the "unique dioxin pattern" identified by Garvey appeared in the Passaic around RM 11 and 12.6—*on either side of the Givaudan site.*[156] The 2000-era dioxin pattern is similar to an earlier pattern from the 1960s—when Givaudan was actively producing hexachlorophene using millions of pounds of dioxin-laden 2,4,5-TCP. The Batson Report never mentions this evidence, nor was any of it included in the nearly 700,000 pages of "supporting factual documentation" EPA has made available to the public.[157] This is damning evidence against Batson's allocation, which assigned Givaudan less than *two hundredths of a percent* of all OU2 response costs—a "finding" it made *without* considering the abundant evidence of Givaudan's discharges *directly* to the Passaic River of dioxins bearing its unique, chemical signature.[158]

Also, in 2017, just a few months before the Batson process's "kickoff"[159] Edward Garland at HDR, presented EPA employees with a dioxin congener analysis that *expressly* identifies Givaudan as an additional, major source of 2,3,7,8-TCDD.[160] The Garland study summarized "potential links between concentrations of 2,3,7,8-substituted dioxins and furans measured in the Lower Passaic River (LPR) sediments and concentrations of those chemicals in the containment cells on the former Givaudan facility in Clifton and on the former Diamond Alkali facility on Lister Avenue in Newark."[161] The study concluded that "[b]ased on each iteration in the suite of analyses, *the Clifton contribution was needed to explain in-river congener concentrations.*"[162] The 2017 Garland study can be found in the proposed consent decree's "supporting" documentation,[163] but the Batson Report does not mention or (apparently) even consider it.

---

[154] The Batson Report acknowledges that "the stormwater pond was decommissioned (drained and filled) in 1999" and that decommissioning the stormwater pond involved "removal of 135,000 gallons of water." Attachment J Givaudan Facility Data Report at 22.

[155] *See* 2004 Givaudan Response to EPA Request for Information at 26; *see also id.* ("The stormwater grate led to a storm sewer that flowed to the Passaic River."); *see also* [M. Bock Decl.].

[156] Batson Report at 93 (map showing the Givaudan facility at RM 12).

[157] *See* Dkt. 84-1 (Alice Yeh Decl.) at 11, ¶ 25 ("[A]t the time of lodging of the proposed consent decree, EPA made the Allocation Report and all of the supporting factual documentation available on its public website.").

[158] *See* **Bock** Decl. at ¶ 51 (Givaudan, Clifton, and Ashland produced, used, and/or disposed of TCP).

[159] **Ex. 8** (Sept. 11, 2018 EPA letter to D. Erickson) at 1 ("The allocation commenced with an October 13, 2017, in-person kickoff meeting attended by EPA, the neutral allocator, and OU2 PRPs.").

[160] *See generally* **Ex. 20** (Jul. 13, 2017 HDR Memorandum re: "Congener Analysis"), *also available* at PAS-00129882 (in proposed consent decree supporting documentation, but with highlighting).

[161] *Id.*

[162] *Id.* at 9 (emphasis added).

[163] PAS-00129882.

54

Both the Garvey and Garland analyses align with other evidence of *multiple* sources of 2,3,7,8-TCDD and other dioxins to the Passaic.[164] EPA itself has written that "Givaudan shouldn't be ignored" as a potential source of 2,3,7,8-TCDD in the Passaic,[165] adopting comments from independent peer reviewers who noted that "***manufacture of hexachlorophene at a Givaudan plant near the confluence of the Third and Passaic Rivers is the likely source***" of the second 2,3,7,8-TCDD profile found near RM 11.[166] Peer-reviewed research has identified hexachlorophene production at Givaudan's former Clifton facility "as a significant source of 2,3,7,8-TCDD to the lower Passaic River."[167] The Remedial Investigation Report for OU2 also identifies hexachlorophene production as a likely source of 2,3,7,8-TCDD:[168]

| Table 5-3: Historical Contaminant Sources by COPC | |
|---|---|
| Analyte | Likely Historical Contaminant Source |
| 2,3,7,8-TCDD | Industrial discharge, by-product of Agent Orange production, by-product of hexachlorophene production |

Givaudan was one of the ***largest hexachlorophene producers*** in North America and the ***only known hexachlorophene producer*** included in the Batson allocation.[169] The production of dioxins is known to be associated with manufacturing processes like those used at Givaudan. Givaudan's 104(e) response[170]—on which Batson relied in his allocation[171]—asserted "it was highly unlikely that Givaudan's G-11 manufacturing process generated TCDD because ***it used acidic conditions and low temperatures in its process . . . TCDD may be produced during use of TCP under alkaline conditions and in temperatures greater than 100 degrees centigrade***." Contemporaneous documentation of Givaudan's manufacturing processes refute this claim, describing how Givaudan used a "***hot alkaline***

---

[164] *See* **Bock** Decl. ¶ 45.

[165] EPA Comments on Draft Lower Passaic River Study Area Remedial Investigation/Feasibility Study – Interim Conceptual Site Model (Aug. 29, 2014) [EPA Doc. 1D 459049].

[166] Report of Peer Review of Conceptual Site Model (2013).

[167] Michael J. Bock et al., Sources of 2,3,7,8-Tetrachlorodibenzo-*p*-dioxin and Other Dioxins in Lower Passaic River, New Jersey, Sediments, ENVIRONMENTAL TOXICOLOGY & CHEMISTRY at 2 (2021) (citing NJDEP, unpublished data, RCRA facility assessment [RFA], report to the USEPA, dated October 1991).

[168] OU2 Remedial Investigation Report (Feb. 5, 2014) at 297.

[169] *See* 15 N.J.R. 1861 (Nov. 7, 1983) (https://www.njstatelib.org/wp-content/uploads/law_files/imported/Research_Guides/Law/njregister/volume15number21%20page1785-1908.pdf) ("Givaudan, the only hexachlorophene manufacturer in New Jersey . . . believes that further regulation of hexachlorophene is unnecessary and that no basis or background exists for regulating hexachlorophene manufacturing."); Douglas C. McGill, *Kean Orders 3d Dioxin Site Shut*, N.Y. TIMES (June 19, 1983) (https://www.nytimes.com/1983/06/19/nyregion/kean-orders-3d-dioxin-site-shut.html) ("The Clifton plant is the largest hexachlorophene maker in the world, and the only one in the United States, according to . . . a spokesman for the company.").

[170] *See* **Ex. 21** (Nov. 10, 2016 Givaudan letter to S. Flanagan at EPA (Givaudan Supplemental Response to 104(e) Request for Information) at 7.

[171] Batson Report, Attachment J for Givaudan at 6.

55

*solution,*" with a pH of 10.3 and a temperature of 130°C to 150°C to manufacture its product.[172] Based on a peer reviewed study by Parette et. al.[173] that modeled chemical processes like Givaudan's, Givaudan would have generated *25 kilograms of TCDD*, far more than the amount Batson assumed in his allocation and nearly twice the *total* amount of TCDD EPA calculates remains to be remedied in the river's sediments.[174]

Givaudan's Supplemental 104(e) Response separately asserted it had no path to the river for its process contaminants, a claim it made based on an analysis of aerial photographs. Givaudan claimed definitively that, "There is no evidence of a defined drainage swale either on or off the property to the Passaic River *in any of the historical aerial photos.*" This claim is refuted by Givaudan's own, 1990 drainage map of its property, which shows long surface drainage swales that drain directly into a stormwater outflow in the Passaic River:



Sampling evidence shows the upland areas drained by these swales are heavily contaminated with TCDD dioxins. And the outflow for those swales is adjacent to the area where, as noted above, Garvey found the "unique dioxin pattern" that appeared in the Passaic around RM 11 and 12.6—*on either side of the Givaudan site.*[175]

Ignoring even the evidence he had, Batson eliminates Givaudan as a substantial TCDD source and wrongly assumes that Diamond Alkali was the only source. EPA's acceptance of that

---

[172] *See* **Ex. 22** (1941 "G-11 Process; (Sodium Salt Method") at GIV_NBC_0664676; **Ex. 23** (U.S. Patent 2,435,593 Process for Making Bis (3,5,6-Tri-Chloro-2-Hydroxyphenyl Methane) at 1, 2. *See also* Appendix A.6 (discussing Batson's analysis of Givaudan's Clifton factory).

[173] Robert Parette et al., *Modeling the formation of 2,3,7,8-tetrachlorodibenzo-p-dioxin in the historical manufacture of 2,4,5-trichlorophenol*, ENVTL. FORENSICS 307 (2017), *available at* https://www.tandfonline.com/doi/full/10.1080/15275922.2017.1368047 (last visited Mar. 20, 2023).

[174] *See generally* Bock Decl., Table 10 (applying the methodology of Parette study to estimate dioxin generation).

[175] Batson Report at 93 (map showing the Givaudan facility at RM 12).

56

ALCD-PUBCOM_0000468

conclusion is arbitrary and capricious when measured against EPA's own, scientific analysis, and produces a demonstrably unfair allocation of responsibility as the basis for the proposed settlement.

When OxyChem brought this additional information to EPA's attention[176]—pointing out that Givaudan had known about it but not presented it to the allocator—EPA responded verbally that this evidence of a significant, independent source of dioxin, one Givaudan misrepresented in its 104(e) submissions, did not "move the needle." EPA's response is the very definition of arbitrary and unfair. EPA has in its possession abundant evidence showing Givaudan is a large, identified, independent source of dioxin in the river. The same evidence shows Givaudan misrepresented its manufacturing process and its drainage paths to the river in otherwise "sworn" 104(e) responses. To reward Givaudan with a blanket release, accepting blindly Batson's uninformed and ill-considered assignment of less than *two hundredths of a percent* of all OU2 response costs to Givaudan, abdicates EPA's commitment that dioxin parties would be expected to *perform* the remedy and would not be allowed to write a check and walk away.

### ii. In Addition to Givaudan, Ashland Inc. and Clean Earth of New Jersey, Inc. Are Among Other, Known Dioxin Contributors

Numerous other settling defendants also engaged in processes known to produce dioxins. In addition to Givaudan, BASF Corporation ("BASF"), Benjamin Moore, PPG Industries Inc. ("PPG"), and Sherwin-Williams all conducted operations associated with dioxin formation.[177] Likewise, it is widely understood that waste incineration involving burning organic material in the presence of chlorine results in dioxins,[178] and several settling defendants' sites[179] were equipped with an incinerator—including sites where incinerator feedstocks were likely dioxin precursors. Batson ignores all of this. Batson does not calculate a score for Ashland Inc.'s Drew Chemical Site, where 2,3,7,8-TCDD was detected at concentrations up to 20.1 parts per trillion (ppt). Batson ignores Montrose operations on the Sherwin-Williams property, where soil sampling shows high concentrations of dioxins and related compounds. And Batson ignores that Legacy Vulcan operated a chlor-alkali facility from 1960 through 1975, despite that manufacturing of certain chlorinated products is a commonly recognized source of dioxin/furans. Indeed, analysis of publicly available data, consisting of only 18 properties of the 92 Batson-evaluated sites, demonstrates that the majority of those sites with available data had dioxin TEQs above EPA's sediment remediation goal ("RG").[180] In sum, *many* of the settling defendants' sites were likely significant sources of dioxins.[181]

Finally, the Batson allocation's estimate for dioxins and furans discharged is so faulty that his reliance on those estimates renders critical components of his allocation useless. Specifically, the report used average concentrations of 2,3,7,8-TCDD not based on raw data; used total discharge volumes rather than a discharge volume with a potential to include dioxins; and

---

[176] *See* Ex. 58 (Nov. 2021 presentation slides regarding Givaudan).

[177] EPA 2006 at pp. 402–403, 490–491, 498; Ni et al. 2005; MED000003 at p. 1; Esposito et al. 1980 at pp. 73, 81, 91; Krizanec et al. 2006. at pp. 5–6; Williams et al. 1992. Formulation of certain pigments (phthalocyanine green and blue, titanium dioxide, dioxazine dyes and pigments, and carbazole violet) were typically manufactured using raw materials and under conditions likely to produce dioxin/furans. **Bock** Decl. ¶ 46.

[178] EPA 2006 at p. 98, 132; McKay 2002.

[179] These include but are not limited to BASF, CBS-Westinghouse, Kearny Smelting and Refining, and PSE&G Essex.

[180] **Bock** Decl. ¶ 48, 49.

[181] **Bock** Decl. ¶ 46.

ALCD-PUBCOM_0000469

demonstrated basic unit conversion errors.[182] As a result of flaws in the allocation methodology, the mass for 2,3,7,8-TCDD is grossly overestimated.[183]

### (a) Ashland's Drew Chemical Site

The Batson Report allocated no responsibility for any COCs to Ashland's Drew Chemical Site located at 1106 Harrison Avenue, Kearny, New Jersey (the "Ashland-Drew site"). Batson neither reviewed nor considered any documentation regarding the Ashland-Drew site and the site was omitted entirely from Batson's allocation report. But the Ashland-Drew site is a known, significant source of COCs to the Passaic River, including dioxins and PCBs.

From 1973 to 1981, Ashland used over 590,000 pounds of 2,4,5-TCP at the Drew Chemical Site to manufacture over 4.4 million pounds of biocides.[184] Ashland sourced the 2,4,5-TCP in part from Dow. Dow-sourced 2,4,5-TCP contained 2,3,7,8-TCDD.[185] In addition, Ashland's biocide processes were conducted at temperatures up to 350 degrees Fahrenheit,[186] and thus likely resulted in the formation of additional dioxin from the 2,4,5-TCP.

Sampling confirms the presence of dioxin at the Ashland-Drew site. Sampling conducted in 1983 by the NJDEP identified 2,3,7,8-TCDD at several locations adjacent to the Ashland-Drew site.[187] Later in 1983, the NJDEP requested that Ashland conduct dioxin sampling at specified locations on the Ashland-Drew site.[188] The samples were taken, but there is no record of the samples ever being analyzed or the results.[189] Remarkably, in its own remediation of the site, despite its knowledge that millions of pounds of 2,4,5-TCP were used on the site, Ashland declined to sample for dioxin or 2,4,5-TCP.[190] OxyChem, however, was able to sample for dioxin at the Ashland-Drew site through discovery in the Contribution Action. In 2020, OxyChem's consultant, TIG, sampled floor drains, manholes, and catch basins at the site. Notably, years before, Ashland had jet cleaned the floor drains and pipelines throughout the site—and had declined to conduct any dioxin sampling before doing so.[191] Despite the passage of years and the jet cleaning, TIG's sampling in 2020 detected concentrations of 2,3,7,8-TCDD above preliminary remediation goals.[192] Sampling results also show that PCBs exceeded the impact to groundwater soil screening

---

[182] **Bock** Decl. ¶ 63–65.

[183] **Bock** Decl. ¶ 68.

[184] **Ex. 24** (Hoffman Dep. Ex. 12).

[185] **Ex. 25** (Nov. 19 1976 Memo "To discuss quality control problems and establish specifications for Dow's 2,4,5-TCP) (GIVA-FED-0000016636).

[186] **Ex. 26** (Hoffman Dep.) at 136:1-25.

[187] **Ex. 27** (Aug. 8, 1983 Technical Report) (OCC-TIG-E01766018).

[188] **Ex. 28** (Nov. 14 1983 letter re: TCDD testing at Drew Chemical facility) (ASHL-FED-0000296994).

[189] **Ex. 26** (Hoffman Dep.) at 222:20-23; 223:24-224:8.

[190] *Id.* at 61:14-62:6; 63:23-64:7.

[191] *Id.* at 229:5-230:5; **Ex. 29** (Jan. 30, 2013 Ashland inspection report) (ASHL-FED-0000288634).

[192] **Ex. 30** (OCC-CER-SD000075986).

ALCD-PUBCOM_0000470

levels at numerous locations. At some locations, the PCB levels were over five times the impact to groundwater screening levels.[193]

There are multiple known pathways to the river through which Ashland discharged 2,4,5-TCP, its dioxin content, and PCBs to the Passaic River. First, for each year from 1973 to 1981, Ashland admits that it discharged *at least* 84 pounds *per year* of 2,4,5-TCP into the sewer system—totaling over 750 pounds.[194] Ashland's sewer system discharged to the PVSC sewer system in Harrison and Greenfields Avenues which are within the Worthington CSO district. During overflow events, the Worthington CSO discharged directly to the Passaic River.[195] The Batson Report calculates an overflow rate for the Worthington CSO, but fails to account for the multiple pounds of Ashland's dioxin-containing 2,4,5-TCP that ended up in the Passaic River through that CSO.

Second, during the 1970s, Ashland's stormwater runoff flowed into Frank's Creek, a tributary to the Passaic River.[196] 2,4,5-TCP, dioxin, and PCBs were likely present in the stormwater runoff from Ashland's site in the 1970s, in particular, because Ashland did not install retaining walls until the 1980s and, as of at least 1974, Ashland had not constructed diking around its above-ground storage tanks.[197] Moreover, in 1982, a RCRA inspection noted that "housekeeping at the facility is poor."[198] Spills and leaks therefore had a clear pathway to the Passaic River through stormwater runoff.

Third, groundwater from the Ashland-Drew site flowed to the Frank's Creek tributary to the Passaic River. In Ashland's 2019 Remedial Action Workplan, Ashland represented to the NJDEP that its groundwater flows to the Harrison Avenue utility corridor that borders the site to the North and which discharges into Frank's Creek.[199] This connection to the Passaic River is particularly relevant given the detection of PCBs in the site's groundwater. Thus, groundwater is a third established pathway for COCs from the Ashland-Drew to the Passaic River.

Without including or even considering the Ashland-Drew site—a known source of COCs to the Passaic River—the Batson Report's allocation is unfair and unreasonable.

### (b) Clean Earth Sites

Clean Earth of North Jersey, Inc. ("Clean Earth") is responsible for contamination in the Passaic from their facility at 101-115 Jacobus Avenue, Kearny, New Jersey, and from a former facility at 53 Pennsylvania Avenue, Kearny, New Jersey. The Pennsylvania Avenue site ("Penn Site") operated from 1972 through 1984. The Jacobus Avenue site ("Jacobus Site") began operations in 1984 and continues to operate today. Clean Earth is the successor to S&W Waste,

---

[193] **Ex. 31** (Hoffman Dep. Ex. 7) (ASHL-FED-000002236) at ASHL-FED-000002303; *see also* **Ex. 26** (Hoffman Dep.) at 112:17-113:4; 113:22-25.

[194] **Ex. 26** (Hoffman Dep.) at 161:10-162:22.

[195] **Ex. 32** (ASHL-FED-0000269732) at ASHL-FED-0000269746; **Ex. 33** (OCC-TIG-E02827693).

[196] **Ex. 26** (Hoffman Dep.) at 97:6-98:3; 100:1-19 ("Q: And so that is consistent with stormwater runoff from the site in the 1970s that flowed into Boylan Avenue, that stormwater would run off into the storm drain and into Frank's Creek, correct? A: Yeah."); *id.* at 94 ("Q: And you agree that Frank's Creek is a tributary to the Passaic, right? A: Yes.").

[197] **Ex. 26** (Hoffman Dep.) at 103:2-6; 102:10-25.

[198] **Ex. 34** (Hoffman Dep. Ex. 28) (OCC-TIG-E02825970).

[199] **Ex. 35** (ASHL-FED-0000106480) at ASHL-FED-0000106499; *see also* **Ex. 26** (Hoffman Dep.) at 103:8-104:23.

ALCD-PUBCOM_0000471

Inc. ("S&W Waste"). For reasons unknown to OxyChem, EPA excluded Clean Earth from the Batson process. Further, Clean Earth received *no* allocation share in the Batson Report.

OxyChem contacted EPA in a March 11, 2022 letter to ask that Clean Earth be issued a General Notice Letter.[200] OxyChem's March 2022 letter outlined the operations and processes of S&W Waste/Clean Earth that resulted in discharges of dioxins, lead, and other hazardous substances to the Passaic River. Clean Earth operated hazardous waste treatment, storage, and disposal ("TSD") facilities and stored wastes at the Former QA dock for future analysis.[201] Notably, as stated in OxyChem's March 2022 letter to EPA:

> Dioxin/furan samples from the Former QA Dock were analyzed, and 2,3,7,8-TCDD concentrations were up to 6,450 ng/kg (see attachment 4, Table 3A). To put this concentration in perspective, the ROD-designated Preliminary Remediation Goal (PRG) for 2,3,7,8-TCDD is 8.3 ng/kg. The spatial distribution of the 2,3,7,8-TCDD at the Former QA Dock, on the eastern edge of the property and not adjacent to the Passaic River, is inconsistent with distributions that would have resulted from site flooding from the River. **There is thus no logical explanation for the presence of 2,3,7,8-TCDD in onsite soil samples on Clean Earth's property *other than* that is the result of Clean Earth's waste handling operations.**[202]

The specific chemical profile of the dioxin/furan of 2,3,7,8-TCDD at this Former QA dock matches the chemical profile in Passaic River sediment. Despite this extremely high level of dioxins, EPA did not issue Clean Earth a General Notice Letter, nor did EPA insist upon their participation in the Batson process.

The Clean Earth facilities are also polluted with various other hazardous materials in addition to dioxin. Since 1986, spills of hazardous materials have been documented and Clean Earth received over 30 notices of violations ("NOVs") related to inadequate storage and onsite discharge of hazardous substances at the Jacobus Avenue site.[203] In addition to the significant level of dioxins contaminating the facilities, lead, copper, mercury, PCBs, and PAHs were found in the site soil.[204] Lead and other metals were then released from the Clean Earth facility into the Passaic River through groundwater as well as surface water. Groundwater metal levels, including lead, were orders of magnitude higher than applicable standards at Clean Earth's facility.[205] Groundwater flow is towards the Passaic River, meaning the lead-contaminated groundwater,

---

[200] **Ex. 36** (Mar. 11, 2022 OxyChem letter to EPA).

[201] Remedial Investigation Report (2007).

[202] **Ex. 36** (Mar. 11, 2022 OxyChem letter to EPA).

[203] Sadat Associates. 1992. Modified Remedial Investigation Work Plan Volume I of V; EPA. 1986. S&W Waste Inc. Potential Hazardous Waste Site Inspection Report; NJDEP. 1996. Application for Individual Stormwater Discharge Permit.

[204] AccuTech. 2007. Remedial Investigation Report, Melon Leasing Corporation; Sadat Associates. 1994. Final Remedial Investigation Report, Volume I of III; Sadat Associates. 1998. Remedial Action Report; NJDEP. 1992. Memo: Data Validation of S&W Waste Inc. Samples for Dioxins; Sadat Associates. 1992. Modified Remedial Investigation Work Plan Volume I of V.

[205] Sadat Associates. 1998. Remedial Action Report; NJDEP.

ALCD-PUBCOM_0000472

dioxins, furans, and other COCs at the facilities also contaminated the Passaic River, and continue to do so.[206]

In summary, the Batson process unfairly and unreasonably excluded Clean Earth, which was a significant contributor to pollution in the Passaic.

> **b.    Batson's Risk-Based Approach Ignores All Other Factors Affecting the Remedy, Contradicting EPA's Own Findings and Pre-Determining the Allocation Outcome**

> **i.    Batson Uses Risk Numbers To Pre-Determine the Outcome**

According to EPA, risk is one of the many factors driving the cost of the remedy:

> Remediating the lower 8.3 miles of the Lower Passaic River will address all of the hazardous contaminants in the sediments in this stretch of the river. There is no precise formula to evaluate how much the selection of the remedy, or the cost of the remedy, is directly attributable to any one hazardous contaminant.[207]

Batson disagrees with EPA. His allocation process assumes there *is* a precise formula that can be used to attribute the cost of the remedy to each contaminant. This assumption *determines the outcome of the allocation*, effectively setting a maximum cost that can be allocated to each of the eight COCs.

Batson begins his allocation by calculating what he calls "Relative Risk Numbers (**RRNs**)." Each of the 8 COCs is given an RRN, which determines the maximum share of cleanup costs that



**MAXIMUM ALLOCABLE COSTS UNDER BATSON'S METHODOLOGY**

Dioxins/Furans $1.678 Billion

PCBs $257 Million

All Other COCs

DDx $27 Million

Mercury $19 Million

Copper $14 Million

Dieldrin $2.6 Million
PAHs $1.2 Million
Lead $0.2 Million

---

[206]  See attached map, incorporated here by reference.

[207]  OU2 ROD at 295 (Responsiveness Summary).

61

Batson believes can be attributed to each chemical:[208]

Under Batson's approach, dioxins are all that matters. The settling parties could have dumped as much PCB, DDT, lead, mercury, copper, dieldrin, or PAHs as they wanted into the Passaic—and many of them did—as long as it was not dioxin. Combined with Batson's unsupportable finding that OxyChem deposited all the dioxin found in the river,[209] Batson's RRN means that his allocation method is skewed from the outset to allocate a vast majority of response costs to OxyChem. Using his methodology, if every allocation party's non-dioxin contribution was *multiplied or divided by a million*, there would be no significant change in the outcome of Batson's allocation:[210] OxyChem would bear over 90% of responsibility no matter what. By using an RRN that caps the allocation share for all non-dioxin parties, Batson determined his outcome in advance.

Batson's risk-based allocation is facially flawed and should never have been applied.[211] Batson's assumption that relative risk is the only factor driving remedial costs contradicts EPA's own statements and policy, ignoring foundational facts about the OU2 remedy:

- After over a hundred years of heavy industrial pollution, the Passaic would need to be remediated *even if there were no dioxins in it*;[212]

- Different parts of the river have different levels of contamination—some chemicals are widespread, while others are concentrated.[213] The remedy considers the special impact of different chemicals, but Batson does not;

- Cleanup costs are not attributable to the risk of any specific chemical; and

- Parts of the cost are *not attributable to risk at all*. The remediation has three major costs, only some of which are risk-related:[214]

    1. **Removal** (taking sediment out of the river for disposal).
    2. **Cap** (adding a layer of sand to contain contamination).
    3. **Dredge** (making the river deeper for boats).
       Dredging the navigation channel is not needed to reduce risk, but rather to allow commercial use of the river and for flood control purposes.[215]

Batson's risk-based approach is contrary to law, contrary to EPA's findings, and does not support any conclusion that it represents an accurate or equitable allocation of *costs* as the statute requires. It should never have been used and it is no evidence that the amount of the settlement in total, or for the individual parties released, bears a reasonable relationship to the liability being settled.

---

[208] *See* Batson Report at 336–337 (maximum costs for each chemical calculated by multiplying relative risk numbers for each chemical by $2 billion).

[209] *See supra* Part VI(B)(2)(a).

[210] **Ex. 37** (Batson Recalculations).

[211] *See supra* at Part III(B)(2) (Third Circuit case law indicates correct approach is cost-driver approach).

[212] *See supra* Part VI(B)(1)(c) (Discussing EPA's consistent, scientific findings that remedying dioxin alone would not be sufficient to remedy the health of the river).

[213] **Menzie** Decl. ¶ 41.

[214] *Id.* Opinion 5. *See also* **Saba** Decl. ¶ 21.

[215] **Menzie** Decl. Opinion 5.

ALCD-PUBCOM_0000474

### ii. Batson Invents Risk Numbers That Contradict EPA's

Even if a risk-based approach was proper, the correct source of risk information would be EPA itself. EPA has commissioned *five* risk assessments in the Passaic area—three for the lower 8 miles, one for the lower 17 miles, and one for Newark Bay.[216] Batson's allocation ***rejects every one*** of these EPA-approved reports. Sweeping aside EPA's own scientific analysis, Batson concludes that dioxins make up nearly **90% of danger to human health in the Passaic**—a higher proportion than *every* EPA-approved risk assessment.[217] EPA's acceptance of Batson's *ipse dixit*, which is contrary to five separate EPA studies, is once again arbitrary and capricious and unfair.



When allocating $2 billion in costs, an error of even a single percent is a multi-million-dollar mistake. Because risk calculations define the boundaries of the entire allocation, the accuracy of Batson's RRNs is critical to the validity of Batson's method. And Batson's relative risk numbers *are not accurate*.

Batson ignores EPA's risk calculations in four significant ways, each of which has the unscientific, unreliable effect of increasing the relative risk of dioxins while minimizing the risk of the 7 other COCs:

- First, although EPA's risk assessments estimate both current and future risk, Batson considers only the "current" risk from 2009 and disregards future risk.

---

[216] **1995:** Screening-Level Human Health and Ecological Risk Assessment for the Passaic River Study Area Human Health Risk Assessment. (**1995 Risk Assessment**)

    **2007:** Lower Passaic River Restoration Project Draft Focused Feasibility Study Risk Assessment. (**2007 Risk Assessment**)

    **2014:** Lower Eight Miles of the Lower Passaic River Risk Assessment. (**2014 Risk Assessment**)

    **2017:** Baseline Human Health Risk Assessment for the Lower Passaic River Study Area. (**2017 Risk Assessment**)

    **2022:** Baseline Human Health Risk Assessment Report – Newark Bay Study Area. (**2022 Risk Assessment**)

[217] Batson Report at 315 (Methodology for Determination of the Relative Rank of OU2 Contaminants of Concern for the Purpose of the Allocation).

63

ALCD-PUBCOM_0000475

- Second, Batson indefensibly excludes an enormous amount of PCB risk by excluding dioxin-like PCBs from his calculations.

- Third, Batson makes a mathematical mistake by averaging percentages of two different values—fish consumption relative risk and crab consumption relative risk—that cannot be averaged.

- Fourth, Batson performs a brand-new "incremental" risk calculation that gives parties a double discount for contributions of non-dioxin chemicals.

These errors compounds, resulting in nearly *double* the actual dioxin risks found by EPA.

| BATSON'S FIVE STEPS FOR INCREASING TCDD RISK | | NONCANCER | CANCER |
|---|---|---|---|
| Step 1: | EPA Estimated Future Risk | 40% | 48% |
| Step 2: | Use Estimate of 2009 Risk | 61% | 80% |
| Step 3: | Remove Non–Dioxin-Like PCBs | 68% | 81% |
| Step 4: | Average Incorrectly | 78% | 85% |
| Step 5: | Compare to Upper Passaic | 82% | 93% |

Each of these mistakes matters. Each one increases the relative risk of TCDD and drives down the relative risk of every other chemical. Despite claiming that "any deviations from the RI/FFS are clearly spelled out" in his report, Batson's decisions deviate from EPA's risk assessments in unexplained and unjustifiable ways. Batson further compounds the problem by failing to "reality check" his assumptions with a standard sensitivity analysis.[218] When taken together, these fundamental mistakes drive the TCDD risk number up to absurd levels contradicted by EPA's own findings. It would be indisputably arbitrary and unfair for EPA to rely on a report affected by errors of this magnitude in making its settlement decision. But, because EPA did exactly that, the United States should reject the proposed settlement.

### (a) Batson Ignores Future Risk by Using Estimated Risks for 2009

EPA found the estimated future risks attributable to dioxins are less than 50% of the total human cancer risk and noncancer hazard:

---
[218] Menzie Decl. at 18 (Opinion 4).

64

ALCD-PUBCOM_0000476

*Future Human Health Risk Tables from 2014 Risk Assessment*[219]

**Fish Cancer Risk - RME**

| COPC | Adult | Adolescent | Child | Adult + Child | Percent Contribution to Total Risk[a] |
|---|---|---|---|---|---|
| TCDD TEQ (D/F) | 1.E-03 | 6.E-04 | 6.E-04 | 2.E-03 | 50% |
| TCDD TEQ (PCBs) | 1.E-03 | 5.E-04 | 4.E-04 | 1.E-03 | 37% |
| Total PCBs | 3.E-04 | 2.E-04 | 2.E-04 | 5.E-04 | 13% |
| 4,4'-DDD | 4.E-06 | 2.E-06 | 2.E-06 | 6.E-06 | 0.1% |
| 4,4'-DDE | 6.E-06 | 3.E-06 | 3.E-06 | 9.E-06 | 0.2% |
| 4,4'-DDT | 6.E-06 | 3.E-06 | 2.E-06 | 8.E-06 | 0.2% |
| Total Chlordane | 2.E-06 | 1.E-06 | 1.E-06 | 3.E-06 | 0.1% |
| Methyl mercury | ND | ND | ND | ND | |
| Total | 3.E-03 | 1.E-03 | 1.E-03 | 4.E-03 | |

**Fish Noncancer Health Hazard - RME**

| | Adult | Adolescent | Child | Percent Contribution to Total Hazard[b] |
|---|---|---|---|---|
| TCDD TEQ (D/F) | 38 | 34 | 65 | 40% |
| TCDD TEQ (PCBs) | 27 | 27 | 50 | 30% |
| Total PCBs | 24 | 24 | 45 | 28% |
| 4,4'-DDD | ND | ND | ND | ND |
| 4,4'-DDE | ND | ND | ND | ND |
| 4,4'-DDT | 0.1 | 0.09 | 0.2 | 0.1% |
| Total Chlordane | 0.04 | 0.04 | 0.06 | 0.04% |
| Methylmercury | 1 | 1 | 2 | 2% |
| Total HI | 90 | 87 | 163 | |

**Crab Cancer Risk - RME**

| COPC | Adult | Adolescent | Child | Adult + Child | Percent Contribution to Total Risk[a] |
|---|---|---|---|---|---|
| TCDD TEQ (D/F) | 6.E-04 | 3.E-04 | 3.E-04 | 9.E-04 | 45% |
| TCDD TEQ (PCBs) | 7.E-04 | 3.E-04 | 3.E-04 | 9.E-04 | 49% |
| Total PCBs | 7.E-05 | 4.E-05 | 3.E-05 | 1.E-04 | 6% |
| 4,4'-DDD | 4.E-07 | 2.E-07 | 2.E-07 | 6.E-07 | 0.03% |
| 4,4'-DDE | 7.E-07 | 3.E-07 | 3.E-07 | 1.E-06 | 0.1% |
| 4,4'-DDT | 6.E-07 | 3.E-07 | 3.E-07 | 8.E-07 | 0.04% |
| Total Chlordane | 1.E-07 | 7.E-08 | 6.E-08 | 2.E-07 | 0.01% |
| Methyl mercury | ND | ND | ND | ND | |
| Total | 1.E-03 | 6.E-04 | 6.E-04 | 2.E-03 | |

**Crab Noncancer Health Hazard - RME**

| | Adult | Adolescent | Child | Percent Contribution to Total Hazard[b] |
|---|---|---|---|---|
| TCDD TEQ (D/F) | 17 | 16 | 29 | 41% |
| TCDD TEQ (PCBs) | 18 | 17 | 32 | 45% |
| Total PCBs | 5 | 5 | 10 | 14% |
| 4,4'-DDD | ND | ND | ND | ND |
| 4,4'-DDE | ND | ND | ND | ND |
| 4,4'-DDT | 0.01 | 0.01 | 0.02 | 0.02% |
| Total Chlordane | 0.002 | 0.002 | 0.004 | 0.01% |
| Methylmercury | 0.3 | 0.3 | 0.5 | 1% |
| Total HI | 40 | 39 | 71 | |

According to EPA's approved 2014 Risk Assessment, dioxins are responsible for *at most half* of future human health risks for any of the four pathways evaluated (cancer and noncancer risks from consumption of fish and crab).[220] Rather than using these risk numbers, Batson calculates risk based on "current risk" only.[221]

This too directly contradicts EPA's analysis. EPA itself directed CPG to calculate risk based on both *current* and *future* models. EPA worked hard to enforce the requirement to consider future risk, one that CPG strongly opposed. When preparing the 2014 Risk Assessment, CPG wanted to include calculations it believed were more reflective of current risk, arguing that:

> Region 2's July 11, 2011 directives do not allow the LPRSA HHRA to include a description and analysis of exposures in the LPRSA (the Site) that are reflective of current conditions. The Region 2 directives limit analysis to a hypothetical future condition.[222]

EPA *fought for and won* this argument in a 2012 dispute resolution.[223] The result was that CPG was directed to use EPA's assumptions to "capture exposures under both current *and future* site conditions."[224] Accordingly, the 2014 Risk Assessment calculated both current and future risks.[225] Disregarding EPA's instructions to CPG, and its scientific views that an assessment of

---

[219] 2014 Risk Assessment at 209–210 (highlights added).

[220] *Id.*

[221] 2014 Risk Assessment at 2-1.

[222] Position Paper: Review of USEPA Region 2 July 11, 2011 Comments on Revised RARC Plan for the LPRSA, Human Health Risk Assessment Issues for Dispute Resolution (2011).

[223] EPA Decision Pursuant to Administrative Settlement Agreement and Order on Consent for Remedial Investigation and Feasibility Study (Feb. 6, 2012).

[224] *Id.* at 5.

[225] 2014 Risk Assessment at 240 (Table 6-1).

ALCD-PUBCOM_0000477

future risks was essential, Batson's allocation considered only current risks,[226] driving up the relative risk of dioxin in express conflict with EPA's risk assessment directives.

### (b) Batson Gives PCB Parties a Discount by Ignoring Dioxin-like PCBs

Dioxin-like PCBs ("DL-PCBs") pose a serious health risk in the Passaic and are considered much more toxic than other PCBs.[227] EPA considered both dioxin-like and non-dioxin-like PCBs in the ROD, and rejected comments arguing against this approach:

> EPA disagrees that application and use of a TEF[228] approach to characterize DL-PCBs and non-dioxin-like PCBs, or Total PCBs, significantly overestimates the cancer risks from PCBs . . . [I]nclusion of the DL-PCB risks does not significantly overestimate the total calculated risks from consumption of fish and crab.[229]

EPA's approach aligned with its own guidance: "The total calculated risks for all chemicals would include dioxin-like PCBS and non-dioxin like PCBs."[230]

Batson rejects EPA's approach and *completely ignores* the risk of dioxin-like PCBs. His justification is that "USEPA made the decision in the RI/FFS and ROD to develop PRGs based on total PCBs only."[231] Not true. EPA's approach to evaluating PCB risk calls for risks to be evaluated for both dioxin-like and non-dioxin-like PCBs:

> The PCB soil cleanup level that will meet a site-specific dioxin TEQ soil cleanup level is compared to the site-specific soil cleanup level for total PCBs to *select the more stringent of the two*, ensuring that the remedy will be protective for *both PCB and dioxin-like PCB[s]*.

The ROD does not set a separate remedial goal for dioxin-like PCBs because the remedial goal for total PCBs requires the remedy to *address all PCB risks*. "Using only total PCBs as a benchmark in the ROD and FFS is far different than saying that dioxin-like PCBs do not contribute

---

[226] *See* Batson Report at 343 (using current exposure concentrations from the 2014 Risk Assessment).

[227] **Harris** Decl. at ¶ 16.

[228] TEF means "Toxic Equivalency Factor." In a 2007 Rule, EPA "finalized revisions to the reporting requirements for the dioxin and dioxin-like compounds category... [T]he final rule requires that, in addition to the total grams released for the entire category, facilities must report the quantity for *each individual member of the category*. EPA will use this reported mass quantity data to calculate toxic equivalency (TEQ) values. TEQs are a weighted quantity measure based on the toxicity of each member of the dioxin and dioxin-like compounds category relative to the most toxic members of the category. EPA will use TEQs to account for how dioxin and dioxin-like compounds vary in toxicity." *See* 40 CFR Part 372, Docket No. EPA-HQ-TRI-2002-0001.

[229] OU2 ROD at 448.

[230] 2017 Risk Assessment at 3943 (EPA Comments).

[231] Batson Report at 327.

ALCD-PUBCOM_0000478

significantly to the risk that requires cleanup."[232]  EPA makes this clear in the ROD.[233]  "EPA did not allow the risk from dioxin-like PCBs to be excluded from the risk assessment and risks from dioxin-like PCBs should not be excluded from the allocation."[234]  If DL-PCBs had been included in Batson's calculations, they would have accounted for nearly 10% of total risk.[235]  Batson's calculations do not account for this substantial risk.

