# Exhibit 10 Part 2

## Comments Submitted by OxyChem (Part 2): OxyChem Appendix B1-B3

United States' Motion to Enter Consent Decree,
*United States v. Alden Leeds, Inc. et al.*, Civil Action No. 22-7326 (D.N.J.)

# APPENDIX B.1
Michael Bock Declaration

ALCD-PUBCOM_0000579

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| Plaintiff, | ) Civil Action No. 2:22-cv-7326 |
| | ) |
| v. | ) |
| | ) |
| ALDEN LEEDS, INC., *et al.* | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |

## DECLARATION OF MICHAEL BOCK

1

ALCD-PUBCOM_0000580

## TABLE OF CONTENTS

LIST OF TABLES ......................................................................................................... 3

LIST OF FIGURES ...................................................................................................... 3

LIST OF ATTACHMENTS ......................................................................................... 3

PURPOSE OF THIS DECLARARTION ..................................................................... 4

QUALIFICATIONS ..................................................................................................... 4

SUMMARY OF OPINIONS ........................................................................................ 6

SUPPORTING INFORMATION FOR OPINIONS ..................................................... 7

Opinion 1. There are serious errors in the Batson Report's allocation of
responsibility for dioxins. .................................................................. 7

a.    EPA guidance specifies that dioxin risks should be calculated using TEQs.
Batson diverges from this guidance and instead uses a mixture of
incompatible metrics, resulting in serious calculation errors that materially
impact the allocation. .......................................................................... 7

Opinion 2. The former Diamond Site located at 80 Lister Avenue in Newark, NJ
is not the only site associated with dioxins, 2,3,7,8-TCDD, and TEQs in
the Passaic. ......................................................................................... 22

a.    The dioxin profile associated with the former Diamond Site is
demonstrably different from the dioxin profiles observed in the Passaic. ........... 23

b.    Dioxin profiles associated with processes that did not occur at the former
Diamond Site have been identified in the Passaic. ................................. 25

c.    Numerous other sites in the Passaic area conducted operations that are
known or suspected to release dioxins. .................................................. 31

d.    Many properties along the Passaic have high dioxin concentrations and are
potential sources of dioxins found in the river. ..................................... 39

Opinion 3. The former Diamond Site is not the sole significant source of 2,3,7,8-
TCDD associated with the manufacture and use of TCP in the Passaic. .............. 45

Opinion 4. The Batson Report's estimate of dioxins discharged from the former
Diamond Site are fundamentally flawed, rendering critical components of
the allocation useless. ......................................................................... 49

REFERENCES ............................................................................................................ 66

ALCD-PUBCOM_0000581

## LIST OF TABLES

**Table 1.** Mammalian TEF values for dioxins and dioxin-like PCBs ............................................. 9
**Table 2.** Mean TEQ EFs, by TEQ category, river mile segment, and depth.. .............................. 19
**Table 3.** Proportion of the TEQs by TEF category, river mile segment, and depth..................... 21
**Table 4.** Summary of dioxin sources/profiles in Passaic sediment from the peer-reviewed
literature ............................................................................................................................... 27
**Table 5.** Upland dioxin data sources ............................................................................................. 41
**Table 6.** OxyChem CTMass calculations comparison .................................................................. 50
**Table 7.** Concentrations of 2,3,7,8-TCDD in building chip samples (OxyChem)....................... 53
**Table 8.** Concentrations of 2,3,7,8-TCDD in TCP (OxyChem) .................................................. 55
**Table 9.** Alternate 2,3,7,8-TCDD discharge estimates for OxyChem based on Parette et al. 2018
................................................................................................................................................ 60
**Table A-1.** Concentrations of 2,3,7,8-TCDD in sump, product, and process streams (OxyChem)
................................................................................................................................................ 75

## LIST OF FIGURES

**Figure 1.** Chemical structure of the dioxin 2,3,7,8-TCDD and the furan 2,3,7,8-TCDF............... 8
**Figure 2.** Components of a box plot................................................................................................ 17
**Figure 3.** Contributions of 2,3,7,8-TCDD, other dioxins, and PCBs to TEFs expressed as an
enrichment factor (TEQs/RG)............................................................................................... 18
**Figure 4.** Percent of samples that exceed the TEQ RG, by category, all depths ......................... 19
**Figure 5.** Proportion of total TEQs (top panel) and dioxin TEQs (lower panel) in each TEQ class
by depth category and river mile ........................................................................................... 21
**Figure 6.** Contributions to TEQs for soils and sediment at the former Diamond Site and Passaic
sediments................................................................................................................................ 24
**Figure 7.** Givaudan Clifton fraction of 2,3,7,8-TCDD versus river mile. ................................... 29
**Figure 8.** Soil TEQs for sites with upland data............................................................................. 40
**Figure 9.** Dioxin TEQ profiles for upland sites with data for all 17 2,3,7,8-subsitiued
congeners.. ............................................................................................................................. 42
**Figure 10.** Locations of upland sites with dioxin data ................................................................. 44

## LIST OF ATTACHMENTS

Attachment 1 – Resume of Michael Bock

ALCD-PUBCOM_0000582

## PURPOSE OF THIS DECLARARTION

Pursuant to 28 U.S.C. § 1746, I, Michael Bock, state the following:

1. I have been retained by Gibbs and Bruns, LLP on behalf of Glen Springs Holdings, Inc (GSH) and Occidental Chemical Corporation (OxyChem) to provide expert opinions related to the Diamond Alkali Superfund Site (OU2) and the Lower Passaic River (Passaic). Specifically, I was asked to evaluate the Final Allocation Recommendation Report (Batson Report) and related consent decree offered by the U.S. Environmental Protection Agency (EPA).

2. My assignment included providing expert responses to the following questions:

    - **Is the use of 2,3,7,8-TCDD as a surrogate for dioxin and furan TEQs[1] scientifically valid and consistent with EPA's 2016 and 2021 Records of Decision (RODs)?**

    - **Are chemicals other than 2,3,7,8-TCDD significant sources of TEQ in Passaic sediments?**

    - **Is the attribution of the dioxin mass to OxyChem supported by the data and the scientific literature or are other sources significant?**

    - **Is the calculation of 2,3,7,8-TCDD discharges from the Diamond Alkali facility correct?**

### QUALIFICATIONS

3. I hold a bachelor's degree in marine studies from the University of South Carolina, a master's degree in marine studies from the University of Delaware, and a doctoral degree in oceanography from the University of Delaware. In 1995 I began working as a postdoctoral fellow at the University of Maine Darling Marine Center in the Marine Geochemistry Laboratory. Between 1998 and 2002 I was employed by Katahdin Analytical Services in Westbrook, Maine as staff scientist and department manager. Between 2002 and 2005 I worked as a project scientist in the Portland, Maine office of Arcadis. From 2005 through 2022 I was

---

[1] Toxic equivalency factor (TEF) expresses the toxicity of dioxins and certain PCBs in terms of 2,3,7,8-TCDD toxicity. Because the toxicity of individual dioxin and PCB congeners varies by orders of magnitude, TEF can be used to express the toxicity as a single number. The TEQ is the sum of the product of the individual concentrations and TEF value for each congener.

4

ALCD-PUBCOM_0000583

employed by Ramboll, formerly ENVIRON and later Ramboll Environ. From 2022 I have been employed by The Intelligence Group, LLC.

4.  I specialize in the investigation and assessment of contaminated marine and freshwater sediments, including statistical analysis, forensic analysis and source allocation, fate and transport modeling, species sensitivity toxicity evaluations, and ecological and human health risk assessment. I have expertise using multivariate statistical data analysis, such as multi-criteria analysis and receptor modeling/source unmixing (*e.g.*, principal components analysis, hierarchical cluster analysis, ratio analysis, least-squares mixing models, cosine-theta analysis, and polytopic vector analysis), to determine fingerprint patterns and allocate sources in environmental samples. My environmental forensic work has focused extensively on discerning sources and the fate of polychlorinated biphenyls (PCBs), dioxins, and polycyclic aromatic hydrocarbons (PAHs) in rivers, lakes, ports, harbors, and soils. I have extensive experience in the analysis and evaluation of chemical data with a focus on PCBs, dioxins, PAHs, and emerging contaminants. I have conducted numerous evaluations identifying sources and delineating impacts associated with these chemicals.

5.  I am considered by my peers to be an authority in environmental science, sediment chemistry, contaminant fate and transport, and chemical forensics. I have given more than 55 conference presentations, taught five courses, and published more than 35 peer-reviewed articles.

6.  My resume, which includes a list of work experience and publications, is presented in Attachment I.

7.  If asked to testify before the Unites States District Court for the District of New Jersey, my testimony would be consistent with this declaration.

5

ALCD-PUBCOM_0000584

## SUMMARY OF OPINIONS

8. **Opinion 1:** There are serious errors in the Batson Report's allocation of responsibility for dioxins.

  a. EPA guidance specifies that dioxin[2] risks should be calculated using TEQs. Batson diverges from this guidance and instead uses a mixture of incompatible metrics, resulting in serious calculation errors that materially impact the allocation.

  b. The Batson Report focuses largely on 2,3,7,8-TCDD, a single contributor to dioxin TEQs, and therefore underestimates the other sources of TEQs and overestimates the share attributed to 2,3,7,8-TCDD.

9. **Opinion 2:** The former Diamond Site located at 80 Lister Avenue in Newark, NJ is not the only site associated with dioxins, 2,3,7,8-TCDD, and TEQs in the Passaic.

  a. The dioxin profile associated with the former Diamond Site is demonstrably different from other dioxin profiles observed in the Passaic.

  b. Dioxin profiles associated with processes that did not occur at the former Diamond Site have been identified in the Passaic.

  c. Numerous other sites in the Passaic area conducted operations that are known or suspected to generate and release dioxins.

  d. Many properties along the Passaic have high dioxin concentrations and are potential sources of dioxins found in the river.

10. **Opinion 3:** The former Diamond Site is not the sole significant source of 2,3,7,8-TCDD associated with the manufacture and use of 2,4,5-trichlorophenol (TCP) in the Passaic.

11. **Opinion 4:** The Batson Report's estimate of dioxins discharged from the former Diamond Site are fundamentally flawed and render critical components of the allocation useless.

---

[2] For convenience, I will refer to dioxins and furans (also commonly referred to as PCDD/Fs or D/Fs) as "dioxins" for the purpose of this declaration.

6

## SUPPORTING INFORMATION FOR OPINIONS

**Opinion 1. There are serious errors in the Batson Report's allocation of responsibility for dioxins.**

12. To support this opinion, I compared EPA's guidance for calculating dioxin risk with the Batson Report's calculations of dioxin discharges, the mass of dioxins in OU2 sediments, and the uses of the discharge and sediment mass to calculate the attenuation factor (A%). I then evaluated the contributions to dioxins in Passaic sediments and compared those contributions to the Batson Report's calculations.

13. Numerous errors and inconsistencies in the way Batson assesses dioxin discharges and sediment masses are serious enough to invalidate the Batson results. Batson's inconsistent conflation of dioxins, TEQs, and 2,3,7,8-TCDD underestimates the sources of dioxin and overestimates the allocation of dioxins to 2,3,7,8-TCDD.

   **a. EPA guidance specifies that dioxin risks should be calculated using TEQs. Batson diverges from this guidance and instead uses a mixture of incompatible metrics, resulting in serious calculation errors that materially impact the allocation.**

14. Polychlorinated dibenzo-p-dioxins (PCDDs, dioxins) and polychlorinated dibenzofurans (PCDFs, furans) are a class of compounds whose chemical structure is based on two benzene rings joined by one oxygen atom (furans) or two oxygen atoms (dioxin). A benzene ring is a molecule composed of six carbons with typically one hydrogen atom attached to each. In a dioxin, up to eight of the hydrogen atoms are substituted with a chlorine atom. The location(s) of the substituted chlorine in molecule are referred to as "positions." Examples of the chemical structure of dioxins and furans are shown in Figure 1.

7

ALCD-PUBCOM_0000586

Figure 1. Chemical structure of the dioxin 2,3,7,8-TCDD and the furan 2,3,7,8-TCDF

15. There are 210 dioxin and furan congeners. The 17 congeners with chlorine substituted in the 2, 3, 7, and 8 positions are considered to have "dioxin-like" toxicity. The World Health Organization (WHO) and EPA have assigned toxicity equivalence factors (TEFs) for each of these 17 congeners to characterize their toxicity relative to 2,3,7,8-TCDD.[3] The WHO and EPA have also assigned TEFs to 12 "dioxin-like" PCB congeners that exhibit dioxin-like toxicity. The WHO 2005 mammalian TEF values are listed in Table 1 below.[4] For the purposes of this declaration, the 17 2,3,7,8-substituted PCDD and PCDF congeners listed in the table are referred to collectively as "dioxins" unless otherwise noted. Different dioxin congeners have differing relative toxicity, and therefore different TEFs, with the relative toxicity ranging from equivalent to 2,3,7,8-TCDD to 1/10,000 as toxic as 2,3,7,8-TCDD.

---

[3] Van den Berg et al. 2006; EPA 2008; EPA 2010

[4] In addition to the mammalian TEFs, which are used to estimate risks to humans and other mammals, the WHO and EPA have developed TEFs for risks to avian and fish receptors, which are published in Van den Berg et al. 2006 and EPA 2008.

ALCD-PUBCOM_0000587

**Table 1.** Mammalian TEF values for dioxins and dioxin-like PCBs

| Compound | WHO 2005 Mammalian TEF Value |
|---|---|
| **PCDDs** | |
| 2,3,7,8-TCDD | 1 |
| 1,2,3,7,8-PeCDD | 1 |
| 1,2,3,4,7,8-HxCDD | 0.1 |
| 1,2,3,6,7,8-HxCDD | 0.1 |
| 1,2,3,7,8,9-HxCDD | 0.1 |
| 1,2,3,4,6,7,8-HpCDD | 0.01 |
| OCDD | 0.0003 |
| **PCDFs** | |
| 2,3,7,8-TCDF | 0.1 |
| 1,2,3,7,8-PeCDF | 0.03 |
| 2,3,4,7,8-PeCDF | 0.3 |
| 1,2,3,4,7,8-HxCDF | 0.1 |
| 1,2,3,6,7,8-HxCDF | 0.1 |
| 1,2,3,7,8,9-HxCDF | 0.1 |
| 2,3,4,6,7,8-HxCDF | 0.1 |
| 1,2,3,4,6,7,8-HpCDF | 0.01 |
| 1,2,3,6,7,8,9-HpCDF | 0.01 |
| OCDF | 0.0003 |
| **Dioxin-like PCBs (non-ortho and mono-ortho substituted PCBs)** | |
| 3,3',4,4'-tetraCB (PCB 77) | 0.0001 |
| 3,4,4',5-tetraCB (PCB 81) | 0.0003 |
| 3,3',4,4',5-pentaCB (PCB 126) | 0.1 |
| 3,3',4,4',5,5'-hexaCB (PCB 169) | 0.03 |
| 2,3,3',4,4'-pentaCB (PCB 105) | 0.0003 |
| 2,3,4,4',5-pentaCB (PCB 114) | 0.0003 |
| 2,3',4,4',5-pentaCB (PCB 118) | 0.0003 |
| 2',3,4,4',5-pentaCB (PCB 123) | 0.0003 |
| 2,3,3',4,4',5-hexaCB (PCB 156) | 0.0003 |
| 2,3,3',4,4',5'-hexaCB (PCB 157) | 0.0003 |
| 2,3',4,4',5,5'-hexaCB (PCB 167) | 0.0003 |
| 2,3,3',4,4',5,5'-heptaCB (PCB 189) | 0.0003 |

16. **The Batson Report characterizes dioxins in three contexts: (1) to evaluate the risks associated with dioxins in the Passaic, (2) to estimate the mass of dioxins discharged from the Allocation Parties (APs), and (3) to define the total mass of dioxins present in Passaic sediments**. The Batson Report's allocation of responsibility for dioxins relies on each of these three calculations. For Batson's method to be work correctly, dioxins must be characterized correctly and consistently in each of these contexts. They were not.

17. EPA guidance,[5] the OU2 ROD,[6] and the OU4 ROD[7] all indicate that dioxin risks should be analyzed using the TEQ methodology, which characterizes toxicity by adding up the contributions of 29 different chemicals: the 17 toxic dioxin congeners and the 12 dioxin-like

---

[5] EPA 2010

[6] EPA 2016 pp. 23–24

[7] EPA 2021

9

PCBs.[8,9] TEQ is the concentration of all 29 chemicals, each weighted by their respective TEF value (as shown above in Table 1). Although 2,3,7,8-TCDD is generally characterized as the most toxic dioxin congener, it is not the sole contributor to dioxin TEQs; accordingly, TEQs include 28 chemicals other than 2,3,7,8-TCDD.

18. In the OU2 ROD, EPA segregates PCBs and dioxins, calculating two separate TEQs for dioxins and for dioxin-like PCBs.[10] For the purposes of this declaration, the total of the **dioxin TEQs** and **dioxin-like PCB TEQs** will be referred to collectively as **total TEQs**. Because the value of total TEQs is dependent on the concentrations of 29 different chemicals, **total TEQs cannot be attributed to 2,3,7,8-TCDD alone**.

19. Both the OU2 and OU4 RODs calculate TEQs using the TEFs values in Table 1. For example, in the 2016 ROD the risks associated with exposure to dioxin TEQs (alternatively known as PCDD/F TEQs) are presented in the human health risk summary tables.[11] These TEQ-derived risks were used to derive the preliminary remediation goals (PRGs) and final remediation goals (RGs) in Table 25 of the OU2 ROD.[12] However, the dioxin RG listed in the ROD (0.0083 micrograms/kilogram [μg/kg]) was associated with 2,3,7,8-TCDD. EPA indicates that 2,3,7,8-TCDD is being used as surrogate for dioxin TEQs:

---

[8] "Dioxin/furan congeners were evaluated as TCDD toxicity equivalence (TEQ) based on individual congener toxicity equivalence factors (TEFs). Dioxin-like compounds (including 2,3,7,8-TCDD, other dioxin/furan congeners and dioxin-like PCBs) typically occur as mixtures in the environment. The toxicity of dioxin-like compounds can be assessed by considering their toxicity relative to 2,3,7,8-TCDD" (EPA 2006 at p. 23).

[9] "The EPA recommends that the toxicity equivalence factor (TEF) methodology, a component mixture method, be used to evaluate human health risks posed by these mixtures, using TCDD as the index chemical." (EPA 2010 at p. ii).

[10] Id.

[11] EPA 2016. Tables 8 through 17

[12] The Responsiveness Summary for the 2016 ROD (Appendix V, p. 220) documents the PRG and RG calculation, which indicates that TCDD TEQs was used as the basis to calculate the 2,3,7,8-TCDD based RG.

ALCD-PUBCOM_0000589

- The remedy evaluations in Section 10 of the 2016 ROD documents model predictions of future reductions in the risks associated with dioxins and furans, not just 2,3,7,8-TCDD, associated with the various remedial alternatives.[13]

- 2,3,7,8-TCDD accounts for the majority of the total TEQs in fish (65.6 percent).[14] Almost 45 percent of the total TEQs were not attributed to 2,3,7,8-TCDD.

- 2,3,7,8-TCDD counts for the majority of TEQs in crab (78.8 percent). More than 21 percent was not attributed to 2,3,7,8-TCDD.[15]

In the OU4 ROD, risks associated with exposure to dioxins are presented in the human health risk summary tables.[16] As with the OU2 ROD, EPA clearly indicates that 2,3,7,8-TCDD is being used as surrogate for dioxins TEQs,[17] but also allows for the possibility that 2,3,7,8-TCDD may not be an acceptable surrogate for dioxin TEQs in the remedy design:

- EPA indicates that there is a strong correlation between 2,3,7,8-TCDD and other contaminants of concern (COCs), including TEQs: "Because of the strong correlation between grain size and the majority of the COCs, and the processes governing their fate and transport, the IR[18] footprint that addresses sources of 2,3,7,8-TCDD and total PCBs will also address sources of the other COCs, including the other dioxins and furans that contribute to the TCDD-TEQ."[19]

- "For the LPRSA, the magnitude of the TCDD-TEQ is well correlated with the 2,3,7,8-TCDD concentration.[20] The correlation between total TEQ and 2,3,7,8-

---

[13] For example, from page 57 of the 2016 ROD: "For just dioxins/furans, computer models predict that implementation of Alternative 2 would reduce risks so that in the 26-year period after construction (2034 to 2059), the human health total cancer risk (for the adult and child) would be 5 x $10^{-5}$ and 2 x $10^{-5}$ for fish and crab consumption, respectively. The noncancer health hazard for the adult would be 1 and 0.4 for fish and crab consumption, respectively, and for the child would be 2 and 0.8 for fish and crab consumption, respectively." Similar language is found in the evaluations of the other alternative (EPA 2016 at pp. 23–24).

[14] EPA 2016. The Responsiveness Summary for the 2016 ROD (Appendix V, p. 194) documents: "The congener 2,3,7,8-TCDD is the main contributor to the Total TEQ in fish from the LPR. The results of an evaluation to determine percent contribution of the concentrations of dioxin-like compounds in fish is provided in Table II.F.1.8-1. As shown in the table, 2,3,7,8-TCDD contributes 65.6 percent of the total TEQ. The next highest average contribution was 1,2,3,7,8- PeCDD with 1.7 percent."

[15] EPA 2016. Appendix V. Responsiveness Summary p. 195

[16] EPA 2021. Appendix 5. Responsiveness Summary. Tables 7-5 and 7-6

[17] EPA 2021. Appendix 5. Responsiveness Summary.

[18] Interim remedy (IR)

[19] EPA 2021. Appendix 5. Responsiveness Summary p. 25. Note that EPA used the term TCDD TEQs to represent PCDD/F TEQs in the 2006 and 2021 RODs.

[20] EPA used TCDD TEQs as a synonym for dioxin TEQs and PCDD/F TEQs

11

ALCD-PUBCOM_0000590

TCDD is shown in Figure 9 (A.4.3-1) at the end of this Responsiveness Summary."[21]

- EPA indicates that if areas of elevated dioxin TEQs are found that do not correspond to elevated 2,3,7,8-TCDD, these areas will be considered in developing the IR footprint. "The PDI program will analyze sediment samples for the full suite of COCs, including all of the chemicals with dioxin-like toxicity. EPA anticipates that if there are any TEQ outliers in the PDI dataset, they will be considered when determining the IR footprint."

Although EPA uses 2,3,7,8-TCDD as a surrogate for dioxins in developing the PRGs and RGs and proposes to use 2,3,7,8-TCDD in designing the remedy, both the OU2 and OU4 RODs make it clear that the risk assessment and related RGs are based on dioxin TEQs. **Because the dioxin risks that define the need for the remedy are based on dioxin TEQs, the allocation of remedial costs must also be based on TEQs.**

20. The Batson Report acknowledges that the dioxin and furan allocation should be based on TEQ. For example:

- Dioxin/furans are defined as polychlorinated dibenzo-p-dioxins (PCDD) and polychlorinated dibenzofurans (PCDF) in Attachment G to the Batson Report.[22]

- The Batson Report includes a list of COCs. The list characterizes dioxins and furans in terms of TEQ for human health and all ecological receptors (aside from benthic invertebrates).[23]

- The Batson Report estimates total risk based on TEQ.[24]

21. **For the purpose of calculating the mass of dioxins, the Batson Report frequently diverges from EPA's TEQ methodology, as defined in the ROD, the Allocation Guide, and the Allocation Protocol.** In the majority of the site assessments, dioxins are not evaluated based on the TEQ of all 17 toxic dioxin congeners, but on 2,3,7,8-TCDD only. Batson then compares the 2,3,7,8-TCDD discharge mass to the mass of 2,3,7,8-TCDD in OU2 sediments. This results in Batson underestimating the contributions of dioxins other than 2,3,7,8-TCDD to dioxin

---

[21] EPA 2021. Appendix 5. Responsiveness Summary p. 26

[22] Batson 2020. Attachment G at p. 3

[23] Batson 2020. Attachment H at p. 5

[24] Batson 2020. Attachment H, Tables 1 through 3, Tables A-1 through A-13

ALCD-PUBCOM_0000591

TEQs and risks. An exception to this approach appears in Batson's evaluation of OxyChem.[25] **Batson's dioxin allocation for OxyChem treats 225 kg of non-dioxins (19.7 kg of 2,4-D, 7.67 kg of 2,4,5-T, and 198.4 kg of NaTCP) as if they were 2,3,7,8-TCDD (225 kg total).[26]** Because these dioxin-associated compounds contain only a small fraction of 2,3,7,8-TCDD and other dioxins (typically less than a part per million), this approach overestimates the contributions of these compounds to dioxin risks. If we conservatively assume 34.1 milligrams per kilogram (mg/kg) of 2,3,7,8-TCDD in these dioxin precursors (Table 8), then there would be less than 1 kg of 2,3,7,8-TCDD in these estimated discharges. Given that the Batson Report assumes that there is 38 kg of 2,3,7,8-TCDD in OU2 sediments,[27] this represents a serious calculation error.

22. Specific examples of the varying metrics used by Batson to calculate the dioxin scores include:

- All of the facility data computation worksheets include dioxin/furans, dioxin/furan precursor 2,4-D, dioxin/furan precursor 2,4,5-T, and dioxin/furan precursor 2,4,6-TCP.[28] **The contributions from the three dioxin/furan precursors were calculated based on the mass of the precursors, not the mass of dioxins, 2,3,7,8-TCDD, or TEQs impurities associated with the precursor.**

- The Batson Report's dioxin and furan mass calculations for OxyChem at the former Diamond Site include contributions from (1) 2,3,7,8-TCDD in direct discharges, (2) 2,4-D in direct discharges, (3) 2,4,5-T in direct discharges, (4) 2,3,7,8-TCDD in overland flow, (5) 2,3,7,8-TCDD in debris, (6) NaTCP in air emissions, and (7) NaTCP in ruptured disk emissions.[29] **Batson did not convert the 2,4-D, 2,4,5-T,**

---

[25] It is important to note the Batson Report defines dioxin associated compounds as 2,4-D (2,4-dichlorophenoxyacetic acid (2,4-D), 2,4,5-trichlorophenoxy acetic acid (2,4,5-T), and 2,4,6-trichlorophenol (2,4,6-TCP) and scores these compounds in the facility data computation worksheets (Batson 2020. Attachment L). This list is inexplicably limited to three dioxin-associated compounds that were identified as relevant to operations at the former Diamond Site. As found in Esposito et al. 1980, there are more than 25 Class I and Class II dioxin-associated compounds and more than 50 Class III dioxin-associated compounds. Batson provides no rational for not considering other dioxin-associated compound that would be associated with sites other than the former Diamond Site.

[26] Batson 2020 Attachment L, OxyChem Facility Data Computation Spreadsheet, pdf pages 2580 and 2583 of 3249.

[27] Batson 2020 Attachment R, Table 1

[28] Batson 2020. Attachment J

[29] Batson 2020. Attachment J and Attachment L

13

or NaTCP product masses to 2,3,7,8-TCDD or TEQ impurities,[30] resulting in a significant overestimation of dioxins and dioxin TEQs.

- The Batson Report's mass calculations for the Givaudan Site are based on a maximum concentration of 0.2 mg/kg 2,3,7,8-TCDD (reported in the primary records as 200 parts per billion [ppb] in sample PA-01). However, this document only seeks to report the presence of concentrations of 2,3,7,8-TCDD greater than 20 ppb.[31] The cited primary record does not aim to characterize the total dioxin concentration or TEQs in these samples. Notably, the Batson Report excluded a slightly higher concentration of **214 ppb 2,3,7,8-TCDD** in the onsite stormwater pond; though the allocator implies that because full details regarding the samples in the pond were not available, it could not be included in the calculation of the score.[32]

- At the Sherwin Williams Site, Batson 2020 discusses a sampling event that identified up to **5.1 ppb 2,3,7,8-TCDD, 19.9 ppb 2,3,7,8-TCDF, and 15.7 ppb OCDD**.[33] At the Site, the calculated **maximum dioxin TEQ was 29 ppb** (the Batson Report references this as over 20 ppb TEQ), with varying compositions of a range of detected dioxin and furan congeners.[34] The Batson Report used a soil TEQ value from a deed notice of **23.5 ppb TEQ to calculate discharges due to soil erosion**.[35] Batson assigns this discharge to OxyChem based on the proximity to the former Diamond Site and the conclusion from the ISRA.[36] The Batson Report does not consider the potential for dioxins to be generated at the Sherwin Williams Site, nor does it acknowledge that the dioxin profiles differ between the former Diamond Site and Sherwin Williams Site, which supports that the former Diamond Site is not the sole dioxin source. A more detailed assessment of the dioxin profiles and the source of these dioxins is presented under Opinion 2c.

- For the Benjamin Moore Site, Batson 2020 evaluated detections of **dioxin TEQs** up to 0.0093 ppb.[37] It bears noting that the **2,3,7,8-TCDD was not detected** in this sample, meaning that the TEQs in this sample are related to the toxicity of the other dioxin/furan congeners and not 2,3,7,8-TCDD.[38] The Batson Report similarly dismisses this concentration as deposited either by wind or flood from the nearby former Diamond Site.[39] Batson does not consider the high likelihood of Benjamin

---

[30] 2,4-D, 2,4,5-T, and NaTCP were products that were produced and sold by the former Diamond facility. Dioxins are inadvertently formed impurities that compose a small fraction of the products, typically ppm or less, that contribute to TEQs.

[31] PAP-00179675 at PAP-00179717–718

[32] Batson 2020. Attachment J. for Givaudan at p. 13; PAP-00179605 at PAP-00179607

[33] PAS-00127794 at PAS-00127967

[34] Batson 2020. Attachment J. for Sherwin-Williams at p. 11; PAP-00367356 at PAP-00367375, 389, 392

[35] PAP-00367276 at PAP-00367345

[36] PAP-00126516 at PAP-00126545

[37] PAP-00724492 at PAP-00724499

[38] PAP-00724492 at PAP-00724535–537

[39] PAP-00725041 at PAP-00725061

ALCD-PUBCOM_0000593

Moore site operations to be associated with dioxins or any comparison of dioxin profiles between the two sites.

- For PPG, Batson 2020 refers to a detection of **20.8 nanograms/gram (ng/g) 2,3,7,8-TCDD** (0.028 ppb) in 2017 and a detection of **216 picograms/gram (pg/g) 2,3,7,8-TCDD** (0.216 ppb) in 2011 (**234 pg/g TEQ**).[40] The only mention of TEQ in the Batson Report's assessment of PPG is with respect to this single sample. As with the data used for other sites like Sherwin Williams and Benjamin Moore, these samples also contain other dioxin/furan congeners.[41] To dismiss these concentrations, Batson 2020 states that the concentrations in soil are due to flooding from the former Diamond Site.[42]

- Batson's "attenuation factor" is based on a comparison of the D/F metrics described above (2,3,7,8-TCDD, TEQs, and dioxin precursors) assigned to OxyChem to the 2,3,7,8-TCDD mass in the OU2 sediment. As documented above, 225 kg of the 3,729.8 kg is based on the estimated discharge of dioxin precursors. Logic dictates that both of these masses should be based on the same metric, specifically 2,3,7,8-TCDD. Baston fails to use the same metrics across different pathways. These errors mean that the Batson report's "attenuation factor" is incorrect, as discussed further in Opinion 4.

23. An equitable allocation should be based on the same metrics that define the need for a remedy. In the case of dioxins in the Passaic, this is total TEQ and not just 2,3,7,8-TCDD, the media used by Batson to define scores and shares. This is especially true if dioxins other than 2,3,7,8-TCDD are significant contributors to TEQs in Passaic sediments, the media used by Batson to define scores and shares.

24. Baton's criteria for assessing the example sites listed above clearly indicate that TEQs were not consistently applied in allocation responsibility for dioxins. The Batson Report uses a mishmash of different substances: 2,3,7,8-TCDD, other PCDD/F congeners, PCDD/F TEQs, and a limited list of dioxin-associated compounds. The Batson Report should have been consistent with the methods described in the Allocation Work Plan, either by using dioxin TEQs or by describing the assumptions used to estimate TEQs when complete data were not available. Instead, the Batson Report uses a mishmash of different approaches: Batson considers 2,3,7,8-TCDD in some places, dioxin congeners in other places, dioxin TEQs in

---

[40] Batson 2020. Attachment J for PPG at pp. 7-8; PAP-00478695 at PAP-00478818–819

[41] PAS-00044273 at PAS-00044316

[42] Batson 2020. Attachment J. for PPG at p. 8

ALCD-PUBCOM_0000594

other places, and sometimes considers compounds that are not dioxins at all. This inconsistent characterization means that Batson's assessment of dioxins shares at different sites are not comparable. As a result, the allocation does not properly consider the contributions of dioxins other than 2,3,7,8-TCDD to TEQs, and therefore does not properly consider dioxin risks.

**b. The Batson Report focuses largely on 2,3,7,8-TCDD, a single contributor to dioxin TEQs, and therefore underestimates the other sources of TEQs and overestimates the share attributed to 2,3,7,8-TCDD.**

25. I analyzed Passaic sediment chemistry data to assess the contributions of 2,3,7,8-TCDD, other dioxins, and dioxin-like PCBs to the dioxin and total TEQs measured in sediments.[43] Dioxin TEQs were calculated in samples in which 14 or more of the 17 WHO congeners were measured.[44] When calculating the proportion of the total TEQs in each sample attributable to each category, samples were only included if both dioxins and PCBs were measured. For the purpose of these evaluations, if a chemical was not detected in a sample, it was not included in the TEQ calculation. This practice is equivalent to setting non-detects to zero.

26. The TEQs associated with the three categories (2,3,7,8-TCDD, other dioxins, and PCBs) are summarized using box plots. Box plots depict the median (midpoint) of the data distribution as a horizontal line; the 1st and 3rd quartiles (25th and 75th percentiles) as a box; values within 1.58 times the width of the box as whiskers; and observations outside of the whiskers as points.[45,46] Figure 2 depicts the components of a box plot.

---

[43] The analysis of sediment data in this declaration relied on data from the offsite sediment database that contains the analytical results of sediment samples collected during 67 sampling events conducted from 1983 to 2016 in the Passaic River, the northern Newark Bay, and the lower Hackensack River. This data was extracted from EQuIS and the National Oceanic and Atmospheric Administration (NOAA) Query Manager. In addition to the offsite sediment database, TIG included sediment samples from EPA's 2015 SERAS Diamond Alkali Dioxin Investigation.

[44] Note that dioxins and PCBs were not measured in all samples.

[45] EPA 2000

[46] Tukey 1977

16

ALCD-PUBCOM_0000595



**Figure 2.** Components of a box plot

27. Box plots depicting the components of the total TEQs associated with each category (2,3,7,8-TCDD, other dioxins, and PCBs) are shown in Figure 3. In this plot, the y-axis corresponds to the concentrations, presented as the enrichment factor (EF) relative to the 2,3,7,8-TCDD TEQ RG.[47] The x-axis divides the Passaic into increments by river mile (RM). The top panel presents the results for surface sediments (sample start depth less than 2 feet [ft]) and buried sediments (sample start depth greater than or equal to 2 ft). Within each RM segment, the TEQs for each category are shown by color. The horizontal line corresponds to an EF of 1 (TEQs = the RG) and the dotted line corresponds to an EF of 10 (TEQs 10 times greater than the RG). Note that TEQs associated with non-2,3,7,8-TCDD dioxins and PCBs were not available above RM 15. The mean TEQ EFs, by RM segment, are summarized in Table 3. Figure 4 presents the percentage of samples that exceeded the RG.

---

[47] EF = TEQ/RG. If the TEQ value is greater than the RG, then the EF is greater than one. For example, an EF of ten means that the TEQ value is ten times the RG.

ALCD-PUBCOM_0000596

28. As shown in Figure 3, Table 2, and Figure 4, in virtually all RM segments, all three TEQ categories exceed the RG in the majority of the samples for both surface and buried sediments (EF >1). Thus, even if the concentration of 2,3,7,8-TCDD was zero, the TEQs would still exceed the RGs, often by an order of magnitude or more, in most samples. These results show that 2,3,7,8-TCDD alone does not characterize exceedances of the TEQ based RG.



**Figure 3.** Contributions of 2,3,7,8-TCDD, other dioxins, and PCBs to TEFs expressed as an enrichment factor (TEQs/RG). The solid horizontal line represents an EF of 1 (TEQs = RG) and the dotted line represents an EF of 10 (TEQs = 10x the RG). The top panel shows surface sediment (sample starting depth < 2ft), the bottom panel is buried sediment (sample start depth ≥ 2ft).

18

ALCD-PUBCOM_0000597

**Table 2.** Mean TEQ EFs, by TEQ category, river mile segment, and depth. The number of samples is in parentheses. EF > 1 indicates and exceedance of the RG.

| River Mile | 2,3,7,8-TCDD TEQ EFs | | Other Dioxin TEQ EFs | | PCB TEQ EFs | |
|---|---|---|---|---|---|---|
| | **Surface** | **Buried** | **Surface** | **Buried** | **Surface** | **Buried** |
| (0,1] | 16 (407) | 30 (613) | 4.5 (399) | 6.3 (610) | 1.1 (399) | 2 (612) |
| (1,2] | 120 (323) | 86 (429) | 17 (305) | 13 (420) | 8.3 (305) | 5.7 (426) |
| (2,3] | 370 (308) | 150 (346) | 46 (297) | 25 (342) | 6.2 (298) | 4.9 (341) |
| (3,4] | 13,000 (810) | 2,700 (669) | 970 (529) | 120 (484) | 11 (497) | 4.8 (462) |
| (4,5] | 560 (326) | 250 (378) | 24 (326) | 15 (378) | 5.8 (327) | 4.8 (379) |
| (5,6] | 570 (225) | 110 (242) | 19 (211) | 9.4 (238) | 6.4 (213) | 3.8 (238) |
| (6,7] | 560 (242) | 280 (253) | 18 (236) | 13 (250) | 6.6 (237) | 4.8 (252) |
| (7,8] | 190 (213) | 310 (298) | 10 (206) | 12 (296) | 3.2 (206) | 4.4 (294) |
| (8,9] | 220 (38) | 110 (109) | 10 (36) | 7.4 (107) | 8.1 (35) | 2.3 (98) |
| (9,10] | 300 (25) | 140 (85) | 9.3 (21) | 9 (82) | 5.7 (21) | 3.2 (77) |
| (10,11] | 340 (56) | 310 (129) | 12 (56) | 11 (129) | 5.6 (56) | 4.4 (121) |
| (11,12] | 370 (271) | 440 (388) | 12 (262) | 14 (370) | 4.9 (215) | 6.5 (320) |
| (12,13] | 200 (22) | 150 (62) | 12 (9) | 7.1 (57) | 7.8 (9) | 3 (55) |
| (13,14] | 23 (19) | 35 (62) | 3.3 (15) | 2.8 (59) | 2 (16) | 1.4 (59) |
| (15,16] | 0.71 (6) | 0.076 (6) | 3.3 (6) | 0.74 (6) | 3.6 (6) | 1.5 (6) |
| (16,17] | | 0.034 (3) | | 0.62 (3) | | 0.14 (3) |



**Figure 4.** Percent of samples that exceed the TEQ RG, by category, all depths

19

29. The sediment TEQs, by category, can also be expressed based on the percentage of the samples that exceed the TEQ RG. As shown in Figure 4, the number of samples that exceed the TEQ RG for non-2,3,7,8-TCDD dioxins is typically a few percent lower than the number that exceed the PRG based on 2,3,7,8-TCDD. However, for some river segments the non-2,3,7,8-TCDD dioxin TEQs exceed the PRG more frequently than 2,3,7,8-TCDD alone. Even in the absence of 2,3,7,8-TCDD, TEQs associated with other dioxins and PCB TEQs frequently exceed the RG.

30. I also examined the proportion of the TEQs associated with each category in the individual sediment samples to evaluate the average mixture of the components of the TEQs. The percentage is simply the proportion multiplied by 100 percent. The proportions were determined by calculating the proportion of the total TEQs and other dioxin TEQs attributable to each category in each sample[48] and then summarizing these proportions across all samples in each river mile category and depth category. These proportions are depicted in the pie charts in Figure 5, with the top two rows being based on total TEQs and the bottom two rows based on the contributions to dioxin TEQs only. Table 3 shows the mean proportions of TEQs for each of the categories. These results demonstrate that 2,3,7,8-TCDD accounts for the majority of TEQs in most, but not all, RM segments, but the TEQs associated with other dioxins and PCBs make up a significant proportion of the dioxin TEQs and total TEQs.

---

[48] If PCB congener data or PCDD/Fs were not analyzed in an individual sample the proportions were not calculated for that sample and it was excluded from this analysis.

ALCD-PUBCOM_0000599



**Figure 5.** Proportion of total TEQs (top panel) and dioxin TEQs (lower panel) in each TEQ class by depth category and river mile

**Table 3.** Proportion of the TEQs by TEF category, river mile segment, and depth. The number of samples is in parentheses.

| River Mile Group | Dioxin TEQ Proportion | | | | Total TEQ Proportion | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2,3,7,8-TCDD TEQs | | Other Dioxin TEQs | | 2,3,7,8-TCDD Tot TEQs | | Other Dioxin Tot TEQs | | PCB Tot TEQs | |
| | Surface | Buried | Surface | Buried | Surface | Buried | Surface | Buried | Surface | Buried |
| (0,1] | 0.67 (621) | 0.49 (408) | 0.33 (621) | 0.51 (408) | 0.64 (604) | 0.45 (398) | 0.31 (604) | 0.49 (398) | 0.05 (604) | 0.06 (398) |
| (1,2] | 0.74 (435) | 0.72 (323) | 0.26 (435) | 0.28 (323) | 0.69 (420) | 0.66 (305) | 0.24 (420) | 0.25 (305) | 0.07 (420) | 0.09 (305) |
| (2,3] | 0.76 (349) | 0.71 (310) | 0.24 (349) | 0.29 (310) | 0.72 (338) | 0.68 (296) | 0.23 (338) | 0.28 (296) | 0.05 (338) | 0.04 (296) |
| (3,4] | 0.78 (673) | 0.78 (822) | 0.22 (673) | 0.22 (822) | 0.74 (458) | 0.74 (483) | 0.22 (458) | 0.22 (483) | 0.05 (458) | 0.04 (483) |
| (4,5] | 0.77 (385) | 0.72 (327) | 0.23 (385) | 0.28 (327) | 0.74 (377) | 0.69 (326) | 0.22 (377) | 0.27 (326) | 0.04 (377) | 0.04 (326) |
| (5,6] | 0.83 (247) | 0.8 (229) | 0.17 (247) | 0.2 (229) | 0.79 (237) | 0.78 (211) | 0.16 (237) | 0.19 (211) | 0.05 (237) | 0.03 (211) |
| (6,7] | 0.86 (256) | 0.81 (244) | 0.14 (256) | 0.19 (244) | 0.82 (249) | 0.79 (235) | 0.14 (249) | 0.17 (235) | 0.04 (249) | 0.04 (235) |
| (7,8] | 0.75 (298) | 0.42 (214) | 0.25 (298) | 0.58 (214) | 0.72 (294) | 0.4 (205) | 0.24 (294) | 0.55 (205) | 0.04 (294) | 0.05 (205) |
| (8,9] | 0.81 (109) | 0.81 (39) | 0.19 (109) | 0.19 (39) | 0.77 (98) | 0.75 (34) | 0.17 (98) | 0.19 (34) | 0.06 (98) | 0.07 (34) |
| (9,10] | 0.86 (86) | 0.75 (25) | 0.14 (86) | 0.25 (25) | 0.81 (76) | 0.71 (21) | 0.14 (76) | 0.22 (21) | 0.05 (76) | 0.07 (21) |
| (10,11] | 0.77 (130) | 0.6 (56) | 0.23 (130) | 0.4 (56) | 0.74 (120) | 0.55 (56) | 0.19 (120) | 0.31 (56) | 0.07 (120) | 0.14 (56) |
| (11,12] | 0.84 (388) | 0.72 (272) | 0.16 (388) | 0.28 (272) | 0.81 (320) | 0.67 (214) | 0.16 (320) | 0.29 (214) | 0.03 (320) | 0.04 (214) |
| (12,13] | 0.83 (63) | 0.76 (22) | 0.17 (63) | 0.24 (22) | 0.79 (54) | 0.69 (9) | 0.17 (54) | 0.22 (9) | 0.04 (54) | 0.09 (9) |
| (13,14] | 0.65 (62) | 0.73 (20) | 0.35 (62) | 0.27 (20) | 0.58 (59) | 0.65 (15) | 0.23 (59) | 0.22 (15) | 0.12 (59) | 0.13 (15) |
| (15,16] | 0.04 (6) | 0.16 (6) | 0.96 (6) | 0.84 (6) | 0.03 (6) | 0.09 (6) | 0.44 (6) | 0.41 (6) | 0.53 (6) | 0.5 (6) |
| (16,17] | 0.05 (3) | | 0.95 (3) | | 0.04 (3) | | 0.81 (3) | | 0.16 (3) | |

31. The contribution of various categories to the TEQs in the analyses presented above clearly demonstrate that 2,3,7,8-TCDD is not the sole significant source of dioxin TEQs or total TEQs in Passaic sediments. Other sources of TEQs are of a similar magnitude, and chemicals other than 2,3,7,8-TCDD result in TEQs far above the 2,3,7,8-TCDD RG on a percentage of TEQs basis across samples (Table 3):

21

- Between RMs 0 and 8, chemicals other than 2,3,7,8-TCDD account for 14 to 51 percent of the dioxin TEQs and 18 to 55 percent of the total TEQs.

- Between RMs 0 and 17, chemicals other than 2,3,7,8-TCDD account for 14 to 94 percent of the dioxin TEQs and 55 to 97 percent of the total TEQs.

32. In summary, the Batson Report assesses dioxins in three contexts: (1) calculating dioxin risk, (2) estimating dioxin discharges by the Allocation Parties (APs), and (3) defining the mass of dioxins present in sediments used for the calculation of A%. All three should have been based on dioxin TEQ, consistent with EPA guidance. Instead, **Batson used a mishmash of different definitions for "dioxins," rather than consistently using dioxin TEQs.** In many cases, the definition of "dioxins" included chemicals that *are not dioxins*. The inconsistent treatment of dioxins resulted in significant errors in Batson's calculations. Batson focuses almost exclusively on 2,3,7,8-TCDD even though 2,3,7,8-TCDD represents only a fraction of the dioxin TEQs in Passaic sediments. Even without 2,3,7,8-TCDD, the majority of the sediments in the Passaic would still have dioxin TEQs at concentrations that exceed the RG. Thus, **the apparent reliance on 2,3,7,8-TCDD as a surrogate for TEQs in the Batson Report is flawed because it ignores the significant contribution of other dioxins to TEQs and risks.** Batson's frequent exclusion of non-2,3,7,8-TCDD dioxins and dioxin-like PCBs results in an excess allocation of TEQs to OxyChem that is inconsistent with EPA guidance and the evidence of other sources of TEQs in the Passaic.

**Opinion 2. The former Diamond Site located at 80 Lister Avenue in Newark, NJ is not the only site associated with dioxins, 2,3,7,8-TCDD, and TEQs in the Passaic.**

33. The Batson Report assigns responsibility for virtually all of the dioxins in the Passaic to OxyChem:

22

ALCD-PUBCOM_0000601

> *"The Allocator's analysis of allocation documents determined that [OxyChem] contributed the vast majority (99.997%) of the total mass of dioxin/furans contributed by all AP facilities (D/F COC TCMass)."*[49]

34. This conclusion is contradicted by overwhelming evidence that the former Diamond Alkali facility at 80 Lister Ave (the "Diamond Site") is not the only site associated with dioxins, 2,3,7,8-TCDD, or TEQs in the Passaic. Three lines of evidence support this conclusion:

(a) Many other dioxin profiles in Passaic sediments do not match the dioxin profile of the former Diamond Site,

(b) Many other sites along the Passaic conducted operations that are associated with dioxins and dioxin-like PCBs.

(c) The available upland soil data shows that dioxins are present at numerous upland sites in concentrations above the sediment RG, and the majority of sites have not been sampled for dioxins.

35. These three lines of evidence are discussed in detail below.

### a. The dioxin profile associated with the former Diamond Site is demonstrably different from the dioxin profiles observed in the Passaic.

36. To start with a simple example: a red dye factory and a blue dye factory operate next to the same lake. If the lake turns red, we can assume that the red dye factory has polluted the lake; vice versa, if the lake turns blue. But if the lake turns purple, both factories are responsible. Similarly, if the former Diamond Site is the sole significant contributor of dioxins to the Passaic, then the dioxins found in the Passaic should match the dioxins found at the former Diamond Site.

37. The former Diamond Site has a unique dioxin profile containing mostly 2,3,7,8-TCDD and very little other dioxins. If the former Diamond Site was the sole contributor of dioxins to the Passaic, then the Passaic's dioxin profile should look similar to the former Diamond Site's profile. If the fractions are different, then other sources of dioxin apart from the former Diamond Site must have contributed to TEQs in Passaic sediments.

---

[49] Batson 2020 at p. 29

23

38. I compiled the available upland dioxin data from the former Diamond Site[50] and used those
    data to calculate the TEQs attributable to 2,3,7,8-TCDD and other dioxins. Figure 6 shows the
    percent of the TEQs attributed to each category of chemical, averaged by sample, for the
    former Diamond Site (dioxin TEQs on the left and total TEQs[51] on the right) and for the Passaic
    (total TEQs in the top panel and dioxin TEQs in the bottom panel).[52] The proportions
    attributable to each TEQ class in Passaic sediments is also presented in Table 3 of Opinion 1.



**Figure 6.** Contributions to TEQs for soils and sediment at the former Diamond Site and Passaic
sediments

---

[50] Upland dioxin data references are listed in Table 5.

[51] Total TEQs are defined under Opinion 1 as the sum of PCDD/F TEQs and PCB TEQs.

[52] Because not all samples with dioxin measurements were measured for PCBs, not all samples were
included in the total TEQ calculations.

24

39. At the former Diamond Site, 2,3,7,8-TCDD makes up 97 percent of dioxin TEQs and 96 percent of total TEQs. Clearly 2,3,7,8-TCDD is the dominant contributor to TEQs at the former Diamond Site, with other dioxins and PCBs being very minor contributors to TEQs. The contribution of different TEQ classes to dioxin TEQs and total TEQs in the Passaic is very different:

- Between RMs 0 and 8, chemicals other than 2,3,7,8-TCDD account for 14 to 51 percent of the dioxin TEQs and from 18 to 55 percent of the total TEQs.

- Between RMs 0 and 17, chemicals other than 2,3,7,8-TCDD account for 14 to 94 percent of the dioxin TEQs and 55 to 97 percent of the Total TEQs. [53]

40. If the former Diamond Site contributed over 99 percent of the dioxin TEQs found in the Passaic, as Batson concludes, then the relative contributions of 2,3,7,8-TCDD and other sources of TEQs should be roughly equivalent at the former Diamond Site and in Passaic sediments. Since this is not the case, the former Diamond Site could not have contributed over 99 percent of the dioxin TEQs found in Passaic sediments. Therefore:

- Any allocation based on 2,3,7,8-TCDD alone does not account for other the significant contributions of other dioxins to dioxin TEQs.

- Other sources of dioxins contribute to dioxin TEQs in the sediments and must be considered in any allocation.

### b. Dioxin profiles associated with processes that did not occur at the former Diamond Site have been identified in the Passaic.

41. The identification of dioxin sources in the Passaic has been a topic of active research since the 1980s. Chemical forensics, or chemical fingerprinting, has been used to statistically compare the dioxin profile of the Passaic to the dioxin profiles of potential sources of dioxins. The

---

[53] Opinion 3 establishes that the former Diamond Site is not the sole source of 2,3,7,8-TCDD in the Lower Passaic River.

ALCD-PUBCOM_0000604

statistical methods used for these analyses have been employed for decades and are well accepted in both peer-reviewed scientific literature and in legal proceedings.[54] These methods include simple statistical comparisons, Principal Components Analysis (PCA)[55] and receptor models such as Polytopic Vector Analysis (PVA), Alternating Least Squares (ALS), and Positive Matrix Factorization/Non-negative Matrix Factorization (PMF/NMF), among others.[56] These methods are widely used to identify the sources of chemicals in a mixture, such as the dioxins found in Passaic sediments.

42. The first efforts to fingerprint dioxins in the Passaic were published in the early 1990s. Further exploration of this topic has resulted in peer-reviewed publications, EPA-sponsored reports, and presentations at scientific conferences as recently as 2023. These studies have consistently identified multiple sources of 2,3,7,8-TCDD and other dioxins to Passaic sediments. Common sources identified across multiple studies include sewage sludge, waste incineration, combustion, pulp and paper, herbicide manufacture, hexachlorophene manufacturing, other chlorinated compounds (pentachlorophenol [PCP], polyvinylchloride [PVC], chloranil), and the use of PCB Aroclors. These studies and the identified sources/profiles from each are summarized below in Table 4.

---

[54] e.g., Johnson et al. 2000, 2002, 2015; Plumb 2004; Myers 2011

[55] e.g., Wenning et al. 1993a, 1993b; Johnson et al. 2002, 2015

[56] e.g., Johnson et al. 2000, 2002, 2015; Huntley et al. 1998; Barabás et al. 2004a,b; Khairy et al. 2016; Cejas and Barrick 2020

ALCD-PUBCOM_0000605

**Table 4.** Summary of dioxin sources/profiles in Passaic sediment from the peer-reviewed literature

| Study | Conclusion/Affiliation | Sources/Profiles Identified |
|---|---|---|
| Bopp et al. 1991 | **Identified 80 Lister as a source**<br>Not affiliated with or funded by the former Diamond Site PRPs | Former Diamond Site |
| Wenning et al. 1993a, b | **Multiple industrial and municipal sources** | Sewage sludge<br>Solid waste incineration fly ash<br>PCP, metals reclamation<br>Vehicular combustion<br>Pulp and paper<br>Herbicide manufacture/2,4,5-T |
| Ehrlich et al. 1994 | **Multiple industrial and municipal sources** | Sewage sludge<br>Pulp and paper<br>Soot/combustion<br>Herbicide manufacture/2,4,5-T<br>PCB Aroclors |
| Huntley et al. 1998 | **Multiple industrial and municipal sources** | PCB Aroclors<br>Sewage Sludge/Chloranil<br>Sewage sludge/pulp and paper<br>Combustion<br>Herbicide manufacture/2,4,5-T<br>Unidentified |
| Barabás et al. 2004a, b | **Multiple industrial and municipal sources**<br><br>Not affiliated with or funded by the former Diamond Site PRPs | Chloranil<br>Herbicide manufacture/2,4,5-T, 2,4-D<br>Combustion<br>PVC<br>PCB Aroclors |
| Garvey et al. 2011<br>(Conference presentation, not peer-reviewed) | **Identification of second significant source**<br>Not affiliated with or funded by the former Diamond Site PRPs | Former Diamond Site<br>2,3,7,8-TCDD source near RM 12 |
| Quadrini et al. 2015 | **80 Lister, focused on 2,3,7,8-TCDD only**<br>Not affiliated with or funded by the former Diamond Site PRPs | Background<br>Herbicide manufacture/2,4,5-T |
| Khairy et al. 2016 | **Multiple industrial and municipal sources**<br>Not affiliated with or funded by the former Diamond Site PRPs | Chloranil<br>Urban background<br>PCB Aroclors<br>Combustion<br>Herbicide manufacture/2,4,5-T |
| Garland, 2017<br>(EPA Sponsored Report) | **Two industrial sources and background**<br>Not affiliated with or funded by the former Diamond Site PRPs | Givaudan (Clifton)<br>Former Diamond Site<br>Background |
| Cejas and Barrick 2020 | **Multiple source profiles, but not assigned to source types**<br>Not affiliated with or funded by the former Diamond Site PRPs | 2,3,7,8-TCDD dominated<br>OCDF dominated<br>TCDF to PeCDF<br>HxCDF to HpCDF<br>PCDD and PCDF signatures<br>PCDF and HpCDD/OCDD |
| Bock et al. 2021 | **Multiple industrial and municipal sources** | Background/PCP<br>Dye and Pigment/ Landfill leachate<br>2,4,5-TCP (herbicide, biocide, hexachlorophene manufacturing)<br>Fly ash, incineration, metals recycling<br>Dyes, PCBs, PVC<br>Combustion<br>Wood burning/metals smelting<br>Unknown<br>Landfills, PCBs, waste incineration<br>Waste incineration, PVC<br>Agrochemicals/vehicle exhaust |
| Bock et al. 2023<br>(Conference poster, not peer-reviewed) | **Multiple industrial sources** | PCB pyrolysis<br>PCB associated dioxins<br>Graphite electrode sludge |

43. **The current scientific consensus, as reported in the peer-reviewed literature, is that the former Diamond Site is one of numerous dioxins sources to the Passaic.**

ALCD-PUBCOM_0000606

44. Several of these studies highlight the importance of multiple sources of 2,3,7,8-TCDD and other dioxins:

    a.    **Garvey et al. 2011:**[57] The authors identified an anomaly in the sediment dioxin and DDT signatures in dated sediments, indicating a significant input of 2,3,7,8-TCDD circa 2000 in the vicinity of RM 12, nine miles upstream from the former Diamond Site. This input had a chemical signature that was distinct from the chemical signature found in the rest of the river. **The authors conclude that there is a second source of 2,3,7,8-TCDD, other than the former Diamond Site, in the vicinity of RM 12.** Givaudan's Clifton facility is located near RM 12.

    b.    **Garland 2017:**[58] The authors used dioxin profiles and chemical tracers to estimate the contribution of the former Diamond Site, the Givaudan Clifton facility, and background to the dioxins present in Passaic sediments. Hexachlorophene (HCP) and 1,2,4,5,7,8-hexachloroxanthene (HCX) were identified as tracers of Givaudan; several studies link the HCP manufacturing process to the presence of HCX.[59] 2,4,6,8-tetrachlorodibenzothiophene (TCDT) was proposed as a tracer of Diamond. HCX and HCP were found at elevated concentrations in Passaic sediments, consistent with the presence of wastes from Givaudan in Passaic sediments. **The authors concluded that the Givaudan contribution was highest in the upper reaches of the river (RM 18-8) and lower in the lower reaches (RM 7-0)** (Figure 7). The Givaudan contribution was significant (typically > 10 percent but as high as 40 percent at RM 15) and spatially variable, with the highest contributions upstream near the Givaudan facility. The model

---

[57] Presentation from the 2011 Battelle Sediment Conference and was not peer-reviewed.

[58] EPA sponsored study that was not peer-reviewed.

[59] Gothe and Wachtmeister 1972, Viswanathan and Kleopfer 1986, Viswanathan et al. 1987, Archer and Crone 1999, Beliveau et al. 2003; Custer et al. 2005.

28

ALCD-PUBCOM_0000607

did not account for all of the variability in the sediment dioxin distribution, suggesting that not all sources were included in the model.



**Figure 7.** Givaudan Clifton fraction of 2,3,7,8-TCDD versus river mile. The y-axis is the fraction attributed to Givaudan and the x-axis is river mile. (Extracted from Figure 8 of Garland 2017). Percent = fraction x 100.

c.  **Khairy et al. 2016**: The authors of this peer-reviewed study used multivariate methods to statistically separate the dioxin profiles in Passaic sediments. **Five source profiles were identified, representing variety of different sources of dioxins including chloranil, combustion, PCBs, urban background, and historical contamination consistent with the former Diamond Site**. There was spatial variability in the contributions of these source profiles to the sediment dioxin profiles, with different sources dominating in different reaches of the river. **The authors concluded that the Diamond plant only contributed a fraction (0–12 percent) of total dioxins in surface sediments.** The contribution of 2,3,7,8-TCDD to TEQs was higher (60 percent), but other sources of TEQs were clearly significant.

29

ALCD-PUBCOM_0000608

d.  **Cejas and Barrick 2020:**[60] The authors used advanced multivariate statistical methods to explore the distribution of dioxin profiles and source impacts in Passaic sediments. **The authors identified seven unique source profile, aka end members, from the sediment data**. The authors also identified spatial variability in the distribution of dioxin profiles. These results indicate that different sources are influencing different reaches of the river.

e.  **Bock et al. 2021:**[61] The authors (including the declarant) analyzed a comprehensive dataset with over 8,000 sediment samples using multivariate methods to identify geospatial distributions of dioxins, with different dioxin profiles more abundant in different reaches of the river. Statistical unmixing was used to identify source profiles from the sediment data. **Eleven source profiles were extracted from the data, each with different contributions in different areas of the river**. The authors identified the same 2,3,7,8-TCDD profile that previous researchers had attributed to the former Diamond Site,[62] and agreed with the other researchers that this profile was most consistent with the manufacture and use of 2,4,5-TCP (TCP). The former Diamond Site manufactured Agent Orange, and TCP is the primary component in the manufacture of 2,4,5-T. However, TCP is also the primary component in the manufacture of HCP. The authors conducted additional statistical analyses that positively identified a TCP-associated dioxin profile in Givaudan soil. **The authors demonstrated that dioxin profiles in Passaic sediments indicate a contribution from Givaudan**. Similar analysis of other potential TCP-associated sites could link additional upland sources to dioxins and 2,3,7,8-TCDD in Passaic sediments.

f.  **Bock et al. 2023:**[63] The authors (including the declarant) compared PCB and dioxin profiles in the lower two miles of the Passaic sediments with the profiles of three nearby upland sources. The authors used multivariate statistical methods and source unmixing to

---

[60] Peer-reviewed study from the scientific literature.

[61] Peer-reviewed study from the scientific literature.

[62] Esposito et al. 1980; Okamoto and Tomonari 1999

[63] Poster presentation from the 2023 Battelle Sediment Conference, not peer reviewed.

ALCD-PUBCOM_0000609

test for impacts consistent with known or suspected activities associated with the upland sites. The analyses were presented as a proof of concept for the comprehensive evaluation of the potential nexus between upland sites and the Passaic. The authors found evidence for PCB and dioxin profiles in the sediments adjacent to the upland sites consistent with the known or suspected upland activities. **The authors conclude that dioxin profiles in the Passaic are a mixture of regional and local sources, further confirming that dioxins in the Passaic are attributable to multiple sources**.

45. These studies all reach a similar conclusion: there are multiple sources of dioxins in the Passaic. Furthermore, three studies (Garvey et al. 2011, Garland, 2017, and Bock et al. 2021) show that the former Diamond Site is not the sole source of 2,3,7,8-TCDD in the river. **The 2,3,7,8-TCDD present in the Passaic is also attributable to Givaudan's Clifton facility** and may also be associated with other TCP-associated sites. The Batson Report fails to consider this scientific consensus in the allocation.

### c. Numerous other sites in the Passaic area conducted operations that are known or suspected to generate and release dioxins.

46. The Batson Report only applies a dioxin contribution to three sites, with two of these sites being assigned to OxyChem. A review of the Batson Report's document index indicated that not all potentially relevant documents were provided by the participating parties, including documents that were produced in connection with OxyChem's Contribution Action[64] and other materials that are attached as exhibits to this declaration. In addition to new information not considered by Batson, there also are several instances in which Batson did not adequately consider the available information. Batson omitted, misapplied, or incorrectly interpreted key

---

[64] U.S. District Court for the District of New Jersey. *Occidental Chemical Corporation v. 21st Century Fox America, Inc., et al.*, Civil Action No. 18-11273.

ALCD-PUBCOM_0000610

facts in ways that underestimated the contributions of dioxins by allocation parties other than OxyChem, including:[65]

**1) The Batson Report leaned heavily on statements written in advocacy by experts.**

    a.    Batson adopted the opinion of Montrose's expert to conclude the 2,4-D process would not generate dioxins.[66] Montrose reportedly did not use the typical production process for 2,4,5-TCP, which is associated with high levels of dioxin formation.[67] However, the processes employed by Montrose nevertheless involved reaction conditions conducive to dioxin formation (chlorinated phenols, free chlorine, alkaline conditions, and elevated temperatures).[68] There remains evidence that (1) while 2,4,6-trichlorophenol is preferentially formed during the direct chlorination process employed by Montrose, 2,4,5-TCP would still form in lesser amounts;[69] (2) former employee testimony specifically describes the 2,4,5-TCP product and does not acknowledge 2,4,6-trichlorophenol;[70] and (3) regardless of whether 2,4,5-TCP, or 2,4,6-trichlorophenol, or both, were generated, any chlorinated phenol with a chlorine in the 2 position (ortho position) has the potential to be a precursor for dioxin formation.[71] Furthermore 2,3,7,8-TCDD has been detected in 2,4,6-trichlorophenol at comparable and in some cases at higher concentrations than in 2,4,5-TCP.[72]

---

[65] These examples are intended to be a representative sample, rather than an exhaustive list, of key interpretative issues found in the Batson Report.

[66] Batson 2020. Attachment J for PPG at pp. 9–11

[67] 2,4,5-TCP production via alkaline hydrolysis of 1,2,4,5-tetrachlorobenzene is associated with 2,3,7,8-TCDD formation (Esposito at pp. 58–59; EPA 2006 at pp. 458–460).

[68] PAS-00003918 at PAS-00004034–043

[69] Esposito et al. 1980 at pp. 103, 107

[70] PAS-00003918 at PAS-00004037

[71] Esposito et al. 1980 at p. 106

[72] EPA 2006 at pp. 460–461

ALCD-PUBCOM_0000611

b. The Batson Report cites Hilton Davis's experts to conclude that that the phthalocyanine pigment manufacturing process employed at the Hilton Davis Site "could not generate" dioxin/furans "as was possibly the case for other manufacturing methods."[73] The process that site operators used still involved the conditions required to generate PCBs and dioxins: a chlorine source, heat, and a dioxin precursor.[74] There is no support for a claim that dioxins could not have been generated in this process. The Batson Report also fails to acknowledge the manufacture of phthalocyanine green from phthalocyanine blue manufactured offsite. To make phthalocyanine green, phthalocyanine blue underwent direct chlorination.[75] There is a well-known association between dioxin/furans in green pigments, with reported measurements of dioxin TEQ in phthalocyanine green about 18 times greater than in phthalocyanine blue.[76] The Batson Report also omits evidence that Hilton Davis purchased blue dye on the open market, pigments that likely would have contained dioxin/furans as they were likely produced using the more common solvent process.[77]

2) **Batson frequently does not link site operations with commonly recognized sources of dioxin/furans in the literature.**

a. Several categories of pigments[78] were typically manufactured using raw materials and under conditions likely to produce dioxin/furans.[79] These compounds are

---

[73] Batson 2020. Attachment J for STWB at p. 1.

[74] Ex. B-73 (LIT000016) at pp. 18–20; Ex. B-72 (HD02287) at HD02317; PAP-00057486 at PAP-00057488

[75] Documentation dated April 12, 1971, states that "all green shade [illegible] is made from Jap crude currently" (Ex. B-85 (NPEC-0011056) at NPEC-0011058).

[76] Ni et al. 2005

[77] Ex. B-85 (NPEC-0011056) at NPEC-0011058; Ex. B-84 (NPEC-0005130), Ex. B-71 (HD02278) at HD02281; Ex. B-73 (LIT000016) at p. 48; Hu and Hornbuckle 2010; Ni et al. 2005

[78] E.g., phthalocyanine green and blue, titanium dioxide, dioxazine dyes and pigments, and carbazole violet.

[79] EPA 2006 at pp. 402–403, 490–491, 498; Ni et al. 2005; Ex. B-78 (MED000003) at p. 1; Esposito et al. 1980 at pp. 73, 81, 91; Krizanec et al. 2006. at pp. 5–6; Williams et al. 1992.

ALCD-PUBCOM_0000612

known to have been manufactured or handled at several sites considered in the
Batson Report, including BASF, Benjamin Moore, Hilton Davis, Montrose, PPG,
and Sherwin Williams. The allocator routinely omits discussion of these
compounds or fails to calculate scores for related operations on the basis of there
being no site-specific confirmation that dioxins were present in the raw materials
at these specific sites.

    i.   **Benjamin Moore** used dioxin-associated copper phthalocyanine pigments
and titanium dioxide.[80]

    ii.  **PPG** used phthalocyanine pigments,[81] some of which are documented to be
associated with dioxins.[82] Dioxins were detected in indoor tanks at the PPG
site but were not considered in Batson's calculations.[83]

    iii. **Sherwin Williams** used carbazole violet pigments,[84] which have a known
association with dioxins.[85]

b.  Waste incineration where organic material is burned in the presence of chlorine is
widely understood to be a source of dioxins.[86] A number of sites[87] considered in
the Batson Report were equipped with an incinerator, including where the
incinerator feedstocks were likely dioxin precursors. For example, at least two
incinerators operated at the BASF Site, one of which handled thousands of pounds
per hour of process waste from the manufacture of phthalic anhydride, a dioxin

---

[80] Ex. B-20 (BMCO-FED-0000001039) at pp. 3, 4, 7–9, 11–14, 44.

[81] Ex. B-13 (BBF000028) at pp. 5, 17–18, 29; Ex. B-88 (PPGLP02590) at PPGLP02593; PAP-00317738 at PAP-00317739.

[82] Ex. B-40 (DOCID_TIG_ESI_0000159570) at DOCID_TIG_ESI_0000159573; Ex. B-40 (DOCID_TIG_ESI_0000159570) at 570-571; Ni et al. 2005

[83] PAP-00295694; Ex. B-87 (PPGL-FED-0000244231)

[84] Ex. B-95 (TSWC-FED-00100123) at TSWC-FED-00100125

[85] Ex. B-78 (MED000003)

[86] EPA 2006 at p. 98, 132; McKay 2002.

[87] These include but are not limited to BASF, CBS-Westinghouse, Kearny Smelting and Refining, and PSE&G EssEx. B-

34

ALCD-PUBCOM_0000613

precursor. The waste stream also contained low concentrations of chlorine, meeting the conditions required for dioxin formation.[88]

3) The Givaudan assessment is missing important information regarding process chemistry, discharge pathways, and the closure of Givaudan's onsite pond. Critical details associated with these processes were provided in recent document productions and depositions that were not available to Batson.

    a. The Batson Report's description of Givaudan's 2,4,5-TCP process does not include critical information regarding reaction temperatures. **Recently produced documents described the manufacture of TCP from 1948 to 1949 using an alkaline process that involved temperatures ranging above 170–175 °C followed by 185 °C for ten minutes after four hours.**[89] This process description was confirmed during Givaudan's 2022 deposition.[90] A 1952 process document details experiments on the preparation of TCP with the same alkaline process. This procedure used crude 1,2,4-trichlorobenzene and "more energetic conditions" with higher reaction temperatures between 180°C and 208°C..[91] Parette et al. 2018 indicates that TCP production at temperatures above 170 °C can form parts per million (ppm) levels of 2,3,7,8-TCDD..[92]

    b. The Batson Report cites a document suggesting Givaudan's HCP process used low temperatures and acidic conditions and was therefore unlikely to form dioxins..[93] Some available Givaudan patents match this process description, but other Givaudan documentation describes a different process with additional steps

---

[88] PAP-00057770 at PAP-00057995; PAS-00054143 at PAS-00054146, 154; The source of the chlorine in the incinerator is unconfirmed, but it may be due to use of hydrochloric acid to neutralize process wastewater (Ex. B-1 (AAB000001) at p. 88; PAP-00057770 at PAP-00057957).

[89] Ex. B-70 (GIVA-FED-0000342825)

[90] August 23, 2022 Deposition of Richard Wroblewski at pp. 40–41, 54–56

[91] Ex. B-48 (GIV_NBC_0665926) at pp. 1–4

[92] Parette et al. 2018

[93] Batson 2020. Attachment J for Givaudan at p. 6

ALCD-PUBCOM_0000614

primarily conducted under alkaline conditions and at elevated temperatures, which
are favorable conditions for the formation of 2,3,7,8-TCDD and other dioxins.[94]
**The Batson Report fails to acknowledge Givaudan's use of an alkaline HCP
process that was more likely to generate dioxins**. The Batson Report only
considers a subset of available dioxin data for Givaudan's HCP from 1970 to 1977[95]
and does not account for 2,3,7,8-TCDD measurements in Givaudan HCP up to three
orders of magnitude higher. **When including all available 2,3,7,8-TCDD
measurements, the average 2,3,7,8-TCDD concentration is 18.82 ppb,**
significantly higher than Batson's assumed value.[96]

c.    The Batson Report assumes that none of Givaudan's discharges to PVSC contained
       dioxins, based only on non-detect dioxin results in very limited effluent monitoring
       data from the 1980s, even though TCP and HCP were detected in site locations

---

[94] Ex. B-47 (GIV_NBC_0664675); PAP-00168652 at PAP-00168652–654; PAP-00181650 at PAP-00181656

[95] Batson 2020. Attachment J for Givaudan, Appendix A-3

[96] I calculated the average using the detection limit for non-detect results. One measurement was an
order of magnitude higher than the rest (4,100 ppb); therefore, I considered this result an outlier and
did not include it in the average calculation. If the 4,100 ppb result was included in the average
concentration the average would be 25.37 ppb. In addition to the samples referenced in the Batson
Report, 2,3,7,8-TCDD analytical results for Givaudan HCP are available from the following
documents: Ex. B-43 (GIV_NBC_0475276) at GIV_NBC_0475276; Ex. B-44 (GIV_NBC_0475302)
at GIV_NBC_0475302, 304; Ex. B-45 (GIV_NBC_0475352) at GIV_NBC_0475352; PAP-
00181650 at PAP-00181669–670; PAP-00183658 at PAP-00183669; Ex. B-49 (GIVA-FED-
0000157959) at GIVA-FED-0000157959; Ex. B-50 (GIVA-FED-0000157997) at GIVA-FED-
0000157997; PAP-00182227 at PAP-00182227; Ex. B-51 (GIVA-FED-0000158028) at GIVA-FED-
0000158028; Ex. B-52 (GIVA-FED-0000158030) at GIVA-FED-0000158030; Ex. B-53 (GIVA-
FED-0000158034) at GIVA-FED-0000158034; Ex. B-54 (GIVA-FED-0000158038) at GIVA-FED-
0000158038; Ex. B-55 (GIVA-FED-0000158046) at GIVA-FED-0000158046; PAP-00181650 at
PAP-00181667; Ex. B-56 (GIVA-FED-0000158061) at GIVA-FED-0000158061; Ex. B-57 (GIVA-
FED-0000158120) at GIVA-FED-0000158120, 121; Ex. B-58 (GIVA-FED-0000158128) at GIVA-
FED-0000158128; Ex. B-59 (GIVA-FED-0000158129) at GIVA-FED-0000158129; Ex. B-60
(GIVA-FED-0000158130) at GIVA-FED-0000158130; Ex. B-61 (GIVA-FED-0000158150) at
GIVA-FED-0000158150; Ex. B-62 (GIVA-FED-0000158161) at GIVA-FED-0000158161; Ex. B-63
(GIVA-FED-0000158175) at GIVA-FED-0000158175; Ex. B-64 (GIVA-FED-0000158188) at
GIVA-FED-0000158188; Ex. B-65 (GIVA-FED-0000158226) at GIVA-FED-0000158226; PAP-
00179605 at PAP-00179628; Ex. B-66 (GIVA-FED-0000158302) at GIVA-FED-0000158302; Ex.
B-67 (GIVA-FED-0000158306) at GIVA-FED-0000158306; Ex. B-68 (GIVA-FED-0000158367) at
GIVA-FED-0000158367; PAP-00182228 at PAP-0018230; PAP-00183549 at PAP-00183550–552,
554, 555; PAP-00178320 at PAP-00178324–328; Ex. B-69 (GIVA-FED-0000163484) at GIVA-
FED-0000163484.

ALCD-PUBCOM_0000615

representative of the sewer discharge pathway. For example, TCP was detected in the soil excavated around Givaudan's former chemical sewer lines at concentrations of 65,000 ppb and 290,000 ppb,[97] suggesting that TCP was likely present in sewer effluent. HCP process wastes were also discharged and detected in Givaudan's "spent acid pit," with HCP found in Givaudan's sewer ditch/pond, which were connected to the sewer system.[98]

d.   The Batson Report did not consider potential direct discharge of dioxins contained in contaminated water removed during the closure of the stormwater pond in 1999 at the Givaudan Site. TCP was detected in three post-excavation samples at concentrations of 2,900 ppb, 3,000 ppb, and 17,000 ppb, but **no sampling for 2,3,7,8-TCDD or other dioxins was reported despite a history of dioxin contamination at the facility**.[99] The contaminated water removed from Givaudan's pond was reportedly sent to the Berks County treatment plant, but the disposal documentation is significantly deficient, lacking signed manifests to confirm receipt of the contaminated water.[100] Other documentation indicates that contaminated water removed from the stormwater pond was disposed onsite[101] and a closure plan approved by the New Jersey Department of Environmental Protection (NJDEP) specified that stormwater in the pond would be pumped out and discharged to the stormwater system.[102]

---

[97] PAS-00033657; PAS-00033747 at PAS-00033873–874

[98] Batson 2020. Attachment J Givaudan at pp. 26–27; PAP-00183732; PAP-00185144 at PAP-00185144–146

[99] PAS-00039956 at PAS-0040294; PAP-00175090 at PAP-00175123

[100] PAS-00033905 at PAS-0034220

[101] PAS-00033905 at PAS-0034233, 235–245

[102] GIVA-FED-0000111392

37

ALCD-PUBCOM_0000616

4) The Batson Report does not calculate any score for the Ashland-Drew Chemical Site (1106 Harrison Ave, Kearny).[103] **The company used more than a quarter of a million pounds of TCP between 1973 and 1981 to produce a range of biocides,**[104] and in 2020, 2,3,7,8-TCDD was detected in areas near drainage ditches at concentrations up to 20.1 parts per trillion (ppt).

5) Batson does not acknowledge or discuss Montrose's operations in the southeast corner of the Sherwin-Williams parcel[105] in the 1940s.[106] Several of the compounds known to have been used and/or produced by Montrose have been identified in high concentrations in soil samples collected on this property; high concentrations of 2,3,7,8-TCDD have been identified as co-located with these compounds in parcel soils.[107] Dioxins were detected at the site, with 2,3,7,8-TCDD at concentrations up to 57.6 ppb and dioxin TEQs up to 5,161.82 ppb.[108] The same sample detected compounds associated with Montrose operations, including chlorobenzene up to 5,000,000 ppb and 1,4-dichlorobenzene at concentrations up to 1,800,000 ppb.[109] **Batson assigned the dioxins found on the Sherwin-Williams parcel to OxyChem based on the proximity to the former Diamond Site when these dioxins should have been assigned to Montrose or Sherwin-Williams.** This parcel and the associated dioxins profiles are discussed in detail in Opinion 2d.

6) The Batson Report fails to acknowledge Legacy Vulcan as a dioxin source. **Legacy Vulcan operated a chlor-alkali facility—a common source of dioxins—from 1960 through**

---

[103] Batson 2020 did calculate scores for the Ashland Site at Foundry Street, Newark, a separate facility.

[104] Ex. B-5 (BAF000023) at p. 21; Ex. B-4 (BAF000004) at pp. 1–6

[105] Ex. B-18 (BBG000066) at p. 1

[106] Ex. B-23 (CAL000001) at p. 1; Ex. B-93 (TSWC-FED-00054404) at TSWC-FED-00054419; Ex. B-14 (BBF000085L); Ex. B-96 (UNK000002) at p. 1; Ex. B-26 (CAL000006) at p. 1; Ex. B-28 (CAL000008) at p. 2; Ex. B-24 (CAL000002) at p. 2; Ex. B-25 (CAL000004) at p. 1; Ex. B-29 (CAL000009) at pp. 3, 5; Ex. B-30 (CAL000010) at p. 4; Ex. B-18 (BBG000066); Ex. B-27 (CAL000007) at p. 3

[107] BBB000017 at p. 280; Ex. B-91 (TSWC-FED-00000001) at TSWC-FED-000000451, 455

[108] Ibid

[109] Ex. B-91 (TSWC-FED-00000001) at TSWC-FED-000000451, 455

38

**1975**.[110] The Legacy Vulcan Site produced caustic soda and chlorine using chlor-alkali cells with graphite anodes.[111] The anodes are associated with the generation of dioxins, as the asphalt that was used as a binding agent to protect the lead and copper fixtures would have generated dioxins upon chlorination.[112] **Legacy Vulcan graphite sludge waste was washed into sewers and into the Passaic River**.[113] Batson fails to assign Legacy Vulcan any dioxin score, even though it discharged to the Passaic while performing chemical processes that are widely recognized sources of dioxin.

47. In summary, many industrial processes known to be associated with the formation of dioxins were conducted at facilities near the Passaic, but very few of those sites have been thoroughly investigated for the presence of dioxins.

**d. Many properties along the Passaic have high dioxin concentrations and are potential sources of dioxins found in the river.**

48. To date, very few upland industrial sites in the Passaic area have been properly investigated for the presence of dioxins in onsite soils. Remedial investigation and ATSM Phase I standards do not require dioxin analysis. Dioxins are not routinely measured in NJDEP or EPA-lead site investigations. Consequently, dioxin data have never been collected for the majority of the

---

[110] Ex. B-79 (MKSK-FED-0000000215) at MKSK-FED-0000000250; Ex. B-41 (DOCID_TIG_ESI_0000165575) at LVC005723

[111] Equipment at the Legacy Vulcan Site in 1960 included 64 Hooker Type "S" electrolytic cells. In 1969, Legacy Vulcan increased the chlorine-caustic soda capacity by adding an additional 20 cells. By 1971, 128 Hooker Type S1 cells and 36 Hooker Type S-4 cells existed at the Legacy Vulcan Site (Ex. B-76 (LVCE0013643) at 643-644; Ex. B-37 (DOCID_TIG_ESI_0000091112) at LVC009248; Ex. B-79 (MKSK-FED-0000000215) at MKSK-FED-0000000270; Ex. B-36 (DOCID_TIG_ESI_0000091076) at p. 3; Ex. B-81 (MKSK-FED-0000002400) at MKSK-FED-0000002424–425; Ex. B-79 (MKSK-FED-0000000215) at MKSK-FED-0000000313). Dioxins are present in graphite electrode sludge/waste from chlor-alkali cells resulting from the chlorination of coal tar (consisting of PAHs) used as a binding agent on the graphite anodes.

[112] Ex. B-80 (MKSK-FED-0000000333) at MKSK-FED-0000000411; Ex. B-75 (LVC000228) at LVC000231; EPA 2006 at pp. 452-455; EUC 2001.

[113] Ex. B-81 (MKSK-FED-0000002400) at MKSK-FED-0000002425; EUC. 2001; PAP-00217426 at PAP-00217429; Ex. B-83 (MKSK-FED-0000003521) at MKSK-FED-0000003562; Ex. B-82 (MKSK-FED-0000003275) at MKSK-FED-0000003289; Ex. B-81 (MKSK-FED-0000002400) at MKSK-FED-0000002530; Ex. B-35 (DOCID_TIG_ESI_0000087998) at p. 2

ALCD-PUBCOM_0000618

sites along the Passaic. Of the 92 sites evaluated in the Batson Report, only a few have been sampled for the presence of dioxins—even when there is evidence that dioxin-associated compounds were used, stored, or produced at those sites. Even including sites that Batson did *not* consider, only 19 sites in the Passaic area have been tested for dioxins (including the Diamond Site). The remaining 18 sites are discussed below.

49. **Of the 18 sites with available data, 16 had dioxin TEQs above the RG, often an order of magnitude higher** (Figure 8). The high concentration of TEQs in onsite soils is consistent with many of these sites being sources of 2,3,7,8-TCDD, other dioxins, and TEQs to the Passaic. Table 5 summarizes the upland dioxin data sources.



**Figure 8.** Soil TEQs for sites with upland data

ALCD-PUBCOM_0000619

**Table 5.** Upland dioxin data sources

| Site | Citations |
|------|-----------|
| Alcatel-Lucent (Nokia) | NJDEP HAZSITE Database 2021 |
| American Modern Metals | HydroQual, Inc. 2006 |
| American Ref-Fuel Co (Covanta Essex) | Ex. B-74 (LPRSA CPG 0007470) |
| Bayonne Barrel and Drum | NJDEP HAZSITE Database 2021; Ex. B-9 (BBA000071); Ex. B-77 (MAXUS3033219)–MAXUS3033328 |
| Benjamin Moore | Ex. B-21 (BMCO-FED-0000008162); Ex. B-22 (BMCO-FED-0000012588); Ex. B-3 (BAB000047); PAP-00724492 |
| Celanese | Hart Crowser 2001 |
| Central Steel Drum | Ex. B-39 (DOCID_TIG_ESI_0000102479); Ex. B-19 (BBG000181) |
| Clean Earth | Ex. B-38 (DOCID_TIG_ESI_0000094142); Ex. B-31 (CENJ-FED-0000056519) |
| Diamond | Ex. B-74 (LPRSA CPG 0007470); PAP-00398154 |
| Drew Chemical | Ex. B-86 (OCC-CER-SD000075986) |
| Givaudan | Ex. B-7 (BBA000055) (Building Soil Sample Exceedance Table, Table A-3, Table A-4, Table A-5); PAP-00398154; GIV-NBC-0500921; Ex. B- 8 (BBA000068); Ex. B-15 (BBF000187); Ex. B-42 (GIV_NBC_0369949) |
| Marcal | NJDEP HAZSITE Database 2021 |
| Montrose (21 Century Fox) | Ex. B- 6 (BBA000014) |
| MSLA 1B (Keegan Landfill) | 1994 Surface Sediment Investigation, Samples IS1 through IS10 for MSLA 1B (Keegan Landfill).; Ex. B-89 (TIERRA-A-017380); Ex. B-90 (TSI-HH-00013758) |
| MSLA 1D (Kearny Landfill) | Ex. B-2 (BAB000027) |
| Pittsburg Plate Glass (PPG) | Ex. B-87 (PPGL-FED-0000244231); Ex. B-34 (DOCID_TIG_ESI_0000085010); PAP-00478695 |
| Sherwin-Williams | Ex. B-74 (LPRSA CPG 0007470); Ex. B-10 (BBC000065); EX. B-102 (BBB000017); Ex. B-11 (BBC000116); Ex. B- 12 (BBC000118); PAP-00367356; Ex. B- 92 (TSWC-FED-00048354) |
| The Okonite Company | ENSR 2008 |

41

ALCD-PUBCOM_0000620



**Figure 9.** Dioxin TEQ profiles for upland sites with data for all 17 2,3,7,8-substituted congeners. Not all sites in Figure 8 had complete congener profiles. The dotted line is the 2,3,7,8-TCDD TEQ RG.

50. Figure 9 shows the dioxin profiles on a TEQ basis.[114] The dotted horizontal line represents EPA's 2,3,7,8-TCDD RG. If a bar extends above that line, that specific chemical exceeds the RG. As shown in Figure 8 and Figure 9, most upland sites have a 2,3,7,8-TCDD concentration that exceeds the RG, and most have TEQs associated with other dioxin congeners that also exceed the RG. **Based on the limited available upland dioxin data, it is clear that more than three sites are probable sources of dioxins (including 2,3,7,8-TCDD) to the Passaic**. Both the PPG and Sherwin-Williams sites have TEQs orders of magnitude above the RG *from chemicals that are not 2,3,7,8-TCDD*. The Batson Report assigns the Sherwin-Williams

---

[114] Congener specific TEQs were calculated by multiplying the concentration of that congener by the TEFs in Table 1. The resulting value represents to contribution of each individual congener to TEQs.

42

dioxins to OxyChem, based on an August 2002 report that connected the dioxin contamination to historical operations at the former Diamond Site.[115] Batson's determination is inconsistent with the observed dioxin profiles in Figure 8. The dioxin TEQ profiles at the former Diamond Site are dominated by 2,3,7,8-TCDD, while the dioxin profiles at Sherwin-Williams are dominated by 1,2,3,4,7,8-HxCDF. From approximately 1935 through at least 1940, Montrose Chemical Company, as a lessee, conducted operations on the portion of the Sherwin-Williams property with these dioxins.[116] **The different profiles represent different sources of dioxins, disproving Batson's conclusion that the dioxin on the Sherwin-Williams came from the Diamond Site**.

51. According to EPA, many chemical processes can be a significant source of 2,3,7,8-TCDD[117] including:

- Coal combustion
- Metals smelting/refining
- Wastewater sludge
- Vehicle exhaust
- Drum and barrel reclamation

The hypothesis that the former Diamond Site is the sole significant source of 2,3,7,8-TCDD is not supported by the literature or the upland soil data. The upland soil profiles in Figure 8 and Figure 9 show that 2,3,7,8-TCDD is associated with sites other than the former Diamond Site. These sites are either far from the former Diamond Site (Figure 10) or have dioxin profiles very different from the Diamond Site, making aerial deposition from the former Diamond Site an enormously improbable source at those sites.

---

[115] Batson 2020. Attachment J for Sherwin-Williams at p. 11; PAP-00126516 at PAP-00126545
[116] Ex. B-18 (BBG000066) at p. 1; Ex17 (BBG000057F) at p. 1
[117] EPA 2006

43

**Figure 10.** Locations of upland sites with dioxin data

52. Batson typically attributed dioxins found in upland sites to flooding from the river, but the upland data presented above shows that many upland sites have elevated concentrations of dioxins and TEQs above the RG. The dioxin profiles from these sites are different from the profiles measured at the former Diamond Site.

53. **Batson's conclusion that the former Diamond Site is responsible for nearly all of the dioxins found in the Passaic cannot be correct**, because (1) the dioxin profile found at the former Diamond Site is different from the dioxin profile in river sediments, (2) the scientific consensus is that many dioxins in the Passaic can be linked to processes at sites other than the former Diamond Site, (3) numerous other sites conducted operations associated with the formation of dioxins, and (4) elevated concentrations of dioxins and TEQs are apparent in the few upland sites for which data are available.

44

ALCD-PUBCOM_0000623

**Opinion 3. The former Diamond Site is not the sole significant source of 2,3,7,8-TCDD associated with the manufacture and use of TCP in the Passaic.**

54. To support this opinion, I investigated the presence of other sources of 2,3,7,8-TCDD associated with the manufacture and use of 2,4,5-TCP (TCP).

55. The presence of high concentrations of 2,3,7,8-TCDD in the Passaic has been attributed to the manufacture and use of TCP. The Batson Report and consent decree assume that TCP production and use at the former Diamond Site is the single dominant source of 2,3,7,8-TCDD in the Passaic.

56. Although the conclusion that TCP production and use at the former Diamond Site is a likely source of 2,3,7,8-TCDD in Passaic sediments is not unreasonable, the conclusion that it is the *sole* significant source is based on two flawed assumptions. First, it assumes that other dioxin-associated processes do not generate 2,3,7,8-TCDD in meaningful quantities (as described in Opinion 2a). Second, it assumes that the former Diamond Site was the only meaningful producer and user of TCP near the Passaic River. Both of these assumptions are not supported by the scientific literature, government reports, and historical record.

57. **In addition to the former Diamond Site, other sites produced, used, and/or disposed of TCP.**[118] Givaudan's Clifton facility, located at RM 11.9, has been identified as a significant source of 2,3,7,8-TCDD.[119] Givaudan manufactured TCP from at least 1945 through 1949, and continued to purchase TCP until 1984. HCP has been identified as a significant source of 2,3,7,8-TCDD at multiple Superfund sites (e.g., Times Beach, MO and Centredale, RI).[120] At peak production, Givaudan used more than 3.5 million pounds of TCP in a single year (nearly 50 million pounds in total between 1947 and 1984),[121] while the former Diamond Facility handled around 16 million pounds in total. Elevated TCP concentrations were detected in

---

[118] E.g., Bock et al. 2021.

[119] Garvey et al. 2011; Garland 2017; Bock et al. 2021

[120] Hites 2011; EPA 2012

[121] Piacitelli et al. 1990

45

Givaudan's soil, storm drain sediments, buildings, spent acid wastes, and chemical effluent pit.[122] The sewer lines connected to the Givaudan plant failed frequently and discharged to directly to the Third River.[123] Alliance Chemical, located near RM 1.1, manufactured dyes, paints, varnishes, and other specialty organic chemicals. TCP, a likely ingredient in many of these products, was detected in soil samples collected from the facility.[124] From 1948 to 1970, Alliance discharged wastes to a Passaic tributary.[125] Clean Earth, a waste treatment and disposal facility, was not even evaluated in the Batson Report; located at RM 2.4. The Clean Earth Site accepted TCP-contaminated wastes during the 1960s and 1970s.[126] Drew Chemical, located near RM 3.5, used around 65,000 pounds of TCP annually between 1971 and 1979, and TCP has been detected in soil collected from the facility.[127] Historical records regarding TCP production and usage are limited, but even the limited information available shows that the former Diamond Site was not the sole user of TCP:

---

[122] NJDEP 1991.

[123] PAP-00184006 at PAP-001840006–007; CFM 1983

[124] Ex. B-16 (BBG000012) at p. 13

[125] Batson 2020. Attachment J for Alliance at p.13–14.

[126] EPA 2023

[127] EHS Support LLC 2017

ALCD-PUBCOM_0000625

- Former Diamond Site: Total 7,779,000 kg of 2,4,5-TCP[128]

- Givaudan – Total 20,450,946 kg of 2,4,5-TCP[129]

- Ashland-Drew- Total 267,000 kg of 2,4,5-TCP[130]

The former Diamond Site was one of *three* facilities known to have used more than a quarter of a million kilograms of 2,4,5-TCP—**Givaudan used almost three times as much TCP as the former Diamond Site**.

58. As documented under Opinion 2b, multiple studies have identified the presence of dioxins associated with the Givaudan Site in the Passaic, demonstrating a dioxin nexus between the site and the Passaic. The presence of 2,3,7,8-TCDD contamination at the Givaudan facility is well documented, and as early as 1985 the Givaudan facility was identified as a likely source of dioxins to the Passaic.[131] The association between Givaudan and 2,3,7,8-TCDD in the Passaic was further explored by Garvey et al. 2011. Bock et al. 2021 includes a comprehensive forensic analysis that demonstrates the nexus between Givaudan and the Passaic. It is important to note that very few papers dismiss the hypothesis that Givaudan is a source of 2,3,7,8-TCDD to the Passaic. Furthermore, Givaudan need not be the largest source in the Passaic in order to have had a significant impact on the Passaic. The existence of a potentially larger source does not equate to EPA's assertion that 80 Lister is the sole significant source. The recent publication of Bock et al. 2021 and the documents recently produced by Givaudan listed under Opinion 2d dispute the assertion that minimal quantities of 2,3,7,8-TCDD were associated with TCP and HCP production at the Givaudan Clifton facility. This necessitates a re-evaluation of

[128] 2,4,5-TCP production in lbs from Batson 2020 Attachment J. for OxyChem at p. 9 (PAP-00143149 at PAP-00143186; PAP-00394455 at PAP-00394457; PAP-00400514 at PAP-00400518; PAP-00142879 at PAP-00142922). I assumed the production for 1951 was the average of 1952 and 1953. The resulting 17,149,985 lbs was converted to kg.

[129] Based on Batson 2020, Attachment J, Appendix A-1. When a range was supplied in A-1, I used the midpoint of the range to estimate HCP production mass. HCP mass was multiple by 1.18 to derived the mass of TCP and then converted to kg.

[130] The company reported that between 1973 and 1981, a total of 65,850 per year of 2,4,5-TCP was used onsite as raw material (Ex. B-5 (BAF000023) at p. 14), 590,000 lbs converted to kg.

[131] Belton et al. 1985

ALCD-PUBCOM_0000626

the significance of the Givaudan Clifton facility as a dioxin source and demonstrates a forensic nexus between the facility and the Passaic.

59. The Givaudan Lagoon Closure Plan, issued May 1996,[132] indicates that water in the lagoon would be pumped to the onsite stormwater system, which then discharged to the Passaic River. The pond closure was conducted in 1999 and a closure report issued in February 2000.[133] Documentation of the closure activities provided in the Remedial Action Report is significantly deficient, lacking a complete set of signed manifests that would otherwise confirm receipt and disposal of the contaminated water at an appropriate offsite wastewater treatment facility.[134] With the 1996 closure plan specifying that pond water during closure would be pumped to the onsite stormwater system and the factual knowledge that the disposal of water at an offsite WWTP during actual closure was not adequately documented, it is reasonable to conclude that some volume of contaminated pond water (potentially exceeding 200,000 gallons) was discharged to the stormwater system and the Passaic River.

60. I conclude that Batson did not account for sites that used large quantities of TCP, a dioxin precursor known to be contaminated with 2,3,7,8-TCDD, in considering sources of dioxins. There is overwhelming evidence that the former Diamond Site is not the only site associated with the use of TCP, with Givaudan specifically being identified in the literature as a second significant source of 2,3,7,8-TCDD in the Passaic. Furthermore, there is no evidence that Batson or EPA attempted to identify any additional TCP-associated sites, even though TCP-associated sites are critical to understanding the sources of 2,3,7,8-TCDD in the Passaic.

---

[132] PAP-00181289 at PAP-00181294

[133] PAP-00175090

[134] PAS-00033905 at PAS-0034220

48

ALCD-PUBCOM_0000627

**Opinion 4. The Batson Report's estimate of dioxins discharged from the former Diamond Site are fundamentally flawed, rendering critical components of the allocation useless.**

61. To support this opinion, I critically evaluated Batson's calculation of the 2,3,7,8-TCDD mass associated with the former Diamond Site. I also developed alternative estimates of the mass based on process chemistry and reported emissions.

62. Batson estimates that 3,729.71 kg of dioxins were discharged from the former Diamond Site to the Passaic. I evaluated Batson's calculation in two ways: (1) by reconstructing Batson's calculations to correct errors in the assumptions, inputs, and calculations, and (2) by developing alternative estimates of the discharge of dioxins based on the methods in Parette et al. 2018 and other independent estimates of dioxin discharges. **Method 1 resulted in a corrected estimate of 376.95 kg using Batson's methodology—approximately 10 percent of the original Batson estimate. Method 2 resulted in estimates between 62 kg and 223 kg—between 2 and 6 percent of the Batson Report's estimate.** These two lines of evidence indicate that the value presented in the Batson Report overestimates the 2,3,7,8-TCDD associated with the former Diamond Site and OxyChem by an order of magnitude or more.

63. I critically reviewed the Batson Report's calculations for errors in the inputs, assumptions, and methods. I recalculated the values using corrected input values and unit conversions. I found numerous errors documented below and in Table 6, which provides a detailed comparison of the original and the corrected calculations. **The corrected discharge estimate is 376.95 kg, approximately 10 percent of the value originally calculated and used in Batson 2020.** The details of these estimates are presented below and are summarized in Table 6.[135]

---

[135] Note that Batson concludes that any discharges to the public sewer did not reach the Passaic; the Batson Report's estimates of sewer discharges are not discussed in Table 6.

ALCD-PUBCOM_0000628

**Table 6.** OxyChem CTMass calculations comparison

| Component | Original (kg) | Corrected (kg) | Explanation |
|---|---|---|---|
| *Overland Fate & Transport* | | | |
| Soil (Diamond Site) | 3.53 | 3.53 | Not evaluated. |
| Soil (Sherwin-Williams) | 0.2 | 0 | **Unsupported Assumption:** The dioxin share from the Sherwin-Williams property was assigned to OxyChem under the incorrect assumption that dioxins originated at the former Diamond Site. |
| 1960 Explosion | 142.851 | 0.000053 | **Averaging Error:** The average 2,3,7,8-TCDD concentration was recalculated using the raw data cited by the Batson Report (1.16 µg/kg vs the Batson Report's value of 3.15 mg/kg) (Table 7). **Unit Conversion Errors:** I corrected two unit conversion errors (ppb to ppm, and milligrams to kilograms). |
| Air | 198.4 | 0.00514 | **Incorrect Chemical:** Batson's mass estimates were for NaTCP, not 2,3,7,8-TCDD. I used the average 2,3,7,8-TCDD concentration in NaTCP to convert to 2,3,7,8-TCDD (see Table 8). **Timeline Error:** TCP operations occurred for 19 years (1950–1969). |
| Rupture disks | 2.71 | 0.0000093 | **Incorrect Chemical:** Batson's mass estimates were for NaTCP, not 2,3,7,8-TCDD. I used the average 2,3,7,8-TCDD concentration in NaTCP to convert from NaTCP to 2,3,7,8-TCDD (see Table 8). Batson also did not apply the same assumption that 10 percent of the emissions would reach the Passaic as it did for the regular air emissions. |
| *Subtotal* | *347.69* | *3.54* | |
| *Direct Discharge* | | | |
| Dioxins | 3,354.61 | 373.41 | **Averaging Error:** The average 2,3,7,8-TCDD recalculated using raw data from the sources cited by Batson (1.45 mg/L versus the 3.3 mg/L used by the Batson Report). **Volumetric Error:** The source Batson uses to estimate discharge volume also states that only one-third of wastewater volume had a potential to contain dioxins (PAS-00128468 at PAS-00128474). **Timeline Error:** TCP operations occurred for 19 years (1950–1969) instead of the 25 years specified in the Batson Report. |
| 2,4-D | 19.7 | 0 | **Consistency Error:** Batson concludes that 2,4-D production would not be associated with dioxins (PAP-00027591 at PAP-00027612). **Incorrect Chemical:** Batson's estimates the mass of 2,4-D, which is not a dioxin. |
| 2,4,5-T | 7.76 | 0 | **Double-Counting:** This chemical is already accounted for in the dioxin discharge calculation. **Incorrect Chemical:** Furthermore, the mass presented by Batson is the mass of 2,4,5-T and not the mass of dioxins. |
| 2,4,6-TCP | 0 | 0 | Not evaluated. |
| *Subtotal* | *3,382.07* | *373.41* | |
| **Total** | **3,729.76** | **376.95** | The corrected 2,3,7,8-TCDD mass is around 10 percent of the value reported by Batson. |

50

ALCD-PUBCOM_0000629

- **Overland Pathway:** Batson 2020 reports a total of 347.69 kg discharged to the Passaic via the overland fate and transport pathway. This pathway includes erosion from soil, 2,3,7,8-TCDD from the 1960 explosion, regular emissions to air, and emissions resulting from ruptured pressure disks on the reaction vessel. I corrected errors related to the calculation of 2,3,7,8-TCDD concentrations, the failure to convert from NaTCP mass to 2,3,7,8-TCDD mass, errors in unit conversions, and the duration of TCP manufacturing operations. **The updated estimated mass from the overland pathway is 3.74 kg, two orders of magnitude lower than the value in the Batson Report.** The details are documented below.

    i. **Soil:** I did not recalculate the soil erosion pathway and the revised mass included the original value of 3.53 kg calculated in the Batson Report for the former Diamond Site. The Batson Report also attributed 0.2 kg of overland transport for the Sherwin-Williams property. This mass was attributed to OxyChem by Batson based on the assumption that the former Diamond Site was the source of this 2,3,7,8-TCDD. Based on the analysis of the TEQ profiles in Opinion 2d, I observed that the dioxin profile found on the Sherwin-Williams Site is very different from that observed at the former Diamond Site; therefore, I concluded that these dioxins should be attributed to the Sherwin-Williams Site and not the former Diamond Site. The total soil pathway value should not include the 0.2 kg from the Sherwin-Williams Site.

    ii. **1960 Explosion:** Batson used the 2,3,7,8-TCDD concentration in building chip samples, the estimated total mass of building materials, and assumed 10 percent of the resultant mass of 2,3,7,8-TCDD was discharged to the Passaic. The concentration value used in the Batson Report, 3.15 parts per million (ppm), was the average of only the lowest and highest values in the

51

concentration range reported in the documents cited in Batson 2020.[136] I
calculated the average using the entire building chip sample dataset (Table
7), resulting in a corrected average value of 1.16 ppb. This corrected average
is substantially lower than that used in the Batson Report for two reasons.
First, it includes the full set of samples, half of which were non-detect
results. To be conservative, the corrected calculation assumes that non-
detects were equal to the detection limit, which results in an overestimation
of the average. Second, the range of chip sample concentrations
summarized in the documents cited in the Batson Report incorrectly
reported the maximum value as 6.3 ppm instead of the actual concentration
(6.3 ppb result) that was reported in the full dataset.[137] By not considering
the full dataset, the Batson Report mistakenly carried this unit error through
the calculations, resulting in a 1000-fold overestimation of the average
concentration. I corrected this error. The resulting mass was 5,300 mg,
which was then converted to 0.0053 kg. Additionally, I determined that the
Batson Report calculations incorrectly converted the mg 2,3,7,8-TCDD to
kg using the wrong conversion factor ($10^{-3}$ vs $10^{-6}$), which results in a
second 1000-fold overestimation of the mass. **When the correct
concentration data and conversion factors are used, along with the
Batson Report's assumption that 1 percent of the mass would reach the
Passaic, the resulting mass is 0.000053 kg. This is over six orders of
magnitude lower than the Batson Report's original value of 142.851 kg
2,3,7,8-TCDD.**

---

[136] PAP-00150544 at PAP-00150859; PAS-00125770 at PAS-00125849–850
[137] PAS-00125770 at PAS-00125863

52

ALCD-PUBCOM_0000631

**Table 7.** Concentrations of 2,3,7,8-TCDD in building chip samples (OxyChem)[138]

| Location | Sample | Date | TCDD Result (ppb) | Flag |
|---|---|---|---|---|
| Chip-Brick Bldg | Interior, N.W. Corner | 1/15/1985 | 0.27 | |
| Chip-Brick Bldg | Exterior, N.W. Corner | 1/15/1985 | 0.3 | U |
| Chip-Brick Bldg | Interior, S.E. Corner | 1/15/1985 | 0.48 | |
| Chip-Brick Bldg | Roof | 1/15/1985 | 1.1 | |
| Chip-Brick Bldg | Floor | 1/15/1985 | 0.13 | |
| Chip-Brick Bldg | Exterior, S.E. Corner | 1/15/1985 | 0.3 | U |
| Chip-Block Bldg | Interior, N.W. Corner | 1/16/1985 | 0.3 | U |
| Chip-Block Bldg | Exterior, N.W. Corner | 1/16/1985 | 0.23 | U |
| Chip-Block Bldg | Interior, S.E. Corner | 1/16/1985 | 5 | U |
| Chip-Block Bldg | Exterior, S.E. Corner | 1/16/1985 | 0.1 | U |
| Chip-Block Bldg | High Traffic | 1/16/1985 | 0.4 | U |
| Chip-Block Bldg | Roof | 1/16/1985 | 0.39 | |
| Chip-Tile Bldg | NW Corner, Interior High/Mid/Low ea wal | 1/19/1985 | 1.1 | |
| Chip-Tile Bldg | SE Corner, Interior High/Mid/Low ea wal | 1/19/1985 | 1.9 | |
| Chip-Tile Bldg | NW Corner, Exterior High/Mid/Low ea wal | 1/19/1985 | 1 | U |
| Chip-Tile Bldg | SE Corner, Exterior High/Mid/Low ea wal | 1/19/1985 | 0.9 | U |
| Chip-Tile Bldg | Floor, High Traffic Area | 1/19/1985 | 6.3 | |
| Chip-Tile Bldg | Roof | 1/19/1985 | 0.67 | |
| Average (Calculated using the full detection limit for non-detect [U flagged] results) | | | **1.16** | |

iii. **Regular Air Emissions:** The Batson Report calculated regular air emissions based on an estimate of the 0.06 lbs/hr of NaTCP "mist" emissions from the scrubber system[139] and the Batson Report assumed 10 percent of this mass reached the Passaic directly. However, the Batson Report failed to convert this mass of NaTCP to the mass of 2,3,7,8-TCDD present in the NaTCP. 2,3,7,8-TCDD was not measured in the air emissions; however, the average concentration of 2,3,7,8-TCDD in TCP samples can be used as an approximation. I calculated the average concentration of 2,3,7,8-TCDD in TCP at the former Diamond Site as 34.1 mg/kg (Table 8). To be conservative, I only considered TCP samples listed as 100 percent, did not include any samples that were filtered or treated, and assumed that

---

[138] PAS-00125570 at PAS-00125863
[139] PAP-00160071 at PAP-00160076

ALCD-PUBCOM_0000632

non-detects were equal to the detection limit. Furthermore, the Batson Report used 25 years for the duration of TCP manufacturing operations, which is incorrect. TCP was produced at the site from 1950 to 1969, which is only 19 years. Therefore, the calculated mass of dioxin emitted from air emissions during TCP operations should be adjusted to 19 years. **Using the appropriate duration for TCP manufacturing operations (19 years) and the average concentration of 2,3,7,8-TCDD (34.1 mg/kg) applied to the mass of NaTCP discharged resulted in 0.00514 kg of 2,3,7,8-TCDD, which is five orders of magnitude lower than the Batson Report's calculated mass of 198.4 kg.**

ALCD-PUBCOM_0000633

**Table 8.** Concentrations of 2,3,7,8-TCDD in TCP (OxyChem)[140]

| Sample Description | Date | | Flag | ppb | ppm |
|---|---|---|---|---|---|
| 100% TCP solution | June | 1965 | | 90,000 | 90 |
| 100% TCP solution | June | 1965 | | 140,000 | 140 |
| 100% TCP solution | June | 1965 | | 86,000 | 86 |
| 100% TCP solution | June | 1965 | | 80,000 | 80 |
| 100% TCP solution | June | 1965 | | 80,000 | 80 |
| 100% TCP solution | June | 1965 | | 53,000 | 53 |
| 100% TCP solution | June | 1965 | | 62,000 | 62 |
| 100% TCP, pre-activated carbon purification treatment | Feb | 1967 | | 19,700 | 19.7 |
| TCP | Apr | 1967 | | 115,000 | 115 |
| TCP | May | 1967 | | 71,000 | 71 |
| TCP | Sept | 1967 | | 1,000 | 1 |
| TCP | Nov | 1967 | | 1,700 | 1.7 |
| TCP | Dec | 1967 | | 2,800 | 2.8 |
| TCP | Jan | 1968 | | 3,000 | 3 |
| TCP | Feb | 1968 | | 7,000 | 7 |
| TCP | Mar | 1968 | | 1,500 | 1.5 |
| TCP | Apr | 1968 | | 1,800 | 1.8 |
| TCP | May | 1968 | U | 1,000 | 1 |
| TCP | July | 1968 | | 1,000 | 1 |
| TCP | Aug | 1968 | | 1,000 | 1 |
| TCP | Sep | 1968 | | 1,000 | 1 |
| TCP | Oct | 1968 | | 8,400 | 8.4 |
| TCP | Nov | 1968 | | 9,300 | 9.3 |
| TCP | Dec | 1968 | | 9,600 | 9.6 |
| TCP | Jan | 1969 | | 5,200 | 5.2 |
| Average (calculated using the full detection limit for non-detect [U flagged] results) | | | | **34,080** | **34.1** |

iv.  **Ruptured Disk Emissions:** Batson calculated air emissions due to

ruptured pressure disks based on an estimate of 1.2 lbs of NaTCP

discharged during each rupture multiplied by the number of rupture events

(five events). Firstly, the Batson Report did not apply the same

methodology as used for the regular air emissions with the assumption that

10 percent of the mass emitted reached the Passaic. Secondly, the Batson

Report again failed to convert the mass of NaTCP to the mass of 2,3,7,8-

TCDD present in the TCP. I corrected this calculation by applying the

---

[140] PAP-00167097 at PAP-00167097; PAP-00143571 at PAP-00143572; PAP-00142879 at PAP-00142930; PAP-00167156 at PAP-00167159; PAP-00167164 at PAP-00167167; PAP-00167196 at PAP-00167197; PAP-00167204 at PAP-00167207; PAP-00167208 at PAP-00167211; PAP-00159107 at PAP-00159110; PAP-00159283 at PAP-00159286; PAP-00159278 at PAP-0015928

ALCD-PUBCOM_0000634

assumption that 10 percent of the mass from rupture disk air emissions reached the river and then by converting to kilograms dioxins using the average 2,3,7,8-TCDD concentration in TCP at the Site as described above in Section 1.1.3 (Table 8). **Using the average 2,3,7,8-TCDD concentration of 34.1 mg/kg and applying the 10 percent reduction factor resulted in 0.0000093 kg of 2,3,7,8-TCDD. This corrected value for rupture disk releases is six orders of magnitude lower than the Batson Report's calculated mass of 2.71 kg.**

- **PVSC Pathway:** Batson assumes no dioxin discharges. This pathway calculation was not checked.

- **Direct Discharges:** Batson reports a total of 3,382.07 kg discharged to the Passaic via the direct discharge pathway. This pathway includes dioxins in process waste discharges and dioxins associated with 2,4-D, 2,4,5-T, and 2,4,6-TCP production. I corrected errors related to the calculation of average 2,3,7,8-TCDD concentrations, errors in assigning 2,3,7,8-TCDD to processes where there was not sufficient evidence to support a dioxin association, in the duration of TCP manufacturing operations, and by double counting. **The updated estimated mass from the direct discharge pathway was 373.41 kg, which is less than one-sixth the value in the Batson Report**. The details are documented below.

    i. **2,3,7,8-TCDD (D/F):** Batson used the ranges of concentrations reported for 2,3,7,8-TCDD in sumps, product, and process streams to calculate an average concentration of 33 ppm, and then assumed that 10 percent of that concentration would be discharged to the Passaic (3.30 mg/L). However, Batson 2020 does not account for the full set of data cited and appears to only have used the lowest and highest values of the concentration ranges to calculate the average 2,3,7,8-TCDD concentration. This is inappropriate as it does not represent the actual distribution of results within the

56

concentration ranges. Furthermore, in two cases, Batson appears to double count higher results in the average when the same results were reported and/or summarized in multiple references. I calculated the average of the entire dataset cited in Batson 2020 (Table A-1, attached at the end of this declaration), and assuming that non-detects were equal to the detection limit, the resulting value is 14.5 ppm. Following the Batson Report's methodology to assume 10 percent of this concentration would be in the discharge, the corrected discharge concentration is 1.45 mg/L. Batson 2020 then multiplied the discharge concentration by the wastewater discharge volume and years of operation to calculate the total mass of 2,3,7,8-TCDD. The Batson Report assumed that full discharge volume (10,742,932 gallons per year) contained 2,3,7,8-TCDD. The reference cited for the discharge flow rate also stated that one-third of that discharge could have contained dioxins.[141] Therefore, I corrected the calculation to use a volume of 3,580,977 gallons per year, or one-third of the full discharge rate. The Batson Report used 25 years for the duration of TCP manufacturing operations, which is incorrect. TCP was produced at the site from 1950 to 1969, which is only 19 years. Therefore, the calculated mass of dioxin during TCP operations should be adjusted to 19 years. **Applying these three corrections (the average concentration, the relevant portion of the discharge volume, and the duration of TCP operations) results in an estimated discharge mass of 373.41 kg. This value is less than 15 percent of the kilograms estimated in the Batson Report.**

ii. **2,4-D:** Batson concludes that 2,4-D production would not be associated with dioxins at 21st Century/Montrose based on the Butler Expert Report.[142]

---

[141] PAS-00128468 at PAS-00128474

[142] PAP-00027591 at PAP-00027612

57

The 2,4-D process at the former Diamond Site was virtually identical to the Montrose process and would have a similar potential for dioxin formation. Batson 2020 should therefore have made the same assumption for 2,3,7,8-TCDD associated with 2,4-D for both facilities. Based on this information, I conclude that zero dioxins would have been associated with the 2,4-D process. However, even if dioxins were associated with the 2,4-D process, it would be incorrect to assign mass for direct discharge based on 2,4-D concentrations in site media because (1) dioxins are a possible impurity that at most would be present in small quantities in 2,4-D; (2) the mass of 2,4-D product estimated in the discharge was used in the assessment, but the mass of 2,4-D should have been converted to the mass of dioxin impurities present in the 2,4-D; and (3) the 2,3,7,8-TCDD calculation directly above already accounts for 2,3,7,8-TCDD in process waste streams from the former Diamond Site (such as sump samples). This would be double counting dioxins from this process. For these reasons, **there should be no direct discharge mass of 2,3,7,8-TCDD calculated from 2,4-D concentrations at the former Diamond Site**.

iii. **2,4,5-T:** The Batson Report uses the average of 2,4,5-T concentrations in site media with a reduction factor of 0.01 percent for soil samples and 0.1 percent for groundwater samples. However, these reduction factors were used to calculate the 2,4,5-T mass, which is not indicative of mass of dioxins. It is incorrect to assign mass for direct discharge based on the estimated 2,4,5-T discharge mass because (1) dioxins are a possible impurity that at most are present in small quantities in the 2,4,5-T product; (2) the mass of 2,4,5-T should have been converted to the mass of dioxin present in the 2,4,5-T; and (3) the 2,3,7,8-TCDD calculation directly above already accounts for 2,3,7,8-TCDD in process waste streams from the

58

former Diamond Site (such as sump samples). **Therefore, there should be no direct discharge mass of 2,3,7,8-TCDD calculated from 2,4,5-T concentrations at the former Diamond Site.**

iv. **2,4,6-TCP:** Batson assumes no dioxin discharges. This pathway was not checked.

64. I conducted an analysis of alternative methods to estimate the potential discharge volumes. These methods include: (1) using process chemistry and the model from Parette et al. 2018 to estimate the 2,3,7,8-TCDD from direct discharges, (2) using previously reported values for the 2,3,7,8-TCDD associated with ruptured pressure disks, and (3) using previously reported values for discharges from the 1960 explosion. When these values are combined with the overland discharges from soil erosions (3.53 kg), I calculated three estimates of discharges (low, medium, high). The alternative calculations are documented in Table 9. **The total calculated low, medium, and high discharge values are 61.31, 81.45, and 222.65 kg. These values are orders of magnitude less than the original Batson estimate and less than half the corrected estimate.** These calculations confirm that there is considerable uncertainty in the discharge estimates.

ALCD-PUBCOM_0000638

**Table 9.** Alternate 2,3,7,8-TCDD discharge estimates for OxyChem based on Parette et al. 2018

| Year | TCP Process | 2,4,5-T Production (lbs)[1] | TCP Production (lbs)[2] | % Waste Potentially Discharged based on TCP Process (A,B,C,D) | Min 2,3,7,8-TCDD Estimate Concentration (ppm)[3] | Min Discharge Mass (kg) | Mid 2,3,7,8-TCDD Estimate Concentration (ppm)[4] | Mid Discharge Mass (kg) | High 2,3,7,8-TCDD Estimate Concentration (ppm)[5] | High Discharge Mass (kg) |
|---|---|---|---|---|---|---|---|---|---|---|
| 1951 | A | 324,000 | 340,200 | 80% | 60 | 7.4070 | 81 | 9.9994 | 228 | 28.1465 |
| 1952 | A | 342,132 | 359,239 | 80% | 60 | 7.8215 | 81 | 10.5590 | 228 | 29.7217 |
| 1953 | A | 305,868 | 321,161 | 80% | 60 | 6.9925 | 81 | 9.4398 | 228 | 26.5713 |
| 1954 | B | 244,704 | 256,939 | 10% | 60 | 0.6993 | 81 | 0.9440 | 228 | 2.6572 |
| 1955 | B | 526,488 | 552,812 | 10% | 60 | 1.5045 | 81 | 2.0311 | 228 | 5.7171 |
| 1956 | B | 508,032 | 533,434 | 10% | 60 | 1.4518 | 81 | 1.9599 | 228 | 5.5167 |
| 1957 | B | 747,612 | 784,993 | 10% | 60 | 2.1364 | 81 | 2.8841 | 228 | 8.1183 |
| 1958 | B | 762,492 | 800,617 | 10% | 60 | 2.1789 | 81 | 2.9415 | 228 | 8.2799 |
| 1959 | B | 912,840 | 958,482 | 10% | 60 | 2.6086 | 81 | 3.5216 | 228 | 9.9125 |
| 1960 | C | 564,972 | 593,221 | 10% | 60 | 1.6145 | 81 | 2.1795 | 228 | 6.1350 |
| 1961 | C | 1,206,222 | 1,266,533 | 10% | 60 | 3.4469 | 81 | 4.6534 | 228 | 13.0984 |
| 1962 | C | 1,301,754 | 1,366,842 | 10% | 60 | 3.7199 | 81 | 5.0219 | 228 | 14.1357 |
| 1963 | C | 1,472,813 | 1,546,454 | 10% | 60 | 4.2088 | 81 | 5.6818 | 228 | 15.9933 |
| 1964 | C | 1,343,877 | 1,411,071 | 10% | 60 | 3.8403 | 81 | 5.1844 | 228 | 14.5932 |
| 1965 | C | 685,427 | 719,698 | 10% | 60 | 1.9587 | 81 | 2.6442 | 228 | 7.4430 |
| 1966 | C | 678,674 | 712,608 | 10% | 60 | 1.9394 | 81 | 2.6182 | 228 | 7.3697 |
| 1967 | C (9 months)/ D (4 months) | 1,456,692 | 1,529,527 | 8% | 60 | 3.2608 | 81 | 4.4020 | 228 | 12.3909 |
| 1968 | D | 2,864,487 | 3,007,711 | 1.00% | 60 | 0.8186 | 81 | 1.1051 | 228 | 3.1105 |
| 1969 | D | 84,207 | 88,417 | 1.00% | 60 | 0.0531 | 81 | 0.0325 | 228 | 0.0914 |
| Total direct discharges | | | 17,149,958 | lbs | | | | | | |
| | | | 7,779,084 | kg | | **57.66** | | **77.80** | | **219.00** |
| **Other Pathway Discharge Estimates** | | | | | | | | | | |
| Overland soil erosion (kg) | | | | | | 3.53 | | 3.53 | | 3.53 |
| 1960 Explosion (kg) | | | | | | 0.0015 | | 0.0015 | | 0.0015 |
| D/F Air (kg)[6] | | | | | | 0.00514 | | 0.00514 | | 0.00514 |
| D/F Rupture disks (kg) | | | | | | 0.10 | | 0.10 | | 0.10 |
| **Total Discharges (kg)** | | | | | | **61.31** | | **81.45** | | **222.65** |

1. 2,4,5-T production in lbs from Att J. for OxyChem at p. 9. I assumed the production for 1951 was the average of 1952 and 1953.

2. Parette et al. 2018 assumed 1.03 kg of NaTCP was required to produce 1 kg 2,4,5-T.

3. Parette et al. 2018 reported an average 2,3,7,8-TCDD in TCP of 60 ppm.

4. Parette et al. 2018 modeled a 2,3,7,8-TCDD in TCP of 81 ppm in TCP produced between 1949 and March 1951.

5. Parette et al. 2018 modeled a 2,3,7,8-TCDD in TCP of 228 ppm in TCP produced between February and August of 1954

6. There was no alternate estimate available for air emissions. Therefore, this value is the corrected discharge value from Table 6.

A - NaTCP was purified by the dilution filtration process. Parette et al. 2018 estimates 80 percent of the 2,3,7,8-TCDD was potentially discharged.

B - I assumed 10 percent of the 2,3,7,8-TCDD was potentially discharged based on Parette et al. 2018, which indicates substantially less 2,3,7,8-TCDD would have been discharged after transition from the dilution filtration process.

C - The facilities were rebuilt after the 1960 explosion. I assumed 10 percent of the 2,3,7,8-TCDD was potentially discharged based on Parette et al. 2018, which indicates substantially less 2,3,7,8-TCDD would have been discharged after transition from the dilution filtration process.

D - NaTCP was purified using a carbon tower. Analytical data indicated that more than 90 percent of the TCDD was removed by this process. The carbon was drummed and disposed of offsite as solid waste.

60

ALCD-PUBCOM_0000639

- **Process chemistry based direct discharge:** The direct discharge can also be estimated based on process chemistry as described in Parette et al. 2018. Parette only included estimates for discharges from the dilution filtration process. These methods can be extrapolated to estimate discharges between 1951 and 1969. I used 2,4,5-T production volumes from Batson and converted to 2,4,5-TCP based on the factor from Parette et al. 2018 to estimate yearly TCP production. Batson does not report a 2,4,5-T value for 1951, so I used the average from 1952 and 1953. To estimate the mass of 2,3,7,8-TCDD, I used concentrations of measured and modeled 2,3,7,8-TCDD concentrations from Parette et al. 2018, detailed in Table 9. I used the percent discharged from Parette et al. 2018 to estimate 2,3,7,8-TCDD discharges. These values are based on three estimates of 2,3,7,8-TCDD to calculate low, medium, and high estimates of 2,3,7,8-TCDD potentially discharged to the Passaic. Although these values represent a simplistic mode of potential 2,3,7,8-TCDD discharges, they are expected to bracket values based on a more complete modeling of discharges that could be conducted in the future. **I estimate between 57.66 and 219 kg, with medium estimate of 78.80 kg, of 2,3,7,8-TCDD could have been discharged to the Passaic via direct discharges**. These values are much smaller than the 3,382 kg estimated in the Batson Report for direct discharges. The high estimate (219 kg) is approximately half of the corrected estimate of 376.95 kg for direct discharges (from Table 6).

- **1960 Explosion:** Paulus et al. 1987 (as cited in Parette et al. 2018) estimated up to 0.15 kg was released due to the 1960 explosion. **If I used the Batson Report's assumption that 10 percent found its way to the Passaic River, this results in an estimated mass of 0.015 kg**, which is larger than the corrected value from Table 6 (0.000053 kg) but is still much smaller than the value estimated in the Batson Report (142.85 kg).

61

ALCD-PUBCOM_0000640

- **Ruptured Pressure Discs:** Paulus et al. 1987 (as cited in Parette et al. 2018) estimated up to 1 kg was released due to disk ruptures. **If I used the Batson Report's assumption that 10 percent found its way to the Passaic River, this results in an estimated mass of 0.1 kg**, which is larger than the corrected value for this pathway is from Table 6 (0.0000093 kg) but is much smaller than the value estimated in Batson 2020 (2.71 kg).

65. Overall, I conclude that Batson did not accurately calculate the discharge mass based on its own methodology. I corrected the Batson Report's calculations using corrected inputs and assumptions listed below. **The corrected values are approximately 10 percent of the value reported in the Batson Report**.

- The average 2,3,7,8-TCDD concentration used by Batson appears to be based on the ranges reported in the cited documents. The Batson Report did not use the raw data to calculate the average. The average was less than half the value used in the Batson Report.

- The Batson Report used the entire facility's discharge volumes rather than the discharge volume with a potential to include dioxins, resulting in a significant overestimation.

- There were unit conversion errors that resulted in serious overestimations in the Batson Report's calculations.

- Batson failed to convert 2,4-D and 2,4,5-T to the quantity of 2,3,7,8-TCDD or dioxins present as impurities. Furthermore, the dioxins associated with these products would have been accounted for in the direct emissions pathway. Batson 2020 failed to convert NaTCP emissions to 2,3,7,8-TCDD for two pathways (air emissions and ruptured disks), resulting in orders of magnitude overestimations of the dioxins in these pathways.

62

ALCD-PUBCOM_0000641

66. I have also used alternative methods to calculate discharges estimates based on process chemistry and other estimates of 2,3,7,8-TCDD releases. **These values were between 2 and 6 percent of the value used in the Batson Report**.

67. The two independent methods for calculating CMass (corrected estimate using the Batson 2020 method and the alternative process chemistry calculation) both resulted in values much less than the value calculated in the Batson Report. The overestimate of the CMass in the Batson Report has important implications for the allocation:

- Batson estimated 3,729.76 kg, the corrected value is 376.95 kg. The new value is approximately 10 percent of the original Batson Report estimate. This results in a smaller share to OxyChem, especially if underestimates in the dioxin masses associated with other sites and ASPs are identified. The attenuation percentage (A%), which is used to estimate the orphan share, is much too low, resulting in an overestimate of the orphan share for COCs other than dioxins. This overestimation results in a much larger allocation to OxyChem. **The original estimated A% value calculated in Batson 2020 was 1.01 percent, the estimated value based on the corrected calculations is 10 percent.**

- The alternative method resulted in estimates between 61 and 223 kg. The new values are approximately 2 and 6 percent of the original Batson Report estimate. This results in a smaller share to OxyChem, especially if underestimates in the dioxin masses associated with other sites and the Allocation Parties are identified. The A%, which is used to estimate the orphan share, is much too low, resulting in an overestimate of the orphan share for COCs other than dioxins. This overestimation results in a much larger allocation to OxyChem. **The original A% value calculated in Batson 2020 was 1.01 percent, the value based on the alternative calculation are between 17 and 60 percent.**

63

ALCD-PUBCOM_0000642

68. The two different methodologies represent two possible methods for estimating the CMass. Together they demonstrate:

- The Batson calculation had logical and arithmetic errors that demonstrate the value used by Batson is more than an order of magnitude higher than it should be if the methodology had been faithfully followed.

- The alternative calculations are based on a different methodology that results in a much lower estimate.

- The mass estimates herein are provided to demonstrate the overestimation in Batson's original calculations and the high uncertainty associated with these types of estimates of the mass. These values are not meant to be, nor should they be, used as definitive estimates of the dioxin mass associated with the former Diamond Site that is present in Passaic sediments.

69. I conclude that the errors and inconsistencies documented above reveal serious flaws in the allocation, making the conclusions and rankings that form the basis of the Batson allocation unreliable.

ALCD-PUBCOM_0000643

I declare under penalty of perjury that the foregoing is true and correct.

_____

Michael Bock

Executed on _____03/22_____, 2023.

ALCD-PUBCOM_0000644

# REFERENCES

*Citations from the scientific literature and reports authored by or filed publicly with regulatory agencies are cited using the Chicago Manual of Style Format. If these documents were also produced to Batson, the Bates numbers are provided. Documents not freely available via the download links provided below are included as exhibits.*

1994 Surface Sediment Investigation. Samples IS1 through IS10 for MSLA 1B (Keegan Landfill). Data available at
https://sharepoint.ourpassaic.org/SitePages/Passaic%20River%20Datasets.aspx (1994 Surface Sediment Investigation).

Archer, JC, Crone, TA. 1999. Industrial Marker By-Products found with 2,3,7,8-Tetrachlorodibenzo-p-dioxin, USEPA Region VII, PITTCO N 99 poster presentation. Exhibit 97.

Barabás N., Goovaerts P., Adriaens P. 2004a. Modified polytopic vector analysis to identify and quantify a dioxin dechlorination signature in sediments. 1. Theory. Environmental Science & Technology 38:1813–1820. https://pubs.acs.org/doi/abs/10.1021/es026228z

Barabás N., Goovaerts P., Adriaens P. 2004b. Modified polytopic vector analysis to identify and quantify a dioxin dechlorination signature in sediments. 2. Application to the Passaic River. Environmental Science & Technology 38:1821–1827.https://pubs.acs.org/doi/10.1021/es026229r

Batson, David. 2020. Diamond Alkali Superfund Site OU2. Allocation Recommendation Report. AlterEcho. December 28, 2020

Beliveau A.F., Pruell R.J., Taplin B.K. 2003. Discovery of dioxin contamination in the Woonasquatucket River: A preliminary study of the Centredale Manor Restoration Project Superfund Site, North Providence, Rhode Island, USA. Organohalogen Compounds 62:383-386. https://dioxin20xx.org/wp-content/uploads/pdfs/2003/03-371.pdf

Belton TJ, Hazen R, Ruppel BE, Lockwood K, Mueller R, Stevenson E, Post JJ. 1985. A study of dioxin (2,3,7,8-tetrachlorodibenzo-p-dioxin) contamination in select finfish, crustaceans and sediments of New Jersey waterways. Office of Science and Research, New Jersey Department of Environmental Protection, Trenton, NJ, USA.
https://www.state.nj.us/dep/dsr/dioxin/Study%20of%20Dioxin.pdf

Bock, M.J., Brown, L.E., Wenning, R.J. and Bell, J.L., 2021. Sources of 2,3,7,8-Tetrachlorodibenzo-p-dioxin and Other Dioxins in Lower Passaic River, New Jersey, Sediments. *Environmental Toxicology and Chemistry*, *40*(5), pp.1499-1519.
https://setac.onlinelibrary.wiley.com/journal/15528618

Bock, M.J. and N. Rose. 2023. Forensic analysis of PCDD/Fs and PCBs in the Lower Two Mile of the Passaic River, NJ. Poster Presentation, 11th International Conference of Contaminated Sediments, Austin, TX, USA, January 9-12, 2023. Exhibit 98.

ALCD-PUBCOM_0000645

Bopp R. F., Gross M. L., Tong H., Simpson H. J., Monson S. J., Deck B. L., Moser F. C. 1991. A major incident of dioxin contamination: sediments of New Jersey estuaries. Environmental Science & Technology 25(5):951-956. Batson Bates No: PAP-00162270. https://pubs.acs.org/doi/10.1021/es00017a019

Cejas, M.J. and Barrick, R.C., 2020. Chemometric mapping of polychlorinated dibenzo-p-dioxin (PCDD) and dibenzofuran (PCDF) congeners from the Passaic River, NJ: Integrated application of RSIMCA, PVA, and t-SNE. Environmental Forensics, pp.1-17. https://www.tandfonline.com/doi/full/10.1080/15275922.2020.1834022

CFM. 1983. Chemical sewer investigation. Chemical Plant. Givaudan Corporation. Clifton, NJ, USA. Available from: https://www.nj.gov/dep/passaicdocs/docs/3rd-PartyComplaintNexusPackages/3rd-PartyComplaintBNexus/GivaudanSite.pdf. Batson Bates No: PAP-00176745

Custer C.M., Custer T.W., Rosiu C.J, Melancon M.J, Bickham J.W., Matson C.W. 2005. Exposure and effects of 2,3,7,8-tetrachlorodibenzo-p-dioin in tree swallows (tachycineta bicolor) nesting along the Woonasquatucket River, Rhode Island, USA. Environmental Toxicology and Chemistry. 24(1):93-109. https://setac.onlinelibrary.wiley.com/doi/abs/10.1897/03-682.1

Ehrlich R., Wenning R.J., Johnson G.S., Shu S., Paustenbach D.J. 1994. A mixing model for polychlorinated dibenzo-p-dioxins and dibenzofurans in surficial sediments from Newark Bay, New Jersey using polytopic vector analysis. Archives of Environmental Contamination and Toxicology 27:486–500. https://link.springer.com/article/10.1007/BF00214840

EHS Support LLC. 2017. Remedial investigation report. Ashland-Drew Chemical Corporation, Boonton, NJ, USA. CERCLA Bates No: Exhibit 99

ENSR. 2008. Quality assurance project plan: Low resolution coring/sediment sampling, lower Passaic River Restoration Project RI/FS. Revision 1. Lower Passaic River Cooperating Parties Group, Newark, NJ, USA. https://semspub.epa.gov/work/02/616222.pdf

EPA. 2000. Guidance for Data Quality Assessment. Practical Methods for Data Analysis. EPA QA/G-9.QA00 UPDATE. https://www.epa.gov/sites/default/files/2015-06/documents/g9-final.pdf

EPA. 2003. Letter from EPA to Montrose Re: Diamond Alkali Plant, notice of potential liability for response actions in the lower Passaic River study, area, NJ. Washington, DC. [cited 2020 September 20]. Available from: https://www.nj.gov/dep/passaicdocs/docs/3rd-partyComplaintNexusPackages/3rd-PartyComplaintBNexus/MontroseSite.pdf

EPA 2006. An inventory of sources and environmental releases of dioxin-like compounds in the United States for the years 1987, 1995, and 2000. National Center for Environmental Assessment, OoRaD (Ed.), Washington, DC. Batson Bates No: PAP-00161542. https://ordspub.epa.gov/ords/eims/eimscomm.getfile?p_download_id=459709

ALCD-PUBCOM_0000646

EPA. 2008. Framework for Application of the Toxicity Equivalence Methodology for Polychlorinated Dioxins, Furans, and Biphenyls in Ecological Risk Assessment. EPA/100/R-08/004. June 2008. https://www.epa.gov/sites/default/files/2013-09/documents/tefs-draft-052808-0804.pdf

EPA. 2010. Recommended Toxicity Equivalence Factors (TEFs) for Human Health Risk Assessments of 2,3,7,8- Tetrachlorodibenzo-p-dioxin and Dioxin-Like Compounds. EPA/100/R -10/005. December 2010. https://www.epa.gov/sites/default/files/2013-09/documents/tefs-for-dioxin-epa-00-r-10-005-final.pdf. Batson Bates No: PAP-00400654

EPA. 2012. Region 1. Record Of Decision. Centredale Manor Restoration Project Superfund Site, North Providence, Rhode Island. September 2012. https://semspub.epa.gov/work/01/521788.pdf

EPA. 2013. Update to An Inventory of Sources and Environmental Releases of Dioxin-Like Compounds in the United States for the Years 1987, 1995, and 2000 (2013, External Review Draft). U.S. Environmental Protection Agency, Washington, DC, EPA/600/R-11/005A, 2013. https://ordspub.epa.gov/ords/eims/eimscomm.getfile?p_download_id=513526

EPA. 2016. RECORD OF DECISION. Lower 8.3 Miles of the Lower Passaic River, Part of the Diamond Alkali Superfund Site, Essex and Hudson Counties, New Jersey. U.S. Environmental Protection Agency Region II. New York, New York March 3, 2016. https://semspub.epa.gov/work/02/396055.pdf. Batson Bates No: PAP-00400702

EPA. 2021. RECORD OF DECISION For an Interim Remedy in the Upper 9 Miles of the Lower Passaic River Study Area OU4 of the Diamond Alkali Superfund Site Essex, Bergen and Passaic Counties, New Jersey. U.S. Environmental Protection Agency Region II. New York, New York September, 2021. https://semspub.epa.gov/work/02/630399.pdf

EPA 2023. Envirofacts. RCRA facility Information, Clean Earth of North Jersey. https://enviro.epa.gov/enviro/rcrainfoquery_3.facility_information?pgm_sys_id=NJD991291105 Accessed on 3/2/2023.

Esposito M.P., Tiernan T.O., Dryden F.E. 1980. Dioxins (EPA-600/2-80-197). USEPA, Office of Research and Development, Industrial Environmental Research Laboratory. Cincinnati, OH. November. GIV_NBC_0680932. https://nepis.epa.gov/Exe/ZyNET.exe/20007F5B.TXT?ZyActionD=ZyDocument&Client=EPA&Index=1976+Thru+1980&Docs=&Query=&Time=&EndTime=&SearchMethod=1&TocRestrict=n&Toc=&TocEntry=&QField=&QFieldYear=&QFieldMonth=&QFieldDay=&IntQFieldOp=0&ExtQFieldOp=0&XmlQuery=&File=D%3A%5Czyfiles%5CIndex%20Data%5C76thru80%5CTxt%5C00000002%5C20007F5B.txt&User=ANONYMOUS&Password=anonymous&SortMethod=h%7C-&MaximumDocuments=1&FuzzyDegree=0&ImageQuality=r75g8/r75g8/x150y150g16/i425&Display=hpfr&DefSeekPage=x&SearchBack=ZyActionL&Back=ZyActionS&BackDesc=Results%20page&MaximumPages=1&ZyEntry=1&SeekPage=x&ZyPURL

EUC (European Commission) 2001. Integrated Pollution Prevention and Control (IPPC) Reference Document on Best Available Techniques in the Chlor-Alkali Manufacturing Industry

68

ALCD-PUBCOM_0000647

December 200. https://www.etui.org/sites/default/files/ez_import/chlor-alkali-1.pdf?fbclid=IwAR0tnl8EQPK-AwVKN0G1bRUKxwpfFCZqA5u298v5xTWX7P_vMFbQEI33uUI

Garland, E. 2017. Congener Analysis. Technical Memo to Naranjo and Yeh, EPA. Batson Bates No: PAS-00129882

Garvey E., Gbondo-Tugbawa S., Atmadja J., McDonald S. 2011. Dioxin in the Passaic River (New Jersey): The case for two dioxin sources. Presentation, 6th International Conference of Contaminated Sediments, New Orleans, LA, USA, February 10, 2011. Exhibit 100

Gothe R., Wachtmeister C.A. 1972. Synthesis of 1,2,4,5,7,8-Hexachloroxanthene. Acta Chemica Scandinavia 26(6). http://actachemscand.org/pdf/acta_vol_26_p2523.pdf

Hart Crowser. 2001. Draft Summary of Field Operations Non-AOC Sediment Sampling and Testing Program. Sample PRP-99-05-SD-1. Data available at https://sharepoint.ourpassaic.org/SitePages/Passaic%20River%20Datasets.aspx (1999 Sediment Sampling Program)

Hites, R.A., 2011. Dioxins: an overview and history. *Environmental science & technology*, *45*(1), pp.16-20. https://pubs.acs.org/doi/pdf/10.1021/es1013664

Hu, D. and Hornbuckle, K.C., 2010. Inadvertent polychlorinated biphenyls in commercial paint pigments. *Environmental science & technology*, *44*(8), pp.2822-2827. https://pubs.acs.org/doi/10.1021/es902413k

Huntley S., Carlson-Lynch H., Johnson G., Paustenbach D.J., Finley B. 1998. Identification of historical PCDD/F sources in Newark Bay estuary subsurface sediments using polytopic vector analysis and radioisotope dating techniques. Chemosphere 36:1167–1185. https://www.sciencedirect.com/science/article/abs/pii/S004565359710008X

HydroQual, Inc. 2006. Newark Bay Study Final Modeling Work Plan Addendum. Prepared for USEPA and USACE. Contract No. DACW41-02-D-003. August 2006. https://sharepoint.ourpassaic.org/Public%20Documents/2006-10-04%20NBSA%20Modeling%20WP%20Addendum%20HQI.pdf

Johnson G. W., Jarman W. M., Bacon C. E., Davis J. A., Ehrlich R., Risebrough R. W. 2000. Resolving polychlorinated biphenyl source fingerprints in suspended particulate matter of San Francisco Bay. Environmental Science & Technology 34(4):552-559. https://pubs.acs.org/doi/10.1021/es981246v

Johnson G.W., Ehrlich R., Full W., Ramos S. 2002. Principal components analysis and receptor models in environmental forensics. In Introduction to Environmental Forensics (First Edition).

Johnson G.W., Ehrlich R., Full W., Ramos S. 2015. Principal components analysis and receptor models in environmental forensics. In Introduction to Environmental Forensics (Third Edition). https://www.researchgate.net/publication/303423193_Principal_Components_Analysis_and_Receptor_Models_in_Environmental_Forensics

ALCD-PUBCOM_0000648

Khairy M., Barrett K., Lohmann R. 2016. Changing sources of polychlorinated dibenzo-p-dioxins and furans in sediments and ecological risk for nekton in the Lower Passaic River and Newark Bay, New Jersey, USA. Environmental Toxicology and Chemistry 35(3):550–562. Batson Bates No: PAP-00166641. https://setac.onlinelibrary.wiley.com/doi/abs/10.1002/etc.3223

Križanec, B. and Majcen Le Marechal, A., 2006. Dioxins and dioxin-like persistent organic pollutants in textiles and chemicals in the textile sector. *Croatica Chemica Acta*, *79*(2), pp.177-186. https://hrcak.srce.hr/file/6721

McKay, Gordon. 2002 "Dioxin characterization, formation and minimization during municipal solid waste (MSW) incineration." Chemical Engineering Journal 86, no. 3 (2002): 343–368.
Myers, R.K., 1994. Advanced Chemical Fingerprinting in Hazardous Waste Liability under CERCLA. *Fordham Envtl. LJ*, *6*, p.253.
https://www.sciencedirect.com/science/article/abs/pii/S1385894701002285

Ni, Y., Zhang, Z., Zhang, Q., Chen, J., Wu, Y. and Liang, X., 2005. Distribution patterns of PCDD/Fs in chlorinated chemicals. *Chemosphere*, *60*(6), pp.779-784. TIG Internal Bates No: DAA000018.
https://www.sciencedirect.com/science/article/abs/pii/S0045653505005503?via%3Dihub

NJDEP. 1991. RCRA Facility Assessment (RFA) Report, Givaudan Corporation, Clifton, NJ. EPA ID No NJD 002156354. Exhibit 101 (BBM000021)

NJDEP. 2021. HAZSITE database (https://www.nj.gov/dep/srp/hazsite/ ) extracted by NJDEP and provided to TIG on March 16, 2021.

Okamoto Y, Tomonari M. 1999. Formation pathways from 2,4,5-trichlorophenol (TCP) to polychlorinated dibenzo-p-dioxins (PCDDs): An ab initio study. J Phys Chem A 103:7686–7691. https://pubs.acs.org/doi/10.1021/jp991383u

Parette, R., Velinsky, D.J. and Pearson, W.N., 2018. Reconstruction of historical 2, 3, 7, 8-tetrachlorodibenzo-p-dioxin discharges from a former pesticide manufacturing plant to the Lower Passaic River. *Chemosphere*, *212*, pp.1125-1132. Batson Bates No: PAP-00394991. https://www.sciencedirect.com/science/article/abs/pii/S0045653518315753?via%3Dihub

Piacitelli, L., Marlow, D. and Fingerhut, M.A., 1990. *NIOSH dioxin registry site visit report of Givaudan Corporation, Clifton, New Jersey, June 20, 1983, June 11, 1984, August 25, 1986, and September 8, 1986* (No. PB-91-185199/XAB; IWS-117.22). National Inst. for Occupational Safety and Health, Cincinnati, OH (United States). Div. of Surveillance, Hazard Evaluation and Field Studies. Batson Bates No: PAP-00181650

Plumb, R.H., 2004. *Fingerprint analysis of contaminant data: A forensic tool for evaluating environmental contamination*. Technical Support Center for Monitoring and Site Characterization, National Exposure Research Laboratory, Environmental Sciences Division. https://www.epa.gov/remedytech/fingerprint-analysis-contaminant-data-forensic-tool-evaluating-environmental

ALCD-PUBCOM_0000649

Quadrini J.D., Ku W., Connolly J.P., Chiavelli D.A., Israelsson P.H. 2015. Fingerprinting 2,3,7,8 tetrachlorodibenzopdioxin contamination within the Lower Passaic River. Environmental Toxicology and Chemistry 34(7):1485–1498. Batson Bates No: PAP-00162743. https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4676307/

Tukey, J.W., 1977. *Exploratory data analysis* (Vol. 2, pp. 131-160). https://www.amazon.com/Exploratory-Data-Analysis-John-Tukey/dp/0201076160

Van den Berg, M., Birnbaum, L.S., Denison, M., De Vito, M., Farland, W., Feeley, M., Fiedler, H., Hakansson, H., Hanberg, A., Haws, L. and Rose, M., 2006. The 2005 World Health Organization reevaluation of human and mammalian toxic equivalency factors for dioxins and dioxin-like compounds. *Toxicological sciences*, *93*(2), pp.223-241. https://pubmed.ncbi.nlm.nih.gov/16829543/

Viswanathan T.S., Weston R.F., Kleopfer R.D., Gierthy J.F. 1987. The measurement and significance of 1,2,4,5,7,8-hexachloroxanthene in the environment. Chemosphere 16(4):869-875. Batson Bates No: PAP-00169237

Viswanathan T.S., Kleopfer R.D. 1986. The presence of hexachloroxanthene at Missouri dioxin sites. In: Rappe et al. (eds.), Chlorinated Dioxins and Dibenzofurans In Perspective. CRC Press. Boca Raton, FL. CERCLA Bates No: GIV_NBC_0680769. https://www.taylorfrancis.com/chapters/edit/10.1201/9781351070645-14/presence-hexachloroxanthene-missouri-dioxin-sites-tenkasi-viswanathan-robert-kleopfer

Wenning R.J., Paustenbach D.J., Johnson G., Ehrlich R., Harris M., Bedbury H. 1993a. Chemometric analysis of potential sources of polychlorinated dibenzo-p-dioxins and dibenzofurans in surficial sediments from Newark Bay, New Jersey. Chemosphere 27:55–64. Batson Bates No: PAP-00162291. https://www.sciencedirect.com/science/article/abs/pii/004565359390276B

Wenning R.J., Harris M., Finley B., Paustenbach D., Bedbury H. 1993b. Application of pattern recognition techniques to evaluate polychlorinated dibenzo-p-dioxin and dibenzofuran distributions in surficial sediments from the lower Passaic River and Newark Bay. Ecotoxicology and Environmental Safety 25:103–125. https://pubmed.ncbi.nlm.nih.gov/7682913/

Williams, D.T., LeBel, G.L. and Benoit, F.M., 1992. Polychlorodibenzodioxins and polychlorodibenzofurans in dioxazine dyes and pigments. *Chemosphere*, *24*(2), pp.169-180. https://www.sciencedirect.com/science/article/abs/pii/004565359290390D

Wroblewski. 2022. Deposition of Richard Wroblewski (Givaudan). August 23, 2022.

ALCD-PUBCOM_0000650

## Cited Documents from the Batson Repository, by Batson Bates Number

| | | | |
|---|---|---|---|
| PAP-00027591 | PAP-00167156 | PAP-00183549 | PAP-00478695 |
| PAP-00057486 | PAP-00167164 | PAP-00183658 | PAP-00724492 |
| PAP-00057770 | PAP-00167196 | PAP-00183732 | PAP-00725041 |
| PAP-00126516 | PAP-00167204 | PAP-00184006 | PAS-00003918 |
| PAP-00142879 | PAP-00167208 | PAP-00185144 | PAS-00033657 |
| PAP-00143149 | PAP-00167212 | PAP-00208931 | PAS-00033905 |
| PAP-00143571 | PAP-00168652 | PAP-00217426 | PAS-00039956 |
| PAP-00150544 | PAP-00175090 | PAP-00295694 | PAS-00044273 |
| PAP-00159107 | PAP-00178320 | PAP-00317738 | PAS-00054143 |
| PAP-00159278 | PAP-00179605 | PAP-00367276 | PAS-00125770 |
| PAP-00159283 | PAP-00179675 | PAP-00367356 | PAS-00126224 |
| PAP-00159313 | PAP-00181289 | PAP-00394455 | PAS-00126867 |
| PAP-00160071 | PAP-00181650 | PAP-00394460 | PAS-00127794 |
| PAP-00167096 | PAP-00182227 | PAP-00398154 | PAS-00128468 |
| PAP-00167097 | PAP-00182228 | PAP-00400514 | |

## Exhibits

| Exhibit | Document ID |
|---|---|
| Exhibit B-1 | AAB000001 |
| Exhibit B-2 | BAB000027 |
| Exhibit B-3 | BAB000047 |
| Exhibit B-4 | BAF000004 |
| Exhibit B-5 | BAF000023 |
| Exhibit B-6 | BBA000014 |
| Exhibit B-7 | BBA000055 |
| Exhibit B-8 | BBA000068 |
| Exhibit B-9 | BBA000071 |
| Exhibit B-10 | BBC000065 |
| Exhibit B-11 | BBC000116 |
| Exhibit B-12 | BBC000118 |
| Exhibit B-13 | BBF000028 |
| Exhibit B-14 | BBF000085L |
| Exhibit B-15 | BBF000187 |
| Exhibit B-16 | BBG000012 |
| Exhibit B-17 | BBG000057F |
| Exhibit B-18 | BBG000066 |
| Exhibit B-19 | BBG000181 |
| Exhibit B-20 | BMCO-FED-0000001039 |
| Exhibit B-21 | BMCO-FED-0000008162 |
| Exhibit B-22 | BMCO-FED-0000012588 |
| Exhibit B-23 | CAL000001 |
| Exhibit B-24 | CAL000002 |
| Exhibit B-25 | CAL000004 |
| Exhibit B-26 | CAL000006 |
| Exhibit B-27 | CAL000007 |
| Exhibit B-28 | CAL000008 |

ALCD-PUBCOM_0000651

| Exhibit | Document ID |
|---------|-------------|
| Exhibit B-29 | CAL000009 |
| Exhibit B-30 | CAL000010 |
| Exhibit B-31 | CENJ-FED-0000056519 |
| Exhibit B-32 | DAB000014 |
| Exhibit B-33 | DOCID_TIG_ESI_0000084325 |
| Exhibit B-34 | DOCID_TIG_ESI_0000085010 |
| Exhibit B-35 | DOCID_TIG_ESI_0000087998 |
| Exhibit B-36 | DOCID_TIG_ESI_0000091076 |
| Exhibit B-37 | DOCID_TIG_ESI_0000091112 |
| Exhibit B-38 | DOCID_TIG_ESI_0000094142 |
| Exhibit B-39 | DOCID_TIG_ESI_0000102479 |
| Exhibit B-40 | DOCID_TIG_ESI_0000159570 |
| Exhibit B-41 | DOCID_TIG_ESI_0000165575 |
| Exhibit B-42 | GIV_NBC_0369949 |
| Exhibit B-43 | GIV_NBC_0475276 |
| Exhibit B-44 | GIV_NBC_0475302 |
| Exhibit B-45 | GIV_NBC_0475352 |
| Exhibit B-46 | GIV_NBC_0500921 |
| Exhibit B-47 | GIV_NBC_0664675 |
| Exhibit B-48 | GIV_NBC_0665926 |
| Exhibit B-49 | GIVA-FED-0000157959 |
| Exhibit B-50 | GIVA-FED-0000157997 |
| Exhibit B-51 | GIVA-FED-0000158028 |
| Exhibit B-52 | GIVA-FED-0000158030 |
| Exhibit B-53 | GIVA-FED-0000158034 |
| Exhibit B-54 | GIVA-FED-0000158038 |
| Exhibit B-55 | GIVA-FED-0000158046 |
| Exhibit B-56 | GIVA-FED-0000158061 |
| Exhibit B-57 | GIVA-FED-0000158120 |
| Exhibit B-58 | GIVA-FED-0000158128 |
| Exhibit B-59 | GIVA-FED-0000158129 |
| Exhibit B-60 | GIVA-FED-0000158130 |
| Exhibit B-61 | GIVA-FED-0000158150 |
| Exhibit B-62 | GIVA-FED-0000158161 |
| Exhibit B-63 | GIVA-FED-0000158175 |
| Exhibit B-64 | GIVA-FED-0000158188 |
| Exhibit B-65 | GIVA-FED-0000158226 |
| Exhibit B-66 | GIVA-FED-0000158302 |
| Exhibit B-67 | GIVA-FED-0000158306 |
| Exhibit B-68 | GIVA-FED-0000158367 |
| Exhibit B-69 | GIVA-FED-0000163484 |
| Exhibit B-70 | GIVA-FED-0000342825 |
| Exhibit B-71 | HD02278 |
| Exhibit B-72 | HD02287 |
| Exhibit B-73 | LIT000016 |
| Exhibit B-74 | LPRSA_CPG_0007470 |
| Exhibit B-75 | LVC000228 |
| Exhibit B-76 | LVCE0013643 |
| Exhibit B-77 | MAXUS3033219 |

ALCD-PUBCOM_0000652

| Exhibit | Document ID |
|---|---|
| Exhibit B-78 | MED000003 |
| Exhibit B-79 | MKSK-FED-0000000215 |
| Exhibit B-80 | MKSK-FED-0000000333 |
| Exhibit B-81 | MKSK-FED-0000002400 |
| Exhibit B-82 | MKSK-FED-0000003275 |
| Exhibit B-83 | MKSK-FED-0000003521 |
| Exhibit B-84 | NPEC-0005130 |
| Exhibit B-85 | NPEC-0011056 |
| Exhibit B-86 | OCC-CER-SD000075986 |
| Exhibit B-87 | PPGL-FED-0000244231 |
| Exhibit B-88 | PPGLP02590 |
| Exhibit B-89 | TIERRA-A-017380 |
| Exhibit B-90 | TSI-HH-00013758 |
| Exhibit B-91 | TSWC-FED-00000001 |
| Exhibit B-92 | TSWC-FED-00048354 |
| Exhibit B-93 | TSWC-FED-00054404 |
| Exhibit B-94 | TSWC-FED-00054592 |
| Exhibit B-95 | TSWC-FED-00100123 |
| Exhibit B-96 | UNK000002 |
| Exhibit B-97 | Archer and Crone 1999 |
| Exhibit B-98 | Bock et al 2023 |
| Exhibit B-99 | EHS 2017 |
| Exhibit B-100 | Garvey et al 2011 |
| Exhibit B-101 | BBM000021 |
| Exhibit B-102 | BBB000017 |

ALCD-PUBCOM_0000653

**Table A-1.** Concentrations of 2,3,7,8-TCDD in sump, product, and process streams (OxyChem)[143]

| Sample Description[144] | Date | Flag[145] | TCDD concentration[146] | |
|---|---|---|---|---|
| | | | ppb | ppm |
| Recovered methanol (TCP process) | 1985 | | 60,800 | 60.8 |
| Anisole drop tank (TCP process) | 1985 | | 5,530 | 5.53 |
| Tetrachlorobenzene storage tank (TCP process) | 1985 | | 4,200 | 4.2 |
| Anisole still (TCP process) | 1985 | | 679 | 0.679 |
| Isopropanal/butanol (TCP process) | 1985 | | 11.1 | 0.0111 |
| 2,4,5-T slurry hold tank/2,4-D filter feed tank | 1985 | | 100 | 0.1 |
| HCl receiver (DCP, MCA, 2,4-D processes) | 1985 | | 236 | 0.236 |
| MCA chlorinator (DCP, MCA, 2,4-D processes) | 1985 | | 8.2 | 0.0082 |
| 2,4-D filter feed tank (DCP, MCA, 2,4-D processes) | 1985 | | 5 | 0.005 |
| Anisole receiver (TCP/2,4,5-T process) | 1985 | | 12,220 | 12.22 |
| Process building room 5 (TCP/2,4,5-T process) | 1985 | | 8,750 | 8.75 |
| 2,4,5-T press filter (TCP/2,4,5-T process) | 1985 | | 476 | 0.476 |
| Process building room 5 (TCP/2,4,5-T process) | 1985 | U | 2 | 0.002 |
| Manufacturing building room 4 (TCP/2,4,5-T process) | 1985 | U | 1.7 | 0.0017 |
| TCP mother liquid acid tank/NaDCP make-up | 1985 | | 16 | 0.016 |
| Recovered TCP storage tank/DCP hold tank | 1985 | U | 8.4 | 0.0084 |
| 2,4,5-T slurry hold tank/2,4-D filter feed tank | 1985 | U | 2 | 0.002 |
| DCP drop tank (DCP, MCA, 2,4-D processes) | 1985 | | 174 | 0.174 |
| 2,4-D filter feed tank (DCP, MCA, 2,4-D processes) | 1985 | | 35.9 | 0.0359 |
| 2,4-D filter feed tank (DCP, MCA, 2,4-D processes) | 1985 | | 7.5 | 0.0075 |
| DCP chlorinator (DCP, MCA, 2,4-D processes) | 1985 | | 13.9 | 0.0139 |
| MCA chlorinator (DCP, MCA, 2,4-D processes) | 1985 | | 12.1 | 0.0121 |
| 2,4-D slurry tank (DCP, MCA, 2,4-D processes) | 1985 | | 12 | 0.012 |
| 2,4-D filter (DCP, MCA, 2,4-D processes) | 1985 | | 8 | 0.008 |
| 2,4-D slurry hold tank (DCP, MCA, 2,4-D processes) | 1985 | | 3.4 | 0.0034 |
| 2,4-D mother liquid drop tank/caustic drop tank (DCP, MCA, 2,4-D processes) | 1985 | | 2.6 | 0.0026 |
| MCA chlorinator (DCP, MCA, 2,4-D processes) | 1985 | | 1.5 | 0.0015 |
| Sodium sulfate tank (DCP, MCA, 2,4-D processes) | 1985 | U | 16.2 | 0.0162 |

---

[143] PAP-00143149 at PAP-00143163–164, 189–190, 197; PAS-00126867 at PAS-00127134, 136–137; PAS-00126224 at PAS-00126280; PAP-00208931 at PAP-00208962–963; PAP-00394460 at PAP-00394460–461 at pp. 1–2; PAP-00159313 at PAP-00159337; PAP-00142879 at PAP-00142927, 928, 930, 931; PAP-00167096 at PAP-00167096; PAP-00167097 at PAP-00167097; PAP-00167212 at PAP-00167212; PAP-00143571 at PAP-00143572; PAP-00167156 at PAP-00167159; PAP-00167164 at PAP-00167167; PAP-00167196 at PAP-00167197; PAP-00167204 at PAP-00167207; PAP-00167208 at PAP-00167211; PAP-00159107 at PAP-00159110; PAP-00159283 at PAP-00159286; PAP-00159278 at PAP-00159282

[144] Abbreviations not previously defined are dichlorophenol (DCP), monochloroacetic (MCA) acid, tetrachlorobenzene (TC4B), and trichloroanisole (TCA)

[145] Results with a U flag are non-detect (reported as "none detected" or with "<").

[146] For non-detect results, the detection limit is listed as the concentration.

75

ALCD-PUBCOM_0000654

| Sample Description[144] | Date | Flag[145] | TCDD concentration[146] ppb | TCDD concentration[146] ppm |
|---|---|---|---|---|
| 2,4-D dryer | 1985 | U | 3.8 | 0.0038 |
| Unknown drums | 1985 | | 54 | 0.054 |
| Unknown drums | 1985 | U | 6.7 | 0.0067 |
| Sump sample 8006 | 1985 | | 9,160 | 9.16 |
| Sump sample 8005 | 1985 | | 2,680 | 2.68 |
| Sump sample 8004 | 1985 | | 350 | 0.35 |
| Sump sample 8009 | 1985 | | 836 | 0.836 |
| Sump sample 8002 | 1985 | | 1,010 | 1.01 |
| Sump sample 8003 | 1985 | | 105 | 0.105 |
| Sewer sample 8010 | 1985 | | 4,040 | 4.04 |
| Sump sample 8001 | 1985 | | 2,950 | 2.95 |
| Sump sample 8008 | 1985 | | 560 | 0.56 |
| Sewer sample 8007 | 1985 | | 19.5 | 0.0195 |
| Sewer sample 8011 | 1985 | | 420 | 0.42 |
| Sewer sample 8012 | 1985 | | 529 | 0.529 |
| NaTCP carbon treated | Mar 1968 | | 3,800 | 3.8 |
| NaTCP carbon treated | June 1968 | | 900 | 0.9 |
| NaTCP carbon treated | Sept 1968 | | 200 | 0.2 |
| NaTCP carbon treated | Dec 1968 | | 9,000 | 9 |
| NaTCP carbon treated | Mar 1969 | | 3,200 | 3.2 |
| NaTCP carbon treated | June 1969 | | 1,700 | 1.7 |
| T4CB storage tank residue | 1991 | | 4,200 | 4.2 |
| T4CB storage tank residue second sample | 1992 | | 13,000 | 13 |
| T4CB unloading line | 1992 | | 6.7 | 0.0067 |
| Agent Orange | 1972 | | 50 | 0.05 |
| Agent Orange | 1972 | | 9,700 | 9.7 |
| Agent Orange | 1972 | | 50 | 0.05 |
| Agent Orange | 1972 | | 8,000 | 8 |
| Agent Orange | 1972 | | 8,100 | 8.1 |
| Agent Orange | 1972 | | 8,700 | 8.7 |
| Agent Orange | 1972 | | 12,000 | 12 |
| Agent Orange | 1972 | | 17,000 | 17 |
| Agent Orange | 1972 | | 70 | 0.07 |
| Agent Orange | 1972 | | 12,000 | 12 |
| Agent Orange | 1972 | | 15,000 | 15 |
| Agent Orange | 1972 | | 15,000 | 15 |
| Recovered TCA | 1965 | | 73,000 | 73 |
| Waste from sump north of TCP process building | 1968 | | 75,000 | 75 |
| TCP solution 40% - storage tank #133 | May 1965 | | 40,000 | 40 |
| TCP solution 40% - Dalco shipment | May 1965 | | 25,000 | 25 |
| TCP solution 40% | May 1965 | | 16,000 | 16 |
| TCP solution 40% | May 1965 | | 10,000 | 10 |
| Recovered methanol | May 1965 | U | 10,000 | 10 |
| T-acid Lot 299 (2,4,5-T) | May 1965 | U | 10,000 | 10 |
| T-acid Lot 225 (2,4,5-T) | May 1965 | U | 10,000 | 10 |
| T-acid Lot 255 (2,4,5-T) | May 1965 | U | 10,000 | 10 |
| T-acid Lot 288 (2,4,5-T) | May 1965 | | 28,000 | 28 |

76

| Sample Description[144] | Date | Flag[145] | TCDD concentration[146] | |
| | | | ppb | ppm |
|---|---|---|---|---|
| T-acid Lot 279 (2,4,5-T) | May 1965 | | 40,000 | 40 |
| T-acid Lot 281 (2,4,5-T) | May 1965 | | 25,000 | 25 |
| T-acid Lot 289 (2,4,5-T) | May 1965 | | 40,000 | 40 |
| 31% TCP solution | June 1965 | | 28,000 | 28 |
| 100% TCP solution | June 1965 | | 90,000 | 90 |
| 22% TCP solution | June 1965 | | 39,000 | 39 |
| 100% TCP solution | June 1965 | | 140,000 | 140 |
| 44% TCP solution | June 1965 | | 38,000 | 38 |
| 100% TCP solution | June 1965 | | 86,000 | 86 |
| 44% TCP solution | June 1965 | | 35,000 | 35 |
| 100% TCP solution | June 1965 | | 80,000 | 80 |
| 28% TCP solution | June 1965 | | 22,000 | 22 |
| 100% TCP solution | June 1965 | | 80,000 | 80 |
| 28% TCP solution filtered | June 1965 | | 8,000 | 8 |
| 100% TCP solution filtered | June 1965 | | 28,000 | 28 |
| 28% TCP solution filtered | June 1965 | | 5,000 | 5 |
| 100% TCP solution filtered | June 1965 | | 18,000 | 18 |
| 36% TCP solution | June 1965 | | 19,000 | 19 |
| 100% TCP solution | June 1965 | | 53,000 | 53 |
| 40% TCP solution | June 1965 | | 25,000 | 25 |
| 100% TCP solution | June 1965 | | 62,000 | 62 |
| 2,4,5-T | June 1965 | U | 10,000 | 10 |
| 2,4,5-T | Sept 1965 | | 26,000 | 26 |
| 2,4,5-T | Sept 1965 | | 13,000 | 13 |
| 2,4,5-T | Sept 1965 | | 7,000 | 7 |
| 2,4,5-T | Sept 1965 | | 7,000 | 7 |
| 100% TCP, pre-activated carbon purification treatment | Feb 1967 | | 19,700 | 19.7 |
| 100% TCP, post-activated carbon purification treatment | Feb 1967 | | 1,000 | 1 |
| 10.4% TCP before precoat filter | May 1966 | | 43,000 | 43 |
| 10.4% TCP after precoat filter | May 1966 | | 23,000 | 23 |
| 11.6% TCP before 10 µm filter | July 1966 | | 48,000 | 48 |
| 11.6% TCP after 10 µm filter | July 1966 | | 8,000 | 8 |
| 10.2% before 5 µm filter | Aug 1966 | | 26,500 | 26.5 |
| 10.2% after 5 µm filter | Aug 1966 | | 1 | 0.001 |
| 10.1% before 10 µm filter | Nov 1966 | | 33,000 | 33 |
| 10.1% after 10 µm filter | Nov 1966 | | 5,600 | 5.6 |
| 10.1% before 10 µm filter | Nov 1966 | | 30,000 | 30 |
| 10.1% after 10 µm filter | Nov 1966 | | 13,000 | 13 |
| 10.1% before 25/5 um filter | Nov 1966 | | 51,000 | 51 |
| 10.1% after 25 µm filter | Nov 1966 | | 40,000 | 40 |
| 10.1% after 5 µm filter | Nov 1966 | | 3,600 | 3.6 |
| 10.1% before 25/5 um filter | Nov 1966 | | 33,000 | 33 |
| 10.1% after 25 µm filter | Nov 1966 | | 26,000 | 26 |
| 10.1% after 5 µm filter | Nov 1966 | | 9,500 | 9.5 |
| 10.1% before 25/5 µm filter | Nov 1966 | | 6,500 | 6.5 |
| 10.1% after 25 µm filter | Nov 1966 | | 6,500 | 6.5 |

77

| Sample Description[144] | Date | Flag[145] | TCDD concentration[146] | |
| | | | ppb | ppm |
|---|---|---|---|---|
| 10.1% after 5 μm filter | Nov 1966 | | 4,000 | 4 |
| TCP | Apr 1967 | | 11,5000 | 115 |
| TCP | May 1967 | | 71,000 | 71 |
| TCP | Sept 1967 | | 1,000 | 1 |
| TCP | Nov 1967 | | 1,700 | 1.7 |
| TCP | Dec 1967 | | 2,800 | 2.8 |
| TCP | Jan 1968 | | 3,000 | 3 |
| TCP | Feb 1968 | | 7,000 | 7 |
| TCP | Mar 1968 | | 1,500 | 1.5 |
| TCP | Apr 1968 | | 1,800 | 1.8 |
| TCP | May 1968 | U | 1,000 | 1 |
| TCP | July 1968 | | 1,000 | 1 |
| TCP | Aug 1968 | | 1,000 | 1 |
| TCP | Sep 1968 | | 1,000 | 1 |
| TCP | Oct 1968 | | 8,400 | 8.4 |
| TCP | Nov 1968 | | 9,300 | 9.3 |
| TCP | Dec 1968 | | 9,600 | 9.6 |
| TCP | Jan 1969 | | 5,200 | 5.2 |
| 36% TCP solution | Mar 1966 | | 7,000 | 7 |
| Crude 39% TCP solution in crude TCP holding tank | Dec 1965 | | 22,000 | 22 |
| 34% TCP solution | Dec 1965 | | 10,000 | 10 |
| 35% TCP solution | Dec 1965 | | 12,000 | 12 |
| Crude 40% TCP solution in crude TCP holding tank | Feb 1966 | | 16,000 | 16 |
| Crude 46% TCP solution in crude TCP holding tank | Feb 1966 | | 10,000 | 10 |
| Crude 30% TCP solution prior to methanol distillation | Feb 1966 | | 70,000 | 70 |
| Recovered 93% TCP from 2,4,5-T mother liquor | Mar 1966 | | 10,000 | 10 |
| 40% TCP solution (assumed) | May 1966 | | 17,000 | 17 |
| 40% TCP solution (assumed) | July 1966 | | 19,000 | 19 |
| 40% TCP solution (assumed) | Aug 1966 | | 11,000 | 11 |
| 40% TCP solution (assumed) | Nov 1966 | | 13,000 | 13 |
| 40% TCP solution (assumed) | Nov 1966 | | 20,000 | 20 |
| 40% TCP solution (assumed) | Dec 1966 | | 21,000 | 21 |
| 40% TCP solution (assumed) | Jan 1967 | | 38,000 | 38 |
| Purified TCP (15%) | Sept 1967 | | 1,400 | 1.4 |
| Purified TCP | Nov 1967 | U | 1,000 | 1 |
| Purified TCP | Nov 1967 | U | 1,000 | 1 |
| 2,4,5-T | Nov 1967 | U | 1,000 | 1 |
| Purified TCP | Oct 1967 | U | 1,000 | 1 |
| Purified TCP | Oct 1967 | U | 1,000 | 1 |
| Purified TCP | Oct 1967 | | 900 | 0.9 |
| Purified TCP | Oct 1967 | | 1,100 | 1.1 |
| Purified TCP | Oct 1967 | U | 1,000 | 1 |
| Purified TCP | Oct 1967 | U | 1,000 | 1 |
| Purified TCP | Oct 1967 | U | 1,000 | 1 |
| Purified TCP | Oct 1967 | U | 500 | 0.5 |
| Purified TCP | Oct 1967 | U | 500 | 0.5 |
| Purified TCP | Oct 1967 | U | 500 | 0.5 |

78

| Sample Description[144] | Date | Flag[145] | TCDD concentration[146] | |
| | | | ppb | ppm |
| --- | --- | --- | --- | --- |
| Purified TCP solution | Oct 1967 | U | 500 | 0.5 |
| Purified TCP solution | Sept 1967 | U | 1,000 | 1 |
| Purified TCP solution | Sept 1967 | U | 1,000 | 1 |
| Purified TCP solution | Jan 1969 | U | 1,000 | 1 |
| Purified TCP solution | Nov 1967 | U | 1,000 | 1 |
| Purified TCP solution | Nov 1967 | U | 1,000 | 1 |
| Purified TCP solution | Nov 1967 | U | 1,000 | 1 |
| Purified TCP solution | Nov 1967 | U | 1,000 | 1 |
| Purified TCP solution | Nov 1967 | U | 1,000 | 1 |
| 2,4,5-T | Sept 1967 | | 1,500 | 1.5 |
| **Average[147]** | | | **14,493.45** | **14.49** |

---

[147] The average was calculated using the full detection limit for non-detect (U) results.

79

**ATTACHMENT 1**
**Resume of Michael Bock, PhD.**

80

ALCD-PUBCOM_0000659



# Michael Bock, PhD
Managing Director

**Expertise**
- Chemical forensics
- Statistics and data analysis
- Data visualization
- Fate and transport modeling
- Risk assessment

**Summary**

Dr. Bock is a Managing Director with over 25 years of experience in environmental science and consulting. He specializes in the investigation and assessment of contaminated marine and freshwater sediments, including statistical analysis, forensic analysis and source allocation, fate and transport modeling, species sensitivity toxicity evaluations, and ecological and human health risk assessment. His expertise includes using multivariate statistical data analysis such as multicriteria analysis and receptor modeling/source unmixing (e.g., principal components analysis, hierarchical cluster analysis, ratio analysis, least-squares mixing models, cosine-theta analysis, and polytopic vector analysis), to determine fingerprint patterns and allocate sources in environmental samples.

His environmental forensic work has focused extensively on discerning sources and the fate of polychlorinated biphenyls (PCBs), dioxins and furans (PCCD/Fs), Per- and polyfluoroalkyl substances (PFAS), polycyclic aromatic hydrocarbons (PAHs), and metals in rivers, lakes, ports, harbors, groundwater, and soils. He has developed multimedia fate and transport models that are used to model organic chemicals in the environment, during wastewater treatment, and in land applied biosolids. These models have been used to assess the concentration, persistence, treatability, bioaccumulation, and weathering of chemicals in the environment. His experience also includes exploratory data analysis and visualization; conventional, probabilistic, and Bayesian statistical analysis; simulation studies; mathematical modeling; computer programming and automation; database design and management; the critique of chemical analysis methods; data quality; and usability evaluations.

**Professional Experience**

**Environmental Forensics and Data Analysis**

- Forensic analysis of PFAS in multiple media including groundwater, soils, agricultural products, and biota: The work involved exploring the history of PFAS use and disposal and analyzing the geospatial distribution of PFAS in the environment and using multivariate statistical methods. The work included a weight-of-evidence evaluation of PFAS profiles, concentration gradients, disposal practices and historical records, and groundwater transport pathways.

- Forensic analysis of PFAS in groundwater and soils: The work involved exploring the distribution of PFAS in the environment and using multivariate statistical methods to compare the PFAS chemical profiles to possible sources. The project was conducted to define the extent of potential liabilities associated with a manufacturing facility. The work included a weight-of-evidence evaluation of PFAS profiles, concentration gradients, and groundwater and air transport pathways.

- Forensics analysis of PCDD/Fs in a complex estuary system with numerous potential sources: The work involved the evaluation and defense against legal claims that a single facility in a large industrial area is the only significant source of dioxins to the estuary system. The analysis focused on an evaluation of PCDD/F fingerprints in the sediments and associated with various chemical processes. An additional component of the work included the analysis of sediment fate and transport, sediment dating, and the presence of unique chemical tracers.

1

ALCD-PUBCOM_0000660

# Michael Bock, PhD

Managing Director



- Litigation over the alleged impacts of dioxins associated with a copper smelter: The work included a forensics analysis of the PCDD/Fs in house dust and tree bark alleged to have originated from Cerro operations. The case has progressed past the submission of expert reports and depositions, and a settlement was reached with the first set of plaintiffs during trial in January 2020. Additional cases are pending.

- Forensic analysis of PCB sources in soils in Toronto, CA defending a manufacturing company from claims related to the potential offsite migration of PCBs: The work involved the assessment of the mixture of Aroclors at the two properties, the potential for migration and weathering, and assessing the hypothetical link between the PCBs found on one property to other property. The case has progressed past the submission of expert reports and is currently in mediation.

- Forensics analysis of PFAS and other chemicals related to a warehouse fire: The work included a forensic analysis of various PFAS related impacts and other chemicals to a small urban waterway with the goal of delineating the area of impacts. The analysis was able to narrowly define the area of impacts and limit the remedial footprint.

- Forensic analysis of PAHs in sediments of a canal system: The analysis includes delineation of manufactured gas plant (MGP) related impacts in an urban canal system impacted by both point sources and non-point sources. The work focused on the multivariate analysis of alkylated PAHs and other potentially MGP related compounds.

- Forensic analysis of PAHs in soils associated with a Brownfields redevelopment site: The analysis focused on the delineation of MGP related impacts and association with remnant facility infrastructure. Negotiations of liability have reached settlement between the PRPs.

- Forensics analysis of PCDD/Fs and PCBs alleged to have migrated from disposal impoundments into complex river system: During the first phase of the work, supported the successful legal defense against claims regarding the primary waste impoundment. The second phase of the work involves legal claims associated with two waste impoundments and residential properties and is ongoing. The analysis includes multivariate analysis of congener profiles and source identification and source unmixing.

- Forensic analysis of PCBs alleged to the have migrated downgradient from a water drainage conveyance to a river system: The analysis included multivariate analysis of congener profiles and source identification, source unmixing, and the analysis of transport pathways. The project moved into litigation in 2018 and is ongoing.

- Allocation support of PCB impacts to marine mammals in an estuary system: The work included the identification of PCB profiles and the relative abundance of background and non-background PCB profiles in tissue.

- Evaluation of the spatial distribution of PCB congener profiles and the relative potency of these profiles: The work included the evaluation of sediments, birds, fish, and mammals.

- Forensics analysis of PCDD/Fs alleged to have migrated from an agricultural chemical mixing area to harbor sediments: Successfully negotiated with the Navy and the Justice Department to remove PCDD/Fs from the site allocation and remedy design phase of the work.

- PCB weathering study to characterize the alteration of the congener fingerprint due to physical processes: The analyses were used to examine the potential for the misidentification of PCB sources.

2

ALCD-PUBCOM_0000661

## Michael Bock, PhD

Managing Director



- Statistical analysis of fish fillet tissue: This work included conducting a detailed statistical analysis of fish fillet tissue and otolith for concentrations of mercury and selenium.

- Multivariate analyses of large environmental sampling datasets: These datasets contained multiple classes of organic chemicals in an estuary system to investigate the likely age and source of a pesticide hotspot and allocate the remedial action and costs among multiple parties.

- Evaluation of historical MGP processes: This work focused on reaction conditions, the formation of chemical by-products, and waste management.

- PCDD/F fingerprinting evaluation to ascertain the sources of dioxins and furans to a waste disposal pit: The focus of the analysis was the identification of the waste streams most likely responsible for the dioxins in the waste oil.

- PCB fingerprinting analysis: This work analyzed the sources and distributions of PCBs in a west coast harbor. The analyses were used to examine remedial allocations among potentially responsible parties.

- Forensic analyses of historical operations at two Ohio steel manufacturing facilities: The analyses included principal components analysis, bootstrapping and other advanced statistical fingerprinting analyses, and a critique of PCB analytical methods for Aroclors, congeners, and homologues. Data analysis included the description of chemical concentrations and their relationship to geographic area, matrix, sediment depth, and soil depth.

- Analysis of arsenic effluent loadings: Implemented a sampling program and statistical simulation study used to determine the most appropriate sampling interval and duration to characterize arsenic effluent loadings from a large European manufacturing facility.

- Analysis of trends in composition of metals: Used a weight-of-evidence approach involving multivariate statistical analyses, environmental sampling, and fate modeling to examine trends in the composition of metals in lichens. The composition of metals and their weathering in soils were found to be influenced by three factors—proximity to coal fired power plants, year, and season.

- Probabilistic analysis of failure rates of methane detectors installed in multiple residences: This work was conducted to optimize the frequency of replacement of the detectors prior to anticipated failure: Implemented bootstrap techniques in numerous projects in order to generate the most defensible upper confidence limits for use as exposure point concentrations in risk assessments.

- Temporal trends in contaminant concentrations in groundwater: Designed and executed the statistical approach to determine temporal trends in contaminant concentrations in groundwater as part of the five-year review process at a National Priority List (NPL) Superfund site in Louisiana. The results of the analysis, which indicated declining trends in the levels and spatial extent of the contamination, was accepted by the U.S. Environmental Protection Agency (EPA) with negligible comments.

- Temporal trend analyses of groundwater monitoring data: The data were collected from a Massachusetts site impacted by several chlorinated organic compounds in a bedrock aquifer. The results were used to refine the monitoring program and improve performance of the groundwater extraction system.

### Assessment of Sediments

- Investigation of the distribution of furans and other chemicals in the Tittabawassee and Saginaw Rivers in Michigan: Managed the project team responsible for the project databases, statistical analysis, geographic information system (GIS), and exploratory data analysis of the watershed.

3

# Michael Bock, PhD
Managing Director



Responsible for the management of the project library and the development of a searchable document database. Designed and managed the development of a client web site for interactive mapping and information exchange. Performed geospatial and forensic chemical analyses.

- Ecological risk assessment: Provided ecological risk assessment services on a major northeastern river where PCBs are the primary chemical of interest. Activities have included multivariate statistical analyses, food web modeling, critique of opposing parties' studies, and development of ecotoxicologically based remediation goals.

- Chemical exposures calculations due to sediment contaminants in a geographically and hydrodynamically diverse harbor complex: Exposures were calculated based on geographic relationships, water depths, and sediment depths. Created tables and figures to describe the distribution of chemicals, characterized exposure, and described the relationship between sediment contaminates and sediment type. Evaluated the effectiveness of multiple remedial alternatives.

- Field investigation of surface water and sediment sampling of a pond: Led the field investigation. Aided in the design of the sampling plan and coordinated with the laboratory for sample analysis requirements. Evaluated the results of the sediment and surface water investigation and helped formulate recommendations to the client.

- Characterization of digestive environments of marine benthic invertebrates: Designed and executed a study of the digestive environments and how digestive chemistry relates to the bioavailability of nutrients and chemicals in sediments. Investigated the influence of the speciation of metals *in vivo* enzyme activity and digestive uptake.

- Sediment transport on an intertidal sandflat: Designed and implemented a study to predict and measure sediment transport on an intertidal sandflat under a variety of weather conditions. Techniques used included dye tracer studies, sediment traps, suspended load profiles, and mathematical modeling.

- Interaction between clay minerals and organic matter: Designed and executed a study to examine the association between clay minerals and organic matter and how that interaction relates to the preservation of organic matter and chemicals. Techniques used included heavy liquid floatation, X-ray diffraction, enzymatic analysis, chemical analysis, and visible and electron microscopy.

- Benthic surveying in Delaware: Designed and implemented surveys of Delaware Inland Bays for benthic infauna. Conducted a benthic survey of Bethany Beach, Delaware. Samples were collected using grab samples and sediment cores and were preserved and processed in the laboratory for taxonomic classification.

**Fate and Transport Modeling**

- Evaluation of the environmental impacts of an industrial chemical: Designed and implemented a sub-watershed scale multimedia fugacity model combined with a flow network to predict concentration of bisphenol A (BPA). The model predicted the aquatic concentrations in watersheds throughout Germany.

- Probabilistic evaluation of the environmental impacts of an industrial chemical: Designed and implemented a watershed and sub-watershed scale multimedia fugacity model to predict risks to aquatic receptors. The model followed the fate and transport of the chemical via multiple release pathways, during wastewater treatment, and in the aquatic environment. The model predicted the range of exposures in watersheds throughout the continental U.S.

4

ALCD-PUBCOM_0000663

# Michael Bock, PhD
Managing Director



- Bioaccumulation models development: Developed multiple bioaccumulation models and bioaccumulation factors for metals and organic chemicals. The models have been used to support risk assessment and remedial design in soils and sediments.

- Probabilistic evaluation of the environmental impacts of a consumer chemical: Designed and implemented a coupled fugacity food web model to predict risks to ecological receptors due to the release of a consumer chemical. The model followed the fate and transport of a consumer chemical from release to wastewater treatment plants then to wildlife receptors. The model predicted the range of exposures and effects expected in watersheds throughout the continental U.S.

- Bioavailability of arsenic in soil: Designed and executed a study of the bioavailability in soil at a site in Oregon. Employed specialized laboratory analyses to quantify the fraction of arsenic present in soil that is available for uptake in the event of incidental soil ingestion by humans. Evaluated data quality, managed project database, and completed associated statistical and risk analyses.

- Development of soil cleanup goals for lead and arsenic: Used a weight-of-evidence approach involving statistical analyses, environmental sampling, and fate modeling to develop site-specific solubility constants for the development of soil cleanup goals for lead and arsenic at a site in Georgia. The complexity of the site required a consideration of site-specific chemistry and a careful examination of the data for outliers and anomalies.

## Oil and Gas

- Comparative Risk Assessment (CRA) Results Tool: Developed CRA Results Tool for evaluating response options for the API Subsea Dispersant Injection Program Committee. The tool integrates environmental exposures, population exposures, and population recovery for valued ecosystem components potentially exposure to oil released from a hypothetical deepwater blowout to evaluate response options such as subsea dispersant.

- Arctic Response Consequence Analysis Support Tables (ARCASTs): Developed ARCASTs, a pan-Arctic NEBA Support Tool developed for the International Association of Oil & Gas Producers (IOGP) Arctic Response Technology's Joint Industry Programme (JIP).

- Information management system: Assisted in developing a web-based information management system that compiles, evaluates, and facilitates access to publicly available data, reports, articles, and geospatial information related to baseline ecological and human use services provided within a large waterbody.

- Analysis of stressors to ecological resources in a large marine water body: The purpose of the analysis was to characterize the relative importance of unusual and infrequent events such as a large oil spill relative to other stressors.

- PAH weathering study to characterize the alteration of PAH profiles due to physical processes: The analyses were used to evaluate the potential for the misidentification of sources.

## Risk Assessment

- Re-evaluation of mercury toxicity to birds and fish: Assisted in the detailed re-evaluation of mercury toxicity. The analysis was based on a detailed review and reanalysis of the toxicity literature and has resulted in numerous presentations at scientific meetings and two peer reviewed publications.

- Dynamic population-based model: Updated and enhanced a dynamic population-based model designed to track consumer behavior, assess the risk associated with different behaviors, and

5

**Michael Bock, PhD**
Managing Director



predict mortality. The model is being used to assess the relative risks associated with certain legacy products and new alternative products.

- Information management system: Assisted in developing a web-based information management system that compiles, evaluates, and facilitates access to publicly available data, reports, articles, and geospatial information related to baseline ecological and human use services provided within a large waterbody.

- Statistical evaluation of the EPA attenuation factors database: The results of the analysis were used to develop scientifically valid recommendations for default attenuation factors for vapor intrusion into buildings as an alternative to the values proposed by EPA.

- Human health and ecological screening analyses: Designed and managed a customized database that automated human health and ecological screening analyses for 14 administrative orders on consent (AOCs) and five environmental media at a Department of Defense (DOD) site. Managed the verification and importation of a large quantity of DOD analytical data into the database. Facilitated negotiations between DOD and Ohio Environmental Protection Agency related to the screening values and format of the risk analyses. Managed production of over 200 data tables and reviewed those tables for clarity and accuracy. Developed export routines to provide data for the production of over 150 figures.

- Chemical reclassification: Assisted in the development of a proposal to reclassify chemicals under federal hazardous discharge regulations. Participated as a member of project team involved in the critical evaluation of the carcinogenic potential of 1,4-dioxane.

- Background screening levels: Developed background screening levels for trichloroethylene (TCE) in indoor air for one of the largest TCE-contaminated sites in the U.S. Assisted in negotiations with the state of Colorado to finalize methods and application of results for the purposes of determining levels above background.

- Hazardous Ranking System calculations: Assisted in the calculation of Hazardous Ranking System scores for several contaminated sites in New Jersey and Oregon.

- Risk-based site-specific criteria and remediation goals calculations: Calculated risk-based site-specific criteria and remediation goals for several contaminated sites located in Ohio, Oregon, Kentucky, and Massachusetts. Depending upon the needs and conditions of a given site, such goals were designed to ensure the health of residents, anglers, swimmers/waders and trespassers. In other cases, remediation goals were calculated to ensure the viability of populations and communities of ecological receptors, including ospreys, bald eagles, belted kingfishers, American robins, mink, fish, benthic invertebrates, raccoons, and muskrats.

- Environmental risk assessment (ERA) in Massachusetts: Assisted with the preparation of an ERA at an AOC located at Fort Devens, Massachusetts, in which TCE and daughter products were the primary chemicals of interest in groundwater. Aerobic biodegradation of those chlorinated compounds mobilized naturally occurring arsenic and magnesium in subsurface soils, creating potentially hazardous conditions at the downgradient groundwater-surface water interface.

- ERAs in Georgia: Member of the project team involved in preparation of several ERAs at AOCs located at Fort Gordon, Georgia. Participated in environmental investigations of soil, surface water, and sediment.

- Vapor intrusion analysis: Assisted with analyzing potential risks associated with vapor intrusion of tetrachloroethene (PCE), TCE, vinyl chloride, benzene, and other volatile organic compounds (VOCs) in subsurface soil and groundwater at sites across the country: Managed extensive

6

ALCD-PUBCOM_0000665

# Michael Bock, PhD

Managing Director



datasets containing soil gas, subsurface soil, groundwater, indoor air, and ambient air data. Evaluated data to allow discrimination among background contributions, surface infiltration, and vapor intrusion. Executed screening and advanced versions of Johnson and Ettinger's vapor intrusion model.

- Human health risk assessments analyses: Completed the data evaluation, management, database design, statistical analysis, dose estimation, risk calculations, and uncertainty analyses for human health risk assessments conducted under Superfund, Resource Conservation and Recovery Act (RCRA), and state cleanup programs throughout the Northeast and Midwestern U.S. Developed and implemented a standardized database and spreadsheet format optimized for risk assessment purposes. For example, examined potential risks posed by PAH contamination at an apartment complex in Wisconsin, as well as recreational and trespassing risks associated with PAHs at two MGP sites in New York.

| | |
|---|---|
| **Academic Qualifications** | PhD in Oceanography, University of Delaware, 1995 |
| | MS in Marine Studies, University of Delaware, 1992 |
| | BS in Marine Studies, University of South Carolina, 1989 |
| **Professional Training** | 40-Hour OSHA Hazardous Waste Operations (HAZWOPER) Safety Training |

**Publications**

French-McCay DP, Robinson H, Bock M, Crowley D, Schuler P, Rowe JJ. Counter-historical study of alternative dispersant use in the Deepwater Horizon oil spill response. Marine Pollution Bulletin. 2022 Jul 1;180:113778.

Fuchsman, P., Fetters, K., O'Connor, A., Bock, M., Henning, M., Brown, L., Mrdjen, I. and Stanton, K., 2022. Ecological Risk Analysis for Benzalkonium Chloride, Benzethonium Chloride, and Chloroxylenol in US Disinfecting and Sanitizing Products. Environmental Toxicology and Chemistry, 41(12), pp.3095-3115.

Bock, M.J., Brown, L.E., Wenning, R.J. and Bell, J.L. 2021. Sources of 2,3,7,8-tetrachlorodibenzo-p-dioxin and other dioxins in Lower Passaic River, NJ, Sediments. Environ Toxicol Chem. 40(5), pp. 1499-1519. https://doi.org/10.1002/etc.4974.

Pietari, J, J. Fenstermacher, M. Bock, R Chesler, N. Insua, S Mulrennan, R. Kelliher, J. Waters. 2021. Remediating, Insuring, and Litigating PFAS Claims. Journal of Emerging Issues in Litigation. 1(4):229-252. https://www.wilsonelser.com/writable/files/Attorney_Articles_PDFs/jeil_1-4_pietari_003_1_.pdf

Wegeberg S, Fritt-Rasmussen J, Gustavson K, Wenning RJ, Bock M. Oil Spill Response Planning in Cold and Warm Water Environments. InInternational Oil Spill Conference 2021 May (Vol. 2021, No. 1, p. 688879).

Reash, R., Friedrich, L., Bock, M., Halden, N. and Palace, V., 2019. Selenium and mercury in freshwater fish muscle tissue and otoliths: a comparative analysis. Environmental toxicology and chemistry. 38:1467-1475.

ALCD-PUBCOM_0000666

**Michael Bock, PhD**
Managing Director



French-McCay, D., D. Crowley, J. Rowe, M. Bock, H. Robinson, R. Wenning, A. H. Walker, J. Joeckel, and T. Parkerton. 2018. Comparative risk assessment of spill response options for a deepwater oil well blowout: Oil spill modeling. Marine Pollution Bulletin. 133:1001-1015.

Bock, M., H. Robinson, R. Wenning, D, French McCay, J. Rowe, A. H. Walker. 2018. Comparative risk assessment of spill response options for a deepwater oil well blowout: Relative risk methodology. Marine Pollution Bulletin. 133:984-1000.

Walker, A.H., M. McPeek, J. Joeckel, D. Scholz, D. French-McCay, J. Rowe, M. Bock, H. Robinson, and R. Wenning. 2018. Comparative risk assessment of spill response options for a deepwater oil well blowout: Stakeholder engagement. Marine Pollution Bulletin. 133:970-983.

Wenning, R.J., Robinson, H., Bock, M., Rempel-Hester, M.A. and Gardiner, W., 2018. Current practices and knowledge supporting oil spill risk assessment in the Arctic. Marine environmental research, 141, pp.289-304.

Fuchsman, P.C., Brown, L.E., Henning, M.H., Bock, M.J. and Magar, V.S., 2017. Toxicity reference values for methylmercury effects on avian reproduction: Critical review and analysis. Environmental toxicology and chemistry, 36(2), pp.294-319.

Lyndall, J., Barber, T., Mahaney, W., Bock, M. and Capdevielle, M., 2017. Evaluation of triclosan in Minnesota lakes and rivers: Part I–ecological risk assessment. Ecotoxicology and environmental safety, 142, pp.578-587.

Yost, L.J., Barber, T.R., Gentry, P.R., Bock, M.J., Lyndall, J.L., Capdevielle, M.C. and Slezak, B.P., 2017. Evaluation of triclosan in Minnesota lakes and rivers: Part II-human health risk assessment. Ecotoxicology and environmental safety, 142, pp.588-596.

P. Fuchsman, M. Henning, M. Sorenson, L. Brown, M. Bock, C. Beals, J. Lyndall, and V Magar. 2016. Critical perspectives on mercury toxicity reference values for protection of fish. Environ., Toxicol. Chem.

Yost, L.J., Barber, T.R., Gentry, P.R., Bock, M.J., Lyndall, J.L., Capdevielle, M.C. and Slezak, B.P., 2017. Evaluation of triclosan in Minnesota lakes and rivers: Part II-human health risk assessment. Ecotoxicology and environmental safety, 142, pp.588-596.

Johnson, G., Bock, M. 2014. Modeled PCB weathering series in principal components space: Considerations for multivariate chemical fingerprinting. In: Environmental Forensics Proceedings of the 2013 INEF Conference. Morrison, R.D., Sullivan, G (eds). Royal Society of Chemistry (RSC), Cambridge, UK. 117–124.

Song, S. S., F. C. Ramacciotti, B. A. Schnorr, M. J. Bock, C. M. Stubbs. 2011. Evaluation of EPA's empirical attenuation factors database. EM February 2011:22–25.

Bock, M., J. Lyndall, K. T. Barber, P. Fuchsman, E. Peruchon, and M. Capdevielle. 2010. Probabilistic application of a fugacity model to predict triclosan fate during wastewater treatment. Integ. Environ. Assess. Manage. 6:393–404.

8

# Michael Bock, PhD
Managing Director



Fuchsman, P., J. Lyndall, M. Bock, Barber, T., D. Lauren, T. Barber, K. Leigh, E. Peruchon, and M. Capdevielle. 2010. Terrestrial ecological risk evaluation for triclosan in land-applied biosolids. Integ. Environ. Assess. Manage. 6:405–418.

Lyndall, J., P. Fuchsman, M. Bock, T. Barber, D. Lauren, K. Leigh, E. Perruchon, and M. Capdevielle. 2010. Probabilistic risk evaluation for triclosan in surface water, sediments, and aquatic biota tissues. Integ. Environ. Assess. Manage. 6:419–440.

Fuchsman, P.C., T.R. Barber, and M.J. Bock. 2008. Effectiveness of various exposure metrics in defining dose-response relationships for mink (*Mustela vison*) exposed to Polychlorinated Biphenyls. AECT 54(1):130–144.

Wenning R.J, M Bock, M. Maier, and W.J. Luksemburg. 2006. PBDEs, PCDD/Fs, and PCBs in indoor house dust. Organohalogen Compounds. 67.

Fuchsman, P., M. Bock, L. Yeager, and T. Barber. 2005. How not to measure total organic carbon in soil and sediment. SETAC Globe. 6(3):33–34.

Stickney, J.A., S.L. Sager, J.R. Clarkson, L.A. Smith, B.J. Locey, M.J. Bock, R. Hartung, and S.F. Olp. 2003. An updated evaluation of the carcinogenic potential of 1,4-dioxane. Reg. Toxicol. Pharmacol. 38:183–195.

Smoot, J.C., L.M. Mayer, M.J. Bock, P.C. Wood, and R.H. Findlay. 2003. Structural identification of surfactants in gut fluid of the marine polychaete *Arenicola marina*. Mar. Ecol. Prog. Ser. 258:161–169.

Mayer, L.M., L. Benninger, M. Bock, D. DeMaster, Q. Roberts, and C. Martens. 2002. Mineral associations and nutritional quality of organic matter in shelf and upper slope sediments off Cape Hatteras, USA: A case of unusually high loadings. Deep-Sea Research 49:4587–4598.

Mayer, L.M., P.A. Jumars, M.J. Bock, Y. Vetter, and J.L. Schmidt. 2002. Two roads to sparagmos: Extracellular digestion of sedimentary food by bacterial infection vs. deposit feeding. Organism-Sediment Interactions. J.Y. Aller, S.A. Woodin, and R.C. Aller, eds. University of South Carolina Press, Columbia, South Carolina, pp. 335–347.

Chen, Z., L.M. Mayer, D.P. Weston, and M.J. Bock. 2001. Inhibition of digestive enzyme activities by copper in the guts of various marine benthic invertebrates. Environ. Toxicol. Chem. 21:1243–1248.

Mayer, L.M., D.P. Weston, and M.J. Bock. 2001. Benzo-a-pyrene and zinc solubilization by digestive fluids of benthic invertebrates – a cross-phyletic study. Environ. Toxicol. Chem. 20:1890–1900.

Bock, M.J. and L.M. Mayer. 2001. Mesodensity organo-clay associations in a near-shore sediment. Mar. Geol. 163:65–75.

Bock, M.J. and L.M. Mayer. 1999. Digestive plasticity of the marine benthic omnivore *Nereis virens*. J. Exp. Mar. Biol. Ecol. 240:77-92.

Bock, M.J. and D.C. Miller. 1999. Particle-size selectivity, gut volume, gut residence time and the response to a change in diet in deposit feeding polychaetes. Limnol. Oceanogr. 44:1132–1138.

ALCD-PUBCOM_0000668

# Michael Bock, PhD

Managing Director



Bock, M.J. and D.C. Miller. 1997. Particle-bound organic matter as a cue for suspension feeding in tentaculate polychaetes. J. Exp. Mar. Biol. Ecol. 215:65–80.

Bock, M.J. and D.C. Miller. 1996. Fluid flow and suspended particulates as determinants of polychaete feeding behavior. J. Mar. Res. 54:565–588.

Bock, M.J. and D. C. Miller. 1995. Storm effects on particulate food resources on an intertidal sandflat. J. Exp. Mar. Biol. Ecol. 187:81–101.

Bock, M.J. and D. C. Miller. 1994. Seston variability and daily growth in *Mercenaria mercenaria* on an intertidal sandflat. Mar. Ecol. Prog. Ser. 114:117–127.

Miller, D.C., M.J. Bock, and E.J. Turner. 1992. Deposit and suspension feeding in oscillatory flows and sediment fluxes. J. Mar. Res. 50:489–520

**Presentations**    Michael Bock and Nicholas D. Rose. Forensic Analysis of PCDD/Fs and PCBs in the Lower Two Miles of the Passaic River, NJ. Presentation, Battelle - Eleventh International Conference on Remediation and Management of Contaminated Sediments, Austin, TX, January 2023.

Rose, Nicholas D. and Michael Bock. A Modeling Approach for Estimating Background Concentrations in Large Urban Contaminated Sediment Sites. Presentation, Battelle - Eleventh International Conference on Remediation and Management of Contaminated Sediments, Austin, TX, January 2023.

Bock, Michael and Nicholas D. Rose. Is PCA for statistical fingerprinting still relevant in the age of machine learning? SETAC North American, Pittsburgh, PA, November 16, 2022.

Warlow, Erin, Nicholas D. Rose, and Michael Bock. A Weight of Evidence Approach to Filling Data Gaps in Forensic Analyses for Contaminant Source Identification. SETAC North American, Pittsburgh, PA, November 16, 2022.

Bock. M, N. Rose, T. Negley. 2022. The "unique" challenges associated with applying statistical fingerprinting to PFAS. Battelle: Twelfth International Conference on Remediation of Chlorinated and Recalcitrant Compounds. May 22-26. Palm Springs, CA.

Bock, M., Robinson, H., Wenning, R., French-McCay, D., Rowe, J., and A.H. Walker. 2021. A tool for comparing relative risks to ecological components associated with different oil spill response options. IOSC 2021.

Bock, M., and L. Brown. 2019. The importance of validating source identification results and validating alternative hypotheses in a forensic investigation. Battelle Sediments Conference. February 11-14. New Orleans, LA.

Bock, M., Robinson, H., Wenning, R., French-McCay, D., Rowe, J., and A.H. Walker. 2018. Comparing relative risks to ecological components when SSDI is included in oil spill response. Clean Gulf 2018 Meeting. November 13-15, New Orleans, LA.

Bock, M., and L. Brown. 2018. Emerging statistical methods for source apportionment. INEF Annual Meeting. June 25-27. Salt Lake City, UT.

10

**Michael Bock, PhD**
Managing Director



French-McCay, D., Rowe, J., Bock, M., Wenning, R., Robinson, H., and A.H. Walker. 2017. Oil spill modeling for a comparative risk assessment (CRA) of response options for a deepwater oil release. Society for Environmental Toxicology and Chemistry (SETAC) North America 38th Annual Meeting. November 12-16, Minneapolis, MN.

Bock, M., Wenning, R., Robinson, H., French-McCay, D., Rowe, J., and A.H. Walker. 2017. Comparative risk assessment (CRA) of response options for a deepwater oil release. Society for Environmental Toxicology and Chemistry (SETAC) North America 38th Annual Meeting. November 12-16, Minneapolis, MN.

Bock, M., Richard, R., Backus, J., Heise, L., and R. Baranek. 2017. Use of a weight-of-evidence approach to assess sulphide effects on wild rice in Minnesota. Society for Environmental Toxicology and Chemistry (SETAC) North America 38th Annual Meeting. November 12-16, Minneapolis, MN.

Bock, M., Fuchsman, P., O'Conner, A., Capdevielle, M., Fried, K. 2017. Chlorinated triclosan derivatives and dioxin transformation products: pathways, ecological significance and risk communication. Society for Environmental Toxicology and Chemistry (SETAC) North America 38th Annual Meeting. November 12-16, Minneapolis, MN.

Bock, M., and P. Fuchsman. 2016. Advances in the fugacity modeling of emerging substances in aquatic systems. Society for Environmental Toxicology and Chemistry (SETAC) North America 37th Annual Meeting. November 6–10, Orlando, FL.

Bock, M., R. Reash, J. Goodrich-Mahoney, L. Friedrich, and N. Halden. 2016. Comparison of tissue mercury and selenium in fish otoliths and fillets: Can we reconstruct the past? Society for Environmental Toxicology and Chemistry (SETAC) North America 37th Annual Meeting. November 6–10, Orlando, FL.

P. Fuchsman, M. Henning, L. Brown, M. Bock, and V. Magar. 2016. Methylmercury effects on bird reproduction: critical review and identification of toxicity reference values. Society for Environmental Toxicology and Chemistry (SETAC) North America 37th Annual Meeting. November 6–10, Orlando, FL.

Bock, M., M Bunge, M. Vosteen, I. Gutiérrez, J. Wölz, P. Stoldt, E Mihaich, S. Gestermann, R. Werner. 2016. FlowEQ – A coupled flow-network and fugacity based fate and transport model for the assessment of bisphenol A in the environment. SETAC Europe Annual Meeting. Nates, France.

Bock, M., 2015. Statistical fingerprinting and a line of evidence in a forensic evaluation. Invited Short Course. INEF Annual Meeting. Toronto, CA.

Bock, M., 2015. "Outliers" in multivariate statistical fingerprinting. INEF Annual Meeting. August 3-6, Toronto CA.

Barber, T., M. Bock, J. Lyndall, M. Capdevielle, and M. Vandeven. 2014. Species Sensitivity Distributions: An evaluation of methods using triclosan as a case study. Society for Environmental Toxicology and Chemistry (SETAC) Europe 25th Annual Meeting. May 3–7, Barcelona, Spain.

ALCD-PUBCOM_0000670

**Michael Bock, PhD**
Managing Director



Bock, M., T. Barber, P. Fuchsman, M. Capdevielle, and R. Hartsook. 2014. Triclosan transformation products: Environmental risk evaluation. Society for Environmental Toxicology and Chemistry (SETAC) Europe 25th Annual Meeting. May 3–7, Barcelona, Spain.

Bock, M., T. Barber, and L. Brown. 2014. A Fugacity-based model to predict PAH weathering and its implications for predicting future sediment toxicity. Society for Environmental Toxicology and Chemistry (SETAC) North America 35th annual meeting. November 9–13, Vancouver, BC, Canada.

Bock, M., T. Barber, P. Fuchsman, M. Capdevielle, and R. Hartsook. 2014. Triclosan transformation products: Environmental risk evaluation. Society for Environmental Toxicology and Chemistry (SETAC) North America 35th Annual Meeting. November 9–13, Vancouver, BC, Canada.

Lyndall, J., T. Barber, W. Mahaney, M. Bock, M. Capdevielle, and B. Slezak. 2014. Evaluation of triclosan risk in Minnesota lakes and rivers. Society for Environmental Toxicology and Chemistry (SETAC) North America 35th Annual Meeting. November 9–13, Vancouver, BC, Canada.

Yost, L, T. Barber, R. Gentry, M. Bock, M. Capdevielle, and B. Slezak. 2014. Assessment of potential human health risk of triclosan, a personal care product ingredient in the Minnesota aquatic environment. Society for Environmental Toxicology and Chemistry (SETAC) North America 35th Annual Meeting. November 9–13, Vancouver, BC, Canada.

Fuchsman, P., M. Sorensen, L. Brown, M. Bock, A. Daniel, C. Beals, V. Magar, M. Henning. 2014. Are methylmercury toxicity reference values predictive of effects on fish population? Society for Environmental Toxicology and Chemistry (SETAC) North America 35th Annual Meeting. November 9–13, Vancouver, BC, Canada.

Fuchsman, P., W. Mahoney, L. Brown, M. Ferguson, M. Bock, K. Leigh, and M. Henning. 2014. PCB effects on bird reproduction: Genetics, laboratory exposures, and field studies. Society for Environmental Toxicology and Chemistry (SETAC) North America 35th Annual Meeting. November 9–13, Vancouver, BC, Canada.

Barber, T. M. Bock, J. Lyndall, M. Capdevielle, and M. Vandeven. 2014. Species sensitivity distributions: An evaluation of methods using triclosan as a case study. Society for Environmental Toxicology and Chemistry (SETAC) North America 35th Annual Meeting. November 9–13, Vancouver, BC, Canada.

Fuchsman, P., L. Brown, M. Bock, M. Travers, V. Magar, J. Kubitz, C. Pfeifer, and M. Darr. 2014. Bioavailability and toxicity of PAHs and metals in sediments of Duck and Otter Creeks, Ohio. Society for Environmental Toxicology and Chemistry (SETAC) North America 35th Annual Meeting. November 9–13, Vancouver, BC, Canada.

Bock, M. A. Gevertz, T. Barber. 2011. The mathematical estimation of baseline concentrations of metals in sediments based on univariate distributions and receptor modeling. Presentation at SETAC North America 32nd Annual Meeting. November 13-17, Boston, Massachusetts.

Barber, T., M. Bock, P.Fuchsman, J. Lyndall, M. Capdevielle. 2011. An aquatic and terrestrial ecological risk assessment for triclosan. Presentation at SETAC North America 32nd Annual Meeting. November 13-17, Boston, Massachusetts.

12

# Michael Bock, PhD

Managing Director



G. Johnson, and M. Bock. 2011. PCB volatilization and dechlorination series in principal components space: Considerations for receptor model interpretation. Invited Presentation. American Chemical Society Fall 2011 National Meeting & Exposition. August 28 – Sept 1. San Antonio, Texas.

Bock, M., G. Johnson, J. Chiarenzelli, and V. Magar. 2010. The weathering of Aroclor 1242 and source identification: Simulation, laboratory and field results. Platform presentation given at Society of Environmental Toxicology and Chemistry (SETAC) North America 31st Annual Meeting, November 7-11, Portland, Oregon.

Bock, M., M.H. Henning, P. Fuchsman, and A. Glessner. 2009. Strengthening risk conclusions with an analysis of fish fitness and sex ratios in the St. Clair River. 2009 SETAC Meeting.

Henning, M. H., A.R. Glessner, K.S. Wells, and M.J. Bock. 2009. Integration of geospatial and risk-based analyses to prioritize sediment management actions for the St. Clair River Area of Concern. 2009 SETAC Meeting.

Bock, M. J, E. H Martin, T. R. Barber, and M. J. Ferguson. 2009. The estimation of baseline metals concentrations in sediments from New York/New Jersey Harbor. Battelle: Fifth International Conference on Remediation of Contaminated Sediments, Jacksonville, FL.

Henning, M.H., D. Pelletier, A. Glessner, M. Bock, V. Magar, and R. Wenning. 2009. Current conditions in the Saginaw River, its floodplain, and Inner Saginaw Bay. Battelle: Fifth International Conference on Remediation of Contaminated Sediments, Jacksonville, FL.

Lyndall, J. L., M.J. Bock, T. R. Barber, and D. Lauren. 2008. Model for emerging contaminants. Short Course presented at 2008 HDC-SETAC. Seton Hall University. Orange NJ. May 8-9.

M.J. Bock, J. Lyndall, and T.R. Barber. 2008. Application of a probabilistic, fugacity-based model to predict the fate of consumer products in Wastewater Treatment Plants (WWTP) and in land applied biosolids. 2008 NAC-SETAC Meeting.

Bock, M.J., E. Martin, M. Henning, A. Piper, T. Barber, and R. Santiago. 2007. An integrated approach to the management of contaminated harbour sediment: Peninsula Harbour remediation goals, management areas, and residual risk. 2007 National Forum on Contaminants in Fish. Portland, Maine July 23-26.

Lawton, J., T. Barber, M. Bock, H. Verhhar, and M. Capdevielle. 2007. Fate and partitioning of Triclosan in wastewater treatment processing. 2007 SETAC Meeting.

Bock, M., E. Martin, M. Henning, and A. Piper. 2007. An integrated approach to the management of contaminated harbour sediment: Peninsula Harbor remediation goals, management areas, and residual risk. 2007 SETAC Meeting.

Lawton, J.C., T.R. Barber, K.B. Leigh, M.J. Bock, H. Verhaar, and M.C. Capdevielle. 2006. Aquatic risk assessment for triclosan. 2006 SETAC Meeting.

Leigh, K.B., M.H. Henning, M.J. Bock, and M.C. Capdevielle. 2006. Probabilistic exposure distributions developed for the uptake of triclosan by representative avian species in freshwater aquatic environments. 2006 SETAC Meeting.

13

**Michael Bock, PhD**
Managing Director



Fuchsman, P., T.R. Barber, K.B. Leigh, M.J. Ferguson, and M.J. Bock. 2006. Inter-laboratory comparisons of PCB analyses in sediment: Implications for site characterization and risk assessment. 2006 SETAC Meeting.

Bock, M.J., T.R. Barber, M. Ferguson, and M. Capdevielle. 2006. Assessing the fate of chemicals in consumer products using fugacity modeling within a probabilistic framework. 2006 SETAC Meeting.

Bock, M.J., T.R. Barber, and M. Ferguson. 2006. FUGAWEB, a probabilistic fugacity and food web model for assessing ecological risks associated with consumer products. 2006 NAC SETAC.

Reash, R.J., R.E. Shownman, M.J. Bock, and K. Lohman. 2005. Mercury and other trace metals in lichen samples collected near a power plant cluster: Assessment of near-field local deposition. 8th International Conference on Mercury as a Global Pollutant, Aug 2006.

Reash, R.J., R.E. Shownman, and M.J. Bock. 2005. Lichens as bioindicators of emission deposition from coal-fired power plants: A review and results of recent (2004-2005) assessments. Bioindicators 2006.

Bock, M.J. and T. R. Barber. 2005. Statistical fingerprinting of polycyclic aromatic hydrocarbons in environmental samples: A weight of evidence approach. 2005 SETAC Meeting.

Bock, M.J. 2005. Statistical fingerprinting of polycyclic aromatic hydrocarbon sources in environmental samples: A weight of evidence approach. 2005 NAC SETAC Meeting.

Bock, M.J., N. Weinberg, and S. Sager. 2004. The selection of sampling and analysis methods for indoor air evaluations. 2004 SRA Meeting.

Bock, M.J., L.M. Mayer, and D.L. Weston. 1999. Dietary effects on the digestive chemistry of benthic polychaetes: Enzymes and surfactants. 1999 ASLO Aquatic Sciences Meeting, Invited.

Zhen, C., L.M. Mayer, M.J. Bock, D. Weston, R.F.L. Self, and P.A. Jumars. 1998. Cu inhibition of digestive enzymes of deposit feeders: Implications for changing benthic community structure. 1998 SETAC Meeting.

Weston, D.P., L.M. Mayer, L. Gravitz, and M.J. Bock. 1998. A cross-phyletic comparison of contaminant bioavailability. 1998 SETAC Meeting.

Mayer, L.M., P.A. Jumars, M.J. Bock, Y. Vetter, and J. Schmidt. 1998. Laundering sediment: Contrasting digestive strategies of deposit feeders and bacteria. 1998 Belle Baruch Institute Organism-Sediment Interactions Symposium.

Bock, M.J. 1998. SURFS UP: Worms in Waves. 1998 Darling Marine Center Summer Seminar Series.

Bock, M.J. and L.M. Mayer. 1997. Plasticity in the digestive chemistry of a benthic omnivore, *Neries virens*. 1997 Benthic Ecology Meetings.

Mayer, L.M., M.J. Bock, D. DeMaster, E. Canuel, and L. Benninger. 1996. Sedimentary burial of organic carbon: I. Is slope burial at levels above those predicted by grain size? II. The river-ocean interface. 1996 DOE Ocean Margins Program Meeting.

14

**Michael Bock, PhD**
Managing Director



Bock, M.J. and D.C. Miller. 1996. Particle-bound organic matter as a cue for suspension feeding in polychaetes. 1996 Benthic Ecology Meetings.

15

ALCD-PUBCOM_0000674

# APPENDIX B.2
## Carl Edlund Declaration

ALCD-PUBCOM_0000675

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| Plaintiff, | )    Civil Action No. 2:22-cv-7326 |
| | ) |
| v. | ) |
| | ) |
| ALDEN LEEDS, INC., *et al.* | ) |
| | ) |
| Defendants. | ) |
| | ) |

## DECLARATION OF CARL E. EDLUND

1

ALCD-PUBCOM_0000676

## TABLE OF CONTENTS

PURPOSE OF THIS DECLARATION ................................................................. 3

QUALIFICATIONS............................................................................................4

SUMMARY OF OPINIONS.................................................................................5

SUPPORTING INFORMATION FOR OPINIONS....................................................6
    I.     OPINION 1 ................................................................................6
    II.    OPINION 2 ................................................................................7
    III.   OPINION 3 ................................................................................8
    IV.   OPINION 4 ................................................................................9

REFERENCES...................................................................................................11

Attachment 1 – Resume of Carl E. Edlund

2

ALCD-PUBCOM_0000677

## PURPOSE OF THIS DECLARATION

Pursuant to 28 U.S.C. § 1746, I, Carl E. Edlund, declare the following:

1.      I have been retained by Langsam Stevens Silver and Hollaender LLP (LSSH) on behalf of the Occidental Chemical Corporation (OCC) to provide expert opinions related to the Diamond Alkali Superfund Site (OU2), specifically the application of the Comprehensive Environmental response Compensation and Liability Act (CERCLA) to the Diamond Alkali Superfund site. I reserve the right to amend or supplement my opinions as additional information. becomes available. I have reviewed the materials referenced in the attached list of documents. Based on this review and my knowledge and experience in the environmental regulatory field, I have responded to questions submitted to me below.

2.      My assignment included providing expert responses to the following questions:

   **I.   What is the role of the RI/FS at Superfund Sites?**

   **II.  What is the role of the risk assessment process as part of the RI/FS?**

   **III. What is the role of the PRGs in determining what remedy will be selected for the Site?**

   **IV.  Can risks to human health and the environment from individual COCs be compared to one another in the form of relative risks? For example, can one propose a relative risk number or relative risk values among COCs?**

3.      If asked to testify before the District Court of the District of New Jersey, my testimony would be consistent with this declaration.

3

ALCD-PUBCOM_0000678

## QUALIFICATIONS

4.      I invested all my 50-year career (from 1969 to 2019) with the federal government solving

environmental pollution problems on the land, water, and air.  I held positions with progressively

increased responsibility and impact. In the last 35 years of my career, I was the Region 6 Superfund

Branch Chief (1984 to 1999), the Director of the Region 6 Air, Waste and Toxics Division (1999

to 2013) and the Director of the Region 6 Superfund and Emergency Response Division (2013 to

2019). During these periods, I directed hundreds of hazardous waste site screenings, Removal

Actions, remedial investigations, risk assessments, feasibility studies, selection of remedies,

design and construction of remedies and post construction reuse.  This work was over 100 National

Priorities List Superfund sites and represents over $4 billion in investigation  and remediation.

5.      My resume, which includes a list of my work experience and publications, is presented in

Attachment 1.

4

ALCD-PUBCOM_0000679

## SUMMARY OF OPINIONS

6.    **Opinion 1:** At Superfund sites, the RI/FS process defines the nature and extent of contamination, the risk to human health and the environment that contaminants pose, preliminary remediation goals, and the feasibility of possible Remedial Actions.

7.    **Opinion 2:** All COPCs are considered when selecting a remedy and no single COC drives a remedy.

8.    **Opinion 3:** The ROD RGs are based on the PRGs contained in the Proposed Plan and application of the NCP Remedy selection criteria. The PRGs are a foundational element of every remedy proposed in the FS (except for the no action option) and the Remedial Goals embody the finalized PRGs for a given site. COCs must be considered and remediated to their associated Remedial Goals for a remedy to be completed.

9.    **Opinion 4:** Risks to human health and the environment from individual COCs cannot be simply added or made into ratios such as Relative Risk Numbers or Relative Risk ratios because different COCs have different effects on humans and the environment. This also means that one COC cannot present X% higher [or lower] risk than another COC.

5

ALCD-PUBCOM_0000680

## SUPPORTING INFORMATION FOR OPINIONS

**Opinion 1:    At Superfund sites, the RI/FS process defines the nature and extent of contamination, the risk to human health and the environment that contaminants pose, preliminary remediation goals, and the feasibility of possible Remedial Actions.**

10.    The purpose of the Remedial Investigation (RI) is to characterize the nature and extent of contamination at a Superfund site and the purpose of the Feasibility Study (FS) is to evaluate potential remedies for the site.  These are closely linked evaluations.

11.    The RI requires iterative sampling and analysis of contaminants in a variety of media to identify Contaminants of Potential Concern (COPCs).  Part of the RI is a Risk Assessment of individual chemicals to assess whether exposure causes risk to human health or the environment; those that do are COPCs that need to be evaluated for potential remedial action.  From this evaluation, Preliminary Remediation Goals (PRGs) are drafted.  PRGs account for the risk of a COPC in that EPA evaluates the risk posed by an unremediated COPC in the risk assessment and selects PRGs that result in an acceptable level of risk.  PRGs can change throughout the RI/FS process as more information becomes available from site studies.

12.    The FS evaluates alternative remedial actions to address risks from individual COPCs. The FS may require treatability studies, geotextile evaluation, and other physical testing.  Except for the NCP required no action option, all FS options must be protective of human health and the environment.  Other factors include whether there are applicable or relevant standards to be met (i.e., ARARs); long term protectiveness and permanence; reduction of toxicity, mobility, or volume; short term effectiveness; implementability; and cost. The results of the RI/FS evaluations are then used to prepare a Proposed Plan for the site for State and public review.  After responding to State and public comment, the Record of Decision (ROD) is signed or a revised proposed plan

6

ALCD-PUBCOM_0000681

is issued if comments are significant. The ROD defines the remedy, remediation goals, and projected costs of implementing the remedy. The COPCs identified in the RI process are finalized as Contaminants of Concern (COCs) in the ROD.

**Opinion 2: All COPCs are considered when selecting a remedy and no single COC drives a remedy.**

13.     COPCs are considered when selecting and proposing remedies in the Proposed Plan. Each remedy evaluated, at a minimum, must result in site conditions that are protective of human health and the environment. This means that each evaluated remedy must consider and theoretically remediate each and every COPC, taking into account specific site conditions.

14.     Similarly, COPCs are a key consideration when selecting the final remedy.[1] And much like the Proposed Plan, the selected final remedy must be protective of human health and the environment. So the final remedy must sufficiently remediate <u>every</u> COC so that the RGs are met.

15.     No single COC can "drive" a remedy. Instead, the NCP, policy, and guidance all call for the selected remedy to address <u>all</u> COCs identified in the ROD.

16.     In all my years of experience, I have never seen a site with multiple COCs where the remedy is "driven" by a single COC.

---

[1] COPCs become COCs when the ROD is finalized, so a COC is not informative of the remedy selection itself but are informative as to the conclusion of the remedy. Different persons may use different terminology to describe COCs and COPCs in this regard.

7

ALCD-PUBCOM_0000682

**Opinion 3: The ROD RGs are based on the PRGs contained in the Proposed Plan and application of the NCP Remedy selection criteria. The PRGs are a foundational element of every remedy proposed in the FS (except for the no action option) and the Remedial Goals embody the finalized PRGs for a given site. COCs must be considered and remediated to their associated Remedial Goals for a remedy to be completed.**

17.     PRGs are developed for each COPC by evaluating their individual risks.  COCs often impact different receptors and pathways.  Every COC that is above baseline risk is assessed for potential remedial action. PRGs are then associated with each COC.  PRGs remain preliminary until they are subject to State and public review of the Proposed Plan.  After taking into consideration comments, PRGs are made into RGs by the signing of the Record of Decision. PRGs form a foundational element for remedy selection at a given site because the selected remedy must result in concentrations at or below the finalized RGs.

18.     In addition to guidance and regulations, RGs, site specific technical considerations play at least some role in remedy selection. Aquatic sites, such as riverbeds, wetlands, and estuaries require consideration of whether COC's are tightly bound to sediments and whether COC's are resuspended in the water column. The Passaic River is an aquatic site where these factors were considered.  All COCs were determined to be tightly bound in sediments and all COCs were found to be resuspended in the water column. This means that, while they have individual remediation goals, COCs cannot be remediated separately.

19.     In my decades of addressing Superfund sites, I have not seen an instance where a single COC, let alone multiple COCs, are not considered in the remedy selection process.

8

ALCD-PUBCOM_0000683

**Opinion 4: Risks to human health and the environment from individual COCs cannot be simply added or made into ratios such as Relative Risk Numbers or Relative Risk ratios because different COCs have different effects on humans and the environment. This also means that one COC cannot present X% higher [or lower] risk than another COC.**

20.    Assessment of risks from COC's to human health and the environment is built on several progressive evaluations under the National Contingency Plan:

> **I.** Evaluations begin with a Preliminary Assessment (PA) of potential COC's at a hazardous waste site from business records or permit information without physical sampling.

> **II.** This is followed by one or more Site Investigations (SI) studies that that include sampling of potential COC's. The SI studies will typically be followed by a Removal Site Investigation to evaluate whether CERCLA Removal Authorities should be invoked to remove highly toxic COCs.

> **III.** All these studies are evaluated to determine whether a Hazard Ranking Score (HRS) of contamination is high enough for EPA to publicly propose to include the site on the National Priorities List.

> **IV.** Whether conducted by the PRPs or EPA One or more RIs will be conducted to assess the nature and extent of contamination at the site. This includes much more comprehensive testing of COPCs and the excess risk posed by COPC's is defined. PRG's and Baseline Risks are drafted for individual COPCs in the RI study. The FS then examines ranges of options to deal with the PRGs of COPC's.

> **V.** A Proposed Plan is then prepared that includes all the information derived from the studies on the nature and extent of contamination of COPC's, their individual

9

PRGs, and feasibility of remedial options. The Proposed Plan contains EPA's evaluation of the NCP's 9 criteria that govern remedy selection.

VI. After public comment is assessed and modifications, if any, are incorporated into the plan, the ROD is signed. The ROD defines the remedy, projected costs, and RGs.

21.    Different COC's have different effects on humans and the ecosystem, and may affect one or more receptors. All risks including cancer, non-cancer, human and ecological impacts need to be assessed as part of the Remedial Investigation risk assessment. The COCs at the Diamond Alkali site affect one or more different receptors. For example, PolyChlorinated BiPhenols (PCBs) bio-accumulate in fish and crabs and are classified as a probable human carcinogen. PCBs can also cause learning, developmental and behavioral problems in children exposed to the chemical, and anemia, injuries to the stomach, liver and thyroid gland, and reproduction problems in any person exposed. As another example, DDT and its breakdown products also bioaccumulate in fish and crab but also affect reproduction in birds through thinning eggshells. The foregoing shows that risks from each COC have different impacts: some affect human health in terms of excess cancer risk and/or a variety of non-cancer maladies and some COCs pose risks to the environment inclusive or exclusive of human health impacts. For this reason, simple aggregations of risk from each different COC cannot be meaningful. For the same reason, ratios that portray one COC as a percentage of overall site risk (such as relative risk numbers) are not meaningful.

22.    Risks from mixtures of different COC's are not simply additive due to many factors including routes of exposure, ingestion or absorption, and varying concentrations. Evaluations of risk do attempt to categorize contaminants in ways that allow relative comparison for a single type of COC. For example, the carcinogenic potential of different dioxin congeners can be expressed

10

as Toxicity Equivalent Factors (TEF) or Toxic Equivalency Quotients (TEQ), allowing comparison of the net impact of the different congeners of dioxin. However, the combined risk from two or more different COC's cannot be expressed as the simple addition of COC risks. So the TEQs or TEFs of dioxin cannot be simply added to the risks of, for example, Mercury, to create a total risk number.

23.    To illustrate the problem in comparing risks, consider a hypothetical aquatic site with only 2 COCs: COC A poses only a lifetime human excess lifetime cancer risk of $10^{-3}$ and COC B solely damages 1,000 acres of the ecosystem. Both COCs have separate Remediation Goals but their risks cannot be directly compared. It is not meaningful to say COC A has X percent of COC B's risk or that COC B risks are Y percent of total site risks. Most COC's also have more than a single kind of risk compounding the problematic comparison. This is the reason that PRGs and RGs are developed for individual COCs and represent the threshold requirement that the remedy for each COC needs to protect human health and the environment.


I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED on March 21, 2023

_____

Carl E. Edlund

11

ALCD-PUBCOM_0000686

# Attachment #1: Resume

## Carl Edlund P.E. [RET]

### Environmental Protection Agency Charter Member

Carl Edlund began working on environmental issues in 1968 at the National Air Pollution Control Agency. In 1970, the Environmental Protection Agency was formed; Carl was among the first EPA employees. His first plan was to work at the EPA for a brief period and then move on to other opportunities. Instead, he stayed on until he retired from the EPA in 2019 after 50 years of government service. The reasons that he stayed with the EPA are that the problems he encountered were wide, complex, and challenging. Developing solutions to these problems and seeing measurable improvement to the environment was deeply satisfying.

As a new EPA staff engineer in Washington, Carl conducted an incinerator stack testing program to determine if prospective purchases could meet pollution standards. He also authored studies of air pollution from federal installations in Washington D.C. and several other cities. These studies became a component of State and local air quality plans. After several years, he became a member of a national task force that successfully reduced air pollution from steel mills.

In 1977, Carl transferred to EPA's Southwest Regional Office in Dallas that has jurisdiction in Texas, Louisiana, Arkansas, Oklahoma, New Mexico, and 66 federally recognized Tribes. His first assignment was to oversee compliance with air pollution regulations. His biggest case was the largest civil settlement in the agency for over 10 years. His next assignment was to manage funding of the Regional Office and resolve audit issues in grants. Over a 3-year period, he managed resolution of over one billion dollars in grant funds. His next assignment was to manage federally funded cleanups hazardous waste sites under of the Superfund program. Over a 15-year period he cleaned up of over 100 toxic waste sites and made many of them available for sustainable reuse.

In 1999, Carl was inducted into the Senior Executive Service and selected to direct the Region's Air, Waste and Toxics programs. In the Air program, the 50 federally approved State and Local air quality plans he and his staff negotiated resulted in measurable air quality improvements throughout the Region and especially in fence line communities. In the Waste program, his staff developed the Ready-For-Reuse program to stimulate the restoration of formerly contaminated industrial properties to productive, environmentally sustainable reuse. In Toxics programs, he and his staff developed separate initiatives for: indoor air pollution; lead paint; children's health; asbestos abatement; pesticide worker training and pesticide misuse.

In 2013, Carl returned to head the Superfund and Emergency Response Division. In addition to toxic site cleanup, he directed responses to natural disasters such as support to Texas in responding to the climate change enhanced Hurricane Harvey. Man-made disasters also required attention such as the safe disposal of 20 million pounds of abandoned munitions in danger of self-ignition in a small Louisiana community. He expanded the roles of tribal environmental programs in numerous ways; most significantly enabling the Quapaw Tribe to conduct federally funded Superfund cleanup on their tribal lands.

Carl was an adjunct professor at Southern Methodist University for 10 years and is now a member of their Civil and Environmental Engineering Advisory Board. He is a board member of the Environmental Protection Agency Alumni Association.

# APPENDIX B.3

Dennis Farley Declaration

ALCD-PUBCOM_0000688

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
NEWARK VICINAGE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Civil Action No. 2:22-cv-7326 |
| Plaintiff, | ) ) | |
| v. | ) ) | **DECLARATION OF DENNIS P. FARLEY** |
| ALDEN LEEDS, INC., *et al.* | ) ) | |
| Defendants. | ) ) | |

**DECLARATION OF DENNIS FARLEY**

1

ALCD-PUBCOM_0000689

## TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................................... 2

PURPOSE OF THIS DECLARATION ................................................................ 4

SUMMARY OF OPINIONS ................................................................................ 6

Opinion 1: Batson does not appropriately consider the historical fact
record in determining a Culpability Factor for parties subject to
the allocation. ................................................................................. 6

Opinion 2: Baston's assessment of a Culpability Factor and
assignment of Culpability scores is not valid..................................... 6

SUPPORTING INFORMATION FOR OPINIONS ............................................ 7

Opinion 1: Batson does not appropriately consider the historical fact
record in determining a Culpability Factor for parties subject to
the allocation. ................................................................................. 7

A.    Witness accounts of historical operations and discharges
at certain sites reflect highly culpable conduct, but
Batson ignores or was not provided that evidence. ................. 9

1.    The Legacy Vulcan/McKesson Site.................... 9

2.    The Thomasset/Hilton Davis Site (STWB)....... 22

B.    Sites where no witness accounts are available, but where
historical records about site operations and discharges are
available, show highly culpable conduct with respect to
environmental discharges..................................................... 27

1.    The Montrose Site (21st Century Fox
America, Inc.).................................................... 27

2.    The Sherwin-Williams Site ............................... 31

3.    The Givaudan Site (Givaudan Fragrances
Corp.).................................................................. 34

4.    The S.B. Penick Site (CONOPCO, Inc.)........... 42

ALCD-PUBCOM_0000690

5. The Bayonne Barrel & Drum (BB&D) Site ...... 46

6. The PPG Site ..................................................... 51

7. The Alliance Chemical Site ............................... 54

8. The Pitt-Consol Site .......................................... 56

9. The D&J Trucking Site ...................................... 60

10. The EnPro/Teval Site ........................................ 63

11. The Benjamin Moore Site .................................. 66

C. Batson incorrectly assumes that if there is "no information" about a site's historical discharges then the operator was 0% culpable. Available records show the opposite is true: industrial waste discharges to the Passaic River were routine if not uncommon through the first half of the twentieth century. ....................................................... 71

Opinion 2: Batson's assessment of the Culpability Factor is not valid ...... 72

A. The Culpability Scoring methodology as applied to the Diamond Site is inconsistent with its application to most other party's Sites subject to the allocation. ........................... 72

B. Batson's application of the historical fact record to his assessment of the Culpability Factor is so inadequate that it renders the calculated Culpability scores invalid. .............. 74

CONCLUSION .................................................................................................. 76

Attachment 1 – Culpability Table
Attachment 2 – Resume of Dennis Farley

3

ALCD-PUBCOM_0000691

## PURPOSE OF THIS DECLARATION

Pursuant to 28 U.S.C. § 1746, I, Dennis P. Farley declare the following:

1.      I have been retained by Langsam Stevens Silver & Hollaender, LLP on behalf of

Occidental Chemical Corporation (OxyChem) to provide expert opinions related to the Diamond

Alkali Superfund Site (OU2), specifically to review the *Diamond Alkali Superfund Site OU2,*

*Allocation Recommendation Report*, dated December 28, 2020, by David Batson, Esq. (Batson)[i]

and offer my opinions on aspects of Batson regarding the cost allocation methodology used.

2.      My assignment included providing expert responses to the following questions:

- Does Batson apply appropriate consideration of the historical fact record in determining a
  Culpability Factor for parties subject to the allocation?

- Are Batson's assigned Culpability Factor scores valid?

## QUALIFICATIONS

3.      My name is Dennis P. Farley. I hold a Bachelor's degree in Geology/Physics from

Moravian College, in conjunction with Lehigh University, and a Master's Degree in

Environmental Engineering from the New Jersey Institute of Technology. I am a licensed Private

Detective in the State of New Jersey (license #6423).

4.      The information in this declaration is based on my personal knowledge, which I obtained

during my employment with various consultants working on projects related to the

environmental condition and historical sources of contamination to the Passaic River and

Newark Bay Estuary in New Jersey. From 1982 through approximately 1984, I was employed by

NUS Corporation under contract to the U.S. Environmental Protection Agency (EPA). From

approximately 1990 through 1999, I was employed by Kroll Associates, and during that

employment, I worked on contracts with affiliates of Maxus Energy Company. From

4

ALCD-PUBCOM_0000692

approximately 2000, I have been employed by The Intelligence Group, LLC and during that

employment, I have worked on contracts with affiliates of Maxus Energy Company and affiliates

of OxyChem.

5.      During this period, I have developed an in-depth understanding of the fact record as it

relates to historical sources of contaminants to the Lower Passaic River Study Area (Passaic

River) and the Newark Bay Study Area (Newark Bay). These contaminants include a variety of

hazardous substances, including the eight contaminants of concern (COCs) identified in the

Record of Decision for the Lower 8.3 Miles of the Lower Passaic River Part of the Diamond

Alkali Superfund Site, Essex and Hudson Counties, New Jersey (March 2016; hereinafter ROD).

These contaminants, referred to herein as the eight ROD COCs, consist of: (1) dioxins and

furans, (2) PCBs, (3) mercury, (4) DDT/DDx, (5) copper, (6) dieldrin, (7) PAHs, and (8) lead.

Additionally, within the ROD, EPA identifies all eight of these ROD COCs as principal threat

wastes: *"The dioxin, PCB and other COC concentrations in sediments throughout the lower 8.3

miles of the Lower Passaic River are present at levels contributing to $10^{-3}$ risks for humans

consuming fish and crab caught in the lower 8.3 miles, a risk level that can be used as a basis for

identifying principal threat waste."* And *"....EPA nevertheless considers the most highly

contaminated sediments as principal threat wastes at the site."* EPA explains in the ROD that

"The NCP establishes an expectation that EPA will use treatment to address the principal threats

posed by a site…" and thus concludes that these eight ROD COCs are responsible for the need

for the selected remedy as detailed in the ROD.

6.      During my work regarding the Passaic River and Newark Bay, I have investigated

numerous historical and present-day sources of hazardous substances, including these ROD

COCs, to the Passaic River and lower 8.3 miles. I have presented evidentiary materials regarding

5

these sources to EPA Region II personnel, which has resulted in the issuance of more than 75

General Notice Letters to entities responsible for conditions in the Passaic River and Newark

Bay including the lower 8.3 miles of the Passaic River. These entities or potential responsible

parties (PRPs) are typically owner/operators, or their successors and assigns, of upland properties

or sites (Sites) that historically discharged hazardous substances, including the eight ROD COCs,

to the Passaic River or Newark Bay. Many of these Sites discharged hazardous substances that

have resulted in the conditions requiring remediation of the lower 8.3 miles of the Passaic River.

## SUMMARY OF OPINIONS

**Opinion 1: Batson does not appropriately consider the historical fact record in determining a Culpability Factor for parties subject to the allocation.**

    A. **Sites where witness accounts of historical operations and discharges are available show highly culpable conduct with respect to environmental discharges. Batson did not consider these sources in his "Culpability Factor" determination.**

    B. **Sites where no witness accounts are available, but where historical records about site operations and discharges are available, show highly culpable conduct with respect to environmental discharges.**

    C. **Batson incorrectly assumes that if there is "no information" about a site's historical discharges, then the operator was zero percent culpable. Available records show the opposite is true: industrial waste discharges to the Passaic River were common if not routine through the first half of the twentieth century.**

**Opinion 2: Baston's assessment of a Culpability Factor and assignment of Culpability scores is not valid.**

    A. **The Culpability Scoring methodology as applied to the Diamond Site is inconsistent with its application to most other party's Sites subject to the allocation.**

    B. **Batson's application of the historical fact record to his assessment of the Culpability Factor is so inadequate that it renders the calculated Culpability scores invalid.**

6

ALCD-PUBCOM_0000694

## SUPPORTING INFORMATION FOR OPINIONS

**Opinion 1: Batson does not appropriately consider the historical fact record in determining a Culpability Factor for parties subject to the allocation.**

7.     The historical fact record of most interest to this allocation is evidence regarding the discharge of hazardous substances, including ROD COCs, from upland operating Sites to the Passaic River. These upland Sites are typically operations that were industrial in nature and located adjacent to the Passaic River or its tributaries and sewer discharge points. The fact record indicates that industrial discharges were historically made to the Passaic River and continued up through the time of the Clean Water Act in 1972, despite the establishment of the Passaic Valley Sewerage Commissioners' (PVSC) Trunk Sewer in 1924. Records of regulatory enforcement, primarily on the part of PVSC and the United States Coast Guard, are typically first seen in the 1950s and, in some cases, the late 1940s. These records are themselves "spotty" and appear to address various upland operating Sites regarding Passaic River discharges at different times, and to different degrees. Due to later civil litigation that impacted some of these operators and their successors, additional records have been made available in cases where their records were historically maintained, and notably, some of these records have only recently been made available since Batson completed his report. Some of these records include internal correspondence from upland operators and reflect an industry slowly adapting to newly adopted regulations; the evidence indicates there were large investments to make and the codification of the regulations were confusing, not particularly overt, or even known to all. The historical evidence shows that the conduct of most parties, where recorded, was similar during this period.

8.     The Diamond Alkali Superfund Site encompasses the lower 17 miles of the Lower Passaic River. EPA has issued General Notice Letters to more than 100 entities notifying them of their potential liability for the conditions of the Passaic River. In 2016, EPA issued a Record of Decision

7

ALCD-PUBCOM_0000695

for the Lower 8.3 Miles of the Passaic River that found "over 100 industrial facilities have been identified as potentially responsible for discharging contaminants into the river including, but not limited to, dioxins and furans, PCBs, PAHs, DDT and other pesticides, mercury, lead and other metals." EPA identified eight COCs that are present at elevated levels in the Passaic River and require remedial action to reduce those levels. (2016 ROD for OU2).

9.      The Diamond Alkali Superfund Site is named for the first facility identified by EPA as requiring remediation at the Passaic River, the former Diamond Alkali facility located at 80 Lister Avenue, Newark, New Jersey (Diamond Site). The Diamond Site is located at River Mile 3 of the Passaic River. Historical discharges from the Diamond Site of dioxin and DDT, two of the eight ROD COCs, have been identified by EPA as contributing to conditions requiring remediation of the lower 8.3 miles of the Passaic River.

10.     An extensive record was created about the conditions at the initial focus of EPA's investigation, the Diamond Site. The fact record regarding the Diamond Site includes site investigation reports and records related to the enforcement actions beginning in 1983, and publicly available documentation from the PVSC requiring the operators of the Diamond Site to connect to the City of Newark sanitary sewer system in the 1950s (PAP-00147757 at PAP-00147843; PAP-00147757 at PAP-00147848; KLL026956; PAP-00147757 at PAP-00147885). The Diamond Site was also one of the few early sites identified at the Passaic River where the operators pursued insurance coverage through litigation. During litigation between the owner/operators of the Diamond Site and their insurers in the 1980s, discovery consisting of site records and testimony of former employees provided more fulsome detail regarding historical site operations, including the discharge of hazardous substances to the Passaic River.

8

11.     The bulk of the descriptive record about the operational years at the Diamond Alkali site derives from the 1980s insurance litigation and the testimony by plant employees during that litigation. Of the hundreds of contaminated sites along the Passaic River, I am aware of few, if any, for which the testimony of plant employees has been memorialized and made available. One notable exception is the Legacy Vulcan Site, whose plant employees were deposed in the 1990s.

12.     It is my observation that although extensive witness testimony is not available for most sites at the Passaic River, the available record demonstrates that many sites that discharged hazardous substances to the Passaic River had a history of conduct that was similar to the Diamond Site. Like the Diamond Site, initial documentary evidence collected from the public record, where available, is typically comprised of observations and enforcement-related correspondence between public agencies such as the PVSC, the City of Newark or other municipalities, the State of New Jersey, the Federal Water Pollution Control Administration, and/or the Interstate Sanitation Commission. Much of this evidence contains observations of discharges made to the Passaic River and often does not include information that characterizes the observed discharge beyond descriptions regarding color, clarity, and temperature, or generic terms such as "polluting."

### A. Witness accounts of historical operations and discharges at certain sites reflect highly culpable conduct, but Batson ignores or was not provided that evidence.

#### 1. The Legacy Vulcan/McKesson Site

13.     Legacy Vulcan and its predecessors operated at the Doremus Ave., Newark Site, located on the banks of the Passaic River at RM 0.5-0.6, from 1952 to May 1975, when it was sold to Inland Chemical Corporation (Inland), the predecessor to the participating allocation parties Safety-Kleen Envirosystems and McKesson corporation, operated the site through 1982. NJDEP ordered the site to close in 1982 (PAP-00185864). Safety-Kleen sued for insurance coverage in

9

the 1990s. (*Safety-Kleen EnviroSystems Co. v. Continental Casualty Co., et al.*, Case 985528, Superior Court of California).

14.    Depositions of former plant workers provide an extensive record of the operations at the former Vulcan Site. This record was unavailable to Batson because it was withheld from him by Vulcan, McKesson, and Safety-Kleen. There are at least fifteen deposition transcripts that were generated during the *Safety-Kleen* litigation. A review of the records available to Batson shows that one transcript was provided to the allocator, and that transcript was redacted to only include 6 pages.

15.    In the transcripts that were not considered in Batson's Culpability assessment for Legacy Vulcan, former plant workers testified that Legacy Vulcan's practices and policies showed complete disregard for its impact to the Passaic River.

- Bernard Partington, a chemical operator at the Vulcan plant from 1958-79, testified to the following. *See* Ex. - (June 16, 1999 deposition of Bernard Partington, *Safety-Kleen EnviroSystems Co. v. Continental Casualty Co., et al.*, Case 985528, Superior Court of California) at 66:10-68:11.)

  Q. The chemicals that you talked about working with when you were a chemical operator, methylene chloride, carbon tet, chloroform, Benzoic acid, methyl bromide, the chemicals that we've talked about so far this morning, back when you were starting to work with those chemicals in the late '50s, did you understand that those chemicals were toxic and harmful to the environment?

  A. Well, to what degree, no, I didn't understand how bad, is that the right word, they were, but I knew that grass didn't grow where you dumped some of the stuff so that might have told you something. Fish died in the bay where things went out in the bay. Now that would, you know, make any normal individual suspicious that something is wrong, you know. Smell the smell of chlorine, they used chlorine, was objectionable. Now, that's not good for you, you knew that. Methyl bromide the same way. Bromine, they used to manufacture methyl bromide, had a pungent smell and this was toxic, very toxic. Toluene is a solvent that is, I've since learned, you know -- you learn more as you get older and you get more exposed to certain things that there was no need to know back in those

10

days. I mean, you didn't have any booklet on unit site of the chemicals that were used and the right to know, there was no such thing.

Q. So you knew generally that the chemicals at the plant

A. Harmful, yes.[1]

* * *

Q. So once the water was through being used in the cooling process or through cleaning out tanks or vats, et cetera, that all just went right back into the bay?

A. Plus a lot of waste.

Q. That would be the waste that's being cleaned out during the cleaning process, product, waste product, that sort of thing?

A. Spills, anything. Anything that didn't evaporate that required cleaning went to the river.

Q. Anything that didn't evaporate and required cleaning went to the river?

A. Yeah.

Q. And the discharge of effluent back into the bay, was that the same for all the entities, again, Kolker, Frontier, Vulcan, Inland?

A. They all did the same thing.[2]


Q. Was the effluent into the bay a particular color?
A. It could be any color.
Q. Any color?
A. Yes, it could be white. It could be oil. It could be charcoal, it could be whatever they produced the night before. The standing joke of that plant was when, especially when they ran the ester units. Ester units require a lot of washing of chemical batches. They put it into tanks, they save the water, water separated from the product, and if they missed it, it went out to the save-all tank. The save-all tank was unfortunately Newark Bay. That's where the product went.
Q. So the Newark Bay was called the save-all tank?
A. That's right. I'm sure that isn't the first time you heard that.[3]

***

Q. Then the two discharge points of flow went back to the bay, one was collecting all sewer system from the organic side and one was catching all the sewer systems in the inorganic side?
A. Now, there was an open trench on the organic side which spilled into the bay. That was where the chlorinated wastewater went down this open trench. Now, I

[1] Ex. – (June 16, 1999 deposition of Bernard Partington, *Safety-Kleen EnviroSystems Co. v. Continental Casualty Co., et al.*, Case 985528, Superior Court of California) at 66:10-68:11.
[2] *Id.* at 69:8-71-8.
[3] *Id.* At 71:25-74:15.

11

ALCD-PUBCOM_0000699

don't remember if they ever enclosed it or tied it into the main sewer. I don't remember....

Q: How deep was the trench?

A. I would say approximately two-feet, approximately, it could have been 30-inches. I don't know. It's a long time ago. I don't remember.

Q. Was there fluid and effluent running through there on a regular basis?

A. Almost continuously.

Q. And that trench just ended up at the bay and jumped --

A. Leached into the bay.

Q. And is that, the effluent running through the open trench, is that the same as the other effluent, could be any color depends on what they were doing to the plant or since it was inorganic side did it tend to be one color versus another?

A. It was mostly white because they had trouble recovering salt from the caustic plant and the caustic boil out, they used to call them to clean the condensers and steam chest and what have you, that was white. Caustic was always white. In fact, there used to be a trail from the chlorine plant out towards the middle of that bay and I think the Coast Guard came up a few times and I think they were cited a few times for pollution. This was when the environmental people started to get a little more strict on their control of effluent.

Q. Would that probably have been then during the '70s?

A. Probably.[4]

* * *

Q. Did you ever see effluent or discharge into the bay that was purple in color?

A. Believe it or not, all the time I put there, it was not one of my pastimes to watch the sewer. Now I'm only talking at times where I would be interested in it would be like if there was a spill, an oil spill or something, I might out of curiosity take a walk to see how it's mixing with the bay and at that particular time it could be God knows what color. Who cared about the color. I was more than concerned about the sheen on top of the water, oil floats. I was wondering how it would dissipate or how long it would take to dissipate. Curious, you know, of course, that was during the day light hours. At night, God knows. But the spills and the cleansing from the caustic plant, as I stated, it's not a secret. They were sighted numerous times for white material going down. In fact, I think a couple of the boating enthusiasts in the area had some suits against the company because it ate the paint off the boats. I'll tell you it was a cesspool, I had to say that. That's being recorded. It was polluted. It's unconscionable. The reason I say that, I am an outdoors man, I love hunting, fishing and it used to personally upset me. But...[5]

* * *

Q. Is it correct to say that anything that found its way to the sewer ended up in the bay?

---

[4] *Id.* at 74:25-77-8.

[5] *Id.* At 77:9-79:5

ALCD-PUBCOM_0000700

> A. Correct. Had no settling ponds, there was no reclaiming systems, anything that
> went down the sewer eventually went to the bay I might add this was true with all
> of the particular people after Kolker Chemical. Also it seems that this was an
> accepted practice. Not until the late '70s was there any monitoring or what have
> you of the effluent going to the sewer or into the bay...[6]

\*\*\*

> A. Mistakes will happen. The problem was that there was no back-up. There was
> no way of ensuring that the material would not eventually end up in the bay, such
> as a settling pond, dams or things of this nature. There was none of this. Whatever
> hit the sewers, hit the bay. That was --
> Q. Would spills, like an oil spill, would they be hosed down to the sewer system?
> A. Oh, yes. Using river water 90 percent of the time or city water, whichever was
> available.[7]

16.     Another testified that the Vulcan plant lacked "environmental rules" and workers were
unconcerned about compliance or pollution. Ex. – (June 17, 1999 deposition transcript of
Raymond Gilliam, *Safety-Kleen EnviroSystems Co. v. Continental Casualty Co., et al.*, Case
985528, Superior Court of California) at 574:15-575:19.

17.     Legacy Vulcan and its predecessors operated a variety of organic chemical manufacturing
processes including a chlor-alkali plant using electrolytic cells for the production of caustic soda,
chlorine, and raw hydrogen gas. Other products included methylene chloride, acids and a variety
of organic chemicals. Numerous dioxin-associated compounds were used or identified at the site.

18.     From the start of Legacy Vulcan's operations at the site, waste streams containing
hazardous substances were discharged into the river. Between at least 1952 and continuing until
1975, the site industrial process and storm water sewer consisted of a system of open trenches that
discharged directly to the Passaic River through three outfalls (LVC000033 at LVC000035;
MKSK-FED-0000004666 at MKSK-FED-0000004709; MKSK-FED-0000002400 at MKSK-
FED-0000002502, 527–528; MKSK-FED-0000004177 at MKSK-FED-0000004210, 216;

---

[6] 83:8-84:20
[7] *Id.* At 85:20-87:18.

13

MKSK-FED-0000004099 at MKSK-FED-0000004119, 123; MKSK-FED-0000003521 at MKSK-FED-0000003538). That industrial process and storm water sewer included:

    a. The primary line that conveyed a continuous stream of chlorinated wastewater from the organic chemical production plants to an unlined trench, to an approximately 6- to 8-in privately owned outfall to the Passaic River in the northern portion of the site (MKSK-FED-0000002400 at MKSK-FED-0000002529–531; MKSK-FED-00000004177 at MKSK-FED-0000004212–213, 215).

    b. The secondary sewer line was located in the chlor-alkali plant, and conveyed runoff and chemical spills from the inorganic chemical processing area to an open, unlined trench along the southern property boundary, which discharged to the Passaic River at the end of Wilson Avenue via an approximately 32 in to 36 in outfall pipe (Figure 2) (PAS-00058031 at p. 7; MKSK-FED-0000002400 at MKSK-FED-0000002529–531; MKSK-FED-00000004099 at MKSK-FED-0000004114, 4122; PAP-0365518 at PAP-00365518 to PAP-00365519).

19.    According to a 1969 U.S. Federal Water Pollution Control Administration outfall survey, three outfall pipes (a 36-inch, a 6-inch, and an 8-inch discharge pipe) from the site to the Passaic River were present (PAS-00058632 at PAS-0058690).

20.    During Legacy Vulcan's operations, discharges to the Passaic River conveyed through the industrial process and storm water sewer system included:

    a. Effluent from the chemical plant, including chlor-alkali and organic chemical processes

    b. Non-contact cooling water, including water from methylene chloride and benzoic acid production and in caustic chlorine operations

    c. Condensate

14

ALCD-PUBCOM_0000702

    d.  Chemical spills in the processing areas

    e.  Equipment cleaning water

    f.  Tank truck washdown water

    g.  Product spill residues

    h.  Motor oil additive spills

    i.  Waste products

    j.  Tank farm discharges

(PAS-00011294 at PAS-00011296; MKSK-FED-0000004666 at MKSK-FED-0000004704–705, 707; MKSK-FED-00000004177 at MKSK-FED-0000004210, 216; MKSK-FED-0000004099 at MKSK-FED-0000004119, 123; MKSK-FED-0000003521 at MKSK-FED-0000003538)

21.    The anodes used in the chlor-alkali cells at Legacy Vulcan were composed of graphite with an asphalt binder, with the lead and copper fixtures also coated with asphalt (PAP-00362236 at PAP-00362239). Graphite cell binders, such as coal tar and asphalt, are readily chlorinated in chlor-alkali cells, forming PCDD/Fs (MKSK-FED-0000000333 at MKSK-FED-0000000411; PAP-00362236 at PAP-00362239; PAP-00483904 at PAP-00484355–358; G-VUL024540 at G-VUL024541).

    a.  During its operations, Legacy Vulcan routinely cleaned the chlor-alkali plant equipment on a weekly basis. The cleaning process involved pumping existing liquids from tanks, dissolving accumulated salts within the tanks with boiling water, and discharging the dissolved salts and wash water to the sewer system that discharged to the Passaic River. (MKSK-FED-0000003275 at MKSK-FED-0000003369-3370).

15

b. During the cleaning of caustic soda tanks, asbestos that covered grids within the production cells was washed and loose debris such as graphite/binder sludge were drained, via the sewer, into the Passaic River (MKSK-FED-0000002400 at MKSK-FED-0000002424– 425).

c. In addition to the routine cleaning of the equipment, asbestos-coated diaphragm grids within the cells needed to be repaired or replaced daily at the site. Graphite sludge clogged the diaphragm grids, and during the repair process the asbestos coating and sludge was washed off the grid into the site sewer, discharging to the Passaic River (MKSK-FED-0000002400 at MKSK-FED-0000002425; G-VUL024540 at G-VUL024559, 582).

22. On August 15, 1969, the State of New Jersey Department of Health issued an order to Legacy Vulcan to cease pollution to the Passaic River (PAP-00217398 at PAP-00217398). The Administrative Order indicates that effluent discharge from the "main sewer contained metals and chlorinated organics" (SKMC032195 at SKMC032197). Legacy Vulcan reportedly made operational process and sewer upgrades to improve environmental operations at the site (PAP-00217398 at PAP-00217399–401).

23. Despite this, discharges of hazardous substances to the Passaic River continued.

a. PVSC reported in January 1970 that Legacy Vulcan discharged unspecified polluting material from the site into Newark Bay that was "past the Commissioners' dock" (BBK000001 at BBK000001–002). The PVSC treatment plant and dock are located immediately south of the Legacy Vulcan Site near Passaic River Mile 0.

b. On February 22, 1972, phenols were reported as present in industrial effluent discharged via the stormwater and industrial process water sewer system pipes to the Passaic River (SKMC031237). On July 20, 1972, a former employee of Legacy Vulcan notified NJDEP

16

that the facility was dumping methyl bromide into the Passaic River (PAS-00058031 at p. 10).

24.    In June 1972, EPA and Legacy Vulcan initiated a sampling program at the site, to "better define quantities and sources of undesirable components in the Newark plant waste effluent stream entering [the Passaic River]" (PAP-00187079 at PAP-00187087). (Note that references to "Newark Bay" are geographical in nature; the former discharge locations are within the Passaic River). Total effluent discharged to the Passaic River was reported at 10,400 gallons per minute (gpm) (PAP-00187079 at PAP-00187088).

25.    In 1972, the total volume of wastewater discharged from the Site to the Passaic River was 5.39 billion gallons (LVCE0007412 at LVCE0007412–414).

26.    Effluent wastewater sampling that was conducted in August 1971 and February 1972 indicated that Legacy Vulcan discharged effluent to the Passaic River with the following contaminant loads:

   a.  Chlorinated hydrocarbons at 700 lbs/day (PAS-00011294 at PAS-00011296; MKSK-FED-0000000674 at MKSK-FED-0000000675)

   b.  Lead at 10 lbs/day (PAS-00011294 at PAS-00011296; MKSK-FED-0000000674 at MKSK-FED-0000000675)

   c.  Zinc at 250 lbs/day (PAS-00011294 at PAS-00011296; MKSK-FED-0000000674 at MKSK-FED-0000000675)

   d.  Total suspended solids (TSS) ranging from 5,800 lbs/day to 66,000 lbs/day (PAS-00011294 at PAS-00011296; MKSK-FED-0000000674 at MKSK-FED-0000000675)

17

27.     During September and October 1973, sampled effluent being discharged to the Passaic River contained up to 1,090 lbs/day of chlorinated organics, up to 48 lbs/day of zinc, and up to 6.9 lbs/day of lead (PAP-002119174 at p. 2; MSKS-FED-0000003382 at MKSK-FED-00000003391).

28.     On June 22, 1973, surface water samples were collected from a "mosquito ditch," which flowed onto the south-adjoining PVSC property and subsequently to the Passaic River. The sampled water was described as "highly polluting." Samples collected from the mosquito ditch contained pH levels up to 12.9 and relatively high levels of solids and chlorides (MKSK-FED-0000008578 at SKE 407137, CON000022).

29.     A letter from Inland Chemical Corporation (Inland) to PVSC, dated August 8, 1975, indicates that the site was discharging its industrial wastewater directly to the Passaic River at the time of the letter. In addition, the letter indicates that Inland did not discharge its industrial wastewater to the City of Newark or PVSC sewer systems (BBK000007 at p. 1).

30.     After acquiring site operations, Inland discontinued chlor-alkali production at the site on May 1, 1975 and C-1[8] processes on May 15, 1975 (MKSK-FED-0000000215 at MKSK-FED-0000000250). In a letter to EPA, Inland states that the facility was unable to meet the limitations of the discharge permit for TSS and lead originating from the chlor-alkali plant and for zinc originating from the C-1 operations (MKSK-FED-0000000215 at MKSK-FED-0000000250).

31.     The Legacy Vulcan Site was also prone to flooding due to its proximity to the Passaic River and Newark Bay, allowing for runoff of contaminated soil and site media. For example, following a 1962 storm, the site was entirely flooded; river water from the property drained back to the Passaic River when the flood receded (MKSK-FED-0000003382 at MKSK-FED-0000003431).

---

[8] C-1 chemistry generally refers to the conversion of molecules that contain one carbon atom, such as methane, into other compounds (G-VUL005422 at C2). Although witness testimony did not elaborate on the context of C-1 processes at the site, it is assumed that it refers to the chloromethane production at the site.

18

32.    Site media was documented to be heavily contaminated with a multitude of hazardous substances, including those identified by EPA as associated with dioxins.

    a.    In October 1979, Inland was issued an Administrative Order by the NJDEP. Routine inspections revealed that the facility and ground were contaminated with various chemicals, and Inland was to clean up all spills and contaminated soil (PAP-00218989 at PAP-00218990; NJDEP006900-01 NJDEP [within MKSK-FED-0000008732 at MKSK-FED-000008739]).

    b.    A memo dated October 31, 1979, discusses observations of numerous spills and leaking drums. A large spill was observed in the diked waste water storage area, but the dike did not contain it due to the porous nature of the cinder blocks. "Numerous spills were observed and documented at Inland Chemical in Newark, which have resulted in a discharge into [the Passaic River] and an undetermined groundwater contamination potential" (MKSK-FED-0000008732 at MKSK-FED-0000008739).

33.    In September 1980, NJDEP identified a 4-in to 6-in outfall discharging to the Passaic River, located "just to the right of the old Vulcan water intake" (PAP-0365518). In 1981, Inland reported that, in 1974, it had plugged all outlets to the Passaic River from the site with concrete upon acquiring the site (MKSK-FED-0000000190 at MKSK-FED-0000000203). Inland constructed a berm in 1977 to prevent flooding of the site, which had occurred previously during heavy rain events (MKSK-FED-0000005005 at MKSK-FED-0000005017). Despite these efforts, the fact record clearly indicates that discharges of hazardous substance to the Passaic River continued throughout the operations of McKesson and its predecessors.

19

34.    In August 1982, NJDEP filed an Administrative Consent Order "In the Matter of McKesson Envirosystems Company" requiring improvement regarding leaks and spills, poor housekeeping and cleanup of contaminated soil and groundwater (LVCE0013803).

35.    In October 1982, an explosion and fire occurred during McKesson Envirosystems' processing of a waste stream that destroyed four buildings, three cooling towers, and 21 above-ground tanks containing more than 26,500 gallons of various hazardous substances. ( PAS-00010843;    DOCID_TIG_ESI_0000091145;    PAP-00218989;    MKSK-FED-0000008218). Following this incident, NJDEP ordered the site to close (PAP-00218989).

36.    Historical operations at the site are associated with numerous ROD COCs. Lead was found at levels as high as 30,000 mg/kg; mercury at 19 mg/kg; and copper at 8,400 mg/kg (PAP-00188306 at PAP-00188368). Total lead in the plant effluent was indicated to be 10 pounds per day with almost 90 percent entering with the various caustic streams (MKSK-FED-0000000674 at MKSK-FED-0000000675). Other ROD COCs identified at the site include PCBs, DDx, and HMW/LMW PAHs.

37.    Historical operations at the site are also a suspected source of dioxins to the Passaic River. Chlor-alkali processes have been documented to be a source of dioxins (PAP-00483904 at PAP-00484355–358). By 1971, the Site chlor-alkali plant had a total 128 Hooker Type S1 cells and 36 Hooker Type S-4 cells (MKSK-FED-0000000333 at MKSK-FED-0000000411; PAP-00187079 at PAP-00187082; MKSK-FED-0000000215 at MKSK-FED-0000000270; MKSK-FED-0000002400 at MKSK-FED-0000002424–425) with the capacity to produce up to 80 tons of caustic soda per day (MKSK-FED-0000000215 at MKSK-FED-0000000313). The generation of PCDD/Fs in the graphite electrode sludge/waste from chlor-alkali cells is attributable to the chlorination of coal tar and asphalt (consisting of PAHs) used as a binding agent in the graphite

20

anodes (PAP-00483904 at PAP-00484355–358; G-VUL024540 at G-VUL024541). Legacy Vulcan also used asphalt as a protective coating for the lead and copper connections, providing an additional source of dioxin precursors that could be chlorinated to form dioxins. The sludges resulting from the degradation of the electrodes and protective coatings clogged the asbestos-coated diaphragm grids and had had to be washed from the cells during daily routine maintenance and repairs. During repair the asbestos coating and graphite sludge were washed off the grid and into the sewer, discharging to the Passaic River (MKSK-FED-0000002400 at MKSK-FED-0000002425; G-VUL024540 at G-VUL024559, 582). Additionally, other processes including the manufacture and/or use of benzene hexachloride (lindane) and phthalic anhydride are associated with the formation of dioxins, and various dioxin-associated compounds including pentachlorophenol and 2,4,6-trichlorophenol have been identified onsite. Despite this, site media has not been sampled or characterized for dioxins.

38.      Despite the extensive amount of evidence describing the discharge of hazardous substances (including ROD COCs) from this Site to the Passaic River, Batson assigns Legacy Vulcan a culpability factor of 5 percent for "occasional noncompliance." As justification, Batson notes the 1969 NJDEP "pollution abatement orders" to Vulcan to install and provide wastewater treatment and disposal facilities, and to cease discharging "industrial waste or polluting matter" into the Passaic River. But the record indicates an extensive period of direct process waste discharges from this Site to the Passaic River, spanning multiple operators during the period 1952-1982. Moreover, the 1969 NJDEP "pollution abatement orders" were virtually ignored, and discharges of hazardous substances continued to the Site's closing in 1982. Assigning a score based on "occasional non-compliance" is thus inconsistent with the historical fact record.

21

## 2. The Thomasset/Hilton Davis Site (STWB)

39.    From 1955 through 1996, Thomasset/Hilton Davis and their successors operated at a parcel within the former Lister Agricultural Chemical Company property on Lister Avenue in Newark, manufacturing a variety of organic dyes and pigments including phthalocyanine colors.

40.    As early as 1956, representatives from PVSC identified concerns with the sewer infrastructure at the site and resulting direct discharges to the Passaic River.

41.    In July 1956, PVSC identified direct discharges of colored fluids to the Passaic River from a 4-inch pipe and cited Thomasset. PVSC describes the discharge as having a "deep blue color" originating from three large wooden vats (PAP-00147757 at PAP-00147857).

42.    On August 20, 1956, inspectors for the PVSC cited Thomasset for "seepage from floor washings which were discharged into an area on the west side of this plant, was finding its way into the Passaic River" (PAP-00147757 at PAP-00147872).

43.    Later, it was learned, as a result of documents and testimony produced in litigation, that purposeful discharges of process waste were made to the Passaic River despite the site having connected to the City of Newark sanitary sewer following the initial notification in 1956.

   a.   In 1963, acidic discharges to City of Newark sewers had corroded the discharge line, resulting also in the corrosion of Thomasset/Hilton Davis's neighbor's (Sergeant Chemical's) water line. Thomasset/Hilton Davis was notified by the City that its discharge of acidic waste to city sewers must cease. According to the June 22, 2011 deposition of Paul B. Thomasset, a former employee at the Site who was ultimately the plant manager, a decision was made at that time to return the acidic discharge to the river (NPEC-0015546 at NPEC-0015546; DOCID_TIG_ESI_0000080585 at pp. 130–131). As of December 1963, acid waste from blue decant tubs was once again being discharged directly to the

22

Passaic River even though a "new sewer line" was installed in the summer of 1963 (NPEC-0015546 at NPEC-0015546). Discharges were piped to the river, where a dry well constructed of trap rock had been constructed, allowing the discharge to disperse from the dry well through the bulkhead and into the river (DOCID_TIG_ESI_0000080585 at p. 122).

b.  Paul B. Thomasset further stated in this same 2011 deposition: "The plant was originally located, in those days, plants loved being located near rivers, because that's the way to get rid of the waste. Sounds appalling today, but it was routine in those days, so that's the way the business was started there." (DOCID_TIG_ESI_0000080585 at pp. 37–38)

c.  In an internal 1963 Thomasset/Hilton Davis memorandum, it was proposed that, in addition to the documented discharges from the blue decant tanks, acid effluent from Building 2 was to be collected and discharged to the Passaic River at night as a way to resolve problems with acid corrosion of the combined sewer line from the site. The internal memorandum acknowledges that, by using this system, "if investigated by any reasonable intelligent city or state inspector we risk further exposure of our major and serious problem – disposal of decant effluent" (NPEC-0015546 at NPEC-0015548). A follow-up memorandum from April 1964 explores six options for the site's acid effluent issues, including the proposal to collect acid filtrates and dispose of them to the river at night (NPEC-0003728).

d.  In a 1964 letter, Paul B. Thomasset addressed the issue of neutralization of aluminum salt precipitate noting that neutralization of aluminum chloride filtrate with ammonia would have clogged the sewers. Thomasset/Hilton Davis explored the option of having the aluminum chloride solution hauled away, but stated "we should dump this material in the

23

River rather than pay to have it removed or neutralize it" (NPEC-0003732 at NPEC-0003733).

e.   According to Thomasset/Hilton Davis notes dated April 1971, the phthalocyanine blue decant tanks discharged 64,000 gallons per day to the Passaic River during maximum production periods (NPEC-0011056 at NPEC-0011056).

f.   Former Thomasset/Hilton Davis employee Robert Malone reported that prior to 1971 "all process wastes" were discharged to the river, and that the original owner of the company (Paul A. Thomasset) had installed a false sewer system that was designed to bypass the neutralization pits and discharge all process wastes directly into the Passaic River. Employees would throw a switch that caused any flow from the sewers to bypass the neutralization pits, travel through an underground pipe that was approximately six inches in diameter, and discharge directly into the river. This line ran past the three large tanks near the Benjamin Moore Site boundary and out to the river. The line started at the front of the plant by the shipping and receiving area. There was a small trap on the line near the dumpster: "We would open up the trap and turn the valves so the junk could go to the River," Mr. Malone stated (DOCID_TIG_ESI_0000080585 at pp. 214–215).

g.   Also, according to Mr. Malone, "Process wastes from all over the plant were discharged to the River. During the production process of phthalocyanine blue, water was pressed out of the mixture that went down the drains that led to the river. The diversion of flow through the false sewer took place primarily at night." Mr. Malone believed that these practices continued until the late 1960s and the early 1970s (DOCID_TIG_ESI_0000080585 at pp. 214–215).

24

h.  In the 2011 deposition of Paul B. Thomasset, he acknowledged the presence of discharge lines leading from the decant tanks directly to the Passaic River and that "there was probably a way of diverting either to the sanitary sewer or to the River." Mr. Thomasset acknowledges the presence of the illegal discharge system to the river prior to 1971 (DOCID_TIG_ESI_0000080585 at pp. 57, 89–92).

i.  A March 1972 interoffice memorandum from Paul B. Thomasset states "approximately 90% of our rain run off flows to the River and not to the storm sewer" (NPEC-0003746 at NPEC-0003746). Former employee Robert Malone stated in a 1996 affidavit that during heavy storm and high tides, flooding was a frequent problem on the property and that much of this problem was caused by sewers backing up. Floodwater from the Passaic River at times reached as far as Lister Avenue (PAS-00063788 at PAS-00063799–803). During flooding, it was not uncommon for drums of phthalocyanine blue, phthalocyanine green, and cosmetics to float away (PAS-00063788 at PAS-00063799–803). Sometimes flooding occurred so quickly that there was no way to secure everything (PAS-00063788 at PAS-00063799–803).

j.  Available mapping from the early 1970s confirms that a 12-inch storm sewer shared by Thomasset/Hilton Davis and the Montrose Site connected to a 27-inch storm sewer in Lister Avenue; stormwater discharges (and polluting material observed as late as 1977) were routed east in the Lister Ave. storm sewer to the Lockwood Street stormwater outfall discharging    to    the    Passaic    River    (Montrose    references    UNK000004; DOCID_TIG_ESI_0000156144 at pp. 2–3, BBG000061).

25

44.    Wastes from processes used to manufacture phthalocyanine blue and green colors (dyes and pigments), drug and cosmetic colors, and other compounds were discharged to the Passaic River as well as to site soil and groundwater.

   a.    Passaic River ROD COCs, as well as other contaminants, were detected in site media at elevated levels. Many soil contaminants found at levels exceeding New Jersey Department of Environmental Protection (NJDEP) remediation standards at the site are consistent with manufacturing/use by Hilton Davis including dioxin-associated compounds, copper, lead, mercury, polycyclic aromatic hydrocarbons (PAHs) and polychlorinated biphenyls (PCBs). These same COCs were identified in Passaic River sediments. PCDD/Fs (including but not limited to 2,3,7,8-TCDD and toxic equivalency values [TEQ]) were not sampled/analyzed in site media.

45.    Thomasset/Hilton Davis is a suspected source of dioxins to the Lower Passaic River Study Area (Passaic River) based on the following:

   a.    Dioxin-associated chemicals stored, used, and/or produced at the facility including trichlorobenzene, 1,2-dichlorobenzene, phthalic anhydride, Niagathal W (tetrachlor phthalic) or tetrachlorophthalic anhydride, chloranil, and phthalocyanine blue.

   b.    Processes that are associated with the formation of dioxins include phthalocyanine blue-bake process with CuCl2, phthalocyanine green, and carbazole violet.

46.    Despite the extensive amount of evidence describing the purposeful discharge of hazardous substances from this Site to the Passaic River, including ROD COCs, Batson assigned to Thomasset/Hilton Davis Site PRP STWB, Inc. a culpability penalty of only 5 percent. This score represents "Occasional Noncompliance" and is reportedly based upon three violations received in the 1970s. Batson ignores much of the more important evidence regarding the discharge history of

26

this Site dating back to the 1950s, including the accounts of willful contravention of orders made by PVSC, the City of Newark, and State of New Jersey. Assigning a score based on "occasional noncompliance" is inconsistent with the historical fact record.

**B. Sites where no witness accounts are available, but where historical records about site operations and discharges are available, show highly culpable conduct with respect to environmental discharges.**

### 1. The Montrose Site (21st Century Fox America, Inc.)

47.    From 1935 through 1974, the Montrose Chemical Company operated at various locations within the former Lister Agricultural Chemical Company property on Lister Avenue in Newark, starting initially at 62-70 Lister Avenue (later occupied by Sherwin-Williams), and subsequently (1948–1974) at 100 Lister Ave (adjacent to and south of the Hilton Davis/Thomasset Site). Montrose did not operate waterfront to the Passaic, but rather on in-land portions of the former Lister Agricultural Chemical Company property. Like Hilton Davis/Thomasset and Sherwin-Williams, Montrose used existing subsurface sewers and waste collection infrastructure on the property.

48.    Montrose manufactured DDT as well as numerous compounds identified by EPA as associated with dioxins, including 2,4,5-T; 2,4-D; hexachlorobenzene; dichlorobenzene; 1,2,4-trichlorobenzene; lindane; and other isomers of benzene hexachloride.

49.    As early as the 1950s, various Passaic Riverfront operators at the former Lister Agriculture property (Hilton Davis/Thomasset and Sherwin-Williams) were identified by the PVSC and the Federal Water Pollution Control Administration as discharging polluting material and industrial wastes from various discharge infrastructure at the site. Hilton Davis/Thomasset's history of discharges has been previously described, and Sherwin-Williams' history is described later in this declaration.

27

50.    In the 1970s, representatives from the City of Newark cited concerns with the sewer infrastructure at the site and resulting impacts on the surrounding area including the Passaic River. A 1977 inspection found "polluting material" in a 12-inch storm line along the Montrose property driveway (PAP-00159734 at PAP-00159803), which connected into a storm sewer in Lister Ave. that discharged to the Passaic River. As a result of this, in 1978, the City of Newark requested confirmation that all sanitary and process waste connections be removed and flushed clean prior to connecting its stormwater drainage to a municipal catch basin (DOCID_TIG_ESI_0000156144 at p. 2). The City of Newark commented in correspondence, "In the past questionable connections had been made..." to the lateral sanitary sewer and indicated that the routing of sewer discharges was not clearly understood (PAS-00014159 at PAS-00014246).

51.    Discovery of the environmental conditions at the site and historical operations impacting the environment were further identified during site characterization (Remedial Investigation/Feasibility Study [RI/FS]) in the early 1980s, and during subsequent site investigation.

   a.  In a 1993 affidavit, Oscar E. Randall, an employee at the 100 Lister Ave. Montrose Site from 1952 to 1991, made the following statement regarding his observations during his period of employment: "While I worked at Montrose, the waste streams of the facility contained hazardous substances which included products and raw materials. These included liquid process wastes as well as spilled materials which were washed to the facility sewer trenches and drains. .... When I first started at the facility, all the wastewater at the facility ran into sewers that discharged directly into the Passaic River. ...I remember watching the colors of the Montrose waste stream enter the river following periods of waste discharge into the sewers on the plant site...These sewers were 4 inches in diameter and

28

discharged to the Passaic River at the end of the facility driveway on the former Thomasset property. Montrose would discharge process waste from batches in volumes of 5,000 to 10,000 gallons at a time" (PAP-00159734 at PAP-00159777–778). He also stated "most of the property…was unpaved. Much of the unpaved area of the facility was heavily contaminated with spilled substances…Often during periods of high tide the facility itself would flood. Water runoff from the facility drains to the river."

b.  In a 1996 interview with Fred Carraway, a maintenance worker at the 100 Lister Ave. Montrose facility from approximately 1956/57 to 1993, he stated that there were several small diameter pipes which were routed from the plant and discharged into the Passaic River. He repeatedly noted that there were four to five separate pipes, each of 4-inch diameter, which discharged production wastewater from the plant into the river. He explained that these river discharge pipes were in use when he first started working at the facility in 1956/1957.

c.  In 1957 a chemical explosion occurred at the facility, destroying Building 5a that was used for the production of DDT. Documents indicate that building debris and chemical materials were scattered throughout the neighborhood, blanketing the area with the chemical materials (BBM000017 at p. 4).

d.  Former employee Kelsey Brown stated that a "great deal of the alpha isomer [of BHC] was produced as waste," which was stored in piles along the eastern fence line of the facility. The storage area initially consisted of dirt and gravel and was eventually paved in the early 1950s. The material "would blow around and disperse in windy weather." It is likely that the piles and dispersed material came into contact with runoff from the site and would have been carried to the sewer for discharge to the Passaic River. This operational practice was

29

ALCD-PUBCOM_0000717

further confirmed in a March 1994 deposition of former Montrose employee Solomon Koved (PAP-00148875 at PAP-00149018–020).

52.    Passaic River ROD COCs, as well as other contaminants, were detected in 100 Lister Ave. Site media and Passaic River sediments at elevated levels. ROD COCs detected onsite and associated with the historical operations of the Montrose facility include total DDx, copper, lead, and dieldrin in soil, concrete/building structures, and groundwater; mercury and PAHs in soil and groundwater; PCBs in soil and concrete/building structures; PCDD/Fs in soil and surface scrapings. Montrose is a suspected source of dioxins to the Passaic River based on historical processes, which are associated with the formation of dioxin including 2,4-dichlorophenoxyacetic acid (2,4-D), 2,4,5-trichlorophenoxyacetic acid (2,4,5-T), tricresylphosphate (TCP), benzene hexachloride (BHC/HCH/Lindane), and hexachlorobenzene (HCB). While elevated concentrations of these compounds were identified in site soils near process areas or trenches, none of the process area sample locations were co-analyzed for dioxins. In the limited characterization for dioxins that did occur, one surface sample collected in 1983 confirmed the presence of 2,3,7,8-TCDD in a sample scraped from a crack in a concrete area on the eastern side of the property (PAS-00057241 at PAS-00057255–256). Additionally, a wipe sample from the interior of a process vessel from Montrose confirmed the presence of 0.94 ppb dioxin.

53.    Additionally, dioxin contamination was discovered in soil during the remedial investigation at the Sherwin-Williams Site, at the location where Montrose formerly operated until 1948. Dioxins were found co-located with elevated concentrations of dichlorobenzene isomers at depths to 8 ft below ground surface (bgs) (PAP-00126493 at PAP-00126514–515). 2,3,7,8-TCDD was detected at concentrations up to 57.6 ppb and dioxins/furans (TEQ) at concentrations up to 5,161.82 ppb (MaxPriv105893 at p. 283, DOCID_TIG_ESI_0000088734 at p. 26). In 2006, the

30

New York Academy of Sciences performed a study to demonstrate the amount of dioxin that can be contributed to the lower Passaic River using this Site as one example. They estimated that runoff from the site resulted in 0.006 grams TEQ per year of dioxins in runoff from the site. It is expected that other COCs present in soils at the site–including mercury, PCBs, total DDx, copper, lead, dieldrin, and PAHs–would also be transported to storm sewers or to the Passaic River via runoff.

54.    Batson assigned Montrose Site Responsible Party 21st Century Fox America, Inc. a culpability factor of 5 percent for "occasional noncompliance," noting only spills of cresol. Batson does not consider the totality of evidence in the fact record for the Montrose Site at 100 Lister Ave. and does not consider Montrose's prior operations on a portion of the Sherwin-Williams Site at all. Batson ignores direct discharge testimony from employees in assigning this culpability factor, as well as other key evidence regarding waste storage and disposal and a major building explosion that occurred onsite in 1967. Assignment of a score based on "occasional non-compliance" is inconsistent with the historical fact record.

## 2. The Sherwin-Williams Site

55.    From 1902 through 1999, Sherwin-Williams operated at a parcel within the former Lister Agricultural Chemical Company property on Lister Avenue in Newark. During its history at the site, Sherwin-Williams produced various paints and coatings, in addition to pesticides including DDT. Other parties, including the Montrose Chemical Company, operated on parcels later acquired by Sherwin-Williams and produced a variety of products including those associated with the generation of dioxins.

56.    Sherwin-Williams discharged wastes and hazardous substances to the Passaic River throughout its history at the site. For example:

31

ALCD-PUBCOM_0000719

a. Prior to interception for sewage treatment in the 1920s, the combined sanitary and storm sewers in the Lister Ave. area discharged directly to the Passaic River at Brown Street, within the Sherwin-Williams Site.

b. In 1969, Sherwin-Williams was identified as a documented discharger to the Passaic River. Documents from the Federal Water Pollution Control Administration identified seven outfall pipes from the site that discharged to the Passaic River. During an inspection, five of the seven pipes were noted to have active dry weather flow, one (a 4-inch pipe) with a colored discharge (PAP-00140891 at PAP-00140892, 959).

c. In 1986, NJDEP documented the direct discharge of paint pigments into the Passaic River during Sherwin-Williams cleaning operations. Wash water discharge was contaminated with powdered paint containing clay, calcium carbonate, and titanium (PAS-00123140 at PAS-00123300).

d. In 1986 and 1987 PVSC inspectors observed discharges described as "grey paint like material" and "heavy latex material" to the Passaic River via the PVSC sanitary sewers (PAS-00123140 at PAS-00123296; PAS-00014579 at PAS-00014645–646).

e. In 1987, Sherwin-Williams was issued a PVSC Notice of Violation when a truck driver flushed heavy latex material into the onsite (storm) sewer which led to the Passaic River (PAS-00123140 at PAS-00123296).

57. Numerous spills were later documented to have occurred historically at the site, and site media are contaminated with various COCs associated with historical site operations, including DDT and dioxin (BBC000116; PAP-00367356; BBL000055).

58. Each of the eight Passaic River ROD COCs were detected onsite including mercury and copper in soil and wastewater effluent; total PCBs in soil; total DDx, PCDD/Fs (including but not

32

limited to 2,3,7,8-TCDD and TEQ), dieldrin, HMW PAHs and LMW PAHs in soil and groundwater; and lead in soil, groundwater, and wastewater effluent. Of note, dioxin contamination was discovered in soil in the southeastern portion of the site[9] (at depths to 8 ft bgs in a sample location referred to as H-8) (PAP-00126493 at PAP-00126502–503). 2,3,7,8-TCDD was detected at concentrations up to 57.6 ppb and dioxins/furans (TEQ) at concentrations up to 5,161.82 ppb (TSWC-FED-00055617 at TSWC-FED-00055899; TSWC-FED-00055592 at TSWC-FED-00055615).

59.   In 2006, the New York Academy of Sciences performed a study to demonstrate the amount of dioxin that can be contributed to the lower Passaic River and Newark Bay using the Sherwin-Williams Site as one example. They estimated that runoff from the site resulted in 0.006 grams TEQ per year of dioxins in runoff from the site. It is expected that other COCs present in soils at the site–including mercury, PCBs, total DDx, copper, lead, dieldrin, and PAHs–would also be transported to storm sewers or to the Passaic River via runoff.

60.   Batson assigned Sherwin-Williams a culpability factor of 5 percent for "occasional noncompliance," noting incidents which are categorized as spills or accidents. Batson even notes a "continued problem of paint materials discharging from Sherwin-Williams," which alone supports that Sherwin William's operating procedures were culpable. Interviews of former employees indicated that it was common practice to dump process waste, drums filled with waste from prior spills, damaged products, paint, and other products and unwanted liquids directly into the Passaic River. From 1948 to 1996, over a dozen instances of waste dumping or flushing, improper sewer connections and spills were recorded at the Site. Assigning a score based on "occasional non-compliance" is inconsistent with the historical fact record.

---

[9] Sherwin-Williams acquired this portion of the Site in 1965. Prior to 1965, multiple tenants including Montrose Chemical Company operated there.

ALCD-PUBCOM_0000721

### 3.  The Givaudan Site (Givaudan Fragrances Corp.)

61.     Givaudan operated at its Clifton, NJ Site from 1924 through 1998, manufacturing a variety
of aromatic chemicals, flavors, fragrances and specialty chemicals including hexachlorophene
(HCP; also identified by Givaudan as G11) from 2,4,5-TCP at the site. Manufacture of HCP took
place from at least 1939 through 1984 on the southern parcel of the Givaudan Site (the area south
of Delawanna Ave.). Givaudan was known to have manufactured 2,4,5-TCP at the Site from at
least 1947 to 1949, and to have acquired it from offsite suppliers during other years of HCP
manufacturing. As early as 1953, Givaudan was cited by PVSC and other municipal inspectors for
discharges to the Third River resulting from breaks and leaks in a sewer line carrying process waste
from the Givaudan facility, in River Road and under the Third River Bridge, to the PVSC trunk
sewer. Historical records indicate this was a continual problem as documented breaks/leaks and
other incidences occurred as follows:

a.   In 1953, the Board of Chosen Freeholders of the County of Passaic approved a resolution
for Givaudan to replace the existing 16-inch cast iron sewer line with a "15" extra strong
clay line beneath the Third River Bridge at River Road" and that Givaudan will be
responsible for the cost of replacement and subsequent maintenance. (PAP-00170263 at
PAP-00170264).

b.   As reported in PVSC's 1971 Annual report on August 27, 1971, "The heavy rains, at the
end of August, caused a 15" clay sewer under River Road near the Third River, to break.
Six sections of pipe....were replaced." The repairs were completed on September 1 "...thus
halting the pollution of Third River" (PAP-00176973 at PAP-00176980).

34

ALCD-PUBCOM_0000722

c.  As reported in PVSC's 1971 Annual report, in September 1971, the 15-inch cast iron line
    under the Third River Bridge crossing "started to leak at several joints" (PAP-00176973 at
    PAP-0017698).

d.  PVSC correspondence from July 1977 stated that "a sample taken on June 22, 1977,
    indicated that a serious pollution of the Third River exists," caused by a leak in an 18-inch
    sanitary sewer crossing the Third River at River Road (PAP-00170263 at PAP-00170263).

e.  On July 18, 1977, a County inspector observed at the River Road and Third River crossing
    a "white water mark" at a storm sewer catch basin which after further investigation
    "appeared to have been an over-flow from a sanitary sewer on the Givaudan property"
    (PAP-00176745 at PAP-00176797).

f.  In a May 1978 correspondence from Givaudan to PVSC, four occurrences of breaks in the
    sewer line crossing the Third River at River Road, and their repairs by Givaudan, are noted:
    August 1977; March 15, 1978; March 21, 1978; and April 10, 1978 (PAP-00181213 at
    PAP-00181224). Givaudan notes in the correspondence that "Due to an embarrassing
    series of circumstances, the new line was eaten through in eight months resulting in a serous
    spill into the river on March 15, 1978 and a less serious spill on March 21, 1978. As of
    April 10, 1978, the line has again been replaced" (PAP-00181213 at PAP-00181224.). In
    a March 29, 1978 correspondence from the NJDEP to Givaudan, the NJDEP states that
    "On March 15 and on March 21, 1978 two separate ruptures…occurred. As a result of this
    sewer line failure, a yet undetermined amount of pollutants entered the Third River" (PAP-
    00181213 at PAP-00181218).

35

ALCD-PUBCOM_0000723

62.     The duration and total quantity of the releases from historical breaks/leaks that occurred in the Givaudan-dedicated River Road sewer are not known; however, it was noted at that time that Givaudan discharged three million gallons per day via this sewer line.

63.     The sewer line in which the breaks and leaks occurred transported Givaudan's entire production waste stream to the PVSC collection system for subsequent treatment; such breaks/leaks were primarily attributed to Givaudan's improper operation of the pH control system (PAP-00181213 at PAP-00181217.) Although these discharges to the Third River appear to not have been characterized for the presence of specific COCs, waste streams associated with 2,4,5-TCP and HCP have been identified by EPA as associated with dioxins, as was confirmed by later site investigation sampling at the facility.

64.     Additionally, a 1951 Givaudan memo titled Recovery of G-11 from Sediment in Sewer Ditch (PAP-00185144 at PAP-00185146) indicates that Givaudan's process wastewater contained high concentrations of HCP. Specifically, the memo states that based on a study conducted in 1951, which included the collection of sediment samples from the "pond," which was "...part of our old sewer system," approximately 10,000 pounds of 60 percent pure G-11 could be recovered. The pond, also referred to as the spent acid pit, was connected to the sewer line in River Road, which was subject to the breaks and leaks noted above, confirming that the wastewater discharged from the breaks and leaks was likely contaminated with HCP, dioxin, and other associated chemicals.

65.     This dedicated Givaudan process waste sewer line within River Road (which had several breaks and leaks as previously discussed) ultimately connected to the PVSC trunk sewer upstream of the Yantacaw Street combined sewer outfalls (CSO)/emergency relief point (Yantacaw CSO). The Yantacaw CSO (also known as Yantacaw Street Overflow Chamber No. 003) was constructed

36

to allow wastewater in the Yantacaw Trunk Sewer to be diverted during rainfall events to the Third River at the confluence with the Passaic River. A partial chronology of bypasses for the period between 1924 and 1990 was developed (PAP-00176612) documenting numerous discharges occurring during the operations of the Givaudan facility. Givaudan was discharging process waste at a flow rate up to 2.5 million gallons per day (PAS-00035825 at PAS-00035828), which would have discharged to the Passaic River during these Yantacaw bypasses. Bypass examples include:

- 1951: Yantacaw bypassed for at least 114 hours, including during regular business hours on January 23, February 1, February 21, March 14, and March 20.

- 1952: Yantacaw bypassed for at least 800 hours, including a continuous bypass that lasted from April 29 to May 5, one that lasted from November 15 to November 28, and other bypasses during regular business hours in March, April, May, June and November.

- 1953: Yantacaw bypassed for at least 1,218 hours, including a continuous bypass that lasted from Sunday, February 15 to Tuesday, March 10 (16 regular business days) and other bypasses during regular business hours in March, April, May, June, October, November and December.

- 1967: Yantacaw bypassing as of Nov, 18, 1967 noted to be 16.30 MGD (or 5.9 million gallons total).

- 1969: Repairs to the two diesel pumps at the treatment plant resulted in bypassing to the river for a period of "several months."

66.    Later, in the early 1980s, NJDEP and EPA identified the Givaudan facility as a potential dioxin site requiring site investigations and remedial actions. Through such work, extensive dioxin contamination was identified and further evidence of historical discharges to the Passaic River and its Third River tributary were confirmed.

ALCD-PUBCOM_0000725

a.  The total estimated potential daily exfiltration of chemical process waste from damaged onsite process sewers was determined to be approximately 80,000 gallons per day based on inspection and testing of the sewers in July 1983 (PAS-00033905 at PAS-00033925). Such exfiltration impacted groundwater and surface/shallow soil.

b.  Site soil sampling and analysis confirmed the presence of dioxin and dioxin-associated compounds and all other ROD COCs. The maximum detection of 2,3,7,8-TCDD identified onsite was 200 ppb in subsurface soil (PAP-00179675 at PAP-00179718).

c.  A May 1993 site stormwater drainage study (PAP-00178565 at PAP-00178577, 585, Table 1 and Exhibit 1) confirmed that for at least 44 percent of the manufacturing area, stormwater runoff discharged to the Passaic River and Third River. Stormwater runoff flowed over known contaminated soil (dioxin and other ROD COC contaminated soil), mobilizing such contaminants within the runoff. In areas with documented surface soil contamination, runoff was collected in onsite drainage swales (DOCID_TIG_ESI_0000092132) and directed offsite to stormwater infrastructure which then discharged directly to the Passaic and Third Rivers (PAP-00178565 at PAP-00178570, Tables 1, 2 and Exhibit 1).

d.  In 1983, Givaudan had been informed by their contractor that "with the discovery of some additional TCDD contamination in exposed soils onsite, it is imperative that the stormwater management plan be implemented as soon as possible. Rerouting of surface drainage away from the exposed soil areas will prevent *further* transport of TCDD both on-site and off-site." (DOCID_TIG_ESI_0000146564 at p. 4). As of 1983, Givaudan was aware of the potential for offsite migration of COCs to adjacent properties, but there is no evidence that Givaudan took any steps to sample neighboring properties and address any possible

38

ALCD-PUBCOM_0000726

impacts. Twelve years later in 1995, Givaudan was notified by its neighbor at 291 River Road, that based on their own sampling, 2,3,7,8-TCDD was detected in soil at concentrations up to 246 ppt. (PAP-00177476 at PAP-00177561–563).

e. A 1992 Stormwater Pond Emergency Repair Plan stated that "During rainfall events which exceed 2 inches, the pond will fill and result in an overflow condition. The runoff continues to a swale finally discharging to the Department of Transportation (DOT) stormwater system at River Road." This River Road stormwater system discharges to the Passaic River (PAP-00181314 at PAP-00181315). The pond contained contaminated stormwater runoff from the site and was also used for a period of time for process waste disposal. Precipitation of two inches or greater over a three-day period of time occurred approximately 500 times during the operational period of the pond. Post-closure sampling of the pond confirmed the presence of ROD COCs (copper, lead and mercury) (PAS-00033747 at PAS-00033887, 888). Additionally, sampling of surface soil directly around the pond in approximately 1983 to 1984 confirmed the presence of dioxin at multiple locations and up to 34.29 ppb (PAP-000183454 at PAP-00183457). Soil samples collected from the area of the swale in which pond overflowed, and which other runoff accumulated and traversed to the DOT stormwater system at River Road, were later sampled and concentrations of 2,3,7,8-TCDD ranging just under 20 ppb were identified at the surface. A near surface sample (sample GIV_L-27 at 10 inches below the surface) 2,3,7,8-TCDD was detected just under 50 ppb (PAP-00183454 at PAP-00183457). Additionally, a figure from a 1983 Phase 1 Report for the Site identifies an "intermittent stream" connecting the pond to the southern property line discharging to River Rd. (which then ultimately discharges to the Third and Passaic Rivers) (PAP-00177476 at PAP-00177554).

39

f. Closure of the onsite stormwater pond was conducted in 1999 and required the removal of water contained in the pond and subsequent excavation of up to seven feet of contaminated sediment (PAP-00175090 at PAP-00175123). During the stormwater pond decommissioning, 2,4,5-TCP was detected in three post-excavation samples at concentrations of 2,900 ppb, 3,000 ppb, and 17,000 ppb (PAS-00039956 at PAS-00040294). Curiously, no sampling for 2,3,7,8-TCDD was reported (PAP-00175090 at PAP-00175125). This data confirms that the stormwater pond received contaminated waste and stormwater and would have contained dioxins. During the pond closure, all water that was removed (in excess of 200,000 gallons) was to be sent to a municipal wastewater treatment plant (WWTP). However, the documentation of contaminated pond water disposal in the remedial action report (PAP-00175090, Appendix C; 2000 Remedial Action Report for Sewer Decommissioning) is significantly lacking; manifests from the WWTP were not signed, which would have otherwise confirmed their receipt of such wastewater (PAS-00033905 at PAS-00034220). Additionally, documentation in the same Appendix C of the remedial action report actually denotes that some waters removed from onsite closure activities was disposed "ON SITE" (one of several example at PAS-00033905 at PAS-00034235). In 1996, a closure plan for the pond (PAP-00181289 at PAP-00181294) was prepared and approved by NJDEP that specified that stormwater in the pond/lagoon would be pumped out and discharged to the stormwater system.

67. In addition to the discussed stormwater discharges, contamination of groundwater at the site, and subsequent migration, allowed for the discharge of site COCs to the Passaic River. As identified during a Phase 1 groundwater evaluation in 1983 (GIVA-FED-0000354654), groundwater contamination was confirmed "...directly attributable to abandoned waste sites,

40

and/or chemical spills on the property…There are many discreet potential contamination sources…in the form of old disposal sites and chemical spill sites." (GIVA-FED-0000354654 at GIVA-FED-0000354686). It is further noted in an internal March 1983 Givaudan memo (PAP-00181320 at PAP-00181493) regarding a regulatory enforcement activity related to groundwater contamination, that groundwater flows to a local restaurant (Rutts-Hut) where it operates a well using such groundwater for a variety of functions. Well water is subsequently discharged to the Passaic River at a rate equivalent to 150 gallons per minute. The internal memo further states that "well contamination will be viewed as a serious problem because pollutants are discharged to a navigable water way (i.e., the Passaic River)."

68.    Passaic River ROD COCs, as well as other contaminants, were detected in site media at elevated levels. Many soil contaminants found at levels exceeding NJDEP remediation standards at the site are consistent with manufacturing/use by Givaudan including 2,3,7,8-TCDD; copper; lead; mercury; PAHs; numerous volatile and semi-volatile constituents; and several other dioxin-associated compounds including 2,4,5-trichlorophenol.

69.    Givaudan is a documented source of dioxins to the Passaic River based on site characterization and site remedial actions focused on dioxin soil contamination. Dioxin and other ROD COCs detected onsite have been detected in Passaic River sediment near the site where discharges from the site occurred.

70.    Despite the extensive amount of evidence describing the discharge of hazardous substances from this Site to the Passaic River, including ROD COCs, Givaudan is assigned a culpability score of only 10 percent by Batson. This assigned culpability score of 10 percent represents "Periodic Noncompliance" and is reportedly based upon three Consent Orders it signed in the 1980s. Batson does not consider the fact that Givaudan operated at the Site beginning in the 1920s, with

41

manufacturing of products containing 2,4,5-TCP in the early 1940s, and assumes no documentation of intentional discharges. In fact, Batson only considers dioxin samples of discharge effluent from the 1980s, well after the manufacture of 2,4,5-TCP at the Site, and similarly ignores high concentrations of 2,4,5-TCP and dioxins in soil as evidence of dioxin generation and historical discharge from the Site. Evidence regarding storm water and groundwater discharges from the Site are similarly minimized, and evidence of offsite dioxin contamination is seemingly ignored. Assigning a score based on "periodic noncompliance" is inconsistent with the historical fact record.

### 4.    The S.B. Penick Site (CONOPCO, Inc.)

71.    S.B. Penick and its various successors (Penick) operated at their Lyndhurst, NJ Site from 1938 to 1993, manufacturing a variety of pesticides and botanical products including DDT, DDE, DDD, chlordane, and benzene hexachlorides. The site is located east of the Passaic River at approximate RM 10.9.

72.    As early as 1938, the site discharged to the Passaic River via the Lake Avenue storm sewer (PAS-00112705 at PAS-00112806). PVSC documented multiple polluting discharge events from the Site to the Passaic River through the storm sewer and via the South Drainage Ditch (connected to the storm sewer that discharged to the Passaic River at the Lake Avenue outfall) during this time including:

   a.   03/1947: A dark brown chemical waste entered storm ditch leading to Passaic River (PAS-00112705 at PAS-00112810; PAS-00112705 at PAS-00112811).

   b.   04/1947: Industrial and sanitary waste reached the Passaic River via storm ditch (PAS-00112705 at PAS-00112813).

42

   c.  04/1948: Amber fluid entered the Passaic River via site storm sewers (PAS-00112705 at PAS-00112815).

   d.  04/1956: A "black foul-smelling discharge" entered the storm sewer and reached the Passaic River; the source was traced back to cleaning operations at the site (PAS-00112705 at PAS-00112747).

   e.  05/1956: A "jet-black" discharge entered the Passaic River that was traced back to the site (PAS-00112705 at PAS-00112744–746).

   f.  11/1970 to 09/1971: Intermittent "polluting" discharges, reported as violations by PVSC, from the site entered the Passaic River via the Lake Avenue storm sewer (PAS-00112705 at PAS-00112727–729).

73.    According to a 1994 NJDEP ISRA inspection report, a former Penick facility employee stated that prior to 1970, the site's own sanitary and storm sewer lines were interconnected, and that the interconnection was removed sometime in the 1970s (PAP-00327204 at PAP-00327204).

74.    However, the fact record indicates that Penick's behavior regarding discharges to the South Drainage Ditch and Passaic River continued for a number of years:

   a.  From January to May 1974, solvent spills and boiler blowdown from the site discharged to Passaic River via storm sewers due to a faulty vent and pump onsite (PAS-00112705 at PAS-00112731–732).

   b.  In February 1976, a yellow substance discharged to Passaic River, the source of which was "dry weather discharge" from the site (PAS-00112705 at PAS-00112806–808; OCC-TIG-E00796550 at pp. 1–2; DOCID_TIG_ESI_0000083066 at p. 1; CAC000003 at p. 1; DOCID-TIG-ESI_0000083515 at p. 1). Penick advised EPA, NJDEP, and PVSC that it was aware of infiltration problems and dry weather flow throughout the plant's sewer

43

system network, causing discharges to the Passaic River (DOCID_TIG_ESI_0000083065 at pp. 1–2; DOCID_TIG_ESI_0000083066 at p. 1; CAC000003 at p. 1; DOCID-TIG-ESI_0000083515 at p. 1).

c.  2/1977 to 9/1977: PVSC reported polluting materials were entering the New York Avenue storm sewer via the South Drainage Ditch (PAS-00112705 at PAS-00112802).

d.  A January, 1978 National Response Center Report reports that a pipeline at Penick was corroded by chemical waste, discharged to storm sewer, overflowed to railroad drainage ditch, thence to city sewers and ultimately discharged to Passaic River (PAP-00328317 at PAP-00328486).

e.  Between February 1978 and June 1984, NJDEP noted several instances of observable staining in various parts of the site including the draining ditch, which showed evidence of black staining (PAS-00112705 at PAS-00112795; PAS-00112705 at PAS-00112793; PAS-00112705 at PAS-00112779; PAS-00112705 at PAS-00112984–985; PAP-00328317 at PAP-00328370, 371).

f.  A 06/29/1990 Letter and Tentative Cleanup Plan for the South Drainage Ditch reports that up to 15 gallons per minute of effluent is diverted into the PVSC sewer line while the remaining effluent is discharged via the town storm sewers to the Passaic River. During a heavy rainstorm, the transfer capacity is "expected to be exceeded." This document also reports on illegal discharges to the trench and an oil-like substance observed on surface waters of the South Drainage Ditch (CONO-FED-0000000214).

g.  A 10/30/1990 progress report indicates that on 9/28/1990, a 2-inch pipe was extended from the storm sewer transfer pit bypass pump into the plant pre-treatment station where oil is skimmed off and pH adjustments are made. The bypass pump flow *now* discharges through

44

this station and is now measured as part of the plant sewer discharges to PVSC (PAS-00112705 at PAS-00113370).

h.  In 1993, NJDEP noted a "black liquid" discharging into the Southern Drainage Ditch from the site (PAS-00112705 at PAS-00113356).

75.    Multiple spills occurred during site operations and COCs contained in these spills were likely transported into the site storm sewer system or the South Drainage Ditch via runoff or overland flow:

a.  A 05/1980 spill of 100,000 gallons of toluene occurred due to leaks in underground storage tanks (USTs); the severity of the spill was not realized until the following year when nearby trees in this area were observed to be defoliated (PAS-00112705 at PAS-00112776; PAS-00112705 at PAS-00112779; PAS-00112705 at PAS-00112927).

b.  Also in 1980, an UST ruptured releasing an unknown amount of toluene (PAP-0327169 at PAP-0327174).

c.  Between 12/1981 and 3/1998, NJDEP noted areas of staining and evidence of other spills in various areas of the site, as well as deteriorating drums and evidence of overflows in diked areas of the site (PAS-00328317 at PAS-00328530; PAS-00112705 at PAS-00112952; PAP-00328317 at PAP-00328371; DOC_ID_TIG_ESI_0000083072 at pp. 1–2; CONO-FED-0000024704 at CONO-FED-0000024704; CONO-FED-0000008538 at CONO-FED-0000008538; PAS-00112705 at PAS-00112973).

76.    Passaic River ROD COCs have been detected onsite and are associated with the historical operations of the Penick facility: total DDx, total PCBs, dieldrin, HMW PAH, LMW PAH, copper, lead, and mercury, in soils and groundwater. Of note, in 1991, the Southern Drainage Ditch was found to have elevated levels of the following Passaic River ROD COCs and site COCs including:

45

individual PAH compounds, 4,4-DDT, 4,4-DDE, 4,4- DDD, lead, mercury, and dioxin-associated compound 1,4- dichlorobenzene (PAP-00328258). Site soil was also contaminated with EPA dioxin-associated compounds lindane and 1,2,4-trichlorobenzene, as well as DDE, DDD, $\alpha$-BHC, b-BHC, dieldrin, aldrin, and heptachlor (PAS-00112705 at PAS-00113156; PAS-00112705 at PAS-00112928; PAP-00327237 at PAP-00327294; PAS-00112705 at PAS-00113127).

77.    Penick is a suspected source of dioxins to the Passaic River due to their onsite usage of dioxin-associated compounds (lindane, maleic acid), onsite contamination that includes dioxin-associated compounds (lindane, 1,2,4 trichlorobenzene, 1,4-dichlorobenzene), and documented discharges to the Passaic River.

78.    Batson applies a culpability factor of 10 percent for periodic non-compliance at the Penick Site. Batson further defines a culpability factor of 10 percent as indicative of "episodic releases of COCs during facility operations or other industrial practices that indicate the potential for mishandling or release of COCs with culpable intent and or knowledge." Incidents cited to support this culpability factor include documented discharges of unknown off color materials in the storm sewer that were traced back to the facility in 1947, 1948, 1956, 1970–1971, 1974, 1976, 1977, and 1978. However, Batson did not account for the employee testimony indicating that prior to the 1970s, the site sanitary sewer lines were interconnected with the storm lines, resulting in intentional discharges of process related wastes. Assigning a score based on "periodic non-compliance" is inconsistent with the historical fact record.

### 5. The Bayonne Barrel & Drum (BB&D) Site

79.    The Bayonne Barrel & Drum Company operated a drum reconditioning operation from at least 1940 through 1983 at their site on Raymond Boulevard in Newark. Processes including the

46

draining of residues, cleaning, incineration and painting took place at the site, which was located along Harrison Creek, a tributary of the Passaic River.

80.     As early as 1945, the BB&D Site was cited by PVSC for documented discharges to Harrison Creek and the Passaic River. In the years prior to connection to the sanitary sewer in the late 1960s, process wastewater discharged to Harrison Creek, which led to the Passaic River.

   a.  As of 1945, PVSC documented BB&D's discharge of drum washings via a drainage ditch into Harrison Creek. A 1945 correspondence to BB&D from PVSC counsel states that BB&D is "required by law to bring about abatement of pollution of the Passaic River and its tributaries..." (PAS-00054964 at PAS-00054966–975).

   b.  BB&D planned to construct a large settling lagoon for wastewater disposal (PAS-00054964 at PAS-00054968, 970; DOCID_TIG_ESI_0000094196). The lagoon was constructed in 1946 and BB&D reported that the outlet ditch to Harrison Creek was permanently blocked off (PAS-00054964 at PAS-00054975). However, drainage channels still connected the lagoon to the Passaic River via Harrison Creek. A 1948 report to the PVSC documented several incidences of lagoon failure and leaks resulting in discharges to Harrison Creek in February, June, August, September and October of that year (PAS-00054964 at PAS-00054976–980).

   c.  PVSC continued to report pollution issues between 1958 to 1959 and ordered BB&D to construct a wastewater settling tank to replace the lagoon (PAS-00054964 at PAS-00054981–985).

   d.  The BB&D facility did not begin to discharge process wastewater to the PVSC POTW via the sanitary sewer in Raymond Boulevard until approximately the late 1960s when the

47

sanitary sewer in Raymond Blvd. was constructed (MAXUS0827997 at MAXUS0827998; PAS-00105664 at PAS-00105668–670).

81.    Records indicate that discharges to the Passaic River continued after tying-in to the sanitary sewer.

    a.    In a 1976 correspondence to PVSC, BB&D reported that all water discharged to the sanitary sewer, except during heavy rainfall when the tanks could not accommodate the additional capacity and overflowed directly to the storm sewer. BB&D reported, "We are also plagued on numerous occasions with flooding on our property due to high tides from the Passaic River and backup through the storm sewers…If any seepage occurs through any other outlet than the Sanitary Sewer, we have no control over this" (PAS-00105664 at PAS-00105686). Storm drains from this portion of the site discharged via Harrison Creek (enclosed in a stormwater culvert as of 1980) to the Passaic River (OCC-TIG-BS0003127 at OCC-TIG-BS0003138).

    b.    During a 1982 NJDEP inspection, a 5,000-gallon UST that received process wastewater from drum cleaning was found to be overflowing into the storm sewer. The line to the UST was also found to be leaking to the storm sewer and was broken in two places (BBD00044017 at BBD00044019; BBA000014 at p. 3). Problems with the wastewater system were also apparent, with repeated site visits by PVSC and NJDEP reporting discharges to the storm sewer during at least 1980 to 1983. The flow of discharge to the storm sewer during at least one inspection was 5 to 10 gallons per minute (MAXUS0827997 at MAXUS0827998–999; DOCID_TIG_ESI_0000094168 at pp. 1–2; PAS-00054964 at PAS-00054992–993).

48

    c.   NJDEP inspections from 1982 to 1984 documented uncontrolled waste management onsite with no containment or runoff control including ash/sludge material, 30,000 stacked drums, and sol stained soil (PAS-00105664 at PAS-00105779; FOIA-EPA-0113817).

82.    Later, in the early 1980s, EPA issued the BB&D facility a Consent Order to conduct investigations and remedial actions and submit a site closure plan. Through such work, extensive dioxin contamination, as well as contamination with other ROD COCs, was identified and further evidence of historical discharges to the Passaic River were confirmed.

    a.   During a 1995 EPA Removal Action, eight ash piles were sampled (the same ash storage piles that had remained onsite since the facility closed in 1983 [PAS-00054964 at PAS-00054993–999]). Analysis of the samples indicated the presence of dioxin, PCBs, and metals. Two of the waste ash piles with high levels of dioxin were excavated and removed from the site at this time (SEQ00001447 at SEQ00001450–451). An unknown amount of ash and "pit sludges" were removed from Building 2 (drum staging and incineration building) and secured in covered roll-off containers (SEQ00001447 at SEQ00001450–451).

    b.   Sampling of the site in 1997 identified 911 ppb TEQ (total TCDD toxic equivalency) in a surface soil sample (PAS-00105664 at PAS-00105894). Sampling conducted in 2011 identified a detection of 45 ppb of 2,3,7,8 TCDD in a subsurface soil sample (NJDEP 2021 Hazsite database). Other detections in soil samples included total PCBs up to 3,520 ppm (BBDPHARMA01289 at BBDPHARMA01292) and elevated concentrations of 40 to 60 ppm of 4,4'-DDD and 4,4'-DDE.

    c.   Sediment in the storm drains was sampled and analyzed in 1997. Results showed that sediment contamination included PAHs, PCBs, copper, and lead, among other

49

contaminants (FOIA-EPA-0116923; FOIA-EPA-0116904 at p. 10; FOIA-EPA-0116904 at p. 19). Sediment samples were also collected from the storm drains for dioxin analysis and reportedly contained "elevated" levels of dioxin (BBD00000295; FOIA-EPA-0116904 at pp. 1–2, 13).

d. The New York Academy of Science's Harbor Project evaluated dioxin data from analysis of site runoff as of 2006 and found that the site was actively contributing between 1 and 9 grams TEQ to the Passaic River each year (PAP-00428781 at PAP-00428884–887).

83. Passaic River ROD COCs, as well as other contaminants, were detected in site media at elevated levels. Many soil contaminants found at levels exceeding NJDEP remediation standards at the site are consistent with operations at BB&D including 2,3,7,8-TCDD, dioxin-associated compounds, DDx, PCBs and metals.

84. BB&D is a documented source of dioxins to the Passaic River based on site characterization and site remedial actions undertaken focused on dioxin contaminated ash piles and soil. Dioxin and other ROD COCs, detected in onsite soil, sediment from the storm drains discharging to Harrison Creek and waste piles, have been detected in Passaic River sediment near the site where discharges from the site occurred.

85. Despite the extensive, historical evidence of polluting discharges from this Site to the Passaic River, and the presence of significant concentrations of dioxins on the Site, EPA has failed to even issue a General Notice Letter to the Site PRPs for conditions in the Passaic River. This lack of action is inconsistent with other upland Superfund Sites with multiple PRPs in Region II for which EPA has issued General Notice Letters for conditions in receiving water bodies, such as at the Berry's Creek Superfund Site in New Jersey.

50

### 6. The PPG Site

86.    PPG and its predecessors operated their site waterfront to the Passaic River at RM 7.2 from 1902 until August 1971, when the site was sold to Riverside Avenue Properties. Initially, operations consisted of paint and varnish manufacture but over the years, operations expanded to include manufacture of lacquer, resins, linseed oil, and oil storage. After the sale of the property, operations by various tenants continued through the 1990s and into the 2000s. Post PPG operations consisted mainly of repackaging, warehousing, and distribution of various products and chemicals. In 2013, the Site was added to the National Priorities List.

87.    As early as 1969, PPG was cited by various agency inspectors for direct discharges from the operating facility to the Passaic River.

   a.    In 1969, the U.S. Department of the Interior Federal Water Pollution Control Administration observed two 36-inch outfalls, and several other pipes, discharging from the PPG Site (PAP-00140891 at PAP-00140959).

   b.    In 1972, during a PVSC site inspection, seven outfalls were observed, two of which were reportedly sealed by PPG upon cessation of operations (PAS-00080015 at PAS-00080016; PAS-00102443 at PAS-00102448, 458; PAS-00006295 at PAS-00006301).

88.    In May 1969, an explosion and fire destroyed Building 17, the facility resin mill and storage facility for various materials. The former building was located adjacent to the Passaic River and debris from the explosion and fire-fighting efforts likely released hazardous substances to the Passaic River.

89.    Later, interviews of former PPG employees indicated that multiple discharges of wastes and other materials took place directly to the Passaic River from the PPG Site.

51

ALCD-PUBCOM_0000739

a. A PPG employee from 1946 to 1971 recalled floor drains covered by grates and 4-6 inch pipelines directly to the Passaic River in each building. He recalled witnessing employees sweeping products including solvents, paint residue and raw materials down the floor drains to the river. He also recalled witnessing employees dumping materials directly into the floor drains as well as directly into the river.

b. A PPG employee from 1953 to 1968 recalled solvents were used to clean paint vats, and solvents and paint residue would be disposed via a "disposal sewer line," and that floor wash water used to cleanup spills and residual paint would be disposed into a hole in the floor covered by a plate.

c. PPG Industries employee from 1945 to 1971, recalled that paint residue was disposed down a floor drain from the third floor of an unspecified building, and discharged into the Passaic River.

d. PPG Industries employee from an unknown date to 1971, recalled seeing on one or two occasions approximately one drum or less of paint spilled into the Passaic River from a loose hose during a paint delivery at the dock.

e. PPG Industries employee from the early 1930s to 1971, recalled seeing stormwater and boiler room (Building 6) water discharged to the sewer system

f. PPG Industries employee from 1945 to 1971, recalled a flooding event at the site where several drums stored outside Building 17 had floated away.

90.    In 2009, the PPG Site was identified by EPA as a source of an ongoing discharge to the Passaic River including discharges of benzene, mercury, chromium, and arsenic (DOCID_TIG_ESI_0000159569 at DOCID_TIG_ESI_0000159569). EPA's emergency removal action to stop the discharge to the Passaic River in 2009 consisted of plugging discharge pipes

52

from several buildings and two related storage tanks that were once associated with PPG's historical operations (DOCID_TIG_ESI_0000159569 at DOCID_TIG_ESI_0000159569).

    a.   Analysis of aqueous samples from the two tanks, located in the basement of one of the original facility buildings, exhibited total dioxin TEQ values ranging to 21,707 pg/L (PPGL-FED-0000017445 at PPGL-FED-0000017456).

    b.   A floor sweep composite sample collected by EPA from the first floor of one of PPG's operations building (Building 7) exhibited a total dioxin TEQ calculated value of 939 nanograms per kilogram (ng/kg) (PPGL-FED-0000017445 at PPGL-FED-0000017461; PAP-00319479 at PAP-00320389). A floor sweep composite soil sample collected from the 3rd and 5th floors of Building 7 exhibited total dioxin TEQ calculated values of 2,446 ng/kg and 214 ng/kg, respectively (PPGL-FED-0000017445 at PPGL-FED-0000017469, 477).

    c.   The site was finalized on the National Priority List on May 24, 2013 and referred to as the Riverside Industrial Park Superfund site. An RI/FS was initiated on May 9, 2014 (DOCID_TIG_ESI_0000159571 at DOCID_TIG_ESI_0000159571–572).

91.    Passaic River ROD COCs were detected in onsite media including mercury, lead, and LMW PAHs in wastewater and soil; PCBs and copper in soil; and PCDD/Fs (including but not limited to 2,3,7,8-TCDD and TEQ) in wastewater and floor sweeps. Additionally, dioxin-associated compounds including chlorinated benzenes (DCBs and TCBs), 2,4-dichlorophenol, 2,4,6-trichlorophenol, and pentachlorophenol were identified onsite.

92.    Despite the extensive history of discharges from this Site to the Passaic River, Batson assigns a culpability factor score of 5 percent due to occasional noncompliance. This assignment is reportedly based on evidence related to direct discharges to the river and the 1969 fire in the

ALCD-PUBCOM_0000741

resin building. Batson does not account for the multiple violations documented by PVSC, EPA, or former employee testimony. Multiple lines of evidence support culpable intent to avoid regulations applicable to PPG, and this culpability score is inappropriate. Assigning a score based on "occasional non-compliance" is inconsistent with the historical fact record.

### 7. The Alliance Chemical Site

93.     Alliance Chemical operated from 1946 through 2001 at their Site in Newark, manufacturing specialty organic chemicals including dye and pigment intermediates. The headwaters of Plum Creek, a tributary of the Passaic River, are located on the Site approximately a half mile upstream of its discharge point to the Passaic River at approximately RM 1.

94.     As early as 1948, Alliance was observed by a PVSC inspector discharging an unspecified, yellow-colored liquid to a storm ditch leading to Plum Creek (BBG000015). Similar discharges continued to occur over a number of years.

    a.  In 1965, inspections conducted by the U.S. Army Corps of Engineers (USACE), reported that acidic substances from Alliance were being discharged to the Newark Bay, (via Plum Creek). The source was believed to be from a weak "wall" located in Alliance's acid pit. Note: although the discharge location is identified geographically as "Newark Bay," the actual discharge point is located within the Passaic River near RM 1 (PAS-00049812 at PAS-00049845–846).

    b.  In 1966, USACE notified Alliance that discolored acidic waters in the Newark Bay had been partially traced back to Alliance (PAS-00049812 at PAS-00049849). Alliance acknowledged the discharges and attributed the events to a leak in a pit wall (the same weak wall identified during the USACE inspection in 1965) and a malfunctioning sump pump (PAS-00049812 at PAS-00049854–855). Until 1970, the acid pit (also described as

54

the unlined lagoon) was used as an equalization pond for aqueous influent before the wastewater was discharged to Plum Creek (MAXUS0832032 at MAXUS0832033; PAS-00049812 at PAS-00049874).

c. In a 1968 internal memorandum, Alliance described its handling of acidic wastes as "inadequate" and admitted that red-colored water had been discharging from its site facility (PAS-00049812 at PAS-00049874–875).

d. In June 1969, PVSC traced "polluting material" found in the Passaic River back to Alliance (PAS-00049812 at PAS-00049879).

e. In December 1969, PVSC collected samples from the Alliance outlet to Plum Creek and found the effluent to be "flammable and dangerous" (PAS-00049812 at PAS-00049887).

95.    Alliance was a manufacturer of specialty organic chemicals, which included processes identified by EPA as associated with the generation of dioxins as well as other Passaic River COCs. Process wastewater was discharged directly to Plum Creek from its lagoon during the timeframe of the above-reported discharges.

96.    Later, in 1970, Alliance began to discharge its pre-treated effluent to PVSC, and ultimately filled the lagoon and wastewater ditch leading to Plum Creek.

a. In the early 1980s, NJDEP conducted limited onsite sampling in the areas around the former lagoon, and due to Alliance's use of dioxin-generating compounds, recommended that the site be further evaluated for the presence of 2,3,7,8-TCDD. Soil sampling conducted for this purpose in 1985 was incomplete in the area of the former lagoon and wastewater ditch due to the condition of the fill material that had been used. Samples in these proposed locations were recommended for resampling by the consultant, but no documentation of such resampling has been identified to date.

55

b. Subsequently, dioxin was identified at the site during sampling conducted for the NJ Turnpike Authority. Additional sampling episodes conducted at the site also identified the presence of dioxin-associated compounds including 2,4,5-trichlorophenol and 2,4-tichlorophenol at ppm-range concentrations, in addition to other Passaic River COCs.

97.    Many of the Passaic River ROD COCs, as well as other contaminants, were detected in site media at elevated concentrations, including dioxins, PCBs, mercury, total DDx, copper, lead and PAHs.

98.    Batson applies a culpability factor of 10 percent for periodic non-compliance at the Alliance Site. Batson further defines a culpability factor of 10 percent as indicative of "episodic releases of COCs during facility operations or other industrial practices that indicate the potential for mishandling or release of COCs with culpable intent and or knowledge." Incidents cited to support this culpability factor include Notice of Violations for hazardous discharges spanning from 1973 to 1992. However, this assessment does not account for discharges made as early as 1948 and continuing through the 1960s. As this Site discharged its process waste directly to Plum Creek and the Passaic River up until connecting to PVSC in the 1970s. Assigning a score based on "periodic non-compliance" is inconsistent with the historical fact record.

### 8. The Pitt-Consol Site

99.    The Pitt-Consol Site was operated from 1925 through 1983 by predecessors of VSI Liquidating, Inc. and the Pitt-Consol Chemical Company. Located waterfront to and inland of the Passaic River at RM 1.3, manufacturing at the site centered on the production of coal tar distillation products, including acids, cresols, tars, phenolics, naphthalene and related products.

100.    Historical records of the PVSC indicate a long period of non-compliance resulting in a significant history of discharges of hazardous substances to the Passaic River.

56

ALCD-PUBCOM_0000744

a.  The Roanoke Avenue CSO is owned and operated by the City of Newark, and discharges to the Passaic River via an outfall located to the south of RM 1.5 (PAP-00395561 at PAP-00395571, 669–672). Dry weather discharges from this CSO were routine and commonplace over a period of decades due to illegal tie-ins and malfunctions, resulting in the discharge of hazardous substances from the site. (PAS-00006250 at PAS-00006259).

b.  As early as 1948, PVSC documented issues with pollution entering the river from the Roanoke Avenue combined sewer including Pitt-Consol Site yard drainage of oil and tar, as well as a gasoline and fuel oil discharge to the Passaic River (PAS-00014082 at PAS-00014089; PAS-00014082 at PAS-00014086; PAS-00044093 at PAS-00044107).

c.  In 1949, PVSC reported that the sewer chamber between Roanoke and Doremus was "foul with gas" and that the acidic condition of the sewer was disintegrating the masonry (PAS-00044093 at PAS-00044109).

d.  Discharges of polluting materials from unknown sources continued to enter the river via the Roanoke Avenue combined sewer for several years. In 1958, PVSC requested that the City of Newark prepare a report on the status of abating this pollution (PAS-00044093 at PAS-00044131). The pollution continued and in 1969, PVSC reported many illegal industrial connections to the Roanoke Avenue combined sewer and initiated court proceedings against the City of Newark. In December 1969, the City of Newark built a dam near the Roanoke Avenue outfall so that dry weather flow would be diverted to the PVSC WWTP (PAS-00123140 at PAS-00123205–206). In 1970, a judgment was entered against the City of Newark, and they were ordered to abate and remove all pollution from the Roanoke Avenue and other sewers (PAS-00035111 at PAS-00035316).

57

e.  In 1971, PVSC advised the City of Newark that sewers, including Roanoke Avenue
    continued to represent a source of pollution to the river (PAS-00035111 at PAS-00035316).
    The 1972 PVSC Annual Report (covering 1971) reports industrial waste still being
    discharged into the Passaic River, despite construction of the dam in December 1969.
    Therefore, the City of Newark set out to determine the source of the pollution (PAS-
    00035111 at PAS-00035325).

f.  As part of the City of Newark investigation, on December 9, 1971, during an attempt to
    install a TV camera in a manhole on Roanoke Avenue adjacent to the site, the sewer
    exploded, injuring three workers (PAS-00014082 at PAS-00014156–457; PAS-00014082
    at PAS-00014158). The explosion in the Roanoke Avenue combined sewer resulted from
    explosive vapors in the sewer being ignited during preparations for the TV inspection of
    the sewer line. That work re-commenced in January 1972 (PAS-00035111 at PAS-
    00035325–326).

g.  The TV inspection was completed on January 10, 1972, and a 10-inch connection was
    found downstream of the regulator chamber, west of Doremus Avenue and on the Pitt-
    Consol Site. Samples of the discharge revealed chemical oxygen demand (COD) levels of
    2,662 mg/L and explosive vapors in the combined sewer. The City/PVSC solution to this
    matter was to re-lay approximately 1,200 ft of 54-inch pipe from Doremus Avenue to
    Avenue P; however, no date was given for when this work would begin. This report does
    not mention any enforcement action such as an order to stop the discharge or state whether
    any violations were issued to Pitt-Consol Chemical Company (PAS-00014082 at PAS-
    00014156–457).

58

h. The discharge continued and in 1978, the City of Newark hired Clinton Bogert Engineers to investigate its source (PAS-00006250 at PAS-00006250). According to the Clinton Bogert report, the Avenue P regulator was reported to not be working because sediment was blocking the regulator gate chamber. All flow in the 54-in combined sewer was being discharged directly to the river. The report also states that two tide gate chambers were located at the 60-in outfall, but they only swung open and were unable to return to the fully closed position because of sediment buildup at the outfall. Additionally, coal and tar-like material were found, partially blocking the 60-inch CSO (PAS-00006250 at PAS-00006260). The Avenue P regulator was observed to be jammed in an open position, allowing for untreated wastewater to be discharged to the Passaic River from the Roanoke CSO, likely dating from the mid-1950s (PAS-00044093 at PAS-00044121; PAS-00014082 at PAS-00014154).

i. During sampling performed jointly by PVSC and Pitt-Consol Chemical Company, black tar-like material and chemicals used at the site were observed in the Roanoke Avenue CSO. No tar or coal-like material was found west of the Avenue P regulator chamber. Therefore, the report states: "Its source is evidently Pitt-Consol." Additionally, the report stated that it "appears" that the groundwater beneath the site had been contaminated and that the contaminated groundwater was leaking into the outfall and directly to the Passaic River (PAS-00006250 at PAS-00006261).

101. In a 1972 PVSC Waste Effluent Survey completed by Pitt-Consol with updated information covering 1972 through 1975, it was reported the facility discharged of 67,447,908 gallons of water containing concentrations of hexavalent chromium (0.074 ppm), iron (up to 10 ppm), copper (up to 10 ppm), phenol (2,364 ppm), cresol (1,108 ppm), and xylenols (974 ppm) to

59

the Roanoke Ave. combined sanitary sewer (PAS-00014082 at PAS-00014143–146). This was during the period highlighted above during which all discharges made to the Roanoke combined sewer were discharged to the Passaic River through the Roanoke Ave. Outfall.

102.    Passaic River ROD COCs were detected at the site including mercury, PCBs, and copper in soil and groundwater; and lead, HMW PAHs, and LMW PAHs in soil, groundwater, and the lagoon area. Additionally, through site sampling and analysis of soil and groundwater, dioxin-associated compounds have been detected including 1,2-dichlorobenzene, 1,4-dichlorobenzene, and chlorobenzene.

103.    Batson has assigned Pitt-Consol a culpability factor score of 10 percent for periodic noncompliance based on evidence related to a few discharge events that occurred in the 1970s and early 1980s. While it does attempt to consider the reported connection to the Roanoke Ave CSO discovered in 1972, Batson does not consider the entirety of the time period of discharges via this malfunctioning CSO, which dates from at least as early as the 1950s, nor the reported releases in the 1940s. Assigning a score based on "periodic non-compliance" is inconsistent with the historical fact record.

### 9.        The D&J Trucking Site

104.    D&J Trucking operated at their Newark, NJ Site from 1974 to 1978 (DOCID_TIG_ESI_0000144303 at p. 1; DOCID_TIG_ESI_0000144304 at p. 2). The Site is bordered by a drainage ditch to the east and another drainage ditch to the south, which converge in the southeast corner of the property and drain in a southerly direction into Plum Creek which discharges into the Passaic River at approximate RM 1 (DOCID_TIG_ESI_0000176684 at pp. 45).

60

105.    Numerous hazardous substances were transported to and disposed of by D&J Trucking at
this Site including, but not limited to, liquid waste such as paint waste, tank washings, alkyd
resins, and still bottoms containing hazardous substances (DOCID_TIG_ESI_0000090172 at pp.
7, 19).

106.    Sources of the waste include the Alliance Chemical Site located at 33 Avenue P, Newark,
NJ, (DOCID_TIG_ESI_0000090172 at p. 19) and the Benjamin Moore and Sherwin-Williams
facilities at 134 Lister Avenue, Newark, New Jersey, and 60 Lister Avenue, Newark, New
Jersey, respectively (DOCID_TIG_ESI_0000090172 at p. 7).

107.    D&J dumped liquid waste from vacuum trucks and drums directly onto the ground
surface or into unlined pits at the Site. Liquid waste discharged into Plum Creek and ultimately
into the Passaic River (DOCID_TIG_ESI_0000090172 at p. 7).

108.    D&J Trucking discharged wastes and hazardous substances to the Passaic River through
its tenure at the Site.

  a.  Storm water from the Site discharged to both the drainage ditch along the eastern edge of
      the Site and to the drainage ditch that runs along the southern edge of the Site
      (DOCID_TIG_ESI_0000090172 at pp. 38, 56; DOCID_TIG_ESI_0000144294 at pp. 62;
      DOCID_TIG_ESI_0000176684 at pp. 16, pg. 40).

  b.  In 1977, drums of wastewater containing paint pigments from Benjamin Moore were
      observed being dumped on the ground at the Site (DOCID_TIG_ESI_0000090172 at pp.
      38, 56; DOCID_TIG_ESI_0000144294 at pp. 62; DOCID_TIG_ESI_0000176684 at pp.
      16, 40).

  c.  Also in 1977, several empty 55-gallon drums were observed along the edge of the
      drainage ditch, on the eastern edge of the Site. The surface water of the ditch appeared

61

ALCD-PUBCOM_0000749

polluted and oily matter was observed leaking into Plum Creek, and therefore, would
have ultimately entered the Passaic River (DOCID_TIG_ESI_0000090172 at pp. 38, 56;
DOCID_TIG_ESI_0000144294 at pp. 62; DOCID_TIG_ESI_0000176684 at pp. 16, 40).

d. 55-gallon drums containing hazardous liquid waste containing ROD COCs were dumped
into unlined pits at the Site. It is expected that the hazardous liquid waste would have
seeped into the groundwater beneath the Site, discharging to Plum Creek and/or the
Passaic River (DOCID_TIG_ESI_0000176684 at pp. 43).

109.    In 1977, NJDEP inspections revealed D&J Trucking was continuing to illegally dump
industrial waste at the Site. In December 1977, the president of D & J Trucking and a D&J
Trucking driver were arrested at the Site while illegally dumping drums of paint waste and
flammable material into an open pit (DOCID_TIG_ESI_0000176693 at pp. 1). "Oily matter"
was observed leaking into Plum Creek at the Site (DOCID_TIG_ESI_0000090172 at pp. 7).

110.    In February 1978, NJDEP revoked D&J Trucking's Solid Waste Administration
registration because of the "willful, negligent, and illegal discharges" at the Site
(DOCID_TIG_ESI_0000090172 at pp. 77).

111.    Passaic River ROD COCs detected onsite include dieldrin/DDx, PAHs, PCBs, copper,
lead, mercury and dioxin-associated compounds (DOCID_TIG_ESI_0000090172 at pp. 13, 58,
59; DOCID_TIG_ESI_0000161269 at p. 424).

112.    Site sediments and surface water in the drainage ditch and Plum Creek were sampled and
appear to have been impacted by site COCs including PAHs, copper, lead, dieldrin/DDx and
dioxin-associated compounds (DOCID_TIG_ESI_0000090172 at 38, 56;
DOCID_TIG_ESI_0000144294 at pp. 62; DOCID_TIG_ESI_0000176684 at pp. 16, 40).

62

113.    In 2002, D&J Trucking was the subject of a lawsuit filed by NJDEP relative to the

Avenue P Site and property located adjacent to the D&J Trucking Site on the western side of

Avenue P. The properties subject to the lawsuit are associated with Alliance Chemical Site, the

Avenue P Landfill Site, and the Revere Smelting Site. The Complaint alleges that the Defendants

including D&J Trucking (in addition to Benjamin Moore and Sherwin-Williams) improperly

disposed of hazardous substances, unlawful dumping, and failure to remediate the discharge of

hazardous substances which caused environmental harm for decades. D&J Trucking is alleged to

have engaged in landfill operations, open dumping and creating lagoons of hazardous liquid

wastes including paints, lacquers, paint removers, varnishes, chemicals, and petroleum waste

from the 1960s through the mid-1970s (8/24/2022 Complaint NJDEP vs Ootzie Properties-

NWK, LLC et al.).

114.    Passaic River ROD COCs detected onsite and in the adjacent drainage ditch include

dieldrin/DDx, PAHs, PCBs, copper, lead, mercury and dioxin-associated compounds. Passaic

River sediments adjacent to the site are contaminated with elevated levels of these same COCs.

### 10.        The EnPro/Teval Site

115.    The EnPro/Teval Site is located at 900-1000 South Fourth Street, Harrison, NJ. Two

parcels were originally developed as a single facility for use in the steel industry by the

"Harrison Works," which began operating in 1889 (DOCID_TIG_ESI_0000141817 at

DOCID_TIG_ESI_0000141922). Crucible Steel, a predecessor to EnPro, began operating at the

property early in the 20th century and continued operating on both parcels until 1947, at which

time EnPro sold one of the two parcels.

   a.    In 1947 Charles F. Guyon, Inc., a predecessor to Teval, purchased the "Guyon Parcel"

        and operated a pipe fabrication facility until 1980 (TEVAL 00675 at TEVAL 00677).

63

b. EnPro continued to operate on the remaining parcel until May 1973 and sold it in March 1974 (TIERRA-B-015617 at TIERRA-B-015669, 671).

116.   Prior to 1970, EnPro's predecessor Crucible discharged wastewater and acidic effluent to the Passaic River without treatment.

a. In 1970, PVSC filed a complaint against Crucible alleging that "for some time past" Crucible discharged "polluting material" containing "oil" and material of "a disagreeable appearance and odor" to the Passaic River through a culvert that it owned. These discharges were in violation of New Jersey State statutes (PAS-00000862 at PAS-00000862, 864).

b. After 1970, Crucible installed a rudimentary wastewater treatment plant, and according to an environmental health consultant, the system was only partially effective in neutralizing the wastewater prior to its discharge to the Passaic River (TIERRA-B-015617 at TIERRA-B-015669–670; PAS-00083048 at PAS-00083158).

117.   The Site had a central underground storm sewer system network.

a. The underground storm sewer system was likely constructed in the late 1800s at the time of site development. The Site had an underground storm sewer piping system including 16 laterals that connected to an onsite outfall which discharged to the Passaic River (PAS-000883048 at PAS-000883094, 096; PAS-00083048 at PAS-00083120-122, 127, 129-130; BBF000054).

b. The main storm sewer of the central underground storm sewer system discharged directly to the Passaic River via an inlet at its terminus (BBF000054; PAS-00083048 at PAS-00083121; PAS-000883048 at PAS-000883106 - 89; PAS-000883048 at PAS-000883092 - 95). An undated hand drawn map of the site illustrates two points of

64

ALCD-PUBCOM_0000752

discharge: a 6ft by 6ft box culvert and a 12-inch sewer discharging storm and cooling water (PAS-0083048 at PAS-00083136).

118. Witnesses report observations of process-related material being released to site media and/or washed into surface drains. Before 1969, Crucible regularly spread spent rolling solutions that contained hazardous substances onto its grounds as a dust-abatement procedure (G-PAS-00083048 at PAS-00083128). In 1970, Crucible's General Manager observed that employees steam-cleaned equipment near utility access holes leading to the storm sewer system (PAS-000883048 at PAS-000883095). Crucible's maintenance superintendent acknowledged that employees had dumped waste oil into a pit near a surface drain (PAS-000883048 at PAS-000883105).

119. Site operators used molten lead to quench steel products manufactured onsite in such a fashion that would vaporize in the air, and cool forming lead oxide dust which had to been collected and disposed of as solid waste (PAS-00000913 at PAS-00000913).

120. The site is also documented to be underlain with thick layers of slag 2 to 15 ft deep (PAS-00083048 at PAS-00083121) believed to be associated with, at least in part, the operations of Crucible steel based on observations of historical aerial photographs from 1930, 1954, 1966, and 1970.

121. Passaic River ROD COCs were detected in on site media including PCBs, copper, lead, mercury, and PAHs and were similarly identified in Passaic River sediments.

122. Batson assigns EnPro a Culpability Factor of zero, indicating that the operation was "Historically Compliant." But the historical fact record indicates that EnPro and its predecessors discharged Site wastewater and acidic effluent to the Passaic River from their initiation of Site operations in the early 1900s until 1970. Further, the fact record contains a Civil Action

65

Complaint filed with the Superior Court of New Jersey by PVSC in 1970 related to these direct discharges into the Passaic River that were identified as being in violation of New Jersey State statutes. Assigning a score based on "historical compliance" is inconsistent with the historical fact record.

### 11.        The Benjamin Moore Site

123.    From 1925 to the present, Benjamin Moore operated at several parcels on Lister Avenue in Newark, including part of the former Lister Agricultural Chemical Company property. During its history at the Site, Benjamin Moore produced various paints and coatings, including latex and oil-based paints, stains, varnishes, colorants and alkyd resins. The site is located directly on the Passaic River at River Mile 3.4 (BBF000016 at p. 1; PAP-00238568 at PAP-00238574–575; DOCID_TIG_ESI_0000171686 at p. 1).

124.    Benjamin Moore discharged wastes and hazardous substances to the Passaic River throughout its history at the site.

   a.   Prior to the construction of a sanitary sewer in Lister Avenue in 1937 (PAS-00058552 at PAS-00058556–557; PAP-00448145), the only sanitary and storm sewers in Lister Avenue were a combined sewer, which discharged during overflow conditions to the Passaic River. During this period, it is likely Benjamin Moore discharged waste and stormwater to combined sewer lines that existed during the Lister Agricultural Chemical Company Era, and/or discharged directly to the Passaic River (BBM000020).

   b.   Additionally, the Lockwood storm sewer was routed through the Benjamin Moore Site to the Passaic River, where it ended at a 72-inch outfall, and at least one other Site stormwater outfall was utilized on the western portion of the Site, where it discharged to the Passaic River near Building 7.

66

ALCD-PUBCOM_0000754

c.  Between 1967 and 1968, a Newark Testing Laboratories inspection reported that
"sewerage from the sanitary sewer on Lister Avenue has corroded and eroded its way into
the storm sewer through several eroded openings in the sewer walls" around the
Benjamin Moore plant. The storm sewer referenced in Lister Avenue is that which
connects to the Lockwood SSO (PAS-00055350 at PAS-00055352; BBF000036 at p. 3).
The inspector also notes that a "test of paint solids in sanitary sewer same as in storm
sewer." A separate memo references "a problem at Lockwood, Blanchard, and other
streets in that area whereby manufacturing plants are dumping illegal materials in the
sewers" (BBF000035). It is notable that Benjamin Moore began disposing of their diluted
wash water into the sanitary sewer in June of 1967, two months before the Newark
Testing Laboratories inspection noted pollution and paint solids migrating from the
sanitary sewer to the storm sewer and ultimately to the Passaic River (PAP-00238448).

d.  The New Jersey Department of Health issued an Administrative Order (AO) to Benjamin
Moore on August 15, 1969 due to pollution in the Passaic River "in terms of odor,
turbidity, color, biochemical oxygen demand, chemical oxygen demand, ether soluble
matter and suspended solids" (PAS-00055004 at PAS-00055026). As of October 1969,
Benjamin Moore notes that they are no longer directing wash liquids into their flood
control system. However, NJDEP correspondence from March 15, 1973 regarding the
1969 AO stated that the unacceptable discharge continued based on laboratory samples
collected from a six inch pipe on the Benjamin Moore property during an inspection in
February 1973 (BMC0857, PAS-00055004 at PAS-00055040, BMC0642). Following
this, Benjamin Moore investigated the origin of the discharge, reporting in a March 28,
1973 memo that "liquid waste from the Vehicle Plant…is at present connected to our

67

storm sewer system." The memo continues to identify the "connections which can cause contamination": the portable kettle cooling operation, a lab sink, overflow from the 2,000 gallon reactor cooling system, effluent from the 1600 gallon reactor scrubber, and over from the cooling towers of the 1600 and 1000 gallon reactors (BMC0189). Benjamin Moore connected the drains in Building 11 (also identified as the Vehicle Plant, the Resin Plant, or the Alkyd Bldg.) to the sanitary sewer on June 25, 1973 to "direct contaminated water into [the] city sanitary sewer instead of [the] storm sewer," further confirming that for some period prior to this time, contaminated water was being discharged directly to the river via the onsite storm sewer (PAP-00238493, BMC0666).

e.  In April 1971, Benjamin Moore was pumping sludge and caustic wash water to the Passaic River, via a sump pit adjacent to the northeast corner of Building 4A (PAP-00238478; BMC0817).

f.  In the 1973 Report on the Quality of Interstate Waters of the Lower Passaic River and Upper and Lower Bays of New York Harbor, the U.S. Department of Interior identified that two pipes (60-inch and 10-inch) were observed along the waterfront of the Benjamin Moore property discharging into the Passaic River.

125.  In 1977, Benjamin Moore obtained a NPDES permit to discharge to the Passaic River from an outfall designated as 001. However, episodic discharges to the Passaic River continued, resulting in additional violations:

a.  On January 25, 1978, there was a "bad spill of latex (Rholex AC-61)" at the tank farm area east of the main plant because of a leak between a valve body and bonnet. The spilled latex mixed with heavy rain and melted snow and washed into the plant storm drainage system, resulting in a milky solution being pumped into the Passaic River (BMC0752).

68

ALCD-PUBCOM_0000756

b. On March 13, 1978, the Coast Guard was concerned with an "oil spill" from the Site. The spill was the result of a punctured 55-gallon drum. However, the Coast Guard investigator was not satisfied about the general cleanliness of the yard, particularly when he learned that the storm sewer system pumps all the surface runoff from the Site into the river (PAS-00055004 at PAS-00055068–069). Benjamin Moore noted specifically in its internal memo regarding the spill that "the Coast Guard is concerned only with materials that will float on top of the water, they are not concerned with soluble material" (PAS-00055004 at PAS-00055069). This direction provided by a regulatory agency regarding pollution to the Passaic River in 1978 is further indication of how regulatory enforcement evolved over time, consistent with the general history of Passaic River pollution.

c. A July 8, 1980, memo refers to a spill of "dirty solvent" between 50 and 100 gallons (BMC0653). There are few details about the spill, to confirm whether it was an upland release or a release to the Passaic River, though Benjamin Moore did report the release to PVSC, suggesting at minimum an opportunity for release to the Passaic River.

d. On July 9, 1986, an unknown yellow water-soluble liquid was discharged to the Passaic River through the onsite storm sewer system (BMCO-FED-0000017787 at BMCO-FED-0000017808).

e. On March 11, 1987, an NJDEP inspection indicated that Benjamin Moore's "contaminated stormwater," boiler blowdown, and compressor blowdown ultimately discharged to the surface waters of the State (PAP00238568 at PAP00238821).

f. On March 6, 1996, 58,000 gallons of titanium dioxide mixed with water (equivalent to 16,000 lbs. of titanium dioxide) was released over a site storm drain (BMCO-FED-0000019514).

69

126.    Four unlined lagoons for the disposal of process wash water bordered the Passaic River at the portion of the Site of lowest elevation; the earliest lagoon (construction date unknown, but prior to 1952) was a wooden pit with an earthen bottom located north of Building 7. An additional lagoon (approximately 600 sq ft. in area) was built in 1952 at the northeast corner of the property and used (except for some time in the mid-1960s when alternative methods were explored) until two more lagoons were built in 1968 on Lot 62 and used until 1970 (PAP-00238467 at PAP-00238469–471; PAP-00238448 at PAP-00238448, 450; PAS-0035466 at PAS-0035468; PAS-00057913 at PAS-00057915; PAP-00238087 at PAP-00238098). Not only would these lagoons contribute to groundwater contamination, but also contribute to contaminated discharges to the Passaic River during the documented periods of flooding.

127.    In addition to the point discharges via direct infrastructure, the site has a history of frequent flooding and uncontrolled discharges via non-point discharges. Several former employees recall the Site flooding during their time of employment, including a particularly large flood event at or around 1960 that caused extensive damage to the facility and resulted in a retaining wall with auxiliary pump being built (MAXUS0797257 at MAXUS0797268, 271, 273, 280, 314, 342, 325).

128.    Passaic River ROD COCs were detected in onsite media including mercury, lead, copper and PAHs in wastewater and soil; PCBs in soil; and PCDD/Fs (including but not limited to 2,3,7,8-TCDD and TEQ) in soil.

129.    Benjamin Moore is a documented source of ROD COCs to the Passaic River based on site characterization and site remedial actions undertaken as well as samples of process waste streams.

130.    Batson applies a culpability factor of 10 percent for periodic non-compliance at the Benjamin Moore Site. Batson defines a culpability factor of 10 percent as indicative of "episodic releases of COCs during facility operations or other industrial practices that indicate the potential

70

for mishandling or release of COCs with culpable intent and or knowledge." Incidents cited to

support this culpability factor include Notice of Violations for three hazardous discharges spanning

from 1969 to 1980. However, this assessment does not account for discharges made earlier, nor

does it consider the high likelihood that these (and other) cited releases took place over a significant

number of years, likely dating to the beginning of Benjamin Moore's operations at the site in the

1920s. Assigning a score based on "periodic non-compliance" is inconsistent with the historical

fact record.

### C. Batson incorrectly assumes that if there is "no information" about a site's historical discharges then the operator was 0% culpable. Available records show the opposite is true: industrial waste discharges to the Passaic River were routine if not uncommon through the first half of the twentieth century.

131.    In some cases, additional information exists in the fact record for a historical operating

Site as a result of litigation or subsequent investigation efforts including enforcement efforts, site

characterization, or historical investigation. Like the Diamond Site, this additional evidence

provides more fulsome detail regarding Site operations, including the discharge of hazardous

substances and ROD COCs. It is my observation that documents and testimony produced in

litigation can be necessary to fully understand the nature of hazardous substance discharges from

Sites to the Passaic River, and these documents are important to understanding the degree of

culpability associated with those discharges.

132.    As currently comprised, the fact record for the Passaic River contains a number of

examples of willful and purposeful discharges from Sites containing hazardous substances,

including the eight ROD COCs, which have impacted OU2. Like the Diamond Site, the fact

record is typically comprised of enforcement-related observations from the public record, and it

is further supplemented regarding culpability for discharges to the Passaic River and Newark

71

Bay as provided by documents produced in litigation or from further enforcement and site
characterization efforts.

**Opinion 2: Batson's assessment of the Culpability Factor is not valid.**

133.    Batson's method to assess the "Culpability Factor" of each facility was fundamentally
flawed.

134.    Batson assigned each of the 101 facilities he analyzed a Culpability Factor between 0%
and 10%, with one exception—the Diamond Alkali facility was assigned a 100% "Culpability
Factor."

135.    A table showing the evidence assessed against each party is attached as Table 1. The
categories used by Batson included:

- 0% ("Historically Compliant or No Evidence") - 37 sites.

- 5% ("Occasional Noncompliance")  - 27 sites.

- 10% ("Periodic Noncompliance") – 26 sites.

- 100% ("Intentional Action with Knowledge of Risk to HH/E") – 1 site.

### A. The Culpability Scoring methodology as applied to the Diamond Site is inconsistent with its application to most other party's Sites subject to the allocation.

136.    The Culpability Scoring methodology as applied to the Diamond Site is inconsistent with
its application to most other party's Sites considered by Batson. As indicated in the preceding
Site examples, which provide an overview of each Site's evidence regarding historical
discharges to the Passaic River, most, if not all, have evidence of sustained significant releases.
In the majority of these examples, Batson interprets evidence from regulatory documents, which
are "episodic" from a calendar perspective, as discreet "events," and thus judges the discharge
history to be episodic or occasional. In fact, when taken in whole, the majority of these records

72

are indicative of long-term, ongoing Significant Sustained Releases, many dating back to the beginning of Site operations. As stated previously in this declaration (paragraph 7), the historical fact record is filled with instances of initial enforcement regarding discharges in the 1950s through the 1970s. Batson astonishingly accounts for these enforcement records as evidence of discreet, episodic events rather an initial discovery, or evidence of continual, sustained releases. For example:

- Batson applies a culpability factor of 10 percent for periodic non-compliance at the Penick Site. Incidents cited to support this culpability factor include documented discharges of unknown off color materials in the storm sewer that were traced back to the facility in 1947, 1948, 1956, 1970–1971, 1974, 1976 1977, and 1978. Such repeated episodes of discharges dating back to the early history of Site operations are entirely indicative of continual, sustained releases from the Site, and consistent with a Culpability score of 100.

- Batson assigns Legacy Vulcan a culpability factor of 5 percent for "occasional noncompliance." As justification, Batson notes the 1969 NJDEP "pollution abatement orders" to Vulcan to install and provide wastewater treatment and disposal facilities, and to cease discharging "industrial waste or polluting matter" into the Passaic River. It is clear from the evidentiary record and the intent of this 1969 NJDEP order that non-existent or inadequate treatment facilities resulted in continual, sustained releases dating to the start of Site operations.

137.    These examples, as well as those discussed earlier in this declaration, indicate that the majority of sites should receive, under Batson's framework, culpability scores comparable to the Diamond Site.

73

ALCD-PUBCOM_0000761

138.    To achieve the 100% score assigned to the Diamond Site, Batson highlighted the

descriptive testimony from the Diamond Alkali insurance litigation and ignored similar evidence

of culpable conduct that was available for other allocation sites.

### B. Batson's application of the historical fact record to his assessment of the Culpability Factor is so inadequate that it renders the calculated Culpability scores invalid.

139.    Batson assigns the Diamond Site a Culpability Factor of 100 percent, representing

"Intentional Action with Knowledge of Risk to Human Health/Environment." Batson defines a

score of 100 percent as representative of "significant sustained releases of COCs in

contravention of standard industrial practices indicating knowledge of the risk and illegality of

the actions and an intentional disregard of the impact on human health or the environment." The

next lowest tier scored by Batson is 10 percent, defined as "episodic releases of COCs during

facility operations," followed by 5 percent, defined as "occasional or minor releases of COCs

during facility operations," and finally zero percent, defined as "Operation of facility met

industrial standards of environmental conduct for era" OR "there was insufficient information in

available documents upon with to make a determination." The difference in Batson's scoring

methodology between sustained releases (100 percent) and episodic releases (10 percent) is

extremely large given the gaps typical in the fact record for historical sites such as the Passaic

River, as a minor difference in the availability of evidence for a Site could result in an extremely

large scoring difference. And, to award a culpability score of zero in instances where there was

insufficient evidence available with which to make a determination is nonsensical; this

effectively creates a situation where an absence of evidence is judged as "evidence of absence."

Such reasoning is completely inconsistent with modern cost allocation mediation practice, as

there is no way it can result in a fair approximation of culpability for all parties.

74

140. Even when documentary evidence exists, it is often missing from Batson's record, simply not considered, or given minimal consideration due to evidence claimed to offset the allegations of discharge. It is notable that much of the "offsetting evidence" considered is not part of the historical fact record for the site, but has been an authored opinion by a party's expert submitted for purposes of advocacy. Some examples of ignored evidence include:

- In Legacy Vulcan Site example provided above, the fact record further indicates that the 1969 NJDEP "pollution abatement orders" were not complied with, and discharges of hazardous substances continued to the Site's closing in 1982. This action, which clearly is indicative of culpability, is also ignored by Batson in his assignment of a 5 percent score.

- Thomasset/Hilton Davis Site PRP STWB, Inc. is assigned a culpability score of only 5 percent by Batson, which is reportedly based upon three violations received in the 1970s. Batson completely ignores much of the more important evidence regarding the discharge history of this Site dating back to the 1950s, including the accounts of willful contravention of orders made by PVSC, the City of Newark, and State of New Jersey.

- Montrose Site PRP 21st Century Fox America is assigned a culpability factor of 5 percent for "occasional noncompliance," noting only spills of cresol. Batson ignores long-term direct discharge testimony from employees in assigning this culpability factor, giving more credence to other witness testimony and an expert retained by 21st Century Fox America. Batson provides no justification for this distinction.

141. Batson's application of the historical fact record to its assessment of the Culpability Factor is so inadequate that it renders the calculated Culpability scores invalid.

75

## CONCLUSION

142.    As shown by the Site fact record examples provided, multiple entities have operated at

Sites and discharged hazardous substances, including the eight ROD COCs, to the lower 8.3

miles of the Passaic River. These Site operators are culpable for willful and purposeful

discharges that have contributed to the need for remediation of the lower 8.3 miles as selected by

EPA in the ROD. As evaluated by Batson, the historical fact record is not appropriately

considered in determining a Culpability Factor for parties subject to the allocation, rendering

Batson's assessment of the Culpability Factor invalid.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and

correct.

Dated: March 22, 2023

Dennis P. Farley

76

**Cited Documents from the Batson Repository**

| | | |
|---|---|---|
| PAP-000183454 | PAP-00238467 | PAS-00014159 |
| PAP-00126493 | PAP-00238478 | PAS-00014579 |
| PAP-00140891 | PAP-00238493 | PAS-00033747 |
| PAP-00147757 | PAP00238568 | PAS-00033905 |
| PAP-00148875 | PAP-00238568 | PAS-00035111 |
| PAP-00159734 | PAP-00319479 | PAS-00039956 |
| PAP-00170263 | PAP-00327204 | PAS-00044093 |
| PAP-00175090 | PAP-00327237 | PAS-00049812 |
| PAP-00176745 | PAP-00328258 | PAS-00054964 |
| PAP-00176973 | PAP-00328317 | PAS-00055004 |
| PAP-00177476 | PAP-00362236 | PAS-00055350 |
| PAP-00178565 | PAP-00367356 | PAS-00057241 |
| PAP-00179675 | PAP-00395561 | PAS-00057913 |
| PAP-00181213 | PAP-00428781 | PAS-00058031 |
| PAP-00181289 | PAP-00448145 | PAS-00058552 |
| PAP-00181314 | PAP-00483904 | PAS-00063788 |
| PAP-00181320 | PAP-0327169 | PAS-00080015 |
| PAP-00185144 | PAP-0365518 | PAS-00083048 |
| PAP-00185864 | PAS-00000862 | PAS-000883048 |
| PAP-00187079 | PAS-00000913 | PAS-00102443 |
| PAP-002119174 | PAS-00006250 | PAS-00105664 |
| PAP-00217398 | PAS-00006295 | PAS-00112705 |
| PAP-00218989 | PAS-00010843 | PAS-00123140 |
| PAP-00238087 | PAS-00011294 | PAS-00328317 |
| PAP-00238448 | PAS-00014082 | PAS-0035466 |

ALCD-PUBCOM_0000765

Cited Documents Not Included in the Batson Repository

| | |
|---|---|
| 8/24/2022 Complaint NJDEP vs Ootzie Properties-NWK, LLC et al. | DOCID_TIG_ESI_0000091145 |
| BBA000014 | DOCID_TIG_ESI_0000092132 |
| BBC000116 | DOCID_TIG_ESI_0000094168 |
| BBD00000295 | DOCID_TIG_ESI_0000094196 |
| BBD00044017 | DOCID_TIG_ESI_0000141817 |
| BBDPHARMA01289 | DOCID_TIG_ESI_0000144294 |
| BBF000016 | DOCID_TIG_ESI_0000144303 |
| BBF000035 | DOCID_TIG_ESI_0000144304 |
| BBF000036 | DOCID_TIG_ESI_0000146564 |
| BBF000054 | DOCID_TIG_ESI_0000156144 |
| BBG000015 | DOCID_TIG_ESI_0000159569 |
| BBG000061 | DOCID_TIG_ESI_0000159571 |
| BBK000001 | DOCID_TIG_ESI_0000161269 |
| BBK000007 | DOCID_TIG_ESI_0000171686 |
| BBL000055 | DOCID_TIG_ESI_0000176684 |
| BBM000017 | DOCID_TIG_ESI_0000176693 |
| BBM000020 | DOCID-TIG-ESI_0000083515 |
| BMC0189 | FOIA-EPA-0113817 |
| BMC0642 | FOIA-EPA-0116904 |
| BMC0653 | FOIA-EPA-0116923 |
| BMC0666 | GIVA-FED-0000354654 |
| BMC0752 | G-VUL005422 |
| BMC0817 | G-VUL024540 |
| BMC0857 | KLL026956 |
| BMCO-FED-0000017787 | LVC000033 |
| BMCO-FED-0000019514 | LVCE0007413 |
| CAC000003 | LVCE0013803 |
| CON000022 | MaxPriv105893 |
| CONO-FED-0000000214 | MAXUS0797257 |
| CONO-FED-0000008538 | MAXUS0827997 |
| CONO-FED-0000024704 | MAXUS0832032 |
| DOC_ID_TIG_ESI_0000083072 | MKSK-FED-0000000190 |
| DOCID_TIG_ESI_0000080585 | MKSK-FED-0000000215 |
| DOCID_TIG_ESI_0000083065 | MKSK-FED-0000000215 |
| DOCID_TIG_ESI_0000083066 | MKSK-FED-0000000333 |
| DOCID_TIG_ESI_0000088734 | MKSK-FED-00000004177 |
| DOCID_TIG_ESI_0000090172 | MKSK-FED-0000000674 |
| | MKSK-FED-0000002400 |

78

ALCD-PUBCOM_0000766

MKSK-FED-0000003275
MKSK-FED-0000003382
MKSK-FED-0000003521
MKSK-FED-0000004099
MKSK-FED-0000004177
MKSK-FED-0000004666
MKSK-FED-0000005005
MKSK-FED-0000008218
MKSK-FED-0000008578
MKSK-FED-0000008732
UNK000004 (Montrose)
NPEC-0003728
NPEC-0003732
NPEC-0003746
NPEC-0011056
NPEC-0015546
OCC-TIG-BS0003127
OCC-TIG-E00796550
PPGL-FED-0000017445
SEQ00001447
SKMC031237
SKMC032195
TEVAL 00675
TIERRA-B-015617
TSWC-FED-00055592
TSWC-FED-00055617

79

ALCD-PUBCOM_0000767

| Party | Facility Years of Operation | Facility Years of Ownership | BATSON Culpability Factor | BATSON Culpability Category | BATSON Culpability Notes |
|---|---|---|---|---|---|
| Alden Leeds 3 - 2145 McCarter Highway | 1964-1971 | 1961-1971 | 0% | Historically Compliant or No Evidence | No information on violations or sloppy practices was identified in the available file material. |
| Atlantic Richfield (ARCO) | 1930s-1951 | 1930s-1951 | 0% | Historically Compliant or No Evidence | No information on violations or sloppy practices was identified in the available file material. |
| Berol Corporation | 1919-1996 | 1919-1997 | 0% | Historically Compliant or No Evidence | No information on NOVs was identified in the available file material. There were releases to the surface. Stained areas on compromised asphalt in courtyard area; excavated 227 tons soil due to PAHs to a depth of 36 in. Removed naptha UST in Feb 1995 and excavated 30 tons soil. Excavated 3.5 tons soil from sink drain discharge area to depth of 36 in (see FDR page 10 for more information). |
| Canning Gumm LLC | 1933-2002 | 1933-present | 0% | Historically Compliant or No Evidence | No information on NOVs was identified in the available file material. The facility monitored their effluent discharged to the PVSC in the 1980s and 1990s and had occassional violations of the lead permit limit. Each time the facility responded to try to fix the issues, and noted that lead was not used in their processes. Leaking USTs led to onsite LNAPL contamination from No. 2 fuel oil, which is being remediated. |
| CBS Corporation | 1889-1984 | 1891-1983 | 0% | Historically Compliant or No Evidence | During a 1996 inspection of the facility (CBS owned/operated the site 1889-1984), inspection of the Transformer Areas showed oil staining and an actual puddle of oil was apparent on the concrete floor next to Transformer A2. Oil staining was also evident on the floor near the rear of the transformer room. Floor drains were observed (PAP-00347568). A 55-gallon drum of boiler treatment chemical was stored on top of, and leaking into a trench in the engine room. Miscellaneous oils in 55-gallon drums were also stored above the trenches. A leaking oil pump was observed on top of a trench in front of the active boiler in the engine room. Oil staining was also observed on the concrete floor in front of one of the inactive boilers (PAP-00347568). Given date of inespection, difficult to assertain whether actions resulting in contamination were during CBS operations on site. |
| CNA 1 - 226 Rome Street | 1920s-1957 | 1920s-1962 | 0% | Historically Compliant or No Evidence | No information on violations or sloppy practices was identified in the available file material. |
| CNA 2 - 290 Ferry Street | 1890-1973 | 1890-1973 | 0% | Historically Compliant or No Evidence | No information on violations or sloppy practices was identified in the available file material. |
| Chevron Environmental Management Co. | 1951-1984 | 1951-1984 | 0% | Historically Compliant or No Evidence | Although a couple spills were noted, they were minor amounts (less than 4 gallons) of diesel and gasoline (Questionnaire, p. 22; PAP-00067539-56; PAP-00066946-67). No information on NOVs identified in the available file material. |
| Coats & Clark 1 - 735 Broad Street | 1922-1940s | 1921-1947 | 0% | Historically Compliant or No Evidence | EPA performed a Potential Hazardous Waste Site Preliminary Assessment in 1982 in response to a complaint that mercury was disposed on-site in a shallow pit and surface water. Facilty was indicated to be abating pollution with their water treatment plant when processes were moved there in 1926 (PAP-00128118; PAP-00129824). Given date of inespection, difficult to assertain whether actions resulting in contamination were during Coats & Clark operations on site. |
| Coats & Clark 2 - 900 Passaic Ave/ 260 Ogden St | 1865-1947 | 1865-1989 | 0% | Historically Compliant or No Evidence | Facilty was identified by the PVSC as polluting the Passaic River in 1926, but this pollution was subsequently eliminated when the wet operations were moved to Bloomfield (which had a water treatment plant) in 1926 (PAS-00027177-78; PAP-00128118). No information on violations was identified in the available file material. |
| Cooper 1 - 7,13 & 26 Bank Street | 1848-1887 | Not Provided | 0% | Historically Compliant or No Evidence | No information on violations or sloppy practices was identified in the available file material. |
| Cooper 2 - 33 Littleton Avenue | 1976-1985 | 1976-1988 | 0% | Historically Compliant or No Evidence | The report stated that two wipe samples collected from stained areas on the concrete floor near the transformers inside the building contained PCB levels of 58 and 119 ppm. The report stated that "it is presumed that the elevated PCB levels PCBs were assumed to have resulted from historical spills from the transformers |

ALCD-PUBCOM_0000768

| Party | Facility Years of Operation | Facility Years of Ownership | BATSON Culpability Factor | BATSON Culpability Category | BATSON Culpability Notes |
|---|---|---|---|---|---|
| | | | | | prior to retrofilling"(PAS-00027729). No indication of release of contamination to exterior of building. No information on NOVs was identified in the available file material. |
| DII Industries, LLC | 1985-1993 | 1985-1997 | 0% | Historically Compliant or No Evidence | There is one violation citing N.J.A.C. 7:26-9.4 (g) 8 et seq. –failure to conduct semi-annual drills. 9.6(f) 4 –failure to familiarize local hospitals with properties of hazardous waste handled onsite. 9.7(a) –failure to have a written contingency plan (PAS-00122350). |
| EnPro Holdings, Inc. | 1900-1973 | 1900-1974 | 0% | Historically Compliant or No Evidence | "Small amounts"of oily waste were released to soil at the Spiegel property during the late 1960s (Questionnaire, p. 5). Specific information regarding volumes, locations, or waste types released could not be located in the file material. No information on NOVs was identified in the available file material. |
| EPEC Polymers, Inc. | 1900-1982 | 1900-1982 | 0% | Historically Compliant or No Evidence | PVSC identified violations for pollution entering the Passaic River in 1972, 1972, and 1976 (due to leaks and a polluting boiler blow down line), but the facility addressed the issues promptly and resolved the pollution (PAS-00008606, 10, 12-13). No evidence that COCs involved. |
| Everett Smith Group | 1937-1939 | 1937-1941 | 0% | Historically Compliant or No Evidence | No information on violations or sloppy practices was identified in the available file material. |
| Foundry Street Corporation (Foundry Street Complex) | Not Provided | 1970-2006 | 0% | Historically Compliant or No Evidence | No information on violations or sloppy practices was identified in the available file material. |
| GE 2 - 1000 South 2nd Street | 1950-1975 | 1950-1976 | 0% | Historically Compliant or No Evidence | No information on violations or sloppy practices was identified in the available file material. |
| Harris Corporation | 1946-present | 1941-present | 0% | Historically Compliant or No Evidence | The threshold value for lead was noted to be exceeded in monitoring reports from January to March 1999 (PAP-00722741); however, these deficiencies were noted to not be violations of the permit (PAP-00722287-8, 738). According to a Preliminary Assessment and Site Investigation Report, dated June 26, 2012, during visual inspection of transformers and switchgear conducted at the Kingsland Road Area in May 1996, three transformers were identified as having stains on concrete pads adjacent to the transformers; PCBs detected in soil beneath pads. No information on NOVs was identified in the available file material. |
| Hartz Consumer Group, Inc. | 1971-1996 | 1970-1999 | 0% | Historically Compliant or No Evidence | No information on violations or sloppy practices was identified in the available file material. |
| Honeywell International, Inc. | 1899-1987 | 1899-1987 | 0% | Historically Compliant or No Evidence | Soil staining observed in Areas E and F. Area H contained a former drum wash disposal pit area that has been filled with cement preventing access to the pit. No information on NOVs was identified in the available file material. |
| ISP Chemicals LLC | 1992-2001 | 1992-present | 0% | Historically Compliant or No Evidence | According to the 2002 Preliminary Assessment, the property was inspected by a representative of the NJDEP on June 14, 2001. The NJDEP inspector noted several areas of stained floors, paving, and walls during the site inspection. No information on NOVs was identified in the available file material. |
| Leemilt's Petroleum, Inc. | 1985-2012 | 1985-2013 | 0% | Historically Compliant or No Evidence | According to the PVSC, approximately 1,500 cubic yards of soil and debris were illegally placed in two piles at Area A in 1996. The material was subsequently removed (PAP-00084093). However, no indication disposal was by Leemilt. The PA/SIR also identified several NJDEP case numbers for spills (PAP-00084077, 91). |
| Newark Group, Inc. | 1912-2003 | 1912-2013 | 0% | Historically Compliant or No Evidence | A 1970 Stream Contamination Report reported that on April 6, 1970, as a result of negligence, a violation occurred at Newark Boxboard when approximately 500 gal of paper pulp overflowed into a driveway and then into the Blanchard Street storm sewer (PAS-00035386). (non-COC) |
| Newark Morning Ledger Co. | 1966-2014 | 1964-2015 | 0% | Historically Compliant or No Evidence | No information on violations or sloppy practices was identified in the available file material. |

| Party | Facility Years of Operation | Facility Years of Ownership | BATSON Culpability Factor | BATSON Culpability Category | BATSON Culpability Notes |
|---|---|---|---|---|---|
| Pabst Brewing Company | 1945-1985 | 1945-2003 | 0% | Historically Compliant or No Evidence | Pabst and New West Developers, Inc. received Notices of Violation (NOV) on May 5, 2005 (prior to Pabst ownership) and April 28, 2011, for failure of New West to conduct a remedial investigation and conduct remediation to abate contamination; area subsequeently remedied by Pabst. (PAP-00286348-49; PAP-00286135). |
| Revere Smelting & Refining Corp. | 1964-1972 | 1957-1970 | 0% | Historically Compliant or No Evidence | The RIR states that the Avenue P landfill, located just north of Revere Smelting, was used from the 1920s until the 1970s, and it was believed that the surrounding industrial companies and manufacturing plants used the landfill and adjacent areas beyond the property border of the landfill site as an illegal dump to dispose of hazardous materials, manufacturing by-products, solid waste/junk and process wastes (PAP-00125850). A 2008 RIR stated the Avenue P Landfill Site included land upon which the Revere-DE operated from April 1970 to December 31, 1972 as well as additional adjacent properties for a total of eight acres. The Avenue P site was created by filling in salt marshes in the early 1900s (PAP-00125850). In addition, the RIR noted that the highest concentrations of metals were detected in samples collected at the base of the landfill, indicating that the ash and glass layer present at the landfill/marsh interface is a likely source. This debris was likely deposited on site at a time when the area was predominantly marshland (PAP-00125886). Low probability that Revere is source of such contamination. |
| Schiffenhaus 1 - 49 4th Street | 1909-1924 | 1909-1924 | 0% | Historically Compliant or No Evidence | No information on violations or sloppy practices was identified in the available file material. |
| Schiffenhaus 2 - 204 Academy Street | 1895-1908 | 1895-1908 | 0% | Historically Compliant or No Evidence | No information on violations or sloppy practices was identified in the available file material. |
| Sequa Corporation (Foundry Street Complex) | 1967-1986 | 1962-1990 | 0% | Historically Compliant or No Evidence | Soil sampling and remediation took place to remove PCB contaminated soils and groundwater from the site. A total of 1,400 cubic yards of PCB-impacted soils were removed from accessible exterior areas, which were generally excavated to a depth of two feet. A total of 165 cubic yards of PCB-impacted soils were removed from the former Boiler Room floor (PAP- 00124050). No information on NOVs was identified in the available file material. |
| Stanley Black & Decker, Inc. | 1875-1985 | 1875-1997 | 0% | Historically Compliant or No Evidence | According to a Request for Information, dated March 30, 2004, Stanley received wastewater treatment system violations associated with its remediation system initiated on December 15, 1998 (PAS-00085670). Violations were for TSS, TOC, TPH in effluent samples collected in 1999 and 2001. There were numerous areas with stained soil. (PAP-00018703, PAP-00018761, PAP- 00018779-80, 82, PAP-00018807-09, 12, PAP-00018831, 33). |
| STWB 2 - 192 & 194 Bloomfield Ave | 1920-1965 | 1920-1965 | 0% | Historically Compliant or No Evidence | No information on violations or sloppy practices was identified in the available file material. |
| Tate & Lyle 1 - 100 3rd Ave | 1968-1978 | 1968-1978 | 0% | Historically Compliant or No Evidence | No information on violations or sloppy practices was identified in the available file material. |
| Tate & Lyle 2 - 320 Schuyler Ave | 1968-1978 | 1968-1972 | 0% | Historically Compliant or No Evidence | No information on violations or sloppy practices was identified in the available file material. |
| Teval/Guyon | 1947-1992 | 1947-2006 | 0% | Historically Compliant or No Evidence | Sandblasting waste was stored on the ground just north of Building G-16. Periodically, it would be scooped up and put in a dumpster and then trucked offsite to a disposal facility in Pennsylvania (PAP-00190195). There were several areas with stained soil. No information on NOVs was identified in the available file material. |
| Textron Inc. | 1956-1962 | 1956-1962 | 0% | Historically Compliant or No Evidence | Captain Vicari of the Belleville Fire Department stated that he was aware of a number of fires at the facility during the 1960s. Captain Vicari also stated that methyl ethyl ketone was dumped by employees who used the substance to wash parts. Spills and fires were also noted in the 1980s. It was stated that violation notices were issued to |

| Party | Facility Years of Operation | Facility Years of Ownership | BATSON Culpability Factor | BATSON Culpability Category | BATSON Culpability Notes |
|---|---|---|---|---|---|
| | | | | | the facility by the Fire Department (PAS- 00103080). Unable to determine if fires and spills cited occurred during Texaco period of ownership which ended in 1962. |
| Tiffany and Company | 1987-1986 | 1980-1991 | 0% | Historically Compliant or No Evidence | No information on violations or sloppy practices was identified in the available file material. |
| 21st Century Fox America, Inc. (21CFA) | 1939-1972 | 1939-1974 | 5% | Occasional Noncompliance | An RI Report noted spills may have occurred during 1914 (possibly earlier) through the mid-1980s due to several rail lines that crossed the facility, based on buried rail ties discovered at the site (PAS-00107038). Former Montrose Chemical employee Oscar Randall noted that much of the unpaved area at the property was heavily contaminated with spilled substances. The soil was jet black and smelled strongly of cresol, and the groundwater was discolored and smelled (PAS-00106689). According to the interview of Randell dated January 25, 1994, he and other workers would routinely dump five-gallon pails of waste cresol into the Passaic River (PAS-00003917) - not possible to quantify amount. No indication that NOVs issued to facility |
| Alden Leeds 1 - 55 Jacobus Ave | 1993-2005 | Not Provided | 5% | Occasional Noncompliance | According to a "Field Investigation"form prepared by the Hudson Regional Health Commission, dated April 21, 1987, a "violation order"would be issued to Alden Leeds regarding the connection of a septic holding tank to the storm drain system at the 55 Jacobus Avenue facility (PAS-00000047). |
| Alden Leeds 2 - 100 Hackensack Ave | 1993-2005 | Not Provided | 5% | Occasional Noncompliance | Facility had a fire on July 26, 1971 that destroyed the building and resulted in the release of "a large quantity"of chlorinated cyanuric acid into the Second River (PAS-00000022). PVSC presented an Award of Excellence to Alden Leeds-Hackensack Ave. for operations from January 1, 2002 through December 31, 2005 without incurring a reporting or effluent violation (PAP- 00097620; PAS-00020963). |
| Campbell Foundry Company | 1927-present | 1927-present | 5% | Occasional Noncompliance | NJDEP issued several violations related to poor housekeeping (e.g., spilling hazardous waste - cupola dust on the ground, hazardous waste containers split open and the hazardous waste spilled on the ground, etc.) in 1983 (PAS-00012571; PAP-00070212). |
| CNA 3 - 354 Doremus Ave | 1954-1996 | 1954-1996 | 5% | Occasional Noncompliance | A 1969 Administrative Order issued for discharging industrial waste and "other polluting matter" into the Passaic River (PAS-00071180-81). On May 17, 1991, the facility received a NOV for failure to monitor their effluent for lead to comply with General Pretreatment Regulations (PAS- 00071202). Older Celanese employees noted that in the mid-1970s, persons were sometimes seen dumping materials into Plum Creek north of the northwest corner of the Celanese property at night. Employees stated that a certain material deposited was a thick white liquid (PAP- 00021048). No evidence of Involvement of Celenese staff. |
| Congoleum Corp. | 1886-1974 | 1886-1979 | 5% | Occasional Noncompliance | Poor housekeeping identified in the 1950s during an inspection (fire hazards noted, oil dumped in the weeds) (PAP-00056081). In April 1990 three areas of abandoned drums in poor condition were discovered along the Passaic River, and solidified sludge from a vinyl tile manufacturing process was observed on the property (PAP-00337307; PAP-00054201-02). Congoleum employees had heard stories over the years had stated "scrap vinyl may have been buried on some portions of the Kearny Facility"(PAS-00104956; PAS-00104961). On or about August 19, 1943, during World War II, there was an explosion at the Kearny Facility. (PAP-00233575). According to an October 18, 1943, memo to the Kearny Fire Department the explosion occurred at Building No. 12 in the Number 6 stove, as a result of an explosion of vapors of Sovosol No. 5 used as a solvent for the paint used in the treating of camouflage nets (PAP-00232310). |

| Party | Facility Years of Operation | Facility Years of Ownership | BATSON Culpability Factor | BATSON Culpability Category | BATSON Culpability Notes |
|---|---|---|---|---|---|
| Covanta Essex Company | 1990-present | 1978-present | 5% | Occasional Noncompliance | According to a NJDEP letter, dated June 22, 1988, the site was given an "unacceptable" rating for failing to monitor stormwater discharges and inaccurately reporting on discharge monitoring reports that there were no stormwater discharges (PAS-00082684). A 1991 compliance inspection gave the facility an "unacceptable"rating due to lead effluent violations, operational deficiencies (including the presence of ash piles on the ground), and the facility's effluent at outfall DSN001 was black at inspection, violating the facility's permit which is for stormwater only (PAS-00082812-14). On or about December 1, 1992, NJDEP and ARF entered into an Administrative Consent Order. ARF had exceeded certain discharge limits for lead, among others, in its NJPDES permit (PAS-00106056). Potential for contamination to be caused by preexisting conditions not CE actions |
| Curtiss-Wright Corporation | 1942-1983 | 1946-2001 | 5% | Occasional Noncompliance | A PVSC letter report of pollutions corrected in 1969, dated March 31, 1970, identified intermittent polluting discharges containing oil in 1968 from Curtiss-Wright to Felds Brook, which the report described as a tributary to the Passaic River (PAS-00008279). A letter reporting the results of an Inspection and Insulating Fluid Evaluation by Burlington Testing Company dated September 7, 1984 stated that 27 of 62 transformers showed evidence of slight leakage at various points, such as gauges, fins, valves, gaskets, tap changer, and bushing throats. Spills at two of the askarel (PCB)-filled transformers were also noted (PAP-00191030). |
| Drum Services of Newark Inc. | 1997-2004 | 1997-2008 | 5% | Occasional Noncompliance | Drum Services is listed as a company that was issued fines from PVSC during the August 1, 1997 to July 31, 1998; August 1, 1998 to July 31, 1999 and the August 1, 2000 to July 31, 2001 time periods (PAS-00017752; PAS-00021364). No additional information was provided in the files reviewed. |
| Elan Chemical Co., Inc. | 1977-present | 1977-present | 5% | Occasional Noncompliance | PVSC filed suit against Elan alleging that Elan discharged pollutants in excess of the discharge limitations of its PVSC Permit No. 20403242 (PAS-00059893, PAS-00060847 et seq.). No OU2 COCs were alleged to be associated with these discharges (PAS-00060849-50). An inspection of Elan by the NJDEP in December 1988 noted a drum storage area was sloped down into drainage depressions, which flowed to the Passaic River. Oil was observed to be leaking from the drums and evidence was found of past spills of other materials in the area. (PAS-00061334-37). |
| Garfield Molding Company, Inc. | 1917-2014 | 1917-2014 | 5% | Occasional Noncompliance | On July 2, 1974, PVSC wrote to Garfield confirming that their boiler blowdown was polluting (PAS- 00102945). This violation was eliminated August 1974 (PAS-00102945). Several unpermitted discharges and other violations of the NJPDES-discharge permit were noted to have occurred during the historical operations, as well as deficiencies of the facility (e.g., spreading waste oil on the unpaved driveways to control dust) (PAS-00102947-9). There were several drum storage areas noted. The floor of Building 16 was heavily stained and a portion of the roof was missing. |
| GE 1 - 415 South 5th Street | 1882-1976 | 1882-1976 | 5% | Occasional Noncompliance | No information on violations was identified in the available file material.UST Spill information; during the 2012 UST removals, visual evidence of a release from the 550-gallon UST was observed in soil. NJDEP was notified and case No.12-06-06-0920-51 was assigned to the 550 gallon UST (contents unknown). Case No.12-06-07-1005-05 was assigned to the 3,000 gallon trichloroethene (TCE) UST when holes were noted in the UST (PAP-00074242; PAP-00074662). 750 square foot area excavated to address PCB contamination of soil. Numerous areas inside and outside buildings were contaminated with mercury. |

| Party | Facility Years of Operation | Facility Years of Ownership | BATSON Culpability Factor | BATSON Culpability Category | BATSON Culpability Notes |
|---|---|---|---|---|---|
| Goodrich Corporation | 1982-1994 | 1982-present | 5% | Occasional Noncompliance | The PVSC sent a notice of violation on May 2, 1991, for non-COCs (chloroform and toluene) but these were noted by the facility to be sampling error and subsequent results showed compliance (PAP-00208805). Another PVSC notice of violation for permit 0949429 based on a non-COC (methylene chloride) was dated April 13, 1994 (PAP-00208813). Violations were noted for Hart Chemical Co. (tenant) at the facility based on a December 15, 1988, inspection by the New Jersey Bureau of Fire Safety. The violations included permits needed for the flammable and corrosive areas, and a diked area for the manufacturing area (PAP-00433532). New Jersey Department of Health inspected on September 14, 1992 and noted violations for failure to label containers (PAP- 00433862-65). |
| Hoffman-La Roche Inc. | 1930-2015 | 1928-2016 | 5% | Occasional Noncompliance | Spills identified in the data report as occurring in the 1980s and 1990s (mostly fuel oil, one mercury). One large release of No. 6 fuel oil to the process waste lines migrated through the PVSC sewer system to the treatment plant in Newark in the late 1970s or early 1980s, which was a violation of Roche's connection permit (Nachman Synthesis, p. 8). On March 2, 1991, a 10-15 gallon, 100-foot trail of PCB-contaminated transformer oil was released to the roadway due to a broken valve during a transformer relocation by an outside contractor. On April 10, 1947, an inspector discovered oil on Nichol's Pond, a tributary to Third River. The source was traced to Roche's power plant upstream on Nichol's Brook. It was found that a tank truck delivering fuel oil had a spill and lost approximately 100 gallon of fuel oil which escaped through a yard drain into the ditch along the railroad and into Nichol's Brook. Also see spill/release table on pp 15-16 of the FDR. |
| Legacy Vulcan Corporation | 1952-1975 | 1952-1974 | 5% | Occasional Noncompliance | New Jersey State Department of Health had issued "pollution abatement orders" to Vulcan in 1969 (PAS-00058707). Vulcan was given notice to install and provide wastewater treatment and disposal facilities, and to cease discharging "industrial waste or polluting matter" into the Passaic River (PAP-00217398). |
| National Standard LLC | 1938-1988 | 1938-1999 | 5% | Occasional Noncompliance | On August 14, 1972 PVSC inspectors collected samples of discharges from site outfalls, and analysis showed the samples "were polluting." On August 16, 1972, PVSC directed that they cease polluting at once. National Standard addressed the issue right away (PAS-00034750-52). NJDEP issued an Administrative Order and Notice of Civil Administrative Penalty Assessment to National Standard in August 1987 due to improper hazardous waste storage and management (PAS-00004222-28). According to a Disruption and Closure Permit Application, dated June 1, 1989, lead dross (scum from the surface of the molten lead) and soils with elemental lead associated with operations at the site also were placed in onsite landfill; however, investigations, including borings and test pits, did not reveal lead dross in the landfill (PAP-00197231). It was estimated that a total of 170,000 cubic yards of miscellaneous debris was present within the landfilled areas (PAP-00197232). |
| Nokia-Lucent Technologies | 1925-1984 | 1925-1984 | 5% | Occasional Noncompliance | Violations of (unspecified) effluent limitations identified by EPA in 1977 (PAS-00073276). A response letter from Western Electric Company addressed the exceedances, stating they were not above limits (PAP-00127236). An inspection report noted that there were two instances in 1981 when the NPDES permit levels were not met (parameters not specified) (PAS-00080369). A Compliance Monitoring Report dated October 1, 1982 stated outfall 002 was out of compliance for soluble copper one time in the previous year (PAP-00127263, 65). A memorandum dated November 12, 1979, stated that partially filled drums of hazardous waste had been consolidated at the O.P. yard, but the practice of tipping the drums to pour out the waste was hazardous and would be discontinued in accordance with New Jersey's new spill law (PAS-00080312). |

ALCD-PUBCOM_0000773

| Party | Facility Years of Operation | Facility Years of Ownership | BATSON Culpability Factor | BATSON Culpability Category | BATSON Culpability Notes |
|---|---|---|---|---|---|
| Okonite Company | 1885-1989 | 1885-1993 | 5% | Occasional Noncompliance | 1973 PVSC Annual Report identified a sample of the boiler blowdown outlet that was found to be polluting, and the company was directed to halt this pollution (PAS-00034781; PAS-00102011). On August 27, 1985 NJDEP issued Okonite an Administrative Order concerning a violation of the Solid Waste Management Act, N.J.S.A. 13:1E-1 et seq and regulations promulgated thereunder, specifically N.J.A.C 7:26-7.6(f) 2 for failure to file an annual report (PAS-00102064-5). Area K had an unpaved area of oil-stained soils with water softener resin beads and tar-like material. Also, at an unpaved area beneath the Banbury mixer where oil-stained soils were observed. At the loading oil-stained soils were also found (PAP-00245798-802). |
| Passaic Pioneer Properties Co. | n/a | 1936-2006 | 5% | Occasional Noncompliance | Documented instances of dye wastes (in 1947, 1948, 1951, 1956, 1971, 1978) and cooling water (1969) being released to the Passaic River by tenants resulted in violations (PAS-00115125; PAS- 00115406; PAS-00035373; PAS-00115415-426). |
| Pharmacia LLC | 1955-1991 | 1954-1994 | 5% | Occasional Noncompliance | According to an Administrative Consent Order between NJDEP and Monsanto, dated July 24, 1989 (1989 ACO), on November 14, 1986, Monsanto submitted to NJDEP a report which stated that in the mid-1960s approximately 2,000 gallons of heat transfer liquid containing PCBs were landfilled on site. NJDEP filed a civil complaint against Monsanto on November 1, 1988 for failure to immediately notify NJDEP of the full nature and extent of discharges of hazardous substances which it caused to occur at the site, including the release of PCBs and petroleum hydrocarbons. PCBs used as non-contact cooling fluid starting in 1960. 2,000 gallons of PCB oil released during a 1967-1968 production upset were disposed on-site in the PCB disposal area/pit. In 1972, during conversion to non-PCB containing fluid, a tank containing 2,000 gallons of PCB oil was also discarded in the PCB disposal area/pit (PAS-00073345). Placement of PCB containing material intended to contain appropriately contaminants onsite & disposal areas voluntarily remediated in coordination with NJDEP by facility in late 1980s (PAP-00717529-30). |
| PPG Industries Inc. | 1902-1971 | 1902-1971 | 5% | Occasional Noncompliance | Indications of direct dumping of containers to river, as reported in an affidavit of a former employee, though he stated that he had no knowledge of the contents of the containers (PAS- 00080135; PAS-00080161-62). According to former employees, a fire in the resin building occurred in 1969 but did not result in resin material reaching the river. The resin material was confined to the building (PAS-00044290). According to a PPG employee, a vapor cloud was released from one of the resin reactors in Building 17. Newark City firefighters pumped water from the river into the building and nearby storage tanks to attempt to contain the fire. The building was damaged beyond repair during the fire and was later demolished (PAS-00006303). |
| PSE&G 2 - 155 Raymond Blvd | 1915-present | 1915-present | 5% | Occasional Noncompliance | PVSC Annual Reports noted discharges of oil from the facility to the Passaic River in 1973 and 1974. In January 1991, PSEG was issued a Notice of Violation by the NJDEP for the January 28, 1991 discharge of kerosene from a leaking underground fill line at its Essex Generating Station at 155 Raymond Blvd. (PAP-00131028-29; PAP-00131033; PAP-00131037). According to the Environmental Documentation of Demolition Phase 3 Report, Essex Generating Station, during the structural demolition of the decommissioned Essex Generating Station concrete surfaces located within two areas of the Essex Generating Station were observed to be oil stained. These areas were the concrete floor in the turbine building; and the two underlying concrete slabs where the oil pots containing percent levels of PCBs were removed from the potential transformer cabinets. The sample collected below potential transformer 1 contained 13,000 ppm of PCBs, and the sample collected below potential transformer 4 contained 60 ppm. A mineral oil leak from a transformer, located hundreds of feet from the Passaic River or Lawyer's Ditch, |

| Party | Facility Years of Operation | Facility Years of Ownership | BATSON Culpability Factor | BATSON Culpability Category | BATSON Culpability Notes |
|---|---|---|---|---|---|
| | | | | | occurred on September 16-17, 1993. No discharge to the Passaic River occurred. The mineral oil from the transformer and from the spill area was analyzed and shown to contain 10-11 ppm PCBs. It was estimated that 900 gallons of mineral oil were discharged to the gravel/soil beneath the transformer. |
| Purdue Pharma Technologies Inc. | 1971-1995 | n/a | 5% | Occasional Noncompliance | An explosion and fire at the site on April 21, 1995, resulted in firefighting material runoff that was "very evident" in the Saddle River for its entire two-mile length to its confluence with the Passaic River (PAS-00007951). No evidence that COC involved in discharge. |
| Quality Carriers, Inc./Quala Systems | 1970-2007 | 1970-present | 5% | Occasional Noncompliance | According to the 1998 BCM ISRA PSA, the following summary of PVSC rule violations occurred: -Between April 26, 1989 and August 6, 1997 - Multiple violations of discharging corrosive waste -July 31, 1990 - pH monitoring equipment was not operating in conformance with its intended use. (No COC involvement) -Between January 30, 1991 and May 8, 1995 - Multiple violations of Petroleum Hydrocarbons results exceeding limits. There were numerous areas with staining. The drum storage pad located next to the oil skimmer was filled with approximately three inches of oily liquid waste. The integrity of the pad could not be determined (PAS-00084669). |
| Sherwin Williams Co. | 1901-1999 | 1900-2011 | 5% | Occasional Noncompliance | Spills (emulsion paint and washwater/thinner) identified by former employees resulted in discharges to the Passaic River, but information for the quantity of the discharge or if they contained COCs was not available. NOV was issued by PVSC in 1986 as a result of cleaning causing an accumulation of gray viscous material in the PVSC sand catcher. (No COC involvement) This was due to an accidental in-plant chemical spill, which caused blockages within their waste piping disposal system (PAS-00014642-47). Correspondence from May and June 1987 discusses the continued problem of paint materials discharging from Sherwin Williams and clogging up the PVSC sand catcher located at the entrance of the Sherwin Williams site (PAS-00014638-41). |
| SpectraServ, Inc. | 1962-present | 1969-present | 5% | Occasional Noncompliance | The facility has received numerous NOVs from PVSC since 1999. The NOVs were for non-COCs (e.g., petroleum hydrocarbons, discharge of sludge to the sanitary sewer, use of water to dilute a discharge, discharge of floatable greases to the sanitary sewer, discharge of solids to the sanitary sewer, improper discharge monitoring). |
| STWB 1 - 120 Lister Ave | 1957-1986 | 1957-1986 | 5% | Occasional Noncompliance | PVSC inspection in 1971 noted poor housekeeping at the site and green fluorecein dye discharged into a catch basin within the site area, which reached the Lockwood Street storm sewer and the Passaic River (PAS-00002739). In February 1972, PVSC issued a notice of violation indicating that the sewer department took out a sample from the sewer line and found "chemical in the line." (PAS-00002741). Note: The specific "chemical in the line" was not identified. On April 27, 1976, a $750 fine was imposed on TCI for violations of the Spill Prevention, Control, and Countermeasure (SPCC) regulations under Section 311 of the Federal Water Pollution Control Act (PAS-00002727). Note: No additional information was provided. No indication that COC involved |

ALCD-PUBCOM_0000775

| Party | Facility Years of Operation | Facility Years of Ownership | BATSON Culpability Factor | BATSON Culpability Category | BATSON Culpability Notes |
|-------|----------------------------|-----------------------------|----------------------------|------------------------------|---------------------------|
| Sun Chemical Corporation (Foundry Street Complex) | 1986-2003 | 1990-2004 | 5% | Occasional Noncompliance | A May 11, 1992 Memorandum documented a lead violation for Sun Chemical Corporation for a sample collected on April 21, 1992 (PAP-00374626; PAS-00111661; PAS-00128931). A 1987 survey found the ground, building surfaces and drums stored near the plant were stained purple, and it was stated that it was believed these stains were from pigments manufactured by Sun Chemical Company (PAP-00031574). In 1990, it was reported that the driveway located between Arkansas Chemical and Sun Chemical Corporation was stained with a magenta colored substance, which also existed on Sun Chemical Corporation's site. A strip like drain running down the center of the driveway contained standing water with a noticeable sheen on it (PAP-00031576-77). According to a February 13, 1991 Memorandum, on November 26, 1990, a RCRA investigation was conducted at Sun Chemical Corporation to investigate "alleged dumping and sloppy housekeeping practices" at the site. The site tour confirmed the discoloration of the surrounding areas as reported in incident No. 90-10-24-1208 (PAS-00044985; PAS-00111388). |
| Alliance Chemical Inc. | 1945-2001 | 1965-2006 | 10% | Periodic Noncompliance | NOVs issued for hazardous discharges (e.g., acid, corrosive waste, greasy material, pH) from 1973 to 1992 (PAS-00049898, PAP-00065863, PAP-0006643, etc.), including exceedances of lead in samples collected in November 1990 (PAP-00066412). PVSC filed a Complaint dated December 17, 1993, due to continued violation of Permit No.20401080 (for zinc and cyanide). Since it was likely to continue to exceed its discharge limitations and adversely affect public health or safety or the operations of the PVSC system, PVSC demanded revoking the sewerage connection permit (PAP-00216733-36). ...some... fill came from the building, which was destroyed in a January 1980 explosion and fire (PAS-00049994). Unable to quantify releases from explosion and firefighting. Alliance also used the Avenue P landfill site to the south to store their drums; FDR says, "The 1990 Avenue P Landfill Investigative Summary noted that a 1974 aerial photograph identified a road entering the northwestern portion of the Avenue P Landfill from Alliance, and the number of drums on the Alliance premises was significantly reduced. Most of the drums were discovered in the northwest portion of the landfill (PAS-00129646-47)." |
| Arkema Inc. | 1921-1989 | 1921-1989 | 10% | Periodic Noncompliance | NOVs issued in 1988 for copper and lead in wastewater discharge samples (PAP-00351641; PAP- 00351653). The December 1989 Report of Inspection noted outdoor soil staining due to oil from leaking indoor machinery. There was a heavily stained drum storage area in the North Yard. Exhaust ventilators for the plating room for Building 3 had condensate drains that were discharging to the stained soil below (PAS-00102607). There was a former spill in the location of the warehouse loading bay, one sample collected - had high PAHs. A compressor on the inside of the building discharged blowdown to the outside. When the boiler for this building was in operation, it also appeared to have discharged blowdown to the exterior (PAS-00102606-07). According to the ECRA Sampling Report and Phase II Sampling Plan, the associated stained soil was later removed (PAS-00102639-40). A compressor on the inside of the building discharged blowdown to the outside. When the boiler for this building was in operation, it also appeared to have discharged blowdown to the exterior (PAS-00102606-07). According to the ECRA Sampling Report and Phase II Sampling Plan, the associated stained soil was later removed (PAS-00102639- 40). |

| Party | Facility Years of Operation | Facility Years of Ownership | BATSON Culpability Factor | BATSON Culpability Category | BATSON Culpability Notes |
|---|---|---|---|---|---|
| Ashland Inc. | 1968-1992 | 1968-2003 | 10% | Periodic Noncompliance | The facility received a notice of violation from PVSC on August 10, 1990, for failure to maintain continuous monitoring of facility outfalls (PAS-00050635). Ashland was notified on May 26, 1971, to cease pollution at once, and warned against discharge to the sanitary sewer without proper pretreatment, after a sample of washings entering into the Roanoke Avenue Storm Sewer at Avenue P. was "not only highly polluting,"but contained flammable and explosive materials (PAP-00089153). Inspections conducted by NJDEP personnel on March 13 and 28, 1979, noted spillage and/or leakage throughout Ashland's facility. Areas noted included the following: all tank farms, loading/unloading manifolds, pipe connections, sumps, and the storm sewer system. According to NJDEP, corrective measures were discussed with Ashland's officials who stated that it would not be economically feasible for the company to implement all of the remedies required by NJDEP. |
| Atlas Refining Inc. | 1897-present | 1918-present | 10% | Periodic Noncompliance | Violations noted in 1972 (PAS-00051992-93; PAS-00052130-31) and 1981 (PAS-00072987) that were related to spills and poor housekeeping practices at the facility. In a March 8, 1989 Civil Action Complaint filed in the Superior Court of New Jersey, PVSC requested the permit be revoked stating that the petroleum hydrocarbon content control system and other pretreatment systems were functioning improperly. The complaint noted that violations were issued to Atlas from 1986 to 1989 (PAS-00052011-12). Atlas installed a Pretreatment System in 1986 (PAS-00052028). In addition, in at least the early 1970s, oil was released as a result of Atlas activities in the railyard near the Central Railroad tracks, and during periods of rainfall this material drained towards Blanchard Street and entered the catch basin and thus the Passaic River. |
| Automatic Electroplating Corp. | 1970-2005 | 1970-Unknown | 10% | Periodic Noncompliance | In January 1986, AEP was found to be "in violation of Sections 307 and 308 of the Clean Water Act, 33 U.S.C. Subsection 1317, and Subsection 1318"(PAS-00000193). (Note: Subsection 1317 pertains to toxic and pre-treatment effluent standards and Subsection 1318 pertains to access to records.) "AEP consistently failed to meet electro-plating discharge standards which initiated enforcement actions by the USEPA in 1986"(PAS-00000228). A Civil-Action Suit (86-0920) was filed by USEPA, Region 2, and AEP signed a Consent Decree on April 15, 1987 for settlement of the pending actions (PAS-00000193; PAS-00014392). It is also noted that according to a "Foundry Street Complex Site Inspection"report prepared by NJDEP, dated November 15, 1990, a material storage area located on the south side of Building 19 appeared to be stained and that "a small area, approximately 2' x 2', appeared to be saturated with oil"near the northwest corner of Building 19 (PAS-00105569). |
| BASF Catalysts LLC | 1957-2009 | 1957-2009 | 10% | Periodic Noncompliance | Multiple Administrative Consent Orders - Civil Penalties from NJDEP regarding air permit violations, improper use of materials (PCBs, sodium nitrate), and waste manifest errors in the 1980s and 1990s; fines were paid by the company. No information for how the PCB material was misused (PAP-00050754). The facility received nine NOVs from PVSC and NJDEP (1994-1997) for pH levels below 5.0 and one Administrative Consent Order –Civil Penalty from NJDEP for the same violation on April 9, 1995. The Administrative Consent Order facilitated the construction of the waste water treatment system. Following correction, no further action was required on any of them (PAP-00050757-59). Primarily non-COC violations |

| Party | Facility Years of Operation | Facility Years of Ownership | BATSON Culpability Factor | BATSON Culpability Category | BATSON Culpability Notes |
|---|---|---|---|---|---|
| BASF Corporation | 1936-1990 | 1936-2008 | 10% | Periodic Noncompliance | Multiple Administrative Consent Orders from NJDEP related to the air permits, incinerator air emissions, and waste handling and/or documentations in the 1980s and 1990. BASF received an "unacceptable" rating from NJDEP following a Compliance Evaluation Inspection conducted on February 9, 1988 for NJPDES Permit No. NJ0001112. In 1987, all permitted parameters (total organic carbon, petroleum hydrocarbons, temperature, and pH) exceeded established limitations in NPDES permit (PAP-00057827-28). In August 1988, BASF was given a Notification of Reportable Events #22-27 for violating PCB regulations. The July 1987 Annual Report noted PCB contaminated transformer YAR 49871 had been stored for disposal on site for more than one year and the area the unit was stored in did not comply with regulations (PAP-00061053-58). According to the PVSC Annual Report for 1971, dated January 18, 1972, on July 13, 1971 PVSC received a call ...about BASF discharging into the Passaic River. Upon inspection by PVSC, industrial waste was seen coming out of the ground and flowing into the Passaic River. BASF immediately ordered excavation of the area and found a break in a 3-inch pipe which was a temporary sanitary line for a construction trailer. The sewage from the main line was backing up and flowing out through the break. The break was repaired the same day and the line was later removed (PAS-00034592). The PVSC Annual Report for 1973... stated BASF ordered five truckloads of 2-ethyl-hexanol from Eldorado Terminal Corp. for delivery on Saturday, February 10, 1973. During delivery, a welded seam ruptured on the storage tank and 2,500 barrels of alcohol drained into the Passaic River. The loss was not detected by BASF until Sunday, February 11, 1973...(PAS-00034721). Barriers for drainage or flood control, and runoff control systems did not exist at the site (PAP-00062140). |
| Benjamin Moore & Co. | 1925-present | 1925-present | 10% | Periodic Noncompliance | On August 15, 1969, the WPCP of the NJDOH issued an Administrative Order to Benjamin Moore pursuant to the provisions of R.S. 58:12-2. In response to a Benjamin Moore inquiry for the specific details on which the order was based, in a September 4, 1969 letter the State stated that the alleged violation was based on "pollution of the Passaic River in terms of odor, turbidity, color, biochemical oxygen demand, chemical oxygen demand, other soluble matter and suspended solids." Benjamin Moore followed up and discovered 3 drains in the vehicle plant that discharged to the storm sewer. These were connected to the sanitary sewer (PAS-00055008-9, 21-22, 26). On March 23, 1978, the Coast Guard notified Benjamin Moore that a Coast Guard helicopter had noticed a spill from the plant in the River. Investigation with the Coast Guard found a 55-gal drum had been punctured approximately amid ships" and part of its contents had migrated to the Passaic River. At 12:50 PM, July 8, 1980, a valve malfunction spilled about 3,000 gallons of wash solvent. Although this was contained by the retaining dike around the tanks, about 25-50 gallons allegedly leaked from the dike into the Passaic River...According to the Site Assessment, "Given the date of the release, the only COC that could have been contained in the wash solvent was naphthalene..."(PAP-CONF-00010225). |
| Conopco, Inc. | 1941-1986 | 1938-1986 | 10% | Periodic Noncompliance | The PVSC documented discharges of unknown off-color materials in the storm sewer that were traced to be coming from the facility in 1947, 1948, 1956, 1970-1971, 1974, 1976, 1977, and 1978. Several of these were noted as violations (see Section 6 of Data Report). An October 23, 1990, Progress Report on Cleanup of South Drainage Trench referred to notices of violations Penco of Lyndhurst received concerning unpermitted discharges to the storm sewer and from the drainage ditch (PAS-00113370, 372-73). According to the PVSC Weekly Summary of Inspections by Inspector, on May 3, 1956, inspection of the Lyndhurst storm sewer showed a jet |

| Party | Facility Years of Operation | Facility Years of Ownership | BATSON Culpability Factor | BATSON Culpability Category | BATSON Culpability Notes |
|---|---|---|---|---|---|
| | | | | | black discharge into the Passaic River that had killed a number of small fish. In May [1977], suppression of a fire on para-nitrophenol (PNP) pallets washed PNP into the storm sewer (PAS- 00112802). Many of the chemicals were stored in above- and below-ground tanks and in 55- gallon drums in various locations. Prior to construction Buildings 38 and 39, the area occupied by Building 39 was used for storage of solvents in drums. Infrequently, materials were spilled or drums ruptured. (see FDR p. 6) |
| Cooper 3 - 75 Belmont Avenue | 1889-1987 | 1848-1887 | 10% | Periodic Noncompliance | PVSC issued a notice to desist pollution to Edison Chemical Company at Belleville on May 1, 1939 (PAS-00028126). A record of ten years of inspections performed by the PVSC on the Edison Company, Storage Battery Division, in Silver Lake, Belleville, dated June 15, 1948, documented the investigation of contamination entering the Second River. NJDEP issued a Directive Letter to McGraw Edison on June 6, 1984, to cease operation of the unlined pretreatment lagoons (PAP- 00049811). An August 4, 1987, NJDEP Inspection Report stated that the facility did not have a hazardous waste management program consistent with hazardous waste regulations. A NOV would have been issued, but the operations had ceased (PAP-00050211-13). On May 12, 1948, "exceptionally strong iron wastes were found flowing into the Second River from the Meadow Brook storm sewer of such intensity that Second River looked like a river of blood all the way down to its confluence with the Passaic River."The discharge emanated from Edison Storage Battery Division, Belmont Avenue, Belleville facility. The cause was a waterline break that resulted in releasing 100,000 gallons of water that flooded all north side buildings, undermined the buildings and producing a 30-foot hole in the yard and resulting in subsequent collapse of all three industrial sewers. Chemicals, sand, and finished chemical materials were washed into the sewer and caused a blockage. The broken water line was repaired with a sleeve and the pipes broke again. The large hole filled with an acid and iron solution. A pump line from the hole drained the mixture into the clear water line directly to the storm sewer and into Second River. The waste could not be put into the sanitary sewer until new sewer pipes had been installed. The acid corroded the pumps and caused them to fail...(PAP-00050268-69). |
| Essex Chemical Corporation | 1956-1989 | 1955-1989 | 10% | Periodic Noncompliance | Criminal charges were filed against Essex in United States District Court, District of New Jersey on July 11, 1974, arising from a 1972 release to the Passaic River from Essex (PAS-00062740). As described by a PVSC inspector, a 20,000 gallon tank car with oleum and nitric acid overflowed through a vent pipe due to internal pressure. The ground was covered with soda ash and water to neutralize the overflow, and the fire department then washed the residue into the Passaic River (PAS-00062745). New Jersey State Department of Health issued "pollution abatement orders" to Essex in 1969 (PAP-00140967). No further information was available. |

| Party | Facility Years of Operation | Facility Years of Ownership | BATSON Culpability Factor | BATSON Culpability Category | BATSON Culpability Notes |
|---|---|---|---|---|---|
| Franklin Burlington Plastics Inc. | 1976-2010 | 1976-2017 | 10% | Periodic Noncompliance | According to the 1990 EPA SI, at an unknown date Franklin Plastics received a Notice of Violation for oily spills along the eastern wall of the Production Plant (PAP-00337303). In 1984, there were numerous violations that included spillage, discolored soils, oil saturated soils, improperly labeled drums, unmarked drums, disposal of drums, and other storage of material concerns (PAP- 00337237). NJDEP Division of Water Resources, inspected the facility in July 1985 and gave it an "unacceptable" rating due to permit limit exceedances of temperature, chromium, and zinc concentrations (PAP-00057085-89;). A 1980 EPA Potential Hazardous Waste Site Identification and Preliminary Assessment form identified an open dump, landfill, drums, aboveground tanks, a railroad, and other hazardous major site activities. Overturned drums potentially contaminating the soil were noted onsite, as well as "many" 55-gallon drums that were leaking and overflowing. An August 1, 1984 Investigative Report for Franklin Plastics Corporation noted an oil-like substance that heavily contaminated the southwestern corner inside of the Production Plant. Two spills being cleaned by the workers were noted on the ground during the inspection in an area where a liquid plasticizer was discharged from tank trailers into pipes for storage (PAP- 00338659). During sampling "spill and vegetative stress area near the air pollution control units" as noted and another sample was collected where "the soils were covered with a silvery material" |
| Givaudan Fragrances Corp. | 1924-1998 | 1924-1998 | 10% | Periodic Noncompliance | On June 17, 1983, the governor of New Jersey issued an Executive Order declaring a state of emergency due to TCDD contamination at the site (PAS-00001801). Givaudan entered into an Administrative Consent Order with NJDEP on March 5, 1987; an Amended Administrative Consent Order TCDD was signed on February 16, 1988. These consent orders required the investigation and remediation of TCDD contamination in soil (PAS-00001767-73). |
| Goody Products Inc. | 1968-1994 | 1969-1996 | 10% | Periodic Noncompliance | Multiple violations for discharging polluting materials into the waters of Dead Horse Creek, a tributary to the Passaic River in 1975 and 1978-9 (PAP-00105499; PAP-00105516-17; PAP- 00103534-43; PAP-00105481-83). The Goody Products facility received a rating of "Unacceptable" due to several deficiencies in 1987 (the bypass of the effluent filter and filter press at Industrial Treatment, discharge 001, due to pump failure had not been reported as required, sanitary wastewater treatment plant was flooded). NOVs issued for copper exceedances of the permit limits in 1988-9, 1991 (PAP-00105282-84; PAP-00447388-91; PAP- 00447037-38). In 1993, Administrative Consent Order Affidavit identified exceedances, alleged discharges to ground surface, and unpermitted discharges (PAP-00350695-98). |
| Hexcel Corp. | 1973-1986 | 1973-1986 | 10% | Periodic Noncompliance | Two violations were noted in the ECRA application. One is stated to be related to failure to submit information to local agencies, while the other is a notice that spills and leaking drums were observed close to the east bank of the Saddle River during a state inspection in the September of 1984. Both violations were stated to be resolved (PAS-00091296-97). The document does not state these violations involved OU2 COCs. The Purdue Pharma facility property was impacted by PCBs from Hexcel. An industrial sewer line historically ran north to south across the site, beginning at the adjacent Hexcel property and continuing to the Hendricks pump station located adjacent to the Fortunato property (PAP-00127468, 559). Aroclor 1242, used by Hexcel, was detected in Purdue Pharma soil along the route of the industrial sewer line. Soil: Ranging from 0.6 milligrams per kilogram (mg/kg) at a depth of four feet below ground surface (bgs) to 8,500 mg/kg collected from seven to 7.5 feet bgs at sample location TP-7, and 1,700 mg/kg collected from nine to 9.5 feet bgs at sample location TP-7B (PAS-00084957; PAP- 00127670). PCB-laden (Aroclor 1242) light non- |

ALCD-PUBCOM_0000780

| Party | Facility Years of Operation | Facility Years of Ownership | BATSON Culpability Factor | BATSON Culpability Category | BATSON Culpability Notes |
|---|---|---|---|---|---|
| | | | | | aqueous phase liquid (LNAPL): 3,400 mg/kg at [Purdue Pharma] well MW-E14 installed just south of Molnar Avenue adjacent to Hexcel (PAS- 00084957). PCBs also were present in [Purdue Pharma] soil along approximately 200 feet of the Saddle River riverbank at concentrations as high as 94 mg/kg, as discussed in the Remedial Investigation Report/Remedial Action Work Plan, dated June 17, 2004. The PCBs extended south from the Hexcel property line, where the primary Aroclor detected was 1242, to the Fortunato property line, where the primary Aroclors detected were 1254 and 1260. No new perspective provided |
| Kearny Smelting & Refining | 1944-present | 1944-present | 10% | Periodic Noncompliance | Poor housekeeping identified in 1984, 1986, and 1994 inspections (damaged drums and wastewater discharged to the ground; raw material, scrap, product, slag, and waste exposed to stormwater) (PAS-00003772-73, 79; PAS-00003766). Hudson Regional Health Commission sent KRSC a Notice of Violation for a discharge of a No. 4 Fuel Oil. The oil leak was from the pipes in the pump house which caused approximately 100 to 150 gallons of No. 4 Fuel Oil to spill to the ground (PAS-00032753-55). On October 11, 1991 KSRC entered into an ACO to address the violations that had occurred throughout the years of operation, including discharging of pollutants and hazardous substances at and around the site and the mismanagement of wastes (PAS-00003777-81). |
| Neu Holdings (Eden Wood Corporation) | 1933-1987 | 1933-1980 | 10% | Periodic Noncompliance | In 1947, PVSC stream contamination reports documented four incidents of discharge (paper pulp, oily discharge, paperboard) from Clifton Paper Board Company into the Passaic (PAS- 00113923, 925, 927, 929). In March and December 1956, Clifton Paper Board received violations for oil and water discharges from a pipe (PAS-00113935; PAS-00113937). The violations were eliminated on the next day in March and on the same day in December. Sewage discharged in 1977 (PAS-00113563). In September 1976, PVSC notified WPBC that they had two of five outlets (002 and 004) were above values that PVSD did not consider acceptable for discharge limits into the Passaic River for suspended solids, turbidity, and pH (PAS-00113566). The Herald News, dated June 1982, noted that the Clifton Mill had been partially gutted by fire in April 1980 and had never reopened (PAS-00113961). There were stained soils in the drum storage area (PAS- 00113605). |
| Otis Elevator Co. | 1910-1980 | 1910-1980 | 10% | Periodic Noncompliance | Former employee stated that a fellow employee had occasionally disposed of water-based coolant collected from metal cutting operations into an exterior drain or other such structure, believed to drain to the primary wastewater discharge line that ran from the facility to the Passaic Valley Sewerage Commission (PVSC) sewer system. A review of the annual reports from 1969 through 1976 and the 1977 Draft Report mention Otis in 1969, 1971, and 1972 for two minor violations (PAS-00076592-93). In the 1972 PVSC Annual Report, Otis received a violation for samples taken on December 14, 1971 from the five outlets that were flowing (7, 8, 10, 15, and 16). The discharge from Outlet 7 had been polluting PAP-00319432-323; PAS-00006171-72; PAS-00076763-64). According to a Cease and Desist Order from NJDOH to Otis dated October 3, 1969,, NJDOH found that Otis had been discharging harmful, deleterious and polluting matter from a sewer or drain into the Passaic River (PAS-00076756-58). |

ALCD-PUBCOM_0000781

| Party | Facility Years of Operation | Facility Years of Ownership | BATSON Culpability Factor | BATSON Culpability Category | BATSON Culpability Notes |
|---|---|---|---|---|---|
| Pitt Consol Chemical Company | 1955-1983 | 1955-present | 10% | Periodic Noncompliance | An incidence report to the Coast Guard, dated May 12, 1981, is listed on the inspection report and states that an "unknown" red liquid was released into the Passaic River by dumping or illegal discharge from Pitt-Consol on May 11, 1981. (PAS-00051363, PAS-00051497, PAS-00051507). Based on the Summary of Existing Environmental Data, Pitt-Consol Site, dated July 24, 1989, an oily, creosote-like staining was observed in fill on the northern portion of the site and coal-like and tar-like material have been observed in areas of the site, primarily on the western half of the facility in fill material (PAP-00016509-10). The PVSC Annual Report for 1972 stated that industrial waste was discharging to the Passaic River from the Roanoke Ave storm sewer, even though a concrete dam had been built to prevent overflow from the sanitary sewer into the storm sewer. In order to locate the source of the pollution, the Roanoke Avenue storm sewer was cleaned in late 1971. While preparing a visual inspection of the storm sewer, a manhole on the Pitt-Consol property exploded, injuring three men. Inspection of the sewer with a camera in January 1972 found a 10 inch connection discharging polluted water from the Pitt-Consol facility (PAS-00006274-5). |
| PMC, Inc. | 1971-2007 | 1971-2007 | 10% | Periodic Noncompliance | The PVSC permit request filed in September 1985 was in response to a civil action by the EPA against Kleer Kast for violation of the federal Clean Water Act for discharging contact cooling water to Frank's Creek. On July 1, 1986, the company began discharging contact cooling water to the PVSC system rather than to surface water (PAS-00015237; PAS-00015262; PAS-00015264; PAS-00015296-298; PAS-00015302-303). On March 6, 1990, Kleer Kast reported to PVSC that approximately 50 gallons of Number 6 fuel oil were discharged to the sewer during a 1-hour period. The discharge resulted from a leak in a fuel oil recirculating line. PVSC issued a NOV to Kleer Kast on March 7, 1990 for the discharge (PAS-00015134-136; PAS-00015134-6). During a June 9, 1994 facility inspection, NJDEP documented that an oil-like substance was leaking from the foundation of the loading dock area of Alexandria Plastics, a tenant at the Kleer Kast Site (PAS-00014840; PAS-00015208). |
| PSE&G 1 - 4th Street | 1902-present | 1884-present | 10% | Periodic Noncompliance | Numerous violations: in 1969, violations concerning pollutants from the Harrison Gas Plant entering the Passaic River. A sample of the plant's outfall collected by the Department of Health on August 21, 1969, contained 363 ppm of ether soluble matter (usually inferred as oil) (PAP- 00140328-29; PAP-00140419-20). PSE&G Harrison Gas Plant paid fines to the Coast Guard regarding oil/kerosene/tar spills to the Passaic River in the 1970s and 1980s and 1994 (see data report). On September 25, 1987, the EPA found PSE&G Harrison in violation of general facility requirements pertaining to PCBs. A penalty of $8,500 was assessed (PAS-00104676-77). Note: The nature of the violation was not described in further detail. A 1988 inspection found several violations concerning documentation and storing PCB waste more than one year after being placed into storage for disposal (PAP-00140392-95; PAP-00140436-37). In November 2004 and April 2010, PSE&G voluntarily reported un-manifested PCB shipment from the Harrison Gas Plant facility. In April 2011, PSE&G and U.S. EPA entered into a Consent Agreement and Final Order due to violating TSCA on three occasions by storing PCB waste and/or shipping PCB waste for disposal without identifying it as PCB on EPA Manifest Form 8700-22 (PAP-00130040-47; PAP-00130049- 55). Facility manufactured gas from oil during early days, which generates wastes high in PAHs; manufactured gas plant (MGP) historical practices disposed of wastes on the facility or adjacent property. Former employees who worked at the Harrison Gas Plant prior to 1944 allegedly stated that on-site disposal of tar wastes on the ground occurred at the site (PAS-00013565-66). During testimony, a PSE&G |

| Party | Facility Years of Operation | Facility Years of Ownership | BATSON Culpability Factor | BATSON Culpability Category | BATSON Culpability Notes |
|---|---|---|---|---|---|
| | | | | | chemist testified in deposition that he observed an area in the north corner of the Harrison Plant where solidified tar, clinkers, and debris had been buried and covered with gravel. As early as the 1940s, he noticed that the solidified tar associated with the buried waste would re-liquefy during the summer months and rise to the surface (PAS- 00013567). It was also testified in deposition that some gas plant materials, such as coke, were stored on the ground and that other gas plant materials, such as tar, tarry and oily wastes, condensates, light oils, and spent oxide wastes were present in or on the ground due to leaks, spills, and occasional on-site disposal (PAS-00013571). Floating free product layers were observed in 7 piezometers along the river at thicknesses up to 1.79 feet (PAP-00128600 ) - this indicates that free phase product could have been discharged directly to the river with groundwater. Lead was also a site waste. A list of wastes generated by the PSE&G Harrison Gas Plant facility for the year 1997 included 6.78 tons of lead waste and 8 tons of lead and PCB waste. These waste streams were both transported off-site and landfilled (PAS-00104679-80). |
| Roman Asphalt Corporation | 1964-2006 | Leased from Michael Lamorgese | 10% | Periodic Noncompliance | A NOV was issued to Roman Asphalt on September 18, 1986, due to "hazardous substance discharge" which included reported "pooling oil in facility yard and running off to Rt. 21 drainage system and bank" (PAS-00111340). Another NOV was issued to Roman Asphalt on October 6, 1986, due to "discharge of hazardous substance." The NOV reported that "oil has run off property onto embankment of State Hwy 21 South". This pooling oil was apparently used motor oil from oil changes in heavy equipment (PAS-00111343). |
| Royce Associates | 1929-1982 | 1955-1964 | 10% | Periodic Noncompliance | A 1971 PVSC Annual Report notes that Royce Chemical was pumping industrial waste into a storm drain on Carlton Avenue. The material was reportedly diverted to a sanitary line when the Inspector informed them of the violation (PAS-00034516; PAS-00034633). Polluting materials from Royce Chemical were again discharged to the Carlton Hill storm drain and ultimately to the Passaic River in January and February 1973, twice in 1974, and in 1979 (PAS-00034660; PAS- 00034762-3; PAS-00034785; PAS-00034904-5; PAS-00008134). Spills of No. 6 heating oil reportedly caused soil contamination at the site. Waste disposal manifests indicate that soils and oily waste were removed from the Royce Chemical facility in May and August 1983 (PAS-00008141). |

| Party | Facility Years of Operation | Facility Years of Ownership | BATSON Culpability Factor | BATSON Culpability Category | BATSON Culpability Notes |
|---|---|---|---|---|---|
| Safety Kleen Envirosystems Co./McKesson Corp. | 1975-1987 | 1974-present | 10% | Periodic Noncompliance | At least 11 inspections conducted by NJDEP between January 18, 1980, and May 19, 1982, identified what was described as "leachate of an oil substance is presently entering Newark Bay" and/or "leachate into bay" and/or an "oil like material," among other similar descriptions. The source of the discharge was documented as being unknown (PAP-00186512-21, 6530-1, 6881, 6908, 6913, 7305, 7310; PAP-00365518-9). dating back to 1979, NJDEP personnel had noted the following deficiencies at the facility: (1) poor, careless housekeeping resulting in extensive spillage; (2) a contaminated stormwater discharge into Newark Bay; (3) open drums in deteriorated condition stored in improper storage areas; (4) an oily material surfacing in the Newark Bay near the facility's shoreline; and (5) a purple- colored groundwater discharge into Newark Bay (PAP-00185827). According to a Civil Action brought by the State of New Jersey against Inland, dated March 19, 1980, Inland failed to comply with and implement all of NJDEP's requirements of Inland's Temporary Operating Authority; Inland since or from about October 30, 1979, had failed and continued to fail to comply with the October 30, 1979, Administrative Order; and, Inland's acts since or from about October 30, 1979, had constituted and continued to constitute pollution of the environment or a potential threat of pollution of the environment (PAP-00365511). According to a June 23, 1993, Administrative Consent Order, on October 30, 1979, the facility was issued an Administrative Order by the New Jersey Department of Environmental Protection and Energy (NJDEPE). The order stated that routine inspections conducted by NJDEPE on September 19, October 9, October 16 and October 24 revealed that the facility grounds were contaminated with various chemicals; therefore, the facility was to cease accepting waste and clean up all spills and contaminated soil (PAS-00011254). On October 10, 1982, an explosion and fire destroyed much of the facility. The New Jersey Department of Environmental Protection (NJDEP) closed the site two days later (PAS-00091937). |
| Schiffenhaus 3 - 2013 McCarter Highway | 1925-2007 | 1925-2007 | 10% | Periodic Noncompliance | A NOV was issued by PVSC to Schiffenhaus for a copper exceedance in October 1996. Schiffenhaus subsequently advised in a July 1996 letter that the copper source may be copper phthalocyanine pigments (PAS-00017812; PAS-00017942; PAS-00017954). In May 1995, Schiffenhaus was "out of compliance"with "Local Pretreatment Limitations"for copper (PAS- 00017986-87). Reportedly, the facility was over the "threshold limit"for cadmium, chromium, copper, mercury and lead (PAS-00017991). In January 1997, a NOV was issued by PVSC to Schiffenhaus due to the facility's failure to meet compliance milestones established in its Sewer Connection Permit for "local limits"on metals. PVSC advised that Schiffenhaus was determined to be in "significant non-compliance" with PVSC rules and regulations (PAS-00017812; PAS-00017941-42). On October 17, 1997, PVSC filed a complaint in the Superior Court of the State of New Jersey against Schiffenhaus. The complaint alleged that Schiffenhaus violated its PVSC discharge permit by not being in compliance with "local pretreatment limits"established by the permit. Schiffenhaus agreed to pay a fine of $1,000 to settle the PVSC legal action (PAS- 00017813; PAS-00017933). |
| Seton Company, Inc. (Seton Tanning) | 1906-2006 | 1906-2006 | 10% | Periodic Noncompliance | In 1956, it was noted that Seton dumped solid industrial waste into the sanitary sewer. In 1978, PVSC documented poor housekeeping and illegal industrial discharges to the combined sanitary and storm sewer system on Verona Avenue. Reportedly, the discharged material contained "high pH liquids as well as animal fats, greases and oils." Seton representatives indicated that they could not afford the pre-treatment that was required (PAS-00008172). According to the Civil Action Consent Order filed on May 2, 1991, Seton's wastewater discharge continued to exceed |

| Party | Facility Years of Operation | Facility Years of Ownership | BATSON Culpability Factor | BATSON Culpability Category | BATSON Culpability Notes |
|---|---|---|---|---|---|
| | | | | | "pretreatment effluent limitations" for chromium, sulfur, and pH (PAS-00102337-338) |
| **Occidental Chemical Corp.** | 1946-1969 | 1946-1986 | 100% | Intentional Action with Knowledge of Risk to HH/E | In the 1984 Aetna litigation, Judge Stanton found that Diamond, was concious that its discharge into the river were illiegal, and that the company as a matter of corporate policy, intentionally and continuously discharged dioxin, DDT, and other hazardous substances from the Lister Plant into the Passaic River during the entire period of its plant operations. Specifically, the trial court found that "Diamond was conscious that its discharges into the (Passaic) (R)iver were illegal. It deliberately concealed them, and over a period of many years employed an alarm system to warn employees to stop the discharges when Passaic Valley inspectors were on the premises." Also, "Housekeeping at the (Lister Plant) ranged from inadequate to poor throughout the entire period of its operation by (DSCC). . . . Spills of liquid and solid chemical products and wastes were literally continuous during every day of the plant's operations andome pipes were always leaking."Although "factory floors at the Newark plant were so badly corroded by acid spills that they had to be replaced nearly every summer...nothnig was done to mitigatethe polluting effect spills and leaks had upon the physical environment." And that OxyChem's "toleration and continuous spiling and leaking" ---was just "the way of life at the Newark Plant" and "its management accepted the spills and leaks as part of the normal routine of operating a chemical manufacturing plant."(PAS-00128426-29 & 49-50) |

ALCD-PUBCOM_0000785

**Dennis Farley**
President & CEO
Principal Scientist



| | |
|---|---|
| **Expertise** | • Environmental liability investigation regarding historical sources of contamination to upland sites, groundwater, surface water and sediments including dioxins, polychlorinated biphenyls (PCBs), pesticides, polycyclic aromatic hydrocarbons (PAHs), mercury and other metals |
| | • Representation of clients at large-scale Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) sites, and support of the cost allocation and remedy selection process |
| | • Support of complex litigation matters regarding multiple parties, including expert witness testimony and non-testifying expert roles |

**Summary**    Mr. Farley has more than 37 years of experience in the environmental field. His expertise includes conducting and directing environmental investigations, providing litigation support, and providing consulting services to corporate and government clients on a domestic and international basis. He is extensively experienced in liability investigation, source identification, and the investigation of potentially responsible parties (PRPs). He regularly oversees and conducts work regarding cost allocation among multiple parties, and provides expert testimony in litigation, arbitration, and mediation settings.

**Professional Experience**    Project manager and lead investigator supporting litigation over damages for a large-scale CERCLA contaminated sediment site. Supported the preparation of several hundred third-party claims; oversaw the review, substantive coding, and evaluation of all incoming document productions pursuant to discovery orders; and coordinated witness interviews with counsel for a large pool of *de bene esse* witnesses. Evaluated and vetted claimed damages by plaintiffs and supported legal team in preparation of third-party cases.

Project manager and lead investigator for a PRP at an urban-waterway CERCLA site. Oversaw and conducted investigations regarding the operating histories and contribution of hazardous substances by various third parties. Conducted internal analysis of client-owned and operated properties and the potential for historical contribution of hazardous substances to the site. Produced expert reports and provided expert testimony in mediated allocation proceedings.

Project manager and lead investigator for a PRP at an urban-waterway and marsh-complex CERCLA site. Oversaw and conducted investigations regarding the operating histories and contribution of hazardous substances by various third parties. Provided services regarding ongoing allocation proceedings including the preparation of expert reports, evaluation of discovery, and preparation of disclosure questionnaires regarding third parties.

Project manager and lead investigator for the source identification program component of a full-scale remedial investigation and feasibility study implementation at a bay and tributary complex National Priorities List (NPL) site in the northeast U.S. Responsibilities included developing an inventory of historical and current sources of organic and inorganic sediment contamination, identifying evidence regarding discharges from identified sources, and compiling source sampling plans and strategies. The scope of effort focused on point sources ranging from industrial operating facilities to large-scale storm sewer, sanitary, and combined sewer networks and regional treatment facilities.

Project manager and lead investigator for PRP group charged with the identification and evaluation of PRP liability cases for an urban river complex NPL site in the northeast U.S. Responsibilities included

3

**Dennis Farley**
President & CEO
Principal Scientist



the development of investigation plans, and implementation of liability investigations regarding historical and present-day industrial operations. Presented evidentiary packages to EPA regarding PRP liability.

Project manager and lead investigator for the initial PRP named at an urban river complex NPL site in the northeast U.S. Responsibilities included the historical reconstruction of 150 years of regional industrial operations, shipping and commerce, the development of local and regional sewerage infrastructure and waste treatment capabilities, and identification of historical and present-day discharge pathways. Developed investigation plans and implemented liability investigations of PRPs; compiled evidentiary packages and presented to EPA. These efforts resulted in general notice letter distributions by EPA to more than forty PRPs, allowing for formation of a PRP steering committee and take-over of remedial and enforcement-related work at the site.

Project manager for historical liability analysis and PRP identification regarding a manufacturing facility in northeastern U.S. Responsibilities included analysis of regional groundwater contamination sources, and investigation of historical operations conducted at select off-site facilities regarding contribution of observed contamination at site. Identified historical tenant operations, conducted corporate successorship and financial viability analysis of select entities, and developed evidence of hazardous substance releases. Developed nexus of U.S. government-contracted operations during the WWII period and investigated and documented all operations conducted at the site. Served as expert witness at a deposition regarding corporate successorship, overcoming motion to dismiss made by Fortune 500 defendant.

Project manager and lead investigator for a client resolving liabilities stemming from historical site operations with third party in litigation proceeding. Evaluated all produced evidence regarding historical site operations and provided testimony at deposition as a 30(b)(6) witness on behalf of client.

Expert witness for a matter in U.S. Federal Bankruptcy Court. Provided testimony at trial regarding the status of subject CERCLA sites and forecasted anticipated expenditures.

Project manager for PRP group charged with the identification and evaluation of PRP liability cases for a regional groundwater contamination NPL site in the western U.S. Developed inventory of potential sources and investigated specific historical industrial operations for evidence of hazardous substance use and discharge. Developed evidence for use in PRP negotiation and allocation mediation.

Project manager for several PRPs identified as waste generators at a local municipal landfill in the northeast U.S. Investigated the local hauling and waste disposal operations conducted at the time of filling and identified waste generators and haulers that had historically utilized the site.

Project manager for PRP charged with the identification and evaluation of PRP liability cases for an urban river complex NPL site in the Midwest U.S. Responsibilities included analysis of regional sediment contamination sources, and investigation of historical operations conducted at select facilities regarding the discharge of hazardous substances.

Project manager for investigation of several NPL and state-lead landfill and septic disposal sites in northeast U.S. Responsibilities included the investigation and development of evidence regarding historic hauling, waste generation, and disposal operations at these sites. Sites historically involved

4

ALCD-PUBCOM_0000787

**Dennis Farley**
President & CEO
Principal Scientist



hauler and disposal control by organized crime, resulting in the nexus of waste generators from large regional areas through complex hauler relationships and routing of hauled waste streams. Results included the documentation of hauling and disposal by numerous entities, statements and depositions from numerous witnesses, identification of key documentary evidence, and identification and enforcement agency notification of responsible parties.

Project manager for PRP charged with the identification and evaluation of PRP liability cases for an urban river complex site in the southern U.S. Responsibilities included analysis of regional sediment contamination sources, and investigation of historical operations conducted at select facilities regarding the discharge of hazardous substances.

Project manager for multi-national corporate client with numerous predecessor operations posing liability for environmental conditions resulting from historical operations. Conducted internal assessment of prioritized historical entities and facilities in order to develop internal knowledge base of potential liabilities for management purposes.

Project manager for multi-national corporate client with more than 60 historical operating facilities and third-party sites undergoing remediation and/or characterization. Conducted assessments and evaluation of on-going site work to support the formulation of cost estimates and environmental reserves.

Project manager and lead investigator for environmental compliance and fraud investigation at an active coke manufacturing facility in southeastern U.S. Investigated and identified sources of fraudulent reporting made to regulatory agencies and customers and assisted in the implementation of business controls and practices to mitigate future recurrence.

Project manager and lead investigator for product tampering investigation at a waste oil refinery located in the Midwest U.S. Investigated and identified sources of internal sampling and analytical deficiencies that resulted in facility shutdown and cleanup due to PCB contamination of process streams at facility.

Project manager for numerous investigations conducted in support of toxic tort litigation and claims made relating to alleged exposures to asbestos-containing materials, silica, and mold. Conducted and managed investigations related to historic product identification and alternate routes of exposure. Investigated backgrounds of plaintiffs, compiled work histories, developed evidence of product use, prepared statements and obtained witness affidavits.

Project manager for numerous investigations regarding the existence of historic general liability insurance policies for application against incurred or obtained historic operating liabilities for toxic tort and environmental damages. Investigated operating histories of companies, identified historic repositories of information, identified and located witnesses, and developed evidence from government records.

Conducted numerous domestic and international assessments of commercial treatment, storage, and disposal facilities used by corporate clients for the disposal and/or recycling of hazardous waste streams. Evaluated site settings, operating histories, compliance records, backgrounds and financial viability of subjects.

5

ALCD-PUBCOM_0000788

**Dennis Farley**
President & CEO
Principal Scientist



Conducted numerous domestic and international assessments of commercial and industrial facilities in support of corporate transactions including acquisitions and divestitures. Managed and implemented various Phase I and II investigations in pre-transaction settings, and remedial investigation of facilities in post-transaction settings. Conducted site characterizations of on-site and off-site soil, sediment, and groundwater contamination.

Conducted and managed numerous remedial investigations of operating sites including industrial facilities, landfills, NPL sites, and waste disposal facilities. Designed and implemented sampling programs, managed field sampling teams, conducted sampling of various media, and supervised the installation of numerous groundwater monitoring and extraction wells. Conducted pumping tests of aquifers, analyzed site conditions and prepared numerous reports regarding site characterization, groundwater hydraulics and remedial options.

| | |
|---|---|
| **Academic Qualifications** | MS in Civil and Environmental Engineering, New Jersey Institute of Technology, 1988 |
| | BS in Geology and Physics, Moravian College / Lehigh University, 1982 |
| **Licenses and Registrations** | State of New Jersey Licensed Private Detective #6423 |
| | State of New York Licensed Investigator #11000116681 |
| **Publications and Presentations** | Lasseter, K., D. Farley, E. Pyne. "A Review of Allocation Methods and Rationale for Method Selection." Presentation, Battelle – Tenth International Conference on Remediation and Management of Contaminated Sediments, New Orleans, LA, February 2019. |

ALCD-PUBCOM_0000789