# Exhibit 10 Part 3

## Comments Submitted by OxyChem (Part 3): OxyChem Appendix B4-B7

United States' Motion to Enter Consent Decree,
*United States v. Alden Leeds, Inc. et al.*, Civil Action No. 22-7326 (D.N.J.)

# APPENDIX B.4

Mark Harris Declaration

ALCD-PUBCOM_0000790

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| Plaintiff, | ) Civil Action No. 2:22-cv-7326 |
| | ) |
| v. | ) |
| | ) |
| ALDEN LEEDS, INC., *et al.* | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |

## DECLARATION OF DR. MARK HARRIS

ALCD-PUBCOM_0000791

## TABLE OF CONTENTS

LIST OF FIGURES.................................................................................. 3

LIST OF TABLES.................................................................................. 3

PURPOSE OF THIS DECLARATION...........................................................4

QUALIFICATIONS.............................................................................. 4

SUMMARY OF OPINIONS...................................................................... 5

SUPPORTING INFORMATION FOR OPINIONS............................................ 7

Opinion 1. The Batson report misuses environmental risk assessment, an accepted scientific method, to measure something it cannot measure, remediation costs and who is responsible for them. The accepted use and purpose of environmental risk assessment methods is to measure environmental and health risks, it is not to quantify the costs to address those risks or to allocate those costs among parties responsible for creating those risks. Batson's lack of training as a toxicologist or scientist causes him to misuse this accepted scientific method to prove something risk assessment was not designed to demonstrate; namely, how costs to remedy an environmental hazard should be allocated. Through its misuse of environmental risk assessment, the Batson report engages in a form of pseudo-science, implying it has measured and allocated costs when an environmental risk assessment can do neither. Batson's misuse of risk assessment also fails to consider that the area subject to remediation is defined by more than just one chemical (i.e., multiple chemicals exceed remediation goals). The size of the lower eight miles of the Passaic River ("OU2") is a primary factor affecting the cost of the remedial approach described in the focused feasibility study (FFS)[1], and the size is not dependent on a single chemical. Many chemicals are present above levels protective of human health and the environment across all of OU2, which should be considered in the cost allocation for the remedy...................................................................................7

Opinion 2. If a risk-based approach had to be used in the allocation, the recalculation of human health and ecological risks in the Batson report is scientifically unreliable and erroneous since it excludes the contribution of dioxin-like PCBs. The U.S. EPA approved Risk Assessment in the FFS, which specifically accounts for dioxin-like PCBs, provides a more comprehensive assessment of risk more appropriate to developing the risk-related factor included in the allocation...................................................11

---

[1] The Louis Berger Group, Inc. with Battle HDR/HydroQual, 2014. Focused Feasibility Study Report for the Lower Eight Miles of the Lower Passaic River.

ALCD-PUBCOM_0000792

Opinion 3. Allocation Method 1 in the Batson report misapplies a well
understood scientific concept—attenuation—and is fatally flawed.
Batson created an unscientific artificial attenuation factor
to reconcile the amount of chemical discharged in OU2 with the
amount of chemical in sediment in OU2. This is unsupportable and
removes from his assessment large quantities of chemicals he finds
were actually produced by the participating parties. Allocation
Method 1 relies on a comparison of the estimated total mass discharged
to the total mass estimated in sediment by U.S. EPA. For Allocation
Method 1 to work, the estimated mass discharged of each chemical
by all allocation parties should be less than or approximately equal to
the total mass in the sediment, but for some chemicals the estimated
mass discharged was higher than in the sediment. To address this
discrepancy rather than acknowledge that Allocation Method 1
would not work, the Batson report created an artificial attenuation
factor for one chemical and then applied it to all the chemicals,
disregarding the abundant scientific literature regarding attenuation
and EPA's own findings in the FFS that the COCs in OU2 attenuate
at markedly different rates. Allocation Method 1 is unreliable as a
measure of mass balance and should not have been calculated............................15

CONCLUSION...........................................................................................20

REFERENCES...........................................................................................22

Attachment 1 — *Curriculum Vitae* of Dr. Mark Harris
Attachment 2 — Appendix D, Risk Assessment, to the Focused Feasibility Study Report, 2014,
           prepared by the Louis Berger Group.

## LIST OF FIGURES

Figure 1. Relative Risk Number (RRN) calculated in the Batson report...........................15
Figure 2. Relative Risk Number (RRN) calculated using
the U.S. EPA approved risk assessment in the FFS....................................................15

## LIST OF TABLES

Table 1. Comparison of mass of constituents of concern (COCs) in sediment
to mass discharged (values from the Batson report)....................................................18

ALCD-PUBCOM_0000793

### PURPOSE OF THIS DECLARATION

Pursuant to 28 U.S.C. § 1746, I, Dr. Mark Harris, state the following:

1. I have been retained by Langsam Stevens Silver & Hollaender, LLP on behalf of Occidental
   Chemical Corporation ("OxyChem") to provide expert opinions related to the Diamond
   Alkali Superfund Site (OU2)—specifically, to review the *Diamond Alkali Superfund Site
   OU2, Allocation Recommendation Report*, dated December 28, 2020, by David Batson, Esq.
   ("Batson report")[2] and offer my opinions on the allocation calculations provided in the
   report.

2. My assignment included providing expert responses to the following questions:

   - **Is it a scientifically accepted methodology to use an assessment of environmental
     risks to determine the allocation of the costs to remedy those risks as described
     in the Batson report for the Diamond Alkali Superfund Site OU2 ("OU2")?**

   - **Do the allocation methods used in the Batson report conform to generally
     accepted standards for assessing environmental risks of chemicals in the
     environment?**

### QUALIFICATIONS

3. I am the cofounder of the consulting firm ToxStrategies which has over 80 employees
   providing toxicology, epidemiology, and risk assessment consulting services to both the
   public and private sector. I am a graduate of Texas A&M with a B.S. in Biochemistry (1986)
   and a Ph.D. in Toxicology (1990). I also earned an MBA at Southern Methodist University
   (2000). I have conducted numerous human health risk assessments and published many
   papers in peer-reviewed scientific journals involving polychlorinated dibenzo-p-dioxins,
   polychlorinated dibenzofurans, and polychlorinated biphenyls. I am familiar with generally

---

[2] December 28, 2020 Diamond Alkali Superfund Site OU2 Allocation Recommendation
Report by David Batson, Esq. of AlterEcho.

ALCD-PUBCOM_0000794

accepted scientific methodologies used to measure, assess, and address the risks of hazardous substances on human health and the environment and the purposes for which those risk measurements and assessments are used by qualified scientists in the field.

## SUMMARY OF OPINIONS

4. **Opinion 1:** There are generally accepted scientific methodologies used by qualified scientists to measure the relative risk of chemicals to human health and the environment. The accepted use and purpose of these methods is to measure environmental and health risks, it is not relevant or appropriate to quantify the costs to address those risks or to allocate those costs among parties responsible for creating those risks at OU2. Batson's lack of training as a toxicologist or scientist causes him to misuse this accepted scientific method to prove something; risk assessment was not designed to demonstrate; namely, how costs to remedy an environmental hazard should be allocated. Through its misuse of environmental risk assessment methods, the Batson Report engages in a form of pseudo-science, implying it has measured and allocated costs when an environmental risk assessment can do neither. This is evident from one of many possible examples. The "method" Batson uses to allocate *costs* does not allocate cost at all: it allocates risk. On a plain reading of the OU2 ROD, however, it is apparent that a risk-based allocation is unsuited to allocate remedial costs, because the area subject to remediation is defined by more than just one chemical (i.e., multiple chemicals exceed cleanup goals). The size of the lower eight miles of the Passaic River ("OU2") is a primary factor affecting the cost of the remedial approach described in the focused feasibility study (FFS)[3], and the size and extent of remediation required is not dependent on the risk (or

---

[3] The Louis Berger Group, Inc. with Battle HDR/HydroQual, 2014. Focused Feasibility Study Report for the Lower Eight Miles of the Lower Passaic River.

5

ALCD-PUBCOM_0000795

even the relative risk) of any single chemical because all COCs are present above levels protective of human health and the environment across all of OU2. Batson ignores this and his use of "risk allocation" to allocate costs—a different thing entirely—is scientifically unsound and unreliable.

5. **Opinion 2:** If a risk-based approach had to be used in the allocation, the recalculation of human health and ecological risks in the Batson report is erroneous since it excludes the contribution of dioxin-like PCBs. The U.S. EPA approved Risk Assessment in the Focused Feasibility Study, which specifically accounts for dioxin-like PCBs, provides a more comprehensive assessment of risk and is a more scientifically appropriate and accurate means of developing the risk-related factor included in the allocation. A qualified scientist in the field, if asked to assess the risks to human health of chemicals would not exclude from his analysis dioxin-like PCBs, which are known to be significant environmental and human toxins. By excluding these chemicals from his assessment of risk, Batson deviated from accepted, scientific methodology and failed to fully or accurately quantify the risks he was supposedly measuring.

6. **Opinion 3:** Allocation Method 1 in the Batson report is fatally flawed because an artificial attenuation factor was created to reconcile the amount of chemical discharged in OU2 with the amount of chemical in sediment in OU2. This is inappropriate and skews the allocation. There is abundant literature and an accepted scientific methodology to assess the rate at which chemicals attenuate in the environment.[4] Batson appears unfamiliar with this literature

---

[4] *See e.g.,* Monitored Natural Attenuation of Inorganic Contaminants in Ground Water. Volume 2. Assessment for Non-Radionuclides Including Arsenic, Cadmium, Chromium, Copper, Lead, Nickel, Nitrate, Perchlorate, and Selenium. U.S. EPA Oct. 2007; *see also* Burcu Simsir *et al.,* Natural Attenuation in Streambed Sediment Receiving Chlorinated Solvents from Underlying Fracture Networks. Envion. Sci. Techool. 2017 May 2.

6

and lacks qualifications to perform attenuation calculations. As a result, his report does not
appear to understand (and, in any event, does not apply correctly) how attenuation works in
an environmental system. To cite one example, Batson assumes a uniform rate of attenuation
for all COCs measured by the rate at which dioxins attenuate. This is unsound. EPA
documented in the RI/FFS that different COCs have different half lives in the environment of
OU2.[5] Allocation Method 1 relies on a comparison of the estimated total mass discharged to
the total mass estimated in sediment by U.S. EPA. For Allocation Method 1 to work, the
estimated mass discharged of each chemical by all allocation parties should be less than or
approximately equal to the total mass in the sediment, but for some chemicals the estimated
mass discharged was higher than in the sediment. To address this discrepancy rather than
acknowledge that Allocation Method 1 would not work, Batson misapplies attenuation by
creating an inaccurate attenuation factor for one chemical (dioxins) and then applying it to all
other chemicals. By misapplying attenuation this way, Batson makes thousands of pounds of
discharges by the participating parties disappear from his calculation, even though the mass
in the OU2 sediments is unchanged. This is unscientific. Batson did not measure accurately
or reliably how any of the chemicals he considered actually attenuated. Allocation Method 1
should not have been calculated.

**SUPPORTING INFORMATION FOR OPINIONS**

**Opinion 1. The Batson report misuses environmental risk assessment, an accepted scientific
method, to measure something it cannot measure, remediation costs and who is responsible
for them. The accepted use and purpose of environmental risk assessment methods is to**

---

[5] See The Louis Berger Group, Inc. with Battle HDR/HydroQual, 2014. Focused
Feasibility Study Report for the Lower Eight Miles of the Lower Passaic River. See also OU2
Remedial Investigation Report (Feb. 5, 2014).

7

measure environmental and health risks, it is not to quantify the costs to address those risks or to allocate those costs among parties responsible for creating those risks. Batson's lack of training as a toxicologist or scientist causes him to misuse this accepted scientific method to prove something; risk assessment was not designed to demonstrate; namely, how costs to remedy an environmental hazard should be allocated. Through its misuse of environmental risk assessment, the Batson report engages in a form of pseudo-science, implying it has measured and allocated costs when an environmental risk assessment can do neither. Batson's misuse of risk assessment also fails to consider that the area subject to remediation is defined by more than just one chemical (i.e., multiple chemicals exceed remediation goals). The size of the lower eight miles of the Passaic River ("OU2") is a primary factor affecting the cost of the remedial approach described in the focused feasibility study (FFS)[6], and the size is not dependent on a single chemical. Many chemicals are present above levels protective of human health and the environment across all of OU2, which should be considered in the cost allocation for the remedy.

7. The Diamond Alkali Superfund Site OU2 consists of contaminated sediment in the lower 8.3 miles of the Passaic River in New Jersey.[7]

8. The total estimated inventory of contaminated fine-grained sediments in OU2 (surface and deeper sediments combined) is approximately 9.7 million cubic yards (cy).[8]

---

[6] The Louis Berger Group, Inc. with Battle HDR/HydroQual, 2014. Focused Feasibility Study Report for the Lower Eight Miles of the Lower Passaic River.

[7] Batson report, p. 7.

[8] Batson report, p. 8.

8

ALCD-PUBCOM_0000798

9.  The remediation approach is a combination of dredging to maintain the shipping channel and covering the entire area with an engineered cap, at a total cost of more than $1 billion.[9]

10. Dozens of APs contributed to the contaminated sediments in OU2, and the stated purpose of the Batson report was to allocate remedial costs between and among those APs.

11. The Batson report misuses an accepted scientific methodology—environmental risk assessment—by applying it to a discipline it is not equipped to measure, remediation costs and the liability for those costs. A risk assessment estimates potential human or ecological health effects using a process standardized by U.S. EPA that relates potential exposure to a chemical and chemical toxicity in effort to estimate potential health effects. In a human health risk assessment, two independent categories of health effects are assessed: cancer risk and non-cancer health effects. Ecological risk is represented by a single category in the allocation, which is based on the combination of a number of contributing factors, such as chemical concentrations in sediment and potential risk to birds.

12. In this case, a competent, reputable scientist in the field would not use an environmental risk assessment to allocate the costs to remedy those risks among the parties responsible for creating them. Batson, who is not a qualified scientist in the field, deviates from accepted scientific practice in my field when he tries (and fails accurately) to use an environmental risk assessment for this purpose.

13. Batson also misapplies accepted methods of environmental risk assessment. In the Batson report, the two human health categories and one ecological category are combined to create a single risk-based value to allocate liability by chemical. For each of the three categories, percent contribution is calculated for each chemical by dividing the chemical specific

---

[9] Batson report, p. 27.

9

contribution by the total. For each chemical, a total percent contribution across all three categories was calculated as an average; if a particular chemical did not contribute to a category (for example, copper is not a carcinogen) then the contribution was 0%. The Batson report refers to this average contribution across all three categories as the relative risk number (RRN). For example, if PCBs contributed 10% of the total cancer risk, 20% of the total noncancer health effects, and 30% of the ecological risk, the relative risk number for PCBs would be 20 (10+20+30)/3). This is not a scientifically accepted method of combining risks across these categories. For example, chemicals that do not contribute to two of three categories (e.g., copper) would have a maximum RRN of 33%, which does not reflect the impact of copper across OU2.

14. Use of a chemical-specific risk-based approach for allocation does not consider that the costs for the OU2 remedy are not related to specific chemicals. A risk-based approach allocates liability to the highest risk chemicals without considering that other chemicals independently also present an unacceptable risk.

15. Based on my knowledge of environmental risks, my experience, and my review of the extent to which all COCs exceed the remedial goals throughout the Passaic River, it is arbitrary and inaccurate to conclude that the risk of one chemical drove the remedial selection or its cost; to the contrary, as a toxicologist, it is apparent to me that the extensive contamination with COCs other than dioxin would, to a reasonable degree of scientific certainty, likely have required a very similar remedy across OU2. This remedy would be necessary for several individual chemicals (or chemical groups such as PCBs) as well as all the chemicals together regardless of their relative risk number. Since individual chemicals would result in the need for the same

10

remedy across OU2, using a risk-based approach is not an appropriate way to allocate liability for the remedy.

**Opinion 2. If a risk-based approach had to be used in the allocation, the recalculation of human health and ecological risks in the Batson report is scientifically unreliable and erroneous since it excludes the contribution of dioxin-like PCBs. The U.S. EPA approved Risk Assessment in the FFS, which specifically accounts for dioxin-like PCBs, provides a more comprehensive assessment of risk more appropriate to developing the risk-related factor included in the allocation.**

16. Dioxin-like PCBs are similar to dioxin in their effects on human and environmental health and are considered much more toxic than other PCBs. Dioxin-like PCBs behave like dioxin with respect to potential human health effects because of the similarities in their chemical structure. A small quantity of dioxin-like PCBs could have a much larger impact on overall risk than non-dioxin like PCBs. While they are present together in the environment, for a risk assessment to be complete, the contribution of both dioxin-like and non-dioxin like PCBs should be included.

17. Based on the U.S. EPA approved risk assessment in the Focused Feasibility Study Report (FFS),[10] dioxin-like PCBs contributed 11% of the total cancer risk, 9% of the total hazard index for potential human health risks, and 5.4% of the ecological hazard for an average contribution across all three categories of 8.5% (or a relative risk number of 8.5).

---

[10] Lewis Berger Group, in conjunction with Battelle HDR/HydroQual. 2014. Focused Feasibility Study Report.

11

ALCD-PUBCOM_0000801

18. The Batson report's exclusion of dioxin-like PCBs does not conform to accepted scientific methods to assess risk. It erroneously ignores 8.5% of the overall risk, which comes from dioxin-like PCBs, then redistributes the omitted risk—without any scientific basis to do so—to the other chemicals in the Batson calculations. This is a serious error. It does not, as Batson claims, allocate responsibility by risk, it excludes a quite serious risk from consideration. As stated in Attachment H, the Batson report focuses his assessment on total PCBs, because "EPA made the decision in the RI/FFS [Remedial Investigation/Focused Feasibility Study] and ROD [Record of Decision] to develop PRGs [preliminary remediation goals] based on total PCBs only." However, Batson's report makes a contrary observation when it describes U.S. EPA's rationale for using a subset of chemicals when setting PRGs, acknowledging that while all the chemicals contribute to unacceptable risk, the rationale for limiting the number of chemicals with PRGs was *not* based on risk.[11] Rather, it was because they were *representative* COCs:

The Batson report states:

*"While all of the COCs discussed in Section 7.2 cause unacceptable risks (HQ greater than 1) to some or all of the receptors evaluated, risk-based PRGs were developed for dioxins, PCBs, mercury and Total DDx, because they are representative COCs (based on the magnitude of HQs and number of receptors affected) and because there were multiple lines of evidence developed to evaluate how the alternatives would achieve PRGs for these four COCs after remediation. In addition, most active alternatives (i.e., alternatives other than No Action) designed to address these COCs would also address the other COCs."[12]*

---

[11] Batson report, p. 16.

[12] Id.

12

19. Using only total PCBs as a benchmark in the ROD and FFS is far different than saying that dioxin-like PCBs do not contribute significantly to the risk that requires cleanup. Dioxin-like and non-dioxin-like PCBs are discharged and generally distribute in the sediment together so that an appropriate benchmark could be set for total PCBs that would address the risk of both groups. But this does not mean the dioxin-like PCBs do not have a much higher level of risk and toxicity than other PCBs; in fact, they do. As such, while it would not be mechanically necessary to develop independent PRGs for both dioxin-like and non-dioxin like PCBs, that does not change the markedly different contribution to *risk* each group contributes.

20. This is a fundamental error because Batson's relative risk number (RRN)--which erased the risks of dioxin-like PCBs—was then used by him to allocate liability among the chemicals. The relative risk number was based on a re-calculation of potential human health risks in the Batson report that did not include dioxin-like PCBs as described and had other differences from the U.S. EPA approved Human Health Risk Assessment in the FFS.[13]

21. Lastly, the Batson report incorrectly calculates percent contribution to risk or hazard index based on fish and crab consumption rather than adding the exposures together before developing percent contribution. When quantifying potential cancer risks and non-cancer hazards, exposure to fish and crabs should be added for each chemical *before* calculating the percent contribution of the chemical to total risks and hazards because those values are different. Rather than do this accurately, the Batson report developed a percent contribution of a chemical to total risk or hazard for fish and a percent contribution of a chemical to total risk or hazard for crabs and then averaged these different percentages together. This is

---

[13] In the Batson report (page 9 of Attachment A to Attachment H), the authors re-calculated risks to also update some of the exposure assumptions and toxicity criteria that U.S. EPA had updated since the FFS was published in 2014.

ALCD-PUBCOM_0000803

mathematically incorrect because chemical exposure is additive across these exposure pathways. In particular, because the contribution of crab consumption to potential health effects is lower than fish, averaging percent contributions by food source and then calculating an overall percent contribution will provide an erroneous result. Although the magnitude of the error introduced by this approach is smaller than the error introduced by exclusion of dioxin-like PCBs from the calculations, the existence of two fundamental mistakes like these renders his report fundamentally unreliable as a measurement of risk. Put simply, Batson's assessment of risks does not conform to accepted scientific methods of assessing risks and is replete with serious errors.

22. I recalculated a relative risk number (RRN) using the U.S. EPA approved risk assessment in the FFS. Figures 1 and 2 below show the contribution of each chemical to the relative risk number from the Batson report and the risk assessment from the FFS, respectively. Using the U.S. EPA approved risk assessment from the FFS as the basis of the calculation reduces the contribution of dioxins to the relative risk number from approximately 84% to 66%. The U.S. EPA approved risk assessment, which specifically evaluates individual chemicals on the basis of risk to human health and the environment, applies generally accepted scientific methodologies and is consistent with the approach to assessing environmental risks used by qualified scientists. For example, the U.S. EPA approved risk assessment:

(1) includes the contribution of dioxin-like PCBs to the overall risk;

(2) excludes the deduction of background contributions to risk (which were not quantified in the risk assessment); and

14

(3) properly adds risk by chemical for both crab and fish consumption before developing percent contributions to total risk.[14] Making these corrections, which is required to conform to generally accepted scientific methodologies, demonstrates that Batson's assessment of relative risk is not scientifically reliable and is flatly wrong.



Figure 1. Relative Risk Number (RRN) calculated in the Batson report.

Figure 2. Relative Risk Number (RRN) calculated using the U.S. EPA approved risk assessment in the FFS.

**Opinion 3. Allocation Method 1 in the Batson report misapplies a well understood scientific concept—attenuation—and is fatally flawed. Batson created an unscientific artificial attenuation factor to reconcile the amount of chemical discharged in OU2 with the amount of chemical in sediment in OU2. This is unsupportable and removes from his assessment large quantities of chemicals he finds were actually produced by the participating parties. Allocation Method 1 relies on a comparison of the estimated total mass discharged to the**

---

[14] Lewis Berger Group, in conjunction with Battelle HDR/HydroQual. 2014. Focused Feasibility Study Report

15

ALCD-PUBCOM_0000805

total mass estimated in sediment by U.S. EPA. For Allocation Method 1 to work, the
estimated mass discharged of each chemical by all allocation parties should be less than or
approximately equal to the total mass in the sediment, but for some chemicals the estimated
mass discharged was higher than in the sediment. To address this discrepancy rather than
acknowledge that Allocation Method 1 would not work, the Batson report created an
artificial attenuation factor for one chemical and then applied it to all the chemicals,
disregarding the abundant scientific literature regarding attenuation and EPA's own
findings in the FFS that the COCs in OU2 attenuate at markedly different rates. Allocation
Method 1 is unreliable as a measure of mass balance and should not have been calculated.

23. Allocation Method 1 in the Batson report is based on the Diamond Alkali Superfund Site
OU2 Allocation Protocol.[15] Allocation Method 1 uses a number of flawed underlying
assumptions to arrive at grossly flawed results. In addition to the flawed relative risk number
(RRN) previously discussed in paragraphs 16 to 22, Allocation Method 1 compares estimates
of discharges by APs to the total estimated mass of chemical in sediment, which in this case
are inconsistent and should not be compared.

24. It is a fundamental error to *assume* a value in a calculation where the value is known or
demonstrated by data. There is abundant literature and an accepted scientific methodology to
assess the rate at which chemicals attenuate in the environment.[16] EPA, in fact, calculated the

---

[15] Batson report, Attachment H, at p. 1-9.

[16] EPA documented in the RI/FFS that different COCs have different half lives in the
environment of OU2.

*See e.g.,* Monitored Natural Attenuation of Inorganic Contaminants in Ground Water.
Volume 2. Assessment for Non-Radionuclides Including Arsenic, Cadmium, Chromium,
Copper, Lead, Nickel, Nitrate, Perchlorate, and Selenium. U.S. EPA Oct. 2007; *see also* Burcu
Simsir *et al.,* Natural Attenuation in Streambed Sediment Receiving Chlorinated Solvents from
Underlying Fracture Networks. Envion. Sci. Techool. 2017 May 2.

ALCD-PUBCOM_0000806

half-life of each of the COCs in the RI/FFS. Batson appears unfamiliar with the relevant literature, ignores EPA's findings, and lacks the scientific qualifications required to perform attenuation calculations. Batson committed a fundamental error when he created an attenuation rate for one chemical, then applied it uniformly to all chemicals, ignoring the relevant data. His report does not appear to understand (and, in any event, does not apply correctly to the data) how attenuation works in an environmental system.

Allocation Method 1 in the Batson report uses estimates of the mass of chemical discharged by each party and uses the total mass of chemical in the sediment of OU2 which was estimated by U.S. EPA to allocate liability among the APs for risk by chemical. The calculation by chemical and allocation party is:

$$\frac{Mass\ Discharged\ by\ each\ AP\ (kg)}{Total\ Mass\ in\ Sediment\ (kg)} \times Risk\ Reduction\ Number$$

25. However, it was not possible to use this approach as outlined, because the mass of dioxin and other chemicals in the historical discharge estimates in OU2 was *greater* than the mass in all of the OU2 sediments as estimated by U.S.EPA. Table 1 below highlights the chemicals for which the discharged mass derived by Batson exceeded the total mass in the OU2.

17

**Table 1.** Comparison of mass of constituents of concern (COCs) in sediment to mass discharged (values from the Batson report)

| COC | Total Mass Discharged by all APs (kg) | Total Mass in OU2 (kg) |
|---|---|---|
| Copper | 276,960 | 2,100,000 |
| Lead | 288,578 | 3,200,000 |
| Mercury | 4,323 | 42,000 |
| HPAHs | 4,346,389 | 240,000 |
| LPAHs | 3,012,835 | 170,000 |
| PCBs | 20,067 | 26,000 |
| DDx | 2,517 | 27,000 |
| Dieldrin | 1.3 | 390 |
| Dioxins | 3730 | 38 |

Orange shading highlights the chemicals for which the mass discharged is greater than the mass in the sediments.

26. To mathematically eliminate the discrepancy between the total mass of chemical discharged and the total mass of chemical in the sediment, Allocation Method 1 used an attenuation factor (A%) that was developed and applied inappropriately in an ill-conceived effort to make the calculations work, rather than recognizing that there is a fundamental flaw in one or both of the foundational estimates (mass discharged and residual mass of chemicals in the sediments in OU2). Allocation Method 1 should not have been used or applied as viable basis for allocation with this irreconcilable flaw in the assumptions.

27. The Batson report developed an attenuation factor (A%) based on the ratio of the total mass of dioxins in the sediments to the total mass of chemicals discharged (about 1%) and then applied that rate uniformly to <u>all</u> the chemical discharges. The Batson report failed to recognize the abundant scientific evidence—including evidence in the RI/FFS--that the COCs do *not* attenuate in the environment at the same rates or at any common rate.

18

28. Batson failed to perceive both errors. Both are serious. The enormous disconnect between the mass of chemical he calculates as having been discharged amount and the total mass of chemicals in the sediment is obvious and should have alerted Batson to the fact that he had made a large mathematical mistake. Batson, tried, but failed scientifically to explain it away by creating his "attenuation factors," because those factors do not rest on any scientific principle or on the evidence of *actual* attenuation in OU2. This is evident simply from comparing the example of mercury. There, Batson calculates a total discharge mass of mercury by all PRPs of 4,323 kilograms. But there are *ten times* that amount—42,000 kg—of mercury in the OU2 sediments. Attenuation does not *increase* mass balance; it decreases it over time. Equally serious is his use of an inaccurate rate of attenuation for dioxins, which he then applied to a wide variety of chemicals with different chemical and physical properties. No scientific principle or literature supports this, and it is contrary to U.S. EPA's findings in the RI/FFS.

29. The Batson report attempts to provide justification for using dioxin as the indicator of attenuation, but the result of this choice is to drive *down* the discharges of all the other chemicals significantly (i.e., by 100-fold). This is scientifically unsupportable and Batson's misuse of what he calls "attenuation" (which is not the scientific understanding) has no support in the generally accepted scientific literature.

30. In Allocation Method 1, Batson uses his inaccurate and artificially high rate of attenuation of the non-dioxin chemicals to *reduce* the liability attributed to the non-dioxin APs, relieving them of responsibility for known discharges by them that he actually identifies. By doing so,

19

Batson *increases* the liability attributed to unknown discharges, which are referred to as "orphan shares[17]."

31. Batson's next step also distorts the calculation in ways that the data and evidence do not support. Once the risks from the chemicals were allocated based on discharges he arbitrarily reduced based on his "attenuation factor," the remaining chemical risks that were not allocated to (and, in fact, had been removed from) the known dischargers (i.e., orphan shares) were re-allocated among the allocation parties (including OxyChem) based on each allocation party's total risk allocation.

32. As a result, Allocation Method 1 inappropriately results in the dioxin dischargers (of which OxyChem is the primary discharger according to the Batson report) being almost entirely responsible for the relative risk in OU2 and consequently also almost entirely responsible for the orphan shares, *including orphan shares* of chemicals they never produced.

33. Although the discrepancy in the measurements was acknowledged in the Batson report as the rationale for implementing Allocation Method 2, Allocation Method 1 should never have been used because of the fatal flaw in the underlying assumptions. And Allocation Method 2 does not address the many other errors that cause the report to be unreliable either as an allocation of risks or an allocation of remedial costs.

### CONCLUSION:

The Batson report's two allocation methods are not scientifically accepted methodologies and are used in ways not consistent with scientific methods, models, literature, or the data

---

[17] Orphan Shares refers to parties that are potentially responsible for the cleanup who have no money to contribute to the cleanup or who are no longer in existence. See June 4, 1996, U.S. EPA "Fact Sheet: Orphan Share Reform,"(Fact Sheet: Orphan Share Reform (epa.gov)) (last visited March 19, 2023).

20

available to Batson. The report is so erroneous and biased that neither of the methods it contains could be used reliably to allocate risks in OU2, much less remedial costs in OU2, the purpose for which the report was prepared. Fundamental parts of the allocation methods (the relative risk number (RRN) and the "attenuation" factor) are incorrect. The U.S. EPA approved risk-assessment, which includes and accounts for dioxin-like PCBs, was not used as part of the relative risk number (RRN) significantly understates the contribution of APs discharging PCBs by 10%. In addition, Allocation Method 1 includes an attenuation factor that adds further to the errors in this method. Finally, neither method recognizes that relative risk factor/number is not a scientifically appropriate way to allocate liability when the area requiring remediation has several chemicals or chemical groups all of which contribute individually to risks above acceptable levels for human health and the environment, and the cost of remediation is directly related to size of OU2 and not risk.

I, <u>Dr. Mark Harris</u>, declare under penalty of perjury that the foregoing is true and correct.

Executed on March 22, 2023

Mark Harris, Ph.D., MBA

ALCD-PUBCOM_0000811

## REFERENCES

Burcu Simsir *et al.*, Natural Attenuation in Streambed Sediment Receiving Chlorinated Solvents from Underlying Fracture Networks. Envion. Sci. Techool. 2017 May 2.

December 28, 2020 Diamond Alkali Superfund Site OU2 Allocation Recommendation Report by David Batson, Esq. of AlterEcho.

Monitored Natural Attenuation of Inorganic Contaminants in Ground Water. Volume 2. Assessment for Non-Radionuclides Including Arsenic, Cadmium, Chromium, Copper, Lead, Nickel, Nitrate, Perchlorate, and Selenium. U.S. EPA Oct. 2007

OU2 Remedial Investigation Report (Feb. 5, 2014).

The Louis Berger Group. 2014. Focused Feasibility Study Report for the Lower Eight Miles of the Lower Passaic River.

June 4, 1996, U.S. EPA "Fact Sheet: Orphan Share Reform," (Fact Sheet: Orphan Share Reform (epa.gov)) (last visited March 19, 2023).

22

## ATTACHMENT 1

# Curriculum Vitae of Dr. Mark Harris

ALCD-PUBCOM_0000813



Innovative Solutions
Sound Science

# Mark Harris, Ph.D., M.B.A.

MANAGING PRINCIPAL SCIENTIST



## CONTACT INFORMATION

ToxStrategies, Inc.
23501 Cinco Ranch Blvd, Suite B226
Katy, TX 77494
phone 281-712-2062 x2001
fax (832) 218-2756
mharris@toxstrategies.com

## PROFESSIONAL PROFILE

Dr. Mark Harris is a cofounder of ToxStrategies and has more than 25 years of experience in the areas of toxicology, human health risk assessment, and risk-based site investigations. He routinely applies his skills as a toxicologist and human health risk assessor to many types of projects, including designing, placing, and overseeing toxicology laboratory studies; and developing state-of-the-science toxicity values via the application of both default and more rigorous approaches such as benchmark modeling, application of weight-of-evidence techniques, and consideration of mode-of-action information. Other project experience includes estimating human exposures using a variety of approaches, including designing, implementing, and using data from biomonitoring studies; using complex data sets such as NHANES and conducting studies to gather human exposure information; modeling uptake and exposure via a variety of exposure pathways; and conducting both screening-level and complex site-specific risk assessments to quantify human health risks, including conduct of probabilistic risk assessments. Dr. Harris has a strong understanding of a wide variety of regulatory guidance documents that focus on human health risk assessment. He has substantial experience in dealing with regulatory agencies, ranging from implementation of administrative orders to developing site cleanup standards. Additionally, Dr. Harris has extensive experience in developing risk-based site investigations for both industrial and residential sites and in conducting source identification studies using both chemical fingerprinting techniques and historical records searches.

Dr. Harris is a co-author of more than 65 scientific journal articles and has participated in numerous technical seminars. He is a peer reviewer for several scientific journals, including the *Journal of Soil and Sediment Contamination, Integrated Environmental Assessment and Management (IEAM)*, the *Journal of Air and Waste Management,* and *Environmental Science and Technology (ES&T)*.

ALCD-PUBCOM_0000814



*Innovative Solutions*
*Sound Science*

### EDUCATION AND DEGREES EARNED

1990    Texas A&M University, Ph.D., Toxicology

2000    Southern Methodist University, MBA

1986    Texas A&M University, B.S., Biochemistry

### PROFESSIONAL ASSOCIATIONS

American Chemical Society (ACS)

Society of Environmental Toxicology and Chemistry (SETAC)

Society of Risk Analysis (SRA)

### CERTIFICATIONS AND COURSES

2002    Texas Risk Reduction Program (GSI Training Course)

2000    Hazardous Waste Shipping, DOT Regulation Compliance

1997    Spanish Language Immersion (Thunderbird University)

1992    OSHA Hazardous Waste Operations

1988    Molecular Endocrinology/Hormone Action

### PROFESSIONAL HONORS/AWARDS

1990–1991    Outstanding Doctoral Research Award, Texas A&M University

1990    Outstanding Graduate Student Award, College of Veterinary Medicine, Texas A&M University

1989    George T. Edds Award for Graduate Student Research, College of Veterinary Medicine, Texas A&M University

### SCIENTIFIC ADVISORY PANELS, COMMITTEES, & WORKGROUPS

2000    United States Environmental Protection Agency (USEPA) Expert Panel to evaluate Chapter 9 (Toxic Equivalency Factors) and Integrated Risk Characterization and Summary Section of Dioxin Reassessment (prepared by USEPA, July 2000)

ALCD-PUBCOM_0000815



*Innovative Solutions*
*Sound Science*

## PROFESSIONAL EXPERIENCE

Provided an expert report evaluating potential health effects associated with inhalation exposure to diacetyl incurred by an employee of a flavor manufacturer.

Evaluated a risk assessment prepared by a regulatory agency involving volatile organic chemicals and metals and potential exposure via inhalation by individuals living and working near a waste-handling facility. Prepared a rebuttal expert report describing shortcomings of regulatory agency approach to evaluating potential health risks.

Co-investigator of a study evaluating the mode of action of hexavalent chromium following oral exposure in rodents.

Managed the preparation of a human health risk assessment evaluating exposure via the fish ingestion pathway. The site was a large river in the northeastern United States. Risks associated with metals, PAHs, pesticides, PCBs, and PCDD/Fs were determined.

Co-principal investigator on a large biomonitoring study designed to assess the levels of dioxin-like compounds in the blood serum of workers at a former secondary copper smelting facility. This involved overseeing the development of the study protocol and comprehensive exposure questionnaire, study implementation, development of applicable background blood levels, fingerprinting analyses, data analyses, and interpretation of study findings. In addition, this project involved coordinating with an external Science Advisory Board and an Institutional Review Board.

