# Exhibit 10 Part 4

## Comments Submitted by OxyChem (Part 4): OxyChem Appendix B8-B12

United States' Motion to Enter Consent Decree,
*United States v. Alden Leeds, Inc. et al.*, Civil Action No. 22-7326 (D.N.J.)

# APPENDIX B.8

Rob Olian Declaration

ALCD-PUBCOM_0000956

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Hon. Madeline Cox Arleo |
| | ) | Hon. Magistrate Leda D. Wettre |
| Plaintiff, | ) | |
| | ) | Civil Action No. 2:22-cv-07326 |
| v. | ) | |
| | ) | |
| ALDEN LEEDS, INC., *et al.* | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

## DECLARATION OF ROBERT M. OLIAN, J.D.

1

ALCD-PUBCOM_0000957

## PURPOSE OF THIS DECLARATION

Pursuant to 28 U.S.C. § 1746, I, Robert M. Olian, declare the following:

1.      I have been retained by Langsam Stevens Silver & Hollaender, LLP on behalf of Occidental Chemical Corporation ("OxyChem") to provide expert opinions related to the the Diamond Alkali Superfund Site, specifically the Allocation Report regarding the Lower 8.3 Miles of the Passaic River prepared by David Batson and AlterEcho on behalf of the U.S. Environmental Protection Agency (EPA).

2.      My opinions relate to the general principles that govern the creation of a usable model, the application of those general principle to the specifics of CERCLA allocation models, the best practices for construction accurate CERCLA allocation models, and the numerous ways in which the Batson allocation violated both general and CERCLA-specific precepts and best practices and resulted in an allocation that is wholly inadequate for its intended purpose.

## QUALIFICATIONS

3.      I am a retired attorney who now mediates and arbitrates complex environmental matters on a part-time basis through my sole-owner business, envADR LLC. In addition to my work as a mediator and arbitrator, I also serve as one of three trustees overseeing the remediation of the Fisher-Calo Superfund site in Indiana. Before retiring, I spent my entire career in private practice in the Chicago office of Sidley Austin LLP (the name of the firm has changed slightly through the years), beginning immediately after my graduation from Harvard Law School in 1977. I became a partner in the firm in 1985 and remained a partner until my retirement at the end of 2016. I practiced environmental law for all but the first year of my career and co-chaired the firm's national environmental practice for approximately the last 20 years of my tenure as a partner. Prior to my legal career I graduated from Harvard College *cum laude* with a bachelor's degree in Applied Mathematics and a master's degree in Public Policy from Harvard Kennedy School.

4.      During my years in private practice, I personally handled dozens of CERCLA matters and had supervisory responsibility for dozens of others that were directly handled by other members of Sidley's environmental group. Many of the matters I personally worked in the early years after CERCLA's enactment (Stringfellow Acid Pits, Chem-Dyne, Midco, Fisher-Calo, Ninth Avenue and Brockman, to name just a handful) were large multi-party (e.g. 50 or more PRPs) cases requiring allocation similar to this matter regarding OU2 at the Lower Passaic River. In several of the CERCLA matters I worked on, I chaired or served either on site steering committees whose responsibility included the development of allocation models or on allocation committees devoted solely to that purpose.

ALCD-PUBCOM_0000958

5.    During my 6+ years as an ADR neutral, I have conducted at least 10 mediations involving liability allocation at complex CERCLA sites similar to the Lower Passaic.

6.    Between my experience in private practice and my service as a mediator, I believe I have used or considered the full spectrum of possible CERCLA allocation models across type (e.g. per capita, mass/volume-based, toxicity based, and various permutations), scope (three parties to 350 parties), and complexity, including multi-factor models constructed by external consulting firms as was the case here.

7.    I never represented OxyChem while in private practice, and my only prior involvement with David Batson was when he moderated a panel discussion (among myself, Ken Feinberg and one other panelist whose name I cannot recall) on Alternate Dispute Resolution at the 2017 ABA SEER meeting.

8.    My resume, which includes a list of work experience and publications, is presented in Attachment 1.

9.    If asked to testify, my testimony would be consistent with this affidavit.


## SUMMARY OF OPINIONS


10.    **Opinion 1:** General modeling precepts exist and apply to CERCLA allocation models.

11.    **Opinion 2:** An allocator's consistent failure to adhere to general modeling precepts and best practices in CERCLA allocations is a strong indicator of bias.

12.    **Opinion 3**: Batson's allocation model fares poorly against the precepts of an effective CERCLA allocation. Batson's model was biased against non-participating parties, in particular Occidental Chemical Corporation.

3

ALCD-PUBCOM_0000959

**Opinion 1.    General modeling precepts exist.**

13.    George E.P. Box, one of the world's greatest statisticians, famously wrote that "all models are wrong, but some are useful." To construct a useful model, the modeler must assure that:

      a.    The model is applicable to the given purpose;

      b.    The model is constructed coherently to produce the desired outputs; and

      c.    The data that are input into the model are correct and normalized.

14.    In developing an allocation model, the first question the allocator must ask is, "What will this allocation be used for?" Just as it would make little sense to apply a profit/loss model used to measure the value of a business to evaluate the effectiveness of a charitable organization, so too does it make little or no sense to apply a purely risk-based model to the allocation of remedy costs that are only tangentially related to contaminant risk.

15.    For example, an allocation model based purely on mass may be entirely appropriate to make an initial apportionment of responsibility among PRPs who have coalesced to respond to an EPA request to undertake an RI/FS. That very same model may be utterly inappropriate, however, if the purpose of the allocation is to allocate the PRPs' respective contributions to the cost of a remedy that has already been defined. Indeed, when PRPs at an Operable Unit allocate early in the CERCLA process (e.g., before the RI/FS), it is quite common for their initial agreement to contain a provision providing for reallocation and a true-up once the remedy has been established in the ROD.

16.    Second, the model's construct or "flow chart" must reflect all meaningfully relevant inputs, properly weight those inputs and exclude factors that bias or are irrelevant to the output.

17.    Third, the data must be correct and correctly entered. Where the data collected may be fragmentary and difficult to compare, the model must assure that the construct of the model is robust and sensitive to such data gaps.

18.    The general modeling precepts identified above apply, of course, in the specific context of CERCLA allocation models.

19.    In terms of applicability to the purpose, every CERCLA allocation process must begin with the recognition that allocations occur across a spectrum of factual scenarios:

      a.    The allocation may be performed solely for the use of participating PRPs seeking to allocate among themselves, or it may be an allocation that will be

4

used to attach binding legal consequences on parties outside of the allocation process;

b. The responsible parties may or may not be readily identifiable;

c. The types of wastes contributed by the PRPs may or may not be readily identifiable;

d. The amount of waste contributed by each PRP may or may not be readily estimable;

e. Wastes may or may not be commingled; and

f. Allocations may occur before or after remedy selection - in either instance, the remedy drivers may or may not be assignable to particular waste streams on a "but for" theory of causation.

20.    The particular facts of a case must be analyzed to determine how the allocation should be constructed. An allocator would typically begin by asking: "What is the allocation trying to determine?" and "Will the allocation be qualitative or quantitative?" The allocator should then perform sensitivity analyses to determine what inputs, assumptions and model flows are material to the output and should "ground-truth" the allocation results to assure that they conform to the observable facts.

21.    For many years, CERCLA allocations generally began and ended with models based on the "Gore factors," namely:

a. The ability of parties to distinguish their contribution of contaminants into OU2 (releases to soil and groundwater);

b. The amount of hazardous substances involved;

c. The degree of toxicity of the relevant hazardous substances;

d. The degree of PRP involvement in the manufacture, treatment, transport, or disposal of the hazardous substance; and

e. The degree of cooperation between the PRP and the government to prevent harm to human health and the environment.

22.    However, CERCLA allocation models are not "one size fits all" and allocators' pseudo-precise attempts to quantify the Gore factors were leading allocators to create poor or failed models. Thus the Gore Factors came to be supplemented, modified, or replaced by the so-called Torres Factors:

a. The extent to which costs are related to wastes for which each PRP is responsible;

5

    b.  Each PRP's level of culpability;

    c.  The degree to which each PRP benefitted from disposal of the waste; and

    d.  The party's ability to pay its share of the cost.

23.  As Judge Torres noted, "Because the factors to be considered are both numerous and difficult to quantify, allocation cannot be made with mathematical precision." *United States v. Williams M. Davis*, 31 F. Supp. 2d 45 (D.R.I. 1998), *aff'd in part*, 261 F.3d 1 (1st Cir. 2001). Further, ". . . allocation is a highly fact-intensive process that depends upon the particular circumstances of each case." *Id.* p.63.

## Opinion 2: An allocator's consistent failure to adhere to general modeling precepts and best practices in CERCLA allocations is a strong indicator of bias.

24.  My experience as a mediator in CERCLA allocation proceedings and as a private practitioner in chairing or serving on PRP allocation committees has informed the following observations about CERCLA allocations in general:

    a.  An allocator must fit the allocation model to the purpose the allocation is designed to address. Allocating the cost of a remedy based on the PRP's respective contribution to the necessary costs is far different than an allocation based on the PRPs contribution to the mass of contamination being remedied. When the allocator purports to allocate responsibility for one purpose, but the allocation model does not consider the data necessary to achieve that purpose, then the model is either poorly designed and not credible, or the allocation was designed to achieve a different purpose. If the departure from the stated purpose benefits one set of parties and detracts from others, this indicates the allocation model is biased.

    b.  An allocation that begins with meaningful data gaps or large differences in the quality and quantity of data relevant to various PRPs does not become more precise simply because more factors (contaminant pathways, toxicity, etc.) are included in the model. Indeed, it is often the case that inclusion of more factors materially increases the imprecision inherent in the underlying data. If the data gaps in an allocation are consistently resolved to favor one party and not another, this indicates the allocation model is biased.

    c.  Similarly, a model that contains arbitrary numerical multipliers for some factors (cooperation, intent, etc.) may exponentially multiply the imprecision of the underlying allocations. If the allocation model contains a significant amount of this type of "noise," and imprecision benefits certain parties but not others, this indicates the allocation model is biased.

ALCD-PUBCOM_0000962

d. All allocation models are likely to need some element of calibration to better align the model with the "facts on the ground." However, when "calibration" turns into the use of significant arbitrary adjustment factors, one should question the validity of the allocation model itself. In the language of statisticians, any model can be made to "work" mathematically if the modeler is given enough arbitrary "degrees of freedom".

e. Allocations that result in large orphan shares are particularly problematic, in that the lack of precision in the allocation is magnified when carried across to the orphan share. Finding a large orphan share in a well understood site, with known responsible parties, also suggests the allocation approach used was in error or was designed to shift responsibility away from the parties participating in the allocation.

25. Allocations require special scrutiny where:

a. The design of the model departs significantly from the stated purpose of the allocation.

b. The model assigns a large share of responsibility to parties who didn't participate in the allocation process.

c. The information available to the allocator for some parties is greater in volume or of significantly greater reliability than for other parties.

d. The imprecision of the allocation is masked, deliberately or otherwise, by calculations that take rough estimates as inputs (e.g. to one significant figure as that term is used by scientists) and result in outputs that are presented with 5 or 6 significant figures and assign allocation shares to the ten-thousandths of a percent.

e. The allocation does not reflect that any "sensitivity analysis" – i.e. varying the inputs and assumptions used by the modeler to see whether those variations cause significant changes in the model output – was done to examine the materiality of imprecision in the inputs.

f. The allocation does not reflect that any "sensitivity analysis" was done to examine the effect of choices made by the allocator.

g. The choices made by the allocator uniformly bias the result against one or more parties, particularly where those parties are not participating in the allocation process.

h. The model as designed ignores or makes arbitrary assumptions as to material contributions to the contamination.

7

ALCD-PUBCOM_0000963

**Opinion 3: Batson's allocation model fares poorly against these principles of an effective CERCLA allocation, and contains over a dozen indicators that the model was designed to be biased in favor of the participating parties, and against non-participating parties, in particular Occidental Chemical Corporation.**

26.     When measured against the general principles above, the Batson report fares poorly on virtually all counts.

27.     First, the allocation is remedy-agnostic. Batson uses an allocation based purely on mass and toxicity (with various arbitrary adjustment factors added at the end) without any regard to the nature of the remedy or what drives its cost. While that might be appropriate in certain circumstances—e.g., an internal PRP group allocation to fund the performance of an RI/FS—it is not appropriate where, as here, the remedy is defined and the question is who (and to what extent) various parties are responsible to pay for it. In this case, the allocation should seek to allocate the PRPs' respective responsibility for the cost of the remedy, as instructed by the Torres Factors. That approach, often called "cost-causation", is not the approach Batson applies.

28.     By way of simple example, if remediation of a failed solvent recovery facility needed to address two drums, each of which was to be incinerated at waste incinerator that prices on a per drum basis, it would not matter if one drum contained waste that was twice as toxic. Each drum would cost the same to incinerate and the only proper allocation would be 50/50. Using Batson's approach in this example would result in an 80/20 allocation.

29.     In the instant case, the dredge and cap remedy in the Passaic River is defined by EPA on a polygon-by-polygon areal basis. The cost of dredging and capping an area is driven by the need to reduce the concentration of any one of the eight contaminants of contaminants of concern that exceed EPA's acceptable risk levels for that contaminant. The cost of the remedy is tangentially connected to the risk in that the risk sets the limits of acceptable concentrations for a contaminant, but remedy will be implemented in areas where any of the contaminants exceed acceptable risk levels, regardless of the relative risk levels between contaminants. The remedy will cost more if there are more areas where any one of the eight contaminants exceeds the risk level set for that contaminant. Batson's allocation is being used to allocate the costs of this particular remedy, but does not incorporate data for any of these cost drivers into the model—it does not even consider any of the sampling data in the Passaic River. Instead, Batson's model is designed to achieve a different purpose: to allocate higher shares to parties that have contributed higher risk chemicals, with no regard for how the distribution of those chemicals is actually related to the cost.

30.     Second, Batson provides no explanation for, or sensitivity analysis of, the cooperation and compliance adjustment factors he uses to manipulate already imperfect "base allocations". His use of +/- 10%, or 20% or 100% is completely arbitrary even if he was capable of perfectly assigning those factors.

31.     Third, Batson's allocation ignores or makes arbitrary assumptions as to material contributions to the contamination driving the remedy. When assessing data about

8

upland site contamination he selectively finds or ignores the impact of historic fill, omits certain facilities or sections of sites, and uses a background contamination factor that effectively eliminates other significant other contributors. These arbitrary assumptions and oversights universally increase the share of costs allocated to non-allocation parties, in particular to OxyChem, which received a 99.99% share under Batson's model.

32.    Fourth, the facility discussions for each of the parties actively participating in the allocation almost uniformly contain significantly less information than is set forth in the discussion of OxyChem, a party that is then penalized for lack of cooperation. Document searches at one level of diligence are often less productive than searches conducted under more stringent levels of diligence.

33.    Fifth, given the evident data gaps and the resultant "missing" sources of the contamination known to be in the OU2 sediment, Batson's attempt to dress up the allocation by looking at such things as overland fate and transport can only be regarded as a diversion designed to draw the reader's attention away from his significant modeling errors that are truly material.

34.    Finally, in reviewing the declarations of other experts in this case, it appears that, in addition to the above deficiencies, there are at least a dozen other factors where Batson had a choice to make in terms of assigning weight and meaning. As to each of those factors, Batson chose the option that most severely worked against OxyChem. While it is possible for a coin to land on heads 12 times in a row, the odds of that happening are so slim that one should suspect a weighted coin when it happens. The same is true here – whether consciously or unconsciously, Batson has tilted the playing field unacceptably. And, to make matters worse, Batson never examines the impacts of his choices by way of sensitivity analysis or otherwise.

35.    Among these anti-OxyChem choices, the following are particularly noteworthy. First, Batson chose an allocation model in which the "risk" assigned to a contaminant is a determinative factor in each party's assignment of liability for costs. This initial choice fixed each party's liability share to the level of "risk" associated with the chemicals it discharged to the Passaic River. This choice biased the allocation at the outset against any party that discharged contaminants with the highest "Relative Risk Number" (RRN). But because the RRN is not associated with the cost of the remedy, this initial choice created an outcome where parties that are responsible for the same remedial activity are given dramatically different shares of liability.

36.    As shown by the following simple example using Batson's actual model, it would have been evident when selecting this "risk-based" model that if a party were to be found liable for 100% of the discharges of any of the contaminants at issue, that party's total allocation share would be fixed at the same percentage that Batson assigns as the risk number for that contaminant. A party Batson found to have contributed 100% of all dioxin discharges would receive at least an 83.2% of the total allocation, no matter whether the other parties loaded one pound of each of the other COCs, or a million pounds. The Batson

9

model is not in fact a mass-based allocation adjusted for risk. Rather it is an allocation that is almost totally divorced from contaminant mass and the cost to remove and remedy it, and is instead driven almost entirely by the risk number (RRN). This result is so nonsensical on its face that the Batson model should be rejected for that reason alone.

**Example 1**

| Party | Discharge Mass (kg) | % Contribution | RRN | Share |
|---|---|---|---|---|
| Party 1 (dioxin) | 38 | 100% | **83.92** | 83.92% |
| Party 2 (PCBs) | 13,000 | 50% | **12.87** | 6.43% |
| Party 3 (PCBs) | 13,000 | 50% | **12.87** | 6.43% |
| Party 4 (DDT) | 27,000 | 100% | **1.37** | 1.37% |
| Party 5 (mercury) | 42,000 | 100% | **0.95** | 0.95% |
| Party 6 (copper) | 2,100,000 | 100% | **0.69** | 0.69% |
| Party 7 (dieldrin) | 390 | 100% | **0.13** | 0.13% |
| Party 8 (HPAHs) | 240,000 | 100% | **0.05** | 0.05% |
| Party 9 (lead) | 3,200,000 | 100% | **0.01** | 0.01% |
| Party 10 (LPAHs) | 170,000 | 100% | **0.01** | 0.01% |

In Example 1, assuming each party has only discharged one of the contaminants shows how Batson's method scales each party's share to his Relative Risk Number. The party that contributed 100% of the dioxin is assessed a total share of the allocation that is also equal to the relative risk assign to dioxin, almost 84%. The two PCB parties that each contributed half of the PCBs are allocated a total share that equates to half of the risk number assessed for PCBs, or 6.43% each. To illustrate this further, Example 2 shows the same model, but the PCB pair now split their mass contributions unevenly.

**Example 2:**

| Party | Discharge Mass (kg) | % Contribution | RRN | Share |
|---|---|---|---|---|
| Party 1 (dioxin) | 38 | 100% | 83.92 | 83.92% |
| Party 2 (PCBs) | 25,220 | 97% | 12.87 | 12.48% |
| Party 3 (PCBs) | 780 | 3% | 12.87 | 0.39% |
| Party 4 (DDT) | 27,000 | 100% | 1.37 | 1.37% |
| Party 5 (mercury) | 42,000 | 100% | 0.95 | 0.95% |
| Party 6 (copper) | 2,100,000 | 100% | 0.69 | 0.69% |
| Party 7 (dieldrin) | 390 | 100% | 0.13 | 0.13% |
| Party 8 (HPAHs) | 240,000 | 100% | 0.05 | 0.05% |
| Party 9 (lead) | 3,200,000 | 100% | 0.01 | 0.01% |
| Party 10 (LPAHs) | 170,000 | 100% | 0.01 | 0.01% |

The uneven distribution affects the pair of parties that have discharged the same chemical, whose shares fluctuate against each other under the cap of the risk number, but do not affect

10

the shares of any other party. The absurdity of Batson's static approach to risk and mass is further illustrated in Example 3, which assumes that one party has discharged 1,000,000 kg of PCBs into the Passaic River. Despite this extraordinary contribution of PCBs, *none of the shares of the other parties are affected*. In Batson's model, a dioxin party found to have contributed 100% of the dioxin will never receive an allocation share below 83.92%, even if all the other parties are found responsible for outrageous discharges of the other contaminants.

### Example 3

| Party | Discharge Mass (kg) | % Contribution | RRN | Share |
|---|---|---|---|---|
| Party 1 (dioxin) | 38 | 100% | 83.92 | 83.92% |
| Party 2 (PCBs) | **1,000,000** | **100%** | **12.87** | **12.87%** |
| Party 3 (PCBs) | 0 | 0% | 12.87 | 0.0% |
| Party 4 (DDT) | 27,000 | 100% | 1.37 | 1.37% |
| Party 5 (mercury) | 42,000 | 100% | 0.95 | 0.95% |
| Party 6 (copper) | 2,100,000 | 100% | 0.69 | 0.69% |
| Party 7 (dieldrin) | 390 | 100% | 0.13 | 0.13% |
| Party 8 (HPAHs) | 240,000 | 100% | 0.05 | 0.05% |
| Party 9 (lead) | 3,200,000 | 100% | 0.01 | 0.01% |
| Party 10 (LPAHs) | 170,000 | 100% | 0.01 | 0.01% |

37.    Batson's choice to use a risk-based allocation model raises red flags because the relative risk among the contaminants is only tangential to the purpose of this allocation, which is to allocate the costs of a defined remedy.[1] The fact that this element of Batson's model would ensure, at the outset, that OxyChem would receive an 84% total share, no matter how much contamination the other parties contributed, indicates that Batson's model was designed to bias the allocation against OxyChem.

38.    The risk-driven deficiencies with Batson's model are further explicated by experts Mark Harris, Ph.D., Michael Bock, Ph.D., Philip Spadero, and Tarek Saba, Ph.D., who offer, inter alia, the following opinions:

- Batson's use of "risk allocation" to allocate costs is scientifically unsound and unreliable. Through its misuse of environmental risk assessment methods, Batson engages in a form of pseudo-science, implying he has measured and

[1] "The goal of the Allocation is to provide the EPA with a basis for such future settlements with the Allocation Parties…. Through conduct of the Allocation, the Allocator will recommend a numerical ranking of the relative shares of responsibility between and among the Allocation Parties for that portion of the costs associated with the remedial design (RD) and remedial action (RA) for Diamond Alkali OU2 determined, during Phase 2, to be attributable to the Allocation Parties as a group." Batson Report at 6.

11

allocated costs when an environmental risk assessment can do neither. The "method" Batson uses to allocate costs has not allocated cost at all: it allocated risk. (Harris Opinion 1).

- In re-calculating the risk factors for the purpose of this allocation, Batson made basic calculation errors—like excluding dioxin-like PCBs from the PCB risk—that deviated from accepted, scientific methodology. The exclusion of dioxin-like PCBs from the calculations assigned an artificially low RRN to PCBs, and an artificially high RRN to dioxin. (Harris Opinion 2).

- There are serious errors in Batson's analysis of dioxin risk. Batson's selective data inputs and calculations depart from EPA guidance, and use a mixture of incompatible metrics, resulting in serious calculation errors that artificially inflate of Batson's relative risk number for dioxin. (Bock Opinion 1).

- Batson's relative risk calculations are incomplete because Batson did not include any uncertainty or sensitivity analyses. Therefore, Batson's conclusion that one of the eight COCs (2,3,7,8-TCDD) contributes approximately 84% to his "overall environmental harm" requires verification or a reality check. (Menzie Opinion 4).

- The selected remedy consists of several elements for which the risk of each contaminant has different implications for the cost of remediation. Three distinct elements are 1) surface sediment removal for which costs will fluctuate based on contaminant risk, 2) armored capping designed to intern underlying contaminated sediment, which is a decision that already incorporated the risk factor assigned to each contaminant, and 3) navigational dredging, for which the costs bear no relationship to the contaminant risk. Batson's allocation method does not account for the difference between a flat assessment of contaminant risk and the different ways the contaminant risk has been incorporated into the cost of the remedy. (Menzie Opinion 5).

- The remedy selected at the Passaic River is not a unique remedy based on the presence of dioxin; even if dioxin was not present in the sediment in the Passaic River, the same dredge and cap remedy would be necessary to address the ubiquitous presence of high concentrations of other contaminants, particularly PCBs, mercury, and 4,4'-DDx. A review of similar sediment sites supports this conclusion, as similar dredge and cap remedies have been selected at sediment sites that had high concentrations of other contaminants, but little to no dioxin. (Spadero Opinions 1 and 2).

- All of the eight contaminants of concern identified by EPA exceed acceptable risk levels and drive the cost of the selected remedy in the Passaic River. A review of the distribution of contaminants that exceed acceptable risk levels in

ALCD-PUBCOM_0000968

the Passaic River shows dioxin does not drive the cost of the remedy more than the other contaminants. (Saba Opinion 1 and 2).

39.    After the havoc wreaked by Batson's use of the risk factor, perhaps the greatest failure of Batson's model is illustrated by his choice to apply an "attenuation factor" of 1%. Batson's attenuation factor was calculated with no regard to the true scientific concept of attenuation, which is a *rate over time* at which a certain particle erodes away. Instead, Batson multiplies his 1% attenuation by all the discharges masses he found of every contaminant, to reduce the discharge mass from each party down to 1% of what the original evidence showed.

40.    Further, Batson's attenuation factor was based on several basic mathematical errors. Put simply, Batson's calculations of the discharges of the dioxin from the OxyChem site "found" a dioxin contribution that was 10,000% higher than what EPA had found to be in the environment. This finding was based on several errors in Batson's calculations, including two basic unit conversion errors (mistaking parts per billion for parts per million, and milligrams for kilograms) that resulting in a grossly incorrect overestimation of the dioxin discharges. Batson did not catch or correct these errors. I think it is fair to say that any reputable scientists, upon finding that kind of distortion between reality and the model's output, would come to one of two conclusions:

- Either the model is poorly constructed and should be rethought from scratch; or

- There is some other factor that must be accounted for. Indeed, particle physicists have won Nobel Prizes for discovering the existence of sub-atomic particles based on the need to account for gaps in their models.

Batson chose the second approach, but will not win a Nobel prize. He selected an attenuation factor based not on scientific principles, but solely on the divisor needed to eliminate the 10,000% error in his model output. The problem with his non-scientific choice is quickly revealed though when all the other COCs in the model are then under-estimated by approximately the same 10,000% factor.

41.    Returning to the same simple example used to illustrate the effect of risk in Batson's model, above, Example 4 shows the devastating effect the blanket 1% "attenuation factor" causes in Batson's model. In contrast to Example 3, where extreme PCB discharges had no effect on the shares of non-PCB parties, Example 4 shows that artificially and improperly "attenuated" concentrations of PCBs *will* affect parties that did not discharge any PCBs to the Passaic River—by driving their relative shares proportionally higher.

**Example 4**

| Party | Discharge Mass (kg) | % Contribution | RRN | Share |
|---|---|---|---|---|
| Party 1 (dioxin) | 38 | 100% | 83.92 | 96.03% |
| Party 2 (PCBs) | 260 | 1% | 12.87 | 0.15% |
| Party 3 (PCBs) | 260 | 1% | 12.87 | 0.15% |

13

| Party 4 (DDT) | 27,000 | 100% | 1.37 | 1.57% |
|---|---|---|---|---|
| Party 5 (mercury) | 42,000 | 100% | 0.95 | 1.09% |
| Party 6 (copper) | 2,100,000 | 100% | 0.69 | 0.79% |
| Party 7 (dieldrin) | 390 | 100% | 0.13 | 0.15% |
| Party 8 (HPAHs) | 240,000 | 100% | 0.05 | 0.06% |
| Party 9 (lead) | 3,200,000 | 100% | 0.01 | 0.01% |
| Party 10 (LPAHs) | 170,000 | 100% | 0.01 | 0.01% |

Since the PCB parties in this example only account for 2% of the total PCBs discharged to the Passaic River, the other parties take on the unaccounted-for share of the PCB risk number. This redistribution of responsibility for non-allocation party mass contributions causes the dioxin share, which was already the highest, to jump 12% higher as it takes on the leftover PCB share. This compounds Batson's already nonsensical risk factor calculations and ensures that Batson's allocation model will arrive at a result that has no connection to reality, and certainly no connection to any metric that could be useful to evaluate responsibility for the cost of the remedy at the Passaic River.

42.    The actual effect of the 1% attenuation factor in Batson's model is shown in the table below, which includes the masses that Batson found were discharged from the allocation parties. Apart from dioxin and PAH contributions, Batson found the allocation parties discharged less than 1% of each contaminant into the Passaic River.

| Party | Discharge Mass (kg) | % Contribution | RRN | Share |
|---|---|---|---|---|
| Dioxin parties | 37,999 | 99.99% | 83.92 | 99.86% |
| Mercury parties | 44 | 0.11% | 0.95 | 1.09% |
| PCB parties | 204 | 0.79% | 12.87 | 0.12% |
| HPAH parties | 44,282 | 18.45% | 0.05 | 0.01% |
| LPAH parties | 30,695 | 18.06% | 0.01 | 0.01% |
| Lead parties | 2,944 | 0.09% | 0.01 | 0.01% |
| DDT parties | 26 | 0.10% | 1.37 | 0.002% |
| Copper parties | 2,814 | 0.13% | 0.69 | 0.001% |
| Dieldrin parties | 0.01 | 0.003% | 0.13 | 0.00001% |

43.    The "attenuation factor" deficiencies with Batson's model are more specifically explicated by expert Tarek Saba, who opines that Batson's use of an attenuation factor was unnecessary, and that his application was unscientific.

- Batson's estimation of 1% for a dioxin attenuation factor misapplies an accepted scientific concept—attenuation—and contradicts information provided by EPA, violates EPA's contractor analysis, and violates the Focused Feasibility Study (FFS) report for OU2 which formed the basis of the Remedy

14

of Decision for OU2 of the Lower Passaic River. Batson's application of his dioxin attenuation factor to the other contaminants violates EPA's published documents for the Passaic River and violates basic scientific principles. (Saba Opinion 3b and 3c)

- By simply removing Batson's mathematically and scientifically problematic attenuation factor and percent contribution concepts, and instead scaling the discharge masses Batson found from each allocation facility to the relative risk for each contaminant, the data Batson collected would yield a substantially different outcome: the OxyChem share would reduce to 31.09%. (Saba Opinion 3d).

44.   With respect to dioxin, Batson made multiple decisions and errors that both artificially inflated the relative risk number assigned to dioxin and ensured that OxyChem would be assessed a 100% share of dioxin. As demonstrated in the simplified examples of the operation of Batson's actual model, above, assessing a high relative risk number to dioxin while also attributing 100% of the dioxin to OxyChem would ensure that OxyChem received a total allocation share no lower than 83.92% *at the outset*, even before any data about any other allocation party was entered into the model. Much of the data underlying both Batson's calculation of the dioxin risk number and his determination that OxyChem contributed 100% of the dioxin was incorrect, miscalculated, cherry-picked, or manipulated to achieve this result, which strongly indicates that Batson's model was designed to allocate an artificially high share to OxyChem. Expert Michael Bock, Ph.D., opines:

- OxyChem is not the only source of dioxin at the Passaic River. Batson's assessment of the contribution of dioxins focuses on 2,3,7,8-TCDD, the particular congener associated with the OxyChem site, and overlooks or severely underestimates contributions of dioxins to the Passaic River from at least four other sites. (Bock Opinions 2 & 3).

- Batson committed several basic calculation and unit conversion errors in his calculation of the amount of dioxins discharged from the OxyChem site—resulting in an estimate that was at least 10 times greater than is supported by the evidence. This materially impacts Batson's calculation of the attenuation factor and renders it mathematically invalid. (Bock Opinion 4).

45.   The critical methodological flaws described above were also compounded by Batson's analysis of the allocation party discharge pathways, which overlooked critical evidence, cherry-picked favorable and unfavorable data based on whether the party was participating in the allocation, and made serious calculation errors. (Saba Opinion 3a). These low discharge estimates are not credible. Per historian David Stradling, industrial pollution increased during World War II and in the post-war years until the passage of the Clean Water Act in 1973. "The Passaic River, long polluted by sewage, had become an industrial sacrifice zone." (Stradling at para. 48).

15

ALCD-PUBCOM_0000971

46.     Moreover, Batson chose not to factor in the in-river sampling data, which ignored critical evidence of actual discharges and biased the allocation in favor of parties with poor record-keeping practices. The in-river sampling data is critical to show the actual contamination. Expert Tarek Saba, Ph.D. had identified examples of extreme concentrations of contaminants found just off-shore of a facility, typically right next to an outfall, and are of the opinion that the upland sampling data is not an adequate stand-in for the in-river data. (Saba Opinion 3a).

47.     Finally, Batson's incorporation of subjective factors like "culpability" and "cooperation" was inappropriate for this allocation, and the metrics he used for each were biased. Batson provides no explanation for, or sensitivity analysis of, the adjustment factors he uses to manipulate his already imperfect "base allocations". His use of +/- 10%, or 20% or 100% is completely arbitrary even if he was capable of perfectly assigning PAPs to those tiers.

48.     Experts Stradling and Farley criticize Batson's choice to selectively apply the evidence to bias the "culpability" factor against OxyChem:

- Many of the settling parties were operating in the pre-Federal-regulation period before 1973, and at that time sporadic regulation and a culture that normalized industrial discharges to the Passaic River invalidates Batson's "culpability" scale of 0-10% for all parties except OxyChem. (Stradling, Farley Opinion 1).

- The number of parties for which the Batson Report finds "no evidence" of culpability (37), demonstrates the problem of applying complicated mathematical formulas to incomplete data sets. (Stradling at para. 54).

49.     When considering the "Cooperation Factor," Batson chooses to define cooperation only as cooperation with *his* process and fails to acknowledge actual cooperation in the performance of the OU2 remedy. The allocation was designed to allocate responsibility for the OU2 remedial design and remedial action. Allocation Protocol at 2 ("[T]his methodology outlines a process for conducting an allocation to determine the relative shares of responsibility among and between the Allocation Parties for the costs for **remedial design and remedial action** associated with OU2 of the Diamond Alkali Superfund Site.") (emphasis added).

50.     Nonetheless, Batson did not consider work performed voluntarily on the remedial design—one of the two items explicitly being allocated - and considered remedial and removal activities only. See Allocation Report, Attachment S ("Considerations in Determining Culpability & Cooperation Factors") at 2 ("The following is a summary of activities undertaken by Allocation Parties and the amounts of funding, if available, committed in support of EPA's remedial or removal activities in the Lower Passaic River and OU2[:] 2007 RI/FAS ... Other RI/FS Costs ... 2012 Phase 1 Removal Action."). OxyChem has a long history of actual cooperation and performance on the OU2 design. None of the other parties cooperated, and many fought EPA's choices. See Dkt. 110-4 (Exhibit C to OxyChem's

ALCD-PUBCOM_0000972

Reply Brief in support of Motion to Intervene, "Chronology of Work on Lower Passaic River Remedies").

## Conclusion

51.    The Batson allocation model is fundamentally at odds with general modeling precepts and CERCLA allocation principles in particular. The parties who participated in the allocation would be entitled to overlook all of the errors and flaws in the Batson allocation and accept its findings if the sole purpose of the allocation were to fix relative shares among themselves. But the Batson model must be held to a far higher standard where, as here, the Court is being asked to impose significant legal consequences on parties that are not willing to overlook the numerous and significant errors in Batson's model.

52.    In addition to all the objective deficiencies in the Batson report noted in the body of my declaration, perhaps the greatest "tell" that the allocation needs heightened scrutiny is that all the allocation parties who were invited to settle based on the allocation accepted that opportunity. In all my years in private practice and as a mediator, I have never seen any other allocation that every participating party has been able to agree to. How does one accomplish that as an allocator? Here, the modus operandi was to construct a model that assigned 99%+ of the liability to the "empty chair", a party that was never going to be cashing out no matter what allocation model was used.

53.    I have no reason to suspect that Batson has or had any particular animus toward OxyChem. But I do know from my experience as a mediator that a neutral or an allocator "wins" when the mediation/allocation is successful and "loses" when it is not. Moreover, as an allocator, one "loses" even more if your proprietary allocation model, for which EPA paid a great deal of money, is found unacceptable by enough PAPs that it becomes unusable for EPA's purposes. Batson implicitly acknowledges this in his report by expressing concern that the output of his model could "hamper future settlement efforts." Allocation Report at 28.

54.    A second "tell" as to the inadequacy of Batson's work is that he would have the reader believe his model can allocate to the ten-millionth of a percentage point. Even if Batson were acting with perfect information and needing to make no assumptions, it is mathematically dishonest to claim that level of precision (see Wikipedia discussion of the mathematical         concept         of         "significant         figures"         at https://en.wikipedia.org/wiki/Significant_figures). Here, where there are major data gaps, arbitrary factors of up to 100% being applied, and untested assumptions about overland fate and transport, etc., the use of allocation shares computed to the ninth decimal point should put even the most credulous readers on notice that the author is seeking to "put lipstick on a pig."

55.    To bring Batson's ultimate allocation shares out of their microcosm and into the real world, Figure 1 shows Batson's Attachment Q, the ranking of the allocation shares applied to EPA's estimated cost to complete the remediation of the Passaic River, $1.82

17

billion. An allocation of a $1.82 billion liability that supports allowing most of the 85 parties to settle for less than $1,000 is not a credible allocation.

56.    In sum, there is no dispute that allocators rarely have the luxury of precise information, or that "rough justice" may still be better than no allocation at all. But the roughness of the justice needs to be explicitly made clear and arrived at in a fair fashion that comports with general modeling principles. An allocation that cloaks unprincipled rough justice with false precision does a disservice to all.

57.    Famously, Winston Churchill defined Russia as "a riddle, wrapped in a mystery, inside an enigma." Batson's model may be similarly characterized as "poor or missing data, wrapped in a structure that has multiple significant scientific deficiencies, inside a model that is wholly inappropriate for the use to which it is being applied." If Batson's model is suitable for anything, it would be for a case study in a Quantitative Methods course – as an example of what not to do.

18

ALCD-PUBCOM_0000974

I, Robert M. Olian, declare under penalty of perjury that the foregoing is true and correct.


EXECUTED on March 22, 2023

_____
Robert M. Olian, J.D.

19

ALCD-PUBCOM_0000975

# ROBERT M. OLIAN

Rob Olian started envADR after his December 2016 retirement from Sidley Austin LLP, where he began practicing in 1977. At Sidley, Mr. Olian headed the Chicago Environmental practice group and was co-leader of the firm's national Environmental practice from 1994 until he retired. Through the years, Mr. Olian's practice moved from RCRA compliance to CERCLA to civil and criminal enforcement and ultimately to environmental tort litigation.

Mr. Olian is a Fellow in the American College of Environmental Lawyers and a former member of the College's Executive Committee and is on the board of the Association for Conflict Resolution–Chicago. He was a member of the N.D. Ill. Trial Bar until retirement and was listed in the top tier of *Chambers USA's America's Leading Lawyers for Business* and *Best Lawyers in America* for the last ten years he was in private practice. *Best Lawyers* also named him 2016 Lawyer of the Year for Chicago Litigation – Environmental and 2017 Lawyer of the Year for Chicago – Environmental. He remains listed for environmental expertise is *Who's Who Legal: Environment* 2021, was recognized among leading mediators in the 2018, 2019, 2020, and 2021 editions of *Who's Who Legal: Mediation*, and received the 2020 Client Choice Award for excellence in client service in the Mediation category.

Mr. Olian has spoken about environmental mediation to numerous groups, including the ABA SEER, the Natural Resources Defense Council, the Chicago Bar Association, the Indianapolis Bar Association and the Association for Conflict Resolution. He served as editor of the *Illinois Environmental Law Handbook, 2nd Edition* (published by Government Institutes) and as an author and editor of the *Superfund Handbook* (published by ENSR).

Mr. Olian graduated from Harvard College cum laude in Applied Mathematics in 1973 and received both his law degree from Harvard Law School and his Masters in Public Policy from Harvard Kennedy School in 1977. He completed the 40-hour Certificate Program in Mediation Skills at Northwestern University in 2016.

At envADR, Mr. Olian provides facilitative mediation, evaluative mediation, allocation, and arbitral services as a neutral, primarily in environmental matters. He also continues to serve as one of three trustees for the Fisher-Calo Superfund Site in Indiana and recently concluded a multi-year engagement as administrator of a property value protection program on behalf of a utility company.

**Figure 1**

| Batson Allocation Method #1 "Protocol" Allocation | | | | Batson Allocation Method # 2 "Alternative" Allocation | | |
|---|---|---|---|---|---|---|

| Allocation Party | Allocation Share | Allocation Share of $1.82 B | | Allocation Party | Allocation Share | Allocation Share of $1.82 B |
|---|---|---|---|---|---|---|
| Occidental Chemical Corp. | 99.9396103% | $1,819,900,304 | | Occidental Chemical Corp. | 92.93938% | $1,692,426,082 |
| Nokia-Lucent Technologies | 0.0281047% | $511,787 | | Nokia-Lucent Technologies | 3.27964% | $59,722,310 |
| Pharmacia LLC | 0.0156633% | $285,229 | | Pharmacia LLC | 1.83157% | $33,352,979 |
| PMC, Inc. | 0.0038111% | $69,400 | | Cooper Industries LLC | 0.36873% | $6,714,488 |
| EnPro Holdings, Inc. | 0.0024639% | $44,867 | | Hexcel Corp. | 0.28497% | $5,189,247 |
| Hexcel Corp. | 0.0024234% | $44,130 | | Pitt Consol Chemical Company | 0.17796% | $3,240,630 |
| Pitt Consol Chemical Company | 0.0012727% | $23,176 | | 21st Century Fox America, Inc. (21CFA) | 0.17596% | $3,204,284 |
| ISP Chemicals LLC | 0.0012605% | $22,954 | | PMC, Inc. | 0.15184% | $2,765,094 |
| Givaudan Fragrances Corp. | 0.0012338% | $22,467 | | ISP Chemicals LLC | 0.14757% | $2,687,231 |
| Congoleum Corp | 0.0009848% | $17,933 | | Congoleum Corp. | 0.11702% | $2,130,960 |
| BASF Corporation | 0.0007663% | $13,955 | | BASF Corporation | 0.09263% | $1,686,709 |
| Cooper Industries LLC | 0.0004488% | $8,172 | | EnPro Holdings, Inc. | 0.07138% | $1,299,792 |
| PSE&G Corp. | 0.0004339% | $7,901 | | Seton Company, Inc. (Seton Tanning) | 0.04035% | $734,799 |
| Seton Company, Inc. (Seton Tanning) | 0.0002749% | $5,005 | | Sherwin Williams Co. | 0.03685% | $671,113 |
| Hoffman-La Roche Inc. | 0.0001644% | $2,994 | | Conopco, Inc. | 0.02752% | $501,095 |
| Legacy Vulcan Corporation | 0.0001437% | $2,617 | | PSE&G Corp. | 0.02305% | $419,697 |
| 21st Century Fox America, Inc. (21CFA) | 0.0001306% | $2,378 | | Kearny Smelting & Refining | 0.02233% | $406,546 |
| Celanese Ltd./CAN Holdings LLC | 0.0000888% | $1,617 | | CBS Corporation | 0.02093% | $381,203 |
| Curtiss-Wright Corporation | 0.0000698% | $1,271 | | Hoffman-La Roche Inc. | 0.02072% | $377,275 |
| Teval/Guyon | 0.0000603% | $1,098 | | EPEC Polymers, Inc. | 0.01948% | $354,673 |
| Okonite Company | 0.0000535% | $974 | | Givaudan Fragrances Corp. | 0.01886% | $343,528 |
| Alliance Chemical Inc. | 0.0000478% | $871 | | Legacy Vulcan Corporation | 0.01677% | $305,300 |
| Kearny Smelting & Refining | 0.0000478% | $871 | | Curtiss-Wright Corporation | 0.01552% | $282,550 |
| Sherwin Williams Co. | 0.0000453% | $826 | | SpectraServ, Inc. | 0.01472% | $268,022 |
| CBS Corporation | 0.0000453% | $825 | | Schiffenhaus Packaging Corp. (Rock-Tenn) | 0.01135% | $206,658 |
| Benjamin Moore & Co. | 0.0000347% | $631 | | Okonite Company | 0.01131% | $206,019 |
| EPEC Polymers, Inc. | 0.0000336% | $611 | | Alliance Chemical Inc. | 0.00957% | $174,310 |
| Conopco, Inc. | 0.0000309% | $563 | | Celanese Ltd./CAN Holdings LLC | 0.00777% | $141,568 |
| Royce Associates | 0.0000282% | $513 | | Teval/Guyon | 0.00767% | $139,689 |
| SpectraServ, Inc. | 0.0000246% | $448 | | Benjamin Moore & Co. | 0.00403% | $73,391 |
| General Electric Company | 0.0000233% | $424 | | DII Industries, LLC | 0.00390% | $70,969 |
| Safety Kleen /McKesson Corp. | 0.0000200% | $364 | | Safety Kleen /McKesson Corp. | 0.00285% | $51,871 |
| Chevron Environmental Management Co. | 0.0000193% | $351 | | Royce Associates | 0.00254% | $46,214 |
| Stanley Black & Decker, Inc. | 0.0000176% | $321 | | Chevron Environmental Management Co. | 0.00225% | $40,938 |
| Schiffenhaus Packaging Corp. (Rock-Tenn) | 0.0000165% | $301 | | Stanley Black & Decker, Inc. | 0.00191% | $34,768 |
| Leemilt's Petroleum, Inc. | 0.0000162% | $295 | | BASF Catalysts LLC | 0.00190% | $34,638 |
| Tiffany and Company | 0.0000149% | $271 | | Tiffany and Company | 0.00190% | $34,579 |
| Atlantic Richfield (ARCO) | 0.0000125% | $228 | | Leemilt's Petroleum, Inc. | 0.00188% | $34,205 |
| Atlas Refining Inc. | 0.0000089% | $162 | | Otis Elevator Co. | 0.00167% | $30,377 |
| DII Industries, LLC | 0.0000087% | $159 | | Atlantic Richfield (ARCO) | 0.00141% | $25,712 |
| Campbell Foundry Company | 0.0000064% | $116 | | Textron Inc. | 0.00102% | $18,611 |
| Goody Products Inc. (Newell) | 0.0000059% | $107 | | Arkema Inc. | 0.00094% | $17,131 |
| Garfield Molding Company, Inc. | 0.0000041% | $74 | | Atlas Refining Inc. | 0.00090% | $16,431 |
| Otis Elevator Co. | 0.0000035% | $63 | | Newark Morning Ledger Co. | 0.00085% | $15,456 |
| Berol Corporation | 0.0000024% | $44 | | Campbell Foundry Company | 0.00081% | $14,790 |
| Franklin Burlington Plastics Inc. | 0.0000023% | $42 | | Newark Group, Inc. | 0.00074% | $13,493 |
| BASF Catalysts LLC | 0.0000022% | $41 | | Garfield Molding Company, Inc. | 0.00068% | $12,470 |
| Arkema Inc. | 0.0000019% | $34 | | Revere Smelting & Refining Corp. | 0.00061% | $11,057 |
| Goodrich Corporation | 0.0000014% | $26 | | Franklin Burlington Plastics Inc. | 0.00056% | $10,266 |
| Textron Inc. | 0.0000012% | $21 | | Goodrich Corporation | 0.00055% | $10,013 |
| Newark Morning Ledger Co. | 0.0000011% | $20 | | Coats & Clark, Inc. | 0.00047% | $8,512 |
| PPG Industries Inc. | 0.0000011% | $19 | | Harris Corporation | 0.00045% | $8,121 |
| Revere Smelting & Refining Corp. | 0.0000010% | $19 | | Goody Products Inc. (Newell) | 0.00028% | $5,138 |
| Newark Group, Inc. | 0.0000010% | $18 | | General Electric Company | 0.00028% | $5,112 |
| Quality Carriers, Inc./Quala Systems | 0.0000010% | $18 | | Purdue Pharma Technologies Inc. | 0.00019% | $3,543 |
| Sun Chemical Corp (Foundry Street Complex) | 0.0000008% | $14 | | PPG Industries Inc. | 0.00019% | $3,409 |
| Coats & Clark, Inc. | 0.0000007% | $13 | | Neu Holdings (Eden Wood Corporation) | 0.00017% | $3,106 |
| Harris Corporation | 0.0000007% | $12 | | Passaic Pioneer Properties Co. | 0.00012% | $2,167 |
| Foundry Street Corp (Foundry Street Complex) | 0.0000004% | $7 | | Quality Carriers, Inc./Quala Systems | 0.00012% | $2,116 |
| Purdue Pharma Technologies Inc. | 0.0000003% | $5 | | Tate & Lyle Ingredients Americas LLC | 0.00012% | $2,114 |
| Ashland Inc. | 0.0000003% | $5 | | Sun Chemical Corp (Foundry Street Complex) | 0.00009% | $1,646 |
| Neu Holdings (Eden Wood Corporation) | 0.0000002% | $5 | | Foundry Street Corp (Foundry Street Complex) | 0.00004% | $775 |
| Roman Asphalt Corporation | 0.0000002% | $3 | | Honeywell International, Inc. | 0.00004% | $752 |
| Alden Leeds Inc. | 0.0000002% | $3 | | STWB Inc. | 0.00004% | $687 |
| Passaic Pioneer Properties Co. | 0.0000001% | $3 | | Essex Chemical Corporation | 0.00004% | $670 |
| Tate & Lyle Ingredients Americas LLC | 0.0000001% | $3 | | Canning Gumm LLC | 0.00003% | $605 |
| Elan Chemical Co., Inc. | 0.0000001% | $1 | | Berol Corporation | 0.00001% | $221 |

**Figure 1**

| Allocation Party | Allocation Share | Allocation Share of $1.82 B |
|---|---|---|
| STWB Inc. | 0.0000001% | $1 |
| Honeywell International, Inc. | 0.0000000% | $1 |
| Essex Chemical Corporation | 0.0000000% | $1 |
| Canning Gumm LLC | 0.0000000% | $1 |
| Hartz Consumer Group, Inc. | 0.0000000% | $0 |
| National Standard LLC | 0.0000000% | $0 |
| Covanta Essex Company | 0.0000000% | $0 |
| Automatic Electroplating Corp. | 0.0000000% | $0 |
| Sequa Corporation (Foundry Street Complex) | 0.0000000% | $0 |

| Allocation Party | Allocation Share | Allocation Share of $1.82 B |
|---|---|---|
| Ashland Inc. | 0.00000% | $24 |
| Roman Asphalt Corporation | 0.00000% | $17 |
| Alden Leeds Inc. | 0.00000% | $15 |
| Hartz Consumer Group, Inc. | 0.00000% | $7 |
| Covanta Essex Company | 0.00000% | $4 |
| National Standard LLC | 0.00000% | $1 |
| Elan Chemical Co., Inc. | 0.00000% | $1 |
| Automatic Electroplating Corp. | 0.00000% | $0 |
| Sequa Corporation (Foundry Street Complex) | 0.00000% | $0 |

ALCD-PUBCOM_0000978

# APPENDIX B.9
## Tarek Saba Declaration

ALCD-PUBCOM_0000979

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| UNITED STATES OF AMERICA )<br><br>    Plaintiff, )<br> )<br>v. )<br> )<br>ALDEN LEEDS, INC., *et al.* )<br> )<br>    Defendants. )<br> )<br> ) | Hon. Madeline Cox Arleo<br>Hon. Leda D. Wettre<br><br>Civil Action No. 2:22-cv-7326 |

**DECLARATION OF TAREK SABA, PH.D.**

1

## TABLE OF CONTENTS

LIST OF FIGURES ..................................................................................... iii

LIST OF TABLES ...................................................................................... iii

ACRONYMS LIST ..................................................................................... iv

PURPOSE OF THIS DECLARATION ............................................................ 1

SUMMARY OF FINDINGS AND OPINIONS .................................................. 2

QUALIFICATIONS ..................................................................................... 4

SUPPORTING INFORMATION FOR FINDINGS AND OPINIONS ...................... 5

Opinion 1.    For each COC with concentrations above its RG, the OU2-impacted areas
and sediment volume can be calculated using generally accepted and
established mathematical tools. ................................................................ 5

Opinion 2.    All COCs drive the remedy costs, with some COCs driving specific
elements of the remedy components. 2378-TCDD is not a remedy cost
driver above the other COCs. .................................................................. 8

Opinion 3a.   Batson's methodology to estimate COC masses discharged from the PAP
sites to OU2 is neither a scientifically accepted methodology nor reliable
as it contradicts the analysis that formed the basis of the ROD and the
available PAP sites data and information. ................................................ 15

Opinion 3b.   Batson's estimation of a dioxin attenuation factor misapplies an accepted
scientific concept—attenuation—and contradicts factual information and
analysis provided by EPA and violates the Focused Feasibility Study
(FFS) for OU2 which formed the basis of the ROD. ................................ 24

Opinion 3c:   Batson's application of his dioxin attenuation factor to the other ROD
COCs violates the OU2 analysis that formed the basis of the ROD and
violates scientific principles. ................................................................ 28

Opinion 3d:   Aside from Batson's flawed and biased allocation steps, removing
Batson's COC attenuation factors or his relative risk analysis from his
allocation would result in substantially lower allocation percentages for
OxyChem. Specifically, if Batson's use of his "attenuation factor" is
removed from his allocation steps and the remainder of his analysis is
scaled to correspond to the COC masses discharged from the PAP sites by
their respective Relative Risk Number (as presented in Batson),
OxyChem's percent share would be 31.1% and 48.7% (before and after
applying Batson's biased culpability and cooperation factors,
respectively). .................................................................................... 31

Batson-related Conclusions ...................................................................... 32

Opinion 4:    Extending Batson's OU2 allocation to include OU4 is not scientifically
supportable, would be inconsistent with the presence of COC sources that

ALCD-PUBCOM_0000981

disproportionately impact OU4 versus OU2 and would be inconsistent
with EPA contractors' conclusions.......................................................................... 33

REFERENCES ............................................................................................................. 38

Attachment 1 – Resume of Tarek Saba.
Attachment 2 – COC Exceedances in OU2.

ALCD-PUBCOM_0000982

Report of Dr. Tarek Saba

## LIST OF FIGURES

Page

Figure 1.   COCs rank in terms of their relative impacted OU2 sediment volumes. ................... 7

Figure 2.   OU2 remedy elements and percentages of total cost.................................................. 9

Figure 3.   Batson's estimation that the OxyChem site discharged more PCB mass than
the other example sites is not consistent with the data and information
available. (a) Maximum PCB soil concentration reported for the PAP sites
and (b) Batson-estimated PCB mass discharged to the Passaic River from the
PAP sites.............................................................................................................. 16

Figure 4.   Upland PCB soil concentrations on sites surrounding the OxyChem site are
much higher. (PCB concentrations are represented by red bars. The height of
the bar corresponds to the concentration)................................................................. 18

Figure 5.   Batson (2020) misrepresented PCB discharges from the EnPro site and
impacts to OU2 sediment. ......................................................................................... 19

Figure 6.   Givaudan's fraction contribution of 2378-TCDD to OU2 (figure taken from
Garland 2017, with red annotations added). Importantly, Garland (2017) did
not investigate other dioxin sources along the Passaic River, a limitation to
his analysis................................................................................................................. 26

Figure 7.   PCB spatial distribution in OU4 indicates predominant impacts from OU4-
related sources. ......................................................................................................... 36

## LIST OF TABLES

Table 1.   Example sites with dieldrin detections. ....................................................................... 21

Table 2.   Batson's attenuation factor created an unrealistic orphan share and further
biased his allocation against OxyChem..................................................................... 29

iii

ALCD-PUBCOM_0000983

## ACRONYMS LIST

| | |
|---|---|
| 2378-TCDD | 2,3,7,8-Tetrachlorodibenzo-p-dioxin (a ROD COC) |
| CD | consent decree |
| CERCLA | Comprehensive Environmental Response, Compensation, and Liability Act |
| CIL | chemical isolation layer |
| COC | Chemical of Concern |
| DDx | DDT and its degradation products (a ROD COC) |
| EPA | U.S. Environmental Protection Agency |
| FFS | Focused Feasibility Study |
| HMW | high molecular weight |
| kg | kilograms |
| lbs | pounds |
| LWM | low molecular weight |
| LPRSA | Lower Passaic River Study Area |
| mg/kg | milligram per kilogram |
| NAPL | nonaqueous phase liquids |
| OxyChem | Occidental Chemical Corporation |
| OU | Operable Unit |
| PAH | polycyclic aromatic hydrocarbons (a ROD COC) |
| PAP | Participating Allocation Party |
| PCB | polychlorinated biphenyls (a ROD COC) |
| PVSC | Passaic Valley Sewerage Commission |
| RCRA | Resource Conservation and Recovery Act |
| RG | remediation goal |
| RM | River Mile |
| ROD | Record of Decision |
| SIP | Self-Implementing Cleanup Plan |
| TSCA | Toxic Substances Control Act |
| USGS | U.S. Geological Survey |

iv

ALCD-PUBCOM_0000984

Report of Dr. Tarek Saba

## PURPOSE OF THIS DECLARATION

Pursuant to 28 U.S.C. § 1746, I, Tarek Saba, declare the following:

1. I have been retained by the law firm Langsam Stevens Silver & Hollaender, LLP on behalf of Occidental Chemical Corporation (OxyChem) to provide expert opinions related to the Diamond Alkali Superfund Site (OU2; Operable Unit 2), specifically the Allocation Report prepared by AlterEcho (referred to as Batson (2020) or the Batson report) on behalf of the U.S. Environmental Protection Agency (EPA).

2. My assignment included providing expert responses to the following questions:

   - **For each OU2 Chemical of Concern (COC), can one identify the OU2 areas containing that COC at concentrations exceeding its remediation goal (RG)? If yes, how do individual COCs rank in terms of the relative impacted OU2 sediment volume?**

   - **Which OU2 Record of Decision (ROD) COCs are driving the OU2 remedy costs, based on the 95% remedy design report?**

   - **Batson (2022) allocation-related questions:**

     - **Is Batson's methodology for estimating COC masses discharged from the different Participating Allocation Party (PAP) sites to OU2 a generally accepted scientific methodology, consistent across sites, consistent with facts, and reliable?**

     - **Is Batson's introduction of the dioxin attenuation factor an accurate and acceptable application of a recognized scientific concept—attenuation— and consistent with the analysis that formed the basis of the ROD?**

     - **Is Batson's extension of the dioxin[1] attenuation factor to the other ROD COCs consistent with generally accepted scientific methodologies and the available data and with the analysis that formed the basis of the ROD?**

     - **Would Batson's allocation for OxyChem be substantially different if his COC attenuation factor and/or his COC relative risk numbers were not included in his allocation?**

   - **Is it scientifically supportable or even reasonable to extend Batson's allocation from OU2 to include OU4?**

---

[1]    The terms "dioxin", "dioxins/furans", and "2,3,7,8-TCDD" appear to be used interchangeably in the Batson report. Dioxins/furans comprise 17 compounds, one of which is 2,3,7,8-TCDD.

1

Report of Dr. Tarek Saba

## SUMMARY OF FINDINGS AND OPINIONS

3. **Opinion 1:** For each COC with concentrations above its RG, the OU2-impacted areas and sediment volume can be calculated using generally accepted and established mathematical tools. By applying such tools, COCs with the highest relative impact on sediment volume across OU2 can be demonstrated:

| Sediment depth | 2,3,7,8-TCDD | DDx | Dieldrin | Mercury | Copper | Lead | PAHs | PCBs | No exceedance |
|---|---|---|---|---|---|---|---|---|---|
| 0 – 2.5 ft | 16% | 17.9% | 4.0% | 18.2% | 13.4% | 12.5% | 1.8% | 15.4% | 0.7% |
| 2.5 – 10 ft | 10.1% | 15.9% | 3.6% | 19.7% | 12.6% | 12.0% | 3.6% | 9.7% | 12.9% |

4. **Opinion 2**: All COCs drive the remedy costs, with some COCs driving specific elements of the remedy components more than other COCs. 2,3,7,8-Tetrachlorodibenzo-p-dioxin (2,3,7,8-TCDD) is not a remedy cost driver above the other COCs.

5. **Batson allocation-related opinions**

   - **Opinion 3a:** Batson's methodology to estimate COC masses discharged from the PAP sites to OU2 is neither a scientifically accepted methodology nor reliable as it contradicts the analysis that formed the basis of the ROD and the available PAP sites' data and information.

   - **Opinion 3b:** Batson's estimation of a dioxin attenuation factor misapplies an accepted scientific concept—attenuation—and contradicts factual information and analysis provided by EPA and violates the Focused Feasibility Study (FFS) for OU2 which formed the basis of the ROD.

   - **Opinion 3c**: Batson's application of his dioxin attenuation factor to the other ROD COCs violates the OU2 analysis that formed the basis of the ROD and violates scientific principles.

   - **Opinion 3d**: Aside from Batson's flawed and biased allocation steps, removing Batson's COC attenuation factors or his relative risk analysis from his allocation would result in substantially lower allocation percentages for OxyChem. Specifically, if Batson's use of his attenuation factor is removed from his allocation steps and the remainder of his analysis is scaled to correspond to the COC masses discharged from

2

the PAP sites by their respective Relative Risk Number (as presented in Batson), OxyChem's percent share would be **31.1%** and **48.7%** (before and after applying Batson's biased culpability and cooperation factors, respectively).

6. **Opinion 4:** Extending Batson's OU2 allocation to include OU4 is not scientifically supportable, would be inconsistent with the presence of COC sources that disproportionately impact OU4 versus OU2, and would be inconsistent with EPA contractors' conclusions.

3

Report of Dr. Tarek Saba

## QUALIFICATIONS

7.  I am a Principal Scientist and Office Director (Maynard, Massachusetts) at Exponent, Inc., a publicly traded science and engineering consulting firm. Exponent employs over approximately 900 staff worldwide; more than 425 of whom hold doctorates in their field.

8.  I have a bachelor's degree in Civil Engineering (1989), a master's in Water Resources (1992), and a doctorate in Environmental Engineering (1999). I worked as a post-doctorate researcher investigating contaminant spills in the environment and a subcontractor for EPA and the National Science Foundation investigating the behavior of contaminants in the subsurface.

9.  Over the past 25 years, I focused my work experience on combining chemical forensics, fate and transport analysis, and hydrogeologic data, with historical industrial operational information and practices to determine sources of organic and inorganic compounds in environmental media. From such analysis, I develop apportionment and allocation models among responsible parties. I have extensive experience with and am well familiar with the generally accepted scientific methods used to allocate response costs among sources of contamination.

10. Relevant to this matter, my experience includes tracking sources (e.g., chemical signatures), fate, transport, extent, and timing of contamination from multiple industrial sites such as petroleum terminals and refineries, former manufactured gas plant sites, tar distillation facilities, manufacturing facilities, polychlorinated biphenyls (PCB) handling sites, and landfills, among other industrial operations.

11. I have issued expert reports and/or testified on chemicals and matters related to the OU2 COCs in several states and under different legal settings such as the Resource Conservation and Recovery Act (RCRA), the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), insurance claims, and the applicability of the petroleum exclusion at CERCLA Sites. Furthermore, I pioneered research to understand the behavior of free phase oils (also known as nonaqueous phase liquids or NAPL) in the subsurface and revised U.S. Geological Survey (USGS) numerical codes to better simulate the fate and transport of NAPL and dissolved compounds in the subsurface. I have many publications in the areas of fate and transport of contaminants, chemical fingerprinting, and weathering analysis of contaminants at Superfund Sites and techniques used to determine their sources.

12. My curriculum vitae is presented in Attachment 1.

4

ALCD-PUBCOM_0000988

Report of Dr. Tarek Saba

## SUPPORTING INFORMATION FOR FINDINGS AND OPINIONS

**Opinion 1.** **For each COC with concentrations above its RG, the OU2-impacted areas and sediment volume can be calculated using generally accepted and established mathematical tools.**

13. To evaluate the impact of each COC on OU2, I used an established scientific approach for environmental scientists and practitioners to identify impacted areas and sediment masses for each COC. The steps to the approach are presented below.

14. **Step 1**: Assembled available OU2 sediment chemistry data for the ROD COCs.

15. **Step 2**: Divided OU2 into polygons, called "Thiessen Polygons".[2,3,4]

- The Thiessen Polygons Method is a widely used technique that assigns areas of influence around each sediment core sample location (Chow et al. 1988; Hwang et al. 1999; Arnold and Milne 1984).



- Thiessen polygons (see diagram) are polygons whose boundaries define the area that is closest to each sampling point relative to all other points. The polygons are mathematically defined by the perpendicular bisectors of the lines between all points.

16. **Step 3**: Once the Thiessens polygons were developed, each sample with COC chemistry data was assigned to a polygon based on its location.

17. **Step 4**: The average concentration for each ROD COC in each Thiessen polygon was compared to its RG to determine if the sediment within the polygon exceeded its RG. The figures in Attachment 2 present maps demonstrating the polygons within OU2 that have an average concentration exceeding the RG for each COC. The figures visually demonstrate the extensive spatial extent of impact the ROD COCs have on OU2.

---

[2]    OU2 surface sediment (0 – 2.5 ft) was divided into one set of Thiessen polygons, with another set of Thiessen polygons used for the deeper sediment (2.5 – 10 ft).

[3]    Thiessen polygons were constructed in ArcGIS using "Create Thiessen Polygons". Sample locations used for creating the Thiessen polygons were selected using the available chemistry data. A sample location was considered acceptable for polygon development if it had a chemical measurement for each of the ROD COCs.

[4]    Also known as Voronoi polygons/tessellations (Arnold and Milne 1984; Hwang et al. 1999).

5

ALCD-PUBCOM_0000989

Report of Dr. Tarek Saba

**Ranking of individual COCs by their relative impacted OU2 sediment volume**

18. To determine the OU2 sediment volume[5] impacted by each COC at concentrations above its RG, the following steps were used:

    - Within each polygon, the sediment volume was fractionally divided among the COCs that exceed their RGs within the polygon.[6] For example, if four (4) COCs exceeded their RGs in a polygon, then 25% of the sediment volume in that polygon was assigned to each of those COCs.

    - The total impacted sediment volume for each COC was calculated by summing the impacted sediment volumes for each COC in all polygons covering OU2.

19. The results of the relative impacted sediment volumes are presented in Figure 1 and demonstrate how individual COCs rank in terms of their relative impacts to OU2 sediment.

---

[5]    For each polygon, the sediment volume was calculated by multiplying the surface area of the polygon by sediment depth (0-2.5 ft for surface sediments and 2.5-10 ft for subsurface sediments).

[6]    For each COC, if more than one sediment sample was collected within a polygon, the average concentration of the COC was compared to its RG.

6

ALCD-PUBCOM_0000990



Figure 1. COCs rank in terms of their relative impacted OU2 sediment volumes.

ALCD-PUBCOM_0000991

**Opinion 2.    All COCs drive the remedy costs, with some COCs driving specific elements
of the remedy components. 2378-TCDD is not a remedy cost driver above the
other COCs.**

20. OU2 remedy elements include a) pre-design investigation, b) dredging sediment to allow for
the commercial use of OU2 (from River Mile [RM] 0 – 1.7) and to allow for placement of a
sediment cap without increasing the risk of flooding, c) capping of the dredged sediment to
prevent vertical migration of contaminants from below the cap to above the cap, and d) dredged
material management to dewater the dredged sediment and landfill it (Glenn Springs Holdings
[GSH] 2022a). Figure 2 presents the remedy elements and their percent contribution to the
remedy cost (U.S. EPA 2016).[7]

21. As Figure 2 demonstrates, none of the remedy elements is driven exclusively or dominated by
dioxins. Rather, for some remedy elements, COCs such as mercury, PCBs, and free phase oils
(i.e., NAPL) rise above other COCs. Approximately 70% of the dredged sediment is expected
to be generated to accommodate for the "continued commercial use of the federal navigation
channel" and is unrelated to environmental risks or the presence of any COC.

---

[7]    Remedy element costs are presented in the OU2 ROD Table 34

ALCD-PUBCOM_0000992



**Capping costs:**
- 78% of the chemical isolation layer (CIL; part of the cap) design driven by mercury, 8% by HMW PAHs, 3% by DDx.
- Cap erosion protection addresses erosion forces and possible direct disturbance of the cap by human activity unrelated to COCs.

**Upland Processing Facility:**
facility sizing and operational costs are functions of dredged sediment volume (70% of sediment volume associated with navigational dredging).

The **pre-design investigation (PDI)** considered all ROD COCs.

**Dredging costs:**
- RM 0 to 1.7 dredging: 70% of sediment volume, related to the federal navigation channel dredging.
  RM 1.7 to 8.3: 30% of the sediment volume, related to recreational navigation and to control flooding.

**Dredged Material Management costs:**
- Chemicals likely to be in the water influent identified to be dioxins/furans, volatile organic compounds (VOCs), semi VOCs (SVOCS, including PAHs,), PCBs, pesticides/herbicides, and metals.
- Stabilization of NAPL-containing sediment.
- Sediment disposal cost.

Figure 2. OU2 remedy elements and percentages of total cost.

9

ALCD-PUBCOM_0000993

22. Details of the remedy design components include: [8,9]

- **Pre-design investigation (PDI) – 5% of remedy cost**: Considered all ROD COCs and included elements such as OU2 surveys (e.g., cultural, shoreline), samples collection and analysis for all COCs (and additional chemicals), among other activities.[10]

- **Dredging – 12% of remedy cost**:
  - RM 0 – 1.7 (70% of the dredged sediment volume will be generated from this stretch): the OU2 ROD requires dredging for the continued commercial use of the federal navigation channel.
  - RM 1.7 to 8.3 (30% of the dredged sediment volume): the need for dredging is for recreational use and flood control; to accommodate the placement of an engineering cap without increasing flooding potential.
  - Commercial berthing area dredging: Maintenance dredging which varies for each active berthing area; not related to COCs.

- **Capping – 20% of remedy cost**: Cap components include:
  - An erosion protection layer to design the cap for stability (design not related to COCs).
  - A chemical isolation layer (CIL) to retard chemicals from leaching vertically upward and breaking through the cap. For the CIL, mercury is the primary design driver (78% of the design) because it tends to have the shortest breakthrough times. The other drivers include HMW PAHs (high molecular weight PAHs, 8%), DDx (the insecticide DDT and its degradation products; 3%), with the remaining 11% not applicable to any COC.

- **Upland Processing Facility – 9% of remedy cost**: Sediment de-sanding and dewatering, not COC specific (includes operation and maintenance).

- **Dredged Material Management – 54% of remedy cost**: Includes

---

[8]   Percentage of remedy cost based on U.S. EPA 2016 Table 34.

[9]   Cost drivers based on GSH (2022a-c).

[10]  The PDI elements included: Geophysical, bathymetric, shoreline, and debris survey, utility survey, sediment core collection and chemical analysis of ROD COCs and other chemicals, sediment geotechnical characterization, waste characterization, porewater sampling and analysis of ROD COCs among other chemicals, water column sampling, dredge elutriate and column settling test, bulkhead and shoreline evaluation, fish studies, cultural resources survey, habitat survey, and borrow site assessment.

10

ALCD-PUBCOM_0000994

Report of Dr. Tarek Saba

- Dewatering water discharge: After treatment, water will be discharged and chemical levels (including OU2 COCs, among other chemicals) in the effluent will need to meet NPDES permit requirements.

- NAPL-containing sediment from RM 4.56 to 5.0 and RM 5.4 to 5.66 will require stabilization. The NAPL is coal tar (primarily PAHs).

- Sediment disposal: Most of the waste generated during the OU2 remedy action is anticipated to be characterized as non-hazardous waste, with the following exceptions:

    I.   Toxic Substances Control Act (TSCA)-level PCBs in the sediment.

    II.  Additional delineation of dioxins at three sample locations; and

    III. Elevated mercury relative to beneficial use of the sediment.

23. In conclusion, all ROD COCs drive the remedy cost, with some COCs dominant over others in determining specific elements of the remedy. Dioxins are not a main remedy driver in any of the remedy design components.

11

ALCD-PUBCOM_0000995

Report of Dr. Tarek Saba

**Batson Allocation-Related Opinions**

24. Before presenting my opinions regarding the Batson report, I present the "allocation steps" Batson followed that are relevant to my analysis, to put my opinions in proper perspective.

25. Batson's allocation steps relevant to my opinions include:

- **Step 1**: Batson calculated COC masses discharged from the PAP sites to OU2 and defined the discharge pathways to include discharges via sewer lines, discharges via connection to the PVSC (Passaic Valley Sewerage Commission) sewers and outfalls, direct discharges through a pipe, and COC transport through soil erosion and overland flow to OU2.

  Knowing that several of the PAP sites started operations during the early to mid-1900s, it is not feasible to track COC discharges from those sites, because much of the information about COC discharge concentrations, concentration variability with time, and discharge flow rates are not available.[11] In addition, historical spills and discharges were not required to be reported and were not included.

  To conduct his discharge analysis for each COC, Batson selected a single soil data point and a single water concentration value (extracted from recent site investigation reports) to represent COC concentrations that would have been discharged over decades of a site's historical operations.

  Extensive cherry-picking, bias, and omissions of concentration data occurred at this step, as it was up to Batson to judge what is an "appropriate" representative COC concentration for the decades of variable and complex site operations.

- **Step 2**: Batson calculated "the percentage of each COC discharged from a facility that *remains* in the OU2 sediment" (emphasis added). In other words, Batson describes that not all COC masses that he estimated were discharged into OU2 remained in OU2.

  Batson introduced this step to resolve the difference between Batson's unrealistically high (and mathematically incorrect)[12] dioxin mass that he estimated was discharged from the

---

[11]  Laboratory capabilities to measure COC concentration in different environmental media and waste streams were not available until the mid to late 1970s, at the earliest.

[12]  I understand a different expert is addressing Batson's mathematical and unit conversion errors.

12

Diamond Shamrock Chemical Company (OxyChem) site (3,729.71 kg) and the actual total dioxin mass present in OU2 sediment (38 kg – calculated by EPA).

To resolve the difference between Batson's speculated mass discharged and EPA's calculations, Batson introduced a dioxin attenuation factor of 0.010188 (or approximately 1%).[13] The purpose of the attenuation factor is to claim that only 1% of Batson's "estimated" dioxin discharged from the OxyChem site remained in OU2. The other 99% of the dioxin mass he estimated to have been discharged from the OxyChem site disappeared "following the actions of natural processes and human activities that diminished their mass from when they may have originally reached OU2 sediments."

Because Batson introduced an attenuation factor for dioxins, he needed to similarly introduce attenuation factors for the other COCs. To resolve this "problem",[14] according to Batson, he elected to use the same attenuation factor value (approximately 1%) for dioxins to be applicable to all other COCs.

Batson's introduction of the same attenuation factor across all COCs is not scientifically accurate or supportable, nor is it a generally accepted application of the accepted understanding of "attenuation."[15] Batson's misapplication of his attenuation factor created an additional problem for Batson: introducing a 1% attenuation factor resulted in severe underestimation of the COC masses that he estimated to have been discharged from the PAP sites. The underestimation resulted in Batson accounting for less than 1% of the COC masses for copper, lead, mercury, PCBs, DDx and dieldrin in OU2 sediment as originating from PAP site discharges. To resolve this additional problem, Batson claimed that the remaining 99+% of several of the COC masses in OU2 are from "orphan" discharges (detailed below). The one exception is for dioxins, as to which Batson claims he was able to track all the mass in OU2 (because he tailored the attenuation factor for dioxins).

---

[13]    Attenuation factor used in calculations in Batson Attachment L

[14]    Batson stated, "the determination of an appropriate A% [attenuation factor] for a matter such as this is typically problematic".

[15]    Attenuation is a measurable, in-situ physical, chemical, and biological process in which particular contaminants decrease in concentration or bioavailability over time in a given environment. It is well understood that the rate of attenuation for hazardous substances differs based on the substance itself, as well as the condition in which the substance exists in the environment.

ALCD-PUBCOM_0000997

One can see that the multiple issues with Batson's "allocation" originated from a mismatch between his estimation of the COC discharge masses from the PAP sites and EPA calculations of what the COC masses are in OU2.[16] Batson's introduction of an attenuation factor to resolve that mismatch created additional problems.

My opinions and supporting analysis of the Batson steps are presented below.

---

[16] EPA's estimated COC masses in the OU2 sediments were based on quantitative COC concentration measurements in the sediments.

14

**Opinion 3a.    Batson's methodology to estimate COC masses discharged from the PAP sites to OU2 is neither a scientifically accepted methodology nor reliable as it contradicts the analysis that formed the basis of the ROD and the available PAP sites data and information.**

26. Batson's estimates of COC masses discharged from each of the PAP sites were (i) combinations of compounded speculations, (ii) missing contaminated PAP site areas entirely, (iii) missing some sites entirely,[17] (iv) missing site studies that contained COC sampling results, (v) dismissing COCs found on the PAP sites based on the claim that they are associated with "historic landfill", and (vi) cherry-picking one sample to represent an entire site historical operational period.  Because Batson discussed over 90 sites, I present Batson's COC mass discharge analysis flaws for a few representative PAP site examples as they exemplify why his COC mass discharge analysis is scientifically unreliable.

**Batson's estimate of PCB masses discharged from the PAP sites is biased, illogical, and missed critical information.**

27. To illustrate how Batson's PCB mass discharge estimates are biased and/or incorrect, I present data and information for a few representative sites:  OxyChem, Sherwin Williams, EnPro Holdings, PPG, and Kearny Smelting.  The selection of these sites is for illustrative purposes only, and I reserve the right to discuss additional sites, if asked.

28. In summary, among the example sites, Batson claimed that the highest PCB mass discharged to OU2 is from the OxyChem site, and reasoned that PCBs are a "possible byproduct" (i.e., an impurity) in OxyChem's manufacturing operations and that the then-operator of the OxyChem site purchased 5,000 lbs of PCB-containing transformer oil in one year (see Figure 3 for Batson's estimation of PCB discharges from the example sites).

29. Compare Batson's reasoning for the OxyChem site to the other example sites:  Sherwin Williams used over 19,000 lbs of PCBs; EnPro had an area abutting OU2's shoreline with orders of magnitude higher PCB concentrations than the PCB RG (an area that Batson did not account for); PPG purchased 40,000 lbs of PCBs, and had PCB-impacted soils onsite that were not accounted for; and Kearny Smelting had a PCB-impacted area with extremely elevated concentrations, indicative of pure-phase PCBs (presented in a study Batson did not cite or

---

[17] For example, Clean Earth of New Jersey, Inc. ("Clean Earth") did not participate in the allocation.

15

include in his analysis). The example sites had extensive PCB use with significantly greater maximum soil PCB detections than at the OxyChem site (Figure 3). Yet, this factual information was not factored in Batson's discharge calculations for the example sites. Applying similar facts and circumstances differently among parties is a red flag for biased and flawed allocation methodology.[18] Below are the details.



Figure 3. Batson's estimation that the OxyChem site discharged more PCB mass than the other example sites is not consistent with the data and information available. (a) Maximum PCB soil concentration reported for the PAP sites and (b) Batson-estimated PCB mass discharged to the Passaic River from the PAP sites.

___

[18] In many instances, Batson dismissed COC soil concentrations as being not representative of a site if the concentrations were not detected in the surface soil. This reasoning is flawed, because it does not account for occurrences (e.g., spills, discharges, poor chemical handling practices) that resulted in higher COC concentrations found in the subsurface soil layers, or cases where sites were further filled after releases occurred, thus burying the contamination. Indeed, as demonstrated later in this declaration, Batson was able to account for less than 1% of the PCB mass found in OU2 sediment.

16

Report of Dr. Tarek Saba

- **OxyChem**: Of all the sites presented in this section, Batson estimated that OxyChem discharged the highest PCB mass. Batson reasoned that PCBs are a "possible byproduct" (i.e., an impurity) in some of the OxyChem site manufacturing operations, and that "Monsanto sales records show the purchase of **5,000 pounds** of…transformer inerteen…in 1967…inerteen coolant contained PCBs". (Batson 2020; emphasis added).

- **Sherwin-Williams**: Batson claims that the "Overland mass discharged" from the Sherwin Williams site for 69 years of operation is represented by "**18 mg/kg**" as a "max of reported concentrations" found in surface soil (0-0.5 ft). Batson stated that "the lack of historic use of PCBs…show that the PCB contamination [the 18 mg/kg] is due to an off-site source". Batson neglected to cite "Raw Material Consumption Reports" which documented Sherwin Williams' use of over **19,000 lbs** of PCBs[19] and that the maximum PCB concentration found (**140 mg/kg**) was in the middle of the Sherwin Williams' site under the manufacturing parcel (Weston Solutions 2008). Batson ignored Sherwin Williams' PCB consumption reports and "deemed appropriate" to use an order of magnitude lower PCB concentration unrelated to Sherwin Williams (according to Batson) to represent the SW site PCB discharges to OU2.

To put Batson's speculative analysis in perspective, Figure 4 presents PCB concentrations found in the OxyChem site soil, compared to the Sherwin Williams site and the Montrose site (aka 21st Century Fox America, former Montrose Chemical Company). The figure demonstrates that the OxyChem site has much lower PCB concentrations than the Sherwin Williams site. Yet, Batson estimated that the OxyChem site discharged 130 times more PCBs than the Sherwin Williams site.[20]

---

[19]    Sherwin Williams ca. 1957, 1960, 1961, 1963

[20]    Note than Batson estimated no PCB discharges from the Montrose Site to OU2.

17

Report of Dr. Tarek Saba



Figure 4. Upland PCB soil concentrations on sites surrounding the OxyChem site are much higher. (PCB concentrations are represented by red bars. The height of the bar corresponds to the concentration).

- **EnPro Holdings**: Batson ignored an entire EnPro site area where the highest PCB concentrations were found (i.e., Area of Concern AOC-1a; PCBs up to **240 mg/kg** (PARS 2008; see Figure 5 for location).[21] For his PCB discharge into OU2 estimations, Batson (2020) used the "maximum" PCB soil concentrations found on the EnPro site of **3.8 mg/kg** and **5.97 mg/kg** to represent different operational time periods, as opposed to the **240 mg/kg** found on AOC-1a which is the most relevant to OU2 impacts (i.e., located directly adjacent to OU2).

---

[21]    Batson neither present AOC-1a on the site map in his report nor did he discuss its PCB concentrations.

ALCD-PUBCOM_0001002



Figure 5. Batson (2020) misrepresented PCB discharges from the EnPro site and impacts to OU2 sediment.

- **PPG site**: PPG was owner and operator of its site between 1902 and 1971. From 1965 to 1970, Monsanto PCB sales records demonstrate that PPG purchased over **40,000 lbs** of PCB Aroclor 1254 for its Newark facility (Lower Passaic re Newark, NJ Sales Summary Analysis, n.d.). PCB onsite concentrations were elevated, up to **936 mg/kg** at a location directly adjacent to the Passaic River shoreline (Woodard and Curran 2016). Yet, Batson speculated that "PCBs may have also been present in historic fill" and "deemed appropriate" to use a different PCB concentration value of **5 mg/kg** to represent the maximum concentration. Batson described that the PCBs were attributable to "leaks, poor storage or disposal with replacement, or spills of PCB oils" from transformers present at the site during PPG operations for the period from 1930 to 1971 (Batson 2020).

- **Kearny Smelting:** In his report, Batson (2020) states that the highest concentrations of PCBs detected in site soils ranged from 7.2 mg/kg to 14.0 mg/kg and used a soil concentration of **11.0 mg/kg** to calculate the overland discharged mass. However, a 2020 Self-Implementing Cleanup Plan (SIP) submitted to EPA for the Kearny Smelting

19

property found PCB concentrations as high as **46,400 mg/kg**[22] on site (PT Consultants 2020). It appears that Batson was not provided this information.

30. The examples above demonstrate how the inputs for Batson's methodology were arbitrary, incorrect, and biased against the OxyChem site.

**Batson's estimate of dieldrin masses discharged from the PAP sites is biased and incomplete.**

31. Batson claims that dieldrin (an insecticide) was discharged to OU2 from three sites: Montrose, OxyChem, and Conopco, Inc. (in order of discharged masses, according to Batson).

32. For the OxyChem site, Batson reasoned that "*it is possible that dieldrin was present at the facility*", and that dieldrin "*was detected*" in soil samples. Batson, however, cites no operational evidence indicating that OxyChem's predecessor either manufactured or used dieldrin at its facility. More telling, Batson used a 1983 dieldrin concentration in a soil sample (**0.09 mg/kg**) *located half a mile away* from the OxyChem site (NUS Corporation 1984) to attribute that contamination to OxyChem. Then, Batson "assumed" that the equivalent groundwater dieldrin concentration on the OxyChem site is **0.00009 mg/l** (without scientific calculations of partitioning of dieldrin between soil and groundwater), and that groundwater had been discharging for 37 years from the 5.6-acre OxyChem site to OU2 (Batson 2020) – clearly a haphazard analysis that is not supported by relevant data, reflecting a clear bias against the OxyChem site.

33. Conversely, Batson neglected many sites where dieldrin "*was detected*" in soil, and where "*it is possible that dieldrin was found at the facility*" – similar to the OxyChem site. Table 1 below lists examples of those sites:

---

[22]    A separate soil sample was found to have a PCB concentration of 18,300 mg/kg (PT Consultants 2020)

ALCD-PUBCOM_0001004

Table 1. Example sites with dieldrin detections.

| Example Site | Maximum dieldrin concentration in site soil | Comments |
|---|---|---|
| Sherwin Williams | 5.4 mg/kg | Batson claims that the "mass discharged from surface soil" from the site for 99 years of operation is represented by "**0.093 mg/kg**" as a maximum concentration found in surface soil (0-0.5 ft). Batson ultimately assigns **ZERO** dieldrin mass discharged from the site. Batson did not include soil data from a Remedial Action Workplan prepared for Sherwin Williams that reported dieldrin concentrations in soil up to 5.4 mg/kg (Weston Solutions 2008). |
| Givaudan | 22 mg/kg | Batson assigned **ZERO** dieldrin discharge mass. In his calculations for total mass discharged from surface soil, Batson states that there were **no reported detections of dieldrin** at the Givaudan site. In his summary of the site, Batson neglects to state that dieldrin was detected at the site. Multiple detections of dieldrin were found in soil sampled from the spent acid pit on site (ERM 1999). The spent acid pit was an unlined trench used to collect production waste prior to 1961 (ERM 1999; Givaudan Fragrance Corporation 2004; Gibbons 2016). The highest concentrations of dieldrin detected in the spent acid pit were **22 mg/kg** (10-10.5 ft) and **4.0 mg/kg** (11.5 ft.), with the 4.0 mg/kg sample location specifically reported as above the contact between historic fill and native material (ERM 1999). Yet, Batson failed to consider all dieldrin data collected at the site and claimed there was no reported data available to represent the Givaudan site dieldrin discharges to OU2. |
| Penick/Conopco | 0.3 mg/kg | Batson claims that the "mass discharged from surface soil" from the site for 45 years of operation is represented by "**0.1 mg/kg**" as a "maximum surface soil concentration" (2-2.5 ft) (Batson 2020). However, a higher concentration of dieldrin was reported in a 1996 letter to the NJDEP as **0.3 mg/kg** (CPC International 1995). In his summary of the site, Batson did not further describe the selection process for the 0.1 mg/kg sample and does not discuss that dieldrin was detected at the site. |
| Celanese/CNA | 3.4 mg/kg | Operated as a chemical manufacturing, storage, and transfer facility. Dieldrin was found on the site at concentrations up to 3.4 mg/kg but Batson assigned **ZERO** dieldrin discharge mass. |

## Batson's inconsistent consideration of the presence of historic fill for metals detected in soil was biased

34. Batson (2020) states that for sites located completely on historic fill, if soil concentrations of copper, lead, and/or mercury are detected below levels defined by Batson as "typical" of

21

historic fill, then their presence is attributed to historic fill rather than site operations. However, Batson does not apply this assumption equally, even when it is undisputed sites are built on historic fill.

35. The OxyChem site, shown as being completely located on historic fill,[23] is the only site of the 92 sites discussed in the Batson report where historic fill was not considered or discussed. The bias in Batson's approach resulted in the attribution of copper and lead levels in soil to OxyChem site operations. According to the approach outlined by Batson, these levels should have been attributed to the presence of historic fill at the site.

36. In contrast, many sites had copper and/or lead soil levels at extremely elevated concentrations, yet Batson attributed those concentrations to historic fill. For example:

- The **EnPro** site: Copper was part of the site's manufactured products such as "copper-bearing stainless [steel]" and "sheet and bar copper" (Kaufmann 1986). Copper site soil concentrations were up to 7,900 mg/kg (Batson 2020; compare to the 63 mg/kg copper OU2 sediment RG [U.S. EPA 2016]). Yet, in his calculations of copper discharged mass, Batson (2020) assigned a site soil concentration of zero mg/kg, claiming that copper is associated with "historic fill". Similarly, lead was part of the site's manufacturing operations, "Molten lead was used in quenching baths as part of the steel manufacturing process" (Coltec Industries 1996). Lead concentrations in the site soil were up to 72,800 mg/kg (Batson 2020). Based on the NJ DEP historical fill database (NJ DEP 2008 Table 4-2), this observed lead level is over 125x the average concentration of lead in typical historic fill (574 mg/kg) and more than 5x the maximum concentration in typical historic fill (10,700 mg/kg). Yet, Batson assumed that lead in the site soil is associated with "historic fill" and assigned zero mg/kg concentration to the site soil.

- The **Kearny Smelting** and the **Revere Smelting and Refining** sites conducted operations that Batson acknowledged had known uses of lead. The sites were associated with maximum lead soil concentrations of 1.5x and 18.2x the 10,000 mg/kg level (respectively) that Batson considered to be the upper boundary characterizing "typical" historic fill. For these sites, a soil value below the maximum detected was used in the calculations and the lead detections were attributed to the presence of historic fill.

---

[23] In Batson's (2020) Attachment C.

22

37. Batson's inconsistent approach to considering the impact of historic fill on metals makes it not possible for others to predict how Batson handled any given site.

ALCD-PUBCOM_0001007

Report of Dr. Tarek Saba

**Opinion 3b:   Batson's estimation of a dioxin attenuation factor misapplies an accepted scientific concept—attenuation—and contradicts factual information and analysis provided by EPA and violates the Focused Feasibility Study (FFS) for OU2 which formed the basis of the ROD.**

38. For the OxyChem site, Batson estimated that **3,729.71 kg** of "dioxins/furans" were discharged to OU2.[24] This estimated mass was calculated using assumptions that a single "dioxin/furan" concentration (either in a soil sample or a water sample) represents decades of hypothetical discharges from the site to the Passaic River. For example:

- Batson estimated that 2.5 acres of the OxyChem site had a uniform dioxin/furan concentration in the soil of **50 mg/kg** and that the entire 2.5 acres were eroding into OU2 for 40 years (from 1946 to 1986). Similar assumptions were made for dioxin/furan concentrations in pipes discharging into OU2.

39. The **3,729.71** kg of dioxins/furans mass that Batson estimated is at odds with factual data: EPA calculated that the mass of 2,3,7,8-TCDD in the entire OU2 sediment column is only **38** kg. (Louis Berger Group, Inc. et. al 2014).[25]

40. To resolve the difference between Batson's high estimate of **3,729.71 kg** discharged mass and EPA's calculation of **38 kg**, Batson introduced a purported dioxin attenuation factor of 0.01018 (or approximately 1%) and claimed that only 1% of the mass discharged from the OxyChem site remained in OU2 sediments while 99% of the mass discharged must have disappeared "following the actions of natural processes and human activities that diminished their mass from when they may have originally reached OU2 sediment" (Batson 2020). Batson did not identify the "natural processes and human activities" that resulted in 99% of the dioxin mass disappearing.[26]

41. Batson's attenuation factor contradicts the FFS conducted for OU2 (Louis Berger Group, Inc. et al. 2014). The FFS calculated that 2,3,7,8-TCDD concentration decreases to half its value in 25 years (i.e., the half time of dioxins is 25 years). If Batson's estimation of dioxin mass

---

[24] I understand a different expert is addressing Batson's mathematical and unit conversion errors and Batson's misrepresenting factual information errors that went into the estimation of the 3,729.71 kg. My analysis discusses conceptual errors.

[25] Note that Batson uses the terms "dioxins/furans" and "2,3,7,8-TCDD" interchangeably, which is not scientifically correct. Dioxins/furans comprise 17 compounds, one of which is 2,3,7,8-TCDD.

[26] Batson conducts and cites no scientific analysis at all to support this conclusion; to the contrary, he derives this "attenuation factor" by a process of *subtraction* alone. This is not how attenuation is understood in the scientific literature or in the OU2 FFS analysis.

24

discharged from the OxyChem site is correct, then a **3,729.71 kg** mass in the sediment in 1986 (the date the dioxin discharges from the OxyChem site stopped, according to Batson), would mean there should be approximately **1,864 kg** in the 2010 – 2015 timeframe and not **38 kg**, as calculated by EPA. The disconnect between Batson's estimations and EPA's calculations cannot be resolved.

42. Batson's dioxin attenuation factor of 1% makes no scientific sense: If 99% of the dioxin mass disappeared from 1986 to 2005, for example, this means that OU2 dioxin mass, disappearing at the same rate as Batson claims, would reach its target cleanup before the year 2030, with no remedy implemented at all.[27,28] If so, then a "no action" remedy should have been adopted by the ROD, which is not the case.

43. As such, there is only one conclusion: Batson's estimate of 3,729.71 kg dioxin/furan mass discharged from OxyChem into OU2 is incorrect and biased high.

**Batson's foundational assumption that led to his 1% dioxin attenuation factor is that the OxyChem site is the only site that released dioxins to OU2. This assumption contradicts EPA's contractors' analysis.**

44. To arrive at the value of approximately 1% for his dioxin attenuation factor, Batson assumed that all the dioxins in OU2 originated from the OxyChem site, and stated, "The Allocator's analysis of allocation documents determined that OCC contributed the vast majority (99.997%) of the total mass of dioxin/furans contributed by all AP facilities" (Batson 2020). Batson's statement contradicts the work of EPA contractors in which the Givaudan site was found to be a substantial contributor of 2,3,7,8-TCDD to the Passaic River:

- In 2011, an EPA-funded team delivered a presentation titled, "Dioxin in the Passaic River (NJ): The case for 2 dioxin sources" (Garvey et al. 2011). In that presentation, Garvey et al. (2011) described that upper river reaches, around RM 8, 11, 12 "can be identified as an external dioxin load, with a unique dioxin pattern" (Garvey et al. 2011).

---

[27] Between 1986 (the date dioxin discharges stopped from the OxyChem site, according to Batson) and 2005 (the year high resolution cores were taken and used in the FFS report to assess COC half times [Louis Berger Group, Inc. et al. 2014c]), 2,3,7,8-TCDD mass decreased from 3,729.71 kg to 38 kg, according to Batson. This rate corresponds to a half-life of 2.87 years. Starting with 38 kg of 2,3,7,8-TCDD in 2005 and using a half-life of 2.87 years, the 2,3,7,8-TCDD concentration would be 0.19 kg in 2027. The 0.19 kg is equivalent to an average concentration of 8.3 ng/kg, the cleanup goal for 2,3,7,8-TCDD (U.S. EPA 2016).

[28] Note that during the Phase 1 sediment dredging program, EPA calculated that OxyChem removed 9.8 kg of 2,3,7,8-TCDD.

25

ALCD-PUBCOM_0001009

Garvey et al. (2011) described how chemical forensics "uniquely identifies upper reach contamination relative to lower reach in the 1960s".

- Following Garvey et al. (2011), EPA contracted the engineering company HDR to investigate dioxin sources around RM 12. In a 2017 memo to EPA (Garland 2017), the authors informed EPA that "the mean Clifton [Givaudan site – located at RM 12] contribution of 2,3,7,8-TCDD decreases from approximately 15% at RM 14 to less than 10% downstream of RM 6." Garland (2017) presented a figure highlighting the percent contribution of 2,3,7,8-TCDD from the Givaudan site to the Passaic River – presented in Figure 6.[29]

- The information from Figure 6 translates to Givaudan contributing 3.8 kg (approximately 10%) of the total mass of 2,3,7,8-TCDD in OU2. It is important to note that the Garland (2017) analysis did not investigate additional dioxin sources. Nonetheless, Garland (2017) highlights the foundational flaw in Batson's allocation that the OxyChem site discharged 99.997% of the dioxin mass.



Figure 6. Givaudan's fraction contribution of 2378-TCDD to OU2 (figure taken from Garland 2017, with red annotations added). Importantly, Garland (2017) did not investigate other dioxin sources along the Passaic River, a limitation to his analysis.

---

[29] Garland (2017) did not investigate other dioxin sources in OU2. I understand other experts are addressing this point.

ALCD-PUBCOM_0001010

45. In conclusion, Batson's steps to calculate his dioxin attenuation factor are based on flawed assumption that the OxyChem site discharged 99.997% of 2378-TCDD to the OU2. Batson's faulty dioxin attenuation factor does not reflect any generally accepted scientific methodology and ignores relevant data and sources, making his entire allocation scientifically incorrect.

27

ALCD-PUBCOM_0001011

Report of Dr. Tarek Saba

**Opinion 3c:    Batson's application of his dioxin attenuation factor to the other ROD COCs violates the OU2 analysis that formed the basis of the ROD and violates scientific principles.**

46. Batson described how selecting an attenuation factor for each COC is "problematic".[30]  To get around this problem, Batson extended his dioxin attenuation value (1%) to the other ROD COCs, claiming that all chemicals (whether organic like PCBs, or inorganic like lead, for example), "bind tightly to fine-grained sediment particles in the Lower Passaic River and are transported in the sediment load in a similar way."

47. Batson's logic contradicts the analysis presented in the FFS report (Louis Berger Group, Inc. et al. 2014c), where the half time for the COCs were calculated to be different:

- Mercury ...............34 years (confidence interval 19 – 173)
- Lead ....................39.5 years (23 – 151)
- Copper ................57 years (30.7 – 405)
- 2378-TCDD ........25 years (14 – 101)
- Total PCBs ..........26 years (16 – 61)
- HMW PAHs ........44 years (no confidence interval provided)
- LMW PAHs .........63 years (no confidence interval provided)

48. The half times for the COCs are all different, and their "attenuation" within the OU2 system is not "similar" as Batson claims.  Indeed, Batson's extension of his dioxin attenuation factor to the other COCs created an additional problem for Batson, as explained below.[31]

**Batson's attenuation factor resulted in his claim that over 99% of the COC masses in OU2 are attributed to "orphan share".**

49. To highlight how Batson's application of the same dioxin-based attenuation factor to all COCs inflated the OxyChem site's share, Table 2 presents an accounting of Batson's estimates of COC masses discharged into OU2 and what EPA calculated to have been found in OU2.

---

[30]   Batson (2020) stated, "Due to the variety of COCs, mix of natural forces and human activities affecting the movement of sediments, and varying periods over which COCs were placed in OU2 sediments, the determination of an appropriate A% for a matter such as this is typically problematic"

[31]   Note that Batson confuses COC concentrations with COC masses.  For example, while the lead or copper concentration in sediment could decrease with time because of the introduction of cleaner sediment to OU2, the lead or copper mass will not decrease with time (e.g., degrade).  As such, the application of an attenuation factor for lead or copper to justify decreasing lead and copper masses with time is illogical.

ALCD-PUBCOM_0001012

Table 2. Batson's attenuation factor created an unrealistic orphan share and further biased his allocation against OxyChem.

| COC | Total mass in OU2<br><br>Masses From EPA (kg)<br>(Presented in Batson 2020, Attachment S) | Batson estimate of COC discharged mass from the PAP sites that remained in OU2 sediment (kg)<br>(Summarized from Batson 2020, Attachment L) | Batson's estimated percent COC mass in OU2 from PAP sites<br>(Summarized from Batson 2020, Attachment L) | Batson's "Orphan Share" | Comments |
|---|---|---|---|---|---|
| Copper | 2,100,000 | 2,822 | 0.13% | 99.87% | Batson claims that almost all the COC masses in OU2 are attributed to "orphan share" and the PAP sites contributed a very small percentages of COC masses<br><br>(OxyChem is included in these COCs) |
| Lead | 3,200,000 | 2,940 | 0.09% | 99.91% | |
| Mercury | 42,000 | 44 | 0.10% | 99.90% | |
| HMW PAHs | 240,000 | 44,282 | 18.45% | 81.55% | |
| LMW PAHs | 170,000 | 30,695 | 18.06% | 81.94% | |
| PCBs | 26,000 | 204 | 0.79% | 99.21% | |
| DDx | 27,000 | 26 | 0.09% | 99.91% | |
| Dieldrin | 390 | 0 | 0.00% | 100% | |
| Dioxins | 38 | 38 | 100%<br>(All dioxins were accounted for, contrary to the other COCs) | 0.00% | All dioxins mass is accounted for (no orphan share) and attributed (99.997%) to OxyChem |

29

ALCD-PUBCOM_0001013

50. Table 2 shows a striking difference between what Batson claims to have been discharged from the PAP sites and remained in OU2 sediment, and what EPA determined to be the COC masses in OU2 sediment, except for dioxins.

51. To resolve the mass differences in Table 2 (EPA-calculated COC mass [column 2 of Table 2] vs. Batson's estimated masses discharged from the PAP sites that remain in sediment [column 3 of Table 2]), Batson claims that most of the COC mass in OU2 sediment is attributed to "orphan share", except for dioxins. Batson claims to have been able to track all of the dioxins (99.997%) to the OxyChem site by tailoring his attenuation factor to service his dioxin estimations.

52. Attributing most of the COC masses to orphan share severely reduced the PAP sites' contribution to contamination.  For example, all the PAP sites contributed less than 1% of copper, lead, mercury, PCBs, DDx and dieldrin mass to OU2, ultimately resulting in Batson's allocation of 92.9393785% to 99.9396103% to OxyChem.

30

ALCD-PUBCOM_0001014

Report of Dr. Tarek Saba

**Opinion 3d:   Aside from Batson's flawed and biased allocation steps, removing Batson's COC attenuation factors or his relative risk analysis from his allocation would result in substantially lower allocation percentages for OxyChem. Specifically, if Batson's use of his "attenuation factor" is removed from his allocation steps and the remainder of his analysis is scaled to correspond to the COC masses discharged from the PAP sites by their respective Relative Risk Number (as presented in Batson), OxyChem's percent share would be 31.1% and 48.7% (before and after applying Batson's biased culpability and cooperation factors, respectively).**

53. As discussed above, the attenuation factor concept adopted by Batson is not a generally accepted scientific methodology but was instrumental to resolve the difference between Batson's speculated (and incorrect) dioxin mass discharged from the OxyChem site and EPA's calculations of the actual dioxin mass in OU2 sediment.

54. If one is to remove Batson's attenuation factor from his allocation steps and scale COC masses discharged from the PAP sites by their respective "Relative Risk Numbers" (as presented in Batson), OxyChem's percent share would be **31.1%** and **48.7%** (before and after applying Batson's biased culpability and cooperation factors, respectively).[32,33]

55. If the attenuation factor is to be included in Batson's allocation and the COC "Relative Risk Numbers" are replaced with the COC rankings in surface sediment (as presented in Figure 1 of this declaration), OxyChem's share would be **30.3%** and **48.7%** (before and after applying Batson's culpability and cooperation factors, respectively).

56. The analysis above highlights how Batson's "allocation steps" could be simply rearranged to produce completely different allocation percentages for OxyChem, a sensitivity analysis that was not conducted by Batson. The lack of a sensitivity analysis is contrary to generally accepted scientific methods and a sign of a biased allocation.[34]

---

[32]   For each PAP site, total COC mass discharged is calculated by
$PAP\ Site\ (total\ COC\ discharged) = \sum_{n=1}^{9}(COC\ discharged\ mass\ {}_n\ X\ RRN\ COC_n)$. Each PAP site is then ranked based on its relative PAP Site (total COC discharged).

[33]   I understand a different expert evaluated Batson's culpability and cooperation factors.

[34]   The discussion above is to demonstrate that the lack of sensitivity analysis is yet one more flaw of the Batson report. It is not an endorsement of Batson's allocation, for he committed multiple scientific, mathematical, and logical errors

31

ALCD-PUBCOM_0001015

**Batson-related Conclusions**

57. The foundation of Batson's allocation steps (estimation of masses discharged from the PAP sites) was based on extensive cherry-picking, omissions of relevant data, and bias against the OxyChem site.

58. EPA's calculation of the COC masses found in OU2 sediment exposed how severely flawed Batson's allocation steps were. Batson spent much of his effort trying to resolve those differences:

- Introduced a dioxin attenuation factor to curb his overestimation of dioxins discharged from the OxyChem site.
- Introduced attenuation factors for the other COCs, which was "problematic", so Batson simply used the same attenuation factor for the remaining COCs, inconsistent with the FFS for OU2, and created another problem for Batson.
- Batson found he can only account for less than 1% of the COC masses for copper, lead, mercury, PCBs, DDx, and dieldrin in OU2, so he attributed the remaining 99+% of the mass to "orphan share".
- The excessive "orphan share" necessitated Batson proposing a "protocol calculation" and an "alternative calculation", both of which are based on the faulty assumptions presented above.

59. I conclude, with a reasonable degree of scientific certainty, that many of the steps Batson followed in his allocation do not reflect generally accepted scientific methodology, were scientifically incorrect, arbitrary, contradictory to the basis of the ROD, and biased against OxyChem.

60. I reserve the right to discuss sites additional to the ones presented in this declaration if asked.

32

Report of Dr. Tarek Saba

**Opinion 4:    Extending Batson's OU2 allocation to include OU4 is not scientifically supportable, would be inconsistent with the presence of COC sources that disproportionately impact OU4 versus OU2 and would be inconsistent with EPA contractors' conclusions.**

61. The proposed consent decree (CD)[35] states, "OU4 [the upper 9 miles of the Passaic River] was included in the cashout settlement offer because the LPRSA [Lower Passaic River Study Area] is tidal…that the LPRSA is tidal means that releases of COCs into the river from the facilities would have been transported and settled throughout the LPRSA". The CD did not provide additional analysis.

62. However, the physical nature of OU2 is different from OU4. The OU4 ROD reports that "As discussed in the March 3, 2016 ROD for the lower 8.3 miles of the LPRSA, which is OU2 of the Diamond Alkali Superfund Site, wider and thicker beds of contaminated sediments accumulated below RM 8.3 due to a combination of a wider cross section and a deeper historical navigation channel" (U.S. EPA 2021). In other words, sediment accumulation rates between OU2 and OU4 are different, and therefore, PAP site contributions to contamination between OU4 and OU2 are different. Indeed, there are two different remedies, and different RODs were issued for OU2 and OU4.

63. EPA contractors concluded that sites located within OU4 impact OU4 and OU2 sediments in different proportions; see for example Figure 6 and the discussion therein on the Givaudan's site impact of dioxins to OU4 relative to OU2.[36]

64. To illustrate how Batson's "OU2 allocation" is inapplicable to OU4, I present two PAP sites that discharged PCBs to OU4: the Penick/Conopco and Givaudan sites. Note that Batson's OU2 allocation attributed more PCB mass discharges to OxyChem than the Conopco and Givaudan sites, combined.

- The Conopco site (located around RM 11.5; OU4). The Conopco site (aka Penick site) manufactured and processed insecticides (such as DDT) and had PCB-containing

---

[35]    United States of America v. Alden Leeds, Inc., et al. 2022

[36]    I understand a different expert opines that the sediments between OU4 and OU2 are not well-mixed, and as such, the impacts from the PAP sites on OU2 (and hence liability and allocation) is not equal to OU4.

33

transformers, as Batson concedes.[37]  Site investigations found PCBs in soil up to **148 mg/kg**, with drainage ditch soil containing up to **21 mg/kg**.  Batson "deemed appropriate" to select a concentration of **0.62 mg/kg** as the "maximum concentration" for overland discharges from the site over a period of 45 years. No other pathways from the site were considered to have contributed PCBs to OU4. Ultimately, Batson calculated a total of **0.12 kg** PCBs discharged to OU4 (Batson 2020), and further applied his "1% PCBs attenuation factor" to the Conopco site PCB discharges, which resulted in Conopco having effectively no PCB discharges.

- The Givaudan site (located around RM 12; OU4). Givaudan had extensive PCB use on site, with some information cited in Batson and additional information missed.  Batson described that the site, "had 30 PCB-containing transformers" with another 1982 record reporting, "Givaudan had 38 transformers in operation containing PCBs".  In addition to the information in the Batson report, a waste generation report described Givaudan's shipment of massive volumes of PCB-containing waste (NJDEP 2002):

    - 10/27/93: PCB-contaminated liquids – 5,522 kg
    - 1/10/92: PCB-contaminated solids - 9,345 kg and 144 kg
    - 1/09/92: PCB-contaminated liquids - 3,423 kg and 9,453 kg
    - 9/09/90: PCB-contaminated solids - 20,030 kg and 440 kg; PCB-contaminated liquids - 18,590 kg
    - 9/8/90: PCB-contaminated liquids - 12,600 pounds and 250 gallons.
    - 6/16/89: PCBs – 9,050 pounds
    - 01/15/87: PCBs – 200 pounds
    - 7/17/84: PCBs – 129 gallons, 56 gallons, and 112 gallons
    - 2/04/83: PCBs – 50 pounds

    Notwithstanding the extensive PCB use and waste generated on the Givaudan site, Batson ultimately estimated that Givaudan discharged less PCBs than the OxyChem site (120.2 kg for the OxyChem site versus 2.85 kg for Givaudan).

- Figure 7 demonstrates how the spatial distribution of PCBs in OU4 indicates impacts from OU4 sources.  (Note that Batson did not cite the spatial distribution of any COC

---

[37]  Batson stated, "According to an undated Regulatory Compliance Status (circa mid-1980's), nine transformers on-site were owned by the public utility. They were fenced in but accessible to Penick personnel. The utility informed Penick that the transformers contained PCBs at 50-500 ppm. Penick owned three transformers on-site; one of which contained PCBs at less than 50 ppm (PAP-00328085)."

ALCD-PUBCOM_0001018

in the Passaic River and as such, Batson's "allocation" has no linkage to how the COCs are spatially distributed in the Passaic River).

65. In conclusion, the proposed CD's statement about extending Batson's "allocation" from OU2 to OU4 would not be consistent with EPA's contractors' analyses, the different natures of OU2 and OU4 (per the OU4 ROD), sediment transport analysis, and the spatial distributions of the COCs in OU4.

35

ALCD-PUBCOM_0001019



Figure 7.    PCB spatial distribution in OU4 indicates predominant impacts from OU4-related sources.

ALCD-PUBCOM_0001020

I declare under penalty of perjury that the foregoing is true and correct.


EXECUTED on March 22, 2023


_Tarek Saba_

Tarek Saba, Ph.D.

ALCD-PUBCOM_0001021

## REFERENCES

Arnold, D.B. and Milne, W.J. 1984. The use of Voronoi tessellations in processing soil survey results. IEEE Computer Graphics and Applications, 4(3), pp.22-28.

Batson, D. (Alterecho). 2020. Diamond Alkali Superfund Site OU2. Allocation Recommendation Report. December 28.

Chow, V.T., Maidment, D.R., and Mays, L.W. 1988. Applied Hydrology. MacGraw-Hill, Inc. ISBN 0-07-100174-3.

Coltec Industries. 1996. Response to Request for Information Under 42 U.S.C. 9601, Diamond Alkali Superfund Site, Passaic River Study Area. Bates Nos PAS-00000913 – PAS-00000936.

CPC International. 1995. Re: Former Penick Corporation Lyndhurst, New Jersey ISRA Case No. 84090. Declaration of Environmental Restrictions. Bates Nos. PAS-00113359 – PAS-00113367.

ERM (Environmental Resources Management). 1999. Re: Givaudan Roure Corporation 100 Delawanna Avenue, Passaic County Clifton, New Jersey Facility. Appendix A: Summary of Investigations and Historic Data. Bates No. BBA000055.

Garland, E. 2017. External memoranda from E. Garland to E. Naranjo and A. Yeh, regarding congener analysis, dated July 13, 2018. Bates Nos. PAS-00129882 – PAS-00129890.

Garvey, E.A., Atmadja, J., Gbondo-Tugbawa, S.S., and McDonald, S. 2011. Dioxin in the Passaic River (NJ): the Case for 2 Dioxin Sources. The Louis Berger Group, Morristown, NJ, Elmsford, NY, and Exton, PA.

Gibbons. 2016. Re: Lower Passaic River Study Area Former Givaudan Fragrances Corp. Facility, 125 Delawanna Avenue, Clifton, NJ. Supplemental Response to 104(e) Request for Information (November 2016). Bates Nos. PAS-00048073 – PAS-00048432.

Givaudan Fragrance Corporation. 2004. Request for Information Response Document, Clifton, New Jersey 0018037. Bates Nos. PAS-00083337 – PAS-00083379.

GSH (Glenn Springs Holdings, Inc.). 2022a. Basis of Design Report. Pre-Final (95%) Remedial Design. Diamond Alkali Superfund Site. Lower 8.3 Miles of the Lower Passaic River (Operable Unit 2). Essex and Hudson Counties, New Jersey.

GSH (Glenn Springs Holdings, Inc.). 2022b. Appendix L: Chemical Isolation Layer Design. Basis of Design Report. Pre-Final (95%) Remedial Design. Diamond Alkali Superfund Site. Lower 8.3 Miles of the Lower Passaic River (Operable Unit 2). Essex and Hudson Counties, New Jersey.

GSH (Glenn Springs Holdings, Inc.). 2022c. Design Criteria Report. Pre-Final (95%) Remedial Design. Diamond Alkali Superfund Site. Lower 8.3 Miles of the Lower Passaic River (Operable Unit 2). Essex and Hudson Counties, New Jersey.

38

ALCD-PUBCOM_0001022

Hwang, S.A., Fitzgerald, E.F., Cayo, M., Yang, B.Z., Tarbell, A. and Jacobs, A. 1999. Assessing Environmental Exposure to PCBs among Mohawks at Akwesasne through the Use of Geostatistical Methods. Environmental Research, 80(2), pp.S189-S199.

Kaufmann, D.W. 1986. Crucible: The Story of a Steel Company. Bates Nos. ENPR-FED-0000004581 – ENPR-FED-0000004878.

Louis Berger Group, Inc., Battelle, and HDR/HydroQual. 2014a. Focused Feasibility Study Report. Lower Eight Miles of the Lower Passaic River. Appendix C: Mass Balance Modeling Analysis. Prepared for U.S. Environmental Protection Agency, Region 2 and U.S. Army Corps of Engineers, Kansas City District.

Louis Berger Group, Inc., Battelle, and HDR/HydroQual. 2014b. Focused Feasibility Study Report. Lower Eight Miles of the Lower Passaic River. Prepared for U.S. Environmental Protection Agency, Region 2 and U.S. Army Corps of Engineers, Kansas City District. Bates Nos. PAP-00693851 – PAP-00694198.

Louis Berger Group, Inc., Battelle, and HDR/HydroQual. 2014c. Focused Feasibility Study Report. Lower Eight Miles of the Lower Passaic River. Data Evaluation Report No. 5: Contaminant Inventory Analysis. Prepared for U.S. Environmental Protection Agency, Region 2 and U.S. Army Corps of Engineers, Kansas City District. Bates Nos. PAP-00398749 – PAP-00398849.

Lower Passaic re Newark, NJ Sales Summary Analysis. Not dated. Bates Nos. PAP-00304327 – PAP-00304520.

NJDEP (New Jersey Department of Environmental Protection). 2002. Waste Manifests from 01/01/80 to 12/31/94 from Generator NJD002156354 to Specified TSDF's. Bates Nos. OCC-TIG-E02075905 – OCC-TIG-E02075941.

NJDEP (New Jersey Department of Environmental Protection). 2008. N.J.A.C. 7:26E Technical Requirements for Site Remediation. Date last amended September 2, 2008. Rule expiration date December 17, 2009.

NUS Corporation. 1984. Project for Performance of Remedial Response Activities at Uncontrolled Hazardous Substance Facilities – Zone 1. Bates Nos. PAS-00125529 – PAS-00125611.

PARS (PARS Environmental, Inc.). 2008. Baseline Ecological Evaluation. Former Miles A. Galin Property (aka Former Crucible Steel Site) 900-1000 Frank E. Rodgers Boulevard Harrison,

ALCD-PUBCOM_0001023

New Jersey. Prepared for Gannett Fleming, Inc. PARS Project No. 710-02. Bates Nos. TEVAL 03325 – TEVAL 03465.

PT Consultants. 2020. Self-Implementing On-Site Cleanup and Disposal Plan. Prepared for Kearny Smelting. Bates Nos. KSRC DNJ 0225 – KSRC DNJ 0278.

Sherwin Williams. Circa 1957. Raw Material Consumption Report September 1, 1956 to August 31, 1957. Bates Nos. TSWC-FED-00117376 – TSWC-FED-00117683.

Sherwin Williams. Circa 1960. The Sherwin-Williams Company 1959-60 Raw Material Consumption Report. Bates Nos. TSWC-FED-00117073 – TSWC-FED-00117375.

Sherwin Williams. Circa 1962. Raw Material Consumption Report September 1, 1960 through August 31, 1961. Raw Material Consumption Report September 1, 1961 through August 31, 1962. Bates Nos. TSWC-FED-00107173 – TSWC-FED-00107766.

Sherwin Williams. Circa 1963. Raw Material Consumption Report September 1, 1962 through August 31, 1963. Bates Nos. TSWC-FED-00096455 – TSWC-FED-00096791.

U.S. EPA. 2016. Record of Decision: Lower 8.3 Miles of the Lower Passaic River Part of the Diamond Alkali Superfund Site Essex and Hudson Counties, New Jersey. U.S. Environmental Protection Agency Region 2.

U.S. EPA. 2021. Record of Decision for an Interim Remedy in the Upper 9 Miles of the Lower Passaic River Study Area OU4 of the Diamond Alkali Superfund Site Essex, Bergen and Passaic Counties, New Jersey. U.S. Environmental Protection Agency Region 2.

United States of America v. Alden Leeds, Inc., et al. 2022. Consent Decree. United States District Court District of New Jersey. Civil Action No. 2:22-cv-07326.

Weston Solutions. 2008. Remedial Action Work Plan. The Sherwin-Williams Company Former Newark Facility Newark, New Jersey. Volume 1. Prepared for The Sherwin-Williams Company. Work Order No. 20076.023. Bates No. BBC000116.

Woodard and Curran. 2016. Report on PPG Industries Nexus to Lower Passaic River Study Area. Project No. 16692.00/001. Bates Nos. PAS-00044232 – PAS-00044619.

ALCD-PUBCOM_0001024

## Attachment 1

**Resume of
Tarek Saba, Ph.D.**

ALCD-PUBCOM_0001025




Engineering & Scientific Consulting

## Tarek Saba, Ph.D.
Principal Scientist & Office Director | Environmental & Earth Sciences
1 Mill and Main Place, Suite 150 | Maynard, MA 01754
(978) 461-4605 tel | tsaba@exponent.com

## Professional Profile

Dr. Tarek Saba is a principal scientist in Exponent's Environmental & Earth Sciences practice and the Maynard, Massachusetts, Office Director. He has 27 years of professional and academic experience in industrial archeology, hydrogeology, chemical forensics, and chemical fate and transport analysis. As a consultant and expert witness, Dr. Saba has advised clients in cases involving reconstruction of chemical releases (tracking sources and timing), fate and transport of chemicals, and allocation of contamination liability and remedy costs among responsible parties under different legal frameworks, such as CERCLA, RCRA, and NRDA, and in different industrial settings, such as hydraulic fracturing, natural gas storage fields, petroleum refineries, salt domes, manufactured gas plants (MGPs), landfills, coal ash basins, coal mines, coal ash ponds, salvage yards, pesticide and herbicide manufacturing facilities, military sites, airports, and shipyards, among many others.

Dr. Saba's expertise includes chemical fingerprinting and evaluating the environmental chemistry of different chemical groups such as PCBs, PFAS, dioxins and furans, metals, PAHs, petroleum products (e.g., gasoline, diesel fuels) and petroleum additives (e.g., MTBE), LNAPL, DNAPL, chlorinated solvents (PCE, TCE, and their degradation products and additives such as 1,4-dioxane), tar and creosote, and radioactive compounds (e.g., radium). Before joining Exponent, Dr. Saba worked on developing groundwater remediation technology as a subcontractor for EPA.

## Academic Credentials & Professional Honors

Ph.D., Environmental Engineering, University of Colorado, Boulder, 1999

M.S., Water Resources, Cairo University, 1994

B.S., Civil Engineering, Cairo University, 1992

## Publications

### Book Chapters

Saba, T. Hydraulic fracturing: Data analysis methods to identify sources of dissolved gas and chemical compounds in drinking water wells. Chapter 14. In: Introduction to Environmental Forensics. Murphy, B.L., and R.D. Morrison (eds), pp. 513–529, 2015. ISBN: 9780124046962.

Shields, W.J., T. Saba, P.D. Boehm, and J. Pietari. Congeners: A forensics analysis. In: Introduction to Environmental Forensics. Murphy, B.L., and R.D. Morrison (eds), pp. 347–393, 2015. ISBN: 9780124046962. Congeners addressed included dioxins/furans, PAHs, PCBs, and PFAS congeners.

ALCD-PUBCOM_0001026

**Peer Reviewed and Other Publications**

Saba, T. Forensic analysis of breakthrough curves in fractured bedrock to reconstruct a past contaminant release event— a case study, Environmental Forensics. 2019. DOI: 10.1080/15275922.2019.1657518.

Boehm, P.D., J. Pietari, L. Cook, and T. Saba. Improving rigor in polycyclic aromatic hydrocarbon source fingerprinting, Environmental Forensics, 2018; DOI:10.1080/15275922.2018.1474287.

Saba, T., and P.D. Boehm. Determination of the applicability of CERCLA's petroleum exclusion at contaminated sites – focus on metals. Environmental Forensics 2018; 19(1):27–38.

Saba, T. Study finds Marcellus NORM exposure risks low. Oil and Gas Journal; June 2015.

Saba, T. Evaluating claims of groundwater contamination from hydraulic fracturing. Oil and Gas Journal. July 2013. Available at: http://www.ogj.com/content/ogj/en/articles/print/volume-111/issue-7/drilling-production/evaluating-claims-of-groundwater-contamination.html.

Saba, T., and S. Su. Tracking polychlorinated biphenyls (PCBs) congener patterns in Newark Bay surface sediment using principal component analysis (PCA) and positive matrix factorization (PMF). Journal of Hazardous Materials 2013; 260:634-643.

Saba, T., and P.D. Boehm. Use of natural gas compositional tracers to investigate gas migration from a gas storage field. Environmental Geosciences June 2012; 19(2):1-12.

Saba, T., and M. Orzechowski. Lack of data to support a relationship between methane contamination of drinking water wells and hydraulic fracturing: A response to Osborn et al. Proceedings, National Academy of Science of the United States of America, 2011. www.pnas.org/cgi/doi/10.1073/pnas.1108435108.

Saba, T., and P.D. Boehm. Congener-based analysis of the weathering of PCB Aroclor 1242 in paper mill sludge. Chemosphere 2011; 82:1321-1328.

Saba, T., and P.D. Boehm. Quantitative polychlorinated biphenyl (PCB) congener and homologue profile comparisons. Environmental Forensics 2011; 12(2):134-142.

Saba, T., and P.D. Boehm. CERCLA's petroleum exclusion and the use of chemical forensic methods. ABA Superfund and NRD Litigation Committee Newsletter 2011; 6(2).

Saba, T., F. Mohsen, B. Hilbert, M. Garry, and B. Murphy. White paper: Methanol use in hydraulic fracturing fluids. Submitted to the Methanol Institute, August 2011 (Version 2 issued January 2012).

Saenton, S., T.H. Illangasekare, K. Soga, and T. Saba. Effects of source zone heterogeneity on surfactant enhanced NAPL dissolution and resulting remediation end-points. Journal of Contaminant Hydrology 2002; 59(1-2):27-44.

Saba, T., T.H. Illangasekare, and J. Ewing. Effect of flow dimensionality on mass transfer rate coefficient estimations under enhanced conditions. Journal of Contaminant Hydrology 2001; 51(1-2):63-82.

Saba, T., and T.H. Illangasekare. Effect of groundwater flow dimensionality on mass transfer from entrapped nonaqueous phase liquid contaminants. Water Resources Research 2000; 36(4):971-979.

**Conference Proceedings and Presentations**

Drollette, B., T. Saba, L. Cook, and G. Getzinger. PFAS Environmental Forensics: Unique Approaches to a Unique Contaminant. Presented at the 36th Annual International Conference on Soils, Sediments, Water and Energy. October 20, 2020.

Tarek Saba, Ph.D.
05/22 | Page 2

Saba, T., and L. Cook. Considerations for PFAS Fingerprinting. Presented at:

- The 36th Annual International Conference on Soils, Sediments, Water and Energy.  October 20, 2020.
- The Law Seminar International - PFAS litigation in the Pacific Northwest.  Virtual interactive zoom broadcast.  September 14 - 15, 2020.

Saba, T.  Simulation of Contaminant Flow Through Fractured Bedrock to Calculate Oil and Gas Impoundment Leakage Date.  Presented at the 35th Annual International Conference on Soils, Sediments, Water, & Energy, October 21-24, 2019. Amherst, MA.

Saba, T., and L. Cook. Application and Interpretation Pitfalls of Principal Component Analysis (PCA) for Assessment of Contaminated Sediment Sites.  Presented at the 35th Annual International Conference on Soils, Sediments, Water, & Energy, October 21-24, 2019, Amherst, MA.

Saba, T. Hydraulic fracturing and the use of chemical fingerprinting methods in claims of natural gas migration and groundwater contamination. Presented at:

- Short course, SETAC North America 36th Annual Meeting, Salt Lake City, UT. November 1-5, 2016.
- Association for Environmental Health and Sciences Conference, Amherst, MA. October 2015.
- Chartered Institution of Water and Environmental Management Annual Conference, University of London, England, July 2015.
- United Kingdom Environmental Law Association. Liverpool, England, July 4, 2015.
- British Water Technical Forum, London, England, November 19, 2014.
- Department of Environmental Earth and Atmospheric Sciences Lecture Series, University of Massachusetts, Lowell, March 5, 2014.
- Association of Engineering Geologists, Woburn, MA, November 21, 2013.
- International Network of Environmental Forensics Conference, Penn State University, University Park, PA, June 10-12, 2013.
- American Nuclear Society Northeast Meeting, Canton, MA, June 5, 2013.
- The Hydraulic Fracking Conference, the Seminar Group, Santa Barbara, CA, February 8, 2013.
- Conference on Research Frontiers in the Science of Unconventional Energy Resources, Yale Climate and Energy Institute, New Haven, CT, March 5, 2013.
- Future Energy Conference, Seattle, Washington, November 13-14, 2012.

Saba, T. CERCLA's petroleum exclusion and the use of chemical forensic methods. The 29th Annual International Conference on soils, sediments, water, and energy. University of Massachusetts, Amherst, MA. October 21-24, 2013.

Saba, T., and F. Mohsen. Hydrofracking: Separating the realities from the myths. The American Bar Association 41st Annual Conference on Environmental Law. Salt Lake City, UT, March 22-24, 2012.

Garry, M., T. Saba, F. Mohsen, and L. Hilbert. Health assessment of methanol used in hydraulic fracturing fluids. The 51st Annual Meeting of the Society of Toxicology, San Francisco, CA, March 11-15, 2012.

Saba, T., and S. Su. Tracking sources of polychlorinated biphenyls (PCBs) to Newark Bay sediments using principal component analysis (PCA) and positive matrix factorization (PMF). SETAC North America 32nd Annual Meeting, Boston, MA, November 13-17, 2011.

Saba, T., and P.D. Boehm. Quantitative PCB congener and homologue profile comparisons. Presented at the 6th International Conference on Remediation of Contaminated Sediments. New Orleans, LA, February 7- 11, 2011.

Tarek Saba, Ph.D.
05/22  |  Page 3

Menzie, C., M. Kierski, T. Saba, S. Meyer, E. Kovatch, J. Kahler. R. Fox, and J. Kern. Multisite ambient investigation for MGPs on the Chicago River. Presented at the 6th International Conference on Remediation of Contaminated Sediments, New Orleans, LA, February 7-11, 2011.

Saba, T., P.D. Boehm. Congener-based analysis of the weathering of PCBs in paper mill sludge. Presented at the 2010 Dioxin Conference, San Antonio, TX, 2010.

Saba, T., and P.D. Boehm. Historical reconstruction of contamination using environmental forensic methods. Boston Bar Association Seminar, Boston, MA, February 11, 2010.

Boehm, P., J. Brown, T. Saba, and K. O'Reilly. The three-part approach to PAH source identification and apportionment in sediments as applied to petroleum, coal tars, and combustion sources. SETAC North America 30th Annual Meeting, New Orleans, LA, November 19-23, 2009.

Saba, T. Environmental weathering of PCBs in sediments. The 26th Annual International Conference on Soils, Sediments, and Water, University of Massachusetts at Amherst, MA, October 18-21, 2009.

Boehm, P.D., W. Shields, A. Fairbrother, and T. Saba. Determination of the chemical background for sediment — Approaches and conundrums. SMWG meeting in Sarasota Springs, NY. September 29, 2009.

Saba, T., and P.D. Boehm. Using chemical forensics and other lines of evidence to distinguish PAH contributions from different pyrogenic sources to the sediments of the Hylebos Waterway Superfund Site — A CERCLA and MTCA cost recovery case. SMWG Spring Sponsor Forum, Kalamazoo, MI, April 29-30, 2008.

Saba, T., P.D. Boehm, and L. Benton. Identification of natural gas sources using geochemical forensic tools. The 23ed Annual International Conference on Soils, Sediments, and Water, University of Massachusetts at Amherst, October 15-18, 2007.

Butler, E., and T. Saba. Use of PCB congener and homolog analysis in source apportionment at a rail yard Superfund site. The Annual International Conference on Soils, Sediments, and Water, University of Massachusetts at Amherst, October 16-19, 2006.

Biemer, T., M. Brown, E. Butler, and T. Saba. Better litigation through chemistry. Presentation to the Boston Bar Association, October 6, 2005.

Saxe, J.K., T. Saba, and E.J. Wannamaker. Do arsenic-containing products influence arsenic concentrations in subsurface drinking water supplies? Society of Environmental Toxicology and Chemistry 24th Annual Meeting, Austin, TX, November 9-13, 2003.

Sharma, M., T. Saba, and A. Bittner. Optimization of groundwater pump and treat systems using numerical modeling and the Monte Carlo approach. 2003 NGWA Midsouth Focus Conference, Philadelphia, PA, 2003.

Sharma, M., T. Saba, and A. Bittner. Optimization of groundwater pump and treat systems using numerical modeling and the Monte Carlo Approach. Presented at the National Ground Water Association Mid-South Focus Conference, Nashville, TN, September 19, 2003.

Illangasekare, T.H., S. Saenton, T. Saba, and C.S. Wilson. Up-scaling of NAPL dissolution from entrapped sources: Implications on end-points for risk assessment. Proceedings. Contaminated Site Remediation Conference, Melbourne, Australia, December 4-8, 2000.

Illangasekare, T.H., T. Cort, T. Saba, F. Barranco, and D. Dai. Pilot-scale laboratory evaluation of

ALCD-PUBCOM_0001029

subsurface restoration technologies for a diesel contaminated site. Summit of the Geological Society of America, Reno, NV, 2000.

Illangasekare, T.H., and T. Saba. Upscaling of contaminant transport in heterogeneous aquifers: Dissolution of entrapped separate phase organic chemicals. Proceedings, Engineering Jubilee Congress, Engineering of Peradeniya; (2):127-132, 2000.

Illangasekare, T.H., and T. Saba. Intermediate scale physical model testing to investigate upscaling of dissolution of non-aqueous phase liquids in aquifers. Proceedings, Physical Modeling and Testing Environmental Geotechnics, Network of European Centrifuges for Environmental Geotechnic Research (NECER). Garnier J, Thorel E, and Haze E (eds), pp. 285-292, La Baule, France, May 15-17, 2000.

Saba, T., and T.H. Illangasekare. Surfactant-enhanced dissolution of non-aqueous phase waste chemicals: Effect of flow dimensionality. Conference of Hazardous Waste Research, St. Louis, MO, April 1999.

Saba, T., and T.H. Illangasekare. Effects of aquifer heterogeneity and groundwater flow dimensionality on upscaling of natural and surfactant enhanced dissolution of non-aqueous phase liquid waste chemicals. Conference on Hazardous Water Research, Snowbird, UT, 1998.

Saba, T. and T.H. Illangasekare. Effect of aqueous phase flow dimensionality on surfactant enhanced dissolution from entrapped non-aqueous phase liquid contaminants at the spill-site scale. American Geophysical Union, San Francisco, CA, December 6, 1998.

Illangasekare, T.H., and T. Saba. Upscaling of mass transfer from zones with entrapped nonaqueous phase chemicals. American Geophysical Union, San Francisco, CA, December 6, 1998.

Vestal, E.W., T.H. Illangasekare, A. Ramaswami, A. Bielefeldt, A.M. Riffel, and T. Saba. Modeling of net interphase mass exchange in NAPL-water systems undergoing biodegradation at the spill-site scale. American Geophysical Union, San Francisco, CA, December 6, 1998.

Saba, T., and T.H. Illangasekare. Natural dissolution of organic chemicals entrapped in a two-dimensional groundwater systems. AGU 18th Annual Hydrology Days, Colorado State University, Fort Collins, CO, 1998.

## Project Experience

**Cost Allocation-Related Projects**

Waterway sediment sites, northeastern United States (CERCLA Sites): Developed frameworks to allocate environmental response costs among responsible parties. Allocation frameworks were supported by chemical forensics, historical operational information, and transport pathways from upland sites to the sediment.

Waterway sediment site, northwestern United States (CERCLA): for a confidential Alternative Dispute Resolution (ADL) process, provided several expert reports evaluating 1) upland sites (historical operations at different manufacturing facilities, contaminants associated with those operations, historical and current transport pathways) and 2) waterway sediment by conducting chemical fingerprinting analysis to track contaminant sources.  The outcome from the analysis was a reconstruction of historical upland operations, contaminant releases, and spatial extents of impacts to the sediment by different potential responsible parties (PRPs), and a proposal of allocation parameters to be considered by the allocation team.

Paoli Railyard Site (CERCLA): Identified PCB sources and approximate spill timing as part of a soil remedial cost allocation model. Reviewed historical PCB purchase records and waste handling practices

ALCD-PUBCOM_0001030

and performed fingerprinting analysis using PCB congener data.

Major waterway, Washington (CERCLA): As part of sediment remedial cost allocation, analyzed the spatial distribution of Record of Decision contaminants of concern (e.g., PCBs, metals, BEHP, dioxins, and PAHs, among others) to investigate the relationship between sediment contamination patterns and upland sites operations and discharge records.

Major rivers, Midwestern Unites States (CERCLA): Designed and directed field sampling programs, conducted fingerprinting analysis, and calculated mass of PCBs discharged as part of contamination liability and remedial cost allocation analysis.

Petroleum refinery/terminal, Midwestern United States: Reviewed and provided comments on an allocation model to allocate cleanup costs between successive refinery owners. Age-dated petroleum products in groundwater, and linked contamination to the evolution of refinery operations with time.

Hylebos Waterway (CERCLA): Evaluated PAH sources to the sediments as part of a dredging cost allocation matter. Determined the relative importance of candidate sources (primarily creosoted pilings, aluminum smelter sludge, and urban runoff) through chemical fingerprinting, sediment age dating, and PAH concentration gradients.

Industrial site, Kansas: Developed a model to allocate environmental response cost between successive owners/operators at a site. Historical operations included chemical manufacturing, a warehouse, and pipe fabrication. Main chemicals of concern included chlorinated solvents, acetone, and petroleum components (i.e., naphthalene, and trimethylbenzene).

Former munitions site, Massachusetts (CERCLA): Evaluated fate and transport of metals in soil and groundwater resulting from historical munitions and other industrial disposal activities in support of contamination liability analysis.

**Per- and polyfluorinated alkyl substances (PFAS)**

For confidential clients at multiple sites: Advised clients on sources and potential liabilities for PFAS contamination in groundwater, soils, and sediments at multiple sites (e.g., former military sites, airports, landfills, sites where previous fires occurred). Applied detailed understanding of PFAS manufacturing processes (ECF vs. telomerization), PFAS formulations in different products (e.g., AFFF), changes in PFAS formulations with time, and understanding of domestic and international manufacturing sources. Conducted fate and transport analysis including tracking compound transformations associated with PFAS migration in soil, surface water, groundwater, and air. Forensic analysis included evaluation of percent linear versus branched compounds to assist in evaluating PFAS sources, and the effect of transport in different environmental media on PFAS fingerprints. Evaluated background PFAS concentrations and profiles resulting from regional industrial activities.

**Hydraulic Fracturing, Drilling Mud, Natural Gas Fingerprinting (composition and isotope analysis), NORM, Evaluation of Groundwater Contamination Claims, and Impoundment Emissions of Hazardous Air Pollutants**

Natural gas production, Pennsylvania and West Virginia: Evaluated the scientific merit of claims of groundwater and surface water contamination from hydraulic fracturing operations. Sampled groundwater, streams, ponds, and natural gases in shallow and deep soils, and characterized potential contamination sources such as land use, household activities, former coal mining, roads, and dust. Reconstructed natural baseline conditions in the study areas, using natural gas composition and stable isotope analysis to track sources of gases in groundwater. Issued expert reports, scientific publications, articles, book chapters, and provided expert testimony in depositions and court.

For a proppant manufacturer, directed laboratory testing to leach chemical components from coated

Tarek Saba, Ph.D.
05/22   |   Page 6

proppants and conducted life-cycle analysis of the leached material.

For the Methanol Institute, evaluated the use of methanol in hydraulic fracturing and modeled hypothetical scenarios of methanol impacting groundwater and surface water. Assessed health impacts of methanol and air emissions from gas operations. Issued a white paper detailing the analysis (http://www.methanol.org/Environment/Resources/Environment/Methanol-Fracking-Fluid-White-Paper-Aug-2011.aspx).

Drilling mud accidental releases (West Virginia and Pennsylvania): Characterized the extent of impacts and remedy effectiveness.

Chemical emissions from ponds: Calculated emission rates of methanol from ponds and tanks used to store recycled water (tons per year), as part of a permitting process.

Naturally occurring radioactive material (NORM) in produced water: Characterized NORM concentration levels with time and space at gas pads to define trends and designed a treatment system to reduce NORM-containing solid waste.

Produced water treatment facility: Assessed design, chemical reactions, and failure points along the produced water treatment train.

Natural gas migration from storage fields using gas isotope analysis:

- Gas Storage Fields, Kansas, Louisiana, Wyoming, Michigan, and New York: Designed and implemented forensic field programs to differentiate native gas from storage gas using composition and isotope analysis. Authored reports to State's Conservation Commission, presented findings to FERC, and served as an expert witness.
- Gas Storage Fields, northeastern Pennsylvania: Investigated sources of natural gas bubbling in residential water wells and potential connection to nearby natural gas storage fields. Designed field sampling programs and used gas composition and isotope analysis to determine the origin of the gas in the water wells.

### PCBs: Tracking of Sources, Timing of Releases, and Apportionment of Liability Cases for Upland Soils and Major Sediment Waterways

Major bay, Northeast: Analyzed homologue and congener patterns to identify PCB sources to the sediments. Identified congeners associated with specific sources using EPA numerical models (Positive Matrix Factorization). Conducted principal component analysis (PCA) and analyzed PCB profiles in sediment cores as part of a remedial investigation report for the bay.

Bayou (CERCLA site) connected to a major channel, southern United States: Investigated fate and transport of PCBs in sediment and the effect of dredging on surface water quality.

Major bay, Florida: Investigated PCB sources to the surface sediment by analyzing PCB congener data (profile analysis, spatial and concentration distribution analysis, and PCA).

Midwestern city: Identified historical uses of PCB-containing hydraulic fluids in the die casting industry.

Major waterway, East Coast: Analyzed PCB congener data to determine PCB sources and entry points to a waterway for allocation of contamination and remedy costs between responsible parties.

Major waterway, Washington: Analyzed PCB congener data to determine PCB sources and entry points to a waterway for allocation of contamination and remedy costs between responsible parties.

Landfill site, Georgia: Evaluated feasibility of proposed remedial alternative at a PCB- and VOC-

Tarek Saba, Ph.D.
05/22  |  Page 7

ALCD-PUBCOM_0001032

contaminated landfill. Recommended modifications to the proposed design to optimize the remediation process.

Northeast nuclear facility: Characterized the spatial distribution of PCBs and lead in soils; contaminants were present in paints used in the facility and contaminated soils, sediments, and groundwater during decommissioning of the facility. Conducted statistical analysis (e.g., variogram) to calculate the sample spacing needed to characterize the extent of spatial impacts.

### Hydrogeology, Fate and Transport Analysis, Groundwater Modeling, and Government Research.

New Hampshire Superfund site: Developed a 3-D numerical groundwater and solute transport model for chlorinated solvents (MODFLOW and MT3D). Designed a numerical code that automated conducting hundreds of groundwater simulations to optimize the design of a pump and treat system (i.e., optimize groundwater well locations, injection, and extraction rates) to minimize the treatment time of a chlorinated solvents groundwater plume.

Coal ash: Reviewed and assessed the ability of groundwater numerical models to simulate fate and transport of metals associated with coal ash.

Coal mine, West Virginia: Analyzed groundwater data to investigate the cause of a coal mine flooding.

Oil and gas impoundment, Pennsylvania: Calculated timing of produced water release by conducting groundwater flow analysis through fractured bedrock.

Chemical manufacturing facility, Argentina: Designed and modeled a hydraulic barrier system to mitigate offsite transport of contaminated groundwater. Conducted contaminant transport modeling and optimization of injection/extraction well locations.

### Government Scientific Research

For the Hazardous Substances Research Center, revised USGS groundwater numerical codes MODFLOW and MT3D, capable of simulating the fate and transport of dissolved contaminants in groundwater. Revisions extended MODFLOW/MT3D capabilities to simulate the behavior of NAPLs in the subsurface, including NAPL entrapment in subsurface soils and dissolution in groundwater.

Developed a proprietary model for DNAPL dissolution and transport in groundwater as part of a DOD contract for a decision support system to evaluate effectiveness and cost of DNAPL source zone treatment.

For EPA, investigated novel groundwater remediation technologies on a field scale at the Dover Air Force Base. Supervised and provided technical assistance for research groups to investigate cutting-edge groundwater-remediation technologies (funded by the Strategic Environmental Research and Development Program SERDEP; a joint program between Department of Defense, EPA, and Department of Energy). Managed treatment and disposal of hazardous waste generated from remediation experiments. Collected aqueous and soil samples required for regulatory compliance and performance monitoring. Established and maintained electronic data acquisition systems.

For EPA, served as technical reviewer for BIOCHLOR, a numerical model that simulates biodegradation of chemicals in groundwater.

For NSF, developed groundwater numerical models to predict soil heterogeneity using chemical data (i.e., breakthrough curves) generated from chemical tracers injected into groundwater.

### Dioxins/Furans: Fingerprinting and Analysis of Source

Tarek Saba, Ph.D.
05/22   |   Page 8

Louisiana site: Evaluated dioxin and furan fingerprinting patterns in the sediment of bayous and marsh areas to determine responsible parties. Combined dioxin/furan data with sediment age dating information to determine with a high degree of certainty the likely sources of contamination.

Transformer service facility, Mississippi: Evaluated dioxin and furan fingerprint patterns in dust and soil samples collected from residential areas around a transformer service facility to determine whether the dioxin/furans originated from the facility or from background sources.

Major Bay, eastern United States: Analyzed dioxin and furan data from the bay sediments as part of remedial investigation phases. Analysis included age dating of sediment core samples, contaminant spatial patterns (e.g., dioxins/furans, PCBs, PAHs, heavy metals), correlation between dioxins (e.g., 2,3,7,8-TCDD) and other contaminants, and evaluation of the impact of historical dredging activities on current contaminant spatial profiles. Tracked dioxin contamination in the bay sediment to potential upland site sources by reconstructing historical industrial operations at sites located along the bay boundaries, evaluating dioxin generation from different industrial process and contaminant transport pathways to the bay.

**Petroleum Chemistry: PAHs, BTEX, Metals, and Additives (e.g., MTBE)**

Southern U.S. refinery: As part of insurance claim, evaluated petroleum products, sources, and timing of releases of petroleum compounds and additives (MTBE) to state-owned groundwater. Reconstructed releases by combining refinery unit operational and closure histories before and after the enactment of the CWA with chemical data collected over 20 years.

CERCLA sediment site (Brooklyn, New York): Conducted chemical fingerprinting analysis on different chemical classes (i.e., PAHs, PCBs, metals) and identified industrial markers in the sediment to track impacts from different facility on the sediment site as part of CERCLA remedy design costs allocation.

Former refinery sites, CERCLA liability (Illinois, Oklahoma): Combined historical waste handling practices, waste handling unit closures, RCRA cleanup actions, and chemical fingerprinting analysis to determine the sources and timing of contamination, with a focus on the applicability of the "petroleum exclusion" under CERCLA at the sites.

Texas refinery: Conducted chemical fingerprinting to age-date a petroleum plume beneath the refinery site to determine the responsible party among successive owners.

Midwestern steel manufacturing site: Evaluated the connection between sediment PAH contamination and surface water sheens using chemical fingerprinting techniques.

West Virginia salvage yard site: Evaluated the use of benzene/xylene ratio to age-date contamination and allocate cleanup costs between successive owners.

Petroleum spill, Oregon: Conducted laboratory studies to understand the fate of a diesel spill. Tracked diesel spilled in pilot-scale tanks using gamma ray spectroscopy techniques.

**Metals: Fate and Transport Analysis, Age Dating, and Source Tracking for Allocation of Liability and Remedial Costs**

Former crushed glass disposal site, Pennsylvania: Assessed leach tests conducted on crushed glass and other material to determine the leachability of different metals from the disposed material to the site and assessed the extent of impacts to the site soils, groundwater, and a nearby river.

Arsenical pesticide: Evaluated fate and transport of the different arsenic species in soils and their potential for migration to groundwater and surface waters at Florida sites. Authored reports to the Florida Department of Environmental Protection.

Tarek Saba, Ph.D.
05/22 | Page 9

ALCD-PUBCOM_0001034

Bayou sediment, Louisiana: Tracked Bayou sediment metal contamination to multiple responsible parties in support of remedial cost allocation. Data evaluation included identification of marker metals and combination of metals used by different industries located along the creek.

Metals in paint: Used statistical methods (variogram analysis) to investigate the sufficiency of a soil-sampling program in characterizing a lead contaminated site.

Former petroleum refinery site, Oklahoma: Investigated the sources of metals in soil and groundwater (petroleum products versus petroleum waste) to determine whether CERCLA's petroleum exclusion applies to the site.

Hydraulic Fracturing, northeastern United States: Evaluated metals data in residential water wells to determine their sources.

**Coal Ash**

For utility companies, eastern United States: Evaluated coal ash basin closure options through the state of North Carolina, by addressing several technical aspects such as: analyses of compound (e.g., boron) leaching rates from coal ash to groundwater under different basin closure scenarios (e.g., cap in place, excavation), evaluation of contaminant fate and transport models (USGS numerical codes called MODFLOW and MT3DMS) to predict the spatial extent of ash-related compounds in groundwater inside and outside ash basin regulatory compliance boundaries, and analysis of seep discharge rates under basin decanting scenarios.

For utility company, southern United States: Evaluated groundwater data produced from monitoring wells located around coal ash ponds. Compared recent data to historical regional background groundwater data and designed field sampling programs to evaluate groundwater condition at different hydrogeologic formations.

**Manufactured Gas Plants (MGPs): Fate and Transport Analysis and Chemical Fingerprinting (DNAPL, Tar, Distillation Products such as Creosote and Road Tar), Standard of Care, and Site Characterization**

Former MGPs in New York, New Hampshire, Maine, Vermont, and Florida: As part of insurance litigation, evaluated standard of care regarding byproducts handling practices and approximate timing of contamination. Researched historical literature regarding status of environmental knowledge at different times, the different MGP equipment and their construction and operation, historical records such as feedstock changes with time, tar records, spills, leaks, Sanborn insurance maps, public service commission reports, and aerial photographs, among other sources of information. Integrated historical information with forensic analysis, fate and transport, and hydrogeology to identify approximate period of historical leaks and spills. Analyzed tar, oil, and NAPL entrapment and migration patterns to identify contamination sources and track the extent of spatial impact to soil, sediment, and groundwater.

New York former MGPs: As part of site characterization efforts required by the New York State Department of Environmental Conservation, designed environmental sampling programs of soil, sediment, and groundwater to identify potential contamination sources. Conducted chemical fingerprinting analysis on different chemical classes (i.e., PAHs, PCBs, metals) as part of site investigations to track sources of contamination at former MGP sites in Brooklyn, New York. Work is part of site characterization efforts.

Former MGP Site, Michigan: Evaluated the source of impacts to site's soil and groundwater. Potential sources included manufactured gas plant, a landfill, and wastewater treatment facility, all occupying the same footprint at different time frames. Presented findings to an arbitration committee.

Tarek Saba, Ph.D.
05/22  |  Page 10

Olympia, Washington: Integrated hydrogeology, fate and transport, and chemical fingerprinting analysis of available environmental data to evaluate sources of DNAPL/tar/PAH contamination at a site located two city blocks from a former MGP.

Bellingham, Washington: Investigated sources of PAH contamination in soils in an area adjacent to former MGP operations. In addition to the former MGP operations, other potential sources included creosoted pilings, historical wood milling operations, and operations related to railroad activities.

Former MGP, Rhode Island: Conducted analysis to distinguish between PAHs and metals from different sources (historical filling material, former MGP operations, a former rubber manufacturer, and natural background).

**Chlorinated Solvents and 1-4 dioxane: Fate and Transport Analysis, Field Sampling Design and Analysis of Isotope Data, and Soil Vapor Intrusion Analysis**

Several manufacturing facilities, Midwestern and western United States: Evaluated sources of chlorinated solvents (PCE, TCE, and degradation products and 1-4-dioxane) at or near manufacturing facilities. Utilized different contaminant evaporation models to estimate the approximate start date of PCE release(s) to the soils. Combined information from compound-specific isotope analysis, solvent additive concentrations (1,4-dioxane), and historical information to determine sources and contribution from different sources.

Manufacturing facility, Illinois: Conducted isotope analysis for carbon and chlorine and fate and transport analysis to age-date multiple chlorinated solvent plumes (PCE, TCE, and their degradation products). Used multiple lines of evidence including groundwater travel times, daughter/parent compound ratios, and historical construction of contamination to determine the age of the different plumes. Presented findings to the Illinois Environmental Protection Agency.

Dry cleaning facility, Massachusetts: Reviewed cost recovery documents for municipal water treatment due to alleged contamination from dry cleaning activities. Documented overestimated treatment costs.

Dry cleaning facility, Canada: evaluated carbon isotope data for TCE in groundwater to identify different sources of chlorinated solvents contamination downgradient from the dry cleaner.

Superfund site, New Hampshire: Optimized injection and extraction well locations and flow rates for faster PCE recovery in a pump and treat system, reducing total remediation time by 25%. Modified MODFLOW and MT3D computer modeling to fit Superfund site-specific characteristics and linked the modified versions to a USGS optimization code. Reduced projected plume recovery time by 25%.

Dry cleaning facility, Massachusetts: Allocated contamination shares between responsible parties in a chlorinated solvents plume. Evaluated PCE degradation pathway and performed groundwater modeling and soil vapor intrusion analysis.

Metal electroplating facility, Oklahoma: Conducted analysis, including fate and transport and isotope analysis, to identify sources of chlorinated solvents around the facility. Work included investigating solvent spatial and degradation patterns in groundwater, and assessment of soil vapor intrusion analysis.

**Natural Resource Damage Assessment**

New Jersey Bayway and Bayonne refineries (NRDA): Under the NJ Spill Act, NJ DEP sued the former owner of the Bayway/Bayonne refineries for natural resource damages to soil, sediment, and groundwater. NJDEP experts used the Habitat Equivalency Analysis (HEA) model to calculate the value of damage to natural resources. Work included analysis of the spatial extent of impact to soil, sediment, and groundwater and the start date of contamination for VOCs, PAHs (SVOCs), metals, NAPLs, and pesticides. Reconstructed operations at refinery areas of concern from the early 1900s and identified

Tarek Saba, Ph.D.
05/22  |  Page 11

whether chemical impacts to the environment were attributed to refinery activities or other sources (e.g., background, offsite sources, or other historical activities unrelated to refinery operations). Divided the refineries into areas that either needed additional analysis to determine whether there is harm to ecological receptors or included impacts unrelated to refinery operations. Calculated extent of groundwater contamination with time in response to remedy actions and whether groundwater use was lost from the early 1900s through future. Coordinated work with ecological experts.

ALCD-PUBCOM_0001037

## Attachment 2

## COC Exceedances in OU2

ALCD-PUBCOM_0001038



PCBs
Exceedance in surface sediment (0 -2.5 ft) highlighted

Legend
Polygon with no PRG exceedance
Polygon with PRG exceedance

Google Earth

2 mi

ALCD-PUBCOM_0001039



# PCBs

Exceedance in subsurface sediment (2.5 -10 ft) highlighted

**Legend**

Polygon with no PRG exceedance

Polygon with PRG exceedance

Google Earth

2 mi

N

ALCD-PUBCOM_0001040



**2378-TCDD**

Exceedance in surface sediment (0 - 2.5 ft) highlighted

Legend

⬭ Polygon with no PRG exceedance
🔶 Polygon with PRG exceedance

2 mi

Google Earth

ALCD-PUBCOM_0001041



**2378-TCDD**

Exceedance in subsurface sediment (2.5 - 10 ft) highlighted

Legend

Polygon with no PRG exceedance
Polygon with PRG exceedance

Google Earth

2 mi

N



**Mercury**

Exceedance in surface sediment (0 -2.5 ft) highlighted

Legend

⬡ Polygon with no PRG exceedance
🔶 Polygon with PRG exceedance

Google Earth

2 mi

N



**Mercury**
Exceedance in subsurface sediment (2.5 -10 ft) highlighted

Legend
◇ Polygon with no PRG exceedance
◆ Polygon with PRG exceedance

Google Earth

2 mi

N



**Dieldrin**

Exceedance in surface sediment (0 - 2.5 ft) highlighted

Legend

Polygon with no PRG exceedance

Polygon with PRG exceedance

2 mi

ALCD-PUBCOM_0001045



**Dieldrin**

Exceedance in subsurface sediment (2.5 -10 ft) highlighted

Legend

⬡ Polygon with no PRG exceedance

⬡ Polygon with PRG exceedance

Google Earth

2 mi

ALCD-PUBCOM_0001046



**DDx**

Exceedance in surface sediment (0 - 2.5 ft) highlighted

Legend

Polygon with no PRG exceedance
Polygon with PRG exceedance

ALCD-PUBCOM_0001047



**DDx**

Exceedance in subsurface sediment (2.5 - 10 ft) highlighted

Legend

◇ Polygon with no PRG exceedance

⬠ Polygon with PRG exceedance

Google Earth

2 mi

N



## Copper
Exceedance in surface sediment (0 -2.5 ft) highlighted

### Legend
⬡ Polygon with no PRG exceedance
🔶 Polygon with PRG exceedance

Google Earth

2 mi

N

ALCD-PUBCOM_0001049



# Copper

Exceedance in subsurface sediment (2.5 -10 ft) highlighted

## Legend

- Polygon with no PRG exceedance
- Polygon with PRG exceedance

Google Earth

N

2 mi

ALCD-PUBCOM_0001050



**Lead**
Exceedance in surface sediment (0 -2.5 ft) highlighted

Legend
⬡ Polygon with no PRG exceedance
🔶 Polygon with PRG exceedance

ALCD-PUBCOM_0001051



**Lead**
Exceedance in subsurface sediment (2.5 -10 ft) highlighted

**Legend**
◇ Polygon with no PRG exceedance
⬤ Polygon with PRG exceedance

Google Earth

2 mi

N



# PAHs (HPAHs and LPAHs)

Exceedance in surface sediment (0 -2.5 ft) highlighted

## Legend

◇ Polygon with no PRG exceedance
🔶 Polygon with PRG exceedance

Google Earth

2 mi

N

ALCD-PUBCOM_0001053

# PAHs (HPAHs and LPAHs)

Exceedance in subsurface sediment (2.5 -10 ft) highlighted

**Legend**
- Polygon with no PRG exceedance
- Polygon with PRG exceedance



ALCD-PUBCOM_0001054

# APPENDIX B.10

## Philip Spadaro Declaration

ALCD-PUBCOM_0001055

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
|      Plaintiff, | )   Civil Action No. 2:22-cv-7326 |
| | ) |
| v. | ) |
| | ) |
| ALDEN LEEDS, INC., *et al.* | ) |
| | ) |
|      Defendants. | ) |
| | ) |
| | ) |

## DECLARATION OF PHILIP SPADARO

ALCD-PUBCOM_0001056

# TABLE OF CONTENTS

LIST OF TABLES .......................................................................................................... 3

LIST OF FIGURES ........................................................................................................ 3

PURPOSE OF THIS DECLARATION............................................................................ 4

QUALIFICATIONS ....................................................................................................... 5

SUMMARY OF OPINIONS ........................................................................................... 6

SUPPORTING INFORMATION FOR OPINIONS ........................................................ 12

Opinion 1. The sole focus on 2,3,7,8-TCDD TEQ as the driver of remedy costs
for OU2 is inappropriate given the sediment chemistry for the other ROD
COCs. Based on my experience, the other ROD COCs collectively, and
some individually, would require the same or a nearly similar remediation
area for OU2, even if 2,3,7,8-TCDD TEQ was not present in the OU2
sediment. ........................................................................................................... 12

Opinion 2. At other contaminated sediments sites, the selected remedy for areas
without 2,3,7,8-TCDD TEQ (or individual dioxins and furans) as a key
COC is the same as OU2: dredging and capping. Similar dredging and
capping remedies have been selected at other sediment sites where 2,3,7,8-
TCDD TEQ is not a COC based on the presence of other COCs found in
LPR OU2. Often these other OU2 COCs have lower EFs than those
present in LPR OU2........................................................................................... 26

    i.    The in-water portion of the PHSS consists of 14 project areas with
remedies driven by one to three of the focused COCs. The active
remedies applied to these project areas are capping, dredging, and
dredging combined with capping................................................................ 26

    ii.   Lower Duwamish Waterway Superfund Site includes six early
action areas (EAAs), which were remediated using dredging and/or
capping and five of these EAAs did not have 2,3,7,8-TCDD TEQs
as a key COC .......................................................................................... 32

    iii.  Gowanus Canal (OU1) Remedy consists of dredging all soft
sediment and placing a cap even though 2,3,7,8-TCDD TEQ (and
individual dioxins and furans) are not COCs........................................... 37

    iv.  The Alcoa (Point Comfort)/Lavaca Bay remedy consists of
dredging even though 2,3,7,8-TCDD TEQ (and individual dioxins
and furans) are not COCs........................................................................ 39

CONCLUSION.............................................................................................................. 40

REFERENCES .............................................................................................................. 41

Attachment 1 – Resume of Philip Spadaro

ALCD-PUBCOM_0001057

## LIST OF TABLES

1. Median of detected EFs in LPR OU2, PHSS, and LDW for the LPR OU2 other ROD COCs
2. CERCLA sediment sites with similar remedies to OU2 that are not driven by 2,3,7,8-TCDD TEQ
3. Summary of EFs for the other ROD COCs in OU2
4. Summary statistics of detected EFs in PHSS compared to median EFs in LPR
5. Key COCs and selected remedies for PHSS project areas
6. Summary statistics of detected EFs in LDW compared to median EFs in LPR
7. Key COCs and implemented remedies in the LDW EAAs

## LIST OF FIGURES

1. Area of OU2 where contaminant concentration exceeds remediation goals (RG) for more than one OU2 COC except 2,3,7,8-TCDD TEQ
2. Example figure explaining how to read and understand Figures 3 through 10
3. Aerial plot of max detected total PCB congener concentrations at any depth and river mile plots of all detected total PCB congener concentrations for the LPR
4. Aerial plot of max detected mercury concentrations at any depth and river mile plots of all detected mercury concentrations for the LPR
5. Aerial plot of max detected HMW PAH concentrations at any depth and river mile plots of all detected HMW PAH concentrations for the LPR
6. Aerial plot of max detected LMW PAH concentrations at any depth and river mile plots of all detected LMW PAH concentrations for the LPR
7. Aerial plot of max detected dieldrin concentrations at any depth and river mile plots of all detected dieldrin concentrations for the LPR
8. Aerial plot of max detected total 4,4'-DDx concentrations at any depth and river mile plots of all detected total 4,4'-DDx concentrations for the LPR
9. Aerial plot of max detected copper concentrations at any depth and river mile plots of all detected copper concentrations for the LPR
10. Aerial plot of max detected lead concentrations at any depth and river mile plots of all detected lead concentrations for the LPR
11. Combined area of RG exceedance for all other ROD COCs without 2,3,7,8-TCDD TEQ
12. Location of Project Areas within PHSS
13. Location of EAAs within the LDW
14. Location of Gowanus Canal RTAs

3

ALCD-PUBCOM_0001058

## PURPOSE OF THIS DECLARATION

Pursuant to 28 U.S.C. § 1746, I, Philip Spadaro, state the following:

1. I have been retained by Langsam Stevens Silver & Hollaender, LLP on behalf of Glen
   Springs Holdings, Inc (GSH) and Occidental Chemical Corporation (OCC) to provide expert
   opinions related to Operable Unit 2 (OU2) of the Diamond Alkali Superfund Site.

2. Discussion of OU2 remediation is often focused solely on the toxicity equivalence quotient
   (TEQ) for 2,3,7,8-TCDD,[1] a Record of Decision (ROD) contaminant of concern (COC).
   However, EPA's ROD finds that "data show that elevated concentrations of COCs are
   ubiquitous in surface sediments of the lower 8.3 miles, bank-to-bank,"[2] which includes seven
   other ROD COCs: polychlorinated biphenyls (PCBs), mercury, lead, copper, total DDx,[3]
   dieldrin, and polycyclic aromatic hydrocarbons (PAHs)[4] (referred to as the other ROD
   COCs).[5]

---

[1] Seventeen of the dioxin and furans congeners are toxic to humans and animals. Because dioxins and furans are typically present as a mixture in environmental systems, the overall toxicity of the 17 dioxins and furans is typically compared to 2,3,7,8-TCDD because it is the most toxic of the 17 congeners. The 2,3,7,8-TCDD TEQ for a given congener is calculated by multiplying the congener's concentration by its toxicity equivalence factor (TEF), which is between 0 and 1 to denote its toxicity relative to 2,3,7,8-TCDD. The total 2,3,7,8-TCDD TEQ can be calculated for a sample by summing together all the individual TEQs.

[2] "Since the conceptual site model shows that elevated concentrations of COCs are ubiquitous in surface sediments of the lower 8.3 miles, bank-to-bank, the entire lower 8.3 miles was considered a single exposure point for a majority of the evaluated receptors" (EPA 2016, p. 46).

[3] Total DDx is the sum of 2,4'-dichlorodiphenyltrichloroethane (DDT); 4,4'-DDT; and their break down products: 2,4'-dichlorodiphenyldichloroethylene (DDE); 4,4'-DDE; 2,4'-dichlorodiphenyldichloroethane (DDD); and 4,4'-DDD. The ROD focused only on the 4,4' congeners (EPA 2016. p. 11). Thus, to be conservative, my declaration only focuses on the total 4,4,'-DDx concentrations in OU2 sediment.

[4] To be consistent with the results presented in the OU2 ROD (EPA 2016, p. 166), this declaration considers high-molecular weight PAHs (HPAHs) and low-molecular weight PAHs (LPAHs) separately.

[5] EPA 2016, pp. 24–26

4

ALCD-PUBCOM_0001059

3. My assignment included providing expert responses to the following questions:

- **Do the other ROD COCs, collectively or individually, require the same extent of remediation for OU2, even if 2,3,7,8-TCDD TEQ did not exist?**
- **Are there other CERCLA sediment sites, similar to OU2, that contained some or all of the other ROD COCs and required the same remedy as OU2 (i.e., dredge and cap)?**

### QUALIFICATIONS

4. I earned a bachelor's degree in chemistry from Rutgers University and a master's degree in geophysical sciences from the University of Chicago. I am an expert in sediment cleanup design and implementation, evaluation of environmental effects of sediment dredging, and urban and industrial waterfront redevelopment. I have more than 38 years of experience in applying my technical expertise to projects in which sediment quality has been a prominent issue.

5. Relevant to this matter, my practice focuses on identifying CERCLA sediment COCs that necessitate remediation and applying remediation technologies to meet the required ROD cleanup levels for all the ROD COCs.

6. I am considered by my peers to be an authority in designing remediation systems for contaminated sediment sites including dredging, capping, sediment dewatering, disposal, source control, and other remedy elements that are being applied to OU2. I have given approximately 70 conference presentations and published approximately 12 papers related to the topics discussed in this declaration.

7. My resume, which includes a list of work experience and publications, is presented in Attachment 1.

8. If asked to testify, my testimony would be consistent with this declaration.

5

ALCD-PUBCOM_0001060

## SUMMARY OF OPINIONS

9. **Opinion 1:** The sole focus on 2,3,7,8-TCDD TEQ as the driver of remedy costs for OU2 is inappropriate given the sediment chemistry for the other ROD COCs. Based on my experience, the other ROD COCs collectively, and some individually, would require the same or similar remediation area for OU2 even if 2,3,7,8-TCDD TEQ was not present in the OU2 sediment. As shown in Figure 1, almost the entirety of OU2 exceeds remediation goals (RGs) for at least one of the other ROD COCs.[6]

---

[6] The maps that comprise the top part of Figures 3 through 10 and the entirety of Figures 1 and 11 were generated by developing Thiessen polygons for all the unique sample locations where a relevant COC or COCs were measured. A Thiessen polygon shows the extent of an area represented by a given point relative to other nearby points. For Figures 3 through 10, the polygons were colored based on the maximum concentration at any depth for the given COC for each sample location. For Figures 1 and 11, the polygons were colored based on the maximum concentration at any depth for any COC except 2,3,7,8-TCDD TEQ for each sample location.

6



*Figure 1. Area of OU2 where contaminant concentration exceeds remediation goals (RG) for more than one OU2 COC except 2,3,7,8-TCDD TEQ*

ALCD-PUBCOM_0001062

10. **Opinion 2:** At other contaminated sediments sites, the selected remedy for areas without
2,3,7,8-TCDD TEQ (or individual dioxins and furans) as a key COC is the same as the
remedy selected for OU2: dredging and capping. Similar dredging and capping remedies
have been selected at other sediment sites where 2,3,7,8-TCDD TEQ is not a COC based on
the presence of other COCs found in OU2 of the Lower Passaic River (LPR). Often these
other OU2 COCs have lower enrichment factors (EFs) than are present in OU2. An EF is the
magnitude that a COC concentration is above a relevant screening level (such as the RGs for
OU2). For example, an EF of 10 for 2,3,7,8-TCDD in a sample in OU2 would mean the
concentration is 10 times the RG. An EF of 0.1 for 2,3,7,8-TCDD in a sample in OU2 would
mean it is one tenth the concentration of the RG. EFs are useful because they provide a more
direct comparison of sediment sampling results, in relation to RGs, between chemicals at the
same site and chemicals across different sites. Table 1 shows the median EF for the other ROD
COCs in LPR OU2 compared to the median EF for those same COCs at other sediment sites.
Table 2 shows the areas at other CERCLA sediment sites that did not have 2,3,7,8-TCDD
TEQ (or individual dioxin and furans) as a key COC, yet still included dredging and/or
capping as the remedy. The following paragraphs detail the remedies chosen at different sites
for each of the specific LPR OU2 COCs.

11. **PCBs:** The median EF for total PCBs was at least one order of magnitude lower at the
Portland Harbor Superfund Site (PHSS) and the Lower Duwamish Waterway Superfund Site
(LDW) than the EF for total PCBs in LPR OU2. All these areas, including the ones where
PCBs were the only COC, require dredging, capping, or dredging and capping as the selected
remedy. PCBs were the only key COC in three of the PHSS project areas, one of the key
COCs in another PHSS project area, and one of the key COCs in all five LDW Early Action
Areas.

8

ALCD-PUBCOM_0001063

12. **Mercury:** Even though the median EF for mercury was two orders of magnitude lower in the LDW relative to LPR OU2, mercury was a key COC in four of the five LDW Early Action Areas. The remedy for these areas was dredging or dredging and capping. Mercury was also one of the two key COCs at Lavaca Bay where the remedy was dredging.

13. **PAHs:** The median EFs for PAHs were approximately an order of magnitude lower at the PHSS and the LDW relative to LPR OU2. Yet, PAHs were one of the key COCs in four PHSS project areas, including one where it was the only key COC, and three of the five LDW Early Action Areas. The selected remedies for these areas were dredging, capping, or dredging and capping. PAHs were also one of two key COCs in the Gowanus Canal where the remedy was dredging and capping and in Lavaca Bay where the remedy was dredging.

14. **Total DDx:** Even though the median EF for total DDx was two orders of magnitude lower at the PHSS relative to LPR OU2, total DDx was one of the key COCs in two PHSS project areas where the remedy was dredging, capping, or dredging and capping.

15. **Copper:** Even though the median EF was one order of magnitude lower at the LDW relative to LPR OU2, copper was one of the key COCs in one of the LDW Early Action Areas where the remedy was dredging and capping.

16. **Lead:** Even though the median EF was approximately two orders of magnitude lower at the LDW relative to LPR OU2, lead was one of the key COCs in three of the LDW Early Action Areas where the remedy was dredging or dredging and capping.

9

ALCD-PUBCOM_0001064

| COC | LPR OU2 Median EF | PHSS Median EF | LDW Median EF |
|---|---|---|---|
| Copper | 3.4 | **0.1** | **0.12** |
| Dieldrin | 0.78 | 9.3 | NA |
| Lead | 2.5 | **0.056** | **0.062** |
| Mercury | 54 | **0.67** | **0.37** |
| Total DDx | 500 | **1.1** | NA |
| Total HMW PAHs | 0.34 | **0.066** (Total PAHs) | **0.088** |
| Total LMW PAHs | 0.46 | **0.066** (Total PAHs) | **0.032** |
| Total PCBs | 28 | **1.2** | **0.79** |

*Table 1. Median of detected EFs in LPR OU2, PHSS, and LDW for the LPR OU2 other ROD COCs.* **Bold** *results are the median PHSS or LDW EFs that are lower than the median for LPR OU2. NA results are because dieldrin and total DDx are not key COCs for the LDW.*

| Site, Project Area, or Early Action Area | Key COCs | Proposed or Implemented Remedy |
|---|---|---|
| **PHSS Project Areas** | | |
| River Mile 2 East | **PCBs** | Dredge, cap, dredge and cap |
| River Mile 3.5 East | **PCBs** | Dredge, cap, dredge and cap |
| Terminal 4 | **PAHs, PCBs** | Dredge, cap, dredge and cap |
| B1a (Linnton) | **PAHs, DDx** | Dredge, cap, dredge and cap |
| Gasco/ Navigation Channel | **PAHs** | Dredge, cap, dredge and cap |
| US Moorings | **PAHs, DDx** | Dredge |
| Swan Island Basin | **PCBs** | Dredge, cap, dredge and cap |

ALCD-PUBCOM_0001065

| Site, Project Area, or Early Action Area | Key COCs | Proposed or Implemented Remedy |
|---|---|---|
| **LDW Early Action Area** | | |
| Norfolk CSO | **PCBs; mercury**; BEHP; 1,4-dichlorobenzene | Dredging |
| Jorgensen Forge | **PCBs,** cadmium, chromium, **lead, mercury**, nickel, silver, zinc, individual PAHs, BEHP, butylbenzylphthalate, **total low molecular weight (LMW) PAHs, total high molecular weight (HMW) PAHs** | Dredging (remediation not yet complete) |
| Boeing Plant 2 | **PCBs, lead**, individual PAHs, | Dredging |
| Slip 4 | **PCBs**, arsenic, cadmium, chromium, **copper, lead, mercury**, silver, zinc, individual PAHs, benzoic acid, benzyl alcohol, BEHP, butylbenzylphthalate, di-n-octyl phthalate, N-nitrosodiphenylamine, phenol, **total HMW PAHs** | Dredge and cap |
| Duwamish/Diagonal CSO | **PCBs, mercury**, silver, zinc, chlorinated benzenes, BEHP, butylbenzylphthalate, **total HMW PAHs**, benzoic acid, tributyltin | Dredge and cap |
| **Other Superfund Sites** | | |
| Gowanus Canal | **PAHs**, NAPL | Dredging and cap |
| Lavaca Bay | **Mercury, PAHs** | Dredge |

*Table 2. CERCLA sediment sites with similar remedies to OU2 that are not driven by 2,3,7,8-TCDD TEQ. **Bold** COCs are also LPR OU2 COCs.*

11

## SUPPORTING INFORMATION FOR OPINIONS

**Opinion 1. The sole focus on 2,3,7,8-TCDD TEQ as the driver of remedy costs for OU2 is inappropriate given the sediment chemistry for the other ROD COCs. Based on my experience, the other ROD COCs collectively, and some individually, would require the same or a nearly similar remediation area for OU2, even if 2,3,7,8-TCDD TEQ was not present in the OU2 sediment.**

24. To support this opinion, I relied on the available sediment data for the LPR[7] and investigated the exceedances of the other ROD COCs in OU2 sediment over the ROD cleanup goals (Figures 3–10). I also reviewed the ROD to identify the screening levels for each COC and their relevant role in remediation.

25. The ROD for OU2 identifies the selected remedy as dredging the entire OU2 area from bank-to-bank and then placing a cap across this entire area, except where all fine-grained contaminated sediments have been removed by dredging. The remedy anticipates dredging depths of 2.5 ft, outside the navigation channel in the lower 1.7 miles, so that cap placement does not increase the potential for flooding.[8] Development of this remedy was based on the following eight COCs: 2,3,7,8-TCDD TEQ; PCBs; mercury; lead; copper; total DDx; dieldrin; and PAHs (HMW PAHs and LMW PAHs). Based on my review, the ROD

---

[7] All plots in this declaration relied on sediment samples collected within OU2, with the exception that sediments remediated as part of Phase 1 activities have been removed. This data comes from the offsite sediment database that contains the analytical results of sediment samples collected during 67 sampling events conducted from 1983 to 2016 in the Passaic River, the northern Newark Bay, and the lower Hackensack River. This data was extracted from EQuIS and the National Oceanic and Atmospheric Administration (NOAA) Query Manager. In addition to the offsite sediment database, TIG included sediment samples from EPA's 2015 SERAS Diamond Alkali Dioxin Investigation. Only data with detected results for a given analyte were included in this analysis. For totals calculations, individual analytes that were not detected were counted as zero during the summation.

[8] EPA 2016, p. 90

12

identifies RGs for OU2 for 2,3,7,8-TCDD TEQ; PCBs; mercury; and total DDx.[9] For the other four COCs, the ROD identifies background concentrations below which cleanup is typically not feasible.[10] These background-based cleanup levels are also referred to as RGs in this opinion. The ROD noted that dioxins and furans, PCBs, and the other COCs had concentrations in sediments that would contribute to a $10^{-3}$ excess cancer risk for human consumption of fish and crab; thus, those COCs constitute principal threat waste (PTW).[11] A PTW is a waste, such as contaminated sediment, that can be considered a source of contaminants to groundwater, surface water, air, or biological receptors. The ROD states that there is an "expectation that EPA will use treatment to address the principal threats posed by a site wherever practicable."[12] Consistent with this, the ROD noted that active remediation combined with natural recovery was needed to achieve the remediation goals for both dioxins and furans and, at least in the surface sediment, for the COCs other than dioxins/furans with remediation goals based on human health RGs (PCBs and mercury).[13] Thus, concentrations above either a remediation goal or a background concentration would require some form of remediation.

26. All other ROD COCs exceed the RGs to some extent in OU2, as shown in Table 3 below. Specifically, more than half of all sediment samples for total 4,4'-DDx, total PCBs, and mercury exceed their RG by at least 10 times. This is illustrated by a median EF of greater than 10 in Table 3. Copper and lead concentrations in sediments also exceeded their respective RGs in more than half of all sediment samples (median EF greater than 1), while

---

[9] EPA 2016, pp. 53, 165

[10] EPA 2016, pp. 53–54, 166

[11] EPA 2016, p. 89

[12] EPA 2016, p. 89

[13] EPA 2016, p. 55

13

dieldrin and PAHs only occasionally exceed their RG. For comparison, all RGs in Table 3

are presented in µg/kg. This unit of measure compares the mass of a COC to the mass of

sediment. Thus, 1 µg/kg means there is 1 µg (microgram; one millionth of a gram) of a COC

in 1 kg (kilogram) of sediment. This unit is often referred to as parts per billion

because1 µg/kg means there is 1 µg (or one "part") of a COC in one billion µg ("parts") of

sediment. For example, the dieldrin RG of 5 µg/kg means there are 5 µg of dieldrin in one

billion µg of sediment.

| COC | RG (µg/kg) | OU2 EF | | | |
|---|---|---|---|---|---|
| | | Minimum | Maximum | Mean | Median |
| Copper | 63,000 | 0.0073 | 130 | 4.2 | 3.4 |
| Dieldrin | 5 | 0.00027 | 2,400 | 3.5 | 0.78 |
| Lead | 130,000 | 0.00077 | 200 | 3 | 2.5 |
| Mercury | 74 | 0.021 | 33,000 | 83 | 54 |
| Total 4,4'-DDx | 0.3 | 0.0047 | 4,300,000 | 7,300 | 500 |
| Total HMW PAHs | 53,000 | 0.0000055 | 64 | 0.62 | 0.34 |
| Total LMW PAHs | 7,900 | 0.000042 | 700 | 2.8 | 0.46 |
| Total PCBs | 50 | 0.000012 | 2,700 | 61 | 28 |

*Table 3. Summary of EFs for the other ROD COCs in OU2*

27. As detailed below, the results of the summary statistics in Table 3 are consistent with a more

detailed analysis of each individual COC EF. For the remainder of this opinion, my analysis

relies on the evaluation of individual concentrations of the eight other ROD COCs. These

results are presented in Figures 3 through 10, which look similar except each figure shows

the concentration of a different ROD COC. These figures show both an overhead (aerial)

14

ALCD-PUBCOM_0001069

view of the COC concentration based on Thiessen polygons[14] and a linear (river mile) view.

This shows how the maximum COC concentration differs between different banks of the

river (aerial view) and how all the COC concentrations differ moving upstream and

downstream of the river (river mile view). For readers unfamiliar with these types of plots,

Figure 2 provides a key for reading Figures 3 through 10.

---

[14] Thiessen polygons (Voronoi diagrams) show the area of influence represented by a given point relative to other nearby points. Thus, any location within the polygon is closer to the given point than any other point around it. For Figures 3 through 10, the polygons were colored based on the maximum concentration at any depth for the given COC for each sample location. For Figure 11, the polygons were colored based on the maximum concentration at any depth for any COC except 2,3,7,8-TCDD TEQ for each sample location.

15

ALCD-PUBCOM_0001070



*Figure 2. Example figure explaining how to read and understand Figures 3 through 10*

16

ALCD-PUBCOM_0001071

28. Figure 3 below demonstrates that the typical total PCB concentrations in sediment are 10 to 100 times greater than the RG. Concentrations exceed this to a greater extent in certain areas of the map (such as the east bank near RM 1.8 and the west bank near RM 5.5), but the total PCB concentration does not exceed the RG in other sporadic areas (gray areas sporadically seen near the banks or in the center of the river). Thus, almost all of the sediment for LPR OU2 would still require extensive remediation, such as dredging, capping, or dredging and capping, based solely on total PCB concentrations.



*Figure 3. Aerial plot of max detected total PCB congener concentrations at any depth and river mile plots of all detected total PCB congener concentrations for the LPR. Sediments remediated as part of Phase 1 activities have been removed from this figure.*

17

ALCD-PUBCOM_0001072

29. The results for mercury look very similar to total PCBs, as shown in Figure 4 below. For mercury, the typical concentrations in sediment are 10 to 100 times greater than the RG. Compared to total PCBs, mercury concentrations tend to be similar across the entire OU2 area, and there are also fewer areas where mercury concentrations do not exceed the RG (gray areas). Thus, almost all of the sediment for LPR OU2 would still require extensive dredging, capping, or dredging and capping remediation based solely on mercury concentrations.



*Figure 4. Aerial plot of max detected mercury concentrations at any depth and river mile plots of all detected mercury concentrations for the LPR. Sediments remediated as part of Phase 1 activities have been removed from this figure.*

18

30. As discussed above, PAHs have separate RGs for HMW PAHs and LMW PAHs. However, the sediment concentration for total HMW PAHs and total LMW PAHs is relatively similar, as shown in Figures 5 and 6. PAH exceedances of RGs occur only sporadically. The two specific areas where PAHs exceed their RGs by greater than 10 (total HMW PAHs) or 100 times (total LMW PAHs) are around RM 3 and between RM 4 and 5. These two areas likely indicate in-water and/or upland sources of PAHs in these areas. The rest of OU2 has large sections with no RG exceedances or relatively small exceedances of the total LMW PAH and total HMW PAH RGs. Thus, select areas of sediment for LPR OU2 would still require remediation based solely on total HMW PAH and total LMW PAH concentrations.



*Figure 5. Aerial plot of max detected total HMW PAH concentrations at any depth and river mile plots of all detected total HMW PAH concentrations for the LPR. Sediments remediated as part of Phase 1 activities have been removed from this figure.*

19

ALCD-PUBCOM_0001074



*Figure 6. Aerial plot of max detected total LMW PAH concentrations at any depth and river mile plots of all detected total LMW PAH concentrations for the LPR. Sediments remediated as part of Phase 1 activities have been removed from this figure.*

31. The spatial extent of dieldrin RG exceedances is much greater than the spatial extent of

PAHs, as shown in Figure 7. Dieldrin concentrations tend to be between one to 10 times the

RG between RM 0 and RM 8. RG exceedances are patchy, but common between RM3 and

RM7. Thus, some areas of the sediment for LPR OU2 would still require remediation based

solely on dieldrin concentrations.

20

ALCD-PUBCOM_0001075



*Figure 7. Aerial plot of max detected dieldrin concentrations at any depth and river mile plots of all detected dieldrin concentrations for the LPR. Sediments remediated as part of Phase 1 activities have been removed from this figure.*

32. Similar to PCBs and mercury, total DDx for the 4,4' isomers exceed the RG throughout the entire OU2 area, as shown in Figure 8. These exceedances are relatively high, generally exceeding the RG by at least 100 times in almost all locations. Only a small number of areas have no RG exceedances for total DDx. Thus, almost all of the sediment for LPR OU2 would require extensive remediation, such as dredging, capping, or dredging and capping, based solely on total DDx concentrations.

21

ALCD-PUBCOM_0001076



*Figure 8. Aerial plot of max detected total 4,4'-DDx concentrations at any depth and river mile plots of all detected total 4,4'-DDx concentrations for the LPR. Sediments remediated as part of Phase 1 activities have been removed from this figure.*

33. For copper and lead, the concentrations generally exceed the RG throughout OU2 as shown in Figures 9 and 10, respectively. These exceedances are typically low with most exceedances less than 10 times the RG. One area in the river, near RM 4.5, has higher concentrations for both copper and lead. An area around RM 6.5 has elevated concentration of lead. Areas with no RG exceedances are relatively few and far between. Thus, almost all of the sediment for LPR OU2 would still require remediation based solely on either copper or lead concentrations.

22

ALCD-PUBCOM_0001077



*Figure 9. Aerial plot of max detected copper concentrations at any depth and river mile plots of all detected copper concentrations by river mile for the LPR. Sediments remediated as part of Phase 1 activities have been removed from this figure.*

ALCD-PUBCOM_0001078



*Figure 10. Aerial plot of max detected lead concentrations at any depth and river mile plots of all detected lead concentrations by river mile for the LPR. Sediments remediated as part of Phase 1 activities have been removed from this figure.*

34. Figure 11 shows the combined results for the other ROD COCs without 2,3,7,8-TCDD TEQ.

As can be seen from this map, less than one percent of OU2 contains areas where none of the

other ROD COCs exceed RGs. Specifically, 742.24 acres of the total 746.20 acres of OU2

exceed RGs. In contrast, considering only 2,3,7,8-TCDD only 698.05 acres would exceed the

RG and considering all eight COCs 742.79 acres would exceed the RG. Thus, even in the

absence of 2,3,7,8-TCDD TEQ, essentially the same area would require remediation due to

RG exceedances from the other ROD COCs. This shows that the other ROD COCs are just

24

ALCD-PUBCOM_0001079

as important as 2,3,7,8-TCDD TEQ in defining the area in OU2 requiring remediation. It also confirms that the focus on 2,3,7,8-TCDD TEQ as the sole cause or driver of this remedy is inappropriate.



*Figure 11. Combined area of RG exceedance for all other ROD COCs without 2,3,7,8-TCDD TEQ*

25

ALCD-PUBCOM_0001080

**Opinion 2. At other contaminated sediments sites, the selected remedy for areas without 2,3,7,8-TCDD TEQ (or individual dioxins and furans) as a key COC is the same as OU2: dredging and capping. Similar dredging and capping remedies have been selected at other sediment sites where 2,3,7,8-TCDD TEQ is not a COC based on the presence of other COCs found in LPR OU2. Often these other OU2 COCs have lower EFs than those present in LPR OU2.**

35. In my experience working on other sediment superfund mega sites, dredging and capping are common technologies used to address various COCs. As examples, I have selected four representative sediments sites: the in-water portion of the PHSS (Oregon), the LDW (Washington), the Gowanus Canal (New York), and Lavaca Bay (Texas). The selected remedies for these sites include both dredging and capping even though 2,3,7,8-TCDD TEQ (or individual dioxins and furans) are not key COCs.

i.    **The in-water portion of the PHSS consists of 14 project areas with remedies driven by one to three of the focused COCs. The active remedies applied to these project areas are capping, dredging, and dredging combined with capping.**

36. The PHSS and LPR OU2 are both sites located in a highly developed urban area with a chosen remedy that includes dredging and/or capping. In some areas of the PHSS, 2,3,7,8-TCDD TEQ and individual dioxins and furans are key COCs. In other areas of the PHSS, the remediation is driven by some of the same COCs that are found at LPR OU2 and not by dioxins and furans. Here, too, the selected remedy is still dredging and/or capping.

37. The PHSS is located along the lower reach of the Willamette River in Portland, Oregon, and extends from approximately river mile (RM) 1.9 to 11.8. According to EPA's ROD for PHSS, land use along the lower Willamette River includes marine terminals, manufacturing

26

and other commercial operations, public facilities, parks, and open spaces.[15] EPA, in its ROD for PHSS, identified 27 COCs for sediments and assigned cleanup levels for each COC as goals for the remediation. These 27 COCs include all of the eight LPR OU2 COCs: 2,3,7,8-TCDD TEQ; PCBs; mercury; copper; lead; total DDx; total PAHs; and dieldrin. To simplify the analysis and develop and evaluate the remedial alternatives for the site, EPA identified the following six focused COCs: PCBs; PAHs; 1,2,3,7,8-pentachlorodibenzo-p-dioxin (1,2,3,7,8-PeCDD); 2,3,4,7,8-pentachlorodibenzofuran (2,3,4,7,8-PeCDF); 2,3,7,8-TCDD;[16] and total DDx. The focused COCs contribute the most significant amount of risk to humans and the environment and are co-located with the other COCs.[17] The co-location of the focused COCs with other PHSS COCs means that addressing the focused COCs through cleanup will also address the goals for the other PHSS COCs.[18] This is similar to the OU2 ROD selecting RGs for only four "representative" COCs.[19] The chosen remedy for the PHSS ROD requires active remediation such as dredging and/or capping at select areas coupled with monitored natural recovery (MNR) or enhanced MNR (EMNR) in the remaining portions of the site.[20] The chosen remedy defined areas of active remediation as areas where one of the six focused COCs exceeds remedial action levels (RALs) and/or PTW thresholds. In addition to PTW thresholds for the six focused COCs,[21] PTW thresholds were also

---

[15] EPA 2017, p. 16

[16] EPA chose 2,3,7,8-TCDD and individual dioxin and furan congeners as the focused COCs. EPA did not choose 2,3,7,8-TCDD TEQ as a focused COC.

[17] EPA 2017, pp. 33, 240

[18] EPA 2017, p. 33

[19] EPA 2016, pp. 53

[20] EPA 2017, p. 2

[21] For the PTW threshold for PAHs, carcinogenic PAHs were used to evaluate the PTW threshold instead of total PAHs.

ALCD-PUBCOM_0001082

developed for four other contaminants: 1,2,3,4,7,8-hexachlorodibenzofuran (1,2,3,4,7,8-HxCDF); 2,3,7,8-tetrachlorodibenzofuran (2,3,7,8-TCDF); chlorobenzene; and naphthalene.[22]

38. Similar to LPR OU2, total PCBs and total DDx exceed their cleanup levels (CLs) throughout the PHSS (EFs greater than 1) (Table 4). Total PCBs exceed their CLs by one to three orders of magnitude, while total DDx exceeds its CLs by one to five orders of magnitude. For copper, lead, mercury and PAHs, the median EF is at least one order of magnitude higher in LPR OU2 compared to PHSS. Additionally, copper, lead, and mercury regularly exceed the RGs in LPR OU2 but not the CLs in PHSS.

| COC | PHSS EF | | | | LPR OU2 EF |
|---|---|---|---|---|---|
| | Minimum | Maximum | Mean | Median | Median |
| Copper | 0.0061 | 1.4 | 0.11 | **0.1** | 3.4 |
| Dieldrin | 5.6 | 300 | 23 | 9.3 | 0.78 |
| Lead | 0.00066 | 0.66 | 0.069 | **0.056** | 2.5 |
| Mercury | 0.14 | 10 | 0.85 | **0.67** | 54 |
| Total DDx | 0.0054 | 34000 | 78 | **1.1** | 500 |
| Total PAHs | 0.00015 | 140 | 1.4 | **0.066** | HMW PAHs: 0.34 LMW PAHs: 0.46 |
| Total PCBs | 0.01 | 430 | 7.4 | **1.2** | 28 |

*Table 4. Summary statistics of detected EFs in PHSS compared to median EFs in LPR. **Bold** results are the median PHSS EF that are lower than the median for LPR OU2.*

---

[22] EPA 2017, p. 245

28

ALCD-PUBCOM_0001083

39. EPA has divided the PHSS into 14 project areas (Figure 12).[23] Each of the six focused COCs

has been identified as a key COC in at least one of the project areas (Table 5). While the

remedy for these project areas has not been finalized, the PHSS ROD determined likely

remedies that were refined in the PHSS Explanation of Significant Differences (ESD) (Figure

12; Table 5).[24]

---

[23] EPA 2022, p. This does not include the five EPA lead project areas. This includes the
Gasco/Navigation Channel and U.S. Moorings project areas, which are shown as one on Figure
12 as separate project areas.

[24] EPA 2017, pp. 202–206; EPA 2018, pp. 62–66

ALCD-PUBCOM_0001084



*Figure 12 Location of Project Areas within PHSS*

30

ALCD-PUBCOM_0001085

| Project Area | Key COCs[25] | ESD Remedy[26] |
| --- | --- | --- |
| River Mile 2 East* | **PCBs** | Dredge, cap, dredge and cap |
| River Mile 3.5 East* | **PCBs** | Dredge, cap, dredge and cap |
| Terminal 4* | **PAHs** **PCBs** | Dredge, cap, dredge and cap |
| B1a (Linnton)* | **PAHs** **DDx** | Dredge, cap, dredge and cap |
| Gasco/ Navigation Channel* | **PAHs** | Dredge, cap, dredge and cap |
| US Moorings* | **PAHs** **DDx** | Dredge |
| Willamette Cove | **PCBs** PeCDD | Dredge, cap |
| River Mile 7 West | **DDx** PeCDF TCDD | Dredge, cap, dredge and cap |
| Willbridge Cove | **DDx** PeCDF TCDD | Dredge, cap, dredge and cap |
| Swan Island Basin* | **PCBs** | Dredge, cap, dredge and cap |
| River Mile 9 West | **PCBs** PeCDD TCDD | Dredge, cap, dredge and cap |

[25] The key COCs are those listed as the key COCs for the sediment decision units (SDUs) in the Portland Harbor Site Features GIS files here: http://ph-public-data.com/document/CDMSmith2019/. While the SDUs tend to align with existing project areas, the exact areas are not the same and some SDUs were split into multiple project areas. Thus, the key COCs for each project area may end up differing from those listed.

[26] EPA 2018, pp. 62–66

31

ALCD-PUBCOM_0001086

| Project Area | Key COCs[25] | ESD Remedy[26] |
|---|---|---|
| River Mile 10 West | **PCBs** PeCDD TCDD | Dredge, cap, dredge and cap |
| River Mile 10 East | **PCBs** PeCDD | Dredge, cap |
| River Mile 11 East | **PCBs** PeCDD | Dredge, cap |

*Table 5. Key COCs and selected remedies in PHSS project areas.\* project areas do not include dioxin and furan congeners as key COCs. **Bold** COCs are LPR OU2 COCs.*

40. As can be seen from Table 5, seven of the 14 project areas have key COCs that do not include dioxin and furan congeners (River Mile 2 East, River Mile 3.5 East, Terminal 4, B1a [Linnton], Gasco/ Navigation Channel, US Moorings, Swan Island Basin). All seven of the project areas without dioxins and furans as a key COC include dredging as part of the remedy presented in the ESD and six of the seven include dredge and capping as part of the remedy. Thus, in the PHSS, dredging and capping is a remedy for OU2 COCs even when dioxins and furans are not driving the remedy design.

**ii.    Lower Duwamish Waterway Superfund Site includes six early action areas (EAAs), which were remediated using dredging and/or capping and five of these EAAs did not have 2,3,7,8-TCDD TEQs as a key COC**

41. The LDW and LPR OU2 are both located in a highly developed urban area with a remedy that includes dredging and/or capping. While 2,3,7,8-TCDD TEQ is a key COC in one EAA, it is not a key COC in the remaining five EAAs where other LPR OU2 ROD COCs are driving the remediation and the implemented remedy was dredging and/or capping.

42. The LDW is a five-mile segment of the Duwamish River located in Seattle, Washington. Industrial activities have occurred in and on upland areas adjacent to the LDW since the early

32

1900s, including operations related to aircraft and steel manufacturing, petroleum storage, cargo storage and transport, sawmill facilities, shipyards, and drum recycling.[27] In EPA's 2014 ROD, 28 contaminants (almost four times as many as LPR OU2) were identified as COCs within the waterway, including the following LPR OU2 COCs: PCBs; 2,3,7,8-TCDD TEQ; copper; lead; mercury; HMW PAHs; and LMW PAHs.[28] Similar to the LPR, PCBs exceed CLs throughout the LDW (Table 6) and typically exceed their CLs by one to two orders of magnitude. For the remaining contaminants that are both COCs in the LDW and LPR OU2, the median EF is higher in LPR OU2 than LDW with more widespread exceedances of the screening level (EFs greater than 1).

| COC | LDW EF | | | | LPR OU2 EF |
| | Minimum | Maximum | Mean | Median | Median |
|---|---|---|---|---|---|
| Copper | 0.0013 | 31 | 0.23 | **0.12** | 3.4 |
| Lead | 0.0022 | 51 | 0.24 | **0.062** | 2.5 |
| Mercury | 0.011 | 600 | 1 | **0.37** | 54 |
| Total HMW PAHs | 0.00021 | 100 | 0.25 | **0.088** | 0.34 |
| Total LMW PAHs | 0.00031 | 130 | 0.18 | **0.032** | 0.46 |
| Total PCBs | 0.0024 | 22000 | 15 | **0.79** | 28 |

*Table 6. Summary statistics of detected EFs in LDW compared to median EF in LPR. **Bold** results are the median LDW EF that are lower than the median for LPR OU2*

---

[27] EPA 2014, p. 18

[28] EPA 2014, pp. 90–91. The other COCs are arsenic; carcinogenic PAHs (cPAHs); cadmium; chromium; silver; zinc; 4-methylphenol; 2,4-dimethylphenol; benzoic acid; benzyl alcohol; pentachlorophenol; phenol; 15 individual PAHs; bis(2-ethylhexy)phthalate; butyl benzyl phthalate; dimethyl phthalate; 1,2-dichlorobenzene; 1,4-dichlorbenzene; 1,2,4-trichlorobenzene; dibenzofuran; hexachlorobenzene; and n-nitrosodiphenylamine.

33

ALCD-PUBCOM_0001088

43. The technologies chosen in the LDW ROD included dredging, capping, and dredge and capping.[29] As part of the remedial investigation, six EAAs within the waterway were identified and prioritized for cleanup starting in 1999 (Figure 13).[30] Several different COCs were responsible for driving remediation efforts within the EAAs and within the waterway overall. The remedies applied to each EAA included dredging or dredge and capping and five of the six areas did not include 2,3,7,8-TCDD TEQ as a key COC (Table 7).

---

[29] EPA 2014, p. 153

[30] EPA 2014, p. 21

ALCD-PUBCOM_0001089



*Figure 12. Location of EAAs within the LDW.*

35

ALCD-PUBCOM_0001090

| EAA | Key COCs[31] | Chosen Remedy[32] |
|-----|-------------|-------------------|
| Norfolk CSO | **Mercury**, BEHP, **PCBs**, 1,4-dichlorobenzene | Dredging |
| T117 | **PCBs**; cPAHs; 2,3,7,8-TCDD TEQ, arsenic; individual PAHs; dibenzofuran; phenol | Dredging |
| Jorgensen Forge | **PCBs**, cadmium, chromium, **lead, mercury**, nickel, silver, zinc, individual PAHs, BEHP, butylbenzylphthalate, dibenzofuran, **total LMW PAHs, total HMW PAHs** | Dredging (remediation not yet complete) |
| Boeing Plant 2 | **PCBs, lead**, indivual PAHs | Dredging |
| Slip 4 | **PCBs**, arsenic, cadmium, chromium, **copper, lead, mercury**, silver, zinc, individual PAHs, benzoic acid, benzyl alcohol, BEHP, butylbenzylphthalate, di-n-octyl phthalate, N-nitrosodiphenylamine, phenol, **total HMW PAHs** | Dredge and cap |
| Duwamish/ Diagonal CSO | **PCBs, mercury**, silver, zinc, chlorinated benzenes, BEHP, butylbenzylphthalate, **total HMW PAHs**, benzoic acid, tributyltin | Dredge and cap |

*Table 7: Key COCs and implemented remedies in the LDW EAAs.* **Bold** *Key COCs are COCs that are also LPR OU2 COCs.*

44. To date, five of the six EAAs in the LDW have been remediated and one has been partially remediated. For all six of these EAAs the chosen remedy includes dredging and for one of them the chosen remedy included dredging and capping. Only one of the EAAs had 2,3,7,8-TCDD TEQ as a key COC.

---

[31] King County 1996, p. 76; Port of Seattle 2016, p. 69; Anchor Environmental 2008, pp. 120–123; Ecology 2010, p. 23; Integral 2015, p. 69; EcoChem 2005, p. 7; EPA 2014, p. 21

[32] King County 1999, p. 6; Port of Seattle 2016, pp. 22–23; LDWG 2022, p. 7; Boeing 2018; EPA 2014, p. 21; EcoChem 2005, p. 14

ALCD-PUBCOM_0001091

iii.     **Gowanus Canal (OU1) Remedy consists of dredging all soft sediment and placing a**
         **cap even though 2,3,7,8-TCDD TEQ (and individual dioxins and furans) are not**
         **COCs.**

45. The Gowanus Canal and LPR OU2 are both situated in a highly developed urban area with a
    remedy that includes dredging and capping. In the Gowanus Canal, neither 2,3,7,8-TCDD
    TEQ nor individual dioxins and furans are key COCs, but the other LPR OU2 ROD COCs
    are key COCs.

46. The Gowanus Canal is a 1.8-mile-long canal located in Brooklyn, New York. Formerly a
    creek surrounded by tributaries and marshes, the canal was constructed in the 1800s to
    support industrial development in Brooklyn. Since its construction, the canal supported a
    coal-fired power plant; three manufactured gas plants (MGPs); paint, ink, cement and
    chemical manufacturing; multiple oil refineries; and other heavy industries.[33] In EPA's 2013
    ROD, 14 COCs were identified within the canal and assigned RGs, including PCBs, total
    HMW PAHs, arsenic, chromium, mercury, tetrachloroethylene (PCE), and dieldrin.[34] PAHs
    are the primary COC relating to three former MGPs (Fulton, Carrol Gardens, and
    Metropolitan),[35] which are contained in coal tar non-aqueous phase liquid (NAPL). Coal tar
    NAPL is present in accumulated and native sediment along most of the canal's length, but
    particularly in remediation target areas (RTAs) 1 and 2, where seep migration is occurring
    adjacent to the former MGP sites (Figure 13).[36]

---

[33] EPA 2013, pp. 10–12

[34] EPA 2013, Table 6

[35] EPA 2013, p. 13

[36] EPA 2013, pp. 30–31, 40, 89, and Figure 6

37



*Figure 13. Location of Gowanus Canal RTAs.*

47. The selected remedy for the Gowanus Canal is driven by the need to address NAPL and

includes dredging the entire column of "soft sediment," solidification and capping of native

sediment in targeted areas. In addition to dredging of the entire soft sediment column and cap

38

placement, native sediment will be stabilized in-place in NAPL-impacted areas (RTAs 1 and 2). [37] Thus, the prescribed remedy includes dredging and capping, driven by PAH and related coal tar NAPL contamination. Again this remedy was selected even though 2,3,7,8-TCDD TEQ (and individual dioxins and furans) was not a key COC for any of the RTAs.

iv.    **The Alcoa (Point Comfort)/Lavaca Bay remedy consists of dredging even though 2,3,7,8-TCDD TEQ (and individual dioxins and furans) are not COCs.**

48. Like LPR OU2, the Alcoa (Point Comfort)/Lavaca Bay Superfund Site has a remedy that includes dredging. Neither 2,3,7,8-TCDD TEQ nor individual dioxins and furans are key COCs for the Alcoa (Point Comfort)/Lavaca Bay Superfund Site, but the other LPR OU2 ROD COCs are key COCs.

49. The Alcoa (Point Comfort)/Lavaca Bay Superfund Site is in Texas and consists of the Alcoa Point Comfort Operations Plant, Dredge Island, and portions of Lavaca Bay, Cox Bay, Cox Cove, Cox Creek, Cox Lake, and western Matagorda Bay. Beginning in 1948, historical operations included an aluminum smelter plant, bauxite refining, a cryolite plant, a chlor-alkali production plant, and a coal tar processing plant. [38] 2,3,7,8-TCDD TEQ (and individual dioxins and furans) are not COCs at this site. Instead, the 2007 ROD identified mercury (methylmercury and inorganic mercury) and PAHs as COCs in Lavaca Bay sediments. [39]

50. The selected remedy for Lavaca Bay included dredging of mercury-contaminated sediments in Witco Marsh, the Witco Channel, and adjacent to the chlor-alkali plant area sediments. The dredging of mercury-contaminated sediments in the Witco area also addressed PAH

---

[37] EPA 2013, pp. 87–90 and Table 17

[38] EPA 2001, pp. 2, 15–16, 21

[39] EPA 2001, pp. 82–84, Table 7-1, Table 7-2, Table 7-5

39

contamination from a dense non-aqueous phase liquid (DNAPL) found in the Witco area.[40]
Thus, the prescribed dredging remedy was driven by mercury and PAH contamination.
2,3,7,8-TCDD TEQ (and individual dioxins and furans) was not a key COC for any of the
remediation areas.

## CONCLUSION

51. As demonstrated, even if 2,3,7,8-TCDD TEQ were not present in the sediment for LPR OU2,
the same area would still require remediation. At other CERCLA sediment sites
contaminated with the OU2 COCs, the remedial technology chosen and/or implemented is
the same as that for OU2, dredging and capping, even though 2,3,7,8-TCDD TEQ (and
individual dioxins and furans) are not COCs. This is true even when those other OU2 COCs
are present at EFs lower than those that exist in LPR OU2. It is common at CERCLA
sediment sites to perform dredging and/or capping as the remedial technology for the other
OU2 COCs regardless of whether 2,3,7,8-TCDD TEQ (and individual dioxins and furans)
are a COC.

52. It is therefore my opinion, to a reasonable degree of certainty, that the EFs of the other ROD
COCs in LPR OU2 would have required an identical or nearly identical dredging and
capping remedy even in the absence of 2,3,7,8-TCDD.

I declare under penalty of perjury that the foregoing is true and correct.
Executed on March 21, 2023

---

[40] EPA 2001, pp. 105–107; EPA 2007, p. 7

40

# REFERENCES

Anchor Environmental. 2008. Final Source Control Evaluation Report.

Boeing. 2018. Plant 2 Habitat Restoration and Sediment Cleanup, Lower Duwamish Waterway, Seattle Washington.

EcoChem. 2005. Duwamish/Diagonal CSO/SD Sediment Remediation Project Closure Report.

Ecology (Washington State Department of Ecology). 2010. Lower Duwamish Waterway RM 4.2 to 4.9 East (Boeing Developmental Center).

EPA (U.S. Environmental Protection Agency). 2001. Record of Decision Alcoa (Point Comfort)/Lavaca Bay Site.

EPA (U.S. Environmental Protection Agency). 2007. Explanation of Significant Differences Alcoa (Point Comfort)/Lavaca Bay Site.

EPA (U.S. Environmental Protection Agency). 2013. Record of Decision Gowanus Canal Superfund Site.

EPA (U.S. Environmental Protection Agency). 2014. Record of Decision Lower Duwamish Waterway Superfund Site.

EPA (U.S. Environmental Protection Agency). 2016. Record of Decision Lower 8.3 Miles of the Lower Passaic River Part of the Diamond Alkali Superfund Site.

EPA (U.S. Environmental Protection Agency). 2017. Record of Decision Portland Harbor Superfund Site.

EPA (U.S. Environmental Protection Agency). 2018. Proposed Explanation of Significant Differences Portland Harbor Superfund Site.

EPA (U.S. Environmental Protection Agency). 2022. Portland Harbor Superfund Site Updates.

Integral (Integral Consulting inc.). 2015. Lower Duwamish Waterway Slip 4 Early Action Area Long-Term Monitoring Data Report Year 3 (2015).

King County (King County Water Pollution Control Division). 1996. Norfolk CSO Sediment Cleanup Study Elliot Bay/Duwamish Restoration Program.

King County (King County Department of Natural Resources). 1999. Norfolk CSO Sediment Remediation Project, Closure Report, Elliot Bay/Duwamish Restoration Program.

LDWG (Lower Duwamish Waterway Group). 2022. Our Work – Lower Duwamish Waterway Group. (https://ldwg.org/our-work/#early-action)

Port of Seattle. 2016. Removal Action Construction Report, Phase 1: Sediment and Upland Cleanup.

41

## Attachment 1

**Resume of Philip Spadaro**



ALCD-PUBCOM_0001097

# Philip A. Spadaro, LG

Vice President and
Managing Director

Licensed Geologist, WA
Licensed Geologist, OR

**Expertise**
- Contaminated sediment investigation and remediation
- Environmental chemistry forensic analysis
- Technical support for allocation, litigation, and construction claims
- Source identification and control
- Environmental effects of dredging and capping
- Manufactured gas works investigation and remediation
- Confined disposal facility siting and design
- Design coordination and management
- Community outreach and communication
- Waterfront property redevelopment

**Summary**
Mr. Spadaro is a leading expert in urban and industrial waterfront redevelopment, sediment cleanup, and environmental effects of dredging. Technically based in environmental chemistry with strong proficiency in hydrogeology, geology, regulatory affairs, and remediation technology, Mr. Spadaro has over 36 years of experience applying his expertise and management skills to projects where sediment quality is a prominent issue. As a senior technical advisor, Mr. Spadaro provides technical support for investigation, cleanup, monitoring, litigation, allocation, construction claims, cost-recovery actions and other matters related to sediment remediation. In addition, Mr. Spadaro has extensive expertise in the siting, design, permitting, and construction of confined disposal facilities and in the fate and transport of contaminants in estuarine, riverine, and marine aquatic environments. He is an expert advisor to clients for international sediment management and remediation projects in Europe, the Middle East, and Asia.

Through years of work focused entirely on the remediation of contaminated sediment and land on the urban and industrial waterfront, Mr. Spadaro has developed expertise in application of the available technologies including dredging, capping, monitored natural attenuation, and source control. The successful execution of these highly complex sediment remediation projects demands meticulous planning, strong, scientifically sound technical approaches, and credibility with regulatory authorities. Mr. Spadaro's international reputation for designing and implementing inventive, appropriate, and cost-effective waterfront solutions is anchored in these qualities and in his commitment to seek out and respect the unique needs of every project, client, and cultural setting.

**Professional Experience**

**Project Coordination for the Swan Island Basin Operable Unit of the Portland Harbor Superfund Site (2020 – Ongoing)** PRP group for the Swan Island OU, Multnomah County, Oregon

Mr. Spadaro is serving as the Project Coordinator for this Operable Unit within the Portland Harbor Superfund Site. In this role, Mr. Spadaro coordinates the work of the supervising consultant design team to achieve the objectives of the Settlement Agreement with EPA.

**Determination if Natural Resource Damages and Evaluation of Possible Restoration (2020)** Confidential Client, Klaipeda, Lithuania

Mr. Spadaro was the commercial representative and client liaison for an investigation of possible natural resource damages due to wastewater discharge from an industrial facility. The discharge contributed increased concentrations of nutrients to the Coronian Lagoon. The evaluation included

# Philip A. Spadaro, LG

Vice President and
Managing Director

Licensed Geologist, WA
Licensed Geologist, OR

comparison of ten years of chemistry data for the facility treatment facility and the lagoon as well as evaluation of the treatment plant capabilities.

**Technical Consultant for Environmental Liability Assessment and Cost Allocation (2019–2020)**
Confidential Shipyard Site, Whatcom County, Washington

Mr. Spadaro is the project director and expert witness for a case involving technical expert support for environmental liability assessment and cost allocation for the remediation of contamination at a shipyard site under an Agreed Order with Washington State Department of Ecology (Ecology). TIG Environmental's client is corporate successor to a former owner and operator of a facility on the site. TIG Environmental is producing technical evaluations of historical and current operations on the site and developing forensic and statistical analyses to identify contaminants attributable to the different types of operations at the site. Based on the results of these technical evaluations and analyses, TIG Environmental is developing an allocation strategy and methodology to estimate potential allocable shares to each owner and operator associated with the Site. TIG Environmental is assisting client's counsel with developing early cash-out settlement strategies to negotiate with the party performing the remediation.

**Forensic Analysis for Environmental Liability Assessment (2019–2020)**
Confidential Client, Confidential Location

TIG Environmental is providing its expert technical consulting related to determining the origin of polychlorinated biphenyls (PCBs) detected in PCBs in cow's milk. TIG Environmental is performing a forensic evaluation to identify potential sources of PCBs in surrounding areas and the pathways for those discharges to expose the local cows to PCBs (soil, sediment, feed, grazing, drinking water, architectural coatings). To support this effort, TIG Environmental suggested sampling efforts and expert evaluation of the resulting data. In addition, TIG Environmental is developing graphics to visualize the data and memoranda to summarize the results of the forensic evaluation. Mr. Spadaro is the project director and client liaison for the case.

**Expert Consultation for Sediment Remediation Projects in Flanders (2016–2020)**
Flemish Government and AnteaGroup, Antwerp, Belgium

In Flanders, the management of contaminated upland sites and the management of water are the responsibility of two separate governmental authorities. Sediments are a shared responsibility. The Public Waste Agency of Flanders (OVAM) is responsible for upland cleanup and soil. Sediments fall under the Soil Decree. The Flanders Environment Agency (VMM) is responsible for water management. Sediments are considered part of the aquatic system. Historically, each agency has adopted a different approach to sediment pollution. Increasing demand for use of the historically industrialized waterfront throughout Flanders was looking for a more coordinated approach in which investigation of contaminated upland sites would involve a collateral evaluation of the likelihood of potential sediment contamination. The Flemish Government requested assistance in harmonizing the regulations and addressing several specific sites in Ghent and Antwerp.

2

# Philip A. Spadaro, LG

Vice President and
Managing Director

Licensed Geologist, WA
Licensed Geologist, OR

**South Park Marina Remedial Action (2017–Ongoing)**
South Park Marina Limited Partnership, Seattle, Washington

Mr. Spadaro is the project director for a team of scientists and engineers assisting the owner of a recreational marina site in the South Park neighborhood of Seattle, Washington. This site is the subject of remedial action under a Washington State Department of Ecology (Ecology) Administered Agreed Order. Soil and groundwater at the site are contaminated with polychlorinated biphenyls (PCBs), petroleum hydrocarbons, volatile organic compounds, pesticides, and metals requiring cleanup under the Washington State Model Toxics Control Act (MTCA). TIG Environmental's work includes investigating of historical sources of contamination both on-site and nearby off-site. As a result, TIG Environmental identified and nominated additional potentially liable persons (PLPs) for release(s) of hazardous materials affecting the site to Ecology. These PLPs are now involved as participants under the Agreed Order. TIG Environmental, on behalf of South Park Marina Limited Partnership, and the other PLPs are working in partnership to oversee the completion of the tasks required to be performed under the Agreed Order, including a remedial investigation (RI) work plan, RI field activities, a source control evaluation, and a RI Report. TIG Environmental completed several source control, RI, feasibility study (FS), and preliminary engineering design tasks supportive of efforts under the current Agreed Order and/or future formal program designations.

**Evaluation of Underwater Sound from Dredging Vessels (2015)**
Confidential Client, Confidential location

As a result of the growing interest in the possible impacts of underwater sound, a major dredging company commissioned a study of the sound produced by their vessels. The study includes measurements of underwater sound produced by a hydraulic cutter suction dredge, a backhoe excavator dredge, and a rock drilling vessel. Operation-dependent and distance-dependent measurements were made and cataloged for future reference.

**Technical Support of Cost Allocation (2014–Ongoing)**
Confidential Client, Seattle, Washington

TIG Environmental provides expert technical support to a private property owner participating in a Superfund site allocation. The Superfund sediment site consists of five miles of an urban and industrial estuarine waterway. Working with the property owner's attorney, TIG Environmental evaluated potential sources of polychlorinated biphenyl (PCB) contamination in sediments adjacent to the property and developed an allocation strategy based on forensic chemistry and sediment transport modeling.

Mr. Spadaro is retained to assist in the development of an allocation strategy in reference to the Lower Duwamish Waterway Superfund site. TIG was asked to evaluate the potential relationship, if any, between the marina, a small recreational boatyard, and sediment contamination that may have been caused by the discharge of hazardous substances, potentially resulting in the need for remedial action and associated response costs. TIG Environmental collected upland and in-water samples and evaluated PCB sources. Several major off-site sources were identified. Two additional potentially responsible parties (PRPs) were identified for the upland site contamination.

# Philip A. Spadaro, LG

Vice President and
Managing Director

Licensed Geologist, WA
Licensed Geologist, OR

**Design for Sediment Removal, Capping, and Natural Attenuation (2015–Ongoing)**
Yosemite Slough Cooperating Parties Group, San Francisco, California

TIG Environmental and a design team with engineers and scientists from multiple specialist firms are conducting pre-remedial design studies for a contaminated intertidal channel in a highly urbanized area within San Francisco Bay. EPA had originally proposed a time-critical removal action for removing more than 20,000 cubic yards of contaminated sediment, however TIG Environmental helped its client achieve agreement with EPA on the application of risk-based multi-technology approach, which will result in significant reduction in removal volume and cost.

Pre-remedial design studies include specialized evaluations of sedimentation rates, depth of the biologically active zone, bulk sediment and pore water chemistry, erosion and particle transport, and geotechnical parameters. Overall, the studies will support the design for dredging, capping, and monitored natural recovery of the contaminated sediments.

Mr. Spadaro is the director of the design team of engineers and scientists from multiple specialist firms. The design will include multiple proof-of-concept studies and the development of plans and specifications for construction.

**Technical Consultation and Allocation/Litigation Support (2012–Ongoing)**
Confidential Client, Seattle, Washington

TIG Environmental provides litigation support to a Washington State agency participating in a Superfund site allocation. The Superfund sediment site consists of five miles of urban and industrial estuarine waterway. The key issues revolve around potential stormwater loads from state-maintained roads, bridges, and properties. TIG Environmental prepared expert reports that evaluate whether there is a potential relationship between the Superfund site sediment contamination and the discharge of hazardous substances from the state-owned facilities, potentially resulting in the need for remedial action and associated response costs. TIG Environmental is developing an allocation strategy based on sampling and statistical analysis of stormwater, historical and scientific research, drainage pathway delineation, and sediment transport modeling. TIG Environmental also assists the state agency with the development of source control plans in accordance with Ecology's source control strategy.

The Superfund site is the subject of an ongoing cost allocation process. As part of this process, PRPs have agreed to supply an allocator with specific information on historical and current discharges. Mr. Spadaro leads a team of scientists developing such information for one of the participants. The work involves historical research, interviews, and development of a conceptual site model of the relationship between the facility and the river. Extensive sampling and research on historical sources of PCBs led to the conclusion that the area adjacent to the subject participant was not the principal source and that nearby industrial facilities were sources.

**Expert Consultation for Sediment and Uplands Cleanup Cost Allocation (2015–Ongoing)**
Confidential Client, Bellingham, Washington

TIG Environmental provides technical support to a former operator of a rock crushing facility that operated on uplands adjacent to an industrial waterway in Bellingham, Washington. The 51-acre site has been occupied by numerous industrial operations, including saw and lumber mills, fish processing,

ALCD-PUBCOM_0001101

# Philip A. Spadaro, LG

Vice President and
Managing Director

Licensed Geologist, WA
Licensed Geologist, OR

municipal landfilling, bulk fuel storage, coal storage and shipping, and boat maintenance. Sediments within the waterway and soil and groundwater within the uplands require cleanup under MTCA. The waterway and uplands are administered as separate cleanup sites by Ecology under Agreed Orders. Environmental testing confirmed elevated concentrations of mercury, nickel, phthalates, polycyclic aromatic hydrocarbons (PAHs), and dioxin/furans in sediment, and lead, arsenic, mercury, nickel, PAHs, and petroleum hydrocarbons in uplands soil. The client's former rock crushing operation is identified as the source of nickel. Improper screening levels for nickel were selected and interpreted as enforceable cleanup levels by Ecology during the remedial investigation and feasibility study (RI/FS) phase of both sites. TIG Environmental conducted several technical analyses to evaluate the role of nickel as a contaminant requiring cleanup in sediments and soil. As a result of TIG Environmental's work, Ecology recognized the improperly selected screening levels and requested that the performing party modify the nickel cleanup levels. Less stringent cleanup levels were developed for use during the cleanup action and used as the basis for allocating a lower percentage share of cleanup costs to the client.

Mr. Spadaro is providing technical support for the case regarding the sources of the subject contaminants, particularly nickel, and the lack of a causal effect in site bioassay tests.

### Remedial Design and construction, Deep excavation of PCB-contaminated Sediments (2014)
Jorgensen Forge Corporation and Boeing Airplane Company, Seattle, Washington

As part of the Record of Decision (ROD) at Lower Duwamish Waterway Superfund site, numerous Early Actions were proposed for implementation prior to the development of a larger, more comprehensive remedy. Groundwater, soil, and sediment issues were identified at the Jorgensen Forge industrial facility. TIG Environmental was hired to assist Jorgensen Forge in the design and implementation of a deep excavation to remove high concentrations of PCB contaminated sediments along the riverbank. TIG Environmental strategized, designed, and implemented a removal action, which included an internally braced sheetpile enclosure needed to excavate the deeply buried sediments and yet maintain stability of nearby slopes and structures. The work was accomplished under EPA oversight in a short time period. TIG Environmental played a critical role in negotiating with the agencies, procuring materials, and pre-qualifying construction contractors as well as monitoring the construction on behalf of the owner.Mr. Spadaro was project director for the design and construction.

### Expert Review of Remediation of Wood Waste in Sediment (2013)
Confidential Client/Location

Wood waste is an important issue at many sites. Aside from the potential for related chemical contamination, the physical effects on benthic community structure can be significant. Remediation is not straight forward since these sediments are difficult to dredge or cap due to their very low strength and high water content. This work entailed compiling approaches taken at various sites around the world and assessing capping and dredging at a site in a fjord setting.

ALCD-PUBCOM_0001102

# Philip A. Spadaro, LG

Vice President and
Managing Director

Licensed Geologist, WA
Licensed Geologist, OR

**Expert Review of Deep Water Dredging and Capping Technologies (2013)**
Confidential Client/Location

Mr. Spadaro assisted a team of experts in review of currently available and possible future technologies for dredging and capping in approximately 200 meters of water as part of the considerations surrounding the long-term management and eventual decommissioning of offshore oil production assets.

**Technical Consultation and Litigation Support (2013–2019)**
Confidential Client, California

TIG Environmental and a co-consultant provided technical support for investigative identification of PRPs associated with an intertidal channel with contaminated sediments. Historical research consisted of identification and review of property records and aerial photographs, and several other PRPs were identified and successfully brought into the case. In addition, TIG Environmental used multiple lines of technical evidence and analysis to underpin a successfully applied cost allocation concept.

Mr. Spadaro served as senior technical advisor in negotiations with EPA to improve removal action design and address community concerns regarding quality of life issues. He also provided technical support for allocation of cleanup costs to multiple parties.

**Technical Consultation and Allocation/Litigation Support (2009–Ongoing)**
Confidential Client, Multnomah County, Oregon

TIG Environmental provides technical expert support for environmental liability assessment and cost allocation for the remediation of sediments in the Portland Harbor Superfund Site, and for the associated Natural Resource Damages claims. The harbor has been the site of numerous industrial and manufacturing operations for more than a century, including shipbuilding, petroleum storage and distribution, metal salvaging, and electrical power generation. Technical support for this project includes research, sampling, and forensic analysis to determine the specific contaminants associated with activities or facilities. The project also includes evaluating potential historical contaminant sources, determining contaminant fate and transport, and chemical fingerprinting PAHs and PCBs.

Mr. Spadaro is currently providing expert analysis, advice, reporting, and testimony related to the site. He also supervises a large team of scientists and engineers developing the technical work needed to support the client's position in the case.

**Rehabilitation of Evaporation Ponds (2012)**
Haifa Chemicals Corporation, LTD, Haifa, Israel

Mr. Spadaro served as part of an expert team to evaluate alternatives for rehabilitation of four evaporation ponds associated with fertilizer manufacturing in the Negev Desert in southern Israel. The work involved on-site assessment of conditions, including specialized odor assessment followed by development of rehabilitation alternatives. The selected alternative included dredging of two ponds and capping of a third with the dredged material. Interactions with the Ministry of Environment were crucial in securing permission to accomplish the work.

# Philip A. Spadaro, LG

Vice President and
Managing Director

Licensed Geologist, WA
Licensed Geologist, OR

### Removal Action Studies, Design, and Construction Management, Passaic River Superfund Site (2008–2012)

Confidential Client, Passaic River, Newark, New Jersey

The Passaic River is one of the most highly contaminated urban and industrial waterways in the world. Mr. Spadaro has maintained a long-term strategic consulting role with one of the involved parties. He provided technical advice on and oversight of numerous technical studies and conceptual design efforts leading ultimately to a plan for sediment removal and off-site disposal. Work included evaluation of stormwater and combined sewer overflow inputs, review of EPA and consultant work products, and preparation of design documents for Phase I and Phase II non-time-critical removal actions of 200,000 cubic yards of highly contaminated sediment. Mr. Spadaro served as technical advisor for a multi-disciplinary team performing studies of sediment quality, dredging, sediment processing, transport and disposal, water quality, hydrodynamics, community health and safety, and confined disposal facility siting and design. He provided review and quality assurance for extensive design deliverable development as well as support and trouble-shooting during the construction phase.

### Strategic Consultation and Technical Support for Litigation, Passaic River Superfund Site (2008–2012)

Confidential Client, Passaic River, Newark, New Jersey

Multiple sources of contamination have contaminated the Passaic River, which passes through one of the most heavily industrialized regions in the world, over a period of approximately 200 years. Mr. Spadaro assisted one of the responsible parties in sediment characterization, source identification and sediment geochronology. Work included development of sampling designs for surface water, sediments, sewers and storm drains. In close coordination with the client's legal counsel, Mr. Spadaro developed white papers and technical reports to catalog sources and provide advice for allocation and cost recovery actions.

### Waterfront Facility Redevelopment Plan (2011–2012)

Southern Wood Piedmont Corporation, Wilmington, North Carolina

Southern Wood Piedmont, the former owner of a wood treatment facility on the Cape Fear River, hired Mr. Spadaro to assist them, their attorneys, and the North Carolina Port Authority (the current site owner) in the development of a comprehensive plan for reuse of the property. The work was performed based on remedial action plans developed by others and included evaluation of container, liquid bulk, and solid bulk facilities.

### Xiawangang Canal Remedial Action Conceptual Design (2011–2012)

OTEK Pty. Ltd. Of Australia and the Zhuzhou Municipal Economic Authority Zhuzhou City, Hunan Province, China

The redevelopment and public safety plans of the city included removal of heavy contaminated sediments from a 4-kilometer canal in an industrial zone. The work, which was conducted on a highly accelerated schedule, included site reconnaissance and preparation of a basis of design report and conceptual design for removal and treatment of 30,000 cubic meters of sediment. Mr. Spadaro

# Philip A. Spadaro, LG

Vice President and
Managing Director

Licensed Geologist, WA
Licensed Geologist, OR

supervised a team of engineers and scientists, working around the clock and in two languages, to produce the needed documentation for final designers and contractors locally.

**Department of Sediment Investigation and Remediation Guidance Documents (2011)**
Energy Institute, United Kingdom

The Energy Institute (a consortium of energy companies) retained Mr. Spadaro and others to develop guidance on the rapidly developing regulatory climate related to contaminated sediments in the European Union and the United Kingdom. Using existing knowledge, focused research, and interviews, the guidance was developed at a practical, working level for technical personnel within the member companies.

**Expert Report on Remediation and Cost Effectiveness (2010–2011)**
DLA Piper and BAE Systems, Inc., San Diego, California

The BAE Systems shipyard in San Diego, California was facing litigation related to proposed sediment remediation. Their attorneys retained Mr. Spadaro and other experts to prepare an expert report that evaluates the cost effectiveness of the proposed remedy relative to more extensive, but not necessarily more effective, proposals. The expert work included toxicological and economic evaluations (performed by others) as well as an overall synthesis that was presented to hearing examiners for the California Water Quality Control Board. The examiners found the work definitive and adopted the original remediation plan.

**Control of NAPL Seeps, Pine Street Canal Superfund Site (2006–2011)**
Green Mountain Power, Burlington, Vermont

An existing sand cap that was designed by others to physically isolate chemical contaminants from the overlying water failed, and nonaqueous-phase liquid (NAPL) was seeping through the cap and entering the water column. Mr. Spadaro was retained to evaluate NAPL controls to eliminate seepage into the canal and was readily and economically implemented as partial replacement for the existing sand cap. Serving as principal-in-charge for this evaluation, design, and construction effort, with responsibility for ensuring that activities were consistent with project goals and that technical work products met quality assurance standards. The work included field studies, bench and pilot tests, and, ultimately, design of a light-weight reactive core mattress cap using organoclay to sorb NAPL leaking through the original sand cap. The new cap was successfully installed in 2010 and 2011.

**Emergency Removal of Contaminated Sediments (2010)**
Confidential Client, Wiesbaden, Germany

An accidental release of a dense non-aqueous phase liquid heat transfer fluid required the removal of free product and contaminated sediments from the River Rhine. The work included expedited site testing and field design with contractor assistance for removal and processing of the sediments as well as treatment of dewatered fluids. Mr. Spadaro served as senior advisor for an international team of scientists, engineers, and contractors. The free product and involved sediments were effectively removed and deposited at an offsite disposal facility. Processing included in-barge dewatering with

ALCD-PUBCOM_0001105

# Philip A. Spadaro, LG

Vice President and
Managing Director

Licensed Geologist, WA
Licensed Geologist, OR

geotubes. Complicating factors included the presence of unexploded ordinance in the sediments and
sensitive nearby structures.

**Design of Engineered Containment Facility for Contaminated Sediments (2004–2011)**
Hamilton Port Authority, Hamilton, Ontario

The Hamilton Port Authority, Environment Canada, and the Ontario Ministry of the Environment began
constructing an engineered containment facility in the Randle Reef area of Hamilton Harbour, where
sediments are contaminated as the result of a coal-tar spill in the 1980s. Mr. Spadaro served as the
environmental studies task manager and overall technical advisor for this multidisciplinary project.
Critical factors for design included contaminant transport and fate, short-term and long-term water
quality, and effluent treatment. The basis of design report and final design are complete and have been
accepted by the multi-agency consortium sponsoring the project.

**Development of Conceptual Dredged Material Management Plan (2011)**
Louisiana Office of Coastal Protection and Research, Baton Rouge, Louisiana

The office of Coastal Protection has the responsibility for rehabilitating salt marshes along the coast of
Louisiana. Mr. Spadaro reviewed existing dredging and restoration activities with respect to cost and
technology. Using historical data and interviews with dredging contractors, he provided a
comprehensive evaluation of past practices and recommendations for future dredging and restoration.

**Peer Review of Proposed Remediation Plans (2009–2010)**
Haifa Chemicals Corporation, LTD, Haifa, Israel

The Kishon River Authority proposed a removal action based on historical effluent discharges. Mr.
Spadaro reviewed existing information and proposed alternative remediation plans. He also prepared a
critical review of site characterization and remedial action plans. Additional work included providing
strategic advice on sediment remediation plans and cost allocation.

**Sediment and Water Quality Data Review (2011)**
Confidential Client and Offshore Location, Southeast Asia

Mr. Spadaro was asked to review 10 years of sediment and water quality data related to offshore oil
and gas production to evaluate possible environmental impacts of production activity. He provided
recommendations for program improvement and additional field studies.

**Review of Corporate Contaminated Sediment Issues (2008)**
Akzo Nobel, Arnhem, the Netherlands

Mr. Spadaro provided training to high level corporate environmental staff in a two-day workshop
dealing exclusively with contaminated sediment management. He reviewed contaminated sediment
management policies and practices at numerous sites and provided suggestions for technical studies
and negotiation strategies to improve outcomes.

# Philip A. Spadaro, LG

Vice President and
Managing Director

Licensed Geologist, WA
Licensed Geologist, OR

**Peer Review of Confined Disposal Facility Design and Management (2009)**
U.S. Army Corps of Engineers, New Orleans, Louisiana

As part of restoration efforts following damage caused by Hurricane Katrina, Mr. Spadaro was retained by the U.S. Army Corps of Engineers (USACE) to evaluate the disposal of contaminated dredge material from the Industrial Harbor Navigation Canal in a nearby confined disposal facility (CDF). He served as overall technical advisor to the project team conducting peer review of CDF design, community safety, and long-term maintenance and monitoring. He also assisted USACE in addressing community concerns about short- and long-term risks of CDF operation as well as the potential for catastrophic failure.

**Evaluation of CDF Feasibility (2009–2010)**
Retia (Arkema), Portland, Oregon

Mr. Spadaro served as technical advisor to multi-disciplinary team performing engineering evaluation of the feasibility of a CDF for dichlorodiphenyltrichloroethane- (DDT-)contaminated sediments. Work included negotiation with EPA and conceptual design of sediment removal and a unique cellular cofferdam wall confined disposal facility.

**Sediment Removal Action Evaluation and Design (2007–2009)**
3M Corporation, East Cove, Cottage Grove, Minnesota

Mr. Spadaro provided strategic advice for negotiation of removal action with Minnesota Pollution Control Agency. He evaluated conceptual removal action design and provided technical oversight for a proposed design-build approach to remove sediments contaminated with fluorinated compounds in a cove adjacent to the Mississippi River.

**Sediment Removal Action (2008)**
3M Corporation, Sayreville, New Jersey

Mr. Spadaro assisted the client with review of proposed removal action at Horseshoe Road Superfund Site on Raritan River. He evaluated capping, removal, and natural recovery.

**Evaluation of Proposed Removal Action (2008)**
Ford Motor Company, River Raisin, Michigan

Mr. Spadaro evaluated the EPA-proposed removal action for contaminated sediments in this highly industrialized river drainage. He advised the client on removal action costs and benefits and evaluated the potential for additional PRP involvement. Mr. Spadaro performed limited sampling to refine agency proposed removal action design.

**Contaminated Sediment Management and Remedial Design (2005–2009)**
Sediment Investigation and Remediation Strategic Consulting,
Rada di Augusta, Priolo Site of National Interest
Confidential Client, Priolo, Sicily, Italy

Mr. Spadaro, defined an overall strategy regarding 9,000,000 cubic yards of contaminated sediments in Rada di Augusta, a 25-square-kilometer bay. The initial review of the Italian government's investigation

10

ALCD-PUBCOM_0001107

# Philip A. Spadaro, LG

Vice President and
Managing Director

Licensed Geologist, WA
Licensed Geologist, OR

results and cleanup plan revealed extensive enrichment in mercury from a local chloralkali plant and petroleum hydrocarbon contamination. The government's plan called for large-scale dredging and construction of a confined disposal facility. Since performing the initial data review, focused sampling has been conducted to evaluate conditions in the bay. An engineering evaluation was performed to assess remediation alternatives based on a multi-technology approach appropriate to this enormous and complex site.

### Contaminated Sediment Management and Remedial Design (2006–2007)
Confidential Client, Navassa, North Carolina

Prior investigation results indicated the presence of lead and other metals in the nearshore sediments adjacent to this former fertilizer plant on the Cape Fear River. Initially asked to review the existing engineering evaluation/cost analysis (EE/CA) as an expert on the remediation of contaminated sediments, Mr. Spadaro conducted pre-design sampling of sediment and wetlands soils needed to support the design of a remedy.

### Litigation Support for a Construction Claim (2006–2007)
Confidential PRP Group Client, Tacoma, Washington

Mr. Spadaro led a team that provided expert support regarding the validity of a contractor's claim that its own failure to perform construction on schedule resulted from a purportedly inadequate dredging design. He was responsible for supervising engineers who reviewed the design, plans, and specifications and assisting the client's attorneys in developing their litigation strategy.

### Litigation Support, Gashouse Cove Marina (2004–2006)
Pacific Gas and Electric Company (PG&E), San Francisco, California

Gashouse Cove Marina is located at the site of a former manufactured gas plant (MGP) once operated by PG&E. Sediments in the vicinity were contaminated with PAHs from multiple sources, including the MGP. Mr. Spadaro worked with PG&E's legal department to evaluate the City of San Francisco's proposed plan for redevelopment of the marina—the plan calls for dredging, which has the potential to expose contaminated sediments—and the City's claim against PG&E for partial cost of the redevelopment. In addition to litigation support, the team conducted source evaluation and engineering analysis to help ensure that PG&E's level of responsibility was accurately assessed.

### Due Diligence Investigation (2006–2007)
Port of Tacoma, Tacoma, Washington

Mr. Spadaro served as a consultant to the Port's environmental, real estate, and legal departments as they worked to evaluate the Port's responsibilities and liabilities should it have decided to purchase a large, contaminated property. The effort involved evaluating extensive environmental documentation from a 1970s-era cleanup, the site's 100-year industrial history, its multi-agency regulatory history, and large-scale soil, groundwater, and sediment contamination with chlorinated solvents and caustics.

### Litigation Support for Insurance Cost Recovery (2005)
Nadler Law Group and Confidential Puget Sound Port Authority

11

ALCD-PUBCOM_0001108

# Philip A. Spadaro, LG

Vice President and
Managing Director

Licensed Geologist, WA
Licensed Geologist, OR

Mr. Spadaro was retained to serve as an expert for a complex insurance cost recovery matter involving numerous waterfront properties. The key element of this case involved cost-recovery claims for construction of a confined disposal facility to contain contaminated sediments.

### Upland Source Control Investigation and Remediation (2004–2005)
Port of Portland, Portland, Oregon

Mr. Spadaro served as the principal in charge on this 5-year contract to evaluate and clean up multiple Port terminals and other properties along the Willamette River. The work involved review of historical and current site information and ongoing investigation consistent with agreements between the Port and the Oregon Department of Environmental Quality.

### EE/CA for Non-Time-Critical Removal Action (2003–2005)
Port of Portland, Portland, Oregon

Mr. Spadaro served as the project manager for a 3-year contract to provide technical assistance for the removal of contaminated sediments adjacent to Terminal 4 of the Port. Mr. Spadaro's responsibilities included managing characterization of contaminated Willamette River sediments, preparing an engineering evaluation/cost analysis (EE/CA) in accordance with the Administrative Order by Consent between the Port and EPA Region 10, and preparing associated work plans and technical reports. He coordinated with the Port to integrate data and decision making for Terminal 4 with work at the larger Portland Harbor Superfund Site and incorporated developing upland source control strategies now under development into removal alternatives for Terminal 4. The EE/CA was reviewed by the EPA and accepted without comment.

### Elliott Bay Water Quality Monitoring and Sediment Sampling (2003–2004)
US Army Corps of Engineers, Seattle, Washington

The Pacific Sound Resources Superfund Site, located on Elliott Bay, has long been a source of hazardous substances associated with former wood-treating operations. Cleanup actions included removing about 700 treated wood pilings, dredging 10,000 cubic yards of contaminated nearshore sediments, and placing a clean sediment cap over about 58 acres of contaminated sediments. Mr. Spadaro supported the construction effort by monitoring water quality during dredging and cap placement and by conducting verification sampling to confirm the integrity and thickness of the engineered cap. He served as the officer in charge for several work elements, including writing the sampling, monitoring, and quality assurance plans, mobilizing in the field to collect water quality and vibracore sediment samples, and coordinating laboratory analysis and data validation. Prior to cap placement, Mr. Spadaro also coordinated physical and chemical testing of the import material to ensure it was suitable for use.

### Sediment Sampling Program at Marine Transfer Stations (2003–2004)
New York City Department of Sanitation, New York Harbor, New York

Working on behalf of the prime contractor, Mr. Spadaro executed an initial sediment sampling program related to the conversion of eight former marine transfer stations operated in New York Harbor by the New York City Department of Sanitation. Conversion of the solid waste facilities involved demolishing

ALCD-PUBCOM_0001109

# Philip A. Spadaro, LG

Vice President and
Managing Director

Licensed Geologist, WA
Licensed Geologist, OR

several structures, removing old piles, repairing bulkheads, and dredging to increase navigational depths. Mr. Spadaro served as technical specialist for the sediment sampling program. This was designed to provide preliminary sediment and water quality data to aid in determining the engineering controls needed to limit contaminant releases to surface water during construction, and identify handling, transportation, and disposal options for the dredged sediment.

### Litigation Support for Insurance Cost Recovery (2002)
Short, Cressman, and Burgess and Confidential Puget Sound Port Authority, Washington

Mr. Spadaro was retained as an expert to review extensive documentation and current site conditions at multiple facilities owned by a mid-sized port authority. The sites included a shipyard, boatyard, landfill, and other types of active and unused facilities. Activities included extensive interaction with the port's attorneys, a review of reports, site visits and interviews, preparation of expert opinions, and depositions. The port prevailed in its complaint and received a settlement in keeping with its expectations.

### North Channel Confined Disposal Facility (2001–2002)
Port Authority of Venice, Venice, Italy

The Port of Venice was contemplating construction of a large confined disposal facility for containment of contaminated dredge materials. Mr. Spadaro was retained by the Port as a special consultant to address contaminant mobility issues associated with facility construction.

### Sediment Treatment Technology Evaluation (2001)
State of Washington

Mr. Spadaro served as project manager and senior scientist to evaluate several contaminated sediment treatment technologies for their effectiveness, ability to be implemented, and cost under three Washington State Department of Natural Resources-specified scenarios. Two were particular to Bellingham Bay, where a multiagency group is working to establish a model process for selecting disposal sites; the third was more widely applicable to contaminated sediments from throughout Puget Sound. Together, the three scenarios form a natural progression for the development of sediment treatment technology in the region.

### Removal Action at the Olympic View Resource Area (2001–2002)
City of Tacoma, Tacoma, Washington

The EPA approved a removal action at the Olympic View Resource Area (OVRA) to address approximately 2.2 acres of contaminated marine sediments within the 12.4-acre OVRA site. Mr. Spadaro helped design the removal action—including the development of design and construction documents, design methods, assumptions, and evaluations—and documented quality assurance methods in a construction quality assurance plan. In addition, he was involved in the performance of an engineering evaluation and cost analysis for the removal action that summarized investigation results and evaluated remedial alternatives in accordance with the National Contingency Plan. Following public comment and EPA review, a preferred remedial alternative was selected. The design team's analysis report presented design criteria and regulatory requirements for the preferred alternative,

13

ALCD-PUBCOM_0001110

# Philip A. Spadaro, LG

Vice President and
Managing Director

Licensed Geologist, WA
Licensed Geologist, OR

rationales for design decisions, and a detailed construction cost estimate. Mr. Spadaro served as senior technical review scientist for the project.

### Metal Bank Superfund Site Remediation (1998–2001)
PRP Group, Philadelphia, Pennsylvania

River sediments and upland areas were contaminated with polychlorinated biphenyls from the recycling of 1970s-era transformers and transformer oils at this former metals recycling facility located on the banks of the Delaware River; the design team was responsible for remediation of the river sediments. Mr. Spadaro provided senior technical review during development of the preliminary design submittal to EPA Region III.

### Design of Hylebos Waterway, Phase I Dredging, Slip 1 Disposal (1999–2002)
Port of Tacoma, Tacoma, Washington

Cleanup of the outer Hylebos Waterway was the third major cleanup in the Commencement Bay Nearshore Tideflats since the bay was declared a Superfund site. Mr Spadaro. served as project manager for all three design projects. In this cleanup, contaminated sediments at the mouth of the waterway were dredged and deposited in a confined disposal facility constructed in Slip 1 at the Blair Waterway. While serving as project manager, responsibilities included senior technical review and oversight of all project elements, including design of both the dredging plan and the containment facility.

### Hylebos Waterway, Area 5106 Dredging and Disposal Project (1999–2002)
Port of Tacoma, Tacoma, Washington

Mr. Spadaro provided the port with technical oversight as it developed plans for the dredging, treatment, and disposal of approximately 50,000 cubic yards of sediments heavily contaminated with volatile organic compounds. Plans called for hydraulic dredging followed by thermal treatment of the sediments at an upland treatment plant and disposal of the treated sediments in a confined disposal facility to be constructed in Slip 1 of the Blair Waterway. Mr. Spadaro was responsible for reviewing all technical documents on behalf of the Port, including studies of fate and transport and the engineering evaluation/cost analysis.

### Ross Island CAD Cells Assessment (1998–2000)
Port of Portland, Portland, Oregon

From 1992 to 1998, sediments dredged by the Port of Portland were disposed of under permit at five capped aquatic disposal (CAD) cells in Ross Island Lagoon (Willamette River), where sand and gravel mining was ongoing. In 1999, the port asked the design team to initiate a comprehensive site investigation to evaluate regulatory and environmental issues associated with use of the CAD cells, including such components as contaminant fate and transport, geotechnical stability, and ecological and human health risks. Mr. Spadaro served as program manager and provided senior technical review for the investigation, which incorporated extensive sampling of soil, sediments, and groundwater; a thorough review of the mining and disposal history, including a detailed permit review; biological surveys; risk assessments; and an analysis of lagoon bathymetry and groundwater flow and gradient. Evaluation of the investigation results will be used by the Oregon Department of

14

# Philip A. Spadaro, LG

Vice President and
Managing Director

Licensed Geologist, WA
Licensed Geologist, OR

Environmental Quality to determine whether this type of confined disposal will continue in Oregon. The investigation results demonstrated conclusively that capped aquatic disposal can be accomplished in an environmentally safe manner and that these CAD cells are functioning as intended to isolate Port dredged material from the environment.

### Thea Foss and Wheeler-Osgood Waterways Pre-Remedial Design (1994–2003)
City of Tacoma, Tacoma, Washington

Mr. Spadaro served as project manager for the sediment remedial design component of this large-scale waterway redevelopment. The 8,000-ft-long waterway receives considerable storm drainage and direct discharges from adjacent industries. The variety of inputs, including effects from operation of a former manufactured gas plant, had caused several inorganic and organic constituents of interest, such as oils, tars, polycyclic aromatic hydrocarbons, phthalates, and PCBs, to develop in the sediments. Technical elements of the remedial design included an evaluation of source control measures, a natural recovery analysis, an evaluation of potential disposal sites, a hydrographic survey, and the development of habitat mitigation plans. The remedial design included natural recovery in the mouth of the waterway, enhanced natural recovery in its middle section, and more active remediation at the head of the waterway. Several alternatives were considered for the active remediation, including capping the contaminated sediments in place or removing them to a confined aquatic, nearshore, or upland disposal site. The pre-remedial design process concluded in 2000, and the remediation plan received EPA approval. The remedy incorporated dredging approximately 700,000 cubic yards of sediments and capping 36 acres, including thin-layer and thick-layer caps, and an innovative hybrid sorbent cap that will combine the traditional function of isolation with a treatment component for oily seeps. In addition, Mr. Spadaro managed the design of a confined disposal facility in the adjacent St. Paul Waterway, where the dredged sediments will be placed. He also assisted the city in a related effort to proportionately allocate cleanup costs among numerous non-city potentially responsible parties and to recover the city's costs from its insurers.

### Contaminant Mobility Investigation and Dredging Feasibility Study (1998–2000)
Confidential Client, Massachusetts

Mr. Spadaro served as technical specialist for issues of contaminant mobility and remedial alternatives in the evaluation of an historical manufactured gas plant. The site is regulated under the Massachusetts state cleanup program. He assisted the owners and prime consultants in their assessment of oil-releasing sediments; key to investigation was an evaluation of nonaqueous phase transport from upland areas to sediments, from sediments to the water column, and through the water column offsite to nearby estuaries. He accomplished this analysis through evaluation of existing data, proposing additional data gathering to close gaps, and assisting in the development of a focused feasibility study for remedial action at site. Mr. Spadaro evaluated several technologies, including dredging to remove oil-containing sediments, capping, natural recovery, and controlling nonaqueous phases, both to determine the best available technical approach and to control potential costs. Ultimately, he provided the PRP client with the information necessary to negotiate a financial settlement, relieving it of future liability for the site.

### Grand Calumet River/Indiana Harbor Ship Canal Remedial Options Assessment (1997–1999)

ALCD-PUBCOM_0001112

# Philip A. Spadaro, LG

Vice President and
Managing Director

Licensed Geologist, WA
Licensed Geologist, OR

PRP Group, East Chicago/Gary/Hammond, Indiana

On behalf of the PRPs, Mr. Spadaro assessed remedial options for sediments in this system under a
Natural Resource Damage Assessment action brought by the Natural Resource Trustees, which
included the EPA, the U.S. Fish and Wildlife Service, and the Indiana Department of Natural
Resources. He acted as technical specialist for the evaluation of remedial alternatives, and assisted the
project team by identifying gaps in the existing data set; defining the need for further technical studies;
interpreting existing chemical and physical testing data; establishing the history of dredging and
sediment deposition in the waterways; and providing strategic guidance to the PRP group. On the
basis of this evaluation, the PRPs made a settlement offer to the regulatory agencies on the basis of
this evaluation.

### Island End River MGP Site Evaluation (1998–2001)
Eastern Enterprises, Weston, Massachusetts

Mr. Spadaro was retained by the PRPs to evaluate the feasibility of reconfiguring a CDF proposed to
contain sediments contaminated with PAHs at this Boston Harbor site of a former manufactured gas
plant. In addition, he assessed methods for managing sheen-producing sediments that will remain
outside the CDF's boundaries. He provided senior technical review for these evaluations, with
particular emphasis on oil seepage and innovative approaches to the management of oily sediments.

### Brooklyn Navy Yard Confined Disposal Area Feasibility Study (1998–2000)
Brooklyn Navy Yard Development Corporation, Brooklyn, New York

Faced with the necessity of dredging to accommodate ongoing vessel maintenance, Mr. Spadaro
evaluated the feasibility of constructing a bermed, nearshore CDF at the head of the Wallabout
Channel to contain up to 450,000 cubic yards of dredged material. In addition, the feasibility study
examined other disposal alternatives, such as constructing an upland CDF, using the dredged material
as landfill cover, or removing the material for offsite disposal under a mine reclamation program. In
support of the feasibility study and other efforts, he provided senior technical review, with particular
emphasis on the assessment of chemical fate and transport and contaminant mobility. Other elements
of the project included development of a conceptual design for the CDF and an evaluation of the
regulatory structure and key permitting requirements.

### Fox River Dredging (1998–2000)
Fort James Corporation, Green Bay, Wisconsin

As a result of historical discharges to the river system, bottom sediments in the lower Fox River are
impacted by PCBs. As one PRP, Fort James Corporation had a keen interest in the selection of
appropriate, technically sound, and cost-effective remediation and restoration actions. During early
planning for a possible remedial action, Mr. Spadaro assisted Fort James in assessing issues broadly
associated with its liability. After a demonstration dredging project undertaken by the state and the Fox
River Group, a PRP organization, failed to meet expectations and attain cleanup goals, Fort James
elected to independently redesign and complete the project as a full-scale removal. For that more
recent work, Mr. Spadaro managed technical oversight of the dredging design. Careful engineering of
the dredge prism was a key issue; because capacity at the disposal site was limited, cleanup goals had

ALCD-PUBCOM_0001113

# Philip A. Spadaro, LG

Vice President and
Managing Director

Licensed Geologist, WA
Licensed Geologist, OR

to be achieved while limiting the removal to 50,000 cubic yards. Following the removal action, verification sampling showed that the design team's engineering had successfully met both objectives, resolving Fort James' obligations at the site.

### Claremont Channel Deepening (1997–2002)
Hugo Neu Schnitzer East (HNSE), Jersey City, New Jersey

This project, a public-private partnership among the State of New Jersey, the City of Jersey City, HNSE (a major metal recycling firm), and Liberty National Development Corporation, incorporated several phases, all associated with improvements in the Claremont Channel. Key elements of the proposed effort included dredging 1.25 million cubic yards of contaminated sediments and beneficially using the dredged material to create five acres of intertidal habitat, as well as to cap two former upland industrial properties and grade a new golf course. Dredged material employed at the upland sites and in the golf course were amended with PROPAT®, a product manufactured by HNSE from auto shredder residue, a recycled material. Mr. Spadaro served as technical specialist regarding matters of dredging design, CDF design, bench-scale and pilot-scale mixing studies, permitting, and project funding, which will include state bond funds and funds designated for demonstrating the efficacy of new remediation technologies.

### Nearshore Confined Disposal Facility (1996–1999)
River Terminal Development Corporation, New Jersey

Mr. Spadaro served as technical specialist for permitting and conceptual design of the first nearshore confined disposal facility in the New York/New Jersey area proposed for construction specifically to contain contaminated sediments. In the early project stages, responsibilities included negotiating with the Corps of Engineers and regional regulators (including the New Jersey Department of Environmental Protection) to secure the necessary permits. He also led discussions with local environmental groups to develop support for the remediation of severely contaminated sediments, which would lead to some habitat destruction, as well as to redevelop an important waterfront facility. Participation included assessments of contaminant mobility and habitat mitigation requirements.

### Remedial Investigation and Feasibility Study (RI/FS) of Shipyard Sediment Operable Unit (1994–2000)
Lockheed Martin Corporation, Seattle, Washington

Mr. Spadaro served as project manager for work undertaken on behalf of a PRP. He reviewed the EPA's RI/FS study documents, developed supplemental remedial investigation strategies, and negotiated the statement of work and Administrative Order on Consent with the EPA. Technical aspects of the pre-remedial design studies included surface and subsurface sediment sampling, biological evaluations, and natural recovery analysis. Involvement continued through design analysis and development of a preliminary remedy design that included limited dredging and capping. The design team was successful in demonstrating to the EPA that large-scale active remediation was unnecessary, thus reducing the projected costs of remedial action by more than a factor of 10.

### Litigation Support for Blair, Sitcum, and Milwaukee Waterways Cost-Recovery Action (1995–1997)

17

ALCD-PUBCOM_0001114

# Philip A. Spadaro, LG

Vice President and
Managing Director

Licensed Geologist, WA
Licensed Geologist, OR

Attorneys for the Port of Tacoma, Tacoma, Washington

Mr. Spadaro supported litigation and cost-recovery actions through investigation of the origins of
sediment contamination in the waterways and adjacent upland properties and development of dredging
and sediment contamination chronologies. To this end, he implemented a methodology structured to
capture all available literature and documentation, including Port contract records, Corps of Engineers
files, previous investigations, aerial photographs, and personal interviews. The historical information
was then correlated with sediment contamination profiles to provide technical grounds for legal action
against insurers and other PRPs. The work culminated with testimony as an expert technical witness.

### Sitcum Waterway Remediation (1991–1995)
Port of Tacoma, Tacoma, Washington

Mr. Spadaro served as project manager for this complex, long-term remediation, the largest sediment
remediation ever undertaken by EPA mandate. One purpose of the project was to increase container
terminal space by filling approximately 70 percent of the Milwaukee Waterway with 1.6 million cubic
yards of fill sediments taken from the Blair Waterway (where redevelopment plans called for removing
sediments to expand Port facilities) and the Sitcum Waterway (where sediment removal was a
component of the Comprehensive Environmental Response, Compensation, and Liability Act
[CERCLA] cleanup). The project began with a conceptual design in the early 1980s and progressed to
encompass sediment quality testing, geotechnical engineering, hydrogeologic evaluations, and pre-
remedial design and remedial design phases. Conceptualized specialty services executed by the
design team included elutriate, leaching, and settling tests; natural recovery modeling; and dredge and
disposal water quality modeling. In addition, Mr. Spadaro managed environmental permitting issues
and ensured compliance with CERCLA and Clean Water Act mandates.

### Mercury Contamination Source Evaluation Middle Waterway (1990–1993)
Foss Maritime, Tacoma, Washington

Mr. Spadaro served as project manager for this investigation of the source of mercury contamination in
sediments. He conceptualized and oversaw focused sampling of seeps, upland soils, and sediments to
assess ongoing source control measures. This project required a comprehensive review of historical
sources of mercury deposits in the waterway, which in turn led to subsequent development of an
expanded PRP list. Components of the pre-remedial design included natural recovery modeling and an
assessment of the feasibility of various alternatives for confined disposal.

### Sediment Assessment of Blair Waterway, Slip 2 Nearshore Fill (1987–1990)
Port of Tacoma, Tacoma, Washington

This logistically complex project called for expanding the land area of Terminal 3 and constructing
Terminal 4 at the port by dredging adjacent offshore sediments and using the dredged material to fill
Slip 2. As project manager, Mr. Spadaro oversaw the collection of sediment samples using hollow-stem
augers, impact coring, and vibracoring through 40–60 ft of water and to 20–40 ft below the mud line. Th
team was able to significantly reduce the sampling and analysis requirements through negotiation with
regulatory agencies. In addition, and of considerable benefit to the client, initial assessment of

18

# Philip A. Spadaro, LG

Vice President and
Managing Director

Licensed Geologist, WA
Licensed Geologist, OR

sediment chemistry was so thorough that when the Port altered its original plan, it was not necessary to negotiate the chemistry requirements.

**Open-Water Sediment Disposal Permits for Multiple Waterfront Facilities in Puget Sound**
As project manager for Puget Sound Dredge Disposal Analysis (PSDDA) compliance, Mr. Spadaro negotiated with regulatory agencies to develop technically sound and cost-effective sampling plans, oversaw and managed sampling and chemical analyses, and provided senior review of technical studies. This effort successfully obtained PSDDA-related permits.

**Open-Water Disposal Permit for Sitcum Waterway Maintenance Dredging (1987–2000)**
Port of Tacoma, Tacoma, Washington

**Open-Water Disposal Permit for Everett Marina Project (1989)**
Port of Everett, Everett, Washington

**Open-Water Disposal Permit for Hylebos Facility Project (1990)**
Lone Star NW, Washington

**Open-Water Disposal Permit for West Blair Terminal Project (1995)**
Port of Tacoma, Tacoma, Washington

**Open-Water Disposal Permit for SeaLand Pier Extension Project (1989)**
Port of Tacoma, Tacoma, Washington

**Open-Water Disposal Permit for Pier 7D (1988)**
Port of Tacoma, Tacoma, Washington

**Open-Water Disposal Permit for Terminal 3 (1987)**
Port of Tacoma, Tacoma, Washington

**Queen City Farms Superfund Site Waste Pond Closure (1984–1987)**
Rabanco Disposal Company, Washington

Mr. Spadaro served as the owner's representative during construction and provided daily field reports and briefings. Activities at this major Superfund site included extensive geologic exploration and mapping in support of remedial design for closure of four industrial waste lagoons. Exploration techniques included hollow-stem auger, air rotary, and impact hammer drilling as well as test pits and trenching. Mapping of subsurface waste deposits and underlying glacially overridden advance, outwash, and till deposits was critical for successful design of waste excavation, groundwater interceptor trench, impermeable cap, and slurry cutoff wall.

**Academic Qualifications**

MS in Geochemistry, University of Chicago, 1983

BS in Chemistry, Cook College at Rutgers University, 1981

19

# Philip A. Spadaro, LG

Vice President and
Managing Director

Licensed Geologist, WA
Licensed Geologist, OR

| | |
|---|---|
| **Professional Affiliations** | • American Chemical Society |
| | • Central Dredging Association |
| | • Western Dredging Association |
| | • Society of Environmental Toxicology and Chemistry |
| | • Permanent International Association of Navigational Congresses |
| | • Society of Industrial Archeology |

**Publications and Presentations**

Spadaro, P. and L. Rosenthal. 2023. "Alternative Approaches for Funding Cleanup of Contaminated Sediments." Presentation, Battelle – Eleventh International Conference on Remediation and Management of Contaminated Sediments, Austin, TX, January 2023.

Spadaro, P. and L. Rosenthal. 2023. "Beneficial Use of Contaminated Sediments: Cities, Polluters, Ports, Developers, and 'Circularity' Economics." Presentation, Battelle – Eleventh International Conference on Remediation and Management of Contaminated Sediments, Austin, TX, January 2023.

Garbaciak, S., P. Spadaro, J. Hagen, T. Havranek, V. Magar, G. Horvitz, and A. Timmis. 2023. "Will Sediment Caps Last Forever? And How Should We Address the Possibility that They Don't?" Panel, Battelle – Eleventh International Conference on Remediation and Management of Contaminated Sediments, Austin, TX, January 2023.

Nadeau, S., P. Spadaro, E. Hedblom, C. Detering, D. Moore, E. Stern, and L. Rosenthal. 2023. "Beneficial Use of Contaminated Sediments: The Promise and the Challenge." Panel, Battelle – Eleventh International Conference on Remediation and Management of Contaminated Sediments, Austin, TX, January 2023.

Spadaro, P. and Rosenthal, L. 2021. "Cleanup of Rivers and Harbors: The Uncertain Promise of a Circular Economy." Presentation, Eleventh International SedNet Conference, Online. June 28–30, 2021.

Spadaro, P. and Rosenthal, L. "Funding the Cleanup of Rivers and Harbors: Cities, Polluters, Ports, Developers, and the Promise of Circular Economy." *Journal of Soil and Sediment*, special 20th anniversary edition, (2020) 20:4238–4247.

Spadaro, P. 2020. "From Record of Decision to Basis of Design – Dealing with the Details." Presentation, Environmental Law Education Center Seminar on Sediment Remediation Technologies – What is Effective, Portland, OR, January 29, 2020.

Spadaro, P. and L. Rosenthal. 2019. "Waterfront Contribution: A New Finance Paradigm for Cleanup of Contaminated Sediments." Technical paper and presentation – Twenty-Second World Dredging Congress (WODCON), Shanghai, China, April 22–26, 2019.

Spadaro, P. and T. van Hoestenberghe. "Use of a Fiber Optic Temperature Sensor System to Evaluate EMNR/MNR at a Sediment Remediation Site." Presentation, 15th International AquaConSoil Conference, Antwerp, Belgium, 20–24 May 2019.

20

ALCD-PUBCOM_0001117

# Philip A. Spadaro, LG

Vice President and
Managing Director

Licensed Geologist, WA
Licensed Geologist, OR

Spadaro, P. "Who should Pay for Sediment Cleanup." Presentation, 15th International AquaConSoil Conference, Antwerp, Belgium, 20–24 May 2019.

Glenn J., A Hackett, and P. Spadaro. "Best Practices and Lessons Learned for an Efficient and Equitable Allocation." Poster, Battelle – Tenth International Conference on Remediation and Management of Contaminated Sediments, New Orleans, LA, February 2019.

Spadaro. P and J. Winter-Stoltzman. "Use of a Fiber Optic Temperature Sensor System to Evaluate EMNR/MNR at a Sediment Remediation Site." Presentation, Battelle – Tenth International Conference on Remediation and Management of Contaminated Sediments, New Orleans, LA, February 2019.

Dittman, J. and P. Spadaro. 2017. "Who Should Pay for Sediment Cleanup?" Paper/presentation, Eighth International Smart Rivers Conference, Pittsburgh, Pennsylvania, September 18–21, 2017.

Spadaro, P., J. Gabster, S. Biondi, F. Sambo, and B. Kellems. 2017. "Stormwater Management at Facilities Draining to Sediment Superfund Sites." Paper/presentation, 16th Annual Stormwater Conference (StormCon), Bellevue, Washington, August 27–31, 2017.

Spadaro, P.A. 2017. "Who Should Pay for Sediment Cleanup?" 2017. Paper/presentation, Tenth International SedNet Conference, Genoa, Italy, June 14–17, 2017.

Vanacker, G., P. Spadaro, N. Van den Heuvel, and B. Caussyn. 2017. "Remediation of Urban Waterways in Flanders – The Bluegreen Network and Eeklo Example." Paper/presentation, Tenth International SedNet Conference, Genoa, Italy, June 14–17, 2017.

Dittman, J., M. Hayes, D. Profusek, B. Romagnoli, and P. Spadaro. 2017. "CERCLA Sediment Remediation – Managing Cost Risk and Uncertainty." Paper/presentation, Ninth International Conference on Remediation and Management of Contaminated Sediments, New Orleans, Louisiana, January 9–12, 2017.

Glenn, J., P. Spadaro, C. Moody, and R. Reed. 2017. "Who Owns the Riverbed?" Paper/Presentation, Ninth International Conference on Remediation and Management of Contaminated Sediments, New Orleans, Louisiana, January 9–12, 2017.

Sittoni, L., K. Cronin, B. van Maren, J. Rego, R. Schueder, P. Spadaro, J. Dittman, C. Moody, and D. Profusek. 2017. "A Robust and Effective Approach to Evaluate Impact of Stormwater Discharge to Sediment Concentration." Paper/Presentation, Ninth International Conference on Remediation and Management of Contaminated Sediments, New Orleans, Louisiana, January 9–12, 2017.

Spadaro, P., G. Vanacker, G. Kayens, W. De Cooman, J. Teuchies, K. Van Nieuwenhove, K. Lauryssen, and A. Boden. 2017. "Sediment Remediation in Flanders – A New Model for Intragovernmental Coordination." Poster/Presentation, Ninth International Conference on Remediation and Management of Contaminated Sediments, New Orleans, Louisiana, January 9–12, 2017.

Spadaro, P. "Case Studies in the Remediation and Restoration of Urban Waterways." Presentation, Winter meeting of IE-NET (Engineering network of Flanders and Brussels), Antwerp, Belgium, December 2016

ALCD-PUBCOM_0001118

# Philip A. Spadaro, LG

Vice President and
Managing Director

Licensed Geologist, WA
Licensed Geologist, OR

Spadaro, P. "Use of Environmental Forensics in the Evaluation of Sources of Contaminated Sediments in Urban Waterways." Presentation, Winter meeting of IE-NET (Engineering network of Flanders and Brussels), Antwerp, Belgium, December 2016

Dittman, J.A., Hayes, M.K., Profusek, D.M., Romagnoli, R., and Spadaro, P.A., "CERCLA Sediment Remediation – Analysis of Project Cost from Completed and Planned Projects." Presentation and Technical Paper, WODCON 2016, Miami, Florida, June 13–16, 2016.

Spadaro, P. 2015. "National Trends and Important Considerations in Sediment Cleanup." Keynote Address at the Oregon Environmental Cleanup Conference, Portland, Oregon, September 18, 2015.

Spadaro, P., J. Beaver, and C. Brown. 2015. "Commencement Bay Superfund Multiple CDFs: Designs and Long-Term Performance Evaluations." Presentation, Dredging 2015 Conference, Savannah, Georgia, October 19–22, 2015.

Romagnoli, B., P. Spadaro, C. Moody, P. Bluestein, and P. Brzozowski. 2015. "Dredging Operations and the Potential Impacts of Underwater Sound." Presentation, Dredging 2015 Conference, Savannah, Georgia, October 19–22, 2015.

Spadaro, P., M. Henley, J. O'Loughlin, and M.P. Slevin III. 2015. "The Role of the Municipality in Cleanup of Contaminated Sediments: Lessons from the Thea Foss Waterway in Tacoma, Washington." Presentation, Ninth International SedNet Conference, Kraków, Poland, September 23–26, 2015.

Spadaro, P., S. Bowerman, J. Dittman, D. Profusek, C. Moody, and K. Maitland. 2015. "Evaluation of the Effect of Bridge Coatings on Sediment Quality." Poster/Presentation, International Conference on Contaminated Sediments (ContaSed 2015), Ascona, Switzerland, March 8–13, 2015.

Bowerman, S., P. Spadaro, J. Dittman, D. Profusek, C. Moody, and K. Maitland. 2015. "Evaluation of the Effect of Bridge Coatings on Sediment Quality." Poster/Presentation, Eighth International Conference on Remediation and Management of Contaminated Sediments, New Orleans, Louisiana, January 12–15, 2015.

DeShields, B., M. Pattanayek, P. Spadaro, and N. van Aelstyn. 2015. "The Perfect Is the Enemy of the Good: A Rational Approach to PCB Cleanup Goals and Source Control for San Francisco Bay." Presentation, Eighth International Conference on Remediation and Management of Contaminated Sediments, New Orleans, Louisiana, January 12–15, 2015.

Spadaro, P., M. Henley, J. O'Loughlin, and M.P. Slevin III. 2015. "The Role of the Municipality in Cleanup of Contaminated Sediments: Lessons from the Thea Foss Waterway in Tacoma, Washington." Presentation, Eighth International Conference on Remediation and Management of Contaminated Sediments, New Orleans, Louisiana, January 12–15, 2015.

Dittman, J., C. Moody, P. Spadaro, and D. Profusek. 2015. "Methods for Evaluating the Impact of Urban Stormwater on Sediment Quality." Short Course Presented at the Eighth International

22

# Philip A. Spadaro, LG

Vice President and
Managing Director

Licensed Geologist, WA
Licensed Geologist, OR

Conference on Remediation and Management of Contaminated Sediments, New Orleans, Louisiana, January 12–15, 2015.

Romagnoli, B., Spadaro, P.A., Reed, R., Bowman, M., Kellems, B., Bluestein, P., Brzozowski, P., Orchard, B., McIntyre, K., 2013. "Construction of Phase I of the EPA Non-Time Critical Removal Action in the Lower Passaic River." WEDA Journal of Dredging Engineering, Vol. 13, No. 1, pp. 16–33.

Romagnoli, B., Spadaro, P.A., Bowman, M., Kellems, B., Bluestein, P., Brzozowski, P., Reed, R., Orchard, B., McIntyre, K., 2013. "Design of Phase I of the EPA Non-Time Critical Removal Action in the Lower Passaic." WEDA Journal of Dredging Engineering, Vol. 13, No. 1, pp. 1–15.

Kellems, B., Fabian, K., Orchard, B., Parmelee, R., Bonkoski, B., Spadaro, P.A., Beaver, J., Fitzgerald, W., Santiago, R., Rozenberg, W., 2013. "Randle Reef Sediment Remediation Project." Technical Paper/Presentation, Copri Ports 2013, Seattle, WA, August 2013.

Thomsen, F., Spadaro, P.A., Clarke, D., DeJong, C.A.F., DeWit, P., Borsani, F., Goethals, F., Holtkamp, M.J., van Raalte, G.H., San Martin, E., 2013. "WODA Technical Guidance on: Underwater Sound in Relation to Dredging." Technical Paper/Presentation, WODCON XX Global Dredging Conference, Brussels, Belgium, June 2013.

Baker, K., Spadaro, P.A., Hay, S., MacLeod, C., 2013. "Guidance on characterising, assessing and managing risks associated with potentially contaminated sediments." Publication, Energy Institute in cooperation with CONCAWE, London, England, May 2013.

Baker, K., Spadaro, P.A., Hay, S., MacLeod, C., 2012. "Guidance on characterising, assessing and managing risks associated with potentially contaminated sediments." Poster/Presentation, 2012 Sediment Management Seminar, Ft. Lauderdale, Florida, February 2012.

Orchard, B., Spadaro, P.A., Gabriel, J., Barry, J., Schifano, V., 2012. "Xiawangang Canal Sediment Remediation Project." Poster/Presentation, 2012 Sediment Management Seminar, Ft. Lauderdale, Florida, February 2012.

Spadaro, P.A., et al., 2011. "Underwater Sound in Relation to Dredging. Publication, Dredging and Port Construction." Position Paper, CEDA. Publication, Dredging and Port Design, London, United Kingdom, December 2011.

Spadaro, P.A. 2011. "Remediation of Contaminated Sediment: A Worldwide Status Survey of Regulation and Technology." Publication, Terra et Aqua. The Hague, Netherlands, June 2011.

Loveland, G., Kellems, B.L., Spadaro, P.A., Bowman, M., Taplin, S., Anson, R. 2011. "Rehabilitation an Existing Sand Cap – Construction Challenges." Abstract, 7th WEDA XXXI Technical Conference & TAMU 42 Dredging Seminar, Nashville, TN, June 2011.

Cohen, B., Collins, G., Excude, D., Garbaciak, S., Hassan, K., Lawton, D., Perk, L., Simoneaux, R., Spadaro, P.A., Newman, M., 2011. "Evaluating Alternatives to Improve Dredging Efficiency and Cost-Effectiveness for Inland Marsh Restoration Projects." Abstract, 7th WEDA XXXI Technical Conference & TAMU 42 Dredging Seminar, Nashville, TN, June 2011.

ALCD-PUBCOM_0001120

# Philip A. Spadaro, LG

Vice President and
Managing Director

Licensed Geologist, WA
Licensed Geologist, OR

Spadaro, P.A. 2011. "A Survey of the Current Approaches to Contaminated Sediment Remediation in Various Countries." Presentation, 7th International SedNet Event. Venice, Italy, April 2011.

Spadaro, P.A. 2011. "A Survey of the Current Approaches to Contaminated Sediment Remediation in Various Countries." Abstract, Battelle Conference. New Orleans, Louisiana, February 2011.

Spadaro, P.A. 2010. "A Survey of the Current Approaches to Contaminated Sediment Remediation in Various Countries." In proceedings of WODCON XIX. Beijing, China, September 2010.

PIANC Environmental Commission. 2009. "Dredging Management Practices for the Environment: A Structured Selection Approach." PIANC WG 100 (ex EnviCom 13. 2009). Member of the International Working Group 100.

Dunn, S.M., B.L. Kellems, and P.A. Spadaro. 2009. "Long-Term Recontamination Modeling at a Sediment Remediation Site." In Proceedings of the 5th International Conference on Remediation of Contaminated Sediments. Jacksonville, Florida, February 2–5, 2009.

Parmelee, R., B.L. Kellems, S.M. Dunn, P.A. Spadaro. 2009. "Evaluation of NAPL migration mechanisms at the Pine Street Canal Superfund Site." In Proceedings of the 5th International Conference on Remediation of Contaminated Sediments. Jacksonville, Florida, February 2–5, 2009.

Dunn, S.M., B.L. Kellems, and P.A. Spadaro. 2008. "Recontamination Analysis at a Sediment Remediation Site." In Proceedings of the Western Dredging Association, Twenty-Eighth Technical Conference and Thirty-ninth Texas A&M Dredging Seminar. June 8–11, 2008, St. Louis, Missouri.

Spadaro, P.A., et al. 2007. International group participant to review "Best Management Practices Applied to Dredging and Dredged Material Disposal Projects for Protection of the Environment." PIANC WG 13. 2007.

Spadaro, P.A. 2007. Sediment remediation technologies presented at the Environmental Law Education Conference, Washington Environmental Cleanup Conference, Seattle, Washington, June.

Spadaro, P.A., and C. Vogt. 2007. Innovation in Dredging through Collaboration – A Worldwide Connection, chaired the WEDA Environmental Commission Panel at WODCON XXVIII Global Dredging Congress, Lake Buena Vista, Florida. May/June.

Spadaro, P.A. 2006. Preparing infrastructure for cargo: Outside the gates. Panel participant, American Association of Port Authorities Conference on Harbors, Navigation, and Environment, Vancouver, British Columbia, June.

Spadaro, P.A. 2006. Program summary of Day 1 and introduction of Day 2, The Harbors and Sediments Conference of the International Society of Environmental Forensics, Honolulu, Hawaii, April.

Fabian, K., and P.A. Spadaro. 2006. "The role of confined disposal facilities in contaminated sediment remediation." Presentation. Third European Conference on Contaminated Sediments, Budapest, Hungary, March.

ALCD-PUBCOM_0001121

# Philip A. Spadaro, LG

Vice President and
Managing Director

Licensed Geologist, WA
Licensed Geologist, OR

Spadaro, P.A. 2006. "The construction phase of the project." Presentation. Environmental Law Education Center Advanced Sediment Conference, Seattle, Washington, September.

Spadaro, P.A. et al. 2003. "Hydrogeologic assessment of the north channel CDF, Porto Marghera, Venice, Italy." Proceedings, International Conference on Remediation of Contaminated Sediments, Venice, Italy, September.

Spadaro, P.A., and L. Rosenthal. 2003. "The concept of adversarial legalism as applied to waterfront cleanup." Proceedings, International Conference on Remediation of Contaminated Sediments, Venice, Italy, September.

Spadaro, P.A., and M.L. Henley. 2003. "Thea Foss Waterway remedial design - Observations for future projects." Poster presentation, International Conference on Remediation of Contaminated Sediments, Venice, Italy, September.

Spadaro, P.A. 2003. "Analysis of technical considerations for nearshore CDF design." Poster presentation, International Conference on Remediation of Contaminated Sediments, Venice, Italy, September.

Spadaro, P.A. 2003. "Capping of NAPL-containing sediments." Environmental Law Education Center Seminar on Contaminated Sediments, Portland, Oregon, September.

Mohan, R., and P.A. Spadaro. 2003. "State-of-the-art design for capping NAPL-containing sediments." Presentation, Western Dredging Association Twenty-Third Annual Meeting, Chicago, Illinois, June.

Mohan, R., P.A. Spadaro, and D. Ludwig. 2003. "Habitat design considerations for in situ caps." Presentation, Electric Power Research Institute workshop on in situ capping of contaminated sediments, Cincinnati, Ohio,

Spadaro, P.A. 2003. Guest instructor, environmental dredging short course, Texas A&M University, College Station, Texas, January.

Spadaro, P.A. 2002. Guest lecturer, theory of adversarial legalism relative to dredging and waterfront redevelopment projects, Goldman School of Public Policy, University of California Berkeley, Berkeley, California, November.

Kellems, B.L., and P.A. Spadaro, R. McGinnis, J. Morrice, and M. Lear. 2002. "Design of sorbent cap for control of seepage and sequestration of coal-tar NAPL and PAHs." Presentation, Third Specialty Conference on Dredging and Dredged Material Disposal, COPRI/ASCE, Orlando, Florida.

Moore, R.F., and P.A. Spadaro, and S. Degens. 2002. "Ross Island Lagoon - A case study for confined disposal of contaminated dredged material, Portland, Oregon." Presentation, Third Specialty Conference on Dredging and Dredged Material Disposal, COPRI/ASCE, Orlando, Florida.

ALCD-PUBCOM_0001122

# Philip A. Spadaro, LG

Vice President and
Managing Director

Licensed Geologist, WA
Licensed Geologist, OR

Graalum, S.J., P.A. Spadaro, and M.L. Henley. 2002. "Thea Foss Waterway remediation and St. Paul Waterway nearshore fill design." Presentation, Third Specialty Conference on Dredging and Dredged Material Disposal, COPRI/ASCE, Orlando, Florida.

Spadaro, P.A. 2001. "Sequential risk mitigation in contaminated sediment management at the Thea Foss Waterway Superfund site, Tacoma Washington, USA." Presentation, International Conference on Remediation of Contaminated Sediments, Venice, Italy.

Spadaro, P.A., R. Moore, and S. Degens. 2001. "Confined dredged material disposal investigation, Ross Island Lagoon, Portland, Oregon." Presentation, Twenty-First Western Dredging Association Annual Meeting and Conference and the Thirty-Third Texas A&M University Dredging Seminar, Houston, Texas.

Spadaro, P.A. 2000. "Evaluation of five capped aquatic disposal cells in Portland, Oregon." Presentation, Conference on Dredged Material Management: Options and Environmental Considerations, Massachusetts Institute of Technology, Cambridge, Massachusetts.

Graalum, S.J., P.A. Spadaro, and M.L. Henley. 2000. "Thea Foss Waterway remediation: Design status report." Presentation, Western Dredging Association XX and Texas A&M Thirty-Second Annual Dredging Seminar, Providence, Rhode Island.

Spadaro, P.A., S. Garbaciak, R.G. Fox, D.W. Matthews, and R.M. Weaver. 1999. Site characterization and remedial design issues for contaminated sediments associated with historical manufactured gas plants. Presentation, Characterization and Treatment of Sediments (CATS 4) Conference, Antwerp, Belgium.

Garbaciak, S., P.A. Spadaro, T.M. Thornburg, and R.G. Fox. 1997. "Sequential risk mitigation and the role of natural recovery in contaminated sediment projects (preprint)." International Conference on Contaminated Sediments, Rotterdam, The Netherlands.

Spadaro, P.A., M.L. Henley, and J.R. Verduin. 1997. "Interim status report: Thea Foss and Wheeler-Osgood Waterways cleanup." Presentation, Western Dredging Association, Eighteenth Annual Meeting.

Verduin, J.R., P.A. Spadaro, and T. Wang. 1996. "A general framework for consideration of a nearshore CDF: Contaminated sediment confinement and upland creation." Presentation, Western Dredging Association, Seventeenth Annual Meeting.

Templeton, D.W., and P.A. Spadaro. 1996. "The role of natural recovery in contaminated sediment." Presentation, Western Dredging Association, Seventeenth Annual Meeting.

Spadaro, P.A. 1995. "Sediment remediation: Puget Sound case studies." Presentation, Law Seminars International's West Coast Conference on Contaminated Sediments.

Spadaro, P.A., D.W. Templeton, G. L. Hartman, and T.S. Wang. 1993. "Predicting water quality during dredging and disposal of contaminated sediments from the Sitcum Waterway in Commencement Bay, Washington." Water Science Technology, Vol. 28, No. 8-9, pp. 237–254.

ALCD-PUBCOM_0001123

# Philip A. Spadaro, LG

Vice President and
Managing Director

Licensed Geologist, WA
Licensed Geologist, OR

Templeton, D.W., P.A. Spadaro, and R. Gilmur. 1993. "The role of natural recovery in sediment remediation projects." Proceedings, the International Conference on Contaminated Sediment Remediation, Milwaukee, Wisconsin.

27

ALCD-PUBCOM_0001124

# APPENDIX B.11
David Stradling Declaration

ALCD-PUBCOM_0001125

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| Plaintiff, | ) Civil Action No. 2:22-cv-7326 |
| | ) |
| v. | ) |
| | ) |
| ALDEN LEEDS, INC., *et al.* | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |

## DECLARATION OF DAVID STRADLING, PH.D.

ALCD-PUBCOM_0001126

Pursuant to 28 U.S.C. § 1746, I, Dr. David Stradling, declare the following:

1.      My name is David Stradling. I hold a Bachelor of Arts degree in Political Science from Colgate University, a Master of Arts in Teaching Degree in Teaching Social Studies from Colgate University, and a Ph.D. from the University of Wisconsin-Madison. I am the Zane L. Miller Professor of Urban History and the Director of Environmental Studies at the University of Cincinnati, where I teach a variety of courses on urban and environmental history. I am the author of several books, including *The Nature of New York: An Environmental History of the Empire State* (Cornell University Press, 2010), *Making Mountains: New York City and the Catskills* (University of Washington Press, 2007), *Smokestacks and Progressives: Environmentalists, Engineers and Air Quality in America, 1881-1951* (Johns Hopkins University Press, 1999), and, with Richard Stradling, *Where the River Burned: Carl Stokes and the Struggle to Save Cleveland* (Cornell University Press, 2015).

2.      I was retained by the law firm of Langsam Stevens Silver & Hollaender LLP on behalf of Occidental Chemical Corporation ("OxyChem") to evaluate certain aspects of the December 2020 Final Allocation Recommendation Report prepared by AlterEcho (the "Batson Report"). Specifically, I was asked to evaluate the Batson Report's consideration of the handling and disposal of hazardous substances, and its related consideration of "culpability," in the context of the historical record of industrial practices during periods of time when the sites at issue operated.

3.      As explained in more detail below, the Batson Report's inferences and conclusions regarding the handling and disposal of hazardous substances, and its consideration of "culpability" relating to those activities, appear to ignore the complicated history of toxic waste disposal and suggest a greater degree of certainty than extant documentation should allow.

2

ALCD-PUBCOM_0001127

4.     The information in this Declaration is based on my personal knowledge, which I obtained during my education, publication of scholarship, through my over twenty years of research and teaching at NJIT-Rutgers-Newark and the University of Cincinnati, and through my targeted review of the history of the Passaic River. During this period, I developed an in-depth understanding of the environmental history of the United States, which is the subject of this Declaration. The scope of the national hazardous waste problem, and absence of statutory regimes to target this very problem, together indicate the failure of hazardous waste disposal regimes in the 19th and 20th centuries. The short history contained in this Declaration describes the causes and extent of this failure.

5.     The creation of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA", also known as "Superfund"), arose out of a developing understanding by both scientists and the public of the environmental effects of hazardous waste. Before 1970, industrial practices reflected "little concern with long-term control and trusteeship" of hazardous wastes.[1] Or, as the famed sanitary engineer Abel Wolman wrote, the disposal of hazardous wastes before federal regulation in the 1970s was "haphazard, desultory, and . . . certainly not carefully reviewed, designed or operated."[2] Scholars Craig Colten and Peter Skinner found that into mid-1900s, while the quantity of waste grew exponentially and the types of wastes grew more dangerous, industrial waste disposal practices continued to maximize expedience while minimizing cost. Knowledge concerning waste toxicity accumulated slowly, and industry utilized this knowledge first and foremost to reduce risks at production facilities and to reduce short-term legal liability.

---

[1] Craig E. Colten and Peter N. Skinner, *The Road to Love Canal: Managing Industrial Waste Before EPA*, 46 (1996).

[2] Joel A. Tarr, *The Search for the Ultimate Sink: Urban Pollution in Historical Perspective*, 346 (1996).

3

ALCD-PUBCOM_0001128

6.    The history of industrial waste management is entangled with the handling of human waste. Both types of waste regularly found their way into waterways. For public officials and industrial employees charged with waste management, human health was always the primary concern. Through the early twentieth century, public health officials —those most directly connected to waste management —focused nearly exclusively on bacterial diseases spread by human waste. This was the case even before scientists had discovered bacteria and developed the germ theory of disease in the late 1800s. Public officials justifiably prioritized the protection of water supplies, the sources of which tended to move farther and farther from polluting cities and industries, while sewage treatment was slow to develop. By 1936, the state of New Jersey still had a million residents whose waste flowed into sewers and thence into waterways without treatment.[3] As an example, within the Newark Bay Estuary, many cities continued to discharge waste without treatment long after 1936: Jersey City in 1955[4], Bayonne in 1954[5], Elizabeth in 1957-1968[6], and the south side of Newark in 1965.[7] These cities are all referenced in the Newark Bay Study Area RIWP – Report on Investigation of Sources of Pollutants and Contaminants.[8]

7.    In production settings, early waste management focused on employee health. Industrial firms engaged in a risk management strategy that was designed to prevent nuisance complaints and the development of regulation. This approach targeted common concerns about

---

[3] Willem Rudolfs and L. R. Setter, *Industrial Wastes in New Jersey*. NEW JERSEY AGRICULTURAL EXPERIMENT STATION BULLETIN, 610, 3 (1936).

[4] 201 Wastewater Facilities Plan, Hudson County Utilities, Vol. 1 (1979).

[5] Judgment, *Interstate Sanitation Commission vs. City of Bayonne, et. al.*, Docket No. C 556-50, (Superior Ct., Chancery Div., Hudson Cty., N.J.)

[6] Letter from Director and Chief Engineer Thomas R. Glenn, Jr., to City Hall of Elizabeth, N.J. (April 19, 1965)

[7] Letter from The Singer Co. to Interstate Sanitation Comm. (July 30, 1965)

[8] Tierra Solutions, Inc., *Newark Bay Study Area RIWP – Report on Investigation of Sources of Pollutants and Contaminants* (2006).

4

visible, odiferous, and acute pollution problems, rather than chronic consequences of waste disposal.

8.      Developing effective sewage treatment would require billions of dollars in infrastructural investments —at least when it came to biological (human) waste – which slowed movement towards its development. Not until the mid-twentieth century did local governments take responsibility through the creation of sewer districts and municipal departments. As a result, until the environmental revolution of the late 20th century, hazardous waste management remained almost entirely the responsibility of industrial producers. In summary, "the net environmental impact of legislation and enforcement during the years leading up to 1960 were negligible."[9]

9.      A review of the history of industrial waste handling in the United States leads to three interrelated conclusions. First, regulation was very slow to develop, and not just at the federal level. Most state and municipal governments held on to common law conceptions of nuisance that required public complaint and an identifiable perpetrator, a philosophy that tended to normalize industrial pollution and categorized it as a necessary part of economic growth. Second, the public health officials who were responsible for water pollution management in the late 1800s and early 1900s were slow to recognize that the natural cleansing properties of waterways would be quickly overwhelmed by population and industrial growth. Even as specific locations experienced problematic pollution in formerly useful streams – sources of potable water and sites of recreation – studies tended to overestimate the ability of natural processes to mitigate pollution's negative consequences. Dilution, motion, and oxidation in natural streams can indeed reduce and eliminate threats from pollution, although not in intensely used waterways or in cases in which the pollutants are extremely toxic and chemically persistent. Third, when natural cleansing failed urban and

---

[9] Colten and Skinner, *supra* at 64, 94.

5

industrial waterways, the public and government typically recategorized these streams, stripping them of their identities as natural waterways. Rivers such as the Cuyahoga in Ohio, the Monongahela in Pennsylvania, and the Newtown Creek in New York became ecological sacrifice zones, where regulators averted their eyes from obvious pollution in deference to industrial growth. Instead, legislators' and regulators' attention focused on rural, recreational streams and on sources of urban water supplies, both of which could be more easily protected by preventing new sources of pollution.

### Nineteenth-Century Philosophies of Waste Management

10.    Through the Civil War Era, virtually all Americans believed rivers and streams were "legitimate depositories for wastes."[10] A Massachusetts Board of Health investigation of river pollution in 1873 concluded, "The temptation to cast into the moving water every form of portable refuse and filth, to be borne out of sight, is too great to be resisted."[11] Streams became waste disposal sites not just out of convenience or cost, but because of the belief that rivers could clean themselves. This was not an unreasonable expectation for the time. For most of history, humans had little reason to doubt the cleansing powers of nature, not just because streams conveniently took wastes out of sight, but because they converted them into useful materials once again. "Organic pollution, substances ranging from soaps and animal oils to waxes and resins, consists of carbon compounds that can be broken down by microorganisms present in river water." In other words, when combined with motion, settling, and dilution, aquatic microorganisms helped streams and rivers "purify themselves."[12] Since most wastes that entered waterways through the

---

[10] Theodore Steinberg, *Nature Incorporated: Industrialization and the Waters of New England,* 191 (1991).

[11] *Id.* at 205.

[12] *Id.* at 206.

6

nineteenth century were organic materials, conditions on the ground rarely challenged popular conceptions of nature's power to cleanse. However, this self-cleaning ability was not – and is not – limitless.

11.     Faith in nature's self-cleansing power did not preclude acts of pollution and harm, and in such cases the United States relied on English Common Law on nuisances. Nuisance law primarily operated retroactively and at the impetus of property owners who had been harmed by pollution. To be successful, nuisance complaints required acts that interfered with the enjoyment and possession of property caused "by things erected, made, or done, not on the soil possessed by the complainant but on neighboring soil."[13] To be effective in limiting harm created by pollution, nuisance law required courts amenable to providing relief to those suffering the ill effects and the ability of victims to identify the offending polluter. Courts "generally held polluters liable for damages caused by waste disposal in streams, if the damage was understood, but the legal system provided few substantive prohibitions against the act of polluting itself." Additionally, understanding the damage caused by a particular polluter was not always easy in urban industrial environments.[14]

12.     Into the twentieth-century, local public health officials, who were typically charged with abating pollution, took up the discharge of waste into public waters only if other property owners complained about harm. Relying on lay complaints about pollution to force abatement normalized and entrenched the idea that pollution was most problematic when it had an objectionable appearance or odor. This emphasis on visible or odorous pollution did not disappear

---

[13] *State, Dep't of Envtl. Prot. v. Ventron Corp.*, 94 N.J. 473, 489 (1983) (citing 2 F. Pollock and F. Maitland, *The History of English Law* 53 (1895); *see* W. Seavey, *Nuisance; Contributory Negligence and Other Mysteries*, 65 HARV.L.REV. 984 (1952); W. Prosser, Law of Torts § 571-74 (4th ed. 1971).

[14] *State v. Ventron.*, 94 N.J. 473 (1983); Martin V. Melosi, *Hazardous Wastes and Environmental Liability: An Historical Perspective*, 25 HOUS. L. REV. 741, 768. (1988).

ALCD-PUBCOM_0001132

as the miasmatic theory of disease faded, even though it was the idea that foul odors themselves could cause harm that had solidified this aspect of nuisance law. In short, nuisance law provided a means of providing relief for those harmed by pollution, but it typically functioned best in isolated and extreme cases – farmers whose livestock were harmed by a sudden discharge in a small stream, or fishermen who witnessed fish kills as a result of pollution. In urban situations, it was a very blunt legal tool.[15]

13.     Early local regulations, to the degree that they developed, tended to focus on chronically problematic nuisances, especially packinghouses and dairies, whose wastes created foul odors and sparked fears of disease. For example, in the mid-1880s, New York State responded to the destruction of oyster beds by outlawing the dumping of sludge acid and other oil refinery wastes in New York Harbor, but since the offending refineries were in New Jersey, where officials were disinclined to impose restrictions, the oyster beds received no relief. Instead, the oyster industry simply disappeared from the waters around Staten Island, entirely supplanted by the industrial complex of refineries and chemical manufacturers.[16]

### Industrialization and Urbanization

14.     In the late 1800s, industrial waste began to threaten water quality and challenge the public's virtually universal faith in a self-cleansing nature. Inorganic pollutants from industry, including acids and alkalis, could kill the bacteria that helped streams self-purify.[17] Scientists and physicians, within and outside of industry, understood that some industrial waste was hazardous. Manufacturers developed knowledge of their products and byproducts in part to develop safe

---

[15] Colten and Skinner, *supra* at 87-88.

[16] Andrew Hurley, *Creating Ecological Wastelands: Oil Pollution in New York City, 1870-1900*, 355-56. J. URB. HIST. (1994).

[17] Steinberg, *supra* at 206.

8

handling practices in their own facilities. Industrial disease caused by dangerous chemicals such as lead and mercury forced the development of best practices to limit workplace exposure, although these practices generally focused on limiting acute disease and ignored the potential hazards of chronic lower-level exposure. These best practices also did not always lead to precautionary handling of waste beyond production sites.[18]

15.    As early as the 1870s, studies of New England's waterways (the first in the nation to industrialize) revealed the growing consequences of industrial effluent. In 1876, a Massachusetts study of the Nashua found that at Fitchburg the river was "extensively polluted by the wash of nine paper mills, four woolen mills, two cotton mills, gas works, and other manufacturing establishments on or in the immediate vicinity of the stream." Residents knew not to bathe in the water, which had taken on a "dirty appearance," not the least because dyestuffs could tint the small river.[19] Even more problematic was the Merrimack River, into which the Nashua flows. Below Lawrence, a major textile manufacturing city, a study in 1874 found that the river's surface was "dotted over with bits of wool and cotton," "covered with a greasy film," and sometimes "thickly strewn with flocks of soap-suds."[20] However, that report, undertaken by the Massachusetts Board of Health, found that despite the obvious signs of pollution, the Merrimack was still clean enough for domestic purposes, revealing that the faith in nature's self-cleansing powers remained strong in the public health community. The report found that chemically the river was not so terribly changed by industrial wastes due to self-purification. Oxidation, deposition, and dilution kept the river clean. In the case of the Merrimack, the most important factor was

---

[18] Colten and Skinner, *supra* at 14. *See also* Christopher Sellers, *Hazards of the Job: From Industrial Disease to Environmental Health Science* (1999).

[19] Steinberg, *supra* at 210.

[20] Steinberg, *supra* at 213.

9

dilution, because although industry clustered around the falls of the river, the volume of water coming downstream still well outpaced the volumes of wastes cast into the river by the factories.[21]

16.    When combined with the growing problem of sewage disposal in the river, however, industrial pollution of New England's rivers continued to gain the attention of state health officials, particularly as they learned about Britain's efforts to control water pollution in its industrial cities. In 1878, the Massachusetts Board of Health concluded, "It would be unwise to place too great restrictions upon manufacturers by setting up, for all cases, some arbitrary standard of purity, which must be always followed, but which could not be enforced." Even as Massachusetts became the first state to regulate industrial wastes, enforcement remained nearly non-existent. Into the late 1800s most municipalities had no regulations regarding industrial waste and instead continued to rely on nuisance law.[22]

17.    In the late 1800s, even the most industrialized landscape in the United States still relied on streams as an effective and seemingly safe means of disposing of industrial waste. Except in instances where a particular industrial plant outgrew its waterway's ability to dilute pollution, confidence in the self-cleaning theory of nature persisted throughout the country. Wastewater professionals continued to focus on the treatment of human and biological waste rather than industrial waste. Indeed, sanitary engineers only considered industrial wastes problematic when they interfered with sewage treatment technology, reduced the natural cleansing powers of nature by consuming dissolved oxygen, or when they created foul odors or tastes in drinking water. Otherwise, industrial pollution garnered surprisingly little regulatory attention. Even in the early

---

[21] Steinberg, *supra* at 214-215.

[22] Steinberg, *supra* at 229; Tarr, *supra* at 343.

ALCD-PUBCOM_0001135

20th century, toxic wastes appeared less problematic to public health officials because they were germicidal.[23]

18.    A great shift in the philosophy of waste disposal in waterways resulted from growing concern about human waste, not industrial waste. Increased anxiety about the health consequences of using a single waterway as both the source of drinking water and a sink for human waste led to study after study around the country, and increasingly newspapers printed their own concerns. For instance, in 1890, a Lawrence, Massachusetts, newspaper noted, "Lowell is only nine miles above us, and all the sewage from her 80,000 people finds an outlet into the Merrimac." But sewage did not threaten alone. "In addition, too, the poisonous dyes and mill refuse also find an outlet in the river. This disease-laden water flows only nine miles, and then the people of Lawrence drink it." Note the importance of the distance described in the report. In conceptions at the time, nature needed space to do its work.[24]

19.    Research into the origins of deadly diseases, especially typhoid fever, confirmed the perception of sewage as the pollutant in most dire need of abatement. In 1893, William Sedgwick definitively connected a typhoid outbreak in the Merrimack Valley with microorganisms in the river. The typhoid outbreak was linked to bacteria that came from sewage outfalls. Sedgwick determined that this outbreak of typhoid fever in Lowell led to epidemics in Lawrence, downstream. Although an emphasis on disease continued to direct attention away from industry as the major concern in cleaning nineteenth-century streams, "[t]he idea that rivers purified themselves under any and all conditions. . .was now rejected."[25]

---

[23] Colten and Skinner, *supra* at 64-65; Tarr, *supra* at 344.

[24] Steinberg, *supra* at 234.

[25] Steinberg, *supra* at 239.

11

ALCD-PUBCOM_0001136

20.    The developing germ theory of disease encouraged cities to invest in new infrastructure, particularly to acquire untainted drinking water and, slowly until after World War II, to install treatment facilities for sewage before it entered streams. Investments in infrastructure designed to avoid and treat human waste led to significant public health advances, which in turn obscured the growing problem of industrial waste management.[26]

21.    Although industrial pollution generally garnered less concern from the public and public officials than did sewage, the most polluting industries tended to move outside city centers, forced out by nuisance laws, or voluntarily moving farther from residential neighborhoods to preserve control over waste disposal in the air, into waterways, and on land. The late 19th-century and early 20th-century suburbanization of industry, which typically clustered along waterways because of the need for transportation and water for industrial processes, led to the creation of ecological sacrifice zones – areas where industry could pollute with near impunity. Metropolitan New York developed large sacrifice zones around oil refining, first along the Newtown Creek, which separates Brooklyn from Queens, and then along Kill Van Kull and Arthur Kill, where, after 1907, Standard Oil built its massive Bayway refinery. Although residents complained about pollution from these industrial zones, especially about odors and the destruction of oyster beds fouled by oily wastes and sludge acid, pollution only intensified, especially during the rapid expansion around World War II.[27]

22.    Oversight of water pollution generally fell to public health officials, given the focus on the potential of polluted waters to cause disease. The germ theory of disease led the attention of public health officials toward human waste and away from industrial waste. Although more and

---

[26] Melosi, *supra* at 746.

[27] Hurley, *supra* at 354.

12

more studies linked industrial pollution to fish kills, dead shellfish reefs, and dying vegetation, public health officials failed to act against purely ecological damage, because "they did not consider aquatic life within their realm of responsibility." Even as some states did begin to take responsibility for regulating industrial pollution, enforcement was variable by design. For example, the State of Pennsylvania determined that some rivers should not be used for waste disposal – rural, recreational streams – while other streams were already beyond repair. In other words, Pennsylvania wrote the concept of ecological sacrifice zones into its water pollution abatement law.[28]

23.    Even as researchers turned their attention to limiting the impact of water pollution on human populations, the focus on industrial pollution was modest. In 1921, Earle Phelps summarized scientific developments combatting industrial pollution.[29] Phelps found progress in Britain, where pollution was intense, and where the Alkali Act of 1863 became the world's first effective anti-water pollution regulation. It worked so well, Phelps reported, because hydrochloric acid was a valuable by-product, and industries learned to collect and sell this waste rather than discard it into streams. Still, the Alkali Act stood out for its singular success. Phelps found nothing to report from continental Europe. Some important research had been conducted in New England, but altogether the treatment of industrial wastes had gained little concerted research and had sparked little effective regulation. Some research even affirmed the nineteenth-century philosophy empowering nature, including Ohio River studies that found that the river could be "rejuvenated by natural agencies to a condition approximating its initial condition of purity. This is noticeably

---

[28] Tarr, *supra* at 359-60.

[29] Earle B. Phelps, *Stream Pollution by Industrial Wastes and Its Control*, in *A Half Century of Public Health: Jubilee Historical Volume of the American Public Health Association*, 197, 201, 205, 206. (1921).

13

the case below Pittsburgh."[30] Such conclusions certainly slowed investments in abatement technologies and infrastructure.

24. Altogether, Phelps concluded that because of the importance of industry, people, especially policy makers and regulators, had a remarkably high tolerance for nuisances. "If there are no feasible methods for the prevention of a nuisance that nuisance will in general be tolerated," he wrote, "even though it be a serious one, instead of the industry being destroyed."[31] State regulators typically maintained a "policy of cooperation with industry." This policy persisted, even though one 1923 study found that nearly 250 municipal water supplies around the country had been affected by industrials wastes.[32] Federal policy related to water pollution barely existed until after World War II, with the first legislation passed in 1924 addressing only oil pollution emanating from ocean-going vessels.[33]

25. Beginning in the 1930s, the organic chemical industry expanded rapidly, catalyzed by World War II. This industry created "a new spectrum of wastes whose quantities, toxicity, and persistence took quantum leaps."[34] In the 1930s, chemical manufacturers tended not to invest in waste treatment facilities, although some techniques could be quite effective at reducing risks, including incineration. In 1936, a State of New Jersey survey of industrial wastes found that the chemical industry released over 6.8 million gallons of waste into waterways, the vast majority of which received no treatment.[35] Additionally, although the United States Public Health Service

---

[30] Phelps, *supra* at 205.

[31] Earle B. Phelps, *Stream Pollution by Industrial Wastes and Its Control,* in *A Half Century of Public Health: Jubilee Historical Volume of the American Public Health Association,* 197, 201, 205, 206. (1921).

[32] Melosi, *supra* at 754.

[33] Colten and Skinner, *supra* at 69, 78.

[34] Colten and Skinner, *supra* at 5.

[35] Rudolfs and Setter, *supra* at 14; Colten and Skinner, *supra* at 55.

14

worked with the Army Corps of Engineers to conduct the most comprehensive study of water pollution to date, their Ohio River Basin Study, published in 1944, concluded: "Industrial wastes, by their variety, effect damages to all water uses, but, in general, have a lesser effect on public health than have domestic wastes."[36]

26.    Knowledge development around hazardous waste occurred largely within industry and among public health officials. As early as 1941, one New England official warned of the potential of toxic contamination of water supplies due to "artificial" wastes. He believed that dilution was still effective, but he warned that sanitary engineers would need to be vigilant and prepared to take action to protect water supplies. Two years later, the United States Public Health Service warned that dumping toxic wastes into waterways could be hazardous to human health. The rapid expansion of industrial production for munitions strained rivers and streams - and the industrial employees charged with monitoring industrial health and safety. At the same time, the war emergency forced producers to almost singularly focus on output, and already slow and languorous investments in pollution control experienced "serious disruption" as a result of the war effort. This disruption persisted through the duration of the Cold War. As Cold War military production increased, companies with defense department contracts "gained confidence that their waste management practices would not be scrutinized."[37]

27.    After World War II, as industry shifted toward the production of commercial goods, researchers within industry, government, and academia continued to study toxicity with an emphasis on acute exposure. At the same time, knowledge regarding the persistence of chemicals in the environment and in animal and human bodies expanded. In 1955, an investigator at the

---

[36] Tarr, *supra* at 372.

[37] Colten and Skinner, *supra* at 21, 139, 141.

15

University of Cincinnati's Kettering Lab reported to the Tenth Industrial Waste Conference that toxic chemicals released into water could accumulate in animals which, if consumed, could potentially harm humans.[38]

28.    Manufacturers hoping to avoid legal exposure via nuisance law or the creation of tighter regulation reduced risk by keeping wastes on company property, disposing even liquid wastes into wells, pits, or holding ponds. A 1979 Congressional report found that more than 90 percent of chemical industry wastes produced since 1950 had been disposed of on the producer's property.[39]

29.    By the early 1950s, researchers had learned more about the movement of chemicals in soil and into groundwater and surface waters. In 1953, the United States Geological Survey warned industries that waste disposal in unlined pits would be insufficient for keeping chemicals from moving off site. While percolation of sewage through soil could dramatically reduce bacterial threats, such movement seemed not to reduce the threats posed by organic chemicals. In addition, both the inability of municipal sewage systems to handle large volumes from industry and concerns about the adverse effects of chemicals on sewage treatment meant that nationally only 3.5 percent of chemical wastes emptied into municipal treatment works in the late 1950s.

30.    In summary, by the early 1960s, scientists found that the natural processes relied upon to reduce the hazardous qualities of wastes were ineffective for some pollutants and that they needed to develop their own treatment and storage systems.[40]

---

[38] Colten and Skinner, *supra* at 22, 28.

[39] Colten and Skinner, *supra* at 50.

[40] Colten and Skinner, *supra* at 30-31, 41, 44, 61.

16

31.    Even as the economy grew and the volume of hazardous wastes expanded rapidly in the first three decades after World War II, state and federal governments largely relied on industry to self-regulate. As the Illinois Sanitary Water Board noted in a 1946 policy statement, "The industry is responsible for the solution of its problem." Meanwhile, in 1943 Division of Industrial Hygiene authorities, housed in the National Institute of Health, could only note, "the dumping of industrial wastes into our rivers and streams is an unjustifiable although time-honored practice which should be discontinued." Further, they noted, "[w]hile the dumping of obnoxious but nontoxic wastes may have to be condoned, the dumping of highly toxic matters may produce fatal consequences."[41] Industry was left to determine which wastes posed lethal threats and to determine how to mitigate those threats. Large corporations were typically reliant on plant managers to enact and enforce pollution control measures, which could be sacrificed "owing to cost considerations." A federal survey of chemical manufacturers in 1957 found that just over a third of facilities reported having some form of "industrial" treatment equipment.[42] Smaller facilities were much less likely to report their waste disposal practices and treat their wastes.[43]

## Pollution and the Passaic

32.    The history of the Passaic River follows national trends. "The Passaic River was one of the major centers of the American industrial revolution, starting two centuries ago. By the end of the 19th century, a multitude of industrial operations, such as manufactured gas plants, paper manufacturing and recycling facilities, petroleum refineries, pharmaceutical and chemical manufacturers, and others had sprung up along the river's banks as the cities of Newark and

---

[41] Colten and Skinner, *supra* at 81, 85-86.

[42] Colten and Skinner, *supra* at 90.

[43] Colten and Skinner, *supra* at 62, 90.

17

Paterson grew. These industries and municipalities often discharged wastewater directly to the river."[44] This history of pollution has left the Passaic River seriously environmentally degraded, with "high concentrations of dioxin, PCBs, heavy metals and pesticides."[45]

33.    At the outset, colonial settlement in the valley was sparse and largely agricultural, and through the first half of the nineteenth century, population and industry placed a light burden on the Passaic River. Agricultural runoff in the era before widespread commercial fertilizer use had little impact on water quality. As cities grew along the river, they naturally turned to the Passaic River for their water supplies, starting for Jersey City in 1854, Paterson in 1857, Newark in 1870, and Passaic in 1872.[46] Into the second half of the 19th century, most homes used septic systems rather than sewers, and "[b]efore it became hopelessly polluted, the Passaic River was a treasured recreational retreat for Newarkers."[47] Swimming, boating, and fishing were all popular in the lower Passaic through the Civil War Era. Boat clubs lined the slow-moving river between Paterson and Newark, and rowing was popular into the 1870s.[48] At the same time, residents began to notice significant changes in the river.

34.    In response to rapid growth, Newark and Jersey City created a Joint Commission on Water Supply, which in 1873 issued a report on the water quality of the Passaic. The report cited growing concern about the threat of sewage dumped into the Passaic, particularly by Paterson, which was also growing rapidly and whose sewage drained directly into the river.

---

[44] The Louis Berger Group, Focused Feasibility Study Report, p. 1-6 (2014).

[45] Press Release, Environmental Protection Agency. EPA Finalizes Passaic River Cleanup, One of the Largest Superfund Projects in EPA History Will Protect Peoples Health and the Environment. (March 4, 2016) https://www.epa.gov/archive/epa/newsreleases/epa-finalizes-passaic-river-cleanup-one-largest-superfund-projects-epa-history-will html.

[46] Norman F. Brydon, *The Passaic River: Past, Present, Future,* 271 (1974).

[47] Stuart Galishoff, *Safeguarding the Public Health: Newark, 1895-1918,* 54 (1975).

[48] Timothy Iannuzzi, et. al., *A Common Tragedy: History of an Urban River.* 33-44, (2002).

18

Officials and residents were concerned about disease – as tainted water had been connected to dysentery, cholera, and typhoid – as well as distaste and odor. Professor Henry Wurtz sampled Passaic water in the summer of 1873, which was an especially dry one, and noted that "the taste and smell of the water became quite offensive to many people." Still, he found that the natural cleansing properties of the river were keeping pace, perhaps because of the dense growth of water weeds downstream from Paterson. Wurtz was impressed with "the rapid agencies of self-purification" in the Passaic through oxidation and consumption by plants and fish. Wurtz understood that continued growth in the use of the river as a sewer would eventually end the viable use of the Passaic for water supply. He noted, the Passaic "receives a constantly increasing amount of drainage from towns, country, and factories, as well as much swamp-ooze." The list he created indicated the relative lack of concern about industry, which received no special attention in his report. It was the nitrogen from sewage that concerned Wurtz most. "At some time, as may be confidently predicted, both the plants and the fish will fail us."[49]

35.    The "Lower Passaic River has been used as a major means of conveyance for industrial and municipal discharges from the middle of the 19th century to the present," delivering a number of contaminants including 2,3,7,8-TCDD, PAHs, PCBs, DDT, mercury, lead, and others.[50] A period of rapid demographic and industrial growth began in the late 1800s. Population growth led to significant and noticeable increases in sewage run-off, as more and more pipes ran directly to the river. Small streams, tributaries to the Passaic, were buried to become combined sewers, accepting run-off from streets as well as sewage pipes from businesses and homes. Other changes altered the hydrology of the river. Dredging deepened channels to ease ship movements,

---

[49] *Reports to the Joint Commission on the Water Supply of the Cities of Newark and Jersey City,* 9, 29, 42-43 (1873).

[50] The Louis Berger Group, *Focused Feasibility Study Report,* Appendix D: Risk Assessment, p. 3-2.

19

changing tidal patterns and increasing the current. Property owners shored up embankments, removing natural vegetation and shallows along parts of the shoreline. Marshes along the river and in Newark Bay were drained to create usable land, further diminishing the natural cleansing properties of the river. At the same time, growing cities tapped into the headwaters of the Passaic for potable water, and the flow of the river declined significantly. By the early 1900s, one study found that the dry-weather flow of the river had declined from approximately 85 million gallons per day to just 35 million gallons per day. All these changes diminished ecosystem complexity, and the region saw dramatically declining fish and bird populations in the late 1800s. Pollution in the river became more and more noticeable over time.[51]

36.     In May 1887, the Jersey City *Eagle* published a scathing article under the headline "Pestilential! We Are Drinking Foul Sewage Water." The article described a report by Albert Leeds, Chemistry professor at Stevens Institute of Technology, who had studied the many sewage pipes leading to the Passaic River. That study, prompted by the *Eagle* itself and by a petition of leading citizens, described in great detail what cities and factories were emptying into the Passaic River. Leeds had confirmed what most residents already knew: the Passaic River was "wholly unfit for use."[52]

37.     Leeds' report followed the Passaic River downstream, describing the polluting pipes. This analysis began with the "gauntlet of the sewers at Paterson," a rapidly growing city of 70,000. In addition to the human waste, Leeds noted the city's many factories, "each of which pours out its own peculiar filth." These establishments mostly manufactured cotton, wool, jute, and silk, "every day pouring forth millions of gallons of brilliantly colored and poisonous dyestuffs

---

[51] Galishoff, *supra* at 55.

[52] Leeds, Albert R., *Shall We Continue to Use the Sewage Polluted Passaic or Shall We Get Pure Water*, 3-4 (1887).

ALCD-PUBCOM_0001145

into the river." Additionally, the city had plans to expand its sewer system, throwing human waste into the river which would have formerly accumulated in cesspools. Downstream, the Oil Storage Station in Passaic was a significant source of pollution, along with the paper factory in Bloomfield and Seabury & Johnson's Porous Plaster factory in Watsessing, "which emptie[d] its refuse chemicals" into the Second River, which in turn flowed into the Passaic. Wastes from the hat factories in Orange also flowed into the Second River, as did effluent from Hendrickson's Copper Rolling Mill and several other factories that discharged acid waste and arsenic. The largest contributor to pollution was the city of Newark, with 160,000 residents and sewers emptying into the Passaic River. Twice daily, the tides pushed these wastes upstream toward the water intakes for Jersey City and Newark.[53]

38.    The map included in Leeds' report is incorporated here by reference as Exhibit A.

39.    Despite the references to industry, Leeds emphasized that the major concern was clearly sewage (fecal matter and urine), which is what most public health officials tested for. To drive home the health threats posed by sewage, Leeds relayed a story from 1883, when a hard winter left the Passaic River frozen long enough to prevent oxidation of human wastes. "Much sickness prevailed at Passaic [River]," Leeds reported, "where the smell of sewage was readily recognizable in the drinking water, and the symptoms of this sickness were such that it was popularly known as the 'water cholera.'" Leeds estimated that half of the organic matter in the Jersey City water taken from the Passaic River in 1884 was sewage, and he concluded that drinking water from the Passaic River was dangerous to health and likely to cause death to consumers.[54]

---

[53] Leeds, *supra* at 10-13.

[54] Leeds, *supra* at 21-23.

21

40.    As was the case in many American cities, Newark and surrounding communities found it easier to build new water supply systems to deliver pure, rural waters, than to clean up urban waterways. In 1892, Newark's Pequannock system began delivering water to several communities in the lower Passaic Valley. Jersey City tapped the Rockaway River. Both cities relied on reservoirs and aqueducts to supply clean water, although Jersey City famously became the first city to use chlorine to kill bacteria in its water supply. In short, Jersey City and Newark had to seek water sources well beyond their borders to avoid the disease-ridden waters of the Passaic River.

41.    Meanwhile, the fouling of the Passaic River continued unabated. In the mid-1890s, New Jersey set up a three-person Passaic Valley Sewerage Commission ("PVSC"). The PVSC issued an extensive report in 1897 that concluded that while the Passaic River arrived in Paterson relatively clean, after the great falls, the "pollution is enormous, constant, and increasing yearly." The population along the lower Passaic River was nearly half a million and growing. Sewage-laden mud along the shores gave off foul odors in summer, and citizens expressed concern regarding decreased property values along the river due to the Passaic River's loss of recreational use. Residents kept windows closed overnight in the summer, despite the heat, to keep out the stench. The PVSC report emphasized the necessity of a trunk sewer to prevent the wastes from flowing into the Passaic, but decisions regarding what should happen to those wastes would be hotly debated for years, significantly delaying the building of the sewer. Should the trunk sewer empty into Newark Bay or carry on under Staten Island and empty into New York Harbor? Should

22

sewage from the Passaic Valley receive treatment – then exceedingly rare – before being dumped into any open waters?[55]

42.    Despite the uncertainties, the 1897 PVSC report made two things clear. First, the potential health consequences from sewage-laden waters were still the major concerns, as was emphasized in the bacteriologist's report by Richard N. Connolly examining bacteria levels. He concluded that the water was "as foul as it possibly can be." Second, because the health consequences of bacteria remained the primary concern, industrial wastes took a decidedly secondary consideration in the conversation about water pollution. Predictions about worsening conditions hinged entirely on population growth rather than the shifting nature of the economy, which was only increasing in industrial intensity, including the development of petroleum and chemical production in the region.[56]

43.    Yet another report on the Passaic River's pollution appeared in 1907. Written by the well-known engineer Allen Hazen and sponsored by the Joint Committee on Sewage Disposal City of Paterson, the report concluded that the Passaic River (no longer a source of drinking water) was not a public health threat, but it should be cleaned up because it was unpleasant. Once again, domestic sewage was the major focus. Hazen did note that altogether Paterson's mills discharged more wastewater than did the city's sewers. Still, he concluded, "[t]he discharges from the mills are not directly injurious to public health, and it is not fair to ask the manufacturers to incur expense on that ground." Instead, Hazen thought new laws would be required to force industry to treat their own wastes, or at least find some other outlet for their disposal. The laws would also have to determine who should pay. Hazen asked, "are the costs to be assessed upon the industries which

---

[55] Passaic Valley Sewerage Commission, *Report, February 1897* (Newark, N. J.: John E. Rowe & Son, Printers, 1897), 10-12; "Disposal of Industrial Wastes," *Paterson Morning Call*, November 16, 1931.

[56] Passaic Valley Sewerage Commission, *supra* at 82.

23

produce the wastes and which profit by their production?" Hazen noted this was "practically a new question in America," affirming that nineteenth-century laxity around the use of streams for waste disposal continued into the 20th century.[57]

44.    Population growth increased pressure on cities, especially Newark and Paterson, to find a solution to sewage. The Passaic River could no longer absorb the quantities of waste directly discharged into it. The natural cleansing powers were overrun. When it finally opened in 1924, the Passaic Valley Trunk Sewer drained about 80 square miles, encompassing the lower part of the Passaic watershed. The sewer served 22 municipalities, which altogether had a population of over a million residents just 8 years after the sewer opened. The trunk sewer was not a panacea, however; pipes that emptied into it were combined sewers, meaning that heavy rains quickly swamped capacity and raw sewage spilled into the Passaic River. Liquid waste from many industrial sites continued to flow directly into the Passaic River. In addition, engineers had underestimated the rapid expansion of industry in the late 1920s, which resulted in increased flows from Paterson's mills forcing the overflow of the trunk sewer into the Passaic River.[58]

### The Environmental Movement and Tightening Regulation

45.    The State of New Jersey's response to water pollution was largely structural: the State built sewers and sewage treatment plants and constructed reservoirs and aqueducts to deliver pure water from more pristine rural waterways. The State did attempt regulatory solutions. In 1899, the State passed An Act to Secure the Purity of the Public Supplies of Potable Waters in this State, which outlawed the discharge, whether directly into state waters of any "sewage, drainage, domestic or factory refuse, excremental or other polluting matter of any kind whatsoever which,

---

[57] Joint Committee on Sewage Disposal of the City of Paterson, *Report*, 69, 106. (1906)

[58] Galishoff, 63; "Disposal of Industrial Wastes," *Paterson Morning Call*, November 16, 1931; "Sewage Commission Criticized," *Paterson Morning Call*, August 6, 1937.

24

either by itself or in connection with other matter" capable of impairing municipal water supplies.[59] This law was designed to protect the expensive water supply systems, especially reservoirs, recently developed or in planning stages. The law had no salubrious effect on the lower Passaic River, which could no longer be considered a source of potable water.[60]

46.      In 1937 the State passed a broader provision that stipulated, "No person shall allow any dyestuff, coal tar, sawdust, tanbark, lime, refuse from gas houses, or other deleterious or poisonous substance to be turned into or allowed to run into any of the waters of this state in quantities destructive of life or disturbing the habits of the fish inhabiting the same." The new language for the first time recognized the consequences of pollution for non-humans and the growing importance of protecting outdoor recreation in a densely populated state.[61]

47.      Despite these legislative developments, industry continued to develop on the Passaic River nearly unabated. "[I]n those days, plants loved being near rivers, because that's the way to get rid of the waste. Sounds appalling today, but it was routine in those days, so that's the way the business was started there."[62] Through the mid-to-late 1900s, companies typically utilized and disposed of hazardous chemicals without much regard of their effects on the environment.[63]

---

[59] An Act to Secure the Purity of the Public Supplies of Potable Waters. Laws, Session of 1899, Chapter 41, pg. 73-76

[60] L.1899, c. 41, p. 73.; *see also* N.J.S.A. 23:5-28,

[61] *Id.*

[62] Paul B. Thomasset, Plant Engineer for Thomasset Colors from 1956-1976, discussing direct discharges of waste to the river in the 1950s from the Thomasset plant at 120 Lister Avenue, Newark, New Jersey (June 22, 2011 deposition of Paul B. Thomasset at 37:22-38:1, *In re: NPEC, Inc.*, civil action number 11-153, District of New Jersey

[63] "Q. The chemicals that you talked about working with when you were a chemical operator, methylene chloride, carbon tet, chloroform, Benzoic acid, methyl bromide, the chemicals that we've talked about so far this morning, back when you were starting to work with those chemicals in the late '50s, did you understand that those chemicals were toxic and harmful to the environment?

A. Well, to what degree, no, I didn't understand how bad, is that the right word, they were, but I knew that grass didn't grow where you dumped some of the stuff so that might have told you something. Fish died in the bay where

25

With industry developed along its banks for over a century, "...it was common practice to discharge wastewater into the [Passaic] river" until around the 1970s.[64]

48.    World War II brought intense production pressures and reduced regulatory expectations around the country and in North Jersey specifically. Rapidly increased demands for chemicals of all types, including leaded fuels and DDT, both of which were essential to the war effort, kept North Jersey facilities humming. Metals of all types were in great demand, and Crucible Steel's Ordinance Department at the Atha Works in Harrison dramatically increased production even before the war began. During the war, Atha Works produced alloy steel ingots and forged them into cannons, shells, and armor-piercing projectiles.[65] One public health official, Dwight F. Metzler, reported that "the government made major new product demands upon all industries, including the chemical industry, in support of the war effort." Given the pace of expanding production, he continued, "Liquid wastes were often disposed of directly into watercourses, and solids were settled out in ponds or stored or buried or dumped."[66] Reflecting back from the perspective of 1965, Frank Pecci of the Passaic Valley Water Commission lamented the State's long deference to growth and progress at the expense of the environment and human health. "During World War II – around 1942 – that's when the real problem started," he said,

---

things went out in the bay. Now that would, you know, make any normal individual suspicious that something is wrong, you know. Smell the smell of chlorine, they used chlorine, was objectionable. Now, that's not good for you, you knew that. Methyl bromide the same way. Bromine, they used to manufacture methyl bromide, had a pungent smell and this was toxic, very toxic. Toluene is a solvent that is, I've since learned, you know -- you learn more as you get older and you get more exposed to certain things that there was no need to know back in those days. I mean, you didn't have any booklet on unit site of the chemicals that were used and the right to know, there was no such thing," *Bernard Partington, Foreman for Vulcan Materials Company from 1958-1979, discussing chemical discharges to the river in the 1950s from the Vulcan Materials plant at 600 Doremus Avenue, Newark, New Jersey (June 16, 1999 deposition of Bernard Partington at 66:10-67:14, Safety-Kleen Envirosystems Company v. Continental Casualty Company., case number 985528, Superior Court of the State of California).*

[64] Alice Yeh, EPA Remedial Project Manager for lower 8.3 miles of the Passaic River (May 17, 2014 "Passaic River Superfund Site Public Meeting," Portuguese Sports Club, Newark, New Jersey).

[65] Dwight W. Kaufman, Crucible: The Story of a Steel Company 144, 163 (1986).

[66] Colten and Skinner, *supra* at 139-140.

26

"because no one stopped to think about pollution."[67] The Passaic River, long polluted by sewage, had become an industrial sacrifice zone.

49.    Workplace safety, typically more heavily regulated than emissions and disposal, also experienced diminished State oversight during the war, and the problems persisted long after. In 1969, Anthony Mazzocchi of the Oil, Chemical and Atomic Workers International Union (OCAW) observed that the "New Jersey safety program is an atrocity." Mazzocchi was particularly concerned with lead, a well-known toxicant. Workers exposed to lead complained about the lack of "response from the New Jersey State Health officials." Sloppy workplace handling of lead did not necessarily result in State documentation or remediation.[68]

50.    After World War II, industry shifted to the production of consumer goods, but the use of dangerous chemicals only increased. DDT and related chemicals had proved their usefulness in killing mosquitos and controlling the spread of disease during the war, and now state and county governments would join the federal government in spraying the chemicals wherever insects threatened crops or mosquitos threatened the enjoyment of the outdoors. DDT appeared in consumer products, making its way into kitchens, garages, and yards around the country. DDT production peaked in the late 1950s at 180 million pounds a year, much of which was destined to be broadcast into the environment, sometimes even from airplanes.[69]

51.    Despite the fact that it was a commonly known toxicant, consumption of lead in consumer goods increased in the postwar decades. Leaded gasoline use expanded dramatically, peaking in 1970, and combined with the continued use the use of leaded paint, this would mean

---

[67] "Passaic River is Mess of Pollution," *The Record* (Hackensack), May 18, 1965.

[68] Gerald Markowitz and David Rosner, *Deceit and Denial: The Deadly Politics of Industrial Pollution* 160. (2002).

[69] Thomas R. Dunlap, ed., *DDT, Silent Spring, and the Rise of Environmentalism.* 5 (2008).

27

that the entire United States "was lead poisoned ."[70] These chemicals, combined with others, such as PCBs and mercury, continued to find their way into urban environments. Robert Kehoe, the famed expert on lead poisoning, summarized in 1958, "The industrial environment has become, to a remarkable extent, the national environment."[71] This was particularly evident in densely populated and intensely industrial places such as northern New Jersey.

52.    In 1968, New Jersey amended its water pollution legislation to add clarity and more fully reflect growing environmental concerns in the 1960s, which moved beyond just protecting the health and property of human beings to include the welfare of other species. The revised statute read: "No person shall put or place into, turn into, drain into, or place where it can find its way into any of the fresh or tidal waters within the jurisdiction of this State any deleterious, destructive or poisonous substances of any kind ... In case of pollution of said waters by substances known to be injurious to fish, birds or mammals, it shall not be necessary to show that the substances have actually caused the death of any of these organisms." Three years later, the Water Quality Improvement Act of 1971 added even more specificity, listing petroleum products, debris, and "hazardous substances" to the list of materials that could not be allowed to drain into state waters. Hazardous substances were further defined as "elements and compounds which, when discharged in any quantity into, upon, or in any manner which allows flow and runoff into the waters of this State or adjoining shorelines, presents a serious danger to the public health or welfare, including but not limited to, damage to the environment, fish, shellfish wildlife, vegetation, shorelines, stream banks, and beaches." The Water Quality Improvement Act also required polluters to pay

---

[70]    Abadin    H,    Ashizawa    A,    Stevens    YW,    et    al.,    "Toxicological    Profile    for    Lead,"
https://www.ncbi.nlm.nih.gov/books/NBK158770/; Christian Warren, *Brush with Death: A Social History of Lead Poisoning*, 1 (2000).

[71] Sellers, *supra* at 224.

28

for cleanup. In sum, the Water Quality Improvement Act was a response to growing knowledge about the quantities of harmful substances – some of them extremely toxic to both human and non-human life – then being disposed of in waterways.[72]

53.    After incremental movement toward accepting responsibility for water quality in navigable waterways, over which the federal government had always asserted authority, Congress finally passed effective legislation with the Clean Water Act Amendments of 1972, typically referred to at the Clean Water Act. By the time of its passage, all large rivers in the United States had been terribly polluted, with the famously flammable Cuyahoga River providing only the most startling example.[73]

### Application of Historical Record to the Batson Allocation

54.    The lack of adequate State and municipal documentation, as well as a lack of records from private parties, regarding the types and quantities of pollutants entering the Passaic River and its tributaries before 1970 makes an accurate allocation of culpability across various industries nearly impossible. The Batson Report attempts to assign responsibility based on limited documentation, in many cases supplied by facilities that were not required to keep complete records of spills or regular waste disposal practices. The Batson Report admits "the lack of and variability of available data on facility operations and site conditions which required a significant level of allocation data to be inferred through reference to other data sources as detailed in the Allocation Protocol." In short, allocation figures are based on differential accountings of Chemicals of Concern ("COC"), undoubtedly exacerbated by the length of time many facilities operated, particularly in the decades before the development of the regulatory regime of the 1970s.

---

[72] *State, Dept. of Environmental Protection v. Ventron Corp.,* 94 N.J. 473, 496 (1983).

[73] David Stradling and Richard Stradling, *Where the River Burned: Carl Stokes and the Struggle to Save Cleveland* (2015).

ALCD-PUBCOM_0001154

The number of parties for which the Batson Report finds "no evidence" of culpability (37), demonstrates the problem of applying complicated mathematical formulas to incomplete data sets.[74]

55.    A chart demonstrating the length of time for operations for various sites on the Passaic is incorporated here by reference as Exhibit B. That Batson lacks party-specific documentary evidence of environmental practices and disposals during earlier periods does not establish there were *no* disposals or hazardous substances by these parties in prior periods. The absence of evidence is not evidence of absence, particularly given the well-documented history of typical industrial behavior and evidence of the condition of the river and its use to dispose of industrial wastes during these earlier periods.

56.    This problem is further demonstrated by the Batson Report's attempt to quantify the "culpability" of all parties in the absence of consistent or full information. With minimal explanation, the Batson Report assigns "100%" culpability to OxyChem, and assigns either 0%, 5%, or 10% to each of the other parties being evaluated. Based on the historical record and the information presented in the Batson Report, including the admitted lack of documentation regarding many sites the determination about "culpable" practices at the Lister Plant relative to dozens of nearby industrial operations conducted during the same timeframe and earlier timeframes asserts a certainty that cannot be supported by the historical record. As noted above, it is an error to assume that a lack of documentation equals a lack of culpability, given the industries and time periods at issue.

---

[74] 609904, Final Allocation Recommendation Report For OU2 Lower Passaic River Study Area For The Diamond Alkali Company Site, 35.

ALCD-PUBCOM_0001155

57.     Allocation of culpability is further complicated by the very definition of culpability. The Batson Report notes "culpable conduct is described in the Allocation Protocol as referring to the release or discharge of COCs in contravention of prevailing industrial standards and practices, either (1) knowingly and with intent to skirt environmental regulatory obligations, and/or (2) with conscious awareness that the release or discharge of COCs were illegal or posed substantial risk to human health or the environment."[75] The reference to undefined "prevailing" standards is problematic. Undoubtedly industries handling materials such as lead, mercury, and other COCs were "consciously aware" of the risks to human health, given that industrial hygiene practices strove to minimize workplace exposure, for which they were responsible. But the historical evidence shows many industries continued to dispose of these chemicals in the environment, anyway. Through most of the twentieth century, few managers of industrial facilities would assume that the absence of government regulation of particular chemicals indicated that those chemicals were safe for human or environmental health.

### Conclusions

58.     Waste management has always prioritized the protection of human health, largely out of apprehension about communicable diseases like cholera and typhoid fever. Both miasma theory and germ theory problematized foul waters, especially those fouled by human waste. Not surprisingly, public health professionals charged with water pollution control and providing safe drinking water kept the nation's attention on human waste in sewage. Until the late 20th century, industry was largely left to self-regulation, controlled only where rural, recreational streams and waters tapped for municipal supplies could be affected.

---

[75] *Id.* at 32.

31

59.    In the early 20th century, dumping wastes on land, especially on land owned by industry, became the norm, as industry hoped to avoid public outcry, nuisance suits, and government regulation. Government reliance on public outrage – disgust at odors and taste of tap water or the spoilation of recreational waters – made for a limited regulatory response. Dependent on industry for economic prosperity and their tax bases, cities were loath to force industry to investigate wastes that largely went unnoticed by the public, even when these wastes, such as lead and other heavy metals, could be much more hazardous than wastes that drew public ire, such as phenols.[76]

60.    The normalization of industrial pollution, in the air, on land, and in waterways, led to the creation of ecological sacrifice zones. These sacrificial districts were reinforced by zoning for industrial use and a paucity of industrial regulation. Public health officials typically steered clear of these areas, as they supplied no potable water, and after a while even the general public would give up on the idea of using heavily polluted waterways and surrounding lands for recreation or shell fishing. Only with a growing ecological understanding of hazardous waste, its ability to move through groundwater and through food webs, did citizens begin to demand more than the mere protection of drinking water quality. Only with the environmental revolution of the 1970s did the federal government take responsibility for both protecting human and ecological health.

61.    The history of the Lower Passaic River tracks and is a prime example of these broader developments in public health, practices by and regulation of industry, and environmental policy.

62.    The Batson Report ignores these widely recognized aspects of industrial history in the United States generally and at the Lower Passaic River specifically. As a result, the Batson

---

[76] Melosi, *supra* at 457.

32

Report's inferences and conclusions regarding the handling and disposal of hazardous substances,
and its consideration of "culpability" relating to those activities, are not consistent the historical
record.

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED on March 22, 2023

David Stradling

33

ALCD-PUBCOM_0001158

# EXHIBIT A

ALCD-PUBCOM_0001159



ALCD-PUBCOM_0001160

# EXHIBIT B

ALCD-PUBCOM_0001161



Operational Years of Allocation Party Sites

CERCLA 1980
NJ Spill Act 1976
Clean Water Act 1973

Diamond 1951-1969

PVSC Treatment Plant 1924

Givaudan 1924-1998

Sherwin-Williams 1900-1999

General Electric 1882-1976

1850    1875    1900    1925    1950    1975    2000

ALCD-PUBCOM_0001162

# APPENDIX B.12
## Thomas Voltaggio Declaration

ALCD-PUBCOM_0001163

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| Plaintiff, | ) Civil Action No. 2:22-cv-7326 |
| | ) |
| v. | ) |
| | ) |
| ALDEN LEEDS, INC., *et al.* | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |

**DECLARATION OF THOMAS C. VOLTAGGIO**

ALCD-PUBCOM_0001164

## TABLE OF CONTENTS

PURPOSE OF THIS DECLARATION ........................................................3

QUALIFICATIONS ..............................................................................3

SUMMARY OF OPINIONS ....................................................................5

SUPPORTING INFORMATION FOR OPINIONS ...........................................6

    Opinion 1.........................................................................................6

    Opinion 2.........................................................................................8

    Opinion 3.........................................................................................9

    Opinion 4.........................................................................................10

REFERENCES...................................................................................12

2

ALCD-PUBCOM_0001165

## PURPOSE OF THIS DECLARATION

Pursuant to 28 U.S.C. § 1746, I, Thomas C. Voltaggio, declare the following:

1. I have been retained by Langsam Stevens Silver and Hollaender LLP (LSSH) on behalf of the Occidental Chemical Corporation (OCC) to provide expert opinions related to the Diamond Alkali Superfund Site (OU2), specifically the application of the Comprehensive Environmental response Compensation and Liability Act (CERCLA) to the Diamond Alkali Superfund site. I reserve the right to amend or supplement my opinions as additional information becomes available. I have reviewed the materials referenced in the attached list of documents. Based on this review and my knowledge and experience in the environmental regulatory field, I have responded to questions submitted to me below.

2. My assignment included providing expert responses to the following questions:

   a. **What is the role of the RI/FS at Superfund Sites?**

   b. **What is the role of the risk assessment process as part of the RI/FS?**

   c. **What is the role of the PRGs in determining what remedy will be selected for the Site?**

   d. **Can risks to human health and the environment from individual COCs be compared to one another in the form of relative risks? For example, can one propose a relative risk number or relative risk values among COCs?**

## QUALIFICATIONS

3. As a senior manager in the EPA Region 3 Superfund program from the inception of Superfund in 1981 to 2000, I was intimately involved with the applicable requirements that were placed upon EPA Superfund operational programs and Potentially Responsible Parties (PRPs) at Superfund sites, including, among other things, CERCLA statutory requirements, the National Contingency Plan (NCP) and EPA policy and guidance on CERCLA response activities, including removal actions, remedial actions and the process required under CERCLA to determine if a site is eligible for Superfund response.

4. I have a Bachelor's degree in Chemical Engineering from the City College of New York, New York, NY, awarded in June of 1968. I joined the U.S. Environmental Protection Agency (EPA) in July of 1971, which was six months after the formation of the EPA under

3

Richard Nixon. In 1983, I became responsible for the implementation of the Superfund Remedial Program and was responsible for all Superfund remedial site identification, assessment, investigation design and cleanup. This included determination of site eligibility for CERCLA remedial response. In 1984, I became responsible for all Superfund response activities in Region III including emergency and remedial response. With the addition of the emergency response activities, I became responsible for overseeing all Superfund lead response actions in Region III. This included determination of site eligibility for all CERCLA response, including removal response. In 1989, I became responsible for the Superfund Program in Region III, including all response and enforcement activities. With the addition of Superfund enforcement activities, I became responsible for all programmatic facets of the Superfund program, including fund lead response, cost recovery, Potentially Responsible Parties (PRP) searches and enforcement actions under Superfund. I retired from EPA in January of 2006 after 34 ½ years of EPA service.

5.  Throughout my career, I have testified to Congressional committees, state legislatures, local governments, and met with individual members of Congress, US Senators and various State officials regarding EPA activities. I have assisted over a dozen other nations in the development and implementation of environmental and homeland security programs, including hazardous waste site investigation, cleanup decisions and remediation implementation.

6.  My resume, which includes a list of my work experience and publications, is presented in Attachment 1.

7.  If asked to testify before the District Court of the District of New Jersey, my testimony would be consistent with this declaration.

4

# Summary of Opinions

8. **Opinion 1**: The remedial investigation (RI) serves as the mechanism for EPA to investigate the environmental conditions at a specific site, including conducting a risk assessment to determine how threatening a hazardous waste site is to human health and the environment. The risk assessment process results in the establishment of <u>preliminary remediation goals (PRGs)</u> for each COC at the Site, i.e., goals for removing or treating all the COCs at the Site to levels determined by EPA to be safe for humans and ecological receptors.

9. **Opinion 2**: The feasibility study (FS) is the process by which EPA develops, screens, and creates a detailed evaluation of alternative remedial actions potentially appropriate for a given site.

10. **Opinion 3**: PRGs are developed for individual COCs and the threshold requirement that the remedy for each COC need to protect human health and the environment. The RGs, which are developed from the PRGs, for each COC are the starting point and foundation for EPA selecting a remedy for the Site in the Record of Decision. Because RGs *already take risks* of each COC into account, RGs (rather than the risk levels themselves) are more closely connected to and more determinative of the actual remedy selected in the ROD and the costs associated with the selected remedy than the risks themselves.

11. **Opinion 4**: Different levels, combinations, and types of COCs may result in different levels of effects on humans and ecological receptors. For example, public health risks from exposure to carcinogenic substances are evaluated differently than public health risks from non-carcinogenic substances. Similarly, ecological risks are evaluated differently than either of the public health risk assessments.

ALCD-PUBCOM_0001168

## SUPPORTING INFORMATION FOR OPINIONS

**Opinion 1: The remedial investigation (RI) serves as the mechanism for EPA to investigate the environmental conditions at a specific site, including conducting a risk assessment to determine how threatening a hazardous waste site is to human health and the environment. The risk assessment process results in the establishment of <u>preliminary remediation goals (PRGs)</u> for each COC at the Site, i.e., goals for removing or treating all the COCs at the Site to levels determined by EPA to be safe for humans and ecological receptors.**

12. Having managed Superfund remedial programs since the early 1980's until 2000, I have reviewed, approved and developed RI/FS actions for approximately 20 years.

13. RI work consists of sampling and developing analytical data, which is later used to determine the degree and extent of contamination and the potential for risk presented by the environmental conditions at the site during the Risk Assessment.

14. The next step is Risk Assessment development and implementation. The Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) requires that actions selected to remedy hazardous waste sites be protective of human health and the environment. Because the NCP requires remediation to protect "public health and the environment", public health and ecological assessments <u>must</u> be performed. The risk assessment evaluates the risk at the Site to both human health and ecological receptors. By developing a risk assessment during the RI, EPA determines how threatening a site is to human health and the environment. This determination consists of complex scientific evaluations to characterize the degree of human health and environmental risk presented by the COCs at the site.

15. Although public health criteria are significant components of the analyses of determination of the need for PRG development, another factor that is considered is ecological risk criteria. An ecological risk assessment is the process for evaluating how likely it is that the environment might be impacted as a result of exposure to one or more environmental stressors, such as chemicals, land-use change, disease, and invasive species. As a result, COC remediation goals MUST consider both public health and ecological risk effects.

16. Risk Assessments consider the potential consequences of the environmental data, assessing risk to human health and the environment, conducting treatability testing to evaluating the potential performance and cost of the treatment technologies that are being considered.

6

Risk Assessors seek to determine, for each potentially dangerous contaminant present at the site, a preliminary idea of whether the levels of contamination present a danger to human health and the environment and seek to determine a safe level for each potentially dangerous contaminant present; if contaminants are unsafe, it is necessary to determine levels of the contamination reduction that warrant cleanup measures to ensure human health and environmental protection.

17. During the risk assessment, EPA, through an iterative process, identifies chemicals of concern (COCs) at the Site COCs are those chemicals that may be necessary to remediate based on estimates of current and possible future risks, if no cleanup actions were taken.

18. The EPA Risk Assessment Program is called upon to help plan a remedial action at a site. The goal of all such actions is to ensure that the residual risks that remain at the site after cleanup will be within some specified limit of acceptability. Thus, the first step in the process is for the risk manager to specify the maximum level of residual risk that will be considered acceptable. Based on this, the risk assessor can then solve the basic risk equations to find the concentration of a chemical that corresponds to the specified "target risk." Concentration values derived in this way are thus referred to as preliminary remediation goal (PRGs).

19. Stated another way, PRGs are goals for removing or treating the contaminants at the Site to levels determined by EPA to be safe for humans and ecological receptors. The risks of each contaminant is evaluated in relation to human and ecological receptors and incorporates (i.e., builds-in) risk levels into the calculation of the PRGs; The risks posed by a contaminant is accounted for in the PRGs developed by EPA.

**Opinion 2: The feasibility study (FS) is the process by which EPA develops, screens, and creates a detailed evaluation of alternative remedial actions potentially appropriate for a given site.**

20. The Feasibility Study (FS) examines ranges of options to evaluate with the PRGs of COC's. Options include studies of cost, feasibility, effectiveness of addressing individual COC PRGs and include a no action option.

21. Contaminants are evaluated in the FS. This FS process includes measurements of the degree and extent of contamination of the substances of concern, an evaluation of the human health and environmental risks of exposure to the identified substances and the

7

degree to which reduction to safe levels is considered by the various. The particular contaminants that present risks that need to be addressed at the site based upon the risk assessments performed, become COCs.

22. Many times preliminary goals are considered to determine if the risk assessments for each COC require the start of any remediation process (base line analysis). If enough contamination is necessary to initiate remediation, then those COCs need to be evaluated to determine the final goals to meet levels that are necessary to meet the Nine Criteria which defines all the consideration that must be evaluated. *(See, infra,* ¶¶ 28-30).

23. Each COC needs to be evaluated to determine pre-remediation risks for both Human health and ecological risks. If pre-remediation risks are within levels that will not cause unnecessary or inappropriate remediation, then nothing further may be necessary for those COCs. Should the pre-remediation risks for those COCs need reduction, then the remedial evaluation and feasibility study must be used to determine what remediation levels are necessary to meet the Nine Criteria. *(See, infra,* ¶¶ 28-30).

24. After the RIFS is completed, the process consists of preparing a Proposed Plan. A Proposed Plan briefly summarizes the alternatives studied in the detailed analysis phase of the RI/FS, highlighting the key factors that led to identifying the *Preferred Alternative*. The Proposed Plan, as well as the RI/FS and the other information that forms the basis for the lead agency's response selection, is made available for public comment in the Administrative Record file.

25. Superfund's risk managers use information developed during the risk assessment and other site factors to select the best cleanup strategies to manage risks to acceptable levels, which are fully evaluated in the Record of Decision (ROD), resulting in the selection of a remedy.

**Opinion 3: PRGs are developed for individual COCs and the threshold requirement that the remedy for each COC need to protect human health and the environment. The RGs, which are developed from the PRGs, for each COC are the starting point and foundation for EPA selecting a remedy for the Site in the Record of Decision. Because RGs *already take risks* of each COC into account, RGs (rather than the risk levels themselves) are more closely connected to and more determinative of the actual remedy selected in the ROD and the costs associated with the selected remedy than the risks themselves.**

8

26. The PRGs for each COC are the starting point and foundation for EPA selecting a remedy for the Site in the ROD, which is the governing EPA document for remedy selection. PRGs, as noted above, are preliminary levels of contaminant risk deemed safe for humans and ecological receptors and preliminary targets for cleanup alternatives. PRGs become final remediation goals (RGs) in the ROD.

27. In developing RGs, EPA considers the level of contamination that currently exists for each COC under consideration, the analysis of what type of remediation is necessary to reduce the contamination appropriately and the manner in which the remediation occurs. Other considerations include the technical facets of remediation options, the costs and the length of time necessary to meet the goals.

28. The selected remedy for a Superfund site is determined by EPA in the finalization of the Record of Decision (ROD). This evaluates *all Nine Criteria* and determines the remedy that best meets CERCLA requirements. These criteria are:

    a. <u>Threshold Criteria</u>

       1. Overall protection of human health and the environment

       2. Compliance with ARARs (applicable or relevant and appropriate standards)

    b. <u>Primary Balancing Criteria</u>

       3. Long-term effectiveness and permanence

       4. Reduction of toxicity, mobility or volume

       5. Short-term effectiveness

       6. Implementability

       7. Cost

    c. <u>Modifying Criteria</u>

       8. State acceptance

       9. Community acceptance

29. The use of these nine criteria has been a required element in all Superfund remedial actions that I have managed since the beginning of my career in Superfund since the 1980s.

30. The remedy selected in the ROD must appropriately evaluate each of the Nine Criteria and determine how each criterion is considered to arrive at the best balance of the statuary and regulatory requirements.

9

ALCD-PUBCOM_0001172

31. All COCs must be addressed in the selection of the ROD remedy. The RGs, as developed in the ROD, are the starting point and foundation for EPA selecting a remedy for the Site in the Record of Decision.

32. Because PRGs and RGs already take *risks* of each COC into account in their development of the PRGs in the RI/FS risk assessment process, RGs (rather than the risk levels themselves) are more closely connected to and more determinative of the actual remedy selected in the ROD as well as the costs associated with the selected remedy.

**Opinion 4 – Different levels, combinations, and types of COCs may result in different levels of effects on humans and ecological receptors. For example, public health risks from exposure to carcinogenic substances are evaluated differently than public health risks from non-carcinogenic substances. Similarly, ecological risks are evaluated differently than either of the public health risk assessments.**

33. The degree of difference between human and ecological receptor effect that would result from the amounts of the COCs (and mix of COCs) must be considered in the analysis between all the receptors. Some COCs present a more significant effect. Others less. There may be different levels of risk between public health and ecological effects for a particular COC or there may be fewer. It is inappropriate to compare the risks of different COCs that pose different types of risk.

34. For example, public health risks from exposure to carcinogenic substances are evaluated differently than public health risks from non-carcinogenic substances. Carcinogenic substances are evaluated based on the increased risk of cancer from exposure to the substance, usually expressed as a factorial of 10 (lifetime cancer risks of anywhere from 1 in 10,000 to 1 in 1 million). Non-carcinogen and ecological risks are evaluated using the Hazard Quantity and Hazard Index numbers. An ecological risk assessment that determines a aHQ less than one (unity) indicates that the contaminant alone is unlikely to cause adverse ecological effects. If multiple contaminants of potential ecological concern exist at the site, it might be appropriate to sum the HQs for receptors that could be simultaneously exposed to the contaminants that produce effects by the same toxic mechanism.

35. The sum of the HQs is called a hazard index (HI) in the analysis for ecological risk determination. HI less than one indicates that the group of contaminants is unlikely to cause adverse ecological effects. An HQ or HI less than one does not indicate the absence

10

of ecological risk; rather, it should be interpreted based on the severity of the effect reported and the magnitude of the calculated quotient. The HQ>1 has become the calculated level which indicates that sufficient ecological risk requires a cleanup decision for ecological risk in the RIFS. HQ>10 or 100 have become indicative of much more significant ecological risk and need for cleanup.

36. Comparison of HQs/HIs to human health cancer risk is not appropriate in the form of relative risk factors or ratios.

37. Similarly, ecological risks are evaluated differently than either of the public health risks assessments. For example, dioxin can present cancer risk and the risk is measured in lifetime cancer risks of anywhere from 1 in 10,000 to 1 in 1 million. Copper, on the other hand, poses only an ecological risk expressed as a Hazard Quantity or Hazard Index. As with the comparison of cancer and non-cancer human health impacts discussed above, environmental/ecological risks cannot be compared numerically to human health cancer risks.

38. An additional distinction between non-carcinogen and ecological effect is that the nature of exposure is typically significantly different. Ecological exposure tend to assess the effect on ecological resources in the environment, wherein the non-carcinogenic public health assessment tend to deal with human exposure to a public health risk.

39. In my career, I have no recollection of ever seeing anyone compare the risks from individual COCs in the form of relative risks.

## Concluding Statement

40. I have worked at USEPA for 34+ years, and more than 25 years in the Superfund program, becoming the Director of the Division as well as after the passage of CERCLA in 1980 have managed all parts of in the programs and understand the criteria that are used for determining CERCLA requirements. Because Preliminary Remediation Goals (PRGs) and Final Remedial Goals (RGs) already take *risk*s of each COC into account in their development of the PRGs in the RIFS risk assessment process, Final Remediation Goals (RGs) (rather than the risk levels themselves) are more closely connected to and more determinative of the actual remedy selected in the ROD as well as the costs associated with the selected remedy. Further, comparing risks across different risk type (e.g. carcinogenic

11

v. environmental), in the form of a numerical calculation of relative risk, is inappropriate and something I have never seen done in my career.

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED on March 21, 2023

Thomas C. Voltaggio

12

ALCD-PUBCOM_0001175

## List of Documents Relied Upon

1 – The Comprehensive Environmental Response Compensation and Liability Act of 1980
2 – The National Contingency Plan – 40CFR 300
3 - Record of Decision provisions for Operable Unit Two (OU2), Lower 8.3 Miles of the Lower Passaic River of the Diamond Alkali Superfund Site

13

ALCD-PUBCOM_0001176

## Attachment 1

## Resume

**Thomas C. Voltaggio**
1529 Chalet Drive
Cherry Hill, NJ 08003

Phone: 856/745-1488          tom@voltaggioconsulting.com          Fax: 856/673-0243

---

### *ENVIRONMENTAL MANAGEMENT / DISPUTE RESOLUTION / SUPERFUND*

#### Profile

Forty Three years of comprehensive experience in multiple aspects of environmental management at the federal level, including executive level leadership, scientific and technical management, budgeting and analysis, enforcement and compliance, biological and chemical environmental emergency response, homeland security terrorism response processes and operations and information management and technology. Nine years as principal and sole member of an independent consulting company with diverse clients, including Seven years providing consulting services to USEPA under the Federal Consulting Group.

Proven ability to troubleshoot and develop creative, innovative solutions to environmental and homeland security challenges and successfully manage change for improved performance and efficiency through the use of dispute resolution skills.

Demonstrated success in conducting environmental consultation and training to foreign governments in multiple aspects of environmental management, environmental emergency response and homeland security processes and operation.

#### Achievement Summary

Assisted several dozen clients over the past nine years in achieving solutions to environmental and homeland security problems as an independent consultant. See www.voltaggioconsulting.com for detailed information. Serves as a Senior Advisor for Dawson & Associates, a major DC consulting firm. Appointed by Governor Jon Corzine to the New Jersey Tidelands Resource Council. Serves as a senior consultant for the Federal Consulting Group, assisting EPA with management consultation services.

From its inception, and for more than 17 years, successfully directed the "Superfund" hazardous waste site cleanup program of the EPA in the Middle Atlantic States through more than 500 complete cleanups by 1997. During this time, became a national expert and participated in legislative and regulatory development and national program planning.
Brought about dozens of resolutions of complex environmental issues in air, water and hazardous waste fields with major corporations, state, local and federal governments through the use of detailed and profound knowledge of environmental programs and a well-developed skill in "getting to yes" environmental dispute resolution.

14

Managed the nation's largest biochemical terrorism response when EPA was called upon to clean up the Anthrax contamination on Capitol Hill in the fall of 2001. Interacted on a daily basis with the highest levels of Agency and Congressional leadership. As a result, became the leading regional spokesperson for homeland security at EPA.

Trained as a Principal Federal Official (PFO) under the National Response Plan by the Department of Homeland Security and was named Deputy Principal Federal Official (DPFO) for the New Jersey venue of the TOPOFF3 national exercise in 2005. Deployed to New Orleans as EPA's Senior Federal Official at the national response to Hurricane Katrina.

## Experience

**Voltaggio Consulting, LLC,** Cherry Hill, NJ - 1/4/2006 - Present

Owner and Principal Member of an environmental consulting firm

**United States Environmental Protection Agency,** Philadelphia, PA, Chicago, IL and Dallas, TX - 7/1/1971-1/3/2006

### Acting Regional Administrator - 1/2001 - 7/2001
Worked directly for the Administrator of EPA in managing the regional office during the presidential transition of the 2000 elections. Directed all regional operations and represented the administration in all public venues.

### Deputy Regional Administrator - 7/1998 - 1/2001; 7/2001 - 1/2006
As the highest career executive, managed an annual budget of approximately $700M and directed a staff of 900+ technical, administrative and legal employees in the regional office to implement federal environmental programs in the Middle Atlantic States.
Instituted programs which dramatically improved relations between state environmental agencies and regional EPA office through intensive personal interaction. Instituted several procedures and policies which turned distrust into trust, mainly focusing on eliminating surprises and developing and implementing issue escalation processes.

### Director, Hazardous Waste Management Division - 1/1991 - 6/1998
### Chief, Superfund Branch - 2/1981 -12/1990
Directed all hazardous waste programs in the six state regional office. These included the Superfund, Brownfield, Resource Conservation and Recovery, Underground Storage Tank, Emergency Response and Oil Pollution programs. During this time, the middle Atlantic region was a national leader in Superfund cleanup implementation, and was well known as having enlightened leadership regarding common sense solutions for difficult and complex problems. Directed the Brownfield program from its infancy through the current time. Developed red tape cutting procedures to speed economic development throughout the region. Utilized knowledge of hazardous waste cleanup programs to provide assistance to foreign governments in the development of their cleanup and Brownfields programs. These consultations started in 1986 and have continued to the present. Countries assisted include Italy, Hungary, Poland, Czech Republic, India, Japan, Taiwan, South Africa and China. In 1988, spent two months in Italy developing an environmental waste cleanup program for the Italian government. Over several

15

ALCD-PUBCOM_0001178

years in the mid-1990's, assisted the Czech government in developing a risk assessment and an alternatives analysis for the reclamation of an abandoned steel mill site. Provided other waste site reclamation consultations for the Hungarian and South African governments.

**Education**

**Texas Christian University, Fort Worth, TX - 1971**
Master of Management Science

**City College of New York, New York, NY - 1968**
Bachelor of Chemical Engineering

ALCD-PUBCOM_0001179