# Exhibit 10A

## Letter from Neil Ackerman, President, OxyChem to EPA Administrator Regan (March 16, 2023)

United States' Motion to Enter Consent Decree,
*United States v. Alden Leeds, Inc. et al.*, Civil Action No. 22-7326 (D.N.J.)

Thu Mar 16 14:36:44 EDT 2023
"Wachter, Eric" <Wachter.Eric@epa.gov>
FW: Privileged & Confidential: Passaic River Issues
To: "CMS.OEX" <cms.oex@epa.gov>; "Gaines, Cynthia" <Gaines.Cynthia@epa.gov>

DRF

**From:** Ackerman, Neil R. <Neil_R._Ackerman@oxy.com>
**Sent:** Thursday, March 16, 2023 2:22 PM
**To:** Regan, Michael <Regan.Michael@epa.gov>
**Cc:** dr.bchavis@nnpa.org; Prieto, Jeffrey (he/him/his) <Prieto.Jeffrey@epa.gov>
**Subject:** Privileged & Confidential: Passaic River Issues

regards,

**Neil Ackerman**
PRESIDENT
14555 Dallas Pkwy, Ste 400; Dallas,TX 75254
Office: 972.404.4865
Zero In™ atoxy.com
**OxyChem.**

*PRIVILEGED & CONFIDENTIALITY NOTICE*

**********************************

*The information in this e-mail may be confidential and/or privileged. This e-mail is intended to be reviewed only by the individual or organization named above. If you are not the intended recipient, you are hereby notified that any review, dissemination or copying of this e-mail or the information contained herein and in its attachments, if any, is prohibited. If you received this e-mail in error, please immediately notify the sender by return e-mail and delete this e-mail from your system. THANK YOU.*



**Neil R. Ackerman**
President

14555 Dallas Parkway, Suite 400
Dallas, TX 75254-6119
Ph: 972.404.3800

March 16, 2023

The Honorable Michael S. Regan
Environmental Protection Agency
Office of the Administrator
1200 Pennsylvania Avenue NW
Washington, DC 20460

Dear Administrator Regan,

I write to follow up on my prior request to meet personally to discuss OxyChem's Passaic River cleanup offers and, at the suggestion of Dr. Benjamin Chavis, Jr., to share additional information about EPA's proposed settlement.

During the prior administration, EPA embarked on a settlement process for the Passaic River that exceeded the limits of EPA's authority under CERCLA. OxyChem and others wrote to EPA at the time, cautioning EPA that it lacked authority from Congress to allocate the liability of private parties for response costs at Superfund sites. EPA rejected those concerns and proceeded anyway, using a process Congress had twice declined to authorize EPA to use.

Now, EPA seeks to approve a settlement based on that unauthorized process. Concurrently, it has rejected OxyChem's voluntary offer to perform the entire interim remedy for the upper 9 miles of the Passaic River (Operable Unit 4), at an estimated cost of $441 million, as well as OxyChem's good faith offer to enter into a series of agreements to implement the entire remedy in the lower 8.3 miles of the Passaic River (Operable Unit 2), at an estimated cost of $1.38 billion. In both respects, EPA's actions contravene the limits of its authority and undermine the purpose of CERCLA.

It is well known that Congress empowered courts, not EPA, to allocate liability for cleanup costs at Superfund sites.[1] Congress has been unequivocal on this point: EPA is not authorized to allocate responsibility for cleanup costs.[2] Less well known is that Congress expressly refused EPA's request for authority to allocate responsibility at Superfund sites, using a process that is very similar to the one used here. Dr. Benjamin Chavis, Jr., in his capacity as the president of the Alliance for a Superfund Action Partnership (ASAP), provided extensive written testimony opposing the proposed CERCLA amendment. For your convenience, I have attached a copy of Dr. Chavis's witness testimony on the proposed Superfund Reform Act of 1994.

---

[1] *See* 42 U.S.C. §9613(f)(1) ("In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate.")

[2] When Congress means to authorize an agency to adjudicate responsibility, it does so by statute. *See* 15 U.S.C. §78d-1(a) (SEC), 7 U.S.C. §18 (CFTC), and 30 U.S.C. §§901-944 (Department of Labor). No part of CERCLA authorizes EPA to adjudicate responsibility for Superfund cleanup costs.

EPA, under the prior administration, ignored Congress's limits on its authority and embarked on a multi-year process to allocate responsibility for costs. This process was led by a former EPA employee, David Batson. Mr. Batson has stated that he drafted the proposed 1994 CERCLA amendment that Congress rejected.[3]  It now appears that EPA is attempting to carry out through executive fiat what it failed to achieve legislatively.  By doing so, EPA is exceeding the authority Congress granted to it.  Equally as striking is that the author of the proposed but rejected 1994 amendment is also the architect of the report upon which EPA relies to support this settlement.

The process the prior administration put in place demonstrates the prescience of Dr. Chavis's concern that an EPA-controlled allocation process would cause more litigation and delay much needed cleanup work. It will do the same here if EPA does not correct its course.

A separate concern is that EPA's actions in the proposed Passaic settlement contradict its own settlement guidance. There, EPA states that "the Agency will negotiate only if the initial offer from PRPs constitutes a substantial proportion of the costs of cleanup at the site, or a substantial portion of the needed remedial action." Contrary to this guidance, EPA proposes a $150 million settlement with 85 polluters. EPA admits this settlement will cover only a "minor" portion of the $1.82 billion in estimated cleanup costs and it requires no cleanup work from the settling companies.

EPA also seeks to cut off contribution rights of parties, like OxyChem, that are performing a substantial portion of the remedial action.[4]

Cutting off the contribution rights of performing parties undercuts the fundamental purpose of CERCLA. The right to seek contribution was enacted by Congress in a 1986 amendment to CERCLA.[5] Its purpose was to incentivize voluntary cleanups, to ensure "that the Government should obtain the full costs of cleanup from those it targets for enforcement and leave the remaining costs to be recovered in private contribution actions between settling and nonsettling parties."[6] OxyChem's approach—clean the river and seek contribution from others—is *exactly* what CERCLA provides in the statute. EPA's refusal of comprehensive cleanup offers by OxyChem and its attempt to cut off OxyChem's contribution rights are the opposite.

The Passaic River cleanup is important to New Jersey and to OxyChem. We simply ask that the costs of the cleanup be distributed equitably among all parties who are responsible for the cleanup. We are concerned that EPA's intentional disregard of its own guidance and the clear limits Congress placed on its authority could deter future voluntary cleanups in New Jersey and across the country.

As I have stated in meetings with several New Jersey mayors, Region 2 Administrator Garcia, New Jersey Department of Environmental Protection Commissioner LaTourette, New Jersey Governor Murphy's staff, and others, OxyChem remains willing to perform the cleanup offers it made in its

---

[3] *See Columbia Falls Aluminum Co. v. Atlantic Richfield Co.*, Case No. 9:18-cv-00131 (D. Mon.), ECF 82-1 at 6.

[4] Even if Congress had authorized EPA to allocate CERCLA liability (it did not) the process EPA used here was not reliable. I enclose a summary of some of the critical scientific, math, and measurement errors that undermine the report prepared by EPA's allocator, Mr. Batson.

[5] *See* 42 U.S.C. §9613(f).

[6] 132 Cong. Rec. S14,903 (daily ed. Oct. 3, 1986) (statement of SARA floor manager Sen. Stafford).

2

January and June 2022 letters. By accepting OxyChem's offers, EPA can deliver a significant win for the people of New Jersey and the Passaic River. We also believe our right to seek contribution from other responsible parties must be protected as we commit to doing further work.

I would be pleased to meet with you to discuss this issue in person.

Sincerely,

Neil Ackerman
President

cc:     Dr. Benjamin Chavis, Jr., President and Chief Executive Officer, National Newspaper
        Publishers Association and Co-Founder, Environmental Justice Movement
        Jeffrey M. Prieto, Environmental Protection Agency, General Counsel

NRA/cjs

3

S. Hrg. 103-559

# SUPERFUND REFORM ACT OF 1994

# HEARINGS

### BEFORE THE

## SUBCOMMITTEE ON
## SUPERFUND, RECYCLING, AND SOLID WASTE
## MANAGEMENT
### OF THE

## COMMITTEE ON
## ENVIRONMENT AND PUBLIC WORKS
## UNITED STATES SENATE

### ONE HUNDRED THIRD CONGRESS

#### SECOND SESSION

ON

## S. 1834

A BILL TO AMEND THE COMPREHENSIVE ENVIRONMENTAL RESPONSE, COMPENSATION, AND LIABILITY ACT OF 1980, AND FOR OTHER PURPOSES

———

FEBRUARY 10; MARCH 2; AND APRIL 12, 1994

———

Printed for the use of the Committee on Environment and Public Works



U.S. GOVERNMENT PRINTING OFFICE

77-137±=                    WASHINGTON : 1994

$S321-18$

For sale by the U.S. Government Printing Office
Superintendent of Documents, Congressional Sales Office, Washington, DC 20402
ISBN 0-16-044482-9

ALCD-PUBCOM_0024523

## COMMITTEE ON ENVIRONMENT AND PUBLIC WORKS

### MAX BAUCUS, Montana, *Chairman*

| | |
|---|---|
| DANIEL PATRICK MOYNIHAN, New York | JOHN H. CHAFEE, Rhode Island |
| GEORGE J. MITCHELL, Maine | ALAN K. SIMPSON, Wyoming |
| FRANK R. LAUTENBERG, New Jersey | DAVE DURENBERGER, Minnesota |
| HARRY REID, Nevada | JOHN W. WARNER, Virginia |
| BOB GRAHAM, Florida | ROBERT SMITH, New Hampshire |
| JOSEPH I. LIEBERMAN, Connecticut | LAUCH FAIRCLOTH, North Carolina |
| HOWARD M. METZENBAUM, Ohio | DIRK KEMPTHORNE, Idaho |
| HARRIS WOFFORD, Pennsylvania | |
| BARBARA BOXER, California | |

PETER L. SCHER, *Staff Director*
STEVEN J. SHIMBERG, *Minority Staff Director and Chief Counsel*

———

### SUBCOMMITTEE ON SUPERFUND, RECYCLING, AND SOLID WASTE MANAGEMENT

### FRANK LAUTENBERG, New Jersey, *Chairman*

| | |
|---|---|
| DANIEL PATRICK MOYNIHAN, New York | DAVE DURENBERGER, Minnesota |
| BOB GRAHAM, Florida | ALAN K. SIMPSON, Wyoming |
| HOWARD M. METZENBAUM, Ohio | ROBERT SMITH, New Hampshire |
| HARRIS WOFFORD, Pennsylvania | JOHN W. WARNER, Virginia |
| BARBARA BOXER, California | |

(II)

ALCD-PUBCOM_0024524

# C O N T E N T S

Page

## FEBRUARY 10, 1994

### OPENING STATEMENTS

Baucus, Hon. Max, U.S. Senator from the State of Montana ............................... 3
Boxer, Hon. Barbara, U.S. Senator from the State of California ......................... 7
Durenberger, Hon. Dave, U.S. Senator from the State of Minnesota................. 4
Lautenberg, Hon. Frank R., U.S. Senator from the State of New Jersey............ 1
Simpson, Hon. Alan K., U.S. Senator from the State of Wyoming........................ 6
Smith, Hon. Robert, U.S. Senator from the State of New Hampshire ................. 5
Wofford, Hon. Harris, U.S. Senator from the Commonwealth of Pennsylvania . 6

### WITNESS

Browner, Carol M., Administrator, Environmental Protection Agency............... 8
    Prepared statement ................................................................................................ 31

### ADDITIONAL MATERIAL

S. 1834 .................................................................................................................... 38

## MARCH 2, 1994

### DELEGATION TO THE STATES AND COMMUNITY PARTICIPATION

#### OPENING STATEMENTS

Durenberger, Hon. Dave, U.S. Senator from the State of Minnesota.................. 223
Lautenberg, Hon. Frank R., U.S. Senator from the State of New Jersey............ 213
Warner, Hon. John W., U.S. Senator from the Commonwealth of Virginia........ 234

#### WITNESSES

Angell, Phillip, divisional vice president, Browning Ferris Industries, partici-
    pant in Keystone Commission ............................................................................ 248
    Prepared statement ................................................................................................ 299
Cusic, Helen, Grand Cal(umet) Task Force, Whiting, IN ....................................... 246
    Prepared statement ................................................................................................ 290
Early, Blakeman, Washington director, pollution and toxics program, Sierra
    Club.......................................................................................................................... 221
    Prepared statement ................................................................................................ 277
Greer, Linda, senior scientist, National Resources Defense Council, Washing-
    ton, DC, participant in Keystone Commission.................................................. 217
    Prepared statement ................................................................................................ 260
Parr, Michael S., remediation program manager, Du Pont Company, Wilming-
    ton, DE, on behalf of the Chemical Manufacturers Association........................ 219
    Prepared statement ................................................................................................ 275
Pierle, Michael, vice president, Monsanto, participant in Keystone Commis-
    sion........................................................................................................................... 215
    Prepared statement ................................................................................................ 257
Porter, J. Winston, president, Waste Policy Institute, Alexandria, VA............... 244
    Prepared statement ................................................................................................ 288

(III)

ALCD-PUBCOM_0024525

IV

| | Page |
|---|---|
| Varney, Robert W., Commissioner, New Hampshire Department of Environmental Services, on behalf of the National Governors Association | 241 |
| Prepared statement | 283 |

ADDITIONAL MATERIAL

Statements:
| American Institute of Chemical Engineers | 301 |
|---|---|
| Association of State and Territorial Solid Waste Management Officials | 306 |

APRIL 12, 1994

SUPERFUND LIABILITY SCHEME

OPENING STATEMENTS

| Lautenberg, Hon. Frank R., U.S. Senator from the State of New Jersey | 351 |
|---|---|
| Smith, Hon. Robert, U.S. Senator from the State of New Hampshire | 355 |
| Warner, Hon. John W., U.S. Senator from the Commonwealth of Virginia | 371 |

WITNESSES

| Chavis, Benjamin F. Jr., executive director, NAACP, on behalf of the Alliance for a Superfund Action Partnership | 357 |
|---|---|
| Prepared statement | 434 |
| Gover, Kevin, Gover, Stetson and Williams, P.C., Albuquerque, NM | 398 |
| Prepared statement | 509 |
| Kenworthy, Patricia, director for regulatory affairs, Monsanto Corporation, on behalf of the Keystone Commission | 361 |
| Prepared statement | 513 |
| McKnight, K.L., Aluminum Company of America | 393 |
| Prepared statement | 503 |
| Morningstar, Mary, corporate counsel, Lockheed Corporation, Bedford, MA | 386 |
| Prepared statement | 489 |
| Pollak, Ed, corporate senior vice president, Olin Corporation, on behalf of the Coalition on Superfund, accompanied by Michael S. McGavick, American Insurance Association | 384 |
| Prepared statements | 515, 522 |
| Robinson, Florence, North Baton Rouge Environmental Association, on behalf of the Keystone Commission | 359 |
| Prepared statement | 466 |
| Roush, Michael, director of Senate lobbyists, National Federation of Independent Businesses, Washington, DC | 363 |
| Prepared statement, with letter | 484 |
| Stevens, Hon. Ted, U.S. Senator from the State of Alaska | 352 |
| Prepared statement | 399 |
| Udall, Hon. Tom, Attorney General, State of New Mexico, on behalf of the National Association of Attorneys General | 356 |
| Prepared statement | 401 |
| Responses to additional questions | 430 |
| Williams, Patricia, legislative representative and counsel, National Wildlife Federation, Washington, DC | 391 |
| Prepared statement | 500 |

ADDITIONAL MATERIAL

| National Association of Manufacturers, letter from | 535 |
|---|---|
| Statements: | |
| Community Health Resources, Inc. | 536 |
| Industrial Compliance, Inc., Golden, CO | 529 |
| Local Governments for Superfund Reform | 531 |
| Tulalip Tribe of Washington | 536 |
| University of New Hampshire | 379 |

434

PREPARED STATEMENT OF DR. BENJAMIN F. CHAVIS, JR., ALLIANCE FOR A SUPERFUND
ACTION PARTNERSHIP

### I. OVERVIEW

Good morning. I am Dr. Benjamin F. Chavis, Jr., Executive Director and Chief
Executive Officer of the National Association for the Advancement of Colored
People (NAACP). I am also Chairman of the Alliance for a Superfund Action Part-
nership (ASAP). I appreciate your inviting me here today to share with you the
views of the NAACP and ASAP on Superfund reauthorization issues.

