# Exhibit 11

## Comments Submitted by Non-Parties

United States' Motion to Enter Consent Decree,
*United States v. Alden Leeds, Inc. et al.*, Civil Action No. 22-7326 (D.N.J.)

| | |
|---|---|
| **From:** | Rowley, Laura (ENRD) |
| **To:** | Spohn, Andrew (ENRD) |
| **Subject:** | FW: [EXTERNAL] Re: SETTLEMENT IS IT FAIR TO NJ |
| **Date:** | Friday, February 3, 2023 2:46:53 PM |

Laura J. Rowley
U.S. Department of Justice
Environmental Enforcement Section
(202) 532-5896 (cell)

**From:** Koch, Ariel (ENRD) <Ariel.Koch@usdoj.gov>
**Sent:** Friday, January 13, 2023 8:52 AM
**To:** Rowley, Laura (ENRD) <Laura.Rowley@usdoj.gov>
**Subject:** FW: [EXTERNAL] Re: SETTLEMENT IS IT FAIR TO NJ

Good morning –

This was sent to the public comment box, DJ# 90-11-3-07683/17

-Ariel

**From:** jean public <_____>
**Sent:** Thursday, January 12, 2023 4:17 PM
**To:** ENRD, PUBCOMMENT-EES (ENRD) <PENRD3@ENRD.USDOJ.GOV>; info@sierraclub.org
**Subject:** [EXTERNAL] Re: SETTLEMENT IS IT FAIR TO NJ

On Thu, Jan 12, 2023 at 11:48 AM jean public <_____> wrote:
```
[Federal Register Volume 88, Number 8 (Thursday, January 12, 2023)]
[Notices]
[Pages 2133-2134]
From the Federal Register Online via the Government Publishing Office
[www.gpo.gov]
[FR Doc No: 2023-00530]

=========================================================================
-------------------------------------------------------------------------

DEPARTMENT OF JUSTICE

Notice of Lodging of Proposed Consent Decree Under the
Comprehensive Environmental Response, Compensation, and Liability Act

    On December 16, 2022, the Department of Justice lodged a proposed
Consent Decree with the United States District Court for the District
of New Jersey in United States v. Alden Leeds, Inc., et al., Civil
Action No. 2:22-cv-07326. The proposed Consent Decree resolves the
United States' claim against 85 defendants under section 107(a) of the
Comprehensive Environmental Response, Compensation, and Liability Act
of 1980 (``CERCLA''), 42 U.S.C. 9607(a), relating to Operable Unit 2
```

ALCD-PUBCOM_0000001

and Operable Unit 4 of the Diamond Alkali Superfund Site (``Site'') in
New Jersey.

   In the proposed Consent Decree, the 85 Settling Defendants agree to
pay $150 million in cleanup costs. EPA Region 2's estimated future
cleanup costs for Operable Unit 2 and Operable Unit 4 of the Site are
$1.82 billion. EPA sponsored an allocation process, which involved
hiring a third party neutral to perform an allocation. The process
concluded in December 2020 with a Final Allocation Recommendation
Report that recommends relative shares of responsibility for each
allocation party's facility or facilities evaluated in the allocation.
After review of the Final Allocation Recommendation Report, EPA
identified the parties who were eligible to participate in the proposed
Consent Decree. Based on the results of the allocation, the United
States concluded that the Settling Defendants, individually and
collectively, are responsible for a minor share of the response costs
incurred and to be incurred at or in connection with the cleanup of
Operable Unit 2 and Operable Unit 4, for releases from the facilities
identified in the proposed Consent Decree. Certain Settling Defendants
had previously resolved their liability for Operable Unit 2, and so
were not evaluated in the allocation, but are participating in the
proposed Consent Decree in order to resolve their liability for
Operable Unit 4. The Consent Decree includes covenants not to sue
related to Operable Unit 2 and Operable Unit 4 under sections 106 and
107(a) of CERCLA, as well as contribution protection under section 113
of CERCLA. The consent decree does not include reopeners for previously
unknown conditions or information, or for cost overruns, but the
settlement amount collectively paid by the Setting Defendants protects
against the risk that future costs will exceed EPA's estimate of the
future cleanup costs for Operable Unit 2 and Operable Unit 4.

   On December 22, 2022, the Department of Justice published a notice
in the Federal Register opening a public comment period on the consent
decree for a period of forty-five (45) days. 87 FR 78711. By this
notice, the Department of Justice is extending the public comment by an
additional forty-five (45) days, through March 22, 2023. Comments
should be addressed to the Assistant Attorney General, Environment and
Natural Resources Division, and should refer to United States v. Alden
Leeds, Inc., et al., Civil Action No. 2:22-cv-07326, D.J. Ref. No. 90-
11-3-07683/1. All comments must be submitted no later than March 22,
2023. Comments may be submitted either by email or by mail:

------------------------------------------------------------------------
         To submit comments:                     Send them to:
------------------------------------------------------------------------
By email...........................  pubcomment-ees.enrd@usdoj.gov.
By mail............................  Assistant Attorney General, U.S.
                                     DOJ--ENRD, P.O. Box
                                     7611,Washington, DC 20044-7611.
------------------------------------------------------------------------


   During the public comment period, the proposed Consent Decree may
be examined and downloaded at this Justice Department website:
https://www.justice.gov/enrd/consent-decrees. We will provide a paper copy of
the proposed modification upon written request and payment of
reproduction costs. Please mail your request and payment to: Consent
Decree Library, U.S. DOJ--ENRD, P.O. Box 7611, Washington, DC 20044-
7611.

   Please enclose a check or money order for $36.25 (25 cents per page
reproduction cost) payable to the United States Treasury. In addition,
the Final Allocation Recommendation Report

[[Page 2134]]

may be examined at this EPA website:
https://semspub.epa.gov/src/collection/02/SC41378.

Henry S. Friedman,
Assistant Section Chief, Environmental Enforcement Section, Environment
and Natural Resources Division.
[FR Doc. 2023-00530 Filed 1-11-23; 8:45 am]
BILLING CODE 4410-CW-P

| From: | Rowley, Laura (ENRD) |
|---|---|
| To: | Spohn, Andrew (ENRD) |
| Subject: | FW: [EXTERNAL] Passaic River Cleanup Comments |
| Date: | Friday, February 3, 2023 2:47:20 PM |

Laura J. Rowley
U.S. Department of Justice
Environmental Enforcement Section
(202) 532-5896 (cell)

**From:** Uanserume, Samuel (ENRD) <Samuel.Uanserume@usdoj.gov>
**Sent:** Wednesday, January 25, 2023 5:19 PM
**To:** Rowley, Laura (ENRD) <Laura.Rowley@usdoj.gov>
**Subject:** FW: [EXTERNAL] Passaic River Cleanup Comments

Hello Laura,

Here's a comment for DJ # 90-11-3-07683/17

-Sam, **CMU**

**From:** John PierreCharles <organicsunmarket@gmail.com>
**Sent:** Wednesday, January 25, 2023 5:08 PM
**To:** ENRD, PUBCOMMENT-EES (ENRD) <PENRD3@ENRD.USDOJ.GOV>
**Subject:** [EXTERNAL] Passaic River Cleanup Comments

Dear Mr. Kim,

Thank you for the work being done by the EPA and DOJ to address environmental issues facing North Jersey. I know that myself and countless other business owners and community members are grateful for the prospect of a Passaic River that is once again clean and safe for the towns in this area to enjoy.

That said, I am concerned with the recent proposed consent decree with some of the parties responsible for the current state of the river. While this $150 million settlement represents a contribution towards the cleanup process, it will not come close to the estimated $2 billion needed for this cleanup. The pollution in the Passaic River has severely affected the health and well-being of our community for decades. The businesses and families living near and along the river deserve a properly completed and funded cleanup, and polluters should be held responsible for the environmental damages they have caused.

Requiring just a portion of polluters to pay such a small amount of the funds needed just encourages companies to continue to pollute the environment, lets too many responsible polluters off the hook, and does a disservice to the community that lives on and near the Passaic River. I encourage the EPA to reconsider its

settlement and instead hold all polluters accountable for their fair share of the cleanup costs.

Kind regards,

Steven P Charles

Owner, Organic Sun Market

Montclair, NJ

| | |
|---|---|
| **From:** | Rowley, Laura (ENRD) |
| **To:** | Spohn, Andrew (ENRD) |
| **Subject:** | FW: [EXTERNAL] Passaic River Clean Up |
| **Date:** | Friday, February 3, 2023 2:47:35 PM |

Laura J. Rowley
U.S. Department of Justice
Environmental Enforcement Section
(202) 532-5896 (cell)

**From:** Koch, Ariel (ENRD) <Ariel.Koch@usdoj.gov>
**Sent:** Wednesday, February 1, 2023 10:07 AM
**To:** Rowley, Laura (ENRD) <Laura.Rowley@usdoj.gov>
**Subject:** FW: [EXTERNAL] Passaic River Clean Up

Good morning –

This was sent to the EES CD Copy box, DJ# 90-11-3-07683/17

-Ariel

**From:** Catherine Belisle <rabbitrabbitinteriors@gmail.com>
**Sent:** Wednesday, February 1, 2023 9:57 AM
**To:** ENRD, PUBCOMMENT-EES (ENRD) <PENRD3@ENRD.USDOJ.GOV>
**Subject:** [EXTERNAL] Passaic River Clean Up

Dear Mr. Kim,

Thank you for your work as part of the recent efforts by the DOJ and EPA to hold polluters accountable and find funding for the cleanup of the Passaic River in New Jersey. As a community I know I speak for many others like myself when I say that this long-overdue cleanup process will be life changing for those who live near and make a living off of the river.

Because of the river's importance for recreation, healthy living, and economic prosperity, myself and other business owners and residents see it as a priority that these efforts are done right. The way that the EPA and DOJ settled with some of the responsible parties for $150 million towards this cleanup unfortunately falls short of doing so. This settlement relieves many of these companies from their full legal and moral responsibility to pay for the damage they have done to the Passaic River and the surrounding communities. Financially, this leaves the burden of funding this cleanup in limbo and leaves the community without clarity on how we will actually reach the estimated $2 billion needed to clean up the river. This may place the burden on taxpayers and our local community for the cleanup of harmful chemicals that these companies are responsible for.

I ask that you please reconsider this settlement and hold all polluters responsible for their full share which will ensure that the Passaic River cleanup is fully funded.

Respectfully,
Catherine Belisle
Rabbit Rabbit Interiors


Catherine Belisle
Rabbit Rabbit
42 Fairfield Street
Montclair, NJ 07042
973-746-2040
rabbitrabbitinteriors@gmail.com



# OFFICE OF THE MAYOR

**RANDY GEORGE**
**MAYOR**

BOROUGH OF NORTH HALEDON
103 Overlook Avenue
North Haledon, New Jersey 07508
(973) 427-4129
(973) 427-1846 Fax
mayor@northhaledon.com

February 1, 2023

Todd Kim, Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530

Re:    United States v. Alden Leeds, Inc., et al.,
       Civil Action No. 2.22-ev-07326, D.J. Ref. No. 90-11-3-07683/1

Your Honor,

As the Mayor of the Borough of North Haledon, located in Passaic County, New Jersey, I
appreciate the work you have done to ensure healthier communities in New Jersey and
across the country.

However, I am writing with concern about the EPA's recently proposed consent decree
with 85 parties responsible for polluting the Passaic River. While this may appear as
progress for cleaning up the river, settling with some of the polluters for $150 million of
the $2 billion it would cost to clean up the Passaic River in New Jersey is not a fair solution
for the taxpayers and the Passaic community. The pollution of the Passaic River is a serious
issue that has affected the health and well-being of the community for decades. The
polluters should be held responsible for the damages they have caused and should be
required to pay their fair share of the clean-up costs.

Allowing the polluters to pay only a fraction of the clean-up costs would not only be unfair
to the taxpayers and the Passaic community, but it would also send a message that
polluting the environment is acceptable as long as the polluter is willing to pay a small fine.
This would encourage other companies to continue to pollute with the expectation that
they will be able to settle for a small amount rather than being held accountable for the full
extent of their actions.

The EPA should not settle with some of the polluters for $150 million of the $2 billion it would cost to clean up the Passaic River in New Jersey. Polluters should be held fully responsible for the damages they have caused and should be required to pay their fair share of the clean-up costs. This is the only way to ensure that the taxpayers and the Passaic community are not left to bear the burden of the costs and that the polluters are held accountable for their actions.

Very truly yours,

Borough of North Haledon

*Randy George*

Randy George, Mayor

ALCD-PUBCOM_0000008

| From: | Rowley, Laura (ENRD) |
|---|---|
| To: | Spohn, Andrew (ENRD) |
| Subject: | FW: United States v. Alden Leeds, Inc., et al., Civil Action No. 2:22–cv–07326, D.J. Ref. No. 90–11–3–07683/1 |
| Date: | Friday, February 3, 2023 2:48:15 PM |

Laura J. Rowley
U.S. Department of Justice
Environmental Enforcement Section
(202) 532-5896 (cell)

**From:** Koch, Ariel (ENRD) <Ariel.Koch@usdoj.gov>
**Sent:** Thursday, February 2, 2023 8:45 AM
**To:** Rowley, Laura (ENRD) <Laura.Rowley@usdoj.gov>
**Subject:** FW: United States v. Alden Leeds, Inc., et al., Civil Action No. 2:22–cv–07326, D.J. Ref. No. 90–11–3–07683/1

Good morning –

This was sent to the public comment box, DJ# 90-11-3-07683/17

-Ariel

**From:** Alicia D'Angelo Smith <░░░░░░@░░░░░░>
**Sent:** Wednesday, February 1, 2023 5:35 PM
**To:** ENRD, PUBCOMMENT-EES (ENRD) <PENRD3@ENRD.USDOJ.GOV>
**Subject:** [EXTERNAL] United States v. Alden Leeds, Inc., et al., Civil Action No. 2:22–cv–07326, D.J. Ref. No. 90–11–3–07683/1

Todd Kim, Assistant Attorney General
Environment and Natural Resources Division

Dear Assistant AG Kim, Environment & Natural Resources Division,

I am writing to express my concern over the ongoing pollution recovery efforts in the Passaic River and its potential impact on the town where I've lived my entire life--Ridgewood. While I understand that the EPA has recently reached a settlement with 85 companies, allowing them to pay $150 million in damages combined, I believe this does not align with the community's mission to clean up the Passaic River since it slows down the recovery process, does not hold all polluters accountable, and

could lead to local municipalities and taxpayers bearing the burden of the remaining costs.

This consent decree lets other companies that have also contributed to the pollution off the hook, and does not follow the appropriate process for recouping damages for cleanup efforts. Every entity that contributed to the pollution of the Passaic River should pay their fair share in damages. The settlement could lead to major delays in the recovery of the Passaic and leave local municipalities—including Ridgewood—bearing the burden of the pollution costs, which in turn would be shifted to residents.

I believe that the most efficient solution would be to hold all polluting entities accountable in order to speed up the recovery and ensure that the cleanup is handled fairly. I urge the EPA and DOJ to consider this approach and to work with the impacted communities to find a solution that is in the best interest of all parties involved.

Thank you for your time and attention to this matter.

Sincerely,
Alicia D. Smith, Esq.

Ridgewood, NJ 07450

| | |
|---|---|
| **From:** | Rowley, Laura (ENRD) |
| **To:** | Keir, Andrew W. (ENRD); Silagi, Alex (USANJ); Rosenthal, Arnold (ENRD); Flanagan, Sarah; Fajardo, Juan; DeLuca, Kathryn; Zizila, Frances |
| **Cc:** | Spohn, Andrew (ENRD) |
| **Subject:** | FW: [EXTERNAL] Passaic River / C.A. No. 2:22–cv–07326, D.J. Ref. No. 90–11–3–07683/1 |
| **Date:** | Monday, February 6, 2023 9:23:32 AM |

FYI – another comment.

Laura J. Rowley
U.S. Department of Justice
Environmental Enforcement Section
(202) 532-5896 (cell)

**From:** Koch, Ariel (ENRD) <Ariel.Koch@usdoj.gov>
**Sent:** Monday, February 6, 2023 8:41 AM
**To:** Rowley, Laura (ENRD) <Laura.Rowley@usdoj.gov>
**Subject:** FW: [EXTERNAL] Passaic River / C.A. No. 2:22–cv–07326, D.J. Ref. No. 90–11–3–07683/1

Good morning –

This was sent to the public comment box, DJ# 90-11-3-07683/17

-Ariel

**From:** Manny Saggio <manny@theloosewheel.co>
**Sent:** Saturday, February 4, 2023 10:55 AM
**To:** ENRD, PUBCOMMENT-EES (ENRD) <PENRD3@ENRD.USDOJ.GOV>
**Subject:** [EXTERNAL] Passaic River / C.A. No. 2:22–cv–07326, D.J. Ref. No. 90–11–3–07683/1

Dear Mr. Kim,

Seeing a clean and viable Passaic river was something I was looking forward to seeing in my lifetime. Now recent news of the settlement brokered with the corporations that originally polluted the river have brought this into doubt for me.

The settlement reached will only pay for a fraction of what it will cost to fully clean the river and restore it to an ecological state that would make it safe for recreation and other activities that would directly benefit the surrounding communities. In short, a clean river would mean healthier, stronger, and more prosperous communities. Thus if we are to reach our potential we must hold the original polluters of the river to their responsibility to clean what they made a mess.

Please deny the settlement and make sure these corporations pay their fair share in the cleanup of the river.

Respectfully,

Manny Saggio
The Loose Wheel Bicycle Co.
Cell: +1-973-941-8510

Email: manny@theloosewheel.co
Web: www.theloosewheel.co

| From: | |
|---|---|
| To: | ENRD, PUBCOMMENT-EES (ENRD) |
| Subject: | [EXTERNAL] United States v. Alden Leeds, Inc., et al., Civil Action No. 2:22–cv–07326, D.J. Ref. No. 90–11–3–07683/1 |
| Date: | Tuesday, February 7, 2023 7:36:04 PM |

Dear Assistant AG Kim, Environment & Natural Resources Division,

I am writing to express my concern over the ongoing pollution recovery efforts in the Passaic River and its potential impact on Ridgewood. While I understand that the EPA has recently reached a settlement with 85 companies, allowing them to pay $150 million in damages combined, I believe this does not align with the community's mission to clean up the Passaic River since it slows down the recovery process, does not hold all polluters accountable, and could lead to local municipalities and taxpayers bearing the burden of the remaining costs.

This consent decree lets other companies that have also contributed to the pollution off the hook, and does not follow the appropriate process for recouping damages for cleanup efforts. Every entity that contributed to the pollution of the Passaic River should pay their fair share in damages. The settlement could lead to major delays in the recovery of the Passaic and leave local municipalities—including Ridgewood—bearing the burden of the pollution costs, which in turn would be shifted to residents.

I believe that the most efficient solution would be to hold all polluting entities accountable in order to speed up the recovery and ensure that the cleanup is handled fairly. I urge the EPA and DOJ to consider this approach and to work with the impacted communities to find a solution that is in the best interest of all parties involved.

Thank you for your time and attention to this matter.

Sincerely,
Nicole Amico Smith

Ridgewood, NJ 07450

| | |
|---|---|
| **From:** | |
| **To:** | ENRD, PUBCOMMENT-EES (ENRD) |
| **Subject:** | [EXTERNAL] United States v. Alden Leeds, Inc., et al., Civil Action No. 2:22–cv–07326, D.J. Ref. No. 90–11–3–07683/1 |
| **Date:** | Tuesday, February 7, 2023 7:55:29 PM |

Dear Todd Kim, Environment & Natural Resources Division,

I am writing to express my concern over the ongoing pollution recovery efforts in the Passaic River and its potential impact on the town where I'm raising my family, Ridgewood. While I understand that the EPA has recently reached a settlement with 85 companies, allowing them to pay $150 million in damages combined, I believe this does not align with the community's mission to clean up the Passaic River since it slows down the recovery process, does not hold all polluters accountable, and could lead to local municipalities and taxpayers bearing the burden of the remaining costs.

This consent decree lets other companies that have also contributed to the pollution off the hook, and does not follow the appropriate process for recouping damages for cleanup efforts. Every entity that contributed to the pollution of the Passaic River should pay their fair share in damages. The settlement could lead to major delays in the recovery of the Passaic and leave local municipalities—including Ridgewood—bearing the burden of the pollution costs, which in turn would be shifted to residents.

I believe that the most efficient solution would be to hold all polluting entities accountable in order to speed up the recovery and ensure that the cleanup is handled fairly. I urge the EPA and DOJ to consider this approach and to work with the impacted communities to find a solution that is in the best interest of all parties involved.

Thank you for your time and attention to this matter.

Sincerely,

Maureen Kuenzler

████████████████

Ridgewood, NJ  07450

ALCD-PUBCOM_0000015

| | |
|---|---|
| **From:** | Rowley, Laura (ENRD) |
| **To:** | Flanagan, Sarah; Fajardo, Juan; DeLuca, Kathryn; Zizila, Frances; Keir, Andrew W. (ENRD); Silagi, Alex (USANJ); Rosenthal, Arnold (ENRD) |
| **Cc:** | Spohn, Andrew (ENRD) |
| **Subject:** | FW: [EXTERNAL] United States v. Alden Leeds, Inc., et al., Civil Action No. 2:22–cv–07326, D.J. Ref. No. 90–11–3–07683/1 |
| **Date:** | Wednesday, February 8, 2023 12:31:30 PM |

Another one.

Laura J. Rowley
U.S. Department of Justice
Environmental Enforcement Section
(202) 532-5896 (cell)

**From:** Koch, Ariel (ENRD) <Ariel.Koch@usdoj.gov>
**Sent:** Wednesday, February 8, 2023 9:46 AM
**To:** Rowley, Laura (ENRD) <Laura.Rowley@usdoj.gov>
**Subject:** FW: [EXTERNAL] United States v. Alden Leeds, Inc., et al., Civil Action No. 2:22–cv–07326, D.J. Ref. No. 90–11–3–07683/1

**From:** Mara Conzo
**Sent:** Wednesday, February 8, 2023 9:43 AM
**To:** ENRD, PUBCOMMENT-EES (ENRD) <PENRD3@ENRD.USDOJ.GOV>
**Subject:** [EXTERNAL] United States v. Alden Leeds, Inc., et al., Civil Action No. 2:22–cv–07326, D.J. Ref. No. 90–11–3–07683/1

Dear Assistant AG Kim, Environment & Natural Resources Division,

I applaud the EPA's efforts to clean up the Passaic River, however, the recently announced proposed settlement with some of the polluters responsible for the damage is the wrong approach and should be reconsidered.

The proposed settlement would bring in just $150 million to clean up the river when the full process is estimated to be $2 billion. This would leave area taxpayers on the hook for the remaining bill. Allowing the polluters to pay only a fraction of the clean-up costs would not only be unfair to these taxpayers and the Passaic community, but it would also send a message that polluting the environment is acceptable as long as the polluter is willing to pay a minimal fine. This would encourage other companies to continue to pollute with the expectation that they will be able to settle for a small amount rather than being held accountable for the full extent of their actions.

The residents of the surrounding communities have been living with the impacts of pollution for far too long and they deserve a full and comprehensive cleanup. Polluters should be held fully responsible for the damages they have caused and

should be required to pay their fair share of the clean-up costs. This is the only way to
ensure that the taxpayers and the Passaic community are not left to bear the burden
of the costs and that the polluters are held accountable for their actions.
Thank you for your time and attention to this matter.

Sincerely,

Mara Bain

████████████ Ridgewood, NJ 07450

ALCD-PUBCOM_0000017

| From: | Karen Wilkinson |
|---|---|
| To: | ENRD, PUBCOMMENT-EES (ENRD) |
| Subject: | [EXTERNAL] River cleanup |
| Date: | Wednesday, February 15, 2023 11:20:01 AM |

Dear Assistant Attorney General Kim, Environment & Natural Resources Division,

As a property investor in communities throughout New Jersey, I appreciate the work your office is doing to address the various environmental issues to make our region a healthier place to live and work. To that end, I am writing to express my concern, over the recently proposed consent decree with 85 parties responsible for polluting the Passaic River. I worry that settling with only some of the polluters for $150 million of the $2 billion it would cost to clean up the river is not a fair solution that will end up costing taxpayers in the Passaic area and delay remediation.

The pollution of the Passaic River is a serious issue that has affected the health and well-being of the community for decades. The polluters should be held responsible for the damages they have caused and should be required to pay their fair share of the clean-up costs. Allowing them to pay only a fraction of the clean-up costs would not only be unfair to the taxpayers and the community, but it would also send a message that polluting the environment is acceptable as long as the polluter is willing to pay a small fine. This would encourage other companies to continue to pollute with the expectation that they will be able to settle for a small amount rather than being held accountable for the full extent of their actions.

I urge the EPA to reconsider this proposed settlement and hold all the polluters accountable for paying their fair share. Anything less is unfair to the taxpayers and residents of the community who have already been negatively impacted by the polluted river for so long.

Thank you,

Karen Wilkinson
President, Emerald Management Group

| From: | Peter Rosario |
|---|---|
| To: | ENRD, PUBCOMMENT-EES (ENRD) |
| Subject: | [EXTERNAL] United States v. Alden Leeds, Inc., et al., Civil Action No. 2:22–cv–07326, D.J. Ref. No. 90–11–3–07683/1 |
| Date: | Wednesday, February 15, 2023 11:17:12 AM |
| Attachments: | image001.png |

Dear Assistant Attorney General Kim, Environment & Natural Resources Division,

I applaud the EPA's efforts to clean up the Passaic River, it's another action that will help protect our communities for years to come. However, I'm writing to express my concern with the proposed settlement with polluters for the cleanup, as I believe it would only further affect area communities who have already been disproportionately impacted by environmental pollution.

The proposed settlement of $150 million, while it may seem like a large sum, is only a fraction of the $2 billion it would cost to fully clean up the Passaic River. This would leave taxpayers and local municipalities to foot the remaining bill, placing an undue burden on already struggling communities. Furthermore, this settlement would delay the cleanup of the river and further impact the surrounding community, which includes low-income communities of color who have been disproportionately affected by environmental pollution.

The Passaic River has been polluted for decades and the cleanup process has already been delayed for too long. The residents of the surrounding communities—including my hometown of Passaic--have been living with the impacts of pollution for far too long and we deserve a full and comprehensive cleanup. To settle for less is to continue to harm these communities and to perpetuate the systemic injustices that have led to their disproportionate exposure to pollution in the first place.

I urge the EPA to reconsider this proposed settlement and to fully fund the cleanup of the Passaic River, so that the communities who have been harmed for so long can finally see justice.

My Best,

Pete.


**Peter T. Rosario (He/Him, El/Su)**
President and Chief Executive Officer
La Casa de Don Pedro
75 Park Avenue

Newark, NJ  07104
prosario@lacasanwk.org
tel: 973.482.8312  |  fax: 973.482.1883
www.lacasanwk.org



**For all the latest on La Casa, be sure to follow us on:**
**Instagram  Facebook  Twitter  Flickr**

*La Casa's centers are now open. Most programs are operating in-person with health & safety protocols in place. **Click here** for updates.

ALCD-PUBCOM_0000020

| | |
|---|---|
| **From:** | Rowley, Laura (ENRD) |
| **To:** | Keir, Andrew W. (ENRD); Silagi, Alex (USANJ); Rosenthal, Arnold (ENRD); Flanagan, Sarah; Fajardo, Juan; DeLuca, Kathryn; Zizila, Frances |
| **Cc:** | Spohn, Andrew (ENRD) |
| **Subject:** | FW: United States v. Alden Leeds, Inc., et al., Civil Action No. 2:22-cv-07326, D.J. Ref. No. 90-11-3-07683/1 |
| **Date:** | Wednesday, February 15, 2023 3:58:13 PM |

FYI

Laura J. Rowley
U.S. Department of Justice
Environmental Enforcement Section
(202) 532-5896 (cell)

---

**From:** Koch, Ariel (ENRD) <Ariel.Koch@usdoj.gov>
**Sent:** Wednesday, February 15, 2023 8:33 AM
**To:** Rowley, Laura (ENRD) <Laura.Rowley@usdoj.gov>
**Subject:** FW: United States v. Alden Leeds, Inc., et al., Civil Action No. 2:22-cv-07326, D.J. Ref. No. 90-11-3-07683/1

Good morning –

This was in the public comment box, DJ# 90-11-3-07683/17

-Ariel

---

**From:**▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Sent:** Wednesday, February 15, 2023 8:15 AM
**To:** ENRD, PUBCOMMENT-EES (ENRD) <PENRD3@ENRD.USDOJ.GOV>
**Subject:** [EXTERNAL] United States v. Alden Leeds, Inc., et al., Civil Action No. 2:22-cv-07326, D.J. Ref. No. 90-11-3-07683/1

Dear Assistant Attorney General Kim, Environment & Natural Resources Division,

As business owner who provides asphalt and concrete pavement solutions to communities throughout New Jersey, including the Passaic region, I am thankful for the progress in the recovery efforts of the Passaic River. However, I am writing to express my concern over the recent settlement by the EPA allowing 85 companies to pay $150 million in damages for their role in polluting the river.

While I understand the goal of the consent decree is to hold these companies accountable for their actions and I applaud efforts to clean up this vital natural resource, it's an unfair deal that doesn't hold ALL polluters responsible and residents and local business owners could end up holding the bag. As business owners, we should all be held to the same standards. It's unfair to hold some polluters accountable while letting others off the hook for their contributions to

the pollution. ALL should pay their fair share.

Furthermore, the settlement does not follow the appropriate process for damage recovery and may lead to major delays in the cleanup of the Passaic. I believe the most efficient way to proceed with the river's cleanup process is to bring all polluters to the table and follow the process to hold everyone accountable. This way, all polluters pay their fair share in damages and the Passaic community can proceed with the cleanup process quickly, efficiently, and without hurting taxpayers.

I urge you to take action in ensuring that the EPA and other responsible parties take a more comprehensive approach in the cleanup efforts of the Passaic River. Doing otherwise is just bad business.

Thank you for your time and consideration,

Bob Fell
Owner, Garden State Sealing



| From: | Rowley, Laura (ENRD) |
|---|---|
| To: | Keir, Andrew W. (ENRD); Silagi, Alex (USANJ); Rosenthal, Arnold (ENRD); Flanagan, Sarah; Fajardo, Juan; DeLuca, Kathryn; Zizila, Frances |
| Cc: | Spohn, Andrew (ENRD) |
| Subject: | FW: [EXTERNAL] United States v. Alden Leeds, Inc., et al., Civil Action No. 2:22-cv-07326, D.J. Ref. No. 90-11-3-07683/1 |
| Date: | Thursday, February 23, 2023 10:57:32 AM |

FYI

Laura J. Rowley
U.S. Department of Justice
Environmental Enforcement Section
(202) 532-5896

**From:** Koch, Ariel (ENRD) <Ariel.Koch@usdoj.gov>
**Sent:** Thursday, February 23, 2023 8:41 AM
**To:** Rowley, Laura (ENRD) <Laura.Rowley@usdoj.gov>
**Subject:** FW: [EXTERNAL] United States v. Alden Leeds, Inc., et al., Civil Action No. 2:22-cv-07326, D.J. Ref. No. 90-11-3-07683/1

Good morning –

This was sent to the public comment box. DJ# 90-11-3-07683/17

-Ariel

**From:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Sent:** Wednesday, February 22, 2023 7:16 PM
**To:** ENRD, PUBCOMMENT-EES (ENRD) <PENRD3@ENRD.USDOJ.GOV>
**Subject:** [EXTERNAL] United States v. Alden Leeds, Inc., et al., Civil Action No. 2:22-cv-07326, D.J. Ref. No. 90-11-3-07683/1

Dear Assistant AG Kim, Environment & Natural Resources Division,

As a small business owner who features and promotes small businesses throughout New Jersey, I am writing with concern about the EPA's proposed settlement that would only hold some corporate polluters responsible for the harm they have caused to the Passaic River. Allowing some companies to pay damages while letting others off the hook for their contributions to the pollution of the River is simply unfair and sets a very dangerous precedent that could lead to more bad actors hurting our environment.

The proposed settlement would bring in just $150 million to clean up the River, far short of the $2 billion estimated to complete the process. Allowing polluters to pay only a fraction of the clean-up costs could leave taxpayers, including area small

business owners, liable to make up the difference. Not only is this unfair to taxpayers, but it also sends the wrong message to companies that they can pollute with the expectation that they will be able to settle for a small amount rather than being held accountable for the full extent of their actions.

The most efficient way to the proceed with the River's cleanup is to bring all polluters to the table and follow the process to hold everyone accountable. This way, all polluters pay their fair share in damages and the cleanup process can proceed quickly, efficiently, and without hurting taxpayers. All businesses should be held to the same standards. Anything less than that is the wrong move.

Thank you for this opportunity to share my perspective.

Sincerely,
April Sette
President, NJ Buzz Productions



| From: | Rowley, Laura (ENRD) |
|---|---|
| To: | Keir, Andrew W. (ENRD); Rosenthal, Arnold (ENRD); Silagi, Alex (USANJ); Flanagan, Sarah; Fajardo, Juan; DeLuca, Kathryn; Zizila, Frances |
| Cc: | Spohn, Andrew (ENRD) |
| Subject: | FW: [EXTERNAL] United States v. Alden Leeds, Inc., et al., Civil Action No. 2:22–cv–07326, D.J. Ref. No. 90–11–3–07683/1 |
| Date: | Thursday, February 23, 2023 1:58:51 PM |

FYI

Laura J. Rowley
U.S. Department of Justice
Environmental Enforcement Section
(202) 532-5896

**From:** Uanserume, Samuel (ENRD) <Samuel.Uanserume@usdoj.gov>
**Sent:** Thursday, February 23, 2023 1:36 PM
**To:** Rowley, Laura (ENRD) <Laura.Rowley@usdoj.gov>
**Subject:** FW: [EXTERNAL] United States v. Alden Leeds, Inc., et al., Civil Action No. 2:22–cv–07326, D.J. Ref. No. 90–11–3–07683/1

-Sam, **CMU**

**From:** Jim harrington <█████████████████████████>
**Sent:** Thursday, February 23, 2023 1:22 PM
**To:** ENRD, PUBCOMMENT-EES (ENRD) <PENRD3@ENRD.USDOJ.GOV>
**Subject:** [EXTERNAL] United States v. Alden Leeds, Inc., et al., Civil Action No. 2:22–cv–07326, D.J. Ref. No. 90–11–3–07683/1

Dear Assistant AG Kim, Environment & Natural Resources Division,

Long retired from the corporate world, I have the time to enjoy many of the natural treasures New Jersey has to offer. I am grateful for the steps the EPA has taken to protect our state's environment and ensure healthy communities for residents across our region. One issue I am concerned about, however, is the recent action concerning the clean-up of the long-polluted Passaic River. Specifically, the proposed consent decree with 85 parties responsible for polluting the waterway.

