# Exhibit 14.16

United States' Motion to Enter Consent Decree,
*United States v. Alden Leeds, Inc. et al.*, Civil Action No. 22-7326 (D.N.J.)

# EXHIBIT A-58

**Appendix A to** OxyChem's Comments in Opposition to Proposed Consent Decree, *United States v. Alden Leeds, Inc., et al.*, Civil Action No. 2:22-cv-07326 (D.N.J.)

ALCD-PUBCOM_0006853

City of Newark, New Jersey
## Feasibility Study

# POLLUTION ABATEMENT PROGRAM



**Clinton Bogert Associates**
Consulting Engineers
September, 1978
Revised January, 1979

TSI-DBR-00040196
ALCD-PUBCOM_0006854

**CLINTON BOGERT ASSOCIATES**



2125 CENTER AVENUE • FORT LEE, NEW JERSEY 07024
(201) 944-1676  •  CABLE: BOGERTENG FORTLEENJ

CONSULTING
ENGINEERS

PARTNERS
IVAN L. BOGERT
HERBERT L. KALFMAN

PRINCIPAL ASSOCIATES
WAYNE CAKINS
JOHN H. SCARINO

ASSOCIATES
JOHANNES DEWAAL
FRANCIS J. DOBROWOLSKI
IGNAZ POTTENBUCHER
DANIEL S. GREENE
HERBERT LANDESMAN
UMBERTO A. MILLETARI
WILLIAM WHEELER

January 24, 1979

Honorable Kenneth A. Gibson, Mayor
City of Newark
City Hall
920 Broad Street
Newark, New Jersey  07102

Re:  Pollution Abatement

Dear Mayor Gibson:

In accordance with our contract dated February 15, 1978, sub-
mitted herewith is our report on the sources of pollution discharging
to the lower Passaic River during dry weather from the Roanoke Avenue
combined sewer system and the Blanchard, Lockwood, and Brown Street
storm sewer systems.  Each system is discussed in a separate section
which contains:

(1)  A description of the existing sewers.
(2)  Findings of the physical inspection.
(3)  Conclusions and recommendations applicable to that system.

Appropriate additional items are included as follows:

(1)  For the Roanoke Avenue combined sewer system (Section III),
     a hydraulic analysis is presented.  Significant conclusions
     are:

     (a)  all dry weather overflows may not be eliminated by re-
          habilitation of the existing system alone; but either
          flow routing, using storage available in the existing
          sewers, or increased interceptor capacity is required;
          and,

     (b)  a faulty regulator results in all sewage flows dis-
          charging untreated to the Passaic River.

(2)  For the Blanchard Street storm sewer (Section IV), the re-
     sults of dry weather flow sampling and gauging, smoke test-
     ing and T.V. inspection are presented.  Significant conclu-
     sions are the need to:

     (a)  replace about 1,300 feet of existing 24" storm sewer
          which appears in danger of collapse,

     (b)  improve housekeeping around industrial railroad sid-
          ings, and,

TSI-DBR-00040197
ALCD-PUBCOM_0006855

Honorable Kenneth A. Gibson, Mayor
City of Newark
City Hall
920 Broad Street
Newark, New Jersey  07102



CONSULTING
ENGINEERS

January 24, 1979
Page 3


     We would be pleased to meet with you to review any matters con-
tained herein.  We wish to express our appreciation of the assistance
given us by members of your staff, particularly Mr. Robert Benz, in
carrying forward this work.

                              Very truly yours,

                              CLINTON BOGERT ASSOCIATES


                              Herbert L. Kaufman
                              P.E., N.J. Lic. No. 13647


HLK:mmb
Enclosure

TSI-DBR-00040198
ALCD-PUBCOM_0006856

Table of Contents

Page No.

Letter of Transmittal

I.   Introduction........................................ 1

II.  Scope of Work...................................... 3

III. Roanoke, Doremus, and Wilson Avenue Sewers....... 4
     A.  Existing Sewers............................... 4
     B.  Physical Inspection Findings.................. 5
         1.  Avenue "P" Regulator and Roanoke
             Outfall Sewer............................ 5
         2.  Roanoke Avenue Sanitary Sewer............ 6
         3.  Doremus Avenue Interceptor............... 6
         4.  Wilson Avenue Interceptor................ 7
         5.  Roanoke Avenue Regulator................. 7
     C.  Hydraulic Analysis............................ 8
         1.  Flow Measurement Methods................. 8
         2.  Observed Flow Rates...................... 8
         3.  Diversion of Roanoke Flow to PVSC
             Interceptor..............................10
         4.  Diversion Works..........................14
     D.  Conclusions and Recommendations..............17

IV.  Blanchard Street...................................20
     A.  Physical Inspection Findings.................20
     B.  Dry Weather Sampling and Flow Rates.........23
     C.  Smoke Testing................................24
     D.  Television Inspection........................25
     E.  Conclusions and Recommendations.............26

V.   Lockwood Street Outfall............................28
     A.  Physical Inspection Findings.................28
         1.  Lister Avenue Sewer......................28
         2.  Morris Canal Sewers......................29
         3.  Euclid Avenue Sewer......................29
         4.  Albert Avenue Sewer......................30
         5.  Lockwood Street Sewer....................30
         6.  Lister Avenue Tide Gate..................30
         7.  Lockwood Street Outfall..................31
     B.  Dry Weather Flow Sampling and Flow
         Monitoring...................................32
     C.  Smoke Testing................................34
     D.  Television Inspection........................35
     E.  Conclusions and Recommendations.............38
                    (continued)

i

TSI-DBR-00040199
ALCD-PUBCOM_0006857

Table of Contents
(continued)

Page No.

VI.   Brown Street...................................41
      A.    Configuration...........................41
      B.    Physical Inspection Findings............42
      C.    Dry Weather Effluent Sampling...........44
      D.    Conclusions and Recommendations.........45

VII.   General Recommendations......................46
VIII.  Appendices                        Following Text
       A.    Analytical Test Results
       B.    Letter From Robinson Pipe Cleaning
             Company

ii

ILLUSTRATIONS
(Following Appendices)

A.   Plate 1 – Sanitary and Combined Sewer Configurations on Roanoke, Doremus and Wilson Avenues

B.   Plate 2 – Sources of Pollution in Storm Sewer Systems on Blanchard, Lockwood and Brown Streets

C.   Plate 3 – Diurnal Sewage Flow Patterns, Roanoke Avenue Outfall Sewer

D.   Plate 4 – Diurnal Sewage Flow Patterns, Roanoke Avenue Outfall Sewer

E.   Plate 5 – Diurnal Sewage Flow Patterns, Doremus Avenue Interceptor

F.   Plate 6 – Diurnal Sewage Flow Patterns, Doremus Avenue Interceptor

G.   Plate 7 – Diurnal Sewage Flow Patterns, Wilson Avenue Interceptor

H.   Plate 8 – Diurnal Sewage Flow Patterns, Wilson Avenue Interceptor

I.   Plate 9 – Flow Rates at the Lister Avenue Tide Gate Chamber

iii

TSI-DBR-00040201
ALCD-PUBCOM_0006859

I.   Introduction

Polluted liquid wastes are being discharged into the lower Passaic River from four sewers owned by the City of Newark. These wastes include continuous discharges from the wet weather outfall of the Roanoke Avenue combined sewer, and the Blanchard Street and the Lockwood Street storm sewers, and intermittent discharges from the Brown Street sewer. During dry weather, no flow should be discharged from the Roanoke Avenue outfall and only non-polluted water from the Blanchard Street, Lockwood Street, and Brown Street storm sewers, however, high levels of pollutants have been detected in the dry weather discharges at all four locations. The following ranges of pollutant concentrations and pH have been reported by the Passaic Valley Sewerage Commissioners (PVSC) during the last two-years.

### Pollutant Concentration
#### (ppm)

| Location | TSS | COD | BOD | pH |
|---|---|---|---|---|
| Roanoke Avenue | 5-1428 | 116-15600 | 102-6300 | 2.0-7.3 |
| Blanchard Street | 5-1070 | 51-2815 | 7-420 | 1.9-8.2 |
| Lockwood Street | 16-3148 | 119-3408 | 8-840 | 3.3-9.2 |
| Brown Street | 7-93 | 42-352 | 16-135 | 6.2-9.8 |

A non-functioning regulator causes the dry weather discharge at Roanoke Avenue. Illegal connections, surface chemical spillage and contaminated groundwater are the sources of pollutants detected in the three storm sewers.

Water from the Passaic River may enter all four sewers with the incoming tide and dilute the pollutant concentration. The pollutants may also be carried upstream of their entering points. Polluted flow from the sewer increases in rate with the falling tide. The highest

1

TSI-DBR-00040202
ALCD-PUBCOM_0006860

pollutant concentration and flow rates can be expected at low tide. During this study, samples were obtained within the three storm se-wers systems at or near the times of low tide.  The analytical test results of these samples are included in Appendix A.

TSI-DBR-00040203
ALCD-PUBCOM_0006861

II.  SCOPE OF WORK

The PVSC industrial waste surveys for each industry in the tri-
butary area have been reviewed and the probable pollutants in each
industrial waste compared with those found in the sewer discharges.
All manholes, regulators, tide gates, and inlets have been inspected.
The condition and serviceability of sewerage facilities was noted.
Connections to manholes and inlets and other sources of flow were
located.  Spillage and housekeeping procedures at the various indust-
rial facilities were observed.  Dry weather flow sampling points were
selected, and dry weather flow sampled to isolate sources of pollu-
tion entering the storm sewer systems.  Where possible, storm and
sanitary sewers were smoke tested to locate cross connections, and
the sections of storm sewer suspected of having industrial waste
connections were inspected with closed circuit television.  In some
reaches, television inspection was not possible because of physical
blockages or waste pools resulting from irregular sewer grades.  The
condition of the various pipes was determined and the location of
improper or suspicious connections noted.  The results of these in-
vestigations were analyzed and are presented in this report.  Recom-
mendations for eliminating all the sources of pollution identified by
the described techniques are included.

