

April 3, 2023

TO:    Emory A. Rounds
Director
U.S. Office of Government Ethics
1201 New York Ave NW #500
Washington, D.C. 20005

Corey Amundson
Chief, Public Integrity Section
Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

Inspector General Sean O'Donnell
Environmental Protection Agency
Office of Inspector General
1200 Pennsylvania Avenue, N.W. (2410T)
Washington, DC 20460

**Re: Request for Investigation into Potential Violation by David Batson of the Lifetime Ethics Ban (18 U.S.C. § 207)**

Dear Mr. Rounds, Mr. Amundson, and Mr. O'Donnell:

We write today over concerns about an alleged ethics violation involving a former employee of the Environmental Protection Agency (EPA) that has the potential to undermine the public's confidence in the government's management of one of the most expensive Superfund sites in the country. The actions of the former employee and the EPA may also be perceived as part of a broader effort by the agency to revamp the manner in which it administers the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) and manages the cleanup of other Superfund sites despite unclear legal authority to do so.

Media reports about a proposed consent decree on the Lower Passaic River have highlighted such concerns. Specifically, these reports note that the approach being taken could form the basis for a precedent to transfer billions of dollars of Superfund remediation costs on to the federal taxpayer while uniquely positioning the former employee's private contracting firm to benefit through the award of additional sole source contracts in the future. This type of revolving door activity is clearly harmful to the public's interest but also appears to run afoul of the individual's ethics obligations under the law. Accordingly, we request an investigation based on the following facts.



**Background**

David Batson's Work at EPA

David Batson worked at the EPA from 1979 to 2015, serving for his last 26 years as the Senior Alternative Dispute Resolution (ADR) Specialist and ADR Counsel, according to his LinkedIn profile.[1] Mr. Batson has extensive experience in the field of CERCLA and, from his own testimony in court filings, appears to be a certified expert in Superfund management and, specifically, the allocation process of determining liability and equitable responsibility for cleanup.[2] During his tenure with EPA, Mr. Batson developed a strong opinion on the role that he believed the Agency should play in directing and initiating remediation activities at Superfund sites. According to Mr. Batson, the EPA attempted to adopt this perspective through congressional action in the 1990's. Mr. Batson claims to be "the primary author of Section 413 of the Superfund Reform Act of 1994, which Congress considered but did not enact. The provision provided for the use of an allocation process, conducted by a non-government, third-party neutral, as the basis of settlement between the USEPA and PRPs [potentially responsible parties] for the costs of remediating Superfund sites."[3]

Mr. Batson subsequently led a pilot program in 1994-1995 at the EPA where his proposed allocation process was put into practice. An additional effort to revise the EPA's statutory role in the allocation process under CERCLA was attempted in 1999 as part of the Recycle America's Land Act of 1999.[4] This legislative effort also failed to become law and no subsequent efforts by the EPA have been undertaken to revise its role in the allocation process under CERCLA. However, it remains a distinct possibility that Congress will grant the EPA authority to adopt this process or, perhaps even more likely, that the EPA will determine it can implement such a system even absent express congressional authorization. Such a decision could prove extremely beneficial to any employer that retained Mr. Batson's services, as this firm would be uniquely positioned to operate as the preferred contractor to serve as a third-party neutral, a role tailored by Mr. Batson and one that fits his own expertise.

Mr. Batson's Move to the Private Sector

In 2015, Mr. Batson left his employment at the EPA and joined AlterEcho, a national environmental consulting firm, as a mediator and CERCLA allocation expert. According to Mr. Batson, he "specialize[s] in providing PRPs a range of ADR and technical services

---

[1] https://www.linkedin.com/in/david-batson-adr (Last visited March 20,2023)
[2] *Columbia Falls Aluminum Co. v. Atlantic Richfield Co.*, No. 9:18-cv-00131-DWM (D. Mont. 2020), ECF No. 82-1, David C. Batson, Esq., Cost Allocation Between Columbia Falls Aluminum Company and Atlantic Richfield Company Regarding Remedial Costs Associated With The Anaconda Aluminum Company Columbia Falls Reduction Plant Superfund Site, (Feb. 14, 2020) ("Expert Report").
[3] *Id*. at 6.
[4] H.R. Rep. No. 106-353 (1999).



