**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**
**NEWARK VICINAGE**

UNITED STATES OF AMERICA,

Plaintiff,

-v-

ALDEN LEEDS, INC., et al.,

Defendants.

Hon. Madeline Cox Arleo, U.S.D.J.
Hon. Leda D. Wettre, U.S.M.J.

Civil Action No. No. 2:22-cv-07326 (MCA-LDW)

**NOKIA OF AMERICA CORPORATION'S BRIEF IN RESPONSE TO UNITED STATES'S MOTION TO ENTER CONSENT DECREE**

Michael D. Lichtenstein, Esq.
Thomas E. Mesevage, Esq.
Zachary L. Berliner, Esq.
**LOWENSTEIN SANDLER LLP**
One Lowenstein Drive
Roseland, New Jersey 07068
(973) 597-2408
mlichtenstein@lowenstein.com
tmesevage@lowenstein.com
zberliner@lowenstein.com
*Counsel for Intervenor*
*Nokia of America Corporation*

# TABLE OF CONTENTS

**Page**


PRELIMINARY STATEMENT .......... 1

BACKGROUND .......... 4

A. The Proposed CD and Its Impact on Nokia .......... 4

B. The Allocation and its Results. .......... 8

C. The United States's Reliance on the Allocation Report to Select APs Eligible for Settlement and APs to Be Work Parties. .......... 11

D. The "Inherent Limitation" in the Allocation Scoring: The Allocator's Inferences, Assumptions, and Failure to Produce a Numerically Significant Ranking of APs. .......... 12

E. Uncertainty of the Tiering. .......... 14

LEGAL ARGUMENT .......... 17

I. Legal Standard. .......... 17

II. The United States's Decision to Draw the Line Between the Tier 2 Parties and the Settling Defendants (Tiers 3 to 5) is Based on an Arbitrary and Irrational Determination of Comparative Fault. .......... 18

III. Any Reliance by the United States on the Alternative Method to Justify Its Treatment of the Tier 2 Parties Does Not Solve the Tiering Problem But Merely Adds Unfairness By Breaching the Protocol and Judicial Precedent to Artificially Inflate the Tier 2 Share. .......... 22

a. The Alternative Method Does Not Fix the Tiering's Uncertainty. .......... 23

b. The Alternative Method Increases Unfairness to the Tier 2 APs By Violating the Approved Protocol, Defying Judicial Precedent, and Artificially Inflating the Alleged Tier 2 Share. .......... 25

IV. The United States's Disregard of the Allocator's Culpability and Cooperation Findings Does Not Justify Its Treatment of the Tier 2 Parties, Does Not Solve the Tiering Problem, and Adds Unfairness By Breaching the Approved Protocol and Judicial Precedent and Ignoring Undisputed Facts to Artificially Inflate the Tier 2 Share. .......... 28

a. Removing the Culpability and Cooperation Findings Does Not Fix the Tiering Problem .......... 29

b. Removing the Culpability and Cooperation Findings Unfairly Increases the Tier 2 Percentages Even More. .......... 29

V. The United States Failed to Engage the Tier 2 Parties in Good-Faith Settlement Negotiations .......... 31

CONCLUSION .......... 32

DECLARATIONS

1. Declaration of Zakariah E. Sabatka
2. Declaration of Stephanie Plancich
3. Declaration of Mark A. Kauffman, Jr.
4. Declaration of Talaat Ijaz

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Agere Sys., Inc. v. Advanced Env't Tech. Corp.*,
602 F.3d 204 (3d Cir. 2010)....................31

*Bd. of Cnty. Comm'rs v. Brown Grp. Retail, Inc.*,
768 F. Supp. 2d 1092 (D. Colo. 2011)....................26

*Caldwell Trucking PRP Grp. v. Pullman Co.*,
No. 95-cv-1690, 2002 U.S. Dist. LEXIS 28410 (D.N.J. Nov. 21, 2002), *aff'd sub nom. Caldwell Trucking PRP v. Rexon Tech. Corp.*, 421 F.3d 234 (3d Cir. 2005)....................26

*California Department of Toxic Substances Control v. Allen's Formal Wear, Inc.*,
Civ. No. 13-5069, 2014 WL 12561578 (C.D. Cal. Mar. 24, 2014)....................32

*City of Bangor v. Citizen Commc'ns Co.*,
Civ. No. 02-183-B-S, 2007 U.S. Dist. LEXIS 38762 (D. Me. May 25, 2007), *aff'd*, 532 F.3d 70 (1st Cir. 2008)....................18

*City of Bangor v. Citizens Commc'ns Co.*,
532 F.3d 70 (1st Cir. 2008)....................17

*Litgo N.J., Inc. v. Martin*,
No. 06-cv-2891, 2010 WL 2400388 (D.N.J. June 10, 2010), *aff'd sub nom. Litgo N.J. Inc. v. Comm'r N.J. Dep't of Env't Prot.*, 725 F.3d 369 (3d Cir. 2013)....................26

*Litgo N.J., Inc. v. Martin*,
No. 06-cv-2891, 2011 WL 5325655 (D.N.J. Nov. 2, 2011).................... 17, 30

*Lockheed Martin Corp. v. United States*,
35 F. Supp. 3d 92 (D.D.C. 2014), *aff'd*, 833 F.3d 225 (D.C. Cir. 2016)....................31

*New York v. City of Johnstown*,
No. 87-cv-636, 1998 U.S. Dist. LEXIS 5037 (N.D.N.Y. Apr. 2, 1998)....................18

*Occidental Chem. Corp. v. 21st Century Fox Am.*,
No. 18-cv-11273, 2022 WL 21296506 (D.N.J. Mar. 10, 2022) ..................... 30

*Trinity Indus., Inc. v. Greenlease Holding Co.*,
903 F.3d 333 (3d Cir. 2018)..................................................................... 10

*In re Tutu Water Wells CERCLA Litig.*,
326 F.3d 201 (3d Cir. 2003)............................................................. 17, 19

*United States v. Atlas Mins. & Chems., Inc.*,
Civ. No. 91-5118, 1995 U.S. Dist. LEXIS 13097 (E.D. Pa. Aug. 22, 1995)................................................................................................ 26

*United States v. BASF Corp.*,
990 F. Supp. 907 (E.D. Mich. 1998) ........................................................ 18

*United States v. Cannons Eng'g Corp.*,
899 F.2d 79 (1st Cir. 1990)...........................................................18, 31, 32

*United States v. Charles George Trucking, Inc.*,
34 F.3d 1081 (1st Cir. 1994) ................................................................... 18

*United States v. Davis*,
11 F. Supp. 2d 183 (D.R.I. 1998), *aff'd*, 261 F.3d 1 (1st Cir. 2001)......... 17, 18

*United States v. Davis*,
31 F. Supp. 2d 45 (D.R.I. 1998) .............................................................. 26

*United States v. Kramer*,
19 F. Supp. 2d 273 (D.N.J. 1998) ............................................................ 17

*United States v. Kramer*,
953 F. Supp. 592 (D.N.J. 1997)................................................................ 26

*United States v. Se. Pa. Transp. Auth. ("SEPTA")*,
235 F.3d 817 (3d Cir. 2000)............................................................. 17, 19

**STATUTES**

42 U.S.C. § 9607(a) ..................................................................................5

42 U.S.C. § 9613(f)(1)...........................................................................4, 5

## PRELIMINARY STATEMENT

When the United States first proposed an allocation process (the "Allocation") to calculate non-binding shares of responsibility for the cleanup of the Lower Passaic River (the "LPR"), the United States Environmental Protection Agency ("EPA") promised "transparency and fairness . . . concepts that EPA consistently stated are of importance to the Agency." *See* Declaration of Alice Yeh ("Yeh Decl."), ECF No. 288-5, Exh. E at 1. In deciding to participate in the Allocation, Nokia relied on this commitment and participated in good faith.

