**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**
**NEWARK VICINAGE**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ALDEN LEEDS, INC., *et al.*,<br><br>Defendants,<br><br>and<br><br>PHARMACIA LLC, *et al.*,<br><br>Intervenors. | Hon. Madeline Cox Arleo, D.J.<br>Hon. Leda D. Wettre, M.J.<br><br>Case No: 2:22-cv-07326(MCA-LDW)<br><br>**PHARMACIA LLC'S BRIEF IN RESPONSE TO UNITED STATES' MOTION TO ENTER CONSENT DECREE** |

John F. Gullace, Esq.
Bryan F. Franey, Esq.
Danielle N. Bagwell, Esq.
MANKO, GOLD, KATCHER & FOX LLP
Three Bala Plaza East, Suite 700
Bala Cynwyd, Pennsylvania 19004
Tel.: (484) 430-5700/Fax: (484) 430-5711

*Attorneys for Intervenor Pharmacia LLC*

Date: April 1, 2024

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ..... iii

I. BACKGROUND ..... 2

II. EPA IS REQUIRED TO FOSTER SETTLEMENTS WITH THE NON-SETTLING PARTIES, TREAT THEM FAIRLY, ACT IN GOOD FAITH, AND HONOR ITS AGREEMENTS ..... 6

III. PHARMACIA IS PREPARED TO SETTLE ITS LIABILITY BASED UPON THE PROTOCOL METHODOLOGY DESPITE ITS DEEPLY FLAWED USE OF OVERLAND FATE AND TRANSPORT ..... 8

A. Pharmacia Is Willing to Adopt the Protocol Methodology to Resolve Its Liability ..... 8

B. The Overland Fate and Transport Pathway Calculation by AlterEcho Created Artificial Distinctions Between Allocation Parties and Is Unfair ..... 9

1. AlterEcho Selected an Arbitrary, Non-Representative Maximum Concentration to Calculate Overland Fate and Transport ..... 12

2. AlterEcho Selected an Arbitrary "Affected Area" that Grossly Inflated Pharmacia's Overland Fate and Transport Estimate ..... 14

IV. EPA DEPARTED FROM THE ALLOCATION AND UNFAIRLY PENALIZED THE TIER 2 PARTIES ..... 16

A. EPA, the Allocator and the Allocation Parties Agreed to Use the Protocol Methodology, Which Follows the Customary Method Reallocating Orphan Shares Pro Rata ..... 16

B. The United States Misstates the Results of the Protocol Methodology ..... 18

C. The Alternative Methodology Unfairly Assigns the 99% PCB Orphan Share to Parties Contributing Less than 1% of the PCBs ..... 19

D. If EPA Persists in Advocating for the Unfair and Judicially Unrecognized Alternative Methodology, EPA Must in Fairness Be Estopped from Arguing that PCB Parties Can Also Be Responsible for Dioxins ....................24

V. THE UNITED STATES' DECISION TO BACKOUT THE COMMONLY APPLIED CULPABILITY AND COOPERATION ADJUSTMENT FACTORS IS UNFAIR ....................26

A. Culpability and Cooperation Are Universally Accepted Gore Factors Consistently Applied by the Courts ....................26

B. EPA, Alter Echo, and the Participating Allocation Parties Agreed that AlterEcho Would Evaluate and Apply Well Established Culpability and Cooperation Adjustment Factors to the Allocation ....................28

C. AlterEcho's Application of Culpability and Cooperation Factors Was Not "Subjective" and With Regard to OxyChem, It Was Premised Upon Findings of Fact from a 20-Day Trial ....................30

D. Fairness Requires the United States to Apply the Culpability and Cooperation Factors Used by the Allocator to Assign Responsibility ....................33

VI. CONCLUSION ....................37

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Agere Sys. Inc. v. Advanced Env't Tech. Corp.*,
602 F.3d 204 (3d Cir. 2010) ....................33

*Am. Cyanamid Co. v. Nascolite Corp.*,
No. Civ. A. 92–CV–3394, 1995 WL 934871 (D.N.J. Mar. 31, 1995) ....................35

*Burlington N. & Santa Fe Ry. Co. v. United States*,
556 U.S. 599 (2009) ....................25

*Caldwell Trucking PRP Grp. v. Pullman Co.*,
No. 95-1690, 2002 U.S. Dist. LEXIS 28410 (D.N.J. Nov. 21, 2002) ....................18

*Diamond Shamrock Chems. Co. v. Aetna Cas. & Sur. Co.*,
609 A.2d 440 (N.J. Super. Ct. App. Div. 1992) ....................*passim*

*Diamond Shamrock Chems. Co. v. Aetna Cas. & Sur. Co.*,
No. C-3939-84 (N.J. Super. Ct. Ch. Div. Apr. 12, 1989) ....................3, 4, 5

*Litgo N.J., Inc. v. Comm'r N.J. Dep't. of Env't Prot.*,
725 F.3d 369 (3d Cir. 2013) ....................27

*Litgo N.J., Inc. v. Martin*,
No. 06-2891, 2010 WL 2400388 (D.N.J. June 10, 2010) ....................18

*Lockheed Martin Corp. v. United States.*,
35 F. Supp.3d 92 (D.D.C. 2014) ....................36

*United States v. Alliedsignal, Inc.*,
62 F. Supp. 2d 713 (N.D.N.Y. 1999) ....................16

*United States v. Consolidation Coal Co.*,
345 F.3d 409 (6th Cir. 2013) ....................33, 36

*United States v. Davis*,
31 F. Supp. 2d 45 (D.R.I. 1998) ....................................................................33

*United States v. Kramer*,
953 F. Supp. 592 (D.N.J. 1997) ..............................................................18, 27

*United States v. Kramer*,
19 F.Supp. 2d 273 (D.N.J. 1998) .......................................................................7

*United States v. Pesses*,
No. 90-654, 1994 WL 741277 (W.D. Pa. Nov. 7, 1994)...................................26

*United States v. BP Amoco Oil PLC*,
277 F.3d 1012 (8th Cir. 2002) .....................................................................27, 34

*United States v. Cannons Eng'g Corp.*,
899 F.2d 79 (1st Cir. 1990).................................................................................8

*United States v. Compaction Sys. Corp.*,
88 F. Supp. 2d 339 (D.N.J. 1999) ...................................................................27

*United States v. Mallinckrodt, Inc.*,
No. 4:02-cv-01488, 2007 WL 1231665 (E.D. Mo. Apr. 26, 2007)....................27

**Other Authorities**

U.S.E.P.A., *Developing Allocations Among Potentially Responsible Parties for the Costs of Superfund Site Cleanups* 6-7 (Superfund Admin. Improvements Proj. Oct. 1994) ..........................................................27

Pharmacia LLC ("Pharmacia") is submitting this Response to the United States' Motion to Enter the Consent Decree because, with respect to Pharmacia and Nokia of America ("Nokia") (collectively the "Tier 2" parties), the United States' brief and supporting declarations (the "U.S. Brief") show that the United States is not abiding by the agreements it made with the parties during the allocation. The United States Environmental Protection Agency's ("EPA's") piecemeal approach to settlement, its manipulation of its own allocation to create distinctions without meaning between the settling and Tier 2 parties, and its refusal to engage in parallel settlement discussions with parties similarly situated to the settling parties, create unnecessary and significant uncertainty, risk, and potential unfairness to Pharmacia and Nokia, and other similarly situated parties.

Over the next ten years, the remediation of the Lower Passaic River ("LPR") is estimated to cost $1.821 billion. The $150 million settlement between EPA and the eighty settling parties (the "Consent Decree") constitutes approximately 8.2% of that estimate. Under the allocation methodology agreed to by EPA, Occidental Chemical Company ("OxyChem") was assigned 99.94% of the responsibility for the contamination of the LPR. Through the lens of this EPA-approved allocation methodology (the "Protocol Methodology"), the $150 million settlement between EPA and the settling parties is hundreds of times greater than the settling parties' collective allocated share and is clearly fair and reasonable in the aggregate.

However, EPA has shown its willingness to change the ground rules after the fact, making it impossible to know whether the Tier 2 parties will be treated fairly by EPA, if settlement discussions continue to be deferred by EPA. EPA should be directed to engage Pharmacia, Nokia and other interested, similarly situated parties, in settlement discussions during the pendency of this proceeding.

## I. BACKGROUND

The Consent Decree is based upon an allocation process that was used to create distinctions or "tiers" of responsible parties. The allocation was then used to determine which parties would be invited to participate in the settlement, and which would not.

