# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## NEWARK VICINAGE

| | |
|---|---|
| UNITED STATES OF AMERICA | Hon. Madeline Cox Arleo |
| | Hon. Leda Dunn Wettre |
| Plaintiff, | |
| | |
| v. | Civil Action No. 2:22-cv-07326 |
| | |
| ALDEN LEEDS, INC., *et al.* | |
| | **INTERVENOR OCCIDENTAL** |
| Defendants, | **CHEMICAL CORPORATION'S** |
| | **MEMORANDUM IN OPPOSITION** |
| and | **TO THE UNITED STATES' MOTION** |
| | **TO ENTER CONSENT DECREE** |
| PASSAIC VALLEY SEWERAGE | |
| COMMISSIONERS, *et al.* | |
| | **ORAL ARGUMENT REQUESTED** |
| Intervenors. | |

MCDERMOTT WILD LLC
900 Haddon Avenue, Suite 233
Collingswood, NJ 08108
Tel:  (856) 746-7962
By:   John J. McDermott, Esq.
      (jmcdermott@mcdermottwild.com)
      Lauren Krohn Wild, Esq.

CLEMENT & MURPHY, PLLC
706 Duke St.
Alexandria, VA 22314
Tel:  (202) 742-8900
By:   Erin E. Murphy, Esq.
      (erin.murphy@clementmurphy.com)
      C. Harker Rhodes IV, Esq.
      Joseph J. DeMott, Esq.

GIBBS & BRUNS, LLP
1100 Louisiana, Suite 5300
Houston, TX 77002
Tel:  (713) 650-8805
By:   Kathy D. Patrick, Esq.
      (kpatrick@gibbsbruns.com)
      Anthony N. Kaim, Esq.
      Ann T. Lebeck, Esq.

LANGSAM STEVENS SILVER &
HOLLAENDER, LLP
1818 Market Street, Suite 2430
Philadelphia, PA 19103
Tel:  (215) 732-3255
By:   Larry D. Silver, Esq.
      (lsilver@lssh-law.com)
      David E. Romine, Esq.

*Attorneys for Intervenor Occidental Chemical Corporation*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................. 1

I.  Significant Pollution Flowed Into the Passaic River for More Than a Century ..... 4

II.  OxyChem Is the Only Company Working to Restore the Passaic .......................... 4

III.  EPA Commissions David Batson to Conduct an Allocation of Responsibility ...... 6

A.  2017: EPA Announces the Batson Process ................................................. 7

B.  2018: OxyChem Opts Out Because of Obvious Flaws in Batson's Proposal ........................................................................................................ 7

C.  2019: The Batson Process Marches Toward Its Predetermined Result....... 7

D.  2020: The Batson Report Issues—Intentionally Skewed Against OxyChem ..................................................................................................... 8

E.  2023: Batson's Conflicts and Lack of Neutrality Are Revealed ................. 9

IV.  The United States Seeks This Court's Approval of the Proposed Settlement....... 10

STANDARD OF REVIEW ............................................................................... 10

ARGUMENT ..................................................................................................... 12

I.  The Proposed Settlement Is Procedurally Invalid Under CERCLA §122 ............ 13

A.  The Proposed Settlement Violates CERCLA §122(e) and §122(f).......... 13

B.  The Government's Efforts to Circumvent §122 Are Not Valid or Lawful ................................................................................................................ 14

II.  The Proposed Settlement Is Procedurally Unfair Because It Resulted From a Collusive, Improper Process ................................................................................. 16

A.  Batson Was Fatally Conflicted and Not a "Third-Party Neutral" ............. 21

B.  The Batson Process Participants Were Allowed to Manipulate the Results................................................................................................... 21

C.  EPA Wrongly Sought to Make Participation in the Batson Process Mandatory by Punishing Those Who Refused to Participate .................. 23

III.  The Proposed Settlement Is Substantively Unfair and Unreasonable ................. 25

A.  The Court Lacks Sufficient Information to Ensure the Proposed Settlement Correlates With Rational Estimates of the Harm Each Defendant Caused ................................................................................ 27

B.  Batson's Assessments of Settling Defendants' Liability as "Minor" Has No Rational Basis Because It Ignores and Contradicts the Evidence....... 27

C.  Batson Used an Analytic Approach That Predetermined an Intended Result: Assigning Overwhelming Liability to OxyChem ........................ 29

1.  Batson's decision to allocate by relative risk rather than actual cost drivers is arbitrary and inconsistent with EPA's own remedial decisions ................................................................................................. 31

2.  Batson's risk numbers contradict EPA's own findings and arbitrarily ignore the significant risk posed by dioxin-like PCBs............................ 32

3.  Batson committed serious mathematical and scientific errors................ 33

4.  Batson unfairly treated similarly-situated PRPs differently .................... 38

5.  The government's "alternative allocation" does not cure these errors. .... 39

D.  The Government Arbitrarily Includes OU4 in the Proposed Settlement .. 41

E.  The Proposed Bar on OxyChem's Contribution Claims Is Also Unfair and Unreasonable ................................................................................ 42

IV.  The Proposed Settlement Contravenes CERCLA's Goals and the Public Interest. ................................................................................................. 43

A.  The Proposed Settlement Is Inconsistent With CERCLA's Goals ............ 45

B.  The Proposed Settlement Discourages Voluntary Cleanups and Does Not Minimize Litigation Involving the Government ................................ 45

C.  The Proposed Settlement Harms the Public ................................................ 46

CONCLUSION ................................................................................................. 47

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Akzo Coating of Am., Inc. v. Am. Renovating*,
  842 F. Supp. 267 (E.D. Mich. 1993) .................................................................44

*Beazer E. v. Mead Corp.*,
  412 F.3d 429 (3d Cir. 2005).............................................................................26

*Bennett v. Spear*,
  520 U.S. 154 (1997).........................................................................................12

*Burlington N. & Santa Fe Ry. Co. v. United States*,
  556 U.S. 599 (2009).........................................................................................45

*C.P.C. Int'l, Inc. v. Aerojet-General Corp.*,
  759 F. Supp. 1269 (W.D. Mich. 1991) ...........................................................45

*Colum. Falls Aluminum Co. v. Atl. Richfield Co.*,
  2021 WL 3769886 (D. Mon. Aug. 25, 2021) ...................................................31

*Cranbury Brick Yard, LLC v. United States*,
  943 F.3d 701 (3d Cir. 2019).............................................................................46

*El Paso Nat. Gas Co. v. United States*,
  390 F. Supp. 3d. 1025 (D. Ariz. 2019) ............................................................31

*Exec. Bus. Media, Inc. v. U.S. Dep't of Def.*,
  3 F.3d 759 (4th Cir. 1993) ...............................................................................16

*Gen. Time Corp. v. Bulk Materials, Inc.*,
  826 F. Supp. 471 (M.D. Ga. 1993) .........................................................13, 44, 45

*Kelley v. Wagner*,
  930 F. Supp. 293 (E.D. Mich. 1996).................................................................46

*La. Pub. Serv. Comm'n v. FCC*,
  476 U.S. 355 (1986).........................................................................................20

*Mathes v. Century Alumina Co.*,
  2008 WL 4693550 (D.V.I. Oct. 22, 2008)..................................................27, 46

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Ins. Co.*,
  463 U.S. 29 (1983)...........................................................................................33

*N.J. Dep't of Envtl. Prot. v. Am. Thermoplastics Corp.*,
  974 F.3d 486 (3d Cir. 2020).............................................................................46

*PSE&G v. Cooper Industries*
  (D.N.J.), No. 2:21-cv-13644-KM-JBC, Dkt. 50 (Jun. 26, 2023)......................30

*Shoshone Bannock Tribes v. Reno*,
  56 F.3d 1476 (D.C. Cir. 1995)..........................................................................16

*Trinity Indus., Inc. v. Greenlease Holding Co.*,
  903 F.3d 333 (3d Cir. 2018)........................................................................32, 45

*In re Tutu Water Wells CERCLA Litig.*,
    326 F.3d 201 (3d Cir. 2003) ............................................................................... *passim*

*United States v. Alliedsignal, Inc.*,
    62 F. Supp. 2d 713 (N.D.N.Y. 1999) ................................................................... 49

*United States v. Alsol Corp.*,
    2021 U.S. Dist. LEXIS 52344 (D.N.J. Mar. 19, 2021) ........................................ 46

*United States v. Atl. Rsch. Corp.*,
    551 U.S. 128 (2007) ............................................................................................. 17

*United States v. Cannons Eng'g Corp.*,
    899 F.2d 79 (1st Cir. 1990) ................................................................................. 13

*United States v. Cornell-Dubilier Elecs., Inc.*,
    2014 WL 4978635 (D.N.J. Oct. 3, 2014) ............................................................ 25

*United States v. GenCorp, Inc.*,
    935 F. Supp. 928 (N.D. Ohio 1996) .................................................................... 28

*United States v. Hardage*,
    750 F. Supp. 1460 (W.D. Okla. 1990) ................................................................ 44

*United States v. Hercules*,
    961 F.2d 796 (8th Cir. 1992) ........................................................................ 16, 17

*United States v. Kramer*,
    19 F. Supp. 2d 273 (D.N.J. 1998) ....................................................................... 50

*United States v. Montrose Chem. Corp.*,
    50 F.3d 741 (9th Cir. 1995) ................................................................................. 28

*United States v. Moore*,
    703 F. Supp. 455 (E.D. Va. 1988) ...................................................................... 12

*United States v. Occidental Chemical Corporation and Chemical Land Holdings, Inc.*,
    No. 89-5064 (D.N.J.) ........................................................................................... 22

*United States v. Pesses*,
    1994 WL 741277 (W.D. Pa. Nov. 7, 1994) ................................................. *passim*

*United States v. Rohm & Haas Co.*,
    712 F. Supp. 666 (D.N.J. 1989) .......................................................................... 47

*United States v. Rose*,
    538 F.3d 175 (3d Cir. 2008) ................................................................................ 20

*United States v. S. Jersey Clothing Co.*,
    976 F. Supp. 2d 577 (D.N.J. 2013) ............................................................... 17, 19

*United States v. Se. Pa. Transp. Auth.*,
    235 F.3d 817 (2000) ....................................................................................... 27, 45

*United States v. Wyeth Holdings LLC*,
    2015 WL 7862724 (D.N.J. Dec. 3, 2015) ........................................................... 45

**Statutes**

5 U.S.C. § 552 ...................................................................................................10, 21, 40

5 U.S.C. §§ 571 *et seq.*.................................................................................................22

5 U.S.C. § 706(2) ..........................................................................................................12

18 U.S.C. § 207(a)(1).....................................................................................................22

42 U.S.C. §§ 9601 *et seq.*..............................................................................................1

42 U.S.C. § 9606 ...............................................................................................17, 18

42 U.S.C. § 9607 ......................................................................................16, 17, 18, 19

42 U.S.C. § 9613 ....................................................................................13, 26, 43, 44

42 U.S.C. § 9622 ..................................................................................................*passim*

Small Business Liability Relief and Brownfields Revitalization Act, Pub. L. No.
 107-118, 115 Stat. 2356 (2002) ...............................................................................16

**Other Authorities**

Conf. Rep. on H.R. 2005, Superfund Amendments and Reauthorization Act of
 1986, 132 Cong. Rec. H9032-04, 1986 WL 788178 ...............................................15

*No Way Out: The Plight of the Superfund Nonsettlor*, 20 Envtl. L. Rep. 10,295
 (1990)........................................................................................................................13

Recycle America's Land Act of 1999, H.R. 1300, 106th Cong. (1999).......................13

Superfund Program; Non-Binding Preliminary Allocations of Responsibility
 (NBAR), 52 Fed. Reg. 19,919, 19,919-20 (May 28, 1987).................................15, 20

Superfund Reform Act of 1994, S.1834, 103d Cong. (1994)........................................13

# INTRODUCTION

The government's proposal to release 82 defendants from an estimated $1.84 billion in environmental liability for pennies on the dollar is flawed from start to finish. The "foundation" of this extraordinary settlement is a purported "non-binding allocation of responsibility" conducted by former Environmental Protection Agency ("EPA") attorney David Batson (the "Batson Report"). Mot.3; RS.10. That allocation process departed from binding statutory requirements, suffered from all manner of procedural defects, and reached the facially absurd conclusion that Intervenor Occidental Chemical Corporation ("OxyChem" or "OCC") should bear nearly all responsibility for cleaning up the Passaic River, even though scores of other companies discharged vast quantities of toxic chemicals into the river for much of the last two centuries. OxyChem stands ready to pay its fair share of the cleanup costs and has already taken the lead in designing EPA's selected remedies. But the proposed settlement would let off numerous major polluters virtually scot-free, leaving OxyChem—and New Jersey taxpayers—footing a grossly disproportionate share of the bill. That is not fair, reasonable, or consistent with the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"). This Court should deny the government's motion to approve the settlement.

To start, the proposed settlement must be rejected because EPA's reliance on the Batson Report contravenes statutory limits on EPA's authority. While CERCLA authorizes EPA to promote settlements by conducting a "non-binding preliminary allocation of responsibility" ("NBAR"), EPA may not outsource the job to a private contractor or introduce an NBAR as evidence in any judicial proceeding. 42 U.S.C. §9622(e)(3). CERCLA likewise authorizes EPA to offer covenants not to sue concerning liability to the United States, but only if "remedial action has been completed... at the facility that is the subject of such covenant." *Id.* §9622(f). EPA flouted these

and other requirements of CERCLA §122 several times over, including by having a private party (Batson) perform an NBAR for the lower 8.3 miles of the Passaic River; introducing that NBAR as a key piece of evidence in these proceedings; and offering covenants not to sue when remedial action is nowhere near complete. Neither EPA nor the Attorney General has authority to settle CERCLA claims without regard for the requirements that Congress imposed in §122, which the government plainly failed to comply with here. That alone dooms the proposed settlement.

The Batson Report also suffers from other procedural flaws. While the government describes Batson as a "third-party neutral," *e.g.*, Mot.16, it recently disclosed that he was retained as an "expert witness" for the United States in a related, ongoing matter in which the government is directly adverse to OxyChem, *see* Appendix A[1], Ex.1 at 6-11. The allocation process that Batson oversaw was also fundamentally unfair: Potentially responsible parties ("PRPs") were able to selectively withhold (or misrepresent) critical information about their own liability, had no meaningful way to challenge each other's submissions, and were allowed to review and edit the draft Batson report without public attribution. EPA compounded these problems by directing Batson to assign a share of liability to OxyChem, even though OxyChem had chosen not to participate and thus its views were *not* adequately represented. Together, these procedural defects empowered the settling PRPs to work to minimize their own liability while placing almost the entire burden on OxyChem.

