# Exhibit 1



Kathy D. Patrick
Partner
kpatrick@gibbsbruns.com
713.751.5253

August 14, 2023

*Via Email*

The Honorable Todd Sunhwae Kim
Assistant Attorney General
Todd.Kim@usdoj.gov
Ms. Laura Rowley
Senior Trial Attorney
Laura.Rowley@usdoj.gov
Environment and Natural Resources Division
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530

   RE: Proposed Consent Decree in *United States v. Alden Leeds, Inc., et al.*, Civil Action No. 2:22-cv-07326-MCA-LDW in the United States District Court for the District of New Jersey, D.J. Ref. No. 90-11-3-07683/1

Dear Assistant Attorney General Kim and Ms. Rowley:

   Freedom of Information Act responses provided to Occidental Chemical Corporation ("OxyChem") in 2023 (the "2023 FOIA Responses") show that David Batson, the ostensible "neutral" the United States engaged to conduct a "third party allocation" to "assign shares" of liability to responsible parties in Operable Unit 2 ("OU2") of the Diamond Alkali Superfund Site, was not neutral as to the United States or OxyChem.

   The 2023 FOIA Responses reveal that in April 2016 the United States Environmental Protection Agency ("EPA") and United States Department of Justice ("DOJ") engaged Mr. Batson as an expert witness to advise the United States on how to settle its claims against OxyChem[1] in *United States v. Occidental Chemical Corporation and Chemical Land Holdings LLC*, a consent decree in which OxyChem has ongoing obligations to the United States. EPA's apparent decision to withhold from OxyChem the critical fact that Mr. Batson had been retained to advise the United States about its claims *against* OxyChem, while repeatedly assuring OxyChem that Mr. Batson was a neutral as to both the United States and OxyChem, is a serious matter. EPA never disclosed

---

[1] *See* Revised Work Plan for Task Order #096, Diamond Alkali-Lower Passaic River Allocation (Attachment D to Attachment G ("Diamond Alkali Superfund Site OU2 Allocation Guide") of the Diamond Alkali Superfund Site OU2 Allocation Recommendation Report, David Batson, Esq. Allocator (Dec. 28, 2020) (the "Batson Report"), made public in December 2022) at 1-3.

The Honorable Todd Sunhwae Kim
and Ms. Laura Rowley
August 14, 2023

to OxyChem that Mr. Batson was: (1) acting as an undisclosed expert witness for the United States in a matter *against* OxyChem while also (2) tasked with "ensur[ing]" OxyChem was "*fairly represented in the allocation process*" (as another newly disclosed work plan amendment has now revealed), all while also acting (3) in a proceeding where Mr. Batson's task was to "*assign shares*" *of liability to OxyChem* for the United States' benefit.

Mr. Batson's simultaneous engagement as an EPA contractor in these three, irreconcilably conflicted capacities was unlawful. EPA violated limits on its own authority when it signed contracts permitting Mr. Batson to serve as a neutral despite these conflicts, violating its authority again by demanding Mr. Batson sign contracts representing that he had no personal conflicts, when EPA knew Mr. Batson had multiple conflicts. Finally, applicable law required EPA to disclose *all* of Mr. Batson's conflicts to OxyChem in writing, but EPA did not. Instead, EPA misrepresented Mr. Batson was "neutral," misrepresented that Mr. Batson had no conflicts in communications with OxyChem about the allocation, and then withheld from its FOIA responses for years the critical documents that would have disclosed this conflict. This nondisclosure was also unlawful.

1.  **Relevant Background**

On March 30, 2017, EPA announced its intention to "use the services of a *third party allocator*" to assist it in evaluating potential settlement offers to potentially responsible parties ("PRPs") in OU2 of the Diamond Alkali Superfund Site.[2]  *See* Ex. A (3/30/2017 Letter from E. Wilson) at 2.

After EPA announced its decision to undertake a purported allocation of liability for response costs in OU2, several parties objected to the process, including on the ground that Congress in CERCLA had forbidden EPA to conduct binding allocations of liability for response costs and instead had limited EPA's authority to conducting a nonbinding allocation of responsibility (NBAR) under CERCLA Section 122.  *See* Ex. B (2/13/2018 Letter from Benjamin Moore & Co.); *see also* Ex. C (11/7/2018 Letter from OxyChem) & Ex. D (1/30/2018 Letter from Small Parties Group).

Faced with these protests, EPA changed course to claim Mr. Batson was not conducting an NBAR under CERCLA but, instead, was acting as a neutral under the Administrative ADR Act. On September 11, 2018, EPA wrote again to the PRPs, now asserting it had "designed the allocation to be a confidential process covered by the Alternative Dispute Resolution Act [sic][3] (ADR), 5 U.S.C. § 574, conducted with the assistance of a *neutral allocator* and team of technical experts, i.e. AlterEcho."  Ex. E (9/11/2018 Letter from S. Flanagan) at 2; *see also* Ex. F (9/18/2017

---

[2] For ease of reading, unless otherwise indicated, all emphasis is added and internal citations are omitted.

[3] The statute EPA cited, 5 U.S.C. §§ 571 et seq., codifies "the Administrative Dispute Resolution Act of 1996," not the "Alternative Dispute Resolution Act of 1998," a different statute codified at 28 U.S.C. §§ 652 et seq.  Because the Alternative Dispute Resolution Act applies only in federal courts, not administrative agencies, OxyChem assumes EPA intended to invoke the statute it cited, rather than the Act it named.  As used in this letter, the term "Administrative ADR Act" refers to the statute EPA cited and invoked to conduct the Batson Allocation.

The Honorable Todd Sunhwae Kim
and Ms. Laura Rowley
August 14, 2023

Letter from E. Wilson) at 2 ("To perform the allocation, EPA has retained AlterEcho and its senior allocation specialist, Mr. David Batson, Esq., through the Agency's prime contract with CSRA.")[4]; *Alden Leeds* Dkt. No. 84-1 (Declaration of Alice Yeh) ("Yeh Decl.") at ¶21.[5]  Mr. Batson's allocation report makes the same claim, asserting the "Allocation was conducted as an alternative dispute resolution (ADR) process pursuant to the provisions of the ADR Act of 1996, 5 USC 571, et seq., and relevant state authorities."[6]

### 1.    OxyChem's FOIA Requests Leading to the 2023 FOIA Responses

OxyChem issued two FOIA Requests to DOJ that led to the 2023 FOIA Responses.

- First, on **December 12, 2022**, based on the work plan ultimately attached to the Batson Allocation, OxyChem sought documents related to "the Department of Justice's retention in 2016 of David Batson of Techlaw… as referenced at page 2 of the Task Order titled 'Diamond Alkali-Lower Passaic River Allocation' and dated June 27, 2019 . . . and amounts paid by DOJ to Techlaw or David Batson for this retention."  *See* Ex. G (1/26/2023 Letter from DOJ) at 1 (regarding FOIA No. 2023-06019).  After OxyChem "agreed to first receive [DOJ's] official contracting documents," *id.*, DOJ produced 13 pages of documents on January 26, 2023.  *Id.*

- Second, on **April 28, 2023**. OxyChem sought "all confidentiality agreements entered into at any time between the U.S. Department of Justice and Mr. David C. Batson, with Mr. Batson acting in any capacity, including, without limitation, Mediation Specialist, Senior ADR Specialist, Deputy Dispute Resolution Specialist, Senior Collaboration & ADR Specialist, ADR Counsel, and Expert Witness."  *See* Ex. H (6/27/2023 Letter from DOJ) at 1 (regarding FOIA No. 2023-06154).  DOJ responded on June 27, 2023, by producing a single document—an April 1, 2016 expert witness confidentiality agreement with Mr. Batson.

---

[4] Brian Donohue, a lawyer for the Department of Justice whom the 2023 FOIA Responses revealed had retained Mr. Batson in 2016 not as an ADR neutral—but rather as an expert witness for the United States in *Chemical Land*—was copied on all three EPA letters, raising further questions about why Mr. Batson's adverse, expert witness conflicting interest was not disclosed to all parties from the outset. *See* Ex. A (3/30/2017 Letter from E. Wilson) at 2; Ex. F (9/18/2017 Letter from E. Wilson) at 2; Ex. E (9/11/2018 Letter from S. Flanagan) at 3.

[5] The United States reiterated that claim in court.  *See Alden Leeds* Dkt. No. 119-1 (United States Sur-Reply to OxyChem's Motion to Intervene) at 5 n.4 ("Contrary to OxyChem's assertions, the Allocation Recommendation Report is not a nonbinding preliminary allocation of responsibility (a.k.a. 'NBAR') as that term is used in Section 122(e)(3) of CERCLA.").

[6] Batson Report at 18.

The Honorable Todd Sunhwae Kim
and Ms. Laura Rowley
August 14, 2023

### 2. The 2023 FOIA Responses Show That Mr. Batson Could Not Have Served as a Neutral Under the Administrative ADR Act

EPA admits the Batson Allocation is the sole basis for the proposed settlement it lodged with the Court in *Alden Leeds*,[7] a settlement for which EPA solicited public comment at 88 Fed. Reg. 2133.[8]  Essential to EPA's thesis that it can rely on and use the Batson Allocation is its claim that Mr. Batson was a "neutral" and "third party" allocator under the ADR Act.

The 2023 FOIA Responses show Mr. Batson was neither neutral nor a third party to the United States. Mr. Batson had disabling conflicts of interest, none of which EPA disclosed as the Administrative ADR Act mandates. The agency thus acted unlawfully by retaining Mr. Batson to serve as an alleged "neutral" to conduct the allocation.

We begin with a review of EPA's initial claims that Mr. Batson was "neutral" followed by a discussion of the new, contradictory information provided in the 2023 FOIA Responses.

### a. EPA Repeatedly Claimed Mr. Batson Was a "Neutral" Under the Administrative ADR Act

OxyChem's 2022 and 2023 FOIA requests were not the first time it sought information about Mr. Batson's scope of work, the contracts under which EPA employed him, and his expected approach.[9]  OxyChem also sought this information in 2019 and 2021.  When EPA responded to OxyChem's earlier requests, it withheld key information about Mr. Batson's conflicts and represented falsely that Mr. Batson was an entirely neutral mediator/allocator as to OxyChem.

According to an "Allocator Work Plan" produced by EPA, "In 2016, the Department of Justice retained a *mediator/allocation specialist*, David Batson of TechLaw/AlterEcho, to assist in

---

[7] *See* Yeh Decl. at ¶21; *see also Alden Leeds* Dkt. No. 119-1 (United States Sur-Reply to OxyChem Motion to Intervene) at 5 ("both [Federal Register] notices state that the proposed settlement is based on an Allocation Recommendation Report").

[8] *See Notice of Lodging of Proposed Consent Decree Under the Comprehensive Environmental Response, Compensation, and Liability Act*, 88 Fed. Reg. 2133, 2133 (Jan. 12, 2023) ("Fed. Register Notice") (soliciting public comments and stating, "*Based on the results of the allocation*, the United States concluded that the Settling Defendants, individually and collectively, are responsible for a minor share of the response costs . . . .").

[9] *See, e.g.,* Ex. I (Confirmation of 7/26/2019 FOIA Request by OxyChem (EPA-R2-2019-007617)) (asking for "[a]ny amendments, changes, or revisions to the Revised Work Plan attached to this request" ); Ex. J (Confirmation of 12/5/2019 FOIA Request by OxyChem (EPA-R2-2020-001533)) ("All documents and communications shared between EPA and any representative of TechLaw/AlterEcho concerning additional revisions to the Revised Work Plan for Contract # EP-W-14-020 as revised on May 31, 2019 . . . ."); Ex. K (Confirmation of 5/27/2021 Modified FOIA Request by OxyChem (EPA-R2-2021-002471, originally submitted 2/5/2021)) (seeking *inter alia* "[a]ll documents and communications shared between EPA and any representative of ERG and/or AlterEcho concerning the Final Allocation Recommendation Report or any drafts thereof").

The Honorable Todd Sunhwae Kim
and Ms. Laura Rowley
August 14, 2023

settlement analysis."[10]  That work plan represented that, "Based on our review and understanding of the legal requirements of this work, CSRA certifies that no real, apparent, or potential organizational *or individual conflict of interest exists with this assignment*, based on previous or ongoing work or other potential conflicts."  Ex. L (Task Order 96) at 20, § 8.0.  The period for performance under that task order, by its terms, ran "through June 15, 2019."  *Id.* at 21, § 11.0.

In each revised work plan, EPA reiterated the same claims that Mr. Batson was a "mediation/allocation specialist" and had *no* conflicts of interest.[11]  A "revised" work plan shows that Mr. Batson's "allocation" work plan was first submitted on June 30, 2017, revised in March 2018, and submitted again on May 31, 2019, without any change to the representation that Mr. Batson had no conflicts of interest.[12]  And then again, on September 3, 2019, EPA submitted a work plan which asserted Mr. Batson would approach the allocation according "to the established norms and ethical standards of ADR professionals."[13]  Another version of the task order from around the same time period, which certain settling defendants filed with the Court, made the same representations; namely, that Mr. Batson was a neutral allocator, would conform to the ethics of ADR Professionals, and had no individual conflict of interest as to the assignment.[14]

Finally, on July 28, 2020, EPA modified the Task Order "to improve the managerial oversight of the project schedule," again describing Mr. Batson's task as to "*provide neutral, unbiased support for development of an allocation for potentially responsible parties (PRPs) at the Diamond Alkali Superfund Site in New Jersey*. . . . This Task Order continues the allocation work started under Contract EP-W-14-020, Task Order 96."[15]

---

[10] *See* Ex. L (Public Version, Work Plan EPA Conflict Prevention and Resolution Services Contract, Contract #EP-W-14-020 Work Plan for Task Order #096 Diamond Alkali-Lower Passaic River Allocation) ("Task Order 96") at 3.  The Task Order reinforced the representation that Mr. Batson was and would be neutral by ostensibly mandating that he and his team "will also *not take a stand on the merits of substantive items under discussion*, including but not limited to, any substantive issues raised by OU2 PRPs," would "approach this task in accordance with the basic terms of the contract and *according to the established norms and ethical standards of ADR professionals*," and that the "work pursuant to the Task Order will be maintained as confidential by the ADR professional pursuant to the provisions of the ADR Act of 1996 (Public Law 104-320; 5 U.S.C. 571 et al.) and applicable federal, state and judicial requirements."  *Id.* at 4-5.  These documents were retrieved online in response to FOIA Request EPA-R2-2018-004579, which OxyChem did not submit, *see* https://foiaonline.gov/foiaonline/action/public/search/quickSearch.

[11] *See, e.g.*, Ex. M (Task Order 96, Rev. May 31, 2019) at 3-5 (regarding neutrality and requirement to conform to the norms of the Administrative ADR Act and alternative dispute resolution professionals).

[12] *See* Ex. M (Revised Work Plan, submitted May 31, 2019) at 1.

[13] *See* Ex. N (Redacted 9/20/2019 ERG "Revised Work Plan and Pricing Estimate for Task Order Request #013, Diamond Alkali-Lower Passaic River Allocation," originally submitted September 3, 2019) at 10.

[14] *See* Dkt. No. 370-5, filed October 24, 2018, in *Occidental Chemical Company v. 21st Century Fox et al.*, Case No. 2:18-cv-11273 in the United States District Court for the District of New Jersey, at 4-5 and Section 8.0 (July 23, 2019 Revised Work Plan for Task Order #96 making the same representations that Mr. Batson was acting as a neutral, would conform to the ethics of ADR professionals, and had no personal conflicts of interest).

[15] *See* Ex. O (7/28/2020 EPA memorandum and request for task order modification) at 1.

The Honorable Todd Sunhwae Kim
and Ms. Laura Rowley
August 14, 2023

      **b. In 2023, EPA Provided FOIA Responses Revealing That Mr. Batson Had
Multiple, Disabling Conflicts of Interest in the *Chemical Land* Case Where
He Was Retained as an Expert Witness and as to the Allocation**

In the 2023 FOIA Responses, EPA produced for the first time previously withheld
documents from the 2016-2020 period when Mr. Batson was purportedly acting as a neutral
allocator. These newly-produced documents reveal that EPA and DOJ did *not* engage Mr. Batson
in 2016 as an ADR neutral, as EPA's letters to PRPs and the Task Order 96 work plans claimed.

Instead, beginning on April 1, 2016, and continuing at all times pertinent to his
"allocation," Mr. Batson was retained by DOJ and EPA to serve as an "expert witness" for the
United States in a matter adverse to OxyChem.

In June of 2023, EPA's supplemental FOIA response included a confidentiality agreement
in which Mr. Batson agreed to serve as an "expert witness" for the DOJ in DJ# 90-11-3-0768311.[16]
The relevant excerpt from this document is below:



A related document, produced by EPA for the first time in a January 2023 FOIA response,
confirms that the DOJ engaged Mr. Batson in April 2016 *not* as a neutral, but instead as an "expert
witness" for the United States, contains the same DJ File number and indicates the following case
name: *United States v. Chemical Land Holdings, LLC*, a case filed by the United States *against*
OxyChem. *See* Ex. G (1/26/2023 Letter from DOJ regarding FOIA No. 2023-06019) at 3
(4/12/2016 Contract/Purchase Order, attached to letter), excerpted below:

---

[16] *See* Ex. H (6/27/2023 Letter from DOJ regarding FOIA No. 2023-06154) at 3 (2016 D. Batson
Confidentiality Agreement, attached to letter).

The Honorable Todd Sunhwae Kim
and Ms. Laura Rowley
August 14, 2023

**Attachment to Exhibit G: United States' Engagement of David Batson To Provide "Expert Testimony on Behalf of U.S." in "U.S. v. Chemical Land Holdings"**



DOJ's reference to *Chemical Land Holdings* fails to mention that the lead defendant in "*United States v. Chemical Land Holdings*" is OxyChem:[17]

---

[17] Ex. P, C.A. No. 89-5025, *United States v. Occidental Chem. Corp., Chemical Land Holdings, Inc.* (Complaint of the United States against OxyChem and related Consent Decree). Though *Chemical Land* is closed on the court docket, the consent decree imposes continuing performance obligations on OxyChem over which the Court retains continuing jurisdiction. *See id.* Art. XXXIV at pg. 79 ("Continuing Jurisdiction. This Court retains jurisdiction over both the subject matter of this Consent Decree and over all Parties for the duration of the performance of the terms and provisions of this Consent Decree for the purposes of issuing such further orders or directions as may be necessary or appropriate to construe or modify the terms of this Decree, or to effectuate compliance with its terms, to the extent allowed by law.").

The Honorable Todd Sunhwae Kim
and Ms. Laura Rowley
August 14, 2023

As shown by the caption, when EPA and DOJ retained Mr. Batson in 2016 as an expert witness in the *Chemical Land* case to "assist in settlement analysis" of the United States' claims, both agencies knew the government's claims (and its interests) in that case *were adverse to OxyChem*. The United States *sued* OxyChem in *Chemical Land*, Ex. P, asserting OxyChem was liable to the United States under CERCLA Sections 106 and 107 and was obliged to perform response work at the Diamond Alkali Superfund Site—the same site now at issue in the pending consent decree in *Alden Leeds*.

These documents refute any argument that Mr. Batson—retained in 2016 as an expert witness for the United States in *Chemical Land*—was "neutral" on the question of OxyChem's liability for response costs in the Diamond Alkali Superfund Site. Indeed, the judgment in the *Chemical Land* case imposes significant and *ongoing* remedial and monitoring responsibilities on OxyChem, *see id.* at Paragraph D (providing that OCC would contract to perform the work required by the decree); *see also id.* Paragraph V, B, 1 ("OCC shall design, implement, and complete the Work in accordance with the provisions of the National Contingency Plan…"),[18] obligations that remain in effect, even after the initial remedial construction was completed. *See id.* ¶12 (requiring OxyChem to "Implement suitable monitoring, contingency, operation and maintenance, …during the Remedial Construction *and after completion of the Remedial Construction*.").

In sum, in 2016, the United States engaged Mr. Batson as an expert witness in a matter involving the Diamond Alkali Superfund Site in which the interests of the United States are, and remain, directly *adverse to OxyChem*. It continued to engage him in the same capacity throughout the "allocation" he was engaged to conduct. Mr. Batson was in no way a "neutral" in *any matter involving the Passaic River and the Diamond Alkali Superfund Site*, or on the question of OxyChem's alleged liability.

### c. The DJ File Number Used by DOJ for Mr. Batson's Engagement Links Mr. Batson's Work as an Expert Witness to His Work as a Purported "Neutral" Allocator

DOJ used the same DJ File number on the form engaging Mr. Batson as an expert witness against OxyChem in the *Chemical Land* matter that it used for the allocation engagement and the public comment on the proposed settlement in *Alden Leeds*. In other words, in the exact same file, Mr. Batson was retained as an expert witness for the United States in a case *against* OxyChem and purported to perform work as a neutral to assign a share of liability *to* OxyChem in the allocation that is the sole support for the settlement EPA submitted for public comment in *Alden Leeds*. It would be disqualifying for Mr. Batson to work as a neutral in any matter *related to* one in which he had served as an expert witness for the United States. Here, his conflicted work was performed in the *exact same DJ File number*.

---

[18] Section III, B provides that "CLH [Chemical Land Holdings] is a party to this Consent Decree for a specific, limited purpose. CLH shall allow access to the Site as provided …and shall abide by the agreements on conveyance and use of this property."

The Honorable Todd Sunhwae Kim
and Ms. Laura Rowley
August 14, 2023

Specifically, the same DJ File No. 90-11-3-07683/1 appears in all of the following documents:

1. Mr. Batson's **April 1, 2016**, confidentiality agreement (Ex. H at 3) where he agreed to serve as an expert witness, produced in the June 2023 FOIA Response:



2. The **April 12, 2016,** DOJ document engaging Mr. Batson to serve as an expert witness to provide expert testimony on behalf of the United States *against* OxyChem in *Chemical Land* (Ex. G at 3), produced for the first time in the January 2023 FOIA Responses:



The Honorable Todd Sunhwae Kim
and Ms. Laura Rowley
August 14, 2023

3. The **July 24, 2018** renewal by DOJ of Mr. Batson's engagement as an *expert witness* against OxyChem in *Chemical Land* (Ex. G at 15), also produced for the first time in January of 2023.



The Honorable Todd Sunhwae Kim
and Ms. Laura Rowley
August 14, 2023

Finally, removing all doubt that Mr. Batson's conflicted engagement as an expert witness *was* in the same matter where he was performing the allegedly (but not actually) neutral allocation, the identical DJ Ref. Number appears in the Federal Register Notice inviting public comment on the settlement based on the Batson Allocation Report.[19]

**DEPARTMENT OF JUSTICE**

**Notice of Lodging of Proposed Consent Decree Under the Comprehensive Environmental Response, Compensation, and Liability Act**

On December 16, 2022, the Department of Justice lodged a proposed Consent Decree with the United States District Court for the District of New Jersey in *United States* v. *Alden Leeds, Inc., et al.,* Civil Action No. 2:22–cv– 07326. The proposed Consent Decree resolves the United States' claim against 85 defendants under section 107(a) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. 9607(a), relating to Operable Unit 2 and Operable Unit 4 of the Diamond Alkali Superfund Site ("Site") in New Jersey.

On December 22, 2022, the Department of Justice published a notice in the **Federal Register** opening a public comment period on the consent decree for a period of forty-five (45) days. 87 FR 78711. By this notice, the Department of Justice is extending the public comment by an additional forty-five (45) days, through March 22, 2023. Comments should be addressed to the Assistant Attorney General, Environment and Natural Resources Division, and should refer to *United States* v. *Alden Leeds, Inc., et al.,* Civil Action No. 2:22–cv– 07326, D.J. Ref. No. 90–11–3–07683/1. All comments must be submitted no later than March 22, 2023. Comments may be submitted either by email or by mail:

> ### d.  EPA Multiplied Mr. Batson's Conflicts by Also Requiring Him, Without Disclosure to OxyChem, to "Fairly Represent" OxyChem in the Allocation

Mr. Batson's conflicts began when he was engaged as an expert involving claims by the United States *against* OxyChem while concurrently acting as a neutral to "assign shares" of liability *to* OxyChem. But they did not end there.

In a September 2019 revised work plan EPA revealed it had expanded Mr. Batson's "expert witness" engagement to include another conflicted role.[20]  Now, EPA mandated—and Mr. Batson agreed—that while acting as an expert for the United States against OxyChem, he would also "fairly represent" OxyChem's interests in his work to assign liability *to* OxyChem in the allocation. The work plan excerpt reflecting this addition of yet another conflict to his work is below:

---

[19] *See* Fed. Register Notice at 2133.

[20] *See* Ex. Q (ERG Work Plan for period of "Task Order Issuance to October 30, 2020," as attached to Batson Report).

The Honorable Todd Sunhwae Kim
and Ms. Laura Rowley
August 14, 2023

> **ERG's Understanding of the Work**
>
> ERG's work plan reflects our team's understanding of what work has already been completed on this allocation project and what work remains to be done. As the project has evolved, some key numbers and factors have changed, such that this estimate may differ from previous projections regarding the level of effort needed to complete the tasks envisioned in the SOW. Specific factors that have evolved include:
>
> - There has been an increase in the number of facilities that must be calculated an equitable share, from 83 to 92 (+11%).
> - Occidental (OCC) not being a participating party as had been anticipated and OCC filing a lawsuit against PAPs have substantially increased the level of effort required of the Allocation Team, which will spend additional resources to ensure that OCC is fairly represented in the allocation process, and complicates communications and other considerations regarding maintaining confidentiality.

Mr. Batson's expanded and conflicted engagement—allegedly to now "fairly represent" OxyChem—was revealed to OxyChem when the United States lodged the proposed settlement in *Alden Leeds* and included the revised work order as an attachment to the Batson Report.[21] This conflict was never disclosed to OxyChem. And OxyChem never agreed the United States' expert against it in a continuing consent decree against it could "assign shares" of liability to it for the claims the government made in that case.

There is no doubt these matters are all linked and all tainted by Mr. Batson's multiple conflicts of interest. On July 28, 2020, EPA again expanded the scope of Mr. Batson's existing engagement in a task modification order that refers back to the same, underlying task order, Task Plan 96. *See* Ex. O (7/28/2020 EPA memorandum and request for task order modification) at 1. This agreement mandates explicitly that Mr. Batson adhere to "Alternative Dispute Resolution (ADR) Best Practices" and observe an Ethical Code of Conduct to ensure his neutrality[22]—an impossible standard given that he was concurrently serving as an expert witness for the United States in a case *against* OxyChem. The relevant ethical provisions, which EPA knew Mr. Batson could not observe given his disabling conflicts, are excerpted below.

> A. Alternative Dispute Resolution (ADR) Best Practices:
> The Contractor shall approach this task in accordance with terms of the basic contract and according to the established norms and ethical standards of ADR professionals. Based on EPA's evaluation of a large number of ADR cases, the Agency has determined that the following practices are significantly related to positive substantive, relational, and procedural outcomes from ADR cases. The contractor shall ensure that this direction is provided to ADR professionals providing services under this task order:

---

[21] The referenced work plan is Attachment E to the Batson Report, which was released on the same day that the proposed decree was lodged.

[22] *Id.* at 7.

The Honorable Todd Sunhwae Kim
and Ms. Laura Rowley
August 14, 2023

---

B. Ethical Codes of Conduct:
   The Contractor shall ensure that ADR professionals serving as neutral third parties under
   this contract receive information about and perform in accordance with ethical codes
   applicable to the practice of dispute resolution professionals.  Relevant examples of
   ethical codes include those adopted by the American Arbitration Association, American
   Bar Association, Association for Conflict Resolution:
   https://www.americanbar.org/groups/dispute_resolution/resources/Ethics/

---

**e.  Mr. Batson's Work as an Expert Witness Adverse to OxyChem in *Chemical Land* Disqualified Him from Serving as a "Neutral" Under the Administrative ADR Act**

Even if the Administrative ADR Act were available to EPA as a basis for convening and relying on the Batson Allocation (under CERCLA Section 122, it is not), the 2023 FOIA Responses show EPA violated the Administrative ADR Act.  EPA's actions are unlawful, "in excess of [its] statutory jurisdiction, authority or limitations," and "without observance of procedure required by law," 5 U.S.C. § 706(2)(A) and (D), and are otherwise "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  *Id.* at § 706(2)(C).

Section 573 of the Administrative ADR Act states that, "A neutral shall have no official, financial, or personal conflict of interest with respect to the issues in controversy, unless such interest is fully disclosed in writing to all parties and all parties agree that a neutral may serve."

Given Mr. Batson's conflicts of interest, which were known to EPA and DOJ at the time, it was unlawful for EPA to engage him to convene and conduct the Batson Allocation.  It would also be unlawful for EPA to use it for any purpose and would additionally be arbitrary and capricious for EPA to rely in any way on the Batson Allocation, whether under the Administrative ADR Act or otherwise.

**First**, Mr. Batson was not a "neutral" under Administrative ADR Act § 573(a).  The 2023 FOIA Responses show he had multiple undisclosed and disabling conflicts of interests with OxyChem.  The 2023 Responses also show EPA's earlier representations to OxyChem that Mr. Batson was a "third party" and "neutral" as to OxyChem were materially false.

- EPA's letters represented to OxyChem that EPA had engaged Mr. Batson as a third party "neutral" under the Administrative ADR Act.

  - The 2023 FOIA Responses show DOJ engaged Mr. Batson as an expert witness in a continuing consent decree against OxyChem in *Chemical Land* and *not* as a neutral.

13

The Honorable Todd Sunhwae Kim
and Ms. Laura Rowley
August 14, 2023

- o Further, while the forms DOJ used to engage Mr. Batson in *Chemical Land* included an option to engage Mr. Batson as an "ADR Neutral," **DOJ affirmatively chose not to engage Mr. Batson in that capacity.**

- o **Instead, each time, when presented with the same choice, DOJ engaged Mr. Batson as an expert witness on behalf of the United States in *Chemical Land*, the pending case against OxyChem, and did not engage him as an ADR Neutral.**

- The 2023 FOIA Responses also reveal the United States engaged Mr. Batson to serve as an "expert witness" in the *Chemical Land* case *against OxyChem* beginning in 2016, *before* EPA made its 2017 announcement that it was engaging him to perform the purportedly neutral allocation at issue now in the *Alden Leeds* settlement.

- EPA continued to engage Mr. Batson as *an expert witness* throughout the period he was performing the purportedly neutral allocation. The 2023 FOIA Responses confirm Mr. Batson's "allocation work" spanned the entire period in which he was engaged by DOJ *not* as an ADR Neutral, but rather as an expert witness in a matter adverse to OxyChem, *Chemical Land.*

- EPA then provided repeated FOIA Responses to OxyChem that failed to disclose the facts about Mr. Batson's conflicts. In every FOIA Response until 2023, EPA withheld information about Mr. Batson's employment as the United States' expert in *Chemical Land*, instead producing only the documents that described him—falsely—as a "neutral" and represented that he had no personal conflicts of interest in the matter.

EPA cannot both retain Mr. Batson as an expert witness for the United States *against* OxyChem, while directing him to "assign shares" of liability *to* OxyChem as a purported "neutral." Here, EPA's actions in excess of its authority are made worse by EPA having failed to disclose the conflict to OxyChem in the FOIA responses it provided to OxyChem *for years*.

**Second**, EPA's failure to disclose in writing Mr. Batson's multiple "official, financial, and personal conflicts of interest with respect to the issues in controversy" violated Administrative ADR Act § 573(a). The repeated misrepresentations to OxyChem that Mr. Batson had *no* personal conflicts of interest in correspondence and work plans provided to OxyChem, when Mr. Batson was concurrently retained as an expert witness in *Chemical Land*, a case against OxyChem, were unlawful. Mr. Batson was engaged and repeatedly re-engaged by EPA/DOJ as an expert witness, and pointedly was *not* engaged as a neutral, all while EPA failed to disclose that information to OxyChem and asserted (falsely) that he was a neutral and had no conflict of interest.

**Third**, Mr. Batson's now-revealed concurrent service as an expert witness for the United States in a consent decree arising from the United States' claims *against* OxyChem, while purportedly allocating the liability *of* OxyChem to the United States as a purported neutral is a disqualifying conflict of interest. It violated Task Plan 96 and later work order versions, which all required Mr. Batson to be free of any personal or financial conflicts of interest. It also violated

The Honorable Todd Sunhwae Kim
and Ms. Laura Rowley
August 14, 2023

New Jersey Rules of Professional Conduct ("NJRPC") 1.12, governing the subsequent employment of ADR neutrals, and NJRPC 1.7, which prohibits a lawyer from accepting an engagement where "there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibility to another client...." The ethical rules in Maryland and North Carolina, where Mr. Batson is licensed to practice law, are similar. *See* Maryland Attorneys' Rules of Professional Conduct Rule 19-301.7(a)(2) (same); North Carolina Rules of Professional Conduct (prohibiting employment in a case where "the representation of one or more clients may be materially limited by the lawyer's responsibilities to another client…."). Finally, it also violated ethical rules for mediators, which EPA incorporated into Mr. Batson's contracts in Task 96, including Model Standard III.[23] *See also CEATS, Inc. v. Continental Airlines, Inc.*, 755 F.3d 1356, 1362 (Fed. Cir. 2014) ("Because parties arguably have a more intimate relationship with mediators than with judges, it is critical that potential mediators not project any reasonable hint of bias or partiality. Indeed, all mediation standards *require* the mediator to disclose any facts or circumstances that even *reasonably* create a presumption of bias.") (emphasis in original) (citing Am. Bar Ass'n Model Standards of Conduct for Mediators § III.C (2005)).

Here, Mr. Batson's conflict was even worse. He is both a lawyer bound by the ethical rules of the profession and purportedly acting as a mediator bound by the "norms" of "ADR professionals." *See* Ex. L (Task Order 96) at pp. 4-5 and Section 8.0. No rule of professional responsibility, no provision of the Administrative ADR Act, and no provision of Task Order 96 permitted Mr. Batson to secretly—and *without full disclosure or OxyChem's consent*—agree to "represent" OxyChem's interest in a supposedly neutral dispute resolution proceeding he was conducting in which OxyChem had declined to participate. There is also no *ethical* circumstance in which *a lawyer* like Mr. Batson (who undertook an obligation to *represent* OxyChem's interest) could permissibly have allowed the settling parties to dictate the information he would consider, allowed them to submit *ex parte* expert reports[24] about OxyChem (without any notice to OxyChem), or allowed those adverse parties to edit *and anonymize* comments to his report,[25] all of which Mr. Batson did—at EPA's behest.

---

[23] "A mediator shall avoid a conflict of interest or the appearance of a conflict of interest during and after a mediation. A conflict of interest can arise from involvement by a mediator with the subject matter of the dispute or from any relationship between a mediator and any mediation participant, whether past or present, personal or professional, that reasonably raises a question of the mediator's impartiality." *See also* III(C) (requiring mediator disclosure of all actual and potential conflicts known to the mediator) and III(D) (requiring withdrawal if a conflict on the part of the mediator would undermine the integrity of the mediation).

[24] A reference to an expert report authored by Robert Parette on page 4 of the "Occidental Chemical Corporation Facility Data Report" in Attachment J to the Batson Report recently led OxyChem to discover certain *Alden Leeds* settling defendants retained Dr. Parette to submit an expert report to Mr. Batson entitled, "Opinions on the Discharges of COCs from 80 Lister Avenue (Newark, NJ) into the Lower Passaic River." *See* Ex. R (8/3/2023 Letter from EPA re FOIA No. EPA-R2-2023-004728), Attachment at 1.

[25] *See* Ex. N (Sept. 20, 2019 EC Conflict Prevention and Resolution Services, Contract #68HERH19D0033 Revised Work Plan and Pricing Estimate for Task Order Request #013 Diamond Alkali Lower Passaic River Allocation) at Section 5, Task B (requiring Batson and allocation team to "solicit from PRPs participating in the allocation positions on the drafting of the recommendation report" and to record all "general comments regarding the draft allocation report, without attribution to individual OU2 PRP comments.")

The Honorable Todd Sunhwae Kim
and Ms. Laura Rowley
August 14, 2023

**Fourth**, EPA made OxyChem an *involuntary* party to the Batson Allocation process when it amended Mr. Batson's work plan to mandate that Mr. Batson should also "fairly represent" OxyChem's interests while purportedly acting as a neutral, while concurrently assigning liability to OxyChem, and while concurrently, and secretly, working as an expert witness in a case against OxyChem. OxyChem was not informed of these multiple conflicts in writing by EPA, as Administrative ADR Act § 573(a) requires. And OxyChem certainly did not consent to Mr. Batson's serving as a purported "neutral" despite his many undisclosed conflicts. EPA can therefore make no use of the Batson Allocation or Batson Report in any proceeding, because to do so would be unlawful under Administrative ADR Act § 574(a) and (b).

**Finally**, the 2023 FOIA Responses raise serious issues under the Ethics Reform Act. The 2023 FOIA Responses suggest EPA exceeded its authority under the Ethics Reform Act in several ways, not least by: (1) allowing a former employee to work in the private sector on a matter on which he worked while employed by EPA; (2) engaging him as an "expert witness" in that matter, in an apparent attempt to avoid the lifetime ban imposed by 18 U.S.C. § 207(a); and (3) portraying him to affected parties like OxyChem as a purported "neutral" in the same matter (thus rendering him ineligible to serve as an expert witness within the meaning of 5 C.F.R. § 2641.301(f)). The government also appears to have allowed Mr. Batson to do this while billing Mr. Batson's work to the taxpayers *not* as a neutral but rather as an expert witness.

Section 207 of the Ethics in Government Act imposes a lifetime ban on former federal employees, prohibiting them from profiting in the private sector on work they performed for the government.[26] Although working as an "expert witness" *for the United States* is an arguable exception to this ban, *see* 5 C.F.R. § 2641.301(f), as set forth in the prior section, *acting* as an expert witness for the United States *against* OxyChem, while allocating shares of liability *to* OxyChem as a purported "neutral" created another problem. If Mr. Batson was an expert witness *for* the United States, then he was not a neutral under the Administrative ADR Act; conversely, if he was a neutral, then he was not acting as an expert witness aligned with the United States.

While it appears EPA continues to withhold critical documents,[27] the limited information that has been disclosed raises serious questions about whether it was lawful for Mr. Batson to serve as a contractor to both DOJ and EPA in these circumstances. Put directly, if Mr. Batson was working as a purported neutral, but the government allowed him to bill his time as an "expert

---

[26] There is no dispute that Mr. Batson worked extensively on the Diamond Alkali Superfund Site while employed at EPA.

[27] EPA's 2023 FOIA Responses are limited. EPA's responses, for example, do not include any analysis of Ethics Reform Act requirements for either Mr. Batson or EPA itself. OxyChem is aware that a public interest group has filed a complaint with EPA's Inspector General complaining about a different aspect of Mr. Batson's obligations under the Ethics Reform Act; namely, EPA's decision to contract with him on a matter in which he worked while employed at the government. *See* Ellie Borst, *Watchdog group dings ex-EPA official in N.J. Superfund cleanup* (Apr. 4, 2023), https://subscriber.politicopro.com/article/eenews/2023/04/04/watchdog-group-dings-ex-epa-official-in-n-j-superfund-cleanup-00090382 (discussing Apr. 3, 2023 letter from Protect the Public's Trust, re: "Request for Investigation into Potential Violation by David Batson of the Lifetime Ethics Ban (18 U.S.C. § 207).").

The Honorable Todd Sunhwae Kim
and Ms. Laura Rowley
August 14, 2023

witness" to avoid what would otherwise have been a lifetime ban on his employment under the
Ethics Reform Act, then that is a serious matter. Equally serious is the government's failure to
disclose to OxyChem the highly-material fact that Mr. Batson had been engaged *not* as a neutral
but rather as an *expert witness* for the United States against OxyChem in the *Chemical Land* case.
Both facts create serious conflict issues for Mr. Batson and EPA as it pertains to the Batson
Allocation.

Government contractors can face significant consequences if they are found to have
violated the Ethics Reform Act's lifetime ban or the post-employment conflict of interest rules that
bind them. *See, e.g.*, 18 U.S.C. § 207(a)(1). Submitting invoices to the United States that
inaccurately describe work performed, while disguising or concealing a conflict of interest that
burdens that work, may also raise issues under the False Claims Act. 31 U.S.C. §§ 3729-3733; *see
also Universal Health Svcs v. United States*, 579 U.S. 176, 186-87 (2016) (applying False Claims
Act to hold, "When . . . a defendant makes representations in submitting a claim but omits its
violations of statutory, regulatory, or contractual requirements, those omissions can be a basis for
liability if they render the defendant's representations misleading with respect to the goods or
services provided.").

The information in the 2023 FOIA Responses reveals that the Batson Allocation was a
fundamentally flawed, highly-conflicted proceeding. To proceed with the settlement lodged in
*Alden Leeds*, when the sole basis for it is the profoundly conflicted Batson Allocation, would be
unlawful not only for the reasons OxyChem has already outlined in its comments on that proposed
settlement, but also because EPA's reliance on an allocation performed under serious conflicts of
interest makes the settlement procedurally unfair and a violation of due process. *See, e.g.*, *In re
Tutu Water Wells CERCLA Litig.*, 326 F.3d 201, 207 (3d Cir. 2003) (court must review proposed
CERCLA consent decree for "procedural and substantive fairness"). The fact that Mr. Batson
clearly was not neutral eliminates one of the key safeguards that courts regularly rely on when
finding a consent decree procedurally fair. *See, e.g.*, *In re Volkswagen "Clean Diesel" Mktg., Sales
Pracs., & Prod. Liab. Litig.*, No. MDL 2672 CRB (JSC), 2017 WL 2214655, at *4 (N.D. Cal. May
17, 2017) (settlement master); *Heim v. Heim*, No. 5:10-CV-03816-EJD, 2014 WL 1340063, at *6
(N.D. Cal. Apr. 2, 2014) ("neutral mediator"); *United States v. Schlumberger Tech. Corp.*, No. 11-
CV-399-JPG, 2014 WL 1304233, at *2 (S.D. Ill. Apr. 1, 2014) ("neutral third party").

Given Mr. Batson's evident conflicts of interest, his allocation—which assigned the vast
majority of potential liability to OxyChem, the party as to whom Mr. Batson was adverse and
conflicted—cannot be remotely described as procedurally fair. Nor is it consistent with CERCLA's
policies, which favor settlement only on the understanding that settlements will be reached in a
manner that is fair to all the affected parties rather than through a conflicted process. Nor is it
consistent with the basic constitutional guarantee of due process, which "demands impartiality on
the part of those who function in judicial or quasi-judicial capacities." *Schweiker v. McClure*, 456
U.S. 188, 195 (1982); *see Gibson v. Berryhill*, 411 U.S. 564, 579 (1973) (recognizing that "[m]ost
of the law concerning disqualification because of interest applies with equal force to . . .
administrative adjudicators"). Because Mr. Batson was hired to "serve[] as both accuser and
adjudicator," his allocation reflects "an unconstitutional potential for bias" and cannot be the basis
for any procedurally fair and constitutionally valid settlement. *Williams v. Pennsylvania*, 579 U.S.
1, 8 (2016).

17

The Honorable Todd Sunhwae Kim
and Ms. Laura Rowley
August 14, 2023

For all these reasons, EPA should withdraw from the settlement in its entirety. It would be seriously unlawful for EPA to proceed with its proposed settlement in light of the grave conflicts of Mr. Batson that have come to light in EPA's delayed 2023 FOIA Responses. OxyChem further submits that EPA must include this letter in the administrative record in any proceeding related to these issues, including the pending settlement lodged with the court in *United States v. Alden Leeds, Inc., et al.*, Civil Action No. 2:22-cv-07326-MCA-LDW, in the United States District Court for the District of New Jersey ("*Alden Leeds*").

OxyChem reserves its right to demand discovery in *Alden Leeds* regarding these issues, as the matters addressed herein concern serious, previously undisclosed, and disabling conflicts of interest on Mr. Batson's part. OxyChem also reserves all other rights arising from the prejudice and injuries to OxyChem as a result of the undisclosed conflicts of interest set forth above.

Sincerely,

Kathy D. Patrick

Cc:
Ms. Erin Murphy
Mr. Harker Rhodes
Ms. Melissa Hunt
Ms. Stacy Neal

18

# Exhibit A

 **UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**

REGION II

290 BROADWAY

NEW YORK, NEW YORK 10007-1866

MAR 3 0 2017;

BY CERTIFIED MAIL,
RETURN RECEIPT REQUESTED & ELECTRONIC MAIL

To:    See List of Addressees – Attachment A

Re:    Diamond Alkali Superfund Site, Lower 8.3 Miles of Lower Passaic River,
Essex and Hudson Counties, New Jersey

Notice regarding Next Steps Including Initial Cash Out Settlement

The United States Environmental Protection Agency ("EPA") has documented the release and threatened release of hazardous substances, pollutants and contaminants at the Diamond Alkali Site ("Site") in Essex, Bergen, Hudson and Passaic Counties, New Jersey. The Site includes the former Diamond Alkali facility at 80-120 Lister Avenue, Newark, New Jersey, the Lower Passaic River Study Area ("LPRSA"), the Newark Bay Study Area, and the areal extent of contamination.

The Site was placed on the National Priorities List ("NPL") in 1984. In 1987, EPA issued a Record of Decision for Operable Unit 1 ("OU1"), the former Diamond Alkali facility at 80-120 Lister Avenue, Newark, New Jersey. On March 3, 2016, EPA issued a ROD for Operable Unit 2 ("OU2"), the lower 8.3 miles of the Lower Passaic River. Currently, remedial investigation/feasibility studies are being conducted for the 17-mile LPRSA and the Newark Bay Study Area.

The OU2 ROD was issued by EPA to address human health and environmental risks posed by contaminated sediments found in the lower 8.3 miles of the Lower Passaic River, an area from the river's confluence with Newark Bay to River Mile 8.3 near the border between the City of Newark and Belleville Township, New Jersey. The OU2 ROD calls for, among other things, the construction of an engineered cap bank to bank over the river bottom of the lower 8.3 miles of the river, dredging of the river bottom prior to placement of the cap, and implementation of institutional controls designed to protect the engineered cap.

On March 31, 2016, EPA notified each Addressee that it may be a potentially responsible party under Section 107(a) of the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended ("CERCLA"), 42 U.S.C. § 9607(a), with respect to OU2 for the Site. That letter also notified the recipients that EPA intended to: a) negotiate a settlement with Occidental Chemical Corporation ("OCC") for OCC's performance of the remedial design
for the remedy selected in the OU2 ROD; b) negotiate a remedial action consent decree under which OCC and other major parties will implement and pay for the remedy selected in the OU2 ROD; and c) identify parties that may be eligible for a cash out settlement with EPA for the lower 8.3 miles of the Lower Passaic River.

On September 30, 2016, EPA and OCC entered into Administrative Settlement Agreement and Order on Consent for Remedial Design, CERCLA Docket No. 02-2016-2021, for OCC's performance of the remedial design selected in the OU2 ROD, under EPA oversight.

**NEXT STEPS**

As of the date of this letter, EPA is notifying 20 parties that EPA has identified them as candidates for early cash out settlements. The 20 parties are listed in the enclosure to this letter. EPA has identified for immediate settlement those parties that are not associated with a disposal or release of any of the contaminants of concern ("COCs") for OU2, as identified in the OU2 ROD.

Parties that are responsible for the release or discharge of dioxins, furans, or polychlorinated biphenyls ("PCBs") into the Lower Passaic River should participate in implementing or funding the remedy selected for the lower 8.3 miles of the Lower Passaic River. EPA will provide notice to those parties shortly, as well as an opportunity to meet with EPA to discuss their status.

For parties that are not one of the 20 early cash out parties and are also not associated with the release of dioxins, furans, or PCBs into the Lower Passaic River, a cash out settlement might be appropriate. This determination requires additional complex settlement analysis. EPA expects to use the services of a third party allocator before extending cash out settlement offers to any such party. In a subsequent letter, EPA will identify the parties that should be part of the allocation process. There will be a future opportunity for OU2 PRPs to offer input on the factors that they think should be considered in the allocation process, and to provide feedback on the overall design of the allocation process.

If you have any questions regarding this letter, you may contact Juan Fajardo via email at fajardo.juan@epa.gov or by phone at (212) 637-3132.

We look forward to working with you.

Sincerely yours,

Eric J. Wilson
Deputy Director for Enforcement and Homeland Security
Emergency and Remedial Response Division

Enclosure:  List of Early Cash Out Parties

cc:  Brian Donohue, Esq., USDOJ
     Mark Barash, Esq., USDOI
     Kate Barfield, Esq., NOAA
     John Dickinson, Esq., New Jersey Attorney General's Office

2

**Attachment A - List of Addressees**

**Diamond Alkali Superfund Site**
**Lower 8.3 Miles - Passaic River**
**Notice of Next Steps**

| Company | Contact Information | Facility |
|---|---|---|
| A.E. Staley Manufacturing Co., Inc. 2200 E. Eldorado Street Decatur, IL 62521-1578  Now Tate & Lyle Ingredients Americas LLC | John R. Holsinger, Esq. Two University Plaza, Suite 300 Hackensack, NJ 07601 201-487-9000 (T) johnh@jrholsinger.com  Heidi R. Balsley, Esquire Corporate Counsel A.E. Staley Manufacturing Co., Inc. 2200 E. Eldorado Street Decatur, IL 62521 Heidi.Balsley@tateandlyle.com | 320 Schuyler Avenue and 100 Third Avenue Kearny, NJ |
| Alcan Corporation Two Alliance Center 3560 Lenox Rd Atlanta, GA 30326  Now Novelis Corp. | John Tillman, Esq. North American Regional Counsel Novelis Corporation Two Alliance Center 3560 Lenox Rd Atlanta, GA 30326 404-760-4049 (T) John.tillman@novelis.com | Jacobus Ave. Kearny, NJ |
| Alden Leeds Inc. 55 Jacobus Ave. Kearny, NJ 07032 | Mark Epstein, President Alden Leeds Inc. 55 Jacobus Ave. Kearny, NJ 07032  Joseph Fiorenzo, Esq. Sills Cummis & Gross The Legal Center One Riverfront Plaza Newark, NJ 07102 973-643-7000 (T) jfiorenzo@sillscummis.com | 2145 McCarter Highway Newark, NJ  55 Jacobus Avenue Kearny, NJ |
| Alliance Chemical, Inc. Linden Avenue Ridgefield, NJ 07657 | Fredi Pearlmutter, Esq. Lindabury, McCormick, Estabrook & Cooper, P.C. 53 Cardinal Drive Box 2369 Westfield, NJ 07091 908-233-6800 (T) fpearlmutter@lindabury.com | 33 Avenue P Newark, NJ |

| | | |
|---|---|---|
| American Ref-Fuel Co.<br>155 Chestnut Ridge Road<br>Montvale, NJ 07645<br><br>Now Covanta Essex Company | Nancy Tammi, Esq.<br>VP, Associate General Counsel<br>Covanta<br>445 South Street<br>Morristown, NJ 07960<br>862-345-5133 | 183 Raymond Blvd & 66 Blanchard St<br>Newark, NJ |
| | Barbara Hopkinson Kelly, Esq.<br>Wilson Elser Moskowitz Edelman &<br>Dicker LLP<br>200 Campus Drive<br>Florham Park, NJ 07932-0668<br>973.735.5765 (Direct)<br>609.213.8589 (Cell)<br>973.624.0808 (Fax)<br>barbara.kelly@wilsonelser.com | |
| Arkema Incorporated<br>2000 Market Street<br>Philadelphia, PA 19103-3222 | Paula Martin, Esq.<br>Doug Loutzenhiser<br>Legacy Site Services, LLC<br>468 Thomas Jones Way, Suite 150<br>Exton, PA 19341-2528<br>Paula.martin@total.com | Wallace & Tiernan<br>25 Main Street<br>Belleville, NJ |
| Ashland, Inc.<br>5200 Blazer Parkway<br>Dublin, OH 43017 | Robin E. Lampkin<br>Ashland Inc.<br>5200 Blazer Parkway<br>Dublin, OH  43017<br>Telephone:  614-790-3019<br>realmpkin@ashland.com<br><br>William S. Hatfield, Esq.<br>Gibbons P.C.<br>One Gateway Center<br>Newark, NJ 07102<br>whatfield@gibbonslaw.com | 221 Foundry St.<br>Newark, NJ |
| Atlas Refining, Inc.<br>142 Lockwood Street<br>Newark, NJ 07105<br><br>Now Atlas Refinery, Inc. | Steven Schroeder, Jr., President & CEO<br>Atlas Refinery, Inc.<br>142 Lockwood Street<br>Newark, NJ 07105<br><br>Thomas Ryan,  Esq.<br>Laddey, Clark & Ryan LLP<br>60 Blue Heron Road, Suite 300<br>Sparta, NJ 07871<br>973-729-1880(T)<br>tryan@lcrlaw.com | 142 Lockwood St.<br>Newark, NJ |

| | | |
|---|---|---|
| Automatic Electro Plating Corp.<br>185 Foundry Street, Suite 3<br>Newark, NJ 07105 | Michael O'Rourke, President<br>Automatic Electro Plating Corp.<br>1017 Applegate Parkway<br>Waxhaw, NC 28173-6738<br>Michael.orourke@aol.com | 185 Foundry Street Complex<br>Newark, NJ<br>(Bldgs 19, 21, 22) |
| BASF Catalysts LLC<br>100 Campus Drive<br>Florham Park, NJ | Karyllan D. Mack, Esq. (see below) | Engelhard Corporation<br>One West Central Avenue<br>East Newark, NJ |
| BASF Corp.<br>3000 Continental Drive<br>Mount Olive, NJ 07828 | Karyllan D. Mack, Esq.<br>Environmental Counsel<br>BASF Corporation<br>100 Park Avenue<br>Florham Park, NJ 07932<br>Karyllan.mack@basf.com<br><br>David Schneider, Esquire<br>Bressler, Amery & Ross<br>Post Office Box 1980<br>Morristown, NJ 07962<br>dschneider@bressler.com | 50 Central Ave.<br>Kearny, NJ<br>&<br>150 Wagaraw Rd<br>Hawthorne, NJ |
| Belleville Industrial Center<br>681 Main Street<br>Building 43<br>Belleville, NJ 07109 | Carol Shapiro, President<br>Belleville Industrial Center<br>681 Main Street, Building 43<br>Belleville, NJ 07109<br>973-751-0400 (T)<br>shappyfam@aol.com<br><br>Ryder T. Ulon, Esq,<br>Gary F. Werner, Esq.<br>Schenck, Price, Smith & King, LLP<br>220 Park Avenue<br>Post Office Box 991<br>Florham Park, NJ 07932<br>973-540-7321 (T)<br>rtu@spsk.com<br>gfw@spsk.com | Helion Industries, Inc.<br>681 Main St.<br>Belleville, NJ |

| | | |
|---|---|---|
| Benjamin Moore & Co.<br>51 Chestnut Ridge Rd.<br>Montvale, NJ 07645 | Mark Boyland, Esq.<br>Paul Sangillo, Esq.<br>Benjamin Moore & Co.<br>101 Paragon Drive<br>Montvale, NJ 07645<br>201.949.6318 (T)<br>Mark.boyland@benjaminmoore.com<br>Paul.sangillo@benjaminmoore.com<br><br>Eric S. Aronson, Esq.<br>David G. Mandelbaum, Esq.<br>GreenbergTraurig<br>500 Campus Drive<br>Suite 400<br>Florham Park, NJ 07932<br>aronsone@gtlaw.com<br>973-360-7935 | 134 Lister Ave.<br>Newark, NJ |
| Berol Corporation<br>c/o Newell Rubbermaid Inc.<br>2707 Butterfield Road, Suite 100<br>Oak Brook, IL 60523 | Andrew Sawula, Esq.<br>Schiff Hardin LLP<br>One Westminster Place, Suite 200<br>Lake Forest, IL 60045<br>847-295-4336 (T)<br>asawula@schiffhardin.com | Faber-Castell Corporation<br>41 Dickerson Street<br>Newark, NJ |
| Campbell Foundry Company<br>800 Bergen Street<br>Harrison, NJ 07029 | Timothy J. Corriston, Esq.<br>Connell Foley LLP<br>85 Livingston Avenue<br>Roseland, NJ 07068<br>973-535-0500 (T)<br>tcorriston@connellfoley.com | 800 Bergen Street<br>Harrison, NJ |
| Canning Gum LLC<br>c/o MacDermid Incorporated<br>1401 Blake Street<br>Denver, CO 80202 | John Cordani, Esq.<br>VP, General Counsel<br>MacDermid Inc.<br>245 Freight Street<br>Waterbury, CT 06702 | Frederick Gumm Chemical Co.<br>538 Forest Street<br>Kearny, NJ |

| Celanese Ltd.<br>Route 202-206<br>P.O. Box 2500<br>Somerville, NJ 08876<br><br>CNA Holdings LLC<br>participating on behalf of<br>Celanese Ltd | Duke K. McCall, III, Esq.<br>Bingham McCutchen LLP<br>2020 K Street, N.W.<br>Washington, DC 20006-1806<br>202-373-6607 (T)<br>duke.mccall@bingham.com<br><br>James J. Dragna<br>Morgan Lewis<br>300 South Grand Ave., 22nd Floor<br>Los Angeles, CA 90071-3132<br>Jim.dragna@morganlewis.com<br><br>James O'Toole, Esq.<br>Buchanan Ingersoll & Rooney PC<br>Two Liberty Place<br>50 S. 16th Street, Suite 3200<br>Philadelphia, PA 19102-2555<br>James.otoole@blpc.com | 354 Doremus Ave<br>Newark, NJ |
| Chargeurs, Inc.<br>178 Wool Road<br>Jamestown, SC 29453 | James. R. Brendel, Esq.<br>Thorp Reed & Armstrong, LLP<br>One Oxford Centre<br>301 Grant Street, 14th floor<br>Pittsburgh, PA 15219-1425<br>412-394-2373 (T)<br>jbrendel@thorpreed.com | United Piece Dye Works<br>199 and 205 Main Street and<br>42 Arnot Street<br>Lodi, NJ |
| Chevron Texaco Corporation<br>6001 Bollinger Canyon Rd.<br>K-2056<br>San Ramon, CA 94583<br><br>Chevron Environmental<br>Management Company<br>participating for itself, Texaco,<br>Inc. and TRMI-H LLC | Shawn Raymond DeMerse<br>Chevron U.S.A. Inc.<br>Law Department<br>1400 Smith Street, Rm 07090<br>Houston, TX 77002<br>shawndemerse@chevron.com<br><br>Louis M. DeStefano, Esq.<br>Buchanan Ingersoll & Rooney, PC<br>550 Broad Street, Suite 810<br>Newark, NJ 07102-4517<br>973.273.9800 (T)<br>louis.destefano@bipc.com | Getty Newark Terminal<br>86 Doremus Ave.<br>Newark, NJ |
| Coats & Clark, Inc.<br>3420 Toringdon Way, Suite 301<br>Charlotte, NC 28277 | Dan Riesel, Esq.<br>Jeff Gracer, Esq.<br>Sive Paget & Riesel, P.C.<br>460 Park Avenue<br>New York, NY 10022<br>212-421-2150<br>driesel@spr.com | Clark Thread Co.<br>260 Ogden Street<br>Newark NJ<br>900 Passaic Avenue<br>East Newark NJ<br>735 Broad Street<br>Bloomfield NJ |

| | | |
|---|---|---|
| EnPro Holdings LLC as assignee of Coltec Industries Inc.<br><br>5605 Carnegie Boulevard<br>Charlotte, NC 28209 | Tom Price, Esq.<br>EnPro Industries<br>5605 Carnegie Boulevard<br>Charlotte, NC 28209<br>704-731-1525 (T)<br>tom.price@enproindustries.com<br><br>Charles E. Merrill, Esquire<br>Husch Blackwell Sanders LLP<br>190 Carondelet Plaza, Suite 600<br>St. Louis, MO 63105<br>314-480-1952<br>charlie.merrill@huschblackwell.com | Crucible Steel Co.<br>1000 South Fourth St.<br>Harrison, NJ |
| Congoleum Corp.<br>3705 Quakerbridge Road<br>Mercerville, NJ 08619 | Russell Hewit, Esq.<br>Dughi, Hewit & Domolewski, P.C.<br>340 North Avenue<br>Cranford, NJ 07016<br>908-272-0200(T)<br>rhewit@dughihewit.com | 195 Belgrove Drive<br>Kearny, NJ |
| Cooper Industries, Inc.<br>600 Travis Street<br>Houston, TX 77002 | Lisa D. Sutton<br>Vice Present/Chief Counsel – EHS<br>Eaton Corporation<br>1000 Eaton Boulevard<br>Cleveland, OH 44122<br>440-523-4358 (T)<br><br>John F. Cermak<br>Sonja A. Inglin<br>Baker Hostetler<br>11601 Wilshire Boulevard, Ste 1400<br>Los Angeles, CA 90025-0509<br>310-442-8889 (T) (Cermak)<br>310-442-8885 (T) (Inglin)<br>jcermak@bakerlaw.com<br>singlin@bakerlaw.com | J. Wiss & Sons Co<br>7, 13, 26 Bank Street and<br>33 Littleton Avenue (aka 400<br>West Market Street)<br>Newark, NJ |
| Cooper Industries, LLC<br>600 Travis Street, Suite 5800<br>Houston, TX 77002 | (see above) | Thomas A. Edison, Inc.<br>Belleville Avenue &<br>Sherman Avenue<br>Bloomfield, NJ<br>75 Belmont Avenue<br>Belleville, NJ |
| Croda Inc.<br>300-A Columbus Circle<br>Edison, NJ 08837 | Stephen Swedlow, Esq.<br>Quinn, Emanuel, Urquhart & Sullivan, LLP<br>500 West Madison St., Suite 2450<br>Chicago, IL 60601<br>312-705-7400<br>stephenswedlow@quinnemanuel.com | Hummel Lanolin<br>185 Foundry Street Complex<br>Newark, NJ<br>(Block 5005, Lot 21; Bld 39) |

| | | |
|---|---|---|
| Curtiss-Wright Corp.<br>4 Becker Farm Road<br>Roseland, NJ 07068 | Diana Buongiorno<br>Chiesa Shahinian & Giantomassi, PC<br>One Boland Drive<br>West Orange, NJ 07052<br>973-530-2075(T)<br>dbuongiorno@csglaw.com | 1 Passaic St.<br>Woodridge, NJ |
| Darling International, Inc.<br>251 O'Connor Ridge Boulevard,<br>Suite 300<br>Irving, TX 75038 | Steven Singer, Esq.<br>34 Hillside Avenue<br>Montclair, NJ 07042<br>973-744-6093<br>stsinger@verizon.net | Standard Tallow Corp.<br>61 Blanchard Street,<br>Newark, NJ<br>1215 Harrison Avenue,<br>Kearny, NJ |
| DII Industries, LLC<br>c/o Halliburton<br>2101 City West Blvd.<br>Houston, TX 77042-3021 | Thomas C. Jackson, Esq.<br>Joshua Frank, Esq.<br>Baker Botts LLP<br>1299 Pennsylvania Ave., N.W.<br>Washington, DC 20004-2400<br>202-639-7710 (T)<br>Thomas.Jackson@bakerbotts.com<br>Joshua.frank@bakerbotts.com | Worthington Corp. &<br>Dresser Industries, Inc.<br>401 Worthington Avenue<br>Harrison, NJ |
| DiLorenzo Properties Company<br>c/o 401 East 74th Street<br>New York, NY 10021-3919 | David Kohane, Esq.<br>Cole Schotz, PC<br>PO Box 800<br>25 Main Street<br>Hackensack, NJ 07601-7015<br>DKohane@coleschotz.com<br><br>For estate of Alex DiLorenzo<br>Gary P. Gengel, Esq.<br>Latham & Watkins, LLP<br>885 Third Avenue<br>New York, NY 10022-4834<br>Gary.Gengel@lw.com | American Modern Metals<br>44 Passaic Ave. (a/k/a 25<br>Belgrove Drive)<br>Kearny, NJ |
| Drum Service of Newark, Inc.<br>38 Laurel Drive<br>Wayne, NJ 07470 | Ralph Foglia<br>38 Laurel Drive<br>Wayne, NJ 07470 | Hilton-Davis<br>120 Lister Ave.<br>Newark, NJ |
| Eden Wood Corporation<br>47 Parsippany Road<br>Whippany, NJ 07981 | Warren L. Dean, Jr.<br>Thompson Coburn LLP<br>1909 K Street, N.W.<br>Suite 600<br>Washington, D.C. 20006-1167<br>202.585.6908 (T)<br>wdean@thompsoncoburn.com | Whippany Paper Board<br>1 Ackerman Avenue<br>Clifton, NJ |

| | | |
|---|---|---|
| E.I. duPont de Nemours & Co.<br>1007 Market Street<br>Wilmington, DE 19898 | Bernard Reilly, Esq.<br>Chemours Legal Department<br>1007 Market Street<br>Wilmington, DE 19898<br>302-774-5445(T)<br>bernard.j.reilly@usa.dupont.com | Pitt Consol<br>191 Doremus Ave.<br>Newark, NJ |
| Elan Chemical Co.<br>268 Doremus Ave.<br>Newark, NJ 07105 | Jocelyn Kapp Manship, CEO<br>Elan Chemical Company Inc.<br>268 Doremus Avenue<br>Newark, NJ 07105<br><br>Randy Schillinger, Esq.<br>Saiber Schlesinger Staz & Goldstein<br>One Gateway Center, 13th Fl<br>Newark, NJ 07102<br>973-622-3333(T)<br>rs@saiber.com | 268 Doremus Ave.<br>Newark, NJ |
| El Paso Tennessee Pipeline Co.<br>1001 Louisania Street<br>Houston, TX 77002<br><br>EPEC Polymers Inc.<br>participating on behalf of itself<br>and EPEC Oil Company<br>Liquidating Trust | Andrea A. Lipuma, Esquire<br>Saul Ewing LLP<br>750 College Road East<br>Suite 100<br>Princeton, NJ 08540-6617<br>Telephone: 609-452-5032<br>alipuma@saul.com | Tenneco, Inc.<br>290 River Drive<br>Garfield, NJ |
| EM Sergeant Pulp & Chemical Co.<br>6 Chelsea Road<br>Clifton, NJ 07012 | Messrs. Scott and Alan Reisch<br>EM Sergeant Pulp & Chemical Co.<br>6 Chelsea Road<br>Clifton, NJ 07012<br><br>Ivo Balabanov<br>qc@sgtnutra.com | 120 Lister Avenue<br>Newark, NJ |
| Essex Chemical Corp.<br>2030 WMDC<br>Midland, MI 48674 | Kenneth Mack, Esq.<br>Linda Mack, Esq.<br>Fox Rothschild LLP<br>Post Office Box 5231<br>Princeton, NJ 08543-5231<br><br>Princeton Pike Corp. Center<br>997 Lenox Drive, Bldg. 3<br>Lawrenceville, NJ 08648<br>609-896-3000(T)<br>kmack@foxrothschild.com | 330 Doremus Ave.<br>Newark, NJ |

| | | |
|---|---|---|
| Everett Smith Group, Ltd.<br>330 East Kilbourn Avenue, Ste 750<br>Milwaukee, WI 53202 | Sarah A. Slack, Esq.<br>Foley & Lardner, LLP<br>Suite 500<br>150 East Gilman Street<br>Madison, WI 53703-1482<br>608-258-4239<br>sslack@foley.com | Blanchard Bro. & Lane, Inc.<br>40 Bruen Street<br>Newark, NJ |
| Fiske Brothers Refining Co.<br>129 Lockwood Street<br>Newark, NJ | Damon Sedita, Esq.<br>Sedita, Campisano & Campisano, LLC<br>Wayne Plaza 1<br>145 Route 46 West<br>Suite 102<br>Wayne, NJ 07470<br>973-787-0299<br>dsedita@scclegal.com | 129 Lockwood Street<br>Newark, NJ |
| Flexon Industries Corp.<br>One Flexon Plaza<br>366 Frelinghuysen Avenue<br>Newark, NJ 07114 | Tom Spiesman, Esq.<br>Porzio Bromberg & Newman, PC<br>100 Southgate Parkway<br>PO Box 1997<br>Morristown, NJ 07962<br>973-889-4208 (T)<br>tspiesman@pbnlaw.com | 666 Washington Avenue<br>Belleville, NJ |
| Foundry Street Corporation<br>67 Kettle Hole Road 2524<br>Montauk, NY 11954-5084 | Gerald Borriello<br>Foundry Street Corporation<br>67 Kettle Hole Road 2524<br>Montauk, NY 11954-5084<br>geraldborriello@gmail.com | 185 Foundry Street Complex<br>Newark, NJ<br>(Block 5005, Lot 22 – Bldgs 19, 21, 22) |
| Fragrances North America<br>1775 Windsor Road<br>Teaneck, NJ 07666<br><br>Now Givaudan Corp. | Richard Wroblewski, P.G.<br>Environmental Specialist<br>Givaudan Fragrances Corp.<br>300 Waterloo Valley Road<br>Mount Olive, NJ 07828<br>richard.wroblewski@givaudan.com<br><br>William Hatfield, Esq.<br>Gibbons, PC<br>One Gateway Center<br>Newark, NJ 07102-5310<br>973-596-4511 (T)<br>whatfield@gibbonslaw.com | Givaudan Fragrances<br>125 Delawanna Avenue<br>Clifton, NJ |
| Franklin Burlington Plastics, Inc.<br>113 Passaic Ave.<br>Kearny, NJ 07032 | Norman Spindel, Esq.<br>Lowenstein Sandler PC<br>65 Livingston Avenue<br>Roseland, NJ 07068<br>973-597-2514(T)<br>nspindel@lowenstein.com | 113 Passaic Ave.<br>Kearny, NJ |

9

| | | |
|---|---|---|
| Garfield Molding Company, Inc.<br>10 Midland Avenue<br>Wallington, NJ 07057 | Stephen W. Miller, Esq.<br>Ricci Tyrrell Johnson & Grey<br>1515 Market Street, Suite 700<br>Philadelphia, PA 19102<br>215-320-2088 (T)<br>smiller@rtjglaw.com | 10 Midland Avenue<br>Wallington, NJ |
| General Electric Company<br>3135 Easton Turnpike<br>Fairfield, CT 06828-0001 | Roger Florio, Esq.<br>General Electric<br>640 Freedom Business Center<br>King of Prussia, PA 19406<br>Roger.florio@ge.com<br><br>Gary P. Gengel, Esq.<br>Latham & Watkins, LLP<br>One Newark Center, 16th floor<br>Newark, NJ 07101<br>973-639-7287 (T)<br>gary.gengel@lw.com | 415 South 5th Street<br>& 1000 South 2nd Street<br>Harrison, NJ |
| Goodrich Corporation<br>Four Coliseum Centre<br>2730 West Tyvola Road<br>Charlotte, NC 28217 | Earl W. Phillips, Jr., Esq.<br>Robinson & Cole LLP<br>280 Trumbull Street<br>Hartford, CT 06103-3597<br>860-275-8220 (T)<br>ephillips@rc.com | Kalama Chemical<br>290 River Drive<br>Garfield, NJ |
| Harrison Supply Company<br>800 Passaic Avenue<br>East Newark, NJ 07029 | Timothy J. Corriston, Esq.<br>Connell Foley LLP<br>85 Livingston Avenue<br>Roseland, NJ 07068<br>973-535-0500 (T)<br>tcorriston@connellfoley.com | 800 Passaic Avenue<br>East Newark, NJ |
| Hexcel Corp.<br>2 Stamford Plaza<br>Stamford, CT 06901 | Steve Leifer, Esq.<br>Baker Botts LLP<br>1299 Pennsylvania Ave., NW<br>Washington, DC 20004<br>202-639-7723(T)<br>sleifer@bakerbotts.com | 205 Main St.<br>Lodi, NJ |
| Hoffman-La Roche Inc.<br>340 Kingsland Street<br>Nutley, NJ 07110 | John Klock, Esq.<br>Gibbons, PC<br>One Gateway Center<br>Newark, NJ 07102<br>jklock@gibbonslaw.com<br><br>Frederick Kentz, Esq.<br>Vice President and General Counsel<br>Hoffmann-La Roche Inc.<br>150 Clove Road,<br>Little Falls, NJ 07424 | 340 Kingsland Road<br>Nutley, NJ |

| | | |
|---|---|---|
| Honeywell International, Inc.<br>P.O. Box 2245<br>Morristown, NJ 07962 | Jeremy Karpatkin, Esq.<br>Arnold & Porter<br>555 Twelfth Street, NW<br>Washington, DC 20004-1206<br>202-942-5564 (T)<br>Jeremy.karpatkin@apks.com | General Chemical Co.<br>65 Lodi Street/8th Street<br>Passaic, NJ |
| ISP Chemicals, Inc.<br>1361 Alps Road<br>Wayne, NJ 07470<br><br>now ISP Chemicals LLC | Robin E. Lampkin<br>Ashland Inc.<br>5200 Blazer Parkway<br>Dublin, OH 43017<br>614-790-3019 (T)<br>relampkin@ashland.com<br><br>William Hatfield, Esq.<br>Gibbons, PC<br>One Gateway Center<br>Newark, NJ 07102-5310<br>973-596-4511 (T)<br>whatfield@gibbonslaw.com | ISP Van Dyk, Inc.<br>1 Main St./11 William St.<br>Wayne, NJ |
| ITT Industries, Inc.<br>77 River Road<br>Clifton, NJ 07014<br><br>participating as Exelis Inc. for<br>itself and ITT Industries, Inc | Susanne Peticolas, Esq.<br>Gibbons, PC<br>One Gateway Center<br>Newark, NJ 07102-5310<br>973-596-4751 (T)<br>speticolas@gibbonslaw.com | 100 Kingsland Drive<br>Clifton, NJ |
| Kearny Smelting & Refining<br>936 Harrison Ave #5<br>Kearny, NJ 07032 | Ms. Francine Rothschild, President<br>Kearny Smelting & Refining<br>936 Harrison Ave<br>Kearny, NJ 07032<br>201-991-7276 (T)<br><br>Lee D. Henig-Elona, Esq.<br>Gordon & Rees<br>18 Columbia Turnpike, Suite 220<br>Florham Park, NJ 07932<br>973-549-2520(T direct)<br>973-549-2500(T office)<br>lhenig-elona@gordonrees.com | 936 Harrison Ave.<br>Kearny, NJ |

| Lucent Technologies<br>600 Mountain Avenue<br>Murray Hill, NJ 07974<br><br>now Alcatel-Lucent USA, Inc. | Ralph McMurry, Esq.<br>Ralph L. McMurry Law Office<br>30 Vesey Street, 15th Floor<br>New York, NY 10007<br>212-608-5444/5053 (T)<br>rlmcmurry@earthlink.net<br><br>Gary M. Fisher, Esq.<br>Alcatel-Lucent<br>Environment, Health & Safety Corporate<br>Center<br>600 Mountain Avenue<br>Room 1F-102G<br>Murray Hill, NJ 07974<br>gary.fisher@alcatel-lucent.com | AT&T/Western Electric<br>100 Central Ave.<br>Kearny, NJ |
| --- | --- | --- |
| Mallinckrodt, Inc.<br>675 McDonnell Blvd.<br>Hazelwood, Missouri<br>63042 | William Hatfield, Esq.<br>Gibbons P.C.<br>One Gateway Center<br>Newark, NJ 07102<br>973-596-4511 (T)<br>whatfield@gibbonslaw.com<br><br>Eric Berry, Esq.<br>Vice President – Environmental Law<br>Mallinckrodt Pharmaceuticals<br>975 McDonnell Blvd<br>Hazelwood, MO 63042<br>Eric.Berry@mallinckrodt.com | 165-167 Main St.<br>Lodi, NJ |
| Monsanto Co.<br>800 North Lindbergh Blvd.<br>St. Louis, Missouri 63167<br><br>Pharmacia Corporation (f/k/a<br>Monsanto Company) | John F. Gullace, Esq.<br>Manko, Gold, Katcher & Fox, LLP<br>401 City Avenue, Suite 500<br>Bala Cynwd, PA 19004<br>484-430-2326(T)<br>jgullace@mgkflaw.com | Monsanto Co.<br>Foot of Pennsylvania Ave.<br>Kearny, NJ |
| National-Standard Company<br>1618 Terminal Road<br>Niles, MI 49120<br><br>Now National-Standard LLC | Susanne Peticolas, Esq.<br>Gibbons, PC<br>One Gateway Center<br>Newark, NJ 07102-5310<br>973-596-4751(T)<br>speticolas@gibbonslaw.com | 714-716 Clifton Avenue<br>Clifton, NJ |
| Newark Morning Ledger<br>1 Star Ledger Plaza<br>Newark, NJ 07102 | Daryl Kessler, Esq.<br>Sabin, Bermant & Gould, LLP<br>One World Trade Center -44th Floor<br>New York, NY 10007-2915<br>212-381-7026<br>dkessler@sabinfirm.com | 1 Star Ledger Plaza<br>Newark, NJ |

| | | |
|---|---|---|
| Newell Rubbermaid, Inc.<br>29 E. Stephenson Street<br>Freeport, IL 60132 | Andrew Sawula, Esq.<br>Schiff Hardin LLP<br>One Westminster Place, Suite 200<br>Lake Forest, IL 60045<br>847-295-4336 (T)<br>asawula@schiffhardin.com | Goody Products<br>969 Newark Turnpike<br>Kearny, NJ |
| News America Inc.<br>767 Fifth Ave., 46th Floor<br>New York, NY 10153<br><br>fka News Publishing Australia,<br>Ltd., now Twenty-First Century<br>Fox America | Peter Simshauer, Esq.<br>Skadden, Arps, Slate, Meagher & Flom LLP<br>500 Boylston Street<br>Boston, MA 02116<br>617-573-4880(T)<br>psimshau@skadden.com | Chris-Craft Inc./Montrose<br>Chemical Co.<br>100 Lister Ave.<br>Newark, NJ |
| Occidental Chemical Corp.<br>Occidental Tower<br>5005 LBJ Freeway<br>Dallas, TX 75244 | Dennis F. Blake<br>Senior Vice President<br>Occidental Chemical Corp.<br>5005 LBJ Freeway<br>Dallas, TX 75244<br><br>Larry Silver, Esq.<br>Langsam Stevens Silver<br>1818 Market Street, Suite 2610<br>Philadelphia, PA 19103-5319<br>215- 239.9023<br>lsilver@lssh-law.com | Diamond Shamrock<br>Chemicals Co.<br>80 and 120 Lister Ave.<br>Newark, NJ |
| The Okonite Company, Inc.<br>102 Hilltop Road<br>Ramsey, New Jersey 07446 | David Brook, Esq.<br>McCullough Ginsberg Montano &<br>Partners LLP<br>55 Bleeker Street<br>Millburn, NJ 07041<br>dbrook@mgpllp.com | Canal and Jefferson Streets<br>Passaic, NJ |
| Otis Elevator Co.<br>North America Operations<br>10 Farm Springs Road<br>Farmington, CT 06032 | Earl W. Phillips, Jr., Esq.<br>Robinson & Cole LLP<br>280 Trumbull Street<br>Hartford, CT 06103-3597<br>860-275-8220(T)<br>ephillips@rc.com | 1000 First St.<br>Harrison, NJ |
| Pabst Brewing Company<br>9014 Heritage Parkway, Suite 308<br>Woodridge, IL 60517 | Eugene Kashper, Chairman & CEO<br>Pabst Brewing Company<br>10635 Santa Monica Blvd Ste 350<br>Los Angeles, CA 90025 | 400 Grove Street<br>Newark, NJ |
| Palin Enterprises | Mr. Michael Palin<br>Palin Enterprises<br>235 Park Avenue South, #8<br>New York, NY 10003-1045 | American Modern Metals<br>44 Passaic Ave. (a/k/a 25<br>Belgrove Drive)<br><br>Kearny, NJ |

13

| | | |
|---|---|---|
| Passaic Pioneer Properties<br>PO Box 327<br>35 Eighth Street<br>Passaic, NJ 07055 | Timothy J. Corriston, Esq.<br>Connell Foley LLP<br>85 Livingston Avenue<br>Roseland, NJ 07068<br>973-535-0500 (T)<br>tcorriston@connellfoley.com | 35 Eighth Street<br>Passaic, NJ |
| Pfizer Inc.<br>235 E. 42nd St.<br>New York, NY 10017 | Seth Kerschner, Esq.<br>White & Case LLP 1155 Avenue of the<br>Americas<br>New York, NY 10036-2787<br>212-819-8630(T)<br>212-354-8113(F)<br>Seth.kerschner@whitecase.com | 230 Brighton Road<br>Clifton, NJ |
| PMC, Inc.<br>12243 Branford Street<br>Sun Valley, CA 91352 | Phillip Kamins, President & CEO<br>PMC Global, Inc.<br>12243 Branford St<br>Sun Valley, CA 91352<br>818-896-1101(T) | Kleer Kast<br>450 Schuyler Avenue<br>Kearny, NJ |
| Power Test of New Jersey, Inc.<br>125 Jericho Turnpike<br>Jericho, NY 11753<br><br>now Leemilt's Petroleum, Inc.,<br>successor to Power Test of NJ,<br>Inc. | Christine Fitter, Asst Secretary<br>Leemilt's Petroleum, Inc.<br>125 Jericho Turnpike, Suite 103<br>Jericho, NY 11753<br>cfitter@gettyrealty.com<br><br>Nicole Moshang, Esq.<br>Manko, Gold Katcher & Fox LLP<br>401 City Avenue, Ste. 500<br>Bala Cynwyd, PA 19004<br>484-430-2324 (T)<br>nmoshang@mgkflaw.com | Getty Newark Terminal<br>86 Doremus Ave.<br>Newark, NJ |
| PPG Industries, Inc.<br>One PPG Place<br>Pittsburgh, PA 15272 | Gary P. Gengel, Esq.<br>Latham & Watkins, LLP<br>885 Third Avenue<br>New York, NY 10022-4834<br>gary.gengel@lw.com | 29 Riverside Ave.<br>Newark, NJ |

| PSE&G Corp.<br>P.O. Box 570<br>Newark, NJ 07101 | John F. Doherty, Esq.<br>Associate General Litigation Counsel<br>PSE&G Services Corporation<br>80 Park Plaza, T5D<br>Post Office Box 570<br>Newark, NJ 07102<br>973-430-6478(T)<br>John.doherty@pseg.com<br><br>Kevin R. Gardner, Esq.<br>Connell Foley<br>85 Livingston Avenue<br>Roseland, NJ 07068<br>973-535-0500(T)<br>kgardner@connellfoley.com | 155 Raymond Blvd.<br>Newark, NJ<br>&<br>4th St.<br>Harrison, NJ |
| --- | --- | --- |
| Purdue Pharma Technologies, Inc.<br>One Stamford Forum<br>Stamford, CT 06901 | James (Jay) Stewart, Esq.<br>Lowenstein Sandler PC<br>65 Livingston Avenue<br>Roseland, NJ 07068<br>973-597-2522(T)<br>jstewart@lowenstein.com | Napp Technologies<br>199 Main St.<br>Lodi, NJ |
| Quality Distribution, Inc.<br>150 East Pennsylvania Avenue<br>Suite 450<br>Downingtown, PA 19335<br><br>Quality Carriers, Inc. | Bonni Kaufman, Esq.<br>Holland & Knight, LLP<br>800 17th Street N.W. Suite 1100<br>Washington, DC 20006<br>202-419-2547<br>Bonni.kaufman@hklaw.com | Chemical Leaman Tank Lines<br>80 Doremus Avenue<br>Newark, NJ |
| Roman Asphalt Corporation<br>14 Ogden Street<br>Newark, NJ 07104 | Michael La Morgese, President<br>Roman Asphalt Corporation<br>14 Ogden St<br>Newark, NJ 07104<br>973-482-1113(T)<br>Roman@romanasphalt.com | 14 Ogden Street<br>Newark, NJ |
| Royce Associates<br>366 N. Broadway, Ste. 400<br>Jericho, NJ 11753 | A.J.Royce, President<br>Royce Associates, ALP<br>35 Carlton Ave<br>East Rutherford, NJ 07073<br>201-438-5200(T)<br><br>Ronald Bluestein, Esq.<br>Flamm Walton<br>794 Penllyn Pike<br>Blue Bell, PA 19422<br>267-419-1500 (T)<br>rbluestein@flammlaw.com | Royce Chemical Company<br>17 Carlton Avenue<br>East Rutherford, NJ |

15

| | | |
|---|---|---|
| RSR Corp.<br>2777 Stemmons Freeway, Suite 1800<br>Dallas, TX 75207<br><br>now Revere Smelting and Refining Corporation | Jane C. Luxton, Esq.<br>Christopher Clare, Esq.<br>Clark Hill PLC<br>601 Pennsylvania Avenue NW<br>North Building, Suite 1000<br>Washington, DC 20004<br>202-572-8674(T)<br>703-598-3275(M)<br>jluxton@clarkhill.com<br>cclare@clarkhill.com | Revere Smelting & Refining<br>387 Avenue P<br>Newark, NJ |
| RTC Properties, Inc.<br>79 Fifth Avenue<br>New York, NY 10003 | Michael L. Rodburg, Esq.<br>Lowenstein Sandler, PC<br>65 Livingston Avenue<br>Roseland, NJ 07068<br>973-597-2466(T)<br>mrodburg@lowenstein.com | AT&T/Western Electric<br>100 Central Ave.<br>Kearny, NJ |
| S&A Realty Corp.<br>55 Passaic Avenue<br>Kearny, NJ 07032 | Jeffrey Pollock, Esq.<br>Fox Rothschild<br>P.O. Box 5231<br>Princeton, NJ 08543<br>609-896-7660(T)<br>jmpollock@foxrothschild.com | American Modern Metals<br>44 Passaic Ave. (a/k/a 25 Belgrove Drive)<br>Kearny, NJ |
| Safety Kleen Envirosystems Co.<br>1301 Gervais St.<br>Columbia, SC 29201<br><br>McKesson Corporation for itself and for Safety-Kleen Envirosystems, Inc. | John Edgcomb, Esq.<br>Edgcomb Law Group, LLP<br>One Post Street, Suite 2100<br>San Francisco, California 94104-5225<br>415-399-1555 (T)<br>jedgcomb@edgcomb-law.com | 600 Doremus Ave.<br>Newark, NJ |
| Schiffenhaus Packaging Corp.<br>c/o Rock-Tenn Company<br>504 Thrasher Street<br>Norcross, GA 30071 | Camille V. Otero, Esq.<br>Gibbons, PC<br>One Gateway Center<br>Newark, NJ 07102-5310<br>cotero@gibbonslaw.com | 204 Academy Street<br>49 Fourth Street<br>2013 McCarter Highway<br>Newark, NJ |

| | | |
|---|---|---|
| Sequa Corporation<br>200 Park Avenue<br>New York, NY 10166 | Brian L. Buniva, Esq.<br>Senior Counsel & Senior Director<br>Environment, Health & Safety Sequa<br>Corporation<br>707 E. Main Street, Suite 1450<br>Richmond, VA 23219<br>845-230-7374 (Direct)<br>804-873-0610 (Mobile)<br>Brian_Buniva@sequa.com<br><br>Gary P. Gengel, Esq.<br>Kegan A. Brown, Esq.<br>Latham & Watkins, LLP<br>885 Third Avenue<br>New York, NY 10022-4834<br>gary.gengel@lw.com | Sun Chemical Corporation<br>185 Foundry Street<br>Newark, NJ<br>(prior to 1987) |
| Seton Company, Inc.<br>1000 Madison Avenue<br>Norristown, PA 19403\<br><br>now Seton Tanning | Lawrence E. Bradford, Esq.<br>Cole Schotz, PC<br>PO Box 800<br>25 Main Street<br>Hackensack, NJ 07601-7015<br>201-525-6205(T)<br>lbradford@coleschotz.com | Seton Leather Company<br>849 Broadway<br>Newark, NY 07104 |
| SpectraServ, Inc.<br>75 Jacobus Avenue<br>Kearny, NJ 07032 | Diana Buongiorno, Esq.<br>Chiesa Shahinian & Giantomassi, PC<br>One Boland Dr<br>West Orange, NJ 07052<br>973-530-2075(T)<br>dbuongiorno@csglaw.com | 75 Jacobus Ave.<br>Kearny, NJ |
| STWB, Inc.<br>c/o Bayer Corporation<br>100 Bayer Road<br>Pittsburgh, PA 15205 | Timothy I. Duffy, Esq.<br>Coughlin Duffy LLP<br>Post Office Box 1917<br>350 Mount Kemble Avenue<br>Morristown, NJ 07962-1917<br>973-631-6002(T)<br>tduffy@coughlinduffy.com<br>lhall@coughlinduffy.com (Assistant) | Lehn & Fink Products Corp.<br>192-194 Bloomfield Avenue<br>Bloomfield, NJ 07003<br><br>Thomasett Colors/Sterling<br>120 Lister Ave.<br>Newark, NJ |

| | | |
|---|---|---|
| Sun Chemical Corporation<br>35 Waterview Boulevard<br>Parsippany, NJ 07054-1285 | Warren W. Faure, Esq.<br>EH&S Counsel<br>Sun Chemical Corporation<br>35 Waterview Boulevard<br>Parsippany, NJ 07054<br>973-404-6590(T)<br>Warren.faure@sunchemical.com<br><br>Ted Wolff, Esq.<br>Manatt, Phelps & Phillips, LLP<br>7 Times Square<br>New York, NY 10036<br>twolff@manatt.com | Sun Chemical Corporation<br>185 Foundry Street<br>Newark, NJ<br>(1987 to present) |
| Teval Corporation<br>99 Cherry Hill Road, Suite 105<br>Parsippany, NJ 07054 | Lee D. Henig-Elona, Esq.<br>Gordon & Rees<br>18 Columbia Turnpike, Suite 220<br>Florham Park, NJ 07932<br>973-549-2520(T direct)<br>973-549-2500(T office)<br>lhenig-elona@gordonrees.com | Guyon Pipe<br>900-1000 South 4th Street<br>Harrison, NJ |
| Teva Pharmaceuticals USA, Inc.<br>1090 Horsham Road<br>North Wales, PA 19454 | Gail Port, Esq.<br>Proskauer Rose LLP<br>11 Times Square<br>New York, NY 10036-8299<br>212-969-3243(T)<br>gport@proskauer.com | Biocraft Laboratories<br>12 Industrial Park<br>Waldwick, NJ |
| Textron, Inc.<br>40 Westminster Street<br>Providence, RI 02903 | Jamie Schiff, Esq.<br>Textron, Inc.<br>40 Westminster Street<br>Providence, RI 02903<br>401-457-2422 (T)<br>jschiff@textron.com | Spencer Kellogg Division<br>400 Doremus Avenue<br><br>Newark, NJ |
| The Andrew Jergens Co.<br>2535 Spring Grove Ave.<br>Cincinnati, OH 45214<br><br>now KAO U.S.A Inc. | Richard T. La Jeunesse, Esq.<br>Graydon Head & Ritchey LLP<br>1900 Fifth Third Center<br>511 Walnut Street<br>Cincinnati, OH 45202<br>513-629-2702(T)<br>rlajeunesse@graydon.com | 1 Franklin Ave.<br>Belleville, NJ |

18

| The BOC Group, Inc.<br>575 Mountain Avenue<br>Murray Hill, NJ 07974<br><br>now Linde LLC on behalf of<br>The BOC Group, Inc. | James (Jay) Stewart, Esq.<br>Lowenstein Sandler PC<br>65 Livingston Avenue<br>Roseland, NJ 07068<br>973-597-2522(T)<br>jstewart@lowenstein.com | 681 Main Street<br>Belleville, NJ |
| --- | --- | --- |
| The Hartz Mountain<br>Corporation<br>400 Plaza Drive<br>Secaucus, NJ 07094<br><br>The Hartz Consumer Group,<br>Inc. on behalf of The Hartz<br>Mountain Corporation | Curtis L. Michael, Esq.<br>Horowitz, Rubino & Patton<br>400 Plaza Drive<br>PO Box 2038<br>Secaucus, NJ 07094-2038<br>Curt.michael@hrplaw.com | 600/700 South 4th Street<br>Harrison, NJ |
| The Newark Group, Inc.<br>20 Jackson Drive<br>Cranford, NJ 07016 | David M. Meezan, Esq.<br>Kazmarek Mowrey Cloud Laseter LLP<br>1230 Peachtree Street N.E.<br>Suite 3600<br>Atlanta, GA 30309<br>404-969-0733<br>dmeezan@kmcllaw.com | The Newark Boxboard Co.<br>17 Blanchard Street<br>Newark, NJ |
| The Sherwin Williams Co.<br>101 Prospect Ave., N.W.<br>Cleveland, OH 44115 | Donald McConnell, Esq.<br>The Sherwin Williams Co.<br>101 Prospect Ave, NW<br>Cleveland, OH 44115<br>216-566-3741(T)<br>216-515-4400(F)<br>don.j.mcconnell@sherwin.com<br><br>Herbert (Bart) Bennett, Esq.<br>Sokol, Behot & Fiorenzo<br>229 Nassau Street<br>Princeton, NJ 08542-4601<br>609-279-0900(T)<br>hbbennett@sbflawfirm.com | 60 Lister Ave.<br>Newark, NJ |
| The Stanley Works<br>1000 Stanley Drive<br>New Britain, CT 06053<br><br>now Stanley Black & Decker,<br>Inc. | Andrew Kolesar, Esq.<br>Thompson Hine LLP<br>312 Walnut Street, 14th Floor<br>Cincinnati, OH 45202<br>513-352-6545(T)<br>andrew.kolesar@thompsonhine.com | Stanley Tools<br>140 Chapel St.<br>Newark, NJ |

| | | |
|---|---|---|
| Three County Volkswagen<br>701 Riverside Ave.<br>Lyndhurst, NJ 07071 | Lee D. Henig-Elona, Esq.<br>Gordon & Rees<br>18 Columbia Turnpike, Suite 220<br>Florham Park, NJ 07932<br>973-549-2520(T direct)<br>973-549-2500(T office)<br>lhenig-elona@gordonrees.com | 701 Riverside Ave.<br>Lyndhurst, NJ |
| Tiffany & Co.<br>727 Fifth Avenue<br>New York, NY 10022 | John Klock, Esq.<br>Gibbons, PC<br>One Gateway Center<br>Newark, NJ  07102-5310<br>973-596-4757 (T)<br>jklock@gibbonslaw.com | 820 Highland Avenue<br>Newark, NJ |
| Unilever Bestfoods<br>International Plaza<br>Sylvan Avenue<br>Englewood Cliffs, NJ 07632<br><br>Conopco, Inc., d/b/a Unilever<br>(as successpr to CPC/Bestfoods,<br>former parent of the Penick<br>Corporation | Joshua Frank, Esq.<br>Baker Botts<br>1299 Pennsylvania Ave., N.W.<br>Washington, DC  20004-2400<br>202-639-7710 (T)<br>Joshua.frank@bakerbotts.com<br><br>Andrew Shakalis, Esq.<br>Associate General Counsel – Environmental<br>& Safety<br>Unilever<br>700 Sylvan Avenue<br>Englewood Cliffs, NJ  07632<br>201-894-2763 (T)<br>201-894-2727 (F)<br>Andrew.shakalis@unilever.com | Penick Corporation<br>540 New York Avenue<br>Lyndhurst, NJ |
| Viacom Inc.<br>11 Stanwix St.<br>Pittsburgh, PA 15222<br><br>Now CBS Corporation | Jeffrey B. Groy, Esq.<br>VP, Sr. Counsel/ Environmental<br>CBS Corporation<br>333 West Wacker Drive, 27th Floor<br>Chicago, IL  60606<br>312-288-3851(T)<br>312-288-3801(F)<br>Jeff.Groy@cbs.com | Westinghouse Electric<br>95 Orange St.<br>Newark, NJ |

| | | |
|---|---|---|
| Vulcan Materials Co.<br>1200 Urban Center Drive<br>Birmingham, AL 35242<br><br>Now Legacy Vulcan Corp. | Eva Fromm O'Brien, Esq.<br>Fulbright & Jaworski<br>Fulbright Tower<br>1301 McKinney<br>Suite 5100<br>Houston, TX 77010-3095<br>713-651-5321 (T)<br>713-651-5246 (F)<br>eobrien@fulbright.com<br><br>John M. Floyd, Esq.<br>Senior Attorney<br>Vulcan Materials Company<br>1200 Urban Center Drive<br>Birmingham, AL 35242<br>205-298-3745 (Direct)<br>205-492-4219 (Cell)<br>205-298-2960 (F)<br>floydj@vmcmail.com | 600 Doremus Ave.<br>Newark, NJ |
| Wiggins Plastics Inc.<br>186 Kingsland Road<br>Clifton, NJ 07014 | Glenn Tucker, Esq.<br>Sheryl Reba, Esq.<br>Greenberg Dauber<br>One Gateway Center, Suite 600<br>Newark, NJ 07102<br>973-643-3700(T)<br>973-643-1218(F)<br>gtucker@greenbergdauber.com<br>sreba@greenbergdauber.com | 180 Kingsland Road<br>Clifton, NJ |
| Wyeth<br>5 Giralda Farms<br>Madison, NJ 07940 | Ronald J. Schott, Esq.<br>Corporate Counsel<br>Pfizer<br>5 Giralda Farms<br>Madison, NJ 07940<br>973-660-6641(T)<br>973-660-7176(F)<br>ronald.schott@pfizer.com<br><br>Seth Kerschner, Esq.<br>White & Case LLP 1155 Avenue of the<br>Americas<br>New York, NY 10036-2787<br>212-819-8630(T)<br>212-354-8113(F)<br>Seth.kerschner@whitecase.com | Shulton Inc. and<br>American Cyanamid Co.<br>697 Route 46<br>Clifton, NJ |

21

| | | |
|---|---|---|
| Passaic Valley Sewerage Commission | Gregory A. Tramontozzi, Esq<br>Executive Director<br>Passaic Valley Sewerage Commissioners<br>600 Wilson Avenue<br>Newark, NJ 07105<br><br>Michael Witt, Esq.<br>Chasan Leyner & Lamparello, PC<br>300 Harmon Meadow Blvd.<br>Secaucus, NJ 07094<br>201-801-6093<br>mwitt@chasan.com | |
| City of Newark | Angela Foster, Esq.<br>First Assistant Corporation<br>Counsel<br>City of Newark Department of Law<br>Room 316, City Hall<br>920 Broad Street<br>Newark, NJ 07102<br>973-733-3880<br>fostera@ci.newark.nj.us | |
| Borough of East Newark | Honorable Joseph R. Smith, Mayor<br>Borough of East Newark<br>34 Sherman Avenue<br>East Newark NJ 07029 | |
| Town of Harrison | Honorable James A. Fife, Mayor<br>Town of Harrison<br>318 Harrison Avenue<br>Harrison, New Jersey 07029<br><br>Mr. Paul J. Zarbetski, Esq.<br>Town of Harrison<br>318 Harrison Avenue<br>Harrison, New Jersey 07029 | |
| Town of Kearny | Honorable Alberto G. Santos, Mayor<br>Town of Kearny<br>402 Kearny Avenue<br>Kearny, NJ 07032 | |

**Proposed Cash Out Parties**
**Lower 8.3 Miles of the Lower Passaic River**
**Diamond Alkali Superfund Site**

1. Alcan Corporation - now Novelis Corp.

2. Alden Leeds Inc.

3. Belleville Industrial Center

4. DiLorenzo Properties Company

5. EM Sergeant Pulp & Chemical Co.

6. Fiske Brothers Refining Co.

7. Flexon Industries Corp.

8. Harrison Supply Company

9. Mallinckrodt, Inc.

10. Palin Enterprises

11. Pfizer Inc.

12. Roman Asphalt Corporation

13. RTC Properties, Inc.

14. S&A Realty Corp.

15. Teva Pharmaceuticals USA, Inc.

16. The Andrew Jergens Co. - now KAO U.S.A Inc.

17. The BOC Group, Inc. - now Linde LLC on behalf of The BOC Group, Inc.

18. Three County Volkswagen

19. Wiggins Plastics Inc.

20. Wyeth

# Exhibit B



David G. Mandelbaum
Tel 215.988.7813
Fax 215.717.5201
mandelbaumd@gtlaw.com

**VIA EMAIL AND UPS NEXT DAY AIR**                                    February 13, 2018

Juan M. Fajardo, Esquire
Office of Regional Counsel
USEPA, Region 2
290 Broadway
17th Floor
New York, NY 10002

Re:    <u>Lower Passaic River Site / Planned Allocation of Responsibility for Operable Unit 2</u>

Dear Juan:

I am writing on behalf of this firm's client, Benjamin Moore & Co., concerning the allocation process that the Environmental Protection Agency ("EPA") has designed and is intending to implement using David Batson as the assigned allocator ("the Batson allocation"). I make specific reference to Eric Wilson's letter of January 5, 2018, to the Diamond Alkali – Lower 8.3 Miles Contact Group. I intend this letter to supplement the views of the Small Parties Group ("SPG"), transmitted by letter dated January 30, 2018, which Benjamin Moore endorses.

We are not aware of any evidence demonstrating that Benjamin Moore released dioxins, furans, or polychlorinated biphenyls to the Lower Passaic River from its facility, which is located next to the Diamond Shamrock Site on Lister Avenue. Whether EPA ultimately agrees with that proposition or not, Benjamin Moore has reservations about the allocation process as currently envisioned that Benjamin Moore wishes to reiterate at this time.

   a.   The Batson Process Is Not Authorized by CERCLA.

There appears to be no statutory basis for the Batson allocation –which can be summed up as an EPA-improvised process for organizing certain information and allocating measures of OU2 responsibility in anticipation of a court-approved endorsement of settlement. But Congress has already mandated the process for an allocation in aid of settlement – a nonbinding preliminary allocation of responsibility ("NBAR") – in section 122(e)(3) of Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"). EPA issued guidelines for NBARs at 52 Fed. Reg. 19,919 (May 28, 1987). Per the EPA's guidelines, an NBAR is intended only as an aid to settlement among those parties who participate and EPA, and not as a justification for a contested settlement. The very nature of an NBAR confirms its more limited purpose; an NBAR is a voluntary allocation process, the results of which (i) may be adjusted by the PRPs after preparation, and (ii) cannot be introduced in any court proceeding (including one for the entry of a consent decree).

Juan M. Fajardo, Esquire
February 5, 2018
Page 2

In contrast to an NBAR, the Batson allocation is neither voluntary nor nonbinding.  While EPA and Mr. Batson on the one hand, and many of the noticed parties on the other, have talked about parties electing not to participate in the allocation process, Mr. Batson has advised that EPA has directed him to make an allocation to every noticed party unless that party was offered and accepted an early cash-out[1] or is one of the noticed parties specifically excluded from the allocation process.[2]  No so-called "allocation party" has the ability to opt out of, or to adjust, this allocation, including the parties that neither consent to it nor participate.

In short, while Benjamin Moore is not endorsing an NBAR proceeding for the Passaic River allocation, Benjamin Moore is not aware of any statutory provision or regulation that permits EPA to depart from an NBAR and develop an alternative *mandatory* settlement process.  Absent such a basis, the Batson allocation is not authorized by the statute, and the costs incurred to implement it are neither costs of response incurred consistent with the national contingency plan, nor reasonable enforcement costs.  Moreover, rather than accepting the Batson allocation as a basis for a settlement order, a court will likely reject the Batson allocation as inconsistent with CERCLA's requirements.

To be clear, Benjamin Moore believes that parties who wish to attempt settlement can use whatever they like to help them.  They just cannot force others into that process, nor can they use that process to show a resulting settlement to be fair, reasonable, or consistent with CERCLA.  If Mr. Batson's process, trial by combat, or a Ouija board would help, by all means it should be used, but that is for the parties seeking the help, and not any subsequent court.

   b.  The EPA Allocation Process is Arbitrary and Promotes a Piecemeal Settlement that Invites Challenge.

The EPA allocation process treats similarly situated parties differently, and thus is entirely arbitrary.  Nowhere is this clearer than with respect to EPA's decision to pursue an entirely separate settlement process with the Passaic Valley Sewerage Commission ("PVSC" or "the POTW") and certain municipalities.  EPA has stated its decision not to pursue the PVSC's significant industrial users, which account for several thousand responsible parties.  And yet, although several of the noticed allocation parties are connected to the Passaic River only through their use of the POTW, EPA has arbitrarily maintained those parties, but not PVSC, bear responsibility for purposes of this allocation.  If there is a principled reason for treating the POTW separately, then that reasoning surely applies likewise to parties whose sole connection to OU2 liability is through the POTW.  If that is not the case, then all parties potentially responsible for contamination to the River solely through use of the POTW, including but not limited to those noticed to date, should be included in the Batson allocation.

---

[1] This is yet another example of the unfairness of the Batson allocation.  The early cash-out settlements previously offered by EPA to select parties was predicated on EPA's assessment that these parties had not released *any* contaminant of concern ("COC") to the Passaic River.  Yet those selected parties who refused to accept the cash-out offer – i.e., to pay an arbitrary cash-out amount for having no liability at all – are nonetheless expected to participate in the Batson allocation at considerable expense.
[2] The parties excluded from the Batson allocation include the Passaic Valley Sewerage Commission and certain municipalities.

Juan M. Fajardo, Esquire
February 5, 2018
Page 3

A separately negotiated settlement between EPA and PVSC and others only reinforces the
appearance that EPA is only looking to justify early (in-kind) settlements, rather than to promote
a comprehensive settlement of OU2 responsibility without litigation. Under the guidelines, an
NBAR should allocate 100 percent of the costs of the remedial action – rather than carve out
costs to address in separate proceedings. Moreover, EPA's approach appears to disregard
section 113(f)(2) of CERCLA, as there is no suggestion that these early settlements will be
structured to assure a reduction in the liability of non-settling parties by the amounts of the
settlements EPA does reach in these separate proceedings.

The Batson allocation is not positioned as constructed to reach a settlement for 100 percent of the
costs of the remediation or any consensus among those who are the most responsible. Rather,
insofar as it eschews a comprehensive, unbiased, and informed allocation, the Batson allocation
appears designed solely to promote early settlements for a set of parties selected by EPA through
an exercise of discretion. If the purpose of the Batson allocation is simply to provide EPA with
justification for settlements with the parties responsible for the smallest shares, then that ought to
be the only outcome of the process. Mr. Batson can sort the parties into two groups; those who
meet EPA's criteria for cash-out offers and those that do not. Further allocation will be counter-
productive and invite litigation.

Benjamin Moore favors attempts to reach a reasonable and fair allocation of shared OU2
responsibility, consistent with CERCLA and without litigation. However, the Batson allocation
is not designed to aid settlement – which ought to be the only rationale for an allocation prepared
by EPA or on EPA's behalf. In fact, the Batson allocation will inevitably result in the very
protracted litigation that presumably all parties, including EPA and Benjamin Moore, seek to
avoid. Ultimately, it is the court, not EPA, that is qualified to prepare a binding allocation; and
any administrative settlement effort must be intended to mimic the likely judicial allocation if it
is intended to promote a consensual, rather than litigated, result. But the allocation process as
planned does very little to replicate a litigated equitable allocation (which would include review
of relevant documents and expert analysis) under section 113(f)(1) of CERCLA. While
Benjamin Moore hopes to receive a cash-out offer, the value of the offer will be diminished if it
does not withstand challenges from non-settling parties.

Benjamin Moore will participate in Mr. Batson's process if the process goes forward because it
has no choice; Mr. Batson will assign a share to Benjamin Moore whether Benjamin Moore
participates or not. Neither EPA nor any other party should interpret Benjamin Moore's active
participation as waiver of any claim, defense, or position concerning the reasonableness or
lawfulness of the allocation, the recoverability of the costs of the allocation under CERCLA or
other law, or the propriety of any settlement based upon the allocation or the allocation report.

Very truly yours,

David G. Mandelbaum

cc: David C. Batson, Esq.

# Exhibit C



Kathy Patrick
Partner
kpatrick@gibbsbruns.com
713.751.5253

November 7, 2018

**BY ELECTRONIC MAIL**

Mr. John Prince
Deputy Director, Emergency and Remedial Response Division
Environmental Protection Agency Region 2
290 Broadway
New York, NY 10007-1866

Mr. Eric Schaaf
Regional Counsel
Environmental Protection Agency EPA Region 2
290 Broadway
New York, NY 10007-1866

Ms. Sara Flanagan
Chief, New Jersey Superfund Branch
Office of Regional Counsel
Environmental Protection Agency Region 2
New York, NY 10007-1866

  Re: September 2016 Administrative Settlement Agreement and Order on Consent
    between the United States Environmental Protection Agency and Occidental Chemical
    Corporation

Dear Mr. Prince, Mr. Schaaf, and Ms. Flanagan:

  I write on behalf of Occidental Chemical Corporation (Occidental) to express
Occidental's concern regarding a letter sent on September 11, 2018 by Sara Flanagan, EPA's
New Jersey Superfund Branch Chief, to David Erickson of Shook, Hardy & Bacon L.L.P, who is
counsel to certain of the Defendants in Occidental's pending CERCLA action in the District of
New Jersey.

  We note that while Ms. Flanagan's letter appears to concern contribution and cost
recovery claims that are reserved to Occidental under the September 2016 Administrative
Settlement Agreement and Order on Consent between Occidental and EPA (the "2016
ASAOC"), the letter was not addressed to Occidental and Occidental did not receive a copy of it
until it was forwarded to us later by Kathryn DeLuca of Region 2.

Both the context of the letter, and the way Mr. Erickson has read it, have caused Occidental concern.

In the 2016 ASAOC, Occidental agreed to incur the expenses necessary to design EPA's selected remedy for Operable Unit 2 of the Diamond Alkali Superfund Site. EPA estimated Occidental would incur approximately $165 million to perform this work.[1] But Occidental's exposure to these costs is not capped; it has agreed to perform the work regardless of its costs to do so. Given the risks this contract shifted from the United States and other parties to Occidental, it was essential that the 2016 ASAOC preserve Occidental's right to pursue contribution recoveries from the more than 100 other parties whom EPA has alleged may be responsible for hazardous substances in the Lower Passaic River.[2]

Occidental is the only party that has stepped up to perform the expensive, essential work to design the remedy for OU2. Occidental also provided millions of dollars of funding in the bankruptcy of its indemnitors Maxus Energy Corporation and Tierra Solutions, Inc., to pursue their parent companies, and other responsible parties, so that parties responsible for the presence of hazardous substances in the Passaic River pays their fair shares of clean-up costs. Occidental undertook these efforts, in part, because it knew it had the right to pursue claims under CERCLA Sections 107 and 113 against other responsible parties to recover the response costs Occidental incurred to design the OU2 remedy, as well as other response costs it has incurred and will incur in the future at OU2 and in other operable units of the Site.

More recently, and again *alone* among the responsible parties, Occidental has been working closely with EPA, the Passaic Valley Sewerage Commission and other governmental entities to negotiate an agreement under which Occidental will agree to design and construct a sediment processing facility for the selected OU2 remedy with land and other infrastructure and services to be provided by the PVSC and the local governments. The costs of this work to Occidental are expected to exceed $160 million.

In Ms. Flanagan's September 11 letter to Mr. Erickson, who is counsel for certain Defendants in the CERCLA action, she stated it was EPA's intention to use the "allocation process" implemented by David Batson, an EPA consultant, to attempt to "negotiate a remedial action consent decree with the major parties to implement and pay for the OU2 remedy, and to identify parties that may be eligible for a cash out settlement *for OU2*."[3] EPA's letter was silent

---

[1] This estimate was provided by EPA in a press release and is not reflected in the EPA's Record of Decision.

[2] *See* 2016 ASAOC at ¶ 101 ("nothing in this Settlement Agreement constitutes a satisfaction of, or release from, any claim or cause of action against…any person not a party to this Settlement Agreement, for any liability such person may have under CERCLA…."); *see also* ¶ 103 ("…each of the Parties expressly reserves any and all rights (including, but not limited to, claims pursuant to Section 113 of CERCLA), defenses, claims, demands, and causes of action which each Party may have with respect to any matter, transaction, or occurrence relating in any way to OU2 for the Site against any person not a Party hereto.").

[3] *See* Letter from S. Flanagan, Chief, New Jersey Superfund Branch, to D. Erickson, September 11, 2001 (emphasis added).

Messrs. Prince, Schaaf,
and Ms. Flanagan
November 7, 2018
Page 3

on whether EPA intended to use the Batson process to protect the Defendants from Occidental's claims for costs Occidental has incurred under the 2016 ASAOC.

Mr. Erickson's clients, however, have since argued to the Court that EPA's letter confirms it is EPA's position that the Batson process "*is intended* to result in settlements with EPA that would result in contribution protection, *including from Occidental's claims*."[4] In addition, in a later brief in support of a Motion for Protective Order, Defendants argued that "[t]he EPA Allocation [] may result in Participating Allocation Parties receiving *complete* contribution protection, *including from Occidental's claims here*" in Occidental's CERCLA action.[5]

Occidental hopes the Defendants have read more into Ms. Flanagan's letter than EPA intended. From Occidental's perspective, the far more sensible reading of Ms. Flanagan's letter is the one that is consistent with both CERCLA and the terms of the 2016 ASAOC: namely, that while EPA may intend to provide contribution protection to the Defendants for costs incurred by the United States, it will not purport to bar contribution claims for costs incurred by Occidental, because those claims are reserved to Occidental under CERCLA and the 2016 ASAOC. If Occidental is mistaken, and Mr. Erickson's statement of EPA's intentions is correct, then please consider the following:

First, EPA has never informed Occidental that the Batson Process was intended to or would bar Occidental's rights to recover costs Occidental itself has incurred to design the remedy. Even assuming EPA had authority to do it, such an action by EPA would be unreasonable, arbitrary and capricious, given the extent of Occidental's cooperation with EPA, the Defendants' obvious responsibility for hazardous substances in the Passaic River, and the Defendants' utter lack of any cooperation on efforts to design and implement the remedy for OU2.

Second, Occidental does not believe EPA has that authority under CERCLA. By definition, Occidental's claims for contribution are for costs incurred by Occidental; they are not for a "liability to the United States" nor are they costs incurred "by the United States Government."[6] By the plain language of Sections 113 and 122 of CERCLA, Congress did not

---

[4] *See* Letter from D. Erickson to Magistrate Judge Dickson, October 4, 2018 at 3 (emphasis added), attached as Ex. "A."

[5] The "Small Parties Group" Defendants' Brief in Support of a Protective Order for the EPA Allocation and Mediated Settlement Process, *Occidental Chemical Corp. v. 21st Century Fox, et. al,* Case No. 2:18-cv-11273, Dkt. 271, at 3 n.3.

[6] CERCLA Section 122(g) is the only provision of CERCLA that plainly allows EPA to bar private parties' claims for contribution, but that authority is limited to *de minimis* settlements. No other provision of CERCLA, including CERCLA Section 113(f)(2) or Section 122(h), contains language that expressly permits EPA to bar private parties' contribution claims, as distinct from contribution claims for "costs incurred by the United States" (Section 122(h)) or contribution claims for "liability to the United States" (Section 122(f)(2)). *See e.g. United States* v. *Hardage*, 750 F. Supp. 1460, 1493 (W.D. Okla. 1990) ("CERCLA provides the United States with no authority to settle private party response cost claims."); *Akzo Coating of Am., Inc.* v. *Am. Renovating*, 842 F. Supp. 267, 271 (E.D. Mich. 1993) ("If defendants were permitted to settle with the government for part of the cleanup costs of a site, and then become immune from suit for contribution by private entities who paid for other cleanup costs, it would defeat the policy of

Messrs. Prince, Schaaf,
and Ms. Flanagan
November 7, 2018
Page 4

give EPA the prerogative to divest Occidental of its rights to seek recovery of the costs Occidental itself has alone expended as the sole performing party on the remedial design; to the contrary, Congress specifically afforded Occidental the exclusive legal right to sue to recover them.

Third, Occidental intends to protect its rights to recover the costs it has expended—and those it will expend—from the parties who have refused to bear their fair share of the costs to design the remedy to respond to the contamination at OU2. Courts scrutinize closely whether the "matters addressed" in a settlement exceed those for which EPA is permitted to offer relief. EPA could force Occidental to urge the court to do so here if EPA (and interested settling parties) purport to define "matters addressed" in a manner that would limit Occidental's rights to pursue recoveries of response costs that Occidental—and Occidental *alone*—has incurred. Occidental intends to test in court the legality and fairness of any consent decree or administrative settlement between EPA and a defendant Occidental named in its CERCLA action, if the settlement purports to compromise or inhibit Occidental's rights to seek contribution.

Finally, any purported release by EPA of *Occidental's* claims, in connection with the EPA's settlement of its own claims, would not only violate CERCLA, but would also constitute an unconstitutional taking of Occidental's property rights, including Occidental's statutory and common law rights to seek contribution for its own privately-incurred costs. If EPA has already purported to settle contribution claims for costs Occidental incurred on the Remedial Design, the monies collected must go to Occidental, not to the United States Treasury, because Occidental is the party that stepped up and agreed to incur *all* those costs.

In light of the position taken by the Defendants, Occidental requests a clear answer about EPA's intentions, before Occidental agrees to undertake an additional obligation of $160 million to design and build the sediment processing facility. We would like an opportunity to meet promptly to discuss these issues.

Sincerely,

Kathy Patrick
Counsel to Occidental Chemical Corporation

Cc:     Ms. Marcia Backus
        Ms. Melissa Hunt
        Mr. Frank Parigi
        Mr. Mike Anderson
        Mr. Larry Silver

---

CERCLA."); *Transtech Indus., Inc.* v. *A7Z Septic Clean*, 798 F.Supp. 1079 (D.N.J. 1992) ("Section 113(f)(2) prevents parties from having to pay twice for the same cleanups. Thus, defendant is immune from further liability for the response costs incurred by the United States during the time … covered by the consent decree …").

# Exhibit D

## SMALL PARTIES GROUP

January 30, 2018

VIA EMAIL

Eric J. Wilson
Deputy Director for Enforcement
and Homeland Security
USEPA
Region 2
290 Broadway
New York, NY 10007-1866

**Re:    Allocation for Operable Unit 2 Remedial Action**
**Diamond Alkali Superfund Site, Essex and Hudson Counties, New Jersey**

Dear Mr. Wilson:

This letter responds to your correspondence dated January 5, 2018 regarding the above matter, submitted on behalf of the Small Parties Group.[1]  Because of the complexity of this case, as well as the size and cost of the remedy, it is important that the allocation process provide the Allocator and the Region with sufficient information to evaluate the merits properly without engaging in unnecessary layers of process that are inefficient and unproductive.  In order to be credible, though, the allocation must be a complete and comprehensive process.  The proposed process should be restructured to increase the potential it will generate a defensible allocation, and we again urge the Region to reconsider its approach.

### ASSURING A SUFFICIENT DATABASE OF DOCUMENTS

EPA's willingness to increase the number of documents to be considered by Mr. Batson is a positive step.  And we understand that the document submission and review portion of the allocation process is not intended to duplicate the full discovery process that litigation would include.  Yet we are justifiably concerned that the document database will not contain the documents needed to perform a fair, reasonable, and credible allocation.   For example, EPA and Mr. Batson have represented that the entire State Litigation file relating to the Diamond Alkali site has been provided and is already included in the document repository.  Our review of the database of documents provided by EPA to Mr. Batson shows with certainty that this is not the case as many documents are not included.  Additional examples of fundamental defects in the database include:

---

[1] The Small Parties Group consists of more than 50 members.  This letter is not being submitted on behalf of any members who are participating in the first round cash out settlement.  Most, but not all, remaining members who were invited to participate in the allocation support this letter and the statements herein.

- It fails to include documents in EPA's possession and/or about which EPA is fully aware that evidence the massive discharges of dioxins, furans and other COCs from the Diamond Alkali upland site into the river. These documents and categories of documents include:

  o Judicial opinions, both of the New Jersey Superior Court and Appellate Division, holding that Occidental Chemical Corp.'s predecessor, Diamond Alkali, intentionally and illegally discharged dioxin, furans, DDT, and other contaminants of concern from the Diamond Alkali upland site to the Passaic River;[2]

  o The documents submitted by NJDEP in the *NJDEP v. Occidental Chemical Corp.* litigation in support of its motion for summary judgment against Occidental; these documents include, in NJDEP's words, "pleadings, documentary evidence produced during discovery, and even a final judgment establishing . . . without question, that [Occidental's predecessor] intentionally discharged dioxin, DDT and other hazardous substances into the Passaic River – a practice so pervasive that [the predecessor's] employees had a name for it: 'riverize'" (Brief in Support of Plaintiffs' Motion for Partial Summary Judgment Against Occidental Chemical Corp., No. ESX-L9868-05 (May 6, 2011) at 2);

  o Attachment A to the Cooperating Parties Group's (CPG) comments on EPA's proposed plan for the lower eight miles of the Passaic River, submitted to EPA on August 20, 2014, addressing discharges from the upland site to the river; and

  o Published articles in the peer-reviewed scientific literature establishing that the Diamond Alkali upland site "is the dominant source of the 2,3,7,8-TCDD in sediments within approximately the lower 14 miles of the lower Passaic River" (James Quadrini, et al., "Fingerprinting 2,3,7,8-tetrachlorodibenzodioxin contamination within the lower Passaic River," 34 Environ. Toxicol. Chem. 1485 (2015));

- It also fails to include documents necessary to make informed determinations about many other PRPs' respective relative liability shares.

---

[2] *See Diamond Shamrock Chem. Co. v. Aetna Cas. & Surety Co.*, 258 N.J. Super. 167, 183 (App. Div. 1992) (Diamond Alkali's "waste disposal policy … essentially amounted to 'dumping everything' into the Passaic River"); *id.* at 197 (Diamond Alkali "intentionally and knowingly discharged hazardous pollutants with full awareness of their inevitable migration to and devastating impact upon the environment"); *id.* at 212-13 ("Diamond's management knew of the hazardous nature of dioxins at a relatively early stage. … Despite specific preventative recommendations, Diamond made a conscious decision to run the autoclave, in which chemicals were processed …, at a higher temperature … The only conclusion to be drawn is that Diamond's management was wholly indifferent to the consequences flowing from its decision. Profits came first.").

The process currently under discussion for supplementing the document repository leaves the relevancy of the documents to be added/produced to be determined by each individual party producing said documents. There is no agreement among the parties regarding what information is deemed relevant and must be produced. Furthermore, requiring parties to demonstrate the relevance of each document they produce at the time of production will be neither efficient nor practical. Rather, in order to ensure a consistent approach a detailed process for document production is essential, including clear criteria for selecting specific categories of documents for submission. For example, document categories may include: PRP site operations and conduct; hazardous substance discharges; pathways for hazardous substance discharges to impact the Passaic River; the lower Passaic River 8.3 mile FFS area site issues; and any factual information that participants will rely on to support submissions arguing what allocation share they or any other participant should be given, just to name a few.

Furthermore, parties should also be required to certify that a reasonable investigation of their records has been made and responsive information in their custody has been fully disclosed. A process for addressing those instances in which parties may make incomplete or deficient productions must also be developed and codified. In order to insure that a level playing field is established, all key, relevant information must be collected before the allocation process commences so that no advantage is gained by a party due to the lack of sufficient information in EPA's database or the failure of a PRP to undertake a diligent inquiry and produce relevant documents. In this regard we note particularly that some parties have to date not indicated an intention to participate in this allocation. Therefore, if these parties do not ultimately participate, no voluntary process of certifying productions of documents will apply to them, nor will they respond to any allocation questionnaire.

In order to create an appropriately comprehensive database, the document production cannot be limited by an arbitrary page limit. Even an augmented page limitation could very well be (and likely will be) disproportionate to the complexity of the allocation, the number of relevant documents existing, and the enormous costs at issue.

We believe that a complete database collection and meaningful meetings with the Allocator could be completed within the timeframe needed to expeditiously fund and implement the OU2 remedy.

## ASSURING A FULL ALLOCATION

In its January 5, 2018 letter, EPA stated that it will not consent to add more parties to the allocation at this time. EPA's refusal extends even to the Passaic Valley Sewerage Commission (PVSC) and the four municipalities already identified as potentially responsible parties. The parties are extremely concerned with proceeding with an allocation that does not include these identified PRPs, especially PVSC.

EPA justifies its refusal to include PVSC and the four municipalities by stating that they "are uniquely situated to provide in-kind services with respect to the remedy selected for Operable Unit 2 (OU2) of the Diamond Alkali Superfund Site." In eventually justifying to a District Court any settlement with these parties, EPA will bear the burden of demonstrating that "the proportion of total projected costs to be paid by the settlors" is commensurate "with the

proportion of liability attributable to them." *United States v. Montrose Chemical Corp. of Cal.*, 50 F.3d 741, 744 (9th Cir. 1995) (citing *United States v. Charles George Trucking*, 34 F.3d 1081, 1087 (1st Cir. 1994)).

Including PVSC and the municipalities in the allocation is obviously and for many reasons the fairest and most reasonable way to determine objectively "the proportion of liability attributable to them." To be clear, that proportion is very substantial, as noted in the CPG's prior correspondence on this topic, and as would be demonstrated in the allocation. For instance, EPA Region 2 has, in prior correspondence, repeatedly stated that the risk drivers for the River are dioxin, furans, and PCBs. While the Diamond Alkali site is clearly the primary source of dioxins and furans to the River, as was set forth in detail in the October 24, 2017 letter to the EPA on behalf of the CPG, PVSC has been identified as a major, if not the primary, source of PCBs to the watershed, contributing an estimated total PCB mass of 91,613 lb. to the River.

Indeed, PVSC itself has recognized that it arranged for disposal and disposed of vast amounts of hazardous substances in the Passaic River, associated with hundreds of customers that EPA has excluded from the general notice letter and allocation process. In the New Jersey State Court litigation regarding the Passaic River and Newark Bay Complex, on September 20, 2012, PVSC submitted a letter brief to the trial court in support of an order to show cause seeking a stay of third and fourth party claims in the suit to allow the parties to pursue settlement discussions. In its papers, PVSC advised the trial court that "PVSC is prepared to name an additional 500 parties to this lawsuit by the Court's September 24, 2012 deadline."[3] The letter brief states that "PVSC alone has identified approximately 500 *viable* Fourth Party Defendants" that needed to be sued and added that "[t]his number will almost certainly increase as additional Fourth Parties are identified through discovery."[4] Indeed, as of 2012, PVSC had over 2,500 customers that had not been named in the lawsuit. Prior to PVSC's submission, on August 22, 2012, Special Master Corodemus posted a list setting forth the identities of several thousand entities not currently parties in the action that have been, or potentially could be, identified in a first pleading as Fourth Parties to the litigation. While those additional parties were not added to the litigation as the trial court issued a stay to allow the third party defendants to engage in settlement discussions with the State of New Jersey, PVSC's letter brief and the Special Master's list of potential fourth parties support the conclusion that EPA has not identified all viable parties in this matter for the allocation of OU2.

Moreover, in February of 2017, William J. Hengemihle of FTI Consulting submitted correspondence on behalf of the CPG identifying a number of supplemental industrial users who are believed to have discharged, directly or indirectly, into the Lower Passaic River. By refusing to include these other parties, PVSC, or the four previously identified municipalities in the allocation process, EPA is excluding significant, primary sources of the Passaic River risk drivers from the allocation. At a minimum, EPA should allow the parties that participate in the allocation process to submit evidence to the Allocator related to PVSC, the municipalities and additional sources for inclusion in the allocation to ensure that it appropriately accounts for those sources.

---

[3] PVSC September 20, 2012 letter brief submitted by Michael D. Witt, Esq., at p.7.
[4] PVSC September 20, 2012 letter brief submitted by Michael D. Witt, Esq., at p.9 [emphasis added].

Should it become necessary to oppose a proposed consent decree between EPA and these parties on the basis that the settlement embodied in the decree does not fairly reflect these parties' proportionate liability, we will be required to inform the Court of EPA's refusal to allow the allocator to evaluate their proportionate liability (in addition to making the full demonstration of their very substantial proportionate liability).  For these reasons, and the additional reasons previously identified by the CPG, we renew our request that the allocator evaluate these parties' proportionate liability.  If EPA is not amenable to adding the PVSC, municipalities, or additional industrial users to the allocation process, then the parties believe that these parties' true share should be evaluated as part of the allocation despite their lack of process participation. Their exclusion from the allocation altogether would proscribe a fair and complete allocation.

## CLARIFYING SETTLEMENT CRITERIA

Finally, the parties require additional information on the assessment and evaluation that EPA undertook in order to determine which parties met the stated criteria (*i.e.*, no association with the release or disposal of any of the COCs for OU2, as identified in the ROD, into the Lower Passaic River) for cash out settlements.  Since EPA stated that these criteria would be used for future cash out offers, this information will be essential in proceeding with an allocation process that allows for an early "off-ramp" for additional cash out settlements.  This would also enable the participating parties to propose supplemental criteria for the cash out settlements for the EPA's and the allocator's benefit.

## CONCLUSION

We are always willing to discuss the above issues and work with EPA to develop a comprehensive allocation process, one that the participants and EPA can agree on and that the participants would remain willing to fund.  To that end, we reiterate our prior request for a meeting with EPA to further discuss these issues.

This letter is intended as a good faith effort to improve this allocation's utility in settling this matter in whole or in part.  Nothing in this letter should be construed as an admission or agreement by any party as to any fact or matter.

Thank you in advance for your consideration of these important issues.


cc:    David Batson, Esq., AlterEcho
       Mary Apostolico, CSRA
       Kathryn Barton, EPA - OARM

# Exhibit E



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**

REGION 2
290 BROADWAY
NEW YORK, NY 10007-1866

September 11, 2018

**BY ELECTRONIC MAIL**

David R. Erickson, Esq.
Shook, Hardy & Bacon L.L.P.
2555 Grand Boulevard
Kansas City, MI 64108

Re:    Diamond Alkali Superfund Site - Operable Unit 2 Allocation Proceeding

Dear Mr. Erickson:

This will provide some background on the settlement framework developed by the Environmental
Protection Agency (EPA) for the lower 8.3 miles of the Lower Passaic River, which is Operable Unit 2
(OU2) of the Diamond Alkali Superfund Site (the Site), including the Agency's ongoing allocation, and
the importance of confidentiality.

On March 3, 2016, EPA issued the Record of Decision (ROD) selecting a remedy for OU2 to address
human health and environmental risks posed by contaminated sediments found in the lower 8.3 miles of
the Lower Passaic River, an area from the river's confluence with Newark Bay to River Mile 8.3 near the
border between the City of Newark and Belleville Township, New Jersey. In March 2016, EPA notified
over 100 parties that they were potentially responsible parties (PRPs) under Section 107(a) of the
Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended
(CERCLA), 42 U.S.C. § 9607(a), with respect to OU2 of the Site.

On September 30, 2016, EPA and Occidental Chemical Company (OCC) entered into Administrative
Settlement Agreement and Order on Consent for Remedial Design, CERCLA Docket No. 02-2016-
2021, for OCC to design the remedy selected in the OU2 ROD, under EPA oversight. The agreement
with OCC is an element of the EPA's settlement framework for OU2; additional elements include
EPA's intention to negotiate a remedial action consent decree with the major parties to implement and
pay for the OU2 remedy, and to identify parties that may be eligible for a cash out settlement for OU2.
The ongoing allocation is a critical component of the latter elements of EPA's settlement framework.

The allocation currently includes all OU2 PRPs, except public entities and a handful of parties to which
EPA offered an early cash out settlement. EPA entered into a contract and developed a Task Order
Statement of Work (SOW) for performance of the allocation by a neutral allocator. The allocation
commenced with an October 13, 2017, in-person kickoff meeting attended by EPA, the neutral allocator,
and OU2 PRPs. At the conclusion of the allocation process, the allocator will recommend a relative

share of responsibility for each allocation party's facility (or facilities, for those with more than one).[1] EPA plays an active role in the allocation process by providing input and comments, and by virtue of the fact that it is the sponsor of the allocation. The neutral allocator is taking EPA's comments into consideration, along with the input and comments from the PRPs participating in the allocation.

EPA designed the allocation to be a confidential process covered by the Alternative Dispute Resolution Act (ADR), 5 U.S.C. § 574, conducted with the assistance of a neutral allocator and team of technical experts, i.e. AlterEcho. Congress enacted the ADR Act to support and encourage the use of ADR in the federal government and provide explicit confidentiality pretentions for ADR processes. The Act includes a detailed confidentiality section "explicitly stating its intent to give parties in federally-related ADR proceedings assurance that their dispute resolution communications would generally be 'immune from discovery.'" ABA Ad Hoc Committee on Federal ADR Confidentiality, *Guide to Confidentiality Under the Federal Administrative Dispute Resolution Act* (March 2005).

The PRPs participating in the allocation have each signed a Confidentiality Agreement, agreeing to hold all communications and submissions related to the allocation confidential. EPA addressed confidentiality in the Agency's prime contract with CSRA (through which EPA retained the allocation team at AlterEcho), and in the SOW pursuant to which AlterEcho is performing the allocation. The SOW contains the confidentiality terms in EPA's agreement with CSRA-AlterEcho and references the ADR Act. Section 2.0 of the SOW states, in relevant part:

> Unless otherwise noted herein, all allocation related communications by the CSRA Team involving the OU2 PRPs or representatives of EPA or DOJ, individually or in groups, will be held confidential pursuant to the provisions of the ADR Act of 1996, 5 USC 574.

Section 3.0 of the SOW reads, in relevant part:

> CSRA will approach this task in accordance with the basic terms of the contract and according to the established norms and ethical standards of ADR professionals. Except as otherwise noted herein, information provided to the ADR professional by any of the parties, including EPA, communications between parties and the ADR professional, and notes and dispute resolution work product generated by the ADR professional during work pursuant to the Task Order will be maintained as confidential by the ADR professional pursuant to the provisions of the ADR Act of 1996 (Public Law 104-320; 5 USC571 et al.) and applicable federal, state and judicial requirements.

The information that is not confidential is noted in Section 4, Task 3 of the SOW, which reads, in relevant part:

> The allocation process will be designed based upon information received during consultations with EPA and OU2 PRPs on the allocation database and using all relevant non-confidential received information, including data, records, and other documents. No

---

[1] EPA invited all OU2 PRPs, except public entities, to participate in the allocation. 72 parties have chosen to participate, representing most of the allocation parties. The allocator will recommend a share for each allocation party, regardless of whether that allocation party has chosen to participate. Ten parties, including OCC, have chosen not to participate.

confidential information will be included in the allocation database. Though to be designed for purposes of conducting the allocation, the database will be designed in such a way as to allow access and use by EPA and DOJ staff for their settlement purposes following submission of the Allocation Data Reports in Task 8.

EPA's settlement framework, including the allocation, is in line with Congress' strong preference for settlements with responsible parties under CERCLA to avoid spending resources on litigation rather than on cleanup. H.R. Rep. No. 99-253, pt. 1, at 80 (1985), *reprinted in* 1986 U.S.C.C.A.N. 2835. As the court noted in *United States v. Charter Intl Oil Co.,* 83 F.3d 510, 520 (1st Cir. 1996), "[p]erhaps mindful of the huge resources going into the transaction costs of CERCLA litigation, rather than to remediating the sites, Congress sought to encourage earlier resolutions by agreement." These settlements serve to "reduce excessive litigation expenses and transaction costs, thereby preserving scarce resources for CERCLA's real goal: the expeditious cleanup of hazardous waste sites." *United States v. DiBiase,* 45 F.3d 541, 546 (1st Cir. 1995).

Because the allocation process is an important component in EPA's settlement framework, which in turn is important to timely cleanup of the lower 8.3 miles of the Lower Passaic River, EPA supports the confidentiality of documents and communications generated for the allocation, including EPA's comments and communications with the allocator, the participating PRPs' comments and communications with the allocator, the Position Briefs, and the Responsive Briefs.

We hope this letter enhances understanding of the settlement framework, including the OU2 allocation process.

Sincerely,

*Sarah P. Flanagan*

Sarah P. Flanagan
Chief, New Jersey Superfund Branch
Office of Regional Counsel

cc:    Allocation Parties, Appendix A
       David Batson, Esq., AlterEcho
       Brian Donohue, Esq., USDOJ
       Laura Rowley, Esq. USDOJ
       David Moora, Esq., US EPA

**Appendix A**
**Diamond Alkali Superfund Site – Operable Unit 2**
**Participating Allocation Parties**

1. 21st Century Fox America Inc.(21CFA)
2. Alliance Chemical Inc.
3. Arkema / Legacy Site Services
4. Ashland LLC
5. Atlantic Richfield (ARCO)
6. Atlas Refining Inc.
7. BASF Corporation
8. Benjamin Moore & Co
9. Berol Corporation
10. Campbell Foundry Company
11. Canning Gumm LLC
12. CBS Corporation
13. Celanese Ltd./CNA Holdings LLC
14. Chargeurs Inc.
15. Chevron Environmental Management Company
16. Coats and Clark Inc.
17. Congoleum Corporation
18. Conopco Inc
19. Cooper Industries LLC
20. Covanta Essex Co.
21. Croda Inc.
22. Curtiss-Wright Corporation
23. Darling Ingredients Inc.
24. DII Industries, LLC
25. Eden Wood Corporation
26. Elan Chemical Co Inc.
27. EnPro Holdings Inc.
28. EPEC Polymers
29. Essex Chemical Corporation
30. Everett Smith Group
31. Franklin –Burlington Plastics
32. Garfield Molding Company Inc.
33. General Electric Company
34. Givaudan Fragrances Corp
35. Goodrich Corp
36. Goody Products, Inc. on behalf of itself and Newell Brands Inc. (f/k/a Newell Rubbermaid Inc.)
37. Hartz Consumer Group Inc.
38. Hexcel Corporation
39. Hoffman – LaRoche Inc.
40. Honeywell International Inc.
41. ISP Chemicals LLC
42. Harris Corporation
43. Kearny Smelting
44. Leemilt's Petroleum Inc.
45. Legacy Vulcan Corporation
46. Lucent Technologies
47. National Standard LLC
48. Newark Group Inc.
49. Newark Morning Ledger Co.
50. The Okonite Company, Inc.
51. Otis Elevator Co.
52. Palin Enterprises
53. Pabst Brewing Company
54. Passaic Pioneer Properties Co
55. Pharmacia LLC
56. Pitt-Consol Chemical Company
57. PPG Industries Inc.
58. PSEG (Public Service Enterprise Group)
59. Purdue Pharma Technologies
60. Quality Carriers Inc.
61. Revere Smelting & Refining Corp/RSR Corp
62. Safety Kleen Ecirosystems Company/ McKesson Corp.
63. Sequa Corporation
64. Sherwin Williams Company
65. Spectraserv Inc.
66. Stanley Black & Decker Inc.
67. STWB Inc.
68. Sun Chemical
69. Tate & Lyle Ingredients Americas LLC
70. Teval Corporation
71. Textron Inc.
72. Tiffany and Company

# Exhibit F



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
REGION 2
290 BROADWAY
NEW YORK, NY 10007-1866

SEP 18 2017

**BY EMAIL AND CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

To:     See List of Addressees - Attachment A

Re:     Allocation for Operable Unit 2 Remedial Action
        Diamond Alkali Superfund Site, Essex and Hudson Counties, New Jersey

Dear Sir/Madam:

On August 28, 2017, the U.S. Environmental Protection Agency ("EPA") hosted a meeting at its New York City offices to provide you with an opportunity to share your views on the Agency's proposed settlement framework for implementation of the remedy selected for the lower 8.3 miles of the Passaic River, which is Operable Unit 2 ("OU2") of the Diamond Alkali Superfund Site (the "Site"). I want to once again thank all of the parties that participated in the meeting. Your participation has helped both EPA and the other parties better understand the issues and concerns regarding the framework.

After careful consideration, the Agency has concluded that the allocation process should include all of the potentially responsible parties ("PRPs") for OU2 (apart from the Passaic Valley Sewerage Commission ("PVSC"), the four municipal PRPs referred to below, and the PRPs that settle pursuant to the "early" cash-out settlement that EPA offered in March 2017), and should not be limited to the "middle tier" parties. Transparency and fairness are concepts that EPA has consistently stated are of importance to the Agency in this matter and, after considering your comments and concerns, we think those concepts are best served by having one allocation for all of these parties.

Numerous parties at the August 28, 2017 meeting expressed concern regarding the financial burden that would be placed on PRPs that are not responsible for the release of dioxins, furans and/or polychlorinated biphenyls ("PCBs") into the Lower Passaic River if those parties are not given the opportunity to settle with the United States for their OU2 liability, as opposed to having to implement the remedial action for OU2. EPA appreciates those concerns. As we have stated, we anticipate that with the help of the allocation process, EPA will be able to offer cash-out settlements to a number of the parties.

Similarly, EPA's expectation that the private PRPs responsible for the release of dioxins, furans and/or PCBs will perform the OU2 remedial action has not changed. It is therefore our goal that, in addition to supporting potential additional cash-out settlements, the allocation will lead to a consent decree in which those parties agree to perform the OU2 remedial action under EPA oversight.

To perform the allocation, EPA has retained AlterEcho and its senior allocation specialist, Mr. David Batson, Esq., through the Agency's prime contract with CSRA. EPA and AlterEcho invite you to attend a meeting to introduce the allocation process. Among other things, the allocation will provide opportunities for participating parties to comment on factors that should be part of the allocation and to contribute relevant information about themselves and other parties for use in the allocation. This meeting will be held on October 13, 2017 at 9:00 A.M. on the 27th floor of EPA's offices, which are located at 290 Broadway, New York, NY 10007.

Mr. Batson has requested that each party designate a primary contact for future communications on the allocation and that the primary contact attend the October 13th meeting in person. EPA has established a conference line for others wishing to participate. The call-in number is 866-299-3188, and the conference code is 212-637-3136. Please respond to EPA by October 5, 2017 with the following information: 1) name of and party represented by the primary contact attending the meeting; 2) names of other representatives planning to call in for each such party. Your response should be directed to Alice Yeh, Remedial Project Manager, Emergency and Remedial Response Division at yeh.alice@EPA.gov or U.S. EPA Region 2, 290 Broadway - 19th Floor, New York, NY 10007.

After the allocator assigns shares to the parties, EPA will make a decision as to which parties should receive cash-out settlement offers, the dollar amount of each offer, and how the money raised by the cash-out settlements will be applied towards OU2 costs.

During the August 28, 2017 meeting, several parties raised questions concerning EPA's enforcement approach for PVSC and the municipalities to which EPA issued notices of potential liability (the City of Newark, Borough of East Newark, Town of Harrison and Town of Kearny). EPA has initiated discussions with PVSC and the municipalities about substantial contributions that, collectively, they might make to the OU2 remedy. At this time, we do not believe it would be helpful to include them in the allocation.

If you have any questions regarding this matter, please contact Assistant Regional Counsel Juan Fajardo at 212-637-3132 or fajardo.juan@epa.gov.

Very truly yours,

Eric J. Wilson
Deputy Director for Enforcement and Homeland Security
Emergency and Remedial Response Division

cc: Brian Donohue, Esq., USDOJ
    Mark Barash, Esq., USDOI
    Kate Barfield, Esq., NOAA
    John Dickinson, Esq., New Jersey Attorney General's Office

**Attachment A – List of Addressees**

**Diamond Alkali Superfund Site**
**Lower 8.3 Miles - Passaic River**

| Company | Contact Information | Facility |
|---|---|---|
| A.E. Staley Manufacturing Co., Inc.<br>2200 E. Eldorado Street<br>Decatur, IL 62521-1578<br><br>Now Tate & Lyle Ingredients Americas LLC | John R. Holsinger, Esq.<br>Two University Plaza, Suite 300<br>Hackensack, NJ 07601<br>201-487-9000 (T)<br>johnh@jrholsinger.com<br><br>Heidi R. Balsley, Esquire<br>Corporate Counsel<br>A.E. Staley<br>Manufacturing Co., Inc.<br>2200 E. Eldorado Street<br>Decatur, IL 62521<br>Heidi.Balsley@tateandlyle.com | 320 Schuyler Avenue and 100 Third Avenue<br>Kearny, NJ |
| Alden Leeds Inc.<br>55 Jacobus Ave.<br>Kearny, NJ 07032 | Mark Epstein, President<br>Alden Leeds Inc.<br>55 Jacobus Ave.<br>Kearny, NJ 07032<br><br>Joseph Fiorenzo, Esq.<br>Sills Cummis & Gross<br>The Legal Center<br>One Riverfront Plaza<br>Newark, NJ 07102<br>973-643-7000 (T)<br>jfiorenzo@sillscummis.com | 2145 McCarter Highway<br>Newark, NJ<br><br>55 Jacobus Avenue<br>Kearny, NJ |
| Alliance Chemical, Inc.<br>Linden Avenue<br>Ridgefield, NJ 07657 | Fredi Pearlmutter, Esq.<br>Lindabury, McCormick, Estabrook & Cooper, P.C.<br>53 Cardinal Drive<br>Box 2369<br>Westfield, NJ 07091<br>908-233-6800 (T)<br>fpearlmutter@lindabury.com | 33 Avenue P<br>Newark, NJ |

| American Ref-Fuel Co.<br>155 Chestnut Ridge Road<br>Montvale, NJ 07645<br><br>Now Covanta Essex Company | Nancy Tammi, Esq.<br>VP, Associate General Counsel<br>Covanta<br>445 South Street<br>Morristown, NJ 07960<br>862-345-5133 | 183 Raymond Blvd & 66<br>Blanchard St<br>Newark, NJ |
|---|---|---|
| | Barbara Hopkinson Kelly, Esq.<br>Wilson Elser Moskowitz Edelman &<br>Dicker LLP<br>200 Campus Drive<br>Florham Park, NJ 07932-0668<br>973.735.5765 (Direct)<br>609.213.8589 (Cell)<br>973.624.0808 (Fax)<br>barbara.kelly@wilsonelser.com | |
| Arkema Incorporated<br>2000 Market Street<br>Philadelphia, PA 19103-3222 | Paula Martin, Esq.<br>Doug Loutzenhiser<br>Legacy Site Services, LLC<br>468 Thomas Jones Way, Suite 150<br>Exton, PA 19341-2528<br>Paula.martin@total.com | Wallace & Tiernan<br>25 Main Street<br>Belleville, NJ |
| Ashland, Inc.<br>5200 Blazer Parkway<br>Dublin, OH 43017 | Robin E. Lampkin<br>Ashland Inc.<br>5200 Blazer Parkway<br>Dublin, OH 43017<br>Telephone: 614-790-3019<br>realmpkin@ashland.com<br><br>William S. Hatfield, Esq.<br>Gibbons P.C.<br>One Gateway Center<br>Newark, NJ 07102<br>whatfield@gibbonslaw.com | 221 Foundry St.<br>Newark, NJ |
| Atlas Refining, Inc.<br>142 Lockwood Street<br>Newark, NJ 07105<br><br>Now Atlas Refinery, Inc. | Steven Schroeder, Jr., President & CEO<br>Atlas Refinery, Inc.<br>142 Lockwood Street<br>Newark, NJ 07105<br><br>Thomas H. Prol, Esq.<br>Laddey, Clark & Ryan,<br>LLP<br>60 Blue Heron Road, Suite 300<br>Sparta, NJ 07871<br>tryan@lcrlaw.com<br>tprol@lcrlaw.com | 142 Lockwood St.<br>Newark, NJ |

| | | |
|---|---|---|
| Automatic Electro Plating Corp.<br>185 Foundry Street, Suite 3<br>Newark, NJ 07105 | Michael O'Rourke, President<br>Automatic Electro Plating Corp.<br>1017 Applegate Parkway<br>Waxhaw, NC 28173-6738<br>Michael.orourke@aol.com | 185 Foundry Street Complex<br>Newark, NJ<br>(Bldgs 19, 21, 22) |
| BASF Catalysts LLC<br>100 Campus Drive<br>Florham Park, NJ | Karyllan D. Mack, Esq. (see below) | Engelhard Corporation<br>One West Central Avenue<br>East Newark, NJ |
| BASF Corp.<br>3000 Continental Drive<br>Mount Olive, NJ 07828 | Karyllan D. Mack, Esq.<br>Environmental Counsel<br>BASF Corporation<br>100 Park Avenue<br>Florham Park, NJ 07932<br>Karyllan.mack@basf.com<br><br>David Schneider, Esquire<br>Bressler, Amery & Ross<br>Post Office Box 1980<br>Morristown, NJ 07962<br>dschneider@bressler.com | 50 Central Ave.<br>Kearny, NJ<br>&<br>150 Wagaraw Rd<br>Hawthorne, NJ |
| Benjamin Moore & Co.<br>51 Chestnut Ridge Rd.<br>Montvale, NJ 07645 | Paul Sangillo, Esq.<br>Benjamin Moore & Co.<br>101 Paragon Drive<br>Montvale, NJ 07645<br>201.949.6318 (T)<br>Paul.sangillo@benjaminmoore.com<br><br>Eric S. Aronson, Esq.<br>David G. Mandelbaum, Esq.<br>GreenbergTraurig<br>500 Campus Drive<br>Suite 400<br>Florham Park, NJ 07932<br>aronsone@gtlaw.com | 134 Lister Ave.<br>Newark, NJ |
| Berol Corporation<br>c/o Newell Rubbermaid Inc.<br>2707 Butterfield Road, Suite 100<br>Oak Brook, IL 60523 | Andrew Sawula, Esq.<br>Schiff Hardin LLP<br>One Westminster Place, Suite 200<br>Lake Forest, IL 60045<br>847-295-4336 (T)<br>asawula@schiffhardin.com | Faber-Castell Corporation<br>41 Dickerson Street<br>Newark, NJ |

| Campbell Foundry Company<br>800 Bergen Street<br>Harrison, NJ 07029 | Timothy J. Corriston, Esq.<br>Connell Foley LLP<br>85 Livingston Avenue<br>Roseland, NJ 07068<br>973-535-0500 (T)<br>tcorriston@connellfoley.com | 800 Bergen Street<br>Harrison, NJ |
| --- | --- | --- |
| Canning Gum LLC<br>c/o MacDermid Incorporated<br>1401 Blake Street<br>Denver, CO 80202 | Richard A. Nave, CHMM<br>Corporate Director EH&S<br>Platform Specialty Products Corp.<br>245 Freight Street<br>Waterbury, CT 06702 | Frederick Gumm Chemical Co.<br>538 Forest Street<br>Kearny, NJ |
| Celanese Ltd.<br>Route 202-206<br>P.O. Box 2500<br>Somerville, NJ 08876<br><br>CNA Holdings LLC<br>participating on behalf of Celanese Ltd | Duke K. McCall, III, Esq.<br>Morgan, Lewis & Bockius LLP<br>1111 Pennsylvania Ave., NW<br>Washington, DC 20004-2541<br>202-373-6607 (T)<br>duke.mccall@morganlewis.com<br><br>James J. Dragna<br>Morgan Lewis<br>300 South Grand Ave., 22nd Floor<br>Los Angeles, CA 90071-3132<br>Jim.dragna@morganlewis.com<br><br>James O'Toole, Esq.<br>Buchanan Ingersoll & Rooney PC<br>Two Liberty Place<br>50 S. 16th Street, Suite 3200<br>Philadelphia, PA 19102-2555<br>James.otoole@blnc.com | 354 Doremus Ave<br>Newark, NJ |
| Chargeurs, Inc.<br>178 Wool Road<br>Jamestown, SC 29453 | James. R. Brendel, Esq.<br>Clark Hill PLC<br>One Oxford Centre<br>301 Grant Street, 14th floor<br>Pittsburgh, PA 15219<br>412-394-2373 (T)<br>jbrendel@clarkhill.com | United Piece Dye Works<br>199 and 205 Main Street and 42 Arnot Street<br>Lodi, NJ |

| | | |
|---|---|---|
| Chevron Texaco Corporation<br>6001 Bollinger Canyon Rd.<br>K-2056<br>San Ramon, CA 94583<br><br>Chevron Environmental<br>Management Company<br>participating for itself, Texaco,<br>Inc. and TRMI-H LLC | Shawn Raymond DeMerse<br>Chevron U.S.A. Inc.<br>Law Department<br>1400 Smith Street, Rm 07090<br>Houston, TX 77002<br>shawndemerse@chevron.com<br><br>Louis M. DeStefano, Esq.<br>Buchanan Ingersoll & Rooney, PC<br>550 Broad Street, Suite 810<br>Newark, NJ  07102-4517<br>973.273.9800 (T)<br>louis.destefano@bipc.com | Getty Newark Terminal<br>86 Doremus Ave.<br>Newark, NJ |
| Coats & Clark, Inc.<br>3420 Toringdon Way, Suite 301<br>Charlotte, NC 28277 | Dan Riesel, Esq.<br>Jeff Gracer, Esq.<br>Sive Paget & Riesel, P.C.<br>460 Park Avenue<br>New York, NY  10022<br>212-421-2150<br>driesel@spr.com | Clark Thread Co.<br>260 Ogden Street<br>Newark NJ<br>900 Passaic Avenue<br>East Newark  NJ<br>735 Broad Street<br>Bloomfield NJ |
| EnPro Holdings LLC as<br>assignee of Coltec<br>Industries Inc.<br><br>5605 Carnegie Boulevard<br>Charlotte, NC 28209 | Tom Price, Esq.<br>EnPro Industries<br>5605 Carnegie Boulevard<br>Charlotte, NC 28209<br>704-731-1525 (T)<br>tom.price@enproindustries.com<br><br>Charles E. Merrill, Esquire<br>Husch Blackwell Sanders LLP<br>190 Carondelet Plaza, Suite 600<br>St. Louis, MO  63105<br>314-480-1952<br>charlie.merrill@huschblackwell.com | Crucible Steel Co.<br>1000 South Fourth St.<br>Harrison, NJ |
| Congoleum Corp.<br>3705 Quakerbridge Road<br>Mercerville, NJ 08619 | Russell Hewit, Esq.<br>Dughi, Hewit & Domolewski, P.C.<br>340 North Avenue<br>Cranford, NJ 07016<br>908-272-0200(T)<br>rhewit@dughihewit.com | 195 Belgrove Drive<br>Kearny, NJ |

| | | |
|---|---|---|
| Cooper Industries, Inc.<br>600 Travis Street<br>Houston, TX 77002 | Lisa D. Sutton<br>Vice Present/Chief Counsel – EHS<br>Eaton Corporation<br>1000 Eaton Boulevard<br>Cleveland, OH 44122<br>440-523-4358 (T)<br><br>John F. Cermak<br>Sonja A. Inglin<br>Baker Hostetler<br>11601 Wilshire Boulevard, Ste 1400<br>Los Angeles, CA 90025-0509<br>310-442-8889 (T) (Cermak)<br>310-442-8885 (T) (Inglin)<br>jcermak@bakerlaw.com<br>singlin@bakerlaw.com | J. Wiss & Sons Co<br>7, 13, 26 Bank Street and<br>33 Littleton Avenue (aka 400<br>West Market Street)<br>Newark, NJ |
| Cooper Industries, LLC<br>600 Travis Street, Suite 5800<br>Houston, TX 77002 | (see above) | Thomas A. Edison, Inc.<br>Belleville Avenue &<br>Sherman Avenue<br>Bloomfield, NJ<br>75 Belmont Avenue<br>Belleville, NJ |
| Croda Inc.<br>300-A Columbus Circle<br>Edison, NJ 08837 | Stephen Swedlow, Esq.<br>Quinn, Emanuel, Urquhart & Sullivan, LLP<br>191 N. Wacker Drive, Suite 2700<br>Chicago, IL 60606<br>stephenswedlow@quinnemanuel.com | Hummel Lanolin<br>185 Foundry Street Complex<br>Newark, NJ<br>(Block 5005, Lot 21; Bld 39) |
| Curtiss-Wright Corp.<br>4 Becker Farm Road<br>Roseland, NJ 07068 | Diana Buongiorno<br>Chiesa Shahinian & Giantomassi, PC<br>One Boland Drive<br>West Orange, NJ 07052<br>973-530-2075(T)<br>dbuongiorno@csglaw.com | 1 Passaic St.<br>Woodridge, NJ |
| Darling International, Inc.<br>251 O'Connor Ridge Boulevard,<br>Suite 300<br>Irving, TX 75038 | Steven Singer, Esq.<br>34 Hillside Avenue<br>Montclair, NJ 07042<br>973-744-6093<br>stsinger@verizon.net | Standard Tallow Corp.<br>61 Blanchard Street,<br>Newark, NJ<br>1215 Harrison Avenue,<br>Kearny, NJ |
| DII Industries, LLC<br>c/o Halliburton<br>2101 City West Blvd.<br>Houston, TX 77042-3021 | Thomas C. Jackson, Esq.<br>Joshua Frank, Esq.<br>Baker Botts LLP<br>1299 Pennsylvania Ave., N.W.<br>Washington, DC 20004-2400<br>202-639-7710 (T)<br>Thomas.Jackson@bakerbotts.com<br>Joshua.frank@bakerbotts.com | Worthington Corp. &<br>Dresser Industries, Inc.<br>401 Worthington Avenue<br>Harrison, NJ |

6

| Drum Service of Newark, Inc.<br>104 Lister Ave.<br>Newark, NJ 07105 | Ralph Foglia<br>104 Lister Ave.<br>Newark, NJ<br>07105 | Hilton-Davis<br>120 Lister Ave.<br>Newark, NJ |
|---|---|---|
| Eden Wood Corporation<br>47 Parsippany Road<br>Whippany, NJ 07981 | Warren L. Dean, Jr.<br>Thompson Coburn LLP<br>1909 K Street, N.W.<br>Suite 600<br>Washington, D.C. 20006-1167<br>202.585.6908 (T)<br>wdean@thompsoncoburn.com | Whippany Paper Board<br>1 Ackerman Avenue<br>Clifton, NJ |
| E.I. duPont de Nemours & Co.<br>1007 Market Street<br>Wilmington, DE 19898 | Stephen Rahaim, Esq.<br>Chief Environmental<br>Counsel<br>E.I. duPont de Nemours and<br>Company<br>Chestnut Run Plaza<br>721/1264<br>974 Centre Road<br>P.O. Box 2915<br>Wilmington, DE 19805<br>302-996-8278(T)<br>stephen.rahaim@dupont.com | Pitt Consol<br>191 Doremus Ave.<br>Newark, NJ |
| Elan Chemical Co.<br>268 Doremus Ave.<br>Newark, NJ 07105 | Jocelyn Kapp Manship, CEO<br>Elan Chemical Company Inc.<br>268 Doremus Avenue<br>Newark, NJ 07105<br><br>Randy Schillinger, Esq.<br>Saiber Schlesinger Staz & Goldstein<br>One Gateway Center, 13th Fl<br>Newark, NJ 07102<br>973-622-3333(T)<br>rs@saiber.com | 268 Doremus Ave.<br>Newark, NJ |
| El Paso Tennessee Pipeline Co.<br>1001 Louisania Street<br>Houston, TX 77002<br><br>EPEC Polymers Inc.<br>participating on behalf of itself<br>and EPEC Oil Company<br>Liquidating Trust | Andrea A. Lipuma, Esq.<br>Saul Ewing LLP<br>650 College Road East<br>Suite 4000<br>Princeton, NJ 08540-6603<br>Telephone: 609-452-5032<br>alipuma@saul.com | Tenneco, Inc.<br>290 River Drive<br>Garfield, NJ |

7

| | | |
|---|---|---|
| Essex Chemical Corp.<br>2030 WMDC<br>Midland, MI 48674 | Kenneth Mack, Esq.<br>Linda Mack, Esq.<br>Fox Rothschild LLP<br>Post Office Box 5231<br>Princeton, NJ 08543-5231<br><br>Princeton Pike Corp. Center<br>997 Lenox Drive, Bldg. 3<br>Lawrenceville, NJ 08648<br>609-896-3000(T)<br>kmack@foxrothschild.com | 330 Doremus Ave.<br>Newark, NJ |
| Everett Smith Group, Ltd.<br>330 East Kilbourn Avenue, Ste 750<br>Milwaukee, WI 53202 | Sarah A. Slack, Esq.<br>Foley & Lardner, LLP<br>Suite 500<br>150 East Gilman Street<br>Madison, WI 53703-1482<br>608-258-4239<br>sslack@foley.com | Blanchard Bro. & Lane, Inc.<br>40 Bruen Street<br>Newark, NJ |
| Foundry Street Corporation<br>67 Kettle Hole Road 2524<br>Montauk, NY 11954-5084 | Gerald Borriello<br>Foundry Street Corporation<br>67 Kettle Hole Road 2524<br>Montauk, NY 11954-5084<br>geraldborriello@gmail.com | 185 Foundry Street Complex<br>Newark, NJ<br>(Block 5005, Lot 22 – Bldgs 19, 21, 22) |
| Fragrances North America<br>1775 Windsor Road<br>Teaneck, NJ 07666<br><br>Now Givaudan Corp. | Richard Wroblewski, P.G.<br>Environmental Specialist<br>Givaudan Fragrances Corp.<br>300 Waterloo Valley Road<br>Mount Olive, NJ 07828<br>richard.wroblewski@givaudan.com<br><br>William Hatfield, Esq.<br>Gibbons, PC<br>One Gateway Center<br>Newark, NJ 07102-5310<br>973-596-4511 (T)<br>whatfield@gibbonslaw.com | Givaudan Fragrances<br>125 Delawanna Avenue<br>Clifton, NJ |
| Franklin Burlington Plastics, Inc.<br>113 Passaic Ave.<br>Kearny, NJ 07032 | Norman Spindel, Esq.<br>Lowenstein Sandler PC<br>65 Livingston Avenue<br>Roseland, NJ 07068<br>973-597-2514(T)<br>nspindel@lowenstein.com | 113 Passaic Ave.<br>Kearny, NJ |

| | | |
|---|---|---|
| Garfield Molding Company, Inc.<br>1115 Inman Ave. #196<br>Edison, NJ 08820 | Patrick J. McStravick,<br>Ricci Tyrrell Johnson<br>& Grey 1515 Market<br>Street, Suite 700<br>Philadelphia, PA 19102<br>215-320-2087 (T)<br>PMcStravick@rtjglaw.com | 10 Midland Avenue<br>Wallington, NJ |
| General Electric Company<br>3135 Easton Turnpike<br>Fairfield, CT 06828-0001 | Roger Florio, Esq.<br>General Electric<br>640 Freedom Business Center<br>King of Prussia, PA 19406<br>Roger.florio@ge.com<br><br>Gary P. Gengel, Esq.<br>Latham & Watkins, LLP<br>One Newark Center, 16th floor<br>Newark, NJ 07101<br>973-639-7287 (T)<br>gary.gengel@lw.com | 415 South 5th Street<br>& 1000 South 2nd Street<br>Harrison, NJ |
| Goodrich Corporation<br>Four Coliseum Centre<br>2730 West Tyvola Road<br>Charlotte, NC 28217 | Earl W. Phillips, Jr., Esq.<br>Robinson & Cole LLP<br>280 Trumbull Street<br>Hartford, CT 06103-3597<br>860-275-8220 (T)<br>ephillips@rc.com | Kalama Chemical<br>290 River Drive<br>Garfield, NJ |
| Hexcel Corp.<br>2 Stamford Plaza<br>Stamford, CT 06901 | Steve Leifer, Esq.<br>Baker Botts LLP<br>1299 Pennsylvania Ave., NW<br>Washington, DC 20004<br>202-639-7723(T)<br>sleifer@bakerbotts.com | 205 Main St.<br>Lodi, NJ |
| Hoffman-La Roche Inc.<br>340 Kingsland Street<br>Nutley, NJ 07110 | John Klock, Esq.<br>Gibbons, PC<br>One Gateway Center<br>Newark, NJ 07102<br>jklock@gibbonslaw.com<br><br>Frederick Kentz, Esq.<br>Vice President and General Counsel<br>Hoffmann-La Roche Inc.<br>150 Clove Road,<br>Little Falls, NJ 07424 | 340 Kingsland Road<br>Nutley, NJ |

9

| | | |
|---|---|---|
| Honeywell International, Inc.<br>P.O. Box 2245<br>Morristown, NJ 07962 | Jeremy Karpatkin, Esq.<br>Arnold & Porter Kaye<br>Scholer LLP<br>601 Massachusetts Ave.,<br>NW<br>Washington, DC 20001<br>202-942-5564 (T)<br>Jeremy.karpatkin@apks.com | General Chemical Co.<br>65 Lodi Street/8th Street<br>Passaic, NJ |
| ISP Chemicals, Inc.<br>1361 Alps Road<br>Wayne, NJ 07470<br><br>now ISP Chemicals LLC | Robin E. Lampkin<br>Ashland Inc.<br>5200 Blazer Parkway<br>Dublin, OH 43017<br>614-790-3019 (T)<br>relampkin@ashland.com<br><br>William Hatfield, Esq.<br>Gibbons, PC<br>One Gateway Center<br>Newark, NJ 07102-5310<br>973-596-4511 (T)<br>whatfield@gibbonslaw.com | ISP Van Dyk, Inc.<br>1 Main St./11 William St.<br>Wayne, NJ |
| ITT Industries, Inc.<br>77 River Road<br>Clifton, NJ 07014<br><br>participating as Exelis Inc. for<br>itself and ITT Industries, Inc | Susanne Peticolas, Esq.<br>Gibbons, PC<br>One Gateway Center<br>Newark, NJ 07102-5310<br>973-596-4751 (T)<br>speticolas@gibbonslaw.com | 100 Kingsland Drive<br>Clifton, NJ |
| Kearny Smelting & Refining<br>936 Harrison Ave #5<br>Kearny, NJ 07032 | Ms. Francine Rothschild, President<br>Kearny Smelting & Refining<br>936 Harrison Ave<br>Kearny, NJ 07032<br>201-991-7276 (T)<br><br>Lee D. Henig-Elona, Esq.<br>Gordon & Rees<br>18 Columbia Turnpike, Suite 220<br>Florham Park, NJ 07932<br>973-549-2520(T direct)<br>973-549-2500(T office)<br>lhenig-elona@gordonrees.com | 936 Harrison Ave.<br>Kearny, NJ |

| | | |
|---|---|---|
| Lucent Technologies<br>600 Mountain Avenue<br>Murray Hill, NJ 07974<br><br>now Alcatel-Lucent USA, Inc. | James (Jay) Stewart, Esq.<br>Lowenstein Sandler LLP<br>65 Livingston Avenue<br>Roseland, NJ 07068<br>973-597-2522 (T)<br>jstewart@lowenstein.com<br><br>Gary M. Fisher, Esq.<br>Alcatel-Lucent<br>Environment, Health & Safety Corporate<br>Center<br>600 Mountain Avenue<br>Room 1F-102G<br>Murray Hill, NJ  07974<br>gary.fisher@alcatel-lucent.com | AT&T/Western Electric<br>100 Central Ave.<br>Kearny, NJ |
| Monsanto Co.<br>800 North Lindbergh Blvd.<br>St. Louis, Missouri 63167<br><br>Pharmacia Corporation (f/k/a<br>Monsanto Company) | John F. Gullace, Esq.<br>Manko, Gold, Katcher & Fox, LLP<br>401 City Avenue, Suite 500<br>Bala Cynwd, PA  19004<br>484-430-2326(T)<br>jgullace@mgkflaw.com | Monsanto Co.<br>Foot of Pennsylvania Ave.<br>Kearny, NJ |
| National-Standard Company<br>1618 Terminal Road<br>Niles, MI 49120<br><br>Now National-Standard LLC | Susanne Peticolas, Esq.<br>Gibbons, PC<br>One Gateway Center<br>Newark, NJ  07102-5310<br>973-596-4751(T)<br>speticolas@gibbonslaw.com | 714-716 Clifton Avenue<br>Clifton, NJ |
| Newark Morning Ledger<br>1 Star Ledger Plaza<br>Newark, NJ  07102 | Michael J. Anderson, Esq.<br>Sabin, Bermant & Gould LLP<br>One World Trade Center, 44th Floor<br>New York, New York 10007<br>Direct No. (212) 381-7068<br>Fax No. (212) 381-7201<br>manderson@sabinfirm.com<br><br>Frances B. Stella, Esq.<br>Brach Eichler L.L.C.<br>101 Eisenhower Parkway<br>Roseland, New Jersey 07068<br>Direct No. (973) 403-3149<br>Fax No. (973) 618-5549<br>fstella@bracheichler.com | 1 Star Ledger Plaza<br>Newark, NJ |

| | | |
|---|---|---|
| Newell Rubbermaid, Inc.<br>29 E. Stephenson Street<br>Freeport, IL 60132 | Andrew Sawula, Esq.<br>Schiff Hardin LLP<br>One Westminster Place, Suite 200<br>Lake Forest, IL 60045<br>847-295-4336 (T)<br>asawula@schiffhardin.com | Goody Products<br>969 Newark Turnpike<br>Kearny, NJ |
| News America Inc.<br>767 Fifth Ave., 46th Floor<br>New York, NY 10153<br><br>fka News Publishing Australia,<br>Ltd., now Twenty-First Century<br>Fox America | Peter Simshauer, Esq.<br>Skadden, Arps, Slate, Meagher & Flom LLP<br>500 Boylston Street<br>Boston, MA 02116<br>617-573-4880(T)<br>psimshau@skadden.com | Chris-Craft Inc./Montrose<br>Chemical Co.<br>100 Lister Ave.<br>Newark, NJ |
| Occidental Chemical Corp.<br>Occidental Tower<br>5005 LBJ Freeway<br>Dallas, TX 75244 | Dennis F. Blake<br>Senior Vice President<br>Occidental Chemical Corp.<br>5005 LBJ Freeway<br>Dallas, TX 75244<br><br>Larry Silver, Esq.<br>Langsam Stevens Silver<br>1818 Market Street, Suite 2610<br>Philadelphia, PA 19103-5319<br>215- 239.9023<br>lsilver@lssh-law.com | Diamond Shamrock<br>Chemicals Co.<br>80 and 120 Lister Ave.<br>Newark, NJ |
| The Okonite Company, Inc.<br>102 Hilltop Road<br>Ramsey, New Jersey 07446 | David Brook, Esq.<br>McCullough Ginsberg Montano &<br>Partners LLP<br>55 Bleeker Street<br>Millburn, NJ 07041<br>dbrook@mgpllp.com | Canal and Jefferson Streets<br>Passaic, NJ |
| Otis Elevator Co.<br>North America Operations<br>10 Farm Springs Road<br>Farmington, CT 06032 | Earl W. Phillips, Jr., Esq.<br>Robinson & Cole LLP<br>280 Trumbull Street<br>Hartford, CT 06103-3597<br>860-275-8220(T)<br>ephillips@rc.com | 1000 First St.<br>Harrison, NJ |
| Pabst Brewing Company<br>9014 Heritage Parkway<br>Suite 308<br>Woodridge, IL 60517 | Eugene Kashper, Chairman & CEO<br>Pabst Brewing Company<br>10635 Santa Monica Blvd Ste 350<br>Los Angeles, CA 90025 | 400 Grove Street<br>Newark, NJ |

| Palin Enterprises | Diana Buongiorno, Chiesa Shahinian & Giantomasi PC One Boland Dr. West Orange, NJ 07052 dbuongiorno@csglaw.com<br><br>Mr. Michael Palin Palin Enterprises 235 Park Avenue South, #8 New York, NY 10003-1045 | American Modern Metals 44 Passaic Ave. (a/k/a 25 Belgrove Drive)<br><br>Kearny, NJ |
|---|---|---|
| Passaic Pioneer Properties PO Box 327 35 Eighth Street Passaic, NJ 07055 | Timothy J. Corriston, Esq. Connell Foley LLP 85 Livingston Avenue Roseland, NJ 07068 973-535-0500 (T) tcorriston@connellfoley.com | 35 Eighth Street Passaic, NJ |
| PMC, Inc. 12243 Branford Street Sun Valley, CA 91352 | Phillip Kamins, President & CEO PMC Global, Inc. 12243 Branford St Sun Valley, CA 91352 818-896-1101(T) | Kleer Kast 450 Schuyler Avenue Kearny, NJ |
| Power Test of New Jersey, Inc. 125 Jericho Turnpike Jericho, NY 11753<br><br>now Leemilt's Petroleum, Inc., successor to Power Test of NJ, Inc. | Christine Fitter, Asst Secretary Leemilt's Petroleum, Inc. 125 Jericho Turnpike, Suite 103 Jericho, NY 11753 cfitter@gettyrealty.com<br><br>Nicole Moshang, Esq. Manko, Gold Katcher & Fox LLP 401 City Avenue, Ste. 500 Bala Cynwyd, PA 19004 484-430-2324 (T) nmoshang@mgkflaw.com | Getty Newark Terminal 86 Doremus Ave. Newark, NJ |
| PPG Industries, Inc. One PPG Place Pittsburgh, PA 15272 | Gary P. Gengel, Esq. Latham & Watkins, LLP 885 Third Avenue New York, NY 10022-4834 gary.gengel@lw.com | 29 Riverside Ave. Newark, NJ |

| PSE&G Corp.<br>P.O. Box 570<br>Newark, NJ 07101 | John F. Doherty, Esq.<br>Associate General Litigation Counsel<br>PSE&G Services Corporation<br>80 Park Plaza, T5D<br>Post Office Box 570<br>Newark, NJ 07102<br>973-430-6478(T)<br>John.doherty@pseg.com<br><br>Kevin R. Gardner, Esq.<br>Connell Foley<br>85 Livingston Avenue<br>Roseland, NJ 07068<br>973-535-0500(T)<br>kgardner@connellfoley.com | 155 Raymond Blvd.<br>Newark, NJ<br>&<br>4th St.<br>Harrison, NJ |
| --- | --- | --- |
| Purdue Pharma Technologies, Inc.<br>One Stamford Forum<br>Stamford, CT 06901 | James (Jay) Stewart, Esq.<br>Lowenstein Sandler PC<br>65 Livingston Avenue<br>Roseland, NJ 07068<br>973-597-2522(T)<br>jstewart@lowenstein.com | Napp Technologies<br>199 Main St.<br>Lodi, NJ |
| Quality Distribution, Inc.<br>150 East Pennsylvania Avenue<br>Suite 450<br>Downingtown, PA 19335<br><br>Quality Carriers, Inc. | Bonni Kaufman, Esq.<br>Holland & Knight, LLP<br>800 17th Street N.W. Suite 1100<br>Washington, DC 20006<br>202-419-2547<br>Bonni.kaufman@hklaw.com | Chemical Leaman Tank Lines<br>80 Doremus Avenue<br>Newark, NJ |
| Royce Associates<br>366 N. Broadway, Ste. 400<br>Jericho, NJ 11753 | A.J.Royce, President<br>Royce Associates, ALP<br>35 Carlton Ave<br>East Rutherford, NJ 07073<br>201-438-5200(T)<br><br>Ronald Bluestein, Esq.<br>Flamm Walton<br>794 Penllyn Pike<br>Blue Bell, PA 19422<br>267-419-1500 (T)<br>rbluestein@flammlaw.com | Royce Chemical Company<br>17 Carlton Avenue<br>East Rutherford, NJ |

| | | |
|---|---|---|
| RSR Corp.<br>2777 Stemmons Freeway<br>Suite 1800<br>Dallas, TX 75207<br><br>now Revere Smelting and Refining Corporation | Jane C. Luxton, Esq.<br>Christopher Clare, Esq.<br>Clark Hill PLC<br>1001 Pennsylvania Avenue<br>NW, Suite 1300 South<br>Washington, DC  20004<br>202-572-8674(T)<br>703-598-3275(M)<br>jluxton@clarkhill.com<br>cclare@clarkhill.com | Revere Smelting & Refining<br>387 Avenue P<br>Newark, NJ |
| Safety Kleen Envirosystems Co.<br>1301 Gervais St.<br>Columbia, SC 29201<br><br>McKesson Corporation for itself and for Safety-Kleen Envirosystems, Inc. | Marylin Jenkins, Esq.<br>Edgcomb Law Group<br>One Post Street, Suite 2100<br>San Francisco, California 94104-5225<br> 707-755-4341 (T)<br>mjenkins@edgcomb-law.com | 600 Doremus Ave.<br>Newark, NJ |
| Schiffenhaus Packaging Corp.<br>c/o Rock-Tenn Company<br>504 Thrasher Street<br>Norcross, GA  30071 | Camille V. Otero, Esq.<br>Gibbons, PC<br>One Gateway Center<br>Newark, NJ  07102-5310<br>cotero@gibbonslaw.com | 204 Academy Street<br>49 Fourth Street<br>2013 McCarter Highway<br>Newark, NJ |
| Sequa Corporation<br>200 Park  Avenue<br>New York, NY 10166 | Brian L. Buniva, Esq.<br>Senior Counsel & Senior Director<br>Environment, Health & Safety<br>Sequa Corporation<br>919 E. Main Street, Suite 1300<br>Richmond, VA 23219<br>845-230-7374 (Direct)<br>804-873-0610 (Mobile)<br>Brian_Buniva@sequa.com<br><br>Gary P. Gengel, Esq.<br>Kegan A. Brown, Esq.<br>Latham & Watkins, LLP<br>885 Third Avenue<br>New York, NY  10022-4834<br>gary.gengel@lw.com | Sun Chemical Corporation<br>185 Foundry Street<br>Newark, NJ<br>(prior to 1987) |
| Seton Company, Inc.<br>1000 Madison Avenue<br>Norristown, PA 19403\<br><br>now Seton Tanning | David M. Kohane, Esq.<br>Cole Schotz, PC<br>PO Box 800<br>25 Main Street<br>Hackensack, NJ  07601-7015<br>201-525-6267(T)<br><br>DKipimuaohane.bradford@coleschotz.com | Seton Leather Company<br>849 Broadway<br>Newark, NY  07104 |

| | | |
|---|---|---|
| SpectraServ, Inc.<br>75 Jacobus Avenue<br>Kearny, NJ 07032 | Diana Buongiorno, Esq.<br>Chiesa Shahinian & Giantomassi, PC<br>One Boland Dr<br>West Orange, NJ 07052<br>973-530-2075(T)<br>dbuongiorno@csglaw.com | 75 Jacobus Ave.<br>Kearny, NJ |
| STWB, Inc.<br>c/o Bayer Corporation<br>100 Bayer Road<br>Pittsburgh, PA 15205 | Timothy I. Duffy, Esq.<br>Coughlin Duffy LLP<br>Post Office Box 1917<br>350 Mount Kemble Avenue<br>Morristown, NJ 07962-1917<br>973-631-6002(T)<br>tduffy@coughlinduffy.com<br>lhall@coughlinduffy.com (Assistant) | Lehn & Fink Products Corp.<br>192-194 Bloomfield Avenue<br>Bloomfield, NJ 07003<br><br>Thomasett Colors/Sterling<br>120 Lister Ave.<br>Newark, NJ |
| Sun Chemical Corporation<br>35 Waterview Boulevard<br>Parsippany, NJ 07054-1285 | Warren W. Faure, Esq.<br>EH&S Counsel<br>Sun Chemical Corporation<br>35 Waterview Boulevard<br>Parsippany, NJ 07054<br>973-404-6590(T)<br>Warren.faure@sunchemical.com<br><br>Ted Wolff, Esq.<br>Manatt, Phelps & Phillips, LLP<br>7 Times Square<br>New York, NY 10036<br>twolff@manatt.com | Sun Chemical Corporation<br>185 Foundry Street<br>Newark, NJ<br>(1987 to present) |
| Teval Corporation<br>99 Cherry Hill Road, Suite 105<br>Parsippany, NJ 07054 | Lee D. Henig-Elona, Esq.<br>Gordon & Rees<br>18 Columbia Turnpike, Suite 220<br>Florham Park, NJ 07932<br>973-549-2520(T direct)<br>973-549-2500(T office)<br>lhenig-elona@gordonrees.com | Guyon Pipe<br>900-1000 South 4th Street<br>Harrison, NJ |
| Textron, Inc.<br>40 Westminster Street<br>Providence, RI 02903 | Jamie Schiff, Esq.<br>Textron, Inc.<br>40 Westminster Street<br>Providence, RI 02903<br>401-457-2422 (T)<br>jschiff@textron.com<br><br>Bonni Kaufman, Esq.<br>Holland & Knight<br>800 17th Street, NW<br>Suite 1100<br>Washington, DC 20006<br>202-955-3000<br>bonni.kaufman@hklaw.com | Spencer Kellogg Division<br>400 Doremus Avenue<br><br>Newark, NJ |

| | | |
|---|---|---|
| The Hartz Mountain Corporation<br>400 Plaza Drive<br>Secaucus, NJ 07094<br><br>The Hartz Consumer Group, Inc. on behalf of The Hartz Mountain Corporation | Curtis L. Michael, Esq.<br>Horowitz, Rubino & Patton<br>400 Plaza Drive<br>PO Box 2038<br>Secaucus, NJ 07094-2038<br>Curt.michael@hrplaw.com | 600/700 South 4th Street<br>Harrison, NJ |
| The Newark Group, Inc.<br>20 Jackson Drive<br>Cranford, NJ 07016 | David M. Meezan, Esq.<br>Kazmarek Mowrey Cloud Laseter LLP<br>1230 Peachtree Street N.E.<br>Suite 3600<br>Atlanta, GA 30309<br>404-969-0733<br>dmeezan@kmcllaw.com | The Newark Boxboard Co.<br>17 Blanchard Street<br>Newark, NJ |
| The Sherwin Williams Co.<br>101 Prospect Ave., N.W.<br>Cleveland, OH 44115 | Herbert (Bart) Bennett, Esq.<br>Sokol, Behot & Fiorenzo<br>229 Nassau Street<br>Princeton, NJ 08542-4601<br>609-279-0900(T)<br>hbbennett@sbflawfirm.com | 60 Lister Ave.<br>Newark, NJ |
| The Stanley Works<br>1000 Stanley Drive<br>New Britain, CT 06053<br><br>now Stanley Black & Decker, Inc. | Andrew Kolesar, Esq.<br>Thompson Hine LLP<br>312 Walnut Street, 14th Floor<br>Cincinnati, OH 45202<br>513-352-6545(T)<br>andrew.kolesar@thompsonhine.com | Stanley Tools<br>140 Chapel St.<br>Newark, NJ |
| Tiffany & Co.<br>727 Fifth Avenue<br>New York, NY 10022 | John Klock, Esq.<br>Gibbons, PC<br>One Gateway Center<br>Newark, NJ 07102-5310<br>973-596-4757 (T)<br>jklock@gibbonslaw.com | 820 Highland Avenue<br>Newark, NJ |

| | | |
|---|---|---|
| Unilever Bestfoods<br>International Plaza<br>Sylvan Avenue<br>Englewood Cliffs, NJ 07632<br><br>Conopco, Inc., d/b/a Unilever<br>(as successpr to CPC/Bestfoods,<br>former parent of the Penick<br>Corporation | Joshua Frank, Esq.<br>Baker Botts<br>1299 Pennsylvania Ave., N.W.<br>Washington, DC 20004-2400<br>202-639-7710 (T)<br>Joshua.frank@bakerbotts.com<br><br>Andrew Shakalis, Esq.<br>Associate General Counsel – Environmental<br>& Safety<br>Unilever<br>700 Sylvan Avenue<br>Englewood Cliffs, NJ 07632<br>201-894-2763 (T)<br>201-894-2727 (F)<br>Andrew.shakalis@unilever.com | Penick Corporation<br>540 New York Avenue<br>Lyndhurst, NJ |
| Viacom Inc.<br>11 Stanwix St.<br>Pittsburgh, PA 15222<br><br>Now CBS Corporation | Jeffrey B. Groy, Esq.<br>VP, Sr. Counsel/ Environmental<br>CBS Law Department<br>CBS Corporation<br>2 East Mifflin Street, Suite 200<br>Madison, WI 53703<br>262-705-0579(T)<br>jeff.groy@cbs.com | Westinghouse Electric<br>95 Orange St.<br>Newark, NJ |
| Vulcan Materials Co.<br>1200 Urban Center Drive<br>Birmingham, AL 35242<br><br>Now Legacy Vulcan Corp. | Eva Fromm O'Brien, Esq.<br>Fulbright & Jaworski<br>Fulbright Tower<br>1301 McKinney<br>Suite 5100<br>Houston, TX 77010-3095<br>713-651-5321 (T)<br>713-651-5246 (F)<br>eobrien@fulbright.com<br><br>John M. Floyd, Esq.<br>Senior Attorney<br>Vulcan Materials Company<br>1200 Urban Center Drive<br>Birmingham, AL 35242<br>205-298-3745 (Direct)<br>205-492-4219 (Cell)<br>205-298-2960 (F)<br>floydj@vmcmail.com | 600 Doremus Ave.<br>Newark, NJ |

| | | |
|---|---|---|
| Roman Asphalt Corporation 14 Ogden Street Newark, NJ 07104 | Michael V. Calabro, Esq. Law Offices of Michael V. Calabro 475 Bloomfield Avenue Newark, NJ 07107 973 482-1085 Mcalabro475@gmail.com | 14 Ogden Street Newark, NJ |

# Exhibit G



**U.S. Department of Justice**

Environment and Natural Resources Division

236380-4-1-23-06019

| *Law and Policy Section* | *Telephone (202) 514-1442* |
|---|---|
| *P.O. Box 7415* | |
| *Ben Franklin Station* | |
| *Washington, DC  20044-7415* | |

January 26, 2023

**VIA EMAIL**

Claire Grega
Langsam Stevens Silver & Hollaender LLP
1818 Market Street
Suite 2430
Philadelphia, PA 19103
(216) 904- 1027
cgrega@lssh-law.com

FOIA No.: 2023-06019

Dear Ms. Grega:

  This is an interim response relating to your Freedom of Information Act (FOIA) request seeking "any and all documents related to the Department of Justice's retention in 2016 of David Batson of Techlaw 'to assist in settlement analysis', as referenced at page 2 of the Task Order titled 'Diamond Alkali-Lower Passaic River Allocation' and dated June 27, 2019 . . . and amounts paid by DOJ to Techlaw or David Batson for this retention." The Environment and Natural Resources Division (ENRD) received your FOIA request on December 12, 2022.

  On January 23, 2023, you spoke with ENRD Attorney Madeline Van Nostrand and FOIA Coordinator and FOIA Public Liaison Charles Smiroldo. They informed you that responsive invoices were submitted to ENRD as "confidential" and required ENRD to consult with the submitter of the information. *See* Department of Justice FOIA regulations, 28 C.F.R. § 16.7. They also informed you that contractor rates are typically considered confidential business information protected by FOIA Exemption 4. You agreed to first receive ENRD's official contracting documents, and then you would assess your need for any further information.

  Please find attached a PDF containing 13 pages responsive to your request, portions of which have been redacted pursuant to Exemptions 4 and/or 6 of the FOIA. Exemption 4 relates to "trade secrets and commercial or financial information obtained from a person [that is] privileged or confidential." 5 U.S.C. § 552(b)(4). Exemption 6 relates to information about individuals in "personnel and medical files and similar files" where the disclosure of such information would "constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). Please be advised that we have considered the foreseeable harm standard when reviewing records and applying FOIA exemptions.

This information was provided free of charge to you. If you require any additional information, fees will be assessed.

ENRD will continue to process your FOIA request only if you determine that this release does not satisfy your request. For now, your request is being placed on hold.

For your information, Congress excluded three discrete categories of law enforcement and national security records from the requirements of the FOIA. *See* 5 U.S.C. 552(c) (2006 & Supp. IV 2010). This response is limited to those records that are subject to the requirements of the FOIA. This is a standard notification that is given to all our requesters and should not be taken as an indication that excluded records do, or do not, exist.

If you are not satisfied with ENRD's determination in response to this request, you may administratively appeal by writing to the Director, Office of Information Policy (OIP), United States Department of Justice, 441 G Street, NW, 6th Floor, Washington, D.C. 20530, or you may submit an appeal through OIP's FOIA STAR portal by creating an account following the instructions on OIP's website: https://www.justice.gov/oip/submit-and-track-request-or-appeal. Your appeal must be postmarked or electronically transmitted within 90 days of the date of my response to your request. If you submit your appeal by mail, both the letter and the envelope should be clearly marked "Freedom of Information Act Appeal."

If you need any further assistance, please contact Madeline Van Nostrand at (202) 514-3473 or our FOIA Public Liaison Amber Blaha at (202) 616-5515. Additionally, you may contact the Office of Government Information Services (OGIS) at the National Archives and Records Administration to inquire about the FOIA mediation services it offers. The contact information for OGIS is as follows: Office of Government Information Services, National Archives and Records Administration, 8601 Adelphi Road-OGIS, College Park, Maryland 20740-6001, e-mail at ogis@nara.gov; telephone at (202) 741-5770; toll free at 1 (877) 684-6448; or facsimile at (202) 741-5769.

Sincerely,

/s/ *Judy Harvey*

Judy Harvey
Assistant Chief, Law & Policy Section

**Department of Justice**

**Request, Authorization and Contract for Services of Expert Witness, Litigative Consultant, or ADR Neutral**

**Contract / Purchase Order Number:    DJJ-16W-ENR01-0221**                    R0156035

| Part I – Request for Services |
|---|

| 1. Requesting Official (Name & Title) MAHER JR, ROBERT ASST SEC CH | 2. Signature of Requesting Official [ SIGNATURE IN CONTRACT FILE ] | 3. Point of Contact (Name and Tel.) DONOHUE, BRIAN<br><br>Telephone: 202-514-5413 | 4. Date of Request 04/12/2016 |
|---|---|---|---|
| 5. Originating Office ENRD/EES<br><br>**ORIGINAL** | 6. Originating Office Address Washington, DC | 7. Case Name, Court & Docket No. U.S. V. CHEMICAL LAND HOLDINGS (SUPERFUND TRACKING NUMBER - DIAMOND ALKALI SITE - PASSAIC RIVER) NJ, 2004-2011 | 8. DJ File No./USAO No. 90-11-3-07683/1 |
| 9. Contractor (Name and Tel.) Mr. David Batson<br><br>Telephone: 703-818-3228 Fax: 70-818-8813 | 10. Contractor Mailing Address AlterEcho, Inc. 14500 Avion Parkway Suite 300 Chantilly, Virginia 20151-1101 | 11. Contractor TIN or SSN (Individual) Ex 6 — PII<br><br>DUNS: Business Type: | 12. Contractor Specialty Allocation/Mediation |

| 13. Reason for Request (Place an "X" in the applicable Box in the Left Column) | |
|---|---|
| X | 13.a. Expert Testimony on Behalf of U.S. |
| | 13.b. Deposition Conducted by DOJ Attorney |
| | 13.c. Medical Examination of Plaintiff/Witness Defendant in Contemplation of Testimony on Behalf of U.S. |
| | 13.d. Examination Under 18 USC 4241, Mental Competency to Stand Trial Only |
| | 13.e. Dual Purpose Psychiatric Examination (Time of Offense and Competency to Stand Trial) on the motion of: |
| | 13.f. ADR Neutral Services |
| | 13.g. Litigative Consultant Services |
| | 13.h. Other (explain below): |

**Attach the Statement of Work to this Form**

| 14. Negotiated Contractor Rates, Estimate Expenses, and Performance Dates (Note: Expenses incurred must be supported by receipts) | | | | | |
|---|---|---|---|---|---|
| Service/Expense | Performance Dates (From-To) | Hour/Day | Quantity | Rate | Total |
| 14.a. Examine Case | | | | | |
| 14.b. Prepare Testimony | | Per Hour | | Ex 4 — CBI | |
| 14.c. Court Testimony | | | | | |
| 14.d. Deposition | | | | | |
| 14.e. Litigative Consultant/Neutral | | | | | |
| 14.f. Per Diem (if not part of fee) | | Day | | | |
| 14.g. Privately Owned Vehicle (NTE coach rate) | | Mile | | | |
| 14.h. Common Carrier Transportation Via GTA | | | | | |
| 14.i. Common Carrier Transportation Reimbursed | | | | | |
| 14.j. Taxi | | | | | |
| 14.k. Miscellaneous (eg. Printing, exhibits, parking) | | | | | |
| 14.l. Total Estimated Expenses | | | | | $5,000.00 |

| 15. Submit Invoices & EFT Information to:<br><br>US DOJ - ENRD/Executive Office Procurement, Expert Contracts Unit P.O. BOX 7611 Washington, DC 20044-7611 | 16. Payment will be made by: (Place an "X" in the applicable Box and fill-in if not JMD/Finance)<br><br>X  U.S. Department of Justice JMD/FS Fiscal Services/Operations Two Constitution Square 145 N Street NE, 7th floor Washington, DC 20002-3371 Tel. Hotline: (202) 616-5755 |
|---|---|

AN  4/14/2016          PRJ = EVJK

epartment of Justice

Request, Authorization and Contract for Services of
Expert Witness    tigative Consultant, or ADR Neutral

| ontract/Purchase Order No. & Effective Date: | | DJJ-16W-ENR01-0221 | | |
|---|---|---|---|---|

### Part II – Funding Approval

| 17.a. Authorized Amount $5,000.00 | 17.b. YREGDOC R0156035 | 17.c. Cost Center 6B1598 | 17.d. OBL Month 1604 | 17.e. Sub Object Code (SOC) 1157 |
|---|---|---|---|---|

17.f. Remarks

*NOTE: The FEW Appropriation (15X0311) shall ONLY be used to fund Witness Services (i.e., items 13.a. through 13.e. above)*

18. Funding Amount (Place an "X" in the applicable Box in the Left Column and fill-in the Amount and Performance Period)

| | | 18.b. Amount | 18.c. Period (From – To) |
|---|---|---|---|
| **X** | 18.a. Fully Funded This Contract is FULLY FUNDED in the amount specified in block 18.b. to cover the estimated costs of the ENTIRE project whose performance period is specified in Block 18.c. This amount shall NOT be exceeded without authorization and written modification of this contract by the Contracting Officer. | $5,000.00 | (from) date of CO signature below (to) 3/21/2021 |
| | 18.d. Incrementally Funded This Contract is INCREMENTALLY FUNDED. The total estimated cost of the project is specified in Block 14.i. Currently, funding is provided only in the amount specified in Block 18.e. to cover the estimated costs incurred during the performance period specified in Block 18.f. The amount specified in Block 18.e. shall NOT be exceeded without authorized and written modification of this contract by the Contracting Officer. | 18.e. Amount | 18.f. Period (From – To) |

*Reminder: Witnesses are not entitled to Advance Payments.*

### 19. Funding Approval

| 19.a. Signature of Approving Official | 19.b. Name & Title of Approving Official Teanne Featherstone, Budget Analyst | 19.c. Date Approved 4/18/16 |
|---|---|---|

### Part III – Contract

This contract consists of the documents listed below. In the event of any inconsistency among the foregoing documents, such inconsistency shall be resolved in the order in which said documents are listed.
(1) OBD Form 47, Request, Authorization and Contract for Services of Experts Witness, Litigative Consultant, or ADR Neutral, consisting of 2 pages.
(2) Attachment 1, Contract Terms, Conditions, and Procedures, consisting of 3 pages.
(3) Attachment 2, Statement of Work
(4) The Contractor's proposal, incorporated herein by reference.
By signing this document, the Contractor agrees to perform services as described herein in accordance with the terms, conditions, and rates set forth in the contract.
The Contractor also certifies that, to the best of its knowledge, there is nothing derogatory in the background of its employees that could impugn testimony given by these employees or work products delivered by the Contractor.
This contract/purchase order is issued in accordance with FAR 15.504 if the value exceeds the Simplified Acquisition Threshold or 13.004 if not exceeding the Simplified Acquisition Threshold.

### 20. Contractor Signature

| 20.a. Signature of Authorized Person | 20.b. Name & Title of Signer Judy Manley, VP | 20.c. Date Signed 4-25-16 |
|---|---|---|

### 21. Contracting Officer Signature

| 21.a. Signature of Contracting Officer | 21.b. Name of Contracting Officer Latoya Clayton-Bullock Johanna R. Cusack | 21.c. Date Signed 4-25-16 |
|---|---|---|

2016 MAY 18 PH 5:20

DOJ-ENR0

Previous Editions are Obsolete
This form was electronically produced by Elite Federal Forms, Inc.

Form OBD-47 (Revised 8/2010)
Page 2 of 2

**U.S. Department of Justice**

**Request, Authorization and Contract for Services of Expert Witness, Litigative Consultant, or ADR Neutral**

Contract/Purchase Order No.: **16W-0221**

### Part I – Request for Services

| 1. Requesting Official (Name & Title)<br>Robert E. Maher, Jr.<br>Assistant Section Chief | 2. Signature of Requesting Official | 3. Point of Contact (Name and Tel.)<br>Brian Donohue<br>**Telephone:** 202-514-5413 | 4. Date of Request<br>04/12/2016 |
|---|---|---|---|
| 5. Preparer (Name & Tel.)<br>Rosa Moreira Centeno<br>(202) 514-2598 | 6. Originating Office (Name & Address)<br>U.S. DOJ/ENRD/EES<br>P.O. Box 7611, Ben Franklin Station<br>Washington, DC 20044-7611 | 7. Case Name, Court & Ct. Docket No.<br>U.S. v. Chemical Land Holdings<br>(Passaic River Matter) | 8. DJ File No./USAO No.<br>90-11-3-07683/1 |
| 9. Contractor (Name and Tel.)<br>David Batson<br><br>Telephone: 703-818-3228 | 10. Contractor Mailing Address<br>AlterEcho, Inc.<br>14500 Avion Parkway, Suite 300<br>Chantilly, VA 20151-1101 | 11. Contractor TIN or SSN (Individual)<br>Ex. 6 — PII | 12. Contractor Specialty<br>Allocation/Mediation |

### 13. Reason for Request (Place an "X" in the applicable Box in the Left Column)

| | |
|---|---|
| ✓ | 13.a. Expert Testimony on Behalf of U.S. |
| | 13.b. Deposition Conducted by DOJ Attorney |
| | 13.c. Medical Examination of Plaintiff/Witness/Defendant in Contemplation of Testimony on Behalf of U.S. |
| | 13.d. Examination Under 18 USC 4241, Mental Competency to Stand Trial Only |
| | 13.e. Dual Purpose Psychiatric Examination (Time of Offense and Competency to Stand Trial) on the motion of: |
| | |
| | 13.f. ADR Neutral Services |
| | 13.g. Litigative Consultant Services |
| | 13.h. Other (explain below): |

### *Attach the Statement of Work to this Form*

**14. Negotiated Contractor Rates, Estimated Expenses, and Performance Dates** *(Note: Expenses incurred must be supported by receipts)*

| Service/Expense | Performance Dates (From-To) | Hour/Day | Quantity | Rate | Total |
|---|---|---|---|---|---|
| 14.a. Examine Case | | | | | |
| 14.b. Prepare Testimony | | | | | |
| 14.c. Court Testimony | | | | | |
| 14.d. Deposition | | | | | |
| 14.e. Litigative Consultant/Neutral | | NTE | | | 4,550.00 |
| 14.f. Per Diem (If not part of fee) | | Day | | 450– Incl. trans | 450.00 |
| 14.g. Privately Owned Vehicle (NTE coach rate) | | Mile | | | |
| 14.h. Common Carrier Transportation Via GTA | | | | | |
| 14.i. Common Carrier Transportation Reimbursed | | | | | |
| 14.j. Miscellaneous | | | | | |
| **14.k. Total Estimated Expenses** | | | | | **$5,000.00** |

| 15. Submit Invoices & EFT Information to: | 16. Payment will be made by: (Place an "X" in the applicable Box and fill-in if not JMD/Finance) |
|---|---|
| | ✓ **U.S. Department of Justice**<br>**JMD/Finance Staff**<br>**600 E Street, NW, Room 4045**<br>**Washington, DC 20530-0001**<br>**Tel. Hotline: (202) 616-5755** |

2016 APR 12 PM 12:20



DOJ-ENRD

**U.S. Department of Justice**

**Request, Authorization and Contract for Services of Expert Witness, Litigative Consultant, or ADR Neutral**

**Contract/Purchase Order No.:**

| Part II – Funding Approval |
|---|

| 17. Appropriation Data |
|---|

| 17.a. Authorized Amount | 17.b. YREGDOC | 17.c. Cost Center | 17.d. OBL Month | 17.e. Sub Object Code (SOC) |
|---|---|---|---|---|
| | | | | |

**17.f. Remarks**

*Note: The FEW Appropriation (15X0311) shall ONLY be used to fund Witness Services (i.e., Items 13.a through 13.e above)*

| 18. Funding Amount (Place an "X" in the applicable Box in the Left Column and fill-in the Amount and Performance Period) | | |
|---|---|---|
| ✓ | **18.a. Fully Funded**  This Contract is FULLY FUNDED in the amount specified in Block 18.b to cover the estimated costs of the ENTIRE project whose performance period is specified in Block 18.c. This amount shall NOT be exceeded without authorization and written modification of this contract by the Contracting Officer. | **18.b. Amount**  $5,000.00 | **18.c. Period (From - To)** |
| | **18.d. Incrementally Funded**  This Contract is INCREMENTALLY FUNDED. The total estimated cost of the project is specified in Block 14.k. Currently, funding is provided only in the amount specified in Block 18.e to cover estimated costs incurred during the performance period specified in Block 18.f. The amount specified in Block 18.e shall NOT be exceeded without authorization and written modification of this contract by the Contracting Officer. | **18.e. Amount** | **18.f. Period (From - To)** |

*Reminder: Witnesses are not entitled to Advance Payments.*

| 19. Funding Approval | | |
|---|---|---|
| 19.a. Signature of Approving Official | 19.b. Name & Title of Approving Official | 19.c. Date Approved |

| Part III – Contract |
|---|

This contract consists of the documents listed below. In the event of any inconsistency among the following documents, such inconsistency shall be resolved in the order in which said documents are listed.

(1) OBD Form 47, Request, Authorization and Contract for Services of Expert Witness, Litigative Consultant, or ADR Neutral, consisting of 2 pages.
(2) Attachment 1, Contract Terms, Conditions, and Procedures, consisting of 3 pages.
(3) Attachment 2, Statement of Work.
(4) The Contractor's proposal, incorporated herein by reference.

By signing this document, the Contractor agrees to perform services as described herein in accordance with the terms, conditions, and rates set forth in this contract.

The Contractor also certifies that, to the best of its knowledge, there is nothing derogatory in the background of its employees that could impugn testimony given by these employees or work products delivered by the Contractor.

This contract shall not become effective until signed by an authorized representative of the Contractor AND the Contracting Officer.

| 20. Contractor Signature | | |
|---|---|---|
| 20.a. Signature of Authorized Person | 20.b. Name and Title of Signer | 20.c. Date Signed |

| 21. Contracting Officer Signature | | |
|---|---|---|
| 21.a. Signature of Contracting Officer | 21.b. Name of Contracting Officer | 21.c. Date Signed |

**U.S. Department of Justice**

**Request, Authorization and Modification of Contract for Services of Expert Witness, Litigative Consultant, or ADR Neutral**

| Contract / Purchase Order Number: | DJJ-16W-ENR01-0221 | | R01-56035 |
|---|---|---|---|

### Part I – Request for Services

| 1. Requesting Official (Name and Title) MAHER JR, ROBERT ASST SEC CH | 2. Signature of Requesting Official <Signature in Contract File> | 3. Point of Contact (Name and Tel.) DONOHUE, BRIAN Telephone: 202-514-5413 | 4. Date of Request 06/16/2016 |
|---|---|---|---|
| 5. Originating Office (Name & Address) ENRD/EES Washington, DC | 6. Case Name, Court & Docket No. U.S. V. CHEMICAL LAND HOLDINGS (SUPERFUND TRACKING NUMBER - DIAMOND ALKALI SITE - PASSAIC RIVER) NJ 2004-2011 DJ File No. 90-11-3-07683/1 | 7. Contractor (Name, Address & Telephone) Mr. David Batson Techlaw, Inc. 14600 Avion Parkway Suite 300 Chantilly, Virginia 20151-1101 TIN/SSN: Ex. 6 — PII Telephone: 703-818-3228 Business Type: | DUNS: Fax: 703-818-8813 |

### 8. Modification Information

| 8.a. Type of Service (Insert "Expert Witness", "Litigative Consultant" or "ADR Neutral") Expert Witness | 8.b. Performance Period (From – To) 04/25/2016 to 03/31/2021 | 8.c. Estimated Cost Total SOW $5,000.00 | 8.d. Modification Number 0001 | 8.e. Effective Date Date of CO signature In Block 14c below |
|---|---|---|---|---|

**9. Description of Modification** (insert below-attach continuation sheets if necessary)

The contract action changes name from company subsidiary AlterEcho, Inc. to actual name of company Techlaw, Inc.

### Part II – Funding Approval

#### 10. Appropriation Data

| 10.a. Authorized Amount $0.00 | 10.b. YREGDOC R01-56035 A | 10.c. Cost Center 6B1598 | 10.d. OBL Month 1604 | 10.e. Sub Object Code (SOC) 1157 |
|---|---|---|---|---|

10.f. Remarks

#### 11. Summary of Funding and Performance Period Changes

| Description | Performance Dates (From – To) | Amount |
|---|---|---|
| 11.a. Current Contract (to include any prior modifications) | | $5,000.00 |
| 11.b. This Modification (funds added/subtracted additional time) | | $0.00 |
| 11.c. Revised Total Contract Funding | | $5,000.00 |
| **The Contractor shall not exceed the amount shown in Block 11.c. unless authorized in writing by the Contracting Officer** | | |

#### 12. Funding Approval

| 12.a. Signature of Approving Officer | 12.b. Name & Title of Approving Official Teanne Featherstone, Budget Analyst | 12.c. Date Approved 7/13/16 |
|---|---|---|

### Part III - Contract Modification

Type of Modification (Place an "X" in the applicable Box in the Left Column)

| | This is supplemental agreement requires the signature of the Contractor AND the Contracting Officer to effect the changes described in Block 9. |
|---|---|
| X | This unilateral modification ONLY requires the signature of the Contracting Officer to effect the administrative changes (e.g., change the paying office or appropriate data) described in Block 9. |

#### 13. Contractor Signature

| 13.a. Signature of Authorized Person | 13.b. Name and Title of Signer | 13.c. Date Signed |
|---|---|---|

#### 14. Contracting Officer Signature

| 14.a. Signature of Contracting Officer | 14.b. Name of Contracting Officer Johnnie R. Cusack | 14.c. Date Signed 7-13-16 |
|---|---|---|


JM 7/13/16

**U.S. Department of Justice**

**Request, Authorization and Modification of Contract for Services of Expert Witness, Litigative Consultant, or ADR Neutral**

| Contract / Purchase Order Number: | DJJ-16W-ENR01-0221 | R01-56035 |
|---|---|---|

### Part I – Request for Services

| 1. Requesting Official (Name and Title) MAHER JR, ROBERT ASST SEC CH | 2. Signature of Requesting Official *<Signature in Contract File>* | 3. Point of Contact (Name and Tel.) DONOHUE, BRIAN Telephone: 202-514-5413 | 4. Date of Request 06/20/2016 |
|---|---|---|---|

| 5. Originating Office (Name & Address) ENRD/EES Washington, DC **ORIGINAL** | 6. Case Name, Court & Docket No. U.S. V. CHEMICAL LAND HOLDINGS (SUPERFUND TRACKING NUMBER - DIAMOND ALKALI SITE - PASSAIC RIVER) NJ 2004-2011 DJ File No. 90-11-3-07683/1 | 7. Contractor (Name, Address & Telephone) Mr. David Batson Techlaw, Inc. 14500 Avion Parkway Suite 300 Chantilly, Virginia 20151-1101 TIN/SSN: Ex. 6 — PII Telephone: 703-818-3228 Business Type: | DUNS: Fax: 703-818-8813 |
|---|---|---|---|

#### 8. Modification Information

| 8.a. Type of Service (Insert "Expert Witness", "Litigative Consultant" or "ADR Neutral") **Expert Witness** | 8.b. Performance Period (From – To) 04/25/2016 to 03/31/2021 | 8.c. Estimated Cost **Total SOW $10,250.00** | 8.d. Modification Number **0002** | 8.e. Effective Date Date of CO signature in Block 14c below |
|---|---|---|---|---|

**9. Description of Modification (Insert below-attach continuation sheets if necessary)**
Add Work in Accordance with Attached SOW.

### Part II – Funding Approval

#### 10. Appropriation Data

| 10.a. Authorized Amount **$5,250.00** | 10.b. YREGDOC **R01-56035 B** | 10.c. Cost Center **6B1598** | 10.d. OBL Month **1604** | 10.e. Sub Object Code (SOC) **1157** |
|---|---|---|---|---|

10.f. Remarks

#### 11. Summary of Funding and Performance Period Changes

| Description | Performance Dates (From – To) | Amount |
|---|---|---|
| 11.a. Current Contract (to include any prior modifications) | | $5,000.00 |
| 11.b. This Modification (funds added/subtracted additional time) | | $5,250.00 |
| 11.c. Revised Total Contract Funding | | $10,250.00 |

*The Contractor shall not exceed the amount shown in Block 11.c. unless authorized in writing by the Contracting Officer*

#### 12. Funding Approval

| 12.a. Signature of Approving Officer | 12.b. Name & Title of Approving Official **Teanne Featherstone, Budget Analyst** | 12.c. Date Approved 7/15/16 |
|---|---|---|

### Part III - Contract Modification

Type of Modification (Place an "X" in the applicable Box in the Left Column)

| | This is supplemental agreement requires the signature of the Contractor AND the Contracting Officer to effect the changes described in Block 9. |
|---|---|
| X | This unilateral modification ONLY requires the signature of the Contracting Officer to effect the administrative changes (e.g., change the paying office or appropriate data) described in Block 9. |

#### 13. Contractor Signature

| 13.a. Signature of Authorized Person | 13.b. Name and Title of Signer Judy Manley, Executive VP | 13.c. Date Signed 8-1-16 |
|---|---|---|

#### 14. Contracting Officer Signature

| 14.a. Signature of Contracting Officer | 14.b. Name of Contracting Officer Johnnie R. Cusack | 14.c. Date Signed 7-15-16 |
|---|---|---|

AN 7/15/2016

**U.S. Department of Justice**

**Request, Authorization and Modification of Contract for Services of Expert Witness, Litigative Consultant, or ADR Neutral**

**Contract/Purchase Order Number:**

| Part I – Request for Services | | | |
|---|---|---|---|
| **1. Requesting Official (Name & Title)** Robert E. Maher, Jr. Assistant Section Chief | **2. Signature of Requesting Official** | **3. Point of Contact (Name and Tel.)** Brian Donohue Telephone: (202) 514-5413 | **4. Date of Request** 6/20/16 |
| **5. Originating Office (Name & Address)** USDOJ-ENRD-EES 601 D St. NW Washington DC, 20004 | **6. Case Name, Court & Ct. Docket No.** U.S. v. Chemical Land Holdings (Passaic River Matter) 90-11-3-07683/1 | **7. Contractor (Name, Address & Telephone)** David Batson 14500 Avion Parkway, Suite 300, Chantilly, VA Telephone: (703) 818-3228 | |

| 8. Modification Information | | | | |
|---|---|---|---|---|
| **8.a. Type of Service (Insert "Expert Witness", "Litigative Consultant" or "ADR Neutral")** Expert Witness | **8.b. Performance Period (From - To)** 04/25/2016-03/31/2021 | **8.c. Estimated Cost** | **8.d. Modification Number** | **8.e. Effective Date** |

**9. Description of Modification (insert below—attach continuation sheets if necessary)**

| Part II – Funding Approval | | | | |
|---|---|---|---|---|
| 10. Appropriation Data | | | | |
| **10.a. Authorized Amount** | **10.b. YREGDOC** R0156035 | **10.c. Cost Center** 6B1598 | **10.d. OBL Month** | **10.e. Sub Object Code (SOC)** 1157 |

**10.f. Remarks**

**11. Summary of Funding and Performance Period Changes**

| Description | Performance Dates (From - To) | Amount |
|---|---|---|
| **11.a. Current Contract (to include any prior modifications)** | 04/25/2016-03/31/2021 | $5,000.00 |
| **11.b. This Modification (funds added/subtracted additional time)** | | $5,250.00 |
| **11.c. Revised Total Contract Funding** | | $10,250.00 |

*The Contractor shall not exceed the amount shown in Block 11.c unless authorized in writing by the Contracting Officer*

| 12. Funding Approval | | |
|---|---|---|
| **12.a. Signature of Approving Official** | **12.b. Name & Title of Approving Official** | **12.c. Date Approved** |

| Part III – Contract Modification | |
|---|---|
| Type of Modification (Place an "X" in the applicable Box in the Left Column) | |
| | This supplemental agreement requires the signature of the Contractor AND Contracting Officer to effect the changes described in Block 9. |
| | This unilateral modification ONLY requires the signature of the Contracting Officer to effect the administrative changes (e.g., change the paying office or appropriation data) described in Block 9. |

| 13. Contractor Signature | | |
|---|---|---|
| **13.a. Signature of Authorized Person** | **13.b. Name and Title of Signer** | **13.c. Date Signed** |

| 14. Contracting Officer Signature | | |
|---|---|---|
| **14.a. Signature of Contracting Officer** | **14.b. Name of Contracting Officer** | **14.c. Date Signed** |

2016 JUN 20 PM 4:56



EXPEDITE

**U.S. Department of Justice**

**Request, Authorization and Modification of Contract for Services of Expert Witness, Litigative Consultant, or ADR Neutral**

| Contract / Purchase Order Number: | DJJ-16W-ENR01-0221 | | R01-58035 |
|---|---|---|---|

### Part I – Request for Services

| 1. Requesting Official (Name and Title)<br>MAHER JR, ROBERT<br>ASST SEC CH | 2. Signature of Requesting Official<br><Signature in Contract File> | 3. Point of Contact (Name and Tel.)<br>DONOHUE, BRIAN<br>Telephone: 202-514-6413 | 4. Date of Request<br>01/06/2017 |
|---|---|---|---|
| 5. Originating Office (Name & Address)<br>ENRD/EES<br><br>Washington, DC | 6. Case Name, Court & Docket No.<br>U.S. V. CHEMICAL LAND HOLDINGS (SUPERFUND TRACKING NUMBER - DIAMOND ALKALI SITE - PASSAIC RIVER) NJ<br>2004-2011<br><br>DJ File No. 90-11-3-07683/1 | 7. Contractor (Name, Address & Telephone)<br>Mr. David Batson<br>Techlaw, Inc.<br>14500 Avion Parkway<br>Suite 300<br>Chantilly, Virginia 20151-1101<br><br>TIN/SSN: Ex 6 — PII<br>Telephone: 703-818-3228<br>Business Type: | DUNS:<br>Fax: 703-818-8813 |

### 8. Modification Information

| 8.a. Type of Service(Insert "Expert Witness", "Litigative Consultant" or "ADR Neutral")<br><br>Expert Witness | 8.b. Performance Period (From – To)<br><br>04/25/2016 to 03/31/2021 | 8.c. Estimated Cost<br><br>Total SOW<br>$10,250.00 | 8.d. Modification Number<br><br>0003 | 8.e. Effective Date<br><br>Date of CO signature in Block 14c below |
|---|---|---|---|---|

**9. Description of Modification (Insert below-attach continuation sheets if necessary)**
Funds deobligated in order to create a FY17 contract per the Office of the Comptroller, Superfund Analysis.

### Part II – Funding Approval

**10. Appropriation Data**

| 10.a. Authorized Amount ($1,811.63) | 10.b. YREGDOC R01-58035 C | 10.c. Cost Center 6B1598 | 10.d. OBL Month 1604 | 10.e. Sub Object Code (SOC) 1157 |
|---|---|---|---|---|
| 10.f. Remarks | | | | |

**11. Summary of Funding and Performance Period Changes**

| | Performance Dates (From – To) | Amount |
|---|---|---|
| 11.a. Current Contract (to include any prior modifications) | | $10,250.00 |
| 11.b. This Modification (funds added/subtracted additional time) | | ($1,811.63) |
| | | $8,438.37 |

### Part III – Over Commit Funding

*The Contractor shall not exceed the amount shown in Block 11.c. unless authorized in writing by the Contracting Officer*

**12. Funding Approval**

| 12.a.. Signature of Approving Officer<br>*[signature]*  for | 12.b. Name & Title of Approving Official<br>Teanne Featherstone, Budget Analyst | 12.c. Date Approved<br>1/6/17 |
|---|---|---|

### Part IV – Contract Modification

**Type of Modification (Place an "X" in the applicable Box in the Left Column)**

| | |
|---|---|
| | This is supplemental agreement requires the signature of the Contractor AND the Contracting Officer to effect the changes described in Block 9. |
| X | This unilateral modification ONLY requires the signature of the Contracting Officer to effect the administrative changes (e.g., change the paying office or appropriate data) described in Block 9. |

**13. Contractor Signature**

| 13.a. Signature of Authorized Person | 13.b. Name and Title of Signer | 13.c. Date Signed |
|---|---|---|
| | | |

**14. Contracting Officer Signature**

| 14.a. Signature of Contracting Officer<br>*Jacqueline Y. Lashley* | 14.b. Name of Contracting Officer<br>Jacqueline Y. Lashley | 14.c. Date Signed<br>01/06/2017 |
|---|---|---|

*[handwritten: 1/6/2017]*

**Previous Editions are Obsolete**

Form OBD-47 (MOD) (Revised 3/2005)
Page 1 of 1

**U.S. Department of Justice**

**Request, Authorization and Modification of Contract for Services of Expert Witness, Litigative Consultant, or ADR Neutral**

| Contract / Purchase Order Number: | DJJ-16W-ENR01-0221 |
|---|---|

### Part I – Request for Services

| 1. Requesting Official (Name and Title)<br>MAHER JR, ROBERT<br>ASST SEC CH | 2. Signature of Requesting Official<br>*<Signature in Contract File>* | 3. Point of Contact (Name and Tel.)<br>DONOHUE, BRIAN<br>Telephone: 202-514-8413 | 4. Date of Request<br>01/06/2017 |
|---|---|---|---|
| 5. Originating Office (Name & Address)<br>ENRD/EES<br><br>Washington, DC | 6. Case Name, Court & Docket No.<br>U.S. V. CHEMICAL LAND HOLDINGS (SUPERFUND TRACKING NUMBER - DIAMOND ALKALI SITE - PASSAIC RIVER) NJ 2004-2011<br><br>DJ File No. 90-11-3-07683/1 | 7. Contractor (Name, Address & Telephone)<br>Mr. David Batson<br>Techlaw, Inc.<br>14500 Avion Parkway<br>Suite 300<br>Chantilly, Virginia 20151-1101<br><br>TIN/SSN: <mark>Ex. 6 — PII</mark>    DUNS:<br>Telephone: 703-818-3226    Fax: 703-818-8813<br>Business Type: | |

### 8. Modification Information

| 8.a. Type of Service(Insert "Expert Witness", "Litigative Consultant" or "ADR Neutral")<br><br>Expert Witness | 8.b. Performance Period (From – To)<br><br>04/25/2016 to 03/31/2021 | 8.c. Estimated Cost<br><br>Total SOW<br>$10,250.00 | 8.d. Modification Number<br><br>0004 | 8.e. Effective Date<br><br>Date of CO signature in Block 14c below |
|---|---|---|---|---|

**9. Description of Modification (Insert below-attach continuation sheets if necessary)**
Contract established using balance remaining on FY16-56035 contract.

### Part II – Funding Approval

### 10. Appropriation Data

| 10.a. Authorized Amount<br>$1,811.63 | 10.b. YREGDOC<br>50157040 | 10.c. Cost Center<br>7B1598 | 10.d. OBL Month<br>1701 | 10.e. Sub Object Code (SOC)<br>1157 |
|---|---|---|---|---|

**10.f. Remarks**
Current Contract Obligation: R0156035 $8,438.37

### 11. Summary of Funding and Performance Period Changes

| | Performance Date (From – To) | Amount |
|---|---|---|
| 11.a. Current Contract (to include any prior modifications) | | $8,438.37 |
| 11.b. This Modification (funds added/subtracted additional time) | | $1,811.63 |
| 11.c. Revised Contract | | $10,250.00 |

*The Contractor shall not exceed the amount shown in Block 11.c. unless authorized in writing by the Contracting Officer*

### 12. Funding Approval

| 12.a. Signature of Approving Officer<br>*Jeanne Featherstone* | 12.b. Name & Title of Approving Official<br>Teanne Featherstone, Budget Analyst | 12.c. Date Approved<br>1/9/2017 |
|---|---|---|

### Part III – Contract Modification

**Type of Modification (Place an "X" in the applicable Box in the Left Column)**

| | |
|---|---|
| | This is supplemental agreement requires the signature of the Contractor AND the Contracting Officer to effect the changes described in Block 9. |
| X | This unilateral modification ONLY requires the signature of the Contracting Officer to effect the administrative changes (e.g., change the paying office or appropriate data) described in Block 9. |

### 13. Contractor Signature

| 13.a. Signature of Authorized Person | 13.b. Name and Title of Signer | 13.c. Date Signed |
|---|---|---|
| | | |

### 14. Contracting Officer Signature

| 14.a. Signature of Contracting Officer<br>*Johnnie R Cusack* | 14.b. Name of Contracting Officer<br>Johnnie R. Cusack | 14.c. Date Signed<br>1-9-17 |
|---|---|---|

*JM  1/9/2017*    PRJ = EVJK

1/11/17

**U.S. Department of Justice**

**Request, Authorization and Modification of Contract for Services of Expert Witness, Litigative Consultant, or ADR Neutral**

| Contract / Purchase Order Number: | DJJ-16W-ENR01-0221 | S01-57040 |
|---|---|---|

## Part I – Request for Services

| 1. Requesting Official (Name and Title)<br>MAHER JR, ROBERT<br>ASST SEC CH | 2. Signature of Requesting Official<br>*<Signature in Contract File>* | 3. Point of Contact (Name and Tel.)<br>DONOHUE, BRIAN<br>Telephone: 202-514-5413 | 4. Date of Request<br>01/06/2017 |
|---|---|---|---|
| 5. Originating Office (Name & Address)<br>ENRD/EES<br><br>Washington, DC<br><br>ORIGINAL | 6. Case Name, Court & Docket No.<br>U.S. V. CHEMICAL LAND HOLDINGS (SUPERFUND TRACKING NUMBER - DIAMOND ALKALI SITE - PASSAIC RIVER) NJ<br>2004 2011<br><br>DJ File No. 90-11-3-07683/1 | 7. Contractor (Name, Address & Telephone)<br>Mr. David Batson<br>Techlaw, Inc.<br>14500 Avion Parkway<br>Suite 300<br>Chantilly, Virginia 20151-1101<br><br>TIN/SSN: Ex. 6 — PII<br>Telephone: 703-818-3228<br>Business Type: | DUNS:<br>Fax: 703-818-8813 |

### 8. Modification Information

| 8.a. Type of Service(Insert "Expert Witness", "Litigative Consultant" or "ADR Neutral")<br><br>Expert Witness | 8.b. Performance Period (From – To)<br><br>04/25/2016 to 09/30/2017 | 8.c. Estimated Cost<br>Total SOW<br>$15,500.00 | 8.d. Modification Number<br><br>0005 | 8.e. Effective Date<br>Date of CO signature In Block 14c below |
|---|---|---|---|---|

**9. Description of Modification (Insert below-attach continuation sheets if necessary)**
Add Work in Accordance with Attached SOW.

## Part II – Funding Approval

### 10. Appropriation Data

| 10.a. Authorized Amount<br>$5,250.00 | 10.b. YREGDOC<br>S01-57040 A | 10.c. Cost Center<br>7B1598 | 10.d. OBL Month<br>1701 | 10.e. Sub Object Code (SOC)<br>1157 |
|---|---|---|---|---|

**10.f. Remarks**
Current Contract Obligation: R0155035 $8,438.37; S0157040 $1,811.63

### 11. Summary of Funding and Performance Period Changes

| Description | Performance Dates (From – To) | Amount |
|---|---|---|
| 11.a. Current Contract (to include any prior modifications) | | $10,250.00 |
| 11.b. This Modification (funds added/subtracted additional time) | | $5,250.00 |
| **11.c. Revised Total Contract Funding** | | **$15,500.00** |

*The Contractor shall not exceed the amount shown in Block 11.c. unless authorized in writing by the Contracting Officer*

### 12. Funding Approval

| 12.a.. Signature of Approving Officer<br>*Teane Featherstone* | 12.b. Name & Title of Approving Official<br>Teanne Featherstone, Budget Analyst | 12.c. Date Approved<br>1/13/17 |
|---|---|---|

## Part III - Contract Modification

Type of Modification (Place an "X" in the applicable Box in the Left Column)

| | This supplemental agreement requires the signature of the Contractor AND the Contracting Officer to effect the changes described in Block 9. |
|---|---|
| X | This unilateral modification ONLY requires the signature of the Contracting Officer to effect the administrative changes (e.g., change the paying office or appropriate data) described in Block 9. |

### 13. Contractor Signature

| 13.a. Signature of Authorized Person<br>*Judy Manley* | 13.b. Name and Title of Signer<br>Judy Manley, Executive VP | 13.c. Date Signed<br>1-13-17 |
|---|---|---|

### 14. Contracting Officer Signature

| 14.a. Signature of Contracting Officer<br>*John R Cusack* | 14.b. Name of Contracting Officer<br>Johnnie R. Cusack | 14.c. Date Signed<br>1-13-17 |
|---|---|---|

*dn 1/12/2017*

Form OBD-47 (MOD) (Revised 3/2
Page

**U.S. Department of Justice**

**Request, Authorization and Modification of Contract for Services of Expert Witness, Litigative Consultant, or ADR Neutral**

**Contract/Purchase Order Number:**

| Part I – Request for Services | | | |
|---|---|---|---|
| 1. Requesting Official (Name & Title)<br>Robert E. Maher, Jr.<br>Assistant Section Chief | 2. Signature of Requesting Official | 3. Point of Contact (Name and Tel.)<br>Brian Donohue<br>Telephone: (202) 514-5413 | 4. Date of Request<br>1/6/17 |
| 5. Originating Office (Name & Address)<br>USDOJ-ENRD-EES<br>601 D St. NW<br>Washington DC, 20004 | 6. Case Name, Court & Ct. Docket No.<br>U.S. v. Chemical Land Holdings<br>(Passaic River Matter)<br>90-11-3-07683/1 | 7. Contractor (Name, Address & Telephone)<br>David Batson<br>14500 Avion Parkway, Suite 300, Chantilly, VA<br>Telephone: (703) 818-3228 | |

| 8. Modification Information | | | | |
|---|---|---|---|---|
| 8.a. Type of Service (Insert "Expert Witness", "Litigative Consultant" or "ADR Neutral"<br>Expert Witness | 8.b. Performance Period (From - To)<br>04/25/2016-03/31/2021 | 8.c. Estimated Cost | 8.d. Modification Number | 8.e. Effective Date |

9. Description of Modification (Insert below–attach continuation sheets if necessary)

| Part II – Funding Approval | | | | |
|---|---|---|---|---|

10. Appropriation Data

| 10.a. Authorized Amount | 10.b. YREGDOC<br>R0156035 | 10.c. Cost Center<br>6B1598 | 10.d. OBL Month | 10.e. Sub Object Code (SOC)<br>1157 |
|---|---|---|---|---|

10.f. Remarks

11. Summary of Funding and Performance Period Changes

| Description | Performance Dates (From - To) | Amount |
|---|---|---|
| 11.a. Current Contract (to include any prior modifications) | 04/25/2016-03/31/2021 | $10,250.00 |
| 11.b. This Modification (funds added/subtracted additional time) | | $5,250.00 |
| 11.c. Revised Total Contract Funding | | $15,500.00 |

*The Contractor shall not exceed the amount shown in Block 11.c unless authorized in writing by the Contracting Officer*

| 12. Funding Approval | | |
|---|---|---|
| 12.a. Signature of Approving Official | 12.b. Name & Title of Approving Official | 12.c. Date Approved |

| Part III – Contract Modification | | |
|---|---|---|

Type of Modification (Place an "X" in the applicable Box in the Left Column)

| | This supplemental agreement requires the signature of the Contractor AND Contracting Officer to effect the changes described in Block 9. |
|---|---|
| | This unilateral modification ONLY requires the signature of the Contracting Officer to effect the administrative changes (e.g., change the paying office or appropriation data) described in Block 9. |

| 13. Contractor Signature | | |
|---|---|---|
| 13.a. Signature of Authorized Person | 13.b. Name and Title of Signer | 13.c. Date Signed |

| 14. Contracting Officer Signature | | |
|---|---|---|
| 14.a. Signature of Contracting Officer | 14.b. Name of Contracting Officer | 14.c. Date Signed |

2017 JAN -6 PM 1:29

ENRD-EES

**U.S. Department of Justice**

**Request, Authorization and Modification of Contract for Services of Expert Witness, Litigative Consultant, or ADR Neutral**

| Contract / Purchase Order Number: | DJJ-16W-ENR01-0221 | S01-57040 |
|---|---|---|

| Part I – Request for Services | | | |
|---|---|---|---|
| 1. Requesting Official (Name and Title)<br>MAHER JR, ROBERT<br>ASST SEC CH | 2. Signature of Requesting Official<br>*<Signature in Contract File>* | 3. Point of Contact (Name and Tel.)<br>DONOHUE, BRIAN<br>Telephone: 202-514-5413 | 4. Date of Request<br>07/24/2018 |
| 5. Originating Office (Name & Address)<br>ENRD/EES<br><br>Washington, DC | 6. Case Name, Court & Docket No.<br>U.S. V. CHEMICAL LAND HOLDINGS (SUPERFUND TRACKING NUMBER - DIAMOND ALKALI SITE - PASSAIC RIVER) NJ<br>2004-2011<br><br>DJ File No. 90-11-3-07683/1 | 7. Contractor (Name, Address & Telephone)<br>Mr. David Batson<br>Techlaw, Inc.<br>14500 Avion Parkway<br>Suite 300<br>Chantilly, Virginia 20151-1101<br><br>TIN/SSN: EX. 6 — PII<br>Telephone: 703-818-3228<br>Business Type: | DUNS:<br>Fax: 703-818-8813 |

| 8. Modification Information | | | | |
|---|---|---|---|---|
| 8.a. Type of Service(Insert "Expert Witness", "Litigative Consultant" or "ADR Neutral")<br><br>Expert Witness | 8.b. Performance Period<br>(From – To)<br><br>04/25/2016 to 03/31/2021 | 8.c. Estimated Cost<br><br>Total SOW<br>$15,500.00 | 8.d. Modification Number<br><br>0006 | 8.e. Effective Date<br><br>Date of CO signature in Block 14c below |

9. Description of Modification (Insert below-attach continuation sheets if necessary)
**PRIOR YEAR FUNDS NO LONGER AVAILABLE. BALANCE OF WORK PERFORMED TO BE PAID FOR WITH CURRENT YEAR FUNDS.**

YIO#:    JENRD1805001

| Part II – Funding Approval | | | | |
|---|---|---|---|---|
| 10. Appropriation Data | | | | |
| 10.a. Authorized Amount ($26.63) | 10.b. YREGDOC S01-57040 B | 10.c. Cost Center 7B1598 | 10.d. OBL Month 1701 | 10.e. Sub Object Code (SOC) 1157 |

10.f. Remarks
Current Contract Obligation: R0156035 $8,438.37; S0157040 $7,061.63

| 11. Summary of Funding and Performance Period Changes | | |
|---|---|---|
| Description | Performance Dates (From – To) | Amount |
| 11.a. Current Contract (to include any prior modifications) | | $15,500.00 |
| 11.b. This Modification (funds added/subtracted additional time) | | ($26 63) |
| 11.c. Revised Total Contract Funding | | $15,473.37 |

**The Contractor shall not exceed the amount shown in Block 11.c. unless authorized in writing by the Contracting Officer**

| 12. Funding Approval | | |
|---|---|---|
| 12.a.. Signature of Approving Officer<br><br>Refer to UFMS approval in accordance with FMIB 17-18. | 12.b. Name & Title of Approving Official<br>Teanne Featherstone, Supervisory Budget Analyst | 12.c. Date Approved<br><br>9/20/18 |

| Part III - Contract Modification | | |
|---|---|---|

| Type of Modification (Place an "X" in the applicable Box in the Left Column) | |
|---|---|
| X | This is supplemental agreement requires the signature of the Contractor AND the Contracting Officer to effect the changes described in Block 9. |
|  | This unilateral modification ONLY requires the signature of the Contracting Officer to effect the administrative changes (e.g., change the paying office or appropriate data) described in Block 9. |

| 13. Contractor Signature | | |
|---|---|---|
| 13.a. Signature of Authorized Person | 13.b. Name and Title of Signer | 13.c. Date Signed |

| 14. Contracting Officer Signature | | |
|---|---|---|
| 14.a. Signature of Contracting Officer | 14.b. Name of Contracting Officer<br>Johnnie R. Cusack | 14.c. Date Signed |

# Exhibit H



**U.S. Department of Justice**
Environment and Natural Resources Division

236380-4-1-23-06154

*Law and Policy Section*                                                                    *Telephone (202) 514-1442*
*P.O. Box 7415*
*Ben Franklin Station*
*Washington, DC 20044-7415*

June 27, 2023

**<u>VIA EMAIL</u>**

Claire A. Grega
Langsam Stevens Silver & Hollaender LLP
1818 Market Street, Suite 2430
Philadelphia, PA 19103-3644
(215) 732-3255
cgrega@lssh-law.com

FOIA No.: 2023-06154

Dear Ms. Grega:

This letter responds to your Freedom of Information Act (FOIA) request seeking "all confidentiality agreements entered into at any time between the U.S. Department of Justice and Mr. David C. Batson, with Mr. Batson acting in any capacity, including, without limitation, Mediation Specialist, Senior ADR Specialist, Deputy Dispute Resolution Specialist, Senior Collaboration & ADR Specialist, ADR Counsel, and Expert Witness." The Environment and Natural Resources Division (ENRD) received your FOIA request on April 25, 2023.

Please find attached one PDF responsive to your FOIA request which we release in its entirety.

There are no fees associated with the processing of your FOIA request.

For your information, Congress excluded three discrete categories of law enforcement and national security records from the requirements of the FOIA. *See* 5 U.S.C. § 552(c) (2006 & Supp. IV 2010). This response is limited to those records that are subject to the requirements of the FOIA. This is a standard notification that is given to all our requesters and should not be taken as an indication that excluded records do, or do not, exist.

If you are not satisfied with ENRD's determination in response to this request, you may administratively appeal by writing to the Director, Office of Information Policy (OIP), United States Department of Justice, 441 G Street, NW, 6th Floor, Washington, D.C. 20530, or you may submit an appeal through OIP's FOIA STAR portal by creating an account following the

instructions on OIP's website: https://www.justice.gov/oip/submit-and-track-request-or-appeal.
Your appeal must be postmarked or electronically transmitted within 90 days of the date of my
response to your request.  If you submit your appeal by mail, both the letter and the envelope
should be clearly marked "Freedom of Information Act Appeal."

    This concludes our response to your request.  If you need any further assistance, please
contact Madeline Van Nostrand at (202) 514-3473 or our FOIA Public Liaison Charles Smiroldo
at (202) 514-0424.  Additionally, you may contact the Office of Government Information
Services (OGIS) at the National Archives and Records Administration to inquire about the FOIA
mediation services it offers.  The contact information for OGIS is as follows: Office of
Government Information Services, National Archives and Records Administration, 8601 Adelphi
Road-OGIS, College Park, Maryland 20740-6001, e-mail at ogis@nara.gov; telephone at (202)
741-5770; toll free at 1-877-684-6448; or facsimile at (202) 741-5769.

Sincerely,

/s/ *Judy Harvey*

Judy Harvey
Assistant Chief, Law & Policy Section

# Confidentiality Agreement

In consideration of potential employment by the U. S. Department of Justice ("DOJ") as an expert witness (the term "expert witness" shall also include litigative consultants), the expert hereby agrees to the following:

1. The provisions of this confidentiality agreement ("CA") shall apply to and be binding upon the expert, the expert's company, business, employees, agents, officers, successors and assigns, and any person acting on behalf of the expert in relation to expert witness services in connection with this case or matter. The term expert as used in this agreement includes the expert, the expert's company, business, employees, agents, officers, successors and assigns, and any person acting on behalf of the expert.

2. Except as required by law, as otherwise provided in this agreement, or as directed by the DOJ, no information obtained, developed, gathered or created as a result of expert services and work performed in connection with this matter shall be provided or disclosed orally, in writing, or in any other form, including electronic data, to any third party or person who is not a party to this agreement. In any case in which disclosure of such information is or may be appropriate, no disclosures shall be made without prior written approval of the DOJ. This prohibition includes, but is not limited to, communications with any person representing the media, any industry representatives, and any colleagues or fellow researchers. Disclosure may be made to persons who have signed and filed CAs with the DOJ in connection with this matter and your management, supervisory, or support personnel as necessary to provide the expert services and work performed in connection with this matter.

3. Except as required by law, as otherwise provided in this agreement, or as directed by the DOJ, all documents, information, electronic data, or other work obtained, developed, gathered or created as a result of expert services and work performed in connection with this matter, including documents or other information provided to me by the United States or other party, shall be treated as privileged and confidential information. The expert shall not reveal such materials to any third party or person without prior written approval from the DOJ, except for those persons who have signed and filed CAs with the DOJ in connection with this matter and your management, supervisory, or support personnel as necessary to provide the expert services and work performed in connection with this matter.

4. Should any documents, information, or electronic data provided, obtained, developed, gathered or created in connection with this matter be lost, discovered missing, or mistakenly or inadvertently turned over without DOJ consent to an unauthorized person or third party, the expert shall immediately report the details of such incident to the DOJ. In the event the expert receives any requests for such information, the expert shall immediately notify the DOJ and await and follow DOJ instructions on how to proceed.

5. Within 90 days after the expiration of the contract with the DOJ for expert services, all documents and other information provided, obtained, developed, gathered or created in connection with this matter shall be delivered, upon request, to the DOJ. Upon request, all electronic data and information will be provided or returned to DOJ and deleted from the expert's computer system.

6. In the event the DOJ provides the expert with any computer software to aid in the performance of duties as an expert witness, the expert shall abide by the tenets of any licensing agreement for such software and shall return the full software product to the DOJ (including all component parts, the media and printed materials, any upgrades, and the licensing agreement) within a time frame requested by the DOJ, but not later than 90 days after the expiration of the contract for expert services. Furthermore, the expert shall fully uninstall and delete, from the expert's computer hard drive, server, or other application hosting device, the software provided, as well as any files originating from said software upon expiration of the contract for expert services. Finally, while possession of such software, the expert shall utilize it only for activities directly and explicitly related to the contract for expert services.

7. From this date forward and throughout the periods of potential and actual litigation, the expert shall not testify as a witness or participate as a consultant or expert in any federal, state or administrative proceeding regarding this case or the issues relevant to this case on behalf of any other person or third party. Furthermore, the expert shall not enter into any agreement for the performance of work or the provision of services with any person or party who is either a litigant or a potential litigant in this matter without prior notification and written approval from the DOJ. As may be appropriate during the period of the contract for expert services or after expiration of the contract, the expert shall make disclosures of any potential or actual conflicts of interest.

8. In the event that additional personnel are necessary to assist the expert in the performance of the contract for expert services, the expert shall notify the DOJ promptly and seek approval to hire or use the services of such personnel. The expert shall require each person to sign a CA identical to this one, and provide copies to the DOJ.

Signature of Expert Witness/Employee: _____    Date: __4/1/16__

Printed Name of Expert Witness/Employee: __David C. Bateson__

Company Name: __Alter Echo__

Case Name: __Passaic River__

DJ#: __90-11-3-07683/1__                                             ees ver 8Mar2005

# Exhibit I

| | |
|---|---|
| **From:** | admin@foiaonline.gov |
| **To:** | Marshal Hoda |
| **Subject:** | FOIA Request EPA-R2-2019-007617 Submitted |
| **Date:** | Friday, July 26, 2019 9:42:35 AM |

This message is to confirm your request submission to the FOIAonline application: View Request. Request information is as follows:

- Tracking Number: EPA-R2-2019-007617
- Requester Name: Mr. Marshal Hoda
- Date Submitted: 07/26/2019
- Request Status: Submitted
- Description: Any amendments, changes, or revisions to the Revised Work Plan attached to this request.

# Exhibit J

| | |
|---|---|
| **From:** | admin@foiaonline.gov |
| **To:** | Marshal Hoda |
| **Subject:** | FOIA Request EPA-R2-2020-001533 Submitted |
| **Date:** | Thursday, December 5, 2019 2:42:33 PM |

This message is to confirm your request submission to the FOIAonline application: View Request. Request information is as follows:

- Tracking Number: EPA-R2-2020-001533
- Requester Name: Marshal Hoda
- Date Submitted: 12/05/2019
- Request Status: Submitted
- Description: All documents and communications shared between EPA and any representative of TechLaw/AlterEcho concerning additional revisions to the Revised Work Plan for Contract # EP-W-14-020 as revised on May 31, 2019 (the "May 2019 Revised Workplan"). The May 2019 Revised Work Plan is attached to this request.

  All communications and documents shared between EPA and any third-party allocator, including but not limited to any representative of TechLaw/AlterEcho, concerning new or additional contracts concerning the Diamond Alkali-Lower Passaic River Allocation as contemplated in May 2019 Revised Work Plan. See, e.g., May 2019 Revised Work Plan at p.5 ("Tasks 8-11 will not be performed within the task order Period of Performance and are no longer required under this contract. It is anticipated that Tasks 8-11 will be initiated in a new task order under the follow-on contract.").

  All new or additional contracts or agreements between EPA and any third-party allocator, including but not limited to any representative of TechLaw/AlterEcho, concerning the Diamond Alkali-Lower Passaic River Allocation as contemplated in the May 2019 Revised Work Plan. See, e.g., May 2019 Revised Work Plan at p.5 ("Tasks 8-11 will not be performed within the task order Period of Performance and are no longer required under this contract. It is anticipated that Tasks 8-11 will be initiated in a new task order under the follow-on contract.").

# Exhibit K

| | |
|---|---|
| **From:** | admin@foiaonline.gov |
| **To:** | Marshal Hoda |
| **Subject:** | FOIA Request EPA-R2-2021-002471 Modified |
| **Date:** | Thursday, May 27, 2021 3:45:13 PM |

The FOIA request - EPA-R2-2021-002471 has been supplemented with additional supporting files. Additional details for this item are as follows:

- Tracking Number: EPA-R2-2021-002471
- Requester: Mr. Marshal Hoda
- Submitted Date: 02/05/2021
- Description: 1. The Final Allocation Recommendation Report submitted to EPA by ERG and/or AlterEcho pursuant to Task B5 of the Revised Work Plan attached to this Request.

  2. All documents and communications shared between EPA and any representative of ERG and/or AlterEcho concerning the Final Allocation Recommendation Report or any drafts thereof.

# Exhibit L

# Work Plan

# EPA Conflict Prevention and Resolution Services Contract

# Contract # EP-W-14-020

## Work Plan for Task Order #096

## Diamond Alkali-Lower Passaic River Allocation

████████████████████

**Prepared for:**

US Environmental Protection Agency
Washington, DC 20460

EPA Program Office:                            Region 2
EPA Task Order Contracting Officer's
Representative (TOCOR):                        Alice Yeh

████████████████
█████████                                      █████████████
                                               ████████████████

CSRA Task Order Manager (TOM):                 Mary Apostolico
████████████████
███                                            ███████████████
                                               ██████████████████████

Subcontractor Task Manager:                    David Batson
                                               TechLaw / AlterEcho
███████████████
████████████                                   ████████████████
                                               ██████████████████████

This Work Plan describes CSRA's approach for performing the tasks described in the Statement of Work. It includes a description of the activities associated with each task as well as a list of transmittals and deliverables and their due dates. A cost estimate for this Task Order Work Plan is provided as a separate attachment.

The Work Plan is organized as follows:

Section 1.0 - Background
Section 2.0 - Assumptions
Section 3.0 - Project Methodology and Approach
Section 4.0 - Work Tasks
Section 5.0 - Reports, Transmittals and Deliverables
Section 6.0 - Staffing Plan
Section 7.0 - Quality Management
Section 8.0 - Conflict of Interest
Section 9.0 - Cyber Security
Section 10.0 - Project Budget
Section 11.0 - Period of Performance

## 1.0    Background

The Diamond Alkali Site (the Site) has a long history, involving over 100 potentially responsible parties (PRPs). Since the late 1800s, the Lower Passaic River has been a highly industrialized waterway, receiving direct and indirect discharges from numerous industrial facilities. Data collected in the Lower Passaic River, and EPA's analyses, show that contaminated sediment in the lower 8.3 miles are a major source of contamination to the rest of the river and Newark Bay and pose an unacceptable risk to human health and the environment due to the presence of a variety of contaminants that stay in the environment for a long time and can build up in fish and shellfish. These contaminants include dioxins and furans, PCBs, mercury, DDT and its primary breakdown products, copper, dieldrin, PAHs, and lead.

On March 4, 2016, EPA issued a record of decision selecting the remedy for the lower 8.3 miles of the Lower Passaic River, which is Operable Unit 2 (OU2) of the Site. Currently, the remedial design (RD) for OU2 is being performed by Occidental Chemical Corporation (OCC) pursuant to an administrative order on consent. The cost of the remedial action (RA), estimated for purposes of remedy selection, is $1.38 billion.

Region 2 has issued a notice of potential liability to approximately 100 parties, informing them of their responsibility for the RD/RA for OU2. The Region has offered a first round of cash-out settlements to a group of approximately 20 PRPs. The Region expects to separately address the liability of municipalities and public entities. For the remaining PRPs, the Region expects to enter into settlement negotiations for performance and funding of the remedy with OCC and other parties (the "Major PRPs") that the Region considers to be major PRPs for OU2. The Region plans another round of cash-out settlements with "Middle Tier PRPs", i.e., not part of the phase 1 cash-out group, but also not Major PRPs. The Region requires the services of a third party allocator to develop a settlement framework and evaluate the 80 Middle Tier and Major parties within the framework. This proposal applies same allocation process to all of the private OU2 PRPs remaining after the first round of cash-out settlements, with the expectation that, in the settlement phase, the resulting allocation will enable EPA to identify the Middle Tier PRPs, eligible for a phase two cash out offer, and the Major PRPs that will be performing and/or funding the remedy.

Region 2 understands that the PRP group (the Cooperating Parties Group, or CPG) has made at least two previous attempts to develop a mutually acceptable allocation of liability to promote settlement with EPA for costs and work at the Site, however both efforts fell short of agreement. Region 2 believes that because of these previous efforts, additional information available from responses to CERCLA 104(e) letters, information available from previous litigation at the state level and numerous conversations with PRPs over the years, the project will be able to be built primarily upon existing information and contacts. Some minor augmentation of background, data and allocation factors may need to occur to develop what is hoped to be an acceptable settlement proposal and structure. In 2016, the Department of Justice retained a mediator/allocation specialist, David Batson of TechLaw/AlterEcho, to assist in settlement analysis. Those discussions and analyses have resulted in this effort.

## 2.0   Assumptions

This work plan and the attached cost estimate are based on the following assumptions, in addition to Task-specific assumptions noted in Section 4.0 of the Work Plan. All work will be conducted in accordance with the specific tasks in the Work Plan to the performance metrics specified therein.

General Assumptions:

- EPA will provide the CSRA Team with a list of parties noticed regarding their responsibility for the RD/RA for OU2, including:
    - a list of Major and Middle Tier Parties ("OU2 PRPs");
    - a list of Phase 1 cash-out parties; and
    - a list of other OU2 parties, including municipalities and other entities
- Maximum of 80 PRPs will be provided an opportunity to participate in or be evaluated for the purpose of determining a share of responsibility in the allocation process
- All OU2 PRPs will be provided an opportunity to participate in the design of the allocation database and process and to provide additional Site-related information for possible addition to the database, and will be designated a share of responsibility in the Final Allocation Recommendation Report
- The Final Allocation Recommendation Report will also divide the parties into logical groupings of similarly-situated PRPs
- EPA will provide the CSRA Team with a listing and contact information for each OU2 PRP; Reference herein to meetings or other forms of communication with the OU2 PRPs means communication with the identified representatives of such parties
- A maximum of 150,000 pages of documents will reviewed and utilized to conduct the allocation, including;
    - A maximum of 130,000 pages of documents received from EPA for CSRA Team review
    - A maximum of 20,000 extra pages of documents received from PRPs for CSRA review
- All communications by the CSRA Team will be by phone or email unless meeting noted
- Maximum of 4 hours of combined project status/update calls will be held by the CSRA Team with EPA per month
- Out-of-DC Area Meetings:
    - 3 meetings involving 2 contractor staff
- Out-of-DC area meetings will be held at the EPA Region 2 offices or other location in the greater New York City metropolitan area as determined by EPA, or OU2 PRPs they supply meeting space
- Travel for and timing of out-of-DC area meetings will be scheduled to allow CSRA Team members to travel from Washington, DC and return on the same day

███████████████████████████████████████
██████████████████████████

- Meetings will be scheduled and held within noted timeframes
- The allocation database will be designed and organized primarily for purposes of allocation
- Space and equipment for meetings will be provided by EPA or PRPs
- The CSRA Team will provide EPA with a copy of all communications sent to OU2 PRPs regarding the subject, substance, and logistics of OU2 PRP meetings with CSRA Team members
- Any part of a communication, attachment to a communication, presentation, or written material provided to OU2 PRPs by the CSRA Team that involves a description of the Site or EPA actions or activities will be provided to EPA for review and approval prior to submission to the OU2 PRPs
- Unless otherwise noted herein, all allocation related communications by the CSRA Team involving the OU2 PRPs or representatives of EPA or DOJ, individually or in groups, will be held confidential pursuant to the provisions of the ADR Act of 1996, 5 USC 574
- In order to ensure a common expectation of confidentiality, all PRP participants in the allocation process will be required to enter, and EPA will appropriately acknowledge, a confidentiality agreement
- The CSRA Team will provide invoices to EPA at the end of each month in which a task is completed (activity, transmittal, and/or deliverable) identified in Section 5.0 of the Work Plan, with a written Progress Report detailing associated activities accomplished during the reporting period, how such activities meet Task Order performance standards, and associated labor and other direct costs

███████████████████████████████████████
████████████████████████

- Invoices and progress reports will be provided at the end of the month in each a task is completed.  Task activities, transmittals and deliverables are described below in Section 4. Work Tasks.
- "Staffing" referenced in Section 4.0 Work Tasks refers to TechLaw staff.
- This Task Order can be modified to change the statement of work or add funding.

## 3.0    Project Methodology and Approach

The proposed methodology and approach consists of the following:
- To support this Task Order, CSRA selected TechLaw support.
- CSRA and TechLaw (the CSRA Team) will not interpret EPA policy on behalf of the EPA or make decisions on items of policy, regulation or statutes. The CSRA Team also will not take a stand on the merits of substantive items under discussion including, but not limited to, any substantive issues raised by OU2 PRPs.  The CSRA Team will not interpret EPA's March 4, 2016, record of decision selecting the remedy for OU2 of the Site.
- In gathering information or performing research with parties outside the EPA, CSRA Team members will identify themselves as contractors to EPA and not as EPA employees.
- CSRA will approach this task in accordance with the basic terms of the contract and according to the established norms and ethical standards of ADR professionals. Except as otherwise noted herein, information provided to the ADR professional by any of the parties, including EPA, communications between parties and the ADR professional, and notes and dispute resolution work product generated by the ADR professional during

work pursuant to the Task Order will be maintained as confidential by the ADR professional pursuant to the provisions of the ADR Act of 1996 (Public Law 104-320; 5 USC 571 et al.) and applicable federal, state and judicial requirements.

- To enhance the positive substantive, relational, and procedural outcomes from ADR cases, CSRA will direct all ADR professionals providing ADR services under this task order to do the following prior to the mediation or facilitation and throughout the process:
    - o Inquire about whether individual participants have the time, financial, and logistical resources necessary to participate effectively in the process and – where resources are inadequate – assist them in identifying appropriate resources or in making necessary adjustments to the process to accommodate resource constraints;
    - o Assist the participants in identifying the issues that are important to resolving any controversy and solutions that will address the needs shared by the participants;
    - o Conduct the process to promote active engagement from all participants;
    - o Explore with the participants appropriate ways to incorporate high quality and relevant information resources necessary to resolve the issues; and
    - o To support productive dialogue and effective implementation of any agreements reached by the participants, ensure that participants have appropriate authority to make commitments on behalf of their organizations.

As prime contractor, CSRA will support this Task Order through the following activities:

- Provide progress reports at the end of each month in which an activity, transmittal, and/or deliverable identified in Section 5.0 of the Work Plan is completed;
- Communicate and coordinate with the EPA Task Order Contracting Officer's Representative (TOCOR) by phone as needed;
- Coordinate with the subcontractor, TechLaw;
- Incorporate the principles of Quality Management while carrying out this task;
- Provide deliverables in electronic format (as agreed to by the TOCOR) to the EPA TOCOR; and
- NOTIFY THE EPA PROJECT DIRECTOR AND PROGRAM OFFICE CONTACT WHEN 75% OF THE FUNDS PROVIDED HAVE BEEN EXPENDED.


## 4.0    Work Tasks

Task 0.0        **Task Order Management**

In accordance with proper contract implementation, CSRA and TechLaw will ensure effective management of the resources and deliverables required by EPA.

Specifically, the CSRA Task Order Manager (TOM) for this effort will:

- Ensure that all technical direction received falls into the scope of work prior to initiating any action;
- Ensure completion and maintain copies of all contract transmittals and deliverables;
- Oversee subcontractor activities through regular and periodic conversations with the subcontractor to ensure effective performance;
- Ensure that progress and financial reports accurately clearly articulate the work completed as per the approved work plan, and identify any problems encountered and activities to address them;
- Speak on an as-needed basis with the EPA TOCOR to review the financial and work status of the project;

- Review the progress report and invoice with the EPA TOCOR; and
- Update the Dashboard task order management tracking system as invoices are submitted.

The CSRA Team developed this Work Plan to provide a detailed explanation of all activities associated with and a proposed approach for completing each of the defined tasks. The CSRA Team identified the transmittals and deliverables and their associated due dates and developed a detailed fixed price budget, including a breakout of labor and travel costs.

███████

| Item | Title | Due No Later Than[†] | Type |
|------|-------|----------------------|------|
| 0.1 | Work Plan | Within 10 days* of SOW issuance or as approved by the EPA CO | **Deliverable** |
| 0.2 | Progress Reports | Submitted after completion of each task and with submission of invoice | **Deliverable** |

[†] Or as otherwise directed by the TOCOR
* All references to "days" refer to business days

**Task 1**        **Preliminary Work**

| Item | Title | Due No Later Than[†] | Type |
|------|-------|----------------------|------|
| 1.1 | Task Order Kick-Off Meeting | Within 20 days* of Task Order approval | Transmittal |

[†] Or as otherwise directed by the TOCOR
* All references to "days" refer to business days

The CSRA Team will prepare for and participate in a meeting with EPA to discuss tasks described in the Task Order, EPA's expectations for the project, and a plan for conducting the outreach to PRPs. Prior to the meeting, the CSRA Team will develop its overall strategy for conduct of the allocation process, including a timeline of tasks and strategy for communications with the OU2 PRPs. During the meeting, the EPA will advise the CSRA Team regarding the identity of the OU2 PRPs and the scope and nature of the selected remedy. Following the meeting, the CSRA Team will send an email summarizing the agreed-upon PRP Outreach Plan for approval of the EPA technical lead in consultation with EPA legal personnel. The developed PRP outreach plan will include a process for contacting and receiving information from PRPs, including for meetings and conference calls with the OU2 PRPs as a group, and individual OU2 PRP contacts via email, letter, or phone, and confidentiality procedures.

This task will require the following efforts on the part of the CSRA Team:
- Development of a plan for conducting outreach to OU2 PRPs that includes an opportunity for all OU2 PRPs to (1) provide feedback on the design of the allocation, including additional data, information or factors which should be considered in design of the database, (2) review their individual PRP data report for accuracy, (3) provide suggestions regarding design of the allocation process and (4) provide feedback on the allocation report. The plan will also explain how the CSRA Team will update EPA on PRP outreach efforts
- Drafting and submission of an email summarizing the agreed-upon PRP outreach plan for approval of the EPA technical lead

- The CSRA Team will supply two (2) senior staff located in Washington, DC for the meeting

Tech Law Staffing - Senior Allocation Specialist; Senior Project Manager

*Performance Standards/Metrics:*
- The CSRA Team participates in the Task Order Kick-Off Meeting
- The submitted summary of the PRP Outreach Plan provides a summary of the agreement reached at the Task Order Kick-Off Meeting regarding the plan for communications by the CSRA Team with the OU2 PRPs

**Task 2**        **Public Announcement of Project**

| Item | Title | Due No Later Than† | Type |
|------|-------|--------------------|------|
| 2.1 | EPA Project Public Announcement Meeting | Within 40 days* of Task Order approval | Activity |

† Or as otherwise directed by the TOCOR
* All references to "days" refer to business days

The CSRA Team will participate in a meeting, sponsored by EPA, with the OU2 PRPs to announce and explain the allocation project, including opportunities for participation of the OU2 PRPs in the development of the allocation process.  Following the project announcement meeting noted in Task 2, the CSRA Team will work to obtain and record signatures of the OU2 PRPs and acknowledgement of EPA to the Participation Agreement distributed during the project announcement meeting.

This task will require the following efforts on the part of the CSRA Team:
- Preparation of talking points and handout material for participants regarding the allocation process in consultation with the EPA technical lead in consultation with EPA legal personnel
- Preparation of a written Participation Agreement for consideration and execution of the OU2 PRPs, incorporating an explanation of relevant confidentiality protections and requirements associated with the allocation process
- The CSRA Team will supply two (2) senior staff located in Washington, DC to participate in the meeting
- Communication via email, and as required via phone, with the OU2 PRPs as a group regarding execution of and to answer questions regarding the Participation Agreement
- Recording and compilation of executed Participation Agreement signature pages

Conduct of this task is dependent upon EPA's ability to successfully make arrangements for and schedule the meeting, and communicate with OU2 PRPs regarding the meeting, and upon receipt of EPA's final approval of the PRP outreach plan agreed upon during the Task Order Kick-Off Meeting within 10 business days of the meeting.

Staffing - Senior Allocation Specialist, Senior Project Manager

*Performance Standards/Metrics:*
- Talking points and materials prepared for the meeting provide an overview of the project and opportunities for PRP participation noted in the PRP Outreach Plan developed in Task 1
- The CSRA Team participates in the Task Order Kick-Off Meeting

- A majority of the members of the OU2 PRPs execute the Participation Agreement

**Task 3**        <u>**Initial Allocation Process and Database Design**</u>

| Item | Title | Due No Later Than[†] | Type |
|------|-------|----------------------|------|
| 3.1 | Submit initial allocation process and database design to EPA | Within 100 days* of Task Order approval | Transmittal |

† Or as otherwise directed by the TOCOR
* All references to "days" refer to business days

The CSRA Team will review documents received from EPA and prepare a written descriptive summary of the initial design for the allocation process, including a design of the allocation database, and submit to EPA for review.

The allocation process will be designed based upon information received during consultations with EPA and OU2 PRPs on the allocation database and using all relevant non-confidential received information, including data, records, and other documents.  The initial design will include recommendations for: (1) data sources to be considered for the allocation; (2) applicable allocation factors; and (3) methodology for determination of shares.

The searchable database will be designed to have the capability to contain and organize all of the information and data used in the allocation, including received PRP disclosure statements and nexus documents from third party litigation.  No confidential information will be included in the allocation database.  Though to be designed for purposes of conducting the allocation, the database will be designed in such a way as to allow access and use by EPA and DOJ staff for their settlement purposes following submission of the Allocation Data Reports in Task 8.  The CSRA Team will, as an interim measure, create and provide EPA access to a SharePoint site in which any site documents received from the OU2 PRPs will be maintained.

This task will require the following efforts on the part of the CSRA Team:
- Conduct a preliminary review of Site data on OU2 contaminants of concern as identified in the OU2 ROD to determine appropriate allocation data sets
- Conduct preliminary research, analysis, and determine applicable case law, legal requirements, and equitable considerations for use in conducting allocation
- Conduct initial review and analysis of EPA selected remedy for OU2 to determine method to account for differential impact of contaminants of concern and source location
- Conduct a preliminary review of information received from EPA, including PRP disclosure statements and nexus documents from third party litigation, in order to determine the appropriate design of the database required to support conduct of the allocation process
- Conduct initial coding of data and loading of coded data into database to determine credibility of database design concept
- Establish preliminary recommendations regarding allocation computations appropriate for OU2, procedures for use of data in allocation computations, and appropriate allocation methodology, and the design of a searchable database with

capability to contain and organize all of the information and data used in the allocation
- Preparation of a written descriptive summary of the initial design for the allocation process, including (1) a timeline for submission of allocation related documents, including PRP position briefs and reply briefs, and (2) a written description of the design of the database with a suggested method for providing OU2 PRPs specific information on the contents of the database, suggestions on methods for resolving data gaps in data regarding OU2 PRPs not identified in documents received from EPA, and if practical, images of anticipated data screens.
- Establish a SharePoint site that provides EPA access to documents received from OU2 PRPs

Conduct of this task is dependent upon; (1) receipt of all allocation documents and information regarding the site remedy from EPA within 20 business days of approval of the Task Order, and (2) receipt of all information from EPA as individual documents in OCR searchable pdf format to allow loading into the allocation database.

Staffing - Senior Allocation Specialist; Senior Project Manager; Database Designer

*Performance Standards/Metrics:*
- The CSRA Team submits a written descriptive summary of the initial design for the allocation process, including a database design, within the noted timeframe
- The submitted written descriptive summary of the initial design for the allocation process includes a summary of the basis of and anticipated conduct the allocation process, including preliminary recommendations on data sources to be considered for the allocation, applicable allocation factors, and methodology for determination of shares
- The submitted initial database design provides a written description of the database, including, suggested method for providing OU2 PRPs specific information on the contents of the database, suggestions on methods for resolving data gaps in data regarding OU2 PRPs not available in documents received from EPA, and if practical, images of anticipated data screens

## Task 4          Conference Call w EPA on Initial Database Design

| Item | Title | Due No Later Than[†] | Type |
|------|-------|----------------------|------|
| 4.1 | Conference Call with EPA on Initial Allocation Process and Database Design | Within 10 days* of submission of initial allocation process and database design | Activity |

† Or as otherwise directed by the TOCOR
* All references to "days" refer to business days

Task 4.1 – The CSRA Team will prepare for and participate in a conference call with EPA regarding the initial allocation process and database design. The purpose of the call will be to advise and consult with EPA regarding the submitted initial allocation process and database design and to discuss and resolve any EPA comments. Following the conference call, the CSRA Team will edit the initial allocation process and database design based on received EPA comments to create a draft design for submission to the OU2 PRPs.

This task will require the following efforts on the part of the CSRA Team:
- The CSRA Team will supply two (2) senior project staff located in Washington, DC to participate in the conference call
- Conference call assumed to be no more than two (2) hours in length

Staffing – Senior Allocation Specialist; Senior Project Manager

*Performance Standards/Metrics:*
- The CSRA Team participates in the draft Database Design conference call

**Task 5**        <u>**Meeting with PRPs on Draft Allocation Process and Database Design**</u>

| Item | Title | Due No Later Than[†] | Type |
|------|-------|---------------------|------|
| 5.1 | Conduct Meeting with PRPs on Draft Allocation Process and Database Design | Within 40 days* of submission of initial allocation process and database design to EPA | Activity |
| 5.2 | Conference Call with EPA on Meeting with PRPs on Draft Allocation Process and Database Design | Within 10 days* following the Meeting with PRPs on Draft Allocation Process and Database Design | Activity |

† Or as otherwise directed by the TOCOR
* All references to "days" refer to business days

Task 5.1 - The CSRA Team will plan, schedule, and conduct a meeting with the OU2 PRPs as a group regarding the draft design of the allocation process and database. The purpose of the meeting will be to advise the OU2 PRPs as a group regarding the anticipated conduct of the allocation process and the anticipated organization of data and contents of the database, and to obtain PRP comments regarding the draft allocation process and database design. The CSRA Team will also communicate with the OU2 PRPs individually to obtain the input of OU2 PRPs, including those that did or were unable to attend the outreach meeting, regarding suggestions on the effective design and conduct of the allocation process and database, and to obtain additional records and information, if any, for the allocation database. The CSRA Team will establish a deadline of 60 business days following the meeting with PRPs on draft allocation process and database design for the submission by OU2 PRPs of additional data for inclusion in the allocation database.

This task will require the following efforts on the part of the CSRA Team:
- Making arrangements for a meeting in the greater New York City metropolitan area sufficient to accommodate the OU2 PRPs as a group
- Coordination of meeting space and equipment for meetings provided by EPA or OU2 PRPs
- Communication via email with the OU2 PRPs regarding substance, date/time, and location of meeting
- Development of meeting agenda
- Development of participant materials, including a descriptive summary of Site information received from EPA and a description of the draft allocation process and database design
- Travel of two (2) senior staff from Washington, DC to attend meeting

- Communications by Senior Allocation Specialist via phone, email, or other electronic media as required with OU2 PRPs; Communications will be limited to an average of 20 minutes for each OU2 PRP
- Record PRP comments regarding allocation process and database design and conduct, without attribution to individual OU2 PRP comments

Staffing – Senior Allocation Specialist; Senior Project Manager

*Performance Standards/Metrics:*
- The CSRA Team conducts a meeting with the OU2 PRPs as a group regarding design of the allocation process and database
- A majority of the members of the OU2 PRPs as a group attend the meeting either in person or remotely
- The CSRA Team copies the EPA technical lead on its email communication to the OU2 PRPs regarding substance, date/time, and location of meeting, and provides EPA with a copy of utilized meeting materials

Task 5.2 - The CSRA Team will schedule and hold, within 10 business days of holding the meeting with the OU2 PRPs on the draft allocation process and database design, a conference call with EPA regarding the findings of the meeting.

This task will require the following efforts on the part of the CSRA Team:
- Scheduling and participating in a conference call with EPA to provide EPA information on the meeting, including a list of participants at the meeting and summary of suggestions received regarding the allocation process and database design
- Conference call assumed to be no more than two (2) hours in length

Timing of this task is dependent upon the availability of assigned EPA staff to participate in a conference call within noted timeframe.

Staffing – Senior Allocation Specialist; Senior Project Manager

*Performance Standards/Metrics:*
- The CSRA Team participates in a conference call with EPA regarding the findings of the meeting following the Database Design Outreach Meeting
- In conducting the post-meeting conference call with EPA, the CSRA Team provides a summary of information and suggestions obtained from the OU2 PRPs without attribution to contributions of individual participants

**Task 6            Final Allocation Design**

| Item | Title | Due No Later Than[†] | Type |
|------|-------|---------------------|------|
| 6.1 | Submit Final Allocation Design to EPA and PRPs | Within 50 days* following the Meeting with PRPs on Draft Allocation Process and Database Design | Transmittal |

† Or as otherwise directed by the TOCOR
* All references to "days" refer to business days

The CSRA Team will complete the design of the allocation process based on input received from EPA and PRPs for submission to the OU2 PRPs and EPA.

This task will require the following efforts on the part of the CSRA Team:
- Conduct coding of data and loading of coded data into database
- Communications by Senior Allocation Specialist via phone, email, or other electronic media as required with OU2 PRPs; Communications will be limited to an average of 20 minutes for each OU2 PRP
- Record, compile, and organize suggestions of OU2 PRPs regarding allocation process design and conduct without attribution to individual comments
- Edit draft allocation design based on analysis of received Site data, EPA comments on the draft allocation design, and consideration of input received from OU2 PRPs during meeting and other outreach methods to prepare a written descriptive summary of the final allocation design and submit to EPA and the OU2 PRPs

Staffing - Senior Allocation Specialist; Senior Project Manager

*Performance Standards/Metrics:*
- The CSRA Team submits a written descriptive summary of the final design for the allocation process within the noted timeframe
- The submitted written descriptive summary of the final design for the allocation process includes a description of the basis of and anticipated conduct of the allocation process, addresses any identified ambiguities in the draft report, and includes a summary of how the comments of EPA and the OU2 PRPs regarding the draft allocation design were, or were not, taken into account in the final allocation design, without attribution.

**Task 7        Draft PRP Data Reports**

| Item | Title | Due No Later Than[†] | Type |
|------|-------|----------------------|------|
| 7.1 | Submit Draft PRP Data Reports to PRPs | Within 100 days* following the Meeting with PRPs on Draft Allocation Process and Database Design | Transmittal |

† Or as otherwise directed by the TOCOR
* All references to "days" refer to business days

The CSRA Team will organize and conduct a technical and scientific evaluation of data in the allocation database to develop individual data reports for each of the OU2 PRPs. The PRP Data Reports will provide selected information regarding each OU2 PRP's relation to OU2 and OU2 contaminants of concern that will be used in conduct of the allocation.  The CSRA Team will establish a deadline of 40 business days from receipt of the data report for submission of corrections or suggestions by the OU2 PRPs for improving the quality of the received OU2 PRP's data report.

This task will require the following efforts on the part of the CSRA Team:
- Conduct coding of data and loading of coded data into database obtained from OU2 PRPs
- Review Site data loaded into database to determine appropriate organization for allocation

- Compile and organize Site data in database to support allocation analysis and share computations
- Organize data in allocation database into individual PRP data reports
- Provide a copy of the PRP data reports to the OU2 PRPs

Conduct of this task is dependent upon the following:
- Access by the CSRA Team to EPA technical data regarding Site conditions and the selected OU2 remedy
- Sufficient data on identified PRPs to allow analysis of associated contaminants of concern and hazardous substance fate and transport at the Site
- Successful establishment of the allocation database
- Receipt of additional data from OU2 PRPs for inclusion in the allocation database by 60 business days following the meeting with PRPs on draft allocation process and database design

Staffing - Data Analysts; Senior Scientist; Senior Project Manager; Senior Allocation Specialist

*Performance Standards/Metrics*
- The CSRA Team submits the PRP Data Reports to the OU2 PRPs within the noted timeframe
- The submitted written individual PRP Data Reports include a summary of information in the allocation database that is relevant to a determination regarding the associated OU2 PRP's relation to OU2 and OU2 contaminants of concern for use in conduct of the allocation
- The CSRA Team copies the EPA technical lead on the email communications to the OU2 PRPs providing a copy of their data report

**Task 8**        **Final Data Reports**

| Item | Title | Due No Later Than† | Type |
|------|-------|--------------------|------|
| 8.1 | Submit Final PRP Data Reports to EPA and PRPs | Within 40 days* following the deadline for submission of corrected PRP data reports | Transmittal |
| 8.2 | Provide EPA Access to Allocation Database | Upon submission of corrected PRP data reports | Activity |

† Or as otherwise directed by the TOCOR
* All references to "days" refer to business days

The CSRA Team will analyze corrections or suggestions for improving the quality of the data reports received from OU2 PRPs to determine whether modifications of the original data reports are warranted. Based on this analysis, the CSRA Team will modify the data reports, as deemed appropriate. The CSRA Team will then provide a copy of all of the revised data reports to EPA and a revised copy of their own individual data reports to each of the OU2 PRPs, with an explanation of how suggested changes were, or were not, incorporated.

This task will require the following efforts on the part of the CSRA Team:
- Analyze received suggestions and corrections to data reports in relation to existing Site data and the final allocation design in order to determine appropriate modifications
- Modify the individual data reports, as warranted based on above analysis
- Provide an explanation to the OU2 PRPs regarding whether, and if so how, received suggestions resulting in changes to their individual data report, including a description of why their suggestions and comments were, or were not, taken into account
- As required, the CSRA Team will conduct communications with individual OU2 PRPs to answer questions regarding their final data report

Timing of this task is dependent upon receipt of comments from OU2 PRPs regarding their data report within established timeframes

Staffing - Data Analysts; Senior Scientist; Senior Project Manager; Senior Allocation Specialist

*Performance Standards/Metrics*
- The CSRA Team submits the Final PRP Data Reports to EPA and OU2 PRPs within the noted timeframe
- The submitted revised Final PRP Data Reports address any identified ambiguities in the draft reports and includes a summary of how received comments regarding the draft PRP Data Reports were, or were not, taken into account in the final reports
- The CSRA Team copies the EPA technical lead on the email communications to the OU2 PRPs providing a copy of their individual data report

**Task 9**          **Draft Allocation Report**

| Item | Title | Due No Later Than[†] | Type |
|------|-------|---------------------|------|
| 9.1 | Submit Draft Allocation Recommendation Report | Within 90 days* following submittal of final PRP Data Reports | Transmittal |

† Or as otherwise directed by the TOCOR
* All references to "days" refer to business days

The CSRA Team will prepare a first draft of the allocation recommendation report and submit to the OU2 PRPs and EPA for review.  The draft allocation report will designate shares of responsibility among the OU2 PRPs, as appropriate based on the allocation analysis.  The draft allocation report will include a recommendation on the possible grouping of the OU2 PRPs into tiers of similar levels of responsibility.

This task will require the following efforts on the part of the CSRA Team:
- Review and consideration of input regarding allocation received from the OU2 PRPs and EPA
- Review and understand the basis for EPA's selected remedy for OU2, in consultation with EPA technical and legal personnel
- Review and understand the relative toxicity of identified contaminants of concern relevant to the selection of the OU2 remedy, in consultation with EPA technical and legal personnel

- Analyze the relative toxicity of materials discharged by OU2 PRPs and other differentiating factors, including fate and transport of hazardous substances released by PRPs based on the data contained in the RI/FS, in relation to the selected remedy
- Compilation and analysis of allocation data related to each OU2 PRP, including contaminants of concern, to establish the relative impact of the actions of each OU2 PRP on the conditions that resulted in EPA selecting the OU2 remedy
- Establish appropriate allocation algorithms
- Load compiled PRP data into allocation calculations to determine relative relationships among the OU2 PRPs
- As appropriate, establish appropriate tiers of OU2 PRP responsibility based on calculations and consideration of equitable factors
- Prepare draft allocation recommendation report
- Submission of the draft report to the OU2 PRPs and EPA

Timing of this task is dependent upon receipt of position briefs and reply briefs regarding allocation from OU2 PRPs within established timeframes

Staffing - Senior Allocation Specialist; Senior Project Manager

*Performance Standards/Metrics:*
- The CSRA Team submits the Draft Allocation Recommendation Report within the noted timeframe
- The submitted written Draft Allocation Recommendation Report includes an overview of the basis for the determinations of shares among the OU2 PRPs, including a description of the use of data sources and application of allocation factors and methodology utilized, and reason for potential vulnerabilities, if any, in the resulting allocation
- The report identifies and explains the rationale, if applicable, for grouping OU2 PRPs into tiers of similar relative responsibility

**Task 10**         **Final Allocation Recommendation Report**

| Item | Title | Due No Later Than[†] | Type |
|------|-------|---------------------|------|
| 10.1 | Conference Call with EPA regarding Draft Allocation Recommendation Report | Within 10 days* of submittal of Draft Allocation Report | Transmittal |
| 10.2 | Submit Final Allocation Recommendation Report to OU2 PRPs and EPA | Within 60 days* of submittal of Draft Allocation Report | **Deliverable** |

† Or as otherwise directed by the TOCOR
* All references to "days" refer to business days

Task 10.1 - The CSRA Team will prepare for and participate in a meeting with EPA regarding the submitted draft allocation recommendation report. The purpose of the meeting will be to obtain EPA comments regarding the submitted draft allocation report, including the basis and findings of the draft allocation report and the report format.

This task will require the following efforts on the part of the CSRA Team:
- The CSRA Team will supply one (2) senior staff located in Washington, DC to participate in the conference call

- Conference call assumed to be no more than two (2) hours in length

Staffing - Senior Allocation Specialist

Performance Standards/Metrics:
> The CSRA Team participates in the meeting regarding the submitted draft allocation recommendation report

Task 10.2 - The CSRA Team will prepare a Final Allocation Recommendation Report. The Final Allocation Recommendation Report will take into consideration comments on the draft allocation recommendation report received during consultation with EPA and during meetings with and received in position and reply briefs from the OU2 PRPs.

This task will require the following efforts on the part of the CSRA Team:
- Review and consider the comments by OU2 PRPs and EPA regarding the draft allocation recommendation report
- Editing of the draft allocation recommendation report to incorporate appropriate modifications based on OU2 and EPA comments to produce the Final Allocation Recommendation Report

Staffing - Senior Allocation Specialist; Senior Project  Manager

*Performance Standards/Metrics:*
- The CSRA Team submits a Final Allocation Recommendation Report within the noted timeframe
- The submitted Final Allocation Recommendation Report includes the elements of the Draft Allocation Recommendation Report described in Task 17, addresses any identified ambiguities in the draft report, and provides a summary, without attribution to individual comments, of how comments of the OU2 PRPs and EPA regarding the Draft Allocation Recommendation Report were, or were not, taken into account in the final report, without attribution.

## Task 11    Final PRP Outreach Report

| Item | Title | Due No Later Than[†] | Type |
|------|-------|---------------------|------|
| 11.1 | Submit Final PRP Outreach Report | Within 10 days* of submittal of Final Allocation Report | Activity |

† Or as otherwise directed by the TOCOR
* All references to "days" refer to business days

The CSRA Team will prepare and provide to EPA a report regarding outreach efforts conducted with the OU2 PRPs, including a list of participants in outreach efforts, a description of topics discussed, and a summary of issues or concerns raised.

This task will require the following efforts on the part of the CSRA Team:
- Review and organize the comments of OU2 PRPs received during conduct of the Task Order, without attribution to individual OU2 PRPs
- Prepare and provide EPA an overview of conducted outreach efforts, including a list of OU2 PRPs that have participated in outreach meetings, conference calls, or individual communications with the CSRA Team and a summary of suggestions received from the OU2 PRPs regarding the allocation process

Staffing - Senior Allocation Specialist; Senior Project Manager

*Performance Standards/Metrics:*
- The CSRA Team submits a written summary of PRP outreach efforts within the noted timeframe
- The Final PRP Outreach Report includes a summary of conducted PRP outreach efforts, including a list of OU2 PRPs that have participated in outreach meetings, conference calls, or individual communications with the CSRA Team and a summary of suggestions received from the OU2 PRPs regarding the allocation process
- In drafting the Final PRP Outreach Report, the CSRA Team provides a summary of information and suggestions obtained from the OU2 PRPs without attribution to contributions of individual participants

**Task 12**        **Task Order Closeout Report**

| Item | Title | Due No Later Than† | Type |
|------|-------|--------------------|------|
| 12.1 | Submit Draft Task Order Closeout Report | Within 10 days* of submittal of Final Allocation Report | Transmittal |
| 12.2 | Final Task Order Closeout Report | Within 10 days* of receipt of EPA's comments on Draft Task Order Closeout Report | **Deliverable** |

† Or as otherwise directed by the TOCOR
* All references to "days" refer to business days

Task 12.1 - The CSRA Team will design and produce the first draft of a report regarding the conduct of tasks pursuant to the Task Order and submit it for review by EPA. The report will not contain any confidential or sensitive information. The contents of the Draft Task Order Close-Out Report will include:
- A half-page description of the project that describes the nature of the project, the parties, the process, and the outcomes
- If appropriate, a short section reflecting on the process and procedural lessons learned and recommendation for improvements and identification of those activities conducted that contributed to the success of the process
- A brief summary of the final costs of the project broken out by percentage of labor hours and other direct costs

This task will require the following efforts on the part of the CSRA Team:
- Review of project activities and compilation of project summary
- Consideration and compilation of thoughts on lessons learned regarding project
- Compilation of project budget costs
- Preparation of the Draft Task Order Close-out Report

Staffing - Senior Allocation Specialist; Senior Project Manager

*Performance Standards/Metrics:*
- The CSRA Team submits a Draft Task Order Closeout Report within the noted timeframe
- The submitted Draft Task Order Closeout Report includes the items noted above as contents of the report

Task 12.2 - The CSRA Team will prepare a Final Task Order Closeout Report and submit to EPA. The Final Task Order Closeout Report will take into consideration comments received from EPA regarding the draft of the Task Order closeout report. CSRA will provide one (1) copy of the Final Task Order Closeout Report to the PO and one (1) copy to the TOCOR in electronic format.

This task will require the following efforts on the part of the CSRA Team:
- Review and consideration of comments by EPA regarding the draft Task Order Closeout Report
- Editing, and as required redesign, of the closeout report to incorporate modifications based on EPA comments in order to produce the Final Task Order Closeout Report

Staffing - Senior Allocation Specialist; Senior Project Manager

*Performance Standards/Metrics:*
- The CSRA Team submits a Final Task Order Closeout Report within the noted timeframe
- The submitted Final Task Order Closeout Report addresses any identified ambiguities in the draft report and includes a summary of how EPA's comments regarding the Draft Allocation Recommendation Report were, or were not, taken into account in the final report

## 5.0    Reports, Transmittals and Deliverables

CSRA will provide EPA all reports in accordance with the contract.

Copies of all contract deliverables will be sent to both the PO and the TOCOR. If oral briefings are scheduled for EPA staff, the PO will be notified in time to attend.

**Schedule**

| Item | Title | Due No Later Than[†] | Type |
|------|-------|---------------------|------|
| 1 | Task Order Kick-Off Meeting | Within 20 days* of Task Order approval | Transmittal |
| 2 | EPA Project Public Announcement Meeting | Within 40 days* of Task Order approval | Activity |
| 3 | Submit initial allocation process and database design to EPA | Within 100 days* of Task Order approval | Transmittal |
| 4 | Conference Call with EPA on Initial Allocation Process and Database Design | Within 10 days* of submission of initial allocation process and database design | Activity |
| 5.1 | Conduct Meeting with PRPs on Draft Allocation Process and Database Design | Within 40 days* of submission of initial allocation process and database design to EPA | Activity |
| 5.2 | Conference Call with EPA on Meeting with PRPs on Draft Allocation Process and Database Design | Within 10 days* following the Meeting with PRPs on Draft Allocation Process and Database Design | Activity |
| 6 | Submit Final Allocation Design to EPA and PRPs | Within 50 days* following the Meeting with PRPs on Draft Allocation Process and Database Design | Transmittal |
| 7 | Submit Draft PRP Data Reports to PRPs | Within 100 days* following the Meeting with PRPs on Draft Allocation Process and Database Design | Transmittal |
| 8.1 | Submit Final PRP Data Reports to EPA and PRPs | Within 40 days* following the deadline for submission of corrected PRP data reports | Transmittal |
| 8.2 | Provide EPA Access to Allocation Database | Upon submission of corrected PRP data reports | Activity |
| 9 | Submit Draft Allocation Recommendation Report | Within 90 days* following submittal of final PRP Data Reports | Transmittal |
| 10.1 | Conference Call with EPA regarding Draft Allocation Recommendation Report | Within 10 days* of submittal of Draft Allocation Report | Transmittal |
| 10.2 | Submit Final Allocation Recommendation Report to OU2 PRPs and EPA | Within 60 days* of submittal of Draft Allocation Report | **Deliverable** |
| 11 | Submit Final PRP Outreach Report | Within 10 days*  of submittal of Final Allocation Report | Activity |
| 12.1 | Submit Draft Task Order Closeout Report | Within 20 days*  of submittal of Final Allocation Report | Transmittal |
| 12.2 | Final Task Order Closeout Report | Within 10 days* of receipt of EPA's comments on Draft Task Order Closeout Report | **Deliverable** |

*\* All references to days in this chart refer to business days*

## 6.0     Staffing Plan

This Task Order will be staffed as follows:

| Team Member Name[†] | Role in the Project |
|---|---|
| Mary Apostolico<br>CSRA International | Overall Contract Management, Quality Assurance, Task Order Management |
| Jennifer Cutrona<br>CSRA | Dashboard and Financial Tracking |
| David Batson<br>TechLaw | Senior Allocation Specialist |
| Judy Manley<br>TechLaw | Senior Project Manager |
| Travis Kline<br>TechLaw | Senior Toxicologist |
| Erman Evcimen<br>TechLaw | Database Designer |
| Amber Kozacek<br>TechLaw | Researcher |

[†]Other team members than those listed in the above table may work on this task order to complete the required work.

[*]The task order mainly will be managed by the TOM listed in the above table; however, additional team members may conduct task order management activities to ensure coverage during periods when the TOM is unavailable (e.g., vacation, illness, business travel, time constraints).

## 7.0     Quality Management

As part of its quality assurance practices, CSRA TOM will:
- Review this Work Plan with the EPA TOCOR, as requested by the TOCOR;
- Meet or hold conference calls as needed with the TOCOR to review progress; and
- Speak regularly with the subcontractor to receive project status updates.

In addition, all work on this Task Order will be performed in accordance with CSRA's strict quality assurance practices, including but not limited to incorporating quality management principles and processes into the development of the required transmittals, deliverables, and the consulting services offered. Although CSRA will ensure the timely delivery of all transmittals and deliverables, CSRA will not perform a review of these documents prepared by the subcontractor.

## 8.0     Conflict of Interest

Based on our review and understanding of the legal requirements of this work, CSRA certifies that no real, apparent, or potential organizational or individual conflict of interest exists with this assignment, based on previous or ongoing work, or other potential conflicts.

## 9.0    Cyber Security

CSRA has interpreted compliance with information assurance / security provisions contained in this contract as a requirement to provide its standard CSRA information system and procedures. CSRA contract pricing does not include or reflect any additional requirements or certification and accreditation for the CSRA information system or procedures, connectivity to the Government system(s), or storage of any Government-provided data or project data, or for stand-alone development or storage environments. Should the Government require increased or specialized information assurance security or other actions beyond those reflected in the standard CSRA information system or procedures, then the Government will notify CSRA and such revisions will be provided in accordance with the "changes" clause of this contract.

## 10.0    Project Budget

The budget for this task is provided as an Attachment.

## 11.0    Period of Performance

The task order period of performance runs through June 15, 2019.

# Exhibit M

# Revised Work Plan

## EPA Conflict Prevention and Resolution Services Contract

## Contract # EP-W-14-020

## Work Plan for Task Order #096

## Diamond Alkali-Lower Passaic River Allocation

### Submitted: May 31, 2019
Revised: March 16, 2018
*Originally submission:  June 30, 2017*

**Prepared for:**

US Environmental Protection Agency
Washington, DC 20460

| | |
|---|---|
| EPA Program Office: | Region 2 |
| EPA Task Order Contracting Officer's Representative (TOCOR): | Alice Yeh |
| Telephone Number: | 212-637-4427 |
| E-Mail Address: | yeh.alice@epa.gov |
| | |
| CSRA Task Order Manager (TOM): | Mary Apostolico |
| Telephone Number: | 517-290-4415 |
| E-Mail: | mary.apostolico@csra.com |
| | |
| Subcontractor Task Manager: | Mark Heaney |
| | TechLaw / AlterEcho |
| Telephone Number: | 703-818-3201 |
| E-mail Address: | mark.heaney@alterecho.com |

This Revised Work Plan describes CSRA's approach for performing the tasks described in the Revised Statement of Work. It includes a description of the activities associated with each task as well as a list of transmittals and deliverables and their due dates. A cost estimate for this Task Order Work Plan is provided as a separate attachment.  Previous revisions to this work plan included adding additional documents relevant to the allocation to be submitted by the PRPs (along with associated time to evaluate the documents for relevance), additional time for PRPs to communicate, meet, and exchange information with the allocator, and a step for early identification of PRPs who are similarly situated to the parties that received the first round of cash out settlement offers from EPA for EPA's use in making early settlement determinations. **New revisions to this work plan are presented with strike through for deletions and in bold blue for additions.  They include changes related to additional documents to be submitted by the PRPs, an increase in the number of facilities being evaluated, and increased interaction with the PRPs and the allocator** Exemption (b) (3) (A)


The Work Plan is organized as follows:

Section 1.0 - Background
Section 2.0 - Assumptions
Section 3.0 - Project Methodology and Approach
Section 4.0 - Work Tasks
Section 5.0 - Reports, Transmittals and Deliverables
Section 6.0 - Staffing Plan
Section 7.0 - Quality Management
Section 8.0 - Conflict of Interest
Section 9.0 - Cyber Security
Section 10.0 - Project Budget
Section 11.0 - Period of Performance

## 1.0    Background

The Diamond Alkali Site (the Site) has a long history, involving over 100 potentially responsible parties (PRPs). Since the late 1800s, the Lower Passaic River has been a highly industrialized waterway, receiving direct and indirect discharges from numerous industrial facilities. Data collected in the Lower Passaic River, and EPA's analyses, show that contaminated sediment in the lower 8.3 miles are a major source of contamination to the rest of the river and Newark Bay and pose an unacceptable risk to human health and the environment due to the presence of a variety of contaminants that stay in the environment for a long time and can build up in fish and shellfish. These contaminants include dioxins and furans, PCBs, mercury, DDT and its primary breakdown products, copper, dieldrin, PAHs, and lead.

On March 4, 2016, EPA issued a record of decision selecting the remedy for the lower 8.3 miles of the Lower Passaic River, which is Operable Unit 2 (OU2) of the Site. Currently, the remedial design (RD) for OU2 is being performed by Occidental Chemical Corporation (OCC) pursuant to an administrative order on consent. The cost of the remedial action (RA), estimated for purposes of remedy selection, is $1.38 billion.

Region 2 has issued a notice of potential liability to approximately 100 parties, informing them of their responsibility for the RD/RA for OU2. The Region has offered a first round of cash-out settlements to a group of approximately 20 PRPs. The Region expects to separately address the liability of municipalities and public entities. For the remaining PRPs, the Region expects to

enter into settlement negotiations for performance and funding of the remedy with OCC and other parties (the "Major PRPs") that the Region considers major PRPs for OU2. The Region plans another round of cash-out settlements with "Middle Tier PRPs", i.e., not part of the phase 1 cash-out group, but also not Major PRPs. The Region requires the services of a third party allocator to develop a settlement framework and evaluate the 80 Middle Tier and Major parties within the framework. This proposal applies same allocation process to all of the private OU2 PRPs remaining after the first round of cash-out settlements, with the expectation that, in the settlement phase, the resulting allocation will enable EPA to identify the Middle Tier PRPs, eligible for a phase two cash out offer, and the Major PRPs that will be performing and/or funding the remedy.

Region 2 understands that the PRP group (the Cooperating Parties Group, or CPG) has made at least two previous attempts to develop a mutually acceptable allocation of liability to promote settlement with EPA for costs and work at the Site, however both efforts fell short of agreement. Region 2 believes that because of these previous efforts, additional information available from responses to CERCLA 104(e) letters, information available from previous litigation at the state level and numerous conversations with PRPs over the years, the project will be able to be built primarily upon existing information and contacts. Some minor augmentation of background, data and allocation factors may need to occur to develop what is hoped to be an acceptable settlement proposal and structure. In 2016, the Department of Justice retained a mediator/allocation specialist, David Batson of TechLaw/AlterEcho, to assist in settlement analysis. Those discussions and analyses have resulted in this effort.

## 2.0    Assumptions

This work plan and the attached cost estimate are based on the following assumptions, in addition to Task-specific assumptions noted in Section 4.0 of the Work Plan. All work will be conducted in accordance with the specific tasks in the Work Plan to the performance metrics specified therein.

**General Assumptions:**

- EPA will provide the CSRA Team with a list of parties noticed regarding their responsibility for the RD/RA for OU2, including:
    - a list of Major and Middle Tier Parties ("OU2 PRPs");
    - a list of Phase 1 cash-out parties; and
    - a list of other OU2 parties, including municipalities and other entities
- Maximum of ~~80~~ 83 PRPs will be provided an opportunity to participate in or be evaluated for determining a share of responsibility in the allocation process. **Ten of these PRPs are non-participating parties.**
- **The allocation will cover a maximum of 97 facilities associated with the 83 PRPs.**
- All OU2 PRPs will be provided an opportunity to participate in the design of the allocation database and process and to provide additional Site-related information for possible addition to the database, and will be designated a share of responsibility in the Final Allocation Recommendation Report
- The Final Allocation Recommendation Report will also divide the parties into logical groupings of similarly-situated PRPs
- EPA will provide the CSRA Team with a listing and contact information for each OU2 PRP; Reference herein to meetings or other forms of communication with the OU2 PRPs means communication with the identified representatives of such parties
- A maximum of ~~150,000~~ ~~290,000~~ *506,000* pages of documents will *be* reviewed and utilized to conduct the allocation, including;
    - A maximum of 130,000 pages of documents received from EPA for CSRA Team review

- A maximum of ~~20,000~~ ~~160,000~~ *376,000* extra pages of documents received from PRPs for CSRA review. **The parties have indicated that based on the evolution of the allocation approach they have indicated additional relevant documents to submit. This represents an increase in the number of pages to be reviewed by 216,000 or approximately 2,482 pages per 87 participating party facilities.**
- All communications by the CSRA Team will be by phone or email unless meeting noted
- The CSRA Team estimates 8-10 hours of communications per party over the remainder of the project. This time is presented as 2 hours per party in Tasks 5.A.1 and 6.A.4; additional meetings (5.A.1, 5.B.1, 9, 10.2); and an undefined number of calls and e-mails allowed for in remaining tasks. **An additional approximately 45 minutes per participating party has been added to Task 7** <span style="color:red">Exemption (b) (3) (A)</span>



- Maximum of 4 hours of combined project status/update calls will be held by the CSRA Team with EPA per month
- Out-of-DC Area Meetings:
  - 6 meetings involving 2 contractor staff
- Out-of-DC area meetings will be held at the EPA Region 2 offices or other location in the greater New York City metropolitan area as determined by EPA, or OU2 PRPs they supply meeting space
- Travel for and timing of out-of-DC area meetings will be scheduled to allow CSRA Team members to travel from Washington, DC and return on the same day
- Travel and per diem costs for <span style="color:red">Not Responsive by Agreement with FOIA Requestor</span>

- Meetings will be scheduled and held within noted timeframes
- The allocation database will be designed and organized primarily for purposes of allocation
- Space and equipment for meetings will be provided by EPA or PRPs
- ~~The CSRA Team will provide EPA with a copy of all communications sent to OU2 PRPs regarding the subject, substance, and logistics of OU2 PRP meetings with CSRA Team members~~
- Any part of a communication, attachment to a communication, presentation, or written material provided to OU2 PRPs by the CSRA Team that involves a description of the Site or EPA actions or activities will be provided to EPA for review and approval prior to submission to the OU2 PRPs
- Unless otherwise noted herein, all allocation related communications by the CSRA Team involving the OU2 PRPs or representatives of EPA or DOJ, individually or in groups, will be held confidential pursuant to the provisions of the ADR Act of 1996, 5 USC 574
- In order to ensure a common expectation of confidentiality, all PRP participants in the allocation process will be required to enter, and EPA will appropriately acknowledge, a confidentiality agreement
- The CSRA Team will provide invoices to EPA at the end of each month in which a task is completed (activity, transmittal, and/or deliverable) identified in Section 4.0 of the Work Plan, with a written Progress Report detailing associated activities accomplished during the reporting period, how such activities meet Task Order performance standards, and associated labor and other direct costs
- <span style="color:red">Not Responsive by Agreement with FOIA Requestor</span>

- "Staffing" referenced in Section 4.0 Work Tasks refers to TechLaw staff.
- This Task Order can be modified to change the statement of work or add funding.
- Tasks 8 – 11 will not be performed within the task order Period of Performance and are no longer required under this contract.  It is anticipated Tasks 8-11 will be initiated in a new task order under the follow on contract.

## 3.0    Project Methodology and Approach

The proposed methodology and approach consists of the following:
- To support this Task Order, CSRA selected TechLaw support.
- CSRA and TechLaw (the CSRA Team) will not interpret EPA policy on behalf of the EPA or make decisions on items of policy, regulation or statutes. The CSRA Team also will not take a stand on the merits of substantive items under discussion including, but not limited to, any substantive issues raised by OU2 PRPs.  The CSRA Team will not interpret EPA's March 4, 2016, record of decision selecting the remedy for OU2 of the Site.
- In gathering information or performing research with parties outside the EPA, CSRA Team members will identify themselves as contractors to EPA and not as EPA employees.
- CSRA will approach this task in accordance with the basic terms of the contract and according to the established norms and ethical standards of ADR professionals. Except as otherwise noted herein, information provided to the ADR professional by any of the parties, including EPA, communications between parties and the ADR professional, and notes and dispute resolution work product generated by the ADR professional during work pursuant to the Task Order will be maintained as confidential by the ADR professional pursuant to the provisions of the ADR Act of 1996 (Public Law 104-320; 5 USC 571 et al.) and applicable federal, state and judicial requirements.
- To enhance the positive substantive, relational, and procedural outcomes from ADR cases, CSRA will direct all ADR professionals providing ADR services under this task order to do the following prior to the mediation or facilitation and throughout the process:
  - Inquire about whether individual participants have the time, financial, and logistical resources necessary to participate effectively in the process and – where resources are inadequate – assist them in identifying appropriate resources or in making necessary adjustments to the process to accommodate resource constraints;
  - Assist the participants in identifying the issues that are important to resolving any controversy and solutions that will address the needs shared by the participants;
  - Conduct the process to promote active engagement from all participants;
  - Explore with the participants appropriate ways to incorporate high quality and relevant information resources necessary to resolve the issues; and
  - To support productive dialogue and effective implementation of any agreements reached by the participants, ensure that participants have appropriate authority to make commitments on behalf of their organizations.

As prime contractor, CSRA will support this Task Order through the following activities:
- Provide progress reports at the end of each month in which an activity, transmittal, and/or deliverable identified in Section 5.0 of the Work Plan is completed;
- Communicate and coordinate with the EPA Task Order Contracting Officer's Representative (TOCOR) by phone as needed;
- Coordinate with the subcontractor, TechLaw;
- Incorporate the principles of Quality Management while carrying out this task;

- Provide deliverables in electronic format (as agreed to by the TOCOR) to the EPA TOCOR; and
- NOTIFY THE EPA PROJECT DIRECTOR AND PROGRAM OFFICE CONTACT WHEN 75% OF THE FUNDS PROVIDED HAVE BEEN EXPENDED.

## 4.0    Work Tasks

Task 0.0       **Task Order Management**

In accordance with proper contract implementation, CSRA and TechLaw will ensure effective management of the resources and deliverables required by EPA.

Specifically, the CSRA Task Order Manager (TOM) for this effort will:
- Ensure that all technical direction received falls into the scope of work prior to initiating any action;
- Ensure completion and maintain copies of all contract transmittals and deliverables;
- Oversee subcontractor activities through regular and periodic conversations with the subcontractor to ensure effective performance;
- Ensure that progress and financial reports accurately clearly articulate the work completed as per the approved work plan, and identify any problems encountered and activities to address them;
- Speak on an as-needed basis with the EPA TOCOR to review the financial and work status of the project;
- Review the progress report and invoice with the EPA TOCOR; and
- Update the Dashboard task order management tracking system as invoices are submitted.

The CSRA Team developed this Work Plan to provide a detailed explanation of all activities associated with and a proposed approach for completing each of the defined tasks. The CSRA Team identified the transmittals and deliverables and their associated due dates and developed a detailed fixed price budget, including a breakout of labor and travel costs.

*Please note:* Not Responsive by Agreement with FOIA Requestor
Not Responsive by Agreement with FOIA
Requestor

| Item | Title | Due No Later Than[†] | Type |
|------|-------|---------------------|------|
| 0.1 | Work Plan | Within 10 days* of SOW issuance or as approved by the EPA CO | **Deliverable** |
| 0.1a | Revised Work Plan | Within 10 days* of SOW issuance or as approved by the EPA CO | Deliverable |
| *0.1b* | *Revised Work Plan* | *Within 10 days* of SOW issuance or as approved by the EPA CO* | *Deliverable* |
| 0.2 | Progress Reports | Submitted after completion of each task and with submission of invoice | **Deliverable** |

[†] Or as otherwise directed by the TOCOR
* All references to "days" refer to business days

## Task 1       **Preliminary Work** - Complete

| Item | Title | Due No Later Than[†] | Type |
|------|-------|----------------------|------|
| 1.1 | Task Order Kick-Off Meeting | Within 20 days* of Task Order approval | Transmittal |

[†] Or as otherwise directed by the TOCOR
* All references to "days" refer to business days

The CSRA Team will prepare for and participate in a meeting with EPA to discuss tasks described in the Task Order, EPA's expectations for the project, and a plan for conducting the outreach to PRPs. Prior to the meeting, the CSRA Team will develop its overall strategy for conduct of the allocation process, including a timeline of tasks and strategy for communications with the OU2 PRPs. During the meeting, the EPA will advise the CSRA Team regarding the identity of OU2 PRPs and the scope and nature of the selected remedy. Following the meeting, the CSRA Team will send an email summarizing the agreed-upon PRP Outreach Plan for approval of the EPA technical lead in consultation with EPA legal personnel. The developed PRP outreach plan will include a process for contacting and receiving information from PRPs, including for meetings and conference calls with the OU2 PRPs as a group, and individual OU2 PRP contacts via email, letter, or phone, and confidentiality procedures.

This task will require the following efforts on the part of the CSRA Team:
- Development of a plan for conducting outreach to OU2 PRPs that includes an opportunity for all OU2 PRPs to (1) provide feedback on the design of the allocation, including additional data, information or factors which should be considered in design of the database, (2) review their individual PRP data report for accuracy, (3) provide suggestions regarding design of the allocation process and (4) provide feedback on the allocation report. The plan also explain how the CSRA Team will update EPA on PRP outreach efforts
- Drafting and submission of an email summarizing the agreed-upon PRP outreach plan for approval of the EPA technical lead
- The CSRA Team will supply two (2) senior staff located in Washington, DC for the meeting

Tech Law Staffing - Senior Allocation Specialist; Senior Project Manager

*Performance Standards/Metrics:*
- The CSRA Team participates in the Task Order Kick-Off Meeting
- The submitted summary of the PRP Outreach Plan provides a summary of the agreement reached at the Task Order Kick-Off Meeting regarding the plan for communications by the CSRA Team with the OU2 PRPs

**Task 2**       **Public Announcement of Project - Complete**

| Item | Title | Due No Later Than[†] | Type |
|------|-------|----------------------|------|
| 2.1 | EPA Project Public Announcement Meeting | Within 40 days* of Task Order approval | Activity |

† Or as otherwise directed by the TOCOR
* All references to "days" refer to business days

The CSRA Team will participate in a meeting, sponsored by EPA, with the OU2 PRPs to announce and explain the allocation project, including opportunities for participation of the OU2 PRPs in the development of the allocation process. Following the project announcement meeting noted in Task 2, the CSRA Team will work to obtain and record

signatures of the OU2 PRPs and acknowledgement of EPA to the Participation Agreement distributed during the project announcement meeting.

This task will require the following efforts on the part of the CSRA Team:
- Preparation of talking points and handout material for participants regarding the allocation process in consultation with the EPA technical lead in consultation with EPA legal personnel
- Preparation of a written Participation Agreement for consideration and execution of the OU2 PRPs, incorporating an explanation of relevant confidentiality protections and requirements associated with the allocation process
- The CSRA Team will supply two (2) senior staff located in Washington, DC to participate in the meeting
- Communication via email, and as required via phone, with the OU2 PRPs as a group regarding execution of and to answer questions regarding the Participation Agreement
- Recording and compilation of executed Participation Agreement signature pages

Conduct of this task is dependent upon EPA's ability to successfully make arrangements for and schedule the meeting, and communicate with OU2 PRPs regarding the meeting, and upon receipt of EPA's final approval of the PRP outreach plan agreed upon during the Task Order Kick-Off Meeting within 10 business days of the meeting.

Staffing - Senior Allocation Specialist, Senior Project Manager

*Performance Standards/Metrics:*
- Talking points and materials prepared for the meeting provide an overview of the project and opportunities for PRP participation noted in the PRP Outreach Plan developed in Task 1
- The CSRA Team participates in the Task Order Kick-Off Meeting
- A majority of the members of the OU2 PRPs execute the Participation Agreement


**Task 3**       <u>**Initial Allocation Process and Database Design -**</u> Complete

| Item | Title | Due No Later Than[†] | Type |
|------|-------|---------------------|------|
| 3.1 | Submit initial allocation process and database design to EPA | Within 100 days* of Task Order approval | Transmittal |

† Or as otherwise directed by the TOCOR
* All references to "days" refer to business days

The CSRA Team will review documents received from EPA and prepare a written descriptive summary of the initial design for the allocation process, including a design of the allocation database, and submit to EPA for review.

The allocation process will be designed based upon information received during consultations with EPA and OU2 PRPs on the allocation database and using all relevant non-confidential received information, including data, records, and other documents. The initial design will include recommendations for: (1) data sources to be considered for the allocation; (2) applicable allocation factors; and (3) methodology for determination of shares.

The searchable database will be designed to have the capability to contain and organize all of the information and data used in the allocation, including received PRP disclosure statements and nexus documents from third party litigation. No confidential information will be included in the allocation database. Though to be designed for purposes of conducting the allocation, the database will be designed in such a way as to allow access and use by EPA and DOJ staff for their settlement purposes following submission of the Allocation Data Reports in Task 8. The CSRA Team will, as an interim measure, create and provide EPA access to a SharePoint site in which any site documents received from the OU2 PRPs will be maintained.

This task will require the following efforts on the part of the CSRA Team:
- Conduct a preliminary review of Site data on OU2 contaminants of concern as identified in the OU2 ROD to determine appropriate allocation data sets
- Conduct preliminary research, analysis, and determine applicable case law, legal requirements, and equitable considerations for use in conducting allocation
- Conduct initial review and analysis of EPA selected remedy for OU2 to determine method to account for differential impact of contaminants of concern and source location
- Conduct a preliminary review of information received from EPA, including PRP disclosure statements and nexus documents from third party litigation, in order to determine the appropriate design of the database required to support conduct of the allocation process
- Conduct initial coding of data and loading of coded data into database to determine credibility of database design concept
- Establish preliminary recommendations regarding allocation computations appropriate for OU2, procedures for use of data in allocation computations, and appropriate allocation methodology, and the design of a searchable database with capability to contain and organize all of the information and data used in the allocation
- Preparation of a written descriptive summary of the initial design for the allocation process, including (1) a timeline for submission of allocation related documents, including PRP position briefs and reply briefs, and (2) a written description of the design of the database with a suggested method for providing OU2 PRPs specific information on the contents of the database, suggestions on methods for resolving data gaps in data regarding OU2 PRPs not identified in documents received from EPA, and if practical, images of anticipated data screens.
- Establish a SharePoint site that provides EPA access to documents received from OU2 PRPs

Conduct of this task is dependent upon; (1) receipt of all allocation documents and information regarding the site remedy from EPA within 20 business days of approval of the Task Order, and (2) receipt of all information from EPA as individual documents in OCR searchable pdf format to allow loading into the allocation database.

Staffing - Senior Allocation Specialist; Senior Project Manager; Database Designer

*Performance Standards/Metrics:*
- The CSRA Team submits a written descriptive summary of the initial design for the allocation process, including a database design, within the noted timeframe
- The submitted written descriptive summary of the initial design for the allocation process includes a summary of the basis of and anticipated conduct the allocation

process, including preliminary recommendations on data sources to be considered for the allocation, applicable allocation factors, and methodology for determination of shares
- The submitted initial database design provides a written description of the database, including, suggested method for providing OU2 PRPs specific information on the contents of the database, suggestions on methods for resolving data gaps in data regarding OU2 PRPs not available in documents received from EPA, and if practical, images of anticipated data screens

**Task 4**        **Conference Call w EPA on Initial Database Design – Complete**

| Item | Title | Due No Later Than† | Type |
|------|-------|--------------------|------|
| 4.1 | Conference Call with EPA on Initial Allocation Process and Database Design | Within 10 days* of submission of initial allocation process and database design | Activity |

† Or as otherwise directed by the TOCOR
* All references to "days" refer to business days

Task 4.1 – The CSRA Team will prepare for and participate in a conference call with EPA regarding the initial allocation process and database design. The purpose of the call will be to advise and consult with EPA regarding the submitted initial allocation process and database design and to discuss and resolve any EPA comments. Following the conference call, the CSRA Team will edit the initial allocation process and database design based on received EPA comments to create a draft design for submission to the OU2 PRPs.

This task will require the following efforts on the part of the CSRA Team:
- The CSRA Team will supply two (2) senior project staff located in Washington, DC to participate in the conference call
- Conference call assumed to be no more than two (2) hours in length

Staffing – Senior Allocation Specialist; Senior Project Manager

*Performance Standards/Metrics:*
- The CSRA Team participates in the draft Database Design conference call

**Task 5**        **Meeting with PRPs on Draft Allocation Process ~~and~~ /Database Design, and Initiation of early Settlement Process - Complete**

| Item | Title | Due No Later Than† | Type |
|------|-------|--------------------|------|
| 5.A.1 | Conduct *two* Meeting*s* with PRPs on Draft Allocation Process and Database Design | Within 40 days* of submission of initial allocation process and database design to EPA | Activity |
| 5.A.2 | Conference Call with EPA on Meeting*s* with PRPs on Draft Allocation Process and Database Design | Within 10 days* following the Meeting with PRPs on Draft Allocation Process and Database Design | Activity |
| 5.B.1 | Submit guidance on | Within 5 days of Revised Task Order | Transmittal |

| | | Approval | |
|---|---|---|---|
| | preparation of allocation submissions to EPA and PRPs | Approval | |
| 5.B.2 | Submit recommendation on relevancy of documents provided by OU2 PRPs to EPA and PRPs | Within 30 days of Revised Task Order Approval | Transmittal |

† Or as otherwise directed by the TOCOR
* All references to "days" refer to business days

Task 5.A.1 - The CSRA Team will plan, schedule, and conduct two meetings with the OU2 PRPs as a group regarding the draft design of the allocation process and database. The purpose of the meetings will be to advise the OU2 PRPs as a group regarding the anticipated conduct of the allocation process and the anticipated organization of data and contents of the database, and to obtain PRP comments regarding the draft allocation process and database design. The CSRA Team will also communicate with the OU2 PRPs individually to obtain the input of OU2 PRPs, including those that did or were unable to attend the outreach meetings, regarding suggestions on the effective design and conduct of the allocation process and database, and to obtain additional records and information, if any, for the allocation database.

This task will require the following efforts on the part of the CSRA Team:
- Making arrangements for a meeting in the greater New York City metropolitan area sufficient to accommodate the OU2 PRPs as a group
- Coordination of meeting space and equipment for meetings provided by EPA or OU2 PRPs
- Communication via email with the OU2 PRPs regarding substance, date/time, and location of meeting
- Development of meeting agenda
- Development of participant materials, including a descriptive summary of Site information received from EPA and a description of the draft allocation process and database design
- Travel of two (2) senior staff from Washington, DC to attend meeting
- Communications by Senior Allocation Specialist via phone, email, or other electronic media as required with OU2 PRPs
- Communications will be limited to an average of 2 hours for each OU2 PRP
- Record PRP comments regarding allocation process and database design and conduct, without attribution to individual OU2 PRP comments

Staffing – Senior Allocation Specialist; Senior Project Manager

*Performance Standards/Metrics:*
- The CSRA Team conducts a meeting with the OU2 PRPs as a group regarding design of the allocation process and database
- A majority of the members of the OU2 PRPs as a group attend the meeting either in person or remotely
- The CSRA Team copies the EPA technical lead on its email communication to the OU2 PRPs regarding substance, date/time, and location of meeting, and provides EPA with a copy of utilized meeting materials

Task 5.A.2 - The CSRA Team will schedule and hold, within 10 business days of holding the meetings with the OU2 PRPs on the draft allocation process and database design, a conference call with EPA regarding the findings of the meetings.

This task will require the following efforts on the part of the CSRA Team:
- Scheduling and participating in a two conference calls with EPA to provide EPA information on the meetings, including a list of participants at the meeting and summary of suggestions received regarding the allocation process and database design
- Conference call assumed to be no more than two (2) hours in length

Timing of this task is dependent upon the availability of assigned EPA staff to participate in a conference call within noted timeframe.

Staffing – Senior Allocation Specialist; Senior Project Manager

*Performance Standards/Metrics:*
- The CSRA Team participates in a conference call with EPA regarding the findings of the meeting following the Database Design Outreach Meeting
- In conducting the post-meeting conference call with EPA, the CSRA Team provides a summary of information and suggestions obtained from the OU2 PRPs without attribution to contributions of individual participants

Task 5.B.1 - The CSRA Team will prepare a written guide regarding the format and preparation of written submissions by OU2 PRPs pursuant to the allocation process and submit to EPA and the OU2 PRPs

The preparation guide will be designed based upon information received during consultations with EPA and OU2 PRPs on the allocation process.  The preparation guide will include the format and content of required allocation documents, including: (1) initial equitable factors brief; (2) preliminary factual submission; (3) document submission certification; and (4) notification of early settlement eligibility.

This task will require the following efforts on the part of the CSRA Team:
- Conduct a conference call with OU2 PRPs to announce and explain modifications to the allocation project, including opportunities for participation of the OU2 PRPs in the development of the allocation process
- Conduct of communications, including a meeting, with OU2 PRPs regarding recommended format and content of above noted required allocation submissions
- Preparation of written guide regarding the format and preparation of written submissions by OU2 PRPs pursuant to the allocation process for review by EPA
- Preparation of written guide based upon EPA comments and suggestions for review by OU2 PRPs.
- Preparation of a final written guide regarding the format and preparation of written submissions by OU2 PRPs pursuant to the allocation process based upon comments and suggestions received from the OU2 PRPS and EPA

Staffing - Senior Allocation Specialist; Senior Project Manager

Performance Standards/Metrics:
- The CSRA Team conducts a call with OU2 PRPs as a group to announce and explain modifications to the allocation project, including opportunities for participation of the OU2 PRPs in the development of the allocation process
- The CSRA Team submits a written guide regarding the format and preparation of written submissions by OU2 PRPs pursuant to the allocation process to EPA for review within the noted timeframe
- The CSRA Team submits a written guide to the OU2 PRPs within the noted timeframe
- The submitted written guide includes the format and content of required allocation documents, including: (1) initial equitable factors brief; (2) preliminary factual submission; (3) document submission certification; and (4) notification of early settlement eligibility.

Task 5.B.2 – The CSRA Team will organize and conduct a review of initial indices of documents proposed for inclusion in the Allocation Document Database by OU2 PRPs to develop a recommendation on the relevancy of proposed documents to the allocation process.

This task will require the following efforts on the part of the CSRA Team:
- Conduct an analysis of document information contained in indices received from the OU2 parties to determine if the proposed documents meet established relevancy criteria for inclusion in Allocation Document Repository
- Drafting of a written recommendation indicating which of the recommended documents are deemed    to meet the established relevancy criteria for inclusion in Allocation Document Repository, with an explanation of the rationale for the exclusion of any recommended document

Staffing - Data Analysts; Senior Project Manager; Senior Allocation Specialist

Performance Standards/Metrics
- The CSRA Team submits the written recommendation regarding the relevancy of OU2 PRP documents to EPA, with a copy to the OU2 PRPs, within the noted timeframe
- The submitted written recommendation indicates which of the documents recommended by OU2 PRPs are deemed to meet the established relevancy criteria for inclusion in Allocation Document Repository, with an explanation of the rationale for the exclusion of any recommended document

## Task 6    Final Allocation Design and Early settlement PRP Data Reports - *Complete*

| Item | Title | Due No Later Than[†] | Type |
|------|-------|---------------------|------|
| 6.A | Submit Final Allocation Guide to EPA and PRPs | Within 50 days* following the Meeting with PRPs on Draft Allocation Process and Database Design | Transmittal |
| 6.B.1 | Submit draft PRP Data Reports regarding Early Settlement PRPs to PRPs and EPA | Within 10 days* of EPA final decision regarding additional documents for inclusion in repository | Transmittal |

| 6.B.2 | Submit final PRP Data Reports regarding Early Settlement PRPs to PRPs and EPA | Within 15 days of submission of Draft Early Settlement Part Data Reports | Transmittal |

† Or as otherwise directed by the TOCOR
* All references to "days" refer to business days

Task 6.A. - The CSRA Team will complete the ~~design of the~~ allocation *guide* ~~process~~ based on input received from EPA and PRPs for submission to the OU2 PRPs and EPA.

This task will require the following efforts on the part of the CSRA Team:
- Conduct coding of data and loading of coded data into database
- Communications by Senior Allocation Specialist via phone, email, or other electronic media as required with OU2 PRPs; Communications will be limited to an average of 2 hours for each OU2 PRP
- Review of factors statements by OU2 PRPs regarding suggestions on protocol and equitable factors for use in allocation
- Record, compile, and organize suggestions of OU2 PRPs regarding allocation process design and conduct without attribution to individual comments
- Conduct a call with EPA to discuss suggestions received from OU2 PRPs regarding allocation process design and conduct without attribution to individual comments
- Edit draft allocation design based on analysis of received Site data, EPA comments on the draft allocation design, and consideration of input received from OU2 PRPs during meeting and other outreach methods to prepare a written descriptive summary of the final allocation design and submit to EPA and the OU2 PRPs

Staffing - Senior Allocation Specialist; Senior Project Manager

*Performance Standards/Metrics:*
- The CSRA Team submits a written descriptive summary of the final design for the allocation process within the noted timeframe
- The submitted written descriptive summary of the final design for the allocation process includes a description of the basis of and anticipated conduct of the allocation process, addresses any identified ambiguities in the draft report, and includes a summary of how the comments of EPA and the OU2 PRPs regarding the draft allocation design were, or were not, taken into account in the final allocation design, without attribution.

Task 6.B.1. - The CSRA Team will organize and conduct a technical and scientific evaluation of data in the allocation database to develop individual data reports for each of the OU2 Early Settlement PRPs. The PRP Data Reports will provide selected information regarding each OU2 Early Settlement PRP's relation to OU2 and OU2 contaminants of concern that will be used in conduct of the allocation. The CSRA Team will establish a deadline of 10 business days from receipt of the data report for submission of corrections or suggestions by the OU2 PRPs for improving the quality of the received OU2 Early Settlement PRP's data report.

This task will require the following efforts on the part of the CSRA Team:
- Conduct a call with EPA to discuss the Allocation Team recommendation regarding the relevancy to the allocation of documents provided by OU2 Early Settlement PRPs

- Conduct coding of data and loading of coded data into database obtained from OU2 Early Settlement PRPs
- Review preliminary factual submission by OU2 Early Settlement PRPs
- Review Site data loaded into database to determine appropriate organization for allocation
- Compile and organize Site data in database to support allocation analysis and share computations
- Organize data in allocation database and draft individual OU2 Early Settlement PRP data reports
- Provide a copy of the Early Settlement PRP data reports to the OU2 PRPs for review

Conduct of this task is dependent upon the following:
- Access by the CSRA Team to EPA technical data regarding Site conditions and the selected OU2 remedy
- Sufficient data on identified Early Settlement PRPs to allow analysis of associated contaminants of concern and hazardous substance fate and transport at the Site
- Successful establishment of the allocation database
- Receipt of additional data from OU2 Early Settlement PRPs for inclusion in the allocation database

Staffing - Data Analysts; Senior Scientist; Senior Project Manager; Senior Allocation Specialist

Performance Standards/Metrics
- The CSRA Team submits the PRP Data Reports to the OU2 PRPs within the noted timeframe
- The submitted written individual PRP Data Reports include a summary of information in the allocation database that is relevant to a determination regarding the associated OU2 Early Settlement PRP's relation to OU2 and OU2 contaminants of concern for use in conduct of the allocation
- The CSRA Team copies the EPA technical lead on the email communications to the OU2 Early Settlement PRPs providing a copy of their data report

Task 6.B.2. - The CSRA Team will analyze corrections or suggestions for improving the quality of the data reports received from OU2 PRPs to determine whether modifications of the original data reports are warranted. Based on this analysis, the CSRA Team will modify the data reports, as deemed appropriate. The CSRA Team will then provide a copy of all of the revised data reports to EPA and a revised copy of individual data reports will be uploaded to the document repository for access by all of the OU2 PRPs, with an explanation of how suggested changes were, or were not, incorporated.

This task will require the following efforts on the part of the CSRA Team:
- Analyze received suggestions and corrections to data reports in relation to existing Site data and the final allocation design in order to determine appropriate modifications
- Modify the individual data reports, as warranted based on above analysis
- Provide an explanation to the OU2 Early Settlement PRPs regarding whether, and if so how, received suggestions resulting in changes to their individual data report, including a description of why their suggestions and comments were, or were not, taken into account

- Upload final OU2 Settlement PRP data reports to allocation document repository
- As required, the CSRA Team will conduct communications with individual OU2 Early Settlement PRPs to answer questions regarding their final data report

Timing of this task is dependent upon the following:
- Receipt of EPA's determination regarding the relevancy to the allocation of documents provided by OU2 Early Settlement PRPs within established timeframe
-  Receipt of comments from OU2 Early Settlement PRPs regarding their data report within established timeframes

Staffing - Data Analysts; Senior Scientist; Senior Project Manager; Senior Allocation Specialist
Performance Standards/Metrics
- The CSRA Team submits the Final PRP Data Reports to EPA and OU2 Early Settlement PRPs within the noted timeframe, and uploads data reports to document repository
- The submitted revised Final PRP Data Reports address any identified ambiguities in the draft reports and includes a summary of how received comments regarding the draft PRP Data Reports were, or were not, taken into account in the final reports
- Certifications regarding the completeness of document/data searches conducted by the OU2 Early Settlement PRPs are uploaded to the Allocation Document Repository
- The CSRA Team copies the EPA technical lead on the email communications to the OU2 Early Settlement PRPs providing a copy of their individual data report

## Task 7        Draft PRP Data Reports

| Item | Title | Due No Later Than[†] | Type |
|------|-------|------------------|------|
| 7.A.1 | ~~Submit recommendation on~~ *Determine* relevancy of documents provided by OU2 PRPs ~~to EPA and PRPs~~ | Within 10 days of OU2 Party submission of document indices. **(Note that the documents will be retained in the confidential database and only available to the Allocation Team until the Final Allocation Recommendation Report is completed)** | Submittal |
| 7.A.2 | Submit Draft PRP Data Reports to PRPs | Within ~~100~~ *50* 5 days* *of parties submitting additional documents comments.* ~~EPA final decision regarding additional documents for inclusion in repository~~ | Transmittal |
| 7.A.3 | Summary Memo of activities completed | July 15, 2019 | Transmittal |
| 7.B | Submit recommendation on eligibility of PRPs for early settlement to EPA | Within 20 days of loading of Final Early Settlement Party Data Reports | Transmittal - *Completed* |

† Or as otherwise directed by the TOCOR
* All references to "days" refer to business days

Task 7.A.1 - The CSRA Team will organize and conduct a review of indices of remaining documents proposed for inclusion in the Allocation Document Database by OU2 PRPs to *determine* the relevancy of proposed documents to the allocation process.

This task will require the following efforts on the part of the CSRA Team:
- Conduct an analysis of document information contained in indices received from the OU2 PRPs to determine if the proposed documents meet established relevancy criteria for inclusion in Allocation Document Repository
- Provide a written *notification* ~~recommendation~~ to the OU2 PRPs indicating which of the recommended documents are *not* deemed to meet the established relevancy criteria for inclusion in Allocation Document Repository, with an explanation of the rationale for the exclusion of any recommended document
- *Provide EPA with a summary of the types of documents deemed not relevant and excluded from the document repository and a count of the number of pages of documents provided by the OU2 PRPs that will be loaded into the repositories. If the number of pages of documents submitted by a PAP is determined to be unreasonably excessive, AlterEcho will discuss the issue with EPA and propose a resolution.*

Staffing - Data Analysts; Senior Project Manager; Senior Allocation Specialist

Performance Standards/Metrics
- The CSRA Team provides EPA *an email certification with a summary of the types of documents that were deemed not relevant, the total page count for the documents deemed not relevant, and a count of the number of pages of documents provided by the OU2 PRPs that were deemed relevant and loaded into the repositories.*
- ~~The submitted written recommendation indicates which of the documents recommended by OU2 PRPs are deemed to meet the established relevancy criteria for inclusion in Allocation Document Repository, with an explanation of the rationale for the exclusion of any recommended document~~

Task 7.A.2 - The CSRA Team will organize and conduct a technical and scientific evaluation of data in the allocation database to develop individual data reports for each of the OU2 PRPs *facilities for which an early settlement was not completed with EPA*. The PRP Data Reports will provide selected information regarding each OU2 PRP's relation to OU2 and OU2 contaminants of concern that will be used in conduct of the allocation.  The CSRA Team will establish a deadline of 40 business days from receipt of the data report for submission of corrections or suggestions by the OU2 PRPs for improving the quality of the received OU2 PRP's data report.

This task will require the following efforts on the part of the CSRA Team:
- ~~Conduct a call with EPA to discuss the Allocation Team recommendation regarding the relevancy to the allocation of documents provided by OU2 PRPs~~
- *Employ a rigorous approach to filling data gaps with additional information requested and obtained from EPA or the Participating Allocation Parties (e.g., industry resources, EPA/NJDEP files, Sanborn Fire Insurance Maps, aerial photographs and possibly supplemental 104e requests) in accordance with the protocol for handling data gaps and ambiguities included in the Allocation Methodology.*
- Conduct coding of data and loading of coded data into database obtained from OU2 PRPs

- Review preliminary factual submission by OU2 PRPs
- Review Site data loaded into database to determine appropriate organization for allocation
- Compile and organize Site data in database to support allocation analysis and share computations
- Organize data in allocation database into and draft individual OU2 PRP data reports *for each facility. Existing data reports for facilities included in the early settlement phase will be updated with new information, if necessary.*
- Provide a copy of the PRP data reports to the OU2 PRPs for review

Timing of this task is dependent upon the following:
- ~~Receipt of EPA's determination regarding the relevancy to the allocation of documents provided by OU2 PRPs within established timeframe~~
- Receipt of comments from OU2 PRPs regarding their data report within established timeframes

Conduct of this task is dependent upon the following:
- Access by the CSRA Team to EPA technical data regarding Site conditions and the selected OU2 remedy
- Sufficient data on identified PRPs to allow analysis of associated contaminants of concern and hazardous substance fate and transport at the Site
- Successful establishment of the allocation database
- Receipt of additional data from OU2 PRPs for inclusion in the allocation database within established timeframes

Staffing - Data Analysts; Senior Scientist; Senior Project Manager; Senior Allocation Specialist

*Performance Standards/Metrics*
- The CSRA Team submits the PRP Data Reports to the OU2 PRPs within the noted timeframe
- The submitted written individual PRP Data Reports include a summary of information in the allocation database that is relevant to a determination regarding the associated OU2 PRP's relation to OU2 and OU2 contaminants of concern for use in conduct of the allocation
- ~~The CSRA Team copies the EPA technical lead on the email communications to the OU2 PRPs providing a copy of their data report~~
- *To document the above two bullets, the CSRA Team provides EPA with an email certification including a summary of the types of information included in the data reports, a list of the PAPs for which a Draft Data Report was completed, and the date Draft Data Reports were submitted to the PAPs.*

*Task 7.A.3.  The CSRA Team will continue to provide the following activities through July 31, 2019.*

- **Conduct of communications, including a conference call, with OU2 PRPs regarding recommendations on and legal/equitable theories pertinent to conduct of the allocation to be included in Position and Response Briefs from the OU2 PRPs**

- **Review and consideration of input regarding allocation received from the OU2 PRPs and EPA**
- **Review and understand the basis for EPA's selected remedy for OU2, in consultation with EPA technical and legal personnel**
- **Compilation and analysis of allocation data related to each OU2 PRP, including contaminants of concern, to establish the relative impact of the actions for each OU2 PRP on the conditions that resulted in EPA selecting the OU2 remedy**
- **Establish appropriate allocation algorithms**
- **Initiate preparation of draft allocation recommendation report**

Task 7.B - The CSRA Team will organize and conduct an analysis of information regarding the relationship of OU2 Early Settlement PRPs to the Site and Site remedy, including relevant documents in the Allocation Document Repository, PRP Data Reports, and Preliminary Submissions, to develop a recommendation on the eligibility of OU2 Early Settlement PRPs for the opportunity to enter negotiations with EPA regarding a cash-out settlement. The recommendation will be based upon eligibility criteria specified by EPA in its May 17, 2017 to OU2 PRPs on the subject; specifically that "(t) he parties that EPA identified as eligible for an early cash out settlement are those that, based on information reviewed by EPA, are not associated with the release or disposal of any of the COCs for OU2, as identified in the ROD, into the Lower Passaic River.

This task will require the following efforts on the part of the CSRA Team:
- Conducting an analysis of documents and other information submitted by OU2 Early Settlement PRPs and contained in the Allocation Document Repository to determine whether the OU2 Early Settlement PRPs meet the eligibility criteria specified by EPA.
- Drafting of a written recommendation indicating which of the OU2 Early Settlement PRPs are deemed    to meet the specified eligibility criteria for the opportunity to enter negotiations with EPA regarding a cash-out settlement, with an explanation of the rationale for the exclusion of any OU2 Early Settlement PRP.

Staffing - Data Analysts; Senior Scientist; Senior Project Manager; Senior Allocation Specialist

Performance Standards/Metrics
- The CSRA Team submits the written recommendation on the eligibility of OU2 Early Settlement PRPs for the opportunity to enter negotiations with EPA regarding a cash-out settlement, within the noted timeframe
- The submitted written recommendation indicates which of the OU2 Early Settlement PRPs are deemed  to meet the specified eligibility criteria for the opportunity to enter negotiations with EPA regarding a cash-out settlement, with an explanation of the rationale for the exclusion of any OU2  Early Settlement PRP

**Task 8          Final Data Reports**

**Task 8 will not be performed within the task order Period of Performance and is no longer required to be completed under this contract. It is anticipated task 8 will be initiated in a new task order under the follow on contract.  It is included in this work plan for reference purposes.**

| Item | Title | Due No Later Than† | Type |
|------|-------|-------------------|------|
| 8.1 | Submit Final PRP Data Reports to PRPs | Within **20** days* of the deadline OU2 PRPs corrections to PRP data reports | Transmittal |
| 8.2 | Provide EPA Access to Allocation Database | Upon *submission of the Final Allocation Recommendation Report.* ~~loading of corrected PRP data reports~~ | Activity |

† Or as otherwise directed by the TOCOR
* All references to "days" refer to business days

The CSRA Team will analyze corrections or suggestions for improving the quality of the *Revised Draft Data Reports* received from OU2 PRPs to determine whether modifications of the original data reports are warranted.  Based on this analysis, the CSRA Team will modify the data reports, as deemed appropriate.  The CSRA Team will then provide a copy of all of the Revised **D**raft **D**ata **R**eports to ~~EPA and a revised copy of their own individual data reports to each of the~~ OU2 PRPs, with an explanation of how suggested changes were, or were not, incorporated.

This task will require the following efforts on the part of the CSRA Team:
- Analyze received suggestions and corrections to *Revised Draft Data Reports* in relation to existing Site data and the final allocation design in order to determine appropriate modifications
- Modify the individual data reports, as warranted based on above analysis
- Provide an explanation to the OU2 PRPs regarding whether, and if so how, received suggestions resulting in changes to their individual data report, including a description of why their suggestions and comments were, or were not, taken into account.  ***Upload final OU2 Settlement PRP data reports to allocation document repository***
- As required, the CSRA Team will conduct communications with individual OU2 PRPs to answer questions regarding their final data report

Timing of this task is dependent upon the following:
- Receipt of comments from OU2 PRPs regarding their *Revised Draft Data Report* within established timeframes

Staffing - Data Analysts; Senior Scientist; Senior Project Manager; Senior Allocation Specialist

*Performance Standards/Metrics*
- The CSRA Team submits the Final PRP Data Reports to ~~EPA and~~ OU2 PRPs within the noted timeframe, and uploads data reports to document repository
- The submitted revised Final PRP Data Reports address any identified ambiguities in the draft reports and includes a summary of how received comments regarding the draft PRP Data Reports were, or were not, taken into account in the final reports
- **To document the above two bullets, the CSRA Team provides EPA with an email certification including a summary of the type of identified ambiguities in the Draft Data Reports that were addressed in the Final Data Reports and a summary of how received comments regarding the draft PRP Data Reports were, or were not, taken into account in the final reports, a list of the completed Revised Draft Data Reports, and the date the reports were submitted.**

- ~~The CSRA Team copies the EPA technical lead on the email communications to the OU2 PRPs providing a copy of their individual data report~~

**Task 9**        **Draft Allocation Report**

*Task 9 will not be performed within the task order Period of Performance and is no longer required to be completed under this contract. It is anticipated Task 9 will be completed under a new task order in the follow on contract. It is included in this work plan for reference purposes.*

| Item | Title | Due No Later Than† | Type |
|------|-------|--------------------|------|
| 9.1 | *Submit Draft Allocation Recommendation Report* | *Within 60 days\* following submittal of Response Briefs by PRPs* | Transmittal |

† Or as otherwise directed by the TOCOR
\* All references to "days" refer to business days

Task 9 - The CSRA Team will prepare a first draft of the allocation recommendation report and submit to the OU2 PRPs ~~and EPA~~ for review. The draft allocation report will designate shares of responsibility among the OU2 PRPs, as appropriate based on the allocation analysis. The draft allocation report will include a recommendation on the possible grouping of the OU2 PRPs into tiers of similar levels of responsibility.

This task will require the following efforts on the part of the CSRA Team:
- Conduct of communications, including a conference call, with OU2 PRPs regarding recommendations on and legal/equitable theories pertinent to conduct of the allocation included in Position and Response Briefs received from the OU2 PRPs
- Review and consideration of input regarding allocation received from the OU2 PRPs and EPA
- Review and understand the basis for EPA's selected remedy for OU2, in consultation with EPA technical and legal personnel
- Review and understand the relative toxicity of identified contaminants of concern relevant to the selection of the OU2 remedy, in consultation with EPA technical and legal personnel
- Analyze the relative toxicity of materials discharged by OU2 PRPs and other differentiating factors, including fate and transport of hazardous substances released by PRPs based on the data contained in the RI/FS, in relation to the selected remedy
- Compilation and analysis of allocation data related to each OU2 PRP, including contaminants of concern, to establish the relative impact of the actions of each OU2 PRP on the conditions that resulted in EPA selecting the OU2 remedy
- Establish appropriate allocation algorithms
- Load compiled PRP data into allocation calculations to determine relative relationships among the OU2 PRPs
- As appropriate, establish appropriate tiers of OU2 PRP responsibility based on calculations and consideration of equitable factors
- Prepare draft allocation recommendation report
- Submission of the draft report to the OU2 PRPs ~~and EPA~~

Timing of this task is dependent upon receipt of position briefs and reply briefs regarding allocation from OU2 PRPs within established timeframes.

Staffing - Senior Allocation Specialist; Senior Project Manager

*Performance Standards/Metrics:*
- The CSRA Team submits the Draft Allocation Recommendation Report within the noted timeframe
- The submitted written Draft Allocation Recommendation Report includes an overview of the basis for the determinations of shares among the OU2 PRPs, including a description of the use of data sources and application of allocation factors and methodology utilized, and reason for potential vulnerabilities, if any, in the resulting allocation
- The report identifies and explains the rationale, if applicable, for grouping OU2 PRPs into tiers of similar relative responsibility
- To document the above bullets, the CSRA Team will provide EPA with an email certification that the Draft Allocation Recommendation Report has been submitted to the PAPs.

**Task 10**       **Final Allocation Recommendation Report**

Task 10 will not be completed within the task order Period of Performance and is no longer required to be completed under this contract.  It is anticipated Task 10 will be completed under a new task order in the follow-on contract.  It is included in this work plan for reference purposes.

| Item | Title | Due No Later Than† | Type |
|------|-------|--------------------|------|
| ~~10.1~~ | ~~Meeting with EPA regarding Draft Allocation Recommendation Report~~ | ~~Within 10 days* of submittal of Draft Allocation Report~~ | ~~Transmittal~~ |
| 10.2 | Conduct Meeting with PRPs on Draft Allocation Report | Within 20 days of submittal of Draft Allocation Report | Activity |
| ~~10.3~~ | ~~Conference Call with EPA on Meeting with PRPs on Draft Allocation Report~~ | ~~Within 10 days* following the Meetings with PRPs on Draft Allocation Report~~ | ~~Activity~~ |
| 10.~~4~~2 | Submit Final Allocation Recommendation Report to OU2 PRPs and EPA | Within 65 ~~0~~ days* of submittal of Draft Allocation Report | **Deliverable** |

† Or as otherwise directed by the TOCOR
* All references to "days" refer to business days

~~Task 10.1 - The CSRA Team will prepare for and participate in a meeting with EPA regarding the submitted draft allocation recommendation report. The purpose of the meeting will be to obtain EPA comments regarding the submitted draft allocation report, including the basis and findings of the draft allocation report and the report format.~~

~~This task will require the following efforts on the part of the CSRA Team:~~
- ~~The CSRA Team will supply one (2) senior staff located in Washington, DC to attend the meeting~~
- ~~Meeting assumed to be no more than four (4) hours in length~~

~~Staffing    Senior Allocation Specialist; Senior Project Manager~~

~~Performance Standards/Metrics:~~
- ~~The CSRA Team participates in the meeting regarding the submitted draft allocation recommendation report~~

Task 10.2 – The CSRA Team will plan, schedule, and conduct a meeting with the OU2 PRPs as a group regarding the draft allocation recommendation report.  The purpose of the meeting will be to advise the OU2 PRPs as a group regarding the draft allocation recommendation report and to obtain preliminary PRP comments regarding the draft allocation recommendation report. The CSRA Team will also communicate with the OU2 PRPs individually to obtain the input of OU2 PRPs, including those that did or were unable to attend the meeting, regarding draft allocation recommendation report.
This task will require the following efforts on the part of the CSRA Team:
- Making arrangements for a meeting in the greater New York City metropolitan area sufficient to accommodate the OU2 PRPs as a group
- Coordination of meeting space and equipment for meetings provided by EPA or  OU2 PRPs
- Communication via email with the OU2 PRPs regarding substance, date/time, and location of meeting
- Development of meeting agenda
- Development of participant  materials, a needed
- Travel of two (2) senior staff from Washington, DC to attend meeting
- Communications by Senior Allocation Specialist via phone, email, or other electronic media as required with OU2 PRPs
- Recording of PRP comments regarding the draft allocation recommendation report, without attribution to individual OU2 PRP comments

Staffing – Senior Allocation Specialist; Senior Project Manager

Performance Standards/Metrics:
- The CSRA Team conducts a meeting with the OU2 PRPs as a group regarding the draft allocation recommendation report
- A majority of the members of the OU2 PRPs as a group attend the meeting either in person or remotely
- ~~The CSRA Team copies the EPA technical lead on its email communication to the OU2 PRPs regarding substance, date/time, and location of meeting, and provides EPA with a copy of utilized meeting materials~~

~~Task 10.3   The CSRA Team will schedule and hold, within 10 business days of holding the meeting with the OU2 PRPs on the draft allocation recommendation report, a conference call with EPA regarding the findings of the meeting.~~

~~This task will require the following efforts on the part of the CSRA Team:~~
- ~~Scheduling and participating in a conference call with EPA to provide EPA information on the meeting, including a list of participants at the meeting and summary of suggestions received regarding the draft allocation recommendation report~~
- ~~Conference call assumed to be no more than two (2) hours in length~~

~~Timing of this task is dependent upon the availability of assigned EPA staff to participate in a conference call within noted timeframe.~~

~~Staffing    Senior Allocation Specialist; Senior Project Manager~~

~~Performance Standards/Metrics:~~
- ~~The CSRA Team participates in a conference call with EPA regarding the findings of the meeting with PRPs regarding the draft allocation recommendation report~~
- ~~In conducting the post meeting conference call with EPA, the CSRA Team provides a summary of information and suggestions obtained from the OU2 PRPs without attribution to contributions of individual participants~~

Task 10.4 - The CSRA Team will prepare a Final Allocation Recommendation Report. The Final Allocation Recommendation Report will take into consideration comments on the draft allocation recommendation report received ~~during consultation with EPA and~~ during meetings with and received in position and reply briefs from the OU2 PRPs.

This task will require the following efforts on the part of the CSRA Team:
- Review and consider the comments by OU2 PRPs ~~and EPA~~ regarding the draft allocation recommendation report
- Editing of the draft allocation recommendation report to incorporate appropriate modifications based on OU2 ~~and EPA~~ comments to produce the Final Allocation Recommendation Report

Staffing - Senior Allocation Specialist; Senior Project   Manager

*Performance Standards/Metrics:*
- The CSRA Team submits a Final Allocation Recommendation Report within the noted timeframe
- The submitted Final Allocation Recommendation Report includes the elements of the Draft Allocation Recommendation Report described in Task 9, addresses any identified ambiguities in the draft report, and provides a summary, without attribution to individual comments, of how comments of the OU2 PRPs ~~and EPA~~ regarding the Draft Allocation Recommendation Report were, or were not, taken into account in the final report, without attribution.
- The Final Allocation Recommendation Report includes references to all materials considered and relied upon, and a complete description of the allocation process and the basis upon which shares were assigned.

## Task 11        Final PRP Outreach Report

Task 11 will not be performed within the task order Period of Performance and is no longer required to be completed under this contract.  It is anticipated Task 11 will be completed under a new task order in the follow on contract.  It is included in this work plan for reference purposes.

| Item | Title | Due No Later Than[†] | Type |
|------|-------|----------------------|------|
| 11.1 | Submit Final PRP Outreach Report | Within 10 days* of submittal of Final Allocation Report | Activity |

† Or as otherwise directed by the TOCOR
* All references to "days" refer to business days

The CSRA Team will prepare and provide to EPA a report regarding outreach efforts conducted with the OU2 PRPs, including a list of participants in outreach efforts, a description of topics discussed, and a summary of issues or concerns raised.

This task will require the following efforts on the part of the CSRA Team:
- Review and organize the comments of OU2 PRPs received during conduct of the Task Order, without attribution to individual OU2 PRPs
- Prepare and provide EPA an overview of conducted outreach efforts, including a list of OU2 PRPs that have participated in outreach meetings, conference calls, or individual communications with the CSRA Team and a summary of suggestions received from the OU2 PRPs regarding the allocation process

Staffing - Senior Allocation Specialist; Senior Project Manager

*Performance Standards/Metrics:*
- The CSRA Team submits a written summary of PRP outreach efforts within the noted timeframe
- The Final PRP Outreach Report includes a summary of conducted PRP outreach efforts, including a list of OU2 PRPs that have participated in outreach meetings, conference calls, or individual communications with the CSRA Team and a summary of suggestions received from the OU2 PRPs regarding the allocation process
- In drafting the Final PRP Outreach Report, the CSRA Team provides a summary of information and suggestions obtained from the OU2 PRPs without attribution to contributions of individual participants

## Task 12      Task Order Closeout Report

| Item | Title | Due No Later Than† | Type |
|------|-------|--------------------|------|
| 12.1 | Submit Draft Task Order Closeout Report | Within 10 days* of submittal of Final Allocation Report | Transmittal |
| 12.2 | Final Task Order Closeout Report | Within 10 days* of receipt of EPA's comments on Draft Task Order Closeout Report | **Deliverable** |

† Or as otherwise directed by the TOCOR
* All references to "days" refer to business days

Task 12.1 - The CSRA Team will design and produce the first draft of a report regarding the conduct of tasks pursuant to the Task Order and submit it for review by EPA. The report will not contain any confidential or sensitive information. The contents of the Draft Task Order Close-Out Report will include:
- A half-page description of the project that describes the nature of the project, the parties, the process, and the outcomes
- If appropriate, a short section reflecting on the process and procedural lessons learned and recommendation for improvements and identification of those activities conducted that contributed to the success of the process
- A brief summary of the final costs of the project broken out by percentage of labor hours and other direct costs

This task will require the following efforts on the part of the CSRA Team:

- Review of project activities and compilation of project summary
- Consideration and compilation of thoughts on lessons learned regarding project
- Compilation of project budget costs
- Preparation of the Draft Task Order Close-out Report

Staffing - Senior Allocation Specialist; Senior Project Manager

*Performance Standards/Metrics:*
- The CSRA Team submits a Draft Task Order Closeout Report within the noted timeframe
- The submitted Draft Task Order Closeout Report includes the items noted above as contents of the report

Task 12.2 - The CSRA Team will prepare a Final Task Order Closeout Report and submit to EPA. The Final Task Order Closeout Report will take into consideration comments received from EPA regarding the draft of the Task Order closeout report. CSRA will provide one (1) copy of the Final Task Order Closeout Report to the PO and one (1) copy to the TOCOR in electronic format.

This task will require the following efforts on the part of the CSRA Team:
- Review and consideration of comments by EPA regarding the draft Task Order Closeout Report
- Editing, and as required redesign, of the closeout report to incorporate modifications based on EPA comments in order to produce the Final Task Order Closeout Report

Staffing - Senior Allocation Specialist; Senior Project Manager

*Performance Standards/Metrics:*
- The CSRA Team submits a Final Task Order Closeout Report within the noted timeframe
- The submitted Final Task Order Closeout Report addresses any identified ambiguities in the draft report and includes a summary of how EPA's comments regarding the Final Allocation Recommendation Report were, or were not, taken into account in the final report

## 5.0    Reports, Transmittals and Deliverables

CSRA will provide EPA all reports in accordance with the contract. If EPA responds with a request for additional information, Subcontractor is required to provide information, as requested.

**As required herein,** copies of ~~all~~ contract deliverables will be sent to both the PO and the TOCOR. If oral briefings are scheduled for EPA staff, the PO will be notified in time to attend.

Schedule

| Item | Title | Due No Later Than[†] | Type |
|------|-------|---------------------|------|
| 1 | Task Order Kick-Off Meeting | Within 20 days* of Task Order approval | Transmittal – Completed |

| Item | Title | Due No Later Than[†] | Type |
|---|---|---|---|
| 2 | EPA Project Public Announcement Meeting | Within 40 days* of Task Order approval | Activity – Completed |
| 3 | Submit initial allocation process and database design to EPA | Within 100 days* of Task Order approval | Transmittal – Completed |
| 4 | Conference Call with EPA on Initial Allocation Process and Database Design | Within 10 days* of submission of initial allocation process and database design | Activity - Completed |
| 5.A.1 | Conduct *two* Meetings with PRPs on Draft Allocation Process and Database Design | Within 40 days* of submission of initial allocation process and database design to EPA | Activity – Completed |
| 5.A.2 | Conference Call with EPA on Meetings with PRPs on Draft Allocation Process and Database Design | Within 10 days* following the Meeting with PRPs on Draft Allocation Process and Database Design | Activity – Completed |
| 5.B.1 | Submit guidance on preparation of allocation submissions to EPA and PRPs | Within 5 days of Revised Task Order Approval | Transmittal – Completed |
| 5.B.2 | Submit recommendation on relevancy of documents provided by OU2 PRPs to EPA and PRPs | Within 30 days of Revised Task Order Approval | Transmittal – Completed |
| 6.A | Submit Final Allocation Design to EPA and PRPs | Within 50 days* following the Meeting with PRPs on Draft Allocation Process and Database Design | Transmittal – Completed |
| 6.B.1 | Submit draft PRP Data Reports regarding Early Settlement PRPs to PRPs and EPA | Within 10 days* of EPA final decision regarding additional documents for inclusion in repository | Transmittal – Completed |
| 6.B.2 | Submit final PRP Data Reports regarding Early Settlement PRPs to PRPs and EPA | Within 15 days of submission of Draft Early Settlement Part Data Reports | Transmittal - Completed |
| 7.A.1 | Determine relevancy of documents provided by OU2 PRPs | Within 10 days of OU2 Party submission of document indices | Submittal |
| 7.A.2 | Submit Draft PRP Data Reports to PRPs | *Within 50 days* of parties submitting additional documents* | Transmittal |
| *7.A.3* | *Summary Memo of activities completed* | *July 15, 2019* | *Transmittal* |
| 7.B | Submit recommendation on eligibility of PRPs for early settlement to EPA | Within 20 days of loading of Final Early Settlement Party Data Reports | Transmittal - Completed |

*\* All references to days in this chart refer to business days*

Please note: the following work products are not required to be completed within the period of performance of this task order. It is anticipated the following work products will be completed under a new task order in the follow on contract. It is included in this work plan for reference purposes.

| Item | Title | Due No Later Than[†] | Type |
|---|---|---|---|
| 8.1 | Submit Final PRP Data Reports to ~~EPA and~~ PRPs | Within ~~40~~ 20 days* of the deadline for OU2 PRPs corrections to PRP data reports | Transmittal |
| 8.2 | Provide EPA Access to Allocation Database | Upon submission of the Final Allocation Recommendation Report ~~loading of corrected PRP data reports~~ | Activity |
| 9.1 | Submit Draft Allocation Recommendation Report to PRPs | Within 60 days* following submittal of Response Briefs by PRPs | Transmittal |
| ~~10.1~~ | ~~Meeting with EPA regarding Draft Allocation Recommendation Report~~ | ~~Within 10 days* of submittal of Draft Allocation Report~~ | ~~Transmittal~~ |
| 10.2 | Conduct Meeting with PRPs on Draft Allocation Report | Within 20 days of submittal of Draft Allocation Report | Activity |
| ~~10.3~~ | ~~Conference Call with EPA on Meeting with PRPs on Draft Allocation Report~~ | ~~Within 10 days* following the Meetings with PRPs on Draft Allocation Report~~ | ~~Activity~~ |
| 10.4 | Submit Final Allocation Recommendation Report to OU2 PRPs and EPA | Within *65* ~~0~~ days* of submittal of Draft Allocation Report | **Deliverable** |
| 11 | Submit Final PRP Outreach Report | Within 10 days* of submittal of Final Allocation Report | Activity |
| 12.1 | Submit Draft Task Order Closeout Report | Within 20 days* of submittal of Final Allocation Report | Transmittal |
| 12.2 | Final Task Order Closeout Report | Within 10 days* of receipt of EPA's comments on Draft Task Order Closeout Report | **Deliverable** |

## 6.0    Staffing Plan

This Task Order will be staffed as follows:

| Team Member Name[†] | Role in the Project |
|---|---|
| Mary Apostolico CSRA International | Overall Contract Management, Quality Assurance, Task Order Management |
| Jennifer Cutrona CSRA | Dashboard and Financial Tracking |
| David Batson TechLaw | Senior Allocation Specialist |
| ~~Judy Manley~~ Mark Heaney TechLaw | Senior Project Manager |

| Team Member Name† | Role in the Project |
|---|---|
| ~~Travis Kline~~ Jenifer Heath<br>TechLaw | Senior Toxicologist |
| Erman Evcimen<br>TechLaw | Database Designer |
| ~~Amber Kozacek~~ Rachel<br>Shay<br>TechLaw | Researcher |

†Other team members than those listed in the above table may work on this task order to complete the required work.

*The task order mainly will be managed by the TOM listed in the above table; however, additional team members may conduct task order management activities to ensure coverage during periods when the TOM is unavailable (e.g., vacation, illness, business travel, time constraints).

## 7.0  Quality Management

As part of its quality assurance practices, CSRA TOM will:
- Review this Work Plan with the EPA TOCOR, as requested by the TOCOR;
- Meet or hold conference calls as needed with the TOCOR to review progress; and
- Speak regularly with the subcontractor to receive project status updates.

In addition, all work on this Task Order will be performed in accordance with CSRA's strict quality assurance practices, including but not limited to incorporating quality management principles and processes into the development of the required transmittals, deliverables, and the consulting services offered. Although CSRA will ensure the timely delivery of all transmittals and deliverables, CSRA will not perform a review of these documents prepared by the subcontractor.

## 8.0  Conflict of Interest

Based on our review and understanding of the legal requirements of this work, CSRA certifies that no real, apparent, or potential organizational or individual conflict of interest exists with this assignment, based on previous or ongoing work, or other potential conflicts.

## 9.0  Cyber Security

CSRA has interpreted compliance with information assurance / security provisions contained in this contract as a requirement to provide its standard CSRA information system and procedures. CSRA contract pricing does not include or reflect any additional requirements or certification and accreditation for the CSRA information system or procedures, connectivity to the Government system(s), or storage of any Government-provided data or project data, or for stand-alone development or storage environments. Should the Government require increased or specialized information assurance security or other actions beyond those reflected in the standard CSRA information system or procedures, then the Government will notify CSRA and such revisions will be provided in accordance with the "changes" clause of this contract.

**10.0    Project Budget**

The budget for this task is provided as an Attachment.

**11.0    Period of Performance**

The task order period of performance runs through September 30, 2019.

# Exhibit N



**Conflict Prevention and Resolution Services**

**Contract # 68HERH19D0033**

# Revised Work Plan and Pricing Estimate for Task Order Request #013

# Diamond Alkali-Lower Passaic River Allocation

Original submitted: September 3, 2019
Revised: September 12, 2019; September 20, 2019

Prepared for: U.S. Environmental Protection Agency, Washington, DC 20460

| EPA Customer | EPA Region 2 |
|---|---|
| EPA Task Order Contracting Officer's Representative (TOCOR) | Alice Yeh, EPA Region 2<br>212-637-4427<br>yeh.alice@epa.gov |
| ERG Task Order Manager (TOM) | Laura Bachle<br>703-841-1705<br>laura.bachle@erg.com |
| Period of Performance | Task Order Issuance to October 30, 2020 |

# Contents

1.  Overview and Pricing Summary
2.  Background
3.  Assumptions
4.  Project Methods and Approach
5.  Work Tasks
6.  Reports, Transmittals, and Deliverables
7.  Staffing Plan
8.  Quality Management
9.  Conflict of Interest
10. Detailed Pricing Estimate

## 1.    Overview and Pricing Summary

This work plan describes ERG's approach for performing the tasks described in the statement of work (SOW). It includes a description of the activities associated with each task as well as a list of transmittals and deliverables and their due dates.

Table 1 provides a summary of ERG's proposed hours and pricing. Section 10 provides a more detailed breakout of pricing by subtask, labor categories, and other direct costs (ODCs).

Table 1. Summary of Proposed Hours and Pricing

| Contract year | Hours | Price |
|---|---|---|
| Year 1 | Not Responsive by Agreement with FOIA Requestor | $1,294,305 |
| **Total Task Order, All Years** | | $1,294,305 |

## 2.    Background

The lower 8.3 miles of the Lower Passaic River are one of four Operable Units (OUs) of the Diamond Alkali Superfund site. This OU is designated as OU2. The site has been on the National Priorities List since 1984. Contaminated sediments in this portion of the river are a significant source of contamination to the rest of the river down to Newark Bay. Contaminants including dioxins, mercury, PCBs, and DDT and its breakdown products can accumulate in in aquatic life and pose an unacceptable risk to human health and the environment.

Under an administrative order on consent (AOC), Occidental Chemical Corporation (OCC) is performing the remedial design for this OU. The cost for remedial action (RA) is estimated at $1.38 billion. EPA Region 2 has issued a notice of potential liability to approximately 100 parties and has offered a first round of cash-out settlements to approximately 20 potentially responsible parties (PRPs). Region 2 will address the liability of municipalities and public entities separately.

Under this TO, a third-party allocator will support Region 2 in assigning a share of responsibility to 83 non-public, non-municipal PRPs (representing 97 facilities) not included in the first round of cash-out settlements. The Region expects to use the results of the allocation to enter into settlement agreements with the subset of PRPs with the greatest share of responsibility to perform the RA and enter into another round of cash-out settlements. This effort will be based in part on existing

information and contacts generated from previous attempts to develop a mutually acceptable allocation of liability.

This is an ongoing project with a well qualified service provider already in place under a previous contract. ERG has selected the same service provider, AlterEcho, as the most effective way to continue the work.

## 3.   Assumptions

This work plan and pricing estimate are based on the following assumptions:

### General Assumptions

- Activities and pricing are included for the entire 13-month period of performance.

- ERG reserves the right to adjust the amount of the budget for general task order management if the contract and task order periods of performance are extended beyond the current period of performance.

- This TO can be modified to change the statement of work or add funding.

### ERG's Understanding of the Work

ERG's work plan reflects our team's understanding of what work has already been completed on this allocation project and what work remains to be done. As the project has evolved, some key numbers and factors have changed, such that this estimate may differ from previous projections regarding the level of effort needed to complete the tasks envisioned in the SOW. Specific factors that have evolved include:

- There has been an increase in the number of facilities that must be calculated an equitable share, from 83 to 92 (+11%).

- <span style="color:red">Exemption (b) (3) (A)</span>

- The level of anticipated interaction required with PAP counsel, including the volume of comments that will be received and that will require analysis and confirmation, is substantially greater than anticipated.

- <span style="color:red">Exemption (b) (3) (A)</span>

○                                    Exemption (b) (3) (A)

## Task A: Preliminary Work

- General task order management activities include development of monthly progress reports and invoices, regular status check-in calls with the TOCOR, ongoing updates of progress and financial data in ERG's project tracking system (as required under ERG's CPRS contract), and development of the task order final report.

- Not Responsive by Agreement with FOIA Requestor

- Not Responsive by Agreement with FOIA Requestor

- Not Responsive by Agreement with FOIA Requestor

## Task B: Allocation Design and Production

- A maximum of 83 PRPs will be provided an opportunity to participate in or be evaluated for the purpose of determining a share of responsibility in the allocation process. They are designated herein as Allocation Parties. Ten of these PRPs are non-participating parties.

- The allocation will cover a maximum of 92 facilities associated with the 83 Allocation Parties.

- All OU2 Allocation Parties will be designated a share of responsibility in the Final Allocation Recommendation Report.

- All OU2 PRPs which have agreed or agree in the future to participate in the allocation by executing the OU2 Allocation Guide and Confidentiality Agreement (Participating Allocation Parties or PAPs) will be provided an opportunity to participate in the design of the allocation database and process and to provide additional site-related information for possible addition to the database.

- The Final Allocation Recommendation Report will divide the Allocation Parties into logical groupings of similarly-situated PRPs

- EPA will provide the ERG Team with a listing and contact information for each OU2 PAP. Reference herein to meetings or other forms of communication with the OU2 PAPs means communication with the identified representatives of such parties.

- A maximum of 593,895 pages of documents will be reviewed and utilized to conduct the allocation, including:

  ○ A maximum of 130,000 pages of documents received from EPA for ERG Team review under the previous contract.

  ○ A maximum of 413,895 extra pages of documents received from PRPs for ERG Team review

under the previous contract.

- o The PAPs have indicated to the ERG Team that they have an additional 50,000 pages of relevant documents to submit over the remainder of the project.

- <span style="color:red">Exemptions (b) (3) (A) and (b) (5)</span>

- All communications by the ERG Team will be by phone or email unless a meeting is noted.
- The ERG Team estimates [Not I] hours of communications per PAP over the remainder of the project. This time is presented as communications in Tasks B3, B4, and B5, and meetings in Tasks B5 and B6. This partially responds to the PRP outreach requirements specified in Section II.B.2 of the SOW.
- A maximum of [Not I] hours of combined project status/update calls will be held by the ERG Team with EPA per month. ERG assumes these calls will be held on a weekly basis. This time is included under Task A3.
- The allocation database will be designed and organized primarily for purposes of allocation.
- Any part of a communication, attachment to a communication, presentation, or written material provided to OU2 PRPs by the ERG Team that involves a description of the site or EPA actions or activities will be provided to EPA for review and approval prior to submission to the OU2 PAPs.
- Unless otherwise noted herein, all allocation-related communications by the ERG Team involving the OU2 PAPs or representatives of EPA or DOJ, individually or in groups, will be held confidential pursuant to the provisions of the ADR Act of 1996, 5 USC 574.
- In order to ensure a common expectation of confidentiality, all PAP participants in the allocation process have entered, and EPA has appropriately acknowledged, a confidentiality agreement.

Pricing Estimate

- <span style="color:red">Not Responsive by Agreement with FOIA Requestor</span>

- <span style="color:red">Not Responsive by Agreement with FOIA Requestor</span>

- <span style="color:red">Not Responsive by Agreement with FOIA Requestor</span>

- <span style="color:red">Not Responsive by Agreement with FOIA Requestor</span>

Not Responsive by Agreement with FOIA Requestor

- Not Responsive by Agreement with FOIA Requestor
- Not Responsive by Agreement with FOIA Requestor

- Not Responsive by Agreement with FOIA Requestor

- Not Responsive by Agreement with FOIA Requestor

## 4.    Project Methods and Approach

ERG's general approach to this TO consists of the following steps:

- ERG has prepared and submitted this work plan and a pricing estimate. We will proceed to perform work described in the following SOW tasks upon issuance of the TO by the Contracting Officer.

- As agreed upon with EPA, all reports, transmittals and deliverables—with the exception of Items B-5 and B-6 in Table 3—will be submitted to the TOCOR and Project Officer (PO). Items B-2 and B-3 will be submitted with Item B-7.

- ERG will be responsible for evaluating the service provider's performance at the end of the project and during the project if it lasts through the annual contract evaluation performance schedule.

- ERG understands that during the performance of this work, Region 2 may share information with the ERG Team that is pre-decisional and deliberative or is considered to be attorney work product in preparation of potential litigation. ERG recognizes that such work is privileged to the United States and EPA under the Freedom of Information Act. While the ERG Team will conduct the allocation process in a manner transparent to the public to the extent possible, the ERG Team will consult with EPA before releasing information to the public to ensure confidential information is protected.

In conducting this work, ERG will comply with all terms in the overall contract, including—but not limited

to—the following requirements:

- ERG and subcontractor AlterEcho (ERG Team) will not interpret EPA policy on behalf of the EPA or make decisions on items of policy, regulation or statutes. The ERG Team also will not take a stand on the merits of substantive items under discussion.

- In gathering information or performing research with parties outside the EPA, ERG Team members will identify themselves as contractors to EPA and not as EPA employees.

- ERG will approach this task in accordance with the basic terms of the contract and according to the established norms and ethical standards of ADR professionals. Specifically, ERG will ensure that ADR professionals supporting this TO abide by ethical codes of conduct such as those defined in the SOW. Information provided to the ADR professional by any of the parties, communications between parties and the ADR professional, and notes and dispute resolution work product generated by the ADR professional during work pursuant to the TO will be maintained as confidential by the ADR professional pursuant to the provisions of the ADR Act of 1996 (Public Law 104-320; 5 USC 571 et al.) and applicable federal, state, and judicial requirements.

- To enhance the positive substantive, relational, and procedural outcomes from ADR cases, ERG will direct all ADR professionals providing services under this TO to do the following prior to the mediation or facilitation and throughout the process:

  o Inquire about whether individual participants have the time, financial, and logistical resources necessary to participate effectively in the process and—where resources are inadequate—assist them in identifying appropriate resources or in making necessary adjustments to the process to accommodate resource constraints.

  o Assist the participants in identifying the issues that are important to resolving any controversy and solutions that will address the needs shared by the participants.

  o Conduct the process to promote active engagement from all participants.

  o Explore with the participants appropriate ways to incorporate high quality and relevant information resources necessary to resolve the issues.

  o To support productive dialogue and effective implementation of any agreements reached by the participants, ensure that participants have appropriate authority to make commitments on behalf of their organizations.

- Obtain approval in writing for any long-distance travel.

As prime contractor, ERG will support this TO through the following activities:

- Provide monthly progress reports by the 15th of each month.

- Communicate and coordinate with the EPA TOCOR as needed.

- Coordinate with the subcontractors.

- Incorporate the principles of quality management while carrying out this task.

- Provide deliverables in electronic format (as agreed to by the TOCOR) to the EPA TOCOR.

- Notify the EPA PO and TOCOR when 75 percent of the funds provided have been expended or funding for less than six weeks of work remains.

# 5.   Work Tasks

Task A: Preliminary Work

*Task A1: Select Dispute Resolution Professionals*

ERG will select a team of experienced senior dispute resolution professional to provide all support under this TO, in consultation with the TOCOR and PO. Service provider selection will be based on the team's knowledge of the Superfund allocation of liability process; experience constructing allocation plans consistent with EPA settlement guidelines and legal requirements; access to resources for database design, entry, analysis, and manipulation; and, understanding of the PRP legal and technical issues and concerns in designing allocation processes. Based on these qualifications, and prior experience, ERG has selected AlterEcho as the service provider. AlterEcho provides technical continuity, historical knowledge, and relevant experience.

*Task A2: Develop Work Plan*

ERG has developed this work plan to provide a detailed explanation of all activities associated with and a proposed approach for completing each of the defined tasks. The ERG Team has identified the transmittals and deliverables and their associated due dates and developed a detailed budget, including a breakout of labor hours and other direct costs. This work plan also identifies quality assurance/quality control procedures, conflict of interest (COI) assurances for all ERG Team members, and procedures for substitution of labor categories in the event of temporary or permanent personnel changes. We will proceed to perform work described in the following SOW tasks only upon issuance of the TO by the Contracting Officer.

*Task A3: Oversee Deliverables*

In accordance with proper contract implementation, ERG and the selected subcontractor will ensure effective oversight and management of the resources and deliverables required by EPA. Specifically, the ERG TOM for this effort will:

- Ensure that all technical direction received falls into the scope of work prior to initiating any action.

- Ensure completion and maintain copies of all contract transmittals and deliverables.

- Assist in resource planning, and manage the budget and hours on a regular basis to ensure accurate and effective financial tracking.

- Oversee subcontractor activities through regular and periodic conversations with the subcontractor to ensure effective performance.

- Ensure that monthly progress and financial reports accurately record the level of effort expended, clearly articulate the work completed and work planned for the subsequent month, clarify any lagging subcontractor costs, and identify any problems encountered and activities to address them.

- Speak on an as-needed basis with the EPA TOCOR to review the financial and work status of the project. ERG assumes that conference calls will be held as often as weekly.

- Review the first progress report and invoice with the EPA TOCOR.

- Update ERG's management tracking system on an ongoing basis.

Table 2. Transmittals and Deliverables Under Task A

| Item | Title | Due no later than | Type |
|------|-------|-------------------|------|
| A-1 | Work plan | August 30, 2019 | Deliverable |
| A-2 | Monthly progress reports | 15th of each month** | Deliverable |

**ERG will not prepare or submit a progress report in months when no substantive work has been performed.

## Task B: Allocation Design and Production

### Task B1: Initial Review

Under the previous contract, EPA provided the contractor with the information, materials, and reports generated pertaining to the allocation. AlterEcho organized and reviewed this information under that contract. No further activity or level of effort is anticipated for this task.

### Task B2: PRP Outreach

Throughout the course of the allocation, the ERG Team will conduct outreach to OU2 PRPs participating in the allocation to provide them with the opportunity to comment on and correct the draft data reports produced under the previous contract and to provide input on the drafting of the allocation recommendation report. This will include:

- Ensuring that each PRP's data or information used in the allocation is correctly input into the database.
- Soliciting PRP positions on the drafting of the allocation recommendation report.
- Communicating how their input was or was not taken into consideration in developing the allocation recommendation report.

The activities and level of effort associated with the PRP outreach activities described above are directly linked to the Allocation Design and Production task described below. They are incorporated into the descriptions and estimates for those tasks.

Per Section II.B.2.b of the SOW, the ERG Team will prepare and provide to EPA a report regarding outreach efforts conducted with the OU2 PAPs during the entire project, including a list of participants in outreach efforts, a description of topics discussed, and a summary of issues or concerns raised.

This task will require the following efforts on the part of the ERG Team:

- Review and provide EPA with a generalized description of topics discussed and summary of issues or concerns raised by OU2 PAPs during conduct of the TO, without attribution to individual OU2 PAPs.
- Prepare and provide EPA an overview of conducted outreach efforts, including a list of OU2 PAPs that have participated in outreach meetings, conference calls, or individual communications with the ERG Team.

### Task B3: Searchable Database

Per Section II.B.3 of the SOW, the ERG Team will maintain and update the searchable database developed under the previous contract. The searchable database contains and organizes all of the information and data used in the allocation.

- Under the previous contract, the database was designed and initially populated with information received from EPA, including PRP disclosure statements and nexus documents from third party litigation totaling approximately 130,000 pages.

- Under the previous contract, the database was also populated with up to 413,895 pages of documents received from PRPs deemed relevant to the allocation by the previous contractor and any other information used in the allocation.

- The database is designed in such a way as to allow access and use by EPA and DOJ staff for their settlement purposes.

- Completion of database: The ERG Team will upload applicable new documents received as part of the TO activities. The PAPs have indicated to the ERG Team that they have an additional 50,000 pages of relevant documents to submit. The ERG Team will complete the database and provide the completed database to EPA when the final allocation recommendation report, described in Task B7, is complete.

*Task B4: Draft and Final Facility Data Reports*

Per Section II.B.4.a of the SOW, the ERG Team will organize and conduct a technical and scientific evaluation of data in the allocation database to develop individual data reports for each of the OU2 PAP facilities for which an early settlement was not offered by EPA. Under the previous contract, 72 Draft PRP Data Reports were completed and made available to the PAPs for submission of corrections or suggestions. <span style="color:red">Exemptions (b) (3) (A) and (b) (5)</span>

This will include review and evaluation of additional Facility Questionnaire information and supporting documents to be submitted and expanding the depth of data review focused on mass of contaminants associated with the facility. The reports will provide selected information regarding each OU2 PAP's relation to OU2 and OU2 contaminants of concern that will be used in conduct of the allocation. The ERG Team will establish a deadline of 10 business days from receipt of the Draft Facility Data Reports for submission of corrections or suggestions by the OU2 PAPs for improving the quality of the received Draft Facility Data Reports.

This task will require the following efforts on the part of the ERG Team:

- Conduct coding of data and loading of coded data obtained from OU2 PAPs into database.

- Review preliminary factual submission by OU2 PAPs.

- Review site data loaded into database to determine appropriate organization for allocation.

- Compile and organize site data in database to support allocation analysis and share computations.

- Organize data in allocation database into and draft individual OU2 PRP data reports for each of the OU2 PAP facilities for which an early settlement was not offered by EPA <span style="color:red">Exemptions (b)(3)(A) and (b)(5)</span>.

- Provide a copy of the Draft Facility Data Reports to the OU2 PAPs for review.

Exemptions (b) (3) (A) and (b) (5)

Conduct of this task is dependent upon the following factors:

- Access by the ERG Team to EPA technical data regarding site conditions and the selected OU2 remedy.

- Sufficient data on identified PRPs to allow analysis of associated contaminants of concern and hazardous substance fate and transport at the site.

- Successful establishment of the allocation database.
- Receipt of additional data from OU2 PAPs for inclusion in the allocation database within established timeframes.
- As indicated in the Assumptions section of this Work Plan, it is assumed that there are an additional 50,000 pages of relevant documents to submit over the remainder of the project.

Per Section II.B.4.c of the SOW, the ERG Team will analyze corrections or suggestions for improving the quality of the Draft Facility Data Reports received from OU2 PAPs to determine whether modifications of the original draft data reports are warranted. Based on this analysis, the ERG Team will modify the data reports, as deemed appropriate. The ERG Team will then provide a copy of all of the Final Facility Data Reports to the OU2 PRPs, with an explanation of how suggested changes were, or were not, incorporated.

- This task will require the following efforts on the part of the ERG Team: Employ a rigorous approach to filling data gaps with additional information requested and obtained from EPA or the PAPs (e.g., industry resources, EPA/NJDEP files, Sanborn Fire Insurance Maps, aerial photographs and possibly supplemental 104e requests) in accordance with the protocol for handling data gaps and ambiguities included in the Allocation Methodology.

- Analyze received suggestions and corrections to Draft Facility Data Reports in relation to existing Site data and the final allocation design in order to determine appropriate modifications.

- Modify the individual data reports, as warranted based on the above analysis.

- Provide an explanation to the OU2 PAPs regarding whether, and if so how, received suggestions resulted in changes to their individual data report, including a description of why their suggestions and comments were, or were not, taken into account. Upload Final Facility Data Reports to the confidential allocation document repository.

- As required, the ERG Team will conduct communications with individual OU2 PAPs to answer questions regarding their Final Facility Data Reports.

Timing of this task is dependent upon the following factors:

- Receipt of comments from OU2 PRPs regarding their Draft Facility Data Reports within established timeframes.

- Exemptions (b) (3) (A) and (b) (5)

*Task B5: Allocation and Allocation Recommendation Report*

The ERG Team will ensure that each PRP's data or information used in the allocation is accurately input into the database and will solicit from the PRPs participating in the allocation positions on the drafting of the allocation recommendation report (as described below). AlterEcho will perform the allocation. The activities and level of effort associated with performing the allocation are directly linked to the subtasks described below. They are incorporated into the descriptions and estimates for those tasks.

Per Section II.B.5.a and b of the SOW, the ERG Team will prepare a first draft of the allocation recommendation report and submit it to the OU2 PAPs for review. The draft allocation report will designate shares of responsibility among the OU2 PRPs, as appropriate based on the allocation analysis. The draft allocation report will include a recommendation on the possible grouping of the OU2 PRPs into tiers of similar levels of responsibility.

This task will require the following efforts on the part of the ERG Team:

- Conduct communications, including conference calls and/or meetings, with OU2 PAPs regarding recommendations on and legal/equitable theories pertinent to conduct of the allocation raised in Position and Response Briefs received from the OU2 PAPs. The ERG Team will focus on establishing routine group communication calls and electronic updates to achieve greater efficiency in communication and as a means to reduce individual PAP-initiated calls and electronic inquiries.

- Review and consider input regarding allocation received from the OU2 PAPs and EPA.

- Review and understand the basis for EPA's selected remedy for OU2, in consultation with EPA technical and legal personnel.

- Analyze the relative toxicity of materials discharged by OU2 PRPs and other differentiating factors, including fate and transport of hazardous substances released by PRPs based on the data contained in the RI/FFS, in relation to the selected remedy.

- Compile and analyze allocation data related to each OU2 PRP, including contaminants of concern, to establish the relative impact of the actions of each OU2 PRP on the conditions that resulted in EPA selecting the OU2 remedy.

- Load compiled PRP data into allocation calculations to determine relative relationships among the OU2 PRPs.

- As appropriate, establish appropriate tiers of OU2 PRP responsibility based on calculations and consideration of equitable factors.

- Prepare the draft allocation recommendation report.

- Submit the draft report to the OU2 PAPs for review and comment.

Timing of this task is dependent upon receipt of position briefs and reply briefs regarding allocation from OU2 PAPs within established timeframes.

Per Section II.B.5.c of the SOW, the ERG Team will plan, schedule, and conduct a meeting with the OU2 PAPs as a group regarding the draft allocation recommendation report. The purpose of the meeting will be to advise the OU2 PAPs as a group regarding the draft allocation recommendation report and to obtain preliminary PAP comments regarding the draft allocation recommendation report. The ERG Team

will also communicate with the OU2 PAPs individually as necessary to obtain the input of OU2 PAPs, including those that did or were unable to attend the meeting, regarding the draft allocation recommendation report. As noted previously, the ERG Team will focus on establishing routine group communication calls and electronic updates to achieve greater efficiency in communication and as a means to reduce individual PAP initiated calls and electronic inquiries.

This task will require the following efforts on the part of the ERG Team:

- Making arrangements for a meeting in the greater New York City metropolitan area sufficient to accommodate the OU2 PAPs as a group.

- Coordination of meeting space and equipment for meetings provided by EPA or OU2 PAPs.

- Communication via email with the OU2 PAPs regarding substance, date/time, and location of meeting.

- Development of the meeting agenda.

- Development of participant materials, as needed.

- Travel of two senior staff from Washington, DC, to attend the meeting.

- Communications by a Dispute Resolution Professional via phone, email, or other electronic media with OU2 PAPs as required.

- Recording of PAP general comments regarding the draft allocation recommendation report, without attribution to individual OU2 PAP comments.

Per Section II.B.5.c of the SOW, the ERG Team will prepare a Final Allocation Recommendation Report. The Final Allocation Recommendation Report will take into consideration comments on the Draft Allocation Recommendation Report received during meetings with and received in position and reply briefs from the OU2 PAPs and during communications with EPA regarding the nature and scope of the Final Allocation Recommendation Report; address any identified ambiguities in the draft report; include references to all materials considered and relied upon, and a complete description of the allocation process and the basis upon which shares were assigned. The Final Allocation Recommendation Report will include an overview of the basis for the determinations of shares among the OU2 PRPs, including a description of the use of data sources and application of allocation factors and methodology utilized, and reason for potential vulnerabilities, if any, in the resulting allocation. The report will identify and explain the rationale, if applicable, for grouping OU2 PRPs into tiers of similar relative responsibility. The Final Allocation Recommendation Report will also address any identified ambiguities in the draft report, and provide a summary of how comments of the OU2 PRPs regarding the Draft Allocation Recommendation Report were, or were not, taken into account in the final report, without attribution to individual comments.

This task will require the following efforts on the part of the ERG Team:

- Review and consider the comments received from OU2 PAPs regarding the Draft Allocation Recommendation Report.

- Conduct communications, including conference calls and/or meetings, with OU2 PAPs regarding comments regarding the Draft Allocation Recommendation Report received from OU2 PAPs.

- Edit the Draft Allocation Recommendation Report to incorporate appropriate modifications based on received comments to produce the Final Allocation Recommendation Report.

The ERG Team will provide access the OU2 Allocation Database to identified members of the EPA Case Team. This task will require the following efforts on the part of the ERG Team:

- Submission to members of the EPA Case Team Review of credentials and instructions for accessing information in the OU2 Allocation Database.

*Task B6: Meetings or Conference Calls*

The activities and level of effort associated with performing the allocation are directly linked to the other tasks in this work plan. They are incorporated into the descriptions and estimates for those tasks as noted. The ERG Team will attend and participate in the following meetings either in person or by telephone or video conference at EPA's discretion.

- Progress meetings or conference calls. Please see Task A2 of this work plan.

- Kickoff meeting or conference call with EPA. Please see Task A2 of this work plan.

- Draft allocation recommendation report meeting or conference call with PRPs. Please see Task B5 of this work plan.

It is anticipated that all meetings will be held at EPA or PRP-provided facilities.

*Task B7: Task Order Closeout Report*

Per Section II.B.7 of the SOW, the ERG Team will design and produce the first draft of a report regarding the conduct of tasks pursuant to the TO and submit it for review by EPA. The report will not contain any confidential or sensitive information. The contents of the Draft Task Order Closeout Report will include:

- A half-page description of the project that describes the nature of the project, the parties, the process, and the outcomes.

- If appropriate, a short section reflecting on the process and procedural lessons learned and recommendation for improvements and identification of those activities conducted that contributed to the success of the process.

- A brief summary of the final costs of the project, broken out by percentage of labor hours and other direct costs.

This task will require the following efforts on the part of the ERG Team:

- Review of project activities and compilation of a project summary.

- Consideration and compilation of thoughts on lessons learned regarding this project.

- Compilation of project budget costs.

- Preparation of the Draft Task Order Closeout Report.

The ERG Team will prepare a Final Task Order Closeout Report and submit it to EPA. The Final Task Order Closeout Report will take into consideration comments received from EPA regarding the draft of the Task Order closeout report. ERG will provide one copy of the Final Task Order Closeout Report to the PO and one copy to the TOCOR in electronic format.

This task will require the following efforts on the part of the ERG Team:

- Review and consideration of comments by EPA regarding the draft Task Order Closeout Report.

- Editing, and as required redesign, of the closeout report to incorporate modifications based on EPA comments in order to produce the Final Task Order Closeout Report.

- As directed by the TOCOR, the ERG Team will participate in a post-process debriefing with EPA officials to discuss lessons learned and potential next steps.

Per discussions with EPA, while the Final Allocation Report is referenced under this task in the EPA SOW, report development is not included under this task, but rather under Task B5.

*Task B8: Post-Process Debriefing*

As directed by the EPA TOCOR, the ERG Team will participate in a post-process debriefing with EPA officials, including the PO, TOCOR, and relevant EPA management, to discuss lessons learned and next steps. It is anticipated that this meeting will take place via teleconference.

Table 3. Transmittals and Deliverables Under Task B

| Item | Title | Due no later than* | Type |
|------|-------|--------------------|------|
| B-1 | Kickoff meeting or conference call | Within 20 business days of work plan approval | Activity |
| B-2 | Completion of searchable database | Upon submission of final allocation recommendation report | Deliverable |
| B-3 | Completion of final facility data reports | Within 40 business days of work plan approval | Transmittal |
| B-4 | Perform allocation | 140 business days after completion of final facility data reports | Activity |
| B-5 | Draft allocation recommendation report | 140 business days after completion of final facility data reports | Transmittal |
| B-6 | Draft allocation recommendation report meeting | Within 20 business days of submittal of draft allocation recommendation report | Transmittal |
| B-7 | Final allocation recommendation report | 65 business days after completion of draft allocation recommendation report | Deliverable |
| B-8 | Final PRP outreach report | 10 business days after completion of final allocation recommendation report | Transmittal |
| B-9 | Draft case closure report | 10 business days after acceptance of final allocation recommendation report | Transmittal |
| B-10 | Final case closure report | 10 business days after receipt of EPA comments | Deliverable |

## 6.    Reports, Transmittals, and Deliverables

ERG will submit deliverables in accordance with the contract. As agreed upon with EPA, with the exception of Items B-5 and B-6 in Table 3, copies of all contract deliverables will be sent to both the PO and the TOCOR. Items B-2 and B-3 will be submitted with Item B-7. If oral briefings are scheduled for EPA staff, the PO will be notified in time to attend. Specific deliverables and the timing of their delivery are identified in the tables in Section 5 above.

## 7.    Staffing Plan

Not Responsive by Agreement with FOIA Requestor

Not Responsive by Agreement with FOIA Requestor



Not Responsive by Agreement with FOIA Requestor

## 8. Quality Management

As part of routine quality assurance practices, the ERG TOM will:

- Communicate as needed with the TOCOR to review progress.
- Communicate regularly with the subcontractor(s) to receive project status updates.

In addition, all work on this TO will be performed in accordance with ERG's strict quality assurance practices including—but not limited to—incorporating quality management principles and processes described in ERG's Quality Management Plan into the development of the required transmittals, deliverables, and consulting services offered. ERG will ensure the timely delivery of all transmittals and deliverables.

## 9.   Conflict of Interest

ERG certifies that, to the best of our knowledge and belief, no real, apparent, or potential organizational or individual conflict of interest exists with this task order, based on previous or ongoing work, or other potential conflict. We recognize our continuing obligation to search and report any actual or potential personal and organizational conflicts of interest, should they arise during performance of work under this task order. ERG's official conflict of interest certification appears on the next page.

## CONFLICT OF INTEREST CERTIFICATION

**Eastern Research Group, Inc.**
**EPA Contract No. 68HERH19D0033**
**Task Order Request No.: 012**

In accordance with EPAAR 1552.209-71 (Organizational Conflicts of Interest), EPAAR 1552.209-73 (Notification of Conflicts of Interest Regarding Personnel), and Prime Contract clause (Work Assignment Conflicts of Interest Certification), Eastern Research Group, Inc. makes the following certifications:

ORGANIZATIONAL AND PERSONAL CONFLICTS OF INTEREST:

☒    To the best of our knowledge and belief, no actual or potential organizational conflicts of interest exist. In addition, none of the individuals proposed for work under this Order has any personal conflicts of interest.

OR:

☐    To the best of our knowledge and belief, all actual or potential organizational and personal conflicts of interest have been reported to the EPA Contracting Officer.

This is to certify that our personnel who perform work under this Order, or relating to this Order, have been informed of their obligation to report personal and organizational conflicts of interest to our designated COI Official.

Eastern Research Group, Inc. recognizes its continuing obligation to search for, identify, and report any actual or potential organizational or personnel conflicts of interests that may arise during the performance of this Order or work relating to this Order.

*Laura Bachle*

_____
Authorized Signature

Laura Bachle
Printed Name

Task Order Manager
Title

August 30, 2019
Date

# Exhibit O



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
CINCINNATI ACQUISITIONS DIVISION
CINCINNATI, OHIO 45268**

DATE:        July 28th, 2020

SUBJECT:     Contract #68HERH19D0033_TO 68HERH19F0406, Modification P00004

FROM:        Erin M. Ridder, Contracting Officer

TO:          Kelly Loomis

Attached is request for task order modification for Task Order #68HERH19F0406, Modification
P00004, which was awarded for the project entitled, **"Diamond Alkali-Lower Passaic River
Allocation."**

The government requests you prepare a revised cost proposal for the task order modification in
accordance with the changes outlined in the attached Performance Work Statement. The proposal
must be submitted to ridder.erin@epa.gov by **August 10th, 2020**. The modification adds the
number of documents the allocation team must review and incorporate into the allocation; adds
level of effort; improves the managerial oversight of the project schedule; and to extend the
period of performance.

The following documents provided for this modification will become part of the Task Order
Award:

- Performance Work Statement

Any questions should be directed to the undersigned within two business days of receipt.

Erin M. Ridder
Contracting Officer

Cc:
Alice Yeh, Task Order Contracting Officer Representative
Terry Fenton, CL-COR
Terry Simpson, Alt CL-COR

**PERFORMANCE WORK STATEMENT**
**Contract 68HERH19D0033**
**TO # 68HERH19F0406**
**Modification: P00004**

**TITLE:  Diamond Alkali-Lower Passaic River Allocation**

**MODIFICATION P00004:** This performance work statement (PWS) modification is to add to the number of documents that the allocation team must review and incorporate into the allocation (see Section II.B.4), <span style="color:red">Exemption (b)(3)(A) & (7)(A)</span>

to improve the managerial oversight of the project schedule (see Section II.B.6), and to extend the period of performance (POP) [see Sections I and V].

**ABSTRACT:** This task order will provide neutral, unbiased support for development of an allocation for potentially responsible parties (PRPs) at the Diamond Alkali Superfund Site in New Jersey. This allocation will form the basis for final negotiations between the EPA Region 2 and PRPs. This Task Order is funded by EPA Region 2 Superfund program. This Task Order continues the allocation work started under Contract EP-W-14-020, Task Order 96 (referred to below as the previous contract).

## I.    BACKGROUND

The Diamond Alkali Site has a long history, involving over 100 potentially responsible parties (PRPs). Since the late 1800s, the Lower Passaic River has been a highly industrialized waterway, receiving direct and indirect discharges from numerous industrial facilities. Data collected in the Lower Passaic River, and EPA's analyses, show that contaminated sediment in the lower 8.3 miles are a major source of contamination to the rest of the river and Newark Bay and pose an unacceptable risk to human health and the environment due to the presence of a variety of contaminants that stay in the environment for a long time and can build up in fish and shellfish. These contaminants include dioxins and furans, PCBs, mercury, DDT and its primary breakdown products, copper, dieldrin, PAHs, and lead.

On March 4, 2016, EPA issued a record of decision selecting the remedy for the lower 8.3 miles of the Lower Passaic River, which is Operable Unit 2 (OU2) of the Site. Currently, the remedial design (RD) for OU2 is being performed by Occidental Chemical Corporation (OCC) pursuant to an administrative order on consent. The cost of the remedial action (RA), estimated for purposes of remedy selection, is $1.38 billion.

Region 2 has issued a notice of potential liability to approximately 100 parties, informing them of their responsibility for the RD/RA for OU2. The Region has offered a first round of cash-out settlements to a group of approximately 20 PRPs. The Region also expects to separately address the liability of municipalities and public entities. The Region requires the services of a third-party allocator to assign a share of responsibility to the 83 PRPs that are not in the first round of cash-out settlements and that are not municipalities or public entities. Some of the PRPs have

1

multiple facilities in the allocation, so that the total number of facilities to be assigned a share of responsibility will be 97. The Region expects to use the results of the allocation to: 1) enter into settlement agreements with a small group of the PRPs with the largest shares of responsibility to perform the remedial action; and 2) enter into another round of cash-out settlements with the other PRPs with smaller shares of responsibility.

Region 2 understands that a PRP group (the Cooperating Parties Group, or CPG) has made at least two previous attempts to develop a mutually acceptable allocation of liability to promote settlement with EPA for costs and work at the site, however both efforts fell short of agreement. Region 2 believes that because of these previous efforts, additional information available from responses to CERCLA 104(e) letters, information available from previous litigation at the state level and numerous conversations with PRPs over the years, the allocation project will be able to build upon existing information and contacts. Some augmentation of background, data and allocation factors may need to occur to develop what is hoped to be an acceptable settlement proposal and structure. In 2016 the Department of Justice retained a mediator, David Batson of Techlaw to assist in settlement analysis. Those discussions and analyses have resulted in this effort.

This work needs to start in August 2019 because of milestones anticipated in site cleanup and is expected to last up to 13 months. **This PWS amendment extends the expected period of performance from October 30, 2020 to March 31, 2021.**

## II.    SCOPE OF WORK – TASKS
### A. Preliminary Work
1. The contractor shall select a team of dispute resolution professionals and support staff in consultation with the Contract Level Contracting Officer's Representative (CL COR) and Task Order Contracting Officer Representative (TOCOR).  The lead service provider shall have the following qualifications:
   - Detailed knowledge of a range of Superfund allocation of liability processes.
   - Multiple instances and experience constructing allocation plans consistent with EPA settlement guidelines and legal requirements.
   - Access to staff resources for database design, entry, analysis and manipulation.
   - Understanding of PRP legal and technical issues and concerns in designing allocation processes.
2. The contractor shall be responsible for oversight of deliverables on this Task Order and shall be responsible for transmission of reports and invoices as required by the contract.

### B. **Allocation Design and Production Performance Requirement:**
The purpose of this project is to provide neutral, unbiased allocation development and negotiation support to establish a reasonable basis for EPA settlement offers to Diamond Alkali OU2 PRPs by developing and implementing an allocation process for the parties that are not in the first round of cash-out settlements and that are not municipalities or public entities. Major deliverables include (1) a searchable database containing documents and data used for the allocation and (2) a written allocation analysis report

2

(i.e., allocation report). Authority to initiate work for each subtask described below will be provided via email by the TOCOR as a need to conduct subtasks is identified.

During the performance of the work described in the subtasks, Region 2 may share information with the contractor that is pre-decisional and deliberative or is considered to be attorney work product in preparation of potential litigation. Such work is privileged to the United States and EPA under the Freedom of Information Act. While the contractor shall conduct the allocation process in a manner transparent to the public to the extent possible, the contractor must consult with EPA before releasing information to the public to ensure confidential information is protected. The contractor shall perform the following negotiation support subtasks:

1. <u>Initial review of information provided by EPA:</u> EPA will provide the contractor with the information, materials and reports generated under the previous contract pertaining to the allocation. The contractor shall review this information.

2. <u>PRP Outreach:</u> The contractor shall conduct outreach to OU2 PRPs participating in the allocation to provide them with the opportunity to comment on and correct the draft data reports produced under the previous contract and to provide input on the drafting of the allocation recommendation report.

   a) The PRP outreach performed by the contractor shall be include (1) ensuring that each PRP's data or information used in the allocation is correctly input into the database, (2) soliciting PRP positions on the drafting of the allocation recommendation report, and (3) communicating how their input was or was not taken into consideration in developing the allocation recommendation report.

   b) The contractor shall complete a report regarding outreach efforts conducted with the OU2 PRPs, including a list of participants in outreach efforts, description of topics discussed, and summary of issues or concerns raised.

3. <u>Searchable database:</u> The contractor shall finish developing the searchable database started under the previous contract. The searchable database should contain and organize all of the information and data used in the allocation.

   a) Under the previous contract, the database was designed and initially populated with information received from EPA, including PRP disclosure statements and nexus documents from third party litigation totaling approximately 130,000 pages.

   b) Under the previous contract, the database was also populated with up to **413,895** pages of documents received from PRPs deemed relevant to the allocation by the previous contractor and any other information used in the allocation.

   c) The database shall be designed in such a way as to allow access and use by EPA and DOJ staff for their settlement purposes.

   d) Completion of database: The contractor shall complete the database and provide the completed database to EPA when the final allocation recommendation report, described in paragraph 5, is complete.

4. <u>Final Facility Data Reports:</u>

   a) Draft Facility Data Reports: After reviewing and analyzing relevant information in the database (described in paragraph 3 above) on each PRP facility, the previous

3

contractor developed individual data reports for each facility. The data reports provided the information that will be used to conduct the allocation.

b) PRP Review of Draft Data Reports: After completing the draft data reports, the previous contractor sent the draft reports to the PRPs participating in the allocation for their review and comment on the accuracy of the information. Note: EPA did not have an opportunity to review the draft data reports.

c) Final Facility Data Reports: The contractor shall solicit comments from the PRPs participating in the allocation on the accuracy of the information in the draft data reports. The contractor shall finalize the data reports based on the comments received.

d) Additional documents received: As of June 2020, the contractor had received an additional 48,600 pages of facility data from the PRPs participating in the allocation. The contractor shall review the additional information and incorporate it into the searchable database and allocation recommendation report, as necessary and appropriate.

5. <u>Allocation and Report</u>

a) Allocation: The contractor shall ensure that each PRP's data or information used in the allocation is correctly input into the database. <span style="color:red">Exemption (b)(3)(A) & (7)(A)</span>

The contractor shall solicit from the PRPs participating in the allocation positions on the drafting of the allocation recommendation report (as described in paragraph 2). **As of June 2020, the contractor had received an additional 276,851 pages of position briefs, expert reports and supporting information from the PRPs participating in the allocation. From June 2020 through the end of the allocation, the contractor expects to receive up to another 50,000 pages of response briefs, expert reports and supporting information. The contractor shall review the expected total of up to 326,851 pages of additional information and incorporate it into the searchable database and allocation recommendation report, as necessary and appropriate.**

b) The contractor shall perform the allocation.

c) Draft allocation recommendation report: The contractor shall provide a draft allocation recommendation report for review and comment by the PRPs participating in the allocation. **The contractor shall enforce the page limits and other requirements specified in the Allocation Guide for comments on the draft allocation recommendation report.** EPA will not have an opportunity to review the draft allocation recommendation report.

d) Final allocation recommendation report: After considering the PRPs' input, the contractor shall provide a final allocation recommendation report to EPA and the PRPs in the allocation.

4

6. <u>Meetings or Conference Calls:</u> The contractor shall attend and participate in the following meetings either in-person or by telephone or video conference at EPA's discretion.

   a) Progress meetings or conference calls: Contractor shall hold weekly conference calls with EPA, and others as directed or determined by EPA, to discuss progress. **The contractor shall ensure that due dates for deliverables are met, and that any potential delays are reported to EPA as soon as possible and mitigated as much and as quickly as possible so that the final allocation recommendation report is not further delayed.**

   b) Kickoff meeting or conference call with EPA: Contractor shall meet with EPA to discuss tasks described in this task order and EPA's expectations.

   c) Draft allocation recommendation report meeting or conference call with PRPs: Contractor shall meet with the PRPs participating in the allocation to discuss their comments on the draft allocation recommendation report.

   d) The contractor shall provide meeting facilities, equipment, supplies and support for meetings in cases where EPA or other participant facilities are unavailable or inappropriate.

7. The contractor shall furnish a final allocation recommendation report as described above and a short (2 page) Task Order Closeout Report. The Task Order Close Out Report shall not contain any confidential or sensitive information. The contents shall include:

   a) A half page description of the case that describes the nature of the case, the parties, the process and the outcomes.

   b) If appropriate, a short section reflecting on the process and procedural lessons learned and recommendation for improvements. The contractor shall identify those activities conducted that contributed to the success of the process.

   c) Brief summary of the final costs of the project broken out by labor hours and other direct costs.

   The CL COR and TOCOR will review the draft Task Order Closeout Report and provide comments and revisions as necessary. The contractor shall prepare the final report incorporating their comments and revisions. The contractor shall provide one copy of the final report to the CL COR and one copy to the TOCOR. The final report may be transmitted in electronic form (Word format), rather than in hard copy if the TOCOR agrees

8. As directed by the TOCOR, the contractor shall participate in a post-process debriefing with EPA officials, including the CL COR, TOCOR and Technical Point of Contact (POC) and relevant EPA management, to discuss lessons learned and next steps.

## C. Reports and Deliverables

All deliverables and tasks required under this task order must be submitted or completed within the time durations listed in the schedule set forth below. After notification to and agreement from the EPA team, TOCORs and CL CORs, the contractor may submit a revised proposed schedule for EPA approval. Upon EPA's approval, the revised schedule will supersede the schedule set forth below.

5

| | Description of Deliverable, Transmittal or Activity | ¶ Ref. | Type | Deadline |
|---|---|---|---|---|
| 1 | Kickoff meeting or conference call with EPA | II.B.6.b. | Activity | Within 20 business days of task order issuance |
| 2 | Completion of searchable database | II.B.3.c. & II.B.3.d. | Deliverable | Upon submission of the final allocation recommendation report (5.c.) |
| 3 | Completion of final facility data reports. | II.B.4.c | Transmittal | Within 40 business days of approval of TO award |
| 4 | Perform allocation | II.B.5.a. | Activity | **170** business days after completion of final facility data reports (4.c.) |
| 5 | Draft allocation recommendation report | II.B.5.b. | Transmittal | **170** business days after completion of final facility data reports (4.c.) |
| 6 | Draft allocation recommendation report meeting | II.B.6.c. | Transmittal | Within 20 business days of submittal of draft allocation recommendation report (5.b.) |
| 7 | Final allocation recommendation report | II.B.5.c. | Deliverable | 65 business days after completion of draft allocation recommendation report (5.b) |
| 8 | Final PRP outreach report | II.B.2.b. | Transmittal | 10 days after completion of final allocation recommendation report (5.c.) |
| 9 | Draft case closure report | II.B.7 | Transmittal | 10 business days after acceptance of final allocation recommendation report |
| 10 | Final case closure report | II.B.7 | Deliverable | 10 business days after receipt of EPA comments. |

1. Performance Standards:
   a. The contractor shall provide negotiations support using the guidance listed in Attachment B, other applicable guidance, and/or direction provided in an individual task order.
   b. The contractor shall send Region 2 TOCOR all reports in accordance with the contract.
   c. The contractor shall provide a task order proposal plan within the schedule provided in the contract.
2. Deliverables shall be submitted to EPA by
   a. Written paper text to Task level COR, when requested
   b. Via e-mail to Task level COR
   c. On electronic media (specify disk, CD, etc.) (only upon request and issued through written technical direction from EPA TOCOR)
   d. Posted on a SharePoint server for access by Contract Level COR

**III.    WORK APPROACH**

6

A. Alternative Dispute Resolution (ADR) Best Practices:
   The Contractor shall approach this task in accordance with terms of the basic contract and according to the established norms and ethical standards of ADR professionals. Based on EPA's evaluation of a large number of ADR cases, the Agency has determined that the following practices are significantly related to positive substantive, relational, and procedural outcomes from ADR cases.  The contractor shall ensure that this direction is provided to ADR professionals providing services under this task order:

- Prior to the mediation or facilitation and throughout the process, the ADR professional shall inquire about whether individual participants have the time, financial, and logistical resources necessary to participate effectively in the process and -- where resources are inadequate -- assist them in identifying appropriate resources or in making necessary adjustments to the process to accommodate resource constraints.
- The ADR professional shall assist the participants in identifying the issues that are important to resolving any controversy and solutions that will address the needs shared by the participants.
- The ADR professional shall conduct the process to promote active engagement from all participants.
- The ADR professional shall explore with the participants appropriate ways to incorporate high quality and relevant information resources necessary to resolve the issues.
- To support productive dialogue and effective implementation of any agreements reached by the participants, the ADR professional shall ensure that participants have appropriate authority to make commitments on behalf of their organizations.

B. Ethical Codes of Conduct:
   The Contractor shall ensure that ADR professionals serving as neutral third parties under this contract receive information about and perform in accordance with ethical codes applicable to the practice of dispute resolution professionals.  Relevant examples of ethical codes include those adopted by the American Arbitration Association, American Bar Association, Association for Conflict Resolution:
    https://www.americanbar.org/groups/dispute_resolution/resources/Ethics/

C. Confidentiality:
   All parties to this task order acknowledge that the confidentiality provisions of the Administrative Dispute Resolution Act, 5 U.S.C. Section 574 (ADR Act) shall govern the contractor's alternative dispute resolution activities (if any) under this task order, when activities pursuant to the task order fall within the jurisdiction of the ADR Act.

D. Contractor Representation:
   In gathering information or performing tasks with parties outside the EPA, the contractor shall identify themselves as a contractor to EPA, not an EPA employee. The Contractor shall provide input or make recommendations based on the information gathered, however, decisions on all substantive issues will be made by EPA. THE CONTRACTOR SHALL NOT INTERPRET EPA POLICY ON BEHALF OF EPA NOR MAKE DECISIONS ON ITEMS OF POLICY, REGULATION OR STATUTE.  THE

7

CONTRACTOR SHALL NOT TAKE A STAND ON THE MERITS OF
SUBSTANTIVE ITEMS UNDER DISCUSSION.

E. Status Notifications:
THE CONTRACTOR SHALL NOTIFY THE EPA CL COR AND TOCOR WHEN 75%
OF THE FUNDS PROVIDED HAVE BEEN EXPENDED OR WHEN FUNDING FOR
LESS THAN 6 WEEKS WORK REMAINS. Notifications shall be in writing and cc to
the CL COR.

F. Task Order Procedures, Constraints and Disclaimers
If out of town travel is required to accomplish the tasks under this task order, the
contractor shall obtain advance approval for that trip and its costs in writing from the
TOCOR and/or the CL COR.  To the extent possible, the contractor's per diem costs shall
be within allowable limits set by GSA.

This task order is not funded by multiple appropriations.  This task order does not provide
for training of contractor personnel, provision of Government Furnished Property or
Accountable Personal Property, leased items or property or IT products or services.  The
PWS does not include any tasks that are inherently governmental in nature or provide
personal services.  The PWS does not anticipate transferring or developing Confidential
Business Information or Personally Identifiable Information to the contractor.  This
project will not involve collection of environmental data and so is not subject to needing
an EPA Quality Assurance Project Plan.  Printing shall be in accordance with limitations
of the contract.  This project does not involve the service provider conducting surveys,
data collection or questionnaires.  Development of communications products as a result
of activities on this task order will be in compliance with EPA's Policy and
Implementation Guide for Communications Product Development and Approval found at
HTTP://www.epa.gov/productreview/guide/index.html.

The Contractor is directed to conduct Conflict of Interest checks and provide this
information for TOCOR review and CO approval.

## IV.    EPA CONTACTS

A. EPA Task Order Contracting Officer Representative (TOCOR):
Alice Yeh
290 Broadway, New York, NY 10007
Phone: 212-637-4427
yeh.alice@epa.gov
B. EPA Contract Level Contracting Officer's Representative (CL COR):
Terry Fenton
Conflict Prevention and Resolution Center (MC-2388A)
Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, DC  20460

8

Phone: 202-564-2090 Fax: (202) 501-1715
fenton.terry@epa.gov

C. CPRC contact for this task order
Terry Simpson
Conflict Prevention and Resolution Center (MC-2388A)
Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, DC  20460
Phone: (202) 564-2462 Fax: (202) 501-1715
Email: simpson.terry@epa.gov

D. EPA Contracting Officer (CO)
Erin M. Ridder
Cincinnati Acquisition Division
Environmental Protection Agency
26 West Martin Luther King Drive (Mail Code: W136A)
Cincinnati, OH 45268
Phone: (513)487-2155
Ridder.erin@epa.gov

## V.    PERIOD OF PERFORMANCE

The period of performance of this task order shall be until **March 31, 2021.**

9

# Exhibit P

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

UNITED STATES OF AMERICA,          :

       Plaintiff,          :

       v.          :          Civil Action No. _____

OCCIDENTAL CHEMICAL CORPORATION,          :
CHEMICAL LAND HOLDINGS, INC.,          :

       Defendants.          :

_____:

## COMPLAINT

Plaintiff, the United States of America, by authority
of the Attorney General and at the request of the Administrator
of the United States Environmental Protection Agency (hereinafter
"EPA"), alleges as follows:

### PRELIMINARY STATEMENT

1.   This is a civil action brought under Sections 106
and 107 of the Comprehensive Environmental Response,
Compensation, and Liability Act of 1980, as amended ("CERCLA"),
42 U.S.C. §§ 9606 and 9607, for injunctive relief and
reimbursement of costs incurred and to be incurred by the United
States in response to releases and threatened releases of
hazardous substances into the environment from a portion of the
Diamond Alkali Superfund site.  The Diamond Alkali Superfund site
is located at 80 and 120 Lister Avenue, Newark, New Jersey and
areas which hazardous substances have migrated from these two
parcels.

- 2 -

## JURISDICTION AND VENUE

2.  This court has jurisdiction over the subject matter of this action pursuant to 42 U.S.C. §§ 9606, 9607 and 9613(b) and 28 U.S.C. §§ 1331 and 1345.

3.  Venue is proper in this judicial district pursuant to 42 U.S.C. §§ 9606, 9607 and 9613(b) and 28 U.S.C. § 1391(b) and (c), because the claims arose within the District of New Jersey.

## DEFENDANTS

4.  Defendant Occidental Chemical Corporation ("OCC") is a corporation incorporated under the laws of the State of New York.  OCC is a successor in interest to Diamond Shamrock Chemicals Company, a prior owner and operator of the 80 and 120 Lister Avenue portions of the Diamond Alkali superfund site.

5.  Defendant Chemical Land Holdings, Inc. ("CLH") is a corporation incorporated under the laws of the State of Delaware. CLH is the present owner of the Site.

## FACTUAL BACKGROUND

Site History

6.  The Diamond Alkali Superfund site includes the properties located at 80 and 120 Lister Avenue, Newark, New Jersey and the areas to which hazardous substances have migrated from these two parcels.  The "Site" for purposes of this Complaint is limited to the properties located at 80 and 120 Lister Avenue, Newark, New Jersey.  Such properties are

- 3 -

designated as Block 2438, Lots 57, 58 and 59 on the tax map of Newark.

      7.   Diamond Shamrock Corporation, which was named Diamond Alkali Company until 1967, operated a plant situated at the 80 Lister Avenue portion of the Diamond Alkali Superfund Site from 1951 through 1969, where, among other chemicals, the company manufactured 2,4-D, 2,4,5-T and 2,4,5-Trichlorophenol, from which 2,3,7,8-Tetrachlorodibenzo-p-dioxin is a by-product. Diamond Shamrock Corporation ceased production activities at the plant in August, 1969.

      8.   In 1971, Diamond Shamrock Corporation sold the plant and property to Chemicaland Corporation, which conducted certain chemical manufacturing activities for itself and others during the several years it owned and occupied the 80 Lister Avenue property.

      9.   Walter Ray Holding Company purchased the 80 Lister Avenue plant and property at a tax sale in 1980 and held the premises until 1981. Walter Ray Holding Company sold the property in June, 1981, to Marisol, Inc. which conducted salvage operations, including removal of certain materials to certain off-Site locations, and waste consolidation activities.

      10.   In September, 1983, Diamond Shamrock Corporation adopted a new corporate structure. A stock holding company was formed under the name "Diamond Shamrock Corporation." The former Diamond Shamrock Corporation changed its name to Diamond Shamrock

- 4 -

Chemicals company, and became a subsidiary of the new Diamond Shamrock Corporation.

11.   On April 19, 1984, Diamond Shamrock Chemicals Company acquired the property located at 120 Lister Avenue from E. M. Sergeant Pulp and Chemical Co., Inc. to assist with the cleanup of the 80 Lister Avenue property.  Similarly, Diamond Shamrock Chemicals Company acquired the plant and property at 80 Lister Avenue from Marisol, Inc. on January 27, 1986.

12.   On September 4, 1986, Diamond Shamrock Corporation sold all the outstanding stock in Diamond Shamrock Chemicals Company to Oxy-Diamond Alkali Corporation, a wholly-owned indirect subsidiary of Occidental Petroleum Corporation.  Diamond Shamrock Chemicals Company was then renamed Occidental Electrochemicals Corporation.  Title to the 80 and 120 Lister Ave properties had previously been transferred by way of an intra-Holding company transaction to Diamond Shamrock Chemical Land Holdings, Inc.

13.   Effective November 30, 1987, Occidental Electrochemicals Corporation was merged into Occidental Chemical Corporation, a wholly-owned indirect subsidiary of Occidental Petroleum Corporation.  On December 4, 1987, the name of Diamond Shamrock Chemical Land Holdings, Inc. was changed to Chemical Land Holdings, Inc.

History of Response Actions

14.   During the summer of 1983, hazardous substances were detected at various related locations in Newark, New Jersey.

- 5 -

EPA conducted removal actions at four of these related locations known as 80 Lister Avenue, Brady Metals, Municipal Swimming Pool and Lockwood Street.  Together these four locations are referred to as the Diamond Alkali Superfund Site.

15.  The removal activities conducted by EPA at these four locations included vacuuming hazardous substances from the streets and excavating soil contaminated with hazardous substances.  The hazardous substances were later secured on the 120 Lister Avenue site.

16.  Pursuant to an administrative consent order entered into between the State of New Jersey Department of Environmental Protection ("NJDEP") and Diamond Shamrock Chemicals Company and Marisol, Inc., and authorized on March 13, 1984 (hereinafter "ACO I"), Diamond Shamrock Chemicals Company commenced a Site Evaluation for the property located at 80 Lister Avenue, Newark, New Jersey.

17.  EPA, pursuant to Section 105 of CERCLA, 42 U.S.C. § 9605, placed the Diamond Alkali Superfund Site on the National Priorities List, which is set forth at 40 C.F.R. Part 300, Appendix B, by publication in the Federal Register on September 21, 1984, 49 Fed. Reg. 37070.

18.  Pursuant to a second administrative consent order entered into between NJDEP and Diamond Shamrock Chemicals Company, et al. and authorized on December 21, 1984 ("ACO II"), Diamond Shamrock Chemicals Company commenced a Site Evaluation for the 120 Lister Avenue property.  ACO II also required the

- 6 -

cleanup of certain off-site properties and the transfer of contaminated materials resulting from such action to 120 Lister Avenue for storage.

19.  The Site Evaluations conducted pursuant to ACO I and ACO II for the 80 and 120 Lister Avenue properties together constitute a Remedial Investigation ("RI"), as that term is used at 40 C.F.R. § 300.68, to determine the nature and extent of contamination at the Site.

20.  Pursuant to ACO I and ACO II, Diamond Shamrock Chemicals Company conducted a Feasibility Study ("FS"), as that term is used at 40 C.F.R. § 300.68, to develop and evaluate alternatives for the remediation of the Site and prepared an FS Report for the Site dated October, 1985.

21.  EPA issued a Record of Decision on September 30, 1987, which documents the selection of a remedial action plan for the cleanup of the Site.

22.  EPA has conducted other response actions at the Site, including collecting and analyzing soil and water samples, other investigative activities and oversight of investigative activities conducted by the owners and operators of the Site.

23.  EPA has incurred response costs at the Site totalling at least $2,003,018.50.  EPA previously was reimbursed $1,834,766.57 by potentially responsible parties associated with the Site.  The United States will continue to expend monies to address the releases and threatened releases at the Site and to recover the cost of the response actions taken at the Site.

- 7 -

### STATUTORY PROVISIONS

24. Subsection 106(a) of CERCLA, 42 U.S.C. § 9606(a),

provides in pertinent part:

> Sec. 106(a) - In addition to any other action taken by a State or local government, when the President determines that there may be an imminent and substantial endangerment to the public health or welfare or the environment because of an actual or threatened release of a hazardous substance from a facility, he may require the Attorney General of the United States to secure such relief as may be necessary to abate such danger or threat, and the district court of the United States in the district in which the threat occurs shall have jurisdiction to grant such relief as the public interest and the equities of the case may require. The President may also, after notice to the affected State, take other action under this section including, but not limited. to, issuing such orders as may be necessary to protect public health and welfare and the environment.

25. Section 107(a) of CERCLA, 42 U.S.C. § 9607(a),

provides in pertinent part:

*    *    *

> Sec. 107(a) - Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section --
>
> (1) the owner and operator of a . . . facility;
>
> (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,
>
> (3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and
>
> (4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of

- 8 -

response costs, of a hazardous substance, shall be
liable for -

   (A)  all costs of removal or remedial action
   incurred by the United States Government . . . not
   inconsistent with the national contingency plan; .
   . . .

26.  The term "facility" is defined in Section 101(9)
of CERCLA, 42 U.S.C. § 9601(9), as --

(A)  any building, structure, installation, equipment, pipe
or pipeline (including any pipe into a sewer or publicly
owned treatment works), well, pit, pond, lagoon,
impoundment, ditch, landfill, storage container, motor
vehicle, rolling stock or aircraft, or (B) any site or area
where a hazardous substance has been deposited, stored,
disposed of, or placed, or otherwise come to be located; but
does not include any consumer product in consumer use or any
vessel.

27.  "Hazardous substance" is defined by Section
101(14) of CERCLA, 42 U.S.C. § 9601(14), to include:

(A)  any substance designated pursuant to section
311(b)(2)(A) of the Federal Water Pollution Control Act, (B)
any element, compound, mixture, solution, or substance
designated pursuant to section 102 of this Act, (C) any
hazardous waste having the characteristics identified under
or listed pursuant to section 3001 of the Solid Waste
Disposal Act (but not including any waste the regulation of
which under the Solid Waste Disposal Act has been suspended
by Act of Congress), (D) any toxic pollutant listed under
section 307(a) of the Federal Water Pollution Control Act,
(E) any hazardous air pollutant listed under section 112 of
the Clean Air Act, and (F) any imminently hazardous chemical
substance or mixture with respect to which the Administrator
has taken action pursuant to section 7 of the Toxic
Substance Control Act. . . .

28.  "Person" is defined in Section 101(21) of CERCLA,
42 U.S.C. § 9601(21), as "an individual, firm, corporation,
association, partnership, consortium, joint venture, commercial
entity, United States Government, State, municipality,

- 9 -

commission, political subdivision of a State, or any interstate
body."

     29.  "Release" is defined in Section 101(22) of CERCLA,
42 U.S.C. § 9601(22), as "any spilling, leaking, pumping,
pouring, emitting, emptying, discharging, injecting, escaping,
leaching, dumping, or disposing into the environment . . . ."

<u>FIRST CLAIM FOR RELIEF -- SECTION 107(a) of CERCLA</u>

     30.  Paragraphs 1 through 29 are realleged and
incorporated herein.

     31.  The Site is a "facility" within the meaning of
Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

     32.  At relevant times, a release or threatened release
of hazardous substances occurred at the Site.

     33.  The United States has incurred costs for actions
taken in response to the release or threatened release of
hazardous substances from the Site.

     34.  The actions taken by the United States concerning
the Site constitute "response" actions as defined in Section
101(25) of CERCLA, 42 U.S.C. § 9601(25).

     35.  The response actions at the Site were not
inconsistent with the National Oil and Hazardous Substances
Pollution Contingency Plan, 40 C.F.R. Part 300.

     36.  The United States has satisfied any condition
precedent to a response action and to recovery under Section 107
of CERCLA, 42 U.S.C. § 9607.

- 10 -

37. Diamond Shamrock Chemicals Company is a person who owned and operated the Site at the time of disposal of hazardous substances at the Site. OCC is the successor in interest to Diamond Shamrock Chemicals Company. OCC is jointly and severally liable to the United States under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), for the costs of response actions incurred and to be incurred at the Site.

38. CLH is the current owner of the Site. CLH is jointly and severally liable to the United States under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), for the costs of response actions incurred and to be incurred at the Site.

### SECOND CLAIM FOR RELIEF -- SECTION 106(a) of CERCLA

39. Paragraphs 1 through 35 are realleged and incorporated herein.

40. There has been an actual release or threatened release of hazardous substances into the environment at and from the Site within the meaning of Section 106(a) of CERCLA, 42 U.S.C. § 9606(a).

41. EPA has determined that there may be an imminent and substantial endangerment to the public health or welfare or the environment because of an actual or threatened release of hazardous substances at the Site.

42. OCC and CLH are jointly and severally liable under Section 106(a) of CERCLA, 42 U.S.C. § 9606(a), for taking such actions as may be necessary to abate the imminent and substantial endangerment or threat of such endangerment at the Site.

- 11 -

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff the United States respectfully prays that this Court:

1.    Enter judgment against defendants, jointly and severally, in favor the United States for all previously unreimbursed response costs incurred by the United States in response to the release or threatened release of hazardous substances at the Site, which costs are currently in excess of $168,252.05, not including interest;

2.    Enter a declaratory judgment against defendants, jointly and severally pursuant to Section 113(g) of CERCLA, 42 U.S.C. § 9613(g), in favor of the United States for all costs to be incurred in the future by the United States for response activities related to the Site;

3.    Issue an injunction requiring defendants, jointly and severally, to remedy the imminent and substantial endangerment to the public health or welfare or the environment at the Site by implementing the remedial actions selected by EPA in its Record of Decision and any other action necessary to remediate conditions at the Site;

4.    Award to the United States its costs, including the costs of this enforcement action, attorneys' fees and other expenses;

5.    Grant such other relief as it may deem just and proper.

- 12 -

Respectfully submitted,

RICHARD B. STEWART
Assistant Attorney General
Land and Natural Resources Division
U.S. Department of Justice

By: _____
JERRY SCHWARTZ
Attorney
Environmental Enforcement Section
U.S. Department of Justice
P. O. Box 7611
Ben Franklin Station
Washington, D.C. 20044
(202) 633-4059


SAMUEL A. ALITO, JR.
United States Attorney
District of New Jersey

By: _____
SUSAN C. CASSELL
Deputy Chief, Civil Division
United States Attorney's Office
District of New Jersey
Federal Building, Room 502
970 Broad Street
Newark, New Jersey   07102
(201) 621-2940

OF COUNSEL:

Randye B. Stein, Esquire
Office of Regional Counsel
U.S. Environmental Protection Agency
Region II
26 Federal Plaza
New York, New York   10278

RECEIVED

SEP 1 1 1997

CHEMICAL LAND HOLDINGS, INC.

i

## TABLE OF CONTENTS

|        |                                                                                                                              | Page |
|--------|------------------------------------------------------------------------------------------------------------------------------|------|
| I.     | JURISDICTION                                                                                                                  | 9    |
| II.    | DEFINITIONS                                                                                                                   | 10   |
| III.   | PARTIES BOUND                                                                                                                 | 14   |
| IV.    | PURPOSE                                                                                                                       | 18   |
| V.     | GENERAL PROVISIONS                                                                                                            | 19   |
| VI.    | WORK TO BE PERFORMED                                                                                                          | 21   |
| VII.   | ADDITIONAL WORK                                                                                                               | 30   |
| VIII.  | REMEDY EVALUATION TO ASSURE PROTECTION OF HUMAN HEALTH AND THE ENVIRONMENT AND TO ASSESS REMEDIAL ALTERNATIVES                | 31   |
| IX.    | ENDANGERMENT                                                                                                                  | 34   |
| X.     | PARTIES DESIGNATED REPRESENTATIVES                                                                                            | 35   |
| XI.    | FACILITY ACCESS                                                                                                               | 37   |
| XII.   | SAMPLING AND DATA                                                                                                             | 39   |
| XIII.  | PUBLIC INSPECTION                                                                                                             | 40   |
| XIV.   | REPORTING REQUIREMENTS                                                                                                        | 41   |
| XV.    | PLANS, REPORTS AND ITEMS REQUIRING AGENCY APPROVAL OR RESPONSE TO AGENCY COMMENTS                                             | 44   |
| XVI.   | YEARLY PROGRESS REPORTS FOR THE BENEFIT OF THIS COURT                                                                         | 46   |
| XVII.  | COMPLETION OF REMEDIAL CONSTRUCTION                                                                                           | 46   |
| XVIII. | ASSURANCE OF ABILITY TO COMPLETE WORK                                                                                         | 48   |
| XIX.   | RETENTION OF RECORDS                                                                                                          | 49   |
| XX.    | RESPONSE AUTHORITY                                                                                                            | 51   |

ii

| | | Page |
|---|---|---|
| XXI. | FORCE MAJEURE | 51 |
| XXII. | REIMBURSEMENT | 54 |
| XXIII. | STIPULATED PENALTIES | 60 |
| XXIV. | DISPUTE RESOLUTION | 65 |
| XXV. | COVENANTS NOT TO SUE | 68 |
| XXVI. | WAIVER OF ANY CLAIM-SPLITTING DEFENSE | 72 |
| XXVII. | OTHER CLAIMS | 73 |
| XXVIII. | CLAIMS AGAINST THE FUNDS | 74 |
| XXIX. | INSURANCE/FINANCIAL RESPONSIBILITY | 75 |
| XXX. | NOTICES | 76 |
| XXXI. | LODGING AND OPPORTUNITY FOR PUBLIC COMMENT | 78 |
| XXXII. | MODIFICATION | 78 |
| XXXIII. | ADMISSIBILITY OF DATA | 79 |
| XXXIV. | CONTINUING JURISDICTION | 79 |
| XXXV. | COMMUNITY RELATIONS | 80 |
| XXXVI. | OTHER PROVISIONS | 80 |

DACD:07:14:89

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | X | |
| THE STATE OF NEW JERSEY, | X | |
| | X | CIVIL ACTION NO. |
| Plaintiffs, | X | |
| | X | |
| v. | X | , J. |
| | X | |
| OCCIDENTAL CHEMICAL CORPORATION, | X | |
| CHEMICAL LAND HOLDINGS, INC., | X | |
| | X | |
| Defendants. | X | |
| | X | |

<u>CONSENT DECREE</u>

WHEREAS, on _____, 1989, the United
States of America ("the United States"), on behalf of the
Administrator of the United States Environmental Protection
Agency ("EPA"), and the State of New Jersey, Department of
Environmental Protection ("the State"), filed a Complaint in this
matter against Occidental Chemical Corporation ("OCC"), as
successor to Diamond Shamrock Chemicals Company, and Chemical
Land Holdings, Inc. ("CLH") pursuant to the Comprehensive En-
vironmental Response, Compensation, and Liability Act of 1980, as
amended ("CERCLA"), 42 U.S.C. §9601 <u>et</u> <u>seq</u>., and the authority
vested in the Commissioner of the New Jersey Department of En-
vironmental Protection ("NJDEP") pursuant to N.J.S.A. 13:1D-1 <u>et</u>

DACD:07:14:89                          2

seq., the New Jersey Water Pollution Control Act, N.J.S.A.
58:10A-1 et seq., the New Jersey Solid Waste Management Act,
N.J.S.A. 13:1E-1 et seq., the New Jersey Spill Compensation and
Control Act, N.J.S.A. 58:10-23.11a et seq., and the authority
delegated to the Assistant Director of the Responsible Party
Cleanup Element of the Division of Hazardous Waste Management of
NJDEP pursuant to N.J.S.A. 13:1B-4 for the recovery of past
response costs incurred by the United States and the State and
for conduct of remedial design, remedial construction, operation
and maintenance, remedy evaluation activities and Site stabiliza-
tion activities in response to alleged releases and substantial
threat of releases of hazardous substances into the environment
at the Diamond Alkali Superfund Site located in the City of
Newark, County of Essex, New Jersey, sometimes referred to as the
Diamond Shamrock Superfund Site;

      WHEREAS, Diamond Shamrock Corporation, which was named
Diamond Alkali Company until 1967, operated a plant situated at
the 80 Lister Avenue portion of the Diamond Alkali Superfund Site
from 1951 through 1969, where, among other chemicals, the company
manufactured 2,4-D, 2,4,5-T and 2,4,5-Trichlorophenol, from
which 2,3,7,8-Tetrachlorodibenzo-p-dioxin is a by-product.
Diamond Shamrock Corporation ceased production activities at the
Site in August, 1969. In 1971, Diamond Shamrock Corporation sold
the plant and property to Chemicaland Corporation, which

conducted certain chemical manufacturing activities for itself
and others during the several years it owned and occupied the
Site. Walter Ray Holding Company purchased the plant and
property at a tax sale in 1980 and held the premises until 1981.
Walter Ray Holding Company sold the property in June, 1981 to
Marisol, Inc. which conducted salvage operations, including
removal of certain materials to certain off-Site locations, and
waste consolidation activities;

WHEREAS, in September, 1983, Diamond Shamrock
Corporation adopted a new corporate structure. A stock holding
company was formed under the name "Diamond Shamrock Corporation."
The former Diamond Shamrock Corporation changed its name to
Diamond Shamrock Chemicals Company, and became a subsidiary of
the new Diamond Shamrock Corporation. On April 19, 1984, Diamond
Shamrock Chemicals Company acquired the property located at 120
Lister Avenue from E. M. Sergeant Pulp and Chemical Co., Inc. to
assist with the cleanup of the Site. Similarly, Diamond Shamrock
Chemicals Company acquired the plant and property at 80 Lister
Avenue from Marisol, Inc. on January 27, 1986;

WHEREAS, on September 4, 1986, Diamond Shamrock
Corporation sold all the outstanding stock in Diamond Shamrock
Chemicals Company to Oxy-Diamond Alkali Corporation, a wholly-
owned indirect subsidiary of Occidental Petroleum Corporation.
Diamond Shamrock Chemicals Company was then renamed Occidental

Electrochemicals Corporation.  Title to the Site had previously been transferred by way of an intraholding company transaction to Diamond Shamrock Chemical Land Holdings, Inc., a wholly-owned indirect subsidiary of Diamond Shamrock Corporation.  Effective November 30, 1987, Occidental Electrochemicals Corporation was merged into Occidental Chemical Corporation, a wholly-owned indirect subsidiary of Occidental Petroleum Corporation.  On December 4, 1987, the name of Diamond Shamrock Chemical Land Holdings, Inc. was changed to Chemical Land Holdings, Inc. Chemical Land Holdings, Inc., a subsidiary of Maxus Energy Corporation, is the current holder of title to the Site;

WHEREAS, EPA, pursuant to Section 105 of CERCLA, 42 U.S.C. §9605, placed the Diamond Alkali Superfund Site on the National Priorities List, which is set forth at 40 C.F.R. Part 300, Appendix B, by publication in the Federal Register on September 21, 1984, 49 Fed. Reg. 37070;

WHEREAS, in response to alleged releases and substantial threat of releases of hazardous substances into the environment at the Diamond Alkali Superfund Site, and pursuant to an administrative consent order entered into between NJDEP and Diamond Shamrock Chemicals Company and Marisol, Inc., and authorized on March 13, 1984 (hereinafter "ACO I"), Diamond Shamrock Chemicals Company commenced a Site Evaluation for the property located at 80 Lister Avenue, Newark, New Jersey.

DACD:07:14:89                              5

Thereafter, pursuant to a second administrative consent order
entered into between NJDEP and Diamond Shamrock Chemicals
Company, et al. and authorized on December 21, 1984 ("ACO II"),
Diamond Shamrock Chemicals Company commenced a Site Evaluation
for the property located at 120 Lister Avenue, Newark, New
Jersey.  ACO II also required the cleanup of certain off-site
properties and the transfer of contaminated materials resulting
from such action to 120 Lister Avenue for storage.  The Site
Evaluations conducted pursuant to ACO I and ACO II for the 80 and
120 Lister Avenue properties together constitute a Remedial
Investigation ("RI"), as that term is used at 40 C.F.R. §300.68,
to determine the nature and extent of contamination at the Site;

          WHEREAS, pursuant to ACO I and ACO II, Diamond Shamrock
Chemicals Company prepared a Site Evaluation Report for the 80
Lister Avenue property dated February, 1985, a Site Evaluation
Report for the 120 Lister Avenue property dated May, 1985, and a
Site Evaluation Addendum for the 80 and 120 Lister Avenue
properties dated February, 1986.  These Reports collectively
constitute an RI Report for the Site;

          WHEREAS, pursuant to ACO I and ACO II, Diamond Shamrock
Chemicals Company conducted a Feasibility Study ("FS"), as that
term is used at 40 C.F.R. §300.68, to develop and evaluate
alternatives for the remediation of the Site;

WHEREAS, pursuant to ACO I and ACO II, Diamond Shamrock Chemicals Company prepared an FS Report for the Site dated October, 1985;

WHEREAS, on August 1, 1987, pursuant to Section 117 of CERCLA, 42 U.S.C. §9617, EPA published a notice of completion of the FS and of the proposed interim plan for remedial action, and provided opportunity for public comment to be submitted in writing to EPA by August 31, 1987, or orally at a public meeting scheduled and subsequently held in the City of Newark, New Jersey on August 11, 1987;

WHEREAS, pursuant to Section 117 of CERCLA, 42 U.S.C. §9617, EPA made and has kept a transcript of the August 11, 1987, public meeting and has made this transcript available to the public;

WHEREAS, certain persons, including a representative of OCC, provided comments on EPA's proposed remedial action plan;

WHEREAS, EPA issued a Record of Decision on September 30, 1987, which documents the selection of a remedial action plan for the cleanup of the Site, discusses EPA's reasons for adopting such plan and responds to each of the significant comments on and criticisms of the proposed remedial action plan;

WHEREAS, the State has given its concurrence to the remedial action plan selected in the Record of Decision;

WHEREAS, EPA and NJDEP consider the selected remedial action plan to be an interim remedy in view of the periodic

evaluation of the selected remedial action required under the
Record of Decision in order to assure that human health and the
environment are being protected by the Remedy, taking into
account, as provided in Section 121 of CERCLA, 42 U.S.C. §9621,
without limitation, any changes in knowledge concerning the risks
posed by dioxin and other Hazardous Materials at the Site; and to
develop, screen and assess the viability of implementing remedial
alternatives more protective of human health and the environment,
including those alternatives which are based purely on advances
in technology and those which utilize more permanent solutions;

WHEREAS, pursuant to Section 117(b) of CERCLA, 42
U.S.C. §9617(b), EPA provided notice of adoption of the selected
remedial action plan in the form of the Record of Decision,
including notice of the availability of the Record of Decision to
the public for review at EPA and NJDEP offices, and at the local
community repository at the Newark Public Library, 5 Washington
Street, Newark, New Jersey;

WHEREAS, pursuant to Section 117(d) of CERCLA, 42
U.S.C. §9617(d), EPA published such notice in a major local
newspaper of general circulation on December 7, 1987;

WHEREAS, in accordance with Section 121(f)(1)(F) of
CERCLA, 42 U.S.C. §9621(f)(1)(F), the State has had a substantial
and meaningful involvement in the initiation, development and se-
lection of the remedial action to be undertaken at the Site;

DACD:07:14:89                                         8

WHEREAS, the State has actively participated in negotiations leading to this settlement and is a party to this settlement;

WHEREAS, pursuant to Section 122(j) of CERCLA, 42 U.S.C. §9622(j), EPA notified the Federal natural resource trustees of negotiations with potentially responsible parties ("PRPs") on the subject of addressing releases and threatened releases of hazardous substances at the Site, and EPA encouraged the participation of the Federal natural resource trustees in such negotiations;

WHEREAS, pursuant to Section 121(d)(1), the United States, the State and OCC believe that the remedial action plan adopted by EPA and set forth in the Record of Decision is consistent with the NCP;

WHEREAS, OCC agrees to implement the Work as defined, _infra_, in Section II of this Consent Decree, and EPA has determined that the Work will be implemented properly by OCC and that OCC is qualified to implement the Work;

WHEREAS, Diamond Shamrock Chemicals Company's obligations under ACO I and ACO II will be fulfilled if Settling Defendants comply with this Consent Decree and complete, to the satisfaction of NJDEP, those items specified by the State in writing to be developed by the State within forty-five (45) Working Days of the entry of this Decree;

WHEREAS, OCC agrees that this Consent Decree addresses only remediation of the 80 and 120 Lister Avenue properties, and does not address performance of tasks related to the Passaic River, the bedrock aquifer and other properties;

WHEREAS, pursuant to Section 122 of CERCLA, 42 U.S.C. §9622, the United States, the State, OCC and CLH have each stipulated and agreed to the making and entry of this Consent Decree prior to the taking of any testimony, based upon the pleadings herein;

NOW THEREFORE, it is ORDERED, ADJUDGED, AND DECREED as follows:

I.

<u>JURISDICTION</u>

This Court has jurisdiction over the subject matter of this action and the parties to this Consent Decree pursuant to Sections 106, 107 and 113 of CERCLA, 42 U.S.C. §§9606, 9607 and 9613, and 28 U.S.C. §1345, and pendant jurisdiction over those claims arising under the laws of the State. OCC and CLH do not admit and reserve their rights to contest the jurisdiction of this Court over, and to award relief for, subject matters or activities not expressly required by this Consent Decree. The Parties agree that nothing in this Consent Decree nor the fact that it is being entered shall constitute an admission of fact or conclusion of law.

DACD:07:14:89                    10

## II.

## <u>DEFINITIONS</u>

Whenever the following terms are used in this Consent Decree and the attachments hereto, the following definitions specified in this Section shall apply:

A. "<u>Appendix</u>" or "<u>Appendices</u>" means those attachments listed below, which are incorporated herein and made a part of this Consent Decree by reference:

Appendix I        -   Statement of Work

Appendix II       -   Cleanup Standards

Appendix III      -   80 Lister Avenue:   Metes and Bounds

Appendix III-1    -   120 Lister Avenue:   Metes and Bounds

Appendix III-2    -   80 and 120 Lister Avenue:   Survey Plat

B. "<u>CERCLA</u>" means the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. §9601 <u>et</u> <u>seq</u>.

C. "<u>Consent Decree</u>" means this Consent Decree, all Appendices to this Consent Decree and all modifications to such documents.  For convenience, all references in the attached Appendices to this Consent Decree shall be understood to refer to this document.

D. "<u>Contractor</u>" means the company or companies retained by OCC to perform the Work required by this Consent Decree and all attachments hereto.

DACD:07:14:89                            11

E.  "<u>Diamond Alkali Superfund Site</u>" means the real property located at 80 and 120 Lister Avenue, in the City of Newark, County of Essex, New Jersey, and those areas to which contamination originating at 80 Lister Avenue has migrated.

F.  "<u>Dioxin</u>," "<u>TCDD</u>" and "<u>2,3,7,8-TCDD</u>" mean 2,3,7,8-Tetrachlorodibenzo-p-dioxin.

G.  "<u>EPA</u>" means the United States Environmental Protection Agency.

H.  "<u>Hazardous Materials</u>" means "hazardous substance" within the meaning of Section 101(14) of CERCLA, 42 U.S.C. §9601(14); "hazardous substances" within the meaning of Section 3 of the Spill Compensation and Control Act, N.J.S.A. 58:10-23.11.b.k.; "pollutant" within the meaning of the New Jersey Water Pollution Control Act, N.J.S.A. 58:10A-3(n); and "pollutant or contaminant" within the meaning of Section 101(33) of CERCLA, 42 U.S.C. §9601(33).

I.  "<u>National Contingency Plan</u>" shall be used as that term is used in Section 105 of CERCLA, 42 U.S.C. §9605, and the National Oil and Hazardous Substances Pollution Contingency Plan, 40 C.F.R. Part 300, and any amendments thereto.

J.  "<u>NJDEP</u>" means the State of New Jersey Department of Environmental Protection.

K.  "<u>Operation and Maintenance</u>" and "<u>O&M</u>" mean those activities required by Section H of Appendix I, as may be modified pursuant to the provisions of this Consent Decree and any schedules,

plans or reports required to be submitted pursuant hereto.

L.  "Parties" means the United States of America on behalf of the United States Environmental Protection Agency; the State of New Jersey, Department of Environmental Protection; Occidental Chemical Corporation; and Chemical Land Holdings, Inc.

M.  "Record of Decision" and "ROD" mean that document issued on September 30, 1987, to present the remedial action plan selected by the Regional Administrator of EPA Region II to address the 80 and 120 Lister Avenue portion of the Diamond Alkali Superfund Site;

N.  "RCRA" means the Resource, Conservation and Recovery Act, as amended, 42 U.S.C. §6901 et seq.

O.  "Remedy" means the selected remedial alternative set forth in the Record of Decision, as described in Section VI.B, infra, and as shall be developed, implemented and/or modified pursuant to this Consent Decree.

P.  "Remedial Construction" means those activities required by Section G of Appendix I, as may be modified pursuant to the provisions of this Consent Decree and any schedules, plans or reports required to be submitted pursuant hereto.

Q.  "Remedial Design" means those activities required by Section F of Appendix I, as may be modified pursuant to the provisions of this Consent Decree and any schedules, plans or reports required to be submitted pursuant hereto.

DACD:07:14:89                    13

R.    "Remedy Evaluation" means those activities required by Section I of Appendix I, as may be modified pursuant to the provisions of the Consent Decree and any schedules, plans or reports required to be submitted pursuant hereto.

S.    "Settling Defendants" means Occidental Chemical Corporation, as successor to Diamond Shamrock Chemicals Company, and Chemical Land Holdings, Inc.

T.    "Site" means the real property located at 80 and 120 Lister Avenue, in the City of Newark, County of Essex, New Jersey. Such properties are designated as Block 2438, Lots 57, 58 and 59 on the Tax Map of Newark, as described by metes and bounds in Appendices III and III-1, and the survey plat in Appendix III-2.

U.    "Site Stabilization" means those activities required by Section D of Appendix I, as may be modified pursuant to the provisions of this Consent Decree and any schedules, plans or reports required to be submitted pursuant hereto.

V.    "State" means the State of New Jersey.

W.    "Statement of Work" means that document incorporated herein as Appendix I of this Consent Decree.

X.    "Work" means all work and other activities required by this Consent Decree, including, but not limited to:  Site Stabilization, Remedial Design, Remedial Construction, Operation and Maintenance, Additional Work pursuant to Section VII., _infra_,

DACD:07:14:89                    14

Remedy Evaluation, and implementation of the response actions selected pursuant to Remedy Evaluation.

Y.  "Working Day" means any day of the week except for Saturday or Sunday, that is not a designated Federal or State holiday.

Z.  All terms not otherwise defined herein shall have their ordinary meanings except that those terms defined in Section 101 of CERCLA, 42 U.S.C. §9601, shall have the meanings set forth therein.

## III.

### PARTIES BOUND

A.  This Consent Decree applies to and is binding upon the undersigned Parties and their successors and assigns.  Each undersigned representative of a party to this Consent Decree certifies that he or she is fully authorized by the entity which he or she represents to enter into the terms and conditions of this Decree and to execute and legally bind that entity to it.

B.  The Parties agree that CLH is a party to this Consent Decree for specific, limited purposes.  CLH shall allow access to the Site as provided in Section XI, _infra_, and shall abide by the agreements on conveyance and use of the property in this Section III.

C.  OCC shall provide a copy of this Consent Decree to each chief contractor and chief subcontractor retained to perform the

DACD:07:14:89                        15

Work required by this Consent Decree.  Chief contractors or sub-
contractors shall be those contractors or subcontractors whose
contracts or subcontracts for Work performed pursuant to this
Consent Decree have a total value exceeding twenty-five thousand
dollars ($25,000).  The obligation to provide a copy of this
Consent Decree to a chief contractor or chief subcontractor shall
be triggered when the planned or actual value of Work exceeds
twenty-five thousand dollars ($25,000).  OCC shall be res-
ponsible to the United States and the State for ensuring that each
of its contractors and subcontractors perform the Work contemplated
herein in accordance with this Consent Decree.

    D.   <u>Conveyance of the Site</u>

      1.  Settling Defendants may convey any or all of their
interest in the Site, provided that no conveyance or transfer of
title, lease, easement or other interests in the Site shall be con-
summated without a provision permitting a continuance of the Work
pursuant to this Consent Decree, and all such conveyances of title,
grants of easements or other conveyances of any interest in the
Site shall contain a covenant to permit such Work.  At least sixty
(60) calendar days prior to any conveyance, Settling Defendants
having control of or ownership over the Site shall notify EPA and
NJDEP by registered mail of their intent to convey any interest in
the Site, and the provisions to be made allowing the continued im-
plementation of the Work.  If such property is alienated, Settling
Defendants' obligations under this Consent Decree shall continue

unless the grantee agrees to assume these obligations and both EPA and NJDEP agree, in writing, to allow the grantee to assume the obligations of the grantor.

2.    The restrictions and obligations set forth herein shall run with the land and shall be binding on any and all parties who acquire any interest in the Site.  In addition, Settling Defendants shall promptly give notice to EPA and NJDEP of any actual conveyance or transfer of any interest they may have in any property not part of the Site but which is used to implement the Work in the immediate vicinity of the Site, to the extent such conveyance is known or should be known to Settling Defendants.

3.    A notification of the existence of this Consent Decree and where and how a copy may be obtained shall be recorded by Settling Defendants in the Office of the Clerk of Essex County, State of New Jersey and any other appropriate office as a lien and encumbrance on all parcels comprising the Site. Settling Defendants agree to execute such legal instruments and documents, if any, as may be required to effectuate the recording of such notice in the Office of the Clerk of Essex County, State of New Jersey and any other appropriate office, and to pay the costs of the preparation and recording of such documents.

4.    Within forty-five (45) calendar days of entry by this Court of this Consent Decree, written proof of such recording with the Office of the Clerk of Essex County, State of New Jersey and any other appropriate office as required pursuant

DACD:07:14:89                    17

to Section III.D.3, <u>supra</u>, shall be sent to those individuals specified in Section XXX, <u>infra</u>.

     5.  Any deed, title or instrument of conveyance for the Site or any part thereof shall contain a permanent deed restriction to the benefit of EPA and NJDEP that states:

> The Owner agrees not to make any use of, or take any actions at, the Site inconsistent with the Work at the Site as set forth in the Consent Decree entered in United States of America v. Occidental Chemical Corporation, Civil Action No.          , in the United States District Court for the District of New Jersey. The Owner also agrees to the imposition of such use and/or access restrictions as may be deemed necessary by the United States Environmental Protection Agency ("EPA") and the State of New Jersey Department of Environmental Protection ("NJDEP") to insure compliance with the referenced Consent Decree and/or the integrity of the Work.  The restrictions shall continue until such time as the Site is declared by EPA, in consultation with the State, to be fit for unrestricted use. The restrictions shall include provisions for the continuation of access rights.  The use and access restrictions are to run with the land and be for the benefit of and enforceable by EPA and NJDEP.  The Owner shall record the restrictions with the Clerk of Essex County, State of New Jersey immediately upon the request of EPA and/or NJDEP that it do so.

Settling Defendants shall include the above statements in all leases, subleases or rental agreements relating to the Site or any part thereof which are executed on or after the effective date of this Consent Decree.

     6.  Any such lease or sublease for the Site or any part thereof shall contain the permanent deed restriction described in Section III.D.5, <u>supra</u>, until such time as the Site is declared

DACD:07:14:89                          18

by EPA, in consultation with the State, to be fit for the removal
of those restrictions set forth in Section III.D.5, *supra*.

      7.  Any deed restriction as described above shall run
with the land until such time the Site is declared by EPA, in
consultation with the State, to be fit for the removal of those
restrictions set forth in Section III.D.5, *supra*.

    E.  <u>Use of the Site</u>

      Until such time as EPA and NJDEP approve otherwise, the
use or development of the Site shall be in a manner consistent
with the terms of this Consent Decree, including the permanent
deed restrictions described in Section III.D.5, *supra*.


IV.

<u>PURPOSE</u>

    The purpose of this Consent Decree is to serve the public
interest by protecting the public health, welfare and the
environment from releases and threatened releases of Hazardous
Materials at or from the Site through the implementation of the
Work, and to settle the claims asserted by the United States and
the State against Settling Defendants in the Complaint.

DACD:07:14:89                              19

## V.

## GENERAL PROVISIONS

A. **Permits and Approvals.**

1. All activities undertaken by OCC pursuant to this Consent Decree shall be undertaken in accordance with the requirements of Section 121(e)(1) of CERCLA, 42 U.S.C. §9621(e)(1), and the National Contingency Plan and any amendments thereto.

2. The off-site transfer, treatment, storage or disposal of Hazardous Materials removed from the Diamond Alkali Superfund Site by OCC must be in compliance with Section 121(d)(3) of CERCLA, 42 U.S.C. §9621(d)(3). To the extent applicable to it, OCC is responsible for compliance with all requirements relating to off-site management under RCRA, and N.J.A.C. 7:26-1.1 _et_ _seq._, including fulfilling the standards applicable to generators and transporters of hazardous waste promulgated at 40 C.F.R. Parts 262 and 263. In particular, this responsibility includes using and signing manifest forms for hazardous wastes transported from the Diamond Alkali Superfund Site. Furthermore, in the Site Management Plans for Remedial Construction and for Operation and Maintenance, both of which are required by Appendix I, OCC shall designate any facilities it proposes to use for such off-site transfer, storage, treatment or disposal. OCC shall conduct off-site disposal activities in conformance with the National Contingency Plan and any amendments

DACD:07:14:89                          20

thereto, and the Revised Procedures for Planning and Implementing
Off-site Response Actions, EPA Office of Solid Waste and
Emergency Response, November 13, 1987, and any amendments
thereto.

3.    Approvals which may be granted by EPA, the State or
other governmental entity shall not relieve OCC from any
liability it may have arising from or relating to its acts or
omissions or the acts or omissions of any of its contractors,
subcontractors or any other person or entity acting on its behalf
in the performance of the Work or its failure to perform fully or
complete the Work.

4.    Nothwithstanding any other provision in this Consent
Decree, no Federal, State or local permits shall be required for
any portion of the Work conducted entirely at the Diamond Alkali
Superfund Site.

B.    National Contingency Plan.

1.    OCC shall design, implement and complete the Work in
accordance with the provisions of the National Contingency Plan,
and any amendments thereto, and any standards, specifications and
schedules of completion developed in accordance with Section VI,
infra, or agreed to by the Parties, or ordered by this Court.

2.    This Court finds and the Parties agree that the Work
is consistent with the National Contingency Plan.  Settling
Defendants do not waive their rights to contest the consistency

DACD:07:14:89                    21

with the National Contingency Plan of any further response action ordered pursuant to Remedy Evaluation.

    C.  If the application of any amendment to CERCLA or the National Contingency Plan after the date of lodging of this Consent Decree would substantially alter OCC's obligations under this Decree, EPA, in consultation with the State, shall determine to what extent such amendment shall be incorporated to modify those tasks remaining to be implemented in furtherance of the Work.

    D.  At places in this Consent Decree the obligations of the Parties are calculated in terms of a specified number of calendar days.  If performance of any responsibility under this Consent Decree falls due on a Saturday, Sunday, or official Federal or State holiday, the due date for such performance is automatically extended until the end of the next day that is not a Saturday, Sunday, or official Federal or State holiday.

VI.

WORK TO BE PERFORMED

A.  <u>Commitment by OCC</u>.

    OCC agrees to finance, design, construct, operate and maintain, and conduct periodic evaluations of the Remedy in accordance with all terms, conditions and schedules set forth herein and developed and approved hereunder, and to perform the Work in accordance with Appendix I.

DACD:07:14:89                        22

   B.  The following is a description of the components of the
selected remedial alternative:

        1.  Construct a slurry wall tying into the silt layer
underlying the Site.  The slurry wall shall be designed and con-
structed to encircle the soil and debris at the Site which
exceeds any soil cleanup standard specified in Appendix II.
Where a cleanup standard is exceeded at or beyond the Site
boundary, the slurry wall shall extend as close as is practicable
to the Site boundary.

        2.  Construct a flood wall and appurtenances to protect
the Site from the 100 year flood.  The flood wall may be designed
to incorporate the functions of the slurry wall along the Passaic
River front.  The design considerations for such flood wall shall
include the specifications and guidances of the United States
Army Corps of Engineers and NJDEP, as well as the impact of the
proposed Passaic River flood control project.

        3.  To the maximum extent practicable, disassemble and
decontaminate all non-porous permanent structures and materials
to facilitate off-site reuse, recycle or disposal.  Deconta-
mination procedures shall be designed and implemented to attain
the cleanup standard for dioxin specified in Appendix II.  The
decontamination procedures shall also be protective of human
health and the environment with respect to all other Hazardous
Materials known to be present at the Site.

DACD:07:14:89                    23

4.  To the extent practicable, transport all containers (other than those shipping containers currently stored at 120 Lister Avenue) containing Hazardous Materials, but containing less than 1.0 ppb of dioxin, off-site, for treatment or disposal.

5.  Demolish all remaining structures on-site and secure all materials contaminated at or above 1.0 ppb of dioxin on-site. Secured materials shall be segregated to the maximum extent practicable.  The placement of secured materials shall be in accordance with the requirements specified in Appendix II.

6.  Stabilize and immobilize the contents of the remaining containers (other than those shipping containers currently stored at 120 Lister Avenue) of dioxin contaminated materials.

7.  Locate and plug inactive underground conduits, and reroute active systems.

8.  Haul, empty, spread and compact the contaminated materials stored at 120 Lister Avenue and, to the maximum extent practicable, decontaminate the non-porous portions of the shipping containers for off-site reuse, recycle or disposal. Decontamination procedures shall be designed and implemented to attain the cleanup standard for dioxin specified in Appendix II. The decontamination procedures shall also be protective of human health and the environment with respect to all other Hazardous Materials known to be present at the Site.

DACD:07:14:89                              24

9.  Install, operate and maintain a ground water withdrawal system designed to maintain a hydraulic gradient preventing the migration of ground water from the volume contained within the slurry wall.

10.  Install, operate and maintain a treatment system for ground water and other aqueous liquids resulting from the Work. The treatment system shall discharge treated wastewater either to the Passaic Valley Sewerage Commmission treatment works or directly to the Passaic River.  The treatment system shall be designed, constructed, and operated and maintained to attain and shall attain the cleanup standards (effluent limitations) specified in Appendix II.  The treatment system shall be designed, constructed, and operated and maintained in accordance with the requirements (other than administrative requirements) for discharge of treatment system effluent to navigable waters, discharge to publicly owned treatment works and discharge to surface waters specified in Appendix II, as appropriate.

11.  Construct a surficial cap consisting of suitable materials designed to meet the requirements of RCRA.  The cap shall cover the slurry wall and the entire area encircled by the slurry wall.  The design, construction, and operation and maintenance of the cap shall be in accordance with the requirements specified in Appendix II.

12.  Implement suitable monitoring, contingency, operation and maintenance, and site security plans designed to

DACD:07:14:89                              25

ensure the protection of human health and the environment during the Remedial Construction and after the completion of the Remedial Construction.

13.   On-site containment of all sludge generated from the wastewater treatment processes until such time that an alternative method of sludge management is approved.

14.   Design, construct, and operate and maintain the Remedy to attain the cleanup standards listed in Appendix II.

C.   With respect to Sections VI.B.3, VI.B.4 and VI.B.8, _supra_, EPA, in consultation with the State, shall determine the level constituting compliance with an individual Subparagraph "to the maximum extent practicable" or "to the extent practicable," and, in so doing, shall determine what constitutes implementation of the particular component of the selected remedial alternative for the Site.

D.   Within seven (7) calendar days of the date of lodging of this Consent Decree with this Court, OCC shall commence those tasks required by Sections D and E of Appendix I and, thereafter, complete such tasks in accordance with those schedules set forth in or developed and approved under Appendix I.

E.   Schedules prepared by OCC pursuant to Appendix I shall express schedule dates in terms of periods of time following prerequisite events, rather than as calendar dates.  The entry of this Consent Decree by this Court shall be deemed a prerequisite event for activities conducted pursuant to Sections F, G, H and I

DACD:07:14:89                          26

of Appendix I.  The previous statement shall not, however,
preclude OCC from performing Work in accordance with Section F of
Appendix I prior to the entry of this Consent Decree, should OCC
elect to do so, if OCC obtains EPA's prior written approval.

    F.  The timing of compliance with the requirements of
Section VI.B, _supra_, with respect to the attainment of cleanup
standards shall be governed by the following:

    1.  With respect to any action-specific cleanup
standards specified or referenced in Appendix II, and except as
expressly provided in this Consent Decree and in plans and/or
schedules developed and approved by EPA, in consultation with the
State, OCC shall comply with the requirements of Section VI.B,
_supra_, during the implementation of the Work.

    2.  With respect to any cleanup standards specified or
referenced in Appendix II which were not being attained prior to
the commencement of the Work, OCC shall comply with the
requirements of Section VI.B, _supra_, regarding such cleanup
standards by not later than the completion of Remedial
Construction.  Such cleanup standards are not deemed action-
specific cleanup standards with respect to any occurrences of
non-attainment which existed prior to the commencement of the
Work and continue subsequent to the commencement of the Work.

    3.  With respect to any cleanup standards specified or
referenced in Appendix II which were being attained prior to the

commencement of the Work, OCC shall comply with the requirements of Section VI.B, supra, during the implementation of the Work.

G.  With respect to the attainment of effluent limitations required by Section VI.B.10, supra, the following shall apply:

1.  In the event that an analysis (or a number of anaylses) of a treatment system effluent sample (or samples) yields a concentration value (or an average concentration value) for an analyte which is less than or equal to the practical quantitation limit ("PQL") value for the analytical method employed as specified in the Sampling, Analysis and Monitoring Plan for Remedial Design (see Section E.2.a of Appendix I), the effluent limitation shall be deemed to have been attained for that analyte with respect to that sample (as well as for any average effluent limitation for that analyte with respect to that group of samples).  However, if at any time EPA, in consultation with the State, approves an analytical method with a lower PQL, the achievability of such new PQL or such effluent limitation, whichever is less stringent, shall be grounds for additional work pursuant to Section VI.G.5, infra, unless OCC proves to the satisfaction of EPA, in consultation with the State, that attainment of effluent values at or below the new PQL is not technically practicable.

2.  In the Remedial Design Workplan required by Section E of Appendix I, OCC shall, at a minimum, set forth plans to conduct treatability studies to evaluate all known wastewater

treatment methods that are or may be feasible for the treatment of those Hazardous Materials present at the Site in order to attain the effluent limitations set forth in Appendix II.

3.  In the event that the wastewater treatability studies conducted pursuant to the approved Remedial Design Workplan lead EPA, in consultation with the State, to conclude, based on technical evidence presented to EPA and the State by OCC and on any other relevant information, that it is not technically practicable to attain an effluent limitation for a particular Hazardous Material, EPA, in consultation with the State, may direct the Remedial Design to proceed based on the most stringent design criteria and effluent values which EPA, in consultation with the State, determines are technically practicable; provided that OCC proves to the satisfaction of EPA, in consultation with the State, that the most stringent design criteria, when implemented, will result in a reduced adverse impact on the water quality of the Passaic River compared to the impact associated with the unremediated ground water migration from the Site to the Passaic River.  In the event EPA, in consultation with the State, directs the Remedial Design to proceed as set forth above, OCC shall not be deemed in violation of this Consent Decree for failure to attain such effluent limitations, provided that an effluent value which is based on the design criteria and is specified in the Final Design Report (see Section F of Appendix

DACD:07:14:89                          29

I), is attained for the Hazardous Material or parameter to which
the effluent limitation applies.

    4.  If OCC does not achieve the effluent values approved
by EPA, in consultation with the State, pursuant to Sections
VI.G.1 and VI.G.3, _supra_, OCC shall be deemed in violation of
this Consent Decree unless OCC proves to the satisfaction of EPA,
in consultation with the State, that the attainment of such
effluent values is not technically practicable despite OCC's
evaluation and testing of all known methods to attain such
values.  If EPA, in consultation with the State, agrees that OCC
has proved that the attainment of such effluent values is not
technically practicable, the Remedial Construction and/or
Operation and Maintenance activities may continue, provided that
OCC shall, as part of the Remedy Evaluation required by Section
VIII, _infra_, evaluate and, if not previously tested, test all
known methods for achieving such effluent values, and provided
that OCC proves to the satisfaction of EPA, in consultation with
the State, that the Final Design Report and/or Operation and
Maintenance Plan, when implemented, will result in a reduced
adverse impact on the water quality of the Passaic River compared
to the impact associated with the unremediated ground water
migration from the Site to the Passaic River.

    5.  Notwithstanding Sections VI.G.1, VI.G.2, VI.G.3 and
VI.G.4, _supra_, the finding of an effluent value greater than an
effluent limitation may be grounds for additional work pursuant

DACD:07:14:89                           30

to Section VII, _infra_, and may be a factor considered in the
determination of the appropriateness of additional response
action pursuant to Section VIII.B, _infra_.

     6.  The relief provided by Sections VI.G.1, VI.G.2,
VI.G.3 and VI.G.4, _supra_, may be terminated by EPA, in
consultation with the State, pursuant to schedules developed by
or approved by EPA, in consultation with the State, to attain
more stringent effluent values established and approved pursuant
to Section(s) VII and/or VIII.C, _infra_.

     7.  With respect to this Section VI.G, EPA, in consulta-
tion with the State, shall determine what constitutes
"technically practicable" in consideration of the EPA CERCLA
Compliance With Other Laws Manual, August, 1988.

## VII.

### ADDITIONAL WORK

A.  In the event EPA, in consultation with the State, and/or
OCC determine(s) that additional work, including additional Reme-
dial Design or Remedial Construction, is necessary to meet, at
the Site, the cleanup standards described and/or referenced in
Section VI, _supra_, and/or the Statement of Work, notification of
the need for such additional work will be provided to the other
parties. Additional work as defined in this Section VII shall be
limited to that work which is required to achieve successful
implementation of the components of the selected remedial

DACD:07:14:89                    31

alternative, as set forth in Section VI.B, supra.  The per-
formance of Additional Work shall not be deemed a "modification"
within the meaning of Sections XXXII.A and XXXII.C., infra.

B.  Any additional work which OCC determines to be necessary
is subject to approval by EPA, in consultation with the State.

C.  Any additional work which is determined to be necessary
by OCC and approved by EPA, in consultation with the State, or
determined to be necessary by EPA, in consultation with the
State, to meet the cleanup standards, shall be completed by OCC
in accordance with those standards, specifications and schedules
developed by OCC and approved by EPA, in consultation with the
State.

D.  The provisions of this Section VII shall remain effec-
tive throughout the duration of this Consent Decree.


VIII.

REMEDY EVALUATION TO ASSURE PROTECTION OF HUMAN HEALTH

AND THE ENVIRONMENT AND TO ASSESS REMEDIAL ALTERNATIVES

A.  OCC shall conduct a Remedy Evaluation for the Site once
every two (2) years following completion of the Remedial
Construction activities required under this Consent Decree (1) to
assure that human health and the environment are being protected
by the Remedy implemented by OCC under this Decree, taking into
account, as provided in Section 121 of CERCLA, 42 U.S.C. §9621,
without limitation, any changes in knowledge concerning the risks
posed by dioxin and other Hazardous Materials at the Site and
addressed by this Decree; and (2) to develop, screen and assess

DACD:07:14:89                              32

the viability of implementing remedial alternatives more
protective of human health and the environment, including those
alternatives which are based purely on advances in technology and
those which utilize more permanent solutions.

    B.  In the event that a Remedy Evaluation results in
modifications of the Remedy that may affect subsequent Remedy
Evaluations in some manner, OCC may request EPA to revise the
format or content of any subsequent Remedy Evaluation to
accomodate the modifications. EPA, in consultation with the
State, will make such revisions as it deems appropriate.

    C.  EPA and the State will review each Remedy Evaluation
conducted by OCC.  If, upon such review, EPA, in consultation
with the State, determines that further response action is
necessary as a result of a Remedy Evaluation conducted pursuant
to Sections VIII.A.1 and VIII.A.2, _supra_, EPA will notify OCC of
its preliminary determination with respect to the need for
further study and/or remedial action.  The criteria for EPA's
determination regarding the necessity of further response action
as a result of a Remedy Evaluation conducted pursuant to Section
VIII.A.2, _supra_, will be the same as the criteria for the Se-
lection of appropriate remedial actions set forth in Section 121
of CERCLA, 42 U.S.C. §9621, with the exception of the criteria
set forth in Section 121(c), 42 U.S.C. §9621(c).  OCC will be
provided an opportunity to confer with EPA, which may coincide

DACD:07:14:89                          33

with an opportunity for public comment, if appropriate, with
respect to any response action proposed by EPA pursuant to this
Section VIII, and to submit written comments for the record with
respect to any response action proposed by EPA.  After the
comment period closes, EPA will either affirm, modify or rescind
its proposed response action in writing, stating the reasons for
any further response action required.  OCC shall implement and
finance such response action, subject to its rights under Section
XXIV, _infra_, to dispute whether the response action selected by
EPA is consistent with the criteria specified above. OCC shall
not be liable for any stipulated penalties that may accrue during
any period of dispute resolution referred to in the preceding
sentence unless OCC's invocation of dispute resolution is
determined to be without sufficient cause.  The requirement that
such response action be performed shall not be deemed a
"modification" within the meaning of Sections XXXII.A and
XXXII.C, _infra_.

   D.  OCC agrees to reimburse the United States and the State
for those costs incurred in overseeing and reviewing OCC's Remedy
Evaluations and any subsequent remedial action conducted by OCC
under this Section VIII.

   E.  EPA and the State reserve their rights as set forth in
Section 121(f) of CERCLA, 42 U.S.C. §9621(f).

DACD:07:14:89                               34

F.  The provisions of this Section VII shall terminate upon
EPA's determination that a permanent remedy has been implemented
at the Site.


## IX.

### ENDANGERMENT

A.  In the event of any action or occurrence during the term
of this Consent Decree which causes or threatens a release of
Hazardous Materials from the Site or which causes or may cause an
imminent and substantial endangerment to public health or welfare
or the environment, OCC shall immediately, upon notice or disco-
very of such action or occurrence, take all appropriate action to
prevent, abate or minimize such release or endangerment and shall
immediately notify the EPA RPM or, if that is impossible, the Re-
sponse and Prevention Branch, EPA Region II at (201) 548-8730.
OCC shall take such action in accordance with all applicable pro-
visions of the Health and Safety/Contingency Plan developed
pursuant to Appendix I and approved thereunder.

B.  In the event EPA and/or the State take action to respond
to the circumstances set forth in Section IX.A, supra, OCC shall
reimburse all costs of the response action incurred by EPA that
are not inconsistent with the National Contingency Plan and/or
incurred by the State as the State is authorized to recover by

law, subject to those defenses set forth under Section 107(b) of CERCLA, 42 U.S.C. §9607(b).

C. Nothing in this Consent Decree shall be deemed to limit the power and authority of the United States, the State or this Court to take, direct or order all appropriate action to protect human health and the environment or to prevent, abate or minimize an actual or threatened release of Hazardous Materials on, at or from the Site.

## X.

### PARTIES' DESIGNATED REPRESENTATIVES

A. 1. Within ten (10) calendar days of lodging of this Consent Decree, EPA shall designate a Remedial Project Manager ("RPM") and NJDEP shall designate a Case Manager to monitor the progress of the Work and to coordinate communications among EPA, NJDEP and OCC. EPA and NJDEP may each designate an alternate representative.

2. Within ten (10) calendar days of lodging of this Consent Decree, OCC shall designate a Project Coordinator who shall have primary responsibility for implementation of the Work.

B. 1. The EPA RPM and any designated representative exercising the authority of Section X.B.3, infra, shall have the training provided for a grant of the authority set forth in 40 C.F.R. §§300.68(a)(2) and 300.33(b), or any similar provision in future amendments or revisions to the National Contingency Plan.

DACD:07:14:89                               36

2.   The EPA RPM shall work in cooperation with the NJDEP Case Manager.

3.   The EPA RPM and the NJDEP Case Manager shall each have the authority to require a cessation of the performance of the Work or any other activity at the Site that may present or contribute to an imminent and substantial endangerment to public health, welfare or the environment or cause or threaten to cause the release of Hazardous Materials from the Site.  In the event the EPA RPM or the NJDEP Case Manager suspends the Work or any other activity at the Site, EPA, in consultation with the State, may extend the compliance schedule developed under this Consent Decree as appropriate.

4.   EPA, NJDEP and OCC shall each have the right to change their respective designated representatives by notifying the other parties in writing.  OCC shall notify EPA and NJDEP of any such change at least seven (7) calendar days prior to the change. EPA and NJDEP will make reasonable efforts to notify OCC prior to any such change; however, any failure by EPA and/or NJDEP to notify OCC shall not be a breach of this Consent Decree.

C.  The EPA RPM and the NJDEP Case Manager may assign other representatives, including other EPA and NJDEP employees or contractors, to serve as their representatives for oversight of performance of daily operations during implementation of the Work.

DACD:07:14:89                           37

D.  The EPA RPM, or the NJDEP Case Manager, acting with the concurrence of the EPA RPM, may make or authorize field modifications, consistent with the implementation of the Work, in writing, to the studies, designs, techniques or procedures undertaken or utilized in performing the Work required under this Consent Decree, provided any such modifications are consistent with Appendix I. Such field modifications shall not be deemed a modification within the meaning of Section XXXII, _infra_.

E.  The absence of OCC's Project Coordinator shall not be cause for work stoppage.

F.  To the maximum extent possible, except as specifically provided in this Consent Decree, communications among the Parties shall be between their designated representatives.

## XI.

### FACILITY ACCESS

A.  EPA and the State, and their representatives, including contractors and subcontractors, shall have access at all times to the Site and any other property on which the Work is being performed to the extent that access to such property is controlled by or available to Settling Defendants to enable the Parties and their representatives to conduct any activity authorized by this Consent Decree, including, but not limited to:

DACD:07:14:89                       38

1.  Monitoring the progress of activities taking place;

2.  Verifying any data or information submitted to EPA
and NJDEP;

3.  Conducting investigations relating to contamination
at or near the Site;

4.  Obtaining samples at or relating to the Site; and

5.  Inspecting and copying records, operating logs, con-
tracts or other documents required to assess compliance with this
Consent Decree.

B.  All access to the Site shall be in compliance with the
applicable Health and Safety/Contingency Plan as uniformly
applied to all Parties.

C.  1.  To the extent that the Diamond Alkali Superfund Site
or other areas where the Work is to be performed hereunder is
owned by parties other than those bound by this Consent Decree,
OCC shall use best efforts to obtain access from the owners for
the purpose of implementing the requirements of this Decree in
accordance with the schedule set forth in the approved Remedial
Design Work Plan.  Such agreements shall provide access not only
for OCC, but also for EPA and the State and authorized repre-
sentatives or agents of EPA and the State.

2.  If such access agreements are not obtained within
the time specified herein, OCC shall so notify EPA and NJDEP in

accordance with the procedures set forth in Section XXX, infra, and OCC shall use its best efforts to otherwise secure necessary access. For purpose of securing access, "best efforts" may involve the expenditure of money and the initiation of judicial proceedings to the extent authorized by law.

3. Should OCC, using its best efforts, fail to secure access to the Site or other areas where the Work is to be performed hereunder, EPA and the State may assist OCC in obtaining such access. OCC shall reimburse EPA and the State for all expenses incurred in obtaining access, in accordance with Section XXII, infra.

## XII.

### SAMPLING AND DATA

A. Within seven (7) calendar days of a request by EPA or the State, OCC shall make available to EPA and the State all requested results of sampling and/or tests or other data generated by or for OCC with respect to the implementation of the Work.

B. At the request of any party, any other party shall provide split or duplicate samples to the requesting party, or allow split or duplicate samples to be taken by the requesting party of any samples collected that relate in any way to the implementation of the Work. OCC shall notify EPA and the State not less than ten (10) calendar days in advance of any sample collection activity. In addition, EPA and the State shall have the right to

take any additional samples or direct OCC to take any additional samples that EPA and the State deem necessary to determine whether the Work is being implemented properly.

C.  Notwithstanding any other provision of this Consent Decree, EPA and the State hereby retain all of their information gathering, access and inspection authorities and rights under CERCLA, RCRA, and any other applicable Federal or State statutes or regulations.

## XIII.

## PUBLIC INSPECTION

All data, factual information and documents submitted by Settling Defendants to EPA and NJDEP pursuant to this Consent Decree shall be available for public inspection.  Settling Defendants shall not assert a claim of confidentiality regarding any monitoring or hydrogeologic data, any information specified under Section 104(e)(7)(F)(i) through (viii) of CERCLA, 42 U.S.C. §9604(e)(7)(F)(i) through (viii), or any other chemical, scientific or engineering data related to the Work or submitted to EPA and the State pursuant to this Consent Decree. Information entitled to protection under 18 U.S.C. §1905 is excluded from public inspection in accordance with Section 104(e)(7) of CERCLA, 42 U.S.C. §9604(e)(7).

## XIV.

## REPORTING REQUIREMENTS

A. **Monthly Progress Reports.**

In addition to any other requirement of this Consent Decree, OCC shall prepare and provide to EPA and the State written monthly progress reports. For each calendar month, or part thereof, such monthly progress report shall: (1) describe all actions which have been taken to fulfill the requirements of this Consent Decree during the prior month; (2) describe any potential and/or actual noncompliance with this Consent Decree and other problems encountered; (3) describe all corrective actions taken in response to any potential and/or actual noncompliance or problems which occurred during the prior month; (4) include all final results of sampling, tests and all other data received or generated by OCC during the course of implementing the Work during the prior month; (5) describe all actions, data and plans which are scheduled for the next two months; (6) include information regarding percentage of completion, all delays encountered or anticipated that may affect the future schedule for performance of the Work, and a description of all efforts made to mitigate those delays or anticipated delays; and (7) include a section entitled "Summary For Submission to Court" which summarizes items (1) through (6), supra. Such monthly progress reports are to be submitted to EPA and the State by the twentieth (20th) calendar day of each succeeding month, the first

such report being due following the first full month following
lodging of this Consent Decree with this Court.

    B.   <u>Weekly Progress Reports</u>.

      In addition to the monthly progress report required pur-
suant to Section XIV.A, <u>supra</u>, during Remedial Construction, OCC
shall prepare and provide to EPA and the State a weekly written
progress report.  For each calendar week, such weekly progress
report shall:  (1) describe all actions which have been taken
toward fulfilling the requirements of this Consent Decree; (2)
describe any potential and/or actual noncompliance with this
Consent Decree and other problems encountered; (3) describe all
corrective actions taken for any potential and/or actual
noncompliance or problems which occurred during the relevant
week; (4) describe all actions, data and plans which are
scheduled for the next three (3) consecutive weeks; and (5)
describe the types and amounts of Hazardous Materials removed or
remediated.  Such weekly Remedial Construction progress reports
shall be submitted to EPA and the State by the tenth (10th)
calendar day following each Sunday for the week ending on that
Sunday.

    C.  <u>Incomplete or Deficient Reports</u>.

      1.  In the event that EPA deems a progress report to be
incomplete or otherwise deficient, EPA shall notify OCC of the

alleged deficiency in writing.  OCC shall make the necessary re-
visions and resubmit the revised progress report with the next
scheduled progress report or, if the next progress report is due
less than fourteen (14) calendar days following OCC's receipt of
the notice of deficiency, with the subsequently scheduled
progress report.

2.  In the event EPA determines that a revised progress
report is deficient for failure to address a deficiency stated in
accordance with the procedures of Section C.1, _supra_, OCC shall
be deemed in violation of this Consent Decree.

D.  Submittal of Reports.

1.  If the date for submission of any report, item or
notification required pursuant to this Consent Decree falls upon
a weekend or Federal or State holiday, the time period for
submission of that item or notification is extended to the next
Working Day following the weekend or holiday.

2.  In the event EPA or the State requests more than one
(1) copy of any report, OCC shall provide a reasonable number of
copies as requested.

E.  1.  Upon the occurrence of any event during performance
of the Work which requires reporting to the National Response
Center pursuant to Section 103 of CERCLA, 42 U.S.C. §9603, or
which requires notification pursuant to N.J.A.C. 7:1E-1.1 _et_
_seq._, OCC shall also orally notify the EPA RPM and the NJDEP Case
Manager promptly.

2.  In the event of the unavailability of the EPA RPM,
OCC shall promptly orally notify the Response and Prevention
Branch, EPA, Region II at (201) 548-8730, in addition to the re-
porting required by Section 103 of CERCLA, 42 U.S.C. §9603.

3.  In the event of the unavailability of the NJDEP Case
Manager, OCC shall promptly notify the NJDEP Bureau of Emergency
Response at (609) 292-1075.

4.  Within ten (10) calendar days of the onset of such
an event, OCC shall furnish to EPA and NJDEP a written report
setting forth the event(s) which occurred and the measure(s)
taken and to be taken in response thereto.


XV.

PLANS, REPORTS AND ITEMS REQUIRING AGENCY APPROVAL

OR RESPONSE TO AGENCY COMMENTS

A.  In the event EPA disapproves any plan, report (other
than a progress report covered by Section XIV, supra), or other
item required to be submitted to EPA and NJDEP for approval
pursuant to this Consent Decree, OCC shall have a reasonable time
as specified in the notice, but not less than fourteen (14)
calendar days from the receipt of written notice of such
disapproval to correct any deficiencies and resubmit the plan,
report or other item for approval. The notice of disapproval from

EPA shall include an explanation of why the plan, report or other item is being disapproved. OCC shall address each of EPA's comments and resubmit the previously disapproved plan, report or other item along with the required changes to EPA and NJDEP within the period set forth above.

B. In the event any comment on any report required under Appendix I is not adequately addressed by OCC in the second (2nd) submittal, OCC shall be deemed in violation of this Consent Decree, subject to the provisions of Section XV.C, _infra_. In the event EPA, in consultation with the State, does not approve OCC's second (2nd) submittal, or any portion thereof, EPA retains the right to amend or develop the submittal. OCC shall implement any such submittal as amended or developed by EPA, subject to OCC's right to invoke dispute resolution under this Consent Decree.

C. It is the intention of the Parties to engage in such discussions as may be necessary to resolve technical issues raised by EPA's comments made pursuant to Sections XV.A and XV.B, _supra_. EPA, in consultation with the State, may modify its comments and/or extend the due date for a subsequent submittal as a consequence of such discussions.

D. EPA and NJDEP will endeavor to complete their review of plans, reports and other items submitted to them for approval within the time periods specified as goals for such review and set forth in the letter from EPA to OCC dated October 17,

1989, as may be revised by subsequent letters. Failure by EPA
and/or NJDEP to complete review in accordance with such letter(s)
shall not relieve OCC of any obligation under this Consent
Decree, nor shall it automatically extend the time for perform-
ance by OCC except to the extent that Appendix I or a schedule
approved under this Section XV requires that performance of a
particular activity commence following approval of the plan,
report or other item under review.

## XVI.

### YEARLY PROGRESS REPORTS FOR THE BENEFIT OF THIS COURT

On or before March 31st following each calendar year during
which this Court retains jurisdiction hereof pursuant to Section
XXXIV, infra, EPA and the State shall file with this Court a
compilation of the monthly "Summary For Submission to Court"
submitted by OCC pursuant to Section XIV.A, supra, during the
preceding calendar year.

## XVII.

### COMPLETION OF REMEDIAL CONSTRUCTION

A.  Within ninety (90) calendar days of completion of all
activities required pursuant to Sections G.1 through G.6 of
Appendix I, OCC shall submit to EPA and the State a written

report certifying that, subject to any exceptions identified in the Final Report for Remedial Construction required by Section G.7 of Appendix I, all Remedial Construction activity components have been completed in full satisfaction of the standards and specifications set forth in the Final Design Report prepared and approved pursuant to this Consent Decree. Said report shall be signed by a New Jersey licensed professional engineer. The Final Report for Remedial Construction required by Section G.7 of Appendix I shall be submitted together with the written certification.

B. If EPA, in consultation with the State, determines that Remedial Construction has not been completed in accordance with the standards and specifications set forth in the Final Design Report prepared and approved pursuant to this Consent Decree, EPA shall notify OCC, in writing, of the specific tasks and activities which have not been so performed. OCC shall then implement the specified activities and tasks in accordance with those standards, specifications and schedules approved by EPA.

C. 1. Any portion of the Work performed pursuant to this Consent Decree shall not be deemed complete until it has been reviewed by EPA and NJDEP, and approved by EPA in writing.

2. At such time as EPA determines that Remedial Construction has been completed in accordance with the standards and specifications set forth in this Consent Decree, and that the

Remedial Construction is operating in accordance with such requirements, EPA shall notify OCC of such approval in writing.

D.   Approval of completion of the Remedial Construction work in no way limits OCC's obligations under Sections VI, VII and VIII, _supra_.

## XVIII.

### ASSURANCE OF ABILITY TO COMPLETE WORK

A.   Within fourteen (14) calendar days of the effective date of this Consent Decree, OCC shall submit a letter of credit to EPA for the purpose of demonstrating its ability to complete the Work and to pay all claims that arise in connection with the performance of the Work.   The letter of credit must be adequate to assure EPA and the State that it is unnecessary to require additional assurances.

B.   OCC shall submit such financial assurance annually.

C.   The Parties agree that the total of sixteen million dollars ($16,000,000) in letters of credit presently in effect pursuant to ACO I and ACO II shall be adequate financial assurance hereunder as of the effective date of this Consent Decree, provided however, that by no later than fourteen (14) calendar days after the effective date of this Decree, such letters of credit shall be

DACD:07:14:89                              49

modified to be held by OCC for the benefit of EPA and NJDEP to sa-
tisfy the requirements of this Consent Decree.

D.  In the event EPA or the State subsequently determines such
financial assurance is inadequate, EPA shall so inform OCC in writ-
ing and OCC shall have thirty (30) calendar days from the date of
receipt of such written notice to obtain further financial assur-
ance which shall assure EPA and the State that OCC has sufficient
assets to implement and complete the Work or the requirements of
ACO I and ACO II.

E.  OCC may petition EPA for a reduction in the amount of fi-
nancial assurance required following EPA's approval of the comple-
tion of Remedial Construction work pursuant to Section XVII.C.2,
_supra_, and at such time as OCC submits each Remedy Evaluation con-
ducted pursuant to Section VIII.A, _supra_.


XIX.

RETENTION OF RECORDS

A.  Settling Defendants shall preserve and retain, and EPA
and the State shall use their best efforts to preserve and
retain, all records and documents now in their possession or
control and those which may come into their possession or control
(including, for OCC, those in the possession or control of Maxus
Energy Corporation) that relate in any manner to the Site or the
Work, regardless of any document retention policy to the
contrary, for not less than six (6) years after EPA certifies

DACD:07:14:89                    50

approval of the Remedial Construction or six (6) years after the records or documents come into a party's possession, whichever is later.

B.    Settling Defendants shall preserve, or shall instruct their contractors, their contractors' subcontractors and anyone else acting on their behalf in connection with the Site, to preserve (in the form of originals or exact copies, or upon EPA approval, microfiche of all originals) all records and documents of whatever kind, nature or description that relate to the Site or the Work for the time period specified in Section XIX.A, supra.

C.    OCC shall, within sixty (60) calendar days of the effective date of this Consent Decree, obtain the written agreement of Maxus Energy Corporation to preserve, retain and provide to OCC on demand originals or copies of all records and documents fitting the description set forth in Section XIX.B, supra, for the time period specified in Section XIX.A, supra.  A copy of the executed agreement between OCC and Maxus Energy Corporation shall be submitted to EPA and the State within ninety (90) calendar days of the effective date of this Consent Decree.

D.    Prior to ceasing to preserve and retain any records and documents retained pursuant to Sections XIX.A, XIX.B and XIX.C,

_supra_, Settling Defendants shall provide at least ninety (90) ca-
lendar days written notice to EPA and the State.  EPA will there-
after notify Settling Defendants in writing with respect to the
appropriate disposition of said records and documents, which may
include transfer of said materials to EPA or the State.

E.  Failure by EPA or the State to preserve and retain re-
cords and documents that relate to the Site or the Work shall not
be deemed a violation of this Consent Decree.

F.  Nothing herein shall require the disclosure of informa-
tion subject to a legally applicable privilege.


XX.

RESPONSE AUTHORITY

Subject to the provisions of Section XXV, _infra_, and
notwithstanding any other provision of this Consent Decree, EPA
and the State reserve all rights to take any and all response
actions authorized by law.


XXI.

FORCE MAJEURE

A.  For the purposes of this Consent Decree, "_Force Majeure_"
shall mean any event arising from causes entirely beyond the con-
trol of OCC and of any entity controlled by OCC, including its
contractors and subcontractors, which delays or prevents the per-
formance of any obligation under this Consent Decree.  "_Force Ma-
jeure_" shall not include increased costs or expenses, or finan-

cial incapacity.  OCC's inability to meet the effluent limi-
tations set forth in Appendix II for the reasons stated in
Section VI.G, _supra_, shall not be a Force Majeure event and shall
be resolved as set forth in Section VI.G, _supra_.  If OCC claims
and EPA agrees that a delay or prevention of performance is or
was attributable to a Force Majeure event, any failure by OCC to
perform Work under this Consent Decree that results solely from
the Force Majeure event shall not be deemed a violation of this
Consent Decree.

    B.  1.  OCC shall, within forty-eight (48) hours of when it
knows of a Force Majeure, knows or should have known of a Force
Majeure event, notify, by telephone, the EPA RPM or, in the event
of his or her unavailability, the Chief of the Site Compliance
Branch, Emergency and Remedial Response Division of EPA, Region
II at (212) 264-2649, and the NJDEP Case Manager at (609) 633-
1455 or, after business hours, the NJDEP Hotline at (609) 292-
7172.

    2.  Within fourteen (14) calendar days of the date it
provides the notice specified in Section XXI.B.1, _supra_, OCC
shall also notify EPA and NJDEP, in writing.  Such notice shall
include, to the extent such information is available to or
obtainable by OCC, the reason(s) for such delay or prevention of
performance, the anticipated duration of such delay, OCC's
rationale for interpreting such circumstances as being beyond its

DACD:07:14:89                          53

control (should that be its claim), the measure(s) taken and to
be taken by OCC to prevent or minimize the delay, and the time
OCC estimates to implement such measure(s). Such notice shall be
accompanied by all pertinent documentation including, but not
limited to, third party correspondence.

    3.   Failure to provide timely notice in accordance with
Section XXI.B.2, _supra_, shall constitute a waiver of any claim of
Force Majeure.

    C.   If OCC claims and EPA agrees that a delay or prevention
of performance is or was attributable to a Force Majeure event,
the affected plans or schedules incorporated in this Consent
Decree may be modified by OCC, subject to EPA's approval, to
provide such additional time as may be necessary to allow for
completion of the specific phase of the Work and/or any suc-
ceeding phase of the Work affected by such delay, or to allow for
the completion of a substitute activity in furtherance of the
implementation of the Work in the event EPA, in consultation with
the State, determines that a substitute activity is appropriate.
The modification of such affected plans or schedules, and/or the
substitution of an activity shall not be deemed a "modification"
within the meaning of Sections XXXII.A and XXXII.C, _infra_.

    D.   EPA's determination that a delay or prevention of
performance is or was attributable to a Force Majeure event shall
not necessarily justify or excuse nonperformance on any
subsequent day.

DACD:07:14:89                    54

E.  OCC shall have the burden of proving that any failure to perform any obligation under this Consent Decree is excused by this Section XXI.

## XXII.

### REIMBURSEMENT

A.  United States.

1.  Past Costs.

a.  Within forty-five (45) calendar days of receipt of a demand for payment, subject to Section XXII.A.4, *infra*, OCC shall pay to the Hazardous Substances Superfund all costs incurred by the United States since February 1, 1985, for response actions relating to the Diamond Alkali Superfund Site.  Payment shall be made by certified or cashiers check payable to the "EPA Hazardous Substances Superfund," mailed to EPA - Region II, Attention: Superfund Accounting, P.O. Box 360188M, Pittsburgh, Pennsylvania 15251.  A copy of such check shall be sent to the Regional Counsel, Office of Regional Counsel, EPA, Region II, 26 Federal Plaza, New York, New York 10278, Attention:  Diamond Alkali Site Attorney.

b.  As soon thereafter as is practicable, EPA shall make a demand or successive demands for payment of those remaining costs incurred by the United States as of the effective date of

this Consent Decree. OCC shall make payment of such costs in ac-
cordance with Section XXII.A.1.a, _supra_, subject to Section
XXII.A.4, _infra_.

    2. <u>Oversight Costs</u>.

      Within forty-five (45) calendar days of receipt from
the United States of an itemized accounting of costs incurred in
connection with its oversight functions under this Consent Decree
for a fiscal year or any part thereof, OCC shall pay to the Hazard-
ous Substances Superfund all those undisputed costs incurred by
the United States during the period in question. Such costs
shall include, but shall not be limited to, those costs incurred
by the United States in connection with its review or development
of plans, reports and other items, its oversight of the Work
implemented by OCC pursuant to this Consent Decree, its efforts
to secure access to the Site or other areas for performance of
the Work required under this Decree, and any additional response
costs, including enforcement costs, relating to matters covered
by this Decree. Such payments shall be remitted by OCC as
specified in Section XXII.A.1.a, _supra_.

    3. <u>Effect of Dispute Resolution</u>.

      i. During the pendency of and pending the
resolution of any dispute pursuant to Section XXIV, _infra_, and
subject to Section XXII.A.4, _infra_, OCC shall not be required to
tender payment of any disputed costs to EPA under Sections
XXII.A.1 or XXII.A.2, _supra_, provided that, during the pendency

DACD:07:14:89                    56

of the resolution of the dispute, such disputed costs shall be
paid into an interest-bearing escrow account within forty-five
(45) calendar days of receipt of a demand for payment, plus any
additional time for payment that may accrue pursuant to Section
XXII.C, _infra_.

ii.   In the event OCC prevails in any dispute
resolution under Section XXIV, _infra_, OCC shall have no liability
to pay such disputed costs to EPA under Sections XXII.A.1 and
XXII.A.2, _supra_, and the monies in the interest-bearing escrow
account shall be returned to OCC.

iii.   In the event OCC does not prevail in any dispute
resolution under Section XXIV, _infra_, OCC shall be liable to EPA
for the monies in the interest-bearing escrow account, such monies
to be paid to EPA within forty-five (45) calendar days of the final
resolution of the dispute.

4.   The initial one million dollars ($1,000,000) of re-
sponse costs set forth in Section XXII.A.1, _supra_, are not incon-
sistent with the National Contingency Plan.  The Parties are not
addressing the issue of consistency with the National Contingency
Plan with respect to those Section XXII.A.1 response costs, if any,
which exceed one million dollars ($1,000,000).

DACD:07:14:89                           57

5.   Payment by OCC of the response costs set forth in Sections XXII.A.1 and A.2, _supra_, is not a penalty, fine or monetary sanction.

6.   Interest shall accrue on any amounts overdue under Sections XXII.A.1 and A.2, _supra_, in accordance with Section 107(a) of CERCLA, 42 U.S.C. § 9607(a).  In accordance with 31 U.S.C. §3717, a handling charge shall be assessed at the end of each thirty (30) calendar day late period, and a six (6) percent per annum penalty charge shall be assessed if the penalty is not paid within ninety (90) calendar days of the due date.

B.   The State of New Jersey.

1.   Past Costs.

a.   Within forty-five (45) calendar days of receipt of a demand for payment, OCC shall pay to the State all costs incurred by the State as of the effective date of this Consent Decree, for response actions relating to the Diamond Alkali Superfund Site.  Payment shall be made by certified check payable to the "Treasurer, State of New Jersey," mailed to the Division of Hazardous Waste Management, New Jersey Department of Environmental Protection, 401 East State Street - CN 028, Trenton, New Jersey 08625-0028, Attention:  Ms. Melinda Dower.

b.   As soon thereafter as is practicable, the State shall make a demand or successive demands for payment of those remaining costs incurred by the State as of the effective date of

this Consent Decree.  OCC shall make payment of such costs in ac-
cordance with Section XXII.B.1.a, _supra_.

    2.  <u>Oversight Costs</u>.

        Within forty-five (45) calendar days of receipt from
the State of an itemized accounting of costs incurred in
connection with its oversight functions under this Consent Decree
and those items of work specified in the letter produced by the
State pursuant to Section XXXVI.C.2, _infra_, for a fiscal year or
any part thereof, OCC shall pay to NJDEP those costs incurred by
the State for the period in question.  Such costs shall include,
but shall not be limited to, those costs incurred by the State in
connection with its review or development of plans, reports and
other items, its oversight of the Work implemented by OCC
pursuant to this Consent Decree, its efforts to secure access to
the Site or other areas for performance of the Work required
under this Consent Decree, and any additional response costs,
including enforcement costs, relating to matters covered by this
Decree and those items of work specified in the letter produced
by the State pursuant to Section XXXVI.C.2, _infra_.  Payment shall
be remitted as specified in Section XXII.B.1.a, _supra_.

    3.  Payment by OCC of the response costs set forth in
Sections XXII.B.1 and XXII.B.2, _supra_, is not a penalty, fine or
monetary sanction.

DACD:07:14:89                          59

4. The payments due to the State under this Section XXII.B are not subject to dispute resolution under this Consent Decree.

C. Documentation.

1. All demands for payment made by EPA or the State pursuant to this Section XXII. will include cost documentation that verifies that the claimed costs were incurred and that the amount of the demand was properly calculated, and will include the amount, date, description of activity, entity or person to whom the costs were paid or by whom the costs were incurred.

2. Upon receipt of written request, EPA and the State shall make the underlying cost documentation available to OCC for review, and shall designate persons with information concerning the incurrence of costs to answer reasonable questions of OCC concerning such costs, subject to any legal or statutory privilege. Any delay of greater than fourteen (14) calendar days from the date of request by OCC under this Section XXII.C.2 shall extend the due date by an equivalent number of days of delay beyond the fourteenth (14th) calendar day for the payment of those costs which are the subject of the data request, but in no event beyond an additional sixty (60) calendar days.

DACD:07:14:89                          60

## XXIII.

### STIPULATED PENALTIES

A.   Subject to Section XXI, _supra_, and Section XXIV, _infra_, Settling Defendants agree to make payments to EPA and the State as set forth in this Section XXIII.

B.   For each and every violation of the reporting require-ments set forth in Sections XIV.A, B, C and D, OCC shall pay stipulated penalties to EPA and the State in the amount of five hundred dollars ($500) per calendar day per violation.

C.   Except as otherwise specified in Section XXIII.B, _supra_, in the event OCC or CLH fails to meet any requirement as to it under this Consent Decree that falls after the entry of this Decree with this Court, including, but not limited to: (1) any requirement set forth in an approved plan which becomes incorpo-rated in this Decree, (2) any deadline, time limit or schedule milestone established under this Decree, and (3) any payment of past costs, oversight costs, stipulated penalties or interest re-quired hereunder, OCC or CLH shall pay to EPA and the State sti-pulated penalties in the following amounts for each calendar day of each and every violation of said requirement:

DACD:07:14:89                    61

| Calendar Days of Delay | Penalty Per Violation Per Calendar Day |
|---|---|
| 1st through 5th day | $ 1,500 |
| 6th through 14th day | $ 5,000 |
| 15th through 30th day | $ 6,500 |
| 31st through 90th day | $ 8,500 |
| 91st day and beyond | $15,000 |

The sums shown are the total penalty owed per violation per calendar day to EPA and the State.

D.   Stipulated penalties shall begin to accrue on the day that performance is due or noncompliance occurs, and shall continue to accrue through the final day of correction of the noncompliance. Stipulated penalties relating to the adequacy of any reports, plans or other items requiring EPA's response shall begin to accrue on the day OCC or CLH receives written notification of the violation from EPA.  Nothing herein shall prevent the simultaneous accrual of separate penalties for separate violations of this Consent Decree, provided that in the event a report, plan or other item requiring EPA approval pursuant to Sections XIV or XV, supra, is disapproved for more than one (1) reason, only a single stipulated penalty shall be owed for each day of noncompliance stemming from such disapproval.  This does not, however, preclude the imposition of separate stipulated penalties stemming from the disapproval of and the lateness of the same submittal.

E.   Subject to Section XXIII.M, infra, all stipulated penalties due under this Section XXIII shall be payable to EPA and the

DACD:07:14:89                    62

State within forty-five (45) calendar days of OCC or CLH's

receipt of a notification of noncompliance.  Interest shall begin

to accrue on any unpaid balance, if any, on the first calendar

day after payment is due.

F.   Interest shall accrue on any amounts overdue under this

Section XXIII in accordance with Section 107(a) of CERCLA, 42

U.S.C. §9607(a).  In accordance with 31 U.S.C. §3717, a handling

charge shall be assessed at the end of each thirty (30) calendar

day late period, and a six (6) percent per annum penalty charge

shall be reassessed if the penalty is not paid within ninety (90)

calendar days of the due date.

G.   Those stipulated penalties which become due shall be

paid by Settling Defendants, fifty (50) percent to EPA and fifty

(50) percent to the State.

H.   Those stipulated penalties due to EPA shall be paid by

certified or cashiers check payable to "EPA Hazardous Substances

Superfund," and shall be mailed to EPA - Region II, Attention:

Superfund Accounting, P.O. Box 360188M, Pittsburgh, Pennsylvania

15251.  A copy of such check shall be sent to the Regional

Counsel, Office of Regional Counsel, EPA, Region II, 26 Federal

Plaza, New York, New York 10278, Attention:  Diamond Alkali Site

Attorney.

I.   Those stipulated penalties due to the State shall be

paid by certified check payable to the "Treasurer, State of New

Jersey," and shall be mailed to the Division of Hazardous Waste

Management, New Jersey Department of Environmental Protection,

401 East State Street - CN 028, Trenton, New Jersey 08625-0028,

Attention:  Ms. Melinda Dower.

J.  In addition to the payments set forth above, the United

States and the State specifically reserve the right to seek reme-

dies, sanctions and/or penalties which may be available to the

United States and the State by reason of OCC or CLH's failure to

comply with the requirements of this Consent Decree, including

sanctions and penalties that the United States may seek under

Section 122(l) of CERCLA, 42 U.S.C. §9622(l).  The United States

and the State, however, will not utilize such remedies to obtain

penalties inconsistent with the exercise or result of the dispute

resolution provisions of Section XXIV, _infra_.  The United States

and the State agree that this Court should consider the amount of

stipulated penalties already paid by OCC or CLH under this

Section XXIII for a particular violation, in the award of any

monetary sanctions or penalties that OCC or CLH may be required

to pay in the event that the United States or the State seeks

additional relief against OCC or CLH for the same noncompliance.

Nothing in this Section XXIII.J shall limit any remedy or action

available to the United States or the State at law or equity

(including the remedy of contempt) to enforce the terms of this

Consent Decree.

K.  No payments under this Section shall be tax deductible.

L.  The payment of stipulated penalties does not alter

Settling Defendants' responsibility to complete any requirement
of this Consent Decree.

    M.   **Effect of Dispute Resolution.**

        1.  During the pendency of and pending the resolution of
any dispute pursuant to Section XXIV, *infra*, OCC or CLH shall not
be required to tender payment of any stipulated penalties to EPA
and the State under this Section XXIII provided that, during the
pendency of the resolution of such dispute, those stipulated
penalties that accrue during any month shall be paid into an
interest-bearing escrow account monthly, by not later than the
fifth (5th) calendar day of each calendar month after the dispute
arises.

        2.  In the event OCC or CLH prevails in any dispute re-
solution under Section XXIV, *infra*, OCC or CLH shall have no lia-
bility to pay stipulated penalties to EPA and the State under
this Section XXIII with respect to the matter submitted for
dispute resolution, and the monies in the interest-bearing escrow
account shall be returned to OCC or CLH.

        3.  In the event OCC or CLH does not prevail in any
dispute resolution under Section XXIV, *infra*, OCC or CLH shall be
liable to EPA and the State for the monies in the interest-
bearing escrow account plus all stipulated penalties that have
accrued which have not yet been paid into the escrow account, all
such monies to be paid to EPA and the State within forty-five

(45) calendar days of the final resolution of the dispute, except

as provided in Section VIII.C, _supra_.

N.  EPA and the State each have the discretion to waive or

reduce payments otherwise due under this Section XXIII.


## XXIV.

### DISPUTE RESOLUTION

A.  As required by Section 121(e)(2) of CERCLA, 42 U.S.C.

§9621(e)(2), the Parties shall attempt to resolve expeditiously

and informally any disagreements concerning the implementation or

application of this Consent Decree or the performance of the Work

required hereunder.  Unless the Parties agree otherwise, in writ-

ing, such attempted informal resolution shall not extend beyond

thirty (30) calendar days from the date on which EPA, OCC or CLH

receives written notice of the existence of a dispute.

B.  If a dispute arising under this Consent Decree is not

resolved through informal means under Section XXIV.A, _supra_, the

interpretation advanced by EPA shall be considered binding unless

OCC or CLH invokes the dispute resolution provisions of this

Section XXIV.  Should OCC or CLH desire dispute resolution under

this Section XXIV, it shall give written notice to EPA within

five (5) calendar days after receipt of EPA's written interpre-

tation of the subject of the dispute.

C.  1.  Within fifteen (15) Working Days of receipt of

notice of dispute pursuant to Section XXIV.B, _supra_, OCC and/or

CLH shall serve on EPA and the State a written statement which
sets forth the issues in dispute, the relevant facts upon which
the dispute is based, any factual data, analysis or opinion
supporting its position, and supporting documentation
(hereinafter such written statement shall be referred to as a
"Statement of Position") on which it relies.

    2.  EPA shall serve its Statement of Position on OCC or
CLH no later than thirty (30) calendar days after receipt of OCC
or CLH's Statement of Position.

    3.  Within fifteen (15) calendar days of receipt of
EPA's Statement of Position, OCC or CLH may serve a Reply
Statement of Position.

    4.  Within fifteen (15) calendar days of receipt of OCC
or CLH's Reply Statement of Postion, EPA may serve a Surreply
Statement of Position.

    5.  EPA may extend the time periods for exchange of
Statements of Position by any party.

    D.  An administrative record of any dispute under this Sec-
tion XXIV shall be maintained by EPA.  This record shall include
the written notification of such dispute, the Statements of Posi-
tion and any other relevant information.  The record shall be
available for review by the Parties.

    E.  Upon review of the administrative record, the Director
of the Emergency and Remedial Response Division, EPA Region II

shall issue an Order resolving the dispute, a copy of which will
be provided to OCC or CLH.

F.   Any such Order issued pursuant to Section XXIV.E, _supra_,
shall be reviewable by this Court provided that within seven (7)
calendar days of receipt of the Order, OCC or CLH files a
petition for judicial review with this Court which describes the
nature of the dispute.   Thereafter, judicial review will be
available only by instituting a new action to the extent
permitted by law.   In proceedings on any dispute between EPA and
OCC concerning matters covered by Section 113(j) of CERCLA, 42
U.S.C. §9613(j), OCC shall have the burden of demonstrating that
the position of EPA is arbitrary and capricious or otherwise not
in accordance with law.   In all other disputes, the standard of
review will be determined in accordance with applicable law.

G.   The invocation or implementation of the procedures
stated in this Section XXIV shall not stay the accrual of stipu-
lated penalties, extend or postpone any deadline, or affect in
any way Settling Defendants' obligations (including the obliga-
tion to pay stipulated penalties) under this Consent Decree with
respect to the disputed issue unless otherwise agreed to by EPA, in
writing, or ordered by this Court, provided that this Court may
modify such schedule only if OCC or CLH both prevails in dispute
resolution and demonstrates that such schedule modification is
required by the impracticality of having to continue the Work
pending the resolution of the dispute.   In the event that a dispute

relates solely to the issue of stipulated penalties that arise in connection with an agreed upon or Court ordered schedule modification, OCC need only address the issue of the appropriateness of stipulated penalties to be paid to EPA and the State.

H.  The invocation or implementation of the procedures stated in this Section XXIV shall not stay the accrual of stipulated penalties under Section XXIII, _supra_.  However, such penalties shall be paid into an interest-bearing escrow account pursuant to Section XXIII.M, _supra_.


## XXV.

## COVENANTS NOT TO SUE

A.  _OCC_.

1.  ~~In consideration of the Work which will be performed~~ and payments which will be made by OCC under the terms of this Consent Decree, and in consideration of the work which has been performed and will be performed pursuant to ACO I and ACO II, and except as otherwise specifically provided in Sections XXV.A.2, XXV.A.3, XXV.A.4, XXV.A.5 and XXV.A.6, _infra_, the United States and the State covenant not to sue or to issue any administrative orders against OCC for Covered Matters.  These covenants extend only to OCC and do not release any other person from liability. For purposes of this Section XXV.A, and except as provided in Sections XXV.A.4, XXV.A.5 and XXV.A.6, _infra_, "Covered Matters"

DACD:07:14:89                      69

include any and all civil claims available to the United States
under Sections 106(a) and 107(a) of CERCLA, 42 U.S.C. §§9606(a)
and 9607(a), and Section 7003 of RCRA, 42 U.S.C. §6973, and
available to the State under Section 107(a) of CERCLA, 42 U.S.C.
§9607(a), and N.J.S.A. 58:10-23.11a et seq., N.J.S.A. 13:1E-1 et
seq., and N.J.S.A. 58:10A-1 et seq., relating solely to the Work
performed under this Consent Decree and ACO I and ACO II, and for
the reimbursement of costs incurred by the United States and the
State prior to the effective date of this Decree, in connection
with this Site pursuant to Section XXII, supra. This covenant
not to sue OCC shall take effect upon receipt of all payments
due, and does not extend to future liability.

2. This covenant not to sue OCC shall be conditioned
upon performance by OCC of its obligations under this Consent
Decree, ACO I and ACO II.

3. This covenant not to sue OCC does not pertain to
any matters other than Covered Matters as defined by Section
XXV.A.1, supra.

4. "Covered Matters" does not include:

i. Liability arising from Hazardous Materials re-
moved from the Diamond Alkali Superfund Site;

ii. Liability arising from past, present or future
disposal or release or threatened release of Hazardous Materials
outside of the Site;

DACD:07:14:89                    70

   iii. Liability for damages for injury to, destruction of or loss of natural resources resulting from the release of Hazardous Materials at the Diamond Alkali Superfund Site;

   iv. Claims based on a failure by OCC to meet the requirements of this Consent Decree including, but not limited to, claims for injunctive relief or claims for civil penalties pursuant to Section 122(l) of CERCLA, 42 U.S.C. §9622(l);

   v. Liability for violations of Federal or State law which occur during implementation of the Work;

   vi. Claims based on criminal liability;

   vii. Any matter as to which the United States or the State is owed indemnification under Section XXVII.A, <u>infra</u>; and

   viii. Liability for third party claims asserted against EPA, NJDEP and the New Jersey Spill Compensation Fund, N.J.S.A. 58:10-23.11a <u>et</u> <u>seq</u>.

   5. Notwithstanding any other provision of this Consent Decree, the United States reserves its right to institute proceedings in this action or in a new action seeking to compel OCC (1) to perform additional response actions at the Site, or (2) to reimburse the United States for response costs if:

   i. conditions at the Site, previously unknown to the United States, are discovered, or

   ii. information is received, in whole or in part, after entry of this Consent Decree,

DACD:07:14:89                    71

and the Administrator of EPA or his delegate finds, based on
these unknown conditions or this information, together with any
other relevant information, that the Work is not protective of
public health or welfare or the environment.  The provisions of
this Section XXV.A.5 in no way limit OCC's obligations under
Section VIII, _supra_, to perform any additional response action.

6.   Notwithstanding any other provision of this Consent
Decree, the State reserves its right to institute proceedings in
this action or in a new action seeking to compel OCC (1) to
perform additional response actions at the Site, or (2) to
reimburse the State for response costs if:

i.   conditions at the Site, previously unknown to
the State, are discovered, or

ii.   information is received, in whole or in part,
after entry of this Consent Decree,
and the Commissioner of NJDEP or his delegate finds, based on
these unknown conditions or this information, together with any
other relevant information, that the Work is not protective of
public health or welfare or the environment. The provisions of
this Section XXV.A.6 in no way limit OCC's obligations under
Section VIII, _supra_, to perform any additional response action.

B.  Limited Covenant For CLH.

1.   Except as otherwise specifically provided in Section
XXV.B.3., _infra_, the United States and the State covenant not to

sue or to issue any administrative orders against CLH for Covered
Matters as defined in Section XXV.B,2, _infra_.  These covenants
extend only to CLH and do not release any other person from lia-
bility.

2.   For purposes of this Section XXV.B, and except as
specifically provided in Section XXV.B.3, _infra_, "Covered
Matters" include those actions which will be performed by CLH
pursuant to Sections III and XI, _supra_.  This covenant not to sue
CLH shall be conditioned upon performance by CLH of its
obligations under this Consent Decree.

3.   The United States and the State reserve their rights
to take any administrative or judicial action against CLH for any
other liability which it may have pursuant to CERCLA, RCRA,
N.J.S.A. 13:1D-1 _et_ _seq._, N.J.S.A. 58:10A-1 _et_ _seq._, N.J.S.A.
13:1E-1 _et_ _seq._, and N.J.S.A. 58:10-23.11a _et_ _seq._, including,
but not limited to, any liability which CLH may have for those
matters set forth in Section XXV.A.4, _supra_.


## XXVI.

### WAIVER OF ANY CLAIM-SPLITTING DEFENSE

The Parties recognize and acknowledge that the settlement
embodied in this Consent Decree is only a partial resolution of
issues related to the remediation of conditions at the Diamond

DACD:07:14:89

Alkali Superfund Site.  Settling Defendants hereby waive the de-
fenses of the entire controversy doctrine and claim-splitting by
the United States and the State with respect to amending of the
Complaint in this action or the filing of sequential lawsuits by
the United States and/or the State for claims involving the
Diamond Alkali Superfund Site in subsequent litigation regarding
Settling Defendants' liability for remedial action to address
off-Site areas, including, without limitation, the Passaic River
and other areas and/or payment of costs to finance remedial
action to address the Passaic River and other areas.


XXVII.

OTHER CLAIMS

A.  OCC agrees to indemnify, save and hold harmless the Uni-
ted States and the State and their representatives from any and
all claims or causes of action arising from acts or omissions of
Settling Defendants and/or their contractors, subcontractors or
any other person acting on their behalf in the performance of the
Work or their failure to perform fully or complete the Work.

B.  The United States and the State are not to be construed
as parties to, and do not assume any liability for, any contract
entered into by Settling Defendants in carrying out the activi-
ties required pursuant to this Consent Decree.  The proper
completion of the Work required under this Consent Decree is the
sole responsibility of OCC.

C.  Settling Defendants waive any claims for damages or
reimbursement from the United States or the State or for set-off
of any payments made or to be made to the United States or the
State, arising from or on account of any contract, agreement or
arrangement between any one or more of the Settling Defendants
and any person performing the Work on or with respect to the
Site, including but not limited to claims on account of construc-
tion delays.

XXVIII.

CLAIMS AGAINST THE FUNDS

A.  In consideration of the entry of this Consent Decree,
Settling Defendants waive any rights they may have to assert any
claims pursuant to Sections 106(b)(2) and/or 112 of CERCLA, 42
U.S.C. §§9606(b)(2) and/or 9612, against the United States for
reimbursement from the Hazardous Substances Superfund for any
past costs or costs incurred by Settling Defendants in performing
the Work required by this Consent Decree, and nothing in this
Decree shall be construed as EPA's preauthorization of a CERCLA
claim against the Hazardous Substances Superfund within the
meaning of 40 C.F.R. §300.25 and any amendments thereto.
Settling Defendants' waiver of any rights they may have to assert
claims pursuant to Section 106(b) of CERCLA, 42 U.S.C. §9606(b),
is limited to claims that may arise in the implementation of the
Work.

B.   Settling Defendants waive their rights to assert any claims against the State, including the New Jersey Spill Compensation Fund, N.J.S.A. 58:10-23.11a et seq., for reimbursement of any sum related to any past costs or costs incurred in performing the Work required under this Consent Decree.

## XXIX.

### INSURANCE/FINANCIAL RESPONSIBILITY

A.   Prior to commencing any on-Site Work, Settling Defendants shall procure and shall maintain or shall cause to be procured and maintained for the duration of this Consent Decree, general liability and automobile insurance with limits of five million dollars ($5,000,000), and one million dollars ($1,000,000), respectively, and shall use best efforts to and shall document and provide to EPA and the State documentation of their efforts to have EPA and the State named as additional insureds.  In addition, for the duration of this Consent Decree, Settling Defendants shall satisfy all applicable laws and regulations regarding the provision of workers compensation insurance.

B.   Prior to commencement of the Work under this Consent Decree, OCC shall provide EPA and NJDEP with a certificate of insurance in the required amounts.

C.   If OCC demonstrates by evidence satisfactory to EPA that any contractor or subcontractor maintains insurance equivalent to

DACD:07:14:89                    76

that described above, or insurance covering the same risks but in
a lesser amount, then, with respect to that contractor or subcon-
tractor, OCC need provide only that portion of the insurance de-
scribed above which is not maintained by the contractor or sub-
contractor.

    D.  OCC shall not be liable to EPA and the State for and
does not assume liability for any injury or damages to persons or
property resulting solely from acts or omissions of EPA or the
State or by any person acting by, through or under them or on
their behalf in carrying out any activity under this Consent
Decree.


XXX.

<u>NOTICES</u>

    A.  Whenever, under the terms of this Consent Decree, notice
is required to be given, a report or other document is required
to be forwarded by one party to another or any other written
communication is required, such correspondence or a copy thereof
shall be directed to the addresses and individuals specified
below, unless this Consent Decree specifies otherwise:

        1.  <u>As to the United States and/or EPA:</u>

           a.  Chief, New Jersey Superfund Branch
                Office of Regional Counsel
                United States Environmental Protection Agency,
                  Region II
                26 Federal Plaza
                New York, New York  10278
                Attention:  Diamond Alkali Site Attorney

DACD:07:14:89                      77

    b.  **Chief, New Jersey Compliance Branch
United States Environmental Protection Agency,
Region II**
26 Federal Plaza, Room 737
New York, New York  10278
Attention:  Diamond Alkali Project Manager

    c.  **Chief, Environmental Enforcement Section Land &
Natural Resources Division
United States Department of Justice**
Benjamin Franklin Station
P.O. Box 7611
Washington, D.C.  20044
Attention:  File No. 90-11-2-399

2.  <u>As to the State and/or NJDEP:</u>

New Jersey Department of Environmental Protection
Division of Hazardous Waste Management
401 East State Street
CN 028
Trenton, New Jersey  08625-0028
Attention:  Ms. Melinda Dower

3.  <u>As to OCC:</u>

Occidental Chemical Corporation
c/o Maxus Energy Corporation
717 North Harwood Street
Dallas, Texas  75201
Attention:  Mr. William C. Hutton
          Director, Environmental Affairs

4.  <u>As to CLH:</u>

Chemical Land Holdings, Inc.
c/o Maxus Energy Corporation
717 North Harwood Street
Dallas, Texas  75201
Attention:  Mr. William C. Hutton
          Director, Environmental Affairs

B.  The United States (and, where applicable, EPA) and the

State (and, where applicable, NJDEP) agree that they will provide

each other with a copy of any notice, report or other document

DACD:07:14:89                           78

directed to OCC or CLH.  Such copies shall be directed to the ad-
dresses and individuals specified in Section XXX.A, supra.


## XXXI.

### LODGING AND OPPORTUNITY FOR PUBLIC COMMENT

A.  This Consent Decree shall be lodged with this Court for
not less than thirty (30) calendar days for public notice in ac-
cordance with the requirements of Section 122(d)(1)(2) of CERCLA,
42 U.S.C. §9622(d)(1)(2), and 28 C.F.R. §50.7.

B.  The United States and the State reserve their right to
withhold consent if comments disclose facts or considerations
which indicate that this Consent Decree is inappropriate,
improper or inadequate.


## XXXII.

### MODIFICATION

A.  Except as expressly provided for in Sections VII, VIII,
X, and XXI, supra, there shall be no material modification of
this Consent Decree without written approval of all Parties to
this Decree and this Court.

B.  No oral modifications of this Consent Decree shall be
effective.

C.  Modifications that do not materially alter the require-
ments of this Consent Decree may be made upon written consent of
all Parties, which shall be filed with this Court.

DACD:07:14:89                                79

## XXXIII.

### ADMISSIBILITY OF DATA

In the event that this Court is called upon to resolve a dispute concerning implementation of this Consent Decree, the Parties waive any evidentiary objection to the admissibility into evidence of the results of any analyses of samples conducted by or for a party at or in connection with the Diamond Alkali Superfund Site, or other data gathered, generated, or evaluated pursuant to this Decree, unless a party can demonstrate that there was a significant noncompliance with applicable chain of custody procedures. The Parties waive their right to contest the validity of any data unless it is established that such data has not been validated in accordance with all relevant quality assurance and quality control procedures established by or pursuant to this Consent Decree, or unless it is established that the data has not met the quality assurance and quality control criteria of the applicable approved Quality Assurance Project Plan.

## XXXIV.

### CONTINUING JURISDICTION

This Court retains jurisdiction over both the subject matter of this Consent Decree and over all Parties for the duration of the performance of the terms and provisions of this Consent Decree for the purposes of issuing such further orders or

DACD:07:14:89                           80

directions as may be necessary or appropriate to construe or
modify the terms of this Decree, or to effectuate compliance with
its terms, to the extent allowed by law.


## XXXV.

### COMMUNITY RELATIONS

Settling Defendants shall cooperate with EPA and NJDEP in
providing information regarding the Work required under this Con-
sent Decree to the public.  As requested by EPA or NJDEP,
Settling Defendants shall participate in the preparation of all
appropriate information disseminated to the public and in public
meetings which may be held or sponsored by EPA and/or NJDEP to
explain activities at or concerning the Diamond Alkali Superfund
Site.


## XXXVI.

### OTHER PROVISIONS

A.  This Consent Decree shall be effective upon the date of
its entry by this Court.

B.  Notwithstanding Section XXXVI.A, _supra_, within seven (7)
calendar days of lodging of this Consent Decree with this Court,
each party, to the extent applicable to it, agrees to comply (ex-
cept as expressly provided elsewhere in this Decree) with the

following Sections of this Consent Decree:  V, VI, X, XIV, XV,

XIX, XXI, XXIV, XXVII, XXX, XXXII, XXXIII and XXXV.

    C.  1.  OCC hereby agrees to perform the obligations imposed

upon Diamond Shamrock Chemicals Company under ACO I and ACO II.

Those provisions of ACO I and ACO II that relate to matters be-

yond the scope of the matters covered by this Consent Decree

shall remain in effect.  Those provisions of ACO I and ACO II

that relate to matters within the scope of the matters covered by

this Consent Decree are superseded.  The letters of credit

referenced in Section XVIII, supra, shall remain in effect as

provided therein, and NJDEP shall be able to draw upon said

letters of credit in order to satisfy the requirements of ACO I

and ACO II.

    2.  The remaining specific items of work which were ori-

ginally to be performed pursuant to ACO I and ACO II and which

are beyond the scope of this Consent Decree shall be identified

by the State within forty-five (45) Working Days of the entry of

this Decree.  Failure by the State to provide such an identifica-

tion will not constitute a violation of this Consent Decree.  The

specific items of work which remain to be identified under ACO I

and ACO II, and NJDEP's review and approval of the implementation

and completion of such items by OCC are not subject to dispute

resolution under this Consent Decree.

    D.  The provisions of State of New Jersey Executive Orders

Nos. 40 and 40 D (1983) shall remain in effect.  The Work

DACD:07:14:89                          82

performed by OCC pursuant to this Consent Decree is consistent
with said Executive Order.

    E.  The section headings set forth in this Consent Decree
are included for convenience of reference only, and shall be
disregarded in the construction and interpretation of any of the
provisions of this Decree.

    F.  This Consent Decree represents the entire agreement
among the Parties with respect to the matters covered by this
Decree, and shall supersede all drafts, writings, negotiations
and discussions among the Parties.

                        **********

DACD:07:14:89

THE UNDERSIGNED PARTIES hereby enter into this Consent Decree:

<u>PLAINTIFFS</u>

FOR THE UNITED STATES:

RICHARD B. STEWART
Assistant Attorney
General
Land and Natural Resources
    Division
U.S. Department of Justice
Washington, D.C.  20530

SUSAN C. CASSELL
United States Attorney's Office
District of New Jersey
Newark, New Jersey  07102

JERRY SCHWARTZ
Attorney
Environmental Enforcement
Section
Land and Natural Resources
    Division
U.S. Department of Justice
Washington, D.C.  20530

EDWARD E. REICH
Acting Assistant Administra-
    tor for Enforcement and
    Compliance Monitoring
U.S. Environmental Protection
    Agency
Washington, D.C.  20460

DACD:07:14:89

84

RANDYE B. STEIN
Assistant Regional Counsel
U.S. Environmental Protection
    Agency
Region II
New York, New York  10278


FOR THE STATE OF NEW JERSEY:

(Signature)

Ronald T. Corcory

Type Name:

Assistant Director for
    Responsible Party Cleanups
Division of Hazardous Waste
    Management
State of New Jersey
Department of Environmental
    Protection
Trenton, N.J.  08625


SETTLING DEFENDANTS

Settling Defendants herein, Occidental Chemical Corporation,
as successor to Diamond Shamrock Chemicals Company, and Chemical
Land Holdings, Inc., by the duly authorized representatives
named, titled and signed hereunder, hereby consent to this
Consent Decree with respect to the Diamond Alkali Superfund Site
located in Newark, New Jersey, and to the filing of this Decree
with the United States District Court for the District of New
Jersey, and agree to be bound by the terms and conditions hereof.

Upon the lodging of this Consent Decree, Settling Defendants
agree that all requirements as to service of process set forth in
Federal Rule of Civil Procedure 4, including service of a

DACD:07:14:89                85

summons, and all requirements as to service of pleadings and
other papers set forth in Federal Rule of Civil Procedure 5, and
any applicable local rules of this Court, shall be deemed to be
met by service of process by mail upon the following authorized
agents:

FOR OCCIDENTAL CHEMICAL CORPORATION,
  as successor to
  Diamond Shamrock Chemicals Company:

    Authorized agent for service of process:

        Michael J. Rudick
        Vice President and General Counsel
        Occidental Chemical Corporation
        5005 LBJ Freeway
        Occidental Tower
        Dallas, Texas  75244

        By:    _____
               MICHAEL J. RUDICK
               Vice President and General
               Counsel
               Occidental Chemical Corpora-
               tion

FOR CHEMICAL LAND HOLDINGS, INC.

    Authorized agent for service of process:

        D. L. Smith
        President
        Chemical Land Holdings, Inc.
        717 North Harwood Street
        Dallas, Texas  75201

        By:    _____
               D. L. SMITH
               President
               Chemical Land Holdings, Inc.

DACD:07:14:89                    86

APPROVED and ENTERED this

day of _____, 1989.


                                    _____
                                    UNITED STATES DISTRICT JUDGE

# Exhibit Q



**Conflict Prevention and Resolution Services**

**Contract # 68HERH19D0033**

# Task Order #009

# Diamond Alkali-Lower Passaic River Allocation

| EPA Customer | EPA Region 2 |
|---|---|
| EPA Task Order Contracting Officer's Representative (TOCOR) | Alice Yeh, EPA Region 2<br>212-637-4427<br>yeh.alice@epa.gov |
| ERG Task Order Manager (TOM) | Laura Bachle<br>703-841-1705<br>laura.bachle@erg.com |
| Period of Performance | Task Order Issuance to October 30, 2020 |

# Contents

1.  Background
2.  Assumptions
3.  Project Methods and Approach
4.  Work Tasks
5.  Reports, Transmittals, and Deliverables
6.  Staffing Plan

## 1.    Background

The lower 8.3 miles of the Lower Passaic River are one of four Operable Units (OUs) of the Diamond Alkali Superfund site. This OU is designated as OU2. The site has been on the National Priorities List since 1984. Contaminated sediments in this portion of the river are a significant source of contamination to the rest of the river down to Newark Bay. Contaminants including dioxins, mercury, PCBs, and DDT and its breakdown products can accumulate in in aquatic life and pose an unacceptable risk to human health and the environment.

Under an administrative order on consent (AOC), Occidental Chemical Corporation (OCC) is performing the remedial design for this OU. The cost for remedial action (RA) is estimated at $1.38 billion. EPA Region 2 has issued a notice of potential liability to approximately 100 parties and has offered a first round of cash-out settlements to approximately 20 potentially responsible parties (PRPs). Region 2 will address the liability of municipalities and public entities separately.

Under this TO, a third-party allocator will support Region 2 in assigning a share of responsibility to 83 non-public, non-municipal PRPs (representing 97 facilities) not included in the first round of cash-out settlements. The Region expects to use the results of the allocation to enter into settlement agreements with the subset of PRPs with the greatest share of responsibility to perform the RA and enter into another round of cash-out settlements. This effort will be based in part on existing information and contacts generated from previous attempts to develop a mutually acceptable allocation of liability.

This is an ongoing project with a well-qualified service provider already in place under a previous contract. ERG has selected the same service provider, AlterEcho, as the most effective way to continue the work.

## 2.    Assumptions

This work plan and pricing estimate are based on the following assumptions:

General Assumptions

- Activities and pricing are included for the entire 13-month period of performance.

- ERG reserves the right to adjust the amount of the budget for general task order management if the contract and task order periods of performance are extended beyond the current period of performance.

- This TO can be modified to change the statement of work or add funding.

ERG's Understanding of the Work

ERG's work plan reflects our team's understanding of what work has already been completed on this allocation project and what work remains to be done. As the project has evolved, some key numbers and factors have changed, such that this estimate may differ from previous projections regarding the level of effort needed to complete the tasks envisioned in the SOW. Specific factors that have evolved include:

- There has been an increase in the number of facilities that must be calculated an equitable share, from 83 to 92 (+11%).

- Occidental (OCC) not being a participating party as had been anticipated and OCC filing a lawsuit against PAPs have substantially increased the level of effort required of the Allocation Team, which will spend additional resources to ensure that OCC is fairly represented in the allocation process, and  complicates communications and other considerations regarding maintaining confidentiality.

- The level of anticipated interaction required with PAP counsel, including the volume of comments that will be received and that will require analysis and confirmation, is substantially greater than anticipated.

- The complexity of the required allocation analysis is greater than anticipated as a result of:

  o Data gaps relating to facility operation and contaminant discharge data, significant variability of available data across the PAP facilities, and the need for equitable analysis to discern and develop appropriate surrogate data

  o The pervasiveness of historic fill at facility locations.

  o The large volume of data on OCC submitted by PAPs

  o The complexity and multiplicity of overflow valves and bypasses and each facility's specific connections and historic uses of system.

  o Different dredging events have varied with respect to area and sediment removal impacts, which in turn varies the potential for contaminant removal

  o The diverse hydrology of impacted area, fate and transport of contaminants, and tidal influences on the system.

Task B: Allocation Design and Production

- A maximum of 83 PRPs will be provided an opportunity to participate in or be evaluated for the purpose of determining a share of responsibility in the allocation process. They are designated herein as Allocation Parties. Ten of these PRPs are non-participating parties.

- The allocation will cover a maximum of 92 facilities associated with the 83 Allocation Parties.

- All OU2 Allocation Parties will be designated a share of responsibility in the Final Allocation Recommendation Report.

- All OU2 PRPs which have agreed or agree in the future to participate in the allocation by executing the OU2 Allocation Guide and Confidentiality Agreement (Participating Allocation Parties or PAPs) will be provided an opportunity to participate in the design of the allocation database and process and to provide additional site-related information for possible addition to the database.

- The Final Allocation Recommendation Report will divide the Allocation Parties into logical groupings of similarly situated PRPs

- EPA will provide the ERG Team with a listing and contact information for each OU2 PAP. Reference herein to meetings or other forms of communication with the OU2 PAPs means communication with the identified representatives of such parties.

- A maximum of 593,895 pages of documents will be reviewed and utilized to conduct the allocation, including:

  - A maximum of 130,000 pages of documents received from EPA for ERG Team review under the previous contract.

  - A maximum of 413,895 extra pages of documents received from PRPs for ERG Team review under the previous contract.

  - The PAPs have indicated to the ERG Team that they have an additional 50,000 pages of relevant documents to submit over the remainder of the project.

- At the time of termination of the prior Task Order, the contractor was awaiting notice from EPA on its determination regarding an offer of Early Settlement to 20 of the PAPs. Consequently, the contractor was unable to complete Draft Facility Data Reports for the PAPs being considered for a possible EPA Early Settlement offer. Therefore, Draft Facility Data Reports for such PAPs will be completed pursuant to the current work plan. The timing of EPA's determination regarding Early Settlement offers may affect the contractor's ability to complete the tasks specified in Tasks B4 and B5 within specified deadlines. For the Work Plan, the ERG Team is assuming receipt of notice of EPA's determination regarding Early Settlement offers on or before October 31, 2019.

- All communications by the ERG Team will be by phone or email unless a meeting is noted.

- The ERG Team estimates 4 hours of communications per PAP over the remainder of the project. This time is presented as communications in Tasks B3, B4, and B5, and meetings in Tasks B5 and B6. This partially responds to the PRP outreach requirements specified in Section II.B.2 of the SOW.

- A maximum of 4 hours of combined project status/update calls will be held by the ERG Team with EPA per month. ERG assumes these calls will be held on a weekly basis. This time is included under Task A3.

- The allocation database will be designed and organized primarily for purposes of allocation.

- Any part of a communication, attachment to a communication, presentation, or written material provided to OU2 PRPs by the ERG Team that involves a description of the site or EPA actions or activities will be provided to EPA for review and approval prior to submission to the OU2 PAPs.

- Unless otherwise noted herein, all allocation-related communications by the ERG Team involving the OU2 PAPs or representatives of EPA or DOJ, individually or in groups, will be held confidential pursuant to the provisions of the ADR Act of 1996, 5 USC 574.

- In order to ensure a common expectation of confidentiality, all PAP participants in the allocation process have entered, and EPA has appropriately acknowledged, a confidentiality agreement.

Pricing Estimate

- Travel:

  - Key project meetings will be held at the EPA Region 2 office or another location in the greater New York City metropolitan area as determined by EPA or hosted by OU2 PAPs if they supply meeting space. These meetings will require travel for ERG's selected service provider, whose

key staff for this project are located in the Washington, DC, area.

- o Four meetings, each involving two staff from ERG's selected service provider, are assumed. Two of these four meetings will require overnight stays.

- Space and equipment for meetings will be provided by EPA or PAPs.

## 3.    Project Methods and Approach

- As agreed upon with EPA, all reports, transmittals and deliverables—with the exception of Items B-5 and B-6 in Table 3—will be submitted to the TOCOR and Project Officer (PO). Items B-2 and B-3 will be submitted with Item B-7.

- ERG will be responsible for evaluating the service provider's performance at the end of the project and during the project if it lasts through the annual contract evaluation performance schedule.

- ERG understands that during the performance of this work, Region 2 may share information with the ERG Team that is pre-decisional and deliberative or is considered to be attorney work product in preparation of potential litigation. ERG recognizes that such work is privileged to the United States and EPA under the Freedom of Information Act. While the ERG Team will conduct the allocation process in a manner transparent to the public to the extent possible, the ERG Team will consult with EPA before releasing information to the public to ensure confidential information is protected.

In conducting this work, ERG will comply with all terms in the overall contract, including—but not limited to—the following requirements:

- ERG and subcontractor AlterEcho (ERG Team) will not interpret EPA policy on behalf of the EPA or make decisions on items of policy, regulation or statutes. The ERG Team also will not take a stand on the merits of substantive items under discussion.

- In gathering information or performing research with parties outside the EPA, ERG Team members will identify themselves as contractors to EPA and not as EPA employees.

- ERG will approach this task in accordance with the basic terms of the contract and according to the established norms and ethical standards of ADR professionals. Specifically, ERG will ensure that ADR professionals supporting this TO abide by ethical codes of conduct such as those defined in the SOW. Information provided to the ADR professional by any of the parties, communications between parties and the ADR professional, and notes and dispute resolution work product generated by the ADR professional during work pursuant to the TO will be maintained as confidential by the ADR professional pursuant to the provisions of the ADR Act of 1996 (Public Law 104-320; 5 USC 571 et al.) and applicable federal, state, and judicial requirements.

- To enhance the positive substantive, relational, and procedural outcomes from ADR cases, ERG will direct all ADR professionals providing services under this TO to do the following prior to the mediation or facilitation and throughout the process:

- o Inquire about whether individual participants have the time, financial, and logistical resources necessary to participate effectively in the process and—where resources are inadequate—assist them in identifying appropriate resources or in making necessary adjustments to the process to accommodate resource constraints.

- o Assist the participants in identifying the issues that are important to resolving any controversy and solutions that will address the needs shared by the participants.

- o Conduct the process to promote active engagement from all participants.
- o Explore with the participants appropriate ways to incorporate high quality and relevant information resources necessary to resolve the issues.
- o To support productive dialogue and effective implementation of any agreements reached by the participants, ensure that participants have appropriate authority to make commitments on behalf of their organizations.
- Obtain approval in writing for any long-distance travel.

## 4.   Work Tasks

Task B: Allocation Design and Production

*Task B1: Initial Review*

Under the previous contract, EPA provided the contractor with the information, materials, and reports generated pertaining to the allocation. AlterEcho organized and reviewed this information under that contract. No further activity or level of effort is anticipated for this task.

*Task B2: PRP Outreach*

Throughout the course of the allocation, the ERG Team will conduct outreach to OU2 PRPs participating in the allocation to provide them with the opportunity to comment on and correct the draft data reports produced under the previous contract and to provide input on the drafting of the allocation recommendation report. This will include:

- Ensuring that each PRP's data or information used in the allocation is correctly input into the database.
- Soliciting PRP positions on the drafting of the allocation recommendation report.
- Communicating how their input was or was not taken into consideration in developing the allocation recommendation report.

The activities and level of effort associated with the PRP outreach activities described above are directly linked to the Allocation Design and Production task described below. They are incorporated into the descriptions and estimates for those tasks.

Per Section II.B.2.b of the SOW, the ERG Team will prepare and provide to EPA a report regarding outreach efforts conducted with the OU2 PAPs during the entire project, including a list of participants in outreach efforts, a description of topics discussed, and a summary of issues or concerns raised.

This task will require the following efforts on the part of the ERG Team:

- Review and provide EPA with a generalized description of topics discussed and summary of issues or concerns raised by OU2 PAPs during conduct of the TO, without attribution to individual OU2 PAPs.
- Prepare and provide EPA an overview of conducted outreach efforts, including a list of OU2 PAPs that have participated in outreach meetings, conference calls, or individual communications with the ERG Team.

*Task B3: Searchable Database*

Per Section II.B.3 of the SOW, the ERG Team will maintain and update the searchable database developed under the previous contract. The searchable database contains and organizes all of the information and data used in the allocation.

- Under the previous contract, the database was designed and initially populated with information received from EPA, including PRP disclosure statements and nexus documents from third party litigation totaling approximately 130,000 pages.

- Under the previous contract, the database was also populated with up to 413,895 pages of documents received from PRPs deemed relevant to the allocation by the previous contractor and any other information used in the allocation.

- The database is designed in such a way as to allow access and use by EPA and DOJ staff for their settlement purposes.

- Completion of database: The ERG Team will upload applicable new documents received as part of the TO activities. The PAPs have indicated to the ERG Team that they have an additional 50,000 pages of relevant documents to submit. The ERG Team will complete the database and provide the completed database to EPA when the final allocation recommendation report, described in Task B7, is complete.

*Task B4: Draft and Final Facility Data Reports*

Per Section II.B.4.a of the SOW, the ERG Team will organize and conduct a technical and scientific evaluation of data in the allocation database to develop individual data reports for each of the OU2 PAP facilities for which an early settlement was not offered by EPA. Under the previous contract, 72 Draft PRP Data Reports were completed and made available to the PAPs for submission of corrections or suggestions. At the time of termination of the prior contract, the contractor was awaiting notice from EPA on its determination regarding an offer of Early Settlement to 20 additional PAPs. Consequently, the contractor was unable to complete Draft Facility Data Reports for the PAPs being considered for a possible EPA Early Settlement offer. Therefore, Draft Facility Data Reports for such PAPs will be completed pursuant to this work plan. For this work plan, the ERG Team is assuming receipt of notice of EPA's determination regarding Early Settlement offers on or before October 31, 2019. The Draft Facility Data Reports for the up to 20 Early Settlement facilities will supplement existing limited scope data reports prepared for those facilities to support the Early Settlement evaluation process and criteria. This will include review and evaluation of additional Facility Questionnaire information and supporting documents to be submitted and expanding the depth of data review focused on mass of contaminants associated with the facility. The reports will provide selected information regarding each OU2 PAP's relation to OU2 and OU2 contaminants of concern that will be used in conduct of the allocation. The ERG Team will establish a deadline of 10 business days from receipt of the Draft Facility Data Reports for submission of corrections or suggestions by the OU2 PAPs for improving the quality of the received Draft Facility Data Reports.

This task will require the following efforts on the part of the ERG Team:

- Conduct coding of data and loading of coded data obtained from OU2 PAPs into database.

- Review preliminary factual submission by OU2 PAPs.

- Review site data loaded into database to determine appropriate organization for allocation.

- Compile and organize site data in database to support allocation analysis and share computations.

- Organize data in allocation database into and draft individual OU2 PRP data reports for each of the OU2 PAP facilities for which an early settlement was not offered by EPA (up to 20 facilities).

- Provide a copy of the Draft Facility Data Reports to the OU2 PAPs for review.

Timing of this task is dependent upon receipt of notice of EPA's determination regarding Early Settlement offers on or before October 31, 2019.

Conduct of this task is dependent upon the following factors:

- Access by the ERG Team to EPA technical data regarding site conditions and the selected OU2 remedy.

- Sufficient data on identified PRPs to allow analysis of associated contaminants of concern and hazardous substance fate and transport at the site.

- Successful establishment of the allocation database.

- Receipt of additional data from OU2 PAPs for inclusion in the allocation database within established timeframes.

- As indicated in the Assumptions section of this Work Plan, it is assumed that there are an additional 50,000 pages of relevant documents to submit over the remainder of the project.

Per Section II.B.4.c of the SOW, the ERG Team will analyze corrections or suggestions for improving the quality of the Draft Facility Data Reports received from OU2 PAPs to determine whether modifications of the original draft data reports are warranted. Based on this analysis, the ERG Team will modify the data reports, as deemed appropriate. The ERG Team will then provide a copy of all of the Final Facility Data Reports to the OU2 PRPs, with an explanation of how suggested changes were, or were not, incorporated.

- This task will require the following efforts on the part of the ERG Team: Employ a rigorous approach to filling data gaps with additional information requested and obtained from EPA or the PAPs (e.g., industry resources, EPA/NJDEP files, Sanborn Fire Insurance Maps, aerial photographs and possibly supplemental 104e requests) in accordance with the protocol for handling data gaps and ambiguities included in the Allocation Methodology.

- Analyze received suggestions and corrections to Draft Facility Data Reports in relation to existing Site data and the final allocation design in order to determine appropriate modifications.

- Modify the individual data reports, as warranted based on the above analysis.

- Provide an explanation to the OU2 PAPs regarding whether, and if so how, received suggestions resulted in changes to their individual data report, including a description of why their suggestions and comments were, or were not, taken into account. Upload Final Facility Data Reports to the confidential allocation document repository.

- As required, the ERG Team will conduct communications with individual OU2 PAPs to answer questions regarding their Final Facility Data Reports.

Timing of this task is dependent upon the following factors:

- Receipt of comments from OU2 PRPs regarding their Draft Facility Data Reports within established timeframes.
- Receipt of notice of EPA's determination regarding Early Settlement offers on or before October 31, 2019.

*Task B5: Allocation and Allocation Recommendation Report*

The ERG Team will ensure that each PRP's data or information used in the allocation is accurately input into the database and will solicit from the PRPs participating in the allocation positions on the drafting of the allocation recommendation report (as described below). AlterEcho will perform the allocation. The activities and level of effort associated with performing the allocation are directly linked to the subtasks described below. They are incorporated into the descriptions and estimates for those tasks.

Per Section II.B.5.a and b of the SOW, the ERG Team will prepare a first draft of the allocation recommendation report and submit it to the OU2 PAPs for review. The draft allocation report will designate shares of responsibility among the OU2 PRPs, as appropriate based on the allocation analysis. The draft allocation report will include a recommendation on the possible grouping of the OU2 PRPs into tiers of similar levels of responsibility.

This task will require the following efforts on the part of the ERG Team:

- Conduct communications, including conference calls and/or meetings, with OU2 PAPs regarding recommendations on and legal/equitable theories pertinent to conduct of the allocation raised in Position and Response Briefs received from the OU2 PAPs. The ERG Team will focus on establishing routine group communication calls and electronic updates to achieve greater efficiency in communication and as a means to reduce individual PAP-initiated calls and electronic inquiries.

- Review and consider input regarding allocation received from the OU2 PAPs and EPA.

- Review and understand the basis for EPA's selected remedy for OU2, in consultation with EPA technical and legal personnel.

- Analyze the relative toxicity of materials discharged by OU2 PRPs and other differentiating factors, including fate and transport of hazardous substances released by PRPs based on the data contained in the RI/FFS, in relation to the selected remedy.

- Compile and analyze allocation data related to each OU2 PRP, including contaminants of concern, to establish the relative impact of the actions of each OU2 PRP on the conditions that resulted in EPA selecting the OU2 remedy.

- Load compiled PRP data into allocation calculations to determine relative relationships among the OU2 PRPs.

- As appropriate, establish appropriate tiers of OU2 PRP responsibility based on calculations and consideration of equitable factors.

- Prepare the draft allocation recommendation report.

- Submit the draft report to the OU2 PAPs for review and comment.

Timing of this task is dependent upon receipt of position briefs and reply briefs regarding allocation from OU2 PAPs within established timeframes.

Per Section II.B.5.c of the SOW, the ERG Team will plan, schedule, and conduct a meeting with the OU2 PAPs as a group regarding the draft allocation recommendation report. The purpose of the meeting will be to advise the OU2 PAPs as a group regarding the draft allocation recommendation report and to obtain preliminary PAP comments regarding the draft allocation recommendation report. The ERG Team will also communicate with the OU2 PAPs individually as necessary to obtain the input of OU2 PAPs, including those that did or were unable to attend the meeting, regarding the draft allocation recommendation report. As noted previously, the ERG Team will focus on establishing routine group communication calls and electronic updates to achieve greater efficiency in communication and as a means to reduce individual PAP initiated calls and electronic inquiries.

This task will require the following efforts on the part of the ERG Team:

- Making arrangements for a meeting in the greater New York City metropolitan area sufficient to accommodate the OU2 PAPs as a group.

- Coordination of meeting space and equipment for meetings provided by EPA or OU2 PAPs.

- Communication via email with the OU2 PAPs regarding substance, date/time, and location of meeting.

- Development of the meeting agenda.

- Development of participant materials, as needed.

- Travel of two senior staff from Washington, DC, to attend the meeting.

- Communications by a Dispute Resolution Professional via phone, email, or other electronic media with OU2 PAPs as required.

- Recording of PAP general comments regarding the draft allocation recommendation report, without attribution to individual OU2 PAP comments.

Per Section II.B.5.c of the SOW, the ERG Team will prepare a Final Allocation Recommendation Report. The Final Allocation Recommendation Report will take into consideration comments on the Draft Allocation Recommendation Report received during meetings with and received in position and reply briefs from the OU2 PAPs and during communications with EPA regarding the nature and scope of the Final Allocation Recommendation Report; address any identified ambiguities in the draft report; include references to all materials considered and relied upon, and a complete description of the allocation process and the basis upon which shares were assigned. The Final Allocation Recommendation Report will include an overview of the basis for the determinations of shares among the OU2 PRPs, including a description of the use of data sources and application of allocation factors and methodology utilized, and reason for potential vulnerabilities, if any, in the resulting allocation. The report will identify and explain the rationale, if applicable, for grouping OU2 PRPs into tiers of similar relative responsibility. The Final Allocation Recommendation Report will also address any identified ambiguities in the draft report and provide a summary of how comments of the OU2 PRPs regarding the Draft Allocation Recommendation Report were, or were not, taken into account in the final report, without attribution to individual comments.

This task will require the following efforts on the part of the ERG Team:

- Review and consider the comments received from OU2 PAPs regarding the Draft Allocation Recommendation Report.

- Conduct communications, including conference calls and/or meetings, with OU2 PAPs regarding

comments regarding the Draft Allocation Recommendation Report received from OU2 PAPs.

- Edit the Draft Allocation Recommendation Report to incorporate appropriate modifications based on received comments to produce the Final Allocation Recommendation Report.

The ERG Team will provide access the OU2 Allocation Database to identified members of the EPA Case Team. This task will require the following efforts on the part of the ERG Team:

- Submission to members of the EPA Case Team Review of credentials and instructions for accessing information in the OU2 Allocation Database.

### Task B6: Meetings or Conference Calls

The activities and level of effort associated with performing the allocation are directly linked to the other tasks in this work plan. They are incorporated into the descriptions and estimates for those tasks as noted. The ERG Team will attend and participate in the following meetings either in person or by telephone or video conference at EPA's discretion.

- Progress meetings or conference calls. Please see Task A2 of this work plan.

- Kickoff meeting or conference call with EPA. Please see Task A2 of this work plan.

- Draft allocation recommendation report meeting or conference call with PRPs. Please see Task B5 of this work plan.

It is anticipated that all meetings will be held at EPA or PRP-provided facilities.

### Task B7: Task Order Closeout Report

Per Section II.B.7 of the SOW, the ERG Team will design and produce the first draft of a report regarding the conduct of tasks pursuant to the TO and submit it for review by EPA. The report will not contain any confidential or sensitive information. The contents of the Draft Task Order Closeout Report will include:

- A half-page description of the project that describes the nature of the project, the parties, the process, and the outcomes.

- If appropriate, a short section reflecting on the process and procedural lessons learned and recommendation for improvements and identification of those activities conducted that contributed to the success of the process.

- A brief summary of the final costs of the project, broken out by percentage of labor hours and other direct costs.

This task will require the following efforts on the part of the ERG Team:

- Review of project activities and compilation of a project summary.

- Consideration and compilation of thoughts on lessons learned regarding this project.

- Compilation of project budget costs.

- Preparation of the Draft Task Order Closeout Report.

The ERG Team will prepare a Final Task Order Closeout Report and submit it to EPA. The Final Task Order Closeout Report will take into consideration comments received from EPA regarding the draft of the Task

Order closeout report. ERG will provide one copy of the Final Task Order Closeout Report to the PO and one copy to the TOCOR in electronic format.

This task will require the following efforts on the part of the ERG Team:

- Review and consideration of comments by EPA regarding the draft Task Order Closeout Report.
- Editing, and as required redesign, of the closeout report to incorporate modifications based on EPA comments in order to produce the Final Task Order Closeout Report.
- As directed by the TOCOR, the ERG Team will participate in a post-process debriefing with EPA officials to discuss lessons learned and potential next steps.

Per discussions with EPA, while the Final Allocation Report is referenced under this task in the EPA SOW, report development is not included under this task, but rather under Task B5.

*Task B8: Post-Process Debriefing*

As directed by the EPA TOCOR, the ERG Team will participate in a post-process debriefing with EPA officials, including the PO, TOCOR, and relevant EPA management, to discuss lessons learned and next steps. It is anticipated that this meeting will take place via teleconference.

Table 3. Transmittals and Deliverables Under Task B

| Item | Title | Due no later than* | Type |
|------|-------|--------------------|------|
| B-1 | Kickoff meeting or conference call | Within 20 business days of work plan approval | Activity |
| B-2 | Completion of searchable database | Upon submission of final allocation recommendation report | Deliverable |
| B-3 | Completion of final facility data reports | Within 40 business days of work plan approval | Transmittal |
| B-4 | Perform allocation | 140 business days after completion of final facility data reports | Activity |
| B-5 | Draft allocation recommendation report | 140 business days after completion of final facility data reports | Transmittal |
| B-6 | Draft allocation recommendation report meeting | Within 20 business days of submittal of draft allocation recommendation report | Transmittal |
| B-7 | Final allocation recommendation report | 65 business days after completion of draft allocation recommendation report | Deliverable |
| B-8 | Final PRP outreach report | 10 business days after completion of final allocation recommendation report | Transmittal |
| B-9 | Draft case closure report | 10 business days after acceptance of final allocation recommendation report | Transmittal |
| B-10 | Final case closure report | 10 business days after receipt of EPA comments | Deliverable |

## 5.   Reports, Transmittals, and Deliverables

ERG will submit deliverables in accordance with the contract. As agreed upon with EPA, with the exception of Items B-5 and B-6 in Table 3, copies of all contract deliverables will be sent to both the PO

and the TOCOR. Items B-2 and B-3 will be submitted with Item B-7. If oral briefings are scheduled for EPA staff, the PO will be notified in time to attend. Specific deliverables and the timing of their delivery are identified in the tables in Section 5 above.

## 6.    Staffing Plan

This task order will be staffed as described in Table 4.

Table 4. Preliminary Staffing Matrix

| Individual (firm)† | Labor category | Project role |
|---|---|---|
| David Batson (AlterEcho) | Dispute Resolution Professional - Level 3A | Senior allocation specialist; conduct allocation and prepare draft and final allocation recommendation reports; lead communication and meetings with PAPs |
| Mark Heaney (AlterEcho) | Scientific/Technical Consultant or Analyst- Level 3A | Subcontractor's project manager; quality assurance; deliverable preparation; draft and final facility data reports; draft and final allocation recommendation reports |
| Ann Schnitz, Ph.D. (AlterEcho) | Scientific/Technical Consultant or Analyst - Level 3A | Senior human health toxicologist; support performance of allocation |
| Mike Carney, Ph.D. (AlterEcho) | Scientific/Technical Consultant or Analyst - Level 3A | Senior ecological toxicologist; support performance of allocation |
| Rachel Shay (AlterEcho) | Scientific/Technical Consultant or Analyst - Level 1A | Researcher; maintenance of searchable database; preparation of draft and final facility data reports; preparation of PRP Outreach Report |
| Derek Lawrence (AlterEcho) | Scientific/Technical Consultant or Analyst - Level 2B | Researcher; preparation of draft and final facility data reports |
| Lynne Larsen (AlterEcho) | Scientific/Technical Consultant or Analyst - Level 1A | Researcher; preparation of draft and final facility data reports |
| Dan Michor (AlterEcho) | Communications Specialist Level 3 | GIS specialist; draft and final facility data reports; draft and final allocation recommendation reports |

| Individual (firm)[†] | Labor category | Project role |
|---|---|---|
| Holly Sprunger (AlterEcho) | Scientific/Technical Consultant or Analyst - Level 2B | Quality assurance; draft and final facility data reports; draft and final allocation recommendation reports data management |
| Pam Ginger (AlterEcho) | Administrative Clerical/Technical Support A | Administrative; monthly reports |
| Rachel Ireland (AlterEcho) | Scientific/Technical Consultant or Analyst - Level 2B | Researcher and data specialist; draft and final facility data reports; draft and final allocation recommendation reports data management |
| Amanda Rohrbaugh (AlterEcho) | Scientific/Technical Consultant or Analyst - Level 2B | Researcher and data specialist; draft and final facility data reports; draft and final allocation recommendation reports data management |
| Judy Manley (AlterEcho) | Scientific/Technical Consultant or Analyst - Level 3A | Data specialist; quality assurance; maintenance of searchable database; draft and final facility data reports; draft and final allocation recommendation reports |
| Karla Brasaemle (AlterEcho) | Scientific/Technical Consultant or Analyst - Level 3A | Contaminant fate and transport specialist; support allocation; draft and final allocation recommendation reports |
| Nicole Goers (AlterEcho) | Scientific/Technical Consultant or Analyst - Level 3A | Senior engineer; quality assurance; draft and final facility data reports; support allocation; draft and final allocation recommendation reports data management |
| Kristen Rapal (AlterEcho) | Scientific/Technical Consultant or Analyst - Level 3A | Researcher and data specialist; draft and final facility data reports; draft and final allocation recommendation reports data management |

# Exhibit R



United States Environmental Protection Agency
Region 2
290 Broadway, 17th Floor
New York, New York  10007

08/03/2023

Lauren Krohn
Langsam, Stevens, Silver &Hollaender LLP
1818 Market St #2430
Philadelphia, PA 19103

RE: Freedom of Information Act Request Number EPA-R2-2023-004728, Final Response

Dear Lauren Krohn,

This letter concerns the above-referenced FOIA request, received by the U.S. Environmental Protection Agency (EPA or Agency), National FOIA Office (NFO), on June 9, 2023. Your FOIA request was assigned to EPA Region 2; the request sought the expert report authored by Robert Parette referenced on page 4 of the "Occidental Chemical Corporation Facility Data Report" included in Attachment J to the December 28, 2020 Diamond Alkali Superfund Site OU2 Allocation Recommendation Report (see FOIA request for exact wording).

The Agency has concluded its search for records responsive to your request and is providing the enclosed record as it was received from AlterEcho through ERG, EPA's prime contractor, except for the "Declassified" stamp that EPA added.  EPA has considered the foreseeable harm standard when reviewing records.

The cost to process your request was $97. Please see the attached invoice for billing and payment instructions.

This letter concludes EPA Region 2's response to your FOIA request.  You may appeal this determination by email at hq.foia@epa.gov, or by mail to the EPA's National FOIA Office, U.S. EPA, 1200 Pennsylvania Avenue, N.W. (2310A), Washington, DC 20460 or through FOIAonline if you are an account holder. If you are submitting your appeal by hand delivery, courier service, or overnight delivery, you must address your correspondence to 1200 Pennsylvania Avenue, N.W., WJC-N Building, Room 7309C, Washington, DC 20460.

Your appeal must be in writing, and it must be received no later than 90 calendar days from the date of this letter. The Agency will not consider appeals received after the 90-calendar-day limit. Appeals received after 5:00 p.m. EST will be considered received the next business day. The appeal letter should include the FOIA tracking number listed above.  For quickest possible handling, the subject line of your email, the appeal letter, and its envelope, if applicable, should be marked "Freedom of Information Act Appeal."

If you need any further assistance or would like to discuss any aspect of your request, you may seek assistance from EPA's FOIA Public Liaison at hq.foia@epa.gov or call (202) 566-1667. You may also seek assistance from the Office of Government Information Services (OGIS). You may contact OGIS in any of the following ways: by mail, Office of Government Information Services, National Archives and Records Administration, 8601 Adelphi Road, College Park, MD 20740-6001; email: ogis@nara.gov; telephone: (202) 741-5770 or (877) 684-6448; or fax: (202) 741-5769. For all media inquiries, please contact press@epa.gov.

Sincerely,

 /s/


Patricia C. Hick
Acting Deputy Regional Counsel

ADR CONFIDENTIAL
NOT BINDING OR TO BE DEEMED AN ADMISSION FOR ANY OTHER PURPOSE OR PROCEEDING



MATSON &
ASSOCIATES

DECLASSIFIED

_____  _____
Initials        Date

**Expert Report**

Opinions on the Discharges of COCs
from 80 Lister Avenue (Newark, NJ)
into the Lower Passaic River

Prepared for:
Lower Passaic River Small Parties Group

**Robert Parette, Ph.D., P.E.**

**June 14, 2019**

**PREPARED SUBJECT TO REQUIREMENTS OF AND FOR
USE ONLY IN EPA ALLOCATION**

ADR CONFIDENTIAL
MEDIATION SESSION
COMMUNICATION NOT BINDING OR TO BE DEEMED AN ADMISSION FOR ANY OTHER PURPOSE OR PROCEEDING



**Figure 12: 1956 site "sewer map" showing outfalls to LPR from production areas[103]**