# Exhibit 18

# Attachment 6

# Quarterly Progress Report

## January to March 2022

Remedial Design – Lower 8.3 Miles of the Lower Passaic River
Operable Unit Two of the Diamond Alkali Superfund Site
In and About Essex and Hudson Counties – New Jersey

April 2022
Revision 0



**Glenn Springs Holdings, Inc.**
A Subsidiary of Occidental Petroleum
5 Greenway Plaza, Suite 110
Houston, TX 77046

OCC-CER-E002595567

# TABLE OF CONTENTS

1    Purpose .................................................................................................................. 1

2    Summary of Activities During Reporting ............................................................... 1

2.1    Deliverables and Documentation.................................................................... 1

2.2    Field Activities ................................................................................................ 1

2.3    In-River Remedial Design .............................................................................. 2

2.3.1    Design Criteria Report .......................................................................... 2

2.3.2    Basis of Design Report ......................................................................... 2

2.4    Upland Facilities Remedial Design ................................................................ 3

2.5    Supporting Deliverables ................................................................................. 5

2.5.1    Site Wide Monitoring Plan .................................................................... 5

2.5.2    Community Health and Safety Plan ...................................................... 5

2.5.3    Construction Quality Assurance/Quality Control Plan and Borrow Site Assessment ............... 6

2.5.4    Institutional Controls Implementation and Assurance Plan .................. 6

2.5.5    Operation and Maintenance Plan.......................................................... 6

2.5.6    Transportation and Offsite Disposal Plan ............................................. 6

2.6    Meetings ......................................................................................................... 7

3    Sampling Results and Data Transmittal ............................................................... 7

4    Description of Submitted Deliverables ................................................................. 7

5    Remedial Design Schedule .................................................................................. 8

6    Description of Modifications ................................................................................. 8

7    Community Involvement Plan Activities ............................................................... 9

8    Planned Activities for Next Quarter ..................................................................... 9

8.1    Field Activities ................................................................................................ 9

8.2    In-River Remedial Design .............................................................................. 9

8.2.1    Design Criteria Report .......................................................................... 9

8.2.2    Basis of Design Report ......................................................................... 9

8.3    Upland Facilities Remedial Design .............................................................. 10

8.4    Supporting Deliverables ............................................................................... 11

8.4.1    Site Wide Monitoring Plan .................................................................. 11

8.4.2    Community Health and Safety Plan .................................................... 11

8.4.3    Construction Quality Assurance/Quality Control Plan and Borrow Site Assessment ............. 11

8.4.4    Institutional Controls Implementation and Assurance Plan ................ 11

OCC-CER-E002595568

8.4.5    Operation and Maintenance Plan ........................................................... 12

8.4.6    Transportation and Disposal Plan ........................................................... 12

## LIST OF ATTACHMENTS

Attachment 1  Project Deliverables Chronology ................................................... 13

Attachment 2  Remedial Design Project Deliverables Schedule ............................ 24

Attachment 3  Remedial Design Project Schedule ............................................... 31

OCC-CER-E002595569

# 1    PURPOSE

As per the Administrative Settlement Agreement and Order on Consent for Remedial Design (Settlement Agreement) Statement of Work (SOW), Paragraph 4.3, this Quarterly Progress Report provides a description of activities that took place during the reporting period, including:

a) **Summary of Activities During Reporting Period**: Includes actions that have been taken toward achieving compliance with the Settlement Agreement.

b) **Sampling Results and Data Transmittal**: Includes results of sampling, tests, and all other data received or generated by the Settling Party, in an interactive, searchable database (in Excel or Access format) upon completion of data validation.

c) **Description of Submitted Deliverables**: Provides a description of all deliverables the Settling Party submitted to the U.S. Environmental Protection Agency (EPA).

d) **Remedial Design (RD) Schedule**: Includes an updated RD schedule, together with information regarding approximate percentage of completion, delays encountered or anticipated that may affect the future schedule for completion of the RD, and a description of efforts made to mitigate those delays or anticipated delays.

e) **Description of Modifications**: Provides a description of any modifications to the work plans or other schedules that the Settling Party has proposed or that have been approved by EPA.

f) **Community Involvement Plan (CIP) Activities**: Provides a description of all activities undertaken in support of the CIP during the reporting period and those to be undertaken during the next reporting period.

Descriptions of these activities for the subject period are presented in Sections 2 through 7. In addition, Section 8 presents a brief description of anticipated activities in the next quarterly reporting period (although this is not a requirement of the Settlement Agreement SOW).

# 2    SUMMARY OF ACTIVITIES DURING REPORTING

Various activities were performed during the reporting period to support compliance with the Settlement Agreement SOW, as summarized below.

## 2.1    Deliverables and Documentation

Refer to Section 4 and Attachment 1 (Project Deliverables Chronology) for a list of deliverables submitted to EPA during the reporting period.

## 2.2    Field Activities

During the reporting period, the following field-related activities were performed:

- Initiated the field investigation at Passaic Valley Sewerage Commission (PVSC) by mobilizing to the site on March 4. After utility clearances were complete, began upland soil borings using mud-rotary drilling on the Witco parcel on March 14. Marine borings (mud-rotary drilling) along the Witco shoreline began on March 30. The geophysical survey that supported the utility clearance was also

OCC-CER-E002595570

conducted to identify other subsurface features (e.g., historical building foundation remnants). Field work was conducted with EPA oversight personnel present.

- Initiated collection of sediment cores and surface water for use in the dewatering and water treatment bench-scale studies on March 16. As of the end of March, approximately 70% of the core collection was completed.

## 2.3 In-River Remedial Design

The in-river components of the 95 Percent Design (95PD) Basis of Design Report (BODR) were submitted to EPA on March 31, which incorporated revisions based on EPA comments on the 60 Percent Design, as well as EPA comments on the 95PD advanced deliverables. The following subsections discuss the Design Criteria Report (DCR) and the in-river components of the 95PD BODR.

### 2.3.1 Design Criteria Report

The Design Criteria Report (DCR) summarizes and explains the criteria that are considered for specific elements of the design. The 95PD submittal included design criteria related to in-river and upland facilities and the following appendices:

- Applicable or Relevant and Appropriate Requirements and To Be Considered Criteria (Appendix A)
- EPA Region 2 Green Policy Touchstone Practices Metrics (Appendix B)

### 2.3.2 Basis of Design Report

The BODR describes relevant design elements and includes technical appendices with supporting engineering calculations and analysis. The following design support activities were completed during the reporting period based on EPA input and for advancement of the design toward the 95PD deliverable:

- Continued quantitative evaluations to support the remedial action (RA) dredge-then-cap sequence.
- Completed the modeling of sediment traps in the federal navigation channel to determine the size. Coordinated with EPA to evaluate the effectiveness of the sediment traps, which will continue in the next reporting period.
- Completed the development of the resuspension monitoring water quality standards and the dredging sequence and schedule.
- Completed the capping design for the non-aqueous phase liquid areas, sensitivity testing for the chemical isolation layer, the capping sequence and schedule, and cap transitions.
- Updated the intertidal mudflat and vegetated wetland functions and values assessment based on the 95PD cap design units, cap surface elevations, and planned habitat enhancements.
- Confirmed the dredging slope stabilities for the final 95PD dredge prism design and the capping slope stabilities for the 95PD cap surface design. Where needed, identified additional evaluation to be completed during the 100 Percent Design (100PD). Prepared capping transitions details.
- Revised the capping extent along the southern side of Kearny Point where the area transitions to the Hackensack River.

OCC-CER-E002595571

- Submitted calculation packages estimating potential settlement in bridge corridors to bridge owners for review and input.

- Completed the BODR main text, figures, and tables. Upland facilities content was incorporated to the extent practical. The submittal also included the following appendices:

  o Appendix A – Remedial Design Drawings

  o Appendix B – Remedial Design Specifications

  o Appendix C – Sediment Data Synthesis, Calculations, and Cap Design Unit Development

  o Appendix D – Utility Corridors Design

  o Appendix E – Evaluation of Zones of Influence and Dredging Offsets for Shorelines and Structures

  o Appendix F – Dredge and Cap Designs for Bridge Corridors

  o Appendix G – Dredge and Cap Stability Geotechnical Analyses

  o Appendix H – Debris Removal

  o Appendix I – Evaluation of Dredging Technologies

  o Appendix J1 – Dredge Plume Dispersion Modeling

  o Appendix J2 – Resuspension Best Management Practices Applicable to Operable Unit 2

  o Appendix J3 – Resuspension Monitoring Program

  o Appendix J4 – Residuals Stabilization Layer Evaluation

  o Appendix K – Flood Elevation Modeling for Cap Surface Design

  o Appendix L – Chemical Isolation Cap Modeling

  o Appendix M – Erosion Protection Design

  o Appendix N – Intertidal Mudflat Restoration Plan

  o Appendix O – Vegetated Wetlands Restoration Plan

  o Appendix P – Remedial Action Seasonal Planning and Adaptive Management

  o Appendix Q – Permit Substantive Requirements Compliance Documentation

  o Appendix R – Cap Material Management.

## 2.4 Upland Facilities Remedial Design

Following submittal of the 60 Percent Design, the upland facilities design was envisioned as a design-build effort to be conducted under a new partial consent decree. However, as the 95PD advanced, Glenn Springs Holdings, Inc. (GSH) and EPA agreed to complete the design for the upland facilities under the current Settlement Agreement. The upland facilities design will, therefore, be incorporated into the BODR (Section 2.3.2 above), and the appendices will be submitted to EPA separately due to the later timing of the associated design activities. The design deliverables associated with the upland facilities are

OCC-CER-E002595572

anticipated to be submitted in two packages, one in December 2022 and the second in March 2023. During the reporting period, the following activities were completed:

Sediment desanding and dewatering plant (SDDP) and water treatment plant (WTP) design:

- Completed preparation of the Dewatering Bench-Scale Study Work Plan for determining appropriate filter cloth and polymer usage and estimate production scale filter cake percent solids, throughput capacity and dewatering cycle time to support the design of the SDDP. Field work was initiated as discussed in Section 2.2.

- Continued preparation of the Water Treatment Bench-Scale Study Work Plan. The water treatment bench-scale study will be used to refine the design parameters for the specific unit processes of the WTP to comply with discharge criteria. The study will use the filtrate generated during the dewatering bench-scale study.

- Initiated updates to the SDDP mass balance based on the RA sequence and schedule, including confirming solids and water throughputs for the sediment processing and WTP.

- Developed range of influent flow rates for the WTP. Continued the design of the plant, including identifying the minimum number of pieces of equipment.

- Updated Appendix Q (Permit Substantive Requirements Compliance Documentation) for the March 2022 95PD BODR (Section 2.3.2) to include substantive requirements related to upland facilities work. Documentation of how the RD addresses the substantive requirements will be added later in 2022 and submitted to EPA with other upland facilities appendices.

- Initiated development of the deliverables associated with the SDDP and WTP components (to be submitted in December 2022):
  - Appendix A – SDDP and WTP Drawing Sets
  - Appendix B – RD Specifications for the SDDP and WTP
  - Appendix S – Sediment Desanding and Dewatering Plant Design
  - Appendix T – Water Treatment Plant Design.

PVSC site development:

- Completed preparation of the PVSC Field Investigation Work Plan The work plan includes collecting geotechnical data from upland and marine soil borings and test pits, conducting additional cultural resources evaluations, and a wetlands assessment. Data obtained will be used for the site development design for the PVSC site.

- Established routine coordination meetings with PVSC to attempt to facilitate PVSC's desire to continue to utilize portions of the PVSC site while still prioritizing site acreage for the OU2 RA.

- Performed additional Delft3D flood modeling to evaluate potential flood rise impacts to surrounding uplands due to potential flood protection measures installed on the PVSC site.

- Refined the site layout to account for potential flood protection measures being evaluated. Expanded the footprint of the SDDP and WTP elements. Defined building and parking lot sizes.

- Prepared conceptual SDDP, WTP, and upland support facility (USF) layout for PVSC and included preliminary version in the 95PD BODR (Section 5.1).

OCC-CER-E002595573

- Initiated development of the deliverables associated with the PVSC site development components (to be submitted in March 2023):

  o Appendix A – PVSC Site Development Drawing Sets

  o Appendix B – RD Specifications associated with the PVSC site development

  o Appendix U1 – PVSC Site Development.

USF site development:

- Continued evaluating properties that may be available for USFs during the RA, including various municipal-owned properties.

- Prepared conceptual dredging USF layout for Public Service Electric and Gas Company (PSE&G) Harrison and included preliminary version in the 95PD BODR discussed in Section 2.3.2.

- Prepared conceptual capping USF layouts and included preliminary versions in the 95PD BODR Appendix R.

- Evaluated potential settlement of the existing Operable Unit 1 (OU1) cap from USF activities associated with OU2.

- Coordinated with Mariana Properties Site project team to discuss the forthcoming upland capping remedy to be installed at this site and proposed upland support activities for the RA.

- Conducted meeting with PSE&G to discuss use of PSE&G Harrison as a USF for the RA.

- Initiated development of the deliverables associated with the upland facilities site development components:

  o Appendix A – USF Site Development Drawing Sets (to be submitted in March 2023)

  o Appendix B –RD Specifications associated with the USF site development (to be submitted in March 2023)

  o Appendix U2 – USF Site Development (to be submitted in December 2022).

## 2.5    Supporting Deliverables

### 2.5.1    Site Wide Monitoring Plan

The Site Wide Monitoring Plan (SWMP) describes collection and evaluation of post-construction monitoring data to measure progress towards achieving interim remediation milestones and remediation goals, reducing risk to potential receptors, and attaining RA objectives. During the reporting period, EPA comments on Revision 3, which were received in December 2021, were reviewed and edits were initiated. In addition, a meeting with EPA was held on January 18 to discuss EPA's general comment #3 to resolve questions on the sampling approach for armor stone cap areas with expected initial limited sediment deposition and the generalized random tessellation stratified sample design.

### 2.5.2    Community Health and Safety Plan

The Community Health and Safety Plan (CHASP) evaluates potential impacts to community health and safety and summarizes monitoring, mitigation measures, safety management, and community reporting

---

OCC-CER-E002595574

for the following quality of life concerns: air quality, odor, noise, light, road traffic, and marine navigation. During the reporting period, changes to the air quality monitoring program outlined in the draft CHASP were initiated, and upland facilities locations were added. Revisions were also made to address EPA's comments on the draft CHASP received in December 2021.

In addition, a presentation to the Community Advisory Group was given on March 10 to present quality of life-related monitoring and controls.

### 2.5.3 Construction Quality Assurance/Quality Control Plan and Borrow Site Assessment

The Construction Quality Assurance/Quality Control Plan (Construction QA/QC Plan) outlines construction quality assurance activities to verify construction is performed in accordance with the approved final design specifications and quality objectives. A revised Construction QA/QC Plan (Revision 1) was submitted to EPA on December 21, which also included the first draft of the Resuspension Monitoring Field Sampling Plan and the revised Borrow Site Assessment appendix. EPA comments were received February 22 and review of the comments was initiated.

In addition, revisions to the Air Monitoring Field Sampling Plan appendix continued. The revisions include adjustments to the air monitoring framework and additional items to address EPA comments.

### 2.5.4 Institutional Controls Implementation and Assurance Plan

The Institutional Controls Implementation and Assurance Plan (ICIAP) describes the plan for implementing and maintaining the institutional controls required for the remedy. The ICIAP provides the details for three types of planned institutional controls: information devices for enhanced fish and crab consumption advisories, governmental controls and proprietary controls for cap protection based on property ownership, and governmental controls and informational devices for cap protection using navigation restrictions. A draft ICIAP was submitted to EPA for review on September 30. During the reporting period, additional EPA comments were received on January 26 and review of the comments was initiated. To facilitate addressing EPA's December 2021 comments, a meeting was held with EPA, U.S. Army Corps of Engineers (USACE), and U.S. Coast Guard (USCG) to discuss navigation-based institutional controls on March 3. In addition, real property deeds and survey maps research is ongoing.

### 2.5.5 Operation and Maintenance Plan

The Operation and Maintenance Plan (OMP) describes the procedures for addressing cap repair and maintenance in areas identified through routine monitoring under the SWMP. A draft OMP was submitted to EPA for review on September 30, and EPA comments were received on November 12. During the reporting period, edits to the document were initiated.

### 2.5.6 Transportation and Offsite Disposal Plan

The Transportation and Disposal Plan (TODP) documents the transportation and disposal options for dredged material. The 95PD TODP will define the RA waste characterization process, evaluate shipping logistics; requirements for local, offsite transloading shipments of dewatered sediment via rail; and local transportation routes concerning PVSC and the Clean Earth commercial stabilization facility in Jersey City, New Jersey. During the reporting period, the waste characterization process was advanced,

---

OCC-CER-E002595575

including evaluating the potential need for additional in-situ sediment sampling based on offsite disposal or beneficial use facility requirements, when these samples would be collected, and use of the rapid TAT method for dioxin analysis to confirm offsite facility acceptance based on post-processing concentrations.

In addition, the following activities for the site-specific rapid TAT dioxin analytical method comparability study were advanced:

- Ann Arbor Technical Services completed the analyses of 60 archived sediment samples using the draft rapid TAT analytical method for dioxins and furans. Prepared splits of the 60 sediment samples and shipped to SGS Wilmington for laboratory analysis for dioxins and furans.

- Initiated the laboratory analysis of the 60 sediment split samples for dioxin and furans by EPA Method 1613. SGS Wilmington completed the analysis of 40 samples by the end of March. SGS Wilmington will complete the analysis of the remaining 20 samples in April. The results will be used to complete the site-specific rapid TAT dioxin method comparability study.

## 2.6   Meetings

Major review meetings for this reporting period conducted between EPA, EPA's technical consultants, stakeholders, and the GSH team are described below:

- **January 18**. Teleconference to discuss EPA's general comment #3 on the SWMP.

- **February 18**. Meeting between EPA, GSH and PVSC to coordinate on the design of the PVSC site for use as the UPF and a USF for the OU2 RA.

- **March 3**. Teleconference to discuss EPA and USCG comments on the draft navigation-based institutional controls under a USCG regulated navigation area in the ICIAP.

- **March 29.** Teleconference during which a summary of the 2,3,7,8- tetrachlorodibenzodioxin (2,3,7,8-TCDD) results from Ann Arbor Technical Services analyses using the draft rapid TAT dioxin method was presented.

## 3   SAMPLING RESULTS AND DATA TRANSMITTAL

There were no data submittals during the reporting period.

## 4   DESCRIPTION OF SUBMITTED DELIVERABLES

Deliverables submitted to EPA since the Settlement Agreement was issued in 2016 are listed in the Project Deliverables Chronology provided as Attachment 1. RD deliverables submitted to EPA for the January to March 2022 reporting period are listed below:

- In-River RD:
  - The 95PD DCR was submitted to EPA on March 31.
  - The 95PD BODR with the in-river components was submitted to EPA on March 31. This submittal included the main text, tables, and figures, and Appendices A through R.

OCC-CER-E002595576

- Upland Facilities RD:

  o The draft Dewatering Bench-Scale Study Work Plan was submitted to EPA on January 14. EPA comments were received on February 1.

  o The revised Uniform Federal Policy for Quality Assurance Project Plan (Revision 24) for use in the PVSC field investigation was submitted to EPA on January 21. EPA approval was received January 25.

  o The revised PVSC Field Investigation Work Plan (Revision 1) was submitted to EPA on January 25. EPA approval was received on February 4.

  o The draft Water Treatment Bench-Scale Study Work Plan was submitted to EPA on January 31. EPA comments were received on February 22.

  o The revised UFP-QAPP (Revision 25) for the bench-scale study work plans was submitted to EPA on January 31. EPA comments were received on February 22.

  o The revised Dewatering Bench-Scale Study Work Plan (Revision 1) was submitted to EPA on February 9. EPA conditional approval and minor comments were received on March 2.

  o The revised Health and Safety Plan (HASP) (Revision 11) for the PVSC field investigation and bench-scale studies was submitted to EPA on February 17.

  o The revised HASP (Revision 12) for additional changes related to the PVSC field investigation was submitted to EPA on February 24.

  o The revised Dewatering Bench-Scale Study Work Plan (Revision 2) was submitted to EPA on March 4 and EPA approved on March 7.

  o The revised Water Treatment Bench-Scale Study Work Plan (Revision 1) and revised UFP-QAPP (Revision 25) were submitted to EPA on March 21. EPA comments were received on March 29 and a revised documents will be submitted next reporting period.

  o GSH requested approval from EPA for disposal locations for waste generated from the Dewatering Bench-Scale Study and PVSC uplands Witco property investigation work during this reporting period. EPA provided approval for the three disposal locations on March 29, April 1st, and April 7th.

# 5    REMEDIAL DESIGN SCHEDULE

The current RD project deliverables schedule is provided in Attachment 2, and a Gantt Chart schedule for design deliverables is provided in Attachment 3. The schedule reflects the 95PD upland design efforts in 2022 and early 2023, followed by submittal of the 100PD (including supporting deliverables) in August 2023.

# 6    DESCRIPTION OF MODIFICATIONS

No change requests were submitted during this reporting period.

OCC-CER-E002595577

# 7    COMMUNITY INVOLVEMENT PLAN ACTIVITIES

Due to the COVID-19 pandemic, the Community Advisory Group meetings were performed virtually. Virtual meetings were held on January 13 and March 10. On January 13, EPA provided a brief update on the status of the 95PD. On March 10, EPA provided an update on the expected content in the in-river 95PD and GSH provided a brief status of the 95PD, as well as an overview of the CHASP.

# 8    PLANNED ACTIVITIES FOR NEXT QUARTER

The following activities are planned for the next quarter (April through June 2022). Because of the changes to the upland facilities design, this section has been re-arranged since the previous quarterly progress report to align with the path forward.

## 8.1    Field Activities

The following field-related activities are anticipated in the next reporting period:

- Continue implementation of the field investigation at PVSC. Field work at Witco will conclude in mid-April with follow-up field work (topographic survey, wetlands delineation verification, and excavation of two final test pits) to occur during a second mobilization later in 2022 when the site is projected to be less active/occupied. Additional field work at SalSon will occur later in 2022 after access is obtained.

- Continue collection of sediment and surface water for use in the sediment dewatering and water treatment bench-scale studies. Field work is anticipated to continue through mid-April.

- Conduct the sediment dewatering bench-scale studies. Mobilization is planned for April 4, and bench-scale testing at the OU1 Lister site will commence on April 12.

- Conduct the water treatment bench-scale studies. Bench-scale testing at the subcontractor's (SAMCO's) facilities is anticipated to begin April 25, pending generation of filtrate from the sediment dewatering studies.

## 8.2    In-River Remedial Design

Because the in-river pre-final design was completed during the reporting period, the project will transition to the final design (100PD) phase in the next reporting period.

### 8.2.1    Design Criteria Report

EPA comments on the 95PD DCR submittal are anticipated in the next reporting period. Review of the comments will begin following receipt.

### 8.2.2    Basis of Design Report

Various design elements will be completed for the 100PD, including design support activities, such as:

- Coordination with berthing area owners regarding changes needed for the dredging and cap surface grading plans to maintain stable berthing area structures during dredging.

OCC-CER-E002595578

- For a limited number of outfalls identified in BODR Appendix E (Evaluation of Zones of Influence and Dredging Offsets for Shorelines and Structures), continue the evaluation of the impact of sediment removal on the adjacent structures.

- Follow up with two bridge owners (NJ Department of Transportation and NJ Turnpike Authority) regarding their questions on the settlement calculations included in the 95PD.

- Continue modeling of the sediment traps in the federal navigation channel to evaluate effectiveness. Evaluate revised sediment trap modeling data from EPA to determine sedimentation rates, captured contaminant mass, and reductions in flux to Newark Bay.

- Following concurrence with EPA on the proposed RA sequence in the 95PD, initiate the Delft3D modeling to update turbidity advisory values based on the RA sequence (modeling conducted during the 95PD utilizes the 60PD RA schedule).

- Coordinate with EPA on modeling to update resuspension monitoring water quality standards values based on the 95PD RA sequence.

- Anticipate EPA comments on the 95PD submittal and begin review.

## 8.3   Upland Facilities Remedial Design

As discussed in Section 2.4, the BODR appendices for the upland facilities, as well as the associated RD Drawings and RD Specifications will be submitted to EPA in December 2022 and the second submission in March 2023. In the next reporting period, the following design activities will be conducted:

- Continue the SDDP and WTP design:
  - Complete the sediment dewatering bench-scale study and evaluate study results.
  - Continue the water treatment bench-scale study and laboratory analysis of the results. Begin evaluating the study results.
  - Complete preliminary SDDP design and mass balance, including preparing the process flow diagram, developing scalped materials management, and developing sand separation management.
  - Continue the WTP design, including preparing the mass balance, preparing instrumentation diagrams, and preparing equipment lists.

- Continue the PVSC site development:
  - Complete the PVSC field investigation at the Witco parcel (two test pits and the topographic survey will be conducted during a second mobilization later in 2022) and associated geotechnical laboratory analysis. Begin evaluating the geotechnical data.
  - Prepare existing conditions drawings.
  - Advance civil design components.
  - Finalize flood protection measures.
  - Developing building schematics.

- Continue the USF site development:

OCC-CER-E002595579

    o   Identify shoreline/waterfront structural improvements.

    o   Identify in-river improvements to support transfer of material to and from the USF, such as dredging and/or armoring to accommodate loading areas.

    o   Initiate drawings for each USF.

## 8.4 Supporting Deliverables

The supporting deliverables will be advanced in the next reporting period. The supporting deliverables are anticipated to be submitted to EPA in June and September 2022.

### 8.4.1 Site Wide Monitoring Plan

Revisions to the SWMP will continue to be made in the next reporting period, and Revision 4 will be submitted to EPA in June. A meeting with EPA is anticipated in the next reporting period to discuss refinements to EPA's proposed sampling approach.

### 8.4.2 Community Health and Safety Plan

Revisions to the draft CHASP will continue to be made in the next reporting period, and Revision 1 will be submitted to EPA in June. In addition, the risk-based air quality criteria will be recalculated based on the revised exposure durations, the odor monitoring program will be expanded, and the preliminary transportation routes will be added to the CHASP. A meeting with EPA is anticipated during the next reporting period to discuss the revised air monitoring program in advance of the submittal in June.

### 8.4.3 Construction Quality Assurance/Quality Control Plan and Borrow Site Assessment

Revisions to the Construction QA/QC Plan will continue to be made in the next reporting period, and Revision 2 will be submitted to EPA in June. In addition to addressing EPA's comments received in February, updates are also anticipated to reflect advancements in the 95PD BODR and the upland facilities construction quality assurance activities. Meetings with EPA are anticipated during the next reporting period to discuss the borrow site assessment criteria, resuspension monitoring field sampling plan, and in situ testing during cap placement.

### 8.4.4 Institutional Controls Implementation and Assurance Plan

Revisions to the ICIAP will continue to be made in the next reporting period, and Revision 1 will be submitted to EPA in June. In addition to addressing EPA's comments, updates are also anticipated to reflect discussions with the USCG and the additional real property research. Per USCG's suggestion, a series of teleconferences will also be conducted to discuss the proposed navigation based institutional controls with berthing area owners, USCG's bridges manager, USACE permitting department, and NJDEP permitting department.

OCC-CER-E002595580

### 8.4.5 Operation and Maintenance Plan

EPA's comments on the draft OMP will continue to be addressed during the next reporting period, and updates to the OMP will be completed in tandem with revisions to the SWMP and ICIAP. The revised OMP will be submitted to EPA on June 30.

### 8.4.6 Transportation and Disposal Plan

The development of the TODP will continue in the next reporting period. In the next reporting period, the following activities are anticipated:

- Update the dredged material waste characterization dataset based on the dredge limits submitted with the 95PD BODR in March 2022 (Section 2.3.2).

- Continued development of the process to be implemented during the RA for identification, selection and approval of waste disposal facilities, waste characterization and waste profile approval, including:

  o Additional discussions with the Pennsylvania Department of Environmental Protection to formalize a process to approve dredged material for beneficial use at the Clean Earth of Bethlehem site.

- Continued evaluation of shipping logistics, offsite transloading options, and local transportation routes.

  Continue the site-specific rapid TAT dioxin analytical method comparability study. SGS expects to complete 2,3,7,8-TCDD analyses of the remaining 20 of the total 60 samples obtained from archive using EPA Method 1613, for comparison to results obtained by Ann Arbor Technical Services using the site-specific method. Development of the correlation of validation study report will occur.

OCC-CER-E002595581

**Attachment 1**
**Project Deliverables Chronology**

OCC-CER-E002595582



**PROJECT DELIVERABLES CHRONOLOGY**

Pre-Design Investigation and Remedial Design
Lower 8.3 Miles of the Lower Passaic River
Operable Unit Two (OU2) of the Diamond Alkali Superfund Site
In and About Essex and Hudson Counties, New Jersey

**April 2022**

| Date | Deliverable Information | |
|------|------|------|
| Date | Type/Title | Description |
| 10/7/2016 | Initial | Project Coordinator Designation submitted to EPA by GSH |
| 10/14/2016 | Initial | Supervising Contractor Designation submitted to EPA by GSH |
| 10/19/2016 | Initial | EPA approval of Tetra Tech as Supervising Contractor |
| 10/25/2016 | Initial | Financial assurance documentation submitted to EPA by GSH |
| 12/21/2016 | PMP | Draft PMP submitted to EPA by GSH |
| 1/13/2017 | RDWP/ERP | Draft RDWP with ERP submitted to EPA by GSH |
| 1/17/2017 | Quarterly | Quarterly Progress Report (for period of Oct. through Dec. 2016) submitted to EPA by GSH |
| 2/27/2017 | PMP | Final PMP submitted to EPA by GSH |
| 3/7/2017 | RDWP/ERP | Draft RDWP/ERP submitted to EPA by GSH |
| 3/22/2017 | RDWP/ERP | Final RDWP/ERP submitted to EPA by GSH |
| 3/23/2017 | RDWP/ERP | EPA approval of RDWP/ERP received |
| 4/7/2017 | GBSD WP | Draft GBSD WP submitted to EPA by GSH |
| 4/7/2017 | HASP | Draft HASP submitted to EPA by GSH |
| 4/7/2017 | UFP-QAPP | Draft FSP/UFP-QAPP submitted to EPA by GSH |
| 4/14/2017 | Quarterly | Quarterly Progress Report (for period of Jan. through Mar. 2017) submitted to EPA by GSH |
| 5/22/2017 | PDI WP | Draft PDI WP submitted to EPA by GSH |
| 5/22/2017 | SWMP | Draft SWMP submitted to EPA by GSH |
| 6/8/2017 | UFP-QAPP | Revised FSP/UFP-QAPP with RTC submitted to EPA by GSH |
| 6/8/2017 | GBSD WP | Revised GBSD WP submitted to EPA by GSH with response to EPA 5/4 comments |
| 6/21/2017 | SSEWP | Draft SSEWP submitted to EPA by GSH |
| 6/23/2017 | GBSD WP | Revised GBSD WP submitted to EPA by GSH with response to EPA 6/15 comments |

Attachment 1                                                                                                    14

OCC-CER-E002595583

| Date | Deliverable Information | |
|------|------------|-------------|
| Date | Type/Title | Description |
| 6/26/2017 | GBSD WP | EPA approval of GBSD WP received |
| 7/14/2017 | Quarterly | Quarterly Progress Report (for period of April through June 2017) submitted to EPA by GSH |
| 8/11/2017 | UFP-QAPP | Revised FSP/UFP-QAPP submitted to EPA by GSH |
| 8/11/2017 | PDI WP (App. I) | Revised draft PDI WP App. I (Cultural Resources Survey WP) submitted to EPA by GSH |
| 8/18/2017 | PDI WP – Group 1 | Revised Draft Appendices C-1 (Sediment Coring); C-2 (Geotechnical); C-3 (Waste); F (DRET); and G (Bulkhead) submitted to EPA by GSH |
| 9/8/2017 | SSEWP | Revised draft SSEWP (Rev. 1) submitted to EPA by GSH |
| 9/22/2017 | UFP-QAPP | Revised FSP/UFP-QAPP submitted to EPA by GSH |
| 9/22/2017 | PDI WP – Group 1 | Revised Draft Appendix C-1 (Sediment Coring); C-2 (Geotechnical); C-3 (Waste); F (DRET); G (Bulkhead); and L (SOPs) submitted to EPA by GSH |
| 9/28/2017 | UFP-QAPP | Revised FSP/UFP-QAPP submitted to EPA by GSH |
| 9/28/2017 | PDI WP – Group 1 | Revised Draft Appendix C-1 (Sediment Coring); C-2 (Geotechnical); C-3 (Waste); F (DRET); and G (Bulkhead) submitted to EPA by GSH |
| 9/29/2017 | UFP-QAPP | EPA approval of FSP/UFP-QAPP (Rev. 4) received |
| 9/29/2017 | PDI WP – Group 1 | EPA Approval of Appendix C-1 (Sediment Coring); C-2 (Geotechnical); C-3 (Waste); F (DRET); G (Bulkhead); I (Cultural); and L (SOPs for App. C, F, G and I) |
| 10/13/2017 | Quarterly | Quarterly Progress Report (for period of July through September 2017) submitted to EPA by GSH |
| 10/13/2017 | UFP-QAPP | Revised FSP/UFP-QAPP (Rev. 5) associated with updated Group 2 PDI WP components submitted to EPA by GSH |
| 10/13/2017 | SSEWP | EPA approval of SSEWP (Rev. 1) received |
| 10/13/2017 | PDI WP | Revised draft PDI WP (Rev. 1) submitted to EPA by GSH |
| 10/13/2017 | PDI WP – Group 2 | Draft appendices submitted to EPA by GSH: B (Utility Survey WP, Rev 0); D (Porewater Sampling Plan, Rev. 1); E (Water Column Sampling WP, Rev.1); H (Fish Study WP, Rev. 1); J (Habitat Survey WP, Rev. 1); K (Borrow Site Assessment WP, Rev. 0); and L (SOPs for Group 2 WPs) |
| 10/16/2017 | GBSD Survey Report | Draft GBSD Survey Report submitted to EPA by GSH |
| 12/8/2017 | PDI WP – Group 2 | Revised draft appendices submitted to EPA by GSH: B (Utility Survey WP, Rev 1); E (Water Column Sampling WP, Rev.2); J (Habitat Survey WP, Rev. 2); H (Fish Study WP, Rev.2) |
| 12/12/2017 | SSEWP Tech. Memo. #1 | SSEWP Tech. Memo. #1 submitted to EPA by GSH |
| 12/15/2017 | PDI WP | Revised PDI WP (Rev. 2) submitted to EPA by GSH |
| 12/15/2017 | PDI WP – Group 2 | Draft appendices submitted to EPA by GSH: D (Pore Water Sampling Plan, Rev. 2); K (Borrow Site Assessment WP, Rev. 1); and L (SOPs for Group 2 WPs) |

