# Exhibit 31



**Conflict Prevention and Resolution Services**

**Contract # 68HERH19D0033**

# Revised Work Plan and Pricing Estimate for Task Order Request #013

# Diamond Alkali-Lower Passaic River Allocation

Original submitted: September 3, 2019
Revised: September 12, 2019

Prepared for: U.S. Environmental Protection Agency, Washington, DC 20460

| EPA Customer | EPA Region 2 |
|---|---|
| EPA Task Order Contracting Officer's Representative (TOCOR) | Alice Yeh, EPA Region 2<br>212-637-4427<br>yeh.alice@epa.gov |
| ERG Task Order Manager (TOM) | Laura Bachle<br>703-841-1705<br>laura.bachle@erg.com |
| Period of Performance | Task Order Issuance to October 30, 2020 |

# Contents

1. Overview and Pricing Summary
2. Background
3. Assumptions
4. Project Methods and Approach
5. Work Tasks
6. Reports, Transmittals, and Deliverables
7. Staffing Plan
8. Quality Management
9. Conflict of Interest
10. Detailed Pricing Estimate

## 1.  Overview and Pricing Summary

This work plan describes ERG's approach for performing the tasks described in the statement of work (SOW). It includes a description of the activities associated with each task as well as a list of transmittals and deliverables and their due dates.

Table 1 provides a summary of ERG's proposed hours and pricing. Section 10 provides a more detailed breakout of pricing by subtask, labor categories, and other direct costs (ODCs).

Table 1. Summary of Proposed Hours and Pricing

| Contract year | Hours | Price |
|---|---|---|
| Year 1 | 4,559 | $1,294,305 |
| **Total Task Order, All Years** | 4,559 | $1,294,305 |

## 2.  Background

The lower 8.3 miles of the Lower Passaic River are one of four Operable Units (OUs) of the Diamond Alkali Superfund site. This OU is designated as OU2. The site has been on the National Priorities List since 1984. Contaminated sediments in this portion of the river are a significant source of contamination to the rest of the river down to Newark Bay. Contaminants including dioxins, mercury, PCBs, and DDT and its breakdown products can accumulate in in aquatic life and pose an unacceptable risk to human health and the environment.

Under an administrative order on consent (AOC), Occidental Chemical Corporation (OCC) is performing the remedial design for this OU. The cost for remedial action (RA) is estimated at $1.38 billion. EPA Region 2 has issued a notice of potential liability to approximately 100 parties and has offered a first round of cash-out settlements to approximately 20 potentially responsible parties (PRPs). Region 2 will address the liability of municipalities and public entities separately.

Under this TO, a third-party allocator will support Region 2 in assigning a share of responsibility to 83 non-public, non-municipal PRPs (representing 97 facilities) not included in the first round of cash-out settlements. The results of the allocation will be used to enter into settlement agreements with the

subset of PRPs with the greatest share of responsibility to perform the RA and enter into another round of cash-out settlements. This effort will be based in part on existing information and contacts generated from previous attempts to develop a mutually acceptable allocation of liability.

This is an ongoing project with a well qualified service provider already in place under a previous contract. ERG has selected the same service provider, AlterEcho, as the most effective way to continue the work.

## 3.  Assumptions

This work plan and pricing estimate are based on the following assumptions:

### General Assumptions

- Activities and pricing are included for the entire 13-month period of performance.
- ERG reserves the right to adjust the amount of the budget for general task order management if the contract and task order periods of performance are extended beyond the current period of performance.
- This TO can be modified to change the statement of work or add funding.

### Understanding of the Work

ERG's work plan and pricing estimate reflect our team's understanding of what work has already been completed on this allocation project and what work remains to be done. As the project has evolved, some key numbers and factors have changed, such that this estimate may differ from previous projections regarding the level of effort needed to complete the tasks envisioned in the SOW. Specific factors that have evolved include:

- An increase in the number of facilities that must be calculated an equitable share, from 83 to 92 (+11%). Each additional facility requires a separate allocation analysis and all the effort associated with that.
- The impact of Occidental (OCC) not being a participating party (as had been anticipated) and of OCC filing a lawsuit against PAPs. This change in OCC status has substantially changed the responsibility of the Allocation Team to ensure integrity and equity of the allocation. The Allocation Team is required to "stand in the shoes" of OCC in considering the volume of data and arguments proposed by PAPs regarding OCC responsibility in order to appropriately balance equities in allocation analysis. If OCC was participating, the Allocation Team would not have this responsibility. Further, this fact of litigation significantly complicates communications and other considerations regarding maintaining confidentiality. It forces the Allocation Team to take on responsibility for considering EPA's concerns and settlement preferences without the ability to communicate openly with EPA.
- Experience our team has obtained with the level of anticipated interaction required with PAP counsel. This includes our team's current knowledge regarding the volume of comments that will be received and that will require analysis and confirmation—including Position Briefs, Response Briefs, and Draft Allocation Recommendation Reports.

- Perspectives our team has obtained regarding the complexity of the required allocation analysis and the impact of efforts required to ensure credibility of allocation for future judicial review. Complicating factors include:
  - The amount of missing facility operation and contaminant discharge data, significant inconsistency of available data across the PAP facilities, and the need for equitable analysis to discern appropriate surrogate data.
  - The pervasiveness of historic fill at facility locations. During earlier settlement efforts, our team gained knowledge regarding the complexity of required data analysis to determine both the scope of historic fill and the potential for disruption causing movement of COCs to match allocation requirements.
  - Issues related to OCC, including the sheer volume of data received from PAPs to review and take into consideration. There are also complexities of equitable considerations given the role of OCC in driving a need for and cost of remedy in relation of other PRPs, to ensure a judicially confirmable allocation.
  - Sewer system operation. Our team has gained knowledge regarding the complexity and multiplicity of overflow valves and bypasses and each facility's specific connections and historic uses of system. Issues include the impact of weather events on routine use of overflows/bypasses and the location of PRP facilities across multiple sewer sheds serviced by different municipalities with dedicated overflows/bypasses operated via varying policies and procedures.
  - History of Corps of Engineers (COE) dredging. Our team has obtained knowledge regarding a multiplicity of dredging events over an extended period of time. Different dredging events have varied with respect to area and sediment removal impacts, which in turn varies the potential for contaminant removal.
  - The diverse hydrology of impacted area. The team has gained expanded knowledge regarding the diversity of pathways for fate and transport of contaminants to Operable Unit 2, as well as knowledge regarding tidal influences on the system.

## Task A: Preliminary Work

- General task order management activities include development of monthly progress reports and invoices, regular status check-in calls with the TOCOR, ongoing updates of progress and financial data in ERG's project tracking system (as required under ERG's CPRS contract), and development of the task order final report.

- The Task Order Manager (TOM) estimate includes 2 hours to connect with and onboard the selected service provider; 10 hours to develop this work plan; and 10 hours for general management, including subcontractor coordination, review of key deliverables as needed (including the required TO closeout report), check-ins with EPA as needed, and required progress reporting and invoice review.

- ERG's Project Manager (PM) provides overall quality assurance. The PM estimate includes review and consultation on work plan development, deliverable review, and any challenging issues that may arise.

- ERG's administrative staff estimates include hours for preparing this work plan, setting up a subcontracting agreement, processing subcontractor invoices, setting up this TO and recording the necessary monthly data in ERG's project tracking system, and generating monthly invoices and progress reports.

## Task B: Allocation Design and Production

- A maximum of 83 PRPs will be provided an opportunity to participate in or be evaluated for the purpose of determining a share of responsibility in the allocation process. They are designated herein as Allocation Parties. Ten of these PRPs are non-participating parties.

- The allocation will cover a maximum of 92 facilities associated with the 83 Allocation Parties.

- All OU2 Allocation Parties will be designated a share of responsibility in the Final Allocation Recommendation Report.

- All OU2 PRPs which have agreed or agree in the future to participate in the allocation by executing the OU2 Allocation Guide and Confidentiality Agreement (Participating Allocation Parties or PAPs) will be provided an opportunity to participate in the design of the allocation database and process and to provide additional site-related information for possible addition to the database.

- The Final Allocation Recommendation Report will divide the Allocation Parties into logical groupings of similarly-situated PRPs

- EPA will provide the ERG Team with a listing and contact information for each OU2 PAP. Reference herein to meetings or other forms of communication with the OU2 PAPs means communication with the identified representatives of such parties.

- A maximum of 593,895 pages of documents will be reviewed and utilized to conduct the allocation, including:

  o A maximum of 130,000 pages of documents received from EPA for ERG Team review under the previous contract.

  o A maximum of 413,895 extra pages of documents received from PRPs for ERG Team review under the previous contract.

  o The PAPs have indicated to the ERG Team that they have an additional 50,000 pages of relevant documents to submit over the remainder of the project.

- At the time of termination of the prior Task Order, the contractor was awaiting notice from EPA on its determination regarding an offer of Early Settlement to 20 of the PAPs. Consequently, the contractor was unable to complete Draft Facility Data Reports for the PAPs being considered for a possible EPA Early Settlement offer. Therefore, Draft Facility Data Reports for such PAPs will be completed pursuant to the current work plan. The timing of EPA's determination regarding Early Settlement offers may affect the contractor's ability to complete the tasks specified in Tasks B4 and B5 within specified deadlines. For the Work Plan, the ERG Team is assuming receipt of notice of EPA's determination regarding Early Settlement offers on or before October 31, 2019.

- All communications by the ERG Team will be by phone or email unless a meeting is noted.

- The ERG Team estimates 4 hours of communications per PAP over the remainder of the project. This time is presented as communications in Tasks B3, B4, and B5, and meetings in Tasks B5 and

B6. This partially responds to the PRP outreach requirements specified in Section II.B.2 of the SOW.

- A maximum of 4 hours of combined project status/update calls will be held by the ERG Team with EPA per month. ERG assumes these calls will be held on a weekly basis. This time is included under Task A3.

- The allocation database will be designed and organized primarily for purposes of allocation.

- Any part of a communication, attachment to a communication, presentation, or written material provided to OU2 PRPs by the ERG Team that involves a description of the site or EPA actions or activities will be provided to EPA for review and approval prior to submission to the OU2 PAPs.

- Unless otherwise noted herein, all allocation-related communications by the ERG Team involving the OU2 PAPs or representatives of EPA or DOJ, individually or in groups, will be held confidential pursuant to the provisions of the ADR Act of 1996, 5 USC 574.

- In order to ensure a common expectation of confidentiality, all PAP participants in the allocation process have entered, and EPA has appropriately acknowledged, a confidentiality agreement.

## Pricing Estimate

- All labor has been priced at ERG's Year 1 contract rates, given the expected period of performance for this work.

- The specialized nature of this work means there are very few individuals who are well qualified to do it. Thus, the market rate for these experts is high. Accordingly, several of these individuals fit into the labor category "Scientific/Technical Consultant or Analyst - Level 3A," which—because of its high rate—requires case-specific approval from the Contracting Officer to use. We hereby request permission to use this labor category for this TO.

- To offset some of the cost, ERG is able to offer a discount of 32 percent on the aforementioned labor category, relative to ERG's contract-level rate schedule. This discount applies to this TO only.

- Travel:

  o Key project meetings will be held at the EPA Region 2 office or another location in the greater New York City metropolitan area as determined by EPA, or hosted by OU2 PAPs if they supply meeting space. These meetings will require travel for ERG's selected service provider, whose key staff for this project are located in the Washington, DC, area.

  o Four meetings, each involving two staff from ERG's selected service provider, are assumed. Two of these four meetings will require overnight stays.

- Space and equipment for meetings will be provided by EPA or PAPs.

- ERG has included costs for long-distance calling on Task A. This ODC covers the cost of conferring with EPA TOCORs/etc. and service providers.

- Our pricing estimate also includes two service center allocations described below. These allocations are applied per hour of ERG labor, in accordance with our disclosed accounting practice approved by the Defense Contract Audit Agency, and in accordance with ERG's CPRS

contract. We charge these costs across all projects that benefit from the use of these shared resources. These costs are not included in ERG's indirect overhead rate pool.

- o One of these allocations covers the cost of computer equipment and general software licensing (e.g., Windows operating system, Microsoft Office). This charge is allocated at a current rate of $1.52 per hour of ERG labor.

- o The other allocation covers local telephone access, include facsimile costs, telephone voicemail and other system costs, and telephone equipment depreciation. This charge is allocated at a current rate of $0.34 per hour of ERG labor.

- It is ERG's disclosed accounting practice to charge our currently accepted general and administrative (G&A) rate to all ODCs. In accordance with ERG's disclosed accounting practice, ERG will apply our most currently accepted provisional Subcontractor Overhead rate to all allowable subcontractor and consultant ODCs incurred under any resultant contract.

## 4.   Project Methods and Approach

ERG's general approach to this TO consists of the following steps:

- ERG has prepared and submitted this work plan and a pricing estimate. We will proceed to perform work described in the following SOW tasks upon issuance of the TO by the Contracting Officer.

- As agreed upon with EPA, all reports, transmittals and deliverables—with the exception of Items B-2, B-3, B-5 and B-6 in Table 3—will be submitted to the TOCOR and Project Officer (PO).

- ERG will be responsible for evaluating the service provider's performance at the end of the project and during the project if it lasts through the annual contract evaluation performance schedule.

- ERG understands that during the performance of this work, Region 2 may share information with the ERG Team that is pre-decisional and deliberative or is considered to be attorney work product in preparation of potential litigation. ERG recognizes that such work is privileged to the United States and EPA under the Freedom of Information Act. While the ERG Team will conduct the allocation process in a manner transparent to the public to the extent possible, the ERG Team will consult with EPA before releasing information to the public to ensure confidential information is protected.

In conducting this work, ERG will comply with all terms in the overall contract, including—but not limited to—the following requirements:

- ERG and subcontractor AlterEcho (ERG Team) will not interpret EPA policy on behalf of the EPA or make decisions on items of policy, regulation or statutes. The ERG Team also will not take a stand on the merits of substantive items under discussion.

- In gathering information or performing research with parties outside the EPA, ERG Team members will identify themselves as contractors to EPA and not as EPA employees.

- ERG will approach this task in accordance with the basic terms of the contract and according to the established norms and ethical standards of ADR professionals. Specifically, ERG will ensure that ADR professionals supporting this TO abide by ethical codes of conduct such as those defined in the SOW. Information provided to the ADR professional by any of the parties,

communications between parties and the ADR professional, and notes and dispute resolution work product generated by the ADR professional during work pursuant to the TO will be maintained as confidential by the ADR professional pursuant to the provisions of the ADR Act of 1996 (Public Law 104-320; 5 USC 571 et al.) and applicable federal, state, and judicial requirements.

- To enhance the positive substantive, relational, and procedural outcomes from ADR cases, ERG will direct all ADR professionals providing services under this TO to do the following prior to the mediation or facilitation and throughout the process:

  o Inquire about whether individual participants have the time, financial, and logistical resources necessary to participate effectively in the process and—where resources are inadequate—assist them in identifying appropriate resources or in making necessary adjustments to the process to accommodate resource constraints.

  o Assist the participants in identifying the issues that are important to resolving any controversy and solutions that will address the needs shared by the participants.

  o Conduct the process to promote active engagement from all participants.

  o Explore with the participants appropriate ways to incorporate high quality and relevant information resources necessary to resolve the issues.

  o To support productive dialogue and effective implementation of any agreements reached by the participants, ensure that participants have appropriate authority to make commitments on behalf of their organizations.

- Obtain approval in writing for any long-distance travel.

As prime contractor, ERG will support this TO through the following activities:

- Provide monthly progress reports by the 15th of each month.
- Communicate and coordinate with the EPA TOCOR as needed.
- Coordinate with the subcontractors.
- Incorporate the principles of quality management while carrying out this task.
- Provide deliverables in electronic format (as agreed to by the TOCOR) to the EPA TOCOR.
- Notify the EPA PO and TOCOR when 75 percent of the funds provided have been expended or funding for less than six weeks of work remains.

## 5. Work Tasks

### Task A: Preliminary Work

#### Task A1: Select Dispute Resolution Professionals

ERG will select a team of experienced senior dispute resolution professional to provide all support under this TO, in consultation with the TOCOR and PO. Service provider selection will be based on the team's knowledge of the Superfund allocation of liability process; experience constructing allocation plans consistent with EPA settlement guidelines and legal requirements; access to resources for database

design, entry, analysis, and manipulation; and, understanding of the PRP legal and technical issues and concerns in designing allocation processes. Based on these qualifications, and prior experience, ERG has selected AlterEcho as the service provider. AlterEcho provides technical continuity, historical knowledge, and relevant experience.

## Task A2: Develop Work Plan

ERG has developed this work plan to provide a detailed explanation of all activities associated with and a proposed approach for completing each of the defined tasks. The ERG Team has identified the transmittals and deliverables and their associated due dates and developed a detailed budget, including a breakout of labor hours and other direct costs. This work plan also identifies quality assurance/quality control procedures, conflict of interest (COI) assurances for all ERG Team members, and procedures for substitution of labor categories in the event of temporary or permanent personnel changes. We will proceed to perform work described in the following SOW tasks only upon issuance of the TO by the Contracting Officer.

## Task A3: Oversee Deliverables

In accordance with proper contract implementation, ERG and the selected subcontractor will ensure effective oversight and management of the resources and deliverables required by EPA. Specifically, the ERG TOM for this effort will:

- Ensure that all technical direction received falls into the scope of work prior to initiating any action.

- Ensure completion and maintain copies of all contract transmittals and deliverables.

- Assist in resource planning, and manage the budget and hours on a regular basis to ensure accurate and effective financial tracking.

- Oversee subcontractor activities through regular and periodic conversations with the subcontractor to ensure effective performance.

- Ensure that monthly progress and financial reports accurately record the level of effort expended, clearly articulate the work completed and work planned for the subsequent month, clarify any lagging subcontractor costs, and identify any problems encountered and activities to address them.

- Speak on an as-needed basis with the EPA TOCOR to review the financial and work status of the project. ERG assumes that conference calls will be held as often as weekly.

- Review the first progress report and invoice with the EPA TOCOR.

- Update ERG's management tracking system on an ongoing basis.

**Table 2. Transmittals and Deliverables Under Task A**

| Item | Title | Due no later than | Type |
|------|-------|-------------------|------|
| A-1 | Work plan | August 30, 2019 | Deliverable |
| A-2 | Monthly progress reports | 15th of each month** | Deliverable |

\*\*ERG will not prepare or submit a progress report in months when no substantive work has been performed.

## Task B: Allocation Design and Production

### Task B1: Initial Review

Under the previous contract, EPA provided the contractor with the information, materials, and reports generated pertaining to the allocation. AlterEcho organized and reviewed this information under that contract. No further activity or level of effort is anticipated for this task.

### Task B2: PRP Outreach

Throughout the course of the allocation, the ERG Team will conduct outreach to OU2 PRPs participating in the allocation to provide them with the opportunity to comment on and correct the draft data reports produced under the previous contract and to provide input on the drafting of the allocation recommendation report. This will include:

- Ensuring that each PRP's data or information used in the allocation is correctly input into the database.
- Soliciting PRP positions on the drafting of the allocation recommendation report.
- Communicating how their input was or was not taken into consideration in developing the allocation recommendation report.

The activities and level of effort associated with the PRP outreach activities described above are directly linked to the Allocation Design and Production task described below. They are incorporated into the descriptions and estimates for those tasks.

Per Section II.B.2.b of the SOW, the ERG Team will prepare and provide to EPA a report regarding outreach efforts conducted with the OU2 PAPs during the entire project, including a list of participants in outreach efforts, a description of topics discussed, and a summary of issues or concerns raised.

This task will require the following efforts on the part of the ERG Team:

- Review and provide EPA with a generalized description of topics discussed and summary of issues or concerns raised by OU2 PAPs during conduct of the TO, without attribution to individual OU2 PAPs.
- Prepare and provide EPA an overview of conducted outreach efforts, including a list of OU2 PAPs that have participated in outreach meetings, conference calls, or individual communications with the ERG Team.

### Task B3: Searchable Database

Per Section II.B.3 of the SOW, the ERG Team will maintain and update the searchable database developed under the previous contract. The searchable database contains and organizes all of the information and data used in the allocation.

- Under the previous contract, the database was designed and initially populated with information received from EPA, including PRP disclosure statements and nexus documents from third party litigation totaling approximately 130,000 pages.

- Under the previous contract, the database was also populated with up to 413,895 pages of documents received from PRPs deemed relevant to the allocation by the previous contractor and any other information used in the allocation.

- The database is designed in such a way as to allow access and use by EPA and DOJ staff for their settlement purposes.

- Completion of database: The ERG Team will upload applicable new documents received as part of the TO activities. The PAPs have indicated to the ERG Team that they have an additional 50,000 pages of relevant documents to submit. The ERG Team will complete the database and provide the completed database to EPA when the final allocation recommendation report, described in Task B7, is complete.

### Task B4: Draft and Final Facility Data Reports

Per Section II.B.4.a of the SOW, the ERG Team will organize and conduct a technical and scientific evaluation of data in the allocation database to develop individual data reports for each of the OU2 PAP facilities for which an early settlement was not offered by EPA. Under the previous contract, 72 Draft PRP Data Reports were completed and made available to the PAPs for submission of corrections or suggestions. At the time of termination of the prior contract, the contractor was awaiting notice from EPA on its determination regarding an offer of Early Settlement to 20 additional PAPs. Consequently, the contractor was unable to complete Draft Facility Data Reports for the PAPs being considered for a possible EPA Early Settlement offer. Therefore, Draft Facility Data Reports for such PAPs will be completed pursuant to this work plan. For the this work plan, the ERG Team is assuming receipt of notice of EPA's determination regarding Early Settlement offers on or before October 31, 2019. The Draft Facility Data Reports for the 20 Early Settlement facilities will supplement existing limited scope data reports prepared for those facilities to support the Early Settlement evaluation process and criteria. This will include review and evaluation of additional Facility Questionnaire information and supporting documents to be submitted and expanding the depth of data review focused on mass of contaminants associated with the facility. The reports will provide selected information regarding each OU2 PAP's relation to OU2 and OU2 contaminants of concern that will be used in conduct of the allocation. The ERG Team will establish a deadline of 10 business days from receipt of the Draft Facility Data Reports for submission of corrections or suggestions by the OU2 PAPs for improving the quality of the received Draft Facility Data Reports.

This task will require the following efforts on the part of the ERG Team:

- Conduct coding of data and loading of coded data obtained from OU2 PAPs into database.

- Review preliminary factual submission by OU2 PAPs.

- Review site data loaded into database to determine appropriate organization for allocation.

- Compile and organize site data in database to support allocation analysis and share computations.

- Organize data in allocation database into and draft individual OU2 PRP data reports for each of the OU2 PAP facilities for which an early settlement was not offered by EPA (up to 20 facilities).

- Provide a copy of the Draft Facility Data Reports to the OU2 PAPs for review.

Timing of this task is dependent upon receipt of notice of EPA's determination regarding Early Settlement offers on or before October 31, 2019.

Conduct of this task is dependent upon the following factors:

- Access by the ERG Team to EPA technical data regarding site conditions and the selected OU2 remedy.

- Sufficient data on identified PRPs to allow analysis of associated contaminants of concern and hazardous substance fate and transport at the site.

- Successful establishment of the allocation database.

- Receipt of additional data from OU2 PAPs for inclusion in the allocation database within established timeframes. As indicated in the Assumptions section of this Work Plan, it is assumed that there are an additional 50,000 pages of relevant documents to submit over the remainder of the project.

Per Section II.B.4.c of the SOW, the ERG Team will analyze corrections or suggestions for improving the quality of the Draft Facility Data Reports received from OU2 PAPs to determine whether modifications of the original draft data reports are warranted. Based on this analysis, the ERG Team will modify the data reports, as deemed appropriate. The ERG Team will then provide a copy of all of the Final Facility Data Reports to the OU2 PRPs, with an explanation of how suggested changes were, or were not, incorporated.

