# Exhibit 71



Privileged and Confidential - Attorney Client Work Product

April 16, 2019

Eric Aronson, Shareholder
Greenberg Traurig, L.L.P.
500 Campus Drive, Suite 400
Florham Park, NJ 07932

*sent via email to aronsone@gtlaw.com*

Re:    **Site Assessment**
       **Benjamin Moore & Co. ("Benjamin Moore")**
       **134 Lister Avenue Newark, New Jersey ("BMC Plant")**
       **Lower Passaic River Planned Allocation of Responsibility for Operable Unit 2 ("OU2")**

Dear Eric:

Terraphase Engineering has prepared this Site Assessment for Greenberg Traurig, LLP on behalf of Benjamin Moore to provide information related to the physical setting, manufacturing operations, environmental conditions, and regulatory history of the BMC Plant. This assessment has been prepared to support Benjamin Moore's responses to the Initial Submission Questionnaire ("Questionnaire") requested in the United States Environmental Protection Agency ("USEPA") led allocation process ("Allocation"). We understand that Benjamin Moore's responses to the Questionnaire will reference sections in this assessment as appropriate.

In the Record of Decision for OU2 of the Diamond Alkali Superfund Site, dated March 3, 2016 ("ROD"), the USEPA identified eight Contaminants of Concern ("COCs"):

| | |
|---|---|
| 1. Dioxin/Furans | 5. PAHs - Polycyclic Aromatic Hydrocarbons |
| 2. PCBs - Polychlorinated Biphenyls | 6. DDx |
| 3. Mercury | 7. Copper |
| 4. Lead | 8. Dieldrin |

Three of the eight COCs (Dioxin/Furans, DDx, and Dieldrin) have never been used, stored, disposed, generated, or otherwise handled at the BMC Plant; as such, these COCs are not discussed herein at length. The remaining sections of this Site Assessment discuss COC use and presence at the BMC Plant, and their relevance to AlterEcho (the "Allocator") and USEPA in the Allocation.[1]  For Terraphase's conclusions, see Section 7.

---

[1] The Site Assessment is drafted to address relevant material for purposes of this Allocation and is limited by certain Allocation parameters, including a page limit.  It is therefore not intended to be an exhaustive assessment of the BMC Plant or on-site operations. Moreover, due diligent investigation is ongoing, and it is anticipated that the information contained herein may be supplemented at a later date.

The documents Terraphase reviewed in preparation of this Site Assessment are attached as Appendix A.

## 1.0    SITE SETTING

### 1.1    Description of BMC Plant

Benjamin Moore owns and operates the BMC Plant, which consists of Block 2438, Lots 34 (2.85 acres), 40 (8.21 acres), and 62 (4.553 acres) for a total of 15.6 acres.[2] The BMC Plant location is shown on Figure 1. Benjamin Moore has operated at this location for over 100 years and has controlled the property continuously throughout its ownership.  Approximately 90% of the BMC Plant is covered by impervious surfaces (asphalt and/or concrete), including paved parking lots, industrial buildings with loading docks, and numerous Above Ground Storage Tanks ("ASTs").[3] The balance of the property that is unpaved consists of (1) limited landscaping located to the east of Building 6, 9, and 17 and to the west of the guard house, and (2) a limited area of surface soil covered with gravel, brick, and concrete fragments located at the northeastern corner of the BMC Plant. Figure 2 presents the BMC Plant layout.

The three lots were owned by Alfred Lister from the 1870s until 1886. From 1886 to 1930, Lister's Agricultural Chemical Works used parts of the current BMC Plant for the manufacture of agricultural chemicals. Benjamin Moore has owned Lots 40 and 62 since 1925. Benjamin Moore purchased Lot 34 in 1958.

The area surrounding the BMC Plant is highly urbanized, consisting primarily of industrial properties developed since the late 1800s, and is largely covered by impervious surfaces, except to the east. The BMC Plant is bordered on the north by the Lower Passaic River ("Passaic River" or "River") and to the east by vacant land (formerly the Fairmount Chemical Company property, with a current owner listed as Morris Fairmount Associates Urban Renewal, LLC). Lister Avenue borders the BMC Plant to the south, across which is Atlas Refinery, Inc. West of the BMC Plant are two vacant parcels. The parcel closest to Lister Avenue is currently owned by Chemical Waste Management. The second parcel, closer to the Passaic River, is known as the Hilton Davis property. The BMC Plant is also near the Diamond Alkali property, which is located west of the property, adjacent to the vacant Hilton Davis property.

There are thirteen main buildings located at the BMC Plant (*see* Figure 2). Nine of the thirteen buildings form an interconnected complex at the center of the BMC Plant (i.e., Buildings 1, 4, 4a, 5, 6, 7, 8, 9, and 17).[4]

---

[2] NJDEP, Bureau of GIS, NJ-Geoweb, https://www.nj.gov/dep/gis/geowebsplash.htm.
[3] Lot 40 was paved before 1932.  Lot 62, which was vacant or used for trailer storage until 1961, was at least partially paved by 1972. (7-BenjaminMoore, pages 14-15). Lot 34 was vacant before 1951 and paved sometime thereafter. The entire property was paved over likely before 1973.
[4] No building numbers 2, 3, 10, 11, 15 or 16 currently exist at the BMC Plant.

RAP_00725043

April 16, 2019
Eric Aronson, Shareholder
Site Assessment - Benjamin Moore & Co.
Privileged and Confidential - Attorney Client Work Product

| Building ID | Operations | Potential for COCs (Y/N) |
|---|---|---|
| 1 | Alkyd and latex paint manufacturing | Y – Mercury, lead, copper, and naphthalene; *See* Section 2.1.1 |
| 4 and 4a | Raw material storage | Y – Mercury, lead, copper, and naphthalene; *See* Section 2.1.1 |
| 5 | Finished product storage | N |
| 6 | Office space | N |
| 7 | 1st floor: Raw material storage<br>2nd and 3rd floors: Alkyd and latex paint manufacturing | Y – Mercury, lead, copper, and naphthalene; *See* Section 2.1.1 |
| 8 | Distribution | N |
| 9 | Office space | N |
| 11 (former) | Alkyd and latex resin manufacturing | Y – PCBs; *See* Section 2.6 through 2.8 |
| 12 | Boiler | N |
| 13 | Overflow storage | N |
| 14 | Overflow storage | N |
| 17 | Distribution | N |

Building 1 consists of three floors and is used for latex and alkyd paint manufacturing. Paint manufacturing is also conducted on the second and third floors of Building 7. The first floor of Building 7 houses a raw material receiving area. Raw materials for the paint manufacturing process (i.e., resins and oils) are stored in ASTs housed in Buildings 4 and 4a. Building 5 is a one-story building used for finished product storage. Buildings 6 and 9 consist of two stories of office space. Buildings 8 and 17 house finished product storage and distribution areas.

Immediately to the northeast of the central building complex are several areas housing outdoor ASTs containing raw material for the paint manufacturing process, a drum storage area, a waste shed where empty paint cans are crushed, and two spill sheds which house spill response materials. The ASTs and storage areas are paved and surrounded by a concrete pad and a three-foot dike. Beyond the waste sheds to the east is a paved area used for trailer storage. South of the trailer storage area is a paved employee parking lot.

Building 11 (a.k.a. the "Vehicle Plant") was a two-story brick building located to the west of the central building complex that historically housed the alkyd and latex resin manufacturing operations. Raw materials for the resin manufacturing process are stored in ASTs located in dikes to the north, south, and west of Building 11, and in drums and totes stored in a shed located at the western property boundary. The pipe shop, a brick building that houses maintenance and pipe welding operations, is located to the north of Building 11. Building 11 was taken out of service shortly after the fall of 2012 and was ultimately demolished in 2014.

April 16, 2019
Eric Aronson, Shareholder
Site Assessment - Benjamin Moore & Co.
Privileged and Confidential - Attorney Client Work Product

Buildings 12, 13, and 14 are located on the western property boundary, south of Building 11. Building 12 houses a large boiler and Buildings 13 and 14 are used as overflow storage areas. A small structure formerly used as a drivers' lounge area is located in the southwestern portion of the BMC Plant along Lister Avenue. A guardhouse is located at the southeastern corner of the BMC Plant near the entrance at Lister Avenue.

Material has historically been transported to the BMC Plant by truck or rail and received in designated unloading areas. The former truck fueling area is located to the north of the drivers' lounge structure. Distribution areas are located on the southern side at Building 8 and at Building 17.

## 1.2    Facility Operations

Benjamin Moore's manufacturing operations consists of: (a) manufacture of latex and alkyd resins ("vehicles"[5]); (b) manufacture of latex and alkyd paints, colorants, and technical coatings; and, (c) packaging and distribution of finished products. Beginning in 1925, Benjamin Moore manufactured, and packaged alkyd paint at the BMC Plant for distribution. From approximately 1931 until the 1950s, Benjamin Moore manufactured Paqua, a trademark name for a synthetic resin, water paste paint. In 1955, Benjamin Moore added the manufacture of latex paints. Subsequently, Benjamin Moore added the manufacture of alkyd resin in 1959, latex resin in 1963, and colorants in 1965. The products are manufactured through a batch process, which includes the processes of blending, reacting, and heat treating. From 1966 to 1980, Benjamin Moore manufactured aerosol paint sprays. Benjamin Moore ceased manufacturing alkyd resin at the BMC Plant in July 2007. The BMC Plant's operations were reduced after 2012, and Benjamin Moore now only manufactures latex vehicle, paints, and colorants at the BMC Plant. (*See generally* 7-BenjaminMoore; PAS-00055192-PAS00055349; PAS-00055154-PAS00055162; PAS-00055004-PAS-00055147).

The following table provides a summary of the major operations at the BMC Plant.

| Operation | Description |
|---|---|
| Receiving/Warehousing | Raw material, including solvents, pigments, oils, and monomers in both liquid and solid form are received in bags, pails, drums, totes, and bulk form and either stored inside the facility, under canopy areas, or in ASTs. |
| Alkyd Resin Manufacture (operations ceased in July 2007) | Alkyd resins were manufactured in Building 11 by combining raw materials, including pentaerythritol ("PE"), phthalic anhydride ("PA"), vegetable oils (e.g., linseed, soybean, sunflower), and solvents (mostly mineral spirits with small amounts of ethyl benzene) in a heated kettle. The resultant water/solvent mixture ("decanter water") is collected in a pipe that empties into a tote located on the asphalt outside of the building. Resin manufacturing operations are directed from the Control Lab located within the building. |

---

[5] Latex "Vehicle" is a term of art in the paint industry that identifies fully polymerized latex in a suspension that becomes the film forming agent which binds pigments and other coating components." (PAS-00055008).

April 16, 2019
Eric Aronson, Shareholder
Site Assessment - Benjamin Moore & Co.
Privileged and Confidential - Attorney Client Work Product

| Operation | Description |
|---|---|
| Latex Resin Manufacture | Latex resin was manufactured in Building 11 via an emulsion polymerization reaction. Monomers (mostly vinyl acetate and butyl acrylate in either 90:10 or 80:20 ratios) are combined in kettles with potassium persulfate and various surfactants and thickeners (e.g., hydroethylcellulose). Recycled, non-contact cooling water is used to control the reaction temperature. Latex manufacturing operations are directed from the Control Lab located within the building. |
| Alkyd/Latex Paint Manufacture | Pigments are stored in boxes and bags on the third floor of Building 1, where they are dispersed into water (latex paints) or resin (alkyd paints). For certain organic pigments, an additional milling step is required to aid in their dispersion to the thinning and shading department located on the second floor of Building 1. At that location, the paints are thinned to the desired consistency using either solvent or water, and any necessary additives such as thickeners or color are added. During the thinning step, quality control samples are taken and analyzed in the QA/QC laboratory located adjacent to the thinning area. The paints are then strained and transferred to one of the seven filling and packaging lines located on the first floor of Building 1. One-gallon cans are filled and packaged by an automated packaging line consisting of a gravity-driven filling machine, a lid applicator, a handle applicator, a label machine, a cardboard case packer, a carton coding machine, and a carton palletizer. Once arranged on a pallet, the cardboard cases of one-gallon containers are shrink-wrapped and transferred to warehouse or distribution areas with forklifts or pallet jacks. Benjamin Moore also packaged paints in various other containers including quart, two-gallon, and five-gallon cans and pails using a similar process. |
| Product Warehousing/Distribution | Buildings 8, 17, 4, and 4a serve as finished product storage areas. Building 8 houses floor-stacked items, composed mostly of one-gallon cans of paint. The southern side of Building 8 serves as a distribution area for shipments to dealers. Building 17 serves as a storage and distribution area for interplant shipments. Resins that are manufactured on-site are stored in bulk in ASTs located in Building 4 and 4a. These resins are either used in the paint manufacturing processes conducted at the BMC Plant or shipped via tanker trucks to other Benjamin Moore plants. |
| Office | Office operations are conducted in Building 6 and 9. Lunch room and restroom facilities are also located within this area. |

## 1.3    Topography

The BMC Plant is situated at an elevation of approximately 3 to 8 feet above mean sea level ("AMSL"), slightly above the adjacent tidal Passaic River. Topography at the BMC Plant is relatively flat with a slight decrease in elevation to the north, towards the Passaic River.[6]

## 1.4    BMC Plant Geology

Much of the City of Newark, including the BMC Plant, has been mapped by the New Jersey Department of Environmental Protection ("NJDEP") as having large areas of historic fill.[7] In addition, site investigations performed have confirmed the presence of fill across the BMC Plant (*see* Section 6). Below this historic fill layer, which extends to a depth of approximately 8 feet below ground surface ("bgs"), a unit generally consisting of gray-black organic silt/clay and sand (commonly referred to as the "meadow mat") has typically been identified.

A buried valley exists under the Newark area which is filled with stratified drift and interbedded lenses of till. In the southern portion of Newark, the main valley is filled with as much as 200 feet of lacustrine clay and sandy clay and is overlain by 50 to 100 feet of other stratified and unstratified glacial drift. In the northern part of Newark, the valley contains several deposits of sand and gravel interbedded with clay and till. The sand and gravel ranges in thickness from one to nineteen feet (7-BenjaminMoore, page 16).

Below the alluvial material which completes the overburden sequences, the BMC Plant is underlain by the Passaic Formation (formerly referred to as the Brunswick Formation), which consists of bedrock that is 6,000 feet thick and composed of shale and sandstone with local occurrences of sandy and pebbly consolidated beds. The depth to bedrock in the vicinity of the BMC Plant is approximately 100 feet (7-BenjaminMoore, page 16).

## 1.5    BMC Plant Hydrogeology

Confined and semiconfined groundwater exists in lowland areas of Newark. Because of heavy pumping, parts of the confined aquifer have become dewatered and are no longer confined. The confined condition is a result of clay beds along the Passaic River mantling the bedrock and variations in fracturing or weathering within the Passaic Formation. Local pumping and seasonal recharge greatly affect the water table in the Newark area. The deep-water table near the BMC Plant is approximately 95 to 135 feet bgs, however, the water table has been recorded as high as 30 feet in the general area (7-BenjaminMoore, page 16). The depth to shallow groundwater ranges from 4 to 6 feet bgs, but as reported during excavation activities in 2008, can be as shallow as 2 feet bgs (1-CONFBenjaminMoore, page 3).

The natural deep groundwater flow direction in the Passaic Formation follows the strike of bedrock to the northeast. However, deep groundwater flow is influenced by local pumping and can range in flow direction from southwest to northeast (7-BenjaminMoore, page 16). The direction of shallow groundwater is expected to be tidally influenced and to flow generally north towards the Passaic River (1-CONFBenjaminMoore, page 3).

---

[6] Google Earth, https://www.google.com/earth/
[7] NJDEP, Bureau of GIS, NJ-Geoweb, https://www.nj.gov/dep/gis/geowebsplash.htm

April 16, 2019
Eric Aronson, Shareholder
Site Assessment - Benjamin Moore & Co.
Privileged and Confidential - Attorney Client Work Product

Saltwater intrusion has made the water unsuitable for drinking or irrigation purposes. Groundwater is used for industrial and commercial purposes within four miles of the BMC Plant (7-BenjaminMoore, page 16).

## 2.0    CONTAMINANTS OF CONCERN USE AND PRESENCE

### 2.1    Hazardous Substances and Petroleum Products

#### 2.1.1    Primary Raw Materials

Benjamin Moore has used and stored the following primary raw materials [8] (*See generally* 7-BenjaminMoore;    1-CONFBenjaminMoore;    PAS-00055192-PAS00055349;    PAS-00055154-PAS00055162; PAS-00055004-PAS-00055147):

- Solvents, including Varsol 18, Isopar L, Solvent 140-66, mineral spirits, ethyl benzene, toluene, and xylene, are stored in ASTs, drums, or totes in the AST containment dikes and the drum and tote canopies. According to an MSDS issued in 1983, one of the solvents Benjamin Moore used contained naphthalene (96-BenjaminMoore). Tank records from 1992 indicated that this solvent was stored in an AST on-site in Building 4 (Tank 34 in Dike 1) (106-BenjaminMoore). Paint additives including coalescing agents, drying agents, defoaming agents, and biocides are stored in drums and totes in the canopy area west of Building 5.

- Monomers, including vinyl acetate, butyl acrylate, and methylmethacrylate ("MMA"), are stored in ASTs with individual capacities ranging from 12-20,000-gallons located in the solvent and monomers area north of Building 11.

- Powdered pigments are stored in boxes, 50-pound bags, or in 1000- or 2000-pound bulk bags on the third floor of Building 1, or in slurry from in ASTs in the latex, slurry, and surfactant area. According to Benjamin Moore representatives, the primary pigment materials include titanium dioxide, silicates, diatomaceous earth, and clays. There are 75 various pigments in total.

Benjamin Moore historically used certain metals that have now been identified by USEPA as COCs for the Passaic River as ingredients in paint products.[9] These products were primarily used in Buildings 1 and 7 (5-BenjaminMoore, page 3).

- Mercury. Except for a certain type of red paint and a biocide in water-based paints, Benjamin Moore's products were mercury-free. Benjamin Moore used mercury compounds in the manufacture of red latex paints from approximately 1953 until as late as 1971 (7-BenjaminMoore, page 9).

- Lead. Benjamin Moore used lead compounds in the manufacture of paint primarily from approximately 1951 until at least 1971. Yellow chromate, also known as lead chromate, was added to paints at the facility after 1971, however these specialty paints only comprised 0.4%

---

[8] Except as specifically noted in this Section 2.1.1, these primary raw materials are not a source of COCs at the BMC Plant. Vegetable oil is also considered a primary raw material used at the BMC Plant.

[9] Terraphase has no records documenting the purchase or inventory of any COCs for use as raw material in product. According to available records and employee accounts, Benjamin Moore never used dioxin/furan, DDx, Dieldrin or PCBs as ingredients in paint products.

April 16, 2019
Eric Aronson, Shareholder
Site Assessment - Benjamin Moore & Co.
Privileged and Confidential - Attorney Client Work Product

of Benjamin Moore's total paint production. Based on information reviewed, laboratory samples of paint sludge as late as 2001 contained trace amounts of lead.[10] Solvent waste from lead-containing specialty paints was kept separate and recycled in subsequent batches (7-BenjaminMoore, page 9; 100-BenjaminMoore, page 2). Benjamin Moore stored lead-containing paint sludge separately and disposed this waste off-site (*See* 101-BenjaminMoore, page 8).

- Copper. Benjamin Moore used raw material containing trace amounts of copper compounds in pigments used in the manufacture of paint. Because no specific information regarding the timing and use of copper at the BMC Plant is available, we have conservatively assumed copper may have been used during the entire manufacturing history.

## 2.1.2    Lower Passaic River Operable Unit 2 COCs Detected in Soils and Groundwater at the BMC Plant

Beginning in 2001, ENVIRON International Corporation ("ENVIRON")[11] performed an investigation of the BMC Plant and identified COCs in soils and groundwater. Details regarding the investigations, completion of the remedy, and issuance of a Response Action Outcome ("RAO") are provided in Section 6.

## 2.2    Underground Storage Tanks

Benjamin Moore personnel report that no underground storage tanks ("USTs") are currently or were formerly located at the BMC Plant. No evidence of USTs (e.g., fill ports or vent pipes) have been observed at the BMC Plant.

## 2.3    Aboveground Storage Tanks

Raw materials for the paint manufacturing process (i.e., resins and oils) are stored in ASTs housed in Buildings 4 and 4a. Several diked areas of ASTs containing raw material for the paint manufacturing process are situated immediately to the northeast of the central building complex.

AST storage areas are identified on Figure 2. These areas include the oil and latex storage area; the solvent and monomer storage area; the latex, alkyd (former), and oil storage area in Buildings 4 and 4a; and, the latex, slurry, and surfactant storage area.

Benjamin Moore maintains a Spill Prevention Control and Countermeasure ("SPCC") plan, as required by the NJDEP, based on the capacity of petroleum products it stores in ASTs. In addition, Benjamin Moore also maintains a Discharge Prevention Control and Countermeasure ("DPCC") plan, as required by the NJDEP, specifying the types of secondary containment for each storage area, proposed cleanup method for any hypothetical spill, and emergency response procedures.

---

[10] Absent other information regarding lead used in paint manufacturing, Terraphase has assumed lead may have been used up to 2001 to be conservative about the historical use timeline. It is plausible, however, that lead was present in sludge as a result of water intake from the City of Newark.

[11] In December 2014 Ramboll purchased ENVIRON. As such, any reports submitted to NJDEP prior to this date were authored by ENVIRON, while more recent reports (post-2014) were authored by Ramboll.

April 16, 2019
Eric Aronson, Shareholder
Site Assessment - Benjamin Moore & Co.
Privileged and Confidential - Attorney Client Work Product

## 2.4    Drains and Sumps

The BMC Plant has always had a segregated plant storm water system because of its position adjacent to the Passaic River.  The main paint plant never had floor drains. Historically three drains in the Vehicle Plant were discharging to the storm sewer from a portable kettle cooling operation, a reactor cooling system, and a sink in the laboratory. These drains were subsequently connected to the sanitary sewer system in June 1973 (56-BenjaminMoore). The storm sewer is protected from chemical contamination on-site by secondary containment of the various tanks and chemical handling areas. The entire BMC Plant is surrounded by a 100-year flood wall which serves as an additional containment mechanism to protect the River. The protective flood wall was installed by Benjamin Moore around the BMC Plant in response to a Report on Flood Control dated June 28, 1961 to prevent tidal flooding from the Passaic River (*See* 20-BenjaminMoore). The location of the 100-year flood wall is presented on Figure 2.

Rain water runoff is directed through storm drains towards a pump station located alongside the River. This water is then placed in a cement holding sump. There are two pumps in the station. A manual pump directs the storm water to the Newark Storm system where it is treated by the Passaic Valley Sewerage Commission ("PVSC") (7-BenjaminMoore, pages 12-13).