Tellingly, Batson does not apply the same approach to dioxins and furans.  Batson uses *total TEQ* to generate dioxin RRNs, even though the ROD sets a remedial goal for a single dioxin (2,3,7,8-TCDD).  This faulty method results in an overestimate of risk for 2,3,7,8-TCDD, since other dioxins/furans also contribute to total TEQ.  2,3,7,8-TCDD is not the sole contributor to dioxin TEQs and therefore sediment TEQs cannot be based solely on this congener.[236]

Batson was flatly wrong to ignore dioxin-like PCBs—but even if he were right, his conclusions would still be wrong because he failed to apply the same treatment to dioxins.[237]

### (c) Batson Incorrectly Used the Average of Two Risks With Different Characteristics That Are Not Averageable As-Is

To begin with, there is no reason for Batson to have included crab consumption in his relative risk calculations.  Only fish consumption was used to develop remedial goals—crab consumption was not.[238]  But even if crab consumption were an appropriate consideration (for example, EPA's interim remediation milestones consider both fish and crab),[239] Batson makes a math mistake in doing so.

Starting with an example—imagine that a person has a pizza and two breadsticks for dinner.  The pizza is 50% bread, 30% cheese, and 20% tomato.  The breadsticks are, of course, 100% bread.  What percentage of the total calories come from bread, cheese, and tomato?

The correct calculation would be to start by adding up the total calories for the entire meal before calculating the relative percentage for each ingredient:

---

[232] **Harris** Decl. at ¶ 20.

[233] OU2 ROD at 448 ("EPA disagrees that application and use of a TEF approach to characterize DL-PCBs and non-dioxin-like PCBs, or Total PCBs, significantly overestimates the cancer risks from PCBs . . . inclusion of the DL-PCB risks does not significantly overestimate the total calculated risks from consumption of fish and crab.").

[234] Menzie Decl. ¶ 31.

[235] **Harris** Decl. ¶ 18.

[236] **Bock** Decl.

[237] **Bock** Decl. at ¶ 16. The overall TEQ (Total TEQ) is a mixture of dioxins, furans, and PCBs..

[238] OU2 ROD at 165 (Table 25).

[239] OU2 ROD at 164 (Table 24).

67

| Relative Calorie Count | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Pizza | | Breadsticks | | Full Meal | | *Incorrect:* Average the **Percentages** of Bread |
| Ingredient | Calories | (%) | Calories | (%) | Calories | Percent Total Calories | |
| Bread | 1,000 | 50% | 500 | 100% | 1,500 | **60%** | **75%** |
| Cheese | 600 | 30% | 0 | 0% | 600 | **24%** | **15%** |
| Tomato | 400 | 20% | 0 | 0% | 400 | **16%** | **10%** |
| *Total* | *2,000* | *100%* | *500* | *100%* | *2,500* | *100%* | *100%* |

It would be a mistake to **average the percentages** for two different food types and conclude that, because the pizza is 50% bread and the breadsticks are 100% bread, the meal is 75% bread. The breadsticks and the pizza are different sizes and have different numbers of bread calories and total calories. Averaging *percentages* does not account for the different *values*, yielding an incorrect calculation that makes it seem as though bread makes up more of the total calories than it actually does.

Batson makes the same mistake when calculating human health hazard and cancer risk. Taking Batson's noncancer hazard calculations as an example:[240]

| Noncancer Hazard | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Fish | | Crab | | Fish + Crab | | *Incorrect:* Average the Hazard *Percentages* |
| COC | Hazard | (%) | Hazard | (%) | Total | Percent Total Relative Hazard *Values* | |
| Mercury | 2.76 | 2% | 0.79 | 1% | 3.55 | **1%** | **1%** |
| Dieldrin | 0.38 | 0% | 0.08 | 0% | 0.46 | **0%** | **0%** |
| DDx | 2.10 | 1% | 0.43 | 1% | 2.53 | **1%** | **1%** |
| Total PCBs | 69.00 | 38% | 9.99 | 16% | 78.99 | **32%** | **27%** |
| Dioxins/Furans | 109.52 | 60% | 49.79 | 82% | 159.31 | **65%** | **71%** |
| *Total* | *184* | *100%* | *61* | *100%* | *100* | *100%* | *100%* |

Batson's relative hazard calculation uses the *incorrect approach*. The relative risk *should* have been calculated by summing the total risk from both pathways, because fish consumption and crab consumption have different levels of hazard. This would have also been consistent with EPA's guidance that total risk should be calculated by adding the risk "for each pollutant in each pathway of concern . . . *then summing the risk for all pathways*."[241]

Batson's approach rests on a fundamental math error—averaging *percentages* for values with different scales. That fundamental math mistake causes him to overstate the relative risk of dioxins and materially *understate* the true risk of PCBs.

---

[240] Batson Report at 340.

[241] https://www.epa.gov/risk/conducting-human-health-risk-assessment

ALCD-PUBCOM_0000480

**(d) Batson Relies on Irrelevant "Incremental" Risk Calculations That Give Polluters a Double Discount**

Batson's final strategy for increasing dioxin risk is to calculate "incremental" risk for each COC. Batson calculates risk factors for each chemical for both the lower Passaic and the upper Passaic (the less-contaminated area above the Dundee Dam). Batson's treatment of "incremental" risk is inappropriate. As EPA has stated, "background data should not be used to mitigate or otherwise detract from the risks posed by the site itself."[242] EPA's guidance requires all risks, even "background" risks, to be considered in risk analysis.[243]

Batson's use of incremental risk calculations gives parties a double discount.[244] Batson's allocation method already compares a party's contribution to the *total amount* of a chemical in OU2 sediments—*including "background" contamination*. Even without an incremental risk calculation, Batson's method would not assign responsibility based on background contamination because he assumes, elsewhere, that the settling parties did not contribute to background mass.[245] Batson's method "sloppily double counts source reductions, resulting in an inappropriately high share of 'overall environmental harm' for 2,3,7,8-TCDD."[246] The addition of unnecessary and arbitrary "incremental" risk calculations does not reflect the true risks at the site, and gives polluters a free pass for their actual contributions.

**c.    Batson Uses a Made-Up "Attenuation Factor" That Contradicts Basic Science and EPA Findings and Gives Every Settling Defendant a 99% Discount.**

EPA has spent years identifying the many polluters of the Passaic and trying to hold them responsible for paying their share of cleanup costs. After all of EPA's work and millions spent on allocation,[247] Batson makes a laughingstock of EPA and its efforts. He concludes that the 85 settling parties are barely responsible after all—according to Batson, they are collectively responsible for *fractions of a percent* of nearly every contaminant in the river:

---

[242] 2017 Risk Assessment at 3728.

[243] Role of Background in the CERCLA Cleanup Program (EPA 2002).

[244] **Menzie** Decl. at ¶ 28.

[245] Notably, Batson does not make the parallel assumption in OxyChem's favor. Batson assigns OxyChem liability for background contamination with chemicals such as lead and mercury contained in historic fill under the plant site, ignoring that no evidence attributes those chemicals to operations of the Diamond Alkali plant. Batson then makes the opposite assumption for neighboring plants built on that same, historic fill, *excluding it* from considering their total contamination values. This is yet another example of Batson's arbitrary application of his assumptions and methodologies: where an assumption can be applied to increase OxyChem's liability, he applies it; where the same assumption (which he applies to other parties) would decrease OxyChem's liability, he does not apply it to OxyChem. *See* **Olian** Decl.

[246] **Menzie** Decl. at ¶ 28.

[247] Batson Work Plan.

ALCD-PUBCOM_0000481



This absurd result is only possible because Batson misapplies a scientific concept to make *millions of pounds of contamination disappear*. Batson estimates that the settling parties contributed over two million pounds of contaminants to the Passaic.[248] These estimates are arbitrary and unreliable to begin with[249]—but Batson compounds the problem by using faulty science to turn *two million* pounds into *twenty thousand*.

Batson uses a simple trick to perform this remarkable vanishing act: what he calls "**attenuation**."[250] According to EPA, "attenuation" means "natural processes that decrease or attenuate soil and groundwater contaminant concentrations."[251] To Batson, "attenuation" simply means *multiplying everything by 1 percent*,[252] a convenient, inaccurate assumption that makes 99% of the settling parties' contamination disappear from view, even though it *unquestionably* remains in the river.

Batson's "attenuation factor" also contradicts the Focused Feasibility Study (FFS) conducted for OU2. The FFS calculated that 2,3,7,8-TCDD concentration decreases to half its value in 25 years (*i.e.*, the half time of dioxins is 25 years).[253] In other words, Batson's **3,729.71 kg** mass in the sediment in 1986 (the date the dioxin discharges from the Diamond Alkali plant

---

[248] Batson Report.

[249] *See generally* Part III, V *supra*, Appendix A.

[250] Batson Report at 29.

[251] https://www.epa.gov/superfund/groundwater-technologies.

[252] Batson Report at 30.

[253] Focused Feasibility Study Report for the Lower Eight Miles of the Lower Passaic River (2014), Appendix C Mass Balance Modeling Analysis (2014) [EPA Doc. ID 703642].

ALCD-PUBCOM_0000482

property stopped, according to Batson) would be **1,864 kg** by 2023 (the last year of sampling data used in mass calculations[254]), not **38 kg** as Batson reports.[255]

Batson's "attenuation factor" disregards basic science, EPA's peer-reviewed calculations, and his own methodology. This post-hoc calculation relies on obvious mathematical mistakes and provably false assumptions. Batson's invented, incorrect approach gives every settling defendant a 99-percent-off coupon for every chemical they put into the Passaic. It is arbitrary, capricious, and affords the United States no basis to conclude that the settling parties are paying an amount reasonably related to their *actual* contribution of contaminants to the river.

### i. If Diamond Alkali's Contribution of Dioxin Was Calculated Incorrectly, the Rest of the Allocation Is Unusable

As explained *supra*, Part VI(B)(2)(a), Batson's calculation of TCDD released from the Diamond Alkali facility compounds impossible assumptions with egregious errors. Batson's "attenuation factor" doubles down by using them to reduce the allocation share of *every settling party*. Batson justifies this approach with the following formula:

Knowing both that close to 100% of dioxin/furans in OU2 sediments was historically contributed by OCC[256] ... allows the percentage of each COC that reached and remains in OU2 sediments (A%) to be accurately estimated[257] as the quotient of the total mass [of dioxins/furans in the Passaic] and the total mass of dioxin/furan determined to be historically contributed to OU2 sediments.

$$\frac{38_{kg}}{3764.0051_{kg}} = 0.0100956$$

The scientific concept of "attenuation" is real one, but this calculation looks nothing like it. As EPA has explained, attenuation includes "a variety of physical, chemical, or biological processes that, under favorable conditions, act without human intervention to reduce the mass, toxicity, mobility, volume, or concentration of contaminants in soil or groundwater."[258]

Batson's allocation protocol pays lip service to the concept of attenuation, but he *skips that step* in the actual allocation because the math was too hard.[259] In the allocation protocol, Batson

---

[254] Data Evaluation Report 5 (Contaminant Inventory Analysis) at 35.

[255] *See* **Tarek Saba**, Ph. D., Exponent Decl. at ¶ 43.

[256] Batson does not "know[] this." As demonstrated above, Givaudan is a significant, independent contributor of dioxin to the site, as are Clean Earth and Ashland's Drew Facility, two facilities whose contributions of dioxins Batson also did not include in his allocation. *See supra* Part VI(B)(2)(a).

[257] The (erroneous) identification of the contributor of dioxin in no way "allows" for any rational estimation of the amount of *other* chemicals contributed by *other* parties that remain in the sediment.

[258] Use of Monitored Natural Attenuation at Superfund, RCRA Corrective Action, and Underground Storage Tank Sites at 12 (EPA 2019).

[259] Batson Report at 310 (Allocation Protocol); 29 (Allocation Report).

ALCD-PUBCOM_0000483

was charged with determining "the percentage of *each* COC discharged . . . that remains in the OU2 sediments through an analysis" of circumstances that would affect a COC:

| | |
|---|---|
| *Allocation Protocol* | (b) The Allocation Team will determine the percentage of each COC discharged from a facility that remains in the OU2 sediments through an analysis of the circumstances that affect a COC remaining in OU2 sediment (e.g., navigational dredging, COC solubility). |

The Batson Report itself acknowledged the variability of several of these circumstances made

| | |
|---|---|
| *Allocation Report* | Due to the variety of COCs, mix of natural forces and human activities affecting the movement of sediments, and varying periods over which COCs were placed in OU2 sediments, the determination of an appropriate A% for a matter such as this is typically problematic. Such forces and activities include the daily tidal flow in the Lower Passaic River, the effects of storms, flooding, and other hydraulic events on the movement of sediments, and the dredging and removal of sediments for navigation of commercial vessels and other reasons. |

it "typically problematic" to determine the attenuation rate of each COC:

But rather than consider or measure *any of these factors* for each COC as his contract required, Batson instead made up his own version of "attenuation" for *all* chemicals as a flat-rate reduction based on two data points: EPA's calculation of TCDD in OU2 and Batson's calculation of TCDD released from the Diamond Alkali site. The attenuation factor "was developed and applied inappropriately in an effort to make the calculations work, rather than recognizing that there is a fundamental flaw in one or both of the foundational estimates."[260]

Batson's decision to replace the complexity of the attenuation determination his contract required for all COCs with a single arbitrary figure derived from a single COC—dioxin—is inexcusable. In fact, the in-depth, individual COC attenuation analysis Batson was looking for has *already been done*—but Batson simply ignored it. Below are some of the many examples of attenuation analyses by EPA Batson recognized that he could have used to assess *accurately* the attenuation rates of each COC:

---

[260] Harris Decl. at ¶ 35.

ALCD-PUBCOM_0000484

| Factors Batson Ignores[261] | Potential Sources of Information |
|---|---|
| "Due to the **variety of COCs**, mix of **natural forces and human activities** affecting the movement of sediments, and **varying periods** over which COCs were placed in OU2 sediments, the determination of an appropriate A% for a matter such as this is typically problematic. Such forces and activities include the daily **tidal flow** in the Lower Passaic River, the **effects of storms, flooding, and other hydraulic events** on the movement of sediments, and the **dredging and removal** of sediments for navigation of commercial vessels and other reasons." | • *Mass Balance Modeling Analysis*<br>• *Preliminary Geochemical Evaluation*<br>• *A Model for the Evaluation and Management of Contaminants of Concern in Water*<br>• *Updated Mechanistic Model*<br>• *Peer Review of Conceptual Site Model*<br>• *Sediment Transport and Morphodynamics*<br>• *Contaminant History as Recorded in the Sediments*<br>• *Geochemical Evaluation of Historical Sediment Data*<br>• *EPA Factsheet: The Passaic River's Polluted Past*<br>• *Final Hydrodynamic Modeling Report*<br>• *System Understanding of Sediment Transport*<br>• *Peer Review of Sediment Transport, Organic Carbon, and Contaminant Fate and Transport Model*<br>• *Geophysical Survey Technical Report*<br>• *Environmental Dredging Pilot Study Report*<br>• *Final Dredging Technology Review Report* |

Batson listed the kinds of evidence that would be useful in evaluating attenuation, but then proceeded to ignore all of them. Rather than calculate an individualized attenuation rate for each COC, Batson's "attenuation factor" relies on Batson's *own* calculations of TCDD discharged from the Diamond Alkali site.

As discussed *infra* in Part VI(B)(2)(a), the Diamond Alkali calculations are simply indefensible—including basic unit conversion errors that result in ***million-fold overestimates*** of certain emissions.[262] The "attenuation factor" relies on these calculations, incorporating the same mistakes into every settling party's allocation share. Batson's estimates of the settling parties'

---

[261] The "Factors Batson Ignores" column quotes from the Batson Report at 29 (emphasis added). The "Potential Sources of Information" are available via EPA's website, identified by EPA Doc. IDs: 703642 (*Appendix C; Mass Balance Modeling Analysis* (2014)); 207280 (*Technical Memorandum: Preliminary Geochemical Evaluation* (2005)); 207281 (*A Model for the Evaluation and Management of Contaminants of Concern in Water, Sediment, and Biota in the NY/NJ Harbor Estuary; Contaminant Fate & Transport & Bioaccumulation Sub-models* (2007)); 377122 (*Attachment E; Updated Mechanistic Model* (2016)); 700800 (The Louis Berger Group, Inc., *Lower Passaic River Restoration Project; Report of Peer Review of Conceptual Site Model* (2013)); 213226 (Deltares presentation, *on the sediment transport & morphodynamics in LPR* (Feb. 4, 2010)); 703640 (*Data Evaluation Report No. 1: "Summary of Major Sediment and Water Investigations Conducted in the Lower Passaic River"* (2014)); 212851 (Ed Garvey, PhD, PG, Malcolm Pirnie Inc. presentation, *Lower Passaic River: Geochemical Evaluation of Historical Sediment Data* (May 4, 2005)); 240926 (May 5, 2005 letter from Clifford E. Firstenberg, Tierra Solutions, Inc. to Alice Yeh, EPA); 239626 (EPA, *The Passaic River's Polluted Past* (2014)); 213221 (HydroQual, *Final Hydrodynamic Modeling Report* (2008)); 213222 (HydroQual, *Lower Passaic River Lower Eight Miles Focused Feasibility Study; Report of the Peer Review of Sediment Transport, Organic Carbon and Contaminant Fate and Transport Model* (2013)); 213247 (*Technical Report, Geophysical Survey, Lower Passaic River Restoration Project* (2006)); 212841 (*Lower Passaic River Restoration Project; Environmental Dredging Pilot Study Report* (2012)); 206865 (TAMS, *Dredging Technology Review Report* (2004)).
[262] *See* **Bock** Decl.

73

pollution would have been at least *ten times higher* if he had simply checked his own math.[263]  EPA can have no confidence in an allocation that is based on errors this egregious.

### ii. Batson's "Attenuation" Factor is Obviously and Provably Wrong

If chemicals "attenuated" out of the Passaic as quickly as Batson assumes, *every* COC would be gone in just a few years.[264]  Batson's allocation cannot be used as the basis of a settlement for the cost of cleaning up the Passaic, because Batson assumes that there is *no need for the cleanup*. Batson's "attenuation factor" is not just inconsistent—it is clearly incorrect.  Taken at face value, Batson's "attenuation" analysis would show there is no *need* for EPA's OU2 and OU4 remedies, or the related settlement, because the passage of time would remedy all.

But it hasn't.  The contaminants are still there, in the river, including the tens of thousands of pounds of PCBs Batson eliminates through his attenuation alchemy.  And like alchemy, Batson's analysis is not a *real* assessment of what contaminants are there or who is responsible for them.

### (a) EPA's Natural Recovery Calculations Disprove Batson's Assumptions

When planning a cleanup at a Superfund site like this one, EPA takes attenuation, also known as Monitored Natural Recovery ("MNR"), into account.  MNR "is a remedy for contaminated sediment that typically uses ongoing, naturally occurring processes to contain, destroy, or reduce the bioavailability or toxicity of contaminants in sediment."[265]

EPA considered the effect of attenuation when selecting the OU2 remedy.  To evaluate MNR, EPA had to estimate how long COCs would remain in the Passaic.  In EPA's model, "concentrations declined over time, but only slowly, with 'half times' for the decline in sediment concentration on the order of 30 years."[266]

EPA's "half time" calculations disprove Batson's "attenuation factor":[267]

---

[263] **Menzie** Decl. Opinion 4.

[264] **Saba** Decl. ¶ 44.

[265] Chapter 4 of the Contaminated Sediment Remediation Guidance for Hazardous Waste Sites: Monitored Natural Recovery

[266] Remedial Investigation Report at 127 (2014) [EPA Doc. ID 703638].

[267] Appendix  C  Mass  Balance  Modeling  Analysis  (2014)  [EPA  Doc.  ID  703642]. Note that EPA's "half time" calculations do not necessarily assume that COCs are disappearing—they simply show that sediment concentrations decrease over time through a variety of mechanisms including degradation and burial.

74

**Table 5-2: Contaminant Half Times for "Excess Concentration" in Lower Passaic River Sediments Based on High Resolution Cores from 2005 and Surface Samples in 2007 (See Text for Explanation)**

| Analyte | Half Time (Confidence Interval) 1980-2007 (years) |
|---|---|
| Mercury (mg/kg) | 34 (19-173) |
| Lead (mg/kg) | 39.5 (23-151) |
| Copper (mg/kg) | 57 (30.7-405) |
| gamma-Chlordane (µg/kg)[a] | 99 |
| 4,4'-DDE (µg/kg) | 19 (13-33) |
| Dieldrin (µg/kg) | No Applicable[b] |
| 2,3,7,8-TCDD (ng/kg) | 25 (14-101) |
| Total PCB (µg/kg) | 26 (16-61) |
| HMW PAH (mg/kg)[t] | 44 |
| LMW PAH (mg/kg) | 63 |

If 99% of COCs "attenuated" away like Batson assumes, then EPA's calculated "half times" would be impossible. With a half time of 25, it would have taken nearly ***200 years*** for 3,800 kg of 2,3,7,8-TCDD to drop to 38 kg—but Batson's "attenuation factor" accomplishes the same feat in just a few decades. This assumption is impossible based on EPA's record.[268]

More important, EPA's calculation of contaminant half times shows that Batson's *assumption* that all COCs attenuate at the rate of dioxin is flatly false. Batson's "attenuation factor" assumes incorrectly assumes that every chemical attenuates at the same rate, which EPA's empirical mass balance analysis shows to be clearly false. Batson's error is most egregious with respect to dieldrin, which does not appear to be "attenuating" at all.[269] Batson nevertheless applies his "attenuation factor" to decrease the allocation parties' estimated contributions of dieldrin by 99%, relieving a critical dieldrin party—Montrose Chemical—of virtually all liability to clean it up.

### (b) Batson's Own Mass Calculations Contradict His "Attenuation Factor"

Attenuation is not a constant—it is a rate. An attenuation calculation has to be a *rate over time*; ideally a rate of decay *for a specific chemical* over time.[270] Batson's application of a flat rate "attenuation factor" leads to absurd results, as his own calculations prove.

For example, Batson's allocation relies on estimates of the total mass of COCs in OU2, based on sampling data through the year **2012**.[271] But Batson calculates that ISP Chemicals contributed PCBs to the Passaic through **2020**—***nearly a decade later***.[272] This leads to an impossible contradiction: ISP contributed 18kg of PCBs to the river *every year* between 2012 to 2020, but only contributed 5kg in total. Where did it all go? According to Batson, the PCBs somehow travelled back in time to 2012, and disappeared before even entering the river.

The absurdity of applying a flat-rate "attenuation factor" becomes even clearer when comparing Batson's assumed attenuation rates for different parties. Batson found that Bath Iron

---

[268] **Saba** Decl. Opinion 3b.

[269] Appendix C Mass Balance Modeling Analysis at 51 (2014) [EPA Doc. ID 703642].

[270] Appendix C Mass Balance Modeling Analysis (2014) [EPA Doc. ID 703642].

[271] Data Evaluation Report 5 (Containment Inventory Analysis) at 35.

[272] Batson Report at 2499.

ALCD-PUBCOM_0000487

Works/Congoleum Corp. began contributing PCBs to the Passaic in the 1930s, while ISP only began in the 1990s. Despite the 60-year difference, Batson still applies the same flat rate to the PCBs contributed by both companies. If Batson's attenuation calculations are to be believed, the PCBs contributed by Bath Iron Work/Congoleum Corp. attenuated at a snail's pace, in the same river sediments, while the PCBs contributed by ISP somehow attenuated instantly.



### 3. The Batson Report's Methodology Unjustly Allocates a Supermajority of Responsibility to OxyChem by Treating the Lister Plant and OxyChem Differently From Other Sites and PRPs

Like the prior Batson allocations considered and rejected by courts,[273] the allocation here assigns a supermajority of responsibility to one party. It accomplishes this by evaluating the evidence regarding OxyChem and Diamond's Lister Plant differently than it evaluates evidence regarding other sites and parties. This inconsistency occurred even for evidence that is substantially similar or even *the same*.

This renders the Batson process fatally flawed *on its own terms*. The Allocation Protocol recognized the risk for inconsistent interpretations drawn from similar evidence and committed Batson and his team to adhere to this principle:

> The Allocation Team will adhere to the following principles in seeking and utilizing such additional relevant information: ... ***The Allocator will ensure consistency in his application of inferences***—For example, if an inference is drawn regarding the fate and transport of a COC based on the nature of the COC or waterway via which it is transported, the same inference will be applied for other facilities discharging the same COC or transporting via the same waterway."

---

[273] *See* Part VI(B)(3)(e) *infra*.

ALCD-PUBCOM_0000488

May 29, 2019 Addendum to Allocation Protocol, at 2. Batson and his team breached that commitment. Inconsistent "application of inferences" is found throughout the Batson report and its analyses of each site, rendering Batson's conclusions regarding *every* site and party biased and unreliable—and reflects an interpretation of the record that is *implausible*.

### a.    Treatment of Historic Fill

A striking example of Batson's inconsistent application of inferences concerns his treatment of historic fill for parties whose plants were located at or near the Lister Avenue Diamond Alkali facility.

Batson recognizes that the plants operated by Diamond Alkali, Sherwin-Williams, Montrose Chemical, Hilton Davis, and Benjamin Moore were all constructed on historic fill.[274] This fill is contaminated with COCs.[275] For every company *except* Diamond Alkali, he excludes the background contamination in this historic fill from his analysis, relieving these parties of responsibility to cleanup contamination it caused in the river. This contradicts EPA's own scientific findings,[276] which require that all risks, even "background" risks, be considered in risk analysis.[277]

Batson does the opposite for Diamond Alkali. There, he assigns the plant liability for background contamination with COCs such as mercury, while ignoring that those concentrations are similar to the levels of background in the soils of its Lister Avenue neighbors. Also ignored by Batson is the fact that that there is *no* operational evidence that Diamond Alkali used or discharged mercury or PCBs in its operations. This yields the following crazy result, in which OxyChem is penalized for historic fill while its neighbors are relieved of liability for it:[278]

---

[274] Batson Report at 89 (Allocation Facilities & Historic Fill, RM 2-4.

[275] *See, e.g.,* Batson Report at 377 n.2 (citing two NJDEP studies, *Characterization of Ambient Levels of Selected Metals and cPAHs in New Jersey Soils* (2002) and *Characterization of Ambient Levels of Selected Metals and Other Analytes in New Jersey Soils* (1997)); Batson Report at 22 (discussing historic fill contamination).

[276] 2017 Risk Assessment at 3728 ("background data should not be used to mitigate or otherwise detract from the risks posed the site itself.")

[277] Role of Background in the CERCLA Cleanup Program (EPA 2002).

[278] Note that while Batson finds that Sherwin-Williams' facility is located on historic fill, Batson does not assign copper, lead, and mercury shares to Sherwin-Williams because its soil contamination is higher than historic fill.

ALCD-PUBCOM_0000489



Batson's treatment of historic fill is arbitrary, capricious, and unfair, and disregarded his obligation to be "ensure consistency in his application of inferences."[279] This unjustifiably *increased* OxyChem's assigned share in two ways. First, by relieving the settling parties of responsibility for contaminants in their soils, he made those contaminants part of the orphan share that landed on OxyChem. And second, by *including* background contaminants in historic fill in OxyChem's share, Batson made OxyChem liable for contaminants it never contributed. None of this is accurate or consistent and it does not support the United States' acceptance of the settlement for *any* of the Lister neighbors, because Batson admittedly ignored background contamination EPA directed him to consider, dramatically understating the liability of each of them.

### b.    "Cooperation" Factor

After using the evidence of each party's operations to calculate a purported "base" share, Batson multiplied each party base share by two "factors": a "cooperation" factor and a "culpability" factor. The cooperation factor was set according to "the level to which the Allocation Party cooperated or failed to cooperate with federal and state authorities ***in addressing the contamination in OU2***." Allocation Protocol at 34. Batson's conclusions regarding "cooperation" reflect inconsistent "application of inferences" as between OxyChem and the other allocation parties.

### i.    Cooperation Regarding the OU2 Remedy

EPA and Batson admit the allocation process was designed to allocate responsibility for EPA's selected remedy for the lower 8.3 Miles of the Passaic River (OU2).[280] In evaluating how each party "cooperated with governmental/regulatory entities" regarding the remedial design and remedial action in OU2, Batson inexplicably fails to consider—or even *acknowledge*—OxyChem's

---

[279] Baston Report at 357.

[280] *See, e.g.*, Allocation Protocol at 2 ("[T]his methodology outlines a process for conducting an allocation to determine the relative shares of responsibility among and between the Allocation Parties for the costs ***for remedial design and remedial action associated with OU2*** of the Diamond Alkali Superfund Site.") (emphasis added).

78

voluntary performance and funding the entire *OU2 remedial design*.[281] He also fails to count against other parties the refusal of every other party to contribute *at all* to any of the work in OU2.

Put directly, OxyChem alone has cooperated with EPA in OU2. Batson gave it no credit for cooperation. Conversely, the settling parties refused to cooperate, but Batson gave them no punishment for their failure to cooperate, disregarding the express requirements of the protocol he agreed to apply.

These critical, missing elements of the record tell a very different story than Batson's allocation report. OxyChem and its indemnitors performed the Phase I removal, which addressed contaminated mudflats in the Passaic River near the Lister Avenue plant and the Lister neighbors. OxyChem and its indemnitors stepped up; none of the Lister neighbors lifted a finger. In total, on OxyChem's behalf, its indemnitors spent hundreds of millions of dollars in *voluntary, cooperative* efforts with EPA to address and assess contamination in OU2.[282] The settling parties never spent a penny.

Before EPA's Record of Decision for OU2 was even entered, the parties with whom EPA proposes to settle—all of whom received favorable *cooperation* scores in the Batson allocation—expressed to EPA their *unwillingness* to cooperate in OU2: "The CPG has repeatedly told EPA that it *will not fund or perform* the Proposed Plan remedy."[283] None of the settling parties has ever done *any* work (or even offered to do any work) anywhere in OU2: not then, not ever. Yet Batson finds they "cooperated" with EPA.

After issuing its March 4, 2016 Record of Decision, EPA wrote to dozens of PRPs requesting that OxyChem voluntarily agree to design the OU2 Remedy and inviting the other parties—including now-settling parties—to participate in funding the design.[284] Following that request, OxyChem's indemnitors Maxus and Tierra were forced into bankruptcy by their foreign parent corporation. OxyChem immediately stepped up and cooperated again. Within weeks of Maxus's bankruptcy, OxyChem agreed to perform—and fund the entire estimated $165 million cost of—the design of the OU2 Remedy, alone. This was *cooperating* with EPA, but Batson gives it no value. The settling parties refused to contribute, and Batson deducts nothing.

After OxyChem executed an Administrative Settlement and Order on Consent (2016 ASAOC), EPA acknowledged OxyChem's speed and cooperation in doing so: "Thanks very much for moving this along so quickly—not just during the past day or two, but over the past several months."[285] OxyChem has been performing the design (and incurring millions of dollars in costs

---

[281] *See id.* ("The following is a summary of activities undertaken by Allocation Parties and the amounts of funding, if available, committed in support of EPA's remedial or removal activities in the Lower Passaic River and OU2[:] 2007 RI/FAS … Other RI/FS Costs … 2012 Phase 1 Removal Action.").

[282] *See* First Day Affidavit of Javier Gonzalez at para. 8, Dkt. 2, *In re Maxus Energy Corp. et al.*, Case No. 16-11501 (D. Del.).

[283] Aug. 18, 2015 letter from W. Hyatt (CPG Common Counsel) to S. Flanagan (EPA).

[284] Apr. 26, 2016 letter from N. DiForte to B. Lippard ("EPA is not opposed to amending the RD AOC to add settling parties that are participating as funding parties. We encourage [OxyChem] to contact other financially capable PRPs responsible for contaminants of concern for Operable Unit 2 ('OU2') of the Site, to initiate negotiations aimed at funding the remedial design."); *see* May 13, 2016 Decl. of Walter Mugdan, filed in, *Lower Passaic River Study Area Cooperating Parties Group v. United States Environmental Protection Agency*, Case No. 15-CV-7828, ECF. No. 22-3 (D.N.J.) ("As described in the notice letter, the first action is to request the voluntary performance of the remedial design by one particular PRP (though other PRPs may contribute to the funding).").

[285] See Ex. 57 (Sept. 29, 2016 email from W. Mugdan to M. Anderson).

ALCD-PUBCOM_0000491

to do so) since the 2016 ASAOC was executed. The remedial design is already 95% complete and expected to be completed this year. OxyChem has delivered every milestone, as expected, as requested by EPA. In the meantime, *no other party* offered to contribute anything to EPA to fund the design.

The Batson process protocol *required* Batson to consider "whether opportunities to cooperate with governmental/regulatory entities to address environmental or public harm were … voluntarily undertaken via an AOC/CD or independently in cooperation with such entities." Batson, Attachment S at 2. OxyChem's prompt acceptance of EPA's request to design and fund the OU2 remedial design—at a cost that exceeds the total settlement payment that all 85 settling parties collectively propose to make to forever discharge their joint and several obligations to perform a $1.82 billion cleanup in OU2 and OU4—is the most substantial "cooperation" by any party relating to the sole subject of Batson's allocation: OU2.

The settling parties have *never* cooperated with EPA *at all* in OU2, even though many of their facilities are located there. Batson was required by the protocol to consider the settling parties' *refusal* to cooperate with governmental and regulatory entities. The record has no evidence of cooperation by any settling party in OU2; quite the contrary, the settling parties all *refused* to cooperate, stating in writing their *unwillingness* to cooperate with EPA to either "perform or fund" the OU2 remedy. Again, Batson deducts nothing for the stubborn refusal of even one of these parties to step up and contribute to the investigation, assessment, and remediation of pollution they released into OU2.

Batson violated the protocol requirements by failing to credit OxyChem's extensive cooperation in OU2, including its execution of the 2016 ASAOC, as well as the evidence that it has performed that commitment fully and to EPA's satisfaction, funding alone and delivering alone the OU2 remedial design at an EPA estimated cost of $165 million. Batson again violated the protocol by failing to penalize the settling parties for their steadfast refusal to cooperate *in any way* from the day that EPA announced its proposed plan for OU2 up through the present. Both violations show that Batson's allocation fails on its own terms and reveals an irreparable, arbitrary, and capricious bias against OxyChem.

### ii. Cooperation for Other Work

The same bias was applied to the record of other "opportunities to cooperate." For example, Batson credits each member of the so-called "Cooperating Parties Group" with a *20%* "base score" enhancement for "Continuous provision of funding and participation in PRP Group(s)/actions to cooperate with governmental/regulatory entities to address environmental or public harm created by own activities." *See, e.g.*, Batson Report at 2417.

Conversely, Batson determined that OxyChem's participation in and funding of the CPG's actions warrants only a *10%* enhancement because, while OxyChem was an "original" member of the group, it was not a "continuous" member. *Id.* at 2587. This makes no sense. The CPG's actions determined by Batson to warrant a 20% enhancement to *each* member were its performance of the Remedial Investigation/Feasibility Study in OU4 (the "OU4 RI/FS"). The CPG parties claim to have collectively incurred $140,665,491 relating to that project and related payments to EPA. But individually and on average, those parties incurred less than $2 million per party in total over nearly 20 years. In contrast, OxyChem's indemnitors contributed $26 million to that *same* project. And since those indemnitors entered bankruptcy in June 2016, OxyChem itself has reimbursed EPA for nearly $5 million in added costs to oversee that project—contributing in that time more funding than any individual settling party contributed during the entire life of the project. In total,

ALCD-PUBCOM_0000492

OxyChem received a 10% base score enhancement for contributing nearly $31 million dollars in funding to the OU4 RI/FS. Dozens of parties to the proposed settlement each received a *20% enhancement—double* the enhancement received by OxyChem—for contributing less than $2 million each to the same project.

And while Batson does credit OxyChem for its indemnitor's performance of the Tierra Removal, the base score enhancement provided is not proportionate to the work performed. According to EPA, the Tierra Removal removed substantial amounts of all eight COCs, six of which are chemicals for which the Diamond Alkali site has *no* responsibility at all. To perform that work, OxyChem's indemnitor spent nearly *$84 million* to remove those sediments, which were contaminated by discharges from *all parties*. And, like OxyChem's performance of the OU2 remedial design, the section of contaminated sediments *directly* impacted the cleanup in OU2. There is no rational basis for Batson's decision to enhance OxyChem's base score by only 10% for an $84 million project that directly removed an enormous amount of contaminated sediments from OU2, while giving the CPG parties each an enhancement of 20% for *far* less significant and less costly work in a different section of the river (OU4).

Batson also credits the settling parties for actions those parties *did not take*. Batson states that "Activities by members of the CPG and SPG in support of EPA's actions to address OU2 remediation are ongoing in nature." Batson Report at 3249. The report does not specify what those "ongoing actions" are, and the administrative record in support of the proposed settlement contains no information reflecting any form of cooperation by the CPG and SPG parties. In fact, it shows the exact opposite: a steadfast refusal to fund or perform any work, *at all*, in OU2.

There is no way to read Batson's application of his "cooperation" factor as anything but evidence of a systematic bias against OxyChem. At every turn, OxyChem's cooperation is ignored or minimized; at every turn, the settling parties' refusal to cooperate in OU2 is ignored while its cooperation elsewhere is overstated. This violated the protocol. It is arbitrary, capricious, and wholly irrational. And it inexplicably *punishes* for a lack of cooperation the only party that has actually done any work in OU2: OxyChem.

### c.    "Culpability" Factor

Batson also violates the protocol's requirement of "consistent inferences" through his "culpability" factor. When applying that factor, Batson purports to consider "a party's actions that exacerbate the scope of contamination requiring remediation or to cooperate with government in efforts to resolve the risk associated with such contamination."

Batson penalizes OxyChem by a factor of *100%* based on statements in a New Jersey Superior Court opinion about actions of employees of Diamond Alkali decades before OxyChem bought the stock of Diamond Shamrock Chemicals Company. When OxyChem bought the stock of DSCC the Lister Plant had been closed for nine years and Diamond Alkali had not operated it for seventeen years. The structure of OxyChem's purchase of DSCC stock can in no way be read as a ratification or adoption of the actions—decades earlier—of employees of Diamond Alkali. Quite the contrary: The Stock Purchase Agreement provided that liability for all Inactive Sites (including the former Lister Plant site) would be retained by Diamond Shamrock Corporation which would "defend, indemnify, and hold harmless" OxyChem against all of them. Attributing the wrongful acts of persons never employed by OxyChem to *enhance* OxyChem's personal culpability *decades after* those actions occurred is unsupportable. This is far more severe than the

ALCD-PUBCOM_0000493

penalty applied to any other party—all other parties were penalized by a factor of 10% or less, and many were not penalized at all.[286]

Batson's application of this extreme culpability finding is a staggering display of bias. Incredibly, the Batson report concedes that the severe penalty applied to OxyChem was dictated by the *other parties* in the process:

> A number of the PAPs propose that the differential between 100% culpability and other levels of culpability be increased to account for the extreme difference between *the culpable behavior of OCC* and that of any other Allocation Party. The Allocator selected the scale and definition of relative culpable behavior above in recognition of this fact, while accounting also for the wide divergence of available information regarding Allocation Party behaviors.