Managed the design, implementation, and data analysis of a wild and farm-raised catfish sampling program in southern Mississippi. Chemical analyses included PCDD/Fs, dioxin-like PCBs, total PCBs, and PBDEs.

Evaluated the human health risk associated with a consumer food product contaminated by a non-food-grade lubricant. Conducted assessments specific to children's exposure in multiple countries around the globe in which the food product was sold, to aid the client with their implementation of a health-protective strategy to eliminate exposure to the contaminated product.

Evaluated PCB surface soil contamination at six softball fields within a larger recreational facility in Texas. Made recommendations regarding the continued use of the softball fields given the presence of PCBs. Additionally, developed a statistically based soil sampling plan for other areas of the park that were found to contain PCBs.

Reviewed PCDD/F and metal analyses of soils collected outside of a major industrial facility in southern Mississippi following the landfall of Hurricane Katrina, to determine whether these chemicals/metals posed any threat to human health and the environment.

Managed a large, multi-site RI/FS/Remediation in the northeastern United States, which resulted in the expedited closure of 18 industrial sites that contained varying quantities and concentrations of hexavalent chromium. This project involved characterizing affected environmental media, including soils, groundwater, surface water, sediments, and air; conducting a site-specific exposure assessment; developing site-specific hexavalent chromium cleanup standards; and developing and implementing various innovative remediation technologies for addressing hexavalent chromium.

Conducted a county-wide PRP search for industrial dischargers into a former publicly owned treatment works (POTW), to assist the client with the cost of investigation and remediation of the POTW and surrounding land. This project involved the review of historical records, search of various electronic databases, and interviews with knowledgeable individuals from the time period when the POTW operated.

ALCD-PUBCOM_0000816



*Innovative Solutions*
Sound Science

Participated in a third-party review of a human health risk assessment on a former pentachlorophenol wood preservative site in Arkansas. Reviewed the calculations, assumed exposure pathways and conclusions, and made recommendations to the client for modifications to improve the assessment.

Assisted a client on the U.S. West Coast in an environmental-damage lawsuit brought by the National Oceanic Atmospheric Administration (NOAA) involving the discharge of PCBs to a POTW. Specifically, this effort involved utilizing historical data to estimate the amount of PCBs discharged by the client to the POTW that actually reached the environment.

Assisted in the development of chemical fingerprints for various sources of polychlorinated dibenzo-p-dioxins in a large urban river in the eastern United States.

Developed a surface water sampling plan and prepared a preliminary human health risk assessment for pathogens (bacteria, viruses, and parasites) discharged from a combined sewer overflow in a large urban river in the eastern United States.

Provided an expert report evaluating potential health effects associated with alleged exposure to benzene and hydrogen sulfide by employees of a wastewater treatment plant.

Prepared an expert report evaluating PCDD/F concentrations in surface soils adjacent to a large lake in East Texas. Compared the PCDD/F data to known local background concentrations of PCDD/Fs to demonstrate that the surface soils adjacent to the lake were not impacted by industrial operations.

## MANUSCRIPTS

Bhat VS, Cohen SM, Gordon EB, Wood CE, Cullen JM, **Harris MA**, Proctor DM, Thompson CM. 2020. An adverse outcome pathway for small intestinal tumors in mice involving chronic cytotoxicity and regenerative hyperplasia: A case study with hexavalent chromium, captan, and folpet. Crit Rev Toxicol (open access), https://doi.org/10.1080/10408444.2020.1823934.

Thompson CM, Donahue DA, Hobbs C, Costecalde Y, Franzen A, Suh M, Proctor DM, **Harris MA**. 2020. Exposure to environmentally-relevant concentrations of hexavalent chromium does not induce ovarian toxicity in mice. Regul Toxicol Pharmacol 116, open access: https://doi.org/10.1016/j.yrtph.2020.104729.

Chappell G, Rager J, Wolf J, Babic M, Leblanc, Ring C, **Harris MA**, Thompson CM. 2019. Comparison of gene expression responses in the small intestine of mice following exposure to three carcinogens using the S1500+ gene set informs a potential common adverse outcome pathway. Toxicol Pathol 47(7):851–864, https://doi.org/10.1177/0192623319873882.

Klaren WD, Ring C, **Harris MA**, Thompson CM, Borghoff S, Sipes NS, Hsieh J-H, Auerbach SS, Rager JE. 2018. Identifying attributes that influence *in vitro*-to-*in vivo* concordance by comparing *in vitro* Tox21 bioactivity versus *in vivo* DrugMatrix transcriptomic responses across 130 chemicals. Toxicol Sci kfy220, available at https://doi.org/10.1093/toxsci/kfy220.

Thompson CM, Kirman CR, Hays SM, Suh M, Harvey SE, Proctor DM, Rager JE, Haws LC, **Harris MA**. 2018. Integration of mechanistic and pharmacokinetic information to derive oral reference dose and margin-of-exposure values for hexavalent chromium. J Appl Toxicol 38:351–365. doi: 10.1002/jat.3545.

Bichteler A, Wikoff DS, Loko F, **Harris MA**. 2017. Estimating serum concentrations of dioxin-like compounds in the U.S. population effective 2005–2006 and 2007–2008: A multiple imputation and trending approach incorporating NHANES pooled sample data. Environ Int 105:112–125. doi: 10.1016/j.envint.2017.05.003.

ALCD-PUBCOM_0000817



Innovative Solutions
Sound Science

Thompson CM, Wolf, JC, McCoy A, Suh M, Proctor DM, Kirman CR, Haws LC, **Harris MA**. 2017. Comparison of toxicity and recovery in the duodenum of B6C3F1 mice following treatment with intestinal carcinogens captan, folpet, and hexavalent chromium. Toxicol Pathol 45(8):1091–1101. DOI: 10.1177/019262331yy4324.

Thompson CM, Suh M, Proctor DM, Haws LC, **Harris MA**. 2017. Ten factors for considering the mode of action of Cr(VI)-induced gastrointestinal tumors in rodents. Mut Res/Genetic Toxicol Environ Mutagen 823:45–57.

Thompson CM, Young RR, Dinesdurage H, Suh M, **Harris MA**, Rohr AC, Proctor DM. 2017. Assessment of the mutagenic potential of hexavalent chromium in the duodenum of big blue® rats. Toxicol Appl Pharmacol 330(1):48-52.

Rager JE, Ring CL, Fry RC, Suh M, Proctor DM, Haws LC, **Harris MA**, Thompson CM. 2017. High-throughput screening data interpretation in the context of *in vivo* transcriptomic responses to oral Cr(VI) exposure. Toxicol Sci kfx085. doi: 10.1093/toxsci/kfx085.

Thompson CM, Wolf JC, Elbekai RH, Paranjpe MG, Seiter JM, Chappell MA, Tappero RV, Suh M, Proctor DM, Bichteler A, Haws LC, **Harris MA**. 2015. Duodenal crypt health following exposure to Cr(VI): micronuncelus scoring, γ-H2AX immunostaining, and synchrotron x-ray fluorescence microscopy. Mut Res 789–790:61–66.

Thompson CM, Young RR, Suh M, Dinesdurage HR, Elbekai RH, **Harris MA**, Rohr, AC, Proctor DM. 2015. Assessment of the mutagenic potential of cr(VI) in the oral mucosa of big blue® transgenic f344 rats. Environ Mol Mutagen. 56(7):621–628. doi: 10.1002/em.21952.

Thompson, CM, Seiter J, Chappell MA, Tappero RV, Proctor DM, Suh M, Wolf JC, Haws LC, Vitale R, Mittal L, Kirman CR, Hays SM, **Harris MA**. 2015. Synchrotron-based imaging of chromium and γ-H2AX immunostaining in the duodenum following repeated exposure to Cr(VI) in drinking water. Toxicol Sci 143(1):16–25.

Suh M, Thompson C, Kirman C, Carakostas M, Haws LC, **Harris M**, Proctor D, Abraham L, Hixon JG. 2014. High concentrations of hexavalent chromium in drinking water alter iron homeostasis in F344 rats and B6C3F1 mice. Food Chem Toxicol 65:381–388.

Urban JD, Wikoff DS, Bunch ATG, **Harris MA**, Haws LC. 2014. A review of background dioxin concentrations in urban/suburban and rural soils across the United States: Implications for site assessments and the establishment of soil cleanup levels. Sci Tot Environ 466–467: 586–597.

Bunch AG, Perry CS, Abraham L, Wikoff DS, Tachovsky JA, Hixon JG, Urban JD, **Harris MA,** Haws LC. 2013. Evaluation of impact of shale gas operations in the Barnett Shale region on volatile organic compounds in air and potential human health risks. Sci Tot Environ 468–469(2014): 832–842.

Kirman CR, Aylward LL, Suh M, **Harris MA**, Thompson CM, Haws LC, Proctor DM, Lin SS, Parker W, Hays SM. 2013. Physiologically based pharmacokinetic model for humans orally exposed to chromium. Chem Biol Interact 204:13–27. doi:pii: S0009-2797(13)00082-3. 10.1016/j.cbi.2013.04.003

O'Brien T, Ding H, Suh M, Thompson C, Parsons BL, **Harris MA**, Winkelman WA, Wolf JC, Hixon JG, Schwartz AM, Myers MB, Haws LC, Proctor DM. 2013. Assessment of K-Ras mutant frequency and micronucleus incidence in the mouse duodenum following 90-days of exposure to Cr(VI) in drinking water. Mutat Res 754:15–21. pii: S1383-5718(13)00075-2. doi: 10.1016/j.mrgentox.2013.03.008

Thompson CM, Proctor DM, Suh M, Haws LC, Kirman CR, **Harris MA**. 2013. Assessment of the mode of action underlying development of rodent small intestinal tumors following oral exposure to hexavalent chromium and relevance to humans. Crit Rev Toxicol 43(3):244–274.

Thompson CM, Kirman CR, Proctor DM, Haws LC, Suh M, Hays S, Hixon JG, Harris MA. 2013. A chronic oral reference dose for hexavalent chromium-induced intestinal cancer. J Appl Toxicol 34:525–536.

ALCD-PUBCOM_0000818



Kirman CR, Hays SM, Aylward LL, Suh M, **Harris MA**, Thompson CM, Haws LC, Proctor DM. 2012. Physiologically based pharmacokinetic model for rats and mice orally exposed to chromium. Chem Biol Interact 200(1):45–64.

Kopec AK, Kim S, Forgacs AL, Zacharewski TR, Proctor DM, **Harris MA**, Haws LC, Thompson CM. 2012. Genome-wide gene expression effects in B6C3F1 mouse intestinal epithelia following 7 and 90 days of exposure to hexavalent chromium in drinking water. Toxicol Appl Pharmacol 259(1):1326.

Proctor DM, Suh M, Aylward LL, Kirman CR, **Harris MA**, Thompson CM, Gürleyük H, Gerads R, Haws LC, Hays SM. 2012. Hexavalent chromium reduction kinetics in rodent stomach contents. Chemosphere 89(5):487–493.

Thompson CM, Fedorov Y, Brown DD, Suh M, Proctor DM, Kuriakose L, Haws LC, **Harris MA**. 2012. Assessment of Cr(VI)-induced cytotoxicity and genotoxicity using high content analysis. PLoS ONE 7(8):e42720.

Thompson CM, Hixon JG, Proctor DM, Haws LC, SuhM, Urban JD, **Harris MA**. 2012. Assessment of genotoxic potential of Cr(VI) in the mouse duodenum: An in silico comparison with mutagenic and nonmutagenic carcinogens across tissues. Regul Toxicol Pharmacol 64(1):68–76.

Thompson CM, Proctor DM, Suh M, Haws LC, Hebert CD, Mann JF, Shertzer HG, Hixon JG, **Harris MA**. 2012. Comparison of the effects of hexavalent chromium in the alimentary canal of F344 rats and B6C3F1 mice following exposure in drinking water: Implications for carcinogenic modes of action. Toxicol Sci 125(1):79–90.

Thompson CM, Proctor DM, Haws LC, Hebert CD, Grimes SD, Shertzer HG, Kopec AK, Hixon JG, Zacharewski TR, **Harris MA**. 2011. Investigation of the mode of action underlying the tumorigenic response induced in B6C3F1 mice exposed orally to hexavalent chromium. Toxicol Sci 123(1):58–70.

Thompson CM, Haws LC, **Harris MA**, Gatto NM, Proctor DM. 2011. Application of the U.S. EPA mode of action framework for purposes of guiding future research: A case study involving the oral carcinogenicity of hexavalent chromium. Toxicol Sci 119(1):20–40.

Tachovsky JA, Urban JD, Wikoff DS, Haws LC **Harris MA**. 2010. Reduction of a large fish tissue analyte database: Identifying and assessing data specific to a remediation site for risk assessment application. Chemosphere 80(5):481–488.

Urban J, Tachovsky JA, Haws L, Wikoff Staskal D, **Harris M**. 2010. Response to Mugdan et al.'s comment on Urban et al. "Assessment of human health risks posed by consumption of fish from the Lower Passaic River, New Jersey." Sci Tot Environ 408(6):1468–1470.

Urban JD, Tachovsky JA, Haws LC, Staskal DF, **Harris MA**. 2010. Response to Buchanan et al.'s comment on Urban et al. "Assessment of Human Health Risks Posed by Consumption of Fish from the Lower Passaic River, New Jersey." Sci Total Environ 408(8): 2004–2007.

Scott LLF, Staskal DF, Williams ES, Luksemburg WJ, Urban JD, Nguyen LM, Haws LC, Birnbaum LS, Paustenbach DJ, **Harris MA**. 2009. Levels of polychlorinated dibenzo-p-dioxins, dibenzofurans, and biphenyls in southern Mississippi catfish and estimation of potential health risks. Chemosphere74(7):1002–10.

Urban JD, Tachovsky JA, Staskal DF, Haws LC, **Harris MA**. 2009. Assessment of human health risks posed by consumption of fish from the Lower Passaic River, New Jersey. Sci Tot Environ 408(2):209–224.

Haws LC, **Harris MA**, Scott LLF, Williams ES, Paustenbach DJ. 2008. Assessment of the potential human health risks posed by benzene in a commercial beverage. J Food Sci 73(4): 33–41.

Donovan E, Unice K, Roberts JD, **Harris M**, Finley B. 2008. Risk of gastrointestinal disease associated with exposure to pathogens in the water of the Lower Passaic River. Appl Environ Microbiol 74:994–1003.

ALCD-PUBCOM_0000819



*Innovative Solutions*
*Sound Science*

Donovan EP, Staskal DF, Unice KM, Roberts JD, Haws LC, Finley BL, **Harris MA**. 2008. Risk of gastrointestinal disease associated with exposure to pathogens in the sediments of the Lower Passaic River. Appl Environ Microbiol 74:1004–1018.

Henry KS, Petura JC, Brooks S, Dentico S, Kessel SA, **Harris M**. 2007. Preventing surface deposition of chromium with asphalt caps at chromite ore processing residue sites: A case study. Canad Geotech J 44:814–839.

Ferriby LL, Knutsen JS, **Harris M**, Unice KM, Scott P, Nony P, Haws LC, Paustenbach D. 2007. Evaluation of PCDD/F and dioxin-like PCB serum concentration data from the 2001–2002 National Health and Nutrition Examination Survey of the United States Population. J Exp Anal Env Epidemiol 17:358–371.

Paustenbach DJ, Fehling K, Scott P, **Harris M**, Kerger B. 2006. Identifying soil clean-up criteria for dioxin in urban residential soils: How have 20 years of research and risk assessment experience affected the analysis? J Toxicol Environ Health, Part B. 9:87–145.

Haws L, Su S, **Harris M**, DeVito M, Walker N, Farland W, Finley B, Birnbaum L. 2006. Development of a refined database of mammalian relative potency estimates for dioxin-like compounds. Toxicol Sci 89(1): 4–30.

Proctor D, Panko J, Liebig E, Mundt K, Buczynski M, Barnhart R, **Harris M**, Morgan R, Finley B, Paustenbach D. 2002. Workplace concentrations of airborne hexavalent chromium for the Painesville, Ohio chromate production plant. Appl Occup Environ Hyg J 18(6):430–449.

Scott P, Petura J, **Harris M**. 2002. Derivation of a liquid to solid ratio for ASTM method D3987 85 for soils containing chromite ore processing residue using selected unsaturated zone models. Soil Sed Contam 12(4): 443–480.

Finley BL, Proctor DM, **Harris M**, Fowler JF. 2000. Letter to the editor. Am J Contact Derm 123–125.

Scott P, Finley B, **Harris M**, Rabbe D. 1997. Determination of background airborne hexavalent chromium concentrations in industrial areas. J Air Waste Manage Assoc 47:592–600.

Costa M, Zhitkovich A, **Harris M**, Paustenbach D, Gargas M. 1997. DNA-protein crosslinks produced by various chemicals in cultured human lymphocytes. J Toxicol Environ Health 50:433–449.

Gargas M, Norton R, **Harris M**, Paustenbach D, Finley B. 1994. Urinary excretion of chromium following ingestion of chromite ore processing residue in humans: Implications for biomonitoring. Risk Anal 14(6): 1019–1024.

**Harris M**, Zacharewski T, Safe S. 1993. Comparative potencies of Aroclors 1232, 1248, 1254, and 1260 in male Wistar rats—Assessment of the toxic equivalency factor (TEF) approach for polychlorinated biphenyls (PCBs). Fund Appl Toxicol 20:456–463.

Copeland TL, Paustenbach DJ, **Harris MA**, Otani J. 1993. Comparing the results of a Monte Carlo analysis with EPA's reasonable maximum exposed individual (RMEI): A case study of a former wood treatment site. Regul Toxicol Pharmacol 18: 275–312.

Zacharewski T, **Harris M**, Biegel L, Morrison V, Merchant M, Safe S. 1992. 6-Methyl-1,3,8-trichlorodibenzofuran (MCDF) as an antiestrogen in human and rodent cancer cell lines: Evidence for the role of the Ah receptor. Toxicol Appl Pharmacol 113: 311–318.

Wenning RJ, **Harris MA**, Ungs MJ, Paustenbach DJ, Bedbury H. 1992. Chemometric comparison of polychlorinated dibenzo-p-dioxin and dibenzofuran residues in surficial sediments from Newark Bay, New Jersey and other industrialized waterways. Arch Environ Contam Toxicol 22: 397–413.

Wenning RJ, **Harris MA**, Paustenbach DJ, Bedbury H. 1992. Potential sources of 1,2,8,9-tetrachlorodibenzo-p-dioxin in the aquatic environment. Ecotoxicol Environ Safety 23(2): 133–146.

ALCD-PUBCOM_0000820



Innovative Solutions
Sound Science

Safe S, Astroff B, **Harris M**, Zacharewski T, Dickerson R, Romkes M, Biegel L. 1991. 2,3,7,8-Tetrachlorodibenzo-p-dioxin (TCDD) and related compounds as antioestrogens: Characterization and mechanism of action. Pharmacol Toxicol 69: 400–409.

Safe S, **Harris M**, Biegel L, Zacharewski T. 1991. Mechanism of action of TCDD as an antiestrogen in transformed human breast cancer and rodent cell lines. Banbury Report 35: Biological basis for risk assessment of dioxins and related compounds. Cold Spring Harbor Laboratory Press, pp. 367–377.

Zacharewski T, **Harris M**, Safe S. 1991. Evidence for a possible mechanism of action of the 2,3,7,8-tetrachlorodibenzo-p-dioxin-mediated decrease of nuclear estrogen receptor levels in wild-type and mutant hepa 1c1c7 cells. Biochem Pharmacol 41:1931–1939.

Piskorska-Pliszczynska J, Astroff B, Zacharewski T, **Harris M**, Rosengren R, Morrison V, Safe L, Safe S. 1991. Mechanism of action of 2,3,7,8-tetrachlorodibenzo-p-dioxin antagonists: Characterization of 6-[125I] methyl-8-iodo-1,3-dichlorodibenzofuran-Ah receptor complexes. Arch Biochem Biophys 284(1): 193–200.

Randerath K, Putman KL, Randerath E, **Harris M**, Zacharewski T, Safe S. 1990. Effects of 2,3,7,8-TCDD and related compounds on the levels of age-dependent I-spot DNA adducts in the liver of female and male Sprague-Dawley rats. Chemosphere 20(7–9): 1049–1052.

Randerath K, Putman KL, Randerath E, Zacharewski T, **Harris M,** Safe S. 1990. Effects on 2,3,7,8-tetrachlorodibenzo-p-dioxin on I-compounds in hepatic DNA of Sprague-Dawley rats: sex specific effects and structure-activity relationships. Toxicol Appl Pharmacol 103:271–280.

**Harris M**, Piskorska-Pliszczynska J, Zacharewski T, Safe S. 1990. Human breast cancer cell lines as models for investigating the effects of TCDD and related compounds. Chemosphere 20(7–9): 1135–1140.

**Harris M**, Zacharewski T, Piskorska-Pliszczynska J, Rosengren R, Safe S. 1990. Structure-dependent induction of aryl hydrocarbon hydroxylase activity in C57BL/6 mice by 2,3,7,8-tetrachlordibenzo-p-dioxin and related congeners: Mechanistic studies. Toxicol Appl Pharmacol 105:243–253.

**Harris M**, Zacharewski T, Safe S. 1990. Effects of 2,3,7,8-tetrachorodibenzo-p-dioxin and related compounds on the occupied nuclear estrogen receptor in MCF-7 human breast cancer cells. Cancer Res 50: 3579–3584.

Safe S, Mason G, Sawyer T, Zacharewski T, **Harris M**, Yao C, Keys B, Farrell K, Holcomb M, Davis D, Safe L, Piskorska-Pliszcyzynska J, Leece B, Denomme M, Hutzinger O, Thoma H, Chittim B, Madge J. 1989. Development and validation of in vitro induction assays for toxic halogenated aromatic mixtures: A review. Toxicol Ind Health 5(5): 757–775.

Safe S, Zacharewski T, Safe L, **Harris M**, Yao C, Holcomb M. 1989. Validation of the AHH induction bioassay for the determination of 2,3,7,8-TCDD toxic equivalents. Chemosphere 18(1–6): 941–946.

Zacharewski T, **Harris M**, Safe S. 1989. Induction of cytochrome P450-dependent monooxygenase activities in rat hepatoma H-4-IIE cells in culture by 2,3,7,8-tetrachlorodibenzo-p-dioxin and related compounds: Mechanistic studies using radiolabeled congeners. Arch Biochem Biophys 272(2):344–355.

Zacharewski T, **Harris M**, Safe S, Thoma H, Hauschulz G, Knorr E, Hutzinger O. 1989. Application of the in vitro AHH induction bioassay for determining 2,3,7,8-TCDD equivalents: Pyrolyzed flame retardant mixtures. Chemosphere 18(1–6):383–387.

**Harris M**, Piskorska-Pliszczynska J, Zacharewski T, Romkes M, Safe S. 1989. Structure-dependent induction of aryl hydrocarbon hydroxylase in human breast cancer cell lines and characterization of the Ah receptor. Cancer Res 49: 4531–4535.

ALCD-PUBCOM_0000821



Biegel L, **Harris M**, Davis D, Rosengren R, Safe L, Safe S. 1989. 2,2',4,4',5,5'-hexachlorobiphenyl as a 2,3,7,8-tetrachlorodibenzo-p-dioxin antagonist in C57BL/6J mice. Toxicol Appl Pharmacol 97: 561–571.

**Harris M**, Zacharewski T, Astroff B, Kamps C, Safe S. 1989. Characterization of 6-methyl-1,3,8-trichlorodibenzofuran (MCDF) as a 2,3,7,8-TCDD antagonist in male rats: Induction of monooxygenases. Chemosphere 19:769–772.

**Harris M**, Zacharewski T, Astroff B, Safe S. 1989. Partial antagonism of 2,3,7,8-tetrachlorodibenzo-p-dioxin mediated induction of aryl hydrocarbon hydroxylase by 6-methyl-1,3,8-trichlorodibenzofuran: mechanistic studies. Molec Pharmacol 35:729–735.

Zacharewski T, **Harris M**, Safe S, Thoma H, Hutzinger O. 1988. Applications of the in vitro aryl hydrocarbon hydroxylase induction assay for determining "2,3,7,8-tetrachlorodibenzo-p-dioxin equivalents": Pyrolyzed brominated flame retardants. Toxicology 51: 177–189.

**Harris M**, Kamps C, Safe S. 1988. Role of the 4-5S binding protein in the induction of aryl hydrocarbon hydroxylase in the rat. Carcinogenesis 9(8): 1475–1479.

## BOOKS AND BOOK CHAPTERS

Proctor D, **Harris M**, Rabbe D. 2002. Chapter 9: A risk assessment of chromium contaminated soils: Ten years of research to characterize the health hazards. In: Human and Ecological Risk Assessment: Theory and Practice. Paustenbach D (ed). pp. 485–555.

Sanatamaria A, Ferriby L, **Harris M**, Paustenbach D. 2006. Use of biomarkers in health risk assessment. In: Toxicologic Biomarkers, DeCaprio A (ed). Informa Healthcare. pp. 85–109.

Proctor D, Finley B, **Harris MA**, Paustenbach DJ Rabbe D (eds). 1997. Chromium in Soil: Perspectives in Chemistry, Health, and Environmental Regulation. Lewis Publishers, New York.

## ABSTRACTS AND PRESENTATIONS

Chappell G, Wolf JC, **Harris MA**, Thompson CM. Variation in transcriptomic responses in the crypt and villus of mouse small intestine following oral exposure to hexavalent chromium. Poster presented at Society of Toxicology Annual Meeting, San Diego, CA, March 2022.

Thompson CM, Chappell GA, Mittal L, Gorman B, Proctor DM, Haws LC, **Harris MA**. Use of targeted mode-of-action research to inform human health risk assessment of hexavalent chromium. Poster presented at Society of Toxicology Annual Meeting, San Diego, CA, March 2022.

Perry C, Rish W, Ring C, Mittal L, **Harris M**. Use of probabilistic risk assessment and physiologically based pharmacokinetic modeling in supporting soil remedial objectives for dioxins and furans at a Canadian site. Poster for Society for Risk Analysis, Virtual Annual Meeting, 2020.

Ring C, Fitch S, Haws L, **Harris M**, Wikoff D. Quantitative integration of dose-response data for relative potency estimates of dioxin-like chemicals. Poster for Society of Toxicology, Virtual Annual Meeting, 2020, https://eventpilotadmin.com/web/page.php?page=Session&project=SOT20&id=P3385.

Wikoff D, Franzen A, Chappell G, **Harris M**, Thompson C. Systematic characterization of hexavalent chromium and potential female reproductive outcomes: Application of US EPA critical appraisal tools and stepwise inclusion of mechanistic data. Poster for Society of Toxicology, Virtual Annual Meeting, 2020, https://eventpilotadmin.com/web/page.php?page=Session&project=SOT20&id=P3209.

ALCD-PUBCOM_0000822



Innovative Solutions
Sound Science

Chappell GA, Rager JE, Wolf JC, Babic M, LeBlanc KJ, Ring CL, **Harris MA**, Thompson C. Similarities in the transcriptomic signatures in the duodenum of mice exposed to hexavalent chromium, captan, or folpet inform the mechanisms of chemical-induced mouse small intestine cancer. Presentation at Society of Toxicology Annual Meeting, Baltimore, MD, March 2019.

Brorby G, Ring C, Loko F, **Harris MA**. Characterization of hexavalent chromium and total chromium in drinking water monitoring data. Poster MP 117. Society of Environmental Toxicology and Chemistry (SETAC) North America 39th Annual Meeting, Sacramento, CA, November 4–8, 2018.

Thompson CM, Suh M, Proctor DM, **Harris MA**. Ten factors for considering the mode of action of Cr(VI)-induced intestinal tumors in rodents. Society of Toxicology Annual Meeting, San Antonio, TX, March 11-15, 2018.

Thompson CM, Wolf JC, Suh M, Proctor DM, Haws LC, **Harris MA**. Toxicity and recovery in the duodenum of B6C3F1mice following treatment with intestinal carcinogens; captan, folpet, and hexavalent chromium: Evidence for an adverse outcome pathway. Society of Toxicology Annual Meeting, San Antonio, TX, March 11–15, 2018.

Thompson C, Rager J, Suh M, Proctor D, Haws L, **Harris M**. Mechanistic support for nonlinear risk assessment of rat oral cavity tumors induced by exposure to Cr(VI) in drinking water. Poster presented at Society of Toxicology Annual Meeting. March 15, 2017. Baltimore, MD.

Chappell G, Welsh B, Harvey S, **Harris M**, Wikoff D. Validation and application of a text mining tool in the identification and categorization of mechanistic data: A case study in improving problem formulation of carcinogenicity assessments. Poster presented at Society of Toxicology Annual Meeting. March 15, 2017. Baltimore, MD.

Kirman CR, Proctor D, Suh M, Haws L, **Harris M**, Thompson C, Hays S. Using physiologically-based pharmacokinetic modeling to address potentially sensitive subpopulations exposure to hexavalent chromium. Poster presented at Society of Toxicology Annual Meeting. March 15, 2017. Baltimore, MD.

Rager JE, Thompson CM, Ring C, Fry RC, **Harris MA**. Integration of transcriptomics and high-throughput screening predictions with robust *in vivo* data to inform hexavalent chromium mode of action. Poster presented at Society of Toxicology Annual Meeting. March 14, 2017. Baltimore, MD.

Thompson C, Kirman C, Suh M, Proctor D, Haws L, **Harris M**, Hays S. Risk assessment of oral exposure to Cr(VI): Integration of mode of action, pharmacokinetics, and dose-response modeling. Poster presented at Society of Toxicology Annual Meeting. March 14, 2017. Baltimore, MD.

**Harris MA**, Thompson CM, Proctor DM, Suh M, Wolf JC, Seiter JM, Chappell MA, Haws LC. Analysis of duodenal crypt health following exposure to Cr(VI) in drinking water. Presented at the Society of Toxicology's 54th Annual Meeting, March 22-26, 2015. San Diego, CA.

Thompson CM, Young RR, Suh M, Dinesdurage H, Elbekai R, **Harris MA**, Rohr AC, Proctor DM. Hexavalent chromium does not induce mutations in the oral mucosa of transgenic Big Blue® rats following drinking water exposures at a carcinogenic dose. Presented at the Society of Toxicology's 54th Annual Meeting, March 22-26, 2015. San Diego, CA.

Thompson CM, Proctor DM, Suh M, Wolf JC, Haws LC, Seiter JM, Chappell MA, **Harris MA**. X-ray fluorescence microspectroscopic analysis of duodenal mucosae following Cr(VI) exposure in drinking water. Presented at the Society of Toxicology's 53rd Annual Meeting, March 23-27, 2014. Phoenix, AZ.

**Harris MA**, Thompson CM, Wolf JC, Fedorov Y, Hixon JG, Proctor DM, Suh M, Haws LC. Assessment of genotoxic potential of Cr(VI) in the intestine via in vivo intestinal micronucleus assay and in vitro high content analysis in differentiated and undifferentiated Caco-2. Presented at the Society of Toxicology's 51st Annual Meeting, March 11-15, 2012. San Francisco, CA.

ALCD-PUBCOM_0000823



*Innovative Solutions*
*Sound Science*

O'Brien TJ, Hao D, Suh M, Proctor D, Thompson CM, **Harris MA**, Parsons BL, Meyers MB. K-ras codon 12 GGT to GAT mutation is not elevated in the duodenum of mice subchronically exposed to hexavalent chromium in drinking water. Presented at the Society of Toxicology's 51st Annual Meeting, March 11-15, 2012. San Francisco, CA.

Proctor DM, Thompson CM, Suh M, Haws LC, **Harris MA**. Mode of action for intestinal carcinogenesis of ingested hexavalent chromium in mice. Presented at the Society of Toxicology's 51st Annual Meeting, March 11-15, 2012. San Francisco, CA.

Thompson CM, Hixon JG, Kopec AK, **Harris MA**, Proctor DM, Haws LC. Assessment of genotoxic potential of Cr(VI) in the mouse duodenum via toxicogenomic profiling. Presented at the Society of Toxicology's 51st Annual Meeting, March 11-15, 2012. San Francisco, CA.

Wikoff D, DeVito M, Walker N, Hixon G, **Harris M**, Tachovsky A, Birnbaum L, Haws L. Application of machine learning in the development of a weighting framework for evaluating estimates of relative potency for dioxin-like compounds. Presented at the Society of Toxicology's 51st Annual Meeting, March 11-15, 2012. San Francisco, CA.

Haws LC, DeVito MJ, Walker NJ, **Harris MA**, Tachovsky JA, Birnbaum LS, Farland WH, Wikoff DS. Development of a consensus-based weighting framework for evaluating estimates of relative potency for dioxin-like compounds that includes consideration of data from human cells. Presented at Dioxin 2011, August 21-25, 2011. Brussels, Belgium.

Haws LC, Fitzgerald L, Burkhalter B, **Harris M**, Wikoff DS. Assessment of the US EPA's proposed toxicological values for TCDD for regulation of dioxin-like compounds in foods: Bridging the science divide in a global market. Presented at Dioxin 2011, August 21-25, 2011. Brussels, Belgium.

Wikoff DS, Thompson C, Walker N, DeVito M, **Harris M**, Birnbaum L, Haws L. Derivation of relative potency estimates using benchmark dose modeling: A case study with TCDF. Presented at Dioxin 2011, August 21-25, 2011. Brussels, Belgium.

Fitzgerald L, Burkhalter B, Urban J, Staskal D, **Harris M**, Haws L. VOC serum levels in the general U.S. population: An analysis of the 2003-2004 NHANES dataset. Presented at the Society of Toxicology's 50th Annual Meeting, March 6-10, 2011. Washington, D.C.

Haws L, Proctor D, Thompson C, **Harris M**. Research plan to fill data gaps in the mode of action for cancer risk assessment of hexavalent chromium in drinking water. Presented at the Society of Toxicology's 50th Annual Meeting, March 6-10, 2011. Washington, D.C.

Kim S, Thompson CM, Kopec AK, **Harris MA**, Zacharewski TR. Comparison of basal and CrVI-mediated solute carrier gene expression in rodent duodenal epithelium. Presented at the Society of Toxicology's 50th Annual Meeting, March 6-10, 2011. Washington, D.C.

Proctor D, Thompson C, Haws L, **Harris M**. Use of mode of action and pharmacokinetic findings to inform the cancer risk assessment of ingested Cr(VI): A case study. Presented at the Society of Toxicology's 50th Annual Meeting, March 6-10, 2011. Washington, D.C.

Urban J, Fitzgerald L, Burkhalter B, Staskal D, **Harris M**, Haws L. BTEX serum levels in the general U.S. population: An analysis of 2003-2004 NHANES dataset. Presented at the Society of Toxicology's 50th Annual Meeting, March 6-10, 2011. Washington, D.C.

**Harris M**, Tachovsky JA, Staskal-Wikoff D, Aylward L, Burkhalter B, Simon T, Haws L. Serum concentrations of dioxin-like compounds in a population in Midland, Michigan: An evaluation of the impact of soil exposures. Presented at Dioxin 2010, September 12-17, 2010, San Antonio, TX.

ALCD-PUBCOM_0000824



*Innovative Solutions*
*Sound Science*

Harris M, Tachovsky JA, Staskal-Wikoff D, Simon T, Burkhalter B, Urban J, Haws L. Assessment of the impact of various soil cleanup levels on serum concentrations of dioxin-like compounds in humans. Presented at the 49th Annual Meeting of Society of Toxicology. March 7-11, 2010. Salt Lake City, Utah.

Haws L, Tachovsky JA, Staskal-Wikoff D, Aylward L, Burkhalter B, Urban J, Simon T, Harris M. An evaluation of the influence of different soil cleanup levels on the concentration of dioxin-like compounds in human serum. Presented at Dioxin 2010, September 12-17, 2010, San Antonio, TX.

Staskal-Wikoff D, Burkhalter B, Stapleton H, Harris M. PBDEs in Newark Bay sediments. Presented at Dioxin 2010, September 12-17, 2010, San Antonio, TX.

Tachovsky A, Staskal D, Urban J, Harris MA, Haws L. Assessment of environmental data collected in a community with numerous petroleum refining and petrochemical facilities. Presented at the 49th Annual Meeting of Society of Toxicology. March 7-11, 2010. Salt Lake City, Utah.

Urban J, Burkhalter B, Tachovsky JA, Haws L, Harris M. Evaluation of polychlorinated naphthalenes (PCNs) in Newark Bay sediment. Presented at Dioxin 2010, September 12-17, 2010, San Antonio, TX.

Haws LC, DeVito MJ, Walker NJ, Birnbaum LS, Farland WH, Harris MA, Tachovsky JA, Unice KM, Scott PK, Staskal-Wikoff DF. Development of distributions of relative potency estimates to quantitatively assess uncertainty inherent in the TEFs for dioxin-like compounds: A proposed consensus-based weighting. Presented at Dioxin 2009. Beijing, China.