My personal involvement in toxic waste issues goes back many years. I helped
found what is known as the environmental justice movement to assist in drawing
attention to a long ignored reality: people of color were being disproportionately vic-
timized by hazardous waste facilities, past, present and future. I spoke out against
siting a dump in a North Carolina minority community. My interest in Superfund
reform stems directly from years of grassroots experience with toxic waste issues. I
believe that this law has directly contributed to the environmental racism afflicting
people of color. And despite fine words, no bill presently before you changes this
much at all.

Over the last few months, a diverse group of citizen advocates, local governments,
companies and associations realized that the debate on Superfund offered us a
chance to find common ground on an issue which has historically been very divisive.

---

[14] Section 107(f)(1) of CERCLA, 42 U.S.C. § 9607(f)(1).
[15] In re Acushnet River & New Bedford Harbor: Proceedings re Alleged PCB Pollution, 716 F.
Supp. 676, 679 (D. Mass. 1989).
[16] Section 107(c)(1) of CERCLA, 42 U.S.C. § 9607(c)(1) (emphasis added).

435

After detailed discussions, that shared belief evolved into the Alliance for a Super-fund Action Partnership (ASAP).

Today, ASAP represents the broadest and largest diverse constituency of Super-fund stakeholders you can find: the NAACP, Local Governments for Superfund Reform, the American Furniture Manufacturers Association, International Fabri-care Institute, the City of Atlanta, the Society of Independent Gas Marketers of America, the National Food Processors Association, The Grocery Manufacturers of America, Johnson Controls, Inc., Continental Corporation, the American Interna-tional Group, Texaco, Phillips, and many others in a variety of fields. A full list of current membership is attached as an addendum to this testimony.

Our group did not start out constrained by past ideology or commitments to old slogans and principles. To be sure, we did start out from very different perspectives, but we shared a common purpose—to make Superfund work. Unlike others, we did not take any options off the table.

In a moment, I will discuss the Eight Point Plan we developed in detail. But before I do, I ask that you consider this:

At one time or another, everyone here has said that there's too much litigation in Superfund, too much mistrust, too little clean-up. And many have also agreed that a major cause of all these problems is the retroactive, site-by-site system used to raise clean-up funds.

Yet, you are here today seriously considering a bill drafted by the Administration which will keep this failed system in place. Moreover, the bill contains provisions that would further complicate the legal warfare and that would divert dollars that could be used for clean-up.

Some have—and others will—come before you to say that things aren't so bad, that Superfund is basically working, that with a nip here and a tuck there, all will be well. Or their rhetoric will be bold, but their reform plans will be modest. Our message to you is this: They are wrong.

Theirs is a view glimpsed from Washington's corridors, not from toxic ground zero—the communities and people living with Superfund risk every day. In Wash-ington, the talk is of making "polluters" pay and of "fair share" allocation.

At toxic ground zero, the talk is of one thing: Clean-up our neighborhood, do it fast and do it right. Communities want to see clean-up crews and public health pro-fessionals, not lawyers, allocators and allocation committees.

Mr. Chairman and members of this Subcommittee, if your house is swept into the ocean after a hurricane, you don't rebuild it as before; if it is uprooted by an earth-quake, you build to new standards. The same should be true for Superfund. But what you have before you seeks to achieve reform by building on the very same foundation with the very same materials which have been crumbling around you for 13 years—a dominant focus on fundraising through the mechanism of retroactive, site-specific liability. I implore you to think more boldly.

I am extremely pleased to note that some new voices are joining the chorus for fundamental reform. I am speaking here of your colleague Senator Robert Smith and Representative Bill Zeliff, who recently introduced the Comprehensive Super-fund Improvement Act of 1994. I am not usually in the habit of praising conserva-tive legislators. But I have been told their bill is derived directly from more than a year of discussions with Superfund stakeholders and experts in New Hampshire, not Washington. In many ways they are responding to some of the same practical im-peratives which I feel. Their bill grapples directly and honestly with Superfund's debilitating and wasteful approach to financing. Based on their grassroots discus-sions, they recognize that fundamental reform is required. Here are two Republi-cans who are not afraid to say that increasing business taxes to fund clean-up is a far more efficient way to protect the public than the law we have today—and it is better for business.

I do not endorse their bill because the scope of their liability and financing is not broad enough, although it is clearly headed in the right direction. In addition, I hope you and they will see that liability and financing changes are the place to start from in changing the focus of Superfund so it can address public health and community needs. Comprehensive Superfund reform must also address the other six points of our Eight Point Plan, issues such as public health focus, community empowerment, site selection and prioritization, minority participation, and commu-nity development.

In addition, I appreciate the efforts of the Administration and the National Com-mission on Superfund, not only to address Superfund's problems but to address addi-tional environmental justice concerns. A few of the specific suggestions raised in the Eight Point Plan have been incorporated in the Administration's bill.

But environmental justice concerns cannot be addressed by a section heading at the back of a bill. Our concerns are not "add-on" items. The central environmental justice concern is how the central purpose of Superfund—clean-up—is carried out. This requires fundamental reform.

I feel absolutely certain in saying today that if you enact this bill, which fundamentally maintains the current law with the current financing system, you will come back here in a few years, long after the congratulations and smiles at the bill signing, explaining to citizens, but probably not very persuasively, what went wrong. In other words, you may be able to pass a bill which does not fundamentally reform Superfund, but, if you do, you most assuredly will not solve the problem.

We say it's time to make fundamental change in Superfund. And change—and boldness—is what ASAP's Eight Point Plan is all about.

## II. DETAILS OF THE EIGHT POINT PLAN

The ASAP Eight Point Plan is designed to achieve several critical goals—the same ones shared by the Administration and members of this Subcommittee: a new focus on public health; significant community involvement in the process; accelerated clean-up; better site prioritization to ensure the most effective allocation of resources; reduced transaction costs; more rational remedies; greater fairness; and stronger public and private support for the program.

But the difference between the Eight Point Plan and other options is that its reforms are integrated. Each point of the plan relies on the others to work. We recognize, where other plans do not, the inextricable interrelationships of various parts of the current program—and of our proposed solutions. And we especially recognize that virtually every one of the problems identified by major stakeholders is either connected to or grows out of the retroactive, site-specific liability system. As long as it is in place, trying to reform other parts of the program will simply not succeed.

Let me stress that the Eight Point Plan is not set in stone, and we are improving it all the time. We are actively reaching out to environmental justice and community activists, to State and local leaders, to environmentalists and public health experts, and to other businesses for new ideas and refinements. And we reach out to you and your staffs to assist us in perfecting our plan.

### 1. THE RIGHT PURPOSE: PUBLIC HEALTH

Thirteen years after enactment of Superfund, the Nation still awaits clean-up of more than 1,200 of our worst toxic waste sites, much less the many which have thus far been ignored. Full-scale health investigations are being conducted at an annual rate of only 15 percent of the eligible sites. Despite the national Trust Fund created to clean-up toxic waste sites and pay for health evaluations, whole communities have had no relief from the imminent threat of disease.

And, while toxic exposure is bad for any community, a 1987 study by the United Church of Christ Commission on Racial Justice, which I led, showed that hazardous waste sites and NPL sites are located disproportionately in minority communities.

We have failed in our public health mission primarily because Superfund today is focussed on fundraising, not on public health and environmental protection. In fact, the public health focus of Superfund legislative intent has been severely compromised. Public health professionals are barely visible in the process; they are overshadowed by lawyers, financial planners, transactions and negotiations. Rarely does an epidemiologist, medical doctor or biostatistician get involved in the process until after large sums have been spent on legal fees and other non-clean-up or health preservation-related activities. Site clean-up and related health activity are literally put on hold for years.

The Agency for Toxic Substance and Disease Registry (ATSDR) is hopelessly backlogged in its conduct of health investigations of NPL sites. Yet such investigations can provide valuable insight into long-term and aggregate health effects of communities exposed to chemical releases from hazardous waste sites. To date, toxicological profiles have been generated for only 176 of 275 Superfund "Priority Chemicals."

Current staff levels cannot possibly keep up with the present demand for health assessments and other mandated responsibilities (e.g., applied research, emergency response, health education and surveillance, and registries). Clearly, ATSDR, at its present level of appropriations and operations, is overwhelmed.

It also is not clear that ATSDR was ever charged with the responsibility to respond to health effects once identified. Most local medical providers may not—and in fact usually are not—abreast of information needed to diagnose or treat symptoms that are associated with exposures to toxic chemicals at toxic waste sites. In

437

short, responsibility for health response activity is an enigma for many affected residents.

By ATSDR's own admission, serious gaps exist in scientific knowledge about the toxicity, bioavailability, exposure and human health effects of individual hazardous substances—and mixtures of these substances—released from hazardous Superfund sites, especially during emergency releases. Additionally, physicians and other health care providers near Superfund sites express the need for training and technical assistance on hazardous substances and related health effects.

The Administration is to be commended for its sensitivity to—and inclusion of—specific provisions which seek to address the problems of highly impacted communities, particularly those of people of color. But these are only demonstration programs, essentially add-ons to the current system, rather than basic reform, and no new financing source is provided for them.

### ASAP Solution

ASAP proposes a Superfund program run on public health grounds by public health officials—not run on fundraising grounds by lawyers. This public health process would begin at the time a site is first proposed for the NPL and would not end until the site is delisted.

ASAP's plan addresses five specific problem areas:

### 1. Professional Visibility

Presently, except in the instance of ATSDR health assessments and related activities, public health professionals and other scientists are seldom engaged in Superfund clean-up activity. The government should expand the use of health experts and give them leadership roles in clean-up decisions. They should be involved from the beginning so that the focus of Government action is on protecting the health of affected citizens. They should arrive on site before decisions are made, interact with the community, and lead the process.

EPA also should engage Superfund "Public Health Oversight Teams" to monitor and assist site clean-up and health assessment activity. The teams should be activated upon identification of each NPL site or other sites that request assistance. Such teams should be made up of health and environment professionals at the local, State and Federal levels. Team members should include experts who don't work for EPA and ATSDR, as well as representation from these agencies. This team should operate in concert with proposed Citizen Working Groups (CWGs), and should be empowered to make recommendations to EPA or State site representatives.

### 2. Health Assessments and Investigations

As noted earlier, it is very clear that ATSDR cannot, at its current operating level and budget, meet the high volume demand for health assessments and health investigations. Therefore, the budget for ATSDR must be increased to accommodate the number of pending and projected health assessments and investigations.

In addition, ATSDR must strengthen its contracting priorities to engage the needed assistance from outside contractors, particularly local and State public health organizations.

ATSDR also should prioritize follow-up investigations for sites, because many communities may need attention more quickly than others.

### 3. Health Effect Studies and Applied Research

ASAP agrees with proposed language in the Administration's bill to engage research assistance via cooperative agreements and grants to public and non-profit institutions. Health research initiatives are presently suffering—particularly applied-research—and without this valuable information, surveillance and disease registry information is severely handicapped.

But caution must be exercised not to rely on studies that are inherently long term, and which require exposure models and study designs that may take years to construct.

Therefore, in all appropriate circumstances, ASAP proposes scientifically sound toxic substance chemical screening within affected populations to rapidly determine actual exposures to known toxins at the site and in the area. This is a much more immediately usable tool than "health effect studies," which, if done right, take 20 years and require statistically stable study populations.

Screening, along with other tests, allows for addressing site assessment, NPL inclusion, prioritization and population impact all at once. ASAP proposes that these comprehensive "fingerprint screenings" (with appropriate control groups) be a principal criterion in listing a site, prioritizing it and protecting public health.

ALCD-PUBCOM_0024530

438

### 4. Non-Emergency Health Response and Guidance

Local health care providers must be engaged in the health response process. Historically, there has been a separation of environmental health from primary health care. Persons affected by toxic substances can seek health remedies from local doctors literally for years, but often times those doctors do not recognize the ailment. A formal mechanism to provide local clinicians with Superfund information needs to be instituted.

ASAP recommends that whenever a site is designated by ATSDR for health investigation or whenever a site health assessment warrants further consideration, an Environmental Health Response Briefing should be routinely issued to the medical establishment in affected communities. Similarly, there should be consultation by government health experts with primary care providers close to the site in the early stages of site assessment.

### 5. Health Education and Training

Bridging the gap between environmental health effects and primary health care has been discussed for years among environmental scientists, with little progress. This must occur.