I worry that settling with only some of the polluters for $150 million of the $2 billion it would cost to clean up the river is not a fair solution for the taxpayers and the Passaic community. The pollution of the Passaic River is a serious issue that has affected the health and well-being of communities in the region for decades. The polluters should be held responsible for the damages they have caused and should be required to pay their fair share of the clean-up costs.

Furthermore, the $150 million settlement would not be sufficient to cover the full cost of the clean-up, which would mean that the taxpayers and the Passaic community would be left to bear the burden of the remaining costs. This is unacceptable as the polluters should be held fully responsible for the damages they have caused and should be required to pay the full cost of the clean-up.

As a CEO of one of the nation's leading retailers of athletic apparel, accountability was at the center of every business decision I made and action I took. Letting some companies pay damages while letting others off the hook for their contributions to the pollution of the River flies in the face of accountability. I respectfully ask that this ill-advised settlement be reconsidered.

Thank you,
Jim Harrington
Former CEO, Lady Footlocker
█████████, Hamilton, NJ

ALCD-PUBCOM_0000027

United States v. Alden Leeds, Inc., et al., Civil Action No. 2:22—cv—07326, Dd. Ref. No. 90—11 3_
07683/1

Email should be addressed to:

Todd Kim, Assistant Attorney General, Environment and Natural Resources Division

Email Address to send comments:

pubcomment-ees.enrd@usdoj.gov

Dear Assistant AG Kim, Environment & Natural Resources Division,

As a Council Representative in Somerville, I applaud the EPA's efforts to address the various environmental issues facing our region, including cleaning up long-polluted water ways like the Passaic River. However, I'm writing with concern about the recently announced proposed settlement that would only hold some of the polluters responsible for the damage they have caused to the river and bring in just a small fraction of the money needed to clean it up. This approach sets a very dangerous precedent for municipalities, letting polluters off the hook and making taxpayers liable for harms they didn't cause.

The proposed settlement would bring in just $150 million to clean up the river, far short of the $2 billion estimated to complete the process. Allowing the polluters to pay only a fraction of the clean-up costs is not only unfair to taxpayers, but it also sends the wrong message that polluting the environment is acceptable as long as the polluter is willing to pay a minimal fine. This would encourage other companies to continue to pollute with the expectation that they will be able to settle for a small amount rather than being held accountable for the full extent of their actions.

Residents in the Passaic region have been living with the impacts of pollution of the river for far too long and they deserve a full and comprehensive cleanup. Polluters should be held fully responsible for the damages they have caused and should be required to pay their fair share of the clean-up costs. This is the only way to ensure that the taxpayers and the Passaic community are not left to bear the burden of the costs and that the polluters are held accountable for their actions. I urge the EPA not to

move forward with this ill-advised settlement.

Thank you for your time and attention.

Sincerely,

*Gramble T Brady, Jr.*

ALCD-PUBCOM_0000029

| From: | Rowley, Laura (ENRD) |
|---|---|
| To: | DeLuca, Kathryn; Fajardo, Juan; Flanagan, Sarah; Keir, Andrew W. (ENRD); Rosenthal, Arnold (ENRD); Silagi, Alex (USANJ); Zizila, Frances |
| Cc: | Spohn, Andrew (ENRD) |
| Subject: | FW: [EXTERNAL] United States v. Alden Leeds, Inc., et al., Civil Action No. 2:22-cv-07326, D.J. Ref. No. 90-11-3-07683/1 |
| Date: | Monday, March 6, 2023 2:00:57 PM |

FYI

Laura J. Rowley
U.S. Department of Justice
Environmental Enforcement Section
(202) 532-5896

**From:** Earl, Michelle (ENRD) <Michelle.Earl2@usdoj.gov>
**Sent:** Monday, March 6, 2023 9:58 AM
**To:** Rowley, Laura (ENRD) <Laura.Rowley@usdoj.gov>
**Subject:** FW: [EXTERNAL] United States v. Alden Leeds, Inc., et al., Civil Action No. 2:22-cv-07326, D.J. Ref. No. 90-11-3-07683/1

Good morning,

This was sent to one of our inboxes, for DJ # 90-11-3-07683/17.

Respectfully,

**Michelle Earl**

Case Management Unit

**Docketing Clerk**

Environmental Enforcement Section (EES)

Environmental and Natural Resources Division (ENRD)

United States Department of Justice (USDOJ)

**From:** Tim Morris
**Sent:** Sunday, March 5, 2023 7:51 AM
**To:** ENRD, PUBCOMMENT-EES (ENRD) <PENRD3@ENRD.USDOJ.GOV>
**Subject:** [EXTERNAL] United States v. Alden Leeds, Inc., et al., Civil Action No. 2:22-cv-07326, D.J. Ref. No. 90-11-3-07683/1

Do the right thing and:
1. Hold those accountable who contributed to this pollution issue.
2. Enforce the immediate cleanup & restoration - every minute of every day those chemicals contribute, in some way, to the destruction and degradation of wildlife & humans as well as to the

environment in general... something we can I'll afford....

Please consider the Earth we are leaving behind for our kids... and their kids.... They wouldn't choose
this... nor should we.

Most sincerely,
Tim Morris
Severn, MD

ALCD-PUBCOM_0000033

| | |
|---|---|
| **From:** | Rowley, Laura (ENRD) |
| **To:** | Keir, Andrew W. (ENRD); Silagi, Alex (USANJ); Rosenthal, Arnold (ENRD); Sarah Flanagan; Juan Fajardo; Kathryn DeLuca; Frances Zizila |
| **Cc:** | Spohn, Andrew (ENRD) |
| **Subject:** | Fwd: [EXTERNAL] United States v. Alden Leeds, Inc., et al., Civil Action No. 2:22-cv-07326, D.J. Ref. No. 90-11-3-07683/1 |
| **Date:** | Tuesday, March 7, 2023 9:39:34 AM |

FYI

Laura J. Rowley
U.S. Department of Justice
Environmental Enforcement Section
(202) 532-5896

Begin forwarded message:

> **From:** "Earl, Michelle (ENRD)" <Michelle.Earl2@usdoj.gov>
> **Date:** March 7, 2023 at 9:32:23 AM EST
> **To:** "Rowley, Laura (ENRD)" <Laura.Rowley@usdoj.gov>
> **Subject: FW: [EXTERNAL] United States v. Alden Leeds, Inc., et al., Civil Action No. 2:22-cv-07326, D.J. Ref. No. 90-11-3-07683/1**
>
> Good morning,
>
> This was sent to one of our inboxes, for DJ # 90-11-3-07683/17.
>
> Respectfully,
>
> Michelle Earl
> Case Management Unit
> Docketing Clerk
> Environmental Enforcement Section (EES)
> Environmental and Natural Resources Division (ENRD)
> United States Department of Justice (USDOJ)
>
> -----Original Message-----
> From: Deborah Wagner █████████████
> Sent: Monday, March 6, 2023 8:24 PM
> To: ENRD, PUBCOMMENT-EES (ENRD) <PENRD3@ENRD.USDOJ.GOV>
> Subject: [EXTERNAL] United States v. Alden Leeds, Inc., et al., Civil Action No. 2:22-cv-07326, D.J. Ref. No. 90-11-3-07683/1
>
> I'm horrified that polluting companies pay nothing while taxpayers pay for the cleaning of the Passaic River. What Justice is that? Make the companies pay.

| | |
|---|---|
| **From:** | Rowley, Laura (ENRD) |
| **To:** | DeLuca, Kathryn; Fajardo, Juan; Flanagan, Sarah; Keir, Andrew W. (ENRD); Rosenthal, Arnold (ENRD); Silagi, Alex (USANJ); Zizila, Frances |
| **Cc:** | Spohn, Andrew (ENRD) |
| **Subject:** | FW: [EXTERNAL] United States v. Alden Leeds, Inc., et al., Civil Action No. 2:22–cv–07326, D.J. Ref. No. 90–11–3–07683/1 |
| **Date:** | Tuesday, March 7, 2023 3:20:17 PM |

FYI

Laura J. Rowley
U.S. Department of Justice
Environmental Enforcement Section
(202) 532-5896

---

**From:** Earl, Michelle (ENRD) <Michelle.Earl2@usdoj.gov>
**Sent:** Tuesday, March 7, 2023 3:17 PM
**To:** Rowley, Laura (ENRD) <Laura.Rowley@usdoj.gov>
**Subject:** FW: [EXTERNAL] United States v. Alden Leeds, Inc., et al., Civil Action No. 2:22–cv–07326, D.J. Ref. No. 90–11–3–07683/1

Good afternoon,

This was sent to the Public Comments Box, for DJ # **90-11-3-07683/17**.

Respectfully,

**Michelle Earl**

Case Management Unit

**Docketing Clerk**

Environmental Enforcement Section (EES)

Environmental and Natural Resources Division (ENRD)

United States Department of Justice (USDOJ)

---

**From:** Gerald O'Donnell <godonnell@graysabre.com>
**Sent:** Tuesday, March 7, 2023 2:56 PM
**To:** ENRD, PUBCOMMENT-EES (ENRD) <PENRD3@ENRD.USDOJ.GOV>
**Subject:** [EXTERNAL] United States v. Alden Leeds, Inc., et al., Civil Action No. 2:22–cv–07326, D.J. Ref. No. 90–11–3–07683/1

Dear Assistant Attorney General Kim, Environment & Natural Resources Division:

As a New Jersey based Service-disabled Veteran-Owned Small Business owner, I have long been an advocate for small businesses across New Jersey. I am writing with concern about the

EPA's recent settlement with 85 companies to pay a token $150 million, and thereby relieving them from the responsibility of paying the estimated $2 billion it would cost to clean up the Passaic River.

The EPA knows full well of the 150 year record of pollution of the Passaic River and the scope of this situation and solution. New Jersey small businesses and taxpayers ought not be, in the end, burdened with the cost of Passaic River clean-up.

It is unfair that some companies are being let off the hook, while the responsibility for clean-up will be left to others. Moreso, the amount being collected falls woefully short of needs. This would ultimately leave local taxpayers, including small businesses in the region, on the hook to cover the shortfall.

Put simply, this settlement is unfair. It does not hold ALL polluters responsible. It exposes residents and local businesses to risk of future increased costs.  Of those responsible, all should pay their fair share.

Furthermore, the settlement does not follow the appropriate process for damage recovery and may lead to major delays in the cleanup of the Passaic. The most efficient way to proceed with the River's cleanup process is to bring all polluters to the table, include all in the entire process, and hold all polluters accountable. In this way, all polluters will pay their fair share in damages, which may balloon far beyond the $2 billion as projects like these tend to do. The Passaic community may then proceed with the entire process quickly, efficiently, and without, at all, ensnaring local taxpayers.

I urge you to take action in ensuring that the EPA and other responsible parties take a more comprehensive approach in the cleanup efforts of the Passaic River.

Small businesses should not be, to any potential degree, exposed to the costly environmental clean-up of large corporate polluters.

Thank you for your consideration,

*Gerald J.O'Donnell*
*GraySabre LLC*



ALCD-PUBCOM_0000037

| From: | Rowley, Laura (ENRD) |
|---|---|
| To: | DeLuca, Kathryn; Fajardo, Juan; Flanagan, Sarah; Keir, Andrew W. (ENRD); Rosenthal, Arnold (ENRD); Silagi, Alex (USANJ); Zizila, Frances |
| Cc: | Spohn, Andrew (ENRD) |
| Subject: | FW: [EXTERNAL] United States v. Alden Leeds, Inc., et al., Civil Action No. 2:22–cv–07326, D.J. Ref. No. 90–11–3–07683/1 |
| Date: | Wednesday, March 8, 2023 9:13:07 AM |

FYI

Laura J. Rowley
U.S. Department of Justice
Environmental Enforcement Section
(202) 532-5896

**From:** Earl, Michelle (ENRD) <Michelle.Earl2@usdoj.gov>
**Sent:** Wednesday, March 8, 2023 9:09 AM
**To:** Rowley, Laura (ENRD) <Laura.Rowley@usdoj.gov>
**Subject:** FW: [EXTERNAL] United States v. Alden Leeds, Inc., et al., Civil Action No. 2:22–cv–07326, D.J. Ref. No. 90–11–3–07683/1

Good morning,

This was sent to one of our inboxes, for DJ # 90-11-3-07683/17.

Respectfully,

**Michelle Earl**

Case Management Unit

**Docketing Clerk**

Environmental Enforcement Section (EES)

Environmental and Natural Resources Division (ENRD)

United States Department of Justice (USDOJ)

**From:** Pete Lillo
**Sent:** Tuesday, March 7, 2023 6:51 PM
**To:** ENRD, PUBCOMMENT-EES (ENRD) <PENRD3@ENRD.USDOJ.GOV>
**Subject:** [EXTERNAL] United States v. Alden Leeds, Inc., et al., Civil Action No. 2:22–cv–07326, D.J. Ref. No. 90–11–3–07683/1

Dear Assistant Attorney General Kim, Environment & Natural Resources Division,

I am writing today to express my concern about the recent decision by the EPA to settle with a set of companies that have polluted the Passaic River. While the

settlement amount may be described as a "landmark" by some, it represents less than 10% of the $2 billion price tag to remove cancer-causing dioxin, PCBs, mercury and other industrial pollutants that have remained buried for decades in the riverbed.

This decision sends a dangerous message to companies that they are better off denying responsibility for Superfund cleanups than cooperating and performing the necessary work. It also puts the burden of cleanup on the taxpayers and the communities affected by the pollution.

The Passaic River is a vital resource for the communities that rely on it for drinking water, recreation, and economic activity. The pollution of the river has had a devastating impact on the health and well-being of those communities. It is unacceptable for the EPA to allow the companies responsible for this pollution to escape their legal and moral responsibilities.

Furthermore, the decision undermines the principle of polluter pays, which holds that those who create environmental damage should bear the cost of cleaning it up. The settlement also undermines the principle of Superfund law, which holds that liable parties should pay for the clean up of their own pollution.

I urge you to take action to ensure that the companies responsible for polluting the Passaic River are held accountable for the full cost of cleanup. The EPA must send a clear message that polluters will not be allowed to escape their responsibilities and that communities have the right to live in a safe and healthy environment.

Thank you,
Pete Lillo
Founder & President
**Bear Brook Feather Friends Sanctuary and Rescue**

| From: | Rowley, Laura (ENRD) |
|---|---|
| To: | DeLuca, Kathryn; Fajardo, Juan; Flanagan, Sarah; Keir, Andrew W. (ENRD); Rosenthal, Arnold (ENRD); Silagi, Alex (USANJ); Zizila, Frances |
| Cc: | Spohn, Andrew (ENRD) |
| Subject: | FW: [EXTERNAL] Passaic River / C.A. No. 2:22–cv–07326, D.J. Ref. No. 90–11–3–07683/1 |
| Date: | Wednesday, March 8, 2023 9:13:42 AM |

FYI

Laura J. Rowley
U.S. Department of Justice
Environmental Enforcement Section
(202) 532-5896

**From:** Earl, Michelle (ENRD) <Michelle.Earl2@usdoj.gov>
**Sent:** Wednesday, March 8, 2023 9:13 AM
**To:** Rowley, Laura (ENRD) <Laura.Rowley@usdoj.gov>
**Subject:** FW: [EXTERNAL] Passaic River / C.A. No. 2:22–cv–07326, D.J. Ref. No. 90–11–3–07683/1

Good morning,

This was sent to one of our inboxes, for DJ # 90-11-3-07683/17.

Respectfully,

**Michelle Earl**

Case Management Unit

**Docketing Clerk**

Environmental Enforcement Section (EES)

Environmental and Natural Resources Division (ENRD)

United States Department of Justice (USDOJ)

**From:** Catherine Fisher <cat@kitchenalamode.com>
**Sent:** Tuesday, March 7, 2023 10:21 PM
**To:** ENRD, PUBCOMMENT-EES (ENRD) <PENRD3@ENRD.USDOJ.GOV>
**Subject:** [EXTERNAL] Passaic River / C.A. No. 2:22–cv–07326, D.J. Ref. No. 90–11–3–07683/1

Dear Mr. Kim,

I greatly appreciate the work being done by the EPA and DOJ to hold polluters accountable for cleaning up sites such as the Passaic River, which has been contaminated by cancer-causing dioxin, PCBs, mercury, and other industrial pollutants buried in the riverbed for decades. It is imperative that polluters pay for the environmental cleanups in situations like this, particularly when they profited from

their years of pollution.

However, I'm upset about the recent settlement announced by the EPA and DOJ, which holds some polluters responsible for only $150 million of cleanup costs in the Passaic. This amount is significantly less than the estimated $2 billion needed to clean up the river fully. In my opinion, polluters should bear the costs associated with their pollution, and these legal and financial responsibilities should not be ignored or passed on to members of the community.

The settlement risks placing the burden of cleanup costs on our local community and its members, which is unacceptable. The Passaic River cleanup should not be funded by taxpayers. It is crucial that polluters pay their fair share, and the work needed to restore the river to its healthy state should be fully funded by those responsible. Therefore, it is essential that the EPA ensures that all responsible parties pay their fair share to clean up the Passaic River.

Thank you for your time and consideration.
Sincerely,
Catherine Fisher
Co-owner, Kitchen a la Mode LLC

| From: | Rowley, Laura (ENRD) |
|---|---|
| To: | DeLuca, Kathryn; Fajardo, Juan; Flanagan, Sarah; Keir, Andrew W. (ENRD); Rosenthal, Arnold (ENRD); Silagi, Alex (USANJ); Zizila, Frances |
| Cc: | Spohn, Andrew (ENRD) |
| Subject: | FW: Passaic River / C.A. No. 2:22–cv–07326, D.J. Ref. No. 90–11–3–07683/1 |
| Date: | Wednesday, March 8, 2023 5:08:23 PM |

FYI

Laura J. Rowley
U.S. Department of Justice
Environmental Enforcement Section
(202) 532-5896

**From:** Earl, Michelle (ENRD) <Michelle.Earl2@usdoj.gov>
**Sent:** Wednesday, March 8, 2023 9:12 AM
**To:** Rowley, Laura (ENRD) <Laura.Rowley@usdoj.gov>
**Subject:** FW: Passaic River / C.A. No. 2:22–cv–07326, D.J. Ref. No. 90–11–3–07683/1

Good morning,

This was sent to one of our inboxes, for DJ # 90-11-3-07683/17.

Respectfully,

**Michelle Earl**

Case Management Unit

**Docketing Clerk**

Environmental Enforcement Section (EES)

Environmental and Natural Resources Division (ENRD)

United States Department of Justice (USDOJ)

**From:** Andrew Kit
**Sent:** Tuesday, March 7, 2023 10:16 PM
**To:** ENRD, PUBCOMMENT-EES (ENRD) <PENRD3@ENRD.USDOJ.GOV>
**Subject:** [EXTERNAL] Passaic River / C.A. No. 2:22–cv–07326, D.J. Ref. No. 90–11–3–07683/1

Dear Mr. Kim,

As a lifelong resident of the Passaic River watershed community and co-owner of
Kitchen a la Mode LLC, a NJ small business, I am deeply invested in the health and
safety of our natural resources and have been disheartened by the decades-long

pollution of our river.

However, I am writing to voice my concerns over the recent settlement with 85 of the responsible polluting companies for only $150 million in damages. While holding polluters accountable is an essential step in the right direction, I feel that this solution falls short in facilitating effective cleanup efforts.

Firstly, this settlement only holds some of the responsible parties accountable while letting other companies off the hook. Secondly, the $150 million price tag is only a fraction of the estimated total cost of the cleanup. This sends the wrong message to polluters by not holding them responsible for their full share in polluting damages.

These companies brought hazardous chemicals into our ecosystem and should bear the full cost of their contribution to this environmentally reckless behavior. Doing so would ensure that companies face the consequences of their actions and deter future companies from polluting our river.

Most importantly, the current settlement may shift some of the financial burden to municipalities and local communities, who should not be held responsible for the actions of a select number of companies. I urge your office to deny the proposed settlement and find a solution that holds all responsible parties accountable for their full share in polluting damages.

Thank you for your time and consideration.

Best regards,
Andrew Kit

ALCD-PUBCOM_0000043

| From: | Rowley, Laura (ENRD) |
|---|---|
| To: | DeLuca, Kathryn; Fajardo, Juan; Flanagan, Sarah; Keir, Andrew W. (ENRD); Rosenthal, Arnold (ENRD); Silagi, Alex (USANJ); Zizila, Frances |
| Cc: | Spohn, Andrew (ENRD) |
| Subject: | FW: [EXTERNAL] United States v. Alden Leeds, Inc., et al., Civil Action No. 2:22-cv-07326, D.J. Ref. No. 90-11-3-07683/1 |
| Date: | Friday, March 10, 2023 10:49:01 AM |

FYI

Laura J. Rowley
U.S. Department of Justice
Environmental Enforcement Section
(202) 532-5896

-----Original Message-----
From: Earl, Michelle (ENRD) <Michelle.Earl2@usdoj.gov>
Sent: Friday, March 10, 2023 10:48 AM
To: Rowley, Laura (ENRD) <Laura.Rowley@usdoj.gov>
Subject: FW: [EXTERNAL] United States v. Alden Leeds, Inc., et al., Civil Action No. 2:22-cv-07326, D.J. Ref. No. 90-11-3-07683/1

Good morning,

This was sent to one of our inboxes, for DJ # 90-11-3-07683/17

Respectfully,

Michelle Earl
Case Management Unit
Docketing Clerk
Environmental Enforcement Section (EES)
Environmental and Natural Resources Division (ENRD)
United States Department of Justice (USDOJ)


-----Original Message-----
From: Jerry Klown
Sent: Friday, March 10, 2023 10:11 AM
To: ENRD, PUBCOMMENT-EES (ENRD) <PENRD3@ENRD.USDOJ.GOV>
Subject: [EXTERNAL] United States v. Alden Leeds, Inc., et al., Civil Action No. 2:22-cv-07326, D.J. Ref. No. 90-11-3-07683/1

For the good of all the people of NJ and for the children and grandchildren refrenceUS v AldenDJ ref no. 90-11-3-07683/1 stop the nonsense of the EPA proposed settlement of 150 million dollars letting 85 companies off the hook for the cleanup of toxins they dumped into the Passaic River as a taxpayer we should not have to pay for the clean up costs that these companies should have to pay which is estimated to cost over a billion dollars with this ridiculous settlement the EPA is proposing to settle for thankyou for your understanding in this matter Mr GWichSr Garfield NJ07026

Sent from my iPhone

| From: | Rowley, Laura (ENRD) |
|---|---|
| To: | DeLuca, Kathryn; Fajardo, Juan; Flanagan, Sarah; Keir, Andrew W. (ENRD); Rosenthal, Arnold (ENRD); Silagi, Alex (USANJ); Zizila, Frances |
| Cc: | Spohn, Andrew (ENRD) |
| Subject: | FW: [EXTERNAL] United States v. Alden Leeds, Inc., et al., Civil Action No. 2:22-cv-07326, D.J. Ref. No. 90-11-3-07683/1 |
| Date: | Monday, March 13, 2023 10:23:14 AM |

FYI

Laura J. Rowley
U.S. Department of Justice
Environmental Enforcement Section
(202) 532-5896

-----Original Message-----
From: Earl, Michelle (ENRD) <Michelle.Earl2@usdoj.gov>
Sent: Monday, March 13, 2023 9:12 AM
To: Rowley, Laura (ENRD) <Laura.Rowley@usdoj.gov>
Subject: FW: [EXTERNAL] United States v. Alden Leeds, Inc., et al., Civil Action No. 2:22-cv-07326, D.J. Ref. No. 90-11-3-07683/1

Good morning,

This was sent to one of our inboxes, for DJ # 90-11-3-07683/17

Respectfully,

Michelle Earl
Case Management Unit
Docketing Clerk
Environmental Enforcement Section (EES)
Environmental and Natural Resources Division (ENRD)
United States Department of Justice (USDOJ)

-----Original Message-----
From: Charles Harden
Sent: Sunday, March 12, 2023 11:03 AM
To: ENRD, PUBCOMMENT-EES (ENRD) <PENRD3@ENRD.USDOJ.GOV>
Subject: [EXTERNAL] United States v. Alden Leeds, Inc., et al., Civil Action No. 2:22-cv-07326, D.J. Ref. No. 90-11-3-07683/1

Stop the nonsense clean up the River these companies have made millions in profits. At the expense of polluting our rivers and streams killing fish and making our water toxic. It's time to remediating the wrong and bring back clean rivers and streams.

Sent from Charles Harden

| From: | Rowley, Laura (ENRD) |
|---|---|
| To: | DeLuca, Kathryn; Fajardo, Juan; Flanagan, Sarah; Keir, Andrew W. (ENRD); Rosenthal, Arnold (ENRD); Silagi, Alex (USANJ); Zizila, Frances |
| Cc: | Spohn, Andrew (ENRD) |
| Subject: | FW: United States v. Alden Leeds, Inc., et al., Civil Action No. 2:22–cv–07326, D.J. Ref. No. 90–11–3–07683/1 |
| Date: | Monday, March 13, 2023 2:59:32 PM |

FYI

Laura J. Rowley
U.S. Department of Justice
Environmental Enforcement Section
(202) 532-5896

---

**From:** Earl, Michelle (ENRD) <Michelle.Earl2@usdoj.gov>
**Sent:** Monday, March 13, 2023 2:59 PM
**To:** Rowley, Laura (ENRD) <Laura.Rowley@usdoj.gov>
**Subject:** FW: United States v. Alden Leeds, Inc., et al., Civil Action No. 2:22–cv–07326, D.J. Ref. No. 90–11–3–07683/1

Good afternoon,

This was sent to the Public Comments Box, for DJ # **90-11-3-07683/17**.

Respectfully,

**Michelle Earl**

Case Management Unit

**Docketing Clerk**

Environmental Enforcement Section (EES)

Environmental and Natural Resources Division (ENRD)

United States Department of Justice (USDOJ)

---

**From:** Affatato, Joseph <Joseph_Affatato@american-national.com>
**Sent:** Monday, March 13, 2023 1:44 PM
**To:** ENRD, PUBCOMMENT-EES (ENRD) <PENRD3@ENRD.USDOJ.GOV>
**Subject:** [EXTERNAL] United States v. Alden Leeds, Inc., et al., Civil Action No. 2:22–cv–07326, D.J. Ref. No. 90–11–3–07683/1

Dear Assistant Attorney General Kim, Environment & Natural Resources Division:

The EPA should be commended for its extensive efforts to address the various environmental

issue facing our region. As an outdoor enthusiast, I appreciate the work that you do to protect our state's environment and ensure healthier communities across the Garden State. In light of this, I was pleased to learn that there has been some recent progress regarding the clean up of the long-polluted Passaic River. However, I am concerned about the EPA's approach in this matter, especially as a small business owner of an insurance brokerage.

I find it troubling that the EPA's recently proposed consent decree with 85 parties responsible for polluting the Passaic River would only bring in $150 million of the $2 billion needed to clean up the Passaic River. Not only this far short of what's needed to restore the river, the proposed settlement only holds some companies responsible for their harms, while letting others off the hook. This makes absolutely no sense and sends the wrong message that polluting the environment is acceptable if the polluter is willing to pay a small fine. It would encourage other companies to continue to pollute with the expectation that they will be able to settle for a small amount rather than being held accountable for the full extent of their actions. The EPA should be requiring ALL polluters to pay their fair share to clean up the river.

Moreover, the settlement brings in far too little to complete the extensive River clean up, which leaves the question—who will be tapped to pay the rest? I am concerned it will be taxpayers, including small businesses, in the region, which is simply unfair. The pollution of the Passaic River is a serious issue that has affected the health and well-being of North Jersey for decades. The polluters should be held responsible for the damages they have caused and should be required to pay their fair share of the clean-up costs.

I urge you to take action to ensure the EPA and other responsible parties take a more comprehensive approach in the cleanup efforts of the Passaic River. Small businesses should not be on the hook for actions of large polluters.

Thank you for your time and consideration,

Joseph Affatato
Owner
American National Insurance Company
2620 Whitehorse Hamilton Square Rd
Hamilton NJ 08690

Sent from Mail for Windows

ALCD-PUBCOM_0000047

This email message has been delivered safely and archived online by Mimecast. For more information please visit http://www.mimecast.com

Confidentiality: This transmission, including any attachments, is solely for the use of the intended recipient(s). This transmission may contain information that is confidential or otherwise protected from disclosure. The use or disclosure of the information contained in this transmission, including any attachments, for any purpose other than that intended by its transmittal is strictly prohibited. Unauthorized interception of this email is a violation of federal criminal law. If you are not an intended recipient of this transmission, please immediately destroy all copies received and notify the sender.

ALCD-PUBCOM_0000048

| From: | Rowley, Laura (ENRD) |
|---|---|
| To: | DeLuca, Kathryn; Fajardo, Juan; Flanagan, Sarah; Keir, Andrew W. (ENRD); Rosenthal, Arnold (ENRD); Rowley, Laura (ENRD); Silagi, Alex (USANJ); Zizila, Frances |
| Cc: | Spohn, Andrew (ENRD) |
| Subject: | FW: [EXTERNAL] United States v. Alden Leeds, Inc., et al., Civil Action No. 2:22-cv-07326, D.J. Ref. No. 90-11-3-07683/1 |
| Date: | Tuesday, March 14, 2023 9:44:51 AM |

FYI

Laura J. Rowley
U.S. Department of Justice
Environmental Enforcement Section
(202) 532-5896

-----Original Message-----
From: Earl, Michelle (ENRD) <Michelle.Earl2@usdoj.gov>
Sent: Tuesday, March 14, 2023 9:08 AM
To: Rowley, Laura (ENRD) <Laura.Rowley@usdoj.gov>
Subject: FW: [EXTERNAL] United States v. Alden Leeds, Inc., et al., Civil Action No. 2:22-cv-07326, D.J. Ref. No. 90-11-3-07683/1

Good morning,

This was sent to one of our inboxes, for DJ # 90-11-3-07683/17

Respectfully,

Michelle Earl
Case Management Unit
Docketing Clerk
Environmental Enforcement Section (EES)
Environmental and Natural Resources Division (ENRD)
United States Department of Justice (USDOJ)

-----Original Message-----
From: Gene Agresta ▮▮▮▮▮▮▮▮▮▮
Sent: Tuesday, March 14, 2023 7:58 AM
To: ENRD, PUBCOMMENT-EES (ENRD) <PENRD3@ENRD.USDOJ.GOV>
Subject: [EXTERNAL] United States v. Alden Leeds, Inc., et al., Civil Action No. 2:22-cv-07326, D.J. Ref. No. 90-11-3-07683/1

Help residents of New Jersey save our rivers and clean up same

Thank you
Gene Agr
▮▮▮▮▮▮▮▮

| From: | Rowley, Laura (ENRD) |
|---|---|
| To: | DeLuca, Kathryn; Fajardo, Juan; Flanagan, Sarah; Keir, Andrew W. (ENRD); Rosenthal, Arnold (ENRD); Rowley, Laura (ENRD); Silagi, Alex (USANJ); Zizila, Frances |
| Cc: | Spohn, Andrew (ENRD) |
| Subject: | FW: United States v. Alden Leeds, Inc., et al., Civil Action No. 2:22-cv-07326, D.J. Ref. No. 90-11-3-07683/1 |
| Date: | Wednesday, March 15, 2023 9:19:16 AM |

FYI

Laura J. Rowley
U.S. Department of Justice
Environmental Enforcement Section
(202) 532-5896

-----Original Message-----
From: Earl, Michelle (ENRD) <Michelle.Earl2@usdoj.gov>
Sent: Wednesday, March 15, 2023 9:15 AM
To: Rowley, Laura (ENRD) <Laura.Rowley@usdoj.gov>
Subject: FW: United States v. Alden Leeds, Inc., et al., Civil Action No. 2:22-cv-07326, D.J. Ref. No. 90-11-3-07683/1

Good morning,

This was sent to one of our inboxes, for DJ # 90-11-3-07683/17.

Respectfully,
Michelle Earl
Case Management Unit
Docketing Clerk
Environmental Enforcement Section (EES)
Environmental and Natural Resources Division (ENRD)
United States Department of Justice (USDOJ)

-----Original Message-----
From: Chuck Hanclich and Lori Rottenberg ▮▮▮▮▮▮▮▮▮▮
Sent: Tuesday, March 14, 2023 5:31 PM
To: ENRD, PUBCOMMENT-EES (ENRD) <PENRD3@ENRD.USDOJ.GOV>
Subject: [EXTERNAL] United States v. Alden Leeds, Inc., et al., Civil Action No. 2:22-cv-07326, D.J. Ref. No. 90-11-3-07683/1

Dear DoJ,

I would like to know why the companies that have poisoned the Passaic River over the last 150 years are not being held fully responsible for their deeds. My understanding is that the $150 million settlement being pursued by EPA is only a tiny fraction of the nearly $2 billion needed to restore the river, and that most of the settlement will help the EPA recoup its costs. This is obscene. All across America, greedy companies bank on lax enforcement while they irrevocably poison our planet for short-term gain. Please prove them wrong.