3

TSI-DBR-00040204
ALCD-PUBCOM_0006862

III. Roanoke, Doremus and Wilson Avenue Sewers

A.  Existing Sewers

The present sewer layout is shown on Plate 1.  The manholes on
Wilson Avenue are numbered consecutively from W-1 in the Avenue "P"
intersection to W-9 on the westerly side of Doremus Avenue.  The
manholes on Doremus Avenue are numbered consecutively from D-1 on the
northerly side of Wilson Avenue to D-28 on the southerly side of the
Roanoke Avenue regulator.  Changes made in 1951 to accommodate con-
struction of the New Jersey Turnpike included construction of the
Avenue "P" regulator on the 54-inch Roanoke Avenue combined sewer at
a point approximately 1425 feet upstream of Doremus Avenue.  The re-
gulator was planned to divert all dry weather flow to the Doremus
Avenue interceptor through a new 24-inch sanitary sewer paralleling
the 54-inch Roanoke Avenue combined sewer.  The combined sewer down-
stream of the Avenue "P" regulator was converted to a wet weather
outfall.  The 18-inch sanitary sewer in the northern portion of
Doremus Avenue was connected to the new 24-inch sanitary sewer by an
inverted siphon passing under the 54-inch Roanoke combined sewer and
its flow bypasses the old Roanoke Avenue regulator which was sealed
off and abandoned.  Sewage in the Doremus Avenue sewer flows to the
Wilson Avenue interceptor and discharges to the PVSC interceptor.
All excess wet weather flow in the Roanoke Avenue combined sewer was
intended to overflow the Avenue "P" regulator weir and discharge to
the Passaic River.

4

TSI-DBR-00040205
ALCD-PUBCOM_0006863

B.   Physical Inspection Findings

(1)   Avenue "P" Regulator and Roanoke Outfall Sewer

The Avenue "P" regulator is not functioning. Over two feet of dry, granular sediment blocks the regulator gate chamber and prevents flow between the diversion chamber and the Roanoke Avenue dry weather sewer. As a result, all flow in the Roanoke Avenue combined sewer enters the Passaic River through the Roanoke Avenue outfall. There is no visible evidence of chemical attack or deterioration of the concrete regulator structure. The regulator mechanism is corroded and not functional. A wooden overflow weir, provided in the diversion chamber, is intact. This weir does not cause the upstream pipe to surcharge above the crown in dry weather. It does reduce upstream flow velocity and causes sedimentation. About 0.5 feet of primarily granular sediment was found in the combined sewer above the regulator. This material accumulates in dry weather and the lighter fractions, probably including most organic pollutants, may be flushed toward the Passaic River during relatively small rainfall events. Tests of wet weather flows in other areas indicate the flushing of such solids is accompanied by a large increase in BOD. High tides cause backup, reduce velocities, and cause sediment accumulation in the Roanoke Avenue outfall during dry weather. Some of this material may be carried away by the flow at low tide and some is scoured out by wet weather flows. About 0.2 feet of primarily granular sediment was found in the outfall sewer downstream of the Avenue "P" regulator. The size of this sewer changes to 60-inch at a manhole on the easterly side of Doremus Avenue. Remnants of the brick dam, used to divert flow into the Roanoke Avenue regulator, were observed in this manhole. There are two tide gate chambers in the 60-inch outfall. Both tide gates can swing open but neither can close completely because of sediment. No deterioration of the concrete was visible in

5

TSI-DBR-00040206
ALCD-PUBCOM_0006864

the tide gate chambers.  A lump of bituminous material is partially blocking the discharge of the 60-inch outfall.

(2)  Roanoke Avenue Sanitary Sewer

The 24-inch Roanoke Avenue sanitary sewer does not receive any flow at its upstream end because of the previously described blockage in the Avenue "P" regulator gate chamber.  The manhole in the 24-inch sanitary sewer immediately downstream of the regulator contains over two feet of dry sediment.  The sewer receives flow from the Pitt Consol Chemical Company downstream of that manhole.  About 0.5 feet of a black, tar-like sediment was found in the sewer downstream of the Pitt Consol connections.  The same black material was observed on the ground surface at the Pitt Consol plant.  This material was not evident upstream of the Avenue "P" regulator or in the Roanoke Avenue outfall.  Its source is evidently Pitt Consol.  Sampling and analysis done jointly by the PVSC laboratory and Pitt Consol also detected chemicals used at the plant in the Roanoke Avenue outfall.  However, no connections from Pitt Consol were found in the outfall.  Spillage appears to have contaminated the groundwater and some appears to be leaking into the outfall.  Groundwater pollution may also be leaking directly into Newark Bay.  Groundwater pollution was not investigated since it was outside the scope of this study.

(3)  Doremus Avenue Interceptor

The Doremus Avenue interceptor receives flow from the Roanoke Avenue sanitary sewer.  Severe sedimentation was noted in this line. The first four lengths of 24-inch pipe upstream from Wilson Avenue (D-1 to D-5) were constructed on a reverse grade and the fifth length (D-5 to D-6) laid flat.  The invert at Wilson Avenue is 1.2 feet higher than the low point where the minimum flow depth is greater than half pipe.  Further upstream the sewer size changes from 24-inch to 22-inch and then to 20-inch in diameter.  Sediment depth in the

6

TSI-DBR-00040207
ALCD-PUBCOM_0006865

22-inch and 20-inch pipe sections varies with gradient. There is no sediment in the manhole inverts of the steeper sections of 22-inch pipe. As the gradient decreases upstream, sediment depth in the 22-inch line increases to about 0.5 feet. Sediment accumulations in the 20-inch sewer vary from 0.5 feet to 1.4 feet near the Roanoke Avenue regulator. The sediment found in the interceptor is the same black tar-like substance observed in the Roanoke Avenue sanitary sewer. The cover is missing from the fifth manhole (D-5) upstream from Wilson Avenue.

(4)  Wilson Avenue Interceptor

Several of the Wilson Avenue interceptor manholes have been covered by construction activities at the PVSC treatment plant. Those manholes that were inspected had clean inverts and were flowing freely. No backup into the Doremus Avenue interceptor was observed. Most of the flow in the Wilson Avenue interceptor is pumped from the Port Newark Area.

(5)  Roanoke Avenue Regulator

The Roanoke Avenue regulator was abandoned in 1951. Several feet of dry sediment has accumulated in the regulator chamber. The regulator mechanism is corroded and not functional. The regulator structure appears to be sound. There is no evidence of chemical attack or concrete deterioration. The inlet and outlet pipes are sealed.

7

TSI-DBR-00040208
ALCD-PUBCOM_0006866

C.   Hydraulic Analysis

(1)   Flow Measurement Methods

Electronic flow meters were used to obtain diurnal flow patterns
in the Roanoke Avenue combined sewer, the Doremus Avenue interceptor
and the Wilson Avenue interceptor.  These meters were installed at
the locations shown on Plate 1.  The inverts of the manholes used for
monitoring were free of sediment.  There was tidal interference at
the Roanoke outfall sewer monitoring point during each high tide.  No
backwater or other flow interference was apparent at the monitoring
points on Doremus and Wilson Avenue.  The continuous depth readings
on the meter charts were converted to flow rates by use of the
Manning equation.  Dye dilution techniques were not used to measure
flow because of the fluorescence present in the waste and the possi-
ble deterioration of the dye in the extremely acidic flow.  The sewer
gradients at the monitoring points were field verified.  A friction
factor (n) of 0.015 was used in this analysis.  The actual friction
factors in these sewers may be higher because of joint misalignments
and sediment depositions.  Flow rate is inversely proportional to
friction factor.  If the actual friction factor is higher than 0.015,
the actual flow rates in the sewers metered will be lower than those
computed and the hydraulic capacities of the existing sewers will be
lower by the same proportion.

(2)  Observed Flow Rates

The flow rates determined in the Roanoke outfall sewer during
the period April 24, 1978 to May 30, 1978 are shown on Plates 3 & 4.
These rates have been corrected to eliminate tidal effects.  Minimum
flow rates were found about noon with higher rates in the morning and
afternoon.  The flow meter data was supplemented by instantaneous
measurements obtained before, during, and after the meters were

8

TSI-DBR-00040209
ALCD-PUBCOM_0006867

installed. Maximum peak dry weather flow rates of 2.2 mgd and mini-
mum flow rates of 0.2 mgd were recorded. The apparent constant flow
rate over the weekend (April 29 and April 30) cannot be explained.
The flow meter was checked on Thursday April 27 and found to be
operational. On Monday, May 1, the battery and chart were changed
and the calibration was checked. No errors in calibration or timing
were noted and that meter remained in service during the next week.
Similar uniform and high discharges occurred at other unusual times
for shorter periods. Most of the flow in this sewer is discharged by
two companies, Arkansas Chemical and Sun Chemical. Unusual flow
patterns may result from variations in processes and work shifts at
these plants.

Plates 5 and 6 show diurnal flow patterns recorded in the
Doremus Avenue interceptor during the period May 1 to May 5. The
flow meter malfunctioned on May 6 and no readings were obtained over
the weekend. Weekend data for April 22 and April 23 was included to
show the effect of antecedent rainfall and springtides on the flow
rate in the sewer. The flow on April 22 was about double that of the
preceding dry days. The consistency with which higher flow rates
coincide with higher tide periods indicates probable inflow caused by
tide related fluctuations. About two inches of rain fell on April
19, saturating the ground and raising the river level. At 8:15 PM on
April 22, the tide crested one foot above normal and flow in the
sewer increased from below 0.8 mgd to 1.1 mgd. Weekday flow rates
generally fluctuate between 0.3 and 0.4 mgd with peaks of 0.5 mgd
occurring at the times of high tide. The lowest flow rate measured
was approximately 0.2 mgd.