to support the resolution of allocation disputes at federal and state hazardous waste sites."[5] According to trial testimony offered by Mr. Batson, he has been "continuously" working with a "PRP group to perform an allocation on their behalf" for the Lower Passaic site since 2016.[6] AlterEcho was part of a contract with EPA for the Diamond Alkali-Lower Passaic River Allocation, listing Mr. Batson in its staffing matrix in the role of "Senor allocation specialist."[7]

On behalf of AlterEcho, Mr. Batson has detailed his work on various Superfund sites while at the EPA. As is typical, many of these sites have taken years or even decades to initiate cleanup and complete the necessary remediation. Some remain outstanding to this day. One such site is "Diamond Alkali," located along the Passaic River in New Jersey (also known as the Lower Passaic River Superfund Site).[8] Mr. Batson's resume specifies his role in the site's management as "[m]ediated PRP Group organization and funding agreements, including design and implementation of allocation for operational funding, for sediment site involving dioxin, PCB and heavy metals contamination of urban waterway.  Supported PRP search activities and mediated selection of allocation consultant." [9]

His 2019 resume also identifies his most recent work on the site:

> Diamond Alkali Sediment OU2 Superfund Site, New Jersey – Served as allocator for the design and conduct of a unique allocation process to establish relative responsibility among over 100 PRPs for $1.5 Billion remediation of major urban river settlement site.[10]

Although described differently, the referenced sites are part of the same Superfund site and involve largely the same set of specific parties identified as bearing responsibility for the contamination and remediation. Mr. Batson clarifies this point in a 2019 court filing.[11] He describes his work, in trial testimony, as contributing to different phases of the site's cleanup:

> At the Passaic there is two phases of the Passaic case. Actually, there is three phases to the Passaic case. There was the phase that I was involved

---

[5] Expert Report at 7.
[6] *El Paso Natural Gas Company, LLC v. United States*, 3:14:cv-08165-DGC (D. Ariz. 2019), Notice of Filing of Official Transcript of Trial at 108, ECF No. 193.  ("Batson Testimony").
[7] Contract #68HERH19D0033, "Revised Work Plan and Pricing Estimate for Task Order Request #013: Diamond Alkali-Lower Passaic River Allocation," Eastern Research Group, Inc. (September 20, 2019) ("Diamond Alkali Allocation Task Order").
[8] Expert Report at 47-50.
[9] *Id*. at 49.
[10] *Id*. at 48.
[11] *El Paso Natural Gas Company, LLC v. United States*, 3:14:cv-08165-DGC (D. Ariz. 2019), Notice of Filing of Official Transcript of Trial at 108-109, ECF No. 193.  ("Batson Testimony").



> in as a convening neutral and someone that provided an allocation for the initial cost for that site, and that was back in, what, 10 years ago, 15 years ago. I forget the exact time.
>
> At that point, I went in, assisted the parties in dealing with their initial allocation of operating costs, worked with the parties as a convening neutral, assist them in hiring a party that did PRP searches. Actually, I helped – the agency helped to pay for part of those neutral services for PRP search purposes, and to go on to perform their first allocation.
>
> I have been employed since mid-2015 as a full-time neutral working with the now current PRP group to do their final allocation as it relates to the full two billion dollar remediation.[12]

Indeed, Mr. Batson's duties at the EPA required extensive engagement with outside entities, including receiving payments directly from them at times. In sworn testimony, Mr. Batson describes this unique role:

> So I would go out on a government salary, I would be paid by the government, all my other expenses would be paid by the private parties, travel, support services, scientific services, through direct supplying, obviously, of that service, so we didn't have to deal with the wonders of ethics rules. And I worked with, oh, a large number of different PRP groups as they were organizing as we went through the early stages of allocations, helping them to understand allocation practice, but also understand how to effectively negotiate that allocation with the government.[13]

Naturally, it appears reasonable to conclude that Mr. Batson was personally and substantially involved in allocating liability among PRPs in many of the Superfund sites he worked on, including the one located along the Lower Passaic River known as the Diamond Alkali site.