The goal of allocator David Batson (the "Allocator") was to produce a numerically significant ranking of the 79 Allocation Parties' ("APs") relative shares of responsibility to inform settlement decisions between the APs and EPA. However, in his final Allocation Report, the Allocator admitted that data limitations in the Allocation were so significant that he could not produce such a ranking with a degree of reliable certainty.

To solve this problem, the Allocator split the APs into five "Tiers," claiming that each grouped APs of similar responsibility within an "acceptable level of certainty." Allocation Recommendation Report (Dec. 28, 2020) ("Allocation Report"), ECF No. 289, at ARR0035. But the Allocator did not explain how he did this nor what he meant by or how he assessed "acceptable level of certainty."

Occidental Chemical Company ("OxyChem"), the successor to Diamond Alkali Company, was assigned a 99.94% share and placed alone in Tier 1. OxyChem alone bears responsibility for the largest share of risk driving the need to clean up the LPR. *See* Yeh Decl., ECF No. 288-5, ¶ 16. Indeed, the United States concludes that, but for the Diamond Alkali Company operations and releases, it is unknown if the LPR would have become a Superfund site or, if so, what type of cleanup would be appropriate. Declaration of Michael Sivak, ECF No. 288-7, ¶ 11.

In stark contrast to OxyChem's share, the Allocator collectively assigned 73 APs 0.06% share of relative responsibility, which the Allocator then divided into four tiers: Tiers 2 to 5. The Tier 2 parties—limited to Intervenors Nokia of America Corporation ("Nokia") and Pharmacia LLC ("Pharmacia")—were assigned a combined 0.044% share. This separated Tier 2 from the APs put in Tier 3 by a gap of less than three hundredths of a percent.

This slight distinction between Tier 2 and Tier 3 is the basis for the United States's pivotal enforcement decision that Tier 3 APs could negotiate a cashout settlement—resulting in the consent decree now before the Court (the "Proposed CD" or the "Proposed Settlement")—while Tier 2 APs were unilaterally deemed work parties exposed to joint and several liability for performing and/or funding the rest of the $1.89 billion cleanup of the LPR. In so doing, the United States relied

solely on the Allocator's conclusory statement that the distinction between the relative responsibility of the Tier 2 APs and the Tier 3 APs is acceptably certain.

Nokia's expert, Dr. Stephanie Plancich, Ph.D. ("Dr. Plancich"), unequivocally finds that this conclusion fails. With a simple sensitivity test, she confirms that the Allocator's assignment of APs to Tier 2 or Tier 3 is effectively a result of chance. Chance cannot be the basis for government action.

Nokia has repeatedly sought an opportunity to address the United States's arbitrary distinction between Tier 2 and Tier 3 parties and engage in substantive settlement negotiations to resolve its liability. The United States has steadfastly refused to engage. This is neither the fairness nor the transparency the United States promised at the start of the Allocation.

Nokia does not oppose a settlement that resolves the liability of parties with a minor share of responsibility for the cleanup. But it does object to the unfairness that the Proposed Settlement will visit on Nokia if Nokia is denied an opportunity, during the pendency of the Court's review of the Proposed CD, to engage with the United States and remedy its random decision to treat Nokia differently than the Tier 3 parties.

Transparency, fairness, and this Court's obligation to evaluate the impact of the Pending CD on non-settling parties call for nothing less.

## BACKGROUND

### A. The Proposed CD and Its Impact on Nokia.

Through the Proposed CD, the United States seeks to settle the liability of 82 companies (the "Settling Defendants") that it deems legally responsible for the projected $1.89 billion cleanup (the "Cleanup") of the 17-mile LPR[1]—one of the largest cleanups in Superfund history—for a total of $150 million. The United States has excluded Intervenor Nokia,[2] also deemed responsible for the Cleanup and indistinguishable from many, if not all, Settling Defendants in terms of responsibility, from the Proposed CD.

The Proposed CD materially affects Nokia's interests. Notably, if approved, the Proposed CD would protect the Settling Defendants from CERCLA contribution claims under Section 113(f)(1) of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9613(f)(1), for "matters addressed" in the Proposed CD, defined as "all response actions taken or to be taken and all response costs incurred or to be incurred, at or in connection with OU2 and

[1] *See* Yeh Decl., ECF No. 288-5, ¶ 56 (listing $1.89 billion in total estimated Cleanup costs).

[2] Nokia is the contractual successor to the environmental liabilities of the Western Electric Company for its former Kearny Works facility in Kearny, New Jersey. Declaration of Zakariah E. Sabatka ("Sabatka Decl.") ¶ 5. Closed in 1984, the Kearny Works manufactured equipment for The Bell Operating System, the group of telecommunication companies, led by the Bell Telephone Company and later by the American Telephone and Telegraph Company ("AT&T"). *Id.* ¶ 6.

OU4,[3] by the United States or any other person, except the State [of New Jersey] . . . ." Proposed CD, ECF No. 283, § 23. The Settling Defendants may argue that this provision eliminates Nokia's right under CERCLA § 113(f)(1), 42 U.S.C. § 9613(f)(1), to seek contribution from them concerning the entire 17-mile LPR.

Further, if the Proposed CD is approved, the United States covenants not to sue or take administrative action against the Settling Defendants under CERCLA §§ 106 and 107(a), 42 U.S.C. §§ 9606, 9607(a), concerning the LPR. Proposed CD, ECF No. 283, § 13. This would leave OxyChem—the party responsible for dioxin discharges to the LPR and allocated the vast majority of responsibility—and only a few parties, including Nokia, subject to potential joint and several liability, exposing Nokia, despite its miniscule share, to a calamitous financial risk. Thus, Nokia has a protectable interest in ensuring that the Proposed CD is fair to all affected parties, reasonable, and consistent with CERCLA's purposes, and does not arise from arbitrary government conduct.[4]

Like many Settling Defendants, Nokia is a defendant in two lawsuits brought by OxyChem, pending in this Court, that would result in a Court-imposed equitable

[3] For EPA's administrative purposes, OU2 and OU4 are distinct but overlapping portions, or "operable units" ("OUs"), of the LPR: OU2 is the "lower" 8.3 miles of the LPR, and OU4 is the full 17-mile LPR. Yeh Decl., ECF No. 288-5, ¶¶ 6.b, d.

[4] It is this interest that led to Nokia's motion to intervene.

allocation of the Cleanup costs among over 100 parties.[5] Also like the Settling Defendants, Nokia participated fully in the Allocation, sponsored by EPA and conducted by the Allocator, that ended in December 2020 with the issuance of the Allocator's Final Allocation Recommendation Report (the "Allocation Report"). Sabatka Decl. ¶ 8. The United States admits that the Proposed CD is based on the results in the Allocation Report. Memorandum in Support of United States of America's Motion to Enter Consent Decree ("U.S. Br."), ECF No. 288-1, at 19.