EPA approved the ground rules for the allocation and the formula to be used to calculate shares of responsibility (the "Allocation Guide").[1] Importantly, EPA required that the allocation shares add up to 100% among the parties invited to participate in the allocation, even though it is self-evident that, given more than a century of releases of contaminants into the LPR, not all of the contamination of the LPR had been caused by the eighty-four parties invited to participate in the allocation. *Id.*

[1] *See generally* Diamond Alkali Superfund Site OU2 Allocation Guide (June 15, 2018, as amended July 6, 2018, and Mar. 22, 2019), ECF No. 289-2; Diamond Alkali Superfund Site OU2 Allocation Protocol, ECF No. 289-3.

The list of participants in the allocation consisted of parties who had received General Notice Letters of liability in 2016 (the "GNL"), with a few very notable exceptions: the Passaic Valley Sewerage Commission ("PVSC"), the City of Newark, the City of East Newark, the City of Harrison and the City of Kearny (the "Municipalities").[2] Even though PVSC and the Municipalities had received GNLs, EPA steadfastly refused to allow them to participate in the allocation.[3] EPA asserted that PVSC and the Municipalities are "uniquely" positioned to provide "in-kind services" for the remediation of the LPR, but this rationale for excluding them from the allocation is not a plausible justification.[4] At some point, EPA and the Court will need to determine whether the "in-kind" services provided by PVSC and the Municipalities reflect their fair share of responsibility for the contamination of the LPR. EPA has created a situation where these "in-kind" services cannot be evaluated against an allocated share of responsibility for PVSC and the Municipalities. Also excepted was OxyChem. It attended the first kick-off

---

[2] *See* Diamond Alkali Superfund Site OU2 Allocation Recommendation Report (Dec. 28, 2020), ECF No. 289 ("Allocation Report"), at 6.

[3] Letter from Eric J. Wilson, EPA, to Allocation Parties (Feb. 16, 2018), ECF No. 289-2 at 132 ("EPA has explained in several letters … the basis on which we have chosen not to add to the allocation PVSC and the four municipalities that were notified of their status as PRPs…").

[4] Letter from Eric J. Wilson, EPA, to Allocation Parties (Jan. 5, 2018), ECF No. 289-2 at 130-131 ("Also, as EPA has indicated, the Passaic Valley Sewerage Commission and the four municipalities identified as potential responsible parties are uniquely situated to provide in-kind services with respect to the remedy…").

meetings for the allocation, but ultimately refused to cooperate and participate in the allocation.[5]

EPA hired an allocator, David Batson of AlterEcho ("AlterEcho"), to conduct an allocation of responsibility. AlterEcho named OxyChem as the only Tier 1 party and determined it was responsible for nearly the entirety of the most toxic, polluting substance in the LPR – a form of dioxin called 2,3,7,8-TCDD. The allocator found OxyChem to be responsible for 99.94% of the contamination of the LPR, using the allocation rules and allocation formula approved by EPA at the beginning of the allocation, the so-called "Protocol Methodology".

The next two biggest shares were assigned to the Tier 2 parties, Nokia and Pharmacia, at 0.0281% and 0.0157%, respectively. Nokia and Pharmacia's allocation shares were based entirely on AlterEcho's use of a disputed Overland Fate and Transport ("OFT") methodology. The OFT calculation was used to estimate the amount of a contaminant transported by rainwater or flooding off a site via erosion. Both Pharmacia and Nokia objected to the use of the OFT methodology because it was inconsistent with the agreed upon Allocation Guide and with the known scientific transport mechanisms for contaminants to the LPR.

[5] Although OxyChem did not participate in the allocation it nonetheless had an outsized role in the development of the factual record for the allocation. By far, the single largest source of documents submitted to the allocation database were originally from OxyChem. Declaration of Alice Yeh ("Yeh Decl.") ¶ 39, ECF No. 288-5 at 24.

More specifically, the method took a maximum PCB concentration from one sample and assumed it existed across the entire property at issue. Although Pharmacia has consistently pointed out that AlterEcho's OFT pathway artificially and inflated the allocation shares of Pharmacia and Nokia, Pharmacia remains prepared to discuss settlement with the United States based upon the agreed upon results of the Protocol Methodology, which includes the flawed OFT pathway analysis. Thus far, EPA has declined to engage in settlement negotiations with Pharmacia and Nokia.

On January 31, 2024, the United States filed its motion to enter its proposed Consent Decree with nearly all of the Tier 3-5 parties from the allocation. In that motion, the United States explained how it used the allocation to decide who to settle with and for how much. The United States did not use the approved Protocol Methodology, which the parties had agreed to as a condition to participate in the allocation. Rather, EPA adopted AlterEcho's "Alternative" allocation methodology (the "Alternative Methodology").

The Alternative Methodology used an unorthodox approach that assigned the unattributed or "orphan" mass of contaminants of concern ("COCs") on a COC-by-COC basis. The result is that only parties responsible for PCBs in the allocation divide the orphan share of PCBs in the LPR. But according to the allocation, 99% of the PCBs in the LPR were not put there by parties in the

allocation. Because AlterEcho allocated less than one percent of the PCBs in the LPR to allocation parties, nearly all (99%) of the PCBs in the LPR are an orphan share for purposes of the allocation, and this PCB orphan share is worth more than $200 million. This unwarranted change to the allocation considerably increased Nokia's and Pharmacia's allocation shares to 3.28% and 1.83%, respectively.

The United States further altered the allocation by rejecting the culpability and cooperation adjustment factors calculated and recommended by AlterEcho. These factors have been a regular part of CERCLA allocations since the original Gore factors were first applied decades ago. By adopting the Alternative Allocation and rejecting the traditional culpability factors, the United States further ratcheted up Pharmacia and Nokia's allocation shares and produced a result far different from AlterEcho's conclusions, allocating 11.01 percent of total liability to just two parties, Nokia and Pharmacia (3.94% to Pharmacia and 7.06% to Nokia), and reducing the allocation share to the uniquely responsible party - OxyChem - by hundreds of millions of dollars.

## II. EPA IS REQUIRED TO FOSTER SETTLEMENTS WITH THE TIER 2 PARTIES, TREAT THEM FAIRLY, ACT IN GOOD FAITH, AND HONOR ITS AGREEMENTS

As the United States recognized in the U.S. Brief, the Consent Decree lodged in *U.S. v. Alden Leeds* must be fair, reasonable, and consistent with the purposes of CERCLA. To satisfy this requirement, the Consent Decree must be

fair to all non-settling parties, including Pharmacia. *U.S. v. Kramer*, 19 F.Supp. 2d 273, 285 (D.N.J. 1998) ("The court has also considered whether the Consent Decrees are fair to non-settlors, *as it is required to do*.") (emphasis added).

A "goal of the [Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended ("CERCLA")] is to encourage early settlement and minimize litigation." U.S. Br. at 5-6, ECF 288-1 at 12-13. According to the United States, "[t]he Third Circuit recognizes that Congress made a deliberate policy choice of encouraging settlements" in CERCLA matters. U.S. Br. at 27, ECF 288-1 at 34. Despite this preference for settlement, the United States has pursued a settlement strategy that prioritizes finalizing this $150 million settlement at the expense of discussions with other parties who participated in the allocation in good faith. Its strategy has left Pharmacia and Nokia out of settlement negotiations, and the result is that they may face inconsistent results in the future or costly litigation against OxyChem.

The United States relies heavily on *United States v. Cannons Engineering Corp.*, 899 F.2d 79 (1st Cir. 1990) to justify its settlement approach, but the First Circuit in *Cannons* held that EPA has broad settlement authority *"[s]o long as it operates in good faith, … ."* *Cannons*, 899 F.2d at 93 (emphasis added).

As explained below, the allocation used to distinguish the Tier 2 parties from the settling parties diverged from the Allocation Guide and resulted in an outcome

for the Tier 2 parties that cannot be supported. The United States then twice compounded this unfair result by adopting the Alternative Allocation and rejecting the culpability factor used by the allocator. As a result, the Tier 2 parties' liability is increased exponentially in an unfair manner.

EPA initiated the allocation process upon which it relies for the Consent Decree, and Pharmacia participated relying on EPA's representation that it "committed to use the Allocator's recommended shares of relative responsibility. . . *as a primary factor in its future negotiations*." Allocation Report at 6, ECF 289 at 7 (emphasis added). This has not occurred. In the U.S. Brief, the United States now ignores the most fundamental determinations from the Allocation Report to the further detriment of Pharmacia and Nokia, leaving their fates uncertain.