Unsurprisingly, Batson's deeply flawed allocation process led to a substantively unfair and unreasonable settlement. As a threshold matter, the government has not disclosed how much *any* of the 82 settling parties is paying in exchange for a full release from an estimated $1.84 billion in joint-and-several liability. This omission leaves the Court no way to assess whether "the terms of

---

[1] Appendix A ("App. A") is OxyChem's Evidentiary Appendix. Tab 1 in this Appendix is a glossary of relevant terms, abbreviations, and acronyms for the convenience of the Court.

the consent decree... apportion liability according to rational estimates of the harm *each party* has caused," as Third Circuit precedent requires. *In re Tutu Water Wells CERCLA Litig.*, 326 F.3d 201, 207 (3d Cir. 2003).[2] It also raises the specter that judicial approval of the settlement will allow companies that should bear significant responsibility for the cleanup to escape without meaningful liability. Indeed, the record confirms that the proposed settlement includes numerous companies that discharged massive amounts of toxic substances into the Passaic for decades.

The substantive flaws in Batson's allocation confirm that the settlement's terms are unreasonable. Instead of assessing how much each polluter's actions contributed to the total cleanup *costs*, Batson based his allocation on the *risks* posed by the eight most dangerous contaminants of concern ("COCs")—and assumed that dioxins account for nearly all of these risks, irrationally ignoring virtually identical risks posed by dioxin-like polychlorinated biphenyls ("PCBs"), for which OxyChem has no liability at all. Batson then erroneously attributed practically all dioxins in the Passaic's lower 8.3 miles to OxyChem, ignoring two EPA-sponsored studies demonstrating that settling defendant Givaudan Fragrances Corporation ("Givaudan") was responsible for at least 5-15% of dioxins in that area. Batson ultimately concluded that OxyChem should pay almost everything while scores of other companies that spent decades discharging contaminants such as mercury, lead, PCBs, polycyclic aromatic hydrocarbons ("PAHs"), and dichloro-diphenyl-trichloroethane ("DDT") pay next to nothing. That result makes no sense, and contradicts EPA's own findings that PCBs are a larger driver of remedial cost than dioxins.

Numerous other flaws further skewed Batson's analysis against OxyChem. He minimized other parties' responsibility through an "attenuation factor" that hugely discounted pollution by practically everyone *except OxyChem*. He also gave OxyChem a cooperation score of *zero*, despite

---

[2] Unless otherwise indicated, all emphasis is added and quotation marks and citations omitted.

OxyChem's long history of voluntary participation in EPA's efforts to clean up the Passaic. Even the government rejects that view, but its attempts to retroactively correct Batson's mistakes cannot change the bottom line: The foundation of this settlement is riddled with serious errors.

The government also has no plausible basis for discharging the settling defendants' liability for the entire 17-mile stretch of the Passaic River. The Batson Report, with all its flaws, addressed only the river's lower 8.3 miles. EPA has designated the river's upper 9 miles for a separate $441 million interim remedy (which OxyChem is designing), but has yet to determine its permanent remedy because that portion of the river has significantly different characteristics and requires a different remedial approach. It is manifestly unreasonable to apply Batson's allocations to the upper 9 miles, which Batson did not even evaluate.

The government thus comes nowhere near carrying its burden to show that the proposed settlement is "fair, reasonable, and consistent with CERCLA's goals." *Tutu Water Wells*, 326 F.3d at 207. Its proposal is far too generous to polluters and risks leaving taxpayers footing the bill for PCBs, mercury, and other chemicals for which OxyChem bears no liability. That unfairness is not mitigated (much less cured) by EPA's last-minute addition of a "re-opener," as that provision does not protect either New Jersey taxpayers or OxyChem from being hit with a disproportionate share of the cleanup costs. It is thus no surprise that the public comments from New Jerseyans were almost all negative. *See, e.g.*, App. A, Tab.3 (non-party comment index). The proposed settlement plainly does not serve the public interest, and this Court should deny the government's motion.

## BACKGROUND

### I.    Significant Pollution Flowed Into the Passaic River for More Than a Century

Pollution of the Passaic River dates back to the industrial revolution.[3] By 1887, "factories

---

[3] Ex.3, OU2 Record of Decision Summary (2016) at 3.

too numerous to mention" lined the banks of the Passaic, "every day pouring forth millions of gallons of brilliantly colored and poisonous dyestuffs into the river."[4] And by 1926, the United States declared the river's "fish life destroyed."[5] Yet the pollution continued unabated for several more decades[6]; the Passaic did not become the subject of major regulatory action until the 1980s.

In 1982, the New Jersey Department of Environmental Protection ("NJDEP") closed the river to fishing due to PCBs in fish tissue.[7] In 1983, New Jersey issued executive orders addressing dioxins found in the soils at the Givaudan property and former Diamond Alkali property,[8] which was designated as a Superfund Site in 1984.

EPA's initial investigation into a 6-mile stretch of the Passaic found not only dioxins but many other contaminants not associated with Diamond Alkali.[9] Upon further investigation, EPA determined that active cleanup of the lower 8.3 miles of the river—which it designated "Operable Unit 2" or "OU2" of the Diamond Alkali Site—was needed. It identified 8 COCs (dioxins, PCBs, mercury, DDT, PAHs, dieldrin, copper, and lead) as "pos[ing] the greatest potential risks to human health and the environment," reporting that "elevated concentrations of COCs are ubiquitous in surface sediments of the lower 8.3 miles, bank to bank."[10] EPA's cleanup plan entails dredging OU2 to remove polluted sediment from the riverbed and then capping the riverbed with a layer of clean sediment. A narrower interim remedy was selected for the upper 9 miles of the river (together with OU2, "OU4"), whose final cleanup plan will be determined later. *See* OCC Cmt. 105-07; Sharkey Decl. ¶19 (interim remedy will "lead to a final record of decision").

---

[4] B.11, Stradling Decl. ¶37.
[5] Ex.7, Cong. Rpt. on Pollution Affecting Navigable Waters (Jun. 4, 1926) at 12.
[6] Ex.6, Tr. of EPA Public Meeting (May 21, 2014) at 12:18-20.
[7] Ex.8, NJDEP Emergency New Rule, "Fisheries Closures and Advisories" (Dec. 15, 1982).
[8] Ex.9, N.J. Exec. Order 40C (Givaudan Corp., 125 Delawanna Avenue) (Jun. 17, 1983); Ex.10, N.J. Exec. Order No. 40C (80 Lister Avenue) (June 29, 1983).
[9] Ex.3, OU2 Record of Decision Summary (2016) at 4.
[10] *Id.* at 14-16 (identity of COCs) and 17 (ubiquity of sediment contamination with COCs).

## II.    OxyChem Is the Only Company Working to Restore the Passaic

While most of the settling parties "repeatedly told EPA that [they] will not fund or perform [EPA's] remedy,"[11] OxyChem alone committed hundreds of millions of dollars to remediation and is the only company actively working to clean up the Passaic. OxyChem's environmental engineers are turning EPA's cleanup plans into reality—with no help from the settling parties.

Unlike many settling parties, OxyChem itself never polluted the Passaic.[12] OxyChem is allegedly liable as a corporate successor to the Diamond Alkali Company, which operated a plant on Lister Avenue from the 1940s to 1969. That plant was sold to a third party in 1971. Roughly 15 years later, when the plant had been shuttered for almost a decade, OxyChem acquired the stock of Diamond Alkali's successor, Diamond Shamrock Chemicals Company ("DSCC"). The seller (eventually known as Maxus Energy Corporation) retained all of DSCC's environmental liability for the Lister Plant and provided OxyChem with a total environmental indemnification.[13] Maxus then paid nearly $300 million for remedial work related to the Lister Plant, the Passaic River, and Newark Bay before declaring bankruptcy in 2016.[14] OxyChem assumed Maxus's cleanup work, and agreed to design EPA's OU2 remedy at an EPA-estimated cost of $165 million.[15] Every other party, including those settling here, refused to contribute.[16] OxyChem completed the design on schedule and recently submitted the final design report for EPA review and approval.[17]

In January 2022, OxyChem also offered to implement EPA's selected remedy in OU4 at an estimated cost of $441 million.[18] OxyChem reiterated its offer six months later, along with a

---

[11] Ex.11, CPG Ltr. to EPA (Aug. 18, 2015); Ex.12, EPA Ltr. (May 17, 2017) at 2. *Cf.* Mot.14-15.

[12] Ex.13, EPA News Release (Oct. 5, 2016); *see also* OCC Cmt. 81-82 & 84-86.

[13] *See* OCC Cmt. 84-85.

[14] Ex.14, Chronology of Work on Lower Passaic Remedies; Ex.15, Maxus Project Summary Table; *see also* Ex.16, Decl. J. Gonzalez in Support of Ch. 11 Petitions (Jun. 18, 2016) ¶8.

[15] Ex.13; Ex.17 (May 29, 2016) (EPA thanking OxyChem for speed in agreeing to perform).

[16] *See, e.g.*, Ex.19, Givaudan Ltr. (May 11, 2016) (refusing to contribute to remedy design).

[17] Ex.18, OxyChem Progress Rpt. to EPA (2022) at 13 (Design Project Deliverables Chronology).

[18] Ex.20, OxyChem Ltr. to EPA (Jan 13, 2022).

proposal for a sequence of agreements through which OxyChem would implement the OU2 remedy.[19] In total, OxyChem offered to perform cleanup work estimated to cost $1.84 billion. EPA never substantively responded to OxyChem's offers and now brushes them aside. Mot.15 n.6.

## III.    EPA Commissions David Batson to Conduct an Allocation of Responsibility

### A.    2017: EPA Announces the Batson Process

In 2017, EPA launched an allocation performed by former EPA attorney David Batson. That allocation "provides the foundation for" the proposed settlement here. Mot.47. EPA not only initiated the Batson process, but funded it (at a cost of almost $4 million), paused all other negotiation and enforcement at the Diamond Alkali Site during its pendency, committed to using Batson's allocation as the "primary factor" in settlement negotiations, and remained closely involved from start to finish.[20]

When EPA announced the proposed allocation in March 2017, it was limited to "parties that are not … associated with the release of dioxins, furans, or PCBs into the Lower Passaic River."[21] But after an August 2017 meeting, EPA expanded the allocation to include all parties except public entities. On September 18, 2017, EPA announced it had hired Batson as its allocator and invited the parties to another meeting where Batson would explain his proposal.[22]

### B.    2018: OxyChem Opts Out Because of Obvious Flaws in Batson's Proposal

The parties immediately identified glaring substantive and procedural flaws in Batson's proposed allocation process. Benjamin Moore—now one of the settling parties—warned that "a

---

[19] Ex.21, OxyChem Ltr. to EPA (Jun. 27, 2022).
[20] Ref.1, Batson Report at ARR0006; Ref.5, Allocation Guide at ARR0142 ("[t]he Allocation is being conducted at the direction of EPA"), ARR0144 (EPA to receive draft data reports and recommendations), ARR0145 (EPA to receive draft allocation methodology), ARR0154 (allocation factors to be developed "in consultation with... EPA").
[21] Ex.22, EPA Ltr. regarding Next Steps (Mar. 30, 2017).
[22] Ex.23, EPA Ltr. regarding August Meeting (Sep. 18, 2017) at 1-2.

court will likely reject the Batson allocation as inconsistent with CERCLA's requirements."[23] Other PRPs were similarly apprehensive: The so-called Small Parties Group ("SPG") decried an allocation process where "the relevancy [of] documents to be added/produced" would be "determined by each individual party producing said documents."[24] OxyChem, too, met with EPA to convey serious concerns about EPA's lack of authority, the inadequate record, and the risk of delay posed by a piecemeal settlement approach.[25] Finding those concerns unresolved, OxyChem declined to participate.

### C.    2019: The Batson Process Marches Toward Its Predetermined Result

With OxyChem out, the remaining parties had an obvious goal: assign all cleanup costs to the absent party. Nearly all settling parties are members of the SPG, a joint defense group whose only criterion is not being OxyChem.[26] Ignoring the SPG's clear incentive to skew the process against OxyChem, Batson and EPA allowed its members to help "design the allocation protocols, methodology, and database" and "comment and correct the draft data reports [he] produced." *See* OCC Cmt. 36; RS.81; Yeh Decl. ¶35. The participants even reviewed and commented on Batson's draft allocation report (with no public attribution) before it was submitted to EPA.[27] EPA concedes it *relied on the settling parties*—whose shared interest was to maximize OxyChem's liability and minimize their own—to "highlight any errors or omissions" in Batson's process.[28]

---

[23] Ex.24, Benjamin Moore Ltr. to EPA (Feb. 13, 2018); Ex.25, EPA Ltr. Response (May 1, 2018).
[24] Ex.26, SPG Ltr. to EPA (Jan. 30, 2018) at 1, 3, 4.
[25] The United States' suggestion that OxyChem "waited until the allocation process was complete" and only then "expressed its disagreement with the allocation process," Mot.38, is false. *See* Ex.27, OxyChem Ltr. detailing concerns (Oct. 12, 2017); Ex.28, EPA Ltr. Response (Nov. 28, 2017).
[26] Ex.29, G. Gengel to S. Flanagan (Apr. 11, 2012) (informing EPA that "SPG membership is open to all non-Tierra [OxyChem's indemnitor] related members of the CPG"); Ex.30, Givaudan Interrogatory Responses (Jul. 11, 2019) at 30-32 (listing "Small Parties Group" members).
[27] Ref.5, Batson Allocation Guide at ARR0146.
[28] RS.81 at 80; *see* Ex.31, Revised Workplan and Pricing Estimate (Sep. 12, 2019) at 3-4 (noting "the volume of data and arguments proposed by [participating parties] regarding OCC" and "the sheer volume of data received from PAPs" that was "related to OCC").

### D.    2020: The Batson Report Issues—Intentionally Skewed Against OxyChem

When Batson submitted his report to EPA, the agency recognized it had fatal flaws. The so-called "allocation" saddled an absent party (OxyChem) with nearly all responsibility for the $1.84 billion cleanup, assigning facially absurd "fair shares" to other major industrial facilities.[29] For example, the allocation calculated that Stanley Black & Decker (with 100 years of operation on the Passaic) could pay $321; General Electric (with two sites on the Passaic totaling 124 years of operation) could pay $424; and Otis Elevator (with 70 years of operation on the Passaic) could pay just *$63*. EPA had no choice but to express its serious concerns, in writing, to Batson:[30]

- The allocation "assumed that close to 100% of dioxins in OU2 sediments were contributed by OCC: *Does that assumption pre-judge the results of the allocation*?"