OCC-CER-E002595584

| Date | Deliverable Information | |
|---|---|---|
| Date | Type/Title | Description |
| 12/15/2017 | UFP-QAPP | Revised FSP/UFP-QAPP (Rev. 6) associated with updated Group 2 PDI WP components submitted to EPA by GSH |
| 1/15/2018 | Quarterly | Quarterly Progress Report (for period of October through December 2017) submitted to EPA by GSH |
| 1/26/2018 | PDI WP – Group 2 | Revised draft appendices submitted to EPA by GSH: B (Utility Survey WP, Rev. 2) and J (Habitat Survey WP, Rev. 2) |
| 1/31/2018 | SWMP | Revised SWMP was submitted to EPA by GSH |
| 2/9/2018 | SSEWP Tech. Memo. #2 | SSEWP Tech. Memo. #2 submitted to EPA by GSH |
| 2/9/2018 | PDI WP – Group 2 | Revised draft appendices submitted to EPA by GSH: K (Borrow Site Assessment WP, Rev. 2); E (Water Column Sampling WP, Rev. 3); and L (SOPs for Group 2 WPs) |
| 2/9/2018 | UFP-QAPP | Revised FSP/UFP-QAPP (Rev. 8) submitted to EPA by GSH |
| 2/15/2018 | GBSD Survey Report | Final GBSD Survey Report submitted to EPA by GSH |
| 3/29/2018 | UFP-QAPP | Revised FSP/UFP-QAPP (Rev. 9) submitted to EPA by GSH |
| 3/29/2018 | PDI WP – Group 2 | Revised appendices submitted to EPA by GSH: K (Borrow Site Assessment WP, Rev. 3) |
| 4/6/2018 | PDI WP – Group 2 | EPA Approval of the PDI WPs |
| 4/11/2018 | SSER | Draft SSER submitted to EPA by GSH |
| 4/16/2018 | Quarterly | Quarterly Progress Report (for period of January through March 2018) submitted to EPA by GSH |
| 4/19/2018 | PDI Evaluation Reports | Draft Stage IA Underwater Investigation Report submitted to EPA by GSH |
| 4/27/2018 | PDI Evaluation Reports | Draft Stage IA Terrestrial Archaeology Report submitted to EPA by GSH |
| 4/27/2018 | PDI Evaluation Reports | Draft Historic Architecture Report submitted to EPA by GSH |
| 5/18/2018 | SSER | Final SSER submitted to EPA by GSH |
| 6/8/2018 | PDI Evaluation Reports | Final Stage IA Underwater Investigation Report submitted to EPA by GSH |
| 6/22/2018 | TSWP | Draft TSWP submitted to EPA by GSH |
| 6/22/2018 | UFP-QAPP | Revised FSP/UFP-QAPP (Rev. 10) submitted to EPA by GSH |
| 6/28/2018 | PDI Evaluation Reports | Revised Stage IA Terrestrial Archaeology Report submitted to EPA by GSH |
| 6/29/2018 | PDI Evaluation Reports | Habitat Survey Desktop Evaluation Interim Report submitted to EPA by GSH |
| 7/16/2018 | Quarterly | Quarterly Progress Report (for period of April through June 2018) submitted to EPA by GSH |
| 7/31/2018 | PDI Evaluation Reports | Draft Winter Flounder Habitat Assessment Report submitted to EPA by GSH |
| 7/31/2018 | PDI Evaluation Reports | Draft Migratory Fish Report submitted to EPA by GSH |
| 7/31/2018 | PDI Evaluation Reports | Draft Sediment Geotechnical Characterization Report submitted to EPA by GSH |

OCC-CER-E002595585

| Date | Deliverable Information | |
|---|---|---|
| Date | Type/Title | Description |
| 8/31/2018 | PDI Evaluation Reports | Draft Sediment Waste Characterization Report submitted to EPA by GSH |
| 8/31/2018 | TSWP | Revised TSWP (Rev. 1) submitted to EPA by GSH |
| 8/31/2018 | UFP-QAPP | Revised FSP/UFP-QAPP (Rev. 11) submitted to EPA by GSH |
| 9/14/2018 | PDI Evaluation Reports | Draft DRET and CST Report submitted to EPA by GSH |
| 10/1/2018 | PDI Evaluation Reports | Draft Sediment Core Collection and Chemical Analysis Report submitted to EPA by GSH |
| 10/5/2018 | TSWP | Revised TSWP (Rev. 2) submitted to EPA by GSH |
| 10/5/2018 | UFP-QAPP | Revised FSP/UFP-QAPP (Rev. 12) submitted to EPA by GSH |
| 10/26/2018 | PDI Evaluation Reports | Revised Geotechnical Characterization Report (Rev. 1) submitted to EPA by GSH |
| 10/15/2018 | Quarterly | Quarterly Progress Report (for period of July through Sept 2018) submitted to EPA by GSH |
| 10/26/2018 | PDI WP – Supplemental | List of Proposed Sediment Archive Samples for Analysis submitted to EPA by GSH |
| 10/26/2018 | PDI WP – Supplemental | EPA approval of the Proposed Sediment Archive Samples for Analysis received |
| 10/26/2018 | PDI WP – Supplemental | Substrate Delineation Poling SOP and mapset submitted to EPA by GSH |
| 10/29/2018 | PDI WP – Supplemental | EPA approval of the substrate delineation poling activities |
| 11/2/2018 | TSWP | Final TSWP (Rev. 3) submitted to EPA by GSH |
| 11/2/2018 | UFP-QAPP | Revised FSP/UFP-QAPP (Rev. 13) submitted to EPA by GSH |
| 11/7/2018 | TSWP | EPA approval of Final TSWP (Rev. 3) received |
| 11/12/2018 | PDI Evaluation Reports | Revised Sediment Waste Characterization Report (Rev 1) submitted to EPA by GSH |
| 11/16/2018 | PDI Evaluation Reports | Final Stage IB Marine Archaeology Report submitted to EPA by GSH |
| 11/29/2018 | PDI Evaluation Reports | Draft Distributed Temperature Sensing Mapping Report submitted to EPA by GSH |
| 11/30/2018 | PDI WP | Draft Borrow Site Assessment Sampling and Analysis Plan submitted to EPA by GSH |
| 12/7/2018 | PDI Evaluation Reports | Revised DRET and CST Report (Rev. 1) submitted to EPA by GSH |
| 12/10/2018 | PDI Evaluation Reports | Draft Preliminary Bulkhead & Shoreline Assessment Report submitted to EPA by GSH |
| 1/9/2019 | PDI WP – Supplemental | Draft PDI WP Addendum submitted to EPA by GSH |
| 1/15/2019 | Quarterly | Quarterly Progress Report (for period of Oct through Dec 2018) submitted to EPA by GSH |
| 1/25/2019 | PDI Evaluation Reports | Draft Utility Survey Report submitted to EPA by GSH |
| 2/1/2019 | 30PD | Design Criteria Report for 30PD submitted to EPA by GSH |

OCC-CER-E002595586

| Date | Deliverable Information | |
|---|---|---|
| Date | Type/Title | Description |
| 2/1/2019 | 30PD | BODR Appendix A – Evaluation and Selection of Dredge Technologies |
| 2/1/2019 | 30PD | BODR Appendix G – Water Treatment System Design |
| 2/1/2019 | PDI Evaluation Reports | Winter 2018 Poling – Methods and Results Report submitted to EPA by GSH |
| 2/14/2019 | PDI Evaluation Reports | Draft Habitat Survey Report submitted to EPA by GSH |
| 2/14/2019 | PDI WP – Supplemental | Revised FSP/UFP-QAPP (Rev. 14) submitted to EPA by GSH |
| 2/28/2019 | 30PD | Transportation and Offsite Disposal Plan for 30PD submitted to EPA by GSH |
| 3/6/2019 | PDI WP – Supplemental | Revised PDI WP Addendum (Rev. 1) submitted to EPA by GSH |
| 3/6/2019 | UFP-QAPP | Revised FSP/UFP-QAPP (Rev. 15) submitted to EPA by GSH |
| 3/11/2019 | PDI Evaluation Reports | Final Sediment Geotechnical Characterization Report (Rev. 2) submitted to EPA by GSH |
| 3/12/2019 | PDI Evaluation Reports | Revised DRET and CST Report (Rev. 2) submitted to EPA by GSH |
| 3/15/2019 | PDI Evaluation Reports | Revised Preliminary Bulkhead & Shoreline Assessment Report (Rev. 1) submitted to EPA by GSH |
| 3/25/2019 | PDI Evaluation Reports | Revised Sediment Core Collection and Chemical Analysis Report (Rev. 1) submitted to EPA by GSH |
| 3/29/2019 | 30PD | Basis of Design Report for 30PD was submitted to EPA by GSH |
| 4/4/2019 | PDI WP | Revised Borrow Site Assessment Sampling and Analysis Plan (Rev. 1) submitted to EPA by GSH |
| 4/12/2019 | PDI WP Addendum | Revised PDI WP Addendum (Rev. 2) submitted to EPA by GSH |
| 4/15/2019 | Quarterly | Quarterly Progress Report (for period of January through March 2019) submitted to EPA by GSH |
| 4/18/2019 | PDI Evaluation Reports | Revised Sediment Waste Characterization Report (Rev. 2) submitted to EPA by GSH |
| 5/3/2019 | PDI Evaluation Reports | Final Winter 2018 Poling – Methods and Results Report submitted to EPA by GSH |
| 5/3/2019 | PDI Evaluation Reports | Final Utility Survey Report submitted to EPA by GSH |
| 5/6/2019 | TSER | Draft TSER (Rev. 0) submitted to EPA by GSH |
| 5/8/2019 | PDI Evaluation Reports | Interim Water Column Monitoring Data Summary Tech Memo submitted to EPA by GSH |
| 5/20/2019 | PDI Evaluation Reports | Final Habitat Survey Report (Rev. 1) submitted to EPA by GSH |
| 5/22/2019 | PDI Evaluation Reports | Final Preliminary Bulkhead & Shoreline Assessment Report (Rev. 2) submitted to EPA by GSH |
| 5/31/2019 | PDI WP Addendum | Revised PDI Work Plan Addendum (Rev. 3) submitted to EPA by GSH |
| 5/31/2019 | UFP-QAPP | Revised FSP/UFP-QAPP (Rev. 17) submitted to EPA by GSH |
| 6/12/2019 | PDI Evaluation Reports | Revised Sediment Core Collection and Chemical Analysis Report (Rev. 2) submitted to EPA by GSH |

OCC-CER-E002595587

| Date | Deliverable Information | |
|---|---|---|
| Date | Type/Title | Description |
| 6/17/2019 | PDI WP Addendum | EPA approval of PDI Work Plan Addendum (Rev. 3) received |
| 6/25/2019 | PDI Evaluation Reports | Revised DRET and CST Report (Rev. 3) submitted to EPA by GSH |
| 7/11/2019 | PDI WP | Revised Borrow Site Assessment SAP (Rev. 2) submitted to EPA by GSH |
| 7/15/2019 | Quarterly | Quarterly Progress Report (for period of April through June 2019) submitted to EPA by GSH |
| 7/16/2019 | PDI WP | EPA approval of Borrow Site Assessment SAP (Rev. 2) received |
| 7/17/2019 | PDI Evaluation Reports | Sediment Geotechnical Characterization Report Addendum (Rev. 0) submitted to EPA by GSH |
| 7/31/2019 | PDI Evaluation Reports | Winter Flounder Habitat Assessment Report (Rev. 1) submitted to EPA by GSH |
| 7/31/2019 | PDI Evaluation Reports | Migratory Fish Report (Rev. 1) submitted to EPA by GSH |
| 7/31/2019 | PDI Evaluation Reports | Essential Fish Habitat Report (Rev. 0) submitted to EPA by GSH |
| 8/6/2019 | Support Sites | Waterfront Development Permit Equivalent submitted to NJDEP by GSH |
| 8/19/2019 | TSER | Revised TSER (Rev. 1) submitted to EPA by GSH |
| 9/6/2019 | PDI Evaluation Reports | Draft Water Column Monitoring Data Report (Rev. 0) submitted to EPA by GSH |
| 9/12/2019 | PDI Evaluation Reports | Sediment Geotechnical Characterization Report Addendum (Rev. 1) submitted to EPA by GSH |
| 9/25/2019 | 60PD | Intermediate Design – Advanced Design Submittal submitted to EPA by GSH |
| 9/25/2019 | Upland Processing Facility | Upland Processing Facility Pre-Engineering Investigation Work Plan submitted to EPA by GSH |
| 10/3/2019 | PDI Evaluation Reports | PDI Evaluation Report, Sediment Core Collection and Chemical Analysis Data Report Addendum, Porewater and Discharge Sampling Data Report, and Bulkhead and Shoreline Geotechnical Data Report were submitted to EPA by GSH |
| 10/15/2019 | Quarterly | Quarterly Progress Report (for period of July through September 2019) submitted to EPA by GSH |
| 11/1/2019 | PDI Evaluation Reports | Winter Flounder Habitat Assessment Report (Rev. 2) submitted to EPA by GSH |
| 11/1/2019 | PDI Evaluation Reports | Migratory Fish Report (Rev. 2) submitted to EPA by GSH |
| 11/1/2019 | PDI Evaluation Reports | Essential Fish Habitat Report (Rev. 1) submitted to EPA by GSH |
| 12/13/2019 | TSER | Revised TSER (Rev. 2) submitted to EPA by GSH |
| 12/20/2019 | 60PD | Design Criteria Report and Basis of Design Report for Intermediate Design (60PD) submitted to EPA by GSH |
| 12/20/2019 | 60PD | SWMP (Rev. 1) submitted to EPA by GSH |
| 12/20/2019 | 60PD | Intermediate TODP for intermediate design (60PD) submitted to EPA by GSH |

OCC-CER-E002595588

| Date | Deliverable Information | |
|------|-------------|------------|
| Date | Type/Title | Description |
| 12/20/2019 | 60PD | Pre-final design supporting document outlines (including draft Borrow Site Assessment) submitted to EPA by GSH |
| 12/23/2019 | PDI Evaluation Reports | Essential Fish Habitat Report (Rev. 2) submitted to EPA by GSH |
| 1/16/2020 | Quarterly | Quarterly Progress Report (for period of October through December 2019) submitted to EPA by GSH |
| 2/28/2020 | PDI Evaluation Reports | Revised PDI Evaluation Report (Rev. 1), Sediment Core Collection and Chemical Analysis Data Report Addendum (Rev. 1), Porewater and Discharge Sampling Data Report (Rev. 1), and Bulkhead and Shoreline Geotechnical Data Report (Rev. 1) were submitted to EPA by GSH |
| 2/28/2020 | PDI Evaluation Reports | Revised Water Column Monitoring Data Report (Rev. 1) submitted to EPA by GSH |
| 3/31/2020 | PDI WP – Supplemental | List of Proposed Sediment Archive Samples for Analysis submitted to EPA by GSH |
| 4/15/2020 | Quarterly | Quarterly Progress Report (for period of January through March 2020) submitted to EPA by GSH |
| 4/24/2020 | UFP-QAPP | Revised FSP/UFP-QAPP (Rev. 19) submitted to EPA by GSH |
| 4/24/2020 | PDI WP | Revised Borrow Site Assessment Sampling and Analysis Plan (Rev. 3) submitted to EPA by GSH |
| 4/28/2020 | TSER | Revised TSER (Rev. 3) submitted to EPA by GSH |
| 5/29/2020 | PDI Evaluation Reports | Sediment Core Collection and Chemical Analysis Data Report Addendum (Rev. 2) submitted to EPA by GSH |
| 6/4/2020 | PDI WP | Revised Borrow Site Assessment Sampling and Analysis Plan (Rev. 3a) resubmitted to EPA by GSH |
| 6/4/2020 | UFP-QAPP | Revised FSP/UFP-QAPP (Rev. 20) submitted to EPA by GSH |
| 6/26/2020 | PDI Evaluation Reports | Porewater and Discharge Sampling Data Report (Rev. 2) submitted to EPA by GSH |
| 6/29/2020 | HASP | Borrow Site Assessment Health and Safety Plan submitted to EPA by GSH |
| 6/30/2020 | PDI Evaluation Reports | Bulkhead and Shoreline Geotechnical Data Report (Rev. 2) submitted to EPA by GSH |
| 7/15/2020 | Quarterly | Quarterly Progress Report (for period of April through June 2020) submitted to EPA by GSH |
| 7/17/2020 | PDI Evaluation Reports | PDI Evaluation Report (Rev. 2) and Water Column Monitoring Data Report (Rev. 2) were submitted to EPA by GSH |
| 8/26/2020 | 95PD | Field Poling Work Plan submitted to EPA by GSH |
| 9/11/2020 | PDI Evaluation Reports | Bulkhead and Shoreline Geotechnical Data Report (Rev. 3) submitted to EPA by GSH |
| 9/14/2020 | PDI Evaluation Reports | Porewater and Discharge Sampling Data Report (Rev. 3) submitted to EPA by GSH |

OCC-CER-E002595589

| Date | Deliverable Information | |
|---|---|---|
| Date | Type/Title | Description |
| 9/14/2020 | 95PD | Field Poling Work Plan (Rev. 1) submitted to EPA by GSH |
| 9/24/2020 | TSER | Revised TSER (Rev. 4) submitted to EPA by GSH |
| 9/24/2020 | PDI Evaluation Reports | Revised Water Column Monitoring Data Report (Rev. 3) submitted to EPA by GSH |
| 10/15/2020 | Quarterly | Quarterly Progress Report (for period of July through September 2020) submitted to EPA by GSH |
| 11/6/2020 | TSER | Revised TSER (Rev. 5) submitted to EPA by GSH |
| 11/30/2020 | PDI Evaluation Reports | Revised Water Column Monitoring Data Report (Rev. 4) submitted to EPA by GSH |
| 12/11/2020 | PMP | Project Coordinator Change submitted to EPA by GSH |
| 12/18/2020 | PDI Evaluation Reports | Revised Water Column Monitoring Data Report (Rev. 5) submitted to EPA by GSH |
| 12/18/2020 | 95PD | Advanced design deliverables, including BODR Appendix B (Remedial Design Specifications), Appendix F (Dredge and Cap Designs for Bridge Corridors), Appendix H (Debris Removal), Appendix J1 (Dredge Plume Dispersion Modeling), Appendix J2 (Resuspension Best Management Practices Applicable to Operable Unit 2), Appendix J3 (Resuspension Monitoring Program), Appendix M (Erosion Protection Design), Appendix N (Intertidal Mudflats Restoration Plan), and Appendix O (Vegetated Wetlands Restoration Plan), submitted to EPA by GSH |
| 1/15/2021 | Quarterly | Quarterly Progress Report (for period October through December 2020) submitted to EPA by GSH |
| 1/29/2021 | Supporting Deliverables | Construction QA/QC Plan, including Borrow Site Assessment submitted to EPA by GSH |
| 1/29/2021 | Supporting Deliverables | SWMP (Advanced Partial Rev. 2) submitted to EPA by GSH |
| 2/5/2021 | TSER | Final TSER (Rev. 6) submitted to EPA by GSH |
| 2/11/2021 | TSER | EPA approval of Final TSER (Rev. 6) received |
| 3/9/2021 | 95PD Support | List of Proposed Sediment Archive samples for Analysis submitted to EPA by GSH |
| 4/15/2021 | Quarterly | Quarterly Progress Report (for period January through March 2021) submitted to EPA by GSH |
| 4/27/2021 | 95PD Support | List of Proposed Sediment Archive samples for Analysis submitted to EPA by GSH |
| 4/30/2021 | Supporting Deliverables | SWMP (Rev. 2) submitted to EPA by GSH |
| 4/30/2021 | Supporting Deliverables | Borrow Site Assessment Sampling and Analysis Plan Addendum submitted to EPA by GSH |
| 5/21/2021 | Supporting Deliverables | Borrow Site Assessment Sampling and Analysis Plan Addendum (Rev. 1) submitted to EPA by GSH |

OCC-CER-E002595590

| Date | Deliverable Information | |
|------|-------------------------|---|
| Date | Type/Title | Description |
| 5/27/2021 | HASP | Borrow Site Assessment Sampling and Analysis Plan Addendum Health and Safety Plan submitted to EPA by GSH |
| 5/28/2021 | UFP-QAPP | Revised FSP/UFP-QAPP (Rev. 21) submitted to EPA by GSH |
| 6/22/2021 | Supporting Deliverables | Borrow Site Assessment Sampling and Analysis Plan Addendum (updated Rev. 1) submitted to EPA by GSH |
| 6/25/2021 | UFP-QAPP | Revised FSP/UFP-QAPP (Rev. 22) submitted to EPA by GSH |
| 6/30/2021 | Upland Facilities | Dredged Material Management Evaluation Report was submitted to EPA by GSH |
| 7/7/2021 | 95PD Support | 2021 Archive Sample Analysis Summary Memorandum was submitted to EPA by GSH |
| 7/15/2021 | UFP-QAPP | Revised FSP/UFP-QAPP (Rev. 23) submitted to EPA by GSH |
| 7/15/2021 | Quarterly | Quarterly Progress Report (for period April through June 2021) submitted to EPA by GSH |
| 8/31/2021 | Supporting Deliverables | Community Health and Safety Plan was submitted to EPA by GSH |
| 9/1/2021 | Supporting Deliverables | Borrow Site Assessment 2020 Sample Reanalysis and 2021 Sample Analysis Data Memorandum was submitted to EPA by GSH |
| 9/30/2021 | Supporting Deliverables | Institutional Controls Implementation and Assurance Plan was submitted to EPA by GSH |
| 9/30/2021 | Supporting Deliverables | Operation and Maintenance Plan was submitted to EPA by GSH |
| 10/15/2021 | Quarterly | Quarterly Progress Report (for period July through September 2021) submitted to EPA by GSH |
| 10/29/2021 | Supporting Deliverables | SWMP (Rev. 3) was submitted to EPA by GSH |
| 11/19/2021 | Upland Facilities | Method Comparability Study for the Development of Site-Specific, Rapid Turnaround Time Analytical Method for Dioxins/Furans in Processed Sediment submitted to EPA by GSH |
| 11/30/2021 | Upland Facilities | PVSC Field Investigation Work Plan was submitted to EPA by GSH |
| 12/21/2021 | Supporting Deliverables | Construction QA/QC Plan, including Borrow Site Assessment, was submitted to EPA by GSH |
| 1/14/2022 | Upland Facilities | Dewatering Bench-Scale Study Work Plan was submitted to EPA by GSH |
| 1/15/2022 | Quarterly | Quarterly Progress Report (for period October through December 2021) submitted to EPA by GSH |
| 1/21/2022 | UFP-QAPP | Revised FSP/UFP-QAPP (Rev. 24) submitted to EPA by GSH |
| 1/25/2022 | Upland Facilities | Revised PVSC Field Investigation Work Plan (Revision 1) as submitted to EPA by GSH |
| 1/31/2022 | Upland Facilities | Water Treatment Bench-Scale Study Work Plan was submitted to EPA by GSH |
| 2/9/2022 | Upland Facilities | Revised Dewatering Bench-Scale Study Work Plan (Revision 1) was submitted to EPA by GSH |

OCC-CER-E002595591

| Date | Deliverable Information | |
| --- | --- | --- |
| Date | Type/Title | Description |
| 2/17/2022 | HASP | Revised HASP (Revision 11) was submitted to EPA by GSH |
| 2/24/2022 | HASP | Revised HASP (Revision 12) was submitted to EPA by GSH |
| 3/4/2022 | Upland Facilities | Revised Dewatering Bench-Scale Study Work Plan (Revision 2) was submitted to EPA by GSH |
| 3/21/2022 | Upland Facilities | Revised Water Treatment Bench-Scale Study Work Plan (Revision 1) was submitted to EPA by GSH |
| 3/31/2022 | 95PD | Design Criteria Report and Basis of Design Report for Prefinal Design (95PD) submitted to EPA by GSH |

**Notes**

| | | | |
| --- | --- | --- | --- |
| 30PD | 30 Percent Design | PMP | Project Management Plan |
| 60PD | 60 Percent Design | QAPP | Quality Assurance Project Plan |
| 95PD | 95 Percent Design | RTC | response to comments |
| App | Appendix | RDWP | Remedial Design Work Plan |
| BODR | Basis of Design Report | SOP | Standard Operating Procedure |
| Construction QA/QC Plan | Construction Quality Assurance/Quality Control Plan | SSEWP | Site Selection and Evaluation Work Plan |
| CST | column settling test | SSER | Site Selection and Evaluation Report |
| DRET | dredging elutriate test | SWMP | Site Wide Monitoring Plan |
| EPA | U.S. Environmental Protection Agency | TODP | Transportation and Disposal Plan |
| ERP | Emergency Response Plan | TSER | Treatability Study Evaluation Report |
| FSP | Field Sampling Plan | TSWP | Treatability Study Work Plan |
| GBSD | geophysical, bathymetric, shoreline, and debris survey | UFP | Uniform Federal Policy |
| GSH | Glenn Springs Holdings, Inc | WMP | Waste Management Plan |
| HASP | Health and Safety Plan | WP | Work Plan |
| PDI | pre-design investigation | | |

Attachment 1                                                                                          23

OCC-CER-E002595592

**Attachment 2**
**Remedial Design Project Deliverables Schedule**

OCC-CER-E002595593



**REMEDIAL DESIGN PROJECT DELIVERABLES**
**SCHEDULE**
**Pre-Design Investigation and Remedial Design**
**Lower 8.3 Miles of the Lower Passaic River**
**Operable Unit Two (OU2) of the Diamond Alkali**
**Superfund Site**
**In and About Essex and Hudson Counties – New**
**Jersey**
**April 2022**

| Deliverable[1] | Compliance Milestone[2] | Certification Required[3] | EPA Approval/ Comment | Draft to EPA[4] | Deadline[5] | SOW Paragraph | Submittal Status (to EPA) | EPA Approval/ Comment Status | % Complete[8] |
|---|---|---|---|---|---|---|---|---|---|
| Progress Reports[6] | | | -- | Refer to PMP Jan. 15th April 15th July 15th Oct. 15th | Quarterly, starting the month following Effective Date of the Settlement Agreement and until EPA approves the Final (100%) RD | 4.3 | Various | -- | Ongoing |
| PMP | X | | (does not require) | 1/17/2017 | 90 days after EPA's Authorization to Proceed regarding Supervising Contractor | 3.1 | Final Submitted 2/27/2017 | Final PMP Approved | 100% |
| RDWP | X | | Approval | 1/17/2017 | | 3.3 | Final Submitted 3/22/2017 | Approved 3/23/2017 | 100% |
| ERP | | | Approval | 1/17/2017 | With RDWP; supporting deliverable [7] | 5.7(b) | | | |
| PDI WP | X | | Approval | 5/22/2017 | 60 days after EPA's approval of RDWP | 3.2(a) | Final Submitted 3/29/2018 | Approved 4/6/2018 | 100% |
| *PDI WP Components Submitted Separately* | | | | | | | | | |
| GBSD WP (App. A) | | | Approval | | | -- | Final Submitted 6/23/2017 | Approved 6/26/2017 | 100% |
| Sediment Coring WP (App. C.); DRET and CST WP (App. F); Bulkhead and Shoreline WP (App. G); Cultural Survey WP (App. I); | | | Approval | See "Submittal Status" | With PDI WP | -- | Final Submitted 9/22/2017 & 9/28/2017 | Approved 9/29/2017 | 100% |
| Utility Survey WP (App. B); Pore-Water Sampling WP (App. D); Water Column Sampling WP (App. E); Fish Study WP (App. H); Habitat Survey WP (App. J); Borrow Site Assess. WP (App. K) | | | Approval | | | -- | Final Submitted 1/26/2018, 12/15/2017, 2/9/2018, 12/8/2017, 1/26/2018, & 3/29/2018 | Approved 4/6/2018 | 100% |

OCC-CER-E002595594



**SCHEDULE**
**Pre-Design Investigation and Remedial Design**
**Lower 8.3 Miles of the Lower Passaic River**
**Operable Unit Two (OU2) of the Diamond Alkali**
**Superfund Site**
**In and About Essex and Hudson Counties – New Jersey**
**April 2022**

| Deliverable[1] | Compliance Milestone[2] | Certification Required[3] | EPA Approval/ Comment | Draft to EPA[4] | Deadline[5] | SOW Paragraph | Submittal Status (to EPA) | EPA Approval/ Comment Status | % Complete[8] |
|---|---|---|---|---|---|---|---|---|---|
| PDI WP Addendum | | | Approval | 1/9/2019 | | | Final Submitted 5/31/2019 | Approved 6/17/2019 | 100% |
| Borrow Site Assessment SAP | | | Approval | | | | Final (Rev. 3a) Submitted 6/4/2020 | Approved 6/24/2020 | 100% |
| Borrow Site Assessment SAP Addendum | | | Approval | 4/30/2021 | | | Final (Rev. 1) Submitted 6/22/2021 | Approved 7/1/2021 | 100% |
| HASP | | | Comment | With PDI WP | With PDI WP; supporting deliverable[7] | 5.7(a) | 2/24/2022 (Rev. 12) BSA: 5/27/2021 (Rev. 1) | -- | 100% |
| FSP | | | Approval | | | 5.7 (c) | Rev. 24 (1/21/2022) | Approved 1/25/2022 | 100% |
| QAPP | | | Approval | | | 5.7(d) | | | 100% |
| PDI Evaluation Report | X | X | Comment | 10/3/2019 | 1 year and 180 days after EPA approval of PDI WP | 3.2(b) | Final 12/18/2020 *Inclusive of the 7/17/2020 PDI Evaluation Report and associated individual PDI reports finalized between 2/15/2018 and 12/18/2020* | -- | 100% |
| Site Selection and Evaluation Work Plan | X | | Approval | 6/21/2017 | 90 days after EPA's approval of RDWP | 3.6(a) | Final Submitted 9/8/2017 | Approved 10/13/2017 | 100% |
| Site Selection and Evaluation Report | X | X | Comment | 4/11/2018 | 180 days after EPA's approval of Site Selection and Evaluation WP | 3.6(b) | Final Submitted 5/18/2018 | Approved 5/19/2018 | 100% |
| TSWP | | | Approval | 6/22/2018 | 90 days after EPA's approval of PDIWP | 3.7(b) | Final Submitted 11/2/2018 | Approved 11/7/2018 | 100% |

OCC-CER-E002595595



## REMEDIAL DESIGN PROJECT DELIVERABLES SCHEDULE
### Pre-Design Investigation and Remedial Design
### Lower 8.3 Miles of the Lower Passaic River
### Operable Unit Two (OU2) of the Diamond Alkali
### Superfund Site
### In and About Essex and Hudson Counties – New Jersey
**April 2022**

| Deliverable[1] | Compliance Milestone[2] | Certification Required[3] | EPA Approval/ Comment | Draft to EPA[4] | Deadline[5] | SOW Paragraph | Submittal Status (to EPA) | EPA Approval/ Comment Status | % Complete[8] |
|---|---|---|---|---|---|---|---|---|---|
| TSER | | X | Comment | 5/6/2019 | 180 days after EPA's approval of TSWP | 3.7(c) | Final Submitted 2/5/2021 | Approved 2/11/2021 | 100% |
| Preliminary (30%) RD | X | | Comment | 1/1/2020 | 90 days after submittal of PDI Evaluation Report | 3.8 | 2/1/2019 (DCR) 3/29/2019 (BODR and Drawings) | Comments 6/3/2019 | 100% |
| Intermediate (60%) RD | X | | Comment | 12/31/2019 | 120 days after EPA's comments on the Preliminary (30%) RD – *Updated per Attachment 3 schedule* | 3.9 | 12/20/2019 (DCR and BODR) | Comments 3/3/2020, 3/4/2020 | 100% |
| Value Engineering Study Results | | | Comment | 10/31/2020 | 90 days after submittal of Intermediate (60%) RD – *Updated per Attachment 3 schedule* | 3.10 | 10/30/2020 (Final) | -- | 100% |
| Pre-Final (95%) RD | X | | Comment | 3/31/2022, 12/21/2022, 3/31/2023 | 90 days after EPA's comments on the intermediate RD and VE Study – *Updated per Attachment 3 schedule* | 3.11 | 3/31/2022 (in-river components) | -- | 70% |

Attachment 2

27



**REMEDIAL DESIGN PROJECT DELIVERABLES**
**SCHEDULE**
**Pre-Design Investigation and Remedial Design**
**Lower 8.3 Miles of the Lower Passaic River**
**Operable Unit Two (OU2) of the Diamond Alkali**
**Superfund Site**
**In and About Essex and Hudson Counties – New**
**Jersey**
**April 2022**

| Deliverable(1) | Compliance Milestone(2) | Certification Required(3) | EPA Approval/ Comment | Draft to EPA(4) | Deadline(5) | SOW Paragraph | Submittal Status (to EPA) | EPA Approval/ Comment Status | % Complete(8) |
|---|---|---|---|---|---|---|---|---|---|
| Final (100%) RD | X | X | Approval | TBD (4) | 60 days after EPA's comments on the Pre-Final (95%) RD | 3.12 | Pending Comments on Prior Deliverables | -- | 0% |
| *Supporting Deliverables* | | | | | | | | | |
| Site Wide Monitoring Plan | | | Comment | 5/22/2017 | 60 days after EPA's approval of RDWP | 3.5 & 5.7(e) | 10/29/2021 (Rev. 3) | Comments 12/20/2021 | 95% |
| TODP *(Upland Facilities Design)* | | | Comment | 1/1/2020 | With Preliminary (30%) RD; supporting deliverable(7) – *To be completed as part of the Upland Facilities Design per Attachment 3 schedule* | 3.8 & 5.7(g) | 12/20/2019 (Intermediate [60%]) | Comments 3/4/2020 | 60% |
| Community Health and Safety Plan | | | Comment | 8/31/2021 | N/A | 1.4 | 8/31/2021 | Comments 10/22/2021 | 70% |
| Construction QA/QC Plan | | | Comment | 1/31/2021 | With Pre-Final (95%) RD; supporting deliverable(7) | 3.11 & 5.7(f) | 12/21/2021 (Rev. 1) with Borrow Site Assessment | Comments 2/22/2022 | 60% |

OCC-CER-E002595597



**REMEDIAL DESIGN PROJECT DELIVERABLES SCHEDULE**
**Pre-Design Investigation and Remedial Design**
**Lower 8.3 Miles of the Lower Passaic River**
**Operable Unit Two (OU2) of the Diamond Alkali**
**Superfund Site**
**In and About Essex and Hudson Counties – New Jersey**
**April 2022**

| Deliverable[1] | Compliance Milestone[2] | Certification Required[3] | EPA Approval/ Comment | Draft to EPA[4] | Deadline[5] | SOW Paragraph | Submittal Status (to EPA) | EPA Approval/ Comment Status | % Complete[8] |
|---|---|---|---|---|---|---|---|---|---|
| Operation and Maintenance Plan | | | Comment | 9/30/2021 | With Pre-Final (95%) RD; supporting deliverable[7] | 3.11 & 5.7(h) | 9/30/2021 | Comments 11/12/2021 | 65% |
| ICIAP | | | Comment | 9/30/2021 | With Pre-Final (95%) RD; supporting deliverable[7] | 3.11 & 5.7(i) | 9/30/2021 | Comments 12/9/2021, 1/26/2022 | 60% |
| Periodic Review Support Plan (PRSP) | | | Approval | TBD at EPA Direction | 30 days after EPA request | 4.5 | Pending Approvals of Prior Deliverables | -- | 0% |

**Notes:**

| | | | |
|---|---|---|---|
| % | percent | QAPP | Quality Assurance Project Plan |
| App | appendix | QA/QC | Quality Assurance/Quality Control |
| BODR | Basis of Design Report | RAWP | Remedial Action Work Plan |
| DCR | Design Criteria Report | SAP | Sampling and Analysis Plan |
| EPA | U.S. Environmental Protection Agency | SOW | Statement of Work |
| ERP | Emergency Response Plan | RD | remedial design |
| FSP | Field Sampling Plan (Included as part of the QAPP) | TBD | to be determined |
| GBSD | geophysical, bathymetric, shoreline, and debris survey | TODP | Transportation and Offsite Disposal Plan |
| HASP | Health and Safety Plan | TSWP | Treatability Study Work Plan |
| ICIAP | Institutional Controls Implementation and Assurance Plan | TSER | Treatability Study Evaluation Report |
| PDI | pre-design investigation | WP | Work Plan |
| PMP | Project Management Plan | | |

[1]  Information obtained from the Settlement Agreement and SOW (refer to Appendix A and Notes 2 and 3, below).