This task will require the following efforts on the part of the ERG Team:

- Analyze received suggestions and corrections to Draft Facility Data Reports in relation to existing Site data and the final allocation design in order to determine appropriate modifications.

- Modify the individual data reports, as warranted based on the above analysis.

- Provide an explanation to the OU2 PAPs regarding whether, and if so how, received suggestions resulted in changes to their individual data report, including a description of why their suggestions and comments were, or were not, taken into account. Upload Final Facility Data Reports to the confidential allocation document repository.

- As required, the ERG Team will conduct communications with individual OU2 PAPs to answer questions regarding their Final Facility Data Reports.

Timing of this task is dependent upon the following factors:

- Receipt of comments from OU2 PRPs regarding their Draft Facility Data Reports within established timeframes.

- Receipt of notice of EPA's determination regarding Early Settlement offers on or before October 31, 2019.

*Task B5: Allocation and Report*

The ERG Team will ensure that each PRP's data or information used in the allocation is accurately input into the database and will solicit from the PRPs participating in the allocation positions on the drafting of the allocation recommendation report (as described below). AlterEcho will perform the allocation. The activities and level of effort associated with performing the allocation are directly linked to the subtasks described below. They are incorporated into the descriptions and estimates for those tasks.

Per Section II.B.5.a and b of the SOW, the ERG Team will prepare a first draft of the allocation recommendation report and submit it to the OU2 PAPs for review. The draft allocation report will designate shares of responsibility among the OU2 PRPs, as appropriate based on the allocation analysis. The draft allocation report will include a recommendation on the possible grouping of the OU2 PRPs into tiers of similar levels of responsibility.

This task will require the following efforts on the part of the ERG Team:

- Conduct communications, including conference calls and/or meetings, with OU2 PAPs regarding recommendations on and legal/equitable theories pertinent to conduct of the allocation raised in Position and Response Briefs received from the OU2 PAPs. The ERG Team will focus on establishing routine group communication calls and electronic updates to achieve greater efficiency in communication and as a means to reduce individual PAP-initiated calls and electronic inquiries.

- Review and consider input regarding allocation received from the OU2 PAPs and EPA.

- Review and understand the basis for EPA's selected remedy for OU2, in consultation with EPA technical and legal personnel.

- Analyze the relative toxicity of materials discharged by OU2 PRPs and other differentiating factors, including fate and transport of hazardous substances released by PRPs based on the data contained in the RI/FS, in relation to the selected remedy.

- Compile and analyze allocation data related to each OU2 PRP, including contaminants of concern, to establish the relative impact of the actions of each OU2 PRP on the conditions that resulted in EPA selecting the OU2 remedy.

- Load compiled PRP data into allocation calculations to determine relative relationships among the OU2 PRPs.

- As appropriate, establish appropriate tiers of OU2 PRP responsibility based on calculations and consideration of equitable factors.

- Prepare the draft allocation recommendation report.

- Submit the draft report to the OU2 PAPs for review and comment.

Timing of this task is dependent upon receipt of position briefs and reply briefs regarding allocation from OU2 PAPs within established timeframes.

Per Section II.B.5.c of the SOW, the ERG Team will plan, schedule, and conduct a meeting with the OU2 PAPs as a group regarding the draft allocation recommendation report. The purpose of the meeting will be to advise the OU2 PAPs as a group regarding the draft allocation recommendation report and to obtain preliminary PAP comments regarding the draft allocation recommendation report. The ERG Team

will also communicate with the OU2 PAPs individually as necessary to obtain the input of OU2 PAPs, including those that did or were unable to attend the meeting, regarding the draft allocation recommendation report. As noted previously, the ERG Team will focus on establishing routine group communication calls and electronic updates to achieve greater efficiency in communication and as a means to reduce individual PAP initiated calls and electronic inquiries.

This task will require the following efforts on the part of the ERG Team:

- Making arrangements for a meeting in the greater New York City metropolitan area sufficient to accommodate the OU2 PAPs as a group.
- Coordination of meeting space and equipment for meetings provided by EPA or OU2 PAPs.
- Communication via email with the OU2 PAPs regarding substance, date/time, and location of meeting.
- Development of the meeting agenda.
- Development of participant materials, as needed.
- Travel of two senior staff from Washington, DC, to attend the meeting.
- Communications by a Dispute Resolution Professional via phone, email, or other electronic media with OU2 PAPs as required.
- Recording of PAP general comments regarding the draft allocation recommendation report, without attribution to individual OU2 PAP comments.

Per Section II.B.5.c of the SOW, the ERG Team will prepare a Final Allocation Recommendation Report. The Final Allocation Recommendation Report will take into consideration comments on the Draft Allocation Recommendation Report received during meetings with and received in position and reply briefs from the OU2 PAPs and during communications with EPA regarding the nature and scope of the Final Allocation Recommendation Report.

This task will require the following efforts on the part of the ERG Team:

- Review and consider the comments received from OU2 PAPs regarding the Draft Allocation Recommendation Report.
- Conduct communications, including conference calls and/or meetings, with OU2 PAPs regarding comments regarding the Draft Allocation Recommendation Report received from OU2 PAPs.
- Edit the Draft Allocation Recommendation Report to incorporate appropriate modifications based on received comments to produce the Final Allocation Recommendation Report.

The ERG Team will provide access the OU2 Allocation Database to identified members of the EPA Case Team. This task will require the following efforts on the part of the ERG Team:

- Submission to members of the EPA Case Team Review of credentials and instructions for accessing information in the OU2 Allocation Database.

*Task B6: Meetings or Conference Calls*

The activities and level of effort associated with performing the allocation are directly linked to the other tasks in this work plan. They are incorporated into the descriptions and estimates for those tasks as noted. The ERG Team will attend and participate in the following meetings either in person or by telephone or video conference at EPA's discretion.

- Progress meetings or conference calls. Please see Task A2 of this work plan.
- Kickoff meeting or conference call with EPA. Please see Task A2 of this work plan.
- Draft allocation recommendation report meeting or conference call with PRPs. Please see Task B5 of this work plan.

It is anticipated that all meetings will be held at EPA or PRP-provided facilities.

*Task B7: Final Allocation Recommendation Report*

Per Section II.B.7 of the SOW, the ERG Team will design and produce the first draft of a report regarding the conduct of tasks pursuant to the TO and submit it for review by EPA. The report will not contain any confidential or sensitive information. The contents of the Draft Task Order Closeout Report will include:

- A half-page description of the project that describes the nature of the project, the parties, the process, and the outcomes.
- If appropriate, a short section reflecting on the process and procedural lessons learned and recommendation for improvements and identification of those activities conducted that contributed to the success of the process.
- A brief summary of the final costs of the project, broken out by percentage of labor hours and other direct costs.

This task will require the following efforts on the part of the ERG Team:

- Review of project activities and compilation of a project summary.
- Consideration and compilation of thoughts on lessons learned regarding this project.
- Compilation of project budget costs.
- Preparation of the Draft Task Order Closeout Report.

The ERG Team will prepare a Final Task Order Closeout Report and submit it to EPA. The Final Task Order Closeout Report will take into consideration comments received from EPA regarding the draft of the Task Order closeout report. ERG will provide one copy of the Final Task Order Closeout Report to the PO and one copy to the TOCOR in electronic format.

This task will require the following efforts on the part of the ERG Team:

- Review and consideration of comments by EPA regarding the draft Task Order Closeout Report.
- Editing, and as required redesign, of the closeout report to incorporate modifications based on EPA comments in order to produce the Final Task Order Closeout Report.

- As directed by the TOCOR, the ERG Team will participate in a post-process debriefing with EPA officials to discuss lessons learned and potential next steps.

Per discussions with EPA, while the Final Allocation Report is referenced under this task in the EPA SOW, report development is not included under this task, but rather under Task B5.

## Task B8: Post-Process Debriefing

As directed by the EPA TOCOR, the ERG Team will participate in a post-process debriefing with EPA officials, including the PO, TOCOR, and relevant EPA management, to discuss lessons learned and next steps. It is anticipated that this meeting will take place via teleconference.

Table 3. Transmittals and Deliverables Under Task B

| Item | Title | Due no later than* | Type |
|------|-------|--------------------|------|
| B-1 | Kickoff meeting or conference call | Within 20 business days of work plan approval | Activity |
| B-2 | Completion of searchable database | Upon submission of final allocation recommendation report | Deliverable |
| B-3 | Completion of final facility data reports | Within 40 business days of work plan approval | Transmittal |
| B-4 | Perform allocation | 140 business days after completion of final facility data reports | Activity |
| B-5 | Draft allocation recommendation report | 140 business days after completion of final facility data reports | Transmittal |
| B-6 | Draft allocation recommendation report meeting | Within 20 business days of submittal of draft allocation recommendation report | Transmittal |
| B-7 | Final allocation recommendation report | 65 business days after completion of draft allocation recommendation report | Deliverable |
| B-8 | Final PRP outreach report | 10 business days after completion of final allocation recommendation report | Transmittal |
| B-9 | Draft case closure report | 10 business days after acceptance of final allocation recommendation report | Transmittal |
| B-10 | Final case closure report | 10 business days after receipt of EPA comments | Deliverable |

## 6.    Reports, Transmittals, and Deliverables

ERG will submit deliverables in accordance with the contract. As agreed upon with EPA, with the exception of Items B-2, B-3, B-5 and B-6 in Table 3, copies of all contract deliverables will be sent to both the PO and the TOCOR. If oral briefings are scheduled for EPA staff, the PO will be notified in time to attend. Specific deliverables and the timing of their delivery are identified in the tables in Section 5 above.

## 7.    Staffing Plan

This task order will be staffed as described in Table .

**Table 4. Preliminary Staffing Matrix**

| Individual (firm)[1] | Labor category | Project role |
|---|---|---|
| Laura Bachle (ERG)* | Communications Specialist – Level 2A | TOM for this TO |
| Jan Connery (ERG) | Program Manager | Contract-level support and quality assurance |
| Trinita White (ERG) | Deputy Contract Administrator | Administrative assistance, financial tracking, execution of subcontractor agreement |
| Lisa Kennedy (ERG) | Deputy Contract Administrator | Process and track subcontractor invoices |
| Peter Frongillo (ERG) | Scientific/Technical Consultant or Analyst – Level 1B | Project assistant and TO financial data management support |
| David Batson (AlterEcho) | Dispute Resolution Professional - Level 3A | Senior allocation specialist; conduct allocation and prepare draft and final allocation recommendation reports; lead communication and meetings with PAPs |
| Mark Heaney (AlterEcho) | Scientific/Technical Consultant or Analyst-Level 3A | Subcontractor's project manager; quality assurance; deliverable preparation; draft and final facility data reports; draft and final allocation recommendation reports |
| Ann Schnitz, Ph.D. (AlterEcho) | Scientific/Technical Consultant or Analyst - Level 3A | Senior human health toxicologist; support performance of allocation |
| Mike Carney, Ph.D. (AlterEcho) | Scientific/Technical Consultant or Analyst - Level 3A | Senior ecological toxicologist; support performance of allocation |
| Rachel Shay (AlterEcho) | Scientific/Technical Consultant or Analyst - Level 1A | Researcher; maintenance of searchable database; preparation of draft and final facility data reports; preparation of PRP Outreach Report |
| Derek Lawrence (AlterEcho) | Scientific/Technical Consultant or Analyst - Level 2B | Researcher; preparation of draft and final facility data reports |
| Lynne Larsen (AlterEcho) | Scientific/Technical Consultant or Analyst - Level 1A | Researcher; preparation of draft and final facility data reports |
| Dan Michor (AlterEcho) | Communications Specialist Level 3 | GIS specialist; draft and final facility data reports; draft and final allocation recommendation reports |

| Individual (firm)† | Labor category | Project role |
|---|---|---|
| Holly Sprunger (AlterEcho) | Scientific/Technical Consultant or Analyst - Level 2B | Quality assurance; draft and final facility data reports; draft and final allocation recommendation reports data management |
| Pam Ginger (AlterEcho) | Administrative Clerical/Technical Support A | Administrative; monthly reports |
| Rachel Ireland (AlterEcho) | Scientific/Technical Consultant or Analyst - Level 2B | Researcher and data specialist; draft and final facility data reports; draft and final allocation recommendation reports data management |
| Amanda Rohrbaugh (AlterEcho) | Scientific/Technical Consultant or Analyst - Level 2B | Researcher and data specialist; draft and final facility data reports; draft and final allocation recommendation reports data management |
| Judy Manley (AlterEcho) | Scientific/Technical Consultant or Analyst - Level 3A | Data specialist; quality assurance; maintenance of searchable database; draft and final facility data reports; draft and final allocation recommendation reports |
| Karla Brasaemle (AlterEcho) | Scientific/Technical Consultant or Analyst - Level 3A | Contaminant fate and transport specialist; support allocation; draft and final allocation recommendation reports |
| Nicole Goers (AlterEcho) | Scientific/Technical Consultant or Analyst - Level 3A | Senior engineer; quality assurance; draft and final facility data reports; support allocation; draft and final allocation recommendation reports data management |
| Kristen Rapal (AlterEcho) | Scientific/Technical Consultant or Analyst - Level 3A | Researcher and data specialist; draft and final facility data reports; draft and final allocation recommendation reports data management |

† Note that team members other than those listed in the above table may work on this TO to complete the required work. If substitutions are necessary, ERG will make every effort to replace staff with appropriately qualified personnel in the same or lower cost labor category; however, this may not be possible because of time constraints and/or available personnel.

*The TO will be managed mainly by the TOM listed in Table 4. However, additional team members may conduct task order management activities to ensure coverage during periods when the TOM is unavailable (e.g., vacation, illness, business travel, time constraints). In the event of a temporary substitution, the ERG Project Manager or TOM will notify the EPA TOCOR and PO, in advance, of the nature and duration of the substitution.

## 8.    Quality Management

As part of routine quality assurance practices, the ERG TOM will:

• Communicate as needed with the TOCOR to review progress.

- Communicate regularly with the subcontractor(s) to receive project status updates.

In addition, all work on this TO will be performed in accordance with ERG's strict quality assurance practices including—but not limited to—incorporating quality management principles and processes described in ERG's Quality Management Plan into the development of the required transmittals, deliverables, and consulting services offered. ERG will ensure the timely delivery of all transmittals and deliverables.

## 9.    Conflict of Interest

ERG certifies that, to the best of our knowledge and belief, no real, apparent, or potential organizational or individual conflict of interest exists with this task order, based on previous or ongoing work, or other potential conflict. We recognize our continuing obligation to search and report any actual or potential personal and organizational conflicts of interest, should they arise during performance of work under this task order. ERG's official conflict of interest certification appears on the next page.

## CONFLICT OF INTEREST CERTIFICATION

**Eastern Research Group, Inc.**
**EPA Contract No. 68HERH19D0033**
**Task Order Request No.: 012**

In accordance with EPAAR 1552.209-71 (Organizational Conflicts of Interest), EPAAR 1552.209-73 (Notification of Conflicts of Interest Regarding Personnel), and Prime Contract clause (Work Assignment Conflicts of Interest Certification), Eastern Research Group, Inc. makes the following certifications:

ORGANIZATIONAL AND PERSONAL CONFLICTS OF INTEREST:

☒    To the best of our knowledge and belief, no actual or potential organizational conflicts of interest exist. In addition, none of the individuals proposed for work under this Order has any personal conflicts of interest.

OR:

☐    To the best of our knowledge and belief, all actual or potential organizational and personal conflicts of interest have been reported to the EPA Contracting Officer.

This is to certify that our personnel who perform work under this Order, or relating to this Order, have been informed of their obligation to report personal and organizational conflicts of interest to our designated COI Official.

Eastern Research Group, Inc. recognizes its continuing obligation to search for, identify, and report any actual or potential organizational or personnel conflicts of interests that may arise during the performance of this Order or work relating to this Order.

*Laura Bachle*
_____
Authorized Signature

Laura Bachle
_____
Printed Name

Task Order Manager
_____
Title

August 30, 2019
_____
Date

## 10.   Detailed Pricing Estimate

ERG's detailed pricing estimate begins on the next page.

# Exhibit 32

| | |
|---|---|
| **From:** | Yeh, Alice |
| **To:** | Young, Robert; Laura Bachle |
| **Cc:** | DeLuca, Kathryn |
| **Subject:** | Diamond Alkali: Questions on the Final Allocation Report |
| **Date:** | Thursday, February 4, 2021 2:19:00 PM |
| **Attachments:** | Questions on allocation report 2020-02-04 sent to AlterEcho.docx |

Here is the first batch of questions on the Final Allocation Recommendation Report.

<span style="color:red">Exemption (b)(3)(A)</span>

Let me know if you have any questions.

*Privileged/Confidential/Attorney-Client Communication/Attorney Work Product/ADR Act Confidential*

**Questions to AlterEcho on Final Allocation Recommendation Report**

*sent: 2/4/21*

<u>Questions for Written Response</u>

1. Where does AlterEcho think a non-participating party might take issue with the allocation process (either the process itself or the application of the process)?

2. OFT DMass was not calculated for about 35 Allocation Party facility sites where the information suggested an "extremely low probability" that any discharge would reach OU2 sediments based on these facility sites being in another watershed or above Dundee Dam.  What was the "extremely low probability" that was used as the criterion for this determination? (Page 22)

3. How much impact did historic fill have on the allocation shares? Was this a significant addition to the OFT pathway?

4. The determination of lessor liability results in a split of 25%/75% for the owner and the lessee.  What is the basis for this division? (Page 27)

5. The attenuation factor (A%) calculation assumed that close to 100% of dioxins in OU2 sediments were contributed by OCC: Does that assumption pre-judge the results of the allocation? How significant an assumption is this to the allocation as a whole?

6. The range of Culpability Factors is +/- 5%, +/- 10% or +/- 100%, and the range of Cooperation Factors is +/- 10% and +/- 20%.  What is the basis for these percentages? Why were other percentages, such as +/- 50%, not considered or used? (Pages 33-34)

7. Why was the term "orphan share" used in the report instead of "unallocated share"? When commenting on the allocation protocol/methodology, we discussed that AlterEcho was not tasked with calculating an orphan share, and nothing in the methodology/protocol or work plan provides for AlterEcho to calculate an orphan share or identify "orphan parties." EPA defines the term "orphan" in a specific way for settlement purposes, and the unallocated share in this allocation is not the same thing as an orphan share. To be sure, EPA guidance specifically excludes unattributable wastes (i.e., waste that cannot be specifically attributed to an identified party) from inclusion in any "orphan share."

8. The Outreach Report includes the following statement on p.5: "Operation of the Yantacaw CSO and the Newark Bay Bypass at the PVSC POTW; Clarification of years of operation of these valves resulted in their removal as sewer system discharge locations (Addressed by Allocator at FARR, p. 23-24). "

*Privileged/Confidential/Attorney-Client Communication/Attorney Work Product/ADR Act Confidential*

Assuming "Yantacaw CSO" refers to the Yantacaw Bypass, please explain why the Bypass was removed as a discharge location – or if this is an error or misunderstanding.  This does not appear to be addressed in the FARR on pp. 23-24 of the FARR, which says only the following about the Yantacaw Bypss: "1950-1962:  Changes made to elapsed time include:  Entry 2/7/1951 start bypass time incorrectly enter in Gail Koch report.  Entry for 10/1/1958 was moved to Union tab; and entry for 10/15/1959 end bypass incorrectly enter in Koch Report."  Attachment P, the Bypass Valve Worksheets, does include flow calculations for Yantacaw.

9. Why were OCC's remediation of OU1 and agreement to perform the OU2 remedial design not accounted for in the cooperation factor?

10. In the assignment of culpability and cooperation factors, OCC's failure to participate in the allocation (CUF = +20%) seemed to have been given twice as much weight as OCC's implementation of the Tierra Removal (COF = -10%). Is that a fair assignment, given that the Tierra Removal remediated the river and would have cost much more than participation in the allocation?

Question for Conference Call (Oral Response only)

1. Please walk through the calculation of Occidental Chemical Corp's share.  The walk through should show how input values were derived and how input values were combined to produce the Allocation Facility Cmass Calculation table in Appendix L (Facility Computation Sheets).

# Exhibit 33

| From: | Young, Robert |
|---|---|
| To: | Yeh, Alice; Laura Bachle |
| Cc: | DeLuca, Kathryn |
| Subject: | RE: Diamond Alkali: Questions on the Final Allocation Report |
| Date: | Thursday, February 4, 2021 3:31:38 PM |

Alice – confirming receipt.  I am forwarding these to David Batson and will let you know if we have any questions.

Thanks
Rob Young

---

**From:** Yeh, Alice <Yeh.Alice@epa.gov>
**Sent:** Thursday, February 4, 2021 1:19 PM
**To:** Young, Robert <Robert.Young@AlterEcho.com>; Laura Bachle <Laura.Bachle@erg.com>
**Cc:** DeLuca, Kathryn <deluca.kathryn@epa.gov>
**Subject:** Diamond Alkali: Questions on the Final Allocation Report

****CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.****

Here is the first batch of questions on the Final Allocation Recommendation Report.

Exemption (b)(3)(A)

Let me know if you have any questions.

# Exhibit 34



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
REGION 2
290 BROADWAY
NEW YORK, NY 10007-1866

September 11, 2018

**BY ELECTRONIC MAIL**

David R. Erickson, Esq.
Shook, Hardy & Bacon L.L.P.
2555 Grand Boulevard
Kansas City, MI 64108

Re:    Diamond Alkali Superfund Site - Operable Unit 2 Allocation Proceeding

Dear Mr. Erickson:

This will provide some background on the settlement framework developed by the Environmental
Protection Agency (EPA) for the lower 8.3 miles of the Lower Passaic River, which is Operable Unit 2
(OU2) of the Diamond Alkali Superfund Site (the Site), including the Agency's ongoing allocation, and
the importance of confidentiality.

On March 3, 2016, EPA issued the Record of Decision (ROD) selecting a remedy for OU2 to address
human health and environmental risks posed by contaminated sediments found in the lower 8.3 miles of
the Lower Passaic River, an area from the river's confluence with Newark Bay to River Mile 8.3 near the
border between the City of Newark and Belleville Township, New Jersey. In March 2016, EPA notified
over 100 parties that they were potentially responsible parties (PRPs) under Section 107(a) of the
Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended
(CERCLA), 42 U.S.C. § 9607(a), with respect to OU2 of the Site.

On September 30, 2016, EPA and Occidental Chemical Company (OCC) entered into Administrative
Settlement Agreement and Order on Consent for Remedial Design, CERCLA Docket No. 02-2016-
2021, for OCC to design the remedy selected in the OU2 ROD, under EPA oversight. The agreement
with OCC is an element of the EPA's settlement framework for OU2; additional elements include
EPA's intention to negotiate a remedial action consent decree with the major parties to implement and
pay for the OU2 remedy, and to identify parties that may be eligible for a cash out settlement for OU2.
The ongoing allocation is a critical component of the latter elements of EPA's settlement framework.

The allocation currently includes all OU2 PRPs, except public entities and a handful of parties to which
EPA offered an early cash out settlement. EPA entered into a contract and developed a Task Order
Statement of Work (SOW) for performance of the allocation by a neutral allocator. The allocation
commenced with an October 13, 2017, in-person kickoff meeting attended by EPA, the neutral allocator,
and OU2 PRPs. At the conclusion of the allocation process, the allocator will recommend a relative

ALCD-PUBCOM_0001249

share of responsibility for each allocation party's facility (or facilities, for those with more than one).[1] EPA plays an active role in the allocation process by providing input and comments, and by virtue of the fact that it is the sponsor of the allocation. The neutral allocator is taking EPA's comments into consideration, along with the input and comments from the PRPs participating in the allocation.