Except for three drains in Building 11, which were re-directed to the sanitary sewer in June 1973, all sanitary wastes were always directed to the sanitary sewer which is separate and distinct from the storm sewer. The sanitary sewer lines at the BMC Plant connect to the PVSC. Benjamin Moore has been connected to PVSC since it began operation. PVSC began operation of the Newark Bay Treatment Plant in 1924, approximately one year prior to Benjamin Moore's initial manufacturing operations. Additional information regarding the PVSC discharges is provided in Section 3.0.

## 2.5    Transformers and Capacitors

The BMC Plant has a pad mounted transformer situated behind Building 6 and a pole-mounted transformer between Building 11 and Building 5. Benjamin Moore had transformers located outdoors at the BMC Plant that likely contained PCB-oils until the early- to mid-1980s. PCBs were also likely present in fluorescent light ballasts at the BMC Plant.

In 1982, shortly after the federal PCB ban, Benjamin Moore investigated possible sources of PCBs at the BMC Plant. Benjamin Moore submitted samples of its transformer oil to a lab for analysis. PCBs were detected in transformer oil at 95.3 parts per million ("ppm"). (9-CONFBenjaminMoore, Attachment 4, page 45).

## 2.6    Historic Fill

Historic fill was identified during prior investigations at the BMC Plant (*see* Section 6). According to NJDEP, historic fill is ubiquitous throughout Newark and is mapped at the BMC Plant. [12] Investigations at the BMC Plant have confirmed the presence of historic fill. Specifically, brick, gravel, and wood fragments have been encountered in soil. In addition, as discussed in Section 6, analytical results of soil samples collected from the BMC Plant within the historic fill have identified the typical constituents associated with historical fill (i.e., metals and PAHs) within the range of Target Contaminant Concentrations in Typical Historical Fill Material (formerly Table 4-2 in N.J.A.C. 7:26E-

---

[12] https://www.nj.gov/dep/gis/geowebsplash.htm

PAR-00725050

April 16, 2019
Eric Aronson, Shareholder
Site Assessment - Benjamin Moore & Co.
Privileged and Confidential - Attorney Client Work Product

4.6, which was removed from the Technical Requirements for Site Remediation when amended May 7, 2011). PCBs were also found in historic fill material along with other typical constituents that are present on the BMC Plant. Given historic fill conditions in the region, coupled with only the sporadic occurrence of PCBs at low concentrations, Ramboll determined that the PCBs identified in one area of the BMC Plant are the result of historic placement of fill.[13] The determination was approved by the Licensed Site Remediation Professional ("LSRP") of record and accepted by the NJDEP.

## 2.7    Heating and Cooling Systems

Two Therminol boilers are used for resin manufacturing processes in Building 11. The BMC Plant is heated by natural gas-fired boilers. Public Service Electric & Gas Company ("PSE&G") supplies natural gas and electricity to the buildings.

For a limited period of time, Benjamin Moore utilized a closed-loop heat transfer system in the alkyd manufacturing operation located in the former Building 11. From approximately 1969/1970 until the spring of 1972, Benjamin Moore used Therminol FR,[14] a heat transfer fluid containing PCBs, in the heater (5-BenjaminMoore, page 2). Therminol was circulated in heat transfer "jackets" external to the pressurized high temperature alkyd reaction vessels called kettles and was used to provide indirect/non-contact precision heating (See 9-CONFBenjaminMoore, pages 39-40). According to Benjamin Moore's records and employee accounts, Therminol FR was never mixed with, nor encountered, product batches, and Benjamin Moore never used PCBs in products or paint formulations manufactured or stored at the BMC Plant (See 1-CONFBenjaminMoore, page 7). In 1972, when Monsanto discontinued the sale of the Therminol FR series, Benjamin Moore completed a changeover to Therminol 66, a non-PCB-containing oil (See generally, 9-CONFBenjaminMoore.). That same year, Benjamin Moore sent its remaining Therminol FR supply to Monsanto for disposal by incineration (131-BenjaminMoore).

As described above in Section 2.5, Benjamin Moore investigated possible sources of PCBs at the BMC Plant. Benjamin Moore's sent a sample of spent Therminol 66 to Monsanto for analysis in 1982. The results indicated that no PCBs were detected, evidencing PCBs were no longer present in even trace amounts in the Therminol heater as of that time (36-BenjaminMoore).

Because of the prior use of Therminol FR in Building 11, samples of the building materials (concrete) were collected for laboratory analysis in accordance with NJDEP's *Guidance for Characterization of Concrete and Clean Material Certification for Recycling* prior to the demolition of Building 11 (see 9-CONFBenjaminMoore). As a result of this sampling, concrete was identified with PCBs, with the highest concentrations of PCBs found in the area where the Therminol heater was located. There was

---

[13] Terraphase has no knowledge of the use, storage, disposal of, generation, or handling of COCs having resulted in the placement, deposition, or otherwise result in the location of COCs, on or in the soils or other non-impervious surfaces of the BMC Plant. Terraphase agrees with Ramboll that the source of known COCs in soils on-site was identified is historic fill.

[14] Based on the records we have reviewed, we are aware Benjamin Moore changed out spent Therminol from the heater on an annual basis and sent the material for reclaim. Benjamin Moore would have made corresponding purchases of Therminol from the manufacturer Monsanto to replenish the heater. There are records documenting the purchase of PCB-containing materials from Monsanto from 1970-1972, but they have little value in confirming the exact nature of purchases per year (PAS-00104384 – PAS-00104387). Specifically, the Monsanto records do not identify whether the BMC Plant was in receipt of the PCB shipments, and therefore it is unclear whether Benjamin Moore's Newark facility received some or any of this material.

April 16, 2019
Eric Aronson, Shareholder
Site Assessment - Benjamin Moore & Co.
Privileged and Confidential - Attorney Client Work Product

no evidence that minor leaks that may have occurred from the Therminol heater could have escaped the building and concrete slabs and no direct pathway from this portion of the building (e.g., floor drains, etc.). Due to the presence of PCBs in the concrete materials, Building 11 demolition materials were managed and disposed properly off-site as a TSCA waste for PCB concentrations greater than 1 mg/kg and either as a non-hazardous waste or for recycling, as appropriate, for PCB concentrations less than 1 mg/kg.

## 2.8    Pits, Lagoons, or Basins

According to available information, in 1950 or 1951, wash water from Paqua and later latex paints was disposed in a pit ("French Drain") located north of Building 7 and west of the transformer vault. The French Drain walls were wood and there was a wood baffle dividing the pit into two compartments. The wash water was dumped into one side of the pit where the solids settled out. The liquid migrated to the second half of the pit and drained into the ground. Later in 1951, an unlined wash water lagoon ("Lagoon") was set up in the northeastern portion of the BMC Plant and a sump pump was used to pump the liquid from the French Drain to the Lagoon. Shortly after, a second Lagoon was created to allow material to dry in one Lagoon before being accumulated and disposed off-site (wash water collection areas are collectively referred to as "Lagoons"). In June 1967, Benjamin Moore began to discharge latex wash water to the sanitary sewer. In May 1968, the latex wash water clogged the sanitary sewer line, so the plant reverted to the use of the Lagoons.[15] Between 1968 and 1970, two new unlined Lagoons were installed on the then recently purchased Lot 62 for latex wash water collection and evaporation (5-BenjaminMoore, pages 3-4; 41-BenjaminMoore, pages 2-3). A Lagoon on the northeast corner of Lot 62 is first visible on historical aerial photographs in 1971. The Lagoons were used until sometime in the 1970s.

For a limited period, Benjamin Moore directed stormwater to a stormwater retention basin ("Basin") that was located near or in the same location as the former Lagoons on Lot 62. The Basin was approximately 80 feet by 100 feet and 3 feet deep (7-BenjaminMoore, pages 13, 15).

Additional discussion of wastewater management and sampling completed at the Basin/Lagoon features is provided in Sections 3 and 6, respectively.

## 3.0    WASTEWATER DISCHARGES AND OFF-SITE DISPOSAL

### 3.1    Sanitary Waste and Stormwater

Sanitary waste has always been discharged directly to the PVSC sewer system since operations began at the BMC Plant in 1925. Waste was/is discharged to the PVSC under permit #20403112 and later under permit #20250002. Permit conditions require continuous monitoring of the effluent's lower explosive limit ("LEL"), as well as collection of a 24-hour composite sample for biological oxygen demand ("BOD"), total suspended solids ("TSS"), arsenic, cadmium, copper, lead, mercury, molybdenum, nickel, and zinc to be reported to the PVSC on a monthly basis. Terraphase reviewed data associated with Benjamin Moore's discharge to the PVSC and discovered that low levels of certain metals (i.e., lead, copper, nickel, and zinc) have been reported in the discharge; however, these levels have consistently been below the discharge thresholds (See e.g., PAS-00055122).

---

[15] Some records suggest Benjamin Moore was discharging latex wash water to the sanitary sewer as late as 1973/1974. (5-BenjaminMoore, page 5).

Since 1924, the PVSC has owned and operated a collection system that carries stormwater and sewage from the surrounding municipalities to New York Bay. In 1937, PVSC constructed a treatment plant at the terminus of the collection system in Newark to treat the combined sewage and stormwater and reduce solids and contaminant discharges to the New York Bay. Untreated waste discharged to the River by PVSC generally falls into three categories: 1) discharge due to system breakdown, maintenance, and repair activities; 2) PVSC-controlled discharges ("bypasses") during high flow events such as rain storms and snow melt; and 3) automatic discharges at combined sewer overflow ("CSO") points. The sanitary sewer lines in the vicinity of Benjamin Moore directly connect to the PVSC treatment plant and there has never been any bypass or CSO outfall between the BMC Plant and the PVSC treatment plant. Further, the PVSC treated all waste sent to its treatment plant before discharging to the New York Bay or backup outfall, and therefore Benjamin Moore's sanitary waste was treated before any discharge. No untreated waste from the BMC Plant would have been discharged by PVSC to the River.

Storm water collects at the BMC Plant and drains into a series of storm drains which is ultimately discharged to the pump house located at the northern end of the BMC Plant. The water is then discharged to the Passaic River via the City of Newark storm water outfall located approximately 150 feet east of the pump house (20 feet to the north of the BMC Plant), or in periods of heavy rain, directly from a 14-inch outfall at the pump house which is manually operated. The storm water discharge is permitted as part of the facility's New Jersey Basic Industrial General Permit (NJPDES General Permit No. NJ0088315). An easement along the eastern portion of the BMC Plant is owned by the City of Newark, which maintains the 72-inch storm water outfall. Storm water directed to this outfall is from several industrial properties in the neighborhood, not solely from the BMC Plant. Historically, Benjamin Moore directly discharged stormwater to the Passaic River via a 10-inch outfall that was sealed sometime after 1961. Benjamin Moore was also diverting stormwater into the Basin for some period.

Based on a review of available documents, with exception to minor violations discussed in Section 5, Benjamin Moore has been cited only once in its 100-year history for its storm water discharge from the BMC Plant. On August 15, 1969, Benjamin Moore received an Administrative Order from the New Jersey Department of Health ("NJDOH"), Water Pollution Control Program ("WPCP"), citing Benjamin Moore for the discharge of "industrial waste and other polluting matter" into the Passaic River. Benjamin Moore responded in an October 20, 1969 letter, which clarified that investigations at the plant revealed some incidents of latex "wash liquid" being discharged into the flood control system and thereby eventually into the Passaic River. The letter stated that operators had subsequently been instructed not to do so. The NJDEP raised the issue again in an April 24, 1972 letter, which stated that Benjamin Moore had failed to comply with the 1969 Order. Samples collected from Benjamin Moore's storm water discharge pipe in February 1973 showed the discharge to be unacceptable in color, turbidity, pH, TSS, chemical oxygen demand, and BOD. However, further investigation as to the source of the exceedances revealed that this was not the result of a discharge; rather three drains in Building 11 were discharging to the storm sewer system from a portable kettle cooling operation, a reactor cooling system, and a sink in the laboratory. These drains were subsequently connected to the PVSC on or before May 1973. Although water with color, turbidity, and BOD was leaving Building 11 from these drains and entering the storm water system, no COCs were associated with these water sources. The water discharged from the cooling and portable kettles would not have encountered any product material or PCB-containing Therminol. The only water discharged from the reactor would

April 16, 2019
Eric Aronson, Shareholder
Site Assessment - Benjamin Moore & Co.
Privileged and Confidential - Attorney Client Work Product

have been condensate water; all other material was recycled back into the reactor. The sink drain would have carried water from handwashing or possibly the washing of paintbrushes, but any discharge of COCs would have been inconsequential. In addition, COCs that may have been present in certain pigments, additives, etc. (copper, lead, mercury) were not handled in Building 11. These COCs, when present, were managed and added to paints on the second floor of Building 1. There is no evidence that the inadvertent discharge to the stormwater system allowed COCs to enter the Passaic River.

## 3.2    Process Waste Streams

The activities that result in the generation of hazardous waste are the following: oil-based paint manufacturing, cleaning of tanks and equipment, washing of manufacturing equipment with solvents, and washing manufacturing equipment with a caustic solution. In these processes, Benjamin Moore generates four waste streams: sodium hydroxide or caustic soda (D002), ignitable mineral spirits waste and paint sludge (D001), and spent non-halogenated solvents (F003 & F005), such as xylene, methanol, and methyl ethyl ketone, that are due to the various additives for different types of paints.

Generally, Benjamin Moore's wastes were recycled back into the product or reused as a cleaning solution to the extent possible. Waste that cannot be recycled back into operations is stored in 55-gallon drums and taken off-site within 90 days to an authorized facility, except as noted below.[16] Depending on the type of paint manufactured (water-based or oil-based), the equipment is cleaned and washed out with one of the following cleaning agents: water, caustic soda, or distilled mineral spirits. Benjamin Moore employs a distillation unit for processing the mineral spirits waste so that it can be used as a cleaning agent for the equipment.

Based on the historic use of certain COCs in products, it is possible that trace amounts of COCs (lead, mercury, copper, and naphthalene) may have been present in wastes generated at the BMC Plant and discharged to the PVSC. However, as stated, any waste would have been pre-treated prior to discharge and there is no data to suggest more than *di minimis* quantities of COCs reached the Passaic River from Benjamin Moore.

Information about Benjamin Moore's historic and current disposal practices is included below.

### 3.2.1 Wash Water

As previously indicated, there were latex wash water Lagoons formerly at the BMC Plant. Latex "wash water" is a paint industry term identifying the wastewater resulting from rinsing equipment used in the making of latex paint with water. This water-based waste is/was non-hazardous as recognized by USEPA's own decision not to list latex wash water as a hazardous waste. The generation of latex wash water began in the early 1950s when the plant began producing latex paint. The record indicates that Benjamin Moore began disposing of paint wash water in a French Drain and later in unlined Lagoons

---

[16] As of 1993, Benjamin Moore's procedures for preparing its solvent wash and paint wastes for disposal are as follows: the waste is generated throughout the factory in 55-gallon drums; when a drum is full it is taken outside and transferred into a roll-off container; the container has a screen at the front end where the material is fed through; the liquid portion goes through the screen and the heavy portion is then shoveled into DOT 17H drums which was closed when full; the drums are stored with the date and a hazardous waste sticker along with a flammable sticker; then, these drums are shipped to an NJDEP licensed facility before the 90 days allowed by the NJDEP. One to two loads of the bulk material in roll-off containers is shipped to an NJDEP licensed facility each month. There is no treatment of waste on-site.

April 16, 2019
Eric Aronson, Shareholder
Site Assessment - Benjamin Moore & Co.
Privileged and Confidential - Attorney Client Work Product

at the BMC Plant beginning in the early 1950s (5-BenjaminMoore, pages 3-5). There was a short period of time that Benjamin Moore discharged latex wash water to the sanitary sewer.

Beginning in 1980, better use of recycling techniques led to the complete recycling of all wash water. The wash water is currently recycled 100 percent on-site by using it in the production of another batch of similar material.

### 3.2.2 Solvent Wash

The solvent wash (mainly mineral spirits), used in cleaning out equipment used for oil-based paints, is hazardous due to the ignitability of the material. This material is reclaimed on-site and recycled back into production operations by a solvent recovery system, however between 1982 and 1986 Benjamin Moore was beneficially reusing spent solvent wash as a non-commercial alternate fuel in on-site boilers. Benjamin Moore never discharged solvents to the sanitary sewer.

The solvent wash from the cleaning of equipment is an aromatic hydrocarbon mixture and a sulphur refined material that falls into two groups. There are two different recovery systems that are employed depending on the group. The first group is "white wash solvent." Because of the very light color and good uniformity of this solvent, it is pumped directly up to the third floor into one of two 1,000-gallon holding tanks. From these tanks, the solvent is recycled directly into new paint production. Turnover of this wash is quite rapid and all of it is recycled with no ultimate waste generation. The first group accounts for 40 to 45 percent of solvent wash generated.

The second group is a "dark wash solvent" which constitutes the remaining 55 to 60 percent of the waste solvent generated. This material is chemically like the white wash solvent except for color. This difference makes recycling more difficult. The dark wash solvent is pumped outside into one of the four 20,000-gallon holding tanks. From these tanks, solvent is pumped into one of two 5,000-gallon outdoor holding tanks. At this point, the solvent is evaluated for color and appropriate host batches are selected for re-use. The dark wash solvent is pumped to the third floor of the plant as required for production. Benjamin Moore cannot recycle all the dark solvents held at the BMC Plant, and the material that cannot be recycled is transported off-site for disposal.

### 3.2.3   Other Wastes

Caustic waste is produced from cleaning equipment in the resin section and tank trailers. Tank trailers are washed out by a caustic wash solution, which is placed back into a storage tank after cleaning. Several washes can be done with the same wash solution. Once the solution gets thick and unusable, the solids are drummed and placed in a storage area for hazardous waste disposal. At one time, Benjamin Moore discharged caustic waste to the PVSC, but the practice stopped in 1981 and Benjamin Moore has since disposed all caustic wastes off-site (*See* 5-BenjaminMoore, page 9).

Paint sludge and solid waste material, consisting of paint skins that were too thick or too large to be reused, are produced from the manufacturing of resins and paints. The waste is stored in drums and disposed off-site.

Scrubber water from the alkyd reactors is discharged to the PVSC. Non-contact cooling water was discharged to the Passaic River (NPDES permit number NJ0030414) until at least 1982. *See id*. Both scrubber water and non-contact cooling water did not have contact with product or other material containing COCs.

April 16, 2019
Eric Aronson, Shareholder
Site Assessment - Benjamin Moore & Co.
Privileged and Confidential - Attorney Client Work Product

Solvent decanter water (1/10 of 1% of xylol or ethyl benzene) is created in the manufacture of alkyd resins. It is the water remaining after decanting a condensate composed of water and xylol or ethyl benzene. (*See* 7-BenjaminMoore, page 297-299.) From 1985 until 1988, Benjamin Moore discharged solvent decanter water to the PVSC. Decanter water did not contain COCs and did not have contact with product or other material containing COCs.

There are limited records indicating the quantities of potentially hazardous waste disposed off-site prior to the introduction of the hazardous waste manifest system. *See* 40 C.F.R. 172.205. Waste manifests and notes from RCRA and NJDEP inspections from 1978 until 1994 demonstrate Benjamin Moore was disposing of wastes containing lead and mercury off-site, confirming Benjamin Moore was not disposing of these wastes to the PVSC. Benjamin Moore also has hazardous waste manifests indicating the BMC Plant disposed two drums of PCBs in liquid form in 1985, which was around the time that Benjamin Moore was changing out the oils in transformers that may have been PCB-containing (38-BenjaminMoore, page 55). Additionally, Benjamin Moore disposed fluorescent light ballasts containing small capacitors noted as PCB waste in 1994 and 2009, and a transformer in 1999 (*Id.* at 56-58*).* Finally, there is a Monsanto record documenting the return of 32 drums of Therminol FR to Monsanto in 1972 (131-BenjaminMoore).

Since the demolition of the Building 11 in 2015, Benjamin Moore ceased generating Large Quantity Generator ("LQG") quantities of hazardous waste. The only hazardous waste generated at the time of an NJDEP compliance evaluation on October 2, 2015 was one 55-gallon drum of sodium hydroxide (D002) used to clean the kettle from the lab. According to this report, one 55-gallon drum was generated twice a year. Non-hazardous paints with pigments that are not reusable are shipped as non-hazardous waste and all other wastewaters generated in the process are discharged to PVSC.

## 4.0    SPILL HISTORY

During the history of operations at the BMC Plant, several releases have been documented. It is unlikely that any of these releases contained a COC.

- On March 23, 1978, the Coast Guard notified Benjamin Moore that it saw a spill in the Passaic River allegedly originating from the plant. The Coast Guard investigation found that a 55-gallon drum had been punctured and part of its contents had migrated to the River. There is no record of the contents of the drum. The Coast Guard observed the material "floating" on the surface, and therefore this material was lighter than water and could not have contained materials that would accumulate in sediments in the River.

- On July 8, 1980, a valve malfunction resulted in a spill of about 3,000 gallons of wash solvent from a bulk storage tank. Although the spill was contained by secondary containment around the tanks, about 25-50 gallons allegedly leaked from the dike to the Passaic River. Benjamin Moore reported the incident to PVSC, the NJDEP, and the Coast Guard, and called in a spill response contractor who used absorbent pads to collect the spill contents. Given the date of the release, the only COC that could have been contained in the wash solvent was naphthalene, but the presence, if at all, would have been insignificant.

- On January 20, 1980, the NJDEP inspected the BMC Plant and issued a Notice of Violation ("NOV") for the overflow of caustic solution from a cleaning operation and for a minor latex spill. These releases did not involve the presence of COCs and there is no evidence that this material reached the Passaic River or storm or sanitary sewers.

- On April 14, 1982, a valve malfunction on a Linden Bulk Transport truck resulted in the release of approximately 2,000-3,000 gallons of butyl acrylate at the BMC Plant. The spill was contained by a building and a sand dike area, although approximately five to ten gallons were reported to have discharge to the River. Benjamin Moore notified the Coast Guard, NJDEP, and PVSC, and the transport company retained a contractor to address the spill. There are no COCs present in butyl acrylate.

- On April 20, 1982, a small slick was noted on the River. Benjamin Moore notified the Coast Guard, NJDEP, and PVSC, and absorbent pads were used to remove the material from the River. The source of the material is unknown, but because the material was "floating" on the surface, it was lighter than water and could not have contained materials that would accumulate in sediments in the River.

- On January 20, 1988, there was a potential discharge to surface water via storm water runoff of sodium hydroxide overflow from cylinder cleaning operations and the potential discharge of a small amount of latex on the ground near the drum storage area. These releases did not involve the presence of COCs and there is no evidence that this material reached the Passaic River or storm or sanitary sewers.