Batson Report at 33. But there was *no* "culpable behavior of OCC" at issue. The actions to which the settling parties pointed, the ones described at length in the *Aetna* decision, were taken by Diamond Alkali and its employees. No OxyChem employee directed the release of dioxin to the river; as EPA admits, OxyChem itself *never polluted the river at all*. The wrongful actions of Diamond Alkali's employees long before OxyChem acquired the stock of Diamond Alkali's successor, DSCC, are not "culpable behavior of OCC." There is a marked difference in moral turpitude and individual culpability between OxyChem's liability as a bare corporate successor to DSCC and accusing it—as Batson does—of individually culpable actions that EPA itself acknowledges OxyChem *never took*, never ratified, and in fact *rejected* in the Stock Purchase Agreement.

In the same passage of his report, Batson acknowledges "the wide divergence of available information" regarding the conduct of the parties. In other words, Batson was provided virtually no information regarding the "culpable" conduct of other parties, and in the absence of such information deferred to the other parties' insistence that the difference between the absence of any evidence of their conduct and the conduct of OxyChem's predecessor was "extreme."

The record confirms that Batson's deference to the participating PRPs led to an inaccurate and imbalanced assessment of individual culpability. For example, Batson assigns Legacy Vulcan a 5% culpability penalty for "occasional noncompliance", citing "pollution abatement orders" the New Jersey Department of Health issued to Vulcan in 1969. But evidence in Batson's possession—and not considered in his analysis of culpability—confirms there was nothing *occasional* about Vulcan's noncompliance. Vulcan first was required to regularly sample its effluent in 1972, and it soon after informed EPA, "We do not know of any feasible method for a significant reduction in lead [from the plant's effluent]."[287] From that point until closure of Vulcan's operations in 1975 the plant consistently exceeded discharge limits, particularly for lead; ultimately, the chloromethane and chlor-alkali plants operated by Vulcan were permanently shut down in 1975 *because* they could not comply with the applicable discharge limits, including the limit for lead, without a substantial

---

[286] Courts have noted the lack of explanation for Batson's adjustments to parties' share in prior allocations. *See El Paso Nat. Gas Co., LLC v. United States*, 390 F. Supp. 3d. 1025, 1051 (D. Ariz. 2019) ("Based on these factors, Mr. Batson recommends increasing the [opposing parties'] share by ten percent, although he does not explain how he arrived at this specific amount.").

[287] PAP-00186272 (Nov. 29, 1972 submission from Vulcan to EPA) at 15.

ALCD-PUBCOM_0000494

investment.[288]  These effluent discharges occurred for years before sampling was required.  And because the site was never connected to the PVSC system, for more than 20 years the plant on a weekly basis flushed the buildup from its chlor-alkali cells—which used lead, copper, and PAH-containing asphalt—and discharged the untreated wastewater directly into the river.[289]

While the evidence provided to but not considered by Batson invalidates the "culpability" score he assigns to Vulcan, more damning is the evidence *not* provided.  Former plant workers later testified about the plant's practices for the handling and disposal of chemicals, and they consistently described the exact conduct by Diamond Alkali for which Batson assigned OxyChem a 100% penalty.  For example, one worker testified that "the standing joke of that [Vulcan] plant" referred to the Passaic as the "Save-All Tank", and he described the plant's impact on the river as "unconscionable."[290]  Another testified that the Vulcan plant lacked "environmental rules" and workers were unconcerned about compliance or pollution.[291]

Vulcan possessed these transcripts before, during, and after the Batson process, but withheld them.  McKesson and Safety-Kleen, the companies that purchased the plant site from Vulcan, provided one of these transcripts to Batson—but only after *removing* the portions discussing practices at the plant.[292]

Additional instances of "culpable" conduct by individual parties, have been detailed below, including matters as serious as false 104(e) certifications, the unexplained disappearance of relevant documents, and the misrepresentation of operations.  *See supra* Part VII(c)(2)-(3).  Batson considered none of this, because he knew none of it:  his process allowed the settling parties to *decide* what they would (and would not) tell him about their own misconduct.

Evidence regarding the chemical handling and discharge practices at the settling parties' operations are detailed in the attached Declaration of Dennis Farley.  Given the pre-regulation period during which most parties' operations occurred, Batson erred by inferring that the absence of direct evidence regarding the discharge and handling practices during those operations warranted a culpability score of *zero*—an order of magnitude less than the score assigned to the Diamond Alkali operation.  To reach those conclusions, Batson ignored the widely recognized fact that while the settling defendants were operating, discharges to rivers (and the Passaic River specifically) from such operations were commonplace.  Accordingly, Batson's "inferences and conclusions regarding the handling and disposal of hazardous substances, and its consideration of 'culpability' relating to those activities, are not consistent with any plausible interpretation of the historical record."[293]  Batson erred by accepting uncritically—even with no information—the

---

[288] *See* PAP-00363424 at 1 (April 30, 1975 letter from Inland to EPA stating "One of the princip[al] reasons for closing down these two operations is the inability to meet the limitations on the discharge of total suspended solids and lead, which originates from the Chlor-alkali plant, and the limitations on the discharge of zinc, which originates in the C-1 operation.").

[289] Oct. 14, 2022 deposition of Carleton Degges, *OxyChem v. 21st Century Fox Am., Inc., et al.*, Case 2-18-cv-11273, at 33:20-34-6; 8:3-60:11; 62:6-66:10.

[290] June 16, 1999 deposition of Bernard Partington, *Safety-Kleen EnviroSystems Co. v. Continental Casualty Co., et al.*, Case 985528, Superior Court of California, at 74:2-15, 77:9-78:22.

[291] June 17, 1999 deposition of Raymond Gilliam, *Safety-Kleen EnviroSystems Co. v. Continental Casualty Co., et al.*, Case 985528, Superior Court of California, at 574:15-575:19.

[292] *See* PAP-0071782 (partial transcript of June 16, 1999 deposition of plant worker Partington submitted to Batson).

[293] Stradling Decl. at 2.

ALCD-PUBCOM_0000495

settling parties' insistence that their practices varied from that of Diamond Alkali's operation at the Lister Plant, let alone varied enough to assign a penalty for individual culpability to OxyChem—which did not itself pollute the river—that is an order of magnitude higher than the "culpability score" for most parties.

### i. Batson's 100% Culpability Factor to OxyChem Ignores That OxyChem Is Merely a Corporate Successor That Never Itself Polluted the Passaic River

In OxyChem's Contribution Action, the Court recognized that, because there may be other successors to the Diamond Alkali liability, it had not determined whether OxyChem was fully liable for the Lister Plant's discharges. Indeed, OxyChem was a mere legal successor, while Maxus was the true successor to the Lister Plant operations that expressly assumed the liability. Many of the settling defendants here admitted that Maxus was a successor to the Lister Plant liabilities when they filed proofs of claim in Maxus's bankruptcy, asserting under oath that Maxus was liable as an owner and operator under CERCLA.

OxyChem's status as a mere corporate successor and not the true successor that assumed the benefits and liabilities of the Lister Plant operations weighs against treating OxyChem as a highly culpable party. It precludes assigning OxyChem a 100% culpability factor that is ten times higher than the factor applied to any other party, as the Batson Report did. For instance, in *Litgo*, the Third Circuit looked at the "degree of involvement by the parties" and stated that it is "unusual for an owner or operator who played no role in the discharge to be allocated … a large percentage of the costs." *See Litgo New Jersey Inc. v. Comm'r New Jersey Dep't of Envtl. Prot.*, 725 F.3d 369, 387-88 (3d Cir. 2013). The Third Circuit then took into account that there were multiple successors to the same relevant party, and upheld an equitable allocation assigning *different* shares of liability to two successors to the *same* underlying CERCLA liability. One successor was liable as an owner at the time of disposal; the other successor was liable as the current owner and because it expressly assumed the other's environmental liabilities. The two successors received vastly different shares of the allocation. *See id.* at 389-90. Moreover, the *Litgo* court recognized that parties (like OxyChem) that were not themselves directly involved in the release of hazardous materials should generally bear lower shares of liability. The Batson Report completely ignored that OxyChem was a mere corporate successor that did not itself pollute the Passaic River. Indeed, the Batson Report fails to even account for other, more culpable, successors to the Lister Plant liability.

In sum, in ascribing a 100% culpability factor to OxyChem, the Batson Report ignores established equitable allocation principles by treating OxyChem as the polluter, when in reality, the evidence is that OxyChem is a mere corporate successor to a liability to which another party was the true successor. EPA's punitive approach in assigning extreme culpability to OxyChem, which never polluted the river itself, based solely on the fact that it is a bare successor to Diamond Alkali is contrary to established practice. Paul Stofa, a lawyer and chief adviser to the NJDEP on a recent settlement with BASF Corporation ("BASF"), observed at a public hearing that "courts have not supported treating 'successor corporations' like BASF, which acquire land after it's already contaminated, as being liable for as many damages as the initial polluter."[294]

---

[294] Jean Mikle, *'There is still fear': Toms River residents slam settling suit over Ciba polluted land*, ASBURY PARK PRESS, Mar. 14, 2023, *available at* https://www.app.com/story/news/local/redevelopment/2023/03/14/ciba-geigy-basf-lawsuit-toms-river-nj-superfund-site/69993588007/ (last visited Mar. 18, 2023).

84

### ii. Batson's 100% Culpability Factor to OxyChem Ignores That OxyChem Did Not Benefit From the Former Diamond Alkali Facility's Operations or Disposals

OxyChem is not only a mere technical successor to Diamond Alkali; it also never benefited from either the former Diamond Alkali facility or the agricultural chemicals business operated there. Batson's decision to impose a 100% culpability factor onto OxyChem ignores this, while his allocation absolves 85 settling defendants—many of whom *have* directly benefited from disposals of hazardous substances into the Passaic—from further liability in exchange for a "minor" share of costs. That decision contravenes case law recognizing that a fair allocation considers a party's degree of benefit from the disposals. *See, e.g., United States v. Davis*, 31 F. Supp. 2d 45, 66 (D.R.I. 1998) ("Fairness suggests that parties deriving greater benefit from disposal of hazardous waste should bear a greater portion of the responsibility . . . ."), *aff'd* 261 F.3d 1 (1st Cir. 2001).

Diamond Alkali owned and operated its former Newark facility—the Lister Plant—as part of its Agricultural Chemicals Division,[295] the division through which Diamond Alkali produced, distributed, and sold DDT; 2,4-D; and 2,4,5-T products.[296] These products were used or produced at the Lister Plant before Diamond Alkali ceased operations there in 1969.[297]

On July 1, 1983, Diamond Alkali's successor, Diamond Shamrock Corporation ("DSC"), entered into a joint venture called SDS Biotech Corporation ("SDS Biotech").[298] On July 14, 1983, DSC conveyed its agricultural-chemicals assets to SDS Biotech. *See* **Ex. 44** (July 14, 1983 Instrument of Conveyance and Assignment by Old Diamond to SDS Biotech) at MAXUS024218 (conveying "all of the Assets . . . of whatever kind and wherever situated of Transferor, as of the close of business on the date hereof, used in, directly related to or directly associated with the manufacturing and marketing of agricultural chemical . . . products . . ."). Assets assigned to SDS Biotech included DSC's right, title, and interest in registrations for products with 2,4-D as an active ingredient—like 2,4-D Acid Technical Flake (EPA Registration No. 677-266); Crop Rider 2.67D (EPA Registration No. 677-105); and Dacamine (EPA Registration No. 677-201)—and various DACONIL; BRAVO; and DACTHAL products.[299]

After conveying the assets and liabilities of its Agricultural Chemicals Division to SDS Biotech in July 1983, DSC no longer operated an agricultural-chemicals business. *See* **Ex. 46** (April

---

[295] *See, e.g.,* **Ex. 38** (Nov. 1969 "Agricultural-Chemicals Division—Newark Plant Operating Comments") at MAXUS0331013 (memorandum regarding shutdown of activities at the Lister Plant entitled "Agricultural Chemicals Division – Newark Plant"); **Ex. 39** (Dec. 1969 "Agricultural-Chemicals Division—Newark Plant Operating Comments") at MAXUS043208; **Ex. 40** (1965 Diamond Alkali Company Annual Report) at MAXUS4858792 (listing Newark, New Jersey plant as plant within Agricultural Chemicals Division).

[296] **Ex. 40** (1965 Diamond Alkali Company Annual Report) at MAXUS4858792 (listing and discussing products made in Agricultural Chemicals Division).

[297] *See* **Ex. 41** (1969 Diamond Shamrock Corporation Annual Report) at MAXUS0114305 (referencing closure of "Newark, New Jersey, herbicide plant which produced 2,4-D and 2,4,5-T"); **Ex. 42** (1967 Diamond Shamrock Corporation Annual Report) at OCCNJ0005988 ("[W]e recently completed a major expansion of our plant at Newark, New Jersey to produce 2 4 D and 2 4 5T and weed control chemicals.").

[298] **Ex. 43** (1983 Diamond Shamrock Annual Report) at OCCNJ0006555 ("At mid-year we joint-ventured our world-wide agricultural chemicals and animal health businesses with Showa Denko, K.K., a leading Japanese chemicals and pharmaceuticals firm, to form SDS Biotech Corporation.").

[299] *See* **Ex. 44** (Jul. 14, 1983 Agricultural Chemicals Pesticide Registration Assignment from Old Diamond to SDS Biotech) at OCCNJ0089403-06.

85

ALCD-PUBCOM_0000497

4, 1986 letter from James F. Kelly, Diamond Shamrock Corporation, to Dr. Ray Irani, Occidental Petroleum Corp.) at 2 ¶ 3(c) (referring to "agricultural chemicals" as "products or operations of DSCC which had been permanently discontinued or sold to third parties on or before April 1, 1986"); *see also* **Ex. 47** (Sept. 4, 1986 Agreement By and Among Diamond Shamrock Corporation, Occidental Petroleum Corporation, Occidental Chemical Holding Corporation and Oxy-Diamond Alkali Corporation), at OCCNJ0027154 (Schedule 2.23) ¶ 12 (listing "Ag Chem" as one of DSCC's "discontinued businesses"). DSC retained its interest in SDS Biotech for less than 6 months, conveying that interest away for nominal consideration effective January 1, 1984, to Diamond Shamrock Corporate Company, which that same month became a Maxus subsidiary (and, indeed, merged into Maxus in 1998).

OxyChem did not acquire the assets of DSC's successor, DSCC, until late 1986—several years *after* DSC divested itself of its agricultural-chemicals business by assigning it to SDS Biotech.[300] The DSCC entity OxyChem acquired in 1986 held neither the agricultural-chemicals business that housed the Lister Plant nor any residual benefits from that business.

### d.    Interpretation of Evidence Regarding Site Operations

Batson's biased and inconsistent inferences extend to his interpretation of the evidence showing the operations at the Lister Plant and the other parties' sites. Appendix A shows how Batson draws inconsistent—and even *inverse*—inferences from similar evidence. That inconsistency not only invalidates Batson's conclusions regarding those sites, it also renders his entire "allocation" arbitrary and capricious. *See* Olian Decl.

### e.    Every Court That Has Considered Batson's Allocations Has Criticized His Methodology and Rejected His Conclusions

Given the extreme unfairness and fundamental flaws in the method that Batson used to arrive at his astonishing 92+% assignment of responsibility to OxyChem here, it is unsurprising that the only two courts to have considered his methodology and allocations have rejected them for similar reasons.

After retiring from his career as a mediator with EPA, Batson was retained by private parties to provide expert testimony regarding proposed allocations in two lawsuits. The district courts in those cases are the only ones to have considered Baton's allocation methodology. Both criticized that methodology and rejected his conclusions. *See El Paso Nat. Gas Co., LLC v. United States*, 390 F. Supp. 3d. 1025, 1061 (D. Ariz. 2019) (rejecting Batson's allocation of 13.23% to Batson's client and 86.77% to opposing party and instead allocating 65% to Batson's client and 35% to the opposing party); *Columbia Falls Aluminum Co., LLC v. Atlantic Richfield Co.*, 2021 WL 3769886, at *54 (D. Mon. Aug. 25, 2021) (rejecting Batson's allocation of 30% to Batson's client and 70% to the opposing party, and instead allocating 65% to Batson's client and 35% to opposing party).

---

[300] SDS Biotech is now known as Syngenta Crop Protection, LLC ("Syngenta Crop"),[300] an entity that (through its ultimate parent company) is held entirely by a Chinese state-owned entity that continues to benefit from what was originally Diamond Alkali's agricultural-chemicals business. Syngenta Crop continues to market and benefit from products that once belonged to Diamond Alkali's Agricultural Chemicals Division. *See* "Our crop protection products" at https://www.syngenta.com/en/protecting-crops/products-list (last visited Mar. 15, 2023) (products include BRAVO, "the world's leading multi-site fungicide, the foundation partner for fungal control programs and fungicide resistance breaker," and DACONIL, "A well-known contact fungicide giving broad-spectrum control in turf").

86

Those courts recognized the same critical flaws in Batson's methodology that are present here. Both courts determined that Batson's methodology was *unreliable and contrived* to assign the maximum share of liability to the opposing party. *See El Paso*, 390 F. Supp. 3d. at 1052 ("[T]he Court finds [Batson's] proposed allocation to be quite unreliable—contrived to assign maximum responsibility to the [opposing party]."); *Columbia Falls*, 2021 WL 3769886, at *47 ("[P]arts of Batson's proposed methodology are questionable, as is its application here … First, Batson's allocation places the maximum cost burden on the opposing party.").

Unsurprisingly, both courts rejected Batson's allocations and reached entirely different allocations. And those courts did not simply adjust his percentages—they completely *disregarded his work*, entering their own allocations that were the *opposite* of Batson's assigned shares:

| MATTER | BATSON'S PROPOSED ALLOCATION | COURT'S ALLOCATION |
|---|---|---|
| *El Paso Natural Gas Company, LLC v. United States* | Batson's client: **13.23%** <br> Opposing party: 86.77% | Batson's client: 65% <br> Opposing party: **35%** |
| *Columbia Falls Aluminum Company LLC v. Atlantic Richfield Company* | Batson's client: **30%** <br> Opposing party: 70% | Batson's client: 65% <br> Opposing party: **35%** |
| **Passaic River** | Batson participants: **0.1%** <br> Opposing party: 99.9% | |

Batson's "allocation" here reaches the same lopsided conclusions, using the same untenable contrivances, as the ones these courts rejected. Every assumption Batson used was *designed* to increase OxyChem's alleged responsibility. Staggering math and conceptual errors were never corrected, overstating OxyChem's responsibility in extreme ways. Any factor that reduced OxyChem's responsibility was ignored (as with cooperation and culpability) applied inconsistently (as with liability for historic fill) or whisked away through attenuation alchemy (leaving OxyChem to shoulder responsibility for orphan shares of chemicals for which it has no *actual* liability, while relieving parties that produced those chemicals of any responsibility to clean them up). None of this is scientific. None of it is supported by evidence. None of it justifies releasing even one of these 85 parties from liability for the $1.82 billion EPA estimates it will cost to address the hazardous substances in the Passaic River.

Notably, both courts criticized Batson's methodology on grounds that plague his Passaic allocation as well. For example, Batson fails to explain the basis for his decisions about how to interpret the factual record and what effect those interpretations would have on the allocation. In *El Paso* Batson assigned the opposing party certain portions of what he found to be an "orphan share," and determined that the effect would be a 10% increase in the opposing party's share. But the court observed that "he does not explain how he arrived at this specific amount." The same is true here. Batson simply creates the orphan share by claiming—wrongly—that the settling parties' chemicals have attenuated, leaving OxyChem to clean them up.

ALCD-PUBCOM_0000499

In *Columbia Falls*, Batson did not provide any meaningful explanation of his decision to not include certain waste streams. *See* 2021 WL 3769886, at *48 ("It is not reasonable, however, to simply omit this contributing feature [and] it raises the concern that other waste streams may be oversimplified under Batson's method."). Here, Batson similarly fails to explain his decisions to exclude various aspects of the factual record. *See, e.g., generally* Appendix A. As prior courts have held, these failures discredit Batson's conclusions, again making it arbitrary and improper for the United States to rely on them in any way to accept the settlement.

On top of committing the same errors he made in *El Paso* and *Columbia Falls*, Batson commits other astonishing errors that courts have held are a basis to vacate even a *district court's* allocation. For example, Batson treats two different units of measurement—parts per billion and parts per million—as if they were the same.[301] The Third Circuit reversed a district court allocation that made a similar error. *See Trinity Industries*, 903 F.3d at 358 (vacating district court's allocation in CERCLA contribution action because "the District Court treated conceptually distinct units of measurement as equal"). The United States cannot possibly rely on the reasonableness of an allocation that rests on this fundamental measurement error. And the United States can have *zero* confidence that Batson accurately assessed the quantitative responsibility of any of the settling parties when, in reality, he *does not recognize* that parts per million is a quantity that is *a thousand times larger* than parts per billion.

### f.    Batson Was Unqualified and Ineligible to Allocate Liability at the Lower Passaic River

As explained above, every court to consider one of Batson's allocations criticized his methodology and rejected his conclusions. Batson's brief and unsuccessful attempt at "allocating" in private practice resulted from his lack of qualifications.

David Batson is a mediator. During his career with EPA, his title was "ADR Specialist." Batson Initial Report in Columbia Falls, at 4-6. After leaving EPA, Batson worked as an ADR mediator hired by private parties. Batson 2019 Resume at 1, 2, 3.

Batson conducted the "allocation" at issue here much like his mediations. But the two are not the same thing. An allocation is a scientific assessment of all parties' liability for response costs.[302] A mediation is an agreed upon, voluntary resolution in which parties address their own liabilities to one another. What Batson conducted was a mediation, not an allocation. And it is unsurprising that Batson managed to reach consensus among the participating parties: They all agreed they had virtually no liability at the Lower Passaic River. And they all agreed that OxyChem should pay for everything. That was undoubtedly the easiest mediation Batson ever conducted, but it is not an allocation. And it is obviously improper to use that collective agreement

---

[301] Bock Decl. at ¶ 61.

[302] *See United States v. Montrose Chem. Corp.*, 50 F.3d 741, 746 (9th Cir. 1995) ("[W]e do not believe that the court could possibly have adequately determined that the settlement was substantively fair without having *some benchmark* with which to compare it."); *New Jersey Dept. of Env. Prot. v. Atlantic Richfield Co. (In re MTBE Prods. Liab. Litig.)*, 33 F. Supp. 3d 259, 268 (S.D.N.Y. 2014) (applying standard for CERCLA consent decree to reject Spill Act settlement because "without a reasonable measure of *both total damages* and [settling party's] share, I cannot determined whether the settlement is fair and reasonable") (emphasis added); *Mathes*, 2008 WL 4693550, at *13 (court could not evaluate substantive fairness of consent decree because the government had "*not provided the Court with any estimations of the past or projected response costs.*") (emphasis added); *United States v. Pesses*, 1994 WL 741277, at 16 ("Comparative fault and accountability cannot be assessed in a vacuum; such an analysis is dependent upon correlations between the various defendants' contributions *and the overall costs of remediation…*") (emphasis added).

among the PRPs as the basis for a release and contribution protection by EPA, particularly when key parties—including OxyChem and the PVSC—did not participate and when those who did—the settling parties—had a powerful incentive to manipulate the process and collude to overstate OxyChem's responsibility.

In addition to being unqualified, Batson was ineligible to allocate liability at the Lower Passaic River. In 2004, Batson served as a mediator at the Passaic River for many of the same parties now being allocated responsibility. As described on Batson's resume, he:

> Mediated PRP Group organization and funding agreements, including design and implementation of allocation for operational funding, for sediment site involving dioxin, PCB and heavy metals contamination of urban waterway. Supported PRP search activities and mediated selection of allocation consultant.

**Ex. 48** (2019 Batson Resume).[303] Similarly, he described his prior role at the Passaic under oath in *El Paso*: "At that point I went in, assisted the parties in dealing with their initial allocation of operating costs, worked with the parties as a convening neutral, [and] assist[ed] them in hiring a party that did PRP searches."[304] He described his *current* role as being "retained by the PRP group to perform an allocation on their behalf,"[305] to "do their final allocation as it relates to the full two billion dollar remediation."[306]

It is clearly improper for a mediator to subsequently *adjudicate* the same matter. *See United States v. Kramer*, 19 F. Supp.2d 273, 278, n. 7 & 9 (D.N.J. 1998) ("The use of a magistrate judge as a settlement judge in a CERCLA non-jury case serves to insulate the trial judge from direct settlement negotiations. . . . At the request of the settlement process participants, I appointed Magistrate Judge Rosen to perform additional duties as Settlement judge . . . while I continue to adjudicate the dispositive matters which arose on the litigation track."); Federal Judicial Center, *Manual for Complex Litigation, Fourth*, § 34.2 at 665 ("Reference to a magistrate judge ... may facilitate settlement negotiations, thereby limiting the district judge's involvement and preserving the ability to preside on dispositive motions and at trial.").

Compounding this problem is Batson's claim to have somehow *represented* OxyChem in the allocation process:

> Occidental (OCC) not being a participating party as had been anticipated and OCC filing a lawsuit against PAPs have substantially increased the level of effort required of the Allocation Team, which will spend additional resources ***to ensure that OCC is fairly represented in the allocation process,*** and

---

[303] Recognizing the conflicts of interest and ethical violations this created, Batson subsequently deleted this reference to prior involvement at the Lower Passaic River. *See* **Ex. 49** (2020 Batson Resume).

[304] **Ex. 50** (Excerpt from Feb. 21, 2019 trial transcript in *El Paso Natural Gas Co., LLC v. United States*, Case No. CV-14-08165-PCT-DGC in the United States District Court for the District of Arizona, the Honorable David G. Campbell presiding) at 759:20-23.

[305] *Id.* at 759:7-8. *See also* **Ex. 51** (Feb. 10, 2004 letter from W. Hyatt to NJDEP) ("As you are aware, the Group has already asked David Batson, EPA Alternative Dispute Resolution Liaison, to assist in coalescing the group and in helping it to develop an allocation of responsibility. We anticipate that Mr. Batson will designate an allocation consultant to assist the Group in the near future.").

[306] **Ex. 50** (Excerpt from Feb. 21, 2019 trial transcript in *El Paso Natural Gas Co.*) at 760:3-5.

89

complicates communications and other considerations regarding maintaining confidentiality.

The allocation protocol required Batson to conform to the ethical standards applicable to mediators.[307] Those standards are clear and unequivocal. A neutral mediator cannot "represent" an absent party's interest in a mediation: he is required, in all events, to remain neutral. A neutral mediator cannot conduct a mediation without the consent of all parties whose interests are affected by it.[308] And most important, a person who has worked as a mediator is prohibited, ethically, from purporting to *adjudicate* the responsibility of the parties to the mediation without their consent.[309]

Batson violated every one of these ethical rules. He, as a neutral, conducted a mediation among these same parties in 2004. Then, when he left EPA, he agreed to adjudicate and allocate the "fair shares" of responsibility of the *same* parties for the *same* Superfund site—*and* claims to be "representing" OxyChem, without its consent and over its active objection, in that adjudication.[310] None of this is permissible. None of it is ethical. All of it deprived OxyChem of due process and was unfair. To adopt this unethical, biased, manipulated "allocation" to assign 92+% liability to OxyChem—an absent party—would be a shockingly unconstitutional act by the United States.

## 4.    The Batson Report Does Not Provide an Accurate Estimate of Harm Caused by Settling Defendants

Because the Batson process was procedurally flawed and substantively erroneous, it is unsurprising that the proposed consent decree provides no rational estimate of the harm each settling defendant caused.[311] The attached Appendix A provides an overview of errors in the Batson Report regarding 17 settling defendants that exemplify Batson's repeated failure to consider (or lack of access to) highly relevant evidence, his consistent bias in favor of the settling defendants, and the disconnection between facts recognized by his report and the miniscule shares he assigns to settling defendants.

---

[307] Batson Report at 225.

[308] See **Moffit** Decl., ¶¶ 30, 38.

[309] See **Moffit** Decl., Opinion 3.

[310] EPA paid Batson nearly *$4 million* to conduct his "allocation" under these circumstances. In addition, the parties participating in the process retained and compensated their own expert, which Batson relied on and incorporated into his analysis. *See* Batson Report, Attachment O (expert report prepared by Gayle Schlea Koch, Axlor Consulting LLC, "at the request of counsel for the LPRSA Small Parties Group"). It is unknown whether the participating parties funded additional components of Batson's report, made direct or indirect payments to Batson or AlterEcho, or paid for Batson's travel or other costs throughout the process. During his career with EPA, it was Batson's practice to accept funding for travel and expenses and other services that were provided directly to circumvent "ethics rules." *See, e.g.,* **Ex. 50** (Excerpt from Feb. 21, 2019 trial transcript in *El Paso Natural Gas Co.,* at 715:17-21) (Batson testifying under oath that while working for EPA at Superfund sites "all my other expense would be paid by the private parties, travel, support services, scientific services, through direct supplying obviously, of that service, so we didn't have to deal with the wonders of ethics rules.").

[311] *In re Tutu Water Wells,* 326 F.3d at 207 (substantive fairness requires that the proposed decree's terms be "based on 'comparative fault' and apportion liability 'according to rational estimates of the harm each party has caused.'") (quoting *United States v. SEPTA,* 235 F.3d at 823); *United States v. Cannons Eng'g Corp.,* 899 F.2d 79, 89 (1st Cir. 1990) (an "important facet of reasonableness" is "whether the settlement satisfactorily compensates the public ..."); *United States v. Acton Corp.,* 733 F. Supp. 869, 872 (D.N.J. 1990) (reasonableness analysis includes "the reasonableness of the settlement as compared to the settlor's potential volumetric contribution").

90

ALCD-PUBCOM_0000502

## VII.    The Proposed Settlement Improperly Relies on a Third-Party Allocation That Was Procedurally Unfair

### A.    The Proposed Consent Decree Is Improper Because the Batson Process Arbitrarily Excluded PVSC and Municipalities

EPA arbitrarily excluded PVSC and liable municipalities from the settlement process. In 2017, EPA wrote to the prospective participants in the Batson allocation:

> During the August 28, 2017 meeting, several parties raised questions concerning EPA's enforcement approach for PVSC and the municipalities to which EPA issued notices of potential liability (the City of Newark, Borough of East Newark, Town of Harrison and Town of Kearny). EPA has initiated discussions with PVSC and the municipalities about substantial contributions that, collectively, they might make to the OU2 remedy. At this time, we do not believe it would be helpful to include them in the allocation.[312]

Almost six years later, OxyChem is performing the OU2 and OU4 remedial designs; EPA has reached a proposed cash-out settlement with 85 parties; and EPA has designated OxyChem and others as "work parties" that it expects to perform the OU2 and OU4 remedies. Yet neither PVSC nor the other municipalities have provided "substantial contributions," or any contributions yet, to the OU2 remedy (individually or collectively) or to the work in OU4. This problem was identified to EPA early on and could have been addressed in a timely manner. The failure to do so is a separate and independent ground of procedural unfairness.

More than four years ago, EPA was specifically told:

> The EPA allocation process treats similarly situated parties differently, and thus is entirely arbitrary. Nowhere is this clearer than with respect to EPA's decision to pursue an entirely separate settlement process with the Passaic Valley Sewerage Commission ("PVSC" or "the POTW") and certain municipalities.[313]

Six months earlier—in late 2017—EPA was also told that excluding municipalities was unfair:

> *A fair settlement process should embrace all PRPs, including PVSC and the Municipalities (whose liability is already presumed by EPA and not in question). It is not fair to have one process applicable to PRPs other than PVSC and Municipalities, and a separate (and non-transparent) process used to allocate PVSC's and the Municipalities' relative liability shares.* This is especially true for an equitable allocation of liability at this site, where, as discussed below, abundant evidence already exists demonstrating that PVSC and the Municipalities:
>
> • Knowingly and willfully discharged an enormous number of PCBs and other risk driving COCs to the Passaic River, contrary to any legitimate

---

[312] Batson Report at 38 (Sept. 18, 2017 letter from Eric J. Wilson, EPA Region 2, to OU2 General Notice Letter Recipients).

[313] **Ex. 4** (Feb. 13, 2018 letter from David G. Mandelbaum to Juan M. Fajardo, EPA Region 2).

ALCD-PUBCOM_0000503

"government function" and even though PVSC could have appropriately treated these wastes at its treatment plant; …[314]

EPA's failure to invite and include in the allocation parties who have significant liability for OU2 and OU4, according to EPA's own estimation, was arbitrary and capricious.

The evidence of this unfairness is manifest in the report. The key allocation pathway the allocator identified to the river *is* the PVSC, which received and treated hazardous substances from the settling companies and transported them to the Passaic River through its sewer systems. Relying on a study commissioned by the settling defendants, Batson concluded that PVSC had discharged a total PCB mass of 91,613 pounds to the river—an amount fifteen times larger than the 6,000 pounds of PCBs EPA found in sediments being remedied in the lower 8.3 miles of the River. A more recent study the same defendants commissioned from Axlor Consulting on which Batson also relied heavily calculated that PVSC released *millions of pounds* of contaminants of

**Table 4. PVSC Bypasses and CSO Contaminants of Concern (lb)**

| COC | Estimated Bypass Mass (1924-2016)** | Estimated CSO Overflow Mass (1924-2016)** | Total Estimated PVSC Mass (1924-2016)** | EPA Estimated Mass in OU-2 Sediments |
|---|---|---|---|---|
| PCBs* | 57,032 | 34,781 | 91,813 | 57,320 |
| Mercury | 242,254 | 205,152 | 447,406 | 92,594 |
| Copper | 1,015,838 | 860,258 | 1,876,096 | 4,629,708 |
| Lead | 3,804,812 | 3,222,088 | 7,026,900 | 7,054,792 |
| Select PAHs (see Exhibit 2-6) | 3,083,750 | 2,611,460 | 5,695,210 | 903,895 |
| **Total** | **8,203,685** | **6,933,739** | **15,137,424** | |

concern to the Passaic River.

As the study put it, "When comparing these estimates of PVSC-discharged COCs to those estimated by EPA as present in the sediments of the lower eight miles of the River, *it is evident that PVSC discharges alone could account for much of the mass of certain COCs in OU2*."

The former Diamond Alkali plant for which OxyChem is alleged to be responsible has no operational history of use of PCBs, Mercury, Copper, Lead, or PAHs. Yet through a sleight of hand, the allocator identified virtually all of these PVSC discharges as orphan share, assigning them not to the settling defendants (whose operations actually used and produced these chemicals) but to OxyChem, which did not. This was substantively and procedurally unfair to OxyChem. It is also substantively and procedurally unfair to the PVSC: if adopted by the Court through the proposed consent decree, it implies a massive share of liability for PVSC as a transporter—even though EPA excluded PVSC from the process at the outset—while denying PVSC the right to pursue contribution from parties that actually produced those chemicals.

---

[314] **Ex. 18** (Oct. 24, 2017 letter from David R. Erickson to Eric Wilson, EPA Region 2) (emphasis added).

ALCD-PUBCOM_0000504

**B.    The Proposed Consent Decree Is Improper Because EPA Arbitrarily Changed the Rules of the Batson Process After OxyChem Opted Out of the Process**

The proposed settlement relies on an unfair *ex parte* allocation of OxyChem's alleged liability.  OxyChem could not agree to join an allocation process that was designed to yield a massive, irrebuttable share for OxyChem through a process that would have barely allowed it to participate.

But the allocation that *actually happened* was completely different—because once OxyChem was out of the picture, EPA rewrote the rules.  OxyChem never had an opportunity to be heard in the new, much broader, allocation.

When EPA first announced its allocation process design in 2017, its goals were modest:

> For parties that are not ... associated with the release of dioxins, furans, or PCBs into the Lower Passaic River, a cash out settlement might be appropriate.  This determination requires additional complex settlement analysis.  EPA expects to use the services of a third party allocator before extending cash out settlement offers to any such party. [315]

As first proposed, the allocation was limited to "middle tier" parties. [316]    Even after EPA decided to invite all PRPs, it made clear that its focus was on settling the OU2 liabilities of parties "not responsible for the release of dioxins, furans, and/or [PCBs] into the Lower Passaic River." [317]

The limited scope of the potential settlements went hand-in-hand with the limited scope of the proposed allocation.  The initial plan offered only **40 minutes** of direct communication with the allocator and would have allowed parties to submit fewer than **300 pages of documents** each. [318]  OxyChem had reasonable concerns that the limited allocation process would not give parties a sufficient opportunity to be heard and would result in fundamentally unfair settlements.  OxyChem was also concerned that, because the bulk of the defendants were represented by joint counsel, they would game their page limits by ceding pages to a joint submission focused on assigning liability to OxyChem, while not affording OxyChem any opportunity to review or respond to those submissions or adequate pages to do so.  This, combined with the absence of an adequate factual record to actually *assess* the responsibility of the companies now parties to the settlement, forced OxyChem to decline to participate in the proposed allocation.

Once OxyChem was gone, EPA changed course.  A new work plan was created—one that would allow "substantially greater" input from the parties:

---

[315] **Ex. 52** (Mar. 30, 2017 EPA letter).

[316] Batson Report at 38 (Sept. 18, 2017 EPA letter).

[317] *Id.*

[318] *See* **Ex. 11** (Work Plan; EPA Conflict Prevention and Resolution Services Contract; Contract #EP-W-14-020; Work Plan for Task Order #096; Diamond Alkali-Lower Passaic River Allocation) at Section 2 (assumptions included that there would be a maximum of 80 PRPs and no more than 20,000 pages from PRPs would be "reviewed and utilized to conduct the allocation," in addition to the maximum 130,000 pages to be received from EPA).

ALCD-PUBCOM_0000505

> The level of anticipated interaction required with PAP counsel, including the volume of comments that will be received and that will require analysis and confirmation, is substantially greater than anticipated.[319]

As time went on, EPA continued to expand the scope of the allocation. The initial proposal would have allowed the parties to submit just 20,000 pages of documents—that number soon expanded to 160,000; then 376,000; then 413,895; and eventually *711,248*.[320] As the number of documents submitted by OxyChem's adversaries expanded, they were also given more and more control over the process, including by submitting expert reports and witness statements,[321] as well as the right to review and comment on the drafting of the allocation report itself.

In 2018, the allocation plan was modified further to provide "additional time for PRPs to communicate, meet, and exchange information with the allocator."[322] Then in 2019, there was "an increase in the number of facilities being evaluated, and increased interaction with the PRPs and the allocator." Later, a 2020 revision added an even a higher "level of effort" from the allocator,[323] including the effort required to allow PRPs to review and comment on the report and the effort required to anonymize them so as to conceal the extent to which the report is, in reality, a PRP allocation report rather than one prepared by an independent expert.

EPA's settlement process also changed dramatically and without notice. EPA's 2017 announcement of the proposed allocation process contained two important limitations. First, it would be focused only on OU2; and, second, it was not intended to offer cash-out settlements to parties that discharged dioxins, furans, or PCBs into the Lower Passaic River.[324] Notably, although the allocation report pertains *only* to OU2, the proposed consent decree now includes parties responsible for the release of dioxins, furans, or PCBs, and purports to settle their liability for both OU2 *and* OU4. *See also* Part VIII below.

None of this was part of the allocation process that EPA described to OxyChem. Compared to the allocation proposal EPA announced, the ultimate, highly-modified process EPA authorized gave the settling parties enormous control over the result—even going so far as to allow them to participate in *drafting* and commenting on the report itself. Without OxyChem's knowledge or consent, the settling parties were thus allowed to litigate OxyChem's share of responsibility at length—affording OxyChem neither notice that this was occurring or an opportunity (like that afforded to the PRPs) to correct the information about it.