Staskal-Wikoff DF, Harris MA, Haws LC, Birnbaum LS, Tachovsky JA. Probabilistic evaluation of cancer and non-cancer risk associated with exposure to BDE 209 in automobiles. Presented at Dioxin 2009. Beijing, China.

Urban JD, Tachovsky JA, Staskal DF, Haws LC, Harris MA. Human health risk assessment of consumption of fish from the Lower Passaic River. Presented at the 48th Annual Meeting of Society for Toxicology. March 15-19, 2009. Baltimore, MD.

Harris MA, Shay E, Unice KM, Scot LF, Haws LC. 2008. Preliminary evaluation of health risks posed by PCDD/Fs and PCBs from the ingestion of fish from the Lower Passaic River. Presented at Dioxin 2008, August 17-22, 2008. Birmingham, England.

Staskal DF, Tachovsky JA, Harris MA, Haws LC. 2008. Preliminary evaluation of human health risks associated with exposure to PBDEs in the United States. Presented at Dioxin 2008, August 17-22, 2008. Birmingham, England.

Tachovsky JA, Harris MA, Scott L, Luksemburg W, Paustenbach D. 2008. Analysis of fish tissue concentrations of dioxins and furans using principal components analysis. Presented at Dioxin 2008, August 17-22, 2008. Birmingham, England.

Staskal D, Urban J, Scott L, Scott P, Tachovsky A, Unice K, Harris M. 2008. A framework for evaluating serum dioxin data derived from biomonitoring studies. Presented at Dioxin 2008, August 17-22, 2008. Birmingham, England.

Haws L, Unice K, Tachovsky A, Harris M, DeVito M, Walker N, Birnbaum L, Farland W, Nguyen L, Staskal D. 2008. Assessment of the impact of using weighted distributions of REPs to develop exposure estimates for dioxin-like compounds. Presented at Dioxin 2008, August 17-22, 2008. Birmingham, England.

Harris MA, Tachovsky JA, Williams ES, Paustenbach DP, Haws LC. 2008. Assessment of the health risks posed by benzene in soft drinks. Society of Toxicology Annual Meeting. March 16–20, 2008. Seattle, WA. The Toxicologist 102:142.

ALCD-PUBCOM_0000825



Innovative Solutions
Sound Science

Haws LC, DeVito MJ, Walker NJ, Birnbaum LS, Unice KM, Scott PK, **Harris MA**, Tachovsky A, Farland WH, Finley BF, Staskal DF. 2008. Development of weighted distributions of REPs for dioxin-like compounds: Implications for risk assessment. Society of Toxicology Annual Meeting. March 16–20, 2008. Seattle, WA. The Toxicologist 102:242.

Scott LLF, Staskal DF, **Harris MA**, Finley BL, Haws LC. 2008. Evaluation of dioxin-like compounds in workers from a primary magnesium production facility relative to levels observed in the general US population. Society of Toxicology Annual Meeting. March 16–20, 2008. Seattle, WA. The Toxicologist 102:358.

Staskal DF, Donovan EP, Haws LC, Roberts JD, Unice KM, Finley BL,**Harris MA**. 2008. Human health risks associated with exposure to pathogens in waters and sediments of the Lower Passaic River. Society of Toxicology Annual Meeting. March 16–20, 2008. Seattle, WA. The Toxicologist 102:370.

Urban JD, Haws LC, Scott LF, Scott PS, Staskal DF, Tachovsky AT, Unice KM, **Harris MA**. 2008. A framework for evaluating serum dioxin data derived from biomonitoring studies. Society of Toxicology Annual Meeting. March 16–20, 2008. Seattle, WA. The Toxicologist 102:246.

Haws LC, Scott LLF, Staskal DF, **Harris MA**, Finley BL. 2007. Dioxin-like compounds in workers at a primary magnesium production facility. Organohalogen Compounds, 69:2098–2101.

Scott P, Haws L, Scott L, **Harris M**. 2007. Evaluation of background dioxin-like PCB congener profiles in human serum collected during NHANES 2001–2002 using principal components analysis. Organohalogen Compounds, 69:2014–2017.

Scott P, Haws L, Scott L, **Harris M**. 2007. Evaluation of background 2,3,7,8-PCDD/F congener profiles in human serum collected during NHANES 2001-2002 using principal components analysis. Organohalogen Compounds 69:2010–2013.

**Harris M**, Haws LC, Tachosvky A, Williams ES, Nguyen LM, Scott LF. Interactive processes in toxicity assessments. Air Toxics Research: Implications of Research on Policies to Protect Public Health. June 12–13, 2007. Houston, TX.

Haws LC, Scott LLF, Staskal DF, **Harris M**, Finley B. 2007. Evaluation of biomonitoring data for dioxin-like compounds in workers at a primary magnesium production facility. Society for Risk Analysis Annual Meeting. December 9–12, 2007. San Antonio, TX. Abstract Book-M5-69:84–85.

**Harris M**, tachovsky JA, Williams ES, Scott LLF, Nguyen L, Haws LC. 2007. Risks posed by air pollutants in the Houston metropolitan area. Society for Risk Analysis Annual Meeting. December 9–12, 2007. San Antonio, TX. Abstract Book-T2-G.4:82–83.

Staskal DF, Donovan EP, Haws LC, Roberts JD, Unice KM, Finley BL, **Harris MA**. 2007. A quantitative microbial risk assessment for exposure to pathogens in waters and sediments of the Lower Passaic River. Society for Risk Analysis Annual Meeting. December 9–12, 2007. San Antonio, TX. Abstract Book-M2-G.1:135.

Tachovsky JA, Haws LC, Scott LLF, Williams ES, **Harris M**. 2007. Benzene in soft drinks and other beverages: Do measured levels pose a human health risk? Society for Risk Analysis Annual Meeting. December 9–12, 2007. San Antonio, TX. Abstract Book-M5.70:138.

Staskal DF, Scott LLF, Williams ES, Luksemburg WJ, Haws LC, Birnbaum LS, Nguyen LM, Paustenbach DJ, **Harris MA**. 2007. Daily intake estimates of PBDEs associated with consumption of catfish in the U.S. Presented at the Fourth International Workshop on Brominated Flame Retardants. April 24–27, 2007. Amsterdam, the Netherlands.

ALCD-PUBCOM_0000826



Ferriby LL, **Harris MA**, Unice KM, Scott PK, Haws LC, Paustenbach DJ. 2007. Development of PCDD/F and dioxin-like PCB serum concentration reference values for the general U.S. population using the 2006 WHO TEFs and the 2001-2002 NHANES data. Presented at the Society of Toxicology's 46th Annual Meeting. March 25–29, 2007. Charlotte, NC.

Haws LC, Walker NJ, DeVito MJ, Birnbaum LS, Unice KM, Scott PK, **Harris MA**, Farland WH, Finley BL, Staskal DF. 2007. Development of weighted distributions of REPs for dioxin-like compounds (DLCs). Presented at the Society of Toxicology's 46th Annual Meeting. March 25–29, 2007. Charlotte, NC.

Williams ES, Ferriby LL, Haws LC, Paustenbach DJ, **Harris MA**. 2007. Assessment of potential human health risks posed by benzene in a commercial beverage. Presented at the Society of Toxicology's 46th Annual Meeting. March 25–29, 2007. Charlotte, NC.

Nguyen LM, Staskal DF, Ferriby LL, Williams ES, Luksemburg WJ, Haws LC, Birnbaum LS, Paustenbach DJ, **Harris MA**. 2007. Dietary intake of PBDEs based on consumption of catfish in southern Mississippi. Presented at the Society of Toxicology's 46th Annual Meeting. March 25–29, 2007. Charlotte, NC.

Scott LLF, **Harris M**, Unice KM, Scott P, Nguyen LM, Haws LC, Paustenbach D. 2007. Effects of excluding serum PCDD/F and dioxin-like PCB data of individuals with incomplete congener profiles on estimates of total TEQ. Ann Epidemiol 17:732.

Paustenbach DJ, Scott LLF, Nguyen LM, Unice KM, Scott P, Haws LC, **Harris M**. 2007. Referent concentrations of PCDD/Fs and dioxin-like PCBs in sera of persons in the U.S. based on the new WHO 2006 TEFs and 2001–2002 NHANES data. Ann Epidemiol 17:734.

Nguyen LM, Scott LLF, **Harris M**, Haws LC. 2007. Factors contributing to blood lead levels in U.S. children based on NHANES Data. Ann Epidemiol 17:734–735.

**Harris M**, Scott LLF, Nguyen LM, Haws LC. 2007. Trends in elevated blood lead levels of U.S. children and associated demographic characteristics. Ann Epidemiol 17:748.

Scott LLF, Nguyen LM, Craft E, Haws LC, **Harris M**. 2007. Comparison of acute lymphocytic leukemia cancer rates among urban areas and counties within Texas. Am J Epidemiol 165:S6.

Staskal DF, Ferriby LL, Williams ES, Luksemburg WJ, Haws LC, Birnbaum LS, Paustenbach DJ, **Harris MA**. 2006. Polybrominated diphenyl ethers in southern Mississippi catfish. Organohalogen Compounds 68:1839–1842.

Paustenbach DJ, **Harris MA**, Ferriby LL, Williams ES, Haws LC, Unice KM, Scott PK. 2006. Development of PCDD/F TEQ serum reference values for the U.S. population for use in evaluating biomonitoring results. Organohalogen Compounds 68:480–483.

Scott PK, Haws LC, Staskal DF, Birnbaum LS, Walker NJ, DeVito MJ, **Harris MA**, Farland WH, Finley BL, Unice KM. 2006. An alternative method for establishing TEFs for dioxin-like compounds. Part 1. Evaluation of decision analysis methods for use in weighting relative potency data. Organohalogen Compounds 68.

Haws LC, DeVito MJ, Birnbaum LS, Walker NJ, Scott PK, Unice KM, **Harris MA**, Farland WH, Finley BL, Staskal DF. 2006. An alternative method for establishing TEFs for dioxin-like compounds. Part 2. Development of an approach to quantitatively weight the underlying potency data. Organohalogen Compounds 68.

Staskal DF, Unice KM, Walker NJ, DeVito MJ, Birnbaum LS, Scott PK, **Harris MA**, Farland WH, Finley BL, Haws LC. 2006. An alternative method for establishing TEFs for dioxin-like compounds. Part 3. Development of weighted distributions of REPs for PCB126 and 2,3,4,7,8-PeCDF. Organohalogen Compounds 68.

ALCD-PUBCOM_0000827



**Tox Strategies**

*Innovative Solutions*
*Sound Science*

Ferriby LL, Williams ES, Lukesemburg WJ, Paustenbach DJ, Haws LC, Birnbaum LS, and **Harris MA**. 2006. Comparing polychlorinated biphenyls in farm-raised and wild-caught catfish from southern Mississippi. Organohalogen Compounds 68:2527–2530.

Ferriby LL, Williams ES, Lukesemburg WJ, Paustenbach DJ, Haws LC, Birnbaum LS, **Harris MA**. 2006. Comparing PCDDs, PCDFs, and dioxin-like PCBs in farm-raised and wild-caught catfish from southern Mississippi. Organohalogen Compounds 68:612–615.

Haws LC, Scott PK, Unice KM, Gough M, **Harris MA**, Staskal DF, Paustenbach DJ, Pavuk M. 2006. Are dioxin body burdens surrogates for other risk factors in associations between dioxin and diabetes? Organohalogen Compounds 68.

Ferriby LL, Franke K, Unice KM, Scott P, Haws LC, **Harris M**, Paustenbach DJ. 2006. Serum reference levels of PCDD/Fs and dioxin-like PCBs stratified by race/ethnicity, gender and age for the general U.S. population. Presented at the American Public Health Association's 134th Annual Meeting and Exposition. November 4–8, 2006. Boston, MA.

Staskal DF, Ferriby LL, Williams ES, Luksemburg WJ, Haws LC, Birnbaum LS, Paustenbach DJ, **Harris MA**. 2006. Polybrominated diphenyl ethers in southern Mississippi catfish. Presented at the 26th International Symposium on Halogenated Environmental Organic Pollutants and POPs. August 21–25, 2006. Oslo, Norway.

Paustenbach DJ, **Harris MA**, Ferriby LL, Williams ES, Haws LC, Birnbaum LS. 2006. Development of PCDD/F TEQ serum reference values for the U.S. population using results from the 2001–2002 National Health and Nutrition Examination Survey (NHANES). Presented at the 26th International Symposium on Halogenated Environmental Organic Pollutants and POPs. August 21–25, 2006. Oslo, Norway.

**Harris M**, Ferriby L, Knutsen J, Nony P, Unice K, Paustenbach D. 2006. Evaluation of PCDD/F and dioxin-like PCB serum concentration data from the 2001–2002 National Health and Nutrition Examination Survey in the United States. Society of Toxicology. March 5–9, 2006. San Diego, CA.

Gough M, Paustenbach D, Kerger B, Leung H, Scott P, **Harris M**. 2006. Dioxin and diabetes: Does the current weight of evidence demonstrate a relationship? Society of Toxicology. March 5–9, 2006. San Diego, CA.

**Harris M**, Finley B, Scott P. 2005. Development of a relative estimate of potency distribution for 2,3,7,8-TCDF. 25th International Symposium on Halogenated Environmental Organic Pollutants and Persistent Organic Pollutants (POPs). Dioxin 2005. August 21–26, 2005. Toronto, Canada.

Paustenbach D, Fehling K, **Harris M**, Scott P, Kerger B. 2005. Identifying asoil-clean-up criteria for dioxin in residential soils: How has 20 years of research and risk assessment experience impacted the analysis? 25th International Symposium on Halogenated Environmental Organic Pollutants and Persistent Organic Pollutants (POPs) . Dioxin 2005. August 21–26, 2005. Toronto, Canada.

**Harris M**, Finley B. Estimating the total TEQ in human blood from naturally-occurring vs. anthropogenic dioxins: A dietary study. Society of Toxicology. March 6–10, 2005. New Orleans, LA.

Connor K, **Harris M**, Edwards M, Chu A, Clark G, Finley B. 2004. Estimating the total TEQ in human blood from naturally-occurring vs. anthropogenic dioxins: A dietary study. Dioxin 2004. September 6–10, 2004. Berlin, Germany.

Haws L, **Harris M**, Su S, Birnbaum L, DeVito M, Farland W, Walker N, Connor K, Santamaria A, Finley B. 2004. Development of a refined database of relative potency estimates to facilitate better characterization of variability and uncertainty in the current mammalian TEFs for PCDDs, PCDFs, and dioxin-like PCBs. Dioxin 2004. September 6–10, 2004. Berlin, Germany.

ALCD-PUBCOM_0000828



*Innovative Solutions*
*Sound Science*

Haws L, **Harris M**, Su S, Walker N, Birnbaum L, DeVito M, Farland W, Connor K, Santamaria A, Finley B. 2004. A preliminary approach to characterizing variability and uncertainty in the mammalian PCDD/F and PCB TEFs. Dioxin 2004. September 6–10, 2004. Berlin, Germany.

Skaggs MM Jr, **Harris M.** 2001. A management trend: Towards special remedial organizations. SPE/ EPA/DOE Exploration and Production Environmental Conference. February 26–28, 2001. San Antonio, TX.

**Harris M**, Skaggs MM. A review of chromium treatment technologies. YPF Environmental Congress. September 1998. Buenos Aires, Argentina.

**Harris M**, Biegel L, Zacharewski T, Safe S. 6-methyl-1,3,8-trichlorodibenzofuran (MCDF) as an antiestrogen: Effects on nuclear estrogen receptor levels, cell growth and the 17ß-estradiol-induced secretion of proteins in MCF-7 Cells. Society of Toxicology 30th Annual Meeting. February 25–March 1, 1991. Dallas, TX.

Safe S, **Harris M**, Zacharewski T, Biegel L. 1990. 2,3,7,8-tetrachlorodibenzo-p-dioxin (TCDD) as an antiestrogen in human breast cancer cells: Mechanistic studies. Proceedings Dioxin '90, Eco-Informa Press. Bayreuth, Germany, 1:137–140.

**Harris M**, Zacharewski T, Safe S. 2,3,7,8-Tetrachlorodibenzo-p-dioxin as an antiestrogen: Effects of nuclear estrogen receptor levels in MCF-7 Cells. Society of Toxicology Meeting. February 12–16, 1990. Miami Beach, FL.

**Harris M**, Romkes M, Safe S. Human breast cancer cells as models for investigating Ah receptor mediated processes. Dioxin '89. September 17–22, 1989. Toronto, Canada.

**Harris M**, Romkes M, Safe S. Human breast cancer cells as models for investigating Ah receptor mediated processes. Society of Toxicology 28th Annual Meeting. February 27–March 3, 1989. Atlanta, GA.

**Harris M**, Zacharewski T, Astroff B, Kamps C, Safe S. Characterization of 6-methyl-1,3,7,8-trichlorodibenz-furan (MCDF) as a 2,3,7,8-TCDD antagonist in male rats: Induction of monooxygenases. Dioxin '88 Symposium. August 21–26, 1988. Umea, Sweden.

**Harris M**, Kamps C, Safe S. Role of 4s binding protein in the induction of aryl hydrocarbon hydroxylase in the rat. Society of Toxicology 27th Annual Meeting. February 15–19, 1988. Dallas, TX..

Skaggs MM Jr, **Harris MA**. 1997. Risk management strategies for site closure actions. National Association for Environmental Management. October 1997. Dallas, TX.

Fernandez P, **Harris M**, Safe S. 1991. Effects of 2,3,7,8-tetrachlorodibenzo-p-dioxin (TCDD) on T47-D human breast cancer cell lines. Society of Toxicology 30th Annual Meeting. February 25–March 1, 1991. Dallas, TX.

Arrellano L, **Harris M**, Safe S. 1991. Induction of Cypiai gene transcription by TCDD in MDA-MB-231 human breast cancer cells. Society of Toxicology 30th Annual Meeting. February 25–March 1, 1991. Dallas, TX.

**Harris M**, Finley B, Wenning R, Paustenbach D. 1991. Evaluation of potential sources of 1,2,8,9-TCDD in aquatic biota from Newark Bay. Society of Toxicology 30th Annual Meeting. February 25–March 1, 1991. Dallas, TX.

Piskorska-Pliszczynska J, Astroff B, Zacharewski T, **Harris M**, Rosengren R, Morrison V, Safe L, Safe S. 1991. Mechanism of action of 2,3,7,8-tetrachlorodibenzo-p-dioxin antagonists: Characterization of [125I]-6-methyl-8-Iodo-1,3-dichlorodibenzofuran-Ah receptor complexes. Society of Toxicology 30th Annual Meeting. February 25–March 1, 1991. Dallas, TX.

Copeland T, **Harris M**, Finley B, Paustenbach D. 1991. Health effects and environmental characterization of Octachlorodibenzo-p-dioxin (OCDD): Impact on risk assessment of former wood treatment sites. Society of Toxicology 30th Annual Meeting. February 25–March 1, 1991. Dallas, TX.

ALCD-PUBCOM_0000829



Harris M, Wenning R, Finley B, Paustenbach D. 1990. Evaluation of potential sources of 1,2,8,9-TCDD in aquatic biota from Newark Bay. Society of Environmental Chemistry and Toxicology. November 11–15, 1990. Washington, DC.

Zacharewski T, Piskorska-Pliszczynska J, Rosengren F, Astroff B, Harris M, Safe L, Safe S. 1990. 8-Iodo-1,3-dichlorodibenzofuran (I-MCDF) and 125I-MCDF as a 2,3,7,8-tetrachlordibenzo-p-dioxin (TCDD) antagonist. Society of Toxicology Meeting. February 12–16, 1990. Miami Beach, FL.

Zacharewski T, Harris M, Safe S. 1989. Structure dependent induction of aryl hydrocarbon hydroxylase of TCDD and related compounds: mechanistic studies. Society of Toxicology 28th Annual Meeting. February 27–March 3, 1989. Atlanta, GA.

Randerath K, Putman KL, Randerath E, Harris M, Zacharewski T, Safe S. Effects of 2,3,7,8-TCDD and related compounds on the levels of age-dependent i-spot DNA adducts in the liver of female and male Sprague-Dawley rats. Dioxin '89. September 17–22, 1989. Toronto, Canada.

Zacharewski T, Harris M, Safe S. 1988. Validation of the in vitro bioassay: Determination of 2,3,7,8-TCDD equivalents in pyrolyzed flame retardants and great lakes fish extracts. Gulf Coast Society of Toxicology and Southwest Environmental Mutagens Society Meeting. 1988. Houston, TX.

Zacharewski T, Harris M, Safe S, Thoma H, Hauschulz G, Knorr E, Hutzinger O. 1987. Applications of the in vitro AHH induction bioassay for determining 2,3,7,8-TCDD equivalents: Pyrolyzed flame retardant mixtures. Dioxin '87 Symposium. October 4–9, 1987. Las Vegas, NV.

Safe S, Zacherewski T, Harris M, Yao C, Holcomb M. 1987. Validation of the AHH induction bioassay for the determination of 2,3,7,8-TCDD toxic equivalents. Dioxin '87 Symposium. October 4–9, 1987. Las Vegas, NV.

Kamps, C., M. Harris, and S. Safe. 1987. Polynuclear aromatic hydrocarbon—4s binding protein interactions. Structure activity relationships. Society of Toxicology 26th Annual Meeting. February 1987. Washington DC.

ALCD-PUBCOM_0000830

# APPENDIX B.5
## Charles Menzie Declaration

ALCD-PUBCOM_0000831

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA | Hon. Madeline Cox Arleo |
| | Hom. Magistrate Leda D. Wettre |
| Plaintiff, | |
| | |
| v. | Civil Action No. 2:22-cv-7326 |
| | |
| ALDEN LEEDS, INC., *et al.* | |
| | |
| Defendants. | |

## DECLARATION OF CHARLES A. MENZIE, Ph.D.

1

ALCD-PUBCOM_0000832

## TABLE OF CONTENTS

LIST OF FIGURES ................................................................................................................ 3
LIST OF TABLES ................................................................................................................ 3
PURPOSE OF THIS DECLARATION ................................................................................ 4
QUALIFICATIONS ............................................................................................................. 5
SUMMARY OF OPINIONS ............................................................................................... 7
SUPPORTING INFORMATION FOR OPINIONS ........................................................... 9
CONCLUSIONS ................................................................................................................ 28

Attachment 1 – Resume of Charles A. Menzie, Ph.D.
Attachment 2 – Technical Support for Charles A. Menzie, Ph.D.'s Opinion 4

ALCD-PUBCOM_0000833

## LIST OF FIGURES

Figure 1. Relative contributions of COCs to "overall environmental harm" based on the subtraction of "background."

Figure 2. Relative contributions of COCs to "overall environmental harm" based on the addition of dioxin-like PCBs.

Figure 3. Total PCB (i.e., non-dioxin-like PCBs) concentrations in sediment samples used in the 2014 Focused Feasibility Study Report for the lower 8.3 miles of the Passaic River.[1]

## LIST OF TABLES

Table 1. Percent contributions from various sources to recently deposited surface sediments of the Lower Passaic River (source: Table 3 in U.S. EPA Record of Decision 2016)[2].

Table 2. The estimated masses of COCs in OU2 (source: Table 1 in Attachment Q of the Batson Report)[3]

---

[1] Louis Berger Group, Inc. 2014. Focused Feasibility Study Report for the Lower Eight Miles of the Lower Passaic River.

[2] U.S. EPA. 2016. Record of Decision. Lower 8.3 Miles of the Lower Passaic River, Part of the Diamond Alkali Superfund Site, Essex and Hudson Counties, New Jersey. U.S. Environmental Protection Agency, U.S. EPA, Region II, New York, New York. March 3, 2016.

[3] Batson, D. 2020. Diamond Alkali Superfund Site OU2 Allocation Recommendation Report. AlterEcho. December 28, 2020.

ALCD-PUBCOM_0000834

## PURPOSE OF THIS DECLARATION

Pursuant to 28 U.S.C. § 1746, I, Charles A. Menzie, declare the following:

1. I have been retained by Langsam Stevens Silver & Hollaender, LLP on behalf of Occidental

   Chemical Corporation ("OxyChem") to provide expert opinions related to the Lower 8.3

   Miles of the Lower Passaic River, designated as Operable Unit ("OU2"), which is part of the

   Diamond Alkali Superfund Site. Specifically, I have been retained to provide expert opinions

   regarding the Allocation Report prepared by David Batson ("Batson Report"), in a process

   ("Batson Process") he conducted at AlterEcho under contract to the U.S. Environmental

   Protection Agency ("U.S. EPA").

2. My opinions relate to flaws in the Batson Process used to determine what Batson refers to as

   the "relative risk numbers" for the eight Chemicals of Concern ("COCs") identified in the

   Record of Decision ("ROD") for OU2. These flaws stem from conceptual and mathematical

   mistakes as well as Batson's decision to exclude from allocation a key group of COCs that

   contribute substantially to the risks and overall harm for sediments within OU2, namely his

   exclusion of the risk of dioxin-like polychlorinated biphenyls ("PCBs") from his PCB risk

   analysis. As a result, the Batson Process underestimates the relative risks of seven of the

   COCs[4] and overestimates the relative risk of the dioxin compound 2,3,7,8-

   tetrachlorodibenzo-p-dioxin ("2,3,7,8-TCDD"). All eight COCs have already been

   determined to pose unacceptable harms that require remediation,[5] as is also acknowledged by

---

[4] Copper, lead, mercury, Total DDx (sum of 4,4'-DDT, 4,4'-DDE, and 4,4'-DDD), dieldrin, polycyclic aromatic hydrocarbons ("PAHs"), and PCBs are the other seven COCs.

[5] Louis Berger Group, Inc. 2014. Focused Feasibility Study Report for the Lower Eight Miles of the Lower Passaic River; U.S. EPA. 2016. Record of Decision. Lower 8.3 Miles of the Lower Passaic River, Part of the Diamond Alkali Superfund Site, Essex and Hudson Counties, New

4

Batson. Further, Batson failed to perform any uncertainty or sensitivity analyses to evaluate the reliability of his conceptual framework and resulting relative risk estimates. I provide a simple reality check that demonstrates his allocation estimates can vary widely depending on how risk and harm are considered with respect to the need for the remediation outlined in the ROD.

3. My assignment included providing expert responses to the following questions:

- Did the Batson Process appropriately recognize the nature of historical solids deposition (i.e., mud/silt) and chemical contamination and sources in OU2?

- Was it conceptually and scientifically acceptable for Batson to subtract "background risks" for COCs from the total risks of these COCs within OU2?

- Did Batson exclude critical information from his analysis?

- With respect to risk/harm related aspects, does the Batson Process appropriately consider the nature and structure of the remedy as outlined in the ROD for OU2?[6]

**QUALIFICATIONS**

4. I, Charles Menzie, am a Principal Scientist with Exponent, Inc. I have a Ph.D. in Biology from the City University of New York with emphases on biological oceanography and ecology. I specialize in the application of risk assessment and causal analysis methods for evaluating contaminant sources and for diagnosing the causes of environmental harms and damages. I have over 30 years of experience and have applied my risk assessment, causal analysis, and remedial expertise at many contaminated sediment Superfund sites on behalf of

Jersey. United States Environmental Protection Agency, Region II, New York, New York. March 3, 2016.

[6] U.S. EPA. 2016. Record of Decision. Lower 8.3 Miles of the Lower Passaic River, Part of the Diamond Alkali Superfund Site, Essex and Hudson Counties, New Jersey. United States Environmental Protection Agency, Region II, New York, New York. March 3, 2016.

ALCD-PUBCOM_0000836

the U.S. EPA, state governments, and industry. Examples include New Bedford Harbor,
Massachusetts; Lake Onondaga, New York; Hudson River, New York; Thames River (Navy
Base), Connecticut; Kalamazoo River, Michigan; Tittabawassee River, Wisconsin; and
Delaware River, Pennsylvania. I am knowledgeable about the assessment of risks and the
design of remedial programs for all eight of the COCs listed in the OU2 ROD,[7] and I am
familiar with the generally accepted scientific standards that apply to the measurement and
assessment of the risks of hazardous substances in the environment.

5.  I have developed allocation approaches based on considerations of thresholds for COCs
requiring remediation. I am experienced in sediment transport and deposition processes and
have studied many estuarine environments, such as the Passaic River. I have been involved in
the development of risk assessment methods and the establishment of screening values on
behalf of the U.S. EPA and state agencies in order to evaluate the potential harms of
contaminants. I chaired numerous expert workshops under the auspices of the U.S. EPA on
assessing the risks of dioxins, PCBs and metals. I chaired the U.S. EPA expert group to
develop a framework for the risk assessment of metals. My expertise and contributions to the
sciences have been recognized by the Society of Risk Analyses ("SRA") who honored me as
a recipient of the Risk Practitioner Award as a Fellow of SRA, the Society of Toxicology and
Chemistry ("SETAC") who honored me as a Fellow of SETAC and selected me to serve as
SETAC's Global Executive Director, and by the Association of the Environmental Health of
Soils ("AEHS") who honored me with a Lifetime Achievement Award. I have served as an
expert to governments, non-governmental organizations ("NGOs"), and industries, and have

---

[7] U.S. EPA. 2016. Record of Decision. Lower 8.3 Miles of the Lower Passaic River, Part of the
Diamond Alkali Superfund Site, Essex and Hudson Counties, New Jersey. United States
Environmental Protection Agency, Region II, New York, New York. March 3, 2016.

6

ALCD-PUBCOM_0000837

presented testimony in cases before the International Court of Justice (World Court),

Supreme Court of the United States, and in state and federal courts in the United States.

6. My resume, which includes a list of work experience and publications, is presented in
   Attachment 1.

7. If asked to testify, my testimony would be consistent with this declaration.

## SUMMARY OF OPINIONS

8. **Opinion 1**: OU2 is a major depositional area for solids and contaminants from the entire
   Passaic River system as well as from Newark Bay; a substantial portion of the masses of
   solids (i.e., mud/silt) and contaminants within OU2 originate upriver and downriver of OU2.

9. **Opinion 2**: Subtracting "background" risks from the risks posed by OU2, as done in the
   Batson Process, is conceptually and mathematically flawed and contradicts U.S. EPA
   guidance. It also ignores the fact that the "background" is itself contaminated and poses risks.
   From a mathematical standpoint, the Batson Process inappropriately disconnects risks from
   the chemical masses that contribute to the COC risks, and the approach double discounts the
   relative risks for most COCs. As a result, the Batson Process artificially lowers the relative
   risks/harms of most COCs and inflates the relative risk associated with 2,3,7,8-TCDD.

10. **Opinion 3**: Batson's exclusion of dioxin-like PCBs from the relative risk calculations is
    wrong because these chemicals are a significant part of the total risk in OU2. Leaving them
    out results in an underestimate of contributions for PCBs and an overestimate for the
    contributions for TCDD-TEQ (D/F).

11. **Opinion 4**: Batson's relative risk calculations are incomplete because Batson did not include
    any uncertainty or sensitivity analyses. Sensitivity analyses are a scientifically accepted way
    to test and demonstrate the soundness of analytical conclusions. Batson does not report that

7

ALCD-PUBCOM_0000838

he conducted any sensitivity analysis to test the validity of his assessments of relative risk. Thus, his conclusion that one of the eight COCs (2,3,7,8-TCDD) contributes approximately 84% to his "overall environmental harm" is not demonstrated or proved to a reasonable degree of scientific certainty. It requires verification or a reality check.

12. **Opinion 5**: The OU2 remedy consists of several elements for which the risk and harm of COCs have different implications for remediation. Three distinct elements are 1) surface sediment removal to accommodate armored capping, 2) armored capping designed to intern underlying contaminated sediment, and 3) navigational dredging. The Batson Process and resulting Batson Report treat the risks/harms of sediments for each of these remedial elements as the same when they are, in fact, very different.

8

ALCD-PUBCOM_0000839

## SUPPORTING INFORMATION FOR OPINIONS

**Opinion 1. OU2 is a major depositional area for solids and contaminants from the entire Passaic River system as well as from Newark Bay; a substantial portion of the masses of solids (i.e., mud/silt) and contaminants within OU2 originate upriver and downriver of OU2.**

13. The physical features of OU2, the estuarine circulation pattern of the river, and the salinity gradient through OU2 combine to cause contaminants and silt to be deposited in this area. OU2 contains major depositional areas for contaminants from throughout the entirety of the Passaic River system, including sources from above the Dundee Dam, below the Dundee Dam, from tributaries, and even from Newark Bay. Although only 8.3 miles in length, OU2 is where much, if not most, of the contamination entering the Passaic River system since the 19th century, came to reside. It also contains 85% of the surface silt in the Lower Passaic River ("LPR") and 90% of the silt by volume for the LPR.[8]

14. Current external sources of the silt and associated contaminants to OU2 include the Passaic River above the Dundee Dam (32% of the total), Newark Bay (14% of the total), and tributaries (6% of the total) (Table 1).[9] Historical external sources were likely larger than the estimated current contributions because the former deep navigational channel present within OU2 was filled with silt after navigational dredging ceased in the 1950s to early 1980s.[10]

---

[8] U.S. EPA. 2016. Record of Decision. Lower 8.3 Miles of the Lower Passaic River, Part of the Diamond Alkali Superfund Site, Essex and Hudson Counties, New Jersey. United States Environmental Protection Agency, Region II, New York, New York. March 3, 2016.

[9] *Id.*

[10] *Id.*

9

15. **Table 1. Percent contributions from various sources to recently deposited surface sediments of the Lower Passaic River (source: Table 3 in the U.S. EPA Record of Decision 2016).[11]**

| COC | Upper Passaic River | Newark Bay | Tributaries | CSOs-SWOs | Lower Passaic River Resuspension |
|---|---|---|---|---|---|
| Solids | 32 | 14 | 6 | 1 | 48 |
| 2,3,7,8-TCDD | 0 | 3 | 0 | 0 | 97 |
| Total TCDD | 3 | 5 | 0 | 0 | 92 |
| Total PCBs | 11 | 6 | 1 | 0 | 81 |
| DDE | 10 | 8 | 3 | 1 | 78 |
| Copper | 14 | 12 | 1 | 1 | 72 |
| Mercury | 11 | 14 | 0 | 0 | 75 |
| Lead | 19 | 7 | 2 | 2 | 71 |
| Benzo(a)pyrene | 53 | 7 | 5 | 1 | 33 |
| Fluoranthene | 47 | 5 | 6 | 2 | 40 |

16. Notes:

17. All numbers represent percent of total mass for each contaminant.

18. Benzo(a)pyrene and Fluoranthene are PAHs.

**Opinion 2. Subtracting "background" risks from the risks posed by OU2, as done in the Batson Process, is conceptually and mathematically flawed and contradicts U.S. EPA guidance. It also ignores the fact that the "background" is itself contaminated and poses risks. From a mathematical standpoint, the Batson Process inappropriately disconnects risks from the chemical masses that contribute to the COC risks, and the approach double discounts the relative risks for most COCs. As a result, the Batson Process artificially lowers the relative risks/harms of most COCs and inflates the relative risk associated with 2,3,7,8-TCDD.**

19. Because of the depositional nature of OU2, past and current contamination from the Passaic River system is now located primarily within OU2. It is this accumulated contamination from all eight COCs that contributes to the total risks associated with OU2 and for which the ROD was developed.

---

[11] *Id.*

ALCD-PUBCOM_0000841

20. The ROD's selected remedy is based on the total risks associated with each of the eight COCs and did not exclude or adjust risk based on "background" levels of contamination.[12] Batson makes conceptual and mathematical mistakes, contravenes EPA policy, and disregards the findings in the OU2 ROD when he subtracts COC-specific "background" risks[13] from his assessment of relative risks.

21. U.S. EPA explicitly rejected subtracting out "background" risk in the OU2 ROD[14] and in their review of the draft Lower Passaic River Study Area (i.e., the full 17-miles of the Passaic River or OU4) baseline human health risk assessment.[15] U.S. EPA's decision not to subtract "background" risk for OU2 is consistent with their national policy for contaminated sites.[16]

---

[12] *See generally* OU2 ROD, Section 7: Summary of Site Risks, pp. 21-22 ("In accordance with EPA's policies and guidance, the baseline risk assessments quantified risks and health hazards as the ***total exposure to contaminants in the lower 8.3 miles, without consideration of the contribution of background or other incoming contaminants to those exposures.***") (Emphasis added).

[13] *See* Batson Report Attachment A to Attachment H, p. 6 ("Risk and hazard estimates, as presented in this approach, represent OU2 (non-background) and incremental quantitative point estimates. Incremental quantitative point estimates represent adjusted values based on the site-related contribution to the system, where relevant, and ***negate contributions from naturally-occurring and anthropogenic background sources***."); *see id.,* pp. 340 and 345 (calculating "background" risks and subtracting them to determine "incremental" risks).

[14] OU2 ROD, pp. 21-22.