Environmental surveillance efforts could be significantly enhanced if the health care provider community were trained to recognize environmentally related health effects. To improve the health status of persons living near hazardous waste sites, the scientific and medical communities must have an understanding of the issues impacting residents of affected communities. This can be achieved by (a) improving scientific understanding of the relationship between exposure and health impacts by involving the expertise of groups like NIH, NSF, and the American Academy of Sciences; (b) improving the ability of local health departments to recognize and diagnose health effects associated with exposure to hazardous substances; and (c) improving the ability of health care providers to diagnose environmentally related disease. This requires both legislative direction and funding.

#### 2. THE RIGHT SIZE: ADEQUATE FUNDING

Since Superfund's inception, public and private financial resources have been improperly allocated and diverted to wasteful litigation. The results have been stalled clean-up and a concentration of clean-up efforts at sites with viable PRPs.

In order to properly refocus the Superfund program on human health, environmental protection and other important priorities, ASAP members believe that adequate funding must be raised in a reliable and efficient way. It is not enough to propose new programs and pay homage to new priorities. Money to fund them must be spelled out and integrated into any reform plan that truly seeks to improve the program.

### ASAP Solution

The Eight Point Plan does just that. Through the elimination of site-specific fundraising and implementation of a broad-based business taxing mechanism, our plan raises more money for clean-up and related priorities while reducing the overall costs to business and assuring greater certainty.

Consider what would happen if we stopped fundraising site-by-site at old multi-party NPL sites and raised the money mostly from business taxes:

• This expanded fund would be able to pay for clean-ups immediately because legal warfare would no longer hinder and delay clean-up work.
• In the absence of site-by-site fundraising, public health and the environment—not fundraising imperatives—would drive the Superfund program and set its priorities.
• Freed from fundraising and the need to allocate liability based upon an incomplete and inadequate information base, EPA could devote far more time and resources to addressing health threats, putting health professionals on the scene first rather than last.
• Business and other PRPs (cities, States and the Federal government) would benefit greatly. Enormous contingent liabilities would be lifted and transaction costs would drop drastically. Costs to business would actually go down, but money for clean-up would go way up.

Point Two of the Eight Point Plan calls for creation of an overall NPL program of $3.6–4.6 billion per year. This represents an annual increase of $500 million to $1.5 billion—money that would go directly into clean-up and support activities, such as public health and job training, environmental restoration, community participation and empowerment, assistance for Indian tribes, and coordination of Federal pro-

ALCD-PUBCOM_0024531

439

grams to help communities recover from the economic and social harm of toxic con-
tamination.

Monies dedicated to actual clean-up of orphan and multi-party sites would expand
by 45-75 percent over current remediation spending. This includes attacking the
backlog of thousands of CERCLA sites which have yet to be analyzed, and setting
clean-up priorities based on a new environmental impact ranking system.

Business will still have the vast majority of Superfund costs but in a much more
efficient manner than the adversarial, litigation-based, site-specific model used
today.

The private-sector financing would be provided by current oil and chemical feed-
stock taxes, an increased broad-based tax on larger businesses (we have recommend-
ed a doubling of the current Environmental Income Tax), a new tax on insurers,
and a small business tax levied on small business large and small quantity genera-
tors, which do not pay the EIT. This would be relatively simple to implement be-
cause the Resource Conservation and Recovery Act (RCRA) requires that every facil-
ity which produces more than 100 kilograms (220 pounds) of hazardous waste per
month be registered with EPA and observe numerous record-keeping requirements.
(RCRA classifies a small quantity generator as a facility which produces between
100-1,000 kilograms of hazardous waste per month. A large quantity generator pro-
duces more than 1,000 kilograms per month.)

Thousands of large, medium and small businesses have written to the President
offering to pay these kinds of taxes. In addition, the Business Roundtable voted to
support a Superfund financing package of increased taxes, and in the words of its
announcement of February 4, called for "if necessary, an increase in the Environ-
mental Income Tax (up to a doubling)." They and other businesses rightly maintain
that this is not an issue of new taxes—this is merely a more efficient way to raise
money they already are spending.

Our very specific financing plan is based on and consistent with the position of
the Business Roundtable and other business leaders.

We are not proposing to tax business; we are accepting business' offer to be taxed
at higher levels to make Superfund work better for everyone.

Indeed, the taxes we propose will actually reduce business costs because of the
elimination of most of the site-specific litigation and other transaction costs. We are
open to other ways of raising the necessary funds from the business community, but
we are confident that the system we have proposed will work well, and has the
broad support of business.

In addition to business, there are two other major groups that would benefit sig-
nificantly from the revision of site-specific PRP liability and therefore should con-
tribute to the fund. These are State governments and the Federal government. Both
have very large liabilities at non-Federal facility NPL sites. States also have various
shares of Superfund costs above and beyond their PRP liability. Our plan therefore
assumes a 10 percent State share. In exchange, State and local government PRP li-
ability would be reduced substantially. In addition, we are exploring delegation of
program management to States with demonstrated competence in this area.

Attached to this testimony are spending and income charts that detail our financ-
ing proposal, and an acceptable financing option (Attachments A, B and C).

### 3. THE RIGHT PLACES: ENVIRONMENTAL IMPACT PRIORITIZATION

Clean-up decisions and progress today depend much more on whether a site has
clean-up funds (i.e., successful negotiations or litigation with large solvent PRPs),
than on whether that site is a public health risk. The complex Hazard Ranking
System does not include key measurements. And, in any case, it only affects Super-
fund listing. It is not the determinant of where resources are applied.

EPA's real decisions on budget priorities for site clean-up are a huge secret be-
cause of the current liability system. The public is excluded from this critical set of
decisions. Why? Because in the continuing legal poker game between EPA and
PRPs, EPA must be able to threaten PRPs that it will pay for clean-up itself and
then fine them.

This is a long way from what we should have: an open prioritization process,
based on public health and environment priorities, with powerful public input.

### ASAP Solution

We propose amendments to the hazard ranking system and prioritization process.
The new system will:

  • Move those sites that most threaten citizens to the top of the priority list.
  • Require greater reliance on real risk and real exposure pathways (including
history of exposure) in contrast to the current system which makes groundwat-

ALCD-PUBCOM_0024532

440

er contamination the heaviest factor in a site's ranking. There are sites, especially in urban areas, where groundwater contamination is not relevant, but where residents face serious threats nonetheless from soil and other contamination. The emphasis on groundwater contamination, though, raises the "bar" for these sites to be included on the NPL.

• Take into consideration not only the risks presented by the toxic waste site in question, but also the health effects it may have in conjunction with other environmental risks in die area (such as other dump sites, industrial facilities and abandoned plants). Sites that affect the same population could be ranked together, similar to the Clean Air "bubble" concept. In ranking sites, the history and extent of exposure is important (taking into account the socio-economic conditions of the community which may exacerbate the effects of exposure). These issues should also inform action under Point 8.

• Require that all subsequent clean-up decisions and actions be based on these same priorities. Once sites are scored, prioritization for financing and remedial action should be based on the severity of the public health risk, not which sites offer the potential for funding. (One of the major defects of the site-specific system is that clean-up priorities "follow the money.") In other words, sites exhibiting the highest public health risk should have first claim on the fund's resources until they are cleaned up, before resources are devoted to lesser priority sites.

• Require that sites in disadvantaged communities receive priority for clean-up over other sites of equivalent public health risk located elsewhere in order to spur economic redevelopment.

• Require that ranking be an open process, with the public afforded the opportunity to comment on these priorities.

We agree with much of the work of the National Commission in this area, although it is limited to listing of sites, as opposed to including prioritization of resources and effort as our plan does.

ASAP proposes a major focus and emphasis on human exposure pathways as a principal prioritization criterion. Specifically, sites with little or no human exposure or assimilation pathways, or sites where those substances are safely managed and contained as part of ongoing operations, would rank much lower.

ASAP strongly feels that site-specific risk assessments using actual census, cultural, meteorological, geological, land-use and comparative natural exposure data should be required.

#### 4. THE RIGHT WAY: EFFECTIVE REMEDIES

The current process for selecting remedies is in need of major change. ASAP believes that remedy selection must be conducted on a site-specific basis with full community participation in the context of a global Superfund budget. Remedy selection must put health concerns first, but also take into account such issues as environmental impact, future land use and available technology.

The belief that we have unending dollars to be extracted on a site-by-site basis from companies with "deep pockets," whether they acted illegally or not, has worked against intelligent remedy selection. Instead of achieving the best remedy for each community, the current system has simply created a bias toward the most expensive remedy. The two are not necessarily the same, since what is best for the community as a whole may be the most cost-effective approach.

Unfortunately, however, after years of exclusion from the process at their sites, communities sometimes pressure EPA for expensive remedies because that may be perceived as the "safest" approach. PRPs in turn resist, which creates distrust in PRP motives and even greater pressure to ignore cost. Citizens also mistrust the current process where private interests with a financial stake are involved in making health decisions. PRPs argue that they should have a say because they are funding the remedy.

This is another example of how liability concerns are intertwined with other aspects of the program.

*ASAP Solution*

Once sites have been ranked based on a revised HRS (see Point 3), the remedy for the site must be chosen on a site-specific basis in a process involving environmental health professionals, environmental engineering professionals, the affected community, relevant governmental authorities, and entities which have knowledge of disposal at the site.

ALCD-PUBCOM_0024533

441

&bull; It is critical that affected community and citizen leaders be fundamentally involved in these decisions.

&bull; Effective protection of public health and the environment must be the overall standard.

&bull; Factors such as land use and available technology must be taken into account.

&bull; Based on current or currently planned future use, a decision should be made to either:

(a) Execute a removal or stabilization action and re-evaluate the site;———

(b) Select a remedial action based on the current actual or likely future risk; or,

(c) Defer the site for re-evaluation at a time certain, not to exceed 5 years. Deferral would have to be based on a determination either that existing technology acceptable to the local community cannot effectively reduce the site risk; that emerging technology may provide a more cost-effective remedy; or that action at other sites presents a greater need for protection of health and the environment. Deferral would not be permitted if the delay would result in any appreciable increase in risk to public health.

Since the plan would include all the key stakeholders in the decision-making process, there is no need to impose external and arbitrary statutory preferences for any specific decision among the options above, nor would there need to be arbitrary preferences for remedial actions such as ARARs or treatment and permanence (although remedies will have to make permanent reductions of risk).

&bull; Remedies and associated efforts (see Points 6 and 8) should encourage sustainable development, including encouraging the creation of permanent new jobs, and increased local knowledge and skill base.

&bull; The same remedial standards and goals should apply to all NPL sites, whether single or multi-party.

### 5. THE RIGHT FINANCING SYSTEM: BUSINESS ASSESSMENTS ON THOSE PARTIES WHICH BENEFIT

The current financing system has failed the test of 13 years of real world experience, and it also creates a whole series of other secondary problems beyond its impact on the speed and efficiency of clean-up.

Except for most of the government and private-sector lawyers who make their living off of it, everyone now recognizes that the retroactive liability financing system is a huge problem. The question is whether we tinker with it, or whether we fundamentally reform it.

The issue is not only cost allocation, or share allocation, among PRPs for clean-up and natural resources expenses. With clean-up progress dependent on private checkbooks at each site, as a practical matter, clean-up priorities and decisions are clearly affected by factors other than public health and environmental priorities.

Progress occurs based on the presence and willingness to settle of PRPs, and—whatever the law says—their financial concerns play a role in public health decisions, and on the speed of clean-up.

Thus, the current focus of the Administration bill on allocation alone (even if its plan worked to stop allocation battles, which it will not) misses a fundamental part of the problem. As long as PRPs are pursued for financing on a site-by-site basis, this cannot be avoided.

Beyond its harm to the clean-up program, the current liability system causes unnecessary harm to PRPs. Long term contingent liability forces delays in investment, exacerbates or eliminates the ability of companies to gain financing, and drains management time away from product production into disputes and litigation. In addition, any other liability remedy that seeks to apportion or allocate a "fair share" for old disposal shares the same problems, albeit under a different name, as the current litigation nightmare. Since disposal records prior to the mid-1980s do not exist within most PRPs or at most sites, any arbiter must guess as to the allocation. This, too, will be a matter of contest, delay and cost.

### *ASAP Solution*

Expanded business taxes and other contributions would generally replace the present site-by-site financing system for legal disposal before a cut-off date in the past. This would remove most transaction costs and remove a series of enormous negative economic effects of the current system.

442

*Liability Reforms*

• Retroactive joint and several liability generally would be eliminated at multi-party sites. At these sites, the expanded fund would pay to clean-up hazardous waste disposed of before a particular cutoff date in the past, and to restore damaged natural resources.

• In general, entities which legally disposed of waste before that date at these sites would no longer pay for clean-up on a site-by-site basis, but instead contribute through the expanded tax and contribution system.

• Entities which illegally disposed of waste will remain liable for clean-up costs and penalties, regardless of when the disposal occurred (the cutoff date will not apply to them).

• Entities which disposed of waste after the cutoff date will remain liable for clean-up costs and penalties associated with the post-cutoff date activities.

• Rights of citizens to pursue personal injury claims ("toxic torts") will be preserved.

• The cutoff date will be selected based on several criteria:

   (1) the impact on speed and efficiency of clean-up (i.e., the date which considers practicality, costs and benefits of pursuing the current system);

   (2) the number of current NPL sites and PRPs affected by each possible cutoff date;

   (3) the practical availability of records at most sites to reasonably and quickly allocate liability;

   (4) the date following implementation of RCRA and other disposal permitting requirements which made the rules of behavior clear for most PRPs such that they should pay for clean-up even if they did not violate the law of the time; and

   (5) the date which most effectively reduces transaction costs and other expenses related to litigation.

We believe a decision based on those criteria will conclude that the end of 1986 is the best cutoff date. However, we recognize that other dates have been suggested and we are open to discussing this matter.

*Transitional Protections*

• We propose creation of a transitional credit system, whereby funds spent on remediation-related activities after January 1, 1990, would be credited against future Superfund tax payments, perhaps on a phased-in basis. Thus, any incentive to delay settlements in anticipation of liability relief is eliminated. This recognizes that some have expressed concerns over whether the proposed liability change would create transition problems, especially in cases where PRPs are on the verge of settlements with EPA, or have already reached settlements and are carrying out particular clean-up tasks.

• PRPs working pursuant to a consent decree or order when the law passes would be required to continue to manage remediation through completion, with the expanded Fund providing reimbursement for all remediation costs (upon appropriate documentation).

*Remediation Management*

• It is hard to imagine a more inefficient remediation system than the one used today. We suggest allowing three alternatives for the actual management of remediation:

   (a) Maintain Section 106 authority so that EPA (or delegated States) could continue to name a PRP to manage the site clean-up, ensuring that the private sector controls remediation management, and for cases where PRPs desire to manage clean-up. Such PRPs would be reimbursed for remediation expenses;

   (b) Have the Federal government directly contract for clean-up with private parties or new public/private organizations (this could mean agencies which have more contracting expertise than EPA handling the implementation of clean-up);

   (c) Delegate the program to competent States with the same authority and funding regime.