Thank you,
Lori Rottenberg

Sent from my iPhone

Sent from my iPhone

ALCD-PUBCOM_0000051

| From: | Rowley, Laura (ENRD) |
|---|---|
| To: | DeLuca, Kathryn; Fajardo, Juan; Flanagan, Sarah; Keir, Andrew W. (ENRD); Rosenthal, Arnold (ENRD); Rowley, Laura (ENRD); Silagi, Alex (USANJ); Zizila, Frances |
| Cc: | Spohn, Andrew (ENRD) |
| Subject: | FW: [EXTERNAL] United States v. Alden Leeds, Inc., et al., Civil Action No. 2:22–cv–07326, D.J. Ref. No. 90–11–3–07683/1 |
| Date: | Wednesday, March 15, 2023 9:22:08 AM |

FYI

Laura J. Rowley
U.S. Department of Justice
Environmental Enforcement Section
(202) 532-5896

**From:** Earl, Michelle (ENRD) <Michelle.Earl2@usdoj.gov>
**Sent:** Wednesday, March 15, 2023 9:21 AM
**To:** Rowley, Laura (ENRD) <Laura.Rowley@usdoj.gov>
**Subject:** FW: [EXTERNAL] United States v. Alden Leeds, Inc., et al., Civil Action No. 2:22–cv–07326, D.J. Ref. No. 90–11–3–07683/1

Good morning,

This was sent to one of our inboxes, for DJ # 90-11-3-07683/17.

Respectfully,

**Michelle Earl**

Case Management Unit

**Docketing Clerk**

Environmental Enforcement Section (EES)

Environmental and Natural Resources Division (ENRD)

United States Department of Justice (USDOJ)

**From:** Kai Tillman
**Sent:** Tuesday, March 14, 2023 4:36 PM
**To:** ENRD, PUBCOMMENT-EES (ENRD) <PENRD3@ENRD.USDOJ.GOV>
**Subject:** [EXTERNAL] United States v. Alden Leeds, Inc., et al., Civil Action No. 2:22–cv–07326, D.J. Ref. No. 90–11–3–07683/1

Dear Assistant Attorney General Kim, Environment & Natural Resources Division:

As an environmental advocate, I applaud the EPA's efforts to clean up the Passaic River, it's another action that will help protect our communities for years to come. However, I'm writing to express my

opposition to the proposed settlement with polluters for the cleanup of the Passaic River in New Jersey. I believe this settlement is unjust and would further harm marginalized communities who have already been disproportionately impacted by environmental pollution.

The proposed settlement of $150 million, while it may seem like a large sum, is only a fraction of the $2 billion it would cost to fully clean up the Passaic River. This would leave taxpayers and local municipalities to foot the remaining bill, placing an undue burden on already struggling communities. Furthermore, this settlement would delay the cleanup of the river and further impact the surrounding community, which includes low-income communities of color who have been disproportionately affected by environmental pollution.

The Passaic River has been polluted for decades and the cleanup process has already been delayed for too long. The residents of the surrounding communities have been living with the impacts of pollution for far too long and they deserve a full and comprehensive cleanup. To settle for less is to continue to harm these communities and to perpetuate the systemic injustices that have led to their disproportionate exposure to pollution in the first place. The state is making progress in environmental justice—this settlement is a step backwards.

I urge the EPA to reconsider this proposed settlement and to fully fund the cleanup of the Passaic River, so that the communities who have been harmed for so long can finally see justice.

Thank you for your time and consideration,

Kai Tillman

Hamilton, NJ 08610

| | |
|---|---|
| **From:** | Rowley, Laura (ENRD) |
| **To:** | DeLuca, Kathryn; Fajardo, Juan; Flanagan, Sarah; Keir, Andrew W. (ENRD); Rosenthal, Arnold (ENRD); Rowley, Laura (ENRD); Silagi, Alex (USANJ); Zizila, Frances |
| **Cc:** | Spohn, Andrew (ENRD) |
| **Subject:** | FW: United States v. Alden Leeds, Inc., et al., Civil Action No. 2:22–cv–07326, D.J. Ref. No. 90–11–3–07683/1 |
| **Date:** | Wednesday, March 15, 2023 1:36:58 PM |

FYI

Laura J. Rowley
U.S. Department of Justice
Environmental Enforcement Section
(202) 532-5896

---

**From:** Earl, Michelle (ENRD) <Michelle.Earl2@usdoj.gov>
**Sent:** Wednesday, March 15, 2023 1:36 PM
**To:** Rowley, Laura (ENRD) <Laura.Rowley@usdoj.gov>
**Subject:** FW: United States v. Alden Leeds, Inc., et al., Civil Action No. 2:22–cv–07326, D.J. Ref. No. 90–11–3–07683/1

Good afternoon,

This was sent to one of our inboxes, for DJ # 90-11-3-07683/17.


Respectfully,

**Michelle Earl**

Case Management Unit

**Docketing Clerk**

Environmental Enforcement Section (EES)

Environmental and Natural Resources Division (ENRD)

United States Department of Justice (USDOJ)


---

**From:** Janet Unger
**Sent:** Wednesday, March 15, 2023 12:27 PM
**To:** ENRD, PUBCOMMENT-EES (ENRD) <PENRD3@ENRD.USDOJ.GOV>
**Subject:** [EXTERNAL] United States v. Alden Leeds, Inc., et al., Civil Action No. 2:22–cv–07326, D.J. Ref. No. 90–11–3–07683/1


To the Assistant Attorney General, Environment and Natural Resources Division
Re: United States v. Alden Leeds, Inc., et al., Civil Action No. 2:22–cv–07326, D.J. Ref. No. 90–

11–3–07683/1

Even though this $150 million proposal may not include the heavy hitters, it sure seems like a miniscule amount of money to collect from so many companies for their wrong-doing.  Why can't companies be held accountable the way they should be?

In addition, it took me a half hour to figure out how to get a comment to the right place on this matter - sure seems like you make it hard for the public to participate!  Grrr!!!

Janet Unger

█████████

Boonton , NJ 07005

3150777

PHYSICAL DOCUMENT

ENV_ENFORCEMENT-n3150777-v1

PUBLIC COMMENTS

| | |
|---|---|
| **Author:** | Rowley, Laura |
| **Document Type:** | CORRES |
| **LSA(s):** | JGOLDBETTER |
| **Co-Counsel:** | |
| **Counsel LSA(s):** | |
| **Distribution List:** | ENRD, EESCaseManagement (ENRD);Rose, Robert (ENRD);Reed, Jason (ENRD);Rowley, Laura (ENRD);Goldbetter, Jennifer (ENRD) |
| **Fileroom:** | 4Con - 5th Floor |
| **DJ#:** | 90-11-3-07683/17 |
| **Case Name:** | U.S. V. ALDEN LEEDS INC., ET AL. (DIAMOND ALKALI SITE - LOWER PASSAIC RIVER STUDY AREA) (OU 2 AND 4) |
| **Court:** | NJ D. N.J.; 3rd Cir. |
| **Notes:** | |
| **Double-Sided:** | N |
| **Received Date:** | 3/15/2023 |
| **Urgent:** | N |
| **Oversize:** | N |
| **Bound Document:** | N |



U.S. DEPARTMENT OF JUSTICE
ENVIRONMENT AND NATURAL
RESOURCES DIVISION

MAR 1 5 2023

To: Assistant Attorney General Todd Kim
Re: C.A. No. 2:22–cv–07326, D.J. Ref. No. 90–11–3–07683/1

EXECUTIVE OFFICE

Dear Mr. Kim,

Thank you for the work being done by the EPA and DOJ to address environmental issues facing North Jersey. I know that myself and countless other business owners and community members are grateful for the prospect of a Passaic River that is once again clean and safe for the towns in this area to enjoy.

That said, I am concerned with the recent proposed consent decree with some of the parties responsible for the current state of the river. While this $150 million settlement represents a contribution towards the cleanup process, it will not come close to the estimated $2 billion needed for this cleanup. The pollution in the Passaic River has severely affected the health and well-being of our community for decades. The businesses and families living near and along the river deserve a properly completed and funded cleanup, and polluters should be held responsible for the environmental damages they have caused.

Requiring just a portion of polluters to pay such a small amount of the funds needed just encourages companies to continue to pollute the environment, lets too many responsible polluters off the hook, and does a disservice to the community that lives on and near the Passaic River. I encourage the EPA to reconsider its settlement and instead hold all polluters accountable for their fair share of the cleanup costs.

Kind regards,

Owner, Organic Sun Market
Montclair, NJ

corr
90-11-3-07683/17

ALCD-PUBCOM_0000057

ALCD-PUBCOM_0000058

Organic Sun Farmel
108 Bloomfield Ave
Mont Clair, NJ 07042

DV DANIELS NJ   070
8 MAR 2023  PM 5  L



X-RAYED

MAR 1 3 2023

DOJ MAILROOM

U.S. DEPARTMENT OF JUSTICE
ENVIRONMENT AND NATURAL
RESOURCES DIVISION

MAR 1 5 2023

EXECUTIVE OFFICE

Todd Kim, Asst AG
US DOJ - ENRD
PO Box 7611
Washington DC, 20044 - 7611

20044-76iiii

3150799

## PHYSICAL DOCUMENT

ENV_ENFORCEMENT-n3150799-v1

### PUBLIC COMMENTS

| | |
|---|---|
| **Author:** | Rowley, Laura |
| **Document Type:** | CORRES |
| **LSA(s):** | JGOLDBETTER |
| **Co-Counsel:** | |
| **Counsel LSA(s):** | |
| **Distribution List:** | ENRD, EESCaseManagement (ENRD);Rose, Robert (ENRD);Reed, Jason (ENRD);Rowley, Laura (ENRD);Goldbetter, Jennifer (ENRD) |
| **Fileroom:** | 4Con - 5th Floor |
| **DJ#:** | 90-11-3-07683/17 |
| **Case Name:** | U.S. V. ALDEN LEEDS INC., ET AL. (DIAMOND ALKALI SITE - LOWER PASSAIC RIVER STUDY AREA) (OU 2 AND 4) |
| **Court:** | NJ D. N.J.; 3rd Cir. |
| **Notes:** | |
| **Double-Sided:** | N |
| **Received Date:** | 3/15/2023 |
| **Urgent:** | N |
| **Oversize:** | N |
| **Bound Document:** | N |

ALCD-PUBCOM_0000059



U.S. DEPARTMENT OF JUSTICE
ENVIRONMENT AND NATURAL
RESOURCES DIVISION

MAR 15 2023

Mr. Todd Kim
Assistant Attorney General, U.S. DOJ—ENRD
P.O. Box 7611
Washington, DC 20044-7611

EXECUTIVE OFFICE

Dear Mr. Kim

First, I want to start by thanking you and your team for addressing one of the long standing environmental issues in the area, cleaning the Passaic River. However, I believe that the EPA's proposed settlement is not enough to address the problem and, as the owner of Pereaux Interior Design in Summit, I feel it's unfair to our local communities to let these polluters pay only a fraction of the clean up cost.

The estimated cost of the clean-up is more than $2 billion, and it is simply unacceptable for the EPA to let a handful of companies off the hook for under 10% of the clean up cost. The Superfund law was established precisely to ensure that each company is held accountable for its fair share of the cost of cleaning up toxic sites like the Passaic River.

If the EPA continues to let these companies get away with such a small settlement, it will set a dangerous precedent for other communities facing similar pollution crises. The residents of this community deserve better, and I implore you to use your normal processes to ensure that each company is held accountable for its fair share of the cost of cleaning up the Passaic River.

Sincerely,

Pereaux Interior Design
Summit, NJ

Corr
90-11-3-0768/17

ALCD-PUBCOM_000061

NEW YORK NY 100

9 MAR 2023 PM 12 L



X-RAYED

MAR 1 3 2023

DOJ MAIL ROOM

U.S. DEPARTMENT OF JUSTICE
ENVIRONMENT AND NATURAL
RESOURCES DIVISION

MAR 1 5 2023

EXECUTIVE OFFICE

Mr. Todd Kim

Assistant Attorney General U.S. DOJ-ENRD

P.O. Box 7611

Washington DC. 20044-7611

20044-761111

||||||||||||||||||||||||||||||||||||||||||||||||||
3150800

## PHYSICAL DOCUMENT

ENV_ENFORCEMENT-n3150800-v1

### PUBLIC COMMENTS

| | |
|---|---|
| **Author:** | Rowley, Laura |
| **Document Type:** | CORRES |
| **LSA(s):** | JGOLDBETTER |
| **Co-Counsel:** | |
| **Counsel LSA(s):** | |
| **Distribution List:** | ENRD, EESCaseManagement (ENRD);Rose, Robert (ENRD);Reed, Jason (ENRD);Rowley, Laura (ENRD);Goldbetter, Jennifer (ENRD) |
| **Fileroom:** | 4Con - 5th Floor |
| **DJ#:** | 90-11-3-07683/17 |
| **Case Name:** | U.S. V. ALDEN LEEDS INC., ET AL. (DIAMOND ALKALI SITE - LOWER PASSAIC RIVER STUDY AREA) (OU 2 AND 4) |
| **Court:** | NJ D. N.J.; 3rd Cir. |
| **Notes:** | |
| **Double-Sided:** | N |
| **Received Date:** | 3/15/2023 |
| **Urgent:** | N |
| **Oversize:** | N |
| **Bound Document:** | N |

Rowley, Laura

Mr. Todd Kim
Assistant Attorney General, U.S. DOJ—ENRD
P.O. Box 7611
Washington, DC 20044–7611

U.S. DEPARTMENT OF JUSTICE
ENVIRONMENT AND NATURAL
RESOURCES DIVISION

MAR 15 2023

Dear Assistant AG Kim,

EXECUTIVE OFFICE

I write to you with gratitude for, but also reservations about the settlement with companies responsible for polluting the Passaic River. I am appreciative of the efforts of the EPA and the DOJ to bring us much-needed funding for river cleanup, and applaud the work done here and around the country to hold polluters accountable.

However, I don't believe the recent settlement handles the situation correctly or adequately ensures polluters pay what they owe for the cleanup of the Passaic River. For decades, companies have dumped chemicals of all sorts into the Passaic River, releasing cancer-causing agents, harming wildlife and the natural environment, and diminishing economic usability of the river and its surrounding area. The proposed settlement would only hold those polluters accountable for less than 10% of the cost it will take to fully restore and clean the Passaic River.

I reiterate my great appreciation for the EPA and DOJ in pursuing funds to remediate environmental issues such as this, but I strongly request that the agencies ensure that every polluter pays their fair share of the costs to clean the Passaic River. Doing so will reinforce that polluters aren't given a pass to get away with their past destruction of the environment and that residents here can look forward to a healthier future.

Kind regards,

Diamond Cycle
Montclair, NJ

Craig Connell

Corr
90-11-3-07683/1

Diamond Cycle Manufacturer
989 Bloomfield Ave.
Montclair NJ 07042

U.S. DEPARTMENT OF JUSTICE
ENVIRONMENT AND NATURAL
RESOURCES DIVISION

MAR 1 5 2023

EXECUTIVE OFFICE

BY DANIELS NJ  070
9 MAR 2023 PM 6 L   X-RAYED
MAR 1 8 2023
DOJ MAILROOM

Mr. Todd Kim
Assistant AG, US DOJ - ENRD
P.O.Box 7611
Washington DC 20044 - 7611

20044-761111

ALCD-PUBCOM_0000064

‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖
3157778

## PHYSICAL DOCUMENT

---

ENV_ENFORCEMENT-n3157778-v1

---

PUBLIC COMMENTS

| | |
|---|---|
| **Author:** | Rowley, Laura |
| **Document Type:** | CORRES |
| **LSA(s):** | JGOLDBETTER |
| **Co-Counsel:** | |
| **Counsel LSA(s):** | |
| **Distribution List:** | ENRD, EESCaseManagement (ENRD);Rose, Robert (ENRD);Reed, Jason (ENRD);Rowley, Laura (ENRD);Goldbetter, Jennifer (ENRD) |
| **Fileroom:** | 4Con - 5th Floor |
| **DJ#:** | 90-11-3-07683/17 |
| **Case Name:** | U.S. V. ALDEN LEEDS INC., ET AL. (DIAMOND ALKALI SITE - LOWER PASSAIC RIVER STUDY AREA) (OU 2 AND 4) |
| **Court:** | NJ D. N.J.; 3rd Cir. |
| **Notes:** | |
| **Double-Sided:** | N |
| **Received Date:** | 3/17/2023 |
| **Urgent:** | N |
| **Oversize:** | N |
| **Bound Document:** | N |

*Rowley, Laura*

Paw Couture Pet Grooming
60A Main St.
Little Falls, NJ 07424

U.S. DEPARTMENT OF JUSTICE
ENVIRONMENT AND NATURAL
RESOURCES DIVISION

MAR 17 2023

EXECUTIVE OFFICE

Todd Kim, Assistant Attorney General
U.S. DOJ—ENRD
P.O. Box 7611
Washington, DC 20044–7611

Re: C.A. No. 2:22–cv–07326, D.J. Ref. No. 90–11–3–07683/1

Dear Mr. Kim,

I would like to first and foremost thank you for the work the EPA and DOJ have done to tackle environmental issues that have affected my community and communities like it around the country for decades. Every American deserves the opportunity to have clean water and a healthy natural environment.

I write to you about the EPA's recent announcement of a settlement with some companies who contributed to the pollution of the Passaic River here in New Jersey. While the $150 million dollars agreed upon is a notable contribution to this work, I am concerned that this is far too little to address the reality of the Passaic River cleanup, which is estimated to cost closer to the range of $2 billion dollars. Industrial and commercial pollution over decades has led to the river's infamous contamination, and the EPA has an essential role to play in ensuring that the responsible polluters are held accountable and pay their fair share.

The EPA should not let polluters off the hook from their responsibility to contribute to cleaning up the river. Holding all responsible parties accountable will ensure that our local environment is cleaned in the necessary way and also send a clear message that pollution by corporations will not be tolerated in the future.

Sincerely,

March. 7, 2023

Owner, Paw Couture Pet Grooming
Little Falls, NJ

Corr
90-11-3-07683/17

ALCD-PUBCOM_0000066

PAN Corra TH Graning & Bakery
60a main St.
Little falls. NJ 07424

U.S. DEPARTMENT OF JUSTICE
ENVIRONMENT AND NATURAL
RESOURCES DIVISION

MAR 17 2023

EXECUTIVE OFFICE

Todd Kim
U.S. DOJ-ENRD
P.O. Box 7611
Washington DC. 20044-7611



DV DANIELS NJ  070
10 MAR 2023 PM 6  L

X-RAYED
MAR 16 2023
DOJ MAILROOM

20044-7611111

ALCD-PUBCOM_0000067

||||||| |||||||| |||||| ||| ||||||||
3157795

PHYSICAL DOCUMENT

ENV_ENFORCEMENT-n3157795-v1

PUBLIC COMMENTS

| | |
|---|---|
| **Author:** | Rowley, Laura |
| **Document Type:** | CORRES |
| **LSA(s):** | JGOLDBETTER |
| **Co-Counsel:** | |
| **Counsel LSA(s):** | |
| **Distribution List:** | ENRD, EESCaseManagement (ENRD);Rose, Robert (ENRD);Reed, Jason (ENRD);Rowley, Laura (ENRD);Goldbetter, Jennifer (ENRD) |
| **Fileroom:** | 4Con - 5th Floor |
| **DJ#:** | 90-11-3-07683/17 |
| **Case Name:** | U.S. V. ALDEN LEEDS INC., ET AL. (DIAMOND ALKALI SITE - LOWER PASSAIC RIVER STUDY AREA) (OU 2 AND 4) |
| **Court:** | NJ D. N.J.; 3rd Cir. |
| **Notes:** | |
| **Double-Sided:** | N |
| **Received Date:** | 3/17/2023 |
| **Urgent:** | N |
| **Oversize:** | N |
| **Bound Document:** | N |

Rowley, Laura

Daniel Silva
Designer / Owner
Fabric Factory Studio
107 Main Street
Little Falls, NJ 07424

U.S. DEPARTMENT OF JUSTICE
ENVIRONMENT AND NATURAL
RESOURCES DIVISION

3/1/23

MAR 17 2023

Todd Kim                          EXECUTIVE OFFICE
Assistant AG
U.S. DOJ—ENRD
P.O. Box 7611
Washington, DC 20044

Re: C.A. No. 2:22–cv–07326, D.J. Ref. No. 90–11–3–07683/1

Assistant AG Kim,

The Passaic River in New Jersey has been polluted for decades by corporations who profited
from doing so. This has caused disastrous environmental damage, harmed the local economy,
and put local residents' health at risk.

I am glad to see that the EPA and DOJ are pursuing funding from polluters to pay for clean up of
the river to restore it to its former state. That said, I was disappointed to see that the recent
settlement with many of those polluters only holds them to roughly $150 million of the estimated
$1-2 billion needed to adequately do the work. While this is a start, I fear this lets polluters skirt
their responsibilities and only pay a small portion of what they are truly responsible for.

What kind of precedent does this set for other polluters? How much did these companies profit
off of their pollution in excess of this small amount that they are being asked to pay? I urge the
EPA and DOJ to pursue a different solution – one which fully funds these cleanup efforts and
requires polluters to pay for the damage they have done.

Kind regards,

Daniel Silva

corr
90-11-3-07683/1

ALCD-PUBCOM_0000069



Daniel Silva
Fabric Factory Studio
107 Main St.
Little Falls, NJ07424

10 MAR 2023 PM 8 L

*RAYED

MAR 15 2023

DOJ MAILROOM

Todd Kim
Assistant AG
U.S. DOJ - ENRD
P.O. Box 7611
Washington DC 20044

U.S. DEPARTMENT OF JUSTICE
ENVIRONMENT AND NATURAL
RESOURCES DIVISION

MAR 17 2023

EXECUTIVE OFFICE

ALCD-PUBCOM_0000070

| From: | Rowley, Laura (ENRD) |
|-------|---------------------|
| To: | DeLuca, Kathryn; Fajardo, Juan; Flanagan, Sarah; Keir, Andrew W. (ENRD); Rosenthal, Arnold (ENRD); Rowley, Laura (ENRD); Silagi, Alex (USANJ); Zizila, Frances |
| Cc: | Spohn, Andrew (ENRD) |
| Subject: | FW: [EXTERNAL] United States v. Alden Leeds, Inc., et al., Civil Action No. 2:22–cv–07326, D.J. Ref. No. 90–11–3–07683/1 |
| Date: | Thursday, March 16, 2023 7:28:55 PM |

FYI

Laura J. Rowley
U.S. Department of Justice
Environmental Enforcement Section
(202) 532-5896

**From:** Earl, Michelle (ENRD) <Michelle.Earl2@usdoj.gov>
**Sent:** Thursday, March 16, 2023 4:57 PM
**To:** Rowley, Laura (ENRD) <Laura.Rowley@usdoj.gov>
**Subject:** FW: [EXTERNAL] United States v. Alden Leeds, Inc., et al., Civil Action No. 2:22–cv–07326, D.J. Ref. No. 90–11–3–07683/1

Good afternoon,

This was sent to one of our inboxes, for DJ # 90-11-3-07683/17.

Respectfully,

**Michelle Earl**

Case Management Unit

**Docketing Clerk**

Environmental Enforcement Section (EES)

Environmental and Natural Resources Division (ENRD)

United States Department of Justice (USDOJ)

**From:** Jeremy Kessler
**Sent:** Thursday, March 16, 2023 1:24 PM
**To:** ENRD, PUBCOMMENT-EES (ENRD) <PENRD3@ENRD.USDOJ.GOV>
**Subject:** [EXTERNAL] United States v. Alden Leeds, Inc., et al., Civil Action No. 2:22–cv–07326, D.J. Ref. No. 90–11–3–07683/1

Dear Assistant Attorney General Kim:
I am writing to express my concern over the ongoing pollution recovery efforts in the Passaic
River. While I understand that the EPA has recently reached a settlement with 85 companies,

allowing them to pay $150 million in damages combined, this approach is troubling because it does not hold all polluters accountable, which could lead to local municipalities and taxpayers, including those in my hometown of South Orange, bearing the burden of the remaining costs.

This consent decree lets other companies that have also contributed to the pollution off the hook, and does not follow the appropriate process for recouping damages for cleanup efforts. Every entity that contributed to the pollution of the Passaic River should pay their fair share in damages. The settlement could lead to major delays in the recovery of the Passaic and leave local municipalities bearing the burden of the pollution costs, which in turn may result in municipalities raising rates and taxes on residents and consumers.

I believe that the most efficient solution would be to hold all polluting entities accountable in order to speed up the recovery and ensure that the cleanup is handled fairly. I urge the EPA and DOJ to consider this approach and to work with impacted communities to find a solution that is in the best interest of all parties involved.

Thank you for your time and attention to this matter.

Sincerely,
Jeremy Kessler
█████████████
South Orange, NJ 07079

| From: | Rowley, Laura (ENRD) |
|---|---|
| To: | DeLuca, Kathryn; Fajardo, Juan; Flanagan, Sarah; Keir, Andrew W. (ENRD); Rosenthal, Arnold (ENRD); Rowley, Laura (ENRD); Silagi, Alex (USANJ); Zizila, Frances |
| Cc: | Spohn, Andrew (ENRD) |
| Subject: | FW: [EXTERNAL] United States v. Alden Leeds, Inc., et al., Civil Action No. 2:22-cv-07326, D.J. Ref. No. 90-11-3-07683/17 |
| Date: | Friday, March 17, 2023 9:25:35 AM |

FYI

Laura J. Rowley
U.S. Department of Justice
Environmental Enforcement Section
(202) 532-5896

-----Original Message-----
From: Earl, Michelle (ENRD) <Michelle.Earl2@usdoj.gov>
Sent: Friday, March 17, 2023 9:24 AM
To: Rowley, Laura (ENRD) <Laura.Rowley@usdoj.gov>
Subject: FW: [EXTERNAL] United States v. Alden Leeds, Inc., et al., Civil Action No. 2:22-cv-07326, D.J. Ref.
No. 90-11-3-07683/17

Happy Friday,

This was sent to one of our inboxes, for DJ # 90-11-3-07683/17.


Respectfully,

Michelle Earl
Case Management Unit
Docketing Clerk
Environmental Enforcement Section (EES)
Environmental and Natural Resources Division (ENRD)
United States Department of Justice (USDOJ)


-----Original Message-----
From: Larry G
Sent: Thursday, March 16, 2023 8:21 PM
To: ENRD, PUBCOMMENT-EES (ENRD) <PENRD3@ENRD.USDOJ.GOV>
Subject: [EXTERNAL] United States v. Alden Leeds, Inc., et al., Civil Action No. 2:22-cv-07326, D.J. Ref. No. 90-
11-3-07683/1

Another shady deal, no doubt based on lots of political donations in exchange for escaping corporate responsibility.
Criminals making deals with criminals. It never ends!

From Larry

| | |
|---|---|
| **From:** | Rowley, Laura (ENRD) |
| **To:** | DeLuca, Kathryn; Fajardo, Juan; Flanagan, Sarah; Keir, Andrew W. (ENRD); Rosenthal, Arnold (ENRD); Rowley, Laura (ENRD); Silagi, Alex (USANJ); Zizila, Frances |
| **Cc:** | Spohn, Andrew (ENRD) |
| **Subject:** | FW: [EXTERNAL] My Comments re Proposed Settlement, United States v. Alden Leeds, Inc., et al., Civil Action No. 2:22-cv-07326, D.J. Ref. No. 90-11-3-07683/1 |
| **Date:** | Friday, March 17, 2023 2:14:39 PM |

FYI

Laura J. Rowley
U.S. Department of Justice
Environmental Enforcement Section
(202) 532-5896

**From:** Earl, Michelle (ENRD) <Michelle.Earl2@usdoj.gov>
**Sent:** Friday, March 17, 2023 2:06 PM
**To:** Rowley, Laura (ENRD) <Laura.Rowley@usdoj.gov>
**Subject:** FW: [EXTERNAL] My Comments re Proposed Settlement, United States v. Alden Leeds, Inc., et al., Civil Action No. 2:22-cv-07326, D.J. Ref. No. 90-11-3-07683/1

Happy Friday,

This was sent to one of our inboxes, for DJ # 90-11-3-07683/17.

Respectfully,

**Michelle Earl**

Case Management Unit

**Docketing Clerk**

Environmental Enforcement Section (EES)

Environmental and Natural Resources Division (ENRD)

United States Department of Justice (USDOJ)

**From:** robert dresdner
**Sent:** Friday, March 17, 2023 1:06 PM
**To:** ENRD, PUBCOMMENT-EES (ENRD) <PENRD3@ENRD.USDOJ.GOV>
**Subject:** [EXTERNAL] My Comments re Proposed Settlement, United States v. Alden Leeds, Inc., et al., Civil Action No. 2:22-cv-07326, D.J. Ref. No. 90-11-3-07683/1

pubcomment-ees.enrd@usdoj.gov
Assistant Attorney General, U.S. DOJ-ENRD,
P.O. Box 7611,

Washington, DC, 20044-7611
**D.J. Ref. No. 90-11-3-07683/1**

**Re:**

United States v. Alden Leeds, Inc., et al., Civil Action No. 2:22-cv-07326, D.J. Ref. **No. 90-11-3-07683/1**

Dear AAGs for Alden Leeds SF Settlement:

The following are our comments [3/17/23] on the proposed Alden Leeds Consent Decree ("CD"). First, the CD does not provide adequate or sufficient information on the *harms* that the CD proposes to address. Instead, the CD provides only a few words naming only the worst most toxic pollutants eg dioxin. There is not even minimal notice to the public of the dates, amounts and dates of ALL discharges. If the public is given no information on the harm, the scope and scale of pollution, and how much pollution was dumped by the PRPs and the environment, the river and wetlands affected, the public obviously can comment on what harms will be addressed by this CD. Why does any public reviewer have to state this OBVIOUS point? Or has CERCLA and the APA and the courts somehow failed to make the full requirement of public notice abundantly clear to senior staff in charge at DOJ, EPA, DEP and the NJ DAG? Is it not OBVIOUS to the public that the CD does not meet notice requirements? Is it not plain that the CD fails to identify the harms are, their diverse, separate scope and extent, and fails to show what is settled thereby and not addressed, so that the public can follow and see whether such is adequate? For example, why are no maps of the extent of pollution whatsoever? Why are almost no details provided about the harms? Without this how can the public review what this CD is proposing to settle?

Second, further to the above, public notice and comment is hampered and in many respects prevented by the failure of the CD to provide adequate information on the proposed remedies. In view of the contamination, its degree and amount and where is it located, what are the remedial pollutant levels, cleanup levels required, and wildlife restoration goals of the cleanup, how and when will the applicable levels and criteria be met? the public needs to know NOW to what extent is the decades old pollution *not* being cleaned up, or merely left in place, and why. And why such extent is left in place and otherwise ignored! Is it being monitored and reported to the public and if so where? The CD provides a totally inadequate description of not only the harms, but also the investigative and remedial actions taken or to be taken by the parties and the government to date, and the exact status of the contamination sites -- as a result, how can the public determine if the government is doing its job?

Without better notice to the public, EPA and DEP will otherwise appear to be negligently failing to provide even minimal notice, and the agencies will appear to be intentionally 'hiding the ball' to prevent the public reviewer from finding out what the CD is proposing and whether the CD is adequate or reasonable. The public is shown a long 145 page CD, given inadequate information on the pollution as I have noted, and the bulk of the CD are signature pages. I do not see how even a educated

reviewer can possibly determine whether this settlement is in the public interest;  in fact the absence of common sense details and basic information implies a deliberate avoidance of notice, as if the government is attempting to shield from pesky reviewers what has been settled and how it is being addressed.

Cross referencing to documents on which the CD relies are not acceptable because such obviously delays and burdens public review. the CD must append any technical documents relied upon and explanatory supplements must be attached as needed to support review, otherwise pubic review is prevented or frustrated with extremely time consuming 'fishing expeditions'.  The CD should be withdrawn,revised and reissued to avoid these foreseeable impediments to review, to include explanatory supplements to support review of all details of the scope of pollution and the potential harms to the environment, including the impacts to wildlife that may have resulted from the pollution.  The CD should be withdrawn,revised and reissued to include adequate links, references, and all details of the proposed remedial plans to allow public review of the cure,  the clean ups, so that the reviewers can assess whether remedy proposed will be adequate to meet the scale and the scope of pollution and the potential harms to the environment, including the impacts to wildlife that may have resulted from the pollution. These are longstanding, notorious, and common sense but significant CD defects --- they need to be fixed NOW -- this Site has languished - doubtless pollution migrating and spreading in many places - for decades.

The CD should be withdrawn,revised and reissued to provide adequate notice to the public of the specific pollution extent, and the proposed remedies, including restoration to natural resources and wildlife.  If the goal as mandated by CERCLA is to restore the River to its pre-industrial, natural state and if Industries ruined it,  then the CD must be revised to demonstrate - for the public reviewer- that this statutory mandate will be met and by a date certain.

Sincerely,
Mr. and Mrs. R. Prescott Dresdner

████████████████

Upper Montclair, NJ 07043

████████████████

| | |
|---|---|
| **From:** | Rowley, Laura (ENRD) |
| **To:** | DeLuca, Kathryn; Fajardo, Juan; Flanagan, Sarah; Keir, Andrew W. (ENRD); Rosenthal, Arnold (ENRD); Rowley, Laura (ENRD); Silagi, Alex (USANJ); Zizila, Frances |
| **Cc:** | Spohn, Andrew (ENRD) |
| **Subject:** | FW: Passaic River cleanup costs |
| **Date:** | Monday, March 20, 2023 4:47:53 PM |

FYI

Laura J. Rowley
U.S. Department of Justice
Environmental Enforcement Section
(202) 532-5896

**From:** Earl, Michelle (ENRD) <Michelle.Earl2@usdoj.gov>
**Sent:** Monday, March 20, 2023 4:44 PM
**To:** Rowley, Laura (ENRD) <Laura.Rowley@usdoj.gov>
**Subject:** FW: Passaic River cleanup costs

Good afternoon,

This was sent to one of our inboxes, for DJ # 90-11-3-07683/17.

Respectfully,

**Michelle Earl**

Case Management Unit

**Docketing Clerk**

Environmental Enforcement Section (EES)

Environmental and Natural Resources Division (ENRD)

United States Department of Justice (USDOJ)

**From:** Mattson, Jane [DEP] <Jane.Mattson@dep.nj.gov>
**Sent:** Monday, March 20, 2023 1:33 PM
**To:** ENRD, PUBCOMMENT-EES (ENRD) <PENRD3@ENRD.USDOJ.GOV>
**Subject:** [EXTERNAL] Passaic River cleanup costs

To whom it may concern:

It is my opinion that the proposed 2-billion clean up of the Passaic River should be paid for by the historical waste producers that are responsible for the contamination. This is required by the Superfund law and should be implemented immediately without revision.