Flow in the Wilson Avenue interceptor is pumped from the com-
bined sewer system in the Port Newark area and discharges by gravity
from the Doremus Avenue interceptor. The diurnal flow patterns re-
corded between May 23 and May 29 are shown on Plates 7 and 8.
Rainfall during May was quite heavy, totaling almost 8 inches at

9

TSI-DBR-00040210
ALCD-PUBCOM_0006868

Newark Airport, or more than 4 inches above normal. However, the rainfall pattern was interesting when correlated with the measured flows. About 1.2 inches of rain fell starting May 4 and extending through May 9; 1.75 inches on May 14 followed by 1.36 inches from May 15 through May 18. On May 24, 2.58 inches of rain fell of which 2.27 inches fell prior to 4 p.m., and on May 25, 0.15 inches fell, mostly in the pre-noon hours. Hence, the measured flow rates on May 23 were preceded by four essentially dry days, while the sharp drop in rates on May 26 occurred less than 12 hours after a major storm. The measured flows of May 23 appear to more nearly represent normal flows while those of May 26 through May 29 reflect the low flows which should be anticipated during a major holiday (Memorial Day) weekend. These flows may largely reflect inflow/infiltration. Tidal variation also appears to influence inflow to this sewer. The effect of rainfall is evident in the measured data on May 24, when the Wilson Avenue interceptor was surcharged. The flow-full capacity of the interceptor at the monitoring point has been estimated as equal to 6.2 mgd. Hence, the flow was greater than that amount. The PVSC interceptor was not continuously monitored but no dry weather backups into Wilson Avenue were observed during spot inspections.

(3)  Diversion of Roanoke Flow to PVSC Interceptor

The feasibility of diverting dry weather flow from the Roanoke Avenue combined sewer, as intended, through the Doremus and Wilson Avenue interceptors and into PVSC interceptor was analyzed. It was assumed that the appropriate regulator would be restored to service and that the downstream sewers could be cleaned. The limited metering indicated the peak dry weather flow rates in each sewer could be concurrent. The peak flows in the 20-inch sewer on Doremus Avenue were obtained by instantaneous measurements. The dry weather peak flows (excluding the May 26 flows) recorded are shown here-following:

10

TSI-DBR-00040211
ALCD-PUBCOM_0006869

| Location | Sewer Diameter in Inches | Peak Dry Weather Flow Rate in mgd |
|---|---|---|
| Wilson Avenue Interceptor | 24 | 6.2(1) |
| Doremus Avenue Interceptor | 22 & 24 | 1.1 |
| Doremus Avenue Interceptor | 20 | 0.5 |
| Roanoke Avenue Outfall Sewer | 54 | 2.2 |

(1)  Full Pipe - no surcharge

As indicated by the measured flows between 10 and 11 p.m. of May 25, higher peak dry weather flows in the Wilson Avenue interceptor than those of May 23 may be probable. With a field verified sewer gradient between manholes W-9 and W-8 of 0.0025 ft/ft the flow-full capacity of the Wilson interceptor closely approximates 6.2 mgd. The peak capacity of 4.5 mgd, cited in the PVSC Infiltration/Inflow Analysis, was computed for a monitoring point approximately 1500 feet downstream of manhole W-8. This sewer is now being resurveyed by E.T. Killam Associates to verify both the estimated capacity and amount of I/I.

If the Roanoke Avenue flow was redirected, peak flow rates at least as great as those shown below could occur. These flow rates would exceed the capacity of the Doremus and Wilson Avenue interceptors and cause surcharging in both lines. The hydraulic gradients required to force these flows through the sewers, and the resulting flow velocities are also shown below.

11

TSI-DBR-00040212
ALCD-PUBCOM_0006870

| Interceptor Location | Sewer Size in Inches | Peak Dry Weather Flow Rate in mgd | Grade Line ft/ft | Flow Velocity in fps |
|---|---|---|---|---|
| Wilson Avenue | 24 | 8.4+ | 0.0046 | 4.3 |
| Doremus Avenue | 24 | 3.3 | 0.00075 | 1.7 |
| Doremus Avenue | 22 | 3.3 | 0.0011 | 1.9 |
| Doremus Avenue | 20 | 2.7 | 0.0012 | 1.9 |

Surcharging to the levels indicated below would be required to pass these flows through the system.

| Manhole Number | Height in Feet of Surcharge Above Crown of Pipe | Height in Feet of High Tide Above Flow Surface |
|---|---|---|
| W-9 | 3.6 | 6.5 |
| D-6 | 5.8 | 5.3 |
| D-21 | 3.2 | 2.0 |
| D-28 | 2.1 | 0.4 |

It would accordingly be possible to restrict activation of over-flow devices to elevations equal to or slightly above the high tide. Due to the proximity of the Passaic River, industrial buildings in the area are located several feet above the high tide elevation. All of the building sewers observed in the manholes on Wilson and Doremus Avenues had drop connections. Buildup of sediment is not anticipated in the building sewers because none of the connections inspected were below the computed levels of surcharge. The height of surcharge is nominal and no damage is anticipated as a result of increased

12

TSI-DBR-00040213
ALCD-PUBCOM_0006871

internal pressures. Infiltration rates would be reduced as internal pressures increase.

The current cause of bypassing at Roanoke Avenue is the faulty Avenue "P" regulator. However, upon repair of the Avenue "P" regulator, extraneous flows could occasionally overload the restored downstream sewers sufficiently to cause a backup and subsequent overflow at time of peak dry weather flow. The flows in the Roanoke Avenue combined sewers could be transported to the PVSC treatment plant during off-peak hours without reducing the present infiltration rates. This would require storage regulation in existing sewers and could be justified as a pollution abatement measure. Infiltration rates in the Roanoke Avenue combined sewer do not appear to be high. Low flow rates of 0.2 mgd have been recorded. The low flow rate in the Doremus Avenue interceptor was also less than 0.2 mgd. Infiltration in these sewers can not be greater than the low flow rates. Increased flow rates, apparently indicating additional inflow, were recorded during the times of high tide. In the Wilson Avenue interceptor, a low flow rate of 2.1 mgd was recorded. Much of that flow was pumped from the Port Newark area and may largely represent infiltration. Infiltration in the Roanoke Avenue and Doremus Avenue sewers was not investigated in greater detail because of its small magnitude. Investigation of the Wilson Avenue interceptor and the Port Newark area was not within the scope of this study. All of the sewers discussed are included in the PVSC's Infiltration/Inflow Analysis and have been recommended for a sewer system evaluation survey. Any infiltration reduction resulting from this study would reduce the anticipated surcharging in the Wilson and Doremus Avenue interceptors but, it is unlikely that the reduction would be sufficient to prevent all dry weather flow discharges at Roanoke Avenue after flow diversion to the Doremus Avenue Interceptor.

13

TSI-DBR-00040214

ALCD-PUBCOM_0006872

(4)  Diversion Works

Prior to redirecting the Roanoke Avenue flow, the downstream sanitary sewers should be cleaned and either the Avenue "P" or the Roanoke Avenue regulator should be restored to service.  It appears preferable to restore the Roanoke Avenue regulator for several reasons.  By constructing a collapsible dam or other appropriate water level control device downstream of the regulator, an additional 1450 linear feet of 54-inch pipe would be available to store wet weather and peak dry weather flows for later diversion and treatment.  In addition, the apparently contaminated groundwater leaking into the pipe at the Pitt Consol plant would be diverted to treatment, and the 24-inch Roanoke Avenue sanitary sewer would not require cleaning.

The Doremus and Wilson Avenue interceptors are over fifty years old, and the preceding analysis assumes these sewers are structurally sound and can be cleaned.  This may be incorrect and the existing sediment in these lines could preclude redirecting the Roanoke Avenue flow, but require the construction of new sewers.  A four step program is recommended for placing the system back in full service.

(1)  Four lengths of the Doremus Avenue interceptor and one length of the Wilson Avenue interceptor should be cleaned and televised.  About 1000 feet of sewer would be inspected at an approximate cost of $6,000.  The following pipe sections, designated by the manhole numbers previously described, might be inspected: D-27 to D-28 (20-inch), D-16 to D-17 (22-inch), D-9 to D-10 (22-inch), D-3 to D-4 (24-inch), and W-5 to W-6 (24-inch).

(2)  If the lines initially inspected are structurally adequate and in good alignment, the remaining footage may be cleaned and televised. If the Doremus Avenue interceptor requires

14

cleaning, it is estimated that 3000 linear feet of sewer would require bucket machine cleaning and 1600 linear feet, hydraulic tool cleaning. No sedimentation was observed in the Wilson Avenue interceptor and no cleaning appears required. The additional cleaning and televising in the second step would cost approximately $38,000.

(3) If the sewers are in acceptable condition, the Roanoke Avenue regulator would be restored to service. The structure would be cleaned, new regulator components installed and plugs removed from the pipes connecting to the regulator. This work would cost approximately $10,000.

(4) A flow regulating structure would be constructed downstream of the regulator at a cost of about $100,000. The cost of the complete restoration program is summarized below:

| | |
|---|---|
| Initial Cleaning and Inspection | $ 6,000 |
| Complete Cleaning and Inspection | 38,000 |
| Regulator Repairs | 10,000 |
| Flow Regulation Structure | 100,000 |
| Total Cost | $154,000 |

In addition to providing relief from all dry weather overflows from the Roanoke sewer, this program would also divert to treatment combined sewage which would otherwise discharge untreated during the most frequent rainfalls. If the existing sewers can not be cleaned, new sewer construction would be required to eliminate the bypassing at Roanoke Avenue.

If the dry weather flow in the Roanoke Avenue combined sewer is diverted, the Doremus and Wilson Avenue interceptors will operate in a surcharged condition. Peak flow velocities in the Doremus Avenue interceptor will be below 2.0 feet per second, and velocities at non-

15

TSI-DBR-00040216
ALCD-PUBCOM_0006874

peak times, lower. Sedimentation should be anticipated in the
Doremus Avenue interceptor. This sewer should be inspected on a
regular basis to monitor sediment build up. Cleaning on a regular
basis may be desirable. Pollutants may be cleaned effectively by low
volume water flushing. Heavier sediment would probably require
hydraulic tools.

16

TSI-DBR-00040217
ALCD-PUBCOM_0006875

D. Conclusions and Recommendations

1. If structurally sound and in good alignment, the existing Doremus and Wilson Avenue interceptors should be cleaned and used to transport most dry weather flow in the Roanoke Avenue combined sewer to the PVSC treatment plant. However, relatively rare dry weather overflows may still occur. These may be eliminated by installing a flow routing device in the Roanoke outfall sewer, downstream of Doremus Avenue. The restoration program discussed previously should be implemented. The total cost of cleaning, internal inspections and regulator restoration work should be approximately $54,000. The flow routing device might cost about $100,000. Sedimentation in the Roanoke and Doremus Avenue sewers should be monitored and cleaning operations performed as necessary. This program is recommended as an immediate and temporary solution. It is estimated that the proposed restoration work could be completed within six months. The flow routing device installation should require about eight months for completion.