**Legal Obligations**

As a former federal employee, Mr. Batson is permanently restricted from participating in particular matters involving specific parties that he substantially and personally worked on while he was a federal official.[14] Sometimes referred to as the "Lifetime Ban," the criminal conflict of interest provision is meant to protect the public's trust in government

---

[12] *Id.* at 108-109.
[13] *Id.* at 64-65.
[14] *See* 18 U.S.C. § 207(a)(1).



actions by prohibiting federal officials from switching sides upon leaving federal service. Federal regulations provide further clarification.[15]

There are several elements to the prohibition. It must constitute: 1) a communication, 2) to or appearance before an employee of the United States, 3) with the intent to influence, 4) on behalf of any other person, 5) in connection with a particular matter involving a specific party or parties, 6) in which the former employee participated personally and substantially while an employee, and 7) in which the United States is a party or has a direct and substantial interest.[16]

Certain waivers and exceptions are also available.[17] Notably, the prohibition does not apply to a former employee who is "acting on behalf of the United States."[18] A further distinction is provided for those acting "as other than [an] employee of the United States."[19] Not all situations connected to working with the government in a contractual manner will qualify for an exception or waiver. For instance, the following are not deemed to be engaging in an activity on behalf of the government: "merely performing work funded by the government, engaging in an activity in response to a contact initiated by the government, because the government will derive some benefit from the activity, or because the former employee or person on whose behalf he is acting may share the same objective as the government."[20]

While not authoritative, EPA provides guidance to former employees that emphasizes the distinction that working as a federal contractor is not the same as "acting on behalf of the United States." Specifically, EPA's website states:

> Former employees can make representations back if they are carrying out official duties on behalf of the United States.  For example, the post-employment restrictions do not apply to a former employee who is re-employed by the United States or is called as a witness by Congress.
>
> The restrictions do apply, however, to former employees who work for a federal contractor.  That work is not deemed to be "an activity on behalf of the United States."  Working for a contractor will NOT absolve you from your post-employment restrictions. See 5 CFR. 2641.301(a) and (b).[21]

Fundamentally, the prohibition's intent is to prevent a revolving door where federal employees can exploit their taxpayer-funded experience by switching sides in a party

---

[15] 5 C.F.R. § 2641.201.
[16] *Id*. at § 2641.201(d)-(j).
[17] *Id*. at § 2641.201(b).
[18] *Id*. at § 2641.201(b)(1).
[19] 5 C.F.R. § 2641.301(a)(2)(ii)(B).
[20] *Id*.
[21] EPA, Office of General Counsel, *Leaving Federal Service (epa.gov)* (Last visited Mar. 20, 2023).



matter for the benefit of their new employer, even in situations where the new employer is a federal contractor.

**Analysis**

<u>The Diamond Alkali Superfund Site is a particular matter that involves specific parties spanning period when former employee personally and substantially worked on the matter</u>

The circumstances surrounding Mr. Batson's current role as allocator for AlterEcho, a private contracting firm, working on a decades-long Superfund site that he was personally and substantially involved in while an EPA employee, raise serious red flags and appear to violate his post-government ethics obligations under 18 U.S.C. § 207(a)(1) ("the Lifetime Ban").

While the process of cleanup at Superfund sites can extend over decades, the stages of cleanup – from identification of potentially responsible parties through complete remediation – are likely to be considered the same particular matter under the Lifetime Ban once the legal rights of specific parties come into play.[22] In the Diamond Alkali/Lower Passaic River site, many of today's PRPs have been identified and involved in Superfund negotiations dating back to the early 2000's. In fact, at least 14 parties that were Diamond Alkali PRPs during Batson's tenure at the EPA remain heavily involved and directly impacted, either positively or negatively, from his work on the same party matter after leaving federal service.[23]

According to public court filings, Mr. Batson worked on the Diamond Alkali Superfund site personally and substantially while an EPA employee in the mid-2000s.[24] Mr. Batson has testified that he participated in different "phases" of the Superfund site while in different capacities – first as an employee of the federal government and most recently as a federal contractor.[25] Indeed, since publication of the DOJ's proposed consent decree on December 22, 2022, many of these parties appear to have obtained a remarkable deal at the expense of other PRPs and possibly the taxpayer. Media reports indicate the 85 PRPs signing onto the agreement will be held responsible for just 11 percent of the total cost estimate, with no indication of where the remaining 89 percent will be covered.[26]

---

[22] 5 C.F.R. § 2641.201(h)(1).