Nokia similarly has sought to settle its liability for the Cleanup based on the Allocation Report by making several settlement offers to the United States, most recently in June 2022. Sabatka Decl. ¶ 9. However, the United States has not only failed to respond to Nokia's offers but declared Nokia ineligible for a cashout settlement like the one provided to the Settling Defendants in the Proposed CD. *Id.* ¶¶ 10–12. Long before finalizing the Proposed CD, EPA and the United States Department of Justice ("DOJ") informed Nokia, Pharmacia, and Public Service Electric & Gas Co. ("PSEG") in November 2021 that they, along with OxyChem, will be "work parties" responsible for funding and performing the Cleanup. *Id.* ¶ 11, Exh. A at 3. Similarly, in March 2022, EPA sent Nokia a notice asking Nokia (and

[5] These two actions are: *Occidental Chem. Corp. v. 21st Century Fox Am., et al.*, No. 2:18-cv-11273 (D.N.J.) ("*21st Century Fox*") and *Occidental Chem. Corp. v. Givaudan Fragrances Corp., et al.*, No. 2:23-cv-01699 (D.N.J.) ("*Givaudan*").

OxyChem, Pharmacia, PSEG, and PMC[6]) to submit an offer to negotiate a consent decree to fully finance and perform the Cleanup. *Id.* ¶ 12, Exh. A at 4.

The United States's stated rationale for its disparate treatment of Nokia is the Allocation. After reviewing the Allocation Report, EPA and DOJ identified:

> two classes of parties: those whose share of liability is such that they would be appropriate for a cash-out settlement, and those whose share of liability is large enough that they should participate in the performance and/or funding of the cleanups of [the LPR] (hereinafter, 'work parties').

*Id.*, Exh. A at 3. But, as Nokia shows below, the Allocation Report fails to establish that Nokia's share of responsibility is genuinely distinguishable from the shares, collective or individual, of the Settling Defendants. The rationale for excluding Nokia from a cashout settlement lacks a legitimate basis and is, thus, arbitrary.

Nokia is not a recalcitrant party—one that was offered and rejected a chance to settle with the United States. Rather, for almost twenty years, Nokia has engaged with EPA in good faith to further the cleanup of the LPR, funding and performing response activities with many Settling Defendants.[7] *Id.* ¶ 13. Yet the United States

[6] PSEG and PMC were also APs but are not included in the Pending CD.

[7] For years after EPA designated the LPR as part of the Diamond Alkali Superfund Site, Nokia has cooperated with EPA, agreeing as part of the Cooperating Parties Group ("CPG") to initially fund, and later perform, an investigation and study of the LPR. From 2012 to 2014, Nokia was also prominent among the companies that implemented a sediment cleanup of a portion of the LPR.

has never offered Nokia the opportunity to negotiate a resolution of its liability and, instead, blocked Nokia from the over-two-year negotiation of the Proposed CD.

In sum, the United States has offered Nokia no option other than fully financing and performing the Cleanup on a joint and several basis, an option taken up by neither OxyChem nor any other party. This predicament is not of Nokia's making; it arises from the United States's reliance on the Allocator's spurious claim of "certainty" in the Allocation tiering to distinguish Nokia from the Settling Defendants and its refusal to negotiate in good faith with Nokia.

**B. The Allocation and its Results.**

Starting in the fall of 2017, EPA sponsored the Allocation to produce a non-binding allocation of responsibility for the Cleanup costs, promising "transparency and fairness" as inducements to participate. Yeh Decl., ECF No. 288-5, Exh. E at 1. While participation was "voluntary," EPA made it clear that should Nokia (or any other invited party) not participate, such party would still receive a share upon which the United States would make enforcement decisions. Placing great weigh on the United States's commitment to fairness, Nokia elected to participate.

The APs, the Allocator, and the United States at length discussed and negotiated the Allocation scope and design. The final Allocation scope covered 92 facilities associated with 79 APs, of which 69—including Nokia—were Participating Allocation Parties ("PAPs"). Allocation Report, ECF No. 289, at

ARR0018. OxyChem was invited to participate but declined. Yeh Decl., ECF No. 288-5, ¶¶ 36–37. The Approved Protocol, intended to be "[c]onsistent with judicial precedent and customary allocation practice," Diamond Alkali Superfund Site OU2 Allocation Protocol ("Approved Protocol"), ECF No. 289-3, at ARR0307, set forth the agreement of the United States, the PAPs, and the Allocator as to the Allocation's process steps, notions of equity, and standards of reliability. Nokia had every reason to believe that the Approved Protocol would be faithfully applied in future government enforcement—anything else would resemble a "bait and switch."

The PAPs, including Nokia, strongly advocated for participation of the Passaic Valley Sewer Commission ("PVSC"), Yeh Decl., ECF No. 288-5, ¶ 28, a major polluter of the LPR, *see infra* p. 27. However, EPA refused to include the PVSC in the Allocation or even let the Allocator assign the PVSC a liability share. Yeh Decl., ECF No. 288-5, ¶¶ 28, 33. EPA has never adequately explained this exclusion of a party bearing a material share of responsibility.

Despite this, Nokia concluded that the Allocation would remain fair because the Approved Protocol provided that "shares of responsibility . . . that cannot be attributed to any of the [APs]" would be distributed to the APs "on a pro rata basis according to their respective allocation shares." Approved Protocol, ECF No. 289-3, at ARR0307. A *pro rata* allocation preserves the APs' relative equitable shares determined by the Allocator; no AP is helped or hurt by the PVSC's or anyone else's

absence from the Allocation. By endorsing the Approved Protocol, EPA agreed that *pro rata* distribution of absent and "orphan"[8] parties' liability aligned with usual allocation practice and judicial precedent, was appropriate for the Allocation, and was the rule for the Allocation.

The Allocator issued the Allocation Report in December 2020. Yeh Decl., ECF No. 288-5, ¶ 47. Based on the notions of equity agreed to by the United States, the Allocator found that, as among the 79 APs, OxyChem is 99.94% responsible, with *all 78 other APs sharing the remaining 0.06%*—a share over *1,600 times*




[8] An "orphan" share that can be allocated among other parties is one that "belong[s] to entities that are unknown, insolvent, or immune from suit." *Trinity Indus., Inc. v. Greenlease Holding Co.*, 903 F.3d 333, 347 n.6 (3d Cir. 2018). This is not the same as the share of a known, solvent party that is simply absent from the proceeding for another reason.

*smaller* than OxyChem's. Allocation Share Relative Ranking & Allocation Tier Designations, ECF No. 289-19, at ARR3240.

**C. The United States's Reliance on the Allocation Report to Select APs Eligible for Settlement and APs to Be Work Parties.**

The Allocator then divided the 79 APs' final relative shares into five Tiers. Understandably, he put only OxyChem in Tier 1. He split all other APs within the 0.06% non-OxyChem share into 4 more Tiers—Tiers 2 to 5. EPA and DOJ then reviewed the Allocation Report and, based on the Allocator's Tiers, determined that the individual and collective shares of the APs in Tiers 3 to 5 were "minor," and thus, those APs were eligible for cashout settlement. Yeh Decl., ECF No. 288-5, ¶ 54. The United States's pivotal choice of parties eligible for a cashout settlement, versus parties designated as "work parties," was based solely on the Allocator's tiering of the APs and claim that the tiering achieved "an acceptable level of certainty." Allocation Report, ECF No. 289, at ARR0035. Indeed, the Allocation provides no other basis to distinguish the APs but the tiering.