## III. PHARMACIA IS PREPARED TO SETTLE ITS LIABILITY BASED UPON THE PROTOCOL METHODOLOGY DESPITE ITS DEEPLY FLAWED USE OF OVERLAND FATE AND TRANSPORT

### A. Pharmacia Is Willing to Adopt the Protocol Methodology to Resolve Its Liability

The Allocation Report was issued to EPA by AlterEcho on December 28, 2020. Under the Protocol Methodology that the United States, AlterEcho, and the allocation parties agreed to use, Pharmacia was assigned a share of 0.0157%. The U.S. Brief and supporting declarations state that the cleanup of the LPR is projected to cost $1.821 billion. Yeh Decl. at ¶56 & n. 67; ECF 288-5 at 37. Ignoring the facts that the United States has already recovered significant funds

toward the cleanup (Yeh Decl. ¶64) and Pharmacia's share of $1.821 billion under the Protocol Methodology agreed to by the United States would be $285,897, Pharmacia nonetheless made a multi-million-dollar settlement offer to the United States in 2021 to try to resolve its liability. At the written direction of the United States, on June 27, 2022, Pharmacia made a second, even more substantial settlement offer to the United States. More than a year and a half later, the United States has not responded to either of Pharmacia's multi-million-dollar settlement offers. EPA instead asks Pharmacia to wait for its opportunity to negotiate a settlement directly with the United States until after the Consent Decree is entered, which creates unnecessary and significant uncertainty, risk and potential unfairness to Pharmacia.

Pharmacia is similarly situated to the settling parties because the factor used to distinguish it from them is fundamentally flawed. That factor, OFT, does not withstand scrutiny as a basis to distinguish between the Tier 2 parties and the settling parties.

### B. The Overland Fate and Transport Pathway Calculation by AlterEcho Created Artificial Distinctions Between PCB Allocation Parties and Is Unfair to Tier 2

AlterEcho's calculation of mass contributions to the LPR through the OFT pathway artificially inflated the allocation shares of Pharmacia and Nokia, to the benefit of OxyChem. AlterEcho's OFT calculation was based on inputs that

unfairly penalized Tier 2 parties (Pharmacia and Nokia) and created an artificial distinction between Tier 2 and the settling parties in Tiers 3 to 5.

AlterEcho determined the mass of COCs in LPR sediments from each allocation party by evaluating the flow of COCs from a facility through four different possible pathways: (1) discharge via connection to a sewer system prior to the establishment of the PVSC; (2) discharge via connection to the PVSC sewer system; (3) direct discharge via a pipe or other discrete conveyance to a water body with a hydraulic connection to the LPR; or (4) overland fate and transport ("OFT") from the facility to a surface water body with a hydraulic connection to the LPR. *See* Allocation Report at 19, ECF No. 289 at 20. The OFT pathway essentially evaluated the transport of COCs over land to the LPR due to rainfall or flooding events. *See* Yeh Decl. ¶ 45a, ECF No. 288-5 at 28.

The OFT pathway was not expected to be a major factor in the allocation. OFT was not identified by EPA as a significant source of COCs, including PCBs, to OU2 in the Record of Decision ("ROD") for OU2, or in any of the related decision documents.[6] The Allocation Guide provided that OFT would not be considered by AlterEcho absent exceptional circumstances.[7]

[6] *See, e.g.,* Remedial Investigation Report for the Focused Feasibility Study of the Lower Eight Miles of the Lower Passaic River, Louis Berger Group, Inc., 2014, Table 5-3 (identifying historical sources of COCs to OU2).

[7] Allocation Guide at Section 7.3.b; ECF No. 289-2 at 80. ("Allocation Parameters . . . Though neither the natural flow of groundwater or rainwater bearing COCs

OFT, however, became the dominant factor in the allocation, accounting for more than 90% of the shares of responsibility allocated to the non-OxyChem parties. Without OFT, Pharmacia and Nokia's allocation share would have been zero. Because of the dramatic impact that OFT had on the Tier 2 allocation shares, the fairness of the OFT calculation is critically important.

The mass contributed by each allocation party through the OFT pathway was calculated by AlterEcho by multiplying five inputs: (1) an assumed erosion rate of 0.1 millimeters per year; (2) the length of time that an allocation party owned or operated at a site (adjusted based on dates of release(s) or remediation); (3) an estimation of the amount of bare soil (the "Affected Area"); (4) the estimated soil density at the site; and (5) the "appropriate concentration" of COCs in the shallow soil (or deeper soil if shallow data was not available). Allocation Report at 21-22, ECF No. 289 at 22.

Two inputs that highlight the unfairness of AlterEcho's OFT calculation for Pharmacia and Nokia are the "appropriate concentration" of COCs and the "Affected Area."

---

under or across the surface of a PAP's facility will be considered for purposes of determining the responsibility of such a PAP during the Allocation …").

### 1. AlterEcho Selected a Non-Representative Maximum Concentration to Calculate OFT

The single most problematic OFT input is the "appropriate concentration" of COCs in shallow soils. Although AlterEcho claimed that it chose the "appropriate concentration" of COCs based on a "single data point for each facility site that was determined to most appropriately represent the level of COC contamination," *id*., its description of its evaluation process is highly misleading. AlterEcho did not find a single data point representative of the level of contamination or most likely to reach the LPR. Rather, it simply identified the ***maximum*** concentration of a COC found in the shallow soil at the site *without* regard to the distance from the LPR or to site features or topography that would allow or inhibit overland flow from that location.[8] AlterEcho's use of the maximum concentration meant that it assumed that the unpaved area at a site was contaminated at the ***highest*** level found in one location, no matter how remote from the river. This is untenable, and not representative of actual site conditions or loading of contaminants to the river.

There is simply no technical or rational basis for assuming that a non-representative maximum concentration found in only one location at a site should be assumed to be the same concentration through the entire site. The inequity of

[8] *See* Allocation Report, Attachment L, Facility Data Computation Sheets, ECF No. 289-9 at 3-101 (identifying maximum COC concentrations in shallow soils for use in calculating OFT mass on pages labeled with "Summary CMass Estimates").

using a maximum concentration is further compounded where a single high concentration is found far from the LPR or is hydrologically separated from the LPR, as is the case at the Pharmacia site. Further compounding the inequity of using a single maximum concentration is the fact that AlterEcho did not use maximum concentrations when calculating contributions of COCs through the other three pathways evaluated by AlterEcho – AlterEcho used lower average concentrations for the other pathways.[9] Notably, OxyChem primarily discharged its wastes directly to the LPR and therefore benefited from this disparate treatment of pathways. Finally, this approach penalizes parties like Pharmacia, who tested and cleaned up contamination at their facilities, rather than collecting no data at all.

For Pharmacia, the impact of using the maximum concentration for PCBs in the OFT calculation instead of a typical geomean average was dramatic. The maximum PCB concentration used by AlterEcho for Pharmacia was 36,000 mg/kg. The geomean average PCB concentration calculated using all shallow soil sampling results for Pharmacia is approximately 19 mg/kg – a difference of three orders of magnitude.[10] Using the geomean concentration for PCBs for Pharmacia would make Pharmacia indistinguishable from the settling parties.

---

[9] *See, e.g.,* Allocation Report at 20, ECF No. 289 at 21 (noting that AlterEcho used average concentration to calculate the mass for the direct discharge pathway, pre-PVSC, and PVSC discharge pathways).

[10] Pharmacia provided AlterEcho with an Excel spreadsheet containing all soil and groundwater sampling data collected at the site. *See* PAP-00725408, *available at*

### 2. AlterEcho Selected an Arbitrary "Affected Area" that Grossly Inflated Pharmacia's OFT Estimate

AlterEcho used the estimated acreage of bare soil at an allocation party's property to determine the area of a site subject to erosion in its OFT calculation. *See* Allocation Report at 21, ECF No. 288 at 22. AlterEcho used the misnomer "Affected Area" to describe these areas of bare soil. This approach means the allocator relied on human drawn property lines to determine what area was subject to erosion. Under this approach, large property owners were penalized simply by owning or operating on large parcels, no matter whether the entire Affected Area was contaminated. This assumption grossly inflated the OFT shares of the Tier 2 parties because they operated on large parcels.

To determine the Affected Area for calculating PCB mass through the OFT pathway for Pharmacia, AlterEcho cited to three maps.[11] They show one location impacted at the maximum concentration of 36,000 mg/kg. The square footage of the area impacted by PCBs at the highest concentration is incredibly small: approximately 70 square feet or 0.0016 acres.

---

https://semspub.epa.gov/work/02/645140.pdf. The geomean is calculated in Excel by taking the 70 shallow soil samples analyzed for PCBs at the Pharmacia site and applying the GEOMEAN function in Excel.