- "Why were OCC's remediation of OU1 and agreement to perform the OU2 remedial design not accounted for in the cooperation factor?"

- "In the assignment of culpability and cooperation factors, OCC's failure to participate in the allocation … seemed to have been given twice as much weight as OCC's implementation of the Tierra Removal … Is that a fair assignment, given that the Tierra Removal remediated the river and would have cost much more than participation in the allocation?"

Tellingly, EPA expressly instructed Batson to provide an "oral response only" to its final question:

- "Please walk through the calculation of Occidental Chemical Corp's share. The walk through should show how input values were derived and how input values were combined to produce … Facility Computation Sheets."

There is no record that Batson altered his biased approach in response to EPA's concerns. But EPA moved on anyway: Despite the Batson Report's glaring flaws, the government used it during 2021 and 2022 to negotiate a settlement with scores of companies that had spent decades polluting the Passaic River. *See* 87 Fed. Reg. 78710 (settlement is "[b]ased on the results of the allocation").

### E.    2023: Batson's Conflicts and Lack of Neutrality Are Revealed

---

[29] Ref.18 at ARR2005 (all shares less than 0.03%); B.8, Olian Decl. ¶55 and Figure 1.
[30] Ex.32, A. Yeh to ERG (Feb. 2, 2021) at 2-3; Ex.33 ERG response to A. Yeh (Feb. 4, 2021).

EPA has repeatedly touted Batson as a "third party" and a "neutral allocator."[31] In 2023, however—long after Batson finalized his report—FOIA responses from EPA revealed that Batson was laboring under a conflict of interest with respect to OxyChem *the entire time*. Back in April 2016—when EPA and OxyChem were negotiating the 2016 settlement terms for OU2's remedial design,[32] and almost a year before EPA announced its intention "to use the services of a third party allocator"—the government retained Batson as an "expert witness" for the United States in a matter adverse to OxyChem.[33] Batson's conflicts also included prior work with settling parties on Passaic issues while employed at EPA. *See* OCC Cmt. 89-90; Ex.1 at 11-13. EPA never disclosed Batson's conflicts to OxyChem, and OxyChem certainly did not consent to them.

## IV.    The United States Seeks This Court's Approval of the Proposed Settlement

The procedurally indefensible Batson process yielded a substantively indefensible settlement. The proposed settlement releases a large group of companies that spent decades discharging highly toxic pollutants into the Passaic from an estimated *$1.84 billion* in joint and several liability to the United States, and seeks to insulate them from contribution claims by OxyChem, all for a collective payment of just *$150 million*. That settlement does not reflect how much these companies' pollution of the Passaic contributed to the projected $1.84 billion cleanup. It instead allows them to pay a collective sum that is pennies on the dollar, based in part on the dubious notion that risks and cleanup costs are nearly all attributable to dioxins. But EPA's own assessments belie that notion; the agency has found that all eight COCs are "principal threat wastes," Ex.3, OU2 ROD at 79, and that its remedial goals cannot be achieved without removing thousands of kilograms of PCBs, mercury, and DDT from the river's sediments, as the OU2

---

[31] Ex.22 at 2 (Batson is a "third party"); Ex.34 at 1 (calling Batson a "neutral allocator").
[32] *See generally* Ex.1 (re. DOJ FOIA disclosures about Batson's conflicts); *see also* Ex.35, EPA draft Remedial Design ASAOC for lower 8.3 miles (Apr. 16, 2016).
[33] Ex.22 at 2; *see* Ex.1 at 6-11.

remedy requires.[34] The settlement discharges the settling defendants' liability not only for the lower 8.3 miles of the Lower Passaic (OU2) but also the upper 9 miles—even though Batson did not study the upper 9 miles and made no findings about who bears responsibility for cleaning it up. And notably, EPA designated an interim remedy for the upper 9 miles *because* it has different characteristics and requires a different remedial approach than OU2, and it remains to be determined what the permanent remedy in this area will be and how much it will cost. The United States also has not disclosed how much each of the 82 settling defendants is paying, making it impossible to assess whether the settlement reflects a "rational estimate[] of the harm *each party* has caused." *Tutu Water Wells*, 326 F.3d at 207. Underscoring that failure, the total settlement amount of $150 million *did not change* when the government removed three egregious polluters (Sherwin-Williams, Kearny Smelting, and Conopco) from the settlement in response to public comments—making clear that the fixed $150 million settlement amount is not tied to any estimate of the harm caused by the settling parties.

Unsurprisingly, public reaction to the proposed settlement has been overwhelmingly negative. Setting aside comments from the settling parties and OxyChem, only *two* public comments supported the settlement, while *seventy-seven* comments urged EPA to reject the settlement.[35] Among other things, commenters objected that:

- "[S]ettling with only some of the polluters for $150 million of the $2 billion it would cost to clean up the river is not a fair solution for the taxpayers and the Passaic community"[36];

- The proposed settlement "requires no actual cleanup work by the settling companies," "absolve[es] from liability multiple companies with multi-billion-dollar revenues for a tiny

---

[34] Ex.3, OU2 ROD 14-17 (discussing *ubiquitous* contamination with all COCs, bank to bank); *see also* Ex.5 (discussing required removal of 3,000 kg PCBs, 11,000 kg of mercury, 600 kg of total DDT (DDx) and 6 kg of dioxins).

[35] The government filed 53 "timely" comments and 31 "untimely" comments it did not file. RS at 1, n.1. The government has produced 30 of the latter, which are included in Ex.2.

[36] App.A, Tab 3, Cmt.1, Jim Harrington, Former CEO, Lady Footlocker (Feb. 23, 2023).

fraction" of estimated costs, and contravenes Congress' "clear refusal to allow the EPA to allocate responsibility at Superfund sites" [37];

- "Allowing the polluters to pay only a fraction of the clean-up costs is not only unfair to taxpayers, but [] also sends the wrong message that polluting the environment is acceptable as long as the polluter is willing to pay a minimal fine. This would encourage other companies to continue to pollute with the expectation that they will be able to settle for a small amount rather than being held accountable for the full extent of their actions."[38]

Despite this public opposition,[39] the government now moves to approve the settlement.

## STANDARD OF REVIEW

A court may not approve a CERCLA settlement unless it is "fair, reasonable, and consistent with CERCLA's goals." *Tutu Water Wells*, 326 F.3d at 207. The required inquiry involves "both procedural and substantive considerations." *Id.* Procedurally, courts must ensure the government has complied with the applicable statutory requirements, *see, e.g.*, *United States v. Pesses*, 1994 WL 741277, at *8 (W.D. Pa. Nov. 7, 1994) (citing *United States v. Moore*, 703 F. Supp. 455, 459 (E.D. Va. 1988)), and that the settlement's negotiation process was fair, *Tutu Water Wells*, 326 F.3d at 207. Substantively, the settlement must apportion liability "'according to rational estimates of the harm each party has caused,'" and the underlying "measure of comparative fault on which the settlement terms are based" cannot be "arbitrary" or "capricious." *Id.*; *see* 5 U.S.C. §706(2).[40]

---

[37] *Id.* at Cmt.2, Dr. Benjamin Chavis, President and Chief Executive, National Newspaper Publishers Association, and former Executive Director of the NAACP (Mar. 22, 2023).

[38] *Id.* at Cmt.3, Dr. Granville Brady, Council Representative in Somerville, NJ (Feb. 23, 2023).

[39] On March 22, 2023, the U.S. Chamber of Commerce wrote to EPA expressing concern that EPA's use of CERCLA settlements to bar contribution claims "raises the potential for due process and takings issues" and "amounts, in effect, to a 'protection racket.'" Ex.36. EPA did not "count" this as a comment or respond to it.

[40] The government errs in asserting that 5 U.S.C. §706(2) does not apply, as EPA's acceptance of the proposed settlement "mark[ed] the 'consummation' of the agency's decisionmaking process." *Bennett v. Spear*, 520 U.S. 154, 178 (1997). *Contra* RS.91. Regardless, under CERCLA or §706(2), the government concedes that the proposed settlement cannot stand if its underlying measure of fault is arbitrary and capricious. *See* Mot.27; Mot.40.

## ARGUMENT

**I.    The Proposed Settlement Is Procedurally Invalid Under CERCLA §122**

When (as here) the government negotiates a CERCLA settlement with only some potentially liable parties, negotiation incentives are skewed. The government has little reason to drive a hard bargain with settling parties because CERCLA's joint-and-several liability regime allows the government to "hold nonsettlors fully liable... for the balance of cleanup costs even if the settlors paid less than their fair share." Barry S. Neuman, *No Way Out: The Plight of the Superfund Nonsettlor*, 20 Envtl. L. Rep. 10,295, 10,300 (1990). Settling parties have a strong incentive to overstate the liability of non-settlors, as this reduces their settlement costs. And non-settling parties like OxyChem find themselves in a bind; a partial settlement reduces the total "potential liability" for the site only "by the amount of the settlement," 42 U.S.C. §9613, leaving the government free to seek the remainder from them. Still worse, some courts have (wrongly) concluded that a government settlement can bar contribution claims against settling parties completely, potentially preventing non-settling parties from holding settling parties to their fair share of liability. *See, e.g.*, *United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 91-92 (1st Cir. 1990). This effectively turns the settlement into a binding allocation of CERCLA liability (which Congress refused to give EPA authority to impose).[41] In short, when the government settles with only some potentially liable parties, it "plac[es] the risk of a bad settlement on nonsettlors," creating a significant potential for "harsh" and "unfair" outcomes. Neuman, *supra*, at 10,300.

To help prevent such unfairness, CERCLA §122 mandates a number of procedures EPA must follow in settling CERCLA claims. *Pesses*, 1994 WL 741277, at *8; *see Gen. Time Corp. v. Bulk Materials, Inc.*, 826 F. Supp. 471, 476-47 (M.D. Ga. 1993) (§122 demonstrates "Congress

---

[41] *See* OCC Cmt. 18-23; *cf.* Recycle America's Land Act of 1999, H.R. 1300, 106th Cong. (1999) (unenacted bill that would have allowed EPA to allocate response costs); Superfund Reform Act of 1994, S.1834, 103d Cong. (1994) (same).

recognized the danger in permitting [a government] settlement to extinguish [nonsettlors'] claims for contribution"). These safeguards include notice-and-comment procedures, 42 U.S.C. §9622(d)(2), (i); judicial review of proposed settlements, *id.* §9622(d)(1)(A); restrictions on the creation and use of NBARs to facilitate settlements, *id.* §9622(e)(3); and specific conditions that must be met before the government may "provide any person with a covenant not to sue concerning any liability to the United States," *id.* §9622(f). Because the government did not comply with these statutory safeguards here, the settlement must be rejected.

### A.    The Proposed Settlement Violates CERCLA §122(e) and §122(f)

The proposed settlement flatly disregards the procedures Congress required in multiple ways. In CERCLA §122(e)(3), Congress authorized EPA to promote settlements by "provid[ing] a nonbinding preliminary allocation of responsibility which allocates percentages of the total cost of response among potentially responsible parties." *Id.* §9622(e)(3). At the same time, Congress placed specific limitations on EPA's authority to conduct such allocations. *See id.* The government admits the Batson Report is a "non-binding allocation of responsibility." RS.10. Yet the government's use of that report contravenes at least three of §122(e)(3)'s restrictions.

First, an NBAR "shall not be admissible as evidence in any proceeding." 42 U.S.C. §9622(e)(3)(C). EPA violated (and continues to violate) this provision by introducing and relying on the Batson Report as the key evidence supporting the proposed settlement. *See* Dkt.289. The government admits the Batson Report was "the starting point for negotiations," Mot.36, and "the foundation for the settlement." Mot.3. But Congress has said an NBAR like the Batson Report cannot be used as evidence "in any proceeding," including this one—and without it, the government's justification for the settlement collapses. Second, the costs of an NBAR "shall be reimbursed by" the settling PRPs. 42 U.S.C. §9622(e)(3)(D). Here, however, EPA treated the roughly $4 million it paid for the Batson Report as a general "response cost" reimbursable from

14

the Diamond Alkali Site's special account. *Compare* Ex.39 (EPA payments to Batson allocation contractors) *with* Ex.40 (EPA "non-billable" costs reimbursed from special site account). Third, EPA must prepare the NBAR *itself. See id.* §9622(e)(3)(A); 132 Cong. Rec. H9032-04 ("Due to the enforcement-sensitive nature of NBARs, all such allocations must be prepared solely by Federal employees."); *Superfund Program; Non-Binding Preliminary Allocations of Responsibility (NBAR)*, 52 Fed. Reg. 19,919, 19,919-20 (May 28, 1987) ("NBAR Guidance") (similar). Here, EPA instead outsourced the Batson Report to a private contractor, *see* Yeh Decl. ¶31, a decision made even more egregious by Batson's serious conflicts of interest, *see infra* pp. 21-23. EPA's preparation and use of the report thus repeatedly violates CERCLA's statutory restrictions.[42]

The proposed settlement also violates §122(f), which permits the government to "provide any person with a covenant not to sue concerning any [CERCLA] liability," 42 U.S.C. §9622(f)(1), but only if specific conditions are met. Among other things, any covenant "concerning future liability... shall not take effect until the President certifies that remedial action has been completed in accordance with the requirements of this chapter at the facility that is the subject of such covenant." *Id.* §9622(f)(3). Here, the proposed settlement includes covenants not to sue that take effect immediately if the Court approves the consent decree, Dkt.283, ¶¶5, 13—even though none of the three remedial actions for which liability is being released has even started, much less been completed. One of those remedies, the final remedy in OU4, has not even been *selected*. Moreover, these covenants are not "in the public interest" and would not "expedite response action consistent with the National Contingency Plan," as required by §122(f)(1). *See infra* pp.45-50. The proposed settlement thus violates both §122(e) and §122(f) on multiple grounds.

---

[42] CERCLA allows EPA to depart from the procedures that Congress proscribed only if it "notif[ies] in writing potentially responsible parties at the facility of such decision and the reasons why use of the procedures is inappropriate." 42 U.S.C. §9622(a). That was not done here.