[2]  Compliance Milestone: Identified deliverables are compliance milestones, subject to stipulated penalties, pursuant to the Settlement Agreement Section XVI, Paragraph 80.

[3]  Certification: Identified deliverables must be signed by the Settling Party's Project Coordinator, or other responsible official of the Settling Party, and must contain the certification statement provided in Section 5.5 of the Settlement Agreement SOW.

OCC-CER-E002595598



**REMEDIAL DESIGN PROJECT DELIVERABLES**
**SCHEDULE**
**Pre-Design Investigation and Remedial Design**
**Lower 8.3 Miles of the Lower Passaic River**
**Operable Unit Two (OU2) of the Diamond Alkali**
**Superfund Site**
**In and About Essex and Hudson Counties – New Jersey**
**April 2022**

(4) Date to EPA is based on the Effective Date of the Settlement Agreement (September 30, 2016), EPA Authorization to Proceed (October 19, 2016), and the information in the "Deadline" column. Some dates are "TBD" (to be determined) because they are subject to the date of EPA comment/approval of prior deliverables, as specified by the Settlement Agreement and indicated in the "Deadline" column.

(5) Deadline information is based on the RD schedule in Section 6.2 of the Settlement Agreement SOW.

(6) Quarterly Progress Reports proposed for submittal on the 15th of January, April, July, and October. If the 15th of the month falls on a weekend or holiday, the report will be submitted the next business day. Refer to PMP Section 3.2.1 for details.

(7) Supporting Deliverables as per Section 5.7 of Settlement Agreement and SOW.

(8) % Complete is an estimate of status of deliverable development relative to EPA comment/approval and finalization.

OCC-CER-E002595599

**Attachment 3**
**Remedial Design Project Schedule**

OCC-CER-E002595600



OCC-CER-E002595601



OCC-CER-E002595602

# Exhibit 19



WILLIAM S. HATFIELD
Director

Gibbons P.C.
One Gateway Center
Newark, New Jersey 07102-5310
Direct: (973) 596-4511 Fax: (973) 639-8320
whatfield@gibbonslaw.com

May 11, 2016

**VIA ELECTRONIC MAIL**

Derrick Vallance
dvallance@maxuscorp.com

Re:  **Lower 8.3 Miles of the Lower Passaic River - Record of Decision - Remedial
Design**

Dear Derrick:

I am in receipt of the letter dated May 9, 2016, requesting the attendance of my client,
Givaudan Fragrances Corporation ("Givaudan"), at a meeting in New York City on May 13,
2016 to discuss the Remedial Design ("RD") process for the remedy selected in the March 4,
2016 Record of Decision ("ROD").  As you know, the U.S. Environmental Protection Agency
("EPA") has requested that Occidental Chemical Corporation ("OCC") complete the RD, which
may be performed by Maxus Energy Corporation and Tierra Solutions Inc. on behalf of OCC.
Please be advised that Givaudan respectfully declines attending the proposed meeting related to
EPA's demand that OCC conduct the RD for the lower 8.3 miles of the Lower Passaic River
("LPR").

Givaudan agrees with the position of the EPA in so far as it has determined that OCC is
responsible for contamination throughout the LPR, including but not limited to the area to be
addressed under the ROD.  This position is amply supported by all of the relevant data obtained
to date.  As such, Givaudan remains resolute that OCC, and OCC alone, is responsible for the
RD process.

Thank you.

Best regards,

William S. Hatfield
Director

475042

# Exhibit 20

# EXHIBIT 6

OxyChem's Comments in Opposition to Proposed Consent Decree,
*United States v. Alden Leeds, Inc., et al.*, Civil Action No. 2:22-cv-07326 (D.N.J.)

ALCD-PUBCOM_0001230



**Occidental Chemical Corporation** *OxyChem*

A Subsidiary of Occidental Petroleum Corporation

14555 Dallas Parkway, Suite 400
Dallas, TX 75254
Phone 713-599-4188

January 13, 2022

Ms. Lisa Garcia
Garcia.lisa@epa.gov
Administrator, Region 2
United States Environmental Protection Agency
290 Broadway
New York, NY 10001

Mr. Pat Evangelista
Evangelista.pat@epa.gov
Director, Superfund and Emergency Management Division
Region 2
United States Environmental Protection Agency
290 Broadway
New York, NY 10007

        Re:    Diamond Alkali Superfund Site

Dear Administrator Garcia and Mr. Evangelista:

        I write on behalf of Occidental Chemical Corporation ("OxyChem") to discuss with you next steps at the Diamond Alkali Superfund Site.

        After evaluating the Record of Decision for the Interim Remedy for Operable Unit 4, OxyChem is willing to negotiate an appropriate Consent Decree with the United States to perform the remedial design and to implement the interim remedy set out in the 2021 Record of Decision for Operable Unit 4 ("2021 ROD") of the Site based on the following terms and conditions:

  • In consideration of this broad scope of work, EPA will provide to OxyChem a full covenant not to sue under section 106 and 107 of CERCLA and agree to full contribution protection for OxyChem for all response actions and response costs incurred by any person related to the upper 9 Miles of the Lower Passaic River in Operable Unit 4;

  • EPA will agree not to conclude cash out settlements with any parties for their liabilities in connection with the 2021 ROD but will, instead, allow OxyChem—as the performing party—to pursue recoveries from any responsible parties of their fair and allocable shares of the response costs OxyChem incurs to perform this work; and,



Responsible Care
A Public Commitment



**Occidental Chemical Corporation** *OxyChem*

A Subsidiary of Occidental Petroleum Corporation

14555 Dallas Parkway, Suite 400
Dallas, TX 75254
Phone 713-599-4188

- EPA will agree not to seek cash out settlements on Operable Unit 2 and Operable Unit 4 with the following parties: Public Service Electric & Gas Company, Nokia Corporation, Pharmacia/Monsanto, Givaudan Fragrances Corporation, the Sherwin-Williams Company, and Ashland LLC for its Drew Chemical facility.

If EPA accepts this proposal, OxyChem is prepared to discuss with EPA options for participation by other performing parties in implementing the 2021 ROD, including those listed immediately above.

Agreeing to these terms with OxyChem affords EPA several important and near-term benefits:

- OxyChem has a demonstrated history of delivering timely, efficient, and compliant performance of tasks it agrees to perform in the river;

- OxyChem would design the interim remedy in the 2021 ROD, thereby ensuring that the remedy is consistent with and complements the remedy OxyChem is presently designing in Operable Unit 2;

- Implementation of the interim remedy in the 2021 ROD is an important contemporaneous step to prevent any hazardous substances upriver from impairing the efficacy of the remedy downriver in OU2; and,

- Working with OxyChem on this sequence of work will accelerate rather than impede the timely conclusion of the remedial action in both operable units, as well as potentially shortening the implementation timetable than otherwise required in Operable Unit 4.

EPA's agreement not to settle with the parties identified above—and not to provide cash out settlements to any party pertaining to the 2021 ROD—is also consistent with EPA's prior statements and the limits of its record evidence for several reasons.

Declining to grant cash-out settlements to Givaudan, Sherwin-Williams, and Ashland's Drew Chemical facility in Operable Units 2 and 4 vindicates EPA's prior statements that "the private PRPs responsible for the release of dioxins, furans, and/or PCBs will *perform* the OU2 remedial action has not changed." *See e.g.*, Letter from Eric J. Wilson, EPA Region 2 September 18, 2017 (Emphasis added). The same is true for the other work parties, Public Service Electric & Gas, Pharmacia/Monsanto, and Nokia.

Requiring these parties to perform work is also supported by the abundant record evidence OxyChem has developed in the CERCLA case. This evidence would support assessing significant responsibility to each of Givaudan, Sherwin-Williams, and Ashland for the presence of dioxin and PCBs in the lower 8.3 miles of the Passaic River. Based on



Responsible Care
A Public Commitment

**OXY**  **Occidental Chemical Corporation** *OxyChem*

A Subsidiary of Occidental Petroleum Corporation

14555 Dallas Parkway, Suite 400
Dallas, TX 75254
Phone 713-599-4188

when these parties produced this evidence in the litigation, it does not appear it was presented to Mr. Batson for his consideration. It also is not in the public's interest to reward these parties with cash out settlements. Readily available evidence refutes the certifications OxyChem understands each of these parties would have to provide to the United States in connection with any settlement based on the allocation process.

As to Operable Unit 4, there is neither any reason nor any basis on which EPA could or should provide cash-out settlements with any other party in Operable Unit 4 if OxyChem agrees to design and implement the 2021 ROD. Neither the private PRPs nor EPA has convened any allocation process pertaining to the upper 9 Miles of the River or the 2021 ROD. To the contrary, the allocation process EPA initiated with Mr. David Batson was limited solely to Operable Unit 2. OxyChem and other parties have previously noted their objections to that process, but there can be no dispute that the process was convened expressly and only to allocate shares of responsibility to some, but not all, parties in Operable Unit 2. It affords EPA no basis on which EPA could purport to settle liabilities upriver, in Operable Unit 4.

Finally, the request that EPA confirm it will not take action to impair or bar OxyChem's contribution claims is no more than what CERCLA Section 308 and the United States Constitution require. CERCLA's policies are vindicated when, as OxyChem seeks here, EPA preserves OxyChem's statutory right to seek contribution from other parties to recover the response costs OxyChem has borne (and those it will bear) in both Operable Units. In neither case does EPA have statutory authority to bar OxyChem's contribution claims for costs that OxyChem alone has borne or committed to bear at the Diamond Alkali Superfund Site.

In extending this offer, OxyChem emphasizes that it has consistently cooperated and collaborated with EPA to ensure efficient and rapid progress in addressing the remediation of the Diamond Alkali Superfund Site. OxyChem desires to continue that cooperative relationship. Achieving an acceptable agreement with EPA to move forward to design and implement the 2021 ROD on the terms outlined above would be another enormous step forward at the Site.

We look forward to discussing this with EPA at your earliest convenience. OxyChem reserves all rights it has at law, in equity, and under the United States Constitution.

Very truly yours,

Charles F. Weiss

Charles F. Weiss
Senior Vice President
charles_weiss@oxy.com

**Responsible Care**
A Public Commitment



**Occidental Chemical Corporation** *OxyChem*
A Subsidiary of Occidental Petroleum Corporation

14555 Dallas Parkway, Suite 400
Dallas, TX 75254
Phone 713-599-4188

Cc:    Mr. Walter Mugdan, Deputy Regional Administrator, EPA Region 2
Mugdan.Walter@epa.gov
Mr. Paul Simon, Acting Regional Counsel, EPA Region 2
simon.paul@epa.gov
Ms. Sarah Flanagan, Chief of NJ Superfund Branch, EPA Region 2
Flanagan.Sarah@epa.gov
Mr. Juan Fajardo, Assistant Regional Counsel, EPA Region 2
Fajardo.juan@epa.gov
Ms. Frances Zizila, Assistant Regional Counsel, EPA Region 2
Zizila.Frances@epa.gov
Mr. Michael Sivak, Chief of Mega Projects, EPA Region 2
Sivak.Michael@epa.gov
Ms. Diane Salkie, Remedial Project Manager, EPA Region 2
salkie.diane@epa.gov
Mr. Brian Donohue, U.S. Department of Justice
Brian.Donohue@usdoj.gov
Ms. Laura Rowley, U.S. Department of Justice
Laura.Rowley@usdoj.gov



# Exhibit 21

**Occidental Chemical Corporation** *OxyChem*

A Subsidiary of Occidental Petroleum Corporation

14555 Dallas Parkway, Suite 400
Dallas, TX 75254
Phone 713-599-4188

June 27, 2022

Mr. Michael S. Regan
Administrator
United States Environmental Protection Agency
1200 Pennsylvania Ave NW
Washington, DC 20460

Mr. Larry E. Douchand
Director
Office of Remediation and Technology Innovation
United States Environmental Protection Agency
1301 Constitution Ave NW
Washington, DC 20460

Ms. Lisa F. Garcia
Administrator, Region 2
United States Environmental Protection Agency
290 Broadway
New York, NY 10007

Ms. Alice Yeh
Remedial Project Manager
Diamond Alkali Superfund Site, Operable Unit 2
Superfund and Emergency Management Division
United States Environmental Protection Agency, Region 2
290 Broadway
New York, NY 10007

Ms. Diane Salkie
Remedial Project Manager
Diamond Alkali Superfund Site, Operable Unit 4
Superfund and Emergency Management Division
United States Environmental Protection Agency, Region
2290 Broadway
New York, NY 10007

     Re:    Occidental Chemical Corporation Response to EPA Region 2 Letters
           dated March 2, 2022, and May 31, 2022

Dear Administrator Regan, Director Douchand, Administrator Garcia, Ms. Yeh and Ms. Salkie:

     I write on behalf of Occidental Chemical Corporation ("OxyChem") to respond to EPA
Region 2's May 31, 2022 letter (the "May Letter") and its earlier, March 2, 2022 letter (the
"Notice Letter"), requesting that OxyChem and other work parties provide a good faith offer to
implement the remedial actions for Operable Unit 2 ("OU2") and Operable Unit 4 ("OU4") of the
Diamond Alkali Superfund Site (the "Site").



OxyChem Response to EPA Notice Letters
June 27, 2022
Page Two

By letter dated January 13, 2022, OxyChem provided an earlier, good faith offer to perform the entire scope of work in OU4 so long as its right to seek contribution from other responsible parties—as enacted by Congress in CERCLA—would be preserved. This condition is what the law requires. In CERCLA, Congress granted performing parties like OxyChem the right to sue other responsible parties for contribution, with the allocation of responsibility adjudicated by a federal court in proceedings that conform to the constitutional requirements of due process. EPA is an agency of limited jurisdiction and Congress did not grant EPA authority to adjudicate responsibility among responsible parties by barring contribution claims or otherwise.

**I.        Good Faith Offer to Perform Remedial Design on OU4**

Consistent with these principles, and its prior good faith offer, OxyChem makes the following good faith offer in response to EPA's Notice Letter. As EPA has requested, OxyChem offers to perform the remedial design of the interim remedy in OU4 on the following conditions (the "Required Conditions"):

1. The United States will take no action to impair or bar OxyChem's contribution claims against the other responsible parties for work OxyChem is undertaking to perform, including, without limitation, in any settlement the United States reaches with any other party. OxyChem's rights to cost recovery under CERCLA Section 107 and to cost reimbursement under CERCLA Section 106(b)(2) shall also be preserved.

2. The United States will provide OxyChem with a covenant not to sue under Sections 106 and 107 of CERCLA for this scope of work.

3. Any settlement recoveries received by EPA in connection with this Operable Unit will be deposited in an Operable-Unit-specific account for performing parties to use in implementing the remedies.

4. The agreement with EPA must include appropriate force majeure and other provisions to permit OxyChem to stop work without penalty if unforeseen conditions or litigation preclude continuation of the work.

5. Financial assurance requirements shall be limited to the work to be performed on an annual basis and will not be cumulative either of work already performed or work contemplated in out years.

6. Inclusion of suitable Adaptive Management provisions to permit EPA and OxyChem to make appropriate revisions as work progresses.

**II.       Proposed Sequencing of Other Work at OU4 and OU2 of the Site**

EPA has also asked OxyChem and other work parties to provide a good faith offer to implement the remedies in OU4 and OU2. If EPA accepts OxyChem's offer above to perform the remedial design in OU4, then OxyChem believes we can reach agreement with the other work parties to perform specific and tailored work scopes that would implement the remedies in OU4 and OU2.

OxyChem proposes a staged process of sequential agreements in which manageable scopes of work can be defined, agreed, implemented, and evaluated in sequence, with the next agreement following when the prior phase of work is planned, designed, and implemented. This sequence could be achieved through expedited negotiations of subsequent agreements, all of which must include the Required Conditions, tracking an overall schedule to which the parties would agree with EPA. OxyChem is willing to discuss leading the implementation of this further work with other work parties, so long as the Required Conditions are met.

Based on its involvement with the OU2 design and its prior work regarding the Upland Processing Facility (the "UPF"), OxyChem believes the work sequence below is essential to an effective remedy in both operable units, consistent with the National Contingency Plan:

1. **Agreement One:** Administrative Settlement Agreement and Order on Consent ("ASAOC") for the design of the OU4 interim remedy set forth in the applicable Record of Decision ("ROD"). OxyChem will negotiate the ASAOC in good faith, subject to the Required Conditions, and consistent with OxyChem's previous offer to perform this work as set out above.

    **Target Date for Execution of ASAOC:** Within EPA Fiscal Year 2022 (by September 30, 2022).

2. **Agreement Two:** Consent Decree for construction of the UPF. OxyChem has worked to obtain agreement to this consent decree since 2018. The difficulties encountered by the Passaic Valley Sewerage Commission ("PVSC") in acquiring the required property through eminent domain have caused significant delays in this decree, as has the resulting inability of the United States and PVSC to reach agreement on consent decree terms. Subject to the Required Conditions and a condition precedent requiring that the property necessary to build the UPF is and will be made available for OxyChem's use throughout the implementation period on the material terms embodied in the draft UPF consent decree, OxyChem will negotiate in good faith (as it has done for several years) to finalize this consent decree.

    **Target Date for Execution of Consent Decree:** Lodged and in force by the time the design for the UPF and other upland facilities is completed and accepted by EPA, which is currently anticipated to occur within EPA Fiscal Year 2023 (by September 30, 2023).

3. **Agreement Three:** Consent Decree for Remedial Action in OU4. OxyChem will negotiate in good faith for a consent decree to implement with the other work parties the interim remedy in OU4, subject to the Required Conditions and the completion of work under Agreements One and Two, above.

4. **Agreement Four:** Consent Decree for remainder of the Remedial Action in OU2. Once there is significant progress in implementing Agreements Two and Three, OxyChem will negotiate in good faith with the other work parties to achieve a consent decree with EPA to implement the remainder of the remedial action in OU2, subject to the Required Conditions.

The sequence above permits EPA and the parties to discuss implementing the remedy in OU2: (i) after the remedy in OU4 has been designed and implemented, and (ii) after the UPF has been designed and constructed. This schedule makes sense for many reasons. As EPA is aware, work to implement the remedies cannot begin in earnest until the UPF is designed and built. Without that facility, there is otherwise no location at which dredged sediment from OU2 (or from OU4) can be processed. The OU4 pre-design investigation and the required design of the remedy are also essential to determine how the remedy in OU4 is best implemented. None of that work has yet been done. The remedy upriver in OU4 should also be implemented first to minimize the risk that upriver construction activities might damage or impair the remedy in OU2.

Given this, and the added fact that OU4 and OU2 encompass parts of the river up to 17 miles apart, sequencing the consent decrees for in-river work ensures clarity of scope and performance. It enables all parties to demonstrate completion of distinct milestones for the interim and final remedial goals for each operable unit. This staged approach will also expedite the design and construction of the remedies in both operable units. By creating a manageable schedule that addresses all stakeholder interests, sequencing work avoids the near certainty that resources would otherwise be wasted through inefficiencies and duplication of untargeted work.

### III.    Further Discussion of Required Conditions

OxyChem is willing to discuss alternative scopes of work in OU4 and OU2 as they arise, but it cannot and will not perform all this work alone. Nor can OxyChem undertake to provide financial assurance at the outset for all estimated costs of implementing the entirety of both remedies. The Required Conditions, described in greater detail below, address both concerns. They are essential to facilitate the timely completion of the work in accordance with the National Contingency Plan and so should be acceptable to EPA.

#### A.  Preservation of Contribution Claims

Hundreds of parties are responsible for pollution in the Passaic River. As described by EPA in the OU2 ROD:

> The Passaic River was one of the major centers of the American industrial revolution starting two centuries ago. By the end of the 19th century, a multitude of industrial operations…had located along the river's banks as cities such as Newark and Paterson grew. ***Industrial operations and municipalities used the river for wastewater disposal. To date, over 100 facilities have been identified as potentially responsible for discharging contaminants into the river including, but not limited to, dioxins and furans, PCBs, PAHs, DDT and other pesticides, mercury, lead, and other metals***.[1]

CERCLA's goal is to ensure that the "polluters pay," meaning that all responsible parties pay their fair and equitable shares of response costs. To ensure that they do, CERCLA affords performing parties—like OxyChem—a statutory right to pursue contribution claims against parties who have not stepped up to clean up pollution that they caused. In Section 113(f)(1) of CERCLA, Congress mandated that the United States district courts, not EPA, weigh the evidence to arrive at an equitable allocation of responsibility that binds all parties.

---

[1] *See* OU2 ROD, Section 2 pg. 3 (emphasis added).

OxyChem Response to EPA Notice Letters
June 27, 2022
Page Five

Here, EPA has acknowledged OxyChem "did not directly discharge pollution into the Passaic River."[2] Instead, EPA alleges OxyChem's liability arises from its purchase of the stock of Diamond Shamrock Chemicals Company ("DSCC"). From the 1940s to 1969, DSCC owned and operated an agricultural chemicals plant at 80-120 Lister Avenue in Newark. During that period, the Lister Avenue plant (the "Lister Plant") manufactured DDT and, at the direction of the United States government, products for use during the Vietnam War that generated dioxin as a manufacturing byproduct. DSCC sold the plant to a third party in 1971. When an affiliate of OxyChem purchased the stock of DSCC in 1986, the Lister Plant had been closed for nine years and DSCC had not operated it for more than sixteen. In the stock purchase agreement, Diamond Shamrock Corporation (later known as Maxus Energy Corporation) agreed to defend, indemnify, and hold OxyChem harmless against all environmental liabilities associated with the former Lister Avenue Plant. Relying on this indemnity, OxyChem merged with DSCC in 1987, a transaction EPA contends made OxyChem responsible for the environmental liabilities of DSCC.

EPA has identified a total of *eight* chemicals of concern for OU2 and OU4: dioxins and furans, PCBs, DDT, dieldrin (an herbicide), poly-aromatic hydrocarbons ("PAHs"), mercury, copper, and lead.[3] The OU2 ROD makes clear that EPA mandated this remedy because the lower 8.3 miles of the Passaic River is "ubiquitously contaminated" with *all eight* COCs.[4] In OU2 alone, the ROD contemplates the permanent capping of over one hundred years of contaminated sediment and the removal from the river of approximately 24,000 pounds of mercury, 6,600 pounds of PCBs, 1,300 pounds of DDT, and 13 pounds of dioxin, subject to the remedial design.[5]

OxyChem has not disputed it bears some legal liability from its merger with DSCC. But that merger in no way makes OxyChem responsible to clean up *all* hazardous substances in the Passaic River or all dioxins found in river sediments. There is no evidence, for example, that the Lister Plant (or OxyChem) is responsible for the estimated 24,000 pounds of mercury that will be removed or remediated in the remedy for OU2, the more than 6,600 pounds of PCBs that must also be removed or remediated, or the costs to remedy contamination in the river from PAHs, dieldrin, or any of the hazardous metals. DDT was manufactured widely and was used within the Site's boundaries by, among others, the municipal entities to whom EPA also sent its Notice Letter. And finally, while the Lister Plant is alleged to be responsible for some dioxins and furans in the Site, EPA's investigation (and OxyChem's own) demonstrates there are other, significant sources that also bear responsibility for the presence of dioxins and furans in the Passaic River, including but not limited to:

- **Givaudan Fragrances Corporation**: EPA identified Givaudan as the source of the Clifton Congener, a significant contributor to dioxin in Passaic sediments that is *not* associated with the former Lister Plant.

- **Clean Earth Environmental Services**: Clean Earth is the admitted successor to S&W Waste, a company with an extensive history of environmental violations and significant dioxin contamination in the soils of its Kearny facility that is also *not* associated with the Lister Plant.

---

[2] *See* EPA Secures $165 Million Agreement with Occidental Chemical to Conduct the Work Needed to Start the Cleanup of the Lower Eight Miles of the Passaic River. News Releases from Region 2. Jan. 19, 2017.

[3] *See* Focused Feasibility Study ("FFS") for Operable Unit 4 at pp. 1-4; 2016 Record of Decision for Operable Unit 2 (the "OU2 ROD") at 14-16.

[4] *Id.* OU2 ROD Section 5.3 (OU2 Conceptual Site Model).

[5] *Id.*

- **Ashland Chemical Corporation**: Ashland's manufacturing operations at its Drew Chemical facility involved large-scale, dioxin-forming processes on an upland site that is significantly contaminated with dioxins that, again, are *not* associated with the Lister Plant.

CERCLA requires all parties responsible for the presence of these hazardous substances in the Site to pay their fair and equitable shares of the costs to remove or remediate them. After extensive study, EPA identified over 100 facilities as potentially responsible for discharging contaminants into the Passaic River.[6] Abundant record evidence in the CERCLA case in the United States District Court in New Jersey supports a significant assignment of responsibility to parties other than OxyChem for the presence of hazardous substances in OU2 and OU4.[7] EPA also assured the public, repeatedly, that it intended "to pursue additional agreements with *all* of the more than 100 parties legally responsible for the contamination to ensure that the cleanup work in the lower 8.3 miles [and in OU4] ***will be carried out and paid for by those responsible for the pollution as required by the Superfund law***."[8]

But despite the abundant evidence available to it, EPA never pursued claims against the parties EPA identified as bearing responsibility. Instead, EPA announced its intention to *release* scores of responsible parties from their cleanup liability to the United States for undisclosed amounts, leaving the five private work parties and New Jersey's taxpayers (through the in-kind contributions of the public work parties) to carry out the work alone.

EPA refuses to provide any information concerning these proposed settlements, their terms, their amounts, or why these settlements are in any way in the public interest. EPA also rejected OxyChem's Freedom of Information Act requests pertaining to these contemplated settlements. EPA's lack of transparency is not in the public interest. EPA appears poised to abandon its public commitment that all identified polluters would be required to *carry out* and *pay for* the cost of cleaning up pollution they caused, in favor of a strategy that would let significant polluters off the hook to the United States. Releasing parties from liability exposes the United States—and its taxpayers—to significant claims for reimbursement by performing parties when the remedies in OU2 and OU4 are complete. *See* 42 U.S.C. Section 9606(b)(2).

If EPA wants to settle the *United States' claims* against those parties, it can do so with court approval. But EPA's choice not to pursue full accountability from polluters does not prevent OxyChem from acting. And OxyChem has done so. It is pursuing in court, as Congress intended, contribution claims to compel the parties who caused this pollution to pay their fair shares of the costs to clean it up. It is contrary to Congress's mandate for EPA to try to prohibit OxyChem and other performing parties from pursuing *their own contribution claims*. The pursuit of these claims costs the United States nothing. And it ensures the full scope of liability of all responsible parties will be determined by the Court, as Congress again intended.

For all these reasons, CERCLA's plain language and purpose are vindicated when OxyChem's contribution and cost recovery rights are preserved. The statute does not authorize—and the Constitution does not permit—EPA to thwart the exclusive authority Congress vested in the federal district courts to allocate liability among responsible parties. Nor do they permit EPA to provide purported "contribution protection" to responsible parties the United States has never

---

[6] *See* OU2 ROD at Section 2.

[7] Neither the public nor OxyChem knows how much of the discovery in the CERCLA case (if any) was made available by the settling parties to EPA or its allocator, AlterEcho and David Batson. For these and other reasons, OxyChem reserves its right to challenge settlements by the United States with any or all parties.

[8] EPA Press Release, October 5, 2016 (emphasis added)

sued, in a manner that seeks to bar OxyChem's contribution claims for costs that OxyChem, not the United States, has incurred or will incur. Accordingly, including in the Consent Decree the Required Condition that preserves OxyChem's contribution claims imposes no burden on EPA not already inherent in the limited authority Congress granted to EPA.

### B.  Financial Assurance Condition

EPA guidance states that consent decrees should be supported by financial assurance. Staging the work and tailoring financial assurance to the work to be performed each year, makes economic sense.

No company alone—and certainly not OxyChem—can *post* financial assurance for a multi-decade scope of work of this magnitude. And no company can secure an entire scope of work that spans decades and still retain sufficient financial resources and resilience to pay to perform the work each year, as the work is due, *while* EPA holds multiple years of financial assurance.

An agreement to limit financial assurance to the work to be performed in a given year ensures resources are available to perform that work. Requiring multi-year financial assurance for the entire project from the outset makes performance impossible. In sum, this Required Condition should be acceptable to EPA. It reflects economic reality.

### C.  PVSC Condition Precedent

The Site Selection report approved by EPA identifies property owned or to be acquired by PVSC as the preferred location where the UPF should be built to process sediment removed from the Passaic River during the remedial actions at OU2 and OU4. This is the most cost-effective option and one preferred by EPA, as it permits negotiation of an in-kind settlement with PVSC, which EPA also prefers. Thus, this condition is one that imposes no burden on EPA and acknowledges the fact that OxyChem cannot build anything on PVSC's property without its consent.

### D.  Force Majeure Condition

EPA has historically included force majeure provisions in consent decrees that implement remedial work. Given the enormous uncertainties embodied in these scopes of work, including force majeure conditions as a Required Condition imposes no burden on EPA here. Instead, it makes good sense.