EPA designed the allocation to be a confidential process covered by the Alternative Dispute Resolution Act (ADR), 5 U.S.C. § 574, conducted with the assistance of a neutral allocator and team of technical experts, i.e. AlterEcho. Congress enacted the ADR Act to support and encourage the use of ADR in the federal government and provide explicit confidentiality pretentions for ADR processes. The Act includes a detailed confidentiality section "explicitly stating its intent to give parties in federally-related ADR proceedings assurance that their dispute resolution communications would generally be 'immune from discovery.'" ABA Ad Hoc Committee on Federal ADR Confidentiality, *Guide to Confidentiality Under the Federal Administrative Dispute Resolution Act* (March 2005).

The PRPs participating in the allocation have each signed a Confidentiality Agreement, agreeing to hold all communications and submissions related to the allocation confidential. EPA addressed confidentiality in the Agency's prime contract with CSRA (through which EPA retained the allocation team at AlterEcho), and in the SOW pursuant to which AlterEcho is performing the allocation. The SOW contains the confidentiality terms in EPA's agreement with CSRA-AlterEcho and references the ADR Act. Section 2.0 of the SOW states, in relevant part:

> Unless otherwise noted herein, all allocation related communications by the CSRA Team involving the OU2 PRPs or representatives of EPA or DOJ, individually or in groups, will be held confidential pursuant to the provisions of the ADR Act of 1996, 5 USC 574.

Section 3.0 of the SOW reads, in relevant part:

> CSRA will approach this task in accordance with the basic terms of the contract and according to the established norms and ethical standards of ADR professionals. Except as otherwise noted herein, information provided to the ADR professional by any of the parties, including EPA, communications between parties and the ADR professional, and notes and dispute resolution work product generated by the ADR professional during work pursuant to the Task Order will be maintained as confidential by the ADR professional pursuant to the provisions of the ADR Act of 1996 (Public Law 104-320; 5 USC571 et al.) and applicable federal, state and judicial requirements.

The information that is not confidential is noted in Section 4, Task 3 of the SOW, which reads, in relevant part:

> The allocation process will be designed based upon information received during consultations with EPA and OU2 PRPs on the allocation database and using all relevant non-confidential received information, including data, records, and other documents. No

---

[1] EPA invited all OU2 PRPs, except public entities, to participate in the allocation. 72 parties have chosen to participate, representing most of the allocation parties. The allocator will recommend a share for each allocation party, regardless of whether that allocation party has chosen to participate. Ten parties, including OCC, have chosen not to participate.

2

confidential information will be included in the allocation database. Though to be designed for purposes of conducting the allocation, the database will be designed in such a way as to allow access and use by EPA and DOJ staff for their settlement purposes following submission of the Allocation Data Reports in Task 8.

EPA's settlement framework, including the allocation, is in line with Congress' strong preference for settlements with responsible parties under CERCLA to avoid spending resources on litigation rather than on cleanup. H.R. Rep. No. 99-253, pt. 1, at 80 (1985), *reprinted in* 1986 U.S.C.C.A.N. 2835. As the court noted in *United States v. Charter Intl Oil Co.,* 83 F.3d 510, 520 (1st Cir. 1996), "[p]erhaps mindful of the huge resources going into the transaction costs of CERCLA litigation, rather than to remediating the sites, Congress sought to encourage earlier resolutions by agreement." These settlements serve to "reduce excessive litigation expenses and transaction costs, thereby preserving scarce resources for CERCLA's real goal: the expeditious cleanup of hazardous waste sites." *United States v. DiBiase,* 45 F.3d 541, 546 (1st Cir. 1995).

Because the allocation process is an important component in EPA's settlement framework, which in turn is important to timely cleanup of the lower 8.3 miles of the Lower Passaic River, EPA supports the confidentiality of documents and communications generated for the allocation, including EPA's comments and communications with the allocator, the participating PRPs' comments and communications with the allocator, the Position Briefs, and the Responsive Briefs.

We hope this letter enhances understanding of the settlement framework, including the OU2 allocation process.

Sincerely,

Sarah P. Flanagan
Chief, New Jersey Superfund Branch
Office of Regional Counsel

cc:    Allocation Parties, Appendix A
       David Batson, Esq., AlterEcho
       Brian Donohue, Esq., USDOJ
       Laura Rowley, Esq. USDOJ
       David Moora, Esq., US EPA

ALCD-PUBCOM_0001251

**Appendix A**
**Diamond Alkali Superfund Site – Operable Unit 2**
**Participating Allocation Parties**

1. 21st Century Fox America Inc.(21CFA)
2. Alliance Chemical Inc.
3. Arkema / Legacy Site Services
4. Ashland LLC
5. Atlantic Richfield (ARCO)
6. Atlas Refining Inc.
7. BASF Corporation
8. Benjamin Moore & Co
9. Berol Corporation
10. Campbell Foundry Company
11. Canning Gumm LLC
12. CBS Corporation
13. Celanese Ltd./CNA Holdings LLC
14. Chargeurs Inc.
15. Chevron Environmental Management Company
16. Coats and Clark Inc.
17. Congoleum Corporation
18. Conopco Inc
19. Cooper Industries LLC
20. Covanta Essex Co.
21. Croda Inc.
22. Curtiss-Wright Corporation
23. Darling Ingredients Inc.
24. DII Industries, LLC
25. Eden Wood Corporation
26. Elan Chemical Co Inc.
27. EnPro Holdings Inc.
28. EPEC Polymers
29. Essex Chemical Corporation
30. Everett Smith Group
31. Franklin –Burlington Plastics
32. Garfield Molding Company Inc.
33. General Electric Company
34. Givaudan Fragrances Corp
35. Goodrich Corp
36. Goody Products, Inc. on behalf of itself and Newell Brands Inc. (f/k/a Newell Rubbermaid Inc.)
37. Hartz Consumer Group Inc.
38. Hexcel Corporation
39. Hoffman – LaRoche Inc.
40. Honeywell International Inc.
41. ISP Chemicals LLC
42. Harris Corporation
43. Kearny Smelting
44. Leemilt's Petroleum Inc.
45. Legacy Vulcan Corporation
46. Lucent Technologies
47. National Standard LLC
48. Newark Group Inc.
49. Newark Morning Ledger Co.
50. The Okonite Company, Inc.
51. Otis Elevator Co.
52. Palin Enterprises
53. Pabst Brewing Company
54. Passaic Pioneer Properties Co
55. Pharmacia LLC
56. Pitt-Consol Chemical Company
57. PPG Industries Inc.
58. PSEG (Public Service Enterprise Group)
59. Purdue Pharma Technologies
60. Quality Carriers Inc.
61. Revere Smelting & Refining Corp/RSR Corp
62. Safety Kleen Ecirosystems Company/ McKesson Corp.
63. Sequa Corporation
64. Sherwin Williams Company
65. Spectraserv Inc.
66. Stanley Black & Decker Inc.
67. STWB Inc.
68. Sun Chemical
69. Tate & Lyle Ingredients Americas LLC
70. Teval Corporation
71. Textron Inc.
72. Tiffany and Company

ALCD-PUBCOM_0001252

# Exhibit 35

Draft - April 26, 2016 - For Settlement Negotiation Purposes - Subject to EPA
Management Review and Approval

# UNITED STATES
## ENVIRONMENTAL PROTECTION AGENCY
### REGION II

| | |
|---|---|
| IN THE MATTER OF: | ADMINISTRATIVE SETTLEMENT AGREEMENT AND ORDER ON CONSENT FOR REMEDIAL DESIGN |
| Operable Unit Two of the Diamond Alkali Superfund Site | |
| | U.S. EPA Region 2 |
| In and About Essex, Hudson, Bergen and Passaic Counties, New Jersey | CERCLA Docket No. 02-2016-2021 |
| | Proceeding Under Sections 104, 106, 107 and 122 of the Comprehensive |
| Occidental Chemical Corporation, | Environmental Response, Compensation, and Liability Act, as amended, 42 U.S.C. §§ |
| Settling Party. | 9604, 9606, 9607 & 9622. |

ED_013299_00000115-00001

Draft – April 26, 2016 – For Settlement Negotiation Purposes – Subject
to EPA Management Review and Approval

ADMINISTRATIVE SETTLEMENT AGREEMENT AND ORDER ON CONSENT
REMEDIAL DESGIN
TABLE OF CONTENTS

I.      JURISDICTION AND GENERAL PROVISIONS
II.     PARTIES BOUND
III.    DEFINITIONS
IV.     FINDINGS OF FACT
V.      CONCLUSIONS OF LAW AND DETERMINATIONS
VI.     SETTLEMENT AGREEMENT AND ORDER
VII.    DESIGNATION OF PROJECT MANAGER AND COORDINATORS
VIII.   WORK TO BE PERFORMED
IX.     SITE ACCESS
X.      ACCESS TO INFORMATION
XI.     RECORD RETENTION
XII.    COMPLIANCE WITH OTHER LAWS
XIII.   PAYMENT OF RESPONSE COSTS
XIV.    DISPUTE RESOLUTION
XV.     FORCE MAJEURE
XVI.    STIPUTLATED PENALTIES
XVII.   COVENANTS BY EPA
XVIII.  RESERVATION OF RIGHTS BY EPA
XIX.    COVENANTS BY SETTLING PARTY
XX.     OTHER CLAIMS
XXI.    EFFECT OF SETTLEMENT/CONTRIBUTION
XXII.   INDEMNIFICATION
XXIII.  INSURANCE
XXIV.   FINANCIAL ASSURANCE
XXV.    INTEGRATION/APPENDICES
XXVI.   EFFECTIVE DATE AND SUBSEQUENT MODIFICATION
XXVII.  NOTICE OF COMPLETION OF WORK

Appendix A:  Record of Decision for Operable Unit Two
Appendix B:  Statement of Work
Appendix C:  Map of Site
Appendix D:  Financial Assurance

i

Draft – April 26, 2016 – For Settlement Negotiation Purposes – Subject
to EPA Management Review and Approval

# I. JURISDICTION AND GENERAL PROVISIONS

1. This Administrative Settlement Agreement and Order on Consent ("Settlement Agreement") is entered into voluntarily by the United States Environmental Protection Agency (the "EPA") and Occidental Chemical Corporation ("Settling Party"). This Settlement Agreement provides that Settling Party shall undertake a Remedial Design ("RD"), including various procedures and technical analyses, to produce a detailed set of plans and specifications for implementation of the Remedial Action selected in EPA's March 3, 2016 Record of Decision for the lower 8.3 miles of the Lower Passaic River, which is Operable Unit Two of the Diamond Alkali Superfund Site (the "Site"). In addition, Settling Party shall reimburse the United States for certain response costs, as provided herein.

2. This Settlement Agreement is issued under the authority vested in the President of the United States by Sections 104, 106, 107 and 122 of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), as amended, 42 U.S.C. §§ 9604, 9606, 9607 and 9622. This authority was delegated to the Administrator of EPA on January 23, 1987 by Executive Order 12580 (52 *Fed. Reg.* 2923, Jan. 29, 1987) and further delegated to EPA Regional Administrators by EPA Delegation No. 14-14-C. This authority was further re-delegated on November 23, 2004 by the Regional Administrator of EPA Region 2 to the Director of the Emergency and Remedial Response Division through EPA Region 2 Delegation No. 14-14-C.

3. EPA and Settling Party recognize that this Settlement Agreement has been negotiated in good faith and that the actions undertaken by Settling Party in accordance with this Settlement Agreement do not constitute an admission of any liability. Settling Party does not admit, and retains the right to controvert in any subsequent proceedings other than proceedings to implement or enforce this Settlement Agreement, the validity of the findings of fact, conclusions of law, and determinations in Sections IV and V of this Settlement Agreement. Settling Party agrees to comply with, and be bound by, the terms of this Settlement Agreement and further agrees that Settling Party will not contest the basis or validity of this Settlement Agreement or its terms.

4. The objectives of EPA and Settling Party in entering into this Settlement Agreement are to protect the public health or welfare or the environment at the Site by the design of response actions at the Site by Settling Party, to reimburse response costs of EPA, and to resolve the claims of EPA against Settling Party as provided in this Settlement Agreement.

5. In accordance with the National Oil and Hazardous Substances Pollution Contingency Plan, 40 C.F.R. Part 300, *et seq.,* as amended ("NCP"), and Sections 121(f)(1)(F) of CERCLA, 42 U.S.C. § 9621(f)(1)(F), EPA notified the State of New Jersey (the "State") on _____, of negotiations with a potentially responsible party regarding the implementation of the remedial

1

ED_013299_00000115-00003

Draft - April 26, 2016 - For Settlement Negotiation Purposes - Subject
to EPA Management Review and Approval

design for Operable Unit Two for the Site, and EPA has provided the State with an opportunity
to participate in such negotiations.

6.  In accordance with Section 122(j)(1) of CERCLA, 42 U.S.C. § 9622(j)(1), EPA
notified the federal natural resource trustees on _____, of negotiations with a potentially
responsible party regarding the release of hazardous substances that may have resulted in injury
to the natural resources under federal trusteeship and encouraged the trustees to participate in the
negotiation of this Settlement Agreement.

## II. PARTIES BOUND

7.  This Settlement Agreement applies to and is binding upon EPA and upon Settling
Party and its successors and assigns. Any change in ownership or corporate status of Settling
Party including, but not limited to, any transfer of assets or real or personal property shall not
alter Settling Party's responsibilities under this Settlement Agreement. The signatories to this
Settlement Agreement certify that they are authorized to execute and legally bind the parties they
represent.

8.  Settling Party shall ensure that its contractors, subcontractors, and representatives
receive a copy of this Settlement Agreement and comply with this Settlement Agreement Settling
Party shall be responsible for any noncompliance with this Settlement Agreement by such
contractors, subcontractors, and representatives. With regard to the activities undertaken pursuant
to this Settlement Agreement, each contractor and subcontractor of Settling Party shall be
deemed to be in a contractual relationship with Settling Party within the meaning of Section
107(b)(3) of CERCLA, 42 U.S.C. § 9607(b)(3).

## III. DEFINITIONS

9.  Unless otherwise expressly provided herein, terms used in this Settlement Agreement
that are defined in CERCLA or in other regulations promulgated under CERCLA shall have the
meaning assigned to them in CERCLA or its implementing regulations. Whenever terms are used
in this Settlement Agreement, in documents attached to this Settlement Agreement, or
incorporated by reference into this Settlement Agreement, the following definitions shall apply:

a. "CERCLA" shall mean the Comprehensive Environmental Response,
Compensation, and Liability Act of 1980, as amended, 42 U.S.C. § 9601, *et seq.*

b. "Day" shall mean a calendar day unless otherwise expressly stated. In
computing any period of time under this Settlement Agreement, where the last day would fall on
a Saturday, Sunday, or federal holiday, the period shall run until the close of business on the next
working Day.

2

Draft - April 26, 2016 - For Settlement Negotiation Purposes - Subject
to EPA Management Review and Approval

c. "Effective Date" shall be the effective date of this Settlement Agreement as provided in Section XXVI (Effective Date and Subsequent Modification).

d. "The EPA" or "EPA" shall mean the United States Environmental Protection Agency and any successor departments or agencies of the United States.

e. "Future Response Costs" shall mean all costs, including, but not limited to, direct and indirect costs, that the United States incurs in reviewing or developing plans, reports and other items pursuant to the this Settlement Agreement, verifying the Work, or otherwise implementing, overseeing, or enforcing this Settlement Agreement, including , but not limited to, payroll costs, contractor costs, travel costs, laboratory costs, costs incurred pursuant to Paragraph 4.1 (Emergency Response and Reporting) of the SOW, the costs incurred pursuant to Paragraph 48 (costs and attorneys' fees and any monies paid to secure access, including the amount of just compensation), and Paragraph 84 (Work Takeover), and Paragraph 47 (Community Involvement), and the costs incurred by the United States in enforcing the terms of this Settlement Agreement, including all costs incurred in connection with Dispute Resolution pursuant to Section XIV (Dispute Resolution) and all litigation costs.

f. "Institutional Controls" or "ICs" shall mean Proprietary Controls and state and local laws, regulations, ordinances, zoning restrictions, or other governmental controls or notices that: (a) limit land or resource use to minimize the potential for human exposure to Waste Material at or in connection with Operable Unit 2 at the Site; (b) limiting land or resource use to implement, ensure non-interference with, or ensure the protectiveness of the remedial action; and/or (c) provide information intended to modify or guide human behavior at or in connection with Operable Unit 2 at the Site.

g. "Interest" shall mean interest at the rate specified for interest on investments of EPA Hazardous Substance Superfund established by 26 U.S.C. § 9507, compounded annually on October 1 of each year, in accordance with CERCLA § 107(a), 42 U.S.C. § 9607(a). The applicable rate of interest shall be the rate in effect at the time the interest accrues. The rate of interest is subject to change on October 1 of each year.

h. "Lower Passaic River Study Area" or "LPRSA" shall mean the 17-mile stretch of the Lower Passaic River and its tributaries from the Dundee Dam to Newark Bay.

i. "NJDEP" shall mean the New Jersey Department of Environmental Protection.

3

ED_013299_00000115-00005

Draft – April 26, 2016 – For Settlement Negotiation Purposes – Subject
to EPA Management Review and Approval

j. "National Contingency Plan" or "NCP" shall mean the National Oil and Hazardous Substances Pollution Contingency Plan promulgated pursuant to Section 105 of CERCLA, 42 U.S.C. § 9605, codified at 40 C.F.R. Part 300, *et seq.,* including all amendments thereto.

k. "Operable Unit 2 (OU2)" shall mean the lower 8.3 miles of the Lower Passaic River, from RM 0, at the river's confluence with Newark Bay, to RM 8.3, near the border between the City of Newark and Belleville Township, New Jersey, located in and about Essex and Hudson Counties, New Jersey.

l. "Paragraph" shall mean a portion of this Settlement Agreement identified by an Arabic numeral.

m. "Parties" shall mean EPA and Settling Party.

n. "Proprietary Controls" shall mean easements or covenants running with the land that (a) limit land or resource use and/or provide access rights and (b) are created pursuant to common law or statutory law by an instrument that is recorded by the owner in the appropriate records office.

o. "Record of Decision for Operable Unit Two" or "OU2 ROD" shall mean EPA Record of Decision relating to Operable Unit Two for the Site, and all attachments thereto that the Regional Administrator, EPA Region II, or her delegate, signed on March 3, 2016, and attached as Appendix A.

p. "Remedial Design" or "RD" shall mean those activities that Settling Party shall undertake to develop the final plans and specifications for the Remedial Action pursuant to the Remedial Design Work Plan.

q. "Remedial Design Work Plan" shall mean the document developed pursuant to the Statement of Work ("SOW") approved by EPA, and any amendment thereto.

r. "Section" shall mean a portion of this Settlement Agreement identified by a Roman numeral.

s. "Settlement Agreement" shall mean this Administrative Settlement Agreement and Order on Consent, all appendices attached hereto, and all documents incorporated by reference into this document including, without limitation, EPA-approved submissions. The EPA-approved submissions (other than progress reports) are incorporated into and become a part of the Settlement Agreement upon approval by EPA. In the event of conflict between this Settlement Agreement and any appendix, this Settlement Agreement shall control.

4

Draft – April 26, 2016 – For Settlement Negotiation Purposes – Subject
to EPA Management Review and Approval

t. "Settling Party" shall mean the Occidental Chemical Corporation.

u. "Site" shall mean the Diamond Alkali Superfund Site, including the former Diamond Alkali property located at 80 and 120 Lister Avenue, Newark, New Jersey, the Lower Passaic River Study Area, Newark Bay, and the areal extent of contamination.

v. "State" shall mean the State of New Jersey.

w. "Statement of Work" or "SOW" shall mean the statement of work for implementation of the Remedial Design, and any modifications thereto in accordance with this Settlement Agreement, as set forth in Appendix B of this Settlement Agreement. The Statement of Work is incorporated into this Settlement Agreement and is an enforceable part of this Settlement Agreement.

x. "Waste Material" shall mean (1) any hazardous substance under Section 101(14) of CERCLA, 42 U.S.C. § 9601(14); (2) any pollutant or contaminant under Section 101(33) of CERCLA, 42 U.S.C. § 9601(33); (3) any solid waste under Section 1004(27) of RCRA, 42 U.S.C. § 6903(27); and (4) any mixture containing any of the constituents noted in (1),(2) or (3), above.

y. "Work" shall mean all activities and obligations Settling Party is required to perform under this Settlement Agreement except those required by Section XI (Record Retention).

## IV. FINDINGS OF FACT

10. Between March 1951 and August 1969, the Diamond Alkali Company operated a manufacturing facility located at 80 Lister Avenue in Newark, New Jersey, which produced, among other products, the defoliant chemical known as "Agent Orange." The Diamond Alkali Company also manufactured dichlorodiphenyl trichloroethane ("DDT"), 2,4-dichlorophenoxy acetic acid ("2,4-D"), 2,4,5-trichlorophenol ("2,4,5-TCP"), and 2,4,5-trichlorophenoxy acetic acid ("2,4,5-T").   A byproduct of the manufacturing process was 2,3,7,8-TCDD (2,3,7,8-tetrachlorodibenzo-p-dioxin, the most toxic form of dioxin), which was released into the Passaic River. Production activities at the Diamond Alkali facility ceased in August 1969.

11. In 1983, hazardous substances were detected at various locations in Newark, New Jersey, including the Diamond Alkali facility located at 80 Lister Avenue and adjoining property at 120 Lister Avenue.

5

Draft - April 26, 2016 - For Settlement Negotiation Purposes - Subject
to EPA Management Review and Approval

12. EPA, pursuant to Section 105 of CERCLA, 42 U.S.C. § 9605, placed the Diamond Alkali Superfund Site on the National Priorities List, which is set forth at 40 C.F.R. Part 300, Appendix B, by publication in the Federal Register on September 21, 1984, 49 Fed. Reg. 37070.

13. Pursuant to Administrative Orders on Consent with NJDEP, the Diamond Shamrock Chemicals Company (formerly Diamond Alkali Company) conducted investigations and response work for the Lister Avenue facility. The investigation included the sampling and assessment of sediment contamination within the Passaic River.

14. Sampling and assessment of sediments in the lower reaches of the Passaic River revealed the presence of hazardous substances including, but not limited to, polychlorinated dibenzo-p-dioxins and polychlorinated dibenzofurans (collectively, "PCDDs/PCDFs"), polychlorinated biphenyls ("PCBs"), polyaromatic hydrocarbons ("PAHs"), DDT, dieldrin, chlordane, mercury, cadmium, copper, and lead. Hazardous substances identified in the sediments of the lower Passaic River included elevated concentrations of 2,3,7,8-TCDD, known to have been generated at the Diamond Alkali facility.

15. On September 30, 1987, EPA issued a Record of Decision ("ROD") that set forth an interim remedy for the 80 and 120 Lister Avenue portion of the Diamond Alkali Superfund Site. Pursuant to a judicial Consent Decree with EPA and NJDEP, OCC and Chemical Land Holdings, Inc. (now known as Tierra Solutions, Inc.), agreed to implement the 1987 ROD. The interim remedy was completed in 2004.

16. In 1994, OCC entered into an Administrative Order on Consent with EPA to investigate a six-mile stretch of the Passaic River from RM1 to RM7. The primary objectives of the investigation were to determine: (1) the spatial distribution and concentration of hazardous substances, both horizontally and vertically in the sediments; (2) the primary human and ecological receptors of contaminated sediments; and (3) the transport of contaminated sediment. Tierra Solutions, Inc. ("Tierra") performed the work on OCC's behalf, under the oversight of EPA.

17. Sampling results from the investigation of the six-mile area and other environmental studies demonstrated that evaluation of a larger area was necessary because sediments contaminated with hazardous substances and other potential sources of hazardous substances are present along the entire Lower Passaic River. Further, the tidal nature of the Lower Passaic River has resulted in greater dispersion of hazardous substances.