- On September 30, 1988, a vat was overfilled and approximately 20-55 gallons of acetate and acrylate spilled onto the concrete and asphalt surface. (Incident Report #88-09-30-2217). There are no COCs present in acetate or acrylate, and there is no evidence that this material reached the Passaic River or storm or sanitary sewers.

- On February 26, 1992, Benjamin Moore notified NJDEP that a butyl cellulose solvent spill occurred at the BMC Plant. Approximately 212 gallons of material discharged onto a concrete and asphalt surface. The discharge was caused when a valve on a portable roller was accidently knocked open. Benjamin Moore personnel cleaned up the spill using vacuum pumps, brooms, and absorbent materials. Four 55-gallon drums of material were recovered and manifested for off-site disposal. (Spill # 92-2-26-1518-23). There are no COCs present in butyl cellulose, and there no is evidence that this material reached the Passaic River or storm or sanitary sewers. NJDEP, Division of Hazardous Waste Management ("DHWM"), conducted a site inspection on March 6, 1992 and confirmed that the spill was properly cleaned, and spill material was containerized for proper disposal.

- On March 6, 1996, approximately 16,000 pounds of titanium dioxide discharged from a tanker at the loading dock over a storm drain. The spill was immediately contained and pumped into tanker trucks. At the time of the spill, Benjamin Moore collected almost all the estimated 58,000 gallons of titanium dioxide and rain water. Benjamin Moore sent 26,732 gallons of the mixture to DuPont for processing and stored the remainder on-site in four tanks in Dike Area 5 to be recycled into other products.

- On June 30, 1988, PVSC responded to a report of a discharge of a white substance into the Passaic River. According to Benjamin Moore, the BMC Plant buildings were recently painted and bled after the heavy rain that morning. PVSC collected a grab sample, but the sample result records are not in the possession of Benjamin Moore.

- On January 31, 2000, PVSC investigated a spill from Tank #56 of white latex emulsion. The raw material was contained and pumped into a tanker and back into Tank #56 once it was

BAR-00725057

April 16, 2019
Eric Aronson, Shareholder
Site Assessment - Benjamin Moore & Co.
Privileged and Confidential - Attorney Client Work Product

repaired. Raw materials that escaped the primary containment could not be recycled and were pumped into a tanker with plans to transport to PVSC upon approval. There are no COCs present in white latex emulsion, and there is no evidence that this material reached the Passaic River or storm or sanitary sewers.

- In 2001, a sprinkler repair at the BMC Plant led to Benjamin Moore's voluntary soil investigation and a Memorandum of Agreement ("MOA") with the NJDEP ultimately regarding three areas of concern ("AOCs"). More details regarding the investigation and cleanup of the soils and groundwater are discussed in Section 6 (Incident Report # 01-12-12-0056-19).

## 5.0    REGULATORY INFORMATION

### 5.1    Environmental Permits and Registrations

The BMC Plant maintains the following permits and registrations.

- *RCRA (EPA ID NJD002453242).* Benjamin Moore filed a Resource Conservation and Recovery Act ("RCRA") Part A Hazardous Waste Permit Application with the USEPA on November 10, 1980 and was consequently listed as a Treatment, Storage, and Disposal ("TSD") facility. From 1984 to 1986, Benjamin Moore attempted to be delisted as a TSD facility and submitted numerous correspondence letters to NJDEP, DHWM, regarding the BMC Plant's operations and hazardous waste handling practices. In correspondence dated July 27, 1983, the NJDEP indicated that Benjamin Moore would be delisted from a TSD facility to generator status. In addition, the NJDEP removed storage in tanks (S02) activity from Benjamin Moore's Part A application of record, leaving only storage in containers (S01) activity. The BMC Plant was officially reclassified as a generator (EPA ID NJD002453242) on December 8, 1986 and has be listed accordingly ever since.

- *Sewer Connection (20403111) and NJDPES (NJ0030414).* Initially, Benjamin Moore had a NJPDES Discharge to Surface Water ("DSW") permit to discharge non-contact cooling water into the Passaic River. After April 30, 1982, the BMC Plant redirected the cooling water into recirculated cooling water systems. The bleed off from these systems is now directed to the sanitary sewer and is treated by PVSC. Benjamin Moore has a sewer Connection Permit which allows them to discharge cooling water and all other discharges from the plant to the PVSC. There are two discharge lines going into the PVSC: one outlet discharge is hooked-up from the central laboratory building and the second hook-up is connected to the scrubber water from the Vehicle Plant.

- *NJPDES (NJ0066788).* Benjamin Moore maintains a NJPDES permit for discharge to surface water. NJDEP directed Benjamin Moore to obtain a NPDES permit in 1987 for its discharge of boiler blow down and compressor blow down. Benjamin Moore submitted its permit application in 1987 (15-BenjaminMoore). Due to the Clean Water Act amendments, NJDEP asked Benjamin Moore to reapply when amendments were finalized. NJDEP eventually issued the discharge permit in 1993.

- *Current NPDES Permit (NJG117897) and Basic Industrial Stormwater General Permit (NJ0088315).* The BMC Plant operates under a general NPDES permit effective February 1, 2018 that

---

expires January 31, 2023. The storm sewer is protected from chemical contamination on-site by secondary containment of the various tanks and chemical handling areas.

- *Air Permit (NJ0000003401305067)*. The BMC Plant operates under a synthetic minor emission Clean Air Act ("CAA") permit.

- *Remedial Action Permit (RAP180001)*. A Remedial Action Permit for Soils was established for the BMC Plant on May 7, 2018 to address contamination in soil, primarily due to the presence of historic fill.

- *Classification Exception Area (CEA)*. A CEA encompasses the entire BMC Plant to a depth of 50 feet bgs. The CEA was established on May 8, 2018. Specifically, the CEA addresses the historical fill contaminants in groundwater, including arsenic, benzo(a)anthracene, benzo(a)pyrene, and cadmium, that are present in groundwater due to historic fill at concentrations greater than the New Jersey Groundwater Quality Standards ("GWQS").

## 5.2    Enforcement Actions, Fines, and Violations

The following enforcement activities have been historically associated with the BMC Plant.[17]

| Enforceable Actions | | | |
|---|---|---|---|
| **Type** | **Issuing Agent** | **Date** | **Description of Violation / Follow-up Activity** |
| Order | NJDOH | August 15, 1969 | The NJDOH issued an order to Benjamin Moore to cease discharges of industrial wastes into the Passaic River. *See* section 3.1. |
| NOV | NJDEP – Haz Waste | October 27, 1982 | Benjamin Moore did not submit an annual report. Follow-up activity not evident from the record. |
| NOV | NJDEP – Haz Waste | August 31, 1983 | Benjamin Moore did not establish financial assurance for closure and post-closure and demonstrate financial responsibility for claims. Follow-up activity not evident from the record. |
| NOV | NJDEP – Haz Waste | April 11, 1984 | Benjamin Moore did not maintain a written description of type and amount of training given to Benjamin Moore personnel in jobs related to hazardous waste management or documentation of training; Benjamin Moore's contingency plan did not include excavation procedures. Follow-up activity not evident from the record. |

---

[17] Enforcement activity for air violations and lesser RCRA violations are not included in this report.

April 16, 2019
Eric Aronson, Shareholder
Site Assessment - Benjamin Moore & Co.
Privileged and Confidential - Attorney Client Work Product

| Enforceable Actions | | | |
|---|---|---|---|
| **Type** | **Issuing Agent** | **Date** | **Description of Violation / Follow-up Activity** |
| NOV | NJDEP – Haz Waste | February 28, 1986 | Benjamin Moore did not record an accumulation start date on containers; Benjamin Moore's emergency equipment list did not include physical description of each item and its capabilities; Benjamin Moore's hazardous waste containers were not arranged so their identification labels were visible. NJDEP issued a Notice of Civil Administrative Penalty on October 1, 1986. |
| NJPDES Permit | NJDEP – Water Resources | April 16, 1987 | An inspection by NJDEP identified storm water, boiler blowdown, and compressor blowdown were discharging to surface waters of the State without a NJPDES permit. *See* Section 5.1. |
| NOV | NJDEP – Water Resources | January 20, 1988 | Potential discharge to surface water via storm water runoff of sodium hydroxide overflow from cylinder cleaning operations and the potential discharge of a small amount of latex on the ground near the drum storage area. Follow-up activity not evident in record. |
| NOV | NJDEP – Haz Waste | April 13, 1992 | There were no hazardous waste labels on drums, lids on drums were not secured, and a manifest was missing a transported ID number. NJDEP completed a follow-up inspection on May 5, 1993 and found that all the violations had been corrected. |
| NOV | PVSC | January 1, 2001 | Zinc exceeded the local limit average. Follow-up activity was not evident from the record. |
| NOV | NJDEP – Haz Waste | October 21, 2008 | Benjamin Moore did not record the accumulation start date on two 55-gallon drums holding D001 hazardous waste and did not have adequate aisle space in between rows of hazardous waste and non-hazardous waste drums. Follow-up activity not evident from the record. |
| NOV | PVSC | January 2011 | Benjamin Moore was fined for a copper exceedance of a local monthly average limit. |
| NOV | PVSC | July 1, 2011 | Benjamin Moore was required to explain copper and zinc exceedances of the local monthly average limits. |
| NOV | NJDEP – Haz Waste | February 24, 2012 | Benjamin Moore stored one 55-gallon drum of sludge waste in the 90-day hazardous waste storage area for greater than 90 days. The deficiency was rectified, and no penalty was assessed. |

PAR-00725060

April 16, 2019
Eric Aronson, Shareholder
Site Assessment - Benjamin Moore & Co.
Privileged and Confidential – Attorney Client Work Product

| Enforceable Actions | | | |
|---|---|---|---|
| Type | Issuing Agent | Date | Description of Violation / Follow-up Activity |
| NOV | PVSC | May 2012 | Benjamin Moore was fined for a copper exceedance of a local monthly average limit. |

## 6.0    RESPONSE ACTIONS

This section describes investigation and remediation activities that have been completed at the BMC Plant.

## 6.1    NJDEP Investigation

On December 19, 1984, NJDEP investigated the BMC Plant.  NJDEP noted that the wall on the northwest corner of the Basin had collapsed and the contents of the Basin were discharging directly to the Passaic River. NJDEP collected soil and stormwater samples from the Basin and analyzed the samples for volatile organic compounds ("VOCs") and TCLP metals (RCRA 8).  VOCs limited to benzene, ethyl benzene, and toluene were detected at maximum concentrations of 0.0101 mg/kg, 0.218 mg/kg, and 0.0185 mg/kg, respectively. These low concentrations are well below the applicable Soil Cleanup Criteria ("SCC") and the Soil Remediation Standards ("SRS"). Detectable metals in the leachate samples include low levels of barium (0.59 mg/L), cadmium (0.03 mg/L), lead (0.45 mg/L), and selenium (0.008 mg/L). The leachate levels are one to orders of magnitude lower than the characteristically hazardous regulatory levels and are considered insignificant. Water samples were also collected from the Basin and analyzed for VOCs. Except for methylene chloride and ethyl benzene, VOCs were not detected. The reported methylene chloride (47 ug/L) and ethyl benzene (78.3 ug/L) concentrations are below the most stringent Surface Water Quality Standards ("SWQS") (N.J.A.C. 7:9B) for saline waters of 310 ug/L and 2,100 ug/L, respectively. Benjamin Moore completed repairs to the Basin by February 15, 1985 (102-BenjaminMoore) and later paved the area for additional parking space. No further action was taken by the NJDEP. (*See also* 7-Benjamin Moore, page 13. *See generally*, PAS-00055192-PAS-00055349; PAS-00055154-PAS00055162; PAS-00055004-PAS-00055147).

## 6.2    ENVIRON/Ramboll Investigation

Ramboll, formerly ENVIRON, conducted investigations and remediation of three AOCs: AOC 1 – an area of historic fill containing PCBs in soils, AOC 2 – site-wide historic fill, and AOC 3 – groundwater contamination as a result of historic fill.  In 2001, a sprinkler repair at the BMC Plant led to Benjamin Moore's voluntary soil investigation and an MOA with the NJDEP ultimately regarding the three AOCs. The initial soil investigation near the sprinkler system identified PCBs[18] in soils (AOC 1). The sampling results prompted Benjamin Moore to enter the MOA to delineate identified PCB contamination. In 2007, ENVIRON submitted a Remedial Investigation Report ("RIR")/Remedial Action Workplan ("RAW") to complete the delineation of soils and investigation of potential contamination in groundwater. Subsequently, a fire-water sprinkler failure at the BMC Plant occurred

---

[18] Because of concerns of potential impacts from a nearby site, soil samples were only analyzed for PCBS and dioxins.

April 16, 2019
Eric Aronson, Shareholder
Site Assessment - Benjamin Moore & Co.
Privileged and Confidential - Attorney Client Work Product

south of Building 11, initiating an investigation into historic fill material (AOC 2). The investigation was consolidated with ENVIRON's then-ongoing investigation at the BMC Plant. As described in subsequent reports, although the initial characterization of AOC 1 targeted PCBs, it was concluded that historic fill is present site-wide and ubiquitous in this portion of Newark. In 2008, ENVIRON submitted a RAW Addendum which proposed to contain-in-place PCB-contaminated soils and site-wide historic fill soils with a deed restriction and an engineering control (i.e., a cap). Groundwater contamination associated with historic fill (AOC 3) was proposed to be addressed by a CEA.[19] NJDEP approved the RIR/RAW and RAW Addendum in 2012, and ENVIRON/Ramboll completed remediation of the BMC Plant in 2018 and executed the Deed Notice[20] and CEA.[21] On June 25, 2018, the LSRP issued an AOC-specific, restricted use RAO, conditioned on the Remedial Action Permit ("RAP") for Soils and a CEA for historic fill.

Ramboll's complete investigation is detailed in the Remedial Action Report ("RAR"), Ramboll 2018. Further information on these investigations is provided below:

*AOC -1: PCB Area*

ENVIRON conducted an initial AOC-specific soil investigations and limited soil removal in the western portion of the BMC Plant in 2001 to address PCB impacts to soil. Aroclor-1242 was detected in one sample (TR2A at 4.7 mg/kg) above the then-applicable Non-Residential cleanup standard.[22] PCB-impacted soils in the location and vicinity of sample TR2A were removed and placed into two 55-gallon drums, which were properly disposed off-site at CWM Chemical Waste Services, LLC landfill in Model City, NY.[23]

In 2007, Benjamin Moore completed PCB delineation in soils and investigated potential groundwater impacts from PCBs. This delineation established that the footprint of the PCB contamination in the soil was approximately 510 square feet, extending no more than ten feet bgs. PCBs were not detected in groundwater.

---

[19] The NJDEP was notified of the presence of historic fill at the BMC Plant in a letter dated October 2, 2008 that requested the NJDEP consolidate response actions for the PCB and historic fill AOCs.

[20] The Deed Notice was recorded by the County of Essex, New Jersey, on November 17, 2017, under instrument number 2017100663, and included all contaminant concentrations exceeding the RDCSCC and/or the NRDCSCC at the BMC Plant, including PCBs, PAHs, and metals. The soils remaining on-site that contain constituents above the NJDEP NRDCSCC are capped by asphalt, buildings, and gravel as documented in the Deed Notice.

[21] The CEA was established on May 8, 2018 for an indefinite period and addresses the historic fill constituents identified in groundwater, including benzo(a)pyrene and benzo(a)anthracene.

[22] Dioxin was also found in four soil samples; however analytical results indicate that the levels of dioxin were at least an order of magnitude below both Residential and Industrial USEPA Screening Levels. In addition, the dioxin levels are below reported average background levels based on case specific studies performed in New Jersey, Ohio, Michigan, Connecticut and others, and background evaluations performed by the USEPA (NJDEP Stakeholder Meeting "Proposal to Amend Remediation Standards" June 2014). The identified dioxins were deemed by NJDEP to be the result of deposition on the Benjamin Moore property, either by wind or flood, from the nearby Diamond Alkali property and are not the result of discharges at the BMC Plant from Benjamin Moore.

[23] As described in this Section 6.1, there have been two documented sprinkler repairs which led to the investigation detailed in the Ramboll RAR. As a result of these repairs and the subsequent investigations and remediation, historic fill was disturbed. The disturbance was not of such a magnitude or nature as to allow for contamination of surface water or groundwater at the BMC Plant that had the potential for release of any contamination to the Passaic River. And, as noted, some of the PCB-impacted soils were removed and disposed off-site.

---

April 16, 2019
Eric Aronson, Shareholder
Site Assessment - Benjamin Moore & Co.
Privileged and Confidential - Attorney Client Work Product

The identified PCBs were attributed to historic fill. While not within the range of Target Contamination Concentrations in Typical Historic Fill Material (formerly Table 4-2 in N.J.A.C. 7:26E-4.6, which was removed from the Technical Requirements for Site Remediation when amended in 2011), Ramboll determined that given historic fill conditions in the region, coupled with only the sporadic occurrence of PCBs at low concentrations, it is probable that the PCBs are the result of the historic placement of fill. The LSRP agreed with Ramboll's assessment and the NJDEP accepted this position by approving the RAP for Soils. Given the location of contamination in soils below an asphalt cap at the BMC Plant, within the 100-year flood wall, and not in proximity to a pathway to the River, it is not possible for the limited area of soil impact to migrate to the Passaic River.

*AOC-2: Pervasive Historic Fill*

A fire-water sprinkler failure at the BMC Plant occurred in December 2007 south of Building 11, initiating an investigation that was consolidated with ENVIRON's then-ongoing investigation at the BMC Plant. Soil samples were collected and analyzed for Priority Pollutant VOCs with a 10-compound library search ("VOC+10"), Priority Pollutant Base Neutral semi-volatile organic compounds ("SVOCs") with a 15-compound library search ("BN+15"), Priority Pollutant metals ("PP metals"), Priority Pollutant pesticides ("PP pest"), Total Petroleum Hydrocarbons ("TPHCs"), and PCBs. Benzo(a)anthracene (0.93 mg/kg) and benzo(b)fluoranthene (1.1 mg/kg) concentrations exceeded the Residential Direct Contact ("RDC") SCC and RDC Soil Remediation Standards ("SRS"). Benzo(a)pyrene exceeded the Non-Residential Direct Contact ("NRDC") SCC and NRDCSRS concentration standards. Naphthalene was detected in concentrations greater than the RDCSRS and the NRDCSRS. Additionally, concentrations of arsenic (300 mg/kg), total chromium (2,500 mg/kg), and lead (2,200 mg/kg) exceeded the RDCSRS, the RDCSCC, the NRDCSRS and the NRDCSRS. Antimony concentrations (190 mg/kg) exceeded the RDCSCC and RDCSRS.

With exception of antimony, naphthalene, and chromium, the contaminants were within the range of Target Contaminant Concentrations in Typical Historic Fill Material. Although not a listed contaminant in the former Table 4-2, Ramboll stated that "[b]ased on the SVOC contaminant mix, this detection [of naphthalene] was likely due to historic fill." Remedial Action Report, Ramboll 2018. The LSRP of record agreed with this position in issuing a RAO for the historic fills and the NJDEP accepted this position by issuing a RAP for Soils. Thus, the metals and PAH compounds identified in the soil samples from the Benjamin Moore BMC Plant are attributed to historical fill.

*AOC-3: Historic Fill Constituents in Groundwater*

Groundwater samples were collected in February and March of 2008 from the on-site monitoring well MW-2 located adjacent to the location of the December 2007 sprinkler line failure and analyzed for VOC+10, BN+15, PP metals, PP pest, and PCBs.

The results of this sampling identified the presence of benzene in excess of the Class II-A GWQS, semi-volatile tentatively identified compounds ("TICs") greater than the interim generic water quality criterion for synthetic organic chemicals, and arsenic and cadmium in the groundwater at concentrations above the GWQS. The investigation concluded that the results were related to historic fill, except for benzene, which was attributed to an off-site source, the adjacent Chemical Waste Management property, which is being addressed pursuant to Program Interest #020491.

April 16, 2019
Eric Aronson, Shareholder
Site Assessment - Benjamin Moore & Co.
Privileged and Confidential - Attorney Client Work Product

*Supplemental Investigation*

An additional groundwater investigation was performed in October 2010, when an area south of the pump house (i.e., pump house area) was excavated to construct improvements to the nearby loading and unloading area. Based on observations during the construction (i.e., possible odor/contamination of groundwater in excavation), ENVIRON collected one sample of the groundwater pumped from the excavation and stored in a fractionation (frac) tank. The frac tank sample was analyzed for Target Compound List ("TCL") VOCs. The results identified tetrachloroethene ("PCE") at a concentration slightly greater than the GWQS.

On August 3, 2012, ENVIRON installed one permanent monitoring well (MW-3) immediately downgradient of site construction activities (i.e., south of the pump house). Analytical results indicated the presence of two PAHs above the corresponding GWQS, but no evidence of PCE, consistent with results for groundwater samples collected in other shallow wells at the BMC Plant. The PCE identified in the 2010 samples from the frac tank may have come from the frac tank which was brought on-site by a contractor, rather than the groundwater on-site.

## 7.0    SITE ASSESSMENT CONCLUSIONS

1) Benjamin Moore has operated the facility at the BMC Plant for almost 100 years. In all that time, there are less than a dozen documented spills to the River, and absolutely no evidence that any of the material Benjamin Moore spilled contained a COC. The overwhelming evidence points to the fact that Benjamin Moore's waste was predominantly non-hazardous waste and that, to the extent waste may have contained trace elements of certain COCs, the waste was primarily recycled and reused in the next batch of product or disposed off-site.

2) PVSC, established in 1902, began operation of the Newark Bay Treatment Plant in 1924 to alleviate pollution in the Passaic River and its tributaries. The PVSC infrastructure including the Newark Bay Treatment Plant and its 22-mile interceptor sewer line processes over 300 Million gallons of wastewater every day. Because Benjamin Moore has been connected to the PVSC since its operations began, industrial discharges associated with manufacturing operations were directed to the PVSC since operations began in 1925. No untreated waste from the BMC Plant would have been discharged by PVSC to the River because the sanitary sewer system at the BMC Plant connected directly to the PVSC's treatment plant (i.e. there were no bypass or CSO locations between the BMC Plant and PVSC's treatment plant). Therefore, all of Benjamin Moore's sanitary waste was treated before disposal.

   The BMC Plant has always had a segregated plant storm water system because of its position adjacent to the Passaic River and it did not directly discharge industrial discharges to the Passaic River except inadvertently. The main paint plant never had floor drains. Historically three drains in the Vehicle Plant were discharging to the storm sewer. The storm sewer is protected by secondary containment of the various tanks and chemical handling areas. The entire BMC Plant is surrounded by a 100-year flood wall which serves as an additional containment mechanism to protect the River. As discussed in Section 4, documented spills at the BMC Plant are considered de minimis and did not contain specific COCs.