This again deprived OxyChem of due process which, at minimum, requires that before a party is deprived of property it must "be preceded by notice and an opportunity for hearing *appropriate to the nature of the case*." *Cleveland Bd. of Educ.*, 470 U.S. at 542 (quoting *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950)). Here, EPA fundamentally changed the nature of its allocation process—ceding control of it to the PRPs and expanding it to include OU4, even though the report pertains only to OU2—without notice to OxyChem. This process cannot support entry of any order depriving OxyChem of its property rights in its contribution

---

[319] Revised Work Plan for the Allocation, Batson Attachment E.

[320] **Exs. 11–14; 53; 54** (Batson Work Plans and Task Orders).

[321] **Ex. 53** (Contract Work Plan Tasks Timeline).

[322] **Ex. 54** (Jul. 23, 2019 Batson Revised Work Plan | Contribution Action Docket No. 370-5|).

[323] **Ex. 55** (July 18, 2020 Performance Work Statement).

[324] **Ex. 52** (Mar. 30, 2017 EPA letter).

ALCD-PUBCOM_0000506

claims: it afforded OxyChem no chance to defend itself and no fair notice of what was at stake. In the end, it is no surprise that this procedurally unfair process resulted in an unscientific and incorrect allocation. EPA allowed the PRPs to manipulate the process from the outset to obtain exactly that result. But that tainted, bait and switch process is devoid of *due* process, so the settlement must be withdrawn.

### C. The Proposed Consent Decree Is Improper Because Batson Lacked the Information Needed To Perform a Fair Allocation

There is insufficient evidence to support EPA's proposed settlement because the information Batson needed to perform a fair allocation either (1) *did not exist*, (2) *was excluded* by the settling parties, or (3) *was ignored*. Batson's estimates of the COCs discharged from settling defendants' sites are a result of compounded speculations; omission of entire contaminated site areas; omission of site studies containing sampling results; dismissal of COCs found on settling-defendant sites (claimed to be associated with "historic landfill"); and reliance on single cherry-picked soil samples to represent a site's *entire* historical operational period.[325]

#### 1. Batson Planned His Allocation Around Evidence That Did Not Exist

From the outset, OxyChem warned EPA that it lacked "adequate information from which to derive an equitable allocation of costs"[326]—a warning EPA steadfastly ignored. But, Batson's final report acknowledges he did not have enough information to assign *fair* allocation shares:

> Upon review and application of all available data . . . it is evident that *it is impossible for the allocation process to produce a numerical ranking of the Allocation Parties* that can identify *with any acceptable level of certainty the relative responsibility of similarly situated parties.* This is due to the *lack of and variability of available data* on facility operations and site conditions which *required a significant level of allocation data to be inferred* through reference to other data sources as detailed in the Allocation Protocol.[327]

When Batson planned the allocation, he assumed "that sufficiently consistent data would be made available regarding operations across all Allocation Party facilities."[328] Eventually, however, Batson had to admit that his assumption was wrong. A year into the process, Batson re-wrote his allocation procedure to establish principles for estimating the mass of a COC discharged from an Allocation Party facility *in "absence of credible information."*[329]

The lack of credible information is apparent throughout the Batson Report. For example: Batson calculates overland discharges of contaminants based on soil samples, even though not all facilities have been sampled. The available data for each facility is not consistent—a fact that OxyChem also pointed out before the allocation. OxyChem's concern that EPA had "yet to conduct extensive (or, in some cases, any) sampling of soils at the upland and riparian sites that

---

[325] *See* **Tarek Saba**, Ph.D., Exponent Decl. at ¶¶ 26-29. *See also generally* Appendix A, below, regarding certain settling defendants and related sites.

[326] **Ex. 56** (Oct. 12, 2017 OxyChem letter to EPA).

[327] Batson Report at 35.

[328] **Ex. 4** (Feb. 13, 2018 Benjamin Moore letter to EPA).

[329] Batson Report at 356 (Addendum to Allocation Protocol, May 20, 2019).

ALCD-PUBCOM_0000507

belong to many PRPs"[330] proved to be valid. The result is an allocation that cannot be supported by the existing evidence. More directly, in Batson's own words, it is an allocation prepared "in the absence of credible information."

## 2.    The Settling Parties Excluded Relevant Evidence

OxyChem consistently reminded EPA that any allocation of cleanup costs should take place in open court after full and fair discovery. Other parties shared similar concerns about the Batson process. The SPG, for example, was wary of "leav[ing] the relevancy of the documents to be added/produced to be determined by each individual party producing said documents."[331] Benjamin Moore wrote:

> Ultimately, it is the court, not EPA, that is qualified to prepare a binding allocation . . . But the allocation process as planned does very little to replicate a litigated equitable allocation (which would include review of relevant documents and expert analysis) under section 113(f)(l) of CERCLA.[332]

EPA brushed off the concerns that "without the type of compelled production of documents and depositions available in litigation, certain parties may not produce all relevant information"[333] and plowed ahead anyway. EPA was clear that its process was "not intended to duplicate the full discovery process that litigation would include."[334]

Without the procedural safeguards of adversarial litigation, Batson's allocation was doomed to fail. The settling parties were able to exclude key documents, including Kearny Smelting (whose 2019 sampling data showing major PCB contamination was excluded from the allocation),[335] Sherwin-Williams (who disclosed evidence of DDT, PCB, and mercury use for the first time in 2022, after the allocation report was issued and after years of denials to EPA and others),[336] and Givaudan (who misrepresented its historic processes and production history to the allocator).[337] EPA could have no confidence in the fairness of its proposed settlement unless the settling parties provided complete information.[338] And EPA now knows they did not provide it.

EPA's persistence in seeking approval of a settlement despite its knowledge that there was an absence of credible information, that parties mispresented or concealed material facts, that the material facts about the liability of others simply wasn't known and is arbitrary and capricious in

---

[330] **Ex. 56** (Oct. 12, 2017 OxyChem letter to EPA).

[331] **Ex. 3** (Jan. 30, 2018 SPG letter to EPA).

[332] **Ex. 6** (Feb. 13, 2018 Benjamin Moore letter to EPA).

[333] **Ex. 9** (Nov. 28, 2017 EPA letter to OxyChem).

[334] Batson Report at 63 (Feb. 16, 2018 EPA letter).

[335] *See* Appendix A.

[336] **Ex. 57** (Sept. 29, 2022 OxyChem letter to DOJ).

[337] **Ex. 58** (Nov. 9, 2021 OxyChem Presentation to EPA).

[338] **Ex. 59** (June 16, 1999 deposition of Bernard Partington, *Safety-Kleen EnviroSystems Co. v. Continental Casualty Co., et al.*, Case 985528, Superior Court of California) at 74:2-15, 77:9-78:22; **Ex. 60** (June 17, 1999 deposition transcript of Raymond Gilliam, *Safety-Kleen EnviroSystems Co. v. Continental Casualty Co., et al.*, Case 985528, Superior Court of California) at 574:15-575:19.

ALCD-PUBCOM_0000508

itself. An agency must act based on "substantial evidence" which is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Reefer v. Barnhart*, 326 F.3d 376, 379 (3d Cir. 2003) (quoting *Richardson v Perales*, 402 U.S. 389, 401 (1971)). Here, EPA lacks substantial evidence (and the allocation report does not provide it) so the settlement should be withdrawn.

### 3. The Process Was Designed To Minimize Relevant Evidence of Liability for Everyone Except OxyChem

Even when Batson had the evidence he needed, he often ignored it. Batson himself is partially to blame, but the structure of the allocation made such mistakes inevitable. In litigation, parties can investigate each other's claims and highlight errors and omissions in the evidence offered by their adversaries. In the allocation, Batson's team was responsible for reviewing and summarizing the evidence[339]—and the settling parties themselves were permitted to "correct" them. Page restrictions on document submissions and position papers encouraged the participating parties to collude to place a large share on OxyChem, knowing that: as *designed* the process would not allow OxyChem to refute them; and that, as *applied* after OxyChem declined to participate, OxyChem would not even *know* what was happening. The settling parties made the rational, collusive choice to use their limited space to focus liability on the absent party, OxyChem, rather than highlighting the liabilities of one another.

### D. The Consent Decree Document Certification Is a Sham Because It Allows for Selective Disclosure and Does Not Require the Parties To Produce Non-Public Documents That Might Be Harmful

The Batson process also lacked fundamental integrity because the settling parties could pick and choose which documents they provided to Batson. OxyChem is aware of two examples—and suspects there are many more—in which settling parties self-servingly failed to provide Batson with highly-relevant information about their own potential liability. Though made aware of this after the allocation report was issued and before the settlement was finalized, EPA and DOJ looked the other way.

In 2018, EPA stated that, "We agree that parties participating in the allocation should certify that they have conducted a thorough, comprehensive, good faith search for documents, and have fully and accurately disclosed all relevant information to Batson for his consideration in the allocation." [340] But incredibly, the Batson process did not require any party to produce non-public information that might be *harmful* to its own position.

> Specifically, the proposed consent decree includes the following "Certification" that:
>
> 27. Settling Party Certification. Each Settling Defendant certifies individually that, to the best of its knowledge and belief after a good faith inquiry: (a) it has not

---

[339] *E.g.*, **Ex. 61** (Batson Task Order Modification P00004) at 4–5 ("After reviewing and analyzing relevant information in the database … on each PRP facility, the previous contractor developed individual data reports for each facility.").

[340] *See* Batson Report at 63 (Feb. 16, 2018 letter from Eric J. Wilson, EPA, to "Diamond Alkali - Lower 8.3 Miles Contact Group") at 4. EPA also stated in November 2017 that EPA "will consider using its enforcement resources to supplement the information provided by the Agency and PRPs." We are not aware of EPA ever using enforcement resources to require Passaic River PRPs to supplement information.

ALCD-PUBCOM_0000509

altered, mutilated, discarded, destroyed, or otherwise disposed of any records, reports, documents, or other information (including records, reports, documents, or other information in electronic form) (other than identical copies) relating to its potential liability under CERCLA regarding the Site for the facility(ies) listed in Appendix A since the earlier of notification of potential liability by the United States or the State of New Jersey, or the filing of suit against it regarding the Site; (b) it has fully complied and will fully comply with any and all EPA requests for information under Sections 104(e) and 122(e) of CERCLA, and Section 3007 of RCRA; and (c) (as to each Settling Defendant that participated in the allocation), *it conducted a thorough, good faith search and provided information to AlterEcho consistent with the Allocation Guide that is part of the Final Allocation Recommendation Report*, and certified to that effect consistent with the Allocation Guide.[341]

The Certification is a sham because it does not require any party to produce non-public documents that might be harmful to itself. It requires *only* that the party certify that it has "provided information to AlterEcho consistent with the Allocation Guide"—not that it has provided all documents *relevant* to a credible, scientific assessment of the party's use, production or disposal of the Contaminants of Concern identified in the ROD.

In turn, the Allocation Guide requires *only* that parties produce the categories of documents set forth in the "List of Relevant Document Categories for Allocation (Attachment F)." Attachment F requires the production of documents in *only* three categories: 1. **Public documents**, such as correspondence with and reports submitted to environmental agencies; 2. "**preliminary indices of remaining documents for inclusion**," undefined but presumably at each party's discretion,[342] and 3. **Expert reports**. Incredibly, the Allocation Guide did not require any party to produce non-public information that might be harmful to its own position or even to certify that it had provided *all relevant evidence* pertaining to its exposure to the allocator.

The absence of a certification that all relevant evidence has been produced dooms the settlement, depriving EPA of any ability to demonstrate that it has "substantial evidence" to support its settlement decision in general or as to particular parties.

### 1. The Certification Is a Sham Because There Are No Consequences for Non-Compliance

Beyond the limited document disclosure requirements of the Certification, it also is a sham because there are absolutely no consequences for non-compliance. The Certification is not made under penalty of perjury, as Certifications submitted to a Court are required to be. *See, e.g.*, Local Civ. R. 5.3(c)(3) (requiring compliance with 28 U.S.C. § 1746, *i.e.*, to be made under penalty of perjury, for motions to file under seal), 6.1 (same for motions for extension of time), 11.2 (same for petitions and initial certifications) and 16.1(g) (same for case management motions). *See also GAR Disability Advocates, LLC v. Taylor*, 365 F. Supp.3d 522, 531 n.4 (D.N.J. 2019) (rejecting certification not made under penalty of perjury pursuant to 28 U.S.C. § 1746) (*citing United States v. Branella*, 972 F. Supp. 294, 299-300 (D.N.J. 1997) (same)). The proposed settlement also

---

[341] Dkt. 2-1, ¶ 27 (emphasis added).

[342] The production of documents in step 2 was scheduled for June 15, 2019, *i.e.*, "post-finalization of allocation guidelines for sites." This was apparently an opportunity for the parties to submit documents in response to the allocator's "methodology for the determination of relative shares of responsibility," which had been scheduled for disclosure on June 9, 2019. *See* Batson Report, Attachment G, p. 5.

ALCD-PUBCOM_0000510

contains *no* term permitting EPA to reopen it if it is later demonstrated that the party provided inaccurate or incomplete information to the allocator.

Parties understood what this meant, and, as demonstrated below, used it to game the process by concealing from EPA and its allocator material highly relevant to an assessment of their *actual* responsibility and cooperation with EPA.

### 2.    The Certification Is a Sham Because Sherwin-Williams and Givaudan Withheld Documents and Got Away With It

The Certification is a sham because Sherwin-Williams and Givaudan, both prospective settling parties, withheld documents and got away with it.

#### a.    Sherwin-Williams Materially Misrepresented Facts and Concealed Material Evidence for Years Despite an Obligation To Disclose them to EPA

As OxyChem explained in letters to DOJ dated September 23 and 29, 2022, for years—including during the three years of the allocation process—Sherwin-Williams insisted that it had virtually no documents related to its use of contaminants of concern during the more than one hundred *years* of its operation of a paint and chemical manufacturing facility on Lister Avenue in Newark. In 1995, EPA sent Sherwin-Williams a 104(e) request notifying of both its obligation to retain relevant documents and its "continuing obligation to supplement your response if information not known or not available to you at the date of submission of your response should later become available." In its March 2, 1995 response, the company denied making or handling dioxin-associated compounds, DDT, minimized its use of other hazardous substances, and confirmed that plant manifest, inventory, and billing records were stored on site.

On October 4, 1995, EPA notified Sherwin-Williams it was a PRP, again obligating it to retain all relevant documents. But discovery responses in the CERCLA case—apparently unknown to EPA's allocator—confirm that Sherwin-Williams had *no* document retention policy in place and, in fact, destroyed relevant records when the building where the records were stored was demolished in 1999. Eventually, in response to motions to compel in OxyChem's pending CERCLA case,[343] Sherwin-Williams produced *33,254* pages of information in September 2022. These documents directly contradicted Sherwin-Williams 104(e) response, revealing that Sherwin-Williams used PCBs, DDT, and other hazardous substances at its Newark plant adjacent to the Passaic River. The deposition of Sherwin-Williams on September 27, 2022 confirmed that Sherwin-Williams failed to notify EPA of these facts (among others), even though it submitted a response to EPA's information request under 42 U.S.C. §9604(e) in 1995 without such information. Most of the documents Sherwin-Williams produced in 2022 pre-dated the 1995 response to EPA and all were subject to the obligation to supplement that the 104(e) request imposed. But Sherwin Williams *never* supplemented that response to make the truth clear—even though *all* of these documents were in the possession or control of Sherwin-Williams throughout. Nor did Sherwin-Williams submit those documents for the Batson process, as DOJ acknowledged in its response to OxyChem's letter.

---

[343] These events confirm the value of a judicial allocation and processes to compel the production of evidence. For more than a decade, Sherwin-Williams was able to conceal these documents from EPA, but it could not do so in federal court where compulsory process is available to uncover evidence. OxyChem's Contribution Action is still ongoing. The case was filed in 2018, well before the 2022 production.

ALCD-PUBCOM_0000511

It is no answer for DOJ to claim, as it did, that the timely production of these documents "would not have materially changed the basis upon which [the allocator] recommended Sherwin-Williams' share in the allocation."[344] Cooperation with EPA was a factor the allocator considered and the allocator was entirely *unaware* that Sherwin-Williams spoliated relevant documents and withheld others from EPA for years despite an obligation to provide candid and supplemental disclosures of relevant information. EPA and DOJ have no way to know *how* the allocator would have considered these facts had he known them, because the allocation report was *indisputably* finalized before these facts came to light.[345]

It is wholly arbitrary and capricious for EPA to give a party that misrepresented facts, destroyed documents, and concealed others a blanket *release* of joint and several liability for a $1.82 billion cleanup in OU2 and OU4—particularly when the withheld documents establish Sherwin Williams' extensive use of PCBs and DDT, two contaminants of concern that drive the costs of these remedies. EPA should, at minimum, modify the settlement to exclude Sherwin Williams from it.

### b. Givaudan Provided Misleading Information About Its Manufacturing Processes and Path for Process Contaminants To Be Discharged to the Passaic River

Givaudan withheld from the Batson process documents demonstrating substantially greater formation of 2,3,7,8 TCDD in its upland manufacturing processes than was previously disclosed, but which Givaudan produced in litigation. Givaudan's 104(e) response also materially misstated the existence of surface swales in dioxin contaminated soils that collected stormwater and discharged it to the river. Givaudan's misstatements and omissions were highly significant because Batson's allocation and assignment to OxyChem of 99.97% of liability at OU2 is largely due to his characterization of the risk of 2,3,7,8 TCDD.[346]

There is no mystery behind why Sherwin-Williams and Givaudan produced documents in the litigation that they did not produce to Batson. There was no requirement to do so in the allocation process. But the failure to produce documents in litigation can lead to real consequences, like monetary sanctions or exclusion of evidence. *See* Fed. R. Civ. P. 37. Here, there were no consequences for failing to produce documents in the Batson process, and neither Sherwin-Williams nor Givaudan have faced any yet, despite EPA's awareness of these actions. Equally important, this can (and likely will) happen again: the CERCLA litigation is ongoing, but EPA has *no ability* to reopen the settlement once confirmed even if a party is shown to have provided deceptive, incomplete, or misleading information to the allocator and EPA.

For all these reasons, the Certification is a sham with respect to all of the prospective settling parties. It in no way ensures EPA has relevant, much less substantial, evidence to support its settlement decisions. At a minimum, the two parties that demonstrably made no good faith effort to produce their relevant documents, Sherwin-Williams and Givaudan, should be excluded from the proposed consent decree. *See, e.g., United States v. Skalsky*, 621 F. Supp. 528 (D.N.J. 1985)

---

[344] *See* Dec. 15, 2022 letter from Brian G. Donohue, U.S. DOJ, to Larry Silver, counsel for OxyChem.

[345] The Final Report was finalized in December of 2020; the information regarding Sherwin-Williams spoliation and concealment of documents was provided to EPA by OxyChem when the information was revealed in the CERCLA litigation in 2022.

[346] OxyChem notified EPA and DOJ about the Givaudan documents in November 2021. The Batson NBAR report had been completed in December 2020, and EPA and DOJ took no action.

ALCD-PUBCOM_0000512

(non-prosecution agreement voided by witness's failure to testify as to relevant information known to him), *aff'd*, 857 F.2d 172 (3d Cir. 1988).

## VIII. The Proposed Settlement's Application to OU4 Is Arbitrary and Capricious and Would Preclude the District Court's Entry of the Consent Decree

The United States should also withhold its consent because EPA's decision to fully discharge the settling parties' liability for Operable Unit 4 (OU4) is arbitrary and capricious.

"[T]he proper way to gauge the adequacy of settlement amounts to be paid by settling PRPs is to compare the proportion of total projected costs to be paid by the settlors with the proportion of liability attributable to them. ..." *United States v. Montrose Chem. Corp.*, 50 F.3d 741, 747 (9th Cir. 1995) (citing *United States v. George Trucking, Inc.*, 34 F.3d 1081, 1087 (1st Cir. 1994)). That comparison cannot be performed unless the total projected costs are known. *Id.* at 15.

Courts have consistently rejected consent decrees where the information available is insufficient to evaluate the adequacy of the payments by settling parties. *See id.* at 747; *NJDEP v. Atlantic Richfield Co. (In re MTBE Prods. Liab. Litig.)*, 33 F. Supp. 3d at 268; *Mathes*, 2008 WL 4693550, at *13; *United States v. Pesses*, 1994 WL 741277, at *5.

Here, the administrative record is deficient in the same way, requiring the United States to reject the settlement as to OU4.

The Batson process focuses exclusively on the OU2 remedy. It did not—and was not designed to—allocate "recommended shares of responsibility" for the remedies in OU4. The report thus provides *no* evidence to support the release of any party in OU4; to the contrary, the report draws no conclusions at all about the responsibility of any party for the presence of hazardous substances in OU4. This is unsurprising: Batson issued his final report nearly a year *before* the *interim* remedy for OU4 was selected and before its $441 million costs were known. And the costs of the final remedy are not yet known or even *knowable*. *See, e.g.*, Sept. 2021 Record of Decision for an Interim Remedy in the Upper 9 Miles, at 25 ("EPA will evaluate remedial alternatives in a proposed plan and will issue a final ROD that includes final risk-based remediation goals (RGs) and specifies any additional actions beyond the IR, if any, that are needed to attain the RGs and address remaining unacceptable risks associated with the LPRSA, in both sediments and surface water.").

EPA has not provided any meaningful explanation for its dramatic expansion of the settlement's scope to include OU4, *because it cannot explain it*: EPA itself has found that the operable units are distinct and have different characteristics that affect the movement of contaminated sediments in each. Reflecting those findings, the remedy in OU4 also differs markedly from the one EPA selected for OU2, making the drivers of the cleanup costs different for each.

In addition, the OU4 interim remedy will be followed by additional work and a final remedy to be selected later in a separate Record of Decision. No cost estimate has been *or can be* calculated for that additional work. Because the proposed Consent Decree releases liability for those unknown costs, the District Court would be precluded from entering it even if the United States decides to proceed.

## A.    The Batson Process Addressed Only OU2—Not OU4

ALCD-PUBCOM_0000513

The stated objective of the Batson allocation was "to establish the relative equitable responsibility of certain parties for a portion of the costs of remediating Operable Unit 2 (OU2) of the Lower Passaic Diamond Alkali Superfund Site." Batson Report at 6. Every description of his objectives, his process, and the scope of his retention by EPA makes clear that the allocation was focused exclusively on OU2. Batson also makes clear that this focus intentionally excluded other costs at the site beyond the OU2 remedy, describing his report as:

> an intentional variation of how a typical private allocation process would be conducted. Unlike a typical allocation—the outcome of which is a recommendation on the share of responsibility of each PRP for total site related costs—this Allocation will provide a recommendation on the relative shares of responsibility between and among the Allocation Parties for that portion of the costs associated with the RD and RA for OU2, determined through future settlement negotiations to be attributable to the Allocation Parties as a group.[347]

Batson's "Final Allocation Recommendation Report" was submitted in December of 2020. Nearly a year later, on September 28, 2021, EPA announced the selection of an interim remedy for OU4. *See* Dkt. 2-1 at p. 5 ("[O]n September 28, 2021, EPA issued a ROD for OU4 ("OU4 ROD") selecting an interim remedy for the upper 9-miles of OU4"). A year later, EPA filed the proposed consent decree on December 16, 2022. In it, with no additional analysis by Batson, the proposed settlement that was filed included a release of the settling parties' liability for OU4. *See* Dkt. 2-1 at ¶ 6 ("The objective of the Parties in entering this Consent Decree is for Settling Defendants to make a cash payment to resolve their alleged civil liability under Sections 106 and 107 of CERCLA for OU2 and OU4").

The proposed decree attempts to excuse this *ipse dixit* expansion as follows:

> OU4 was included in the cashout settlement offer because the LPRSA is tidal, the facilities evaluated in the allocation are located throughout the 17 miles of the LPRSA (not just along the lower 8.3 miles), and the interim remedy selected for OU4 will complement the remedy selected for OU2. That the LPRSA is tidal means that releases of COCs into the river from the facilities would have been transported and settled throughout the LPRSA. The contamination and risk in the upper 9 miles of the LPRSA have been investigated and characterized by the RI/FS undertaken under the 2007 ASAOC and, similar to OU2, the primary risk drivers are dioxins/furans and PCBs, with mercury, DDT (and its breakdown products), PAHs, dieldrin, copper, and lead also identified as COCs. The two remedies working together are meant to address the releases contributing to the human health and ecological risks to the LPRSA.[348]

The problem is obvious. Batson's allocation addressed *only* OU2 and the United States does not even attempt to explain how the output from Batson's process can be used—*years after* that process was completed—to address an Operable Unit he explicitly did not consider,[349] or an interim remedy

---

[347] Batson Report at 7 ("Purpose of the Allocation").

[348] Dkt. 2-1 at 6.

[349] Batson Report at 7.

ALCD-PUBCOM_0000514

that was not even announced until nearly a year *after* his report was completed and his "recommended shares" were finalized.

Because Batson's allocation model was developed for the specific purpose of "recommending shares" of the OU2 remedy, extending it to the then non-existent OU4 interim remedy violates basic principles of allocating liability at a Superfund site. *See* **Olian** Decl. ¶ 13 ("To construct a useful model, the modeler must assure that the model is applicable to the given purpose."); *id.* ¶ 18 ("The general modeling precepts identified above apply, of course, in the specific context of CERCLA allocation models [and] an allocator would typically begin by asking: 'What is the allocation trying to determine?'"). Applying the Batson process, after it was completed, to something it was neither intended nor designed to address is "based on a clear error of judgment, a serious mathematical error, or other indicia that the parties did not intelligently enter into the compromise." *United States v. Acton Corp.*, 733 F. Supp. 869, 872 (D.N.J. 1990) (citing *United States v. Rohm & Haas Co.*, 721 F. Supp. 666, 687 (D.N.J. 1989)). Accordingly, as explained below, the proposed decree must at minimum be modified to exclude any release of liability (and any bar on contribution claims) in OU4.

## B.    The Operable Units and the Remedies Selected for Each Are Different and Not Interchangeable

EPA has separated the 17-mile Lower Passaic River into two separate operable units because those operable units are different. The river's shape, depths, and related characteristics are not the same in the lower 8 miles and the upper 9 miles. *See* Decl. of Pradeep Mugunthan at Opinion 2 ("The geomorphology of the upper 9 miles is substantially different from the lower 8.3 miles"). As a result, sediments and contaminants bound to them move and settle differently in the Upper 9 than they do in the Lower 8. *See id.* at 11 ("Since hydrodynamics is the fundamental driver of sediment and contaminant fate and transport[350] and the upper 9 miles has a fundamentally different hydrodynamic regime than the lower 8.3 miles, it would be unreasonable to extend the proportional allocations from the lower 8.3 miles to the upper 9 miles"). Contaminants discharged from sources in the upper 9 miles are also distributed differently within the river's sediments than contaminants discharged from sources located in the lower 8.3 miles. *See id.* at 20 ("Alternative upstream sources provide a more rational explanation of the contaminant accumulation in area above RM 10 than predominantly tidally driven upstream transport from the lower 8.3 miles.").

---

[350] "Fate and transport" is the science of "how the nature of contaminants might change (chemically, physically, or biologically) and where they go as they move through the environment. Fate and transport evaluations help you determine how likely it is that 1) contaminants have moved or will move beyond the source area, and 2) contamination could migrate and exposures could occur beyond the sampled areas." Public Health Assessment Guidance Manual, United States Centers for Disease Control, Element 2: Environmental Fate and Transport. April 14, 2022.

Available at:

https://www.atsdr.cdc.gov/pha-guidance/conducting_scientific_evaluations/exposure_pathways/environmental_fate_and_transport.html#:~:text=%E2%80%9CFate%20and%20transport%E2%80%9D%20refers%20to,they%20move%20through%20the%20environment. Last accessed March 16, 2023.

ALCD-PUBCOM_0000515

Region 2 illustrated these differences when presenting its contemplated approach in OU4 to its Contaminated Sediments Technical Advisory Group:[351]



Based on these different characteristics, EPA selected distinct remedies to address each section of the river. *See* **Saba** Decl. Opinion 4 (noting differences in OU2 and OU4 remedies). The OU2 remedy is *final* while the OU4 remedy is *interim* and designed to be followed by additional work, including a risk-based final remedy to be selected by EPA once additional (and currently unknown) information required to make the assessment is available. The OU2 remedy is designed to reduce the calculated levels of risk posed by 8 COCs; in contrast, the OU4 remedy is designed to address "hot spots" of sediments with particularly high concentrations of contaminants. This makes it all the more acute to ensure that the actual *sources* of the contaminant hot spots pay the cleanup costs required to remedy them. The Batson Report makes *no* assessment of these costs, nor could it: it was completed a year before EPA selected the hot spot remedy for OU4.

While the proposed consent decree is correct that the LPRSA is "tidal," the settling parties operated facilities throughout that 17-mile stretch, and the same 8 contaminants are driving and are addressed by both remedies, those facts do not provide a scientifically defensible basis to treat OU4 as interchangeable with OU2. *Id.* at 22-23 ("Based on all of the above, it is my opinion that the proportional allocation from the lower 8.3 miles should not be extended to the upper 9 miles."). Doing so contradicts EPA's own scientific findings and the hydrodynamic and other evidence in the OU4 Record of Decision. The proposed settlement reflects a clear error in judgment, because equates as the same two areas of the river that EPA itself treats as substantially different in contaminant load and required remedial approaches.

---

[351] EPA, 17-Mile Lower Passaic River Study Area CSTAG Presentation, at 18. Feb. 9, 2018.

104

ALCD-PUBCOM_0000516

## C.    The Lack of Estimable Costs To Remediate OU4 Would Preclude the District Court From Entering the Proposed Consent Decree

If the United States decides to proceed with the proposed settlement, it must ask the District Court to find that the decree is fair, reasonable, and consistent with the goals of CERCLA. This analysis includes comparing the amount of the settlement payments to the total projected cost of the remedies for which settling parties are being released from further liability. "[T]he proper way to gauge the adequacy of settlement amounts to be paid by settling PRPs is to compare the proportion of total projected costs to be paid by the settlors with the proportion of liability attributable to them…" *Montrose Chem.*, 50 F.3d at 747 (citing *United States v. George Trucking, Inc.*, 34 F.3d at 1087). That comparison cannot be performed unless the total projected costs are known. *Id.* at 15. Here, they are not. And the settlement contains no reopeners to account for either an overrun in the costs of the interim remedy at OU4 or the costs of any final remedy EPA eventually selects.

The proposed consent decree releases the settling parties from liability for response costs in the entire Lower Passaic River. That includes the costs necessary to design and implement the OU2 remedy selected by EPA's 2016 ROD, the OU4 interim remedy selected by EPA's 2021 ROD, *and* cost of additional work and a final remedy in OU4 following the interim remedy.

Only a portion of those costs have been estimated, and the cost of additional work in OU4 *cannot* be estimated. This is by design: the lack of information necessary to select a final, risk-based remedy for OU4 was the rationale in selecting an *interim* remedy in the first place. In July 2017, the settling defendants in the CPG proposed that EPA pursue an "adaptive management process" in the upper 9 miles by selecting an interim remedy first and a final remedy later. The CPG explained that an interim remedy would fill data gaps that currently prevent the selection of a final remedy:

> Through a systemic approach to collection and evaluation of the recovery assessment monitoring data, the ***key site uncertainties that currently preclude selection of a final remedy*** would be reduced, allowing any further remedial action(s) that may be necessary to reach risk-protective final RFs to be identified and implemented …[352]

---

[352] Integral Consulting, Inc. Aug. 7, 2020 *LPRSA Remedial Investigation and Feasibility Study, Appendix D: Adaptive Management Plan for Upper 9 Miles of LPRSA*, at 2-1 (emphasis added).

ALCD-PUBCOM_0000517

To acquire the information to fill those data gaps, the "CPG Plan" proposed that EPA enter multiple RODs in sequence.[353]



The first ROD would remove specific areas in the upper 9 miles with relatively high concentrations of contaminants, known as "hot spots," then follow that with evaluations to determine whether the cleanup is "working." Depending on the outcome of those evaluations, EPA would enter a subsequent ROD (or RODs) requiring additional cleanup work or "follow-on actions" in the river.[354]

In its 2021 ROD, EPA adopted the sequence proposed by the CPG. *See, e.g.*, Sept. 2021 Record of Decision for an Interim Remedy in the Upper 9 Miles, at 25 ("EPA will evaluate remedial alternatives in a proposed plan and will issue a final ROD that includes final risk-based remediation goals (RGs) and specifies any additional actions beyond the IR, if any, that are needed to attain the RGs and address remaining unacceptable risks associated with the LPRSA, in both sediments and surface water."). EPA explained at public meetings that this approach was driven by the additional time and work needed to acquire the information to select a final, risk-based ROD: "We don't

---

[353] *See* CPG, *Lower Passaic River: A Plan to Expedite Cleanup of the Upper 9-Miles*, at 6. Nov. 2, 2017 (emphasis added).

[354] *Id.* at 17.

ALCD-PUBCOM_0000518

have what we call risk-based numbers. What we need is our bioaccumulation model. And that's going to take some time. That's why we're looking at this interim remedy." OU4 ROD at 419.

EPA is years away from having this information. The work on "ROD 1"—the OU4 interim remedy—has just started this month. OxyChem offered in January 2022 to immediately begin designing and implementing the interim remedy, but EPA declined and instead pursued the proposed consent decree. It was not until earlier this month, on March 13, 2023, that EPA issued a Unilateral Administrative Order requiring OxyChem to conduct the remedial design of the OU4 interim remedy. As a result, EPA is no closer to "ROD 2" than it was in 2021, and the data gaps that precluded selection of a final remedy still exist. Without the data to determine whether—and if so what—final remedy will be required, the total cost of the OU4 remedy cannot be estimated. Put directly, only *some* of the response costs at issue in the proposed consent decree can be estimated, the rest are unknown, and EPA proposes to release liability for all costs in OU4 even though it lacks any (much less adequate) information to estimate what they might be.

This precludes the District Court from entering the proposed consent decree. Courts have consistently rejected consent decrees where the information available is insufficient to evaluate the adequacy of the payments by settling parties. *See Montrose Chem.*, 50 F.3d at 747 ("[W]e do not believe that the court could possibly have adequately determined that the settlement was substantively fair without having *some benchmark* with which to compare it."); *New Jersey Dept. of Env. Prot. v. Atlantic Richfield Co. (In re MTBE Prods. Liab. Litig.*), 33 F. Supp. 3d at 268 (applying standard for CERCLA consent decree to reject Spill Act settlement because "without a reasonable measure of *both total damages* and [settling party's] share, I cannot determined whether the settlement is fair and reasonable") (emphasis added); *Mathes*, 2008 WL 4693550, at *13 (court could not evaluate substantive fairness of consent decree because the government had "*not provided the Court with any estimations of the past or projected response costs*."); *United States v. Pesses*, 1994 WL 741277, at *16 ("Comparative fault and accountability cannot be assessed in a vacuum; such an analysis is dependent upon correlations between the various defendants' contributions *and the overall costs of remediation…*" (emphasis added)).

The administrative record relating to the proposed consent decree is deficient in the same way. EPA does not *have* information about the overall costs to implement even the interim remedy at OU4, much less the eventual costs to implement the final remedy. And the Batson Report provides no basis on which EPA could draw any conclusion about that. It was arbitrary and capricious for EPA to expand the scope of the proposed consent decree to release the settling parties of any further liability in OU4 and, even if the United States decides to proceed with the settlement, the District Court will be precluded from entering it.

## IX.    A Proposed Consent Decree Must Be Fair, Reasonable, and Consistent With CERCLA, and Cannot Be Arbitrary and Capricious

A proposed consent decree must be "fair, reasonable, and consistent with CERCLA's goals." *In re Tutu Water Wells*, 326 F.3d at 207; *United States v. SEPTA*, 235 F.3d 817, 823 (3d Cir. 2000). It also must not be "arbitrary and capricious or otherwise not in accordance with law." 42 U.S.C. §9613(j)(2); *see* 5 U.S.C. §706(2)(A). Because the proposed consent decree here fails to meet those standards, and is generally "inappropriate, improper, or inadequate," the United States should "withdraw or withhold its consent." 42 U.S.C. §9622(d)(2)(B); *see* 28 C.F.R. §50.7(b).

### A.    A Proposed Consent Decree Must Be Fair, Reasonable, and Consistent With CERCLA's Goals

ALCD-PUBCOM_0000519

### 1.  Fairness

A consent decree must be both procedurally and substantively fair. *In re Tutu Water Wells*, 326 F.3d at 207; *see also United States v. Lehigh Cement Co.*, 2020 WL 6799256, at *3 (E.D. Pa. Nov. 19, 2020) (consent decree must demonstrate "both procedural fairness in its formation and substantive fairness in its content."). "Procedural fairness requires that settlement negotiations take place at arm's length," and requires "'openness and bargaining balance'" in the negotiation process. *Tutu Water Wells*, 326 F.3d at 207 (quoting *United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 86 (1st Cir. 1990)). Even when negotiations are conducted in good faith and at arm's length, if some potentially responsible parties (PRPs) are not "privy to the negotiations" or to a relevant, preliminary assessment bearing on the settlement, procedural fairness may be undermined. *Mathes*, 2008 WL 4693550, at *4 (denying motion to approve consent decree where none of the other PRPs were privy to negotiations or to "the preliminary economic damage assessment quantifying the natural resource damages").

Substantive fairness requires that the proposed decree's terms "are based on 'comparative fault' and apportion liability 'according to rational estimates of the harm each party has caused.'" *Tutu Water Wells*, 326 F.3d at 207 (quoting *SEPTA*, 235 F.3d at 823); *see also Mathes*, 2008 WL 4693550, at *3 ("Settlement terms must roughly correlate with comparative fault so that each party bears the costs of the harm for which it is legally responsible."). If the proposed measure of comparative fault is "arbitrary, capricious, and devoid of a rational basis," then the proposed settlement is not substantively fair. *Tutu Water Wells*, 326 F.3d at 207 (quoting *SEPTA*, 235 F.3d at 824).

EPA's *ex parte* allocation exceeded its statutory authority and was procedurally and substantively unfair.

### 2.  Reasonableness

A proposed consent decree must also survive review for reasonableness, which encompasses multiple factors. *See Cannons Eng'g Corp.*, 899 F.2d at 89 ("the evaluation of a consent decree's reasonableness will be a multifaceted exercise"). One factor "of cardinal importance" is the proposed decree's "likely efficaciousness as a vehicle for cleansing the environment." *Id.*; *see Tutu Water Wells*, 326 F.3d at 207 (quoting with approval other aspects of *Cannons*). A second "important facet of reasonableness" is "whether the settlement satisfactorily compensates the public for the actual (and anticipated) costs of remedial and response measures." *Cannons*, 899 F.2d at 86. A third factor is the "relative strength of the parties' litigating positions"; where the government's case is "strong and solid, it should typically be expected to drive a harder bargain." *Id.*; *see also, e.g.*, *United States v. Alsol Corp.*, 2021 WL 1050373, at *3 (D.N.J. Mar. 19, 2021) (inquiry incorporates "three factors": (1) "the technical effectiveness of the plan for environmental cleanup; (2) the amount of monetary compensation to the public; (3) and the overall fairness of the decree in light of the relative strengths of the parties and foreseeable risk of loss"); *United States v. Wyeth Holdings LLC*, 2015 WL 7862724, at *2 (D.N.J. Dec. 3, 2015) (same); *United States v. Cornell-Dubilier Electronics, Inc.*, 2014 WL 4978635, at *9-11 (same).