[15] U.S. EPA. 2015. EPA's Responses to CPG Responses to Comments on the Draft Lower Passaic River Study Area Baseline Human Health Risk Assessment. United States Environmental Protection Agency. October 16, 2015.

[16] U.S. EPA. 2002. Guidance for Comparing Background and Chemical Concentrations in Soil for CERCLA Sites. United States Environmental Protection Agency, Office of Emergency and Remedial Response. OSWER 9285.7-41. September, 2002; U.S. EPA . 2018. Frequently Asked Questions About the Development and Use of Background Concentrations at Superfund Sites: Part One, General Concepts. United States Environmental Protection Agency, Office of Superfund Remediation and Technology Innovation. OLEM Directive 9200.2-141.A March, 2018. https://semspub.epa.gov/work/HQ/100001657.pdf

11

ALCD-PUBCOM_0000842

22. In addition to being at variance with U.S. EPA's position and national guidance, Batson's exclusion of the risk of "background" contamination is flawed on conceptual, scientific, and mathematical grounds.

23. The "background" risk Batson subtracts is based on a dataset he claims represents "naturally-occurring and anthropogenic background sources"[17] from the Upper Passaic River ("UPR") above the Dundee Dam. However, the UPR has its own long history of contamination, much like the LPR and OU2, and is contaminated with many of the same COCs. In subtracting this "background" risk, Batson makes two fundamental logical errors. First, he assumes the risks resulting from "background" contamination directly cause a comparable portion of the risks present in OU2, such that the background risks must be subtracted to understand the magnitude of a theoretical incremental risk. This assumption is not scientifically valid and not supported by the available evidence, as I discuss below. Second, he does not recognize that the historical contribution of contamination to OU2 is a key part of the total risk that should be properly accounted for and properly allocated to parties or as orphan shares not attributable to the settling parties.

24. To illustrate this conceptual flaw in the Batson Process, consider the following hypothetical scenario: PCB concentrations in the sediment above the Dundee Dam (labeled as "background" PCBs) are elevated due to sources above the dam and pose a significant risk to human health and ecological receptors. PCB concentrations below the Dundee Dam (labeled as OU2 PCBs) are at the same concentration as above the Dam and also pose significant risk to human health and ecological receptors but are associated with sources below the dam. By

---

[17] See Batson report Attachment A at Attachment H, p. 6.

ALCD-PUBCOM_0000843

subtracting the PCB "background" risks from OU2 PCB risks, one would reach the false

conclusion that there is no PCB risk to human health and ecological receptors in OU2.

25. Thus, by incorrectly subtracting the "background" risk, Batson eliminates from consideration

large percentages of the actual risks for COCs found in sediments in OU2. Batson's

observation that the level of some COCs above the Dundee Dam is similar to that of some

COCs below the Dundee Dam is a coincidence rather than evidence that parties in OU2 did

not contribute to the risks in OU2. The coincidence of similar levels of contamination above

and below the dam likely reflects similar histories of industrial development in both areas

over time. Such similarities do not establish that the risks for OU2 and the LPR were *not*

caused or sourced from the settling parties, some of whom have operated on the river for

nearly a century.

26. Aside from the illogical and erroneous decision by Batson to use this false equivalence to

subtract the risks of one contaminated area (UPR) from another contaminated area (OU2),

Batson's risk subtraction approach is not the mathematically correct way to determine the

contribution of background sources in the UPR and their associated risks to the risks in OU2.

Instead, a calculation of the incremental contribution of the UPR contaminants to the OU2

contaminant inventory can be made directly using the information provided in the ROD. This

calculation is based on the mass of each COC present within recent OU2 sediments

originating from the UPR rather than using a "background" risk value disconnected from

actual mass contribution. Determining responsibility on a mass basis is crucial, as the

"overall environmental harm" of OU2 does not change;— rather, the sources of the risks

generating the harm change (i.e., associated parties and/or orphan shares).

27. The direct calculation of the "background" contribution involves using the information

provided in the ROD on the inventories of COCs associated with the "background" source

13

(Table 1). The ROD shows us that the "background" source contribution of PCBs to OU2 levels is 11%; thus, the balance of 89% of the PCBs within OU2 are associated with sources to the LPR below the Dundee Dam. The "background" source contributions of other COCs are also provided in the ROD, including DDE at 10%, mercury at 11%, and copper at 14%. This information can be used to differentiate risks between "background" and "non-background" source contributions to OU2. This method properly establishes the contributions and relative responsibilities of parties, including those located above and below the Dundee Dam, as well as orphan shares. "Background" contributions are a part of the total risk and should not be excluded. Instead, "background" contributions represent a portion of the orphan shares or known parties also contributing to contamination above the dam.

28. Batson acknowledges in his report that source contributions to the COC mass in OU2 should be used to redistribute the responsibility of the risks. As a result, Batson proposes the use of an "…alternative method for the redistribution of risks attributable to the contributions of any Orphan Parties," as seen in sub-steps 2c and 2d of his allocation methodology.[18] However, in subtracting orphan share responsibility from participating allocation parties' ("PAPs") COC mass contributions, as well as incorrectly subtracting "background" risk from OU2 risk, Batson effectively doubles the reduction of allocation party shares. This is particularly biased towards increasing the risks assigned to 2,3,7,8-TCDD because unlike background contributions of other COCs, 97% of 2,3,7,8-TCDD in OU2 deposited surface sediments is due to OU2 resuspension (Table 1). Therefore, not only does Batson ignore technical guidance regarding the treatment of background risk, he also sloppily double-counts source

---

[18] Batson, D. 2020. Diamond Alkali Superfund Site OU2 Allocation Recommendation Report. AlterEcho. December 28, 2020.

14

ALCD-PUBCOM_0000845

reductions, resulting in an inappropriately high share of "overall environmental harm" for 2,3,7,8-TCDD.

29. The implications and magnitudes of the Batson Process are evident in Table 3 of Attachment H in his report.[19] Subtraction of background results in 84% contribution of TCDD-TEQ (D/F) to "overall environmental harm" (Scenario 1, Figure 1A). Retaining "background"—as is appropriate—yields a lower, 74% contribution of TCDD-TEQ (D/F) to "overall environmental harm" (Scenario 2, Figure 1B).

---

[19] Batson, D. 2020. Diamond Alkali Superfund Site OU2 Allocation Recommendation Report. AlterEcho. December 28, 2020.

15

ALCD-PUBCOM_0000846



**Figure 1. Relative contributions of COCs to "overall environmental harm" based on the subtraction of "background".** A) Scenario 1: Batson's baseline case with the subtraction of background samples resulting in a TCDD TEQ (D/F) contribution of 84%. B) Scenario 2: Batson's baseline case without the subtraction of background samples resulting in a TCDD TEQ (D/F) contribution of 74%.

ALCD-PUBCOM_0000847

**Opinion 3. Batson's exclusion of dioxin-like PCBs from the relative risk calculations is wrong because these chemicals are a significant part of the total risk in OU2. Leaving them out results in an underestimate of contributions for PCBs and an overestimate for the contributions for TCDD-TEQ (D/F).**

30. The PCBs present in OU2 include non-dioxin-like PCBs (confusingly referred to as "Total PCBs" in the OU2 risk assessments and ROD and dioxin-like PCBs.[20] The PCBs present in OU2 are comprised of the sum of both non-dioxin-like and dioxin-like PCB. Both contribute to the risks calculated for OU2 and are determined in the ROD to require remediation. PCBs are made up of 209 different compounds, referred to as congeners. Twelve of the 209 different PCB congeners are structurally similar to 2,3,7,8-TCDD and cause dioxin-like toxicity.[21] The toxicity of dioxin-like PCBs congeners can be expressed by weighting the toxicity of each dioxin-like PCB congener against that of 2,3,7,8-TCDD.[22] The overall toxicity of the mixture of dioxin-like PCBs is expressed as the sum of the 2,3,7,8-TCDD equivalents of the 12 dioxin-like PCB congeners. The OU2 risk assessment reported the risk associated with exposure to dioxin-like PCBs, separately from risk for non-dioxin-like PCBs,

---

[20] Louis Berger Group, Inc. 2014. Focused Feasibility Study Report for the Lower Eight Miles of the Lower Passaic River; Louis Berger Group, Inc. 2014. Remedial Investigation Report for the Focused Feasibility Study of the Lower Eight Miles of the Lower Passaic River; U.S. EPA. 2016. Record of Decision. Lower 8.3 Miles of the Lower Passaic River, Part of the Diamond Alkali Superfund Site, Essex and Hudson Counties, New Jersey. United States Environmental Protection Agency, Region II, New York, New York. March 3, 2016.

[21] PCB congeners with dioxin-like toxicity are those known to bind to a specific type of cellular receptor and elicit a specific suite of toxic or biochemical responses.

[22] For example, PCB congener No. 126 is one-tenth as toxic as 2,3,7,8-TCDD to mammals.

17

ALCD-PUBCOM_0000848

which as noted above are referred to in the risk assessment as "Total PCBs".[23] Batson
ignores this.

31. U.S. EPA specifically stated in its U.S. EPA's October 16, 2015 response to comments from
the LPR Cooperating Parties Group that risk from dioxin-like PCBs should be included in
any consideration of environmental harm, stating:

> "Consistent with EPA's documents titled "Use of Dioxin TEFs in Calculating Dioxin
> TEQs at CERCLA and RCRA Sites" (2013 Guidance) and the "1996 Reassessment
> of PCB Cancer" (1996 Guidance), cancer risks and non-cancer hazards should be
> provided for Total PCBs, dioxin-like PCBs and non-dioxin like PCBS and dioxin
> TEQ…"[24]

Thus, U.S. EPA did not exclude the risk from dioxin-like PCBs from its own risk
assessment, and it was a fundamental error for Batson to exclude the risks from dioxin-like
PCBs from his allocation. By excluding dioxin-like PCBs, Batson's relative risk number for
"dioxin" of 83.92% is overstated because it is incorrectly calculated by excluding dioxin-
like PCBs.

32. Although Batson acknowledges that the OU2 risk assessment separately evaluated both
dioxin-like PCBs[25] and non-dioxin-like PCBs (e.g., "Total PCBs"), the Batson Report

---

[23] Louis Berger Group, Inc. 2014. Focused Feasibility Study Report for the Lower Eight Miles of
the Lower Passaic River; Louis Berger Group, Inc. 2014. Remedial Investigation Report for the
Focused Feasibility Study of the Lower Eight Miles of the Lower Passaic River; The Batson
Report states: "The PCB contribution to the TCDD-TEQ was separately evaluated in the risk
assessments, and to avoid 'double-counting' of exposures and risks, the 12 dioxin-like PCB
congeners were excluded from quantification of Total PCBs."

[24] U.S. EPA. 2015. EPA's Responses to CPG Responses to Comments on the Draft Lower
Passaic River Study Area Baseline Human Health Risk Assessment. October 16, 2015.

[25] Dioxin-like PCBs are referred to in the OU2 risk assessment as TCDD TEQ (PCBs).

ALCD-PUBCOM_0000849

provides two reasons for excluding risks associated with dioxin-like PCBs from the relative

risk calculations.[26] First, Batson states that that dioxin-like PCBs were excluded in part

because U.S. EPA did not develop specific sediment PRGs for dioxin-like PCBs.[27] The lack

of a sediment PRG for dioxin-like PCBs does not mean that dioxin-like PCBs do not

contribute to "overall environmental harm" and cannot be included in the allocation.[28] In

fact, the risks inherent in dioxin-like PCBs are central to EPA's analysis of overall PCB risks

and total COC risks in OU2.[29] Second, Batson states that exclusion of dioxin-like PCBs

facilitated comparisons among various lines of evidence ("LOE") for which risk of dioxin-

like PCBs could not be evaluated.[30] It is apparent from this statement that dioxin-like PCBs

were excluded from the Batson Process in part because of the inability to evaluate risk to

benthic invertebrates, a group of organisms that are relatively insensitive to the effects of

dioxin-like PCBs in comparison to other organisms (e.g., humans and early life stages of fish

and birds). However, this does not mean the risks of dioxin-like PCBs do not exist for

humans or other ecological receptors. Further, Batson's argument could have been applied to

---

[26] Batson, D. 2020. Diamond Alkali Superfund Site OU2 Allocation Recommendation Report. AlterEcho. December 28, 2020.

[27] *Id.*

[28] *Id.*

[29] As U.S. EPA explained in the ROD at footnote 13, "PCBs were evaluated as the sum of 12 dioxin-like congeners (TCDD TEQ based on individual congener TEFs) and the sum of non-dioxin like congeners." Similarly, the human health risks of dioxin-like PCBs are evaluated with dioxins/furans in EPA's "Dioxin TEF Approach." *See* ROD at 7.1.3.4. Notably, the ROD also treats the human health risks of dioxin-like PCBs and other PCBs separately, finding that "The primary contributors to excess risk are dioxins/furans (70 percent for fish consumption and 82 percent for crab consumption), dioxin-like PCBs (11 percent for fish consumption and 12 percent for crab consumption) and non-dioxin-like PCBs (16 percent for fish consumption and 5 percent for crab consumption.") *Id.* at 7.1.4.1.

[30] *Id.*

19

ALCD-PUBCOM_0000850

other COCs for which risk information was not available. For example, some COCs such as copper, lead, and PAHs do not have estimates for human health risks. Eliminating dioxin-like PCBs from the PCB portion of the allocation is wrong and inconsistent with other aspects of the Batson Process.

33. The Batson Process for PCBs has the consequence of incorrectly increasing the contribution of TCDD TEQ (D/F) and decreasing the contribution of PCBs to "overall environmental harm". When Batson's error is corrected, the contribution of TCDD-TEQ (D/F) to "overall environmental harm" decreases from 74% for the Baseline Case (Scenario 2, Figure 2A) without dioxin-like PCBs to 69% (Scenario 3, Figure 2B) with the inclusion of dioxin-like PCBs.

ALCD-PUBCOM_0000851



**Figure 2. Relative contributions of COCs to "overall environmental harm" based on the addition of dioxin-like PCBs.** A) Scenario 2: Batson's baseline case without the subtraction of background samples resulting in a TCDD TEQ (D/F) contribution of 74%. B) Scenario 3: Batson's baseline case without the subtraction of background samples and with the addition of dioxin-like PCBs resulting in a TCDD TEQ (D/F) contribution of 69%.

21

ALCD-PUBCOM_0000852

**Opinion 4. Batson's relative risk calculations are incomplete because Batson did not
include any uncertainty or sensitivity analyses. Sensitivity analyses are a scientifically
accepted way to test and demonstrate the soundness of analytical conclusions. Batson does
not report that he conducted any sensitivity analysis to test the validity of his assessments
of relative risk. Thus, his conclusion that one of the eight COCs (2,3,7,8-TCDD) contributes
approximately 84% to his "overall environmental harm" is not demonstrated or proved to
a reasonable degree of scientific certainty. It requires verification or a reality check.**

34. Batson utilized only one set of inputs and one set of assumptions in his relative risk
    calculations, that in turn yielded one set of hazard estimates for human health and the
    environment. After subtracting "background" hazard estimates from the OU2 hazard
    estimates (as described in my second opinion), Batson then calculated the percent
    contribution of each COC to the total risk from all COCs to each receptor (human or
    ecological). For each COC, Batson then averaged the percent contributions for ecological
    risk, human health noncancer risk and cancer risk to compute the percent contribution of
    each COC to what he calls an "overall environmental harm". But, contradicting accepted
    scientific techniques, Batson does not vary any input or adjust any of the assumptions he
    used in his hazard estimates to see how sensitive his calculations were to the inputs or
    assumptions he chose to use. Thus, the accuracy of his calculations is unknown and, in any
    event, has not been demonstrated to any reasonable degree of scientific certainty using
    accepted scientific methods.

35. A comparison of the concentrations of COCs in surface sediment samples throughout OU2 to
    their corresponding risk-based sediment remediation goals ("RGs") provides a reality check
    on Batson's relative risk calculations, showing his approach does not appropriately reflect the
    actual cleanup mandated in the OU2 ROD. Sediment clean-ups often use exceedance of risk-

22

based sediment RGs to determine the spatial extent of the required sediment remediation. The RGs are themselves based on the toxicity of the compounds as well as exposure levels. In short, the RGs are the risk-based values that drive the remediation; the scale of the harm is related to the scale of exceedances.

36. The OU2 RI/FFS[31] and the ROD[32] state that all of the eight OU2 COCs (copper, lead, mercury, PAHs, dieldrin, Total DDx, Total PCBs, and 2,3,7,8-TCDD) pose unacceptable risks or harm on their own. Risk is already, therefore, embedded in the RGs. Harm warranting remediation exists when exposures of the harmful COCs exceed their respective thresholds. In OU2, risk-based sediment preliminary remediation goals ("PRGs")[33] were only developed for mercury, Total DDx, Total PCBs, and 2,3,7,8-TCDD, because "...they are *representative* [emphasis added] COCs and because there were multiple lines of evidence developed to evaluate how the alternatives would achieve PRGs for these four COCs after remediation".[34] A comparison of the spatial (or volumetric) extent of remediation required

[31] Louis Berger Group, Inc. 2014. Focused Feasibility Study Report for the Lower Eight Miles of the Lower Passaic River; Louis Berger Group, Inc. 2014. Remedial Investigation Report for the Focused Feasibility Study of the Lower Eight Miles of the Lower Passaic River.

[32] U.S. EPA. 2016. Record of Decision. Lower 8.3 Miles of the Lower Passaic River, Part of the Diamond Alkali Superfund Site, Essex and Hudson Counties, New Jersey. United States Environmental Protection Agency, Region II, New York, New York. March 3, 2016.

[33] Chemical-specific sediment-based PRGs were developed for OU2 because there are no chemical-specific applicable or relevant and appropriate requirements ("ARARs"). The OU2 PRGs were developed based on risk-based fish and crab-tissue concentrations that are protective of human health and the environment as well as sediment concentrations that are protective of benthic organisms (OU2 FFS; Louis Berger Group, Inc. 2014). PRGs become final RGs when EPA selects a remedy after considering public comments and issues a ROD.

[34] Louis Berger Group, Inc. 2014. Focused Feasibility Study Report for the Lower Eight Miles of the Lower Passaic River; U.S. EPA. 2016. Record of Decision. Lower 8.3 Miles of the Lower Passaic River, Part of the Diamond Alkali Superfund Site, Essex and Hudson Counties, New Jersey. United States Environmental Protection Agency, Region II, New York, New York. March 3, 2016.

ALCD-PUBCOM_0000854

for *each* COC shows that nearly the same remediation and associated costs are required for each COC, regardless of the presence of other COCs.

37. I illustrate this simple and straightforward comparison for "Total PCBs"[35] in Figure 3. The figure shows the spatial distribution of "Total PCBs" in OU2 surface sediments as reported in the OU2 RI/FFS and as used in the Batson allocation report.[36, 37] The data is shown as a cumulative distribution from lowest to highest concentrations. This figure shows that nearly all of the surface sediment samples in OU2 exceed the RG for "Total PCBs" (50 µg/kg sediment). This is also the case for mercury, Total DDx, and 2,3,7,8-TCDD in surface sediment samples; nearly all samples exceed their respective RGs (see Attachment 2, incorporated here by reference). Therefore, the *same* remedial approach to the clean-up of the sediments in OU2 would be required due to the presence of COCs other than 2,3,7,8-TCDD and the cost of the remedy is likewise driven by all COCs. This reality check shows that Batson's relative risk calculations are not prepared to a reasonable degree of scientific certainty, using acceptable scientific methods, and do not conform to the findings in the U.S. EPA's ROD. The Batson Report does not provide the necessary and complete picture of what is driving the remedy or its associated costs. Instead, through the use of the erroneous assumptions described above, Batson biases the relative risks to increase the responsibility of

---

[35] The sum of the non-dioxin like PCBs.

[36] Batson, D. 2020. Diamond Alkali Superfund Site OU2 Allocation Recommendation Report. AlterEcho. December 28, 2020; Louis Berger Group, Inc. 2014. Focused Feasibility Study Report for the Lower Eight Miles of the Lower Passaic River; Louis Berger Group, Inc. 2014. Remedial Investigation Report for the Focused Feasibility Study of the Lower Eight Miles of the Lower Passaic River.

[37] The sediment dataset included 179 total samples collected during the 2008 low resolution coring study, the 2009 benthic sediment study, or the 2010 CPG benthic sediment study. To remain consistent with the data used in the Batson Report, sample LPRT03G was removed from the dataset resulting in 178 total samples used in our comparisons.

24

2,3,7,8-TCDD, while minimizing the risks of other COCs. To prove otherwise, Batson

should have provided a robust uncertainty analysis of his relative risk calculations.



**Figure 3**. **Total PCB (i.e., non-dioxin-like PCBs) concentrations in sediment samples used in the 2014 FFS for the lower 8.3 miles of the Passaic River.** A) Concentrations of sediment samples organized by river mile to show spatial distribution; B) Concentrations of sediment samples organized by lowest to highest concentration; C) Concentrations of sediment samples organized by lowest to highest concentration on a log scale. The yellow line indicates the ROD selected RG value of 50 µg/kg equal to the non-cancer sediment PRG based on 56 fish meals per year. The purple line indicates the background sediment concentration value of 460 µg/kg.

25

**Opinion 5. The OU2 remedy consists of several elements for which risk and harm of COCs have different implications for remediation. Three distinct elements are 1) surface sediment removal to accommodate armored capping, 2) armored capping designed to intern underlying contaminated sediment, and 3) navigational dredging. The Batson Process and resulting Batson Report treat the risks/harms of sediments for each of these remedial elements as the same when they are, in fact, very different.**

38. Surface sediment removal to accommodate capping is most closely related to the risk assessment for surface sediments. As such, a risk-based allocation approach, (although not an approach as flawed as the Batson Process), would be appropriate.

39. The internment of deeper contaminated sediments via an armored cap is analogous to creating a landfill or constructing a cover for a confined aquatic disposal ("CAD")[38] cell. The interned sediments contain most of the historical contaminants that have entered the Passaic. The estimated masses of the eight COCs and the percent compositions of the eight COCs to the masses are shown in Table 2. Notably, 2,3,7,8-TCDD is a tiny fraction of the pollutant mass that would be interned by the remedy. On the other hand, because of toxicity, risk thresholds are exceeded for this compound and for all eight COCs. This is the reason why incorporating toxicity as an exceedance of a risk threshold, as presented in Opinion 3, makes the most sense for some portions of the remedy. The capping portion of the remedy serves to intern all eight harmful COCs because all *must be* interned and no single COC has a disproportionate influence on the need for capping contaminated sediment.

---

[38] Confined aquatic disposal ("CAD") cells are constructed to reduce the risk from unacceptably contaminated sediments ("UCSs") by storing them in a depression in the bottom of an aquatic system.

ALCD-PUBCOM_0000857

40. **Table 2. The estimated masses of COCs in OU2 (source: Table 1 in Attachment Q of the Batson Report).**

| Contaminant | Original Mass | Removal Phase I | Remaining Mass | Percent of Total | Remedial Mass | Percent of Total |
|---|---|---|---|---|---|---|
| Copper | 2,100,100 | 12,000 | 2,088,100 | 36.29% | 570,000 | 35.74% |
| Lead | 3,200,000 | 16,000 | 3,184,000 | 55.34% | 860,000 | 53.93% |
| Dieldrin | 390 | 230 | 160 | 0.0028% | 30 | 0.00% |
| LMW PAH | 170,000 | 700 | 169,300 | 2.94% | 64,000 | 4.01% |
| HMW PAH | 240,000 | 1,300 | 238,700 | 4.15% | 82,000 | 5.14% |
| 2,3,7,8-TCDD | 38 | 9.8 | 28 | 0.0005% | 6 | 0.0004% |
| Total 4,4'-DDx | 27,000 | 21,000 | 6,000 | 0.10% | 570 | 0.0357% |
| Mercury | 42,000 | 240 | 41,760 | 0.73% | 11,000 | 0.69% |
| Total PCB | 26,000 | 230 | 25,770 | 0.45% | 7,200 | 0.45% |
| | | Total mass = | 5,753,818 | | 1,594,806 | |

41. The remedy also includes several hundred millions of dollars of costs associated with deep sediment removal for navigational purposes.[39] This action is clearly not motivated by risk or harm from hazardous substances, and does not fit with the "overall environmental harm" allocation approach employed by Batson.[40] A substantial portion of this aspect of the remedy is also for economic purposes rather than risk reduction. Allocating the cost for a beneficial, economically-driven use, such as navigational dredging, to a risk-based remediation, does not make sense. Further, this element of the remedy is comprised of several sub-elements which are variably related to risk reduction. In my opinion, this portion of the allocation needs to be rethought. It may be appropriate to use methods aligned with the nature of the remediation with respect to risk as well as to consider the economic aspects of the navigational components so that those costs are not unfairly attributed to the PAPs.

---

[39] U.S. EPA. 2016. Record of Decision. Lower 8.3 Miles of the Lower Passaic River, Part of the Diamond Alkali Superfund Site, Essex and Hudson Counties, New Jersey. United States Environmental Protection Agency, Region II, New York, New York. March 3, 2016.

[40] Batson, D. 2020. Diamond Alkali Superfund Site OU2 Allocation Recommendation Report. AlterEcho. December 28, 2020.

ALCD-PUBCOM_0000858

## CONCLUSIONS

42. My opinions lead to the following conclusions:

- The Batson Report relies on the Batson Process, which is conceptually and mathematically flawed. It includes unsupportable conceptual errors, mathematical errors, and logical fallacies that render it unreliable as an estimate of any party's responsibility for the cost of the OU2 remedy. Collectively, Batson's serious errors generate markedly higher estimates of cost responsibility for 2,3,7,8-TCDD relative to other COCs. This outcome is not supported by the data or a scientifically sound approach for determining how much 2,3,7,8-TCDD and the other COCs contribute to the overall risk to the environment in OU2.

- Clearly, Batson erred by subtracting "background" risk and by excluding the risk of dioxin-like PCBs as these would be additive and not duplicative for the PCB risk.

- The Batson Process as it relates to the derivation and application of relative risk numbers is incomplete as it does not include any uncertainty or sensitivity analyses. A simple reality check shows that there can be a wide departure in estimates of relative risk and responsibility by simply evaluating risk-based remediation using site-specific risk-based thresholds for harm.

- The re-establishment of a deep navigational channel at the lower end of the remedy is not solely a risk or harm matter: it is a major economic component. As such, the allocation costs should reflect both the nature of this portion of the remedy as well as the benefits that accrue from the deep sediment dredging. The Batson Process is separately flawed because it considered neither.

28

ALCD-PUBCOM_0000859

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED on March 21, 2023

_____
Charles A. Menzie, Ph.D.

ALCD-PUBCOM_0000860

## ATTACHMENT 1

## RESUME OF CHARLES A. MENZIE, Ph.D.

ALCD-PUBCOM_0000861





Charles A. Menzie, Ph.D.
Principal Scientist| Ecological & Biological Sciences
15375 SE 30th Place, Suite 250 | Bellevue, WA 98007
(571) 214-3648 tel  | camenzie@exponent.com

**Professional Profile**

Dr. Menzie specializes in the application of risk assessment and causal analysis methods for evaluating the potential for effects and for diagnosing the causes of environmental harms and damages. His technical expertise includes the evaluation of the environmental fate and effects of physical, biological, and chemical stressors on terrestrial and aquatic systems. He has applied his expertise to situations involving nutrient enrichment, chemical contamination, use of pesticides and other chemical products, oil and gas operations, fossil fuel and nuclear power plants, alternative energy projects, mining, invasive species, water management, and vulnerability assessments for climate change. He has a working knowledge on how to approach these issues within the appropriate national and international policy and regulatory frameworks.

Having worked in the environmental field for close to 40 years, Dr. Menzie has had wide geographic experience. This includes all geographic regulatory jurisdictions in the United States (e.g., U.S. EPA Regions) and Canada (provinces). He has also worked in South America (Ecuador, Colombia, Argentina and Uruguay), the middle east (Yemen), the South China Sea, the Indian Ocean (Diego Garcia), and Australia.

Dr. Menzie has provided his ecological and environmental expertise on issues in a diversity of environments. These include most coastal areas of the United States, major river systems of North and South America, freshwater lakes, forest ecosystems of California, rainforests of Ecuador, salt and other marshes of the east and Gulf coasts, the Atlantic outer continental shelf and slope off North America, deep water environs off Hawaii and Puerto Rico, the desert island atoll of Diego Garcia, and the Yemen desert.

With regard to particular groups of compounds, Dr. Menzie has extensive experience with polychlorinated biphenyls (PCBs), polycyclic aromatic hydrocarbons (PAHs), chlorinated pesticides, commercial biocides, and metals with an emphasis on lead, chromium, arsenic, cadmium, and nickel. As part of his risk assessment practice, he has developed exposure and food web models to evaluate how people and ecological receptors may be exposed to these chemicals. These include several spatially-explicit models used to refine exposure estimates. Dr. Menzie has also worked on nutrient enrichment issues related to nitrogen and phosphorus.

1

ALCD-PUBCOM_0000862

## Academic Credentials & Professional Honors

Ph.D., Biology, City University of New York, 1978

M.A., Biology, City College of New York, 1974

B.S., Biology, Manhattan College, 1971
Risk Practitioner Award from the Society of Risk Analysis

Fellow of the Society of Risk Analysis

Fellow of the Society of Environmental Toxicology and Chemistry

Lifetime Achievement Award from the Association for Environmental health of Soils

Champion Award for Women's Council on Energy and the Environment

Dr. Menzie has been called upon to lead and/or participate in numerous peer-review panels and workgroups on behalf of government and industry

## Licenses and Certifications

OSHA Certified Eight-Hour HAZWOPER Annual Refresher Training in Hazardous Waste Operations and Emergency Response, updated annually

OSHA Certified 40-Hours of Training in Hazardous Waste Operations and Emergency Response

## Prior Experience

Principal and President, Menzie-Cura & Associates, Inc., 1983-2006

Manager of Environmental Services Department, EG&G Environmental Consultants, 1976-1983

Lecturer, Boston University and University of Lowell, 1978-1993

## Patents

U.S. Patent # 7,824,129: A Low-Impact Delivery System for In-Situ Treatment of Contaminated Sediment.

## Publications

Menzie CA, Kashuba RO, Goodfellow WL. Implications of sample size, rareness, and commonness for derivation of environmental benchmarks and criteria from field and laboratory data. Ecotoxicol Enviro Saf 2020; 190: 110 – 117.

2

ALCD-PUBCOM_0000863

Taylor AA, Tsuji JS, Garry MR, McArdle ME, Goodfellow WL, Adams WJ, Menzie CM. 2020. Critical review of exposure and effects: implications for setting regulatory health criteria for ingested copper. Environ Manage 65: 131 – 159.

Bridges T, Newell S, Kennedy A, Moore D, Ghosh U, Needham T, Xia H, Kim K, Menzie CA, and Kulacki K. Long-term stability and efficacy of historic activated carbon (AC) deployments at diverse freshwater and marine remediation sites. ERDC/EL TR-20-9 2020.

Sanders JP, Andrade NA, Menzie CA, Amos CB, Gilmour CC, Henry EA, Brown SS, Ghosh U. Persistent reductions in the bioavailability of PCBs at a tidally inundated Phragmites australis marsh amended with activated carbon. Env. Tox. Chem. 2018; 37: 2496-2505.

Ruby MV, Lowney YW, Bunge AL, Roberts SM, Gomez-Eyles JL, Ghosh U, Kissel JC, Tomlinson P, Menzie CA. Oral bioavailability, bioaccessibility, and dermal absorption of PAHs from soil—state of the science. Env. Sci Tech. 2016; 50: 2151-2164.

Menzie CA, Amos CB, Kane-Driscoll S, Ghosh U, and Gilmour C. 2016. Evaluating the efficacy of a low impact delivery system for in-situ treatment of sediments contaminated with methylmercury and other hydrophobic chemicals. ESTCP Project ER-200835 Final Report, February 30, 2016.

Menzie CA, Kane-Driscoll S, Thompson T. Integrating Passive Sampling Methods into Management of Contaminated Sediment Sites: A Guide for Department of Defense Remedial Project Managers 2016: ESTCP Project ER-201216

Patmont C, Ghosh U, LaRosa, P, Menzie C et al. In situ sediment treatment using activated carbon: A demonstrated sediment cleanup technology. Integrated Environmental Assessment and Management 2015; 11: 195-207.

Menzie C, Deardorff TL, Ma J, Edwards M. Risk factors that contribute to the occurrence of catastrophic wildfires in California. World Environmental and Water Resources Congress 2015; 2617-2626.

Greenberg MS, Chapman PM, Allan IJ, Anderson KA, Apitz SE, Beegan C, Bridges TS, Brown SS, Cargill IV JG, McCulloch MC, Menzie CA, Shine JP, Parkerton TF. Passive sampling methods for contaminated sediments: Risk assessment and management. Integrated Environmental Assessment and Management 2014 April; 10(2):224-236.

Staveley J, Law S, Fairbrother A, Menzie C. A causal analysis of observed declines in managed honey bees (*Apis mellifera*). Human and Ecological Risk Assessment 2014; 20:566-591.

Gilmour CC, Riedel GS, Riedel G, Kwon S, Landis R, Brown SS, Menzie CA, Ghosh U. Activated carbon mitigates mercury and methylmercury bioavailability in contaminated sediments. Environmental Science and Technology 2013, in press. DOI: 10.1021/es4021074.

Salatas JH, Gard NW, Wickwire TW, Menzie CA. Stressor analysis approaches for endangered species assessments. Natural Science 2013; 5:27-35.

3

Richkus WA Menzie CA. Application of an ecological risk assessment for evaluation of alternatives considered for restoration of oysters in Chesapeake Bay: Background and approach. Human and Ecological Risk Assessment 2013; 19(5):1172-1186.

Menzie CA Salatas, JH Wickwire TW. Ecological risks associated with oyster restoration options for Chesapeake Bay. Human and Ecological Risk Assessment 2013; 19(5):1204-1233.

Landis WG, Durda JL, Brooks ML, Chapman PM, Menzie CA, Stahl RG Jr, Stauber JL. Ecological risk assessment in the context of global climate change. J Environ Toxicol Chem 2013 Jan; 32(1):79-92. doi: 10.1002/etc.2047.

Menzie CA, Deardorff T, Booth P, Wickwire T. Refocusing on nature: Holistic assessment of ecosystem services. Integr Environ Assess Manag 2012 Jul; 8(3):401-411. doi: 10.1002/ieam.1279. Epub 2012 Jun 5.

Gard NW, Menzie CA. A causal/risk analysis framework for informing endangered species jeopardy reviews for pesticides. Chapter 11. In: Pesticide Regulation and the Endangered Species Act, ACS Symposium Series No. 1111, 2012. Published online: http://pubs.acs.org/isbn/9780841227033.

Cantor R, Menzie C. Seeing the forest through the trees: NRD and dynamic ecosystems. ABA Toxic Torts and Environmental Law Committee Newsletter Winter 2012.

Deardorff TL, Menzie C, Pryke D. Uruguay's Orion Mill wins landmark environmental case before the World Court. Paper 360 ° 2011; 40-42.
Menzie CA, Cantor R, Boehm P. Business planning for climate change: Identifying vulnerabilities and planning for changes in water, temperature, sea level, natural resources, health effects, and extreme events. Environmental Claims Journal 2011; 23(3-4):190-198.

Gard N, Fairbrother A, Menzie C. A causal analysis framework for informing endangered species jeopardy reviews. ACS Meeting, Denver, CO, 2011.

Ghosh U, Luthy RG, Cornelissen G, Werner D, Menzie CA. In-situ sorbent amendments: A new direction in contaminated sediment management. Environmental Science and Technology 2011; 45:1163-1168.

Kane Driscoll SB, McArdle ME, Menzie CA, Reiss M, Steevens JA. A framework for using dose as a metric to assess toxicity of fish to PAHs. Ecotoxicology and Environmental Safety 2010; 73:486-490.

Wenning RJ, Finger SE, Guilhermino L, Helm RC, Hooper MJ, Landis WG, Menzie CA, Munns Jr, WR, Römbke J, Stahl Jr., RG. Global climate change and environmental contaminants: A SETAC call for research. Integrated Environmental Assessment and Management 2010; 6(2):197-198.

ALCD-PUBCOM_0000865

Wickwire T, Menzie CA. The causal analysis framework: Refining approaches and expanding multidisciplinary applications. Human and Ecological Risk Assessment 2010; 16(1).

Menzie CA, Ziccardi LM, Lowney YW, Fairbrother A, Shock SS, Tsuji JS, Hamai D, Proctor D, Henry E, Su SH, Kierski MW, McArdle ME, Yost LJ. Importance of considering the framework principles in risk assessment for metals. Environmental Science and Technology 2009; 43(22):8478-8482.

Kane Driscoll SB, Amos CB, McArdle ME, Menzie CA, Coleman A. Predicting sediment toxicity at former manufactured gas plants using equilibrium partitioning benchmarks for PAH Mixtures. Soil & Sediment Contamination 2009; 18(3):307-319.