• Lien to Prevent Unjust Enrichment: Whenever Fund monies are used to pay response costs for any non-publicly owned site or facility, EPA should be authorized to place a lien upon that private property to prevent unjust enrichment of the property's owner. The amount of the lien shall be for the amount of money paid by the Fund for response costs for the property less any amount

paid by the property owner (i) pursuant to a settlement or judgment in any cost recovery action under CERCLA for that property, or (ii) to any other potentially responsible party pursuant to a settlement or judgment in any third-party suit for contribution for response costs for that property.

### Areas ASAP Is Exploring

We recognize that even a perfect NPL system will only address a part of the problem. There are thousands of other toxic waste sites left to the States and private parties to address. We are exploring expansion of some of our ideas beyond the NPL in order to address the combination of public health and economic development issues created by CERCLA and equivalent State liability regimes at non-NPL sites. These include:

   • An expansion of the trust fund to be available to qualified States if they elect to use it to replace current liability approaches at (a) higher priority State sites; or (b) non-NPL municipal co-disposal sites.
   • Encouraging States to establish voluntary clean-up programs for lower priority sites; this would include a special focus on creating incentives for clean-up and development of sites in economically depressed areas.
   • Part of this includes special approaches with small businesses with on-site contamination (i.e., single small business party, non-NPL sites), perhaps including a program similar to the effective LUST program.
   • Where equitable and in the public interest of efficient clean-up, considering ameliorating retroactive liability for legal disposal at single-party sites where the owner 'agrees to cooperate in rapid, effective remediation action.

#### 6. THE RIGHT PEOPLE: PUBLIC PARTICIPATION AND EMPOWERMENT

Citizens living near hazardous waste sites tell a consistent and discouraging story of exclusion from the clean-up process. They are angry and disillusioned with government and the Superfund program. Excluded from the process, they are forced to watch from the sidelines as PRP and government lawyers decide their fate.

Citizen input is an invaluable tool in arriving at the right remedy for each community. Citizens can offer site-specific information about public health, clean-up needs and economic factors. But Superfund rarely taps this important resource.

### ASAP Solution

ASAP believes community leaders and concerned citizens should be involved at the beginning and throughout the Superfund process. Under our proposal, as the program's focus shifts from financing concerns to concerns of public health, citizens would be involved from the initial stages of the process until the end. Moreover, we would provide both programs and financing to make participation effective and for training and business opportunities in remediation for minority businesses.

   • The public should be able to provide comment on the overall site prioritization and priorities in use of funds. A national and statewide citizen involvement process must be established for this and other purposes.
   • Public meetings and consultation with community leaders would be required before each major decision in the process.
   • As a means of establishing better communication with affected communities, ASAP believes site-specific community working groups (CWGs) should be instituted. CWGs would serve as clearinghouses of information for affected citizens.
   • A CWG would be formed for each site as soon as it is listed on the NPL, given access to all validated data collected by EPA, and encouraged to participate in the process from inception to completion. CWGs would be required to fairly represent the affected community, including affected citizens and the TAG recipient.
   • Major reforms to the TAG program need to be enacted, including simplifying the grant application and accounting process, removing time restrictions on grants, making TAG grants available earlier in the process, eliminating the current cap on grants, providing advance funding (to be accounted for), and allowing flexibility in the use of TAG funds.
   • Both TAG recipients and affected citizens' representatives on the community committees would be given the resources to participate fully.
   • EPA (and each State if the program is delegated) would form a citizens advisory committee to assist it in evaluating the quality of community outreach and involvement in the Superfund process.
   • Funding would be provided for grants for underprivileged and minority communities. These grants would fund groups willing to develop site inventories

ALCD-PUBCOM_0024536

444

and site characterizations through academic research and outreach with members of the affected community.

• The Superfund program would make grants to local educational institutions serving underprivileged and minority communities, especially in high toxic waste impact areas, for the training of minorities in environmental remediation skills.

• EPA and States would have an affirmative responsibility to provide opportunities and incentives for the involvement of minorities and minority businesses in environmental clean-up contracts.

### 7. THE RIGHT SAFEGUARD: PROSPECTIVE LIABILITY

Those knowledgeable about Superfund today will agree that the current laws governing hazardous waste disposal offer powerful incentives for care in hazardous waste disposal. Retroactive liability for historic waste disposal practices is irrelevant to proper current behavior. Then what is its purpose? It can only be to punish past actions even though they were legal at the time. The question is whether punishment helps or hinders clean-up of the old sites where it is applied. All evidence indicates that it is a powerful hindrance to clean-up.

The Eight Point Plan currently calls for prospective strict joint and several liability. With respect to prospective liability, ASAP's overriding concern is that incentives for proper waste management be powerful, predictable and clear.

### 8. THE RIGHT APPROACH: COORDINATION OF OTHER PROGRAMS

A disproportionate number of sites are located in or near poor and minority communities, whose infrastructures are disintegrating. Businesses have fled the area, taking jobs and tax dollars with them. The schools may have taken a sharp downturn, and health problems may have begun to surface. A declining tax base hinders the ability of these communities to respond to the serious problems facing the residents. Superfund's failure to clean-up old toxic waste sites is certainly not the only cause, but it exacerbates the problems of these communities.

*ASAP Solution*

Superfund alone cannot resolve the interrelated problems of communities affected by hazardous waste contamination. However, the Eight Point Plan sets aside a modest amount of Superfund money, not to pay for broader solutions, but to coordinate other government programs and services and focus them on helping affected communities recover, both economically and socially.

Rapid, efficient clean-up and the elimination of retroactive liability are the first steps to help solve the problems of these communities. Yet more than clean-up of the particular sites needs to be done. The resources of other Federal and State programs need to be focussed on areas of high negative environmental impact. A collaborative effort on the part of appropriate Federal, State and local agencies, and the private sector to address the problems affecting these areas needs to occur throughout the process, as well as after a site has been adequately cleaned up so that these communities can recover.

ASAP recommends that a lead Federal agency, such as the Department of Housing and Urban Development, be designated to coordinate efforts of the Federal government, and that it chair an interagency committee including at least the following agencies/departments: Health and Human Services, HUD, Commerce, EPA, Education, Labor, and Agriculture.

This committee would identify those Federal programs which can be effective in this effort and changes that need to be made to other programs so they can be used as well. It should establish working relationships with State and local governments, as well as the citizen working groups.

The lead agency and the committee would establish action plans for revitalizing priority communities, working closely with community leaders, State and local governments, and the private sector. These plans shall include coordination with the Economic Empowerment Zones, as designated under the Omnibus Budget Reconciliation Act of 1994 (P.L. 103-66). Multi-media environmental source reduction programs led by EPA and DOJ should be focused on such areas.

Planning grants would be made available to municipalities and local communities to develop innovative solutions for high toxic impact communities. HUD and the Department of Commerce also may provide grants for economic redevelopment, such as returning formerly contaminated real estate to productive use.

Government contracts at Superfund sites should be designed to the greatest extent possible to allow for minority businesses and small businesses to qualify for

445

participation. EPA should institute a Small Disadvantaged Business program similar to the one instituted by DOD.

Government contractors at Superfund sites should be given incentives to create joint ventures with small and minority businesses, allowing the small business to perform the work for which they qualify, with the intent of helping the small business to expand it's capabilities and qualify for more meaningful clean-up remediation jobs.

There are resources now devoted to the types of activities discussed here. It is in the public's interest to focus them on the areas most in need of assistance—particularly those with high negative environmental impact. Current HUD development programs, SBA incentives for small businesses (8a small business requirements), and tax credits/reductions for empowerment zones all serve to boost the local economy in many of the neighborhoods faced with serious health risks. We do not need to raise significant additional funding to support this activity, but instead need to concentrate on using the resources we have more efficiently.

The Eight Point Plan is the only Superfund reform proposal that looks beyond the problems of the contaminants and considers the rippling effect that a hazardous waste site imposes on a community. Even if the health risks posed by Superfund sites are removed completely, minority and poor neighborhoods in particular often cannot rebound on their own. An assessment of the other economic and social impediments facing these communities and a targeted method of addressing these problems will expedite a community's ability to bounce back from these hardships.

We cannot afford to ignore the devastating rippling effect that impacts communities with hazardous waste sites located near them. We see them everywhere—from the South side of Chicago to the inner-city of Houston to the rural areas of Warren County, North Carolina. These communities need a Superfund that works—one that recognizes that the problems do not start and end with the contamination, they extend and affect an entire community. These problems warrant a coordinated response.

### III. MYTHS ABOUT THE EIGHT POINT PLAN

One of the strangest parts about this Superfund debate is listening to the relentless attacks on our plan, and particularly on our proposed retroactive liability reform. These seem to take on the cloak of deliberate disinformation. I find it personally appalling when we are first told that our approach is "off the table," and cannot be discussed. As we press our concerns, the defenders of the current system assert that ASAP's proposal would slow clean-up and cost more. This is false. Let me take a few minutes to highlight some of the more prevalent myths.

*Myth:* The Administration considered and rejected abolishing retroactive liability.

*Reality:* Not true. From Administrator Browner's first Hill testimony in 1993 (announcing that EPA was open to any change in Superfund, except site specific liability financing), through the NACEPT and Inter-Agency processes last summer and fall, through their reactions to the Treasury Department's proposal to reform liability, and into White House-led meetings last winter, EPA and the Department of Justice adamantly refused to seriously discuss, much less study, fundamentally changing the liability system.

*Myth:* Congress will not pass, and the American taxpayer will not accept, new taxes to support the Superfund program.

*Reality:* There is no proposal I know of, including ours, that even hints at shifting the cost burden from business to individual taxpayers. ASAP, The Business Roundtable, the Smith-Zeliff bill, and other similar proposals, all suggest increased business taxes as the predominant source of funding—as they are today. These proposals are seeking to waste a lot less money on lawyers and to redirect this spending to clean-up.

Furthermore, as noted earlier in my discussion of Point 2 of the Eight Point Plan, large parts of the business community are actively lobbying to replace the current financing system with taxes. There is no secret to this widespread business support for liability reform. The current system hurts them. They therefore are offering more money to address the clean-up concerns of affected communities if they can be relieved of the uncertainty and huge legal fees that the present system imposes on them. It seems to me inconceivable that Congress would not respond to taxpayers who are asking to be taxed and to a plan that promises more and faster clean-up of our communities.

*Myth:* Our trust fund approach would produce the largest public works program in American history.

ALCD-PUBCOM_0024538

*Reality:* This goes beyond exaggeration. We are proposing a $3.6-$4.6 billion annual Superfund program, with total public funding of $3-4 billion. That does not approach the size of the Federal Highway program, which has an annual budget of $20 billion—not to mention the airport or water programs, or even the effort which will be necessary to clean Department of Energy sites.

No one is suggesting that Superfund be made a "taxpayer financed clean-up program," which implies taxes on individuals. ASAP, The Business Roundtable, and other groups all suggest increased business taxes as the predominant source of new funding—as they are today.

*Myth:* A trust fund approach betrays the "'Polluters pay'" concept.

*Reality:* The NAACP and ASAP care about protecting public health, not "concepts." This "concept" has governed Superfund for 13 years and has failed our citizens. In the real world, this "concept" delays site clean-up and benefits lawyers, not citizens. Under ASAP's plan, companies which broke the law will remain liable; the plan would not benefit them in any way. Companies which pollute in the future also will remain liable and pay the full costs of clean-up.

So, I ask, how are we betraying the "polluters pay" concept? We continue to hold the feet of lawbreakers and wrongdoers to the fire.

Most of the die hard defenders of the continued application of this failed "concept" to old disposal do not live, nor do they have members who live, near Superfund sites.

*Myth:* Retroactive liability is an incentive for careful waste management.

*Reality:* Retroactive liability for past legal waste disposal has nothing to do with incentives for careful waste management today. Current and future liability does, and that would not change under our proposal. It is important to distinguish between the two.

Unlike the Administration bill which provides protection against liability for current and future disposal for municipalities, small quantity toxic waste generators, and MSW disposal companies, large and small, we do not weaken future liability for any party for toxic pollution.

*Myth:* Abolition of retroactive liability would transform the program from one in which 70 percent of response work is performed by PRPs to one in which 70 percent is performed by EPA.

*Reality:* Under today's law and all reform proposals Government makes all the important decisions which really determine the costs of clean-up. EPA clearly believes who implements those decisions is more important than whether the work is done. ASAP disagrees. Far too little clean-up is occurring today largely because the current site-specific, litigation-based, adversarial financing system delays clean-up. ASAP's proposal would replace that system with a mechanism that would put business money to work on clean-up, not fighting over who pays and how much.

Much is made of EPA's "Enforcement First" policy (e.g., 70 percent of clean-up work is now paid by PRPs). PRPs now seem to be paying about half of the costs of the overall Superfund program ($1.5 billion in annual PRP settlements versus $1.4-1.5 billion in Superfund appropriations). However, EPA's own data indicate that the speed of clean-up has not accelerated due to this policy.

Under ASAP's plan, the government can continue to use its enforcement authority to require PRPs at a site to manage the clean-up. Therefore, the efficiencies of private sector management will remain and the claim that elimination of retroactive liability will result in EPA performing 70 percent of the work is entirely incorrect. We are also seriously exploring delegating the program to qualified States, which should create additional efficiencies.

*Myth:* Abolishing retroactive liability would require $3 to $4 billion in new tales.

*Reality:* No liability proposal we have ever seen, including ASAP's Eight Point Plan, proposes to raise "$3 to $4 billion a year in new tax revenues." The detailed plan offered by ASAP would require "new tax revenues" from business of $1.2 to $1.8 billion—while providing large increases in current clean-up spending.

*Myth:* Clean-ups would be significantly more expensive under a trust fluid approach

*Reality:* The implication here is that we have an efficient system today. But there is precious little ability today for PRPs to control costs when EPA makes all the key decisions. And under today's system, EPA has no incentive to control any costs (either its own or the cost of remedies it imposes on private parties), since "PRPs will pay."

The fact is that clean-ups would be more efficient under ASAP's proposal than they are today. Qualified States and/or public-private entities would be delegated much of the clean-up work, and PRPs could still be ordered to manage clean-up as

they do today. With a set budget Superfund decision makers would have an incentive to be as efficient as possible.