Jane Mattson

NJ Forest Service
495 Don Connor Blvd
Jackson, NJ 08527
(732) 928-2360

ALCD-PUBCOM_0000078

| From: | Rowley, Laura (ENRD) |
|---|---|
| To: | DeLuca, Kathryn; Fajardo, Juan; Flanagan, Sarah; Keir, Andrew W. (ENRD); Rosenthal, Arnold (ENRD); Rowley, Laura (ENRD); Silagi, Alex (USANJ); Zizila, Frances |
| Cc: | Spohn, Andrew (ENRD) |
| Subject: | FW: [EXTERNAL] Lower Passaic River Cleanup-Public Comment |
| Date: | Monday, March 20, 2023 4:48:09 PM |

FYI

Laura J. Rowley
U.S. Department of Justice
Environmental Enforcement Section
(202) 532-5896

**From:** Earl, Michelle (ENRD) <Michelle.Earl2@usdoj.gov>
**Sent:** Monday, March 20, 2023 4:46 PM
**To:** Rowley, Laura (ENRD) <Laura.Rowley@usdoj.gov>
**Subject:** FW: [EXTERNAL] Lower Passaic River Cleanup-Public Comment

Good afternoon,

This was sent to one of our inboxes, for DJ # 90-11-3-07683/17.

Respectfully,

**Michelle Earl**

Case Management Unit

**Docketing Clerk**

Environmental Enforcement Section (EES)

Environmental and Natural Resources Division (ENRD)

United States Department of Justice (USDOJ)

**From:** Raymond Raya
**Sent:** Monday, March 20, 2023 1:11 PM
**To:** ENRD, PUBCOMMENT-EES (ENRD) <PENRD3@ENRD.USDOJ.GOV>
**Subject:** [EXTERNAL] Lower Passaic River Cleanup-Public Comment

Dear Assistant Attorney General Todd Kim,

As a longtime New Jersey environmental advocate, it has been troubling to watch over the years how government and polluters couldn't come to an agreement on the cleanup of the Passaic River. Now after decades of delay, the EPA is allowing 85 of the 100 companies responsible for polluting the Lower 8.3 miles of the Passaic River to settle for $150 million– a mere fraction of the $2 billion it would cost to clean up the river. In practical terms, the settlement would mean that polluters would pay pennies on the dollar towards the cleanup.

Instead of negotiating settlements that would allow companies to pay small portions of what they actually owe, the EPA should follow the federal Superfund law that uses the court system, not the EPA or a contractor, to ensure that each company pays their fair share. By not holding polluters accountable, the EPA would send a message that it is acceptable to contaminate the environment without facing consequences. This would not only harm the communities that rely on the Lower Passaic River for their livelihoods, but it would also undermine the very purpose of the EPA, which is to protect human health and the environment.

Accordingly, I sincerely hope the agency reconsiders its position and holds those responsible for polluting, not just the Passaic River, but all New Jersey's waterways, to clean up the damage that they have caused.

Thank you for your consideration.

Very truly yours,

*Ray Raya*

Ray Raya, Esq.

**Ray Raya, Esq.**
55 Cornell Court
Freehold, New Jersey 07728
Phone: 732-845-3203
Facsimile: 732-845-3205
website: www.rayalaw.com

Board Certified by the Supreme Court of New Jersey as a Municipal Court Trial Attorney

Please consider the environment before printing this e-mail

**PRIVILEGED AND CONFIDENTIAL**
**ATTORNEY/CLIENT COMMUNICATION**
**This transmission from Raymond Albert Raya, Esq. may contain information which is privileged, confidential and protected by attorney-client
or attorney work product privileges. If you are not the addressee, note that any disclosure, copying, distribution or use of the contents of this
message is prohibited. If you have received this transmission in error, please destroy it and notify me immediately at the above phone number.

3197452

PHYSICAL DOCUMENT

ENV_ENFORCEMENT-n3197452-v1

PUBLIC COMMENTS

| | |
|---|---|
| **Author:** | Rowley, Laura |
| **Document Type:** | CORRES |
| **LSA(s):** | JGOLDBETTER |
| **Co-Counsel:** | |
| **Counsel LSA(s):** | |
| **Distribution List:** | ENRD, EESCaseManagement (ENRD);Rose, Robert (ENRD);Reed, Jason (ENRD);Rowley, Laura (ENRD);Goldbetter, Jennifer (ENRD) |
| **Fileroom:** | 4Con - 5th Floor |
| **DJ#:** | 90-11-3-07683/17 |
| **Case Name:** | U.S. V. ALDEN LEEDS INC., ET AL. (DIAMOND ALKALI SITE - LOWER PASSAIC RIVER STUDY AREA) (OU 2 AND 4) |
| **Court:** | NJ D. N.J.; 3rd Cir. |
| **Notes:** | |
| **Double-Sided:** | N |
| **Received Date:** | 3/23/2023 |
| **Urgent:** | N |
| **Oversize:** | N |
| **Bound Document:** | N |



Casa De Flora Bar
75 Washington St
Bloomfield, NJ
07003

U.S. DEPARTMENT OF JUSTICE
ENVIRONMENT AND NATURAL
RESOURCES DIVISION

MAR 2 3 2023

EXECUTIVE OFFICE

Mr. Todd Kim
Assistant AG
U.S. DOJ—ENRD
P.O. Box 7611
Washington, DC 20044

Mr. Kim,

Thank you for your thorough consideration of public comments concerning the ongoing negotiations for cleanup of the pollution in the Passaic River here in New Jersey. As the owner of Casa De Flora Bar and an active member of the Bloomfield, NJ community, I am writing to express my concerns over the recent settlement with 85 of these polluting companies for $150 million in damages and what this might mean for our local businesses.

The estimated total cost of this cleanup project is around $2 billion, meaning that the $150 million settlement falls short of the full price tag. I worry that this may shift a great deal of the financial burden to local municipalities who may increase taxes and rates on valued businesses like mine. Myself and other business owners believe that a more appropriate solution would be to hold all polluting entities accountable for their fair share in these damages.

Furthermore, this settlement deviates from the standard process for recouping cleanup damages and may threaten to delay the cleanup efforts by opening the settlement up to court challenges and other obstacles. I believe that the most efficient way to deal with this is to follow the process laid out by Superfund law.

Thanks again for your time and consideration of these concerns. I hope that you and your office reconsider the implications of this settlement and work to find a solution that works for all residents of our community.

Kindly,

Casa De Flora Bar, owner

3|14|2023

Corr
90-11-3-07683/17

Casa De FLorca Bar
75 Washington Street
Bloomfield, NJ 07003

DV DANIELS NJ   070

16 MAR 2023 PM 6  L

U.S. DEPARTMENT OF JUSTICE
ENVIRONMENT AND NATURAL
RESOURCES DIVISION

MAR 23 2023

EXECUTIVE OFFICE

Mr. Todd Kim
Assistant AG
U.S. DOJ – ENRD
PO Box 7611
Washington, DC 20044



X-RAYED

MAR 23 2023

DOJ MAILROOM

20044-7611111

ALCD-PUBCOM_0000083

3197456

PHYSICAL DOCUMENT

ENV_ENFORCEMENT-n3197456-v1

PUBLIC COMMENTS

| | |
|---|---|
| **Author:** | Rowley, Laura |
| **Document Type:** | CORRES |
| **LSA(s):** | JGOLDBETTER |
| **Co-Counsel:** | |
| **Counsel LSA(s):** | |
| **Distribution List:** | ENRD, EESCaseManagement (ENRD);Rose, Robert (ENRD);Reed, Jason (ENRD);Rowley, Laura (ENRD);Goldbetter, Jennifer (ENRD) |
| **Fileroom:** | 4Con - 5th Floor |
| **DJ#:** | 90-11-3-07683/17 |
| **Case Name:** | U.S. V. ALDEN LEEDS INC., ET AL. (DIAMOND ALKALI SITE - LOWER PASSAIC RIVER STUDY AREA) (OU 2 AND 4) |
| **Court:** | NJ D. N.J.; 3rd Cir. |
| **Notes:** | |
| **Double-Sided:** | N |
| **Received Date:** | 3/23/2023 |
| **Urgent:** | N |
| **Oversize:** | N |
| **Bound Document:** | N |

Rowley, Laura

Krafty Hair Kreation Studio
487 Bloomfield Ave
Caldwell, NJ 07006

U.S. DEPARTMENT OF JUSTICE
ENVIRONMENT AND NATURAL
RESOURCES DIVISION

MAR 2 3 2023

Todd Kim
Assistant AG                                        EXECUTIVE OFFICE
U.S. DOJ—ENRD
P.O. Box 7611
Washington, DC 20044

Re: C.A. No. 2:22–cv–07326, D.J. Ref. No. 90–11–3–07683/1

Dear Mr. Kim,

I am the owner of Krafty Hair Kreations Studio here in Caldwell, NJ. As an active member of our community, I am writing to express my thoughts over the recent efforts your office has taken to advance cleanup efforts in the Passaic River here in New Jersey.

I am thankful that after many years of continued pollution, companies will be held liable for the damage they caused to a natural resource. However, I worry that the recent proposed settlement with 85 of these companies does not appropriately address the issue and lets many polluters off the hook for their damage. Firstly, the $150 million proposed settlement does not come close to the estimated $2 billion cost of the cleanup, letting many of the responsible parties walk away without contributing their fair share.

Secondly, the proposed settlement does not follow the standard process for recouping damages for a major pollution hub. The settlement may be challenged in court, further delaying the cleanup process in the Passaic - this delay is something our community can no longer afford after decades of harmful pollution in the river. We must find a solution that speeds up the cleanup of our river rather than threatens to delay it.

Finally, I am concerned that the settlement will shift a large part of the cleanup burden on local municipalities and communities, leaving taxpayers and small business owners like myself to foot the bill via raised taxes and rates. A more adequate solution would be to hold all polluters accountable for their fair share so that the economic impact on New Jersey citizens is minimized.

I urge your office to reconsider this settlement proposal and work to find a solution that is fair for everyone and allows the cleanup of the River to begin as soon as possible. Thank you for your time and consideration on this important issue.

Sincerely,

Ronald Becchia
Krafty Hair Kreation

corr
90-11-3-07683/1

ALCD-PUBCOM_0000085

ALCD-PUBCOM_0000086

KrAFty hair Krenfton Studio
487 Bloomfield Ave
CAldwell NJ 07006



DV DANIELS NJ   070

X-RAYED
MAR 2 3 2023
DCJ MAILROOM

U.S. DEPARTMENT OF JUSTICE
ENVIRONMENT AND NATURAL
RESOURCES DIVISION

MAR 2 3 2023

EXECUTIVE OFFICE

Todd Kim
Assistant Ag.
U.S DOJ - ENRD
P O. Box 7611
WAshington DC 20044

20044-7E1111

3197467

PHYSICAL DOCUMENT

ENV_ENFORCEMENT-n3197467-v1

## PUBLIC COMMENTS

**Author:** Rowley, Laura

**Document Type:** CORRES

**LSA(s):** JGOLDBETTER

**Co-Counsel:**

**Counsel LSA(s):**

**Distribution List:** ENRD, EESCaseManagement (ENRD);Rose, Robert (ENRD);Reed, Jason (ENRD);Rowley, Laura (ENRD);Goldbetter, Jennifer (ENRD)

**Fileroom:** 4Con - 5th Floor

**DJ#:** 90-11-3-07683/17

**Case Name:** U.S. V. ALDEN LEEDS INC., ET AL. (DIAMOND ALKALI SITE - LOWER PASSAIC RIVER STUDY AREA) (OU 2 AND 4)

**Court:** NJ D. N.J.; 3rd Cir.

**Notes:**

**Double-Sided:** N

**Received Date:** 3/23/2023

**Urgent:** N

**Oversize:** N

**Bound Document:** N

ALCD-PUBCOM_0000087

3/14/22

U.S. DEPARTMENT OF JUSTICE
ENVIRONMENT AND NATURAL
RESOURCES DIVISION

To: Assistant Attorney General Todd Kim
Re: C.A. No. 2:22–cv–07326, D.J. Ref. No. 90–11–3–07683/1

MAR 23 2023

Assistant AG Kim,

EXECUTIVE OFFICE

Thank you for the work being done by the EPA and DOJ to hold polluters responsible for cleaning up sites like the Passaic River which for decades have contributed to the cancer-causing dioxin, PCBs, mercury, and other industrial pollutants buried in the riverbed. Polluters should carry the costs of environmental cleanups in situations like this, particularly when they profited off their years of pollution.

I write out of concern with the recent settlement the EPA and DOJ announced which would hold some polluters responsible for $150 million dollars of cleanup costs in the Passaic. This does not come close to the $2 billion that will be needed to actually clean up the river. My perspective is that polluters should be the ones who bear the costs associated with their pollution. These legal and financial responsibilities should not be neglected, or worse, passed on to members of the community.

The settlement risks placing the burden of cleanup costs on our local community and its members. The burden of the Passaic River cleanup should not be put on taxpayers. Our community deserves a process where polluters pay their fare share, and the work needed to restore the river to its healthy state should be fully funded by those responsible. It's essential that the EPA ensure that all responsible parties pay their fair share to clean up the Passaic River.

Sincerely, Carl Robinson
Carl Robinson

Owner
Stokedville
Montclair, NJ

90-11-3-07683/1 corr

ALCD-PUBCOM_0000089

C. Robinson
332 Bloomfield ave
Montclair N.J 07042

DV DANIELS NJ 070

16 MAR 2023 PM 6 L

Todd Kim
U.S DOJ - ENRD
P.O.Box 7611
Washington, DC 20044

X-RAYED

MAR 2 3 2023

DOJ MAILROOM

U.S. DEPARTMENT OF JUSTICE
ENVIRONMENT AND NATURAL
RESOURCES DIVISION

MAR 23 2023

EXECUTIVE OFFICE

20044-761111

‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖
3197470

## PHYSICAL DOCUMENT

---

ENV_ENFORCEMENT-n3197470-v1

---

PUBLIC COMMENTS

| | |
|---|---|
| **Author:** | Rowley, Laura |
| **Document Type:** | CORRES |
| **LSA(s):** | JGOLDBETTER |
| **Co-Counsel:** | |
| **Counsel LSA(s):** | |
| **Distribution List:** | ENRD, EESCaseManagement (ENRD);Rose, Robert (ENRD);Reed, Jason (ENRD);Rowley, Laura (ENRD);Goldbetter, Jennifer (ENRD) |
| **Fileroom:** | 4Con - 5th Floor |
| **DJ#:** | 90-11-3-07683/17 |
| **Case Name:** | U.S. V. ALDEN LEEDS INC., ET AL. (DIAMOND ALKALI SITE - LOWER PASSAIC RIVER STUDY AREA) (OU 2 AND 4) |
| **Court:** | NJ D. N.J.; 3rd Cir. |
| **Notes:** | |
| **Double-Sided:** | N |
| **Received Date:** | 3/23/2023 |
| **Urgent:** | N |
| **Oversize:** | N |
| **Bound Document:** | N |

ALCD-PUBCOM_0000090

To:                                                    U.S. DEPARTMENT OF JUSTICE
Todd Kim, Assistant AG                                 ENVIRONMENT AND NATURAL
                                                       RESOURCES DIVISION
U.S. D.O.J. - E.N.R.D.
P.O. Box 7611                                          MAR 2 3 2023
Washington, DC 20044-7611

                                                       EXECUTIVE OFFICE


Mr. Kim,

As a small business owner in Verona, NJ, I write to share my thoughts on the recent settlement
that would let several polluters off the hook and fail to meet the realistic needs for the Passaic
River clean up.

It is unjust to the taxpayers in the Passaic community to allow several polluters to pay little or
none of the cleanup costs. These businesses made a profit from their pollution and should bear
the responsibility of funding the required cleanup. The settlement undermines the principle of
holding polluters accountable for their actions, and it is only fair that those who pollute should
pay to clean up their own mess.

I urge you to reject the proposed settlement and ensure that companies are held accountable for
their full share of the cleanup costs. This will send a clear message to corporations that polluters
will always be responsible for the harm they cause to the communities in which they operate.

Thank you,




Verona, NJ, 07044



Regarding: *C.A. No. 2:22–cv–07326, D.J. Ref. No. 90–11–3–07683/1*


ALCD-PUBCOM_0000091

Verona, NJ 07044

U.S. DEPARTMENT OF JUSTICE
ENVIRONMENT AND NATURAL
RESOURCES DIVISION

MAR 23 2023

EXECUTIVE OFFICE    X-RAYED

MAR 2 2 2023

DOJ MAILROOM

DV DANIELS NJ   070

17 MAR 2023   PM 2



Todd Kim, ASSISTANT AG
US DOJ — ENRD
PO Box 7611
WAShing TON DC 20044 — 7611

20044-7B1111

ALCD-PUBCOM_0000092



3197472

<span style="color:blue">**PHYSICAL DOCUMENT**</span>

ENV_ENFORCEMENT-n3197472-v1

PUBLIC COMMENTS

| | |
|---|---|
| **Author:** | Rowley, Laura |
| **Document Type:** | FILINGS |
| **LSA(s):** | JGOLDBETTER |
| **Co-Counsel:** | |
| **Counsel LSA(s):** | |
| **Distribution List:** | ENRD, EESCaseManagement (ENRD);Rose, Robert (ENRD);Reed, Jason (ENRD);Rowley, Laura (ENRD);Goldbetter, Jennifer (ENRD) |
| **Fileroom:** | 4Con - 5th Floor |
| **DJ#:** | 90-11-3-07683/17 |
| **Case Name:** | U.S. V. ALDEN LEEDS INC., ET AL. (DIAMOND ALKALI SITE - LOWER PASSAIC RIVER STUDY AREA) (OU 2 AND 4) |
| **Court:** | NJ D. N.J.; 3rd Cir. |
| **Notes:** | |
| **Double-Sided:** | N |
| **Received Date:** | 3/23/2023 |
| **Urgent:** | N |
| **Oversize:** | N |
| **Bound Document:** | N |

Rowley, Laura

U.S. DEPARTMENT OF JUSTICE
ENVIRONMENT AND NATURAL
RESOURCES DIVISION

March 2023

MAR 2 3 2023

Todd Kim, Assistant AG
U.S. DOJ—ENRD
P.O. Box 7611
Washington, DC 20044

........TIVE OFFICE

Assistant AG Kim,

As a business owner who lives and works near the Passaic River, I am pleased to see the
efforts being undertaken to improve the condition of the river which has for years been
subjected to industrial pollution. This community has historically relied on the river, and the
damage done has been devastating to the health of the local environment.

The EPA's proposed consent decree with some of the responsible polluters of the river
presents a helpful opportunity to partially fund the necessary cleanup. That said, it does not
come close to the $2 billion price tag required to actually fully fix the environmental issues
here. I am deeply concerned that this settlement of a mere $150 million undermines efforts
here and elsewhere in the country to hold polluters accountable and set standards and
precedents for how industries should operate going forward.

I request that the EPA and DOJ revisit this issue so that the cleanup of the Passaic River is
fully funded, polluters are held accountable, and the community isn't further burdened by
the costs associated with the destruction of our natural resources. The EPA and DOJ have
the opportunity to take incredibly important steps in the right direction here, and the
polluters have a moral obligation to do what is right.

Sincerely,

PINAR FAZLIOGLU

Owner, La Fontaine Cafe
Montclair, NJ

Re: C.A. No. 2:22-cv-07326, D.J. Ref. No. 90-11-3-07683/1

Corr
90-11-3-07683/17

ALCD-PUBCOM_0000094

ALCD-PUBCOM_0000095

From: LA FONTAINE CAFE
12 N. Willow St
Montclair NJ 07042



DANIELS NJ 070
16 MAR 2023 PM 5 L

X-RAYED

MAR 22 2023
DOJ MAILROOM

U.S. DEPARTMENT OF JUSTICE
ENVIRONMENT AND NATURAL
RESOURCES DIVISION

MAR 23 2023

EXECUTIVE OFFICE

To: Todd Kim
U.S. DOJ — ENRD
PO Box 7611
Washington, DC 20044

20044-761111

| From: | Rowley, Laura (ENRD) |
|---|---|
| To: | DeLuca, Kathryn; Fajardo, Juan; Flanagan, Sarah; Keir, Andrew W. (ENRD); Rosenthal, Arnold (ENRD); Rowley, Laura (ENRD); Silagi, Alex (USANJ); Zizila, Frances |
| Cc: | Spohn, Andrew (ENRD) |
| Subject: | FW: United States v. Alden Leeds, Inc., et al., Civil Action No. 2:22–cv–07326, D.J. Ref. No. 90–11–3–07683/1 |
| Date: | Tuesday, March 21, 2023 10:25:10 AM |

FYI

Laura J. Rowley
U.S. Department of Justice
Environmental Enforcement Section
(202) 532-5896

**From:** Earl, Michelle (ENRD) <Michelle.Earl2@usdoj.gov>
**Sent:** Tuesday, March 21, 2023 9:37 AM
**To:** Rowley, Laura (ENRD) <Laura.Rowley@usdoj.gov>
**Subject:** FW: United States v. Alden Leeds, Inc., et al., Civil Action No. 2:22–cv–07326, D.J. Ref. No. 90–11–3–07683/1

Good morning,

This was sent to one of our inboxes, for DJ # 90-11-3-07683/17.

Respectfully,

**Michelle Earl**

Case Management Unit

**Docketing Clerk**

Environmental Enforcement Section (EES)

Environmental and Natural Resources Division (ENRD)

United States Department of Justice (USDOJ)

**From:** Victoria Franklin
**Sent:** Monday, March 20, 2023 5:20 PM
**To:** ENRD, PUBCOMMENT-EES (ENRD) <PENRD3@ENRD.USDOJ.GOV>
**Subject:** [EXTERNAL] United States v. Alden Leeds, Inc., et al., Civil Action No. 2:22–cv–07326, D.J. Ref. No. 90–11–3–07683/1

Dear Assistant Attorney General Kim, Environment & Natural Resources Division:

I grew up not far from the Passaic River and have watched the clean up of the polluted river drag on for years. When news came in December that the EPA had

reached a potential settlement with polluters to finally move forward with the cleanup process, I was happy to hear. That is, until I looked into the details of the proposed settlement and realized it doesn't hold ALL the polluters accountable and only collects a fraction of what is needed to fully clean up the river.

The proposed settlement would bring in $150 million. While that sounds like a lot of money, it's far from the estimated $2 billion that needed to fully clean up River. This shortfall leaves taxpayers and local municipalities at risk for having to make up the shortfall. The settlement also is fundamentally unfair, holding some polluters accountable for their harms, while letting others off the hook.

The Passaic River has been polluted for decades and the cleanup process has already been delayed for too long. The residents of the surrounding communities have been living with the impacts of pollution for far too long and they deserve a full and comprehensive cleanup. I urge the EPA to reconsider this proposed settlement and to fully fund the cleanup of the Passaic River.

Thank you for your time and consideration,

Victoria Franklin



# COFFEY & ASSOCIATES

COUNSELLORS AT LAW

———

A PROFESSIONAL CORPORATION

FAX 973-539-4501
EMAIL GJC@COFFEYLAW.COM

310 SOUTH STREET
MORRISTOWN, NEW JERSEY 07960
973--539-4500

GREGORY J. COFFEY
DIRECT DIAL 973-539-4582

March 22, 2023

**VIA ELECTRONIC MAIL (pubcomment-ees.enrd@usdoj.gov)**
Assistant Attorney General
U.S. DOJ-ENRD
P.O. Box 7611
Washington, DC 20044-7611

> Re:   **United States v. Alden Leeds, Inc., et. al.**
>       **Civil Action No. 2:22-cv-07326**
>       **D.J. Ref No. 90-11-3-07683/1**
>       **Borough of Hasbrouck Heights Comments to Proposed Consent Decree**

Dear Assistant Attorney General:

This firm represents the Borough of Hasbrouck Heights ("Hasbrouck Heights"), a municipality named in the action entitled *Occidental Chemical Corporation v. 21st Century Fox America, Inc., et al.*, Civil Action No. 18-cv-11273-MCA-LDW, in the United States District Court for the District of New Jersey (the "Underlying Action"), but Hasbrouck Heights has not been named on any CERCLA order or directive issued by the United States Environmental Protection Agency ("EPA") or State of New Jersey Department of Environmental Protection ("DEP") related to the site that is the subject of the Underlying Action. We join in the comments made by liaison counsel for the Passaic Valley Sewerage Commission ("PVSC"), but provide further comments herein on the proposed Consent Decree on behalf of Hasbrouck Heights, which we believe apply to other similarly situated municipalities as well. Though we do not have a basis to either object to or endorse the proposed Consent Decree and/or the underlying allocation on which it was based as Hasbrouck Heights was neither invited to participate nor was privy to the allocation process at the time, the nature of the following comments relate to the inequitable circumstance that will ensue as a result of Hasbrouck Heights and other similarly situated municipal entities being left without any protections pursuant to CERCLA in the event the Consent Decree is approved. Indeed, approval of the Consent Decree by the District Court will create a paradox wherein the municipal entities will be left in the Underlying Action with Occidental Chemical Corporation, the primary remedy driver of environmental response costs at the Subject Site. For these reasons and the reasons that follow, we respectfully urge the United States to provide immediate relief to the Hasbrouck Heights and other similarly situated municipal entities from being the "last one standing in a game of musical chairs" against the overwhelmingly culpable Occidental Chemical Corporation.

Assistant Attorney General
March 22, 2023
Page 2

## I.     The Unintended and Deleterious Impact of Approval and Entry of Consent Decree on the Borough of Hasbrouck Heights and Similarly Situated Municipalities

We acknowledge that the United States and the EPA maintain the discretion to choose the entities by which it will engage in settlement negotiations with and enter into Consent Decrees. We further recognize that the test for Court approval relates to its terms being found to be fair, reasonable, and consistent with CERCLA's purpose.[1]  Even so, the United States' and EPA's consideration for offering a Consent Decree for judicial approval and entry, even when fair and reasonable, must take into account its implications on the remaining potentially responsible parties in the Underlying Action.  Here, the effect of entry of the proposed Consent Decree, though it may ultimately be found to be fair and reasonable, creates a circumstance whereby Hasbrouck Heights and the other similarly situated municipalities will find themselves exposed to undue exposure to future liability both in alleged environmental response costs and costs of defense and where Occidental Chemical will clearly focus its sights in the continuing Underlying Action.  Such a scenario is not speculation and has been in fact clearly expressed by Occidental Chemical Corporation to be its intention as threatened in the full-page advertisement placed by it in the Washington Post on Sunday, March 5, 2023.  (*See, Washington Post Advertisement, dated March 5, 2023, reposted by Occidental Chemical Corporation to its Consent Decree opposition website at* https://www.passaicrivercleanup.com/).

Moreover, the law is well settled that the claims asserted against Hasbrouck Heights and other similarly situated municipalities are contribution claims pursuant to CERCLA §113, where any liability to be imposed would be several and not joint and several.[2]   As such, an adjudication of this matter would render a determination of Hasbrouck Heights' fair share of total response costs at the Subject Site.[3]

---

[1] Under CERCLA, a settlement will be approved and entered to the extent it is fair (from both procedural and substantive perspectives), reasonable, and consistent with the statute's purposes. *United States v. Davis,* 261 *F.3d* 1, 23-38 (1ˢᵗ Cir. 2001); *United States v. Akzo Coatings of Am. Inc.,* 949 *F.2d* 1409 (6ᵗʰ Cir. 1991); *United States v. Cannons Eng'g Corp.,* 899 *F.2d* 79 (1ˢᵗ Cir. 1990).  Review of such settlements is committed to the discretion of the reviewing court, which is to exercise that discretion in a limited and deferential manner.  *See, Davis,* 261 *F.3d* at 21; *Cannons Eng'g,* 899 *F.2d* at 84; *Akzo Coatings,* 949 *F.2d* at 1424.

[2] Though the District Court has permitted Occidental Chemical Corporation to maintain a CERCLA §107cost recovery count in its Amended Complaint at the initial pleading stage in the Underlying Action, the circuit-wide decisional law on point on this issue dictates that any liability that might be assessed against Hasbrouck Heights and other similarly situated municipal entity not the recipient of an enforcement directive or order from either EPA or the State of New Jersey is only several and not joint and several.

[3] Although CERCLA itself does not specifically set forth the factors for determining a party's fair contribution share, decisional law interpreting CERCLA and the legislative history developed during the adoption of the Superfund Amendments and Reauthorization Act ("SARA") have afforded criteria for determining contribution shares in CERCLA cases.  *See generally, Hatco v. W.R.Grace,* 836 *F. Supp.* 1049, 1090 (D.N.J. 1993) *modified,* 849 *F. Supp.* 987 (D.N.J. 1994) (the court reviewed the following equitable factors applicable to the allocation of liability among defendants: (1) knowledge and acquiescence; (2) degree of care; (3) degree of cooperation with regulatory agencies; (4) mitigation of damages; and (5)

ALCD-PUBCOM_0000099

Assistant Attorney General
March 22, 2023
Page 3

Even so, and notwithstanding the "fair share" analysis conducted by courts under CERCLA, to the extent an orphan share is found, such orphan share would be absorbed by all viable responsible parties regardless of liability status as either a joint and several liability party or just a several liability party. In either event, compelling Hasbrouck Heights and other similarly situated municipalities to continue to defend a lawsuit against Occidental Chemical Corporation without the contribution protection afforded by a Consent Decree is manifestly precarious and contrary to well-settled public policy principles.

|    |                                                                                 |
|----|---------------------------------------------------------------------------------|
| **II.** | **Public Policy Principles Dictate that the Borough of Hasbrouck Heights be Included as a Settling Member of a Consent Decree with EPA and Afforded Contribution Protection From Any Further Litigation and Threat of Liability Associated with the Subject Site.** |

Although prior case law has determined that municipalities can be held liable as potentially responsible parties under CERCLA, compelling Hasbrouck Heights to continue to defend the Underlying Action against the primary remedy driver in Occidental Chemical Corporation constitutes inequitable treatment, especially where Hasbrouck Heights and other similarly situated municipalities have a constitutional duty to carry out certain functions to the citizenry. Municipalities perform a public service by arranging for sewage disposal services for their residences and are left in a no-win situation. As a pair of commentators observed, "[Municipalities] cannot stop providing services – it is unrealistic and sometimes illegal for them to do so – but by providing these services, municipalities subject themselves to liability under CERCLA." *Joseph M Manko & Madeline H. Cozine, The Battle Over Municipal Liability under CERCLA Heats Up: An Analysis of Proposed Congressional Amendments to Superfund,* 5 *Vill Envtl. L.J.* 23, 32 (1994).

Furthermore, because municipalities do not operate for profit, they are ill suited to bear a significant share of the costs of hazardous waste site cleanups. Municipalities, unlike private parties, are unable to absorb substantial cleanup costs by transferring such costs to consumers. While municipalities may be included in the broad net of potentially responsible parties under CERCLA, Congress never intended for taxpayers to fund a significant share of a hazardous site's cleanup. Several scholars have speculated that if municipalities are found to responsible for a significant share of cleanup costs – as in this case – there are only two likely scenarios: 1) in the best case scenario, many municipalities would cut essential services to their communities or raise property taxes if forced to pay a large proportion of response costs; or 2) in the worst case scenario, they would file for

---

financial benefit to the parties); *United States v. Kramer,* 953 *F. Supp.* 592, 597 (D.N.J. 1997) (courts have broad discretion to consider and apply equitable factors to achieve a just and fair allocation among liable parties); *United States v. Colorado & Eastern Railroad Co.,* 50 *F.3d* 1530, 1536 (10th Cir. 1995) (citing *Environmental Transp. Sys. v. Ensco, Inc.* 969 *F.2d* 503, 509-509 (6th Cir. 1992) (the court may "consider several factors, a few factors, or only one determining factor … depending on the totality of the circumstances" of the case).

Assistant Attorney General
March 22, 2023
Page 4

bankruptcy." *G. Nelson Smith, III, Trashing the Town and Making It Pay: The Problem with the Municipal Liability Scheme under CERCLA*, 26 *Conn. L.Rev.* 585, 596 (1994).

Initiatives ranging from the Environmental Protection Agency's Municipal Settlement Policy to the proposed but never passed federal Toxic Cleanup Equity and Acceleration Act of 1993 ("TCEAA") have attempted to correct the unfair position that Hasbrouck Heights and other similarly situated municipalities have been placed in when required to subsidize industrial cleanup. Both initiatives were geared to promote early settlement, reduce litigation costs, and foster an equitable and predictable cost allocation for municipal entities. Such efforts underscore the intent of the legislature and the executive to distinguish municipalities from other parties to an environmental litigation as well as to refrain from requiring municipalities to shoulder the brunt of a hazardous waste site cleanup.

In this case, and despite repeated efforts on the part of the municipal entities, Hasbrouck Heights not been afforded with the opportunity to explore municipal de minimis settlement initiatives with the United States and the EPA. The inability to do so is especially perplexing in the case of Hasbrouck Heights who maintains a very narrow and limited nexus to the Subject Site. Hasbrouck Heights is not itself a member of the PVSC, but rather has been linked to the Passaic River and the Underlying Action via a sewage connection to the neighboring Borough of Lodi which is a member of the PVSC. In addition, the only portion of the sewage system of Hasbrouck Heights which flows into the sewage system of the Borough of Lodi is located near the westerly boundary of Hasbrouck Heights and is completely independent of the main portion of the sewage system which runs to the Bergen County Utilities Authority. This independent portion which leads into the sewage system of the Borough of Lodi serves sixty (60) single-family residences and is devoid of any commercial or industrial uses. Furthermore, prior to World War II, this independent section of Hasbrouck Heights was composed of vacant lots that were zoned for single-family residential use. Following the conclusion of World War II in or around 1949, this independent section of Hasbrouck Heights was developed with the 60 single-family residences that comprise the area today.