2. The flow routing device may be part of a long term solution for combined sewer overflow pollution abatement which should be developed in future studies.

3. Reconstruction or paralleling of the existing interceptors will be necessary if their structural condition or alignment precludes redirecting the Roanoke Avenue combined sewer flow. When new sewers are planned, the storage and routing of wet weather combined sewer flow must be considered along with future industrial expansion and sewer system evaluation survey recommendations. Sizing replacement interceptors is not possible with the information

17

TSI-DBR-00040218
ALCD-PUBCOM_0006876

presently available. For estimating purposes, it was assumed that a 24-inch sewer would be required on Doremus Avenue and a 30-inch line on Wilson Avenue. The depth of these sewers, high groundwater levels and poor foundation conditions will increase construction costs. The proximity of railroad spurs and gas transmission lines to Doremus Avenue will further increase costs. An approximate 1978 construction cost estimate follows.

|  | Pipe Diameter in Inches | Length of Sewer in Feet | 1978 Construction Cost Estimate |
|---|---|---|---|
| Doremus Avenue | 24 | 5400 | 1,080,000 |
| Wilson Avenue | 30 | 1700 | 510,000 |
| Contingencies | | | 410,000 |
| Total Construction Cost | | | $2,000,000 |

Alternatives to the complete reconstruction of both interceptors may be developed when more information is available. For example, the reconstruction of the Doremus Avenue interceptor may be combined with significant infiltration/inflow reduction in the Port Newark Area, thereby allowing the existing Wilson Avenue interceptor to remain in service. Additional studies will be required before the feasible alternatives can be defined and the most cost effective long term solution selected.

4. Industrial pretreatment regulations should be enforced in the tributary area. The low pH of the Roanoke effluent is a threat to the structural integrity of both sewers and accessories. The corrosive atmosphere in this sewer attacked electrical connections on the flow meter and caused several malfunctions. The condition of the pipes is not

18

TSI-DBR-00040219
ALCD-PUBCOM_0006877

known. It is probable that some deterioration has occurred even though it was not observed in the structures. Area industries should also be requested to review their internal operating procedures and reduce peak discharge rates to the extent possible.

5.  Possible groundwater contamination at the Pitt Consol plant should be investigated. The firm should be required to control chemical spillage and, to the extent feasible, clean up spills that have already occurred. The black tar-like material found in the sanitary sewers evidently originates at the Pitt Consol plant. The discharge of this material should be prohibited.

6.  The tide gate chambers in the Roanoke Avenue outfall should be cleaned and the gates serviced. The lump of bituminous material should be removed from the discharge point.

19

TSI-DBR-00040220
ALCD-PUBCOM_0006878

IV.  Blanchard Street

A.   Physical Inspection Findings

Blanchard Street is served by separate storm and sanitary se-
wers.  The 24-inch storm sewer (see Plate 2), constructed in 1917,
discharges to the Passaic River.  In 1970, the storm sewer was
extended and the sanitary sewer was rebuilt.  The sanitary sewer con-
nects to a trunk sewer in Raymond Boulevard.  The sanitary sewer is
clogged by grease, tallow, paper and black oily waste.  Several san-
itary manholes were observed to surcharge and overflow into the
street.  These overflows usually occurred between 11:00 a.m. and 3:00
p.m. on weekdays.  The frequency of overflow varies depending on in-
dustrial discharge rates.  It does not appear to be related to rain-
fall events.  Overflows were observed at least once a week and were
noted on ten consecutive weekdays in April 1978.  Intermittent over-
flows may have occurred during the last few years.  These sanitary
overflows are a major source of pollutants in the Blanchard Street
storm sewer.  City forces had been cleaning the Blanchard Street
sanitary sewer when backups and overflows were reported.  Equipment
breakdowns and manpower shortages caused a suspension of cleaning
operations in 1978.

Prior to cleaning, the storm sewer contained between 1.0 and 1.5
feet of primarily granular sediment mixed with black oil.  The oil,
which comes from the overflowing sanitary sewer, coats the inside of
the pipes and manholes.  Several inlets were filled with debris and
sediment.  The tide gate is mounted on a headwall on the river bank.
The gate was being held open by sediment and debris during the first
field inspection.  The gate appeared to be fully operational after
City personnel removed the sediment in April 1978.  In subsequent
inspections floating debris had lodged again under the gate indi-
cating the need for frequent maintenance.  A continuous waste

20

TSI-DBR-00040221
ALCD-PUBCOM_0006879

discharge was noted. Dry weather flow rates, varying between 10,000 gpd and 100,000 gpd were estimated using depth measurements. The source of this flow appears to be groundwater. Dry weather flow was observed above manhole B-7 only when the sanitary sewer was over-flowing or the drainage ditches along the Conrail industrial spurs were flooded.

Inlets B-106, B-107, B-108, B-109, B-110 and B-111 receive flow from the railroad spurs and sidings. The ditches along these tracks drain wet lands which were observed to contribute continuous flow for up to two weeks during wet periods. Chemical spillage was observed on the tracks and in the adjacent ditches. The source of the chem-icals appears to be leakage from railroad tank cars. No leaking cars were observed, however. Major spills were noted from the Atlas Refinery Inc. railroad siding. Rain washes some of this spillage through the drainage ditches and railroad ballast into the Blanchard Street storm inlets. Since no leaking cars were found on the Conrail spurs, it is not possible to link other specific industries to the spillage. Valves may not always be closed when the cars are unloaded and chemicals may drip out while the cars are standing on the spurs in a totally random pattern. The Fairmount Chemical Company, the Benjamin Moore Company, Atlas Refinery Inc, and the Fiske Brothers Refining Company all receive tank cars through this railroad spur.

Four pipes were observed along the railroad tracks west of Blanchard Street. Two of the pipes drain the Delissa Pallet storage area and are not sources of pollution. The other two are filled with earth and appear to be old railroad culverts. Railroad drainage ditches are connected to inlets B-106 and B-108 by pipes. The pipe at B-108 is clogged with earth; this causes partial flooding of the siding during rainfall events. Leaks were found in the walls and under the frames of inlet B-106 and B-107 when the ground was satu-rated. The sanitary sewer is adjacent to inlet B-107 at an elevation lower than the leaks observed. The inlet was inspected in dry

21

weather when the sanitary sewer was surcharged and no leakage was observed. During another inspection made during a rainfall event, the sanitary sewer was not surcharged but the inlets walls were leaking, implying that the leakage in inlet B-107 is not caused by sanitary sewer exfiltration. Inlet B-106 is on the opposite side of the street and has the same type of leakage, implying that the leakage is groundwater.

Two minor sources of flow were observed. Neither is believed to be a significant source of pollution. Newark Boxboard Company discharges a small volume of cooling water into the gutter adjacent to their loading dock area. A sump pump at Fairmont Chemical Company intermittently discharges groundwater into the gutter near manhole B-6. The City of Newark is aware of this discharge and had previously inspected the facility. No discharging was observed during the field inspections but water was noted along the curb. The water was clear and there was no evidence of chemical contamination. Algal growth was noted in the water along the curb.

22

TSI-DBR-00040223

ALCD-PUBCOM_0006881

B.   Dry Weather Sampling and Flow Rates.

Samples were obtained at the following locations:

B-2   300 feet south of the Passic River
B-6   1100 feet south of the Passic River
B-7   1300 feet south of the Passaic River

Samples were obtained at B-2 and B-6 on May 2, 1978 and at B-2, B-6 and B-7 on June 14, 1978.  The May samples were taken two hours before low tide with tide water in B-2.  The June samples were obtained at low tide while the Passaic River level was below the invert of the discharge pipe.  Appendix A shows the results of laboratory analysis of the samples.  The May samples show higher levels of pollution at B-6 than at B-2 downstream.  This difference can be attributed to dilution of the pollutants by tide water at B-2. (note chloride concentrations)  There was no tidal flow in the line when the June samples were taken.  The pollutant concentrations at B-6 and B-7 were similar.  There was a substantial increase in pollutants at B-2. This increase may result from leaching from abandoned septic tanks in the area.  The sanitary sewer was not overflowing and the storm sewer was not receiving flow from the railroad drainage ditches when the samples were obtained.  The flow rate during both sampling operations was estimated at 50,000 gpd.

23

TSI-DBR-00040224
ALCD-PUBCOM_0006882

C.   Smoke Testing

Smoke testing of the entire storm and sanitary sewer system was planned.  However, the sanitary sewer was surcharged and badly clogged with grease so that smoke could not be pumped through it. The sanitary sewer could not be dye tested to observe exfiltration due to the oil and hardened grease sealing the manholes above the top of the pipe.  The entire storm sewer was smoke tested at low tide. Smoke did not pass between manholes and was observed only at inlets connected to points where smoke was blown in.  It appeared that there were blockages or severe misalignments in the storm sewer.  No smoke entered industrial facilities and no smoke was observed at roof drains.  The absence of smoke in adjacent buildings does not preclude the existance of illegal connections with water traps.

24

TSI-DBR-00040225
ALCD-PUBCOM_0006883

D.   Television Inspection

Illegal connections were suspected downstream of manhole B-7. Television inspection was planned for 1250 feet of 24-inch storm sewer between manholes B-1 and B-7. The line required cleaning with bucket machines prior to the television inspection. The bucket machine operation encountered obstructions in the pipe which caused the buckets to become lodged frequently. In no single section could a 24-inch tool be passed. Openings varying between 12-inch and 18-inch were cleared. Most of the sediment was removed, but pieces of the 24-inch pipe were also brought out in the buckets which caused suspension of this operation. The obstructions encountered could be the result of joint misalignments, partial cave-ins and pipe fragments lodged in the line. Further cleaning operations could have caused collapse of the street.

Television inspection was attempted without further cleaning. Several attempts were made to pull the camera through various portions of the line. In every case but one, the camera went under water within 10 feet of the manhole and the skids lodged on obstructions. The first 45 feet of line downstream of manhole B-2 were visible. The pipe was cracked and a partial collapse was observed approximately 45 feet downstream of the manhole. Pieces of pipe had fallen into the line and the camera could not pass over them. An 8-inch connection was found in manhole B-5 below the sediment level during the cleaning operations. This connection was filled with sediment and was inactive. The problems encountered during cleaning and television inspections operations are described in greater detail in Appendix B. The 24-inch storm sewer is not structurally sound. This sewer was constructed in 1917 and has been subjected to very heavy truck traffic for the last several decades. A partial collapse of the street could occur as this pipe continues to deteriorate.