[23] *Compare, In re: Lower Passaic River Study Area of the Diamond Alkali Superfund Site*, CERCLA Docket No. 02-2004-2011 (EPA Region 2, 2004), Agreement, at 49-50 App. A – List of Settling parties, *with* Scott Fallon, *EPA lands $150M for Passaic River cleanup, fraction of $1.4B cost. So who pays the rest?*, NORTHJERSEY.COM (Dec. 20, 2022), EPA gets $150M for $1.4B Passaic River cleanup. Who will pay the rest? (northjersey.com).

[24] *See*, *supra*, Expert Report and Batson Testimony.

[25] Expert Report at 64-65.

[26] Notice of Lodging of Proposed Consent Decree Under the Comprehensive Environmental Response, Compensation, and Liability Act, 87 Fed. Reg. 78710 (Dec. 22, 2022). *See also supra.*, S. Fallon, EPA gets



Regardless of the objectivity or the factual basis for the proposed consent decree, the situation has raised the appearance of impropriety with a significant financial benefit appearing to flow to numerous corporations that had worked with Mr. Batson while he was employed at EPA.

<u>Former employee's current role requires a direct communication to the EPA with an intent to influence the USG's position on a matter where it holds a substantial and direct interest</u>

The Diamond Alkali Allocation Task Order describes the services provided by Mr. Batson and his company, AlterEcho, a subcontractor of the Eastern Research Group ("ERG"), to the EPA. In the Task Order, ERG refers to AlterEcho and ERG jointly as the "ERG Team."[27] The services outline sustained and substantial direct communications by Mr. Batson to the EPA and the PAPs (Participating Allocation Parties) on behalf of ERG and AlterEcho in his role as the Senior Allocation Specialist.[28] His project duties include "conduct allocation and prepare draft and final allocation recommendation reports; lead communication and meetings with PAPs."[29] As noted in his project role, Mr. Batson's objective is to ultimately prepare a recommendation to the U.S. government on how allocation of liability among the PAPs should be divided, ostensibly toward the goal of reaching a settlement between the various parties, of which the United States remains a key figure.

The substantial and direct interest of the U.S. government in the Diamond Alkali's Superfund site cleanup is well established. Under CERCLA, the EPA is statutorily charged with managing the cleanup process and the EPA has been a significant player in the Superfund site for several decades. Court filings from 2016 show that the EPA expects to claim over $42 million in past transaction or oversight costs related to this site. The costs date back to 2000 and arguably cover at least some of the costs incurred by Mr. Batson while he was an employee of the EPA.[30]

<u>Former employee – and his current employer – possess different interests than those of the United States</u>

On this particular site, which is projected to be one of the most expensive remediations in Superfund history, the EPA has also adopted a unique approach to the allocation process. The process adopted by the EPA at Diamond Alkali closely resembles the allocation

---

$150M for $1.4B Passaic River cleanup. Who will pay the rest? (northjersey.com), NORTHJERSEY.COM (Dec. 20, 2022),
[27] *See* Diamond Alkali Allocation Task Order.
[28] *Id.*
[29] *Id.* at 17.
[30] *In re: Maxus Energy Corp.*, No. 16-11501 (CSS) (Bankr. Del. 2016), Declaration of Alice Yeh, ECF No. 2379 at 2, ¶ 5.  ("In calculating this [$42.6M] figure, EPA tallied its response costs incurred since 2000 in connection with the [Lower Passaic River Study Area] LPRSA.") ("Maxus Energy Corp")



process Mr. Batson claims to have developed in the 1990's, which he (and the EPA) subsequently sought to enact into law through amendments to CERCLA. Although both legislative efforts failed, the EPA now appears to have revived this particular approach and used it to form the basis for the current Diamond Alkali proposed settlement.