The Allocator-determined relative equitable shares of the APs under the Approved Protocol, and the United States's resulting enforcement classifications, are as follows:

| Relative Equitable Shares & Enforcement Classification | | | | |
|---|---|---|---|---|
| Allocation Tier Designation | Party | Allocation Share | Non-OxyChem Share | Enforcement Classification |
| Tier 1 | OxyChem | 99.940% | | Work Party |
| Tier 2 | Nokia & Pharmacia | 0.044% | 0.060% | Work Party |
| Tiers 3-5 | All other APs | 0.016% | | Eligible for Cash-out Settlement |
| | | 100% | | |

Notably, the difference between Tier 2 and Tiers 3 to 5 is reported in mere hundredths of a percent.

### D. The "Inherent Limitation" in the Allocation Scoring: The Allocator's Inferences, Assumptions, and Failure to Produce a Numerically Significant Ranking of APs.

The Allocator's task was immense. It included quantifying the mass of each of eight contaminants of concern ("COCs") discharged into the LPR from each of the 92 AP facilities that remain in OU2 sediments after "actions of natural processes and human activities." *Id.* at ARR0028–29.

The large data limitations fundamental in such an effort are obvious. Most AP facilities operated for over a century—often for decades before the enactment of seminal environmental laws like the Clean Water Act, which required permitting and monitoring of certain discharges to the LPR. Documents that might have provided

a real-time record of polluting activities were destroyed, unavailable, or not provided to the Allocator. The Allocation was also time and expense limited. *See* Revised Work Plan for the Allocation, ECF No. 289-2, at ARR0120.

Facing material evidentiary gaps, the Allocator filled them with inference and assumption. He made large extrapolations from small data sets. Further, the nature and extent of data provided to the Allocator by the EPA and PAPs diverged widely. Some facilities underwent intense environmental investigation under laws like the New Jersey Industrial Site Recovery Act, N.J.S.A. 13:1K-6 *et seq.*, which requires investigation and remediation when certain types of operations are sold or closed. Other facilities averted such investigation. Generally, the Allocator treated the absence of data—say, the failure to have sampled for a particular COC at a facility—as indicating zero discharge of that COC from the facility.

In May 2019, after the Allocator's work began, the PAPs, the Allocator, and EPA negotiated and adopted an Addendum to the Approved Protocol. Approved Protocol, ECF No. 289-3, at ARR0356–58. The Addendum set a standard to govern inferences:

> The Allocator will rely on the most reliable analytical approaches in establishing inferences for use in determining an appropriate equitable allocated share . . . .

*Id.* Accordingly, inferences were to have *scientific* validity. Further, the Allocator could make assumptions to estimate mass only when "established in consensus with

the [PAPs].” *See id.* at ARR0356. However, the Allocator failed in important ways to abide by this standard. *See infra* pp. 19–20.

At the Allocation’s outset, the Allocator’s goal was to numerically rank the APs, from top to bottom, according to their respective shares of responsibility:

> The intent of the allocation process is to produce a numerical ranking of the relative responsibility of the [APs] with a sufficient numerical significance to provide a basis for informed settlement decisions among and between the [APs] and EPA.

Allocation Report, ECF No. 289, at ARR0019. Yet, as the Allocator recognized, data limitations were so significant that the Allocation could not rank the liability shares of the 78 non-OxyChem APs with an acceptable level of certainty. *Id.* at ARR0035. The Allocator found this to be an “inherent limitation” of the Allocation, one that impeded the Allocator’s “ability to specify the relative relationship between equitable shares assigned to the [APs].” *Id.* As the Allocator stated:

> [D]ata limitations have created a sufficient uncertainty in the determination of allocation shares and substantially affect the credibility of the relative numerical share calculations among and between similarly ranked individual [APs].

*Id.*

**E. Uncertainty of the Tiering.**

Despite this uncertainty, the Allocator claimed to split the APs into “five numerically significant tiers,” each with APs “of similar responsibility within an acceptable level of certainty.” *Id.* The Allocator did not explain how he did this or

what he meant by "an acceptable level of certainty." It appears that the Allocator merely "eye-balled" the APs' shares and created tiers of what he *believed* looked like similar numbers. Still, the Allocator acknowledged that "the specific location of an [AP] within each tiered grouping should be considered insignificant for purposes of the allocation." *Id.*

As the Allocator does not explain how he created or assessed the certainty of his Tiers, Nokia retained two experts to conduct a study to determine whether the distinction between the scores of the Tier 2 and Tier 3 APs was material to a reasonable degree of statistical certainty. *See* Declaration of Stephanie Plancich ("Plancich Decl.") ¶¶ 1–3. In other words, the study was designed to gauge whether the microscopic gap between these two Tiers meant anything at all.

As further detailed below,[9] the study tested the uncertainty of the Allocator's scoring and tiers by using a valid alternative assumption for a key input to the Allocation model and evaluating its impact on the results (commonly called a sensitivity analysis). *Id.* ¶ 15. While the Allocation model has many data inputs—each with potential for error and uncertainty—the study adjusted only one: the estimate of the mass of one COC, polychlorinated biphenyls ("PCBs"), in surface soils used to calculate PCB discharge to the LPR via soil erosion (the Overland Fate

---

[9] *See infra* pp. 19–22.

and Transport ("OFT") Pathway). *Id.* ¶ 21; Declaration of Mark A. Kauffman, Jr. ("Kauffman Decl.") ¶ 10.

The study identified the APs assigned nearly all (about 99%) AP PCB mass in the Allocator's model (the "PCB Group APs"). The seven PCB Group APs span the "work party" and "cash-out party" divide, with two in Tier 2 and five in Tier 3. The study then replaced the Allocator's chosen PCB soil concentration estimate to determine PCB mass in surface soil (almost always the *maximum* concentration) with an alternative, valid representative concentration (geometric mean) based on the PCB Group APs' sample data available to the Allocator. Holding constant all else in the Allocation model, the study recalculated the PCB Group APs' base scores, adjusted based scores, and relative rankings. Plancich Decl. ¶¶ 20–21.

In changing this single assumption, the PCB Group APs' relative rankings changed substantially from the ordering in the Allocation, with several Tier 3 APs ranking higher than Tier 2 APs. As the Allocator's Tiers arise from this ranking, the Tiers are not reliably measured with an acceptable measure of certainty. *Id.* ¶¶ 3, 38. This is so irrespective of the method used to distribute any absent or orphan party share among the APs or whether traditional equitable allocation factors like "culpability" or "cooperation" are disregarded. *See id.* ¶¶ 34, 42.

Thus, as Dr. Plancich concludes:

> [T]he underlying variability in the input data [of the Allocator's model] does affect the outcome of the allocation and the robustness of any

> resulting estimates of scores, relative ranks and Tiers—the Tiering does not "fix" the uncertainty of the allocation results.

*Id.* ¶ 3.