[11] Allocation Report, Attachment L, Facility Computation Sheets, ECF No. 289-15 at 54 (PAP-00035449, PAP-00035422, and PAP-00035436). The maps are available on EPA's website: https://semspub.epa.gov/work/02/645077.pdf.

Without explanation, AlterEcho cited to these maps as justification for an "Affected Area" of 9.75 acres - a difference of three orders of magnitude. AlterEcho then assumed that this *entire* 9.75 acres was contaminated at the highest detected concentration of PCBs. Furthermore, the area shown on the map is more than 560 feet from the river, was covered with clean fill and trap rock to prevent erosion (Allocation Report, Attachment J, Facility Data Report for Pharmacia at 4, ECF No. 289-6 at 392), had no history of flooding (*Id*. at 9, ECF No. 289-6 at 397), and had several impediments to overland flow including a stormwater management system, vegetated buffers, topographic gradient, buildings, and railroad tracks. *Id.* at 10, ECF No. 289-6 at 398.

Had AlterEcho considered these factors, the OFT mass for Pharmacia would be substantially reduced or eliminated altogether. The decision to ignore this site-specific information, assuming soil from a large parcel all had the same maximum concentration of a contaminant, all runoff was contaminated, and all runoff entered the Passaic, is indefensible. *See U.S. v. Alliedsignal, Inc.*, 62 F. Supp. 2d 713, 722 (N.D.N.Y. 1999) (finding consent decree must consider "the actual conditions of the site" and "imposing liability based on allegedly representative models may be capricious when the actual conditions of the Site . . . are known."). OFT artificially inflated Pharmacia's PCB mass. Correcting these OFT deficiencies would make Pharmacia indistinguishable from the settling parties.

## IV. EPA DEPARTED FROM THE ALLOCATION AND UNFAIRLY PENALIZED THE TIER 2 PARTIES

The U.S. Brief suggests the United States does not intend to honor its commitment to Pharmacia and "use the Allocator's recommended shares of relative responsibility among the Allocation Parties as a primary factor in its future negotiations." Allocation Guide at 4, ECF 289-2 at 69.

### A. EPA, the Allocator and the Allocation Parties Agreed to Use the Protocol Methodology, Which Follows the Customary Method Reallocating Orphan Shares Pro Rata

The Allocation Report is unambiguous about the agreement between EPA, AlterEcho, and the participating allocation parties concerning the conduct of the allocation and the mathematical formula to be applied in determining each allocation parties' share of responsibility. Attachment H to the Allocation Report is the "Diamond Alkali Superfund Site OU2 Allocation Protocol" which is a six-step allocation formula, which the United States was required to approve before the allocation could proceed.[12] According to the EPA-approved Protocol Methodology,

> For purposes of this Allocation, shares of responsibility for any contribution of COCs to the OU2 sediments that cannot be attributed to any of the Allocation Parties are in effect distributed among the

---

[12] Email from Alice Yeh, EPA, to David Batson, AlterEcho (May 9, 2019) ("EPA agrees that the Allocation Protocol, including the Methodology for Determination of the Relative Rank of OU2 COCs, can be used to conduct the OU2 allocation.") (attached hereto as Exhibit A).

> Allocation Parties on a pro rata basis according to their respective allocation shares.

Allocation Protocol at 2, ECF No. 289-3 at 4. The United States does not in fact contest the legitimacy of the Protocol Methodology it had approved and that was applied by the AlterEcho: "Here, the underlying allocation was rational because it was based on judicial precedent and customary allocation practice, applying site specific factors such as the mass and relative degree of toxicity of contributed waste, and the equitable distribution of responsibility for contaminants not attributable to any of the allocation parties." U.S. Brief at 3, ECF 288-1 at 10. "In consultation with the participating allocation parties and EPA, AlterEcho developed a methodology based on factors that are commonly used in CERCLA allocations, and then adhered to typical allocation processes in conducting the allocation." U.S. Brief at 32, ECF 288-1 at 39.

As noted above, under the original Protocol Methodology, shares of non-allocation parties are allocated to all responsible parties in accordance with their overall liability, *i.e.*, pro rata—which is the "customary" treatment of absent or orphan shares. This approach comports with the overwhelming judicial precedent on orphan share redistribution. *See, e.g.*, *Caldwell Trucking PRP Grp. v. Pullman Co.*, No. 95-1690, 2002 U.S. Dist. LEXIS 28410, at *81 (D.N.J. Nov. 21, 2002) ("Equity demands that all of the parties bear proportionate responsibility for any 'orphan share.' . . . The Court holds that any calculated orphan share should be

apportioned *pro rata* according to the parties' allocation shares of liability."); *Litgo N.J., Inc. v. Martin*, No. 06-2891, 2010 WL 2400388, at *36-40 (D.N.J. June 10, 2010) (allocating orphan shares pro rata based on parties' relative equitable shares at a site contaminated with TCE, PCE, and other hazardous substances after considering Gore factors); *United States v. Kramer*, 953 F. Supp. 592, 598 (D.N.J. 1997) ("It appears much more equitable to apportion the orphan shares to all the PRPs . . . , according to their relative equitable share.").

### B. The United States Misstates the Results of the Protocol Methodology

Through Alice Yeh, the United States obfuscates how small the Tier 2 parties' allocated share of responsibility was under the Protocol Methodology. At Paragraph 61 of Ms. Yeh's declaration, she reports that "[w]hile the Protocol Method proposes allocating a 99.9% share of responsibility to the Tiers 1 (OxyChem) and 2 (Nokia, Pharmacia) parties, the proposed settlement recovers nearly 8% of total estimated past and future costs …." However, Ms. Yeh does not clarify that OxyChem's share under the Protocol Methodology is 99.94% all by itself, and the Tier 2 share is just 0.0604%.

EPA creates the false impression that the Tier 2 parties are a meaningful component of OxyChem's 99.94% under the Protocol Methodology. Paragraph 57 of Ms. Yeh's Declaration states that EPA's decision to move from the Protocol Methodology to the Alternative Methodology "reduced the non-settling parties'

share of responsibility" but it is obvious from her table at ¶57.a that this decision significantly *increased* the Tier 2 share from 0.0438% to 5.1112%, which increase was offset by an even larger decrease in OxyChem's share. Ms. Yeh's table at ¶57.c also shows that EPA's decision to remove AlterEcho's cooperation and culpability adjustment factors reduced OxyChem's share but more than doubled the share of Tier 2. AlterEcho did not assign a share of 11% to Tier 2, and the United States is hiding the unfair impact to Pharmacia and Nokia by focusing on the reductions in OxyChem's share. EPA's piecemeal approach to settlement, its manipulation of its own allocation to benefit OxyChem and create distinctions without meaning between the settling and Tier 2 parties, and its refusal to engage in parallel settlement discussions with parties similarly situated to the settling parties, create unnecessary and significant uncertainty, risk and potential unfairness to Pharmacia and Nokia, and other similarly situated non-settling parties.

### C. The Alternative Methodology Unfairly Assigns the 99% PCB Orphan Share to Parties Contributing Less than 1% of the PCBs

The Alternative Methodology that EPA now embraces assigns shares of absent parties (such as PVSC, a party EPA excluded from the allocation) only amongst the parties who are associated with a particular contaminant of concern. AlterEcho did not recommend this Alternative Methodology, offering it only "should EPA and the Allocation Parties wish to explore an alternative method." Allocation Report at 28, ECF No. 289 at 29. Notwithstanding the Declaration of

Chris Wittenbrink proffered by the United States, the Alternative Methodology does not appear to be supported by any caselaw.

The Allocation Report itself recognized that "as applied to the unique circumstances of the current matter, this alternative approach results in the potentially inequitable result of a higher overall share of responsibility, for a remedy primarily driven by risks associated with the presence of dioxins/furans, being assigned to Allocation Parties that constitute a relatively small number of parties that contributed a lower risk [contaminant of concern]." Allocation Report at 28; ECF No. at 289 at 29. The "potentially inequitable result" referenced by AlterEcho is a reference to the impact on the Tier 2 parties, Pharmacia and Nokia.

Under the Alternative Methodology, allocation shares are no longer based on what each party may have released into the LPR. Instead, if AlterEcho determined that a participating allocation party released a small volume of PCBs (which AlterEcho determined was the case for Pharmacia and Nokia), that party would assume responsibility for a much larger volume of PCBs contributed by parties that did not participate in the allocation, like PVSC, or that no longer exist. Although less than 1% of the PCBs in the LPR were attributed by AlterEcho to allocation parties, those minor contributors of PCBs are nonetheless assigned responsibility for 100% of the risk associated with PCBs.