**B.    The Government's Efforts to Circumvent §122 Are Not Valid or Lawful**

1. Lacking any plausible argument that it complied with §122(e) or §122(f), the government asserts that it can evade §122 altogether by invoking the Attorney General's "inherent authority... to conduct and resolve litigation involving the United States." RS.11; *see* RS.14; RS.21; RS.24. That argument falls flat. The Attorney General's settlement authority "does not include license to agree to settlement terms that would violate the civil laws governing the agency." *Exec. Bus. Media, Inc. v. U.S. Dep't of Def.*, 3 F.3d 759, 762 (4th Cir. 1993); *see Shoshone Bannock Tribes v. Reno*, 56 F.3d 1476, 1481 (D.C. Cir. 1995) ("[C]ivil laws governing agency conduct may limit the Attorney General in conducting litigation on an agency's behalf."). Whatever the scope of the Attorney General's settlement authority, it does not allow him (or EPA) to rely on the Batson Report in this settlement proceeding, in defiance of Congress' unequivocal command that an NBAR "shall not be admissible as evidence in *any* proceeding." 42 U.S.C. §122(e)(3)(C). Nor could the Attorney General authorize EPA to violate §122(e)(3)(A) and its own guidance by having a private contractor, rather than an agency employee, conduct an NBAR. The government's theory also proves far too much: It would allow EPA to disregard not only Congress' express restrictions on NBARs and covenants not to sue, *see id.* §9622(e)(3), (f), but also Congress' requirements to solicit public comments and submit settlements to judicial review, *see id.* §9622(d), (i). That boundless view of the Attorney General's power would render §122 a dead letter.

The government's invocation of the Attorney General's authority relies almost exclusively on a readily distinguishable out-of-circuit case, *United States v. Hercules*, 961 F.2d 796 (8th Cir. 1992). *See* RS.11; RS.24. To start, *Hercules* involved only cost-recovery claims under CERCLA §107 against a party with "limited ability to pay." 961 F.2d at 799-800.[43] Here, by contrast, the

---

[43] Congress subsequently allowed such inability-to-pay settlements by adding §122(g)(7) to the statute. *See* Pub. L. No. 107-118, 115 Stat. 2356, 2359 (2002).

United States brought not only CERCLA §107 claims (against well-resourced parties) but also CERCLA §106 abatement claims. *See* Dkt.282-2 ¶¶33, 41-45. *Hercules* recognizes that §122(a)-(f)—including the provisions the government violated here—apply to §106 claims. *See* 961 F.2d at 799; *see also* Dkt.283 ¶42 (acknowledging §122(d)(2) applies). *Hercules* also "does not stand for the proposition that the principles codified in §122 are to be ignored in assessing" a proposed CERCLA settlement. *Pesses*, 1994 WL 741277, at *10. Even if §122 were not "an express limitation on the Attorney General's authority to compromise CERCLA claims," the statute would not be thrown out whenever the Attorney General's authority is invoked. *Id.* at *12. Thus, even under *Hercules*, EPA's violations of §122 preclude the settlement's approval. *See Pesses*, 1994 WL 741277, at *14. Nor can *Hercules* be reconciled with a decision from this District, *United States v. S. Jersey Clothing Co.*, 976 F. Supp. 2d 577 (D.N.J. 2013), which rejected a similar attempt to circumvent §122 by framing a CERCLA settlement as an exercise of "the inherent authority of the Attorney General." *See id.* at 585 n.2, 589-90.

In all events, *Hercules* is neither binding nor persuasive. Sections 122(e) and (f) apply to *all* CERCLA settlements. *See infra* pp.18-19. While *Hercules* refused to apply §122 by its terms, it did so on the mistaken theory that doing so would "render several subsections of the statute redundant." 961 F.3d at 799. Even if that were true, the Supreme Court has made clear (as to CERCLA itself) that "it is appropriate to tolerate a degree of surplusage rather than adopt a textually dubious construction that threatens to render the entire provision a nullity." *United States v. Atl. Rsch. Corp.*, 551 U.S. 128, 137 (2007). *Hercules* cannot be reconciled with that principle.

2. The government next attempts to evade §122 by asserting that it applies only to agreements "to perform cleanup work," not monetary settlements like this one. RS.11; *see* RS.21; RS.23; RS.24. That argument is weaker still. The plain text of Section 122, titled "Settlements,"

sets out the government's authority to settle CERCLA claims, and §122(a) directs "the President," who has delegated the relevant authority to EPA, to "facilitate agreements under this section … *us[ing] the procedures in this section*." 42 U.S.C. §9622(a). Those procedures include §122(e), which applies to *any* CERCLA settlement, not just "cleanup" settlements. Section 122(e) authorizes EPA to facilitate settlement by providing certain information to PRPs and initiating "a period of negotiation," *id.* §9622(e)(1)-(2), producing an NBAR under the restrictions the statute imposes, *id.* §9622(e)(3), and compelling PRPs to provide "information necessary or appropriate for performing" an NBAR, *id.* §9622(e)(3)(B). Section 122(f) similarly applies across the board; it defines when the government may "provide *any person* with a covenant not to sue concerning *any liability* to the United States under [CERCLA]." *Id.* §9622(f)(1). None of these provisions is limited to any particular *type* of settlement.

Other provisions of §122, by contrast, *are* textually limited to particular settlements—but still apply here by their terms. Section 122(d), for instance, applies "[w]henever" the government reaches a non-de minimis settlement "with respect to remedial action under section [106 of CERCLA]." 42 U.S.C. §9622(d), and therefore covers the proposed settlement; *see* Dkt.282 ¶45 (alleging that "under Section 106(a)," Defendants are "jointly and severally liable to undertake … remedial action"). Section 122(h) and (i) apply where the government "settle[s] a claim under section [107 of CERCLA] for costs incurred by the United States," again covering this settlement. *See* Dkt.282 ¶¶36-40 (asserting monetary claims under §107).[44]

The government is thus wrong when it claims §122 applies only to "cleanup settlements." RS.11. Indeed, a decision from this District rejected that exact argument in holding that §122

---

[44] In addition, CERCLA §122(g)—titled "De minimis settlements"—covers yet another type of monetary settlement. While that subsection does not apply here, it further undercuts the government's contention that §122 governs only agreements "to perform cleanup work," RS.11.

applies to a cost-recovery settlement under CERCLA §107. *See S. Jersey Clothing Co.*, 976 F. Supp. 2d at 589-90; *cf.* Brief for United States at 8 n.5, *S. Jersey Clothing*, No. 1:96-cv-3166 (D.N.J. Mar. 1, 2013), Dkt.24 (unsuccessfully arguing that §122 "concerns site clean-up agreements" and does not apply to "cash-out settlement[s]"). What is more, the proposed settlement itself states that it will be "lodged with the Court for at least 30 days for public notice and comment *in accordance with Section 122(d)(2) of CERCLA*." Dkt.283 ¶42. The settlement also requires each settlor to certify that "it has fully complied and will fully comply with any and all EPA requests for information under... [§]122(e) of CERCLA," *id.* ¶27, and provides that the settlement proceeds "will be deposited" in "the Special Account" that EPA "established... under Section 122(b)(3) of CERCLA," *id.* ¶¶5, 7. EPA also explicitly relies on guidance recognizing that so-called "cashout" settlements arise under §122(h).[45] Those sources recognize that §122 applies here. The settlement stands or falls under CERCLA and EPA's own statutory authority; EPA is not free to comply with only the parts of the statute that it likes.

3. EPA now disclaims any reliance on §122(e)(3) or the ADR Act, *see* RS.19—rightly so, as its actions violate both. In one last effort to get around §122, the government argues the Batson Report "is not a[n] NBAR as that term is used in Section 122(e)(3)." RS.11; *see* Mot.41, RS.21. Nonsense. On the prior page, the government concedes that the Batson Report is a "non-binding allocation of responsibility." RS.10. As such, it falls squarely within the statute's plain terms. The Batson Report also does exactly what CERCLA contemplates an NBAR will do: It was prepared "after completion of the remedial investigation and feasibility study," was intended to "expedite settlements under [§122] and remedial action," and purports to "allocate[] percentages of the total

---

[45] *See* RS.42 (citing "Guidance on Administrative Response Costs Settlements under Section 122(h) of CERCLA and Administrative Cashout Settlements with Peripheral Parties under Section 122(h) of CERCLA and Attorney General Authority" 2 (Sept. 30, 1998)).

cost of response among potentially responsible parties" at the Site. 42 U.S.C. §9622(e)(3)(A); *see, e.g.*, Mot.16-18; Yeh Decl. ¶¶10-11, 13 n.20, 26-29, 31. The Batson Report also purports to rely on factors set forth in §122(e)(3) and repeated in EPA guidance, including the "volume, toxicity, [and] mobility" of hazardous substances contributed to the site by PRPs, the "strength of [the] evidence," and "aggravating factors." 42 U.S.C. §9622(e)(3)(A); NBAR Guidance at 19919; *see* ARR0308-ARR0313. It is plainly an NBAR and subject to all the restrictions of §122(e)(3).

None of the purported "differences" between the Batson Report and an NBAR that the government cites changes that conclusion. The government notes that (1) EPA commissioned a private contractor to prepare the Batson Report, rather than performing the allocation itself; (2) the Batson Report was prepared later in the process, rather than during the remedial investigation; and (3) participating PRPs received the entire Batson Report, rather than just the numerical results of the allocation. RS.11, RS.21. None of those supposed differences make the Batson Report any less a "nonbinding preliminary allocation of responsibility" under §122(e)(3); rather, they underscore EPA's violation of the statute and its own published guidance in creating and using that allocation.

Having disclaimed reliance on §122(e)(3), EPA is left with no statutory authority for its actions in sponsoring and relying on the Batson Report. This too dooms the settlement. *See La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986) ("[A]n agency literally has no power to act … unless and until Congress confers power upon it."). EPA's suggestion that it has "discretion" to craft an "overall enforcement strategy for [a] Site" and can outsource to a private contractor a non-binding allocation of responsibility in direct violation of §122(e)(3)'s limits, *see* RS.1, RS.16, contravenes the well-settled rule that courts may not construe a general grant of authority to "undermine limitations created by a more specific provision." *United States v. Rose*, 538 F.3d 175, 183 (3d Cir. 2008). If EPA had unfettered "discretion" to conduct non-binding allocations of

responsibility on whatever terms it chooses, then neither §122(e)(3)(A)'s express grant of authority to "provide a nonbinding preliminary allocation of responsibility," nor the limits Congress established on that authority in §122(e)(3)(C) and (D), would have any effect. The government also has no authority to grant covenants not to sue concerning CERCLA liability except as set forth in §122(f), which the proposed settlement plainly contravenes because remedial action has not yet been completed. *See supra* p.15. In short, the implied power EPA claims for itself would nullify the detailed and express NBAR scheme Congress enacted.[46]

In sum, EPA has no authority to conduct a nonbinding allocation of responsibility except as set forth in §122(e)(3). The government concedes both that the Batson Report *is* a "nonbinding allocation of responsibility," RS.10, and that it failed to comply with §122(e)(3), *see* RS.11, RS.21. The Batson Report is accordingly *ultra vires*, procedurally inadequate, and inadmissible in these proceedings under §122(e)(3). And because the Batson Report was "the starting point for negotiations," Mot.36, and "the foundation for the settlement," Mot.3, the settlement itself is likewise fatally procedurally flawed. EPA's clear violations of §122(e) and §122(f) thus require denial of the government's motion to approve the proposed settlement.

## II.   The Proposed Settlement Is Procedurally Unfair Because It Resulted From a Collusive, Improper Process

### A.   Batson Was Fatally Conflicted and Not a "Third-Party Neutral"

The proposed settlement's procedural problems go even deeper. The premise of the government's reliance on the Batson Report—that Batson was "a third-party neutral," *e.g.*, Mot.15-16; Mot.50—is false. Last year, OxyChem obtained documents through the Freedom of Information Act ("FOIA") revealing that in April 2016, EPA and DOJ engaged Batson as an

---

[46] EPA has discretion under §122(e)(3) over *whether* to conduct an NBAR in any given case. *See* RS.11 & n.7. But if (as here) EPA uses an NBAR, it must comply with §122(e)(3)'s requirements.

"expert witness" in *United States v. Occidental Chemical Corporation and Chemical Land Holdings, Inc.*, No. 89-5064 (D.N.J.), a related, ongoing matter in which the United States is directly adverse to OxyChem. *See* Ex.1 at 6-11. This created an obvious conflict of interest. On the one hand, Batson was retained to assist the government in litigation against OxyChem, while on the other hand he was held out as a "neutral" who was supposed to impartially allocate liability *to* OxyChem and scores of other PRPs at the Site. *See id.* at 1-2, 6-14.[47]

The government's attempts to downplay Batson's conflicts go nowhere. First, the government tries to spin Batson as an "expert *consultant*" for DOJ and EPA—despite multiple official documents retaining him as an "expert *witness*" to give "expert *testimony* on behalf of [the] US" in a case against OxyChem, *id.* at 7-8—and asserts that the advice he provided the government was "consistent with" his role as a "neutral" allocator. *See* Ex.37 at 2-3. But the government admits Batson was hired to privately counsel DOJ and EPA attorneys on "how to proceed with enforcement at the Site." *Id.* Batson cannot advise the government on how to proceed with enforcement against OxyChem while purporting to act as a "neutral" third party (or a "neutral" under the ADR Act of 1996, *cf.* Mot.17) when allocating liability to OxyChem in a related matter. The government also spends several pages arguing that Batson did not violate the criminal prohibitions of 18 U.S.C. §207(a)(1). *See* Mot.47-50. That is beside the point: Regardless whether Batson's conduct was criminal, his conflicted role in advising DOJ and EPA on enforcement

---

[47] OxyChem is not alone in raising concerns about Batson's lack of neutrality. On April 3, 2023, the watchdog organization Protect the Public's Trust ("PPT") requested a formal investigation into Batson's potential ethical violations, explaining that, "[b]ased on whistleblower revelations, publicly available documents, court filings, and media reports, Batson's engagement in the Diamond Alkali matter since leaving federal service appears to run counter to his ethics obligations under the law." Ex.38, PPT Ltr. at 10. Among other things, the letter pointed out that Batson had prior ties to numerous companies for which the proposed settlement represents "a remarkable deal at the expense of other PRPs and possibly the taxpayer." *Id.* at 6-7. Batson's role as allocator "raised the appearance of impropriety," *id.* at 7, especially given that "it may well have dramatically changed the course of the Diamond Alkali cleanup process," *id.* at 11.

against OxyChem at the Site and in related litigation, as well as his prior ties to settling parties, prevented him from being "neutral." This lack of neutrality renders both his report and the proposed settlement procedurally unfair.[48]

### B.    The Batson Process Participants Were Allowed to Manipulate the Results

Batson not only lacked neutrality; he also presided over an allocation process that suffered from basic procedural flaws. A key reason OxyChem objected to the Batson process when it was announced, and ultimately chose not to participate, was the lack of safeguards to prevent PRPs from selectively withholding (or misrepresenting) critical information about their own liability. *See, e.g.*, Ex.28, EPA Ltr. (Nov, 28, 2017) (responding to OxyChem concern over the absence of compulsory disclosure). Without meaningful discovery, participants in the Batson process had no way to identify and expose errors and omissions in others' submissions. Batson likewise lacked any power (or incentive) to compel production of all relevant evidence. Instead, he used whatever information participants self-servingly and selectively submitted, allowing them to help "design [his] allocation protocols, methodology, and database," "comment on and correct the draft data reports [he] produced," and even "review and comment on the draft [Batson] Report" itself (with no public attribution). OCC Cmt. 36; RS.81.[49] That is exactly the kind of procedural unfairness Congress sought to prevent by imposing procedural restrictions on NBARs in §122(e)(3)—limits that EPA ignored. *See supra* pp.19-21. The result was predictable: a report that unduly minimizes the settling defendants' own liability while placing almost the entire burden on OxyChem.