No party can agree in advance to underwrite all costs of an unprecedented, decade-long construction project that is subject to inherent unknowns. The interim remedy for OU4 is not designed. The Preliminary Remediation Goals and a final remedy for OU4 are not yet determined. In addition, although the remedial design is nearly complete in OU2, it has not yet been finalized or approved by EPA. In-river implementation of any remedy—in OU2 or in OU4—also cannot begin until the required UPF is designed and built, an enormous project in itself, requiring access to government-owned property that is not yet available for that purpose. Added to these unresolved issues and unknowns are the inherent additional uncertainties of a project that contemplates miles of in-river dredging and construction, in waters of the United States and state- and privately-owned property.[9]

---

[9] Litigation by those opposed to dredging remedies is a frequent occurrence and could interpose significant delays in implementing the OU2 and OU4 remedies. Just last month, a coalition of environmental groups

OxyChem Response to EPA Notice Letters
June 27, 2022
Page Eight

## IV.     OxyChem's Offer is in Good Faith

OxyChem's offer to perform the remedial design for OU4 and its proposal of sequential agreements for other work in the Site are in good faith and consistent with OxyChem's longstanding cooperation with EPA to advance the cleanup of the Passaic River.

### A.  OxyChem's Record of Cooperation

OxyChem's indemnitors at Maxus Energy and its affiliate, Tierra Solutions, Inc., spent approximately $300 million in response costs to perform remedies in Operable Unit 1 (the former Lister Plant site), to conduct remedial investigations in Operable Units 2 and 3 (where work by OxyChem is still ongoing), and to perform an interim removal in OU2.

When its indemnitors filed for bankruptcy protection, OxyChem immediately stepped up and agreed to perform the remedial design of the remedy EPA selected for OU2. OxyChem took this action with the understanding that it could and would—as Congress authorized under CERCLA—pursue contribution from other responsible parties to ensure they paid for their share of the costs to clean up the pollution they caused. EPA has informed OxyChem on multiple occasions that its work on the OU2 Remedial Design has been excellent.

OxyChem has performed consistently and well in remedial investigations in Operable Unit 3. And it has assisted EPA in matters related to the contemplated design and construction of the UPF.

OxyChem's January offer to perform the *entirety* of the interim Remedial Design/Remedial Action ("RD/RA") selected by EPA for OU4—at an EPA-estimated cost of $441 million— on the basic condition that OxyChem remain free to pursue contribution from the 100+ other responsible parties who should pay their fair shares is consistent with OxyChem's longstanding practice of cooperating first and seeking contribution second.

### B.     Attempts to Achieve an Agreement with Proposed Work Parties

To further cooperate with EPA, and promptly on receiving EPA's March Notice Letter, OxyChem reached out to those public and private parties who also received the Notice Letter to seek early opportunities to meet to discuss the letter and responses to it. We have met several times with each group since then.

The private parties understand—as do the public entities—that work to implement any remedy in OU2 and OU4 cannot begin without active support from, and access to essential facilities made available by, the public entities. Accordingly, on March 21, representatives of OxyChem met in person with representatives of the PVSC and the municipalities to discuss the in-kind contributions they could provide toward implementation of the work specified in the Notice Letter. OxyChem provided to the governmental entities a list of properties and potential services they might offer to further an in-kind contribution to implement the work specified in the Notice Letter. The public entities advised OxyChem, however, that they cannot respond to these requests for assistance because they lack information about what EPA would consider a *sufficient* contribution from them for purposes of a good faith offer. OxyChem remains willing to work

---

filed suit seeking to enjoin the dredging of the Matagorda Bay shipping channel, citing the hazards associated with disturbing contaminated sediment. *See* Case No. 1:22-cv-1470, *San Antonio Bay Estuarine Waterkeeper, et al. v. Connor, et. al.*, in the U.S. District Court for the District of Columbia. No party can undertake to perform, or be penalized for failing to perform, when the project is enjoined or tied up in litigation.

OxyChem Response to EPA Notice Letters
June 27, 2022
Page Nine

toward an agreement for in-kind contribution from these public entities, if EPA will clarify what it expects those entities to provide.

Representatives of OxyChem also met remotely on a number of occasions with representatives of three of the private work parties who also received the Notice Letter: Nokia, Pharmacia, and Public Service Electricity & Gas. Work party PMC Global refused to attend any meetings and has declined OxyChem's request to provide input on a proposed offer.

Unfortunately, beyond sharing these concerns, OxyChem's attempts to negotiate an agreed response to EPA's Notice Letter with the private work parties failed. Ignoring their own significant liabilities, those parties are adamant that they too want EPA to "cash them out" in an agreement that would allow them to walk away before the enormous, decade-long work necessary to implement the remedial actions in the OU2 and OU4 RODs has even begun. They appear to intend to urge the United States to place the entire burden of performance on a *single* party, OxyChem, despite the fact that it bears *no liability* for six of the chemicals of concern, is only partially responsible for the other two, and is not *solely* liable for *any* hazardous substance in the Passaic River.

Despite the inability to reach an agreement to date, OxyChem's efforts to negotiate with the other public and private parties that received the Notice Letter demonstrate its good faith, as EPA has recognized. *See* May 25, 2022 Email from J. Fajardo to L. Silver *et al.*; *see also* May 31, 2022 Letter from E. Wilson to OxyChem *et al.* at 1 ("EPA understands the parties participated in the convening process in good faith . . . ."). This letter continues OxyChem's ongoing, good faith actions to respond to EPA's requests for assistance in implementing the remedies at OU2 and OU4.

## C.    Good Faith is Reciprocal

OxyChem intends to continue to cooperate with EPA in a manner consistent with the twin principles Congress embodied in CERCLA; namely, that all responsible parties must pay their fair shares of the costs to clean up hazardous substances for which they are responsible and that parties who perform are entitled to pursue contribution for the costs of that performance from parties who refuse to pay their fair shares. This is a good faith offer: CERCLA squarely permits OxyChem to perform while it retains and pursues remedies the law guarantees.

If EPA accepts OxyChem's offer, OxyChem will negotiate with the work parties—with EPA's good faith and reasonable support—timely agreements to achieve the scopes of work described above. Preserving OxyChem's contribution claims provides an essential *incentive* to these agreements. It allows OxyChem to perform with the assurance that it will bear only its fair and equitable share of the costs as determined by the Court, as Congress intended. And it ensures timely cooperation by other work parties. To be blunt, in the absence of OxyChem's contribution claims, other responsible parties will continue to evade their responsibilities to clean up contamination they caused.

To accede to the private work parties' pleas to be permitted to walk away from their obligations would be contrary to EPA's guidance and its promises to the public. It would also be unsound as a matter of principle. EPA assured the public that the "ubiquitous contamination" it found in the Passaic River would be remedied by *all* responsible parties who would be required to *carry out* the work to remedy pollution they caused. No party with significant responsibility (and certainly none of the work parties identified by EPA or other parties with demonstrated significant responsibility) should be relieved of all liability or have their liability capped *before* the work mandated in OU2 and OU4 is completed.

In contrast to actions that would protect polluters from the responsibility Congress imposed on them to *clean up* their own pollution, agreeing to these terms and Required Conditions with OxyChem affords EPA and communities along the Passaic River important and near-term benefits:

- OxyChem has a demonstrated history of delivering timely, efficient, and compliant performance of tasks it agrees to perform at the Site;

- OxyChem's offer to design the interim remedy in OU4 ensures that remedy will be consistent with and complement the OU2 95% Design OxyChem has already performed and submitted to EPA;

- Allowing OxyChem to coordinate the sequencing of the work in OU4 ahead of work in OU2 will minimize the risk that construction of the upriver remedy in OU4 would impair a downstream remedy in OU2; and

- OxyChem's coordinated work on both remedies will advance the timely conclusion of the remedial action in both operable units and may also shorten the implementation timetable that would otherwise be required in OU4.

EPA's agreement not to attempt to bar OxyChem's contribution claims is also in the public interest.

First, requiring responsible parties to carry out the work keeps EPA's promises to the public. *See, e.g.*, Letter from Eric J. Wilson, EPA Region 2 September 18, 2017 (EPA's view that "the private PRPs responsible for the release of dioxins, furans, and/or PCBs will *perform* the OU2 remedial action has not changed." (emphasis added)).

Second, premature settlement with other parties who bear significant responsibility for pollution in OU2 would impair the public interest. Discovery in the CERCLA case is still underway. Parties alleged to bear responsibility for polluting the Passaic River will be required to give sworn testimony pertaining to their liability in the near term. For some (and perhaps many) parties, evidence from the CERCLA case may refute the certifications OxyChem understands each party must provide to the United States in connection with any settlement, making attempts to settle with those parties a highly uncertain and legally groundless exercise for EPA.

Third, there is no basis on which EPA could or should settle with any party in OU4. Neither the private PRPs nor EPA has convened an allocation process pertaining to the interim remedy specified in OU4 ROD. To the contrary, the allocation process EPA initiated with David Batson and his firm, AlterEcho, was limited solely to OU2.

Finally, the condition that EPA must confirm it will take no action to impair or bar OxyChem's contribution claims is nothing more than what CERCLA Section 308 and the Constitution require. CERCLA's policies are vindicated when, as OxyChem seeks here, EPA preserves OxyChem's statutory right to seek contribution from other parties to recover the response costs OxyChem has borne (and those it will bear) in both operable units. In neither case does EPA have statutory authority to bar OxyChem's contribution claims for costs that OxyChem alone has borne or committed to bear at the Site.

OxyChem Response to EPA Notice Letters
June 27, 2022
Page Eleven

In extending this offer, OxyChem emphasizes its consistent cooperation with EPA. OxyChem has worked efficiently and well to design the OU2 remedy. We desire to continue that cooperative relationship. Permitting OxyChem—at its own expense—to pursue cost recovery and contribution from other responsible parties is in the public interest. It saves the United States enormous costs, holds responsible parties accountable, and eliminates the unneeded costs of pursuing unconfirmable settlements on terms that violate CERCLA. It will also expedite implementation of the remedies. And, as CERCLA mandates, it ensures all responsible parties pay their fair shares of the costs as determined by the District Court for the District of New Jersey or other federal district court.

All of this would be another enormous step forward at the Site. We look forward to discussing this with EPA at your earliest convenience.

OxyChem reserves all rights it has at law, in equity, and under the United States Constitution.

Very truly yours,

Charles F. Weiss
Senior Vice President of
Environmental and Sustainability
Charles_Weiss@oxy.com

cc:

**EPA Headquarters:**

Mr. Lawrence Starfield
Acting Assistant Administrator
Office of Enforcement and Compliance Assurance
Starfield.Lawrence@epa.gov

Mr. Barry Breen
Acting Assistant Administrator
Office of Land and Emergency Management
Breen.Barry@epa.gov

**Region 2:**

Mr. Pat Evangelista
Director, Superfund and Emergency Management Division, EPA Region 2
Evangelista.pat@Epa.gov

Mr. Walter Mugdan
Deputy Regional Administrator, EPA Region 2
Mugdan.Walter@epa.gov

Mr. Paul Simon
Regional Counsel, EPA Region 2
simon.paul@epa.gov

Ms. Sarah Flanagan
Chief of NJ Superfund Branch, EPA Region 2
Flanagan.Sarah@epa.gov

Mr. Juan Fajardo
Assistant Regional Counsel, EPA Region 2
Fajardo.juan@Epa.gov

Ms. Frances Zizila
Assistant Regional Counsel, EPA Region 2
Zizila.Frances@epa.gov

Mr. Michael Sivak
Chief of Mega Projects, EPA Region 2
Sivak.Michael@epa.gov

**DOJ:**

Mr. Brian Donohue
U.S. Department of Justice
Brian.Donohue@usdoj.gov

Ms. Laura Rowley
U.S. Department of Justice
Laura.Rowley@usdoj.gov

# Exhibit 22



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**

REGION II

290 BROADWAY

NEW YORK, NEW YORK 10007-1866

**MAR 3 0 2017;**

BY CERTIFIED MAIL,
RETURN RECEIPT REQUESTED & ELECTRONIC MAIL

To:     See List of Addressees – Attachment A

Re:     Diamond Alkali Superfund Site, Lower 8.3 Miles of Lower Passaic River,
        Essex and Hudson Counties, New Jersey

        Notice regarding Next Steps Including Initial Cash Out Settlement

The United States Environmental Protection Agency ("EPA") has documented the release and threatened release of hazardous substances, pollutants and contaminants at the Diamond Alkali Site ("Site") in Essex, Bergen, Hudson and Passaic Counties, New Jersey. The Site includes the former Diamond Alkali facility at 80-120 Lister Avenue, Newark, New Jersey, the Lower Passaic River Study Area ("LPRSA"), the Newark Bay Study Area, and the areal extent of contamination.

The Site was placed on the National Priorities List ("NPL") in 1984. In 1987, EPA issued a Record of Decision for Operable Unit 1 ("OU1"), the former Diamond Alkali facility at 80-120 Lister Avenue, Newark, New Jersey. On March 3, 2016, EPA issued a ROD for Operable Unit 2 ("OU2"), the lower 8.3 miles of the Lower Passaic River. Currently, remedial investigation/feasibility studies are being conducted for the 17-mile LPRSA and the Newark Bay Study Area.

The OU2 ROD was issued by EPA to address human health and environmental risks posed by contaminated sediments found in the lower 8.3 miles of the Lower Passaic River, an area from the river's confluence with Newark Bay to River Mile 8.3 near the border between the City of Newark and Belleville Township, New Jersey. The OU2 ROD calls for, among other things, the construction of an engineered cap bank to bank over the river bottom of the lower 8.3 miles of the river, dredging of the river bottom prior to placement of the cap, and implementation of institutional controls designed to protect the engineered cap.

On March 31, 2016, EPA notified each Addressee that it may be a potentially responsible party under Section 107(a) of the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended ("CERCLA"), 42 U.S.C. § 9607(a), with respect to OU2 for the Site. That letter also notified the recipients that EPA intended to: a) negotiate a settlement with Occidental Chemical Corporation ("OCC") for OCC's performance of the remedial design
for the remedy selected in the OU2 ROD; b) negotiate a remedial action consent decree under which OCC and other major parties will implement and pay for the remedy selected in the OU2 ROD; and c) identify parties that may be eligible for a cash out settlement with EPA for the lower 8.3 miles of the Lower Passaic River.

On September 30, 2016, EPA and OCC entered into Administrative Settlement Agreement and Order on Consent for Remedial Design, CERCLA Docket No. 02-2016-2021, for OCC's performance of the remedial design selected in the OU2 ROD, under EPA oversight.

**NEXT STEPS**

As of the date of this letter, EPA is notifying 20 parties that EPA has identified them as candidates for early cash out settlements. The 20 parties are listed in the enclosure to this letter. EPA has identified for immediate settlement those parties that are not associated with a disposal or release of any of the contaminants of concern ("COCs") for OU2, as identified in the OU2 ROD.

Parties that are responsible for the release or discharge of dioxins, furans, or polychlorinated biphenyls ("PCBs") into the Lower Passaic River should participate in implementing or funding the remedy selected for the lower 8.3 miles of the Lower Passaic River. EPA will provide notice to those parties shortly, as well as an opportunity to meet with EPA to discuss their status.

For parties that are not one of the 20 early cash out parties and are also not associated with the release of dioxins, furans, or PCBs into the Lower Passaic River, a cash out settlement might be appropriate. This determination requires additional complex settlement analysis. EPA expects to use the services of a third party allocator before extending cash out settlement offers to any such party. In a subsequent letter, EPA will identify the parties that should be part of the allocation process. There will be a future opportunity for OU2 PRPs to offer input on the factors that they think should be considered in the allocation process, and to provide feedback on the overall design of the allocation process.

If you have any questions regarding this letter, you may contact Juan Fajardo via email at fajardo.juan@epa.gov or by phone at (212) 637-3132.

We look forward to working with you.

Sincerely yours,

Eric J. Wilson
Deputy Director for Enforcement and Homeland Security
Emergency and Remedial Response Division

Enclosure:  List of Early Cash Out Parties

cc:  Brian Donohue, Esq., USDOJ
     Mark Barash, Esq., USDOI
     Kate Barfield, Esq., NOAA
     John Dickinson, Esq., New Jersey Attorney General's Office

# Exhibit 23



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
REGION 2
290 BROADWAY
NEW YORK, NY 10007-1866

SEP 18 2017

**BY EMAIL AND CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

To:  See List of Addressees - Attachment A

Re:  Allocation for Operable Unit 2 Remedial Action
     Diamond Alkali Superfund Site, Essex and Hudson Counties, New Jersey

Dear Sir/Madam:

On August 28, 2017, the U.S. Environmental Protection Agency ("EPA") hosted a meeting at its New York City offices to provide you with an opportunity to share your views on the Agency's proposed settlement framework for implementation of the remedy selected for the lower 8.3 miles of the Passaic River, which is Operable Unit 2 ("OU2") of the Diamond Alkali Superfund Site (the "Site"). I want to once again thank all of the parties that participated in the meeting. Your participation has helped both EPA and the other parties better understand the issues and concerns regarding the framework.

After careful consideration, the Agency has concluded that the allocation process should include all of the potentially responsible parties ("PRPs") for OU2 (apart from the Passaic Valley Sewerage Commission ("PVSC"), the four municipal PRPs referred to below, and the PRPs that settle pursuant to the "early" cash-out settlement that EPA offered in March 2017), and should not be limited to the "middle tier" parties. Transparency and fairness are concepts that EPA has consistently stated are of importance to the Agency in this matter and, after considering your comments and concerns, we think those concepts are best served by having one allocation for all of these parties.

Numerous parties at the August 28, 2017 meeting expressed concern regarding the financial burden that would be placed on PRPs that are not responsible for the release of dioxins, furans and/or polychlorinated biphenyls ("PCBs") into the Lower Passaic River if those parties are not given the opportunity to settle with the United States for their OU2 liability, as opposed to having to implement the remedial action for OU2. EPA appreciates those concerns. As we have stated, we anticipate that with the help of the allocation process, EPA will be able to offer cash-out settlements to a number of the parties.

Similarly, EPA's expectation that the private PRPs responsible for the release of dioxins, furans and/or PCBs will perform the OU2 remedial action has not changed. It is therefore our goal that, in addition to supporting potential additional cash-out settlements, the allocation will lead to a consent decree in which those parties agree to perform the OU2 remedial action under EPA oversight.

Recycled/Recyclable • Printed with Vegetable Oil Based Inks on Recycled Paper (Minimum 50% Postconsumer content)

To perform the allocation, EPA has retained AlterEcho and its senior allocation specialist, Mr. David Batson, Esq., through the Agency's prime contract with CSRA. EPA and AlterEcho invite you to attend a meeting to introduce the allocation process. Among other things, the allocation will provide opportunities for participating parties to comment on factors that should be part of the allocation and to contribute relevant information about themselves and other parties for use in the allocation. This meeting will be held on October 13, 2017 at 9:00 A.M. on the 27th floor of EPA's offices, which are located at 290 Broadway, New York, NY 10007.

Mr. Batson has requested that each party designate a primary contact for future communications on the allocation and that the primary contact attend the October 13th meeting in person. EPA has established a conference line for others wishing to participate. The call-in number is 866-299-3188, and the conference code is 212-637-3136. Please respond to EPA by October 5, 2017 with the following information: 1) name of and party represented by the primary contact attending the meeting; 2) names of other representatives planning to call in for each such party. Your response should be directed to Alice Yeh, Remedial Project Manager, Emergency and Remedial Response Division at yeh.alice@EPA.gov or U.S. EPA Region 2, 290 Broadway - 19th Floor, New York, NY 10007.

After the allocator assigns shares to the parties, EPA will make a decision as to which parties should receive cash-out settlement offers, the dollar amount of each offer, and how the money raised by the cash-out settlements will be applied towards OU2 costs.

During the August 28, 2017 meeting, several parties raised questions concerning EPA's enforcement approach for PVSC and the municipalities to which EPA issued notices of potential liability (the City of Newark, Borough of East Newark, Town of Harrison and Town of Kearny). EPA has initiated discussions with PVSC and the municipalities about substantial contributions that, collectively, they might make to the OU2 remedy. At this time, we do not believe it would be helpful to include them in the allocation.

If you have any questions regarding this matter, please contact Assistant Regional Counsel Juan Fajardo at 212-637-3132 or fajardo.juan@epa.gov.

Very truly yours,

Eric J. Wilson
Deputy Director for Enforcement and Homeland Security
Emergency and Remedial Response Division

cc: Brian Donohue, Esq., USDOJ
    Mark Barash, Esq., USDOI
    Kate Barfield, Esq., NOAA
    John Dickinson, Esq., New Jersey Attorney General's Office

# Exhibit 24

 **GT** GreenbergTraurig

David G. Mandelbaum
Tel 215.988.7813
Fax 215.717.5201
mandelbaumd@gtlaw.com

**VIA EMAIL AND UPS NEXT DAY AIR**                                    February 13, 2018

Juan M. Fajardo, Esquire
Office of Regional Counsel
USEPA, Region 2
290 Broadway
17th Floor
New York, NY 10002

Re:    <u>Lower Passaic River Site / Planned Allocation of Responsibility for Operable Unit 2</u>

Dear Juan:

I am writing on behalf of this firm's client, Benjamin Moore & Co., concerning the allocation
process that the Environmental Protection Agency ("EPA") has designed and is intending to
implement using David Batson as the assigned allocator ("the Batson allocation"). I make
specific reference to Eric Wilson's letter of January 5, 2018, to the Diamond Alkali – Lower 8.3
Miles Contact Group. I intend this letter to supplement the views of the Small Parties Group
("SPG"), transmitted by letter dated January 30, 2018, which Benjamin Moore endorses.

We are not aware of any evidence demonstrating that Benjamin Moore released dioxins, furans,
or polychlorinated biphenyls to the Lower Passaic River from its facility, which is located next to
the Diamond Shamrock Site on Lister Avenue. Whether EPA ultimately agrees with that
proposition or not, Benjamin Moore has reservations about the allocation process as currently
envisioned that Benjamin Moore wishes to reiterate at this time.

    a.    The Batson Process Is Not Authorized by CERCLA.

There appears to be no statutory basis for the Batson allocation –which can be summed up as an
EPA-improvised process for organizing certain information and allocating measures of OU2
responsibility in anticipation of a court-approved endorsement of settlement. But Congress has
already mandated the process for an allocation in aid of settlement – a nonbinding preliminary
allocation of responsibility ("NBAR") – in section 122(e)(3) of Comprehensive Environmental
Response, Compensation and Liability Act ("CERCLA"). EPA issued guidelines for NBARs at
52 Fed. Reg. 19,919 (May 28, 1987). Per the EPA's guidelines, an NBAR is intended only as an
aid to settlement among those parties who participate and EPA, and not as a justification for a
contested settlement. The very nature of an NBAR confirms its more limited purpose; an NBAR
is a voluntary allocation process, the results of which (i) may be adjusted by the PRPs after
preparation, and (ii) cannot be introduced in any court proceeding (including one for the entry of
a consent decree).

GREENBERG TRAURIG, LLP  ■  ATTORNEYS AT LAW  ■  WWW.GTLAW.COM
2700 Two Commerce Square  ■  2001 Market Street  ■  Philadelphia, PA 19103  ■  Tel 215.988.7800  ■  Fax 215.988.7801


537583

ALCD-PUBCOM_0001222

Juan M. Fajardo, Esquire
February 5, 2018
Page 2

In contrast to an NBAR, the Batson allocation is neither voluntary nor nonbinding. While EPA and Mr. Batson on the one hand, and many of the noticed parties on the other, have talked about parties electing not to participate in the allocation process, Mr. Batson has advised that EPA has directed him to make an allocation to every noticed party unless that party was offered and accepted an early cash-out[1] or is one of the noticed parties specifically excluded from the allocation process.[2] No so-called "allocation party" has the ability to opt out of, or to adjust, this allocation, including the parties that neither consent to it nor participate.

In short, while Benjamin Moore is not endorsing an NBAR proceeding for the Passaic River allocation, Benjamin Moore is not aware of any statutory provision or regulation that permits EPA to depart from an NBAR and develop an alternative *mandatory* settlement process. Absent such a basis, the Batson allocation is not authorized by the statute, and the costs incurred to implement it are neither costs of response incurred consistent with the national contingency plan, nor reasonable enforcement costs. Moreover, rather than accepting the Batson allocation as a basis for a settlement order, a court will likely reject the Batson allocation as inconsistent with CERCLA's requirements.

To be clear, Benjamin Moore believes that parties who wish to attempt settlement can use whatever they like to help them. They just cannot force others into that process, nor can they use that process to show a resulting settlement to be fair, reasonable, or consistent with CERCLA. If Mr. Batson's process, trial by combat, or a Ouija board would help, by all means it should be used, but that is for the parties seeking the help, and not any subsequent court.

   b.  The EPA Allocation Process is Arbitrary and Promotes a Piecemeal Settlement that Invites Challenge.

The EPA allocation process treats similarly situated parties differently, and thus is entirely arbitrary. Nowhere is this clearer than with respect to EPA's decision to pursue an entirely separate settlement process with the Passaic Valley Sewerage Commission ("PVSC" or "the POTW") and certain municipalities. EPA has stated its decision not to pursue the PVSC's significant industrial users, which account for several thousand responsible parties. And yet, although several of the noticed allocation parties are connected to the Passaic River only through their use of the POTW, EPA has arbitrarily maintained those parties, but not PVSC, bear responsibility for purposes of this allocation. If there is a principled reason for treating the POTW separately, then that reasoning surely applies likewise to parties whose sole connection to OU2 liability is through the POTW. If that is not the case, then all parties potentially responsible for contamination to the River solely through use of the POTW, including but not limited to those noticed to date, should be included in the Batson allocation.

---

[1] This is yet another example of the unfairness of the Batson allocation. The early cash-out settlements previously offered by EPA to select parties was predicated on EPA's assessment that these parties had not released *any* contaminant of concern ("COC") to the Passaic River. Yet those selected parties who refused to accept the cash-out offer – i.e., to pay an arbitrary cash-out amount for having no liability at all – are nonetheless expected to participate in the Batson allocation at considerable expense.

[2] The parties excluded from the Batson allocation include the Passaic Valley Sewerage Commission and certain municipalities.

ALCD-PUBCOM_0001223

Juan M. Fajardo, Esquire
February 5, 2018
Page 3

A separately negotiated settlement between EPA and PVSC and others only reinforces the appearance that EPA is only looking to justify early (in-kind) settlements, rather than to promote a comprehensive settlement of OU2 responsibility without litigation. Under the guidelines, an NBAR should allocate 100 percent of the costs of the remedial action – rather than carve out costs to address in separate proceedings. Moreover, EPA's approach appears to disregard section 113(f)(2) of CERCLA, as there is no suggestion that these early settlements will be structured to assure a reduction in the liability of non-settling parties by the amounts of the settlements EPA does reach in these separate proceedings.

The Batson allocation is not positioned as constructed to reach a settlement for 100 percent of the costs of the remediation or any consensus among those who are the most responsible. Rather, insofar as it eschews a comprehensive, unbiased, and informed allocation, the Batson allocation appears designed solely to promote early settlements for a set of parties selected by EPA through an exercise of discretion. If the purpose of the Batson allocation is simply to provide EPA with justification for settlements with the parties responsible for the smallest shares, then that ought to be the only outcome of the process. Mr. Batson can sort the parties into two groups; those who meet EPA's criteria for cash-out offers and those that do not. Further allocation will be counter-productive and invite litigation.

Benjamin Moore favors attempts to reach a reasonable and fair allocation of shared OU2 responsibility, consistent with CERCLA and without litigation. However, the Batson allocation is not designed to aid settlement – which ought to be the only rationale for an allocation prepared by EPA or on EPA's behalf. In fact, the Batson allocation will inevitably result in the very protracted litigation that presumably all parties, including EPA and Benjamin Moore, seek to avoid. Ultimately, it is the court, not EPA, that is qualified to prepare a binding allocation; and any administrative settlement effort must be intended to mimic the likely judicial allocation if it is intended to promote a consensual, rather than litigated, result. But the allocation process as planned does very little to replicate a litigated equitable allocation (which would include review of relevant documents and expert analysis) under section 113(f)(1) of CERCLA. While Benjamin Moore hopes to receive a cash-out offer, the value of the offer will be diminished if it does not withstand challenges from non-settling parties.

Benjamin Moore will participate in Mr. Batson's process if the process goes forward because it has no choice; Mr. Batson will assign a share to Benjamin Moore whether Benjamin Moore participates or not. Neither EPA nor any other party should interpret Benjamin Moore's active participation as waiver of any claim, defense, or position concerning the reasonableness or lawfulness of the allocation, the recoverability of the costs of the allocation under CERCLA or other law, or the propriety of any settlement based upon the allocation or the allocation report.

Very truly yours,

David G. Mandelbaum

cc: David C. Batson, Esq.

ALCD-PUBCOM_0001224

# Exhibit 25



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**

REGION 2

290 BROADWAY

NEW YORK, NY 10007-1866

MAY – 1 2018

By Email and Regular Mail

David G. Mandlebaum, Esq.
Eric S. Aronson, Esq.
Greenberg Traurig, LLP
2700 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103

Re:     Diamond Alkali Superfund Site ("Site") - OU2 Allocation Proceeding

Dear Messrs. Mandlebaum and Aronson:

We understand that David Batson of AlterEcho will be responding to your letter of April 10,
2016 [sic] regarding the allocation process for Operable Unit 2 (OU2) of the Diamond Alkali
Superfund Site (Site). There are, however, statements in your letter that the U.S. Environmental
Protection Agency (EPA) Region 2 seeks to clarify and correct.

The OU2 allocation process is not mandatory. As you know, Eric Wilson of EPA issued a letter
dated September 18, 2017 to 80 potentially responsible parties (PRPs) inviting those parties to
participate in the allocation. Some of the parties have declined to do so, including, as you note,
Occidental Chemical Corporation (OCC). That EPA's contractor AlterEcho, after consideration of
the facts through the allocation, will assign a share to all 80 PRPs invited to participate does not
make participation in the allocation process mandatory.

Your letter also states that EPA prohibited the parties from undertaking their own allocation.
That is not the case. Rather than preventing the parties from undertaking an allocation, EPA
initiated the allocation process because of the unwillingness (or inability) of the PRPs to
undertake and complete their own allocation. For example, the Lower Passaic River
Cooperating Parties Group (CPG) retained an allocator in 2015, but failed to complete the
allocation. Similarly, in 2012, the CPG initiated an allocation effort intended to apply to the
costs of the removal action at River Mile 10.9, an effort that also was unsuccessful. This track
record is what has led EPA to offer the PRPs the opportunity to participate in the present
allocation process.

Initially, EPA intended to facilitate a more limited allocation process than the present one. As you know, EPA intended to limit the allocation to parties not associated with the release of dioxin, furans and polychlorinated biphenyls (PCBs), the contaminants of concern (COCs) driving the remedy for OU2. Numerous parties contacted EPA, requesting that we expand the allocation process to include all the OU2 PRPs. After much consideration, EPA agreed to include all OU2 PRPs, apart from the PRPs that settle pursuant to EPA's "early" cash out settlement offered in March 2017, and the Passaic Valley Sewerage Commission and four municipal PRPs.

Further, EPA has responded to concerns raised by parties participating in the allocation and supplemented the allocation contract to allow the parties to submit additional documents, to provide additional time for the parties to consult with the allocator and to include an "off-ramp" in the allocation process.

Confidentiality

For the OU2 allocation, confidentiality is addressed in EPA's prime contract with CSRA (through which EPA retained AlterEcho), [1] and in the Task Order Statement of Work (SOW), pursuant to which AlterEcho is performing the allocation. The SOW, a copy of which was provided to the allocation parties, contains the confidentiality terms in EPA's agreement with CSRA-AlterEcho and references the Administrative Dispute Resolution Act of 1996 (ADR Act).

Section 2.0 of the SOW states, in relevant part:

> Unless otherwise noted herein, all allocation related communications by the CSRA Team involving the OU2 PRPs or representatives of EPA or DOJ, individually or in groups, will be held confidential pursuant to the provisions of the ADR Act of 1996, 5 USC 574.

> In order to ensure a common expectation of confidentiality, all PRP participants in the allocation process will be required to enter, and EPA will appropriately acknowledge, a confidentiality agreement.

Section 3.0 of the SOW reads, in relevant part:

> CSRA will approach this task in accordance with the basic terms of the contract and according to the established norms and ethical standards of ADR professionals. Except as otherwise noted herein, information provided to the ADR professional by any of the parties, including EPA, communications between parties and the ADR professional, and notes and dispute resolution work product generated by the ADR professional during

---

[1] The allocation parties were also provided with the web link (https://www.epa.gov/sites/production/files/2015-09/documents/adr_contract_sow.pdf) to EPA's prime contract with CSRA when the OU2 allocation SOW was provided to the parties.

work pursuant to the Task Order will be maintained as confidential by the ADR professional pursuant to the provisions of the ADR Act of 1996 (Public Law 104-320; 5 USC 571 et al.) and applicable federal, state and judicial requirements.

The information that is not confidential is noted in Section 4, Task 3 of the SOW that reads, in relevant part:

> The allocation process will be designed based upon information received during consultations with EPA and OU2 PRPs on the allocation database and using all relevant non-confidential received information, including data, records, and other documents.

> No confidential information will be included in the allocation database. Though to be designed for purposes of conducting the allocation, the database will be designed in such a way as to allow access and use by EPA and DOJ staff for their settlement purposes following submission of the Allocation Data Reports in Task 8.