18. Sampling results show concentrations of PCDDs/PCDFs, PCBs, mercury, and other substances that significantly exceed the levels that can produce toxic effects to biota. Based on the results of monitoring and research undertaken since the mid-1970s, the State of New Jersey has taken a number of steps to limit the exposure of the fish-eating public to toxic contaminants

6

Draft - April 26, 2016 - For Settlement Negotiation Purposes - Subject
to EPA Management Review and Approval

in the Lower Passaic River, Newark Bay, the Hackensack River, the Arthur Kill and the Kill van Kull. The initial measures prohibited the sale, and advised against the consumption, of several species of fish and eel based on the presence of PCB contamination in those species. The discovery of widespread dioxin contamination in the Lower Passaic River and Newark Bay led the State of New Jersey to issue several administrative orders in 1983 and 1984 prohibiting sale or consumption of fish or shellfish from the tidal Passaic River, and prohibiting the sale and consumption of blue crab and striped bass from Newark Bay, the tidal Hackensack River, the Arthur Kill and the Kill van Kull. These State advisories and prohibitions are still in effect with respect to the tidal Passaic River, such that for all finfish and shellfish, there is a "do not eat" advisory, and for blue crab, a prohibition on cooking, selling, or harvesting.

19. In 2002, EPA commenced a remedial investigation and feasibility study ("RI/FS") encompassing the 17-mile Lower Passaic River Study Area ("LPRSA"). In 2004, EPA and a group of potentially responsible parties ("PRPs") known as the Lower Passaic River Study Area Cooperating Parties Group ("CPG") entered into a Settlement Agreement pursuant to Section 122(h) of CERCLA to provide funds for EPA's performance of the 17-mile RI/FS. The Settlement Agreement was amended in 2005 and 2007, adding more parties. In May 2007, the CPG members entered into an Administrative Settlement Agreement and Order on Consent ("AOC") with EPA pursuant to which the settling parties agreed to complete the RI/FS for the 17-mile LPRSA. The 17-mile RI/FS is ongoing.

20. In 2004, EPA and OCC entered into an Administrative Order on Consent pursuant to which OCC agreed to perform the RI/FS for Newark Bay under the oversight of EPA. Tierra is performing the RI/FS for Newark Bay on OCC's behalf. The study of Newark Bay is ongoing.

21. In June 2008, EPA, OCC and Tierra signed an Administrative Order on Consent for a non-time-critical removal action to remove 200,000 cubic yards of contaminated sediment from the river (from RM3.0 to RM3.8) adjacent to the 80-120 Lister Avenue facility. This action is referred to as the "Tierra Removal."

22. In 2012, EPA entered into an Administrative Order on Consent with a group of PRPs that agreed to perform a time-critical removal action to address the risks posed by high concentrations of dioxins, PCBs and other contaminants found in surface and subsurface sediments in the RM 10.9 area, including in a mudflat on the east bank of the river at RM10.9 in Lyndhurst, New Jersey. This action is referred to as the "RM10.9 Removal." Because OCC was not among the settlors, EPA issued a Unilateral Administrative Order ("UAO") to OCC ordering it to participate and cooperate in the RM 10.9 Removal. In 2014, OCC entered into an Administrative Order on Consent with EPA to sample combined sewer outfalls and stormwater outfalls discharging to the Passaic River.

ED_013299_00000115-00009

Draft - April 26, 2016 - For Settlement Negotiation Purposes - Subject
to EPA Management Review and Approval

23. Data collected in the Lower Passaic River, and EPA's analyses show that contaminated sediment in the lower 8.3 miles of the LPRSA are a major source of contamination to the rest of the river and Newark Bay and pose an unacceptable risk to human health and the environment due to the presence of a variety of contaminants that stay in the environment for a long time and can build up in fish and shellfish. These contaminants include polychlorinated dibenzo-p-dioxins and furans (dioxins and furans), polychlorinated biphenyls (PCBs), polycyclic aromatic hydrocarbons (PAHs), DDT and other pesticides, mercury, lead and other metals.

24. Having identified that the majority of the contaminated sediment is found in the lower 8.3 miles of the LPRSA, EPA completed a remedial investigation/focused feasibility study ("RI/FFS") to evaluate taking action to address these sediments while the 17-mile LPRSA was underway.

25. On April 11, 2014, in accordance with Section 117 of CERCLA, 42 U.S.C. § 9617, EPA published, in a major local newspaper of general circulation, a notice of a proposed plan to address contaminated sediments in the lower 8.3 miles of the LPRSA.

26. On March 4, 2016, EPA issued the OU2 ROD, selecting a remedy for the lower 8.3 miles of the LPRSA. The remedy selected in the OU2 ROD includes, but is not limited to the following: 1) construction of an engineered cap over the river bottom of the lower 8.3 miles of the LPRSA bank to bank; 2) dredging of the river bank to bank (approximately 3.5 million cubic yards) so the cap can be placed without increasing the potential for flooding and to allow for the continued use of the federally-authorized navigation channel in the 1.7 miles of the river closest to Newark Bay; 3) reconstructing dredged mudflat areas and restoring mudflat habitat; 4) offsite disposal of dredged material; 5) institutional controls to protect the cap and enhanced outreach to increase awareness of NJDEP's prohibition on fish and crab consumption; and 6) long term monitoring and maintenance.

27. In 1967, the Diamond Alkali Company changed its name to the Diamond Shamrock Corporation. In 1983, the Diamond Shamrock Corporation changed its name to the Diamond Shamrock Chemicals Company.

28. On September 4, 1986, all outstanding stock in the Diamond Shamrock Chemicals Company was acquired by the Oxy-Diamond Alkali Corporation, and the Diamond Shamrock Chemicals Company name was changed to the Occidental Electrochemicals Corporation.

29. On November 30, 1987, the Occidental Electrochemicals Corporation was merged into Occidental Chemical Corporation.

30. OCC is the corporate successor to the Diamond Alkali Company. The Diamond Alkali Company disposed of chemical waste, including hazardous substances, during its

8

Draft - April 26, 2016 - For Settlement Negotiation Purposes - Subject
to EPA Management Review and Approval

ownership and operation of the Lister Avenue facility, located in Newark, Essex County, New
Jersey. The Diamond Alkali Company also disposed of chemical waste, including hazardous
substances, in the LPRSA, which is part of the Site. EPA first notified OCC of its liability for the
Site on October 20, 1988.

## V. CONCLUSIONS OF LAW AND DETERMINATIONS

Based on the Findings of Fact set forth above, as well as the Administrative Record
supporting this Settlement Agreement, EPA has determined that:

31. The Diamond Alkali Superfund Site is a facility as defined in Section 101(9) of
CERCLA, 42 U.S.C. § 9601(9).

32. The contaminants found at the Site, as identified in the Findings of Fact above,
include "hazardous substances" as defined in Section 101(14) of CERCLA, 42 U.S.C. §
9601(14).

33. Settling Party is a "person" as defined in Section 101(21) of CERCLA, 42 U.S.C. §
9601(21).

34. Settling Party is a responsible party as defined in Sections 107(a) of CERCLA, 42
U.S.C. § 9607(a), and is subject to this Settlement Agreement under Section 106(a) of CERCLA,
42 U.S.C. § 9606(a). Settling Party is liable for performance of Work under this Settlement
Agreement and for payment of Future Response Costs under this Settlement Agreement. Settling
Party was the "owner" and/or "operator" of the Lister Avenue portion of the Site at the time of
disposal of hazardous substances, as defined by Section 101(20) of CERCLA, 42 U.S.C. §
9601(20), and within the meaning of Section 107(a)(2) of CERCLA, 42 U.S.C. § 9607(a)(2).
Settling Party also arranged for disposal of hazardous substances at the LPRSA, within the
meaning of Section 107(a)(3) of CERCLA, 42 U.S.C. § 9607(a)(3).

35. The conditions described in the Findings of Fact above constitute an actual or
threatened "release" of hazardous substances from the facility as defined in Section 101(22) of
CERCLA, 42 U.S.C. § 9601(22).

36. The actions required by this Settlement Agreement are necessary to protect the public
health, welfare or the environment, are in the public interest, are consistent with CERCLA and
the NCP and will expedite effective remedial action and minimize litigation.

## VI. SETTLEMENT AGREEMENT AND ORDER

9

Draft - April 26, 2016 - For Settlement Negotiation Purposes - Subject
to EPA Management Review and Approval

37. Based upon the foregoing the Findings of Fact, Conclusions of Law and Determinations, and the Administrative Record for this Site, it is hereby Ordered and Agreed that Settling Party shall comply with all provisions of this Settlement Agreement, including, but not limited to, all attachments to this Settlement Agreement and all documents incorporated by reference into this Settlement Agreement.

## VII. DESIGNATED PROJECT MANAGER AND COORDINATORS

38. Selection of Contractors, Personnel. All Work performed under this Settlement Agreement shall be under the direction and supervision of qualified personnel. Settling Party shall retain one or more contractor(s), including a Supervising Contractor, to perform the Work and shall notify EPA, in writing, of the name(s) and qualifications of such contractor(s), and Supervising Contractor, within 10 days of the Effective Date. Settling Party shall also notify EPA in writing of the name(s) and qualification(s) of any other contractor(s) or subcontractor(s) retained to perform the Work at least 10 days prior to the commencement of such Work. EPA will issue a notice of disapproval of the proposed Supervising Contractor or an authorization to proceed.

39. EPA retains the right to disapprove of any or all of the contractors or subcontractors retained by Settling Party. If EPA disapproves of a selected contractor, Settling Party shall retain a different contractor and shall notify EPA of that contractor's name and qualifications within 10 days of EPA's disapproval.

40. With respect to any contractor proposed to be Supervising Contractor pursuant to Paragraph 38, Settling Party shall demonstrate that the proposed contractor has sufficient technical expertise to supervise the Work and a quality assurance system that complies with ANSI/ASQC E4-1994, "Quality management systems for environmental information and technology programs - Requirements with guidance for use" (American Society for Quality, February 2014 or most recent version) , by submitting a copy of the proposed contractor's Quality Management Plan ("QMP"). The QMP should be prepared in accordance with "The EPA Requirements for Quality Management Plans (QA/R-2)," (EPA/240/B-01/002, March 2001, reissued May 2006, or subsequently issued guidance) or equivalent documentation as determined by EPA.

41. Within 10 days after the Effective Date, Settling Party shall designate a Project Coordinator who shall be responsible for administration of all actions by Settling Party required by this Settlement Agreement and shall submit to EPA the designated Project Coordinator's name, address, telephone number, and qualifications. Settling Party's Project Coordinator must have sufficient technical expertise to coordinate the Work. Settling Party's Project Coordinator may not be an attorney representing any Settling Party in this matter and may not act as the Supervising Contractor. To the greatest extent possible, the Project Coordinator shall be present on site or readily available during Operable Unit 2 Work. EPA retains the right to disapprove of

10

Draft - April 26, 2016 - For Settlement Negotiation Purposes - Subject
to EPA Management Review and Approval

the designated Project Coordinator. If EPA disapproves of the designated Project Coordinator, Settling Party shall retain a different Project Coordinator and shall notify EPA of that person's name, address, telephone number and qualifications within **10** days following EPA's disapproval. Receipt by Settling Party's Project Coordinator of any notice or communication from EPA relating to this Settlement Agreement shall constitute receipt by Settling Party. Settling Party's Project Coordinator shall meet with EPA's Project Coordinator at least monthly.

42. EPA has designated Alice Yeh of the Special Projects Branch, Region II as its Project Coordinator. EPA will notify Settling Party of a change of its designated Project Coordinator. Except as otherwise provided in this Settlement Agreement, Settling Party shall send all submissions required by this Settlement Agreement to the Project Coordinator at:

> ATTN: Site Remedial Project Manager
> Special Project Branch
> Emergency and Remedial Response Division
> U.S. Environmental Protection Agency, Region II
> 290 Broadway, 19th Floor
> New York, New York 10007-1866

43. EPA's Project Coordinator shall have the authority lawfully vested in a Remedial Project Manager ("RPM") and On-Scene Coordinator ("OSC") by the NCP. In addition, EPA's Project Coordinator shall have the authority consistent with the NCP, to halt any Work required by this Settlement Agreement, and to take or direct any other necessary response action when the EPA Project Coordinator determines that conditions at the Site may present an immediate endangerment to public health or welfare or the environment. The absence of the EPA Project Coordinator from the site area shall not be cause for the stoppage or delay of Work. EPA may designate other representatives, which may include its employees, contractors and/or consultants, to oversee the Work as an Alternate Project Coordinator.

44. EPA and Settling Party shall have the right, subject to Paragraph 41, to change their respective designated Project Coordinators. Settling Party shall notify EPA **14** days before such a change is made. The initial notification may be made orally, but shall be promptly followed by a written notice.

## VIII. WORK TO BE PERFORMED

45. **Performance of Work in Accordance with SOW**. Settling Party shall perform all actions necessary to implement the Statement of Work. Settling Party shall: (a) develop the RD; and (b) support EPA's periodic review efforts; all in accordance with the SOW and all EPA-approved, conditionally-approved, or modified deliverables as required by the SOW. All deliverables required

11

ED_013299_00000115-00013

Draft – April 26, 2016 – For Settlement Negotiation Purposes – Subject
to EPA Management Review and Approval

to be submitted for approval under the Settlement Agreement or SOW shall be subject to approval by EPA in accordance with Paragraph 5.6 (Approval of Deliverables) of the SOW.

46.    **Emergencies and Releases**. Settling Party shall comply with the emergency and release response and reporting requirements under Paragraph 4.1 (Emergency Response and Reporting) of the SOW. Subject to Section XVII (Covenants by EPA), nothing in this Settlement Agreement, including Section 4.1 of the SOW, limits any authority of EPA: (a) to take all appropriate action to protect human health and the environment or to prevent, abate, respond to, or minimize an actual or threatened release of Waste Material on, at, or from the Site, or (b) to direct or order such action, or seek a judicial order, to protect human health and the environment or to prevent, abate, respond to, or minimize an actual or threatened release of Waste Material on, at, or from the Site. If, due to Settling Parties failure to take appropriate response action under Section 4.1 of the SOW, EPA takes such action instead, Settling Parties shall reimburse EPA under Section III (Payment of Response Costs) for all costs of the response action

47.    **Community Involvement**. If requested by EPA, Settling Party shall conduct community involvement activities under EPA's oversight as provided for in, and in accordance with, Section 2(Community Involvement) of the SOW. Such activities may include, but are not limited to, designation of a Community Coordinator.

## IX. SITE ACCESS

48. Where any action under this Settlement Agreement is to be performed in areas owned by, or in possession of, someone other than Settling Party, Settling Party shall use its best efforts to obtain all necessary access agreements within 60 days after the Effective Date, or as otherwise specified in writing by the Project Coordinator. If additional areas to which access is necessary are identified after the Effective Date, Settling Party shall use its best efforts to obtain access agreements within 60 days after learning of the need for additional access. Settling Party shall immediately notify EPA if, after using its best efforts, it is unable to obtain such agreements. For purposes of this Paragraph, "best efforts" includes the payment of reasonable sums of money in consideration of access. Settling Party shall describe in writing its efforts to obtain access. EPA may then assist Settling Party in gaining access, to the extent necessary to effectuate the response actions described herein, using such means as EPA deems appropriate. Settling Party shall reimburse EPA for all costs and attorney's fees incurred by the United States in obtaining such access, in accordance with the procedures in Section XIII (Payment of Response Costs).

49. Notwithstanding any provision of this Settlement Agreement, EPA retains all of its access authorities and rights, including enforcement authorities related thereto, under CERCLA, RCRA, and any other applicable statutes or regulations.

12

Draft – April 26, 2016 – For Settlement Negotiation Purposes – Subject
to EPA Management Review and Approval

50. If Settling Party cannot obtain access agreements, EPA may obtain access for Settling Party, perform those tasks or activities with EPA's contractors, or terminate the Settlement Agreement. If EPA performs those tasks or activities with EPA contractors and does not terminate the Settlement Agreement, Settling Party shall perform all other activities not requiring access to that site and shall reimburse EPA for all costs incurred in performing such activities. Settling Party shall integrate the results of any such tasks undertaken by EPA into its reports and deliverables.

## X. ACCESS TO INFORMATION

51. Settling Party shall provide to EPA and the State, upon request, copies of all documents and information within its possession or control or that of its contractors or agents relating to activities for OU2 for the Site or to the implementation of this Settlement Agreement, including, but not limited to, sampling, analysis, data bases, chain of custody records, manifests, trucking logs, receipts, reports, sample traffic routing, correspondence, or other documents or information related to the Work. Settling Party shall also make available to EPA and the State, for purposes of investigation, information gathering or testimony, its employees, agents or representatives with knowledge of relevant facts concerning the performance of the Work.

52. Settling Party may assert business confidentiality claims covering part or all of the documents or information submitted to EPA under this Settlement Agreement to the extent permitted by and in accordance with Section 104(e)(7) of CERCLA, 42 U.S.C. § 9604(e)(7), and 40 C.F.R. § 2.203(b). Documents or information determined to be confidential by EPA will be afforded the protection specified in 40 C.F.R. Part 2, Subpart B. If no claim of confidentiality accompanies documents or information when it is submitted to EPA, or if EPA has notified Settling Party that the documents or information are not confidential under the standards of Section 104(e)(7) of CERCLA or 40 C.F.R. Part 2, Subpart B, the public may be given access to such documents or information without further notice to Settling Party. Settling Party shall segregate and clearly identify all documents or information submitted under this Settlement Agreement for which Settling Party asserts business confidentiality claims.

53. Settling Party may assert that certain documents, records, and other information are privileged under the attorney-client privilege or any other privilege recognized by federal law. If the Settling Party asserts such a privilege in lieu of providing documents, it shall provide EPA and the State with the following: a) the title of the document, record, or information; b) the date of the document, record, or information; c) the name and title of the author of the document, record, or information; d) the name and title of each addressee and recipient; e) a description of the contents of the document, record, or information; and f) the privilege asserted by Settling Party. However, no documents, reports or other information created or generated pursuant to the requirements of this Settlement Agreement shall be withheld on the grounds that they are privileged.

13

Draft – April 26, 2016 – For Settlement Negotiation Purposes – Subject
to EPA Management Review and Approval

54. No claim of confidentiality shall be made with respect to any data, including, but not limited to, all sampling, analytical, monitoring, hydrogeologic, scientific, chemical, or engineering data, or any other documents or information evidencing conditions at, or around, OU2 for the Site.

## XI. RECORD RETENTION

55. During the pendency of this Settlement Agreement and until 10 years after the Settling Party's receipt of EPA's notification that work has been completed, Settling Party shall preserve and retain all non-identical copies of documents, records, and other information (including documents, records, or other information in electronic form) now in its possession or control or which come into its possession or control that relate in any manner to the performance of the Work or the liability of any person under CERCLA with respect to OU2 for the Site, regardless of any corporate retention policy to the contrary. Until 10 years after notification that work has been completed, Settling Party shall also instruct its contractors and agents to preserve all documents, records, and other information of whatever kind, nature, or description relating to performance of the Work.

56. At the conclusion of this document retention period, Settling Party shall notify EPA and the State at least 90 days prior to the destruction of any such documents, records, or other information and, upon request by EPA or the State, Settling Party shall deliver any such documents, records, or other information to EPA or the State. Settling Party may assert that certain documents, records, and other information are privileged under the attorney-client privilege or any other privilege recognized by federal law. If Settling Party asserts such a privilege, it shall provide EPA with the following: a) the title of the document, record, or other information; b) the date of the document, record, or other information; c) the name and title of the author of the document, record, or other information; d) the name and title of each addressee and recipient; e) a description of the subject of the document, record, or other information; and f) the privilege asserted by Settling Party. However, no documents, records, or other information created or generated pursuant to the requirements of this Settlement Agreement shall be withheld on the grounds that they are privileged.

57. Settling Party hereby certifies that to the best of its knowledge and belief, after thorough inquiry, it has not altered, mutilated, discarded, destroyed, or otherwise disposed of any records, documents, or other information (other than identical copies) relating to its potential liability regarding OU2 for the Site since notification of potential liability by EPA or the State or the filing of suit against it regarding OU2 for the Site, and that it has fully complied with any and all EPA requests for information pursuant to Sections 104(e) and 122(e) of CERCLA, 42 U.S.C. §§ 9604(e) and 9622(e), and Section 3007 of RCRA, 42 U.S.C. § 6927.

## XII. COMPLIANCE WITH OTHER LAWS

14

Draft - April 26, 2016 - For Settlement Negotiation Purposes - Subject
to EPA Management Review and Approval

58. Settling Party shall undertake all action that this Settlement Agreement requires in accordance with the requirements of all applicable local, state, and federal laws and regulations, unless an exemption from such requirements is specifically provided by law or in this Settlement Agreement. The activities conducted pursuant to this Settlement Agreement, if approved by EPA, shall be considered consistent with the NCP.

59. As provided in Section 121(e) of CERCLA, 42 U.S.C. § 9621(e), and Section 300.400(e) of the NCP, no permit shall be required for any portion of the Work conducted entirely on-site (i.e., within the areal extent of contamination or in very close proximity to the contamination and necessary for implementation of the Work). Where any portion of the Work that is not on-site requires a federal or state permit or approval, Settling Party shall submit timely and complete applications and take all other actions necessary to obtain and to comply with all such permits or approvals.

60. This Settlement Agreement is not, and shall not be construed to be, a permit issued pursuant to any federal or state statute or regulation.

## XIII. PAYMENT OF RESPONSE COSTS

61. Payment for Future Response Costs:

     a.  Settling Party shall pay EPA all Future Response Costs not inconsistent with the NCP, based solely on information contained in an EPA SCORPIOS Report. On a periodic basis, EPA will send Settling Party a bill requiring payment that includes a SCORPIOS Report. Settling Party shall make all payments within 30 days of receipt of each such bill requiring payment, except as otherwise provided in Paragraph 62.

     b.  Settling Party shall make all payments required by this Paragraph by wire transfer directed to the Federal Reserve Bank of New York with the following information:

    i.     EFT to be directed to: Federal Reserve Bank of New York
    ii.    Bank Routing Number for Federal Reserve Bank of New York: 021030004
    iii.   Federal Reserve Bank of New York account number receiving payment: 68010727
    iv.   SWIFT address: FRNYUS33
    v.    Address: Federal Reserve Bank of New York
             33 Liberty Street
             New York, NY 10045
    vi.   Field Tag 4200 of the Fedwire message to read:
             D68010727 Environmental Protection Agency
    vii.  Case Number: CERCLA-02-
    viii.  Amount of payment:

ED_013299_00000115-00017

Draft – April 26, 2016 – For Settlement Negotiation Purposes – Subject
to EPA Management Review and Approval

ix.    Name of Remitter:
x.    Site/Spill identifier: 02-96

c.  At the time of payment, Settling Party shall send notice that payment has been
made which references the name and address of the party making payment, the date of the
transfer, the payment amount, the name of the Site, the Docket Number CERCLA 02-2016-
2021and Site/Spill ID number 02-96, to:

Alice Yeh
Project Coordinator
Emergency and Remedial Response Division
U.S. Environmental Protection Agency, Region 2
290 Broadway, 19th Floor
New York, NY 10007

Re:  Diamond Alkali Superfund Site

And to:

Sarah Flanagan
Assistant Regional Counsel
Office of Regional Counsel
U.S. Environmental Protection Agency, Region 2
290 Broadway, 17th Floor
New York, NY 10007

Re:  Diamond Alkali Superfund Site

U.S. Environmental Protection Agency
Cincinnati Finance Office
26 Martin Luther King Drive
Cincinnati, Ohio 45268
Attn: Finance (Elizabeth McGuffey)
Email: cinwd_acctsreceivable@epa.gov and mcguffey.elizabeth@epa.gov

d.  The total amount that Settling Party shall pay pursuant to Paragraph 61 shall be
deposited in the Diamond Alkali Superfund Site Special Account within EPA Hazardous
Substance Superfund to be retained and used to conduct or finance response actions at or in
connection with the Site, or to be transferred by EPA to the EPA Hazardous Substance
Superfund.