3) Beginning as early as 1951 until as late as 1980, wash water was discharged to a French Drain and later Lagoons. Solids accumulated in the Lagoons were periodically removed and transported off-site for disposal. This water-based waste was non-hazardous as recognized by

---

EPA's own decision not to list latex wash water as a hazardous waste. Additionally, Benjamin Moore had a stormwater collection Basin that was located generally in the area of Lagoons located on lot 62. NJDEP collected both soil and water samples from the Basin which showed that VOCs and metals in soils and VOCs in water were below applicable standards. Any wash water or storm water managed on the BMC Plant, even temporarily, would not have adversely affected the sediment in the Passaic River. Given the characteristics of the wash water (i.e., 95% water and 5% latex), and the fact that all solids that accumulated from this discharge were removed and transported off-site for disposal, the only pathway for the potential migration of COCs would be via groundwater discharge to surface water. Only minor amounts of lead, mercury, or copper that may have been present in the wash water would have reached the groundwater and subsequently the Passaic River. It is unlikely that any COC discharged by Benjamin Moore from wash water, via a groundwater to surface water discharge, would accumulate in the sediment.

4) The only potential discharges to the Passaic River would have been drains in the Vehicle Plant. Based on 1969 order and follow up in 1973, Benjamin Moore determined that three drains in the Vehicle Plant were connected to the storm water system. On June 1973, these discharges were connected to PVSC. Although water from these drains was leaving Building 11 and entering the storm water system, it is highly unlikely that the water contained hazardous materials. Neither color, turbidity, etc. (as noted in the 1969 Order) is related to the presence or discharge of hazardous materials. The water discharged from the cooling and portable kettles would not have encountered any product material or PCB-containing Therminol. The only water discharged from the reactor would have been condensate water, all other material was recycled back into the reactor. In addition, COCs that may have been present in certain pigments, etc. (copper, lead, mercury) were not handled in Building 11. These COCs, when present were managed and added to paints on the second floor of Building 1. Plainly, there is absolutely no evidence that the inadvertent discharge to the stormwater system allowed COCs to enter the Passaic River.

5) USEPA has determined that sediments of the lower 8.3 miles of the Lower Passaic River pose an unacceptable risk to risk to human health and the environment due to the presence of the eight COCs identified in the ROD. Three (dioxins, DDx, and Dieldrin) of the eight COCs have never been used, stored, disposed, generated, or otherwise handled at the BMC Plant. Each of the five COCs that have been potentially associated with the BMC Plant are discussed below. In addition, because soil samples collected in 2001 for dioxin analysis detected low levels of dioxins in soils, a discussion of the possible source of dioxin is also discussed below.

- Dioxin. Dioxins were detected during the 2001 sprinkler line installation at extremely low levels. The levels of dioxin were at least an order of magnitude below both Residential and Industrial USEPA Screening Levels. In addition, the dioxin levels are below reported average background levels based on case specific studies performed in New Jersey, Ohio, Michigan, Connecticut, and others, and background evaluations performed by the USEPA. Notwithstanding, the dioxin present in soils at the BMC Plant is not related to operations at the BMC Plant but rather the result of deposition on the Benjamin Moore property, either by wind or flood, from the Diamond Alkali property. There is no possibility that dioxin-contaminated soils reached the Passaic River after being deposited on the BMC Plant.

BAR-00725065

April 16, 2019
Eric Aronson, Shareholder
Site Assessment - Benjamin Moore & Co.
Privileged and Confidential - Attorney Client Work Product

- <u>PCBs</u>. Although PCBs were once used in the closed loop system in Building 11 and present in transformers at the property, there has been no report of releases of PCBs or PCB-containing materials to the environment. Low levels of PCBs were identified in one area at the BMC Plant. Given historic fill conditions in the region, coupled with only the sporadic occurrence of PCBs at low concentrations, it was determined that the PCBs are probably the result of historic placement of fill. The PCB area was delineated to the appropriate standards and the presence of an engineering control will serve as the final remedy for any additional impacts resulting from the presence of historic fill at the BMC Plant. Lastly, given the location of the PCBs in BMC Plant soils below an asphalt cap, within the 100-year flood wall, and not in proximity to a pathway to the River, it is not possible for the limited area of soil impact to migrate to the Passaic River. The PCB area has not impacted groundwater, which is consistent with our understanding of the hydrophobic nature of PCBs.

- <u>Mercury</u>. Except for a certain type of red paint and a biocide in water-based paints, the products Benjamin Moore manufactured were mercury-free. Benjamin Moore used mercury compounds in the manufacture of this red latex paints from approximately 1953 until as late as 1971. Spills or discharges of mercury would have insignificant, if any, and only trace amounts of mercury were found in Benjamin Moore's sanitary waste discharges.

- <u>Copper</u>. Benjamin Moore used raw material containing trace amounts of copper compounds in the manufacture of paint. Spills or discharges of copper would have been insignificant, if any, and only trace amounts of copper were found in Benjamin Moore's sanitary waste discharges.

- Lead. Benjamin Moore used lead compounds in the manufacture of paint primarily from approximately 1951 until at least 1971. Yellow chromate, also known as lead chromate, was added to paints at the facility after 1971, however these specialty paints only comprised 0.4% of Benjamin Moore's total paint production. Based on information reviewed, laboratory samples of paint sludge as late as 2001 contained lead. Absent other information regarding lead used in paint manufacturing, Terraphase has assumed lead may have been used up to 2001. Solvent waste from lead-containing specialty paints was kept separate and recycled in subsequent batches Spills or discharges of lead would have been insignificant, if any, and only trace amounts of lead were found in Benjamin Moore's sanitary waste discharges.

- <u>PAHs (specifically Naphthalene)</u>. According to an MSDS issued in 1983, the solvent Blend 2665 contained naphthalene (96-BenjaminMoore). Tank records from 1992 indicated that this solvent was stored in an AST on-site in Building 4; specifically Tank 34 in Dike 1 (106-BenjaminMoore). As described throughout this document, solvents used at the BMC Plant were recycled and reused in the product to extent possible. Any solvent waste not reused in the paint products were transported off-site for disposal. Spills or discharges of naphthalene would have been insignificant, if any.

## 8.0    CLOSING

Terraphase prepared this Site Assessment to provide information as the basis for Benjamin Moore's responses to the Questionnaire. Therefore, the scope of this document is limited to the topics and inquiries within the Questionnaire and is not intended to be an exhaustive assessment of the BMC Plant. If you have any questions or comments regarding this submittal, please contact us at your convenience.

Sincerely,
For Terraphase Engineering Inc.

Nicholas J. Scala, PG, LSRP
Senior Associate Geologist

Christopher Voci, PG
Principal Geologist & Vice President of East Coast Operations

cc: (via email)
D. Mandelbaum, Greenberg Traurig, L.L.P
L. Singer, Greenberg Traurig, L.L.P
C. Wilde, Greenberg Traurig, L.L.P

Attachments:

Figure 1 – Site Location Map
Figure 2 – Site Layout Map
Appendix A – References

PAP-00725067

**FIGURES**



Legend

★ Site Location

Base Map: USGS Elizabeth, NJ 7.5 Minute Quadrangle.

0   700   1,400   2,100   2,800
Feet

1 inch = 2,000 feet

N

**SAFETY FIRST**

CLIENT:
Benjamin Moore & Co.

PROJECT:
134 Lister Avenue
Newark, NJ

PROJECT NUMBER:
J012.001.001

terraphase
engineering

Site Location Map

FIGURE 1

File: K:\GIS\Prj\J012.001 Benjamin & Moore\MXD\J20180926\ Benjamin Moore Site Location Map.mxd 9/26/2018    Created by: Initial   Checked by: Initial   Coordinate System: NAD 1983 StatePlane New Jersey FIPS 2900 Feet



Site Layout Map

FIGURE 2

**APPENDIX A**

REFERENCES

_____

Lockwood Greene Engineers, Inc. 1961. "Report on Flood Control." June 28. (20-BenjaminMoore)

Gay Da Prile, Builder and Contractor. 1973. Invoice for sewer line at Alykd Building. June 25. (56-BenjaminMoore)

Benjamin Moore & Co. 1979. Inter-Office – Engineering Dept. correspondence re: NPCA/WQTF Sludge Analysis. June 5. (44-BenjaminMoore)

NJDEP. 1980. Selected Substances Report. July 25. (128-BenjaminMoore)

Benjamin Moore & Co. 1980. Correspondence to PVSC re: Newark Plant – Sewerage. November 12. (5-BenjaminMoore, Exhibit B)

Benjamin Moore & Co. 1982. Letter re: Our Job #82-2, Newark, DEP Air Permits for Burning Waste Solvent. July 14. (100-BenjaminMoore)

Union Chemicals Division. 1983. Material Health and Safety Bulletin for Blend 2665. January 25. (96-BenjaminMoore)

NJDEP. 1984. NJDEP Inspection Form. April 27. (101-BenjaminMoore)

Benjamin Moore & Co. 1985. Correspondence to NJDEP re: Your Letter of January 17, 1985 Regarding NJPDES. February 15. (102-BenjaminMoore)

Benjamin Moore & Co. 1985. Inter-Office – Engineering Dept. correspondence re: Newark Plant Waste. May 9. (41-BenjaminMoore)

NJDEP. 1986. Administrative Order and Notice of Civil Administrative Penalty Assessment. June 2. (103-Benjamin Moore)

Benjamin Moore & Co. 1986. Spill Prevention, Control, and Countermeasure Plan. August 8. (130-BenjaminMoore)

NJDEP. 1987. Administrative Order and Notice of Civil Administrative Penalty Assessment. October 6. (104-BenjaminMoore)

NJDEP. 1987. Correspondence re: The NJPDES, Benjamin Moore & Co., Newark/Essex County. April 16. (105-BenjaminMoore)

1992. Newark N.J. Storage Tank Integrity Testing. August. (106-BenjaminMoore)

NJDEP. 1993. "Preliminary Assessment." March. (7-BenjaminMoore, pages 6-26)

NJDEP. 1993. Inventory of Waste Manifests (Attachment EEE to 1993 PA Report) and other manifests. (7-BenjaminMoore, pages 348-378; 38-Benjamin Moore; 10-CONFBenjaminMoore; 110-BenjaminMoore-125BenjaminMoore)

PAR-00725072

Benjamin Moore & Co. 1995. "Benjamin Moore's Response to Environmental Protection Agency's Request for Information under 42 U.S.C. § 9601(e). February 21. (PAS-00055192 – PAS-00055349)

Benjamin Moore & Co. 1995. "Benjamin Moore's Response to Environmental Protection Agency's Second Request for Information under 42 U.S.C. § 9601(e). November 27. (PAS-00055154 – PAS-00055162)

Benjamin Moore & Co. 1996. "Benjamin Moore's Response to Environmental Protection Agency's Supplemental Request for Information under 42 U.S.C. § 9601(e). November 22. (PAS-00055004 – PAS-00055147)

Benjamin Moore & Co. 1999. Spill Prevention, Control, and Countermeasure Plan. October 8. (updated April 13, 2011). (129-BenjaminMoore)

Garry A. Lehnert. 2000. Affidavit of Garry A. Lehnert. June 22. (5-BenjaminMoore)

Ramboll. 2018. "Remedial Action Report." February. (1-CONFBenjaminMoore)

Ransom Environmental. 2014. Concrete Characterization Report and attachments. May 13. (9-CONFBenjaminMoore)

Monsanto Environmental Services Report, dated July 15, 1982. (36-BenjaminMoore)

Benjamin Moore. 1988. Inter-office Memorandum re: Newark Operations Storm Water Discharge. March 25. (45-BenjaminMoore)

NJDEP. 1988. Permitting Determination for Industrial Stormwater Discharges. April 4. (11-BenjaminMoore)

Monsanto. 1990. Benjamin Moore & Company. February 23. (131-BenjaminMoore).

PAR-00725073

# TAB D



# Benjamin Moore & Co. *Paints ▲ Stains ▲ Clear Finishes*

NEWARK PLANT   ▲   134 LISTER AVENUE   ▲   NEWARK, NEW JERSEY 07105-4566   ▲   (201) 344-1200   ▲   FAX: (201) 344-2716

November 22, 1996

Mr. Pasquale Evangelista
Emergency and Remedial Response Division
U.S. Environmental Protection Agency
26 Federal Plaza, Room 13-100
New York, New York   10278

RECEIVED

NOV 2 _ 1996

Re:   Benjamin Moore's Supplemental Response to EPA's First and Second Request for
      Information under CERCLA § 104 (e) Concerning the Passaic River

Dear Mr. Evangelista:

This is Benjamin Moore and Company's (BMC) supplemental response in accord with U.S. EPA's January 3, 1995 Request for Information under 42 U.S.C. § 9601 et seq (the Comprehensive Environmental Response Compensation and Liability Act ("CERCLA")) - Diamond Alkali Superfund Site, Passaic River Study Area (the "Request").

BMC's original responses were believed to be correct at the time they were submitted based on the limited information then available. The Request covered a long period of time for which few files survive and during which numerous people were in various positions of responsibility. Quite simply, things which were unimportant prior to the passage of CERCLA now are very important. Consequently, continuing its investigation into possible sources of releases into the Passaic River has been a long drawn out research process for BMC involving multiple requests to State and local agencies for files and records followed by attempts to determine if documents found in State files continue to exist in Benjamin Moore's retired files or elsewhere.

For example, EPA's Second Request asked for information about a 1969 Administrative order from the New Jersey State Department of Health. At the time of response, the only 1969 New Jersey Department of Health document that Benjamin Moore was aware of was related to an alleged discharge of smoke with the word "VOID" written across it. BMC spent months trying to track down this document and its background with the State only to find that it apparently does not exist. Of course the Health Department no longer is responsible for environmental enforcement, nor does it have ready access to its old documents. However, a personal search of the State archives revealed the 1969 Order referenced by EPA and related correspondence which enabled Benjamin Moore to better focus its files search. Subsequently, a long closed and heretofore abandoned file with the same order and other correspondence has been located and is provided and discussed in Attachment 1.

MONTVALE, NJ ▲ NEW YORK, NY ▲ NEWARK, NJ ▲ FLANDERS, NJ ▲ NUTLEY, NJ ▲ BOSTON, MA ▲ RICHMOND, VA ▲ JACKSONVILLE, FL ▲ JOHNSTOWN, NY ▲ CHICAGO, IL ▲ ST. LOUIS, MO
CLEVELAND, OH ▲ HOUSTON, TX ▲ DALLAS, TX ▲ BIRMINGHAM, AL ▲ DENVER, CO ▲ LOS ANGELES, CA ▲ SANTA CLARA, CA ▲ TORONTO, ON ▲ MONTREAL, PQ ▲ LANGLEY, BC ▲ BURLINGTON, ON

*Established 1883*

Page 2

As a result of BMC's continuing investigation, files have been found subsequent to BMC's responses which were not centrally located or identified in a manner that enabled them to be identified by CERCLA subject matter or related issues, or were in storage in separate isolated locations. Consequently, this supplement is necessary.

Additionally, in hindsight, some of the questions in EPA's request were misunderstood. For example, the Second Request asked if Benjamin Moore used zinc, copper or titanium are well known metals with a variety of applications in industry. Benjamin Moore does not use copper, zinc or titanium per se. However, it used commercial products in which these elements in varying degree from trace compounds, and still uses titanium dioxide, and zinc oxide. This is addressed in SR Question 3 in Enclosure 1.

The following supplemental responses at Enclosure 1 are keyed first to the Second Request ("SR") numbers, then to First Request ("FR") questions as indicated. It represents the best available information at this time. BMC is continuing its investigation and will supplement this response if it later discovers other relevant information.

If there are any questions, please call.

Sincerely,

Charles J. Ilsley, Jr.

CJI/je
cc:     KRohrbacher, Esq
        ASchulcz, Esq
        AWagner, Esq

# Attachment 1

# Supplement to Second and First Request for Information:  Benjamin Moore and Passaic River Study

# Attachment 1

## Supplement to Second and First Request for Information:  Benjamin Moore and Passaic River Study

**Attachment 1.**

**Supplement to Second and First Request for Information:  Benjamin Moore and Passaic River Study**

SR Question 1. 1969 Administrative Order from New Jersey State Department of Health.

On August 15, 1969, the Water Pollution Control Program ("WPCP") of the New Jersey State Department of Health (the "State"), issued an administrative order to Benjamin Moore & Co. ("BMC") pursuant to the provisions of R.S. 58:12-2. (Enclosure 1). In response to a BMC inquiry for the specific details on which the order was based, in a Sept. 4, 1969 letter the State indicated that the alleged violation was based on "pollution of the Passaic River in terms of odor, turbidity, color, biochemical oxygen demand, chemical oxygen demand, ether soluble matter and suspended solids." (Enclosure 2).  This was followed by a meeting at Trenton on September 19, 1969 "to explain the specific details that brought about [the] 'Order'."  10/20/69 letter from J. Calise (BMC) to E. Segessen, WPCP (Enclosure 3). At that time Benjamin Moore believed that rinsing strainers (filters used to capture naturally solidified latex particles) used in making pure latex vehicle[1] in an outside area of the plant allowed the rinse water to run into Benjamin Moore's flood control system and then be discharged into the River.  BMC's solution to this problem was to collect and pump this rinse water "into the same storage area where all of the present latex wash[2] from the paint plant [was] collected." (Enclosure 4).  As noted in an 11/20/69 Calise to Segessen letter, Benjamin Moore considered the case closed but solicited input from the State.   Apparently from the record of correspondence, at Enclosure 4 and 5, the State never responded.

In February 1973, after Benjamin Moore sought to clarify the status of the 1969 order (Enclosure 5), the State again tested some effluent discharged from Benjamin Moore's storm water system.  This test resulted in similar problems with color, turbidity, etc.  At that time, BMC initially thought that the problem was caused by infiltration of river water into the sump, but Benjamin Moore decided to check the "entire underground drainage system which feeds the drainage sump."  3/26/73 Malkin (BMC) letter to Mr. Hamilton (N.J.D.E.P.) (Enclosure 6).  This system review revealed

---

[1]    "Vehicle" is a term  of art in the paint industry that identifies fully polymerized latex in a suspension that becomes the film forming agent which binds pigments and other coating components.

[2]    "Latex wash" meant the water collected when latex paint equipment was cleaned; it is also called "wash water." See Supplement to SR Question 8.

that, contrary to Benjamin Moore's belief that all drains in the facility were hooked up to the sanitary sewer, three drains in the vehicle plant were in fact discharging to the storm sewer system: the portable kettle cooling operation, a reactor cooling system and a sink drain in building #11, all in the vehicle plant where pure latex was made.   Once this was discovered, these drains were connected to the sanitary sewer system. (Enclosure 7).

Although there was a "release" of water that allegedly caused problems with turbidity, etc., there is no evidence that this release contained hazardous materials.  Neither turbidity nor color is related to the presence or discharge of hazardous materials. The water discharged from cooling the portable kettles would not have come in contact with any product material, so it could not pick up any hazardous materials if any were present. The scrubber used in the reactor system operated only when the manhole in the reactor was opened to add certain solid ingredients and would have picked up airborne particles released only during the addition of these ingredients into the reactor when the reactor manhole was open.    Monomer was added only after the manhole was closed. However, the ingredients added to the reactor and the particles captured by this system do not contain chemicals similar to the list in 104(e) question No. 3 as can be seen in examining the air permit for the scrubber at Enclosure 8.  The sink was used to wash hands.

SR Question 2. The meaning of "received and utilized in prior years" in reference to certain chemicals identified in 104(e) question No. 3, Mercury, Lead, Methyl Ethyl Keytone, Benzene/Ethyl Benzene.

In 1968,  Benjamin Moore stopped using raw materials that contained mercury compounds in the manufacture of paint; mercury compounds were a common component of biocides – used to prevent mildew in water (latex) based paints. BMC's elimination of mercury from its paint is verified by a June 1972 Consumer Reports article that tested exterior latex paints and commended Benjamin Moore for eliminating mercury from its paints although mercury was used by other paint manufacturers at the time of the article. (Enclosure 9).  At about the same time it eliminated mercury compounds in its latex paints, Benjamin Moore also began eliminating the use of lead compounds.   While these chemicals were once used in Benjamin Moore's paint manufacturing processes, there is no record of a release of these materials to the Passaic River.

Benjamin Moore did not use benzene as a raw material in its products and, as far as it can determine, never used a raw material that contained benzene.  Prior to 1986, ethylbenzene was used as a

2

844530006

reflux solvent[3] in the manufacture of some alkyd resins. Commercially available xylol, which contains ethylbenzene as a common component, is now used as a reflux solvent in the manufacture of alkyd resins. Before completely switching to xylol as the chief alkyd resin reflux solvent in 1986, ethylbenzene was sometimes added to xylol to increase xylol's efficiency as a reflux solvent, when needed to meet specific product criteria. Ethyl Benzene is no longer used in the manufacture of alkyd resins.

Methyl ethyl keytone ("MEK") and toluol, a fraction of tolulene, were routinely used in formulating and manufacturing solvent based paints. MEK is not used now; <u>see</u> 11/27/95 response to Question 2. Toluol is used as a solvent. However, there is no record of releases of these solvents or materials containing these solvents to the Passaic River. Even if there had been a release(s) (see FR No 7.a below, release of an unknown liquid), these solvents are lighter than water, would float on the water and be carried away by the River, i.e., they would not make their way into the River sediment.

<u>SR Question 3.</u> Use ... of copper and zinc, titanium, methylene chloride, and xylene.

Benjamin Moore did receive and use raw material containing trace amounts of copper and zinc, but only as compounds in commercial products used in making paint. Titanium is a non-hazardous component of titanium dioxide, which is used in paint manufacturing.

Methylene chloride was used in small quantities in aerosols as a propellant up until 1980. Xylene was never used in its pure form. Xylol, as a fraction of xylene, was used in the past and is still used as a reflux solvent. <u>See</u> Supplement to SR Question 2 above. Solvent based paint wastes have always been segregated from other wastes and handled and disposed separately. There is no record of any Benjamin Moore releases in the Passaic River of either these substances or wastes containing these substances.

<u>SR Question 6.</u>    Manufacturing processes.

Benjamin Moore's prior response described in general the various processes used to manufacture the paint products produced at the plant. However in reviewing the response, the use of caustics, sodium hydroxide or caustic soda, to clean the equipment was inadvertently omitted. The caustic cleaner is/was used over and over until it loses its ability to clean equipment. Spent

---

[3]    "Reflux solvent" is a solvent which is used to facilitate water removal in manufacturing alkyds but is recoverable during the process. A small percentage of the reflux may become part of the resin product.