Earlier decisions in the District of New Jersey evaluated reasonableness under a broad "six-factor test," considering (1) the "relative costs and benefits of litigating the case under CERCLA"; (2) the "risks of establishing liability on the part of the settlors"; (3) the "good faith efforts and adversarial relationship of the negotiators who crafted the settlement"; (4) the "reasonableness of the settlement as compared to the settlor's potential volumetric contribution"; (5) the "ability of the

ALCD-PUBCOM_0000520

settlors to withstand a greater judgment"; and (6) the "effect of the settlement on the public interest as expressed in CERCLA." *United States v. Acton Corp.*, 733 F. Supp. at 872 (citing *United States v. Rohm & Haas Co.*, 721 F. Supp. at 687). In this calculus, the public interest "deserves considerable weight." *Id.* A settlement may "be deemed unreasonable" if it is "based on a clear error of judgment, a serious mathematical error, or other indicia that the parties did not intelligently enter into the compromise." *Id.*

EPA's proposed settlement fails the requirement of reasonableness.

### 3.    Consistency With CERCLA's Goals

A proposed consent decree must also be consistent with CERCLA's goals. Congress enacted CERCLA in 1980 for two principal purposes: first, "'to promote the timely cleanup of hazardous waste sites'" and, second, "'to ensure that the costs of such cleanup efforts were borne by those responsible for the contamination.'" *Trinity Indus.*, 903 F.3d at 348 (quoting *Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 602 (2009)). Congress also meant to "'encourage settlements that would reduce the inefficient expenditure of public funds on lengthy litigation,'" *Mathes*, 2008 WL 4693550, at *4 (quoting *In re Cuyahoga Equip. Corp.*, 980 F.2d at 119), and "to encourage voluntary cleanups." *Id.* at *7. When a proposed decree seeks to bar contribution claims of a private party that voluntarily incurred costs, the decree counters CERCLA's goals, by "deterr[ing] private parties from undertaking any cleanup 'for fear of being 'stuck' with the full bill.'" *Id.* (quoting *Kelley v. Wagner*, 930 F. Supp. at 299). As such, "entering [a proposed] Consent Decree before determining the response costs and an appropriate apportionment of liability actually counters CERCLA's intent." *Id.*

EPA's proposed settlement, which does not require *any* settling party to perform cleanup work and dedicates *no part* of the funds to the cleanup itself, undermines the purposes of CERCLA.

### B.    A Proposed Consent Decree Cannot Be Arbitrary and Capricious

A proposed consent decree also must not be "arbitrary and capricious or otherwise not in accordance with law." 42 U.S.C. §9613(j)(2); *see also* 5 U.S.C. §706(2)(A); *Alaska Dep't of Envt. Conservation v. EPA*, 540 U.S. 461, 496-97 (2004) (where statute "does not specify a standard for judicial review" of agency action, courts "apply the familiar default standard of the Administrative Procedure Act" and review for arbitrary and capricious action); *United States v. E.I. DuPont de Nemours & Co.*, 432 F.3d 161, 179 (3d Cir. 2005) ("[T]he arbitrary and capricious standard is well established as the appropriate standard for most agency action."). That standard "contemplates a searching 'inquiry into the facts' in order to determine 'whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" *DuPont*, 432 F.3d at 179 (quoting *Indus. Union Dep't v. API*, 448 U.S. 607, 705 (1980)).

Under that standard, EPA's decision to move for entry of the consent decree will not be upheld if it "is not supported by substantial evidence." *Safe Extensions v. FAA.*, 509 F.3d 593, 604 (D.C. Cir. 2007); *see id.* (even for "informal adjudications," the agency's decision "still must be supported by substantial evidence—otherwise it would be arbitrary and capricious"). Indeed, it is "'impossible to conceive of a 'nonarbitrary' factual judgment supported only by evidence that is not substantial in the APA sense.'" *Id.* (quoting *Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Governors of Fed. Reserve Sys.*, 745 F.2d 677, 684 (D.C. Cir. 1984)). Furthermore, an agency's "refusal to consider evidence bearing on the issue before it" likewise "constitutes arbitrary agency action." *Butte Cnty., Cal. v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010).

ALCD-PUBCOM_0000521

EPA's settlement reflects clear errors of judgment as to the limits of its own authority, its misuse of the allocation report, its refusal to consider relevant evidence, and the analysis on which the settlement itself rests.

## X.    Request for Inclusion in the Administrative Record

CERCLA Section 122(d)(2)(B) provides that the Attorney General "shall consider, and file with the court, any written comments, views, or allegations relating to the proposed judgment." EPA has abused and exceeded its authority under CERCLA. Its actions to propose this deeply flawed settlement, rather than to accept the large-scale cleanup work offered by OxyChem, raise serious issues of public concern. OxyChem therefore urges the Attorney General to file these comments with the Court forthwith.

Pursuant to APA Section 706(2), 5 U.S.C. § 706(2) ("the court shall review the whole record"),[355] OxyChem also requests that these comments be included as part of any administrative record the United States submits to the Court for judicial review in connection with any motion for entry of a consent decree approving the proposed settlement.

In support of these comments, OxyChem also submits the exhibits to the comments, Appendix A to the comments, and the reports of the following, qualified experts whose work likewise demonstrates that the conclusions of the Batson Report are unsupported and unsupportable as a basis for the United States to accept a settlement that releases 85 parties from $1.82 billion of liability:

OxyChem's comments are supported by expert declarations from:

- **Michael Bock, Ph.D.** (Managing Director, TIG Environmental), an environmental and marine scientist. Dr. Bock's declaration discusses Batson's allocation of responsibility for dioxins and furans and the evidence Batson overlooked that reveals multiple significant sources of dioxin-like toxicity in Passaic sediments.

- **Carl Edlund**, a former Superfund manager for EPA Region 6 whose declaration addresses how EPA's remediation goals incorporate human health and ecological risk to determine the remedy and its cost.

- **Dennis Farley** (TIG Environmental), a civil and environmental engineer whose declaration discusses Batson's application of "culpability" factors to the settling defendants.

- **Mark Harris, Ph.D.** (Managing Principal Scientist, ToxStrategies), a toxicologist and a recognized expert in human health risks from dioxins and PCBs. Dr. Harris offers opinions regarding the Batson Report, including Batson's failure to consider dioxin-like PCBs.

- **Charles Menzie, Ph.D.** (Principal Scientist, Exponent), a biologist with expertise in risk assessment. Dr. Menzie provides opinions on the Batson Report's use of "relative harm" among the ROD COCs and Batson's calculation of "relative risk" for purposes of the allocation.

- **Prof. Michael Moffitt** (The University of Oregon School of Law), the Philip H. Knight Chair and former Dean of the University of Oregon School of Law and an

---

[355] *See also Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971) (review of agency decision "is to be based on the full administrative record").

ALCD-PUBCOM_0000522

expert in ADR ethics. Professor Moffitt's declaration describes the application of ADR ethical standards to the Batson process.

- **Pradeep Mugunthan, Ph.D., P.E.** (Principal Engineer, Four Peaks Environmental), a civil and environmental engineer with expertise in modelling hydrodynamic, sediment transport, water quality systems. Dr. Mugunthan addresses EPA's arbitrary application of the Batson allocation to the Upper 9 Miles of the Lower Passaic River.

- **Rob Olian, J.D.** (envADR), the former co-chair of Sidley Austin's environmental practice group and a Superfund mediation and allocation specialist. Mr. Olian's declaration describes the foundational issues with Batson's allocation methodology, including Batson's unjustified assumptions and failure to perform sensitivity analyses.

- **Tarek Saba, Ph.D.** (Exponent), an environmental engineer whose declaration addresses the spatial distribution of non-dioxin COCs throughout the Passaic, the cost drivers underlying EPA's OU2 remedy, and Batson's analysis of COC discharges from settling party sites.

- **Philip A. Spadaro, LG** (Vice President and Managing Director, TIG Environmental), Mr. Spadaro is a geochemist specializing in sediment cleanup design and implementation and the environmental effects of sediment dredging. Mr. Spadaro's declaration compares the Passaic to other CERCLA sediment sites to show how the non-dioxin COCs present in the Passaic require remediation both collectively and individually.

- **Professor David Stradling, Ph.D.** (University of Cincinnati), the Zane L. Miller Professor of Urban History and Director of Environmental Studies. Dr. Stradling's declaration describes the industrial history and prevailing waste disposal practices in the Passaic region.

- **Thomas Voltaggio** (Voltaggio Consulting), a former Superfund manager for EPA Region 3 whose declaration describes EPA risk assessment process and its role in remedial decision-making.

ALCD-PUBCOM_0000523

# APPENDIX A

ALCD-PUBCOM_0000524

Below are 17 settling defendants that exemplify EPA allocator, David Batson's ("Batson") fatally flawed analysis of the different facilities considered in his allocation.

The highest percentage share of liability for OU2-related costs Batson assigned to *any* of the below settling defendants is a miniscule .00246385% under his Protocol Calculation (for EnPro Holdings, Inc.) and .1779588% under his Alternative Calculation (for Pitt Consol Chemical Company).[356] To reach these tiny percentage shares of liability, Batson consistently ignored (or was denied access to) critical evidence and highly relevant scientific studies; adopted uncritically settling defendants' statements or their paid consultants' work; and treated settling defendants differently from the manner in which he treated OxyChem.

Because the proposed consent decree is based on Batson's December 28, 2020 Allocation Recommendation Report (the "Batson Report") and its analysis of these parties' shares of liability,[357] the proposed decree lacks any rational estimate of the harm they caused. It is substantively unfair and unreasonable and should be withdrawn.

### 1.    BASF Corporation

The Batson Report assigns BASF Corporation ("BASF") a "Relative Contribution" of nearly zero for lead, PCBs, and other Contaminants of Concern ("COCs")[358]:

Allocation Facility COC Base Scores - Protocol Calculation

**BASF Corporation**

| Constituent Of Concern (COC) | Relative Risk Number (RRN) | Total Mass (Tmass) | COC Historic CMass | COC Relative Contribution | COC Base Score |
|---|---|---|---|---|---|
| Copper | 0.69 | 2,100,000.00 | 0 | 0 | 0 |
| Lead | 0.01 | 3,200,000.00 | 0.62 | 1.948E-7 | 1.948E-9 |
| Mercury | 0.95 | 42,000.00 | 0.35 | 8.390E-6 | 7.970E-6 |
| HPAHs | 0.05 | 240,000.00 | 0.99 | 4.130E-6 | 2.065E-7 |
| LPAHs | 0.01 | 170,000.00 | 3.34 | 1.965E-5 | 1.965E-7 |
| PCBs | 12.87 | 26,000.00 | 2.87 | 1.105E-4 | 1.422E-3 |
| DDx | 1.37 | 27,000.00 | 0 | 0 | 0 |
| Dieldrin | 0.13 | 390.00 | 0 | 0 | 0 |
| Dioxins_Furans | 83.92 | 38.00 | 0 | 0 | 0 |

This is indefensible and inconsistent with the record evidence.

### a.    Dioxin

---

[356] *See* Dec. 28, 2020 Allocation Recommendation Report (the "Batson Report"), Attachment K ("Allocation Operations Spreadsheet").

[357] *Notice of Lodging of Proposed Consent Decree Under the Comprehensive Environmental Response, Compensation, and Liability Act*, 88 Fed. Reg. 2133, 2133 (Jan. 12, 2023) ("Based on the results of the allocation, the United States concluded that the Settling Defendants, individually and collectively, are responsible for a minor share of the response costs incurred at or to be incurred at or in connection with the cleanup of Operable Unit 2 and Operable Unit 4, for releases from the facilities identified in the proposed Consent Decree.").

[358] Batson Report, Attachment L ("Facility Data Computation Sheets") for BASF.

ALCD-PUBCOM_0000525

The Batson Report assigns a 0 to dioxin/furans in all discharge pathways at the BASF site.[359]

This is inconsistent with substantial evidence available to Batson that operations at the BASF site likely generated dioxin. For instance, the Batson Report acknowledges the known use and production of dioxin precursors at BASF, including chloranil, phthalic anhydride, maleic acid, and 2,6-dibromo-p-nitroaniline.[360] The Batson Report also acknowledges that BASF incinerated thousands of pounds of waste per hour, including phthalic anhydride, maleic anhydride, and chlorine.[361] Incineration of dioxin precursors in the presence of chlorine is a well-understood source of dioxin.[362] BASF also handled chloranil onsite,[363] which can contribute to the formation of dioxins.[364]    Finally, BASF predecessor United Cork's cork manufacturing processes mirrored a pulp and paper manufacturing process that EPA has linked to dioxin formation.[365]

Yet the Batson Report gives this extensive evidence no weight—apparently because the BASF site had not been sampled for dioxin and therefore dioxin had not been detected on the site. To state the obvious, the absence of evidence—because of the absence of dioxin sampling—is not evidence that there is no dioxin at the BASF site.

### b.    Direct Discharges

The Batson Report adopts BASF's unsupported statement that BASF's process wastewater was discharged to the sewer starting in 1936. This conclusion ignores voluminous evidence of BASF's direct discharges into the Passaic River.

The record shows that site operators discharged stormwater mixed with process wastewater to the Passaic River since the inception of the plant as a manufacturing site in the 1870s.[366] Site employees report that before the construction of the onsite wastewater treatment plant in 1973, all

---

[359] *Id.*

[360] Batson Report at 534; *see also* Forrest E. Dryden et al., ASSESSMENT OF DIOXIN-FORMING CHEMICAL PROCESSES    (June    1980),    *available    at* https://nepis.epa.gov/Exe/ZyPDF.cgi/91014M6F.PDF?Dockey=91014M6F.PDF, at 41, 42–49 (list of dioxin precursors); *id.* at 98 (identifying BASF Wyandotte Corp. in Parsippany, New Jersey as a producer of phthalic anhydride).

[361] Batson Report at 530.

[362] Gordon McKay, *Dioxin characterisation, formation and minimisation during municipal solid waste (MSW) incineration: review*, 86 CHEM. ENG'G J. 343 (2002).

[363] *See* PAP-00057770 (BASF ECRA Site Evaluation Submission) at PAP-00057785. Documents with prefixes "PAP" or "PAS" are available at:
https://cumulis.epa.gov/supercpad/SiteProfiles/index.cfm?fuseaction=second.scs&id=0200613&doc=Y&colid=41378&region=02&type=SC (last visited Mar. 20, 2023).

[364] Bostjan Krizanec & Alenka Majcen Le Marechal, *Dioxins and Dioxin-like Persistent Organic Pollutants in Textiles and Chemicals in the Textile Sector*, 79 CROATICA CHEMICA ACTA 177 (2006); Dryden et al., *supra* note 5.

[365] *Compare, e.g.*, **Ex. A-1** (May 6, 1993 Interview of Rev. W. Henry Hawes), *with* EPA, AN INVENTORY OF SOURCES AND ENVIRONMENTAL RELEASES OF DIOXIN-LIKE COMPOUNDS IN THE UNITED STATES FOR THE YEARS 1987, 1995, AND 2000 (Nov. 2006), *available at*
https://cfpub.epa.gov/ncea/risk/recordisplay.cfm?deid=159286 (last visited 3/20/2023).

[366] *See* **Ex. A-2** (June 22, 1978 Memorandum of Justification, Storm Water Outfall Diversion) (BASFCORP0052314).

ALCD-PUBCOM_0000526

spills, runoff, and wastewater flowed toward the Passaic River.[367]   United Cork and BASF employees also reported that bad batches of cork were dumped directly into the river.[368]   BASF treated chemicals to remove their coloration, making discharges into the Passaic River less noticeable.[369] BASF's corporate representative could not dispute reports from BASF and United Cork employees, as well as the Coast Guard, of discharges from a 12-inch drainpipe directly into the Passaic River.[370]

Even after BASF connected its water treatment plant to the sewer system, it continued to discharge contaminated water into the Passaic River. For instance, it is undisputed that 152,000 gallons of storm water that was in excess of permitted values for total organic carbon ("TOC"), diethylhexyl phthalate ("DEHP"), and other chemicals, was released into the Passaic River and Newark Bay.[371] Additionally, "BASF knew that there was a major source of water pollution back in 1978 coming from the storm water."[372] In an internal memorandum, BASF debated whether or not to seal off these direct discharges into the Passaic River.[373]

### c.    Overflow Releases from Kearny POTW

The Batson Report appears to assume that there was a 0% bypass frequency with respect to BASF's discharges to the Kearny Publicly Owned Treatment Works ("POTW")—another

---

[367] *See* **Ex. A-3** (May 18, 1993 Interview of Sam Alston, former Boiler Operator for BASF).

[368] **Ex. A-4** (Excerpts from Sept. 20, 2022 BASF corporate representative deposition (Contribution Action)) at 7:22-25 (representative capacity for BASF Corp.) & 117:7-11 ("Q. Sir, I'm asking you, there are reports from United Cork and BASF employees that bad batches of cork were dumped right into the river. Right? A. It says, it says what it says here, yes.").

[369] *See id.* at 125:6-126:1, for the following exchange:

Q. Yeah. My question is not how he came to the conclusion. It's only Mr. Grimes who did work for BASF reports that BASF treated basacryl and palanil to take the color out so that others wouldn't be able to notice the discharge. Right?

A. That's what he says. And my point, my point about his – it's – he's speculating why it was done. He was not -- there is no reason to believe that he would have been involved in that treatment so that's a conclusion that he reached that isn't based on anything that I can find.

Q. Yeah. But his contemporaneous assessment is that BASF treated basacryl and palanil to take the color out before discharging into the river. Right?

MR. SCHNEIDER: Asked and answered.

Q. Is that not his assessment?

A. That's the – that's what he, that's what the summary says, yes.

[370] *Id.* at 121:9-20 ("Q. So BASF and United Cork employees are reporting that they often saw discharges running out of a 12-inch drainpipe directly into the Passaic River. Right? A. It says -- yes. I -- yes, I can -- there, there he states that there are discharges from this drainpipe into the river, yes. Q. And furthermore, he reports that the Coast Guard would sometimes come and note a discharge from the drainpipe into the river? A. Correct.").

[371] *Id.* at 146:5-12 ("Q. Yeah. So there was a discharge of 152,000 gallons of storm water into the river and the bay, right, sir? A. Yes. Q. Okay. And that storm water was in excess of the permitted values for TOC, DEHP and other limits, right, sir? A. That's correct.").

[372] *Id.* at 101:8-21.

[373] *Id.* at 84:13-23.

ALCD-PUBCOM_0000527

indefensible assumption.[374] When wastewater surpassed the treatment plant's capacity, it would enter a regulating chamber, then it would bypass untreated directly into the Kearny Sewage Treatment Plant Outfall.[375]   This outfall then discharged into the Hackensack River at the confluence of the Passaic.

These overflows occurred frequently at the former Kearny POTW. As far back as 1967, site conditions at the POTW were reported to be unsatisfactory with the plant failing to meet performance conditions.[376] The record contains multiple reports by regulatory authorities including NJDEP, EPA, and NJDOH of failing to meet permit conditions, poor plant maintenance, key equipment being out of operation, and discharges of untreated sewage to Newark Bay.[377]   In fact, in 1991, Larry Angelo, the former Chief Operator of the Kearny POTW was indicted, fined, and sentenced to prison on charges of purposely and unlawfully releasing sewage sludge containing toxic pollutants onto the grounds of the plant.[378] The record clearly demonstrates that the Kearny POTW failed to adequately treat industrial waste from its dischargers, including BASF.

## 2.    Benjamin Moore & Co.

The Batson Report assigns Benjamin Moore & Co. ("Benjamin Moore") a "Relative Contribution" of nearly zero for Lead, PCBs, and other COCs.

---

[374] *See* Batson Report, Attachment J for BASF at 4.

[375] **Ex. A-5** (Kearny Sewage Treatment Plant Preliminary Assessment Report) (BAG000001) at 3; **Ex. A-6** (Jan. 1979 Hudson County Utilities Authority Wastewater Facilities Plan, Vol. I) (BAH000001) at 3–4.

[376] **Ex. A-7** (Sept. 15, 2006 Report on Investigation of Sources of Pollutants and Contaminants in the Newark Bay Study Area) (FOIA-EPA-0005854) at 151–164.

[377] *Id.*

[378] Batson Report, Attachment J for BASF at 6; *see also* **Ex. A-5** (Kearny Sewage Treatment Plant Preliminary Assessment Report) (BAG000001); **Ex. A-6** (Jan. 1979 Hudson County Utilities Authority Wastewater Facilities Plan, Vol. I) (BAH000001); **Ex. A-8** (Apr. 1, 1992 Article, *Illegal sludge dumping was ordered*) (BAM000004); **Ex. A-9** (Jul. 17, 1992 Conviction of Larry Angelo) (BAH000002); **Ex. A-10** (Jul. 18, 1922 Article, *Kearny sewage dumper gets 5-year term*) (BAM000006).

116

ALCD-PUBCOM_0000528

As shown below, the Batson Report underestimates the presence of PCB contamination at the site; fails to account for PCB and PCDD/F[379] generation from use of certain raw materials in

For Public Disclosure by Consent of the Port

| Allocation Facility COC Base Scores - Protocol Calculation | | | | | |
|---|---|---|---|---|---|
| Benjamin Moore & Co. | | | | | |
| Constituent Of Concern (COC) | Relative Risk Number (RRN) | Total Mass (Tmass) | COC Historic CMass | COC Relative Contribution | COC Base Score |
| Copper | 0.69 | 2,100,000.00 | 0 | 9.703E-12 | 6.695E-12 |
| Lead | 0.01 | 3,200,000.00 | 0 | 1.401E-11 | 1.401E-13 |
| Mercury | 0.95 | 42,000.00 | 0 | 0 | 0 |
| HPAHs | 0.05 | 240,000.00 | 0.24 | 1.015E-6 | 5.077E-8 |
| LPAHs | 0.01 | 170,000.00 | 0.79 | 4.662E-6 | 4.662E-8 |
| PCBs | 12.87 | 26,000.00 | 0.13 | 5.008E-6 | 6.445E-5 |
| DDx | 1.37 | 27,000.00 | 0 | 0 | 0 |
| Dieldrin | 0.13 | 390.00 | 0 | 0 | 0 |
| Dioxins_Furans | 83.92 | 38.00 | 0 | 1.434E-9 | 1.204E-7 |

its manufacture of coatings; erroneously omits direct discharge pathways; does not properly account for the record of poor housekeeping at the site; and fails to consider importance evidence relating to Benjamin Moore's operations.

### a.    Dioxins

The Batson Report identifies low levels of dioxin in soil, but states that the "source of onsite dioxin detections is unknown."[380]

The Batson Report also recognizes Benjamin Moore's use of phthalocyanine complexes as pigments in paint,[381] that pigments used contained "trace amounts of copper" and that Benjamin Moore used lead compounds in paint manufacturing operations, but omits any mention of the pigments containing PCB or PCDD/F impurities.

The record indicates that Benjamin Moore used significant quantities of raw materials that are known to produce PCBs and dioxins. Those raw materials include Therminol FR (a PCB-containing oil), Aroclor distillate 5460, copper phthalocyanine complexes, materials containing mercury, cobalt, and lead, as well as titanium dioxide and zinc dioxide in their manufacturing of technical and performance coatings.[382] Manufacturing processes using these materials produce PCBs and dioxins.[383]

---

[379] "PCDD/F" stands for polychlorinated dibenzo-p-dioxins and furans.

[380] Batson Report, Attachment J for Benjamin Moore at 6.

[381] *Id.* at 7.

[382] **Ex. A-11** (Oct. 08, 2004 Memo Re Newark Building 11 Demolition) (BMCO-FED-000001269) at 47 (Aroclor distillate 2460); Batson Report, Attachment J for Benjamin Moore at 5 (Therminol), 7 (copper phthalocyanine, lead) & 8 (mercury); PAP-00238467 at PAP-00238469 (cobalt); PAP-00238427 at PAP-00238430 (titanium and zinc oxides).

[383] *See* **Ex. A-12** (121 ENV. H. PERSPECTIVES, A87, *Nonleg*acy *PCBs: Pigment Manufacturing By-Products Get a Second Look* (2013)) (G-PPG000665) at G-PPG000668; **Ex. A-13** (Excerpts from May 16, 1978 Final Task Report, *Microeconomic Impacts on the Proposed "PCB Ban Regulation."*) (G-PPG002817) at G-PPG002817; Georgios Ctistis et al., *PCDDs, PCDFs, and PCBs co-occurrence in TiO2 nanoparticles*, 23 ENVIRON. SCI. POLLUT. RES. 4837, 4839–42 (2015); **Ex. A-14** (Yuwen Ni et al., *Distribution patterns of PCDD/Fs in chlorinated chemicals*, 60:6 CHEMOSPHERE

117

Dioxin detections onsite at Benjamin Moore are not indicative of processes at the former Diamond Alkali site, contrary to the Batson Report's assertion. Detections align with raw materials Benjamin Moore used and processes conducted by Benjamin Moore relating to manufacturing of technical and performance coatings.

By failing to consider known impurities in raw materials and pigments (phthalocyanines, azo/diarylide, and titanium dioxide) used by Benjamin Moore, the Batson Report ignores additional key sources of PCBs and PCDD/Fs.

### b.    Overland Transport Calculations

The Batson Report's stated purpose for the Overland Fate & Transport (OFT) pathway is to assess the volume of contaminated media that could have been discharged from the facility to the Passaic River through overland flow and surface runoff.[384] The Batson Report cites maximum detections of copper (63.8 mg/kg), lead (139 mg/kg), and mercury (0.6 mg/kg) in soil at the Benjamin Moore site, but dismisses these concentrations as below NJDEP Residential Direct Contact Soil Remediation Standards, and assigns a 0 to these COCs for the OFT Pathway when developing scores for the site.[385] The concentrations for these COCs in upland soil at Benjamin Moore are actually notably higher (140 mg/kg for copper, 2,200 mg/kg for lead, and 11 mg/kg for mercury),[386] and also orders of magnitude above the OU2 ROD PRGs for these compounds (63 mg/kg for copper, 130 mg/kg for lead, and 0.074 mg/kg for mercury).[387]

The NJDEP Residential Soil criteria and general assertions about the types of COCs in historic fill should be irrelevant for this allocation. Because the stated purpose of the OFT pathway is to account for the potential for contaminated material in the uplands to contribute to contamination in sediment, the fact that soil concentrations of metals at the Benjamin Moore site are much higher than sediment criteria should be accounted for and quantified.

### c.    Batson Underestimates Flood Potential and Extent of Lagoon Usage

---

799-784 (2005) (DAA000018) at 5–6; EPA, AN INVENTORY OF SOURCES AND ENVIRONMENTAL RELEASES OF DIOXIN-LIKE COMPOUNDS IN THE UNITED STATES FOR THE YEARS 1987, 1995, AND 2000 (2006) § 7.1.5 (discussing titanium dioxide pigment in paints) & § 8.3.6.2 (discussing phthalocyanine dyes); EPA, FINAL TITANIUM DIOXIDE LISTING BACKGROUND DOCUMENT FOR THE INORGANIC CHEMICAL LISTING DETERMINATION (Oct. 2001); City of Spokane Wastewater Mgmt. Dep't, PCBs IN MUNICIPAL PRODUCTS (Rev. Jul. 21, 2015) at 3 ("Numerous studies have associated pigments with inadvertent PCB production."), 5–9 (discussing PCBs in paint) & 11 (discussing source of PCBs); Jacob C. Jahnke & Keri C. Hornbuckle, *PCB Emissions from Paint Colorants*, 53 ENVTL. SCI. & TECH. 5187, 5187-90 (2019); Katsunori Anezaki & Takeshi Nakano, *Concentration levels and congener profiles of polychlorinated biphenyls, pentachlorobenzene, and hexachlorobenzene in commercial pigments*, 21 ENVIRON. SCI. POLLUT. RES. 998, 1001-02 (2014) (listing PCB congeners in azo-type and phthalocyanine-type paint pigments); State of Wash. Dept. of Ecology, POLYCHLORINATED BIPHENYLS (PCBS) IN GENERAL CONSUMER PRODUCTS (2014) at 3-4, 20, 28-30 (discussing PCBs in paint and paint products); **Ex. A-15** (*Inadvertent PCB production and its impact on water quality*, presentation by Lisa A. Rodenburg, Department of Envtl. Sci., Rutgers, the State University of New Jersey (2012)) at 2, 8.

[384] Batson Report at 21.

[385] Batson Report, Attachment L at 7.

[386] PAP-00724492 at PAP-00724501, PAP-00724574.

[387] *See* OU2 ROD at 165 (Table 25).

ALCD-PUBCOM_0000530

The Batson Report also fails to properly account for Benjamin Moore's use of waste lagoons for latex paint and plant wash water. The Batson Report does not account for key facts regarding the duration of use, and documented breaches and discharges to the Passaic River.[388] The report states, "it is unlikely that contaminants in wash water, if any, would have adversely affected the Passaic River sediment through stormwater runoff."[389] The Batson Report also mentions briefly the existence of the later stormwater "retention basin" in the former lagoon location.[390]

But there is evidence of overland transport and discharges to the Passaic River from four unlined lagoons that existed at the site from 1930 to 1977 along the river shoreline. During flood events, materials from the waste lagoons were discharged to the river. The lagoons are visible in aerial photographs, and in some instances with an observable plume dispersing into the river.[391] Additionally, the stormwater retention pond, which existed until after 1982, "had collapsed and a continuous discharge flowed into the Passaic River" according to a 1984 inspection by NJDEP.[392]

Spills occurring at the Benjamin Moore site could reach the recharge basin, which also received water from the Passaic River during periods of tidal change.[393] The site has a history of frequent flooding, which would carry or redistribute contaminants in site soil, lagoon contents (solid and liquid) and stored materials or products to the Passaic River. Several former employees recall the site's flooding during their employment,[394] including a particularly large flood around 1960 that caused extensive damage to the facility and resulted in a retaining wall being built.[395] These facts clearly establish a pathway from the Benjamin Moore site for contaminants in waste water and sediments to reach the Passaic River frequently.

The Batson Report ignores the extent of COC contributions from the lagoons even though the lagoons were documented to have breached on multiple occasions, waste dumped into the lagoons is associated with ROD COCs, and aerial photographs provide evidence of resulting plumes in the Passaic River.[396] This results in an underestimate of COC mass transportable via the OFT pathway for the Benjamin Moore site.

> **d.    Batson Erroneously Concludes That There Were No Direct Discharges**

---

[388] *See* Batson Report, Attachment J for Benjamin Moore at 9.

[389] *Id.*

[390] Batson Report, Attachment J for Benjamin Moore at 13.

[391] *See* **Ex. A-16** (1966 U.S. Geological Survey aerial photograph, cropped to show Benjamin Moore site and surrounding area).

[392] PAP-00238500 at PAP-00238502.

[393] PAP-00238340.

[394] **Ex. A-17** (Mar. 9, 1993 Michael Kozzi Interview) (AAW000007) at 1; **Ex. A-18** (Mar. 16, 1993 William O'Regan Interview) (AAW000010); **Ex. A-19** (Mar. 18, 1993 John Delbridge Interview) (AAW000003).

[395] **Ex. A-20** (Mar. 18, 1993 Albert Leier Interview) (AAW000009) at 2.

[396] *See* **Ex. A-16** (1966 aerial photograph), *supra* note 36.

ALCD-PUBCOM_0000531

The Batson Report does not include COC mass calculations for the direct discharge pathway at the Benjamin Moore site,[397] contradicting the report's own recognition of the site's contributions to both a 14-inch discharge pipe, and the Lockwood storm sewer and outfall (SSO).[398] The Batson Report erroneously suggests that, because both systems discharge stormwater, neither should be considered a contaminant transport pathway.

The record shows that there were discharges from the Benjamin Moore site through both the privately-owned outfall and Lockwood SSO,[399] which contained process discharges and/or other corroding materials. Between 1967 and 1987, multiple inspections by NJDEP, the Coast Guard, Benjamin Moore itself, and Newark Testing Laboratories found violating practices to be occurring at the site, resulting in corroding substances, sludge, liquid process wastes, and spills being discharged directly to the Passaic River, many of which were noted to have a distinct plume/color indicator on the river surface. For example, these instances were not included in the Batson Report:

- In April of 1971, Benjamin Moore was pumping sludge and caustic wash water to the river, via a sump pit adjacent to the northeast corner of Building 4A.[400]

- On January 25, 1978, there was a spill of latex (Rholex AC-61) at the tank farm area east of the main plant because of a leak between a valve body and bonnet. The spilled latex mixed with heavy rain and melted snow and washed into the plant storm drainage system, resulting in a milky solution being pumped into the Passaic River.[401]

- On July 3, 1986, an unknown yellow water-soluble liquid was discharged to the Passaic River through the onsite storm sewer system.[402]

- On March 11, 1987, an NJDEP inspection indicated that Benjamin Moore's contaminated stormwater, boiler blowdown, and compressor blowdown ultimately discharged to the surface waters of the State.[403]

The record documents the existence of both direct discharge pathways and non-point discharges either infiltrating these systems, or reaching the Passaic River directly, further indicating that the Batson Report's direct discharge score of 0 for all COCs is inappropriate.

### e.    The Batson Report Fails to Quantify PCB Discharges

The Batson Report also underestimates the extent of PCB contamination at the Benjamin Moore site. It recognizes that concrete sampling showed PCB contamination, with the highest concentrations close to a Therminol heater in Building 11.[404] The Batson Report suggests "there was

---

[397] Batson Report, Attachment L for Benjamin Moore.

[398] Batson Report, Attachment J for Benjamin Moore at 16.

[399] PAP-00238467 at PAP-00238471; PAS-00055004 at 91.

[400] PAP-00238478.

[401] **Ex. A-21** (Jan. 31, 1978 Memo Re: Newark AC-61 Spill) (BMC0752).

[402] PAP-00238568 at PAP-00238804.

[403] PAP-00238568 at PAP-00238821.

[404] Batson Report, Attachment J for Benjamin Moore at 5.

ALCD-PUBCOM_0000532

no evidence that minor leaks that may have occurred from the Therminol heater could have escaped the building." However, Building 11 was demolished after concrete samples showed extensive PCB contamination (concentrations over 9,000 ppm).[405] And as the report recognizes, Building 11 floor drains discharged to the onsite storm sewer system.[406] Storm sewers on the site discharged to the river through a 14-inch discharge pipe and the Lockwood SSO—a pathway for PCBs to discharge into the Passaic River.

###### f.    The Batson Report Underestimates Benjamin Moore's Culpability

Benjamin Moore should also have a higher culpability factor than 10%, because of the following instances of non-compliance:

- An incident from 1967 involved the infiltration of a sanitary sewer in Lister Avenue and clogging with paint solids composed of polymers.[407]

- An instance on March 23, 1978, when the Coast Guard observed a spill from the plant in the river.[408] (The Batson Report fails to mention that the Coast Guard was "not satisfied with the general cleanliness of [Benjamin Moore's] yard, particularly when [it] learned that [the] storm sewer system pumps all our surface water into the river."[409])

- In April 1982, a tank wagon delivering 5,300 gallons of butyl acrylate sustained a valve malfunction/rupture. The spill was contained with a sand dike poured against a bulkhead abutting the river, although a portion of the spill had flowed into neighboring property. Approximately 3,300 gallons were spilled before it was sealed.[410]

- In 1996, 58,000 gallons of titanium dioxide mixed with water (equivalent to 16,000 lbs. of titanium dioxide) was released over a site storm drain.[411]

- In Building 11, where the Therminol heater was located, PCB concentration ranges detected in building concrete samples ranged up to 9,860 mg/kg (Aroclor 1248)[412]—demonstrating that significant releases of PCB-containing thermal fluids occurred as part of routine site operations.

###### g.    The Batson Report Ignores Key Documents

---

[405] *See* PAP-00724492; **Ex. A-22** (Remedial Investigation Report and Remedial Action Work Plan Vol. I of II) (BMCO-FED-0000012881); PAP-00724492 at PAP-00724652.

[406] Batson Report, Attachment J for Benjamin Moore at 15.

[407] *Id.* at 16-17.

[408] *Id.* at 17.

[409] PAS-00055004 at 66.

[410] **Ex. A-23** (Apr. 14, 1982 Memo Re: Butyl Acrylate Spill) (BMC0810).

[411] **Ex. A-24** (Paper Trail for Titanium Dioxide Disposal) (BMCO-FED-0000019514).

[412] **Ex. A-11** (Oct. 08, 2004 Memo Re: Newark Building 11 Demolition, PCB Contaminated Concrete Waste Products) (BMCO-FED-0000001269) at 32.

ALCD-PUBCOM_0000533

Key documents do not appear to have been considered by Batson in the allocation. These include:

- Documents related to the concrete sampling results and eventual capping of the Benjamin Moore site due to the nature and extent of PCB contamination[413];

- Documents relating to titanium dioxide storage onsite and associated PCB/PCDD/F impurities[414];

- Documents and studies discussing pigment manufacturing processes and their inadvertent production of PCBs and PCDD/Fs[415]; and

- Documents relating to Benjamin Moore's facility violations during more recent operational periods.[416]

Batson's failure to consider these documents is emblematic of his consistent failure to take into account highly relevant information relating to settling defendants' operations—especially when the information is negative.

### 3.    Conopco, Inc.

Batson's allocation for Conopco, Inc. ("Conopco") at 540 New York Ave., Lyndhurst, NJ (the "Conopco Site") is fatally flawed for three main reasons. First, the data upon which Batson calculates the supposed discharged amounts is predicated on faulty premises. Second, Batson does not account for the high probability that the Conopco Site is a source of dioxins and DDx. Third,

---

[413] *Id.*

[414] **Ex. A-25** (Dingfei Hu et al., *Inadvertent PCBs in Commercial Paint Pigments*, 44 ENV. SCI. TECH. 2822-2827 (2010)) (G-SWC036217) at 2828; **Ex. A-26** (Nov. 1996 General Inspection Report) (BBB000002) at 3; **Ex. A-27** (Mar. 1, 1993 Community Right to Know Survey) (BBD000067) at 9; **Ex. A-28** (Nov. 03, 1999 Benjamin Moore & Co. Raw Materials Components List) (BMCO-FED-0000001039) at 3, 4, 7–9, 11–14, 44; Ctistis et al., *supra* note 28, at 4839-42; City of Spokane Wastewater Mgmt. Dep't, *supra* note 28, at 3, 5-9 & 11; State of Wash. Dept. of Ecology, *supra* note 28, at 3-4, 20, 28-30 (discussing PCBs in paint and paint products); **Ex. A-15** (Rodenburg 2012 presentation) at 2, 8; EPA, AN INVENTORY OF SOURCES AND ENVIRONMENTAL RELEASES OF DIOXIN-LIKE COMPOUNDS IN THE UNITED STATES FOR THE YEARS 1987, 1995, AND 2000 (2006) § 7.1.5 (discussing titanium dioxide pigment in paints); EPA, FINAL TITANIUM DIOXIDE LISTING BACKGROUND DOCUMENT FOR THE INORGANIC CHEMICAL LISTING DETERMINATION (Oct. 2001).