Menzie CA, Southworth B, Stephenson G, Feisthauer N. The importance of understanding the chemical form of a metal in the environment: The case of barium sulfate (barite). Human and Ecological Risk Assessment 2008; 14(5):974-991.

Menzie CA, Coleman AJ. Debate & commentary. Polycyclic aromatic hydrocarbons in sediments: An overview of risk-related issues. Human and Ecological Risk Assessment 2007; 13(2):269-275.

Menzie CA, MacDonell MM, Mumtaz M. A phased approach for assessing combined effects from multiple stressors. Environmental Health Perspectives 2007; 115(5):807-816.

Johnson, MS, Wickwire WT, Quinn MJ, Ziolkowski DJ, Burmistrov D, Menzie CA, Geraghty C, Minnich M, Parsons PJ. Are songbirds at risk from lead at small arms ranges? An application of the Spatially Explicit Exposure Model (SEEM). Environmental Toxicology & Chemistry 2007; 26(10):2215-2225.

Magar VS, Wenning RJ, Menzie C, Apitz SE. Parsing ecological impacts in watersheds. Journal of Environmental Engineering 2006; 132(1):1-3.

Menzie CA, Lacey R. Ecological risk assessment in a new millennium: Where are we going? Risk Policy Report 2002; 9(3):36-38.

von Stackelberg K, Menzie C. A cautionary note on the use of species presence and absence data in deriving sediment quality criteria. Environmental Toxicology & Chemistry 2002; 21(2):466-472.

Menzie CA, Hoeppner SS, Cura JJ, Freshman JS, LaFrey EN. Urban and suburban storm water runoff as a source of polycyclic aromatic hydrocarbons (PAHs) to Massachusetts estuarine and coastal environments. Estuaries 2002; 25(2):165-176.
Shatkin JA, Wagle M, Kent S, Menzie CA. Development of a biokinetic model to evaluate dermal absorption of polycyclic aromatic hydrocarbons from soil. Human and Ecological Risk Assessment 2002; 8(4):713-734.

Menzie CA. Hormesis in ecological risk assessment: A useful concept, a confusing term, and/or a distraction? Belle Newsletter 2001; 10(1):17-20.

ALCD-PUBCOM_0000866

Menzie CA, Wickwire WT. Defining populations: A key step in identifying spatial and temporal scales. Toxicology & Industrial Health 2001; 17:223-229.

Menzie CA, Burke AM, Grasso D, Harnois M, Magee B, McDonald D, Montgomery C, Nichols A, Pignatello J, Price B, Price R, Rose J, Shatkin J, Smets B, Smith J, and Svirsky S. An approach for incorporating information on chemical availability in soils into risk assessment and risk-based decision making. Human and Ecological Risk Assessment 2000; 6(3):479-510.

Menzie CA. Applying risk-based solutions — the importance of communication. Journal of Environmental Engineering 1999; 35(4):20-22.

Menzie CA. Risk communication and careful listening — resolving alternative world views. Human and Ecological Risk Assessment 1998; 4(3):619-622.

Charles JC, Menzie CA. Identifying Southeast Asian immigrant populations in Massachusetts at risk from eating contaminated shellfish. Journal of Environmental Management 1998; 52:161-171.

Menzie CA. Implementing risk management at manufactured gas plant sites. Soil Groundwater Cleanup 1997 Aug/Sept; 12-18.

Menzie CA, Freshman JS. An assessment of the risk assessment paradigm for ecological risk assessment. Human and Ecological Risk Assessment 1997; 3(5):853-892.

Freshman JS, Menzie CA. Two wildlife exposure models to assess impacts at the individual and population levels and the efficacy of remedial actions. Human and Ecological Risk Assessment 1996; 2(3):481-496.

Menzie CA, Henning MH, Cura J, Finkelstein K, Gentile J, Maughan J, Mitchell D, Petron S, Potocki B, Svirsky S, Tyler P. Special report of the Massachusetts weight-of-evidence workgroup: A weight-of-evidence approach for evaluating ecological risks. Human and Ecological Risk Assessment 1996; 2(2):277-304.

Menzie CA. The question is essential for ecological risk assessment. Human and Ecological Risk Assessment 1995; 1(3):159-162.

Menzie CA, Potocki B, Santodonato J. Exposure to carcinogenic PAHs in the environment. Environmental Science and Technology 1992; 26(7):1278-1284.

Menzie CA, Burmaster DE, Freshman JS, Callahan CA. Assessment of methods for estimating ecological risk in the terrestrial component: A case study at the Baird & McGuire Superfund Site in Holbrook, Massachusetts. Environmental Toxicology & Chemistry 1992; 11:245-260.

Callahan CA, Menzie CA, Burmaster DE, Wilborn DC, Ernst T. On-site methods for assessing chemical impact on the soil environment using earthworms: A case study at the Baird &

6

ALCD-PUBCOM_0000867

McGuire Superfund Site, Holbrook, MA. Environmental Toxicology & Chemistry 1991; 10(6):817-826.

Burmaster DE, Menzie CA, Freshman JS, Burris JA, Maxwell Nl, Drew SR. Assessment of methods for estimating aquatic hazards at Superfund-type sites: A cautionary tale. Environmental Toxicology & Chemistry 1991; 10(6):827-842.

Menzie CA. Diminishment of recruitment: A hypothesis concerning impacts on marine benthic communities. Marine Pollution Bulletin 1984; 15:127 129.

Menzie CA. Environmental concerns related to offshore oil and gas activities: Muddy issues. Oceanus 1983; 26:32-38.

Menzie CA. Contamination control can be cost effective. Industry Magazine 1982 Aug; 19-22.

Menzie CA. The environmental implications of offshore oil and gas activities: An overview of the effects of routine discharges based on the American experience. Environmental Science and Technology 1982; 16(8):454A-472A.

Maurer D, Leathem W, Menzie CA. Macrobenthic invertebrates from the Mid-Atlantic continental shelf. Int Rev der Ges Hydrobiol 1982; 67(4):491 515.

Menzie CA, Cura JJ, Skinner WF. Thermal impact evaluation for Brunner Island Steam Electric Station: Toward a more realistic assessment. Environmental Monitoring and Assessment 1982; 2:301 308.

Menzie CA. Production ecology of Cricotopus sylvestris Fabricius (Diptera: Chironomidae) in a shallow estuarine area. Limnology and Oceanography 1981; 26(3):467 481.

Mauer D, Leathem W, Menzie CA. The impact of drilling fluids and well cuttings on polychaete feeding guilds from the U.S. northeastern continental shelf. Marine Pollution Bulletin 1981; 12(10):234 347.

Menzie C, Mariani G, Ryther, Jr. J. Seafloor mapping system applied to biological, environmental surveys. Sea Technology 1981; 22(2):15 16.

Menzie CA. The potential significance of insects in the removal of contaminants from aquatic systems. Water, Air, & Soil Pollution 1980; 13:473 479.

Menzie CA. A note on the Hynes method of estimating secondary production. Limnology and Oceanography 1980; 25(4):770-773.

Menzie CA. The chironomid (Insecta: Diptera) and other fauna of a Myriophyllum spicatum L. plant bed in the lower Hudson River. Estuaries 1980; 3(1):38 54.

ALCD-PUBCOM_0000868

Menzie CA. An approach to estimating probabilities of transportation related spills of hazardous materials. Environmental Science and Technology 1979; 13(2):224 228.

Menzie CA. Growth of the aquatic plant Myriophyllum spicatum in a littoral area of the Hudson River Estuary. Aquatic Botany 1979; 6:365 375.

Mulligan HF, Menzie CA. How to prepare environmental reports for drilling on the OCS (outer continental shelf). Oil and Gas Journal 1978; 86-87.

## Books and Book Chapters

Menzie C, Kane Driscoll SB, Kierski M, Morrison AM. Advances in Risk Assessment in Support of Sediment Risk Management. pp. 107-130. In: Processes, Assessment and Remediation of Contaminated Sediments. Reible DD (ed), SERDP ESTCP Environmental Remediation Technology, Vol. 6, 2014.

Welt M, Anderson EL, Menzie CA. Changing perspectives on chemical product risks. Chapter 9. In: Product Liability. RA Cantor (ed), Published through the American Bar Association, 2010.

Menzie CA, Booth P, Law SA, von Stackelberg K. Use of decision support systems to address contaminated coastal sediments: Experience in the United States. In: Decision Support Systems for RiskBased Management of Contaminated Sites. Marcomini A, Suter II GW, Critto A (eds), Springer Verlag, 2009.

Menzie C, Bettinger N, Fritz A, Kaputska L, Regan H, Moller V, Noel H. Population protection goals. In: Population-Level Ecological Risk Assessment. Barnthouse et al (eds), Society of Toxicology and Chemistry, Taylor and Francis, 2007.

Bridges TS, Berry WJ, Della Salla S, Dorn PB, Ells SJ, Gries TH, Ireland DS, Maher EM, Menzie CA, Porebski LM, Stronkhorst J. A framework for assessing and managing risks from contaminated sediments. Chapter 6. In: Use of Sediment Quality Guidelines and Related Tools for the Assessment of Contaminated Sediments. Wenning RJ, Batley GE, Ingersoll CG, Moore DW (eds), Society of Environmental Toxicology and Chemistry (SETAC), 2005.

Lanno R, Menzie CA. Risk assessment of cyanide in water and soil. Chapter 17. In: Cyanide in Water and Soil: Chemistry, Risk, and Management. Dzombak DA, Ghosh RS, Wong-Chong GM (eds), CRC Press/Lewis Publishers, Boca Raton, FL, 2005.

Wickwire WT, Menzie CA, Burmistrov D, Hope BK. Incorporating spatial data into ecological risk assessments: The Spatially Explicit Exposure Module (SEEM) for ARAMS. In: Landscape Ecology and Wildlife Habitat Evaluation: Critical Information for Ecological Risk Assessment, Land-Use Management Activities, and Biodiversity Enhancement Practices. ASTM STP 1458. Kapustka LA, Galbraith H, Luxon M, Biddinger GR (eds). ASTM International, West Conshohocken, PA, 2004.

Menzie CA, Efroymson RA, Ells SJ, Henningsen GM, Hope BK. Risk assessment and risk management. Chapter 2. In: Pellston Workshop on Contaminated Soils: From Soil-Chemical

ALCD-PUBCOM_0000869

Interactions to Ecosystems Management. Lanno RP (ed), SETAC Publications. Pensacola, FL, 2003.

National Research Council. Bioavailability of contaminants in soils and sediments: Processes, tools, and applications. Prepared by Committee on Bioavailability of Contaminants in Soils and Sediments (CA Menzie member). The National Academies Press, Washington D.C., 2003.

Menzie CA. The evolution of ecological risk assessment during the 1990s: Challenges and opportunities. Chapter 16. pp. 281-299. In: Environmental Analysis of Contaminated Sites. Sunahara GI, Renoux AY, Thellen C, Gaudet C, Pilon A (eds), John Wiley & Sons, Ltd., 2002.

Gaudet CL, Menzie CA, Ouellet S. Risk-based assessment of soil contamination: Generic versus sitespecific approaches. Chapter 12. pp. 203-219. In: Environmental Analysis of Contaminated Sites. Sunahara GI, Renoux AY, Thellen C, Gaudet C, Pilon A (eds), John Wiley & Sons Ltd., 2002.

Cura, JJ, Kane Driscoll SB, Lacey R, McArdle M, Menzie CA. Assessing ecological risks of PAHcontaminated sediments. In: Sediments Guidance Compendium. Electric Power Research Institute (EPRI), Palo Alto, CA, 2001.

Menzie CA, Heiger-Bernays WJ, Montgomery CR, Linz DG, Nakles DV. Development of an ecological risk assessment framework based on contaminant availability. In: Ecotox — Environmental Contaminants through the Macroscope. Wuerz Publishing Ltd., Winnipeg, MB, Canada, 1996.

Menzie CA. Perspectives on sediment risk analysis for hazardous waste sites. Proceedings, 22nd Pellston Conference Workshop, Sediment Risk Assessment. SETAC Special Publication, Pacific Grove, 1996, April 23-28, 1995.

Menzie CA. Work group summary report for site clean-up decisions. Chapter 6. Proceedings, 22nd Pellston Conference Workshop, Sediment Risk Assessment, SETAC Special Publication, Pacific Grove, 1995, April 23-28, 1995.

Cura JJ, Mariani G, Ketchum C, Gillmor R, Menzie C, Curtis W, Tuholke B. Site-selection criteria for deep ocean disposal of low-level radioactive wastes. Volume 3, Marine Waste Management: Science and Policy. pp. 177-185. In: Oceanic Processes in Marine Pollution. Champ M, Park K (eds), Kreiger Publishing Co., Melbourne, FL, 1989.

Menzie CA, Cura J, Gillmor R, Magnell B, Mariani G, Bartholomew T, Gardner W, Smith W. The optimum mix of pollution-monitoring platforms: Deepwater Dumpsite 106 Case Study. Volume 3 Marine Waste Management: Science and Policy. pp. 260-276. In: Oceanic Processes in Marine Pollution. Champ M, Park K (eds), Kreiger Publishing Co., Melbourne, FL, 1989.

Nocito JA, Walker HA, Paul JF, Menzie CA. Application of a risk assessment framework for marine disposal of sewage sludge at mid-shelf and off-shelf sites. Proceedings, 11th ASTM Symposium by American Society for Testing and Materials, Philadelphia, PA, 1986

9

Gillmor RB, Menzie CA, Mariani GM, Levin D, Ayers RC, Sauer TC. . Effects of exploratory drilling discharges on the benthos. Volume 4, Energy Wastes in the Ocean. pp. 244-257. In: Wastes in the Ocean. Duedall IW, Kester DR, Park PK (eds), Wiley Interscience Publications, John Wiley & Sons, New York, NY, 1985.

Robson DS, Menzie CA, Mulligan HF. An environmental monitoring study to assess the impact of drilling discharges in the Mid-Atlantic. II. An experimental design and statistical methods to evaluate impacts on the benthic environment. In: Research of Environmental Fate and Effects of Drilling Fluids and Cuttings, 1980.

Menzie CA, Maurer D, Leathem W. An environmental monitoring study to assess the impact of drilling discharges in the Mid-Atlantic. IV. The effects of drilling discharges on the benthic community. In: Research of Environmental Fate and Effects of Drilling Fluids and Cuttings, 1980.

**Proceedings, Conferences, and Symposia**

Menzie C, William P, Cantor R, Cox T, Wenning R, Landis W, Reiss R, Goodfellow W. Joint SRA/SETAC Roundtable: Scientific Integrity in Publications. Society of Risk Analysis, Arlington, VA. December 2015.

Goodfellow WL, Menzie C, Koshuba R. Expressing total dissolved solids toxicity as conductivity or individual ions? SETAC 36th Annual Meeting, Salt Lake City, UT, November 2015.

Goodfellow WL, Menzie C, Masure-Slowey Y. Is manure a RCRA Solid Waste? SETAC 36th Annual Meeting, Salt Lake City, UT, November 2015.

Kashuba R, Menzie C, Cerreto K, Palmquist K, Kessel C. Challenges in deriving causal relationships from field observational data: A case study in West Virginia headwaters. Presented at the Session: Bayesian Networks and Other Probabilistic Methods Applied to Ecological Risk, at the Society for Risk Analysis (SRA) 2014 Annual Meeting, Denver, CO, December 10, 2014.

Kashuba R, Cerreto K, Palmquist K, Kessel C, Menzie C. Cautions for deriving causal relationships and water quality benchmarks from field observational data: A case study in West Virginia headwaters. Presented at the Session: Assessing Contaminant Effects in Multi-stress Ecosystems, at the Society of Environmental Toxicology and Chemistry (SETAC) North America 35th Annual Meeting, Vancouver, BC, Canada, November 9-13 2014.

Menzie C, Fairbrother A. Employing weight-of-evidence approaches: a journey from Massachusetts to British Colombia. Platform presentation, SETAC North America 34th Annual Meeting, Nashville TN, November, 2013.

Semenova S, Deardorff T, Menzie C. Environmental damages associated with wildland fires. Platform presentation TP197, SETAC North America 34th Annual Meeting, Nashville TN, November, 2013.

10

Driscoll S, Menzie C, Ghosh U, et al. Sediment bioavailability initiative: Development of standard methods for the use of passive samplers in management of contaminated sediment. Poster presentation WP143, SETAC North America 34th Annual Meeting, Nashville TN, November, 2013.

Andrade N, Sanders J, Menzie C, et al. 2013. Pilot-scale demonstration of reduced PCB bioavailability with activated carbon amendments in a Phragmites marsh. Platform presentation, SETAC North America 34th Annual Meeting, Nashville TN, November, 2013.

Staveley J, Law S, Menzie C, Fairbrother A . A causal analysis of observed declines in managed honey bees. Platform presentation, SETAC North America 34th Annual Meeting, Nashville TN, November, 2013.

Patmont C, Ghosh U, Menzie C, LaRosa P, Quadrini J, Cornelissen G, Collins J, Hjartland T. In situ sediment immobilization treatment: A demonstrated sediment cleanup technology. 7th Battelle Sediment Management Conference, Dallas, TX, February 7, 2013.

Menzie C, Deardorff T, Ma J, Edwards M. California's catastrophic wildland fires: Increasing the risks of burning hotter, faster, and higher. Poster presentation, SETAC North America 33rd Annual Meeting, Long Beach, CA, November 11-15, 2012.

Menzie C, Ziccardi L, Lowney Y. Examining the fate and effects of vanadium in light of the USEPA Framework for Metals Risk Assessment. Poster presentation, SETAC North America 33rd Annual Meeting, Long Beach, CA, November 11-15, 2012.

Menzie C, Kashuba R. A conceptual model for cumulative risk analysis using CVD as an example. Presented at the U.S. Environmental Protection Agency (EPA) Methods Workshop to Integrate Chemical and Non-Chemical Stressors in Cumulative Risk Assessment (CRA): Cardiovascular Disease (CVD), EPA Laboratories. Research Triangle Park, NC, November 26-27, 2012.

Menzie CA, Ghosh U. Monitoring the efficacy and potential environmental effects of in situ remediation. Platform presentation, SETAC North America 32nd Annual Meeting, Boston, MA, November 13-17, 2011.

Kierski M, Morrison AM, Kane Driscoll S, Menzie CA. A multi-site model to estimate the toxicity of PAH contaminated sediments at MGP sites. Platform presentation, SETAC North America 32nd Annual Meeting, Boston, MA, November 13-17, 2011.

Morrison AM, Kane Driscoll S, McArdle M, Menzie CA. Integrated environmental benefit analysis of sediment remediation thresholds. Platform presentation, SETAC North America 32nd Annual Meeting, Boston, MA, November 13-17, 2011.

McArdle M, Fairbrother A, Kane Driscoll S, Menzie C. Guidance for a weight-of-evidence approach to ecological risk assessments in British Columbia. Poster presentation, SETAC North America 32nd Annual Meeting, Boston, MA, November 13-17, 2011.

11

Wickwire T, Menzie C, Cantor R. Multi-disciplinary and multi-scale climate change vulnerability assessment and response. Poster presentation, SETAC North America 32nd Annual Meeting, Boston, MA, November 13-17, 2011.

Deardorff T, Menzie C, Ma J, Salatas J, Wickwire T, McArdle M, Pryke D. The first international environmental decision by The World Court on paper mill impacts. Poster presentation, SETAC North America 32nd Annual Meeting, Boston, MA, November 13-17, 2011.

Menzie C, Deardorff. Considerations for assessing the status of ecosystem services following the 2007 Grass Valley Wildland Fire: Thinking historically. Poster presentation, SETAC North America 32nd Annual Meeting, Boston, MA, November 13-17, 2011.

Gard N, Fairbrother A, Menzie C. A causal analysis framework for informing endangered species jeopardy reviews. ACS Meeting, Denver, CO, 2011.

Menzie CA, Luthy R. Contaminated sediments: New tools and approaches for in-situ remediation - Session III. Sponsored by National Institute of Environmental Health Sciences, Superfund Research Program, January 19, 2011. Presentation recorded and available through NIEHS, at http://www.cluin.org/conf/tio/sediments3_011911/.

Menzie C, Cantor R, Boehm P, Bailey JR. An approach to business vulnerability and risk assessments related to climate change. Paper presented at the Society of Petroleum Engineers International Conference on Health, Safety and Environment in Oil and Gas Exploration and Production, Rio de Janeiro, Brazil, April 12-14, 2010.

Menzie CA. Perspectives on the application of ecological services. Presented at SETAC North America Meeting, Abstract 693, Portland OR, November 2010.

Fairbrother A, Menzie C. Integrated exposure analysis for human health and ecological risks at contaminated site. Presented at the Society of Environmental Toxicology and Chemistry Annual Conference, Portland, OR, November 2010.

Menzie CA. Health and environmental risks of $CO_2$ sequestration in geological formations. Special Lecture at Lehigh University, March 4, 2010.

O'Reilly KT, Menzie CA. Endangered Species: Chemicals, places, and climate change. ABA Environmental Law Conference, Salt Lake City, UT, March 18-20, 2010.

Menzie CA, Booth P, Saba T. PCB Update: What's new, what you need to know, and why. Exponent Webinar, March 31, 2010. Available at www.exponent.com/webinars.

Menzie CA. Ecological implications of biofuels for the Chesapeake Bay Region. Presented at the Annual Meeting of the Society of Toxicology, Baltimore MD, March 15-19, 2009.

ALCD-PUBCOM_0000873

Menzie C, Henry B, Bigham G. Managing Contaminated Sediments: A Fresh Look. Exponent Webinar March 3, 2009. Available at: www.exponent.com/webinars.

Menzie CA. Combining engineering and biology in a low-impact in-situ treatment and capping for sediments: applications to sites contaminated with PAHs, PCBs, and mercury. RemTec Summit, March 35, 2009.

Cantor R, Menzie C. Vulnerabilities and risk exposures from climate and related changes. American Bar Association 38th Annual Conference on Environmental Law, Keystone C, March 12-15, 2009.

Menzie C, Kierski M. Begin with a vision: Integrating assessment, remediation, and NEBA within management goals. 30th Annual Meeting, Society of Environmental Toxicology and Chemistry, New Orleans, LA, November 2009.

Kane Driscoll S, McArdle M, Menzie C. Assessing risk of metals in sediment: Experience in applying the weight-of-evidence approach to aquatic sites contaminated with heavy metals. Sediment Management Work Group Spring Sponsor Forum, Kalamazoo, MI, April 29—30, 2008.

Kane Driscoll SB, Amos CB, McArdle ME, Menzie CA, Coleman AJ. Use of site-specific equilibrium partitioning benchmarks for polycyclic aromatic hydrocarbon mixtures to predict the toxicity of sediment at former manufactured gas plants. 28th Annual Meeting of SETAC North America, , Milwaukee, WI, November 11-15, 2007.

Kierski M, Menzie C, Carroll C. Dinitrotoluene and Di-n-buytlphthalate exposure and effects evaluation for birds at Badger Army Ammunition Plant. 28th Annual Meeting of SETAC North America, Milwaukee, WI, November 11-15, 2007.

Kierski M, Menzie C, Ferguson E. Soil lead risk for grit ingesting birds: A simple methodology to estimate the number of grit size lead particles in soils and sediment. 28th Annual Meeting of SETAC North America, Milwaukee, WI, November 11-15, 2007.

Wickwire WT, Menzie CA, Burmistrov D. Enhancing the realism of wildlife exposure modeling: An introduction and demonstration of the Spatially Explicit Exposure Model (SEEM). In: An Introduction to the Terrestrial Wildlife Exposure Model (TWEM) and the Spatially Explicit Exposure Model (SEEM). Johnson MJ, Sample BE, Wickwire WT, and Kapustka LA (eds.). SETAC 2004 Short Course Instructor. Society of Environmental Toxicology and Chemistry (SETAC) 4th World Congress and 25th Annual Meeting, Portland, OR, November 14-18, 2004.

Wickwire WT, Menzie CA, Burmistrov D, Johnson MS. Applying a spatially explicit wildlife exposure model to improve remedial efficiency: The SEEM case study (Abstract/Poster Presentation). Annual International Conference on Soils, Sediments and Water, University of Massachusetts, Amherst, MA, October 18-21, 2004.

13

Kane Driscoll SB, McArdle ME, Menzie CA, Coleman A. Application of sediment quality guidelines of PAHs to manufactured gas plant sites. Presented at the 23rd Annual Meeting of SETAC North America, Salt Lake City, UT, November 16-20, 2002.

Menzie CA, Cura JJ, Kane-Driscoll S, Lacey R, McArdle M. Assessing ecological risks of PAH contaminated sediments. Proceedings, International Conference on Remediation of Contaminated Sediments, Venice, Italy, October 10-12, 2001. Battelle Press, Columbus, OH.

Cura JJ, Menzie C. Methodologies for ecological risk assessment: the overall process and recent advances. Conference Workshop #12 - Ecological Risk Assessment: Why and How — An Important Tool in Environmental Decision Making. Presented at the Water Environment Federation 69th Annual Conference & Exposition, Dallas, TX, October 5-9, 1996.

Menzie CA. Problems in ecological assessment related to contaminated site management. pp. 26-27. Proceedings, NRC-CNRC Workshop, Toxicity Testing Applied to Soil Ecotoxicology. NRC's Biotechnology Research Institute in collaboration with Environment Canada and the Quebec Ministry of Environment and Wildlife, Montreal, Quebec, November 28-29, 1995.

von Stackelberg K, Menzie CA, Cura JJ. Risk assessment: Helping to focus risk management objectives for MGP sites. Land Contam Reclam (Special issue) 3(4):24 29. Presented at the International Symposium and Trade Fair on the Clean up of Manufactured Gas Plants, Prague, Czech Republic, September 19 21, 1995.

Menzie CA, Cura JJ. Environmental evaluations at hazardous waste sites. pp. 77-84. Proceedings, HMCNortheast '91 Conference, Hazardous Materials Control Research Institute, Boston, MA, July 10-12, 1991.

Menzie CA, Cura J. Loadings of pollutants in Massachusetts Bay. Presented at U.S. Environmental Protection Agency Conference on Estuaries, Sarasota, FL, February 24-26, 1991.

Burmaster DE, Thompson KM, Menzie CA, Crouch E, McKone T. Monte Carlo techniques for quantitative uncertainty analysis in public health risk assessment. pp. 215-21. Proceedings, 1990 Hazardous Materials Control Research Institute Conference, New Orleans, LA, 1990.

Menzie CA. Application of Connecticut's aquatic toxicity program. Panel discussion and presentation to the 2nd Annual Workshop of the Connecticut Forum of Regulated Environmental Professionals, New Haven, CT, June 2, 1988.

Menzie CA. The use — and possible misuse — of risk assessment as part of overall site management. Presented at the 2nd Hazardous Waste Superfund Conference in San Francisco and Washington, DC, 1988.

Menzie CA, Burmaster DE. Overview of soil clean up levels and risk based decision making. Presented at the HazMat '88 Conference, Atlantic City, NJ, June 14-16, 1988.

14

ALCD-PUBCOM_0000875

Menzie CA, Burmaster DE. Evaluation of environmental risk assessment methods. Presented at
the 9th Annual Meeting of the Society of Environmental Toxicology and Chemistry, Arlington,
VA, November 13-17, 1988.

Burmaster DE, Murphy B, Gushue J, Menzie CA. A risk assessment for the Baird & McGuire
Superfund Site. Presented at the Hazardous Materials International Conference, Washington,
DC, 1987.

Menzie CA, Cura JJ, Gillmor R, Mariani G, Wilson S. Research needs related to ocean disposal.
Presented at the Ocean Waste Management Conference at the University of Rhode Island,
Kingston, RI, May 1983.

Menzie CA, Ryther, Jr. J, Boyer LF, Germano JD, Rhoads DC. Remote methods of mapping
seafloor topography, sediment type, bedforms, and benthic biology. pp. 1046 1051. In: Oceans
'82 Conference Record, IEEE Publication Number 82CH1827 5, Piscataway, NJ, IEEE Service
Center, 1982.

Gillmor, RB, Menzie CA, Ryther, Jr. J. Side-scan sonar and T.V. observations of the benthic
environment and megabenthos in the vicinity of an OCS exploratory well in the Middle Atlantic
Bight. In: Oceans '81 Conference Record. IEEE Publication No. 81CH1685 7, Piscataway, NJ,
IEEE Service Center, 1981.

Menzie CA, Ryther, Jr. J. Diego Garcia (Indian Ocean): An Atoll estuary. Presented at the New
England Estuarine Research Society at the University of Rhode Island, Spring Session, Kingston,
RI, 1980.

Menzie CA, Frye D, Hazelwood RN. OTEC 1 environmental monitoring program. In: Proc. 7th
Ocean Energy Conference, Washington, DC, June 1980.

Mulligan HF, Menzie CA. Phytoplankton as tracers of water masses on and around Georges
Bank. Presented at the Second Informal Workshop on the Gulf of Maine and Scotian Shelf, May,
Dalhousie, Nova Scotia, 1979.

Menzie CA, et al. The environmental impact of the Clean Water Act on the Hudson River
Estuary. Presented at the 4th Hudson River Environmental Symposium, 1976.

Menzie CA, Hyman R, Woodward B. Investigations of the chironomid fauna of Haverstraw Bay.
Presented at the 4th Hudson River Environmental Symposium, 1976.

Menzie CA, Logan D, Matousek J. 1976. Benthic investigations in the Hudson River Estuary.
1972 1974. Presented at the 24th Annual Meeting of the North American Benthological Society,
Madison, WI, 1976.

ALCD-PUBCOM_0000876

**ATTACHMENT 2**

**TECHNICAL SUPPORT FOR CHARLIE A. MENZIE, PH.D.'S OPINION 4**



**Figure A2-1. Mercury concentrations in sediment samples used in the 2014 FFS for the lower 8.3 miles of the Passaic River.** A) Concentrations of sediment samples organized by river mile to show spatial distribution; B) Concentrations of sediment samples organized by lowest to highest concentration; C) Concentrations of sediment samples organized by lowest to highest concentration on a log scale. The yellow line indicates the ROD selected RG value of 0.074 mg/kg equal to the dose-based sediment PRG for mammals. The purple line indicates the background sediment concentration value of 0.72 mg/kg.

1

ALCD-PUBCOM_0000878



**Figure A2-2. 2,3,7,8-TCDD concentrations in sediment samples used in the 2014 FFS for the lower 8.3 miles of the Passaic River.** A) Concentrations of sediment samples organized by river mile to show spatial distribution; B) Concentrations of sediment samples organized by lowest to highest concentration; C) Concentrations of sediment samples organized by lowest to highest concentration on a log scale. The yellow line indicates the ROD selected remediation goal (RG) value of 8.3 ng/kg equal to the non-cancer sediment PRG based on 56 fish meals per year. The purple line indicates the background sediment concentration value of 2 ng/kg.

2

ALCD-PUBCOM_0000879



**Figure A2-3. Total DDx concentrations in sediment samples used in the 2014 FFS for the lower 8.3 miles of the Passaic River.** A) Concentrations of sediment samples organized by river mile to show spatial distribution; B) Concentrations of sediment samples organized by lowest to highest concentration; C) Concentrations of sediment samples organized by lowest to highest concentration on a log scale. The yellow line indicates the ROD selected RG value of 0.3 µg/kg equal to the dose-based sediment PRG for birds. The purple line indicates the background sediment concentration value of 30 µg/kg (*as DDT).

3

ALCD-PUBCOM_0000880

# APPENDIX B.6
## Michael Moffitt Declaration

ALCD-PUBCOM_0000881

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| Plaintiff, ) | Civil Action No. 2:22-cv-7326 |
| ) | |
| v. ) | |
| ) | |
| ALDEN LEEDS, INC., *et al.* ) | |
| ) | |
| Defendants. ) | |
| ) | |
| ) | |

## DECLARATION OF MICHAEL MOFFITT

ALCD-PUBCOM_0000882

# TABLE OF CONTENTS

PURPOSE OF THIS DECLARATION ....................................................................................3

QUALIFICATIONS...............................................................................................................3

SUMMARY OF OPINIONS..................................................................................................4

SUPPORTING INFORMATION FOR OPINIONS ..............................................................6

    Opinion 1.  ADR professional ethical standards are relevant in assessing the
        procedural fairness of the Batson Process. The Batson Process specifically
        promised to adhere to "the established norms and ethical standards of
        ADR professionals." Even in the absence of this explicit commitment,
        ethics applicable to ADR professionals and processes would be an
        appropriate lens through which to judge the procedural fairness of this, or
        any, ADR process. ..............................................................................................6

    Opinion 2.  ADR takes many forms and includes fundamentally different
        processes such as mediation, arbitration, and neutral evaluation. As a
        result, no single, universal articulation of ADR ethical standards applies to
        all contexts. Instead, generally accepted norms and ethical standards for
        ADR professionals depend on the nature of the ADR process in question.
        Because the Batson Process does not specify which "norms and ethical
        standards" it would follow, one would need first to make an assessment
        about the most analogous ADR process in order to establish the relevant
        ethical standards. ................................................................................................8

    Opinion 3.  The Batson Process is inconsistent with at least two of the established
        norms and ethical standards of mediation practice..............................................11

    Opinion 4.  The Batson Process is inconsistent with at least three of the
        established norms and ethical standards of arbitration practice, and it is
        inconsistent with at least two of the established norms and ethical
        standards for neutral evaluators. ........................................................................15

REFERENCES...................................................................................................................24

ATTACHMENT 1. Resume of Michael Moffitt.................................................................26

ALCD-PUBCOM_0000883

## PURPOSE OF THIS DECLARATION

Pursuant to 28 U.S.C. §1746, I, Michael Moffitt, declare the following:

1. I have been retained by Langsam Stevens Silver & Hollaender, LLP on behalf of Occidental
   Chemical Corporation ("OxyChem") to provide expert opinions related to the processes
   resulting in the Batson Allocation Recommendation Report regarding the Diamond Alkali
   Superfund Site (OU2).[1]

2. My assignment included providing expert responses to the following questions:

   - Are Alternative Dispute Resolution (ADR) professional ethical standards relevant in
     assessing the procedural fairness of the Batson Process[2]?

   - If yes, against what articulation(s) of ADR professional norms and ethical standards
     should the Batson Process be assessed?

   - Does the Batson Process adhere to established norms and ethical standards for
     Mediators?

   - Does the Batson Process adhere to established norms and ethical standards for
     Arbitrators or for Neutral Evaluators?

## QUALIFICATIONS

3. I am a tenured law professor, and I hold the Philip H. Knight Chair in Law at the University
   of Oregon. I served as Dean of the Law School at the University of Oregon from 2011
   through 2017. Prior to that, I helped to create a graduate program at the University of Oregon

---

[1] December 28, 2020 *Diamond Alkali Superfund Site OU2 Allocation Recommendation Report* by David Batson, Esq. of AlterEcho hereinafter "Batson Report."

[2] Herein, I understand the "Batson Process" to refer to the process or processes in which David Batson played a role, associated with the Diamond Alkali Sediment OU2 Superfund Site in New Jersey.

3

in Conflict and Dispute Resolution, and I helped to lead the nationally ranked ADR Center at the University of Oregon School of Law for a decade. I also previously served as the Roger D. Fisher Visiting Professor of Law at Harvard Law School, leading its Negotiation Workshops and teaching reading groups on Lawyering and Settlement and on Settlement and the Courts. I have taught a range of ADR-related courses, including Negotiation, Mediation, Arbitration, ADR Survey, and the Law of Settlement.

4.  I have served in a number of leadership roles in the ADR field. For example, I have chaired the Association of American Law Schools Section on Dispute Resolution, and I still serve on its Executive Committee. I served on the Publications Board of the ABA Section of Dispute Resolution. I currently co-chair the Editorial Board of the ABA Section of Dispute Resolution's Dispute Resolution Magazine.

5.  My research for two decades has focused primarily on Dispute Resolution. I have published more than two dozen books and scholarly articles about Dispute Resolution. My law review article, *Settlement Malpractice*, 86 UNIVERSITY OF CHICAGO LAW REVIEW 1825 (2019), won the Dispute Resolution Advancement Award from the Hugh L. Carey Center for Dispute Resolution at St. John's University, the Best Article in the Field of Dispute Resolution by the Association of American Law Schools Section on Dispute Resolution, and the Fred C. Zacharias Memorial Prize as the best scholarly article of the year by the Association of American Law Schools Section on Professional Responsibility.

## SUMMARY OF OPINIONS

6.  **Opinion 1. ADR professional ethical standards are relevant in assessing the procedural fairness of the Batson Process. The Batson Process specifically promised to adhere to "the established norms and ethical standards of ADR professionals." Even in the**

4

absence of this explicit commitment, ethics applicable to ADR professionals and processes would be an appropriate lens through which to judge the procedural fairness of this, or any, ADR process.