*Myth:* Some industries, which have their own clean-up corporations, will no doubt be contracted to do clean-ups. Therefore, industries will now be paid to clean up their own mess.

This point is completely backwards. The problem is that under the current system EPA must negotiate on every clean-up decision with the same businesses which are paying for clean-up. Decisions which affect citizens' lives are made in negotiations behind closed doors between EPA and corporations, which have a primary incentive to save themselves money. Our plan would end this practice and have the Government make clean-up decisions, in consultation with the affected community, based on public health risk—not the checkbooks of private parties.

*Myth:* Poor and minority communities will continue to be by-passed because of an inadequate hazard ranking system

Not true. Unlike the Administration bill which mostly studies environmental justice concerns and does not change the current system under which people of color communities have been short changed, our plan establishes a hazard ranking system that considers not only the actual risks presented by the toxic waste site alone, but also the health effects it may have in conjunction with other environmental risks in the area. Our plan would prioritize sites and spending for clean-up on the basis of public health risks. Once listed, sites would receive money on the basis of the threat they pose to public health. This is unique—no other plan prioritizes clean-up spending on the basis of public health risk.

There is not one sentence in the Administration bill which changes anything about how clean-up resource priorities are made. ASAP's plan says how to change priorities, and provides the funding to get the job done.

*Myth:* Elimination of retroactive liability would remove any incentive for voluntary clean-ups for sites covered by the public fund. Tens of thousands voluntary clean-ups occur now.

*Reality:* There is no evidence to support the claim that "tens of thousands of voluntary clean-ups occur now." EPA, Resources For the Future (RFF) and others have tried to quantify the number of voluntary clean-ups and have failed. Based on a tiny sample of 6 sites of Fortune 20 companies, using an expansive definition of "voluntary," and not seeking to ascribe a motivation such as fear of retroactive liability, RAND estimated that only 8-10 percent of non-NPL sites were being cleaned up "voluntarily"—an estimate that would yield a much smaller number than the extraordinary claim above. Certainly many occur, but there is no evidence that retroactive CERCLA liability is the sole or even the primary cause. EPA's own report on "Indirect Benefits of Superfund" acknowledges that a variety of factors in addition to CERCLA liability contribute to any voluntary clean-ups.

Moreover, ASAP's proposal focuses on multi-party NPL sites. There is no evidence that any multi-party NPL site has ever been voluntarily cleaned up, a fact noted in Superfund studies published by both EPA and RFF.

There is good reason for this: the current liability system often prevents voluntary clean-ups. Significantly, the Administration recognizes this, and proposes in its bill to remove retroactive liability for prospective purchasers of contaminated property.

*Myth:* Abolition of retroactive liability would generate a new round of litigation over who sent how much waste, and when, to each site.

*Reality:* EPA agrees that PRPs today fight with each other, EPA and their insurers over who sent how much waste, and when, to each site. These are extremely complicated factual issues, and they are the major source of Superfund disputes and transaction costs. To these questions, for every one of tens of thousands of PRPs the Administration's bill will add a series of other highly complicated issues (as part of the "Gore Factors" required to be used in allocation decisions): how much control over disposal did parties have? what degree of care in disposal did they use? how cooperative have they been with the Government? Determining this information will add to existing transaction costs, and make a mockery of the goal of completing allocation within 18 months.

ASAP's proposal makes all these disputes moot at 80 percent of NPL sites—those which a survey of EPA managers indicates had stopped accepting waste by the end of 1986. At the remaining 20 percent of sites there would be one remaining issue—how much waste was disposed of after 1986? This would be relatively easy to settle, because there are much better records for disposal occurring after 1986.

Obviously this one issue, affecting a minority of parties at only 20 percent of the sites, could not possibly create more litigation than the current legal maelstrom,

ALCD-PUBCOM_0024540

448

much less after the Administration bill complicates it with new factual issues to be disputed.

*Myth:* Abolition of retroactive liability would be unfair and would result in a windfall for parties who had not cooperated in cleaning up sites.

*Reality:* No business group or entity is seriously making this argument. Like citizens who live near Superfund sites, business knows that relatively few sites have been cleaned up. The lion's share of the clean-up bill has yet to be spent and could well exceed a hundred billion dollars.

*Myth:* Abolition of retroactive liability would remove incentives for private sector investment in innovative technology research

*Reality:* This recent claim flatly contradicts EPA's prior position, and the experience of everyone else concerned about this issue. Last spring, EPA testified before Congress that "fear of liability... slows down the adoption and subsequent commercialization of innovative treatment technologies." At the same time, EPA admitted that, "a fundamental tension exists between having PRPs pay for clean-ups and conducting a program focused on developing new technology."

*Myth:* Removing retroactive liability will result in truly "orphan" sites competing with sites that have existing PRPs for a small pool of money.

*Reality:* Our critics are not reading the numbers. Our plan would spend hundreds of millions of dollars more on clean-up than is currently being spent by EPA and PRPs combined at all sites, orphan or otherwise. More clean-up money will produce more and faster clean-ups, and will provide funding for more clean-up of truly "orphan" sites.

Under the current system, clean-up has not begun at hundreds of orphan sites and sites where EPA and PRPs get bogged down in conflict. The continuing harm to the health of people living near these sites is a national disgrace and an environmental injustice. Only the Eight Point Plan would clean these sites quickly and without punishing innocent communities for the fact that no solvent parties can be found at a local site.

## IV. COMMENTS ON THE ADMINISTRATION'S BILL

By failing to address Superfund's fundamental flaw—retroactive, site-specific liability—the Administration plan is in itself fundamentally flawed. No amount of tinkering with the current system will bring to life the principles embodied in ASAP's Eight Point Plan. Too much of what needs to be done is inextricably entwined with finding a more efficient and effective way to finance site clean-ups. Until that happens, priorities will of necessity stay focused on site-by-site fundraising—not the protection of public health and the environment. Following is a review of the Administration Plan viewed in light of ASAP's eight principles.

### POINT ONE: PUBLIC HEALTH

The Administration is to be commended for its inclusion of specific provisions which seek to address the problems of highly impacted communities, particularly those of people of color. But it does not go nearly far enough, nor can it, because it does not provide the necessary financing reform.

The Administration proposes to conduct "Multiple Sources of Site [Pollution] Demonstrations"; engage research assistance via cooperative agreements and grants to "appropriate" public and nonprofit institutions; conduct selective health effect studies to ascertain the need for broader health studies; and engage peer review of the ATSDR's assessment of relevant toxicological testing. These are good ideas. They are pieces of what we are talking about in Point One of our plan.

The bill authorizes a 5-year study/demonstration project at several sites to provide additional public health benefits to citizens (e.g., health screening, medical care) "in an effort to increase community acceptance and satisfaction with actions taken at these sites." This sounds like the National Commission's "$50 million-a-year for 10 projects" proposal, which is a good idea. But it suffers from the same fatal flaw: there is no new money provided. It is just another one of those ideas which will have to struggle for funding with other Superfund priorities like clean-up. Mr. Chairman, after years of ignoring the problem, unfunded demonstration projects are just not good enough.

In sum, ASAP believes these amendments to the current legislation are positive, and start to address the concerns we have raised, but they are far too narrow in focus as they are mostly demonstration projects, and they do not have proper new funding.

ALCD-PUBCOM_0024541

### POINT TWO: ADEQUATE FUNDING

The Administration proposal would maintain the current inefficient site-by-site liability fundraising system. This means the exorbitant legal fees and other non-clean-up costs incurred today would continue largely undiminished. (See comments on Point 5.)

In crafting its bill, the Administration ignored offers by large and small businesses to pay higher taxes to support fundamental reform of Superfund. In letters to the President, 4,500 businesses of all sizes and a variety of trade associations across the country offered to pay higher taxes in exchange for elimination of retroactive liability.

But the Administration rejected these offers to support higher taxes for a better Superfund. It accepted one offer, though. Insurers had indicated that they would support a new tax on their industry to finance an expanded Superfund and an elimination of pre-1987 liability. Instead, the Administration took this offer and used it to establish an Environmental Insurance Resolution Fund set up only to reduce the liability of solvent PRPs.

The Administration also proposes a specialized $300 million "orphan share" program to reduce the liability of solvent PRPs.

But neither the insurer fund nor the orphan share fund direct new money to clean-up; both simply move money from one group to another. It's the legislative equivalent of rearranging the deck chairs on the Titanic.

It is true that the Administration bill authorizes more money for Superfund (although these additional amounts were not included in the President's Fiscal 1995 Budget). But look closer—even if they are raised, these funds are all earmarked for the proposed orphan share program; again, not new money, just redirecting the flow of funds already in play.

More important, no new financing source is suggested for the $300 million orphan share program; so where will money for it come from? It can only reduce amounts now used by Superfund for clean-up of sites where there are no solvent PRPs. If this amount was fully paid by the current Superfund, clean-up funding would be reduced by one third.

Additional evidence that the "emperor has no clothes" can be found in the Administration's call for a number of new initiatives, programs for which it proposes no new funding. Over the next 5 years, the new and expanded programs with stated costs will require hundreds of millions of dollars in additional resources over and above the additional authorization, and that does not include several programs for which a cost has not been stated.

So one of two possibilities exist: these programs won't get funded, making their creation a sham, or the funding will come out of current resources. If these programs were fully funded, Trust Fund clean-up spending could be reduced by an additional 20–30 percent.

Let me be clear that ASAP fully supports increased spending in many of the areas identified by the Administration. And we appreciate its leadership. But the difference between the Administration and us is that we pay for our proposals; they don't. And the only way you can pay for them, short of increasing appropriations from general revenues, is to increase the size of the Trust Fund with broad based taxes as we propose.

Attached to my testimony is a list of the unfunded new and expanded programs which would draw money from clean-up.

### POINT THREE: ENVIRONMENTAL IMPACT PRIORITIZATION

The Administration has adopted most of the Eight Point Plan's suggestions for NPL site listing changes.

The bill adds to the factors to be considered in an NPL listing decision: "the presence of multiple sources of risk" and "cumulative risk to minority and low-income populations." It changes the bias in the HRS regarding groundwater. All three of these are called for in the Eight Point Plan.

This is a very positive development. Unfortunately, the Administration has not extended this concept to the critical area of clean-up and resource prioritization (nor can it overall until the current financing system is replaced).

### POINT FOUR: EFFECTIVE REMEDIES

To the extent we understand it, the Administration's bill would provide for site-specific clean-up standards as the exception, not the rule. While local input would be accepted on some of the issues which relate to the choice of remedy, particularly land use, it is not at all clear that local views would have a powerful voice overall,

450

or that the remedy choice would be the product of all of those with a legitimate interest in it—government, community and business. Instead, it appears that national decisions would be paramount. ASAP believes the Administration's bill demonstrates all too clearly that the discipline which can be imposed on the system through a global budget cannot be duplicated through a series of standards and exemptions which only complicate the decision-making process.

Many argue over whether there should be national standards. We believe exposure standards for a given route of exposure to a given hazardous substance must be uniform. The issue in remedy selection should be how to most economically and securely prevent unhealthy exposures in a way that is favored by the affected community.

On a positive note, the Administration does authorize a 5-year demonstration project in communities which are also empowerment zones to study multiple source and cumulative risk. EPA is to coordinate with HUD and other departments. ASAP would provide the funding for such efforts at a much larger number of sites.

### POINT FIVE: FINANCING

In contrast to ASAP's comprehensive and integrated reform of the retroactive liability and funding issues, the Administration's proposal is woefully inadequate and virtually guarantees continuation of the same history of delay, inaction, litigation and waste of enormous resources that has marked the first 13 years of Superfund.

Rather than directly confront and reform the liability and funding problems, the Administration makes minor liability changes to favor certain parties and otherwise relies upon an unfair, time consuming and non-binding cost allocation process which only serves to add further delay, litigation and inequity to Superfund.

Although 56 percent of the length of the Administration bill (79 of 141 pages) is devoted to liability provisions, in the final analysis the bill pretty much retains the status quo. To a large degree, the bill does nothing more on liability than:

   1. Give special treatment to certain parties: some cities, all waste disposal companies, banks, small quantity generators of toxic waste;
   2. Add a complicated liability allocation process; and
   3. Raise and allocate $500 million rising to $1.2 billion per year in new funding from the insurance industry solely to reduce the current liability of solvent PRPs.

And that, members of the Subcommittee, should not only give you great pause, it should alone be enough to convince you to set it aside and look at alternatives that yield fundamental reform. If you believe, as many of you have said, that retroactive site-specific liability is the Superfund problem, the Administration bill is still the same old failed story.

Listen to what Local Governments for Superfund Reform has to say about this. In a statement released February 3, LGSR Chairman Joe Palacioz, City Manager of Hutchinson, Kansas, said: "The Administration's plan fails to help local governments fulfill our primary responsibilities at Superfund sites—First, eliminating risk in a timely manner; Second, protecting the local economy and tax base; Third, returning polluted non-productive land to productive, taxable status; and Fourth, controlling costs at these sites. For all local governments, the Administration's ability-to-pay proposal is nothing more than another unfunded mandate, which will ultimately lead to rationing of services and increased taxes on our citizenry to pay for an inefficient Federal program."

*The Allocation Plan*

Trumpeted as a "fair share" plan to eliminate the unfairness of the current liability system, the proposal does nothing of the sort.

   • Fair allocation rests on the availability of data. This is particularly true to meet the new standards for allocation imposed by the bill: the Gore Factors. The share of each PRP will be based not just on the volume and toxicity of the waste it contributed, but also on factors such as its control over disposal, its care or negligence in disposal, and its cooperation with the Government in clean-up. Everyone with any experience at a site knows how little basic data exist for disposal before the mid-1980s, much less evidence of PRP behavior. The proposed law creates more factual issues for lawyers to fight over.

   • The "fair share" allocation plan lets EPA remove the potential benefits of that process for settling parties which want to cash out by charging "premia" (set by EPA) for every possible future event, including and especially the risk that EPA will not collect the fair shares of non-settling parties. In other cases, you may get a share, but EPA can multiple it by any factor it wants.

- EPA is given enormous discretion over all critical issues and in most cases its judgment is not reviewable. Imagine the howls of protest you will soon receive if you put that into law?

For evidence of the continued, unacceptable injustice in this so-called "fair" process, how about the fact that even if a third-party allocator finds that a PRP has no liability, EPA can still order that PRP to clean-up a site!

*Transaction Costs*

The Administration argues its plan will reduce transaction costs 50 percent. Pure fiction.