Finally, the record developed in the public nexus documents do not reveal any instance in which Hasbrouck Heights is alleged to have generated wastes to the Subject Site of a character that would disqualify it for de minimis settlement status with the EPA. As such, by virtue of these undisputed facts and circumstances, and despite its narrow and tenuous nexus to the Subject Site, Hasbrouck Heights finds itself in a particularly vulnerable position in the event the proposed Consent Decree is approved and entered by the Court and it is left with other similarly situated municipalities to continue to defend the Underlying Action against Occidental Chemical Corporation. Such a paradoxical consequence is contrary to both the intent of CERCLA and the public policy principles previously articulated by both the EPA and courts considering proposed Consent Decrees.

Assistant Attorney General
March 22, 2023
Page 5

For all of the foregoing reasons, we respectfully urge the United States to provide immediate relief to Hasbrouck Heights and other similarly situated municipal entities in this matter. We look forward to representatives of the United States initiating these discussions now as a means of addressing the obvious inequities and exposures that will ensue after entry of the proposed Consent Decree.

Thank you for your courtesies and cooperation in this matter.

Respectfully submitted,

COFFEY & ASSOCIATES

/s/ Gregory J. Coffey

Gregory J. Coffey

GJC:

THOMAS TUCCI, JR.
*Chairman*

LUIS A. QUINTANA
*Vice Chairman*

ELIZABETH CALABRESE
JOHN J. COSGROVE
JAMES P. DORAN
JOSEPH F. ISOLA
HECTOR C. LORA
BRENDAN MURPHY
*Commissioners*



*"Protecting Public Health and the Environment"*
600 Wilson Avenue
Newark, New Jersey 07105
P (973) 466-2915 F (973) 817-5738
www.nj.gov/pvsc

GREGORY A. TRAMONTOZZI
*Executive Director*

MATTHEW F. MURRAY
*Clerk*

MICHAEL D. WITT
*General Counsel*

March 21, 2023

The Honorable Todd Kim
Assistant Attorney General
United States Department of Justice—ENRD
P.O. Box 7611
Washington, DC 20044-7611

*Submitted via US mail and email (pubcomment-ees.enrd@usdoj.gov)*

>    **Re:**    ***United States v. Alden Leeds, Inc., et al.***
>        **Civil Action No. 2:22–cv–07326**
>        **D.J. Ref. No. 90–11–3–07683/1**

Dear Assistant Attorney General Kim:

The Passaic Valley Sewerage Commission ("PVSC") submits these comments regarding the proposed consent decree lodged by the Department of Justice on December 16, 2022 (the "Consent Decree"). As background, PVSC is a public agency of the State of New Jersey that operates the fifth-largest wastewater treatment facility in the United States. PVSC's statutorily-defined treatment district encompasses all or parts of 48 municipalities located throughout five counties in northeastern New Jersey, providing service to over 1.5 million residents.

Despite the vast majority of Potentially Responsible Parties ("PRPs") for the Diamond Alkali Superfund Site (the "Site") being identified by the United States Environmental Protection Agency ("EPA") in the late 1990s, PVSC—along with four of its member municipalities—was not named as a PRP until 2016, two decades later. EPA has indicated on a number of occasions that it expects PVSC and the other public entity PRPs to at-most contribute in-kind services (as opposed to any monetary payment) in order to facilitate Site remedies. Such in-kind contributions could include the provision of public property for dredged sediment processing operations.

The Consent Decree is premised on a responsibility allocation report. The report was prepared by an expert allocator selected by EPA, with the participation of most of the private party PRPs. The report clearly demonstrates that Occidental Chemical Corporation bears near-exclusive responsibility for the Site, with the removal of dioxin being the primary driver of the remediation. While comparatively small, the share of CERCLA response activity costs being paid by the

ALCD-PUBCOM_0000103

Settling Parties is significant and correctly reflects the conclusion under the protocol employed by EPA's expert allocator that Occidental Chemical Corporation bears 99.9% of the responsibility for response costs. It is, thus, difficult to credibly claim that the $150 million (about 8% of the estimated remedial costs for Operable Units 2 and 4 of the Site) being paid by the Settling Parties is below a reasonable amount of their collective share of responsibility.

PVSC's principal concern with the Consent Decree is that it exposes the public, vis-à-vis PVSC and its 48 municipal constituent members which share PVSC's funding obligations (collectively "MCMs"), to catastrophic monetary risk which they cannot satisfy because of their lack of resources.[1] Specifically, in Section VII, para. 13 of the Consent Decree, the United States covenants not to sue or take administrative action against the Settling Defendants under Sections 106 and 107(a) of CERLCA regarding Operable Units 2 and 4 of the Site (with a combined estimated interim remedy cost of about $1.8 billion). Further, the Consent Decree purportedly provides the Settling Parties with contribution protection under Section 113 of CERCLA from contribution claims asserted by non-Settling Parties. *See* Section XI, para. 23.

Given CERCLA's joint and several liability scheme, the combined effect of the United States' covenant not to sue and CERLCA contribution protection would be to shift the joint and several liability risk collectively shouldered by the Settling Parties onto PVSC (and by extension, the taxpayers of its MCMs). In other words, prior to entry of the Consent Decree, the risk that a PRP becomes unable to pay its share of responsibility is spread out among well over 100 parties, including the Settling Parties, which include some of the largest corporations in the country. But the moment the Consent Decree is entered, the risk that was being borne by the Settling Parties would be shifted to PVSC and other non-settling PRPs. And the dollar amount associated with this risk is significant, given the Settling Parties' $150 million payment constitutes a small fraction of total response activity costs for the Site. This risk is exemplified by PVSC and 41 of its MCMs being the vast majority of the parties in the litigation filed by Occidental Chemical Corporation concerning CERCLA Site remediation liability which are not Settling Parties.

This problem could be solved by the United States simply negotiating a consent decree with PVSC and its MCMs whereby PVSC would contribute in-kind services to the Site remedy,

---

[1] The MCMs are City of Bayonne, Township of Belleville, Township of Bloomfield, City of Clifton, Borough of East Newark, City of East Orange, Borough of East Rutherford, City of Garfield, Borough of Glen Ridge, Borough of Haledon, Town of Harrison, City of Jersey City, Township of Kearny, Borough of Lodi, Township of Lyndhurst, Township of Montclair, City of Newark, Borough of North Arlington, Township of North Bergen, Township of Nutley, Township of Orange, City of Passaic, City of Paterson, Borough of Prospect Park, Borough of Rutherford, City of Union City, Borough of Wallington, Borough of Elmwood Park, Borough of Fair Lawn, Borough of Glen Rock, Borough of Hawthorne, Township of Little Falls, Borough of North Haledon, Township of Saddle Brook, Township of South Hackensack, Borough of Totowa, Borough of Woodland Park,  Borough of Wood-Ridge, Township of Cedar Grove, City of Elizabeth, Township of Franklin Lakes, City of Hackensack, Borough of Hasbrouck Heights, Township of Hillside, Borough of North Caldwell, Village of Ridgewood, South Orange Village, Township of West Orange.

2

and in turn would receive comparable protections that the Settling Parties are receiving through the Consent Decree.

Other than the problem of PVSC and the MCMs remaining exposed to excessive joint and several liability risk from the absence of its own consent decree, PVSC believes the lodged Consent Decree is fair, reasonable, and consistent with the purposes of CERCLA.

PVSC encourages the United States to promptly negotiate a consent decree with PVSC and its MCMs on a timeline that will permit the Court to enter a consent decree resolving their CERCLA liability for OU2 and OU4 at the same time as the currently lodged Consent Decree.

We appreciate the Department's attention to this matter.

Very truly yours,

Gregory A. Tramontozzi
Executive Director

3

ALCD-PUBCOM_0000105

S. Hrg. 103–559

# SUPERFUND REFORM ACT OF 1994

# HEARINGS

BEFORE THE

## SUBCOMMITTEE ON
## SUPERFUND, RECYCLING, AND SOLID WASTE
## MANAGEMENT
### OF THE

# COMMITTEE ON
# ENVIRONMENT AND PUBLIC WORKS
# UNITED STATES SENATE

### ONE HUNDRED THIRD CONGRESS

SECOND SESSION

ON

## S. 1834

A BILL TO AMEND THE COMPREHENSIVE ENVIRONMENTAL RESPONSE,
COMPENSATION, AND LIABILITY ACT OF 1980, AND FOR OTHER PUR-
POSES

FEBRUARY 10; MARCH 2; AND APRIL 12, 1994

Printed for the use of the Committee on Environment and Public Works



U.S. GOVERNMENT PRINTING OFFICE

77-137≈≈                    WASHINGTON : 1994            S 321- /8

For sale by the U.S. Government Printing Office
Superintendent of Documents, Congressional Sales Office, Washington, DC 20402
ISBN 0-16-044482-9

ALCD-PUBCOM_0000147

## COMMITTEE ON ENVIRONMENT AND PUBLIC WORKS

MAX BAUCUS, Montana, *Chairman*

| | |
|---|---|
| DANIEL PATRICK MOYNIHAN, New York | JOHN H. CHAFEE, Rhode Island |
| GEORGE J. MITCHELL, Maine | ALAN K. SIMPSON, Wyoming |
| FRANK R. LAUTENBERG, New Jersey | DAVE DURENBERGER, Minnesota |
| HARRY REID, Nevada | JOHN W. WARNER, Virginia |
| BOB GRAHAM, Florida | ROBERT SMITH, New Hampshire |
| JOSEPH I. LIEBERMAN, Connecticut | LAUCH FAIRCLOTH, North Carolina |
| HOWARD M. METZENBAUM, Ohio | DIRK KEMPTHORNE, Idaho |
| HARRIS WOFFORD, Pennsylvania | |
| BARBARA BOXER, California | |

PETER L. SCHER, *Staff Director*
STEVEN J. SHIMBERG, *Minority Staff Director and Chief Counsel*

---

### SUBCOMMITTEE ON SUPERFUND, RECYCLING, AND SOLID WASTE MANAGEMENT

FRANK LAUTENBERG, New Jersey, *Chairman*

| | |
|---|---|
| DANIEL PATRICK MOYNIHAN, New York | DAVE DURENBERGER, Minnesota |
| BOB GRAHAM, Florida | ALAN K. SIMPSON, Wyoming |
| HOWARD M. METZENBAUM, Ohio | ROBERT SMITH, New Hampshire |
| HARRIS WOFFORD, Pennsylvania | JOHN W. WARNER, Virginia |
| BARBARA BOXER, California | |

(II)

ALCD-PUBCOM_0000148

# C O N T E N T S

Page

## FEBRUARY 10, 1994

### OPENING STATEMENTS

Baucus, Hon. Max, U.S. Senator from the State of Montana ............................... 3
Boxer, Hon. Barbara, U.S. Senator from the State of California ......................... 7
Durenberger, Hon. Dave, U.S. Senator from the State of Minnesota................... 4
Lautenberg, Hon. Frank R., U.S. Senator from the State of New Jersey............ 1
Simpson, Hon. Alan K., U.S. Senator from the State of Wyoming....................... 6
Smith, Hon. Robert, U.S. Senator from the State of New Hampshire................ 5
Wofford, Hon. Harris, U.S. Senator from the Commonwealth of Pennsylvania . 6

### WITNESS

Browner, Carol M., Administrator, Environmental Protection Agency............... 8
   Prepared statement ............................................................................................. 31

### ADDITIONAL MATERIAL

S. 1834 .......................................................................................................................... 38

## MARCH 2, 1994

## DELEGATION TO THE STATES AND COMMUNITY PARTICIPATION

### OPENING STATEMENTS

Durenberger, Hon. Dave, U.S. Senator from the State of Minnesota................... 223
Lautenberg, Hon. Frank R., U.S. Senator from the State of New Jersey............ 213
Warner, Hon. John W., U.S. Senator from the Commonwealth of Virginia........ 234

### WITNESSES

Angell, Phillip, divisional vice president, Browning Ferris Industries, partici-
   pant in Keystone Commission ......................................................................... 248
   Prepared statement ........................................................................................... 299
Cusic, Helen, Grand Cal(umet) Task Force, Whiting, IN ....................................... 246
   Prepared statement ........................................................................................... 290
Early, Blakeman, Washington director, pollution and toxics program, Sierra
   Club..................................................................................................................... 221
   Prepared statement ........................................................................................... 277
Greer, Linda, senior scientist, National Resources Defense Council, Washing-
   ton, DC, participant in Keystone Commission................................................ 217
   Prepared statement ........................................................................................... 260
Parr, Michael S., remediation program manager, Du Pont Company, Wilming-
   ton, DE, on behalf of the Chemical Manufacturers Association...................... 219
   Prepared statement ........................................................................................... 275
Pierle, Michael, vice president, Monsanto, participant in Keystone Commis-
   sion..................................................................................................................... 215
   Prepared statement ........................................................................................... 257
Porter, J. Winston, president, Waste Policy Institute, Alexandria, VA............... 244
   Prepared statement ........................................................................................... 288

(III)

IV

                                                                                    Page
Varney, Robert W., Commissioner, New Hampshire Department of Environ-
    mental Services, on behalf of the National Governors Association ..................    241
    Prepared statement .........................................................................................    283

ADDITIONAL MATERIAL

Statements:
    American Institute of Chemical Engineers..........................................................    301
    Association of State and Territorial Solid Waste Management Officials......    306

APRIL 12, 1994

SUPERFUND LIABILITY SCHEME

OPENING STATEMENTS

Lautenberg, Hon. Frank R., U.S. Senator from the State of New Jersey............    351
Smith, Hon. Robert, U.S. Senator from the State of New Hampshire.................    355
Warner, Hon. John W., U.S. Senator from the Commonwealth of Virginia........    371

WITNESSES

Chavis, Benjamin F. Jr., executive director, NAACP, on behalf of the Alliance
    for a Superfund Action Partnership..........................................................................    357
    Prepared statement ..........................................................................................    434
Gover, Kevin, Gover, Stetson and Williams, P.C., Albuquerque, NM ..................    398
    Prepared statement ..........................................................................................    509
Kenworthy, Patricia, director for regulatory affairs, Monsanto Corporation,
    on behalf of the Keystone Commission .....................................................................    361
    Prepared statement ..........................................................................................    513
McKnight, K.L., Aluminum Company of America...................................................    393
    Prepared statement ..........................................................................................    503
Morningstar, Mary, corporate counsel, Lockheed Corporation, Bedford, MA .....    386
    Prepared statement ..........................................................................................    489
Pollak, Ed, corporate senior vice president, Olin Corporation, on behalf of the
    Coalition on Superfund, accompanied by Michael S. McGavick, American
    Insurance Association .............................................................................................    384
    Prepared statements .............................................................................. 515, 522
Robinson, Florence, North Baton Rouge Environmental Association, on behalf
    of the Keystone Commission .....................................................................................    359
    Prepared statement ..........................................................................................    466
Roush, Michael, director of Senate lobbyists, National Federation of Inde-
    pendent Businesses, Washington, DC........................................................................    363
    Prepared statement, with letter..............................................................................    484
Stevens, Hon. Ted, U.S. Senator from the State of Alaska ....................................    352
    Prepared statement ..........................................................................................    399
Udall, Hon. Tom, Attorney General, State of New Mexico, on behalf of the
    National Association of Attorneys General .............................................................    356
    Prepared statement ..........................................................................................    401
    Responses to additional questions..............................................................................    430
Williams, Patricia, legislative representative and counsel, National Wildlife
    Federation, Washington, DC.....................................................................................    391
    Prepared statement ..........................................................................................    500

ADDITIONAL MATERIAL

National Association of Manufacturers, letter from...............................................    535
Statements:
    Community Health Resources, Inc. ........................................................................    536
    Industrial Compliance, Inc., Golden, CO .............................................................    529
    Local Governments for Superfund Reform .........................................................    531
    Tulalip Tribe of Washington...................................................................................    536
    University of New Hampshire................................................................................    379

434

PREPARED STATEMENT OF DR. BENJAMIN F. CHAVIS, JR., ALLIANCE FOR A SUPERFUND
ACTION PARTNERSHIP

I. OVERVIEW

Good morning. I am Dr. Benjamin F. Chavis, Jr., Executive Director and Chief
Executive Officer of the National Association for the Advancement of Colored
People (NAACP). I am also Chairman of the Alliance for a Superfund Action Part-
nership (ASAP). I appreciate your inviting me here today to share with you the
views of the NAACP and ASAP on Superfund reauthorization issues.

My personal involvement in toxic waste issues goes back many years. I helped
found what is known as the environmental justice movement to assist in drawing
attention to a long ignored reality: people of color were being disproportionately vic-
timized by hazardous waste facilities, past, present and future. I spoke out against
siting a dump in a North Carolina minority community. My interest in Superfund
reform stems directly from years of grassroots experience with toxic waste issues. I
believe that this law has directly contributed to the environmental racism afflicting
people of color. And despite fine words, no bill presently before you changes this
much at all.

Over the last few months, a diverse group of citizen advocates, local governments,
companies and associations realized that the debate on Superfund offered us a
chance to find common ground on an issue which has historically been very divisive.

14 Section 107(f)(1) of CERCLA, 42 U.S.C. § 9607(f)(1).
15 In re Acushnet River & New Bedford Harbor: Proceedings re Alleged PCB Pollution, 716 F.
Supp. 676, 679 (D. Mass. 1989).
16 Section 107(c)(1) of CERCLA, 42 U.S.C. § 9607(c)(1) (emphasis added).

After detailed discussions, that shared belief evolved into the Alliance for a Superfund Action Partnership (ASAP).

Today, ASAP represents the broadest and largest diverse constituency of Superfund stakeholders you can find: the NAACP, Local Governments for Superfund Reform, the American Furniture Manufacturers Association, International Fabricare Institute, the City of Atlanta, the Society of Independent Gas Marketers of America, the National Food Processors Association, The Grocery Manufacturers of America, Johnson Controls, Inc., Continental Corporation, the American International Group, Texaco, Phillips, and many others in a variety of fields. A full list of current membership is attached as an addendum to this testimony.

Our group did not start out constrained by past ideology or commitments to old slogans and principles. To be sure, we did start out from very different perspectives, but we shared a common purpose—to make Superfund work. Unlike others, we did not take any options off the table.

In a moment, I will discuss the Eight Point Plan we developed in detail. But before I do, I ask that you consider this:

At one time or another, everyone here has said that there's too much litigation in Superfund, too much mistrust, too little clean-up. And many have also agreed that a major cause of all these problems is the retroactive, site-by-site system used to raise clean-up funds.

Yet, you are here today seriously considering a bill drafted by the Administration which will keep this failed system in place. Moreover, the bill contains provisions that would further complicate the legal warfare and that would divert dollars that could be used for clean-up.

Some have—and others will—come before you to say that things aren't so bad, that Superfund is basically working, that with a nip here and a tuck there, all will be well. Or their rhetoric will be bold, but their reform plans will be modest. Our message to you is this: They are wrong.

Theirs is a view glimpsed from Washington's corridors, not from toxic ground zero—the communities and people living with Superfund risk every day. In Washington, the talk is of making "polluters" pay and of "fair share" allocation.

At toxic ground zero, the talk is of one thing: Clean-up our neighborhood, do it fast and do it right. Communities want to see clean-up crews and public health professionals, not lawyers, allocators and allocation committees.

Mr. Chairman and members of this Subcommittee, if your house is swept into the ocean after a hurricane, you don't rebuild it as before; if it is uprooted by an earthquake, you build to new standards. The same should be true for Superfund. But what you have before you seeks to achieve reform by building on the very same foundation with the very same materials which have been crumbling around you for 13 years—a dominant focus on fundraising through the mechanism of retroactive, site-specific liability. I implore you to think more boldly.

I am extremely pleased to note that some new voices are joining the chorus for fundamental reform. I am speaking here of your colleague Senator Robert Smith and Representative Bill Zeliff, who recently introduced the Comprehensive Superfund Improvement Act of 1994. I am not usually in the habit of praising conservative legislators. But I have been told their bill is derived directly from more than a year of discussions with Superfund stakeholders and experts in New Hampshire, not Washington. In many ways they are responding to some of the same practical imperatives which I feel. Their bill grapples directly and honestly with Superfund's debilitating and wasteful approach to financing. Based on their grassroots discussions, they recognize that fundamental reform is required. Here are two Republicans who are not afraid to say that increasing business taxes to fund clean-up is a far more efficient way to protect the public than the law we have today—and it is better for business.

I do not endorse their bill because the scope of their liability and financing is not broad enough, although it is clearly headed in the right direction. In addition, I hope you and they will see that liability and financing changes are the place to start from in changing the focus of Superfund so it can address public health and community needs. Comprehensive Superfund reform must also address the other six points of our Eight Point Plan, issues such as public health focus, community empowerment, site selection and prioritization, minority participation, and community development.

In addition, I appreciate the efforts of the Administration and the National Commission on Superfund, not only to address Superfund's problems but to address additional environmental justice concerns. A few of the specific suggestions raised in the Eight Point Plan have been incorporated in the Administration's bill.

### 436

But environmental justice concerns cannot be addressed by a section heading at the back of a bill. Our concerns are not "add-on" items. The central environmental justice concern is how the central purpose of Superfund—clean-up—is carried out. This requires fundamental reform.

I feel absolutely certain in saying today that if you enact this bill, which fundamentally maintains the current law with the current financing system, you will come back here in a few years, long after the congratulations and smiles at the bill signing, explaining to citizens, but probably not very persuasively, what went wrong. In other words, you may be able to pass a bill which does not fundamentally reform Superfund, but, if you do, you most assuredly will not solve the problem.

We say it's time to make fundamental change in Superfund. And change—and boldness—is what ASAP's Eight Point Plan is all about.

## II. DETAILS OF THE EIGHT POINT PLAN

The ASAP Eight Point Plan is designed to achieve several critical goals—the same ones shared by the Administration and members of this Subcommittee: a new focus on public health; significant community involvement in the process; accelerated clean-up; better site prioritization to ensure the most effective allocation of resources; reduced transaction costs; more rational remedies; greater fairness; and stronger public and private support for the program.

But the difference between the Eight Point Plan and other options is that its reforms are integrated. Each point of the plan relies on the others to work. We recognize, where other plans do not, the inextricable interrelationships of various parts of the current program—and of our proposed solutions. And we especially recognize that virtually every one of the problems identified by major stakeholders is either connected to or grows out of the retroactive, site-specific liability system. As long as it is in place, trying to reform other parts of the program will simply not succeed.

Let me stress that the Eight Point Plan is not set in stone, and we are improving it all the time. We are actively reaching out to environmental justice and community activists, to State and local leaders, to environmentalists and public health experts, and to other businesses for new ideas and refinements. And we reach out to you and your staffs to assist us in perfecting our plan.

### 1. THE RIGHT PURPOSE: PUBLIC HEALTH

Thirteen years after enactment of Superfund, the Nation still awaits clean-up of more than 1,200 of our worst toxic waste sites, much less the many which have thus far been ignored. Full-scale health investigations are being conducted at an annual rate of only 15 percent of the eligible sites. Despite the national Trust Fund created to clean-up toxic waste sites and pay for health evaluations, whole communities have had no relief from the imminent threat of disease.

And, while toxic exposure is bad for any community, a 1987 study by the United Church of Christ Commission on Racial Justice, which I led, showed that hazardous waste sites and NPL sites are located disproportionately in minority communities.

We have failed in our public health mission primarily because Superfund today is focussed on fundraising, not on public health and environmental protection. In fact, the public health focus of Superfund legislative intent has been severely compromised. Public health professionals are barely visible in the process; they are overshadowed by lawyers, financial planners, transactions and negotiations. Rarely does an epidemiologist, medical doctor or biostatistician get involved in the process until after large sums have been spent on legal fees and other non-clean-up or health preservation-related activities. Site clean-up and related health activity are literally put on hold for years.

The Agency for Toxic Substance and Disease Registry (ATSDR) is hopelessly backlogged in its conduct of health investigations of NPL sites. Yet such investigations can provide valuable insight into long-term and aggregate health effects of communities exposed to chemical releases from hazardous waste sites. To date, toxicological profiles have been generated for only 176 of 275 Superfund "Priority Chemicals."

Current staff levels cannot possibly keep up with the present demand for health assessments and other mandated responsibilities (e.g., applied research, emergency response, health education and surveillance, and registries). Clearly, ATSDR, at its present level of appropriations and operations, is overwhelmed.

It also is not clear that ATSDR was ever charged with the responsibility to respond to health effects once identified. Most local medical providers may not—and in fact usually are not—abreast of information needed to diagnose or treat symptoms that are associated with exposures to toxic chemicals at toxic waste sites. In

437

short, responsibility for health response activity is an enigma for many affected residents.

By ATSDR's own admission, serious gaps exist in scientific knowledge about the toxicity, bioavailability, exposure and human health effects of individual hazardous substances—and mixtures of these substances—released from hazardous Superfund sites, especially during emergency releases. Additionally, physicians and other health care providers near Superfund sites express the need for training and technical assistance on hazardous substances and related health effects.

The Administration is to be commended for its sensitivity to—and inclusion of—specific provisions which seek to address the problems of highly impacted communities, particularly those of people of color. But these are only demonstration programs, essentially add-ons to the current system, rather than basic reform, and no new financing source is provided for them.

### ASAP Solution

ASAP proposes a Superfund program run on public health grounds by public health officials—not run on fundraising grounds by lawyers. This public health process would begin at the time a site is first proposed for the NPL and would not end until the site is delisted.

ASAP's plan addresses five specific problem areas:

### 1. Professional Visibility

Presently, except in the instance of ATSDR health assessments and related activities, public health professionals and other scientists are seldom engaged in Superfund clean-up activity. The government should expand the use of health experts and give them leadership roles in clean-up decisions. They should be involved from the beginning so that the focus of Government action is on protecting the health of affected citizens. They should arrive on site before decisions are made, interact with the community, and lead the process.

EPA also should engage Superfund "Public Health Oversight Teams" to monitor and assist site clean-up and health assessment activity. The teams should be activated upon identification of each NPL site or other sites that request assistance. Such teams should be made up of health and environment professionals at the local, State and Federal levels. Team members should include experts who don't work for EPA and ATSDR, as well as representation from these agencies. This team should operate in concert with proposed Citizen Working Groups (CWGs), and should be empowered to make recommendations to EPA or State site representatives.

### 2. Health Assessments and Investigations

As noted earlier, it is very clear that ATSDR cannot, at its current operating level and budget, meet the high volume demand for health assessments and health investigations. Therefore, the budget for ATSDR must be increased to accommodate the number of pending and projected health assessments and investigations.

In addition, ATSDR must strengthen its contracting priorities to engage the needed assistance from outside contractors, particularly local and State public health organizations.

ATSDR also should prioritize follow-up investigations for sites, because many communities may need attention more quickly than others.

### 3. Health Effect Studies and Applied Research

ASAP agrees with proposed language in the Administration's bill to engage research assistance via cooperative agreements and grants to public and non-profit institutions. Health research initiatives are presently suffering—particularly applied-research—and without this valuable information, surveillance and disease registry information is severely handicapped.

But caution must be exercised not to rely on studies that are inherently long term, and which require exposure models and study designs that may take years to construct.

Therefore, in all appropriate circumstances, ASAP proposes scientifically sound toxic substance chemical screening within affected populations to rapidly determine actual exposures to known toxins at the site and in the area. This is a much more immediately usable tool than "health effect studies," which, if done right, take 20 years and require statistically stable study populations.

Screening, along with other tests, allows for addressing site assessment, NPL inclusion, prioritization and population impact all at once. ASAP proposes that these comprehensive "fingerprint screenings" (with appropriate control groups) be a principal criterion in listing a site, prioritizing it and protecting public health.

438

#### 4. Non-Emergency Health Response and Guidance

Local health care providers must be engaged in the health response process. Historically, there has been a separation of environmental health from primary health care. Persons affected by toxic substances can seek health remedies from local doctors literally for years, but often times those doctors do not recognize the ailment. A formal mechanism to provide local clinicians with Superfund information needs to be instituted.

ASAP recommends that whenever a site is designated by ATSDR for health investigation or whenever a site health assessment warrants further consideration, an Environmental Health Response Briefing should be routinely issued to the medical establishment in affected communities. Similarly, there should be consultation by government health experts with primary care providers close to the site in the early stages of site assessment.

#### 5. Health Education and Training

Bridging the gap between environmental health effects and primary health care has been discussed for years among environmental scientists, with little progress. This must occur.

Environmental surveillance efforts could be significantly enhanced if the health care provider community were trained to recognize environmentally related health effects. To improve the health status of persons living near hazardous waste sites, the scientific and medical communities must have an understanding of the issues impacting residents of affected communities. This can be achieved by (a) improving scientific understanding of the relationship between exposure and health impacts by involving the expertise of groups like NIH, NSF, and the American Academy of Sciences; (b) improving the ability of local health departments to recognize and diagnose health effects associated with exposure to hazardous substances; and (c) improving the ability of health care providers to diagnose environmentally related disease. This requires both legislative direction and funding.

##### 2. THE RIGHT SIZE: ADEQUATE FUNDING

Since Superfund's inception, public and private financial resources have been improperly allocated and diverted to wasteful litigation. The results have been stalled clean-up and a concentration of clean-up efforts at sites with viable PRPs.

In order to properly refocus the Superfund program on human health, environmental protection and other important priorities, ASAP members believe that adequate funding must be raised in a reliable and efficient way. It is not enough to propose new programs and pay homage to new priorities. Money to fund them must be spelled out and integrated into any reform plan that truly seeks to improve the program.

#### ASAP Solution

The Eight Point Plan does just that. Through the elimination of site-specific fundraising and implementation of a broad-based business taxing mechanism, our plan raises more money for clean-up and related priorities while reducing the overall costs to business and assuring greater certainty.

Consider what would happen if we stopped fundraising site-by-site at old multiparty NPL sites and raised the money mostly from business taxes:

• This expanded fund would be able to pay for clean-ups immediately because legal warfare would no longer hinder and delay clean-up work.

• In the absence of site-by-site fundraising, public health and the environment—not fundraising imperatives—would drive the Superfund program and set its priorities.

• Freed from fundraising and the need to allocate liability based upon an incomplete and inadequate information base, EPA could devote far more time and resources to addressing health threats, putting health professionals on the scene first rather than last.

• Business and other PRPs (cities, States and the Federal government) would benefit greatly. Enormous contingent liabilities would be lifted and transaction costs would drop drastically. Costs to business would actually go down, but money for clean-up would go way up.

Point Two of the Eight Point Plan calls for creation of an overall NPL program of $3.6–4.6 billion per year. This represents an annual increase of $500 million to $1.5 billion—money that would go directly into clean-up and support activities, such as public health and job training, environmental restoration, community participation and empowerment, assistance for Indian tribes, and coordination of Federal pro-

ALCD-PUBCOM_0000155

grams to help communities recover from the economic and social harm of toxic contamination.

Monies dedicated to actual clean-up of orphan and multi-party sites would expand by 45–75 percent over current remediation spending. This includes attacking the backlog of thousands of CERCLA sites which have yet to be analyzed, and setting clean-up priorities based on a new environmental impact ranking system.

Business will still have the vast majority of Superfund costs but in a much more efficient manner than the adversarial, litigation-based, site-specific model used today.

The private-sector financing would be provided by current oil and chemical feedstock taxes, an increased broad-based tax on larger businesses (we have recommended a doubling of the current Environmental Income Tax), a new tax on insurers, and a small business tax levied on small business large and small quantity generators, which do not pay the EIT. This would be relatively simple to implement because the Resource Conservation and Recovery Act (RCRA) requires that every facility which produces more than 100 kilograms (220 pounds) of hazardous waste per month be registered with EPA and observe numerous record-keeping requirements. (RCRA classifies a small quantity generator as a facility which produces between 100–1,000 kilograms of hazardous waste per month. A large quantity generator produces more than 1,000 kilograms per month.)

Thousands of large, medium and small businesses have written to the President offering to pay these kinds of taxes. In addition, the Business Roundtable voted to support a Superfund financing package of increased taxes, and in the words of its announcement of February 4, called for "if necessary, an increase in the Environmental Income Tax (up to a doubling)." They and other businesses rightly maintain that this is not an issue of new taxes—this is merely a more efficient way to raise money they already are spending.

Our very specific financing plan is based on and consistent with the position of the Business Roundtable and other business leaders.

We are not proposing to tax business; we are accepting business' offer to be taxed at higher levels to make Superfund work better for everyone.

Indeed, the taxes we propose will actually reduce business costs because of the elimination of most of the site-specific litigation and other transaction costs. We are open to other ways of raising the necessary funds from the business community, but we are confident that the system we have proposed will work well, and has the broad support of business.

In addition to business, there are two other major groups that would benefit significantly from the revision of site-specific PRP liability and therefore should contribute to the fund. These are State governments and the Federal government. Both have very large liabilities at non-Federal facility NPL sites. States also have various shares of Superfund costs above and beyond their PRP liability. Our plan therefore assumes a 10 percent State share. In exchange, State and local government PRP liability would be reduced substantially. In addition, we are exploring delegation of program management to States with demonstrated competence in this area.

Attached to this testimony are spending and income charts that detail our financing proposal, and an acceptable financing option (Attachments A, B and C).

### 3. THE RIGHT PLACES: ENVIRONMENTAL IMPACT PRIORITIZATION

Clean-up decisions and progress today depend much more on whether a site has clean-up funds (i.e., successful negotiations or litigation with large solvent PRPs), than on whether that site is a public health risk. The complex Hazard Ranking System does not include key measurements. And, in any case, it only affects Superfund listing. It is not the determinant of where resources are applied.

EPA's real decisions on budget priorities for site clean-up are a huge secret because of the current liability system. The public is excluded from this critical set of decisions. Why? Because in the continuing legal poker game between EPA and PRPs, EPA must be able to threaten PRPs that it will pay for clean-up itself and then fine them.

This is a long way from what we should have: an open prioritization process, based on public health and environment priorities, with powerful public input.