TSI-DBR-00040226
ALCD-PUBCOM_0006884

E.   Conclusions and Recommendations

1.   The frequent overflow of sanitary sewage may be considered
     the most serious source of pollutants found in the storm
     sewer.  The 2500 linear feet of sanitary sewer should be
     cleaned to prevent future surcharging and overflows.  Con-
     tracting this work would cost approximately $10,000.  Area
     industries should be required to conform to discharge qua-
     lity standards and cease discharging grease, tallow, paper
     and oil into the sanitary sewer.  After cleaning, the sani-
     tary sewer should be dye tested to determine if sewage is
     exfiltrating into the storm drainage system.

2.   Industries that receive and ship chemicals in railroad tank
     cards should be required to control spillage and leakage.
     All tank car valves should be closed prior to moving the
     unloaded cars back onto the Conrail spurs.  Atlas Refinery
     should be required to clean up the spillage at its siding
     and prevent future spills.

3.   The 24-inch storm sewer, downstream of manhole B-7, should
     be replaced.  The problems encountered during the cleaning
     and television work indicate that the sewer is cracked,
     misaligned, and partially collapsed in places.  Sizing a
     new sewer is beyond the scope of this study, however, a
     30-inch replacement was assumed for estimating purposes.
     The 1978 construction cost of 1300 linear feet of 30-inch
     storm sewer, manholes, tide gate chamber, and headwall
     would be approximately $450,000.  Replacing this sewer will
     prevent the collapse of the roadway, locate any illegal
     connections, and eliminate the infiltration of contaminated
     groundwater.

26

4.   The existance of illegal connections could not be verified
     because the condition of the storm sewer prevented internal
     inspection.  Illegal connections may exist downstream of
     manhole B-7.  However, because of the age and condition of
     the 24-inch storm sewer, its proximity to abandoned septic
     fields and high groundwater in the area, contaminated
     groundwater is also a probable source of pollutants in the
     storm sewer.  Pollutants may also be leaching directly into
     the river.  Further studies should be made of groundwater
     pollution in the entire study area.

5.   The Fairmount Chemical Company should be required to redi-
     rect its sump pump discharge into an inlet.

6.   The connection found in manhole B-5 should be sealed.

27

TSI-DBR-00040228
ALCD-PUBCOM_0006886

V.   Lockwood Street Outfall

A.   Physical Inspection Findings

The storm sewers in Lockwood Street, Lister Avenue, Chapel
Street, Albert Avenue, Euclid Avenue and the Morris Canal Right-of-
Way all drain through the Lockwood Street outfall (see Plate 2).
Drainage from parts of Raymond Boulevard, Ferry Street, and the
Pulaski Skyway ramp are also connected to the Lockwood Street system.
Separate sanitary sewers serve the entire area.   All storm manholes
and inlets in the study area were inspected.   The limits of tidal
flow were identified and all sources of dry weather flow were iso-
lated.   Chemical spills at industrial facilities were noted.   The
Morris Canal storm sewer west of Lockwood Street (LW-8 to MC-11) was
lamped.

(1)   Lister Avenue Sewer

The manholes, inlets and pipes on Lister Avenue were coated with
a black oily material.   Sediment depth varied between 0.5 and 1.5
feet.   The source of the oil was spillage at the B-Line Trucking
Company.   Tank trucks are allowed to drain while parked at this faci-
lity.   Black oily chemicals flow into inlets on Lister Avenue and
Esther Street.   The flow into Esther Street is continuous and the
curb has been broken out to facilitate it.

A continuous flow of viscous orange chemicals was observed en-
tering an inlet on Cornelia Street.   This material came from leaking
drums stored on the Cellomer Corporation property.   These chemicals
were entering the Lister Avenue storm sewer.   Intermittent spillage
of black oily chemicals was noted at the Fiske Brothers Refining
Company railroad siding and a very small volume of water and oil from
that industry was being discharged into Esther Street.   Both flows

28

were entering the Lister Avenue storm sewer. A cooling water dis-
charge pipe from Fiske Borthers was found at the inlet on the south-
west corner of Lockwood Street and Lister Avenue. A 2-inch ± connec-
tion was found entering inlet LS-10. Because of its diameter, it is
improbable that this line contains wastes. It was not flowing when
inspected. The only building near LS-10 is occupied by the State
Produce Company. No dry weather flow was observed upstream of man-
hole LS-12 and no sources of pollution are suspected above that
point.

(2) Morris Canal Sewers

Continuous flow was observed in the Morris Canal storm sewers
east and west of Lockwood Street. The flow in the easterly line
(LW-8 to MC-105) was traced to the Newark Boxboard Company. This
flow was estimated at 0.16 mgd using depth measurements. The muni-
cipal swimming pool on Waydell Street was discharging an estimated
0.07 mgd into the westerly line upstream of manhole MC3. The car
wash drains at the Sunoco Station on Raymond Boulevard were found to
be connected to the storm sewer between manholes MC3 and MC-4. Per-
sonnel at Associated Auto Body and Trucks Inc. were observed dumping
paint into the storm sewer between manholes MC-6 and MC-7. Manhole
MC-7 is the limit of tidal influence and no dry weather flow was ob-
served upstream of that point. A partial blockage was found in the
invert of manhole MC-2. Sediment varying in depth between 0.5 and
1.0 feet was noted between manholes LW-8 and MC-7.

(3) Euclid Avenue Sewer

The flow in the Euclid Avenue storm sewer, estimated at 0.02
mgd, was traced to the Reddaway Manufacturing Company's cooling water
discharge at inlet E-104.

29

(4)  Albert Avenue Sewer

Tidal flow was observed in the Albert Avenue storm sewer up to manhole A-3.  A minor, intermittent flow of water and oil from Cellomer enters the Cornelia Street gutter and flows to the Albert Avenue storm sewer.  However, no dry weather flow was actually observed upstream of manhole A-3.

(5)  Lockwood Street Sewer

No dry weather flow was observed in the Lockwood Street storm sewer upstream of manhole LW-8.  There is no indication of pollutant sources above that point.  The cross-connections shown on the sewer plans were inspected and found to be sealed.  A railroad drain on the south side of the Messinger Trucking and Warehouse Corporation building appeared to be connected to the Lockwood Street sanitary sewer. Major spillage of chemicals was observed at the Atlas Refinery Inc. railroad siding.  The eastern portion of this siding drains into railroad drainage ditches that are connected to the Blanchard Street storm sewer system.  The discharges from Newark Boxboard, the municipal swimming pool, and Reddaway Manufacturing produce a base discharge of approximately 0.25 mgd.

(6)  Lister Avenue Tide Gate

There was no evidence of chemical attack or deterioration of the concrete chamber.  Sediment in the invert of the chamber prevents the Lister Avenue tide gate from closing completely.  The gate allows inflow during the rising tide.  Assuming a five foot tidal range and an open tide gate, approximately 270,000 gallons of river water enters with each incoming tide, mixes with pollutants being discharged into the system and flows back into the river as the tide falls.  A typical diurnal flow pattern at the tide gate is shown on Plate 9.  If

30

TSI-DBR-00040231
ALCD-PUBCOM_0006889

the tide gates were to close completely, the discharge from the system of any polluted flow would be restricted to a relatively short period around low tide.

(7)  Lockwood Street Outfall

An abandoned railroad drain was found connected to manhole LS-1. The last 25 feet of the 72-inch outfall was exposed and showed evidence of chemical attack. Portion of the crown had completely deteriorated. The headwall was not deteriorated and there was no evidence of chemical attack below the spring line of the pipe.

31

TSI-DBR-00040232
ALCD-PUBCOM_0006890

B.   Dry Weather Flow Sampling and Flow Montoring

Sources of dry weather flow and limits of tidal influence were noted during the physical survey.  Those sewers in which flow was observed were subdivided for sampling.  The first set of samples was obtained on May 2, 1978.  The second set was taken on June 14, 1978. The laboratory analysis of these samples is shown in Appendix A. Both sets of samples show high levels of pollution on Lockwood Street, Lister Avenue, Albert Avenue, and the easterly portion of the Morris Canal storm sewer.  The samples in the Euclid Avenue sewer fell within water quality standards.  Because of tidal action, it was not possible to confirm that all high pollutant readings were caused by discharges near the respective sampling points.  A discharge of pollutants anywhere in the system within the tidal range could be mixed and carried to distant sampling points.  Samples were obtained at the following locations.

| | |
|---|---|
| LW-0 | Lockwood Street Outfall at the Passaic River |
| LS-2 | Lister Avenue upstream of the tide gate chamber |
| LS-4 | Lister Avenue upstream of Lockwood Street |
| LS-7 | Lister Avenue at Joseph Street |
| LW-1 | Lockwood Street upstream of Lister Avenue |
| LW-4 | Lockwood Street upstream of Albert Avenue |
| LW-7 | Lockwood Street downstream of the Morris Canal |
| A-1 | Albert Avenue at Lockwood Street |
| A-3 | Albert Avenue at Joseph Street |
| E-1 | Euclid Avenue at Lockwood Street |
| E-104 | Euclid Avenue (cooling water connection at inlet) |
| MC-1 | Morris Canal at Lockwood Street (west side) |
| MC-3 | Morris Canal 500 ft. west of Lockwood Street |
| MC-7 | Morris Canal 1400 ft. west of Lockwood Street |
| MC-100 | Morris Canal at Lockwood Street (east side) |
| MC-104 | Morris Canal 800 ft. east of Lockwood Street |

32

Euclid Avenue was eliminated from further study because of sampling results. The cooling water discharged at Reddaway Manufacturing was sampled at inlet E-104. The Morris Canal storm sewer west of Lockwood Street (LW-8 to MC-11) was eliminated on the basis of physical inspection, lamping and sampling. The intermittent sources of pollution at the Sunoco Car Wash and Associated Auto Body have been identified. The high levels of pollutants detected at manhole MC-1 in the May 2 sampling is attributed to these sources. Sediment downstream caused flow to pool at manhole MC-7 and remain there as the tide went out. Pollutants from downstream appear to have been carried into that manhole by the tide causing the contamination detected in the MC-7 sample on June 14. The 72-inch Lockwood Street Outfall was not televised because there was no evidence of pollutant sources in the line. The Benjamin Moore Company is the only industry adjacent to the outfall. Maps provided by the City of Newark show the roof drains from one building connected to the outfall. The Benjamin Moore laboratory is located in that building but there are no chemical process facilities. The plant engineer indicates that all other surface and roof drainage is pumped directly into the Passaic River. All other storm sewers in which flow was observed were scheduled for television inspection.