This history raises questions of regulatory overreach, especially in light of the U.S. Supreme Court's *West Virginia v. EPA* decision.[31] That ruling sought to limit the agency from asserting power that Congress had considered and decided not to grant them.[32] However, as troubling as this aspect is, the deep involvement by Mr. Batson as the self-proclaimed father of the EPA-driven allocation process, now adopted by EPA at Diamond Alkali, and his long-standing personal participation in the site only increase concern that public trust in the process could be undermined by the appearance of conflicts of interest. Indeed, both in terms of his legislative efforts while at EPA and his transition to work as a federal contractor on one of the largest Superfund cleanups in the program's history, Mr. Batson has positioned himself – and his employer – to be the preferred vendor if the EPA intends to adopt this approach at other Superfund sites. The potential for Mr. Batson and any employer of his to gain the inside track on a contracting opportunity such as this is striking. It also is important for assessing whether he has been acting on behalf of the United States while performing his duties at AlterEcho.

Former employee is acting on behalf of his current employer, not the United States

As noted above, EPA's own ethics guidance indicates that activities on behalf of federal contractors are not deemed to be acting on behalf of the United States and governmentwide ethics guidance also strongly suggests that Mr. Batson's work for AlterEcho remains subject to the Lifetime Ban. That is, the Office of Government Ethics (OGE) has discussed the important distinctions between post-government restrictions under 18 U.S.C. §§ 203, 205 and those under 18 U.S.C. § 207, the Lifetime Ban:

> We also think it is significant that two related statutes, unlike section 207, contain express exceptions for certain representational activity during the performance of Government contracts. Sections 203 and 205 of title 18, which were enacted originally as part of the same legislation as section 207, expressly exempt certain representational activity "in the performance of work under a grant by, or a contract with or for the benefit of, the United States." 18 U.S.C. 203(e), 205(f). These provisions indicate that Congress knew how to exempt, explicitly, representational activity in the performance of contracts. Perhaps more telling, these provisions also

---

[31] *West Virginia v. Environmental Protection Agency*, 142 S.Ct. 2587 (2022).

[32] *See id*. at 2614  (In rejecting EPA's efforts to expand its authority to regulate greenhouse gas emissions beyond individual power plants, the Court ruled  "we cannot ignore that the regulatory writ EPA newly uncovered conveniently enabled it to enact a program that . . . Congress considered and rejected multiple times." (Citations omitted)).



indicate that Congress carefully imposed very significant limitations and safeguards when it did choose to exempt such activity. *See* section 203(e) (applicable only to special Government employees; requires certification from agency head that activity is in national interest; requires publication of certification in **Federal Register**); section 205(f) (same). It is difficult to believe that Congress would have intended a broad exclusion in section 207 without even mentioning the subject, let alone without imposing any limits on the circumstances under which such activity would be permitted.[33]

In many instances, contractors for the government would appear to remain subject to the post-government employment restrictions under the Lifetime Ban if for the simple reason that their interests often diverge from the government.

> The proposition that Government contractors may have their own interests in recommending certain courses of action as opposed to others should not be surprising. This concern is even illustrated by newspaper headlines. *See* Ariana Eunjung Cha, *Shuttle Safety* vs. *Profit: Contractors Had `Potential' Conflict*, Washington Post, August 27, 2003, at A13."[34]
>
> [T]he Government and its contractors have their own interests in the performance of a contract, which are not necessarily identical.[35]

Perhaps for this reason, OGE has also rejected an agency recommendation to create an exception to permit former employees to make certain contacts during the performance of a government contract.