## LEGAL ARGUMENT

### I. Legal Standard.

As the United States acknowledges, a court may approve a CERCLA consent decree only after finding it "fair, reasonable, and consistent with the Constitution and the mandate of law." *United States v. Kramer*, 19 F. Supp. 2d 273, 280 (D.N.J. 1998); *United States v. Se. Pa. Transp. Auth. ("SEPTA")*, 235 F.3d 817, 823 (3d Cir. 2000); *Litgo N.J., Inc. v. Martin*, No. 06-cv-2891, 2011 WL 5325655, at *2 (D.N.J. Nov. 2, 2011). The "fairness" criterion requires the Court to consider fairness to non-settlors, *Kramer*, 19 F. Supp. 2d at 285; *see City of Bangor v. Citizens Commc'ns Co.*, 532 F.3d 70, 98 (1st Cir. 2008), especially those like Nokia who have not rejected a settlement offer but earnestly sought one. This is because approval of a CERCLA settlement "significantly impacts" the interests and rights of non-settlors. *United States v. Davis*, 11 F. Supp. 2d 183, 189 (D.R.I. 1998), *aff'd*, 261 F.3d 1 (1st Cir. 2001).

"[F]airness" requires the government to show that a consent decree's underlying "measure of comparative fault" is not "arbitrary, capricious, and devoid of rational basis." *In re Tutu Water Wells CERCLA Litig.*, 326 F.3d 201, 207 (3d Cir. 2003) (quoting *SEPTA*, 235 F.3d at 823). Put another way, the allocation method

underlying the distinction between settlor and non-settlor must be "rational," "applied evenhandedly," and fair as to non-settlors. *Davis*, 11 F. Supp. 2d at 189, 192; *see also United States v. Charles George Trucking, Inc.*, 34 F.3d 1081, 1088 (1st Cir. 1994). Likewise, in negotiating a CERCLA consent decree, the United States cannot "discriminate unfairly." *United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 93 (1st Cir. 1990).[10]

Applying these principles, the United States's exclusion of Nokia from the Proposed CD is both arbitrary and irrational.

## II. The United States's Decision to Draw the Line Between the Tier 2 Parties and the Settling Defendants (Tiers 3 to 5) is Based on an Arbitrary and Irrational Determination of Comparative Fault.

The only explanation the United States offers for choosing to settle with the Tiers 3 to 5 APs is that they are each and collectively "relatively minor" contributors to LPR sediment contamination. U.S. Br., ECF. No. 288-1, at 1. The United States does not explain why the Tier 2 share is also not "relatively minor." This omission

[10] Indeed, courts have acknowledged an obligation to consider on a fact-specific basis whether the government acted arbitrarily in excluding parties from a CERCLA settlement. *See New York v. City of Johnstown*, No. 87-cv-636, 1998 U.S. Dist. LEXIS 5037, at *18–19 (N.D.N.Y. Apr. 2, 1998). *See also City of Bangor v. Citizen Commc'ns Co.*, Civ. No. 02-183-B-S, 2007 U.S. Dist. LEXIS 38762, at *29–30 (D. Me. May 25, 2007), *aff'd*, 532 F.3d 70 (1st Cir. 2008) (settlors and non-settlors are "differently situated" given prior liability findings as to settlors only); *United States v. BASF Corp.*, 990 F. Supp. 907, 912–13 (E.D. Mich. 1998) (alleged "disparate treatment" "may not be without some merit," but is validly based on settlors' prior agreement to do part of cleanup).

is critical, because the United States must establish that the Proposed CD is based on a rational measure of comparative fault between all APs—particularly between Tiers 2 and 3, given how numerically similar the two are—and is therefore fair to the Tier 2 parties (Nokia and Pharmacia) left out of the Proposed CD. *Tutu Water Wells*, 326 F.3d at 207; *SEPTA*, 235 F.3d at 823.

The Allocator's Tiers do not meet this test. Specifically, they do not solve the Allocator's admitted inability to produce a reliable ranking of the APs' comparative fault. *See* Allocation Report, ECF No. 289, at ARR0035. Indeed, despite the Allocator's conclusory claim of an "acceptable level of certainty" with his Tiers, *id.*, he presents no quantitative analysis of how he determined the Tiers or if they are statistically distinguishable, Plancich Decl. ¶ 17. Instead, the Tiering only created a fictional line between Tiers 2 and 3 that the United States used to arbitrarily block Nokia from the Proposed Settlement.

The study by Nokia's experts shows this fiction. The study examined the sensitivity of the Allocator's scoring to a valid adjustment to only one of his several estimates: the PCB mass in surface soil used to estimate discharge to the LPR via soil erosion (the OFT Pathway).

In general, such estimates should resemble the most typical value, or the "central tendency," of the data set. *Id.* ¶ 23. But for this estimated input, the Allocator overwhelmingly used the *maximum* PCB concentration available to him,

Declaration of Talaat Ijaz ("Ijaz Decl.") ¶ 7, despite its lack of central tendency and potential to introduce upward bias that then upwardly biases all subsequent scoring, Plancich Decl. ¶ 27.

Thus, for the PCB Group APs, the study made one change: it replaced the Allocator's chosen maximum PCB soil concentration with a valid alternative, the geometric mean of all such data available to the Allocator. *Id.* ¶ 31. With this one change and holding all else constant, the study re-ran the Allocation model to generate new scoring and relative rankings of the PCB Group APs.

As Dr. Plancich states about the results:

> The resulting scores for each PCB Group AP are materially different than the ones presented in the Allocation Report. Not only are the levels of the scores much lower, but the relative ranking of the scores for the APs within the PCB Group change. . . . In Mr. Batson's allocation, Nokia has the highest adjusted base score of the seven APs followed by [Pharmacia]. If the soil concentration is calculated using the geomean, instead, Pitt Consol Chemical Company and Hexcel Corporation have the highest adjusted based scores of the seven PCB Group APs.

*Id.* ¶ 32. Indeed, Nokia drops from *first* to *sixth* among the PCB Group APs, below four Tier 3 APs that are Settling Defendants:

**Exhibit 6**
**Change in Allocation Rank Under Different Estimation Metrics for Soil Concentration**
***Limited to PCB Group Included in Analysis Only Under the Protocol Method***

| Within PCB Group AP Rank | Rank Within the PCB Group Under Different Soil Concentration Estimation Metrics | | | |
|---|---|---|---|---|
| | Using Base Scores | | Using Adjusted Base Scores | |
| | AlterEcho Measure | Geometric Mean | AlterEcho Measure | Geometric Mean |
| (1) | (2) | (3) | (4) | (5) |
| Rank 1 | Nokia-Lucent Technologies | Pitt Consol Chemical Company | Nokia-Lucent Technologies | Pitt Consol Chemical Company |
| Rank 2 | Pharmacia LLC | Hexcel Corp. | Pharmacia LLC | Hexcel Corp. |
| Rank 3 | Hexcel Corp. | Pharmacia LLC | Hexcel Corp. | Pharmacia LLC |
| Rank 4 | ISP Chemicals LLC | Congoleum Corp. | Pitt Consol Chemical Company | Congoleum Corp. |
| Rank 5 | Pitt Consol Chemical Company | BASF Corporation | ISP Chemicals LLC | BASF Corporation |
| Rank 6 | Congoleum Corp. | Nokia-Lucent Technologies | Congoleum Corp. | Nokia-Lucent Technologies |
| Rank 7 | BASF Corporation | ISP Chemicals LLC | BASF Corporation | ISP Chemicals LLC |

**Notes and Sources:**
- Nokia-Lucent Technologies and Pharmacia LLC were assigned Tier 2 in Attachment Q of the Allocation Report, while Hexcel Corp., ISP Chemicals LLC, Pitt Consol Chemical Company, Congoleum Corp., and BASF Corporation were assigned Tier 3.