PCBs introduced to the river from sources above Dundee Dam at river mile 17 have nothing to do with purported dischargers of PCBs between river miles 2 and 3 where Nokia and Pharmacia's facilities were located, and a discharge of PCBs at river mile 2 should not make a party responsible for all PCBs coming into the system from above Dundee Dam at river mile 17.

Meanwhile, PVSC, which knowingly discharged massive amounts of contaminated wastewater from its system to the LPR – wastewater that it required industrial dischargers to convey to its system – and therefore has an actual nexus or special relationship to the "orphan share" discharges of PCBs and other COCs, was prevented by EPA from participating in the allocation and therefore is not being made to take responsibility for its own discharges, or the orphan share discharges through its sewer system. Nokia and Pharmacia are being characterized by EPA in the U.S. Brief as the parties responsible for the 99% PCB orphan share. An orphan share worth $232,519,888.




[13]

---

[13] The graph utilizes EPA's estimates for future remediation costs of OU2 and OU4 of $1.821 billion. Yeh Decl. at ¶56 & n. 67. These costs were allocated across the COCs using the percentages approved by EPA for the allocation: Dioxin: 83.92%; PCBs: 12.87%; DDX:1.37%; Dieldrin: 0.13%; Lead: 0.01%; Mercury: 0.95%; Copper: 0.69%; HPAH: 0.05%; and LPAH: 0.01%. Allocation Protocol, Attachment A, *Methodology for Determination of Relative Rank of OU2 Contaminants of Concern for the Purpose of the Allocation*, Table 3, ECF No. 289-3 at 39. The attributed and unattributed shares of each COC were based upon EPA's total mass numbers for each COC in OU2 sediments (Allocation Report, Attachment R, Additional Contaminant Inventory Analysis for Lower Eight Miles of the Lower Passaic River, April 2019, ECF No. 289-19 at 374) and AlterEcho's mass calculation of COCs from allocation parties in OU2 sediments. *See* Allocation Report, Attachment L, Facility Computation Sheets (summing COC Historic CMass for all allocation parties).

If the mass figures for PVSC appended by AlterEcho to the Allocation Report (calculated by Gayle Koch) of 91,000 pounds (41,277 kg) of PCBs had been included in the Allocation, Pharmacia's allocation under even the Alternative Methodology would have dropped materially. By excluding PVSC, EPA forced Pharmacia to assume almost a third of PVSC's PCB liability, inequitably inflating Pharmacia's share for PCBs.

This 99% PCB orphan share is worth more than $200 million and is by far the largest unrepresented or orphan share in the allocation. Although AlterEcho found that Pharmacia had only contributed 0.24% of the PCBs in the LPR, an over-inflated percentage due to its flawed OFT calculation, the Alternative Methodology assigns Pharmacia approximately one-third of all the PCB mass in the LPR (including one third of PVSC's share), with Nokia getting almost all of the other two-thirds.

Under the Alternative Methodology, Pharmacia's assigned share grows from 0.0157% to 1.8316%, while OxyChem receives a reduced share of 92.9394%. This unfair result is all the more inequitable because dioxins/furans are the primary driver for the cleanup of the LPR, not PCBs. Allocation Report at 29, ECF No. 289 at 30 (noting that the remedy is "primarily driven by risks associated with the presence of dioxin/furans"); Sivak Decl. ¶ 11, ECF No. 288-7 ("The geographic extent of the Diamond Alkali Site and the cleanup are defined by the presence of

dioxin and other [COCs] released from the Diamond Alkali facility that was operated by OxyChem's predecessor"). Furthermore, because OxyChem was found to be responsible for "close to 100%" of the dioxin mass in the LPR, there was no orphan or absent share of dioxin to be assigned to OxyChem. Allocation Report at 29, ECF No. 289 at 30.

EPA's adoption of the Alternative Methodology is a material and significant divergence from the Protocol Methodology agreed upon at the start of the allocation. Pharmacia relied upon the agreement to employ the Protocol Methodology. As noted by AlterEcho, use of the Alternative Methodology is unfair to parties in the position of Pharmacia and Nokia.

### D. If EPA Persists in Advocating for the Unfair and Judicially Unrecognized Alternative Methodology, EPA Must in Fairness Be Estopped from Arguing that PCB Parties Can Also Be Responsible for Dioxins

This COC-by-COC assignment of orphan shares under the Alternative Methodology is not customary in an equitable allocation setting, but could be the basis for a divisibility arrangement.[14] If EPA persists in maintaining, contrary to

[14] Divisibility is the only plausible basis for EPA to rely upon the Alternative Methodology to apportion absent shares on a contaminant-by-contaminant basis. *See Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 613 & 616 (2009) (finding that the United States could not seek to impose joint and several liability on a defendant because there was a reasonable basis to apportion liability based on which chemicals originated from which defendant and the comparative volume of defendants' hazardous-substance-releasing activities). If there is a

existing case law, that allocating orphan shares COC-by-COC is appropriate, then on the same theory, EPA should be estopped from requiring non-dioxin parties like Pharmacia and Nokia from paying any portion of the $1,528,183,200 in cleanup costs attributed to dioxin/furan contamination by the allocation.

Under a COC-by-COC allocation approach, it should not be parties like Nokia and Pharmacia that have no connection to dioxins/furans, and less than 1% responsibility for PCBs. AlterEcho did not find any evidence of dioxin/furan use, generation, or release at Pharmacia's site. Allocation Report, Attachment J, Facility Data Report for Pharmacia, ECF No. 286-6 at 394. The dioxin/furan share of the EPA-estimated clean-up costs is $1,528,183,200 and nearly 100% of it has been allocated to OxyChem.

If EPA relies upon the Alternative Methodology as the basis to divide responsibility on a COC-by-COC basis, forcing two PCB parties (Nokia and Pharmacia) to absorb the 99% PCB orphan share worth more than $200 million, then EPA should be precluded from subsequently claiming that Nokia and Pharmacia should also be responsible for the dioxin/furan orphan share. *See U.S. v. Pesses*, 1994 WL 741277 at 14 (W.D. Pa. 1994) (In context of Consent Decree proceeding with fewer than all parties, Court noted importance of "uniformly

---

reasonable basis upon which to apportion shares of responsibility, they are divisible shares and cannot give rise to joint and several liability. *Id.* at 613.

applying that principle in all additional allocations among the remaining parties.”). For consistency, EPA should be estopped from arguing that Pharmacia and Nokia are jointly and severally liable for the entirety of the $1.821 billion remedy for the LPR, which is driven predominantly by dioxins and furans. Alternatively, in the interests of fairness, the United States should be required to use the Protocol Methodology to justify its settlement with the present settling parties and apply that approach to the non-settling parties moving forward.

## V. THE UNITED STATES’ DECISION TO BACK OUT THE COMMONLY APPLIED CULPABILITY AND COOPERATION ADJUSTMENT FACTORS IS UNWARRANTED

### A. Culpability and Cooperation Are Universally Accepted Gore Factors Consistently Applied by the Courts

Contrary to long-standing precedent, the United States decided to reject the Culpability and Cooperation Adjustment Factors applied by AlterEcho, which have been an integral part of CERCLA equitable allocations since its early days when the so-called Gore Factors were embraced by the courts as the touchstone for equitable allocations. *See, e.g., Litgo N.J., Inc. v. Comm’r New Jersey Dep’t of Env’t Prot.*, 725 F.3d 369, 387 (3d Cir. 2013) (identifying the Gore factors as “factors frequently considered by courts”); *Kramer*, 953 F. Supp. at 598 (“[C]ourts have often applied or referred to the ‘Gore factors’ as a non-exhaustive list of considerations in allocating CERCLA response costs.”); *United States v.*

*Compaction Sys. Corp.*, 88 F. Supp. 2d 339, 355 (D.N.J. 1999) ("Courts often look to the 'Gore factors' . . . to apportion contribution claims . . . .").

EPA also makes regular use of the Gore factors in cost allocations. EPA, *Developing Allocations Among Potentially Responsible Parties for the Costs of Superfund Site Cleanups* 6-7 (Superfund Admin. Improvements Proj. Oct. 1994) ("*Developing Allocations*");[15] *United States v. BP Amoco Oil PLC*, 277 F.3d 1012, 1016 n.3 (8th Cir. 2002) (affirming the entry of a CD supported by EPA's allocation of PRP costs based on its analysis of the Gore factors, among others); *United States v. Mallinckrodt, Inc.*, No. 4:02-cv-01488, 2007 WL 1231665, at *15 (E.D. Mo. Apr. 26, 2007) (discussing EPA's consideration of the Gore factors in apportioning responsibility among PRPs).