---

[48] In accordance with this Court's scheduling order, *see* Dkt.276 at 2, OxyChem intends to request leave on or before May 15 to file a motion for discovery into the full scope of Batson's conflicts.
[49] These procedural flaws are not mitigated by the Allocation Guide's requirement that PRPs "certify" they "conducted a good faith search and provided *information* to AlterEcho consistent with the Allocation Guide…," *see* OCC Cmt. 98, or by the observation that OxyChem would have had the "opportunity" to comment on others' submissions had it participated. RS.81. The certification does not ensure that all *relevant* information was provided, and there was no compelled discovery. *Id.* There were also no meaningful consequences for non-compliance. *See* OCC Cmt. 97-99. These defects also rendered the settlement unfair.

EPA's decision to exclude a handful of parties from the settlement only confirms these procedural flaws. A particularly egregious example is Sherwin-Williams, which operated a paint and pesticide plant on the Passaic for 97 years. When Sherwin-Williams executed the first proposed settlement, it certified that it had "fully complied and would fully comply with any and all EPA requests for information under [CERCLA]" and with the Batson process's disclosure requirements. Dkt.2-1 ¶27. But Sherwin-Williams' certification was a sham. Through judicially-supervised discovery in *21st Century Fox*, OxyChem obtained 33,254 pages of records confirming that Sherwin-Williams' plant used enormous quantities of the same contaminants found nearby in the Passaic—including PCBs, mercury, DDT, lead, and copper. *See* OCC Cmt. 159. Sherwin-Williams later *admitted* its responses to EPA were inaccurate and could not identify any communication satisfying its obligation to supplement and correct its responses. *Id.* at 159-60. But none of this information was available to Batson, who finalized his report well before it came to light. *Id.* at 159; *see also* Ex.41-47.

Even worse, EPA learned all of this *before* it filed its first proposed settlement, but turned a blind eye. OxyChem presented the evidence to the government in late 2022, *id.* at 159-60, but the government responded that it was "satisfied that the information contained in the referenced material would not have materially changed the basis upon which TechLaw/AlterEcho recommended Sherwin-Williams' share in the allocation." Ex.47, DOJ Ltr. (Dec.15, 2022). Although EPA has now excluded the company from the revised settlement, it did so on the exact same record on which it previously *included* it. That is the definition of arbitrary decisionmaking.

Two other companies EPA excluded, Kearny Smelting and Conopco, underscore the same procedural inadequacies. Kearny Smelting withheld from Batson sampling data—available by August 2020, months before the Batson Report was finalized—showing it to be the Passaic's

largest PCB contaminator, even under Batson's methodology. *See* OCC Cmt. 141-44; RS.113. That 2020 data reveals PCB levels thousands of times higher than the data Batson used—46,400 mg/kg versus 11 mg/kg—yet Kearny Smelting (and EPA, who also had this data) failed to provide it to Batson. OCC Cmt. 142. Kearny Smelting was then *included* in the settlement, based on its grossly understated PCB allocation, and was excluded only after OxyChem uncovered this evidence and raised the issue in its comments. The third company removed, Conopco, was excluded only after OxyChem pointed out multiple failures in Batson's analysis, again based on evidence revealed by compulsory discovery in *21st Century Fox*.[50] That evidence included two 1976 documents written by Conopco's predecessor that were not provided to Batson. OCC Cmt. 124-25. These documents contain critical admissions about the massive volume of process water that regularly flowed from Conopco's plant into the Passaic via its "storm" sewer—during dry weather.[51] *See* Ex.26-28.

As each of these examples illustrates, the Batson process was woefully inadequate to ensure disclosure of all relevant facts. *Contra* RS.82, RS.83. And once OxyChem declined to participate, the settling parties lacked any incentive to challenge each other's submissions, because they could instead work together to maximize OxyChem's liability and minimize their own. *Cf. United States v. Cornell-Dubilier Elecs., Inc.*, 2014 WL 4978635, at *5 (D.N.J. Oct. 3, 2014) (settlement should receive "less deference from the Court" when settling parties "do not harbor sharply conflicting interests"). The Batson process was thus fundamentally unfair.

### C.    EPA Wrongly Sought to Make Participation in the Batson Process Mandatory by Punishing Those Who Refused to Participate

EPA also procedurally erred by treating participation in the Batson process as effectively

---

[50] *Compare* RS.102, *with* OCC Cmt. 121-22 (summarizing flaws).

[51] One of the letters OxyChem identified, a January 29, 1976 letter from Conopco's predecessor to Dr. Richard A. Baker at EPA, should have been in EPA's possession and provided to Batson at the outset. *See* OCC Cmt. 124-25; Ex.48, S.B. Penick to EPA (Jan. 29, 1976).

mandatory. While EPA claims participation was voluntary, it directed Batson to "make an allocation to every noticed party," including the "parties that neither consent to [the process] nor participate" (apart from certain entities EPA itself excluded). Ex.7, Benjamin Moore to EPA (Feb. 13, 2018) at 2. Confirming that participation was effectively mandatory, Batson intentionally penalized OxyChem for not participating. He negated OxyChem's long history of cooperation and voluntary cleanup, *see* Ex.14; OCC Cmt. 78-81—which EPA itself recognizes, *see* A. Yeh email to ERG, Ex.32 at Questions 9 and 10—and instead assigned OxyChem a "cooperation score" of *zero* solely because it did not join the Batson process. Ref.22 at ARR2586. While the government has now abandoned Batson's indefensible "culpability and cooperation" findings, Mot.19; Mot.21, those findings are a striking illustration of Batson's bias against OxyChem, making the government's continued reliance on *any* part of his work arbitrary and capricious.

The government's insistence that the allocation was not mandatory, *see* Mot.41-42, also rings hollow because the government seeks to make it mandatory and binding on OxyChem by means of this Court's judgment. EPA urges that approval of the settlement should foreclose all contribution claims, preventing *any judicial allocation* of liability to the settling parties at all. The settling defendants and other allocation parties seek the same. *See, e.g.*, Dkt. 94-1, Nokia Br. (Jan. 23, 2023) at 19 (arguing Court should "rule in this proceeding… on the correctness of the 99.94% share assigned to OxyChem, and affirm that… [the] finding[] *appl[ies] to any subsequent equitable allocation*"). For this reason, too, it was improper and unfair for EPA to treat the Batson process as effectively mandatory, and the Court should not approve the proposed settlement. *See* 42 U.S.C. §9613(f)(1) ("In resolving contribution claims, *the court may* allocate response costs...."); *Beazer E. v. Mead Corp.*, 412 F.3d 429, 449 (3d Cir. 2005) (CERCLA "places both the selection and weighing of equitable factors in the sound discretion of *the district court*").

III.     **The Proposed Settlement Is Substantively Unfair and Unreasonable**

A.      **The Court Lacks Sufficient Information to Ensure the Proposed Settlement Correlates With Rational Estimates of the Harm Each Defendant Caused**

The proposed settlement's procedural flaws are matched only by its substantive flaws. As the Third Circuit has repeatedly held (and the government concedes), "[s]ubstantive fairness requires that the terms of the consent decree... apportion liability 'according to rational estimates of the harm each party has caused.'" *Tutu Water Wells*, 326 F.3d at 207 (quoting *United States v. Se. Pa. Transp. Auth.*, 235 F.3d 817, 823 (2000) ("*SEPTA*")); *see* Mot.27; *see also Mathes v. Century Alumina Co.*, 2008 WL 4693550, at *4 (D.V.I. Oct. 22, 2008) ("Settlement terms must roughly correlate with comparative fault so that each party bears the costs of the harm for which it is legally responsible."). That rule dooms the government's motion, because the government has failed to provide the basic information needed to meet that standard: How much have each of the 82 settling defendants agreed to pay in exchange for being released from an estimated $1.84 billion in joint-and-several liability? *See* OCC Cmt. 2, 6, 31. Disclosing only the *total* amount that the settling parties *all together* will pay—which is all the government has provided—is legally insufficient. Without knowing how much each settling defendant is paying, it is impossible to tell whether the settlement reflects a "rational estimate[] of the harm *each party* has caused." *Tutu Water Wells*, 326 F.3d at 207. As far as the record discloses, some settling parties that discharged large quantities of toxic chemicals into the Passaic, and therefore significantly contributed to the $1.84 billion in projected cleanup costs, may be slated to pay next to nothing for a full release of their liability to the United States, a covenant not to sue, and putative protection from third parties' contribution claims. *See, e.g.*, App. A, Tab 5 (Table of Allocation Shares in Dollars).

The government largely ignores this issue, and what it does say is unpersuasive. *See* RS.30. Even if CERCLA does not expressly require "disclos[ure] [of] the amount to be paid by each

Settling Defendant," RS.30, Third Circuit precedent requires it, because otherwise the Court has no way to verify that each settling party's payment reflects a "rational estimate[] of the harm [it] caused." *Tutu Water Wells*, 326 F.3d at 207. The government cites just one case to support its contrary position, and even that case recognized that "disclosure of settlement amounts and allocations of liability is the norm." *United States v. GenCorp, Inc.*, 935 F. Supp. 928, 934 (N.D. Ohio 1996). And in that case, the court found disclosure unnecessary only because the settlement was proposed by a group of 14 private parties who bore the risk of an inadequate settlement and therefore "ha[d] every incentive to ensure that each settling party pays its full share." *Id.* This case presents the opposite scenario; the parties advocating the settlement have *no* incentive to ensure fairness, and every incentive to leave OxyChem and New Jersey taxpayers holding the bag. Notably, *GenCorp* still ordered submission under seal of the "amounts paid by all settling parties," so the court could review them in camera if necessary. *Id.* at 935. Here, by contrast, the government offers this Court no way to ensure that the amount each settling party is paying bears any relation whatsoever to any estimate of the harm each party actually caused.

The fact that removing three egregious polluters (Sherwin-Williams, Kearny Smelting, and Conopco) from the settlement *did not alter the settlement amount at all*, *see* Mot.25, underscores that there is no connection between what any settling party is paying and the harm that party caused. The evidence shows that each of the three expelled parties was a major contributor to the contamination of the Passaic. *See supra* pp.24-25. Yet when they were taken out of the settlement, the settlement amount inexplicably remained the same, showing that the $150 million settlement is not based on rational estimates of the actual harm each settling party caused. Absent such a connection, the settlement cannot be approved. *See United States v. Montrose Chem. Corp.*, 50 F.3d 741, 747 (9th Cir. 1995) ("[T]he proper way to gauge the adequacy of settlement amounts to

be paid by settling PRPs is to compare the proportion of total projected costs to be paid by the settlors with the proportion of liability attributable to them.").

### B.    Batson's Assessments of Settling Defendants' Liability as "Minor" Has No Rational Basis Because It Ignores and Contradicts the Evidence

Even treating all the settling defendants collectively, the government cannot justify the settlement. The government's overarching premise is that the settling defendants are responsible for only a "minor share" of harm to the Passaic. Mot.19. But the evidence demonstrates the opposite: The proposed settlement includes some of the river's worst polluters. Many operated large industrial complexes for decades before meaningful regulation of hazardous waste and industrial discharges began in the 1970s. *See* Ex.6 at 12:18-20 ("Until the 1970s, it was common practice to discharge wastewater into the river."); B.11; B.8 ¶45. Even a cursory review of their operations' length, scope, and type demonstrates that the harm they caused was anything but "minor." *See* App. A, Tabs 4 and 8 (collecting evidence regarding settling parties' operations).

Settling defendant Givaudan provides a striking example. Givaudan alone should be paying more than $150 million to clean up the Passaic, as a significant portion of the dioxins in the river can be traced directly to the company's operations. Batson ignored two EPA-sponsored studies that support this conclusion. In response, EPA asserts that Givaudan's dioxin share is still "approximately 20 times smaller" than Diamond Alkali's. RS.55. But even taking EPA's claim at face value, Givaudan's share would have been approximately $150 million under Batson's allocation methodology—roughly as large as the entire settlement. *See* App. A, Tab 8 at 5.

Many other companies are significantly underpaying as well. EPA has all but admitted that settling defendant PPG Industries should be paying ten times as much. In its comments, OxyChem pointed out the obvious fact that PPG could not have discharged its process waste to the sewers *before those sewers even existed* (as Batson assumed). *See* OCC Cmt. 151; App. A, Tab 8 at 8. In

response, "EPA recalculated PPG's base score" to be "*approximately 10 times higher than [its] original base score*." RS. 121 (emphasis added). Inexplicably, EPA still allowed PPG to remain in the settlement. For defendant STWB, Inc., there was nothing to recalculate; Batson assigned STWB *no responsibility* for direct discharges, despite STWB's sworn admissions that it poured untreated wastes directly into the Passaic River for decades. *See* App. A, Tab 8 at 9.