Confidentiality is also addressed in the ADR Act, a federal statute that EPA, as a federal agency, is required to abide by even in the absence of a signed confidentiality agreement. The Interagency ADR Working Group, established by Presidential Memorandum dated May 1, 1998, provides guidance on the confidentiality provisions of the ADR Act at https://www.adr.gov/adrguide/ch29.html. In summary, the guidance states the following:

- The ADR Act affirmatively bans neutrals from voluntarily disclosing dispute resolution communications and any communication provided in confidence to the neutral unless one of four statutory exceptions apply (see guidance for exceptions).
- Parties to an ADR proceeding have a similar prohibition on releasing information unless one of seven exceptions apply. Those exceptions include the following (see guidance for a listing of all seven exceptions):
  - Dispute resolution communications relevant in disputes involving a settlement agreement reached in an ADR; and
  - A dispute resolution communication **(except those generated by the neutral)** that was provided or available to all parties to the ADR proceeding.
- The common law of evidence and Federal Rules of Evidence (FRE) 408 have long restricted the admission of settlement discussions – like those in ADR – into evidence to prove or disprove liability or a defense.
- It should be noted that confidentiality clauses in a settlement agreement may not withstand a request under FOIA

3

With the above guidance in mind, EPA has endeavored to protect the confidentiality of the OU2 allocation communications as much as possible in the following ways:

- EPA does not participate in the meetings between AlterEcho and the allocation parties.
- The allocation work plan specifies that AlterEcho will provide summaries of input obtained from the allocation parties at various steps in the allocation process, without attribution to contributions of individual participants.
- AlterEcho will not share with EPA the position briefs and reply briefs submitted by the allocation parties.

However, given the limitations in the ADR Act, there are allocation documents that EPA does not believe can be protected. First, the nexus documents contained in the document repository (or SharePoint site) are not confidential. In addition, EPA does not expect it will be able to protect the data in the allocation database from disclosure under FOIA or common law protection or privilege. Accordingly, the SOW specifies that "No confidential information will be included in the allocation database".[2] The allocation parties should not, therefore, include confidential information in their submissions to the document repository. If a document is within the categories of documents that must be submitted and certified to, and it contains confidential business information, it would be prudent to redact the protected information. If the allocation parties are concerned that the certification requires them to submit documents or material that is entitled to confidentiality under the attorney-client privilege or other privilege, that concern could be resolved by addressing the language of the certification.

With respect to the Allocation Data Reports and the draft and final Allocation Recommendation Reports, which are the work product of neutral but that the allocation parties and EPA will all receive and review, EPA has the following observations:

- In responding to a FOIA request, EPA may assert FOIA Exemption 3, which allows the withholding of information prohibited from release by another federal statute, in this case the ADR Act, as a basis to withhold disclosure of any confidential communication in the possession of an internal neutral. Note that this protection from disclosure pursuant to FOIA does not apply to communications not protected by the ADR Act, such as written communications shared directly by a party with all other parties to the process, even if the parties have agreed in writing that such communications are confidential. Also, because the contents of the Data Reports and the draft and final Allocation Recommendation Reports will be shared with the allocation parties and EPA, and will be relevant to any settlement that the United States is able to enter into, it is possible that

---

[2] Also note that the ADR Act does not protect documents that are exchanged during an ADR process but were produced for an entirely different purpose, and are not otherwise protected from disclosure, such as a document required to be prepared by regulation or discussions regarding an unrelated subject. Much of the information submitted by the allocation parties is likely to fall into this category.

the data reports and the final allocation report cannot be protected from disclosure under FOIA, unless they are deemed to comprise communications generated by the neutral, which under Section 574(7) would not be subject to release.

As described in EPA's September 18, 2017 letter, the OU2 allocation is intended to result in cash-out settlement offers from EPA to those parties that are not associated with the release or disposal of dioxin, furans and/or PCBs, and is also intended to identify those parties that should participate in consent decree negotiations for the performance of the remedial action for OU2 due to their association with the release or disposal of dioxin, furans and/or PCBs into the lower 8.3 miles of the Lower Passaic River.

Any settlement entered into by EPA will require public notice before becoming effective, thereby providing interested parties with an opportunity to comment on the proposed settlement. EPA will respond to comments received and may modify or withdraw from the proposed settlement if comments demonstrate that the proposed settlement is inappropriate, improper or inadequate. In responding to any such comments, and in seeking entry by the court of a consent decree, EPA will very likely need to rely on documentary evidence. EPA, along with the Department of Justice, will make every effort to use documents that are not confidential, such as those from the SharePoint site. However, even if the court were to request the Allocation Recommendation Report, EPA and the Department of Justice can take steps to protect it, such as objecting or moving to file it under seal.

We hope this letter clarifies for you EPA's position with respect to the various categories of information that will be part of the OU2 allocation process.

Sincerely,

Juan M. Fajardo
Assistant Regional Counsel

cc:     David Batson, Esq., AlterEcho *(by email)*
        Brian Donohue, Esq., USDOJ *(by email)*
        Laura Rowley, Esq., USDOJ *(by email)*
        David Moora, Esq., US EPA *(by email)*
        Allocation Parties, Appendix A *(by email)*

Appendix A
Diamond Alkali Superfund Site - Operable Unit 2
Participating Allocation Parties

1. 21st Century Fox
2. Alliance Chemical
3. Arkema / Legacy Site Services
4. Ashland
5. Atlantic Richfield
6. Atlas Refinery
7. BASF
8. Benjamin Moore
9. Campbell Foundry
10. Canning Gumm
11. CBS Corp
12. Celanese
13. Chargeurs
14. Chevron Environmental Management
15. Coats & Clark
16. Congoleum
17. Conopco
18. Cooper Industries
19. Covanta Essex
20. Croda
21. Curtiss Wright
22. Darling Ingredients
23. DII
24. Eden Wood
25. Elan Chemical
26. EnPro Holdings
27. EPEC Polymers
28. Essex Chemical
29. Everett Smith Group
30. Franklin Burlington
31. Garfield Molding
32. General Electric
33. Givaudan Fragrances
34. Goodrich
35. Hartz Consumer Group
36. Hexcel
37. Hoffman – LaRoche
38. Honeywell
39. ISP Chemicals
40. ITT/Excelis/Harris
41. Kearney Smelting
42. Leemilt Petroleum
43. Legacy Vulcan
44. Lucent Technologies
45. National Standard
46. Newark Group
47. Newark Morning Ledger
48. Newell Brands
49. Okonite
50. Otis Elevator
51. Palin Industries
52. Pabst Brewing
53. Passaic Properties
54. Pharmacia
55. Pitt-Consol Chemical
56. PPG Industries
57. PSEG
58. Purdue Pharma Technologies
59. Quality Carriers
60. Revere Smelting
61. Safety Kleen – McKesson
62. Sequa
63. Sherwin Williams
64. Spectraserv
65. Stanley Back & Decker
66. STWB
67. Sun Chemical
68. Tate & Lyle
69. Teval
70. Textron
71. Tiffany

# Exhibit 26

**SMALL PARTIES GROUP**

January 30, 2018

VIA EMAIL

Eric J. Wilson
Deputy Director for Enforcement
and Homeland Security
USEPA
Region 2
290 Broadway
New York, NY 10007-1866

Re:     **Allocation for Operable Unit 2 Remedial Action**
        **Diamond Alkali Superfund Site, Essex and Hudson Counties, New Jersey**

Dear Mr. Wilson:

This letter responds to your correspondence dated January 5, 2018 regarding the above matter, submitted on behalf of the Small Parties Group.[1]  Because of the complexity of this case, as well as the size and cost of the remedy, it is important that the allocation process provide the Allocator and the Region with sufficient information to evaluate the merits properly without engaging in unnecessary layers of process that are inefficient and unproductive.  In order to be credible, though, the allocation must be a complete and comprehensive process.  The proposed process should be restructured to increase the potential it will generate a defensible allocation, and we again urge the Region to reconsider its approach.

ASSURING A SUFFICIENT DATABASE OF DOCUMENTS

EPA's willingness to increase the number of documents to be considered by Mr. Batson is a positive step.  And we understand that the document submission and review portion of the allocation process is not intended to duplicate the full discovery process that litigation would include.  Yet we are justifiably concerned that the document database will not contain the documents needed to perform a fair, reasonable, and credible allocation.   For example, EPA and Mr. Batson have represented that the entire State Litigation file relating to the Diamond Alkali site has been provided and is already included in the document repository.  Our review of the database of documents provided by EPA to Mr. Batson shows with certainty that this is not the case as many documents are not included.  Additional examples of fundamental defects in the database include:

---

[1] The Small Parties Group consists of more than 50 members.  This letter is not being submitted on behalf of any members who are participating in the first round cash out settlement.  Most, but not all, remaining members who were invited to participate in the allocation support this letter and the statements herein.

- It fails to include documents in EPA's possession and/or about which EPA is fully aware that evidence the massive discharges of dioxins, furans and other COCs from the Diamond Alkali upland site into the river.  These documents and categories of documents include:

    o Judicial opinions, both of the New Jersey Superior Court and Appellate Division, holding that Occidental Chemical Corp.'s predecessor, Diamond Alkali, intentionally and illegally discharged dioxin, furans, DDT, and other contaminants of concern from the Diamond Alkali upland site to the Passaic River;[2]

    o The documents submitted by NJDEP in the *NJDEP v. Occidental Chemical Corp.* litigation in support of its motion for summary judgment against Occidental; these documents include, in NJDEP's words, "pleadings, documentary evidence produced during discovery, and even a final judgment establishing . . . without question, that [Occidental's predecessor] intentionally discharged dioxin, DDT and other hazardous substances into the Passaic River – a practice so pervasive that [the predecessor's] employees had a name for it:  'riverize'" (Brief in Support of Plaintiffs' Motion for Partial Summary Judgment Against Occidental Chemical Corp., No. ESX-L9868-05 (May 6, 2011) at 2);

    o Attachment A to the Cooperating Parties Group's (CPG) comments on EPA's proposed plan for the lower eight miles of the Passaic River, submitted to EPA on August 20, 2014, addressing discharges from the upland site to the river; and

    o Published articles in the peer-reviewed scientific literature establishing that the Diamond Alkali upland site "is the dominant source of the 2,3,7,8-TCDD in sediments within approximately the lower 14 miles of the lower Passaic River" (James Quadrini, et al., "Fingerprinting 2,3,7,8-tetrachlorodibenzodioxin contamination within the lower Passaic River," 34 Environ. Toxicol. Chem. 1485 (2015));

- It also fails to include documents necessary to make informed determinations about many other PRPs' respective relative liability shares.

---

[2] *See Diamond Shamrock Chem. Co. v. Aetna Cas. & Surety Co.*, 258 N.J. Super. 167, 183 (App. Div. 1992) (Diamond Alkali's "waste disposal policy … essentially amounted to 'dumping everything' into the Passaic River"); *id.* at 197 (Diamond Alkali "intentionally and knowingly discharged hazardous pollutants with full awareness of their inevitable migration to and devastating impact upon the environment"); *id.* at 212-13 ("Diamond's management knew of the hazardous nature of dioxins at a relatively early stage. … Despite specific preventative recommendations, Diamond made a conscious decision to run the autoclave, in which chemicals were processed …, at a higher temperature … The only conclusion to be drawn is that Diamond's management was wholly indifferent to the consequences flowing from its decision.  Profits came first.").

The process currently under discussion for supplementing the document repository leaves the relevancy of the documents to be added/produced to be determined by each individual party producing said documents. There is no agreement among the parties regarding what information is deemed relevant and must be produced. Furthermore, requiring parties to demonstrate the relevance of each document they produce at the time of production will be neither efficient nor practical. Rather, in order to ensure a consistent approach a detailed process for document production is essential, including clear criteria for selecting specific categories of documents for submission. For example, document categories may include: PRP site operations and conduct; hazardous substance discharges; pathways for hazardous substance discharges to impact the Passaic River; the lower Passaic River 8.3 mile FFS area site issues; and any factual information that participants will rely on to support submissions arguing what allocation share they or any other participant should be given, just to name a few.

Furthermore, parties should also be required to certify that a reasonable investigation of their records has been made and responsive information in their custody has been fully disclosed. A process for addressing those instances in which parties may make incomplete or deficient productions must also be developed and codified. In order to insure that a level playing field is established, all key, relevant information must be collected before the allocation process commences so that no advantage is gained by a party due to the lack of sufficient information in EPA's database or the failure of a PRP to undertake a diligent inquiry and produce relevant documents. In this regard we note particularly that some parties have to date not indicated an intention to participate in this allocation. Therefore, if these parties do not ultimately participate, no voluntary process of certifying productions of documents will apply to them, nor will they respond to any allocation questionnaire.

In order to create an appropriately comprehensive database, the document production cannot be limited by an arbitrary page limit. Even an augmented page limitation could very well be (and likely will be) disproportionate to the complexity of the allocation, the number of relevant documents existing, and the enormous costs at issue.

We believe that a complete database collection and meaningful meetings with the Allocator could be completed within the timeframe needed to expeditiously fund and implement the OU2 remedy.

## ASSURING A FULL ALLOCATION

In its January 5, 2018 letter, EPA stated that it will not consent to add more parties to the allocation at this time. EPA's refusal extends even to the Passaic Valley Sewerage Commission (PVSC) and the four municipalities already identified as potentially responsible parties. The parties are extremely concerned with proceeding with an allocation that does not include these identified PRPs, especially PVSC.

EPA justifies its refusal to include PVSC and the four municipalities by stating that they "are uniquely situated to provide in-kind services with respect to the remedy selected for Operable Unit 2 (OU2) of the Diamond Alkali Superfund Site." In eventually justifying to a District Court any settlement with these parties, EPA will bear the burden of demonstrating that "the proportion of total projected costs to be paid by the settlors" is commensurate "with the

proportion of liability attributable to them." *United States v. Montrose Chemical Corp. of Cal.*, 50 F.3d 741, 744 (9th Cir. 1995) (citing *United States v. Charles George Trucking*, 34 F.3d 1081, 1087 (1st Cir. 1994)).

Including PVSC and the municipalities in the allocation is obviously and for many reasons the fairest and most reasonable way to determine objectively "the proportion of liability attributable to them." To be clear, that proportion is very substantial, as noted in the CPG's prior correspondence on this topic, and as would be demonstrated in the allocation. For instance, EPA Region 2 has, in prior correspondence, repeatedly stated that the risk drivers for the River are dioxin, furans, and PCBs. While the Diamond Alkali site is clearly the primary source of dioxins and furans to the River, as was set forth in detail in the October 24, 2017 letter to the EPA on behalf of the CPG, PVSC has been identified as a major, if not the primary, source of PCBs to the watershed, contributing an estimated total PCB mass of 91,613 lb. to the River.

Indeed, PVSC itself has recognized that it arranged for disposal and disposed of vast amounts of hazardous substances in the Passaic River, associated with hundreds of customers that EPA has excluded from the general notice letter and allocation process. In the New Jersey State Court litigation regarding the Passaic River and Newark Bay Complex, on September 20, 2012, PVSC submitted a letter brief to the trial court in support of an order to show cause seeking a stay of third and fourth party claims in the suit to allow the parties to pursue settlement discussions. In its papers, PVSC advised the trial court that "PVSC is prepared to name an additional 500 parties to this lawsuit by the Court's September 24, 2012 deadline."[3] The letter brief states that "PVSC alone has identified approximately 500 *viable* Fourth Party Defendants" that needed to be sued and added that "[t]his number will almost certainly increase as additional Fourth Parties are identified through discovery."[4] Indeed, as of 2012, PVSC had over 2,500 customers that had not been named in the lawsuit. Prior to PVSC's submission, on August 22, 2012, Special Master Corodemus posted a list setting forth the identities of several thousand entities not currently parties in the action that have been, or potentially could be, identified in a first pleading as Fourth Parties to the litigation. While those additional parties were not added to the litigation as the trial court issued a stay to allow the third party defendants to engage in settlement discussions with the State of New Jersey, PVSC's letter brief and the Special Master's list of potential fourth parties support the conclusion that EPA has not identified all viable parties in this matter for the allocation of OU2.

Moreover, in February of 2017, William J. Hengemihle of FTI Consulting submitted correspondence on behalf of the CPG identifying a number of supplemental industrial users who are believed to have discharged, directly or indirectly, into the Lower Passaic River. By refusing to include these other parties, PVSC, or the four previously identified municipalities in the allocation process, EPA is excluding significant, primary sources of the Passaic River risk drivers from the allocation. At a minimum, EPA should allow the parties that participate in the allocation process to submit evidence to the Allocator related to PVSC, the municipalities and additional sources for inclusion in the allocation to ensure that it appropriately accounts for those sources.

---

[3] PVSC September 20, 2012 letter brief submitted by Michael D. Witt, Esq., at p.7.
[4] PVSC September 20, 2012 letter brief submitted by Michael D. Witt, Esq., at p.9 [emphasis added].

Should it become necessary to oppose a proposed consent decree between EPA and these parties on the basis that the settlement embodied in the decree does not fairly reflect these parties' proportionate liability, we will be required to inform the Court of EPA's refusal to allow the allocator to evaluate their proportionate liability (in addition to making the full demonstration of their very substantial proportionate liability). For these reasons, and the additional reasons previously identified by the CPG, we renew our request that the allocator evaluate these parties' proportionate liability. If EPA is not amenable to adding the PVSC, municipalities, or additional industrial users to the allocation process, then the parties believe that these parties' true share should be evaluated as part of the allocation despite their lack of process participation. Their exclusion from the allocation altogether would proscribe a fair and complete allocation.

## CLARIFYING SETTLEMENT CRITERIA

Finally, the parties require additional information on the assessment and evaluation that EPA undertook in order to determine which parties met the stated criteria (*i.e.*, no association with the release or disposal of any of the COCs for OU2, as identified in the ROD, into the Lower Passaic River) for cash out settlements. Since EPA stated that these criteria would be used for future cash out offers, this information will be essential in proceeding with an allocation process that allows for an early "off-ramp" for additional cash out settlements. This would also enable the participating parties to propose supplemental criteria for the cash out settlements for the EPA's and the allocator's benefit.

## CONCLUSION

We are always willing to discuss the above issues and work with EPA to develop a comprehensive allocation process, one that the participants and EPA can agree on and that the participants would remain willing to fund. To that end, we reiterate our prior request for a meeting with EPA to further discuss these issues.

This letter is intended as a good faith effort to improve this allocation's utility in settling this matter in whole or in part. Nothing in this letter should be construed as an admission or agreement by any party as to any fact or matter.

Thank you in advance for your consideration of these important issues.


cc:    David Batson, Esq., AlterEcho
       Mary Apostolico, CSRA
       Kathryn Barton, EPA - OARM

# Exhibit 27



**Occidental Petroleum Corporation**

5 Greenway Plaza, Suite 110, Houston, Texas 77046
Telephone 713.215.7802  Fax 713.985.8934

Marcia E. Backus
Senior Vice President and General Counsel

October 12, 2017

wilson.ericj@epa.gov

Mr. Eric J. Wilson
Deputy Director for Enforcement and Homeland Security
Emergency and Remedial Response Division
United States Environmental Protection Agency
Region 2
290 Broadway
New York, NY 10007-1866

> Re:    September 18, 2017 Letter Concerning Proposed Allocation Process
> for Operable Unit 2, Diamond Alkali Superfund Site
> Essex and Hudson Counties, New Jersey

Dear Mr. Wilson:

I write on behalf of Occidental Chemical Corporation ("OCC") to express its concern regarding the EPA's proposed "Allocation Process," in which it seeks to impose on potentially responsible parties (PRPs) an informal procedure to be used to allocate the costs of implementing the remedy for Operable Unit 2 of the Diamond Alkali Superfund Site. OCC first learned of this process on September 18 when it received a letter inviting OCC and certain other PRPs to attend a meeting on October 13 with EPA's chosen allocator, David Batson. Given OCC's concerns, OCC believes it will be more productive for it to attend by phone and listen quietly, rather than air these issues in an open meeting. We will shortly send Ms. Yeh notice of our attendees and appreciate the opportunity to attend by phone while EPA evaluates these concerns.

For the reasons stated below, OCC believes the proposed allocation process is premature. EPA's process will not (and cannot) offer the "transparency and fairness" that EPA has "consistently stated are of importance to the Agency." Nonetheless, in the spirit of cooperation, OCC will participate in the October 13 meeting as EPA has requested. Cooperation, however, cannot come at the expense of OCC's legal rights to obtain contribution and cost recovery from all responsible PRPs who have contaminated the sediments of the Lower Passaic River. OCC therefore reserves all of its legal rights and its attendance at the meeting does not constitute its consent to EPA's proposed allocation process.

Mr. Eric J. Wilson
October 12, 2017
Page 2

**The proposed allocation process is inconsistent with the Record of Decision.**

EPA's Record of Decision (ROD) clearly and unequivocally identified *eight* chemicals of concern that drove its selection of the remedy for the Lower 8.3 miles of the Passaic River: dioxins, furans, PCBs, mercury, DDT, copper, dieldrin, PAHs, and lead.[1] According to the ROD, the data EPA studied shows that "elevated concentrations of [these] COCs are *ubiquitous* in surface sediments of the lower 8.3 miles, bank to bank."[2]

Ignoring this finding, and the voluminous record that makes clear that the remedy was selected as a result of all eight chemicals of concern, EPA's September 18 Letter indicates EPA intends to allocate the cost of implementing the remedy to parties responsible for only three chemicals: dioxins, furans, and PCBs. Having inexplicably abandoned its own finding concerning the drivers of this costly remedy, EPA's letter goes on to state that it is excluding scores of PRPs from the allocation process because they "are not responsible for the release of dioxins, furans, and/or polychlorinated biphenyls ("PCBs") into the Lower Passaic River." There is no factual record to support this statement. EPA's decision to exclude entities responsible for the discharges of all eight chemicals of concern cannot be reconciled with the ROD or the administrative record. EPA's unilateral decision to exclude key polluters is also inconsistent with EPA's public statements, which have (until now) consistently emphasized that EPA's agreement on "one singular engineering and design approach for the lower 8.3 miles ... doesn't mean that *the other 100 potentially responsible parties aren't on the hook for some of these costs*. We will apportion liability ...*for the whole cleanup project, not just the design*."[3]

EPA's selected remedy was designed to address not merely the eight chemicals of concern identified in the ROD, but the other contaminants in the Lower Passaic River as well. EPA has no scientific or administrative basis on which it can now abandon the findings of the ROD—after selecting the remedy—in favor of an allocation process that will apportion costs based on only three chemicals of concern, ignoring all other contaminants and PRPs in the process.

**There is not sufficient information to arrive at an equitable allocation of the costs.**

EPA also lacks adequate information from which to derive an equitable allocation of costs. Allocation of costs is a judicial, not an administrative, function under CERCLA. Many PRPs have not provided full responses to discovery concerning the raw materials used in their industrial process, the intermediates created in their operations, or any mass balance analysis to account for all hazardous substances handled, produced or discharged from their facilities. In addition, many PRPs have not produced all relevant documents, or provided testimony from key witnesses. As

---

[1] Lower 8.3 ROD at 15-16.

[2] Lower 8.3 ROD at 17 (emphasis added).

[3] J. Hurdle. "Occidental to Pay $165 Million Toward EPA's Cleanup of Passaic River Pollution." 6 October 2016. NJ Spotlight. (Quoting Judith Enck, EPA Region 2 Administrator) (emphasis added).

Mr. Eric J. Wilson
October 12, 2017
Page 3

explained below, implementing an allocation process now would elevate myth to the stature of facts—but facts are required before an equitable allocation can be achieved.

It is a myth that there exists a complete discovery record in the New Jersey Spill Act litigation filed by the NJDEP. The NJDEP did not join any of the third party PRPs in its state court action. Although Maxus and Tierra added certain PRPs to the case, many PRPs were never made parties to the action by anyone. Obviously, parties not joined provided no discovery at all. Even those PRPs that were joined did not provide complete discovery. Certain PRPs produced some, but not all, of their documents. In addition, as a result of a stay of discovery issued by the New Jersey Special Master, virtually no depositions of other PRPs were taken—either of custodians of records (to ensure document production was complete) or of witnesses with knowledge of production and disposal practices. As this overview makes clear, the NJDEP discovery record is limited and incomplete as it pertains to the actions of many of the PRPs EPA has identified as potentially responsible for the costs of implementing the remedy.

EPA's Administrative Record likewise does not contain sufficient evidence to arrive at an *allocation* of the cost of implementing the remedy. EPA has yet to conduct extensive (or, in some cases, any) sampling of soils at the upland and riparian sites that belong to many PRPs. There is, and can be, no assurance that the available evidence affords an adequate basis from which to assess any PRP's relative share of the cost of the remedy, much less the share to be borne by only some PRPs (and not others, whom EPA has decided to exclude entirely from the process).

**The remedy is still being designed, so its costs and the factors that drive them are not yet known**.

In September of 2016, OCC signed an Administrative Settlement Agreement and Order on Consent under which it agreed to design EPA's remedy for the Lower Passaic River. The AOC affords OCC approximately five years in which to finalize the design.

EPA is fully aware that OCC will need to conduct additional sampling and studies to finalize the design. This sampling is needed, among other things, to design a cap of appropriate thickness (a cost driver) and to identify which contaminated soils might need specialized pre- or post-removal treatment (another cost driver). These studies will also enable OCC and EPA to assess whether particular chemicals might require incineration upon removal, whereas removal and entombment elsewhere might be adequate for others. These are just a few of the significant unknowns and uncertainties that exist concerning how much the remedy will eventually cost and which *chemicals and contaminants* (in what proportions) are driving the costs.

Until the remedy is designed, OCC believes it is premature and inequitable for EPA to attempt to allocate the costs of the remedy to one PRP or another, or one chemical or another, because there is not an adequate factual basis on which EPA or its allocator can do so.

Mr. Eric J. Wilson
October 12, 2017
Page 4

**Premature allocation may create a barrier to later consensual resolutions.**

Careful, evidence-based allocation of the cost of implementing the remedy is essential as a matter of fairness and simple economics. EPA's remedy is the largest and most expensive sediment remediation project EPA has ever directed. EPA estimates it will cost $165 million to design the remedy and another $1.38 billion to implement it. Basic fairness requires that the equitable responsibility for these staggeringly large costs be ascertained carefully and with due process. As a matter of economics, single percentage inaccuracies in the allocation could shift millions of dollars in cost to parties who should not be required to bear them. EPA's selected remedy also has perpetual maintenance obligations. These costs must be borne by the parties responsible for them. They should not be shifted to other parties, simply because they assert their legal rights or decline to accept the mediator's informal attempt to allocate the costs of implementing the remedy before litigation has been filed and before discovery can be conducted.

EPA's attempt to force the early settlement of an allocation for the cost of implementing the remedy at this stage is not merely prejudicial to the PRPs. It also has the potential to impede EPA's ultimate goal of obtaining a consensual resolution on implementation of the remedy itself. Early settlements will reduce the pool of responsible parties available to fund the performance of the remedy. If EPA prejudices the rights of PRPs in this manner, it gives PRPs little reason to step up later and assume responsibility to pay costs that other PRPs would have had to bear, but for EPA's premature decision to settle with certain parties.

**OCC's concerns should be heard and considered.**

Although EPA has acknowledged that "Occidental did not directly discharge pollution into the Passaic River,"[4] OCC has repeatedly demonstrated its commitment to work cooperatively with EPA to address and resolve the legacy issues associated with the former Diamond Alkali plant, which DSCC had ceased operating seventeen years *before* OCC acquired the stock of DSCC in 1986.

Since the surprise bankruptcy of OCC's indemnitor, Maxus Energy Corporation, the U.S. subsidiary of Argentine-controlled oil giant, YPF, S.A., OCC has worked rapidly and directly with EPA to address issues at Diamond Alkali and to stabilize many other contaminated sites around the country. Among other things:

- OCC agreed to an Administrative Order on Consent to design the remedy for the Lower Passaic River at a cost of $165 million.
- OCC worked tirelessly during the Maxus bankruptcy to ensure the safe and orderly transition of *all* of the former DSCC sites, including Diamond Alkali.

---

[4] EPA Region 2 Press Release, October 5, 2016.

Mr. Eric J. Wilson
October 12, 2017
Page 5

- As a result of OCC's efforts, and its cooperation with EPA and the Natural Resource Trustees, the Maxus Bankruptcy Plan was confirmed.
- The Plan ensures that recoveries from YPF will flow directly to EPA and the Trustees, along with other environmental creditors.
- The Plan also establishes an Environmental Response and Remediation Trust through which future costs can be funded, assuming litigation against the Debtors' former parent companies are successful.

By contrast, while OCC was diligently reaching an agreement with EPA to design the OU2 remedy and stabilize other DSCC environmental sites around the country, YPF was pleading the poverty of its U.S. subsidiary in Delaware bankruptcy court, even as it used the assets it had stripped from those subsidiaries as part of a balance sheet it used to help YPF raise nearly $2B on Wall Street from American investors.

Given this history and OCC's efforts to work cooperatively with EPA at Diamond Alkali and elsewhere, EPA's September 18 Letter came as a surprise to OCC. OCC intends to continue to work cooperatively with EPA on the design of the remedy. OCC also intends to cooperate on performing the remedy, *assuming that* a reasonable design is achieved, appropriate responsible parties are available to participate in performing the remedy (and have not been released prematurely), and satisfactory terms of a consent order to perform the remedy can be agreed.

That desire to cooperate is precisely why OCC has written this letter: OCC is extremely concerned that the process, as outlined thus far, will not (and cannot) arrive at a cost allocation which ensures that *all liable PRPs pay their fair share*. We urge EPA to consider and address these concerns before it attempts to mandate this (or any other) mechanism to allocate the costs of implementing the remedy for OU2.

Very truly yours,

*Marcia E. Backus*

Marcia E. Backus
General Counsel, Occidental Petroleum
Corporation

cc:    Mr. Eric Schaaf (schaaf.eric@epa.gov)
       Ms. Sarah Flanagan (flanagan.sarah@epa.gov)

# Exhibit 28



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
REGION 2
290 BROADWAY
NEW YORK, NY 10007-1866

November 28, 2017

## CERTIFIED MAIL
## RETURN RECEIPT REQUESTED

Ms. Marcia E. Backus
Senior Vice President and General Counsel
Occidental Petroleum Corporation
5 Greenway Plaza, Suite 110
Houston, Texas 77046

Re: Allocation Process for Operable Unit 2 of the Diamond Alkali Superfund Site
Essex and Hudson Counties, New Jersey

Dear Ms. Backus:

On behalf of the U.S. Environmental Protection Agency, Region 2 (EPA or the Agency), I would like to thank you and your team for coming to our offices on Thursday, October 19, 2017, to discuss the allocation for Operable Unit 2 (OU2) of the Diamond Alkali Superfund Site (Site). Given the frank discussion that took place, we now have a better understanding of concerns raised by Occidental Chemical Corporation (OCC) regarding the proposed allocation. We are also pleased that we were able to resolve certain misunderstandings concerning EPA's enforcement framework for OU2 of the Site.

Our recent meeting was very productive and addressed many of the issues raised in your October 12, 2017 letter (Letter). This letter further responds to your Letter and addresses issues that were not discussed at our meeting.

Transparency Regarding EPA's Enforcement Approach and Timely Notification of the Proposed Allocation for OU2

With regard to EPA's communications with the responsible parties about the proposed enforcement approach, we note that as early as March 30, 2016, shortly after the Record of Decision for OU2 was signed, EPA informed the OU2 potentially responsible parties (PRPs) of the Agency's enforcement strategy for OU2 including that the Agency believed that some parties should perform the work while others should contribute to funding the work through cash-out settlements with the Agency. The Agency provided greater specificity in its "Next Steps" letter of March 30, 2017 in which we notified the parties of EPA's intention "to use the services of a third party allocator." We again informed the PRPs of our intention to use the services of a third party allocator in our letter of May 17, 2017. Then, based on comments we had received from some PRPs regarding EPA's allocation approach, EPA issued a letter on August 3, 2017, inviting

the OU2 PRPs to a meeting at EPA's New York offices to discuss the Agency's proposed allocation framework. That meeting, which took place on August 28, 2017, was attended by representatives of OCC both in-person in New York and by phone. During that meeting, parties including OCC raised questions regarding EPA's enforcement approach and discussed the relative merits of proceeding with an allocation including only "middle tier" parties or expanding the scope of the allocation to include additional parties.

In addition to these letters and the August meeting, this past summer, staff from EPA's Office of Regional Counsel spoke with representatives of OCC concerning the proposed allocation for OU2. During those discussions, OCC expressed its concern about participating in an allocation given OCC's belief that an allocation would not assure "compulsory disclosure" of all documents and information regarding PRPs' releases or potential releases into the Lower Passaic River.

Proposed Allocation and the Record of Decision for OU2

Again, we are pleased that we were able to clarify at the October 19 meeting that EPA intends to pursue all the OU2 PRPs and not simply those parties responsible for the release of dioxin, furans and/or polychlorinated biphenyls (PCBs) into the Lower Passaic River. As we stated at the meeting, EPA continues to believe that parties responsible for the release of dioxins, furans and/or PCBs into the lower 8.3 miles of Lower Passaic River Study Area should perform the remedial action for OU2 under a consent decree with the United States, and that the remaining PRPs should contribute their fair share of the costs of the remedial action by providing funding for the remedial work, and/or by providing in-kind services.

As we discussed during our October 19 meeting, whether and to what extent hazardous substances other than contaminants of concern (COCs) will be taken into consideration in the allocation is a question that should be raised with AlterEcho within the process established by the allocator for the parties to offer feedback on the design of the allocation.

The Agency intends to pursue all of the OU2 PRPs and is committed to ensuring that all of the OU2 PRPs contribute their fair share towards the costs for OU2 of the Site. While we may at a future point conclude that some PRPs – perhaps, but not necessarily, those not responsible for dioxin, furans and/or PCBs – are eligible for cash-out settlements, any such cash-out would be based on such parties' fair share (with an appropriate premium), and monies recovered would go towards funding of the OU2 remedial action. Importantly, EPA expects future cash-out settlements to be in the form of a judicial consent decree or decrees, subject to public comment and federal court review and approval.