16

Draft – April 26, 2016 – For Settlement Negotiation Purposes – Subject
to EPA Management Review and Approval

62. In the event that the payments for Future Response Costs are not made within 30 days of Settling Party's receipt of a bill, Settling Party shall pay Interest on the unpaid balance. The Interest on Future Response Costs shall begin to accrue on the date of the bill and shall continue to accrue until the date of payment. Payments of Interest made under this Paragraph shall be in addition to such other remedies or sanctions available to the United States by virtue of Settling Party's failure to make timely payments under this Section, including but not limited to, payment of stipulated penalties pursuant to Section XVI.

63.  Settling Party may contest payment of any Future Response Costs billed under Paragraph 61, if it determines that EPA has made a mathematical error or included a cost item that is not within the definition of Future Response Costs, or if it believes EPA incurred excess costs as a direct result of an action by EPA that was inconsistent with the NCP. Such objection shall be made in writing within 30 days of receipt of the bill and must be sent to EPA Project Coordinator. Any such objection shall specifically identify the contested Future Response Costs and the basis for objection. In the event of an objection, Settling Party shall within the 30-day period pay all uncontested Future Response Costs to EPA in the manner described in Paragraph 61. Simultaneously, Settling Party shall establish an interest-bearing escrow account in a federally-insured bank duly chartered in the State of New Jersey and remit to that escrow account funds equivalent to the amount of the contested Future Response Costs. Settling Party shall send to EPA Project Manager a copy of the transmittal letter and check paying the uncontested Future Response Costs, and a copy of the correspondence that establishes and funds the escrow account, including, but not limited to, information containing the identity of the bank and bank account under which the escrow account is established as well as a bank statement showing the initial balance of the escrow account. Simultaneously with establishment of the escrow account, Settling Party shall initiate the Dispute Resolution procedures in Section XIV (Dispute Resolution). If EPA prevails in the dispute, within 5 days of the resolution of the dispute, Settling Party shall pay the sums due (with accrued interest) to EPA in the manner described in Paragraph 61. If Settling Party prevails concerning any aspect of the contested costs, Settling Party shall pay that portion of the costs (plus associated accrued interest) for which it did not prevail to EPA in the manner described in Paragraph 61. Settling Party shall be disbursed any balance of the escrow account. The dispute resolution procedures set forth in this Paragraph in conjunction with the procedures set forth in Section XIV (Dispute Resolution) shall be the exclusive mechanisms for resolving disputes regarding Settling Party's obligation to reimburse EPA for its Future Response Costs.

## XIV. DISPUTE RESOLUTION

64. Unless this Settlement Agreement expressly provides otherwise, the dispute resolution procedures of this Section shall be the exclusive mechanism for resolving disputes arising under this Settlement Agreement. The Parties shall attempt to resolve any disagreements

17

Draft - April 26, 2016 - For Settlement Negotiation Purposes - Subject
to EPA Management Review and Approval

concerning this Settlement Agreement expeditiously and informally. The Parties agree that the
Performance Standards to be developed by EPA will not be subject to dispute.

65. If Settling Party objects to any EPA action taken pursuant to this Settlement
Agreement, including billings for Future Response Costs, it shall notify EPA in writing of its
objection(s) within **10** days of such action, unless the objection(s) has/have been resolved
informally. EPA and Settling Party shall have 30 days from EPA's receipt of Settling Party's
written objection(s) to resolve the dispute through formal negotiations (the "Negotiation
Period"). The Negotiation Period may be extended at the sole discretion of EPA.

66. Any agreement reached by the Parties pursuant to this Section shall be in writing and
shall, upon signature by both Parties, be incorporated into and become an enforceable part of this
Settlement Agreement. If the Parties are unable to reach an agreement within the Negotiation
Period, the Director of the Emergency and Remedial Response Division, Region 2, will issue a
written decision on the dispute to Settling Party. EPA's decision shall be incorporated into and
become an enforceable part of this Settlement Agreement. Following resolution of the dispute, as
provided by this Section, Settling Party shall fulfill the requirement that was the subject of the
dispute in accordance with the agreement reached or with EPA's decision, whichever occurs.

The invocation of formal dispute resolution procedures under this Section shall not
extend, postpone, or affect in any way any obligation of Settling Party under this Settlement
Agreement not directly disputed by Settling Party. Except as provided in Paragraph 75, stipulated
penalties with respect to the disputed matter shall continue to accrue but payment shall be stayed
pending resolution of the dispute as provided in Paragraph 75. Notwithstanding the stay of
payment, stipulated penalties shall accrue from the first day of noncompliance with any
applicable provision of this Settlement Agreement. In the event that Settling Party does not
prevail on the disputed issue, stipulated penalties shall be assessed and paid as provided in
Section XVI (Stipulated Penalties).

### XV. FORCE MAJEURE

67. Settling Party agrees to perform all requirements of this Settlement Agreement within
the time limits established under this Settlement Agreement, unless the performance is delayed
by a *force majeure*. For purposes of this Settlement Agreement, a *force majeure* is defined as any
event arising from causes beyond the control of Settling Party, or of any entity controlled by
Settling Party, or of Settling Party's contractors that delays or prevents performance of any
obligation under this Settlement Agreement despite Settling Party's best efforts to fulfill the
obligation. The requirement that Settling Party exercise "best efforts to fulfill the obligation"
includes using best efforts to address the effects of any potential *force majeure* event: (a) as it is
occurring; and (b) following the potential *force majeure* event such that the delay and any

18

ED_013299_00000115-00020

Draft - April 26, 2016 - For Settlement Negotiation Purposes - Subject
to EPA Management Review and Approval

adverse effect of the delay are minimized to the greatest extent possible. *Force majeure* does not include financial inability to complete the Work, or increased cost of performance.

68. If any event occurs or has occurred that may delay the performance of any obligation under this Settlement Agreement for which Settling Party intends or may intend to assert a claim of *force majeure*,  Settling Party shall notify the EPA Project Coordinator orally or, in his or her absence, EPA's Alternate Project Coordinator or, in the event both of EPA's designated representatives are unavailable, the Director of the Emergency and Remedial Response Division, Region 2, within 24 hours of when Settling Party first knew that the event might cause a delay. Within 14 days thereafter, Settling Party shall provide to EPA in writing: an explanation and description of the reasons for the delay; the anticipated duration of the delay; all actions taken or to be taken to prevent or minimize the delay; a schedule for implementation of any measures to be taken to prevent or mitigate the delay or the effect of the delay; Settling Party's rationale for attributing such delay to a *force majeure* event ; and a statement as to whether, in the opinion of Settling Party, such event may cause or contribute to an endangerment to public health, welfare, or the environment. Settling Party shall include with any notice all available documentation supporting its claim that the delay was attributable to a *force majeure.* Settling Party shall be deemed to know of any circumstance of which Settling Party, any entity controlled by Settling Party, or Settling Party's contractors knew or should have known. Failure to comply with the above requirements regarding an event shall preclude Settling Party from asserting any claim of *force majeure* regarding that event.

69. If EPA agrees that the delay or anticipated delay is attributable to a *force majeure* event, the time for performance of the obligations under this Settlement Agreement that are affected by the *force majeure* event will be extended by EPA for such time as is necessary to complete those obligations. An extension of the time for performance of the obligations affected by the *force majeure* event shall not, of itself, extend the time for performance of any other obligation. If EPA does not agree that the delay or anticipated delay has been or will be caused by a *force majeure* event, EPA will notify Settling Party in writing of its decision. If EPA agrees that the delay is attributable to a *force majeure* event, EPA will notify Settling Party in writing of the length of the extension, if any, for performance of the obligations affected by the *force majeure* event.

70. If Settling Party elects to invoke the dispute resolution procedures set forth in Section XIV (Dispute Resolution), it shall do so no later than 10 days after receipt of EPA's notice under Paragraph 69. In any such proceeding, Settling Party shall have the burden of demonstrating by a preponderance of the evidence that the delay or anticipated delay has been or will be caused by a *force majeure event*, that the duration of the delay or the extension sought was or will be warranted under the circumstances, that best efforts were exercised to avoid and mitigate the effects of the delay, and that Settling Party complied with the requirements of Paragraphs 67 and

19

Draft - April 26, 2016 - For Settlement Negotiation Purposes - Subject
to EPA Management Review and Approval

68. If Settling Party carries this burden, the delay at issue shall be deemed not to be a violation by Settling Party of the affected obligation of this Settlement Agreement identified to EPA.

## XVI. STIPULATED PENALTIES

71. Settling Party shall be liable to EPA for stipulated penalties in the amounts set forth in Paragraphs 72 and 73 for failure to comply with the obligations specified in Paragraphs 72 and 73, unless excused under Section XV (*Force Majeure*). "Compliance" by Settling Party shall include completion of all obligations under this Settlement Agreement in accordance with all applicable requirements of this Settlement Agreement and within the specified time schedules established under this Settlement Agreement.

72. Stipulated Penalty Amounts.

a. The following stipulated penalties shall accrue per violation per day for failure to submit timely or adequate deliverable listed in Subparagraph 72.b (1)-(10), or timely comply with Subparagraph 72.b(11)-(12).

| Penalty Per Violation (Per Day) | Period of Noncompliance (Days) |
| --- | --- |
| $ 5,000 | 1-14 |
| $ 10,000 | 15-30 |
| $ 20,000 | 31and beyond |

b. Compliance Milestones

1. Project Management Plan;
2. Pre-Design Investigation Work Plan;
3. Pre-Design Investigation Evaluation Report;
4. Remedial Design Work Plan;
5. Site Selection and Evaluation Work Plan;
6. Site Selection and Evaluation Report;
7. Preliminary Remedial Design;
8. Intermediate Remedial Design;
9. Pre-Final Remedial Design;
10. Final Remedial Design;
11. Payment of Future Response Costs; and
12. Establishment and maintenance of financial assurance in compliance with the timelines and other substantive and procedural requirements of Section XXIV (Financial Assurance).

20

Draft - April 26, 2016 - For Settlement Negotiation Purposes - Subject
to EPA Management Review and Approval

73. Stipulated Penalty Amounts.

The following stipulated penalties shall accrue per violation per day for any noncompliance with a requirement of this Settlement Agreement not identified in Paragraph 72, including failure to submit other timely or adequate reports or deliverables.

| Penalty Per Violation (Per Day) | Period of Noncompliance (Days) |
|---|---|
| $ 4,000 | 1-14 |
| $ 8,000 | 15-30 |
| $ 16,000 | 31and beyond |

74. In the event that EPA assumes performance of all or any portion of the Work pursuant to Paragraph 84 (Work Takeover), Settling Party shall be liable for a stipulated penalty in the amount of  $25,000,000. Stipulated Penalties under this Paragraph are in addition to the funding available to EPA under Paragraph 108 (Funding for Work Takeover) and Paragraph 84 (Work Takeover).

75. All penalties shall begin to accrue on the day after the complete performance is due, or the day a violation occurs, and shall continue to accrue through the final day of the correction of the noncompliance or completion of the activity. However, stipulated penalties shall not accrue: a) with respect to a deficient submission under Section 5.6 of the SOW (Approval of Deliverables), during the period, if any, beginning on the 31st day after EPA's receipt of such submission until the date that EPA notifies Settling Party of any deficiency; and b) with respect to a decision by the Director of the Emergency and Remedial Response Division, Region 2, under Paragraph 66 of Section XIV (Dispute Resolution), during the period, if any, beginning on the 21st day after the Negotiation Period begins until the date that EPA management official issues a final decision regarding such dispute. Nothing herein shall prevent the simultaneous accrual of separate penalties for separate violations of this Settlement Agreement.

76. Following EPA's determination that Settling Party has failed to comply with a requirement of this Settlement Agreement, EPA may give Settling Party written notification of the failure and describe the noncompliance. EPA may send Settling Party a written demand for payment of the penalties. However, penalties shall accrue as provided in the preceding Paragraph regardless of whether EPA has notified Settling Party of a violation.

77. Settling Party shall pay EPA all penalties accruing under this Section within 30 days of Settling Party's receipt from EPA of a demand for payment of the penalties, unless Settling Party invokes the dispute resolution procedures under Section XIV (Dispute Resolution). All payments to EPA under this Section shall indicate that the payment is for stipulated penalties and shall be made in accordance with Paragraph 61 (Payment for Future Response Costs).

21

Draft - April 26, 2016 - For Settlement Negotiation Purposes - Subject
to EPA Management Review and Approval

78. The payment of penalties and Interest, if any, shall not alter in any way Settling Party's obligation to complete performance of the Work required under this Settlement Agreement.

79. Penalties shall continue to accrue during any dispute resolution period but need not be paid until 15 days after the dispute is resolved by agreement or by receipt of EPA's decision.

80. If Settling Party fails to pay stipulated penalties when due, EPA may institute proceedings to collect the penalties, as well as Interest. Settling Party shall pay Interest on the unpaid balance, which shall begin to accrue on the date of demand made pursuant to Paragraph 87. Nothing in this Settlement Agreement shall be construed as prohibiting, altering, or in any way limiting the ability of EPA to seek any other remedies or sanctions available by virtue of Settling Party's violation of this Settlement Agreement or of the statutes and regulations upon which it is based, including, but not limited to, penalties pursuant to Sections 106(b) and 122(l) of CERCLA, 42 U.S.C. §§ 9606(b) and 9622(l), and punitive damages pursuant to Section 107(c)(3) of CERCLA, 42 U.S.C. § 9607(c)(3). Provided, however, that EPA shall not seek civil penalties pursuant to Section 106(b) or 122(l) of CERCLA or punitive damages pursuant to Section 107(c)(3) of CERCLA for any violation for which a stipulated penalty is provided herein, except in the case of a willful violation of this Settlement Agreement, or in the event that EPA assumes performance of a portion or all of the Work pursuant to Section XVIII (Reservation of Rights by EPA), Paragraph 84. Notwithstanding any other provision of this Section, EPA may, in its unreviewable discretion, waive any portion of stipulated penalties that have accrued pursuant to this Settlement Agreement.

## XVII. COVENANTS BY EPA

81. In consideration of the actions that Settling Party will perform and the payments that Settling Party will make under the terms of this Settlement Agreement, and except as otherwise specifically provided in this Settlement Agreement, EPA covenants not to sue or to take administrative action against Settling Party pursuant to Sections 106 and 107(a) of CERCLA, 42 U.S.C. §§ 9606 and 9607(a), for the Work performed under this Settlement Agreement and for recovery of Future Response Costs. These covenants shall take effect upon the Effective Date. These covenants are conditioned upon Settling Party's complete and satisfactory performance of its obligations under this Settlement Agreement, including, but not limited to, Settling Party's payments of Future Response Costs pursuant to Section XIII (Payment of Response Costs) of this Settlement Agreement. These covenants extend only to Settling Party and do not extend to any other person.

## XVIII. RESERVATION OF RIGHTS BY EPA

82. Except as specifically provided in this Settlement Agreement, nothing herein shall limit the power and authority of EPA or the United States to take, direct, or order all actions

22

Draft – April 26, 2016 – For Settlement Negotiation Purposes – Subject
to EPA Management Review and Approval

necessary to protect public health, welfare, or the environment or to prevent, abate, or minimize an actual or threatened release of hazardous substances, pollutants or contaminants, or hazardous or solid waste on, at, or from the Site. Further, except as specifically provided in this Settlement Agreement, nothing herein shall prevent EPA from seeking legal or equitable relief to enforce the terms of this Settlement Agreement, from taking other legal or equitable action as it deems appropriate and necessary, or from requiring Settling Party in the future to perform additional activities pursuant to CERCLA or any other applicable law.

83. The covenant not to sue set forth in Section XVII (Covenants by EPA) above does not pertain to any matters other than those expressly identified therein. EPA reserves, and this Settlement Agreement is without prejudice to, all rights against Settling Party with respect to all other matters, including, but not limited to:

a. claims based on a failure by Settling Party to meet a requirement of this Settlement Agreement;

b. liability for costs not included within the definitions of  Future Response Costs;

c. liability for performance of response action other than the Work;

d. criminal liability;

e. liability for violations of federal or state law that occur during or after implementation of the Work;

f. liability for damages for injury to, destruction of, or loss of natural resources, and for the costs of any natural resource damage assessments;

g. liability arising from the past, present, or future disposal, release, or threat of release of Waste Materials outside of OU2 for the Site; and

h. liability for costs incurred, or to be incurred, by the Agency for Toxic Substances and Disease Registry related to the Site.

84. <u>Work Takeover</u>. In the event EPA determines that Settling Party has ceased implementation of any portion of the Work, are seriously or repeatedly deficient or late in its performance of the Work, or are implementing the Work in a manner that may cause an endangerment to human health or the environment, EPA may issue a written notice ("Work Takeover Notice") to Settling Party and assume the performance of all or any portion(s) of the Work as EPA deems necessary ("Work Takeover"). Settling Party may invoke the procedures set forth in Section XIV (Dispute Resolution) to dispute EPA's determination that takeover of the Work is warranted under this Paragraph. However, notwithstanding Settling Party's

23

Draft - April 26, 2016 - For Settlement Negotiation Purposes - Subject
to EPA Management Review and Approval

invocation of such dispute resolution procedures, and during the pendency of any such dispute, EPA may in its sole discretion commence and continue a Work Takeover until the earlier of the date that Settling Party remedies, to EPA's satisfaction, the circumstances giving rise to EPA's issuance of the relevant Work Takeover Notice, or the date that a written decision terminating such Work Takeover is rendered in accordance with Section XIV (Dispute Resolution). Funding of Work Takeover costs is addressed under Paragraph 108. Notwithstanding any other provision of this Settlement Agreement, EPA retains all authority and reserves all rights to take any and all response actions authorized by law.

## XIX. COVENANTS BY SETTLING PARTY

85. Settling Party covenants not to sue and agrees not to assert any claims or causes of action against the United States, or its contractors or employees, with respect to the Work, past response actions, Future Response Costs, or this Settlement Agreement, including, but not limited to:

a. any direct or indirect claim for reimbursement from the Hazardous Substance Superfund established by 26 U.S.C. § 9507, based on Sections 106(b)(2), 107, 111, 112, or 113 of CERCLA, 42 U.S.C. §§ 9606(b)(2), 9607, 9611, 9612, or 9613, or any other provision of law;

b. any claim arising out of response actions at, or in connection with, the Site, including any claim under the United States Constitution, the New Jersey Constitution, the Tucker Act, 28 U.S.C. § 1491, the Equal Access to Justice Act, 28 U.S.C. § 2412, as amended, or at common law; or

c. any claim against the United States pursuant to Sections 107 and 113 of CERCLA, 42 U.S.C. §§ 9607 and 9613, relating to the Work or payment of Future Response Costs.

86. Except as expressly provided in Paragraphs 89 (Claims Against De Micromis Parties), and 95 (Claims Against *De Minimis* and Ability to Pay Parties), these covenants shall not apply in the event the United States brings a cause of action or issues an order pursuant to any of the reservations set forth in Section XVIII (Reservation of Rights by EPA), other than in Paragraph 83.a (claims for failure to meet a requirement of the Settlement Agreement) or 83.d (criminal liability), but only to the extent that Settling Party claims arise from the same response action, response costs, or damages that the United States is seeking pursuant to the applicable reservation.

87. Settling Party reserves, and this Settlement Agreement is without prejudice to, claims against the United States subject to the provisions of Chapter 171 of Title 28 of the United States Code, and brought pursuant to any statute other than CERCLA and for which the waiver of

24

Draft - April 26, 2016 - For Settlement Negotiation Purposes - Subject
to EPA Management Review and Approval

sovereign immunity is found in a statute other than CERCLA, for money damages for injury or
loss of property or personal injury or death caused by the negligent or wrongful act or omission
of any employee of the United States while acting within the scope of his office or employment
under circumstances where the United States, if a private person, would be liable to the claimant
in accordance with the law of the place where the act or omission occurred. However, any such
claim shall not include a claim for any damages caused, in whole or in part, by the act or
omission of any person, including any contractor, who is not a federal employee as that term is
defined in 28 U.S.C. § 2671; nor shall any such claim include a claim based on EPA's selection
of response actions, or the oversight or approval of Settling Party's plans or activities.

88. Nothing in this Settlement Agreement shall be deemed to constitute approval or
preauthorization of a claim within the meaning of Section 111 of CERCLA, 42 U.S.C. § 9611, or
40 C.F.R. § 300.700(d).

89. Claims Against De Micromis Parties. Settling Party agrees not to assert any claims
and to waive all claims or causes of action (including but not limited to claims or causes of action
under Sections 107(a) or 113 of CERCLA) that they may have for all matters relating to OU2 for
the Site against any person where the person's liability to Settling Party with respect to OU2 is
based solely on having arranged for disposal or treatment, or for transport for disposal or
treatment, of hazardous substances at the Site, if all or part of the disposal, treatment, or transport
occurred before April 1, 2001, and the total amount of material containing hazardous substances
contributed by such person to the Site was less than 110 gallons of liquid materials or 200
pounds of solid materials.

90. The waiver in Paragraph 89 shall not apply with respect to any defense, claim, or
cause of action that Settling Party may have against any person meeting the above criteria, if such
person asserts a claim or cause of action relating to OU2 for the Site against Settling Party. This
waiver also shall not apply to any claim or cause of action against any person meeting the above
criteria, if EPA determines:

     a.     that such person failed to comply with any EPA request for information or
administrative subpoenas issued pursuant to Section 104(e) or 122(e) of CERCLA, 42 U.S.C. §§
9604(e) or 9622(e), or Section 3007 of RCRA, 42 U.S.C. § 6927, or has impeded or is impeding,
through action or inaction, the performance of a response action or natural resource restoration
with respect to OU2 for the Site, or has been convicted of a criminal violation for the conduct to
which this waiver would apply and that conviction has not been vitiated on appeal or otherwise;
or

     b.     that the materials containing hazardous substances contributed to the Site
by such person have contributed significantly, either individually or in aggregate, to the cost of
response action or natural resource restoration with respect to OU2 for the Site.

25

Draft - April 26, 2016 - For Settlement Negotiation Purposes - Subject
to EPA Management Review and Approval

91. Claims Against *De Minimis* and Ability to Pay Parties. Settling Party agrees not to assert any claims and to waive all claims or causes of action (including but not limited to claims or causes of action under Sections 107(a) or 113 of CERCLA) that they may have for response costs relating to the Site against any person that has entered, or in the future enters, into a final Section 122(g) *de minimis* settlement, or a final settlement based on ability to pay, with EPA with respect to OU2 for the Site. This waiver shall not apply with respect to any defense, claim, or cause of action that Settling Party may have against any person if such person asserts a claim or cause of action relating to OU2 for the Site against Settling Party.

## XX. OTHER CLAIMS

92. By issuance of this Settlement Agreement, the United States and EPA assume no liability for injuries or damages to persons or property resulting from any acts or omissions of Settling Party. The United States or EPA shall not be deemed a party to any contract entered into by Settling Party or its directors, officers, employees, agents, successors, representatives, assigns, contractors, or consultants in carrying out actions pursuant to this Settlement Agreement.

93. Except as expressly provided in Paragraphs 89 (Claims Against De Micromis Parties), 91 (Claims Against *De Minimis* and Ability to Pay Parties), and Section XVII (Covenants by EPA), nothing in this Settlement Agreement constitutes a satisfaction of, or release from, any claim or cause of action against Settling Party or any person not a party to this Settlement Agreement, for any liability such person may have under CERCLA, other statutes, or common law, including, but not limited to, any claims of the United States for costs, damages, and interest under Sections 106 and 107 of CERCLA, 42 U.S.C. §§ 9606 and 9607.