3

caustic (DOO2) is/was drummed and removed to a licensed treatment storage and disposal (TSD) facility. At one time, prior to 1981, diluted spent caustic was permissibly discharged into the sanitary sewer.

The other hazardous wastes historically generated at the plant are ignitable mineral spirit wastes and paint sludge (paint thinner or solids that could not be recycled) (DOO1) and spent non-halogenated solvents (F003 & F005) including MEK and dirty wash solvent (mostly mineral spirits) which were used to clean equipment and could not be recycled into subsequent batches.

The recollection of Benjamin Moore employees who began work in the mid-1960's is that dirty wash solvent was collected and shipped to a recycler who returned the clean solvent for reuse. From 1982 to 1986, wash solvent was burned as an alternative fuel in the plant's boilers. Subsequently, Benjamin Moore began recycling its own wash solvent.

    ii. Assuming that this question is asking for the amount of hazardous <u>waste</u> generated per volume of finished product, this is not an area in which records were kept until the manifest system began for hazardous wastes in 1978 which provides information on individual shipments only. Benjamin Moore provided copies of NJDEP's Hazardous Wastes Generation Annual Reports from 1988 to 1993 with its response to EPA's First Request for Information. Benjamin Moore has assumed this information was sufficient for EPA's purposes since, if the manifested waste was transported elsewhere, it obviously was not disposed of in the River and therefore the information has no relevance to the Passaic River Study. However, if EPA needs more information, Benjamin Moore will provide whatever is needed, available, and reasonable.

    iii. Wastes are/were always kept separate by type.

<u>SR Question 7.</u>    Mr. Shippey and responsibility for "waste management techniques and strategies."

Prior to Mr. Harold Shippey's assumption of specific "responsibilities for waste management techniques and strategies," those responsibilities were part of the general duties of the plant manager who might further delegate those responsibilities. The passage of the Resource Conversation Recovery Act ("RCRA" – also known as the Solid Waste Management Act) in 1976, imposed specific duties and responsibilities along with a set of regulations addressing the storage, manifesting, and deposal of wastes. Accordingly these duties were formally centralized in a single person, Mr. Shippey held the first such position. Prior plant managers are:

4

844530008

```
Prior to 1960   deceased
1960-1965       Joseph Calise
1965-1969       William McDougal
1969-1973       John Brady (deceased)
1973-1979       Lawrence Berg
```

SR Question 8. Discharge of wash waters into PVSA sewer system.

As explained in its response, "wash water" is a paint industry term identifying the result of washing with water equipment used in making latex paint. As to its characteristics, this water based waste was non-hazardous as recognized by EPA's own decision not to list latex wash water as a hazardous waste. Compare 45 FR 47832 (July 16, 1980) (proposed rule) with 46 F.R. 4614, January 16, 1981 (interim rule removing latex paint waste as a proposed listed hazardous waste).

SR Question 9(i). Waste Water Recycling.

The only "waste water" produced in its paint manufacturing process that BMC is aware of at this time, is "wash water" as defined in SR Question 8 above. Wash water recycling began in 1955 when the plant began producing latex paint. See page 2, Question 6, 11/27/95 Response to 2d Request. When the wash water could not be recycled because of its color, it was placed in a settlement basin, the water allowed to percolate or evaporate and the dried latex collected and disposed of as solid waste. NJDEP analysis of aerial photos of the plant concluded that a definite basin first appeared in 1971. However, one employee remembers that there was a settling system in use in 1966. This basin/system eventually became part of the storm water retention system. See 11/27/95 Response to SR Question 13. For a short period, 1967-1968, excess wash water was diluted with water to lower the solids content and then permissibly disposed of in the sanitary sewer. The wash water was then collected and sent to Earthline, a waste treatment facility next door to BMC, which then became SCA and finally Chemical Waste Management (CMW). There are no known records of these waste water shipments although a BMC employee who used to work for the SCA/CWM remembers treating BMC's wash water (floculation of solids). In 1980, better use of recycling techniques led to the complete recycling of all wash water. (ii) There was no "wash water" produced prior to 1955, when the plant began producing latex paint. Consequently, there are no diagrams of waste water collection or disposal systems.

SR Question 10. Discharge pipes leading directly to Passaic River.

Contrary to the assumption in the question, Benjamin Moore has only one discharge pipe that leads directly to the Passaic River. This 14 inch discharge pipe is the outfall for the backup storm water discharge system which is activated manually only when a

5

certain level of storm water accumulates in the pump house that exceeds the capacity of the normal storm water discharge system. See, e.g., Enclosure 6.  It is a backup since it provides an alternative if the primary storm water discharge system is not working, as well as an emergency discharge system that supplements the primary system under flood conditions.  The primary storm water discharge system consists of a sump pump and discharge pipe which empties into the Newark City Storm Water Discharge System's 60 inch outfall to the River on the extreme eastern part of the Benjamin Moore property.

While the 60 inch outfall is technically on the Plant's property, this system and outfall is part of the Newark storm water discharge system and  is owned and maintained by the City of Newark, which has an easement across Benjamin Moore's property for this purpose.  Neither the direct (to the River)/emergency discharge system nor the normal storm water discharge system is connected to any process on the property.  The sole function of both systems is to discharge storm water and any water that might collect within the property through rain, infiltration, or flood.

It is apparent that EPA has made the same mistake that other federal agencies made concerning ownership and responsibility for the 60" outfall.  A 1969 study of possible contamination of the Passaic River incorrectly identified this City of Newark's storm drain  as belonging to Benjamin Moore.  (Enclosure 10). That incorrect assumption was based on a failure to check the appropriate records or understand the storm sewer discharge system.

**Supplemental Responses to First Request for Information**

FR Question 3.  BMC did "receive" and use materials or products which have as components some of the substances listed in Question 3.  See Supplemental Response to SR Question 4 above.  A further check of compounds used by BMC indicates that BMC did use a pigment shade that had trace amounts of nickel.  The nickel was removed from the compound in February 1995.  BMC did not manufacture, discharge or release any of the identified hazardous substances. Wastes containing those substances used by BMC were disposed of according to regulations where appropriate.  See, e.g., Supplement to FR Question 12 (addressing waste manifests).

FR Question 4(a).  BMC did not generate hazardous substances *per se* although some listed hazardous wastes were a by product of BMC's process.  Waste that may have contained hazardous substances was the result of the residual paint products that adhered to the sides of paint tanks or equipment and that was collected in cleaning the tanks or equipment or spent caustic cleaning solution.  Used wash solvent was segregated from other wastes, classified by color and, if unable to be used again, disposed according to the appropriate regulations, which at one time included burning in the plant's boiler.  Caustic soda was/is used until it loses its ability to

6

844530010

clean, was/is then drummed and is sent to a treatment storage and disposal (TSD) facility.

FR Question 4(b).   As stated previously, hazardous substances _per se_ are used but not generated in the manufacturing process, but hazardous substances may have been part of the resulting waste from the clean up of the equipment that is used to make paint.   With solvent based paints, the waste is hazardous because the solvents typically used are typically combustible.   Sodium hydroxide and caustic soda are hazardous because they are caustic.   Latex wash water is not hazardous.   _See_ Supplement to SR Question 6 above which addresses the remainder of this question.

FR Question 5.   Benjamin Moore's original response provides a detailed description of its storage of raw materials and products whether they contain hazardous substances or not.  For purposes of this report, it is assumed this question focuses on hazardous wastes which are listed as such, otherwise the question becomes impossible to answer, e.g., table salt (NaCl) is composed of two hazardous substances, but the product itself is both non-hazardous and useful.   The only hazardous wastes generated at the plant are/were the wash solvent related wastes produced by cleaning paint making equipment, including the mixing/let down tanks, and spent caustic.   The solvent waste is/was collected, stored in outside tanks, and where possible, used in subsequent batches.  From 1982 to 1986, the unrecyclable wash solvent was burned on site in the plant's boilers.   There is some evidence that in the late 1960's, some dirty solvent was burned on site in cleaning out portable tanks.   Caustic cleaners are stored in outside tanks and reused until the caustic has lost its cleaning power; then it is drummed and disposed of at a TSD facility.

FR Question 5(b).   Benjamin Moore's original response indicated that it had hazardous waste manifests from 1978, but did not provide them due to the volume of material representing 18 years worth of records.  Benjamin Moore again asserts its willingness to allow EPA to inspect and copy these records, but sees nothing relevant to the Passaic River Study in their production since if the material was taken off site to a facility, it was obviously not discharged into the River.

FR Question 7(b), 8 and 9.   In its continuing investigation, Benjamin Moore has discovered records of several incidents when small spills or leaks occurred in which low specific gravity liquids were released to the Passaic River.

a.   On March 23, 1978, the Coast Guard notified Benjamin Moore that a Coast Guard helicopter had noticed a spill from the plant in the River.   Investigation with the Coast Guard found a 55 gallon drum had been punctured "approximately amid ship's" and part of its contents had migrated to the River.   The Coast Guard saw the material _floating_ on the surface.   There is no record of the

7

contents of the drum.  However, the fact that material was floating on the surface indicates it was lighter than water, and would not have contained materials that would find themselves in the river sediment. (Enclosure 11).

<u>b.</u>   At 12:50 PM, July 8, 1980, a valve malfunction spilled about 3,000 gallons of wash solvent.  Although this was contained by the retaining dike around the tanks, about 25-50 gallons allegedly leaked from the dike into the River.  Benjamin Moore reported the incident to Passaic Valley Sewerage Commission, the New Jersey Department of Environmental Protection ("DEP"), the Coast Guard and called in environmental spill specialists who used absorbent pads to collect the spill contents where possible.  See Enclosure 12 (Report plus memoranda on notification).

<u>c.</u>   On April 14, 1982, a truck belonging to Linden Bulk Transport Co. was delivering a shipment of Butyle Acrylate.  Due to a malfunction on the truck, approximately 2,000-3,300 gallons of Butyl Acrylate were spilled during the unloading.  The spill was contained by building a sand dike around the area.  The carrier called in Peabody Clean Industry of Linden N.J. to clean up the spill.  The Coast Guard, NJDEP and PVSC were notified.  Apparently, 5-10 gallons made its way to the River which was absorbed, collected, and removed.  Although the spill occurred at Benjamin Moore's Plant, the carrier assumed all responsibility since the spill was due to the carrier's equipment malfunction.  (Enclosure 13).

<u>d.</u>   On April 20, 1982, a small discoloration in the area was noted in the same area where the Butyl Acrylate spill occurred, resulting in a small slick for about 8 minutes.  The same agencies and clean up service were notified and the clean up crew mopped up the material from the River's surface (Enclosure 14).

<u>e.</u>   Additionally, there were several accidental spills of non-hazardous latex at the Plant in 1970, 1982, and 1988, and other minor spills of non-hazardous materials at various times.  These details are not provided here because latex and the other materials are not hazardous substances.

<u>FR Question 11.</u>     This question seems to be focused on formal adversarial proceedings for which there are none that Benjamin Moore is aware of.  However, there have been some minor administrative actions involving the State or Coast Guard and Benjamin Moore which, in an abundance of caution, are provided here.

      a.    The 1969 Order from the NJ Department of Health has been explained in SR Question 1.  The Order is Enclosure 1.

      b.    The March 23, 1978 minor spill of an unidentified floating liquid apparently resulted in a Coast Guard fine.  This is an assumption drawn from the documents

8

                  that survive although no record of such a file exists.
c.    On January 20, 1988, a NJ DEP inspector cited Benjamin Moore for an "NaOH overflow from cylinder cleaning operations" within the Plant. (Enclosure 15) This was not a discharge to the River and required only remedial action to prevent any further spills.
d.    At this time, there are no other actions or proceedings that Benjamin Moore is aware of.

**FR Question 12.**    Benjamin Moore's original response offered to make the numerous hazardous waste manifests available for review if EPA so desires.  *See* FR Question 5(b) above.  To the extent that EPA seeks information on the "purchase, use... hauling... of all hazardous substances", this same offer applies.  Benjamin Moore purchased and purchases solvents (and all its materials) in bulk, which are shipped by common carrier, stored and inventoried at the Plant.  The documents reflecting these many transactions, whose relevance to the Passaic River Study is questionable, represent a considerable volume as well as expense to copy.  Additionally, given the time period for which this information is sought, obviously many such documents are not available due to age, destruction, etc.  Benjamin Moore would be glad to allow review of these documents or provide whatever documents are required provided the requirement(s) is more narrowly defined.

**FR Question 13.** "Results of any analysis of groundwater, surface water, and any other environmental media performed at the facility."

Responding to a false report that Benjamin Moore was operating a "waste lagoon," *see* 11/25/95 response to SR Question 13, the State inspected the Plant on 11/26/84.  As the record shows, Enclosure 16, no waste lagoon was found.  A subsequent visit on 12/19/84 investigated a suspected discharge from the plant in the area of the storm water retention ponds.  The State performed soil and surface water analysis but, these are questionable since the holding time was exceeded.  (Enclosure 17).  Nonetheless, no dioxins, PCBs, or mercury were found.

Results of media testing supporting various Benjamin Moore submissions for permits are attached at Enclosure 18.

**FR Question 16.**
Arthur A. Schulcz, Sr., Esq.
The Harker Firm
5301 Wisconsin Avenue, NW
Suite 740
Washington, DC  20015
Counsel for Benjamin Moore & Co.

assisted in review of responses, records, and preparation of this supplement.

9

Mr. Harold Shippey and Mr. Dominic Muscara, BMC employees, assisted with the supplemental responses to SR 6, FR 4, 5 and 9.

Enclosures:
1. August 15, 1969 WPCP Order
2. September 4, 1996 NJ WPCP Letter
3. 10/10/69 letter - J. Calise (BMC) to E. Segessen (WPCP)
4. 11/20/69 letter - J. Calise (BMC) to E. Segessen (WPCP)
5. BMC - WPCP correspondence re 1969 Order
6. 3/26/73 letter - Malkin (BMC) to Hamilton (NJDEP)
7. drains connected to sanitary sewer
8. Permit for a scrubber listing compounds collected
9. June 1972 Consumer Reports
10. 1969 Study showing outfalls on River
11. 1978 spill related documents
12. 7/8/80 wash solvent spill
13. 4/14/82 butyl acrylate
14. 4/20/82 slick on River
15. 1/20/88 NaOH overflow
16. Reports of 11/26/84 State Inspection
17. Report on 12/19/84 Inspection
18. Media tests for permits

10

844530014

# TAB E

PAR-0725089

# TAB E1

PAP-00AZ500038150

# Monsanto

LAW DEPARTMENT

Monsanto Company
800 N. Lindbergh Boulevard
St. Louis, Missouri 63167
Phone (314) 694-1000

February 23, 1990

Ms. Melissa S. Patterson
Legal Assistant
Gibson, Dunn & Crutcher
333 South Grand Avenue
Los Angeles, CA  90071-3197

Re:   Benjamin Moore & Company

Dear Ms. Patterson:

Your letter of February 5, 1990 to Mr. Larry Meyer of Monsanto inquired whether and how
Benjamin Moore responded to Monsanto's letter dated May 3, 1972, a copy of which you attached
to your letter. That 1972 letter to Benjamin Moore, among other topics, described an incinera-
tion service being offered by Monsanto to its customers of heat transfer fluids containing PCBs.

Our files contain no written response from Benjamin Moore to that letter. We do have, however,
records reflecting that Benjamin Moore returned substantial amounts of PCB-containing heat
transfer fluid for incineration. Specifically, our records show that in 1972, a total of thirty-
three (33) drums of heat transfer fluid, and ten (10) drums of flushing fluid were received from
the Benjamin Moore facility in Chicago (also noted sometimes as Melrose Park). An additional
thirty-two (32) drums of heat transfer fluid were received from the Benjamin Moore facility in
Newark, NJ. Our records show no shipments from any location in California.

If you have any questions, please do not hesitate to call me directly at the number indicated
below.

Very truly yours,

Thomas M. Bistline
Litigation Counsel
314/694-2989

TMB:dlf/166

# TAB E2

PAR-DEP2500238362

*Newark — Therminol*

BENJAMIN MOORE & CO.

JAN 19 1982

ENG. DEP'T.

# Monsanto

**MONSANTO RESEARCH CORPORATION**
P. O. Box 8, Sta. B
Dayton, Ohio 45407
Phone: (513) 268-3411
TWX 810-459-1881

15 January 1982

Mr. Harry Ziegler
Benjamin Moore Company
134 Lister Avenue
Newark, New Jersey  07105

Environmental Services
MRC 215.4180

Dear Mr. Ziegler:

Monsanto Research Corporation is pleased to present these analytical
results concerning the Therminol 66 sample you recently submitted to
our laboratory.

A 1-ml portion of the sample was weighed and diluted to 100 ml with
hexane and analyzed by gas chromatography using a Varian 3700 instru-
ment equipped with a electron capture detector.

Screening standars used were Aroclors 1242, 1254, and 1260.

No PCB was detected in the sample using a lower detection limit of
1 ppm.

Sincerely,

David B. Nelson
Manager
Marketing

DBN/mfc

*Newark Sample - Used Therminol*

*For Reclaim*

PAR-0725093

TAB E3

# ENVIRONMENTAL COUNSEL, LLP

## ATTORNEYS

GARY R. LETCHER                                                                                    ARTHUR A. SCHULCZ, SR.

June 24, 1998

Ms. Amelia Wagner
Assistant Regional Counsel
U.S. Environmental Protection Agency
Region II
290 Broadway — 19th Floor
New York, NY 10007-1866

Re: Analysis of Sediment Chemical Concentrations Over Time

Dear Amelia:

When Benjamin Moore & Co. ("BMC") and the other Passaic River PRPs met with EPA on November 25, 1997, I said that BMC had done some analysis of the sediment data which indicated that the Kearny landfill on the north side of the Passaic River, across from BMC's plant, may be contributing chemicals to the Passaic River sediment. This letter provides some of that sediment analysis from transects 8 through 11 in two different formats. Using the sediment radionuclide results to date the sediment deposit depths and concentrations, Enclosures 1 through 3 look at the concentrations of specific chemicals, *i.e.*, lead, copper and zinc, at various transect sampling points over time, including those on the near, middle and far side of the River. This analysis clearly shows the indisputable impact of the landfill on the River given that the chemical concentrations at transect points near the landfill go from nothing, or almost nothing, to significant concentrations with steady increases over time.

Enclosures 4 through 10 are a series of charts that also look at the trend in sediment concentrations from transects 8 through 11 (above and near BMC's plant) for various chemicals in three 20 year time intervals starting in 1950. The chemicals include MEK, tolulene, xylene, lead, zinc, nickel and copper. Both sets of analysis show that the concentrations of chemicals deposited in the River sediment itself have significantly decreased over time except for one isolated area - the landfill.

BMC knows of no release or disposal from its Newark facility that would have deposited hazardous substances in the Passaic's sediment. We began this analytical review of the sediment near BMC's plant to see if in there was any increase in the sediment concentrations of hazardous substances that were similar to those used at BMC's Newark plant either as a raw material or which may have been a constituent component of a raw material used in the manufacturing process. This analysis verifies the absence of even a scintilla of such circumstantial evidence and supports the

Amelia Wagner
June 24, 1998
Page 2

contention that BMC made no contribution to the hazardous substances in the Passaic. Simply put, if BMC had disposed of hazardous substances that came to rest in the sediment, there should be some noticeable evidence of an increase in sediment concentrations of the particular substances in the sediment near BMC's plant. As you can see, there is none.

The enclosed charts are but a small sample of the in-depth scientific analysis performed by BMC. IBMC has done similar analyses for the following inorganic and organic compounds: arsenic, barium, cadmium, chromium, copper, lead, mercury, nickel, titanium, zinc, benzene, dichlorobenzene, ethyl benzene, methyl ethyl ketone, methylene chloride, toluene, and xylene. We have made the Enclosure 4 through 10 charts into color slides which we would be glad to present to you and other EPA personnel, if there is an interest in seeing them.

If you would like to see the complete set of slides and discuss the results, or if you have any questions, please call me.