[415] **Ex. A-12** (Grossman, *Nonlegacy PCBs*, note 28 *supra*) (G-PPG000665) at G-PPG000668; **Ex. A-29** (Roger Talbert, PAINT TECHNOLOGY HANDBOOK (2008)) (G-PPG000965) at G-PPG0001042; **Ex. A-13** (Excerpts from May 16, 1978 PCB Task Report ) (G-PPG002817) at G-PPG002817; City of Spokane Wastewater Mgmt. Dep't, *supra* note 28, at 3, 5-9 & 11; Jahnke & Hornbuckle, *supra* note 28, at 5187-90; Anezaki & Nakano, *supra* note 28, at 4-5; Ctistis et al., *supra* note 28, 4839-42; State of Wash. Dept. of Ecology, *supra* note 28, at 3-4, 20, 28-30 (discussing PCBs in paint and paint products); **Ex. A-15** (Rodenburg 2012 presentation) at 2, 8; EPA, AN INVENTORY OF SOURCES AND ENVIRONMENTAL RELEASES OF DIOXIN-LIKE COMPOUNDS IN THE UNITED STATES FOR THE YEARS 1987, 1995, AND 2000 (2006) § 7.1.5 (discussing titanium dioxide pigment in paints) & § 8.3.6.2 (discussing phthalocyanine dyes); DAA000018 at 5–6; EPA, FINAL TITANIUM DIOXIDE LISTING BACKGROUND DOCUMENT FOR THE INORGANIC CHEMICAL LISTING DETERMINATION (Oct. 2001).

[416] **Ex. A-23** (Apr. 14, 1982 Memo Re: Butyl Acrylate Spill) (BMC0810); **Ex. A-24** (Paper Trail for Titanium Dioxide Disposal) (BMCO-FED-0000019514).

ALCD-PUBCOM_0000534

Batson either ignored or did not have access to documents regarding the Site's connection to the storm sewer. These flaws render Batson's allocation for Conopco unreliable and ill-founded.

### a.    Faulty Premises

Batson bases his allocation on a faulty premise. He scores Conopco's discharges of copper, lead, mercury, high molecular weight polycyclic aromatic hydrocarbons ("HPAHs"), and low molecular weight polycyclic aromatic hydrocarbons ("LPAHs") using effluent data associated with the Goodrich and/or Purdue Sites, and indicates that no data is available for the Conopco Site.[417] Similarly, Batson does not include any discharges of PCBs, DDx, dieldrin, and dioxins/furans via PVSC for the Conopco Site. Batson identifies "similar operations" as the basis for this assumption; however, no criteria defining the similarities or differences are offered.

OxyChem presumes, but has no way of knowing given Batson's lack of explanation, that the similar operations Batson relies on are related to pharmaceutical manufacturing, since Batson indicates that "bulk pharmaceutical manufacturing" is associated with Purdue and "manufacturing of chemicals used in pharmaceuticals" is associated with Goodrich. While Conopco did manufacture pharmaceutical fine chemicals at the Conopco Site, this description ignores the pesticide manufacturing that occurred at that site over 40+ years and the associated effluent discharges to PVSC. Batson chose incomplete comparisons to replace data he contended was missing, when in fact it was readily available to Conopco but not provided to him (see below).

Further, as with many other sites, Batson took the absence of samples to mean that the samples were negative, and assigned a score of "0" for that particular COC. The Conopco Site specifically, for example, has no sampling for dioxins. Given the lack of sampling, Batson concludes that no discharge of dioxins at the Conopco Site took place.[418] Indeed, the word "dioxin" does not appear at all in his narrative about the Conopco Site.[419] But this reliance on a lack of data ignores the substantial evidence that dioxins could have been formed on that site.

### b.    Batson Ignored Substantial Evidence of Dioxins and DDx at the Conopco Site

Pesticide formulations, which occurred in Building 7 and other areas of the Conopco Site and were acknowledged by Batson,[420] are known to be related to dioxin formation. Lindane, a well-known pesticide, was found in Building 7, and was present in such concentrations that Building 7 had to be remediated.[421] Lindane was detected in site soils at up to 7 ppm (7,000 parts per billion (ppb)).[422]  Lindane is also a Class II pesticide related to and associated with the formation of

---

[417] Batson Report, Attachment L for Conopco at 5.

[418] *See id.* at 1.

[419] *See generally* Batson Report, Attachment J for Conopco.

[420] *See, e.g., id.* at 5 ("Pesticides production occurred in Building 43 and formulations were prepared in Building 7.").

[421] *See id.* at 23.

[422] *See* **Ex. A-30** (Feb. 07, 1985 Environmental Assessment of Contamination Associated with Penick Corporation Lyndhurst, New Jersey Site) (MAXUS3896925) at 946.

ALCD-PUBCOM_0000535

dioxins.[423] Batson ignored this critical fact and assumed, without justification, that no dioxins are associated with the Conopco Site or Conopco's operations.

Equally egregious, Batson assigned zero PVSC discharge of DDx to Conopco. Batson acknowledges that inspections of Building 7 found DDT and DDE, but he downplays the DDE reading as "minute."[424] DDE contamination at the property is far from minute. Maximum reported concentrations of COC pesticides are: 4,4-DDT – 9,700,000 ppb; 4,4-DDE – 9,700,000 ppb; 4,4-DDD – 10,200,000 ppb; and dieldrin – 300 ppb. Anything but "minute," these concentrations show, at a minimum, the onsite use, release, contamination, and possible manufacture of these COC pesticides. Yet Batson ignored without explanation these pesticides and COCs for the purposes of PVSC discharge.

### c.    Batson Ignored, or Lacked Access to, Key Evidence Regarding the Storm Sewer System

Batson ignored, or did not have access to, key evidence regarding the Conopco Site's connection to the storm sewer. Batson's narrative of the Conopco Site cites employee testimony for the proposition that "[p]rior to the 1970s sanitary sewer lines were connected with storm sewer lines [at the Conopco Site]."[425] While this statement is correct,[426] it is incomplete: the storm sewer to which the site connected discharged to the Lake Avenue Storm Sewer Outfall, *which discharged to the Passaic River without any pretreatment*. However, Batson does not utilize this information in forming his allocation. Instead, he only accounts for the Yantacaw Bypass overflows (and even then for only 2.32% of the time).

Had Batson (rightly) accounted for storm sewer discharges, Conopco's discharges would have been markedly higher. Batson notes that "[f]loor drains, trenches and sumps were present in storage and manufacturing buildings that involved hazardous substances includ[ing] Buildings 4, 7, 15 and 16."[427] Those floor drains appear in the "original" buildings on the Conopco Site.[428] Given that the Conopco Site's storm and sanitary sewers were interconnected prior to 1970, it is probable that process wastes containing COCs related to site operations (DDT, dioxin-associated chemical lindane, and other pesticides) discharged to the Conopco Site's sanitary sewers and/or entered the storm sewers, and subsequently discharged to the Passaic.

Evidence unknown to Batson, but produced in the Contribution Action, further emphasizes the importance of the storm sewer discharges. Letters written by Conopco predecessor S.B. Penick & Company ("Penick") provide evidence of the sheer volume of discharges per day from the Conopco Site to the storm sewer. In a January 29, 1976 letter from Penick to Dr. Richard A. Baker at U.S. EPA, Region II, Penick writes that the "goal for meeting the permit requirements was that of essentially drying up (fair-weather basis) the storm sewer system of the Plant. We have

---

[423] M.P. Esposito, T.O. Tiernan, & Forrest E. Dryden, DIOXINS (Nov. 1980), *available at* https://nepis.epa.gov/Exe/ZyPDF.cgi/20007F5B.PDF?Dockey=20007F5B.PDF (last visited Mar. 20, 2023), at 56-57.

[424] *See* Batson Report, Attachment J for Conopco at 8.

[425] *Id.* at 17.

[426] *See, e.g.*, PAP-00327204.

[427] Batson Report, Attachment J for Conopco at 7.

[428] *Id.* at 2.

ALCD-PUBCOM_0000536

reduced the flow from a previous level of several hundred thousand gallons a day to a level of about 10,000 gallons a day."[429] Similarly, a March 2, 1976 letter from Penick to PVSC states that the "flows [to the storm sewer system] have been reduced from levels of about 250,000 gallons a day about a year ago to flows of 10 to 15,000 gallons a day currently."[430] Rather than guess the discharge rate from the Conopco Site, as Mr. Batson did, he easily could have performed calculations based on admissions by Conopco's predecessor in interest.

Recent sampling events also indicate a direct connection between the Lake Avenue Storm Sewer Outfall and the Conopco Site. Three sediment cores were recently collected at the Lake Avenue outfall as part of a 2022 sediment sampling effort conducted in the upper nine miles of the Passaic River in OU4. Cores were collected to a depth of 10 ft, or refusal, and segmented into 1-ft. intervals for the analysis of dioxins/furans, pesticides, DDx, and dieldrin. High hits of dioxins/furans and pesticides were found in this area, particularly in core UPR-11-04, located in closest proximity to the Lake Avenue outfall. Elevated concentrations of dioxins/furans and pesticides were found to be collocated at several depth intervals in this core. The co-location of pesticides and dioxin at the Lake Avenue Storm Sewer Outfall provides supporting evidence that the Conopco Site is a source of both of these COCs, and that discharges from the Conopco Site to the storm sewer caused releases to the Passaic River that are unaccounted for in Batson's allocation.

Batson's analysis of Conopco's responsibility ignores the full record and available documents, resulting in a party allocation that disregards substantial direct discharges of both dioxins and DDx.

### 4.    EnPro Holdings, Inc.

Batson makes several basic factual errors in his analysis of the Crucible Steel site and operations. These errors bias his calculations and cause him to severely underestimate the amount of contaminants that were historically discharged from EnPro's site.

1. **Batson does not acknowledge a portion of the site.** It is undisputed that the dock area was part of the Crucible Steel operations and is part of the site. Batson gives no explanation why this piece of the site was not factored into his calculations. This portion of the site is severely contaminated with PCBs.

2. **Batson does not calculate Crucible Steel's discharges from its weapons manufacturing operations during WWI and WWII.** While he acknowledges that the operations occurred, Batson does not factor in discharges of mercury and PCBs from the arms manufacturing operations.

3. **Batson did not have access to all the sampling data, and therefore uses incorrect sampling data "maximums" in his calculations.** EnPro did not provide a full set of the sampling data for the site. When calculating PCB discharges, for example, Batson represents that the maximum soil sample result for PCBs at the site was 3.8 mg/kg. The actual sampling data for the site contains several PCB soil samples above 200

---

[429] See **Ex. A-31** (Jan. 29, 1976 letter from Penick to EPA) (OCC-TIG-E00796550).

[430] See **Ex. A-32** (Mar. 2, 1976 letter from Penick to PVSC) (OCC-TIG-E00796553).

ALCD-PUBCOM_0000537

mg/kg, and the correct maximum concentration of PCBs at the site is 240 mg/kg. But because Batson uses an incorrectly low sampling result—3.8 mg/kg instead of 240 mg/kg—he calculates an incorrect estimate of PCB discharges that is 60 times lower than it would have been if he used the correct PCB sampling data.

Critically, each of these factual errors result in Batson *under*estimating EnPro's discharges to the Passaic River. None of Batson's factual errors results in *over*estimating EnPro's COC discharges.

### a.  Description of the Crucible Steel Site and Historical Operations

EnPro is the successor to Crucible Steel, which operated its "Atha Works" facility on a 63-acre property next to the Passaic River in Harrison, New Jersey, from 1900 to 1947. EnPro's Atha Works operations included steel manufacturing, but centered around arms production leading into and during World War I and II. Batson acknowledged the arms manufacturing operation in one place in his report, but did not factor into his analysis EnPro's increased use and discharge of hazardous substances directly to the Passaic River, including PCBs, lead, copper, and PAHs during wartime. In the case of mercury, Batson failed to acknowledge that mercury was commonly used in arms production in the first half of the 20th century, and calculated that EnPro was responsible for 0 discharges of mercury, despite high concentrations in the site soil and in former drainpipes that suggest otherwise. EnPro used these hazardous substances in the following manner:

- **PCBs** – After PCBs were introduced in 1929, EnPro used PCBs in the transformers and heat exchange equipment necessary to power and control the high temperatures necessary for steel production, as well as the melting and casting of large metal ingots into 16-inch cannons and heavy battleship artillery. Before PCBs were found to be harmful in the 1960s, it was common practice to dispose of spent PCB oil in site soil or directly to the Passaic River.[431] Site soil contamination shows high concentrations of PCBs on the former dock area next to the Passaic River, up to 240 mg/kg. Batson incorrectly estimates the maximum contamination of PCBs is 3.8 mg/kg.
- **Mercury** – EnPro utilized mercury in its production of artillery, detonators, bombs, armor-piercing projectiles, or other explosives. Site soil shows elevated concentrations of mercury in various areas of the site, specifically near the former shell shops (154 mg/kg), bomb assembly and bomb heat-treating buildings [add], and in drain pipes (78 mg/kg). Batson incorrectly estimates the maximum contamination of mercury is 10.2 mg/kg.
- **Lead** – EnPro admits its steel production involved "lead quenching baths" to rapidly cool the steel during production. Batson estimates the maximum contamination of lead is 72,800 mg/kg, but does not factor this result into his calculation because he determined it was "historic fill."
- **Copper** – EnPro used copper in the production of copper alloys and specialty metals and products for the war effort. Batson estimates the maximum contamination of copper is 432 mg/kg, but does not factor this result into his calculation because he determined it was "historic fill."

---

[431] *See generally* **Farley** Decl.

ALCD-PUBCOM_0000538

- **PAHs** – copious amounts of PAHs entered the environment as a result of EnPro's use of coal and coke in its production of steel.

EnPro directly discharged waste containing these hazardous substances to the Passaic River through an extensive system of underground pipes. This drainage system underpinned the entire 63-acre site and consisted of surface-level manholes that drained into 16,588 feet of lateral pipes, which fed into a main pipe, 6 to 8 feet in diameter. The main discharged directly into the Passaic River through a 6 by 6-foot box culvert outfall. In 1947 EnPro reorganized its operations due to reduced demand for arms production. EnPro sold and leased portions of the property to other entities, discontinued its "Atha Works" operations, and relocated its "Spaulding Works" steel mill operations to a 14-acre portion of the site. EnPro's Spaulding Works continued steel manufacturing operations until 1973.

In addition to the direct discharges, EnPro's contamination entered the Passaic River through groundwater migration, rainwater runoff, and erosion of contaminated soil. As noted above, site soil contamination across the 63-acre site includes high concentrations of PCBs, mercury, lead, copper, and PAHs. Site groundwater contamination echoes those results.

### b. Factual Errors in Batson's Calculation of COC Discharges Through 4 Discharge Pathways

The Batson Report analyzes four discharge pathways to determine EnPro's overall percent contribution of contaminants to the Passaic River: (1) overland, (2) pre-PVSC, (3) PVSC, and (4) direct discharge.[432] Yet the Batson Report ultimately found that over the course of EnPro's 75 years of operations at the site, EnPro discharged only 10 kg of mercury and 5 kg of PCBs.

Batson's calculations fatally underestimate EnPro's actual chemical discharges for two reasons. First, EnPro did not provide—and therefore Batson did not consider—most of the available sampling data for the site, which show significantly higher concentrations of COCs, especially PCBs and mercury. Batson's report does not consider an entire section of the site that was found to be saturated with PCBs. Second, Batson made a material error by treating the Crucible Steel Site as only a steel manufacturing site, when it is well documented that Crucible Steel manufactured weapons (ordnance) for the government during WWI and WWII. Ordnance manufacture at the time involved both mercury and a higher usage of PCBs.[433]

If Batson had considered the correct sampling data and EnPro's ordnance manufacturing operations, EnPro's discharges to the river would be significantly greater. Two COCs that impact human health—PCBs and mercury—would increase exponentially: mercury would increase from 9.87 kg to at least 71.38 kg, and possibly as high as 503.33 kg, and PCBs from 4.11 kg to 210.48 kg.

### i. Pathway 1: Overland, Fate & Transport[434]

---

[432] Batson Report at 19-27.

[433] *See generally* **Stradling** Decl. ¶ 48.

[434] Despite naming Pathway 1 "Overland, Fate & Transport," which would typically encompass groundwater migration into the Passaic River, Batson only factors in soil erosion in Pathway 1. This is a critical oversight in Batson's methodology. Significant quantities of contaminants flow into the Passaic River via groundwater.

ALCD-PUBCOM_0000539

Batson's calculations in Pathway 1 severely undercount overland migration of PCBs, mercury, lead, and copper from EnPro to the Passaic River. These errors are due to (1) incorrect sampling data, and (2) the misapplication of the regulatory loophole for "historic fill."

**Incorrect Sampling**

EnPro did not provide, and Batson did not factor in, the correct COC sampling results at the EnPro site.

To calculate the mass of COCs that discharged to the Passaic River via soil erosion, Batson uses the maximum[435] concentration of each COC found in the site soil—based on the sampling data each participating company chose to provide to him—and factors that concentration into an equation that determines the amount, in kilograms, of each COC that eroded with the soil into the river.

For EnPro, Batson used incorrect maximum sampling data to calculate the Pathway 1 discharges. EnPro did not provide the sampling data reports that recorded the true maximum results to Batson. As a result, Batson's calculations for EnPro's discharges of PCBs, mercury, copper and lead were artificially low. These sampling results represent the corrected values for the main portion of the site.

| Constituent Of Concern (COC) | Batson "Max" Sampling Result (mg/kg) | Batson Overland, Fate & Transport Mass (kg) | Accurate Max Sampling Result (mg/kg) | Re-Calculated Overland, Fate & Transport Mass (kg) |
|---|---|---|---|---|
| Copper | 0 | – | 2,300 | 2,104.84 |
| PCBs | 3.8 | 4.11 | 240 | 210.48 |
| Mercury | 10.2 | 9.87 | 78[436] | 71.38 |
| Lead | 0 | – | 3,710 | 3,395.20 |

### 5.    General Electric Company

Batson's analysis of General Electric Company's ("GE") 5th Street Facility—the former RCA Facility—considers only a quarter of the site's total area. This oversight destroys the credibility of his analysis for this site, and skews his discharge calculations far below any estimate based on reality. The Batson Report gives no explanation for reviewing only a portion of the site—

---

[435] In nearly all instances Batson uses the maximum concentration found at the site. However, he does reserve the right to use a "representative" sample instead.

[436] Mercury was detected up to 550 mg/kg in site soil, which would increase EnPro's Pathway 1 discharge to 503.33 kg.

128

one city block—and overlooking GE's responsibility for the hazardous substances spread across three more city blocks in Harrison, New Jersey.

It is undisputed that the former RCA Facility in Harrison spanned 12.75 acres in Harrison until 1976.[437]



EPA is aware of the true boundaries of the former RCA Facility. In May 2018, NJDEP asked EPA to evaluate the site under the Superfund program due to extreme mercury contamination.[438] EPA publicly described the former RCA Facility as the entire area highlighted in green below.

---

[437] PAP-00341682 (Dec. 31, 1975 RCA Plant Facility Survey, Harrison Plant) at PAP-00341685.

[438] *See* EPA Superfund Site: Former GE/RCA Facility Harrison, NJ,
https://cumulis.epa.gov/supercpad/cursites/csitinfo.cfm?id=0202929 (last visited Mar. 19, 2023).

129

ALCD-PUBCOM_0000541



Inexplicably, Batson's report considers evidence from the "Vo-Toys" section of the site, only—and then purports to assign a share of liability to GE for the **entire former RCA Site**.

Batson's report describes the entire 5th Street Facility as consisting only of "Buildings A, B, and C, which covered a total area of approximately 68,000 square feet."[439] Batson only refers to remedial reports that address only the one-block VO Toys area of the much larger former RCA Facility.



---

[439] Batson Report at 1055.

ALCD-PUBCOM_0000542

In direct contradiction, EPA's 2019 Enforcement Action Memorandum for the Vo-Toy's Site, EPA acknowledged that the "footprint occupied by the Site structures is approximately 195,000 square feet."[440] EPA states that Block 165 was purchased in 1912 and was used as part of the site until it was demolished in the late 1970s for residential housing.[441] Considering GE closed the full plant in 1976[442], around the same time of the redevelopment of Block 165, it's unclear why Batson ignored this portion of the site. GE itself is aware of the boundaries, and produced several maps of the former RCA facility, including the 1975 figure below that depicts multiple buildings at the site and acknowledges portions that are *not* part of the site.



Buildings 33, 34, 36, and 37 were built in the early 1900s and are now known as Buildings A, B, and C at the Vo-Toys Site. Buildings 40, 42, 43, 46 and 47 were built in the early to mid-1900s and are now referred to as Block 165.

Because Batson overlooked at least *three quarters* of the area of site, Batson's analysis of this site is dramatically incorrect.

### a.    Description of the former RCA Site and Historical Operations

---

[440] **Ex. A-33** (Jul. 1, 2019 USEPA Enforcement Action Memorandum for the Vo-Toys Site) (GECO-FED-0000024103) at GECO-FED-0000024112.

[441] *Id.*

[442] **Ex. A-34** (Mar. 24, 1976 RCA Announcement to Close Harrison, NJ Plant) (GE00000603).

ALCD-PUBCOM_000543

In assessing the timeline at the 5th Street Facility, Batson states The Edison Lamp Company acquired the property in May 1881[443] and consolidated into the Edison General Electric Company ("Edison") in 1885.[444] In 1881, Thomas Edison "patented an all-mercury combination vacuum pump" to evacuate incandescent lamps.[445] Edison's demand grew by "April 1882, therefore, operations were transferred to a larger plant in Harrison, New Jersey, where, by mid-summer, 150 employees were producing twelve hundred lamps per day."[446]

Edison's patent and diagram for the all-mercury combination vacuum pump includes a mercury-reservoir and common mercury well.[447] In the below diagram, Edison identified 6, 10, or 20 as suitable mercury reservoirs, and described filling receptable 10 with mercury. The photograph next to the diagram shows Edison, years later, reenacting the process for the all-mercury combination vacuum pump and appears to confirm the pouring of raw mercury into the pump.[448] This directly contradicts Batson's assertion that "mercury was not noted to be used as a raw material in incandescent lamp manufacturing."[449]

 

---

[443] PAP-00342910 (2019 Vo-Toys Building Assessment Summary Report) at PAP-00342922.

[444] PAP-00075191 (Excerpt from Hive of Industry, Harrison, NJ) at PAP-00075192.

[445] PAP-00341716 (2016 The Role of Mercury in Vacuum and PVD Technology) at PAP-00341717.

[446] PAP-00075194 (1979 Excerpt from A Century of Light) at PAP-00075196.

[447] Patent No. 248,425, dated October 18, 1881, *available at* https://www.edisonmuckers.org/wp-content/uploads/2012/06/00248425.pdf (last visited Mar. 19, 2023).

[448] Thomas Edison and Francis Jehl Re-Enacting Invention, *available at* https://www.gettyimages.com/detail/news-photo/thomas-edison-and-friend-francis-jehl-rehearse-for-a-re-news-photo/529797918?adppopup=true (last visited Mar. 19, 2023).

[449] PAP-00075191 (Excerpt from Hive of Industry, Harrison, NJ) at PAP-00075192.

132

While new technology may have replaced the mercury glass vacuums sometime after 1896, incandescent lightbulbs were manufactured on site until 1929.[450] Thereafter, manufacturing switched to radio-tubes, among other things, and there is evidence mercury was used at the site during that time.[451]

The documents provided to Batson support the fact that mercury was used at the facility until at least 1942.[452] On June 19, 1942, RCA released a standardization notice for the reclaiming process of mercury.[453] The notice instructs employees to place the beaker of mercury "in the sink and wash for about one to two minutes with hot running water, at a rate of flow insufficient to carry mercury globules out of the beaker."[454] This notice, and Batson, assume that all employees handling mercury beakers will turn the faucet on at the exact, unspecified, rate to prevent any mercury from going down the drain. With human error as a variable, it cannot be assumed that the reclaiming process prevented mercury discharge. Notably, the former RCA Facility connected to the PVSC system in 1924 and was located within the Bergen Street CSO district.[455]The connection pre-dates the reclaiming process notice, further supporting the risks ensued by washing mercury in the sink.

### b.    Factual Errors in Batson's Calculation of COC Discharges

### i.    Overland Fate & Transport

Batson uses the mercury sampling result of 3.4 mg/kg in his overland calculation, which Batson incorrectly represents is the highest concentration of mercury in the site soil at an exterior location. The sample was taken on May 16, 2014 at a depth of 5.5-6.0 feet.[456] Site samples from soil borings at Block 165 taken in 2017 and 2018 show significantly higher concentrations of mercury in the site soil: On January 29, 2018, 80.3 mg/kg mercury was detected in the site soil at 4-4.5 feet deep.[457] A year earlier, on June 25, 2017, a larger mercury hit of 91.7mg/kg at 3.5-4 feet deep was also detected.[458] General Electric did not disclose these sampling results to Batson.

---

[450] **Ex. A-33** (Jul. 1, 2019 USEPA Enforcement Action Memorandum for the Vo-Toys Site) (GECO-FED-0000024103) at GECO-FED-0000024112.

[451] *Id.*

[452] PAP-00075216 (1942-06-19 Standardizing Notice 34-8-1 Reclaiming Mercury) at PAP-00075216.

[453] *Id.*

[454] *Id.*

[455] PAP-00342793 (Jan. 8, 1998 Affidavit of Seymour A. Lubetkin) at PAP-00342795; PAS-00122715 (2006 Extraction Form).

[456] PAP-00074652 (AMEC's July 15, 2015 Remedial Action Work Plan).

[457] **Ex. A-35** (GE RCA Harrison Sampling Results) (Excerpts from GECO-FED-0000002679). SB-59 is depicted on page GECO-FED-0000021428 of **Ex. A-36** (Mar. 25, 2019 NJDEP Alternative or New Remediation Standard Application Form) (GECO-FED-0000021415).

[458] **Ex. A-37** (Summary of Soil Sample Analytical Results for Mercury) (GECO-FED-0000000995) at GECO-FED-0000000996. SB-25 is depicted on page GECO-FED-0000021428 of **Ex. A-36** (Mar. 25, 2019 NJDEP Alternative or New Remediation Standard Application Form) (GECO-FED-0000021415).

ALCD-PUBCOM_0000545



The 91.7 mg/kg detection, circled in red above, located near the corner of 6th Street and Sussex Street, matches up with Building 40 of Block 165 (above). As explained earlier, Building 40 was built in 1912, which supports the theory of continued raw mercury use at the former RCA facility.

### c.    Culpability Factor

At the outset of the Batson report, Batson outlines the culpability factors, including but not limited to the following:

- Whether actions resulted in the filing of civil or criminal actions to address facility operations or resulting contamination
- Whether actions were taken with apparent disregard of impact on human health or the environment or demonstrate an intentional violation of federal or state environmental authorities

In addressing GE's culpability, Batson notes "[n]umerous areas inside and outside buildings were contaminated with mercury" but seemingly ignores the *seven-year* litigation brought by BRG Harrison Lofts Urban Renewal LLC ("BRG") and EPA's involvement at the site. Instead, Batson's only recognition of mercury in addressing GE's culpability is that there was mercury contamination and fails to mention the significant impact of that contamination.

In 2015, BRG Harrison Lofts Urban Renewal LLC ("BRG") bought the 5th Street Facility Site and sued General Electric in 2016 for its inadequate investigations, mercury contamination, and failure to properly remediate.[459] In a 2016 letter to GE, counsel for BRG explained that

---

[459] PAS-00049076 (2016-11-17 First Amended Complaint - Civil Action No. 2:16-Cv- 006577).

ALCD-PUBCOM_0000546

"mercury vapor concentrations exceed federal benchmarks…on every floor of each of the three Buildings" and "visible globules of elemental mercury" were observed.[460] BRG concluded that "the limited sampling conducted to date demonstrates that the Buildings are an ongoing source of mercury to the environment and may pose an imminent and substantial endangerment to human health or the environment."[461] In a 2019 Building Assessment Summary Report ("BASR"), further sampling was conducted to confirm the high levels or mercury vapor and globules at the site.[462] The BASR concluded that reuse of any of the three buildings at the 5th Street Facility would not be feasible; it would require dismantling of walls and long-term indoor air monitoring.[463]

Also in 2019, EPA determined that the site was a threat to public health or welfare and the environment.[464] EPA acknowledged that the site is in a densely populated area, and if a fire were to take place, it would "release a plume of mercury into the air that will likely travel into the surrounding neighborhood resulting in exposures to airborne mercury vapor above health-based thresholds."[465] If a fire were to occur,"[s]ignificant quantities of mercury could be released and reach the Passaic River via fire-fighting run off through the storm sewer system."[466] Due to the dangerous and complicated nature of this site, this litigation and remediation is ongoing and the site is secured by locked fences.[467]

As explained earlier, this site is also now an EPA Superfund site with testing currently ongoing. In a December 2022 Supplemental Investigation Work Plan, which was not factored into the Batson Report, Anchor QEA acknowledges further mercury and mercury vapor testing will take place.[468]

### d.    Cooperation Factor

In evaluating GE's cooperation, Batson credits GE as a CPG and SPG member. However, GE's corporate representative testified that GE is *no longer* a CPG member[469] and withdrew from the group in September 2014.[470] Assuming any of the settling defendants should receive any cooperation credit as members of the CPG or SPG (given their limited work on the Site), GE should not be rewarded for their departure from the group almost ten years ago.

---

[460] *Id.* at PAS-00049120.

[461] *Id.*

[462] PAP-00342910 (2019 VO-Toys Building Assessment Summary Report).

[463] *Id.*

[464] **Ex. A-33** (Jul. 1, 2019 USEPA Enforcement Action Memorandum for the Vo-Toys Site) (GECO-FED-0000024103).

[465] *Id.* at GECO-FED-0000024116.

[466] *Id.* at GECO-FED-0000024118.

[467] PAP-00342910 (2019 VO-Toys Building Assessment Summary Report).

[468] *See* Anchor QEA, Supplemental Investigation Work Plan (Partial) (Dec. 2022), *available at* https://response.epa.gov/sites/12742/files/Supplemental%20Investigation%20Work%20Plan%20Partial_12072022_FINAL.pdf (last visited Mar. 19, 2023).

[469] **Ex. A-38** (Excerpts from Oct. 10, 2022 Deposition of Robert G. Gibson, GE Corporate Representative (Contribution Action)) at 130:10-18.

[470] **Ex. A-39** (GE's Responses and Objections to Plaintiff's Standard Set of Interrogatories) at 22.

135

6.    **Givaudan Fragrances Corporation**

a.    **The Batson Report Ignores Evidence of Givaudan's Substantial Contribution of 2,3,7,8-TCDD to the Passaic**

The Batson Report assigns Givaudan a miniscule share of liability for OU2-related costs: less than *two hundredths of a percent* under versions of Batson's calculations.[471] To reach this result, Batson erroneously concludes that Diamond Alkali is alone responsible for nearly all 2,3,7,8-TCDD in the Passaic River,[472] ignoring credible and well-established EPA-funded and peer-reviewed studies both establishing multiple dioxin contributors and confirming Givaudan's role as a substantial 2,3,7,8-TCDD contributor. Batson's failure to consider this evidence undermines his allocation and by itself warrants the United States' withdrawal of its proposed settlement.

Batson's analysis of Givaudan confirms not only that Batson failed to take into account the established, peer-reviewed literature describing multiple dioxin sources, but also that Batson did not have—or ignored—contemporaneous evidence that Givaudan's hexachlorophene processes would have resulted in 2,3,7,8-TCDD contamination. Batson's Givaudan analysis also is an example of the bias that Batson showed again and again in favor of the settling defendants.

b.    **Batson's Allocation Fails to Consider Givaudan's Documented Manufacturing Processes, Which Were Ideal for 2,3,7,8-TCDD Formation**

In its earliest known response to a 104(e) request for information by EPA, Givaudan represented it had "manufactured hexachlorophene for many years," and that its manufacturing of hexachlorophene ("HCP") could be separated into two types: (1) hexachlorophene produced in 1948 and 1949 made from "technical grade" 2,4,5-TCP, and (2) hexachlorophene that it produced in all other years made from "pre-purified" 2,4,5-TCP. *See* Givaudan Oct. 26, 1983 Ltr. to EPA at 1-2. The Batson Report assumes neither of these two categories of HCP production resulted in 2,3,7,8-TCDD byproduct,[473] quoting Givaudan's self-serving statement in 2016 that "it was 'highly unlikely' that Givaudan's HCP manufacturing process generated TCDD because it used acidic conditions and low temperatures in its process."[474]

Givaudan's documented manufacturing processes, however, show that they were ideal for 2,3,7,8-TCDD formation. These documents showing alkaline, high-temperature processes apparently were never provided to Batson, because they are neither cited by Batson nor included in the United States' "supporting" documents for the proposed consent decree:

---

[471] *See* Batson Report, Attachment K.

[472] *See* Batson Report, Attachment L (in Allocation Facility CMass Calculation, assigning OxyChem all 38 kg of dioxins/furans).

[473] The Batson Report appears to conclude that no amount of dioxins were discharged from the Givaudan Clifton facility except for 1,212 lbs. related to an August 1982 spill of HCP that was washed down the sewer. *See* Batson Report, Attachment L at 406.

[474] *See* Batson Report, Attachment J for Givaudan at 6 (quoting Nov. 10, 2016 *Givaudan Fragrance Corporation Supplemental Response to 104(e) Request for Information*).

136

ALCD-PUBCOM_0000548

- **1941:** Givaudan's "G-11 Process"[475] uses a "hot alkaline solution."[476]

- **1948:** Givaudan's process for manufacturing 2,4,5-TCP calls for use of "312 lbs. of caustic soda flakes" and maintaining a temperature "for four hours at 175°C."[477]

- **1948:** Givaudan predecessor Burton T. Bush, Inc. patents a "Process for Making Bis-(3,5,6-Tri-Chloro-2-Hydroxyphenyl) Methane," describing "alkaline solutions" and temperatures raised "to 130° C. or even 150° C."[478]

Other documents showing alkaline, high-temperature processes were available to Batson, and completely ignored:

- **1945:** Givaudan's "Improved Process for the Manufacture of Compound G-11" notes the "optimum temperature" for the G-11 process "lies between 130° and 140° . . . ."[479]

- **1979:** A "Process Instruction Form" for G-11 instructs operators to raise pot temperatures "rapidly to 125-130° C," then back to 115-120° C . . . ."[480]

These documents—which the Batson Report never mentions or considers—show Givaudan used a manufacturing process with *alkaline* conditions and *high* temperatures—conditions Givaudan has conceded could lead to 2,3,7,8-TCDD contamination.[481]

The Batson Report notes that Givaudan's 1983 104(e) response admits Givaudan "developed its own method to manufacture technical grade 2,4,5-TCP, which was distilled into 'pre-purified' 2,4,5-TCP and used in HCP manufacture."[482] Batson also acknowledges Givaudan's admission that it made over 300,000 lbs of pre-purified 2,4,5-TCP through this method in 1948 and 1949.[483] Yet Batson completely fails to acknowledge Givaudan's admission in its 1983 response that the "'technical grade' 2,4,5-TCP was manufactured by the *alkaline* hydrolysis of 1,2,4,5 tetrachlorobenzene with caustic soda dissolved in ethylene glycol." *See* **Ex. A-45** (Oct. 26, 1983 Givaudan Letter EPA) at 3 (emphasis added).

In the Contribution Action, Givaudan's corporate representative admitted that Givaudan used an alkaline process. *See* **Ex. A-46** (Excerpt from Videotaped Deposition of Richard

---

[475] "G-11" was Givaudan's HCP product.

[476] *See* **Ex. A-40** (Nov. 18, 1941 G-11 Process, Sodium Salt Method) (GIV_NBC_0664675) at GIV_NBC_0664676.

[477] *See* **Ex. A-41** (1948 G-11 Process) (GIVA-FED-0000342825) at GIVA-FED-0000342847.

[478] *See* **Ex. A-42** (U.S. Patent No. 2,435,593) at 1, 2.

[479] *See* **Ex. A-43** (1945 G-11 Process) (GIV_NBC_0664681) at GIV_NBC_0664681.

[480] *See* **Ex. A-44** (G-11 Process Instruction Form) (GIVA-FED-0000000171) at GIVA-FED-0000000173.

[481] *See* **Ex. A-45** (Givaudan Oct. 26, 1983 Ltr. to EPA) at 1-2 ("EPA's proposed dioxin regulations, published on April 4, 1983, correctly recognized the distinction . . . between hexachlorophene manufactured using 'technical grade' 2,4,5-TCP, in which 2,3,7,8-TCDD contamination might have occurred, on the one hand, and hexachlorophene made with 'pre-purified' 2,4,5-TCP, using a reaction which occurs at rather low temperatures and at acid pH, in which 2,3,7,8-TCDD contamination is not expected to occur, on the other.").

[482] *See* Batson Report, Attachment L for Givaudan at 3.

[483] *Id.*

137

ALCD-PUBCOM_0000549

Wroblewski) at 41 ("Q. And I'm asking you as Givaudan's corporate rep in this litigation, does Givaudan agree that its 2,4,5-TCP process was alkaline? . . . A. I have to rely on this documentation. It was prepared back in the day when the people that were still there ran operations. Q. So Givaudan agrees that it was an alkaline process; correct? . . . A. Yes."). When questioned about the 1948 document recording Givaudan's process for manufacturing 2,4,5-TCP, Givaudan's corporate representative conceded that Givaudan's 2,4,5-TCP manufacturing was both alkaline and a high-temperature process. *Compare* **Ex. A-41** (1948 G-11 Process) at GIVA-FED-0000342847, *with* **Ex. A-46** (Excerpt from Videotaped Deposition of Richard Wroblewski) at 54-56.

Despite this evidence, Givaudan has repeatedly claimed—to EPA and, presumably,[484] EPA's allocator Batson—that its manufacturing process was low temperature and conducted in acidic conditions that would not have generated dioxin. *See* Givaudan Oct. 26, 1983 Ltr. to EPA at 2. Neither Givaudan nor EPA apparently ever provided to Batson three of the critical process documents cited above—the 1941 document regarding the "G-11 Process"; the 1948 document regarding the process for "2,4,5 Trichlorophenol Manufactured at Givaudan-Delawanna Inc."; and U.S. Patent 2,435,593. The United States should withdraw the proposed consent decree; it should not reward Givaudan for misrepresenting or failing to disclose critical facts relevant to liability.

### c.    Batson's Givaudan Analysis Ignores Contemporaneous Evidence in Favor of Post-1976 Givaudan Documents.

In 1976, Givaudan subsidiary Industrie Chimiche Meda Societa Azionaria's ("ICMESA") caused a massive industrial explosion in Seveso, Italy after losing control of its 2,4,5-TCP production process.[485] The "Seveso disaster" was responsible for the highest known exposure to 2,3,7,8-TCDD in residential populations. After the Seveso disaster, Givaudan tried to clean up its act to reduce dioxin content in its G-11. *See, e.g.,* PAP-00183644; PAP-00182228; PAP-00169580 (Givaudan testing for TCDD in the months after the Seveso disaster between August and November 1976). Givaudan stopped producing G-11 altogether a few years later, in 1984.[486]

Batson relies on evidence from *after* the Seveso disaster—*i.e.,* after Givaudan implemented stricter quality controls around 2,3,7,8-TCDD—to incorrectly infer that there was little or no 2,3,7,8-TCDD in the millions of pounds of 2,4,5-TCP that Givaudan purchased *much earlier.* Only *four* of the 130 documents Batson cites in his Givaudan evaluation are dated before the 1976 Seveso disaster:[487]

---

[484] The United States has not made public any of the position statements that it concedes parties like Givaudan submitted during the Batson process.

[485] PAP-00180885.

[486] *See* PAP-00170543 (March 1990 NIOSH Dioxin Registry Site Visit Report of Givaudan Corporation, Clifton, New Jersey) at PAP-00170545 (Givaudan's Clifton plant produced hexachlorophene "from 1945 to 1984"); *id.* ("Hexachlorophene or G-11® as it was known commercially was produced until May 1984.").