7. **Opinion 2: ADR takes many forms and includes fundamentally different processes such as mediation, arbitration, and neutral evaluation. As a result, no single, universal articulation of ADR ethical standards applies to all contexts. Instead, generally accepted norms and ethical standards for ADR professionals depend on the nature of the ADR process in question. Because the Batson Process does not specify which "norms and ethical standards" it would follow, one would need first to make an assessment about the most analogous ADR process in order to establish the relevant ethical standards.**

8. **Opinion 3: The Batson Process is inconsistent with at least two of the established norms and ethical standards of mediation practice.**

9. **Opinion 4: The Batson Process is inconsistent with at least three of the established norms and ethical standards of arbitration practice, and it is inconsistent with at least two of the established norms and ethical standards for neutral evaluators.**

5

ALCD-PUBCOM_0000886

## SUPPORTING INFORMATION FOR OPINIONS

**Opinion 1.  ADR professional ethical standards are relevant in assessing the procedural
fairness of the Batson Process. The Batson Process specifically promised to adhere to "the
established norms and ethical standards of ADR professionals." Even in the absence of this
explicit commitment, ethics applicable to ADR professionals and processes would be an
appropriate lens through which to judge the procedural fairness of this, or any, ADR
process.**

10. When an ADR practitioner makes a specific promise to conduct an ADR process consistent
    with particular norms of ethical behavior, it is entirely appropriate to use those norms to
    assess the fairness of the ADR process they then conduct. In this case, the Batson Process
    specifically committed to adhere to "the established norms and ethical standards of ADR
    professionals."[3] That precise phrase was repeated multiple times in the materials I reviewed
    related to the Batson Process. Such standards are, therefore, are not just relevant, but central,
    to any assessment of whether the ADR process in question was procedurally fair.

11. When an ADR practitioner advertises themselves as being part of a voluntary association,
    and that association has an articulated set of ethical codes or standards, those codes or
    standards may be relevant to assessing the propriety of that practitioner's conduct of an ADR
    process. In this case, before his assignment was finalized, Mr. Batson advertised himself as
    being a member of at least three such organizations: the ABA Section on Dispute Resolution,

---

[3] EPA Conflict Prevention and Resolution Services Contract, Contract #EP-W-14-020,
Work Plan for Task Order #096, Diamond Alkali-Lower Passaic River Allocation, hereinafter
"Revised Work Plan" at 5; Sept. 11, 2018 ltr. from S. Flanagan (EPA) to D. Erickson at 2
(repeating the commitment that the process would be in accordance with "established norms and
ethical standards of ADR professionals."); ERG Conflict Prevention and Resolution Services
Contract# 68HERH19D0033, Task Order #009 Diamond Alkali-Lower Passaic River Allocation,
hereinafter "Work Plan" at 5 (same).

6

the Environmental & Public Policy Section of the Association for Conflict Resolution, and

the ADR Council of the Maryland State Bar Association.[4] Each of these organizations has an

articulated set of norms or ethical standards for ADR practitioners.[5]

12. When an ADR practitioner conducts their business through the auspices of an organization,

that organization's norms and ethical standards generally apply to the conduct of the

practitioner.[6] In this case, the EPA's relationship with the Batson Process, including the fact

that EPA contracted him to do the work,[7] would suggest that federal articulations of norms or

ethical standards for ADR practitioners would be relevant to assessing the fairness of the

Batson Process.[8]

13. Even if an ADR practitioner does not make specific ethical promises with respect to the

conduct of a process, the field generally assumes that certain norms and ethical standards

attach. There is no universal consensus about the precise articulation of these norms.

However, most established articulations of ADR ethical norms share at least four common

---

[4] *See* Batson 2019 Resume, AlterEcho at 3.

[5] The ABA Section on Dispute Resolution lists multiple articulations of ADR ethics, including the American Bar Association / American Arbitration Association / Association for Conflict Resolution MODEL STANDARDS OF CONDUCT FOR MEDIATORS (2005) and the American Bar Association / American Arbitration Association CODE OF ETHICS FOR COMMERCIAL ARBITRATORS (2004). For ACR's articulation of ADR ethical standards, see FINAL REPORT OF ACR ETHICS COMMITTEE (2010). *See also* MARYLAND JUDICIARY, MARYLAND STANDARDS OF CONDUCT FOR MEDIATORS (2020); MARYLAND STANDARDS OF CONDUCT FOR ARBITRATORS, FACT FINDERS, NEUTRAL EVALUATORS, AND SETTLEMENT CONFERENCE PRACTITIONERS (2020).

[6] For example, a mediator who receives a case referral through a court program would be bound, in that mediation, to adhere to that court's standards of conduct for its mediators, even if that same mediator operating in a different case might not be. Or an arbitrator operating through an organization administering the arbitration would generally be bound, in that arbitration, to adhere to the ethical standards articulated by the administering program.

[7] FEDERAL INTERAGENCY ADR WORKING GROUP STEERING COMMITTEE, A GUIDE FOR FEDERAL EMPLOYEE MEDIATORS (2006).

[8] *See, e.g.,* FEDERAL INTERAGENCY ADR WORKING GROUP STEERING COMMITTEE, A GUIDE FOR FEDERAL EMPLOYEE MEDIATORS (2006). ("Non-federal mediators involved in federal mediations may wish to agree to adhere to the Model Standards and to the use of this Guide, as part of their mediation employment agreements executed for such federal mediations.")

7

ALCD-PUBCOM_0000888

features: (1) trust or loyalty, (2) neutrality or impartiality, (3) informed consent or self-determination, and (4) fairness. In many contexts, ADR ethics also specify expectations regarding the confidentiality of the proceedings and associated communications.

**Opinion 2. ADR takes many forms and includes fundamentally different processes such as mediation, arbitration, and neutral evaluation. As a result, no single, universal articulation of ADR ethical standards applies to all contexts. Instead, generally accepted norms and ethical standards for ADR professionals depend on the nature of the ADR process in question. Because the Batson Process does not specify which "norms and ethical standards" it would follow, one would need first to make an assessment about the most analogous ADR process in order to establish the relevant ethical standards.**

14. Although the Batson Process promises to adhere to "the established norms and ethical standards of ADR professionals," that phrase is not self-defining. Different organizations and different jurisdictions have promulgated various ethical standards for ADR practitioners.[9] Furthermore, differences between ADR processes necessitate different ethical standards. The most significant of the distinctions in ADR processes is between adversarial processes (such as arbitration, in which disputants make arguments to a third-party empowered to render a decision) and consensual processes (such as mediation, in which third-parties facilitate negotiations, leaving substantive decisions to the parties themselves). Therefore, although

---

[9] *See, e.g.,* Exon, Susan Nauss, *State Mediation Codes of Conduct and Mediation Ethical Advisory Opinions* in Omer Shapira, MEDIATION ETHICS: A PRACTITIONER'S GUIDE (2021 ABA Publishing) at 349-361 (50-state survey of ethical standards and interpretations). I cite Maryland examples in some places in this Opinion because of Mr. Batson's affiliation with Maryland ADR organizations and because these Maryland examples represent typical articulations of ADR ethical standards. I am not expressing a legal opinion on the choice of law question about the jurisdiction or jurisdictions whose precise articulations of ethical standards would govern Mr. Batson's conduct in this case.

8

most articulations of ethics share some commonalities, there is no single, universal, "established" set of ethical norms or standards for all ADR professionals overseeing all forms of ADR processes.

15. The type of ADR process in question determines the particular ethical obligations attaching to the practitioner. For example, ethical standards for mediators and for arbitrators both almost always include reference to impartiality or neutrality, in the sense that the ADR practitioner is obligated not to show favoritism or to represent one party's interests over another's. And both typically include provisions prohibiting an ADR practitioner from having any real or perceived conflicts of interest, unless the parties have knowingly consented to that practitioner's service following disclosure. However, mediation and arbitration are sufficiently different that each process demands different ethical standards. For example, *ex parte* communication is the norm in many models of mediation and is inappropriate in most forms of arbitration. Similarly, arbitrators are (by the nature of the process) charged with making substantive decisions, while mediation ethics demand that substantive decision-making authority rest with the mediation parties.

16. To determine relevant ADR ethical norms or standards of practice, therefore, one would need to understand (at a minimum) the nature of the ADR process over which the practitioner is presiding. For example, the Maryland judiciary specifically splits its ADR ethical rules into two sets: one for Mediators and a separate one for Arbitrators, Fact Finders, Neutral Evaluators, and Settlement Conference Practitioners.[10] In short, norms of conduct and ethical standards in ADR are process dependent.

---

[10] *See* MARYLAND JUDICIARY, MARYLAND STANDARDS OF CONDUCT FOR MEDIATORS (2020); MARYLAND STANDARDS OF CONDUCT FOR ARBITRATORS, FACT FINDERS, NEUTRAL EVALUATORS, AND SETTLEMENT CONFERENCE PRACTITIONERS (2020).

ALCD-PUBCOM_0000890

17. In this instance, the Batson Process does not describe itself using consistent terminology. Mr. Batson himself described it as "a unique allocation process."[11] The Work Plan uses the description "mediation or facilitation."[12] In general, Mr. Batson describes himself as "an ADR neutral"[13] or as a "Senior Mediator and Allocation Specialist."[14] His role in this particular case is variably described as "convening neutral,"[15] as "neutral allocator,"[16] as "third-party neutral,"[17] as "mediation/allocation specialist,"[18] as "expert witness,"[19] and as "allocation neutral."[20]

18. Aspects of the Batson Process share strong resemblance to familiar ADR processes for which there are "established norms and ethical standards." To the extent that the Batson Process can be characterized, on balance, as being a version of one of these processes, therefore, the corresponding standards would apply. If, however, the Batson Process is not an example of a recognized ADR process, I cannot discern what articulation of "established norms and ethical standards of ADR professionals" one should use to assess whether the Batson Process was procedurally fair or ethical.

---

[11] Batson 2019 resume, AlterEcho at 2.

[12] Revised Work Plan at 5 ("mediation or facilitation").

[13] Batson 2019 resume, AlterEcho at 1.

[14] Feb. 21, 2019 David Batson Expert Witness Testimony (*El Paso Natural Gas Co., LLC v. United States*, 2019 WL 5830841 (D. Ariz.)) at 2.

[15] *Id.* at 24 ("convening neutral"). Note that Batson distinguishes this role in his testimony from that of "allocation neutral," a role he played in a different case. *Id.*

[16] Sept. 11, 2018 ltr. from S. Flanagan (EPA) to D. Erickson at 1 ("neutral allocator").

[17] Nov 28, 2017 ltr. from E. Wilson (EPA) to M. Backus (OxyChem) at 3 (referencing the use of "third party neutrals"). *See also* March 02, 2022 ltr. from E. Wilson (EPA) re Notice of Potential Liability and Notice of Consent Decree Negotiations at 3 ("third-party neutral").

[18] Revised Work Plan at 3.

[19] Department of Justice Contract / Purchase Order Number DJJ-16W-ENR01-0221 (May 18, 2016) at 1 ("expert testimony on behalf of U.S."). The same appears on forms bearing the same [purchase order number dated April 12, 2016, July 13, 2016, July 15, 2016, and June 20, 2016. In two places, however, Mr. Batson is listed as "Allocation/Mediation" *id* at 1, 3.

[20] Diamond Alkali Superfund Site OU2 Allocation Confidentiality Agreement, Batson Report, Appendix F at 1 ("Allocation Neutral"), with signature block for David Batson as "Allocation Neutral" at 5.

ALCD-PUBCOM_0000891

**Opinion 3. The Batson Process is inconsistent with at least two of the established norms
and ethical standards of mediation practice.**

19. "Mediation" does not have a universally accepted definition, although its parameters are
widely established in practice. One of the leading treatises has suggested that "Mediators are
third parties, not otherwise involved in a controversy, who assist disputing parties in their
negotiations."[21] The Federal Interagency ADR Working Group Steering Committee adopted
the definition found in the Model Standards of Conduct for Mediators: "Mediation is a
process in which an impartial third party facilitates communication and negotiation and
promotes voluntary decision making by the parties to the dispute."[22]

20. In this case, the Batson Process appears to meet the three core elements of this definition.[23]
Mr. Batson was a third party who had no particular stake in the substantive outcome of the
dispute in question. The Work Plan describes the engagement as "the mediation or
facilitation,"[24] and it specifically names an intention to help produce negotiated settlements.

21. Mediation has several relatively well-established norms and ethical standards for
practitioners. Virtually every articulation of mediation ethics includes, at a minimum,

---

[21] Cole, Sarah, et al., MEDIATION LAW, POLICY, PRACTICE §5:3 n.18 (2d. ed 2003).

[22] FEDERAL INTERAGENCY ADR WORKING GROUP STEERING COMMITTEE, A GUIDE FOR
FEDERAL EMPLOYEE MEDIATORS (2006) at Preamble.

[23] One of the challenges here is that the Cole, et al., definition uses "assists," rather than
"aims to assist" or some similar formulation. This is problematic because it creates a risk that
someone who is trying to be a mediator and is simply not doing it well would somehow be
treated as not being a mediator, definitionally. I do not mean to imply here that Mr. Batson was
not doing well. My critique here instead is on the precise language of the Cole definition.

[24] Revised Work Plan at 5; Work Plan at 5. *See also* Batson Report at 5 (defining the
Allocation as "the first phase of a two-phase ADR facilitated settlement process."); Diamond
Alkali Superfund Site OU2 Allocation Guide, June 15, 2018, as amended by addendum dated
July 6, 2018 and incorporating consensus of Participating Allocation Parties on March 22, 2019,
Batson Report, Appendix G at 3 (same).

11

ALCD-PUBCOM_0000892

references to (1) the mediator's impartiality or neutrality, and (2) the parties' voluntary self-determination.[25]

22. Viewed through the lens of mediation ethics, the Batson Process contemplates a role for Mr. Batson that is inconsistent with the ethical norm of neutrality or impartiality. Specifically, the Batson Process indicates that Batson will assume responsibility "to ensure that OCC is fairly represented in the allocation process."[26] Mr. Batson does not, however, assign a particular advocate to act on OxyChem's behalf. Instead, it appears from the documents that Mr. Batson intended to serve this role himself. This stance is ethically problematic in two ways: First, it mixes two different roles: that of neutral and that of advocate. Mediation ethics are clear that mediators can play only one role—that of mediator.[27] Second, it creates a condition in which the mediator is acting in tension with the interests of one or more of the disputants. The only reason one would need for OxyChem's interests to be represented in the process would be if their interests might, at least in some way or at some point, differ from the interests of one or more of the other disputants. But in that context, then, to represent or advocate for the interests of one disputant would necessarily mean not to advocate for (or

---

[25] See, e.g., American Bar Association / American Arbitration Association / Association for Conflict Resolution MODEL STANDARDS OF CONDUCT FOR MEDIATORS (2005), Standard II. ("A mediator shall conduct a mediation in an impartial manner and avoid conduct that gives the appearance of partiality."); *Id.*, Standard I. ("A mediator shall conduct a mediation based on the principle of party self-determination. Self-determination is the act of coming to a voluntary, uncoerced decision in which each party makes free and informed choices as to process and outcome.").

[26] Work Plan at 3.

[27] *See* FEDERAL INTERAGENCY ADR WORKING GROUP STEERING COMMITTEE, A GUIDE FOR FEDERAL EMPLOYEE MEDIATORS (2006) Standard VI ("The role of a mediator differs substantially from other professional roles. Mixing the role of another profession is problematic and thus, a mediator should distinguish between the roles. A mediator may provide information that the mediator is qualified by training or experience to provide, only if the mediator can do so consistent with these Standards."); MARYLAND JUDICIARY, MARYLAND STANDARDS OF CONDUCT FOR MEDIATORS (2020) Standard VI.G. ("During a mediation session, the mediator shall not perform any services other than as a mediator.")

12

perhaps even to advocate against) the other disputants' interests. This is precisely what the mediation ethic of neutrality or impartiality prohibits.

23. Self-determination in the mediation context has three components: First, it requires that "each party makes a free and informed choice as to process."[28] Second, it requires that "each party makes a free and informed choice as to … [the substantive] outcome."[29] Third, impliedly, self-determination means that it is the parties, rather than the neutral, who makes these choices.[30]

24. Viewed through the lens of mediation ethics, the Batson Process is inconsistent with each of these components of the norm of self-determination. The Batson Process explicitly provides that any party can opt not to participate.[31] But the Batson Process is also explicit that it will reach a substantive decision regarding all disputants who were initially designated as potential parties, regardless of whether they remain in the process.[32] From a mediation ethics perspective, these two facts sit awkwardly together. The mediation ethical norm of process choice would be rendered meaningless if it were reduced to "You can stay or go, but we're going to resolve your rights and interests with or without you." And mediation's companion ethical norm of substantive choice would be rendered meaningless if it were reduced to "You have a say in the outcome of the process only if you stay in the process, otherwise, those who remain in the process will choose for you."

---

[28] American Bar Association / American Arbitration Association / Association for Conflict Resolution MODEL STANDARDS OF CONDUCT FOR MEDIATORS (2005), Standard I.

[29] *Id.*

[30] *See, e.g.* FINAL REPORT OF ACR ETHICS COMMITTEE (2010) ("other than [in] arbitration or other leader-directed models of dispute resolution, decision-making authority rests with the participants.")

[31] *See* Diamond Alkali Superfund Site OU2 Allocation Confidentiality Agreement, Batson Report, Appendix F at 3 ("Any participant may withdraw from the allocation referred to herein upon written notice to the other Participants and Allocation Neutral.")

[32] *See* Sept. 11, 2018 ltr. from S. Flanagan (EPA) to D. Erickson at 2 n.1.

13

ALCD-PUBCOM_0000894

25. The fact that the Batson process declares the outcome of its proceedings to be "non-binding"[33] suggests that the outcome of the process will have no practical or legal effect on any disputant's interests or rights—at least not without their consent. This is precisely what the mediation ethic of self-determination requires. If, however, the Batson Process affects OxyChem's interests and rights,[34] then the process is inconsistent with mediation's ethical directive to support disputants' self-determination.

26. It is possible that mediation ethics do not represent the correct sub-set of "established norms and ethical standards of ADR professionals" against which to assess the Batson Process. There are, after all, ways in which the Batson Process does not share important characteristics with mediation. Most conspicuously, the Batson Process has parties making arguments to Batson (rather than to each other), as though Mr. Batson were the decision-maker (rather than a facilitator of the parties' negotiations).[35] To the extent the process is an adversarial, adjudicative one, in which the parties make arguments to a third-party decision-maker, then the ethics of arbitration or neutral evaluation, rather than mediation, would likely be the better lens through which to assess the propriety of the process.

---

[33] Nov 28, 2017 ltr. from E. Wilson (EPA) to M. Backus (OxyChem) at 4. *See also*, Batson Report at 6 ("While neither EPA nor the Allocation Parties are bound by the results of the Allocation ... EPA has committed to use the Allocator's recommended shares of relative responsibility among the Allocation Parties as a primary factor in its future negotiations."); Diamond Alkali Superfund Site OU2 Allocation Guide, June 15, 2018, as amended by addendum dated July 6, 2018 and incorporating consensus of Participating Allocation Parties on March 22, 2019, Batson Report, Appendix G at 4 (same); Diamond Alkali Superfund Site OU2 Allocation Protocol, Batson Report, Appendix H at 2 (same).

[34] The structure of the process suggests that its designers anticipated that the results would affect the interests and rights of even non-participants. Otherwise, there would be no reason for Batson to take pains to "to ensure that OCC is fairly represented" in the process. Work Plan at 3 ("the Allocation Team ... will spend additional resources to ensure that OCC is fairly represented in the allocation process.").

[35] *See infra* ¶ 28.

14

ALCD-PUBCOM_0000895

**Opinion 4. The Batson Process is inconsistent with at least three of the established norms and ethical standards of arbitration practice, and it is inconsistent with at least two of the established norms and ethical standards for neutral evaluators.**

27. "Arbitration" does not have a universally recognized definition. The Administrative Dispute Resolution Act,[36] under which the Batson Process was apparently conducted,[37] is silent about what constitutes an arbitration.[38] Even the Federal Arbitration Act includes no definition of the practice it intends to govern.[39] Still, most definitions of Arbitration share common elements: a process in which disputants submit arguments to an impartial party who is empowered to render a decision based on the merits of the dispute.

28. In this case, the Batson Process shares this basic structure with arbitration—one in which disputants submit information and arguments to an impartial party who is empowered to apply decision factors in order to arrive at a conclusion about the substantive merits of the dispute in question. It is true that the Batson Process provides that the Allocator "will not take a stand on the merits of substantive items under discussion."[40] At the same time, however, the Batson Process specifically provides time and opportunity for disputants to "comment on factors ... and contribute relevant information."[41] At the urging of many of the

---

[36] Administrative Dispute Resolution Act, 5 U.S.C. §§571-584.

[37] *See* Sept. 11, 2018 ltr. from S. Flanagan (EPA) to D. Erickson.

[38] *See* 5 U.S.C.A. §571 et seq. (providing a dozen different definitions of terms and multiple restrictions on arbitration practice, without defining arbitration).

[39] *See* Federal Arbitration Act 9 U.S.C. §§ 1 – 16; Burkhart, Daniel, *Agree to Disagree: The Circuit Split on the Definition of 'Arbitration'*, 92 U. Det. Mercy L. Rev. 57 (2015); Roberts, Niall Mackay, *Definitional Avoidance: Arbitration's Common-Law Meaning and the Federal Arbitration Act*, 49 UC Davis L. Rev. 1547 (2016).

[40] Work Plan at 5; Revised Work Plan at 4 (same, adding, "including but not limited to any substantive issues raised by OU2 PRPs.").

[41] Nov. 28, 2017 ltr. from E. Wilson (EPA) to PAPs re Allocation for OU2 Remedial Action, Batson Report, Appendix A at 2; Sept. 18, 2017 ltr. from E. Wilson (EPA) to PRPs re Allocation for OU2 Remedial Action, Batson Report, Appendix A at 2 (same). Mr. Batson, in turn, committed to taking "input and comments" from disputants. Sept. 11, 2018 ltr. from S. Flanagan (EPA) to D. Erickson at 2.

15

ALCD-PUBCOM_0000896

PAPs, the EPA increased the "time to communicate directly with Mr. Batson to address their views regarding their potential allocation share and the share potentially attributed to other allocation parties."[42] If Mr. Batson had no discretion to make decisions affecting the rights or interests of the disputants, I can see no reason why the PAPs would have been so concerned about having an opportunity to influence him. Furthermore, the Allocation Guide itself eventually provided that the "failure of a Participating Allocation Party to participate in compliance with the provisions of the Guide may be considered by the Allocator as a factor in determining such party's allocated share."[43] I can see no way to read this provision other than to suggest that Mr. Batson would have discretion to adjust allocations—placing him in the posture of a decision-maker. And, of course, the Batson Process culminates with Mr. Batson issuing a report reflecting his conclusions about the allocation of costs. As such, the ethics of Arbitration may be most apt to assess the procedural fairness of the Batson Process.

29. Although arbitration is fundamentally a creature of contract, and although most aspects of arbitration are customizable with the consent of the disputants, Arbitration as an ADR practice has a relatively well-established set of norms and ethical standards to which

---

[42] Jan. 5, 2018 ltr. from E. Wilson (EPA) to Batson Invitees, Batson Report, Appendix A, at 1.

[43] Diamond Alkali Superfund Site OU2 Allocation Guide, June 15, 2018, as amended by addendum dated July 6, 2018 and incorporating consensus of Participating Allocation Parties on March 22, 2019 at 3. That discretion, as I understand it, was bounded +/- 10%. *See* Batson Report at 34. But discretion need not be boundless in order to qualify as discretion.

16

ALCD-PUBCOM_0000897

arbitrators (and arbitration processes) must adhere.[44] These include, at a minimum,

foundational notions of consent,[45] impartiality or neutrality,[46] and fairness.[47]

30. Viewed through the lens of arbitration ethics, the Batson Process is inconsistent with the

foundational ethical requirement of consent. Outside of the context of mandatory non-

binding arbitration, arbitration happens only "whenever all parties consent."[48] It would be

ethically improper (and likely a legally unenforceable nullity) for an arbitrator to render a

decision affecting a disputant who did not consent to the dispute being submitted to the

arbitrator.

31. I have seen no evidence that OxyChem ever consented to the Batson Process. In a letter to

PRPs in September of 2017, the EPA indicated that it had "concluded that the allocation

---

[44] Perhaps the most widely recognized of these articulations is the American Bar Association / American Arbitration Association CODE OF ETHICS FOR COMMERCIAL ARBITRATORS (2004).

[45] *See* Administrative Dispute Resolution Act 5 U.S.C. §575(a)(1) ("Arbitration may be used as an alternative means of dispute resolution whenever all parties consent."). The Batson Process specifically points to the Administrative Dispute Resolution Act for statutory support. *See* Diamond Alkali Superfund Site OU2 Allocation Confidentiality Agreement, Batson Report, Appendix F at 2; Sept. 11, 2018 ltr. from S. Flanagan (EPA) to D. Erickson at 3. A non-binding form of arbitration exists in some contexts in which consent is not required because the process is statutorily mandated. But in all other contexts, arbitration is a process that requires the parties' consent, in one form or another. *See, e.g.,* American Bar Association / American Arbitration Association CODE OF ETHICS FOR COMMERCIAL ARBITRATORS (2004), Preamble ("pursuant to voluntary agreement of the parties"); MARYLAND STANDARDS OF CONDUCT FOR ARBITRATORS, FACT FINDERS, NEUTRAL EVALUATORS, AND SETTLEMENT CONFERENCE PRACTITIONERS (2020) Standard VI. ("A quality process requires a commitment by the neutral to diligence and procedural fairness. There should be adequate opportunity for each party to participate in the discussions. The parties decide when and under what conditions they will reach an agreement, be bound by an arbitration award or terminate a neutral.")

[46] *See* American Bar Association / American Arbitration Association CODE OF ETHICS FOR COMMERCIAL ARBITRATORS (2004), Canon I (impartiality); Canon II (avoiding appearances of partiality).

[47] *See id.,* Canon I ("fairness"); *id.,* Canon IV (fairness).

[48] Administrative Dispute Resolution Act 5 U.S.C. § 575(a)(1). In some contexts, parties may be bound to *ex ante* agreements to submit future disputes to arbitration for resolution. But I have seen no evidence in this record of any consent from OxyChem before or during the Batson Process.

17

process should include all" of the PRPs, apart from two select groups.[49] I do not know how to read the "should include" language. If that phrase merely intended to convey the message, "EPA thinks it would be helpful if everyone chose to participate," then that would suggest that disputants are still free to make a choice about whether to consent to participate or not. Two months later, EPA was still using language suggestive of meaningful choice or consent, indicating that they were merely "encourage[ing] OxyChem to participate actively and fully in the allocation process."[50] Six months after that, EPA described the process as "not mandatory."[51] By the end of 2018, however, it clarified that the Batson Process would assign "a share for each allocation party, regardless of whether that allocation party has chosen to participate."[52] Because OxyChem did not consent to Batson Process at all, much less to the prospect that Mr. Batson would "assign [it] a share,"[53] the process is inconsistent with the consent requirement embedded in arbitration ethics.

32. Viewed through the lens of arbitration ethics, the Batson Process is inconsistent with arbitration's foundational ethical requirement of impartiality in at least two ways. First, because arbitration is an adversarial process, arbitration ethics prohibit most forms of *ex parte* communication with the decision maker.[54] The Allocation Guide in this case clearly recognizes the fairness risks associated with *ex parte* communications, as it specifically prohibits parties from initiating communications with the Allocator in contexts that would

---

[49] 2017-09-18 Letter at 1.

[50] Nov 28, 2017 ltr. from E. Wilson (EPA) to M. Backus (OxyChem)

[51] May 1, 2018 ltr. from J. Fajardo (EPA) to D. Mandlebaum & E. Aronson, Batson Report, Appendix A at 1 ("The OU2 allocation process is not mandatory.") Note that EPA also describes the process as "non-binding." Nov 28, 2017 ltr. from E. Wilson (EPA) to M. Backus (OxyChem) at 3. Whether a process is not mandatory is a different question from whether any decisions rendered are non-binding.

[52] Sept. 11, 2018 ltr. from S. Flanagan (EPA) to D. Erickson at 2 n.1.

[53] *Id.*

[54] *See* American Bar Association / American Arbitration Association CODE OF ETHICS FOR COMMERCIAL ARBITRATORS (2004) Canon III.

18

give rise to concern.[55] In the very next section, however, the Allocation Guide provides that "The Allocator may contact and conduct communications with PAPs, individually or in groups, in any manner he deems appropriate to support conduct of the Allocation."[56] Arbitration ethics bar *ex parte* communications in order to prevent the arbitrator from being inappropriately influenced by the assertions of one party, in the absence other parties. Structurally, the Batson Process's communication rules are inconsistent with arbitration ethics.

33. The Batson Process is also inconsistent with arbitration's ethical requirement of impartiality because it envisions the "neutral" ensuring "that OCC is fairly represented" in the process. One form of arbitration involving panels of arbitrators specifically contemplates party-appointed arbitrators who serve a quasi-representational role. In that specific context, those arbitrators are released from the ordinary requirements of arbitrator neutrality.[57] I have found no indication in this record of someone aside from the Allocator being assigned to represent the interests of OxyChem in the process.[58] If the Allocator himself took on that responsibility, that would be inconsistent with the notion of impartiality embedded in arbitration ethics.[59]

---

[55] *See* Diamond Alkali Superfund Site OU2 Allocation Guide, June 15, 2018, as amended by addendum dated July 6, 2018 and incorporating consensus of Participating Allocation Parties on March 22, 2019, Section 5.2. Communications with Allocator at 12 (prohibiting ex parte communications by parties, except for technical reasons).

[56] *Id* at 5.2.d.

[57] See American Bar Association / American Arbitration Association CODE OF ETHICS FOR COMMERCIAL ARBITRATORS, Canons IX and X.

[58] I also see no evidence that OxyChem consented to having someone else represent their interests, which would raise consent concerns. *See* ¶¶ 30 – 31.

[59] See *id.*, Canon I (requiring that an arbitrator "serve independently from the parties" and that they "avoid conduct and statements that give the appearance of partiality toward or against any party").

19

34. Viewed through the lens of arbitration ethics, the Batson Process is inconsistent with arbitration's foundational ethical requirement of fairness.[60] The Batson Process specifically contemplates allocating percentages not only for Participating Allocation Parties, but also for non-participating Allocation Parties. The Allocator, however, only receives information from the PAPs and only hears arguments from PAPs. The Allocator committed to assigning 100% of the responsibility among the Allocation Parties (rather than assigning relative responsibility among PAPs). As a result, every party making an argument or presenting information to Batson would appear to have an incentive to urge increasing the responsibility assigned to non-participating Allocation Parties. Even if those arguments were made entirely in front of all PAPs, none of those PAPs would have an incentive to object. Instead, in the zero-sum nature of the allocation as it was structured, every party would have an incentive to persuade the Allocator to find the non-participating Allocation Parties responsible, at every turn. And the Allocator would never hear a contrary argument. In an adversarial, adjudicative system such as arbitration, this is structurally problematic, from a fairness perspective.[61]

35. It is possible that arbitration ethics do not represent the correct sub-set of "established norms and ethical standards of ADR professionals" through which to assess the Batson Process. There are, after all, ways in which the Batson Process does not share important characteristics with arbitration. The Batson Process does not refer to the process as an

---

[60] *See id,* Canon I.A ("An arbitrator has a responsibility not only to the parties but also to the process of arbitration itself and must observe high standards of conduct so that the integrity and fairness of the process will be preserved. Accordingly, an arbitrator should recognize a responsibility to the public, to the parties whose rights will be decided, and to all other participants in the proceeding.")

[61] Perhaps this consideration is what motivated some parties to elect to stay in the Batson Process. *See, e.g.,* Feb. 13, 2018 ltr. from D. Mandlelbaum to J. Fajardo (EPA) ("Benjamin Moore will participate in Mr. Batson's process if the process goes forward because it has no choice; Mr. Batson will assign a share to Benjamin Moore whether Benjamin Moore participates or not.")

20

"arbitration."[62] And the Batson Process specifically provides that the Allocator "will not take a stand on the merits of substantive items under discussion."[63] It is hard to imagine how an arbitrator could render a decision about a dispute without "taking a stand" on its merits. Here, Mr. Batson issues a report, having arrived at a conclusion on the question of the allocation of liability for response costs—the substantive issue in dispute.

36. To the extent the Batson Process does not empower the neutral to make any substantive decisions, then two ADR process possibilities arise. The first is that Mediation ethics are the more appropriate lens through which to judge the Batson Process. I have covered that possibility above in Opinion 3. The other possibility is that the ADR ethics of non-binding processes (either non-binding arbitration or neutral evaluation) represent the more appropriate lens.

37. The Batson Process is inconsistent with at least two of the norms and ethical standards of non-binding arbitration or neutral evaluation. First, ethics for Neutral Evaluation and for Non-Binding Arbitration contain all of the same admonitions regarding impartiality as Arbitration, which I have treated above.[64] Second, whereas binding Arbitration ethics require consent as to the process, Non-Binding Arbitration and Neutral Evaluation ethics require consent as to the substantive outcome.[65] The principle of consent in binding Arbitration is

---

[62] There is nothing particularly talismanic about the use of the specific word "arbitration." For example, the ABA/AAA Code provides specifically that it applies to all "proceedings in which disputes or claims are submitted for decision." American Bar Association / American Arbitration Association CODE OF ETHICS FOR COMMERCIAL ARBITRATORS, Preamble. It further provides that "the persons who have the power to decide should observe fundamental standards of ethical conduct. In this Code, all such persons are called 'arbitrators,' although in some types of proceeding they might be called 'umpires,' 'referees,' 'neutrals,' or have some other title." *Id.*

[63] Work Plan at 5; Revised Work Plan at 4 (same, adding, "including but not limited to any substantive issues raised by OU2 PRPs.").

[64] *See supra* ¶¶ 32 – 33.

[65] *See, e.g.,* MARYLAND STANDARDS OF CONDUCT FOR ARBITRATORS, FACT FINDERS, NEUTRAL EVALUATORS, AND SETTLEMENT CONFERENCE PRACTITIONERS (2020), Standard I. Self-

21

that a disputant can only ethically be bound by the substantive outcome of that process if the disputant consented to the process leading to the binding result. By contrast, the principle of consent in Neutral Evaluation (or Non-Binding Arbitration) is that a disputant can only ethically be bound by the substantive outcome of the process if the disputant consents to that substantive outcome or to a subsequent negotiated settlement. If the Batson Process is fairly characterized as a Neutral Evaluation, then established ADR ethics would provide that OxyChem's rights and interests should be affected only if it agreed to the substance of the Neutral Evaluator's opinion or to any subsequent resulting settlement. I have seen no evidence in this record that OxyChem provided such agreement.

## Conclusion

38. ADR Ethics represent an important lens through which to assess the procedural fairness of the Batson Process. The Batson Process is inconsistent with components of Mediation and Arbitration ethics, as those are commonly understood in the profession. Perhaps there is some set of "established norms and ethical standards of ADR professionals" of which I am not aware and to which the Batson Process adhered. On this record, however, I cannot determine what such norms or standards might have been. The Batson Process would have been consistent with ADR Ethics if (a) every disputant potentially affected by the outcome had consented to the process, or (b) the process allocated relative responsibility only among the disputants who consented to participate. However, neither of those things was true here.

---

Determination (distinguishing Arbitration parties "defin[ing] the scope of a process in which a decision is rendered" from Neutral Evaluation "giving the parties the ultimate decision-making power" to "accept or reject [the Neutral Evaluator's] determination."

ALCD-PUBCOM_0000903

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED on March 21, 2023

_____
Michael Moffitt

23

# REFERENCES

1. Administrative Dispute Resolution Act, 5 U.S.C.§§571-584

2. American Bar Association / American Arbitration Association / Association for Conflict Resolution MODEL STANDARDS OF CONDUCT FOR MEDIATORS (2005)

3. American Bar Association / American Arbitration Association CODE OF ETHICS FOR COMMERCIAL ARBITRATORS (2004)

4. Batson 2019 Resume, AlterEcho

5. Burkhart, Daniel, *Agree to Disagree: The Circuit Split on the Definition of 'Arbitration'*, 92 U. Det. Mercy L. Rev. 57 (2015)

6. Cole, Sarah, et al., MEDIATION LAW, POLICY, PRACTICE §5:3 n.18 (2d. ed 2003)

7. Department of Justice Contract / Purchase Order Number DJJ-16W-ENR01-0221

8. December 28, 2020 *Diamond Alkali Superfund Site OU2 Allocation Recommendation Report* by David Batson, Esq. of AlterEcho

9. Diamond Alkali Superfund Site OU2 Allocation Confidentiality Agreement, Batson Report, Appendix F

10. Diamond Alkali Superfund Site OU2 Allocation Guide, June 15, 2018, as amended by addendum dated July 6, 2018 and incorporating consensus of Participating Allocation Parties on March 22, 2019, Batson Report, Appendix G

11. Diamond Alkali Superfund Site OU2 Allocation Protocol, Batson Report, Appendix H

12. EPA Conflict Prevention and Resolution Services Contract, Contract #EP-W-14-020, Work Plan for Task Order #096, Diamond Alkali-Lower Passaic River Allocation

13. ERG Conflict Prevention and Resolution Services Contract# 68HERH19D0033, Task Order #009 Diamond Alkali-Lower Passaic River Allocation

14. Exon, Susan Nauss, *State Mediation Codes of Conduct and Mediation Ethical Advisory Opinions* in Omer Shapira, MEDIATION ETHICS: A PRACTITIONER'S GUIDE (2021 ABA Publishing)

15. Feb. 21, 2019 David Batson Expert Witness Testimony (*El Paso Natural Gas Co., LLC v. United States*, 2019 WL 5830841 (D. Ariz.))