- It will increase government transaction costs. The government will be required to conduct PRP searches now carried out largely by the private sector at its own expense. And EPA has agreed to pursue all non-settling parties, rather than forcing this job on a few selected PRPs as it does today. This is fairer, but not cheaper.
- On top of this, EPA is suggesting it will conduct separate and "expedited" cost allocation and cash out processes on its own for favored parties: all municipalities, all generators and transporters of MSW, and "de minimis" and "de micromis" PRPs. EPA staff have said in the past that this is an enormously expensive and time consuming process, precisely why the agency has done so few "de minimis" settlements and NBARs since 1986.
- Insurance transaction costs will go up due to the heavy incentives to draw in as many parties as possible as early as possible in the process; PRPs will initiate actions against their insurers and/or claim duty to defend contributions. This will not apply to parties which settle with the EIRF (except that the EIRF process creates a whole set of issues that insurer lawyers will have to address).

*Effect on Settlements*

While the Administration argues that PRPs will have heavy incentives to settle, in fact the reverse may be true.

- Assuming the neutral allocator does a fair job of cost allocation, EPA has the unrestricted, and unchallengeable power to impose "premia" on settling parties which want to cash out for all future risks: failure of a remedy, new site conditions, etc. Most important, it can charge a premium for its "litigation risk" in collecting the balance of amounts due from non-settling parties. These "premia" are not subject to any challenge—they are entirely up to EPA's discretion. Yet, settling parties would have no ability to recover these extra costs from non-settling PRPs.
- A similar incentive against settlement exists for parties which are less inclined to settle. Faced with the threat of joint and several liability for all costs of clean-up, PRPs have not hesitated to fight for the past decade. The new system will reduce this potential liability for non-settling parties to the costs left after settling parties have paid their fair share. The threat that they will have to pay the orphan share paid by the Fund is no different than today's reality.
- PRPs can refuse to settle at one or all of their sites, but if they settle with the EIRF they will have an average of 40 percent of their past and future legal fees to fight the Government and other parties paid for by the EIRF.
- The provisions protecting settlers against contribution suits and reimbursing them for payments for clean-up in excess of their settled share could prove attractive to some PRPs. We obviously favor reimbursement of PRP clean-up expenses. The problem here is that the Administration provides no new financing for this new responsibility it proposes to assume. Thus, reimbursements under this provision will drain Fund resources from clean-up.

*Effect on Small- and Medium-Sized Businesses*

The vast majority of PRPs are small- and medium-sized businesses and non-profits, including municipalities—not Fortune 500 companies. The Administration explanations recognize their concerns, but the bill does not address their problems. ASAP is blessed with strong and diverse small business membership, so we have a particular understanding of their experience and concerns with Superfund. Our small business members range from Chelsea Clock to the American Furniture Manufacturers, from the International Fabricare Institute (drycleaners) to the Independent Gas Marketers, from the Bailey Corporation to the Electrical Apparatus Service Association, and from the Grocery Manufacturers Association to the National Food Processors Association.

ALCD-PUBCOM_0024544

452

• For those which cannot prove they are "de minimis" contributors (most of them), a "fast-track" allocation process using the Gore Factors means that they will be disadvantaged relative to large, sophisticated PRPs which can produce disposal records and studies of "mobility" and similar issues. Small businesses (and most other PRPs) simply do not have the records to prove their status or amount of contribution, much less the toxicity, mobility, control and negligence factors called for with use of the Gore Factors. Thus, this process will result in cost shifting from such large PRPs to smaller ones.

• Far more small businesses will be brought into the Superfund process far earlier than in the past due to the incentives of this bill to draw in every possible PRP in the beginning. This will exacerbate the business harm caused to smaller PRPs by longstanding contingent Superfund liability.

• For those who are "de minimis" contributors, it is not very credible to hear one more promise in a long string since 1986 that the Administration will provide expedited "de minimis" settlements "wherever practicable" and "as promptly as possible."

• The de micromis exemption allows parties which sent 10 pounds or 10 liters or less of hazardous wastes to a site to certify that they qualify for full exemption from liability. This certification makes sense (as opposed to requiring proof). However, EPA can raise or lower the amount, or determine that such parties will be liable if "such material contributed significantly or could contribute to the costs of response." Almost by definition such disposal "contribute[s] to the cost of response."

• Even if the program works perfectly as it is advertised, all it does is hand a small business a share of an unknown cost for clean-up and perhaps natural resources damages. The actual cost cannot be known for many years if, in fact, she allocation is done quickly and early in the process. Consider the plight of a small business given "only" a one percent share. At the average site that would end up being $250,000. But early in the process no one knows—and what bank will make loans for business use when a range of clean-up costs, say $10 million to $40 million, is possible (or $100,000 to $400,000 for the small business)?

• There are no assurances or protections that a special process for small business will be done quickly or fairly anyway.

Let's be clear what you're doing if you enact the Administration bill: you are providing relief to some big businesses and imposing a greater burden on small business.

*The NFIB Compromise*

Much has been made of a negotiated agreement between the NFIB and some environmental groups. The small business members of ASAP do not think this agreement is either workable or solves their concerns. Indeed, we do not know of any small business PRPs who support this layering on of new band aids to the current liability system which has harmed so many small businesses.

But it is instructive to assume that its provisions will work, and see what happens.

The agreement provides that liability will be terminated for small businesses if very short timetables for share allocations are not met (i.e., 6 months). But it is highly unlikely that either EPA or a neutral allocator can make "fair share" allocation decisions and settlement offers on any sort of rational basis very early in the Superfund process for all small PRPs.

Thus, some might see this as an effective exemption for small business unless one of two things happens:

• EPA invokes the agreement's exception to the deadlines for "just cause." The lack of data (or time required to get it) probably would qualify.

• large PRPs launch intensive efforts to do EPA's work for it (see below).

If these don't happen, an interesting question is what happens to the shares of small businesses if EPA fails to collect it from them.

• Will the Fund pick up their shares, as is the case for amounts over the bill's 10 percent cap on MSW generators? (This would place a major new demand on the existing Superfund, reducing funds for clean-up.)

• Or will other PRPs have to pay that amount? If so, all other PRPs will pay the share of businesses with less than 100 employees. I suspect there will be serious lobbying by larger businesses against this now, and interesting litigation later, over this issue. But what would EPA do with this problem in the real world?

ALCD-PUBCOM_0024545

453

Faced with mass write-offs of liability, if EPA can't delay based on "just cause," EPA will have a huge incentive to do exactly what it does today (explaining why there are so few "de minimis" settlements). Its staff will err on the side of caution and declare that very few parties are "de minimus," forcing everyone into the regular allocation process. That way it won't lose any "big polluters," and it will capture some money that it would otherwise lose.

Small businesses will thus be forced to incur the transaction costs and associated trauma of that intensive allocation process with all the bigger PRPs, and hopefully will be able to find evidence to prove that they are in fact de minimis—based on the complex Gore Factors. As it is today, they will have the burden of convincing the allocator and then EPA.

There are a series of other problems with this approach, including EPA's ability to set whatever premiums it wants on top of any share for parties which wish to "cash out".

In addition, the NFIB agreement appears to require establishing a parallel two track allocation system: EPA would be responsible for figuring out shares for "de minimis" parties (which requires knowing the shares of all parties in order to figure out the "de minimis" shares); the neutral, third party allocator will repeat the same analysis for everyone else. Big PRPs will have their lawyers involved with both processes. And more transaction costs will have been created.

No one has addressed what happens to small parties who are not found by EPA in this initial process (or who decline to participate)? How do they get contribution protection? Can't a non-settling PRP sue them for contribution under the current law? Doesn't this mean that there will be major continuing uncertainty for some class of small businesses? This class will be larger the more rapid the initial process is.

Most important, what did all of this do for clean-up and public health, however it comes out? Nothing.

*Discriminatory Treatment of Various Parties*

• The Administration proposes a limit of 10 percent of total response costs for one group—generators and transporters of municipal waste—yet other municipalities that are owner/operators of MSW sites are left to try to settle their continued retroactive joint and several liability with the Federal government subject to their ability to pay.

• Under the cover of Congressional sympathy for municipalities, the huge companies which pick up and dispose of MSW have gotten themselves covered by the same cap on liability: both for the past and the future.

• Cities also appear to have gained an exemption from liability if they do not conduct MSW pick up themselves, but grant permits and licenses to other parties to perform that function.

• New purchasers of contaminated property who had no role in causing its contamination would have no clean-up liability. But past purchasers who also had nothing to do with pollution would stay liable.

We don't support retroactive liability for any of the above parties unless they broke the law. But carving out certain PRPs and leaving the rest in the system doesn't change the underlying problems with Superfund, and may make them worse. The shares of those parties must be paid by someone. If they are loaded on other PRPs those parties will fight harder. If the Superfund picks up the costs, without new financing less money will be available for clean-up.

*Speed of Clean-up*

EPA's own figures prove that "enforcement first" has not accelerated clean-up at all. Neither does this plan.

• The Administration's allocation system adds a multi-year administrative cost allocation process to the current system which will further delay actual site remediation.

• Using the Administration's own timetable, you can add up 3 years of searches, notifications, allocations, red tape, settlement talks, hearings, public comment, and who know's what else before you even have a final allocation of shares not even actual costs. It is still a pretty good system for lawyers, and it's not a bad system for those big businesses who have the records and time to wait for the process to finish. It's a horrendous system for everyone else.

• With its unilateral focus on cost allocation, the Administration plan ignores the fact that PRPs will continue to fight EPA over testing plans and remedies, to keep their costs down.

• Due to this and the probable presence of non-settling parties at most sites, the Government and PRPs will continue to conduct operations under a "litiga-

454

tion mentality", further delaying progress, and adding transaction costs and "defensive medicine" costs, such as litigation-quality paperwork and testing.

### The Orphan Share initiative

The Administration's plan offers up $300 million in "new funding" for payment of what it considers orphan shares—i.e., shares attributable to identifiable parties who are "insolvent or defunct", plus excess municipal generator shares (over the 10 percent cap), and shares of parties who otherwise have their liability limited.

• This limited conceptualization of "orphan shares" distributes the costs of all unidentified shares to the identified solvent PRPs, thus maintaining their sense of inequity.

• All orphan share amounts over $300 million will be distributed to solvent PRPs.

• While the Administration says funds for this purpose will be separately appropriated, the bill does not say this, and, even if it did, we believe Congress will lump the basic Superfund and this new program together, thus creating competition between the existing Superfund and this new program. Thus, spending on orphan sites and other priorities will come in conflict with this demand to reduce the liability of current, solvent PRPs.

• No new funding source for this purpose is identified, so financing will be subject to existing budget caps (and thus be in competition with other spending programs). Indeed, the new Administration budget for Fiscal 1995 does not include this $300 million addition.

• Like the new insurance trust fund (EIRF), none of this new funding will expand clean-up or pay for other priorities. All of it will reduce the liability of large PRPs who now are forced to pay the orphan share.

• While paying orphan shares is a common complaint of PRPs, having the Government pay it will hardly alter the basic dynamic of the warfare over financing at Superfund sites. Said another way, parties will fight almost as hard over liability for 80 percent of the costs as they will over 100 percent of the costs.

### Subsidizing the Failure of New Technologies

EPA's claim that retroactive liability provides incentives for private sector investment in innovative technologies flatly contradicts its own position, and the experience of everyone else concerned about this issue. As noted above, last spring, EPA testified before Congress that "fear of liability . . . slows down the adoption and subsequent commercialization of innovative treatment technologies." At the same time, EPA admitted that, "a fundamental tension exists between having PRPs pay for clean-ups and conducting a program focused on developing new technology."

Rather than addressing the cause of the problem, the only "fix" offered by the Administration is a provision to be able to offer a discretionary partial subsidy to those PRPs which try new technologies that fail—but only up to a total of $50 million, which is itself not supported by any new financing (and thus, like the promised "orphan share fund" will reduce EPA's own spending on clean-up).

### Impact on Greenfields/Brownfields

To its credit the Administration recognizes that this is a major problem, and that the current liability system is a positive disincentive to development and voluntary clean-up during the sale of property, contrary to the claims of its defenders.

• The bill's full exemption from liability for new buyers of contaminated property is a major break with long standing ideology and should be applauded. It will combat the disincentive to invest in inner cities.

• All the problems of the liability system in this area remain for all other sites; States may not experiment; they can only be delegated the program if they have a liability system just like the Federal law, and use it.

### PRP/Insurer Fund

The Environmental Insurance Resolution Fund (EIRF) portion of the Administration bill, as well as a revised version now under consideration by its advocates, is another example of the piecemeal approach plaguing real reform efforts. Many insurers and PRPs, through their trade associations and individual companies, are already offering detailed critiques of the proposal. Both sides have serious, substantive objections. Another group of PRPs and insurers apparently support it. Here I will just point out a out a few of the problems we see.

Unlike ASAP's broad-based financing proposal (which includes a large, special contribution from the insurance industry), the new EIRF tax on insurers is money which would not increase total clean-up spending or spending on other priorities.

And that leaves aside the question of whether the proposal is even workable. I invite you to read it and draw your own conclusions—if you can get through it.

The fundamental problem with the proposal is that it deals with a peripheral, derivative issue. The Administration's stated purpose for this fund is explicitly and solely to cut insurer/PRP transaction costs. By limiting itself to this narrow issue, it guaranteed that this plan would have no real impact on the liability created problems of the Superfund program.

Even if this proposal solved all the PRP/insurer fights at NPL sites, that would do little for public health, for the pace of clean-ups, and even for ending disputes between and among the Government and PRPs over financing of site costs. The recent RAND transaction cost report noted that only 1 percent of PRP costs were for disputes with their insurers (while around 35 percent were transaction costs).

We are told that the first EIRF deal (the one in the Administration's bill) is dead. A new one was just announced. Then a group of large PRPs attacked it, saying they wanted a better deal, or at least the first one. The insurance companies who negotiated both plans refused. Other insurers who had no role in negotiating either agreement are attacking the ones who did for unfairly allocating the taxes to pay for the plan onto them.

How does any of this warfare benefit communities threatened with toxic waste? This is just another example of how piecemeal reform of the liability system does not work.

• The proposal raises from the insurance industry $500 million in new annual funding, rising rapidly in future years. But it uses every dime of new funding to merely reduce the existing liability of solvent PRPs. None of that money is used to expand clean-up or fund other priorities.

• When new funds are needed for sites with no PRPs and for other key priorities, we cannot understand why hundreds of millions of dollars in new tax revenue will be raised from insurers and spent to pay for past PRP costs, including PRP legal fees dating all the way back to 1981.

• EIRF has nothing to do with settlement of site disputes and getting on with clean-up. PRPs (whether or not they settle at sites) will have an average of 40 percent of their legal bills paid by this new fund within 60 days of submission to the EIRF. This subsidy of future PRP legal fees will fuel the PRP side of the battles between the government and PRPs at sites.