*ASAP Solution*

We propose amendments to the hazard ranking system and prioritization process. The new system will:

- Move those sites that most threaten citizens to the top of the priority list.
- Require greater reliance on real risk and real exposure pathways (including history of exposure) in contrast to the current system which makes groundwat-

ALCD-PUBCOM_0000156

**440**

er contamination the heaviest factor in a site's ranking. There are sites, especially in urban areas, where groundwater contamination is not relevant, but where residents face serious threats nonetheless from soil and other contamination. The emphasis on groundwater contamination, though, raises the "bar" for these sites to be included on the NPL.

• Take into consideration not only the risks presented by the toxic waste site in question, but also the health effects it may have in conjunction with other environmental risks in die area (such as other dump sites, industrial facilities and abandoned plants). Sites that affect the same population could be ranked together, similar to the Clean Air "bubble" concept. In ranking sites, the history and extent of exposure is important (taking into account the socio-economic conditions of the community which may exacerbate the effects of exposure). These issues should also inform action under Point 8.

• Require that all subsequent clean-up decisions and actions be based on these same priorities. Once sites are scored, prioritization for financing and remedial action should be based on the severity of the public health risk, not which sites offer the potential for funding. (One of the major defects of the site-specific system is that clean-up priorities "follow the money.") In other words, sites exhibiting the highest public health risk should have first claim on the fund's resources until they are cleaned up, before resources are devoted to lesser priority sites.

• Require that sites in disadvantaged communities receive priority for clean-up over other sites of equivalent public health risk located elsewhere in order to spur economic redevelopment.

• Require that ranking be an open process, with the public afforded the opportunity to comment on these priorities.

We agree with much of the work of the National Commission in this area, although it is limited to listing of sites, as opposed to including prioritization of resources and effort as our plan does.

ASAP proposes a major focus and emphasis on human exposure pathways as a principal prioritization criterion. Specifically, sites with little or no human exposure or assimilation pathways, or sites where those substances are safely managed and contained as part of ongoing operations, would rank much lower.

ASAP strongly feels that site-specific risk assessments using actual census, cultural, meteorological, geological, land-use and comparative natural exposure data should be required.

#### 4. THE RIGHT WAY: EFFECTIVE REMEDIES

The current process for selecting remedies is in need of major change. ASAP believes that remedy selection must be conducted on a site-specific basis with full community participation in the context of a global Superfund budget. Remedy selection must put health concerns first, but also take into account such issues as environmental impact, future land use and available technology.

The belief that we have unending dollars to be extracted on a site-by-site basis from companies with "deep pockets," whether they acted illegally or not, has worked against intelligent remedy selection. Instead of achieving the best remedy for each community, the current system has simply created a bias toward the most expensive remedy. The two are not necessarily the same, since what is best for the community as a whole may be the most cost-effective approach.

Unfortunately, however, after years of exclusion from the process at their sites, communities sometimes pressure EPA for expensive remedies because that may be perceived as the "safest" approach. PRPs in turn resist, which creates distrust in PRP motives and even greater pressure to ignore cost. Citizens also mistrust the current process where private interests with a financial stake are involved in making health decisions. PRPs argue that they should have a say because they are funding the remedy.

This is another example of how liability concerns are intertwined with other aspects of the program.

*ASAP Solution*

Once sites have been ranked based on a revised HRS (see Point 3), the remedy for the site must be chosen on a site-specific basis in a process involving environmental health professionals, environmental engineering professionals, the affected community, relevant governmental authorities, and entities which have knowledge of disposal at the site.

441

• It is critical that affected community and citizen leaders be fundamentally involved in these decisions.

• Effective protection of public health and the environment must be the over-all standard.

• Factors such as land use and available technology must be taken into account.

• Based on current or currently planned future use, a decision should be made to either:

(a) Execute a removal or stabilization action and re-evaluate the site;——

(b) Select a remedial action based on the current actual or likely future risk; or,

(c) Defer the site for re-evaluation at a time certain, not to exceed 5 years. Deferral would have to be based on a determination either that existing technology acceptable to the local community cannot effectively reduce the site risk; that emerging technology may provide a more cost-effective remedy; or that action at other sites presents a greater need for protection of health and the environment. Deferral would not be permitted if the delay would result in any appreciable increase in risk to public health.

Since the plan would include all the key stakeholders in the decision-making process, there is no need to impose external and arbitrary statutory preferences for any specific decision among the options above, nor would there need to be arbitrary preferences for remedial actions such as ARARs or treatment and permanence (although remedies will have to make permanent reductions of risk).

• Remedies and associated efforts (see Points 6 and 8) should encourage sustainable development, including encouraging the creation of permanent new jobs, and increased local knowledge and skill base.

• The same remedial standards and goals should apply to all NPL sites, whether single or multi-party.

##### 5. THE RIGHT FINANCING SYSTEM: BUSINESS ASSESSMENTS ON THOSE PARTIES WHICH BENEFIT

The current financing system has failed the test of 13 years of real world experience, and it also creates a whole series of other secondary problems beyond its impact on the speed and efficiency of clean-up.

Except for most of the government and private-sector lawyers who make their living off of it, everyone now recognizes that the retroactive liability financing system is a huge problem. The question is whether we tinker with it, or whether we fundamentally reform it.

The issue is not only cost allocation, or share allocation, among PRPs for clean-up and natural resources expenses. With clean-up progress dependent on private checkbooks at each site, as a practical matter, clean-up priorities and decisions are clearly affected by factors other than public health and environmental priorities.

Progress occurs based on the presence and willingness to settle of PRPs, and—whatever the law says—their financial concerns play a role in public health decisions, and on the speed of clean-up.

Thus, the current focus of the Administration bill on allocation alone (even if its plan worked to stop allocation battles, which it will not) misses a fundamental part of the problem. As long as PRPs are pursued for financing on a site-by-site basis, this cannot be avoided.

Beyond its harm to the clean-up program, the current liability system causes unnecessary harm to PRPs. Long term contingent liability forces delays in investment, exacerbates, or eliminates the ability of companies to gain financing, and drains management time away from product production into disputes and litigation. In addition, any other liability remedy that seeks to apportion or allocate a "fair share" for old disposal shares the same problems, albeit under a different name, as the current litigation nightmare. Since disposal records prior to the mid-1980s do not exist within most PRPs or at most sites, any arbiter must guess as to the allocation. This, too, will be a matter of contest, delay and cost.

*ASAP Solution*

Expanded business taxes and other contributions would generally replace the present site-by-site financing system for legal disposal before a cut-off date in the past. This would remove most transaction costs and remove a series of enormous negative economic effects of the current system.

442

*Liability Reforms*

&bull; Retroactive joint and several liability generally would be eliminated at multi-party sites. At these sites, the expanded fund would pay to clean-up hazardous waste disposed of before a particular cutoff date in the past, and to restore damaged natural resources.

&bull; In general, entities which legally disposed of waste before that date at these sites would no longer pay for clean-up on a site-by-site basis, but instead contribute through the expanded tax and contribution system.

&bull; Entities which illegally disposed of waste will remain liable for clean-up costs and penalties, regardless of when the disposal occurred (the cutoff date will not apply to them).

&bull; Entities which disposed of waste after the cutoff date will remain liable for clean-up costs and penalties associated with the post-cutoff date activities.

&bull; Rights of citizens to pursue personal injury claims ("toxic torts") will be preserved.

&bull; The cutoff date will be selected based on several criteria:

(1) the impact on speed and efficiency of clean-up (i.e., the date which considers practicality, costs and benefits of pursuing the current system);

(2) the number of current NPL sites and PRPs affected by each possible cutoff date;

(3) the practical availability of records at most sites to reasonably and quickly allocate liability;

(4) the date following implementation of RCRA and other disposal permitting requirements which made the rules of behavior clear for most PRPs such that they should pay for clean-up even if they did not violate the law of the time; and

(5) the date which most effectively reduces transaction costs and other expenses related to litigation.

We believe a decision based on those criteria will conclude that the end of 1986 is the best cutoff date. However, we recognize that other dates have been suggested and we are open to discussing this matter.

*Transitional Protections*

&bull; We propose creation of a transitional credit system, whereby funds spent on remediation-related activities after January 1, 1990, would be credited against future Superfund tax payments, perhaps on a phased-in basis. Thus, any incentive to delay settlements in anticipation of liability relief is eliminated. This recognizes that some have expressed concerns over whether the proposed liability change would create transition problems, especially in cases where PRPs are on the verge of settlements with EPA, or have already reached settlements and are carrying out particular clean-up tasks.

&bull; PRPs working pursuant to a consent decree or order when the law passes would be required to continue to manage remediation through completion, with the expanded Fund providing reimbursement for all remediation costs (upon appropriate documentation).

*Remediation Management*

&bull; It is hard to imagine a more inefficient remediation system than the one used today. We suggest allowing three alternatives for the actual management of remediation:

(a) Maintain Section 106 authority so that EPA (or delegated States) could continue to name a PRP to manage the site clean-up, ensuring that the private sector controls remediation management, and for cases where PRPs desire to manage clean-up. Such PRPs would be reimbursed for remediation expenses;

(b) Have the Federal government directly contract for clean-up with private parties or new public/private organizations (this could mean agencies which have more contracting expertise than EPA handling the implementation of clean-up);

(c) Delegate the program to competent States with the same authority and funding regime.

&bull; Lien to Prevent Unjust Enrichment: Whenever Fund monies are used to pay response costs for any non-publicly owned site or facility, EPA should be authorized to place a lien upon that private property to prevent unjust enrichment of the property's owner. The amount of the lien shall be for the amount of money paid by the Fund for response costs for the property less any amount

ALCD-PUBCOM_0000159

Case 2:22-cv-07326-MCA-LDW   Document 288-16   Filed 01/31/24   Page 117 of 155
PageID: 4776

paid by the property owner (i) pursuant to a settlement or judgment in any cost recovery action under CERCLA for that property, or (ii) to any other potentially responsible party pursuant to a settlement or judgment in any third-party suit for contribution for response costs for that property.

### Areas ASAP Is Exploring

We recognize that even a perfect NPL system will only address a part of the problem. There are thousands of other toxic waste sites left to the States and private parties to address. We are exploring expansion of some of our ideas beyond the NPL in order to address the combination of public health and economic development issues created by CERCLA and equivalent State liability regimes at non-NPL sites. These include:

• An expansion of the trust fund to be available to qualified States if they elect to use it to replace current liability approaches at (a) higher priority State sites; or (b) non-NPL municipal co-disposal sites.

• Encouraging States to establish voluntary clean-up programs for lower priority sites; this would include a special focus on creating incentives for clean-up and development of sites in economically depressed areas.

• Part of this includes special approaches with small businesses with on-site contamination (i.e., single small business party, non-NPL sites), perhaps including a program similar to the effective LUST program.

• Where equitable and in the public interest of efficient clean-up, considering ameliorating retroactive liability for legal disposal at single-party sites where the owner 'agrees to cooperate in rapid, effective remediation action.

### 6. THE RIGHT PEOPLE: PUBLIC PARTICIPATION AND EMPOWERMENT

Citizens living near hazardous waste sites tell a consistent and discouraging story of exclusion from the clean-up process. They are angry and disillusioned with government and the Superfund program. Excluded from the process, they are forced to watch from the sidelines as PRP and government lawyers decide their fate.

Citizen input is an invaluable tool in arriving at the right remedy for each community. Citizens can offer site-specific information about public health, clean-up needs and economic factors. But Superfund rarely taps this important resource.

### ASAP Solution

ASAP believes community leaders and concerned citizens should be involved at the beginning and throughout the Superfund process. Under our proposal, as the program's focus shifts from financing concerns to concerns of public health, citizens would be involved from the initial stages of the process until the end. Moreover, we would provide both programs and financing to make participation effective and for training and business opportunities in remediation for minority businesses.

• The public should be able to provide comment on the overall site prioritization and priorities in use of funds. A national and statewide citizen involvement process must be established for this and other purposes.

• Public meetings and consultation with community leaders would be required before each major decision in the process.

• As a means of establishing better communication with affected communities, ASAP believes site-specific community working groups (CWGs) should be instituted. CWGs would serve as clearinghouses of information for affected citizens.

• A CWG would be formed for each site as soon as it is listed on the NPL, given access to all validated data collected by EPA, and encouraged to participate in the process from inception to completion. CWGs would be required to fairly represent the affected community, including affected citizens and the TAG recipient.

• Major reforms to the TAG program need to be enacted, including simplifying the grant application and accounting process, removing time restrictions on grants, making TAG grants available earlier in the process, eliminating the current cap on grants, providing advance funding (to be accounted for), and allowing flexibility in the use of TAG funds.

• Both TAG recipients and affected citizens' representatives on the community committees would be given the resources to participate fully.

• EPA (and each State if the program is delegated) would form a citizens advisory committee to assist it in evaluating the quality of community outreach and involvement in the Superfund process.

• Funding would be provided for grants for underprivileged and minority communities. These grants would fund groups willing to develop site inventories

444

and site characterizations through academic research and outreach with members of the affected community.

• The Superfund program would make grants to local educational institutions serving underprivileged and minority communities, especially in high toxic waste impact areas, for the training of minorities in environmental remediation skills.

• EPA and States would have an affirmative responsibility to provide opportunities and incentives for the involvement of minorities and minority businesses in environmental clean-up contracts.

### 7. THE RIGHT SAFEGUARD: PROSPECTIVE LIABILITY

Those knowledgeable about Superfund today will agree that the current laws governing hazardous waste disposal offer powerful incentives for care in hazardous waste disposal. Retroactive liability for historic waste disposal practices is irrelevant to proper current behavior. Then what is its purpose? It can only be to punish past actions even though they were legal at the time. The question is whether punishment helps or hinders clean-up of the old sites where it is applied. All evidence indicates that it is a powerful hindrance to clean-up.

The Eight Point Plan currently calls for prospective strict joint and several liability. With respect to prospective liability, ASAP's overriding concern is that incentives for proper waste management be powerful, predictable and clear.

### 8. THE RIGHT APPROACH: COORDINATION OF OTHER PROGRAMS

A disproportionate number of sites are located in or near poor and minority communities, whose infrastructures are disintegrating. Businesses have fled the area, taking jobs and tax dollars with them. The schools may have taken a sharp downturn, and health problems may have begun to surface. A declining tax base hinders the ability of these communities to respond to the serious problems facing the residents. Superfund's failure to clean-up old toxic waste sites is certainly not the only cause, but it exacerbates the problems of these communities.

*ASAP Solution*

Superfund alone cannot resolve the interrelated problems of communities affected by hazardous waste contamination. However, the Eight Point Plan sets aside a modest amount of Superfund money, not to pay for broader solutions, but to coordinate other government programs and services and focus them on helping affected communities recover, both economically and socially.

Rapid, efficient clean-up and the elimination of retroactive liability are the first steps to help solve the problems of these communities. Yet more than clean-up of the particular sites needs to be done. The resources of other Federal and State programs need to be focussed on areas of high negative environmental impact. A collaborative effort on the part of appropriate Federal, State and local agencies, and the private sector to address the problems affecting these areas needs to occur throughout the process, as well as after a site has been adequately cleaned up so that these communities can recover.

ASAP recommends that a lead Federal agency, such as the Department of Housing and Urban Development, be designated to coordinate efforts of the Federal government, and that it chair an interagency committee including at least the following agencies/departments: Health and Human Services, HUD, Commerce, EPA, Education, Labor, and Agriculture.

This committee would identify those Federal programs which can be effective in this effort and changes that need to be made to other programs so they can be used as well. It should establish working relationships with State and local governments, as well as the citizen working groups.

The lead agency and the committee would establish action plans for revitalizing priority communities, working closely with community leaders, State and local governments, and the private sector. These plans shall include coordination with the Economic Empowerment Zones, as designated under the Omnibus Budget Reconciliation Act of 1994 (P.L. 103–66). Multi-media environmental source reduction programs led by EPA and DOJ should be focused on such areas.

Planning grants would be made available to municipalities and local communities to develop innovative solutions for high toxic impact communities. HUD and the Department of Commerce also may provide grants for economic redevelopment, such as returning formerly contaminated real estate to productive use.

Government contracts at Superfund sites should be designed to the greatest extent possible to allow for minority businesses and small businesses to qualify for

445

participation. EPA should institute a Small Disadvantaged Business program simi-
lar to the one instituted by DOD.

Government contractors at Superfund sites should be given incentives to create
joint ventures with small and minority businesses, allowing the small business to
perform the work for which they qualify, with the intent of helping the small busi-
ness to expand it's capabilities and qualify for more meaningful clean-up remedi-
ation jobs.

There are resources now devoted to the types of activities discussed here. It is in
the public's interest to focus them on the areas most in need of assistance—particu-
larly those with high negative environmental impact. Current HUD development
programs, SBA incentives for small businesses (8a small business requirements), and
tax credits/reductions for empowerment zones all serve to boost the local economy
in many of the neighborhoods faced with serious health risks. We do not need to
raise significant additional funding to support this activity, but instead need to con-
centrate on using the resources we have more efficiently.

The Eight Point Plan is the only Superfund reform proposal that looks beyond the
problems of the contaminants and considers the rippling effect that a hazardous
waste site imposes on a community. Even if the health risks posed by Superfund
sites are removed completely, minority and poor neighborhoods in particular often
cannot rebound on their own. An assessment of the other economic and social im-
pediments facing these communities and a targeted method of addressing these
problems will expedite a community's ability to bounce back from these hardships.

We cannot afford to ignore the devastating rippling effect that impacts communi-
ties with hazardous waste sites located near them. We see them everywhere—from
the South side of Chicago to the inner-city of Houston to the rural areas of Warren
County, North Carolina. These communities need a Superfund that works—one that
recognizes that the problems do not start and end with the contamination, they
extend and affect an entire community. These problems warrant a coordinated re-
sponse.

### III. MYTHS ABOUT THE EIGHT POINT PLAN

One of the strangest parts about this Superfund debate is listening to the relent-
less attacks on our plan, and particularly on our proposed retroactive liability
reform. These seem to take on the cloak of deliberate disinformation. I find it per-
sonally appalling when we are first told that our approach is "off the table," and
cannot be discussed. As we press our concerns, the defenders of the current system
assert that ASAP's proposal would slow clean-up and cost more. This is false. Let
me take a few minutes to highlight some of the more prevalent myths.

*Myth:* The Administration considered and rejected abolishing retroactive liability.

*Reality:* Not true. From Administrator Browner's first Hill testimony in 1993 (an-
nouncing that EPA was open to any change in Superfund, except site specific liabil-
ity financing), through the NACEPT and Inter-Agency processes last summer and
fall, through their reactions to the Treasury Department's proposal to reform liabil-
ity, and into White House-led meetings last winter, EPA and the Department of
Justice adamantly refused to seriously discuss, much less study, fundamentally
changing the liability system.

*Myth:* Congress will not pass, and the American taxpayer will not accept, new
taxes to support the Superfund program.

*Reality:* There is no proposal I know of, including ours, that even hints at shifting
the cost burden from business to individual taxpayers. ASAP, The Business Round-
table, the Smith-Zeliff bill, and other similar proposals, all suggest increased busi-
ness taxes as the predominant source of funding—as they are today. These proposals
are seeking to waste a lot less money on lawyers and to redirect this spending to
clean-up.

Furthermore, as noted earlier in my discussion of Point 2 of the Eight Point Plan,
large parts of the business community are actively lobbying to replace the current
financing system with taxes. There is no secret to this widespread business support
for liability reform. The current system hurts them. They therefore are offering
more money to address the clean-up concerns of affected communities if they can be
relieved of the uncertainty and huge legal fees that the present system imposes on
them. It seems to me inconceivable that Congress would not respond to taxpayers
who are asking to be taxed and to a plan that promises more and faster clean-up of
our communities.

*Myth:* Our trust fund approach would produce the largest public works program
in American history.

446

*Reality:* This goes beyond exaggeration. We are proposing a $3.6–$4.6 billion annual Superfund program, with total public funding of $3–4 billion. That does not approach the size of the Federal Highway program, which has an annual budget of $20 billion—not to mention the airport or water programs, or even the effort which will be necessary to clean Department of Energy sites.

No one is suggesting that Superfund be made a "taxpayer financed clean-up program," which implies taxes on individuals. ASAP, The Business Roundtable, and other groups all suggest increased business taxes as the predominant source of new funding—as they are today.

*Myth:* A trust fund approach betrays the "'Polluters pay'" concept.

*Reality:* The NAACP and ASAP care about protecting public health, not "concepts." This "concept" has governed Superfund for 13 years and has failed our citizens. In the real world, this "concept" delays site clean-up and benefits lawyers, not citizens. Under ASAP's plan, companies which broke the law will remain liable; the plan would not benefit them in any way. Companies which pollute in the future also will remain liable and pay the full costs of clean-up.

So, I ask, how are we betraying the "polluters pay" concept? We continue to hold the feet of lawbreakers and wrongdoers to the fire.

Most of the die hard defenders of the continued application of this failed "concept" to old disposal do not live, nor do they have members who live, near Superfund sites.

*Myth:* Retroactive liability is an incentive for careful waste management.

*Reality:* Retroactive liability for past legal waste disposal has nothing to do with incentives for careful waste management today. Current and future liability does, and that would not change under our proposal. It is important to distinguish between the two.

Unlike the Administration bill which provides protection against liability for current and future disposal for municipalities, small quantity toxic waste generators, and MSW disposal companies, large and small, we do not weaken future liability for any party for toxic pollution.

*Myth:* Abolition of retroactive liability would transform the program from one in which 70 percent of response work is performed by PRPs to one in which 70 percent is performed by EPA.

*Reality:* Under today's law and all reform proposals Government makes all the important decisions which really determine the costs of clean-up. EPA clearly believes who implements those decisions is more important than whether the work is done. ASAP disagrees. Far too little clean-up is occurring today largely because the current site-specific, litigation-based, adversarial financing system delays clean-up. ASAP's proposal would replace that system with a mechanism that would put business money to work on clean-up, not fighting over who pays and how much.

Much is made of EPA's "Enforcement First" policy (e.g., 70 percent of clean-up work is now paid by PRPs). PRPs now seem to be paying about half of the costs of the overall Superfund program ($1.5 billion in annual PRP settlements versus $1.4–1.5 billion in Superfund appropriations). However, EPA's own data indicate that the speed of clean-up has not accelerated due to this policy.

Under ASAP's plan, the government can continue to use its enforcement authority to require PRPs at a site to manage the clean-up. Therefore, the efficiencies of private sector management will remain and the claim that elimination of retroactive liability will result in EPA performing 70 percent of the work is entirely incorrect. We are also seriously exploring delegating the program to qualified States, which should create additional efficiencies.

*Myth:* Abolishing retroactive liability would require $3 to $4 billion in new taxes.

*Reality:* No liability proposal we have ever seen, including ASAP's Eight Point Plan, proposes to raise "$3 to $4 billion a year in new tax revenues." The detailed plan offered by ASAP would require "new tax revenues" from business of $1.2 to $1.8 billion—while providing large increases in current clean-up spending.

*Myth:* Clean-ups would be significantly more expensive under a trust fluid approach.

*Reality:* The implication here is that we have an efficient system today. But there is precious little ability today for PRPs to control costs when EPA makes all the key decisions. And under today's system, EPA has no incentive to control any costs (either its own or the cost of remedies it imposes on private parties), since "PRPs will pay."

The fact is that clean-ups would be more efficient under ASAP's proposal than they are today. Qualified States and/or public-private entities would be delegated much of the clean-up work, and PRPs could still be ordered to manage clean-up as

they do today. With a set budget Superfund decision makers would have an incentive to be as efficient as possible.

*Myth:* Some industries, which have their own clean-up corporations, will no doubt be contracted to do clean-ups. Therefore, industries will now be paid to clean up their own mess.

This point is completely backwards. The problem is that under the current system EPA must negotiate on every clean-up decision with the same businesses which are paying for clean-up. Decisions which affect citizens' lives are made in negotiations behind closed doors between EPA and corporations, which have a primary incentive to save themselves money. Our plan would end this practice and have the Government make clean-up decisions, in consultation with the affected community, based on public health risk—not the checkbooks of private parties.

*Myth:* Poor and minority communities will continue to be by-passed because of an inadequate hazard ranking system

Not true. Unlike the Administration bill which mostly studies environmental justice concerns and does not change the current system under which people of color communities have been short changed, our plan establishes a hazard ranking system that considers not only the actual risks presented by the toxic waste site alone, but also the health effects it may have in conjunction with other environmental risks in the area. Our plan would prioritize sites and spending for clean-up on the basis of public health risks. Once listed, sites would receive money on the basis of the threat they pose to public health. This is unique—no other plan prioritizes clean-up spending on the basis of public health risk.

There is not one sentence in the Administration bill which changes anything about how clean-up resource priorities are made. ASAP's plan says how to change priorities, and provides the funding to get the job done.

*Myth:* Elimination of retroactive liability would remove any incentive for voluntary clean-ups for sites covered by the public fund. Tens of thousands voluntary clean-ups occur now.

*Reality:* There is no evidence to support the claim that "tens of thousands of voluntary clean-ups occur now." EPA, Resources For the Future (RFF) and others have tried to quantify the number of voluntary clean-ups and have failed. Based on a tiny sample of 6 sites of Fortune 20 companies, using an expansive definition of "voluntary," and not seeking to ascribe a motivation such as fear of retroactive liability, RAND estimated that only 8-10 percent of non-NPL sites were being cleaned up "voluntarily"—an estimate that would yield a much smaller number than the extraordinary claim above. Certainly many occur, but there is no evidence that retroactive CERCLA liability is the sole or even the primary cause. EPA's own report on "Indirect Benefits of Superfund" acknowledges that a variety of factors in addition to CERCLA liability contribute to any voluntary clean-ups.

Moreover, ASAP's proposal focuses on multi-party NPL sites. There is no evidence that any multi-party NPL site has ever been voluntarily cleaned up, a fact noted in Superfund studies published by both EPA and RFF.

There is good reason for this: the current liability system often prevents voluntary clean-ups. Significantly, the Administration recognizes this, and proposes in its bill to remove retroactive liability for prospective purchasers of contaminated property.

*Myth:* Abolition of retroactive liability would generate a new round of litigation over who sent how much waste, and when, to each site.

*Reality:* EPA agrees that PRPs today fight with each other, EPA and their insurers over who sent how much waste, and when, to each site. These are extremely complicated factual issues, and they are the major source of Superfund disputes and transaction costs. To these questions, for every one of tens of thousands of PRPs the Administration's bill will add a series of other highly complicated issues (as part of the "Gore Factors" required to be used in allocation decisions): how much control over disposal did parties have? what degree of care in disposal did they use? how cooperative have they been with the Government? Determining this information will add to existing transaction costs, and make a mockery of the goal of completing allocation within 18 months.

ASAP's proposal makes all these disputes moot at 80 percent of NPL sites—those which a survey of EPA managers indicates had stopped accepting waste by the end of 1986. At the remaining 20 percent of sites there would be one remaining issue—how much waste was disposed of after 1986? This would be relatively easy to settle, because there are much better records for disposal occurring after 1986.

Obviously this one issue, affecting a minority of parties at only 20 percent of the sites, could not possibly create more litigation than the current legal maelstrom,

much less after the Administration bill complicates it with new factual issues to be disputed.

*Myth:* Abolition of retroactive liability would be unfair and would result in a windfall for parties who had not cooperated in cleaning up sites.

*Reality:* No business group or entity is seriously making this argument. Like citizens who live near Superfund sites, business knows that relatively few sites have been cleaned up. The lion's share of the clean-up bill has yet to be spent and could well exceed a hundred billion dollars.

*Myth:* Abolition of retroactive liability would remove incentives for private sector investment in innovative technology research

*Reality:* This recent claim flatly contradicts EPA's prior position, and the experience of everyone else concerned about this issue. Last spring, EPA testified before Congress that "fear of liability... slows down the adoption and subsequent commercialization of innovative treatment technologies." At the same time, EPA admitted that, "a fundamental tension exists between having PRPs pay for clean-ups and conducting a program focused on developing new technology."

*Myth:* Removing retroactive liability will result in truly "orphan" sites competing with sites that have existing PRPs for a small pool of money.

*Reality:* Our critics are not reading the numbers. Our plan would spend hundreds of millions of dollars more on clean-up than is currently being spent by EPA and PRPs combined at all sites, orphan or otherwise. More clean-up money will produce more and faster clean-ups, and will provide funding for more clean-up of truly "orphan" sites.

Under the current system, clean-up has not begun at hundreds of orphan sites and sites where EPA and PRPs get bogged down in conflict. The continuing harm to the health of people living near these sites is a national disgrace and an environmental injustice. Only the Eight Point Plan would clean these sites quickly and without punishing innocent communities for the fact that no solvent parties can be found at a local site.

## IV. COMMENTS ON THE ADMINISTRATION'S BILL

By failing to address Superfund's fundamental flaw—retroactive, site-specific liability—the Administration plan is in itself fundamentally flawed. No amount of tinkering with the current system will bring to life the principles embodied in ASAP's Eight Point Plan. Too much of what needs to be done is inextricably entwined with finding a more efficient and effective way to finance site clean-ups. Until that happens, priorities will of necessity stay focused on site-by-site fundraising—not the protection of public health and the environment. Following is a review of the Administration Plan viewed in light of ASAP's eight principles.

### POINT ONE: PUBLIC HEALTH

The Administration is to be commended for its inclusion of specific provisions which seek to address the problems of highly impacted communities, particularly those of people of color. But it does not go nearly far enough, nor can it, because it does not provide the necessary financing reform.

The Administration proposes to conduct "Multiple Sources of Site [Pollution] Demonstrations"; engage research assistance via cooperative agreements and grants to "appropriate" public and nonprofit institutions; conduct selective health effect studies to ascertain the need for broader health studies; and engage peer review of the ATSDR's assessment of relevant toxicological testing. These are good ideas. They are pieces of what we are talking about in Point One of our plan.

The bill authorizes a 5-year study/demonstration project at several sites to provide additional public health benefits to citizens (e.g., health screening, medical care) "in an effort to increase community acceptance and satisfaction with actions taken at these sites." This sounds like the National Commission's "$50 million-a-year for 10 projects" proposal, which is a good idea. But it suffers from the same fatal flaw: there is no new money provided. It is just another one of those ideas which will have to struggle for funding with other Superfund priorities like clean-up. Mr. Chairman, after years of ignoring the problem, unfunded demonstration projects are just not good enough.

In sum, ASAP believes these amendments to the current legislation are positive, and start to address the concerns we have raised, but they are far too narrow in focus as they are mostly demonstration projects, and they do not have proper new funding.

ALCD-PUBCOM_0000165

## 449

### POINT TWO: ADEQUATE FUNDING

The Administration proposal would maintain the current inefficient site-by-site liability fundraising system. This means the exorbitant legal fees and other non-clean-up costs incurred today would continue largely undiminished. (See comments on Point 5.)

In crafting its bill, the Administration ignored offers by large and small businesses to pay higher taxes to support fundamental reform of Superfund. In letters to the President, 4,500 businesses of all sizes and a variety of trade associations across the country offered to pay higher taxes in exchange for elimination of retroactive liability.

But the Administration rejected these offers to support higher taxes for a better Superfund. It accepted one offer, though. Insurers had indicated that they would support a new tax on their industry to finance an expanded Superfund and an elimination of pre-1987 liability. Instead, the Administration took this offer and used it to establish an Environmental Insurance Resolution Fund set up only to reduce the liability of solvent PRPs.

The Administration also proposes a specialized $300 million "orphan share" program to reduce the liability of solvent PRPs.

But neither the insurer fund nor the orphan share fund direct new money to clean-up; both simply move money from one group to another. It's the legislative equivalent of rearranging the deck chairs on the Titanic.

It is true that the Administration bill authorizes more money for Superfund (although these additional amounts were not included in the President's Fiscal 1995 Budget). But look closer—even if they are raised, these funds are all earmarked for the proposed orphan share program; again, not new money, just redirecting the flow of funds already in play.

More important, no new financing source is suggested for the $300 million orphan share program; so where will money for it come from? It can only reduce amounts now used by Superfund for clean-up of sites where there are no solvent PRPs. If this amount was fully paid by the current Superfund, clean-up funding would be reduced by one third.

Additional evidence that the "emperor has no clothes" can be found in the Administration's call for a number of new initiatives, programs for which it proposes no new funding. Over the next 5 years, the new and expanded programs with stated costs will require hundreds of millions of dollars in additional resources over and above the additional authorization, and that does not include several programs for which a cost has not been stated.

So one of two possibilities exist: these programs won't get funded, making their creation a sham, or the funding will come out of current resources. If these programs were fully funded, Trust Fund clean-up spending could be reduced by an additional 20–30 percent.

Let me be clear that ASAP fully supports increased spending in many of the areas identified by the Administration. And we appreciate its leadership. But the difference between the Administration and us is that we pay for our proposals; they don't. And the only way you can pay for them, short of increasing appropriations from general revenues, is to increase the size of the Trust Fund with broad based taxes as we propose.

Attached to my testimony is a list of the unfunded new and expanded programs which would draw money from clean-up.

### POINT THREE: ENVIRONMENTAL IMPACT PRIORITIZATION

The Administration has adopted most of the Eight Point Plan's suggestions for NPL site listing changes.

The bill adds to the factors to be considered in an NPL listing decision: "the presence of multiple sources of risk" and "cumulative risk to minority and low-income populations." It changes the bias in the HRS regarding groundwater. All three of these are called for in the Eight Point Plan.

This is a very positive development. Unfortunately, the Administration has not extended this concept to the critical area of clean-up and resource prioritization (nor can it overall until the current financing system is replaced).

### POINT FOUR: EFFECTIVE REMEDIES

To the extent we understand it, the Administration's bill would provide for site-specific clean-up standards as the exception, not the rule. While local input would be accepted on some of the issues which relate to the choice of remedy, particularly land use, it is not at all clear that local views would have a powerful voice overall,

ALCD-PUBCOM_0000166

450

or that the remedy choice would be the product of all of those with a legitimate interest in it—government, community and business. Instead, it appears that national decisions would be paramount. ASAP believes the Administration's bill demonstrates all too clearly that the discipline which can be imposed on the system through a global budget cannot be duplicated through a series of standards and exemptions which only complicate the decision-making process.

Many argue over whether there should be national standards. We believe exposure standards for a given route of exposure to a given hazardous substance must be uniform. The issue in remedy selection should be how to most economically and securely prevent unhealthy exposures in a way that is favored by the affected community.