33

TSI-DBR-00040234
ALCD-PUBCOM_0006892

C.   Smoke Testing

     The storm and sanitary sewers on Lockwood Street, Lister Avenue,
Albert Avenue, and the easterly portion of the Morris Canal right-
of-way were smoke tested.  No problems were observed when the storm
sewers were tested.  The pipe connecting to manhole LS-1 was found to
terminate in an embankment along the nearby railroad spur.  This pipe
may have functioned as a railroad drain before the track elevation
was lowered; it serves no purpose now.  The effectiveness of the
smoke testing may have been reduced in the larger storm sewers.
Blowers were used to force smoke into the pipes under pressure.  The
volume of the Lockwood Street storm sewer (66-inch) and the number of
inlet openings reduced the pressure behind the smoke and may have
prevented it from reaching remote connections.

     Three inflow sources were detected when the sanitary sewer was
smoke tested.  All observed roof and area drains at Atlas Refinery
Inc. were connected to the sanitary sewer.  These drains are a major
source of inflow and should be reconnected to the storm sewer.  A
cross connection was found at the intersection of Joseph Street and
Lister Avenue.  The storm inlet at the southwest corner of the in-
tersection is connected to the adjacent sanitary manhole.  The sani-
tary sewer elevation is lower than the inlet invert.  Sanitary sewage
could enter the storm sewer if a blockage occurred.  Smoke also es-
caped from the site of a demolished building at the southwest corner
of the Lockwood Street-Albert Avenue intersection.  It appears that
the building connection was not sealed.  No smoke was observed es-
caping from plumbing vents.  It is probable that all connections to
the storm and sanitary sewer have line traps which would prevent the
passage of smoke.

34

TSI-DBR-00040235
ALCD-PUBCOM_0006893

D.   Television Inspection

The following lengths of storm sewer were inspected using closed circuit television.

| | |
|---|---|
| Lister Avenue | LS-1 to LS-3 |
| Lister Avenue | LS-4 to LS-11 |
| Lockwood Street | LS-3 to LW-8 |
| Albert Avenue | A-1 to A-3 |
| Morris Canal | LW-8 to MC-104 |

The inspection of the Lister Avenue line revealed an oil separator at Atlas Refinery Inc. connected to the 66-inch storm sewer approximately 120 ft. upstream of manhole LS-2.  This connection is believed to be a major source of pollutants.  There is a railroad siding drainage system connected to this oil separator.  Tank cars containing chemicals are unloaded at the siding daily and spills are frequent.  Much of the spillage is believed to pass through the separator and enter the Lister Avenue storm sewer.  No other sources of flow were found during the television inspection of Lister Avenue. Significant settlement was noted between LS-4 and LS-11.  The television camera went under water frequently and came out at inlets and manholes.  Most lengths of pipe had settled more than 15 inches. Based upon the portions of line that could be seen and the relatively recent date of construction (1970), no illegal connections are suspected.  The pollution in the line results from spillage at B-Line Trucking and Cellomer, as well as pollutants washed in by the tide. The flow from the Atlas oil separator, immediately downstream, could cause high pollutant concentrations in the Lister Avenue storm sewer.

Several connections were found in the Lockwood Street storm sewer between manholes LW-4 and LW-3.  Pipes were located 34 ft., 92 ft., 104 ft., 133 ft., 143 ft. and 200 ft. downstream of manhole

35

TSI-DBR-00040236
ALCD-PUBCOM_0006894

LW-4. The pipes at 92 ft. and 104 ft. are shown on old plans as connections to inlets at the intersection. These inlets were connected to the new Albert Avenue storm sewer in 1970. The pipes at 34 ft., 143 ft. and 200 ft. appear to be roof or floor drain connections to the Messinger Trucking and Warehouse Corporation building. There are no wastes eminating from this facility. The connection at 143 ft. may also be a concrete spall; the pipe could not be seen clearly. The connection at 133 ft. comes from the west side of the street in the vicinity of the Albert Avenue intersection. This pipe is not shown on the storm sewer plans, but it may be an abandoned inlet connection. These connections were not flowing when the pipe was televised.

A connection of unknown origin was observed in the Lockwood Avenue storm sewer 53 ft. downstream of manhole LW-3. Inlet connections were also observed 170 ft. and 183 ft. downstream of LW-3. The pipe at 53 ft. connected on the east side and may be from Atlas Refinery Inc. A pipe crossing broken into the crown of the 66-inch line and running perpendicular to it was noted at 201 ft. These pipes were not flowing when televised. A 2-inch $\pm$ connection located approximately 10 ft. upstream of manhole LW-2 has been observed by City personnel. This connection comes from the east side of the street and was discharging flow when observed. This connection appeared to originate at Atlas Refinery Inc.

Three connections were noted between manholes LW-2 and LW-1 in the Lockwood street storm sewer. Pipes were observed 149 ft., 159 ft. and 215 ft. downstream of manhole LW-2. The connection at 159 ft. is believed to be from an inlet that was removed during construction of a new building at Atlas Refinery Inc. The connection at 149 ft. appeared to be a large pipe 24-inch $\pm$ surrounded by roots. It could also be a connection crossing the 66-inch line. The connection at 215 ft. was from the westerly side of the street. It

36

TSI-DBR-00040237
ALCD-PUBCOM_0006895

could not be seen clearly and may be a concrete spall. No flow was observed from any of these pipes.

No improper connections were found in the Albert Avenue storm sewer or in the Morris Canal line between manholes LW-8 and MC-104. The pollutants detected in the Albert Avenue line appear to have been carried in by tidal action. Two sources of pollutants are suspected in the Morris Canal sewer east of Lockwood Street. The limit of tidal influence is downstream of manhole MC-104. Yet, pollutants were detected in the sample obtained at that manhole. Newark Boxboard discharges the flow sampled at MC-104 and that flow is polluted. However, the concentration of pollutants downstream, at manhole MC-100, is three times greater than at MC-104. Some pollutants may settle into the sediment during the high tide periods. Flow from Newark Boxboard may flush some of this material and carry it into the Lockwood Street storm sewer.

TSI-DBR-00040238
ALCD-PUBCOM_0006896

E.   Conclusions and Recommendations

1.   Several improvements are required at Atlas Refinery Inc.
     The firm should be required to connect its oil separator to
     the sanitary sewer rather than to the storm sewer.  The
     spillage at the railroad siding should be cleaned up and
     procedures developed to prevent future spills.  Roof and
     area drains should be connected to the storm sewer rather
     than to the sanitary sewer as at present.  The plant has
     been expanded several times over the years and complete
     plans of the piping systems are not available.  The
     Lockwood Street storm sewer is located under the sidewalk
     in front of the Atlas plant.  Connections could have been
     made without excavation in the street.  Connections of
     unknown origin between manholes LW-3 and LW-1 appear to
     lead to drains in the Atlas plant complex.  Fiske Brothers
     Refining Company, the industry across the street, is a less
     likely point of origin since they would have had to exca-
     vate the street and cross the sanitary sewer to make con-
     nections to the storm sewer.  Atlas should be required to
     evaluate its piping and identify connections to the storm
     sewer.  Any sanitary facilities, chemical processes, or
     drains that accept polluted flow should be reconnected to
     the sanitary sewer.  Authorized discharges to the storm
     sewer should be made through a manhole or chamber to allow
     monitoring by the City.

2.   Fiske Brothers Refining Company should be required to cease
     discharging oil and water into Esther Street and to prevent
     spills at their railroad siding.  Fiske Brothers should be
     required to identify existing connections to the storm
     sewer.  Connections that accept pollutants should be re-
     connected to the sanitary sewer.  Connections that carry

38

TSI-DBR-00040239
ALCD-PUBCOM_0006897

nonpolluted flow should be made through a chamber to fac-
ilitate monitoring by the City.

3.   After Atlas and Fiske Brothers have evaluated their piping
     and reconnected lines as necessary, the remaining connec-
     tions of unknown origin between LW-3 and LW-1 should be
     sealed as a precaution.  Initially, temporary plugs should
     be installed.  If the lines are active, a backup will be
     reported.  If no problems occur after one month, the con-
     nections should be permanently sealed.  The connections
     observed between LW-4 and LW-3 are believed to be roof
     drains from the Messinger Warehouse and abandoned inlet
     connections.  They should not be sealed.

4.   B-Line Trucking Company should be required to cease dis-
     charging black oily waste into Lister Avenue and Esther
     Street.  The spillage that has already occurred should be
     cleaned up.  This flow is believed to be the major source
     of black oil in the system.

5.   Newark Boxboard Company should be required to evaluate its
     internal piping.  Only nonpolluted flow should be dis-
     charged into the Morris Canal storm sewer.  Polluted flow
     should be discharged into the Blanchard Street sanitary
     sewer after that line is cleaned.  The City should monitor
     the flow at manhole MC-104 to assure compliance.

6.   Associated Auto Body and Trucks, Inc. should be prohibited
     from dumping paint or other wastes into the Morris Canal
     storm sewer.

7.   The car wash drains at the Sunoco Station should be re-
     connected to the sanitary sewer.  Suitable grit removal and
     oil separation facilities should be provided.

39

TSI-DBR-00040240
ALCD-PUBCOM_0006898

mmm

8.  Cellomer Corporation should be required to clean up the
    spillage on their property and cease discharging oil into
    Cornelia Street.  It should be noted that Cellomer was
    informed of this problem and cleanup operations were under-
    way.