> According to this agency, a former employee who is now employed by a Government contractor should be permitted to make communications and appearances before the Government during the performance of the contract, provided that the contractor exerts no control over the former employee in the making of the communication or appearance. Under such circumstances, the commenter thought "it is at least arguable that the communication is not made on behalf of' the contractor."
>
> OGE has not followed this recommendation in the final rule. A contractor's employee is fulfilling his or her duties as an employee when performing the work of the contractor. Under such circumstances, **OGE cannot avoid the conclusion that the contractor's employee is acting on behalf of his or her employer.** *See, e.g.*, Restatement of the Law

---

[33] Post-Employment Conflict of Interest Restrictions, 73 Fed. Reg. 36168, 36174 (June 25, 2008).
[34] *Id*.
[35] *Id*. at 36182.



> (Second) Agency section 2(2) (1958) (servant is agent employed by master to perform service in his affairs whose physical conduct in performance of service is controlled or is subject to right to control by master); *id.*, comment a (servant is species of agent). (emphasis added).[36]

Under the current set of available facts, it is not difficult to view Mr. Batson's activities on behalf of AlterEcho as a financial benefit to himself, his employer, and his future career prospects as the vendor of choice to manage a novel allocation process at Superfund sites.

<u>Federal contractors did not acknowledge potential conflicts of interest involving former employee</u>

On a final note, the importance of federal contractors avoiding conflicts of interest cannot be overstated. EPA's Acquisition Regulations require that its contractors do so and failure to do so can result in debarment or other penalties.[37] EPA contracts also require contractors to provide an annual certification that all actual or potential conflicts of interest have been reported to EPA.[38] Despite Mr. Batson's prior participation in the Diamond Alkali party matter, ERG expressly provided such a Conflict of Interest Certification, stating that "none of the individuals proposed for work under this Order has any personal conflicts of interest."[39] ERG's submission of this Certification raises the question of whether they conducted proper due diligence in its preparation.

**Conclusion**

Many federal employees gain tremendous expertise and experience while performing their official duties. Some, like Mr. Batson, spend decades accruing knowledge on niche and extremely complex areas of the law that necessarily involve interacting with many large organizations on high-stakes environmental matters. Both the amount of taxpayer funds expended and the private sector liability to be allocated can be massive in programs like the Superfund. Consequently, the incentives to switch sides, and the potential to erode the public's trust in its government, can be enormous. This is why the government has imposed ethics restrictions under the criminal code, in order to deter such behavior.

Based on whistleblower revelations, publicly available documents, court filings, and media reports, Mr. Batson's engagement in the Diamond Alkali matter since leaving federal service appears to run counter to his ethics obligations under the law. Perhaps unsurprisingly, his ongoing involvement with the site has left his employer well-

---

[36] *Id.* at 36175.
[37] 48 C.F.R. § 1552.209-71, Organizational Conflicts of Interest, and *id.* § 1552.209-73 Notification of Conflicts of Interest Regarding Personnel.
[38] *Id.* § 1552.209-75 Annual certification.
[39] Diamond Alkali Allocation Task Order at 20.



positioned to financially benefit into the future. Just as importantly, it may well have dramatically changed the course of the Diamond Alkali cleanup process and significantly impacted the legal positions of numerous parties with whom he dealt as a federal employee. The ethics rules at issue are aimed at and prevent switching of sides by former federal employees, which can undermine that trust and confidence, and which may have occurred in this case by Mr. Batson.

The federal government has become vast, with trillions of dollars appropriated in the last few years alone to fund new government programs. Countless federal employees are no doubt likely to be tempted by the opportunity to switch sides after leaving federal service, which could further erode the public's trust in its government as a neutral and impartial participant. Enforcement of the Lifetime Ban is one of the few ways to discourage this behavior. Thus, I respectfully request that you conduct an investigation into Mr. Batson's activities since leaving the federal government and determine whether they constitute a violation of 18 U.S.C. § 207 or any other relevant law, rule or regulation and take appropriate legal action as warranted.[40] Additionally, any investigation should consider whether the Eastern Research Group or AlterEcho, both government contractors, fully complied with their obligations to avoid conflict of interests in the performance of their federal awards. Thank you for your consideration.

Respectfully,

Michael Chamberlain
Director
Protect the Public's Trust

---

[40] *See, e.g.*, 5 C.F.R. § 2641.103.