*Id.* Exh. 6. Dr. Plancich further notes that this one change likely understates the impact of the uncertainty in the many other inputs to the Allocation model:

> This sensitivity test makes one marginal adjustment only . . . . Only one source of uncertainty in the allocation model (COC soil concentration) was adjusted within one channel (OFT) of the allocation model for the PCB Group. Other inputs to the allocation model are also measured with uncertainty, so the range of observed outcomes from incorporating this variability alone likely understates the impact of the uncertainty in model inputs on the base and adjusted base scores generated by the allocation model.

*Id.* ¶ 35.

Dr. Plancich then finds that the Allocator's Tiers are not reasonably certain:

> The Tiers established in the Allocation Report are a function of [the] ranking, or relative relationship, across the APs. Because the ranking of the PCB Group APs changes under a reasonable alternative sensitivity test of the allocation model, it means the Allocator's proposed Tiers for this Group are unstable. Critically, APs that Mr. Batson ranked as Tier 2—Nokia and Pharmacia—have *lower* base and

> adjusted base scores in the sensitivity test than at least some of the other five PCB Group APs that Mr. Batson had assigned to Tier 3.

*Id.* ¶ 37 (emphasis in original).

In sum, Dr. Plancich finds that, by using only one reasonable alternative estimated input to the Allocation model, the Allocator's Tiers do not withstand even modest scientific scrutiny. Thus, they do not "fix" the inherent limitation arising from the uncertainty of the Allocation results, and it is impossible to conclude that the Allocator's Tiers 2 and 3 are robustly estimated to a reasonable degree of certainty. *Id.* ¶ 3.

Once the distinction between the Tiers collapses, there is no rational way to determine which APs in those two Tiers are more or less relatively responsible for the Cleanup. And since the Allocator's Tiering is the only basis upon which the United States chose to include Tier 3 but not Tier 2 in the Proposed CD, that decision is irrational and arbitrary.

## III. Any Reliance by the United States on the Alternative Method to Justify Its Treatment of the Tier 2 Parties Does Not Solve the Tiering Problem But Merely Adds Unfairness By Breaching the Protocol and Judicial Precedent to Artificially Inflate the Tier 2 Share.

To the PAPs' surprise, the Allocator introduced in the Allocation Report a proposed Alternative Method to distribute the shares of absent parties (like the PVSC) and orphan party shares: distributing *by COC*. Allocation Report, ECF No. 289, at ARR0028–29. For example, PCBs discharged by absent and orphan parties

would be distributed solely to APs the Allocator found to be PCB dischargers, and the same for the other seven COCs.

This is entirely different from the *pro rata* method adopted by the United States, the Allocator, and PAPs as the rule for the Allocation. The Allocator did not endorse the Alternative Method, instead warning of its "potential inequities" and deviation from judicial precedent and allocation practice. *Id.* at ARR0029. Despite this, the United States now cites the Alternative Method as a rationale for the Proposed CD. U.S. Br., ECF No. 288-1, at 19, 21.

**a. The Alternative Method Does Not Fix the Tiering's Uncertainty.**

Nokia's experts ran the sensitivity study using both the Approved Protocol *pro rata* method of absent/orphan party distribution *and* the Alternative Method, and conclude that, like the Approved Protocol, the Alternative Method does not remedy the Tiering uncertainty. Instead, the Allocation model exhibits the same instability: changing only one input leads to very different results. Exhibit 9 in Dr. Plancich's Declaration depicts the instability in the ranking of the PCB Group APs under the Alternative Method:

**Exhibit 9**
**Change in Allocation Rank Under Different Estimation Metrics for Soil Concentration**
***Limited to PCB Group Included in Analysis Only Under the Alternative Method***

| | Rank Within the PCB Group Under Different Soil Concentration Estimation Metrics | | | |
|---|---|---|---|---|
| | Using Base Scores | | Using Adjusted Base Scores | |
| Within PCB Group AP Rank | AlterEcho Measure | Geometric Mean | AlterEcho Measure | Geometric Mean |
| (1) | (2) | (3) | (4) | (5) |
| Rank 1 | Nokia-Lucent Technologies | Hexcel Corp. | Nokia-Lucent Technologies | Hexcel Corp. |
| Rank 2 | Pharmacia LLC | Pharmacia LLC | Pharmacia LLC | Pharmacia LLC |
| Rank 3 | Hexcel Corp. | Pitt Consol Chemical Company | Hexcel Corp. | Pitt Consol Chemical Company |
| Rank 4 | Pitt Consol Chemical Company | BASF Corporation | Pitt Consol Chemical Company | BASF Corporation |
| Rank 5 | ISP Chemicals LLC | Congoleum Corp. | ISP Chemicals LLC | Congoleum Corp. |
| Rank 6 | Congoleum Corp. | Nokia-Lucent Technologies | Congoleum Corp. | Nokia-Lucent Technologies |
| Rank 7 | BASF Corporation | ISP Chemicals LLC | BASF Corporation | ISP Chemicals LLC |

**Notes and Sources:**
- Nokia-Lucent Technologies and Pharmacia LLC were assigned Tier 2 in Attachment Q of the Allocation Report, while Hexcel Corp., ISP Chemicals LLC, Pitt Consol Chemical Company, Congoleum Corp., and BASF Corporation were assigned Tier 3.

Again, just like under the Approved Protocol, Nokia drops from *first* to *sixth* in rank within the PCB Group APs, and below four Tier 3 APs that are Settling Defendants, under the Alternative Methodology. As Dr. Plancich concludes:

> Not only does the Alternative Method suffer from the same uncertainty as the Protocol Method, but the way in which the Orphan Share is allocated magnifies the differential impact of the results between the Allocator's approach and the sensitivity test results. . . . This reallocation only increases the share of responsibility assigned to the PCB Group, but it does not address the underlying uncertainty in the inputs for the OFT calculations when estimating the PCB Mass for the PCB Group in any way.

Plancich Decl. ¶ 42.

**b. The Alternative Method Increases Unfairness to the Tier 2 APs By Violating the Approved Protocol, Defying Judicial Precedent, and Artificially Inflating the Alleged Tier 2 Share.**

The United States's eleventh-hour embrace of the Alternative Method, with little or no justification, underscores the unfair treatment of the Tier 2 parties.

*First*, to justify the Pending CD, the United States incorrectly claims that the Alternative Method "reduced the non-settling parties' share of responsibility." Yeh Decl., ECF No. 288-5, ¶ 57.a. This is clearly untrue as to Tier 2, as a table in the United States's own motion shows. *See id*. Under the Approved Protocol, the Tier 2 APs' share is 0.044%; under the Alternative Method, that share balloons *almost twelve thousand percent* (11,669.41%) to 5.1112%. *Id.*

| Protocol Method | | Alternative Method | |
|---|---|---|---|
| Allocation Party | Allocation Share | Allocation Party | Allocation Share |
| Tier 1 (OxyChem) | 99.9396% | Tier 1 (OxyChem) | 92.9394% |
| Tier 2 | 0.0438% | Tier 2 | 5.1112% |
| Tiers 3-5 | 0.0166% | Tiers 3-5 | 1.9494% |

*Second*, distributing orphan share by COC upends the *pro rata* distribution required by the Approved Protocol. Rejecting customary allocation practice and judicial precedent is not an "in-process modification" reflecting "the necessary flexibility an allocation process must maintain to accommodate information as it is

developed," as one of the United States's experts suggested.[11] Wittenbrink Decl., ECF No. 288-8, ¶ 42.