The expert declaration of Chris Wittenbrink, proffered by the United States as an expert in allocations, acknowledges the centrality of the Gore Factors to CERCLA allocations, and the inclusion of culpability and cooperation as two of the six factors that make up the Gore Factors.[16] The United States' expert at no

---

[15] epa.gov/enforcement/developing-allocations-among-potentially-responsible-parties-costs-superfund-site.

[16] The Wittenbrink Declaration states that: "CERCLA allocations often consider various equitable factors. Some equitable factors are commonly referred to as the Gore Factors. The Gore Factors are as follows: … v. The degree of care exercised by the parties with respect to the hazardous waste concerned, taking into account the characteristics of such hazardous waste; and vi. The degree of cooperation by the parties … ." Wittenbrink Decl. ¶ 13, ECF No. 288-8 at 5. Wittenbrink goes on to declare: "AlterEcho's allocation incorporated the allocation factor of

point criticizes AlterEcho's application of these Gore Factors and at no point defends the United States' decision to ignore these factors, simply stating the fact that "EPA and DOJ elected not to use AlterEcho's culpability factor in support of the Proposed Consent Decree."

### B. EPA, Alter Echo, and the Participating Allocation Parties Agreed that AlterEcho Would Evaluate and Apply Well Established Culpability and Cooperation Adjustment Factors to the Allocation

Again, the allocation approach approved by EPA at the beginning of the allocation included Culpability and Cooperation Adjustment Factors as an integral part of the allocation formula. Allocation at Attach. H. Step 4 of the EPA-approved allocation formula was titled "Establish Adjusted Allocation Party Base Scores" and the first of two agreed upon adjustments required AlterEcho to determine a Culpability Factor:

> Establish for each Allocation Party a Culpability Factor (CUF) that addresses the level to which the Allocation Party's contribution of COCs to OU2 sediments were the result of culpable conduct.
>
> > a. Culpable conduct refers to the release or discharge of COCs in contravention of prevailing industrial standards and practices, either (i) knowingly and with intent to skirt environmental regulatory obligations, and/or (ii) with conscious awareness that the release or discharge of

---

"culpability" related to the manner in which a party conducted its activities resulting in releases to the Site including the care used with regard to material handling, storage and disposal. … AlterEcho considered "cooperation" as a factor in its allocation analysis." *Id.* at ¶ 14, ECF No. 288-8 at 5.

> COCs were illegal or posed substantial risk to human health or the environment.
>
> b. Depending on the nature, extent and/or impact of an Allocation Party's culpable conduct, each Allocation Party will be assigned a numerical Culpability Factor equivalent to 0% to 100% of its Base Score, escalating with the level of culpability.

Allocation Protocol at 7, ECF No. 289-3 at 9. The second agreed-upon adjustment factor was the Cooperation Factor. *Id.*

The Allocation Report even included a four-page Culpability and Cooperation Worksheet explaining how AlterEcho analyzed the culpability and cooperation of each allocation party and the importance of the Gore Factors.

> As noted in the foundational Gore Factors these considerations of culpability and cooperation are described as:
>
> > The degree of care exercised by the party with respect to the hazardous substance concerned, taking into account the characteristics of such hazardous substance; and
> >
> > The degree of cooperation by the party with federal, state, or local officials to prevent any harm to the public health or the environment. In the current matter, a range of actions were evaluated to establish the relative culpability and cooperation of the Allocation Parties.

Allocation Report, Attachment S, ECF No. 289-19 at 375. AlterEcho then included within each allocation party's Facility Data Computation Sheet an explanation of how AlterEcho calculated that party's Culpability and Cooperation Adjustment Factors – factors that all the participating allocation parties, EPA and AlterEcho agreed to use in the allocation.

### C. AlterEcho's Application of Culpability and Cooperation Factors Was Not "Subjective" and With Regard to OxyChem, It Was Premised Upon Findings of Fact from a 20-Day Trial

The United States claims it disregarded the Culpability and Cooperation Adjustment Factors, thus reducing OxyChem's allocation share under the Alternative Methodology from 93% to 85%, and more than doubling the shares of Nokia and Pharmacia, because it now feels these commonly applied factors are "subjective." "The United States did not adopt the cooperation and culpability adjustments that AlterEcho had applied to each facility's base score. The United States concluded that these factors are subjective and that a cashout settlement with these Settling Defendants that did not take those factors into account would be more equitable and maximize recovery." Yeh Decl. at ¶57.b., ECF No. 288-5 at 38. To dismiss OxyChem's culpability factor as "subjective" ignores AlterEcho's reliance on a court's findings of fact after a twenty-day bench trial.

In explaining OxyChem's very high culpability score, AlterEcho exclusively cited to a judicial opinion in which the polluting conduct of OxyChem's predecessor by merger (Diamond Alkali) was at issue, and whether that conduct was so egregious as to deny it insurance coverage. AlterEcho premised OxyChem's singularly high culpability adjustment on Judge Stanton's findings of fact after a lengthy trial. AlterEcho's rationale for OxyChem's high culpability score is quoted in full below:

> In the 1984 Aetna litigation, Judge Stanton found that Diamond, was conscious that its discharges into the river were illegal, and that the company as a matter of corporate policy, intentionally and continuously discharged dioxin, DDT, and other hazardous substances from the Lister Plant into the Passaic River during the entire period of its plant operations. Specifically, the trial court found that "Diamond was conscious that its discharges into the (Passaic) (R)iver were illegal. It deliberately concealed them, and over a period of many years employed an alarm system to warn employees to stop the discharges when Passaic Valley inspectors were on the premises." Also, "Housekeeping at the (Lister Plant) ranged from inadequate to poor throughout the entire period of its operation by (DSCC)... . Spills of liquid and solid chemical products and wastes were literally continuous during every day of the plant's operations and some pipes were always leaking." Although "factory floors at the Newark plant were so badly corroded by acid spills that they had to be replaced nearly every summer ... nothing was done to mitigate the polluting effect spills and leaks had upon the physical environment." And that OxyChem's "toleration and continuous spilling and leaking" -- was just "the way of life at the Newark Plant" and "its management accepted the spills and leaks as part of the normal routine of operating a chemical manufacturing plant." (PAS-00128426-29 & 49-50).

Allocation, Report, Attachment L, Facility Data Computation Sheet for OxyChem, ECF No. 289-15 at 13. For the United States to dismiss a court's findings of fact after a twenty-day bench trial as "subjective" seems odd, especially when it runs counter to decades of precedent applying "culpability" as a core component of any equitable allocation.

The New Jersey Superior Court, Appellate Division, after reviewing the record evidence of the misconduct at the Lister Plant, held that the record was clear:

> Given Diamond's "knowing and routine discharge of contaminants," the judge concluded that "the resulting injury and damage [were] expected from the standpoint of the assured ... ." We are entirely satisfied that these detailed findings were supported by adequate, substantial and credible evidence. ... **Indeed, the trial record admits of no other fair conclusion**.

*Diamond Shamrock Chemicals Co. v. Aetna Cas. & Sur. Co.*, 609 A.2d 440, 441-42 (N.J. Super. Ct. App. Div. 1992) (emphasis added).

An appellate panel concluded that the environmental contamination from OxyChem's Lister Avenue facility was so blatant and willful that it would be denied coverage under its insurance policies and that "the trial record admits of no other fair conclusion," yet EPA, when confronted by these same facts (some of which are quoted in the U.S. Brief) decides that the evidence of OxyChem's culpability is too "subjective" and must be ignored, thus diverging from long-standing judicial precedent applying this important allocation factor, and doubling the allocation shares of Nokia and Pharmacia in the process.

EPA's rationale for ignoring the culpability and cooperation adjustment factors is not plausible. As the Appellate Division panel noted: "Whatever else may be said, the continuous release of dioxins from the plant was not "unforeseen," and the resulting damage was not "unexpected."" *Id*. at 462.[17]

[17] For the Court's convenience, additional excerpts from the trial court and appellate court in *Aetna* are attached as Appendix A.

### D. Fairness Requires the United States to Apply the Culpability and Cooperation Factors Used by the Allocator to Assign Responsibility

The United States has supplied no adequate justification to depart from its agreement to follow the Protocol Methodology and further reject common allocation factors in moving to enter the present Consent Decree.[18] Consistent with the "foundational" Gore factors, AlterEcho evaluated OxyChem's culpability in the context of "the hazardous substance concerned, taking into account the characteristics of such hazardous substance." Allocation Report, Attachment S, ECF No. 289-19 at 376.