The list goes on and on. Batson found that settling defendant Benjamin Moore discharged just 12.78 kg of PCBs into the Passaic River—about 4 one-gallon paint cans—over nearly a century of paint-producing operations on the Passaic. *See* Ref.24 at ARR2117. That conclusion is fanciful, as it ignores that PCBs were used to plasticize paints for over 50 years. Benjamin Moore purchased 7,000 pounds of PCB Aroclors for use at its Newark facility *in 1968-1970 alone*. *See* App. A, Tab 8 at 1. Batson likewise ignored strong evidence that EnPro is liable for discharging significant quantities of PCBs as the corporate successor to Crucible Steel, which used massive quantities of oils containing PCBs over many decades and had *no* documented waste disposal practices *other than* to discharge waste directly to the Passaic River. *See id.* at 3. Batson's determination that Legacy Vulcan discharged *no* PCBs into the river from its Passaic-adjacent facility is similarly unsupportable, as both Vulcan and its predecessor extensively used PCBs and the facility's soil was polluted with them. *See id.* at 9. For its part, Montrose Chemical manufactured DDT along with dioxin-generating chemicals while dumping its wastes into the river, yet Batson awarded it no liability for those direct discharges. *Id.* at 7. Batson also disregarded 76 years' worth of pollution by Cooper Industries under the assumption that Cooper was not liable for the operations of its predecessor J. Wiss & Sons. *See id.* at 2. But a decision from this District has ruled that Cooper *was* "corporate successor to Wiss" and *can* be held liable for its pollution.[52]

---

[52] Ex.51, Summary Judgment Opinion in *PSE&G v. Cooper Industries* (D.N.J.), No. 2:21-cv-13644-KM-JBC, Dkt. 50 (Jun. 26, 2023).

Through a series of misrepresentations, mistakes, and oversights, Batson allowed major polluters to escape meaningful consequences for their actions by recasting them as "minor contributors of pollution." While the government no longer embraces every aspect of the Batson Report, its review was cursory and its modifications were minor. *See* App. A, Tab 5 (table showing change in allocation shares after government modifications). As detailed above, numerous parties have been included in this settlement based on gross underestimates of their liability. And even one such error should be fatal, given the government's decision to structure this as a collective "all or nothing" settlement. *See Tutu Water Wells*, 326 F.3d at 207 (consent decree must apportion liability "according to rational estimates of the harm *each party* has caused").

### C.   Batson Used an Analytic Approach That Predetermined an Intended Result: Assigning Overwhelming Liability to OxyChem

The proposed settlement's treatment of multiple major polluters as "minor contributors" reflects the fundamental errors in the allocation on which the settlement was based. As the government concedes, the Court cannot approve the proposed settlement unless it finds that Batson's allocation—the foundation on which the settlement was built—is not arbitrary or irrational. *See* Mot.27. Batson's work, however, was flawed from start to finish. EPA's response, which cherry-picks data and greenwashes Batson's errors with declarations of new experts, cannot save it, and neither can the "alternative approach" EPA now claims it employed.

Notably, this Court is the third to review an "allocation" by Batson.[53] Both prior courts rejected Batson's conclusions and substituted allocations that were nearly the opposite of Batson's, criticizing his methodology and finding that his allocations were contrived to put maximum cost

---

[53] *See El Paso Nat. Gas Co. v. United States*, 390 F. Supp. 3d 1025, 1052 (D. Ariz. 2019); *Colum. Falls Aluminum Co. v. Atl. Richfield Co.*, 2021 WL 3769886, at *47 (D. Mon. Aug. 25, 2021). In *Columbia Falls*, Atlantic Richfield Co.—a settling defendant here—cross-examined Batson in open court about the Batson Report's absurd results. *See* Ex.52 (excerpts of trial transcript).

on the opposing party. *See* OCC Cmt. 86-88. Batson took the same course here, and EPA's reliance on his flawed allocation dooms the proposed settlement.

### 1. Batson's decision to allocate by relative risk rather than actual cost drivers is arbitrary and inconsistent with EPA's own remedial decisions

The flaws began with Batson's "Allocation Protocol," Ref.12, which was designed with help from the settling parties and riddled with faulty premises that lead to absurd conclusions—including that settling parties are *collectively* responsible for *six hundredths of a percent* of projected cleanup costs. *See* Ref.18 at ARR3240; B.11, Olian Decl. ¶55, Figure 1. The protocol relies on "Relative Risk Numbers" that purport to attribute a percentage of total "risk to human health and the environment" to each of the eight most dangerous COCs in the Passaic. According to Batson, dioxin contributes approximately 84% of the risk, PCBs contribute approximately 13%, and all other COCs—including mercury, DDT, PAHs, dieldrin, copper, and lead—contribute just 3%. Yeh Decl. ¶49. Based on these figures, Batson concluded that the vast majority of remediation costs should be allocated to dioxin contributors, with minimal costs borne by companies that discharged huge amounts of other toxic chemicals into the Passaic.

Batson's reliance on this method to allocate responsibility for cleanup costs is irrational and contradicts EPA's own findings. As the Third Circuit has recognized, the essential inquiry is not how much risk a given COC might pose in the abstract, but how much each party's actions contributed to the costs of remediation. *See* 42 U.S.C. §9622(e)(3) (empowering EPA to "allocate[] percentages *of the total cost of response* among [PRPs]"); *Trinity Indus., Inc. v. Greenlease Holding Co*., 903 F.3d 333, 359 n.20 (3d Cir. 2018) ("[A]ny cost allocation methodology must differentiate between major remediation activities and account for the varying costs across those activities."). The Batson Report never engages with the required cost inquiry; it simply assumes that dioxin contributors should be on the hook for nearly all remediation costs, even if other

pollutants are more expensive to clean up. *See*, *e.g.*, B.9, Saba Decl. at Op. 2.

EPA's acceptance of this "risk allocation" approach is particularly arbitrary and capricious because EPA has determined that dioxins *are not responsible for the majority of remediation costs*. EPA found that remedial goals for dioxin cleanup could be achieved for half the price: In fact, it was the volume of *PCBs, not dioxins,* that required the more expensive remedial action. Ex.3, OU2 ROD at 75; Ex.4, OU2 ROD Table 34; *see also* OCC Cmt. 47-49. EPA equivocates on this point, claiming it did not evaluate a remedy in the absence of dioxins, RS.52, but the OU2 ROD refutes this. It mandates remedial goals for *four* chemicals, dioxins, PCBs, mercury, and DDT, Ex.3 at 42-43, goals EPA admits it cannot reach *without* removing 3,000 kg of PCBs, 600 kg of total DDT (DDx), 11,000 kg of mercury, and 6 kg of dioxins from the river, Ex.5, OU2 ROD App. V at 39, Comment C.2.2. The Batson Report ignores this, making it an unreasonable allocation of costs. In fact, Batson never even attempts to link any PRP's actions with projected cleanup costs, as the law requires. *See* B.11, Olian Decl. ¶27 (Batson failed to apply "cost-causation" and allocated "without any regard to the nature of the remedy or what drives its cost.").

### 2. Batson's risk numbers contradict EPA's own findings and arbitrarily ignore the significant risk posed by dioxin-like PCBs

Even if Batson's risk-based approach were proper, his relative risk calculations are unsupportable. They ignore the sizable, independent risk posed by dioxin-like PCBs—a distinct category of pollutant that are *not* dioxins and that EPA found presented distinct environmental risks in the OU2 ROD. *See* B.5, Menzie Decl. ¶30; *see also* Ex.3, OU2 ROD at 29 (separately evaluating risks of dioxin-like PCBs and other, non-dioxin-like PCBs). By embracing Batson's approach, EPA understates the risks of PCBs and dioxin-like PCBs, overstates the risks of dioxins, reneges on prior remedial decisions, and contradicts its own science. That is a textbook example of arbitrary and capricious agency action, *cf. Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Ins. Co.*, 463 U.S.

29, 43 (1983), and affords the Court no basis to rely on the allocation as a reasonable estimate of any party liable for PCBs.

When EPA calculates PCB-related risk in the environment, it performs one calculation for dioxin-like PCBs and another for non-dioxin-like PCBs.[54] Those two numbers are combined to calculate overall PCB risk.[55] Consistent with this practice, the ROD for OU2 breaks out the risks of dioxin-like PCBs separately, calculating that they present a distinct, 11-12% risk. *See* Ex.3, OU2 ROD at 29. Ignoring this, Batson's allocation did *not* separate and measure the risks of the settling parties' dioxin-like PCBs, arbitrarily contradicting both the ROD and EPA guidance.

Unable to deny Batson's omission, EPA attempts to reframe and excuse it. First, through the declaration of an EPA employee, EPA claims Batson did not calculate the risks of dioxin-like PCBs in the allocation because his data was insufficient:

> *The vast majority of PCB concentration data available to the allocator were in terms of PCB Aroclor mixtures, which does not allow for evaluation of dioxin-like PCBs... Given the available data, AlterEcho's approach to establishing the [Relative Risk Number] for PCBs was rational.*

RS.65 (citing Sivak Decl. ¶56). That is simply inaccurate. A publicly available EPA-sponsored study *establishes* the relative percentage of dioxin-like PCBs in each form of Aroclor (the commercial trade name for PCB based lubricants).[56] It is a matter of simple math to apply those percentages to any Aroclor mixture to determine how much dioxin-like PCBs it contains. *See* App. A, Tab 7, Decl. of Dr. Tarek Saba, et al. ("Saba *et. al.* Decl.") ¶21. The results of this calculation, when applied to the soil samples available to Batson, are depicted below:

---

[54] Ex.53, EPA, *Calculating Dioxin TEQs at CERCLA and RCRA Sites* (2013) at 5.
[55] Ex.54 EPA, *Comments on CPG's Draft Lower Passaic River Study Area Baseline Human Health Risk Assessment*, at 9 (2015) ("risks... from the dioxin-like and non-dioxin like PCBs should be combined to calculate the total cancer risks"); *id*. ("total calculated risks for all chemicals would **include dioxin-like PCBs** and non-dioxin like PCBs").
[56] *See* App. A, Tab 7 (Table 1: Percentage of dioxin-like PCBs in Aroclors).



*Id.* Using available allocation data and applying EPA's own approach in the OU2 ROD, "one could certainly reasonably calculate the dioxin-like PCB concentrations for the assessed facilities from the PCB Aroclor data." Saba *et. al.* Decl. ¶28. Had Batson done so, he (and EPA) would have found at least *22* parties—14 of whom are released in the settlement—with high levels of *dioxin-like PCBs* in their soil, making his assessment of "PCB risks" far too low.[57]

But Batson never performed this analysis—and not because, as EPA now claims, his data was not sufficient. *Contra* Sivak Decl. ¶56. Rather, Batson *chose not to calculate* the risk of dioxin-like PCBs because, he claimed, EPA framed its cleanup goals in terms of total PCBs. *See* ARR 0327.[58] Not so. In fact, EPA's policy is to calculate remedial goals for *both kinds* of PCBs, and to select "the more stringent of the two [remedial goals], ensuring that the remedy *will be protective for both PCB and dioxin-like PCB* exposures."[59] EPA did just that in the OU2 ROD; it made separate assessments of the risks of dioxin-like and non-dioxin-like PCBs, Ex.3, OU2 ROD at 29,

---

[57] Batson's misapplication of his made up "attenuation" factor understated the risks of dioxin-like PCBs for a separate reason. Published studies show that as PCBs attenuate due to weathering, concentrations of dioxin-like PCBs *increase* rather than decrease. *See* Saba et. al. Decl. ¶30; Ex.55, Rushneck et al. (2004) (determining congener compositions of nine Aroclor products)).

[58] Ref.14, Batson Methodology for Determination of Relative Risk at ARR0327.

[59] Ex.53, EPA, *Calculating Dioxin TEQs at CERCLA and RCRA Sites* (2013) at 5.

and selected a protective remedy to address *both*. *See* B.5, Menzie Decl. ¶30 ("The PCBs present in OU2 are comprised of the sum of both non-dioxin-like and dioxin-like PCBs. Both contribute to the risks calculated for OU2 and are determined in the ROD to require remediation."). By entirely omitting dioxin-like PCBs from the allocation, Batson caused half of the *actual* and *measurable* PCB risk arising from dioxin-like PCBs to vanish, effectively adding it to dioxin risk instead:[60]



*See* OCC Cmt. 61-67; B.4, Harris Decl. ¶¶5, 16-22; B.5, Menzie Decl. ¶¶10, 30-33. Based on this fundamental error, Batson assigned 84% of costs to dioxins, just 13% of costs to PCBs (even though dioxin-like PCBs pose increased, dioxin-like risks), and only 3% of costs to the remaining six COCs combined. Ref.12 at ARR0336.

EPA's admission that the allocation did not consider the risk of dioxin-like PCBs—contrary to EPA's guidance and ROD findings—shows the allocation is arbitrary, irrational, and unreliable. The government nevertheless asserts that Batson's failure to evaluate the risk of dioxin-like PCBs should not matter, on the theory that whatever the (many) flaws of Batson's risk-based methodology, the proposed settlement is reasonable because it is "consistent" with EPA's OU2 risk assessments. In the government's words:

---

[60] *Compare* Ex.5, OU2 ROD Responsiveness Summary (2016) at 186 *with* Ref.12 at ARR0336.

> [I]mportantly, the settlement is consistent with the EPA risk assessments, which conclude that dioxins and furans are responsible for 81-94% of the risk posed to human health and the environment, relative to other COCs, and that *PCBs are responsible for 5-16% of that risk.*

Mot.40 (citing Yeh Decl. ¶¶16, 49 (citing OU2 ROD at 29)). EPA is wrong again. The cited EPA

risk assessments find dioxins and furans responsible for 70% to 82% of the risk (*not* 81-94%), and

find PCBs responsible for *16% to 28%* of the risk, not 5-16% as EPA claims:

> The primary contributors to the excess risk are dioxins/furans (70 percent for fish consumption and 82 percent for crab consumption), *dioxin-like PCBs (11 percent for fish consumption and 12 percent for crab consumption)* and non-dioxin-like PCBs (16 percent for fish consumption and 5 percent for crab consumption). The other COPCs contributed a combined 3 percent to the excess cancer risk.

Ex.3, OU2 ROD at 29. In sum, the government can assert Batson's profound errors should not

matter only by *repeating* them—namely, by adding the risks of dioxin-like PCBs *to dioxins* (70%

+ 11% for fish = 81%; 82% + 12% for crab = 94%) rather than associating those risks with PCBs.

That is wholly arbitrary. To state the obvious, the risks of dioxin-like PCBs arise from *PCBs*, not

from dioxins, which are a separate group of chemicals. *See* Saba *et. al.* Decl. ¶3 ("The term 'dioxin-

like PCBs' refers to chemicals that are *not* dioxins or related to dioxins."). When calculated

correctly, using the same data Ms. Yeh cites, the PCB risks are *16% to 28%* (5% + 11% for fish =

16%; 16% + 12% for crab = 28%), not the 5% to 16% that the government's motion claims.