Sufficiency of Information for the Allocation

We also had a productive conversation at our October 19 meeting regarding OCC's views and concerns with the amount, veracity, and completeness of information available for OU2 and the allocation. We understand that OCC is concerned that without the type of compelled production

of documents and depositions available in litigation, certain parties may not produce all relevant information. We do, however, remain optimistic given our discussion at our October 19 meeting that OCC will see the opportunities provided by the non-binding allocation process, described by David Batson at the October 13, 2017 allocation "kick off" meeting. During the allocation, OCC will have the ability to share its concerns about information with the allocator and the other participants in the allocation process. The allocator will be able to take OCC's concerns into consideration in shaping the allocation process, or bring them back to EPA, as appropriate.

Moreover, as indicated at the October 19 meeting, if gaps in the information or data available to AlterEcho threaten to impede the effectiveness of the process, the Agency will consider using its enforcement resources to supplement the information provided by the Agency and PRPs. Further, should EPA conclude that additional cash-out settlements are warranted, we will consider how to incorporate a suitable certification from the settling parties about the completeness of their disclosures.

We note, with regard to the statement in your Letter that "[a]llocation is a judicial, not an administrative, function under CERCLA" that allocation of Superfund site costs outside of court is a commonly used approach. In fact, at large multiparty sites, allocation is a conventional approach to sharing costs and responsibility. EPA has a Conflict Prevention and Resolution Center that provides alternative dispute resolution and conflict resolution services such as the use of third party neutrals.

As we have stated, we do not think that litigation is the best approach to resolving liability for OU2. While this Site has proven to be particularly challenging in that the PRPs have been unable to reach sufficient consensus to begin their own allocation for OU2, we continue to think that the resources expended in litigation coupled with the uncertainty of a legal proceeding and loss of control over the process will far outweigh the challenges associated with the allocation process.

The Allocation Should Be Completed Before Negotiations for the Remedial Action Begin

You state in the Letter that there are "significant unknowns and uncertainties that exist concerning how much the remedy will eventually cost" and that therefore "OCC believes it is premature and inequitable for EPA to attempt to allocate the costs of the remedy" until the remedial design is completed.

EPA conducted a remedial investigation and focused feasibility study for OU2 and selected the remedy for OU2 based on a very large data set, and there is a large amount of data in the record that provides a detailed understanding of both the COCs that drive the risk, and also the hazardous substances that are not COCs but may affect costs. In addition, OCC, through Tierra Solutions, Inc., has already conducted a removal action in the river and has the data from that work. Similarly, the Cooperating Parties Group capped a highly contaminated mudflat and is currently monitoring the results.

4

The purpose of allocation is to provide recommendations regarding the relative shares of responsibility of the parties. Parties will be assigned a percentage share of liability in relation to the other PRPs, not dollar amounts. To the extent that information gathered during the OU2 remedial design affects the ultimate costs of the remedy, EPA will be able to take that information and those additional costs into account in any potential settlements with the PRPs.

Delaying the allocation until the remedial design is completed would defeat a primary goal of the allocation, namely, to have a remedial action consent decree in place so that the remedial action work can begin without delay following completion of the remedial design. While EPA agrees that the remedial design for OU2 may provide additional information that could be relevant to the allocation, the Agency does not believe information gathered during the remedial design will materially affect the factors that drive the costs of the OU2 remedy.

Allocation Will Not Create a Barrier to Settlement

We agree that a fair, carefully structured, information-based allocation is necessary to promote settlements. This is why we initiated the allocation process. We have received numerous requests over the decade that work has been underway for an equitable resolution that would allow parties with minimal responsibility to exit the process so as not to incur transaction costs far in excess of their liability. It is not our view that the allocation, and any cash-out settlements based on the allocation, will create disincentives to any remaining PRPs to assume responsibility for the remedial action especially in light of the fact that we envision that such early settlements would include a premium. Rather than reducing the pool of responsible parties, settlements with such parties will bring funds to the remedial action, and should streamline the negotiation of a remedial action consent decree.

We appreciate OCC's concern that all costs, including long-term "maintenance obligations…must be borne by the parties responsible for them." We did discuss, at some length, OCC's concerns during our October 19 meeting and I believe those discussions were worthwhile and hope that our discussions assured OCC of the Agency's intention to pursue all of the OU2 PRPs for their fair share of OU2 costs.

As we discussed during our meeting, the proposed allocation is non-binding and participation in the allocation does not require any party to forgo its right to contribution or its cost recovery rights. Parties that participate in the allocation process will not be obliged to accept any settlement offers that EPA may make, or to refrain from challenging a settlement offer made to another party. The allocation process is structured to allow OCC and other participants to participate in the design of the allocation and the factors to be considered. And again, assuming EPA identifies additional parties for cash-out settlements, such settlements would take the form of a judicial consent decree, which would be lodged with the federal court, and would be subject to public comment and judicial review and approval. We hope these facts will address the Company's concern that the proposed allocation will "come at the expense of OCC's legal rights to obtain contribution and cost recovery from all responsible PRPs who have contaminated the sediments of the Lower Passaic River."

5

Most important, we understand that to be successful, the allocation must be fair, and that all PRPs, whether those responsible for the COCs driving the remedial costs or others, are more likely to enter into a settlement or settlements with the United States for implementation and/or funding of the remedial action if they find that the settlements are also fair and reasonable.

The Agency is Hearing and Considering OCC's Concerns

As noted, EPA appreciates OCCs concerns and we are listening. We worked with OCC and the other creditors throughout the Maxus Energy Corporation bankruptcy proceeding to achieve a positive result. We intend to continue our efforts at having an open and transparent relationship with OCC, as with other OU2 PRPs, and hope that OCC shares our goal of having the remedial design and remedial action for OU2 performed timely and effectively. As we discussed at the October 19 meeting, we encourage OCC to participate actively and fully in the allocation process and to raise its concerns with the allocator so that they can be addressed in the allocation process.

Sincerely,

Eric J. Wilson
Deputy Director for Enforcement and Homeland Security
Emergency and Remedial Response Division

cc: Brian Donohue, Esq., USDOJ

# Exhibit 29



**Passaic: April 19 EPA/SPG Meeting**
Sarah Flanagan   to: Gary.Gengel                                    04/16/2012 01:14 PM

From:     Sarah Flanagan/R2/USEPA/US
To:       <Gary.Gengel@lw.com>,

Gary,

Thanks - that makes sense.

Sarah

| Sarah - | 04/16/2012 01:12:49 PM |
|---|---|

From:     <Gary.Gengel@lw.com>
To:       Sarah Flanagan/R2/USEPA/US@EPA
Date:     04/16/2012 01:12 PM
Subject:  RE: Passaic: April 19 EPA/SPG Meeting

Sarah –

I do have a copy to the Tierra presentation that Bill Hengemihle provided.  I was really just looking to make sure Tierra gave you a copy of its presentation, as if it didn't I would have to think about whether it was appropriate for us to give you a copy of ours.

Thanks,

**Gary P. Gengel**

**LATHAM & WATKINS LLP**
One Newark Center, 16th Floor
Newark, NJ 07101-3174
Direct Dial: +1.973.639.7287
Fax: +1.973.639.7298
Cell: +1.609.306.9835
Email: gary.gengel@lw.com
http://www.lw.com

**From:** Sarah Flanagan [mailto:Flanagan.Sarah@epamail.epa.gov]
**Sent:** Monday, April 16, 2012 1:08 PM
**To:** Gengel, Gary (NJ)
**Subject:** Passaic: April 19 EPA/SPG Meeting

Gary,

Thanks.  We'll look forward to seeing the presentation whenever you can get it to us.

Tierra did provide a copy of their PowerPoint.  I think you mentioned that Bill Hengemihle had given the Tierra presentation to the CPG, so I assumed you had seen it and/or had a copy of it.  Or is that not why you're asking?

Sarah

From:       <Gary.Gengel@lw.com>
To:         Sarah Flanagan/R2/USEPA/US@EPA
Date:       04/16/2012 12:30 PM
Subject:    RE: Passaic: April 19 EPA/SPG Meeting

Sarah –

We'll provide the PowerPoint in advance, but depending on John's schedule it may not be done until
Thursday morning.  Did Tierra provide a copy of their PowerPoint?

Also, Doug Reid-Green of BASF will now be joining us for the meeting.

Best,

**Gary P. Gengel**

**LATHAM & WATKINS** LLP
One Newark Center, 16th Floor
Newark, NJ 07101-3174
Direct Dial: +1.973.639.7287
Fax: +1.973.639.7298
Cell: +1.609.306.9835
Email: gary.gengel@lw.com
http://www.lw.com

**From:** Sarah Flanagan [mailto:Flanagan.Sarah@epamail.epa.gov]
**Sent:** Monday, April 16, 2012 11:32 AM
**To:** Gengel, Gary (NJ)
**Subject:** Passaic: April 19 EPA/SPG Meeting

Gary,

Would you be able to send a copy of your presentation to EPA in advance of Thursday, or at least,
whatever portion exists in writing?

Thanks.

Sarah

Sarah P. Flanagan
Office of Regional Counsel, NJ Superfund Branch
USEPA, Region 2

290 Broadway, 17th Floor
New York, NY 10007
Tel: 212-637-3136
Fax: 212-637-3096

This email may contain material that is confidential, privileged and/or attorney work product for the sole use of the intended recipient.  Any review of, reliance on, or distribution by others or forwarding without the express permission of the sender is strictly prohibited.  If you are not the intended recipient, please contact the sender and delete all copies.

| | |
|---|---|
| From: | <Gary.Gengel@lw.com> |
| To: | Sarah Flanagan/R2/USEPA/US@EPA |
| Date: | 04/12/2012 09:26 AM |
| Subject: | RE: Passaic: April 19 EPA/SPG Meeting |

Sarah –

Thanks.  I think just John Connolly and I will attend for the SPG.  I'll let you know if this changes.

Best,

**Gary P. Gengel**

**LATHAM & WATKINS** LLP
One Newark Center, 16th Floor
Newark, NJ 07101-3174
Direct Dial: +1.973.639.7287
Fax: +1.973.639.7298
Cell: +1.609.306.9835
Email: gary.gengel@lw.com
http://www.lw.com

**From:** Sarah Flanagan [mailto:Flanagan.Sarah@epamail.epa.gov]
**Sent:** Thursday, April 12, 2012 9:03 AM
**To:** Gengel, Gary (NJ)
**Subject:** Passaic: April 19 EPA/SPG Meeting

Gary,

As of now, it will be Walter Mugdan, Ray Basso, Stephanie Vaughn, Alice Yeh, Eugenia Naranjo, Pat Hick and me.  I included Eric Schaaf and Del Karlen on the meeting invitation but I don't think they are available.  We are not inviting anyone outside EPA.

Thanks for the list of Small Parties Group members.

-Sarah

Sarah P. Flanagan
Office of Regional Counsel, NJ Superfund Branch
USEPA, Region 2
290 Broadway, 17th Floor
New York, NY 10007
Tel: 212-637-3136
Fax: 212-637-3096

This email may contain material that is confidential, privileged and/or attorney work product for the sole use of the intended recipient.  Any review of, reliance on, or distribution by others or forwarding without the express permission of the sender is strictly prohibited.  If you are not the intended recipient, please contact the sender and delete all copies.

| | |
|---|---|
| From: | "Gengel, Gary (NJ)" <Gary.Gengel@lw.com> |
| To: | Sarah Flanagan/R2/USEPA/US@EPA |
| Date: | 04/11/2012 10:29 AM |
| Subject: | Passaic: April 19 EPA/SPG Meeting |

Sarah –

As requested, below is an alphabetical listing of the 53 Passaic Small Party Group (SPG) members.  As the name implies, the SPG members are the small parties in the Passaic Cooperating Parties Group (CPG), and our presentation will in part support this proposition.  SPG membership is open to all non-Tierra related members of the CPG.

Can you please let me know who will attend the meeting for EPA?  Also, are you inviting any of the partner agencies?

We look forward to seeing you at 1:45 pm on April 19.

Best,

**Gary P. Gengel**

**LATHAM & WATKINS LLP**
One Newark Center, 16th Floor
Newark, NJ 07101-3174
Direct Dial: +1.973.639.7287
Fax: +1.973.639.7298

Cell: +1.609.306.9835
Email: gary.gengel@lw.com
http://www.lw.com

**Passaic Small Party Group (SPG) Members**

1.    Ashland Inc.
2.    Atlantic Richfield Company
3.    BASF Corporation
4.    BOC Group
5.    CBS Corporation
6.    Celanese Ltd.
7.    Chevron Environmental Management Company

8.    Coats & Clark
9.    Cooper Industries
10.  Covanta Essex Company
11.  Croda, Inc.
12.  DiLorenzo Properties Company
13.  E.I. Du Pont
14.  El Paso/EPEC Polymers
15.  Essex Chemical Corp.
16.  Franklin-Burlington Plastics, Inc.
17.  Garfield Molding, Inc.
18.  General Electric
19.  Givaudan Fragrances Corporation
20.  Hess Corporation
21.  Hoffmann LaRoche
22.  Honeywell
23.  ISP Chemicals LLC
24.  ITT Corporation
25.  Kao Brands Company
26.  Legacy Site Services
27.  Lucent Technologies Inc.
28.  Mallinckrodt, Inc.
29.  National Standard
30.  Newark Group, Inc.
31.  Newell Rubbermaid
32.  News Publishing Australia Ltd.
33.  Novelis Corporation
34.  Otis Elevator Company
35.  Pfizer, Inc. / Wyeth
36.  Pharmacia
37.  PPG Industries, Inc.
38.  PSE&G
39.  Purdue Pharma
40.  Quality Distribution, Inc.

41. Reichhold Chemicals, Inc.
42. Revere Smelting & Refining
43. Safety-Kleen-McKesson / Bristol-Myers Squibb
44. Sequa Corporation
45. Sun Chemical Corporation
46. Tate & Lyle Ingredients Americas, Inc.
47. Teva Pharmaceuticals USA, Inc.
48. Textron, Inc.
49. The Hartz Consumer Group, Inc.
50. The Stanley Works
51. Three County Volkswagen
52. Tiffany & Company
53. Vulcan Materials Company


**From:** Sarah Flanagan [mailto:Flanagan.Sarah@epamail.epa.gov]
**Sent:** Tuesday, April 10, 2012 3:02 PM
**To:** Gengel, Gary (NJ)
**Subject:** Re: Passaic SPG Meeting

Gary,

It looks like Thursday, April 19, from 2:30 to 3:30 would work for EPA.  Before we confirm, however, could you please provide the identities of the parties that comprise the Small Parties Group?

Thanks

-Sarah

Sarah P. Flanagan
Office of Regional Counsel, NJ Superfund Branch
USEPA, Region 2
290 Broadway, 17th Floor
New York, NY 10007
Tel: 212-637-3136
Fax: 212-637-3096

This email may contain material that is confidential, privileged and/or attorney work product for the sole use of the intended recipient.  Any review of, reliance on, or distribution by others or forwarding without the express permission of the sender is strictly prohibited.  If you are not the intended recipient, please contact the sender and delete all copies.

**********************************************************************
*
To comply with IRS regulations, we advise you that any discussion of Federal tax issues in this e-mail was not intended or written to be used, and cannot be used by you, (i) to avoid any penalties
imposed under the Internal Revenue Code or (ii) to promote, market or recommend to another party any

transaction or matter addressed herein.

For more information please go to   http://www.lw.com/docs/irs.pdf
*****************************************************************************
*

This email may contain material that is confidential, privileged and/or attorney work product for
the sole use of the intended recipient.  Any review, reliance or distribution by others or
forwarding
without express permission is strictly prohibited.  If you are not the intended recipient, please
contact the sender and delete all copies.

Latham & Watkins LLP

# Exhibit 30

**GIBBONS P.C.**
One Gateway Center
Newark, NJ 07102-5310
Tel: (973) 596-4500
Fax: (973) 596-0545
*Attorneys for Defendant*
Givaudan Fragrances Corporation

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## NEWARK VICINAGE

| | |
|---|---|
| OCCIDENTAL CHEMICAL CORPORATION, | Hon. Madeline Cox Arleo<br>Hon. Joseph A. Dickson |
| Plaintiff, | Civil Action No. 2:18-cv-11273 |
| v. | **OBJECTIONS AND ANSWERS OF DEFENDANT GIVAUDAN FRAGRANCES CORPORATION TO STANDARD SET OF INTERROGATORIES TO BE ANSWERED BY PLAINTIFF AND DEFENDANTS** |
| 21ST CENTURY FOX AMERICA, INC.; *et al.,* | |
| Defendants. | |

Defendant Givaudan Fragrances Corporation ("Givaudan" or "Defendant"), by its attorneys, hereby responds to the Standard Set of Interrogatories to Be Answered by Plaintiffs and Defendants (the "Interrogatories") propounded on April 15, 2019 based on the information presently known and available to Defendant and subject to the general and specific objections set forth below.

## GENERAL OBJECTIONS

The following General Objections apply to each of the Interrogatories, and Defendant expressly incorporates the following General Objections in each of its responses. Each response is provided subject to, and without waiver of, these General Objections and any further objections stated in the individual responses.

1.      Defendant objects to the Interrogatories to the extent they are vague, ambiguous, and contain terms that are undefined.

2.      Defendant objects to the Interrogatories to the extent they are overbroad, unduly burdensome, not relevant or reasonably calculated to lead to the discovery of admissible evidence, or otherwise seek to impose obligations that are different from, other than, or beyond those imposed by the Federal Rules of Civil Procedure or other applicable rules.

3.      Defendant objects to the Interrogatories to the extent they purport to require Defendant to provide any information or document that is not within its possession, custody, or control; is already in Plaintiffs' possession, custody, or control; is as accessible to Plaintiffs and any of their representatives or agents as it is to Defendant, and/or which can be obtained more conveniently from a source other than Defendant.

4.      Defendant objects to the Interrogatories to the extent they seek any information, document, materials, or communication subject to, or protected by, any applicable privilege or exemption, including, but not limited to, the attorney-client privilege, the attorney work product doctrine, and/or trial preparation material.  Inadvertent production shall not constitute a waiver of any claim of privilege or other exemption.

5.      Defendant objects to the Interrogatories to the extent they seek any information or document that is confidential, proprietary, competitively sensitive, or contains trade secrets or other private information.

6.      Defendant objects to the Interrogatories to the extent there is no temporal limitation on the scope of the Interrogatories.  Defendant further objects to the Interrogatories to the extent that they seek any information or document from a time period not relevant to this matter.

7.    The fact that Defendant has responded to a particular interrogatory shall not be interpreted as implying that Defendant acknowledges the propriety of the interrogatory. Defendant's responses to the Interrogatories are not intended to be, and shall not be construed as, an agreement or concurrence with Plaintiff's characterization of any facts, circumstances, and/or legal obligations.    Defendant reserves the right to contest any such characterizations as inaccurate.

8.    Defendant's responses to the Interrogatories are submitted without waiving, and while specifically reserving, (i) all objections as to the competency, relevancy, materiality, and admissibility of the subject matter thereof at the trial of this action, or in any other action or proceeding; (ii) the right to further object, on any ground, to these or other Interrogatories; (iii) all objections to any demand for additional information or documents; and (iv) the right at any time to amend or supplement these responses.

9.    Defendant has not completed their discovery in this action and therefore reserves the right to amend or supplement its responses to the Interrogatories, to the extent circumstances so dictate.

## ANSWERS TO INTERROGATORIES

1.      **Identify each Property at Issue at which You have conducted Operations.**

**ANSWER:**      Defendant objects to this Interrogatory on the ground that it is overbroad, as the term "Property at Issue" is defined as *any* property identified and alleged in Plaintiff's Complaint that is or has been owned or operated by *any* defendant at *any* time. Defendant objects to this Interrogatory as vague as the term "Identify" is defined only as relating to persons or business entities and to documents. Defendant objects to this Interrogatory as it seeks information relating to "Operations" that have no bearing on the issues in this litigation because they are not alleged to have resulted in the discharge of any of the relevant COCs or because they fall within categories that are not relevant.

Subject to and without waiving any objections, and subject also to ongoing discovery, Defendant answers as follows.

**Givaudan conducted manufacturing operations at its former facility located at 125 Delawanna Avenue in Clifton, New Jersey (the "Clifton Site").**

2.      **For each Property at Issue identified in response to Interrogatory No. 1, describe Your Operations and the dates during which they occurred, Including any changes in the Operations that occurred over time.**

**ANSWER:**      Defendant incorporates its objections to Interrogatory No. 1 and makes those objections in response to this Interrogatory. Defendant objects to this Interrogatory to the extent it is overbroad, as the term "Property at Issue" is defined in a manner that is unconstrained in time and does not pertain to a specific defendant or number of defendants. Defendant objects to this Interrogatory as it seeks information relating to "Operations" that have no bearing on the issues in this litigation because they are not alleged to have resulted in the discharge of any of the relevant COCs or because they fall within categories that are

4

not relevant. Defendant objects to this Interrogatory to the extent it seeks information related to trade secret or other confidentiality, or to the extent it seeks information protected by privilege such as the attorney-client privilege or the work product doctrine.

Subject to and without waiving any objections, Defendant answers as follows.

**A summary of Givaudan's operations at the Clifton Site can be found at GIV_NBC_0646692 – GIV_NBC_0646719, at GIV_NBC_0486767, and in Attachment 3 of the Preliminary Assessment Report (ERM_GIVAUDAN_3PS_0574937 – ERM_GIVAUDAN_3PS_0575356). Givaudan manufactured fine chemicals and fragrances referred to generally at that time as aromatic chemicals. Feedstock raw materials consisted mostly of spices, essential oils, solvents, and acids. The raw materials were processed onsite using various processing and refining techniques such as compounding, mixing, distilling, purifying, drying, and autoclaving. All of the manufacturing was batch production as no continuous production lines are known to have existed. The majority of finished goods were transferred into steel/fiber drums (liquid product) or bags (powdered product). The final product was stored either indoors or outside for collection by truck or railcar for distribution. Over time, the facility expanded and added new product lines. Equipment upgrades were made to improve efficiency and comply with changing regulations. However, the basic manufacturing operations remained the same until the facility closed in 1998. (See GIV_NBC_0498074 – GIV_NBC_0498118 and ERM_GIVAUDAN_3PS_0574937 – ERM_GIVAUDAN_3PS_0575356). Manufacturing operations ceased in June 1998.**

**3.     Identify and describe any transaction(s) related to the ownership of the Property at Issue identified in response to Interrogatory No. 1.**

**ANSWER:**    Defendant incorporates its objections to Interrogatory No. 1 and makes those objections in response to this Interrogatory. Defendant objects to this Interrogatory to the extent it is overbroad, as it presents no temporal limitation and does not purport to pertain to a defendant or number of defendants. Defendant objects to this Interrogatory as it is vague as the term "ownership" is undefined, as is the term "describe." Further, the terms "Identify" is defined only as relating to persons or business entities and to documents. Defendant objects to this Interrogatory to the extent it seeks information related to trade secret or other confidentiality, or to the extent it seeks information protected by privilege such as the attorney-client privilege or the work product doctrine.

Subject to and without waiving any objections, Defendant answers as follows.

**Burton T. Bush, Inc. acquired the Antoine Chiris company on March 1, 1924, which occupied approximately 12.9 acres at the Clifton Site. On August 14, 1924, Burton T. Bush purchased an adjoining parcel also owned by Antoine Chiris that was leased to Capes Viscose Company. Givaudan purchased the assets of the Burton T. Bush Company on February 25, 1924. An additional 22 parcels were purchased over the years at the Clifton Site. The last tract was acquired in 1982, at which time the Clifton Site totaled 31 acres. (See 2016 104(e) Response, GIVA-FED-0000040111 – GIVA-FED-0000040526).**

**Givaudan sold the majority of the property at the Clifton Site in 1999 to a developer that built two large warehouses on the property, the first beginning in 2000 and finishing the second building in 2006. The Clifton Site was subdivided such that each warehouse is now on its own parcel with separate ownership. Currently, Givaudan only retains ownership of an approximately 2-acre parcel (Block 73.03, Lot 2.02), which is located along the southeast corner of the former plant property at 275 River Road in Clifton, New Jersey.**

6

4.    To the extent You intend to claim You are not the legal successor to the business entity that conducted the Operations described in response to Interrogatory No. 2, Identify and describe any transaction(s) related to the ownership of the business entity that conducted the Operations described in response to Interrogatory No. 2. The time period for this interrogatory is from the earlies date of Your Operations to the present.

**ANSWER:**    Defendant incorporates its objections to Interrogatory No. 2 and makes those objections in response to this Interrogatory. Defendant objects to this Interrogatory to the extent it is vague and incomprehensible, as the terms "legal successor" is undefined, as is the phrase "transaction(s) related to the ownership…" Further, the term "Identify" is defined only as relating to persons or business entities and to documents. Defendant objects to this Interrogatory insofar as it overly broad, it's purported time limitation seeks to encompass information that has no bearing on the issues in this litigation. Defendant objects to this Interrogatory to the extent it seeks information related to trade secret or other confidentiality, or to the extent it seeks information protected by privilege such as the attorney-client privilege or the work product doctrine.

Subject to and without waiving any objections, Defendant answers as follows.

**Not Applicable.**

5.    For each Operation identified in response to Interrogatory No. 2, Identify: (a) the raw materials used; (b) the products and intermediates resulting from the Operations; and (c) any Waste Materials.

**ANSWER:**    Defendant incorporates its objections to Interrogatory No. 2 and makes those objections in response to this Interrogatory. Defendant objects to this Interrogatory to the extent it is overbroad as it is unconstrained in time, and as it seeks to encompass information that has no bearing on the issues in this litigation. Defendant objects to this Interrogatory as vague as the terms "raw materials," "products" and "intermediates" are undefined. Further, the term "Identify" is defined only as relating to persons or

business entities and to documents. Defendant objects to this Interrogatory to the extent it seeks information related to trade secret or other confidentiality, or to the extent it seeks information protected by privilege such as the attorney-client privilege or the work product doctrine.

Subject to and without waiving any objections, Defendant answers as follows.

*See* **Response to No. 2 above.  Raw materials used were primarily natural products, aromatic chemicals and acids. A purified brand of Trichlorophenol (TCP) was used as a raw material in the manufacturing of hexachlorophene, a pharmaceutical grade bactericide (called "G-11").  The G-11 product was sold and used as an ingredient in cosmetics, perfumes, personal hygiene products and household items.**

**Products produced by Givaudan between 1924 and 1983 at the Clifton Site are identified in Givaudan's July 26, 1983 response to NJDEP's request for information (GIV_NBC_0473569 - GIV_NBC_0474645).  Products produced by Givaudan after 1983 at the Clifton Site are identified in its Preliminary Assessment Report (ERM_GIVAUDAN_3PS_0574937 – ERM_GIVAUDAN_3PS_0575356).**

**Complete records of General Plant Waste and Hazardous Substances stored and/or generated at the Givaudan Site are not available.  Available information relating to raw materials that were used in the production of the products is identified in response to Interrogatory 2 above.  Available information related to the quantity of materials stored on site can be found in Givaudan's July 26, 1983 response to NJDEP request for information (GIV_NBC_0473569 - GIV_NBC_0474645), Givaudan's Preliminary Assessment Report (GIVA-FED-0000040527 – GIVA-FED-0000040946), Givaudan's New Jersey Community Right to Know surveys (GIV_NBC_0382753 -**

GIV_NBC_0382821) and aboveground underground storage tank inventories (GIV_NBC_0498074 – GIV_NBC_0498119).

**6.    For each Operation identified in response to Interrogatory No. 2, Identify: (a) each specific location of any storage area(s) (such as tanks, pits, and barrels) used for raw materials and/or Waste Materials; (b) the time period during which the storage area was used; and (c) describe what was stored in each storage area.**

<u>**ANSWER:**</u>    Defendant incorporates its objections to Interrogatory No. 2 and makes those objections in response to this Interrogatory. Defendant objects to this Interrogatory to the extent it is overbroad as it is unconstrained in time, and as it seeks to encompass information that has no bearing on the issues in this litigation. Defendant objects to this Interrogatory as vague as the terms "storage areas," "tanks," "pits," "barrels," and "raw materials," are undefined. Further, the term "Identify" is defined only as relating to persons or business entities and to documents. Defendant objects to this Interrogatory to the extent it seeks information related to trade secret or other confidentiality, or to the extent it seeks information protected by privilege such as the attorney-client privilege or the work product doctrine.

Subject to and without waiving any objections, Defendant answers as follows.

**Givaudan Site raw materials consisted mostly of spices, essential oils, solvents and acids. Prior to 1950, raw materials were generally received by truck and stored onsite. A rail spur was connected to the plant during the late 1950s, early 1960s to allow receiving and shipping of bulk quantities of raw materials. During this time period, there was outdoor drum storage. A summary of the drum storage locations in the early 1950s is set forth on Table B of Givaudan's response to the Lower Passaic River Study Area Request For Information (GIV_NBC_0498074 – GIV_NBC_0498118). A summary of Givaudan's indoor building storage inventory can be found on Table E of Givaudan's response to the**

Lower Passaic River Study Area Request For Information (GIV_NBC_0498074 – GIV_NBC_0498118). By the 1990s timeframe, there were no outdoor drum storage areas except for building 103, where a small outside storage pad was used to store several 55 gallon drums.

Aboveground and underground storage tanks were used to store carrier liquids and base solvents for the aromatic chemicals at the Clifton Site. Summaries of Givaudan's 1940 aboveground storage tank inventory and underground storage tank inventory are set forth on Table C and D of Givaudan's response to the Lower Passaic River Study Area Request For Information (GIV_NBC_0498074 – GIV_NBC_0498118). A summary of Givaudan's aboveground storage tank inventory in 1994 is set forth on Table G of Givaudan's response to the Lower Passaic River Study Area Request For Information (GIV_NBC_0498074 – GIV_NBC_0498118). A summary of Givaudan's Underground storage tank inventory in 1994 is set forth on Table H Givaudan's response to the Lower Passaic River Study Area Request For Information (GIV_NBC_0498074 – GIV_NBC_0498118). A summary of Givaudan's indoor building storage inventory can be found on Table I of Givaudan's response to the Lower Passaic River Study Area Request For Information (GIV_NBC_0498074 – GIV_NBC_0498118).

7.     For each Property at Issue identified in response to Interrogatory No. 1, Identify all catch basins, floor drains, tanks, sinks, trenches on the property, outfalls, air emissions, casualty fires, explosions, intentional dumping, and stormwater and storm sewers.

**ANSWER:**     Defendant incorporates its objections to Interrogatory No. 1 and makes those objections in response to this Interrogatory. Defendant objects to this Interrogatory to the extent it is overbroad as it is unconstrained in time, and as it seeks to encompass information that has no bearing on the issues in this

litigation. Defendant objects to this Interrogatory as vague as the terms "catch basins," "floor drains," "sinks," "trenches," "outfalls," "air emissions," "casualty fires," "explosions," "intentional dumping," "stormwater," and "storm sewers," are undefined. Further, the term "Identify" is defined only as relating to persons or business entities and to documents. Defendant objects to this Interrogatory to the extent it seeks information related to trade secret or other confidentiality, or to the extent it seeks information protected by privilege such as the attorney-client privilege or the work product doctrine.

Subject to and without waiving any objections, Defendant answers as follows.

**Historical City of Clifton records show that parts of the City had sewer access before the 1920s (2016 104(e), GIVA-FED-0000040111 – GIVA-FED-0000040526, Tab No. 25). With the completion of the Passaic Valley Sewerage Commission ("PVSC") trunk sewer line by 1921, the City began adding connections for treatment of its sewage by the PVSC. According to City of Clifton records, the majority of the City of Clifton sewer system was in place, operating and discharging to the PVSC main trunk line by 1927 (2016 104(e), GIVA-FED-0000040111 – GIVA-FED-0000040526, Exhibit C). Copies of sewer maps for the Delawanna area of Clifton, which included Delawanna Avenue, River Road and Oak Street in the vicinity of the former facility, indicate that these sewers were installed by 1927. (2016 104(e), GIVA-FED-0000040111 – GIVA-FED-0000040526, Exhibit H to Sewer Chronology). Following the 1930 ordinance (#989) prohibiting discharge of sewage into surface water bodies, the City passed a series of ordinances requiring sewer hook-ups by all businesses in Clifton. A 1945 City Planning Map shows that essentially the entirety of the City had both sanitary and storm sewers by that date (2016 104(e), GIVA-FED-0000040111 – GIVA-FED-0000040526, Tab No. 51).**

11

While no plans or engineering drawings exist for the Clifton Site before 1946, it is believed the former plant (or at least the northern portion of the plant) was connected to the sewer to dispose of sanitary waste on Delawanna Avenue in the 1920s. (2016 104(e), GIVA-FED-0000040111 – GIVA-FED-0000040526, Exhibit F). During the early years of plant operations, it is believed that some process water was handled onsite and placed into onsite cesspools or seepage pits from 1924 until the early 1950s. (See GIVA-FED-0000040527 – GIVA-FED-0000040946, Figure 11C).