94. No action or decision by EPA pursuant to this Settlement Agreement shall give rise to any right to judicial review, except as set forth in Section 113(h) of CERCLA, 42 U.S.C. § 9613(h).

## XXI EFFECT OF SETTLEMENT/CONTRIBUTION

95. Except as provided in Paragraphs 89 (Claims Against De Micromis Parties), and 91 (Claims Against *De Minimis* and Ability to Pay Parties), nothing in this  Settlement Agreement shall be construed to create any rights in, or grant any cause of action to, any person not a Party to this Settlement Agreement. Except as provided in Section XVII (Covenants by Settling Party), each of the Parties expressly reserves any and all rights (including, but not limited to, claims pursuant to Section 113 of CERCLA, 42 U.S.C. § 9613), defenses, claims, demands, and causes of action which each Party may have with respect to any matter, transaction, or occurrence relating in any way to OU2 for the Site against any person not a Party hereto. Nothing in this Settlement Agreement diminishes the right of the United States, pursuant to Section 113(f)(2) and (3) of CERCLA, 42 U.S.C. § 9613(f)(2) and (3), to pursue any such persons to obtain

26

Draft – April 26, 2016 – For Settlement Negotiation Purposes – Subject
to EPA Management Review and Approval

additional response costs or response action and to enter into settlements that give rise to contribution protection pursuant to Section 113(f)(2).

96. The Parties agree that this Settlement Agreement constitutes an administrative settlement pursuant to which Settling Party has, as of the Effective Date, resolved liability to the United States within the meaning of Section 113(f)(2) and 122(h)(4) of CERCLA, 42 U.S.C. § 9613(f)(2) and 9622(h)(4), and is entitled, as of the Effective Date, to protection from contribution actions or claims as provided by Sections 113(f)(2) and 122(h)(4) of CERCLA, 42 U.S.C. §§ 9613(f)(2) and 9622(h)(4), or as may be otherwise provided by law, for "matters addressed" in this Settlement Agreement. The "matters addressed" in this Settlement Agreement are the Work, and Future Response Costs.

97. The Parties further agree that this Settlement Agreement constitutes an administrative settlement pursuant to which Settling Party has, as of the Effective Date, resolved liability to the United States within the meaning of Section 113(f)(e)(B) of CERCLA, 42 U.S.C. § 9613(f)(3)(B).

98. Settling Party shall, with respect to any suit or claim brought by it for matters related to this Settlement Agreement, notify EPA in writing no later than 60 days prior to the initiation of such suit or claim. Settling Party also shall, with respect to any suit or claim brought against it for matters related to this Settlement Agreement, notify EPA in writing within 10 days after service of the complaint or claim upon it. In addition, Settling Party shall notify EPA within 10 days after service or receipt of any Motion for Summary Judgment and within 10 days after receipt of any order from a court setting a case for trial, for matters related to this Settlement Agreement.

99. In any subsequent administrative or judicial proceeding initiated by EPA, or by the United States on behalf of EPA, for injunctive relief, recovery of response costs, or other relief relating to the Site, Settling Party shall not assert, and may not maintain, any defense or claim based upon the principles of waiver, res judicata, collateral estoppel, issue preclusion, claim-splitting, or other defenses based upon any contention that the claims raised in the subsequent proceeding were or should have been brought in the instant case; provided, however, that nothing in this Paragraph affects the enforceability of the covenant by EPA set forth in Section XVII (Covenants by EPA).

## XXII. INDEMNIFICATION

100. Settling Party shall indemnify, save, and hold harmless the United States, its officials, agents, contractors, subcontractors, employees, and representatives from any and all claims or causes of action arising from, or on account of, negligent or other wrongful acts or omissions of Settling Party, its officers, directors, employees, agents, contractors, or subcontractors, in carrying out actions pursuant to this Settlement Agreement. In addition,

27

Draft - April 26, 2016 - For Settlement Negotiation Purposes - Subject
to EPA Management Review and Approval

Settling Party agrees to pay the United States all costs incurred by the United States, including, but not limited to, attorney fees and other expenses of litigation and settlement, arising from, or on account of, claims made against the United States based on negligent or other wrongful acts or omissions of Settling Party, its officers, directors, employees, agents, contractors, subcontractors, and any persons acting on its behalf or under its control, in carrying out activities pursuant to this Settlement Agreement. The United States shall not be held out as a party to any contract entered into, by, or on behalf of Settling Party in carrying out activities pursuant to this Settlement Agreement. Neither Settling Party nor any such contractor shall be considered an agent of the United States.

101. The United States shall give Settling Party notice of any claim for which the United States plans to seek indemnification pursuant to this Section and shall consult with Settling Party prior to settling such claim.

102. Settling Party waives all claims against the United States for damages or reimbursement or for set-off of any payments made, or to be made, to the United States, arising from, or on account of, any contract, agreement, or arrangement between Settling Party and any person for performance of Work on, or relating to, OU2 for the Site, including, but not limited to, claims on account of construction delays. In addition, Settling Party shall indemnify and hold harmless the United States with respect to any and all claims for damages or reimbursement arising from, or on account of, any contract, agreement, or arrangement between Settling Party and any person for performance of Work on, or relating to, the Site.

## XXIII. INSURANCE

103. At least 14 days prior to commencing any on-Site Work under this Settlement Agreement, Settling Party shall secure and shall maintain for the duration of this Settlement Agreement commercial general liability insurance with limits of 10,000,000 million dollars, for any one occurrence, and automobile insurance with limits of 5,000,000 million dollars, combined single limit, naming EPA as an additional insured with respect to all liability arising out of activities performed by or on behalf of Settling Party pursuant to this Settlement Agreement. Within the same period, Settling Party shall provide EPA with certificates of such insurance and a copy of each insurance policy. Settling Party shall submit such certificates and copies of policies each year on the anniversary of the Effective Date. In addition, for the duration of this Settlement Agreement, Settling Party shall satisfy, or shall ensure that its contractors or subcontractors satisfy, all applicable laws and regulations regarding the provision of worker's compensation insurance for all persons performing the Work on behalf of Settling Party in furtherance of this Settlement Agreement. If Settling Party demonstrates by evidence satisfactory to EPA that any contractor or subcontractor maintains insurance equivalent to that described above, or insurance covering some or all of the same risks but in an equal or lesser amount, then Settling Party needs to provide only that portion of the insurance described above that is not maintained by such contractor or subcontractor.

28

Draft - April 26, 2016 - For Settlement Negotiation Purposes - Subject
to EPA Management Review and Approval

## XXIV. FINANCIAL ASSURANCE

104. In order to ensure completion of the Work, Settling Party shall establish, maintain, and submit to EPA financial assurance, initially in the amount of $165,200,000 (the "Estimated Cost of the Work"), for the benefit of EPA. The financial assurance, which must be satisfactory in form and substance to EPA, shall be in the form of one or more of the following mechanisms (provided that, if Settling Party intends to use multiple mechanisms, such multiple mechanisms shall be limited to surety bonds, letter of credits, trust funds, and insurance policies):

      a.     a surety bond that provides EPA with acceptable rights as a beneficiary thereof unconditionally guaranteeing payment and/or performance of the Work;

      b.     an irrevocable letters of credit, payable to or at the direction of EPA, that is issued by an entity that has the authority to issue letters of credit and whose letter-of-credit operations are regulated and examined by a federal or state agency;

      c.     a trust fund established for the benefit of EPA that is administered by a trustee acceptable in all respects to EPA;

      d.     a policy of insurance issued that provides EPA with acceptable rights as a beneficiary thereof, is issued by an insurance carrier acceptable in all respects to EPA, and ensures the payment and/or performance of the Work;

      e.     a demonstration by Settling Party that Settling Party meets the financial test criteria of 40 C.F.R. § 264.143(f) with respect to the Estimated Cost of the Work (plus the amount(s) of any other federal, state, or tribal environmental obligations financially assured through the use of a financial test or guarantee), provided that all other requirements of 40 C.F.R. § 264.143(f) and this Section are satisfied; and/or

      f.     a written guarantee to fund or perform the Work executed in favor of EPA provided by one of more of the following: (1) a direct or indirect parent company of Settling Party, or (2) a company that has a "substantial business relationship" (as defined in 40 C.F.R. § 264.141(h)) with Settling Party; provided, however, that any company providing such a guarantee must demonstrate to the satisfaction of EPA that it satisfies the financial test and reporting requirements for owners and operators set forth in subparagraph (1) through (8) of 40 C.F.R. § 264.143(f) and this Section with respect to the Estimated Cost of the Work (plus the amount(s) of any other federal, state, or tribal environmental obligations financially assured through the use of a financial test or guarantee).

105. Within 30 days after the Effective Date, Settling Party shall submit all executed or otherwise finalized mechanisms or other documents required, in a form substantially identical to

ED_013299_00000115-00031

Draft - April 26, 2016 - For Settlement Negotiation Purposes - Subject
to EPA Management Review and Approval

the documents attached hereto as Appendix D, and with a copy to the EPA Project Coordinator,
to:

> Chief, Resource Management/Cost Recovery Section
> Emergency & Remedial Response Division
> U.S. EPA Region 2
> 290 Broadway 18th Floor
> New York, NY 10007-1866

106. If Settling Party provides or obtains financial assurance for completion of the Work
by means of a demonstration or guarantee pursuant to Paragraph 104(e) or 104(f) of this
Settlement Agreement, Settling Party and/or its guarantor shall also comply with the other
relevant requirements of 40 C.F.R. § 264.143(f) relating to these mechanisms unless otherwise
provided in this Settlement Agreement, and with the requirements of this Section, including but
not limited to: (a) the initial submission of required financial reports and statements from the
relevant entity's chief financial officer and independent certified public accountant to EPA no
later than 30 days after the Effective Date; (b) the annual re-submission of such reports and
statements within 90 days after the close of each such entity's fiscal year; and (c) the notification
of EPA no later than 30 days after any such entity determines that it no longer satisfies the
financial test requirements set forth 40 C.F.R. § 264.143(f)(1) and in any event within 90 days
after the close of any fiscal year for which the year-end financial data show that such entity no
longer satisfies such financial test requirements. Settling Party agrees that EPA may also, based
on a belief that the relevant entity may no longer meet the financial test requirements of this
Section, require reports of financial condition at any time from the relevant entity in addition to
those specified in this Section. For purposes of the financial assurance mechanisms specified in
this Section, references in 40 C.F.R. Part 264, Subpart H to: (1) the terms "current closure cost
estimate," "current post-closure cost estimate," and "current plugging and abandonment cost
estimate," shall also include the Estimated Cost of the Work; (2) "the sum of current closure and
post closure cost estimates and current plugging and abandonment cost estimates" shall mean
"the sum of all environmental obligations" (including obligations under CERCLA, RCRA,
EPA's Underground Injection Control program, 40 C.F.R. Part 144, enacted as part of the Solid
Waste Disposal Act, 42 U.S.C. §§ 6901 to 6992k, the Toxic Substances Control Act, 15 U.S.C.
§§ 2601 to 2695d, and any other federal, state, or tribal environmental obligation) guaranteed by
such company or for which such company is otherwise financially obligated in addition to the
Estimated Cost of Work to be performed in accordance with this Settlement Agreement: (3) for
purposes of this Paragraph, the terms "owner" and "operator" shall be deemed to refer to
"Settling Party" ; and (4) the terms "facility" and "hazardous waste management facility" shall be
deemed to include the Site.

107. Settling Party shall diligently monitor the adequacy of the financial assurance. In
the event that EPA determines and so notifies Settling Party, or Settling Party becomes aware of

30

Draft - April 26, 2016 - For Settlement Negotiation Purposes - Subject
to EPA Management Review and Approval

information indicating, that financial assurance provided pursuant to this Section is inadequate or otherwise no longer satisfies the requirements set forth in this Section, whether due to an increase in the estimated costs of completing the Work or for any other reason, Settling Party shall notify EPA of the inadequacy within 30 days and, within 30 days after providing to or receiving from EPA such notice, shall obtain and submit to EPA for approval a proposal for a revised or alternate form of financial assurance that satisfies the requirements set forth in this Section. If EPA approves the proposal, Settling Party shall provide a revised or alternate financial assurance mechanism in compliance with and to the extent permitted by such written approval and shall submit all documents evidencing such change to EPA pursuant to the delivery instructions in Paragraph 105 within 30 days after receipt of EPA's written approval. In seeking approval for a revised or alternate form of financial assurance, Settling Party shall follow the procedures set forth in Paragraph 109. If EPA does not approve the proposal, Settling Party shall follow the procedures set forth in Paragraph 109 to obtain and submit to EPA for approval another proposal for a revised or alternate form of financial assurance within 30 days after receipt of EPA's written disapproval.

108. The issuance of a Work Takeover Notice pursuant to Paragraph 84 (Work Takeover) shall trigger EPA's right to receive the benefit of any financial assurance(s) provided pursuant to this Section. At such time, EPA shall have the right to enforce performance by the issuer of the relevant financial assurance mechanism and/or immediately access resources guaranteed under any such mechanism, whether in cash or in kind, as needed to continue and complete all or any portion(s) of the Work assumed by EPA. In the event (a) EPA is unable to promptly secure the resources guaranteed under any such financial assurance mechanism, whether in cash or in kind, necessary to continue and complete the Work assumed by EPA, or (b) the financial assurance involves a demonstration of satisfaction of the financial test criteria pursuant to Paragraph 104.e or 104.f, Settling Party shall immediately upon written demand from EPA deposit into an account specified by EPA, in immediately available funds and without setoff, counterclaim, or condition of any kind, a cash amount up to but not exceeding the estimated cost of the remaining Work to be performed as of such date, as determined by EPA. All EPA Work Takeover costs not paid pursuant to this Paragraph shall be reimbursed under Section XIII (Payment of Response Costs). In addition, if at any time EPA is notified by the issuer of a financial assurance mechanism that such issuer intends to cancel the financial assurance mechanism it has issued, then, unless Settling Party provides an alternate financial assurance mechanism in accordance with this Section no later than 30 days prior to the impending cancellation date, EPA shall be entitled (as of and after the date that is 30 days prior to the impending cancellation) to draw fully on the funds guaranteed under the then-existing financial assurance.

109. Settling Party shall not reduce the amount of, or change the form or terms of, the financial assurance until Settling Party receives written approval from EPA to do so. Settling Party may petition EPA in writing to request such a reduction or change on any anniversary of

31

Draft - April 26, 2016 - For Settlement Negotiation Purposes - Subject
to EPA Management Review and Approval

the Effective Date, or at any other time agreed by the Parties. Any such petition shall include the estimated cost of the remaining Work and the basis upon which such cost was calculated, and, for proposed changes to the form or terms of the financial assurance. If EPA notifies Settling Party that it has approved the requested reduction or change, Settling Party may reduce or otherwise change the financial assurance incompliance with and to the extent permitted by such written approval and shall submit all documents evidencing such reduction or change to EPA pursuant to the delivery instructions in Paragraph 105 within 30 days after receipt of EPA's written decision. If EPA disapproves the request, Settling Party may seek dispute resolution pursuant to Section XIV (Dispute Resolution), provided, however, that Settling Party may reduce or otherwise change the financial assurance only in accordance with an agreement reached pursuant to Section XIV or EPA's written decision resolving the dispute.

110. Settling Party shall not release, cancel, or discontinue any financial assurance provided pursuant to this Section until:

a.      Settling Party receives written notice from EPA in accordance with Paragraph 115 that the Work has been fully and finally completed in accordance with this Settlement Agreement; or

b.      EPA otherwise notifies Settling Party in writing that it may release, cancel, or discontinue the financial assurance(s) provided pursuant to this Section. In the event of a dispute, Settling Party may seek dispute resolution pursuant to Section XIV (Dispute Resolution), and may release, cancel, or discontinue the financial assurance required hereunder only in accordance with an agreement reached pursuant to Section XIV or EPA's written decision resolving the dispute.

## XXV. INTEGRATION/APPENDICES

111. This Settlement Agreement and any deliverables, technical memoranda, specifications, schedules, documents, plans, reports (other than progress reports), etc. that will be developed pursuant to this Settlement Agreement and become incorporated into, and enforceable under this Settlement Agreement and its appendices constitute the final, complete, and exclusive agreement and understanding among the Parties with respect to the settlement embodied in this Settlement Agreement. The Parties acknowledge that there are no representations, agreements, or understandings relating to the settlement other than those expressly contained in this Settlement Agreement. The following appendices are attached to and incorporated into this Settlement Agreement:

"Appendix A" is the Record of Decision for Operable Unit Two

"Appendix B" is the Statement of Work

32

Draft - April 26, 2016 - For Settlement Negotiation Purposes - Subject
to EPA Management Review and Approval

"Appendix C" is the Site Map.

"Appendix D" Financial Assurance.

In the event of a conflict between any provision of this Settlement Agreement and the
provisions of any document attached to this Settlement Agreement or submitted or approved
pursuant to this Settlement Agreement, the provisions of this Settlement Agreement shall control.

## XXVI. EFFECTIVE DATE AND SUBSEQUENT MODIFICATION

112. This Settlement Agreement shall be effective on the date that the Settlement
Agreement is signed by the Director of the Emergency and Remedial Response Division of EPA
Region 2 or his delegate,

113. This Settlement Agreement may be amended by mutual agreement of EPA and
Settling Party. Amendments shall be in writing and shall be effective when signed by EPA.
Neither EPA Project Coordinators nor EPA RPMs have the authority to sign amendments to the
Settlement Agreement.

114. No informal advice, guidance, suggestion, or comment by the EPA Project
Coordinator or other EPA representatives regarding reports, plans, specifications, schedules, or
any other writing submitted by Settling Party shall relieve Settling Party of its obligation to
obtain any formal approval required by this Settlement Agreement, or to comply with all
requirements of this Settlement Agreement, unless it is formally modified.

## XXVII. NOTICE OF COMPLETION OF WORK

115. When EPA determines that all Work has been fully performed in accordance with
the other requirements of this Settlement Agreement, with the exception of any continuing
obligations required by this Settlement Agreement, including payment of Future Response Costs
or record retention, EPA will provide written notice to Settling Party. If EPA determines that any
such Work has not been completed in accordance with this Settlement Agreement, EPA will
notify Settling Party, provide a list of the deficiencies, and require that Settling Party modify the
Work Plan if appropriate to correct such deficiencies. Settling Party shall implement the
modified and approved Work Plan and shall submit the required deliverables. Failure by Settling
Party to implement the approved modified Work Plan shall be a violation of this Settlement
Agreement.

It is so ORDERED AND AGREED this _____ day of _____, _____.

33

Draft – April 26, 2016 – For Settlement Negotiation Purposes – Subject
to EPA Management Review and Approval

BY: _____    DATE:_____

Walter Mugdan, Director
Emergency and Remedial Response Division
U.S. Environmental Protection Agency, Region 2


EFFECTIVE DATE: _____

34

Draft – April 26, 2016 – For Settlement Negotiation Purposes – Subject
to EPA Management Review and Approval

## ADMINISTRATIVE SETTLEMENT AGREEMENT AND ORDER ON CONSENT
FOR REMEDIAL DESIGN

**In the Matter of Operable Unit 2 of the Diamond Alkali Superfund Site
CERCLA Docket No. 02-2016-2021**

For Settling Party _____

By:_____

Title:_____

Date:_____

35

# Exhibit 36



U.S. Chamber of Commerce

1615 H Street, NW
Washington, DC 20062-2000
uschamber.com

March 22, 2023

The Honorable Michael S. Regan
Administrator
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, NW
Washington, DC 20004

The Honorable Todd Sunhwae Kim
Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530

Dear Administrator Regan and Assistant Attorney General Kim:

I write on behalf of the U.S. Chamber of Commerce concerning the Environmental Protection Agency's (EPA's) and Department of Justice's (DOJ's) approaches to resolution of liability issues under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA).[1]

CERCLA is one of the broadest liability statutes in federal law. The Chamber supports accelerating clean-ups at Superfund sites. Based on CERCLA's strict, retroactive, and generally joint and several liability scheme (discussed below), CERCLA enforcement by any party represents potentially major environmental and financial exposure for businesses, government, and individuals. Because of this potential for massive liabilities—which may dramatically expand further given the Agency's recent proposed rule[2] to designate two substances, common in the environment, as hazardous substances subject to CERCLA—now may be a suitable time for reexamining agency practices in this area.[3] As we noted in our comments on the pending proposal, we are concerned that the proposed designation may result in a new wave of CERCLA litigation that "could be unleashed, not only between site owners and EPA, but among public and private potentially responsible parties (PRPs) attempting to allocate costs for cleanup."[4]

The Chamber and its members share EPA and DOJ goals regarding remediation consistent with the "main purposes of CERCLA—prompt cleanup of hazardous waste sites and imposition of all cleanup costs on the responsible party."[5] Settlement agreements are an important tool for achieving these goals.[6] Our principal question is whether current EPA

---

[1] Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C.§ 9601 *et seq.*
[2] Designation of Perfluorooctanoic Acid (PFOA) and Perfluorooctanesulfonic Acid (PFOS) as CERCLA Hazardous Substances, 87 Fed. Reg. 54415 (proposed Sept. 6, 2022) (to be codified at 40 C.F.R. § 302). *See generally* Comments of the U.S. Chamber of Commerce Coalition of Companies and Trade Associations on Proposed Rule, Environmental Protection Agency; Designation of Perfluorooctanoic Acid (PFOA) and Perfluorooctanesulfonic Acid (PFOS) as CERCLA Hazardous Substances; 87 Fed. Reg. 54,415 (Sept. 6, 2022), Docket ID No. EPA–HQ–OLEM–2019-0341 (Nov. 7, 2022) ("Chamber Comments"). The Office of Management and Budget (OMB) is considering a broader advance notice of proposed rulemaking, submitted by EPA for OMB review, which relates to the prospect of designating additional PFAS substances as hazardous under CERCLA. See
https://www.reginfo.gov/public/do/eoDetails?rrid=298163;
https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=202210&RIN=2050-AH25.
[3] The Office of Management and Budget (OMB) is considering a broader advance notice of proposed rulemaking, submitted by EPA for OMB review, which relates to the prospect of designating additional PFAS substances as hazardous under CERCLA. See
https://www.reginfo.gov/public/do/eoDetails?rrid=298163;
https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=202210&RIN=2050-AH25
[4] Chamber Comments 2.
[5] *Key Tronic Corp. v. United States*, 511 U.S. 809, 815 n.6 (1994) (quoting *General Elec. Co. v. Litton Indus. Auto. Sys., Inc.*, 920 F.2d 1415, 1422 (8th Cir. 1990).
[6] *See generally* Brief of Amici Curiae Chamber of Commerce et al., *Atlantic Richfield Co. v. Christian*, No. 17-1498, at 4 & n.2, 20-22 (S. Ct. filed Aug. 2019).

and DOJ practices in this area may be improved to better serve the statutory objectives and to better comport with relevant legal and policy principles.

One question relates to practices concerning extinguishing PRPs' liability to other private PRPs through settlement agreements. For example, CERCLA contains a number of provisions that indicate that a PRP that has resolved its liability to the government through settlement "shall not be liable for claims for contribution regarding matters addressed in the settlement."[7] Depending on the application, extinguishing through settlement any further contribution claim against a party asserted by any entity, public or private, and not just claims asserted by the United States, could raise certain legal and policy concerns.

Section 113, for example, creates a private right of action for contribution among PRPs;[8] the purpose of this right of action is to "create a mechanism for apportioning CERCLA-defined costs" among private actors.[9] By absolving select PRPs of liability for contribution to other PRPs through settlement, the Agency disposes of the claims of absent parties. Depending upon how it is employed, such a practice raises the potential for due process and takings issues, particularly in cases where absent parties may have strong claims against settling PRPs who bear considerable responsibility for contributing to the cleanup costs at issue.[10] This practice amounts, in effect, to a "protection racket," as the government may lack "the legal authority to extinguish another person's claims for response costs under CERCLA."[11]

In addition to legal concerns, such practices may raise policy questions. Given the potential for inequitable results, the Chamber is concerned that EPA and DOJ may not be taking sufficient steps to ensure that costs apportioned to one party via settlement will not ultimately result in other parties bearing disproportionate shares of liability. We thus inquire (1) as to what, if any, procedures EPA and DOJ have in place to anticipate and avoid such outcomes; and (2) as to whether now is a suitable time for EPA and DOJ to consider new procedures to address such issues.