Sincerely,

Arthur A. Schulcz, Sr.

cc:    Karl Rohrbacher

c:\docs\as98\06as98e.wpd

PAP-00725096



Chemical Analysis of Passaic River Sediments for Arsenic
Concentration in mg/Kg (ppm)
Privileged Lawyer/Client Communication
Private & Confidential Work Product Material
Transects 8-11 and Side of River Core Samples

Arsenic
1950 Red
1970 Green
1990 Blue

PAP-00725097



Chemical Analysis of Passaic River Sediments for Arsenic

Concentration in mg/Kg (ppm)

Privileged Lawyer/Client Communication

Private & Confidential Work Product Material

Transects 8-11 and Side of River Core Samples

Arsenic
1950 Red
1970 Green
1990 Blue

PAP-00725098



Chemical Analysis of Passaic River Sediments for Arsenic

Concentration in mg/Kg (ppm)

Privileged Lawyer/Client Communication

Private & Confidential Work Product Material

Transects 8-11 and Side of River Core Samples

Arsenic

1950 Red

1970 Green

1990 Blue

PAP-00725099

Chemical Analysis of Passaic River Sediments for Barium

Concentration in mg/Kg (ppm)

Privileged Lawyer/Client Communication

Private & Confidential Work Product Material

Transects 8-11 and Side of River Core Samples



Barium

1950 Red

1970 Green

1990 Blue

Chemical Analysis of Passaic River Sediments for Barium

Concentration in mg/Kg (ppm)

Privileged Lawyer/Client Communication

Private & Confidential Work Product Material

Transects 8-11 and Side of River Core Samples



Barium
1950 Red
1970 Green
1990 Blue



Chemical Analysis of Passaic River Sediments for Barium

Concentration in mg/Kg (ppm)

Privileged Lawyer/Client Communication

Private & Confidential Work Product Material

Transects 8-11 and Side of River Core Samples

Barium
1950 Red
1970 Green
1990 Blue

PAP-00725102



PAP-00725103



Chemical Analysis of Passaic River Sediments for Benzene

Concentration in ug/Kg(ppb)

Privileged Lawyer/Client Communication

Private & Confidential Work Product Material

Transects 8-11 and Side of River Core Samples

Benzene
1950 Red
1970 Green
1990 Blue

PAP-00725104

Chemical Analysis of Passaic River Sediments for Benzene

Concentration in ug/Kg(ppb)

Privileged Lawyer/Client Communication

Private & Confidential Work Product Material

Transects 8-11 and Side of River Core Samples



Benzene

1950 Red

1970 Green

1990 Blue



Chemical Analysis of Passaic River Sediments for Cadmium

Concentration in mg/Kg (ppm)

Privileged Lawyer/Client Communication

Private & Confidential Work Product Material

Transects 8-11 and Side of River Core Samples

Cadmium
1950 Red
1970 Green
1990 Blue

PAP-00725106



Chemical Analysis of Passaic River Sediments for Cadmium

Concentration in mg/Kg (ppm)

Privileged Lawyer/Client Communication

Private & Confidential Work Product Material

Transects 8-11 and Side of River Core Samples

Cadmium
1950 Red
1970 Green
1990 Blue

PAP-00725107



Chemical Analysis of Passaic River Sediments for Cadmium

Concentration in mg/Kg (ppm)

Privileged Lawyer/Client Communication

Private & Confidential Work Product Material

Transects 8-11 and Side of River Core Samples

Cadmium
1950 Red
1970 Green
1990 Blue

PAP-00725108



Chemical Analysis of Passaic River Sediments for Chromium
Concentration in mg/Kg (ppm)
Privileged Lawyer/Client Communication
Private & Confidential Work Product Material
Transects 8-11 and Side of River Core Samples

Chromium
1950 Red
1970 Green
1990 Blue

PAP-00725109



Chemical Analysis of Passaic River Sediments for Chromium

Concentration in mg/Kg (ppm)

Privileged Lawyer/Client Communication

Private & Confidential Work Product Material

Transects 8-11 and Side of River Core Samples

Chromium
1950 Red
1970 Green
1990 Blue

PAP-00725110



Chemical Analysis of Passaic River Sediments for Chromium

Concentration in mg/Kg (ppm)

Privileged Lawyer/Client Communication

Private & Confidential Work Product Material

Transects 8-11 and Side of River Core Samples

Chromium
1950 Red
1970 Green
1990 Blue

PAP-00725111



Chemical Analysis of Passaic River Sediments for Copper

Concentration in mg/Kg (ppm)

Privileged Lawyer/Client Communication

Private & Confidential Work Product Material

Transects 8-11 and Side of River Core Samples

Copper

1950 Red

1970 Green

1990 Blue

PAP-00725112



Chemical Analysis of Passaic River Sediments for Copper
Concentration in mg/Kg (ppm)
Privileged Lawyer/Client Communication
Private & Confidential Work Product Material
Transects 8-11 and Side of River Core Samples

Copper
1950 Red
1970 Green
1990 Blue

PAP-00725113



Chemical Analysis of Passaic River Sediments for Copper

Concentration in mg/Kg (ppm)

Privileged Lawyer/Client Communication

Private & Confidential Work Product Material

Transects 8-11 and Side of River Core Samples

Copper

1950 Red

1970 Green

1990 Blue



Chemical Analysis of Passaic River Sediments for Dichlorobenzene

Concentration in ug/Kg (ppb)

Privileged Lawyer/Client Communication

Private & Confidential Work Product Material

Transects 8-11 and Side of River Core Samples

Dichlorobenzene

1950 Red

1970 Green

1990 Blue

PAP-00725115

Chemical Analysis of Passaic River Sediments for Dichlorobenzene

Concentration in ug/Kg (ppb)

Privileged Lawyer/Client Communication

Private & Confidential Work Product Material

Transects 8-11 and Side of River Core Samples



PAP-00725116



Chemical Analysis of Passaic River Sediments for Dichlorobenzene

Concentration in ug/Kg (ppb)

Privileged Lawyer/Client Communication

Private & Confidential Work Product Material

Transects 8-11 and Side of River Core Samples

Dichlorobenzene

1950 Red

1970 Green

1990 Blue

PAP-00725117



Chemical Analysis of Passaic River Sediments for Ethylbenzene

Concentration in ug/Kg(ppb)

Privileged Lawyer/Client Communication

Private & Confidential Work Product Material

Transects 8-11 and Side of River Core Samples

Ethylbenzene
1950 Red
1970 Green
1990 Blue

PAP-00725118



Chemical Analysis of Passaic River Sediments for Ethylbenzene

Concentration in ug/Kg(ppb)

Privileged Lawyer/Client Communication

Private & Confidential Work Product Material

Transects 8-11 and Side of River Core Samples

Ethylbenzene
1950 Red
1970 Green
1990 Blue

PAP-00725119



Chemical Analysis of Passaic River Sediments for Ethylbenzene

Concentration in ug/Kg(ppb)

Privileged Lawyer/Client Communication

Private & Confidential Work Product Material

Transects 8-11 and Side of River Core Samples

PAP-00725120



Chemical Analysis of Passaic River Sediments for Mercury
Concentration in mg/Kg (ppm)
Privileged Lawyer/Client Communication
Private & Confidential Work Product Material
Transects 8-11 and Side of River Core Samples

Mercury
1950 Red
1970 Green
1990 Blue

PAP-00725121



Chemical Analysis of Passaic River Sediments for Mercury

Concentration in mg/Kg (ppm)

Privileged Lawyer/Client Communication

Private & Confidential Work Product Material

Transects 8-11 and Side of River Core Samples

Mercury

1950 Red

1970 Green

1990 Blue

PAP-00725122



Chemical Analysis of Passaic River Sediments for Mercury
Concentration in mg/Kg (ppm)
Privileged Lawyer/Client Communication
Private & Confidential Work Product Material
Transects 8-11 and Side of River Core Samples

Mercury
1950 Red
1970 Green
1990 Blue

PAP-00725123



PAP-00725124



Chemical Analysis of Passaic River Sediments for MethylEthyl Ketone

Concentration in ug/Kg(ppb)

Privileged Lawyer/Client Communication

Private & Confidential Work Product Material

Transects 8-11 and Side of River Core Samples

MethylEthyl Ketone

1950 Red

1970 Green

1990 Blue

PAP-00725125



PAP-00725126



Chemical Analysis of Passaic River Sediments for Methylene Chloride

Concentration in ug/Kg(ppb)

Privileged Lawyer/Client Communication

Private & Confidential Work Product Material

Transects 8-11 and Side of River Core Samples

Methylene Chloride
1950 Red
1970 Green
1990 Blue

PAP-00725127



Chemical Analysis of Passaic River Sediments for Methylene Chloride
Concentration in ug/Kg(ppb)
Privileged Lawyer/Client Communication
Private & Confidential Work Product Material
Transects 8-11 and Side of River Core Samples

Methylene Chloride
1950 Red
1970 Green
1990 Blue

PAP-00725128



Chemical Analysis of Passaic River Sediments for Methylene Chloride

Concentration in ug/Kg(ppb)

Privileged Lawyer/Client Communication

Private & Confidential Work Product Material

Transects 8-11 and Side of River Core Samples

Methylene Chloride
1950 Red
1970 Green
1990 Blue

PAP-00725129



PAP-00725130



Chemical Analysis of Passaic River Sediments for Nickel

Concentration in mg/Kg (ppm)

Privileged Lawyer/Client Communication

Private & Confidential Work Product Material

Transects 8-11 and Side of River Core Samples

Nickel

1950 Red

1970 Green

1990 Blue

PAP-00725131



Chemical Analysis of Passaic River Sediments for Nickel
Concentration in mg/Kg (ppm)
Privileged Lawyer/Client Communication
Private & Confidential Work Product Material
Transects 8-11 and Side of River Core Samples

Nickel
1950 Red
1970 Green
1990 Blue



Chemical Analysis of Passaic River Sediments for Lead
Concentration in mg/Kg (ppm)
Privileged Lawyer/Client Communication
Private & Confidential Work Product Material
Transects 8-11 and Side of River Core Samples

Lead
1950 Red
1970 Green
1990 Blue

PAP-00725133



Chemical Analysis of Passaic River Sediments for Lead

Concentration in mg/Kg (ppm)

Privileged Lawyer/Client Communication

Private & Confidential Work Product Material

Transects 8-11 and Side of River Core Samples

Lead

1950 Red

1970 Green

1990 Blue

PAP-00725134



Chemical Analysis of Passaic River Sediments for Lead

Concentration in mg/Kg (ppm)

Privileged Lawyer/Client Communication

Private & Confidential Work Product Material

Transects 8-11 and Side of River Core Samples

Lead
1950 Red
1970 Green
1990 Blue

PAP-00725135



Chemical Analysis of Passaic River Sediments for Titanium

Concentration in mg/Kg (ppm)

Privileged Lawyer/Client Communication

Private & Confidential Work Product Material

Transects 8-11 and Side of River Core Samples

Titanium
1950 Red
1970 Green
1990 Blue

PAP-00725136



Chemical Analysis of Passaic River Sediments for Titanium

Concentration in mg/Kg (ppm)

Privileged Lawyer/Client Communication

Private & Confidential Work Product Material

Transects 8-11 and Side of River Core Samples

Titanium

1950 Red

1970 Green

1990 Blue

PAP-00725137



Chemical Analysis of Passaic River Sediments for Titanium
Concentration in mg/Kg (ppm)
Privileged Lawyer/Client Communication
Private & Confidential Work Product Material
Transects 8-11 and Side of River Core Samples

Titanium
1950 Red
1970 Green
1990 Blue

PAP-00725138



Chemical Analysis of Passaic River Sediments for Toluene

Concentration in ug/Kg(ppb)

Privileged Lawyer/Client Communication

Private & Confidential Work Product Material

Transects 8-11 and Side of River Core Samples

Toluene

1950 Red

1970 Green

1990 Blue

PAP-00725139



Chemical Analysis of Passaic River Sediments for Toluene

Concentration in ug/Kg(ppb)

Privileged Lawyer/Client Communication

Private & Confidential Work Product Material

Transects 8-11 and Side of River Core Samples

Toluene

1950 Red

1970 Green

1990 Blue

PAP-00725140



Chemical Analysis of Passaic River Sediments for Toluene

Concentration in ug/Kg(ppb)

Privileged Lawyer/Client Communication

Private & Confidential Work Product Material

Transects 8-11 and Side of River Core Samples

Toluene
1950 Red
1970 Green
1990 Blue

PAP-00725141





Chemical Analysis of Passaic River Sediments for Xylene

Concentration in ug/Kg(ppb)

Privileged Lawyer/Client Communication

Private & Confidential Work Product Material

Transects 8-11 and Side of River Core Samples

Xylene

1950 Red

1970 Green

1990 Blue

PAP-00725143



Chemical Analysis of Passaic River Sediments for Xylene
Concentration in ug/Kg(ppb)
Privileged Lawyer/Client Communication
Private & Confidential Work Product Material
Transects 8-11 and Side of River Core Samples

Xylene
1950 Red
1970 Green
1990 Blue

PAP-00725144



Chemical Analysis of Passaic River Sediments for Zinc
Concentration in mg/Kg (ppm)
Privileged Lawyer/Client Communication
Private & Confidential Work Product Material
Transects 8-11 and Side of River Core Samples

Zinc
1950 Red
1970 Green
1990 Blue

PAP-00725145



Chemical Analysis of Passaic River Sediments for Zinc

Concentration in mg/Kg (ppm)

Privileged Lawyer/Client Communication

Private & Confidential Work Product Material

Transects 8-11 and Side of River Core Samples

Zinc

1950 Red

1970 Green

1990 Blue

PAP-00725146



Chemical Analysis of Passaic River Sediments for Zinc
Concentration in mg/Kg (ppm)
Privileged Lawyer/Client Communication
Private & Confidential Work Product Material
Transects 8-11 and Side of River Core Samples

Zinc
1950 Red
1970 Green
1990 Blue

PAP-00725147



PAP-00725148















Mile 2 Sampling Locations
Ethylbenzene







Mile 2 Sampling Locations
MethylEthyl Ketone

PAP-00725158





Mile 2 Sampling Locations
Lead

PAR-00725160



PAR-00725161



RAP-00725162





Mile 2 Sampling Locations
Zinc

PAP_00725164

# TAB E4



Sediment Sample Locations and Removal Areas

FIGURE 1

PAP-00725166



**1889**

**1912**

**1927**

**Current**

Legend
- - - Benjamin Moore & Company Boundary
━━━ Brandy Creek / Drainage Ditch
━━━ 72" Concrete Storm Sewer Line

0  200  400  600  800
Feet
1:5,000

Notes: Aerial imagery source Digital Globe

N

SAFETY FIRST

terraphase
engineering

CLIENT: Benjamin Moore & Company

PROJECT: 134 Lister Avenue
Newark, NJ

PROJECT NUMBER: J012.001.001

**Storm Water Discharge**

**FIGURE 2**

# TAB E5



Notes: Aerial imagery source DigitalGlobe

0  150  300  450  600 Feet

1:3,500

N

SAFETY FIRST

terraphase engineering

Legend
— Benjamin Moore & Company Boundary
- - - Parcel Boundary

CLIENT: Benjamin Moore & Company

PROJECT: 134 Lister Avenue
Newark, NJ

PROJECT NUMBER: J012.001.001

Benjamin Moore Vicinity Map

FIGURE 1

**Name**

Attachment 3.pdf
Attachment 4.pdf
Attachment 5.pdf
Attachment 6.pdf

| Size | Modified |
|---|---|
| 1,884,746 | 9/26/2018 10:18 AM |
| 110,639 | 10/3/2018 8:49 AM |
| 117,272 | 10/4/2018 1:25 PM |
| 823,149 | 10/3/2018 8:48 AM |

# Exhibit 72



August 21, 2008

Ms. Jamie Camargo
Case Manager
New Jersey Department of Environmental Protection
Bureau of Northern Field Operations
7 Ridgedale Avenue
Cedar Knolls, New Jersey 07927

Re:  Remedial Action Work Plan Addendum
     Benjamin Moore & Co.
     134 Lister Avenue, Newark, Essex County, New Jersey
     Case Number: 01-12-12-0056-19
     SRP PI#: G000002021

Dear Ms. Camargo:

On behalf of Benjamin Moore & Co. (Benjamin Moore), ENVIRON International Corporation (ENVIRON) has prepared this Remedial Action Workplan (RAW) Addendum for the facility located at 134 Lister Avenue in Newark, New Jersey ("site"; see Figure 1).  This RAW Addendum has been prepared pursuant to a January 11, 2002 Memorandum of Agreement (MOA) between Benjamin Moore and the New Jersey Department of Environmental Protection (NJDEP) to address polychlorinated biphenyl (PCB) impacts identified in soil at the site (Case number 01-12-12-0056-19).

Results of initial soil investigations and limited soil removal conducted at the site in 2001 were provided to the NJDEP in a Site Investigation Report (ENVIRON, April 2002).  In September 2007, Benjamin Moore submitted a Remedial Investigation Report (RIR)/Remedial Action Workplan (RAW) to the NJDEP, which described remedial investigations conducted in 2006 and 2007 to delineate soil PCB impacts in the vicinity of boring TR2A wherein PCBs were originally detected at concentrations slightly exceeding the NJDEP non residential direct contact soil cleanup criterion (NRDC SCC) of 2 mg/kg for PCBs.  In the September 2007 RIR/RAW, Benjamin Moore proposed remedial action consisting of the excavation and off-site disposal of approximately 190 cubic yards of impacted soils to address the identified PCB impacts.  Figure 2 presents the site layout and identifies the location of the remediation area at the site.

This RAW Addendum presents the findings of limited additional delineation investigations conducted since September 2007 and proposes an alternate remedial strategy for addressing PCB-impacted soils at the site as a result of continued encroachment of the identified impacts toward buildings and direct impact on other structures at the site.  This alternate remedial strategy, which is discussed in detail below, consists of in-place containment of PCB-impacted soils in areas where PCB concentrations exceed the NJDEP NRDC SCC, use of the overlying asphalt pavement as an engineering control, and implementation of a site-wide deed restriction limiting current and future site use to non-residential activities.

RAP 00724653

Jamie Camargo                                                              August 21, 2008

While this RAW Addendum has been prepared in general accordance with the requirements specified in N.J.A.C. 7:26E-6.2, certain information presented in detail in the September 2007 RIR/RAW is not re-iterated herein. The findings of additional investigations conducted since September 2007, the proposed alternate remedial strategy, an updated remedial action schedule and costs are presented in the following sections.

## REMEDIAL ACTION PROPOSED IN THE SEPTEMBER 2007 RIR/RAW

The remedial action proposed in the September 2007 RIR/RAW consisted of excavation of approximately 190 cubic yards of impacted soils, and off-site disposal in a Toxic Substances Control Act (TSCA)-regulated waste disposal facility. The proposed remediation area encompassed approximately 510 ft$^2$, and extended to a depth of 10 feet below ground surface (bgs).

PCBs were detected at a maximum concentration of 22 mg/kg at a depth of 7.5 to 8.0 ft bgs in boring TR-2D in July 2007. PCBs were detected at TR2D-1 in August 2007 at a concentration of 2.3 mg/kg at a depth of 8 to 8.5 feet bgs; however, PCBs were not detected in the deeper sample collected from TR-2D or TR2D-1 at a depth of 10 to 10.5 feet bgs. Therefore, vertical delineation of PCB impacts was completed. Horizontal delineation of PCB impacts could not be completed to the east of TR2D-1 in the vicinity of boring TR2D-4 since insufficient soil accumulated in the sampler, and a sample could not be submitted for laboratory analysis.

In January 2008, ENVIRON installed additional soil borings in the vicinity of boring TR2D-1 to complete the horizontal delineation of PCB impacts in this area. The objective of the additional delineation sampling was to attempt to completely define, both horizontally and vertically, the extent of PCB-impacts to soil in the vicinity of TR2D-1 prior to undertaking any remedial action. The findings of the additional delineation investigation are presented below.

## ADDITIONAL INVESTIGATIONS CONDUCTED SINCE SEPTEMBER 2007

Prior to conducting soil sampling, underground utilities in the area were cleared on January 30, 2008 by TPI Environmental, a private utility-locating contractor. A total of five soil borings were installed in the vicinity of TR2D-1. The locations of these soil borings (TR2D-7 through TR2D-11) and concentrations detected at these locations (and in other locations within the remediation area) are shown on Figure 3. Two soil samples were collected from each of the five newly-installed borings at depths of 8.0 to 8.5 feet bgs, and 10.0 to 10.5 feet bgs for a total of 10 samples. The 8.0 to 8.5 feet samples were analyzed for total PCBs using the United States Environmental Protection Agency (USEPA) Method 8082 by Hampton Clarke-Veritech (HC-V), a NJDEP-certified laboratory (Certification Number 14622), with an expedited turnaround time of 3 days.

Laboratory analytical data from the 2008 soil sampling are presented in Appendix A and summarized on Table 1 and Figure 3. Results from the laboratory indicated that PCBs were detected in slight exceedance of the NJDEP residential direct contact soil cleanup criterion (RDC SCC) of 0.49 mg/kg for PCBs, at concentrations of 0.67 mg/kg in TR2D-7 and 1.5 mg/kg and 1.4 mg/kg, respectively, in the parent sample and duplicate sample from TR2D-8. ENVIRON subsequently requested HC-V to analyze the 10.0 to 10.5 feet samples from TR2D-7 and TR2D-8, which were being held as contingency samples to be analyzed only if the two samples from the 8.0 to 8.5 feet interval contained PCBs at levels exceeding the NJDEP RDC SCC. Samples collected from contingency borings TR2D-9, TR2D-10, and TR2D-11 at the 8.0 to 8.5 feet interval were also analyzed to obtain horizontal delineation of the impacts identified at TR2D-7 and TR2D-8. PCBs were detected in slight exceedance of the NJDEP RDC SCC in borings

Jamie Camargo                                                                    August 21, 2008

TR2D-9 and TR2D-10, at concentrations of 1.3 mg/kg, and 0.8 mg/kg, respectively. PCBs were detected at 0.38 mg/kg in TR2D-11, which is lower than the NJDEP RDC SCC. PCBs were not detected in any of the samples analyzed at concentrations exceeding the NJDEP NRDC SCC of 2 mg/kg. Therefore, vertical and horizontal delineation of PCB-impacts to soil is complete to the NRDC SCC. Figure 3 presents the delineated extent of PCB-impacted area exceeding the NRDC SCC.

As noted in the September 2007 RIR/RAW, ground water is encountered at approximately four to five feet below ground surface in the vicinity of the identified PCB impacts to soil. A groundwater grab sample collected in the vicinity of boring TR-2A in December 2006 contained PCBs at a concentration of 49 ug/L, which exceeds the NJDEP Groundwater Quality Standards (GWQS) of 0.5 ug/L for PCBs. However, groundwater concentration results obtained from temporary well points are typically biased high and often erroneous due to the presence of soil particles suspended in the water to which hydrophobic compounds, like PCBs, often sorb. In order to obtain a better understanding of groundwater quality, ENVIRON installed a permanent monitoring well (MW-TR2A; see Figure 3) at the location of boring TR2A and collected a sample in August 2007 for analysis of PCBs. PCBs were not detected in the sample from the permanent monitoring well MW-TR2A; therefore, groundwater quality in the remediation area does not appear to have been affected by PCB impacts to soils in the area.

## PROPOSED REMEDIAL ACTION

Several practical limitations to implementing the remedial action proposed in the September 2007 RIR/RAW were encountered in the course of project planning. Two major utility lines traverse the remediation area (see Figure 3). These include (i) a high pressure water line that supplies the facility's resin plant, fire suppression system for a tank farm, and several risers within the production building; and (ii) a storm sewer line that handles significant volumes of storm water flowing from the west side of the plant. While the exact depth to these utility lines is unclear, they are generally expected to be encountered at a depth of approximately 4 to 6 feet bgs within the remediation area.

In the September 2007 RIR/RAW, ENVIRON originally proposed to complete the excavation to a depth of 10 feet bgs; however, it would be difficult, if not impossible, to access and remove soils underlying the utility lines within the excavation footprint. As noted before, PCBs were detected at a maximum concentration of 22 mg/kg at a depth of 7.5-8.0 ft bgs in TR-2D, which is located less than 5 feet away from the high pressure water line. Because the high pressure water line would be used in the event of a fire at the facility, Benjamin Moore can not temporarily shut off this water line without creating potentially unsafe conditions. Additionally, if excavation is implemented in this area, damage to the utility lines in the course of the work is likely. Any potential damage to the high pressure water line during excavation would result in insufficient water for firefighting activities at the site. Damage to the high pressure water line would also likely result in significant flooding within the excavation. Slug tests conducted on February 1, 2008 revealed essentially no time lag between the injection and recovery of the slug, which confirmed the very highly permeable nature of the subsurface at the site. Compounding the highly permeable nature of the soil is the fact that groundwater has been encountered at a depth of approximately 2 feet bgs during recent soil removal conducted at the site as part of maintenance activities. Therefore, significant volumes of water requiring appropriate off-site disposal will likely be generated if the high pressure water line is damaged during excavation. Although a secondary consideration, the time necessary to complete excavation activities will also increase with the potential to disrupt facility operations over a longer period of time than initially anticipated.