[487] Index of Allocation Report Documents Provided by Participating Allocation Parties and EPA (EPA Doc. IDs 645074 –645152). Dates for the following documents have been corrected: (1) PAP-00345419 (Batson 5/29/1905 date corrected to 1/1/1976 date because first page shows date 1976, without month or day); PAP-00181684 (Batson 11/12/1962 date corrected to 11/12/1982 because this is actually a larger document containing several smaller documents, but Batson only cites to pages from the 1980s, most of which are from 1982—*i.e.,* PAP-00182118 (page within July 1982 document), PAP-00182108 (page within July 1982 document), PAP-00182084 (Nov. 19, 1980 document), PAP-00181773 (Sept. 14, 1982 document), PAP-00181906 (Nov. 10, 1981 document); PAS-00001801 (Batson 1/0/1900 date corrected to June 17, 1983, date on page 3), PAS-00001808 (Batson 1/0/1900 date corrected

ALCD-PUBCOM_0000550



This sample is not representative of Givaudan's operational history. Most of Givaudan's G-11 production occurred *before* the Seveso disaster, and *before* Givaudan ever sampled any of its 2,4,5-TCP feedstock for dioxins:[488]



As shown above, the 1950s and 1960s were Givaudan's busiest decades for G-11 production. Sediment sampling confirms that "the highest 2,3,7,8-TCDD concentration [in the Passaic]

---

to March 5, 1987, date on page 14), PAS-00001783 (Batson 1/0/1900 date corrected to March 5, 1987, date on page 9), PAS-00001767 (Batson 1/0/1900 date corrected to Feb. 16, 1988, date on page 7), PAP-00176650 (Batson 1/2/1900 date corrected to 1/1/1990, because Batson cites to page 22 of larger doc (PAP-00176671), which is dated 1990), and PAS-00048073 (Batson 5/6/2014 date corrected to Nov. 14, 2016, date on page 14)).

[488] *See* PAP-00170543 at PAP-00170561; *see also* Batson Report, Attachment J for Givaudan, Appendix A-1 (hexachlorophene production volume attributed by Batson to Givaudan by year).

ALCD-PUBCOM_0000551

occurs between the mid-1950s and the mid-1960s."[489] Givaudan purchased and consumed millions of pounds of 2,4,5-TCP in that same timeframe.[490] At the time, Givaudan did not test its 2,4,5-TCP feedstock for dioxins—Batson simply assumes, with no evidence, there was little or no 2,3,7,8-TCDD in it.

### d.    The Disparate Treatment of Givaudan Exemplifies the Bias Permeating the Batson Report.

Batson takes Givaudan's representations at face value without supporting evidence—while on the same issues he makes negative inferences for the former Diamond Alkali site. The Batson Report is plagued throughout with bias against OxyChem,[491] and its treatment of Givaudan exemplifies this.

### i.    Disparate Treatment of Discharges

Relying on a single NJDEP report, Batson adopts Givaudan's position that there was little or no TCDD in Givaudan's discharges to the chemical sewer.[492] But while Givaudan's sewer permit required monthly reporting of TCDD content,[493] *Givaudan has no such monitoring reports.*[494] Batson rewards Givaudan for this failure to report (or failure to produce reports): while he notes that "discharge monitoring reports were not identified," he nevertheless accepts Givaudan's claim that its effluent had negligible TCDD content.[495] Batson accepts (without evidence) Givaudan's claim that there was no TCDD in the water running off of Givaudan's stormwater pond—despite having no concentration data to confirm that fact.[496] Batson also takes the evidence provided by Givaudan and compiles records of Givaudan's wastewater discharge, stormwater runoff, and process waste streams.[497] Where Givaudan does not provide evidence, Batson accepts Givaudan's claims about its sewer system, stormwater runoff, and wastewater disposal at face value.[498]

Batson does not take the same approach for assessing the Diamond Alkali site. Batson also had limited information on TCDD content in Diamond Alkali's discharges, but unlike for Givaudan, he chooses to invent a figure for TCDD content in Diamond's effluent based on other samples.[499] Rather than generating a representative average of annual discharges (like he does for

---

[489] Data Evaluation Report No. 3: "Contaminant History as Recorded in the Sediments" (2014) [EPA Doc. ID 703640].

[490] Batson Report, Attachment J for Givaudan, Appendix A-1 & A-2.

[491] *See* OxyChem Comments in Opposition, Part VI(B)(3).

[492] Batson Report, Attachment J for Givaudan at 13.

[493] PAP-00173361.

[494] Batson Report, Attachment J for Givaudan at 13.

[495] Batson Report at 2413 (Givaudan Direct Discharge Information).

[496] Batson Report, Attachment J for Givaudan at 27.

[497] *Id.* at 35–57.

[498] *Id.* at 12 (citing Givaudan's 104(e) response discussing wastewater discharge into on-site pits); 17 (citing Givaudan's 104(e) response discussing stormwater drainage swales); 18 (citing Givaudan's 104(e) response discussing facility connection to city sewer).

[499] Batson Report at 2580 (Occidental Direct Discharge Information).

ALCD-PUBCOM_0000552

Givaudan), Batson extrapolates from a single datapoint to make conclusions about Diamond Alkali's entire production history.[500]

### ii.  Disparate Treatment of 2,3,7,8-TCDD Contamination

Batson also accepts at face value that there was no TCDD released from Givaudan's 2,4,5-TCP production,[501] even though Givaudan presented:

- *"no records* describing 2,4,5-TCP equipment decontamination procedures."[502]

- *"no records* describing the methods of collection, storage, or disposal of such wastes, the names and addresses of haulers who might have hauled such wastes, or disposal site locations."[503]

- *"no records* from which the total amount of wastes generated in the manufacture of technical grade 2,4,5-TCP could be determined."[504]

- *no records* indicating "dates of disposal, the amount disposed on each occasion, the waste hauler, or the disposal location."[505]

Batson again rewards Givaudan for its incomplete record, and assumes there was no TCDD discharged from Givaudan's 2,4,5-TCP production.[506] And, even though Givaudan produced 2,4,5-TCP in the late 1940s, Batson *excludes those years* from his calculations of discharges to sewers and the Passaic.[507] Even in the single calculation that includes the years of 2,4,5-TCP production, Batson starts at 1947—the date that Givaudan claims "industrial" 2,4,5-TCP production began.[508] In doing so, Batson accepts Givaudan's self-serving position, disregarding the contrary NIOSH report that dates 2,4,5-TCP production as beginning in 1945.[509]

### 7.    Kearny Smelting & Refining

#### a.    Kearny Smelting withheld sampling data showing PCB contamination thousands of times higher than the data it provided to Batson.

---

[500] *Id.*

[501] *See supra.*

[502] Batson Report, Attachment J for Givaudan at 7 (emphasis added).

[503] *Id.* (same).

[504] *Id.* (same).

[505] *Id.*

[506] Batson Report at 2412–2415 (Givaudan Facility Data Calculations).

[507] *Id.* (using 1951 as the "Yr Ops started" when calculating direct discharge and sewer discharges).

[508] Batson Report, Attachment J for Givaudan at 7.

[509] *Id.* at 3; *see* PAP-00170543 (March 1990 NIOSH Dioxin Registry Site Visit Report of Givaudan Corporation, Clifton, New Jersey) at PAP-00170546 (discussing 2,4,5-TCP manufactured by Givaudan "from 1945-1949").

141

ALCD-PUBCOM_0000553

During the Batson process, new investigations of Kearny Smelting's site revealed PCB contamination thousands of times higher than the sampling data provided to Batson. If this new data had been considered, Kearny Smelting would have been the *largest PCB contributor* under Batson's allocation protocol. Kearny Smelting failed to disclose this key information to Batson.

In April 2018, Peak Environmental LLC sent Kearny Smelting's CEO Francine Rothschild a site assessment identifying gaps in sampling data and suggesting further investigation of Kearny Smelting's 936 Harrison Avenue property.[510] "Peak performed multiple soil investigations at the property between July 2018 and March 2019,"[511] and SGS North America Inc. conducted additional soil testing between September and November 2019.[512] This 2018 and 2019 sampling revealed PCB contamination up to 46,400 mg/kg.[513] Based on the new data, PT Consultants, Inc. submitted a Self-Implementing Cleanup Plan ("SIP") for PCBs on behalf of Kearny Smelting in August 2020.[514]

Even under Batson's flawed methodology, Kearny Smelting's allocated share for PCB contamination should have been much larger. Batson relied on outdated sampling data from 1993, with PCB concentrations up to 11 mg/kg in surface soil and 14 mg/kg in deeper soils. The new data showed PCB levels *thousands of times higher.*[515]

| PCB | Highest soil concentration by sample date [parts per million (ppm)] | | |
|---|---|---|---|
| | 1993 | September–October 2019 | November 2019 |
| Aroclor 1248 | 7.2 | 966.0 | 496.0 |
| Aroclor 1254 | 14.0 | 18,300.0 | 46,400.0 |
| Aroclor 1260 | - | 2,410.0 | 799.0 |

---

[510] **Ex. A-47** (Apr. 13, 2018 Phase I Environmental Site Assessment, Peak Environmental LLC).

[511] **Ex. A-48** (Aug. 12, 2020 Self-Implementing Cleanup Plan) at 7.

[512] *Id.*, Appendix E. LABORATORY ANALYTICAL PACKAGE 9/30/2019, at 55-111; Appendix F. LABORATORY ANALYTICAL PACKAGE 11/15/2019, at 1028-1051 (Aug. 12, 2020).

[513] The Technical Report created by SGS for PT Consultants was submitted to PT Consultants on November 26, 2019. It is unknown when Kearny Smelting received the reported results from PT consultants, but it can be assumed they received the results between November 26, 2019, when PT Consultants received the results, and August 12, 2020, when the report was sent to EPA.

[514] **Ex. A-48** (Aug. 12, 2020 Self-Implementing Cleanup Plan) at 5.

[515] *Id.*, Appendix E. LABORATORY ANALYTICAL PACKAGE 9/30/2019, at 55-111; Appendix F. LABORATORY ANALYTICAL PACKAGE 11/15/2019, at 1028-1051 (Aug. 12, 2020).

ALCD-PUBCOM_0000554

Batson estimated a PCB discharge of 5.31 kg from Kearny Smelting's soil based on a "[m]aximum total PCB surface soil concentration" of 11 mg/kg.[516] If Batson had used the undisclosed 46,400 mg/kg sample instead, that number would have been **22,398.5 kg**,[517] making Kearny Smelting the single largest PCB contributor according to Batson's methodology:[518]



Both Kearny Smelting and EPA knew about this 2018–19 soil sampling during the Batson process. EPA Region 2 Administrator Peter Lopez received the SIP on August 12, 2020.[519] The Batson Report was not finalized until four months later, on December 28, 2020.[520] According to Batson's revised work plan, PAPs were to submit an executed certification certifying they searched for responsive documents to the neutral allocator on January 31, 2020.[521] Parties continued to submit responsive documents to Batson after this deadline, including in March,[522] May,[523] June,[524]

---

[516] Batson Report at 2511.

[517] (46,400/11) * 5.31

[518] Batson Report at 2493 (ISP Chemicals LLC); 2461 (Hexcel Corp.); 2623 (Pharmacia LLC); 2565 (Nokia-Lucent Technologies).

[519] SIP at 1.

[520] Batson Report at 1.

[521] Contract Work Plan Tasks Timeline, AlterEcho.

[522] Batson Report at 405 (additional documents from Alliance Chemical Inc. submitted March 19, 2020).

[523] *Id.* at 873 (Curtiss-Wright); 1866 (Spectraserv); 1779 (Revere); 426 (Arkema); 1237 (Hoffman LaRoche); 470 (Atlas Refining); 1618 (PPG);1948 (Tate & Lyle); 853 (Cooper Industries); 562 (Benjamin Moore); 1913 (STWB).

[524] *Id.* at 1310 (Leemilt's Petroleum); 1146 (Goody Products).

ALCD-PUBCOM_0000555

and July[525] of 2020. Either Kearny Smelting or EPA should have included the 2018-19 sampling as part of the equitable allocation process before the Batson Report was finalized. If EPA and DOJ allow the Proposed Settlement to stand, Kearny Smelting will be rewarded for withholding critical data.

### 8. Legacy Vulcan Corp./Safety-Kleen Envirosystems Company/McKesson Corp.

Legacy Vulcan Corporation ("Vulcan") (and its predecessor Kolker Chemical Corporation) operated a chlor-alkali plant and a chloromethane plant, among other operations, from 1952 until 1975 at 600 Doremus Avenue in Newark, NJ (the "Doremus Avenue Site"). Inland Chemical Corporation, a predecessor to Safety-Kleen Envirosystems Company, purchased Doremus Avenue site in 1974. Under contracts with Inland, Vulcan continued its operations for approximately one year after that purchase, making Safety-Kleen and its indemnitor McKesson Corporation liable for Vulcan's operations.[526] Inland conducted a solvent-reclamation operation at the site until a massive fire at the site in 1982, after which the New Jersey Department of Environmental Protection ordered the site to be shut down.[527]

Batson's calculation of the allocation share attributable to each of these companies is erroneous and not supported by the record.

#### a. Vulcan, McKesson, and Safety-Kleen withheld critical evidence from Batson.

Depositions of former plant workers provide an extensive record of the operations at the Doremus Avenue Site. This record was unavailable to Batson because it was withheld from him by Vulcan, McKesson, and Safety-Kleen.

Just one of more than a dozen deposition transcripts was provided—and nearly all testimony in that transcript regarding site operations was removed from the copy submitted to Batson. Based on this alone the United States should not proceed with a settlement regarding the Doremus Avenue Site. The substance of the withheld information underscores that it would be arbitrary and capricious to proceed with a settlement based on Batson's uninformed and incorrect allocation.

Former plant workers testified consistently that the plant's practices and policies showed complete disregard for its impact to the Passaic River. One worker testified that "the standing joke of that plant" referred to the Passaic as the "Save-All Tank", and he described the plant's impact

---

[525] *Id.* at 1186 (L3Harris).

[526] PAP-00186886-93; PAP00188783-89; PAP-00187163-75

[527] PAP-00187256; PAS-00091937

ALCD-PUBCOM_0000556

on the river as "unconscionable."[528] Another testified that the Vulcan plant lacked "environmental rules" and workers were unconcerned about compliance or pollution.[529]

The testimony of these employees also informs critical aspects of the Doremus Avenue Site layout and operations that demonstrate the substantial link between those operations and the contamination in Passaic River sediments. For example:

- A former employee testified regarding the "sewers" that flowed not into PVSC, but into the river. "I believe there were many separate sewers discharging into [river] at one time from any areas of the plant, and after one of the expansions, I don't know which one it was, they were all tied together and they all went into this main big monstrosity, 36-inches in diameter…"[530]

- Another testified regarding air "sniff scrubbers" consisting of "spent caustic, salt, chlorinated whatever waste chlorine" which would be dumped routinely to the sewers.[531]

- Describing an open trench that flowed into the river, another testified: "That was where the chlorinated wastewater went down this open trench. … It was approximately at spots four foot wide and it tapered down, you know, pitched down to a point." The trench is described as approximately two feet deep with fluid and had effluent running through it almost continuously.[532]

### b.     For the entire period of operations at the Vulcan site, *all* discharges were directly to the Passaic River. Batson grossly understates the impacts of those discharges.

Batson grossly understates the impact of discharges from the Doremus Avenue Site on the Passaic River, and the shares assigned to Vulcan, McKesson, and Safety-Kleen are not proportionate to the impacts of those discharges.

For example, Batson assigns Vulcan a 5% culpability penalty for "occasional noncompliance", citing "pollution abatement orders" the New Jersey Department of Health issued to Vulcan in 1969. But evidence in Batson's possession—and not considered in his analysis of culpability—confirms there was nothing occasional about Vulcan's noncompliance. Vulcan first was required to regularly sample its effluent in 1972, and it soon after informed EPA, "We do not

---

[528] **Ex. A-49** (June 16, 1999 Depo. of Bernard Partington, *Safety-Kleen EnviroSystems Co. v. Continental Casualty Co., et al.*, Case 985528, Superior Court of California) (MKSK-FED-0000004177) at 74:2-15, 77:9-78:22.

[529] **Ex. A-50** (June 17, 1999 Depo. of Raymond Gilliam, *Safety-Kleen EnviroSystems Co. v. Continental Casualty Co., et al.*, Case 985528, Superior Court of California) at 574:15-575:19.

[530] **Ex. A-51** (Apr. 7, 1999 Depo. of Raymond Gillam, *Safety-Kleen EnviroSystems Co. v. Continental Casualty Co., et al.*, Case 985528, Superior Court of California) (MKSK-FED-000003382) at MKSK-FED-000003427.

[531] **Ex. A-52** (June 17, 1999 Depo. of Bernard Partington, *Safety-Kleen EnviroSystems Co. v. Continental Casualty Co., et al.*, Case 985528, Superior Court of California) (MKSK-FED-0000004099) at MKSK-FED-0000004146.

[532] **Ex. A-49** (Jan. 16, 1999 Depo. of Bernard Partington, *Safety-Kleen EnviroSystems Co. v. Continental Casualty Co., et al.*, Case 985528, Superior Court of California) (MKSK-FED-0000004177) at MKSK-FED-0000004215.

ALCD-PUBCOM_0000557

know of any feasible method for a significant reduction in lead [from the plant's effluent]."[533] From that point until closure of Vulcan's operations in 1975 the plant consistently exceeded discharge limits, particularly for lead; ultimately, the chloromethane and chlor-alkali plants operated by Vulcan were permanently shut down in 1975 because they could not comply with the applicable discharge limits, including the limit for lead, without a substantial investment.[534] These effluent discharges occurred for years before sampling was required. And because the site was never connected to the PVSC system, for more than twenty years the plant on a weekly basis flushed the buildup from its chlor-alkali cells—which used lead, copper, and PAH-containing asphalt—and discharged the untreated wastewater directly into the river.[535]

Drains collected process water and directly connected to sewers or open trenches across the Site, ending in three outfalls at the Passaic River.[536] The effluent was not monitored by the Site or governing agencies during most of Vulcan's time of operation.[537] One former employee described the trenches as "approximately two feet deep and four feet wide and had effluent flowing through it almost continuously."[538] A letter from Inland to PVSC, dated August 8, 1975, indicates that the Site was discharging its industrial wastewater directly to the Passaic River at the time of the letter.[539]

Occasionally, water in the Passaic River was stained an assortment of colors depending on the material exiting the outfalls. There were no settling ponds at the Site, and Vulcan pumped stormwater that pooled onsite either directly or via the sewer system to the river during its operating period.[540] Batson does not acknowledge the drainage ditches, lined and unlined trenches, and additional outfalls that carried water and contaminants to the Passaic River; therefore, the entire volume of contaminants entering this system from the process areas is not captured.

Batson also understates the impact of "overland transport" from the site because he consistently bases that part of his analysis on sampling results that are substantially lower than the highest concentrations detected. Lead was detected at a concentration of 3,100,000 mg/kg lead detected, but Batson states the maximum detected concentration is 30,000 mg/kg; copper was

---

[533] PAP-00186272 (Nov. 29, 1972 submission from Vulcan to EPA) at 15.

[534] *See* PAP-00363424 at 1 (April 30, 1975 letter from Inland to EPA stating "One of the principle reasons for closing down these two operations is the inability to meet the limitations on the discharge of total suspended solids and lead, which originates from the Chlor-alkali plant, and the limitations on the discharge of zinc, which originates in the C-1 operation.").

[535] **Ex. A-53** (Oct. 14, 2022 deposition of Carleton Degges, *OxyChem v. 21st Century Fox Am., Inc., et al.*, Case 2-18-cv-11273) at 33:20-34-6; 8:3-60:11; 62:6-66:10.

[536] **Ex. A-49** (Jun. 16, 1999 Depo. Of Bernard Partington, *Safety-Kleen EnviroSystems Co. v. Continental Casualty Co., et al.*, Case 985528, Superior Court of California) (MKSK-FED-0000004177) at MKSK-FED-0000004211–4213.

[537] *Id.*

[538] *Id.*

[539] **Ex. A-54** (Aug. 8, 1975 Inland Letter to PVSC)

[540] **Ex. A-55** (May 12, 1999 deposition transcript of Harvey Campbell, *Safety-Kleen EnviroSystems Co. v. Continental Casualty Co., et al.*, Case 985528, Superior Court of California) (MKSK-FED-0000002624) at MKSK-FED-0000002722–2723.

ALCD-PUBCOM_0000558

detected at 640,000 mg/kg, but Batson states the maximum is 8,400, mg/kg; and mercury was detected at 4,600 mg/kg, but Batson states the maximum detected is 23 mg/kg.[541]

### c. Discharges from the plant contaminated the Passaic River with PCBs.

Vulcan's chlor-alkali operation required extensive electrical infrastructure.[542] There were at least 12 transformers associated with the plant.[543] Company documents describe an incident in which a transformer was allowed to leak dialectic fluid onto site soil for days before any action was taken.[544] No follow-up sampling or other investigation was performed to evaluate the environmental impacts to the site or the river.[545]

Kolker (Vulcan) purchased at least 183,000 pounds of PCBs (including Aroclors 1242, 1248, 1254, and 1260) between 1958 and 1962.[546] Leaks and handling of the Aroclor fluids necessary for the chlor-alkali operation appear to have severely contaminated the site. But Batson fails to base his analysis on the highest detected concentration of PCBs, a June 1999 surface soil sample from those reports that contained 430 mg/kg total PCBs.[547] Rather, he concludes the maximum detected was 161 mg/kg. This error invalidates his conclusions regarding discharges of PCBs from the site.

### 9. L3 Harris Corporation

The Batson Report undercounts L3 Harris Corporation's ("Harris") contribution of copper to the Passaic River sediments. This is significant because Harris's liability at the Site is primarily due to its copper discharges.

The Batson Report calculates Harris's overland flow contribution of copper to the Passaic River by multiplying the copper found in the soils at the Harris facility by the number of years of discharge. One number the Batson Report uses, 865 ppm copper found in soil, is from a table with Bates number PAP-00199312, what Batson calls the "max concentration" of copper (see PAP-00199312 and Mr. Batson's calculation page attached). However, PAP-00199312 does not show the "max concentration" of copper in Harris's soils. A different table shows a max concentration of 2,380 ppm, almost three times as much.[548] Batson does not explain why he used the lower number from PAP-00199312 as the "max concentration" in the Batson Report.

[541] PAP00363061, Remedial Action Work Plan prepared for NJDEP, Case No. NJD-002153922, August 1994.

[542] Ex. A-56 (Jan. 14, 1975 Letter to Inland) (MKSK-FED-0000009700).

[543] *Id.* at MKSK-FED-0000009720.

[544] Ex. A-57 (July 28, 2022 deposition of James Fleer, *OxyChem v. 21st Century Fox Am., Inc., et al.*, Case 2-18-cv-11273) at 169:16–170:2.

[545] *Id.* at 170:18–21.

[546] PAP00366041-53; PAP-00366040

[547] PAP00363061 (Remedial Action Work Plan prepared for NJDEP, Case No. NJD-002153922, February 2000) at.5-3, 5-5-8-8.

[548] PAP-00199316.

ALCD-PUBCOM_0000559

Substituting 2,380 ppm for 865 ppm (a factor of 2.75) results in an estimated discharge of copper from the River Road portion of Harris's plant[549] of 510.73 kg instead of the original calculation of 185.72 kg (185.72 x 2.75 = 510.73). This results in 511.27 kg copper discharged from overland transport (after adding in 0.54 kg Batson calculated from a different portion of Harris's plant), and a total of 728.39 kg copper (after adding in 217.12 kg Harris discharged through PVSC (2.32% x 9,358.53 = 217.12)).[550] This results in a "COC historic CMass" for copper of 7.42, as opposed to Batson's calculation of 4.11.

In turn, this changes Harris's "COC Base Score" to 2.443E-6 (7.42 / 4.11 = 1.81; 1.81 x the original calculation of 1.350E-6[551] = 2.443E-6); and "Facility Adjusted BS" to 1.95E-6 (80% x 2.443E-6 = 1.9544E-6).[552]

This has the effect of almost doubling Harris's share. The party with the closest "Facility Adjusted BS" to Harris's recalculated "Facility Adjusted BS" is Textron (1.97E-6), which Batson gave a 1.17405E-08 share, almost double Harris's allocation of 6.50242E-09.

### 10.    Pitt-Consol Chemical Company

Batson's allocation for Pitt-Consol Chemical Company ("Pitt-Consol") at 191 Doremus Ave, Newark, NJ ("Pitt-Consol Site") attributes far too few direct discharges to Pitt Consol and places far too much reliance on erroneous assumptions.

#### a.    PVSC Discharges

Pitt-Consol operated at the Pitt-Consol Site from approximately 1955 to 1983 and owned the site from approximately 1955 to present. The Batson Report states that "it is assumed that from 1981-1986 that discharge went to PVSC" to calculate that Pitt-Consol had five years of POTW discharges.[553] One page later, Batson writes "Dam built by the City of Newark in 1969 redirected discharge in the CSO [(combined sewer overflow)] to the PVSC treatment facility" to calculate that Pitt-Consol had 14 years of direct discharge to the Passaic River ending in 1969.[554] But somehow, Batson did not include the years 1970-1980 in his calculations.[555] Batson simply did not calculate discharges for over one third of Pitt-Consol's operating history.

This unaccounted for timeframe most likely included direct discharges, to which Batson assigned a 100% Direct DMass C%, indicating that substantial and consequential discharges to the Passaic are missing from his calculations. The Pitt-Consol Site was connected to the Roanoke Ave storm sewer.[556] And Batson relies on the existence of a dam built in 1969 to inform his opinion

---

[549] Batson analyzed the Harris plant as consisting of three separately considered parts.

[550] *See* Allocation Facility CMass Calculation.

[551] Batson's "COC Base Score" for Harris's copper is 1.350E-6.

[552] *See* Batson's calculation of Harris's "Facility Base Score."

[553] Batson Report, Attachment L for Pitt-Consol at p. 5.

[554] *Id.* at 6.

[555] *Compare id.* at 5 & 6.

[556] Batson Report, Attachment J for Pitt-Consol at 15.

148

that no more direct discharges occurred.[557] His reliance on the dam is misplaced. In 1972, PVSC reported that industrial waste discharge from the Roanoke Avenue storm sewer continued even though a concrete dam had been built to prevent overflow from the sanitary sewer to enter the storm sewer. PAS-00006273 at PAS-00006274-75. To find the pollution's source, the storm sewer was cleaned, and a visual inspection was planned. *Id.* A camera inspection of the sewer revealed a 10-inch connection discharging polluted water from the Pitt-Consol facility. *Id.* The wastes being discharged were described as "highly polluting." *Id.*

In September 1978, Clinton Bogert, on behalf of the City of Newark, issued its study of sources of pollution discharging to the Passaic River from certain storm sewer and combined sewer outfalls (CSOs) in Newark. The report notes, "polluted liquid wastes are being discharged into the lower Passaic River from four sewers owned by the City of Newark. These wastes include continuous discharges from the wet weather outfall of the Roanoke Avenue combined sewer . . . . [A] non-functioning regulator causes the dry weather discharge at Roanoke Avenue."[558] The report goes on to state that "[t]he Avenue 'P' regulator is not functioning. Over two feet of dry, granular sediment blocks the regulator gate chamber and prevents flow between the diversion chamber and the Roanoke Avenue dry weather sewer. As a result, all flow in the Roanoke Avenue combined sewer enters the Passaic River through the Roanoke Avenue outfall."[559] Thus, despite the existence of the dam, dry weather discharges to the Passaic River still occurred from the Roanoke Avenue storm sewer and "all" the flow in the combined sewer, to which Pitt-Consol discharged, entered the Passaic River.

Further, Batson assumes "that from 1981-1986 that all discharges went to PVSC."[560] But several pages later he acknowledges that a May 12, 1981 Coast Guard incidence report "states that an "unknown" red liquid was released into the Passaic River by dumping or illegal discharge from Pitt-Consol on May 11, 1981. (PAS-00051363, PAS-00051497, PAS-00051507)." So Batson assumes that there were no direct discharges on one page, but then a few pages later explicitly acknowledges a documented direct discharge. It is difficult to see how his assumption regarding the lack of direct discharges can be grounded in fact, when even Batson acknowledges that it is not.

Batson failed to perform any COC mass calculations for discharges to PVSC for high molecular weight (HMW) PAHs, polychlorinated biphenyls (PCBs), or dioxins.[561] Batson assumes no HWM PAHs because when effluent was sampled in 1984, naphthalene, a low molecular weight (LMW) PAH, was the only constituent detected. Batson also fails to explain why he did not calculate any discharges for PCBs or dioxins; a lack of detection in 1984 does not mean that HMW PAHs, PCBs, and/or dioxins were not present at an earlier time (or at that time, as the case may be for PCBs and dioxins). A 1979 feasibility study created for the City of Newark Pollution Abatement Program, which Batson discusses in his report, indicates that sanitary flow from the Pitt-Consol Site was directed to the sewer, which ultimately discharged to PVSC. It further states that the black tar-like material found in the sewer downstream of the Pitt-Consol

---

[557] *Id.*; Batson Report, Attachment J for Pitt-Consol at 6.

[558] Ex. A-58 (TSI-DBR-00040196) at TSI-DBR-00040201.

[559] *Id.* at (TSI-DBR-00040196) at TSI-DBR-00040206.

[560] Batson Report, Attachment L for Pitt-Consol at 5 (emphasis added).

[561] *Id.* at 2.

149

connection was the same as that which was observed on the ground at the Site, indicating that the Site was the source.[562] The 1979 report goes on to say that sampling and analysis performed jointly by PVSC and Pitt-Consol detected chemicals used at the facility in outfall samples.[563] The 1979 report attributed groundwater contamination at the site to the chemicals detected in the outfall.[564] Yet Batson ignored (1) the black tar material found in the sewer and attributed to Pitt-Consol, and (2) the groundwater sampling at the site indicating the presence of dioxin-associated compounds (see below). These omissions, and resulting implication that Pitt-Consol's discharges to PVSC were far more polluting than Batson realized or acknowledged, resulted in an indisputably inaccurate and fundamentally unfair analysis and allocation.

These discharges are evidenced by sampling at the Roanoke Avenue CSO. Samples from that location indicate a hotspot for PCBs, LMW/HMW PAHs, and barium. Barium is considered a marker chemical for Pitt-Consol's operations as on-site soil contamination reached 10,700,000 ppb and the samples taken at the CSO are the highest in the entire Passaic River.[565] Total PAHs, taken at the same location, exceeded 1,225 mg/kg, the highest sample in that portion of the River and indicative of a release of tar.

### b.    Dioxin and PCB Generation

Batson also does not properly consider, or even mention, the potential for dioxin formation at the Pitt-Consol site. The Batson Report correctly discusses several processing units producing up to 50 million pounds of cresylics per year.[566] Wastes generated from site manufacturing processes, including wastes known to contain PAHs, were used on site as fuel for boilers.[567] There has been a documented connection between the oxidation of PAHs under semi-combustion conditions and formation of dioxins.[568] In fact, sampling confirmed the presence of dioxin-associated compounds including 1,2-dichlorobenzene (31,300 parts per billion [ppb]); 1,4-dichlorobenzene (31,300 ppb); and chlorobenzene (31,300 ppb) in site soils and 1,2-dichlorobenzene (430 ppb); 1,4-dichlorobenzene (1,300 ppb); and chlorobenzene (2.6 ppb) in groundwater. The absence of sampling for or detections of dioxins cannot be taken as sufficient evidence that no dioxins were produced or released to the site. Yet Batson did not investigate this known connection between site operations and dioxins, and assigned Pitt-Consol a zero share for dioxins in his allocation.[569]

Finally, Batson's only discussion of PCBs at the site related to Pitt-Consol's use of PCBs in heat oil heat transfer systems.[570] Batson misses a crucial other avenue for PCB generation:

---

[562] PAS-00006250 at 6261.

[563] Id.

[564] Id.

[565] **Ex. A-59** (Oct. 07, 2008 Site Investigation/Remedial Investigation Report Vol. I) (DUPONT00087640) at DUPONT00087713.

[566] Batson Report, Attachment J for Pitt-Consol at 2.

[567] *See, e.g.,* **Ex. A-60** (Apr. 15, 1988 Preliminary Assessment, Pitt-Consol) (DUPONT00119957) at DUPONT00119970; **Ex. A-61** (Excerpt from Sept 1, 2022 Deposition of Thomas Stilley) at 41:3-43:1.

[568] Esposito, Tiernan, & Dryden, *supra*, at 35–36.

[569] Batson Report, Attachment L for Pitt-Consol at 1.

[570] Batson Report, Attachment J for Pitt-Consol at 8.

ALCD-PUBCOM_0000562

according to documents produced in the Contribution Action, Pitt-Consol burned 550 pounds of 1,1,1-trichloroethane for heat recovery.[571] Burning 1,1,1-trichloroethane with other wastes provided all the factors necessary for PCB formation: the presence of organic carbon, a source of chlorine as a catalyst, and optimal temperatures. Yet Batson did not so much as consider this potential generation of PCBs at the Pitt-Consol site in his allocation.

## 11.    PPG Industries Inc.

The Batson Report assigns PPG Industries Inc. ("PPG") a "Relative Contribution" of nearly zero for Lead, PCBs, and other COCs, but this is inconsistent with the evidence as discussed below.

From 1902 to 1971, PPG manufactured paint and varnish using resins, pigments, solvents, and metals as raw materials.[572] Lead, copper, and mercury were used as raw materials for paint manufacturing and found in Site soil.[573] PCBs used in transformers were found in Site soil as well.[574] Dioxins/furans were found in building samples and in wastewater.[575] Both buildings with dioxin/furan contamination were piped to the river for waste discharge.[576] This record of extensive contamination explains why EPA named this the Riverside Industrial Superfund Site.

Despite all of this, the Batson Report assigns PPG nearly zero responsibility—an indefensible assignment that is based on implausible assumptions disproven by the record.

- First, the Batson Report gives PPG a zero score for pre-PVSC discharges, when it is undisputed that PPG started operations at the site in 1902—22 years before PVSC even existed—and admittedly did not discharge process waste to the sewers during that time.[577]
- Second, the Batson Report attributes concentrations of COCs like PCBs found in high concentrations at the site[578] to other companies that occupied the site after PPG.[579]
- Third, the Report assigns **no** direct discharge score, despite evidence of direct discharges. For instance, the Batson Report ignores or minimizes the substantial evidence that floor drains onsite led to the Passaic River and were used by PPG

---

[571] **Ex. A-62** (Oct. 8, 1980 Selected Substance Report) (OCC-TIG-E00814191) at OCC-TIG-E00814198; **Ex A-61** (Stilley Depo. Excerpt) at 182:20-185:6.

[572] Riverside Superfund Site, Site Characterization Summary Report (2015); PPG 1996. **Ex. A-63** (Sept. 18, 1996 PPG letter to EPA).

[573] *Id.*

[574] **Ex. A-64** (2018 Riverside Superfund Site Site Characterization Summary Report Addendum).

[575] **Ex. A-65** (Feb. 1, 2012 analytical results) (BBA000210).

[576] **Ex. A-66** (May 9, 1988 Handwritten Memo) (BBB000033).

[577] Batson Report at 1629.

[578] PCBs were detected in soil samples at the PPG facility (up to 721 mg/kg for Aroclor 1254).

[579] Batson Report at 1616 ("PCBs have been detected in soil sampling at the facility, but those detected PCBs are reportedly not attributable to PPG. Rather, Federal Refining Company (a scrap metal recycler), and other parties are reportedly responsible for PCBs at the Facility.").

ALCD-PUBCOM_0000563

employees to sweep solvents, paint residue and raw materials.[580] PPG employees reported dumping process material directly into the river.[581] Additionally, there is extensive evidence of direct discharges from the same buildings PPG operated.[582] The evidence shows that several buildings had direct discharges to the river.[583] When PPG left the site in 1971, PVSC found 7 outfalls to the river.[584] Yet the Batson Report accounts for none of this.[585] The Batson Report credits evidence from long after PPG left the site over contemporaneous evidence—for instance the floor drains that existed during PPG's tenure—to benefit PPG.[586]

- Fourth, the Batson Report says that "there were no reported major spills or releases" despite extensive evidence of spills and releases, including a 1969 fire that killed a PPG worker and caused process tanks to fail, releasing their contents.[587]

### a.    PCBs and Dioxins/Furans

The Batson Report improperly discounted evidence that PPG's dye and pigment handling is a source of PCBs and dioxins/furans, assigning nearly zero for PPG's PCB contribution and zero for its dioxin/furan contribution. This does not account for evidence that pigments PPG used are

---

[580] **Ex. A-67** (Sept. 26, 1994 Moore Affidavit) (BBF000145) ¶ 5; **Ex. A-68** (Jul. 21, 1999 letter to EPA) (BBF000036); **Ex. A-69** (PPG General Specifications) (PPGLP02429).

[581] **Ex. A-67** (Moore Affidavit) ¶ 3.

[582] *See* **Ex. A-70** (Excerpt of Krall Deposition) at 89:10-21:

> Q    My question is, there is a discharge route from lot 57 to the Passaic River; right, sir?
>
> MR. BROWN:   Objection.
>
> A    At the time --
>
> Q    Go ahead.
>
> A    At the time of this investigation, there was.
>
> Q    At the time of the investigation, there was.  And you would agree with me further that lot 57 was another of the lots that PPG operated on for 69 years; right, sir?
>
> A    Yes.  But the PPG never discharged to the river from any of the buildings.

[583] **Ex. A-65** (Feb. 1, 2012 analytical results) (BBA000210); **Ex. A-66** (May 9, 1988 Handwritten Memo) (BBB000033); **Ex. A-68** (Jul. 21, 1999 letter to EPA) (BBF000036); **Ex. A-71** (Feb. 8, 2012 EPA Pollution Report) (BBA0000188); **Ex. A-72** (June 15, 1972 Steam Contamination Report) (BBR000002).

[584] **Ex. A-68** (Jul. 21, 1999 Letter to EPA) (BBF000036).

[585] *See, e.g.*, Batson Report, Attachment J for PPG at 18-20.

[586] "The affidavit of Willie Moore, a former PPG employee, dated September 1994, states that "[e]very building at the PPG facility had a 4-inch to 6-inch sewer pipe running directly to the river." He further had "witnessed PPG employees sweeping residue, including spills of products and raw materials, down these floor drains" (PAS-00080161). In contrast, according to the *Remedial Investigation and Feasibility Study Work Plan* dated July 28, 2017 (July 2017 RI/FS Work Plan), pipes in the river bulkhead wall are consistent with PVSC notes that state that the pipes are related to a water tank drain or compressor cooling water . . . ."

[587] *See* **Ex. A-70** (Krall Depo. Excerpts) at 129:5–24.