16. Feb. 13, 2018 ltr. from D. Mandlelbaum to J. Fajardo (EPA)

17. Federal Arbitration Act 9 U.S.C. §§ 1 - 16

ALCD-PUBCOM_0000905

18. FEDERAL INTERAGENCY ADR WORKING GROUP STEERING COMMITTEE, A GUIDE FOR FEDERAL EMPLOYEE MEDIATORS (2006)

19. FINAL REPORT OF ACR ETHICS COMMITTEE (2010)

20. Jan. 5, 2018 ltr. from E. Wilson (EPA) to Batson Invitees, Batson Report, Appendix A

21. March 02, 2022 ltr. from E. Wilson (EPA) re Notice of Potential Liability and Notice of Consent Decree Negotiations

22. MARYLAND JUDICIARY, MARYLAND STANDARDS OF CONDUCT FOR MEDIATORS (2020)

23. MARYLAND STANDARDS OF CONDUCT FOR ARBITRATORS, FACT FINDERS, NEUTRAL EVALUATORS, AND SETTLEMENT CONFERENCE PRACTITIONERS (2020)

24. May 1, 2018 ltr. from J. Fajardo (EPA) to D. Mandlebaum & E. Aronson, Batson Report, Appendix A

25. Nov 28, 2017 ltr. from E. Wilson (EPA) to M. Backus (OxyChem)

26. Nov 28, 2017 ltr. from E. Wilson (EPA) to PAPs re Allocation for OU2 Remedial Action, Batson Report, Appendix A

27. Roberts, Niall Mackay, *Definitional Avoidance: Arbitration's Common-Law Meaning and the Federal Arbitration Act*, 49 UC Davis L. Rev. 1547 (2016)

28. Sept. 11, 2018 ltr. from S. Flanagan (EPA) to D. Erickson

29. Sept. 18, 2017 ltr. from E. Wilson (EPA) to PRPs re Allocation for OU2 Remedial Action, Batson Report, Appendix A

ALCD-PUBCOM_0000906

**ATTACHMENT 1. Resume of Michael Moffitt**

ALCD-PUBCOM_0000907

# Michael Moffitt

Philip H. Knight Chair in Law and Professor
The University of Oregon School of Law, 1221 University of Oregon, Eugene, OR  97403
541-346-0506    mmoffitt@uoregon.edu

## Experience

**University of Oregon**, Eugene, OR, 2001 – present
*Philip H. Knight Chair in Law (2011   present)*
*Orlando J. and Marian H. Hollis Professor of Law (2010   2011).*
*James O. and Alfred T. Goodwin Senior Faculty Fellow (2008 – 2010).*
*Associate Professor of Law (tenured 2005).*
*Assistant Professor of Law (2001 – 2005).*

- Teaching.  Courses have included first year, upper-division, and graduate school courses on Negotiation, Mediation, the Law of Settlement, Arbitration, Dispute Resolution, and Civil Procedure. Faculty in residence at the Clark Honors College (2019 – present), teaching range of undergraduate courses, including an introductory course on Visions of Conflict, a colloquium on Secrecy, Searching for the Cayuse Five, and a seminar on the Modern Justice System. See below for law school and university teaching awards.

- Scholarship.  Three books and more than two dozen articles in law reviews and specialty journals. Co-founder of the ADR law professors' blog.  See below for scholarly awards.

- University Service.  Elected Chair of the University President's Faculty Advisory Council. Elected member of the Intercollegiate Athletics Committee.  Twice served on search committees for new University of Oregon Presidents.

- Professional Service.  Chaired the Association of American Law Schools Section on Dispute Resolution.  Served on the Publications Board of the American Bar Association Section of Dispute Resolution.  Have served on the editorial board or the editorial advisory board for two peer-reviewed journals.

**Harvard Law School**, Cambridge, MA, January 2018 – June 2019
*Roger D. Fisher Visiting Professor in Negotiation and Conflict Resolution.* Lead instructor for three semester / term sessions of Harvard's Negotiation Workshop, drawing hundreds of graduate students from Harvard, MIT, and the Fletcher School for Law and Diplomacy. Also taught reading groups on Settlement and the Courts and on Lawyering and Settlement.

**University of Oregon School of Law**, Eugene, OR, 2001   present
*Dean (2011   2017)*

- Organizational Leadership.  Managed all aspects of the law school, including three degree programs, approximately 80 full-time employees, 75 part-time employees, foundation accounts of $25M, and an annual budget of approximately $20M.

ALCD-PUBCOM_0000908

# Michael Moffitt

## Experience (continued)

**University of Oregon School of Law**, Eugene, OR, 2001 – present
*Dean (2011   2017)* (continued from previous page)

- Strategic Planning and Implementation. Oversaw strategic planning process involving all employees and hundreds of highly engaged students and alumni, resulting in
    - o  Significant re-focusing of limited resources in small number of areas yielding competitive distinction. Oregon was one of only a handful of public law schools with three or more nationally-ranked specialty programs.
    - o  Launch of a new satellite campus in downtown Portland.
    - o  Expansion of clinical and experiential learning opportunities for students, including securing a new building to house clinics.
    - o  Launch of a new undergraduate program in Legal Studies.
    - o  Cost containment focused on relieving tuition pressure on students, resulting in three consecutive years of declining average student debt loads.
- Fundraising. Launched and led the organization through its most successful fundraising campaign in terms of total dollars, total donors, total documented estate gifts, and new donors. Raised more than $20M.
- Academic Programming. Provide ongoing leadership for three degree programs (J.D., LLM, and a Master's Degree in Conflict and Dispute Resolution). Assured timely implementation of undergraduate program and satellite campus, both of which were approved and implemented within three years of the initial proposals.
- Access and Diversity.
    - o  Increased annual student scholarship awards from $1.4M to $6.9M.
    - o  By 2017, the law school had the highest percentage of students of color in its history, the highest percentage of women in its history, and the highest percentage of students of color of any graduate school or college at the University of Oregon.
- Served six-year term as Dean. Declined invitation to serve another six-year term in order to return to the classroom and to research.

*Associate Dean for Academic Affairs (2008 – 2011).* Oversaw scholarly and curricular activity of the law school faculty. Responsible for J.D. curriculum, course scheduling, visiting and adjunct faculty, and junior faculty development.

*Associate Director, Appropriate Dispute Resolution Center (2001   2011).* Part of leadership team that managed all law school programs related to dispute resolution, including courses, conferences, competitions, symposia, and research. Significant accomplishments included the creation of a university-wide, inter-disciplinary master's program in conflict and dispute resolution. The program now educates more than 50 graduate students each year. The Dispute Resolution program has been ranked in the top ten in the country for several years in a row.

ALCD-PUBCOM_0000909

# Michael Moffitt

## Experience (continued)

### Harvard Law School, Cambridge, MA, 1997 – 2001

*Lecturer on Law (1999 – 2001).* Taught intensive courses on negotiation to second and third year law students and cross-registrants from other university graduate schools.

*Senior Fellow, Harvard Negotiation Research Project (1999 – 2001).* Conducted research projects and collaborated in the development of negotiation workshop curricula.

*Clinical Supervisor for the Harvard Mediation Program (1997 – 1999).* Supervised the operations of a clinical organization consisting of over 100 mediators serving twelve court systems or sessions.

### Conflict Management Group, Cambridge, MA, 1994, 1995 – 1998

*Senior Consultant.* Managed, designed, and delivered strategic assistance programs for public and private organizations in negotiation and conflict situations in almost twenty countries. Clients included the World Health Organization, the Supreme Court of Singapore, the Dutch Ministry of Justice, the World Bank, the Advocates Society of Canada, The Citadel, the Inter-American Development Bank, the Republic of Georgia, the Ktunaxa/Kinbasket Tribal Council, and the Organization for Security and Cooperation in Europe.

### U.S. District Judge Ann Aldrich, Cleveland, Ohio, 1994 – 1995

*Law Clerk.* Drafted opinions and bench memoranda for civil and criminal trials and for appellate cases. Developed and oversaw the implementation of the first fully electronic docketing and filing system in a federal district court.

## Education

### Harvard Law School, J.D., *cum laude* 1994

*Harvard Mediation Program.* President of clinical organization providing mediation services in Boston area courts.

*Harvard Negotiation Project.* Research assistant and teaching assistant for Professors Roger Fisher and Bruce Patton.

*Harvard International Law Journal.* Student editor.

### Marietta College, B.A., History, *summa cum laude,* Phi Beta Kappa, Valedictorian, 1991

Other Honors: Omicron Delta Kappa (national leadership), Alpha Lambda Delta (freshmen excellence), Phi Alpha Theta (history)

Student Government: Twice elected President of the Student Body & Student Senate, 1989 – 1991

Varsity Tennis: Four-year letter winner and three years as captain or co-captain, 1988 – 1991 Academic All-American, 1990 – 1991

ALCD-PUBCOM_0000910

# Michael Moffitt

## Publications

*Decision-making in Alternative Dispute Resolution*, in THE CAMBRIDGE HANDBOOK OF PSYCHOLOGY AND LEGAL DECISION MAKING (Monica Miller, et al, eds.) (with Erik Girvan and Jennifer Reynolds) (Cambridge) (forthcoming).

*Disciplining Mediators: Legal, Disciplinary, and Ethical Liability of Mediators,* in MEDIATION ETHICS: A PRACTITIONER'S GUIDE (Omer Shapira, ed., ABA Publishing) (2022)

*'Machiavelli and the Bar' and Ethical Ratcheting* in DISCUSSIONS ON DISPUTE RESOLUTION (Hinshaw, Schneider, Cole, eds. Oxford) (2021)

*Review of Morrill & Musheno: Navigating Conflict: How Youth Handle Trouble in a High-Poverty School.* 36 NEGOTIATION JOURNAL 73 (2020)

*Settlement Malpractice*, 86 UNIVERSITY OF CHICAGO LAW REVIEW 1825 (2019).

- Awarded the 2022 Dispute Resolution Advancement Award from the Hugh L. Carey Center for Dispute Resolution at St. John's University.
- Awarded the *Fred C. Zacharias Memorial Prize*, 2020, as the best scholarly article of the year by the Association of American Law Schools Section on Professional Responsibility.
- Named *Best Article of 2019 in the Field of Dispute Resolution* by the Association of American Law Schools Section on Dispute Resolution.

DISPUTE RESOLUTION: EXAMPLES & EXPLANATIONS (Aspen 2008), (2D ED. Aspen 2011), (3D ED. Aspen 2014), (4TH ED. Aspen 2019), co-authored with Andrea Kupfer Schneider.

DISPUTE RESOLUTION: BEYOND THE ADVERSARIAL MODEL 3D ED., (Aspen 2018), co-authored with Carrie Menkel-Meadow, Lela Love and Andrea Schneider.

*Frank Sander: Mentor to the Field of Dispute Resolution*, DISPUTE RESOLUTION MAGAZINE 14 (Fall 2012), co-authored with David Hoffman.

*Arthur Miller Scared the Hell Out of Me*, 90 OREGON LAW REVIEW 945 (2012).

*Commentary: The Overconfident Disputant* in MEDIATION ETHICS: CASES AND COMMENTARIES (Ellen Waldman, ed.) (Jossey-Bass 2011).

*Iqbal and Settlement*, 114 PENN ST. L. REV. PENN STATIM 51 (2010).

*Which is Better, Food or Water? The Rule of Law or ADR?*, DISPUTE RESOLUTION MAGAZINE 8 (Summer 2010).

*Islands, Vitamins, Salt, Germs: Four Visions of the Future of ADR in Law Schools*, 25 OHIO STATE JOURNAL ON DISPUTE RESOLUTION 25 (2010).

*Three Things to Be Against ("Settlement" Not Included)*, 78 FORDHAM LAW REVIEW 1203 (2009).

*The Four Ways to Assure Mediator Quality (and why none of them work)*, 24 OHIO STATE JOURNAL ON DISPUTE RESOLUTION 191 (2009).

   Translated and Reprinted: *Las cuatro formas de asegurar la calidad del mediador (y por qué* ninguna *funciona)* in Mediación: Hacia una mediación de calidad, (Florencia Brandoni, ed.) (2011).

ALCD-PUBCOM_0000911

# Michael Moffitt

## Publications (continued)

*Customized Litigation: The Case for Making Civil Procedure Negotiable*, 75 GEORGE WASHINGTON LAW REVIEW 461 (2007).

*Before the Big Bang: The Making of an ADR Pioneer*, 22 NEGOTIATION JOURNAL 437 (2006).

*The Wrong Model, Again: Why the Devil is Not in the Details of the New Model Standards of Conduct for Mediators*, DISPUTE RESOLUTION MAGAZINE 31 (Spring 2006).

*Learning to Learn to Negotiate: An Action Science Perspective*, (with Scott R. Peppet), in THE NEGOTIATOR'S FIELDBOOK, (C. Honeyman and A. Schneider, eds.) (2006).

*Create Value out of Conflict*, 9 NEGOTIATION 1 (Harvard Business School Publishing, June 2006), co-authored with Robert C. Bordone.

THE HANDBOOK OF DISPUTE RESOLUTION (Jossey-Bass 2005), co-edited with Robert C. Bordone.

2005 Book Award winner, The National Institute for Advanced Conflict Resolution.

*Pleadings in the Age of Settlement*, 80 INDIANA LAW JOURNAL 727 (2005).

Cited in *Sessions v. Dimaya*, 138 S.Ct. 1204, 1225 (2018) (J. Gorsuch, Concurrence).

*Schmediation and the Dimensions of Definition*, 10 HARVARD NEGOTIATION LAW REVIEW 69 (2005).

*Lights, Camera, Begin Final Exam: Testing What We Teach in Negotiation Courses*, 54 JOURNAL OF LEGAL EDUCATION 91 (2004).

*Contingent Agreements: Agreeing to Disagree about the Future*, 87 MARQUETTE LAW REVIEW 691 (2004), *updated and reprinted in* THE NEGOTIATOR'S FIELDBOOK, (C. Honeyman & A. Schneider, eds.) (2006).

*The Law of Bargaining*, 87 MARQUETTE LAW REVIEW 839 (2004), co-authored with Russell Korobkin & Nancy Welsh, *updated and reprinted in* THE NEGOTIATOR'S FIELDBOOK, (C. Honeyman & A. Schneider, eds.) (2006).

*Mediator Accountability: Ethical and Legal Standards of the Profession*, 28 AMERICAN JOURNAL OF TRIAL ADVOCACY 47 (2005).

*Mediation "Transparency" Helps Parties See Where They're Going, in* MEDIATION: APPROACHES AND INSIGHTS (Russ Bleemer, ed., CPR Institute for Dispute Resolution, 2005).

*Promises, Promises: Mediators and Their Contracts, in* ALTERNATIVES: CPR INSTITUTE FOR DISPUTE RESOLUTION (January 2004).

*Action Science and Negotiation*, 87 MARQUETTE LAW REVIEW 649 (2004), co-authored with Scott R. Peppet.

*What Me Liable? A Checkup for Mediators*, DISPUTE RESOLUTION MAGAZINE 25 (Summer 2003).

*Suing Mediators*, 83 BOSTON UNIVERSITY LAW REVIEW 147 (2003).

ALCD-PUBCOM_0000912

# Michael Moffitt

## Publications (continued)

*Ten Ways to Get Sued: A Guide for Mediators*, 8 HARVARD NEGOTIATION LAW REVIEW 81 (2003).

*Will This Case Settle? An Exploration of Mediators' Predictions*, 16 OHIO STATE JOURNAL ON DISPUTE RESOLUTION 39 (2000).

*An Introduction to Transparent Mediation, in* ALTERNATIVES: CPR INSTITUTE FOR DISPUTE RESOLUTION (June 1998).

*Remodeling the Model Standards of Conduct for Mediators*, 2 HARVARD NEGOTIATION LAW REVIEW 87 (1997), co-authored with Jamie Henikoff.

*Casting Light on the Black Box of Mediation: Should Mediators Make Their Conduct More Transparent?*, 13 OHIO STATE JOURNAL ON DISPUTE RESOLUTION 1 (1997).

*Loyalty, Confidentiality and Attorney-Mediators: Professional Responsibility in Cross-Profession Practice*, 1 HARVARD NEGOTIATION LAW REVIEW 203 (1996).

## Indisputably.org

One of four ADR law professors who founded indisputably.org, a part of the law professors blog network. Regularly publish timely and candid blog posts about scholarly, legislative, and practice developments in ADR, negotiation, mediation, and arbitration. Periodically post retractions of and/or apologies for the abovementioned blog posts.

## Languages

*French.* Highly proficient. I have taught workshops and provided professional consulting services in French, and I went to school and lived in France for more than three years. But more recent opportunities to practice have been largely limited to ordering wines off of a menu with a snobby accent and chaperoning middle school students on a trip to Quebec. I used to call myself "fluent," but I think "highly proficient" is probably about all I can responsibly claim to be at this point.

ALCD-PUBCOM_0000913

# Michael Moffitt

## Professional Awards

*Dispute Resolution Advancement Award.* 2022. Awarded annually by the Hugh L. Carey Center for Dispute Resolution at St. John's University for "published empirical research [that] furthers the advancement and understanding of the values and skills of dispute resolution."

*Fred C. Zacharias Memorial Prize.* 2020. Awarded to the best scholarly article of the year by the Association of American Law Schools Section on Professional Responsibility.

*Association of American Law Schools Section on Dispute Resolution, Best Scholarly Article,* 2019. Blind reviewed, awarded by faculty peers in the field of dispute resolution.

*University of Oregon Fund for Faculty Excellence Award.* 2007. Named in the first group of recipients at the University of Oregon to receive this award and five-year stipend. Only twenty faculty members received this honor university-wide.

*The 2005 National Institute for Advanced Conflict Resolution Book Award* for THE HANDBOOK OF DISPUTE RESOLUTION (co-edited with Robert C. Bordone) (Jossey-Bass 2005).

*Ersted Award for Distinguished Teaching.* 2004. Awarded annually to a University of Oregon professor to recognize "exceptional abilities to induce students to reason and not merely to memorize." Award recipients are selected by a committee of the University's faculty.

*Orlando J. Hollis Faculty Teaching Award.* 2004. Awarded annually to one University of Oregon law professor to recognize outstanding classroom instruction. The award is determined by a committee of the law faculty.

## Other Awards

*Marietta College Athletics Hall of Fame.* Inducted January 2015.

ALCD-PUBCOM_0000914

# Michael Moffitt

## Selected Conference Presentations

UNLV, Annual Beecroft Lecture, *Truth. Regardless of Reconciliation?*, February 2023, Las Vegas, NV.

Pepperdine, Works-in-Progress, *Negotiations that Never Happened,* October 2021, Malibu, CA.

Quinnipiac – Yale ADR Speaker Series, *Settlement Malpractice*, October 2019, Hamden, CT.

University of Maryland ADR Works-In-Progress Conference, *Settlement Malpractice*, October 2018, Baltimore, MD.

University of Nevada-Las Vegas, *Lawyers, Settlement, and the (tiny) Risk of Legal Malpractice*, September 2018, Las Vegas, NV.

New England Association for Conflict Resolution, *Mediator Quality Control*, April 2018, Cambridge, MA.

Watson Institute for International and Public Affairs, Brown University, *Negotiating Your Next (or current) Job,* Providence, RI, April 2018.

Harvard Mediation Program, *Mediator Transparency,* April 2018, Cambridge, MA.

TechStars Chicago, *Where Value Hides in Negotiations*, July 2017, Chicago, IL.

Novancia Business School, 6ème Biennale Internationale de la Négociation, *The Market(s) for Mediators*, November 2016, Paris, France.

Harvard Law School, *The Future of Mediation*, April 2016, Cambridge MA.

ABA Section of Dispute Resolution, *Legal Educators Colloquium: Integrating Dispute Resolution into the Curriculum,* April 2015, Seattle, WA.

Silicon Flatirons Center, *The Future of Law School Innovation,* panelist *Change Management: How Can Law Schools, Law Students, and Employers Develop a New* Model, Boulder, CO April 2014.

ABA Section of Dispute Resolution, *Legal Educators Colloquium: Approaches to Scholarship in ADR,* April 2012, Washington, DC.

National Symposium on Dispute Resolution in Special Education, *The Four Ways to Assure Mediator Quality (and why none of them work),* October 2011, Eugene, OR.

Harvard Law School, Program on Negotiation, Negotiation Pedagogy Project, *How I Learned to Stop Worrying and Love the Camera: Video in Negotiation Pedagogy,* April 2011, Cambridge, MA.

Oregon Trial Lawyers Association, *The Psychology and Economics of Settlement*, April 2011, Portland, OR.

ALCD-PUBCOM_0000915

# Michael Moffitt

### Selected Conference Presentations (continued)

International Ombudsman Association, *Transparency in Practice: Mediation Ideas for Ombuds*, April 2011, Portland, OR.

ABA Section of Dispute Resolution, *Legal Educators Colloquium: Revisiting Core Concepts,* April 2010, San Francisco, CA.

ABA Section of Dispute Resolution, *Legal Educators Colloquium: Mediation Shop Talk,* April 2009, New York, NY.

Harvard Law School, *Dispute System Design Symposium: Dispute Systems Design in Times of Crisis*, moderator, March 2008, Cambridge, MA.

Harvard Law School, Program on Negotiation Dispute Resolution Forum, *The Four Ways to Assure Mediator Quality (and why none of them work)*, February 2008, Cambridge, MA.

Marquette University Law School, Faculty Colloquium, *Customized Litigation,* March 2007, Milwaukee, WI.

University of Nevada Las Vegas, Saltman Center for Conflict Resolution, *Customized Litigation: The Case for Making Civil Procedure Negotiable*, February 2007, Las Vegas, NV.

Harvard Law School, *Perspectives on Dispute Resolution: A Conference Honoring Frank E. A. Sander*, April 2006, Cambridge, MA.

University of Oregon School of Law, Annual ADR Conference, *Mediation Ethics: Getting Paid, Being Sued, and Keeping Quiet*, February 2006, Eugene, OR.

Tennessee Supreme Court ADR Commission, Advanced Mediation Workshop, *Emerging Issues for the Modern Mediator*, November 2005, Nashville, TN.

Lane County (OR) Bar Association Section on Dispute Resolution, *Mediator Liability*, September 2005, Eugene, OR.

American Association of Law Libraries, Annual Conference, *Difficult Conversations,* July 2005, San Antonio, TX.

Law School Admissions Council, Annual Meeting, *Difficult Conversations*, June 2005, Indian Wells, CA.

International Academy of Mediators, Annual Conference, *Mediator Authenticity, Transparency and Deception*, May 2005, Montréal, PQ, Canada.

ABA Section of Dispute Resolution, Legal Educators Colloquium: *What Can Other Disciplines Teach Us?* April 2005, Los Angeles, CA.

ALCD-PUBCOM_0000916

# Michael Moffitt

### Selected Conference Presentations (continued)

Yale-Quinnipiac Dispute Resolution Speaker Series, *What We Think and What We Say: An Exploration of Mediator Transparency*, April 2005, Hamden, CT.

American Association of Law Schools Annual Meeting, *Experiments in Alternative Assessment*, January 2005, San Francisco, CA.

Law and Society Association Conference, *Canon of Negotiation Initiative: What Did We Get?*, May 2004, Chicago, IL.

American College of Civil Trial Mediators and International Academy of Mediators Annual Meeting, *Mediator Accountability: Ethical and Legal Standards*, April 2004, New Orleans, LA.

ABA Section of Dispute Resolution, Legal Educators Colloquium, *Grading in Skills-Based Classes*, April 2004, New York City, NY.

Wisconsin Association of Mediators, *Informed Practice: What Every Mediator Needs to Know*, November 2003, Madison, WI.

American Association of Law Schools Annual Meeting, *Ethics and Mediation*, January 2003, Washington, D.C.

Oregon State Bar Section on Dispute Resolution, *Emotions and Negotiation*, November 2002, Portland, OR.

Oregon Mediation Association Annual Meeting, *How to Get Sued (Or Not)*, November 2002, Portland, OR.

The Northern Kentucky University Labor-Management Conference, *Transparency in Mediation and Negotiation: The Pros and Cons of Speaking Your Mind*, May 2000, Newport, KY.

The Michigan Conference on Dispute Resolution, *Difficult Conversations: Practical Strategies for Handling Conversations We Dread*, November 1999, Ypsilanti, MI.

The Boston Bar Association Section on Litigation, *International Mediation*, September 1999, Boston, MA.

The CPR Institute for Dispute Resolution, *Transparency in Mediation*, June 1999, Santa Fe, NM.

ABA Section of Dispute Resolution, *Cognitive Barriers to Dispute Resolution*, April 1999, Boston, MA.

The Society of Professionals in Dispute Resolution Annual Conference, *Panel: Ethics in Mediation*, October 1998, Portland, OR.

ALCD-PUBCOM_0000917

# Michael Moffitt

**University, Law School, and Honors College Service**

Member, CHC First Year Experience Committee, 2022 - present
Judge, UO Undergraduate Research Forum, 2023
Member, UO Policy Advisory Council, 2020 - present
Chair, CHC Curriculum Committee, 2021 – 2022
Chair, CHC Teaching Innovation Award Committee, 2021 – 2022
Member, CHC Admissions Committee, 2020-2021
Member, CHC Curriculum Committee, 2019 – 2022
Chair, UO Distinguished Teaching Award Committee, 2019 – 2022
Member, CHC Appointments Committee for the Associate Dean for Faculty, 2019
Faculty Advisor, OUTLAWS, 2015 – 2017
Chair, UO General Counsel Search Committee, 2015
Member, UO Presidential Search Committee, 2014 – 2015
Member, UO Student Athlete Mentor Board, 2014 – 2017
Member, UO Deans Diversity Task Force, 2013 – 2014
Member, Savage Endowment for International Relations and Peace Committee, 2006 – 2012
Member, University of Oregon Task Force on Endowed Faculty Positions, 2012
Chair, University of Oregon Task Force on Portland Initiatives, 2012
Member, University of Oregon Task Force on Endowed Faculty Positions, 2012
Member, University of Oregon Presidential Transition Team, 2009
Member, Oregon University System – UO Presidential Search Committee, 2008 – 2009
Member, Provost's Advisory Council on Academic Excellence, 2007 – 2008
Member, Intercollegiate Athletics Committee (elected by University faculty), 2003 – 2008
Member, University Enrollment Management Committee, 2006 – 2007
Chair, Law School Curriculum Committee, 2006 – 2007
Member, President's Faculty Advisory Council (elected by University faculty), 2005 – 2007
    Chair (elected), 2006 – 2007
Member, University Distinguished Service Award Committee, 2004 – 2005, 2006 – 2007
Member, Dean's Advisory Committee (elected by law faculty), 2005 – 2006
Member, University Distinguished Teaching Award Committee, 2005 – 2006
Chair, Law School Library Committee, 2004 – 2005

ALCD-PUBCOM_0000918

# Michael Moffitt

## Professional and Other Service

American Association of Law Schools, Section on Dispute Resolution
Chair, 2005 – 2007, Member of Executive Committee, 2004 – 2007, 2020 – present

Oregon Labor and Employment Relations Association
Board Member, 2022 – present

United States District Court for the District of Oregon
Member, Merit Screening Committee – Federal Public Defender, 2014

Oregon State Bar
Bench/Bar Professionalism Commission, 2011 – 2012
Member, Out-of-State Lawyers in Arbitration Task Force, 2010 – 2011

American Bar Association Section of Dispute Resolution
Publications Board, 2008 – 2018
Planning Committee Member, Legal Educators Colloquium, 2003 – 2005, 2006 – 2007

Conflict Resolution Quarterly
Editorial Board Member, 2008 – 2011

## Tenure & Promotion External Reviewer

Have provided external reviews of candidates for tenure or promotion at Harvard Law School,
Vermont Law School, Texas Tech University, the University of Nebraska College of Law, UNLV
Boyd School of Law, Northern Illinois University College of Law, Yeshiva University Cardozo
School of Law, and the National University of Singapore.

## Board Memberships

Marietta College (Marietta, Ohio), 2013 – present
Member, Board of Trustees
Member, Executive Committee of the Board, 2015 – 2017, 2021 – present

Dispute Resolution Magazine (ABA), 2017 – present
Co-Chair of the Editorial Board

Consensus Building Institute (Cambridge, MA), 2017 – present
Board Member, Governance Committee Chair (2022 – present)
Vice-Chair of the Board (2021 – present)

Negotiation Journal (Program on Negotiation at Harvard Law School), 2020 – present
Editorial Advisory Board Member

Eugene Public Library Foundation (Eugene, OR), 2017 – 2018
Board Member

ALCD-PUBCOM_0000919

# APPENDIX B.7
Pradeep Mugunthan Declaration

ALCD-PUBCOM_0000920

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
|     Plaintiff, | ) Civil Action No. 2:22-cv-7326 |
| | ) |
| v. | ) |
| | ) |
| ALDEN LEEDS, INC., *et al.* | ) |
| | ) |
|     Defendants. | ) |
| | ) |
| | ) |

## DECLARATION OF PRADEEP MUGUNTHAN

ALCD-PUBCOM_0000921

# TABLE OF CONTENTS

PURPOSE OF THIS DECLARATION..................................................................................... 4

QUALIFICATIONS .............................................................................................................. 4

SUMMARY OF OPINIONS ................................................................................................. 5

SUPPORTING INFORMATION FOR OPINIONS ............................................................. 6

    Opinion 1.  The salt front does not extend upstream of RM 8 frequently, and it
        very rarely goes upstream of RM 10........................................................................ 7

    Opinion 2.  The geomorphology of the upper 9 miles is substantially different
        from the lower 8.3 miles.......................................................................................... 16

    Opinion 3.  Sediment-bound, tidally driven upstream contaminant transport from
        the lower 8.3 miles to the upper 9 miles does not consistently explain the
        observed surface and subsurface sediment patterns of 2,3,7,8 TCDD in the
        upper 9 miles, which are distinctly different from the lower 8.3 miles............... 18

    Opinion 4.  Alternative upstream sources provide a more rational explanation of
        the contaminant accumulation in areas above RM 10 rather than
        predominantly tidally driven upstream transport from the lower 8.3 miles. ........ 25

    Conclusion ..................................................................................................................... 27

REFERENCES ..................................................................................................................... 29

ATTACHMENT 1    Resume of Dr. Pradeep Mugunthan, P.E. .......................................... 30

# LIST OF FIGURES

**Figure 1.** Illustration of Suspended Sediments Transport in the Lower Passaic River.................. 9

**Figure 2.** Lower Passaic River Sediment Characterization based on Side Scan Sonar Survey.... 10

**Figure 3.** Salt Front Location as a Function of Discharge at Dundee Dam (extracted from the
Remedial Investigation Report [CPG 2019])........................................................................ 11

**Figure 4.** Relationship between flows at Dundee Dam and Little Falls. ..................................... 12

**Figure 5.** Estimated (1900 to 2022) and Measured (2007 to 2022) Flows at Dundee Dam. ....... 12

**Figure 6.** Distribution of the Frequency of the Salt Front (2 ppt isohaline) Location within the
Lower Passaic River. ............................................................................................................ 13

**Figure 7.** Estimated Location of the Salt Front in the Lower Passaic River during the 1960s.... 15

**Figure 8.** Cross-sectional Area of the Lower Passaic River (extracted from the Remedial
Investigation Report [CPG 2019]). ....................................................................................... 16

**Figure 9.** Average Navigational Channel Depth and Dredging History in the Lower Passaic
River (extracted from the OU4 RI)........................................................................................ 17

**Figure 10.** 2,3,7,8 TCDD Patterns between RM 11.25 and RM 11.5........................................... 21

**Figure 11.** 2,3,7,8 TCDD Patterns between RM 11 and RM 10.75.............................................. 22

**Figure 12.** 2,3,7,8 TCDD Patterns between RM 4 and RM 4.5.................................................... 23

ALCD-PUBCOM_0000922

**Figure 13.** 2,3,7,8 TCDD Patterns between RM 3 and RM 3.4.................................................... 24
**Figure 14.** 2,3,7,8 TCDD Patterns at a Silt Deposit outside the 2013-2014 TCRA Remediation
     Area................................................................................................................................... 26

## LIST OF TABLES

**Table 1.** Comparison of the Estimated Salt Front Location (River Mile) during the Drought from
     1962 to 1966 Relative to the Long-term Period from 1900 to 2022..................................... 15

ALCD-PUBCOM_0000923

## PURPOSE OF THIS DECLARATION

Pursuant to 28 U.S.C. § 1746, I, Pradeep Mugunthan, declare the following:

1. I have been retained by Langsam Stevens Silver & Hollaender LLP on behalf of Occidental Chemical Corporation to provide expert opinions related to Operable Unit 2 (OU2) and Operable Unit 4 (OU4) of the Lower Passaic River Study Area (Passaic), specifically as a consulting expert on hydrodynamic, sediment and contaminant fate and transport modeling.

2. My assignment included providing expert responses to the following question:

   **Is the tidal nature of the Passaic a sufficient basis for applying an allocation of OU2 remedial costs to a settlement for OU4 remedial costs?**

## QUALIFICATIONS

3. I have a Ph.D. in Civil and Environmental Engineering from Cornell University. I am also a registered Professional Engineer in the states of California and Washington. In my nearly 20 years of professional practice as a consulting environmental engineer, I have performed hydrodynamic, sediment and contaminant fate and transport evaluations at various estuarine and freshwater systems and am familiar with generally accepted scientific methodologies used to assess, evaluate, and measure the fate and transport of contaminants in hydrodynamic environments. Additional details of my qualifications are available in the attached resume (Attachment 1).

4

ALCD-PUBCOM_0000924

## SUMMARY OF OPINIONS

4. **Opinion 1**: The salt front in the Passaic does not extend above river mile (RM) 8 frequently and very rarely goes above RM 10. Even in the summer, when freshwater inflows are lower, the salt front is expected to move upstream of RM 8 on less than 1 out of 5 days.

5. **Opinion 2:** The geomorphology of the upper 9 miles of the Passaic River (OU4) is substantially different from the lower 8.3 miles (OU2). OU4 is narrower and shallower, resulting in more erosion and smaller pockets of silt deposits. OU2 is much wider, substantially deeper, and is predominantly depositional with large silty areas. OU4 has fundamentally different hydrodynamic and sediment transport drivers than OU2.

6. **Opinion 3:** The observed patterns of 2,3,7,8 tetrachlorodibenzo-p-dioxin (TCDD) in the upper 9 miles of the OU4 sediments are distinctly different from the those in OU2. The presence of TCDD in the upper 9 miles of OU4 cannot be fully explained by the theory that tides carried TCDD-contaminated sediments from OU2 to OU4. The higher surface sediment concentrations in OU4 are inconsistent with the surface sediment concentrations in OU2. Sediment and contaminant mass budgets do not provide sufficient evidence of net upstream mass transport from OU2 to OU4 that can fully explain the observed contaminant levels within OU4 to support this hypothesis.

7. **Opinion 4:** A more rational explanation for TCDD accumulation above RM 10 is that there were sources of TCDD above RM 10. There are known historical, and possibly ongoing, sources of TCDD contamination to OU4 tributaries that may better explain the observed concentrations.

5

ALCD-PUBCOM_0000925

## SUPPORTING INFORMATION FOR OPINIONS

8. My opinions were developed using the information presented in the July 2019 OU4 Remedial Investigation Report (OU4 RI), the proposed consent decree from U.S. District Court of New Jersey Civil Action No, 2:22-cv-07326 (Consent Decree), the U.S. Environmental Protection Agency's 2021 Record of Decision for an Interim Remedy (OU4 ROD), the U.S. Geological Survey (USGS) flow data for the Passaic River at Little Falls, New Jersey (USGS Gage No. 01389500) and at the Dundee Dam (USGS Gage No. 01389890), as well as additional references cited herein.