• Insurers today pay about 10 percent of Superfund costs. This proposal hikes that to about 40 percent. And it doesn't even provide assurances that litigation will actually end. That is the worst of all worlds for insurers and does nothing for the overall program. The proposed insurance taxing mechanism has the insurance industry warring with itself.

• By requiring proof of policy terms to benefit from the new fund (while limiting recovery for policy deductibles and other restrictions), a huge new bureaucracy will be required to make these judgments, with insurer and PRP lawyers lobbying it on each claim. How many of you can find copies of or remember the exact terms of your insurance policies from the 1970s and early 1980s?

POINT SIX: PUBLIC PARTICIPATION; COMMUNITY EMPOWERMENT

While the Administration's plan calls for very positive new provisions to involve the public in Superfund decision making, these will cost more than $50 million a year, and no new funding is provided. Therefore, any resources for public participation will come out of existing Superfund money—an unacceptable trade-off.

The Administration bill does not address the community empowerment agenda of the Eight Point Plan, which calls for training citizens in impacted communities in remediation skills, and involving minority businesses in clean-up.

POINT SEVEN: PROSPECTIVE LIABILITY

Much has been made by the Administration of the value of the Superfund liability system in causing parties to exercise care in the disposal of hazardous waste. We believe the Administration has confused the value of liability for old disposal with liability for current and future disposal. We do not disagree on the latter.

We find it extraordinary that, notwithstanding this position, and its unwavering commitment to site-specific liability, the Administration is willing to limit the liability of municipalities and the largest private MSW disposal firms (the entities which control the vast majority of waste disposal in our country), not just for past disposal, but also for current and future disposal. Such parties past and future liability will be capped, in the aggregate, to 10 percent of the clean-up costs at a site if the city (3 years after passage of the law) puts in place a system to collect household toxic

456

waste just twice a year. This is a major step backward in incentives for proper disposal of a very large amount of our society's hazardous substances. This is not just a "break" for cities; it removes a major incentive for appropriate disposal behavior by enormous corporations which dispose of MSW.

This same future liability exemption applies to corporate small quantity generators of hazardous waste, but no such collection responsibility is imposed on cities for such waste. (Up to 200 pounds per month of hazardous waste per generator would thus be essentially exempt, hiding within the same 10 percent MSW cap.)

### POINT EIGHT: PROGRAM COORDINATION

Administrator Browner said in recent testimony: "Economic redevelopment of contaminated sites is an essential component of this legislation." Yet EPA has committed only to a demonstration project, and no new money is raised to pay for it.

More fundamentally, EPA cannot effectively address this widespread problem simply through Superfund reform. The agency must look to other agencies for assistance and support. EPA does not have the required expertise or background to do this. That is why our Eight Point Plan calls for leadership from other agencies and focussing existing programs on these communities.

### V. CONCLUSION

This subcommittee knows well the failures of Superfund. You and others have documented the unconscionably inadequate clean-up record, the staggering waste of public and private resources on legal and liability battles, the disenfranchisement of citizens which erodes confidence in government at all levels, and the suppression of economic dreams as entire communities wait, and wait, and wait for action.

Let us not settle for reform which falls well short of addressing these problems. Enactment of a bill is not what should drive us. Instead, we should only settle for a bill that truly gets the job done. I would prefer no bill at all to one which perpetuates in the name of reform many of the injustices and failures in place today.

Let us not mistake cobbling together a bill which satisfies some vocal and visible constituencies for a bill which will result in a successful program. Such a bill may be politically feasible, but if it doesn't work, it's not much help to anyone.

I believe this Administration and this Subcommittee want a successful Superfund program. I am pleased that President Clinton indicated his bill is a starting point, not an end point; and I was pleased that in my meetings with the Administration, other than EPA, they indicated flexibility on every issue, including the final shape of liability reform. I believe this attitude, coupled with a genuine commitment to serve the interests of all Superfund stakeholders, means we can all find common ground.

Thank you. I look forward to working with you.

### SPENDING ASSUMPTIONS AND EXPLANATION

*Assumption for Calculation*

For the purposes of calculation, we assume a 1986 liability cutoff. No cutoff date has been chosen yet. The actual date will be selected with the goal of speeding clean-up, and reducing transaction costs and disputes. The quality of waste records, waste management regulations, and available disposal facilities will be considered.

*Total Spending*

Fiscal year 1992 spending is the sum of Fiscal Year 1992 PRP settlements ($1.48 billion), as estimated by EPA, and actual gross Fiscal Year 1992 outlays ($1.47 billion). The latter figure was printed in the Fiscal Year 1994 "Budget of the United States Government" and includes some spending which will be recovered in the future. While settlements are only commitments to spend, not actual spending, there is no record of how much PRPs actually spent to clean up NPL sites in 1992. For obvious reasons, spending lags years behind settlements. However, since real annual settlements have held steady at just under $1.5 billion for each of the last 3 years, we believe that they now approximate actual spending.

Breakdowns of Fiscal Year 1992 outlays are not available; in estimating the breakdown among clean-up, enforcement and the several "other" spending categories, we have had to extrapolate from EPA's Fiscal Year 1992 budget for Superfund commitments and obligations.

Proposed spending is 20–50 percent higher than current spending.

ALCD-PUBCOM_0024549

457

*Clean-up Spending Total*—Fiscal Year 1992 spending on clean-up is the sum of PRP settlements ($1.48 billion) and outlays for direct site clean-up (estimated at $920 million).

Proposed spending represents a 40–75 percent increase over current clean-up spending at multi-party and orphan sites. Overall proposed spending is 25–50 percent higher than 1992 spending (or more if less is spent on "other" activities). According to a 1991 study by the University of Tennessee, the proposed spending level of $3–3.57 billion is more than sufficient to dean all of the sites on the NPL over the next 30 years. This assumes an expanded NPL of 3,000 sites and improvements in remedy selection, including consideration of sites' future use.

*Multi-party and orphan NPL sites*—Current spending is calculated using the assumption that 70 percent of all PRP settlements (less $85 million in settlements for emergency removals) is spent at multiparty or orphan sites. Thus, PRP settlements for multi-party sites are estimated at $920 million One recent study estimates that 70 percent of all NPL sites not owned by the U.S. government are multi-party sites. (The other 30 percent are single-party sites where there is only one PRP.) Nevertheless, 70 percent may be an overestimate; site research indicates that disputes over remedy selection, cost allocation and other issues are much more serious at multi-party sites and delay settlement, often indefinitely.

In addition to the $920 million in PRP settlements, we estimate that $680 million from the trust fund were spent at multi-party and orphan sites. $680 million is slightly more than 70 percent of all trust fund clean-up spending and is thus consistent with the fact that EPA spends as much of its insufficient clean-up funds as possible at orphan sites.

*Single-party NPL sites*—Current spending is estimated at 30 percent of PRP settlements, or $445 million, plus $105 million in trust fund spending. The 30 percent estimate is conservative for the same reasons that the 70 percent multi-party site estimate may be high. $105 million is a best guess based on EPA's extreme reluctance to spend trust fund money to dean sites where a viable PRP may be liable. Nevertheless, single-party clean-ups have progressed more quickly and wasted less money than multiparty clean-ups because they do not involve disputes over responsibility for costs.

Our proposal would not affect single party sites, so single-party spending remains unchanged.

*Emergency removals*—Current spending is calculated by discounting the $200 million in Fiscal Year 1992 Superfund removal commitments and obligations—because outlays are generally somewhat lower—and adding $85 million for PRP word The latter figure assumes that 34 percent of all removal spending is by PRPs; in fiscal year 1992 PRPs started 34 percent of all removals.

The proposal would maintain current spending levels for Superfund's successful removal program. Parties who legally disposed of waste at multi-party NPL sites before 1987 would no longer be liable; trust fund expenditures would replace money which is currently spent by such parties.

## Enforcement

EPA has defined "Enforcement" narrowly so as to include only the costs of offices exclusively dedicated to enforcement in current bending calculations. In fact, much of the "clean-up" budget is spent on work which does not directly advance clean-up or reduce health risks, but which is needed to support fundraising and litigation efforts: analytical testing to relate material on sites to PRPs, overtesting, litigation quality documentation, PRP record development, and support for remedy designs to withstand PRP challenges. These savings could be shifted to real clean-up spending, but they are not quantifiable.

Under the proposal, enforcement spending at multi-party sites could be slashed. Almost 80 percent of all these sites would be entirely removed from the liability system, and so require no enforcement spending. Given these substantial savings, a much smaller total enforcement budget would nevertheless allow increases in spending for raising funds at single-party sites and from PRPs who broke the law or disposed of waste after 1986.

## "Other" Categories

*Overhead and research*—This money represents overhead costs for headquarters staff, research and development, and a variety of other expenses. It also includes EPA oversight costs at Federal facilities.

To the extent possible, the proposal would decentralize Superfund spending, cutting Washington overhead spending and freeing up more resources to be spent in effected communities. Studies by GAO and EPA's inspector general have suggested numerous changes to cut overhead costs and spend remaining monies more effi-

458

ciently. EPA oversight costs at Federal facilities would be reimbursed by the agencies responsible for those facilities.

*Natural resource restoration*—The current law has, with a handful of exceptions, failed to address any natural resource restoration. A completely separate process and the prospect of many years of litigation delay restoration—usually indefinitely.

The proposal would bypass litigation and provide funds to go to work immediately to repair natural resources. Spending would be increased. Further, swift action would head off further contamination migration and damage, reducing both environmental and monetary costs.

*Public health*—Far too little money goes for public health outreach, research and testing. To fund the program from one day to the next, EPA must devote resources and energy to chasing PRP money. The result is a program focused on fundraising to the detriment of public health Typically, no public health specialists arrive at Superfund sites until years after an NPL site is designated, if at all; investigators searching for PRPs are often the first on the scene. Clean-up proceeds—or stalls—depending on the outcome of site-by-site PRP fundraising negotiations or litigation. Where PRP negotiations stall or no viable PRP can be found, site clean-up may be completely ignored, regardless of how great a potential health risk the site may pose.

The proposal would focus the entire program on public health protection. Health specialists would be the first on the scene, testing and educating communities neighboring suspected toxic health hazards. Local doctors would be trained to spot and treat the effects of exposure to toxins. Research into these effects would be expanded.

*Public participation*—Superfund's Fiscal Year 1992 community relations budget was $450,000, and 30 full time equivalent (FTE) employees were detailed to community relations. By assuming an average cost of $75,000 per FTE, we have calculated EPA's total Fiscal Year 1992 community relations personnel cost at $2.25 million, yielding a total Fiscal Year 1992 community relations budget of $2.7 million. In addition, EPA awarded 37 technical assistance grants (TAG's) to help communities near Superfund sites deal with technical site data. At a maximum value of $50,000 apiece, the TAGs' total value is less than $2 million.

Current spending on public participation is inadequate. Too few resources are devoted to involving the public. TAGs are too small, limited to 3 years, and renewable only once. The problems of inadequate funding are greatly aggravated by Superfund's current fundraising focus. EPA staff devote much of their time to tracking down and then negotiating with PRPs in meetings closed to the public. EPA and PRP lawyers screen all information before it is released to make sure that it will not hurt their bargaining/litigation position Affected communities are often kept in the dark as to possible exposure—or the lack thereof—and the reason that clean-up has not begun. Their only source of information may be infrequent EPA community meetings, and usually the first opportunity to comment does not come until a ROD is proposed

The proposal would provide more financing for citizen outreach, community working groups, and TAGs. Innovative programs, including bilingual briefings and door-to-door outreach, would be increased. Affected communities would be involved in the process of testing and remedy selection from day one.

*Remediation training in affected communities*—Virtually nothing has been spent on remediation training for the people living near contaminated sites. In 1992, EPA for the first time made a single grant of $87,000 to Cuyahoga Community College to set up a pilot program for outreach and remediation training to inner-city residents. Less than $20,000 of the grant money was spent in 1992.

Under the proposal, new programs will be designed and funded that provide affected communities with opportunities for minority job training and the involvement of minority businesses in environmental clean-up contracts.

*Coordination of other Federal programs*—Superfund itself cannot solve all the interrelated problems of communities negatively affected by toxic waste. However, the proposal would set aside Superfund money for a local agency to coordinate other government programs and services and focus them on helping affected communities recover, both economically and socially.

## WHERE THE MONEY COMES FROM—ASSUMPTIONS AND EXPLANATION

### Assumption for Calculation

For the purposes of calculation, we have assumed a 1986 liability cutoff. No cutoff date has been chosen yet. The actual date will be selected with the goal of speeding

ALCD-PUBCOM_0024551

459

clean-up, and reducing transaction costs and disputes. The quality of waste records, waste management regulations, and available disposal facilities will be considered.

*Total*

The fiscal year 1992 total figure is the sum of all Superfund taxes, appropriations from general revenue, PRP settlements, and recoveries from PRPs. All figures come from EPA documents.

Proposed total program revenue represents a 17–50 percent increase over current revenue and spending (exclusive of private sector transaction costs).

*Taxes and Appropriations*

*Total*—Fiscal Year 1992 taxes and appropriations is the sum of Superfund taxes and Federal appropriations from general revenue.

Proposed taxes and appropriations are 40–110 percent higher than current levels.

*Broad-based business taxes and line item corrributions*—In Fiscal Year 1992, $1.2 billion in Superfund taxes were collected. These taxes came in three forms: petroleum tax, chemical feedstock tax, and the corporate environmental income tax.

The proposal calls for a 100–150 percent increase in broad-based business taxes and line item contributions. Current petroleum and feedstock taxes would be retained. The environmental income tax (EIT) would be expanded and a tax would be levied on smaller businesses. The small business tax would be levied on facilities officially classified by EPA as small quantity generators (SQGs). It would be assessed on a sliding scale; larger businesses would pay more per facility, and smaller businesses would pay less. An alternative would be to apply such a tax to SQGs and large quantity generators owned by companies which do not pay the EIT. Additional taxes on insurers are part of the proposal. (See attached example.)

*State share; State and municipal PRP liability*—States are currently required to match 10 percent of all trust-fund spending at orphan sites within their borders; they are required to match 50 percent of trust fund expenditures at sites owned by municipalities. States must also pay operation and maintenance costs after clean-up at all sites within their borders. We do not have information regarding the total amount paid by States in Fiscal Year 1992, but it is believed to be less than $100 million.