On a positive note, the Administration does authorize a 5-year demonstration project in communities which are also empowerment zones to study multiple source and cumulative risk. EPA is to coordinate with HUD and other departments. ASAP would provide the funding for such efforts at a much larger number of sites.

### POINT FIVE: FINANCING

In contrast to ASAP's comprehensive and integrated reform of the retroactive liability and funding issues, the Administration's proposal is woefully inadequate and virtually guarantees continuation of the same history of delay, inaction, litigation and waste of enormous resources that has marked the first 13 years of Superfund.

Rather than directly confront and reform the liability and funding problems, the Administration makes minor liability changes to favor certain parties and otherwise relies upon an unfair, time consuming and non-binding cost allocation process which only serves to add further delay, litigation and inequity to Superfund.

Although 56 percent of the length of the Administration bill (79 of 141 pages) is devoted to liability provisions, in the final analysis the bill pretty much retains the status quo. To a large degree, the bill does nothing more on liability than:

> 1. Give special treatment to certain parties: some cities, all waste disposal companies, banks, small quantity generators of toxic waste;
> 2. Add a complicated liability allocation process; and
> 3. Raise and allocate $500 million rising to $1.2 billion per year in new funding from the insurance industry solely to reduce the current liability of solvent PRPs.

And that, members of the Subcommittee, should not only give you great pause, it should alone be enough to convince you to set it aside and look at alternatives that yield fundamental reform. If you believe, as many of you have said, that retroactive site-specific liability is the Superfund problem, the Administration bill is still the same old failed story.

Listen to what Local Governments for Superfund Reform has to say about this. In a statement released February 3, LGSR Chairman Joe Palacioz, City Manager of Hutchinson, Kansas, said: "The Administration's plan fails to help local governments fulfill our primary responsibilities at Superfund sites—First, eliminating risk in a timely manner; Second, protecting the local economy and tax base; Third, returning polluted non-productive land to productive, taxable status; and Fourth, controlling costs at these sites. For all local governments, the Administration's ability-to-pay proposal is nothing more than another unfunded mandate, which will ultimately lead to rationing of services and increased taxes on our citizenry to pay for an inefficient Federal program."

### The Allocation Plan

Trumpeted as a "fair share" plan to eliminate the unfairness of the current liability system, the proposal does nothing of the sort.

• Fair allocation rests on the availability of data. This is particularly true to meet the new standards for allocation imposed by the bill: the Gore Factors. The share of each PRP will be based not just on the volume and toxicity of the waste it contributed, but also on factors such as its control over disposal, its care or negligence in disposal, and its cooperation with the Government in clean-up. Everyone with any experience at a site knows how little basic data exist for disposal before the mid-1980s, much less evidence of PRP behavior. The proposed law creates more factual issues for lawyers to fight over.

• The "fair share" allocation plan lets EPA remove the potential benefits of that process for settling parties which want to cash out by charging "premia" (set by EPA) for every possible future event, including and especially the risk that EPA will not collect the fair shares of non-settling parties. In other cases, you may get a share, but EPA can multiple it by any factor it wants.

ALCD-PUBCOM_0000167

• EPA is given enormous discretion over all critical issues and in most cases its judgment is not reviewable. Imagine the howls of protest you will soon receive if you put that into law?

For evidence of the continued, unacceptable injustice in this so-called "fair" process, how about the fact that even if a third-party allocator finds that a PRP has no liability, EPA can still order that PRP to clean-up a site!

*Transaction Costs*

The Administration argues its plan will reduce transaction costs 50 percent. Pure fiction.

• It will increase government transaction costs. The government will be required to conduct PRP searches now carried out largely by the private sector at its own expense. And EPA has agreed to pursue all non-settling parties, rather than forcing this job on a few selected PRPs as it does today. This is fairer, but not cheaper.

• On top of this, EPA is suggesting it will conduct separate and "expedited" cost allocation and cash out processes on its own for favored parties: all municipalities, all generators and transporters of MSW, and "de minimis" and "de micromis" PRPs. EPA staff have said in the past that this is an enormously expensive and time consuming process, precisely why the agency has done so few "de minimis" settlements and NBARs since 1986.

• Insurance transaction costs will go up due to the heavy incentives to draw in as many parties as possible as early as possible in the process; PRPs will initiate actions against their insurers and/or claim duty to defend contributions. This will not apply to parties which settle with the EIRF (except that the EIRF process creates a whole set of issues that insurer lawyers will have to address).

*Effect on Settlements*

While the Administration argues that PRPs will have heavy incentives to settle, in fact the reverse may be true.

• Assuming the neutral allocator does a fair job of cost allocation, EPA has the unrestricted, and unchallengeable power to impose "premia" on settling parties which want to cash out for all future risks: failure of a remedy, new site conditions, etc. Most important, it can charge a premium for its "litigation risk" in collecting the balance of amounts due from non-settling parties. These "premia" are not subject to any challenge—they are entirely up to EPA's discretion. Yet, settling parties would have no ability to recover these extra costs from non-settling PRPs.

• A similar incentive against settlement exists for parties which are less inclined to settle. Faced with the threat of joint and several liability for all costs of clean-up, PRPs have not hesitated to fight for the past decade. The new system will reduce this potential liability for non-settling parties to the costs left after settling parties have paid their fair share. The threat that they will have to pay the orphan share paid by the Fund is no different than today's reality.

• PRPs can refuse to settle at one or all of their sites, but if they settle with the EIRF they will have an average of 40 percent of their past and future legal fees to fight the Government and other parties paid for by the EIRF.

• The provisions protecting settlers against contribution suits and reimbursing them for payments for clean-up in excess of their settled share could prove attractive to some PRPs. We obviously favor reimbursement of PRP clean-up expenses. The problem here is that the Administration provides no new financing for this new responsibility it proposes to assume. Thus, reimbursements under this provision will drain Fund resources from clean-up.

*Effect on Small- and Medium-Sized Businesses*

The vast majority of PRPs are small- and medium-sized businesses and non-profits, including municipalities—not Fortune 500 companies. The Administration explanations recognize their concerns, but the bill does not address their problems. ASAP is blessed with strong and diverse small business membership, so we have a particular understanding of their experience and concerns with Superfund. Our small business members range from Chelsea Clock to the American Furniture Manufacturers, from the International Fabricare Institute (drycleaners) to the Independent Gas Marketers, from the Bailey Corporation to the Electrical Apparatus Service Association, and from the Grocery Manufacturers Association to the National Food Processors Association.

ALCD-PUBCOM_0000168

452

• For those which cannot prove they are "de minimis" contributors (most of them), a "fast-track" allocation process using the Gore Factors means that they will be disadvantaged relative to large, sophisticated PRPs which can produce disposal records and studies of "mobility" and similar issues. Small businesses (and most other PRPs) simply do not have the records to prove their status or amount of contribution, much less the toxicity, mobility, control and negligence factors called for with use of the Gore Factors. Thus, this process will result in cost shifting from such large PRPs to smaller ones.

• Far more small businesses will be brought into the Superfund process far earlier than in the past due to the incentives of this bill to draw in every possible PRP in the beginning. This will exacerbate the business harm caused to smaller PRPs by longstanding contingent Superfund liability.

• For those who are "de minimis" contributors, it is not very credible to hear one more promise in a long string since 1986 that the Administration will provide expedited "de minimis" settlements "wherever practicable" and "as promptly as possible."

• The de micromis exemption allows parties which sent 10 pounds or 10 liters or less of hazardous wastes to a site to certify that they qualify for full exemption from liability. This certification process makes sense (as opposed to requiring proof). However, EPA can raise or lower the amount, or determine that such parties should be liable if "such material contributed significantly or could contribute to the costs of response." Almost by definition such disposal "contribute[s] to the cost of response.

• Even if the program works perfectly as it is advertised, all it does is hand a small business a share of an unknown cost for clean-up and perhaps natural resources damages. The actual cost cannot be known for many years if, in fact, she allocation is done quickly and early in the process. Consider the plight of a small business given "only" a one percent share. At the average site that would end up being $250,000. But early in the process no one knows—and what bank will make loans for business use when a range of clean-up costs, say $10 million to $40 million, is possible (or $100,000 to $400,000 for the small business)?

• There are no assurances or protections that a special process for small business will be done quickly or fairly anyway.

Let's be clear what you're doing if you enact the Administration bill: you are providing relief to some big businesses and imposing a greater burden on small business.

### The NFIB Compromise

Much has been made of a negotiated agreement between the NFIB and some environmental groups. The small business members of ASAP do not think this agreement is either workable or solves their concerns. Indeed, we do not know of any small business PRPs who support this layering on of new band aids to the current liability system which has harmed so many small businesses.

But it is instructive to assume that its provisions will work, and see what happens.

The agreement provides that liability will be terminated for small businesses if very short timetables for share allocations are not met (i.e., 6 months). But it is highly unlikely that either EPA or a neutral allocator can make "fair share" allocation decisions and settlement offers on any sort of rational basis very early in the Superfund process for all small PRPs.

Thus, some might see this as an effective exemption for small business unless one of two things happens:

• EPA invokes the agreement's exception to the deadlines for "just cause."
The lack of data (or time required to get it) probably would qualify.

• large PRPs launch intensive efforts to do EPA's work for it (see below).

If these don't happen, an interesting question is what happens to the shares of small businesses if EPA fails to collect it from them.

• Will the Fund pick up their shares, as is the case for amounts over the bill's 10 percent cap on MSW generators? (This would place a major new demand on the existing Superfund, reducing funds for clean-up.)

• Or will other PRPs have to pay that amount? If so, all other PRPs will pay the share of businesses with less than 100 employees. I suspect there will be serious lobbying by larger businesses against this now, and interesting litigation later, over this issue. But what would EPA do with this problem in the real world?

453

Faced with mass write-offs of liability, if EPA can't delay based on "just cause," EPA will have a huge incentive to do exactly what it does today (explaining why there are so few "de minimis" settlements). Its staff will err on the side of caution and declare that very few parties are "de minimus," forcing everyone into the regular allocation process. That way it won't lose any "big polluters," and it will capture some money that it would otherwise lose.

Small businesses will thus be forced to incur the transaction costs and associated trauma of that intensive allocation process with all the bigger PRPs, and hopefully will be able to find evidence to prove that they are in fact de minimis—based on the complex Gore Factors. As it is today, they will have the burden of convincing the allocator and then EPA.

There are a series of other problems with this approach, including EPA's ability to set whatever premiums it wants on top of any share for parties which wish to "cash out".

In addition, the NFIB agreement appears to require establishing a parallel two track allocation system: EPA would be responsible for figuring out shares for "de minimis" parties (which requires knowing the shares of all parties in order to figure out the "de minimis" shares); the neutral, third party allocator will repeat the same analysis for everyone else. Big PRPs will have their lawyers involved with both processes. And more transaction costs will have been created.

No one has addressed what happens to small parties who are not found by EPA in this initial process (or who decline to participate)? How do they get contribution protection? Can't a non-settling PRP sue them for contribution under the current law? Doesn't this mean that there will be major continuing uncertainty for some class of small businesses? This class will be larger the more rapid the initial process is.

Most important, what did all of this do for clean-up and public health, however it comes out? Nothing.

*Discriminatory Treatment of Various Parties*

• The Administration proposes a limit of 10 percent of total response costs for one group—generators and transporters of municipal waste—yet other municipalities that are owner/operators of MSW sites are left to try to settle their continued retroactive joint and several liability with the Federal government subject to their ability to pay.

• Under the cover of Congressional sympathy for municipalities, the huge companies which pick up and dispose of MSW have gotten themselves covered by the same cap on liability: both for the past and the future.

• Cities also appear to have gained an exemption from liability if they do not conduct MSW pick up themselves, but grant permits and licenses to other parties to perform that function.

• New purchasers of contaminated property who had no role in causing its contamination would have no clean-up liability. But past purchasers who also had nothing to do with pollution would stay liable.

We don't support retroactive liability for any of the above parties unless they broke the law. But carving out certain PRPs and leaving the rest in the system doesn't change the underlying problems with Superfund, and may make them worse. The shares of those parties must be paid by someone. If they are loaded on other PRPs those parties will fight harder. If the Superfund picks up the costs, without new financing less money will be available for clean-up.

*Speed of Clean-up*

EPA's own figures prove that "enforcement first" has not accelerated clean-up at all. Neither does this plan.

• The Administration's allocation system adds a multi-year administrative cost allocation process to the current system which will further delay actual site remediation.

• Using the Administration's own timetable, you can add up 3 years of searches, notifications, allocations, red tape, settlement talks, hearings, public comment, and who know's what else before you even have a final allocation of shares not even actual costs. It is still a good system for lawyers, and it's not a bad system for those big businesses who have the records and time to wait for the process to finish. It's a horrendous system for everyone else.

• With its unilateral focus on cost allocation, the Administration plan ignores the fact that PRPs will continue to fight EPA over testing plans and remedies, to keep their costs down.

• Due to this and the probable presence of non-settling parties at most sites, the Government and PRPs will continue to conduct operations under a "litiga-

454

tion mentality", further delaying progress, and adding transaction costs and "defensive medicine" costs, such as litigation-quality paperwork and testing.

### The Orphan Share initiative

The Administration's plan offers up $300 million in "new funding" for payment of what it considers orphan shares—i.e., shares attributable to identifiable parties who are "insolvent or defunct", plus excess municipal generator shares (over the 10 percent cap), and shares of parties who otherwise have their liability limited.

• This limited conceptualization of "orphan shares" distributes the costs of all unidentified shares to the identified solvent PRPs, thus maintaining their sense of inequity.

• All orphan share amounts over $300 million will be distributed to solvent PRPs.

• While the Administration says funds for this purpose will be separately appropriated, the bill does not say this, and, even if it did, we believe Congress will lump the basic Superfund and this new program together, thus creating competition between the existing Superfund and this new program. Thus, spending on orphan sites and other priorities will come in conflict with this demand to reduce the liability of current, solvent PRPs.

• No new funding source for this purpose is identified, so financing will be subject to existing budget caps (and thus be in competition with other spending programs). Indeed, the new Administration budget for Fiscal 1995 does not include this $300 million addition.

• Like the new insurance trust fund (EIRF), none of this new funding will expand clean-up or pay for other priorities. All of it will reduce the liability of large PRPs who now are forced to pay the orphan share.

• While paying orphan shares is a common complaint of PRPs, having the Government pay it will hardly alter the basic dynamic of the warfare over financing at Superfund sites. Said another way, parties will fight almost as hard over liability for 80 percent of the costs as they will over 100 percent of the costs.

### Subsidizing the Failure of New Technologies

EPA's claim that retroactive liability provides incentives for private sector investment in innovative technologies flatly contradicts its own position, and the experience of everyone else concerned about this issue. As noted above, last spring, EPA testified before Congress that "fear of liability . . . slows down the adoption and subsequent commercialization of innovative treatment technologies." At the same time, EPA admitted that, "a fundamental tension exists between having PRPs pay for clean-ups and conducting a program focused on developing new technology."

Rather than addressing the cause of the problem, the only "fix" offered by the Administration is a provision to be able to offer a discretionary partial subsidy to those PRPs which try new technologies that fail—but only up to a total of $50 million, which is itself not supported by any new financing (and thus, like the promised "orphan share fund" will reduce EPA's own spending on clean-up).

### Impact on Greenfields/Brownfields

To its credit the Administration recognizes that this is a major problem, and that the current liability system is a positive disincentive to development and voluntary clean-up during the sale of property, contrary to the claims of its defenders.

• The bill's full exemption from liability for new buyers of contaminated property is a major break with long standing ideology and should be applauded. It will combat the disincentive to invest in inner cities.

• All the problems of the liability system in this area remain for all other sites; States may not experiment; they can only be delegated the program if they have a liability system just like the Federal law, and use it.

### PRP/Insurer Fund

The Environmental Insurance Resolution Fund (EIRF) portion of the Administration bill, as well as a revised version now under consideration by its advocates, is another example of the piecemeal approach plaguing real reform efforts. Many insurers and PRPs, through their trade associations and individual companies, are already offering detailed critiques of the proposal. Both sides have serious, substantive objections. Another group of PRPs and insurers apparently support it. Here I will just point out a out a few of the problems we see.

Unlike ASAP's broad-based financing proposal (which includes a large, special contribution from the insurance industry), the new EIRF tax on insurers is money which would not increase total clean-up spending or spending on other priorities.

ALCD-PUBCOM_0000171

455

And that leaves aside the question of whether the proposal is even workable. I invite you to read it and draw your own conclusions—if you can get through it.

The fundamental problem with the proposal is that it deals with a peripheral, derivative issue. The Administration's stated purpose for this fund is explicitly and solely to cut insurer/PRP transaction costs. By limiting itself to this narrow issue, it guaranteed that this plan would have no real impact on the liability created problems of the Superfund program.

Even if this proposal solved all the PRP/insurer fights at NPL sites, that would do little for public health, for the pace of clean-ups, and even for ending disputes between and among the Government and PRPs over financing of site costs. The recent RAND transaction cost report noted that only 1 percent of PRP costs were for disputes with their insurers (while around 35 percent were transaction costs).

We are told that the first EIRF deal (the one in the Administration's bill) is dead. A new one was just announced. Then a group of large PRPs attacked it, saying they wanted a better deal, or at least the first one. The insurance companies who negotiated both plans refused. Other insurers who had no role in negotiating either agreement are attacking the ones who did for unfairly allocating the taxes to pay for the plan onto them.

How does any of this warfare benefit communities threatened with toxic waste? This is just another example of how piecemeal reform of the liability system does not work.

• The proposal raises from the insurance industry $500 million in new annual funding, rising rapidly in future years. But it uses every dime of new funding to merely reduce the existing liability of solvent PRPs. None of that money is used to expand clean-up or fund other priorities.

• When new funds are needed for sites with no PRPs and for other key priorities, we cannot understand why hundreds of millions of dollars in new tax revenue will be raised from insurers and spent to pay for past PRP costs, including PRP legal fees dating all the way back to 1981.

• EIRF has nothing to do with settlement of site disputes and getting on with clean-up. PRPs (whether or not they settle at sites) will have an average of 40 percent of their legal bills paid by this new fund within 60 days of submission to the EIRF. This subsidy of future PRP legal fees will fuel the PRP side of the battles between the government and PRPs at sites.

• Insurers today pay about 10 percent of Superfund costs. This proposal hikes that to about 40 percent. And it doesn't even provide assurances that litigation will actually end. That is the worst of all worlds for insurers and does nothing for the overall program. The proposed insurance taxing mechanism has the insurance industry warring with itself.

• By requiring proof of policy terms to benefit from the new fund (while limiting recovery for policy deductibles and other restrictions), a huge new bureaucracy will be required to make these judgments, with insurer and PRP lawyers lobbying it on each claim. How many of you can find copies of or remember the exact terms of your insurance policies from the 1970s and early 1980s?

### POINT SIX: PUBLIC PARTICIPATION; COMMUNITY EMPOWERMENT

While the Administration's plan calls for very positive new provisions to involve the public in Superfund decision making, these will cost more than $50 million a year, and no new funding is provided. Therefore, any resources for public participation will come out of existing Superfund money—an unacceptable trade-off.

The Administration bill does not address the community empowerment agenda of the Eight Point Plan, which calls for training citizens in impacted communities in remediation skills, and involving minority businesses in clean-up.

### POINT SEVEN: PROSPECTIVE LIABILITY

Much has been made by the Administration of the value of the Superfund liability system in causing parties to exercise care in the disposal of hazardous waste. We believe the Administration has confused the value of liability for old disposal with liability for current and future disposal. We do not disagree on the latter.

We find it extraordinary that, notwithstanding this position, and its unwavering commitment to site-specific liability, the Administration is willing to limit the liability of municipalities and the largest private MSW disposal firms (the entities which control the vast majority of waste disposal in our country), not just for past disposal, but also for current and future disposal. Such parties past and future liability will be capped, in the aggregate, to 10 percent of the clean-up costs at a site if the city (3 years after passage of the law) puts in place a system to collect household toxic

456

waste just twice a year. This is a major step backward in incentives for proper disposal of a very large amount of our society's hazardous substances. This is not just a "break" for cities; it removes a major incentive for appropriate disposal behavior by enormous corporations which dispose of MSW.

This same future liability exemption applies to corporate small quantity generators of hazardous waste, but no such collection responsibility is imposed on cities for such waste. (Up to 200 pounds per month of hazardous waste per generator would thus be essentially exempt, hiding within the same 10 percent MSW cap.)

### POINT EIGHT: PROGRAM COORDINATION

Administrator Browner said in recent testimony: "Economic redevelopment of contaminated sites is an essential component of this legislation." Yet EPA has committed only to a demonstration project, and no new money is raised to pay for it.

More fundamentally, EPA cannot effectively address this widespread problem simply through Superfund reform. The agency must look to other agencies for assistance and support. EPA does not have the required expertise or background to do this. That is why our Eight Point Plan calls for leadership from other agencies and focussing existing programs on these communities.

### V. CONCLUSION

This subcommittee knows well the failures of Superfund. You and others have documented the unconscionably inadequate clean-up record, the staggering waste of public and private resources on legal and liability battles, the disenfranchisement of citizens which erodes confidence in government at all levels, and the suppression of economic dreams as entire communities wait, and wait, and wait for action.

Let us not settle for reform which falls well short of addressing these problems. Enactment of a bill is not what should drive us. Instead, we should only settle for a bill that truly gets the job done. I would prefer no bill at all to one which perpetuates in the name of reform many of the injustices and failures in place today.

Let us not mistake cobbling together a bill which satisfies some vocal and visible constituencies for a bill which will result in a successful program. Such a bill may be politically feasible, but if it doesn't work, it's not much help to anyone.

I believe this Administration and this Subcommittee want a successful Superfund program. I am pleased that President Clinton indicated his bill is a starting point, not an end point; and I was pleased that in my meetings with the Administration, other than EPA, they indicated flexibility on every issue, including the final shape of liability reform. I believe this attitude, coupled with a genuine commitment to serve the interests of all Superfund stakeholders, means we can all find common ground.

Thank you. I look forward to working with you.

### SPENDING ASSUMPTIONS AND EXPLANATION

*Assumption for Calculation*

For the purposes of calculation, we assume a 1986 liability cutoff. No cutoff date has been chosen yet. The actual date will be selected with the goal of speeding clean-up, and reducing transaction costs and disputes. The quality of waste records, waste management regulations, and available disposal facilities will be considered.

*Total Spending*

Fiscal year 1992 spending is the sum of Fiscal Year 1992 PRP settlements ($1.48 billion), as estimated by EPA, and actual gross Fiscal Year 1992 outlays ($1.47 billion). The latter figure was printed in the Fiscal Year 1994 "Budget of the United States Government" and includes some spending which will be recovered in the future. While settlements are only commitments to spend, not actual spending, there is no record of how much PRPs actually spent to clean up NPL sites in 1992. For obvious reasons, spending lags years behind settlements. However, since real annual settlements have held steady at just under $1.5 billion for each of the last 3 years, we believe that they now approximate actual spending.

Breakdowns of Fiscal Year 1992 outlays are not available; in estimating the breakdown among clean-up, enforcement and the several "other" spending categories, we have had to extrapolate from EPA's Fiscal Year 1992 budget for Superfund commitments and obligations.

Proposed spending is 20–50 percent higher than current spending.

ALCD-PUBCOM_0000173

457

*Clean-up Spending Total*—Fiscal Year 1992 spending on clean-up is the sum of PRP settlements ($1.48 billion) and outlays for direct site clean-up (estimated at $920 million).

Proposed spending represents a 40–75 percent increase over current clean-up spending at multi-party and orphan sites. Overall proposed spending is 25–50 percent higher than 1992 spending (or more if less is spent on "other" activities). According to a 1991 study by the University of Tennessee, the proposed spending level of $3–3.57 billion is more than sufficient to dean all of the sites on the NPL over the next 30 years. This assumes an expanded NPL of 3,000 sites and improvements in remedy selection, including consideration of sites' future use.

*Multi-party and orphan NPL sites*—Current spending is calculated using the assumption that 70 percent of all PRP settlements (less $85 million in settlements for emergency removals) is spent at multiparty or orphan sites. Thus, PRP settlements for multi-party sites are estimated at $920 million One recent study estimates that 70 percent of all NPL sites not owned by the U.S. government are multi-party sites. (The other 30 percent are single-party sites where there is only one PRP.) Nevertheless, 70 percent may be an overestimate; site research indicates that disputes over remedy selection, cost allocation and other issues are much more serious at multi-party sites and delay settlement, often indefinitely.

In addition to the $920 million in PRP settlements, we estimate that $680 million from the trust fund were spent at multi-party and orphan sites. $680 million is slightly more than 70 percent of all trust fund clean-up spending and is thus consistent with the fact that EPA spends as much of its insufficient clean-up funds as possible at orphan sites.

*Single-party NPL sites*—Current spending is estimated at 30 percent of PRP settlements, or $445 million, plus $105 million in trust fund spending. The 30 percent estimate is conservative for the same reasons that the 70 percent multi-party site estimate may be high. $105 million is a best guess based on EPA's extreme reluctance to spend trust fund money to dean sites where a viable PRP may be liable. Nevertheless, single-party clean-ups have progressed more quickly and wasted less money than multiparty clean-ups because they do not involve disputes over responsibility for costs.

Our proposal would not affect single party sites, so single-party spending remains unchanged.

*Emergency removals*—Current spending is calculated by discounting the $200 million in Fiscal Year 1992 Superfund removal commitments and obligations—because outlays are generally somewhat lower—and adding $85 million for PRP word The latter figure assumes that 34 percent of all removal spending is by PRPs; in fiscal year 1992 PRPs started 34 percent of all removals.

The proposal would maintain current spending levels for Superfund's successful removal program. Parties who legally disposed of waste at multi-party NPL sites before 1987 would no longer be liable; trust fund expenditures would replace money which is currently spent by such parties.

### Enforcement

EPA has defined "Enforcement" narrowly so as to include only the costs of offices exclusively dedicated to enforcement in current bending calculations. In fact, much of the "clean-up" budget is spent on work which does not directly advance clean-up or reduce health risks, but which is needed to support fundraising and litigation efforts: analytical testing to relate material on sites to PRPs, overtesting, litigation quality documentation, PRP record development, and support for remedy designs to withstand PRP challenges. These savings could be shifted to real clean-up spending, but they are not quantifiable.

Under the proposal, enforcement spending at multi-party sites could be slashed. Almost 80 percent of all these sites would be entirely removed from the liability system, and so require no enforcement spending. Given these substantial savings, a much smaller total enforcement budget would nevertheless allow increases in spending for raising funds at single-party sites and from PRPs who broke the law or disposed of waste after 1986.

### "Other" Categories

*Overhead and research*—This money represents overhead costs for headquarters staff, research and development, and a variety of other expenses. It also includes EPA oversight costs at Federal facilities.

To the extent possible, the proposal would decentralize Superfund spending, cutting Washington overhead spending and freeing up more resources to be spent in effected communities. Studies by GAO and EPA's inspector general have suggested numerous changes to cut overhead costs and spend remaining monies more effi-

ALCD-PUBCOM_0000174

458

ciently. EPA oversight costs at Federal facilities would be reimbursed by the agencies responsible for those facilities.

*Natural resource restoration*—The current law has, with a handful of exceptions, failed to address any natural resource restoration. A completely separate process and the prospect of many years of litigation delay restoration—usually indefinitely.

The proposal would bypass litigation and provide funds to go to work immediately to repair natural resources. Spending would be increased. Further, swift action would head off further contamination migration and damage, reducing both environmental and monetary costs.

*Public health*—Far too little money goes for public health outreach, research and testing. To fund the program from one day to the next, EPA must devote resources and energy to chasing PRP money. The result is a program focused on fundraising to the detriment of public health Typically, no public health specialists arrive at Superfund sites until years after an NPL site is designated, if at all; investigators searching for PRPs are often the first on the scene. Clean-up proceeds—or stalls—depending on the outcome of site-by-site PRP fundraising negotiations or litigation. Where PRP negotiations stall or no viable PRP can be found, site clean-up may be completely ignored, regardless of how great a potential health risk the site may pose.

The proposal would focus the entire program on public health protection. Health specialists would be the first on the scene, testing and educating communities neighboring suspected toxic health hazards. Local doctors would be trained to spot and treat the effects of exposure to toxins. Research into these effects would be expanded.

*Public participation*—Superfund's Fiscal Year 1992 community relations budget was $450,000, and 30 full time equivalent (FTE) employees were detailed to community relations. By assuming an average cost of $75,000 per FTE, we have calculated EPA's total Fiscal Year 1992 community relations personnel cost at $2.25 million, yielding a total Fiscal Year 1992 community relations budget of $2.7 million. In addition, EPA awarded 37 technical assistance grants (TAG's) to help communities near Superfund sites deal with technical site data. At a maximum value of $50,000 apiece, the TAGs' total value is less than $2 million.

Current spending on public participation is inadequate. Too few resources are devoted to involving the public. TAGs are too small, limited to 3 years, and renewable only once. The problems of inadequate funding are greatly aggravated by Superfund's current fundraising focus. EPA staff devote much of their time to tracking down and then negotiating with PRPs in meetings closed to the public. EPA and PRP lawyers screen all information before it is released to make sure that it will not hurt their bargaining/litigation position Affected communities are often kept in the dark as to possible exposure—or the lack thereof—and the reason that clean-up has not begun. Their only source of information may be infrequent EPA community meetings, and usually the first opportunity to comment does not come until a ROD is proposed

The proposal would provide more financing for citizen outreach, community working groups, and TAGs. Innovative programs, including bilingual briefings and door-to-door outreach, would be increased. Affected communities would be involved in the process of testing and remedy selection from day one.

*Remediation training in affected communities*—Virtually nothing has been spent on remediation training for the people living near contaminated sites. In 1992, EPA for the first time made a single grant of $87,000 to Cuyahoga Community College to set up a pilot program for outreach and remediation training to inner-city residents. Less than $20,000 of the grant money was spent in 1992.

Under the proposal, new programs will be designed and funded that provide affected communities with opportunities for minority job training and the involvement of minority businesses in environmental clean-up contracts.

*Coordination of other Federal programs*—Superfund itself cannot solve all the interrelated problems of communities negatively affected by toxic waste. However, the proposal would set aside Superfund money for a local agency to coordinate other government programs and services and focus them on helping affected communities recover, both economically and socially.

## WHERE THE MONEY COMES FROM—ASSUMPTIONS AND EXPLANATION

### Assumption for Calculation

For the purposes of calculation, we have assumed a 1986 liability cutoff. No cutoff date has been chosen yet. The actual date will be selected with the goal of speeding

clean-up, and reducing transaction costs and disputes. The quality of waste records, waste management regulations, and available disposal facilities will be considered.

*Total*

The fiscal year 1992 total figure is the sum of all Superfund taxes, appropriations from general revenue, PRP settlements, and recoveries from PRPs. All figures come from EPA documents.

Proposed total program revenue represents a 17-50 percent increase over current revenue and spending (exclusive of private sector transaction costs).

*Taxes and Appropriations*

*Total*—Fiscal Year 1992 taxes and appropriations is the sum of Superfund taxes and Federal appropriations from general revenue.

Proposed taxes and appropriations are 40-110 percent higher than current levels.

*Broad-based business taxes and line item corrributions*—In Fiscal Year 1992, $1.2 billion in Superfund taxes were collected. These taxes came in three forms: petroleum tax, chemical feedstock tax, and the corporate environmental income tax.

The proposal calls for a 100-150 percent incrse in broad-based business taxes and line item contributions. Current petroleum and feedstock taxes would be retained. The environmental income tax (EIT) would be expanded and a tax would be levied on smaller businesses. The small business tax would be levied on facilities officially classified by EPA as small quantity generators (SQGs). It would be assessed on a sliding scale; larger businesses would pay more per facility, and smaller businesses would pay less. An alternative would be to apply such a tax to SQGs and large quantity generators owned by companies which do not pay the EIT. Additional taxes on insurers are part of the proposal. (See attached example.)

*State share; State and municipal PRP liability*—States are currently required to match 10 percent of all trust-fund spending at orphan sites within their borders; they are required to match 50 percent of trust fund expenditures at sites owned by municipalities. States must also pay operation and maintenance costs after clean-up at all sites within their borders. We do not have information regarding the total amount paid by States in Fiscal Year 1992, but it is believed to be less than $100 million.

In addition, State and municipal PRP liability is large and growing: municipalities are involved at about one third of all NPL sites. Liability stems from owning and operating sites, generating and transporting waste, and past regulatory actions. There are no national records of total paymentsand commitments made pursuant to this liability, but they are included as part of the totals for "private-party" settlements and cost reconvenes.

Under the proposal. States would be required to pay 10-15 percent of total program costs, based on expenditures on sites within their borders. The increased State contribution reflects the removal of old State and municipal PRP liability for old waste disposal.

*Federal appropriations from general revenue*—Annual appropriations from general revenue have fluctuated over the last several years. In Fiscal Year 1992, $234 million was appropriated.

Proposed appropriations from general revenue are higher to reflect the removal of Federal liability for lawful pre-1987 waste disposal at private, State, or local government multi-party NPL sites. EPA would be reimbursed for its oversight costs at Federal facilities. Federal facility clean-up financing would not be changed in any other respect.

*Private Party Settlements and Cost Recoveries*

*Total*—EPA estimates the total value of PRP work commitments pursuant to settlements or orders issued in Fiscal Year 1992 at $1.48 billion. In addition, EPA recovered $180 million dollars from PRPs in Fiscal Year 1992, yielding a total of $1.66 billion. Settlements have essentially plateaued, increasing at less than 1 percent over the rate of inflation over the last 3 years (Fiscal Years 1990-1992).

Under the proposal, settlements would fall as EPA would no longer seek to compel work from PRPs whose liability stems from lawful pre-1987 waste disposal at multi-party sites.

*Settlements at single-party sites*—Current settlements and recoveries is calculated using the assumption that 30 percent of total settlements and recoveries are for single-party sites. One recent study estimates that 30 percent of all NIL sites not owned by the U.S. government are single-party sites.

The proposal would not affect single-party sites. PRPs would remain liable, and settlements would not be affected.