9.  Sources of inflow should be eliminated.  The cross connec-
    tion at the intersection of Joseph Street and Lister Avenue
    should be sealed.  The railroad siding drain on the south
    side of the Messinger Warehouse should be disconnected from
    the sanitary sewer.  The Atlas roof and area drains have
    already been discussed.

10. The Lister Avenue storm sewer, west of Lockwood Street
    should be cleaned of debris, sediment and oily wastes.

40

TSI-DBR-00040241

ALCD-PUBCOM_0006899

VI.   Brown Street

A.   Configuration

The 24-inch Brown Street storm sewer and the adjacent 15-inch sanitary sewer are located in the former Brown Street right of way. When the street was vacated, the City retained ownership of the storm sewer and the PVSC retained ownership of the sanitary sewer.  Before the area sewers were separated, the Brown Street line was used as a wet weather outfall.  There is an existing regulator at the southerly end of the storm sewer and cross-connections to the adjacent sanitary sewer are shown on various plans.  The regulator and the cross-connections were sealed during the sewer separation program.  The present sewer easement passes through the Sherwin Williams plant site. An industrial building has been constructed over the northern end of the storm sewer.  Two piles were driven through the storm sewer during the construction of this building.  A chamber was built at that point to allow flow to pass around the piles.  Several storm drains at the plant complex have been connected to the 24-inch sewer.

41

TSI-DBR-00040242
ALCD-PUBCOM_0006900

B.   Physical Inspection Findings

No point sources of pollution were found during the physical
inspection.  The bulkhead in the Brown Street regulator is not leak-
ing and the cross-connections to the sanitary sewer are sealed.  No
evidence of chemical spillage was observed in chemical storage areas,
parking lots, access roads, or loading dock areas tributary to the
storm sewer.  The storm sewer is below high tide elevation and ap-
proximately 15,000 gallons of river water are carried in and out of
the pipe during each tidal cycle.  No flow was observed upstream of
the building during low tide.  A discharge of approximately 25,000
gpd was noted at the bulkhead downstream of the building.  This flow
rate was visually estimated because there was no direct access to the
point of discharge.  Personnel from the City of Newark and the PVSC
have observed flow during the low tide.  The source of this flow may
be infiltration or a connection from the Sherwin Williams plant.

The PVSC inspected the storm and sanitary sewers in 1970.  The
sanitary sewer was televised and dye tests were performed.  This in-
vestigation was conducted to determine the sources of oil and other
pollutants entering the sanitary sewer and storm drainage systems.
Chemicals and oil were found seeping into the sanitary manholes.
Several leaks were observed when the sanitary sewer was televised.
The internal inspection of the storm sewer was not successful.  An
attempt was made to plug the pipe to keep tidal flow out.  Infiltra-
tion was so severe that the line quickly filled up as the tide rose.
Debris prevented inspection of the southerly end of the line.  The
piles made inspection of the pipe under the building impossible.  Re-
pairs were made to the sanitary sewer; the seepage of brown oil was
eliminated and infiltration was reduced.  The sanitary sewer was dye
tested and no dye was detected in the storm sewer.  The Sherwin
William plant engineer cooperated fully during this investigation.
The plant piping was evaluated and no sources of pollutants were
found within the building.  The plant engineer also verified that the

42

site had been used for chemical dumping in the past. Lagoon-like pools, called stillbottoms, were formed with earth berms and filled with the liquid wastes from chemical processes. After the wastes seeped into the ground, the berms were leveled off on top of the residue. The existing plant buildings, chemical storage areas, and parking lots are constructed on top of the contaminated ground. A steel bulkhead prevents this material from seeping directly into the river. The PVSC concluded that contaminated groundwater was the source of the dry weather pollutants in the Brown Street Storm sewer.

43

TSI-DBR-00040244
ALCD-PUBCOM_0006902

C.   Dry Weather Effluent Sampling

The PVSC obtains monthly samples at the storm sewer outfall.
These samples do not show a continuously contaminated effluent. Ac-
ceptable samples have been obtained for periods as long as six
months.  The most polluted sample in the last two years had a COD of
350 ppm $\pm$.  Samples obtained upstream of the building contain lower
levels of pollutants than those taken at the outfall.  This could
indicate infiltration of polluted groundwater under the building or
an intermittent discharge from a source within the structure.  An
analysis performed during the PVSC inspection in 1970 revealed pe-
troleum based oil, esthers, and keytones in the groundwater seepage.
The PVSC laboratory has determined that the pollutants found in the
Brown Street effluent are not similar to the chemicals presently
being used at the Sherwin William plant.  Groundwater pollution was
beyond the scope of this study so no further investigative work was
performed.  However, the available data strongly suggests contamin-
ated groundwater as the source of pollutants.  The degree of contam-
ination depends on groundwater levels, river stage, and tidal le-
vels.

44

TSI-DBR-00040245
ALCD-PUBCOM_0006903

D.   Conclusions and Recommendations

1.   The source of pollutants in the dry weather storm sewer ef-
fluent appears to be infiltration of contaminated ground-
water. Further investigations of this source were not made
because groundwater pollution was excluded from the scope
of this study. Rehabilitating the existing storm sewer
would be expensive. The building constructed over the se-
wer would make reconstruction impractical in its present
location. Piling driven through the existing sewer would
prevent conventional grouting or relining under the build-
ing. A practical alternative might be to abandon, sand
fill and plug the existing sewer. Responsibility for a
replacement sewer to provide drainage for the Sherwin
Williams Co. plant complex is a matter of negotiation.
However, this work may not result in benefit to water
quality since pollutants could still leach to the river.

2.   The City of Newark should formally request Sherwin Williams
to certify that there are no connections to the storm sewer
beneath its factory building. Sherwin Williams should re-
ceive copies of all sampling results concerning the Brown
Street storm sewer.

45

TSI-DBR-00040246
ALCD-PUBCOM_0006904

## VII. General Recommendations

A. Groundwater pollution in the study area should be investigated. Contaminated groundwater is believed to be a source of pollutants in the Brown Street and Blanchard Street storm sewers and the Roanoke Avenue outfall sewer. Chemical plants have been located in the area for several decades. Septic systems were used to dispose of wastes prior to the construction of sanitary sewers. Wastes were dumped and allowed to seep into the ground in the Brown Street area. Chemical spillage was noted at several plants during this study. Groundwater pollution was outside our scope of work and was not investigated in greater detail. Leaching groundwater from this area may significantly impact on the water quality of the Passaic River after other corrective measures have been completed.

B. Industrial facilities and railroad spurs should be inspected frequently to evaluate housekeeping procedures and identify spillage. Immediate action should be taken to have industries clean up spillage for which they are responsible.

C. An effective sewer use Ordinance should be enforced to protect the City's investment in its sewer system and the PVSC facility and to provide for a cleaner environment.

D. A regular maintenance program should be developed for tide gates, regulators, and storm drainage systems. Inlets should be cleaned of sediment and debris.

E. Hazardous conditions exist in the sewers discussed herein. Oxygen deficiencies and explosive atmospheres may exist

46

TSI-DBR-00040247
ALCD-PUBCOM_0006905

intermittently although none were detected during this study. An explosion has occurred in the Roanoke Avenue combined sewer. Sewers should be force ventilated during all inspection, cleaning and maintenance operations. Oxygen content and explosive potential should be monitored continuously while personnel are working below ground. The atmosphere may be harmful to breathe even if it is not oxygen deficient or explosive. The effluent and sediment may also be hazardous. Chemicals used at some plants may attack the skin on contact and others may be absorbed and cause internal damage. All personnel working in the sewer should be equipped with breathing apparatus, protective clothing, explosion-proof lights, and safety lines. Additional personnel and equipment should be available to react to emergencies.

47

TSI-DBR-00040248
ALCD-PUBCOM_0006906

APPENDIX A


Analytical Test
Results

TSI-DBR-00040249
ALCD-PUBCOM_0006907

TABLE 1

ANALYSIS OF STORM SEWER FLOW SAMPLES
(POLLUTANT CONCENTRATIONS IN PPM)

| SAMPLING POINT | pH | COD | TOC | BOD | Cl | TURB | TSS | F.C. /100Ml | PO4 | FLAM | EXPLO | TKN | NH4-N |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| B-2 | 7.5 | 148 | 40 | 36 | 447 | 68 | 30 | – | .09 | 0 | 0 | 24 | 21 |
| B-6 | 7.7 | 228 | 66 | 46 | 286 | 100 | 102 | – | .12 | 0 | 0 | 47 | 34 |
| LW-0 | 7.4 | 216 | 165 | 141 | 340 | 100 | 65 | – | .13 | 0 | 0 | 101 | 93 |
| LW-1 | 8.4 | 2456 | 920 | 819 | 232 | 2700 | 2404 | – | .06 | 0 | 0 | 100 | 67 |
| LS-2 | 9.0 | 3176 | 1040 | 696 | 118 | 4000 | 2516 | – | .19 | 0 | 0 | 93 | 63 |
| LS-4 | 8.8 | 336 | 115 | 133 | 718 | 320 | 67 | – | .06 | 0 | 0 | 70 | 66 |
| A-1 | 8.7 | 1000 | 240 | 387 | 110 | 3200 | 2876 | 1800 | .19 | 0 | 0 | 40 | 10 |
| E-1 | 8.7 | 24 | 8 | 0 | 180 | 25 | 18 | 1000 | .04 | 0 | 0 | 2 | 0 |
| MC-1 | 7.6 | 960 | 60 | 36 | 143 | 89 | 423 | 200 | .30 | 0 | 0 | 63 | 61 |
| MC-100 | 7.3 | 232 | 52 | 51 | 23 | 73 | 56 | 38000 | 1.80 | 0 | 0 | 2 | 0 |
| MC-7 | 6.8 | 460 | 135 | 138 | 255 | 320 | 89 | 100 | .40 | 0 | 0 | 9 | 3 |