*Third*, the Alternative Method ignores decades of judicial precedent. There is no legitimate dispute that, in CERCLA cases, allocating an orphan share *pro rata* is the overwhelming norm.[12] The rare deviation from *pro rata* allocation requires a unique "nexus" to the "orphan,"[13] which does not exist here. Both the Allocator, *see*

---

[11] That expert misleadingly suggests that the Allocator's deviations from the Approved Protocol were limited to expanding the number of records or documents PAPs could submit for the Allocator's consideration. Declaration of Christopher Wittenbrink ("Wittenbrink Decl."), ECF No. 288-8, ¶ 42. Such a statement reflects a material lack of understanding of how the Allocation actually unfolded.

[12] *See Litgo N.J., Inc. v. Martin*, No. 06-cv-2891, 2010 WL 2400388, at *40 (D.N.J. June 10, 2010), *aff'd sub nom. Litgo N.J. Inc. v. Comm'r N.J. Dep't of Env't Prot.*, 725 F.3d 369 (3d Cir. 2013) ("[c]ourts that have addressed the equitable allocation of orphan shares under CERCLA have concluded that it is most equitable to divide the . . . orphan share between the responsible parties according to their relative equitable shares"—*i.e.*, *pro rata*); *Caldwell Trucking PRP Grp. v. Pullman Co.*, No. 95-cv-1690, 2002 U.S. Dist. LEXIS 28410, at *82, 83 (D.N.J. Nov. 21, 2002), *aff'd sub nom. Caldwell Trucking PRP v. Rexon Tech. Corp.*, 421 F.3d 234 (3d Cir. 2005) ("Equity demands that all of the parties bear proportionate responsibility for any 'orphan share.'. . . The Court holds that any calculated orphan share should be apportioned *pro rata* . . . ."); *United States v. Kramer*, 953 F. Supp. 592, 598 (D.N.J. 1997).

[13] *United States v. Davis*, 31 F. Supp. 2d 45, 68–69 (D.R.I. 1998); *Bd. of Cnty. Comm'rs v. Brown Grp. Retail, Inc.*, 768 F. Supp. 2d 1092, 1119 (D. Colo. 2011) ("Given the nature of the relationship between [the defendant] and the [orphan parties], equitable apportionment would result in holding [the defendant] responsible for the . . . 'orphan share' . . . ."); *United States v. Atlas Mins. & Chems., Inc.*, Civ. No. 91-5118, 1995 U.S. Dist. LEXIS 13097, at *266 (E.D. Pa. Aug. 22, 1995) ("[N]o liable party other than Saucony II had any nexus to the Kutztown plant. Considering all circumstances, assigning [the orphan party]'s share to Saucony II achieves the most equitable allocation . . . .").

Allocation Report, ECF No. 289, at ARR0028, and the Settling Defendants, *see* Comments Submitted by the SPG (Mar. 22, 2023), ECF No. 288-10, at 5 n.21, acknowledge this obvious fact. Only the United States does not.

*Fourth*, a large share of the unattributed PCBs in OU2 sediments is not an orphan at all. Instead, it is an Allocation "absent share" orchestrated by the United States to which Nokia has no nexus at all. The PVSC is a known contributor of large amounts of PCBs to the LPR. A key report appended to, and relied upon in, the Allocation Report cites extensive documentation showing the PVSC's discharges of *over 1 trillion gallons* of untreated wastes into the LPR. May 2020 Koch Report, ECF No. 289-19, at ARR2922–23. The facts are similar for PCBs. The report estimates that over 450 likely non-PAP PCB users have been in the PVSC service area, *id.* at ARR2941, and that the PVSC discharged over 41,000 kilograms ("kg") of PCBs to the LPR, *id.* at ARR2964, Tbl. 2-5.[14] This dwarfs the Allocator's estimate of PCB mass discharged to the LPR by *all APs combined*,[15] showing that the PVSC is responsible for much of the PCB mass unattributable to APs.[16]

---

[14] The cited page of the report estimates that the PVSC discharged 91,813 pounds of PCBs, which equates to 41,315.85 kg (as 1 pound roughly equates to 0.45 kg).

[15] *See* Kauffman Decl. Exh. A, Tbl. 1 (noting Allocator's estimated total of 20,066.54 kg of PCBs discharged by all APs into the LPR).

[16] Further, the report's estimate of the PVSC's PCB discharge is "conservatively low," as it was based on readings after adoption of pretreatment practices and the nationwide phase-out of PCB sales. May 2020 Koch Report, ECF No. 289-19, at ARR2950.

By intentionally excluding the PVSC from the Allocation—over the PAPs' objection—EPA artificially inflated the unattributable PCB share. Under the Approved Protocol, this was not an issue, as it was to be allocated *pro rata* among all APs per their Allocator-determined equitable shares. However, under the Alternative Method, the entire PCB unattributed mass—including the absent PVSC share—was placed on only APs deemed to have contributed any amount of PCBs, the vast majority (over 85%) of which fell on Tier 2. Ijaz Decl. ¶ 9. This is particularly galling given that the Kearny Works never sent wastewater to or had a commercial relationship with the PVSC, Sabatka Decl. ¶ 7, while any number of the Settling Defendants certainly did.

## IV. The United States's Disregard of the Allocator's Culpability and Cooperation Findings Does Not Justify Its Treatment of the Tier 2 Parties, Does Not Solve the Tiering Problem, and Adds Unfairness By Breaching the Approved Protocol and Judicial Precedent and Ignoring Undisputed Facts to Artificially Inflate the Tier 2 Share.

Just like its misguided embrace of the Alternative Method, the United States's removal of the Culpability and Cooperation factors of the Approved Protocol on the grounds that the Allocator's judgments are "somewhat subjective" only makes the United States's approach more unfair.

**a. Removing the Culpability and Cooperation Findings Does Not Fix the Tiering Problem.**

In Dr. Plancich's words:

> While the adjusted base scores reflect the results of the allocation including the cooperation and culpability factors applied by the Allocator, the base scores exclude the cooperation and culpability factor adjustments. If the same sensitivity test is run on base scores, the results are qualitatively similar. In other words, the multiplication of the base scores by the cooperation and culpability factors does not change the sensitivity of the allocation model to the underlying uncertainty of the input data.

Plancich Decl. ¶ 34.

**b. Removing the Culpability and Cooperation Findings Unfairly Increases the Tier 2 Percentages Even More.**

*First*, the United States claims that removing the Cooperation and Culpability factors is warranted because they are "subjective." Yeh Decl., ECF No. 288-5, ¶ 57.b. But the United States well knows, and courts have issued detailed findings, that OxyChem intentionally disposed of dioxin—one of the most toxic chemicals ever made—into the LPR fully knowing its illegality and devastating impact on the LPR. As the United States stated in response to OxyChem's motion to intervene:

> A significant record of OxyChem's disposal of dioxin and other hazardous substances into the Passaic River has been developed through related litigation. This Court has found that OxyChem is the corporate successor to the Diamond Alkali Company, and thus "as a matter of law that OxyChem may be held liable for CERCLA response costs flowing from [Diamond Alkali's] operation of the Lister Plant." [*21st Century Fox*], ECF No. 1104 at 4. The Superior Court of New Jersey has found OxyChem jointly and severally liable under New Jersey's Spill Compensation and Control Act, N.J.S.A. Section 58:10-

> 23.11 *et seq.,* which is similar to CERCLA, for past and future cleanup costs incurred by the State of New Jersey associated with discharges of hazardous substances, including dioxin, from the Lister Plant. . . . And the Superior Court, Appellate Division, confirmed that OxyChem's insurers were not liable for cleanup costs associated with the Lister Plant because, *"We are convinced from our examination of the record that Diamond intentionally and knowingly discharged hazardous pollutants with full awareness of their inevitable migration to and devasting impact upon the environment." Diamond Shamrock Chems. Co.* 258 N.J. Super. at 183, 609 A.2d at 447.