---

[18] *See, e.g., Agere Sys. Inc. v. Advanced Env't Tech. Corp.*, 602 F.3d 204, 214, 235 (3d Cir. 2010) (affirming district court holding that "culpability is an appropriate equitable factor" along with district court decision to double PRP's "share of liability above what it had determined to be [PRP's] volumetric share of waste, based on [PRP's] significant culpability in creating a Superfund site and its lack of cooperation in cleaning it up" where PRP "relinquished its potent waste acids to a known polluter."); *U.S. v. Consolidation Coal Co.*, 345 F.3d 409, 414-15 (6th Cir. 2013) (affirming district court's allocation of costs under CERCLA based primarily on "critical factor" of PRPs' varying levels of culpability based on whether parties had knowledge that wastes contained hazardous substances); *U.S. v. Davis*, 31 F. Supp. 2d 45, 65 (D.R.I. 1998) (attributing greatest share of costs to PRP based primarily on culpability factor, holding share should be increased where party "failed to exercise even a modicum of care to prevent or to minimize the obvious potential harm to human health and/or the environment."). Indeed, EPA itself has explained that it considers culpability and degree of cooperation when assigning shares of responsibility. *See U.S. v. BP Amoco Oil PLC*, 277 F.3d 1012, 1016 n.3 (8th Cir. 2002) (discussing declaration from EPA attorney explaining the government's methodology in performing allocation including its reliance on "culpability" and "degree of cooperation[.]").

For the United States to further claim that ignoring OxyChem's egregious misconduct for purposes of an allocation of responsibility for cleanup costs is "equitable" is perplexing. The net effect of making OxyChem's bad acts that caused the contamination primarily at issue in the LPR disappear from the allocation calculations is to increase the Alternative Methodology shares of Nokia and Pharmacia from a collective 5% to 11% while decreasing OxyChem's share from 93% to 85%. EPA should be directed to engage all interested non-settling parties, including Pharmacia and Nokia, in good faith settlement discussions during the pendency of this proceeding, so that all concerned can evaluate whether they are being treated fairly by EPA.

In contrast to the 100% culpability adjustment applied by AlterEcho to OxyChem for its misconduct, AlterEcho assigned 5% to Pharmacia and 5% to Nokia. Allocation Report, Attachment L, Facility Data Computation Sheets for Pharmacia and Nokia, ECF No. 289-15 at 56 and 289-14 at 85. The Allocation Report explains that:

> [t]he following scale and definition of relative culpable behavior was utilized to assign Culpability Factors to individual Allocation Party facilities. …
>
> > **5%** Occasional or minor releases of COCs during facility operations or other industrial practices potentially impacting operations utilizing COCs.
>
> ***

> **100%** Significant sustained releases of COCs in contravention of standard industrial practices indicating knowledge of the risk and illegality of the actions and an intentional disregard of the impact on human health or the environment.

Allocation Report at 33; ECF No. 289 at 34. AlterEcho concluded that Pharmacia was responsible for only "[o]ccasional or minor releases of COCs." *Id.*

Similarly for cooperation, OxyChem was given no reduction by AlterEcho, while Pharmacia and Nokia were each given a reduction of 20%. A 20% reduction was defined as "[c]ontinuous provision of funding and participation in PRP Group(s) actions to cooperate with governmental/regulatory entities to address environmental or public harm created by own activities." Allocation Report at 34, ECF No. 289 at 35. Allocation adjustments for cooperation are customary in CERCLA allocations.[19]

[19] *See American Cyanamid Co. v. Nascolite Corp.*, No. Civ. A. 92–CV–3394, 1995 WL 934871 at *8 (D.N.J. Mar. 31, 1995) (stating that the Gore factor of cooperation is one of "the most important for the Court's consideration"); *Lockheed Martin Corp. v. United States.*, 35 F. Supp.3d 92, 132 (D.D.C. 2014) (finding that "[b]ecause non-cooperating parties can undermine CERCLA's goal of promoting quick and efficient cleanups. . . the degree of cooperation with government officials to prevent any harm to the public health or the environment is very important in the contribution analysis."); *U.S. v. Consolidation Coal Co.*, 345 F.3d 409, 415 (6th Cir. 2003) (finding no error in district court decision to double PRP share where PRP "did not meaningfully cooperate in any phase of the CERCLA process" even though it "knew or should have known that its sludge had been deposited at the site[.]").

Included among the documents placed into the record in this proceeding by the United States is the expert declaration of Dr. Linda S. Birnbaum, a former senior scientist and toxicologist for the United States. ECF 288-10 at 3663. Dr. Birnbaum's declaration was submitted by the SPG with its comments in support of the settlement a year ago. Dr. Birnbaum was offered as a leading expert on the toxicity of dioxin generally, and 2,3,7,8-TCDD, the type of dioxin discharged by OxyChem into the LPR. According to Dr. Birnbaum, "TCDD is the most toxic man-made compound. … TCDD is the most toxic of these related chemicals and is the chemical against which the toxicity of the other compounds is measured." *Id*. at 3665. "[T]here is significant scientific consensus that there is no safe low dose of TCDD." *Id*. at 3667. "The most dioxin-like and toxic PCB – PCB-126 – has a TEF of 0.1, meaning it is ten times less toxic than TCDD." *Id*. at 3666. "In summary, TCDD is the most toxic man-made substance. It is at least ten times more toxic than the most toxic PCB and many thousands of times more toxic than the average PCB." *Id*. at 3671.

Two courts have found that the 2,3,7,8-TCDD dioxin discharges from OxyChem's Lister Avenue facility while operated by its predecessor by merger, Diamond Alkali, were intentional, illegal, routine and done with knowledge of their detrimental impact on the LPR. AlterEcho did not find any evidence of dioxin/furan use, generation or release at Pharmacia's site. AlterEcho did not even

find any evidence of PCB-126 use, generation or release at Pharmacia's site. The PCBs found in soil at the Pharmacia site were many thousands of times less toxic than OxyChem's dioxin discharges to the LPR.

## VI. <u>CONCLUSION</u>

Through the lens of the Protocol Methodology, the $150 million settlement between EPA and the settling parties is hundreds of times greater than the settling parties' collective allocated share and is clearly fair and reasonable. However, EPA has also shown a willingness to distort the Allocation Report creating a uniquely unfair circumstance for Nokia and Pharmacia, an unfair circumstance which was recognized by AlterEcho in the Allocation Report, and which creates unnecessary uncertainty around whether the Tier 2 parties will be treated reasonably by EPA in future settlement negotiations after this Consent Decree is approved.

The agreed-upon Protocol Methodology assigned Pharmacia a share of 0.0157 percent, and even this small amount included the unscientific and unreasonable application of the OFT pathway which grossly inflated Pharmacia's alleged discharges to the LPR and artificially distinguished Pharmacia from the settling parties.

This share was then increased by EPA to 1.83 percent by using the Alternative Methodology to make only PCB parties responsible for the large mass

of orphan PCBs in the LPR – a large orphan share created by PVSC's absence from the allocation. Pharmacia's share was then increased more than 100% by EPA because the United States chose to ignore Pharmacia's long-standing cooperation and OxyChem's intentional bad acts and recalcitrance as determined by AlterEcho and based upon a detailed factual record. This cascade of decisions by EPA creates an unsupportable result – a party that the Allocation Report concluded should be responsible for, at worst, 62.5 kg of PCBs to the LPR out of a total of 26,000 kg of PCBs, is being maneuvered by EPA to pay tens of millions of dollars for a clean-up which will occur because of another party – OxyChem – and is primarily focused on a different COC – dioxin, while scores of other similarly situated parties pay quasi-*de minimis* settlements.

EPA should be required to engage with Pharmacia and other interested non-settling parties, as it agreed to long ago, while the Consent Decree is pending before the Court.

/s/ John F. Gullace
John F. Gullace, Esq.
Bryan F. Franey, Esq.
Danielle N. Bagwell, Esq.
MANKO, GOLD, KATCHER & FOX LLP
Three Bala Plaza East, Suite 700
Bala Cynwyd, Pennsylvania 19004
Tel.: (484) 430-5700/Fax: (484) 430-5711

*Attorneys for Intervenor Pharmacia LLC*

Date: April 1, 2024

**CERTIFICATE OF SERVICE**

I, John F. Gullace, hereby certify that, on this date, I caused a copy of the foregoing document to be served via electronic filing on all counsel of record.