EPA's decision to misstate, minimize, and disregard the known risk of dioxin-like PCBs

shifts hundreds of millions of dollars in allocable costs off of PCB contributors and onto parties

like OxyChem. The effect of this error is larger than the entire proposed settlement.[61] It is arbitrary

and irrational for EPA to adopt an allocation that contradicts both its own ROD findings about the

separate risks of dioxin-like PCBs and its settled remedial approach, which treats those as separate

risks that must be quantified separately. And it is fundamentally unfair for EPA to use this

---

[61] EPA has attributed *at least* 11% of excess risk in OU2 to dioxin-like PCBs. Ex.3, OU2 ROD at 29. 11% of $1.84 billion is approximately $202 million.

settlement to impose the cost of that several-hundred-million-dollar error on OxyChem.

### 3. Batson committed serious mathematical and scientific errors.

Batson made other enormous errors as well. Perhaps most remarkably, he applied a scientifically indefensible "attenuation factor" to give every settling defendant a 99-percent-off coupon for the chemicals they put into the Passaic, dramatically reducing his estimates of their contamination. OCC Cmt. 69. Batson's "attenuation" factor was not derived from any of the many EPA and other sources describing attenuation as the rate at which "natural processes that decrease or attenuate soil and groundwater contaminant concentrations" of particular chemicals. *See, e.g.*, Ex.90, EPA, *Groundwater Technologies*. Instead, Batson's "attenuation" just multiplied everything by 1 percent—a plug number Batson used to account for the discrepancy between the amount of dioxin he posited that Diamond Alkali discharged into the Passaic (over 3,000 kg) and the amount of dioxin EPA actually found in river sediments (38 kg). *See* OCC Cmt. 71-72 (3764.0051 kg versus EPA's 38 kg); Wittenbrink Decl. ¶29; ARR0030. Batson then applied this 1% "attenuation factor" across all COCs, even though EPA and peer-reviewed studies show chemicals attenuate at different rates. For example, concentrations of dioxin-like PCBs can increase (rather than attenuate) over time as other PCBs weather away. Saba *et. al.* Decl. ¶30; Ex.55, Rushneck (2004). Batson nevertheless ignored the disparate characteristics of the COCs here in a way that unfairly benefited all allocation parties *except* OxyChem: While OxyChem is found responsible for nearly *all* dioxins ever discharged into the Passaic, Batson's made-up 1% attenuation factor made everyone else responsible for only 1% of the contaminants that he estimates they contributed to the Passaic. *See* OCC Cmt. 70; *see also id*. at 75-76; *id*., B.4, Harris Decl. at Op. 3 (attenuation factor "removes from [Batson's] assessment large quantities of chemicals he finds were actually produced by the participating parties"). That again contradicts basic science and EPA's own findings. *See* OCC Cmt. 70-75.

Batson made yet another egregious error by using the wrong units in calculating Diamond Alkali's purported dioxin contributions, leading him to a *million-fold* overestimate. In his calculations, Batson inadvertently translated *milligrams* to *kilograms* and parts per *billion* to parts per *million*, *id.* at 88, causing him to incorrectly calculate Diamond Alkali's dioxin contributions as a million times higher. Batson further erred in concluding that dieldrin (an insecticide) was discharged from the Diamond Alkali site, supposedly because it "was detected" in soil samples, Ref.70 at ARR1444 & ARR1468; in reality, these soil samples came from *another site* located *half a mile away*. B.9, Saba Decl. ¶¶32-33.

Even the government does not support Batson's "attenuation" factor, claiming instead that it is "unnecessary," Wittenbrink Decl. ¶¶33-34. The government also does not dispute that Batson miscalculated Diamond Alkali's dioxin contributions by a factor of a million and erred in attributing dieldrin to OxyChem; it just disputes whether these errors require rejecting the settlement. *See* Wittenbrink Decl. ¶¶34, 36; Yeh Decl. ¶52. But as the government admits, the Batson allocation is the foundation for the settlement. Given the Batson allocation's many flaws, the settlement built on that foundation cannot stand.

### 4.   Batson unfairly treated similarly-situated PRPs differently

The Batson allocation also arbitrarily treated OxyChem worse than other PRPs. *See* App. A, Tab 6. For one thing, the documents Batson considered were different for OxyChem than for other parties. With respect to the settling parties, Batson's evaluation was limited to categories of documents that the participating parties were "required" to submit, subject in all events to each party's self-determination that a document fell into one of those categories. Ref.7, List of Relevant Document Categories for Allocation at ARR0277-79; *see supra* §III(B)(1). For OxyChem's predecessor Diamond Alkali, however, Batson evaluated a "large volume of data" submitted by *other PRPs* who had a strong interest in increasing OxyChem's liability. Ref.3, Revised Work Plan

at ARR0120. These documents included interoffice memoranda, deposition transcripts, and other documents far outside the scope of what other PRPs submitted on their own behalf.[62] The same discrepancy extends to expert reports: Various parties submitted *defensive* expert reports about their own liability, but the only *offensive* expert report submitted was the SPG's report against OxyChem.[63] Compounding the prejudice, that report has been *withheld* from OxyChem and EPA, preventing them from performing any evaluation of its credibility or truthfulness and depriving OxyChem of any opportunity to meaningfully respond.[64]

Even where Batson *did* have comparable information about OxyChem and another PRP, he drew inconsistent inferences based on that information. *See supra* §III(B)(3). For example, Batson attributed dieldrin found *down the street* from the Diamond Alkali facility to OxyChem, but not to any of the other owner/operators in the same area. *Id.* Batson also discounted "historic fill" for other parties, but not for OxyChem. *See* RS.70 (admitting this inconsistency). For instance, Batson ignored the mercury, lead, and copper in Benjamin Moore's soil (even though the company used all three metals as raw materials),[65] but did not do the same for OxyChem (even though Diamond Alkali did *not* use mercury, lead, or copper in its operations).[66] Batson also drew inferences about dioxins in Diamond Alkali's wastewater based on dioxin samples taken elsewhere, but refused to do the same for major dioxin contributor Givaudan. *See* App. A, Tabs 6 and 8, attached, summarizing these and other instances of disparate treatment by Batson of PRPs—all of which was detailed in OxyChem's comments. Nearly a year after submission of those comments, the government does not deny this unequal treatment; instead, it offers a new expert

---

[62] Compare Ex.56 (list of documents cited for 80 Lister facility) to Ref.7 at ARR0277-79 (List of Relevant Document Categories for Allocation).
[63] *See* Ex.57, cover page to June 14, 2019 Parette Expert Report, released by EPA via FOIA.
[64] *See* Ex.58, EPA Ltr. and FOIA release (Aug. 3, 2023); Ex.59, DOJ Ltr. (Jul. 28, 2023).
[65] Ref.24 at ARR2117-28.
[66] Ref.24 at ARR2575-86.

report from an attorney who opines that he "did not see bias or collusion." Wittenbrink Decl. ¶43; *see* RS.72; RS.81 at 80. With respect, that hardly refutes the wealth of evidence that Batson applied one set of rules to parties who participated in his process and a different set of rules to OxyChem. Instead, the outcome of the allocation shows the deck was stacked against OxyChem from the outset: There was no true adversity among the participating allocation parties, who seized on EPA's prior decision to single out OxyChem. *See* Ref.6 at ARR0223 (EPA told Batson it planned to "enter into settlement negotiations for performance and funding of the remedy with OCC [and perhaps others]" while offering "cash-out settlements" to "Middle Tier PRPs"). OxyChem had no way to break up this cabal, even if it had chosen to participate.[67] This Court should not approve the predictably unfair result of that unfair process.

### 5. The government's "alternative allocation" does not cure these errors.

While the government has now wisely abandoned some of the most egregiously flawed aspects of Batson's original "protocol" method, the government's new "alternative" method still fails to justify the proposed settlement. *See* Mot.23; RS.68. "The Alternative Allocation approach was developed by AlterEcho *after the completion of the Protocol Allocation analysis.*" In other words, Batson performed his entire allocation under the original protocol, reviewed the results, *and then re-wrote the rules.* He did so because the results of his original allocation were so absurd that they risked "potentially creating an inequitable outcome and hampering future settlement efforts." Ref.1 at ARR0028. But Batson himself "did not recommend the alternative calculation," *id.*, finding the "potential inequities of the use of the different approaches" to be "evident." ARR0029. Even settling defendants agree: They, too, assert the alternative calculation on which EPA now claims to rely is "*contrary to the approved Allocation Protocol and is inconsistent with*

---

[67] The Batson process's limited discovery mechanisms were a primary reason OxyChem chose to pursue its rights in federal court instead. *See* Ex.27, OxyChem Ltr. to EPA (Oct. 12, 2017).

case law."[68] Neither the conflicted and flawed Batson Report nor the government's claimed "alternative" satisfy the government's burden to show this settlement is reasonable or fair.

### D.    The Government Arbitrarily Includes OU4 in the Proposed Settlement

On top of everything else, there is *no* legal or rational basis for the government's bonus gift to the participants: a full release of liability *not only* in OU2 (the lower 8.3 miles of the Passaic), but *also* in the rest of OU4 (the upper 9 miles). EPA long ago recognized crucial differences between OU2 and OU4; those two stretches of the Passaic River are substantially different in shape, depth, and contaminant load, and thus require different remedial approaches. OCC Cmt. 101-04. The Batson Report addressed only OU2. Ref.1 at ARR0006-ARR0007; Dkt. 289 (titled "OU2 Allocation."). Batson made no study and no findings about responsibility in OU4. Accordingly, even if the Batson Report were admissible and could provide any basis for allocating responsibility for OU2 (it cannot), the report nowhere claims to allocate—or provides any rational basis to allocate—responsibility for the additional *$441 million* of EPA-estimated response costs of the interim remedy in OU4, much less the as-yet-undetermined permanent remedy.

The government's muted response comes nowhere close to showing that the settlement is a reasonable estimate of the harm *any* party caused in OU4. The government points generally to the Lower Passaic's "tidal nature," noting that this causes contaminants to be "carried up and down" the river. Mot.20; *see* RS.88. This bare observation does not show that calculations of *specific proportions of responsibility* for cleanup of the lower 8.3 miles in OU2 apply equally to the upper 9 miles of OU4. Nor could it: EPA's response nowhere disputes that hydrodynamics "is the fundamental driver of sediment and contaminant fate and transport[,] and *the upper 9 miles has a fundamentally different hydrodynamic regime than the lower 8.3 miles*." OCC Cmt. 103; *cf.*

---

[68] Dkt. 288-10 (SPG Cmt.) at 5 n.21 (quoting Batson Report at 28).

RS.88 (citing Yeh Decl. ¶20). OU4's remedy is also strikingly different from OU2: It is designed to address "hot spots" of contamination in the upper 9 miles, rather than entombing contaminants bank to bank, as mandated in OU2. OCC Cmt. 104. Any rational allocation for OU4 would thus determine the likely sources of the hot spots in OU4 and assign those sources a greater share of liability. But EPA has performed no such allocation, and neither did Batson. While the government now claims that Batson's risk calculations rely on "site-specific information about risk *from the OU2 and OU4 risk assessments*," Mot.18, Batson titles his risk calculations "*OU2* Percent Contributions to Overall Environmental Harm." Ref.14 at ARR0343. And while Batson's risk calculations cite the OU2 risk assessment over a dozen times, he *never* cites the OU4 risk assessment—not even once. *Id.* As a result, the only thing the evidence shows is that EPA has arbitrarily and capriciously extended the OU2 allocation upriver to OU4, supported by no evidence at all. That does not meet EPA's burden to establish that any portion of the settlement reflects a fair payment for the release of $441 million in *known* liability in OU4 and an unknown added amount for the permanent remedy. The release of liability for OU4 is accordingly arbitrary and unsupportable and requires that approval of the settlement be denied.[69]

### E.    The Proposed Bar on OxyChem's Contribution Claims Is Also Unfair and Unreasonable

The proposed settlement is also substantively unfair and unreasonable in seeking to extinguish OxyChem's contribution claims for costs it alone has incurred and will incur. First, the statute permits EPA to seek a contribution bar only for liability "to the United States." 42 U.S.C. §9613(f)(2). But it is *OxyChem* that will spend over $200 million designing EPA's preferred

---

[69] EPA has not cured this arbitrariness by adding a right for the United States to reopen the settlement if the total cost exceeds $3.8 billion. Dkt.283 ¶15.f. The settlement provides *no* protection to the non-settling parties for those overruns: it vests that right only in the United States. *Id.* ¶23.

remedy for OU2 and interim remedy for OU4, and that reasonably expects to spend hundreds of millions more to help implement those remedies. OxyChem's right to seek contribution for costs OxyChem has paid, and that the United States has not paid, gives rise to liability *to OxyChem*, 42 U.S.C. §9613(f)(1), not "liability to the United States" under CERCLA §113(f)(3)(B).[70]

Second, the government concedes it has no unpaid response costs. It has received nearly $80 million from Maxus's bankruptcy that is currently sitting in a special account for use at the Site, Mot.16, and has stated publicly that it expects private parties to pay the costs of implementing any remaining remedies, making the chance that the United States will *ever* incur response costs very remote.[71] Put simply, the government here attempts to take OxyChem's contribution claims and sell them to the defendants for $150 million—paid to EPA—in the proposed settlement. That is not authorized by CERCLA and raises serious due process and takings concerns. *See* OCC Cmt. 33-34; *Gen. Time Corp.*, 826 F. Supp. 471, 476 (M.D. Ga. 1993) (absent compliance with §122, "barring [a PRP's] contribution claim would violate due process"); *see also* Ex.16, U.S. Chamber of Commerce Letter (raising similar takings and due process concerns and describing settlements like this as a "protection racket"). That provides another reason to reject the proposed settlement.[72]

---

[70] *See, e.g., Akzo Coating of Am., Inc. v. Am. Renovating*, 842 F. Supp. 267, 271 (E.D. Mich. 1993) ("If defendants were permitted to settle with the government for part of the cleanup costs of a site, and then become immune from suit for contribution by private entities who paid for other cleanup costs, it would defeat the policy of CERCLA."); *United States v. Hardage*, 750 F. Supp. 1460, 1493 (W.D. Okla. 1990) ("CERCLA provides the United States with no authority to settle private party response cost claims.").