Aerial photography from the mid/late 1940s shows three enclosed water features on the property. Two of these features are first visible on the 1947 aerial photograph (2016 104(e), GIVA-FED-0000040111 – GIVA-FED-0000040526, Exhibit 8): a thin elongated feature believed to be the Spent Acid Pit (SAP), and the area known as the storm water pond, which remained visible in aerial photos until the plant was closed. The SAP was reported to have been used for handling process water and was noted for such use in a well driller's log (2016 104(e), GIVA-FED-0000040111 – GIVA-FED-0000040526, Tab No. 27). Further, a 1951 Givaudan memo discusses the recovery of G11 from the former pits (2016 104(e), GIVA-FED-0000040111 – GIVA-FED-0000040526Tab No. 41), which supports the facility's practice of containing and handling process water onsite, including from the G11 manufacturing process, before the entire plant connected to the City sewer line on River Road by the early 1950s and directed its process water to PVSC for treatment.

By 1953, the only surface water feature visible onsite is the storm water pond. (2016 104(e), GIVA-FED-0000040111 – GIVA-FED-0000040526, Exhibit 16). The SAP no longer contains standing liquid and there is no evidence of the third water feature. The occurrence and eventual disappearance of the SAP and third surface water feature in these

12

1940s-1950s aerial photos show that the plant used the SAP and third surface water feature to handle plant process wastewater (and possibly non-contact cooling water) until the early 1950's, while the storm water pond was consistently used for collecting rainwater until plant closure in 1998.

The earliest engineering drawing referencing a plant sewer system for the former plant site is dated 1946 (See GIVA-FED-0000013095). Until that time, the documentation indicates that some process water was sent to the City sewer line on Delawanna Avenue, some process water was directed to onsite cesspools or pits, while spent solvents were reused as supplemental fuel in the plant boiler (See GIVA-FED-0000015220 – GIVA-FED-0000015223, GIVA-FED-0000016326 – GIVA-FED-0000016346, and GIVA-FED-0000004799 – GIVA-FED-0000004829). The installation of a dedicated plant sewer system in 1946 and the appearance of the SAP in 1947, followed by the development of a third surface water impoundment by 1949, supports the conclusion that plant process water was initially handled onsite before it was directed to the City Sewer and PVSC for treatment via connection to the sewer line in River Road.

Based on the PVSC, City of Clifton and plant information, the connection of the plant process water (via Outfall 001) to the City of Clifton and PVSC sewer system appears to have been made no later than 1951-52, but it may have been made several years earlier (in 1946). As noted above, the City began installing a sewer line on River Road by 1927. However, Givaudan did not own property along River Road at that time and likely did not have access to this area until it purchased Parcel 3 in 1939 (2016 104(e), GIVA-FED-0000040111 – GIVA-FED-0000040526, Exhibit 2). Based on the information reviewed, the sewer connection would have been made on River Road no later than 1951-52, as it

13

coincides with the absence of the large rectangular surface water impoundment and the appearance of Building 74, which is identified as part of the former plant's early wastewater pre-treatment system (2016 104(e), GIVA-FED-0000040111 – GIVA-FED-0000040526, Exhibit 14).  Also, the SAP is no longer visible on the 1953 aerial photo and Building 83 is present, which is designated as a Waste Neutralization System (2016 104(e), GIVA-FED-0000040111 – GIVA-FED-0000040526, Exhibit 16).  Further, the New Jersey Department of Transportation (NJDOT) engineering drawings for the  Routes 3 and 21 project show that the former plant had connected to the River Road sewer before 1955 (2016 104(e), GIVA-FED-0000040111 – GIVA-FED-0000040526, Exhibit T).

The available documentation supports the conclusion that plant process water was managed and contained on the Clifton Site prior to connecting to the City sewer system.  Based on the historical sewer documentation, the northern portion of the facility was connected to the Delawanna Avenue sewer line as early as 1927.  The southern portion of the facility connected to the River Road sewer line as early as 1946 but no later than 1951-52.  Additional support for this conclusion is contained in 1953 correspondence related to Givaudan's agreement to repair sewer lines on River Road and a reference to 1946 correspondence related to maintenance responsibility (2016 104(e), GIVA-FED-0000040111 – GIVA-FED-0000040526, Tab 35).

Available information indicates that floor drains and sinks were connected to the plant sewer system.  *See* Attachment 11B in the Preliminary Assessment Report (GIVA-FED-0000040527 – GIVA-FED-0000040946).

14

**8.     Describe any treatment performed on Waste Material identified in response to Interrogatory No. 5 before it was disposed of.**

<u>**ANSWER:**</u>     Defendant incorporates its objections to Interrogatory No. 5 and makes those objections in response to this Interrogatory. Defendant objects to this Interrogatory to the extent it is overbroad, as it is unconstrained in time, and as it seeks to encompass information that no bearing on the issues in this litigation. Defendant objects to this Interrogatory as vague, as the term "treatment" and the phrase "disposed of" are undefined. Defendant objects to this interrogatory to the extent it assumes any action or inaction by the Defendant. Defendant objects to this Interrogatory to the extent it seeks information related to trade secret or other confidentiality, or to the extent it seeks information protected by privilege such as the attorney-client privilege or the work product doctrine. .

        Subject to and without waiving any objections, Defendant answers as follows.

<u>See</u> **2004 104(e) Response at GIV_NBC_0498074 – GIV_NBC_0498118.**

**Up until approximately 1950's, onsite sanitary water from Buildings 2, 3, 4, 5, and 6 was directed to septic cesspools located onsite.  Based on available information, plant process water was directed to the City of Clifton sewer system between 1947 and 1952 based on available information.  The City of Clifton system connected into the PVSC main trunk line, which led to the treatment plant in Newark, New Jersey.  Prior to construction of the pretreatment system, the plant directed process water to the PVSC system pursuant to a user fee arrangement.  Early pretreatment included an oil water separator and lime addition.  These systems were modified over the years.  Givaudan constructed a primary wastewater pretreatment plant in the mid 1980's to treat industrial process water prior to it being directed to the PVSC system under wastewater permit No. 03401024.  The process water treatment plant consisted of two pre-treatment systems as follows: (1) a steam**

stripper (installed in 1990) to treat organic process water regulated under the Organic Chemicals, Plastics, Synthetic Fibers (OCPSF) sources as regulated by 40 CFR 414.85. Concentrated organic materials from the steam stripper were collected in a storage tank and shipped offsite to an approved disposal facility. The steam stripper had a treatment capacity of 50,000 gallons per day; and (2) an industrial process water pretreatment system that included basic solids removal via a solids grate, followed by removal of floating oils by a belt skimmer. The process water then went through a three-stage neutralization system using sulfuric acid and sodium hydroxide. An effluent monitoring station was located just before outfall 001 and included a Parshall Flume and a sample access door. The process water pretreatment system was designed to conform with the national pretreatment standards under 40 CFR 401.17 and part 403.5 and had a capacity to treat up to 300,000 gallons per day (1995). The process water system was also designed with a 90,000 gallon emergency surge protection tank.

Givaudan used non-commercial fuel as an alternate fuel source onsite. The non-commercial fuel consisted of used or spent solvents such as toluene, xylene, heptane, and methanol. In 1979, a total of 246,000 gallons of non-commercial fuel was used in one of two small boilers located onsite. Givaudan maintained a storage tank onsite for storing the non-commercial fuel for use in the two small boilers onsite. Based upon a 1979 internal memo, Givaudan used select production liquids as a fuel source under permit from the State. These liquids were blended with conventional fuel to increase energy output from the plant boilers.

Up until approximately 1950's onsite sanitary water from Buildings 2, 3, 4, 5, and 6 was directed to cesspools located onsite. Sanitary water was directed to PVSC for treatment via outfall 003, including sanitary water from buildings 7, 34, 35, and 36.

Industrial process water was directed to outfalls 001 and 002 to PVSC for treatment (under authorized discharge process water permit numbers 03401022 to 03401024 since 1996). The industrial process water underwent equalization and basic neutralization prior to being directed to PVSC for treatment via outfall 001. PVSC monitored the process water stream for several different parameters.

9.     For each Operation identified in response to Interrogatory No. 2, Identify any environmental permits, Including without limitation air quality, water quality, waste disposal, stormwater, waste discharge, and/or operating permits.

**ANSWER:**     Defendant incorporates its objections to Interrogatory No. 2 and makes those objections in response to this Interrogatory. Defendant objects to this Interrogatory to the extent it is overbroad, as it is unconstrained in time, and as it seeks to encompass information that has no bearing on the issues in this litigation. Defendant objects to this interrogatory as vague, as the terms "environmental permits," "air quality," "water quality, "waste disposal," "stormwater," "waste discharge," and "operating permits," are undefined. Further, the term "Identify" is defined only as relating to persons or business entities and to documents. Defendant objects to this interrogatory to the extent is assumes any action or inaction by the Defendant. Defendant objects to this interrogatory insofar as it seeks information related to trade secret or other confidentiality, or to the extent it seeks information protected by privilege such as the attorney-client privilege or the work product doctrine.

Subject to and without waiving any objections, Defendant answers as follows.

**See Preliminary Assessment Report at GIVA-FED-0000040527 – GIVA-FED-0000040946)**

**The facility had the following permits:**

**NJPDES 0099414 for SIU indirect industrial process water, which was sent to PVSC for treatment, issued August 11, 1982, expiration September 30, 1987. This permit required monitoring for dioxin, which was never detected above the relevant limit of 1ppb. (See GIVA-FED-0000004453 – GIVA-FED-0000004456). This NJPDES permit was terminated by rule in February 1993 and replaced with PVSC Permit No. 03401024.**

**PVSC Permit No. 03401024, a PVSC sewer connection permit, was issued March 17, 1991 with an expiration date of March 17, 1996. This permit replaced NJPDES permit 0099414. This permit required the installation of 24 hour composite samplers in Outfalls 001, 002 and 003. The 003 Outfall was for the main office building complex. The 125 Delawanna Avenue facility had two permitted outfalls: 1) Outfall 001 for industrial process water directed to the River Road connection for treatment at PVSC; and 2) Outfall 002 for non-industrial sanitary water directed to the Delawanna Avenue connection for treatment at PVSC. The PVSC permit was renewed as Permit No. 03404940, then Permit No. 03406800. This Permit was terminated on 12/23/1998.**

**At the time of facility closure, process water permits were covered under a single permit document with an effective date of March 17, 1996. (See GIVA-FED-0000008946 – GIVA-FED-0000008973). The only COC for which these permits set a limit was Total Lead with a Maximum for any one day of 690 ug/l and a monthly average of 320 ug/l. At some point during the permit renewal process, Givaudan was required to sample for other parameters, including metals and PAHs. All sample results were either non-detect or below permit levels. (See GIVA-FED-0000004188 – GIVA-FED-0000004198).**

NJPDES 0088374 for ground water (through the onsite pond); Application submitted April 1991 and permit issued in May of 1992, renewed in December 1996.  There are no specific limits identified in the Permit; only the frequency of sampling and analytical testing specifications.  After a diligent search of its records, Givaudan did not identify any notices of violation related to this permit.  (See GIVA-FED-0000002059 – GIVA-FED-0000002070 and GIVA-FED-0000002102 – GIVA-FED-0000002121).

NJ Permit 0099414 for operating the on-site process water pretreatment system. During the years that data was collected for the process water directed to Outfall 001, there were no reported exceedances for dioxin (limit of <1.0 ppb).

Additionally, the facility did maintain air permits for their operations.

10.    For each Operation identified in response to Interrogatory No. 2, Identify each Disposal company that handled any Waste Material that contained COCs and for each such company provide: (a) the dates during which that company handled Waste Material; (b) the chemical composition of the Waste Material handled by that company; (c) the methods of storage, handling, treatment, and disposal used by that company; and (d) the location(s) where that company disposed of the Waste Material.

**ANSWER:**    Defendant incorporates its objections to Interrogatory No. 2 and makes those objections in response to this Interrogatory. Defendant objects to this Interrogatory to the extent it is overbroad, as it is unconstrained in time, and as is seeks to encompass information that has no bearing on the issues in this case. Defendant objects to this Interrogatory as vague, as the terms and phrases, "handled," "chemical composition," and "methods of storage, handling, treatment, and disposal," are undefined. Further, the term "Identify" is defined only as relating to persons or business entities and to documents. Defendant objects to this Interrogatory to the extent it assumes the action or inaction of the Defendant. Defendant objects to this Interrogatory to the extent it seeks information related to trade secret or other confidentiality,

19

or to the extent it seeks information protected by privilege such as the attorney-client privilege or the work product doctrine.

Subject to and without waiving any objections, Defendant answers as follows.

**Debellas Sanitary Services of Parkridge, NJ is identified in the Preliminary Assessment Report (GIVA-FED-0000040527 – GIVA-FED-0000040946) as having the contract to dispose of Municipal Waste collected in dumpsters located around the plant.**

**A summary of excavated soil management is provided in Table 5.4 of the Remedial Action Report for Sewer Decommissioning (February 2000) (GIVA-FED-0000002617 – GIVA-FED-0000002765). As discussed in Section 3.9, soil not fit for site reuse was characterized for disposal, and transported to Clean Earth by EWMI for recycling.  In total, approximately 15,600 tons of excavated soil was transported offsite.  Additionally, approximately 2,558 tons of asphalt were transported to Braen Stone Industries, Inc. for recycling.  As discussed in Section 3.9 of the Remedial Action Report for Sewer Decommissioning (February 2000) (GIVA-FED-0000002617 – GIVA-FED-0000002765), concrete generated during excavation activities was reused onsite following crushing and analysis. Excavations created during the sewer decommissioning activities have been backfilled, compacted and brought to grade.  The footprint of these excavated and backfilled areas are shown on Figure 5-1 of the Remedial Action Report for Sewer Decommissioning (February 2000) (GIVA-FED-0000002617 – GIVA-FED-0000002765).**

**Also, see Attachment 9 in the 2004 104(e) Response (GIV_NBC_0498074 – GIV_NBC_0498118), which  identifies management of residuals from the Hexachlorophene manufacturing operation.**

11.     For each Operation identified in response to Interrogatory No. 2, state whether any raw material, products or intermediates, or Waste Material contained any of the COCs and, if so, Identify: (a) which COC(s) it contained; (b) the raw material or Waste Material that contained the COC; and (c) the approximate quantity (by percentage and concentration) of each COC present in the raw material or Waste Material.

<u>ANSWER</u>:     Defendant incorporates its objections to Interrogatory No. 2 and makes those objections in response to this Interrogatory. Defendant objects to this Interrogatory as it duplicative, and has been asked and answered in one or more prior Interrogatories. Defendant objects to this Interrogatory as overbroad, as it unconstrained in time and as it seeks to encompass information that has no bearing on the issues in this litigation. Defendant objects to this Interrogatory as vague, as the terms, "raw material," "products," and "intermediates," are undefined. Further, the term "Identify" is defined only as relating to persons or business entities and documents. Defendants objects to this Interrogatory to the extent it seeks information related to trade secret or other confidentiality, or to the extent it seeks information protected by privilege such as the attorney-client privilege or the work product doctrine.

Subject to and without waiving any objections, Defendant answers as follows.

**Dioxin (2,3,7,8 TCDD) was present at very low concentrations in a raw material, a purified form of Trichlorophenol (TCP), which Givaudan used to manufacture Hexachlorophene (HCP a/k/a G11), (<u>see</u> GIVA-FED-0000007875), a pharmaceutical grade bactericide. Givaudan used a highly purified form of TCP to meet the strict standards required in the finished G11 product. From approximately 1947 to 1949, Givaudan initiated a pilot production of purified TCP at the plant. In 1948, Givaudan entered into a contract with Hooker Chemical wherein Givaudan provided Hooker its patent for manufacturing purified TCP in exchange for Hooker exclusively supplying Givaudan with TCP by this method (See <u>Attachment 52 in the 2016 104(e), GIVA-FED-0000040111 – GIVA-FED-**

0000040526).  The supply agreement with Hooker ended in the early 1970's.  Between 1971 and 1975, Givaudan used available inventory of purified TCP and did not purchase any additional TCP during this time period. (See GIV_NBC_0473569 – GIV_NBC_0474645). Thereafter, Givaudan began purchasing purified TCP from other suppliers, but only if it met Givaudan's strict quality control standards.  (Id.).  Any shipments of purified TCP that did not meet Givaudan's strict quality control standards were returned to the manufacturer.  Records show that only some off-specification TCP material was disposed of by Givaudan.  (See GIVA-FED-0000009951 – GIVA-FED-0000010538, GIVA-FED-0000012452 – GIVA-FED-0000012455, GIVA-FED-0000017952 – GIVA-FED-0000018001, GIV_NBC_0498074 – GIV_NBC_0498118, and GIVA-FED-0000040111 – GIVA-FED-0000040526).

Dioxin is reported to be generated in the production of TCP.  The purified TCP arrived as solid flakes/powder in drums that were stored in a designated drum storage area for this product.  Givaudan began limited production of purified TCP in small scale distillation batches in 1947, and increased production during 1948.  In 1949, it supplemented its limited TCP feedstock wth purchases of Dowicide.  By 1950, onsite production of purified TCP ceased and all purified TCP was purchased from Hooker Chemical.  In the G11 manufacturing process, virtually all residues of dioxin from the TCP were contained in filter bottoms (which were drummed for offsite disposal), with less than 1% potentially transferred in waste water from the HCP manufacturing operation. (GIV-NBC_0681645 – GIV_NBC_0681668).  Some trace levels of dioxin may also have been retained in the finished G11 product.

The production of HCP (*i.e.* G11) did not create or produce dioxin. Low levels of TCDD were only present as a result of impurities in the TCP feed stock. (<u>See</u> **March 1, 1984 Waste Streams from HCP Manufacturing, Radian (GIVA-FED-0000012573 – GIVA-FED-0000012598); Dioxins – EPA-600, November 1980, pages 106 to 108 (GIVA-FED-0000011008 – GIVA-FED-0000011414); A Retrospective Job Exposure Matrix for Estimating Exposure to 2,3,7,8 TCDD – NIOSH March 1999 (GIVA-FED-0000008978 – GIVA-FED-0000009000); 1991 NIOSH Fingerhut Report; EPA Sponsored Study (GIVA-FED-0000015591 – GIVA-FED-0000015622)).**

**Givaudan is not aware of any other designated COC used as a raw material or generated by the manufacturing operations.**

**12.    Identify any contracts You had with the Disposal Sites, any operator(s) of the Disposal Sites, or any party to haul Containers containing Waste Materials to the Disposal Sites and describe: (a) the chemical composition of the materials You disposed of at the Disposal Sites; (b) the time period of this disposal; and (c) the amounts of Waste Materials disposed at the Disposal Sites.**

<u>**ANSWER:**</u>    Defendant objects to this Interrogatory to the extent it is overbroad, as it is unconstrained in time and as it seeks to encompass information that has no bearing on the issues in this litigation. Defendant objects to this Interrogatory as vague, as the terms "chemical composition" and "materials" are undefined. Defendant objects to this Interrogatory to the extent assumes any action or inaction by the Defendant. Defendant objects to this interrogatory to the extent it is incomprehensible as it refers to "the" unspecified "Disposal Sites." Defendant objects to this Interrogatory to the extent it seeks information related to trade secret or other confidentiality, or to the extent it seeks information protected by privilege such as the attorney-client privilege or the work product doctrine.

Subject to and without waiving any objections, Defendant answers as follows.

See response to No. 10.


     **13.**    **Identify any insurance coverage pertaining to any Property at Issue or Operations identified in response to Interrogatories Nos. 1 or 2 that is or may available to respond to the claims at issue in this litigation and describe the coverage.**

**ANSWER:**    Defendant incorporates its objections to Interrogatories No. 1 and No. 2 and makes those objections in response to this Interrogatory. Defendant objects to this Interrogatory to the extent is assumes any action or inaction by the Defendant. Defendant objects to this Interrogatory to the extent it seeks information that is subject to privilege such as the attorney-client or the work product privilege.

     Subject to and without waiving any objections, Defendant answers as follows.

**Givaudan was assigned rights to general liability insurance purchased from various insurers from 1957 through 1984 by Givaudan Corporation (the "GL Coverage").  As it pertains to defense costs and any liabilities arising out of the former Clifton Site and/or the LPRSA, the GL Coverage was the subject of litigation for approximately 10 years in New Jersey Superior Court (the "Coverage Action").  Givaudan entered into confidential settlement agreements to fully and finally resolve the Coverage Action with all insurer-defendants.**

     **14.**    **Identify all of Your officers, employees, or Agents, who played a substantive role or had supervisory responsibilities pertaining to any Property at Issue or Operations identified in response to Interrogatories Nos. 1 or 2 who have or had knowledge of the ownership, history of Operations, raw materials used, products sold, by-products, waste generated and waste disposal practices for Waste Materials, discharge pathways for Waste Materials, and/or any Response Action related to any Property at Issue or Operations identified in response to Interrogatories Nos. 1 or 2 that related to COCs.  For each Person identified, state their position or title, years employed or retained by You, last known address and telephone number, and the subject matter(s) about which they have knowledge.**

**ANSWER:**    Defendant incorporates its objections to Interrogatories No. 1 and No. 2 and makes those objections in response to this Interrogatory. Defendant further objects to this Interrogatory on the ground that it is overboard, as it is not constrained or limited in time, and as it seeks to encompass information that has no bearing on the issues in this litigation. Defendant objects to the Interrogatory because it is vague, as the terms, "raw materials," "by products," "waste generated" "waste disposal practices," and "discharge pathways," are undefined. Defendant objects to this Interrogatory to the extent it calls for a legal conclusion. Defendant objects to this Interrogatory to the extent it assumes any action or inaction by the Defendant. Defendant objects to this Interrogatory to the extent it seeks information protected by trade secret or other confidentiality, or to the extent it seeks information that is subject to privilege, such as the attorney-client privilege or the work product doctrine.

Subject to and without waiving any objections, Defendant answers as follows.

**Givaudan refers Plaintiffs to the individuals identified in Givaudan's Initial Disclosures, dated December 19, 2018.**

**15.    Are You a party to any joint defense agreement(s) (whether written or unwritten) between or among You and any other Person relating to this litigation and/or any of the Properties at Issue?  If so, Identify the parties to the agreement and state the date it was signed (or verbally agreed to ) and became effective.**

**ANSWER:**    Defendant objects to this Interrogatory to the extent it seeks information that is subject to privilege such as the attorney-client or work product privilege, and to the extent it seeks confidential information. Defendant object to this Interrogatory to the extent it assumes any action or inaction by the Defendant. Defendant objects to this Interrogatory as vague, as the term "joint defense agreement(s)" is not defined.

Subject to and without waiving any objections, Defendant answers as follows.

**Givaudan is, or has been, a party to the following joint defense agreements:**

a.      **A Lower Passaic River Study Area Site PRP Group Organization Agreement entered into on or around February 10, 2004. The members amended this Organization Agreement on or around May 24, 2004, to change their name from the Lower Passaic River Study Area Site PRP Group to the Lower Passaic River Study Area Cooperating Parties Group. The membership of the group was amended and supplemented over time as parties joined and left the group.  The following entities are current or former parties to this joint defense agreement:**

1. **Alliance Chemical, Inc.**
2. **Arkema Inc.**
3. **Ashland Inc**
4. **Atlantic Richfield Company**
5. **BASF Corporation, on its own behalf and on behalf of BASF Catalysts LLC**
6. **Belleville Industrial Center**
7. **Benjamin Moore& Company**
8. **Bristol Meyers Squibb**
9. **CBS Corporation, a Delaware corporation (f/k/a Viacom Inc., successor by merger to CBS Corporation, a Pennsylvania corporation, f/k/a Westinghouse Electric Corp.)**
10. **Celanese Ltd.**
11. **Chemtura Corporation**
12. **Chevron Environmental Management Company, for itself and on behalf of Texaco, Inc. and TRMI–H LLC**
13. **Coats & Clark, Inc.**
14. **Congoleum Corporation**
15. **Conopco, Inc. d/b/a Unilever (as successor to CPC/Bestfoods, former parent of the Penick Corporation (facility located at 540 New York Avenue, Lyndhurst, NJ)**
16. **Cooper Industries LLC**
17. **Croda Inc.**
18. **Curtiss-Wright Corporation**
19. **DII Industries, LLC**
20. **DiLorenzo Properties Company on behalf of itself and The Goldman /Goldman/DiLorenzo Properties Partnerships**
21. **Eastman Kodak Company (NPEC, Inc.)**
22. **Eden Wood Company**
23. **E. I. du Pont de Nemours and Company**
24. **Elan Chemical Company**
25. **El Paso (EPEC Polymers, Inc. on behalf of itself and EPEC Oil Co. Liquidating Trust)**
26. **EnPro Holdings, Inc. (successor by merger to Coltec Industries Inc.)**
27. **Essex Chemical Corporation**
28. **Essex County Improvement Authority**

29. **Flexon Industries Corp.**
30. **Franklin-Burlington Plastics, Inc.**
31. **Garfield Molding Co., Inc.**
32. **General Electric Company**
33. **General Motors Corporation**
34. **Givaudan Fragrances**
35. **Goodrich Corporation on behalf of itself and Kalama Specialty Chemicals, Inc.**
36. **Harris Corporation (f/k/a ITT Corporation)**
37. **Hercules Chemical Corp., Inc.**
38. **Hess Corporation, on its own behalf and on behalf of Atlantic Richfield Company**
39. **Hexcel Corporation**
40. **Hoffmann-La Roche Inc. on its own behalf, behalf of affiliate Roche Diagnostics**
41. **Honeywell International Inc.**
42. **ISP Chemicals**
43. **KAO USA, Inc.**
44. **Leemilt's Petroleum, Inc. (successor to Power Test of New Jersey, Inc.), on its behalf and on behalf of Power Test Realty Company Limited Partnership and Getty Properties Corp., the General Partner of Power Test Realty Company Limited Partnership**
45. **Linde LLC on behalf of The BOC Group Inc.**
46. **Lyondell/Millennium Chemicals, Inc.**
47. **Mallinckrodt**
48. **National-Standard**
49. **Newell Brands Inc. (f/k/a Newell Rubbermaid Inc.), on behalf of itself and its subsidiary Berol Corporation (as successor by merger to Faber-Castell Corporation)**
50. **Nokia (f/k/a Lucent Technologies/Alcatel-Lucent USA Inc.)**
51. **Novelis Corporation (f/k/a Alcan Aluminum Corporation)**
52. **Otis Elevator Company**
53. **Pfizer, Inc.**
54. **Pharmacia Corporation (f/k/a Monsanto Company)**
55. **PPG Industries, Inc.**
56. **Public Service Electric and Gas Company**
57. **Purdue Pharma Technologies, Inc.**
58. **Quality Carriers, Inc. as successor to Chemical Leaman Tank Lines, Inc. and Quality Carriers, Inc.'s corporate affiliates and parents**
59. **Reichhold Holdings/Reichhold Chemicals, Inc.**
60. **Revere Smelting and Refining Corporation**
61. **RSR Corporation**
62. **Safety-Kleen Envirosystems Company by McKesson, and McKesson Corporation**
63. **Sequa Corporation**
64. **Seton Tanning**
65. **Stanley Black & Decker, Inc. (f/k/a The Stanley Works)**
66. **Sun Chemical Corporation**
67. **Tate & Lyle Ingredients Americas, Inc. (f/k/a A.E. Staley Manufacturing Company, including its former division Staley Chemical Company)**
68. **Teva Pharmaceuticals USA, Inc. (f/k/a Biocraft Laboratories, Inc.)**

27

69. **Teval Corporation**
70. **Textron Inc.**
71. **The Hartz Consumer Group, Inc., on behalf of The Hartz Mountain Corporation**
72. **The Newark Group**
73. **The Sherwin-Williams Company**
74. **Three County Volkswagen**
75. **Tierra Solutions (Maxus Energy Corp. & Occidental Chemical Corp.)**
76. **Tiffany and Company**
77. **Twenty-First Century Fox America (f/k/a News Publishing Australia Ltd. (successor to Chris-Craft Industries))**
78. **Vertellus Specialties (f/k/a Reilly Industries, Inc.)**
79. **Vulcan Materials Company**
80. **Wyeth on behalf of Shulton, Inc.**

      b.     A Lower Passaic River Study Area Site Cooperating Parties Group Amended and Restated Organization Agreement entered into on or around March 19, 2007. The membership of the group was amended and supplemented over time as parties joined and left the group. The following entities are current or former parties to this joint defense agreement:

1. **Alliance Chemical, Inc. on behalf of itself and Pfister Chemical Inc.**
2. **Arkema Inc.**
3. **Ashland Inc.**
4. **Atlantic Richfield Company**
5. **BASF Corporation, on its own behalf and on behalf of BASF Catalysts LLC**
6. **Belleville Industrial Center**
7. **Benjamin Moore & Co.**
8. **Bristol-Myers Squibb**
9. **CBS Corporation**
10. **Celanese Ltd.**
11. **Chemtura Corporation and Raclaur, LLC as current and former owner of the property f/k/a Atlantic Industries**
12. **Chevron Environmental Management Company, for itself and on behalf of Texaco Inc.**
13. **Coltec Industries**
14. **Conopco, Inc. d/b/a Unilever (as successor to CPC/Bestfoods, former parent of the Penick Corporation (facility located at 540 New York Avenue, Lyndhurst, NJ))**
15. **Covanta Essex Company**
16. **Croda Inc.**
17. **DiLorenzo Properties Company on behalf of itself and the Goldman/Goldman/DiLorenzo partnerships**
18. **Eden Wood Corporation**
19. **Du Pont Company**
20. **Elan Chemical Co. Inc.**
21. **EPEC Polymers, Inc. on behalf of itself and EPEC Oil Company Liquidating Trust**
22. **Equistar Chemicals LP**

23. Essex Chemical Corporation
24. Flexon Industries Corp.
25. Franklin-Burlington Plastics, Inc.
26. Garfield Molding Co. Inc.
27. General Electric Co.
28. General Motors Corporation
29. Givaudan Fragrances Corp.
30. Goodrich Corporation on behalf of itself and Kalama Specialty Chemicals, Inc.
31. Hercules Chemical Company, Inc.
32. Hess Corporation, on its own behalf and on behalf of Atlantic Richfield Company
33. Hexcel Corporation
34. Hoffmann-La Roche Inc. on its own behalf and on behalf of its affiliate, Roche Diagnostics
35. Honeywell
36. ISP Chemicals LLC
37. ITT Corporation
38. Kao Brands Company
39. Leemilt's Petroleum, Inc . (successor to Power Test of New Jersey, Inc.), on its behalf and on behalf of Power Test Realty Company Limited Partnership and Getty Properties Corp., the General Partner of Power Test Realty Company Limited Partnership.
40. Lucent Technologies Inc.
41. Mallinckrodt Inc., a Delaware corporation
42. Maxus Energy Corporation
43. MHC, Inc. on behalf of itself and Walter Kidde & Company, Inc.
44. Millennium Petrochemicals, Inc. (f/k/a Quantum Chemical Corporation)
45. National-Standard, LLC
46. Newell Rubbermaid Inc., on behalf of itself and its wholly-owned subsidiaries Goody Products, Inc. and Berol Corporation (as successor by merger to Faber-Castell Corporation)
47. News Publishing Australia Ltd.
48. Novelis Corporation (f/k/a Alcan Aluminum Corporation)
49. NPEC, Inc.
50. Occidental Chemical Corporation
51. Otis Elevator Company
52. Pfizer, Inc.
53. Pharmacia Corporation (f/k/a Monsanto Company)
54. PPG Industries, Inc.
55. Public Service Enterprise Group on behalf of its affiliates
56. Purdue Pharma Technologies, Inc.
57. Quality Carriers, Inc. as successor to Chemical Leaman Tank Lines, Inc.
58. Reichhold Inc. (f/k/a Reichhold Chemicals, Inc.)
59. Revere Smelting & Refining Corporation
60. Safety-Kleen Envirosystems Company by McKesson, and McKesson Corporation for itself
61. Sequa Corporation
62. STWB Inc.

63. Sun Chemical Corporation
64. Tate & Lyle Ingredients Americas, Inc. (f/k/a A.E. Staley Manufacturing Company, including its former division Staley Chemical Company)
65. Teva Pharmaceuticals USA, Inc.
66. Teval Corp.
67. Textron Inc.
68. The BOC Group
69. The Hartz Consumer Group, Inc., on behalf of The Hartz Mountain Corporation
70. The Newark Group, Inc.
71. The Sherwin-Williams Company
72. The Stanley Works
73. Three County Volkswagen Corp.
74. Tiffany and Company
75. Tierra Solutions, Inc.
76. Vertellus Specialties Inc., f/k/a Reilly Industries, Inc.
77. Vulcan Materials Company
78. Wyeth, on behalf of Shulton, Inc.


      c.     A Lower Passaic River Small Parties Group (SPG) Joint Defense Agreement entered into on or around May 9, 2008 with a Joinder Agreement and Amendment No. 1 entered into on or around September 28, 2018. The membership of the group was amended and supplemented over time as parties joined and left the group.  The following entities are current or former parties to this joint defense agreement:

1. Akzo Nobel Coatings Inc.
2. Alcatel-Lucent USA
3. Alliance Chemical, Inc.
4. Arkema Inc.
5. Ashland Inc.
6. Atlantic Richfield Company
7. BASF Corporation
8. Bath Iron Works Corporation
9. Benjamin Moore & Co.
10. Canning Gumm LLC
11. CBS Corporation
12. Celanese Ltd.
13. Chemtura Corporation/Raclaur LLC
14. Chevron Environmental Management Company
15. Clean Earth of North Jersey
16. Coats & Clark Inc.
17. Coltec Industries Inc.
18. Congoleum Corporation
19. Conopco, Inc.
20. Cooper Industries LLC
21. Covanta Essex Company
22. Croda Inc.