Congress has on multiple occasions considered revising its approach under CERCLA but has elected to maintain an approach of joint and several liability combined with the ability of the government and PRPs to recoup the costs of cleanup from responsible parties. Both to ensure timely clean-up of polluted sites and ensure that the appropriate parties bear responsibility, it is critical that the EPA and DOJ enforce CERCLA consistent with the approach embodied in the law. As EPA continues to consider potential new regulatory actions under CERCLA, and as EPA and DOJ continue to take important steps to further the resolution of CERCLA disputes that have major implications for U.S. businesses, we urge EPA and DOJ to look anew at whether current practices may warrant updating and reconsideration in light of new developments. We would welcome a meeting to discuss these questions and concerns in greater detail.

Sincerely,

Neil L. Bradley
Executive Vice President, Chief Policy Officer,
And Head of Strategic Advocacy
U.S. Chamber of Commerce

---

[7] 42 U.S.C. § 9613(f)(2); see also id. §§ 9622(f)(2), (g)(5), (h)(4).

[8] 42 U.S.C. § 9613(f)(1).

[9] See County Line Co. v. Tinney, 933 F.2d 1508, 1517 (10th Cir. 1991).

[10] See generally Hansberry v. Lee, 311 U.S. 32, 40 (1940) (due process); Logan v. Zimmerman Brush Co., 455 U.S. 422, 428-31 (1982) (due process); Ruckelshaus v. Monsanto Co., 467 US 986, 1003-04 (1984) (takings).

[11] Light, supra note 8.

# Exhibit 37



**U.S. Department of Justice**

Environment and Natural Resources Division

---

*Environmental Enforcement Section*                                    *Telephone: (202) 532-5896*
*P.O. Box 7611*                                                          *Email: laura.rowley@usdoj.gov*
*Ben Franklin Station*
*Washington, DC 20044-7611*

November 13, 2023

Kathy D. Patrick, Esq.
Gibbs & Bruns, LLP
11000 Louisiana, Suite 5300
Houston, Texas 77002
kpatrick@gibbsbruns.com

     Re:    *United States v. Alden Leeds, Inc., et al.*, Civil Action No. 22-cv-07326-MCA-
            LDW

Dear Ms. Patrick:

     The purpose of this letter is to respond to the principal allegations in your August 14, 2023 letter to Assistant Attorney General Todd Kim and myself. Your letter concerned David Batson, who led the allocation team that completed the allocation detailed in the December 28, 2020 Diamond Alkali Superfund Site OU2 Allocation Recommendation Report. Among other things, your letter argued that Mr. Batson's engagement by the Environmental Protection Agency ("EPA") to assist in the performance of the allocation was somehow "unlawful" because the Department of Justice ("DOJ") had previously retained Mr. Batson as an expert consultant. I write to assure you that Mr. Batson's prior retention by DOJ in no way disqualified him from serving on the team that produced the Allocation Recommendation Report and to correct some of the factual misunderstandings contained in your letter.

     Mr. Batson's retention by DOJ was not inconsistent with his role as lead allocator for the AlterEcho allocation team. In fact, it was entirely consistent with that role. As demonstrated by the attached Statements of Work, which dictate the responsibilities for which Mr. Batson was retained by DOJ, he was hired to "evaluate allocation options by providing advice in developing settlement approaches" in the "Passaic River Matter." In other words, he was hired to give advice about helping to settle the larger Passaic River case, not to serve as an expert witness "against OxyChem" or any other party. At the time of this initial work with Mr. Batson, DOJ and EPA were moving from investigation into remediation of the Lower Passaic River and evaluating options for how to proceed with enforcement at the Site. Given the large number of potentially responsible parties approaching the United States with various arguments about their shares of liability, DOJ and EPA wanted to develop an enforcement strategy that would be fair, transparent, and efficient -- and Mr. Batson was assisting with that. Therefore, no conflict exists between Mr. Batson's role as a consultant and as the lead member of the allocation team, and

nothing disqualifies him from serving as a "neutral" in the allocation process. Moreover, there was no conflict to disclose in communications about the allocation and there was no misrepresentation about Mr. Batson's role in the process. As explained in this letter, your allegations are not supported by the relevant facts.

<u>David Batson's Work for DOJ Was Consistent with His Role on the Allocation Team</u>

Your letter correctly notes that DOJ first retained Mr. Batson in April 2016. The nature of that retention was specified in a Statement of Work ("SOW"). A SOW dictates the terms of an expert's employment and spells out the duties and deliverables expected of the expert. With respect to Mr. Batson, he prepared four SOWs. Those documents are attached hereto as Attachment 1.[1] The first SOW and superseding SOW covered the period from his hiring through June 2016. The second SOW extended his employment through July 31, 2016, and the third extended his employment through March 31, 2017. All of Mr. Batson's SOWs were for the "Passaic River Matter," not a particular civil action. In fact, no case name or civil action number appears anywhere in the documents.

The "Statement of Work to be Performed" in all of the SOWs is similar. The SOWs indicate that Mr. Batson would support DOJ's efforts "to evaluate allocation options by providing advice in developing settlement approaches in this matter, and participation in settlement negotiations." They specify that Mr. Batson would accomplish this work by analyzing background material and participating in case team meetings and calls.

Each of the SOWs listed a single task to be performed. In the first (superseded) SOW, that task was "Prepare for and Meet with EES/EPA Counsel to Provide Advice Regarding Allocation Options in New York, New York."[2] The second and third SOWs state that the task was "Analyze Site Data and Provide EES/EPA Counsel with Advice Regarding Allocation Options to Support Settlements in Passaic River Matter." All of the SOWs describe the task as including "on-going consultation regarding allocation Options," and the second and third SOWs further state that the task included "the development of a recommendation on an allocation approach and preliminary scope of work for EES and EPA consideration." The first SOW allots 13 hours of work for the designated task, while the second and third SOWs allot 15 hours of work.

The SOWs make clear that Mr. Batson was retained by DOJ for the purpose of exploring approaches to settlement in the Passaic River matter, not to serve as an expert witness adverse to

---

[1] A Statement of Work for an expert retained by DOJ is ordinarily protected from disclosure by the attorney work product privilege. We are waiving that privilege with respect to these documents only to clarify for you the nature of Mr. Batson's retention by DOJ. By doing so with respect to these specific documents, the United States does not waive the attorney work product privilege or any other applicable privilege with respect to any other documents or communications. Note that in response to various FOIA requests from OxyChem and related entities over the years, EPA has released different iterations of the work plans describing the allocation tasks AlterEcho completed under EPA contracts.

[2] EES is the Environmental Enforcement Section within DOJ's Environment and Natural Resources Division.

OxyChem.  In fact, rather than performing work that somehow *conflicted* with the work Mr. Batson performed as part of the allocation team, Mr. Batson actually was retained to *begin* the work that eventually led to the allocation memorialized in the Allocation Recommendation Report.  The Statement of Work to be Performed and the described tasks in all of the SOWs make reference to Mr. Batson providing advice and consultation about how to structure a settlement framework, specifically through allocation.  The second and third SOWs specify that Mr. Batson was to develop "a recommendation on an allocation approach *and preliminary scope of work for EES and EPA consideration*."  In other words, DOJ directed Mr. Batson to come up with a way to do an allocation for the Passaic River matter and present an early scope of work for that allocation process.

Other aspects of the SOWs are consistent with this interpretation of Mr. Batson's work for DOJ.  All of the SOWs refer to the "Passaic River matter," not a particular case or claim again OxyChem or any other specific party.  The SOWs do not refer to any case or to a civil action number.  The small number of hours of work – and correspondingly small total cost of the SOWs – also was consistent with the task of beginning work on assisting EPA and DOJ in considering how to develop a settlement framework for the Passaic River matter, and far below what one would expect for an expert witness retained to work on a case against an adverse party.  Moreover, the SOWs refer to case team meetings in New York, where EPA was located, rather than meetings in Washington, D.C., where one would expect meetings to discuss litigation matters with DOJ would take place.

Your letter refers to a "DJ#" appearing in the paperwork for DOJ's retention of Mr. Batson. Specifically, the DJ# 90-11-3-07683/1 appears in such paperwork, as well as in the SOWs Mr. Batson submitted for his retention.  Your letter attaches a great deal of significance to this number because you allege (incorrectly) that it was the same number used for the "*United States v. Chemical Land Holdings, LLC*" case (Civil Action No. 89-5064 (D.N.J.)), which involved the CERCLA liability of OxyChem and other parties for the former Diamond Alkali facility located on Lister Avenue in Newark, New Jersey, which is now identified as Operable Unit 1 of the Diamond Alkali Superfund Site.  OxyChem's contention rests on several false premises.  First, as is plain from the case caption shown on page seven of your letter, OxyChem was the lead defendant in Civil Action No. 89-5064 (D.N.J.).  Accordingly, the case was titled *United States v. Occidental Chemical Corporation* and not *United States v. Chemical Land Holdings*, as your letter asserts.  Second, Civil Action No. 89-5064 (D.N.J.) was associated with DJ number 90-11-2-399, not the DJ number that appears on Mr. Batson's contract from 2016: DJ No. 90-11-3-07683/1.  In fact, DJ number 90-11-3-07683/1 was not created until 2002, over ten years after the consent decree in Civil Action No. 89-5064 (D.N.J.) was entered on November 19, 1990.  Third, the use of a DJ number in the retention of Mr. Batson is a merely clerical matter.  DOJ uses DJ numbers primarily for attorney time keeping purposes, as well as for other internal tracking reasons.  A DJ number is not like a civil action number; it does not necessarily represent an active litigation.  A DJ number may represent a more general matter.  In fact, the 90-11-3-07683/1 number is associated with the full case title "In the Matter of: Chemical Land Holdings (Superfund Tracking Number - Diamond Alkali Site - Passaic River)."  The use of this DJ# 90-11-3-07683/1 in Mr. Batson's paperwork shows only that he was retained for the Passaic

River matter, generally, as also reflected in the SOWs use of "Passaic River matter" instead of a specific case name.[3]

In short, DOJ retained David Batson for a purpose entirely consistent with his work on the allocation team that generated the Allocation Recommendation Report, not in a capacity adverse to OxyChem, as alleged in your August 14, 2023 letter. Thus, no conflict of interest arose from EPA's retention of Mr. Batson as part of the allocation team, there was no conflict that needed to be disclosed to OxyChem in connection with the allocation, and Mr. Batson was able to serve as a "neutral" in the allocation process, within the meaning of the Administrative Dispute Resolution Act.

<u>The Ethics Reform Act is Not Applicable to Mr. Batson's Work on the Allocation Team</u>

Your letter also claims that Mr. Batson's work on the team that produced the Allocation Recommendation Report violated the Ethics Reform Act's lifetime prohibition on certain work by former government employees. As with your allegation about Mr. Batson's work for DOJ, this allegation is similarly misplaced. The Ethics Reform Act provides that a former government employee may not make "any communication to or appearance before" a current government employee "on behalf of any other person," "with the intent to influence" the current government employee, "in connection with a particular matter" in which the United States is a party or has an interest and in which the former employee "participated personally and substantially" as a government employee. 18 U.S.C. § 207(a)(1). Regulations implementing the Ethics Reform Act except former employees from the lifetime prohibition under certain circumstances, including a former employee who is "[a]cting on behalf of the United States." 5 C.F.R. § 2641.201(b)(1).

The Ethics Reform Act's lifetime prohibition does not apply to Mr. Batson's work on the allocation team for multiple reasons. First, Mr. Batson's communications with the United States during his work on the allocation team were not "on behalf of" another person. "A former employee makes a communication or appearance on behalf of another person if the former employee is acting as the other person's agent or attorney or if: (A) The former employee is acting with the consent of the other person, whether express or implied; and (B) The former employee is acting subject to some degree of control or direction by the other person in relation to the communication or appearance." *Id.* § 2641.201(g)(1)(i). Mr. Batson served as a neutral allocator. He was not acting as anyone's agent or attorney and he was not acting subject to control or direction by any party to the allocation.

Second, Mr. Batson was not communicating "with the intent to influence" the United States. "A communication or appearance is made with the intent to influence when made for the purpose of: (i) Seeking a Government ruling, benefit, approval, or other discretionary Government action; or (ii) Affecting Government action in connection with an issue or aspect of

---

[3] The same DJ number, 90-11-3-07683/1, appears in the Federal Register notice, published on December 22, 2022 in connection with *United States v. Alden Leeds*, 2:22-cv-07326 (D.N.J.) because, at the time, a DJ number for that proceeding had not yet been created. Instead, the general "Passaic River matter" DJ number was used.

a matter which involves an appreciable element of actual or potential dispute or controversy." *Id.* § 2641.201(e)(1). Again, Mr. Batson served as a neutral allocator. The Allocation Recommendation Report offered recommendations for how to allocate responsibility among responsible parties in connection with the Diamond Alkali Superfund Site. The Report and Mr. Batson's communications with the United States did not seek a particular government action or try to affect government action in any matter. Moreover, a communication lacks the intent to influence when it is made for the purpose of "[m]aking a communication, at the initiation of the Government, concerning work performed or to be performed under a Government contract." *Id.* at § 2641.201(e)(2). Mr. Batson's work was under a government contract.

Third, the "particular matter" on which Mr. Batson worked during his time with EPA is distinguishable from the matter that was the subject of the allocation. The mere fact that both matters involved the Diamond Alkali Superfund Site does not make it the same matter. A Superfund site can take years to resolve and often involves multiple phases and different potentially responsible parties. In determining whether the situation involves the "same particular matter," the federal ethics rules advise that "all relevant factors should be considered, including the extent to which the matters involve the same basic facts, the same or related parties, related issues, the same confidential information, and the amount of time elapsed." *See* 5 C.F.R. § 2641.201(h)(5). It is not necessarily true that any given Superfund site will always be only one particular matter. There may be different phases of remedial investigation, different feasibility studies, and different remedial actions. In fact, with respect to the Diamond Alkali Site, the allocation focused on allocating responsibility among potentially responsible parties for releases of contamination into the Lower Passaic River. The Record of Decision for the lower 8.3 miles of the River was not even issued until March 3, 2016, after Mr. Batson had left the Agency. Mr. Batson's work on the allocation involved different facts and a different set of potentially responsible parties than the work Mr. Batson did while an EPA employee.

Finally, Mr. Batson's work falls within one of the exceptions to the lifetime ban. Mr. Batson was a contractor for the United States. Thus he was "acting on behalf of the United States" during the course of his work on the allocation team and his work was excepted from the lifetime ban.

Conclusion

The facts demonstrate that DOJ retained Mr. Batson for work that was not "against OxyChem," but rather consistent with his eventual work on the allocation team that generated the Allocation Recommendation Report. Similarly, his work on the allocation team did not violate the lifetime prohibition on certain work by former government employees under the Ethics Reform Act. In short, there is no conflict of interest or ethical concerns with Mr. Batson's work on the allocation.

Thank you for your attention in this matter.

Sincerely,

*/s/ Laura J. Rowley*
Senior Trial Attorney

## STATEMENT OF WORK

### Passaic River Matter

| | |
|---|---|
| **Expert's/Consultant's Name:** | **David Batson** |
| **Expert's Mailing Address, etc.:** | ~~AlterEcho, Inc.~~ *Tech Law, Inc.* |
| | **14500 Avion Parkway, Suite 300** |
| | **Chantilly, VA 20151-1101** |
| | **703-818-3228** |
| | **703-818-8813 (Fax)** |
| | **dbatson@alterecho.com** |
| **Expert's SS# or Employer ID#:** | ██████ |
| **Area of Expertise:** | **CERCLA Allocation** |
| **Expert's Hourly Rate:** | **$350** |
| **Contact Person's Name:** | **Same** |
| **Description of Work Products:** | **See below** |
| **Estimated Costs:** | **15 Hours for Tasks noted below-** |
| **Anticipated Dates of Service:** | **From date of contract approval-March 31, 2017** |
| **Staff s Names and Rates:** | **None** |
| **Subcontractor's Names and Rates:** | **None** |
| **Administrative Fees/Overhead:** | **None** |
| **Case DJ#, etc.:** | **Passaic River Matter, DJ# 90-11-3-07683/1 (Unified)** |
| **Other Documents:** | **Resume, Confidentiality Agreement, and OBD-47 attached** |

### I.   STATEMENT OF WORK TO BE PERFORMED

The tasks set forth below are to be performed in support of Environmental Enforcement Section (EES) efforts to evaluate allocation options by providing advice in developing settlement approaches in this matter, and participation in settlement negotiations. The assignment involves analysis of factual background material and providing such advice, as determined appropriate by the case team, in meeting(s) in New York, New York and calls with the case team.

TASKS:    Analyze Site Data and Provide EES/EPA Counsel with Advice
Regarding Allocation Options to Support Settlements in
Passaic River Matter —15 hours

I will review site related documentation provided by EES and EPA counsel to the extent
necessary, and as instructed by EES Counsel provide on-going consultation regarding allocation
options, including the development of a recommendation on an allocation approach and
preliminary scope of work for EES and EPA consideration. I will attend and participate, on an as-
needed basis, in meetings and calls, as instructed by EES Counsel.

Total Cost - $5,250.00

STATEMENT OF WORK

Passaic River Matter

| | |
|---|---|
| Expert's/Consultant's Name: | David Batson |
| Expert's Mailing Address, etc.: | AlterEcho, Inc.  *Tech law, Inc, str. 7/15/2016* |
| | 14500 Avion Parkway, Suite 300 |
| | Chantilly, VA 20151-1101 |
| | 703-818-3228 |
| | 703-818-8813 (Fax) |
| | dbatson@alterecho.com |
| Expert's SS# or Employer ID #: | ████████ |
| Area of Expertise: | CERCLA Allocation |
| Expert's Hourly Rate: | $350 |
| Contact Person's Name: | Same |
| Description of Work Products: | See below |
| Estimated Costs: | 15 Hours for Tasks noted below |
| Anticipated Dates of Service: | From date of contract approval – July 31, 2016 |
| Staff s Names and Rates: | None |
| Subcontractor's Names and Rates: | None |
| Administrative Fees/Overhead: | None |
| Case DJ#, etc.: | Passaic River Matter, DJ# 90-11-3-07683/1 (Unfiled) |
| Other Documents: | Resume, Confidentiality Agreement, and OBD-47 attached |

## I.     STATEMENT OF WORK TO BE PERFORMED

The tasks set forth below are to be performed in support of Environmental Enforcement Section (EES) efforts to evaluate allocation options by providing advice in developing settlement approaches in this matter, and participation in settlement negotiations. The assignment involves analysis of factual background material and providing such advice, as determined appropriate by the case team, in meeting(s) in New York, New York and calls with the case team.

1

TASKS:  Analyze Site Data and P r o v i d e  EES/EPA  Counsel with Advice
Regarding Allocation Options to Support Settlements in Passaic
River Matter – 15 hours

I will review site related documentation provided by EES and EPA counsel to
the extent necessary, and as instructed by EES Counsel provide on-going consultation regarding
allocation options, including the development of a recommendation on an allocation approach and
preliminary scope of work for EES and EPA consideration.  I will attend and participate, on an as-
needed basis, in meetings and calls, as instructed by EES Counsel.

COST  TOTAL:  $5,250.00

2

## STATEMENT OF WORK

### Passaic River Matter

| | |
|---|---|
| **Expert's/Consultant's Name:** | David Batson |
| **Expert's Mailing Address, etc.:** | AlterEcho, Inc. |
| | 14500 Avion Parkway, Suite 300 |
| | Chantilly, VA  20151-1101 |
| | 703-818-3228 |
| | 703-818-8813 (Fax) |
| | dbatson@alterecho.com |
| **Expert's SS# or Employer ID #:** | ▮▮▮▮▮▮▮ |
| **Area of Expertise:** | CERCLA Allocation |
| **Expert's Hourly Rate:** | $350 |
| **Contact Person's Name:** | Same |
| **Description of Work Products**: | See below |
| **Estimated Costs:** | 13 Hours for Tasks noted below, plus $450 - travel/per diem |
| **Anticipated Dates of Service:** | ~~April~~ - June, 2016   *from date of contract approval* |
| **Staff's Names and Rates:** | None |
| **Subcontractor's Names and Rates:** | None |
| **Administrative Fees/Overhead**: | None |
| **Case DJ#, etc.:** | Passaic River Matter, DJ# 90-11-3-07683/1 (Unfiled) |
| **Other Documents**: | Resume, Confidentiality Agreement, and OBD-47 attached |

## I.     STATEMENT OF WORK TO BE PERFORMED

The tasks set forth below are to be performed in support of Environmental Enforcement Section (EES) efforts to evaluate allocation options by providing advice in developing settlement approaches in this matter, and participation in settlement negotiations.  The assignment involves providing such advice in meeting(s) with the case team, analysis of factual background material, and participation in negotiations with opposing parties.

1

TASKS:   **Prepare for and Meet with EES/EPA Counsel to Provide Advice**
         **Regarding Allocation Options in New York, New York -**

         **13 hours + travel/per diem**

I will meet with EES and EPA counsel, review relevant documents prior thereto to the extent necessary and as instructed by EES Counsel, and provide on-going consultation regarding allocation options. I will attend and participate, on an as-needed basis, in settlement negotiations. I will review factual background material, as instructed by EES Counsel, to assist in providing advice regarding approaches to allocation and participation in settlement negotiations.

# STATEMENT OF WORK

## Passaic River Matter

| | |
|---|---|
| **Expert's/Consultant's Name:** | David Batson |
| **Expert's Mailing Address, etc.:** | AlterEcho, Inc. |
| | 14500 Avion Parkway, Suite 300 |
| | Chantilly, VA 20151-1101 |
| | 703-818-3228 |
| | 703-818-8813 (Fax) |
| | dbatson@alterecho.com |
| **Expert's SS# or Employer ID #:** | ▇▇▇▇▇▇ |
| **Area of Expertise:** | Mediation, CERCLA Allocation |
| **Expert's Hourly Rate:** | $350 |
| **Contact Person's Name:** | Same |
| **Description of Work Products:** | See below |
| **Estimated Costs:** | 13 Hours for Tasks noted below, plus $450 - travel/per diem *FROM Date of contract award slw 4/13/16* |
| **Anticipated Dates of Service:** | ~~April~~ - June, 2016 |
| **Staff's Names and Rates:** | None |
| **Subcontractor's Names and Rates:** | None |
| **Administrative Fees/Overhead:** | None |
| **Case DJ#, etc.:** | Passaic River Matter, DJ# 90-11-3-07683/1 (Unfiled) |
| **Other Documents:** | Resume, Confidentiality Agreement, and OBD-47 attached |

SUPERSEDED

## I.  STATEMENT OF WORK TO BE PERFORMED

The tasks set forth below are to be performed in support of Environmental Enforcement Section (EES) efforts to evaluate allocation options by providing advice in developing settlement approaches in this matter, participation in settlement negotiations, and possibly mediation settlement assistance. The assignment involves providing such advice in meeting(s) with the case team, analysis of factual background material, and participation in negotiations with opposing parties.

1

**TASKS:**   **Prepare for and Meet with EES/EPA Counsel to Provide Advice Regarding Allocation Options in New York, New York –**

**13 hours + travel/per diem**

I will meet with EES and EPA counsel, review relevant documents prior thereto to the extent necessary and as instructed by EES Counsel, and provide on-going consultation regarding allocation options. I will attend and participate, on an as-needed basis, in settlement negotiations. I will review factual background material, as instructed by EES Counsel, to assist in providing advice regarding approaches to allocation and participation in settlement negotiations.