Jamie Camargo                                                                                      August 21, 2008

As specified in TSCA regulations [40 CFR 761.61(a)(4)(i)(B)(1)], the cleanup level for PCBs in low occupancy areas is 25 mg/kg.  In other words, PCBs may remain at a site in low occupancy areas at concentrations less than 25 mg/kg.  The remediation area at the site is located outdoors and is, therefore, a low occupancy area.  As noted previously, the maximum PCB concentration detected within the treatment area at TR-2D at a depth of 7.5 to 8.0 feet bgs is 22 mg/kg, which is lower than the 25 mg/kg threshold specified in the regulation for leaving PCB wastes on-site.  Additionally, the remediation area and its immediate vicinity are entirely located under asphalt pavement; therefore, there is no direct human exposure pathway to the impacted soils.  Figure 4 presents a geologic cross-section of the subsurface lithology in the remediation area.

Based on the foregoing, Benjamin Moore proposes to contain in-place PCB-impacted soils with a deed restriction and engineering control for addressing PCB-impacted soils at concentrations exceeding the NRDC SCC but lower than the 25 mg/kg threshold specified for low occupancy areas in the TSCA regulations.  The overlying asphalt pavement will function as the engineering control in the area where PCB concentrations exceed the NRDC SCC (see Figure 3).  Based on the limited detections of PCBs at levels exceeding the RDC SCC of 0.49 mg/kg but below the NRDC SCC of 2 mg/kg in borings TR2D-7, TR2D-9, and TR2D-10 located outside the delineated extent of the area with PCB-impacts exceeding the NRDC SCC, Benjamin Moore proposes to extend the deed restriction to the entire property by limiting site use to non-residential.  Paint manufacturing activities have been conducted by Benjamin Moore at the site since 1925 and the site was developed as an agricultural chemical manufacturing facility in the late 1800s.  Therefore, site use has been limited to industrial activities for over 100 years.  Furthermore, Benjamin Moore plans to continue industrial operations at the site for the foreseeable future.  The effectiveness of the engineering and institutional controls will be periodically monitored pursuant to the requirements outlined in N.J.A.C. 7:26E-8.5 and 8.7.

The proposed alternative remedial strategy is expected to be equally protective of the human health and the environment, more easily implementable, and more cost-effective than the strategy outlined in the September 2007 RIR/RAW.  Documentation to support the deed notice is provided in Appendix B in accordance with the requirements outlined in N.J.A.C. 7:26E-8.2.

## PERMIT REQUIREMENTS/APPLICATIONS (N.J.A.C. 7:26E-6.2(A)8)

No permits are required from the NJDEP for the implementation of the proposed remedy.  Benjamin Moore is required to notify the USEPA at least 30-days prior to the start of remedial action pursuant to 40 CFR 761.61(a)(3).  Since the proposed remedy does not include active remediation, notification to the USEPA will be provided within 30-days of NJDEP approval of this RAW Addendum.  In accordance with 40 CFR 761.61(a)(3), the USEPA notification will include the following information:

- The nature of the contamination, including kinds of materials contaminated;
- A summary of sampling procedures, and tables and/or maps showing PCB concentrations measured in all samples;
- The location and extent of the identified contaminated area;
- A cleanup plan for the site; and
- A written certification by Benjamin Moore that all sampling plans, sample collection, preparation, and analysis procedures are on file at the location designated in the certificate and available to the USEPA for inspection.

Jamie Camargo                                    -5-                              August 21, 2008

**COST ESTIMATE (N.J.A.C. 7:26E-6.2(A)14)**

The estimated cost of the proposed Remedial Action is approximately $100,000, which includes costs for preparing and recording the deed restriction, periodic monitoring and maintenance of the asphalt cap engineering control to ensure that it continues to remain protective of human health and the environment, and biennial certification over a 30-year period[1].

**SCHEDULE OF IMPLEMENTATION (N.J.A.C. 7:26E-6.2(A)15)**

A final draft of the deed notice will be provided to the NJDEP within 30-days of NJDEP approval of this RAW Addendum. In accordance with N.J.A.C. 7:26E-8.2(f), Benjamin Moore will record the final deed notice with the Essex county clerk within 45-days of receipt of written approval of the final draft deed notice from the NJDEP. Benjamin Moore will also provide copies of the recorded deed notice to the NJDEP Case Manager, and appropriate local authorities in accordance with N.J.A.C. 7:26E-8.2(g). Additionally, as required by 40 CFR 761.61(a)(8)(i)(B), Benjamin Moore will provide the USEPA Regional Administrator with a certification that the deed restriction notice has been properly recorded. Periodic monitoring and maintenance of the engineering and institutional controls, and biennial certifications will be conducted in accordance with N.J.A.C. 7:26E-8.5 and 8.7.

If you have any questions regarding this RAW Addendum, please do not hesitate to contact either one of us.

Sincerely,

Andrew R. Bonas
Senior Manager

Kavitha Subramaniam
Senior Associate

ARB:KS/fs
02-12004B:PRIN_WP\27651v1.DOC

Enclosures

Cc: W. Kip Cleverley, Benjamin Moore (w/out enclosures)
    Prokopis Christou, Benjamin Moore
    William A. Stone, Jr., ENVIRON

---

[1]  While a 30-year duration has been assumed for cost estimation purposes, the deed restriction as well as monitoring and maintenance of the engineering and institutional controls and biennial certifications will be implemented in perpetuity.

# Exhibit 73

## DECLARATION OF THEODORE PICHALSKI

1.    I reside at 2 Georgean Court in Edison, New Jersey. I am currently employed by Teval Corporation ("Teval") as Facility Engineer and have held that position for many years. Prior to that I was employed by Teval's predecessor in name, Charles F. Guyon General Piping Company, subsequently known as Guyon General Piping, Inc. ("Guyon") in a similar capacity.

2.    By way of background, I graduated from high school in 1949 and attended New York Trade School in 1950 and graduated as a certified diesel mechanic. I served in the United States Air Force from 1951 until 1955, and went to Oklahoma A&M (agriculture and mechanical) College while I was in the Air Force. After leaving the Air Force I went to work for DuPont as a diesel mechanic at their plant in Linden, New Jersey, from 1955 until 1969. I then worked at Morrison Steel Company in New Brunswick, New Jersey, as a Facility Engineer during 1970 through 1976, overseeing the warehousing and maintenance of iron and steel products, including structural steel. In 1976 I came to Guyon as the Facility Engineer responsible for overseeing engineering and warehousing operations, storage, transportation and logistics at its facilities in Harrison, New Jersey.

3.    When I arrived at Guyon in 1976, Guyon was in the business of selling pipes and valves, including some pipe fabrication. The pipe fabrication operations involved cutting, welding and shaping of the pipe, including cutting of threads and, in some cases, attaching valves. The pipe products were sold to industrial customers, particularly those in the oil refining business.

TEVAL 04896

4.    Attached hereto as Exhibit 1 is a drawing which depicts the site which was previously owned by Guyon and subsequently Teval Corporation following its name change in 1992. This facility is located at 900-1000 South 4th Street (also known as Frank E. Rodgers Blvd.), Harrison, New Jersey. As indicated on the legend, the drawing was prepared by Langan Engineering and Environmental Services and is dated January 3, 2001. The property designations on that drawing are accurate to the best of my knowledge and recollection. As shown on that drawing, the Guyon/Teval property was bordered on the south by Cape May Street (except for one small tract located at the southwest corner which is just south of Cape May Street). There is an additional stretch of land south of Cape May Street, and south of that is the Passaic River. The Guyon/Teval property is indicated with dots as well as the legend "Teval & Catco Equities." Attached as Exhibit 2 is an additional drawing of the Guyon property which shows the location of the various buildings which Guyon occupied as well as the building numbers which were used by Guyon and subsequently by Teval to identify the buildings.

5.    Guyon's operations were organized into four divisions: The Guyon Piping Division (also known as the Guyon Pipe, Valves and Fitting Division), the Fabrication Division, the Alloy Division, and Elizabeth Industries. The Piping Division did all the warehousing of pipes prior to their sale. The Piping Division also did some working on the pipes, including the cutting of grooves to facilitate attaching pipes or valves, occasional bending of pipes and some cutting of threads. It did not do any welding, however. The Piping Division sold pipes and valves, plus some related fittings, often in large quantities. The materials from which

2

TEVAL 04897

the pipes were made included steel, aluminum, brass, copper and several alloys. With reference to the site drawing which is <u>Exhibit 2</u>, the Piping Division operated primarily in Buildings C-1, C-18, C-22, G-15, G-17, G-20, G-21 and G-22. G-15 was a particularly large building and was a warehouse in which pipes were stored prior to sale. In addition, pipes and valves were stored in Buildings G-10 and G-11 and in the garages G-1, G-2, G-3 and G-4.

6.    Pipe fabrication operations were conducted by the Fabrication Division in Buildings G-6, G-7, G-8, G-9, G-14 and G-16 as shown on <u>Exhibit 2</u>. The fabrication operations included the cutting, bending and threading of pipes, as well as some welding (this was done only in Building G-6). These operations were conducted by Guyon from the time I began work there in 1976 until Guyon leased the fabrication operations to a company called Fabco Piping Inc. ("Fabco") in 1980. The portion of the property on which fabrication activities took place, and which was leased in 1980 to Fabco, is also indicated on <u>Exhibit 1</u> with diagonal lines and the legend "Former Fabco Piping Leasehold".

7.    The Alloy Division provided products which were specifically designated for certain nuclear industry customers. It did not engage in any fabrication, but simply stored the pipes and sold them. The Alloy Division operations were conducted in Buildings G-7, G-12, G-13A, G-13B, G-23 and G-24 and they had their office in building C-10S. At some point Building G-7 was transferred to the Fabrication Division.

8.    Elizabeth Industries bought and sold equipment for customers in bulk – such as a large number of shovels, chain saws, or similar equipment.

3

They had their own building, Building C-4, and operated fairly independently of the other divisions. Their operations generated no process wastes, and no process wastewater.

9.      Charles F. Guyon General Piping Company changed its name in 1984 to Guyon General Piping, Inc. In May, 1992, Guyon sold its operating business assets to Von Leeuwen Pipe and Tool Corporation of Houston, Texas. Guyon then changed its name to Teval Corporation on July 7, 1992. From that time on the only business carried on by Teval was the ownership, leasing and maintenance of the buildings on the property. Its inventory of pipes and valves and their related business equipment were transferred to Von Leeuwen Pipe and Tool Corporation, who removed them from the facilities. This took place over nearly three years. Thereafter a number of buildings in the southern portion of the property were demolished in 1990s.

10.     Attached are excerpts from a color brochure (Exhibit 3) distributed by Guyon during the early 1980s to customers and potential customers which describes and depicts the Harrison, New Jersey, facilities. On the cover is an aerial photo of most of the buildings, and other pictures show storage of pipes awaiting sale in one of the warehouses, large valves stored in the one of the warehouses, as well as various types of fittings and related equipment being stored in anticipation of sale and delivery to customers. On the third page of the brochure, which shows seven maintenance foremen with their golf carts and intercom units, I am the second person from the left. As indicated by the size of the warehouse storage areas, one of the principal advantages which Guyon provided to its customers was the space to

4

TEVAL 04899

store large volumes of pipes, valves and related equipment which would then be shipped on short notice to customers, saving the customers the need to maintain large amounts of warehousing space on their own property.

11.    As described above, Guyon's business operations consisted primarily of purchasing, warehousing and selling pipes. The only fabrication work which was done on these pipes involved cutting some grooves and cutting some threads on the pipes and, in some cases, attaching valves. In addition, some welding was done in the "fabrication" Building G-6. The only waste which was generated by these processes was metal shavings and particles. These wastes were swept up and placed in drums and sold to a recycler. Metal shavings and particles have commercial value so there was an incentive to gather them up and sell them. There were no waste water discharges from any of these operations to the Passaic River. All sanitary waste was discharged to a piping system which went to the publicly owned treatment works operated by the Passaic Valley Sewerage Commission ("PVSC").

12.    When pipes were being cut or threaded, cutting oil was used to keep the pipes and tools from overheating. Cutting oils were purchased and kept in 55-gallon drums that were stored indoors. There was no waste cutting oil because the heat generated by the cutting tools working on the pipes caused the cutting oil to vaporize. Vaporized cutting oil was replaced with fresh oil as needed.

13.    I did not observe any spills or dumping of any waste material outdoors from any of the Guyon buildings. With respect to indoor maintenance, the floors were concrete and were periodically painted to keep them smooth and easy to clean.

5

There were no floor drains in any of the buildings. Any indoor spills were quickly cleaned up to avoid a slip and fall accident.

14. When I arrived at the site in 1976, there were some historic storm water drains at several locations on the site. However, they were all plugged up with dirt and were unusable. Thus there were at that time no functioning storm drains or conduits. However, I noticed that storm water tended to gather along the on-site roadway known as Valley Forge Road between buildings G-13A and G-13B on the north side and G-15 on the south side (see Exhibit 2). In particular, during heavy rains a large amount of rain water would run off the roofs of Buildings 15 and 13A. I installed an 11 inch pipe just below the surface of the ground to carry the storm water to a large brick-lined cistern which I understood had been installed many years earlier by the prior site owner, Crucible Steel Corporation of America, to allow river water to come in from the Passaic and be used as cooling water. The cistern was located near the west end of Valley Forge Road. It was approximately 40 feet deep and was connected to the Passaic River by a large concrete pipe, approximately 48 inches in diameter, which ran directly from the cistern to the Passaic River. From the cistern, cooling water was piped diagonally in a northeastern direction through a 36 inch pipe where it could be used by other buildings. Guyon never made use of this system because it had no need for cooling water. However, this provided a convenient way to dispose of storm water. Attached hereto as Exhibit 4 is another copy of the site drawing which has been marked Exhibit 2 on which I have placed some written longhand notes and lines. On Exhibit 4, in the lower left hand portion of the drawing south

6

of building G-6 there is a black dot, which I have circled in red, which is the approximate location of the river water cistern.

15.     In addition, there were four garages located along the western side of the property between the onsite road known as "Brotherhood Place" (see the site drawing attached hereto Exhibit 2) and Frank E. Rodgers Boulevard (also known as South Fourth Street) which runs from north to south along the west side of the property. Those garages are marked G-1, G-2, G-3, and G-4 on Exhibit 2. Along the east side of those garages was a trough area which sloped south towards Cape May Road. This was a natural drain to the 11 inch pipe storm drains I installed. This was the only use that Guyon made of the cistern.

16.     When I arrived in 1976 there were also two inactive water production wells on the property which were located at the north and south ends of the onsite road known as "Patriot Place", shown on Exhibits 2 and 4. On Exhibit 4 I have shown with red dots the approximate location of those two inactive production wells. The well to the south was completely blocked. The one to the north, though rusted, had been left open and Guyon continued to leave it open for possible later use for fire protection. It was approximately 500 feet deep and I do not recall that it was ever used.

17.     I have been shown affidavits of which appear to have been filed in a case in the Superior Court of New Jersey for Hudson County entitled Passaic Valley Sewerage Commissioners v. Crucible Steel Corporation of America. One affidavit was signed by Henry F. O'Shaughnessy dated June 5, 1970, and the other was signed by Arthur Whinn dated January 25, 1971. The subject of that litigation

7

TEVAL 04902

and the affidavits was an alleged release of oil to the Passaic River in 1970 from the outfall of a large underground drainage system from the property which at that time, according to the affidavits, extended under the Crucible Steel property and also under property which was then owned by Guyon and a number of others. I have reviewed the description of the oil that was found leaking in 1970 from the large pipe as described in the O'Shaughnessy Affidavit at paragraph 8 which describes the oil which was released as "a fine oily substance that has the appearance of a fine number 2 type fuel oil, or mineral oil, which had suspended in it a fine powdery or pulverized substance." Although I was not at the site in 1970, I am not aware of any oily material that was used or generated by Guyon at any time while I was there that would have matched this description of what was apparently released from the large pipe in 1970. Guyon did not use No. 2 fuel oil. Our fuel was diesel and gasoline, which was stored in underground tanks in front of Building G-18.

18.    Although I believe I located the outfall from this system, I have never seen any connections to it from the Guyon property. Shortly after I arrived in 1976 I surveyed the property to see what if any discharge pipes to the Passaic existed and which appeared to come from the Guyon property or neighboring property. The only pipe I could find which appears to be consistent with the description provided in the affidavits referred to above was an approximately eight foot wide pipe near the southeast corner of the property which entered the Passaic River near the eastern boundary between the Guyon property and property owned by Spiegel Trucking Company. On <u>Exhibit 4</u> I have indicated in red the approximate location of that

8

pipe. At that time the pipe extended perhaps 50 to 70 feet north from the edge of

the Passaic River underground and was completely blocked beyond that.

I have no idea how far it might have extended upstream of that. I was never able to

locate any of the "lateral" pipes leading from the various adjacent properties into

that large pipe which were referred to in the affidavits above.

19.    The only other pipe which connected the Guyon operations with the

Passaic River waterfront was a pipeline which in the early years, before my arrival,

brought Bunker #6 fuel oil which was unloaded from barges onto the facility and

piped it into a large rectangular reinforced concrete box where the oil was stored

in three 17,000 gallon tanks. I recall being told that Guyon had never had oil

delivered by barge, and had therefore never used this river access. When I arrived

the barge dock no longer existed. The rectangular box was located on the eastern

side of the property. It also contained two other storage tanks whose capacity was

13,500 gallons each. As of 1976 and thereafter, fuel oil was brought in by truck and

stored in the three larger tanks. The rectangular box was sealed so that no leakage

from the tanks would have escaped into the groundwater.

20.    Attached as Exhibit 5 is a copy of a large drawing which was

prepared by or for Crucible Steel Corporation of America (their name appears in

the lower right-hand corner of the drawing along with the date: 7-28-42) and

which I found at the Guyon facilities during my work there. This site drawing

shows the part of the Crucible Steel property on which the Guyon facilities were

subsequently located, as well as a large area to the east marked "Zone II", which

was owned initially by Crucible Steel and subsequently sold to Spiegel Trucking

9

TEVAL 04904

RAP-00190192

Company, who owned it during most of the time that Guyon operated at the site. The building and facility numbers which appear in circles throughout the drawing are Crucible Steel building numbers and the code for identifying these buildings and structures appears on the right-hand side of the drawing, which corresponds to the south end of the property. I have indicated the approximate location of the Passaic River by drawing that in blue across the right side of the drawing. I have then drawn in brown the approximate location of the pipeline which was formerly used to bring heating oil from barges docked on the Passaic River onto the Guyon property. The location of the large rectangular box where the five storage tanks were located is shown in brown on the eastern part of the Guyon property. As indicated on the drawing, piping then went from that rectangular storage box in a northerly direction to distribute the heating oil to boilers located in Building C-6.

21.    Also on this drawing, <u>Exhibit 5</u>, I have shown in blue the old river water intake piping system to the cistern, and then the continuing pipeline which went in a diagonal direction to the northeast across the property. In brown at the central and left part of the drawing, I have identified tunnels which were large enough for a person to walk through which held water supply and electric lines. No wastewater or waste material ever entered this area. In a gray line in the central left portion of the drawing, I have indicated where a low-pressure gas line ran. This was used by Guyon to heat the garage, Building G-18. In addition, high pressure gas was used in the fabrication operations to heat and bend pipe. The small green rectangular box in the lower central part of the property shows where

10

TEVAL 04905

the large transformers were located (discussed in paragraph 23 below) and the larger green rectangular box above that indicates the location of the tube which carried electric lines. Towards the northern part of the property there is a red line running east to west indicating a tube carrying some telephone lines underground. Just south of that is a blue dot which shows the location of the abandoned water well, available for emergency fire use if necessary, but which was not in fact used at any time while I was there, as discussed in paragraph 16 above.

22.     The only outfalls to the Passaic River system from the Guyon property that I ever saw were (1) the pipe from the cistern and (2) the plugged 8-foot diameter pipe on the southeast side of the property along the boundary with Spiegel Trucking Company.

23.     There were seven electrical transformers at the site and I have indicated their location in blue on the drawing marked Exhibit 4. The main transformer vault was located outside and on the south side of Building G-15, which faced south onto Cape May Road. The transformers themselves were inside the vault, so if there had been any leaking, it would have been contained within the vault. In this main vault, there were three transformers, each of which was 4,160 volts and had been left over from the Crucible days. Each transformer measured approximately 2 feet x 2 feet x 3 feet. From this vault the electricity was transmitted in a northeasterly direction to the office Building G-20. The electricity came into Building G-20 on the second floor where there were two smaller "step down" transformers which broke the voltage down to 440, 220 and 110 volts. From here it was distributed around the facility for use. The remaining

11

TEVAL 04906

two transformers were located at the north end of Building G-7. They were of comparable size to those in the office Building G-20, and all of these were smaller than three large transformers in the vault in Building G-15. These four smaller transformers were located indoors. I never observed any leaking from any of the transformers on the site at any time.

24.    All of these transformers were sampled in 1976 for PCB content. No PCB-containing material was found. Nevertheless, the fluids were drained and replaced at that time with non-PCB oil. I personally participated in this to be sure that we had no PCB-containing equipment on-site.

25.    The historic Crucible Steel drawing which is attached as <u>Exhibit 5</u> indicates that there was a transformer station just to the west of Building G-6 on the southwestern portion of the property. This is facility No. 100 on the drawing which describes the location as "outdoor substation". I do not recall ever seeing that transformer station during the years I was at the site, and therefore assume that if it ever existed it was removed before I began work there in 1976.

26.    Under Buildings G-6, G11 and G-14 there was a 6-foot diameter tunnel containing utilities, specifically electricity, water and gas. You could walk through much of this. This tunnel was built with the buildings presumably by Crucible and was there the whole time I was there. This tunnel contained no wastewater or drainage. The area is indicated in red, overlain with a yellow highlighter, on the site drawing which is attached as <u>Exhibit 4</u>. This tunnel location is also shown on <u>Exhibit 5</u> in brown, as noted above. This tunnel ran generally north and south, and

12

there was a lateral connection which ran east and west under Building G-9 over to Building G-11.

27.     Guyon operated a fleet of trucks to deliver pipe to its customers. The trucks were housed in a garage building, Building G-18, where they were periodically serviced. Guyon had installed a new 250-gallon above-ground steel tank where used motor oil was kept. A company called Northeast Oil periodically came and pumped used oil out and hauled it away for recycling. Extra batteries were stored in Building G-18, and Guyon had several suppliers who periodically provided new batteries and removed old ones. Any spills were promptly cleaned up with rags, and the rags were drummed and disposed of off-site.

28.     With respect to the Fabco Piping, Inc. operations, Fabco conducted pipe fabrication operations from 1980 until 1988 when the company became insolvent, ceased its operations and terminated its lease with Guyon two years prior to its anticipated completion date. Fabco conducted sand blasting operations in Building G-16 and spray painting in building G-14. There was no discharge to the Passaic River of any waste material generated by Fabco, or previously by Guyon when it conducted fabrication activities in these buildings. There were no discharge pipelines or other conduits from any of these buildings to the Passaic River. I do not recall any floor drains in any of the fabrication buildings. Metal threads and particles from pipe threading or cutting operations were collected and drummed and sent offsite for recycling. Sandblast waste was stored on the ground just north of Building G-16. Periodically it would be scooped up and put in a dumpster and then trucked offsite to a disposal facility in Pennsylvania.