ALCD-PUBCOM_0000564

known to contain PCBs.[588] These pigments are also associated with dioxins and furans.[589] The Batson Report also failed to consider that varnishes that contained phthalic anhydride and chlorine-containing pigments, used by PPG, have been shown to form PCDD/Fs. Relatedly, the Batson Report discounted evidence of dioxin sampling at the PPG site.[590]

### b.        Lead

It is undisputed that PPG used lead in manufacturing paint at the site—including on at least 9 lots that suffer from lead contamination.[591] EPA assessed that there were lead hotspots in buildings where PPG had done lead-based operations—a fact PPG admitted at deposition.[592]

In the Contribution Action, PPG's corporate representative admitted that PPG knew its workers were being exposed to lead since the 1930s, including "two cases of lead poisoning at PPG's Newark site."[593] PPG could not dispute that this lead poisoning occurred.[594] PPG did not dispute that it had tested its workers' blood for lead,[595] that PPG's workers were exposed to lead,[596] or that PPG knew as far back as the 1930s that a hazard of working at its Newark plant was lead poisoning.[597]

This evidence of lead contamination by PPG is so strong that EPA has incorporated it into its "conceptual site model" for the PPG site, and has "assessed that lead paint manufacturing operations at the Riverside site were the predominant source of lead contamination to the soil and groundwater at that site."[598]

### c.        Culpability Factor

---

[588] *See, e.g.*, **Ex. A-73** (PPG Paint Raw Materials) (PPGLP02565); **Ex. A-74** (PPG Dry Color Raw Materials) (PPGLP02590); **Ex. A-75** (PPG Dry Color Special Products) (PPGLP02595); **Ex. A-76** (PPG Lacquer Raw Materials) (PPGLP02604); **Ex. A-77** (PPG Varnish Raw Materials) (PPGLP02600); **Ex. A-12** (121 ENV. H. PERSPECTIVES, A87, *Nonlegacy PCBs: Pigment Manufacturing By-Products Get a Second Look* (2013)) (G-PPG000665); **Ex. A-13** (Excerpts from May 16, 1978 PCB Task Report) (G-PPG002817).

[589] *See, e.g.*, EPA, AN INVENTORY OF SOURCES AND ENVIRONMENTAL RELEASES OF DIOXIN-LIKE COMPOUNDS IN THE UNITED STATES FOR THE YEARS 1987, 1995, AND 2000 (2006) at § 8.3.6.2 (discussing phthalocyanine dyes); Yuwen Ni et al., *Distribution patterns of PCDD/Fs in chlorinated chemicals*, 60 CHEMOSPHERE 779 (2005); DAA000018.

[590] *See, e.g.*, **Ex. A-65** (Feb. 1, 2012 analytical results) (BBA000210); **Ex. A-71** (Feb. 8, 2012 EPA Pollution Report) (BBA0000188).

[591] **Ex. A-70** (Krall Depo. Excerpts) at 90:15–22.

[592] *Id.* at 409:14–19.

[593] *Id.* at 210:16–20.

[594] *Id.* at 211:10–14 ("And you don't have any other evidence that you know about that would indicate that there wasn't lead poisoning; correct? . . . I do not.").

[595] *Id.* at 211:22–212:2.

[596] *Id.* at 212:7–10.

[597] *Id.* at 218:10–14.

[598] *Id.* at 328:5–11.

ALCD-PUBCOM_0000565

The Batson Report assigns a culpability factor score of 5% due to occasional noncompliance. This assignment is reportedly based on evidence related to direct discharges to the river and the 1969 fire in the resin building. But substantial evidence supports culpable intent to avoid regulations applicable to PPG, including: (1) multiple documented violations of direct discharges, (2) the site owner intentionally concealing access points to an underground pit that led to the river, and (3) site drainage infrastructure that facilitated the collection of stormwater and groundwater in a sump that discharged directly to the river.

PPG's corporate representative recognized and could not dispute a 1916 report from the US Army Corp of Engineers that Patton (PPG's predecessor) dumped paint waste and other items into the Passaic for a length of 175 feet; and that Patton pleaded guilty and paid a $250 fine for this dumping.

Q.    The chief of engineers for the U.S. Army had developed evidence that Patton Paint Company had been dumping ashes, tin cans, waste paint material and refuse directly into the Passaic; right?

A    That's what it says.

Q.    That's evidence that the chief of engineers for the U.S. Army had developed back in 1916; right, sir?[599]

. . .

Q.    So Patton Paint Company pleaded guilty to the charge that it had been dumping various materials into the Passaic River; right, sir? . . .

A    They're pleading guilty. I don't know what their reasoning for pleading guilty is. They may have pleaded guilty just because it was cheaper to plead guilty than to drag it on to court. I don't know.[600]

. . .

Q.    I'm asking you whether you can dispute that Patton Paint Company pleaded guilty to dumping materials into the Passaic River . . .

A    I can't dispute what's written here.[601]

12.    **Sequa Corporation and Sun Chemical Company**

---

[599] *Id.* at 270:5-271:2.

[600] *Id.* at 278:23-279:8.

[601] *Id.* at 281:12-18.

ALCD-PUBCOM_0000566

The Batson Report uncritically adopts the opinions of Sequa Corporation (formerly known as Sun Chemical Company) ("Sequa") and Sun Chemical Company ("Sun") in determining the source of PCBs at 185 Foundry Street, Newark, New Jersey.[602]

### a.    The Batson Report Used a Biased Report to Support its Conclusions

The Batson Report relies heavily on advocate assessments (commissioned by Sequa) to draw inferences that mirror and often adopt Sequa's paid advocates' positions. In particular, the Batson Report relies almost exclusively upon and reaches the exact same conclusions set forth in a September 9, 2016 paper entitled "Evaluation of Alleged Nexus of Sequa Corporation to the Lower Passaic River Study Area Superfund Site"—which was prepared for Sequa to encourage EPA to assign Sequa only a *de minimis* share of CERCLA liability.[603]

This report is not unbiased. It was commissioned by Sequa to persuade EPA, among other things, that it is minimally liable for the chemicals that polluted the Passaic River. Yet despite its clear bias, Batson uncritically adopted it to support his conclusions for *both* Sequa and Sun.

The Batson Report also frequently references a "Responsible Party Investigation Memorandum, dated April 3, 1991"[604] to support its conclusions. This Responsible Party Investigation was written five years after Sequa began to operate the Sequa-Sun Site and was written by a third-party who did not have access to the site. The Memorandum does not mention interviewing former Sequa or Sun employees or discussing Sequa's or Sun's operations with relevant contemporary personnel. The Memorandum only provided a generalized overview of the Sequa-Sun Site and its operations.

### b.    Sequa and Sun Used PCBs

The evidence is clear that Sequa, and later Sun, used PCBs in their operations. Those PCBs contaminated the Sequa-Sun Site and were discharged through the sewer system—which in turn discharged to the Passaic River.

Sequa used PCBs in its hot oil heat transfer system. During an investigation pursuant to ECRA (later ISRA) between Sequa (then Sun) and Sun (then Sun/ DIC Acquisition Corporation), a swipe sample revealed PCBs in the amount of 14 mg/ft$^2$.[605] Following the transfer of the Sequa-Sun Site to Sun, Sun conducted a site remediation.

The Sequa-Sun Site remediation involved the dismantling and removal of a boiler and the room in which the boiler was housed. The boiler room and the heat transfer system used on the Sequa-Sun Site was the main subject of the remediation Sun performed.

---

[602] The "Sequa-Sun Site" refers to the location of Sequa during its period of operations at this site from 1967 to 1986 and of Sun, which operated and/or owned the site from 1987 to 2004.

[603] *See* PAS-00044620-47081.

[604] *See* PAS-00000185-245.

[605] *See* PAS-00104285-00104294); *see also* PAS-0044861; PAS-00044823; PAS-00044715; PAS-0044805.

ALCD-PUBCOM_0000567

The PCB hot oil heating unit used PCBs and was located in the boiler room.[606] Despite the removal of the boiler itself, the room and its surroundings remained heavily contaminated with PCBs.[607] In the 1960s and before, it was common practice for heat transfer systems to use PCBs.[608] After a certain point the PCBs would burn down and be discarded. Often times the PCBs, as was apparently the case here, were dumped on the floor and not properly disposed of. The heating units would then be refilled and this practice repeated. Sequa likely engaged in this practice of PCB dumping.

The PCB heat transfer system was not isolated to the boiler room. It was a system that traveled throughout the entire Sequa-Sun Site with piping that directly entered the production areas. Given the levels of PCB contamination at the Sequa-Sun Site, it is more than likely that Sequa's and Sun's activities involved the use of PCBs. Additionally, although the clean-up plan involved the removal of the boiler, it is unclear when the entire heat transfer system was completely dismantled and removed from operations.

But the Batson Report overlooks the substance of a February 22, 1987 "Sun/DIC Acquisition Corporation, Site Evaluation Submission" that discussed the "PCB Hot Oil Heating Unit."[609] The Batson Report conveniently picks out statements from that submission to support its conclusion—*e.g.*, "The PCB boiler was tested and certified clean . . ."[610]—but fails to put that statement in context: the boiler itself was removed, but the entire room remained heavily contaminated with PCBs.

### c.    The Batson Allocation Contradicts Itself About the Source of Contaminants From Historic Fill

In its attempt to absolve Sequa and Sun of any responsibility for PCBs, the Batson Report also makes contradictory statements about historic fill. On one hand, the Batson Report cites to NJDEP's conclusion that some of the COCs and/or PCBs found at the site may have been a result of historic fill, and on the other hand, the Batson Report states that the site is not the location for historic fill. After citing contradictory sources, the Batson Report dismisses any connection between Sequa or Sun and PCBs at the Sequa-Sun Site.

The Batson Report also misstates documents to bolster the notion that the Sequa-Sun Site's PCB contamination resulted from historic fill. For example, Batson states: "According to a letter prepared by NJDEP, dated October 11, 1995, NJDEP agreed with Sun Chemical Corporation's assessment that PCB Contamination in soil was attributable to fill."[611] This is not what the October 1995 NJDEP letter says. In relevant part, it states, "[t]he NJDEP is in agreement that the contamination *off-site* appears to be from historic fill, used in the area, and is not requiring

---

[606] *See* PAS-00044864.

[607] *See* PAS-00044838.

[608] PAS-00044634-35.

[609] *See* PAS-0044806-0044835.

[610] *See* PAS-00044835.

[611] *See* PAS-00045465-0045467.

ALCD-PUBCOM_0000568

any actions with regards to the contamination on the Norpak property."[612] The Norpak property is adjacent to the Sequa-Sun Site. However, that same letter makes clear that there is on-site contamination that is *not* a result of historic fill. The letter required Sun to submit a Declaration of Environmental Restriction ("DER")[613] for the Sequa-Sun Site that would identify and address the PCB contamination in the Boiler Room, the New Tank Area, and the Still Area in the plant. NJDEP did not say that the PCB contamination in the boiler room was attributable to historic fill.

There is now a publicly recorded environmental deed restriction (Essex County Recorder of Deeds Book 5470 PG 780) (DER) on the Sequa-Sun Site following a clean-up and remediation plan for operations that occurred during Sequa's tenure at the Sequa-Sun Site and for operations that later continued under Sun.

The DER states that the PCBs in the boiler room are <u>not</u> a result of historical fill. The DER, in pertinent part, states, "WHEREAS, the zone of historic fill material which covers the entire Property, *except* for the areas excavated pursuant to the Remedial Action Workplan approval issued by the Department as shown on Exhibit B, has been vertically delineated on Exhibit C attached hereto and made a part hereof."[614] (emphasis added). Exhibit B of the DER depicts two separate pictures. The first picture is a detailed close-up of the Boiler Room which was expressly remediated for PCBs and illustrates the remaining levels of PCBs on the Sequa-Sun Site. The remaining PCBs in the boiler room ranged from 4.6 ppm[615] to 59 ppm. The second picture is an overview of the Sequa-Sun Site identifying the areas of contamination. Exhibit C depicted in two pictures the vertical extent of historic fill on the Sequa-Sun Site.

The Batson Report fails to even mention that a DER exists when evaluating Sequa. And while the report does mention the DER when evaluating Sun, it appears to give the DER no weight.

Overall, the Batson allocation fails to make any critical review of the materials for Sequa and Sun at the Sequa-Sun Site and in particular sets forth no reasonable explanation for the source of the PCB contamination. Rather, the report relies on unsubstantiated advocacy reports that offer a myriad of reasons for the PCB contamination, most readily historic fill and third-party industrial actions seeping onto the Sequa-Sun Site. The most obvious and logical source of the PCB contamination is from the PCB hot oil heat transfer system that was used on the Sequa-Sun Site since Sequa began its operations in 1967 and was not dismantled or removed until after Sun became the operator (and later owner) of the Sequa-Sun Site after 1986.

### d.    The PCBs From the Sequa-Sun Site Discharged to the Passaic River

Since Batson wrongly concludes that Sequa and/or Sun could not possibly be the source of the PCB contamination at the Sequa-Sun Site, he also dismisses the possibility that the PCBs

---

[612] *See* PAS-00045465 (Oct. 11, 1995 letter from the State of New Jersey to Sun/Dic Acquisition Corp. regarding "Sun Chemical Corp.") at PAS-00045465 (emphasis added).

[613] *See* PAS-00045504-0045522.

[614] *Id.*

[615] Parts per million

ALCD-PUBCOM_0000569

polluted the Passaic River. This assumption is wrong and the facts demonstrate that PCBs from the Sequa-Sun Site reached the Passaic River.

Both Sequa and then Sun's own characterization of the Sequa-Sun Site's sewer and drainage systems demonstrate that the effluent waste from operations went through a neutralization system and then traveled through the CSO to the PVSC which then discharged to the Passaic River. However, given the limited information available during Sequa's period of operations, it is unclear when the neutralization system was installed. More than likely, Sequa operated without a neutralization system prior to 1979. Even with a neutralization system, documents show that the Sequa-Sun Site regularly flooded, and any contaminants including PCBs were washed through the sewer system and ended up in the Passaic River. The path to the Passaic River from the Sequa-Sun Site was aptly illustrated by an October 1978 discharge of red dye (Sequa and Sun both produced quinacridone pigments in red and magenta colors) that was found in the Passaic River.[616] However, despite this obvious breadth of available evidence, the report concludes, "No discharges were specifically attributed to Sequa Corporation."[617]

### 13.    The Sherwin-Williams Company ("Sherwin-Williams")

For nearly 100 years (1902-1999), Sherwin-Williams operated a paint and pesticides plant at 60 Lister Avenue, Newark, NJ (the "Sherwin-Williams Plant"), a site adjacent to the Passaic River. Batson conducted his analysis of the Sherwin-Williams plant without any meaningful information because Sherwin-Williams withheld that information from him.

This is not conjecture; it is confirmed. In September 2022—*two years* after Batson completed his report and just days after Sherwin-Williams signed the proposed consent decree—Sherwin-Williams disclosed for the first time company records revealing that enormous quantities of PCBs, DDT, mercury, lead, and copper were used for many decades at the Sherwin-Williams Plant. The information in these documents contradicts and invalidates every statement in Batson's report about the plant. And, put plainly, this information exposes the entire Batson Process as a farce.

Proceeding to enter a consent order with Sherwin-Williams would be arbitrary and capricious because the underlying allocation has no basis in fact. But the stakes are higher than that. By settling with Sherwin-Williams, the United States sends a dangerous message to responsible parties at every Superfund site and risks irreparable harm to the credibility of EPA's enforcement authority.

#### a.    Sherwin-Williams withheld or destroyed virtually all information about its paint and pesticide plant.

Sherwin-Williams operated its Newark plant for 97 years and was identified as potentially liable for cleaning up the Passaic almost 30 years ago. Yet before September 2022, Sherwin-Williams had disclosed virtually no specific information about the chemicals involved in those operations—not to EPA in response its 1995 Request for Information under CERCLA § 104(e);

---

[616] *See* PAS-00044672-0044675.

[617] *See* PAS-00114295.

ALCD-PUBCOM_0000570

not to NJDEP during the regulatory process following closure of the former plant property; not to OxyChem in discovery in its CERCLA contribution action. And certainly not to David Batson.

"EPA's use of information request letters is the cornerstone of the Superfund enforcement program." *U.S. v. Ponderosa Fibres of America, Inc.*, 178 F.Supp.2d 157, 160 (N.D.N.Y. 2001). On January 3, 1995, EPA sent to Sherwin-Williams a Request for Information under CERCLA § 104(e) seeking information relevant to assessing Sherwin-Williams' potential impact on the Passaic River. Sherwin-Williams responded on March 2, 1995, but now admits its response was not accurate with respect to the presence and use of hazardous substances, including the COCs being addressed in EPA's selected remedy.[618] Specifically, that response failed to disclose any hazardous-substance-containing product or byproduct involved in its 97 years of Newark plant operations. And Sherwin-Williams has acknowledged its continuing obligation to promptly notify EPA of additional information or any part of its March 2, 1995 response that was false, misleading, or misrepresented the truth, but it cannot identify any written or oral communication supplementing its inaccurate response to EPA.[619] Even the statements identifying the *sources* of the information provided in the response were inaccurate.[620]

Sherwin-Williams maintained its inaccurate and incomplete responses at all times between 1995 and 2022. On September 21, 2022, Sherwin-Williams disclosed 33,254 pages of company records that consisted entirely of documents—dated from 1901 through 1995—that had been in Sherwin-Williams' possession for well over two decades, and in most instances for much longer. Those records cover only a fraction of the Newark plant's century-long operation, but establish that those operations involved substantial volumes of the same hazardous substances driving EPA's selected remedy in OU2—in particular, PCBs, mercury, DDT, lead, and copper. Records from most years of the Newark plant's operation remain missing, including documents identified in Sherwin-Williams's March 2, 1995 response as stored at its Newark plant and available for EPA's review upon request.

None of this information was available to Batson during the allocation process, which was completed and its report finalized by December 2020. As a result, Batson's evaluation of the Sherwin-Williams Plant is based entirely on information now recognized by all parties to be false. Upon learning this, OxyChem promptly notified the United States.[621] The United States finally responded with a shrug on December 15, 2022—the night before it lodged the Consent Decree—stating: "Be advised that, after a thorough evaluation of these materials, we are satisfied that the information contained in the referenced material would not have materially changed the basis upon which TechLaw/AlterEcho recommended Sherwin-Williams' share in the allocation."[622] This conclusion was based on Sherwin-Williams' explanation that the missing information was not

---

[618] *See,* **Ex. A-78** (Sept. 27, 2022 Transcript of Rule 30(B)(6) Deposition of Sherwin-Williams) at 28:19-29:8; 102:25-104:3 (response to EPA inaccurate as to DDT); *id.* at 123:23-125:14 (report to NJDEP inaccurate as to DDT); *id.* at 132:6-13 (failed to disclose PCBs).

[619] *Id.* at 121:8-23.

[620] *See* **Ex. A-79** (Dec. 13, 2022 letter from OxyChem to DOJ) at Attachment C, 17:17-22, 51:22-24. *See also* **Ex. A-80** (Oct. 28, 2021 letter from counsel for OxyChem to counsel for Sherwin-Williams) (describing failure to follow EPA instructions regarding current and former employees).

[621] *See* **Ex. A-81** (Sept. 23, 2022 letter from OxyChem to DOJ); **Ex. A-82** (Sept. 29, 2022 letter from OxyChem to DOJ).

[622] **Ex. A-83** (Dec. 15, 2022 letter from DOJ to OxyChem).

ALCD-PUBCOM_0000571

"readily available" during the previous thirty years. **Ex. A-84** (Oct. 7, 2022 letter from Sherwin-Williams to DOJ). The United States accepted those representations at face value, disregarding Sherwin-Williams' sworn testimony to the contrary just a week earlier. *See* **Ex. A-78** (Sept. 27, 2022 transcript) at 25:14-29:21; 59:15-60:4; 88:23-92:23; 126:13-127:7; 206:7-208:6 ("I don't know what information Mr. McConnell had to respond to that question. So I don't know that he had knowledge of this document. I'm not sure what he based his answer on.").

### b.    The documents withheld from Batson contradict his conclusions regarding the Sherwin-Williams Plant.

Batson grossly understates the Sherwin-Williams Plant's contribution of PCBs, copper, lead, and mercury to the Passaic River.

PCBs were detected in the soil at the Sherwin-Williams site. These detections include enormous concentrations of the PCB mixture Aroclor-1254, which was present in site soil at 140,000 ppb. But Batson concludes those detections resulted from an off-site source, *not* from the Sherwin-Williams Plant. Batson reached this conclusion without considering the extensive evidence confirming Sherwin-Williams used PCBs at the plant, including these facts:

- Sherwin-Williams records disclosed in September 2022 reflect that from 1959 through 1963 its Newark plant consumed thousands of pounds of Aroclor-1254.[623]

- Aroclor-1254 was the most common PCB used in paints as a plasticizer from the 1950s through the early 1970s, a period during which Sherwin-Williams' Newark plant produced many millions of gallons of paint and other coatings.[624]

- Publicly available records indicate that Sherwin-Williams was among Monsanto's largest customers of its Aroclor mixtures for in coatings.[625]

- Published studies have reported the presence of PCBs in Sherwin-Williams's paints.[626]

- Sherwin Williams also manufactured products containing titanium dioxide, using over 10 million pounds of titanium dioxide at the Site annually.[627] It is well-documented that PCBs are present as an impurity in titanium dioxide.[628]

---

[623] **Ex. A-78** (Sept. 27, 2022 Transcript of Rule 30(B)(6) Deposition of Sherwin-Williams) at 142:13-21; 160:18-161:8; 162:2-15.

[624] *See* Uhler et al., *Leaching Rates of Polychlorinated Biphenyls (PCBs) from Marine Paint Chips*, 81 ARCHIVES OF ENVTL. CONTAMINATION & TOXICOLOGY 324, 325 (2021).

[625] *See* **Ex. A-85** (Oct. 15, 1969 Monsanto Report of Aroclor "Ad Hoc" Committee).

[626] *See* Hu, et al., *Inadvertent Polychlorinated Biphenyls in Commercial Paint Pigments*, ENVIRON. SCI. TECHNOL. 44 (2010) at 2823.

[627] **Ex. A-86** (summary of Raw Material Consumption Reports produced by Sherwin-Williams).

[628] Ctistis et al., *supra* note 28, at 4839-42; EPA, AN INVENTORY OF SOURCES AND ENVIRONMENTAL RELEASES OF DIOXIN-LIKE COMPOUNDS IN THE UNITED STATES FOR THE YEARS 1987, 1995, AND 2000 (2006) § 7.1.5 (discussing titanium dioxide pigment in paints); EPA, FINAL TITANIUM DIOXIDE LISTING BACKGROUND DOCUMENT FOR THE INORGANIC CHEMICAL LISTING DETERMINATION (Oct. 2001).

ALCD-PUBCOM_0000572

DDT was also detected in soil at the Sherwin-Williams Plant. But Batson attributes those detections to the Diamond Alkali plant on the adjacent property. After the Batson Report was finalized, Sherwin-Williams admitted that DDT was used in Newark plant operations and was an active ingredient in the Sherwin Williams branded pesticide "Pestroy."[629] A company record—disclosed for the first time on September 21, 2022—reported that the Newark plant's "factory output" between September 1947 and August 1948 included more than 200,000 pounds or gallons of Pestroy.[630] Other records show that Sherwin-Williams maintained an inventory of DDT at the Newark plant for that purpose and stored its DDT-containing pesticide products on-site.[631]

The same is true of Batson's conclusions about Sherwin-Williams's use of other COCs driving the need for EPA's selected remedy. Batson concludes that lead was discharged to the Passaic River, but grossly underestimates the amount of lead based on the quantities of lead-containing raw materials used and lead-containing product made at the Sherwin-Williams Plant. Sherwin-Williams admits that company records reflect the Newark plant's extensive consumption of lead-containing raw materials starting in the earliest days of plant operations and continuing for decades. For example, nearly 1.2 million pounds of leaded zinc were consumed at the Newark plant during 1959 and 1960.[632] Company records also reflect that the Newark plant manufactured the pesticide lead arsenate.[633]

It would be arbitrary and capricious for EPA to determine Sherwin-Williams's share of liability for the Passaic River cleanup based on Batson's conclusions, which were reached in the absence of virtually any meaningful information about Sherwin-Williams Plant operations and failing to consider the only records disclosed by Sherwin-Williams.

### c. Batson improperly attributed the COCs present at the Sherwin-Williams Plant to historic fill.

Batson also omits any information regarding metals and related processes and raw materials used onsite relating to mercury, lead, and copper, and appears to attribute metals detected in site media to historic fill. Attributing the presence of these contaminants to historic fill is not credible because the primary processes conducted at the Sherwin Williams site involved these metals—including the production of oil-based paints, primers, lacquers, thinners, oils, solvents, pigments, and alkyd resins, and use of large amounts of lead and titanium for the manufacturing of these products.

Sherwin-Williams used lead and zinc since the beginning of site operations, with quantities over 500 pounds documented onsite in 1901 and 1902,[634] 200 tons of lead and zinc pigments in 1920, and use of between 1 and 2 million pounds of lead-containing metals annually between 1959

---

[629] **Ex. A-78** (Sept. 27, 2022 Transcript of Rule 30(B)(6) Deposition of Sherwin-Williams) at 122:20-125:14.

[630] *Id.* at 49:21-50:12.

[631] *Id.* at 33:1-8; 39:2-9

[632] **Ex. A-78** (Sept. 27, 2022 Tr.) at 184:25-185:8.

[633] *Id.* at 174:1-10; 177:2-23; 188:7-19.

[634] **Ex. A-87** (1901 Sherwin-Williams Annual Report) (TWSC-FED-00091217) at TWSC-FED-00091264); **Ex. A-88** (1902 Sherwin-Williams Annual Report)(TWSC-FED-00091314 at 00091370).

ALCD-PUBCOM_0000573

and 1969.[635] As of 1975, red lead was still used in Sherwin-Williams's metal primer products. As of 1992, 387 pounds of lead products were still at made or used at its Newark plant.[636]

Copper and mercury were also used in products manufactured at the Newark plant—for example, the material consumption reports from 1959 through 1969 show annual usage of copper-containing materials ranging from a total of approximately 14,000 pounds to over 18,000 pounds and annual usage of mercury-containing materials ranging from approximately 3,000 to 20,000 pounds at the site.[637]

There is no support for Batson attributing the presence of the chemicals used by Sherwin-Williams in these operations to historic fill.

**d.    Batson miscalculates the transport of COCs from the Sherwin-Williams Plant to the Passaic River.**

Batson's conclusions regarding *how* contaminants traveled from the Sherwin-Williams site to the Passaic River are entirely unsupported and based on miscalculations.

For example, Batson uses the wrong data when calculating the discharges of PCBs from the Sherwin-Williams site into the river as a result of overland flow. Batson's calculations use a maximum PCB concentration of 18 mg/kg to calculate the COC mass transportable overland.[638] But the maximum PCB concentration detected at the Sherwin-Williams site is an order of magnitude higher: 140 mg/kg of Aroclor 1254.[639] As a result, Batson grossly understates the mass of PCBs discharged from the Sherwin-Williams plant—a serious error invalidating the "share" assigned to Sherwin-Williams.

Batson similarly calculates the discharge of other COCs using the wrong concentrations. He calculates the overland discharge of copper using 1,530 mg/kg as the maximum concentration,[640] but the maximum soil detections at the Sherwin-Williams Site are much higher: – 7,010 mg/kg for copper (instead of 1,530 mg/kg).[641] Batson commits the same error for lead, using 75,800 mg/kg as his maximum concentration instead of the actual maximum of 111,000 mg/kg.[642]

Batson also erred by attempting to calculate the mass of copper, lead, and mercury from discharged from the Sherwin-Williams Plant *before* its connection to the PVSC system in 1924 using data from fifty years later (from the "Heavy Metals Source Determination Study (1976-1978)).[643] As a result, Batson improperly assumes process concentrations associated with

---

[635] **Ex. A-86** (summary of Raw Material Consumption Reports produced by Sherwin-Williams).

[636] *Id.*

[637] *Id.*

[638] Batson Report, Attachment L for Sherwin-Williams at 8.

[639] **Ex. A-89** (Dec. 2008 Remedial Action Work Plan) (BBC000116) at p. 397.

[640] Batson Report, Attachment L for Sherwin-Williams at 7.

[641] **Ex. A-89** (December 2008 Remedial Action Work Plan) (BBC000116) at p. 358, 651.

[642] Batson Report, Attachment L for Sherwin-Williams at 7.

[643] Batson Report, Attachment J for Sherwin-Williams at 6.

162

ALCD-PUBCOM_0000574

operations conducted in the 1970s are the same as operations conducted over a 23-year period in the early 1900s.

Batson makes other unsupported assumptions regarding the flow of contaminated stormwater from the site. He assumes that only 5 percent of the Site—which was constructed in 1901—would have been exposed to rainfall, without providing a basis for that assumption or accounting for changes to the plant site and layout over a 100-year period. He also concludes that the Brown Street combined sewer overflow (CSO) outfall never discharged to the Passaic River, which ignores the fundamental purpose of the Brown Street CSO.

### 14.    STWB, Inc.

Batson's allocation for STWB, Inc. ("STWB") at 120 Lister Ave, Newark, NJ ("STWB Site") is fatally flawed for several reasons. First, Batson does not account for irrefutable evidence that STWB directly and deliberately discharged process wastes into the Passaic River for over a decade in a concerted effort to avoid regulatory scrutiny. Second, Batson ignores the potential for PCB and dioxin formation at the STWB Site, misunderstanding both the science behind groundwater sampling and the STWB Site's manufacturing processes. Third, Batson's calculations regarding overland fate and transport do not account properly for inherent site characteristics, known/expected discharge contaminants, or the consistent application of overland fate & transport methodology across sites. Lastly, Batson appears to have used an unexplained number for his calculation of STWB's discharges to PVSC.

#### a.    Direct Discharges

The evidence showing consistent, deliberate, and malicious discharges from STWB is irrefutable. Batson inexplicably assigned STWB a DMASS Direct Discharge of zero in spite of this evidence. Chief among this evidence is the admission of a former plant engineer and son of the company owner, Paul Thomasset. Mr. Thomasset testified on June 22, 2011, that when he first arrived at the STWB Site in 1956, wastes from the strike tanks "was going to the river. There was a pipe sticking through the bulkhead, visible to anybody who cared to look, sticking out, and twice a day it would push acidic water out into the [Passaic] river."[644] Then in 1958, STWB began discharging that waste into the sewer after regulatory pressure.[645] When STWB's untreated wastes began causing issues in the sewers, instead of installing a neutralization or treatment system on the STWB Site, STWB reverted to discharging the wastes directly into the Passaic River.[646] This direct, continuous, and illegal discharge—explicitly to avoid regulatory scrutiny—was ongoing from approximately 1963-1971,[647] and is well documented.[648] Yet Batson cites none of this documentation, and apparently none of it was provided to Batson by STWB. In the Contribution Action, however, STWB's corporate designee admitted the illegal discharges: "It was my

---

[644] **Ex. A-90** (OCC-TIG-E00068122); **Ex. A-91** (Thomasset Depo. Excerpt) at 38:6-10.

[645] **Ex. A-91** (Thomasset Depo. Excerpt) at 38:13-23.

[646] *Id.* at 39:13-40:21.

[647] *Id.* at 39:13-40:21.

[648] **Ex. A-92** (OCC-TIG-E02140936); **Ex. A-93** (OCC-TIG-E03239891); **Ex. A-94** (OCC-TIG-E01447030); **Ex. A-95** (OCC-TIG-E02135377).

ALCD-PUBCOM_0000575

understanding from entering this that the very end of '63 at least where it was outlined through '71 that some of the acid water from their production was diverted to the Passaic, yes."[649]

Without this critical information, Batson refused to assign any direct discharge liability to STWB or even consider it in assigning STWB a culpability factor (Batson assigned a culpability factor of 5% for "occasional non-compliance" despite a 5% number meaning "[o]ccasional or minor releases of COCs during facility operations or other industrial practices potentially impacting operations utilizing COCs," rather than the 100% factor, which means "[s]ignificant sustained releases of COCs in contravention of standard industrial practices indicating knowledge of the risk and illegality of the actions and an intentional disregard of the impact on human health or the environment."). A decade-long deliberate discharge to avoid regulatory scrutiny qualifies for a 100% culpability factor.

### b.    PCB and Dioxin Formation

Batson did not appear to consider the likelihood that the manufacturing processes at the STWB Site produced PCBs and/or dioxins, instead relying on misunderstandings of science, manufacturing processes, and his own sources. Batson wrote that "[t]he production of phthalo pigments based on peer-reviewed literature could not generate polychlorinated biphenyls (PCBs), polychlorinated dibenzo-p-dioxins (PCDDs), and/or polychlorinated dibenzofurans (PCDFs), as was possibly the case for other manufacturing methods (PAP-00208780-9). This is borne out by on-site groundwater samples that show that 2,3,7,8-tetrachlorodibenzodioxin (TCDD) and PCB congeners in groundwater samples are either below detection limits or non-detect (PAP-00057501-502; PAP-00057596)."[650] None of this is true.

The manufacturing processes at the STWB Site could have produced PCBs or dioxins. The document Batson relies on for that statement, PAP-00208780-9, was prepared at the request of counsel and is marked "privileged and confidential"—a far cry from being "peer-reviewed." This document amounts to nothing more than a litigation-driven expert report provided to Batson because the outcome was favorable (as we have seen above, STWB withheld or neglected to disclose documents that were decidedly unfavorable to their position).

The process that occurred on the STWB Site involved conditions favorable for PCB and dioxin generation: a chlorine source and a dioxin precursor. There is no support for a claim that PCBs and dioxins could not have been generated in this process. Further, during the process to make phthalocyanine green, phthalocyanine blue underwent direct chlorination. The source cited by Batson appears to refer to a process in which the dry alpha blue manufactured onsite was added to a pre-heated blast reactor at high temperatures, which also contained several added sources of chlorine (aluminum chloride anhydrous, sodium chloride, cupric chloride, and gaseous chlorine). However, documentation dated April 12, 1971, states that "all green shade (illegible word) is made from Jap [sic] crude currently."[651] This suggests STWB made its phthalocyanine green using the phthalocyanine blue manufactured offsite rather than its own phthalocyanine blue manufactured using the bake process. There is a well-known association between PCBs and dioxins in pigments in green dye, with reported measurements of PCDD/Fs in phthalocyanine green having a TEQ

---

[649] **Ex. A-96** (Excerpt from Deposition of Mark Bowers) at 231:19-22.

[650] Batson Report, Attachment J for STWB at 1.

[651] **Ex. A-97** (NPEC-0011056) at NPEC-0011058.

164

value about 18 times greater than in phthalocyanine blue.[652]  There is greater potential for production of phthalocyanine green from phthalocyanine blue using the solvent as opposed to the bake process, but both processes would likely generate PCBs and dioxins.

Batson also cites to groundwater samples to support the conclusion that on-site activities did not generate PCBs or dioxins. This displays a misunderstanding of the science. First, these compounds are hydrophobic—they would not readily accumulate in groundwater even if there were an upland source. There also appear to be no records of analysis for PCB congeners in site groundwater, so the supposed absence appears to simply be an absence of evidence rather than a confirmation.   Second, PCB congeners associated with phthalocyanine dyes were found in sediment adjacent to the STWB Site. Third, TCDD is not the only relevant dioxin congener found in the LPRSA, and it is possible that phthalocyanine pigment manufacturing process produces other congeners which still contribute to the dioxin/furan TEQ. The absence of these compounds in groundwater alone does not disprove the presence of these compounds on the site or their contribution to the contamination in LPRSA sediment.

### c.    Overland Fate & Transport (OFT)

Batson grossly underestimates the overland discharge from the STWB Site to the Passaic River.

The stated purpose for the OFT pathway is to assess the volume of contaminated media that could have been discharged from the facility to the LPRSA via overland flow and surface runoff.[653]  The Batson Report cites max detections of copper (1,950 ppm), lead (1,360 ppm), and mercury (5.9 ppm) in soil at the STWB Site, but dismisses these concentrations as below NJDEP Residential Direct Contact Soil Remediation Standards, and assigns a 0 to these COCs for the OFT Pathway when developing scores for the site.[654]  The concentrations for these COCs in upland soil at the STWB Site are orders of magnitude above the ROD PRGs for these compounds (63 ppm for copper, 130 ppm for lead, and 0.074 ppm for mercury). In a similar fashion, Batson cites concentrations for individual PAH constituents in soil at the STWB Site on the order of 100–400 ppm (100,000-400,000 ppb), but assigns a 0 to HPAHs and LPAHs when scoring these COCs for the OFT pathway on the grounds that PAHs are commonly found in areas of historic fill in New Jersey.[655]  However, the ROD PRGs are 7,900 ppb for LPAHs and 53,000 ppb for HPAHs. Concentrations of individual PAHs at the STWB Site are well in excess of the remedial criteria for classes of PAHs in the LPRSA.

Batson did consider lower concentrations of these COCs in site soil as part of the calculation for the Sherwin-Williams Site, indicating an uneven application of the stated methodology. At the Sherwin-Williams Site, the maximum concentration of copper the allocator considered was 1,530 mg/kg (although, as noted earlier, he was wrong—the maximum copper concentration in soil at Sherwin-Williams was actually 7,010 mg/kg).[656]  Batson elects to use this concentration and calculate a mass transported via overland flow from Sherwin Williams.

---

[652] **Ex. A-98** (OCC-TIG-E01572743).

[653] Batson Report at 21.

[654] Batson Report, Attachment J for STWB at 6; Batson Report, Attachment L for STWB at 1.

[655] Batson Report, Attachment J, for STWB at 6-7; Batson Report, Attachment L for STWB at 1.

[656] Batson Report, Attachment L for Sherwin-Williams at 1.

ALCD-PUBCOM_0000577

However, he excluded the higher concentration of 1,950 mg/kg copper at the STWB Site as a permissible concentration. This indicates a failure to ensure a uniform application in his approach.

Batson's approach also shows a clear disregard for the facts. He acknowledges in his report that stormwater at the STWB Site generally flowed towards the Passaic River and in three specific discharge paths.[657] But the stormwater discharging via those paths would have traversed areas described as "sloppy" by PVSC,[658] empty drums of raw materials left uncovered,[659] pigments and coloring agents on grade surfaces throughout the facility (Id.), or a phthalo blue discharge spill area.[660] Even STWB expected, in an EPA Form 2F filing that STWB produced in the Contribution Action, that stormwater outfalls on site would be contaminated with pollutants such as copper, barium, oil & grease (the oil & grease discharges, according to the allocation methodology, would mean that STWB discharged PAHs to the Passaic), color, and iron.[661] Yet Batson found STWB had *no* overland discharges of COCs to the Passaic River.

### d.    Discharges to PVSC

The only numeric score that STWB receives in the allocation is for copper in discharges to the PVSC. Batson assumed that STWB discharged 1.85 mg/L copper to PVSC for 29 years.[662] Batson's narrative description of the STWB evidence not only does not mention such a detection, but states there is no record of sampling in STWB's discharges to the sanitary sewer.[663] We could find no record of a 1.85 detection in PVSC discharges. Taken together, it seems this concentration may be an assumption intended to approximate a low-level concentration of copper based on its use as a raw material onsite.

STWB, like Sherwin-Williams, encapsulates the flaws in Batson's document submission process. STWB conveniently withheld important documents from Batson's review that would have shown their callous disregard for regulations governing discharges to the Passaic. He also would have seen evidence that contradicted a "confidential" expert report STWB submitted and documents showing admissions of contaminants in direct overland discharges. STWB did not give those documents to Batson, and only disclosed them in the Contribution Action. Because of this, Batson conducted (poorly) an analysis of the STWB site with only a small piece of the much larger puzzle.

---

[657] Batson Report, Attachment J for STWB at 8.

[658] **Ex. A-99** (STWB-FED-000014437) at 14457.

[659] **Ex. A-100** (STWB-FED 0000002058).

[660] PAP-00057510–12.

[661] **Ex. A-101** (Oct. 11, 1993 NJDPES/DSW Permit Application for Hilton Davis Co.) (STWB-FED-0000002111) at 2129.

[662] Batson Report, Attachment L for STWB at 1, 5.

[663] Batson Report, Attachment J for STWB at 10.

ALCD-PUBCOM_0000578