9. My opinions were developed to specifically assess the proposed Consent Decree's statement that "the LPRSA is tidal [meaning] that release of COCs into the river from the facilities would have been transported and settled throughout the LPRSA." The Consent Decree suggests that the hydrodynamic, sediment, and contaminant fate and transport mechanisms are functionally the same in the upper 9 miles of OU4[1] as in the lower 8.3 miles in OU2, warranting the same proportional allocations of responsibility for the two areas. The opinions below are structured under four categories to answer the following questions:

- How frequently does the salt front extend into OU4?

- Are there any fundamental differences between OU4 and OU2?

- Could the estimated upstream mass flux[2] sufficiently explain the observed spatial patterns of contaminant distribution?

---

[1] The Consent Decree defines OU4 as the entire 17-mile stretch of the lower Passaic River from Dundee Dam to Newark Bay. The lower 8.3 miles is defined as OU2 within the Consent Decree. Throughout this declaration, OU4 is used synonymously with the upper 9 miles of OU4. Any discussion specific to the lower 8.3 miles of the Passaic River is called out as OU2.

[2] The term mass flux is used in this Declaration to refer to the movement of sediment and contaminant mass per unit time from one cross-section of the river to another (for example upstream flux or downstream flux). Mass flux is also used to refer to the exchange of sediment and contaminant mass per unit between the water column and the sediment bed (for example, depositional flux or erosional flux).

6

ALCD-PUBCOM_0000926

- Are there alternative explanations for the pockets of elevated contaminant concentrations in OU4?

**Opinion 1. The salt front in the Passaic does not extend above river mile (RM) 8 frequently and very rarely goes above RM 10. Even in the summer, when freshwater inflows are lower, the salt front is expected to move upstream of RM 8 on less than 1 out of 5 days.**

10. The OU4 RI proposes that riverbed sediments are carried upstream by the salt front (CPG 2019; Chant et al. 2011). The tide carries salty ocean water upstream into the river; the "salt front" is the border where ocean water and river water meet. For this discussion, I adopt the OU4 RI's definition of the salt front as 2 parts per thousand (ppt) isohaline—as noted in the OU4 RI, a lower salinity threshold would push the salt front further upstream, but almost never above RM 14 (CPG 2019). The salt front is predominantly located within the lower 8 miles (Chant et al. 2011). Depending on the freshwater flows from Dundee Dam and the tidal phase, the location of the salt front can shift within the Passaic River (Figure 1). The salt front exhibits higher turbidity and carries suspended sediments and sediment-bound contaminants with it (CPG 2019; Chant et al. 2011). This zone of high turbidity is referred as the estuarine turbidity maximum (ETM).

11. The direction of net suspended sediment transport due to the interaction of freshwater inflows and tides are illustrated in Figure 1. During periods of moderate or high freshwater flows, the solids that are carried upstream with the ETM during the flood tide is typically lower than the solids that are resuspended and carried downstream during the ebb tide. This phenomenon is known as tidal asymmetry (Chant et al. 2011). During periods of low freshwater flow the direction of tidal asymmetry could reverse, thereby causing a net upstream transport of solids along the ETM (Chant et al. 2011). With moderate or high freshwater flows, the solids brought in from upstream mix with the solids brought in from OU2, resulting in dilution of sediment-bound contaminants within both OU2 and the upper 9 miles of OU4. Moreover, because of the narrow and shallower channel, the upper 9 miles of OU4 tend to have higher velocities that result in largely erosional conditions with pockets of depositional areas. In contrast, OU2 is wider and

7

deeper, and therefore, results in a predominantly depositional environment. This is evident in the sediment characterization from the side-scan sonar data presented in the OU4 RI, which shows coarse-grained sediments within the upper 9 miles with pockets of silt deposits, whereas OU2 is comprised predominantly of silty sediments (Figure 2).

12. The proportional allocation in the Consent Decree is predicated on the salt front extending into the upper 9 miles frequently enough and distributing sediments and sediment-bound contaminants in a similar manner as OU2 to warrant the same proportional allocations, regardless of the source or location of the contaminants and suspended sediments input to the system.

8

ALCD-PUBCOM_0000928



**Figure 1.** Illustration of Suspended Sediments Transport in the Lower Passaic River.

ALCD-PUBCOM_0000929



Notes: 2005 side scan sonar (SSS) data were downloaded from the digital library maintained by OurPassaic.org

**Figure 2.** Lower Passaic River Sediment Characterization based on Side Scan Sonar Survey.

10

ALCD-PUBCOM_0000930

13. To assess whether the tidal nature of the lower Passaic River (particularly the salt front) can sufficiently explain contaminant distributions within the upper 9 miles, I examined the frequency with which the salt front extends upstream of RM 8, near the upper boundary of OU2 (which ends at RM 8.3). To support this analysis, I applied the log-linear relationship[3] between the freshwater inflows at Dundee Dam versus the location of the salt front provided in Figure 3-5 of the OU4 RI, reproduced below as Figure 3. The log-linear relationship in Figure 3 was filtered to remove the effects of daily tides, meaning that the actual salt front location could be higher or lower than this estimate on any given day, but this would be representative of its average location for that day. The OU4 RI indicates that location of the salt front can range between 2.5 and 4.5 miles from low to high tide.



Note: Salt front defined as the point location of 2 parts per thousand (ppth) salinity at the bottom of the water column. The river discharge is simulated from USEPA's hydrodynamic model (HQI 2006) for the water years 1995 to 2004. The time-series of predicted salt front locations was low-pass filtered in order to extract only the response to discharge events (i.e., the daily tidal variability of the results is removed).

**Figure 3.** Salt Front Location as a Function of Discharge at Dundee Dam (extracted from the Remedial Investigation Report [CPG 2019]).

---

[3] The "log linear relationship" exhibited a higher correlation compared to the power relationship presented in Figure 3-5 of the OU4 RI.

11

14. Daily average flows are available from 2007 to present at Dundee Dam[4] and from 1897 to present at Little Falls[5] (see Figure 2 for locations of the USGS gages). For periods when data were available at Dundee Dam and Little Falls, the flows at Dundee Dam were highly correlated to the flows at Little Falls (Figure 4). I used this regression relationship to estimate flows at Dundee Dam from 1900 to the present (Figure 5).



**Figure 4.** Relationship between flows at Dundee Dam and Little Falls.



**Figure 5.** Estimated (1900 to 2022) and Measured (2007 to 2022) Flows at Dundee Dam.

---

[4] USGS Gage No. 01389890.

[5] USGS Gage No. 01389500.

ALCD-PUBCOM_0000932

15. Using the estimated and measured flows at Dundee Dam, I estimated the location of the salt front using the log-linear relationship in Figure 3. The predicted frequency of the salt front's location each year from 1900 to 2022 is shown in Figure 6.



**Figure 6.** Distribution of the Frequency of the Salt Front (2 ppt isohaline) Location within the Lower Passaic River.

13

ALCD-PUBCOM_0000933

16. It is evident from Figure 6 that the salt front seldom extends upstream of RM 12 and is most often located between RM 4 and 6. Even after accounting for tidal excursion of 2.5 to 4.5 miles, the distributions in the upper panel of the Figure 6 would not appreciably change the perspective that the salt front is predominantly located in OU2. The lower panel shows that the salt front would have extended into the upper 9 miles of OU4 fewer than 50 days a year. Over the long-term flow record from 1900 to 2022, the salt front is estimated to be within OU2 93% of the time year-round and 83% of the time during the low flow period from July to October. This indicates that even under summer low flow conditions, the salt front seldom (no more than 1 in 5 days) extends into the upper 9 miles of OU4.

17. Even during the drought of 1960s, the estimated location of the salt front seldom went past RM 10 (Figure 7). On average, the salt front was further upstream by approximately 1.3 miles compared to the longer period of record (Table 1). However, even though the salt front may have shifted further upstream during periods of low flow, there were still runoff events that would have shifted the salt front downstream (Figure 7).

18. These findings are consistent with the conceptual hydrodynamic regime described in the OU4 RI, which notes:

> From Dundee Dam (RM 17.4) to approximately RM 14, the LPR behaves like a tidal river; that is a freshwater stream influenced by tides…Between RM 14 and RM 8, the LPR behaves more like a fluvial estuary, with a mix of freshwater and brackish waters and geomorphology strongly influenced by riverine processes in addition to tides…Downstream of RM 8, the LPR behaves like an upper estuary, that is, characterized by the mixing of freshwater and saltwater, and the strong influence of estuarine circulation.

The conceptual model of the Passaic presented in the OU4 RI and illustrated by the location of the salt front shown above, show that the tidal nature of the Passaic would not necessarily provide the same hydrodynamic regime in OU4 and OU2. Since hydrodynamics is the fundamental driver of sediment and contaminant fate and transport, and existing information indicates that the upper 9 miles of OU4 has a fundamentally different hydrodynamic regime

14

than OU2, using the proportional allocation of responsibility for OU2 contamination to draw conclusions about responsibility for contaminants in the upper 9 miles of OU4 solely on the basis of the lower Passaic River being tidal is not scientifically supported by the available evidence.



**Figure 7.** Estimated Location of the Salt Front in the Lower Passaic River during the 1960s.

**Table 1.** Comparison of the Estimated Salt Front Location (River Mile) during the Drought from 1962 to 1966 Relative to the Long-term Period from 1900 to 2022.

| Statistic | 1900 to 2022 | 1962 to 1966 |
|---|---|---|
| Average | 5.30 | 6.58 |
| 10th percentile | 2.92 | 4.01 |
| Median | 5.28 | 6.78 |
| 90th percentile | 7.76 | 8.54 |

15

ALCD-PUBCOM_0000935

**Opinion 2. The geomorphology of the upper 9 miles of the Passaic River (OU4) is substantially different from the lower 8.3 miles (OU2). OU4 is narrower and shallower, resulting in more erosion and smaller pockets of silt deposits. OU2 is much wider, substantially deeper, and is predominantly depositional with large silty areas. OU4 has fundamentally different hydrodynamic and sediment transport drivers than OU2.**

19. OU4 has a fundamentally different geomorphology than OU2. As characterized in the OU4 RI, the upper 9 miles of the Passaic functions like "*a tidal river*" or "*a freshwater stream influenced by tides*", whereas the lower 8 miles functions as an "*upper estuary . . . characterized by mixing of freshwater and saltwater*".[6] The cross-sectional areas are substantially different between OU4 and OU2 (Figure 8).



**Figure 8.** Cross-sectional Area of the Lower Passaic River (extracted from the Remedial Investigation Report [CPG 2019]).

20. There is also a distinct narrowing of the cross-sectional area below the confluence of the Second River at RM 8. Even after accounting for navigational dredging of OU4 in the mid-

_____

[6] OU4 RI at 63.

16

1970s, the maximum depths in OU4 were substantially shallower than in OU2 during the

periods of heaviest COC contamination (Figure 9).

21. The differing depths mean that OU4 is predominantly erosional with pockets of fine sediments,

whereas OU2 is predominantly depositional, comprising largely of fine-grained sediments (see

Figure 2). The OU4 ROD characterizes this as follows:

> At RM 8.3 there is a pronounced change in the sediment texture within the
> riverbed.... [T]he riverbed from RM 0 to RM 8.3 is dominated by fine-grained
> sediments, while coarser sediments (sand and gravel) with smaller areas of pockets
> of fine-grained sediments generally comprise the riverbed above RM 8.3. About
> 85 percent of the fine-grained sediment surface area (90 percent by volume) of the
> LPR is located below RM 8.3... wider and thicker beds of contaminated sediments
> accumulated below RM 8.3 due to a combination of a wider cross section and a
> deeper navigational channel.



**Figure 9.** Average Navigational Channel Depth and Dredging History in the
Lower Passaic River (extracted from the OU4 RI).

17

ALCD-PUBCOM_0000937

**Opinion 3.  The observed patterns of 2,3,7,8 tetrachlorodibenzo-p-dioxin (TCDD) in the upper 9 miles of the OU4 sediments are distinctly different from the those in OU2. The presence of TCDD in the upper 9 miles of OU4 cannot be fully explained by the theory that tides carried TCDD-contaminated sediments from OU2 to OU4. The higher surface sediment concentrations in OU4 are inconsistent with the surface sediment concentrations in OU2. Sediment and contaminant mass budgets do not provide sufficient evidence of net upstream mass transport from OU2 to OU4 that can fully explain the observed contaminant levels within OU4 to support this hypothesis.**

22. The conceptual model of upstream contaminant transport presented in the OU4 RI indicates a historical net upstream flux under low flow conditions (see Figure 1). The sediments carried upstream would he diluted by fine sediments brought from Dundee Dam and trihutaries during high freshwater flow events. In the case of 2,3,7,8 TCDD, the OU4 RI indicates that much of the contaminant loading to the river occurred in the 50s and 60s. 2,3,7,8 TCDD-contaminated sediments would be expected to get buried by cleaner fine sediments in historically depositional areas in OU4, similar to the burial of contaminated sediments from the 50s and 60s indicated in OU2.

23. An examination of the mass budget of cohesive solids presented in the OU4 RI and corresponding sediment transport model simulations indicate that there is a large net *downstream* flux from the OU4 to the OU2 segment over the long-term, even during low flow conditions. In particular, the long-term (1996 to 2013) mass budget presented in the OU4 RI indicates that the upper 9 miles of OU4 lost approximately 75 metric tons of cohesive solids each day (MT/d) to OU2, with a net erosion of 177 MT/d of fine sediments and a net deposition of 172 MT/d. Over this period, the net upstream solids flux between RM 14.8 and the Dundee Dam was 69 MT/d. This would indicate that over the long term, the erosional flux is larger than the depositional flux, which is consistent with the characterization of the upper 9 miles of OU4 as largely erosional. The model results also indicated that during the lowest measured flow period (June 15 to June 29, 2005), when the daily average freshwater inflow at Dundee Dam was less than 300 cubic feet per second (cfs) (comparable to those encountered during the drought of the 1960s), there was still a net downstream export of approximately 6 MT/d

18

from RM 14.8 – RM 8. Over this period, the net flux of upstream solids from Dundee Dam to RM 14.8 was 8 MT/d (12.53 MT/d downstream and 4.53 MT/d upstream).

24. The evidence above suggests that even under extreme low flow conditions, the influx of fine cohesive solids from the incoming tide is more or less balanced by the resuspension of those solids with the outgoing tide. The balance between the erosion and the deposition fluxes of fine solids in OU4 also seems to hold during the moderate flow periods (as presented for October 2009 to March 2010 in the OU4 RI). During the high flow periods, it is largely erosional.

25. The contaminant mass budgets for 2,3,7,8 TCDD and tetra-PCB in the OU4 RI also show a similar pattern of net *downstream* fluxes (*i.e.*, export from the upper 9 miles of OU4 to OU2). This pattern holds in both the long-term simulation, and during specific periods of high, moderate, and low flows, with the sediment-bound transport and erosion/deposition shown to be the predominant contaminant transport mechanism under all of these conditions.

26. While historical navigational dredging may have resulted in the maintenance of a somewhat deeper channel in the upper 9 miles of OU4, Figure 9 shows that the median depths during historical navigational maintenance were not appreciably different from the current (2007) average bathymetric depths in OU4, unlike OU2 which was dredged much deeper than current conditions. This would suggest the hydrodynamic and sediment transport regime within the Passaic was not appreciably different historically within the upper 9 miles of OU4 despite the cessation of maintenance dredging in the 1970s.

27. The discussion above suggests that if TCDD only migrated with the tides from the sources in OU2, and was entrapped in the fine sediment areas of upper 9 miles of OU4, higher concentrations in deeper sediment profiles should be apparent during periods of highest loading from OU2. That is, deeper sediments should exhibit higher concentrations of TCDD than subsurface sediments, with surface layers exhibiting dilution from cleaner upstream

19

ALCD-PUBCOM_0000939

sediments. But an examination of the TCDD profiles presented in the OU4 RI indicates that in the upper 9 miles of OU4, the highest concentrations often occurred near the surface or in the upper sections of the sediment cores (Figures 10 and 11). These figures also show that there is not a clear or consistent relationship between TCDD peaks and the Cesium-137 (Cs-137) peaks.[7] Some cores show Cs-137 peaks at depth, but contamination at the surface,[8] while others show a Cs-137 peak near the surface with a concomitant higher concentration (see A02-SD1, 11B-0331 and CLRC-067 in Figure 11). In contrast, most cores in the lower 8 miles, particularly those closer to the Lister Avenue site, show contamination at depth, with surface sediments showing significantly lower concentrations indicating dilution and burial with cleaner sediments, and a relatively consistent Cs-137 peak at depth that often coincides with deeper and higher 2,3,7,8 TCDD levels (Figures 12 and 13). One explanation for the presence of high surface sediment contamination in the upper 9 miles of OU4 is that erosion could have mobilized and redistributed historical contamination; but then, such instances would also be associated with high runoff events with significant sediment loading from freshwater sources. Thus, any contaminants mobilized by erosion would likely be diluted when it is redeposited (as is observed in OU2), which is not apparent in the surficial sediment concentrations within the upper 9 miles of OU4.

---

[7] Peaks in the radioisotope Cs-137 are used in the OU4 RI to infer the age of the sediments (and associated sediment-bound contaminants) based on the peak period of nuclear weapons testing and the associated Cs signature from the 1950s and 1960s.

[8] *E.g.*, 13B-0547 in Figure 10.

20



**Figure 10.** 2,3,7,8 TCDD Patterns between RM 11.25 and RM 11.5.

*Note: The images in Figures 10–13 were adapted from figures presented in the OU4 RI (CPG 2019).*

21

ALCD-PUBCOM_0000941



**Figure 11.** 2,3,7,8 TCDD Patterns between RM 11 and RM 10.75.

ALCD-PUBCOM_0000942



**Figure 12.** 2,3,7,8 TCDD Patterns between RM 4 and RM 4.5.

23

ALCD-PUBCOM_0000943



**Figure 13.** 2,3,7,8 TCDD Patterns between RM 3 and RM 3.4.

ALCD-PUBCOM_0000944

**Opinion 4. A more rational explanation for TCDD accumulation above RM 10 is that there were sources of TCDD above RM 10. There are known historical, and possibly ongoing, sources of TCDD contamination to OU4 tributaries that may better explain the observed concentrations.**

28. The high concentrations of TCDD in OU4 surface sediments would be difficult to explain solely on the basis of resuspension and redistribution of older contamination from OU2, because the surface concentrations of TCDD in the OU2 surface are much lower. If OU2 is the primary source of surface sediment concentrations, then one would expect the highest concentrations to be in fine sediment areas further downstream from the hotspot near RM 10.9.[9] There are other large silt deposits in the Lower Passaic River between the confluence with the Second River and the Third River, but these areas generally do not contain as much TCDD as the hotspot at RM 10.9 (Figure 14).

29. The observations above would suggest that alternative upstream sources located in OU4 are more likely to have contributed to the higher concentrations of TCDD in OU4.

30. Using over 8,000 surface and subsurface sediment samples from the 17-mile reach of the Lower Passaic River, including those recently collected from remedy design and previously not available during the development of the OU4 RI, Bock et al (2021) conducted a statistically based spatial heterogeneity and source signatures analysis of dioxin congeners. The study concluded that the sediment profiles were indicative of multiple dioxin source types, including multiple inputs of TCDD. Specifically, this study identified an overlap in the source profiles of the former Diamond Alkali chemical plant and the Givaudan chemical plant, which is located on the Third River and which enters the Passaic River around RM 11, just upstream of the RM 10.9 hot spot. Post-2005 tributary data presented in the OU4 RI appears to indicate the tributaries are not presently a source of contamination, but this does not preclude past

---

[9] The hotspot is located on the point bar on the eastern shore and described in the OU4 RI as having encountered significant infilling post-1976 but prior to 1989 and experienced continued deposition between 1989 and 2004.

ALCD-PUBCOM_0000945

discharges or watershed runoff events that may have mobilized contaminants from the upstream sources. Based on an analysis of sediment deposition history indicated in sediment cores, a second, more recent dioxin source was hypothesized to have contributed to higher surficial levels near RM 11 and RM 12.6 (Garvey et al. 2011). Other past studies have also similarly indicated multiple sources may have contributed to dioxin pollution within the Passaic River (Khairy et al. 2016; Wenning et al. 1993).



**Figure 14.** 2,3,7,8 TCDD Patterns at a Silt Deposit outside the 2013-2014 TCRA Remediation Area.

26

ALCD-PUBCOM_0000946

**Conclusion**

31. Based on an examination of the information presented in the OU4 RI and an analysis of
    freshwater flows and sediment distribution patterns, it is my opinion that the hydrodynamic
    and sediment transport regime of within the upper 9 miles of OU4 is distinctly different from
    OU2. The upper 9 miles of OU4 has relatively limited pockets of silt and largely exports
    sediments to OU2. This is distinctly different from OU2, which is much wider and deeper,
    with extensive silt deposits caused by depositional conditions. The estuarine circulation cannot
    by itself explain the contaminant patterns observed in OU4, because estuarine circulation is
    mostly centered within OU2. This is evident from the very low frequency at which the salt
    front extends beyond RM 10. Historical maintenance dredging activities did not significantly
    alter the median depth from the present-day conditions therefore would not significantly affect
    the upward extent of the salt front over the long term. The higher surface concentrations of
    TCDD in the upper 9 miles of OU4 are inconsistent with surface sediment concentrations in
    OU2, where the legacy contaminated sediments appear to be predominantly in the subsurface
    sediments of the silt deposits. Alternative sources of TCDD located closer to the silt deposits
    within the upper 9 miles of OU4 provide a more rational explanation for the higher surficial
    sediment concentrations, rather than contaminants moving several miles upstream from OU2
    during low flows that do not get remobilized back to OU2 during subsequent moderate or high
    freshwater flow conditions and remain at or near the surficial sediments in the pockets of silt
    deposits.

32. Based on all of the above, it is my opinion that a proportional allocation of remedial costs
    based on OU2 alone should not be extended to the upper 9 miles of OU4 or treated as a
    scientifically defensible allocation of OU4 response costs.

27

ALCD-PUBCOM_0000947

I, Pradeep Mugunthan, declare under penalty of perjury that the foregoing is true and correct.

EXECUTED on March 21, 2023

_____
Pradeep Mugunthan

28

## REFERENCES

Bock, M.J., L.E. Brown, R. J. Wenning, and J. Bell. 2021. Sources of 2,3,7,8-
Tetrachlorodibenzo-p-dioxin and Other Dioxins in Lower Passaic River, New Jersey,
Sediments. Environmental Toxicology and Chemistry, 40(5): 1499-1519, doi:
https://doi.org/10.1002/etc.4974.

Chant, R.J., D. Fugate, and E. Garvey, 2011. The Shaping of An Estuarine Superfund Site: Roles
of Evolving Dynamics and Geomorphology, *Estuaries and Coasts,* 34(1): 90 – 105,
doi:10.1007/s12237-010-9324-z.

CPG (Lower Passaic River Cooperating Parties Group), 2019. Remedial Investigation Report:
Lower Passaic River Study Area Remedial Investigation/Feasibility Study, prepared for
Lower Passaic River Cooperating Parties Group, prepared by Anchor QEA et al. July.

EPA (U.S. Environmental Protection Agency). 2021. Record of Decision for an Interim Remedy
in the Upper 9 Miles of the Lower Passaic River Study Area OU4 of the Diamond Alkali
Superfund Site Essex, Bergen and Passaic Counties, New Jersey. Superfund Site
Identification Number NJD980528996. U.S. Environmental Protection Agency Region 2.
September.

Garvey E, Gbondo-Tugbawa S, Atmadja J, McDonald S. 2011. Dioxin in the Passaic River (New
Jersey): The case for two dioxin sources. Presentation, 6th International Conference of
Contaminated Sediments, New Orleans, LA, USA, February 10, 2011.

Khairy M, Barrett K, Lohmann R. 2016. Changing sources of polychlorinated dibenzo-p-dioxins
and furans in sediments and ecological risk for nekton in the lower Passaic River and
Newark Bay, New Jersey, USA. Environmental Toxicology and Chemistry, 35:550–562,
doi: https://doi.org/10.1002/etc.3223.

Wenning RJ, Harris M, Finley B, Paustenbach D, Bedbury H. 1993. Application of pattern
recognition techniques to evaluate polychlorinated dibenzo-p-dioxin and dibenzofuran
distributions in surficial sediments from the lower Passaic River and Newark Bay.
Ecotoxicology and Environmental Safety, 25:103–125, doi:
https://doi.org/10.1006/eesa.1993.1011 .

ALCD-PUBCOM_0000949

**ATTACHMENT 1  Resume of Dr. Pradeep Mugunthan, P.E.**

ALCD-PUBCOM_0000950



# PRADEEP MUGUNTHAN, PH.D., P.E.

## Principal Engineer

**Education**

*Ph.D., Civil and Environmental Engineering, Cornell University, 2005*

*M.S., Civil and Environmental Engineering, Carnegie Mellon University, 2001*

*B.E., Mining Engineering, Anna University, 2000*

**Licenses**

*Professional Engineer (P.E.), Washington No. 52928, California No. CH 6486*

Pradeep Mugunthan has 18 years of experience performing hydrodynamic, sediment, contaminant fate and transport, and water quality evaluations. He has supported numerous contaminated sediments remediation projects nationwide and internationally. Using a deep understanding of environmental remediation under the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA/Superfund) and cutting-edge modeling and environmental fate and transport analyses, he has supported various clients in evaluating the efficacy of remedial alternatives, designing cost-effective remedies, assessing disposal options for contaminated sediments, and evaluating ecological and human health risk. His experience includes assessing environmental damages and restoration costs associated with the release of over 30 million cubic meters of mine tailings to a major riverine system that resulted in one of the largest mining-related environmental disasters in South America. He is also an expert at modeling groundwater-surface water interactions at contaminated sediment sites and has applied this expertise to evaluate the design of confined disposal facilities and to assess efficacy of upland source control measures and migration of contaminants from groundwater to sediments and surface water. He has performed numerous statistical evaluations of environmental data and designed various monitoring programs including post-remedial compliance monitoring and water quality monitoring programs to support groundwater and surface water model development and assess aquatic habitat conditions.

In addition to his expertise in contaminated sediments, he has provided strategic technical support to numerous clients on water resources and water quality management and National Pollutant Discharge Elimination System (NPDES) permitting issues, particularly in the Columbia River Basin. Through technically sound environmental analyses and skillful negotiations with stakeholders and regulators, Dr. Mugunthan has obtained stakeholder and regulatory buy-in on various environmental projects across the country and abroad. He has worked with state and federal regulators on environmental management under CERCLA, and Clean Water Act, Endangered Species Act (ESA), and Federal Energy Regulatory Commission (FERC)-related compliance issues. He has authored various peer-reviewed journal articles and has presented his work at leading contaminated sediments and environmental conferences.

## Project Experience

### Portland Harbor Superfund Site | Five Tribes
*Portland, Oregon | 2021 to Present*

Dr. Mugunthan is serving as a technical expert on contaminant fate and transport and contaminated sediments remediation to a group of five tribes (through a sub-contract from Industrial Economics, Inc.) on the Portland Harbor Superfund Site (PHSS). In this role, Dr. Mugunthan provides critical reviews of documents developed during remedial design and remedy implementation by various performing parties in the PHSS. The reviews focus on various aspects of the remedy implementation including pre-design investigations, sufficiency assessment, basis of design reports and remedial design documents focusing on a broad range of contaminants, and various hydrodynamic, sediment and contaminant fate and transport processes that can affect the remedial design and remedy implementation.

### Natural Resources Damages and Environmental Restoration Cost Estimation | Confidential Client
*South America | 2017*

Dr. Mugunthan led the development of alternatives and cost estimation for restoring aquatic and terrestrial habitat over a 100 kilometer stretch of a major riverine system that was impacted by a mine tailings dam breach. Various alternatives were developed for removal and/or isolation of over 30 million cubic meters of silt and sand-like processed ore (mine tailings) that were dispersed into the riverine environment, which included several hydropower reservoirs downstream that served as sediment traps. The cost estimation effort included the costs for removal, processing, and disposal of tailings; isolation of tailings to prevent resuspension; restoration of banks and floodplains; and revegetation of riparian and terrestrial habitat. He incorporated findings from a habitat equivalency analysis (HEA) to assess restoration of the aquatic and terrestrial habitat to a level beyond baseline that is sufficient to provide a resilient ecosystem. He also supported a Net Environmental Benefit Analysis (NEBA) to restore a hydropower reservoir approximately 100 kilometers downstream, which was rendered inoperative due to the event. His analyses were central to the overall socio-economic and environmental restoration cost estimation efforts that were used by the national government in its negotiation with the responsible party.

### Grasse River Superfund Site | Arconic (formerly Alcoa)
*Massena, New York | 2005 to 2015*

Dr. Mugunthan developed a fate and transport model of polychlorinated biphenyls (PCBs) and applied the model to evaluate remedial alternatives. The EFDC-based modeling framework included hydrodynamic and sediment transport models of the Grasse River. The fate and transport model results were linked to a bioaccumulation model to assess changes in fish tissue contaminant levels resulting from different remedial alternatives. The remedial alternatives that were evaluated differed in the extent of sediment removal, and the engineering options employed for sediment isolation (capping). Findings from the modeling study were used as an important line of evidence by the U.S. Environmental Protection Agency (EPA) in identifying a preferred alternative.

### Chehalis River Basin Flood Hazard Reduction and Aquatic Species Restoration | Washington State Office of Financial Management
*Olympia, Washington | 2012 to 2017*

Dr. Mugunthan designed and directed water quality field studies to assess baseline environmental conditions that were used to the support environmental impact assessment and subsequent modeling phases of the project. He led the modeling team on hydrothermal and water quality modeling of the proposed reservoir using CE-QUAL-W2 model. He managed sub-consultant work on development of the

downstream model to assess baseline conditions and water quality changes. Additionally, Dr. Mugunthan authored the water quality sections of the programmatic Environmental Impact Statement for the project.

### Assessment of Mercury Fate and Transport in an Estuarine System | Confidential Industrial Client
*Northeast United States | 2011 to 2017*

Dr. Mugunthan served as the lead modeler for evaluating mercury, methyl mercury, and PCB fate and transport in the waterways and marshes of an estuarine Superfund site. Using an EFDC-based modeling framework he evaluated the impacts of different sources of contaminants to the surface sediment and water column contaminant levels. He also assessed the impacts of potential remedial options in improving water column and sediment concentrations.

### Groundwater Source Control, Portland Harbor Superfund Site | Confidential Utility Client
*Portland, Oregon | 2012 to 2017*

Dr. Mugunthan led the groundwater modeling team in developing a 3D groundwater flow model to assess performance of an upland pump and treat source control system at a former manufactured gas plant (MGP) site in Portland Harbor. He led the interaction with state regulators and EPA consultants through the regulatory review process.

### Statistical Evaluations, Neal's Landfill Superfund Site | CBS
*Bloomington, Indiana | 2005 to 2017*

Dr. Mugunthan led the development of a complex statistical model of the rate of decline in PCBs in the springs draining Neal's Landfill. He also developed a fish sampling plan using EPA's Data Quality Objectives process to assess post-remedial changes in fish tissue concentrations.

### Upland Contaminant Migration Risk Evaluation | Confidential Industrial Client
*British Columbia | 2014 to 2016*

Dr. Mugunthan led the development of a series of groundwater-surface water models to evaluate migration of polycyclic aromatic hydrocarbons (PAHs) at an oil refinery to an adjacent tidally influenced surface water body. The modeling framework included EFDC-based AQFATE contaminant fate and transport model for simulating tidally influenced surface water hydrodynamics, sediment transport and contaminant fate and transport, and SEAWAT, a MODFLOW/MT3D-based modeling framework for groundwater contaminant fate and transport. The modeling results were used to confirm the primary pathway of contaminant migration and evaluate the importance of biodegradation in reducing contaminant levels. The model findings were used in conjunction with other studies to support the ecological risk assessment at the site.

### Biogeochemical Modeling for Nutrient Management in San Francisco Bay| San Francisco Estuary Institute
*San Francisco, California | 2018 to Present*

Dr. Mugunthan is serving a modeling lead and advisor to the San Francisco Estuary Institute in the development and application of a complex Delft-3D/DFM based estuarine biogeochemical model of San Francisco Bay. With the potential to affect billions of dollars in treatment upgrades for Bay Area dischargers, this model will be one of several tools used in evaluating nutrient management strategies for the San Francisco Bay and Sacramento-San Joaquin River Delta.

### Water Quality Management of Onondaga Lake and Seneca River | Onondaga County Department of Water Environment Protection
*Syracuse, New York | 2005 to 2012*

Dr. Mugunthan led the development of an EFDC-based water quality modeling framework of Onondaga Lake and in the Seneca River downstream of the lake for evaluating alternatives to improve lake water quality. He worked with New York State Department of Environmental Conservation (NYSDEC) in evaluating scenarios for phosphorus load allocations for the lake and its watershed. He used the modeling tool to assess whether conditions in the lake under historical, pre-colonial (i.e., natural) conditions supported the designated use of sustaining cool water fishery, which was one line of evidence that the state agency used to conclude that the specified designated uses regarding cool water fishery cannot be attained for the lake.

### Mid-Columbia Coho Restoration Program | Yakama Nation
*Chelan and Okanogan Counties, Washington | 2011 to Present*

Dr. Mugunthan performed water quality assessments and led the water quality sections of the National Environmental Policy Act (NEPA) Environmental Impact Statement document for a large ESA-listed salmonid restoration program in the Upper/Mid-Columbia River Basin. He developed a monitoring program to assess baseline environmental conditions and project impacts in the Wenatchee and Methow River basins. During the construction phase of the project, Dr. Mugunthan negotiated a permitting solution with state regulators using a comprehensive technical demonstration of no significant water quality impacts of discharges from proposed aquaculture sites. He led the engineering evaluation of a proposed hatchery and oversaw sub-consultant work on a novel recirculation and land application system to meet stringent total maximum daily load (TMDL) requirements on nutrient loading in the watershed. He represented the client at public outreach and stakeholder meetings to gain stakeholder buy-in on proposed project elements. He continues to provide NPDES permit compliance support for project's acclimation sites.

## Representative Presentations & Publications

**Mugunthan**, P., Russell, K., Gong, B., Riley, M., Chin, A., McDonald, B., and Eastcott, L. 2017. A coupled groundwater-surface water modeling framework for simulating transition zone processes. *Groundwater,* 55(3):302-315.

**Mugunthan**, P., Mohan, R., Russell, K., Mahoney, M., Thornburg, T., and Martin, A. 2017. Modeling long-term contaminant transport at confined disposal facilities: key considerations, methods and case studies. Presented at Battelle Sediments Conference, New Orleans, LA. January 2017.

Johnson, P., **Mugunthan**, P., Miller, J., Haffey, S., Weiland, M., Murauskas, J., Passero, D., DiGiulio, J., Wang, Z., Skalski, J., and Townsend, R. 2016. Post-construction evaluation of adult fishway temperature differential reduction at Lower Granite Dam. Anadromous Fish Evaluation Program (AFEP) Annual Review, Portland, OR. November 2016.

**Mugunthan**, P., Mohan, R., and Narayanan, R. 2016. Remediation of the Ganga: Challenges and Opportunities. Presented at Conference on Dredging, Kolkata, India. January 2016.

**Mugunthan**, P., Edwards, J., Riley, M., Renda, J., Stone, T., Johnson, B., Wilson, M., Gong, B., and Wyatt, B. 2015. Conjunctive Use of Field Testing and Modeling for Evaluating Performance of Groundwater Hydraulic Control and Containment System at a Former MGP Site. Presented at the Battelle Sediments Conference, New Orleans, LA. January 2015.

**Mugunthan**, P., Ferguson, G., Andonaegui, C., and Rhea, J.R. 2011. Evaluating the water quality impacts of discharges from proposed fish acclimation ponds in a 303(d) listed water body in Central Washington. Presented at the Water Environment Federation's Impaired Waters Symposium 2011, Miami, FL. January 12-13, 2011.

**Mugunthan**, P., and Shoemaker, C.A. 2006. "Assessing the impact of parameter uncertainty for computationally expensive groundwater models." *Water Resources Research* 42:W10428.

**Mugunthan**, P., Shoemaker, C.A., and Regis, R. 2005. "Comparison of function approximation, heuristic, and derivative-based methods for automatic calibration of computationally expensive groundwater bioremediation models." *Water Resources Research* 41:W11427, doi:10.1029/2005WR004134.

McDonough, K.M., Lambert, D.C., **Mugunthan**, P., and Dzombak, D.A. 2005. "Hydrologic and geochemical factors governing chemical evolution of discharges from an abandoned, flooded, underground coal mine network." *Journal of Environmental Engineering* 131(4):643.

**Mugunthan**, P., McDonough, K.M., and Dzombak, D.A. 2004. "Geochemical approach to estimate the quality of water entering abandoned underground coalmines." *Environmental Geology* 45:769-780.

**Mugunthan**, P. and C.A. Shoemaker, 2004. "Time Varying Optimization for Monitoring Multiple Contaminants under Uncertain Hydrogeology." *Bioremediation Journal* 8(3-4):129-146. doi:10.1080/10889860490887509.

ALCD-PUBCOM_0000955