In addition, State and municipal PRP liability is large and growing: municipalities are involved at about one third of all NPL sites. Liability stems from owning and operating sites, generating and transporting waste, and past regulatory actions. There are no national records of total paymentsand commitments made pursuant to this liability, but they are included as part of the totals for "private-party" settlements and cost reconvenes.

Under the proposal, States would be required to pay 10–15 percent of total program costs, based on expenditures on sites within their borders. The increased State contribution reflects the removal of old State and municipal PRP liability for old waste disposal.

*Federal appropriations from general revenue*—Annual appropriations from general revenue have fluctuated over the last several years. In Fiscal Year 1992, $234 million was appropriated.

Proposed appropriations from general revenue are higher to reflect the removal of Federal liability for lawful pre-1987 waste disposal at private, State, or local government multi-party NPL sites. EPA would be reimbursed for its oversight costs at Federal facilities. Federal facility clean-up financing would not be changed in any other respect.

*Private Party Settlements and Cost Recoveries*

*Total*—EPA estimates the total value of PRP work commitments pursuant to settlements or orders issued in Fiscal Year 1992 at $1.48 billion. In addition, EPA recovered $180 million dollars from PRPs in Fiscal Year 1992, yielding a total of $1.66 billion. Settlements have essentially plateaued, increasing at less than 1 percent over the rate of inflation over the last 3 years (Fiscal Years 1990–1992).

Under the proposal, settlements would fall as EPA would no longer seek to compel work from PRPs whose liability stems from lawful pre-1987 waste disposal at multi-party sites.

*Settlements at single-party sites*—Current settlements and recoveries is calculated using the assumption that 30 percent of total settlements and recoveries are for single-party sites. One recent study estimates that 30 percent of all NIL sites not owned by the U.S. government are single-party sites.

The proposal would not affect single-party sites. PRPs would remain liable, and settlements would not be affected.

460

*Settlements for lawful pre-1987 waste disposal at multi-party sites*—Current settlements and recoveries are estimated at 70 percent of (non-removal) settlements at all sites for lawful pre-1987 waste disposal.

The proposal would eliminate liability for lawful pre-1987 waste disposal at multi-party sites.

*Settlements for illegal or post-1986 disposal at multi-party sites*—The $80 million in current revenue assumes that 5 percent of all settlements and recoveries are for illegal disposal or for post-1986 disposal. A recent study found no evidence of illegal disposal by any party at 85 percent of all NPL sites not owned by the U.S. government. The study also found that almost 80 percent of all NPL sites had closed before 1987.

The proposal would not affect settlements for illegal disposal or disposal which occurred after 1986. Parties would remain liable for any such disposal.

*Settlements for emergency removals at non-NPL sites*—We have calculated current settlements assuming that PRPs pay 34 percent of an estimated $250 million in Fiscal Year 1992 removal costs. (In 1992, 34 percent of all removal starts were conducted by PRPs.) We have further assumed that just under half of the resulting $85 million (34 percent of $250 million) was spent at non-NPL sites.

The proposal would not affect the funding of removals at non-NPL sites. EPA's removal program has swiftly and efficiently addressed health risks.

ALCD-PUBCOM_0024553

\
357

### STATEMENT OF BENJAMIN F. CHAVIS, JR., EXECUTIVE DIREC-TOR, NAACP; ON BEHALF OF THE ALLIANCE FOR A SUPER-FUND ACTION PARTNERSHIP

Mr. CHAVIS. Thank you, Senator, and good morning. Before getting into my 5 minutes, I will just take ten seconds to say, Senator Lautenberg, that I really appreciate having this opportunity to give testimony this morning before you and the committee. The NAACP has been long committed on this issue. As a former resident of New Jersey, let me say that I appreciate your leadership on this issue. In point of fact, in two weeks we are going to be bringing thousands of people from the Northeast region to New Jersey for the regional meeting of the NAACP and this issue of how to reauthorize Superfund is going to be on the agenda.

As you know, Mr. Chairman, I am the Executive Director and Chief Executive Officer of the NAACP. I am also the Chairman of the Alliance for a Superfund Action Partnership, or ASAP. I would just summarize my written testimony in the time limit provided.

Today, ASAP represents the broadest and largest diverse constituency of Superfund stakeholders you can find—the NAACP, Local Governments for Superfund Reform, the American Furniture Manufacturers Association, International Fabricare Institute, the

ALCD-PUBCOM_0024554

358

City of Atlanta, the Society of Independent Gas Marketers of America, the National Food Processors Association, the Grocery Manufacturers of America, Johnson Controls, Inc., Continental Corporation, the American International Group, Texaco, Phillips, and many others in a variety of fields. A full list of current membership is attached as an addendum to this testimony.

We have presented in detail an eight point plan for fundamental reform of Superfund. Senator and other members of the committee, we believe, first of all, that this legislation should be reauthorized. When we call for fundamental reform, rather than sort of tinkering around the edges, we don't believe that the Administration's bill calls for fundamental reform, particularly on the question of retroactive liability. We are not here to kill the bill but we want to make sure that if Superfund is reauthorized that our communities are not killed.

For 12 or 13 years Superfund has been implemented and enforced to the detriment of African-American communities, native-American communities, Latino-American communities, and other minority communities. We have not had expedited clean-up. What we have had in place of clean-up, in place of protecting public health is a lot of litigation, a lot of transactional costs. We want, as we propose in our eight point plan, for Superfund to be authorized in a way that puts public health first, that puts involvement in the community in determining the clean-up and to expedite clean-up, and to have a business tax which the business community has agreed to if they can get relief from a fundamental reform of Superfund to provide the kind of adequate funding for expedited clean-up of our communities. The Administration's proposal, in our review, does not provide adequate funding. It will not expedite clean-up, and does not put public health first.

We believe that the issue of retroactive liability should be something that is talked about. We think it should not only be talked about; it should be debated. The NAACP has decided to call for a change in the way we look at the liability question, a fundamental change. Without changing the liability question, there will be no fundamental reform of Superfund in our estimation.

I am extremely pleased to note that some new voices are joining the chorus for fundamental reform. I am speaking here of your colleague Senator Robert Smith and Representative Bill Zeliff who recently introduced the Comprehensive Superfund Improvement Act of 1994. I am not usually in the habit of praising conservative legislators, neither is the NAACP, but I have been often told their bill is derived directly from more than a year of discussions with Superfund stakeholders and experts in New Hampshire, not in Washington. In many ways, they are responding to some of the same practical imperatives which I feel. Their bill grapples directly and honestly with Superfund's debilitating and wasteful approach to financing. Based on their grassroots discussions, they recognize that fundamental reform is required. Here are two Republicans who are not afraid to say that increasing business taxes to fund clean-up is a far more efficient way to protect the public health than the law we have today and it is also good for business.

I do not endorse their bill because their scope of the liability and financing is not broad enough, although it is clearly headed in the

359

right direction. In addition, I hope you and they will see that liability and financing changes are the place to start from in changing the focus of Superfund so it can address public health and community needs.

Comprehensive Superfund reform must also address the other six points of our eight point plan.

Senator LAUTENBERG. Mr. Chavis, your point is a valuable one; I know you have an interest. And hearing the accolades for Senator Smith coming from you must satisfy Senator Smith a great deal. Thank you. We ask you please to stay and join us in the discussion.

Mr. CHAVIS. Thank you.

Senator LAUTENBERG. I would like now to call on Ms. Florence Robinson, who is from the North Baton Rouge Environmental Association, on behalf of the Keystone Commission. Ms. Robinson, welcome.

# WHY EPA'S MATH DOESN'T ADD UP

The EPA-sponsored Batson allocation gives OxyChem up to a 99.9% share of cleanup costs. This result is only possible because Batson makes serious errors, disregards EPA's scientific findings, and gives the settling parties enormous discounts on their liability, leaving OxyChem to pay for the rest.

## CONTAMINANT MASS
### 83% Discount

Batson estimates that 83% of contamination could not have come from the settling parties. He then assigns this "orphan share" to OxyChem, without showing OxyChem produced these chemicals.

## ATTENUATION
### 99% Discount

Batson concludes that 99% of the chemicals the settling parties put in the river _vanished_.

## RISK
### 84% Discount

Batson assumes a single chemical (dioxin) is responsible for 84% of cleanup costs.

## CULPABILITY
### 50% Discount

Batson finds that OxyChem, a company with an extensive record of _voluntary_ cooperation, is twice as culpable as the settling parties because it refused to participate in Batson's unauthorized allocation.

## BATSON SHIFTS NEARLY ALL RESPONSIBILITY FROM THE SETTLING PARTIES TO OXYCHEM, CREATING A 99% SHARE WITH NO BASIS IN SCIENCE OR FACT

### 1. Batson's mass contribution calculations are wrong.

Batson's conclusion that OxyChem is 99.9% responsible depends on one central finding: that the other parties to the allocation are only responsible for a tiny fraction of mass of contaminants in the river. This is not credible. The settling parties are mainstay industrial facilities that have discharged to the Passaic River since the late 1800s. Batson's approach vastly underestimates their contribution of hazardous substances to the river, cherry-picking incorrect data and then using it to conclude that no discharges occurred or underestimating them in important ways. For example:

- At the EnPro site, Batson found the highest concentration of PCBs on the site was 3.8 mg/kg. The correct data shows it is 240 mg/kg—over 60 times what Batson used. Batson's use of the wrong number reduced EnPro's discharge mass of PCBs from 460 pounds to 4 pounds.

- At the General Electric site, Batson found the site covered one city block—but the GE plant covered _4 city blocks_ in Harrison from the early 1900s until 1976. This obvious oversight not only reduced his estimate of GE's contamination by 75%, it excluded one of the largest concentrations of mercury: 80.3 mg/kg, or 800 times New Jersey's reportable limit.

Batson also made obvious mistakes that increased OxyChem's share: he compounds a thousand-fold mistake (misreading "parts per million" as "parts per _billion_") with another (forgetting to convert grams to kilograms), resulting in a **_million-fold overestimate_** of OxyChem's discharges. The entire report is riddled with similar, basic math errors that severely underestimate the mass of contaminants discharged by the 85 settling parties—to less than 20% of the 12 million pounds of contaminants in the river.

### 2. Batson's "attenuation factor" underestimates every settling party's contribution by a hundred times.

Batson's initial mass calculations severely underestimate the mass of contaminants discharged by the 85 settling parties—but then Batson **_makes millions of pounds of contamination disappear!_** After applying a bit of pseudo-science Batson turns millions of pounds into just tens of thousands.

To conjure this vanishing act, Batson misapplies a recognized scientific concept: **"attenuation."** According to EPA, "attenuation" means "natural processes that decrease or attenuate soil and groundwater contaminant concentrations."[1] But to Batson, "attenuation" simply means **_multiplying everything by 1 percent_**. Batson's "attenuation factor" disregards basic science, EPA's peer reviewed calculations of the different rates at which chemicals attenuate in the environment. Batson's invented "attenuation factor" serves one purpose: it gives every settling party a 99 percent off coupon for every chemical they put into the Passaic, leaving OxyChem as the only party standing.

[1]https://www.epa.gov/superfund/groundwater-technologies

ALCD-PUBCOM_0024557

### 3. Batson's subjective discounts for "culpability" and "cooperation."

Batson also misapplies his culpability and cooperation concepts to overstate OxyChem's share of costs.

- **Culpability:** Batson ignores EPA's admission that OxyChem itself did not pollute the Passaic River. Instead, he **enhances** OxyChem's share based on actions committed by employees of the Diamond Shamrock Chemicals Company, decades before OxyChem bought DSCC's stock. The "culpability" factor Batson assigns to OxyChem's based on acts of others is **ten times higher** than the culpability he assigns to other parties for **their own** culpable actions—even when evidence shows those parties destroyed documents, concealed information, or misrepresented facts to EPA.

- **Cooperation:** Since 1990 OxyChem has engaged in unparalleled cooperation with EPA on the Passaic River cleanup, all to EPA's satisfaction. More recently, in 2016 OxyChem agreed to perform the entire Remedial Design for Operable Unit 2. In January 2022, OxyChem again stepped forward, offering to implement the OU4 RD/RA "interim remedy" for EPA in January 2022. And, in June 2022, Oxy offered to do **all** the remaining work for OU2—a remarkable level of cooperation far beyond any other party.

**Batson admits OxyChem should have received a 20% reduction in its base score based on its cooperation, but Batson wipes it out.** How? He punishes OxyChem for a single act: reducing its cooperation to 0% because OxyChem refused to participate in his allocation process—a process the Superfund law never authorized.

### 4. Batson uses risk numbers to pre-determine the outcome.

Batson begins his allocation by calculating what he calls Relative Risk Numbers (RRNs). Each of the 8 chemicals of concern EPA identified is given an RRN, which determines the maximum share of cleanup costs that Batson attributes to each chemical. Batson allocates 84% of total risk (and therefore 84% of the total costs) to dioxins. Under this approach, dioxins are all that matters. The settling parties could have dumped as much PCB, DDT, lead, mercury, copper, dieldrin, or PAHs as they wanted into the Passaic—so long as it wasn't dioxin, it would not change Batson's allocation.

Batson's calculation of dioxin risks is wrong for many reasons.

EPA commissioned **five** detailed risk assessments in the Passaic area—three for the lower 8 miles, one for the lower 17 miles, and one for Newark Bay. Batson's allocation rejects every one of EPA's reports. Instead, he alters EPA's risk calculations in four ways that increase the relative risk of dioxins and minimize the risk of the 7 other COCs.

- First, although EPA's risk assessments estimate both current and future risk, Batson considers only "current" risk from 2009 and **disregards future risk**.

- Second, Batson indefensibly **excludes dioxin-like PCBs from his calculations**, in the process excluding an enormous amount of PCB risk.

- Third, Batson **makes another mathematical mistake**, averaging two distinct risk percentages— fish consumption and crab consumption—that cannot be averaged.

- Finally, contradicting EPA, **Batson double-counts risk through an invented, "incremental risk assessment,"** giving parties a deep discount if they contributed chemicals other than dioxin. This is scientifically unsound. Other chemicals, such as dioxin-like PCBs and mercury, are highly toxic in themselves. In EPA's words, "Passaic River sediments are contaminated by many hazardous substances, including, but not limited to dioxin, PCBs, PAHs and heavy metals. Removing 2,3,7,8 TCDD alone will not address the risks from other contaminants in the River."[2] The sleight of hand of Batson's "incremental risk assessment" allows him to conclude dioxins make up nearly 90% of danger to human health in the Passaic—far higher than every EPA-approved risk assessment.



[2]See 11/14/2005 Letter from EPA Region 2 to NJDEP.

2

ALCD-PUBCOM_0024558