ALCD-PUBCOM_0000176

460

*Settlements for lawful pre-1987 waste disposal at multi-party sites*—Current settlements and recoveries are estimated at 70 percent of (non-removal) settlements at all sites for lawful pre-1987 waste disposal.

The proposal would eliminate liability for lawful pre-1987 waste disposal at multi-party sites.

*Settlements for illegal or post-1986 disposal at multi-party sites*—The $80 million in current revenue assumes that 5 percent of all settlements and recoveries are for illegal disposal or for post-1986 disposal. A recent study found no evidence of illegal disposal by any party at 85 percent of all NPL sites not owned by the U.S. government. The study also found that almost 80 percent of all NPL sites had closed before 1987.

The proposal would not affect settlements for illegal disposal or disposal which occurred after 1986. Parties would remain liable for any such disposal.

*Settlements for emergency removals at non-NPL sites*—We have calculated current settlements assuming that PRPs pay 34 percent of an estimated $250 million in Fiscal Year 1992 removal costs. (In 1992, 34 percent of all removal starts were conducted by PRPs.) We have further assumed that just under half of the resulting $85 million (34 percent of $250 million) was spent at non-NPL sites.

The proposal would not affect the funding of removals at non-NPL sites. EPA's removal program has swiftly and efficiently addressed health risks.

\

357

### STATEMENT OF BENJAMIN F. CHAVIS, JR., EXECUTIVE DIREC-TOR, NAACP; ON BEHALF OF THE ALLIANCE FOR A SUPER-FUND ACTION PARTNERSHIP

Mr. CHAVIS. Thank you, Senator, and good morning. Before getting into my 5 minutes, I will just take ten seconds to say, Senator Lautenberg, that I really appreciate having this opportunity to give testimony this morning before you and the committee. The NAACP has been long committed on this issue. As a former resident of New Jersey, let me say that I appreciate your leadership on this issue. In point of fact, in two weeks we are going to be bringing thousands of people from the Northeast region to New Jersey for the regional meeting of the NAACP and this issue of how to reauthorize Superfund is going to be on the agenda.

As you know, Mr. Chairman, I am the Executive Director and Chief Executive Officer of the NAACP. I am also the Chairman of the Alliance for a Superfund Action Partnership, or ASAP. I would just summarize my written testimony in the time limit provided.

Today, ASAP represents the broadest and largest diverse constituency of Superfund stakeholders you can find—the NAACP, Local Governments for Superfund Reform, the American Furniture Manufacturers Association, International Fabricare Institute, the

ALCD-PUBCOM_0000178

358

City of Atlanta, the Society of Independent Gas Marketers of America, the National Food Processors Association, the Grocery Manufacturers of America, Johnson Controls, Inc., Continental Corporation, the American International Group, Texaco, Phillips, and many others in a variety of fields. A full list of current membership is attached as an addendum to this testimony.

We have presented in detail an eight point plan for fundamental reform of Superfund. Senator and other members of the committee, we believe, first of all, that this legislation should be reauthorized. When we call for fundamental reform, rather than sort of tinkering around the edges, we don't believe that the Administration's bill calls for fundamental reform, particularly on the question of retroactive liability. We are not here to kill the bill but we want to make sure that if Superfund is reauthorized that our communities are not killed.

For 12 or 13 years Superfund has been implemented and enforced to the detriment of African-American communities, native-American communities, Latino-American communities, and other minority communities. We have not had expedited clean-up. What we have had in place of clean-up, in place of protecting public health is a lot of litigation, a lot of transactional costs. We want, as we propose in our eight point plan, for Superfund to be authorized in a way that puts public health first, that puts involvement in the community in determining the clean-up and to expedite clean-up, and to have a business tax which the business community has agreed to if they can get relief from a fundamental reform of Superfund to provide the kind of adequate funding for expedited clean-up of our communities. The Administration's proposal, in our review, does not provide adequate funding. It will not expedite clean-up, and does not put public health first.

We believe that the issue of retroactive liability should be something that is talked about. We think it should not only be talked about; it should be debated. The NAACP has decided to call for a change in the way we look at the liability question, a fundamental change. Without changing the liability question, there will be no fundamental reform of Superfund in our estimation.

I am extremely pleased to note that some new voices are joining the chorus for fundamental reform. I am speaking here of your colleague Senator Robert Smith and Representative Bill Zeliff who recently introduced the Comprehensive Superfund Improvement Act of 1994. I am not usually in the habit of praising conservative legislators, neither is the NAACP, but I have been often told their bill is derived directly from more than a year of discussions with Superfund stakeholders and experts in New Hampshire, not in Washington. In many ways, they are responding to some of the same practical imperatives which I feel. Their bill grapples directly and honestly with Superfund's debilitating and wasteful approach to financing. Based on their grassroots discussions, they recognize that fundamental reform is required. Here are two Republicans who are not afraid to say that increasing business taxes to fund clean-up is a far more efficient way to protect the public health than the law we have today and it is also good for business.

I do not endorse their bill because their scope of the liability and financing is not broad enough, although it is clearly headed in the

359

right direction. In addition, I hope you and they will see that liability and financing changes are the place to start from in changing the focus of Superfund so it can address public health and community needs.

Comprehensive Superfund reform must also address the other six points of our eight point plan.

Senator LAUTENBERG. Mr. Chavis, your point is a valuable one; I know you have an interest. And hearing the accolades for Senator Smith coming from you must satisfy Senator Smith a great deal. Thank you. We ask you please to stay and join us in the discussion.

Mr. CHAVIS. Thank you.

Senator LAUTENBERG. I would like now to call on Ms. Florence Robinson, who is from the North Baton Rouge Environmental Association, on behalf of the Keystone Commission. Ms. Robinson, welcome.

ALCD-PUBCOM_0000180



March 22, 2023

<u>Via E-mail</u>

The Honorable Michael S. Regan
Administrator
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, NW
Washington, DC 20004

The Honorable Todd Sunhwae Kim
Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

RE:     *United States v. Alden Leeds, Inc., et al.,*
        **Civil Action No. 2:22–cv–07326, D.J. Ref. No. 90–11–3–07683/1.**

Dear Administrator Regan and Assistant Attorney General Kim:

I am a citizen of the State of New Jersey with a residence in Montclair, located in Essex County. I am currently President and Chief Executive of the National Newspaper Publishers Association and am the former Executive Director and CEO of the NAACP, and Alliance for a Superfund Action Partnership (ASAP).

In a 1987 study by the United Church of Christ Commission on Racial Justice, which I supervised and help to lead along with Charles Lee, showed that many toxic waste sites are located disproportionately in minority communities throughout the United States; and I did coined the term "environmental racism".[1] As a New Jersey resident and a co-founder of the Environmental Justice movement, I have a strong personal interest in seeing that the Passaic River is cleaned in a manner that is efficient, effective, and equitable for the people of New Jersey, the communities along this great river, and even for the companies who have misused this river to dump industrial waste.

---

[1] United Church of Christ, *Toxic Wastes and Race In The United States,* 1987, *available at* https://www.ucc.org/wp-content/uploads/2020/12/ToxicWastesRace.pdf (last visited Mar. 21, 2023).

ALCD-PUBCOM_0000181

Hon. Michael S. Regan and Hon. Todd Sunhwae Kim
March 22, 2023
Page 2

Today, there are over 1,200 Superfund sites in the United States.[2] Black Americans are 75 percent more likely than other groups to live near a hazardous waste facility.[3] New Jersey has 115 Superfund sites, over 10 percent of the United States total and more than any other state in the nation.[4] Cognizant of the Passaic River's troubled past, I long for a future with a vibrant, clean river that can be used for many generations to come. I currently have a tremendous respect for your leadership of the EPA and the priority that you have give Environmental Justice across the nation. Honorable Michael Regan, I personally applaud your leadership. I am hoping that you and your colleague over at the U.S. Department of Justice will receive this letter in the interests of environmental justice and equitable fairness to all parties involved, but most importantly for the sake of actually getting the Passaic River finally cleaned up accordingly.

**The current settlement proposed by Region 2 of the Environmental Protection Agency (EPA), however, will be a significant step in the wrong direction for the cleanup of the Passaic River.**

The EPA's proposed settlement requires no actual cleanup work by the settling companies, further delaying the environmental justice that has been decades in waiting. Instead, the EPA appears to be absolving from liability multiple companies with multi-billion-dollar revenues for a tiny fraction of what the EPA estimates it will cost to clean the river. Although EPA estimates the cost of the clean-up to be $1.82 billion, it asks a New Jersey federal court to release these companies from any future liability for only $150 million. It appears that none of these funds will ever be seen by the communities these companies polluted. Instead, all settlement funds will cover EPA's past and future administrative and oversight costs.

**This is simply unjust and inequitable to the New Jersey communities and citizens who have waited far too long to enjoy a clean, healthy river.**

The area where the pollution occurred for more than 150 years is known as "The Ironbound" neighborhood of Newark due to the heavy industry and network of railroads that surround it. The Ironbound neighborhood, and the towns that line the rest of the nine-mile Superfund site is historically multi-ethnic and working-class. It is one of America's most disadvantaged communities and deserves an efficient cleanup process. With the settlement that EPA has proposed, I fear the Ironbound will have to wait even longer for meaningful progress.

---

[2] *See* EPA Superfund: National Priorities List, *available at* https://www.epa.gov/superfund/superfund-national-priorities-list-npl (last visited Mar. 21, 2023).

[3] NCAAP and Clean Air Task Force, *Fumes Across the Fence Line,* Nov. 2017, available at https://cdn.catf.us/wp-content/uploads/2017/11/21092330/catf-rpt-naacp-4.21.pdf (last visited Mar. 21, 2023); *see also* Clark LP, Millet DB, Marshall JD (2014) "National Patterns in Environmental Injustice and Inequality: Outdoor NO2 Air Pollution in the United States." PLoS ONE 9(4): e94431. Available at: https://journals.plos.org/plosone/article?id=10.1371/journal.pone.0094431

[4] *See* EPA National Priorities List Sites – by State, *available at* https://www.epa.gov/superfund/national-priorities-list-npl-sites-state#NJ (last visited Mar. 21, 2023).

Hon. Michael S. Regan and Hon. Todd Sunhwae Kim
March 22, 2023
Page 3

**Nearly thirty years ago, I testified before Congress regarding the Superfund Reform Act of 1994 about reforms necessary to ensure that cleanups were more equitable and expedient.**

For your convenience, I have attached a copy of my written testimony. Unfortunately, many of the urgent reforms I called for in my 1994 Congressional testimony were not implemented. However, I also raised concerns about parts of the proposed Superfund amendment which would have given the EPA authority to allocate liability among multiple parties at Superfund sites. At that time, I predicted "howls of protest" if Congress allowed the EPA "enormous discretion" to allocate liability at the Superfund sites.[5] Indeed, the EPA should be focused exclusively on completing cleanups for the people and communities EPA is obligated to protect – not on deciding who should pay. I also warned Congress that EPA-led allocations would delay much-needed clean up in disadvantaged communities and prolong, rather than lessen, litigation.

Congress wisely refused to amend the Superfund law to allow the type of EPA-led allocation that was proposed.[6] That function was left where it remains today: solely with the courts, unless parties choose to allocate liability in private proceedings using their private funds. EPA sought allocation authority again in 1999. Once again, Congress, said "no".[7] Despite Congress' clear refusal to allow the EPA to allocate responsibility at Superfund sites, that is exactly what the EPA has done with this settlement.

**There is another serious problem with EPA's proposed settlement: EPA threatens to take away an important incentive that Congress gave companies to encourage voluntary cleanup.**

Congress granted companies who agree to undertake all or part of a Superfund cleanup, the right to ask courts for assistance to ensure all responsible parties pay their fair share of cleanup costs.[8] This right to seek contribution in private actions—funded by private companies—incentivizes companies to cooperate with EPA so that cleanup efforts progress more quickly. And this structure puts courts—rather than EPA—in the role of allocating responsibility.

Taking away this important incentive will be devastating to future cleanups. No rational company will voluntarily perform cleanups if the EPA can unilaterally deprive that party of the right to ensure all responsible parties pay to clean up the pollution they caused.[9]

---

[5] *Superfund Reform Act of 1994, Hearing on S. 1834 Before the Subcomm. On Superfund, Recycling, and Solid Waste Management of the S. Comm. On Environment and Public Works*, 103rd Cong. (1994)

[6] *See* Superfund Reform Act of 1994, S. 1834, 103rd Cong. (1994) (https://www.congress.gov/bill/103rd-congress/senate-bill/1834); *Superfund Reform Act of 1994, Hearing on S. 1834 Before the Subcomm. On Superfund, Recycling, and Solid Waste Management of the S. Comm. On Environment and Public Works*, 103rd Cong. (1994).

[7] *See* Recycle America's Land Act of 1999, H.R. 1300, 106th Cong. (1999) (https://www.congress.gov/bill/106th-congress/house-bill/1300/all-info?r=724&s=1)

[8] 42 U.S.C. § 9613(f)(1)

[9] March 21, 2023 letter from U.S. Chamber of Commerce to U.S. Environmental Protection Agency and U.S. Dept. of Justice. (https://www.uschamber.com/assets/documents/230321_Comments_CERCLA_EPA_DOJ.pdf)

Hon. Michael S. Regan and Hon. Todd Sunhwae Kim
March 22, 2023
Page 4

**The remediation of the Passaic River is among the largest and most complex cleanups in the history of the Superfund program. Despite that complexity, the EPA should put the public interests first and ensure that the Passaic River and other Superfund sites are remediated swiftly, effectively, and equitably.**

The current, proposed settlement ensures the opposite. Sites will not be cleaned quickly. Instead, law firm profits will soar, as litigation and endless appeals wind through the courts. All the while, New Jersey citizens and small businesses in disadvantaged communities along the Passaic River will continue to suffer.

I said this in my testimony before Congress in 1994, and it is still true today:

> *"In Washington, the talk is of making 'polluters' pay and of 'fair share' allocation. At toxic ground zero, the talk is of one thing: Clean up our neighborhood, do it fast and do it right. Communities want to see clean-up crews and public health professionals, not lawyers, allocators, and allocation committees."*

I welcome the opportunity for a dialogue with both of you to discuss my concerns and share my thoughts on how to accomplish a more expedient and equitable approach to the Passaic River cleanup in New Jersey. Thank you for your consideration.

Sincerely,

Benjamin F. Chavis

Dr. Benjamin F. Chavis, Jr.

National Newspaper Publishers Association (NNPA)

Thurgood Marshall Center Trust Building

1816 12th Street NW

Washington, DC 20009

dr.bchavis@nnpa.org 202-905-7613

ALCD-PUBCOM_0000184

Hon. Michael S. Regan and Hon. Todd Sunhwae Kim
March 22, 2023
Page 5

ALCD-PUBCOM_0000185

| | |
|---|---|
| **From:** | Rowley, Laura (ENRD) |
| **To:** | DeLuca, Kathryn; Fajardo, Juan; Flanagan, Sarah; Keir, Andrew W. (ENRD); Rosenthal, Arnold (ENRD); Rowley, Laura (ENRD); Silagi, Alex (USANJ); Zizila, Frances |
| **Cc:** | Spohn, Andrew (ENRD) |
| **Subject:** | FW: Please make companies pay their fair share of the Passaic River cleanup in NJ! |
| **Date:** | Thursday, March 23, 2023 9:40:12 AM |

FYI

Laura J. Rowley
U.S. Department of Justice
Environmental Enforcement Section
(202) 532-5896

**From:** Earl, Michelle (ENRD) <Michelle.Earl2@usdoj.gov>
**Sent:** Thursday, March 23, 2023 9:39 AM
**To:** Rowley, Laura (ENRD) <Laura.Rowley@usdoj.gov>
**Subject:** FW: Please make companies pay their fair share of the Passaic River cleanup in NJ!

Good morning,

This was sent to one of our inboxes, for DJ # 90-11-3-07683/17.

Respectfully,

**Michelle Earl**

Case Management Unit

**Docketing Clerk**

Environmental Enforcement Section (EES)

Environmental and Natural Resources Division (ENRD)

United States Department of Justice (USDOJ)

**From:** R R <
**Sent:** Wednesday, March 22, 2023 9:56 PM
**To:** ENRD, PUBCOMMENT-EES (ENRD) <PENRD3@ENRD.USDOJ.GOV>
**Subject:** Please make companies pay their fair share of the Passaic River cleanup in NJ!

Hello,

As a New Jersey resident, I am in complete agreement with North Haledon, NJ mayor Randy George that "polluters, not taxpayers, should pay for Passaic River cleanup." His op-ed is available at the following link:

https://www.njspotlightnews.org/2023/03/nj-corporations-should-pay-for-passaic-river-cleanup/

Why was the usual Superfund process not followed here? Settling with 85 companies to pay $150 million on a ~$2 billion cleanup is absurd. Absolutely unconscionable. Please rescind this settlement offer and pursue the appropriate Superfund process to determine corporate contributions for the cleanup of the Passaic River. Please read the text of Mr. George's article, pasted below.

Thanks,

Ray Riga
New Jersey, USA

----

# Op-Ed: Polluters, not taxpayers, should pay for Passaic River cleanup

RANDY GEORGE | **MARCH 20, 2023**

As mayor of North Haledon, I'm aware of the pollution in the Passaic River, caused by numerous industrial and commercial activities over time. The lower 8.3 miles of the river are highly contaminated, and the Environmental Protection Agency has identified more than 100 companies responsible for this pollution. Now, the agency is proposing a settlement that would allow 85 of these companies to pay just $150 million without requiring them to clean up the pollution they caused. This payment, only some of which will be put toward cleanup work in the lower Passaic, is a small fraction of the nearly $2 billion estimated cleanup cost, leaving New Jersey taxpayers and a handful of private companies on the hook for the entire cleanup.

Additionally, I support the recent action taken by the EPA to order Occidental Chemical Corp (OxyChem) to design the interim cleanup plan for the upper nine miles of the lower Passaic River. However, it's worth noting that OxyChem has already made previous offers to plan and execute the river cleanup as long as it maintains the right to recoup costs from responsible parties, as outlined by the federal Superfund law. If the EPA hadn't issued the proposed consent decree, the cleanup efforts would have already begun, and New Jersey taxpayers would not have to worry about bearing the costs to clean up the river. The proposed settlement is unfair to taxpayers and inconsistent with the Superfund law, which requires polluters to pay for the cleanup. However, it's not too late for the residents of North Haledon and our surrounding communities to speak up and fight for what's

ALCD-PUBCOM_0000187

fair.

The EPA usually follows the Superfund law, identifying responsible parties and collaborating with them to develop and implement a cleanup plan. If they cannot agree on how to split the costs of the cleanup, responsible parties use the courts, where full disclosure of facts is required before the court distributes the costs equitably among the responsible parties. Here, the EPA took a different path for the Passaic River and chose to rely on an opaque process developed by one of its consultants, who previously worked at the agency. Under this process, companies were allowed to select the data they wanted to provide, without giving other affected parties the opportunity to review or respond to it. This was a seriously flawed process that allowed at least some polluters to game the system. Information disclosed in a recent lawsuit revealed that some companies now being released by EPA did not disclose their use of certain toxic chemicals like dioxins, PCBs, DDT, mercury or lead at their Passaic River facilities or failed to acknowledge that their process wastes made it into the Passaic River. The EPA now seeks to protect those same polluters by releasing them from all responsibility to clean up the pollution they caused.

## 'Less than fair share'

If the 85 companies are permitted to settle with the EPA and pay less than their fair share of the cleanup cost, over three dozen New Jersey townships, the Passaic Valley Sewerage Commission and other companies, none of which are included in the EPA's settlement, would be responsible for the nearly $2 billion in cleanup costs. The companies attempting to "cash out" argue that the New Jersey public entities are responsible because they owned sewer facilities that private companies used to transport the industrial waste produced by companies being released in the settlement. If the settlement is approved, the Passaic Valley Sewerage Commission and local townships would be barred legally from seeking to recoup the enormous costs to clean up the pollutants from the 85 companies who have settled, leaving them no choice but to raise the required funds by raising rates and taxes.

Thankfully, the settlement is subject to a public comment period; that ends on March 22. Concerned New Jersey residents must submit comments to the government before this deadline to ensure their voices are heard. Comments must be emailed to: pubcomment-ees.enrd@usdoj.gov or mailed

to: Todd Kim, Assistant Attorney General, U.S. DOJ—ENRD, P.O. Box 7611, Washington, DC 20044–7611. The government's lawyers will evaluate comments received, and if they still approve the settlement, an independent federal judge will decide its final approval.

The taxpayers of New Jersey deserve a deal that puts communities ahead of corporations. Polluters, not people, should pay for cleaning up the Passaic. The EPA must listen to the public and ensure that the settlement upholds the federal Superfund law. The proposed settlement falls short of these standards and would only prolong the cleanup process. We're already seeing progress on the design of EPA's selected remedies to clean the river, but if the settlement is approved, it will provoke lawsuits that will delay the cleanup for years and will impose significant costs on New Jersey taxpayers — costs that should be paid by polluters, not people.



March 22, 2023

pubcomment-ees.endr@usdoj.gov

Todd Kim
Assistant Attorney General
U.S.DOJ – ENRD
P.O. Box 7611
Washington, D.C. 20044-7611

Re: Proposed Partial Settlement of Passaic River Cleanup, Diamond Alkalai Superfund
Site; OU2 and OU4

To whom it may concern:

I write on behalf of the Meadowlands Regional Chamber of Commerce. The Chamber
represents the Greater Meadowlands Region with close to 1200 member companies and we have
a long history of advocating for issues that affect the quality-of-life in our communities.

We write to express our support for the pending settlement between the USEPA, and
approximately 85 private and public companies. It results in a settlement that has generated a
significant financial commitment from responsible parties otherwise deemed to have been minor
contributors to the pollution in the river. This settlement represents a major step forward in
cleanup of the river and should further support revitalization of the region and its business and
economic interests.

We support the USEPA to approve entry of the Settlement, and to take such actions as
may be necessary to obtain court approval. Further delay would not serve the interests of the
region.

Sincerely,

James Kirkos
CEO

Meadowlands Chamber | 1099 Wall Street West, Suite 100 | Lyndhurst, NJ 07071
Phone: (201) 939-0707 | Email: office@meadowlands.org | www.meadowlands.org



23 March 2023

Assistant Attorney General
U.S. Department of Justice
Environment and Natural Resources Division
P.O. Box 7611
Washington, DC 20044–7611
***[Submitted via email to pubcomment-ees.enrd@usdoj.gov]***

Re: U.S. V. ALDEN LEEDS, INC., ET AL. (Consent Decree Outlining Settlement Among Potentially
    Responsible Parties and USEPA in regard to the Passaic River Superfund Cleanup)

NY/NJ Baykeeper is submitting the following comments in support of the action-oriented
leadership of the US Department of Justice (Justice) and the US Department of Environmental
Protection (EPA) in holding the identified potentially responsible parties accountable and
forwarding the cleanup process for the Passaic River Superfund in Northern New Jersey.

Justice and EPA are pursuing the parties they deem most responsible for the historical industrial
pollution to the Passaic River that caused seventeen miles of the river to be added to the
National Priorities List (Superfund) in 1984. The potentially responsible parties, approximately
100 identified companies, have been determined based on decades of studies and background
investigations done in and adjacent to the Passaic River as part of the Superfund Remedial
Investigation and creation of Record of Decision for the Lower and Interim Record of Decision
for the Upper Passaic River. While some PRPs seek to delay paying their allocated share, the
communities along the river continue to suffer the ill-effects of all the PRPs historical actions.

The current Consent Decree, settling for a sum of $150 million among eighty-five of the PRPs
deemed responsible for a smaller fraction of the contamination, relative to the primary PRP, will
help move the work along for both sides. The PRPs can pay their share of the contribution
determined between them and EPA and move on, while EPA can apply these funds toward
moving the cleanup plan forward on behalf of the communities who have long suffered the
ill-effects of living with a Superfund site in their community. After nearly 40 years, the cleanup is

1222 Route 36, Suite #4, Hazlet, NJ 07730
Phone: 732.888.9870  Fax: 732.888.9873  www.nynjbaykeeper.org



long overdue and owed to the people who have spent four decades without safe, meaningful access to one of the most remarkable Rivers in NJ.

At the heart of Superfund is the concept that the polluter pays, not the victims of pollution. EPA has put decades of research and investigation into determining who the polluters of the Passaic River are and to what extent each company is implicated. NY/NJ Baykeeper has been engaged with the clean-up of the Passaic River (and other Superfund and contaminated site clean-ups) for 30 years and serves as Co-Chair of the Passaic River Community Advisory Group with Ana Baptista, Ph.D. We have worked with EPA during numerous administrations and on multiple sites, and in our opinion none have worked harder than the current to address the rightful concerns of the public and communities along the Passaic River.

We have every reason to trust and support EPAs settlement agreements with each of these eighty-five PRPs. It is important to understand that each party is pursued to pay its fair share for the pollution in the Passaic River, and the party with the greatest contribution will have the greatest financial responsibility. These eighty-five PRPs have chosen to settle (rather than delay) and are not responsible for the widespread and most damaging contamination along the River.

The lion's share of the more than $1 billion price tag for the full remediation of the Passaic lies with a few large corporations, and in turn, the parties who recently settled have a smaller share relative to their contribution. They are still paying their share, and that falls in line with the goals of Superfund law and the intent of the EPA, on behalf of the communities along the Passaic, to ensure that all PRPs pay for this historic remediation effort and not those harmed by the pollution each PRP has been identified as contributing.

Ultimately, our singular goal is for a safe, remediated Passaic River to be returned to the communities along it, and one that is achieved without financially burdening the communities along its banks or subjecting the public to further harm to human health and the environment. Families in the communities along the Passaic have lived with a heavily contaminated and often inaccessible waterway for generations. They have been barred from meaningful access and denied the immense ecological, economic and recreational benefits that come with a remediated, healthy Passaic River. There is no excuse to prolong this injustice any longer, the people of our communities are owed better and EPA's effort here is a step in the right direction.

It is EPAs goal to manage the cleanup effort and recoup financial expenditures from PRPs through settlements or other legal means. We support EPA in their efforts and believe that they will do what is in the best interest of the process and allow them to do their work expeditiously.


Sincerely,

Gregory Remaud
Baykeeper & CEO, NY/NJ Baykeeper

Maria Lopez-Nuñez
Deputy Director, Ironbound Community Corporation

Ana Baptista
Co-Chair, Passaic River Community Advisory Group

Michele Langa
Co-Chair, Passaic River Community Advisory Group

Captain Bill Sheehan
Riverkeeper & Executive Director, Hackensack Riverkeeper

Kim Gaddy
Founder and Director, South Ward Environmental Alliance

Nicole Miller
Co-Chair NewarkDIG



3216614

---

ENV_ENFORCEMENT-n3216614-v1

---

RESOLUTION OBJECTING TO PROPOSED CONSENT DECREE PROPOSED BY THE
DEPARTMENT OF JUSTICE AND THE UNITED STATES ENVIRONMENT PROTECTION AGENCY
WITH 85 POTENTIAL RESPONSIBLE PARTIES AND RESOLVING THEIR LIABILITY...

| | |
|---|---|
| **Author:** | Rowley, Laura |
| **Document Type:** | CORRES |
| **LSA(s):** | JGOLDBETTER |
| **Co-Counsel:** | |
| **Counsel LSA(s):** | |
| **Distribution List:** | ENRD, EESCaseManagement (ENRD);Rose, Robert (ENRD);Reed, Jason (ENRD);Rowley, Laura (ENRD);Goldbetter, Jennifer (ENRD) |
| **Fileroom:** | 4Con - 5th Floor |
| **DJ#:** | 90-11-3-07683/17 |
| **Case Name:** | U.S. V. ALDEN LEEDS INC., ET AL. (DIAMOND ALKALI SITE - LOWER PASSAIC RIVER STUDY AREA) (OU 2 AND 4) |
| **Court:** | NJ D. N.J.; 3rd Cir. |
| **Notes:** | |
| **Double-Sided:** | N |
| **Received Date:** | 4/7/2023 |
| **Urgent:** | N |
| **Oversize:** | N |
| **Bound Document:** | N |

ALCD-CORRS-0000098



Borough of East Rutherford

1 Everett Place East Rutherford, New Jersey 07073
201-933-3444 Fax: 201-933-6111 www.eastrutherfordnj.net

Rowley, Laura

March 23, 2023

U.S. DEPARTMENT OF JUSTICE
ENVIRONMENT AND NATURAL
RESOURCES DIVISION

APR 0 7 2023

U.S. Department of Justice                    EXECUTIVE OFFICE
Todd Kim, Assistant Attorney General
Environment and Natural Resources Division
Law and Policy Section
950 Pennsylvania Avenue, N.W.
Washington, DC 20530-0001

RE: United States v. Alden Leeds, Inc., et al., Civil Action No. 2:22-cv-07326
    D.J. Ref. No. 90-11-3-07683/1

Dear Mr. Kim:

Find attached Resolution #57-2023 adopted by the East Rutherford Governing Body on March 21,
2023.

Please feel free to contact us with any questions.

Sincerely,

Danielle Lorenc, RMC

w/enclosures

Corr
90-11-3-07683/17

ALCD-CORRS-0000099

**BOROUGH OF EAST RUTHERFORD**
**RESOLUTION #57 – 2023**

**RESOLUTION OBJECTING TO PROPOSED CONSENT DECREE PROPOSED BY
THE  DEPARTMENT OF JUSTICE AND THE UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY WITH 85 POTENTIAL RESPONSIBLE PARTIES AND
RESOLVING THEIR LIABILITY FOR DISCHARGING HAZARDOUS SUBSTANCES
INTO THE LOWER PASSAIC RIVER**

**WHEREAS,** a certain federal lawsuit was filed entitled Occidental Chemical Corporation
v. 21st Century Fox America, Inc. et al., Civil Action No. 2:18-CV-11273, wherein Occidental
Chemical Corporation ("OCC") is seeking contribution and cost recovery under Comprehensive
Environmental Response, Compensation, and Liability Act ("CERCLA") for costs incurred, and
costs to be incurred, in connection with the remediation of contaminated sediment in the Lower
Passaic River ("LPR"); and

**WHEREAS,** the Borough of East Rutherford (the "Borough") was named as one of the
third party defendants along with the Passaic Valley Sewerage Commission ("PVSC"), of which
the Borough is a member municipality; and

**WHEREAS,** the claims asserted against the Borough allege that the Borough's discharge
contained one or more contaminants of concern which contributed to the contamination of the
sediments of the LPR; and

**WHEREAS,** the United States of America ("United States"), on behalf of the
Administrator of the United States Environmental Protection Agency ("EPA"), filed a Complaint
in the action entitled United States of America vs. ALDEN LEEDS, INC., et al., Civil Action
No. 2:22-cv-07326, under Section 107 of the Comprehensive Environmental Response,
Compensation, and Liability Act of 1980, 42 U.S.C. §§ 9607, as amended ("CERCLA"), seeking
reimbursement of response costs, and declaratory judgment for future response costs, in
connection with the release or threatened release of hazardous substances at the 17-mile Lower
Passaic River Study Area (the "LPRSA") of the Diamond Alkali Superfund Site in New Jersey
("the Site").

**WHEREAS,** the Department of Justice and the EPA have announced a proposed consent
decree (the "Consent Decree") with 85 potential responsible parties (the "Releasees") requiring
them to pay a total of $150 million to support the cleanup work and resolve their liability for
discharging hazardous substances into the LPR; and

**WHEREAS,** the Consent Decree would release the Releasees from future cleanup costs
even if evidence demonstrates that their share of liability should be greater; and,

**WHEREAS,** the Consent Decree would place an inequitable burden on the other parties
including the Borough of East Rutherford; and,

ALCD-CORRS-0000100

**WHEREAS,** the U.S. Environmental Protection Agency (EPA) and the U.S. Department of Justice (DOJ) have extended the public comment period on a proposed consent decree to March 22, 2023**; AND**

**WHEREAS**, the governing body of the Borough of East Rutherford wishes to comment and strongly believes that Consent Decree if accepted will result in increased costs to the remaining parties including the Borough of East Rutherford and, ultimately, our taxpayers;

**NOW, THEREFORE, BE IT RESOLVED**, that the governing body of Borough of East Rutherford strongly objects to the entry of the proposed Consent Decree and urges the U.S. Environmental Protection Agency (EPA) and the U.S. Department of Justice (DOJ) to reconsider its position and not enter into the proposed Consent Decree; and

**BE IT FURTHER RESOLVED** that a copy of this resolution be sent to Assistant Attorney General, Environment and Natural Resources Division, and should refer to United States v. Alden Leeds, Inc., et al., Civil Action No. 2:22–cv–07326, D.J. Ref. No. 90–11–3–07683/1..

|  | Yes/Aye | No/Nay | Abstain | Absent | I hereby certify that this is a true and exact copy of the Resolution adopted by the Mayor and Council of the Borough of East Rutherford at the meeting held on the 21ˢᵗ day of March, 2023 |
|---|---|---|---|---|---|
| Ravettine | ☒ | ☐ | ☐ | ☐ |  |
| DeRosa | ☒ | ☐ | ☐ | ☐ |  |
| Lorusso | ☒ | ☐ | ☐ | ☐ |  |
| Alvarez | ☒ | ☐ | ☐ | ☐ |  |
| Cronk | ☒ | ☐ | ☐ | ☐ |  |
| Bulger | ☒ | ☐ | ☐ | ☐ |  |
| Mayor Lahullier - tie only | ☐ | ☐ | ☐ | ☐ | **Danielle Lorenc, RMC** |

ALCD-CORRS-0000101

BOROUGH OF EAST RUTHERFORD
Office of the Borough Clerk
*MUNICIPAL BUILDING*
*ONE EVERETT PLACE*
*EAST RUTHERFORD, NJ 07073*

X-RAYED

MAR 3 0 2023

DOJ MAILROOM

U.S. DEPARTMENT OF JUSTICE
ENVIRONMENT AND NATURAL
RESOURCES DIVISION

APR 07 2023

EXECUTIVE OFFICE

REFERRED
MAIL REFERRAL UNIT

MAR 3 0 2023

20530\$0001 C000