SAMPLES TAKEN ON MAY 2, 1978

TSI-DBR-00040250
ALCD-PUBCOM_0006908

TABLE 2

## ANALYSIS OF STORM SEWER FLOW SAMPLES
### (POLLUTANT CONCENTRATIONS IN PPM)

| SAMPLING POINT | pH | COD | TOC | BOD | Cl | TURB | TSS | F.C. /100 Ml | TKN | NH4-N | Grease & Oil |
|---|---|---|---|---|---|---|---|---|---|---|---|
| B-2 | 7.2 | 412 | 170 | 450 | 307 | 178 | 63 | 1200 | 19 | 16 | 41.6 |
| B-6 | 7.6 | 135 | 56 | 126 | 360 | 344 | 334 | 0 | 20.3 | 17.1 | - |
| B-7 | 7.5 | 150 | 62 | 114 | 331 | 136 | 51 | 200 | 17 | 16 | 0 |
| LS-2 | 7.2 | 1119 | 520 | 486 | 335 | 168 | 153 | 0 | 106 | 59.4 | 300.4 |
| LS-4 | 7.9 | 408 | 180 | 210 | 517 | 308 | 156 | 0 | 38 | 31.5 | 36.2 |
| LS-7 | 7.2 | 1188 | 520 | 443 | 124 | 3080 | 2180 | 500 | 23.5 | 7.56 | - |
| LW-1 | 8.7 | 6386 | 560 | 690 | 250 | 344 | 684 | 0 | 217 | 164 | 25.6 |
| LW-4 | 8.2 | 824 | 320 | 455 | 644 | 308 | 204 | 0 | 97 | 71 | 22.6 |
| LW-7 | 5.4 | 5496 | 1520 | 1550 | 1650 | 142 | 323 | 29000 | 393 | 184 | 66.6 |
| A-1 | 6.9 | 313 | 93 | 169 | 859 | 86 | 152 | 6800 | 27 | 18 | - |
| A-3 | 7.3 | 83 | 19 | 35 | 24 | 45 | 196 | 67000 | 6 | .7 | 14.2 |
| E-1 | 7.3 | 44 | 10 | 0 | 13 | 30 | 20 | 0 | 1.7 | 0 | 8.0 |
| E-104 | 8.6 | 36 | 7 | 0 | 14 | 30 | 1 | 100 | 2 | .98 | .8 |
| MC-1 | 7.1 | 48 | 13 | 0 | 141 | 27 | 40 | 1700 | .8 | .6 | 4.6 |
| MC-3 | 6.9 | 44 | 14 | 0 | 143 | 18 | 30 | 900 | 0 | 0 | - |
| MC-7 | 5.9 | 622 | 195 | 350 | 14 | 200 | - | 250,000 | 1.96 | 1.8 | - |
| MC-100 | 6.7 | 954 | 270 | 480 | 24 | 93 | 103 | 4700 | 2.7 | 0 | - |
| MC-104 | 7.4 | 337 | 96 | 156 | 19 | 86 | 85 | 27,000 | 1.7 | 0 | - |

SAMPLES TAKEN ON June 14, 1978

TSI-DBR-00040251
ALCD-PUBCOM_0006909

TABLE 3

ANALYSIS OF METAL CONCENTRATIONS IN STORM SEWER FLOW SAMPLES
(METAL CONCENTRATIONS IN PPM)

| SAMPLING POINT | Cd | Ca | Cr | Cu | Fe | Pb | Mg | Mn | Ni | Na | Zn |
|---|---|---|---|---|---|---|---|---|---|---|---|
| B-2 | – | 0 | – | – | 5.6 | – | – | – | – | 0 | – |
| B-6 | – | 0 | – | – | 28.9 | – | – | – | – | 0 | – |
| B-7 | – | 0 | – | – | 5.39 | – | – | – | – | 0 | – |
| LS-2 | .03 | – | .01 | 2.4 | 2.4 | .1 | 21 | 3.4 | .1 | – | 6 |
| LS-4 | .02 | 0 | .03 | – | 6.04 | .1 | 21 | 1.9 | .1 | – | 8 |
| LW-1 | .07 | – | .10 | – | 7.46 | 2.1 | 25 | 3.1 | .1 | – | 26 |
| LW-7 | .20 | – | .11 | – | 4.58 | 1.9 | 21 | 2.6 | .1 | – | 12 |
| A-1 | – | – | – | – | 5.88 | .1 | – | – | – | – | – |
| MC-1 | – | – | – | – | 0 | 0 | – | – | – | – | 0 |

SAMPLES TAKEN ON JUNE 14, 1978

TSI-DBR-00040252

ALCD-PUBCOM_0006910

APPENDIX B


Letter From
Robinson Pipe Cleaning Company

TSI-DBR-00040253
ALCD-PUBCOM_0006911



# Robinson Pipe Cleaning Co.

*Specializing in today's needs for environmental protection.*
875 North Summer Avenue • Newark, NJ 07104 • (201) 483-3200

August 22, 1978

Clinton Bogert Associates
2125 Center Avenue
Fort Lee, New Jersey 07024

Attention:  Herbert L. Kaufman

SUBJECT:  Television Inspection, City of Newark

Gentlemen:

With reference to the above named project, the following is a detailed
description of the problems we encountered on Blanchard Street, between
manholes B1 and B7, and Lister Street, between manholes LS11 and LS4.

Blanchard Street, manholes B7 to B5

We began cleaning on Blanchard Street between manholes B7 and B5 on July 11,
1978.  A 15 inch bucket was dragged between the manholes with relative ease.
On the first drag with an 18 inch bucket, the bucket hung approximately 30
feet from manhole B5.

July 12, 13, 1978, were spent retrieving the 18 inch bucket and using various
size slitters to break any hard material that would prohibit the passage of
buckets.

July 14 through July 18, 1978, various size slitters and 12 inch and 15 inch
buckets were used to remove sand, silt, a hard yellowish material, and concrete.
Because the tidal gate was malfunctioning, sand and silt continued to wash into
the line.

On July 18, 1978, we removed segments of pipe and therefore discontinued
further cleaning.

Blanchard Street, manholes B5 to B3

On July 19, 1978, we dragged 12 inch and 15 inch buckets between manholes B5
and B3 with great difficulty.  Because the buckets continued to hang in the
pipe line, various size slitters were used.

Affiliate of National Power Rodding Corp.

TSI-DBR-00040254
ALCD-PUBCOM_0006912

# ROBINSON PIPE CLEANING COMPANY

Clinton Bogert Associates                                      Page 2

On July 20, 1978, an 18 inch bucket was hung between manholes B4 and B3. Between July 21 and July 28, 1978, 12 inch and 15 inch buckets and slitters were used to remove sand, silt, a yellowish material and concrete.

On July 28, 1978, we removed segments of pipe and discontinued further cleaning.

## Blanchard Street, manholes B3 to B1

Between July 31 and August 4, 1978, we dragged various size slitters, 12 inch and 15 inch buckets between manholes B3 and B1. We were only able to drag to approximately 15 feet from manhole B1. The same problems were encountered and the same materials were removed that were found between manholes B7 and B3.

On August 4, 1978, we removed segments of pipe and discontinued further cleaning.

## Blanchard Street, Television Inspection

Manholes:   B7-B6, camera submerged, unable to pass or distinguish blockage.
            B6-B5, camera submerged, unable to pass or distinguish blockage.
            B5-B4, the pipe dropped approximately 5 feet from manhole 5 and
            the line was surcharged.  No attempt was made to televise.
            B4-B2, unable to thread these two sections with the use of high
            pressure water or power rodding equipment.
            B2-B1, structural defects, unable to pass.

Because of the condition of the pipe between manholes B7 and B1, we find that television inspection is impossible.

It is our opinion that the pipe is badly deteriorated and structurally unsound. Further work might result in a complete failure.

## Lister Street, manholes, LS11 to SL4

The major problem on Lister Street between manholes LS11 and LS4 were sags that developed pockets of water and grit. Because the camera lens was submerged passing through the sags, portions of the pipe line were not able to be seen.

We trust that this meets with your approval.

Sincerely,

ROBINSON PIPE CLEANING COMPANY

Salvatore F. Perri
Sales Representative

SFP:med



# Robinson Pipe Cleaning Co.

*Specializing in today's needs for environmental protection.*
875 North Summer Avenue • Newark, NJ 07104 • (201) 483-3200

August 22, 1978

Clinton Bogert Associates
2125 Center Avenue
Fort Lee, New Jersey 07024

Services rendered for cleaning and television inspection in the City
of Newark, New Jersey, as follows:

ALBERT AVENUE
A3-A2                     243'
A2-A1                     196'
                         439' @ Lump sum                  $  600.00

BLANCHARD STREET
B1-B7                     1245' @ $6.00                    7470.00

LISTER STREET
LS11-LS7                  545'
LS7-LS4                   468'
                         1013' @ $1.50                     1519.50
LS3-LS1                   333' @ Lump sum                   600.00

LOCKWOOD STREET
8-7                       245'
7-5                       132'
5-4                       306'
4-1                       721'
                         1404' @ $1.50                     2106.00

MORRIS CANAL
MC104-MC102              365'
MC102-MC100             394'
                         759' @ $1.50                      1138.50

                                         $13434.00

Affiliate of National Power Rodding Corp.

TSI-DBR-00040256
ALCD-PUBCOM_0006914

ILLUSTRATIONS

TSI-DBR-00040257
ALCD-PUBCOM_0006915

NEWARK POLLUTION ABATEMENT
FEASIBILITY STUDY

SANITARY AND COMBINED SEWER
CONFIGURATIONS ON ROANOKE,
DOREMUS AND WILSON AVENUES

CLINTON BOGERT ASSOCIATES
CONSULTING ENGINEERS

PLATE I

PLAN

TSI-DBR-00040258

ALCD-PUBCOM_0006916



PLAN

NEWARK POLLUTION ABATEMENT
FEASIBILITY STUDY

SOURCES OF POLLUTION IN STORM
SEWER SYSTEMS ON BLANCHARD,
LOCKWOOD AND BROWN STREETS

CLINTON BOGERT ASSOCIATES
CONSULTING ENGINEERS

PLATE  2

TSI-DBR-00040259

ALCD-PUBCOM_0006917





TSI-DBR-00040261
ALCD-PUBCOM_0006919



TSI-DBR-00040262
ALCD-PUBCOM_0006920



TSI-DBR-00040263
ALCD-PUBCOM_0006921



TSI-DBR-00040264

ALCD-PUBCOM_0006922





FLOW RATES AT THE
LISTER AVENUE TIDE GATE CHAMBER

TSI-DBR-00040266
ALCD-PUBCOM_0006924