ECF No. 84 at 3–4 (emphasis added). The United States also knows that Nokia (and Pharmacia) for decades have been cooperating with EPA to investigate and remediate the LPR. Sabatka Decl. ¶ 13. Given the uncertainty pervading the Allocation, it is absurd to describe only the Culpability and Cooperation factors of the Approved Protocol as "somewhat subjective." U.S. Br., ECF No. 288-1, at 19, 21.

*Second*, removing the Culpability and Cooperation factors again violates the Approved Protocol. The United States must offer more than the scant, conclusory "justification" that the Allocator's culpability and cooperation adjustments were "somewhat subjective" to explain this second departure from the rules the United States itself approved for the Allocation.

*Finally*, the removal defies long-settled caselaw that includes cooperation and culpability as key factors in CERCLA allocations. As the Third Circuit and this very Court in *21st Century Fox* have recognized, "the degree of cooperation by the parties with the Federal, State or local officials" is one of the "Gore factors" that are

"frequently considered by courts" in CERCLA allocations. *Litgo*, 725 F.3d at 387–88; *Occidental Chem. Corp. v. 21st Century Fox Am.*, No. 18-cv-11273, 2022 WL 21296506, at *1 n.2 (D.N.J. Mar. 10, 2022) ("courts often look to the Gore factors," including "the degree of cooperation by the parties . . ."). Likewise, "[c]ourts also often invoke the so-called 'Torres Factors,'" including, among others, "[t]he party's level of culpability." *Lockheed Martin Corp. v. United States*, 35 F. Supp. 3d 92, 123 (D.D.C. 2014), *aff'd*, 833 F.3d 225 (D.C. Cir. 2016). This is notably so when a party's culpability is stark. *See Agere Sys., Inc. v. Advanced Env't Tech. Corp.*, 602 F.3d 204, 235 (3d Cir. 2010) (affirming district court's allocating extra 17.4% of liability to a party based on "culpability and cooperation" due to "valid bases for viewing [the party] as occupying a category of culpability all its own in this case").

## V. The United States Failed to Engage the Tier 2 Parties in Good-Faith Settlement Negotiations.

There is no dispute that the Tier 2 parties, Nokia and Pharmacia, have long sought a chance to negotiate with the United States to resolve their respective responsibility for the Cleanup and avoid the risk of disproportionate liability for the $1.89 billion Cleanup. However, since 2021, when the United States first offered to settle with the Tier 3 to 5 parties, it has consistently denied Nokia and Pharmacia the opportunity to do so.

The First Circuit made clear in its seminal *Cannons* decision that part of the Court's analysis of the Proposed CD is fairness to non-settlors, who might be jointly

and severally liable for the remaining cleanup costs and would be barred from seeking contribution from the Settling Defendants. *Cannons*, 899 F.2d at 86–87. In rejecting a challenge to the consent decrees in *Cannons*, the Court relied heavily on the fact that the objectors "had an opportunity to participate in negotiations with EPA and to join both . . . settlements." *Id.* at 87. This concept is echoed in *California Department of Toxic Substances Control v. Allen's Formal Wear, Inc.*, Civ. No. 13-5069, 2014 WL 12561578, at *3 (C.D. Cal. Mar. 24, 2014), where the court ordered the government to provide information about the settlement process including: (1) whether the non-settlors were invited to participate; (2) whether the government made similar offers to the non-settlors; and, if not, (3) why the government chose to negotiate with the settlors and exclude the non-settlors.

For nearly three years, Nokia has sought to engage in settlement negotiations with the United States, making two settlement offers during that time to which the United States has failed to respond substantively. Before the Court fully considers the United States's request for entry of the Proposed CD, Nokia and Pharmacia should be able to meaningfully negotiate with the United States in good faith on settlement.

## CONCLUSION

Nokia does not oppose any settlement that resolves the liability of parties with a minor share of responsibility for the Cleanup. However, such a settlement, or

series of settlements, should be offered to all similarly situated parties, and each settlement supported by a transparent, fair, and equitable determination of the comparative fault of the applicable settling parties.

The United States first offered to settle with the Tier 3 to 5 parties in 2021 and spent over two years negotiating its terms. During that time, Nokia, a similarly situated party, continually requested the chance to negotiate a resolution of its liability with the United States but was repeatedly denied that opportunity.

Nokia has established that the sole basis upon which the United States distinguished between the 82 Settling Defendants and the Tier 2 parties (Tier 2 versus Tier 3) is an unreliable mathematical nullity, and the government's unjustified and questionable adoption of the Allocation's Alternative Method and rejection of the Allocator's findings on Cooperation and Culpability factors does nothing to make that distinction any more reliable. On this record, the Court must find that the United States lacks any rational basis for treating Nokia differently than Tiers 3 to 5.

As this Court evaluates the legal sufficiency of the settlement memorialized in the Proposed CD, the United States should be compelled to do what it should have done years ago—sit down with Nokia, engage in good-faith negotiations, and resolve the problem of its arbitrary conduct. Without this directive, Nokia confronts the unjustified, inequitable, and unnecessary risk of facing hundreds of millions of

dollars in cleanup liability for which it is not responsible. This Court should not endorse such a result.

Settlement discussions can occur without any prejudice to the United States, the Settling Defendants, the Court, or any other potentially responsible party. All parties acknowledge that there is much work to be done before the Court can rule on the United States's Motion to Enter. Whatever this matter's ultimate timeline, it can certainly allow for simultaneous settlement discussions between Nokia, the United States, and any other similarly situated party.

Respectfully submitted,

Date: April 1, 2024

*s/ Michael D. Lichtenstein*
Michael D. Lichtenstein, Esq.
Thomas E. Mesevage, Esq.
Zachary L. Berliner, Esq.
**LOWENSTEIN SANDLER LLP**
One Lowenstein Drive
Roseland, New Jersey 07068
(973) 597-2408
mlichtenstein@lowenstein.com
tmesevage@lowenstein.com
zberliner@lowenstein.com
*Counsel for Intervenor*
*Nokia of America Corporation*

**CERTIFICATION OF SERVICE**

I hereby certify that on April 1, 2024, true and correct copies of (1) Nokia of America Corporation's Brief in Response to United States's Motion to Enter Consent Decree, (2) Declaration of Zakariah E. Sabatka, (3) Declaration of Stephanie Plancich, (4) Declaration of Mark A. Kauffman, Jr., and (5) Declaration of Talaat Ijaz were served upon all counsel of record via ECF.

Date: April 1, 2024

*s/ Michael D. Lichtenstein*

Michael D. Lichtenstein, Esq.
**LOWENSTEIN SANDLER LLP**
One Lowenstein Drive
Roseland, New Jersey 07068
(973) 597-2408
mlichtenstein@lowenstein.com
*Counsel for Intervenor*
*Nokia of America Corporation*