Dated: April 1, 2024

*/s/ John F. Gullace*

John F. Gullace, Esq.
MANKO, GOLD, KATCHER & FOX LLP
Three Bala Plaza East, Suite 700
Bala Cynwyd, PA 19004
Telephone: (484) 430-5700
jgullace@mankogold.com

# APPENDIX A

**Appendix to Pharmacia LLC's Brief in Response to United States' Motion to Enter Consent Decree Setting Forth Trial and Appellate Court Findings re: Lister Avenue Plant Operations**

- "In sum, the record reveals that at a relatively early date, Diamond became aware of the dangerous propensities of dioxins and chose to disregard methods designed to diminish their production. . . . A number of former plant employees testified concerning Diamond's waste disposal policy which essentially amounted to 'dumping everything' into the Passaic River." *Diamond Shamrock Chemicals Co. v. Aetna Cas. & Sur. Co.*, 609 A.2d 440, 447-48 (N.J. Super. Ct. App. Div. 1992).

- "To summarize this testimony briefly, it was that prior to 1956, all waste products from chemical processes were either directly discharged or ultimately released into the Passaic River. However, in 1956 an industrial sewer line was installed connecting the Passaic Valley Sewerage Commission Lister Avenue Line. Nevertheless, the testimony is persuasive that not all of the effluent from the plant was directed to that sewer line. DDT was manufactured until about 1959. So much DDT waste water was directed into the river that a mid-river 'mountain' of DDT was created. Employees were directed to surreptitiously wade into the river at low tide and 'chop up' the deposits so that they would not be seen by passing boats." *Id.* at 448.

- "Former Diamond employees provided graphic descriptions of the company's heedless indifference to the environmental damage which resulted from its manufacturing operations ... . Blair, too, corroborated Myko's testimony concerning the 2,4-D and 2,4,5-T found on the floor. These substances were washed off the floor and the waste water was allowed to flow outside the building and eventually into the river." *Id.*

- "He confirmed that there were numerous leaks in the autoclave room where the TCP was made. There were leaks in the pipes that ran between the two buildings, and hazardous substances escaped, eventually meandering toward the river. Pipes with caustic material also ran between the two buildings. Often the material would freeze. In order to free the substances, employees would break and then steam clean the pipes. The material steamed from the

pipes would either be released onto the ground or discharged into the river." *Id.*

- "Instead, we rest our holding on the judge's finding of fact that Diamond knowingly and routinely discharged contaminants over a period of 18 years. The judge determined that Diamond knew 'the nature of the chemicals it was handling,' knew that 'they were being continuously discharged into the environment,' and knew that 'they were doing at least some harm.' Given Diamond's 'knowing and routine discharge of contaminants,' the judge concluded that 'the resulting injury and damage [were] expected from the standpoint of the assured... .' We are entirely satisfied that these detailed findings were supported by adequate, substantial and credible evidence. Indeed, the trial record admits of no other fair conclusion. *Id.* at 461 (citations omitted).

- None of the insuring agreements covered Diamond's intentional and knowing polluting activity. Whether or not one subscribes to the Chancery Division judge's definition of 'accident,' it is plain beyond peradventure that the intentional and deliberate acts of the insured do not fall within the purview of the policy language. Whatever else may be said, the continuous release of dioxins from the plant was not 'unforeseen,' and the resulting damage was not 'unexpected.'" *Id.* at 462.

- "As we noted earlier, Diamond's management knew of the hazardous nature of dioxins at a relatively early stage. In the Autumn of 1959, Diamond's representative, Thorton Holder, offered a two-step process by which dioxins could be eliminated, or at least reduced, in the manufacturing process. Despite specific preventive recommendations, Diamond made a conscious decision to run the autoclave, in which chemicals were processed into TCP, at a higher temperature than suggested by Holder. The reason for its decision is obvious. When the temperature in the autoclave was reduced, the reaction time was prolonged, resulting in a decrease in the volume of production. The general rule was that a reduction in temperature of ten degrees reduced the reaction time by 50%. The only conclusion to be drawn is that Diamond's management was wholly indifferent to the consequences flowing from its decision. Profits came first." *Id.*

- "Both the air and the ground, inside and outside of the Lister Avenue plant, were regularly subjected to dioxin emissions through venting, and contamination from spills, leaks and 'sloppy practices' in and around the plant ... . Overwhelming evidence was presented that Diamond knew about the release of dioxins from its plant and the migration of these substances to surrounding areas ... ." *Id.* at 463.

- "We recognize that we should not judge Diamond's conduct from the vantage point of twenty-twenty hindsight. The critical fact remains, however, that Diamond knew it was dealing with a toxic substance. Perhaps it was not aware of the exact extent of the dangerous consequences emanating from its polluting activity. However, we cannot ignore reality by accepting the blithe assurance of Diamond that it did not intend to injure others. The evidence abounds the other way. We need not engage in the debate whether an intent to inflict injury can be inferred as a matter of law. Instead, we are convinced that subjective knowledge of harm was proven as a matter of fact. The Chancery Division judge so found, and we agree that this conclusion is virtually inescapable." *Id.* at 463-64 (citations omitted).

- "From 1951 until 1956, Diamond intentionally discharged all of its waste chemical effluent into the Passaic River. Such discharges had been forbidden by specific statutory enactment since at least 1931. N.J.S.A. 58:14-7 and -8. The penalties for such discharges were relatively light and enforcement was not vigorous by our current standards. However, in 1956, the Passaic Valley Sewerage District became insistent upon compliance with the no-discharge law, and Diamond purportedly tied its entire complex at the Newark plant into an industrial sewer constructed by the Passaic Valley Sewerage Commission." *Diamond Shamrock Chemicals Co. v. Aetna Cas. & Sur. Co.*, C-3939-84, slip op. at 8-9 (N.J. Super. Ct. Ch. Div. Apr. 12, 1989).

- "Although Diamond purported to tie the whole Newark plant into the sewer in 1956, it actually tied only the 2,4-D building into the sewer. The chemical effluent from the main building continued to be discharged directly into the Passaic River. The discharges I have spoken about thus far were intentional, planned discharges from processing equipment through pipes or

ditches. In addition, from 1951 through 1969, spills onto floors and ground surfaces drained mostly into the Passaic River. These spills were constant, and, collectively, they were substantial in volume. Diamond was conscious that its discharges into the river were illegal. It deliberately concealed them, and over a period of many years employed an alarm system to warn employees to stop the discharges when Passaic Valley inspectors were on the premises." *Id.* at 9.

- "Over the years, discharges from the Newark plant into the Passaic River included 2,4,5-T acid (and dioxin), caustic soda, DDT, sulfuric acid, TCP (and dioxin), muriatic acid and monochlorobenzene. The conclusion is inescapable that the consistent policy of Diamond's management (both at the local plant level and at corporate headquarters) was to discharge dangerous chemicals into the Passaic River in known violation of public law. This policy persisted from 1951 through 1969. The policy was consciously adopted by Diamond's management because the pollution of the public waters of the State was not perceived by them as a significant wrong, and because it would have been technically difficult and very costly to have avoided such discharges." *Id.* at 9-10.

- "Much of the extensive testimony about the operation of the Newark plant focused on discharges, spills and drainage of chemicals into the Passaic River." *Id.* at 10.

- "The testimony was highly relevant because it established that from 1951 to 1969 Diamond had a mindset and a method of conducting manufacturing operations which were destructive of the land, air and water resources of the environment." *Id.* at 11.

- "However, even by the standards of the 1951-1969 period, Diamond's conduct in operating the Newark plant was unacceptably wrong and irresponsible. Diamond always put its narrowly perceived economic interest first. It deliberately and persistently cheated on the limited environmental regulations which were in place." *Id.* at 11-12.

- “As my previous discussion of the operations of the Newark plant made clear, Diamond intentionally and continuously discharged highly toxic chemical effluent into the Passaic River from 1951 to 1969.” *Id*. at 32.

- “But Diamond did know the nature of the chemicals it was handling, it did know that they were being continuously discharged into the environment, and it did know that they were doing at least some harm. Diamond unequivocally knew that at least some of this contaminating activity violated the then existing statutory prohibitions against discharges into the Passaic River. It also should have known that much of its activity violated common law rules against nuisance ... .” *Id.* at 33 (citation omitted).

- “I believe that Diamond's knowing and routine discharge of contaminants over a period of 18 years makes it necessary to conclude that the resulting injury and damage was expected from the standpoint of the insured within the meaning of the occurrence basis policies which were in force from 1960 to 1970.” *Id.* at 34.

- “However, given the continuous and large-scale pollution of the Newark plant site by the knowing conduct of Diamond, substantial off-site migration was inevitable. In my judgment, all of the migration should be treated as non-accidental and as being expected from the standpoint of the insured.” *Id.* at 35.