[71] The only foreseeable cost the United States anticipates are "oversight costs." There is a dispute in the law about whether these costs—which are budgeted costs of EPA employees and contractors who work on sites—are recoverable as response costs. But here, the United States' statements that taxpayers will not incur costs to perform the remedy means the only response costs actually at issue are those of private parties like OxyChem for costs they have incurred.

[72] The government's contention that there is no due process issue because "[t]here is no federal common law right to contribution... and hence no deprivation of any constitutionally protected interest," Mot.43, fails. Several courts have recognized that, "the statutorily created right of

44

**IV.    The Proposed Settlement Contravenes CERCLA's Goals and the Public Interest.**

**A.    The Proposed Settlement Is Inconsistent With CERCLA's Goals**

The proposed settlement is also contrary to CERCLA's goals. CERCLA was enacted to expedite cleanups and hold polluters accountable for the cost. *Trinity Indus.,* 903 F.3d at 348 (citing *Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 602 (2009)). A proposed settlement must further those goals. *See Tutu Water Wells*, 326 F.3d at 207. Most do so by requiring settling parties to perform cleanup work or to reimburse the government for costs it has already incurred to clean up a site. *See, e.g.*, *United States v. Wyeth Holdings LLC*, 2015 WL 7862724, at *3 (D.N.J. Dec. 3, 2015) (consent decree was consistent with CERCLA's goals because it mandated cleanup by settling party); OCC Cmt. 38-39 (surveying NJ consent decrees).[73]

The proposed settlement here requires no cleanup work, and so cannot expedite the Passaic's cleanup. *See Pesses*, 1994 WL 741277, at *6 (consent decree requiring no cleanup work did not further the goal of "expediting" remediation). Nor does the proposed settlement hold any settling polluter accountable for the $1.84 billion in projected cleanup costs or the unknown cost of the permanent remedy at OU4, which has yet to be chosen. The government does not dispute those facts, and concedes the Passaic River will be remediated only through later settlement, administrative order, or lawsuit. *See Mot.*34 (decree "doesn't recover all response costs"); *id.* at 33 (decree "is just one step"); RS.12 (EPA "expect[s] to pursue more settlements, litigation, or issue orders"). If EPA later reaches a settlement that performs or funds the cleanup, *that* settlement may advance CERCLA's goals. But a potential future settlement or enforcement action cannot backfill

---

contribution *is a property interest*, which cannot be extinguished without procedural due process of law." *Gen. Time Corp.*, 826 F. Supp. at 477 (citing *C.P.C. Int'l, Inc. v. Aerojet-General Corp.*, 759 F. Supp. 1269, 1283 (W.D. Mich. 1991)). And while the Third Circuit has rejected different challenges to a contribution bar in the past, *see SEPTA*, 235 F.3d at 823-25, it did not address the arguments presented here.

[73] The exceptions—*de minimis* and ability-to-pay settlements—do not apply here.

this settlement's shortcomings. *This* settlement releases 82 well-resourced parties from all liability for polluting the Passaic, providing taxpayers with no cleanup and only a fraction of the necessary $1.84 billion. That is plainly inconsistent with CERCLA's goals.

**B.    The Proposed Settlement Discourages Voluntary Cleanups and Does Not Minimize Litigation Involving the Government**

CERCLA also envisions EPA will obtain performance of cleanup work or recover funds for cleanup "through the liability scheme set forth in CERCLA, wherever possible." *United States v. Alsol Corp.*, 2021 U.S. Dist. LEXIS 52344, at *9 (D.N.J. Mar. 19, 2021). Congress prioritized achieving CERCLA's goals through settlements to minimize litigation *by the government*. *Mathes*, 2008 WL 4693550, at *4 (CERCLA favors reduction of "inefficient expenditure of public funds on lengthy litigation"). CERCLA thus "incentivizes the State and Federal Governments to recover fully from a single PRP, after which *that PRP can litigate the proper allocation of liability among other PRPs*." *N.J. Dep't of Envtl. Prot. v. Am. Thermoplastics Corp.*, 974 F.3d 486, 496 (3d Cir. 2020). "This reduces litigation directly involving the States and the Federal Government." *Id*.

This approach depends on performing parties' right to pursue contribution from others. *See Cranbury Brick Yard, LLC v. United States*, 943 F.3d 701, 704-06 (3d Cir. 2019) (overview of liability scheme). When a proposed settlement seeks to bar contribution claims of a private party that voluntarily incurred costs, it contradicts CERCLA's goals, by "deter[ring] private parties from undertaking any cleanup 'for fear of being stuck with the full bill.'" *Mathes*, 2008 WL 4693550, at *4 (quoting *Kelley v. Wagner*, 930 F. Supp. 293, 299 (E.D. Mich. 1996)).

EPA has long followed CERCLA's scheme at other sites, per its settlement policy:

[T]he Agency will negotiate only if the initial offer from PRPs constitutes a substantial proportion of the costs of cleanup at the site, or a substantial portion of the needed remedial action. Entering into discussions for less than a substantial proportion of cleanup costs or remedial actions at the site, would not be an effective use of government resources.

46

Ex.90, EPA Interim CERCLA Settlement Policy (Dec. 5, 1984) at 5. The government concedes enforcement should proceed consistent with this policy: After remedy selection, EPA negotiates for a settlement requiring performance of the remedial design and remedial action. RS.42. If a settlement is reached, EPA need not pursue further settlements—except *de minimis* or ability-to-pay settlements—and performing PRPs will pursue contribution claims. Ex.90 at 43.

Here, however, EPA abandoned this structure and its own policy. OxyChem has already agreed to perform and fund OU2's $165-million remedial design and is performing the design of the remedy in OU4. As noted, it also offered to implement both remedies. Ex.5. But EPA now seeks to cut off OxyChem's right to pursue contribution from those who refused to pay their fair share. Instead of negotiating with OxyChem when it offered to perform or fund all or most of the remedial action, EPA spent millions of dollars pursuing this "minor" cash-out settlement, enriching a former EPA lawyer and his new employer in the process. EPA tries to justify this departure by arguing that CERCLA prioritizes *any* settlement, but that misrepresents CERCLA's statutory goal, which is to minimize litigation *with the government* by obtaining *voluntary performance*. It also misrepresents the factual record, as given the need to pursue further enforcement, EPA cannot credibly claim that this settlement will reduce litigation or conserve government resources. The proposed settlement accordingly contravenes CERCLA's basic purposes.

### C.    The Proposed Settlement Harms the Public

The proposed settlement also undermines the public interest, a "core concern" in evaluating a consent decree. *United States v. Rohm & Haas Co.*, 712 F. Supp. 666, 680 (D.N.J. 1989). To evaluate the public interest here, the Court should consider the public comments. *See* Dkt.226, DOJ Ltr. to Court at 5 (purpose of filing comments on docket is to assist the Court's evaluation).

Here, setting aside comments from the settling parties and OxyChem, only *two* comments

support the settlement, while *seventy-seven* oppose it.[74] Comments from New Jersey taxpayers, municipalities, businesses, environmentalists, and environmental justice advocates are nearly unanimous: The settlement harms the public. *See, e.g.*, Dkt. 288-16 at 33-34 ("I am writing with concern about the EPA's recent settlement with 85 companies to pay a token $150 million...."); *id.* at 36-37 ("This decision sends a dangerous message to companies that they are better off denying responsibility for Superfund cleanups than cooperating and performing the necessary work."); *id.* at 28-29 ("This approach sets a very dangerous precedent for municipalities, letting polluters off the hook and making taxpayers liable for harms they didn't cause."); *id.* at 26-27 ("This is unacceptable as the polluters should be held fully responsible for the damages they have caused and should be required to pay the full cost of the clean-up."); *id.* at 138-141 ("EPA should be focused exclusively on completing cleanups for the people and communities EPA is obligated to protect—not on deciding who should pay").

EPA offers vague and unsupported reassurances about the settlement, but the public can see for itself. Rather than requiring settling parties to perform the cleanup—or accepting OxyChem's comprehensive offer to do so—EPA is giving full releases to 82 parties for a "minor" payment, disregarding the interest of surrounding communities and the broader public. *See Pesses*, 1994 WL 741277, at *40-41 (where the "site still presents a real danger to the public," public interest is not served by a decree that "does not assure... any further response action at the site").

Nearby municipalities and their taxpayers are clearly harmed by the proposed settlement. Passaic Valley Sewerage Commission ("PVSC") recognizes that the settlement exposes the public to "catastrophic monetary risk" by shifting liability from the settling companies to PVSC, its member municipalities, and taxpayers. App.A, Tab 2 at Cmt.6. The Borough of Hasbrouck Heights

---

[74] *See* Dkt.288-16 (53 non-party comments filed by the United States); Ex.2, thirty additional non-party comments received by DOJ but not included in the United States' filing.

shares this concern, Cmt.7, while the Borough of East Rutherford passed a resolution "strongly object[ing] to the entry of the proposed Consent Decree." Ref.8 at 153-54. The proposed settlement's impact on these municipalities and their taxpayers is no accident. For years, many settling companies tried to escape liability for the chemicals they discharged by arguing the public entities that carried their chemicals and process wastes through the sewers to the Passaic should pay for the cleanup. Ex.7, Settling Parties Ltr. to EPA (Jan. 30, 2018) ("In an equitable allocation, PVSC and the Municipalities should be ascribed among the highest shares of all PRPs…"). After EPA announced the Batson process, the settling parties emphasized that "government parties should pay their fair shares (including by raising additional taxpayer funds if necessary)." Ex.60, Presentation by Settling Parties to EPA (Aug. 28, 2017) at 7.

The "fair share" the settling parties believe New Jersey taxpayers should fund is enormous. They commissioned an expert report—adopted by Batson and attached to his report—concluding that PVSC and its member municipalities are responsible for discharging millions of pounds of PCBs and other contaminants and are liable for the largest share of liability (after OxyChem) for the $1.84 billion cleanup. *See* Ref.16, Koch Report at ARR2899; Ref.35, Pharmacia Intervention Br. at 9, n.6 (had PVSC participated in the allocation, "it would be the party with by far the second largest allocation share…"). EPA dismisses these concerns, too. It promises it might someday release the public entities from liability for PCBs, mercury, and other chemicals not associated with OxyChem's predecessor. RS.12. But affected municipalities and taxpayers are justifiably skeptical, and it is by no means clear that public entities will receive a deal like this one. *Cf. United States v. Alliedsignal, Inc.*, 62 F. Supp. 2d 713, 720 (N.D.N.Y. 1999) (rejecting settlement with municipal defendants because it did not "fairly represent" their share of response costs); Ex.61 Settling Parties Ltr. to EPA (Oct. 24, 2017) (questioning "what 'in kind' services PVSC and/or the

Municipalities might provide that would be fairly coextensive with their collective *substantial liability share*").

Finally, New Jersey's legislature is also concerned about the settlement's impact on the public. Both the General Assembly and the Senate introduced resolutions urging EPA to commit any funds recovered in settlements at New Jersey Superfund Sites to actual cleanup work, and to impose a cap on the amount of such recoveries EPA can spend on its own administrative costs.[75] EPA has made no such commitment.[76] Instead, EPA said it would pursue settlements that ensure polluting companies perform and fund its selected remedies. *See, e.g.*, Ex.62, EPA Press Release (Mar. 4, 2016) ("[P]olluters should pay for the cleanups, not taxpayers... The EPA will pursue agreements to ensure that the cleanup work in the lower eight miles will be carried out and paid for by those responsible for the pollution as required by the Superfund law."); Ex.63, EPA talking points for Community Action Group meeting on proposed OU4 interim remedy (Jan. 9, 2018) ("PRPs will NOT be released from liability for carrying out any such further needed work that may be identified when the final remedy is selected."). Despite these promises, EPA has spent eight years and millions in public funds pursuing a settlement that allows scores of corporate polluters to walk away from the cleanup for pennies on the dollar. That outcome would disserve the public interest.

## CONCLUSION

The government's motion should be denied.

---

[75] Ex.64, Assemb. Res. 87, 221st Leg., Reg. Sess. (N.J. 2024); Ex.65, S. Res. 63, 221st Leg., Reg. Sess. (N.J. 2024). *See* Ex.66 Press Release, NJ Senate Democrats, Senate Resolution Urges EPA to Use Superfund Settlements Exclusively for Clean-Up Work (Jan. 16, 2024)

[76] EPA refuses to commit the $150 million payment to cleanup work rather than its own administrative costs or the general Superfund. Attempting to justify that refusal, the government cites *United States v. Kramer*—but there, the settlement reimbursed the Superfund for costs it had *already spent* to complete the cleanup at that site. Mot.35, n.11.

April 1, 2024                           Respectfully submitted,


                                        MCDERMOTT WILD LLC

                        By:     *s/ John J. McDermott*
                                John J. McDermott, Esq.
                                (jmcdermott@mcdermottwild.com)
                                Lauren Krohn Wild, Esq.
                                900 Haddon Avenue, Suite 233
                                Collingswood, NJ 08108
                                Tel:  (856) 727-0315
                                Fax:  (856) 746-7965

                                GIBBS & BRUNS, LLP
                                Kathy D. Patrick, Esq.
                                (kpatrick@gibbsbruns.com)
                                Anthony N. Kaim, Esq.
                                Ann T. Lebeck, Esq
                                1100 Louisiana, Suite 5300
                                Houston, TX 77002
                                Tel:  (713) 650-8805
                                Fax:  (713) 750-0903

                                CLEMENT & MURPHY, PLLC
                                Erin E. Murphy, Esq.
                                (erin.murphy@clementmurphy.com)
                                C. Harker Rhodes IV, Esq.
                                Joseph J. DeMott, Esq.
                                760 Duke St.
                                Alexandria, VA 22314
                                Tel:  (202) 742-8900

                                LANGSAM STEVENS SILVER &
                                HOLLAENDER LLP
                                Larry D. Silver, Esq.
                                (lsilver@lssh-law.com)
                                David E. Romine, Esq.
                                1818 Market Street, Suite 2430
                                Philadelphia, PA 19103
                                Tel:  (215) 732-3255
                                Fax:  (215) 732-3260

                                *Attorneys for Intervenor*
                                *Occidental Chemical Corporation*

## **CERTIFICATE OF SERVICE**

The undersigned certifies that on April 1, 2024, a copy of Intervenor Occidental Chemical

Corporation's Memorandum in Opposition to the United States' Motion to Enter Consent Decree

was served on all counsel of record via CM/ECF.


Dated: April 1, 2024                              By:      *s/ John J. McDermott*
                                                           John J. McDermott