23. DII Industries, LLC
24. DiLorenzo Properties Company on behalf of itself and the Goldman/Goldman/DiLorenzo Properties Partnership
25. DuPont Company
26. Emerald Kalama Chemical LLC
27. EPEC Polymers, Inc.
28. Essex Chemical Corporation
29. The Essex County Improvement Authority (as contractual indemnitor for Celanese's former Doremus Avenue facility)
30. Franklin-Burlington Plastics, Inc.
31. Garfield Molding Co. Inc.
32. General Electric Co.
33. Givaudan Fragrances Corporation
34. Goodrich Corporation
35. The Hartz Consumer Group, Inc.
36. Hess Corporation
37. Hexcel Corporation
38. Hoffman-LaRoche
39. Honeywell
40. ISP Chemicals LLC
41. ITT
42. Johnson & Johnson Consumer Products Inc.
43. Kalama Specialty Chemicals Inc.
44. Kao Brands Company
45. Leemilt's Petroleum, Inc.
46. Linde, Inc.
47. Mallinckrodt LLC
48. Millennium Chemicals, Inc. affiliated entities MHC, Inc. (on behalf of itself and Walter Kidde & Company, Inc.)
49. Millennium Petrochemicals, Inc. (f/k/a Quantum Chemical Corporation)
50. Equistar Chemicals LP
51. Nappwood Land Corporation
52. National-Standard
53. The Newark Group, Inc.
54. Newell Rubbermaid Inc., (on behalf of itself and its wholly-owned subsidiaries Goody Products, Inc. and Berol Corporation (as successor by merger to Faber-Castell Corporation))
55. News Publishing Australia Ltd.
56. Novelis Corporation
57. Noveon Hilton Davis, Inc.
58. The Okonite Company
59. Otis Elevator Company
60. Pabst Brewing Company, LLC
61. Pfizer Inc.
62. Pharmacia Corporation
63. PPG Industries, Inc.
64. PSEG

65. Purdue Pharma Technologies, Inc.
66. Quality Carriers, Inc. (as successor to Chemical Leaman Tank Lines)
67. Reichhold Inc.
68. Revere Smelting & Refining
69. Royce Associates, A Limited Partnership
70. RTC Properties, Inc.
71. Safety-Kleen Envirosystems Company
72. McKesson Corporation
73. Sequa Corporation
74. The Sherwin-Williams Company
75. The Stanley Works
76. STWB Inc.
77. Sun Chemical
78. Sunoco (R&M) LLC
79. Sunoco Partners, Marketing, & Terminals, L.P.
80. Tate & Lyle Ingredients Americas, Inc. (f/k/a A.E. Staley Manufacturing Company,
    including its former division Staley Chemical Company)
81. Teva Pharmaceuticals USA, Inc.
82. Textron Inc.
83. Three County Volkswagen
84. Tiffany & Company
85. United States Steel Corporation
86. Vulcan Materials Company
87. Wyeth, on behalf of Shulton, Inc.


        d.       A Third-Party Defendant Newark Bay Complex Joint Defense Agreement
entered into on or around January 23, 2009 with regards to the litigation captioned *New
Jersey Department of Environmental Protection v. Occidental Chemical Corporation* (Docket
No. ESX-L-9868-05) in New Jersey Superior Court, Essex County. The membership of the
group was amended and supplemented over time as parties joined and left the group.  The
following entities are current or former parties to this joint defense agreement:

1.    3M Company
2.    ACH Food Companies, Inc.
3.    Alliance Chemical, Inc.
4.    Alumax Mill Products, Inc.
5.    Apexical, Inc.
6.    Arkema Inc.
7.    Ashland Inc. on behalf of itself and on behalf of its wholly owned holding and
      investment company, Ashland International Holdings Inc.
8.    Associated Auto Body & Trucks, Inc.
9.    BASF Corporation, on its own behalf and on behalf of BASF Catalysts, BASF
      Construction Chemicals and CIBA Corporation
10.   Bayer Corporation
11.   Beazer East, Inc.
12.   Belleville Industrial Center

13. Benjamin Moore & Co.
14. Berol Corporation and Goody Products, Inc.
15. BP Marine Americas, Inc.
16. Celanese Ltd.
17. Coltec Industries
18. ConAgra Panama, Inc.
19. Conopco, Inc.
20. Consolidated Rail Corporation
21. Covanta Essex Company
22. Croda Inc.
23. CWC Industries, Inc.
24. Cytec Industries Inc.
25. Darling International, Inc.
26. Davanne Realty Co.
27. DiLorenzo Properties Company
28. Dow Chemical Company, Essex Chemical Corporation and Morton International, Inc.
29. E. I. du Pont de Nemours and Company and Pitt-Consol Chemical Company
30. Eastman Kodak Company
31. Eden Wood Corporation
32. Electric Boat / named as General Dynamics Corporation
33. EPEC Polymers, Inc.
34. Exxon Mobil Corporation
35. Fiske Brothers Refining Company
36. Flexon Industries Corp. and Thirty-Three Queen Realty, Inc.
37. Flint Group Incorporated
38. Franklin-Burlington Plastics, Inc.
39. Garfield Molding Co., Inc.
40. General Cable Industries, Inc.
41. General Electric Company
42. Givaudan Fragrances Corporation
43. Gordon Terminal Service Co. of N.J.
44. Hartz Mountain Corporation
45. Hess Corporation
46. Hexcel Corporation on behalf of itself and on behalf of Fine Organics Corporation
47. Hoffmann-La Roche Inc.
48. Honeywell International Inc. and Universal Oil Products Company
49. ICI Americas, Inc. (Akzo Nobel)
50. INNOSPEC ACTIVE CHEMICALS LLC
51. INX International Ink Co.
52. ISP Chemicals LLC
53. ITT Corporation
54. Kao Brands Company
55. KINDER MORGAN ENERGY PARTNERS, LP/GATX
56. Linde, Inc.
57. Lucent Technologies Inc. (Alcatel-Lucent USA Inc.)
58. Mallinckrodt Inc.

59. Merck & Co., InciSchering Corporation
60. Metal Management Northeast, Inc.
61. N L Industries, Inc.
62. National Fuel Oil, Inc.
63. National-Standard LLC
64. Nestle U.S.A., Inc.
65. News Publishing Australia Ltd. (successor to Chris-Craft Industries)
66. Novelis Corporation (f/lc/a Alcan Aluminum Corporation)
67. Otis Elevator Company
68. Pfizer, Inc.; American Cyanamid Company (now known as Wyeth Holdings Corporation), Wyeth (now known as Wyeth LLC), and Shulton, Inc., solely as to allegations in Third Party Complaint D related to the Clifton, NJ facility
69. Pharmacia Corporation
70. Phelps Dodge Industries, Inc.
71. Power Test Realty Company Limited Partnership and Getty Properties Corp., the General Partner of Power Test Realty Company Limited Partnership
72. PPG Industries, Inc.
73. Praxair, Inc.
74. PRC-Desoto International, Inc.
75. Prysmian Communications Cables and Systems USA LLC
76. Public Service Electric and Gas Company
77. Purdue Pharma Technologies, Inc. and Nappwood Land Corporation
78. Quality Carriers, Inc., and Quala Systems, Inc.
79. Reichhold Chemicals, Inc.
80. Revere Smelting & Refining Corporation
81. Roman Asphalt Corporation
82. Safety-Kleen Envirosystems Company by McKesson, and McKesson Corporation for itself
83. Sequa Corporation
84. Stanley Black & Decker, Inc. (The Stanley Works)
85. Sun Chemical Corporation
86. Sunoco, Inc. (R&M) f/k/a Sun Refining & Marketing Co., Sunoco, Inc. f/k/a Sun Oil Co., and Sun Pipe Line Company improperly identified as Sun Pipeline Co
87. Tate & Lyle Ingredients Americas, Inc.
88. Teva Pharmaceuticals USA, Inc. (f/k/a Biocraft Laboratories, Inc.)
89. Textron Inc.
90. The Dial Corporation
91. The Newark Group
92. The Procter & Gamble Manufacturing Company
93. The Sherwin-Williams Company
94. The Valspar Corporation
95. Three County Volkswagen
96. Tiffany & Co.
97. TRMI-H LLC
98. Troy Chemical Corporation, Inc.
99. Vertellus Specialties Inc. f/k/a/ Reilly Industries, Inc.; Rutherford Chemicals LLC
100. Vulcan Materials Company

101. **Waste Management, Inc. (Chemical Waste Management, Inc.)**
102. **Zeneca, Inc.**


e.    A Confidential Common Interest Agreement entered into on or around March 11, 2014. The membership of the group was amended and supplemented over time as parties joined and left the group.  The following entities are current or former parties to this joint defense agreement:

1. **21 Century Fox America, Inc.**
2. **Arkema Inc.**
3. **Ashland Inc.**
4. **Alcatel-Lucent USA Inc.**
5. **BASF Catalysts, LLC**
6. **BASF Corporation**
7. **Belleville Industrial Center**
8. **Benjamin Moore & Co.**
9. **BP America Inc., on behalf of BP Products North America Inc. and Atlantic Richfield Company**
10. **CBS Corporation**
11. **Celanese Ltd.**
12. **Chevron Environmental Management Company for itself and on behalf of Texaco Inc. and TRMI-H LLC**
13. **Coats & Clark Inc.**
14. **Coltec Industries Inc.**
15. **Conopco, Inc. d/b/a Unilever (as successor to CPC/Bestfoods, former parent of the Penick Corporation)**
16. **Cooper Industries, LLC**
17. **Covanta Essex Company**
18. **Croda, Inc.**
19. **DiLorenzo    Properties    Company    on    behalf    of    itself    and Goldman/Goldman/DiLorenzo Partnerships**
20. **DII Industries, LLC**
21. **E.I. du Pont de Nemours and Company**
22. **Elan Chemical Company Inc.**
23. **EPEC Polymers, Inc.**
24. **Essex Chemical Corporation**
25. **Exelis Inc. for itself and ITT Corporation**
26. **Flexon Industries Corporation**
27. **Franklin-Burlington Plastics, Inc.**
28. **Garfield Molding Co., Inc.**
29. **General Electric Co.**
30. **Givaudan Fragrances Corporation**
31. **The Hartz Consumer Group, Inc.**
32. **Hess Corporation**
33. **Hexcel Corporation**
34. **Hoffmann-LaRoche Inc.**

35. Honeywell International Inc.
36. ISP Chemicals LLC
37. KAO USA Inc.
38. Leemilt's Petroleum, Inc.
39. Legacy Vulcan Corporation (f/k/a Vulcan Materials Company)
40. Linde (f/k/a The BOC Group)
41. Mallinckrodt LLC
42. McKesson/Safety-Kleen
43. National-Standard, LLC
44. The Newark Group
45. Newell Rubbermaid Inc., on behalf of itself and its wholly-owned subsidiaries Goody Products, Inc. and Berol Corporation (as successor by merger to Faber-Castell Corporation)
46. Novelis Corporation
47. Otis Elevator Company
48. Goodrich Corporation
49. Pfizer Inc.
50. Pharmacia LLC
51. PPG Industries, Inc.
52. Public Services Enterprises Group Incorporated on behalf of its affiliates
53. Purdue Pharma Technologies Inc.
54. Quality Carriers, Inc.
55. Reichhold Inc.
56. Revere Smelting & Refining
57. Sequa Corporation
58. Seton Company
59. The Sherwin-Williams Company
60. Stanley Black & Decker Inc.
61. STWB Inc.
62. Sun Chemical Corporation
63. Tate & Lyle Ingredients Americas LLC
64. Textron Inc.
65. Teva Pharmaceuticals USA, Inc.
66. Three County Volkswagen
67. Tiffany and Company
68. Wyeth on behalf of Shulton, Inc.

f.     A Joint Defense Agreement entered into on or around August 15, 2018 related to the Diamond Alkali Superfund Site Small Parties Litigation Group. The membership of the group was amended and supplemented over time as parties joined and left the group.  The following entities are current or former parties to this joint defense agreement:

1.  21st Century Fox America, Inc.
2.  Akzo Nobel Coatings Inc.
3.  Arkema Inc.

36

4. **Ashland LLC**
5. **Atlantic Richfield Company**
6. **BASF Corporation (on its own behalf and on behalf of BASF Catalysts LLC)**
7. **Bath Iron Works Corporation**
8. **Benjamin Moore & Co.**
9. **Canning Gumm LLC**
10. **CBS Corporation**
11. **Clean Earth of North Jersey, Inc.**
12. **CNA Holdings LLC (by and through its indemnitor Essex County Improvement Authority)**
13. **Coats & Clark Inc.**
14. **Conopco, Inc., d/b/a Unilever (as successor to CPC/Bestfoods, former parent of Penick Corporation)**
15. **Cooper Industries, LLC**
16. **Covanta Essex Company**
17. **Croda, Inc.**
18. **DII Industries, LLC**
19. **E. I. du Pont de Nemours and Company (on its own behalf and on behalf of Pitt-Consol Chemical Company)**
20. **EnPro Holdings, Inc. (successor to Coltec Industries Inc.)**
21. **Essex Chemical Corporation**
22. **Franklin-Burlington Plastics, Inc.**
23. **Garfield Molding Company, Inc.**
24. **General Electric Company**
25. **Givaudan Fragrances Corporation**
26. **Kalama Specialty Chemicals, Inc.**
27. **Noveon Hilton Davis, Inc.**
28. **Emerald Kalama Chemical, LLC**
29. **Goodrich Corporation on behalf of itself, Kalama Specialty Chemicals, Inc., Emerald Kalama Chemical, LLC, and Noveon Hilton Davis, Inc.**
30. **Harris Corporation for itself and as successor in interest by merger to Exelis Inc., successor in interest to ITT Corporation, Avionics Division**
31. **Hexcel Corporation**
32. **Hoffman-LaRoche Inc.**
33. **Honeywell International Inc.**
34. **ISP Chemicals LLC**
35. **Johnson & Johnson**
36. **Leemilt's Petroleum, Inc.**
37. **Legacy Vulcan, LLC**
38. **Mallinckrodt LLC**
39. **MI Holdings, Inc.**
40. **Nappwood Land Corporation**
41. **National-Standard, LLC**
42. **Newell Brands Inc. (f/k/a Newell Rubbermaid Inc.) on behalf of itself and its subsidiaries Goody Products, Inc. and Berol Corporation (as successor by merger to Faber-Castell Corporation)**
43. **Nokia of America Corporation**

44. Novartis Corporation
45. Novelis Corporation (f/k/a Alcan Aluminum Corp.)
46. Otis Elevator Company
47. Pabst Brewing Company, LLC
48. Pharmacia LLC
49. PPG Industries, Inc.
50. Public Service Electric & Gas Company (PSE&G)
51. Purdue Pharma Technologies, Inc.
52. Quala Systems, Inc.
53. Quality Carriers, Inc.
54. Revere Smelting & Refining Corporation
55. Royce Associates, A Limited Partnership
56. RTC Properties, Inc.
57. Safety-Kleen Envirosystems Company, by McKesson Corporation and McKesson Corporation for itself
58. Sequa Corporation
59. Stanley Black & Decker, Inc.
60. STWB Inc.
61. Sun Chemical Corporation
62. TPL Management Operations, a series of Evergreen Resources Group, LLC on behalf of itself and Sunoco (R&M), LLC and Sunoco Partners Marketing & Terminals L.P.
63. Tate & Lyle Ingredients Americas LLC
64. Textron Inc.
65. The Hartz Consumer Group (as successor to certain liabilities of The Hartz Mountain Corporation)
66. The Newark Group, Inc.
67. The Okonite Company, Inc.
68. The Sherwin-Williams Company
69. Tiffany & Company
70. United States Steel Corporation

g.     A Joint Defense Agreement entered into on or around October 24, 2017 related to the entities designated as subjects of "Preserved Contribution Claims" in the "Notice of Filing of Identified Preserved Contribution Claims Under Proposed Amended Chapter 11 Plan of Liquidation Proposed by Maxus Energy Corporation, et al. and the Official Committee of Unsecured Creditors and Related Proposed Amended Disclosure Statement for the Amended Chapter 11 Plan of Liquidation Proposed by Maxus Energy Corporation, et al. and the Official Committee of Unsecured Creditors" (ECF No. 1147) in the bankruptcy matter captioned In re: Maxus Energy Corporation, et al. in the United States Bankruptcy Court for the District of Delaware, Case No. 16-11501 (CSS). The entities that have been parties to this joint defense agreement include:

1.  Alcatel-Lucent USA Inc.
2.  Bayer Corporation for itself and its subsidiary, STWB Inc.
3.  BASF Catalysts LLC

38

4. **Chevron Environmental Management Company, for itself and as Attorney in Fact for Texaco Inc. and TRMI-H LLC**
5. **E.I. DuPont de Nemours and Company**
6. **EPEC Polymers**
7. **Givaudan Fragrances Corporation**
8. **21st Century Fox America, Inc.**
9. **PPG Industries, Inc.**
10. **PSEG Services Corp.**
11. **Sun Chemical Corporation**
12. **The Sherwin-Williams Co.**
13. **Conopco, Inc. d/b/a Unilever (as successor to CPC/Bestfoods, former parent of Penick Corporation)**

**Givaudan, either individually and/or as a member of an above-listed group, is currently or has previously shared information and/or communications with others based on certain non-written common interest arrangements with other entities and/or groups.**

**16.    Identify and describe all litigations, arbitrations, mediations, or settlements in which You have been involved relating to any Property at Issue or Operations identified in response to Interrogatories Nos. 1 or 2 that pertained in any way to the COCs, Identify the outcome of those proceedings, and Identify where Documents related to those proceedings are stored.**

**ANSWER:**    Defendant incorporates its objections to Interrogatories No. 1 and No. 2 and makes those objections in response to this Interrogatory. Defendant objects to this Interrogatory to the extent it on the ground that it is overbroad, as it is not constrained or limited in time, and as it seeks to encompass information that has no bearing on the issue in this litigation. Defendant objects to this interrogatory to the extent it seeks information that is subject to privilege, such as the attorney-client privilege or the work product doctrine. Defendant objects to this interrogatory to the extent is assumes any action or inaction by the Defendant. Defendant object to this Interrogatory to the extent it seeks confidential materials.

Subject to and without waiving any objections, Defendant answers as follows.

Givaudan was involved in litigation styled *New Jersey Department of Environmental Protection v. Occidental Chemical Corporation* (Docket No. ESX-L-9868-05) in New Jersey Superior Court, Essex County, which was resolved by settlement. Responsive, non-privileged documents related to that litigation have previously been produced.

Defendant is also involved in the ongoing EPA Allocation proceeding conducted by David Batson. The EPA Allocation has not yet concluded. Documents in Defendant's possession, custody or control relating to the EPA Allocation are subject to attorney-client, work product, settlement, and other applicable privileges and the Diamond Alkali Superfund Site OU2 Allocation Confidentiality Agreement.

17.    Identify the dates and describe the nature and results of any soil, groundwater, surface water, stormwater, sediment, wastewater, or other site media sampling that relates to COCs on any Property at Issue identified in response to Interrogatory No. 1 or in the Passaic River.

**ANSWER:**    Defendant incorporates its objections to Interrogatory No. 1 and makes those objections in response to this Interrogatory. Defendant objects to this Interrogatory to the extent it is overbroad, as the term "Property at Issue" is defined in a manner that is unconstrained in time and does not pertain to a specific defendant or number of defendants. Defendant objects to this Interrogatory as it seeks information that has no bearing on the issues in this litigation. Defendant objects to this Interrogatory to the extent it seeks information related to trade secret or other confidentiality, or to the extent it seeks information protected by privilege such as the attorney-client privilege or the work product doctrine.

Subject to and without waiving any objections, Defendant answers as follows.

Beginning in approximately 1983 and continuing through the present, the former Clifton facility has been sampled extensively by both state and federal agencies, and by Givaudan

40

under state or federal supervision. This sampling over 30+ years has generated thousands of samples, the results of which can be found in the reports cited herein. In summary, sample results for 2,3,7,8-TCDD ranged from less than 1ppb (the majority of samples) to 7ppb, with only a few samples exceeding 7ppb and only one sample at 200ppb (this sample was located in the production area adjacent to a "hot box" where purified TCP was transferred to be heated). This isolated area of surficial soil impact was an outlier and was fully delineated and remediated. (See 1990 table summarizing samples >7 ppb, at GIVA-FED-0000004540). Sampling conducted in the 1980s under NJDEP supervision conclusively established that there was no offsite impact or migration of TCDD from the former Clifton facility, as documented in the March 5, 1987 Administrative Consent Order. (See Paragraph 15 of GIVA-FED-0000010626 – GIVA-FED-0000010633; and see NJDEP letter dated September 15, 1985, GIVA-FED-0000018138). In the 1980s, EPA also sampled private property around the Givaudan site and found no impacts. (See GIVA-FED-0000008384 – GIVA-FED-0000008387, GIVA-FED-0000012392 – GIVA-FED-0000012413, GIVA-FED-0000013097 – GIVA-FED-0000013122, GIVA-FED-0000010626 – GIVA-FED-0000010633, GIVA-FED-0000018138, GIVA-FED-0000004451, GIVA-FED-0000004605 – GIVA-FED-0000004664, GIVA-FED-0000012461, and GIVA-FED-0000012485). Further, there is no evidence of any impacts of TCDD to surface water or groundwater, which conclusion is supported by sampling conducted by EPA, NJDEP and Givaudan (See Paragraph 15 of GIVA-FED-0000010626 – GIVA-FED-0000010633; and see NJDEP letter dated September 15, 1985 at GIVA-FED-0000018138).

In 2009 Givaudan collected ground water samples for TCDD analysis from wells both up and down gradient of the cell parcel. Results were reported as non-detect for TCDD.

Givaudan began collecting soil and ground water samples at the Clifton Site in the 1980s, with the major soil and ground water investigations being completed toward the end of operations or after plant shutdown between the mid-1990s to early 2000s. Multiple sampling events occurred with the more significant soil sampling being competed in 1996 (with 98 locations sampled generating over 200 samples) and in 1998 to 2000 (with hundreds of locations sampled generating over 2,000 samples). These investigations do not include the hundreds of additional soil samples collected for the onsite sewer remediation, UST samples, and other borings completed over the years. This comprehensive sampling disclosed only random, isolated detections of some PAH compounds, Lead, Copper, Dieldrin and Mercury above the NJDEP Non–Residential Direct Soil Contact Criteria and, to a lesser extent, samples above the NJDEP Impact to Ground Water Screening Level. However, no defined source areas were identified for any of these compounds, which were found mostly beneath buildings or at depth in soil borings or random sewer line locations. They are not associated with manufacturing operations and are believed to be associated with fill materials.

    **18.**    **For any Property at Issue identified in response to Interrogatory No. 1, Identify and describe any Response Action that has occurred on that location.**

**ANSWER:**    Defendant incorporates its objections to Interrogatory No. 1 and makes those objections in response to this Interrogatory. Defendant objects to this Interrogatory to the extent it is overbroad, as the term "Property at Issue" is defined in a manner that is unconstrained in time and does not pertain to a specific defendant or number of defendants. Defendant object to this Interrogatory as vague as the term "Remedial Action" is undefined. Defendant objects to this Interrogatory to the extent it assumes any action

42

or inaction by the Defendant. Defendant objects to this interrogatory to the extent it seeks confidential materials.

Subject to and without waiving any objections, Defendant answers as follows.

**Givaudan delineated soil in the onsite Contaminated Process and Contaminated Non-Process areas and excavated affected areas until less than 1 ppb TCDD was detected. Excavated soils (approximately 6,750 cubic yards) were placed in an engineered containment cell on the southeast portion of the Clifton Site, which was completed in December 1997. That parcel is still owned by Givaudan. (See GIVA-FED-0000002500 – GIVA-FED-0000002616, and GIVA-FED-0000004605 – GIVA-FED-0000004664). Following closure of the Givaudan facility in 1998, and subsequent structure demolition, any soils suspected to be impacted by TCDD underneath four buildings, including the aboveground storage tank pad associated with Building 60, Building 93, Building 95, and Building 68/168, were excavated to original grade and sent offsite for disposal. (See GIVA-FED-0000009010 – GIVA-FED-0000009019, and GIVA-FED-0000014285 – GIVA-FED-0000014414) Thereafter, NJDEP issued a No Further Action letter for the TCDD remediation in 2002. No offsite areas have ever been identified as being impacted during the decades-long investigations of TCDD at the Clifton Site.**

**During the 1990s, Givaudan removed and or closed dozens of Underground Storage Tanks. See GIV_NBC_0379892 – GIV_NBC_0379998. The designated RCRA Hazardous Waste Storage tanks were closed in the late 1990s. See Attachment 7B in the Preliminary Assessment Report (GIVA-FED-0000040527 – GIVA-FED-0000040946).**

Provided below is a summary of the remedial action achievements from the sewer decommissioning activities (see GIVA-FED-0000002617 – GIVA-FED-0000002765):

• A total of 11,251 linear feet of old chemical, new chemical, and stormwater sewer was removed. The associated materials (piping, concrete, etc.) have been disposed of offsite, or reused onsite for backfill (if approved by NJDEP as acceptable).

• Four cesspools that were associated with the sewer line were removed.

• One underground storage tank identified during the sewer removal, and four underground storage tanks found under a demolished building were removed.

• Excavation and off-site recycling of 15,602 tons of soil impacted by VOCs, SVOCs, and Metals.

• Excavation and off-site recycling of 2,559 tons of asphalt.

• Excavation, crushing, characterization, and beneficial on-site reuse of 18,692 tons of concrete.

• The removal of approximately 135,000 gallons of water from the Pond prior to excavation and backfilling.

• The complete removal of impacted sediments from the bottom of the Pond that may have been contributing to localized ground water impacts.

- **The partial removal of impacted soil adjacent to the northern portion of the Pond related to the former spent acid pit.**

- **The advancement of 65 soil borings to address sewers that were left in place due to accessibility problems during excavation activities.**

- **The emplacement of approximately 24,000 tons of certified clean fill to supplement site soil and concrete acceptable for reuse in backfilling.**

**A biosparge remediation system was installed in the northern portion of the plant to treat/remove LNAPL. The system operated for less than a year and successfully removed the LNAPL and lowered dissolved phase VOC concentrations in the targeted treatment area. In situ chem ox treatment was used in select areas to treat residual phase toluene. This was successful in two areas of the plant, a third known as Area D will be treated with a SVE/AS system beginning in 2019. A vapor mitigation system is in place in the corner of Building 1 on the property due to the presence of VOCs above ground water and sub slab screening levels.**

 

**19.     For any Property at Issue identified in response to Interrogatory No. 1, Identify and describe any major capital improvements and/or major changes to the footprint of the property.**

**ANSWER:**     Defendant incorporates its objections to Interrogatory No. 1 and makes those objections in response to this Interrogatory. Defendant objects to this Interrogatory to the extent it is overbroad, as the term "Property at Issue" is defined in a manner that is unconstrained in time and does not pertain to a specific defendant or number of defendants. Defendant objects to this Interrogatory as vague as the terms,

"major capital improvements" and "major changes" are undefined and seek to encompass information that has no bearing on the issues in this litigation. Defendant objects to this Interrogatory the extent is seeks information related to trade secret or other confidentiality, or to the extent it seeks information protected by privilege such as the attorney-client privilege or the work product doctrine.

Subject to and without waiving any objections, Defendant answers as follows.

**The former Clifton plant footprint changed from 1924 through 1982 as the plant expanded and properties were acquired to achieve full build out (2016 104(e), GIVA-FED-0000040111 – GIVA-FED-0000040526). As land was purchased, new buildings and infrastructure were completed to accommodate the growing business. This included buildings, above and below grade storage tanks, utilities, and roads. A major addition to the plant was the treatment plant for process water treatment., which was upgraded over the years. An upgrade to the chemical sewer line was made in 1985 to comply with OCPSF regulations. Over time, buildings were demolished that were no longer in use.**

   **20.    Identify all complaints, Communications, or notices by any governmental agency or other Persons concerning any alleged release or disposal of COCs at or from each Property at issue or operations identified in response to Interrogatory Nos. 1 or 2.**

**ANSWER:**    Defendant incorporates its objections to Interrogatories No. 1 and No. 2 and makes those objections in response to this Interrogatory. Defendant further objects to this Interrogatory on the ground that it is overboard, as it is not constrained or limited in time, and as it seeks to encompass information that has no bearing on the issues in this litigation. Defendant objects to the Interrogatory because it is vague, as the terms, "release" and "disposal" are undefined. Defendant objects to this Interrogatory to the extent it

calls for a legal conclusion. Defendant objects to this Interrogatory to the extent it assumes any action or inaction by the Defendant. Defendant objects to this Interrogatory to the extent it seeks information protected by trade secret or other confidentiality, or to the extent it seeks information that is subject to privilege, such as the attorney-client privilege or the work product doctrine.

Subject to and without waiving any objections, Defendant answers as follows.

**Summaries of responsive information can be found in the July 2004 104(e) response (GIV_NBC_0498074 – GIV_NBC_0498118) and November 2016 104(e) response (GIVA-FED-0000040111 – GIVA-FED-0000040526).**

**21.    Identify or describe Your document retention and document destruction polic(ies) relating to the retention or destruction of business records relating to each Property at Issue or Operations identified in response to Interrogatory Nos. 1 or 2.**

**ANSWER:**    Defendant incorporates its objections to Interrogatories No. 1 and No. 2 and makes those objections in response to this Interrogatory. Defendant further objects to this Interrogatory on the ground that it is overboard, as it is not constrained or limited in time, and as it seeks to encompass information that has no bearing on the issues in this litigation. Defendant objects to this Interrogatory to the extent it calls for a legal conclusion. Defendant objects to this Interrogatory to the extent it assumes any action or inaction by the Defendant. Defendant objects to this Interrogatory to the extent it seeks information protected by trade secret or other confidentiality, or to the extent it seeks information that is subject to privilege, such as the attorney-client privilege or the work product doctrine.

Subject to and without waiving any objections, Defendant answers as follows.

**A copy of Givaudan's Records Management Program Manual can be found at (XXX).**

47

22.    Identify all Response Action costs for which You seek recovery in this litigation and for each, describe the purpose for which those costs were spent and what documentation You have establishing that You incurred and paid those costs.

**ANSWER:**    Defendant objects to this Interrogatory to the extent it is premature and seeks trial strategy and proofs. Defendants objects to this Interrogatory to the extent it assumes any action or inaction on the part of the Defendant. Defendant objects to this Interrogatory because it is vague, as the term "Response Action" is undefined. Defendant objects to this Interrogatory to the extent is calls for a legal conclusion. Defendant objects to this Interrogatory to the extent it seeks information that is protected by privilege, such as the attorney-client privilege or the work product doctrine.

Subject to and without waiving any objections, Defendant answers as follows.

**Givaudan objects to this Interrogatory as premature because no counterclaims or third-party claims have been asserted in this litigation and because the pending motions to dismiss will impact the type and scope of claims at issue. Givaudan reserves the right to supplement this response as necessary.**

23.    Identify and Describe all settlements related to claims for environmental liability pertaining to any Property at Issue or Operations identified in response to Interrogatories Nos. 1 or 2 with non-parties (including, but not limited to Defendants voluntarily dismissed from the current litigation and governmental entities) regarding any Properties at Issue.

**ANSWER:**    Defendant incorporates its objections to Interrogatories No. 1 and No. 2 and makes those objections in response to this Interrogatory. Defendant objects to this Interrogatory on the ground that it is overbroad, as the term "Property at Issue" is defined as *any* property identified and alleged in Plaintiff's Complaint that is or has been owned or operated by *any* defendant at *any* time. Defendant objects to the Interrogatory to the extent it assumes any action or inaction by Defendant.

Defendant objects to this interrogatory to the extent it seeks information protected by trade secret or other confidentiality, or to the extent it seeks information that is subject to privilege, such as the attorney-client privilege or the work product doctrine. Defendant further objects to this Interrogatory on the ground that it is overbroad, as it seeks to encompass information that has no bearing on the issues in this litigation. Defendant objects to this Interrogatory because it is vague, as the term "environmental liability" is undefined.

Subject to and without waiving any objections, Defendant answers as follows.

**Givaudan entered into a settlement with the State of New Jersey in *New Jersey Department of Environmental Protection v. Occidental Chemical Corporation* (Docket No. ESX-L-9868-05) (New Jersey Superior Court, Essex County).**

**24.    Identify any property or facility, other than a Property at Issue, located within the Lower Passaic River Study Area as depicted in Attachment 1, at which You conducted Operations.**

<u>**ANSWER:**</u>    Defendant objects to this interrogatory to the extent it is overbroad, , as it is unconstrained in time and as it seeks to encompass information that has no bearing on the issues in this litigation. Defendant objects to this Interrogatory because it is vague, as the term "Identify" is defined only as relating to persons or business entities and to documents.

Subject to and without waiving any objections, Defendant answers as follows.

**Not applicable.**

## <u>CORPORATE CERTIFICATION</u>

49

## CORPORATE CERTIFICATION

I, Richard Wroblewski, am the authorized agent for Givaudan Fragrances Corporation, and I sign the foregoing Answers to Interrogatories for and on behalf of Givaudan Fragrances Corporation. The answers to Interrogatories are not within the personal knowledge of the undersigned, but the facts stated in the foregoing answers to Interrogatories have been assembled by counsel and employees of Givaudan Fragrances Corporation, including the undersigned, and the matters set forth in the aforesaid answers to Interrogatories are in accordance with the information available and are true, insofar as it is possible to verify them. Those with personal knowledge of the facts set forth in the Answers are identified therein or in the documents previously provided in the Response to the Request for Production of Documents. I am aware that if any of the foregoing statements are willfully false, I am subject to punishment.


Dated: July 11, 2019                    *Richard Wroblewski*

50