2

# Exhibit 38



April 3, 2023

TO:    Emory A. Rounds
         Director
         U.S. Office of Government Ethics
         1201 New York Ave NW #500
         Washington, D.C. 20005

         Corey Amundson
         Chief, Public Integrity Section
         Department of Justice
         950 Pennsylvania Avenue, NW
         Washington, DC 20530-0001

         Inspector General Sean O'Donnell
         Environmental Protection Agency
         Office of Inspector General
         1200 Pennsylvania Avenue, N.W. (2410T)
         Washington, DC 20460

**Re: Request for Investigation into Potential Violation by David Batson of the Lifetime Ethics Ban (18 U.S.C. § 207)**

Dear Mr. Rounds, Mr. Amundson, and Mr. O'Donnell:

We write today over concerns about an alleged ethics violation involving a former employee of the Environmental Protection Agency (EPA) that has the potential to undermine the public's confidence in the government's management of one of the most expensive Superfund sites in the country. The actions of the former employee and the EPA may also be perceived as part of a broader effort by the agency to revamp the manner in which it administers the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) and manages the cleanup of other Superfund sites despite unclear legal authority to do so.

Media reports about a proposed consent decree on the Lower Passaic River have highlighted such concerns. Specifically, these reports note that the approach being taken could form the basis for a precedent to transfer billions of dollars of Superfund remediation costs on to the federal taxpayer while uniquely positioning the former employee's private contracting firm to benefit through the award of additional sole source contracts in the future. This type of revolving door activity is clearly harmful to the public's interest but also appears to run afoul of the individual's ethics obligations under the law. Accordingly, we request an investigation based on the following facts.



**Background**

David Batson's Work at EPA

David Batson worked at the EPA from 1979 to 2015, serving for his last 26 years as the Senior Alternative Dispute Resolution (ADR) Specialist and ADR Counsel, according to his LinkedIn profile.[1] Mr. Batson has extensive experience in the field of CERCLA and, from his own testimony in court filings, appears to be a certified expert in Superfund management and, specifically, the allocation process of determining liability and equitable responsibility for cleanup.[2] During his tenure with EPA, Mr. Batson developed a strong opinion on the role that he believed the Agency should play in directing and initiating remediation activities at Superfund sites. According to Mr. Batson, the EPA attempted to adopt this perspective through congressional action in the 1990's. Mr. Batson claims to be "the primary author of Section 413 of the Superfund Reform Act of 1994, which Congress considered but did not enact. The provision provided for the use of an allocation process, conducted by a non-government, third-party neutral, as the basis of settlement between the USEPA and PRPs [potentially responsible parties] for the costs of remediating Superfund sites."[3]

Mr. Batson subsequently led a pilot program in 1994-1995 at the EPA where his proposed allocation process was put into practice. An additional effort to revise the EPA's statutory role in the allocation process under CERCLA was attempted in 1999 as part of the Recycle America's Land Act of 1999.[4] This legislative effort also failed to become law and no subsequent efforts by the EPA have been undertaken to revise its role in the allocation process under CERCLA. However, it remains a distinct possibility that Congress will grant the EPA authority to adopt this process or, perhaps even more likely, that the EPA will determine it can implement such a system even absent express congressional authorization. Such a decision could prove extremely beneficial to any employer that retained Mr. Batson's services, as this firm would be uniquely positioned to operate as the preferred contractor to serve as a third-party neutral, a role tailored by Mr. Batson and one that fits his own expertise.

Mr. Batson's Move to the Private Sector

In 2015, Mr. Batson left his employment at the EPA and joined AlterEcho, a national environmental consulting firm, as a mediator and CERCLA allocation expert. According to Mr. Batson, he "specialize[s] in providing PRPs a range of ADR and technical services

---

[1] https://www.linkedin.com/in/david-batson-adr (Last visited March 20,2023)
[2] *Columbia Falls Aluminum Co. v. Atlantic Richfield Co.*, No. 9:18-cv-00131-DWM (D. Mont. 2020), ECF No. 82-1, David C. Batson, Esq., Cost Allocation Between Columbia Falls Aluminum Company and Atlantic Richfield Company Regarding Remedial Costs Associated With The Anaconda Aluminum Company Columbia Falls Reduction Plant Superfund Site, (Feb. 14, 2020) ("Expert Report").
[3] *Id.* at 6.
[4] H.R. Rep. No. 106-353 (1999).



to support the resolution of allocation disputes at federal and state hazardous waste sites."[5] According to trial testimony offered by Mr. Batson, he has been "continuously" working with a "PRP group to perform an allocation on their behalf" for the Lower Passaic site since 2016.[6] AlterEcho was part of a contract with EPA for the Diamond Alkali-Lower Passaic River Allocation, listing Mr. Batson in its staffing matrix in the role of "Senor allocation specialist."[7]

On behalf of AlterEcho, Mr. Batson has detailed his work on various Superfund sites while at the EPA. As is typical, many of these sites have taken years or even decades to initiate cleanup and complete the necessary remediation. Some remain outstanding to this day. One such site is "Diamond Alkali," located along the Passaic River in New Jersey (also known as the Lower Passaic River Superfund Site).[8] Mr. Batson's resume specifies his role in the site's management as "[m]ediated PRP Group organization and funding agreements, including design and implementation of allocation for operational funding, for sediment site involving dioxin, PCB and heavy metals contamination of urban waterway.  Supported PRP search activities and mediated selection of allocation consultant." [9]

His 2019 resume also identifies his most recent work on the site:

> Diamond Alkali Sediment OU2 Superfund Site, New Jersey – Served as allocator for the design and conduct of a unique allocation process to establish relative responsibility among over 100 PRPs for $1.5 Billion remediation of major urban river settlement site.[10]

Although described differently, the referenced sites are part of the same Superfund site and involve largely the same set of specific parties identified as bearing responsibility for the contamination and remediation. Mr. Batson clarifies this point in a 2019 court filing.[11] He describes his work, in trial testimony, as contributing to different phases of the site's cleanup:

> At the Passaic there is two phases of the Passaic case. Actually, there is three phases to the Passaic case. There was the phase that I was involved

---

[5] Expert Report at 7.

[6] *El Paso Natural Gas Company, LLC v. United States*, 3:14:cv-08165-DGC (D. Ariz. 2019), Notice of Filing of Official Transcript of Trial at 108, ECF No. 193.  ("Batson Testimony").

[7] Contract #68HERH19D0033, "Revised Work Plan and Pricing Estimate for Task Order Request #013: Diamond Alkali-Lower Passaic River Allocation," Eastern Research Group, Inc. (September 20, 2019) ("Diamond Alkali Allocation Task Order").

[8] Expert Report at 47-50.

[9] *Id*. at 49.

[10] *Id*. at 48.

[11] *El Paso Natural Gas Company, LLC v. United States*, 3:14:cv-08165-DGC (D. Ariz. 2019), Notice of Filing of Official Transcript of Trial at 108-109, ECF No. 193.  ("Batson Testimony").



in as a convening neutral and someone that provided an allocation for the
initial cost for that site, and that was back in, what, 10 years ago, 15 years
ago. I forget the exact time.

At that point, I went in, assisted the parties in dealing with their initial
allocation of operating costs, worked with the parties as a convening
neutral, assist them in hiring a party that did PRP searches. Actually, I
helped – the agency helped to pay for part of those neutral services for
PRP search purposes, and to go on to perform their first allocation.

I have been employed since mid-2015 as a full-time neutral working with
the now current PRP group to do their final allocation as it relates to the
full two billion dollar remediation.[12]

Indeed, Mr. Batson's duties at the EPA required extensive engagement with outside
entities, including receiving payments directly from them at times. In sworn testimony,
Mr. Batson describes this unique role:

So I would go out on a government salary, I would be paid by the
government, all my other expenses would be paid by the private parties,
travel, support services, scientific services, through direct supplying,
obviously, of that service, so we didn't have to deal with the wonders of
ethics rules. And I worked with, oh, a large number of different PRP
groups as they were organizing as we went through the early stages of
allocations, helping them to understand allocation practice, but also
understand how to effectively negotiate that allocation with the
government.[13]

Naturally, it appears reasonable to conclude that Mr. Batson was personally and
substantially involved in allocating liability among PRPs in many of the Superfund sites
he worked on, including the one located along the Lower Passaic River known as the
Diamond Alkali site.

**Legal Obligations**

As a former federal employee, Mr. Batson is permanently restricted from participating in
particular matters involving specific parties that he substantially and personally worked
on while he was a federal official.[14] Sometimes referred to as the "Lifetime Ban," the
criminal conflict of interest provision is meant to protect the public's trust in government

---

[12] *Id.* at 108-109.
[13] *Id.* at 64-65.
[14] *See* 18 U.S.C. § 207(a)(1).



actions by prohibiting federal officials from switching sides upon leaving federal service. Federal regulations provide further clarification.[15]

There are several elements to the prohibition. It must constitute: 1) a communication, 2) to or appearance before an employee of the United States, 3) with the intent to influence, 4) on behalf of any other person, 5) in connection with a particular matter involving a specific party or parties, 6) in which the former employee participated personally and substantially while an employee, and 7) in which the United States is a party or has a direct and substantial interest.[16]

Certain waivers and exceptions are also available.[17] Notably, the prohibition does not apply to a former employee who is "acting on behalf of the United States."[18] A further distinction is provided for those acting "as other than [an] employee of the United States."[19] Not all situations connected to working with the government in a contractual manner will qualify for an exception or waiver. For instance, the following are not deemed to be engaging in an activity on behalf of the government: "merely performing work funded by the government, engaging in an activity in response to a contact initiated by the government, because the government will derive some benefit from the activity, or because the former employee or person on whose behalf he is acting may share the same objective as the government."[20]

While not authoritative, EPA provides guidance to former employees that emphasizes the distinction that working as a federal contractor is not the same as "acting on behalf of the United States." Specifically, EPA's website states:

> Former employees can make representations back if they are carrying out official duties on behalf of the United States. For example, the post-employment restrictions do not apply to a former employee who is re-employed by the United States or is called as a witness by Congress.
>
> The restrictions do apply, however, to former employees who work for a federal contractor. That work is not deemed to be "an activity on behalf of the United States." Working for a contractor will NOT absolve you from your post-employment restrictions. See 5 CFR. 2641.301(a) and (b).[21]

Fundamentally, the prohibition's intent is to prevent a revolving door where federal employees can exploit their taxpayer-funded experience by switching sides in a party

---

[15] 5 C.F.R. § 2641.201.
[16] *Id.* at § 2641.201(d)-(j).
[17] *Id.* at § 2641.201(b).
[18] *Id.* at § 2641.201(b)(1).
[19] 5 C.F.R. § 2641.301(a)(2)(ii)(B).
[20] *Id.*
[21] EPA, Office of General Counsel, *Leaving Federal Service (epa.gov)* (Last visited Mar. 20, 2023).



matter for the benefit of their new employer, even in situations where the new employer is a federal contractor.

**Analysis**

<u>The Diamond Alkali Superfund Site is a particular matter that involves specific parties spanning period when former employee personally and substantially worked on the matter</u>

The circumstances surrounding Mr. Batson's current role as allocator for AlterEcho, a private contracting firm, working on a decades-long Superfund site that he was personally and substantially involved in while an EPA employee, raise serious red flags and appear to violate his post-government ethics obligations under 18 U.S.C. § 207(a)(1) ("the Lifetime Ban").

While the process of cleanup at Superfund sites can extend over decades, the stages of cleanup – from identification of potentially responsible parties through complete remediation – are likely to be considered the same particular matter under the Lifetime Ban once the legal rights of specific parties come into play.[22] In the Diamond Alkali/Lower Passaic River site, many of today's PRPs have been identified and involved in Superfund negotiations dating back to the early 2000's. In fact, at least 14 parties that were Diamond Alkali PRPs during Batson's tenure at the EPA remain heavily involved and directly impacted, either positively or negatively, from his work on the same party matter after leaving federal service.[23]

According to public court filings, Mr. Batson worked on the Diamond Alkali Superfund site personally and substantially while an EPA employee in the mid-2000s.[24] Mr. Batson has testified that he participated in different "phases" of the Superfund site while in different capacities – first as an employee of the federal government and most recently as a federal contractor.[25] Indeed, since publication of the DOJ's proposed consent decree on December 22, 2022, many of these parties appear to have obtained a remarkable deal at the expense of other PRPs and possibly the taxpayer. Media reports indicate the 85 PRPs signing onto the agreement will be held responsible for just 11 percent of the total cost estimate, with no indication of where the remaining 89 percent will be covered.[26]

---

[22] 5 C.F.R. § 2641.201(h)(1).

[23] *Compare, In re: Lower Passaic River Study Area of the Diamond Alkali Superfund Site*, CERCLA Docket No. 02-2004-2011 (EPA Region 2, 2004), Agreement, at 49-50 App. A – List of Settling parties, *with* Scott Fallon, *EPA lands $150M for Passaic River cleanup, fraction of $1.4B cost. So who pays the rest?*, NORTHJERSEY.COM (Dec. 20, 2022), EPA gets $150M for $1.4B Passaic River cleanup. Who will pay the rest? (northjersey.com).

[24] *See, supra*, Expert Report and Batson Testimony.

[25] Expert Report at 64-65.

[26] Notice of Lodging of Proposed Consent Decree Under the Comprehensive Environmental Response, Compensation, and Liability Act, 87 Fed. Reg. 78710 (Dec. 22, 2022). *See also supra.*, S. Fallon, EPA gets



Regardless of the objectivity or the factual basis for the proposed consent decree, the situation has raised the appearance of impropriety with a significant financial benefit appearing to flow to numerous corporations that had worked with Mr. Batson while he was employed at EPA.

<u>Former employee's current role requires a direct communication to the EPA with an intent to influence the USG's position on a matter where it holds a substantial and direct interest</u>

The Diamond Alkali Allocation Task Order describes the services provided by Mr. Batson and his company, AlterEcho, a subcontractor of the Eastern Research Group ("ERG"), to the EPA. In the Task Order, ERG refers to AlterEcho and ERG jointly as the "ERG Team."[27] The services outline sustained and substantial direct communications by Mr. Batson to the EPA and the PAPs (Participating Allocation Parties) on behalf of ERG and AlterEcho in his role as the Senior Allocation Specialist.[28] His project duties include "conduct allocation and prepare draft and final allocation recommendation reports; lead communication and meetings with PAPs."[29] As noted in his project role, Mr. Batson's objective is to ultimately prepare a recommendation to the U.S. government on how allocation of liability among the PAPs should be divided, ostensibly toward the goal of reaching a settlement between the various parties, of which the United States remains a key figure.

The substantial and direct interest of the U.S. government in the Diamond Alkali's Superfund site cleanup is well established. Under CERCLA, the EPA is statutorily charged with managing the cleanup process and the EPA has been a significant player in the Superfund site for several decades. Court filings from 2016 show that the EPA expects to claim over $42 million in past transaction or oversight costs related to this site. The costs date back to 2000 and arguably cover at least some of the costs incurred by Mr. Batson while he was an employee of the EPA.[30]

<u>Former employee – and his current employer – possess different interests than those of the United States</u>

On this particular site, which is projected to be one of the most expensive remediations in Superfund history, the EPA has also adopted a unique approach to the allocation process. The process adopted by the EPA at Diamond Alkali closely resembles the allocation

---

[$150M for $1.4B Passaic River cleanup. Who will pay the rest? (northjersey.com),](#) NORTHJERSEY.COM (Dec. 20, 2022),

[27] *See* Diamond Alkali Allocation Task Order.

[28] *Id.*

[29] *Id.* at 17.

[30] *In re: Maxus Energy Corp.*, No. 16-11501 (CSS) (Bankr. Del. 2016), Declaration of Alice Yeh, ECF No. 2379 at 2, ¶ 5. ("In calculating this [$42.6M] figure, EPA tallied its response costs incurred since 2000 in connection with the [Lower Passaic River Study Area] LPRSA.") ("Maxus Energy Corp")



process Mr. Batson claims to have developed in the 1990's, which he (and the EPA) subsequently sought to enact into law through amendments to CERCLA. Although both legislative efforts failed, the EPA now appears to have revived this particular approach and used it to form the basis for the current Diamond Alkali proposed settlement.

This history raises questions of regulatory overreach, especially in light of the U.S. Supreme Court's *West Virginia v. EPA* decision.[31] That ruling sought to limit the agency from asserting power that Congress had considered and decided <u>not</u> to grant them.[32] However, as troubling as this aspect is, the deep involvement by Mr. Batson as the self-proclaimed father of the EPA-driven allocation process, now adopted by EPA at Diamond Alkali, and his long-standing personal participation in the site only increase concern that public trust in the process could be undermined by the appearance of conflicts of interest. Indeed, both in terms of his legislative efforts while at EPA and his transition to work as a federal contractor on one of the largest Superfund cleanups in the program's history, Mr. Batson has positioned himself – and his employer – to be the preferred vendor if the EPA intends to adopt this approach at other Superfund sites. The potential for Mr. Batson and any employer of his to gain the inside track on a contracting opportunity such as this is striking. It also is important for assessing whether he has been acting on behalf of the United States while performing his duties at AlterEcho.

<u>Former employee is acting on behalf of his current employer, not the United States</u>

As noted above, EPA's own ethics guidance indicates that activities on behalf of federal contractors are not deemed to be acting on behalf of the United States and governmentwide ethics guidance also strongly suggests that Mr. Batson's work for AlterEcho remains subject to the Lifetime Ban. That is, the Office of Government Ethics (OGE) has discussed the important distinctions between post-government restrictions under 18 U.S.C. §§ 203, 205 and those under 18 U.S.C. § 207, the Lifetime Ban:

> We also think it is significant that two related statutes, unlike section 207, contain express exceptions for certain representational activity during the performance of Government contracts. Sections 203 and 205 of title 18, which were enacted originally as part of the same legislation as section 207, expressly exempt certain representational activity "in the performance of work under a grant by, or a contract with or for the benefit of, the United States." 18 U.S.C. 203(e), 205(f). These provisions indicate that Congress knew how to exempt, explicitly, representational activity in the performance of contracts. Perhaps more telling, these provisions also

---

[31] *West Virginia v. Environmental Protection Agency*, 142 S.Ct. 2587 (2022).

[32] *See id.* at 2614 (In rejecting EPA's efforts to expand its authority to regulate greenhouse gas emissions beyond individual power plants, the Court ruled "we cannot ignore that the regulatory writ EPA newly uncovered conveniently enabled it to enact a program that . . . Congress considered and rejected multiple times." (Citations omitted)).



indicate that Congress carefully imposed very significant limitations and safeguards when it did choose to exempt such activity. *See* section 203(e) (applicable only to special Government employees; requires certification from agency head that activity is in national interest; requires publication of certification in **Federal Register**); section 205(f) (same). It is difficult to believe that Congress would have intended a broad exclusion in section 207 without even mentioning the subject, let alone without imposing any limits on the circumstances under which such activity would be permitted.[33]

In many instances, contractors for the government would appear to remain subject to the post-government employment restrictions under the Lifetime Ban if for the simple reason that their interests often diverge from the government.

> The proposition that Government contractors may have their own interests in recommending certain courses of action as opposed to others should not be surprising. This concern is even illustrated by newspaper headlines. *See* Ariana Eunjung Cha, *Shuttle Safety* vs. *Profit: Contractors Had `Potential' Conflict*, Washington Post, August 27, 2003, at A13."[34]

> [T]he Government and its contractors have their own interests in the performance of a contract, which are not necessarily identical.[35]

Perhaps for this reason, OGE has also rejected an agency recommendation to create an exception to permit former employees to make certain contacts during the performance of a government contract.

> According to this agency, a former employee who is now employed by a Government contractor should be permitted to make communications and appearances before the Government during the performance of the contract, provided that the contractor exerts no control over the former employee in the making of the communication or appearance. Under such circumstances, the commenter thought "it is at least arguable that the communication is not made on behalf of` the contractor."

> OGE has not followed this recommendation in the final rule. A contractor's employee is fulfilling his or her duties as an employee when performing the work of the contractor. Under such circumstances, **OGE cannot avoid the conclusion that the contractor's employee is acting on behalf of his or her employer.** *See, e.g.*, Restatement of the Law

---

[33] Post-Employment Conflict of Interest Restrictions, 73 Fed. Reg. 36168, 36174 (June 25, 2008).
[34] *Id.*
[35] *Id.* at 36182.



(Second) Agency section 2(2) (1958) (servant is agent employed by master to perform service in his affairs whose physical conduct in performance of service is controlled or is subject to right to control by master); *id.,* comment a (servant is species of agent). (emphasis added).[36]

Under the current set of available facts, it is not difficult to view Mr. Batson's activities on behalf of AlterEcho as a financial benefit to himself, his employer, and his future career prospects as the vendor of choice to manage a novel allocation process at Superfund sites.

<u>Federal contractors did not acknowledge potential conflicts of interest involving former employee</u>

On a final note, the importance of federal contractors avoiding conflicts of interest cannot be overstated. EPA's Acquisition Regulations require that its contractors do so and failure to do so can result in debarment or other penalties.[37] EPA contracts also require contractors to provide an annual certification that all actual or potential conflicts of interest have been reported to EPA.[38] Despite Mr. Batson's prior participation in the Diamond Alkali party matter, ERG expressly provided such a Conflict of Interest Certification, stating that "none of the individuals proposed for work under this Order has any personal conflicts of interest."[39] ERG's submission of this Certification raises the question of whether they conducted proper due diligence in its preparation.

**Conclusion**

Many federal employees gain tremendous expertise and experience while performing their official duties. Some, like Mr. Batson, spend decades accruing knowledge on niche and extremely complex areas of the law that necessarily involve interacting with many large organizations on high-stakes environmental matters. Both the amount of taxpayer funds expended and the private sector liability to be allocated can be massive in programs like the Superfund. Consequently, the incentives to switch sides, and the potential to erode the public's trust in its government, can be enormous. This is why the government has imposed ethics restrictions under the criminal code, in order to deter such behavior.

Based on whistleblower revelations, publicly available documents, court filings, and media reports, Mr. Batson's engagement in the Diamond Alkali matter since leaving federal service appears to run counter to his ethics obligations under the law. Perhaps unsurprisingly, his ongoing involvement with the site has left his employer well-

---

[36] *Id.* at 36175.
[37] 48 C.F.R. § 1552.209-71, Organizational Conflicts of Interest, and *id.* § 1552.209-73 Notification of Conflicts of Interest Regarding Personnel.
[38] *Id.* § 1552.209-75 Annual certification.
[39] Diamond Alkali Allocation Task Order at 20.



positioned to financially benefit into the future. Just as importantly, it may well have dramatically changed the course of the Diamond Alkali cleanup process and significantly impacted the legal positions of numerous parties with whom he dealt as a federal employee. The ethics rules at issue are aimed at and prevent switching of sides by former federal employees, which can undermine that trust and confidence, and which may have occurred in this case by Mr. Batson.

The federal government has become vast, with trillions of dollars appropriated in the last few years alone to fund new government programs. Countless federal employees are no doubt likely to be tempted by the opportunity to switch sides after leaving federal service, which could further erode the public's trust in its government as a neutral and impartial participant. Enforcement of the Lifetime Ban is one of the few ways to discourage this behavior. Thus, I respectfully request that you conduct an investigation into Mr. Batson's activities since leaving the federal government and determine whether they constitute a violation of 18 U.S.C. § 207 or any other relevant law, rule or regulation and take appropriate legal action as warranted.[40] Additionally, any investigation should consider whether the Eastern Research Group or AlterEcho, both government contractors, fully complied with their obligations to avoid conflict of interests in the performance of their federal awards. Thank you for your consideration.


Respectfully,


Michael Chamberlain
Director
Protect the Public's Trust

---

[40] *See, e.g.*, 5 C.F.R. § 2641.103.