13

TEVAL 04908

29.    After Fabco terminated its lease in 1988, the property was inspected
by the New Jersey Department of Environmental Protection ("NJDEP") under
the Environmental Cleanup Responsibility Act ("ECRA"), later known as the
Industrial Sites Recovery Act ("ISRA"), and determined that there was some
residual contamination resulting from these activities, notably in the area where
sandblast residue had formerly been stored in the area outside Building G-16
and where paint waste had been stored near  Building G-14.  NJDEP insisted that
Guyon, as the property owner, perform appropriate remedial action.  This was done
during 1990-94, at the conclusion of which NJDEP advised Teval (the successor by
name change to Guyon) that the remedial action had been satisfactorily completed
and NJDEP issued to Teval's law firm, Lowenstein, Sandler, Kohl, a "No Further
Action Letter" dated September 2, 1994, stating that the property was "in full
compliance with ISRA."  A copy of that letter is attached as Exhibit 6.

30.    From 1992 through 2005 the buildings which had not been demolished,
as described in paragraph 9 above, remained vacant, except building-12 (near
Building C-22) which was rented out to Miele-Bros., also known as North Jersey
Appliance.

31.    In 2006 the Town of Harrison took title to the Teval property by
eminent domain.  The site is now part of a 48-acre site which is being restored and
developed by Advance Realty Group, under contract with the Town of Harrison,
to construct the Harrison MetroCenter which will include housing, offices, real
estate space and a soccer stadium for the New York Red Bulls soccer team.
The groundbreaking took place in September, 2006, and the construction is being

14

managed by Turner Construction Company. Ever since early 2006 therefore,

Teval has had no further ownership or other interest in the property and no

presence at the property.

I declare under penalty of perjury that the foregoing is true and correct

to the best of my knowledge and recollection. Executed this __5__ day

of _November_ 2007.

Theodore Pichalski

15

TEVAL 04910



TEVAL 04911



**EXHIBIT 2**

TEVAL 04912



pipe
valves
fittings

DISTRIBUTED BY
CHARLES F. GUYON, INC.

EXHIBIT 3

TEVAL 04913



Two switching engines are required for moving materials over the five miles of railroad track at the 39-acre Harrison, N.J. facility of Charles F. Guyon, Inc.—22 separate buildings—over 1 million ground floor square feet under cover.

# CHARLES F. GUYON, INC.

## Executive and Sales Offices
345 Park Avenue
New York, NY 10154
(212) 759-7171
TWX 710-581-4354

## Main Plant
900 South 4th Street
Harrison, NJ 07029
(201) 485-5600

## Delaware Valley Division
Route 130 · N. Virginia Avenue
Penns Grove, NJ 08069
(609) 299-5900
(215) 242-4800
(301) 539-4888

## Southeast Region
Route 10 and Kingston Avenue
Chester, VA 23831
(804) 458-6200
(804) 358-3400

## Charles F. Guyon Export Co. Inc.
(201) 485-5600

## Toll-Free Number
800-526-1208:
Serving Eastern Pennsylvania area codes 215 and 717,
Delaware, Maryland, Washington, D.C., and Connecticut

**COVER** Aerial view of the world's largest pipe, valve, and fittings facility in Harrison, N.J. Owned and operated by Charles F. Guyon, Inc., this plant with its 22 buildings is minutes away from all major New Jersey-New York arteries, and has unobstructed river transportation to the Atlantic Ocean.



Maintenance foremen are equipped with golf carts and FM intercom units to maintain a constant, uninterrupted flow of materials moving to and from inventory.

This brochure illustrates and describes the largest and most diversified inventory of pipe, valves, and fittings in the United States. Over 61,000 items—all of domestic manufacture—are stocked at our 39-acre complex in Harrison, N.J., Delaware Valley Division in Penns Grove, N.J., and the Southeast Region warehouse in Chester, VA.

Charles F. Guyon, Inc. has been serving the industrial community for more than 60 years.

The capabilities of Charles F. Guyon, Inc. and its reputation for product quality, reliability, and superior service are unmatched in the distribution of piping components. Moreover, our reputation has been further enhanced through a

continuing policy of stocking specials as standard on-the-shelf commodities, and the successful establishment of *next-day-delivery* service with our own trucks to our customers. This policy has been maintained even in times of serious shortages.

Our dedication to serving as your *one-source* warehouse, has led to the formation of the Guyon Contract Services Department, and with it the implementation of the stockless purchasing concept available to our major customers.

For a closer, first-hand look at how we operate to better serve our customers, simply call or write for an appointment to inspect and tour our facilities.





View of carbon steel, single random pipe building—10 stories high, containing all welded and seamless ASTM grades, including large diameter and heavy wall material. Double random pipe is inventoried in other buildings. Our inventory consists of over 60,000 tons of prime pipe manufactured by major U.S. mills.

## TYPES and Manufacturers

**STEEL:**

**Buttweld, Seamless,
Electric Resistance Weld,
Seamless Pressure Tubing,
Double Submerged-Arc Weld**
    All major domestic mills

**STAINLESS STEEL**
    Armco Steel
    Carpenter Technology
    Consolidated Metals
    Trent Tube Div. of Colt Industries

**MONEL**
    International Nickel

**ALUMINUM**
    Reynolds Aluminum

**YOLOY**
    Jones & Laughlin Steel

**COPPER TUBING & BRASS**
    Cerro Copper & Brass
    Reading Tube

Coating, Wrapping & Lining Furnished to all Specifications.

TEVAL 04916

RAP-00190204



One of the largest stocks of domestic cast steel valves in the U.S. Inventory comprises 150# - 600# flanged and buttweld end in sizes through 24 inches.

## TYPES and Manufacturers

**BRONZE & IRON BODY**

Jenkins
Powell
Walworth

**CAST STEEL**

Jenkins
Powell
Walworth

**FORGED STEEL**

Edwards
Hancock
Jenkins
Vogt

**LUBRICATED PLUG**

Rockwell Nordstrom
Walworth
WKM

**NON-LUBRICATED PLUG**

Duriron

**STAINLESS STEEL & MONEL**

Aloyco
Jenkins
Powell
Vogt

**ALUMINUM**

Powell

**BALL TYPE**

Apollo
Hills McCanna
Jenkins
Powell
WKM

**DIAPHRAGM**

Grinnell-Saunders
Hills McCanna

**BUTTERFLY**

Jenkins
Walworth
WKM



TEVAL 04917



Fitting and valve warehouse—over three football fields long and almost one wide. Materials are stocked through 48″ diameter. Massive quantities assure our customers of a continuous supply, regardless of market conditions.

## TYPES and Manufacturers

**WELDING FITTINGS & FLANGES**
**(Carbon-Stainless-Alloy-Aluminum-Monel)**

Babcock & Wilcox
Flowline
Taylor Forge
Tube Turns

**SCREWED & SOCKET WELD FITTINGS**
**(Carbon-Stainless-Alloy-Aluminum-Monel)**

Alloy Stainless Products
Bonney Forge
Vogt

**CAST, MALLEABLE & DUCTILE FITTINGS**
**(Screwed/Flanged)**

Flagg
Grinnell
Stockham

**BRASS & COPPER FITTINGS**

Flagg
Mueller Brass
Nibco

**FLANGED CAST STEEL FITTINGS**

Glover

**UNIONS**

Dart
Jefferson

**O-LETS**
**(Carbon-Stainless-Aluminum)**

Bonney Forge

**DRESSER FITTINGS & COUPLINGS**

Dresser

**SILBRAZE FITTINGS**

Flagg (Flagg-Flow)

**VICTAULIC FITTINGS**

Victaulic

TEVAL 04918



View of typical product stocking facility devoted exclusively to Stainless Steel and Aluminum, which indicates our commitment to service in this particular piping specialty. Pipe, valves and fittings are inventoried in all common analyses, as well as Stainless Steel Alloy 20 and Aluminum 5083 for cryogenic service. Color coded plastic lined bins and wood lined racks assure quality control and prevent contamination.

## TYPES and Manufacturers

**BOLTS & NUTS**
Major Manufacturers

**EXPANDER FLANGES**
Tube Turns

**EXPANSION JOINTS**
Major Manufacturers

**GASKETS**
Major Manufacturers

**GAUGES**
Ashcroft

**HANGERS**
F&S Central
Grinnell

**HINGED CLOSURES**
Tube Turns

**INSULATED JOINTS**
Tube Turns

**STEAM TRAPS & STRAINERS**
Armstrong
Sarco

**THERMOMETERS & INSTRUMENTATION**
Ashcroft

**TRANSITION JOINTS**
Tube Turns

Complete catalogs of all manufacturers' products
in this brochure available upon request.



RAP-00190207



# iN plant capabilities

**PIPE SHOP**
Equipment available for cutting, threading, bevelling and grooving.

**MACHINE SHOP**
Complete machining facilities enable us to quickly perform a wide variety of special requirements i.e., modification of flange facing (RMS specifications, etc.), taperboring fittings, installing valve bypasses, etc.

**TRUCKING**
Our large fleet of company owned vehicles give us the capability of making prompt deliveries to plants, jobsites and docks.



**QUALITY CONTROL**
A professionally staffed Quality Control Department maintains complete mill test report files and is responsible for the checking of incoming and outgoing shipments.

**COMPUTER**
Our inventory, order processing, and accounting functions are fully computerized allowing for instant communication between our plants, and assuring our customers of fast and accurate processing of all orders.

**EXPORT**
We offer a full in-house export packing and documentation service.



TEVAL 04920



Guyon's 70-vehicle fleet stands ready to meet our customers' delivery requirements.

# CONTRACT SERVICES

### 1. What is Guyon Contract Service?

Our Contract Services Department, which operates as a separate sales entity of the company offers many programs encompassing commodity blanket commitments as well as the sophisticated yet practical concept of Systems Contracting, all uniquely tailored to meet a customer's special needs.

### 2. Who is it for?

Any company that must repetitively purchase Pipe, Valves and Fittings for MRO requirements, and maintain a large stores inventory to accomodate its daily needs, will benefit the most.

### 3. What are the advantages?

A few of the dramatic cost reducing benefits derived from the utilization of Guyon's capabilities are:
a) Purchasing administrative costs
b) Cost of inventory possession
c) Elimination of continually expanding warehouse—store facilities
d) Guaranteed supply, even during periods of shortage
e) Accurate material usage reports are available
f) Competitive pricing through Guyon's huge purchasing power
g) Special contract surplus return privileges
h) Immediate availability of unique long-lead time materials inventoried by us at your request
i) Seven day—24 hour emergency service

### 4. Why Guyon?

Charles F. Guyon's dedicated staff, backed by a massive inventory of domestic standard and special piping components, offers our customers one-source availability along with a proven performance record accrued over our many years of experience in the contract service field.
For a more detailed account of how Contract Services can work for the benefit of your company, we cordially invite you to contact us so we may arrange an appointment to discuss a custom-made approach to your individual needs. We also extend a warm invitation to tour any of our plant facilities.

A DYNAMIC COMPANY
WITH UNIQUE CAPABILITIES
**GUYON**

View across the Passaic River of Guyon Main Complex—largest depot of piping components in the United States.

OVER A half CENTURY of GUYON SERVICE

Pipe, Valves and Fittings
Serving Industry Worldwide

CHARLES F. GUYON, INC.
DISTRIBUTORS

**Executive and Sales Offices**
345 Park Avenue
New York, NY 10154
(212) 759-7171
TWX 710-581-4354

**Main Plant**
900 South 4th Street
Harrison, NJ 07029
(201) 485-5600

**Delaware Valley Division**
Route 130 · N. Virginia Avenue
Penns Grove, NJ 08069
(609) 299-5900
(215) 242-4800
(301) 539-4888

**Southeast Region**
Route 10 and Kingston Avenue
Chester, VA 23831
(804) 458-6200
(804) 358-3400

Printed in U.S.A.

TEVAL 04922



EXHIBIT 4

TEVAL 04923

RAP-00190211

**LARGE CRUCIBLE STEEL DRAWING**
**(Ted Pichalski marked as "Map #2")**

**EXHIBIT 5**

TEVAL 04924

# Exhibit 74



FILED

JUN 9 1970

*[signature]*

**SIMON, DENSTMAN & NOONAN**
11 COMMERCE STREET
NEWARK, N. J. 07102
(201) 642-2656
ATTORNEYS FOR Defendant



SUPERIOR COURT OF NEW JERSEY
CHANCERY DIVISION–HUDSON COUNTY
DOCKET NO.

*C C 2403-69*

PASSAIC VALLEY SEWERAGE
COMMISSIONERS, a public
corporation,

           Plaintiff,

    v.

CRUCIBLE STEEL CORPORA-
TION OF AMERICA, SPALDING
WORKS, 1000 South Fourth
Street, Harrison, New
Jersey,

           Defendant.

                          Civil Action

                          <u>AFFIDAVIT</u>

STATE OF NEW JERSEY  :
                    : s s
COUNTY OF HUDSON    :

      HENRY F. O'SHAUGHNESSY, being duly sworn, accord-

ing to law upon his oath deposes and says:

      1. I am Vice President of the Spaulding operation

of defendant, Crucible, Inc. I am the General Manager of the

manufacturing plant operated by said defendant in Harrison, N. J.

I have held the mentioned office and job assignment with defendant

for approximately six months or more. The events involved in the

- 1 -

*1.1*

TEVAL 01996

above captioned civil action occurred during this period.  I have
a B.S. degree in civil engineering and, prior to my employment
with defendant, I had about 17 years of experience in the metal
fabricating industry, primarily in the management field.

2.  Defendant owns about 14 acres of land in Harri-
son, New Jersey, on which it conducts a steel rolling mill.  These
14 acres are part of a larger industrial complex containing about
60 acres on which many others operate various types of industrial,
manufacturing and service activities.  I am informed that at one
time defendant owned the entire complex, and that, from time to
time, it conveyed portions of the tract to others, until it was
left with the mentioned 14 acres.

3.  At its Harrison plant, defendant fabricates
sheet and coil steel into various products which meet the parti-
cular specifications of defendant's customers.  Its manufacturing
activity is not conducted at or near the bank of the Passaic Ri-
ver.  Separating the plant and the river is a roadway about 50
feet wide and an open area about 75 feet wide.

4.  On January 16, 1970, plaintiff gave written
notice to defendant that a "polluting material such as oil" was
being discharged from a box culvert located at the bank of the
Passaic River "in front" of defendant's Harrison plant.

5.  This culvert is the terminal point of a large
underground storm drain pipe or main.  According to available
maps, this main is 1275 feet long; it is 8 feet 6 inches in dia-
meter in some places, and 8 feet 8 inches in diameter at other
places.  Only a relatively short portion of this main runs be-
neath defendant's 14 acre tract.  Before this main reaches defen-
dant's lands, it runs a considerable distance beneath lands in the

- 2 -

151

complex formerly owned by defendant but presently owned and used by others. After this main leaves defendant's property it runs beneath the above mentioned roadway and beneath the open area described above, a total distance of about 125 feet before it terminates at the river.

6. This main is part of a storm drainage system, which has been in existence for many years. It consists of about 16,588 feet of underground pipe. It is designed to collect surface water and to discharge it into the Passaic River. Other components in the system are manholes into which surface drainage runs, and laterals from the manholes which are connected to the main.

7. From the maps available it appears that there are 16 known laterals which run into this main. Four of these laterals run to the main from manholes on the 14 acre portion of the complex presently owned by defendant, and the other 12 run into the main from points outside the property owned by defendant and used by other occupants of the industrial complex.

8. After defendant received the notice from plaintiff dated January 16, 1970, I had a number of conversations with plaintiff's personnel. They described the "polluting material" referred to in their notice as a continuous flow of a fine oily substance that has the appearance of a fine number 2 type fuel oil, or a mineral oil, which had suspended in it a fine powdery or pulverized substance. Defendant has not been furnished with any specific or more accurate description of this substance. I was informed by plaintiff's chemist, Mr. Goldberg, that the samples taken by plaintiff at the outfall of the above mentioned main and submitted to him for analysis, did not contain sufficient quanti-

- 3 -

ties of this substance to permit him to identify it.

9. I am reasonably certain that the substance which plaintiff claims is running into the river from this main, is not any industrial waste which is incidental to defendant's fabricating activity at the Harrison plant. That operation produces two kinds of industrial waste: spent acid, both nitric acid and sulfuric acid, neither of which answers to the description of the "polluting substance" which plaintiff contends is being discharged into the river. The other waste product is rolling solution which may have oily characteristics but it does not resemble either fuel oil or mineral oil. Depending upon the process employed, this rolling solution, after use, is either blue-green or pink in color. Defendant is not discharging either type of waste into the subject drainage system. The defendant does not use fuel oil in its plant; it employs gas as heating fuel.

10. I am informed that from time to time during the summer months, defendant, as a dust abatement measure, has spread spent rolling oil upon the ground in its plant area. However, I am also informed that this practice has not been engaged in since the summer of 1969, and it certainly was not done during my entire tenure with defendant. Therefore, this practice, certainly cannot account for the presence of an oily polluting substance at the outfall of the drainage main as late as January 1970. If it should become necessary to employ dust abatement measures in the future, defendant will take precautions not to spread any substance used for this purpose in the area of drains.

11. When defendant received the abovementioned notice from plaintiff in January 1970, I caused to be made a careful, systematic review and examination of defendant's operation at its

- 4 -

TEVAL 01999

Harrison plant, with emphasis upon its method of handling possible contaminants. As a result of this examination and review the following was discovered and the indicated measures were taken:

(a) It was discovered that some of defendant's employees had been steam cleaning mobile equipment in the vicinity of some manholes. While it was not known that these manholes are connected by means of laterals to the subject drainage main, there being other drainage systems in the complex, this practice was discontinued to prevent any possibility that oil, removed from the equipment during the cleaning process, would be washed down the manholes and ultimately into this main.

(b) I directed that tighter control be exercised over spent acid discharge, notwithstanding that the claimed pollutant is not described as an acid.

(c) It was discovered that some of defendant's employees were dumping waste oil into a pit which had previously contained a fuel storage tank and this pit was near a surface drain. Although it was not known that this drain connects to the mentioned drainage main, this oil dumping practice was stopped.

(d) It was found that a pump employed in a hood annealing operation was discharging oil into a pit. This discharge was sealed off and the oil is now being collected in metal drums.

12. The following other occupants of the complex use the subject drainage main through one or more laterals which connect to the main from the portions of the complex which they occupy:

(a) Charles F. Guyon, Inc., which has 5 laterals that run into the main.

- 5 -

TEVAL 02000

       (b)   Miele Bros. Trucking Co., which uses 2 laterals.

       (c)   Azco Steel Company, which has 1 lateral.

       (d)   Gabest, Inc., which has 1 lateral.

       (e)   Prince Packaging Products, Inc., which also
has 1 lateral.

       (f)   Joseph Supor Trucking Co., which has 2 laterals.

       13.  It may well be that in addition to the 4 con-
necting laterals on defendant's lands and the 12 laterals men-
tioned in the preceding paragraph, there are additional laterals
which other occupants of the complex have constructed and connect-
ed to the subject drainage main. However, the 16 laterals speci-
fically mentioned herein are the only ones shown on the maps
available to this defendant and the only ones known to the defen-
dant.

       14.  In addition to the specific measures mentioned
in Paragraph 11, and since suit was instituted, Mr. Arthur Whinn,
the Maintenance Superintendent of defendant's Harrison plant, in-
stalled filters in all of the known laterals that run into the
drainage main. This was done in an effort to locate the source
of any contaminants that might have been reaching the main.
Thereafter, and recently, defendant discovered a slight trace of
an oily substance on one of the filters. This substance was
traced back to a basement machine shop on defendant's premises,
where defendant found that oil was dripping from a grinding ma-
chine and was entering a drain apparently connected to the men-
tioned lateral. Up to this time, defendant had believed that this
drain ran into a dry well storage area. Defendant is presently at
work diverting this oil dripping away from this drain and expects
to have this condition corrected in about a week or less.

       15.  In addition, on May 11, 1970, I met with re-

presentatives of some of the other occupants of the complex who
make use of this drainage system.  At the time I explained the pro-
blem and received assurances from them that they will cooperate
in preventing pollutants from entering the drainage system from
the premises they occupy.  I have received like assurances from
all but one of those other occupants who were not able to send
representatives to the meeting.  The exception was Prince Pack-
aging Products, Inc.  I was not able to contact this company and
I am not certain that it is any longer actively engaged in busi-
ness within the complex.

16.  I earnestly request that the court refrain
from entering a pendente lite injunction against the defendant.
On the basis of the knowledge presently available to it, defendant
has taken all steps within its power to bring about an end to the
condition about which plaintiff complains.  If that condition
continues despite defendant's efforts, it is because defendant,
at present, does not know what is causing the condition.  Detec-
tion of the cause is extremely difficult because up to the present
time plaintiff has not collected a sufficient amount of the con-
taminant  entering the river to permit its identification.  If a
pendente lite injunction were entered, defendant, at present,
would not know what more it could do to comply with it.  Defendant
requires additional time to continue its investigation to locate
the cause of the substance which plaintiff finds offensive, as-
suming that it has not already been found and corrected, or is
not already in process of correction.  It is proper in this con-
nection to observe that no serious harm or injury will be sus-
tained if injunctive relief is withheld at the present time.  From
what has been stated above, only minute quantities of the polluting

- 7 -

substance are being discharged into the river from the drainage
main.

17. It has occurred to defendant that the claimed
condition may be halted if the subject drainage system is closed.
However, I am informed that defendant has no legal right to take
such action because when defendant, from time to time, conveyed
portions of its lands to others in the complex, it conferred upon
them, by way of easements, the right to use this system for drain-
age purposes. Equally important, if storm and surface waters were
not permitted to escape through this system, there would be danger
of flooding not only on defendant's premises, but in other areas
of the complex served by the system. It is to be expected that
resulting flood waters would contain considerable contaminants,
would run off into the river and would create a danger of a much
greater degree of pollution than the small amount presently
claimed by plaintiff.

18. Defendant assures the Court that the present
withholding of injunctive relief will not result in any relaxa-
tion of its efforts to continue its monitoring of the system and
its efforts to locate and control or correct the source of the
claimed pollution, assuming that correction has not already been
effected or is not in process.

SUBSCRIBED AND SWORN TO    :

BEFORE ME THIS 5th DAY    :

OF   June    1970    :

_____
HENRY F. O'SHAUGHNESSY

Notary Public of New Jersey.
T. E. SULLIVAN
NOTARY PUBLIC OF NEW JERSEY
My Commission Expires March 12, 1973

- 8 -

21