# Exhibit 77

May 27, 1941



MEMORANDUM

TO:        MR. DONALD M. NELSON

FROM:      EDWIN M. MARTIN

MAY 29 1941 AM

SUBJECT:   Proposed Expansion of Facilities of the     NO............
           Crucible Steel Company of America at
           Harrison, New Jersey


        The Navy Department proposes to expand the
facilities of the Crucible Steel Company of America
at Harrison, New Jersey for the production of steel
for gun forgings, projectiles, bombs and other
forgings at an estimated cost of $175,000.00.


        In view of the small expenditure involved,
it is recommended that this proposal be approved.

N. Ord. 7

IN REPLY ADDRESS
BUREAU OF ORDNANCE, NAVY DEPARTMENT
AND REFER TO No.

**NAVY DEPARTMENT**

**BUREAU OF ORDNANCE**

WASHINGTON, D. C.

L24(4818)
(Prl)

MAY 23 1941

-13-

From:   Chief of the Bureau of Ordnance.
To:   Navy Plant Site Board,
   (Captain A. B. Anderson, Senior Member).

Subject:   Expansion of Plants - Commercial.

Reference:   (a)  SecNav ltr. Op-23M-1 MF N1-13/L24(410318)
   of 9 April 1941.

    1.    In accordance with reference (a), the follow-
ing proposed plant expansions are forwarded for your con-
sideration and clearance with the Plant Site Committee of
the Office of Production Management.

    Signed:

    Crucible Steel Company of America

    Harrison, New Jersey

Approved: 23 May 1941
S/ A. B. ANDERSON, Captain, USN
Senior Member,
Navy

    **Nature of facilities and amount:**

    To acquire and install in the Contractor's plant at
Harrison, N. J., the necessary additional facilities
required to produce steel for gun forgings, projectiles,
bombs and other forgings required for the National Defense
Program.

    Estimated Cost $175,000.00.
    Work to be done at actual
    cost without profit or fee
    to the Contractor.

    **Justification:**

    Reference is made to Clearance No. 231 approved
October 18, 1940, to Clearance No. 237 approved October 22,
1940, to Clearance No. 713 approved April 4, 1941, and to
Clearance No. 818 approved April 28, 1941. The above
clearances total $4,877,212.20. The increase herein
requested of $175,000.00 added to the above makes a total
expansion of the Contractor's plant of $5,052,212.20. A

L24(4818)
(Prl)

-2-

breakdown of the addition herein requested is attached
hereto.

W. H. P. BLANDY

T. D. Ruddock
By Direction

Signed:

Approved:  23 May 1941
S/ A. B. ANDERSON, Captain, USN
Senior Member,
Navy Department Plant Site Board

Approved:

Plant Site Committee, O.P.M.

HGH:mg



## EXTENSION OF CONTRACT WITH
## CRUCIBLE STEEL COMPANY OF AMERICA

### Break-Down of Estimated Cost

| | |
|---|---:|
| Crane . . . . . . . . . . . . | $25,000.00 |
| 1 Crane Runway, 500' long . | 45,000.00 |
| Roofing ingot and mould storage 40' x 700' . . . | 15,000.00 |
| Tracks in scrap yard and changes to building. . . | 30,000.00 |
| Soaking pits . . . . . . . . | 24,000.00 |
| Piling and foundation . . . | 25,000.00 |
| Contingencies . . . . . . . | 11,000.00 |
| | $175,000.00 |

N. Ord. 7

IN REPLY ADDRESS
BUREAU OF ORDNANCE, NAVY DEPARTMENT
AND REFER TO No.

L24(4818)
(Pr1)

**NAVY DEPARTMENT**

**BUREAU OF ORDNANCE**

WASHINGTON, D. C.

JUN 25 1941

and the tool steel. The magnets and tool steel are used
exclusively in National Defense work.

-30-

| | |
|---|---|
| **From:** | Chief of the Bureau of Ordnance. |
| **To:** | Navy Plant Site Board,<br>(Captain A. B. Anderson, Senior Member). |
| **Subject:** | Expansion of Plants - Commercial. |
| **Reference:** | (a) SecNav ltr. Op-23M-1 MF N1-13/L24(410318)<br>of 9 April 1941. |

1.     In accordance with reference (a), the follow-
ing proposed plant expansions are forwarded for your con-
sideration and clearance with the Plant Site Committee of
the Office of Production Management.

**Name and location of plant:**

**Crucible Steel Company,**

**Harrison, New Jersey.**

**Nature of facilities and amount:**

Buildings, machinery, furnaces and auxiliary
equipment as listed in Exhibit A.

Total cost $1,044,009.00.

**Justification:**

The increased facilities are to provide for a new
electric furnace and necessary associated equipment for the
production of steel for projectiles, A. P. bombs and guns.
These facilities also provide for a bomb assembly building
and a new building to house the present magnet foundry and
tool steel factory. It has been determined to have the
Crucible Steel Company build the complete bomb with tail
assembly and the above building is necessary for this
purpose.   The three new heat treating furnaces which will
be provided in the new building will be used on the magnets

L24(4818)         -2-                    -30-
(Prl)          [INDUSTRIAL FACILITIES]
                                        June 18, 1941.

and the tool steel.  The magnets and tool steel are used
exclusively in National Defense work.

| ITEM NUMBER | DESCRIPTION | AMOUNT |
|---|---|---|
| 1. | 33 - Scrap Buggies | $ 86,000.00 |
| 2. | Standard Gauge Tracks | 8,000.00 |
| 3. | Alterations to Platform & Bldg. | 20,000.00 |
| 4. | Track Work on Platform | 5,300.00 |
| 5. | Pouring Platform & alterations to building | |
| 6. | 10- Ingot buggies - $2800.00 each | $1,000.00 |
| | | 2,800.00 |
| | | 8,000.00 |
| 7. | | 1,800.00 |
| 8. | | 4,000.00 |
| | | 15,800.00 |
| 12. | 4 - Soaking Pits | 24,000.00 |
| 13. | Electric Furnace including Foundations, Transformer house & Appurtenances | 166,000.00 |
| 14. MG | Extension to Charging Platform | $1,000.00 |
| 15. | 1- New Trolley - Change in Ladle Crane Eastside - Electric Furnace Building | $1,000.00 |
| 16. | 2 - Hood Annealing Furnaces - 5 Hoods | 26,000.00 |
| 17 | Repair, rebuild & erect Crane Westside of Annealing Building | 7,000.00 |

                                        Signed:

                                        W. H. P. BLANDY

Approved: 27 June 1941
S/ A. B. ANDERSON, Captain, USN,
      Senior Member,
Navy Department Plant Site Board

                                        A. G. Noble
                                        By Direction

Approved:

Plant Site Committee, O.P.M.

- 8 -



<u>EXHIBIT A</u>

June 18, 1941.

| ITEM NUMBER | DESCRIPTION | AMOUNT |
|---|---|---|
| 1. | 35 - Scrap Buggies $ | 35,000.00 |
| 2. | Standard Gauge Tracks | 5,000.00 |
| 3. | Alterations to Platform & Bldg. | 20,000.00 |
| 4. | Track Work on Platform | 3,500.00 |
| 5. | Pouring Platform & alterations to building | 17,000.00 |
| 6. | 10- Ingot buggies - $3500.00 each | 35,000.00 |
| 7. | 1 - Locomotive | 8,000.00 |
| 8. | 2 - Ingot Strippers - 1 @$5000.00   1 @10000.00 | 15,000.00 |
| 9. | 2 - Water Tanks & Piping | 1,500.00 |
| 10. | 2 - Tar Equipment for Mold Clearing and Platform | 4,000.00 |
| 11. | Track Work to Forge Shops and Mills | 12,500.00 |
| 12. | 4 - Soaking Pits | 24,000.00 |
| 13. | Electric Furnace including foundations, Transformer house & Appurtenances | 155,000.00 |
| 14. | Extension to Charging Platform | 21,000.00 |
| 15. | 1- New Trolley - Change in Ladle Crane Westside - Electric Furnace Building | 11,000.00 |
| 16. | 3 - Hood Annealing Furnaces - 5 bases | 36,000.00 |
| 17 | Repair, rebuild & erect Crane Westside of Annealing Building | 7,000.00 |

- 2 -

| 18. | 1 - Winch-Car Puller & Anchors | 11,000.00 |
|---|---|---|
| 19. | 1 - #0 Straightening Machine | 6,000.00 |
| 20. | 3 - 16" x 8' Center Hevi-duty Lathes-4000.each | 12,000.00 |
| 21. | 6 - 10 " Peerless Hacksaws - $1350.00 each | 8,100.00 |
| 22/ | 1 - Hydraulic Press Straightener-300 Ton | 15,000.00 |
| 23. | 1 - 30' x 3' Furnace | 7,500.00 |
| 24. | Lean-to on 4 - Hammer Shops | 3,500.00 |
| 25. | Monorail Cranes & Appurtenances | 4,000.00 |
| 26. | Bomb Assembly Building, including Heating, lighting and other service facilities in building | 91,600.00 |
| 27. | Sewer, water, electric, gas, air and other service facilities outside building | 4,100.00 |
| 28. | Tracks & Roadways | 5,300.00 |
| 29. | 1 - 5 Ton Crane | 8,000.00 |
| 30. | Building - Magnet Foundry & Finishing including heating, lighting and other service facilities in building | 146,840.00 |
| 31. | Sewer, Water, Electric, Gas, Air and other service facilities outside building. | 18,750.00 |
| 32. | Track changes and additions | 500.00 |
| 33. | 1 - 5 Ton Crane, 3 2-1/2 Ton Hoists | 15,000.00 |
| 34. | 1 - Heat Treating Furnace-Hi-Temperature<br>2 - Heat Treating Furnace-Lo-Temperature | 25,000 |

- 3 -

| 35. | | Moving present Magnet Foundry | 30,000.00 |
|---|---|---|---|
| 36. | | Electric Power Facilities | 25,000.00 |
| 37. | | Transportation | 10,000.00 |
| 38. | | Freight & Contingencies | 95,519.00 |
| 39. | 2- | Boring lathes and 2 turning lathes for 3"/50 guns and appurtenances | 100,000.00 |

TOTAL . . . . $  1,044,009.00

NAVY DEPARTMENT
BUREAU OF ORDNANCE

#30

b24(4818)
(Prlb)

Washington, D.C

Subject:    Expansion of Plants – Commercial.

Sirs:

        The following plant expansion is submitted for clearance:

Contractor:  Crucible Steel Company of America.

Product:     Projectiles, bombs, and guns

Location:    Harrison, New Jersey

Amount:      $75,000 for construction of and equipment for
             additional office space.

Labor:       No additional labor required.

Power:       For lighting purposes only.

Subcontracting: Subcontracting is not necessary since this expansion
             is not to be utilized for production purposes.

Remarks:     Due to the increased amount of physical and chemical
             analyses incident to the manufacture of projectiles,
             bombs and guns being produced by the subject concern
             for the Navy, serious congestion in the present office
             building prevails.  The proposed expansion will pro-
             vide urgently needed office facilities and thus elimi-
             nate the existing congestion.

             The fuel consumption will be limited to the amount
             required for heating purposes.  Labor requirements
             and housing facilities need not be considered as no
             additional labor will be required.  An increase in the
             daily water requirements will not be involved.

             Reference is made to the following contract clearances
             authorized by the Director of Purchases of the Office
             of Production Management:

L24(4818)
(Prlb)

| Clearance No. | Date of Approval |
|---|---|
| 231 | 18 Oct. 1941 |
| 237 | 22 Oct. 1941 |
| 713 | 4 April 1941 |
| 818 | 28 April 1941 |
| 897 | 16 May 1941 |
| 1173 | 30 June 1941 |
| 1408 | 15 Sept. 1941 |

The above clearance aggregated a total of
$6,379,971.20.

The relatively minor increase in the amount of
$75,000. will provide urgently needed additional
office space and facilities necessitated by ex-
isting conditions.

Very truly yours,

W. H. P. BLANDY
Rear Admiral, U.S.N.
Chief of the Bureau of Ordnance

A. G. NOBLE
Commander, U.S.N.
By direction

NOV 25 1941

Approved:

Plant Site Committee
Office of Production Management

The Director General
Office of Production Management
(Plant Site Committee)
Social Security Building
Washington, D. C.
Attention:  Mr. D. C. MacKeachie, Chairman

JLL:md



NOV 28 1941

Dear Admiral Blandy:

Subject:  Your Memorandum of November 25, 1941, re
          Expansion of Plant Facilities of the Crucible
          Steel Company of America, at Harrison, N. J.

        The expenditure of approximately $75,000 for

the expansion of plant facilities of the Crucible Steel

Company of America at Harrison, New Jersey for the pro-

duction of projectiles, bombs and guns has been cleared

by the Plant Site Board of the Office of Production

Management.

                          Sincerely yours,


                          Douglas C. MacKeachie
                          Chairman
                          Plant Site Board


Admiral W. H. P. Blandy          Per E. M. MARTIN
Chief of the Bureau of Ordnance
Navy Department
Washington, D. C.




CC/ Dr. Glenn E. McLaughlin

L24(4818)
(Prlb)

NAVY DEPARTMENT
BUREAU OF ORDNANCE
Washington, D. C.

DEC 20 1941    #76

Subject:            Expansion of Plants – Commercial

Enclosure:          (A) List of machine tools and equipment for the
(Herewith)              proposed expansion.

Sirs:

The proposed expansion is submitted for clearance,
the details of which are as follows:

Contractor:         Crucible Steel Company of America

Product:            6" and 8" A.P. Projectiles.

Location:           Harrison, New Jersey.

The details of the proposed expansion to provide
for construction and equipment of buildings and acquisition, equip-
ping and installation of machine tools for the manufacture of 6"
and 8" armor piercing projectiles, are outlined as follows:

Amount:             Total amount for construction, equipment, machine
                    tools, and contingencies is $1,252,540.00
                    (See Enclosure (A) ).

Labor:              An additional labor supply of approximately 800
                    men will be needed.

                            Semi-skilled      640
                            Unskilled         160
                                   Total      800

Power:              An increase of electrical power by 2500 H.P. will
                    result from this expansion and will be furnished
                    by the Public Service Corporation of New Jersey.

Subcontracting:     Special equipment is necessary for the heat
                    treating and manufacture of armor piercing pro-
                    jectiles.  At the present time, there are only
                    two sources of supply for this type of projectile
                    other than the subject concern.  Due to the large
                    increase in the requirements for A.P. Projectiles,
                    the facilities of all three concerns have been, or
                    are to be, expanded in the interest of the National
                    Defense program.  Subcontracting does not readily
                    lend itself to the forging and machining operations
                    necessary to production of armor piercing projec-
                    tiles.

(4818)
(Prlb)

Remarks:        Additional space is provided for by construction
                of buildings and utilization of existing space.
                Part of the expansion is being consolidated with
                present machine tools, forging and heat treating
                equipment and does not permit an accurate es-
                timate of floor space at the present.

                The Public Service Corporation of New Jersey
                will furnish the additional 15,000 gallons of
                fuel oil that will be required per week. Any
                additional increases in the coal consumption
                will be obtained from the Contractor's own mines.

                The existing source of water supply will be
                adequate for all requirements. These sources
                being the North Jersey Water Company, well
                water from driven wells and water from the Passaic
                River which is adjacent to the Contractor's plant.

                Facilities and railway sidings are adequate for
                raw materials coming in and outgoing shipments.
                Some incoming materials will be delivered by truck.

                With the exception of some scrap from local
                manufactures and copper from brass industries in
                the Connecticut Valley, the major raw material,
                steel, will be obtained from the Contractor's own
                company.

                Attention is directed to the Contract Clearances
                in the following amounts that have been extended
                this company to supply the necessary facilities for
                production of heavy forgings, gun forgings, projec-
                tiles, periscope tubes, shafting, rudder stocks,
                turbine rotor forgings, and other heavy forgings.

| Contract Clearance No. | Amount | Approved |
|---|---|---|
| 231 | $    765,531.20 | 10/18/40 |
| 237 | 1,575,981.00 | 10/22/40 |
| 713 | 2,385,000.00 | 4/4 /41 |
| 818 | 150,700.00 | 4/28/41 |
| 897 | 175,000.00 | 5/16/41 |
| 1173 | 1,044,009.00 | 6/30/41 |
| 1408 | 283,750.00 | 9/15/41 |
| Change Letter | 200,000.00 | 10/30/41 |
| | 6,579,971.20 | |

This proposed expansion of $1,252,540.00 will
bring the total expansions up to $7,832,511.20,
and will enable the Contractor to make greater
use of his experience and existing facilities
in the production of 6" and 8" armor piercing
projectiles.

Ultimate production will reach 5,800 A.P. or
S.A.P. 6" and 8" projectiles per month.

            Very truly yours,

                W. H. P. BLANDY
            Rear Admiral, U.S.N.
        Chief of the Bureau of Ordnance

            A. G. NOBLE
            Commander, U.S.N.
            By direction

Approved:

        Plant Site Committee
        Office of Production Management

The Director General
Office of Production Management
(Plant Site Committee)
Social Security Building
Washington, D. C.
Attention:  Mr. D. C. MacKeachie, Chairman

LAW/gal


Copies to:

        Pra  (white)
        Prl  (pink)
        Prla (pink)
        Pr9b (pink)
        Fi   (pink)


            12/20/41

REFERENCE A

TO COVER EXPANSION FOR ADDITIONAL FACILITIES
NECESSARY TO MANUFACTURE 6" S.A.P. PROJECTILES
AND 6" A.P. PROJECTILES FOR NAVY.

| ITEM NO. | DESCRIPTION | APPROPRIATION |
|---|---|---|
| 1 | Heat Treating Building 75 ft. x 150 (North of Building 49) | $ 42,490.00 |
| 2 | Crane Runway 75 ft. x 150 ft. between the above and roadway south of mill | 12,000.00 |
| 3 | Lighting | 4,500.00 |
| 4 | Plumbing | 1,000.00 |
| 5 | Water (city) Line | 800.00 |
| 6 | Water (Cooling) Line | |
| 7 | Gas Lines | 800.00 |
| 8 | Oil Lines | 400.00 |
| 9 | Sewer Lines | 400.00 |
| 10 | Air Lines | 800.00 |
| 11 | Roadways | 1,000.00 |
| 14 | 2 – Double Chamber Furnaces (Same as in 1-F Shop) 2 – Controls 2 – Wiring | 38,000.00 |
| 15 | 2 – Single Chamber Furnace (Same as in 1-F Shop 2 – Controls 2 – Wiring | 26,000.00 |
| 16 | 2 – Pumps and Appurtenances 2 – Controls 2 – Wiring | 5,000.00 |
| 17 | Blowers | 1,500.00 |
| 18 | Quench Tanks | 3,000.00 |
| 19 | Quenching Water Supply | 7,000.00 |
| 20 | Drainage | 3,000.00 |

|  | DESCRIPTION | APPROPRIATION |
|---|---|---|
|  | Tramrail | $ 3,000.00 |
|  | 5 - 35 Ft. Car Type Furnaces (As in British Bldg. 99) | 95,000.00 |
|  | 5 - Controls |  |
|  | 5 - Wiring |  |
| 6 | 2 - Base and Hood Type Furnaces | 20,000.00 |
|  | 2 - Controls |  |
|  | 2 - Wiring |  |
| 24 | Foundations | 6,000.00 |
| 25 | Electrical | 3,000.00 |

## MACHINE TOOLS FOR 6"A.P.

| 27 | 1 - 36" Lathe for Rough Turn | 15,000.00 |
|---|---|---|
|  | 1 - Control |  |
|  | 1 - Wiring |  |
| 28 | 1 - 10" Saw for Finish Saw Cut | 1,500.00 |
|  | 1 - Control |  |
|  | 1 - Wiring |  |
| 29 | 2 - 10" Saws to Cut Tests | 3,000.00 |
|  | 2 - Controls |  |
|  | 2 - Wiring |  |
| 30 | 1 - 20" Lathe for Band Groove | 8,000.00 |
|  | 1 - Control |  |
|  | 1 - Wiring |  |
| 31 | 2 - 3A Warner & Swasey Lathes (For Counterbore) | 30,000.00 |
|  | 2 - Controls |  |
|  | 2 - Wiring |  |
| 32 | 1 - 3A Warner & Swasey Lathe (To Turn Inside and Outside of Cap) | 15,000.00 |
|  | 1 - Control |  |
|  | 1 - Wiring |  |
| 33 | 1 - 16" Lathe for Rough Ream | 13,000.00 |
|  | 1 - Control |  |
|  | 1 - Wiring |  |

| DESCRIPTION | APPROPRIATION |
|---|---|

1 – 18" Lathe for Turning Rings on Windshield ... $ 5,500.00
  1 – Control
  1 – Wiring

1 – 20" Lathe – Square Turret for Threading Windshield ... 8,000.00
  1 – Control
  1 – Wiring

1 – 20" Lathe – Tool and Repair Shop ... 5,000.00
  1 – Control
  1 – Wiring

## MACHINE TOOLS FOR 6" S.A.P. SHELLS

37   2 – 30" Lathes for Rough Turn ... 30,000.00
     2 – Controls
     2 – Wiring

38   3 – 16" Lathes for Rough Ream ... 45,000.00
     3 – Controls
     3 – Wiring

39   3 – 16" Lathes for Finish Ream ... 45,000.00
     3 – Controls
     3 – Wiring

40   2 – 10" Saws – Saw Test ... 3,000.00
     2 – Controls
     2 – Wiring

41   3 – 10" Saws to Finish Cut ... 4,500.00
     3 – Controls
     3 – Wiring

42   1 – 16" Lathe – Finish Turn ... 15,000.00
     1 – Control
     1 – Wiring

43   1 – 20" Lathe for Face Base and Radius ... 8,000.00
     1 – Control
     1 – Wiring

44   1 – 20" Lathe for Band Grooving ... 8,000.00
     1 – Control
     1 – Wiring

45   1 – 18" Lathe for Band Turning ... 7,000.00
     1 – Control
     1 – Wiring

| | DESCRIPTION | APPROPRIATION |
|---|---|---|
| | 2 – 18" Lathes to Thread and Fit Windshield<br>2 – Controls<br>2 – Wiring | $ 14,000.00 |
| | 1 – 20" Lathe for Turning Ring<br>1 – Control<br>1 – Wiring | 7,000.00 |
| | 2 – 18" Lathes for Tool Room<br>2 – Controls<br>2 – Wiring | 14,000.00 |
| 49 | 1 – J & L Thread Grinder<br>1 – Control<br>1 – Wiring | 18,000.00 |
| 50 | 1 – West Tire Setter (For Banding)<br>1 – Control<br>1 – Wiring | 5,500.00 |
| 51 | 1 – 16" Lathe (Rough Turn)<br>1 – Control<br>1 – Wiring | 12,000.00 |
| 52 | 1 – 16" Lathe (Finish Turn)<br>1 – Control<br>1 – Wiring | 12,000.00 |
| 53 | 1 – 16" Lathe (Finish Ream)<br>1 – Control<br>1 – Wiring | 12,000.00 |
| 54 | 1 – 18" Engine Lathe (Form Nose)<br>1 – Control<br>1 – Wiring | 5,500.00 |
| 55 | 3 – 10" Marvel Saws (Saw Cut)<br>3 – Control<br>3 – Wiring | 3,600.00 |
| 56 | 1 – 18" Engine Lathe with Square Furret (Band Groove)<br>1 – Control<br>1 – Wiring | 5,500.00 |
| 57 | 1 – Punch Press (Notch Band Groove)<br>1 – Control<br>1 – Wiring | 3,400.00 |

DESCRIPTION                                              APPROPRIATION

      1 - #4 West Tire Setter (Band)              $   5,000.00
      1 - Control
      1 - Wiring

      2 - #3A Warner & Swasey Lathes              24,000.00
          (Counterbore)
      2 - Controls
      2 - Wiring

      1 - "D" Hall Planetary (Thread Base)        12,500.00
      1 - Control
      1 - Wiring

61    1 - 18" Axelson Lathe (Thread Cap)           7,500.00
      1 - Control
      1 - Wiring

62    1 - 18" Axelson Lathe (Blond)               7,500.00
      1 - Control
      1 - Wiring

63    1 - 20" Lathe with band turn attachment
          (Band Turn)
      1 - Control
      1 - Wiring

64    4 - #3A Warner & Swasey Lathes             42,000.00
          (Rough and Finish)
      4 - Controls
      4 - Wiring

65    1 - 2F Fostermatic (Turn Drill and Cap)    14,000.00
      1 - Control
      1 - Wiring

66    1 - #5 J & L Automatic (Face Finish         5,800.00
          Fuse Hole)
      1 - Control
      1 - Wiring

67    1 - Special Reliance Thread Miller          6,500.00
          (Mill Thread)
      1 - Control
      1 - Wiring

68    1 - 18" Engine Lathe (Finish Turn)          5,500.00
      1 - Control
      1 - Wiring

69    1 - 18" Engine Lathe (Finish Chase          5,500.00
          Thread)
      1 - Control
      1 - Wiring

| | DESCRIPTION | APPROPRIATION |
|---|---|---|
| | 1 - 16" Shaper<br>1 - Control<br>1 - Wiring | $  2,600.00 |
| | 1 - 24" Shaper<br>1 - Control<br>1 - Wiring | 4,000.00 |
| | 2 - 16" Engine Lathes<br>2 - Controls<br>2 - Wiring | 9,000.00 |
| 73 | 2 - Norton Surface Grinders<br>2 - Controls<br>2 - Wiring | 5,000.00 |
| 74 | 2 - 1-1/2" Drill Presses<br>2 - Controls<br>2 - Wiring | 1,400.00 |
| 75 | 1 - #2 Plain Miller<br>1 - Control<br>1 - Wiring | 8,000.00 |
| 76 | 2 - Hammond Grinders<br>2 - Controls<br>2 - Wiring | 1,600.00 |
| 77 | 3 - 18" Marvel Saws<br>3 - Controls<br>3 - Wiring | 13,500.00 |
| 78 | 9 - J & L Thread Grinders<br>9 - Controls<br>9 - Wiring | 117,000.00 |
| 80 | 1 - 40' Span (approx.) 15-Ton Crane)<br>    (New 6" Heat Treat. Bldg. 118) ) | |
| 81 | 1 - 40' Span (approx.) 5-Ton Crane )<br>    (New 6" Heat Treat. Bldg. 118) ) | |
| 82 | 1 - 75 ft. Span - 10-Ton Crane )<br>    (New Billet Yard) ) | |
| 83 | 1 - 22'2" Span - 5-Ton Crane )<br>    (Ord. mach. Shop - 1B) ) | 67,000.00 |
| 84 | 1 - 22'2" Span - 5-Ton Crane )<br>    (Ord. Mach. Shop - 1B) ) | |
| 85 | 1 - 22'2" Span - 5-Ton Crane )<br>    (Ord. Mach. Shop - 2B ) | |
| 86 | 1 - 36'11" Span - 5-Ton Crane ) | |

| DESCRIPTION | APPROPRIATION |
|---|---|
| Miscellaneous Tools | $ 10,000.00 |
| Changes to erect Equipment | 35,000.00 |

<u>ITEMIZED</u>

| | |
|---|---|
| 10% Building Contingencies | 5,000.00 |
| Freight | 5,000.00 |
| Installation | 40,000.00 |
| Contingencies | 10,000.00 |
| "        – Crane Runway | 2,000.00 |
| Conveyors, Tractors, etc. | 42,250.00 |
| Auxiliary Freight and Erection | 38,200.00 |
| Contingencies – Machine Tools | 30,000.00 |
| TOTAL | $1,252,540.00 |



DEC 24 1941

Dear Admiral Blandy:

Subject: Crucible Steel Company of America, Harrison,
New Jersey, Expansion of Plant Facilities.

The expenditure of approximately $1,252,540
for the expansion of plant facilities of the Crucible
Steel Company of America at Harrison, New Jersey for
the production of 6" and 8" A. P. Projectiles has been
cleared by the Plant Site Board of the Office of Pro-
duction Management.

In approving this proposal, the Plant Site
Board does not pass on the strategic factors involved
in locating this expansion in New Jersey.

The Division of Contract Distribution has no
comments on this proposal.

Sincerely yours,

Douglas C. MacKeachie
Douglas C. MacKeachie
Chairman
Plant Site Board

CC/ Dr. Glenn E. McLaughlin

Admiral W. H. P. Blandy
Chief, Bureau of Ordnance
Navy Department
Washington, D. C.

December 26, 1941.

Comments on proposed expansion of plant facilities of the Crucible
Steel Company of America, at Harrison, N.J.


1. Proposal:  To expand plant facilities for the manufacture of 6" and
8" armor piercing projectiles, at a total capacity if of 5,800 per month.
                                      to attain a

2. Requirements:
     A. Labor: Semi-skilled: 640; Unskilled: 160; Total : 800.
     B. Power: 1,865 K.W.
     C. Fuel Oil: 15,000 gallons per week.
     D. Cost: $1,252,540.


3. Defense Activity: in northern New Jersey:
     Supply contracts thru October 31, 1941: $1,096,716,000
     Plant expansion contracts thru Sept. 30, 1941: $130,134,361.


4. Remarks:

     According to the Bureau of Employment Security, the Norther New
Jersey area has an adequate supply of labor, although there are shortages
in some skilled occupations. This expansion will not be affected by
these shortages, since its requirements are for semi-skilled and unskilled
workers.

     Power in this area is will be very tight for 1942. According to present
estimates of the Federal Power Commission, there will be a shortage of
258,025 K.W. by the end of the year. Encroachment on the system's
reserves of 276,700 K.W. will be necessary. The outlook for 1943 is
considerably better. There is additional capacity shheduled for that
year which will reduce the shortage to 72,725 K.W.


5. Recommendations:

     The proposed expansion will not comprise an independent operating
unit, but will be integrated into the existing operation.
Existing building space, machinery and equipment will to some extent be
utilized. It is recommended that this proposal be approved.

L24 (4818)
(Prlb)

NAVY DEPARTMENT
BUREAU OF ORDNANCE
Washington, D.C.                    #73

DEC 29 1941

Subject:        Expansion of Plants – Commercial

Enclosure:      (A) List of machine tools and equipment for
(Herewith)          proposed expansion.

Sirs:

                The proposed expansion is submitted for clearance.

Contractor:     Crucible Steel Company of America

Product:        14" – 1,000 lb. A.P. Bombs.

Location:       Harrison, New Jersey

                The details of the proposed expansion to provide
for additional facilities to increase the production rate of 14"
1,000 lb. A. P. Bombs are outlined as follows:

Amount:         Machinery and equipment – – – – $1,649,700.00
                (See Enclosure (A) for itemized list.)

Labor:          Approximately 350 men will be required.

                        Semi-skilled – – 80% – – 280
                        Unskilled – – – 20% – – 70
                                    Total       350

Power:          Approximately 2,500 H.P. will be the power re-
                quired. Public Service Electric Company will fur-
                nish the requirements.

Subcontracting: Due to the urgency of the demands for 14" – 1,000 lb
                A.P. Bombs it has become necessary to expand this
                company's facilities to increase the production
                rate. The Contractor is now producing this item at
                the rate of 500 per month and by this proposed ex-
                pansion will be able to increase his production
                rate by an additional 500 bombs per month – – a
                total of 1,000 – 14" 1,000 lb. A.P. bombs per month.

                There are only two other sources for this type of
                bomb at the present – Bethlehem Steel Company and
                The Midvale Company. The special equipment in-
                volved in the manufacturing of these bombs and the
                experience necessary to produce satisfactory pro-
                ducts renders subcontracting impossible.

Remarks:        Prior to the present proposal the forging facilities
                of the Crucible Steel Company has been expanded in
                the amount of $6,579,971.20. The contemplated ad-
                ditional expenditure will increase the total to
                $9,482,211.20 and provide an urgently needed source
                for the production of 14" – 1,000 lb. A.P. bombs.

cc: McLaughlin
    Waring
    Oak          12/5/41
    McKelvey
    Haines

.................ely 8,500 square feet of floor space will be provided by this expansion.

The Public Service Gas Company will supply additional gas to total 1,400,000 cubic feet per 24 hour day for the manufacturing of 14" A.P. 1,000 lb. bombs, and the Sun Oil Company will supply the additional fuel oil to total 10,000 gallons every 24 hours.

An adequate water supply is available. The water requirements will be furnished by the North Jersey Water Company, well water from driven wells, and water from the Passaic River, which is adjacent to the Contractor's plant.

No difficulty is anticipated in housing facilities. Local labor will be used.

The facilities and railway sidings are adequate for raw materials coming in and outgoing shipments. Some incoming materials will be delivered by truck.

With the exception of some scrap from local manufacturers and copper from brass industries in the Connecticut Valley, the major raw material, steel, will be obtained from the Contractor's own company.

The increasing demands for this type of bomb had necessitated expansion of facilities in the few companies equipped to manufacture this item in order that the rate of supply may be correspondingly increased at an early date.

                              Very truly yours,

                              W. H. P. BLANDY
                              Rear Admiral, U.S.N.
                              Chief of the Bureau of Ordnance

                              A.G. NOBLE
                              Commander, U.S.N.
                              By direction

Approved:

            Plant Site Committee
            Office of Production Management

The Director General,
Office of Production Management
(Plant Site Committee)
Social Security Building
Washington, D. C.
Attention: Mr. D. C. MacKeachie, Chairman

LAW/gal

# EXPANSION OF FACILITIES FOR THE MANUFACTURE OF
## 14" A.P. BOMBS

| Item No. | Description | Estimated Cost Sub-Total | Total |
|---|---|---|---|
| Machine Tools: | | | |
| 1. | 4 — 36" x 96" Engine Lathes | $ 64,000.00 | |
| 2. | 4 — 18" Marvel Saws | 17,200.00 | |
| 3. | 3 — 42" LeBlond Boring Lathes | 96,000.00 | |
| 4. | 2 — 27" x 120" Lodge & Shipley | 17,000.00 | |
| 5. | 4 — 24" x 88" Fay Automatic Lathes | 128,000.00 | |
| 6. | 7 — 32" x 96" Engine Lathes | 105,000.00 | |
| 7. | 2 — Hammond Grinders | 1,600.00 | |
| 8. | 1 — 42" x 18' Engine Lathe | 21,000.00 | |
| 9. | 1 — 30" x 12' Engine Lathe | 14,000.00 | |
| 10. | 2 — 14" Peerless Saws | 4,600.00 | |
| 11. | 1 — 16" Reliance Lathe | 12,000.00 | |
| 12. | 3 — 4A Warner & Swasey Turret Lathes | 45,000.00 | |
| 13. | 6 — 2-A Warner & Swasey Turret Lathes | 60,000.00 | |
| 14. | 1 — 1-1/2" Drill Press | 750.00 | |
| 15. | 1 — Surface Grinder (Pratt & Whitney) | 3,200.00 | |
| 16. | 1 — Sellers Tool Grinder | 4,500.00 | |
| 17. | 1 — 24" Shaper | 5,000.00 | |

- 1 -

| No. | Description | Sub-Total | Total |
|-----|-------------|-----------|-------|
| 18. | 1 – 30" Shaper | $ 7,000.00 | |
| 19. | 1 – 36" Radial Drill Press | 4,000.00 | |
| 20. | 2 – 36" Drill Presses | 3,600.00 | |
| 21. | 2 – 24" Drill Presses | 3,000.00 | |
| 22. | 2 – 18" x 12 Engine Lathes | 12,000.00 | |
| 23. | 2 – 24" x 12 Engine Lathes | 20,000.00 | |
| 24. | 1 – No. 2 B&S Milling Machine | 8,000.00 | |
| 25. | 1 – No. 3 B&S Milling Machine | 10,000.00 | |
| 26. | 1 – 10" Marvel Saw | 1,300.00 | |
| 27. | 1 – Hammond 2 Wheel Grinder | 800.00 | |
| 28. | 1 – 10-Ton Capacity Arbor Press | 500.00 | |
| 29. | 1 – Hardening Furnace | 1,000.00 | |
| 30. | 3 – Clark Trucktractors | 9,600.00 | |
| 31. | 24 – Platform Skids | 600.00 | |
| 32. | 2 – 16" x 2' Engine Lathes | 9,000.00 | |
| 33. | 1 – No. 3 Surface Grinder | 4,500.00 | |
| 34. | 2 – 16" Shapers | 7,000.00 | |
| 35. | 2 – 9" Marvel Saws | 2,600.00 | |
| 36. | 1 – 32" Shaper | 6,500.00 | |
| 37. | 1 – Hammond Grinder | 800.00 | |
| 38. | 1 – 10" Peerless Saw | 1,300.00 | |
| 39. | 2 – 18" x 12" Engine Lathes | 12,000.00 | |
| 40. | Jigs and Fixtures | 30,000.00 | $753,950.00 |

– 2 –

| Item No. | Description | Estimated Cost Sub-Total | Total |
|---|---|---|---|
| 41. | Buildings (with approximately 35,000 sq. ft. of floor space.) | | $210,000.00 |
| 42. | 2 - 15-Ton Cranes | | 33,000.00 |
| 43. | 1 - 10-Ton Crane | | 14,000.00 |
| 44. | 3 - 5-Ton Cranes | | 24,000.00 |
| 45. | Annealing Furnaces, Heat Treating Furnaces, Lead Pots, Tanks and Accessories | | 284,000.00 |
| 46. | Track Changes | | 10,000.00 |
| 47. | Transportation Equipment | | 15,000.00 |
| 48. | Electrical Equipment, such as Transformers, Feeders, Switch Gear, Switch Boards, etc. | | 93,250.00 |
| 49. | Freight and Erection | | 62,500.00 |
| 50. | Allowance for Contingencies | | 150,000.00 |
| | TOTAL SCHEDULE II | | $1,649,700.00 |

- 3 -

L24 (4868)
(Prla)

#104

NAVY DEPARTMENT
BUREAU OF ORDNANCE
Washington, D. C.

JAN 5 - 1942

Subject:                Expansion of Plants - Commercial

Enclosure:              (A) List of machine tools and equipment for
(Herewith)                  proposed expansion.

Sirs:

                        The proposed expansion is submitted for clearance.

Contractor:             Crucible Steel Company of America

Product:                40 mm. Anti-aircraft Gun Barrels.

Location:               Harrison, New Jersey.

                        The details of the proposed expansion to provide
for facilities in the Contractor's plant to enable it to manufacture
40 mm. gun barrels are outlined as follows:

Amount:                 Machine tools - - - - - - - $233,750.00
                        Magnet Building - - - - -    50,000.00
                        Office Building - - - - -    75,000.00

                                Total - - - $358,750.00

Labor:                  Approximately 60 additional men will be required
                        by this expansion and divided into classifications
                        as follows:

                                Semi-skilled - - - 80% - - 48
                                Unskilled - - - - 20% - - 12
                                Total - - - - - - - - 60

Power:                  An increase of 100 H.P. will result, and this
                        requirement will be furnished by the Public
                        Service Electric Company.

Subcontracting:         The forging and heat treating of 40 mm. gun bar-
                        rels is of such a nature that special equipment
                        is necessary. The experience of the Contractor
                        in the handling of forging and heat treating
                        operations will be further utilized by this ex-
                        pansion, and the Contractor will produce forgings
                        and rough machined gun barrels which will be
                        finished as completed units by Chrysler Corporation

                        Subcontracting for these forging and heat treating
                        operations is not practicable.

Remarks:                The urgent demands for 40 mm. guns have necessita-
                        ted expansion of available sources of supply and
                        the opening of new sources in order that the pro-
                        duction rate be increased to provide sufficient
                        quantities for the War Program. The deliveries

on this type of anti-aircraft gun are far behind
the needs, and it is essential that facilities to
provide for this item be increased.

This proposed expansion in the amount of $358,750
will enable the Contractor to manufacture 250
forgings for 40 mm. Bofor gun barrles per month
which will implement the manufacture of completed
guns with Chrysler Corporation.

Approximately 41,000 square feet of floor space
will be provided in this expansion.  The Magnet
Building will provide for 30,000 square feet and
the Office Building for 11,000 square feet.

Additional gas requirements will be 200,000
cubic feet every 24 hours and will be furnished
by the Public Service Gas Company.  Commercial
fuel oil in the amount of 4,000 gallons every
24 hours will be needed and furnished by the Sun
Oil Company.

An adequate supply of water is available.  The
North Jersey Water Company, well water from driven
wells, and water from the Passaic River which is
adjacent to the Contractor's plant will furnish
all the requirements.

There is no anticipated difficulty in providing
housing facilities for the labor requirements.

Raw materials, with the exception of some scrap
which will be delivered by truck, will be delivered
by rail.  Adequate facilities for unloading and
loading by cranes and railway sidings are available.

The major source of raw material, steel, will
be supplied by the Contractor's own plant, with
some scrap furnished by local manufacturers.

This proposed expansion will increase the production

rate of Bofor guns for which there is an ur-
gent demand and help provide for the needs of
the War Program.

Very truly yours,

W. H. P. BLANDY
Rear Admiral, U.S.N.
Chief of the Bureau of Ordnance

A. G. NOBLE
Commander, U.S.N.
By direction

Approved:

Plant Site Committee
Office of Production Management

Director General,
Office of Production Management
(Plant Site Committee)
Social Security Building
Washington, D. C.
Attention:  Mr. D. C. MacKeachie, Chairman

LAW/gal

Copy to:

Pr5d  (Pink)
Pr3   (Pink)
F1    (Pink)

1/5/42

rate of Bofor guns for which there is an ur-
gent demand and help provide for the needs of
the War Program.

                    Very truly yours,

                    W. H. P. BLANDY
                    Rear Admiral, U.S.N.
              Chief of the Bureau of Ordnance


                    A. G. NOBLE
                    Commander, U.S.N.
                    By direction

Approved:

          Plant Site Committee
          Office of Production Management

Director General,
Office of Production Management
(Plant Site Committee)
Social Security Building
Washington, D. C.
Attention:  Mr. D. C. MacKeachie, Chairman

LAW/gal


    Copy to:

        Pr5d (Pink)
        Pr3  (Pink)
        F1   (Pink)


                    1/5/42

Crucible Steel Company

lities for 40 mm. guns for Chrysler Corp.

## SCHEDULE K

| Description | Estimated Cost |
|---|---|

### Shop Building

| | |
|---|---|
| nges to present Hammer Shop Bldg. | $ 5,000.00 |
| Furnace for Hammer | 6,000.00 |
| Auxiliary furnace and auxiliaries for hot ingots | 15,000.00 |
| 2 - 18" Marvel Saws | 10,000.00 |
| 1 - 16" x 2 ft. Test Lathe | 5,100.00 |
| 1 - 8" x 132" Lo Swing Lathe | 20,000.00 |
| 1 - #2 Universal Miller | 10,000.00 |
| 6 - 1/2 ton Hoists | 4,000.00 |
| 1 - Tool Grinder | 1,000.00 |
| 1 - 20 ft. Vertical Quenching Furnace | 20,000.00 |
| 1 - Oil Quenching Tank and Cooling Unit | 3,700.00 |
| 1 - Water Quenching Tank and Cooling Unit | 3,700.00 |
| Concrete pit for furnace and tanks | 15,000.00 |
| 1 - Horizontal Car-type Furnace | 18,000.00 |
| 1 - Stabilizing Furnace (hood type) | 16,000.00 |
| 1 - Draw Furnace | 15,000.00 |
| Transportation and Ingot Facilities | 15,000.00 |
| Freight and erection | 30,000.00 |
| Allowance for Contingencies | 21,250.00 |
| Subtotal | $233,750.00 |

### Magnet Building

| | | |
|---|---|---|
| Demolition | $ 3,000.00 | |
| Floors | 7,000.00 | |
| Interior Walls | 18,000.00 | |
| Sash | 2,000.00 | |
| Settling Tanks | 2,000.00 | 32,000.00 |
| Increase in wages on this project | | 10,000.00 |
| Increase in labor cost for installation of air line | | 2,000.00 |
| Increase in labor cost for installation of sewer, water and electricity | | 6,000.00 |
| Subtotal | | $50,000.00 |

## SCHEDULE K

| Description | Estimated Cost |
|---|---|
| **Office Building** | |
| Two-story building to be erected to the north of the Contractor's office building | $ 75,000.00 |
| Subtotal | $ 75,000.00 |
| GRAND TOTAL | $358,750.00 |

JAN 7   1942

MEMORANDUM FOR:   CHIEF OF THE BUREAU OF ORDNANCE
                  Navy Department

         SUBJECT:  Expansion of Plant Facilities of
                   the Crucible Steel Company of
                   America at Harrison, New Jersey.

         The expenditure of approximately $358,750 for

machine tools, magnet building and office building

required by the Crucible Steel Company of America at

Harrison, New Jersey for the production of 40 mm.

anti-aircraft gun barrels has been cleared by the

Plant Site Board of the Office of Production Manage-

ment.

         In approving this proposal, the Board does not

pass upon the strategic factors involved in locating

this expansion in New Jersey.

         The Division of Contract Distribution has no

comments on this proposal.

                         Douglas C. MacKeachie

                         DOUGLAS C. MacKEACHIE
                         Chairman, Plant Site Board

CC/   Dr. McLaughlin

## EXECUTIVE OFFICE OF THE PRESIDENT

### NATIONAL RESOURCES PLANNING BOARD

#### WASHINGTON, D. C.

January 12, 1942

MEMORANDUM for Mr. Martin

From:     Glenn E. McLaughlin

Subject:     Expansion of Plant Facilities of the Crucible Steel
Company of America at Harrison, New Jersey

1. <u>Proposal</u>:  To expend approximately $358,750 for machine tools,

   magnet building and office building required by the Crucible

   Steel Company of America at Harrison, New Jersey for the pro-

   duction of 40 mm. anti-aircraft gun barrels.

2. <u>Recommendation</u>:  Approval recommended.

Glenn E. McLaughlin

Glenn E. McLaughlin, Chief
Industrial Location Section

EXECUTIVE OFFICE OF THE PRESIDENT
NATIONAL RESOURCES PLANNING BOARD

February 3, 1942

MEMORANDUM for Mr. Edwin Martin, Member, Plant Site Board,
War Production Board

Subject:   Expansion of Plant Facilities of the Crucible
Steel Company of America at Harrison, New Jersey

1. **Proposal:**  To expend approximately $796,900 for machine

tools, equipment, etc., required by the Crucible Steel

Company of America at Harrison, New Jersey for the pro-

duction of 5" Common Projectiles.

2. **Recommendation:**  Approval recommended.

                                        Glenn E. McLaughlin, Chief
                                        Industrial Location Section


cc:  Cmmdr. Krick

                         DOUGLAS C. MacKEACHIE
                         Chairman, Plant Site Board


CC/ Dr. McLaughlin

#217

L24(4818)
(Prla)

NAVY DEPARTMENT
BUREAU OF ORDNANCE
Washington, D.C.


FEB 9 - 1947

Subject:        Expansion of Plant – Commercial

Enclosure:      (A) List of machine tools and facilities for
(Herewith)          proposed expansion.

Sirs:

                The proposed expansion of facilities is submitted
for clearance.

Contractor:     Crucible Steel Company of America

Product:        5" Common Projectiles.

Location:       Harrison, New Jersey

                The details of the proposed expansion to provide
for additional facilities in the Contractor's plant to enable it
to manufacture 5" common projectiles are outlined as follows:

Amount:         Machine tools, forging equipment, facilities
                and contingencies – – – – – – – – $796,900.00
                    (See Enclosure (A) for itemized list)

Labor:          The labor requirements will be as follows:

                    Skilled        10%    20    Male
                    Semi-skilled   70%   140     "
                    Unskilled      20%    40     "
                        Total            200

Power:          Approximately 375 H.P. demand load will be re-
                quired by this expansion.  The Public Service
                Corporation of New Jersey will supply the power
                requirements.

Subcontracting: The work involved in the manufacture of these
                projectiles is of such a nature that subcon-
                tracting is not practicable.  Only the small
                additional parts of these projectiles can be
                subcontracted.

Remarks:        The demand for 5" projectiles has necessitated
                expansion of facilities in order that the pro-
                duction capacity be increased to provide for
                the necessary procurement rate.  In so much as
                the 5"/38 cal. common projectiles have not been
                manufactured since 1939 and the 5"/51 cal. common
                projectile is a new projectile which has not
                previously been manufactured, it is necessary to
                expand production facilities in order to supply

                            2/9/42

the desired capacity for these projectiles.

The Contractor at one time had complete facilities for manufacturing 5" common projectiles. However, some of the machinery of this production line has since been removed and placed in production lines of different size projectiles. Therefore, it is necessary to provide for additional facilities, in the amount of $796,900, in order that the Contractor can utilize his remaining equipment in the production of 5" common projectiles. This expansion will enable the Contractor to produce 15,000 projectiles per month. In view of the fact that the Contractor has had previous experience in the manufacture of these projectiles, this expansion will enable him to supply an additional capacity of these projectiles in the shortest possible time.

No additional floor space will be necessary. Sufficient space is available in the Contractor's plant.

The Sun Oil Company will supply the additional fuel oil needed by the heat treating equipment. The Public Service Corporation of New Jersey will supply any additional gas requirements.

Adequate facilities to handle any increase in water requirements are available. River water from the Passaic River, well water from driven wells and water from the city of East Newark is available.

The transportation facilities are adequate to handle any increase in the requirements resulting from this expansion.

Some of the Company's present employees and local labor will be used. No housing difficulties are anticipated.

The Contractor will obtain steel, as raw materials, from his own Company and copper from American Brass Company, Revere Copper & Brass Company and other brass manufacturers.

L24(=625)
(Frla)

This proposed expansion will provide for an
additional capacity of 5" common projectiles
that will help provide for requirements of the
War Program.

Very truly yours,

W. H. P. BLANDY
Rear Admiral, U.S.N.
Chief of the Bureau of Ordnance

H. D. KRICK
Commander, U.S.N.
By direction

Approved:

Plant Site Board
War Production Board

Mr. D. C. MacKeachie, Chairman
Plant Site Board
War Production Board
Social Security Building
Washington, D. C.

LAW/bh

BODY

| Item No. | DESCRIPTION | No. Rec'd | Cost Mach. | Total Cost |
|---|---|---|---|---|
| 1. | 18" Automatic Lathe | 8 | $15,000.00 | $120,000.00 |
| 2. | 3A Warner & Swasey | 2 | 12,000.00 | 24,000.00 |
| 3. | Hepburn | 2 | 8,000.00 | 16,000.00 |
| 4. | Punch Press | 1 | 3,500.00 | 3,500.00 |
| 5. | #3 Cinn.Centerless Grinder | 2 | 10,000.00 | 20,000.00 |
| 6. | 3A W & S Turret Lathe | 3 | 15,000.00 | 45,000.00 |
| 7. | Hall Planetary Type B | 2 | 13,000.00 | 26,000.00 |
| 8. | 18" Engine Lathe | 7 | 5,500.00 | 38,500.00 |
| 9. | #2 Plain Miller | 1 | 8,000.00 | 8,000.00 |
| 10. | Special Reliance | 2 | 12,000.00 | 24,000.00 |
| 11. | Toledo Scale | 2 | 300.00 | 600.00 |
| 12. | Racks & Benches | 10 | | 5,000.00 |

WINDSHIELD

| | | | | |
|---|---|---|---|---|
| 1. | 18" Engine Lathe | 4 | 5,500.00 | 22,000.00 |
| 2. | 1A Warner & Swasey | 2 | 8,000.00 | 16,000.00 |
| 3. | Arbor Press | 1 | 500.00 | 500.00 |
| 4. | Polisher | 1 | 500.00 | 500.00 |
| 5. | Heating Units & Tanks | 1 | 300.00 | 300.00 |

TOOL ROOM

| | | No. Req. | | |
|---|---|---|---|---|
| 1. | 18" Engine Lathe | 3 | 15,000.00 | 45,000.00 |
| 2. | #2 Milling Machine | 1 | 8,000.00 | 8,000.00 |
| 3. | #3 Universal Milling Machine | 1 | 10,000.00 | 10,000.00 |
| 4. | 16" Shaper | 1 | 2,600.00 | 2,600.00 |

# 5" COMMON PROJECTILES
(continued)

| Item No. | DESCRIPTION | No. Req. | Cost Each | Total Cost |
|---|---|---|---|---|
| 5. | 24" Shaper | 2 | ¢ 4,000.00 | ¢ 8,000.00 |
| 6. | Bench Lathe | 1 | 3,000.00 | 3,000.00 |
| 7. | Sellers Tool Grinder | 1 | 4,500.00 | 4,500.00 |
| 8. | Universal Tool Grinder | 1 | 3,200.00 | 3,200.00 |
| 9. | Cincinnati Tool Grinder | 1 | 4,200.00 | 4,200.00 |
| 10. | Hammond Grinders | 2 | 800.00 | 1,600.00 |
| 11. | 1" Drill Press | 1 | 2,500.00 | 2,500.00 |
| 12. | Bench Drill Press | 1 | 1,000.00 | 1,000.00 |
| 13. | Marvel Saw 9" | 2 | 1,400.00 | 2,800.00 |
| 14. | P&W Morey Slotter 12" | 1 | 7,500.00 | 7,500.00 |
| 15. | #70 Heald Grinder | 1 | 7,500.00 | 7,500.00 |

TOTAL FOR MACHINE
TOOLS — ¢501,300.00

| | | | | |
|---|---|---|---|---|
| 1. | Freight | | | 6,500.00 |
| 2. | Rotary Heat Treating Furnace with quenching equipment | 1 | 35,000.00 | 35,000.00 |
| 3. | Rotary Forging Furnace | 1 | 35,000.00 | 35,000.00 |
| 4. | Flame Cutting Equipment with auxiliaries | 1 | 12,600.00 | 12,600.00 |
| 5. | — 500 Ton Hydraulic Presses | 2 | 35,000.00 | 70,000.00 |
| 6. | Installation of the 500 Ton Hydraulic Press (Foundations, piping & valves) | — | ---- | 25,000.00 |
| 7. | Transportation Equipment, Chip Handling | — | ---- | 12,000.00 |

5" COMMON PRODUCTS
(continued)

| Item No. | DESCRIPTION | No. Req. | Cost Each | Total Cost |
|---|---|---|---|---|
| 8. | Erection & Installation 59 Machines at ¢500.00 | | | ¢29,500.00 |
| 9. | Contingencies 10% | | | 70,000.00 |
| | | | TOTAL | ¢796,900.00 |

Plant Site #217

**WAR PRODUCTION BOARD**

**WASHINGTON, D. C.**

FEB 9 – 1942

Subject:    Expansion of Plant – Commercial

            List of machine tools and facilities for
            proposed expansion.

                              **February 10, 1942**

The proposed expansion of facilities is submitted
for clearance.

Contractor:    Crucible Steel Company of America

Product:       5" Common Projectiles.

Location:      Harrison, New Jersey

          MEMORANDUM FOR: CHIEF OF THE BUREAU OF ORDNANCE
                          NAVY DEPARTMENT

          SUBJECT: Expansion of Plant Facilities of the
                   Crucible Steel Company of America at
                   Harrison, New Jersey.  - - $796,900.00
                   (See Enclosure (A) for itemized list)

Amount:

          The Plant Site Board approves your proposal to

          expend approximately $796,900 for machine tools, equip-

          ment, etc., required by the Crucible Steel Company of

          America at Harrison, New Jersey for the production of

          5" Common Projectiles.

Power:    Approximately 375 H.P. demand load will be re-
          quired. The Public Service
          Corporation of New Jersey will supply the power
          requirements.

Subcontracting:  The work involved in the manufacture of these
          projectiles is of such a nature that subcon-
          tracting is not practicable. Some small
          additional parts of these projectiles can be
          subcontracted.

                          Douglas C. MacKeachie
                          DOUGLAS C. MacKEACHIE
                          Chairman, Plant Site Board

Remarks:  The demand for 5" projectiles has necessitated
          expansion of facilities in order that the pro-
          duction capacity be increased to provide for
          the necessary procurement rate. In so much as
          the 5"/38 cal. common projectiles have not been
          manufactured since 1939 and the 5"/51 cal. common
          projectile is a new projectile which has not
CC/ Dr. McLaughlin been manufactured, it is necessary to
          expand production facilities in order to supply

                          2/9/42

L24143(d)
(Prla)

NAVY DEPARTMENT
BUREAU OF ORDNANCE
Washington, D.C.

MAR 22 1942

Subject:     Expansion of Plants – Commercial

Enclosure:   (A) List of machine tools and facilities for
(Herewith)       proposed expansion.

Sirs:

The proposed expansion is submitted for clearance.

Contractor:   Crucible Steel Company of America

Product:      14" 1600-lb Bombs

Location:     Atha Works
              Harrison, New Jersey

The details of the proposed expansion to provide
for additional facilities to enable the Contractor's plant to in-
crease the production rate of 14" 1600-lb bombs are outlined as
follows:

Amount:       Machine tools, facilities
              & contingencies . . . . . . . . .$164,450
              Annealing furnaces, buildings,
              equipment & contingencies . . . . 189,200
                                  Total     $353,650
              (See Enclosure (A) for itemized list)

Labor:        The additional labor required by this expansion
              will be as follows:
                      Skilled . . . . . . . 110 Male
                      Unskilled . . . . . . 50    "
                          Total        160    "

Power:        An additional demand load of approximately 1000 HP
              will be required.  Source of supply: Public Service
              Corporation of New Jersey.

Subcontracting:  The nature of the work involved in the manufacture
                 of these bombs is such that subcontracting is not
                 practicable.  The forging and heat treating
                 operations require special equipment and consider-
                 able experience.  Approximately 8 percent of the
                 parts required for the bombs will be subcontracted.

LDW-2510
(Pris)

Page 46

Remarks:

An additional manufacturing capacity for 14" 1600-lb bombs is urgently needed in order to provide for the present and future bomb program.  The Midvale Company, the Bethlehem Steel Company and Crucible Steel Company are the only sources of supply for this item.  Additional expansions for increasing forging and rough machining capacities are being negotiated with all three companies to obtain a greater capacity of forgings for bombs.

Attention is directed to a previous Plant Site Clearance in the amount of $1,649,700, approved 2 January 1942, which provided for machinery and equipment to enable the Contractor to increase his production rate of A.P. bombs.  This expansion in the amount of $353,650, and for which clearance is herein requested, will provide for additional facilities to enable the Contractor to increase his ingot and machining capacity by 300 bombs per month.  The total capacity of the Contractor's plant for 14" 1600-lb bombs will then be 1800 per month.

Approximately 6,000 square feet of additional manufacturing space will be constructed, and approximately 2,000 square feet of space will be utilized in old buildings.

Additional fuel requirements for this expansion will be approximately 20,000 gallons of oil per month – obtained from Sun Oil Company – and approximately 2,000 cubic feet of gas per month – obtained from Public Service Corporation of New Jersey.

Ample transportation facilities are available.

No housing difficulties are anticipated as the result of this increase in labor requirements. Local facilities and facilities  in  nearby communities are believed available.

A Government-ownership type of contract will be used to finance this expansion.

This expansion will provide for an additional
capacity of bombs which are urgently needed
by the Navy in the present War.

Very truly yours,

W. H. P. BLANDY
Rear Admiral, U.S.N.
Chief of the Bureau of Ordnance

H. D. Krick
Commander, U.S.N.
By direction

Approved:

Plant Site Board
War Production Board

Mr. D. C. MacKeachie, Chairman
Plant Site Board
War Production Board
Social Security Building
Washington, D. C.

LAW/gai

Copy to:
    Pr3
    Pr9
    F1

3/22/42

CRUCIBLE STEEL COMPANY OF AMERICA
Atha Works
Harrison, New Jersey

ADDITIONAL MACHINE TOOLS AND FACILITIES TO MANUFACTURE
60 - 14" 1600 LB. BOMBS PER DAY

| Item No. | Description | Price Each | Total Price |
|---|---|---|---|
| 1. | 2 - 32" x 12' Center Lathes | $15,500.00 | $31,000.00 |
| 2. | 1 - 32" x 96" Lathe | 14,500.00 | 14,500.00 |
| 3. | 2 - Radial Drills 4' Arm | 5,000.00 | 10,000.00 |
| 4. | 1 - 2A Warner & Swasey | 10,000.00 | 10,000.00 |
| 5. | 1 - 1A Warner & Swasey | 8,000.00 | 8,000.00 |
| 6. | 1 - Centering Machine | 7,000.00 | 7,000.00 |
| 7. | 1 - 32" x 10' Lathe | 15,000.00 | 15,000.00 |
| 8. | 1 - 24" Shaper | 6,000.00 | 6,000.00 |
| 9. | 1 - 6' Radial Drill for Forge Tools | 8,000.00 | 8,000.00 |
| 10. | 2 - 42" x 96" Lathes | 16,500.00 | 33,000.00 |
| 11. | Installation and Freight | | 7,000.00 |
| | | | $149,500.00 |
| 12. | Hoists, Scales, Contingencies, etc. 10% | | 14,950.00 |
| | TOTAL | | $164,450.00 |

CRUCIBLE STEEL COMPANY OF AMERICA
Harrison, New Jersey

FACILITIES FOR THE INSTALLATION OF
8 ADDITIONAL ANNEALING FURNACES AND BUILDINGS
NECESSARY TO INCREASE THE PRODUCTION RATE OF
14" 1600 lb. BOMB FROM 1600 TO 1800 BOMBS PER MONTH

| Item No. | Description | Cost |
|---|---|---|
| 1. | 8 – Base and Hood Type Furnaces | $120,000.00 |
| 2. | Building 50' x 120' | 40,000.00 |
| 3. | 1 – 15 ton Crane, 47 foot span | 12,000.00 |
| | | $172,000.00 |
| 4. | Site clearance and Contingencies, 10% | 17,200.00 |
| | TOTAL | $189,200.00 |

## SUMMARY

| | |
|---|---|
| Additional Machine Tools and Facilities to Manufacture 60 14" 1600 Lb. Bombs Per Day | $164,450.00 |
| Facilities for the Installation of 8 Additional Annealing Furnaces and Buildings Necessary to Increase the Production Rate of 14" 1600 lb. Bombs from 1600 to 1800 Bombs Per Month | 189,200.00 |
| GRAND TOTAL | $353,650.00 |

#368

C
O
P
Y

March 24, 1943

MEMORANDUM FOR:  CHIEF OF THE BUREAU OF ORDNANCE
                NAVY DEPARTMENT

        SUBJECT:  Expansion of facilities of the Crucible
                  Steel Company of America, Harrison, New
                  Jersey

        The Plant Site Board has approved your proposal

to provide additional facilities at Harrison, New Jersey

for the production of 14" 1600-lb. bombs, by the Crucible

Steel Company of America.

        This project involves an expenditure of approxi-

mately $353,650 for buildings, machine tools and equipment.

                        DOUGLAS C. MacKEACHIE
                        Chairman, Plant Site Board

CC: Dr. McLaughlin

# Exhibit 78


United States
Environmental Protection
Agency

https://19january2017snapshot.epa.gov/www3/region9/pcbs/faq.html

**Pacific Southwest, Region 9**
Serving: Arizona, California, Hawaii, Nevada, Pacific Islands, Tribal Nations

# PCBs Questions & Answers

On this page:

- What are Polychlorinated Biphenyls (PCBs)?
- What is a PCB Transformer?
- Do you own a PCB Transformer?
- How might I be exposed to PCBs?
- Can PCBs affect my health?
- What steps are being taken to address PCBs globally?
- Do PCBs pose a potential hazard on the ships anchored in Region 9?

## What are Polychlorinated Biphenyls?

Polychlorinated biphenyls (PCBs) are synthetic chemicals which are no longer produced in the United States, but are still found in the environment. PCBs have been used as coolants and lubricants in transformers, capacitors, and other electrical equipment because they don't burn easily and are good insulators. The manufacture of PCBs was stopped in the U.S. in 1977 because of evidence they build up in the environment and can cause harmful health effects. Products made before 1977 that may contain PCBs include old fluorescent lighting fixtures and electrical devices containing PCB capacitors and hydraulic oils.

*The manufacture of PCBs was stopped in the U.S. in 1977 because of evidence they build up in the environment and can cause harmful health effects.*

## What is a PCB transformer?

Polychlorinated biphenyls (PCBs) were used in electrical transformers manufactured between 1929 and 1977, with the majority being installed in residential and commercial buildings and industrial facilities prior to 1978. A "PCB transformer" is a transformer that is known, or assumed under TSCA, to contain PCBs at concentrations greater than 500 parts per million (ppm). "PCB-Contaminated Transformers" known, or assumed under TSCA, to contain between 50 and 499 ppm PCBs are also subject to EPA regulations.

## Do you own a PCB Transformer?

Generally, a transformer will have a nameplate attached to the unit indicating the name of the dielectric fluid, the approximate weight in pounds, and the amount of fluid, usually in gallons. In accordance with the Toxic Substance Control Act (40 C.F.R. § 761.40 (a)), proper PCB identification labels must be visible near the access to the transformers and also on the transformer itself.

Since PCBs were marketed under different names, the nameplate on a PCB Transformer may not carry the specific term "PCBs". Trade names for PCBs could include:

- Abestol, Aroclor, Askarel, Chlophen
- Chlorextol, DK, EEC-18, Fenclor
- Inerteen, Kennechlor, No-Flamol, Phenoclor
- Pyralene, Pyranol, Saf-T-Kuhl, Solvol
- Non-Flammable Liquid


Photo credit: John Wallace
(UW, Environ- mental Health
& Saftey [EXIT EPA])

If the nameplate says "PCBs" or any of the names on the above list, then the transformer most likely contains PCBs. If the transformer's nameplate does not have any of the above labels, or if the label is missing or illegible, the utility company may be able to tell if the transformer contains PCBs. Otherwise the only way to be certain is to test the electrical fluid.

## How might I be exposed to PCBs?

Fluorescent lighting fixtures, electrical devices and appliances manufactured 30 or more years ago may leak small amounts of PCBs and be sources of skin exposure. During normal operation of this equipment, the PCBs are entirely enclosed. When the equipment wears out, however, it can burn or break and leak PCBs. Although exposure no longer occurs as a result of the manufacture of PCB-containing products, it can still occur during the maintenance or repair of equipment that contains PCBs or as a result of accidents involving such equipment.

Though not a significant concern in Region 9, consuming contaminated food could be an additional source of exposure. The main dietary sources of PCBs are fish (especially sportfish caught in contaminated lakes or rivers), meat, and dairy products. The California Office of Health Hazard Assessment provides FAQs about PCBs in sports fish (PDF) (3 pp, 25K). [EXIT Disclaimer]

## Can PCBs affect my health?

PCBs have been shown to cause a variety of adverse health effects and are associated with acne-like skin conditions in adults and neurobehavioral and immunological changes in children. The EPA has also classified all PCBs as probable human carcinogens.

Workers exposed to high levels of PCBs on the job have documented skin and eye irritation. To protect workers against the health effects of exposure to hazardous substances (including PCBs), the Occupational Health and Safety Administration (OSHA) sets

PCBs and Public Health Resources

**The Agency for Toxic Substances and Disease Registry (ATSDR)**

- The ATSDR toxicological profile for PCBs [EXIT EPA] characterizes the

permissible exposure limits (PELs). PELs are regulatory limits on the amount or concentration of a substance in the air

## What steps are being taken to address PCBs globally?

The Stockholm Convention [EXIT EPA] is a global treaty to protect human health and the environment from Persistent Organic Pollutants (POPs), including PCBs. POPs are chemicals that remain intact in the environment for long periods, become widely distributed geographically, accumulate in the fatty tissue of living organisms and are toxic to humans and wildlife.

## Do PCBs pose a potential hazard on the former Naval ships anchored in Region 9?

Out-of-service ships within Region 9 can contain PCBs and PCB-contaminated material. For vessels deployed before the 1979 PCB ban, PCBs may be found in both the solid (waxy) and liquid (oily) forms in equipment and materials onboard ships. The equipment that may contain PCBs in concentrations of greater than or equal to 50 ppm include: cable insulation, rubber and felt gaskets, electronic equipment, caulking, oil-based paint etc.

Some of these ships are considered for dismantling or use as artificial reefs. Ships containing PCBs and PCB contaminated materials, however, require regulatory guidance and cleanup before dismantling or use as an artificial reef.

- toxicity and adverse health effect information for PCBs.
- ATSDR public health statement for PCBs [EXIT EPA]
- ATSDR has also released "Public Health Implications of Exposure to PCBs," [EXIT EPA] documenting health consequences of PCB exposure.

Fish Advisories for PCBs

---

PCBs & Ships
Additional Resources

- A Guide for Ship Scrappers: Tips for Regulatory Compliance (PDF) (261 pp, 1.2MB)
- Best Management Practices for Preparing Vessels Intended to Create Artificial Reefs (PDF) (77 pp, 1.8MB)
- The United Nations Environment Programme (UNEP) news article on the consequences of ship dismantling: "Ship Dismantling Industry Set to go Green." [EXIT EPA]

# Exhibit 79



This report is one in a series of volumes published by the U.S. Environmental Protection Agency (EPA) to provide information of general interest regarding environmental issues associated with specific industrial sectors. The documents were developed under contract by Abt Associates (Cambridge, MA), and Booz-Allen & Hamilton, Inc. (McLean, VA). This publication may be **purchased** from the Superintendent of Documents, U.S. Government Printing Office. A listing of available Sector Notebooks and document numbers are included on the following page.

**All telephone orders should be directed to:**

>  Superintendent of Documents
>  U.S. Government Printing Office
>  Washington, DC 20402
>  (202) 512-1800
>  FAX (202) 512-2250
>  8:00 a.m. to 4:30 p.m., ET, M-F

**Using the form provided at the end of this document, all mail orders should be directed to:**

>  U.S. Government Printing Office
>  P.O. Box 371954
>  Pittsburgh, PA 15250-7954

**Complimentary** volumes are available to certain groups or subscribers, such as public and academic libraries, Federal, State, local, and foreign governments, and the media. For further information, and for answers to questions pertaining to these documents, please refer to the contact names and numbers provided within this volume.

**Electronic** versions of all Sector Notebooks are available free of charge at the following web address: **www.epa.gov/oeca/sector**. Direct technical questions to the "Feedback" button at the bottom of the web page.

**Sector Notebook Project**                                    **Iron and Steel Industry**

*Cover photograph courtesy of American Iron and Steel Institute.*

EPA/310-R-95-005

EPA Office of Compliance Sector Notebook Project

# Profile of the Iron and Steel Industry

**September 1995**

Office of Compliance
Office of Enforcement and Compliance Assurance
U.S. Environmental Protection Agency
401 M St., SW (MC 2221-A)
Washington, DC 20460

US EPA ARCHIVE DOCUMENT

## Sector Notebook Contacts

The Sector Notebooks were developed by the EPA's Office of Compliance.  Questions relating to the Sector Notebook Project can be directed to:

Seth Heminway, Coordinator, Sector Notebook Project
US EPA Office of Compliance
401 M St., SW (2223-A)
Washington, DC  20460
(202) 564-7017

Questions and comments regarding the individual documents can be directed to the appropriate specialists listed below.

| Document Number | Industry | Contact | Phone (202) |
|---|---|---|---|
| EPA/310-R-95-001. | Dry Cleaning Industry | Joyce Chandler | 564-7073 |
| EPA/310-R-95-002. | Electronics and Computer Industry* | Steve Hoover | 564-7007 |
| EPA/310-R-95-003. | Wood Furniture and Fixtures Industry | Bob Marshall | 564-7021 |
| EPA/310-R-95-004. | Inorganic Chemical Industry* | Walter DeRieux | 564-7067 |
| EPA/310-R-95-005. | Iron and Steel Industry | Maria Malave | 564-7027 |
| EPA/310-R-95-006. | Lumber and Wood Products Industry | Seth Heminway | 564-7017 |
| EPA/310-R-95-007. | Fabricated Metal Products Industry* | Scott Throwe | 564-7013 |
| EPA/310-R-95-008. | Metal Mining Industry | Jane Engert | 564-5021 |
| EPA/310-R-95-009. | Motor Vehicle Assembly Industry | Anthony Raia | 564-6045 |
| EPA/310-R-95-010. | Nonferrous Metals Industry | Jane Engert | 564-5021 |
| EPA/310-R-95-011. | Non-Fuel, Non-Metal Mining Industry | Rob Lischinsky | 564-2628 |
| EPA/310-R-95-012. | Organic Chemical Industry* | Walter DeRieux | 564-7067 |
| EPA/310-R-95-013. | Petroleum Refining Industry | Tom Ripp | 564-7003 |
| EPA/310-R-95-014. | Printing Industry | Ginger Gotliffe | 564-7072 |
| EPA/310-R-95-015. | Pulp and Paper Industry | Seth Heminway | 564-7017 |
| EPA/310-R-95-016. | Rubber and Plastic Industry | Maria Malave | 564-7027 |
| EPA/310-R-95-017. | Stone, Clay, Glass, and Concrete Industry | Scott Throwe | 564-7013 |
| EPA/310-R-95-018. | Transportation Equipment Cleaning Ind. | Virginia Lathrop | 564-7057 |
| EPA/310-R-97-001. | Air Transportation Industry | Virginia Lathrop | 564-7057 |
| EPA/310-R-97-002. | Ground Transportation Industry | Virginia Lathrop | 564-7057 |
| EPA/310-R-97-003. | Water Transportation Industry | Virginia Lathrop | 564-7057 |
| EPA/310-R-97-004. | Metal Casting Industry | Jane Engert | 564-5021 |
| EPA/310-R-97-005. | Pharmaceuticals Industry | Emily Chow | 564-7071 |
| EPA/310-R-97-006. | Plastic Resin and Man-made Fiber Ind. | Sally Sasnett | 564-7074 |
| EPA/310-R-97-007. | Fossil Fuel Electric Power Generation Ind. | Rafael Sanchez | 564-7028 |
| EPA/310-R-97-008. | Shipbuilding and Repair Industry | Anthony Raia | 564-6045 |
| EPA/310-R-97-009. | Textile Industry | Belinda Breidenbach | 564-7022 |
| EPA/310-R-97-010. | Sector Notebook Data Refresh-1997 | Seth Heminway | 564-7017 |
| EPA/310-R-98-001. | Aerospace Industry | Anthony Raia | 564-6045 |
| EPA/310-R-98-002. | Agricultural Chemical, Pesticide, and Fertilizer Industry | Amy Porter | 564-4149 |
| EPA/310-R-98-003. | Agricultural Crop Production Industry | Ginah Mortensen | (913)551-7864 |
| EPA/310-R-98-004. | Agricultural Livestock Production Ind. | Ginah Mortensen | (913)551-7864 |
| EPA/310-R-98-005. | Oil and Gas Exploration and Production Industry | Dan Chadwick | 564-7054 |
| EPA/310-R-98-008. | Local Government Operations | John Dombrowski | 564-7036 |

*Spanish Translations Available

**Industry Sector Notebook Contents: Iron and Steel Industry**

Exhibits Index . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

List of Acronyms . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

I. INTRODUCTION TO THE SECTOR NOTEBOOK PROJECT . . . . . . . . . . . . . . . . . . . 1
   A. Summary of the Sector Notebook Project . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
   B. Additional Information . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II. INTRODUCTION TO THE IRON AND STEEL INDUSTRY . . . . . . . . . . . . . . . . . . . 3
   A. Introduction, Background, and Scope of the Notebook . . . . . . . . . . . . . . . . . . . . . 3
   B. Characterization of the Iron and Steel Industry . . . . . . . . . . . . . . . . . . . . . . . . . . 3
      1. Industry Size and Geographic Distribution . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
      2. Product Characterization . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
      3. Economic Trends . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

III. INDUSTRIAL PROCESS DESCRIPTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
   A. Industrial Processes in the Iron and Steel Industry . . . . . . . . . . . . . . . . . . . . . . . 13
      1. Steelmaking Using the Basic Oxygen Furnace . . . . . . . . . . . . . . . . . . . . . . . . 16
      2. Steelmaking Using the Electric Arc Furnace (EAF) . . . . . . . . . . . . . . . . . . . . 21
      3. Forming and Finishing Operations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
   B. Raw Material Inputs and Pollution Outputs . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
   C. Management of Chemicals in the Production Process . . . . . . . . . . . . . . . . . . . . . . 25

IV. CHEMICAL RELEASE AND TRANSFER PROFILE . . . . . . . . . . . . . . . . . . . . . . . 27
   A. EPA Toxic Release Inventory for the Iron and Steel Industry . . . . . . . . . . . . . . . . 29
   B. Summary of Selected Chemicals Released . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
   C. Other Data Sources . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
   D. Comparison of Toxic Release Inventory Between Selected Industries . . . . . . . . . . . 44

V. POLLUTION PREVENTION OPPORTUNITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

VI. SUMMARY OF APPLICABLE FEDERAL STATUTES AND REGULATIONS . . . . . 53
   A. General Description of Major Statutes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53
   B. Industry Specific Regulatory Requirements . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63
   C. Pending and Proposed Regulatory Requirements . . . . . . . . . . . . . . . . . . . . . . . . . 68

US EPA ARCHIVE DOCUMENT

VII. COMPLIANCE AND ENFORCEMENT HISTORY . . . . . . . . . . . . . . . . . . . . . . . . . . .  75
     A. Iron and Steel Industry Compliance History  . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  79
     B. Comparison of Enforcement Activity Between Selected Industries  . . . . . . . . . . . . . .  81
     C. Review of Major Legal Action  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  86
          1. Review of Major Cases  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  86
          2. Supplementary Environmental Projects (SEPs) . . . . . . . . . . . . . . . . . . . . . . . . .  86

VIII. COMPLIANCE ACTIVITIES AND INITIATIVES . . . . . . . . . . . . . . . . . . . . . . . . . .  89
     A. Sector-related Environmental Programs and Activities  . . . . . . . . . . . . . . . . . . . . . .  89
     B. EPA Voluntary Programs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  90
     B. EPA Voluntary Programs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  94
     C. Trade Association/Industry Sponsored Activity . . . . . . . . . . . . . . . . . . . . . . . . . . . .  95
          1.  Industry Research Programs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  95
          2. Summary of Trade Associations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  97

IX. CONTACTS/ACKNOWLEDGMENTS/RESOURCE MATERIALS  . . . . . . . . . . . . . .  101

Endnotes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  105

**US EPA ARCHIVE DOCUMENT**

## Exhibits Index

Exhibit 1: Geographic Distribution of SIC 331 Establishments: Steel Works, Blast Furnaces, and Rolling and Finishing Mills . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
Exhibit 2: Top U.S. Iron and Steel Producers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
Exhibit 3: Iron and Steel Manufacturing Process Overview . . . . . . . . . . . . . . . . . . . . . . . 15
Exhibit 4: Iron and Steel Manufacturing Cokemaking and Ironmaking . . . . . . . . . . . . . . . . 19
Exhibit 5: Iron and Steel Manufacturing Steelmaking . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
Exhibit 6: Source Reduction and Recycling Activity for Iron and Steel Industry (SIC 331) as Reported within TRI . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
Exhibit 7: Releases for Iron and Steel Facilities (SIC 331) in TRI, by Number of Facilities Reporting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
Exhibit 8: Transfers for Iron and Steel Facilities in TRI, by Number of Facilities Reporting . . 34
Exhibit 9: Top 10 TRI Releasing Iron and Steel Facilities . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
Exhibit 10: Top 10 TRI Releasing Facilities Reporting SIC 331 Operations . . . . . . . . . . . . . 37
Exhibit 11: Pollutant Releases (short tons/year) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
Exhibit 12: Summary of 1993 TRI Data: Releases and Transfers by Industry . . . . . . . . . . . . 45
Exhibit 13: Toxics Release Inventory Data for Selected Industries . . . . . . . . . . . . . . . . . . . . 46
Exhibit 14: Five-Year Enforcement and Compliance Summary for Iron and Steel . . . . . . . . . 80
Exhibit 15: Five-Year Enforcement and Compliance Summary for Selected Industries . . . . . . 82
Exhibit 16: One-Year Inspection and Enforcement Summary for Selected Industries . . . . . . . 83
Exhibit 17: Five-Year Inspection and Enforcement Summary by Statute, Selected Industries . 84
Exhibit 18: One-Year Inspection and Enforcement Summary by Statute, Selected Industries . 85
Exhibit 19: FY-1993-1994 Supplemental Environmental Projects Overview: Iron and Steel Manufacture . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86
Exhibit 20: SIC 331 Facilities Participating in the EPA's 33/50 Program . . . . . . . . . . . . . . . 91

## List of Acronyms

AFS -          AIRS Facility Subsystem (CAA database)
AIRS -         Aerometric Information Retrieval System (CAA database)
BIFs -         Boilers and Industrial Furnaces (RCRA)
BOD -          Biochemical Oxygen Demand
CAA -          Clean Air Act
CAAA -         Clean Air Act Amendments of 1990
CERCLA -       Comprehensive Environmental Response, Compensation and Liability Act
CERCLIS -      CERCLA Information System
CFCs -         Chlorofluorocarbons
CO -           Carbon Monoxide
COD -          Chemical Oxygen Demand
CSI -          Common Sense Initiative
CWA -          Clean Water Act
D&B -          Dun and Bradstreet Marketing Index
ELP -          Environmental Leadership Program
EPA -          United States Environmental Protection Agency
EPCRA -        Emergency Planning and Community Right-to-Know Act
FIFRA -        Federal Insecticide, Fungicide, and Rodenticide Act
FINDS -        Facility Indexing System
HAPs -         Hazardous Air Pollutants (CAA)
HSDB -         Hazardous Substances Data Bank
IDEA -         Integrated Data for Enforcement Analysis
LDR -          Land Disposal Restrictions (RCRA)
LEPCs -        Local Emergency Planning Committees
MACT -         Maximum Achievable Control Technology (CAA)
MCLGs -        Maximum Contaminant Level Goals
MCLs -         Maximum Contaminant Levels
MEK -          Methyl Ethyl Ketone
MSDSs -        Material Safety Data Sheets
NAAQS -        National Ambient Air Quality Standards (CAA)
NAFTA -        North American Free Trade Agreement
NCDB -         National Compliance Database (for TSCA, FIFRA, EPCRA)
NCP -          National Oil and Hazardous Substances Pollution Contingency Plan
NEIC -         National Enforcement Investigation Center
NESHAP -       National Emission Standards for Hazardous Air Pollutants
$NO_2$ -          Nitrogen Dioxide
NOV -          Notice of Violation
$NO_X$ -          Nitrogen Oxide
NPDES -        National Pollution Discharge Elimination System (CWA)
NPL -          National Priorities List
NRC -          National Response Center

US EPA ARCHIVE DOCUMENT

NSPS -          New Source Performance Standards (CAA)
OAR -           Office of Air and Radiation
OECA -          Office of Enforcement and Compliance Assurance
OPA -           Oil Pollution Act
OPPTS -         Office of Prevention, Pesticides, and Toxic Substances
OSHA -          Occupational Safety and Health Administration
OSW -           Office of Solid Waste
OSWER -         Office of Solid Waste and Emergency Response
OW -            Office of Water
P2 -            Pollution Prevention
PCS -           Permit Compliance System (CWA Database)
POTW -          Publicly Owned Treatments Works
RCRA -          Resource Conservation and Recovery Act
RCRIS -         RCRA Information System
SARA -          Superfund Amendments and Reauthorization Act
SDWA -          Safe Drinking Water Act
SEPs -          Supplementary Environmental Projects
SERCs -         State Emergency Response Commissions
SIC -           Standard Industrial Classification
$SO_2$ -        Sulfur Dioxide
$SO_x$ -        Sulfur Oxides
TOC -           Total Organic Carbon
TRI -           Toxic Release Inventory
TRIS -          Toxic Release Inventory System
TCRIS -         Toxic Chemical Release Inventory System
TSCA -          Toxic Substances Control Act
TSS -           Total Suspended Solids
UIC -           Underground Injection Control (SDWA)
UST -           Underground Storage Tanks (RCRA)
VOCs -          Volatile Organic Compounds

Sector Notebook Project                                             Iron and Steel Industry

# I. INTRODUCTION TO THE SECTOR NOTEBOOK PROJECT

## I.A. Summary of the Sector Notebook Project

Environmental policies based upon comprehensive analysis of air, water and land pollution are an inevitable and logical supplement to traditional single-media approaches to environmental protection. Environmental regulatory agencies are beginning to embrace comprehensive, multi-statute solutions to facility permitting, enforcement and compliance assurance, education/ outreach, research, and regulatory development issues. The central concepts driving the new policy direction are that pollutant releases to each environmental medium (air, water and land) affect each other, and that environmental strategies must actively identify and address these inter-relationships by designing policies for the "whole" facility. One way to achieve a whole facility focus is to design environmental policies for similar industrial facilities. By doing so, environmental concerns that are common to the manufacturing of similar products can be addressed in a comprehensive manner. Recognition of the need to develop the industrial "sector-based" approach within the EPA Office of Compliance led to the creation of this document.

The Sector Notebook Project was initiated by the Office of Compliance within the Office of Enforcement and Compliance Assurance (OECA) to provide its staff and managers with summary information for eighteen specific industrial sectors. As other EPA offices, states, the regulated community, environmental groups, and the public became interested in this project, the scope of the original project was expanded. The ability to design comprehensive, common sense environmental protection measures for specific industries is dependent on knowledge of several inter-related topics. For the purposes of this project, the key elements chosen for inclusion are: general industry information (economic and geographic); a description of industrial processes; pollution outputs; pollution prevention opportunities; Federal statutory and regulatory framework; compliance history; and a description of partnerships that have been formed between regulatory agencies, the regulated community and the public.

For any given industry, each topic listed above could alone be the subject of a lengthy volume. However, in order to produce a manageable document, this project focuses on providing summary information for each topic. This format provides the reader with a synopsis of each issue, and references where more in-depth information is available. Text within each profile was researched from a variety of sources, and was usually condensed from more detailed sources pertaining to specific topics. This approach allows for a wide coverage of activities that can be further explored based upon the citations and references listed at the end of this profile. As a check on the information

included, each notebook went through an external review process. The Office of Compliance appreciates the efforts of all those that participated in this process and enabled us to develop more complete, accurate and up-to-date summaries. Many of those who reviewed this notebook are listed as contacts in Section IX and may be sources of additional information. The individuals and groups on this list do not necessarily concur with all statements within this notebook.

## I.B. Additional Information

### Providing Comments

OECA's Office of Compliance plans to periodically review and update the notebooks and will make these updates available both in hard copy and electronically. If you have any comments on the existing notebook, or if you would like to provide additional information, please send a hard copy and computer disk to the EPA Office of Compliance, Sector Notebook Project, 401 M St., SW (2223-A), Washington, DC 20460. Comments can also be uploaded to the Enviro$en$e Bulletin Board or the Environ$ense World Wide Web for general access to all users of the system. Follow instructions in Appendix A for accessing these data systems. Once you have logged in, procedures for uploading text are available from the on-line Enviro$en$e Help System.

### Adapting Notebooks to Particular Needs

The scope of the existing notebooks reflect an approximation of the relative national occurrence of facility types that occur within each sector. In many instances, industries within specific geographic regions or states may have unique characteristics that are not fully captured in these profiles. For this reason, the Office of Compliance encourages state and local environmental agencies and other groups to supplement or re-package the information included in this notebook to include more specific industrial and regulatory information that may be available. Additionally, interested states may want to supplement the "Summary of Applicable Federal Statutes and Regulations" section with state and local requirements. Compliance or technical assistance providers may also want to develop the "Pollution Prevention" section in more detail. Please contact the appropriate specialist listed on the opening page of this notebook if your office is interested in assisting us in the further development of the information or policies addressed within this volume. If you are interested in assisting in the development of new notebooks for sectors not covered in the original eighteen, please contact the Office of Compliance at 202-564-2395.

## II. INTRODUCTION TO THE IRON AND STEEL INDUSTRY

This section provides background information on the size, geographic distribution, employment, production, sales, and economic condition of the iron and steel industry. The type of facilities described within the document are also described in terms of their Standard Industrial Classification (SIC) codes. Additionally, this section contains a list of the largest companies in terms of sales.

### II.A. Introduction, Background, and Scope of the Notebook

The iron and steel industry is categorized by the Bureau of the Census under the Standard Industrial Classification (SIC) code 33, primary metal industries. The industry is further classified by the three-digit codes 331, Steel Works, Blast Furnaces, and Rolling and Finishing Mills, and 332 Iron and Steel Foundries. Since steel works, blast furnaces, and rolling and finishing mills account for the majority of environmental releases, employees, and value of shipments, this profile concentrates on the three-digit SIC 331. The environmental releases associated with foundries are similar to the steel casting and finishing processes included under SIC 331, therefore SIC 332 will not be addressed in this notebook. Some sections of the profile focus specifically on industries in the four-digit SIC 3312, since virtually all establishments producing primary products (iron and steel) under SIC 3312, also produce secondary products that fall under some of the other iron and steel SIC codes under SIC 331.

### II.B. Characterization of the Iron and Steel Industry

#### II.B.1. Industry Size and Geographic Distribution

There are approximately 1,118 manufacturing facilities under SIC 331 according to *1992 Census of Manufactures* data.[1] The payroll totaled $9.3 billion for a workforce of 241,000 employees, and value of shipments totaled $58 billion. Net shipments of steel mill products for all grades including carbon, alloy, and stainless totaled 92.7 million net tons in 1993[2] and 95.1 million net tons in 1994.[3] In terms of environmental issues, value of shipments, and number of employees, SIC 3312 (Blast Furnaces and Steel Mills), is the most significant four-digit code under SIC 331. The 1992 Census data reported 247 establishments under SIC 3312, with an estimated 172,000 employees, a payroll of $7 billion, and a value of shipments totaling $42 billion. For the same year, the American Iron and Steel Institute estimated 114 companies operated 217 iron and steel facilities; this estimate included any facility with one or more iron or steelmaking operation.[4]

The *1987 Census of Manufactures*[5] further categorizes SIC 3312 by the type

of steel mill: integrated or non-integrated. A fully integrated facility produces steel from raw materials of coal, iron ore, and scrap. Non-integrated plants do not have all of the equipment to produce steel from coal, iron ore, and scrap on-site, instead they purchase some of their raw materials in a processed form.

*SIC Diversity*

The Bureau of the Census categorizes the three- and four-digit SIC codes related to iron and steel as follows:

SIC 331 - Steel works, blast furnaces, coke ovens, rolling and finishing mills
      3312 - Steel works, blast furnaces, and rolling mills
      3313 - Electrometallurgical products, except steel
      3315 - Steel wiredrawing and steel nails and spikes
      3316 - Cold-rolled steel sheet, strip, and bars
      3317 - Steel pipe and tubes

The remainder of the industries classified under SIC code 33 cover the ferrous and non-ferrous foundries, and smelting, refining, and shaping of nonferrous metals which are not covered in this profile.

*Two Steel Industries*

In the past fifteen years, the U.S. steel industry has lost over 61 percent of its employees and 58 percent of its facilities. Slow growth in demand for steel, markets lost to other materials, increased imports, and older, less efficient production facilities are largely to blame for the industry's decline. While the integrated steel industry was contracting, a group of companies, called minimills, more than doubled their capacity in the same period and they continue to expand into new markets. Minimills use electric arc furnaces (EAFs) to melt scrap and other materials to make steel products, instead of using coke, iron ore, and scrap as the integrated producers do. In addition to fundamentally different production technologies, other differences between the integrated steel mills and minimill are also significant: minimills have narrow product lines, they often have small, non-unionized work forces that may receive higher pay per hour than a comparable unionized work force, but without union benefits. Additionally, minimills typically produce much less product per facility (less than 1 million tons of steel per year). Lower scrap prices in the 1960s and 1970s created opportunities for the minimill segment of the market to grow rapidly. Initially, the EAF technology could only be used in the production of low quality long products, such as concrete reinforcing bar, but over the years minimill products have improved in quality and have overcome technological limitations to diversify their product lines. Recently, minimills have entered new markets, such as flat-rolled products,

US EPA ARCHIVE DOCUMENT

however, more than half of the market for quality steel products still remains beyond minimill capability. The EAF producers do face the problems of fluctuating scrap prices which are more volatile than the prices of raw materials used by integrated producers.

*Geographic Distribution*

The highest geographic concentration of mills is in the Great Lakes region, where most integrated plants are based (Exhibit 1). According to the *1987 Census of Manufactures*, 46 percent of steel mills are located in six Great Lakes states: New York, Pennsylvania, Ohio, Indiana, Illinois, and Michigan, with a heavy concentration of steel manufacturing in the Chicago area. Approximately 80 percent of the U.S. steelmaking capacity is in these states. The South is the next largest steel-producing region, although there are only two integrated steel plants. Steel production in the western U.S. is limited to one integrated plant and several minimills. Historically, the mill sites were selected for their proximity to water (tremendous amounts are used for cooling and processing, and for transportation) and the sources of their raw materials, iron ore and coal. Traditional steelmaking regions included the Monongahela River valley near Pittsburgh and along the Mahoning River near Youngstown, Ohio. The geographic concentration of the industry continues to change as minimills are built anywhere electricity and scrap are available at a reasonable cost and there is a local market for a single product.

*Size Distribution*

Large, fully-integrated steel mills have suffered considerably in the last 15 years, largely due to loss of market share to other materials, competition, and the high cost of pension liabilities. In comparing the *1992 Census of Manufacture* data with the data from 1977, these changes are clear. While the number of establishments under SIC 3312 fell by 58 percent from 504 facilities in 1977 to 247 in 1992, the absolute number of integrated mills has always been small, and the reduction is largely due to a drop in the number of small establishments. A more relevant statistic is the reduction in employees during the same time period. The work force for these facilities was dramatically reduced as plants closed or were reorganized by bankruptcy courts. Those that remained open automated and streamlined operations resulting in a 61 percent reduction in the number of production employees over the same 15 year period. Approximately 172,000 were still employed in SIC 3312 establishments in 1992.

The *1987 Census of Manufactures* breaks the SIC code 3312 down into four sub-industries: Fully-integrated (consists of coke ovens, blast furnaces, steel furnaces, and rolling and finishing mills), partially integrated with blast furnace (consists of blast furnaces, steel furnaces, and rolling and finishing mills), partially integrated without blast furnaces (consists of steel furnaces and either

rolling and finishing mills or a forging department; includes mini mills), and non-integrated (all others, including stand-alone rolling and finishing mills, and stand-alone coke plants). This division highlights some important characteristics about the size of facilities in this industry. Only 8 percent (20 plants) of the establishments under SIC 3312 in 1987 were fully integrated mills. However, 46 percent of the industry's employees worked in these 20 plants.

US EPA ARCHIVE DOCUMENT



**Exhibit 1: Geographic Distribution of SIC 331 Establishments: Steel Works, Blast Furnaces, and Rolling and Finishing Mills**

US EPA ARCHIVE DOCUMENT

*Top Steel Producers*

*Market Share Reporter*, published by Gale Research Inc., annually compiles reported market share data on companies, products, and services. The 1995 edition ranks top U.S. steel producers by 1993 sales in millions of dollars, as shown in Exhibit 2.

| Exhibit 2: Top U.S. Iron and Steel Producers | | |
|:---:|:---|:---:|
| **Rank** | **Company** | **1993 Sales** (millions of dollars) |
| 1 | US Steel Group - Pittsburgh, PA | 5,422 |
| 2 | Bethlehem Steel Corp. - Bethlehem, PA | 4,219 |
| 3 | LTV Corp. - Dallas, TX | 3,868 |
| 4 | National Steel Corp. - Pittsburgh, PA | 2,418 |
| 5 | Inland Steel Industries, Inc. - Chicago, IL | 2,175 |
| 6 | Armco Inc. - Parsippany, NJ | 1,595 |
| 7 | Weirton Steel Corp. - Weirton, WV | 1,201 |
| 8 | Wheeling-Pittsburgh Steel - Pittsburgh, PA | 1,047 |
| Source:   Market Share Reporter, 1995. | | |

## II.B.2. Product Characterization

The iron and steel industry produces iron and steel mill products, such as bars, strips, and sheets, as well as formed products such as steel nails, spikes, wire, rods, pipes, and non-steel electrometallurgical products such as ferroalloys. Under SIC 3312, Blast Furnaces and Steel Mills, products also include coke, and products derived from chemical recovery in the coking process such as coal tar and distillates.

Historically, the automotive and construction sectors have been the two largest steel consuming industries. Consequently, fluctuations in sales and choice of materials in these industries have a significant impact on the iron and steel industry. Over the last two decades, the structure of the steelmaking industry has changed dramatically due to new technologies, foreign competition, and loss of market share to other materials. Many of the large, fully-integrated facilities have closed, and those that are still operating, have reduced their workforce, increased automation, and invested in new technologies to remain competitive.

## II.B.3. Economic Trends

*Domestic Market*

After years of collapsing markets, bankruptcies, mill closings and layoffs, the steel industry experienced a turnaround in 1993. Shipments were at their highest level since 1981.[6] For the first time since 1989, steelmakers were able to boost their prices. This increase in demand is due in part to the weak dollar, which makes importing foreign steel more expensive than it used to be. The relatively high level of shipments was also attributable to a strong demand from the steel industry's two largest customers - the automotive and construction sectors.[7] Recently, prices for steel sold to the automotive industry have been set in long-term contracts. The prices set in the automotive contracts tend to influence the steel prices of other contract negotiations, such as those with appliance manufacturers. Overall, more than half of all steel sold in the U.S. is covered by long-term contracts; the rest is sold on the spot market.

*International Trade*

Problems in international steel trade intensified in the last 5 years due in large part to a worldwide weakening in demand. With the exception of China, where rapid economic growth has led to a steady increase in steel demand, the export market has been weak. The "voluntary restraint arrangements" that limited imports in the 1980s expired in 1992. Since then, the U.S. steel industry has discouraged imports by filing complaints that products are being dumped - sold at less than the cost of production. Similar cases have also been filed against U.S. exporters. To address the problems of unfairly traded steel, most major steel-producing countries have participated in multilateral steel agreement (MSA) negotiations under the General Agreement on Tariffs and Trade (GATT).[8]

Steel imports for 1992 totaled 15.2 million metric tons. From 1989 to 1993, the quantity of steel imported was fairly consistent, from 15.7 million metric tons in 1989 to 15.3 million metric tons estimated for 1993. The exception is a slight dip to 14.3 million metric tons in 1991. The forecast for 1994, at 16.3 million metric tons, is a more significant increase than has been seen in the last five years. The export market has seen slightly more variability over the same time period, with a high of 5.7 million metric tons exported in 1991, and 3.8 million metric tons in exports forecast for 1994.[9]

*Labor*

US EPA ARCHIVE DOCUMENT

According to *1992 Census of Manufactures*, there were an estimated 172,000 people employed in SIC 3312 industries, with a payroll of $7 billion. This was a 61 percent decrease from 1977 levels of 442,000 employees, and a 42% reduction from 1982 levels of 295,000 employees. This dramatic reduction in workforce was primarily due to reductions at the large integrated facilities. For example, the U.S. Steel plant in Gary, Indiana, employed 30,000 people during the plant's peak employment in 1953. In 1992, there were about 8,000 employees working at the 4,000-acre facility.

This reduction in workforce, coupled with investments in new equipment, automation, and management restructuring has resulted in the increased productivity that was essential for integrated mills to remain competitive in the face of the severe competitive pressures both from EAF producers in the U.S. and from abroad. With these changes, the U.S. industry has become one of the lowest-cost producers in the developed world. Productivity in steelmaking is often measured in man-hours per ton of finished steel. For every ton produced, American steelmakers spend 5.3 man-hours, compared with 5.6 for the Japanese and Canadian industries, and 5.7 for the British, French, and Germans. The increase in productivity is also reflected in changes in the value added by manufacture, as reported by the Census. During the ten year period where employment in the industry dropped by 42% (1982 - 1992), the value added by manufacture increased by 39% from $11.8 million in 1982 to $16.5 million in 1992.

Problems from such a sizable workforce reduction persist. The industry says one big cost is "legacy costs" - obligations to pay pensions and health benefits to the tens of thousands of retirees and their spouses. Some integrated companies have five retired workers for every active employee. For many of the large, integrated facilities, these pensions are underfinanced. Of the 50 most underfinanced pension plans, five are in the steel industry. This puts the newer minimills, who do not have such legacy costs, at a clear competitive advantage.

In addition to pension payments, major U.S. steel producers are now paying out an average $5.30 per hour worked, 17 percent of total hourly employment costs, for health care. The industry argues that these high costs place it at a disadvantage with its major foreign competitors, some of whom pay no direct health care expenses.

US EPA ARCHIVE DOCUMENT

**Sector Notebook Project**                                    **Iron and Steel Industry**

*Long-term Prospects*

Production of steel products in 1993 totaled 89.0 million net tons which represents an 89.1 percent capacity utilization. Shipments for 1994 rose to 95.1 million net tons and it is forecasted that demand will stay high, with industry capacity utilization increasing through 1995.[10]  After years of losing market share to other materials, steel appears to be regaining a competitive position. In the automotive market, some parts that were recently made of plastic, such as fenders, roofs, and hoods, are being returned to steel. The decades-long downtrend in steel content in automobiles appears to have slowed and recently has actually reversed.  According to Ford Motor Company, the average vehicle built in 1993 contained 1,726 pounds of steel, up from 1,710 pounds in 1992, marking the second consecutive yearly increase. A further increase is anticipated in 1994 due to new and expanding applications of steel.  In addition to increased orders from the automotive sector, the residential construction sector is a potentially rich market for steel producers. Steel framing for houses is being promoted as a light-weight, high strength alternative to wood framing.  A galvanized steel frame for a 2,000 square foot house would weigh approximately one-fourth the weight of a lumber structure.

## III. INDUSTRIAL PROCESS DESCRIPTION

This section describes the major industrial processes within the iron and steel industry, including the materials and equipment used, and the processes employed. The section is designed for those interested in gaining a general understanding of the industry, and for those interested in the inter-relationship between the industrial process and the topics described in subsequent sections of this profile -- pollutant outputs, pollution prevention opportunities, and Federal regulations. This section does not attempt to replicate published engineering information that is available for this industry. Refer to Section IX for a list of reference documents that are available.

This section specifically contains a description of commonly used production processes, associated raw materials, the byproducts produced or released, and the materials either recycled or transferred off-site. This discussion, coupled with schematic drawings of the identified processes, provide a concise description of where wastes may be produced in the process. This section also describes the potential fate (via air, water, and soil pathways) of these waste products.

### III.A. Industrial Processes in the Iron and Steel Industry

In view of the high cost of most new equipment and the relatively long lead time necessary to bring new equipment on line in the steel industry, changes in production methods and products in the steel industry are typically made gradually. Installation of major pieces of new steelmaking equipment may cost millions of dollars and require additional retrofitting of other equipment. Even new process technologies that fundamentally improve productivity, such as the continuous casting process (described below), are adopted only over long periods of time. Given the recent financial performance of the steel industry, the ability to raise the capital needed to purchase such equipment is limited.

Environmental legislation is challenging the industry to develop cleaner and more efficient steelmaking processes at the same time competition from substitute materials are forcing steelmakers to invest in cost-saving and quality enhancing technologies. In the long term, the steel industry will likely continue to move towards more simplified and continuous manufacturing technologies that reduce the capital costs for new mill construction and allow smaller mills to operate efficiently. The companies that excel will be those that have the resources and foresight to invest in such technologies.

Steel is an alloy of iron usually containing less than one percent carbon. The

process of steel production occurs in several sequential steps (Exhibit 3). The two types of steelmaking technology in use today are the basic oxygen furnace (BOF) and the electric arc furnace (EAF). Although these two technologies use different input materials, the output for both furnace types is molten steel which is subsequently formed into steel mill products. The BOF input materials are molten iron, scrap, and oxygen. In the EAF, electricity and scrap are the input materials used. BOFs are typically used for high tonnage production of carbon steels, while EAFs are used to produce carbon steels and low tonnage alloy and specialty steels. The processes leading up to steelmaking in a BOF are very different than the steps preceeding steelmaking in an EAF; the steps after each of these processes producing molten steel are the same.

When making steel using a BOF, cokemaking and ironmaking precede steelmaking; these steps are not needed for steelmaking with an EAF. Coke, which is the fuel and carbon source, is produced by heating coal in the absence of oxygen at high temperatures in coke ovens. Pig iron is then produced by heating the coke, iron ore, and limestone in a blast furnace. In the BOF, molten iron from the blast furnace is combined with flux and scrap steel where high-purity oxygen is injected. This process, with cokemaking, ironmaking, steelmaking, and subsequent forming and finishing operations is referred to as fully integrated production. Alternatively, in an EAF, the input material is primarily scrap steel, which is melted and refined by passing an electric current from the electrodes through the scrap. The molten steel from either process is formed into ingots or slabs that are rolled into finished products. Rolling operations may require reheating, rolling, cleaning, and coating the steel. A description of both steelmaking processes follows:

US EPA ARCHIVE DOCUMENT



EXHIBIT 3
IRON AND STEEL MANUFACTURING
PROCESS OVERVIEW

### III.A.1. Steelmaking Using the Basic Oxygen Furnace

The process of making steel in a Basic Oxygen Furnace (BOF) is preceded by cokemaking and ironmaking operations. In cokemaking, coke is produced from coal. In ironmaking, molten iron is produced from iron ore and coke. Each of these processes and the subsequent steelmaking process in the BOF are described below.

**Cokemaking**

Coal processing in the iron and steel industry typically involves producing coke, coke gas and by-product chemicals from compounds released from the coal during the cokemaking process (Exhibit 4). Coke is carbon-rich and is used as a carbon source and fuel to heat and melt iron ore in ironmaking. The cokemaking process starts with bituminous pulverized coal charge which is fed into the coke oven through ports in the top of the oven. After charging, the oven ports are sealed and the coal is heated at high temperatures (1600 to 2300°F) in the absence of oxygen. Coke manufacturing is done in a batch mode where each cycle lasts for 14 to 36 hours. A coke oven battery comprises a series of 10 to 100 individual ovens, side-by-side, with a heating flue between each oven pair. Volatile compounds are driven from the coal, collected from each oven, and processed for recovery of combustible gases and other coal byproducts.[11] The solid carbon remaining in the oven is the coke. The necessary heat for distillation is supplied by external combustion of fuels (e.g., recovered coke oven gas, blast furnace gas) through flues located between ovens.[12] At the end of the heating cycle, the coke is pushed from the oven into a rail quench car. The quench car takes it to the quench tower, where the hot coke is cooled with a water spray. The coke is then screened and sent to the blast furnace or to storage.

In the by-products recovery process, volatile components of the coke oven gas stream are recovered including the coke oven gas itself (which is used as a fuel for the coke oven), naphthalene, ammonium compounds, crude light oils, sulfur compounds, and coke breeze (coke fines). During the coke quenching, handling, and screening operation, coke breeze is produced. Typically, the coke breeze is reused in other manufacturing processes on-site (e.g., sintering) or sold off-site as a by-product.[13]

The cokemaking process is seen by industry experts as one of the steel industry's areas of greatest environmental concern, with air emissions and quench water as major problems. In efforts to reduce the emissions associated with cokemaking, U.S. steelmakers are turning to technologies such as pulverized coal injection, which substitutes coal for coke in the blast furnace. Use of pulverized coal injection can replace about 25 to 40 percent

of coke in the blast furnace, reducing the amount of coke required and the associated emissions. Steel producers also inject other fuels, such as natural gas, oil, and tar/pitch to replace a portion of the coke.

Quench water from cokemaking is also an area of significant environmental concern. In Europe, some plants have implemented technology to shift from water quenching to dry quenching which eliminates suspected carcinogenic particulates and VOCs. However, major construction changes are required for such a solution and considering the high capital costs of coke batteries, combined with the depressed state of the steel industry and increased regulations for cokemaking, it is unlikely that new facilities will be constructed. Instead, industry experts expect to see an increase in the amount of coke imported.

**Ironmaking**

In the blast furnace, molten iron is produced (Exhibit 4). Iron ore, coke, and limestone are fed into the top of the blast furnace. Heated air is forced into the bottom of the furnace through a bustle pipe and tuyeres (orifices) located around the circumference of the furnace. The carbon monoxide from the burning of the coke reduces iron ore to iron. The acid part of the ores reacts with the limestone to create a slag which is drawn periodically from the furnace. This slag contains unwanted impurities in the ore, such as sulfur from the fuels. When the furnace is tapped, iron is removed through one set of runners and molten slag via another. The molten iron is tapped into refractory-lined cars for transport to the steelmaking furnaces. Residuals from the process are mainly sulfur dioxide or hydrogen sulfide, which are driven off from the hot slag. The slag is the largest by-product generated from the ironmaking process and is reused extensively in the construction industry.[14] Blast furnace flue gas is cleaned and used to generate steam to preheat the air coming into the furnace, or it may be used to supply heat to other plant processes. The cleaning of the gas may generate air pollution control dust in removing coarse particulates (which may be reused in the sintering plant or landfilled), and water treatment plant sludge in removing fine particulates by venturi scrubbers.

**Sintering** is the process that agglomerates fines (including iron ore fines, pollution control dusts, coke breeze, water treatment plant sludge, coke breeze, and flux) into a porous mass for charging to the blast furnace.[15] Through sintering operations, a mill can recycle iron-rich material, such as mill scale and processed slag. Not all mills have sintering capabilities. The input materials are mixed together, placed on a slow-moving grate and ignited. Windboxes under the grate draw air through the materials to deepen the combustion throughout the traveling length of the grate. The coke breeze provides the carbon source for sustaining the controlled combustion. In the process, the fine materials are fused into the sinter agglomerates, which can

be reintroduced into the blast furnace along with ore.  Air pollution control equipment removes the particulate matter generated during the thermal fusing process.  For wet scrubbers, water treatment plant sludge are generally land disposed waste.  If electrostatic precipitators or baghouses are used as the air pollution control equipment, the dry particulates captured are typically recycled as sinter feedstock, or are landfilled as solid waste.

**Steelmaking Using the Basic Oxygen Furnace**

Molten iron from the blast furnace, flux, alloy materials, and scrap are placed in the basic oxygen furnace, melted and refined by injecting high-purity oxygen.  A chemical reaction occurs, where the oxygen reacts with carbon and silicon generating the heat necessary to melt the scrap and oxidize impurities.  This is a batch process with a cycle time of about 45 minutes. Slag is produced from impurities removed by the combination of the fluxes with the injected oxygen.  Various alloys are added to produce different grades of steel.  The molten steel is typically cast into slabs, beams or billets.

The waste products from the basic oxygen steelmaking process include slag, carbon monoxide, and oxides of iron emitted as dust.  Also, when the hot iron is poured into ladles or the furnace, iron oxide fumes are released and some of the carbon in the iron is precipitated as graphite (kish).  The BOF slag can be processed to recover the high metallic portions for use in sintering or blast furnaces, but its applications as a saleable construction materials are more limited than the blast furnace slag.

Basic oxygen furnaces are equipped with air pollution control systems for containing, cooling, and cleaning the volumes of hot gases and sub-micron fumes that are released during the process.  Water is used to quench or cool the gases and fumes to temperatures at which they can be effectively treated by the gas cleaning equipment.  The resulting waste streams from the pollution control processes include air pollution control dust and water treatment plant sludge.  About 1,000 gallons of water per ton of steel (gpt) are used for a wet scrubber.  The principal pollutants removed from the off-gas are total suspended solids and metals (primarily zinc, and some lead).[16]



**EXHIBIT 4**
**IRON AND STEEL MANUFACTURING**
**COKEMAKING AND IRONMAKING**



EXHIBIT 5
IRON AND STEEL MANUFACTURING
STEELMAKING

**III.A.2.  Steelmaking Using the Electric Arc Furnace (EAF)**

In the steelmaking process that uses an electric arc furnace (EAF), the primary raw material is scrap metal, which is melted and refined using electric energy. During melting, oxidation of phosphorus, silicon, manganese, carbon and other materials occurs and a slag containing some of these oxidation products forms on top of the molten metal.[17] Oxygen is used to decarburize the molten steel and to provide thermal energy. This is a batch process with a cycle time of about two to three hours. Since scrap metal is used instead of molten iron, there are no cokemaking or ironmaking operations associated with steel production that uses an EAF.

The process produces metal dusts, slag, and gaseous products. Particulate matter and gases evolve together during the steelmaking process and are conveyed into a gas cleaning system. These emissions are cleaned using a wet or dry system. The particulate matter that is removed as emissions in the dry system is referred to as EAF dust, or EAF sludge if it is from a wet system and it is a listed hazardous waste (RCRA K061). The composition of EAF dust can vary greatly depending on the scrap composition and furnace additives. The primary component is iron or iron oxides, and it may also contain flux (lime and/or fluorspar), zinc, chromium and nickel oxides (when stainless steel is being produced) and other metals associated with the scrap. The two primary hazardous constituents of EAF emission control dust are lead and cadmium.[18] Generally, 20 pounds of dust per ton of steel is expected, but as much as 40 pounds of dust per ton of steel may be generated, depending on production practices.[19] Oils are burned off "charges" of oil-bearing scrap in the furnace. Minor amounts of nitrogen oxides and ozone are generated during the melting process. The furnace is extensively cooled by water; however, this water is recycled through cooling towers.

### III.A.3. Forming and Finishing Operations

Whether the molten steel is produced using a BOF or an EAF, to convert it into a product, it must be solidified into a shape suitable and finished.

**Forming**

The traditional forming method, called ingot teeming, has been to pour the metal into ingot molds, allowing the steel to cool and solidify. The alternative method of forming steel, called continuous casting accounted for more 86% of raw steel produced in the U.S. in 1992[20], compared with approximately 30 percent in 1982. The continuous casting process bypasses several steps of the conventional ingot teeming process by casting steel directly into semifinished shapes. Molten steel is poured into a reservoir from which it is released into the molds of the casting machine. The metal is cooled as it descends through the molds, and before emerging, a hardened outer shell is formed. As the semifinished shapes proceed on the runout table, the center also solidifies, allowing the cast shape to be cut into lengths.

Process contact water cools the continuously cast steel and is collected in settling basins along with oil, grease, and mill scale generated in the casting process. The scale settles out and is removed and recycled for sintering

operations, if the mill has a Sinter Plant.  Waste treatment plant sludge is also generated.[21]

The steel is further processed to produce slabs, strips, bars, or plates through various forming operations.  The most common hot forming operation is hot rolling, where heated steel is passed between two rolls revolving in opposite directions.  Modern hot rolling units may have as many as 13 stands, each producing an incremental reduction in thickness.  The final shape and characteristics of a hot formed piece depend on the rolling temperature, the roll profile, and the cooling process after rolling.  Wastes generated from hot rolling include waste treatment plant sludge and scale.

In subsequent cold forming, the cross-sectional area of unheated steel is progressively reduced in thickness as the steel passes through a series of rolling stands.  Generally, wires, tubes, sheet and strip steel products are produced by cold rolling operations.  Cold forming is used to obtain improved mechanical properties, better machinability, special size accuracy, and the production of thinner gages than hot rolling can accomplish economically.[22] During cold rolling, the steel becomes hard and brittle. To make the steel more ductile, it is heated in an annealing furnace.

Process contact water is used as a coolant for rolling mills to keep the surface of the steel clean between roller passes.  Cold rolling operations also produce a waste treatment plant sludge, primarily due to the lubricants applied during rolling.  Grindings from resurfacing of the worn rolls and disposal of used rolls can be a significant contributor to the plant's wastestream.

**Finishing**
One of the most important aspects of a finished product is the surface quality. To prevent corrosion, a protective coating may be applied to the steel product.  Prior to coating, the surface of the steel must be cleaned so the coating will  adhere to the steel.  Mill scale, rust, oxides, oil, grease, and soil are chemically removed from the surface of steel using solvent cleaners, pressurized water or air blasting, cleaning with abrasives, alkaline agents or acid pickling.  In the pickling process, the steel surface is chemically cleaned of scale, rust, and other materials.  Inorganic acids such as hydrochloric or sulfuric acid are most commonly used for pickling.  Stainless steels are pickled with hydrochloric, nitric, and hydrofluoric acids.  Spent pickle liquor may be a listed hazardous waste (RCRA K062), if it contains considerable residual acidity and high concentrations of dissolved iron salts.  Pickling prior to coating may use a mildly acidic bath which is not considered K062.

Steel generally passes from the pickling bath through a series of rinses. Alkaline cleaners  may also be used to remove mineral oils and animal fats and oils from the steel surface prior to cold rolling.  Common alkaline cleaning agents include: caustic soda, soda ash, alkaline silicates, phosphates.

Steel products are often given a coating to inhibit oxidation and extend the life

of the product. Coated products can also be painted to further inhibit corrosion. Common coating processes include: galvanizing (zinc coating), tin coating, chromium coating, aluminizing, and terne coating (lead and tin). Metallic coating application processes include hot dipping, metal spraying, metal cladding (to produce bi-metal products), and electroplating. Galvanizing is a common coating process where a thin layer of zinc is deposited on the steel surface.

## III.B. Raw Material Inputs and Pollution Outputs

Numerous outputs are produced as a result of the manufacturing of coke, iron, and steel, the forming of metals into basic shapes, and the cleaning and scaling of metal surfaces. These outputs, categorized by process (RCRA waste code provided where applicable), include:

*Cokemaking*

Inputs:
• Coal, heat, quench water
Outputs:
• Process residues from coke by-product recovery (RCRA K143, K148)
• Coke oven gas by-products such as coal tar, light oil, ammonia liquor, and the remainder of the gas stream is used as fuel. Coal tar is typically refined to produce commercial and industrial products including pitch, creosote oil, refined tar, naphthalene, and bitumen.
• Charging emissions (fine particles of coke generated during oven pushing, conveyor transport, loading and unloading of coke that are captured by pollution control equipment. Approximately one pound per ton of coke produced are captured and generally land disposed).
• Ammonia, phenol, cyanide and hydrogen sulfide
• Oil (K143 and K144)
• Lime sludge, generated from the ammonia still (K060)
• Decanter tank tar sludge (K087)
• Benzene releases in coke by-product recovery operations
• Naphthalene residues, generated in the final cooling tower
• Tar residues (K035, K141, K142, and K147)
• Sulfur compounds, emitted from the stacks of the coke ovens
• Wastewater from cleaning and cooling (contains zinc, ammonia still lime (K060), or decanter tank tar (K087), tar distillation residues (K035))
• Coke oven gas condensate from piping and distribution system; may be a RCRA characteristic waste for benzene.

*Ironmaking*

Inputs:
• Iron ore (primarily in the form of taconite pellets), coke, sinter, coal, limestone, heated air

Outputs:
- Slag, which is either sold as a by-product, primarily for use in the construction industry, or landfilled
- Residual sulfur dioxide or hydrogen sulfide
- Particulates captured in the gas, including the air pollution control (APC) dust or waste treatment plant (WTP) sludge
- Iron is the predominant metal found in the process wastewater
- Blast furnace gas (CO)

### Steelmaking

Inputs:
- In the steelmaking process that uses a basic oxygen furnace (BOF), inputs include molten iron, metal scrap, and high-purity oxygen
- In the steelmaking process that uses an electric arc furnace (EAF), the primary inputs are scrap metal, electric energy and graphite electrodes.
- For both processes, fluxes and alloys are added, and may include: fluorspar, dolomite, and alloying agents such as aluminum, manganese, and others.

Outputs:
- Basic Oxygen Furnace emission control dust and sludge, a metals-bearing waste.
- Electric Arc Furnace emission control dust and sludge (K061); generally, 20 pounds of dust per ton of steel is expected, but as much as 40 pounds of dust per ton of steel may be generated depending on the scrap that is used.
- Metal dusts (consisting of iron particulate, zinc, and other metals associated with the scrap and flux (lime and/or fluorspar) not associated with the EAF.
- Slag.
- Carbon monoxide.
- Nitrogen oxides and ozone, which are generated during the melting process.

### Forming, Cleaning, and Descaling

Inputs:
- Carbon steel is pickled with hydrochloric or sulfuric acid; stainless steels are pickled with hydrochloric, nitric, and hydrofluoric acids.
- Various organic chemicals are used in the pickling process.
- Alkaline cleaners may also be used to remove mineral oils and animal fats and oils from the steel surface. Common alkaline cleaning agents include: caustic soda, soda ash, alkaline silicates, phosphates.

Outputs:

    • Wastewater sludge from rolling, cooling, descaling, and rinsing operations which may contain cadmium (D006), chromium (D007), lead (D008)
    • Oils and greases from hot and cold rolling
    • Spent pickle liquor (K062)
    • Spent pickle liquor rinse water sludge from cleaning operations
    • Wastewater from the rinse baths. Rinse water from coating processes may contain zinc, lead, cadmium, or chromium.
    • Grindings from roll refinishing may be RCRA characteristic waste from chromium (D007)
    • Zinc dross

## III.C. Management of Chemicals in the Production Process

The Pollution Prevention Act of 1990 (PPA) requires facilities to report information about the management of TRI chemicals in waste and efforts made to eliminate or reduce those quantities. These data have been collected annually in Section 8 of the TRI reporting Form R beginning with the 1991 reporting year. The data summarized below cover the years 1992-1995 and is meant to provide a basic understanding of the quantities of waste handled by the industry, the methods typically used to manage this waste, and recent trends in these methods. TRI waste management data can be used to assess trends in source reduction within individual industries and facilities, and for specific TRI chemicals. This information could then be used as a tool in identifying opportunities for pollution prevention compliance assistance activities.

From the yearly data presented below it is apparent that the portion of TRI wastes reported as recycled on-site has increased and the portions treated or managed through energy recovery on-site have decreased between 1992 and 1995 (projected). While the quantities reported for 1992 and 1993 are estimates of quantities already managed, the quantities reported for 1994 and 1995 are projections only. The PPA requires these projections to encourage facilities to consider future waste generation and source reduction of those quantities as well as movement up the waste management hierarchy. Future-year estimates are not commitments that facilities reporting under TRI are required to meet.

Exhibit 6 shows that the iron and steel industry managed about 1.3 billion pounds of production-related waste (total quantity of TRI chemicals in the waste from routine production operations) in 1993 (column B). Column C reveals that of this production-related waste, over half (52%) was either transferred off-site or released to the environment, and most of this quantity was recycled off-site (typically in a metals recovery process). Column C is calculated by dividing the total TRI transfers and releases by the total quantity of production-related waste. In other words, about 48% of the industry's TRI wastes were managed on-site through recycling, energy recovery, or treatment as shown in columns E, F and G, respectively. The majority of waste that is

US EPA ARCHIVE DOCUMENT

released or transferred off-site can be divided into portions that are recycled off-site, recovered for energy off-site, or treated off-site as shown in columns H, I and J, respectively. The remaining portion of the production related wastes (15% for 1993), shown in column D, is either released to the environment through direct discharges to air, land, water, and underground injection, or it is disposed off-site.

| A | B | C | D | On-Site | | | Off-Site | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | E | F | G | H | I | J |
| Year | Quantity of Production-Related Waste (10$^6$ lbs.)$^a$ | % Released and Transferred$^b$ | % Released and Disposed$^c$ Off-site | % Recycled | % Energy Recovery | % Treated | % Recycled | % Energy Recovery | % Treated |
| 1992 | 1,301 | 40% | 10% | 32% | 2% | 16% | 34% | 1% | 5% |
| 1993 | 1,340 | 52% | 15% | 24% | 1% | 17% | 35% | 1% | 6% |
| 1994 | 1,341 | --- | 15% | 23% | 1% | 18% | 37% | 1% | 6% |
| 1995 | 1,357 | --- | 15% | 22% | 1% | 18% | 38% | 1% | 6% |

**Exhibit 6: Source Reduction and Recycling Activity for Iron and Steel Industry (SIC 331) as Reported within TRI**

$^a$ Does not include any accidental, non-production related wastes.
$^b$ Total TRI transfers and releases as reported in Section 5 and 6 of Form R as a percentage of production related wastes; this value may not equal the sum of the percentages released and transferred due to reporting errors in Section 8.
$^c$ Percentage of production related waste released to the environment and transferred off-site for disposal.

## IV. CHEMICAL RELEASE AND TRANSFER PROFILE

This section is designed to provide background information on the pollutant releases that are reported by this industry. The best source of comparative pollutant release information is the Toxic Release Inventory System (TRI). Pursuant to the Emergency Planning and Community Right-to-Know Act, TRI includes self-reported facility release and transfer data for over 600 toxic chemicals. Facilities within SIC Codes 20-39 (manufacturing industries) that have more than 10 employees, and that are above weight-based reporting thresholds are required to report TRI on-site releases and off-site transfers. The information presented within the sector notebooks is derived from the most recently available (1993) TRI reporting year (which then included 316 chemicals), and focuses primarily on the on-site releases reported by each sector. Because TRI requires consistent reporting regardless of sector, it is an excellent tool for drawing comparisons across industries.

Although this sector notebook does not present historical information regarding TRI chemical releases, please note that in general, toxic chemical releases reported in TRI have been declining. In fact, according to the 1993 Toxic Release Inventory Data Book, reported releases dropped by 42.7% between 1988 and 1993. Although on-site releases have decreased, the total amount of reported toxic waste has not declined because the amount of toxic chemicals transferred off-site has increased. Transfers have increased from 3.7 billion pounds in 1991 to 4.7 billion pounds in 1993. Better management practices have led to increases in off-site transfers of toxic chemicals for recycling. More detailed information can be obtained from EPA's annual Toxics Release Inventory Public Data Release book (which is available through the EPCRA Hotline at 1-800-535-0202), or directly from the Toxic Release Inventory System database (for user support call 202-260-1531).

Wherever possible, the sector notebooks present TRI data as the primary indicator of chemical release within each industrial category. TRI data provide the type, amount and media receptor of each chemical released or transferred. When other sources of pollutant release data have been obtained, these data have been included to augment the TRI information.

### TRI Data Limitations

The reader should keep in mind the following limitations regarding TRI data. Within some sectors, the majority of facilities are not subject to TRI reporting because they are not considered manufacturing industries, or because they are below TRI reporting thresholds. Examples are the mining, dry cleaning, printing, and transportation equipment cleaning sectors. For these sectors, release information from other sources has been included.

The reader should also be aware that TRI "pounds released" data presented within the notebooks is not equivalent to a "risk" ranking for each industry. Weighting each pound of release equally does not factor in the relative toxicity of each chemical that is released. The Agency is in the process of developing an approach to assign toxicological weightings to each chemical released so that one can differentiate between pollutants with significant differences in toxicity. As a preliminary indicator of the environmental impact of the industry's most commonly released chemicals, the notebook briefly summarizes the toxicological properties of the top five chemicals (by weight) reported by each industry.

## Definitions Associated With Section IV Data Tables

### General Definitions

**SIC Code** -- is the Standard Industrial Classification (SIC) is a statistical classification standard used for all establishment-based Federal economic statistics. The SIC codes facilitate comparisons between facility and industry data.

**TRI Facilities** -- are manufacturing facilities that have 10 or more full-time employees and are above established chemical throughput thresholds. Manufacturing facilities are defined as facilities in Standard Industrial Classification primary codes 20-39. Facilities must submit estimates for all chemicals that are on the EPA's defined list and are above throughput thresholds.

### Data Table Column Heading Definitions

The following definitions are based upon standard definitions developed by EPA's Toxic Release Inventory Program. The categories below represent the possible pollutant destinations that can be reported.

**RELEASES** -- are an on-site discharge of a toxic chemical to the environment. This includes emissions to the air, discharges to bodies of water, releases at the facility to land, as well as contained disposal into underground injection wells.

**Releases to Air (Point and Fugitive Air Emissions)** -- Include all air emissions from industry activity. Point emission occur through confined air streams as found in stacks, ducts, or pipes. Fugitive emissions include losses from equipment leaks, or evaporative losses from impoundments, spills, or leaks.

**Releases to Water (Surface Water Discharges)** -- encompass any releases going directly to streams, rivers, lakes, oceans, or other bodies of water. Any estimates for storm water runoff and non-point losses must also be included.

**Releases to Land** -- includes disposal of toxic chemicals in waste to on-site landfills, land treated or incorporation into soil, surface impoundments, spills, leaks, or waste piles. These activities must occur within the facility's boundaries for inclusion in this category.

**Underground Injection** -- is a contained release of a fluid into a subsurface well for the purpose of waste disposal.

**TRANSFERS** -- is a transfer of toxic chemicals in wastes to a facility that is geographically or physically separate from the facility reporting under TRI. The quantities reported represent a movement of the chemical away from the reporting facility. Except for off-site transfers for disposal, these quantities do not necessarily represent entry of the chemical into the environment.

**Transfers to POTWs** -- are wastewaters transferred through pipes or sewers to a publicly owned treatments works (POTW). Treatment and chemical removal depend on the chemical's nature and treatment methods used. Chemicals not treated or destroyed by the POTW are generally released to surface waters or landfilled within the sludge.

**Transfers to Recycling** -- are sent off-site for the purposes of regenerating or recovering still valuable materials. Once these chemicals have been recycled, they may be returned to the originating facility or sold commercially.

**Transfers to Energy Recovery** -- are wastes combusted off-site in industrial furnaces for energy recovery. Treatment of a chemical by incineration is not considered to be energy recovery.

**Transfers to Treatment** -- are wastes moved off-site for either neutralization, incineration, biological destruction, or physical separation. In some cases, the chemicals are not destroyed but prepared for further waste management.

**Transfers to Disposal** -- are wastes taken to another facility for disposal generally as a release to land or as an injection underground.

## IV.A. EPA Toxic Release Inventory for the Iron and Steel Industry

This section summarizes TRI data of facilities involved in the production of iron and steel products who report their operations under SIC 331. These include blast furnaces and steel mills, steel wire manufacture, and cold rolled steel products but also include a small number of nonferrous operations (such as facilities manufacturing nonferrous electrometalurgical products under SIC 3313). The *Census of Manufactures* reports 1,118 iron and steel establishments under SIC 331. Although 381 iron and steel facilities filed TRI reports in 1993 (under SIC 3312, 3313, 3315, 3316, 3317), the 155 facilities (41 percent) classified under SIC 3312 (blast furnaces and steel mills) are responsible for over 75 percent of reported releases and transfers. TRI information is likely to provide a fairly different profile for the facilities not

reporting under 3312 (non-steel producing facilities).

According to TRI data, the iron and steel industry released and transferred a total of approximately 695 million pounds of pollutants during calendar year 1993. These releases and transfers are dominated by large volumes of metal-bearing wastes. The majority of these wastes (70 percent or 488 million pounds) are transferred off-site for recycling, typically for recovery of the metal content. *Transfers* of TRI chemicals account for 86 percent of the iron and steel industry's total TRI-reportable chemicals (609 million pounds) while *releases* make up 14 percent (85 million pounds). Metal-bearing wastes account for approximately 80 percent of the industry's transfers and over fifty percent of the releases.

Releases from the industry continue to decrease, while transfers increased from 1992 to 1993. The increase in transfers is likely due to increased off-site shipments for recovery of metals from wastes. This shift may also have contributed to the decrease in releases. Another factor influencing an overall downward trend since 1988 in releases and transfers is the steel mill production decrease during the 1988 to 1993 period. In addition, pollution control equipment and a shift to new technologies, such as continuous casting, are responsible for significant changes in the amount and type of pollutants released during steelmaking. Finally, the industry's efforts in pollution preventing also play a role in driving pollutant release reductions.

Evidence of the diversity of processes at facilities reporting to TRI is found in the fact that the most frequently reported chemical (sulfuric acid) is reported by only 41 percent of the facilities; the sixth most frequently reported chemical was used by just one-fourth of TRI facilities. The variability in facilities' pollutant profile may be attributable to a number of factors. Fewer than 30 of the facilities in the TRI database for SIC 331 are fully integrated plants making coke, iron, and steel products. The non-integrated facilities do not perform one or more of the production steps and, therefore, may have considerably different emissions profiles. Furthermore, steel making operations with electric arc furnaces have significantly different pollutant profiles than those making steel with basic oxygen furnaces.

**Releases**

The iron and steel industry releases just 14 percent of its TRI total poundage. Of these releases, over half go to on-site land disposal, and one quarter of releases are fugitive or point source air emissions (Exhibit 7). Manganese, zinc, chromium, and lead account for over 90 percent of the on-site land disposal. The industry's air releases are associated with volatilization, fume or aerosol formation in the high temperature furnaces and byproduct processing. Ammonia, lighter weight organics, such as methanol, acids and metal contaminants found in the iron ore are the principal types of chemicals released to the air. In addition to air releases of chemicals reported in TRI, the iron and steel industry is a significant source of particulates, carbon

US EPA ARCHIVE DOCUMENT

monoxide, nitrogen oxides and sulfur compounds due to combustion. Ammonia releases account for the largest part of the fugitive releases (approximately 42 percent) and 1,1,1-trichloroethane, hydrochloric acid, zinc compounds, and trichloroethylene each contribute another 4 - 5 percent. Underground injection (principally of hydrochloric acid) makes up about 14 percent of the releases reported by the industry.

**Transfers**

Eighty percent of transfers reported by SIC 331 industries are sent off-site for recycling. Zinc, manganese, chromium, copper, nickel, and lead are the six metals transferred by the greatest number of facilities (Exhibit 8).

Acids used during steel finishing, such as hydrochloric, sulfuric, nitric, and phosphoric acids, account for another 17 percent of transfers. These acids are most often sent off-site for recycling or for treatment. Hydrochloric acids are also managed by on-site underground injection. The next class of chemicals of significant volume in TRI are solvents and lightweight carbon byproducts, including: 1,1,1-trichloroethane, trichloroethylene, phenol, xylene, methanol, and toluene. These solvents are primarily released as fugitive air emissions, but also from point sources. A small percentage of these solvents are transferred off-site for recycling.

Chemicals sent off-site for disposal (primarily zinc, sulfuric acid, manganese, and ammonium sulfate) account for another 10 percent of transfers. Only approximately 7 percent of chemicals transferred off-site go to treatment. These chemicals are primarily hydrochloric acid, sulfuric acid, and nitric acid. Only about one percent of transfers by weight are POTW discharges (mainly sulfuric acid). Another one percent of transfers are sent for energy recovery (with hydrochloric acid as the most significant contributor).

**Exhibit 7: Releases for Iron and Steel Facilities (SIC 331) in TRI, by Number of Facilities Reporting**
**(1993 Releases reported in pounds/year)**

| CHEMICAL NAME | # REPORTING CHEMICAL | FUGITIVE AIR | POINT AIR | WATER DISCHARGES | UNDERGROUND INJECTION | LAND DISPOSAL | TOTAL RELEASES | AVG. RELEASE PER FACILITY |
|---|---|---|---|---|---|---|---|---|
| SULFURIC ACID | 157 | 385,882 | 321,639 | 27,700 | 0 | 4,705 | 739,926 | 4,713 |
| MANGANESE COMPOUNDS | 110 | 472,855 | 808,182 | 145,595 | 4,800 | 21,252,405 | 22,683,837 | 206,217 |
| CHROMIUM COMPOUNDS | 108 | 19,821 | 87,971 | 53,107 | 4,800 | 1,953,629 | 2,119,328 | 19,623 |
| ZINC COMPOUNDS | 108 | 596,037 | 874,585 | 121,804 | 250 | 13,497,412 | 15,090,088 | 139,723 |
| HYDROCHLORIC ACID | 102 | 612,814 | 1,469,636 | 25 | 11,726,300 | 744 | 13,809,519 | 135,387 |
| CHROMIUM | 95 | 10,858 | 24,926 | 4,432 | 0 | 415,839 | 456,055 | 4,801 |
| MANGANESE | 94 | 38,655 | 42,782 | 79,069 | 0 | 791,189 | 951,695 | 10,124 |
| NICKEL COMPOUNDS | 86 | 9,030 | 12,107 | 11,007 | 1,100 | 654,514 | 687,758 | 7,997 |
| NICKEL | 83 | 10,505 | 19,817 | 9,490 | 3,200 | 126,359 | 169,371 | 2,041 |
| NITRIC ACID | 66 | 96,647 | 487,887 | 39 | 0 | 44,730 | 629,303 | 9,535 |
| LEAD | 61 | 34,634 | 107,468 | 17,088 | 0 | 126,479 | 285,669 | 4,683 |
| LEAD COMPOUNDS | 61 | 55,593 | 76,024 | 11,559 | 0 | 1,087,501 | 1,230,677 | 20,175 |
| AMMONIA | 59 | 5,162,886 | 1,012,664 | 4,836,185 | 860,000 | 6,479 | 11,878,214 | 201,326 |
| PHOSPHORIC ACID | 56 | 78,666 | 7,672 | 260 | 0 | 142,814 | 229,412 | 4,097 |
| COPPER COMPOUNDS | 51 | 10,474 | 81,731 | 8,918 | 1,100 | 1,518,033 | 1,620,256 | 31,770 |
| COPPER | 36 | 17,281 | 4,902 | 3,237 | 0 | 16,320 | 41,740 | 1,159 |
| ZINC (FUME OR DUST) | 36 | 328,089 | 322,975 | 58,831 | 0 | 3,571,000 | 4,280,895 | 118,914 |
| XYLENE (MIXED ISOMERS) | 32 | 172,712 | 76,091 | 510 | 0 | 274 | 249,587 | 7,800 |
| HYDROGEN FLUORIDE | 30 | 96,276 | 133,328 | 19 | 0 | 20,789 | 250,412 | 8,347 |
| TOLUENE | 30 | 222,938 | 408,507 | 513 | 0 | 328 | 632,286 | 21,076 |
| NAPHTHALENE | 26 | 98,890 | 35,809 | 1,830 | 15,000 | 300 | 151,829 | 5,840 |
| BENZENE | 24 | 482,755 | 347,643 | 911 | 7,000 | 600 | 838,909 | 34,955 |
| CYANIDE COMPOUNDS | 24 | 14,928 | 91,928 | 72,033 | 41,000 | 909 | 220,798 | 9,200 |
| CHLORINE | 23 | 16,510 | 6,409 | 48,910 | 0 | 0 | 71,829 | 3,123 |
| ETHYLENE GLYCOL | 21 | 52,505 | 255 | 99,306 | 0 | 6,950 | 159,016 | 7,572 |
| ETHYLENE | 20 | 196,170 | 771,732 | 0 | 0 | 0 | 967,902 | 48,395 |
| BARIUM COMPOUNDS | 19 | 847 | 1,260 | 12,523 | 0 | 140,857 | 155,487 | 8,184 |
| 1,1,1-TRICHLOROETHANE | 19 | 1,184,793 | 160,942 | 0 | 0 | 0 | 1,345,735 | 70,828 |
| ANTHRACENE | 17 | 3,830 | 11,636 | 9 | 0 | 0 | 15,475 | 910 |
| PHENOL | 16 | 101,903 | 77,677 | 30,445 | 76,000 | 23,817 | 309,842 | 19,365 |
| ALUMINUM (FUME OR DUST) | 15 | 5,536 | 56,575 | 22,522 | 0 | 210,064 | 294,697 | 19,646 |
| PROPYLENE | 15 | 28,149 | 81,649 | 0 | 0 | 0 | 109,798 | 7,320 |
| METHANOL | 14 | 487,709 | 18 | 0 | 0 | 35 | 487,762 | 34,840 |
| DIBENZOFURAN | 13 | 2,571 | 29 | 0 | 0 | 0 | 2,600 | 200 |
| MOLYBDENUM TRIOXIDE | 13 | 923 | 852 | 1,860 | 0 | 6,450 | 10,085 | 776 |
| ETHYLBENZENE | 12 | 13,504 | 3,803 | 250 | 0 | 0 | 17,557 | 1,463 |
| TRICHLOROETHYLENE | 12 | 572,277 | 484,600 | 5 | 0 | 0 | 1,056,882 | 88,074 |
| AMMONIUM SULFATE(SOLUTION) | 10 | 5 | 0 | 5,693 | 0 | 0 | 5,698 | 570 |
| CADMIUM COMPOUNDS | 10 | 904 | 1,391 | 5 | 0 | 0 | 2,300 | 230 |
| STYRENE | 10 | 4,724 | 636 | 5 | 0 | 7 | 5,372 | 537 |
| COBALT | 9 | 419 | 684 | 3,709 | 0 | 760 | 5,572 | 619 |
| GLYCOL ETHERS | 8 | 76,065 | 268,798 | 0 | 0 | 0 | 344,863 | 43,108 |
| DICHLOROMETHANE | 7 | 133,725 | 264,215 | 0 | 0 | 0 | 397,940 | 56,849 |
| COBALT COMPOUNDS | 6 | 18 | 781 | 535 | 0 | 3,100 | 4,434 | 739 |
| CRESOL (MIXED ISOMERS) | 6 | 6,341 | 1,801 | 259 | 0 | 0 | 8,401 | 1,400 |
| QUINOLINE | 6 | 379 | 1,801 | 0 | 0 | 0 | 2,185 | 364 |

**Exhibit 7 (cont.):  Releases for Iron and Steel Facilities (SIC 331) in TRI, by Number of Facilities Reporting**
**(1993 Releases reported in pounds/year)**

| CHEMICAL NAME | # REPORTING CHEMICAL | FUGITIVE AIR | POINT AIR | WATER DISCHARGES | UNDERGROUND INJECTION | LAND DISPOSAL | TOTAL RELEASES | AVG. RELEASE PER FACILITY |
|---|---|---|---|---|---|---|---|---|
| QUINOLINE | 6 | 2,185 | 379 | 1,801 | 5 | 0 | 2,185 | 364 |
| 1,2,4-TRIMETHYLBENZENE | 6 | 9,730 | 434 | 0 | 0 | 0 | 10,164 | 1,694 |
| ANTIMONY COMPOUNDS | 5 | 1,715 | 110 | 635 | 0 | 1,052 | 3,512 | 702 |
| BIPHENYL | 5 | 202 | 1 | 0 | 0 | 0 | 203 | 41 |
| ANTIMONY | 4 | 803 | 650 | 5,515 | 0 | 1,300 | 8,260 | 2,067 |
| TETRACHLOROETHYLENE | 4 | 34,498 | 10,800 | 0 | 0 | 0 | 45,290 | 11,325 |
| ACETONE | 3 | 340,285 | 0 | 0 | 0 | 0 | 340,285 | 113,428 |
| BARIUM | 3 | 373 | 996 | 4,416 | 0 | 117,264 | 123,049 | 41,016 |
| CADMIUM | 3 | 24 | 388 | 0 | 0 | 0 | 412 | 137 |
| SEC-BUTYL ALCOHOL | 3 | 56,794 | 10,650 | 250 | 0 | 0 | 67,694 | 22,565 |
| VANADIUM (FUME OR DUST) | 3 | 4,180 | 700 | 3,200 | 0 | 22,000 | 30,080 | 10,027 |
| CALCIUM CYANAMIDE | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| CARBON DISULFIDE | 2 | 1,638 | 250 | 0 | 0 | 0 | 1,888 | 944 |
| DIETHANOLAMINE | 2 | 1,900 | 0 | 25,000 | 0 | 0 | 26,900 | 13,450 |
| HYDROGEN CYANIDE | 2 | 5 | 10 | 0 | 0 | 0 | 15 | 8 |
| METHYL ETHYLKETONE | 2 | 3,700 | 51,400 | 0 | 0 | 0 | 55,100 | 27,550 |
| N-BUTYL ALCOHOL | 2 | 250 | 27,807 | 0 | 0 | 0 | 28,057 | 14,029 |
| SILVER | 2 | 5 | 0 | 0 | 0 | 0 | 5 | 3 |
| THIOUREA | 2 | 250 | 0 | 767 | 0 | 0 | 1,017 | 509 |
| ALUMINUM OXIDE(FIBROUS | 1 | 250 | 0 | 0 | 0 | 0 | 250 | 250 |
| ARSENIC | 1 | 15 | 15 | 0 | 0 | 0 | 30 | 30 |
| BROMOTRIFLUOROMETHANE | 1 | 250 | 0 | 0 | 0 | 0 | 250 | 250 |
| BUTYL BENZYL PHTHALATE | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| CARBONYL SULFIDE | 1 | 250 | 0 | 0 | 0 | 0 | 250 | 250 |
| METHYL ISOBUTYL KETONE | 1 | 170 | 0 | 0 | 0 | 0 | 170 | 170 |
| POLYCHLORINATED BIPHENYLS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| PYRIDINE | 1 | 750 | 16,000 | 0 | 8,200 | 0 | 24,950 | 24,950 |
| SELENIUM COMPOUNDS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1,3-BUTADIENE | 1 | 250 | 0 | 0 | 0 | 0 | 250 | 250 |
| 2,4-DIMETHYLPHENOL | 1 | 250 | 0 | 0 | 0 | 0 | 250 | 250 |
| TOTAL | 381 | 12,377,570 | 9,174,029 | 5,729,986 | 12,748,750 | 45,767,008 | 85,797,343 | 85,797,343 |

US EPA ARCHIVE DOCUMENT

September 1995

34

SIC 331

Sector Notebook Project

Iron and Steel Industry

**Exhibit 8: Transfers for Iron and Steel Facilities in TRI, by Number of Facilities Reporting**
**(1993 Transfers reported in pounds/year)**

| CHEMICAL NAME | # REPORTING CHEMICAL | POTW DISCHARGES | DISPOSAL | RECYCLING | TREATMENT | ENERGY RECOVERY | TOTAL TRANSFERS | AVG. TRANSFER PER FACILITY |
|---|---|---|---|---|---|---|---|---|
| SULFURIC ACID | 157 | 7,192,127 | 11,060,393 | 15,416,092 | 6,533,083 | 0 | 40,295,552 | 256,660 |
| MANGANESE COMPOUNDS | 110 | 1,498 | 2,500,170 | 25,091,810 | 514,579 | 0 | 28,108,057 | 255,528 |
| CHROMIUM COMPOUNDS | 108 | 1,353 | 1,394,134 | 25,225,915 | 312,628 | 1,059 | 26,935,089 | 249,399 |
| ZINC COMPOUNDS | 108 | 8,611 | 34,813,453 | 157,386,808 | 5,021,396 | 3,100 | 197,233,368 | 1,826,235 |
| HYDROCHLORIC ACID | 102 | 217,138 | 395,161 | 32,888,151 | 23,981,197 | 8,497,000 | 65,978,647 | 646,849 |
| CHROMIUM | 95 | 2,289 | 1,010,326 | 32,865,366 | 36,816 | 750 | 33,915,547 | 357,006 |
| MANGANESE | 94 | 2,461 | 4,442,385 | 39,076,967 | 40,744 | 0 | 43,562,557 | 463,431 |
| NICKEL COMPOUNDS | 86 | 4,678 | 381,519 | 8,831,918 | 121,984 | 0 | 9,340,099 | 108,606 |
| NICKEL | 83 | 2,091 | 455,271 | 13,271,504 | 57,207 | 0 | 13,786,073 | 166,097 |
| NITRIC ACID | 66 | 51,087 | 1,616,149 | 54,046 | 3,073,168 | 0 | 4,794,450 | 72,643 |
| LEAD | 61 | 2,242 | 515,410 | 7,382,111 | 151,145 | 27 | 8,050,935 | 131,983 |
| LEAD COMPOUNDS | 61 | 957 | 682,835 | 13,703,747 | 152,866 | 0 | 14,540,405 | 238,367 |
| AMMONIA | 59 | 488,144 | 53,077 | 0 | 5,650 | 2,700 | 549,821 | 9,319 |
| PHOSPHORIC ACID | 56 | 9 | 90,626 | 18,000 | 19,549 | 0 | 128,184 | 2,289 |
| COPPER COMPOUNDS | 51 | 1,930 | 99,140 | 998,167 | 35,473 | 0 | 1,134,710 | 22,249 |
| COPPER | 36 | 746 | 63,934 | 5,598,545 | 7,123 | 0 | 5,670,348 | 157,510 |
| ZINC (FUME OR DUST) | 36 | 958 | 669,220 | 60,234,732 | 199,821 | 0 | 61,104,731 | 1,697,354 |
| XYLENE(MIXED ISOMERS) | 32 | 308 | 600 | 7,360 | 828 | 23,816 | 32,912 | 1,029 |
| HYDROGEN FLUORIDE | 30 | 28,300 | 387,574 | 15,046 | 827,889 | 0 | 1,258,809 | 41,960 |
| TOLUENE | 30 | 360 | 650 | 1,760 | 7,747 | 7,897 | 18,414 | 614 |
| NAPHTHALENE | 26 | 1,578 | 24,300 | 0 | 3,561 | 900 | 30,339 | 1,167 |
| BENZENE | 24 | 1,574 | 1,800 | 469 | 4,477 | 1,800 | 10,120 | 422 |
| CYANIDE COMPOUNDS | 24 | 29,753 | 3,184 | 0 | 13,238 | 0 | 46,175 | 1,924 |
| CHLORINE | 23 | 1,310 | 250 | 92,563 | 0 | 0 | 94,123 | 4,092 |
| ETHYLENE GLYCOL | 21 | 250 | 16,984 | 279,247 | 25,000 | 57,550 | 379,031 | 18,049 |
| ETHYLENE | 20 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| BARIUM COMPOUNDS | 19 | 0 | 132,219 | 68,028 | 0 | 0 | 200,247 | 10,539 |
| 1,1,1-TRICHLOROETHANE | 19 | 0 | 2,000 | 165,861 | 33,988 | 79,528 | 281,377 | 14,809 |
| ANTHRACENE | 17 | 0 | 4,200 | 0 | 2 | 0 | 4,202 | 247 |
| PHENOL | 16 | 359,945 | 1,176 | 0 | 108,247 | 6,464 | 475,832 | 29,740 |
| ALUMINUM(FUME OR DUST) | 15 | 5 | 125,775 | 47,675,040 | 0 | 0 | 47,800,820 | 3,186,721 |
| PROPYLENE | 15 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| METHANOL | 14 | 720 | 0 | 0 | 0 | 0 | 720 | 51 |
| DIBENZOFURAN | 13 | 0 | 2,690 | 0 | 0 | 0 | 2,690 | 207 |
| MOLYBDENUM TRIOXIDE | 13 | 0 | 750 | 139,341 | 0 | 0 | 140,091 | 10,776 |
| ETHYLBENZENE | 12 | 0 | 325 | 760 | 250 | 1,502 | 2,837 | 236 |
| TRICHLOROETHYLENE | 12 | 0 | 38,556 | 76,036 | 53,726 | 24,191 | 192,509 | 16,042 |
| AMMONIUM | 10 | 0 | 2,000,000 | 0 | 0 | 0 | 2,000,000 | 200,000 |
| CADMIUM COMPOUNDS | 10 | 0 | 0 | 194,474 | 1,369 | 0 | 195,843 | 19,584 |
| STYRENE | 10 | 5 | 322 | 0 | 0 | 0 | 327 | 33 |
| COBALT | 9 | 0 | 40,026 | 830,040 | 7 | 0 | 870,073 | 96,675 |
| GLYCOL ETHERS | 8 | 0 | 0 | 0 | 1,273 | 26,000 | 27,273 | 3,409 |
| DICHLOROMETHANE | 7 | 0 | 0 | 8,229 | 8,200 | 750 | 17,179 | 2,454 |
| COBALT COMPOUNDS | 6 | 255 | 444 | 75,378 | 1,355 | 0 | 77,432 | 12,905 |
| CRESOL(MIXED ISOMERS) | 6 | 5 | 5 | 0 | 501 | 2,107 | 2,618 | 436 |
| QUINOLINE | 6 | 5 | 510 | 0 | 0 | 0 | 515 | 86 |

**Exhibit 8 (cont.): Transfers for Iron and Steel Facilities in TRI, by Number of Facilities Reporting**
**(1993 Transfers reported in pounds/year)**

| CHEMICAL NAME | # REPORTING CHEMICAL | POTW DISCHARGES | DISPOSAL | RECYCLING | TREATMENT | ENERGY RECOVERY | TOTAL TRANSFERS | AVG. TRANSFER PER FACILITY |
|---|---|---|---|---|---|---|---|---|
| QUINOLINE | 6 | 5 | 510 | 0 | 0 | 0 | 515 | 86 |
| 1,2,4-TRIMETHYLBENZENE | 6 | 5 | 380 | 0 | 250 | 750 | 1,380 | 230 |
| ANTIMONY COMPOUNDS | 5 | 0 | 410 | 0 | 0 | 0 | 410 | 82 |
| BIPHENYL | 5 | 0 | 550 | 0 | 0 | 0 | 550 | 110 |
| ANTIMONY | 4 | 0 | 34,855 | 0 | 0 | 0 | 34,855 | 8,714 |
| TETRACHLOROETHYLENE | 4 | 0 | 4,000 | 13,853 | 0 | 3,517 | 21,370 | 5,343 |
| ACETONE | 3 | 0 | 1 | 0 | 4,308 | 0 | 4,309 | 1,436 |
| BARIUM | 3 | 0 | 5 | 3,105 | 0 | 0 | 3,110 | 1,037 |
| CADMIUM | 3 | 0 | 17,400 | 82,944 | 0 | 0 | 100,344 | 33,448 |
| SEC-BUTYL ALCOHOL | 3 | 0 | 0 | 0 | 990 | 0 | 990 | 330 |
| VANADIUM (FUME OR DUST) | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| CALCIUM CYANAMIDE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| CARBON DISULFIDE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| DIETHANOLAMINE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| HYDROGEN CYANIDE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| METHYL ETHYL KETONE | 2 | 0 | 0 | 0 | 0 | 339 | 0 | 170 |
| N-BUTYL ALCOHOL | 2 | 0 | 0 | 0 | 0 | 500 | 2 | 250 |
| SILVER | 2 | 0 | 0 | 2,666 | 0 | 0 | 2 | 1,336 |
| THIOUREA | 2 | 5 | 0 | 0 | 0 | 0 | 2 | 0 |
| ALUMINUM OXIDE(FIBROUS) | 1 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
| ARSENIC | 1 | 0 | 0 | 0 | 52,117 | 0 | 52,117 | 52,117 |
| BROMOTRIFLUOROMETHANE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| BUTYL BENZYL PHTHALATE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| CARBONYL SULFIDE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| METHYL ISOBUTYL KETONE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| POLYCHLORINATED BIPHENYLS | 1 | 0 | 18,691 | 0 | 6,428 | 0 | 25,119 | 25,119 |
| PYRIDINE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| SELENIUM COMPOUNDS | 0 | 0 | 736 | 0 | 0 | 0 | 736 | 736 |
| 1,3-BUTADIENE | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2,4-DIMETHYLPHENOL | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **TOTAL** | 381 | 8,402,697 | 63,104,571 | 487,776,079 | 41,420,180 | 8,742,247 | 609,539,881 | 1,599,842 |

The TRI database contains a detailed compilation of self-reported, facility-

specific chemical releases. The top reporting facilities for this sector based on pounds released are listed below. Facilities that have reported <u>only</u> the SIC codes covered under this notebook appear on the first list. The second list contains additional facilities that have reported the SIC code covered within this report, <u>and</u> one or more SIC codes that are not within the scope of this notebook. Therefore, the second list includes facilities that conduct multiple operations - some that are under the scope of this notebook, and some that are not. Currently, the facility-level data do not allow pollutant releases to be broken apart by industrial process.

| Exhibit 9: Top 10 TRI Releasing Iron and Steel Facilities[a] | | |
|---|---|---|
| **Rank** | **Facility** | **Total TRI Releases in Pounds** |
| 1 | Elkem Metals Co* - Marietta, OH | 18,604,572 |
| 2 | Northwestern Steel & Wire Co. - Sterling, IL | 14,274,570 |
| 3 | Granite City Steel - Granite City, IL | 5,156,148 |
| 4 | Midwest Steel Div. Midwest Steel Div. - Portage, IN | 4,735,000 |
| 5 | AK Steel Corp. Middletown Works - Middletown, OH | 4,189,050 |
| 6 | Bethlehem Steel Corp. Burns Harbor Div. - Burns Harbor, IN | 3,899,470 |
| 7 | Wheeling-Pittsburgh Steel Corp Mingo Junction Plant - Mingo Junction, OH | 3,089,795 |
| 8 | USS Gary Works - Gary, IN | 2,403,348 |
| 9 | LTV Steel Co. Inc. Cleveland Works - Cleveland, OH | 1,985,131 |
| 10 | Gulf States Steel Inc. - Gadsden, AL | 1,959,707 |

Source: U.S. EPA *Toxic Release Inventory Database*, 1993.
\* This is an Electrometallurgical Products facility (SIC 3313), not a steel mill.

---

[a] Being included on this list does not mean that the release is associated with non-compliance with environmental laws.

| Exhibit 10: Top 10 TRI Releasing Facilities Reporting SIC 331 Operations[b] | | | |
|---|---|---|---|
| Rank | SIC Codes Reported in TRI | Facility | Total TRI Releases in Pounds |
| 1 | 3313 | Elkem Metals Co[*] - Marietta, OH | 18,604,572 |
| 2 | 3312, 3315 | Northwestern Steel & Wire Co. - Sterling, IL | 14,274,570 |
| 3 | 3312, 3274 | Inland Steel Co. - East Chicago, IN | 10,618,719 |
| 4 | 3313, 2819 | Kerr-McGee Chemical Corp. Electrolytic Plant - Hamilton, MS[*] | 5,446,555 |
| 5 | 3312 | Granite City Steel - Granite City, IL | 5,156,148 |
| 6 | 3316 | Midwest Steel Div. Midwest Steel Div. - Portage, IN | 4,735,000 |
| 7 | 3312 | AK Steel Corp. Middletown Works - Middletown, OH | 4,189,050 |
| 8 | 3312 | Bethlehem Steel Corp. Burns Harbor Div. - Burns Harbor, IN | 3,899,470 |
| 9 | 3312 | Wheeling-Pittsburgh Steel Corp Mingo Junction Plant - Mingo Junction, OH | 3,089,795 |
| 10 | 3312 | USS Gary Works - Gary, IN | 2,403,348 |

Source: U.S. EPA *Toxic Release Inventory Database*, 1993.
[*] This is an Electrometallurgical Products facility (SIC 3313), not a steel mill.

## IV.B. Summary of Selected Chemicals Released

The following is a synopsis of current scientific toxicity and fate information for the top chemicals (by weight) that facilities within this sector self-reported as released to the environment based upon 1993 TRI data. Because this section is based upon self-reported release data, it does not attempt to provide information on management practices employed by the sector to reduce the release of these chemicals. Information regarding pollutant release reduction over time may be available from EPA's TRI and 33/50 programs, or directly from the industrial trade associations that are listed in Section IX of this document. Since these descriptions are cursory, please consult the sources referenced below for a more detailed description of both the chemicals described in this section, and the chemicals that appear on the full list of TRI chemicals appearing in Section IV.A.

---

[b] Being included on this list does not mean that the release is associated with non-compliance with environmental laws.

The brief descriptions provided below were taken from the *1993 Toxics Release Inventory Public Data Release* (EPA, 1994), and the Hazardous Substances Data Bank (HSDB), accessed via TOXNET. TOXNET is a computer system run by the National Library of Medicine. It includes a number of toxicological databases managed by EPA, the National Cancer Institute, and the National Institute for Occupational Safety and Health.[c] HSDB contains chemical-specific information on manufacturing and use, chemical and physical properties, safety and handling, toxicity and biomedical effects, pharmacology, environmental fate and exposure potential, exposure standards and regulations, monitoring and analysis methods, and additional references. The information contained below is based upon exposure assumptions that have been conducted using standard scientific procedures. The effects listed below must be taken in context of these exposure assumptions that are more fully explained within the full chemical profiles in HSDB. For more information on TOXNET, contact the TOXNET help line at 1-800-231-3766.

*Ammonia* (CAS: 7664-41-7)

**Sources.** In cokemaking, ammonia is produced by the decomposition of the nitrogen-containing compounds which takes place during the secondary thermal reaction (at temperatures greater than 700°C (1296°F)). The ammonia formed during coking exists in both the water and gas that form part of the volatile products. The recovery of this ammonia can be accomplished by several different processes where the by-product ammonium sulfate is formed by the reaction between the ammonia and sulfuric acid.[23]

**Toxicity.** Anhydrous ammonia is irritating to the skin, eyes, nose, throat, and upper respiratory system.

Ecologically, ammonia is a source of nitrogen (an essential element for aquatic plant growth), and may therefore contribute to eutrophication of standing or slow-moving surface water, particularly in nitrogen-limited waters such as the Chesapeake Bay. In addition, aqueous ammonia is moderately toxic to aquatic organisms.

**Carcinogenicity.** There is currently no evidence to suggest that this chemical is carcinogenic.

---

[c] Databases included in TOXNET are: CCRIS (Chemical Carcinogenesis Research Information System), DART (Developmental and Reproductive Toxicity Database), DBIR (Directory of Biotechnology Information Resources), EMICBACK (Environmental Mutagen Information Center Backfile), GENE-TOX (Genetic Toxicology), HSDB (Hazardous Substances Data Bank), IRIS (Integrated Risk Information System), RTECS (Registry of Toxic Effects of Chemical Substances), and TRI (Toxic Chemical Release Inventory).

**Environmental Fate.** Ammonia combines with sulfate ions in the atmosphere and is washed out by rainfall, resulting in rapid return of ammonia to the soil and surface waters.

Ammonia is a central compound in the environmental cycling of nitrogen. Ammonia in lakes, rivers, and streams is converted to nitrate.

**Physical Properties.** Ammonia is a corrosive and severely irritating gas with a pungent odor.

*Hydrochloric Acid* (CAS: 7647-01-1)

**Sources.** During hot rolling, a hard black iron oxide is formed on the surface of the steel. This "scale" is removed chemically in the pickling process which commonly uses hydrochloric acid.[24]

**Toxicity.** Hydrochloric acid is primarily a concern in its aerosol form. Acid aerosols have been implicated in causing and exacerbating a variety of respiratory ailments. Dermal exposure and ingestion of highly concentrated hydrochloric acid can result in corrosivity.

Ecologically, accidental releases of solution forms of hydrochloric acid may adversely affect aquatic life by including a transient lowering of the pH (i.e., increasing the acidity) of surface waters.

**Carcinogenicity.** There is currently no evidence to suggest that this chemical is carcinogenic.

**Environmental Fate.** Releases of hydrochloric acid to surface waters and soils will be neutralized to an extent due to the buffering capacities of both systems. The extent of these reactions will depend on the characteristics of the specific environment.

**Physical Properties.** Concentrated hydrochloric acid is highly corrosive. *Manganese and Manganese Compounds* (CAS: 7439-96-5; 20-12-2)

**Sources.** Manganese is found in the iron charge and is used as an addition agent added to alloy steel to obtain desired properties in the final product. In carbon steel, manganese is used to combine with sulfur to improve the ductility of the steel. An alloy steel with manganese is used for applications involving relatively small sections which are subject to severe service conditions, or in larger sections where the weight saving derived from the higher strength of the alloy steels is needed.[25]

**Toxicity.** There is currently no evidence that human exposure to manganese at levels commonly observed in ambient atmosphere results in adverse health effects. However, recent EPA review of the fuel additive MMT (methylcyclopentadienyl manganese tricarbonyl) concluded that use of MMT in gasoline could lead to ambient exposures to manganese at a level sufficient

to cause adverse neurological effects in humans.

Chronic manganese poisoning bears some similarity to chronic lead poisoning. Occurring via inhalation of manganese dust or fumes, it primarily involves the central nervous system. Early symptoms include languor, speech disturbances, sleepiness, and cramping and weakness in legs. A stolid mask-like appearance of face, emotional disturbances such as absolute detachment broken by uncontrollable laughter, euphoria, and a spastic gait with a tendency to fall while walking are seen in more advanced cases. Chronic manganese poisoning is reversible if treated early and exposure stopped. Populations at greatest risk of manganese toxicity are the very young and those with iron deficiencies.

Ecologically, although manganese is an essential nutrient for both plants and animals, in excessive concentrations manganese inhibits plant growth.

**Carcinogenicity.** There is currently no evidence to suggest that this chemical is carcinogenic.

**Environmental Fate.** Manganese is an essential nutrient for plants and animals. As such, manganese accumulates in the top layers of soil or surface water sediments and cycles between the soil and living organisms. It occurs mainly as a solid under environmental conditions, though may also be transported in the atmosphere as a vapor or dust.

*1,1,1-Trichloroethane* (CAS: 71-55-6)

**Sources.** Used for surface cleaning of steel prior to coating.

**Toxicity.** Repeated contact of 1,1,1-trichloroethane (TCE) with skin may cause serious skin cracking and infection. Vapors cause a slight smarting of the eyes or respiratory system if present in high concentrations.

Exposure to high concentrations of TCE causes reversible mild liver and kidney dysfunction, central nervous system depression, gait disturbances, stupor, coma, respiratory depression, and even death. Exposure to lower concentrations of TCE leads to light-headedness, throat irritation, headache, disequilibrium, impaired coordination, drowsiness, convulsions and mild changes in perception.

**Carcinogenicity.** There is currently no evidence to suggest that this chemical is carcinogenic.

**Environmental Fate.** Releases of TCE to surface water or land will almost entirely volatilize. Releases to air may be transported long distances and may partially return to earth in rain. In the lower atmosphere, TCE degrades very slowly by photooxidation and slowly diffuses to the upper atmosphere where photodegradation is rapid.

US EPA ARCHIVE DOCUMENT

Any TCE that does not evaporate from soils leaches to groundwater. Degradation in soils and water is slow. TCE does not hydrolyze in water, nor does it significantly bioconcentrate in aquatic organisms.

*Zinc and Zinc Compounds* (CAS: 7440-66-6; 20-19-9)

**Sources.** To protect steel from rusting, it is coated with a material that will protect it from moisture and air. In the galvanizing process, steel is coated with zinc.[26]

**Toxicity.** Zinc is a nutritional trace element; toxicity from ingestion is low. Severe exposure to zinc might give rise to gastritis with vomiting due to swallowing of zinc dusts. Short-term exposure to very high levels of zinc is linked to lethargy, dizziness, nausea, fever, diarrhea, and reversible pancreatic and neurological damage. Long-term zinc poisoning causes irritability, muscular stiffness and pain, loss of appetite, and nausea.

Zinc chloride fumes cause injury to mucous membranes and to the skin. Ingestion of soluble zinc salts may cause nausea, vomiting, and purging.

**Carcinogenicity.** There is currently no evidence to suggest that this chemical is carcinogenic.

**Environmental Fate.** Significant zinc contamination of soil is only seen in the vicinity of industrial point sources. Zinc is a relatively stable soft metal, though burns in air. Zinc bioconcentrates in aquatic organisms.

## IV.C. Other Data Sources

The toxic chemical release data obtained from TRI captures the vast majority of facilities in the iron and steel industry. It also allows for a comparison across years and industry sectors. Reported chemicals are limited however to the 316 reported chemicals. Most of the hydrocarbon emissions from iron and steel facilities are not captured by TRI.[27] The EPA Office of Air Quality Planning and Standards has compiled air pollutant emission factors for determining the total air emissions of priority pollutants (e.g., total hydrocarbons, SOx, NOx, CO, particulates, etc.) from many iron and steel manufacturing sources.[28]

The Aerometric Information Retrieval System (AIRS) contains a wide range of information related to stationary sources of air pollution, including the emissions of a number of air pollutants which may be of concern within a particular industry. With the exception of volatile organic compounds (VOCs), there is little overlap with the TRI chemicals reported above. Exhibit 11 summarizes annual releases (from the industries for which a Sector Notebook Profile was prepared) of carbon monoxide (CO), nitrogen dioxide ($NO_2$), particulate matter of 10 microns or less (PM10), total particulates (PT), sulfur dioxide ($SO_2$), and volatile organic compounds (VOCs). With 1.5 million short tons/year of carbon monoxide, the iron and steel industry

emissions are estimated as more than twice as much as the next largest releasing industry, pulp and paper.  Of the eighteen industries listed, the iron and steel industry also ranks as one of the top five releasers for $NO_2$, PM10, PT, and $SO_2$.  Carbon monoxide releases occur during ironmaking (in the burning of coke, CO produced reduces iron oxide ore), and during steelmaking (in either the basic oxygen furnace or the electric arc furnace).  Nitrogen dioxide is generated during steelmaking.  Particulate matter may be emitted from the cokemaking (particularly in quenching operations), ironmaking, basic oxygen furnace (as oxides of iron that are emitted as sub-micron dust), or from the electric arc furnace (as metal dust containing iron particulate, zinc, and other materials associated with the scrap).  Sulfur dioxide can be released in ironmaking or sintering.

Sector Notebook Project                                    Iron and Steel Industry

| Exhibit 11: Pollutant Releases (short tons/year) | | | | | | |
|---|---|---|---|---|---|---|
| **Industry Sector** | CO | NO$_2$ | PM$_{10}$ | PT | SO$_2$ | VOC |
| U.S. Total | 97,208,000 | 23,402,000 | 45,489,000 | 7,836,000 | 21,888,000 | 23,312,000 |
| Metal Mining | 5,391 | 28,583 | 39,359 | 140,052 | 84,222 | 1,283 |
| Nonmetal Mining | 4,525 | 28,804 | 59,305 | 167,948 | 24,129 | 1,736 |
| Lumber and Wood Production | 123,756 | 42,658 | 14,135 | 63,761 | 9,419 | 41,423 |
| Furniture and Fixtures | 2,069 | 2,981 | 2,165 | 3,178 | 1,606 | 59,426 |
| Pulp and Paper | 624,291 | 394,448 | 35,579 | 113,571 | 541,002 | 96,875 |
| Printing | 8,463 | 4,915 | 399 | 1,031 | 1,728 | 101,537 |
| Inorganic Chemicals | 166,147 | 103,575 | 4,107 | 39,062 | 182,189 | 52,091 |
| Organic Chemicals | 146,947 | 236,826 | 26,493 | 44,860 | 132,459 | 201,888 |
| Petroleum Refining | 419,311 | 380,641 | 18,787 | 36,877 | 648,155 | 369,058 |
| Rubber and Misc. Plastics | 2,090 | 11,914 | 2,407 | 5,355 | 29,364 | 140,741 |
| Stone, Clay and Concrete | 58,043 | 338,482 | 74,623 | 171,853 | 339,216 | 30,262 |
| **Iron and Steel** | **1,518,642** | **138,985** | **42,368** | **83,017** | **238,268** | **82,292** |
| Nonferrous Metals | 448,758 | 55,658 | 20,074 | 22,490 | 373,007 | 27,375 |
| Fabricated Metals | 3,851 | 16,424 | 1,185 | 3,136 | 4,019 | 102,186 |
| Computer and Office Equipment | 24 | 0 | 0 | 0 | 0 | 0 |
| Electronics and Other Electrical Equipment and Components | 367 | 1,129 | 207 | 293 | 453 | 4,854 |
| Motor Vehicles, Bodies, Parts and Accessories | 35,303 | 23,725 | 2,406 | 12,853 | 25,462 | 101,275 |
| Dry Cleaning | 101 | 179 | 3 | 28 | 152 | 7,310 |
| Source: U.S. EPA Office of Air and Radiation, AIRS Database, May 1995. | | | | | | |

**IV.D. Comparison of Toxic Release Inventory Between Selected Industries**

The following information is presented as a comparison of pollutant release and transfer data across industrial categories. It is provided to give a general sense as to the relative scale of releases and transfers within each sector profiled under this project. Please note that the following figure and table do not contain releases and transfers for industrial categories that are not included in this project, and thus cannot be used to draw conclusions regarding the total release and transfer amounts that are reported to TRI. Similar information is available within the annual TRI Public Data Release Book.

Exhibit 12 is a graphical representation of a summary of the 1993 TRI data for the iron and steel industry and the other sectors profiled in separate notebooks. The bar graph presents the total TRI releases and total transfers on the left axis and the triangular points show the average releases per facility on the right axis. Industry sectors are presented in the order of increasing total TRI releases. The graph is based on the data shown in Exhibit 13 and is meant to facilitate comparisons between the relative amounts of releases, transfers, and releases per facility both within and between these sectors. The reader should note, however, that differences in the proportion of facilities captured by TRI exist between industry sectors. This can be a factor of poor SIC matching and relative differences in the number of facilities reporting to TRI from the various sectors. In the case of the iron and steel industry, the 1993 TRI data presented here covers 381 facilities. These facilities listed SIC 331 (Steel Works, Blast Furnaces, and Rolling and Finishing Mills) as a primary SIC code.

**Exhibit 12: Summary of 1993 TRI Data:**
**Releases and Transfers by Industry**



| SIC Range | Industry Sector | SIC Range | Industry Sector | SIC Range | Industry Sector |
|---|---|---|---|---|---|
| 36 | Electronic Equipment and Components | 2911 | Petroleum Refining | 286 | Organic Chemical Mfg. |
| 24 | Lumber and Wood Products | 34 | Fabricated Metals | 26 | Pulp and Paper |
| 32 | Stone, Clay, and Concrete | 371 | Motor Vehicles, Bodies, Parts, and Accessories | 281 | Inorganic Chemical Mfg. |
| 27 | Printing | 331 | Iron and Steel | 333,334 | Nonferrous Metals |
| 25 | Wood Furniture and Fixtures | 30 | Rubber and Misc. Plastics | | |

US EPA ARCHIVE DOCUMENT

US EPA ARCHIVE DOCUMENT

## Exhibit 13: Toxics Release Inventory Data for Selected Industries

| Industry Sector | SIC Range | # TRI Facilities | 1993 TRI Releases | | 1993 TRI Transfers | | Total Releases + Transfers (million lbs.) | Average Releases+ Transfers per Facility (pounds) |
|---|---|---|---|---|---|---|---|---|
| | | | Total Releases (million lbs.) | Average Releases per Facility (pounds) | Total Transfers (million lbs.) | Average Transfers per Facility (pounds) | | |
| Stone, Clay, and Concrete | 32 | 634 | 26.6 | 42,000 | 2.2 | 4,000 | 28.8 | 46,000 |
| Lumber and Wood Products | 24 | 491 | 8.4 | 17,000 | 3.5 | 7,000 | 11.9 | 24,000 |
| Furniture and Fixtures | 25 | 313 | 42.2 | 135,000 | 4.2 | 13,000 | 46.4 | 148,000 |
| Printing | 2711-2789 | 318 | 36.5 | 115,000 | 10.2 | 32,000 | 46.7 | 147,000 |
| Electronic Equip. and Components | 36 | 406 | 6.7 | 17,000 | 47.1 | 116,000 | 53.7 | 133,000 |
| Rubber and Misc. Plastics | 30 | 1,579 | 118.4 | 75,000 | 45 | 29,000 | 163.4 | 104,000 |
| Motor Vehicles, Bodies, Parts, and Accessories | 371 | 609 | 79.3 | 130,000 | 145.5 | 239,000 | 224.8 | 369,000 |
| Pulp and Paper | 2611-2631 | 309 | 169.7 | 549,000 | 48.4 | 157,000 | 218.1 | 706,000 |
| Inorganic Chem. Mfg. | 2812-2819 | 555 | 179.6 | 324,000 | 70 | 126,000 | 249.7 | 450,000 |
| Petroleum Refining | 2911 | 156 | 64.3 | 412,000 | 417.5 | 2,676,000 | 481.9 | 3,088,000 |
| Fabricated Metals | 34 | 2,363 | 72 | 30,000 | 195.7 | 83,000 | 267.7 | 123,000 |
| **Iron and Steel** | **331** | **381** | **85.8** | **225,000** | **609.5** | **1,600,000** | **695.3** | **1,825,000** |
| Nonferrous Metals | 333, 334 | 208 | 182.5 | 877,000 | 98.2 | 472,000 | 280.7 | 1,349,000 |
| Organic Chemical Mfg. | 2861-2869 | 417 | 151.6 | 364,000 | 286.7 | 688,000 | 438.4 | 1,052,000 |
| Metal Mining | 10 | | Industry sector not subject to TRI reporting. | | | | | |
| Nonmetal Mining | 14 | | Industry sector not subject to TRI reporting. | | | | | |
| Dry Cleaning | 7216 | | Industry sector not subject to TRI reporting. | | | | | |

Source:  U.S. EPA, Toxics Release Inventory Database, 1993.

## V. POLLUTION PREVENTION OPPORTUNITIES

The best way to reduce pollution is to prevent it in the first place. Some companies have creatively implemented pollution prevention techniques that improve efficiency and increase profits while at the same time minimizing environmental impacts. This can be done in many ways such as reducing material inputs, re-engineering processes to reuse by-products, improving management practices, and employing substitution of toxic chemicals. Some smaller facilities are able to actually get below regulatory thresholds just by reducing pollutant releases through aggressive pollution prevention policies.

In order to encourage these approaches, this section provides both general and company-specific descriptions of some pollution prevention advances that have been implemented within the iron and steel industry. While the list is not exhaustive, it does provide core information that can be used as the starting point for facilities interested in beginning their own pollution prevention projects. This section provides summary information from activities that may be, or are being implemented by this sector. When possible, information is provided that gives the context in which the technique can be effectively used. Please note that the activities described in this section do not necessarily apply to all facilities that fall within this sector. Facility-specific conditions must be carefully considered when pollution prevention options are evaluated, and the full impacts of the change must examine how each option affects air, land and water pollutant releases.

Most of the pollution prevention activities in the iron and steel industry have concentrated on reducing cokemaking emissions, Electric Arc Furnace (EAF) dust, and spent acids used in finishing operations. Due to the complexity, size, and age of the equipment used in steel manufacturing, projects that have the highest pollution prevention potential often require significant capital investments. This section describes pollution prevention opportunities for each of the three focus areas (cokemaking, EAF dust, and finishing acids), and then lists some general pollution prevention opportunities that have been identified by the iron and steel industry.

### Cokemaking

The cokemaking process is seen by industry experts as one of the steel industry's areas of greatest environmental concern, with coke oven air emissions and quenching waste water as the major problems. In response to expanding regulatory constraints, including the Clean Air Act National Emission Standards for coke ovens completed in 1993, U.S. steelmakers are turning to new technologies to decrease the sources of pollution from, and their reliance on, coke. Pollution prevention in cokemaking has focused on two areas: reducing coke oven emissions and developing cokeless ironmaking techniques. Although these processes have not yet been widely demonstrated on a commercial scale, they may provide significant benefits for the integrated segment of the industry in the form of substantially lower air emissions and wastewater discharges than current operations.

*Eliminating Coke with Cokeless Technologies*

Cokeless technologies substitute coal for coke in the blast furnace, eliminating the need for cokemaking. Such technologies have enormous potential to reduce pollution generated during the steelmaking process. The capital investment required is also significant. Some of the cokeless technologies in use or under development include:

• *The Japanese Direct Iron Ore Smelting (DIOS) process.* This process produces molten iron directly with coal and sinter feed ore. A 500 ton per day pilot plant was started up in October, 1993 and the designed production rates were attained as a short term average. During 1995, the data generated will be used to determine economic feasibility on a commercial scale.

• *HIsmelt process.* A plant using the HIsmelt process for molten iron production, developed by HIsmelt Corporation of Australia, was started up in late 1993. The process, using ore fines and coal, has achieved a production rate of 8 tons per hour using ore directly in the smelter. Developers anticipate reaching the production goal of 14 tons per hour. During 1995, the data generated will be used to determine economic feasibility on commercial scale. If commercial feasibility is realized, Midrex is expected to become the U.S. engineering licensee of the HIsmelt process.

• *Corex process.* The Corex or Cipcor process has integral coal desulfurizing, is amenable to a variety of coal types, and generates electrical power in excess of that required by an iron and steel mill which can be sold to local power grids. A Corex plant is in operation in South Africa, and other plants are expected to be operational in the next two years in South Korea and India.

*Reducing Coke Oven Emissions*

Several technologies are available or are under development to reduce the emissions from coke ovens. Typically, these technologies reduce the quantity of coke needed by changing the method by which coke is added to the blast furnace or by substituting a portion of the coke with other fuels. The reduction in the amount of coke produced proportionally reduces the coking emissions. Some of the most prevalent or promising coke reduction technologies include:

• *Pulverized coal injection.* This technology substitutes pulverized coal for a portion of the coke in the blast furnace. Use of pulverized coal injection can replace about 25 to 40 percent of coke in the blast furnace, substantially reducing emissions associated with cokemaking operations. This reduction ultimately depends on the fuel injection rate applied to the blast furnaces which will, in turn be dictated by the aging of existing coking facilities, fuel costs, oxygen availability, capital requirements for fuel injection, and available hot blast temperature.

• *Non-recovery coke battery.* As opposed to the by-product recovery coke

plant, the non-recovery coke battery is designed to allow combustion of the gasses from the coking process, thus consuming the by-products that are typically recovered. The process results in lower air emissions and substantial reductions in coking process wastewater discharges.

• *The Davy Still Autoprocess.* In this pre-combustion cleaning process for coke ovens, coke oven battery process water is utilized to strip ammonia and hydrogen sulfide from coke oven emissions.

• *Alternative fuels.* Steel producers can also inject other fuels, such as natural gas, oil, and tar/pitch, instead of coke into the blast furnace, but these fuels can only replace coke in limited amounts.

### Recycling of Coke By-products

Improvements in the in-process recycling of tar decanter sludge, a RCRA listed hazardous waste (K087) are common practice. Sludge can either be injected into the ovens to contribute to coke yield, or converted into a fuel that is suitable for the blast furnace.

### Reducing Wastewater Volume

In addition to air emissions, quench water from cokemaking is also an area of significant environmental concern. In Europe, some plants have implemented technology to shift from water quenching to dry quenching in order to reduce energy costs. However, major construction changes are required for such a solution and considering the high capital costs of coke batteries, the depressed state of the steel industry, and increased regulations for cokemaking, it is unlikely that this pollution prevention opportunity will be widely adopted in the U.S.

### Electric Arc Furnace Dust

Dust generation in the EAF, and its disposal, have also been recognized as a serious problem, but one with potential for pollution prevention through material recovery. EAF dust is a RCRA listed waste (K061) because of its high concentrations of lead and cadmium. With 550,000 tons of EAF dust generated annually in the U.S., there is great potential to reduce the volume of this hazardous waste.[27] Steel companies typically pay a disposal fee of $150 to $200 per ton of dust. With an average zinc concentration of 19 percent, much of the EAF dust is shipped off-site for zinc reclamation. Most of the EAF dust recovery options are only economically viable for dust with a zinc content of at least 15 - 20 percent. Facilities producing specialty steels such as stainless steel with a lower zinc content, still have opportunities to recover chromium and nickel from the EAF dust.

In-process recycling of EAF dust involves pelletizing and then reusing the pellets in the furnace, however, recycling of EAF dust on-site has not proven to be technically or economically competitive for all mills. Improvements in technologies have made off-site recovery a cost effective alternative to thermal treatment or secure landfill disposal.

**Pickling Acids**

In finishing, pickling acids are recognized as an area where pollution prevention efforts can have a significant impact in reducing the environmental impact of the steel mill. The pickling process removes scale and cleans the surface of raw steel by dipping it into a tank of hydrochloric or sulfuric acid. If not recovered, the spent acid may be transported to deep injection wells for disposal, but as those wells continue to close, alternative disposal costs are rising.

Large-scale steel manufacturers commonly recover hydrochloric acid in their finishing operations, however the techniques used are not suitable for small- to medium-sized steel plants.[28] Currently, a recovery technique for smaller steel manufacturers and galvanizing plants is in pilot scale testing. The system under development removes iron chloride (a saleable product) from the hydrochloric acid, reconcentrates the acid for reuse, and recondenses the water to be reused as a rinse water in the pickling process. Because the only by-product of the hydrochloric acid recovery process is a non-hazardous, marketable metal chloride, this technology generates no hazardous wastes. The manufacturer projects industry-wide hydrochloric acid waste reduction of 42,000 tons/year by 2010. This technology is less expensive than transporting and disposing waste acid, plus it eliminates the associated long-term liability. The total savings for a small- to medium-sized galvanizer is projected to be $260,000 each year.

The pilot scale testing project is funded in part by a grant from the U.S. Department of Energy under the NICE[3] program (see section VIII.B. for program information) and the EPA. (Contact: Bill Ives, DOE, 303-275-4755)

To reduce spent pickling liquor (K062) and simultaneously reduce fluoride in the plant effluent, one facility modified their existing treatment process to recover the fluoride ion from rinse water and spent pickling acid raw water waste streams. The fluoride is recovered as calcium fluoride (fluorspar), an input product for steelmaking. The melt shop in the same plant had been purchasing 930 tons of fluorspar annually for use as a furnace flux material in the EAF at a cost of $100 per ton. Although the process is still under development, the recovered calcium fluoride is expected to be a better grade than the purchased fluorspar, which would reduce the amount of flux used by approximately 10 percent. Not only would the generation rate of sludge from spent pickling liquor treatment be reduced (resulting in a savings in off-site sludge disposal costs), but a savings in chemical purchases would be realized.

**Other areas with pollution prevention opportunities**

Other areas in iron and steel manufacturing where opportunities may exist for pollution prevention are listed below, in three categories: process modifications, materials substitution, and recycling.

*Process Modification*

Redesigning or modifying process equipment can reduce pollution output, maintenance costs, and energy consumption, for example:

• Replacing single-pass wastewater systems with closed-loop systems to minimize chemical use in wastewater treatment and to reduce water use.
• Continuous casting, now used for about 90% of crude steel cast in the U.S., offers great improvements in process efficiency when compared to the traditional ingot teeming method. This increased efficiency also results in a considerable savings in energy and some reduction in the volume of mill wastewater.

*Materials Substitution*

• Use scrap steel with low lead and cadmium content as a raw material, if possible.
• Eliminate the generation of reactive desulfurization slag generated in foundry work by replacing calcium carbide with a less hazardous material.

*Recycling*

Scrap and other materials are recycled extensively in the iron and steel industry to reduce the raw materials required and the associated pollutants. Some of these recycling activities include:
• Recycle or reuse oils and greases.
• Recover acids by removing dissolved iron salts from spent acids.
• Use thermal decomposition for acid recovery from spent pickle liquor.
• Use a bipolar membrane/electrodialytic process to separate acid from metal by-products in spent $NO_3$-HF pickle liquor.
• Recover sulfuric acid using low temperature separation of acid and metal crystals.

## VI. SUMMARY OF APPLICABLE FEDERAL STATUTES AND REGULATIONS

This section discusses the Federal regulations that may apply to this sector. The purpose of this section is to highlight and briefly describe the applicable Federal requirements, and to provide citations for more detailed information. The three following sections are included:

- Section VI.A. contains a general overview of major statutes
- Section VI.B. contains a list of regulations specific to this industry
- Section VI.C. contains a list of pending and proposed regulations

The descriptions within Section VI are intended solely for general information. Depending upon the nature or scope of the activities at a particular facility, these summaries may or may not necessarily describe all applicable environmental requirements. Moreover, they do not constitute formal interpretations or clarifications of the statutes and regulations. For further information, readers should consult the Code of Federal Regulations and other state or local regulatory agencies. EPA Hotline contacts are also provided for each major statute.

### VI.A. General Description of Major Statutes

*Resource Conservation and Recovery Act*

The Resource Conservation And Recovery Act (RCRA) of 1976 which amended the Solid Waste Disposal Act, addresses solid (Subtitle D) and hazardous (Subtitle C) waste management activities. The Hazardous and Solid Waste Amendments (HSWA) of 1984 strengthened RCRA's waste management provisions and added Subtitle I, which governs underground storage tanks (USTs).

Regulations promulgated pursuant to Subtitle C of RCRA (40 CFR Parts 260-299) establish a "cradle-to-grave" system governing hazardous waste from the point of generation to disposal. RCRA hazardous wastes include the specific materials listed in the regulations (commercial chemical products, designated with the code "P" or "U"; hazardous wastes from specific industries/sources, designated with the code "K"; or hazardous wastes from non-specific sources, designated with the code "F") or materials which exhibit a hazardous waste characteristic (ignitability, corrosivity, reactivity, or toxicity and designated with the code "D").

Regulated entities that generate hazardous waste are subject to waste accumulation, manifesting, and record keeping standards. Facilities that treat, store, or dispose of hazardous waste must obtain a permit, either from EPA or from a State agency which EPA has authorized to implement the permitting program. Subtitle C permits contain general facility standards such as contingency plans, emergency procedures, record keeping and reporting requirements, financial assurance mechanisms, and unit-specific standards. RCRA also contains provisions (40 CFR Part 264 Subpart S and §264.10) for

conducting corrective actions which govern the cleanup of releases of hazardous waste or constituents from solid waste management units at RCRA-regulated facilities.

Although RCRA is a Federal statute, many States implement the RCRA program. Currently, EPA has delegated its authority to implement various provisions of RCRA to 46 of the 50 States.

Most RCRA requirements are not industry specific but apply to any company that transports, treats, stores, or disposes of hazardous waste. Here are some important RCRA regulatory requirements:

- **Identification of Solid and Hazardous Wastes** (40 CFR Part 261) lays out the procedure every generator should follow to determine whether the material created is considered a hazardous waste, solid waste, or is exempted from regulation.

- **Standards for Generators of Hazardous Waste** (40 CFR Part 262) establishes the responsibilities of hazardous waste generators including obtaining an ID number, preparing a manifest, ensuring proper packaging and labeling, meeting standards for waste accumulation units, and record keeping and reporting requirements. Generators can accumulate hazardous waste for up to 90 days (or 180 days depending on the amount of waste generated) without obtaining a permit.

- **Land Disposal Restrictions** (LDRs) are regulations prohibiting the disposal of hazardous waste on land without prior treatment. Under the LDRs (40 CFR 268), materials must meet land disposal restriction (LDR) treatment standards prior to placement in a RCRA land disposal unit (landfill, land treatment unit, waste pile, or surface impoundment). Wastes subject to the LDRs include solvents, electroplating wastes, heavy metals, and acids. Generators of waste subject to the LDRs must provide notification of such to the designated TSD facility to ensure proper treatment prior to disposal.

- **Used Oil Management Standards** (40 CFR Part 279) impose management requirements affecting the storage, transportation, burning, processing, and re-refining of the used oil. For parties that merely generate used oil, regulations establish storage standards. For a party considered a used oil marketer (one who generates and sells off-specification used oil directly to a used oil burner), additional tracking and paperwork requirements must be satisfied.

- **Tanks and Containers** used to store hazardous waste with a high volatile organic concentration must meet emission standards under RCRA. Regulations (40 CFR Part 264-265, Subpart CC) require generators to test the waste to determine the concentration of the waste, to satisfy tank and container emissions standards, and to inspect and monitor regulated units. These regulations apply to all

facilities who store such waste, including generators operating under the 90-day accumulation rule.

- **Underground Storage Tanks** (USTs) containing petroleum and hazardous substance are regulated under Subtitle I of RCRA. Subtitle I regulations (40 CFR Part 280) contain tank design and release detection requirements, as well as financial responsibility and corrective action standards for USTs. The UST program also establishes increasingly stringent standards, including upgrade requirements for existing tanks, that must be met by 1998.

- **Boilers and Industrial Furnaces** (BIFs) that use or burn fuel containing hazardous waste must comply with design and operating standards. BIF regulations (40 CFR Part 266, Subpart H) address unit design, provide performance standards, require emissions monitoring, and restrict the type of waste that may be burned.

*EPA's RCRA/Superfund/UST Hotline, at (800) 424-9346, responds to questions and distributes guidance regarding all RCRA regulations. The RCRA Hotline operates weekdays from 8:30 a.m. to 7:30 p.m., ET, excluding Federal holidays.*

*Comprehensive Environmental Response, Compensation, And Liability Act*

The Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), a 1980 law commonly known as Superfund, authorizes EPA to respond to releases, or threatened releases, of hazardous substances that may endanger public health, welfare, or the environment. CERCLA also enables EPA to force parties responsible for environmental contamination to clean it up or to reimburse the Superfund for response costs incurred by EPA. The Superfund Amendments and Reauthorization Act (SARA) of 1986 revised various sections of CERCLA, extended the taxing authority for the Superfund, and created a free-standing law, SARA Title III, also known as the Emergency Planning and Community Right-to-Know Act (EPCRA).

The CERCLA **hazardous substance release reporting regulations** (40 CFR Part 302) direct the person in charge of a facility to report to the National Response Center (NRC) any environmental release of a hazardous substance which exceeds a reportable quantity. Reportable quantities are defined and listed in 40 CFR §302.4. A release report may trigger a response by EPA, or by one or more Federal or State emergency response authorities.

EPA implements **hazardous substance responses** according to procedures outlined in the National Oil and Hazardous Substances Pollution Contingency Plan (NCP) (40 CFR Part 300). The NCP includes provisions for permanent cleanups, known as remedial actions, and other cleanups referred to as "removals." EPA generally takes remedial actions only at sites on the National Priorities List (NPL), which currently includes approximately 1300 sites. Both EPA and states can act at other sites; however, EPA provides

responsible parties the opportunity to conduct removal and remedial actions and encourages community involvement throughout the Superfund response process.

*EPA's RCRA/Superfund/UST Hotline, at (800) 424-9346, answers questions and references guidance pertaining to the Superfund program. The CERCLA Hotline operates weekdays from 8:30 a.m. to 7:30 p.m., ET, excluding Federal holidays.*

*Emergency Planning And Community Right-To-Know Act*

The Superfund Amendments and Reauthorization Act (SARA) of 1986 created the Emergency Planning and Community Right-to-Know Act (EPCRA, also known as SARA Title III), a statute designed to improve community access to information about chemical hazards and to facilitate the development of chemical emergency response plans by State and local governments. EPCRA required the establishment of State emergency response commissions (SERCs), responsible for coordinating certain emergency response activities and for appointing local emergency planning committees (LEPCs).

EPCRA and the EPCRA regulations (40 CFR Parts 350-372) establish four types of reporting obligations for facilities which store or manage specified chemicals:

•       **EPCRA §302** requires facilities to notify the SERC and LEPC of the presence of any "extremely hazardous substance" (the list of such substances is in 40 CFR Part 355, Appendices A and B) if it has such substance in excess of the substance's threshold planning quantity, and directs the facility to appoint an emergency response coordinator.

•       **EPCRA §304** requires the facility to notify the SERC and the LEPC in the event of a release exceeding the reportable quantity of a CERCLA hazardous substance or an EPCRA extremely hazardous substance.

•       **EPCRA §311 and §312** require a facility at which a hazardous chemical, as defined by the Occupational Safety and Health Act, is present in an amount exceeding a specified threshold to submit to the SERC, LEPC and local fire department material safety data sheets (MSDSs) or lists of MSDS's and hazardous chemical inventory forms (also known as Tier I and II forms). This information helps the local government respond in the event of a spill or release of the chemical.

•       **EPCRA §313** requires manufacturing facilities included in SIC codes 20 through 39, which have ten or more employees, and which manufacture, process, or use specified chemicals in amounts greater than threshold quantities, to submit an annual toxic chemical release report. This report, commonly known as the Form R, covers releases

and transfers of toxic chemicals to various facilities and environmental media, and allows EPA to compile the national Toxic Release Inventory (TRI) database.

All information submitted pursuant to EPCRA regulations is publicly accessible, unless protected by a trade secret claim.

*EPA's EPCRA Hotline, at (800) 535-0202, answers questions and distributes guidance regarding the emergency planning and community right-to-know regulations.  The EPCRA Hotline operates weekdays from 8:30 a.m. to 7:30 p.m., ET, excluding Federal holidays.*

*Clean Water Act*

The primary objective of the Federal Water Pollution Control Act, commonly referred to as the Clean Water Act (CWA), is to restore and maintain the chemical, physical, and biological integrity of the nation's surface waters. Pollutants regulated under the CWA include "priority" pollutants, including various toxic pollutants; "conventional" pollutants, such as biochemical oxygen demand (BOD), total suspended solids (TSS), fecal coliform, oil and grease, and pH; and "non-conventional" pollutants, including any pollutant not identified as either conventional or priority.

The CWA regulates both direct and indirect discharges.  The **National Pollutant Discharge Elimination System (NPDES)** program (CWA §402) controls direct discharges into navigable waters.  Direct discharges or "point source" discharges are from sources such as pipes and sewers.  NPDES permits, issued by either EPA or an authorized State (EPA has authorized approximately forty States to administer the NPDES program), contain industry-specific, technology-based and/or water quality-based limits, and establish pollutant monitoring requirements.  A facility that intends to discharge into the nation's waters must obtain a permit prior to initiating its discharge.  A permit applicant must provide quantitative analytical data identifying the types of pollutants present in the facility's effluent.  The permit will then set forth the conditions and effluent limitations under which a facility may make a discharge.

A NPDES permit may also include discharge limits based on Federal or State water quality criteria or standards, that were designed to protect designated uses of surface waters, such as supporting aquatic life or recreation.  These standards, unlike the technological standards, generally do not take into account technological feasibility or costs.  Water quality criteria and standards vary from State to State, and site to site, depending on the use classification of the receiving body of water.  Most States follow EPA guidelines which propose aquatic life and human health criteria for many of the 126 priority pollutants.

Storm Water Discharges

In 1987 the CWA was amended to require EPA to establish a program to address **storm water discharges**. In response, EPA promulgated the NPDES storm water permit application regulations. Storm water discharge associated with industrial activity means the discharge from any conveyance which is used for collecting and conveying storm water and which is directly related to manufacturing, processing, or raw material storage areas at an industrial plant (40 CFR 122.26(b)(14)). These regulations require that facilities with the following storm water discharges apply for an NPDES permit: (1) a discharge associated with industrial activity; (2) a discharge from a large or medium municipal storm sewer system; or (3) a discharge which EPA or the State determines to contribute to a violation of a water quality standard or is a significant contributor of pollutants to waters of the United States.

The term "storm water discharge associated with industrial activity" means a storm water discharge from one of 11 categories of industrial activity defined at 40 CFR 122.26. Six of the categories are defined by SIC codes while the other five are identified through narrative descriptions of the regulated industrial activity. If the primary SIC code of the facility is one of those identified in the regulations, the facility is subject to the storm water permit application requirements. If any activity at a facility is covered by one of the five narrative categories, storm water discharges from those areas where the activities occur are subject to storm water discharge permit application requirements.

Those facilities/activities that are subject to storm water discharge permit application requirements are identified below. To determine whether a particular facility falls within one of these categories, consult the regulation.

**Category i**: Facilities subject to storm water effluent guidelines, new source performance standards, or toxic pollutant effluent standards.

**Category ii**: Facilities classified as SIC 24-lumber and wood products (except wood kitchen cabinets); SIC 26-paper and allied products (except paperboard containers and products); SIC 28-chemicals and allied products (except drugs and paints); SIC 291-petroleum refining; and SIC 311-leather tanning and finishing.

**Category iii**: Facilities classified as SIC 10-metal mining; SIC 12-coal mining; SIC 13-oil and gas extraction; and SIC 14-nonmetallic mineral mining.

**Category iv**: Hazardous waste treatment, storage, or disposal facilities.

**Category v**: Landfills, land application sites, and open dumps that receive or have received industrial wastes.

**Category vi**: Facilities classified as SIC 5015-used motor vehicle parts; and SIC 5093-automotive scrap and waste material recycling facilities.

**Category vii**: Steam electric power generating facilities.

**Category viii:** Facilities classified as SIC 40-railroad transportation; SIC 41-local passenger transportation; SIC 42-trucking and warehousing (except public warehousing and storage); SIC 43-U.S. Postal Service; SIC 44-water transportation; SIC 45-transportation by air; and SIC 5171-petroleum bulk storage stations and terminals.

**Category ix:** Sewage treatment works.

**Category x:** Construction activities except operations that result in the disturbance of less than five acres of total land area.

**Category xi:** Facilities classified as SIC 20-food and kindred products; SIC 21-tobacco products; SIC 22-textile mill products; SIC 23-apparel related products; SIC 2434-wood kitchen cabinets manufacturing; SIC 25-furniture and fixtures; SIC 265-paperboard containers and boxes; SIC 267-converted paper and paperboard products; SIC 27-printing, publishing, and allied industries; SIC 283-drugs; SIC 285-paints, varnishes, lacquer, enamels, and allied products; SIC 30-rubber and plastics; SIC 31-leather and leather products (except leather and tanning and finishing); SIC 323-glass products; SIC 34-fabricated metal products (except fabricated structural metal); SIC 35-industrial and commercial machinery and computer equipment; SIC 36-electronic and other electrical equipment and components; SIC 37-transportation equipment (except ship and boat building and repairing); SIC 38-measuring, analyzing, and controlling instruments; SIC 39-miscellaneous manufacturing industries; and SIC 4221-4225-public warehousing and storage.

Pretreatment Program

Another type of discharge that is regulated by the CWA is one that goes to a publicly-owned treatment works (POTWs). The national **pretreatment program** (CWA §307(b)) controls the indirect discharge of pollutants to POTWs by "industrial users." Facilities regulated under §307(b) must meet certain pretreatment standards. The goal of the pretreatment program is to protect municipal wastewater treatment plants from damage that may occur when hazardous, toxic, or other wastes are discharged into a sewer system and to protect the quality of sludge generated by these plants. Discharges to a POTW are regulated primarily by the POTW itself, rather than the State or EPA.

EPA has developed technology-based standards for industrial users of POTWs. Different standards apply to existing and new sources within each category. "Categorical" pretreatment standards applicable to an industry on a nationwide basis are developed by EPA. In addition, another kind of pretreatment standard, "local limits," are developed by the POTW in order to assist the POTW in achieving the effluent limitations in its NPDES permit.

Regardless of whether a State is authorized to implement either the NPDES or the pretreatment program, if it develops its own program, it may enforce

requirements more stringent than Federal standards.

**Spill Prevention, Control and Countermeasure Plans**

The 1990 Oil Pollution Act requires that facilities posing a substantial threat of harm to the environment prepare and implement more rigorous Spill Prevention Control and Countermeasure (SPCC) Plan required under the CWA (40 CFR §112.7). As iron and steel manufacturing is an energy intensive industry, an important requirement affecting iron and steel facilities is oil response plans for above ground storage. There are also criminal and civil penalties for deliberate or negligent spills of oil. Regulations covering response to oil discharges and contingency plans (40 CFR Part 300), and Facility Response Plans to oil discharges (40 CFR Part 112) and for PCB transformers and PCB-containing items are being revised and finalized in 1995.[29]

*EPA's Office of Water, at (202) 260-5700, will direct callers with questions about the CWA to the appropriate EPA office. EPA also maintains a bibliographic database of Office of Water publications which can be accessed through the Ground Water and Drinking Water resource center, at (202) 260-7786.*

*Safe Drinking Water Act*

The Safe Drinking Water Act (SDWA) mandates that EPA establish regulations to protect human health from contaminants in drinking water. The law authorizes EPA to develop national drinking water standards and to create a joint Federal-State system to ensure compliance with these standards. The SDWA also directs EPA to protect underground sources of drinking water through the control of underground injection of liquid wastes.

EPA has developed primary and secondary drinking water standards under its SDWA authority. EPA and authorized States enforce the primary drinking water standards, which are, contaminant-specific concentration limits that apply to certain public drinking water supplies. Primary drinking water standards consist of maximum contaminant level goals (MCLGs), which are non-enforceable health-based goals, and maximum contaminant levels (MCLs), which are enforceable limits set as close to MCLGs as possible, considering cost and feasibility of attainment.

The SDWA **Underground Injection Control** (UIC) program (40 CFR Parts 144-148) is a permit program which protects underground sources of drinking water by regulating five classes of injection wells. UIC permits include design, operating, inspection, and monitoring requirements. Wells used to inject hazardous wastes must also comply with RCRA corrective action standards in order to be granted a RCRA permit, and must meet applicable RCRA land disposal restrictions standards. The UIC permit program is primarily State-enforced, since EPA has authorized all but a few States to administer the program.

The SDWA also provides for a Federally-implemented Sole Source Aquifer program, which prohibits Federal funds from being expended on projects that may contaminate the sole or principal source of drinking water for a given area, and for a State-implemented Wellhead Protection program, designed to protect drinking water wells and drinking water recharge areas.

*EPA's Safe Drinking Water Hotline, at (800) 426-4791, answers questions and distributes guidance pertaining to SDWA standards. The Hotline operates from 9:00 a.m. through 5:30 p.m., ET, excluding Federal holidays.*

*Toxic Substances Control Act*

The Toxic Substances Control Act (TSCA) granted EPA authority to create a regulatory framework to collect data on chemicals in order to evaluate, assess, mitigate, and control risks which may be posed by their manufacture, processing, and use. TSCA provides a variety of control methods to prevent chemicals from posing unreasonable risk.

TSCA standards may apply at any point during a chemical's life cycle. Under TSCA §5, EPA has established an inventory of chemical substances. If a chemical is not already on the inventory, and has not been excluded by TSCA, a premanufacture notice (PMN) must be submitted to EPA prior to manufacture or import. The PMN must identify the chemical and provide available information on health and environmental effects. If available data are not sufficient to evaluate the chemicals effects, EPA can impose restrictions pending the development of information on its health and environmental effects. EPA can also restrict significant new uses of chemicals based upon factors such as the projected volume and use of the chemical.

Under TSCA §6, EPA can ban the manufacture or distribution in commerce, limit the use, require labeling, or place other restrictions on chemicals that pose unreasonable risks. Among the chemicals EPA regulates under §6 authority are asbestos, chlorofluorocarbons (CFCs), and polychlorinated biphenyls (PCBs).

*EPA's TSCA Assistance Information Service, at (202) 554-1404, answers questions and distributes guidance pertaining to Toxic Substances Control Act standards. The Service operates from 8:30 a.m. through 4:30 p.m., ET, excluding Federal holidays.*

*Clean Air Act*

The Clean Air Act (CAA) and its amendments, including the Clean Air Act Amendments (CAAA) of 1990, are designed to "protect and enhance the nation's air resources so as to promote the public health and welfare and the productive capacity of the population." The CAA consists of six sections, known as Titles, which direct EPA to establish national standards for ambient air quality and for EPA and the States to implement, maintain, and enforce these standards through a variety of mechanisms. Under the CAAA, many

facilities will be required to obtain permits for the first time. State and local governments oversee, manage, and enforce many of the requirements of the CAAA. CAA regulations appear at 40 CFR Parts 50-99.

Pursuant to Title I of the CAA, EPA has established national ambient air quality standards (NAAQSs) to limit levels of "criteria pollutants," including carbon monoxide, lead, nitrogen dioxide, particulate matter, ozone, and sulfur dioxide. Geographic areas that meet NAAQSs for a given pollutant are classified as attainment areas; those that do not meet NAAQSs are classified as non-attainment areas. Under §110 of the CAA, each State must develop a State Implementation Plan (SIP) to identify sources of air pollution and to determine what reductions are required to meet Federal air quality standards.

Title I also authorizes EPA to establish New Source Performance Standards (NSPSs), which are nationally uniform emission standards for new stationary sources falling within particular industrial categories. NSPSs are based on the pollution control technology available to that category of industrial source but allow the affected industries the flexibility to devise a cost-effective means of reducing emissions.

Under Title I, EPA establishes and enforces National Emission Standards for Hazardous Air Pollutants (NESHAPs), nationally uniform standards oriented towards controlling particular hazardous air pollutants (HAPs). Title III of the CAAA further directed EPA to develop a list of sources that emit any of 189 HAPs, and to develop regulations for these categories of sources. To date EPA has listed 174 categories and developed a schedule for the establishment of emission standards. The emission standards will be developed for both new and existing sources based on "maximum achievable control technology" (MACT)." The MACT is defined as the control technology achieving the maximum degree of reduction in the emission of the HAPs, taking into account cost and other factors.

Title II of the CAA pertains to mobile sources, such as cars, trucks, buses, and planes. Reformulated gasoline, automobile pollution control devices, and vapor recovery nozzles on gas pumps are a few of the mechanisms EPA uses to regulate mobile air emission sources.

Title IV establishes a sulfur dioxide nitrous oxide emissions program designed to reduce the formation of acid rain. Reduction of sulfur dioxide releases will be obtained by granting to certain sources limited emissions allowances, which, beginning in 1995, will be set below previous levels of sulfur dioxide releases.
Title V of the CAAA of 1990 created a permit program for all "major sources" (and certain other sources) regulated under the CAA. One purpose of the operating permit is to include in a single document all air emissions requirements that apply to a given facility. States are developing the permit programs in accordance with guidance and regulations from EPA. Once a State program is approved by EPA, permits will be issued and monitored by that State.

US EPA ARCHIVE DOCUMENT

Title VI is intended to protect stratospheric ozone by phasing out the manufacture of ozone-depleting chemicals and restrict their use and distribution. Production of Class I substances, including 15 kinds of chlorofluorocarbons (CFCs), will be phased out entirely by the year 2,000, while certain hydrochlorofluorocarbons (HCFCs) will be phased out by 2030.

*EPA's Control Technology Center, at (919) 541-0800, provides general assistance and information on CAA standards. The Stratospheric Ozone Information Hotline, at (800) 296-1996, provides general information about regulations promulgated under Title VI of the CAA, and EPA's EPCRA Hotline, at (800) 535-0202, answers questions about accidental release prevention under CAA §112(r). In addition, the Technology Transfer Network Bulletin Board System (modem access (919) 541-5742)) includes recent CAA rules, EPA guidance documents, and updates of EPA activities.*

## VI.B. Industry Specific Regulatory Requirements

The steel industry has invested substantial resources in compliance with environmental regulations. Expenditures for environmental air control totaled $279 million in 1991, while water and solid waste control combined totaled $66 million. This translates to 15 percent of total capital expenditures for the industry in 1991. The high percentage of total environmental capital expenditures for air control (81 percent) is primarily due to keeping coke ovens operating in compliance with the Clean Air Act. Although coke ovens are considered by many industry experts to be the biggest environmental problem of the iron and steel industry, environmental regulations affect the industry throughout all stages of the manufacturing and forming processes. An overview of how federal environmental regulations affect this industry follows.

US EPA ARCHIVE DOCUMENT

**Sector Notebook Project**                                    **Iron and Steel Industry**

*Clean Air Act (CAA)*

The CAA, with its 1990 amendments (CAAA), regulates the pollutants that steel mills can add to the air. Title I of the Act addresses requirements for the attainment and maintenance of the National Ambient Air Quality Standards (NAAQS) (40 CFR, §50). EPA has set NAAQS for six criteria pollutants, which states must plan to meet through state implementation plans (SIPs). NAAQS for nitrogen dioxide, lead, and particulate matter frequently affect the iron and steel industry.

One of the most significant impacts of the CAAA on the iron and steel industry is tied to the standards developed for toxic air emissions or Hazardous Air Pollutants (HAPs). For the steel industry, these standards, National Emission Standards for Hazardous Air Pollutants (NESHAPs), have a significant effect on the industry's coke ovens. In late 1991, the coking industry entered into a formal regulatory negotiation with EPA and representatives of environmental groups, state and local air pollution control agencies, and the steelworkers union to develop a mutually acceptable rule to implement the terms of the Act's coke oven provisions. After a year of discussions, an agreement on a negotiated rule was signed. In exchange for a standard that is structured to give operators certainty and flexibility in the manner they demonstrate compliance, the industry agreed to daily monitoring, to install flare systems to control upset events, and to develop work practice plans to minimize emissions. National Emissions Standards currently in effect that pertain to the iron and steel industry include:

- Coke Oven Batteries (40 CFR §63 Subpart L). As of April 1, 1992, there were 30 plants with 87 by-product coke oven batteries that would be affected by this regulation.

- Benzene Emissions from Coke By-product Recovery Plants (40 CFR §61 Subpart L). Regulates benzene sources in coke by-product recovery operations by requiring that specified equipment be enclosed and the emissions be ducted to an enclosed point in the by-product recovery process where they are recovered or destroyed. Monitoring requirements are also stated.

- Halogenated Solvent Cleaning (40 CFR §63 Subpart T). Emission standards for the source categories listed in §112(d), including solvents used in the iron and steel industry such as 1,1,1-trichloroethane, trichloroethylene, and methylene chloride.

- Chromium - Industrial Process Cooling Towers (40 CFR §63 Subpart Q). This standard will eliminate chromium emissions from industrial process cooling towers. Industrial process cooling towers using chromate-based water treatment programs have been identified as potentially significant sources of chromium air emissions; chromium compounds being among the substances listed as HAPs in §112(e).

US EPA ARCHIVE DOCUMENT

The CAA also impacts the minimill segment of the industry. The Electric Arc Furnace was identified as a possible source of hazardous air pollutants subject to a MACT determination, however, EPA data indicates that the impact is much less than originally anticipated and there are currently no plans for establishing a MACT standard.

The 1990 CAAA New Source Review (NSR) requirements apply to new facilities, expansions of existing facilities, or process modifications. New sources of the "criteria" pollutants regulated by the NAAQS in excess of levels defined by EPA as "major" are subject to NSR requirements (40 CFR Section 52.21(b)(1)(i)(a)-(b)). NSRs are typically conducted by the state agency under standards set by EPA and adopted by the state as part of its state implementation plan (SIP). There are two types of NSRs: Prevention of Significant Deterioration (PSD) reviews for facilities in areas that are meeting the NAAQS, and Nonattainment (NA) reviews for areas that are violating the NAAQS. Permits are required to construct or operate the new source for PSD and NA areas.

For NA areas, permits require the new source to meet the lowest achievable emission rate (LAER) standards and the operator of the new source must procure reductions in emissions of the same pollutants from other sources in the NA area in equal or greater amounts to the new source. These "emission offsets" may be banked and traded through state agencies.

For PSD areas, permits require the best available control technology (BACT), and the operator or owner of the new source must conduct continuous on-site air quality monitoring for one year prior to the new source addition to determine the effects that the new emissions may have on air quality. This one year waiting period before construction can be disruptive to some mills' expansion plans. In several cases, mills looking to construct or expand have attempted to be reclassified as a "synthetic minor," where they ask the state to put tighter restrictions on their quantity of emissions allowed on their air permit. With these reduced emissions, they become a minor instead of a major source, thereby becoming exempt from the lengthy and expensive PSD review.

EPA sets the minimum standards for LAER and BACT for iron and steel mill NSRs in its new source performance standards (NSPS), 40 CFR 60:

•       Standards of Performance for Steel Plants: Electric Arc Furnaces (40 CFR §60, Subpart AA). Regulates the opacity and particulate matter in any gases discharged from EAFs constructed after October 21, 1974 and on or before August 17, 1983. Also requires a continuous monitoring system for the measurement of the opacity of emissions discharged from control equipment.

•       Standards of Performance for Steel Plants: Electric Arc Furnaces and Argon-Oxygen Decarburization Vessels (AODs) (40 CFR §60, Subpart AAa). Regulates the opacity and particulate matter in any

gases discharged from EAFs and AODs (used to blow argon and oxygen or nitrogen into molten steel for further refining) constructed after August 7, 1983. Also requires a continuous monitoring system for the measurement of the opacity of emissions discharged from EAF and AOD air pollution control equipment.

•    Standards of Performance for Primary Emissions from Basic Oxygen Process Furnaces (BOPF) (40 CFR §60, Subpart N). Regulates the discharge of gases for particulate matter and opacity. These standards apply to BOPFs for which construction is commenced after June 11, 1973. Primary emissions refer to particulate matter emissions from the BOPF generated during the steel production cycle and captured by the BOPF primary control system.

•    Standards of Performance for Secondary Emissions from Basic Oxygen Process Steelmaking Facilities (40 CFR §60, Subpart Na). Regulates the discharge of gases for particulate matter and opacity for BOPFs for which construction is commenced after January 20, 1983. Secondary emissions means particulate matter emissions that are not captured by the BOPF primary control system.

*Clean Water Act (CWA)*

The steel industry is a major water user and 40 CFR 420 established Effluent Limitations Guidelines and Standards for the Iron and Steel Manufacturing Point Source Category. These are implemented through the NPDES permit program and through state and local pretreatment programs. Part 420 contains production-based effluent limitations guidelines and standards, therefore steel mills with higher levels of production will receive higher permit discharge allowances. The regulation contains 12 subparts for 12 distinct manufacturing processes:

|  |  |
|---|---|
| A. Cokemaking | G. Hot Forming |
| B. Sintering | H. Salt Bath Descaling |
| C. Ironmaking | I. Acid Pickling |
| D. Steelmaking | J. Cold Forming |
| E. Vacuum Degassing | K. Alkaline Cleaning |
| F. Continuous Casting | L. Hot Coating |

The pollutants regulated by 40 CFR 420 are divided into three categories:

1. *Conventional Pollutants:* Total Suspended Solids, Oil and Grease, pH
2. *Nonconvention Pollutants:* Ammonia-N, Phenols
3. *Priority or Toxic Pollutants:* Total cyanide, total chromium, hexavalent chromium, total lead, total nickel, total zinc, benzene, benzo(a)pyrene, naphthalene, tertrachloroethylene.

Wastewater is often recycled "in-plant" and at the "end-of-pipe" to reduce the volume of discharge. Process wastewater is usually filtered, and/or clarified

on-site before being directly or indirectly discharged. Oil and greases are removed from the process wastewater by several methods which include oil skimming, filtration, and air flotation. These oils can then be used as lubricants and preservative coatings. The remaining sludge contains waste metals and organic chemicals. Iron in the sludges can be recovered and reclaimed through sintering and pelletizing operations. Many steel mills discharge industrial waste water through sewers to publicly owned treatment works.

The Storm Water Rule (40 CFR 122.26(b)(14) subparts (i, ii)) requires the capture and treatment of storm water at primary metal industry facilities including iron and steel manufacturing. Management of storm water will reduce discharges with respect to conventional pollutants (suspended solids and biological oxygen demand (BOD)), as well as other pollutants, such as certain metals and oil and grease.

*Resource Conservation and Recovery Act (RCRA)*

Several RCRA-listed wastes are produced during coke, iron, and steelmaking, forming, and cleaning/descaling operations. These wastes are identified below by process.

Coke Manufacturing

• Tar residues (K035, K087, K141, K142, and K147)
• Oil (K143 and K144)
• Naphthalene residues (K145)
• Lime sludge (K060)
• Wastewater sump residues containing benzene and polynuclear aromatic hydrocarbons (K144)
• Coke oven gas condensate from transfer and distribution lines

Iron and Steel Manufacturing

• EAF emission control dust and sludge (K061). Annually, 550,000 short tons of K061 are produced; 90 percent of this waste (500,000 short tons) is managed for metal recovery.[29]

Finishing

• Wastewater sludge from cooling, descaling, and rinsing (D006, D007, D008, D009, D010, and D011)
• Spent pickle liquor (K062). An exemption for this waste is detailed in 40 CFR 261.3(c)(2)(ii)(A). 904,945 short tons of K062 are generated annually in the U.S. and 52 percent of this waste is managed for recovery of iron, chromium, and nickel.[30]

*Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA)*

The metals and metal compounds used in steelmaking, as well as steelmaking process chemicals, are often found in steel mills' air emissions, water discharges, or waste shipments for off-site disposal include chromium, manganese, nickel copper, zinc, lead, sulfuric acid, and hydrochloric acid. Metals are frequently found at CERCLA's problem sites. When Congress ordered EPA and the Public Health Service's Agency for Toxic Substances and Disease Registry (ATSDR) to list the hazardous substances most commonly found at problem sites and that pose the greatest threat to human health, lead, nickel, and aluminum all made the list.[31] Several sites of former steel mills are on the National Priorities List. Compliance with the requirements of RCRA lessens the chances that CERCLA compliance will be an issue in the future.

## VI.C. Pending and Proposed Regulatory Requirements

The iron and steel industry has been identified in the Source Reduction Review Project (SRRP) as an industry for which a more integrated (across environmental media) approach to rulemaking is warranted. Efforts such as the Office of Water's review of the need for revised effluent guidelines for the industry (described below) and the technology-based standards for coke oven emissions under the Clean Air Act Amendments will be coordinated among several media offices.

*Clean Air Act*

Even with the flexibility the industry gained through the formal negotiations to develop the rule to implement the coke oven provisions of the CAA, coke-producing steel companies face difficult decisions of how best to utilize scarce capital to meet the CAAA standards. Additionally, coke oven operators still face unknown technology-based standards in 2010 and risk-based standards in 2020.

The Act's air toxic provisions will also ultimately have other major impacts. Included on the list of chemicals under the air toxics program are compounds of chromium, nickel, manganese, cadmium and other heavy metals. Because many of these metals are routinely found in iron ore, scrap, and alloying materials that are processed in iron and steel plants, most steelmaking processes will be affected in some way. EPA's priority list of source categories calls for the development of regulations for most of these sources by 2000, but until EPA identifies the technology corresponding to MACT for these sources and promulgates regulations, it is difficult to determine the additional impacts and costs to the industry for this program.

Tightening the national ambient air quality standard for particulate matter (PM-10) may also affect the iron and steel industry. Under the CAAA, EPA will be reviewing the basis for the existing ambient air PM-10 standard. A lower standard may cause more areas of the country to be classified as non-attainment areas and would trigger requirements for states to impose much more stringent emission control standards for sources of particulate matter, including iron and steel sources.

Hydrochloric acid and chlorine are among the pollutants listed as hazardous air pollutants in §112 of the CAAA. Steel pickling processes that use hydrochloric acid have been identified by the EPA as potentially significant sources of hydrochloric acid and chlorine air emissions and, as such, a source category for which national emission standards are likely. EPA is expected to make a determination on the steel pickling process sometime in 1995, with the final rule promulgation scheduled for 11/96. Many facilities either are already in compliance, or they have the required control equipment, but need to upgrade it or perform maintenance procedure to come into compliance. (Contact: James Maysilles, EPA Office of Air Quality Planning and Standards, 919-541-3265).

Title III of the CAAA, requires EPA to develop national emission standards for hazardous air pollutants (NESHAP) from specific stationary sources including iron and steel mills (contact: Phil Murine, EPA Office of Air Quality Planning and Standards, 919-541-5289) and iron and steel foundries (contact: James Maysilles, EPA Office of Air Quality Planning and Standards, 919-541-3265). Both of these types of facilities have been identified by the EPA as potentially significant sources of air emissions of substances that are among the pollutants listed as hazardous air pollutants in §112 of the CAAA. As such, these industries may be source categories for which national emission standards may be warranted. In integrated iron and steel mills, air emission of HAPs may include compounds of chromium, lead, manganese, and polycyclic organic matter, in quantities sufficient to designate these facilities as major sources. Emission standards were to be developed for Electric Arc Furnaces also. However, EPA data does not show that EAFs emit sufficient hazardous pollutants to include them on the list of major sources of these pollutants. Therefore, a proposed regulatory action is scheduled to remove this category from the list of sources where new regulations will be promulgated.

Other, more general, proposed regulatory actions under the CAA have an effect on some facilities within the iron and steel industry. These include:

• Risk Management Program for Chemical Accidental Release Prevention (40 CFR 68). Requires facilities where a regulated substance is present (defined by the list, with threshold quantities, promulgated under §112(r)(3)) to prepare and implement a risk management plan and provide emergency response. The final rule will be promulgated by 3/29/96.

• New Source Review Reform (40 CFR 51, 52). This action will amend the new source review regulations to reduce the level of program complexity. The final rule will be promulgated 1/96.

• Revised New Source Performance Standard for NOx (40 CFR 60, Subpart Db). Revisions apply to NOx emissions from fossil fuel-fired steam generating units, including industrial boilers and must reflect improvements in NOx reduction methods. The final rule will be promulgated by 12/31/96.

• Title V Federal Air Operating Permit Rules (40 CFR 70 and 71). Sets requirements for state permitting programs for major stationary air pollutants. Also establishes a federal permitting program for use where states fail to establish or implement an adequate program. The final rule will be promulgated by 11/95.

• Title V State Air Operating Permit Rules (40 CFR 70). Revisions of the state operating permit rules promulgated in 1992. This regulation is intended to restructure the process for issuing and revising permits, to give state agencies more flexibility. States will be allowed to issue a single permit covering both New Source Review and Title V permitting requirements.

*Clean Water Act (CWA)*

Since approximately 80 percent of the nation's integrated steelmaking capacity is located in the Great Lakes states, the current efforts to develop uniform water quality standards under the Great Lakes Water Quality Initiative may have a significant impact on the industry. According to the American Iron and Steel Institute (AISI), the industry is concerned with the establishment of uniform water quality guidance for all waters. AISI believes that states should be given the responsibility of designating uses and associated water quality standards for all water bodies within their jurisdictions. These designations, AISI believes, should take into account the feasibility of the attainment of swimmable and fishable waters where naturally occurring pollutants prevent its attainment, where pollution sources prevent attainment and correction of these sources would cause more environmental harm than good, or where attainment would result in unreasonable social and economic impacts. AISI concludes that requiring discharges of non-contact cooling water to be cleaner than when drawn from the stream or lake, while at the same time disregarding the water quality impacts of non-point sources such as urban or agricultural runoff, will impose huge costs, restrict growth, or force zero discharge on direct dischargers. By March 23, 1997, the Great lakes states (Illinois, Indiana, Michigan, Minnesota, New York, Pennsylvania, Ohio, and Wisconsin), as well as tribes in the area, must adopt rules and procedures consistent with the Water Quality Guidance for the Great Lakes System (40 CFR 132; also amends 122, 123, and 131). The Guidance places particular emphasis on decreasing bioaccumulative toxics and also provides a process for addressing both point and non-point source pollution.

The EPA is currently revisiting the CWA Effluent Guidelines and Standards for Iron and Steel Manufacturing Point Source Category. A two-year study is scheduled to be completed in late 1995 which reviews the existing regulations to determine what changes have been made in the industry since the 1982 regulations were promulgated. One focus of the project is to investigate the types of pollution prevention measures that have been implemented. The study was initiated as a result of a Natural Resources Defense Council (NRDC) consent decree. (Contact: George Jett, EPA Office of Water, 202-260-7151).

US EPA ARCHIVE DOCUMENT

The Office of Water is also initiating a 3-year data collection and analysis effort (which began in 1994) to quantify the adverse impacts from cooling water intake structures and the efficacy of certain control mechanisms. Regulatory options will be developed and a regulation proposed based on the study results. This regulation may have a relatively significant impact on the iron and steel industry.

*Resource Conservation and Recovery Act (RCRA)*

Under RCRA, emission control dust and sludge from electric arc furnaces (EAF) are a listed hazardous waste (K061) and are subject to land disposal restrictions. This pollution control dust/sludge is composed of various metals: primarily iron with lesser concentrations of zinc, lead, cadmium, and sometimes nickel and chromium. The metals primarily recovered are iron or nickel alloys or zinc. Two or the primary hazardous constituents, lead and cadmium, are not initially recovered, although they are usually shipped off-site for further recovery. Annually, 550,000 short tons of K061 are produced; 90 percent of this waste (500,000 short tons) is managed for metal recovery.[32] EPA's treatment standards were originally based on high temperature metals recovery, but were recently revised to generic treatment levels. As a result, a generator may select one of a variety of options, including stabilization, as alternatives to recycling. Other recovery alternatives include: use as a fertilizer ingredient, use an ingredient in glass grit for abrasive blast, roofing shingles, glass ceramic or ceramic glaze, use as an ingredient in the production of cement, use as an ingredient in the production of special aggregates.[33]

Such recovery practices reduce the quantity of hazardous waste disposed of, however, the industry is concerned with the limitations that are placed on the disposal or uses of non-hazardous residuals from the high temperature metals recovery processes that might serve to discourage or inhibit metal recovery practices. According to several steel industry trade associations (SMA, SSINA, AISI), RCRA has discouraged metal recovery from hazardous wastes generated in steel production. For example, the derived-from rule has discouraged investment in on-site or regional recycling operations because of the additional cost of residual management. The trade associations also state that the lack of adequate metal recovery capacity in the U.S. requires their members to spend an average of $650,000 annually in transportation costs to ship K061 off-site, and a total of $1.4 million annually to recycle K061.[34] Other RCRA impediments stated by the trade associations include the 90-day storage limit for generators, and corrective action/financial assurance.

As part of a 1992 settlement agreement, EPA has agreed to propose (by June 30, 1995) and promulgate (by June 30, 1996) regulations for land disposal restrictions on mineral processing wastes. These regulations will set land disposal restrictions and standards for those mineral processing wastes that are found to be hazardous under RCRA Subtitle C. Currently, all extraction and beneficiation wastes, as well as 20 mineral processing wastes, are exempt from federal hazardous waste regulations.

US EPA ARCHIVE DOCUMENT

Under a proposed regulation, "Hazardous Waste Management System: Amendment to Generic Exclusion for Encapsulated Uses (K061, K062, F006)," (40 CFR 261), the slags created from the treatment of pollution control dusts resulting from scrap metal recycling (i.e., electric arc furnace dust), will be reclassified as nonhazardous and be allowed for road-related uses if the toxic metals in the wastes have been reduced to safe levels by treatment. The final rule will be promulgated by 6/13/96.

Also under RCRA Subtitle C (40 CFR 261), the "Hazardous Waste Identification Rule" will be proposed in 1995 to allow listed wastes which are low risk to be removed from the hazardous waste regulatory scheme. This rule is intended to better align the burden of RCRA regulation with the risks being controlled.

*Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA)*

Steel companies involved in Superfund sites would be affected by changes under impending CERCLA reauthorization. Questions of liability, funding mechanisms, selection of remedial actions, and application of risk concepts are all of concern to the steel industry.

*Safe Drinking Water Act (SDWA)*

The 1986 SDWA amendments required EPA to complete a study of Class V underground injection wells. These are all wells not included in Classes I through IV; they vary from simple septic systems and shallow cesspools to deep, technically sophisticated wells with a wide range of environmental impacts. As a follow up to the study, EPA developed a strategy to assess whether additional controls of these wells would be appropriate. A proposed regulation on Class V wells is being developed as part of this strategy and could potentially affect some iron and steel facilities. Final rule promulgation is scheduled for 11/96.

*Global Climate Change*

Legislative initiatives that address global climate change will also affect the iron and steel industry. Steel is a highly energy intensive industry, where 15 to 20 percent of the manufacturing cost of steel is for energy. Most of that energy is derived from coal, principally in the form of coke. Consequently, a carbon tax could have a major impact on the steel industry. While such a tax is designed to reduce carbon dioxide emissions and to curb energy consumption, industry analysts expect such a tax would also results in 177,000 to 362,000 job losses across the country, according to Wilbur Steger, president of CONSAD Research Corp., as reported in the March 1993 issue of *Iron Age*.

Increasing the corporate average fuel economy (CAFE) of automobiles has been identified as a means of encouraging energy conservation and reducing carbon dioxide emissions. An increase in fuel economy standards may lead

to downsizing automobiles, which will affect steel markets by reducing demand for certain steel products.

Sector Notebook Project                                          Iron and Steel Industry

## VII. COMPLIANCE AND ENFORCEMENT HISTORY

### Background

To date, EPA has focused much of its attention on measuring compliance with specific environmental statutes. This approach allows the Agency to track compliance with the Clean Air Act, the Resource Conservation and Recovery Act, the Clean Water Act, and other environmental statutes. Within the last several years, the Agency has begun to supplement single-media compliance indicators with facility-specific, multimedia indicators of compliance. In doing so, EPA is in a better position to track compliance with all statutes at the facility level, and within specific industrial sectors.

A major step in building the capacity to compile multimedia data for industrial sectors was the creation of EPA's Integrated Data for Enforcement Analysis (IDEA) system. IDEA has the capacity to "read into" the Agency's single-media databases, extract compliance records, and match the records to individual facilities. The IDEA system can match Air, Water, Waste, Toxics/Pesticides/EPCRA, TRI, and Enforcement Docket records for a given facility, and generate a list of historical permit, inspection, and enforcement activity. IDEA also has the capability to analyze data by geographic area and corporate holder. As the capacity to generate multimedia compliance data improves, EPA will make available more in-depth compliance and enforcement information. Additionally, sector-specific measures of success for compliance assistance efforts are under development.

### Compliance and Enforcement Profile Description

Using inspection, violation and enforcement data from the IDEA system, this section provides information regarding the historical compliance and enforcement activity of this sector. In order to mirror the facility universe reported in the Toxic Chemical Profile, the data reported within this section consists of records only from the TRI reporting universe. With this decision, the selection criteria are consistent across sectors with certain exceptions. For the sectors that do not normally report to the TRI program, data have been provided from EPA's Facility Indexing System (FINDS) which tracks facilities in all media databases. Please note, in this section, EPA does not attempt to define the actual number of facilities that fall within each sector. Instead, the section portrays the records of a subset of facilities within the sector that are well defined within EPA databases.

As a check on the relative size of the full sector universe, most notebooks contain an estimated number of facilities within the sector according to the Bureau of Census (See Section II). With sectors dominated by small businesses, such as metal finishers and printers, the reporting universe within the EPA databases may be small in comparison to Census data. However, the group selected for inclusion in this data analysis section should be consistent with this sector's general make-up.

Following this introduction is a list defining each data column presented within this section. These values represent a retrospective summary of inspections and enforcement actions, and solely reflect EPA, State, and local compliance assurance activities that have been entered into EPA databases. To identify any changes in trends, the EPA ran two data queries, one for the past five calendar years (August 10, 1990 to August 9, 1995) and the other for the most recent twelve-month period (August 10, 1994 to August 9, 1995). The five-year analysis gives an average level of activity for that period for comparison to the more recent activity.

Because most inspections focus on single-media requirements, the data queries presented in this section are taken from single media databases. These databases do not provide data on whether inspections are state/local or EPA-led. However, the table breaking down the universe of violations does give the reader a crude measurement of the EPA's and states' efforts within each media program. The presented data illustrate the variations across regions for certain sectors.[d] This variation may be attributable to state/local data entry variations, specific geographic concentrations, proximity to population centers, sensitive ecosystems, highly toxic chemicals used in production, or historical noncompliance. Hence, the exhibited data do not rank regional performance or necessarily reflect which regions may have the most compliance problems.

**Compliance and Enforcement Data Definitions**

**General Definitions**

**Facility Indexing System (FINDS)** -- this system assigns a common facility number to EPA single-media permit records. The FINDS identification number allows EPA to compile and review all permit, compliance, enforcement and pollutant release data for any given regulated facility.

**Integrated Data for Enforcement Analysis (IDEA)** -- is a data integration system that can retrieve information from the major EPA program office databases. IDEA uses the FINDS identification number to "glue together" separate data records from EPA's databases. This is done to create a "master list" of data records for any given facility. Some of the data systems accessible through IDEA are: AIRS (Air Facility Indexing and Retrieval System, Office of Air and Radiation), PCS (Permit Compliance System, Office of Water), RCRIS (Resource Conservation and Recovery Information System, Office of Solid Waste), NCDB (National Compliance Data Base, Office of Prevention, Pesticides, and Toxic Substances), CERCLIS (Comprehensive Environmental and Liability Information System, Superfund),

---

[d] EPA Regions include the following states: I (CT, MA, ME, RI, NH, VT); II (NJ, NY, PR, VI); III (DC, DE, MD, PA, VA, WV); IV (AL, FL, GA, KY, MS, NC, SC, TN); V (IL, IN, MI, MN, OH, WI); VI (AR, LA, NM, OK, TX); VII (IA, KS, MO, NE); VIII (CO, MT, ND, SD, UT, WY); IX (AZ, CA, HI, NV, Pacific Trust Territories); X (AK, ID, OR, WA).

and TRIS (Toxic Release Inventory System).  IDEA also contains information from outside sources such as Dun and Bradstreet and the Occupational Safety and Health Administration (OSHA).  Most data queries displayed in notebook sections IV and VII were conducted using IDEA.

**Data Table Column Heading Definitions**

**Facilities in Search** -- are based on the universe of TRI reporters within the listed SIC code range.  For industries not covered under TRI reporting requirements, the notebook uses the FINDS universe for executing data queries.  The SIC code range selected for each search is defined by each notebook's selected SIC code coverage described in Section II.

**Facilities Inspected** --- indicates the level of EPA and state agency inspections for the facilities in this data search.  These values show what percentage of the facility universe is inspected in a 12 or 60 month period.

**Number of Inspections** -- measures the total number of inspections conducted in this sector.  An inspection event is counted each time it is entered into a single media database.

**Average Time Between Inspections** -- provides an average length of time, expressed in months, between compliance inspections at a facility within the defined universe.

**Facilities with One or More Enforcement Actions** -- expresses the number of facilities that were the subject of at least one enforcement action within the defined time period.  This category is broken down further into federal and state actions.  Data are obtained for administrative, civil/judicial, and criminal enforcement actions.  Administrative actions include Notices of Violation (NOVs).  A facility with multiple enforcement actions is only counted once in this column (facility with 3 enforcement actions counts as 1).

**Total Enforcement Actions** -- describes the total number of enforcement actions identified for an industrial sector across all environmental statutes.  A facility with multiple enforcement actions is counted multiple times (a facility with 3 enforcement actions counts as 3).

**State Lead Actions --** shows what percentage of the total enforcement actions are taken by state and local environmental agencies.  Varying levels of use by states of EPA data systems may limit the volume of actions accorded state enforcement activity.    Some states extensively report enforcement activities into EPA data systems, while other states may use their own data systems.

**Federal Lead Actions** -- shows what percentage of the total enforcement actions are taken by the United States Environmental Protection Agency. This value includes referrals from state agencies. Many of these actions result from coordinated or joint state/federal efforts.

**Enforcement to Inspection Rate** -- expresses how often enforcement actions result from inspections. This value is a ratio of enforcement actions to inspections, and is presented for comparative purposes only. This measure is a rough indicator of the relationship between inspections and enforcement. This measure simply indicates historically how many enforcement actions can be attributed to inspection activity. Reported inspections and enforcement actions under the Clean Water Act (CWA), the Clean Air Act (CAA) and the Resource Conservation and Recovery Act (RCRA) are included in this ratio. Inspections and actions from the TSCA/FIFRA/ EPCRA database are not factored into this ratio because most of the actions taken under these programs are not the result of facility inspections. This ratio does not account for enforcement actions arising from non-inspection compliance monitoring activities (e.g., self-reported water discharges) that can result in enforcement action within the CAA, CWA, and RCRA.

**Facilities with One or More Violations Identified** -- indicates the percentage of inspected facilities having a violation identified in one of the following data categories: In Violation or Significant Violation Status (CAA); Reportable Noncompliance, Current Year Noncompliance, Significant Noncompliance (CWA); Noncompliance and Significant Noncompliance (FIFRA, TSCA, and EPCRA); Unresolved Violation and Unresolved High Priority Violation (RCRA). The values presented for this column reflect the extent of noncompliance within the measured time frame, but do not distinguish between the severity of the noncompliance. Violation status may be a precursor to an enforcement action, but does not necessarily indicate that an enforcement action will occur.

**Media Breakdown of Enforcement Actions and Inspections** -- four columns identify the proportion of total inspections and enforcement actions within EPA Air, Water, Waste, and TSCA/FIFRA/EPCRA databases. Each column is a percentage of either the "Total Inspections," or the "Total Actions" column.

**VII.A. Iron and Steel Industry Compliance History**

Exhibit 14 provides an overview of the reported compliance and enforcement data for the iron and steel industry over the past five years (August 1990 to August 1995). These data are also broken out by EPA Region thereby permitting geographical comparisons. A few points evident from the data are listed below.

• Eighty-five percent of iron and steel facility inspections occurred in Regions III, IV, and V, where the most facilities are located.

• Within the three regions where iron and steel mills are concentrated, the proportion of state-lead enforcement actions was significantly greater than federal action for Regions III and IV (87% state-lead and 91% state-lead, respectively). In Region V, the region with the greatest number of iron and steel facilities, enforcement actions were fairly evenly split between state-lead and federal-lead.

• Of the 275 facilities inspected over the five-year period examined, 115 had one or more enforcement actions (42%), however, the aggregate Enforcement to Inspection Rate across all Regions was 0.14 (499 enforcement actions/3,555 inspections).

US EPA ARCHIVE DOCUMENT

September 1995

80

SIC 331

Sector Notebook Project

Iron and Steel Industry

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Exhibit 14: Five-Year Enforcement and Compliance Summary for Iron and Steel** | | | | | | | | | |
| **A** | **B** | **C** | **D** | **E** | **F** | **G** | **H** | **I** | **J** |
| **Region** | **Facilities in Search** | **Facilities Inspected** | **Number of Inspections** | **Average Months Between Inspections** | **Facilities with 1 or More Enforcement Actions** | **Total Enforcement Actions** | **Percent State Lead Actions** | **Percent Federal Lead Actions** | **Enforcement to Inspection Rate** |
| I | 17 | 11 | 37 | 28 | 6 | 9 | 78% | 22% | 0.24 |
| II | 23 | 19 | 184 | 8 | 8 | 21 | 76% | 24% | 0.11 |
| III | 79 | 68 | 962 | 5 | 26 | 135 | 87% | 13% | 0.14 |
| IV | 59 | 46 | 907 | 4 | 24 | 133 | 87% | 13% | 0.15 |
| V | 135 | 92 | 1,143 | 7 | 36 | 98 | 48% | 52% | 0.09 |
| VI | 32 | 21 | 185 | 10 | 7 | 59 | 39% | 61% | 0.32 |
| VII | 10 | 7 | 43 | 14 | 2 | 7 | 14% | 86% | 0.16 |
| VIII | 5 | 3 | 29 | 10 | 2 | 6 | 83% | 17% | 0.21 |
| IX | 11 | 6 | 23 | 29 | 3 | 21 | 100% | 0% | 0.91 |
| X | 3 | 2 | 42 | 4 | 1 | 10 | 50% | 50% | 0.24 |
| TOTAL | 374 | 275 | 3,555 | 6 | 115 | 499 | 72% | 28% | 0.14 |

**VII.B. Comparison of Enforcement Activity Between Selected Industries**

Exhibits 15 and 16 allow the compliance history of the iron and steel sector to be compared to the other industries covered by the industry sector notebooks. Comparisons <u>between</u> Exhibits 15 and 16 permit the identification of trends in compliance and enforcement records of the industry by comparing data covering the last five years to that of the past year. Some points evident from the data are listed below.

• Of those sectors listed, facilities in iron and steel sector have been one of the most frequently inspected industries over the past five years with an average of 6 months between inspections. Only petroleum refining and pulp and paper facilities were inspected, on average, more frequently.

• Over the past year, the enforcement to inspection rate for the iron and steel industry has decreased from 0.14 for 1990 through 1995 to 0.09 for August 1994 through August 1995.

Exhibits 17 and 18 provide a more in-depth comparison between iron and steel industry and other sectors by breaking out the compliance and enforcement data by environmental statute. As in the previous Exhibits (Exhibits 15 and 16), the data cover the last five years (Exhibit 17) and the last one year (Exhibit 18) to facilitate the identification of recent trends. A few points evident from the data are listed below.

• The percentage of inspections carried out under each environmental statute has changed little between the average of the past five years and that of the past year. Inspections are roughly divided equally among, CAA, CWA, and RCRA, although the past year has shown a slight increase in the percentage of CAA inspections and a slight decrease in the percentage of RCRA inspections.

• While approximately one-third of inspections are carried out under each statute (CAA, CWA, and RCRA), the majority of the enforcement actions are taken under RCRA.

US EPA ARCHIVE DOCUMENT

| Exhibit 15: Five-Year Enforcement and Compliance Summary for Selected Industries | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| A | B | C | D | E | F | G | H | I | J |
| Industry Sector | Facilities in Search | Facilities Inspected | Number of Inspections | Average Months Between Inspections | Facilities with 1 or More Enforcement Actions | Total Enforcement Actions | Percent State Lead Actions | Percent Federal Lead Actions | Enforcement to Inspection Rate |
| Pulp and Paper | 306 | 265 | 3,766 | 5 | 115 | 502 | 78% | 22% | 0.13 |
| Printing | 4,106 | 1,035 | 4,723 | 52 | 176 | 514 | 85% | 15% | 0.11 |
| Inorganic Chemicals | 548 | 298 | 3,034 | 11 | 99 | 402 | 76% | 24% | 0.13 |
| Organic Chemicals | 412 | 316 | 3,864 | 6 | 152 | 726 | 66% | 34% | 0.19 |
| Petroleum Refining | 156 | 145 | 3,257 | 3 | 110 | 797 | 66% | 34% | 0.25 |
| **Iron and Steel** | **374** | **275** | **3,555** | **6** | **115** | **499** | **72%** | **28%** | **0.14** |
| Dry Cleaning | 933 | 245 | 633 | 88 | 29 | 103 | 99% | 1% | 0.16 |
| Metal Mining | 873 | 339 | 1,519 | 34 | 67 | 155 | 47% | 53% | 0.10 |
| Non-Metallic Mineral Mining | 1,143 | 631 | 3,422 | 20 | 84 | 192 | 76% | 24% | 0.06 |
| Lumber and Wood | 464 | 301 | 1,891 | 15 | 78 | 232 | 79% | 21% | 0.12 |
| Furniture | 293 | 213 | 1,534 | 11 | 34 | 91 | 91% | 9% | 0.06 |
| Rubber and Plastic | 1,665 | 739 | 3,386 | 30 | 146 | 391 | 78% | 22% | 0.12 |
| Stone, Clay, and Glass | 468 | 268 | 2,475 | 11 | 73 | 301 | 70% | 30% | 0.12 |
| Fabricated Metal | 2,346 | 1,340 | 5,509 | 26 | 280 | 840 | 80% | 20% | 0.15 |
| Nonferrous Metal | 844 | 474 | 3,097 | 16 | 145 | 470 | 76% | 24% | 0.15 |
| Electronics | 405 | 222 | 777 | 31 | 68 | 212 | 79% | 21% | 0.27 |
| Automobiles | 598 | 390 | 2,216 | 16 | 81 | 240 | 80% | 20% | 0.11 |

US EPA ARCHIVE DOCUMENT

September 1995

83

SIC 331

Sector Notebook Project

Iron and Steel Industry

| Exhibit 16: One-Year Inspection and Enforcement Summary for Selected Industries | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| A | B | C | D | E | | F | | G | H |
| Industry Sector | Facilities in Search | Facilities Inspected | Number of Inspections | Facilities with 1 or More Violations | | Facilities with 1 or more Enforcement Actions | | Total Enforcement Actions | Enforcement to Inspection Rate |
| | | | | Number | Percent* | Number | Percent* | | |
| Pulp and Paper | 306 | 189 | 576 | 162 | 86% | 28 | 15% | 88 | 0.15 |
| Printing | 4,106 | 397 | 676 | 251 | 63% | 25 | 6% | 72 | 0.11 |
| Inorganic Chemicals | 548 | 158 | 427 | 167 | 106% | 19 | 12% | 49 | 0.12 |
| Organic Chemicals | 412 | 195 | 545 | 197 | 101% | 39 | 20% | 118 | 0.22 |
| Petroleum Refining | 156 | 109 | 437 | 109 | 100% | 39 | 36% | 114 | 0.26 |
| **Iron and Steel** | **374** | **167** | **488** | **165** | **99%** | **20** | **12%** | **46** | **0.09** |
| Dry Cleaning | 933 | 80 | 111 | 21 | 26% | 5 | 6% | 11 | 0.10 |
| Metal Mining | 873 | 114 | 194 | 82 | 72% | 16 | 14% | 24 | 0.13 |
| Non-metallic Mineral Mining | 1,143 | 253 | 425 | 75 | 30% | 28 | 11% | 54 | 0.13 |
| Lumber and Wood | 464 | 142 | 268 | 109 | 77% | 18 | 13% | 42 | 0.58 |
| Furniture | 293 | 160 | 113 | 66 | 41% | 3 | 2% | 5 | 0.55 |
| Rubber and Plastic | 1,665 | 271 | 435 | 289 | 107% | 19 | 7% | 59 | 0.14 |
| Stone, Clay, and Glass | 468 | 146 | 330 | 116 | 79% | 20 | 14% | 66 | 0.20 |
| Nonferrous Metals | 844 | 202 | 402 | 282 | 104% | 22 | 11% | 72 | 0.18 |
| Fabricated Metal | 2,346 | 477 | 746 | 525 | 110% | 46 | 10% | 114 | 0.15 |
| Electronics | 405 | 60 | 87 | 80 | 133% | 8 | 13% | 21 | 0.24 |
| Automobiles | 598 | 169 | 284 | 162 | 96% | 14 | 8% | 28 | 0.10 |

* Percentages in Columns E and F are based on the number of facilities inspected (Column C). Percentages can exceed 100% because violations and actions can occur without a facility inspection.

US EPA ARCHIVE DOCUMENT

Sector Notebook Project

Iron and Steel Industry

| Exhibit 17: Five-Year Inspection and Enforcement Summary by Statute for Selected Industries | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Clean Air Act | | Clean Water Act | | Resource Conservation and Recovery Act | | FIFRA/TSCA/ EPCRA/Other | |
| Industry Sector | Facilities Inspected | Total Inspections | Total Enforcement Actions | % of Total Inspections | % of Total Actions | % of Total Inspections | % of Total Actions | % of Total Inspections | % of Total Actions | % of Total Inspection | % of Total Actions |
| Pulp and Paper | 265 | 3,766 | 502 | 51% | 48% | 38% | 30% | 9% | 18% | 2% | 3% |
| Printing | 1,035 | 4,723 | 514 | 49% | 31% | 6% | 3% | 43% | 62% | 2% | 4% |
| Inorganic Chemicals | 298 | 3,034 | 402 | 29% | 26% | 29% | 17% | 39% | 53% | 3% | 4% |
| Organic Chemicals | 316 | 3,864 | 726 | 33% | 30% | 16% | 21% | 46% | 44% | 5% | 5% |
| Petroleum Refining | 145 | 3,237 | 797 | 44% | 32% | 19% | 12% | 35% | 52% | 2% | 5% |
| **Iron and Steel** | **275** | **3,555** | **499** | **32%** | **20%** | **30%** | **18%** | **37%** | **58%** | **2%** | **5%** |
| Dry Cleaning | 245 | 633 | 103 | 15% | 1% | 3% | 4% | 83% | 93% | 0% | 1% |
| Metal Mining | 339 | 1,519 | 155 | 35% | 17% | 57% | 60% | 6% | 14% | 1% | 9% |
| Non-metallic Mineral Mining | 631 | 3,422 | 192 | 65% | 46% | 31% | 24% | 3% | 27% | 0% | 4% |
| Lumber and Wood | 301 | 1,891 | 232 | 31% | 21% | 8% | 7% | 59% | 67% | 2% | 5% |
| Furniture | 293 | 1,534 | 91 | 52% | 27% | 1% | 1% | 45% | 64% | 1% | 8% |
| Rubber and Plastic | 739 | 3,386 | 391 | 39% | 15% | 13% | 7% | 44% | 68% | 3% | 10% |
| Stone, Clay, and Glass | 268 | 2,475 | 301 | 45% | 39% | 15% | 5% | 39% | 51% | 2% | 5% |
| Nonferrous Metals | 474 | 3,097 | 470 | 36% | 22% | 22% | 13% | 38% | 54% | 4% | 10% |
| Fabricated Metal | 1,340 | 5,509 | 840 | 25% | 11% | 15% | 6% | 56% | 76% | 4% | 7% |
| Electronics | 222 | 777 | 212 | 16% | 2% | 14% | 3% | 66% | 90% | 3% | 5% |
| Automobiles | 390 | 2,216 | 240 | 35% | 15% | 9% | 4% | 54% | 75% | 2% | 6% |

US EPA ARCHIVE DOCUMENT

VII.C. Review of Major Legal Action

SIC 331

Iron and Steel Industry

| Exhibit 18: One-Year Inspection and Enforcement Summary by Statute for Selected Industries | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Clean Air Act | | Clean Water Act | | Resource Conservation and Recovery Act | | FIFRA/TSCA/ EPCRA/Other | |
| Industry Sector | Facilities Inspected | Total Inspections | Total Enforcement Actions | % of Total Inspections | % of Total Actions | % of Total Inspections | % of Total Actions | % of Total Inspections | % of Total Actions | % of Total Inspections | % of Total Actions |
| Pulp and Paper | 189 | 576 | 88 | 56% | 69% | 35% | 21% | 10% | 7% | 0% | 3% |
| Printing | 397 | 676 | 72 | 50% | 27% | 5% | 3% | 44% | 66% | 0% | 4% |
| Inorganic Chemicals | 158 | 427 | 49 | 26% | 38% | 29% | 21% | 45% | 36% | 0% | 6% |
| Organic Chemicals | 195 | 545 | 118 | 36% | 34% | 13% | 16% | 50% | 49% | 1% | 1% |
| Petroleum Refining | 109 | 437 | 114 | 50% | 31% | 19% | 16% | 30% | 47% | 1% | 6% |
| **Iron and Steel** | **167** | **488** | **46** | **29%** | **18%** | **35%** | **26%** | **36%** | **50%** | **0%** | **6%** |
| Dry Cleaning | 80 | 111 | 11 | 21% | 4% | 1% | 22% | 78% | 67% | 0% | 7% |
| Metal Mining | 114 | 194 | 24 | 47% | 42% | 43% | 34% | 10% | 6% | 0% | 19% |
| Non-metallic Mineral Mining | 253 | 425 | 54 | 69% | 58% | 26% | 16% | 5% | 16% | 0% | 11% |
| Lumber and Wood | 142 | 268 | 42 | 29% | 20% | 8% | 13% | 63% | 61% | 0% | 6% |
| Furniture | 293 | 160 | 5 | 58% | 67% | 1% | 10% | 41% | 10% | 0% | 13% |
| Rubber and Plastic | 271 | 435 | 59 | 39% | 14% | 14% | 4% | 46% | 71% | 1% | 11% |
| Stone, Clay, and Glass | 146 | 330 | 66 | 45% | 52% | 18% | 8% | 38% | 37% | 0% | 3% |
| Nonferrous Metals | 202 | 402 | 72 | 33% | 24% | 21% | 3% | 44% | 69% | 1% | 4% |
| Fabricated Metal | 477 | 746 | 114 | 25% | 14% | 14% | 8% | 61% | 77% | 0% | 2% |
| Electronics | 60 | 87 | 21 | 17% | 2% | 14% | 7% | 69% | 87% | 0% | 4% |
| Automobiles | 169 | 284 | 28 | 34% | 16% | 10% | 9% | 56% | 69% | 1% | 6% |

### Major Cases/Supplemental Environmental Projects

This section provides summary information about major cases that have affected this sector, and a list of Supplemental Environmental Projects (SEPs).  SEPs are compliance agreements that reduce a facility's non-compliance penalty in return for an environmental project that exceeds the value of the reduction.  Often, these projects fund pollution prevention activities that can significantly reduce the future pollutant loadings of a facility.

### VII.C.1. Review of Major Cases

The Office of Regulatory Enforcement does not regularly compile information related to major cases and pending litigation within an industry sector.  The staff are willing to pass along such information to Agency staff as requests are made.  (Contact: Pete Rosenberg 202-260-8869)  In addition, summaries of completed enforcement actions are published each fiscal year in the *Enforcement Accomplishments Report*; the summaries are not organized by industry sector.  (Contact: Robert Banks 202-260-8296).

### VII.C.2. Supplementary Environmental Projects (SEPs)

Supplemental environmental projects (SEPs) are enforcement options that require the non-compliant facility to complete specific projects.  Regional summaries of SEPs undertaken in the 1993 and 1994 federal fiscal years were reviewed.  Three projects were undertaken that involved iron and steel facilities, as shown in Exhibit 19.

In the iron and steel sector, SEPs resulted from violations  of EPCRA, CERCLA, and RCRA.  Due to differences in regional descriptions, the specifics of the original violations are not known.  The cost for the projects ranged from $53,000 to $900,000 corresponding to initial penalties ranging from $110,000 to $746,438.

US EPA ARCHIVE DOCUMENT

September 1995

87

SIC 331

Sector Notebook Project

Iron and Steel Industry

| Exhibit 19: FY-1993-1994 Supplemental Environmental Projects Overview: Iron and Steel Manufacture | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| General Information | | | | Violation Information | | | | | Pollution Reduction | | |
| FY | Docket # | Company Name | State/ Region | Type | Initial Penalty | Final Penalty | SEP Credit | SEP Cost to Company | Pollutant Concern | Pollutant Reduction | Supplemental Environmental Project Description |
| 93 | --- | Inland Steel Co. | IN | EPCRA 313 | $260,000 | $100,000 | --- | $165,000 | Perchloro-ethylene | 200,000 lbs/yr | Parts cleaning process modified by replacing perchloroethylene with a non-toxic |
| 93 | --- | Follansbee Steel Division of the Louis Berkman Company | WV | CERCLA | $110,000 | $72,250 | $17,250 | $53,000 | Zinc compounds Sulfuric Acid | 500 to 1,000 lb/yr air, 40,000 lb/yr zinc (100%) | Zinc preflux process eliminated and sulfuric acid spillage control installed |
| 94 | --- | Indiana Steel and Wire/G.K. Technologies | IN | RCRA | $746,438 | $425,000 | --- | $900,000 | Ammonia | --- | Will eliminate ammonia emissions through conversion of zinc plating line bath to eliminate the use of anhydrous ammonia |

**Violation Information Terms**
Initial penalty: Initial proposed cash penalty for violation
Final penalty: Total penalty after SEP negotiation
SEP credit: Cash credit given for SEP so that, Final penalty - SEP credit = Final cash penalty
SEP cost to company: Actual cost to company of SEP implementation

NOTE: Due to differences in terminology and level of detail between regional SEP information, in some cases the figure listed as Final penalty may be the Final cash penalty after deduction for SEP credit

## VIII. COMPLIANCE ACTIVITIES AND INITIATIVES

This section highlights the activities undertaken by this industry sector and public agencies to voluntarily improve the sector's environmental performance. These activities include those independently initiated by industrial trade associations. In this section, the notebook also contains a listing and description of national and regional trade associations.

### VIII.A. Sector-related Environmental Programs and Activities

*Common Sense Initiative*

The EPA's Common Sense Initiative (CSI) was announced in November of 1993 to encourage pollution prevention in a few pilot industrial sectors including: iron and steel, electronics, metal plating and finishing, automobiles, printing, and oil refining. The program shifts regulatory focus from concentrating on individual toxic chemicals and media, to industry-wide approaches to environmental problems. A subcommittee will be formed for each industry and a strategic plan will be drawn up to identify opportunities to coordinate rulemaking, to streamline record-keeping and permitting requirements, and to identify innovative approaches in pollution prevention and environmental technology. For the iron and steel industry, a subcommittee has been formed and four workgroups have been established. The workgroups include representatives from industry, EPA (federal and regional), state environmental agencies, public interest groups, trade associations, and research institutions. The iron and steel CSI workgroups include: Innovative Technology, Permits Process, Compliance, and Brownfields. Projects proposed by each of the workgroups are subject to approval by the subcommittee. Project approval is expected in May, 1995. Common Sense Initiative contacts at EPA are:

Designated Federal Official (EPA Office of Water):
        Mahesh Podar, 202-260-5387

Subcommittee Co-Chair (EPA Office of Water):
        Bob Perciasepe, 202-260-5700

Subcommittee Co-Chair (EPA Region V):
        Dave Ullrich, 312-886-3000

OECA contact (Compliance Workgroup):
        Maria Malave, 202-564-7027

OECA contact (Permits Process Workgroup):
        Mike Calhoun, 202-564-6031

## VIII.B. EPA Voluntary Programs

*33/50 Program*

The "33/50 Program" is EPA's voluntary program to reduce toxic chemical releases and transfers of seventeen chemicals from manufacturing facilities. Participating companies pledge to reduce their toxic chemical releases and transfers by 33% as of 1992 and by 50% as of 1995 from the 1988 baseline year. Certificates of Appreciation have been given out to participants meeting their 1992 goals. The list of chemicals includes seventeen high-use chemicals reported in the Toxics Release Inventory. Exhibit 20 lists those companies participating in the 33/50 program that reported the SIC code 331 to TRI. Many of the companies shown listed multiple SIC codes and, therefore, are likely to carry out operations in addition to the iron and steel industry. The SIC codes reported by each company are listed in no particular order. In addition, the number of facilities within each company that are participating in the 33/50 program and that report SIC 331 to TRI is shown. Finally, each company's total 1993 releases and transfers of 33/50 chemicals and the percent reduction in these chemicals since 1988 are presented.

Thirteen of the seventeen target chemicals are used in the iron and steel industry. Of all TRI chemicals released by the iron and steel industry, chromium and chromium compounds, a 33/50 target chemical, were released most frequently (from 347 facilities), and were the third greatest volume. Other target chemicals that were in the top ten TRI releases by volume and by number of facilities reporting that chemical released were nickel and nickel compounds, lead and lead compounds, and 1,1,1-trichloroethane. Approximately twelve percent of eligible iron and steel companies are currently participating in the program. Exhibit 20 shows that 49 companies comprised of 115 facilities reporting SIC 331 are participating in the 33/50 program. (Contact: Mike Burns 202-260-6394 or 33/50 Program 202-260-6907).

**Sector Notebook Project**                                      **Iron and Steel Industry**

| \multicolumn{6}{c}{**Exhibit 20: SIC 331 Facilities Participating in the EPA's 33/50 Program**} |

| Parent Company | City, State | SIC Codes Reported | Number of Participating Facilities | 1993 Releases and Transfers (lbs) | % Reduction 1988 to 1993 |
|---|---|---|---|---|---|
| Acme Metals Inc. | Riverdale, IL | 3312, 3499, 3479 | 3 | 157,232 | 38 |
| Allegheny Ludlum Corporation | Pittsburgh, PA | 3312 | 8 | 1,031,164 | * |
| American Cast Iron Pipe Co. | Birmingham, AL | 3322, 3317, 3325 | 1 | 315,184 | 25 |
| Ameron Inc Delaware | Pasadena, CA | 3272, 3317, 3443 | 1 | 184,882 | ** |
| Amsted Industries Incorporated | Chicago, IL | 3315, 3496, 3471 | 1 | 1,834,493 | 66 |
| Armco Inc. | Pittsburgh, PA | 3312 | 11 | 1,849,709 | 4 |
| Armco Steel Company L.P. | Middletown, OH | 3312 | 2 | 159,944 | * |
| Avesta Sheffield Holding Co. | New Castle, IN | 3312 | 1 | 27,025 | 99 |
| Bayou Steel Corporation | La Place, LA | 3312 | 1 | 1,892 | 98 |
| Bethlehem Steel Corporation | Bethlehem, PA | 3312 | 9 | 792,550 | 50 |
| Cargill Detroit Corporation | Clawson, MI | 3312 | 8 | 717,558 | 31 |
| Carpenter Technology Corp. | Reading, PA | 3312 | 1 | 57,155 | 86 |
| CF&L Steel Corp. | Pueblo, CO | 3312 | 1 | 308,892 | 50 |
| Commercial Metals Company | Dallas, TX | 3312 | 3 | 36,457 | 47 |
| Contran Corporation | Dallas, TX | 3312, 3315 | 1 | 735,655 | 50 |
| Cooper Industries Inc. | Houston, TX | 3462, 3317 | 1 | 1,048,465 | 75 |
| CSC Industries Inc. | Warren, OH | 3312 | 1 | 8,808 | 50 |
| Emerson Electric Co. | Saint Louis, MO | 3469, 3315 | 1 | 2,140,497 | 50 |
| First Mississippi Corporation | Jackson, MS | 3312 | 1 | 200,977 | *** |
| Ford Motor Company | Dearborn, MI | 3312 | 1 | 15,368,032 | 15 |
| Geneva Steel | Orem, UT | 3312, 3317, 3325 | 1 | 12,448 | *** |
| Inland Steel Industries Inc. | Chicago, IL | 3312, 3274 | 1 | 733,786 | 48 |
| J & L Specialty Steel Inc. | Pittsburgh, PA | 3312 | 2 | 669,309 | 100 |
| Kanthal Furnace Prods. | Bethel, CT | 3315, 3316, 3357 | 1 | 21,581 | 41 |
| Katy Industries Inc. | Englewood, CO | 3316, 3351, 3353 | 1 | 82,256 | 52 |
| Kerr-Mcgee Corporation | Oklahoma City, OK | 2819, 3313 | 1 | 374,098 | 35 |
| LTV Steel Co. Inc. | Cleveland, OH | 3312 | 7 | 612,924 | 60 |
| Lukens Inc. | Coatesville, PA | 3312 | 4 | 312,442 | 14 |
| Naco Inc. | Lisle, IL | 3313 | 1 | 71,800 | *** |
| National Steel Corporation | Mishawaka, IN | 3312 | 2 | 682,386 | 50 |
| Olin Corporation | Stamford, CT | 3351, 3316, 3356 | 1 | 574,673 | 70 |
| Oregon Steel Mills Inc. | Portland, OR | 3312, 3295 | 1 | 14,533 | 12 |
| Plymouth Tube Company | Warrenville, IL | 3499, 3317 | 1 | 76,694 | * |
| Renco Group Inc. | New York, NY | 3312 | 2 | 204,629 | 7 |
| Republic Engineered Steels | Massillon, OH | 3312 | 4 | 193,662 | 3 |

US EPA ARCHIVE DOCUMENT

**Sector Notebook Project**                                **Iron and Steel Industry**

| **Exhibit 20: SIC 331 Facilities Participating in the EPA's 33/50 Program** | | | | | |
|---|---|---|---|---|---|
| **Parent Company** | **City, State** | **SIC Codes Reported** | **Number of Participating Facilities** | **1993 Releases and Transfers (lbs)** | **% Reduction 1988 to 1993** |
| Roanoke Electric Steel Corp. | Roanoke, VA | 3312 | 1 | 476 | *** |
| S K W Alloys Inc. | Niagara Falls, NY | 3313 | 1 | 7,777 | * |
| Slater Steels Corporation | Fort Wayne, IN | 3312 | 1 | 22,205 | 50 |
| Swva Inc. | Huntington, WV | 3312 | 1 | 43,405 | 27 |
| Talley Industries Inc. | Phoenix, AZ | 3312 | 1 | 3,804 | *** |
| Texas Industries Inc. | Dallas, TX | 3312 | 1 | 20,964 | * |
| Thomas Steel Strip Corp. | Warren, OH | 3471, 3316 | 1 | 6,839 | 50 |
| Timken Co. | Canton, OH | 3312 | 5 | 278,695 | 30 |
| Toledo Coke Corporation | Toledo, OH | 3312 | 1 | 18 | 90 |
| USS Posco Industries | Pittsburg, CA | 3312 | 1 | 182,431 | 56 |
| USX Corporation | Pittsburgh, PA | 3312 | 6 | 1,510,772 | 25 |
| Walter Industries Inc. | Tampa, FL | 3312 | 1 | 859,751 | *** |
| Weirton Steel Corporation | Weirton, WV | 3312 | 1 | 183,497 | ** |
| Wheeling-Pittsburgh Corp. | Wheeling, WV | 3312 | 6 | 560,055 | 66 |
| Total | | | 115 | | |
| * = not quantifiable against 1988 data.<br>** = use reduction goal only.<br>*** = no numerical goal. | | | | | |
| Source: U.S. EPA, Toxics Release Inventory, 1993. | | | | | |

*Environmental Leadership Program*

The Environmental Leadership Program (ELP) is a national initiative piloted by EPA and state agencies in which facilities have volunteered to demonstrate innovative approaches to environmental management and compliance. EPA has selected 12 pilot projects at industrial facilities and federal installations which will demonstrate the principles of the ELP program. These principles include: environmental management systems, multimedia compliance assurance, third-party verification of compliance, public measures of accountability, community involvement, and mentor programs. In return for participating, pilot participants receive public recognition and are given a period of time to correct any violations discovered during these experimental projects. In the iron and steel industry, one company (California Steel of Fontana, California) submitted a proposal. (Contact: Tai-ming Chang, ELP Director, 202-564-5081 or Robert Fentress, 202-564-7023.)

*Project XL*

Project XL was initiated in March 1995 as a part of President Clinton's *Reinventing Environmental Regulation* initiative. The projects seek to achieve cost effective environmental benefits by allowing participants to replace or modify existing regulatory requirements on the condition that they produce greater environmental benefits. EPA and program participants will negotiate and sign a Final Project Agreement, detailing specific objectives that the regulated entity shall satisfy. In exchange, EPA will allow the participant a certain degree of regulatory flexibility and may seek changes in underlying regulations or statutes. Participants are encouraged to seek stakeholder support from local governments, businesses, and environmental groups. EPA hopes to implement fifty pilot projects in four categories, including facilities, sectors, communities, and government agencies regulated by EPA. Applications will be accepted on a rolling basis and projects will move to implementation within six months of their selection. For additional information regarding XL projects, including application procedures and criteria, see the May 23, 1995 Federal Register Notice, or contact Jon Kessler at EPA's Office of Policy Analysis (202) 260-4034.

*Green Lights Program*

EPA's Green Lights program was initiated in 1991 and has the goal of preventing pollution by encouraging U.S. institutions to use energy-efficient lighting technologies. The program has over 1,500 participants which include major corporations; small and medium sized businesses; federal, state and local governments; non-profit groups; schools; universities; and health care facilities. Each participant is required to survey their facilities and upgrade lighting wherever it is profitable. EPA provides technical assistance to the participants through a decision support software package, workshops and manuals, and a financing registry. EPA's Office of Air and Radiation is responsible for operating the Green Lights Program. (Contact: Susan Bullard at 202-233-9065 or the Green Light/Energy Star Hotline at 202-775-6650)

*WasteWi$e Program*

The WasteWi$e Program was started in 1994 by EPA's Office of Solid Waste and Emergency Response. The program is aimed at reducing municipal solid wastes by promoting waste minimization, recycling collection and the manufacturing and purchase of recycled products. As of 1994, the program had about 300 companies as members, including a number of major corporations. Members agree to identify and implement actions to reduce their solid wastes and must provide EPA with their waste reduction goals along with yearly progress reports. EPA in turn provides technical assistance to member companies and allows the use of the WasteWi$e logo for promotional purposes. (Contact: Lynda Wynn, 202-260-0700 or the WasteWi$e Hotline at 1-800-372-9473)

*Climate Wise Recognition Program*

The Climate Change Action Plan was initiated in response to the U.S. commitment to reduce greenhouse gas emissions in accordance with the Climate Change Convention of the 1990 Earth Summit. As part of the Climate Change Action Plan, the Climate Wise Recognition Program is a partnership initiative run jointly by EPA and the Department of Energy. The program is designed to reduce greenhouse gas emissions by encouraging reductions across all sectors of the economy, encouraging participation in the full range of Climate Change Action Plan initiatives, and fostering innovation. Participants in the program are required to identify and commit to actions that reduce greenhouse gas emissions. The program, in turn, gives organizations early recognition for their reduction commitments; provides technical assistance through consulting services, workshops, and guides; and provides access to the program's centralized information system. At EPA, the program is operated by the Air and Energy Policy Division within the Office of Policy Planning and Evaluation. (Contact: Pamela Herman, 202-260-4407)

*NICE[3]*

The U.S. Department of Energy and EPA's Office of Pollution Prevention are jointly administering a grant program called The National Industrial Competitiveness through Energy, Environment, and Economics (NICE[3]). By providing grants of up to 50 percent of the total project cost, the program encourages industry to reduce industrial waste at its source and become more energy-efficient and cost-competitive through waste minimization efforts. Grants are used by industry to design, test, demonstrate, and assess the feasibility of new processes and/or equipment with the potential to reduce pollution and increase energy efficiency. The program is open to all industries; however, priority is given to proposals from participants in the pulp and paper, chemicals, primary metals, and petroleum and coal products sectors. The program has worked with the iron and steel industry to evaluate the feasibility of an on-site hydrochloric acid recovery system for galvanizers and small- to medium-sized steel manufacturers. (Contact: Bill Ives at DOE's Golden Field Office, 303-275-4755)

## VII.B. EPA Voluntary Programs

*Strategies for Pulp & Paper and Steel Industries*

The U.S. Department of Energy is examining the relationships between productivity, energy efficiency and environmental compliance in the pulp & paper and steel industries. Productivity and energy efficiency investments often complement each other, but can conflict with end-of-pipe emission control projects designed to reduce regulated pollutants. By sponsoring this project, the DOE seeks to better understand such conflicts and use this information to help identify ways DOE and other federal agencies can help industry meet mutual goals in these important areas. The project consists of

US EPA ARCHIVE DOCUMENT

two phases: 1) industry field consultations will be conducted to discuss and clarify the issues; and 2) quantitative analysis will evaluate the interplay between productivity, energy efficiency, and pollution abatement investments. (Contact: Jeff Dowd at 202-586-7258)

## VIII.C. Trade Association/Industry Sponsored Activity

### VIII.C.1.  Industry Research Programs

Without technological changes, the requirements of the Clean Air Act affecting coke ovens may force the shutdown of many facilities. To avoid possible facility closings, the industry is actively investigating alternatives to the conventional coke-oven/blast furnace method of making iron. One promising technology, the direct steelmaking project which was jointly funded by the American Iron and Steel Institute (AISI) and the U.S. Department of Energy (DOE), concluded on March 31, 1994. This technology reduces, melts, and refines iron in a single reactor. An opt-in, DOE cost-sharing program for the smelting of steel plant waste oxides began on April 1, 1994. Based on the success of recent trials, and the further knowledge that was gained from this follow-on program, the technology is now well understood and fully developed. A feasibility study for a demonstration plan is being developed. Under a related project, the AISI and member companies are working with the U.S. Bureau of Mines on a jointly funded research project to improve the dewatering of a variety of steel plant sludges. Currently, the sludges contain too much moisture to permit economic recycling to recover metal values. (Contact: Dave Rice 801-584-4130).

Another cokeless ironmaking technology, called the Cipcor or Corex process, eliminates the need for a coke plant, has integral coal desulfurizing, is amenable to a variety of coal types, and produces a gas that can be used to fire a cogeneration plant. This project will begin in 1995; capital outlays are expected to reach $800 million. Under the DOE Clean Coal Technology Demonstration Program, the Corex construction project may receive a $150 million grant. For more information on the DOE project, contact  J. Lee Bailey (216) 447-3235.

Instead of eliminating coke production, two research projects run by Bethlehem Steel are focused on reducing coke process emissions. The Sparrows Point facility on Chesapeake Bay was the proposed site for one project. At this facility, the Davy Still Autoprocess for pre-combustion cleaning of coke ovens was to be demonstrated. This process utilizes coke oven battery process water to strip ammonia and hydrogen sulfide from coke oven emissions. The facility was constructed but is not in operation due to a suspension of coke-making operations by Bethlehem Steel at that facility. Discussions are ongoing over re-establishment of coke production at Sparrows Point. The other Bethlehem Steel project is a demonstration plant of the British Steel blast furnace granulated coal injection process. In this process, granulated coal is used instead of oil and natural gas in the blast

furnace.  Unlike natural gas, granulated coal does not cause furnace temperature reductions when it is introduced and thus improves process efficiency.  Pollutant outputs are reduced as coal sulphur is removed by flux and bound in the slag.  The process replaces natural gas usage and reduces 40 percent of the coke requirement.  The project facility, located in Burns Harbor, Indiana, is expected to be complete in January of 1995.  The EPA project manager for the Bethlehem Steel projects is Jeff Summers (301) 903-4412.

Another project focussing on reduced emissions from cokemaking is a process under development by Calderon Energy.  A small scale oven was constructed and operated in Alliance, Ohio and a full scale oven is under consideration for funding by the Department of Energy (DOE).  For further DOE information, contact John Augustine (412) 892-4524.

US EPA ARCHIVE DOCUMENT

### VIII.C.2. Summary of Trade Associations

| American Iron and Steel Institute | Members: 50 companies |
|---|---|
| 1101 17th Street, NW | Staff: 44 |
| Washington, DC 20036-4700 | Budget: |
| Phone: (202) 452-7100 | Contact: Bruce Steiner, |
| Fax: (202) 463-6573 | VP-Environment and Energy |

The American Iron and Steel Institute (AISI), founded in 1908, mainly represents integrated iron and steel manufacturers. Based on tonnage of production, AISI represents the companies responsible for 70 percent of U.S. steel manufacture. As the major trade group for the industry, AISI has a diverse agenda. The AISI conducts market development by working with major customer groups (e.g., automotive, machinery) to maintain and promote steel as the material of choice. The AISI is also involved in legislative and regulatory activities; AISI members rely on the organization to keep them abreast of legislative and regulatory developments. The AISI conducts research on manufacturing technology, basic materials, environmental quality control, energy, and fuel consumption. The AISI also compiles industry (including non-members) statistics through surveys. AISI publications are the *American Iron and Steel Institute-Annual Statistical Report*, as well as technical manuals and pamphlets on steel. The AISI holds several meetings and other workshops and seminars for member company representatives.

| Specialty Steel Industry North America | Members: 21 companies |
|---|---|
| 3050 K Street, NW | |
| Suite 400 | |
| Washington, DC 20007 | |
| Phone: 202-342-8630 | |
| Fax: 202-338-5534 | |

The Specialty Steel Industry of North America (SSINA) is a national trade organization comprised of 21 producers of specialty steel products, including stainless, electric, tool, magnetic, and other alloys. SSINA represents over 90 percent of the North American specialty steel industry. The primary purpose of SSINA is to promote and encourage a better understanding between members of the North American specialty steel industry and federal and state officials, and to provide and encourage governmental action in support of the continued growth of a strong North American specialty steel industry. SSINA is comprised of a number of task forces and committees which pursue issues of interest to the North American specialty steel industry, including domestic and international trade, environmental, critical materials matters, manufacturing and standards issues, and other government-related matters. The SSINA committees meet quarterly, normally alternating between Washington, D.C. and Pittsburgh.

US EPA ARCHIVE DOCUMENT

Steel Manufacturers Association (SMA)          email: steelnet@aol.com
1730 Rhode Island Avenue, NW                   World Wide Web home page:
Suite 907                                      http://www.steelnet.org
Washington, DC 20036-3101                      Members: 55
Phone: 202-296-1515
Fax: 202-296-2506

The SMA is the primary trade association of electric arc furnace steelmakers. Last year, EAF steelmakers recycled 38.2 million metric tons of iron and steel scrap. Purchased scrap accounts for almost 100% of the feedstocks used in an EAF to make new steel. Other SMA companies are reconstituted integrated (ore-based) steelmakers, with management practices similar to those of the EAF companies. The SMA Environment Committee meets frequently to address issues affecting the steel industry and works with the EPA and other government agencies to implement effective environmental programs. The SMA also has technical and human resources committees which meet to exchange information and develop public policy positions, as well as ad-hoc task forces to handle specific matters such as radioactive scrap detection, development of emission monitoring protocols, and the EPA's Common Sense Initiative. With 44 U.S., 8 Canadian, and 3 Mexican member companies geographically dispersed across the continent, the SMA is the largest steel trade association in North America in terms of membership. In 1994, the SMA membership accounted for approximately 40% of all steel shipments in the U.S., and as a growing segment of the industry, the SMA share of total U.S. steel production is expected to account for 50% within one decade.

International Iron and Steel Institute          Members: 165
Institut International du Fer et de l'Acier      Staff: 20
120, rue Colonel Bourg, B-1140                  Budget:
Brussels, Belgium 32 2 726 50 95                Contact: Ian Christmas, Deputy
                                                Secretary General

The International Iron and Steel Institute (IISI) is comprised of steel-producing companies, affiliated federations, and technical societies in 48 countries. The IISI seeks to contribute to the steel industry worldwide. Major functions are: to provide a forum for free and open discussions of the industry's problems and opportunities; to undertake research in scientific, technological, economic, financial, governmental, sociological, legal, environmental, and other aspects of the industry; to collect, evaluate, and disseminate statistics and information concerning matters affecting the steel industry; to establish and maintain liaisons with other organizations related to steel; to promote the use of steel. Some IISI committees include Economic Studies, Environmental Affairs, and Industrial Relations. The IISI publishes the monthly *Iron and Crude Steel Production* (in English) and the annuals *Steel Statistical Yearbook* (in English) and *World Steel in Figures* (in English). IISI also publishes conference proceedings and reports on the following issues: environment, economics, raw materials, technology, market promotion, and public relations. The IISI holds an annual world conference.

US EPA ARCHIVE DOCUMENT

Association of Iron and Steel Engineers        Members: 10,000
3 Gateway Center, Suite 2350                   Staff: 19
Pittsburgh, PA 15222                           Budget: $2,500,000
Phone: (412) 281-6323
Fax: (412) 281-4657

The Association of Iron and Steel Engineers (AISE) consists of engineers, operators, and suppliers in the steel industry. Founded in 1907, this association works to improve the technical phases of the production and processing of iron and steel via technical reports and industry awards. Divisions include Environmental Engineering, Steel Producing, and Continuous Casting. AISE publications include a monthly, *Iron and Steel Engineer* and a *Directory of Iron and Steel Plants*. Conferences are semi-annual.

Additional Related Associations

ASM International
9639 Kinsman Rd.
Materials Park, OH 44073-0002
Phone: (216) 338-5151

Society for Mining, Metallurgy, and Exploration, Inc. (SME, Inc.)
P.O. Box 625002
Littleton, CO 80162-5002
Phone: (303) 973-9550

The Mining Metals and Materials Society (TMS)
420 Commonwealth Drive
Warrendale, PA 15086
(412) 776-9000

US EPA ARCHIVE DOCUMENT

## IX. CONTACTS/ACKNOWLEDGMENTS/RESOURCE MATERIALS

For further information on selected topics within the iron and steel industry a list of contacts and publications are provided below.

### Contacts[e]

| Name | Organization | Telephone | Subject |
|---|---|---|---|
| Maria Malave | EPA/OECA (Office of Enforcement and Compliance Assurance) | 202-564-7027 | Regulatory requirements and compliance assistance |
| Steve Sisk | NEIC (National Enforcement Investigations Center) | 303-236-3636 ext. 540 | Regulatory requirements and industrial processes |
| James Maysilles | EPA/OAR (Office of Air and Radiation) | 919-541-3265 | Regulatory requirements (air) |
| Bernard Caton | EPA/OW (Office of Water) | 202-260-7849 | Regulatory requirements (water) |
| Gobind Jagtiani Jeff Dowd | DOE (Department of Energy) | 202-586-1826 202-586-7258 | Energy efficiency and environmental compliance |
| Bruce Steiner | AISI (American Iron and Steel Institute) | 202-452-7100 | Environment and energy |
| Javier Garcia | EPA/Region IV | 404-347-3555 | Inspections, regulatory requirements (RCRA) |
| Ed Wojciechowski | EPA/Region V | 312-886-6785 | Inspections, regulatory requirements (air) |
| Gerald Houck | U.S. Bureau of Mines | 202-501-9439 | Industrial processes |
| | U.S. Bureau of Mines: Center for Health and Safety | 412-892-6602 | Health and safety issues |

---

[e] Many of the contacts listed above have provided valuable information and comments during the development of this document.  EPA appreciates this support and acknowledges that the individuals listed do not necessarily endorse all statements made within this notebook.

## General Profile

U.S. Department of Commerce, *U.S. Industrial Outlook 1994*.

U.S. Department of Commerce, *1987 Census of Manufactures Industry Series: Blast Furnaces, Steel Works, and Rolling and Finishing Mills*, 1990.

U.S. Department of Commerce, *1992 Census of Manufactures Preliminary Report Industry Series: Blast Furnaces, Steel Works, and Rolling and Finishing Mills*, MC92-I-33A(P), May 1994.

American Iron and Steel Institute, *Annual Statistical Report*, Washington, D.C., 1993.

Barnett, Donald F. and Robert W. Crandall, *Up From the Ashes*, The Brookings Institution, Washington D.C., 1986.

## Process Descriptions and Chemical Use Profiles

American Iron and Steel Institute, *Report on Steel Industry Waste Generation, Disposal Practices, and Potential Environmental Impact*, Washington, D.C., February, 1992.

Lankford, William T., et. al., *The Making, Shaping, and Treating of Steel*, Tenth Edition, United States Steel Corporation, Pittsburgh, PA, 1985. (Available from the Association of Iron and Steel Engineers, Pittsburgh, PA).

Organization for Economic Co-operation and Development, *The Role of Technology in Iron and Steel Developments*, 1989.

Russell, Clifford S. and William J. Vaughan, *Steel Production: Processes, Products, and Residuals*, John Hopkins University Press, Baltimore, 1976.

## Regulatory Profile

*Sustainable Environmental Law*, Environmental Law Institute, West Publishing Co., St. Paul, Minn., 1993.

U.S. EPA, Office of Solid Waste, *Hazardous Waste Generation: 2. Iron and Steel Manufacturing*, February, 1994.

U.S. EPA, Office of Pollution Prevention and Toxics, *Toxics Release Inventory, Public Data Release, 1992*, April, 1994. (EPA 745-R-94-001).

U.S. EPA, Solid Waste and Emergency Response, *Report to Congress on Metal Recovery, Environmental Regulation & Hazardous Waste*, February 1994. (EPA 530-R-93-018).

U.S. EPA, Office of Solid Waste, *Report to Congress on Special Wastes from Mineral Processing*, February 1990.

U.S. EPA, Office of Air and Radiation, Office of Air Quality Planning and Standards, *Compilation of Air Pollutant Emission Factors, Volume I: Stationary Point and Area Sources, Metallurgical Industry*, Research Triangle Park, NC, U.S. Government Printing Office, Washington, D.C., September 1985.

U.S. EPA, *Development Document for Effluent Limitations Guidelines and Standards for the Iron and Steel Manufacturing Point Source Category*, Washington, D.C., May 1982 (EPA 440/1-82-024).

## Pollution Prevention

Grieshaber, K. W., C. T. Philipp, and G.F. Bennett, *"Process for Recycling Spent Potliner and Electric Arc Furnace Dust into Commercial Products using Oxygen Enrichment,"* Priorities in Pollution Prevention, Annual Gulf Coast Environmental Conference Proceedings, pp. 84-95, March, 1994.

Freeman, Harry, *Pollution Prevention Research at EPA's Risk Reduction Engineering Laboratory: Cleaner Production Processes and Cleaner Products for a Cleaner Environment*, Priorities in Pollution Prevention, Annual Gulf Coast Environmental Conference Proceedings, pp.1-9, March, 1994.

U.S. EPA, Office of Research and Development, *Industrial Pollution Prevention Opportunities for the 1990s*, EPA/600/8-91/052, August, 1991.

Drabkin, Marvin and Edwin Rissmann, *Waste Minimization Opportunities at an Electric Arc Furnace Steel Plant Producing Specialty Steels*, Environmental Progress, vol.8, no.2, pp. 88-97, May, 1989.

U.S. EPA, Region III, Pollution Prevention Program, *Pollution Prevention Opportunities in the Steel Industry*, October 1990.

Center for Hazardous Materials Research, *Pollution Prevention: Strategies for the Steel Industry*, CHMR Fact Sheet, University of Pittsburgh.

Rimer, A.E. and L.A. Reinders, *A Practical Guide to Pollution Prevention Planning for the Iron and Steel Industries*, Blasland, Bouck & Lee, Chapel Hill, N.C., 1992.

Air & Waste Management Association, *Hazardous Waste Minimization Industrial Overviews*, 1989.

**Sector Notebook Project**                                      **Iron and Steel Industry**

**Trade Journals**

*New Steel (formerly Iron Age)*
*Iron and Steelmaker*
*Iron and Steel Engineer*
*Metal Bulletin*, (212) 213-6202
*World Steel Dynamics*, (212) 713-2498
*Iron Age Manufacturing Management*, (215) 741-4000
*Steel: Semiannual Monitoring Report*, (202) 205-2000

### Endnotes

1. Variation in facility counts occur across data sources due to many factors including, reporting and definitional differences. This notebook does not attempt to reconcile these differences, but rather reports the data as they are maintained by each source. Only preliminary data is available from the *1992 Census of Manufactures.* The final version which includes all data will not be available until mid-1995. *Census of Manufactures*, U.S. Department of Commerce, Bureau of the Census, Preliminary Report Industry Series, MC92-I-33A(P) (Industries 3312, 3313, 3315, 3316, and 3317), 1994.

2. *Annual Statistical Report*, American Iron and Steel Institute, Washington, D.C., 1993.

3. *Net Shipments of Steel Mill Products*, table, American Iron and Steel Institute, Washington, D.C., 1994.

4. *Report on Steel Industry Waste Generation, Disposal Practices, and Potential Environmental Impact*, American Iron and Steel Institute, Washington, D.C., February, 1992.

5. *Census of Manufactures*, U.S. Department of Commerce, Bureau of the Census, Industry Series, MC87-I-33A (Industries 3312, 3313, 3315, 3316, and 3317), 1987.

6. *U.S. Industrial Outlook,* U.S. Department of Commerce. Washington, D.C., 1994, p. 13-1.

7. Ibid, p.13-1.

8. Ibid, 13-3.

9. Ibid, p. 13-5.

10. *Annual Statistical Report*, American Iron and Steel Institute, Washington D.C., 1993. p.73.

11. *Compilation of Air Pollutant Emission Factors, Volume I: Stationary Point and Area Sources, Metallurgical Industry*, U.S. Environmental Protection Agency, Office of Air and Radiation, Office of Air Quality Planning and Standards, Research Triangle Park, NC, U.S. Government Printing Office, Washington, D.C., September 1985.

12. *Report on Steel Industry Waste Generation, Disposal Practices, and Potential Environmental Impact,* American Iron and Steel Institute, Washington, D.C., 1992, p.8.

13. *The Making, Shaping, and Treating of Steel*, Tenth Edition, McGannon, Harold E., ed., United States Steel Corporation, Pittsburgh, PA, 1971.

14. *Report on Steel Industry Waste Generation, Disposal Practices, and Potential Environmental Impact,* American Iron and Steel Institute, Washington, D.C., 1992, p.14.

15. *The Making, Shaping, and Treating of Steel*, Tenth Edition, McGannon, Harold E., ed., United States Steel Corporation, Pittsburgh, PA, 1971, p.189.

16. *Development Document for Effluent Limitations Guidelines and Standards for the Iron and Steel Manufacturing Point Source Category*, U.S. EPA, Washington, D.C., May 1982 (EPA 440/1-82-024).

17. *Report on Steel Industry Waste Generation, Disposal Practices, and Potential Environmental Impact, American Iron and Steel Institute*, Washington, D.C., 1992, p.17.

18. *Report to Congress on Metal Recovery, Environmental Regulation and Hazardous Waste*, U.S. EPA, Office of Solid Waste and Emergency Response, 1994, p. 3 (EPA 530-R-93-018).

19. Comment from Bruce Steiner, American Iron and Steel Institute, Washington, D.C., May 5, 1995.

20. *U.S. Steel Industry at a Glance*, American Iron and Steel Institute, Washington, D.C., 1992.

21. *Report on Steel Industry Waste Generation, Disposal Practices, and Potential Environmental Impact, American Iron and Steel Institute*, Washington, D.C., 1992, p.21.

22. *The Making, Shaping, and Treating of Steel*, Tenth Edition, McGannon, Harold E., ed., United States Steel Corporation, Pittsburgh, PA, 1971, p.565.

23. Ibid, p. 121.

24. Ibid.

25. Ibid.

26. Ibid.

27. Amoco - U.S. EPA Pollution Prevention Project, Yorktown, Virginia, Project Summary, January 1992.

28. *Compilation of Air Pollutant Emission Factors, Volume I: Stationary Point and Area Sources, Chapter 9, Petroleum Industry*.  U.S. EPA, Office of Air and Radiation, Office of Air Quality Planning and Standards, Research Triangle Park, North Carolina, U.S. Government Printing Office, Washington, D.C., September 1985.

27. *Report to Congress on Metal Recovery, Environmental Regulation and Hazardous Waste*. U.S. EPA, Office of Solid Waste and Emergency Response, 1994, p.20 (EPA 530-R-93-018).

28. *Hydrochloric Acid Recovery System for Galvanizers and Steel Manufacture*, U.S. Department of Energy, NICE[3] (National Industrial Competitiveness through Energy, Environment, Economics), DOE/CH10093-233, October 1993.

29. *Sustainable Environmental Law*, Environmental Law Institute, West Publishing Co., St. Paul, Minn., 1993.

ument 309-9 

**Sector Notebook Project**                                    **Iron and Steel Industry**

29. *Report to Congress on Metal Recovery, Environmental Regulation and Hazardous Waste.* U.S. EPA, Office of Solid Waste and Emergency Response, 1994, p.20 (EPA 530-R-93-018)

30. Ibid.

31. *Sustainable Environmental Law,* Environmental Law Institute, West Publishing Co., St. Paul, MN, 1993, p.1238.

32. *Report to Congress on Metal Recovery, Environmental Regulation and Hazardous Waste.* U.S. EPA, Office of Solid Waste and Emergency Response, 1994, p.20 (EPA 530-R-93-018).

33. Ibid, p. 23.

34. Ibid, p. 44.

GPO Document Ordering Form

US EPA ARCHIVE DOCUMENT

Inside Back Cover

US EPA ARCHIVE DOCUMENT

Back Cover

US EPA ARCHIVE DOCUMENT

# Exhibit 80

III.A.1.        <u>Fabricated Metal Products</u>

Once molten metal (ferrous or nonferrous) containing the correct metallurgical properties has been produced (see SIC 33, which comprises activities associated with the nonferrous metals industry), it is cast into a form that can enter various shaping processes. Recently, manufacturers have been using continuous casting techniques that allow the molten metal to be formed directly into sheets, eliminating interim forming stages. This section identifies some of the many forming and shaping methods used by the metal fabrication industry. In general, the metal may be heat treated or remain cold. Heat treating is the modification of the physical properties of a workpiece through the application of controlled heating and cooling cycles. Cold metal is formed by applying direct physical pressure to the metal.

Regardless of the forming method used, the metal fabricating process usually employs the use of cutting oils (e.g., ethylene glycol), degreasing and cleaning solvents, acids, alkalis, and heavy metals. The oils are typically used when forming and cutting the metal. The solvents (e.g., trichloroethane, methyl ethyl ketone), alkalines, and acids (e.g., hydrochloric, sulfuric) are used to clean the surface of the metals. The current trend in the industry is to use aqueous non-VOCs to clean the metals, whenever possible. The use of 1,1,1-trichloroethane and methyl ethyl ketone is declining.

Once molten metal is formed into a workable shape, shearing and forming operations are usually performed. Shearing operations cut materials into a desired shape and size, while forming operations bend or conform materials into specific shapes. Cutting or shearing operations include punching, piercing, blanking, cutoff, parting, shearing, and trimming. Basically, these operations produce holes or openings, or produce blanks or parts. The most common hole-making operation is punching. Cutoff, parting, and shearing are similar operations with different applications. The rate of production is highest in hot forging operations and lowest in simple bending and spinning operations.

Forming operations, as illustrated in Exhibit 9, shape parts by bending, forming, extruding, drawing, rolling, spinning, coining, and forging the metal into a specific configuration. Bending is the simplest forming operation; the part is simply bent to a specific angle or shape. Other types of forming operations produces both two- and three-dimensional shapes.

# Exhibit 81

B. Underground Storage Tank Registration Number ___ Facility ID# 0048053, 0262604, 0226244

| Size of Tank (Gallons) | Tank Contents |
|---|---|
| 4,000 | #0048053 - Leaded Gasoline |
| 5,000 | #0262604 - Heating Oil |
| 8,000 | #0226244 – Unleaded Gasoline (Tank 0001) |
| 8,000 | #0226244 - Medium Diesel Fuel (Tank 0002) |
| 3,000 | #0226244 - #2 Fuel Oil (Tank 0003) |
| 1,000 | #0226244 - Hydraulic Oil (Tank 6) |
| 1,000 | #0226244 - Hydraulic Oil (Tank 7) |
| 3,000 | #0226244 - Hydraulic Oil (Tank 9) |
| 3,000 | #0226244 - Hydraulic Oil (Tank 10) |

C. New Jersey Pollutant Discharge Elimination System (NJPDES) Permit

| Permit Number | Discharge Type | Discharge Location Keyed to Site map | Expiration Date |
|---|---|---|---|
| Not Applicable | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

D. Resource Conservation and Recovery Act (RCRA) permit # _____

E. EPA Identification Number   NJD 0025 24015 _____

F. In accordance with N.J.A.C. 7:26E-3.1(c) xii, list all other federal, state, local government environmental permits for all previous and current owners or operators applied for and/or received for the site including:

    (1) Name and address of the permitting agency
    (2) The reason for the permit
    (3) The permit identification number
    (4) The application date
    (5) The date of approval, denial or status of the application
    (6) The name and current address of the permittees
    (7) The reason for the denial, revocation or suspension if applicable
    (8) The permit expiration date

_____ Check here if no other environmental permits were applied for or received for this site.

Provide the appendix # for the required listing if other environmental permits exist for this site ___ See Appendix M ___.

13

TEVAL 05766

# Exhibit 82

# BASELINE ECOLOGICAL EVALUATION

**Former Miles A. Galin Property
(aka Former Crucible Steel Site)
900-1000 Frank E. Rodgers Boulevard
Harrison, New Jersey**

**PREPARED FOR**

**Gannett Fleming, Inc.
3575 Quakerbridge Road
2nd Floor, Suite 203
Hamilton, NJ  08619**

**PREPARED BY**

**PARS Environmental, Inc.
6A South Gold Drive
Robbinsville, New Jersey 08691
609-890-7277
FAX 609-890-9116**

**PARS PROJECT NO. 710-02**

**OCTOBER 2008**

TEVAL 03325

BASELINE ECOLOGICAL EVALUATION
FORMER MILES A. GALIN PROPERTY
OCTOBER 2008

# TABLE OF CONTENTS

1.0 INTRODUCTION .................................................................................................................... 1

   1.1   SITE HISTORY ................................................................................................................... 2

2.0 CONTAMINANTS OF POTENTIAL ECOLOGICAL CONCERN ................................... 3

   2.1   SOIL .................................................................................................................................. 3

     2.1.1   *AOC 1a – Twelve Former Fuel Oil Aboveground Storage Tanks* ............................... 4

     2.1.2   *AOC 3 – Underground Petroleum Piping* .................................................................. 6

     2.1.3   *AOC 7 – Storm Water Detention Ponds and Fire Ponds* ........................................... 7

     2.1.4   *AOC 12 – Former Non-Contact Cooling Water Discharges* ...................................... 8

3.0 ENVIRONMENTALLY SENSITIVE AREAS ...................................................................... 9

   3.1   SURFACE WATERS ......................................................................................................... 10

   3.2   SOURCE OF WATER SUPPLY ......................................................................................... 11

   3.3   WETLANDS ..................................................................................................................... 12

   3.4   FEDERAL AND STATE LISTED THREATENED OR ENDANGERED SPECIES ..................... 12

4.0 POTENTIAL CONTAMINANT MIGRATION PATHWAYS ........................................... 14

   4.1   STORM WATER/SURFACE WATERS MIGRATION ......................................................... 14

   4.2   GROUNDWATER MIGRATION ....................................................................................... 14

   4.3   POINT SOURCE DISCHARGE TO SURFACE WATER ...................................................... 15

   4.4   FLOODING AND SEDIMENT DEPOSITION ...................................................................... 15

5.0 BEE CONCLUSIONS ............................................................................................................ 17

   5.1   CONTAMINANTS OF POTENTIAL ECOLOGICAL CONCERN (COPEC) ......................... 17

   5.2   ENVIRONMENTALLY SENSITIVE AREAS ...................................................................... 18

   5.3   POTENTIAL CONTAMINANT MIGRATION PATHWAY .................................................. 19

   5.4   RECOMMENDATIONS ..................................................................................................... 20

FIGURES


APPENDIX A

   SOIL SAMPLE RESULTS

APPENDIX B

   PHOTOGRAPHS

APPENDIX C

   PASSAIC RIVER SEDIMENT CONTAMINATION FIGURES (LOWER PASSAIC RIVER RESTORATION PROJECT)

APPENDIX D

   CORRESPONDENCE WITH NHP & USFWS

S:\PROJECTS\50351 - Harrison\Harrison\PROJECT DELIVERABLE\Final Report\Appendices\Appendix G\Final BEE\R-Final BEE.doc   i

TEVAL 03326

**BASELINE ECOLOGICAL EVALUATION**
**FORMER MILES A. GALIN PROPERTY**
**OCTOBER 2008**

## 1.0  INTRODUCTION

Gannett Fleming, Inc. (GF) retained the services of PARS Environmental, Inc. (PARS) to perform a Baseline Ecological Evaluation (BEE) at the Former Miles A. Galin Property (aka Former Crucible Steel Site) located at 900-1000 Frank E. Rodgers Boulevard (4th Street) in Harrison, New Jersey, hereinafter the "Site." A Site Location Map and Site Plan are included as Figure 1 and Figure 2, respectively.

The purpose of this BEE is to identify the potential co-occurrence of contaminants of potential concern, environmentally sensitive areas within the Site boundaries and/or properties immediately adjacent to the Site and potential migration pathways to sensitive areas.

The Site consists of an approximately 48 acre parcel located at 900-1000 Frank E. Rodgers Boulevard in Harrison, New Jersey. The Site is bound by Cape May Street to the south, Frank E. Rodgers Boulevard to the west and the New Jersey Transit PATH rail line to the north. The property immediately east of the Site is currently being redeveloped as a soccer stadium. This property was formerly part of the Crucible Steel industrial complex.

An approximately 1 acre parcel of the Site is located south of the larger approximately 48 acre parcel (see Figure 2). This smaller parcel is bound by Cape May Street to the north, Frank E. Rodgers Boulevard to the west, the Passaic River to the south and a Public Service Electric and Gas (PSE&G) substation to the east.

In a letter dated May 19, 2005, the New Jersey Department of Environmental Protection (NJDEP) required further investigation of four Areas of Concern (AOCs) to evaluate ecological concerns in accordance with N.J.A.C. 7:26E-4.7. These AOCs are Twelve Former Fuel Oil Above Ground Storage Tanks (AOC 1a), Underground Petroleum Piping (AOC 3), Storm Water Detention Ponds and Fire Ponds (AOC 7) and Former Non-Contact Cooling Water Discharge (AOC 12).

Information presented in the *Site Investigation Report and Remedial Action Work Plan* (Langan Engineering and Environmental Services (Langan), February 2002), *Phase 2 Site Investigation Report and Remedial Action Work Plan* (Langan, January 2005), *TSCA Cleanup Plan Notification and Certification of Self-Implementing Cleanup & Disposal of PCB Remediation Waste* (GF, October 2007) and a letter from GF to NJDEP dated March 2, 2007 pertaining to the investigation of AOC 7 were used to support the findings and conclusions presented in this report. Additionally, results from the on-going remedial investigation and remedial action being conducted by GF were used to develop findings and conclusions for the BEE. This information included, but was not limited to, soil and groundwater analytical results.

S:\PROJECTS\50351 - Harrison\Harrison\PROJECT DELIVERABLE\Final Report\Appendices\Appendix G\Final BEE\R-Final BEE.doc

1

TEVAL 03327

**BASELINE ECOLOGICAL EVALUATION**
**FORMER MILES A. GALIN PROPERTY**
**OCTOBER 2008**

## 1.1  SITE HISTORY

A variety of industrial operations were performed at the Site from the early 1900's to 2002. Colt Industries (Crucible Steel Company of America) manufactured and processed steel for military equipment, including ammunition shells and battle ship gun barrels until the late 1940s.  In 1947, portions of the Site were purchased by other parties.  Charles F. Guyon General Piping Company (Guyon) operated a pipe fabrication and material storage facility from 1947 to 1980.  Guyon continued to use the Site until 1992 for warehousing and storage.  Fabco Piping, Inc. leased a portion of the Guyon parcel in 1980 for pipe fabrication until it terminated operations in 1987.

Several tenants used the Site for light industrial operations from the late 1960's until 2002, including warehousing and distribution; light rail car assembly; metal shelving fabrication and indoor parking for trucks and commuter vehicles.

Since the early to mid 1990's, the majority of the buildings at the Site have been demolished and the area has remained vacant.  Several buildings on the northern portion of the Site are still in-use.  Advance Realty Group, LLC is currently facilitating the clean up of the Site as part of the redevelopment of the Site to support the Red Bull Stadium and a riverfront revitalization project.

A detailed description of property ownership and history is included in the *Site Investigation Report and Remedial Action Work Plan* (Langan, February 2002).

BASELINE ECOLOGICAL EVALUATION
FORMER MILES A. GALIN PROPERTY
OCTOBER 2008

As part of the investigation of these AOCs, several contaminants were identified at concentrations exceeding applicable ecological screening criteria. These contaminants include acenaphthene, aluminum, antimony, arsenic, barium, benz(a)anthracene, benzene, benzo(a)pyrene, benzo(b)fluoranthene, beryllium, cadmium, chloroform, total chromium, chrysene, cobalt, copper, total cyanide, dichloro-diphenyl-trichloroethane (DDT), dieldrin, 2,4-dimethylphenol, endrin aldehyde, ethylbenzene, fluoranthene, fluorene, heptachlor, lead, manganese, mercury, methylene chloride, naphthalene, nickel, polychlorinated biphenyls (PCBs), phenanthrene, pyrene, selenium, silver, tetrachloroethene, thallium, trichloroethene, vanadium, total xylenes and zinc.

Compounds detected in soil samples at concentrations above the applicable ecological screening criteria are presented in a table included in Appendix A. This table lists compounds by AOC, sample date, depth interval, parameter and contaminant concentration.

A letter from the NJDEP to Advance Realty Group, LLC, dated May 19, 2005, stated that further investigation of four AOCs was warranted to evaluate ecological concerns. The following sub-sections outline the AOCs identified by the NJDEP letter.

### 2.1.1    AOC 1a – Twelve Former Fuel Oil Aboveground Storage Tanks
AOC 1a is located within the one-acre parcel of the Site located south of Cape May Street. This area formerly housed ASTs used to store fuel oil for heating and for use for other on-Site activities. In 2004, Langan performed a site investigation at AOC 1a that included 12 soil borings (SB-50 through SB-61) to characterize the extent of historic fill and to determine whether releases of stored materials from the ASTs had impacted the soil and/or groundwater.

Antimony, arsenic, barium, benz(a)anthracene, benzo(a)pyrene, benzo(b)fluoranthene, cadmium, chromium, chrysene copper, lead, mercury, naphthalene, nickel, phenanthene, pyrene, selenium, thallium, zinc and PCBs were detected in samples collected from the borings at concentrations above the applicable most stringent soil ecological screening criteria.

Ecological screening criteria for benzo(a)anthracene, benzo(a)pyrene, benzo(b)flouranthene, chrysene, naphthalene, phenanthrene and pyrene are based on the EPA, Region 5 Resource Conservation Recovery Act (RCRA) Ecological Screening Levels. The ecological screening criteria for the other compounds are based on the Wildlife Preliminary Remediation Goals resulting from studies of wildlife, plants and soil invertebrates. Total chromium and copper have an endpoint species of the earthworm. Barium, lead, mercury and zinc have an endpoint species of the woodcock. Nickel, antimony and thallium have an endpoint species of plants. Arsenic has endpoint species of the shrew and plants. Cadmium has endpoint species of plants and the woodcock and selenium has an endpoint species of the mouse. PCBs have an endpoint species of the shrew.

**BASELINE ECOLOGICAL EVALUATION**
**FORMER MILES A. GALIN PROPERTY**
**OCTOBER 2008**

Elevated concentrations of metals, base neutrals and polyaromatic hydrocarbons (PAHs) were detected in soils from 0.0 to 20.5 feet (ft) below ground surface (bgs) and were attributed to historic fill placed on the Site prior to development by Crucible Steel.

PCBs were detected from 0.5 to 7.5 ft bgs at concentrations as high as 5.7 milligrams per kilogram (mg/kg), which was above the soil ecological screening criteria for the compound of 0.371 mg/kg.

In 2006, additional sampling was performed in the vicinity of SB-57 to further delineate the extent of PCB contamination. Soil borings GF-40 and GF-41 were advanced to a depth of 3.0 ft bgs and samples were collected from the borings at depths of 2.0-2.5 and 2.5-3.0 ft bgs. The soil samples were analyzed for PCBs. PCBs were detected in boring GF-40 at a concentration of 0.64 mg/kg at 2.0-2.5 ft bgs and 0.16 mg/kg at 2.5-3.0 ft bgs. PCBs were detected in GF-41 at a concentration of 1.3 mg/kg at 2.0-2.5 ft bgs and 0.68 mg/kg at 2.5-3.0 ft bgs.

In November, 2006, GF conducted "hot spot" remediation of PCB contaminated soil at the locations of SB-57 and SB-58. GF excavated approximate 30 square feet centered at both soil boring locations to depths of 3 feet at SB-57 and eight feet at SB-58. Post-excavation sampling was completed to verify the effectiveness of the remediation. Analytical results from the post-excavation sampling indicated that PCB contamination was not limited to the two "hot spots" areas. In addition to the post-excavation sampling, area wide soil sampling was conducted at AOC 1a. Eleven of the 186 samples collected and analyzed for PCBs were found to exceed the Toxic Substance Control Act (TSCA) threshold value of 50 mg/kg.

In May and June 2007, area wide sampling was conducted by GF to further delineate the PCB contamination and to aid in the design of proposed engineering controls. Soil samples were collected from 0-0.5, 1.5-2.0 and 3.5-4.0 ft bgs and analyzed for PCBs. In the shallow samples, 0.0-0.5 ft bgs, concentrations of PCBs ranged from non-detect to 56 mg/kg. Nine of the 112 shallow samples contained PCB concentrations exceeding 10 mg/kg and only one had a concentration higher than the TSCA threshold value. The concentration of PCBs located in the samples from 1.5-2.0 ft bgs ranged from non-detect to 220 mg/kg. Five of the 68 samples collected from this depth interval contained concentrations greater than 10 mg/kg and two samples had concentrations exceeding the TSCA threshold. The concentration of PCBs in the samples from 3.5-4.0 ft bgs ranged from non-detect to 3.2 mg/kg.

The southern portion of AOC 1a slopes toward the banks of the Passaic River. Several samples were collected in this area parallel to the river at the high tide mark in June 2007. Samples were collected at a depth of 0.0-0.5 ft bgs. Concentrations of PCBs in these samples ranged from 0.075 mg/kg to 2.3 mg/kg.

BASELINE ECOLOGICAL EVALUATION
FORMER MILES A. GALIN PROPERTY
OCTOBER 2008

Samples were collected at the PSE&G substation located immediately east of the Site on June
17, 2008 to further delineate the extent of PCB contamination in the vicinity of AOC 1a.
Samples were collected along the western property boundary of the PSE&G property and along
the banks of the Passaic River at depths ranging from of 0.0-0.5 to 3.5-4.0 ft bgs. Concentrations
of PCBs ranged from non-detect to 2.264 mg/kg. PCB concentrations were above the ecological
screening criteria of 0.371 mg/kg at sample locations PSEG-1 (0.0-0.5 ft bgs), PSEG-18 (0.0-0.5
and 1.5-2.0 ft bgs) and PSEG-19 (0.0-0.5 and 3.5-4.0 ft bgs).

In June and July 2008, GF conducted remedial activities to remove PCB contaminated soil at
concentrations greater than 10 mg/kg as outlined in the *TSCA Cleanup Plan Notification and
Certification of Self-Implementing Cleanup & Disposal of PCB Remediation Waste.* Post-
excavation soil samples were collected to ensure that remedial activities were sufficient.
Concentrations of PCBs in the post-excavation soil samples were all below the 10 mg/kg
threshold. Upon completion of remedial activities, of the parcel will be capped and a deed notice
will be established in accordance with the *Technical Requirements for Site Remediation* and as
required by 40 CFR 761.61(a)(7).

Compounds detected at AOC1a at concentrations above the applicable ecological screening
criteria are included in Appendix A. Figures depicting the locations of soil samples are included
in the GF *Remedial Investigation/Remedial Action Report.*

### 2.1.2    *AOC 3 – Underground Petroleum Piping*
AOC 3 addresses underground petroleum piping throughout the Site. Historically, underground
piping has supplied fuel oil and other petroleum products to various buildings and processes. In
2004, a geophysical survey was conducted to assess the extent and location of piping
at the Site.

During the demolition of the on-Site structures, GF uncovered and removed all remnants of the
piping systems. Soil samples were collected along the pipelines at a frequency of 1 sample per 15
linear feet. Antimony, arsenic, barium, benz(a)anthracene, benzene, benzo(a)pyrene, cadmium, total
chromium, chrysene, copper, lead, mercury, naphthalene, nickel, phenanthrene, selenium, total
xylene and zinc were detected in soil samples at concentrations above the applicable ecological
screening criteria.

Harrison: Eco Soil Comparison

| AOC | USE_ID | SAMP_ID | Depth (ft) | SAMP_DATE | CHEMNAME | Concentration (mg/kg) | NJ Ecological Screening Criterion (mg/kg) |
|---|---|---|---|---|---|---|---|
| AOC 1A | AOC1A-N-010 | AOC-1a-N-010-2 | 2 - 2.5 | 11/28/2006 | PCBs, total | 240 | 0.371 |
| AOC 1A | AOC1A-N-011 | AOC-1a-N-011-2 | 2 - 2.5 | 11/28/2006 | PCBs, total | 65 | 0.371 |
| AOC 1A | AOC1A-N-014 | AOC-1a-N-014-2 | 2 - 2.5 | 11/28/2006 | PCBs, total | 3.9 | 0.371 |
| AOC 1A | AOC1A-N-022 | AOC-1a-N-022-2 | 2 - 2.5 | 11/28/2006 | PCBs, total | 200 | 0.371 |
| AOC 1A | AOC1A-N-023 | AOC-1a-N-023-2 | 2 - 2.5 | 11/28/2006 | PCBs, total | 47 | 0.371 |
| AOC 1A | AOC1A-N-026 | AOC-1a-N-026-2 | 2 - 2.5 | 11/28/2006 | PCBs, total | 2 | 0.371 |
| AOC 1A | AOC1A-N-034.8 | AOC-1a-N-034.8 | 2 - 2.5 | 12/14/2006 | PCBs, total | 5.6 | 0.371 |
| AOC 1A | AOC1A-N-035.12 | AOC-1a-N-035.12 | 2 - 2.5 | 12/14/2006 | PCBs, total | 160 | 0.371 |
| AOC 1A | AOC1A-N-036.8 | AOC-1a-N-036.8 | 2 - 2.5 | 12/14/2006 | PCBs, total | 120 | 0.371 |
| AOC 1A | AOC1A-N-037.12 | AOC-1a-N-037.12 | 2 - 2.5 | 12/14/2006 | PCBs, total | 87 | 0.371 |
| AOC 1A | AOC1A-N-038.8 | AOC-1a-N-038.8 | 2 - 2.5 | 12/14/2006 | PCBs, total | 0.49 | 0.371 |
| AOC 1A | AOC1A-N-040W | AOC1A-N-040W | 1.5 - 2 | 2/26/2007 | PCBs, total | 2.5 | 0.371 |
| AOC 1A | AOC1A-N-041W | AOC1A-N-041W | 1.5 - 2 | 2/26/2007 | PCBs, total | 0.75 | 0.371 |
| AOC 1A | AOC1A-N-046.W | AOC1A-N-046.W | 1.5 - 2 | 2/27/2007 | PCBs, total | 45 | 0.371 |
| AOC 1A | AOC1A-N-047.W | AOC1A-N-047.W | 1.5 - 2 | 2/27/2007 | PCBs, total | 98 | 0.371 |
| AOC 1A | AOC1A-N-35.20 WALL2 | AOC-1A-N-35.20 wall2 | 2 - 2.5 | 1/11/2007 | PCBs, total | 0.96 | 0.371 |
| AOC 1A | AOC1A-N-35.25 WALL2 | AOC-1A-N-35.25 wall2 | 2 - 2.5 | 1/11/2007 | PCBs, total | 1.1 | 0.371 |
| AOC 1A | AOC1A-N-35.30 WALL2 | AOC-1A-N-35.30 wall2 | 2 - 2.5 | 1/11/2007 | PCBs, total | 0.53 | 0.371 |
| AOC 1A | AOC1A-N-35.35 WALL2 | AOC-1A-N-35.35 wall2 | 2 - 2.5 | 1/11/2007 | PCBs, total | 1.3 | 0.371 |
| AOC 1A | AOC1A-N-35.40 WALL2 | AOC-1A-N-35.40 wall2 | 2 - 2.5 | 1/11/2007 | PCBs, total | 0.47 | 0.371 |
| AOC 1A | AOC1A-N-37.20 WALL2 | AOC-1A-N-37.20 Wall 2 | 2 - 2.5 | 1/11/2007 | PCBs, total | 240 | 0.371 |
| AOC 1A | AOC1A-N-37.25 WALL2 | AOC-1A-N-37.25 wall2 | 2 - 2.5 | 1/11/2007 | PCBs, total | 2.6 | 0.371 |
| AOC 1A | AOC1A-N-37.30 WALL2 | AOC-1A-N-37.30 wall2 | 2 - 2.5 | 1/11/2007 | PCBs, total | 0.41 | 0.371 |
| AOC 1A | AOC1A-N-37.35 FLOOR3 | AOC-1A-N-37.35 flloor3 | 3 - 3.5 | 1/11/2007 | PCBs, total | 39 | 0.371 |
| AOC 1A | AOC1A-N-37.35 WALL2 | AOC-1A-N-37.35 wall2 | 2 - 2.5 | 1/11/2007 | PCBs, total | 2.8 | 0.371 |
| AOC 1A | AOC1A-N-37.40 WALL2 | AOC-1A-N-37.40 wall2 | 2 - 2.5 | 1/11/2007 | PCBs, total | 7.5 | 0.371 |
| AOC 1A | AOC1A-N-37.47 WALL2 | AOC-1A-N-37.47 wall2 | 2 - 2.5 | 1/11/2007 | PCBs, total | 0.83 | 0.371 |
| AOC 1A | AOC1A-S-009 | AOC-1a-S-009 | 1.5 - 2 | 11/27/2006 | PCBs, total | 5 | 0.371 |
| AOC 1A | AOC1A-S-010 | AOC-1a-S-10 | 1.5 - 2 | 11/27/2006 | PCBs, total | 19 | 0.371 |
| AOC 1A | AOC1A-S-011 | AOC-1a-S-11 | 1.5 - 2 | 11/27/2006 | PCBs, total | 2 | 0.371 |
| AOC 1A | AOC1A-S-012 | AOC-1a-S-12 | 1.5 - 2 | 11/27/2006 | PCBs, total | 12 | 0.371 |
| AOC 1A | AOC1A-S-013 | AOC-1a-S-13 | 1.5 - 2 | 11/27/2006 | PCBs, total | 2.5 | 0.371 |
| AOC 1A | AOC1A-S-014 | AOC-1a-S-14 | 1.5 - 2 | 11/27/2006 | PCBs, total | 9 | 0.371 |
| AOC 1A | AOC1A-S-015 | AOC-1a-S-15 | 1.5 - 2 | 11/27/2006 | PCBs, total | 1.5 | 0.371 |
| AOC 1A | AOC1A-S-016 | AOC-1a-S-16 | 1.5 - 2 | 11/27/2006 | PCBs, total | 1.8 | 0.371 |
| AOC 1A | AOC1A-S-017 | AOC-1a-S-17 | 3.5 - 4 | 11/27/2006 | PCBs, total | 1.2 | 0.371 |
| AOC 1A | AOC1A-S-018 | AOC-1a-S-18 | 3.5 - 4 | 11/27/2006 | PCBs, total | 0.84 | 0.371 |
| AOC 1A | AOC1A-S-029 | AOC-1a-S-29 | 1.5 - 2 | 11/27/2006 | PCBs, total | 5.25 | 0.371 |
| AOC 1A | AOC1A-S-030 | AOC-1a-S-30 | 1.5 - 2 | 11/27/2006 | PCBs, total | 5.4 | 0.371 |
| AOC 1A | AOC1A-S-031 | AOC-1a-S-31 | 1.5 - 2 | 11/27/2006 | PCBs, total | 11 | 0.371 |
| AOC 1A | AOC1A-S-032 | AOC-1a-S-32 | 1.5 - 2 | 11/27/2006 | PCBs, total | 5.8 | 0.371 |
| AOC 1A | AOC1A-S-033 | AOC-1a-S-33 | 1.5 - 2 | 11/27/2006 | PCBs, total | 20 | 0.371 |
| AOC 1A | AOC1A-S-034 | AOC-1a-S-34 | 1.5 - 2 | 11/27/2006 | PCBs, total | 6 | 0.371 |
| AOC 1A | AOC1A-S-039.8 | AOC-1a-S-039.8 | 1.5 - 2 | 12/14/2006 | PCBs, total | 5.8 | 0.371 |
| AOC 1A | AOC1A-S-040.12 | AOC-1a-S-040.12 | 1.5 - 2 | 12/14/2006 | PCBs, total | 6.7 | 0.371 |
| AOC 1A | AOC1A-S-041.8 | AOC-1a-S-041.8 | 1.5 - 2 | 12/15/2006 | PCBs, total | 5.4 | 0.371 |
| AOC 1A | AOC1A-S-042.12 | AOC-1a-S-042.12 | 1.5 - 2 | 12/15/2006 | PCBs, total | 3.9 | 0.371 |
| AOC 1A | AOC1A-S-043.8 | AOC-1a-S-043.8 | 1.5 - 2 | 12/15/2006 | PCBs, total | 9.8 | 0.371 |
| AOC 1A | AOC1A-S-044.12 | AOC-1a-S-044.12 | 1.5 - 2 | 12/15/2006 | PCBs, total | 1.6 | 0.371 |
| AOC 1A | AOC1A-S-045.8 | AOC-1a-S-045.8 | 1.5 - 2 | 12/15/2006 | PCBs, total | 2.6 | 0.371 |
| AOC 1A | AOC1A-S-046.12 | AOC-1a-S-046.12 | 1.5 - 2 | 12/15/2006 | PCBs, total | 4.4 | 0.371 |
| AOC 1A | AOC1A-S-047.8 | AOC-1a-S-047.8 | 1.5 - 2 | 12/15/2006 | PCBs, total | 21 | 0.371 |
| AOC 1A | AOC1A-S-048.12 | AOC-1a-S-048.12 | 1.5 - 2 | 12/15/2006 | PCBs, total | 23 | 0.371 |
| AOC 1A | AOC1A-S-049.8 | AOC-1a-S-049.8 | 1.5 - 2 | 12/15/2006 | PCBs, total | 5 | 0.371 |
| AOC 1A | AOC1A-S-050.12 | AOC-1a-S-050.12 | 1.5 - 2 | 12/15/2006 | PCBs, total | 4 | 0.371 |
| AOC 1A | AOC1A-S-1 | AOC-1A-S-1 | 1.5 - 2 | 1/18/2007 | PCBs, total | 1.2 | 0.371 |
| AOC 1A | AOC1A-S-10 | AOC-1A-S-10 | 1.5 - 2 | 1/18/2007 | PCBs, total | 15 | 0.371 |
| AOC 1A | AOC1A-S-2 | AOC-1A-S-2 | 1.5 - 2 | 1/18/2007 | PCBs, total | 7 | 0.371 |
| AOC 1A | AOC1A-S-2E | AOC-1A-S-2E | 3.5 - 4 | 1/18/2007 | PCBs, total | 0.86 | 0.371 |

# Exhibit 83

# Remedial Investigation Report
# for the
# Focused Feasibility Study
# of the Lower Eight Miles of the Lower
# Passaic River

Prepared by:

The Louis Berger Group, Inc.

in conjunction with:

Battelle

HDR|HydroQual

2014

**Table 5-3: Historical Contaminant Sources by COPC**

| Analyte | Likely Historical Contaminant Source |
|---|---|
| 2,3,7,8-TCDD | Industrial discharge, by-product of Agent Orange production, by-product of hexachlorophene production |
| Total TCDD | Industrial discharge, by-product of Agent Orange production, by-product of hexachlorophene production |
| Total PCB | Industrial discharge and paper recycling plants |
| Chlordane | Urban runoff and industrial discharge |
| DDT | Industrial discharge historically, urban and agricultural runoff. |
| Dieldrin | Urban runoff, industrial discharge, metabolite of aldrin |
| PAHs | Manufactured gas plants, industrial discharges; urban runoff |
| Copper | Industrial discharge; wastewater-treatment plants |
| Lead | Industrial discharge, gasoline additive |
| Mercury | Industrial and municipal wastewater discharges. |

Sources: ATSDR (1987, 1994, 1995, 1998, 1999, 2000a, 2000b, 2002a, 2002b, 2004 and 2007)

Remedial Investigation Report for the
Focused Feasibility Study
Lower Eight Miles of the Lower Passaic River                                    2014

# Exhibit 84

Case 2:22-cv-07326-MCA-LDW     Document 309-9     Filed 04/01/24     Page 189 of 420
Page ID: 3608
You're viewing an archived copy from the New Jersey State Library.

ADOPTIONS                                                    ENVIRONMENTAL PROTECTION

2. A clause be put back into the rules requiring mutual approval by both boards of education when a teacher in one district desires to coach in another district.

The reactions of the Department of Education to these suggestions were that:

1. A factor contributing to the coaching shortage is the low pay. Although it is unlikely there will be a bidding war for coaches, if competition does raise the pay scale, it might attract more qualified individuals to coaching.

2. The clause requiring mutual approval was deleted from the rules because it is restrictive. When a teacher meets his or her contractual obligation for teaching, he or she can pursue part-time employment in other areas; this should also apply to coaching.

## (a)

## STATE BOARD OF EDUCATION

### Bookkeeping and Accounting in Local School Districts
### Petty Cash Fund

### Adopted Amendment: N.J.A.C. 6:20-2.10

Proposed: June 20, 1983 at 15 N.J.R. 982(a).
Adopted: October 5, 1983 by State Board of Education, Saul Cooperman, Secretary.
Filed: October 20, 1983 as R.1983 d.491, **without change**.

Authority: N.J.S.A. 18A:4-15 and 18A:19-13.

Effective Date: November 7, 1983.

Expiration Date pursuant to Executive Order No. 66(1978): September 1, 1985.

**Summary** of Public Comments and Agency Responses:
**No comments received.**

# ENVIRONMENTAL PROTECTION

## (b)

## DIVISION OF COASTAL RESOURCES

### Obtaining Title to Abandoned Vessels

### Adopted Amendments: N.J.A.C. 7:6-7.1, 7.2, 7.4 and 7.6

Proposed: September 6, 1983 at 15 N.J.R. 1411(a).
Adopted: October 19, 1983 by Robert E. Hughey, Commissioner, Department of Environmental Protection.
Filed: October 24, 1983 as R.1983 d.503, **without change**.

Authority: N.J.S.A. 12:7C-20.

Effective Date: November 7, 1983.

Expiration Date pursuant to Executive Order No. 66(1978): April 12, 1984.
DEP Docket No. 049-83-08.

**Summary**
The Abandoned Vessels Disposition Law, N.J.S.A. 12:7C-7 et seq., enables property owners to obtain title to vessels which have been abandoned on their property for six months or more, provided that notice is given to the vessel's present owner and that proof of such notice is submitted to the Division of Coastal Resources. The implementing rules (N.J.A.C. 7:6-7) first became effective in April 1979, and are now being revised to clarify their intent.

**Summary** of Public Comments and Agency Responses:
**No comments were received.**

## (c)

## DIVISION OF WASTE MANAGEMENT

### Hazardous Waste From Non-Specific Sources
### Hazardous Constituents

### Adopted Amendments: N.J.A.C. 7:26-8.13 and 8.16

Proposed: July 18, 1983 at 15 N.J.R. 1184(a).
Adopted: October 19, 1983, 1983 by Robert E. Hughey, Commissioner, Department of Environmental Protection.
Filed: October 24, 1983 as R.1983 d.502, **without change**.

Authority: Solid Waste Management Act, N.J.S.A. 13:1E-1 et seq.

Effective Date: October 24, 1983.
Expiration Date pursuant to Executive Order No. 66(1978): August 6, 1986.
DEP Docket No. 036-83-06.

**Summary** of Public Comments and Agency Responses:

The Department of Environmental Protection ("Department") held an August 16, 1983 public hearing concerning the proposal at the New Jersey State Museum Auditorium in Trenton, New Jersey. Five persons attended the public hearing, however, they made no comments. The Department received written comments from only one source, Givaudan Corporation ("Givaudan") located in Clifton, New Jersey.

Givaudan, the only hexachlorophene manufacturer in New Jersey, objects to the proposed amendments at 7:26-8.13(b)9 and 11. Givaudan believes that further regulation of hexachlorophene is unnecessary and that no basis or background exists for regulating hexachlorophene manufacturing.

Givaudan notes that the Department's basis and background document states that the Department proposes to regulate as hazardous wastes the four wastestreams which the United States Environmental Protection Agency ("EPA") listed in April 4, 1983 at 48 Fed. Reg. 14514. The EPA proposal has the same language as 7:26-8.13(b)9 plus the following exemption:

"(This listing does not include wastes from the production of hexachlorophene from highly purified 2, 4, 5-trichlorophenol.)"

EPA explains this exemption at 48 Fed. Reg. 14514, note 7:

The 2,4,5,-TCP derivative Hexachlorophene is now synthesized

Case 2:22-cv-07326-MCA-LDW    Document 309-9    Filed 04/01/24    Page 190 of 420
PageID: 13609
You're viewing an archived copy from the New Jersey State Library.

from a purified 2,4,5,-TCP in an acid-catalyzed condensation reaction. **Because the reaction occurs at rather low temperatures, and at acid pH, no CDD or CDF formation is expected to occur.** Earlier production techniques resulted in TCDD contamination. Wastes resulting from Hexachlorophene production therefore are not included in this listing unless prepurified 2,4,5, TCP was not used, or the process took place on equipment contaminated with CDDs or CDFs (Emphasis added.)

However, the Department's recent experience with dioxin contamination in New Jersey illustrates that EPA's expectations have not been realized. Givaudan's comments are inconsistent with the Department's recent findings. Although the Department has allowed Givaudan to resume production, the fact remains that Givaudan's Clifton, New Jersey site was contaminated with dioxin particularly in the hexachlorophene production area. While it is true that Givaudan utilizes highly purified TCP, there is still evidence that levels below one part per billion may be a persistent problem in hexachlorophene production. It is not clear whether this dioxin contamination resulted from historical production of hexachlorophene, current production techniques or other sources. For this reason the Department requires Givaudan to conduct a continuous monthly monitoring program on their Clifton, New Jersey site. Until conclusive information becomes available, the Department will not in the interests of public health exempt wastes from the production of hexachlorophene from highly purified 2,4,5,-trichlorophenol from regulation as a hazardous waste. After consideration of appropriate data from Givaudan's monitoring and other relevant information the Department may reevaluate the exemption requested by Givaudan.

Givaudan has taken extensive steps to protect workers from potential low-level exposure and the Department sincerely commends these efforts. However, the Department must also take comparable steps to prevent any contamination of the environment of New Jersey. The persistence of dioxin in the environment has been clearly demonstrated. Dioxin has the tendency for the dioxin compound to accumulate and biomagnify in the food chain. Fish can bioconcentrate TCDD 20,000 times, meaning one part per billion in river sediments can lead to a level in fish of 20 parts per million. Since dioxin may be the most toxic substance known to man and its teratogenic and carcinogenic potential has been well demonstrated, all potential sources must be tightly controlled.

The widespread contamination at Times Beach, Missouri is due to waste products from hexachlorophene production. Our similar findings at Givaudan's Clifton, New Jersey site confirmed the potential for hexachlorophene waste to contain dioxin. Although measures have been taken to reduce dioxin levels in hexachlorophene manufacturing, the substance continues to be closely regulated by the United States Food and Drug Administration. Waste from the hexachlorophene manufacturing process must also be tightly controlled.

The Department's experience with dioxin in New Jersey remains contrary to EPA's expressed expectations. Granting the exemption requested by Givaudan would be inconsistent with the Department's dioxin experience. The Department must control all potential dioxin contamination by declaring wastes from the production of hexachlorophene from highly purified 2,4,5,-trichlorophenol to be hazardous waste and require their management according to the New Jersey Hazardous Waste Management Rules, N.J.A.C. 7:26. The Department's comprehensive regulation of substituted dibenzodioxins and dibenzofurans as hazardous waste is absolutely necessary for the protection of the public health and welfare of the citizens of the State of New Jersey.

---

# HEALTH

## (a)

### DIVISION OF PUBLIC HEALTH AND ENVIRONMENTAL LABORATORIES

### Chapter IV, State Sanitary Code Laboratories

### Readoption with Amendments: N.J.A.C. 8:44

Proposed: June 20, 1983 at 15 N.J.R. 995(a).
Adopted: October 6, 1983 by Evelyn Geddes, Chairperson, Public Health Council.
Filed: October 24, 1983 as R.1983 d.498, **without change.**

Authority: N.J.S.A. 45:9-42.26 et seq., specifically 45:9-42-34.

Effective Date: November 7, 1983.
Expiration Date pursuant to Executive Order No. 66(1978): November 7, 1988.

**Summary** of Public Comments and Agency Responses: **No comments received.**

---

## (b)

### DRUG UTILIZATION REVIEW COUNCIL

### Interchangeable Drug Products

### Adopted Amendment: N.J.A.C. 8:71

Proposed: June 6, 1983 at 15 N.J.R. 846(a).
Adopted: October 21, 1983 by Drug Utilization Review Council, Leroy L. Schwartz, M.D., Chairman.
Filed: October 21, 1983 as R.1983 d.499, **with portions** of the proposal **not adopted** and **portions not adopted but still pending.**

Authority: N.J.S.A. 24:6E-6b.

Effective Date: November 7, 1983.
Expiration Date pursuant to Executive Order 66(1978): March 6, 1984.

**Summary** of Public Comments and Agency Responses:

BYK-Gulden commented that fluocinolone acetonide cream 0.01%, 0.025%, ointment 0.025%, and solution 0.01%, should all appear in the formulary as manufactured by Pharmaderm and by Fougera. The Council agreed.

Mylan commented that the bioequivalency study of their doxycycline tablets with Vibramycin capsules should be acceptable since the FDA mandated the comparison. The Council did not agree, but the point was moot since Mylan later provided an acceptable direct bioequivalency study of the Mylan doxycycline tablet compared to Vibramycin tablets.

# Exhibit 85

**The New York Times** | https://www.nytimes.com/1983/06/19/nyregion/kean-orders-3d-dioxin-site-shut.html

# *KEAN ORDERS 3D DIOXIN SITE SHUT*

**By Douglas C. McGill, Special To the New York Times**

June 19, 1983



See the article in its original context from
June 19, 1983, Section 1, Page 1    Buy Reprints

New York Times subscribers* enjoy full access to
TimesMachine—view over 150 years of New
York Times journalism, as it originally appeared.

SUBSCRIBE

*Does not include Crossword-only or
Cooking-only subscribers.

*About the Archive*
*This is a digitized version of an article from The Times's print archive, before the start of online publication in 1996. To preserve these articles as they originally appeared, The Times does not alter, edit or update them.*

*Occasionally the digitization process introduces transcription errors or other problems; we are continuing to work to improve these archived versions.*

Governor Kean said today that preliminary tests had discovered dangerous levels of dioxin in the soil at a chemical plant near an elementary school in a mostly residential area here.

He ordered the closing of a section of the plant, which is operated by the Givaudan Corporation, pending the results of further tests and an examination of employees who may have been exposed to the toxic chemical. The area to be closed is 160 feet long and 30 feet wide and contains 14 small buildings.

The Givaudan plant, at 125 Delawanna Avenue, is the third industrial area in New Jersey where dioxin contamination has been found. However, it is the first operating plant found to be contaminated, and the first whose daily business will be affected by a gubernatorial order.

Earlier this year, the New Jersey Department of Environmental Protection checked industrial records and identified 11 areas in the state where dioxin contamination might be found. The owners of the eight remaining areas are cooperating with the state to test for dioxin.

The two other areas, both of which were abandoned industrial plants, were in Edison and in the Ironbound section of Newark. The Governor, at a news conference at Clifton's City Hall today, emphasized that there was ''absolutely no evidence of off-site contamination'' in Clifton. He added that ''a number of precautionary steps have been taken to assure protection of public health.''

The steps included covering contaminated areas with a tarpaulin and ordering a more in-depth test of samples in the residential area surrounding the plant. A van from the Department of Health will also be in the neighborhood, and its staff will perform medical examinations and answer questions from the neighborhood residents.

The Givaudan Corporation is the American unit of a multinational Swiss company of the same name that is a subsidiary of the Hoffman-LaRoche Group of Basel, Switzerland. The plant in Clifton manufactures hexachlorophene, an antibacterial agent used in hospitals, and also makes chemicals that add fragrance and flavor to a variety of products. The Clifton plant is the largest hexachlorophene maker in the world, and the only one in the United States, according to Alexander M. Gerardo, a spokesman for the company.

The complex - in eastern Clifton in Passaic County - covers more than 55 acres and consists of more than 20 beige-colored, concrete buildings, including a six-story headquarters.

The section of the complex that has been closed produces hexachlorophene, which was widely used in soaps and deodorants until it was put under strict control by the Food and Drug Administration in 1972.

About 50 of the plant's 700 employees work in the section of the plant that will be closed, Mr. Gerardo said. Corporation Endorses Order

He said Givaudan supplied hexachlorophene to the manufacturers of soaps and scrub pads that are used in hospital operating rooms and are sold under prescription.

The Givaudan Corporation developed hexachlorophene in the 1940's and is the world's largest producer of the chemical, Mr. Gerardo said.

One of the chemicals used to produce hexachlorophene, Mr. Gerardo said, is trichlorophenol. ''Minute traces'' of dioxin, he said, may be present in the trichlorophenol.

The Givaudan Corporation, which has operated the plant for about 60 years, said in a statement that the levels of dioxin found at its plant did not present an ''occupational or other health hazard.'' But it endorsed the state's order to close a section of the plant temporarily.

Governor Kean said 12 samples taken at the plant showed dioxin levels ranging from 0.04 parts per billion to 11 parts per billion. The Federal Government considers a dioxin level of more than 1 part per billion dangerous to health. Tarpaulin to Cover Area

The Governor said the contaminated areas, all outdoors, would be covered with tarpaulin. ''The detectable values are similar to those found at the Chemical Insecticide Corporation site in Edison and are an order of magnitude less than the values at the Lister Avenue site in Newark,'' the Governor said.

In the Ironbound section of Newark, at the site of the former Diamond Shamrock Company, test readings of up to 1,200 parts per billion of dioxin were found. In the neighborhood surrounding the Newark plant, preliminary tests showed samples with up to 5 parts per billion of dioxin.

Thomas Burke, the director of science and research for the State Department of Environmental Protection, said there were two possible explanations for the presence of dioxin. Dioxin a Toxic Byproduct

The first, he said, would be a contamination of the raw material, trichlorophenol, which is purchased from outside sources, The second, Mr. Burke said, is that at one time, trichlorophenol had been manufactured at the site, and the dioxin discovered yesterday may have been released as a byproduct of that process at that time.

Dioxin is a highly toxic byproduct of several chemical manufacturing processes. Exposure to high levels of the chemical is known to cause a severe form of acne called chloracne and is thought to be a possible cause of birth defects, miscarriages and cancer in humans.

About 500 feet from the plant site is Public School 8, which has about 230 pupils in grades kindergarten through sixth grade. The school is closed for the summer.

The Federal Environmental Protection Agency, which has worked with New Jersey's Department of Environmental Protection at all of the industrial areas investigated thus far, began taking samples today from the areas around the plant, including the school grounds, according to Robert E. Hughey, the state's Environmental Commissioner.

Mr. Hughey said soil samples would be taken from the streets and the yards in an area including 25 to 30 homes within 500 feet of the plant. It is a neighborhood of well-kept, wood-frame houses, many with swing sets and sand boxes in the yards. Samples to Be Taken

In addition, Mr. Hughey said, dust samples will be taken from vacuum cleaners in some of the homes.

A version of this article appears in print on , Section 1, Page 1 of the National edition with the headline: KEAN ORDERS 3D DIOXIN SITE SHUT

**Sign up for the New York Today Newsletter** Each morning, get the latest on New York businesses, arts, sports, dining, style and more. <u>Get it sent to your inbox.</u>

# Exhibit 86

# Dioxin in the Passaic River (NJ):
# The Case for 2 Dioxin Sources

Edward A. Garvey,

Juliana Atmadja

Solomon S. Gbondo-Tugbawa,

Shane McDonald

The Louis Berger Group:
Morristown, NJ, Elmsford, NY & Exton, PA

*Battelle Sixth International Conference on the Remediation of Contaminated Sediments*

*New Orleans, LA*

*February 10, 2011*

    

*The Louis Berger Group, Inc.*



# Outline

- Site Background
- Dioxin Ratios in New York Harbor.
- Dated Sediment Results for Dioxin
- Principal Components Analysis and Dioxin Ratios
- Conclusions

*Although the information in this presentation has been funded by the USEPA, it does not necessarily reflect the views of the agency and no official endorsement should be inferred.*

2

     

*The Louis Berger Group, Inc.*



# Lower Passaic River Estuary

Legend

— Dams
— Goethals Bridge
— Streams/Rivers
▮ Major Waterbodies

Upper Passaic River

Beatties Mill Dam

**Dundee Dam**

Saddle River

Third River

Second River

Lower Passaic River

Hackensack River

Hudson River

**Bronx**

**Manhattan**

East River

**New Jersey**

Diamond Alkali Upland Site

Port Newark

Port Elizabeth

Newark Bay

Upper New York Bay

**Queens**

**Brooklyn**

Jamaica Bay

Arthur Kill

Kill Van Kull

Goethals Bridge

**Staten Island**

0  1.25  2.5  5 Miles

3

    

*The Louis Berger Group, Inc.*

# Lower Passaic River sediments have a unique signature that readily identifies their presence



2,3,7,8-TCDD / Total TCDD

**0.75**

0.12

0.12

Atmospheric Source

**0.06**

0.16

0.12

Passaic Source

**0.7**

Sewage Source

**0.04**

0.71

0.15

0.14

0.28

Chaky (2003)

4

*The Louis Berger Group, Inc.*



Dated Sediment Core Locations 2005

18



🔴 12.6

🟠 11

▲ 7.8

▲ 7.8

🟦 2.2

🟦 1.4

    

*The Louis Berger Group, Inc.*

# The History of 2,3,7,8-TCDD as Recorded in the Sediments



*The Louis Berger Group, Inc.*

# Possible Causes

- Sampling Artifact
  - (but result observed in three separate cores at approximately the same time horizon)
- Resuspension
  - (but impact limited to upper 3 cores)
  - (and other contaminants do not show impact)
- External Source
  - (but no known dischargers)

7

     

*The Louis Berger Group, Inc.*

# Dioxin ratios suggest change at time of event





*The Louis Berger Group, Inc.*

8

# No Similar Event is seen in other Contaminants



     

9

*The Louis Berger Group, Inc.*

# First Principal Component Loadings for Dioxins and Furans in Dated Sediment Core Samples





*The Louis Berger Group, Inc.*





**First Principal Component vs. Approximate Year of Deposition for High Resolution Core Samples**

**Legend**

*High Resolution Core Slices*
- River Mile 1.4
- River Mile 2.2
- River Mile 7.8
- River Mile 11
- River Mile 12.6

*Slices with High Dioxin Concentration*
- RM 7.8, 2001 slice
- RM 11, 2001 slice
- RM 12.6, 2001 slice

*Slices from RM 7.8 and RM12.6 have almost identical first principal components.*



**First Principal Component Shows Circa 2000 Event Pattern to be Distinct from Post-1970 Sediment Patterns**

    

*The Louis Berger Group, Inc.*







## Dioxin Ratio Shows Uniqueness of Circa 2000 Event

*The Louis Berger Group, Inc.*

      

**Second Principal Component Loadings for Dioxins and Furans in Dated Sediment Core Samples**



     

*The Louis Berger Group, Inc.*



$R^2 = 0.717$

Sum of Heavy Furan Congeners (ppb)

Sum of Dioxin Congeners and
Light Furan Congeners (ppb)



**Legend**

**Dated Sediment Core Slices**

- River Mile 1.4
- River Mile 2.2
- River Mile 7.8
- River Mile 11
- River Mile 12.6

- 1950s
- 1960s
- 1970s
- 1980s
- 1990s
- 2000s

**Slices with High Dioxin Concentration**

- RM 7.8, 2001 slice
- RM 11, 2001 slice
- RM 12.6, 2001 slice

— Regression Line

**Factors Suggested by Second Principal Component Do Not Uniquely Identify the Circa 2000 Event**

     

*The Louis Berger Group, Inc.*





**First and Second Principal Components for High Resolution Core Samples**

*Second Principal Component*

*First Principal Component*

**Legend**

**High Resolution Core Slices**

● River Mile 1.4     ● 1950s
■ River Mile 2.2     ● 1960s
◆ River Mile 7.8     ● 1970s
▲ River Mile 11     ● 1980s
▼ River Mile 12.6     ● 1990s
                          ● 2000s

*Slices with High Dioxin Concentration*

◇ RM 7.8, 2001 slice
△ RM 11, 2001 slice
▽ RM 12.6, 2001 slice

**Combined Principal Components Show Circa 2000 Event to Lie Between Patterns Observed Upriver and Downriver in the 1960s**

     

*The Louis Berger Group, Inc.*



# Dioxin to DDT Ratio Shows Variation over Time Between Upper and Lower Reaches.

## Recent event is similar to 1960s conditions seen in the same area



(4,4'-DDD+4,4'-DDE)/2,3,7,8-TCDD Ratio
Dated Sediment Cores

16

     

*The Louis Berger Group, Inc.*





**Combining Ratios Identifies Unique Patterns of Current and Historical Contamination in the Upper and Lower Reaches of the Lower Passaic River**







*The Louis Berger Group, Inc.*

17

# Questions???

- **www.ourpassaic.org**
- **www.ournewarkbay.org**

 USEPA     USFWS

 USACE     NJDEP

 NJDOT     NOAA

*Although the information in this presentation has been funded by the USEPA, it does not necessarily reflect the views of the agency and no official endorsement should be inferred.*

**19**



*The Louis Berger Group, Inc.*



# Exhibit 87

# EXHIBIT 20

OxyChem's Comments in Opposition to Proposed Consent Decree,
*United States v. Alden Leeds, Inc., et al.*, Civil Action No. 2:22-cv-07326 (D.N.J.)



# Memo

| | |
|---|---|
| Date: | July 13, 2017 |

| | |
|---|---|
| To: | Eugenia Naranjo |
| | Alice Yeh |
| From: | Edward Garland, P.E. |
| Subject: | Congener Analysis |

## Introduction

This memorandum summarizes analyses performed to assess potential links between concentrations of 2,3,7,8-substituted dioxins and furans measured in the Lower Passaic River (LPR) sediments and concentrations of those chemicals in the containment cells on the former Givaudan facility in Clifton and on the former Diamond Alkali facility on Lister Avenue in Newark.

## Description of the Data Used

The data used in these analyses were collected by several groups. EPA collected samples from the former Givaudan and Diamond Alkali facilities in 2015 and from the river in 2013. The vast majority of the in-river data were collected by the Cooperating Parties Group (CPG) under EPA oversight between 2008 and 2013. Additional in-river data were collected by Tierra in 2009 in the Phase 1 removal area and in 2012 as part of their Focused Sediment Investigation. In 2011, in-river sediment data were collected at 15 locations by the Joint Defense Group.

Figure 1 presents concentrations of seventeen 2,3,7,8-substituted dioxin and furan congeners measured in three locations:

∗ Upstream of Dundee Dam (referred to as background);

∗ The containment cell on the former Givaudan facility in Clifton; and

∗ The containment cell on the former Diamond Alkali facility on Lister Avenue in Newark.

Gray shading identifies three congeners not included in the analysis; two because they are associated with combustion sources and are ubiquitous in the highly urbanized area surrounding the Lower Passaic River (1,2,3,4,6,7,8 HpCDD and OCDD), and the third (1,2,3,7,8,9-HxCDF) because a high proportion of the in-river data are non-detects.

For each of the three locations, data are shown as individual measurements (triangles), arithmetic averages (circles) and median concentrations (diamonds). Non-detected results are plotted as open symbols at the detection limit.

Individual measurements for any congener vary by more than an order of magnitude. For 2,3,7,8-TCDD, the mean concentration from the Lister Avenue cell is more than two orders of magnitude higher than the mean concentration from the Clifton cell, and the mean background concentration is lower than the Clifton cell mean concentration by over three orders of magnitude. For the penta- and hexa-dioxins, mean concentrations from the two containment cells differ by less than 35% and background concentrations average two to three orders of magnitude less than the containment cell means. For the furans, mean concentrations from the Lister Avenue containment cell are two to three orders of magnitude greater than mean concentrations from the Clifton cell for six of the nine furan congeners, and are a factor of approximately 20 to 60 times greater for the remaining three congeners. Background furan congener mean concentrations are generally one to 1.5 orders of magnitude lower than the mean Clifton concentrations. Congener concentrations were chosen to characterize the three source categories, rather than percentages of the sum of the 2,3,7,8-substituted dioxins and furans because concentrations are more appropriate in the mass balance type approach adopted for this analysis. Characterizing the congeners by percentage of the sum does not account for the order of magnitude differences in concentrations among the three sources.

Figure 1 also shows concentrations of three additional chemicals measured in the containment cells and a limited number of river sediment samples:

* Hexachlorophene (HCP)

* 1,2,4,5,7,8-Hexachloroxanthene (HCX)

* 2,4,6,8-Tetrachlorodibenzothiophene (TCDT)

Measured concentrations of HCX and HCP in the Clifton cell are approximately three orders of magnitude higher than either the Lister Avenue cell concentrations or background concentrations. Conversely, measured concentrations of TCDT in the Lister Avenue cell are approximately four orders of magnitude higher than either the Clifton cell concentrations or background concentrations. Based on these source-specific differences in concentrations, these three chemicals are referred to subsequently in this memorandum as markers.

Eugenia Naranjo
Alice Yeh

July 13, 2017                                                                                               Page 3

Figures 2 and 3 present the cumulative frequency distributions of the 14 dioxin and furan congeners, and the three additional chemicals (HCP, HCX, and TCDT) used in the analysis. Each panel on Figures 2 and 3 presents data for an individual congener, named in the upper left-hand corner of the panel. The ratio of the Lister Avenue cell mean concentrations to the Clifton cell mean concentrations is printed in the lower right-hand corner of each panel. Because the background data contain a substantial number of non-detect results and the detection limits varied considerably for any giver congener, the mean and median concentrations for each congener for the background data were determined with a maximum likelihood estimator (MLE) method (Kmenta, 1986), using an assumption of a log-normal distribution. The MLE estimate of the distribution of each congener is indicated by the blue line and the horizontal purple line indicates the mean background concentration used in the analysis for each congener. The variability of the concentrations, indicated by the slope of the data on the cumulative frequency distributions is similar (in log space) and suggests that concentrations could have varied over time, which would result in variable contributions to in-river concentrations.

## Approach

In order to assess potential links between the concentrations of 2,3,7,8-substituted dioxins and furans measured in LPR sediments and the concentrations of those chemicals in the Lister Avenue and Clifton cells, an equation was developed to describe the concentrations of those chemicals in the LPR sediments as a mixture of what was discharged from the former Diamond Alkali facility (as represented by the chemicals in the Lister Avenue cell), what was discharged from the former Givaudan facility (as represented by the chemicals in the Clifton cell) and what came into the LPR from over Dundee Dam (background). This equation assumes that there were no other major sources of 2,3,7,8-substituted dioxins and furans to the LPR sediments.

In this analysis, the concentrations in each of the three sources are specified as the arithmetic mean concentrations[1]. The approach adopted is to apply equation (1) to reproduce the mixture of fourteen 2,3,7,8-substituted dioxin and furan congeners in individual in-river sediment samples by blending the congener concentrations measured in the three sources. An optimization routine was used for individual in-river samples to determine values of the coefficients $a_j$, $b_j$ and $c_j$ that multiply the congener concentrations from each of the three sources to match the mixture of congeners in the in-river sample.

$$C_{i,j} = a_j C_{i,Lister} \; + \; b_j C_{i,Clifton} + \; c_j C_{i,background} \qquad (1)$$

---

[1] An alternate evaluation using median concentrations (rather than means) was investigated and the results were not sensitive to this change.

hdrinc.com

1 International Boulevard, 10th Floor, Suite 1000, Mahwah, NJ  07495-0027
(201) 335-9300

Eugenia Naranjo
Alice Yeh

July 13, 2017

Page 4

Where:

$C_{i,j}$ = Concentration of congener ($i$) in in-river sediment sample ($j$)

$a_j$ = Multiplier of Lister waste cell congener concentration for in-river sediment sample ($j$)

$C_{i,Lister}$ = Lister waste cell concentration of congener ($i$)

$b_j$ = Multiplier of Clifton waste cell congener concentration for in-river sediment sample ($j$)

$C_{i,Clifton}$ = Clifton waste cell concentration of congener ($i$)

$c_j$ = Multiplier of background (upstream) congener concentration for in-river sediment sample ($j$)

$C_{i,Background}$ = Background concentration of congener ($i$)

The coefficients $a_j$, $b_j$ and $c_j$, vary from in-river sample to in-river sample, but are applied to all 14 congeners to calculate concentrations of the 14 congeners for a single in-river sample. For each in-river sample ($j$), the attenuation or dilution of what was discharged from the former Diamond Alkali facility is described by the coefficient ($a_j$), which is multiplied by the concentrations of the congeners measured in the Lister Avenue cell ($C_{i,Lister}$) to calculate the concentrations in LPR sediment originating from the former Lister Avenue site. The attenuation or dilution of what was discharged from the former Givaudan facility is described as another constant ($b_j$) which is multiplied by the concentrations of the congeners measured in the Clifton cell ($C_{i,Clifton}$) to calculate the concentrations originating from the former Givaudan facility. Similarly the concentrations of the congeners measured in background sediments ($C_{i,background}$) are multiplied by a third constant ($c_j$) to calculate the concentrations originating from what flowed over Dundee Dam.

Figure 1 shows the concentrations of 2,3,7,8-substituted dioxins and furans that were measured in each containment cell: the arithmetic means shown in the figure are the $C_1$, $C_2$, $C_3$ and so on that were used in the equation. A program that solves many equations at once (Excel's Solver) was used to find the combination of $a_j$, $b_j$ and $c_j$ that, when applied to the group of fourteen congeners, would yield the best match of the pattern of 2,3,7,8-substituted dioxins and furans measured in a specific sample of LPR sediments.

The optimization of the coefficients, $a_j$, $b_j$ and $c_j$, which multiply the Lister Avenue, Clifton, and background concentrations, was performed with Excel's Solver tool using an

hdrinc.com

1 International Boulevard, 10th Floor, Suite 1000, Mahwah, NJ 07495-0027
(201) 335-9300

Eugenia Naranjo                                                     July 13, 2017                                          Page 5
Alice Yeh

objective function of the sum of the squares of the relative differences[2] between the calculated congener concentrations and data:

$$Diff_{Rl,j}{}^2 = \sum_{i=1}^{14} \left( \frac{c_{i,j,Prd} - c_{i,j,Obs}}{c_{i,j,Obs}} \right)^2 \qquad (2)$$

Where:

$Diff_{Rel,j}{}^2$  =  Square of relative difference for in-river sediment sample ($j$)

$C_{i,j,Pred}$  =  Predicted concentration of congener ($i$) for in-river sediment sample ($j$)

$C_{i,j,Obs}$  =  Observed concentration of congener ($i$) for in-river sediment sample ($j$)


## Comparison of Computed Congener Concentrations with Data

**Predicted versus Measured**

For each individual in-river sample, the combination of $a_j$, $b_j$ and $c_j$, determined by the Solver optimization and the measured concentrations of each congener in the Lister Avenue and Clifton cells, plus background sediments, yields calculated concentrations of the 14 congeners in the LPR sediment sample. In order to test the results of the Solver optimization of equation (1), the calculated LPR sediment concentrations were compared to the measured LPR sediment concentrations (Figures 4 and 5). In each panel on Figures 4 and 5, a one-to-one line (perfect agreement between calculated LPR sediment concentrations and measured LPR sediment concentrations) is shown as a blue line, and a regression of predicted versus observed concentrations is indicated by the red line, with the slope and coefficient of determination ($R^2$) printed below the panel. Any non-detect data are plotted at half of the detection limit on these and subsequent figures[3].

The predicted concentrations are generally in good agreement with the data, with $R^2$ values greater than 0.9 in all but one of the regressions (the exception being 2,3,7,8-TCDF, with an $R^2$ of 0.82). Scatter around the regression line and differences between the regression and one-to one-line is expected given that only mean concentrations were used

---

[2] Alternate objective functions based on sum of 1) squares of model-data differences, 2) squares of log differences, absolute value of log differences, and maximum(model, data)/minimum(model, data). Only the use of the square of the model-data differences produced significantly different results and that option was rejected because it forced the results to be controlled by only the high concentrations.

[3] Alternate treatments of non-detects in model versus data comparisons were investigated (non-detect equals zero and non-detect equals the detection limit) and the results were not sensitive to these changes.

hdrinc.com

1 International Boulevard, 10th Floor, Suite 1000, Mahwah, NJ  07495-0027
(201) 335-9300

to characterize the three sources, and each showed variations in individual congener concentrations of more than an order of magnitude. For many of the congeners (e.g. 1,2,3,7,8-PeCDD, 1,2,3,4,7,8-HxCDD, and the higher chlorinated furans), the tight cluster of points near the one-to-one line over four or more orders of magnitude means that the $a_j$, $b_j$ and $c_j$, values found by the Solver do well in predicting measured LPR sediment concentrations.  For other congeners (e.g. 2,3,7,8-TCDD, 1,2,3,6,7,8-HxCDD and 2,3,7,8-TCDF) the upper end of the concentration range is under-predicted, which could be caused by use of mean concentrations to characterize the three source terms.

Data for the marker chemicals were available for only a small fraction of the samples, and therefore, the marker chemicals were not included in the Solver optimization. The coefficients $a_j$, $b_j$ and $c_j$, determined by the Solver optimization, are applied to each of the 14 congeners in the three sources, but can also be applied to the mean concentration of the marker chemicals from the three sources.  Predicted versus measured marker chemical concentrations are presented on the last three panels of Figure 5 and show good agreement for the majority of the HCP data.  Predictions for HCX show a fair amount of scatter and a bias toward over-prediction, while TCDT concentrations are generally under-predicted, although with less scatter than HCX.  The predictions for the marker chemicals could also be affected by use of a mean concentration to represent variable concentrations.  These comparisons of computed and measured marker chemicals can be thought of as a validation step, in that the coefficients aj, bj and cj determined by the Solver optimization for the dioxin and furan congeners were applied directly to the marker chemicals without including the agreement for the markers in the optimization.

### Spatial Patterns

In addition to the previous evaluation of the agreement between predicted and observed congener concentrations (Figures 4 and 5) the results generated by the Solver optimization are evaluated further by assessing how the results vary in terms of spatial patterns of the contribution of a single source.   Physical processes in the river are expected to influence spatial gradients in chemical concentrations discharged at different locations in a tidal estuary.  This is evaluated by considering the calculated contribution of each source to the concentrations measured in river sediments, which can be calculated for each sample with the optimized coefficients, $a_j$, $b_j$ and $c_j$, and source concentrations, as:

$$F_{Lisr,i,j} \; = \; \frac{a_j C_{i,Lisr}}{a_j C_{i,Lisr} + b_j C_{i,Clifon} + c_j C_{i,Background}} \qquad (3)$$

hdrinc.com

1 International Boulevard, 10th Floor, Suite 1000, Mahwah, NJ  07495-0027
(201) 335-9300

Eugenia Naranjo                          July 13, 2017                          Page 7
Alice Yeh

$$F_{Clifton,i,j} = \frac{b_j c_{i,Clifton}}{a_j c_{i,Lister} + b_j c_{i,Clifton} + c_j c_{i,Background}} \tag{4}$$

$$F_{Background,i,j} = \frac{c_j c_{i,Background}}{a_j c_{i,Lister} + b_j c_{i,Clifton} + c_j c_{i,Background}} \tag{5}$$

The spatial variation in the contribution of each source to each of the 14 congeners and 3 markers is summarized by the mean (plus and minus 2 standard errors) over all depth intervals versus river mile, binned by one-mile intervals for the Lister (Figure 6 and 7), Clifton (Figures 8 and 9) and background (Figures 10 and 11) components. The ratio of the mean congener concentration in the Lister Avenue cell to the mean in the Clifton cell is printed in the upper left-hand corner of each panel on Figures 6 through 11.

Spatial patterns of the calculated Lister Avenue fractional contribution to in-river congener concentrations (Figures 6 and 7) follow two general patterns. For congeners with high ratios of concentrations in the Lister Avenue cell to the Clifton cell (e.g. 2,3,7,8-TCDD and more highly chlorinated furans), the calculated fractions are high downstream, decrease gradually in the upstream direction to approximately RM 12 or 13, and then decrease sharply upstream of RM 12 or 13. For congeners with ratios of concentrations in the two cells near 1.0 (i.e. penta- and hexa-dioxins) the Lister fraction at the downstream end of the river is approximately 10% to 15% and decreases gradually in the upstream direction.

Spatial patterns of the calculated Clifton fractional contribution to in-river congener concentrations (Figures 8 and 9) also show two general patterns. For congeners with cell concentration ratios (Lister/Clifton) near 1.0, computed fractional contributions peak at approximately 50 to 75% between RM 10 and 11 and decrease rapidly upstream and gradually downstream. For congeners with higher cell concentration ratios, peak Clifton fractional contributions are generally less than 15%. The mean Clifton contribution of 2,3,7,8-TCDD decreases from approximately 15% at RM 14 to less than 10% downstream of RM 6 (Figure 8). Mean contributions to penta- and hexa-dioxins are highest between RM 9 and RM 11, and decrease sharply moving upstream, and gradually moving downstream. Downstream of RM 11, mean contributions to 1,2,3,7,8-PeCDD and 1,2,3,4,7,8-HxCDD are in the range of 60% to 75%. In this same reach, mean contributions to 1,2,3,6,7,8-HxCDD are between 40% and 55% and mean contributions to 1,2,3,7,8,9-HxCDD are between 45% and 65%. Lower contributions are computed for the furan congeners, with maximum values between RM 8 to RM 10 of near 10% for the tetra- and penta-furans and near 5% for the more-highly chlorinated furan congeners (Figure 9) (with 2,3,4,6,7,8-HxCDF having a higher peak near 15%). Downstream of RM 8, the mean Clifton contributions of the hexa-, hepta, and octa-furans is generally less than 5%.

hdrinc.com

1 International Boulevard, 10th Floor, Suite 1000, Mahwah, NJ  07495-0027
(201) 335-9300

Spatial patterns of the calculated background fractional contribution to in-river congener concentrations (Figures 10 and 11) are highest upstream, above the influence of estuarine circulation and decrease to approximately RM 9 to 10.  Between RM 9 and RM 7, the fractional contributions increase and then generally decrease downstream of RM 7, but with less variation than in the reach upstream of RM 10.

These spatial patterns are reasonable given the location of the Clifton and Lister Avenue sources.  The higher computed Clifton contribution to in-river 2,3,4,6,7,8-HxCDF concentrations (relative to the other hexa-, hepta-, and octa-furans) is also reasonable, given the Lister Avenue to Clifton cell concentration ratio of 42 for 2,3,4,6,7,8-HxCDF (compared to ratios for other hexa-, hepta-, and octa-furans ranging from 414 to almost 3700).  Lastly, the spatial pattern of the computed Clifton contribution to the three marker chemicals is reasonable, with Clifton dominating the HCP and HCX concentrations and having a mean contribution to TCDT of less than 5% at all locations.

## Conclusions

The analysis described in this memorandum indicates that mixtures of fourteen 2,3,7,8-substituted dioxin and furan congeners measured in sediment of the LPR can be determined from blending the concentrations of the same 14 congeners measured in three sources: 1) the Lister Avenue cell of the former Diamond Alkali facility, 2) the Clifton cell of the former Givaudan facility, and background concentrations measured in sediments upstream of Dundee Dam.  Concentrations of the 14 congeners predicted by applying Equation (1) to each in-river sediment sample fall reasonably tightly around regressions of computed versus measured concentrations (with the lowest $R^2$ of 0.83 and above 0.9 for the remaining 13 congeners).  Multiple measurements of each congener in containment cells and upstream sediment show concentrations vary considerably about the mean concentrations used in this analysis, which leads to the expectation of variability in computed and measured concentrations in river sediments.  For congeners more prevalent in the Clifton cell (e.g. 1,2,3,7,8-PeCDD, 1,2,3,4,7,8-HxCDD) and congeners more prevalent in the Lister Avenue cell (e.g. higher chlorinated furans), the predicted versus measured in-river concentrations form a tight cluster of points near the one-to-one line over four or more orders of magnitude, indicating that the Solver solutions for blending the three sources does well in predicting measured LPR sediment concentrations.

Given the relative magnitude of individual congener concentrations among the three sources and the location the sources, the results summarized as Clifton contribution are consistent with expected spatial patterns, considering how transport and fate processes affect discharges to a tidal estuary from spatially separated sources of different relative concentrations.  For example, the Clifton contributions to congeners which represent a higher proportion of the Clifton cell data (e.g. penta- and hexa-dioxins), as compared to

1 International Boulevard, 10th Floor, Suite 1000, Mahwah, NJ  07495-0027
(201) 335-9300

the Lister Avenue cell data, are highest near the former Clifton facility and decrease gradually moving downstream.

The mean Clifton contribution of 2,3,7,8-TCDD decreases from approximately 15% at RM 14 to less than 10% downstream of RM 6.  Mean contributions to penta- and hexa-dioxins are highest between RM 9 and RM 11, and decrease sharply moving upstream, and gradually moving downstream.  Conversely, for congeners which represent a low proportion of the Clifton cell data (e.g. hexa- and hepta-furans), as compared to the Lister Avenue cell data, Clifton contributions of less than 10% are typically computed.

The spatial pattern of the computed Clifton contribution of the three marker chemicals, which is generated by using the coefficients $a_j$, $b_j$ and $c_j$, derived from the dioxin and furan congeners, is also reasonable, with Clifton dominating the HCP and HCX concentrations and having a mean contribution to TCDT of less than 5% at all locations.  This comparison serves as a validation rather than a calibration and lends additional support to the conclusion that the analysis approach produced reasonable results.

The analyses described in this memo were conducted with alternate selections of several inputs or data treatments, and regardless of choice, the overall conclusion did not change.  While the exact magnitude of contribution from the Clifton source changed with assumptions, substantial non-zero contributions to more than 50% of in-river samples were computed for penta- and hexa-dioxins.  Based on each iteration in the suite of analyses, the Clifton contribution was needed to explain in-river congener concentrations.

The power in the approach is in fitting the fourteen 2,3,7,8-substituted dioxins and furan congeners included in the analysis all at once.  Concentrations of a single congener could be explained by various combinations of the three sources, however, the adjustment of one source versus another carries the effect to all 14 congeners.  Improvements in the agreement with data for one congener in a specific sample could degrade the agreement for another congener, if the adjustment is made to the wrong source.  The Excel Solver optimization tool is ideal for performing the adjustments by adjusting all fourteen congeners from a single source by the same factor and making the adjustments to the three factors for the three sources simultaneously.   The comparisons of the computed and measured concentrations indicate that the blending calculations provide reasonable predictions of the in-river congener concentrations.

## References

Kmenta, J., 1986.  *Elements of Econometrics*, 2nd Edition, New York: Macmillan Publishing Company, pp. 176-187.

Eugenia Naranjo                    July 13, 2017                    Page 10
Alice Yeh



Figure 1. Concentrations measured in samples from upstream of Dundee Dam (background), and containment cells at Clifton and Lister Ave. sites.

hdrinc.com

1 International Boulevard, 10th Floor, Suite 1000, Mahwah, NJ  07495-0027
(201) 335-9300

Eugenia Naranjo
Alice Yeh

July 13, 2017

Page 11



Figure 2. Cumulative frequency distributions of data from upstream of Dundee Dam (background), and containment cells at Clifton and Lister Ave. sites. Page 1 of 2 page set.

Eugenia Naranjo                                    July 13, 2017                                    Page 12
Alice Yeh



Figure 3. Cumulative frequency distributions of data from upstream of Dundee Dam (background), and containment cells at Clifton and Lister Ave. sites. Page 2 of 2 page set.

Eugenia Naranjo                                July 13, 2017                                Page 13
Alice Yeh



Figure 4. Cross-plot of predicted versus observed concentrations. Page 1 of 2 page set.

hdrinc.com

1 International Boulevard, 10th Floor, Suite 1000, Mahwah, NJ  07495-0027
(201) 335-9300

Eugenia Naranjo                              July 13, 2017                                    Page 14
Alice Yeh



Figure 5. Cross-plot of predicted versus observed concentrations. Page 2 of 2 page set.



Figure 6. Mean +/- two standard errors of Lister fraction of in-river concentrations versus river mile, binned by one-mile intervals. Page 1 of 2 page set.

Eugenia Naranjo
Alice Yeh

July 13, 2017

Page 16



● Arithmetic Mean

Figure 7. Mean +/- two standard errors of Lister fraction of in-river concentrations versus river mile, binned by one-mile intervals. Page 2 of 2 page set.

Eugenia Naranjo
Alice Yeh

July 13, 2017

Page 17



● Arithmetic Mean

Figure 8. Mean +/- two standard errors of Clifton fraction of in-river concentrations versus river mile, binned by one-mile intervals. Page 1 of 2 page set.

Eugenia Naranjo                                   July 13, 2017                                   Page 18
Alice Yeh



Figure 9. Mean +/- two standard errors of Clifton fraction of in-river concentrations versus river mile, binned by one-mile intervals. Page 2 of 2 page set.

hdrinc.com

1 International Boulevard, 10th Floor, Suite 1000, Mahwah, NJ  07495-0027
(201) 335-9300

Eugenia Naranjo
Alice Yeh



Figure 10. Mean +/- two standard errors of background fraction of in-river concentrations versus river mile, binned by one-mile intervals. Page 1 of 2 page set.

Eugenia Naranjo                                    July 13, 2017                                    Page 20
Alice Yeh



● **Arithmetic Mean**

Figure 11. Mean +/- two standard errors of background fraction of in-river concentrations versus river mile, binned by one-mile intervals. Page 2 of 2 page set.

# Exhibit 88



## State of New Jersey
### DEPARTMENT OF ENVIRONMENTAL PROTECTION
DIVISION OF WASTE MANAGEMENT
HAZARDOUS SITE MITIGATION ADMINISTRATION
CN 028, Trenton, N.J. 08625

MARWAN M. SADAT, P.E
DIRECTOR

JORGE H. BERKOWITZ, PH.D.
ADMINISTRATOR

August 2, 1984

M E M O R A N D U M

TO:     Jerry Burke, Assistant Director
        Office of Regulatory Services

FROM:   Dr. Jorge H. Berkowitz, Administrator
        Hazardous Site Mitigation Administration

SUBJECT: REVIEW OF DIOXIN DATA - SCA REACTOR VESSELS, LOCKWOOD STREET, NEWARK

In response to your memorandum of July 10, 1984, Rob Predale, Assistant Chief of the Bureau of Environmental Evaluation and Risk Assessment, has reviewed the dioxin data results for the 10 reactor vessels stored by SCA at the Newark Boxboard Company lot on Lockwood Street. Based on this review we have determined that no remedial action is necessary on the 10 reactor vessels. However, a composite soil sample taken from three locations in the vicinity of two of the reactor vessels indicated a dioxin concentration in the soil of 1.8 ppb. This data point, coupled with three previous soil samples collected by the USEPA within the Newark Boxboard Company lot (sample #578 - 2.1 ppb, #577 - 6.1 ppb, #573 - 1.7 ppb) indicates the presence of low-level dioxin contamination across the site. Consequently, if SCA is given permission to remove the 10 reactor vessels, special precautions should be taken to prevent the off-site migration of contaminated soil through the movement of vehicular traffic involved in the removal operation. We recommend that a polyethylene tarp be placed along the path of any vehicular traffic within the Newark Boxboard Company lot. At the end of the removal of the 10 reactor vessels the polyethylene tarp should be drummed and stored in a secure location.

You should be aware that at this time (based on a site visit on 8/1/84) the Newark Boxboard Company lot has inadequate public access restrictions. Although a fence and other building structures surround most of the site, the driveway entrance on Lockwood Street is unobstructed. Moreover, there are no signs posted indicating the presence of low-level dioxin. We will be recommending specific mitigation actions for the Newark Boxboard Company lot, shortly.

*New Jersey Is An Equal Opportunity Employer*

BBA000208

Attached for your information is a compilation of the dioxin data. Also attached is a copy of a memorandum describing the sampling event, and a diagram indicating sample locations.

If you have any questions please contact Rob Predale at 4-3068.

Attachment

HS74:gh
cc:  Dr. Marwan M. Sadat, DWM
     Tom Burke, OSR
     Dr. Merry L. Morris, HSMA
     Ron Senna, HSMA
     Charles Elmendorf, HSMA
     Joe Buttich, HSMA
     Ann DeCicco, HSMA
     Lisa Geiger, HSMA
     Dr. Richard Spear, EPA-Edison

ATTACHMENT

Dioxin Data — SCA Vessels, Newark Boxboard Company Lot
Samples Collected on May 24, 1984

| ETC Sample # | Location | Sample Type | Concentrations (ng/100 cm$^2$) | Detection Limit |
|---|---|---|---|---|
| E6648 | #610 | wipe | ND | 0.09 |
| E6647 | #001 | wipe | ND | 0.23 |
| E6650 | #616 | wipe | ND | 0.66 |
| E6655 | #603 | wipe | ND | 0.38 |
| E6654 | #002 | wipe | ND | 0.08 |
| E6646 | #003 | wipe | 0.94 | - |
| E6649 | #004 | wipe | ND | 0.19 |
| E6653 | #005 | wipe | ND | 0.05 |
| E6656** | #607 | wipe | ND | 0.25 |
| E6651 | #006 | wipe | ND | 0.20 |
| E6855 | Blank (#700) | wipe | ND | 0.15 |
| E6652 | Below #603 Front #603 Back #610 | composite soil | 1.8* | - |

*   Concentration in parts per billion
**  ETC incorrectly list the ETC number as E6556 in their report.

# Exhibit 89

Investigator: Gerard B. Connolly

     Site: Diamond Alkali, Newark, New Jersey.

     ID#: 4TGB02d6BN,  CIIS#: 93012,  Date: 01/25/94.

SUBJECT: Summary of Interview with Oscar Randell.


On the date indicated above at about 10:00am, this investigator
and Lance Richman, Remedial Project Manager for the Diamond
Alkali Superfund site, interviewed Mr. Oscar Randell at his
residence, 1264 Marcella Avenue, Union, New Jersey, Tel (908)
687-4650. When interviewed regarding his employment at Montrose
Chemical Company's Lister Avenue facility in Newark, New Jersey,
Mr. Randell stated as follows:

I worked for Montrose Chemical Company from 1951 to the end of
1977. I started work as a Class B operator working in the
production of various chemical products. Mr. Kelsey Brown was my
boss. I worked with another Class B operator, Thelb Cameron, who
presently lives in the Newark, New Jersey area (Belvedere N.J.,
Tel (201) 759-5228.) I also remember working with an employee
named Mo Franklin who is now deceased.

I remember Samuel Rothrosen and Benjamin Rothberg as being at the
facility. Mr. Rothrosen was a laboratory chemist and Mr. Rothberg
was an official of the company who worked in the main office.
Mr. Rothrosen would supply me with the paperwork on the chemical
process that I was tasked to implement.

From 1951 to 1956 the company was Montrose Chemical Co., after
1956, the company was owned by Baldwin Chemical Company, then
Chris Craft and subsequently IMC which ended operations in 1977.
In January of 1978, SCA ( Southland Chemical) took over
activities at the plant.

The Montrose produced DDT from 1951 to about 1953/54. After that
date this operation was moved out west to California.  TCP
Tricresyl phosphate) was produced at Montrose during the entire
course of my employment. It was produced for Shell Oil Company as
an additive for its gasoline. DMI was also produced for sale to
the Goodyear Tire and Rubber Company. Thelb Cameron worked on TCP
production with me.

TCP production was as follows:

     Cresol, a corrosive liquid, was brought on site in tank
     cars. It was a brown liquid and had a distinct smell. Cresol
     was pumped into a 2000 gallon vat placed outside for this

**850570001**

purpose. A dry chemical which was packaged in individual
bags was added. This mixture was then pumped into a thermal
jacketed tank that was heated by a Dixon boiler to a
temperature of 500°C for eight hours. A lab sample was
taken for analysis. If the process product was not up to the
appropriate specifications, further processing would occur.
If the sampled process product was satisfactory the mixture
was run through condensers and transferred to a big (10,000
gallon) round tank. A mixture containing 98% sulfuric acid
was added. The amount of acid added was determined by
measuring the volume increase in the tank in inches from
calibrations on the tank. Three, five-gallon buckets of a
black, dry chemical were then added from a 400-500 lb drum.
The process product was than mixed by an agitator in the
tank.  As the chemical was added the mixture changed color
to a" beautiful deep red". The process product was heated
and five gallon buckets of an additional white, "sugar-like"
chemical were added from a 500 lb paper container. After
about 1/2 hour the process product turned crystal clear and
had the consistency of vegetable oil. The process product
was again sampled. If satisfactory, the process product then
went to a wash tank. The process product settled to the
bottom of the tank while water from the washing process
remained on top. An arm skimming the surface of the inner
tank removed the wash-water to an overflow tank. The
decanted water was discharged via a Montrose 4" outflow pipe
directly into the Passaic River. On one occasion in 1957/58,
a worker assigned to one of the three shifts allowed the arm
to sink to the bottom of the wash tank. The result was that
the entire run of product was discharged into the Passaic
River. The worker was fired but no report of the incident
was made. The wash-water, which was visible through the
floor grating, flowed in drains that were connected to a 4"
out flow pipe. The wash-water was a white, milky liquid. I
observed the liquid both in the plant drains and discharging
via the 4" outfall pipe to the Passaic river. After three
washes the material was sampled. If satisfactory, it was
sent to 4000 gallon, insulated drying tank. The drying tank
contained a "steam jet vacuum" to remove any additional
water. The tank used steam heat at a temperature of between
80-90°C. The drying took about eight hours. The finished
product was then pumped into a 4000 gallon holding tank.
When ready for shipment, it was pumped via a 2" line to the
drumming area. The product was spilled regularly. The floor
was always sticky with product. The concrete floor required
regular repaving because of the spills of product. At times
the floor was washed with caustic to remove the product. Any
waste water went to the Passaic river. This process remained
the same throughout my tenure at the facility. I estimated
that between 3000 and 3500 gallons of TCP were produced
three time a week.

Many of the iron drainage pipes at the plant would corrode.
Employees would then have to jackhammer the pipes out and replace

**850570002**

RAS-00003917

them.  They eventually placed down plastic drainage pipes.

In 1957/58 a 2" pipe used to pump Cresol from tank cars ruptured
causing Cresol, a corrosive, to "spill all over."  I and other
workers routinely dumped five gallon pails of waste cresol into
the Passaic River instead of using a waste tank in place for that
purpose.

Some time between 1958 and 1960 the river backed up and flowed
onto the plant. The water was waist high.  Subsequent to the
flood, pumps and motors were moved off of the floor because a
number of them had shorted out during the flood.

DMI production was as follows:

    DMI was produced in a 4000 gallon tank. It did not need to
    be washed. 2000 gallons of methanol were used. The methanol
    had a sweet smell. The methanol was combined with 300, 50 lb
    bags of dry chemical that were carried to the top of the
    tank by hopper. A five gallon pail of a substance containing
    sulfuric acid was added as a catalyst. The tank was closed.
    The mixture was heated to over 500 degrees using diatherm
    heat from the Dixon boiler. The heating continued for more
    than ten hours, after which the methanol was pumped off to
    an under ground tank located in front of the plant. The DMI
    was in a holding tank where a "slop cut" was made to a 500
    gallon tank. After 1/2 hour, the material was light tested.
    It was crystal clear. The liquid was then distilled in an
    insulated tank. 2000 or 3000 gallons of finished product
    were stored at the plant. The product looked like white
    snow.  Approximately two deliveries a week were made to
    Goodyear Tire and Rubber Company for a total of 6000 gallons
    of product.

Concerning DDT production, I was required to scrape hardened
material from product pans. This was done wearing a rubber suit
and gas mask. The product was then chopped up and shipped, in
cotton containers, to California.

I worked almost exclusively on TCP and DMI production.

Three railroad tank cars were buried in front of the plant in the
vicinity of Lister avenue. The three tank cars, which went by the
numbers 31, 32, and 33, had 10,000 gallon capacities. They were
removed by SCA in 1980. I observed the tank-car removal and that
is how I learned they were railroad tank cars.  The tanks were
rusted and falling apart. One of the tanks was used for methanol
recovery during manufacturing, another was used to hold "melano".
I believe it was used in the production of tear gas.

850570003

TIERRA-B-003897

# Exhibit 90

Attachment XII

Interim CERCLA Settlement Policy

12/5/84

Received

JAN 2 8 2000

Enforcement & Compliance Docket
& Information Center



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
**WASHINGTON, D.C. 20460**

DEC - 5 1984

MEMORANDUM

SUBJECT:   Interim CERCLA Settlement Policy

FROM:      Lee M. Thomas, Assistant Administrator
           Office of Solid Waste and Emergency Response

           Courtney M. Price, Assistant Administrator
           Office of Enforcement and Compliance Monitoring

           F. Henry Habicht, II, Assistant Attorney General
           Land and Natural Resources Division
           Department of Justice

TO:        Regional Administrators, Regions I-X

      This memorandum sets forth the general principles governing
private party settlements under CERCLA, and specific procedures
for the Regions and Headquarters to use in assessing private
party settlement proposals.  It addresses the following topics:

1.  general principles for EPA review of private-party cleanup
    proposals;

2.  management guidelines for negotiation;

3.  factors governing release of information to potentially
    responsible parties;

4.  criteria for evaluating settlement offers;

5.  partial cleanup proposals;

6.  contribution among responsible parties;

7.  releases and covenants not to sue;

8.  targets for litigation;

9.  timing for negotiations;

10. management and review of settlement negotiations.

## APPLICABILITY

This memorandum incorporates the draft Hazardous Waste Case Settlement Policy, published in draft in December of 1983. It is applicable not only to multiple party cases but to all civil hazardous waste enforcement cases under Superfund. It is generally applicable to imminent hazard enforcement actions under section 7003 of RCRA.

This policy establishes criteria for evaluating private party settlement proposals to conduct or contribute to the funding of response actions, including removal and remedial actions. It also addresses settlement proposals to contribute to funding after a response action has been completed. It does not address private-party proposals to conduct remedial investigations and feasibility studies. These proposals are to be evaluated under criteria established in the policy guidance from Lee M. Thomas, Assistant Administrator, Office of Solid Waste and Emergency Response, and Courtney Price, Assistant Administrator, Office of Enforcement and Compliance Monitoring entitled " Participation of Potentially Responsible Parties in Development of Remedial Investigations and Feasibility Studies under CERCLA". (March 20, 1984)

## I. General Principles

The Government's goal in implementing CERCLA is to achieve effective and expedited cleanup at as many uncontrolled hazardous waste facilities as possible. To achieve this goal, the Agency is committed to a strong and vigorous enforcement program. The Agency has made major advances in securing cleanup at some of the nation's worst hazardous waste sites because of its demonstrated willingness to use the Fund and to pursue administrative and judicial enforcement actions. In addition, the Agency has obtained key decisions, on such issues as joint and several liability, which have further advanced its enforcement efforts.

The Agency recognizes, however, that Fund-financed cleanups, administrative action and litigation will not be sufficient to accomplish CERCLA's goals, and that voluntary cleanups are essential to a successful program for cleanup of the nation's hazardous waste sites. The Agency is therefore re-evaluating its settlement policy, in light of three years experience with negotiation and litigation of hazardous waste cases, to remove or minimize if possible the impediments to voluntary cleanup.

As a result of this reassessment, the Agency has identified the following general principles that govern its Superfund enforcement program:

° The goal of the Agency in negotiating private party cleanup
  and in settlement of hazardous waste cases has been and will
  continue to be to obtain complete cleanup by the responsible
  parties, or collect 100% of the costs of the cleanup action.

° Negotiated private party actions are essential to an effective
  program for cleanup of the nation's hazardous waste sites.
  An effective program depends on a balanced approach relying
  on a mix of Fund-financed cleanup, voluntary agreements
  reached through negotiations, and litigation. Fund-financed
  cleanup and litigation under CERCLA will not in themselves
  be sufficient to assure the success of this cleanup effort.
  In addition, expeditious cleanup reached through negotiated
  settlements is preferable to protracted litigation.

° A strong enforcement program is essential to encourage
  voluntary action by PRPs. Section 106 actions are particularly
  valuable mechanisms for compelling cleanups. The effectiveness
  of negotiation is integrally related to the effectiveness of
  enforcement and Fund-financed cleanup. The demonstrated
  willingness of the Agency to use the Fund to clean up sites
  and to take enforcement action is our most important tool
  for achieving negotiated settlements.

° The liability of potentially responsible parties is strict,
  joint and several, unless they can clearly demonstrate that
  the harm at the site is divisible. The recognition on the
  part of responsible parties that they may be jointly and
  severally liable is a valuable impetus for these parties to
  reach the agreements that are necessary for successful
  negotiations. Without such an impetus, negotiations run a
  risk of delay because of disagreements over the particulars
  of each responsible party's contribution to the problems at
  the site.

° The Agency recognizes that the factual strengths and weaknesses
  of a particular case are relevant in evaluating settlement
  proposals. The Agency also recognizes that courts may consider
  differences among defendants in allocating payments among
  parties held jointly and severally liable under CERCLA. While
  these are primarily the concerns of PRPs, the Agency will also
  consider a PRP's contribution to problems at the site, including
  contribution of waste, in assessing proposals for settlement and
  in identifying targets for litigation.

° Section 106 of CERCLA provides courts with jurisdiction to
  grant such relief as the public interest and the equities of
  the case may require. In assessing proposals for settlement
  and identifying targets for litigation, the Agency will
  consider aggravating and mitigating factors and appropriate
  equitable factors.

° In many circumstances, cleanups can be started more quickly
  when private parties do the work themselves, rather than
  provide money to the Fund. It is therefore preferable for
  private parties to conduct cleanups themselves, rather than
  simply provide funds for the States or Federal Government
  to conduct the cleanup.

° The Agency will create a climate that is receptive to private
  party cleanup proposals. To facilitate negotiations, the
  Agency will make certain information available to private
  parties. PRPs will normally have an opportunity to be
  involved in the studies used to determine the appropriate
  extent of remedy. The Agency will consider settlement
  proposals for cleanup of less than 100% of cleanup activities
  or cleanup costs. Finally, upon settling with cooperative
  parties, the government will vigorously seek all remaining
  relief, including costs, penalties and treble damages where
  appropriate, from parties whose recalcitrance made a complete
  settlement impossible.

° The Agency anticipates that both the Fund and private resources
  may be used at the same site in some circumstances. When
  the Agency settles for less than 100% of cleanup costs, it
  can use the Fund to assure that site cleanup will proceed
  expeditiously, and then sue to recover these costs from non-
  settling responsible parties. Where the Federal government
  accepts less than 100% of cleanup costs and no financially
  viable responsible parties remain, Superfund monies may be
  used to make up the difference.

° The Agency recognizes the value of some measure of finality
  in determinations of liability and in settlements generally.
  PRPs frequently want some certainty in return for assuming
  the costs of cleanup, and we recognize that this will be a
  valuable incentive for private party cleanup. PRPs frequently
  seek a final determination of liability through contribution
  protection, releases or covenants not to sue. The Agency
  will consider releases from liability in appropriate situ-
  ations, and will also consider contribution protection in
  limited circumstances. The Agency will also take aggressive
  enforcement action against those parties whose recalcitrance
  prevents settlements. In bringing cost recovery actions,
  the Agency will also attempt to raise any remaining claims
  under CERCLA section 106, to the extent practicable.

   The remainder of this memorandum sets forth specific
policies for implementing these general principles.

   Section II sets forth the management guidelines for negotiating
with less than all responsible parties for partial settlements.
This section reflects the Agency's willingness to be flexible
by considering offers for cleanup of less than 100% of cleanup
activities or costs.

Section III sets forth guidelines on the release of
information.  The Agency recognizes that adequate information
facilitates more successful negotiations.  Thus, the Agency
will combine a vigorous program for obtaining the data and
information necessary to facilitate settlements with a program
for releasing information to facilitate communications among
responsible parties.

Sections IV and V discuss the criteria for evaluating
partial settlements.  As noted above, in certain circumstances
the Agency will entertain settlement offers from PRPs which
extend only to part of the site or part of the costs of cleanup
at a site.  Section IV of this memo sets forth criteria to be
used in evaluating such offers.  These criteria apply to all
cases.  Section V sets forth the Agency's policy concerning
offers to perform or pay for discrete phases of an approved
cleanup.

Sections VI and VII relate to contribution protection and
releases from liability.  Where appropriate, the Agency may
consider contribution protection and limited releases from
liability to help provide some finality to settlements.

Section VIII sets forth criteria for selecting enforcement
cases and identifying targets for litigation.  As discussed
above, effective enforcement depends on careful case selection
and the careful selection of targets for litigation.  The Agency
will apply criteria for selection of cases to focus sufficient
resources on cases that provide the broadest possible enforcement
impact.  In addition, targets for litigation will be identified
in light of the willingness of parties to perform voluntary
cleanup, as well as conventional litigation management concerns.

Section IX sets forth the requirements governing the timing
of negotiations and section X the provisions for Headquarters
review.  These sections address the need to provide the Regions
with increased flexibility in negotiations and to change Headquarters
review in order to expedite site cleanup.

II. Management Guidelines for Negotiation

As a guideline, the Agency will negotiate only if the
initial offer from PRPs constitutes a substantial proportion of
the costs of cleanup at the site, or a substantial portion of
the needed remedial action.  Entering into discussions for less
than a substantial proportion of cleanup costs or remedial action
needed at the site, would not be an effective use of government
resources.  No specific numerical threshold for initiating
negotiations has been established.

In deciding whether to start negotiations, the Regions
should weigh the potential resource demands for conducting
negotiations against the likelihood of getting 100% of costs
or a complete remedy.

Where the Region proposes to negotiate for a partial
settlement involving less than the total costs of cleanup, or
a complete remedy, the Region should prepare as part of its
Case Negotiations Strategy a draft evaluation of the case
using the settlement criteria identified in section IV.  The
draft should discuss how each of the factors in section IV
applies to the site in question, and explain why negotiations
for less than all of the cleanup costs, or a partial remedy,
are appropriate.  A copy of the draft should be forwarded to
Headquarters.  The Headquarters review will be used to identify
major issues of national significance or issues that may involve
significant legal precedents.

In certain other categories of cases, it may be appropriate
for the Regions to enter into negotiations with PRPs, even
though the offers from PRPs do not represent a substantial
portion of the costs of cleanup.  These categories of cases
include:

   ° administrative settlements of cost recovery actions
     where total cleanup costs were less than $200,000;

   ° claims in bankruptcy;

   ° administrative settlements with de minimis contributors
     of wastes.

Actions subject to this exception are administrative
settlements of cost recovery cases where all the work at the
site has been completed and all costs have been incurred.  The
figure of $200,000 refers to all of the costs of cleanup.  The
Agency is preparing more detailed guidance on the appropriate
form of such settlement agreements, and the types of conditions
that must be included.

Negotiation of claims in bankruptcy may involve both present
owners, where the United States may have an administrative costs
claim, and other parties such as past owners or generators,
where the United States may be an unsecured potential creditor.
The Regions should avoid becoming involved in bankruptcy proceedings
if there is little likelihood of recovery, and should recognize
the risks involved in negotiating without creditor status.  It
may be appropriate to request DOJ filing of a proof of claim.
Further guidance is provided in the Memorandum from Courtney
Price entitled "Information Regarding CERCLA Enforcement Against
Bankrupt Parties," dated May 24, 1984.

In negotiating with de minimis parties, the Regions should
limit their efforts to low volume, low toxicity disposers who
would not normally make a significant contribution to the costs
of cleanup in any case.

In considering settlement offers from de minimis contributors, the Region should normally focus on achieving cash settlements. Regions should generally not enter into negotiations for full administrative or judicial settlements with releases, contribution protection, or other protective clauses. Substantial resources should not be invested in negotiations with de minimis contributors, in light of the limited costs that may be recovered, the time needed to prepare the necessary legal documents, the need for Headquarters review, potential res judicata effects, and other effects that de minimis settlements may have on the nature of the case remaining to the Government.

Partial settlements may also be considered in situations where the unwillingness of a relatively small group of parties to settle prevents the development of a proposal for a substantial portion of costs or the remedy. Proposals for settlement in these circumstances should be assessed under the criteria set forth in section IV.

Earlier versions of this policy included a threshold for negotiations, which provided that negotiations should not be commenced unless an offer was made to settle for at least 80% of the costs of cleanup, or of the remedial action. This threshold has been eliminated from the final version of this policy. It must be emphasized that elimination of this threshold does not mean that the Agency is therefore more willing to accept offers for partial settlement. The objective of the Agency is still to obtain complete cleanup by PRPs, or 100% of the costs of cleanup

III.  Release of Information

The Agency will release information concerning the site to PRPs to facilitate discussions for settlement among PRPs. This information will include:

- identity of notice letter recipients;

- volume and nature of wastes to the extent identified as sent to the site;

- ranking by volume of material sent to the site, if available.

In determining the type of information to be released, the Region should consider the possible impacts on any potential litigation. The Regions should take steps to assure protection of confidential and deliberative materials. The Agency will generally not release actual evidentiary material. The Region should state on each released summary that it is preliminary, that it was furnished in the course of compromise negotiations (Fed. Rules of Evidence 408), and that it is not binding on the Federal Government.

-8-

This information release should be preceded by and combined with a vigorous program for collecting information from responsible parties. It remains standard practice for the Agency to use the information gathering authorities of RCRA and CERCLA with respect to all PRPs at a site. This information release should generally be conditioned on a reciprocal release of information by PRPs. The information request need not be simultaneous, but EPA should receive the information within a reasonable time.

IV. Settlement Criteria

The objective of negotiations is to collect 100% of cleanup costs or complete cleanup from responsible parties. The Agency recognizes that, in narrowly limited circumstances, exceptions to this goal may be appropriate, and has established criteria for determining where such exceptions are allowed. Although the Agency will consider offers of less than 100% in accordance with this policy, it will do so in light of the Agency's position, reinforced by recent court decisions, that PRP liability is strict, joint and several unless it can be shown by the PRPs that injury at a site is clearly divisible.

Based on a full evaluation of the facts and a comprehensive analysis of all of the listed criteria, the Agency may consider accepting offers of less than 100 percent. Rapid and effective settlement depends on a thorough evaluation, and an aggressive information collection program is necessary to prepare effective evaluations. Proposals for less than total settlement should be assessed using the criteria identified below.

1. Volume of wastes contributed to site by each PRP

Information concerning the volume of wastes contributed to the site by PRPs should be collected, if available, and evaluated in each case. The volume of wastes is not the only criterion to be considered, nor may it be the most important. A small quantity of waste may cost proportionately more to contain or remove than a larger quantity of a different waste. However, the volume of waste may contribute significantly and directly to the distribution of contamination on the surface and subsurface (including groundwater), and to the complexity of removal of the contamination. In addition, if the properties of all wastes at the site are relatively equal, the volume of wastes contributed by the PRPs provides a convenient, easily applied criterion for measuring whether a PRP's settlement offer may be reasonable.

This does not mean, however, that PRPs will be required to pay only their proportionate share based on volume of contribution of wastes to the site. At many sites, there will be wastes for which PRPs cannot be identified. If identified, PRPs may be unable to provide funds for cleanup. Private party funding for cleanup of those wastes would, therefore, not be available if volumetric contribution were the only criteria.

-9-

Therefore, to achieve the Agency's goal of obtaining 100 percent of cleanup or the cost of cleanup, it will be necessary in many cases to require a settlement contribution greater than the percentage of wastes contributed by each PRP to the site. These costs can be obtained through the application of the theory of joint and several liability where the harm is indivisible, and through application of these criteria in evaluating settlement proposals.

2.   Nature of the wastes contributed

The human, animal and environmental toxicity of the hazardous substances contributed by the PRPs, its mobility, persistence and other properties are important factors to consider.  As noted above, a small amount of wastes, or a highly mobile waste, may cost more to clean up, dispose, or treat than less toxic or relatively immobile wastes.  In addition, any disproportionate adverse effects on the environment by the presence of wastes contributed by those PRPs should be considered.

If a waste contributed by one or more of the parties offering a settlement disproportionately increases the costs of cleanup at the site, it may be appropriate for parties contributing such waste to bear a larger percentage of cleanup costs than would be the case by using solely a volumetric basis.

3.   Strength of evidence tracing the wastes at the site to the settling parties

The quality and quantity of the Government's evidence connecting PRPs to the wastes at the site obviously affects the settlement value of the Government's case.  The Government must show, by a preponderunce of the evidence, that the PRPs are connected with the wastes in one or more of the ways provided in Section 107 of CERCLA.  Therefore, if the Government's evidence against a particular PRP is weak, we should weigh that weakness in evaluating a settlement offer from that PRP.

On the other hand, where indivisible harm is shown to exist, under the theory of joint and several liability the Government is in a position to collect 100 % of the cost of cleanup from all parties who have contributed to a site. Therefore, where the quality and quantity of the Government's evidence appears to be strong for establishing the PRP's liability, the Government should rely on the strength of its evidence and not decrease the settlement value of its case. Discharging such PRPs from liability in a partial settlement without obtaining a substantial contribution may leave the Government with non-settling parties whose involvement at the site may be more tenuous.

In any evaluation of a settlement offer, the Agency should weigh the amount of information exchange that has occurred before the settlement offer. The more the Government knows about the evidence it has to connect the settling parties to the site, the better this evaluation will be. The information collection provisions of RCRA and/or CERCLA should be used to develop evidence prior to preparation of the evaluation.

4.   Ability of the settling parties to pay

Ability to pay is not a defense to an action by the Government. Nevertheless, the evaluation of a settlement proposal should discuss the financial condition of that party, and the practical results of pursuing a party for more than the Government can hope to actually recover. In cost recovery actions it will be difficult to negotiate a settlement for more than a party's assets. The Region should also consider allowing the party to reimburse the Fund in reasonable installments over a period of time, if the party is unable to pay in a lump sum, and install-ment payments would benefit the government. A structured settlement providing for payments over time should be at a payment level that takes into account the party's cash flow. An excessive amount could force a party into bankruptcy, which will of course make collection very difficult. See the memorandum dated August 26, 1983, entitled "Cost Recovery Actions under Section 107 of CERCLA" for additional guidance on this subject.

5.   Litigative risks in proceeding to trial

Litigative risks which might be encountered at trial and which should weigh in consideration of any settlement offer include traditional factors such as:

a.   Admissibility of the Government's evidence

If necessary Government evidence is unlikely to be admitted in a trial because of procedural or substantive problems in the acquisition or creation of the evidence, this infirmity should be considered as reducing the Government's chance of success and, therefore, reducing the amount the Government should expect to receive in a settlement.

b.   Adequacy of the Government's evidence

Certain aspects of this point have already been discussed above. However, it deserves mention again because the the government's case depends on substantial quantities of sampling, analytical and other technical data and expert testimony. If the evidence in support of the Government's case is incomplete or based upon controversial science, or if the Government's evidence is otherwise unlikely to withstand the scrutiny of a trial, the amount that the Government might expect to receive in a settlement will be reduced.

c.  Availability of defenses

   In the unlikely event that one or more of the settling parties
appears to have a defense to the Government's action under section
107(b) of CERCLA, the Government should expect to receive less in
a settlement from that PRP.  Availability of one or more defenses
to one PRP which are not common to all PRPs in the case should
not, however, lower the expectation of what an entire offering
group should pay.

6.  Public interest considerations

   The purpose of site cleanup is to protect public health
and the environment.  Therefore, in analyzing a settlement proposal
the timing of the cleanup and the ability of the Government to
clean up the site should be considered.  For example, if the State
cannot fund its portion of a Fund-financed cleanup, a private-party
cleanup proposal may be given more favorable consideration than
one received in a case where the State can fund its portion of
cleanup costs, if necessary.

   Public interest considerations also include the availability
of Federal funds for necessary cleanup, and whether privately
financed action can begin more quickly than Federally-financed
activity.  Public interest concerns may be used to justify
a settlement of less than 100% only when there is a demonstrated
need for a quick remedy to protect public health or the environment.

7.  Precedential value

   In some cases, the factual situation may be conducive to
establishing a favorable precedent for future Government actions.
For example, strong case law can be developed in cases of first
impression.  In addition, settlements in such cases tend to
become precedents in themselves, and are examined extensively by
PRPs in other cases.  Settlement of such cases should always be
on terms most favorable to the Government.  Where PRPs will not
settle on such terms, and the quality and quantity of evidence
is strong, it may be in the overall interest of the Government
to try the case.

8.  Value of obtaining a present sum certain

   If money can be obtained now and turned over to the Fund,
where it can earn interest until the time it is spent to clean
up a site, the net present value of obtaining the sum offered
in settlement now can be computed against the possibility of
obtaining a larger sum in the future.  This calculation may show
that the net present value of the sum offered in settlement is, in
reality, higher than the amount the Government can expect to obtain
at trial.  EPA has developed an economic model to assess these and
other related economic factors.  More information on this model
can be obtained from the Director, Office of Waste Programs Enforcement

9.  Inequities and aggravating factors

    All analyses of settlement proposals should flag for the
decision makers any apparent inequities to the settling parties
inherent in the Government's case, any apparent inequities to
others if the settlement proposal is accepted, and any aggravating
factors. However, it must be understood that the statute
operates on the underlying principle of strict liability, and
that equitable matters are not defenses.

10. Nature of the case that remains after settlement

    All settlement evaluations should address the nature of
the case that remains if the settlement is accepted. For
example, if there are no financially viable parties left to
proceed against for the balance of the cleanup after the
settlement, the settlement offer should constitute everything
the Government expects to obtain at that site. The questions
are:  What does the Government gain by settling this portion
of the case? Does the settlement or its terms harm the remaining
portion of the case? Will the Government have to expend the
same amount of resources to try the remaining portion of the
case?  If so, why should the settlement offer be accepted?

    This analysis is extremely important and should come at
the conclusion of the evaluation.

V. Partial Cleanups

    On occasion, PRPs may offer to perform or pay for one
phase of a site cleanup (such as a surface removal action) but
not commit to any other phase of the cleanup (such as ground
water treatment). In some circumstances, it may be appropriate
to enter into settlements for such partial cleanups, rather
than to resolve all issues in one settlement. For example, in
some cases it is necessary to conduct initial phases of site
cleanup in order to gather sufficient data to evaluate the
need for and type of work to be done on subsequent phases. In
such cases, offers from PRPs to conduct or pay for less than
all phases of site cleanup should be evaluated in the same
manner and by the same criteria as set forth above. Settlements
must be limited to the phase or phases of work actually to be
performed at the site. This provision does not cover preparation
of an RI/FS, which is covered by a separate guidance document:
Lee Thomas and Courtney Price's "Participation of Potentially
Responsible Parties in RI/FS Development" (March 20, 1984).

## VI. Contribution Protection

Contribution among responsible parties is based on the principle that a jointly and severally liable party who has paid all or a portion of a judgment or settlement may be entitled to reimbursement from other jointly or severally liable parties. When the Agency reaches a partial settlement with some parties, it will frequently pursue an enforcement action against non-settling responsible parties to recover the remaining costs of cleanup. If such an action is undertaken, there is a possibility that those non-settlors would in turn sue settling parties. If this action by nonsettling parties is successful, then the settling parties would end up paying a larger share of cleanup costs than was determined in the Agency's settlement. This is obviously a disincentive to settlement.

Contribution protection in a consent decree can prevent this outcome. In a contribution protection clause, the United States would agree to reduce its judgment against the non-settling parties, to the extent necessary to extinguish the settling party's liability to the nonsettling third party.

The Agency recognizes the value of contribution protection in limited situations in order to provide some measure of finality to settlements. Fundamentally, we believe that settling parties are protected from contribution actions as a matter of law, based on the Uniform Contribution Among Tortfeasors Act. That Act provides that, where settlements are entered into in "good faith", the settlors are discharged from "all liability for contribution to any other joint tortfeasors." To the extent that this law is adopted as the Federal rule of decision, there will be no need for specific clauses in consent agreements to provide contribution protection.

There has not yet been any ruling on the issue. Thus, the Agency may still be asked to provide contribution protection in the form of offsets and reductions in judgment. In determining whether explicit contribution protection clauses are appropriate, the Region should consider the following factors:

° Explicit contribution protection clauses are generally not appropriate unless liability can be clearly allocated, so that the risk of reapportionment by a judge in any future action would be minimal.

° Inclusion should depend on case-by-case consideration of the law which is likely to be applied.

° The Agency will be more willing to consider contribution protection in settlements that provide substantially all the costs of cleanup.

-14-

If a proposed settlement includes a contribution protection clause, the Region should prepare a detailed justification indicating why this clause is essential to attaining an adequate settlement.  The justification should include an assessment of the prospects of litigation regarding the clause.  Any proposed settlement that contains a contribution protection clause with a potential ambiguity will be returned for further negotiation.

Any subsequent claims by settling parties against non-settlors must be subordinated to Agency claims against these non-settling parties.  In no event will the Agency agree to defend on behalf of a settlor, or to provide direct indemnification.  The Government will not enter into any form of contribution protection agreement that could require the Government to pay money to anyone.

If litigation is commenced by non-settlors against settlors, and the Agency became involved in such litigation, the Government would argue to the court that in adjusting equities among responsible parties, positive consideration should be given to those who came forward voluntarily and were a part of a group of settling PRPs.

## VII. Releases from Liability

Potentially responsible parties who offer to wholly or partially clean up a site or pay the costs of cleanup normally wish to negotiate a release from liability or a covenant not to sue as a part of the consideration for that cleanup or payment.  Such releases are appropriate in some circumstances. The need for finality in settlements must be balanced against the need to insure that PRPs remain responsible for recurring endangerments and unknown conditions.

The Agency recognizes the current state of scientific uncertainty concerning the impacts of hazardous substances, our ability to detect them, and the effectiveness of remedies at hazardous waste sites.  It is possible that remedial measures will prove inadequate and lead to imminent and substantial endangerments, because of unknown conditions or because of failures in design, construction or effectiveness of the remedy.

Although the Agency approves all remedial actions for sites on the National Priorities List, releases from liability will not automatically be granted merely because the Agency has approved the remedy.  The willingness of the Agency to give expansive releases from liability is directly related to the confidence the Agency has that the remedy will ultimately prove effective and reliable.  In general, the Regions will have the flexibility to negotiate releases that are relatively expansive or relatively stringent, depending on the degree of confidence that the Agency has in the remedy.

Releases or covenants must also include certain reopeners which preserve the right of the Government to seek additional cleanup action and recover additional costs from responsible parties in a number of circumstances. They are also subject to a variety of other limitations. These reopener clauses and limitations are described below.

In addition, the Agency can address future problems at a site by enforcement of the decree or order, rather than by action under a particular reopener clause. Settlements will normally specify a particular type of remedial action to be undertaken. That remedial action will normally be selected to achieve a certain specified level of protection of public health and the environment. When settlements are incorporated into consent decrees or orders, the decrees or orders should wherever possible include performance standards that set out these specified levels of protection. Thus, the Agency will retain its ability to assure cleanup by taking action to enforce these decrees or orders when remedies fail to meet the specified standards.

It is not possible to specify a precise hierarchy of preferred remedies. The degree of confidence in a particular remedy must be determined on an individual basis, taking site-specific conditions into account. In general, however, the more effective and reliable the remedy, the more likely it is that the Agency can negotiate a more expansive release. For example, if a consent decree or order commits a private party to meeting and/or continuing to attain health based performance standards, there can be great certainty on the part of the Agency that an adequate level of public health protection will be met and maintained, as long as the terms of the agreement are met. In this type of case, it may be appropriate to negotiate a more expansive release than, for example, cases involving remedies that are solely technology-based.

Expansive releases may be more appropriate where the private party remedy is a demonstrated effective alternative to land disposal, such as incineration. Such releases are possible whether the hazardous material is transported offsite for treatment, or the treatment takes place on site. In either instance, the use of treatment can result in greater certainty that future problems will not occur.

Other remedies may be less appropriate for expansive releases, particularly if the consent order or agreement does not include performance standards. It may be appropriate in such circumstances to negotiate releases that become effective several years after completion of the remedial action, so that the effectiveness and reliability of the technology can be clearly demonstrated. The Agency anticipates that responsible parties may be able to achieve a greater degree of certainty in settlements when the state of scientific understanding concerning these technical issues has advanced.

Regardless of the relative expansiveness or stringency of the release in other respects, at a minimum settlement documents must include reopeners allowing the Government to modify terms and conditions of the agreement for the following types of circumstances:

°   where previously unknown or undetected conditions that arise or are discovered at the site after the time of the agreement may present an imminent and substantial endangerment to public health, welfare or the environment;

°   where the Agency receives additional information, which was not available at the time of the agreement, concerning the scientific determinations on which the settlement was premised (for example, health effects associated with levels of exposure, toxicity of hazardous substances, and the appropriateness of the remedial technologies for conditions at the site) and this additional information indicates that site conditions may present an imminent and substantial endangerment to the public health or welfare or the environment.

In addition, release clauses must not preclude the Government from recovering costs incurred in responding to the types of imminent and substantial endangerments identified above.

In extraordinary circumstances, it may be clear after application of the settlement criteria set out in section IV that it is in the public interest to agree to a more limited or more expansive release not subject to the conditions outlined above. Concurrence of the Assistant Administrators for OSWER and OECM (and the Assistant Attorney General when the release is given on behalf of the United States) must be obtained before the Government's negotiating team is authorized to negotiate regarding such a release or covenant.

The extent of releases should be the same, whether the private parties conduct the cleanup themselves or pay for Federal Government cleanup. When responsible parties pay for Federal Government cleanup, the release will ordinarily not become effective until cleanup is completed and the actual costs of the cleanup are ascertained. Responsible parties will thereby bear the risk of uncertainties arising during execution of the cleanup. In limited circumstances, the release may become effective upon payment for Federal Government cleanup, if the payment includes a carefully calculated premium or other financial instrument that adequately insures the Federal government against these uncertainties. Finally, the Agency may be more willing to settle for less than the total costs of cleanup when it is not precluded by a release clause from eventually recovering any additional costs that might ultimately be incurred at a site.

Release clauses are also subject to the following limitations:

° A release or covenant may be given only to the PRP providing the consideration for the release.

° The release or covenant must not cover any claims other than those involved in the case.

° The release must not address any criminal matter.

° Releases for partial cleanups that do not extend to the entire site must be limited to the work actually completed.

° Federal claims for natural resource damages should not be released without the approval of Federal trustees.

° Responsible parties must release any related claims against the United States, including the Hazardous Substances Response Fund.

° Where the cleanup is to be performed by the PRPs, the release or covenant should normally become effective only upon the completion of the cleanup (or phase of cleanup) in a manner satisfactory to EPA.

° Release clauses should be drafted as covenants not to sue, rather than releases from liability, where this form may be necessary to protect the legal rights of the Federal Government.

A release or covenant not to sue terminates or seriously impairs the Government's rights of action against PRPs. Therefore, the document should be carefully worded so that the intent of the parties and extent of the matters covered by the release or covenant are clearly stated. Any proposed settlement containing a release with a possible ambiguity will be returned for further negotiation.

VIII. Targets for Litigation

The Regions should identify particular cases for referral in light of the following factors:

- substantial environmental problems exist;

- the Agency's case has legal merit;

- the amount of money or cleanup involved is significant;

- good legal precedent is possible (cases should be rejected where the potential for adverse precedent is substantial);

- the evidence is strong, well developed, or capable of development;

- statute of limitations problems exist;

- responsible parties are financially viable.

The goal of the Agency is to bring enforcement action wherever needed to assure private party cleanup or to recover costs. The following types of cases are the highest priorities for referrals:

- 107 actions in which all costs have been incurred;

- combined 106/107 actions in which a significant phase has been completed, additional injunctive relief is needed and identified, and the Fund will not be used;

- 106 actions which will not be the subject of Fund-financed cleanup.

Referrals for injunctive relief may also be appropriate in cases when it is possible that Fund-financed cleanup will be undertaken. Such referrals may be needed where there are potential statute of limitation concerns, or where the site has been identified as enforcement-lead, and prospects for successful litigation are good.

Regional offices should periodically reevaluate current targets for referral to determine if they meet the guidelines identified above.

As indicated before, under the theory of joint and several liability the Government is not required to bring enforcement action against all of the potentially responsible parties involved at a site. The primary concern of the Government in identifying targets for litigation is to bring a meritorious case against responsible parties who have the ability to undertake or pay for response action. The Government will determine the targets of litigation in order to reach the largest manageable number of parties, based on toxicity and volume, and financial viability. Owners and operators will generally be the target of litigation, unless bankrupt or otherwise judgment proof. In appropriate cases, the Government will consider prosecuting claims in bankruptcy. The Government may also select targets for litigation for limited purposes, such as site access.

Parties who are targeted for litigation are of course not precluded from involving parties who have not been targeted in developing settlement offers for consideration by the Government.

In determining the appropriate targets for litigation, the Government will consider the willingness of parties to settle, as demonstrated in the negotiation stage. In identifying a manageable number of parties for litigation, the Agency will consider the recalcitrance or willingness to settle of the parties who were involved in the negotiations. The Agency will also consider other aggravating and mitigating factors concerning responsible party actions in identifying targets for litigation.

In addition, it may be appropriate, when the Agency is
conducting phased cleanup and has reached a settlement for one
phase, to first sue only non-settling companies for the next
phase, assuming that such financially viable parties are available.
This approach would not preclude suit against settling parties,
but non-settlors would be sued initially.

The Agency recognizes that Federal agencies may be responsible
for cleanup costs at hazardous waste sites.  Accordingly, Federal
facilities will be issued notice letters and administrative orders
where appropriate.  Instead of litigation, the Agency will use
the procedures established by Executive Orders 12088 and 12146
and all applicable Memoranda of Understanding to resolve issues
concerning such agency's liability.  The Agency will take all
steps necessary to encourage successful negotiations.

IX. Timing of Negotiations

Under our revised policy on responsible party participation
in RI/FS, PRPs have increased opportunities for involvement in
the development of the remedial investigations and feasibility
studies which the Agency uses to identify the appropriate remedy.
In light of the fact that PRPs will have received notice
letters and the information identified in section III of this
policy, prelitigation negotiations can be conducted in an
expeditious fashion.

The Negotiations Decision Document (NDD), which follows
completion of the RI/FS, makes the preliminary identification of
the appropriate remedy for the site.  Prelitigation negotiations
between the Government and the PRPs should normally not extend
for more than 60 days after approval of the NDD.  If significant
progress is not made within a reasonable amount of time, the
Agency will not hesitate to abandon negotiations and proceed
immediately with administrative action or litigation.  It should
be noted that these steps do not preclude further negotiations.

Extensions can be considered in complex cases where there is
no threat of seriously delaying cleanup action.  Any extension of
this period must be predicated on having a good faith offer from
the PRPs which, if successfully negotiated, will save the Government
substantial time and resources in attaining the cleanup objectives.

X. Management and Review of Settlement Negotiations

All settlement documents must receive concurrence from OWPE
and OECM-Waste, and be approved by the Assistant Administrator
of OECM in accordance with delegations.  The management guideline
discussed in Section II allows the Regions to commence negotiations
if responsible parties make an initial offer for a substantial
proportion of the cleanup costs.  Before commencing negotiations
for partial settlements, the Regions should prepare a preliminary
draft evaluation of the case using the settlement criteria in
section IV of this policy.  A copy of this evaluation should
be forwarded to Headquarters.

A final detailed evaluation of settlements is required when the Regions request Headquarters approval of these settlements. This written evaluation should be submitted to OECM-Waste and OWPE by the legal and technical personnel on the case. These will normally be the Regional attorney and technical representative.

The evaluation memorandum should indicate whether the settlement is for 100% of the work or cleanup costs. If this figure is less than 100%, the memorandum should include a discussion of the advantages and disadvantages of the proposed settlement as measured by the criteria in section IV. The Agency expects full evaluations of each of the criteria specified in the policy and will return inadequate evaluations.

The Regions are authorized to conclude settlements in certain types of hazardous waste cases on their own, without prior review by Headquarters or DOJ. Cases selected for this treatment would normally have lower priority for litigation. Categories of cases not subject to Headquarters review include negotiation for cost recovery cases under $200,000, and negotiation of claims filed in bankruptcy. In cost recovery cases, the Regions should pay particular attention to weighing the resources necessary to conduct negotiations and litigation against the amounts that may be recovered, and the prospects for recovery.

Authority to appear and try cases before the Bankruptcy Court would not be delegated to the Regions, but would be retained by the Department of Justice. The Department will file cases where an acceptable negotiated settlement cannot be reached. Copies of settlement documents for such agreements should be provided to OWPE and OECM.

Specific details concerning these authorizations will be addressed in delegations that will be forwarded to the Regions under separate cover. Headquarters is conducting an evaluation of the effectiveness of existing delegations, and is assessing the possibility of additional delegations.

Note on Purpose and Uses of this Memorandum

The policies and procedures set forth here, and internal Government procedures adopted to implement these policies, are intended as guidance to Agency and other Government employees. They do not constitute rulemaking by the Agency, and may not be relied on to create a substantive or procedural right or benefit enforceable by any other person. The Government may take action that is at variance with the policies and procedures in this memorandum.

If you have any questions or comments on this policy, or problems that need to be addressed in further guidance to implement this policy, please contact Gene A. Lucero, Director of the Office of Waste Programs Enforcement, (FTS 382-4814), or Richard Mays, Senior Enforcement Counsel, (FTS 382-4137).

# Exhibit 91

# EXHIBIT A-50

**Appendix A to** OxyChem's Comments in Opposition to Proposed Consent Decree,
*United States v. Alden Leeds, Inc., et al.*, Civil Action No. 2:22-cv-07326 (D.N.J.)

ALCD-PUBCOM_0006230

00509

```
 1  THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
 2    IN AND FOR THE COUNTY OF SAN FRANCISCO
 3  ----------------------------------
 4  SAFETY-KLEEN ENVIROSYSTEMS      )
 5  COMPANY, a corporation,        )
 6                                 )
 7       Plaintiffs,        )
 8                         ) CASE NO.
 9  V.                     ) 985528
10                         )
11  CONTINENTAL CASUALTY COMPANY,    )
12  et al.,                )
13       Defendants.       )
14  ----------------------------------)
15
16       DEPOSITION OF RAYMOND GILLIAM
17        THURSDAY, JUNE 17, 1999
18        PAGES 509 - 606; VOLUME 3
19
20
21       BEHMKE REPORTING & VIDEO SERVICES
22       BY:  MICHELLE DIPIERRO-FAIREY, CSR
23            1320 ADOBE DRIVE
24        PACIFICA, CALIFORNIA  94044
25              (650) 359-3201
```

00510

```
 1
 2
 3
 4
 5
 6
 7
 8  Continuing Videotaped Deposition of RAYMOND
 9  GILLIAM, taken on behalf of defendant at THE
10  HYATT REGENCY, 2 Albany Road, New Brunswick,
11  New Jersey, commencing at 9:00 a.m., Thursday,
12  June 17, 1999, before MICHELLE DIPIERRO-FAIREY,
13  Certified Shorthand Reporter No. XI01746
14  pursuant to Notice.
15
16
17
18
19
20
21
22
23
24
25
```

00511

Exhibit
LegacyVulcan_

MKSK-FED-0000003521

ALCD-PUBCOM_0006231

1 APPEARANCES OF COUNSEL:
2 FOR PLAINTIFF, SAFETY-KLEEN ENVIROSYSTEMS
3 COMPANY:
4    BROBECK, PHLEGER & HARRISON, ESQS.
5    BY: TRACY S. RYNIEC, ATTORNEY AT LAW
6    Spear Street Tower
7    One Market Plaza
8    San Francisco, California 94105
9    Telephone: (415) 442-0900
10 FOR THE DEFENDANT LONDON MARKET INSURERS AND
11 UNITED STATES LIABILITY INSURANCE COMPANY:
12    HANCOCK, ROTHERT & BUNSHOFT, ESQS.
13    BY: MARY ANDERSON, ATTORNEY AT LAW
14    515 S. Figueroa Street, 17th Floor
15    Los Angeles, California 90071
16    Telephone: (213) 623-7777
17 FOR THE DEFENDANT ALLSTATE INSURANCE COMPANY
18 AS SUCCESSOR TO NORTHBROOK EXCESS AND SURPLUS
19 LINES INSURANCE COMPANY:
20    LILLICK & CHARLES, LLP
21    BY: BETH L. APPELBAUM, ATTORNEY AT LAW
22    Two Embarcadero Center
23    San Francisco, California 94111
24    Telephone: (415) 984-8200
25
00512
1 APPEARANCES OF COUNSEL - CONTINUED
2 FOR THE DEFENDANT FIRST STATE INSURANCE
3 COMPANY, NEW ENGLAND REINSURANCE CORPORATION
4 AND HARTFORD ACCIDENT AND INDEMNITY:
5    LILLICK & CHARLES, LLP
6    BY: HELEN S. HAYNES, ATTORNEY AT LAW
7    Two Embarcadero Center
8    San Francisco, California 94111
9    Telephone  (415) 984-8200
10
11 FOR THE DEFENDANT CONTINENTAL CASUALTY
12 COMPANY:
13    OLSON, CORTNER & MC NABOE, ESQS.
14    BY: W. HEATHER SOURIAL, ATTORNEY AT LAW
15    Three Embarcadero Center
16    San Francisco, California 94111
17    Telephone: (415) 733-6000
18
19
20
21
22
23
24
25
00513
1          I N D E X
2 Thursday, June 17, 1999

MKSK-FED-0000003522

ALCD-PUBCOM_0006232

3 RAYMOND GILLIAM, VOLUME 3                                    Page
4    Examination by Ms. Haynes        516
5    Examination by Ms. Appelbaum        569
6    Examination by Ms. Sourial    581
7    Examination by Ms. Anderson        585
8
9
10            EXHIBITS
11 Number        Description        Page
12 No exhibits marked.
13
14
15
16
17
18
19
20
21
22
23
24
25
00514
1        VIDEOGRAPHER:  Here begins videotape
2    number eight in the deposition of Raymond
3    Gilliam in the matter of Safety-Kleen
4    Envirosystems Company versus Continental
5    Casualty Company, et al, in the Superior
6    Court of the State of California, County
7    of San Francisco, case number 985528.
8        Today's date is June 17, 1999.  The
9    time on the video monitor is 8:44.  The
10    video operator today is Eric Lenz,
11    contracted by Bemhke Reporting and Video
12    Services, 1320 Adobe Drive, Pacifica,
13    California.
14        This video deposition is taking place
15    at Two Albany Street, New Brunswick, New
16    Jersey, and was noticed by Molly Anderson,
17    Attorney at Law of Hancock, Rothert and
18    Bunshoft.
19        Counsel, please voice identify
20    yourself and state whom you represent.
21        MS. HAYNES:  Helen Haynes with the law
22    firm of Lillick and Charles, in San
23    Francisco, California, and I represent
24    defendants Hartford Accident and Indemnity
25    Company, First State Insurance Company and
00515
1    New England Reinsurance Corporation.
2        MS. RYNIEC:  Tracey Ryniec, Brobeck,
3    Phleger and Harrison in San Francisco,
4    representing McKesson Corporation on

MKSK-FED-0000003523

ALCD-PUBCOM_0006233

5    behalf of Safety-Kleen Envirosystems
6    Company and Mr. Gilliam for the purposes
7    of this deposition.
8        VIDEOGRAPHER:  The Court Reporter
9    today is Michelle Fairey, Certified
10   Shorthand Reporter contracted by Behmke
11   Reporting and Video Services.
12       Would all others present please state
13   your name for the record?
14       MS. SOURIAL:  Heather Sourial on
15   behalf of Continental Insurance Company,
16   Continental Casualty Company and Hartford
17   Insurance Company.
18       MS. HAYNES:  Can we break for a
19   moment?
20       VIDEOGRAPHER:  Yes. We will go off the
21   record at 8:45.  We're off the record.
22       (At this time there is a discussion
23   off the record.)
24       VIDEOGRAPHER:  We are back on the
25   record at 8:49.
00516
1        MS. APPELBAUM:  Good morning, Mr.
2    Gilliam.  My name is Beth Appelbaum, and
3    I'm from the law firm of Lillick and
4    Charles and I'm here today representing
5    Allstate as successor in interest to
6    Northbrook Insurance Company, and I'm here
7    for Marcie Keenan who is the same woman
8    who deposed you the last time you were
9    with us.
10       MS. ANDERSON:  Good morning, Mr.
11   Gilliam.  I'm Molly Anderson from the law
12   firm of Hancock, Rothert and Bunshoft
13   representing London Market Insurers and
14   the U. S. Liability Insurance Company, and
15   I'm here following for Yvette Roland who
16   was present at the earlier phase of your
17   record.
18       VIDEOGRAPHER:  Would the reporter
19   please swear the witness.
20       R A Y M O N D   G I L L I A M
21   called as a witness, having been duly
22   sworn, testified as follows:
23  EXAMINATION BY MS. HAYNES:
24       VIDEOGRAPHER:  Please begin.
25   Q.  Good morning, Mr. Gilliam.  As I said
00517
1  before the deposition began today, I'm going
2  to be continuing the follow-up questioning
3  that Louise McCabe began on day two of your
4  deposition, which, according to my copy of the
5  transcript, was on April 7, 1999.
6    During your testimony, you spoke at some

MKSK-FED-0000003524

ALCD-PUBCOM_0006234

7 length with respect to various events at the
8 Newark, New Jersey site. We're going to
9 continue to refer to 600 Doremus Avenue,
10 Newark, New Jersey that particular facility as
11 the Newark site. Can we have -- share that
12 understanding?
13    A. Sure.
14    Q. Okay. Great. And you were asked a
15 number of questions regarding events during
16 Kolker's ownership and Vulcan's ownership and
17 then Inland's ownership, you remember those
18 types of questions?
19    A. Yes.
20    Q. So you were employed at the Newark
21 facility through the transition from Kolker to
22 Vulcan. Correct?
23    A. That's correct.
24    Q. And the same with respect to Vulcan
25 transition over to Inland?
00518
1    A. That's right.
2    Q. Okay. I want to ask you to think back
3 during the transition time period between
4 Kolker and Vulcan, and ask you if you recall
5 whether Vulcan personnel came to the site at
6 Newark to inspect it prior to buying the site
7 from Kolker?
8    A. Yes, they did.
9    Q. Okay. Were you there when Vulcan
10 personnel came to inspect the site?
11    A. Yes, part -- at least part of the
12 time.
13    Q. Okay. Were you part of a group of
14 Kolker personnel helping tour Vulcan personnel
15 around the facility?
16    A. No.
17    Q. Do you know who at Kolker conducted
18 such a tour, if any?
19    A. I believe it would have been Lee
20 Kolker or Charles Kolker.
21    Q. Do you have a recollection as to who
22 it was at Vulcan who came to visit the Newark
23 facility with regard to inspecting the site
24 before the purchase?
25    A. I believe one of the people was Irv
00519
1 Jordan, I-r-v, I don't know how -- that's an
2 abbreviation, for what I'm not sure, Jordan
3 J-o-r -- J-o-r-d-a-n.
4    Q. And he was with Vulcan?
5    A. He was Vulcan. Right.
6    Q. Do you know what his title was?
7    A. He was a process engineer, I believe
8 -- with Vulcan. They called it Frontier

MKSK-FED-0000003525

ALCD-PUBCOM_0006235

9    Chemical Company at the time.
10    Q.  The Kolker company was called Frontier
11    Chemical at the time?
12    A.  No.  No.  Vulcan had a division called
13    Frontier Chemical.
14    Q.  And it was the Frontier Chemical
15    division that was coming --
16    A.  Of Vulcan.
17    Q.  That was coming to the Newark site to
18    purchase -- okay.
19    A.  Right.
20    Q.  So Mr. Jordan was a process engineer
21    for Frontier Chemical?
22    A.  Right.
23    Q.  Anyone else that you recall either
24    with Vulcan or with Frontier, the subsidiary
25    of Vulcan, who came to the Newark site to
00520
1    inspect it?
2    A.  I'm not sure.  I don't know.
3    Q.  Do you know what Mr. Jordan did at
4    the Newark site as part of his inspection?
5    A.  No.  I don't.  I don't know.
6    Q.  Who do you think would be the person
7    most knowledgeable about Vulcan's inspection
8    of the Newark site or Frontier Chemical's
9    inspection of the site prior to purchase?
10    A.  Well, possibly Irv Jordan's boss was
11    Elbert DeForest.
12    Q.  Elbert?
13    A.  Yes.  E-l-b-e-r-t, D-e-f-o-r-e-s-t.
14    That's a capital F.  Yes.
15    Q.  What was Mr. DeForest's title?
16    A.  He was in charge of research and
17    development.  I don't know the exact title.
18    Might have been a vice president, but I'm not
19    sure.
20    Q.  Do you know what Mr. Jordon was
21    looking at?
22    A.  No, I don't know.
23    Q.  Okay. Do you know how long his
24    inspection of the facility lasted?
25    A.  No, I don't.
00521
1    Q.  Do you know if he made more than one
2    visit to the site?
3    A.  I'm not sure.
4    Q.  And I have the same questions with
5    respect to Inland's purchase of the Newark
6    facility from Vulcan in approximately 1974 --
7    A.  Uh-huh.
8    Q.  -- time frame.  You were working at
9    the facility during the period of time when
10    Inland purchased the Newark site from Vulcan?

MKSK-FED-0000003526

ALCD-PUBCOM_0006236

11    A.  That's correct.
12    Q.  And do you recall if anyone from
13  Inland came to the Newark site to inspect it
14  prior to its purchase from Vulcan?
15    A.  Yes.
16    Q.  Were you part of the inspection
17  process?
18    A.  I don't think so.  I don't recall.
19    Q.  Do you recall who from Inland came to
20  the facility to inspect it prior to purchase?
21    A.  Somebody named Mel Arnold, I believe
22  was involved.
23    Q.  Any other names of folks at Inland
24  that you can recall who had visited the site?
25    A.  The research man, John -- I can't
00522
1  think of his last name right now.
2    Q.  Berger?
3    A.  That's the name, yes.
4    Q.  Do you know, did Mr. Arnold and Mr.
5  Berger visit the site together?
6    A.  I'm not sure, but I remember seeing
7  both of them there.  But I don't think --
8  possibly at different times, possibly the same
9  time.  I'm not sure.
10    Q.  Do you recall anyone else from Inland
11  who might have visited the site prior to its
12  purchase?
13    A.  I know I had met a Mr. Stincker, (sic)
14  but I don't know whether he -- he was the
15  president of Inland -- or the major
16  stockholder, I believe, but I don't know
17  whether he was -- at what time he was there,
18  whether it was afterwards or before they
19  purchased it.
20    Q.  So you met Mr. Skincker, Tom Skincker?
21    A.  That's right.
22    Q.  President of the Inland at the time
23  and you're not sure if at the time that you
24  met him related to a site visit for purchase
25  of the site, or some other reason?
00523
1    A.  No, I don't know.
2    Q.  Do you know how long, number of days
3  or number of hours that Inland folks spent at
4  the Newark facility inspecting it prior to its
5  purchase?
6    A.  I couldn't tell you.  No, I don't
7  know.
8    Q.  Do you know the details of any of the
9  activities that either Mr. Arnold or Mr.
10  Berger conducted in terms of their inspection
11  of the site prior to purchase?
12    A.  I don't know what they did, no.

MKSK-FED-0000003527

ALCD-PUBCOM_0006237

13    Q. And who do you think would be the
14 person most knowledgeable about Inland's
15 inspection of the Newark facility prior to its
16 purchase?
17    A. Well, I believe Mr. Berger would have
18 been most knowledgeable about the facilities
19 themselves. Mr. Arnold probably with the
20 financing.
21    Q. Do you know if when Mr. Berger came to
22 the site, did he have anyone with him to
23 assist him?
24    A. I don't recall.
25    Q. Okay. I apologize if this was asked of
00524
 1 you before, but did you keep written records
 2 or documents in an office at the Newark
 3 facility?
 4    A. I can't recall but I must have. I
 5 don't -- I don't remember specific documents.
 6    Q. Okay. You did have an office at the
 7 Newark facility, didn't you?
 8    A. Yes.
 9    Q. And did you have file cabinets?
10    A. Yes.
11    Q. And would you likely have, if you kept
12 any records you would have kept records in
13 those file cabinets?
14    A. Yes.
15    Q. And you left the Newark facility and
16 Inland's employ at approximately the end of
17 1976. Is that correct? Or beginning of 1977?
18    A. I believe that's correct.
19    Q. When you left the Newark facility and
20 Inland's employ, did you take any documents
21 with you?
22    A. I don't think so -- I may have had --
23 I possibly had some things that I had worked
24 on but...
25    Q. Okay.
00525
 1    A. I -- I don't have them anymore.
 2 They're not in my possession anymore.
 3    Q. Do you believe the majority of records
 4 that you had stayed at the site at Newark
 5 after you left?
 6    A. I would think so.
 7    Q. Do you know what would have been done
 8 with them when you left the site?
 9    A. No.
10    Q. Do you know who took over your
11 position when you left in 1976, '77?
12    A. No.
13    Q. Did you ever work with an employee at
14 the Newark site by the name of Vincent

MKSK-FED-0000003528

ALCD-PUBCOM_0006238

15 Bruzgis?
16    A. Yes.
17    Q. Was that during the Kolker years or
18 Vulcan years, Inland years or more?
19    A. I believe he was there during all
20 periods.
21    Q. Did he report, did he -- I'm sorry.
22 Go ahead.
23    A. I believe he was there during all the
24 periods. I'm sorry.
25    Q. Did he report to you?
00526
1    A. No.
2    Q. And what about Bernie Partington or
3 Bernard Partington. Do you recall an --
4    A. Yes.
5    Q. -- employee by that name?
6    A. Yes.
7    Q. Did he work with you during the
8 Kolker, Vulcan and/or Inland years?
9    A. I believe so, yes.
10    Q. All three you think?
11    A. I believe, I think so.
12    Q. Did Mr. Partington report to you?
13    A. No.
14    Q. Do you remember who Mr. Partington
15 reported to?
16    A. In the later years, I believe, he
17 reported to Mr. Marini.
18    Q. Mr. Marini, Uli Marini?
19    A. Uli Marini, right.
20    Q. That was during the time that Mr.
21 Marini was plant manager?
22    A. That's correct.
23    Q. Was that during Inland's years?
24    A. That's right.
25    Q. Did you have any reason to believe
00527
1 either Mr. Bruzgis or Mr. Partington was
2 anything other than honest and hard working
3 employees at the company?
4    A. I would say that's correct.
5    Q. Do you have any personal knowledge of
6 either Mr. Bruzgis or Mr. Partington ever
7 being disciplined or reprimanded for anything
8 related to their work at the facility?
9    A. I can't recall.
10    Q. But in any event, they didn't report
11 to you. Is that correct?
12    A. I don't remember any time period that
13 they did. At one time they were, each of them
14 were shop stewards at one time in the union,
15 and they might have had some major
16 disagreements with management at times, but

MKSK-FED-0000003529

ALCD-PUBCOM_0006239

17    that's all I could say.
18      Q.  As part of their general duties as a
19    union steward?
20      A.  I would say that's right.
21      Q.  That's kind of the nature of the job,
22    is it?
23      A.  Right.
24      Q.  Okay.  Do you recollect how material
25    was removed from tanks at the facility, at the
00528
1    Newark facility?
2      A.  If it was in tanks, products would be
3    pumped into tank trucks or railroad cars and
4    shipped out in large quantities usually.
5      Q.  Okay.
6      A.  On occasion it would be -- it would
7    fill 55-gallon drums and ship them out in
8    55-gallon drums.
9      Q.  The pumping the products to railroad
10    cars or tank trucks or into 55-gallon drums,
11    those three methods, were those methods
12    applicable during the years of Kolker, Vulcan
13    and Inland?
14      A.  I think so.  Yes.
15      Q.  The pump that was used to pump
16    products out of the tank, was the pump within
17    the containment area around the tanks?
18      A.  Generally I don't think -- in most
19    cases -- in the earlier days there were no
20    containment areas at all.  And...
21      Q.  Well, when you say in the early days,
22    can you give me a time frame?
23      A.  Under -- I'd say under the Kolkers.
24      Q.  And the Kolker years were early '50s
25    to approximately 1961?
00529
1      A.  That's correct.
2      Q.  Do you know when the containment areas
3    were installed at the site?
4      A.  They were very gradually installed, I
5    believe.  I couldn't say exactly when.  Then I
6    got to go back a little bit.  There were
7    containment areas, some containment areas
8    under the Kolker days.  I'm wrong about that.
9      We had a Tank Farm One and a Tank Farm
10    Number Two at the time, I believe, and it did
11    have at least brick or cinder block walls
12    around them.  How -- whether ther were
13    impervious or not, I don't know.
14      Q.  Okay.  With the -- during the Kolker
15    years, were there just the two tank farms,
16    Tank Farm One and Tank Farm Two?
17      A.  I think that's correct.
18      Q.  Okay.  They had a containment -- a

MKSK-FED-0000003530

ALCD-PUBCOM_0006240

19 containment area with cinder block walls
20 around --
21    A. Cinder block or brick walls, I
22 couldn't say for sure. They could have been
23 cement blocks, also. I don't remember what
24 they were.
25    Q. What about the flooring, the bottom of
00530
1 the containment area, was that concrete or
2 cement?
3    A. It would have been concrete, it was --
4 because the tanks were heavy. It was built on
5 piles and poured concrete on top of that.
6    Q. Were there, these two tank farms that
7 we're talking about, Tank Farm One and Tank
8 Farm Two in the Kolker years, were there
9 drains in the floor of the containment area,
10 do you know?
11    A. I don't know of any drains.
12    Q. Okay.
13    A. I don't believe so.
14    Q. Were the containment areas around Tank
15 Farm One and Tank Farm Two, in the Kolker
16 years, the purpose of the containment areas
17 was to contain any spills or leaks that might
18 occur out of the tanks. Is that correct?
19    A. I think so.
20    Q. Do you recall if you had any role in
21 installing those containment areas?
22    A. Oh, no, I did not.
23    Q. And can you refresh my recollection,
24 when did you first arrive at the Newark
25 facility?
00531
1    A. In 1952. November of 1952.
2    Q. So those containment areas were
3 already at the Newark facility around Tank
4 Farm One and Two when you arrived in November
5 '52?
6    A. I don't believe there were any tanks
7 there at the time.
8    Q. There were no tanks in 1952?
9    A. That's correct.
10    Q. When you arrived?
11    A. If I remember correctly there were no
12 tanks, and whether the -- and I -- I don't
13 remember about the tank farm walls either at
14 the time.
15    Q. But at some point -- at some point in
16 time during Kolker's operations they built
17 Tank Farms One and Two with containment areas
18 around them?
19    A. That's correct.
20    Q. During -- during Vulcan's years at the

MKSK-FED-0000003531

ALCD-PUBCOM_0006241

21 Newark facility were additional tanks added at
22 the site?
23    A. Yes.
24    Q. All right. When I say tanks, I'm
25 including tank farms.
00532
1    A. Yes. I think so.
2    Q. Were the -- do you recall, did those
3 tanks and tank farms have containment areas
4 around them?
5    A. I believe most of them did.
6    Q. Of a similar construction, concrete or
7 cement floor with cinder block or cement block
8 walls?
9    A. Or brick. Some were brick. I'm sure
10 I remember some brick walls.
11    Q. Some brick walls, okay.  And again
12 the same purpose around the Vulcan tanks, the
13 tank farms that were added with the
14 containment areas, the purpose being to
15 contain any spills or leaks from the tanks
16 within.  Correct?
17    A. I believe so.
18    Q. Do you have any specific recollection
19 of any tanks at the Newark facility that did
20 not have containment area around them?
21    A. Yes.
22    Q. And what tank would that be?
23    A. There were numerous tanks, and I
24 can't -- I do remember some.  I believe it was
25 what -- they called it, Tank Farm Number Five
00533
1 and it was an area along a fence next to the
2 3M property, Minnesota Mining and
3 Manufacturing property, I believe that tank
4 farm had no walls around it.  And in the
5 methylene chloride production area, we had
6 several tanks that we called run-down tanks.
7 The product from distillation was run into
8 them from the distillation towers, fill those
9 tanks during production, and when the tanks
10 were full and approved by the laboratory, they
11 might -- they were pumped out into the tanks
12 inside the tank farm.
13    Q. And the first tanks that you were
14 talking about were Tank Farm Five?
15    A. Yes.
16    Q. You said they were in an area along
17 the fence?
18    A. Yes.
19    Q. And you said that they had no -- they
20 had walls?
21    A. That's correct.
22    Q. Did -- was Tank Farm Number Five,

MKSK-FED-0000003532

ALCD-PUBCOM_0006242

23 though, on a concrete pad?
24     A.  Yes, it was.
25     Q.  So it had a concrete flooring but it
00534
1 didn't have the walls at the side?
2     A.  I'm almost positive there was no wall
3 around it, yeah.
4     Q.  Okay.  Do you recall seeing any leaks
5 or spills of any material or product directly
6 onto the ground in Tank Farm Number Five?
7     A.  No, I can't recall.
8     Q.  And the same question with respect to
9 the run-down tanks?
10     A.  Yes.
11     Q.  You do recall seeing product directly
12 on the ground, spill or leaked directly on the
13 ground in the run-down tank area, or no?
14     A.  There would -- I can recall on at
15 least one occasion that the tanks had
16 overflowed.
17     Q.  Okay.  Why don't you tell me about what
18 you can recall about this one occasion?
19     A.  I don't remember anymore than a tank
20 running over in that area, and when it was
21 found running over, it was shut down, and the
22 product was stopped going into it, and some of
23 it was pumped out to another location.  But I
24 don't remember anymore details.
25     Q.  Was it, do you know if it was shut
00535
1 down immediately after it was found to be
2 overflowing?
3     A.  That's correct.
4     Q.  And do you have any idea how long it
5 had been overflowing before it was stopped?
6     A.  No.  I don't know.
7     Q.  Any idea how much product was
8 released?
9     A.  No.  I don't know.
10     Q.  Do you recall, did you see -- did the
11 overflow make direct contact with the ground
12 or did it hit cement underneath the tanks?
13     A.  I think it hit cement first and then
14 on the ground.  I don't recall exactly.
15     Q.  So you don't recall exactly whether or
16 not product, after it hit the cement
17 overflowed to the direct ground, the direct
18 soil?
19     A.  I don't know.  It probably -- it most
20 likely did, but I can't recall the details.
21     Q.  So, as you sit here today, you don't
22 have a specific recollection of seeing
23 material hit the soil in that tank area for
24 that overflow incident?

MKSK-FED-0000003533

ALCD-PUBCOM_0006243

25    A.  No.  I don't know the details.
00536
1    Q.  Okay.  Going back, I'd started the
2  line of questioning asking you about your
3  testimony that product got to the tanks at the
4  Newark facility by being pumped from railroad
5  trucks -- railroad cars --
6    A.  Uh-huh.
7    Q.  -- tank trucks or 55-gallon drums?
8    A.  We're talking about products leaving
9  the company?
10    Q.  Is that -- was that a correct
11  statement for product coming into the facility
12  or leaving the facility?
13    A.  It was for leaving.
14    Q.  Okay.  And what -- what I was asking
15  is with respect to those three methods of
16  product leaving, was the pump and the pumping
17  process conducted within containment areas
18  near the tanks?
19    A.  I'd say generally, yes, although more
20  likely -- under the Kolker years it probably
21  was less likely.
22    Q.  And why would it be less likely during
23  the Kolker years?
24    A.  'Cuz some products were filled into
25  drums directly out of what we call run-down
00537
1  tanks which had no walls around them.
2    Q.  Do you have any specific recollection
3  of seeing material ever spill or leak and make
4  direct contact with the soil --
5    A.  No, I can't recall, no.
6    Q.  -- when pumped from the run-down tanks
7  to the drums?
8    A.  No.  I can't recall.
9    Q.  And how about when material or product
10  were put into the tanks, was it the same three
11  methods of arrival; the railroad car, the tank
12  truck and drums?
13    A.  I would say the trucks or railroad
14  cars but generally speaking, I don't think we
15  purchased any products in drums or if we did
16  it was very little.
17    Q.  Is that the same with respect to the
18  Kolker, Vulcan and Inland?
19    A.  I would say that's right.
20    Q.  Did it ever change over time?  Did any
21  one of those three entities use product in
22  55-gallon drums more often than in others?
23    A.  I would believe -- I think under the
24  Kolkers there were more drums being handled
25  than under Vulcan or Inland.
00538

MKSK-FED-0000003534

ALCD-PUBCOM_0006244

1    Q.  Okay.  And the pumping of the product
2  from the railroad cars and the tank trucks
3  into the tanks, would the same be true that
4  the pumping generally took place within the
5  containment areas around the tanks?
6    A.  Well, railroad cars were never --
7  there would never be a containment area around
8  the railroad cars, if it was pumped out of a
9  railroad cars.
10    Q.  Right.  Let me say then the hose
11  connection to the tank, where the hose from
12  the railroad car into the tank, that
13  connection is in a containment area, isn't it?
14    A.  It would not be in a containment area.
15  I can't recall it being in a containment area.
16    Q.  Okay.  Do you recall any spills or
17  leaks associated with pumping product from a
18  railroad car into a tank?
19    A.  I don't recall.
20    Q.  And what about same question with
21  respect to pumping product from tank trucks
22  into the larger storage tanks at the facility?
23  Do you have any specific recollection of any
24  spills or leaks of material in that manner?
25    A.  I don't recall.
00539
1    Q.  Do you recall if any of the piping at
2  the Newark facility was underground?
3    A.  I'm sure some was underground, yes.
4    Q.  Do you know what part of the piping
5  was underground at the Newark facility?
6    A.  Of course water lines were
7  underground.
8    Q.  The water lines?
9    A.  Okay.
10    Q.  Is that the sanitary -- sanitary
11  water lines?
12    A.  I think right now city water lines
13  underground, city water supply.  Fuel oil
14  lines were underground between the tank farm
15  and the boiler room.  It -- although part of
16  it, I think part of it was in, like, a covered
17  trench type of thing, but some of it might
18  have just been buried.  I'm not sure.
19    Q.  Do you recall anyone at Kolker, Vulcan
20  or Inland performing any maintenance related
21  to the underground piping?
22    A.  I can't remember specifically, but if
23  it had to be, if it was -- it very, most
24  likely was done but I don't remember a
25  specific instance.
00540
1    Q.  No specific recollection?
2    A.  Oh, I do remember a repair of an

MKSK-FED-0000003535

ALCD-PUBCOM_0006245

3  underground water line and I think I mentioned
4  it in my last deposition.
5      Q. That would be a repair of the city
6  water line?
7      A. That's correct.
8      Q. Do you remember what time period was
9  that? Was that Kolker or Vulcan or do you
10  recall?
11      A. It was in the Vulcan days, I'd say,
12  late '60s, early '70s.
13      Q. Is that something the maintenance
14  department would be in charge of?
15      A. Yes.
16      Q. During your last several sessions of
17  your deposition --
18      A. Uh-huh.
19      Q. -- there was -- there were repeated
20  questions about during various time frames who
21  did you report to.
22      A. Yes.
23      Q. And there was one gentleman whose name
24  you did not recall. You just remembered he
25  was from Hungary?
00541
1      A. Right.
2      Q. Did you ever happen to recall his
3  name?
4      A. I did and now I forgot it again. Let
5  me think about it. I can't think of his name
6  right now again. I've forgotten his name.
7      Q. Okay. If it comes to you later on,
8  let me know.
9      A. Okay.
10      Q. Okay. And I forgot to ask you when we
11  began questioning this morning, have you had
12  an opportunity to speak with your counsel from
13  the last time your deposition concluded in
14  April until today?
15      A. We had breakfast this morning. That's
16  about all.
17      Q. So you had a meeting this morning?
18      A. Short meeting. Right.
19      Q. How long approximately did you meet
20  with Ms. Ryniec?
21      A. I think 30 minutes at most, maybe
22  less.
23      Q. And was that in preparation for the
24  continuation of your deposition today?
25      A. Yes.
00542
1      Q. And did you review any documents in
2  preparation for -- in preparation for your
3  continuation depo?
4      A. No.

MKSK-FED-0000003536

ALCD-PUBCOM_0006246

5    Q. But you have brought with you a copy
6  of the transcript --
7    A. That's correct.
8    Q. -- from day one and day two of your
9  deposition?
10    A. Right, uh-huh.
11    Q. Did you review those in preparation
12  for your deposition today?
13    A. No.
14    Q. Have you reviewed them at all yet?
15    A. I've just looked up a few names, about
16  all I did.
17    Q. Did it refresh your recollection about
18  any names of any people?
19    A. Oh, no. I was just checking to see
20  the names of the people that were interviewing
21  me the last time.
22    Q. Oh, the counsel present. Okay.
23  During the prior sessions of your deposition
24  you talked a little bit about sometimes VIPs
25  during the '60s would visit the site --
00543
1    A. Yes.
2    Q. -- during the Vulcan years and some
3  site clean-up would be done when VIPs were
4  known to be coming to visit?
5    A. That's right.
6    Q. Do you know how often VIPs from Vulcan
7  would come to visit the site?
8    A. I have no idea.
9    Q. Was it a regular thing?
10    A. But at least once a year, possibly
11  more often.
12    Q. Do you know what they were looking for
13  when they came to visit?
14    MS. RYNIEC: Objection calls for
15    speculation.
16    A. No.
17    Q. Do you know how often they would visit
18  during the '70s? Was it about the same time
19  period, what, about once a year or so?
20    A. Yes. Although on occasion we would
21  have visitors every month.
22    Q. Do you know why sometimes there would
23  be occasions when there would be visitors once
24  a month versus once a year?
25    A. I can't recall.
00544
1    Q. The VIP visiting either once a month
2  or once a year, did that continue with respect
3  to Inland's ownership of the facility? Did
4  Inland VIPs come occasionally and visit the
5  site?
6    A. Yes.

MKSK-FED-0000003537

ALCD-PUBCOM_0006247

7    Q.  Was it with about the same frequency
8  or a different frequency?
9    A.  I couldn't tell you.  I'm not sure.
10  If I was to guess, I would say the same but I
11  don't know.
12    Q.  I believe you had testified about
13  concrete pads that had -- that were
14  occasionally or when necessary were hosed
15  down.  Do you remember that testimony?
16    A.  Yes.
17    Q.  Would the wash-down water go into the
18  sewer lines and then out to the bay?
19    A.  I think so.  It depends upon where --
20  what area it was.  But, in most cases, it
21  would go out to the bay.
22    Q.  At other times if it didn't go into
23  the sewer into the bay, where else would it
24  go.  Do you know?
25    A.  It would be washed on the ground, if
00545
1  it didn't have -- there'd be no other place
2  for it to go, either on the ground or out to
3  the bay.
4    Q.  Okay.  Do you personally recall seeing
5  concrete pads or any equipment washed out with
6  the wash water just rinsing off onto the --
7  onto the soil?
8    A.  I can't recall specifically.
9    Q.  Okay.  But do you recall that it would
10  have happened?  That it would have occurred as
11  a regular course of washing down the equipment
12  or the concrete pads?
13    A.  It might have.  I would think -- it
14  might have, but I'm not sure.
15    Q.  Okay.  If it had occurred, is it --
16  would it have occurred during a particular
17  time period versus another?  In other words,
18  did it happen in Kolker, Vulcan and Inland
19  years?
20    A.  I think so.
21    Q.  You had said that you generated
22  reports to Mr. Marini and Mr. Grish.  Do you
23  recall that testimony?
24    A.  I don't recall the testimony, but I
25  think that's correct.
00546
1    Q.  Okay.  Do you recall if you prepared
2  written reports for Mr. Marini and Mr. Grish?
3    A.  Yes, I did.
4    Q.  What was the nature of those reports,
5  if you can recall?
6    A.  I don't know.  I'd write a report to
7  -- usually a monthly report to show that I was
8  doing something during the course of the

MKSK-FED-0000003538

ALCD-PUBCOM_0006248

9  month.
10    Q.  So basically would a monthly report be
11  a basic summary of your activities at the
12  site --
13    A.  That's correct.
14    Q.  -- throughout the month?
15    A.  Uh-huh.
16    Q.  Would you note any special occurrences
17  or any accidents or any problems, any
18  exceptions to daily activity in monthly
19  reports?
20    A.  I'd put everything in there that I
21  could think of that I was involved with
22  usually, I would think.
23    Q.  Were those monthly reports prepared
24  and given to both Mr. Marini and Mr. Grish?
25    A.  I don't remember.
00547
1    Q.  Did Mr. Grish work out of the
2  headquarters office in Ft. Wayne?
3    A.  I think that's correct.
4    Q.  He was an Inland man, wasn't he?
5    A.  Yes.
6    Q.  So was Mr. Marini, he was a plant
7  manager during Inland days?
8    A.  Yes, Mr. Marini was with Vulcan and
9  then he was at Inland, I believe, he was moved
10  up to plant manager.
11    Q.  When Vulcan took over the Newark site,
12  did it keep the Kolker employees on?
13    A.  Yes.
14    Q.  And what about when Inland took over
15  Vulcan, did Inland keep the Vulcan employees
16  on?
17    A.  Yes.  Although they -- they might have
18  let some people go in both cases.
19    Q.  But as a general rule they kept the
20  same --
21    A.  Correct.
22    Q.  -- generally the same work force?
23    A.  Right.
24    Q.  With respect to your leaving Inland in
25  early 1977, why did you leave Inland's employ?
00548
1    A.  I felt that the company was going
2  downhill and weren't -- there was no real
3  future there.
4    Q.  Was it your sense that the opinion
5  that you just stated was -- was it generally
6  held opinion of other employees at the Newark
7  site?
8    A.  I don't know what they thought.  If I
9  did, then I don't recall what they thought
10  now.

MKSK-FED-0000003539

ALCD-PUBCOM_0006249

11    Q.  Okay.  And so you moved onto Troy
12 Chemical.  Is that correct?
13    A.  Yes.
14    Q.  Okay.  And then you at some point left
15 Troy Chemical to work for Nestle?
16    A.  That's correct.
17    Q.  Do you recall why you left Troy
18 Chemical?
19    A.  I was discharged.
20    Q.  And why were you discharged?
21    A.  I don't remember exactly.  We didn't
22 see eye to eye, the top management and myself,
23 I would say.
24    Q.  Was there anything about the way they
25 operated or did business that you disagreed
00549
1 with?
2    A.  Well, yes.  But I don't remember the
3 exact details.
4    Q.  Then you went to Nestle and you were
5 there for a while and then moved onto Arabian
6 American Oil Company.  Is that correct?
7    A.  That's right.
8    Q.  And I'll ask you the same question
9 with respect to Nestle when you left there,
10 why did you -- why did you switch from Nestle
11 to Arabian American Oil?
12    A.  More money.
13    Q.  Then from Arabian American you moved
14 on to the City of --
15    A.  Vineland.
16    Q.  Vineland, that the way you
17 pronounce --
18    A.  Yes.  Uh-huh.
19    Q.  Thanks.  And what was the reason for
20 that switch, if you can recall?
21    A.  Well, Nestle, I mean -- excuse me,
22 Arabian American Oil Company is -- had been
23 owned by the Arabia -- American Oil Companies,
24 it was taken over by the Arabian government,
25 it -- and it was their intention to get rid of
00550
1 Americans and replace them with Arabs, and I
2 was let go.
3    Q.  Okay.  And from the City of Vineland
4 you moved on to Ingersohl-Dresser.  Is that
5 right?
6    A.  That's correct.
7    Q.  Okay.  What was the nature of that
8 move?
9    A.  From Vineland to Ingersohl-Dresser?
10    Q.  Uh-huh.
11    A.  Disagreement with people in politics
12 in Vineland.  It was working for the city.

MKSK-FED-0000003540

ALCD-PUBCOM_0006250

13    Q.  Did you disagree with some of the city
14  politics that were involved?
15    A.  Well, we had a lot of
16  misunderstandings, I guess.
17    Q.  And then from Ingersohl-Dresser, you
18  moved on to Rhone --
19    A.  Rhone-Polunc, R-h-o-n-e, P-o-l-u-n-c.
20    Q.  And are you still --
21    A.  I'm still there but they are changing
22  the name to Rhodia, R-h-o-d-i-a.  Rhodia is
23  their chemical division and their spinning it
24  off.  Rhone-Polunc is just going to be a drug
25  company and Rhodia will be a chemical company.
00551
1    Q.  So you're working for the chemical
2  side?
3    A.  That's correct.
4    Q.  And the reason for your move from
5  Ingersohl-Dresser to Rhone-Polunc --
6    A.  The plant was closed.
7    Q.  Let me ask you with respect to your
8  discharge from Troy Chemical, did any of the
9  disagreements with top management have
10  anything to do with the handling or use of
11  chemicals or solvents during their operations?
12    A.  I'm not sure specifically.  I know
13  that we had -- we were not handling chemicals
14  in a very good manner.
15    Q.  At Troy?
16    A.  At Troy, right.  There are a lot of
17  mercury compounds and it was being handled
18  pretty sloppily, people were breathing mercury
19  dust -- mercury oxide dust quite often.  It
20  was not a good place to work health-wise.
21    Q.  And the improper, what you saw as the
22  improper handling of those chemicals?
23    A.  That's correct.
24    Q.  You saw that as a safety issue?
25    A.  Yes.
00552
1    Q.  And that was one of the reasons --
2    A.  Well, I was discharged and I can't
3  remember --  I wasn't very happy there.
4    Q.  Did you make it --
5    A.  I think it was wearing between all of
6  us.
7    Q.  Do you recall if you mentioned
8  something to top management at Troy about what
9  you thought was not good handling?
10    A.  I don't remember.  I don't recall.
11    Q.  Okay.  Do you recall if you took issue
12  or had concerns related to the environment and
13  contamination at Troy Chemical?
14    A.  I know that the state was looking at

MKSK-FED-0000003541

ALCD-PUBCOM_0006251

15 their environmental problems and they did have
16 quite a few.
17    Q. You --
18    A. As well as the federal government OSHA
19 was involved also.
20    Q. Okay.
21    A. They were both coming down pretty hard
22 on Troy at the time.
23    Q. Did you observe what you saw to be
24 environmental problems at the Troy Chemical
25 site?
00553
1    A. Yes, but I don't remember any
2 specifics right now.
3    Q. And what about with respect to your
4 leaving the City of Vineland and the
5 disagreements with the politics side of
6 anything?
7    A. Yeah.
8    Q. Did those disagreement relating to
9 politics and your leaving have anything to do
10 with environmental concerns?
11    A. Well, there were environmental
12 concerns, and it had to do with what we call
13 PCBs, poly --
14    Q. Chlorinated bi --
15    A. Right, and inspections of transformers
16 that contained them.
17    Q. What were the problems with respect to
18 the PCB transformers?
19    A. Well, there were no problems really,
20 other than the inspections were not, some of
21 the inspections were not done that the federal
22 government required.
23    Q. Okay. Were you -- was part of your
24 job for the City of Vineland to be conducting
25 those inspections of transformers?
00554
1    A. Yes.
2    Q. Okay. What was your title with the
3 city?
4    A. I was, when I left I was the
5 Superintendent of Electric Generation.
6    Q. Do you know why those inspections
7 weren't getting done?
8    A. Well, they were getting done while I
9 was there, but prior to me being there they
10 weren't done.
11    Q. And did you let somebody at the city
12 know about that?
13    A. No. I was told that -- by my boss, I
14 needed inspections for back history. Go get
15 them for me. Find them. And if they are not
16 there, I want them there. Get them for me.

MKSK-FED-0000003542

ALCD-PUBCOM_0006252

17    Q.  Was he asking you to predate them?
18    A.  Right.
19    Q.  Did that -- did that lead to your
20  deciding to leave the employment with the City
21  of Vineland?
22    A.  Yes.
23    Q.  Got it.  Don't blame you.  Your
24  current employment with Rhone, soon to be
25  Rhodia, is that full-time?

00555
1    A.  Yes.
2    Q.  And, I'm sorry if this was asked
3  before, I've just forgotten.  What is your
4  title now with Rhone?
5    A.  I'm simply an engineer, stationary
6  engineer.
7    Q.  Going back to the -- your observations
8  at the Newark site, did you ever see any of
9  the tanks at Newark rinsed out?
10    A.  I'm sure they were.  I don't remember
11  specifics.
12    Q.  You don't have any specific
13  recollection?
14    A.  Oh, yeah.  I remember some that were
15  cleaned out.
16    Q.  And why would they be cleaned out?
17    A.  Different materials were going to be
18  used in them than previous materials.
19    Q.  Okay.  Do you recall generally what
20  time frame you recall seeing the tanks cleaned
21  out was, that during everybody's tenure?
22    A.  I can recall under Vulcan and possibly
23  Inland.
24    Q.  And would the tanks be cleaned out
25  with water and a particular cleansing product

00556
1  or how would that work?
2    A.  I think usually they would start out
3  steaming the tanks and depending upon what the
4  material was in them, on occasion they would
5  bring in a contractor to -- with a vacuum
6  truck to suck up the liquids.
7    Q.  Okay.  And when the tanks were steamed
8  out, where did the wash-out water go, do you
9  know?
10    A.  It would be collected in the bottom
11  and be sucked out with a vacuum truck.
12    Q.  Okay.  And where would -- where would
13  the wash water that ends up in the vacuum
14  truck go?
15    A.  I don't know, it would be disposed of
16  by the hauler, by the people that owned the
17  truck.  Inland and Vulcan or Kolker, none of
18  them owned a vacuum truck.

MKSK-FED-0000003543

ALCD-PUBCOM_0006253

19    Q. Okay. The cleaning out of the tanks,
20 do you know was that always done by an outside
21 contractor?
22    A. No. It would be done in-house and, at
23 least the start of it and possibly finished up
24 by the outside contractor, at least the
25 disposal was handled by an outside contractor.
00557
1    Q. The wash-out water and whatever was
2 cleaned out of the tank?
3    A. Right. Uh-huh.
4    Q. Do you know if the wash out water was
5 rinsed out of the tanks when they were
6 cleaned? Do you know if that water ever made
7 its way to the sewer or out to the Newark Bay?
8    A. If it did, it would have been an
9 accidental, it wouldn't have been on purpose.
10 I don't think.
11    Q. So that wasn't part of the procedure
12 to --
13    A. In the Kolker days it was.
14    Q. Okay. Do you have any specific
15 recollection of seeing tanks being washed out
16 or the wash-out water going to the sewer?
17    A. I don't remember specific instances
18 right now, no.
19    Q. Did you ever see or hear about
20 chemicals or product being dumped on the bare
21 ground?
22    A. I'm -- I'm not sure. Could you be
23 more specific? Products being dumped on the
24 bare ground?
25    Q. In other words, do you ever recall
00558
1 seeing anybody take drums, 55-gallon drums?
2    A. Yeah.
3    Q. And dump them onto the bare soil?
4    A. No, I --
5    Q. Regardless of what was inside of them?
6    A. No. I don't think so.
7    Q. Do you -- the same question with
8 respect to any chemical, whether it was waste
9 product or new product, ever being poured?
10    A. I don't -- I can recall some solid
11 waste temporarily being stored on the ground
12 and later on being hauled away.
13    Q. Okay.
14    A. But, specifically, just throwing it
15 away on the ground, I can't recall right now.
16    Q. And when you say solid waste, what do
17 you mean by solid waste?
18    A. These would be solids from a
19 distillation operation that residues from a
20 distillation operation that would be a liquid

MKSK-FED-0000003544

ALCD-PUBCOM_0006254

21 when it was hot, when it cooled off it would
22 be a solid, being dropped into pans and then
23 broken up, the solids broken up and placed on
24 the ground until it could be taken away.
25    Q. Solid without a container around it,
00559
1 just a chunk of something or in the pan?
2    A. I think they were chunks and there
3 would not be a container around it, I don't
4 think to my recollection.
5    Q. Do you have a specific recollection
6 as you sit here today of seeing chunks of
7 distillate on the ground?
8    A. No. I don't remember. That wouldn't
9 be, when you say distillate, distillate would
10 be -- would have been liquid --
11    Q. I'm talking about the solid?
12    A. -- the solid would have been the
13 residues more or less.
14    Q. Same response you don't recall
15 seeing --
16    A. I don't remember. No.
17    Q. Then is it true you wouldn't know how
18 long that solid waste would be on the ground
19 before it would be hauled away?
20    A. No. I don't recall.
21    Q. Then would the same be true you
22 wouldn't know what time period that would have
23 occurred in, '60s or '70s?
24    A. Oh, if that happened it would have
25 been in the Kolker years.
00560
1    Q. The tanks at the Newark facility --
2    A. Yes.
3    Q. -- on top, are they opened or closed
4 on top?
5    A. Oh, they are -- the only -- we did
6 have some tanks that were open on the top, and
7 these were brine -- the storage tanks, brine
8 saturators. In other words, sodium chloride,
9 salt. Those are the only tanks I can think of
10 that were open on the top. All the others
11 were closed to my knowledge. My recollection.
12    Q. Do you ever recall seeing any of the
13 brine tanks overflow?
14    A. No. I don't recall.
15    Q. Do you ever recall hearing about it?
16    A. No, I don't recall.
17    Q. In looking at the site maps, in prior
18 testimony --
19    A. Yes.
20    Q. -- on one of the maps, there was a
21 reference to a company or an entity by the
22 name of Vulcan Metallics?

MKSK-FED-0000003545

ALCD-PUBCOM_0006255

23    A.  Yes.
24    Q.  And I think in your prior testimony
25  you had said that Vulcan Materials Company and
00561
1  Vulcan Metallics were two different companies
2  or can you explain the relationship between
3  the two of them for me?
4    A.  Okay.  Vulcan Materials is the -- is
5  the main company, let's say.  The chemicals
6  division, I worked for the chemicals division,
7  and metallics was the metallics division, a
8  separate division, but the chemicals and
9  metallics were two different companies but all
10  came under the corporate name of Vulcan
11  Materials.
12    Q.  Were operations conducted at Vulcan
13  Metallics during the same time period that
14  Vulcan Materials operated the Newark site?
15    A.  Yes.
16    Q.  Do you recall the names of any Vulcan
17  employees that worked at the Vulcan Metallics
18  Division?
19    A.  No.
20    Q.  Do you know the names of any of the
21  solvents or chemicals that were used during
22  the operations at Vulcan Metallics?
23    A.  I think they used caustic soda that we
24  supplied to them but I'm not -- I can't be
25  absolutely sure.
00562
1    Q.  Who would know more about the nature
2  of operations and the employees at the Vulcan
3  Metallics part of the facility?
4    A.  I don't know.  I worked for one person
5  named Walter Bradbury, who did transfer to
6  that division later on, but not at that site.
7  He worked in the Pittsburgh area for Vulcan
8  Metallics.
9    Q.  Do you know when Inland bought the
10  Newark facility, did that include Vulcan
11  Metallics?
12    A.  I don't think so.  But I'm not -- I
13  don't remember the specifics.
14    Could we take a break?
15    Q.  Oh, absolutely.
16    VIDEOGRAPHER:  We'll go off the record
17    at 9:52.
18    (Brief recess.)
19    VIDEOGRAPHER:  We are back on the
20    record at 10:02.
21    Q.  Okay, Mr. Gilliam, just a few more
22  questions.
23    A.  Okay.
24    Q.  When there were equipment failures at

MKSK-FED-0000003546

ALCD-PUBCOM_0006256

25  the facility during the Kolker years, who made
00563
1  the repairs?
2     A.  Usually the maintenance crew.
3     Q.  And how about with respect to the
4  Vulcan years?
5     A.  I would say almost all the time we had
6  our own maintenance crew that made repairs
7  unless it was something special that failed,
8  like such as a -- you might have the
9  manufacturer of the equipment come in to make
10  repairs, but that would be unusual I would
11  say.
12     Q.  So as a general rule, repairs were
13  made by the maintenance crew?
14     A.  That's correct.
15     Q.  During the Vulcan and Inland years as
16  well?
17     A.  I think that's right.
18     Q.  During your testimony back in April
19  you referred to something called a pilot
20  plant?
21     A.  Yes.
22     Q.  What is a pilot plant?
23     A.  A pilot plant is a plant, we would
24  make products in experimental stage.  The --
25  in between making them in the laboratory with
00564
1  small quantities like a liter or less, it
2  would be in the lab.  In a pilot plant it
3  might be 20 to 50-gallon size and we'd just be
4  following up what was done in the lab and
5  seeing how it worked in larger quantities
6  prior to going into the plant.
7     Q.  And this was for -- the end goal is
8  manufacturing these chemicals on a larger
9  basis out in the plant?
10     A.  Yeah.  The pilot plant, right, would
11  be intermediate size prior to going out into
12  larger quantities in the plant.  Yes.
13     Q.  And this pilot plant, did that exist
14  at the Newark facility during the Vulcan
15  years?
16     A.  I don't recall but it must have.  I do
17  remember a pilot plant burning down under the
18  Kolker years, and I don't know whether we ever
19  had one -- I don't think we did have one at
20  the Newark facility under Vulcan.  They had a
21  pilot plant in Wichita, Kansas.
22     Q.  Okay.  So you think there was a pilot
23  plant during the Kolker years that burned down
24  and then it was just not replaced?
25     A.  I think that's correct.
00565

MKSK-FED-0000003547

ALCD-PUBCOM_0006257

1   Q. Do you know if any chemicals were
2 released to the soil or the ground water as a
3 result of the fire during the Kolker years at
4 the pilot plant?
5   A. Well, anything that was there did go
6 into -- the fire was put out by the Newark
7 Fire Department, there was no containment.
8   Q. Did the fire department use water to
9 put out the fire?
10   A. Yes, they did.
11   Q. And did they just spray the entire
12 building with water?
13   A. I think that's correct.
14   Q. Did the wash water from extinguishing
15 the fire soak through to the ground around the
16 plant?
17   A. I think it did. I would think so.
18   Q. Do you recall physically seeing that
19 yourself?
20   A. No. We were spending more time
21 looking at the fire, making sure -- not
22 knowing -- not paying any attention where the
23 water went.
24   Q. Okay. Was anyone injured in that
25 fire, do you know?
00566
1   A. I don't think so.
2   Q. Do you know how long the fire burned?
3   A. Two or three hours.
4   Q. Do you have any idea precisely what
5 chemicals were stored in that building at the
6 time of the fire?
7   A. I think there was sodium and a
8 material called Solv-Esso, it was a product of
9 the Esso Company or Standard Oil of New Jersey
10 which is now Exxon, and a material called
11 methyl isobutyl carbonyl. And that's all I
12 can recall.
13   Q. Okay. Did the fire department scrape
14 away building or any debris that was left once
15 the fire was extinguished?
16   A. I don't think they did. They came to
17 put -- they put the fire out and they broke
18 up, used their tools to break up embers, I
19 believe, to make sure the fire was out, but I
20 don't think that they -- they didn't remove
21 anything from the --
22   Q. Did Kolker employees clean up the
23 burned area once the fire was extinguished?
24   A. I think so, but I don't remember. I
25 don't remember how it was cleaned up.
00567
1   Q. But you recall it was cleaned up?
2   A. Yes. It was cleaned up but I don't

MKSK-FED-0000003548

ALCD-PUBCOM_0006258

3  remember how.
4    Q.  Do you have an understanding that the
5  soil at the Newark facility is contaminated,
6  polluted?
7    A.  I've heard that but...
8    Q.  Does it surprise you?
9    A.  I wouldn't think -- I guess not.  I
10  don't think so, no.
11    Q.  What do you think caused, based on
12  your experience at the site, what do you think
13  caused the soil to be contaminated at the
14  Newark site?
15    A.  I don't know.  I believe it was
16  contaminated when we first came there.  I
17  don't know.  It might have been because there
18  was a lead refinery there prior to us being
19  there.
20    Q.  Prior to Kolker getting there?
21    A.  Right.
22    Q.  Do you know if anybody, tenants the
23  prior to Kolker used chemicals or solvents?
24    A.  I don't know what they did, no.
25    Q.  And same questions with respect to the
00568
1  ground water.  Have you heard or do you now
2  have an understanding that ground water at the
3  Newark site is contaminated?
4    A.  I don't know.
5    Q.  If I propose to you that ground water
6  at the Newark site is contaminated, do you
7  know how it would have became contaminated
8  based on your experience at the site?
9    A.  The only thing I could tell you, only
10  thing I could tell you is they put a lot of
11  fill in there from a -- and it was, it was
12  filled with the residue from a chrome oar.
13  From -- I don't know where we  -- Lee Kolker,
14  bought this fill, got it very cheaply, and it
15  came from a chromium manufacturer where it
16  was removing chromium from gravel and there
17  was chrome still in the fill that he got.
18  That's all I can say.
19    Q.  Do you know when Kolker put in that
20  fill?
21    A.  Oh, that was in the early '50s.
22    Q.  Were you there at the site?
23    A.  Yes.
24    Q.  Did you know what the, at the time
25  that the fill had the chromium in it still?
00569
1    A.  Well, it changed color when it -- it
2  would be one color when it was wet and a
3  different color when it was dry.
4    Q.  And you knew that to be based on

MKSK-FED-0000003549

ALCD-PUBCOM_0006259

5 chromium content that was -- that was in the
6 fill?
7     A.  Well, I didn't know it, but I think
8 Kolker just happened to mention -- would
9 mention that.
10    Q.  Mr. Kolker knew it?
11    A.  I think so, yeah.
12    Q.  Is that probably why he got it cheap?
13       MS. RYNIEC:  Objection calls for
14    speculation.
15    A.  I don't know.
16    Q.  Okay.  Mr. Gilliam, that's all the
17 questions I have for you.  I'm going to pass
18 the questioning over to one of co-counsel
19 here.
20 EXAMINATION BY MS. SOURIAL:
21    Q.  Good morning, Mr. Gilliam.  Again, I'm
22 Heather Sourial and we represent Continental
23 Insurance Company, Continental Casualty
24 Company and Hartford Insurance Company.
25    I just have a few questions for you.
00570
1 Earlier this morning you stated that when you
2 left Inland Chemical Company you believe that
3 the company was going downhill?
4     A.  I'm sorry.  Can you speak a little
5 louder.
6     Q.  Certainly.  This morning, I believe
7 you testified that when you left Inland
8 Chemical Company you stated that you believed
9 the company was going downhill?
10    A.  Yes.
11    Q.  And I was wondering what you meant
12 when you said you felt the company was going
13 downhill?
14    A.  One thing -- the main thing that
15 bothered me was it was in the fall and -- of
16 the year and they weren't preparing for winter
17 because it was an outdoor plant that there
18 were so many things that would freeze up
19 during the winter and Len Grish said we
20 couldn't afford to spend the money to fix it,
21 to prepare for the winter weather.  And I said
22 something is wrong here.  If we can't spend
23 the money to fix it, to prepare for winter, I
24 didn't think I was going to stay there much
25 longer.
00571
1     Q.  What things needed to be done to
2 prepare for winter?
3     A.  Well, repairing of what we call steam
4 tracers and installation on pipes, steam
5 tracers are wrapped around pipes to keep them
6 warm and insulation covers the steam tracers

file:///qnapnas/Concordance/Concordance/Cases/03_Mckesson/09_NewarkLand/TRANSCRIPTS/Gilliam%20Naphulin%20Vol%20I%204714e45baabfcb00

MKSK-FED-0000003550

ALCD-PUBCOM_0006260

7   and the pipes together.  At least that's what
8   I can remember specifically.
9       Q.  And what was your concern if they
10  didn't properly prepare for the winter?
11      A.  That everything would freeze up as
12  soon as the first cold weather hit us, which
13  has -- had happened earlier in other years
14  when we didn't prepare properly.  Every
15  winter, every fall we had to prepare for cold
16  weather or else it would hit us really bad
17  when cold weather did come.  Steam tracers
18  should -- I mean, they leak, they shut-down
19  and so on, if they're not fixed up in the
20  fall, the winter -- by wintertime everything
21  is frozen solid.
22      Q.  Would that also result in any bursting
23  of pipes?
24      A.  It could.
25      Q.  Had that ever happened in the past?
00572
1       A.  Oh, yeah.
2       Q.  Was there a release of any type of
3   chemical caused by any pipes that burst during
4   the winter?
5       A.  Well, I can't -- I don't recall
6   specifically.  Most of the time the pipes were
7   water lines and steam lines and condensate
8   lines, mostly water, but there are some
9   chemicals that -- but I don't recall which
10  ones they were that would freeze.
11      Q.  And when the company said that they
12  didn't have the money to put in the efforts to
13  prepare for winter, did that concern you about
14  their financial state?
15      A.  Yes, it did.
16      Q.  And what was -- if you could tell me
17  more specifically what was your concern about
18  their financial state?
19      A.  Well, if they can't pay for keeping
20  the place warm, I didn't think they could pay
21  our salaries either is what was my thoughts.
22      Q.  How was the production, chemical
23  production or maybe I'll just say how was
24  their operations at that time in terms of
25  profitability?
00573
1       A.  I have no idea.  At that time we were
2   recovering chemicals for other companies,
3   waste chemicals from some of the drug
4   companies and cleaning them up and sending
5   back some of their products to them.  But I
6   don't know the details of how much they made
7   or lost on the product.  I just don't know.
8       Q.  Had you seen any change in the volume

MKSK-FED-0000003551

ALCD-PUBCOM_0006261

9  of materials that were being used at the site?
10    A.  Volume?
11    Q.  Yeah.  I'm referring now to the period
12 of time, I guess it would be the end of 1976.
13    A.  I don't recall.  Might have been less
14 or more, but I don't know.
15    Q.  At the time that you left the company,
16 was there any other indicators to you that
17 concerned you about the company?
18    A.  Well, Mr. Marini had been let go in
19 late '76, and they brought in somebody else
20 who was not nearly as knowledgeable as Mr.
21 Marini to be the plant manager, and I just had
22 my doubts about the company.
23    Q.  Who was the new plant manager?
24    A.  I don't recall his name.  Might have
25 been Brian, first name, but I just don't
00574
1  remember his last name right now.
2    Q.  Did you have any concerns at that time
3  about their ability to comply with
4  environmental regulations?
5    A.  I didn't -- I don't know.  I wasn't
6  thinking about their compliance at the time.
7    Q.  Was that plant -- new plant manager
8  Brian Dawson?
9    A.  I think that's correct.
10    Q.  And why did you feel that he was not
11 as capable as Mr. Marini?
12    A.  I don't remember the details, but Mr.
13 Marini was a chemical engineer and I don't
14 think Mr. Dawson was.
15    Q.  Just going back to your overall
16 impressions, each company; Kolker, Vulcan and
17 Inland --
18    A.  Yes.
19    Q.  -- with respect to their housekeeping
20 in terms of chemicals and environmental
21 compliance, what would be your overall
22 impression and I'll just go back to the Kolker
23 years?
24    A.  What would be my impression of them as
25 in complying with environmental rules?
00575
1    Q.  Yes.
2    A.  Well, I don't think we had any rules
3  or there were very few when Kolker had the
4  place other than local Board of Health rules,
5  I would think.  There was no EPA at the time
6  and we didn't have many rules to follow and we
7  did whatever was necessary to get the product
8  out and not worry about pollution during the
9  Kolker days.  Vulcan gradually changed, they
10 were -- I felt that they -- I feel -- looking

MKSK-FED-0000003552

ALCD-PUBCOM_0006262

11 back that they were not much different than
12 the Kolkers originally, but they changed as
13 time went on, as the laws got more strict they
14 were -- they complied with all the rules and
15 Inland tried to comply with the rules but they
16 would cut corners when they had to, when they
17 felt they had to.  That's what I think.
18     Q.  If you had to go back now and in
19 retrospect identify perhaps the chief problems
20 that stood out in your mind, looking back
21 during each of those periods, what would you
22 identify as being the chief problems during
23 the time that you were with Kolker?  Chief
24 problems I mean in terms of general
25 housekeeping with respect to chemicals or
00576
1 compliance with any environmental --
2     A.  Yeah.  I don't think we worried by in
3 compliance.  To us it was not a problem.  The
4 biggest problem was injuries of -- employee
5 injuries and accidents with the Kolkers, and
6 -- and that's all I could tell you about the
7 Kolkers.
8      When Vulcan came, they put a lot of effort
9 into improve our accident performance rate.
10 We had a lost time injuries, a lot of
11 injuries, a lot of lost time injuries and
12 Vulcan improved on that quite a bit.
13      And the pollution end of it, I don't think
14 anybody really cared about pollution until, I
15 guess, mid '60s, later '60s.  My thoughts, my
16 own thoughts were nobody really cares at all
17 about pollution but the only thing they care
18 about is not being caught polluting, is what I
19 felt about things, my own feelings about it.
20 But then I do remember Leon Speckley saying at
21 one time we got to keep the environment safe
22 for our children and grandchildren.  So he was
23 thinking about pollution.  Leon Speckley was a
24 plant manager and I don't remember the exact
25 time he was plant manager but I think that was
00577
1 in the early '70s, maybe '71, '72.  And we
2 were working hard on pollution improving the
3 pollution situation at that time.
4     Inland came in and John Berger was quite
5 strong on solving our pollution problems or --
6 he didn't want to buy a unit from Vulcan that
7 was polluting the place and he was pretty
8 strict about that.  He wanted Vulcan to -- he
9 wanted to be sure Vulcan was not polluting
10 anymore than it was allowed.  I remember he
11 was looking at all of the paperwork on
12 effluence.  And I don't know how long John was

MKSK-FED-0000003553

ALCD-PUBCOM_0006263

13   -- stayed with the company, whether he was
14   there when I left or not, but I didn't hear
15   much about him after a while.  So I'm not sure
16   whether he was with the company or not at the
17   time I left.  That's all I can tell you.
18       Q.  When you were describing that you felt
19   that there was an overall attitude of not
20   being too concerned about environmental
21   conditions or contamination, but there was
22   more concern of just not being caught; did you
23   mean that during the whole time that you were
24   there at the site or is that during the
25   specific periods --
00578
1       A.  Well, I would say that would be true
2    until the late '60s.
3       Q.  And what changed in the late '60s?
4       A.  I know that I had a boss named George
5    Raycos who was telling me how much the company
6    was concerned about pollution, and I said to
7    him, George, they're not concerned about
8    pollution at all, they're just concerned about
9    being caught polluting.  Joe, that's not true.
10   And we had quite a talk about it.  And that
11   was in the late '60s, and it took me a long
12   time to believe that they were concerned but
13   in the late '70s -- I mean, early '70s, we
14   were working pretty hard to solve all of our
15   pollution problems.
16       Q.  Again, if you could trace back for me,
17   what do you think contributed most
18   significantly to the pollution problems at the
19   site and, again, if you could go back through
20   Kolker and the Vulcan years and the Inland
21   years?
22       MS. RYNIEC:  Objection calls for
23   speculation.
24       A.  I don't think I really know the
25   answer.
00579
1       Q.  Okay.  And I just have one last
2    question for you, but it might take a few
3    questions to get through it.
4       A.  Okay.
5       Q.  I wanted to get a clearer picture of
6    the volume of materials that were being used
7    at the site during the different stages.
8       A.  Uh-huh.
9       Q.  And I do have some notes from the last
10   time that you were here, but if you could,
11   kind of, walk me through the different phases
12   in terms of volume of chemicals that were
13   being produced or reclaimed during the
14   different operations?

MKSK-FED-0000003554

ALCD-PUBCOM_0006264

15   A.  Okay.  Under the Kolker -- during the
16 Kolker years, for instance, I'll just give you
17 methylene chloride.  We were using -- we were
18 producing about, oh, two or three tons of
19 methylene chloride a day in the early days
20 with Kolker.  When Vulcan Materials took over
21 we started producing methylene chloride at the
22 rate of about 25 tons a day and up at the time
23 just before Inland took over, we were
24 producing methylene chloride of about a
25 hundred tons a day.  And about a year after
00580
 1 Inland took over, we shut the methylene
 2 chloride plant down and we started reclaiming
 3 chemicals and things were at a much smaller
 4 scale.  A lot of people were laid off and let
 5 go, but the company which had maybe a hundred
 6 employees was down to maybe about 15 or 20
 7 employees.  I'd say that would have been -- I
 8 don't know what year that would have been, but
 9 '75?  I'm going to guess.  I don't know for
10 sure.
11   Q.  Can you give me an estimate of what
12 the volume was materials during the Inland
13 Chemical time that you were there?
14   A.  The volume of what the reclaimed
15 products?
16   Q.  Yes.
17   A.  I don't remember.  I don't think I was
18 involved with specific numbers at the time and
19 that's why I couldn't tell you, but I'd say we
20 probably were, we were recovering the -- the
21 chloride there from other sources, waste
22 methylene chloride coming from other companies
23 and we were recovering it and I'd say, I'm
24 going to guess in the 15 to 20 tons per day
25 would probably be -- might -- it's just a
00581
 1 guess.
 2   Q.  I guess, I don't want you to guess.
 3 What would you base an estimate of 15 to 20
 4 tons upon?  Is there anything that you could
 5 base it upon?
 6   A.  I just -- the number of trucks coming
 7 in and out.  It was just considerably smaller,
 8 that's all I could tell you.
 9   Q.  All right.  Mr. Gilliam, I thank you
10 for your time and your patience with us and
11 going, and answering all of our questions and
12 at this time I have no further questions.
13   A.  Okay.
14 EXAMINATION BY MS. APPELBAUM:
15   Q.  Good morning, Mr. Gilliam.
16   A.  Hi.

MKSK-FED-0000003555

ALCD-PUBCOM_0006265

17     Q. Hi, I'm Beth Appelbaum.
18     A. Hi, Beth.
19     Q. I just have one quick question for
20 you, maybe two. Taking you back to the end of
21 Ms. Haynes' question, when you remember the
22 pilot plant burning down during the Kolker
23 years?
24     A. Yes.
25     Q. And you testified that anything that
00582
1 was in the plant would have gone into the
2 ground, do you remember or can you estimate
3 the quantity of materials that would have gone
4 into the ground?
5     A. It would have been probably 500
6 gallons.
7     Q. Five hundred gallons total or 500 --
8 you had testified that sodium --
9     A. I would think 500 gallons total,
10 maybe, less than a thousand gallons.
11     Q. Okay. And then my last question for
12 you --
13     A. Yes.
14     Q. -- you testified that it didn't
15 surprise you that you heard that the soil in
16 Newark was contaminated?
17     A. Uh-huh.
18     Q. Why not?
19     A. As I said before we used the fill,
20 landfill that was contaminated to start with,
21 the chrome oar. We had things like the
22 fire that took place at the pilot plant and we
23 had steel drums that had materials in them
24 that some of them rusted away, that were out,
25 stored outside. I can't remember where they
00583
1 -- the exact locations, but I know we had
2 rusty drums that fell apart with chemicals in
3 them.
4     Q. Do you have any recollection of what
5 was inside the steel drums that rusted?
6     A. I don't know. I've forgotten. It was
7 chemicals that didn't -- that did not meet
8 specification and they were stored in hopes of
9 reclaiming them at a later time, but things
10 like strikes and sale of the company and
11 things of that sort, and the former -- the new
12 owners didn't know what was going on there, I
13 guess, and that type of thing.
14     Q. These rusty steel drums, was this --
15     A. Yes.
16     Q. -- during the Kolker years?
17     A. Yes. Uh-huh. They were put there
18 during the Kolker years. I think they rusted

ALCD-PUBCOM_0006266

19 away during the new owners, Vulcan's time.
20 That's my guess but I'm not sure.
21    Q.  Do you remember -- so you do remember
22 these rusty drums during the --
23    A.  Yes.
24    Q.  -- Vulcan's years as well?
25    A.  Well, I think so.  But I -- I'm pretty
00584
1 sure they were there during the Vulcan's
2 years.  Vulcan had to dispose of them.  I
3 think, but I'm not sure.
4    Q.  What about during Inland's time?
5    A.  I think they were gone by the time
6 Inland came.
7    Q.  Okay.  Would you be able to estimate
8 the volume of material that you saw leaking
9 out of these drums?
10    A.  I'm going to say one hundred 55-gallon
11 drums might be a guess.  But it could have
12 been more.  It could have been less.
13    Q.  Did you see any of the material
14 leaking directly into the ground?
15    A.  I don't recall.
16    Q.  And these drums that you were
17 referring to, were they sitting directly on
18 the ground?
19    A.  I think they're probably on a concrete
20 pad, but I don't really know for sure.
21    Q.  Do you think that there were cracks
22 or fissures in the concrete pad that would
23 have allowed them to seep --
24    A.  I don't know but it would have -- it
25 -- there was no dikering around them.
00585
1    Q.  Okay.  All right.  I think that's it
2 for my questions.
3    A.  Okay.
4    Q.  Thank you very much.
5    A.  Uh-huh.
6 EXAMINATION BY MS. ANDERSON:
7    Q.  Hi, Mr. Gilliam.  I'm Molly Anderson.
8    A.  Hi, Molly.
9    Q.  And Yvette and I discussed your
10 previous testimony in detail and she passed on
11 to me a lot of follow-up questions --
12    A.  Okay.
13    Q.  -- that may seem pretty random and out
14 of order.  So I hope you'll just bear with me.
15    A.  Okay.
16    Q.  First of all, I'm wondering if we
17 could get from you your best recollection as
18 to the names of the plant managers during the
19 various years.  I know that you've already
20 given us the name of Jack or John Hurst --

MKSK-FED-0000003557

ALCD-PUBCOM_0006267

21   A. Yes.
22   Q. -- as somebody during the Vulcan --
23   A. That's correct.
24   Q. -- time. Do you recall approximately
25 what years he would have been plant manager?
00586
1   A. I would guess from about -- I'm not
2 sure. I'm going to say 1970 to '72, '73.
3   Q. And what about Mr. Leon Stuckey?
4   A. Steckley.
5   Q. Steckley?
6   A. He would -- I believe he was -- I
7 can't tell you for sure whether he was before
8 or after Hurst, but it was in the -- just
9 before or just after Jack Hurst, but I'm not
10 sure.
11   Q. Now, going way back to the Kolker
12 years, can you remember the names of any the
13 plant managers there?
14   A. Well, there was Charles Kolker was a
15 plant manager from, I'd say, '53 until 1960.
16   Q. Okay.
17   A. In 1960, a man named John Burton took
18 over as plant manager.
19   Q. I had it in my notes that he was at
20 the Lister Avenue plant.
21   A. Oh, yeah, he was at Lister Avenue
22 also.
23   Q. Then he did come to Doremus?
24   A. That's correct.
25   Q. So Mr. Burton was there from 1960
00587
1 to --
2   A. '61, I believe.
3   Q. And after Mr. Burton?
4   A. Well, then Vulcan took over.
5   Q. Uh-huh.
6   A. And the plant manager was named Ed --
7 possibly Edwin McCrillis, M-c-C-r-i-l-l-i-s, I
8 believe, I'm not sure of the exact spelling
9 that was Ed McCrillis. Let me think how long
10 he was there.
11   After McCrillis we had a -- they brought
12 in another fellow from Wichita, Kansas, and I
13 can't think of his name right now.
14   Q. Do you have an approximate year? Do
15 you have a sense of how many years Mr.
16 McCrillis --
17   A. I'd say to '66, let's say, I could be
18 wrong.
19   Q. Okay. And then this person from
20 Wichita took over in approximately 1966?
21   A. I would think so. I could be wrong,
22 but I think he came in in '66, and probably he

file:///qnapnas/Concordance/Concordance/Cases/03_Mckesson/09_NewarkLand/TRANSCRIPTS/Gillum%00Raymbird%20Volume/17120%20x.txt

MKSK-FED-0000003558

ALCD-PUBCOM_0006268

23    was there until, I'm going to say 1970.  I
24    don't -- I can't say for sure anymore.
25      Q.  Okay.  And then would Mr. Hurst have
00588
1    been after this person from Wichita?
2      A.  I'm going -- I think possibly Steckley
3    came in, but I'm not sure and then Hurst.
4      Q.  Okay.
5      A.  But I've forgotten the details.  I
6    just don't remember anymore.
7      Q.  And do you recall who was plant
8    manager at the time that Inland purchased the
9    plant, was that Mr. Steckley?
10      A.  I don't -- remember I was talking --
11    we were talking about a fellow from Hungary
12    that was a plant --
13      Q.  Right.
14      A.  -- manager.  I think he was the plant
15    manager at the time and I just can't remember
16    his name anymore.
17      Q.  All right.  And after that person from
18    Hungary was Mr. Marini?
19      A.  I think that's right.
20      Q.  And then after that Mr. Grish?
21      A.  Well, Brian Dawson, I think, took over
22    for -- from Marini.
23      Q.  Oh, excuse me.  And after Dawson was
24    Grish?
25      A.  Well, I left.  Grish and Dawson --
00589
1    Grish was not the plant manager.  He was a
2    Vice President of Inland but he was -- he was
3    in and out of the plant quite a bit.  I think
4    he was helping Dawson on occasion.
5      Q.  And you left at the time that Mr.
6    Dawson was the plant manager?
7      A.  That's correct.
8      Q.  Thank you.  All right.  Now, we also
9    wonder if you can recall the names of any of
10    the people responsible for maintenance during
11    the Kolker years or the Vulcan years?
12      A.  Uh-huh.
13      Q.  There was a maintenance department,
14    correct, at all times?
15      A.  Yes.
16      Q.   Do you have any recollection of who
17    is in charge of maintenance when you first
18    started under the Kolker administration?
19      A.  We had a man named Ben Santucci. He
20    was in charge of maintenance there for a long
21    time.
22      Q.  Anyone else?
23      A.  I remember somebody else after him,
24    but I can't remember his name.  He was a

MKSK-FED-0000003559

ALCD-PUBCOM_0006269

25  mechanical engineer.  He lived in Matawan

00590

1  area, but I don't know his name.  I remember
2  him, but I don't remember the name right now.
3     Q.  Now, you testified a little earlier
4  today about the phasing out of the methylene
5  chloride production and moving into the
6  methylene or -- excuse me, the solvent
7  reclamation business?
8     A.  Yes.
9     Q.  And that, am I correct in
10  understanding you to say that that happened
11  within the first year that Inland took over
12  the plant?
13     A.  I'd say about a year after Inland took
14  over, but I don't remember the exact details
15  anymore.
16     Q.  So Inland then -- now after this year
17  had passed and the shift had been made, there
18  was no more production of virgin methylene
19  chloride?
20     A.  That's correct.
21     Q.  It was only reclamation?
22     A.  That's right.
23     Q.  If you could think back, Mr. Gilliam,
24  to the time that Inland purchased the plant
25  from Vulcan.

00591

1     A.  Yes.
2     Q.  I wonder if you could give me a
3  description of the conditions of the plant at
4  that time, condition of the equipment, the
5  housekeeping and the grounds of the plant?
6     A.  I'd say it all was very good,
7  appearance-wise was very good.  I'd say it
8  probably was in the best condition as it had
9  been in since I had started there.
10     Q.  Now, you said that you noted that some
11  people from Inland came to inspect the plant
12  Mr. --
13     A.  Yes.
14     Q.  -- Arnold and Mr. Berger at the time
15  of the take-over but that you did not
16  participate in their inspections?
17     A.  That's correct.
18     Q.  At any time before Inland took over,
19  did you accompany anyone or participate in any
20  inspection at the plant by anyone from an
21  environmental agency, state or federal?
22     A.  Well, I had meetings with some state
23  and federal people but I can't specifically
24  remember them.
25     Q.  Do you remember when it was?  Before

00592

MKSK-FED-0000003560

ALCD-PUBCOM_0006270

1  Inland took over or after?
2      A. I'd say before Inland took over.
3      Q. And these were environmental agencies?
4      A. Yes.
5      Q. And what was the nature of those
6  meetings?
7      A. I can't recall.  I do recall one
8  meeting where they, an inspector and I think I
9  mentioned it before about an inspector
10  wanted -- wanted to be paid to look the other
11  way.
12      Q. Yes.  I did read that. What about with
13  the Coast Guard?
14      A. The Coast Guard had, they had a
15  helicopter and they would fly overhead and
16  notice if there were dis -- looking for oil
17  slicks, discoloration of the bay, et cetera.
18  And they had seen, what they saw from us was
19  not an oil slick but they would see white
20  effluent apparently leaving the plant and if
21  we had a release of caustic soda into the bay,
22  it would turn the calcium and magnesium that's
23  naturally in sea water into a white
24  precipitate like milk of magnesia and it would
25  -- the bay would turn white where -- as, you
00593
1  know, the effluent would come out.  We had a
2  flow of 10,000 gallons a minute of river
3  water, of bay water going into the plant used
4  for cooling and leaving the plant.
5      Q. So did the people from the Coast Guard
6  come onto the plant to inspect?
7      A. Yes, they did.
8      Q. And did you accompany them on those
9  inspections?
10      A. At least once.
11      Q. Do you recall about when that was?
12      A. I'd say early '70s.
13      Q. When you were working during the
14  Vulcan years and the methylene chloride was
15  being produced --
16      A. Yes.
17      Q.  Did you have an understanding as to
18  whether that was a toxic substance?
19      A. Probably no more than gasoline was my
20  thoughts.
21      Q. Okay.  But it was as toxic as
22  gasoline?
23      A. Yes.
24      Q. You couldn't eat it or drink it, in
25  other words?
00594
1      A. That's correct.
2      Q. And what was the basis of your having

MKSK-FED-0000003561

ALCD-PUBCOM_0006271

3   that belief that it was toxic?
4       A.  It was in, I remember seeing it in a
5   book listed 500 parts per million was a -- was
6   a maximum allowable, I believe, and gasoline
7   was 500 parts per million maximum allowable.
8       MS. ANDERSON:  Just a few more
9       minutes.
10      VIDEOGRAPHER:  We're going off the
11      record at 10:51 for ending videotape
12      number eight for a change of video tape.
13      (Brief recess.)
14      VIDEOGRAPHER:  We're back on the
15      record at 10:55 on videotape number nine
16      in this deposition.
17      Q.  Okay.  Mr. Gilliam, let's see, you
18  testified and we've actually heard another
19  witness testify about a drainage sewer at the
20  Newark plant lined with acid brick, and I'm
21  wondering if you could describe that sewer and
22  what its function was and what it was lined
23  with?
24      A.  Okay.  The sewer would be an open
25  trench and it would be originally made with
00595
1   poured concrete with forms, and then it would
2   be lined with a brick which would be called an
3   acid-proof brick.  It would be, I don't know
4   how the brick was made, it was made in a
5   furnace of some sort.  And the brick was
6   installed by brick layers and it would be an
7   acid proof cement between the bricks so that
8   the brick would be impervious and the acid or
9   whatever was in the sewer would not get to the
10  concrete.  The trench would be covered up with
11  a -- either a steel grate or it might be an
12  acid-proof material of a grating so that rain
13  water or anything else would go through into
14  the sewer but you could walk across it, not
15  fall through.  So it was a grating covering
16  it, probably started out steel and the steel
17  would slowly would deteriorate.  If it
18  deteriorated too fast it was changed over into
19  a -- some kind of a fiberglass grating that
20  would withstand both the weight of a person
21  walking on it or equipment being moved across
22  it but would not be destroyed by the acids in
23  the area.
24      You know how these trenches would go into
25  tile pipes under, which would travel
00596
1   underground, and join up with other trench --
2   other sewers from other areas and would go out
3   to Newark Bay.
4       Q.  Okay.

MKSK-FED-0000003562

ALCD-PUBCOM_0006272

5    A.  Cooling water, acids, all kinds of
6 waste would be mixed -- would mix together and
7 originally the thought was that an acid in one
8 location and an alkaline in another location
9 would neutralize each other and with all the
10 river water that was going in there between --
11 it would be diluted so that it would go out to
12 Newark Bay and wouldn't cause any problems.
13 Used to be thought that the solution to
14 pollution was dilution they used to say and
15 suddenly people realized it was not the
16 solution and you had to do other things to it
17 to neutralize it, make it suitable to go out
18 into the river water again.
19    Q.  Were this -- were these drains still
20 there at the time you left in late 1976?
21    A.  I think, yes, they never removed them
22 while I was there.
23    Q.  And did the -- was Inland continuing
24 to discharge its waste and cooling water?
25    A.  Well, they didn't have the same waste
00597
1 to discharge.  No.  And the fact is, I don't
2 know of any waste that they were discharging
3 there.  I know they were taking the waste that
4 they generated to a landfill called Kinbuc,
5 K-i-n-b-u-c, I believe.
6    Q.  Now, a little earlier this morning on
7 a slightly related question, you mentioned
8 that Mr. Berger was going over the papers --
9    A.  Uh-huh.
10    Q.  -- having to do with the Vulcan --
11    A.  Yes.
12    Q.  -- effluence.  Can you give me a
13 little more information about that? What
14 papers would Mr. Berger be looking at?
15    A.  We had and analyses of our waste
16 streams that went out to Newark Bay.  They
17 weren't very full analysis.  In other words,
18 we were just checking things like pH, heavy
19 metals, organics, I believe.  And Mr. Berger
20 was quite concerned about the quantities that
21 were going out there and he wanted to be sure
22 that it was all, since Inland was going to buy
23 the place, he didn't want it to be outside of
24 anything, recommended ranges if Inland was
25 going to buy the place.
00598
1    Q.  So he got hold of these papers and
2 reviewed them?
3    A.  Right.
4    Q.  How is it that you knew that he was
5 doing that?
6    A.  He and I sat in a meeting, I sat in a

MKSK-FED-0000003563

ALCD-PUBCOM_0006273

7 meeting, the same meeting as he did, going
8 over them.
9    Q. I see.
10    A. And we were with a vice president of
11 Vulcan Materials as well as the plant manager
12 at the Newark plant, myself and John Berger,
13 if I remember right.
14    Q. Do you recall who the vice president
15 was?
16    A. The vice president was Harvey
17 Campbell.
18    Q. I apologize if this was -- if you gave
19 this testimony earlier, I just -- okay, the
20 vice president, the plant manager --
21    A. The plant manager I think was Leon
22 Steckley at the time.
23    Q. Mr. Berger and you.
24    Now, to jump again to a new topic, you
25 testified in the first day of your previous
00599
1 deposition that on Tank Farm Number Nine there
2 was an occasion on which a toluene valve of
3 was left open. Do you recall testifying about
4 that?
5    A. I think so.
6    Q. And some toluene escaped?
7    A. I -- it seems to me this was
8 deliberate act, but we thought that it was a
9 deliberate act during a strike. Did I say
10 that?
11    Q. You said, "I think possibly Tank Farm
12 Nine was used for toluene storage and there
13 was a time when there was a strike and
14 somebody came into the plant and turned the
15 toluene pump on and pumped some toluene and
16 spilled it."
17    A. Yeah, I think that's right.
18    Q. I just have one question about that.
19 Did you ever learn of any soil or ground water
20 contamination that resulted from that release
21 of toluene?
22    A. No, I don't. But toluene is a -- is
23 volatile solvent, it evaporates about the same
24 rate as gasoline, has the same boiling point
25 as gasoline approximately.
00600
1    Q. Okay. Then you also testified that
2 during the Vulcan years there was a -- there
3 were some spill procedures in effect?
4    A. Uh-huh.
5    Q. Do you recall who prepared those
6 procedures? Were they written?
7    A. I think they were written procedures
8 that was required by, I think, an EPA required

MKSK-FED-0000003564

ALCD-PUBCOM_0006274

9  it.  It had to be done by a professional
10 engineer and so it was done outside the
11 company, if I remember right.  It might have
12 been done by Straubing, or Straubing and
13 Rubin.  I'm not sure.
14    Q.  Would that be Art Straubing?
15    A.  That's correct.
16    Q.  Did he became a consultant?
17    A.  Yes.
18    Q.  Do you recall any details about what
19 the procedure said?
20    A.  I don't recall them, no.  But in
21 general they would be what you did when you
22 found -- when you found a spill or release,
23 who you notified, who you called, action --
24 people to be notified and procedures for
25 clean-up and that type of thing.  But it was
00601
1  mostly notification of various people; plant,
2  manager and so on; notification of EPA or
3  state and federal people, even county people
4  to be notified, what order they would be
5  notified in and the action you would take to
6  clean it up, stop the contamination, et
7  cetera.
8     Q.  And were employees at the plant
9  trained, given any formal training about these
10 procedures?
11    A.  I don't think so.  There might have
12 been a few trained but -- the foreman
13 possibly, but, in general, most of the
14 employees would not have knowledge of what to
15 do.
16    Q.  During the Vulcan years was there an
17 environmental, was there a person on the
18 Vulcan staff who was in charge of
19 environmental affairs during the Vulcan years?
20    A.  I think they tried to put me in charge
21 of it for a while, but I don't remember any --
22 any other persons specifically in charge of
23 it.  But I did get that job for a while.
24    Q.  Do you know about what years you
25 would have had that job?
00602
1     A.  Late -- early '70s.
2     Q.  There were a couple of exhibits in
3  your previous deposition from, letters from
4  Mr. Campbell to Mr. Ply at the EPA?
5     A.  Yes.
6     Q.  That described lab work that was done?
7     A.  Uh-huh.
8     Q.  I wonder if you know the company that
9  did the lab work?
10    A.  I remember a name of a company called

MKSK-FED-0000003565

ALCD-PUBCOM_0006275

11 Mogul, M-o-g-u-l, and I think that they were
12 taken over by another company. But that's all
13 I can remember, Mogul. Maybe right, maybe
14 wrong.
15    Q. Okay. Of the -- all right. I think,
16 I'm just sure, everyone will be happy to know,
17 I think I just have one more question and that
18 is, you referred to somebody named Anthony
19 Papciak?
20    A. Yes.
21    Q. All right. In other documents we have
22 seen in this case, we've -- I've seen a
23 reference to a Henry Papciak?
24    A. Yes.
25    Q. Are they the same person or are
00603
1 they --
2    A. No, they're brothers.
3    Q. They're brothers. And did you know
4 Henry Papciak?
5    A. Yes.
6    Q. Was he also at the Doremus Street
7 plant?
8    A. Yes.
9    Q. During what years approximately?
10    A. I would say he came there in -- he
11 was -- Henry Papciak worked at the Lister
12 Avenue plant and he went to the Army, and some
13 time -- I think, he was drafted went to Korea
14 or something, probably came back there --
15 after the war, Korean War, he was discharged,
16 I guess he came back, went to the Newark plant
17 about '55, I would guess, on Doremus Avenue.
18    Q. Until?
19    A. I think it was there until, probably
20 was there until I left. But I'm not sure.
21 And he was a maintenance employee.
22    Q. All right. I don't have anything
23 further.
24      MS. RYNIEC: I don't have anything
25    further.
00604
1      MS. HAYNES: Probably put the
2    stipulation. We'll go off the record.
3      VIDEOGRAPHER: We'll go off the record
4    at 11:09.
5    (At this time a short recess is taken.)
6      VIDEOGRAPHER: Back on the record at
7    11:09.
8      MS. HAYNES: Mr. Gilliam, when your
9    deposition first began it was explained
10    that the deposition testimony questions
11    and answers are going to be put in a
12    booklet form and you'll be provided with

file:///qnapnas/Concordance/Concordance/Cases/03_Mckesson/09_NewarkLand/TRANSCRIPTS/Gillum%20Naphtinl%20Vol%20...7/26/2007 2:46 PM

MKSK-FED-0000003566

ALCD-PUBCOM_0006276

13    an opportunity to review that booklet and
14    make changes if you deem them necessary.
15        We caution that if you make any
16    changes to the transcript, any of the
17    attorneys in the case can comment on those
18    changes but in the event, all parties have
19    agreed that in the event for some reason
20    if your transcript does not get reviewed
21    and signed, that an unsigned copy of the
22    transcript could still be used after 30
23    days expire from today that the transcript
24    can still be used to the same effect by
25    any of the parties in the case at trial or
00605
1    for any other matter.
2        MS. RYNIEC:  Yes.  We agree.
3        MS. HAYNES:  Great.  Thank you again.
4        VIDEOGRAPHER:  That will conclude this
5    deposition at 11:10.
6        (Witness excused.)
7        (Deposition concluded.)
8
9
10        ------------------------
11        RAYMOND GILLIAM
12
13
14
15
16
17
18
19
20
21
22
23
24
25
00606
1        C E R T I F I C A T E
2    I, MICHELLE DIPIERRO-FAIREY, a Notary
3    Public and Certified Shorthand Reporter of the
4    State of New Jersey, do hereby certify that
5    prior to the commencement of the examination,
6    the witness (s) Raymond Gilliam was sworn by
7    me to testify the truth the whole truth and
8    nothing but the truth.
9        I DO FURTHER CERTIFY that the foregoing is
10    a true and accurate transcript of the
11    testimony that was taken stenographically by
12    and before me at the time, place and on the
13    date herein before set forth.
14        I DO FURTHER CERTIFY that I am neither a

MKSK-FED-0000003567

ALCD-PUBCOM_0006277

15 relative nor employee nor attorney nor counsel
16 for either of the parties to this action, and
17 that I am neither a relative nor employee of
18 such attorney or counsel, and that I am not
19 financially interested in the action.
20  _____
21       MICHELLE DIPIERRO-FAIREY, CSR
22       A Notary Public of the State
23           New Jersey
24 My commission expires:
25 July 2000

MKSK-FED-0000003568

ALCD-PUBCOM_0006278

# Exhibit 92

**RIVERSIDE INDUSTRIAL PARK**

# RIVERSIDE INDUSTRIAL PARK NEWARK, NJ

## Cleanup Activities

Sign up for this Superfund site's mailing list

**On this page:**

- Background
- What Has Been Done to Clean Up the Site?
- What Is the Current Site Status?

**On related pages:**

- Operable Units
- Cleanup Progress

## Background

The Riverside Industrial Park Superfund site includes both current and former manufacturing and packaging facilities, some of which are vacant, at 29 Riverside Avenue in Newark, New Jersey. The 7.6-acre site is located in a mixed residential and commercial/industrial area. From 1902 to 1971, the property was used for paint, resins, linseed oil, and varnish manufacturing by Patton Paint Company, which merged into the Paint and Varnish Division of Pittsburgh Plate Glass Company in 1920. Pittsburgh Plate Glass Company changed its name to PPG Industries, Inc. (PPG) in 1968. Metal pigments, including lead, were brought to the site for manufacturing of paints. From 1971 to the present day, the site is subdivided into fifteen lots. The property has been used by many companies for a variety of businesses from chemical packaging to chemical and cosmetics manufacturing. Although this is currently an active industrial park, there are several abandoned portions of the property which are owned by the City of Newark through foreclosures.

In October 2009, EPA and the New Jersey Department of Environmental Protection (NJDEP) responded to a reported oil spill into the Passaic River near the site. The spill was coming from a pipe on the property and the source was later traced to two basement storage tanks in a vacant building on the site. After investigating the discharge point and source, EPA initiated an emergency removal action to stop the discharge and secure the source. Further investigation of that immediate area within the site led to the discovery of multiple potentially immediate threats including:
-   several abandoned 12,000- to 15,000-gallon underground storage tanks containing hazardous wastes in a tank farm adjacent to the vacant building,
-   approximately one hundred 3,000- to 10,000-gallon above-ground storage tanks with a number of 55-gallon drums,
-   smaller containers in two buildings on-site, and
-   hazardous liquid and sludge in two basement vaults of one of the vacant buildings.

From 2009 through 2014, EPA's short-term cleanup program conducted several quick cleanup activities to eliminate the immediate threats identified as a result of the investigation of the oil spill into the Passaic River. After taking immediate action to protect human health and the environment and performing site investigations, EPA proposed the site to the National Priorities List in September 2012. Riverside Industrial Park was added to the National Priorities List in May 2013. In May 2014, EPA entered into a legal agreement with PPG, one of the 18 Potentially Responsible Parties identified at the site, to perform a Remedial Investigation/Feasibility Study (RI/FS). In 2017, EPA approved a Work Plan prepared by PPG for the RI/FS. PPG performed site-wide remedial investigation (RI) field work with EPA oversight between 2017 and 2019. During this time, EPA also conducted an additional emergency response action to remove debris, asbestos, and biohazard labeled medical waste illegally disposed on-site. In April 2020, EPA approved the RI Report documenting the nature and extent of contamination at the site. EPA approved the FS Report in July 2020, which lists preliminary remedial goals for contaminants in the soil and groundwater along with possible remedial alternatives. In July 2020, EPA issued the Proposed Plan with preferred remedial alternative to address soil, vapor intrusion, and groundwater contamination at the site along with on-site waste removal and cleaning and closing an inactive sewer line. After reviewing and considering all public comments, EPA finalized its cleanup plan in the September 2021 Record of Decision (ROD).

## What Has Been Done to Clean Up the Site?

**Immediate Actions:** In 2009, a spill of oily material into the Passaic River was reported and traced back to a pipe on the property. EPA investigated and discovered that chemicals, including benzene, mercury, chromium, and arsenic, were improperly stored at the site. In assessing the areas of the site adjacent to the discharge source, EPA discovered multiple potentially immediate threats to human health and the environment, including numerous storage tanks, both above and below ground, containing a variety of hazardous industrial wastes and solvents. EPA removed two underground tanks and most of the other containers in 2012. The two basement vaults were emptied of the hazardous liquid and sludge in 2014. Additional action was taken in 2017 to remove debris, asbestos, and biohazard labeled medical waste illegally disposed near Buildings #7 and #12.

**Long-term Cleanup:** Sampling during those initial investigations revealed that soil, groundwater, and storage tanks at the site are contaminated with volatile organic compounds (VOCs), semi-volatile organic compounds (SVOCs), metals, and polychlorinated biphenyls (PCBs). Certain VOCs are probable human carcinogens and PCBs are potential cancer-causing chemicals that persist in the environment and can affect the immune, reproductive, nervous, and endocrine systems of people and animals.

Following the RI, EPA determined that the soil and groundwater at Riverside were contaminated at levels that may cause potential risk to human health and the ecosystem either under current, foreseeable future, and hypothetical future land use scenarios in the absence of additional controls or remedial actions. Soil and groundwater contamination may also present unacceptable risk to future indoor workers from vapor intrusion into future buildings that may be constructed at Riverside. Relative to NJDEP's non-residential soil standards, EPA identified the following chemicals of potential concern (COPCs) in soil: metals, PCBs, VOCs, and SVOCs. Relative to NJDEP's groundwater standards, EPA also identified the following COPCs in groundwater: metals, VOCs, and SVOCs. Surface soil also contained elevated concentrations of VOCs, SVOCs, PCBs, metals, and dioxins that could pose unacceptable risks to wildlife. PPG also identified containerized waste at Riverside along with free petroleum product in underground storage tanks and surrounding soil, as well as pooled petroleum within Building #15. EPA is working in conjunction with NJDEP to address an acetone spill near Building #10 on Lot #`5.

## What Is the Current Site Status?

The Record of Decision (ROD) for Riverside, which is EPA's cleanup plan for the site, was finalized in September 2021. The ROD addresses cleaning up contaminated soil and groundwater as well as other media to prevent or reduce human health and wildlife exposures.

**Soil:** The cleanup plan for soil includes a focused excavation of lead-contaminated soil and petroleum around the perimeter of Building #7 with off-site disposal. The alternative also includes an engineered cap and bulkhead replacement to contain any remaining contaminants and prevent further exposures. Deed notices will be modified to restrict future land use, and fencing will be installed to prevent trespassing. This alternative will prevent or reduce contaminants leaching to the groundwater, and it will prevent or reduce erosion and transport of contaminated soil to the Passaic River.

**Groundwater:** The cleanup plan for groundwater includes a site-wide pumping system to extract contaminated groundwater for treatment and off-site disposal. Based on water quality, EPA may choose to implement periodic injections to assist with the remediation of the groundwater. This cleanup will restore groundwater quality, and it will prevent or reduce transport of contaminants to the Passaic River.

**Vapor Intrusion:** The cleanup plan for vapor intrusion includes air monitoring in existing, occupied buildings. It also requires future buildings to be constructed with a vapor barrier or other technology to seal the ground surface underneath the new building slab to prevent vapor intrusion.

**Waste:** The cleanup plan for waste includes the removal of underground storage tanks near Building #12, removal of the petroleum located inside Building #15A, and the removal of containerized waste. Waste would be transferred to vehicles for off-site disposal or recycling. This cleanup will prevent uncontrolled releases of waste to the environment and prevent exposure.

**Inactive Sewer Pipe:** The cleanup plan for the inactive sewer pipe includes cleaning out and power-washing an inactive manhole and sewer pipe located between Building #9 and the former Building #4. The deposited sediments and remaining water in the manhole will be transferred to vehicles for off-site disposal or recycling. This cleanup will prevent uncontrolled releases of waste to the environment and prevent exposure.

EPA will be reaching out to the responsible parties to begin the engineering design and implentation, called the Remedial Design and Remedial Action (RD/RA) phase of the cleanup.

MARCH 29, 2024

# Exhibit 93

**RECORD OF DECISION**

Riverside Industrial Park Superfund Site
EPA ID# NJSFN0204232

Operable Unit One

Newark, Essex County, New Jersey



United States Environmental Protection Agency
Region 2
New York, New York
September 2021

630397

## <u>DECLARATION STATEMENT</u>

## RECORD OF DECISION

## SITE NAME AND LOCATION

Riverside Industrial Park Superfund Site (EPA ID# NJSFN0204232)
Newark, Essex County, New Jersey
Operable Unit 1 – Entire Site

## STATEMENT OF BASIS AND PURPOSE

This Record of Decision (ROD) documents the U.S. Environmental Protection Agency's (EPA's) selection of a remedy for Operable Unit 1 (OU1) of the Riverside Industrial Park Superfund Site (Site or Riverside Industrial Park), in Newark, Essex County, New Jersey, which addresses contaminated sewer water, soil gas, soil/fill material, and groundwater. The selected remedy also addresses various wastes found across the Site. OU1 includes the entire Site and this remedy is expected to be the final action for the Site. The remedy was chosen in accordance with the requirements of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), as amended, 42 U.S.C. §§ 9601-9675, and the National Oil and Hazardous Substances Pollution Contingency Plan (NCP), 40 C.F.R. Part 300. This decision document explains the factual and legal basis for selecting the remedy. The attached index (see Appendix III) identifies the items that comprise the administrative record upon which the selected remedy is based.

The New Jersey Department of Environmental Protection (NJDEP) was consulted, in accordance with Section 121(f) of CERCLA, 42 U.S.C. § 9621(f). NJDEP concurs with EPA's selection of Waste Alternative 2, Sewer Water Alternative 2, Soil/Fill Alternative 4, and Groundwater Alternative 4. NJDEP does not concur with EPA's selection of Soil Gas Alternative 2 (see Appendix IV).

## SITE ASSESSMENT

Actual or threatened releases of hazardous substances from the Site, if not addressed by the implementation of the response action selected in this ROD, may present an imminent and substantial endangerment to public health and welfare and to the environment.

## DESCRIPTION OF SELECTED REMEDY

The selected remedy addresses five media which include: waste material, sewer water, soil gas, soil/fill material, and groundwater. Lead was found to be the primary contaminant of concern (COC) in soils at the Site. In addition to lead, copper, arsenic, polychlorinated biphenyls (PCBs), volatile organic contaminants (VOCs), and semi-volatile organic contaminants (SVOCs) were found to be of concern in soils. Lead, VOCs, and SVOCs were found to be contaminants of concern

for groundwater. VOCs were found to be COCs for soil gas. VOCs were also found to be a contaminant of concern in the settled solids in an inactive sewer manhole. Non-aqueous phase liquid (NAPL) and various other wastes containing hazardous constituents were found across the Site. The various other wastes are currently contained; however, there is potential for contaminants to be released into the environment.

The major components of the selected remedy are:

### Waste Alternative 2 - Removal and Off-Site Disposal

- Removal and off-site disposal of the underground storage tanks (USTs), the aqueous and solid waste and/or light non-aqueous phase liquid (LNAPL) within the USTs, non-aqueous phase liquid (NAPL)-impacted soil/fill material surrounding the USTs, the LNAPL in the pooled water in Building #15A, the white chalky talc-looking substance in a hopper in Building #7, a plastic 55-gallon drum in Building #12 containing liquid waste, and a five-gallon bucket in Building #17 containing solid waste. The LNAPLs in the UST and in Building #15A are considered principal threat wastes, and the removal and disposal of these wastes will address this concern.
- Following removal of USTs and their contents, confirmation sampling of soil/fill (including underneath the tank) and groundwater will occur.

### Sewer Water Alternative 2 – Removal and Off-Site Disposal

- Transfer of the sewer water and solids from the inactive sewer line into appropriate containers or transport vehicles for off-site treatment and/or disposal.
- The associated sewer line and manhole will be cleaned, and then closed in place by plugging/filling to prevent future buildup of water and solids in the manhole.

### Soil Gas Alternative 2 - Institutional Controls, Air Monitoring and, if needed, Engineering Controls (existing occupied buildings), and Site-Wide Engineering Controls (future buildings)[1]

- Institutional controls (ICs) will be established in the form of deed notices and Classification Exception Areas (CEAs)/Well Restriction Areas (WRAs) site-wide to provide notice of certain restrictions upon the use of the property in relation to soil gas. This requirement will be implemented in conjunction with the deed notice requirement for the soil/fill remedy and the CEA/WRA requirement for the groundwater remedy.
- A building-specific assessment of sub-slab soil gas and/or indoor air quality will be required for any of the currently occupied existing buildings on the Site, and for existing buildings that will be occupied in the future, and, if the assessment identifies unacceptable risks/hazards, engineering controls will be implemented to protect the occupants of such existing buildings from unacceptable vapor intrusion risks/hazards. The assessment will evaluate vapor intrusion COCs in soil (trichloroethylene [TCE], total xylenes, and naphthalene), and, for buildings within 100 feet of groundwater contamination that exceeds screening levels, additional COCs will be evaluated as part of the assessment (benzene, ethylbenzene, and vinyl chloride).
- Future new construction will be required to include a vapor barrier or other appropriate

---

[1] Figure 14 in Appendix I is a schematic drawing that presents the Selected Remedy for Soil Gas. The details will be refined during the remedial design.

means of sealing the ground surface underneath the new building slab or installation of a subsurface depressurization system (SSDS), as determined by EPA.

- In all existing buildings – currently occupied and occupied in the future – periodic indoor air monitoring will be required to verify previous assessment results and to confirm that engineering controls continue to protect indoor workers, due to the potential for unacceptable risk from the presence of indoor air contaminants above vapor intrusion screening levels (VISLs). Air monitoring may also be required in newly constructed buildings. If indoor air monitoring indicates exceedances of EPA VISLs, New Jersey VISLs, and/or New Jersey Indoor Air Remediation Standards (IARS) from Site COCs in existing or newly constructed buildings, further evaluation of the data would be needed to determine whether unacceptable risks/hazards exist in which case property owners or other parties would be required to implement further engineering controls to achieve New Jersey IARS as remediation goals.

### *Soil/Fill Alternative 4: Institutional Controls, Engineering Controls, Focused Removal with Off-Site Disposal of Lead, and NAPL Removal[2]*

- ICs will be established in the form of deed notices site-wide to provide notice that future use of the Site must remain commercial or industrial and identify areas of the Site where contamination exceeds the State of New Jersey residential soil standards.[3] These requirements will be implemented in conjunction with the deed notice requirement for the soil gas remedy.
- Fencing will be required to be maintained and enhanced as appropriate to limit unauthorized access to the Site and use of the Site in a manner inconsistent with the remedy.
- NAPL-impacted soil/fill on Lot 63 will be excavated and disposed of off-site.
- Contaminated soil/fill material will be capped, with a cap that consists of the construction of a barrier over the contaminated areas, to prevent access to and contact with the contaminated media and/or to control its migration.
- A focused excavation and off-site disposal of lead-impacted soil/fill around Building #7 of the Site where high levels of lead were found will be performed.
- The bulkhead will be reinforced or reconstructed, as appropriate, in order to minimize the potential for interaction between the Site and surface water, minimize soil erosion, and prevent off-site transport of soil/fill containing COCs and Contaminants of Potential Ecological Concern (COPECs).

### *Groundwater Alternative 4 – Institutional Controls, Pump and Treat, and Targeted Periodic In-Situ Remediation[4]*

- ICs will be established in the form of CEAs/WRAs site-wide to provide notice that the groundwater in the area does not meet designated use requirements and to prohibit the installation and use of wells for potable and other uses within the designated area.

---

[2] Figure 15 in Appendix I is a schematic drawing that presents the Selected Remedy for Soil/Fill. The details will be refined during the remedial design

[3] The Proposed Plan incorrectly referenced the non-residential standards (NRDCSRS). This has been clarified to state that the deed notices will identify areas of the Site where contamination exceeds New Jersey residential soil standards (RDCSRS).

[4] Figure 16 in Appendix I is a schematic drawing that presents the Selected Remedy for Groundwater. The details will be refined during the remedial design.

- Targeted, periodic in-situ remediation of the groundwater will be conducted. The specific means will be determined during the remedial design with treatability studies to determine the most appropriate treatment approach and reagents. Possible treatments include chemical treatment, biosparging, and air sparging.
- A pump and treat system will be installed to provide hydraulic containment at the river's edge to minimize migration of contaminated groundwater to the river. Extracted groundwater will be collected, treated, and disposed. The number of extraction wells, pumping rate, and individual processes to be utilized for treatment will be determined during the remedial design.
- Groundwater monitoring will be performed to demonstrate that the selected remedy continues to be protective of human health and the environment.

The total estimated cost of the selected remedy is $38,923,100.

## DECLARATION OF STATUTORY DETERMINATION

### Part 1: Statutory Requirements

The Selected Remedy is protective of human health and the environment, complies with federal and state requirements that are applicable or relevant and appropriate to the remedial action, is cost-effective, and utilizes permanent solutions and alternative treatment (or resource recovery) technologies to the maximum extent practicable.

### Part 2: Statutory Preference for Treatment

By utilizing targeted, periodic in-situ treatment to the extent practicable to treat the groundwater contamination in combination with pump and treat to provide hydraulic containment, the Selected Remedy meets the statutory preference for remedies that employ treatment that reduces toxicity, mobility, or volume as a principal element is satisfied. Furthermore, excavation of soil/fill material would reduce the mobility of the lead around Building #7 and NAPL on Lot 63 through removal and appropriate off-site disposal. As required by the disposal facility, the toxicity and volume may be reduced if material is treated to comply with disposal requirements.

### Part 3: Five-Year Review Requirements

Because this remedy results in hazardous substances, pollutants, or contaminants remaining on the Site above levels that will allow for unlimited use and unrestricted exposure, a statutory review will be conducted within five years of the initiation of the remedial action to ensure that the remedy is, or will be, protective of human health and the environment, unless determined otherwise at the completion of the remedial action.

## ROD DATA CERTIFICATION CHECKLIST

The following information is included in the Decision Summary section of this ROD. Additional information can be found in the administrative record file for this action.

- A discussion of the current nature and extent of contamination is included in the "Summary of Site Characteristics" section.

- The Site COCs and their respective concentrations are presented in the "Summary of Site Characteristics" section.

- A discussion of the potential adverse effects associated with exposure to Site COCs and COPECs are included in the "Summary of Site Risks" section.

- The remediation goals for the Site COCs are presented in the "Remedial Action Objectives" section.

- A discussion of principal threat waste is included in the "Principal Threat Wastes" section.

- A discussion of the current and reasonably anticipated future land and groundwater use assumptions is included in the "Current and Potential Future Land and Resources Uses" section.

- The estimated capital, operation and maintenance, and total present-worth costs are presented in the "Description of Remedial Alternatives" section.

- A discussion of the key factors that led to the selection of the remedy is included in the "Comparative Analysis of Alternatives" and "Statutory Determinations" sections.

**AUTHORIZING SIGNATURE**

Evangelista, Pat   Digitally signed by Evangelista, Pat
Date: 2021.09.28 11:19:11 -04'00'

9/28/2021

_____        _____
Pat Evangelista, Director                                        Date
Superfund and Emergency Management Division
EPA Region 2

# TABLE OF CONTENTS

SITE NAME, LOCATION, AND DESCRIPTION ............................................................... 2

SITE HISTORY AND ENFORCEMENT ACTIVITIES ..................................................... 3

HIGHLIGHTS OF COMMUNITY PARTICIPATION ........................................................ 6

SCOPE AND ROLE OF OPERABLE UNIT OR RESPONSE ACTION ........................ 7

SUMMARY OF SITE CHARACTERISTICS ...................................................................... 7

    Hydrogeology ...................................................................................................................... 7

    Remedial Investigation ...................................................................................................... 9

CURRENT AND POTENTIAL FUTURE LAND AND RESOURCE USES ................... 14

    Land Use ........................................................................................................................... 14

    Groundwater Use ............................................................................................................. 15

SUMMARY OF SITE RISKS ............................................................................................. 15

    Baseline Human Health Risk Assessment ..................................................................... 16

    Screening-level Ecological Risk Assessment ................................................................ 31

    Basis for Taking Action ................................................................................................... 32

REMEDIAL ACTION OBJECTIVES ................................................................................. 32

    Remediation goals ............................................................................................................ 33

DESCRIPTION OF REMEDIAL ALTERNATIVES ......................................................... 36

    Waste Alternatives ........................................................................................................... 37

    Sewer Water Alternatives ................................................................................................ 38

    Soil Gas Alternatives ....................................................................................................... 39

    Soil/Fill Alternatives ........................................................................................................ 41

    Groundwater Alternatives ............................................................................................... 45

COMPARATIVE ANALYSIS OF ALTERNATIVES ........................................................ 48

    Waste Alternatives ........................................................................................................... 49

    Sewer Water Alternatives ................................................................................................ 50

    Soil Gas Alternatives ....................................................................................................... 51

    Soil/Fill Alternatives ........................................................................................................ 52

    Groundwater Alternatives ............................................................................................... 54

    State Acceptance .............................................................................................................. 56

    Community Acceptance ................................................................................................... 56

PRINCIPAL THREAT WASTES ....................................................................................... 56

SELECTED REMEDY ........................................................................................................ 56

    Summary of the Estimated Selected Remedy Costs ..................................................... 59

Expected Outcomes of the Selected Remedy ........................................................ 59

STATUTORY DETERMINATIONS ...................................................................... 59

    Protection of Human Health and the Environment................................................. 60

    Compliance with ARARs ...................................................................................... 60

    Cost Effectiveness................................................................................................. 60

    Utilization of Permanent Solutions and Alternative Treatment (or Resource Recovery)
    Technologies to Maximum Extent Practicable ....................................................... 61

    Preference for Treatment as a Principal Element .................................................. 61

    Five-Year Review Requirements............................................................................ 61

DOCUMENTATION OF SIGNIFICANT CHANGES ............................................ 61

## APPENDICES

APPENDIX I  ....................................................................................FIGURES

APPENDIX II  ..................................................................................... TABLES

APPENDIX III ...............................................................ADMINISTRATIVE RECORD INDEX

APPENDIX IV .....................................STATE OF NEW JERSEY CONCURRENCE LETTER

APPENDIX V  .......................................................................RESPONSIVENESS SUMMARY

APPENDIX V-A: ..................................................................PROPOSED PLAN

APPENDIX V-B: .PUBLIC NOTICE: COMMENCEMENT OF PUBLIC COMMENT PERIOD

APPENDIX V-C: ................................................................PUBLIC MEETING TRANSCRIPT

APPENDIX V-D: ............ COMMENTS RECEIVED DURING PUBLIC COMMENT PERIOD

**DECISION SUMMARY**

**Riverside Industrial Park Superfund Site**
**Operable Unit One**
**EPA ID# NJSFN0204232**
**Newark, Essex County, New Jersey**

**SITE NAME, LOCATION, AND DESCRIPTION**

The Site is currently a 7.6-acre partially active industrial park located in the North Ward community of Newark, Essex County, New Jersey (Figure 1 of Appendix I). PPG Industries, Inc. (PPG) and its predecessors occupied the Site and conducted paint and varnish manufacturing operations on the Site from approximately 1902 until 1971. After 1971, the Site was subdivided into 15 parcels/lots, and is now identified as the Riverside Industrial Park (Figure 2 of Appendix I).

Both Riverside Avenue and McCarter Highway border the Site to the west along with a segment of railroad track adjacent to McCarter Highway. Currently, the central and northern portions of the Site contain active industrial/commercial businesses, operating in buildings formerly operated by PPG for paint and varnish manufacturing, while the south side of the Site contains mostly vacant, former PPG buildings. The lots in the northern portion of the Site have Riverside Avenue addresses (Lots 1, 57, 58, 59, 60, 69, and 70), while the lots in the southern portion of the Site have McCarter Highway addresses (Lots 61, 62, 63, 64, 65, 66, 67, and 68). The main entryway is through a vehicle access point on Riverside Avenue; however, pedestrian trespassing occurs regularly through unsecured portions of the Riverside Industrial Park. The majority of the Site (70 percent) is covered with hardened surfaces, such as asphalt (approximately 19 percent), foundation and buildings (approximately 27 percent), and concrete (approximately 24 percent). The remaining portion of the Site is indicated to be pervious (approximately 30 percent). The Passaic River and its tidal mudflat border the Site on the east side. Sections of steel, concrete, and wooden bulkhead provide a retaining wall along most of the Site adjacent to the Passaic River; however, the bulkhead has fallen into disrepair in some locations and several sections of the wooden bulkhead have collapsed. Recent site observations indicate a combined sewer outfall pipe under the area of Lot 63 has collapsed, causing subsidence and a collapse of a section of the bulkhead.

There are 14 buildings at the Site with five of the buildings being vacant (Buildings #6, #7, #12, #15, and #17). At the time of the Remedial Investigation (RI), Buildings #1, #2, #3, #9, #10, #13, #14, and #16 had ongoing business operations along with a small garage building (Building #19) that was used for storage by the occupant of Building #13. The southern portion of the Site is primarily vacant with four of the five unoccupied buildings located there. Former Building #4 was damaged by fire and was demolished in 1982; a sub-grade concrete slab with concrete walls is currently present that was previously used by post-PPG occupants as secondary containment for multiple above-ground storage tanks (ASTs). Debris including several pieces of cars are located near the former Building #4. Former Building #5 was also damaged by fire and demolished in 1982, a vegetated soil/fill mound currently occupies much of the footprint of the building. At the time of the RI, debris/soil mounds were also present within a former AST dike on Lot 68 and on the south side of Building #15 on Lot 58. These soil/fill mounds are of unknown origin. The mound on Lot 68 was removed in 2019.

Smaller structures that are present on the Site include a vacant guard-shack at the entrance to the Site along Riverside Avenue and a small concrete structure of unknown use on the eastern side of Lot 67. Empty ASTs and/or process vessels are present on the exterior of Lots 58, 67, and 69. The empty AST on Lot 58 is a remnant feature from PPG manufacturing practices.

**SITE HISTORY AND ENFORCEMENT ACTIVITIES**

An 1873 map from Atlas of the City of Newark, as compared to later maps, indicates that most of the Site was reclaimed from the Passaic River with imported fill material. An 1892 Certified Sanborn Map suggests that some filling occurred in the late 1800s; however, the major filling events at the Site occurred from 1892 to 1909 (Figure 3 of Appendix I). The origin of fill material at the Site is unknown. Boating docks shown on the north and central portions of the Site on the 1892 map suggest some placement of fill and reclamation of land from the Passaic River occurred. Most of Lots 57, 61, 62, 63, 64, 66, 67, 68, and 70 were within the footprint of the Passaic River with the Triton Boat Club operating a dock area on the north side of Lot 60. By 1909, most of the lots had been created via filling and land development and were developed with structures used by the Patton Paint Company, a hotel, and the Triton Boat Club. Portions of Lots 57 and 70 remained part of the Passaic River in 1909 but were created by placement of fill material prior to 1931. Lot 67 was completely filled by 1966.

From approximately 1902 to 1971, the Site was used for paint, vanish, linseed oil, and resin manufacturing by the Patton Paint Company and its corporate successors. Patton Paint Company merged into the Paint and Varnish Division of Pittsburgh Plate Glass Company in 1920, which changed its name to PPG Industries, Inc. (PPG) in April 1968. After discontinuing all manufacturing operations, PPG conveyed its interest in the Site in August 1971. Since then, the property has been subdivided into the 15 separate lots that exist today with multiple current and former owners and various industrial-related tenants. Detailed descriptions of the Site's ownership history, operational history, known historical activities, documented releases, and previous site investigations are provided in Sections 1.3 and 1.4 of the Remedial Investigation (RI) Report (2020). Highlights from those descriptions are provided below.

- PPG housed paint and varnish manufacturing operations from approximately 1902 to 1971. PPG's operations involved current Lot 1 and Lots 57 through 70. As stated in the Site Characterization Summary Report (SCSR) (Woodard & Curran, 2015), metal pigments were brought to the Site for the manufacturing of paints, including basic lead carbonate (also known as white lead) and copper oxide.

- Frey Industries, Inc. (Frey) occupied Lots 1, 61, 62, 63, and 64 from 1981 to 2007, when operations ceased. Frey warehoused, packaged, repackaged and distributed client-owned chemicals. As stated in the SCSR, products handled by Frey included polyester resins, flammable liquids, corrosives, and poisons. Jobar operated on a portion of Frey's leased property between 1979 and 1982 before its assets were acquired by Frey in 1983. Hazardous wastes generated during the Jobar and Frey operations were a result of cleaning transfer lines, floor sweepings, and absorbents used for cleanup of spills.

- Baron Blakeslee, Inc. (BBI) was a sub-tenant of Frey in the early 1980s. BBI occupied Lot 61 for product distribution, warehousing a variety of chemical products, and analysis of various chemical blends and waste samples. They also reportedly used Building #7 (Lot 63) as a laboratory, Lot 62 for drum storage, and Lot 68 as a common truck and tanker parking area where a 25-gallon tetrachloroethylene spill occurred in 1987. Purex (BBI's parent company) was acquired by Allied Signal. After a series of mergers and acquisitions,

BBI became part of Honeywell International, Inc. (Honeywell) in 1999. The City of Newark currently owns Lots 58, 61, 63, 64, and 68.

- Universal International Industries was identified as conducting various manufacturing operations on Lots 1, 63, and 64. No specific information was located regarding its manufacturing activities.

- Samax Enterprises (Samax) occupied Lot 1 from 1999 to 2011 when operations ceased. Samax stored various raw materials on-site and manufactured various chemicals under the brand name Rock Miracle. As stated in the SCSR, other products include deck strippers, deck wash, marine paint removers, restoration cleaners, lead paint removers, masonry cleaners, paint hardeners, and various solvents. An industrial company, 29 Riverside, LLC, currently occupies Lot 1. (The property is currently owned by Hatzlucha on Riverside, LLC.)

- HABA International, Inc. (HABA) occupied Lot 57 from at least 1982 until 1988. Davion Inc. (Davion), successor to HABA, currently operates on Lot 57. (The property is owned by Plagro Realty, Inc.) HABA and Davion manufactured nail polish remover and related products. As stated in the SCSR, products included acetone, ethyl acetate, dyes, fragrances, fatty acids, and lubricating oil. A material identified as HC Blue 2 was released in 1993 as a result of a fire involving nitrated aniline. Acupak, Inc. was a subtenant of HABA on Lot 57 from at least 1987 to 1988 and conducted packaging for HABA.

- Roloc Film Processing (Roloc) occupied Lot 60 from 1985 until 2008 when operations ceased, and manufactured foils utilized for holograms and decoration in plastic, graphic, automobile, and other related industries. As stated in the SCSR, the coatings on the foils were made from solvent-based material, such as butyl acetate, naphtha, ethyl alcohol, methyl isobutyl ketone, and cellosolve acetate.

- Gilbert Tire Corporation has occupied Lot 60 since at least 2015 (following Roloc's occupation) and is the current occupant. (The property is owned by Shefah in Newark, LLC.). There is no manufacturing equipment. Used tires and wheel rims are stored until transferred off property.

- Chemical Compounds, Inc. (CCI) is the listed owner of Celcor Associates, LLC and has occupied Lots 62, 66, and 67 from at least the early 1990s. These companies manufactured hair dyes and other personal hygiene products using the following raw materials: 8-hydroxyquinoline (technical, pure, sulfate, citrate, and benzoate), copper-8-quinolinolate, ammonium adipate/benzoate, diphenylacetonitrile, and 2-nitro-p-phenylene diamine (as stated in the SCSR). Beginning in 2015, Teluca began operating on Lot 62. Teluca packages and distributes hair dyes, hair color, and related ingredients to hair color marketers. The facility includes a laboratory for completing hair dye research, offices, and warehousing.

- Gloss Tex Industries, Inc. (Gloss Tex) occupied Lot 69 from 1979 to at least 1989 when operations ceased. Gloss Tex manufactured bulk nail enamel, lacquer, and related cosmetic

4

products. According to the SCSR, isopropyl alcohol and dibutyl phthalate are stored on-site. Gloss Tex leased the property from Industrial Development Associates/Corporation (IDA), which currently owns Lot 65.

- Ardmore, Inc. has occupied Lots 59 and 69 (following Gloss Tex's occupation) since 1982 and is the current occupant. (The properties are owned by Sharpmore Holdings, Inc. and Albert Sharphouse.) Ardmore, Inc. manufactures soaps and detergents on Lot 59 and stores empty drums on Lot 69. According to the SCSR, a 1-gallon allyl chloride spill occurred in 1987.

- Monaco RR Construction Company stored railroad rails, cross ties, and spikes on Lot 70. Following their operation, Federal Refining Company (Federal) occupied Lot 70 from 1985 to 2007 when operations ceased. Federal was a scrap metal recycler, specializing in recovery of precious metals for arsenic, barium, cadmium, lead, and zinc. According to the SCSR, an unknown quantity of nitrocellulose spilled in 1990. The current tenant is Midwest Construction Company. Material and equipment used by the company are stored and maintained at the property. (The property is owned by the Estate of Carole Graifman.)

Since 1971, at least 11 documented spills and releases have occurred at the Site, and at least seven lots at the Site are subject to New Jersey Industrial Site Recovery Act (ISRA) remediation cases under NJDEP environmental regulations. The ISRA investigations resulted in ICs on these properties with either modified deed notices for engineering controls (such as pavement surface cover) or groundwater CEAs/WRAs to restrict use of contaminated groundwater. RI sampling was conducted site-wide and was not limited by these state ICs. Refer to the RI Report for more details.

In 2009, EPA and NJDEP responded to an oil spill that was discharging from a pipe into the Passaic River called "The Passaic River Mystery Oil Spill" (NJDEP Case #09-10-29-1320-36). The source of the spill was identified at low tide when a pipe discharging the oil was observed. The pipe was sealed, stopping the release. The pipe that discharged into the Passaic River was traced to a catch basin. An oily substance similar to the material observed in the discharge to the river was observed in the catch basin, and a sewer pipe from Building #12 was observed to discharge into the basin. EPA traced the source to two basement tanks in Building #12, a vacant building located on Lot 64 that had recently been connected to the sewer pipe by a hose. Based on its investigation during removal activities, EPA concluded that contents of the two basement tanks had been intentionally discharged into the sewer line and catch basin and released to the river. The sewer line was plugged, and the tanks secured by EPA.

Further EPA investigations of Lots 63 and 64 led to the discovery of several 12,000-15,000 gallon USTs adjacent to Building #7, numerous 3,000-10,000 gallon ASTs, an underlain concrete basement/impoundment, a number of 55-gallon drums, and pigment hoppers and other smaller containers in Buildings #7 and #12. Between 2011 and 2014, EPA performed a removal action to address these conditions on Lots 63 and 64. EPA's removal action activities included: removal of the liquids from the basements of Buildings #7 and #12; investigation of the USTs with removal of two of them; investigation and disposal of the ASTs, drums, and smaller containers; and soil, groundwater, and waste sampling. The Site was added to the National Priorities list in May 2013.

In 2014, after the conclusion of the EPA's removal action, PPG signed an Administrative Settlement Agreement and Order on Consent (ASAOC) with EPA to complete the RI and the Feasibility Study (FS) for the Site. The RI was completed in April 2020 and the FS was completed in July 2020. The final RI and FS Reports and other related information in the administrative record file provide the basis for this ROD.

## HIGHLIGHTS OF COMMUNITY PARTICIPATION

Throughout the RI/FS process EPA provided progress updates and presented findings to the Passaic River Community Advisory Group (CAG). The CAG consists of stakeholders, who represent a broad range of interests and locales potentially affected by the contamination and cleanup of the Diamond Alkali Co. Superfund Site, including the Lower Passaic River Study Area. Since the Site is adjacent to the Passaic River, the investigation and cleanup of the Site were of interest to the CAG. Presentations given to the CAG were also posted to their website at www.ourpassaic.org.

EPA's preferred remedy and the basis for that preference were identified in a Proposed Plan. On July 22, 2020, EPA released the Proposed Plan for Riverside Industrial Park Superfund Site to the public for comment. Supporting documentation comprising the administrative record was made available to the public at the information repositories maintained at the EPA Region 2 Superfund Records Center, 290 Broadway, 18th Floor, New York, New York, and EPA's website for the Site at www.epa.gov/superfund/riverside-industrial.

EPA published notice of the start of the public comment period and the availability of the above-referenced documents in the Star Ledger on July 22, 2020. The notice was also translated into Spanish and was published in El Diario on July 22, 2020. A news release announcing the Proposed Plan, which included the public meeting date, time, and virtual meeting web link, was issued to various media outlets and posted on EPA's Region 2 website on July 22, 2020. The public comment period initially ran from July 22, 2020 to August 21, 2020 but several extensions were granted, and the public comment period ended on February 19, 2021. Notices of the comment period extensions were published in the Star Ledger and El Diario newspapers and on EPA's website.

A virtual public meeting was held on August 5, 2020, to inform local officials and interested citizens about the Superfund process, to review the preferred alternative as well as other alternatives evaluated in the Proposed Plan, and to respond to any questions from area residents and other attendees. Closed captioning and a Spanish translator were made available for this virtual meeting. During the meeting, public comments were related to details of the proposed remedy, the performance of the work at the Site, and local community health concerns.

Responses to the questions and comments received at the public meeting and in writing during the public comment period can be found in the attached Responsiveness Summary (See Appendix V).

**SCOPE AND ROLE OF OPERABLE UNIT OR RESPONSE ACTION**

The NCP, at 40 CFR Section 300.5, defines an OU as a discrete action that comprises an incremental step toward comprehensively addressing site problems. A discrete portion of a remedial response eliminates or mitigates a release, threat of a release, or pathway of exposure. The cleanup of a site can be divided into several OUs, depending on the complexity of the problems associated with the site.

For the Riverside Industrial Park Superfund Site, the entire Site is designated as OU1, which is expected to be the only OU for the Site. This ROD describes EPA's selected remedial action for OU1, which addresses contaminated soil, soil gas, sewer water, and groundwater present at the Site. This selected remedial action also addresses various wastes found across the Site. This remedy is expected to be the final action for the Site.

**SUMMARY OF SITE CHARACTERISTICS**

*Hydrogeology*

The majority of the Site was reclaimed from the Passaic River through placement of fill material into the river and along the adjacent shore to raise the surface elevation to today's approximate elevation, with most of this work being completed from 1892 to 1909. The fill material ranges in thickness from 6 to 15 feet. The fill material consists predominantly of sands, silts, and gravel, along with man-made materials such as brick, pieces of concrete block, wood, glass, and cinders. The fraction of each material in the fill varies across the Site, however, most of the historic fill material at the Site is characterized as a Loamy Sand or Sand Loam. Based upon historical maps, previous investigations, and data obtained during the RI, fill material is present in surface soil throughout the Site and in subsurface soil where historical filling was conducted to reclaim land from the Passaic River. This material meets the NJDEP definition of "historic fill" and, consistent with that definition, has been shown by RI data to be impacted by chemicals and metals. The sources of fill material are unknown. As fill placement occurred over a more than 30-year period, the sources, and thus the physical and chemical properties, of the fill could have differed over time. The historic fill material at the Site was also likely to have been impacted by historical and/or recent operations and recent and illegal disposal. Lower portions of the fill are saturated, as evidenced by groundwater depths that are typically less than 6 feet below grade. A silt loam underlies the fill unit over the majority of the Site except in areas to the northwest.

In order to understand the movement of groundwater at the Site, groundwater gauging was conducted at Site wells during three groundwater sampling events, slug testing was performed, and tidal influence studies were completed in a number of wells at the Site. The wells installed as part of the RI and existing wells on Site evaluated the shallow fill unit (wells named with the 100-series wells) and the alluvial deposits (wells names with the 200-series wells), which are referred to as the deep unit wells. Wells monitoring the shallow unit were generally screened from 2 to 12 feet below ground surface (bgs) with recharge attributed primarily to precipitation and higher surface elevation areas to the west as well as recharge from the Passaic River during high tide. The deeper groundwater unit is composed of quaternary alluvium (a geological unit known as Qal) and glacial lake deposits (a geological unit known as Qbn), which are hydraulically connected. Wells

7

monitoring the deep unit were screened from 20 to 26 feet bgs with recharge attributed primarily to higher surface elevation areas to the west as well as some leakage from the overlying shallow fill unit. Groundwater movement within the shallow fill unit would be expected to have a limited vertical component of flow due to the observed permeability/grain-size differences between the fill material and underlying fine-grained unit (silt loam), although the silt loam layer is thin and contains a sand fraction. Monitored groundwater elevations also suggest these deep wells are under tidal influence, which suggests some recharge from the Passaic River. The lacustrine lake bottom sediments (a geological unit known as Qbnl) underlying the deltaic deposits is believed to represent a semi-confining unit to vertical groundwater flow.

The primary groundwater flow direction in both the shallow and deep units is east toward the Passaic River, and both the shallow and deep groundwater units are considered to discharge to the Passaic River. Hydraulic conductivity in the wells tested at the Site varied between 4 and 264 feet per day (ft/day). While the data indicate a range of approximately two orders of magnitude for hydraulic conductivity, the fact that many of the wells are constructed in fill materials suggests this range is reasonable given the heterogeneity of fill. The fill material can reasonably be expected to vary between silty sand to low fines content sand and gravel mixes. Generally, the hydraulic conductivity appears to be higher in fill materials on the southern portion of the Site based on the slug-test results in MW-109 and MW-123 with a hydraulic conductivity in fill in the southern half of the Site ranging from approximately 30 to 260 ft/day (see Figure 5 for location of monitoring wells). In the fill in the northern half of the Site, the hydraulic conductivity ranges from 10 to 64 ft/day. In the deeper unit, the soil types vary between silty sands and sand and gravel both related to Qal and Qbn deposits. The wells in the deeper unit are screened in the Qal deposits, with the exception of MW-205 which is screened in the Qbn deposits. The hydraulic conductivity in the Qal appears to vary between approximately 4 and 264 ft/day. The lowest conductivities (4 – 12 ft/day) in the Qal were interpreted from MW-201. The conductivities for MW-202 through MW-204 range from 24 to 264 ft/day. This range likely reflects the heterogeneity expected in the alluvium left behind by the Passaic River. The interpreted conductivity from slug tests in MW-205 in the Qbn deposits varied between 181 and 230 ft/day and is generally reasonable given the description of this unit as deltaic sands and gravels.

Field-specific conductivity readings collected during groundwater sampling events indicate 25 of the 36 wells on the Site had conductivity readings above 1 millisiemens per centimeter (mS/cm), indicating brackish water. Groundwater samples from four of the five deep wells had conductivity readings that slightly exceeded 1 mS/cm. Higher specific conductivity readings in the range of possible brackish conditions were generally associated with wells in the northern portion of the Site closer to the river (MW-116, MW-118, MW-119, and MW-121).

The largest changes in groundwater elevations due to tidal changes are in the wells immediately adjacent to the shoreline. Tidal fluctuations in the deep unit indicate that deep wells on the north end of the Site also appear to exhibit more tidal influence suggesting that the materials on the more northern and inland portions (near MW-205) are more conductive or better connected to the river at depth or both.

8

# Exhibit 94

# EXHIBIT A-56

**Appendix A to** OxyChem's Comments in Opposition to Proposed Consent Decree,
*United States v. Alden Leeds, Inc., et al.*, Civil Action No. 2:22-cv-07326 (D.N.J.)

ALCD-PUBCOM_0006772

**Valuation Counselors, Inc.**

230 WEST MONROE STREET, CHICAGO, ILLINOIS 60606 (312) 368-0200

N2-8

January 14, 1975

...nd Chemical Corporation
...Magnavox Parkway
...ayne, Indiana  46804

A...tion:  Mr. Me... ... Arnold
         Vice Pr...dent, Finance

...tlemen:

In accordance with ...er request, we have p...p...ed an appraisal of the
fair market value a.. ..emaining life of the piping and equipment com-
prising the propert ...ated at

Inland Chemica. .l...t
600 Doremus Ave.ue
Newark, New Jersey  0,105.

The purpose of this appraisal is to express an opinion as to the fair
market value of certain appraised assets as of May 1, 1974.

.. term "fair marke. .lue" is defined as follows:

    .e amount w.. .ne assets will bring if exposed for sale
    .n the open ma.se  with a reasonable time .llowed to f.... ..
    .rchaser, .. .. .uyer and seller hav.ng knowledge of the
    ..ses and p.rp.. ... which the assets are ad..ted and for
    which they a.e .ap.ble of being used. the se..er being
    willing bu. .o. ..mpelled to sell an. the buyer being willing
    but not compe... .d .. buy.

Based on the inves .gati. .. ..d analysis co..ta.ned in the report which
is .lows, it is ou. ... .on that the fair ma.ket value of the appraised
assets as of May .. 1974 .is .fairly repres...ted in the amount of

$4,647,880.

The report con.a... ... .f.....ng:

    This letter ... .. .ng the s.r.ice performed.

MKSK-FED-0000009700

ALCD-PUBCOM_0006773

Inland Chemical Corporation                        January 14, 1975
                                                   Page 2

A statement of facts and limiting conditions.

Processing procedures and general data.

A recapitulation and index.

Piping breakdown.

An inventory of certain assets containing their descrip-
tions, fair market value and remaining lives.

A copy of this report is retained in our files along with the detailed
working papers from which the report was compiled.

                                       Respectfully submitted,

                                       D. S. Felsenthal
                                       President

DSF:o'l
2-2028

                                                         Valuation Counselors, Inc

MKSK-FED-0000009701

ALCD-PUBCOM_0006774




## STATEMENT OF FACTS AND LIMITING CONDITIONS

All facts and data set forth in the report are true and accurate to the best of the appraiser's knowledge and belief.

We have made a personal inspection of the property appraised.

Neither the appraiser nor any officer or employee of Valuation Counselors, Inc. has any financial interest in the property appraised.

The fee for the appraisal report is not contingent upon the values reported.

No investigation of legal fee or title to the property has been made and owner's claim to the property has been assumed to be valid. No consideration has been given to liens or encumbrances which may be against the property except as specifically stated in the appraisal report.

All opinions as to market value are presented as the appraiser's considered opinion based on the facts and data set forth in the report.

Not included in this report are land, land improvements, buildings, air products, the chloro-methanes plant and the equipment, spare parts and inventory of raw materials and finished products related thereto, the dry caustic soda plant and terminal, the truck dispatch center equipment, all over-the-road vehicles and all railroad cars, and any inventories of products produced by Vulcan but not produced by the subject assets which may be terminaled on the real property.

VC

Valuation Counselors, Inc.

## PROCESSING PROCEDURES AND GENERAL DATA

The original chlor-alkali facility was built in late 1950's and early
1960's with a capacity of approximately 55 tons a day of CL2 using
128 Hooker Sl cells under an owner's license agreement.

The plant was redesigned and expanded in 1967-68 with the addition of
36 new Hooker S4B cells. Based on this new design the production is
125 tons CL2/steam a day.

The complete process starts from salt unloading from railroad tank cars,
to brine treatment system, to the cell room, which is an electrolysis
process with a 26.5 KV power supply, outdoor substation, switch gear,
rectifiers and transformers. The electrolysis flow is the gas from the
cell room, single train, for cooling, drying, compression liquification
and storage.

During the process 2.2# of salt produces 1# chlorine and 1# chlorine
gives 5 cubic feet of hydrogen and approximately 1.45# caustic soda.

Final products: hydrogen is piped to a close off-premise customer, the
CL2 is sent to chloro-methanes on-premise plant, storage or to bleach
plant; caustic soda to storage or back to brine field.

The condition of all equipment is just fair due to very little preventive
maintenance by the former owner, age and the corrosive conditions of the
process.

The Hooker Sl cells are obsolete and no longer made although used one
can be purchased from Hooker. The Hooker Company has newer types of
cells which are larger, more efficient and more economical.

Plants of this size are rarely built today. Newer plants are built with
400/600 tons/day capacity and are built much closer to their supplier,
and in an area of less expensive and more electric power. This northeast
area has electric power problems and this plant is the second largest user
in the area.

This plant, at the present time, is still economical because of the world-
wide short supply of chlorine and caustic is also in short supply.

Chlorine today sells for approximately $140-$150/ton. Three years ago it
sold for about $60/ton. Caustic soda today sells for approximately $160-
$180/ton and three years ago for about $50-$60/ton.

Presently non-contractural purchasers are paying up to $400/ton for early
delivery of both chlorine and caustic soda.

Valuation Counselors, Inc.

MKSK-FED-0000009703

ALCD-PUBCOM_0006776

RECAPITULATION AND INDEX

Inland Chemical Plant
600 Doremus Avenue
Newark, New Jersey  07105

|  | | Fair Market Value | Pages |
|---|---|---|---|
| Piping | | $  947 685 | 1-5 |
| Equipment | | | |
| Department 502 | *Occupancy* | $    4 052 | 6-7 |
| Department 503 | *maintenance* | 25 232 | 8-9 |
| Department 504 | *Lab* | 47 874 | 10-11 |
| Department 506 | *Utilities* | 81 963 | 12-14 |
| Department 507 | *Electric* | 917 182 | 15-24 |
| Department 508 | *Steam* | 204 535 | 25-27 |
| Department 509 | *Cell Rebuilding* | 48 759 | 28-30 |
| Department 510 | *Hydrogen* | 44 345 | 31-32 |
| Department 511 | *Brine* | 176 383 | 33-36 |
| Department 512 | *Cell Room* | 1 378 354 | 37-38 |
| Department 513 | *50% Caustic* | 350 196 | 39-50 |
| Department 516 | *H.C.L* | 73 709 | 51-53 |
| Department 517 | *Chlorine* | 232 987 | 54-58 |
| Department 521 | *Bleach* | 27 947 | 59-60 |
| Department 536 | *a.P. Products* | 18 968 | 61 |
| Department 538 | *D.M.A. Phenoxy* | 31 593 | 62-63 |
| Department 560 | *Warehouse* | 16 483 | 64 |
| Department 580 | *Administrative* | 13 494 | 65-68 |
| Department 583 | *Pollution Control* | 6 145 | 69 |
| Total Equipment | | $3 700 201 | |
| Total Fair Market Value | | $4 647 886 | |

Valuation Counselors, Inc.

PIPING BREAKDOWN

| | |
|---|---|
| 50% to Department 513 | $473 842 |
| 30% to Department 512 | 284 309 |
| 10% to Department 511 | 94 769 |
| 5% to Departments 510 | 67 156 |
| 5% to Department 521 | 47 387 |
| **Total Piping** | **$947 685** |

Valuation Counselors, In

MKSK-FED-0000009705

ALCD-PUBCOM_0006778

| Piping | | Fair Market Value | Remaining Life |
|---|---|---|---|
| 1 | Item 240 lineal feet 12" piping, covered, welded. | $ 2 791 | 5 |
| 22 | Fittings. | 2 480 | 5 |
| 3 | Valves. | 770 | 5 |
| 1 | Item 670 lineal feet 6" piping, covered. | 3 238 | 5 |
| 67 | Fittings. | 3 058 | 5 |
| 8 | Valves. | 666 | 5 |
| 1 | Item 2,405 lineal feet 3" piping. | 8 477 | 5 |
| 260 | Fittings. | 2 930 | 5 |
| 18 | Valves. | 745 | 5 |
| 1 | Item 2,530 lineal feet 2" piping. | 3 150 | 5 |
| 270 | Fittings. | 1 616 | 5 |
| 28 | Valves. | 431 | 5 |
| 1 | Item 3,960 lineal feet ½"-1" piping. | 2 103 | 5 |
| 410 | Fittings. | 1 226 | 5 |
| 112 | Valves. | 715 | 5 |
| 1 | Item 3,130 lineal feet 12" covered piping. | 36 396 | 5 |
| 426 | Fittings. | 48 025 | 5 |
| 43 | Valves. | 11 039 | 5 |
| 1 | Item 2,240 lineal feet 12" bare piping. | 20 966 | 5 |
| 1 | Item 6,375 lineal feet 4" covered piping. | 24 920 | 5 |
| 680 | Fittings. | 11 807 | 5 |
| 47 | Valves. | 2 649 | 5 |

*Moscato*

1

VC
Valuation Counselors, Inc.

MKSK-FED-0000009706

ALCD-PUBCOM_0006779

| Piping | | Fair Market Value | Remaining Life |
|---|---|---|---|
| 1 | Item 1,650 lineal feet 8" bare piping. | $ 8 801 | 5 |
| 1 | Item 2,190 lineal feet 8" covered piping. | 15 347 | 5 |
| 320 | Fittings. | 21 390 | 5 |
| 23 | Valves. | 3 705 | 5 |
| 1 | Item 7,120 lineal feet 6" covered piping. | 34 411 | 5 |
| 1,260 | Fittings. | 57 509 | 5 |
| 86 | Valves. | 8 022 | 5 |
| 1 | Item 3,890 lineal feet 6" bare piping. | 15 066 | 5 |
| 1 | Item 5,390 lineal feet 2½" bare piping. | 9 524 | 5 |
| 820 | Fittings. | 7 528 | 5 |
| 143 | Valves. | 5 350 | 5 |
| 1 | Item 3,510 lineal feet 2½" covered piping. | 9 719 | 5 |
| 1 | Item 540 lineal feet 8" underground hydrogen line to air products. | 3 015 | 5 |
| 22 | Building right angle pipe saddles. | 1 386 | 5 |
| 20 | Pipe towers, 4' wide, 2 pipe, 30' high. | 1 800 | 5 |
| 42 | Pipe racks, 30' - 6" I beam, 2 hanger. | 5 292 | 5 |
| 9 | Pipe towers, 30' truck loaders. | 32 400 | 5 |
| 1 | Item 4,985 lineal feet 3" nickel covered piping. | 27 098 | 5 |
| 530 | Fittings. | 8 060 | 5 |
| 46 | Valves. | 1 946 | 5 |

*Moscato*

VC
Valuation Counselors, Inc.

2

MKSK-FED-0000009707

ALCD-PUBCOM_0006780

Case 2:22-cv-07326-MCA-LDW     Document 309-9     Filed 04/01/24     Page 351 of 420
PageID: 13770

| Piping | | Fair Market Value | Remaining Life |
|---|---|---|---|
| 1 | Item 4,240 lineal feet 2" nickel piping. | $ 13 738 | 5 |
| 435 | Fittings. | 3 670 | 5 |
| 120 | Valves. | 4 251 | 5 |
| 1 | Item 3,525 lineal feet ½" - 1" piping. | 8 460 | 5 |
| 360 | Fittings. | 1 944 | 5 |
| 175 | Valves. | 1 838 | 5 |
| 1 | Item 2,290 lineal feet 8" nickel covered piping. | 24 794 | 5 |
| 1 | Item 3,810 lineal feet 6" nickel traced piping. | 34 461 | 5 |
| 1 | Item 4,830 lineal feet 4" nickel piping. | 37 645 | 5 |
| 1 | Item 670 lineal feet 12" piping, Hetron. | 8 902 | 5 |
| 1 | Item 250 lineal feet 30" piping, Hetron. | 9 719 | 5 |
| 1 | Item 350 lineal feet 20" bare piping. | 9 902 | 5 |
| 1 | Item 360 lineal feet 10" bare piping. | 3 447 | 5 |
| 1 | Item 1,280 lineal feet 4" bare piping. | 3 829 | 5 |
| 135 | Fittings. | 2 344 | 5 |
| 22 | Valves. | 1 142 | 5 |
| 1 | Item 640 lineal feet 8" piping, Hetron. | 5 009 | 5 |
| 1 | Item 230 lineal feet 12" piping, Hetron. | 3 056 | 5 |

*Hoscard* (handwritten)



3

Valuation Counselors, Inc.

MKSK-FED-0000009708

ALCD-PUBCOM_0006781

| | Piping | Fair Market Value | Remaining Life |
|---|---|---|---|
| 1 | Item 190 lineal feet 30" piping, Hetron. | $ 7 386 | 5 |
| 1 | Item 2,500 lineal feet 6" bare piping. | 9 683 | 5 |
| 267 | Fittings. | 12 186 | 5 |
| 33 | Valves. | 2 747 | 5 |
| 1 | Item 220 lineal feet 2" bare piping, Hetron. | 383 | 5 |
| 1 | Item 378 lineal feet 1" bare piping, Hetron. | 408 | 5 |
| 1 | Item 1,340 lineal feet 6" covered piping. | 6 476 | 5 |
| 1 | Item 1,290 lineal feet 1½" bare piping. | 1 211 | 5 |
| 145 | Fittings. | 633 | 5 |
| 18 | Valves. | 264 | 5 |
| 1 | Item 760 lineal feet 2" bare piping. | 946 | 5 |
| 78 | Fittings. | 467 | 5 |
| 12 | Valves. | 279 | 5 |
| 1 | Item 2,570 lineal feet 8" nickel covered piping. | 23 970 | 5 |
| 15 | Valves. | 2 465 | 5 |
| 1 | Item 3,640 lineal feet 6" nickel covered piping. | 27 464 | 5 |
| 12 | Valves. | 1 140 | 5 |
| 1 | Item 3,450 lineal feet 4" nickel covered piping. | 21 714 | 5 |
| 22 | Valves. | 1 288 | 5 |

*MOSCATO*

VC

Valuation Counselors, Inc.

4

MKSK-FED-0000009709

ALCD-PUBCOM_0006782



| | Piping | Fair Market Value | Remaining Life |
|---|---|---|---|
| 1 | Item 3,895 lineal feet 3" nickel covered piping. | $ 21 173 | 5 |
| 18 | Valves. | 762 | 5 |
| 1 | Item 4,480 lineal feet 2" nickel covered piping. | 14 515 | 5 |
| 12 | Valves. | 425 | 5 |
| 1 | Item 1,365 lineal feet 20" nickel covered piping. | 40 663 | 5 |
| 8 | Valves. | 11 888 | 5 |
| 1 | Item 4,030 lineal feet 12" nickel covered piping. | 59 592 | 5 |
| 22 | Valves. | 8 173 | 5 |
| 1 | Item 390 lineal feet 2" bare steel piping. | 486 | 5 |
| 400 | Fittings. | 2 394 | 5 |
| 15 | Valves. | 349 | 5 |
| 1 | Item 5,250 lineal feet 1½" piping. | 4 930 | 5 |
| 530 | Fittings. | 2 315 | 5 |
| 22 | Valves. | 323 | 5 |
| 1 | Item 11,950 lineal feet ½" – 1" piping. | 6 346 | 5 |
| 2,100 | Fittings. | 6 281 | 5 |
| 38 | Valves. | 242 | 5 |
| | Total Piping | $947 685 | |

*Moscato*



5

VC
Valuation Counselors, Inc.

MKSK-FED-0000009710

ALCD-PUBCOM_0006783

| | Equipment<br>Department 502 | Fair Market<br>Value | Remaining<br>Life |
|---|---|---|---|
| 5 | Desks, steel, 60 x 34", double pedestal, linoleum top. | $ 360 | 5 |
| 1 | Table, steel, 60 x 30", linoleum top. | 45 | 5 |
| 5 | Chairs, steel, plastic, swivel, arm. | 113 | 5 |
| 1 | Chair, steel, plastic, side, arm. | 15 | 5 |
| 1 | File, steel, 4 drawer, letter. | 26 | 5 |
| 5 | Files, steel, 5 drawer, letter. | 180 | 5 |
| 5 | Cabinets, steel, 36 x 18 x 78", 2 door. | 98 | 5 |
| 3 | Book racks, steel, 3 x 1 x 7', 5 shelf. | 54 | 5 |
| 1 | Water cooler, electric, bottle type. | 75 | 5 |
| 19 | Lockers, steel, 12 x 18 x 72", clothes. | 103 | 5 |
| 1 | Refrigerator, Frigidaire, 14 cubic feet. | 108 | 5 |
| 3 | Cabinets, steel, 24 x 18 x 72", 2 door. | 54 | 5 |
| 2 | Cabinets, steel, 36 x 18 x 84", 2 door. | 45 | 5 |
| 6 | Ladders, wood, 4 - 8' step. | 24 | 5 |
| 1 | Desk, steel, 60 x 30", secretary, linoleum top. | 72 | 5 |
| 2 | Chairs, steel, plastic, swivel, arm. | 36 | 5 |
| 1 | Grinder, Black & Decker, 6", double end, ½ HP. | 26 | 5 |

VC

Valuation Counselors, Inc.

6

MKSK-FED-0000009711

ALCD-PUBCOM_0006784

| Equipment Department 502 | | Fair Market Value | Remaining Life |
|---|---|---|---|
| 1 | Table, steel, 72 x 30", 4" vise. | $ 38 | 5 |
| 1 | Item barrel rests, chests, hand tools, desk. | 81 | 5 |
| 6 | Fire extinguishers, 20#, CO2. | 126 | 5 |
| 1 | Time recorder, Simplex Employee 10 card rack. | 132 | 5 |
| Locker Room: | | | |
| 2 | Fire extinguishers, 2½ gallon, soda acid. | 21 | 5 |
| 342 | Lockers, steel, 12 x 18 x 72", clothes. | 1 949 | 5 |
| 18 | Benches, wood, 12 x 1. | 86 | 5 |
| 22 | Lockers, Changeomatic, 10 door, foot. | 185 | 5 |
| Total Department 502 | | $4 052 | |

7


Valuation Counselors, Inc.

MKSK-FED-0000009712

ALCD-PUBCOM_0006785

· Equipment
Department 503

| | | Fair Market Value | Remaining Life |
|---|---|---|---|
| 1 | Lift truck, Thor, 2 - 48, hydraulic. | $   113 | 5 |
| 1 | Sewer rodder, gas engine, 100' rod. | 173 | 5 |
| 9 | Cabinets, steel, 36 x 18 x 36". | 130 | 5 |
| 5 | Cabinets, steel, 36 x 18 x 78". | 90 | 5 |
| 2 | Tables, steel, 6 x 5, welding vise. | 132 | 5 |
| 1 | Vise, 6", swivel. | 47 | 5 |
| 3 | Racks, steel, 36 bin. | 50 | 5 |
| 4 | Work tables, steel, 6 x 3', wood top. | 192 | 5 |
| 1 | Cabinet, steel, 16' x 4', 16 door. | 117 | 5 |
| 3 | Desks, steel, 60 x 30", double pedestal, linoleum top. | 216 | 5 |
| 3 | Chairs, steel, plastic, swivel, arm. | 68 | 5 |
| 2 | Files, steel, 4 drawer, letter. | 51 | 5 |
| 1 | Book case, wood, 4 section, glass door. | 48 | 5 |
| 1 | Air conditioner, Fedders, ½ ton. | 104 | 5 |
| 1 | Heliarc welder, Hobart GT300 #32RT31407, 300 amp., torch, cables and accessories. | 218 | 5 |
| 1 | Band saw, Kalamazoo 324D #173988, ½ HP motor. | 294 | 4 |
| 1 | Arc welder, Lincoln 230AC, vertical, truck base. | 147 | 5 |
| 1 | Grinder, Queen City 14P, 2 HP double end, #374919, pedestal. | 119 | 3 |

*Puerto Rico*

8

VC

Valuation Counselors, Inc.

MKSK-FED-0000009713

ALCD-PUBCOM_0006786

| Equipment Department 503 | | Fair Market Value | Remaining Life |
|---|---|---|---|
| 1 | Lathe, Hendey, 17" x 60" center quick change geared #30522, 7½ HP motor, chuck, taper attachment; wiring and installation. | $ 3 780 | 5 |
| 1 | Arbor press, Dake 75H, hydraulic #49369, hand operated. | 544 | 8 |
| 1 | Drill press, Edlund 30" back geared, 5 HP motor; wiring and installation. | 660 | 3 |
| 1 | Crane, Valley Craft UH15, portable #C64, hydraulic. | 375 | 5 |
| 1 | Threader, Toledo 2" pipe, complete. | 149 | 5 |
| 1 | Item miscellaneous tools, stool, chair, side tables, etc. | 135 | 3 |
| 1 | Lift truck, Hyster RT-150, Space Saver #RT54296, 15,000# x 20' lift capacity, 48" forks, propane gas, operator guard. | 6 750 | 4 |
| 1 | Loader, Case, Model W70 #9604854, gas power, hydraulic, 1½ yd. shovel, operator cab. | 6 450 | 4 |
| 1 | Trackmobile, Whiting, railroad track and road vehicle, Hercules 3000 engine, 6 cylinder, gas, Ross cam and lever steering, operator's cab. | 4 080 | 5 |
| | Total Department 503 | $25 232 | |

*Summer Associates $550 1977*

9

Valuation Counselors, Inc.

MKSK-FED-0000009714

ALCD-PUBCOM_0006787

| | Equipment Department 504 | Fair Market Value | Remaining Life | |
|---|---|---|---|---|
| 1 | Item 215 lineal feet steel 30" laboratory cabinet, stone top, reagent shelf, gas, air, water, electric, cabinet base. | $20 694 | 5 | A |
| 3 | Fume hoods, steel, 5 x 30 x 48", exhaust, cup sink, gas, air, electric. | 2 888 | 5 | A |
| 4 | Fume hoods, steel, 4 x 2 x 48. | 2 794 | 5 | A |
| 1 | Laboratory cabinet, Island, 10 x 4 x 3', stone top, door, drawer. | 550 | 5 | A |
| 1 | Sink cabinet, steel, 60 x 30", cabinet base, 24" sink, mix faucet. | 358 | 5 | A |
| 1 | Sieve shaker, Fisher Wheeler, 20# capacity. | 454 | 5 | KS |
| 1 | PH meter, Coleman, Model 39. | 289 | 5 | A |
| 1 | PH meter, Coleman, Zeromatic. | 146 | 5 | A |
| 1 | Recorder, Sargent, Model SR. | 351 | 5 | ONEIDAC |
| 1 | Power supply control, Gowmac 9999. | 117 | 5 | ONEIDAC |
| 1 | Pyro Magnester Labline 1268. | 117 | 5 | A |
| 1 | Calculator, Singer Friden EC1117. | 312 | 5 | A |
| 1 | Refrigerator, Westinghouse, 12 cubic feet. | 136 | 5 | A |
| 1 | Gas Chromatograph, F & M Scientific Corp. 720, dual column program temperature with MH 15307856 chart recorder. | 3 750 | 5 | A |
| 1 | Recorder, F & M Scientific Corp. vapor fractometer, L & N Speedomax recorder. | 880 | 5 | A |

10

VC

Valuation Counselors, Inc.

MKSK-FED-0000009715

ALCD-PUBCOM_0006788

| Equipment<br>Department 504 | | Fair Market<br>Value | Remaining<br>Life | |
|---|---|---|---|---|
| 1 | Gas Chromatograph, F & M Scientific Corp. 500, program temperature, Brown recorder, heater. | $ 3 150 | 5 | A |
| 1 | Bank of 3 Hewlett Packard 570 Research Chromatograph with 7127A strip chart recorder and 5752B Bath. | 9 300 | 5 | A |
| 1 | Oven, Labline 3505 #1263. | 175 | 5 | T |
| 2 | Balances, Christian Becker AB4 1200 GV. | 370 | 5 | A |
| 2 | Aqua testers, Hellige. | 180 | 5 | A, C |
| 1 | Aqua tester, Photovolt 700, #1082. | 750 | 5 | C |
| 1 | PH meter, Beckman 72. | 113 | | B |
| Total Department 504 | | $47 874 | | |

VC
Valuation Counselors, Inc.

xs - not assumed for totals work
A - essential to mill
B - scrap not usable - no value
C - use at mill, but not in present condition    D. DeBruicker
2-28-76

MKSK-FED-0000009716

ALCD-PUBCOM_0006789

| Equipment Department 506 | Fair Market Value | Remaining Life |
|---|---|---|
| 1   Portable crane, Austin Western 6 cylinder gas engine, hydraulic 5 ton capacity at 10', hydraulic outrigger, 8,000# with outriggers, 2,000# at 24' no outriggers, 3,500# at 10' with outriggers. | $ 7 110 | 4 |
| 1   Tank, steel, 8' diameter x 30' propane gas storage, brick saddle setting on 2 concrete 10 x 3 x 5' piers, painted; 1 pump, Corken 2069 gas flow 20' head 250 GPM, 1 HP explosion proof motor; piping, wiring and installation. | 6 220 | 8 |
| 1   Air compressor, Worthington, Size 7 x 7, horizontal, single piston #L60559, V belt drive, 20 HP, 1750 RPM motor, lubricator force feed, after cooler, controls, foundation, piping, wiring and installation. | 1 131 | 5 |
| 1   Air receiver, steel, 4' diameter x 8', vertical, control valve, foundation, piping and installation. | 327 | 8 |
| 1   Air compressor, Ingersoll Rand, Size 14 x 10, horizontal, single piston, belt drive, 100 HP, 1750 RPM motor, force feed lubricator, snubber filter, after cooler, 3' diameter x 8' air receiver, foundation, controls, piping, wiring and installation. | 6 270 | 5 |
| 1   Air compressor, Worthington, Size 10 x 9 VBB, vertical, single piston #L87457T, belt drive, 60 HP, 1750 RPM motor, filter, after cooler, Western tank Model HSC-2, 3' diameter x 8' air receiver, foundation, controls, piping, wiring and installation. | 5 985 | 10 |
| 1   Air dryer, C. M. Kemp, Model 75EA4 Oriad #1-7006, 90° F, 120 PSIG, 230 CFM capacity, control, piping, wiring and installation. | 1 305 | 8 |

12

VC

Valuation Counselors, Inc.

MKSK-FED-0000009717

ALCD-PUBCOM_0006790

| Equipment<br>Department 506 | Fair Market<br>Value | Remaining<br>Life |
|---|---|---|
| 2  River water pumps, Johnson 20 x 12" vertical #J24143-4 CB 1593, direct drive, U. S. 200 HP, 1770 RPM enclosed motors, control, piping, wiring and installation. | $10 541 | 8  *City Electric* |
| 1  River water pump, Johnson 20 x 12", vertical CB1593, 100 HP motor. | 5 270 | 5 *New England Electric* |
| 1  Traveling water screen, Rex, chain belt 3' wide endless screen, V belt drive, 2 HP motor, gear reducer, installation. | 7 215 | 5 |
| 1  Item 120 lineal feet 12" welded steel pipe, 20' header, 3 - 12" valves, 3 - 4" globe valves. | 2 558 | 5 |
| 1  River water pump, Worthington, 10 x 12" direct drive, 150 HP, 1150 RPM motor; 30 lineal feet 14" flanged pipe, 2 - 14' check and gate valves, 2 - 14" T 2 - 14 - 10 and 12" reducers, 2 filter screens, twin 24" diameter x 48" pots, 100 lineal feet 12" underground pipe to river with concrete housing filter screen, controls, piping, wiring and installation. | 9 440 | 8  *Moscato* |
| 1  Booster water pump, Ingersoll Rand, Size 2MC #03463021, 200 GPM 70' head direct drive 7½ HP, 1750 RPM, weather-proof motor, controls, piping, foundation, wiring and installation. | 731 | 8 *Moscato* |
| 1  Air compressor, Ingersoll Rand, Type ES2 Size 9 x 4 x 9, horizontal, single piston #93537, 250# pressure discharge, counter balance, V belt drive, 50 HP, 1750 RPM motor, compressor 327 RPM, guards, Madison Kipp SVII lubricator, water cooler, trap, filter, controls, piping, foundation, wiring and installation. | 2 354 | 5 |

13

VC

Valuation Counselors, Inc.

MKSK-FED-0000009718

ALCD-PUBCOM_0006791

| | Equipment Department 506 | Fair Market Value | Remaining Life |
|---|---|---|---|
| 1 | Air compressor, Ingersoll Rand, Type ESH2, Size 12 x 6 x 11", horizontal, single piston #2SK3, 230# discharge pressure, V belt drive, 100 HP, 1740 RPM motor, compressor, 342 RPM, guard, water cooler, automatic lubricator, trap, filter, controls, foundation, piping, wiring and installation. | $ 5 678 | 5 Mosc470 |
| 1 | Air dryer, Pall Trinity Micro Corp., electric #7734, two drying beds, 18" diameter x 42" welded steel pressure tanks, 450° F. and 300 PSIG capacity, piping, controls, wiring and installation. | 1 365 | 5 |
| 1 | Air dryer, Kemp, Model 50EA4, Orion #T6561; piping, wiring and installation. | 1 365 | 5 Mosc470 |
| 3 | Air receivers, welded steel, 42" diameter x 16' long, horizontal pipe leg and concrete pier base, valve, piping and installation. | 7 098 | 8 |
| | Total Department 506 | $81 963 | |

VC
Valuation Counselors, Inc.

MKSK-FED-0000009719

ALCD-PUBCOM_0006792



| | Equipment<br>Department 507 | Fair Market<br>Value | Remaining<br>Life | |
|---|---|---|---|---|
| 3 | Westinghouse cubicles, 3' x 3' x 8', 3 circuit breaker controls, 2 - 0-5 amp meter, meters belong to public service; wiring and installation. | $ 27 135 | 5 | MOSCATO |
| 1 | Bank 60 Exide EOP-11, 200 amp. batteries, Catalog #52819 C & D automatic regulator, ARR130A/C16 battery charger; installation. | 1 935 | 5 | |
| 1 | Neon tester and hot stick. | 75 | 5 | INLAND |
| 3 | Power circuit breakers, Westinghouse Type 345G1500, 38 KV-200 KV, 1200 amp. 22,000 amp. 6550#/oil. | 14 400 | 5 | MOSCATO |
| 3 | Potential transformers, GE, Type JVT 200. | 4 860 | 5 | |
| 3 | Metering transformers, Westinghouse. | 3 420 | 5 | |
| 3 | Current transformers, Westinghouse, IHV-200. | 1 110 | 5 | |
| 1 | Main transformer, Westinghouse, Type SL, Class DA/FA/FOA, 3 phase, #RGR21681 35,000 KV, 26400/13800Y/7969 volts, Wt 40,500# 26575 oil, 96,375 total air cooled, 6 fans, 2 - IR 6 PVT-2 oil circulating pumps. | 68 250 | 5 | |
| 1 | Voltage regulator, Allis Chalmers 750 KVA 8/8% step AFR #9-0110-00175-26. | 1 500 | 5 | |
| 1 | Auxiliary station power transformer, 50KVA; installed. | 1 226 | 5 | |
| 1 | Auxiliary power transformer, GE, Type HT 75 KVA; installed. | 1 697 | 5 | |
| 1 | Oil circuit breaker, Allis Chalmers Type D2-23-500-6 23 KV 1200 amps #21016-1 500 M/A, 3 phase, 87# oil. | 3 450 | 5 | |

15

VC

Valuation Counselors, Inc.

MKSK-FED-0000009720

ALCD-PUBCOM_0006793

| | Equipment<br>Department 507 | Fair Market<br>Value | Remaining<br>Life |
|---|---|---|---|
| 1 | Voltage regulator, GE Inductrol,<br>Type LIRT 1495 KVA, 3 phase,<br>#D554112. | $ 4 500 | 5 |
| 1 | Rectifier transformer, GE Class<br>DA-TD, 6960 KVA, 3 phase to 12<br>phase, voltage rate 15900-407 #D551207. | 16 572 | 5 |
| 1 | Bus ducts for regulator and rectifier<br>transformer 15- 40 copper bar. | 18 000 | 5 |
| 1 | Bank 32 - 20' long 3 wire cables,<br>Connection Instrument. | 15 000 | 5 |
| 1 | Unit substation transformer, GE<br>Class OA/FA, 3 phase, #864301<br>Voltage 13200 480Y/277 1500 KVA<br>with GE Type LVP switch gear;<br>installation. | 8 250 | 5 |
| 3 | Westinghouse 1600 amp. air circuit<br>breaker; installation. | 7 200 | 5 |
| 2 | Semiconductor rectifier, GE Model<br>6RN185L30083, input 407 volts, 5120<br>amp., output 500 volts, 250 amp.,<br>3125 KW, water cooled; installation. | 121 875 | 5 |
| 1 | Bank 8 batteries DC control Gould<br>float charger. | 399 | 5 |
| 1 | Demand meter, GE Catalog #730X,<br>Type PD-57F printing. | 135 | 5 |
| 1 | Bristol single pen chart recorder. | 203 | 5 |
| 1 | Item 300 lineal feet 6" x ½" copper<br>bus bar. | 1 350 | 5 |
| 1 | Switch gear, GE Type AKD 12' x 5 x 7',<br>4 GE AK2-73 600 Volt 3000 amp. manual<br>circuit breaker, 4 GE 1600 amp. power<br>circuit breaker, volt and amp meters,<br>KW meter, 4 AC amp meter; installation. | 29 531 | 5 |

*Moscato*

16

VC

Valuation Counselors, Inc.

| | Equipment<br>Department 507 | Fair Market<br>Value | Remaining<br>Life | |
|---|---|---|---|---|
| 1 | Motor control center No. 1<br>Federal Pacific 18' x 2' x 8'<br>1 - 1200 amp main 440 Volt<br>22 - 400 amp breaker; installation. | $ 6 894 | 5 | *Moscato* |
| 1 | Motor control center ITE<br>480 volt, 1200 amp, 2 - 600<br>amp switch; installation. | 3 430 | 5 | |
| 1 | Transformer lighting 440/240<br>100 KVA. | 719 | 5 | |
| 1 | Transformer lighting 240/110<br>5 KVA. | 122 | 5 | |
| 1 | Power panel, Federal Pacific<br>Type ODP, 1000 amp, 1 - 800 and<br>2 - 400 amp branches. | 3 579 | 5 | |
| 1 | Rectifier control panel, GE S1<br>line, 16 current meters, 2 chart<br>recorders, 8 meters, 15 feeders<br>and breakers. | 10 500 | 5 | |
| 1 | Rectifier control panel, Brown<br>Baveri #J015600 CB, 2 current<br>regulators, Electronik 15 recorder,<br>16 control switches, 6 overcurrent<br>meters, 4 meters; installation. | 15 000 | 5 | |
| 1 | Rectifier transformer unit, Brown<br>Baveri Type TULFMKX 37-33, #56043/A<br>primary 12,800 KVA, secondary 18000<br>KVA, radiator type air oil cooling,<br>interphase reactor 1800 KVA, rectifier<br>rating 10,500 KWDC, 60,000 amperes,<br>complete. | 202 500 | 5 | |
| 17 | Wood 50' PP poles. | 1 785 | 5 | *Inland* |
| 1 | Item 260 lineal feet 4" C & W<br>on poles. | 1 560 | 5 | *Moscato* |
| 1 | Unit substation transformer, GE Class<br>OA, #C863908, Voltage 13200 - 480/277<br>1500 KVA with Type LVF switch gear. | 8 700 | 5 | |

17

VC

Valuation Counselors, Inc.

MKSK-FED-0000009722

ALCD-PUBCOM_0000795

| | Equipment<br>Department 507 | Fair Market<br>Value | Remaining<br>Life | |
|---|---|---|---|---|
| 1 | Switch gear panel, GE Type AKD<br>1 - 3000 and 1600 amp circuit<br>breaker, volt, amp and kilowatt<br>meter; installation. | $ 10 565 | 5 | INLAND |
| 1 | Switchboard, Kolton, 1600 amp<br>480 volt, 1 - 1600, 5 - 400 and<br>4 - 200 amp switches; installation. | 10 423 | 5 | Moscato |
| 1 | Transformer, Allis Chalmers Type<br>LCS 1500/1680 KVA #4483819, Voltage<br>13200-480Y/277, 1725-1932FA KVA<br>and switch gear. | 8 700 | 5 | |
| 1 | Distribution panel, Allis Chalmers<br>Type LA - 3000 amp main switch,<br>4 Type LA 1600 amp branches, volt<br>and amp meter, 1 - 300 amp starter<br>circuit breaker; installation. | 19 511 | 5 | |
| 2 | Motor control centers, steel, 18' x<br>2' x 7', 800 amp main fuses, 30 -<br>200 amp branches, 4 - 400 amp branches. | 10 010 | 5005  1  5005  5 | Moscato<br>INLAND |
| 2 | Motor control centers, steel, 10' x<br>2' x 8', 800 amp main fuses, 29 -<br>200 amp branches, 4 - 400 amp branches. | 9 849 | 5 | Moscato |
| 1 | Transformer, S B Heavy Duty, 45 KVA<br>480-208Y/120 V; installation. | 766 | 5 | |
| 1 | Transformer, Allis Chalmers Type<br>LCS 1000-1120 KVA switch gear;<br>installation. | 4 200 | 5 | |
| 1 | Control center, Allis Chalmers Type<br>LA - 1600 amp main fuse, 5 - LA -<br>600 amp branches. | 3 866 | 5 | |
| 1 | Control center, steel, 12 x 2 x 8',<br>27 - 200 amp branch switch, 1 volt<br>and ampere meter, 1 - 600 amp switch. | 8 558 | 5 | |
| 1 | Transformer, OHT 45 KVA, 440-280Y-<br>120 volts; installation. | 713 | 5 | |



18

VC
Valuation Counselors, Inc.

MKSK-FED-0000009723

ALCD-PUBCOM_0006796

| | Equipment<br>Department 507 | Fair Market<br>Value | Remaining<br>Life |
|---|---|---|---|
| 1 | Sealed dry type transformer, GE, Class AA, 3 phase, 60 cycle, 750 KVA, #E6884501, Voltage 13,200-480Y/277, Type LVP switch gear; installation. | $ 5 100 | 5  Moscato |
| 1 | Substation, GE, 1,600 amp main switch, 3 - 600 amp branches, kilo amp, volt and kilowatt meter. | 3 045 | 5  Inland |
| 1 | Main switch, 600 amp, 800 volts. | 1 875 | 5  Moscato |
| 1 | Control center, steel, 12 x 2 x 7' 32 - 200 amp branches, 1 - 400 amp branch. | 3 592 | 5 |
| 1 | Control center, steel, 4 x 2 x 8', 10 - 200 amp branches. | 889 | 5 |
| 3 | Transformers, 10 KVA, lighting. | 554 | 5 |
| 1 | Transformer, 15 KVA, lighting. | 224 | 5 |
| 3 | Power boards, 3 - 400 amp main switch, 6 - 200 amp branches, 6 - 100 amp branches, 11 - 60 amp branches. | 1 641 | 5 |
| 1 | Transformer, MYC, 25 KVA. | 293 | 5 |
| 1 | Transformer, Hevi-Duty, 9 KVA. | 135 | 5 |
| 1 | Main switchyard circuit breaker structure, 12' x 36' x 20' high overall with 8 - 6" x 20', 13 - 6" x 12' I beam frame, 76 lineal feet 6" I beam supports, 41 ceramic connectors, 2 disconnects, 224 lineal feet 1½" diameter copper tube, 8 - 16 x 16 x 36" concrete piers. | 3 399 | 5 |
| 1 | Circuit breaker structure, 12 x 24 x 20' overall with 6 - 6" x 20', 2 - 6" x 24', and 5 - 6" x 12' I beam supports, 8 - 16 x 16 x 36" concrete supports, 12 fused, 30 ceramic connectors, 70 lineal feet 1½" diameter copper tube. | 3 532 | 5 |

19

VC

Valuation Counselors, Inc.

MKSK-FED-0000009724

ALCD-PUBCOM_0006797

| Equipment Department 507 | | Fair Market Value | Remaining Life |
|---|---|---|---|
| 1 | Circuit breaker structure, 12 x 60 x 20' overall, with 16 - 6" x 20', 54 - 6" x 12' I beam supports, 119 ceramic connectors, 12 fused, 6 S & C interrupter switches, 600 amps, 220 lineal feet 2" diameter copper tube, 100 lineal feet 1½" diameter copper tube, 16 - 16 x 16 x 36" concrete piers. | $ 10 205 | 5 |
| 1 | Power board, wood, 10 x 9' with 480 volt, 1 - 400 amp main switch. | 305 | 5 |
| 1 | Distribution panel board, Square D, 1 - 400 amp main switch OMB Saflex, 6 - 60 amp and 6 - 30 amp branches. | 590 | 5 |
| 1 | NTC 25 KVA transformer. | 293 | 5 |
| 1 | Item 2,760 lineal feet 800 MCM. | 7 750 | 5 |
| 1 | Item 2,500 lineal feet 500 MCM. | 4 718 | 5 |
| 1 | Item 2,500 lineal feet 250 MCM. | 2 738 | 5 |
| 1 | Item 2,600 lineal feet 1/0. | 1 420 | 5 |
| 1 | Item 1,250 lineal feet 2/0. | 758 | 5 |
| 1 | Item 500 lineal feet 5" conduit and wiring. | 3 641 | 5 |
| 52 | Fittings. | 750 | 5 |
| 1 | Item 4,390 lineal feet 3" conduit and wiring. | 17 187 | 5 |
| 6 | Condulets. | 84 | 5 |
| 450 | Fittings. | 4 340 | 5 |
| 1 | Item 4,220 lineal feet 2" conduit and wiring. | 10 191 | 5 |
| 435 | Fittings. | 2 140 | 5 |

Mo scato

20

V€
Valuation Counselors, Inc.

MKSK-FED-0000009725

ALCD-PUBCOM_0006798

| Equipment<br>Department 507 | | Fair Market<br>Value | Remaining<br>Life | |
|---|---|---|---|---|
| 1 | Item 4,205 lineal feet 1½" conduit and wiring. | $ 7 796 | 5 | Moscato |
| 30 | Fittings. | 1 766 | 5 | |
| 1 | Item 3,720 lineal feet ½ - 1" conduit and wiring. | 2 991 | 5 | |
| 379 | Fittings. | 657 | 5 | |
| 1 | Item 780 lineal feet 4" conduit and wiring. | 4 589 | 5 | |
| 80 | Fittings. | 1 036 | 5 | |
| 1 | Item 3,845 lineal feet 2" conduit and wiring. | 9 286 | 5 | |
| 390 | Fittings. | 1 919 | 5 | |
| 1 | Item 4,905 lineal feet 1½" conduit and wiring. | 9 094 | 5 | |
| 515 | Fittings. | 2 115 | 5 | |
| 1 | Item 10,060 lineal feet ½ - 1" conduit and wiring. | 8 088 | 5 | |
| 1,200 | Fittings. | 2 081 | 5 | |
| 1 | Item 4,540 lineal feet copper bus bar, 6" x ¼". | 20 430 | 5 | |
| 1 | Item 5,480 lineal feet aluminum bus bar, 12" x 1". | 23 838 | 5 | |
| 1 | Item 2,055 lineal feet 2" conduit and wiring. | 4 963 | 5 | |
| 215 | Fittings. | 1 058 | 5 | |
| 1 | Item 2,520 lineal feet 1½" conduit and wiring. | 4 672 | 5 | |
| 260 | Fittings. | 1 068 | 5 | |

21

VC

Valuation Counselors, Inc.

MKSK-FED-0000009726

ALCD-PUBCOM_0006799

| | Equipment<br>Department 507 | Fair Market<br>Value | Remaining<br>Life |
|---|---|---|---|
| 1 | Item 900 lineal feet 3" conduit and wiring. | $ 3 524 | 5 *Moscato* |
| 95 | Fittings. | 916 | 5 |
| 1 | Item 1,150 lineal feet 2" conduit and wiring. | 2 777 | 5 |
| 122 | Fittings. | 600 | 5 |
| 1 | Item 1,790 lineal feet ½ - 1" conduit and wiring. | 1 439 | 5 |
| 185 | Fittings. | 297 | 5 |
| 1 | Item 345 lineal feet 4" conduit and wiring. | 2 030 | 5 |
| 3 | Condulets. | 60 | 5 |
| 38 | Fittings. | 492 | 5 |
| 1 | Item 350 lineal feet 3" conduit and wiring. | 1 370 | 5 |
| 6 | Condulets. | 84 | 5 |
| 39 | Fittings. | 376 | 5 |
| 1 | Item 360 lineal feet 1/0. | 197 | 5 |
| 1 | Item 790 lineal feet 2" conduit and wiring. | 1 908 | 5 |
| 82 | Fittings. | 404 | 5 |
| 2 | Condulets. | 17 | 5 |
| 1 | Item 500 lineal feet 1½" conduit and wiring. | 927 | 5 |
| 56 | Fittings. | 230 | 5 |
| 1 | Condulet. | 6 | 5 |
| 1 | Item 1,610 lineal feet ½ - 1" conduit and wiring. | 1 295 | 5 |

22

VC
Valuation Counselors, Inc.

MKSK-FED-0000009727

ALCD-PUBCOM_0006800

| | Equipment<br>Department 507 | Fair Market<br>Value | Remaining<br>Life |
|---|---|---|---|
| 175 | Fittings. | $    304 | 5 *Hoscaro* |
| 1 | Item 145 lineal feet 3" conduit<br>and wiring. | 568 | 5 |
| 18 | Fittings. | 174 | 5 |
| 1 | Item 145 lineal feet 4" conduit<br>and wiring. | 853 | 5 |
| 1 | Condulet. | 20 | 5 |
| 16 | Fittings. | 207 | 5 |
| 3 | Tables, steel, work, 72 x 30", wood<br>top. | 151 | 5 *Ncaro* |
| 5 | Stools, steel, chair type. | 36 | 5 |
| 2 | Chairs, steel, plastic, swivel,<br>arm. | 40 | 5 |
| 6 | Cabinets, steel, 36 x 18 x 48", 2<br>door. | 156 | 5 |
| 3 | Racks, steel, 3 x 1 x 7' bins, 12<br>drawers. | 55 | 5 |
| 1 | Refrigerator, Sanyo, 5 cu. ft. | 56 | 5 |
| 2 | Fire extinguishers, 20#, $CO_2$. | 48 | 5 |
| 1 | Welder, Lincoln, 225 amp, vertical. | 158 | 5 |
| 2 | Roto-bins, steel, 3' diameter, 7 shelf. | 208 | 5 |
| 1 | Desk, steel, 60 x 30", double pedestal<br>linoleum top. | 96 | 5 |
| 2 | Files, steel, 4 drawer, letter. | 68 | 5 |
| 3 | Cabinets, steel, 36 x 12 x 30", 2<br>door. | 58 | 5 |
| 1 | Drafting table, oak, 60 x 38". | 92 | 5 |

23

VC
Valuation Counselors, Inc.

MKSK-FED-0000009728

ALCD-PUBCOM_0006801

| | Equipment<br>Department 507 | Fair Market<br>Value | Remaining<br>Life | |
|---|---|---|---|---|
| 1 | Item minor electric shop hand tools, test equipment. | $  118 | 5 | *IULAND* |
| 2 | Tables, steel, 12 x 2', wood top shelf. | 156 | 5 | |
| 1 | Table, steel, 4 x 3', wood top shelf. | 32 | 5 | |
| 2 | Benches, steel, 60 x 30, 2 - 4 drawer pedestal. | 144 | 5 | |
| 1 | Desk, wood, 60 x 34" double pedestal. | 64 | 5 | |
| 3 | Chairs, wood, side, arm. | 60 | 5 | |
| 1 | File, steel, 4 drawer, letter. | 32 | 5 | |
| 2 | Files, steel, 15 tray, card. | 256 | 5 | |
| 1 | File, steel, 12 tray, card. | 96 | 5 | |
| 1 | File, steel, 8 tray, card. | 48 | 5 | |
| 1 | Oven, Blue M OV12A 12-1429. | 104 | 5 | |
| 2 | Roto-bins, steel, 3' diameter, 6 shelf. | 192 | 5 | |
| 1 | Cabinet, steel, 36 x 18 x 78", 2 door. | 26 | 5 | |
| 8 | Cabinets, steel, 18 drawer, parts. | 144 | 5 | |
| 1 | Drill press, Rockwell 15-017A #1551093. | 152 | 5 | |
| 1 | Grinder, Rockwell, 7" double end pedestal. | 76 | 5 | |
| 1 | Drill press, Malone, 6" high speed sensitive. | 128 | 5 | |
| 1 | Item minor instrument shop equipment hand tools, testers, vises, etc. | 198 | 5 | |
| | Total Department 507 | $917 182 | | |

24



Valuation Counselors, Inc.

MKSK-FED-0000009729

ALCD-PUBCOM_0006802

| Equipment<br>Department 508 | Fair Market<br>Value | Remaining<br>Life |
|---|---|---|

**#1**

1   Boiler, Cleaver Brooks, Model DL94 oil fired, #L849, 5443 sq. ft. boiler 270PSI 923 sq. ft. water wall, 80,000# steam/hour capacity, water tube, steel housing and breeching, setting 66" diameter x 35' steel insulated stack, control console; piping, wiring and installation.    $ 66 000    8    *TRI-STATE. POWER KRO4S sold June 35,000 11-15-??*

**#2**

1   Boiler, Babcock & Wilcox, Type FM oil fired, water tube integral furnace #FM607 250 PSI, 3107 sq. ft. heat surface, 28,000# steam/hour capacity, steel housing, breeching and setting, 4' diameter x 35' high steel stack, control console; piping, wiring and installation.    39 000    3    *INLAND*

**#3**

1   Boiler, Babcock & Wilcox, oil fired water tube integral furnace #FM729 250 PSI, 4669 sq. ft. heat surface, 60,000# steam/hour capacity, steel housing, breeching, setting, control console; piping, wiring and installation.    48 000    4    *Sheldon Boerton Furnace Wrlas 414-386-2609*   *23,000*   *INLAND*

1   Fuel oil preheater, Industrial Eng. & Equip. Co., Catalog No. 50P-73-1-1, 12000 watts, 3 phase, 160 volts; piping, wiring and installation.    825    5    *INLAND JUNK*

1   Fuel oil preheater, steam heated single pass consisting of 6 unit 2½" diameter x 10' long oil pipe with 1" steam insert pipe; piping and installation.    435    8    *INLAND JUNK*

3   Fuel oil pumps, DeLaval 1½ x 1½ rotary gear Model A direct drive 5 HP, 1740 RPM motor; piping, wiring and installation.    1 035   *690/ 345*    5   *2 To TRI-STATE 1 INLAND*

1   Boiler, water feed pump, Gould 4 x 2" rotary direct drive, 50 HP, 3550 RPM motor, foundation, pipe valves; wiring and installation.    1 094    5   *MOTOR TO N.B. ELE TRI. PUMP INLAND*

MKSK-FED-0000009730

ALCD-PUBCOM_0006803

| Equipment<br>Department 503 | | Fair Market<br>Value | Remaining<br>Life | |
|---|---|---|---|---|
| 1 | Boiler water feed pump, 4" x 4" rotary geared, direct drive 75 HP, 3700 RPM motor; piping, wiring and installation. | $ 1,285 | 3 | To Tri State w/ Boiler. |
| 1 | Water softener, Permutit A111B, 500 gallon brine tank, 2 - 4' diameter x 7' filter and softener tank 2" meter, controls; piping, wiring and installation. | 1,938 | 5 | Inland Junk. |
| 1 | Water softener, Permutit, with 3 - 30" diameter x 54" brine filter and softener tanks, 1½" water meter controls; piping, wiring and installation. | 1,545 | 5 | " |
| 2 | Water pumps, Gould Model 3755, Size 2 x 3 - 7, 300 GPM 75' head, direct drive 20 HP, 3500 RPM motor, foundation, controls; piping, wiring and installation. | 1,149 | 5 | " |
| 2 | Filter units, Baker Model HF30, 750°F, sand, 36" diameter x 60" tank, controls; piping, wiring and installation. | 1,765 | 5 | Inland |
| 2 | Boiler water feed pumps, Gould Size 3 x 4" direct drive 75 HP, 3500 RPM motor, controls, foundation, piping, wiring and installation. | 2,801 | 8 | " |
| 1 | Humidifier, Trinity Model 25A-E Dynamic #50153 250 WP, filter, piping, wiring and installation. | 1,191 | 4 | Inland Junk |
| 1 | Boiler, Cleaver Brooks Model SM economizer #D8890, 300,000 # hr capacity, controls, platform, piping and installation. | 11,681 | 10 | Inland |
| 1 | Heat Exchanger, Basco Model D900C, constant temp #7411918, 150 PSI, 1 x 3 pump, ½ HP motor, 25 gallon surge tank; piping, wiring and installation. | 1,602 | 8 | " |

Valuation Counselors Inc.

MKSK-FED-0000009731

ALCD-PUBCOM_0006804

Equipment
Department 508



| | | Fair Market Value | Remaining Life |
|---|---|---|---|
| 1 | Condensate tank, steel, 10,000 gallon, 3" insulation; piping and installation. | $ 2 805 | 8 ? Junk |
| 1 | Welder, Miller Model 201 AC Arc #16121, 175 amp, truck base cables accessories. | 113 | 5 INLAND |
| 1 | Fuel oil tank, welded steel, 35,000 gallon, No. 6 oil steam preheater; piping, installation. | 4 440 | 5 |
| 3 | Fuel oil tanks, welded steel, 25,000 gallon, No. 6 oil steam preheater; piping, installation. | 11 790 | 5 |
| 1 | Fuel oil tank, welded steel, 15,000 gallon; piping, installation. | 2 430 | 5 |
| 1 | Fuel oil tank, welded steel, 15,000 gallon, steam heated, 3" insulation; piping, installation. | 2 595 | 8 |

Total Department 508          $204 535

27

Valuation Counselors, Inc.

MKSK-FED-0000009732

ALCD-PUBCOM_0006805

| | Equipment Department 509 | Fair Market Value | Remaining Life |
|---|---|---|---|
| 2 | Melting pots, Sta Warm Model YZ 753, 440 volts, 21.6 amp #A6645BC with 3/4 HP right angle driven mixer, controls, platform and foundation, wiring and installation. | $ 2 904 | 5 Moscato |
| 1 | Lead melting furnace, steel housing 6'8" x 10'6" x 4', with 5'6" x 7'3" x 4' melting pot, 1,000° F. - 33,790# capacity, 2 course face brick, 3 propane torch burners, 3' high vent hood, 2 door and 12" diameter x 12" exhaust blower, direct drive, 7½ HP, 1750 RPM waterproof motor, foundation, duct work, waterproof controls, North American 12 oz. pressure blower, safety controls and valves, 2 lead troughs, piping, wiring and installation. | 4 650 | 5 " |
| 1 | Air compressor, Worthington Model 15XTP2 tank mounted #445B-2716T, Size 6 x 6 x 4 7/8 x 2 3/4, V belt drive, 15 HP, 1750 RPM motor, 30" diameter x 66" air receiver, air cooled radiator, filters, guard, hose, waterproof wiring. | 939 | 5 Puerto Rico |
| 1 | Dip tank, steel 10" x 16' x 7' deep, steam heating coil, 16' x 2½' mesh platform ladder, piping, installation. | 855 | 8 Moscato |
| 1 | Dip tank, steel, 6 x 3' open top, piping, installation. | 75 | 8 " |
| 1 | Pneumatic jackhammer 30". | 129 | 5 Inland |
| 1 | Tin melting furnace, steel housing 3'6" x 8' x 4' overall with 18,450# capacity tin melting pot, 3" propane gas burner, electric ignition, North American 12 oz. pressure blower, safety controls and valves, exhaust, wiring and installation. | 4 185 | 8 Moscato |
| 1 | Lead mold for Model S43 cell with 126 position graphite plate jig. | 4 500 | 10 " |

28

VC
Valuation Counselors Inc.

MKSK-FED-0000009733

ALCD-PUBCOM_0006806

Equipment
Department 509

| | | Fair Market Value | Remaining Life | |
|---|---|---|---|---|
| 1 | Lead mold for Model S 1 cell with 90 position graphite jig. | $ 2,850 | 10 | MOSCATO |
| 1 | Plate cleaning booth, steel 7' x 4' grate top, 5' x 3' x 7' exhaust hood and piping, installation. | 383 | 10 | |
| 1 | Flux tank, steel, 7' x 3' x 1½' epoxy lined. | 83 | 5 | |
| 1 | Plate tank, polyethylene, 9' x 3' x 2' HCL, twin exhaust hood and pipe. | 147 | 10 | MOSCATO |
| 2 | Impact wrench, Celco WP-1030. | 519 | 5 ? | |
| 3 | Impact wrench, Sioux | 450 | 5 ? | |
| 1 | Bridge Crane, Robbins & Myers, 5 ton capacity top running 27'6" span, 220' Runway double girder, motor driven hoist bridge and trolley, floor controls, 3" Trail Track, 130 LF electric cord reel 22 Column saddles, 440 lineal feet, 12" I Beam track, piping, wiring, installation. | 7,175 | 10 | VAN IDERSTONE |
| 1 | Lift truck Yale G-C-120CP, propane power, 10,000# capacity, 60" fork, 120" lift operator guard. | 5,580 | 4 | INLAND NEW CASTLE |
| 1 | Lift Truck, Yale, 12,000# capacity, propane power, 48" fork, 100" lift operator guard. | 5,768 | 4 | INLAND B.P. |
| 1 | Vacuum pump, Nash CL1003, Hytor all iron manifold, belt drive, Louis Allis 100 HP-1800 RPM motor; silencer, guard, foundation, controls, piping, wiring and installation. | 3,938 | 5 | MOSCATO |
| 1 | Vacuum tank, steel, 30" diameter x 72" steel legs, 18" manhole, piping and installation | 390 | 8 | MOSCATO |
| 1 | Vacuum mix tank, steel 8' diameter x 12'6", steel saddle base, piping and installation | 836 | 8 | MOSCATO |

MKSK-FED-0000009734

ALCD-PUBCOM_0006807

| Equipment Department 509 | | Fair Market Value | Remaining Life | |
|---|---|---|---|---|
| 1 | Vacuum mix tank, steel 6' diameter x 10' steel saddle base, piping and installation. | $ 648 | 12 | Moseoro |
| 1 | Asbestos diaphragm deposit tank, steel 8' x 8' x 6' deep, steel 30" wide x 26' grid platform, piping and installation. | 1 350 | 8 | " |
| 1 | Asbestos diaphragm deposit tank, steel 6 x 6 x 3' deep, piping and installation. | 405 | 8 | " |
| Total Department 509 | | $48 759 | | |

30

VC
Valuation Counselors, Inc.

MKSK-FED-0000009735

ALCD-PUBCOM_0006808

| Equipment<br>Department 510 | Fair Market<br>Value | Remaining<br>Life | |
|---|---|---|---|
| Hydrogen system consisting of: | | | |
| 240 LF 10" steel pipe | $ 1 781 | 10 | Moscato |
| 540 LF 4" steel pipe | 1 847 | 10 | |
| 320 LF 6" steel pipe | 1 340 | 10 | |
| 130 LF 20" steel pipe | 2 535 | 10 | |
| 160 LF 16" steel pipe | 2 825 | 10 | |
| 140 LF 12" steel pipe | 1 324 | 10 | |
| 360 LF 8" steel pipe | 1 675 | 10 | |
| 140 LF 8" steam traced pipe | 1 260 | 10 | |
| 700 LF 8" underground pipe. | 2 520 | 10 | |
| 1  Hydrogen gas cooler, Roben #69009, 16" diameter x 16' single pass, tube, piping and installation. | 3 750 | 8 | |
| 1  Scrubber, steel, 30" diameter x 10' with 10' base, 3 ring cone spray, piping and installation. | 2 025 | 5 | |
| 2  Hydrogen water cooled condensers, 12" diameter x 16', single pass tubes, piping and installation. | 744 | 5 | |
| 1  Holding water tank, steel, 30" diameter x 60". | 197 | 5 | |
| 2  Aurora 3 x 3" Duplex turbine pumps, direct drive, 10 HP, 1755 RPM motor, controls, 75 GPM 200' head, piping, wiring and installation. | 530 | 5 | |
| 1  Chiller, Carrier 51460, 53 ton compressor, direct drive 60 HP motor, 18" diameter x 72" condenser, 10" diameter x 96" receiver, waterproof controls, piping  wiring and in-stallation. | 3 843 | 5 | Incaso |
| 2  Hydrogen compressors, Nash Model A5, belt drive, 75 HP motors, water sealed, foundation, pipe valves, wiring and installation. | 5 280 | 4 | Mosesto |
| 1  Water surge tank, steel 48" diameter x 96" long, steel saddles, piping and installation. | 248 | 5 | ʼf |

31

VC

Valuation Counselors, Inc.



| Equipment<br>Department 510 | Fair Market<br>Value | Remaining<br>Life | |
|---|---|---|---|
| 2   Freon condensers, steel 12"<br>diameter 15', single pass tubes<br>insulation, piping and installation. | $ 3 941 | 5 | MOSCATO |
| 1   Hydrogen water separator, steel,<br>18" diameter x 48", piping and<br>installation. | 383 | 5 | |
| 1   Water condenser drain tank, steel<br>30" diameter x 42". | 203 | 5 | |
| 1   Freon 12 compressor, Frick Model<br>WL000H, #G12554 belt drive, 25 HP<br>motor, 1 - 8" diameter x 6' receiver,<br>1 - 8" diameter x 6' condenser,<br>concrete foundation, control panel,<br>piping, wiring and installation. | 3 353 | 4 | |
| 1   Item of hydrogen seal piping and<br>valves, 53 lineal feet, 16" diameter,<br>25 lineal feet, 12" diameter. | 2 033 | 8 | |
| 1   Hydrogen seal pot, S4 cell room side,<br>water operated steel 36 x 24 x 24"<br>house. | 708 | 5 | |

Total Department 510          $44 345

*Opening*          4738?

9138?

32

Valuation Counselors, Inc.

MKSK-FED-0000009737

ALCD-PUBCOM_0006810

| | Equipment<br>Department 511 | Fair Market<br>Value | Remaining<br>Life |
|---|---|---|---|
| 2 | Salt unloading pump, LaBour style DTZ, size 4 x 6", direct drive, 50 HP motor, waterproof controls, piping, wiring and installation. | $ 3 441 | 5 |
| 1 | Vibrator, National HCP-4, pneumatic, Car unloading, hose, installation. | 525 | 5 |
| 2 | Saturator Tank, steel 25' diameter x 35' high, 2" insulation ladder, open top, controls, pipe valves, piping, and installation. | 35 010 | 10 |
| 1 | Forward pump LaBour, size 2 x 3' nickel direct drive, 25HP - 3500 RPM, waterproof motor controls, pipe valves, wiring and installation. | 2 490 | 3 |
| 1 | Soda ash tank, steel 12' diameter x 18' high, covered top with Draco-Fuller #72-3CT46-313 dust collector, motor driven screen filter, 18" diameter, 2 HP motor driven blower, 10' conical base 12' diameter to 18" diameter, gate valve, 1 Link Belt 9" diameter x 35' inclined screw conveyor, V Belt with reducer drive, 3 HP waterproof motor, controls, pipe, wiring and installation. | 10 538 | 10 |
| 2 | Treatment tank, steel 12' diameter x 12' high, 2" insulation, 4 - 10" x 8' baffles covered top 18" manhole, 1 - Lightnin Model 14 mixer right angle drive, 58.81 to 1 reducer, 30 RPM output, 10 HP 1750 RPM motor, controls, wired.<br><br>240 sq. ft. steel grid platform, 48 lineal feet ladder and steps, 1 - 22' high x 30' x 20' 1 Beam base, pipe valves, installation. | 9 424 | 8 |

Mosçato

33

VC
Valuation Counselors, Inc.

MKSK-FED-0000009738

ALCD-PUBCOM_0006811



| Equipment Department 511 | Fair Market Value | Remaining Life |
|---|---|---|
| 1  Brine Feed tank, reinforced polyester, 42" diameter x 10' high steel frame 10' high, piping, wiring and installation. | $ 3 150 | 8 |
| 2  Raw Brine pump, Gould model 3196 nickel size 3 x 4 , direct drive 7½ HP, 1750 RPM motor, waterproof controls, foundation, wiring, pipe, installation. | 1 584 | 8 |
| 1  Raw Brine surge tank, steel 18' diameter x 18' high 34,000 gallon capacity, domed top, 3" insulation Foxboro liquid level controllers, 10" agitator. | | |
|    6" inlet and back wash, 2" Rec Brine outlet, 2 - 4" outlets, pipe, wiring and installation. | 6 860 | 8 |
| 2  Finish Brine pump Gould model 3196, size 2 x 3" nickel 250 GPM-150' head drive 25HP waterproof motor, controls, pipe, wiring and installation. | 1 734 | 8 |
| 2  Brine settler tank, steel 27' diameter x 35' high over all, vertical 7' @ 27' diameter with 28' conical base upper portion epoxy coated, base is full 27' diameter with Manway pipe, installation. | 37 104 | 8 |
| 1  Soda ash storage tank, steel 5' diameter x 10' high, 1,470 gallon capacity, steam heated 3" insulation 20" manhole, 3 - 2" inlets, 1½" drain, 1" outlet, 9' steel ladder Wallace Tiernan WNN 1838, flow meter , pipe, foundation, installation. | 1 245 | 5 |
| 1  Reagent pump Roper type 1 figure 1-AP16, #F24376, direct drive, 3/4 H.P., waterproof motor, foundation piping, wiring and installation. | 293 | 8 |

MOSCATO

34

VC
Valuation Counselors, Inc.

MKSK-FED-0000009739

ALCD-PUBCOM_0006812

Equipment
Department 511

| | | | Fair Market Value | Remaining Life |
|---|---|---|---|---|
| 1 | Reagent pump Roper type 13 figure 2K10, #B59937, drive, 3/4 h.p. motor, foundation, piping, wiring and installation. | | $ 293 | 8 |
| 2 | Brine Tank pump Gould Model 3196 size 3 x 4 nickel, direct drive, 25 h.p. waterproof motor, waterproof control, pipe, wiring, foundation and installation. | | 2 646 | 8 |
| 2 | Finished Brine Tank, steel 27' diameter x 35' high, 143,900 gallon capacity with 1 circular stairway, 10' crossover flat top, controls, pipe, installation. | | 26 460 | 10 |
| 1 | Polish Brine Tank, steel 27' diameter x 35' high, 143,900 gallon capacity with 1 circular stairway, 10' crossover flat top, controls, pipe, installation. | | 13 230 | 10 |
| 1 | Brine Recovery tank, steel, 8' diameter x 8' open top, 3,000 gallon capacity open top, 8' ladder and platform epoxy lined, Lightnin 3 HP mixer 2" outlet, pipe, installation. | | 1 149 | 8 |
| 1 | Brine pump, Gould 3196 size 1 x 2 nickel drive, 2 HP motor, controls, pipe, wiring, foundation and installation. | | 593 | 5 |
| 1 | Soda Ash Mix Tank, nickel steel 6' diameter x 6' deep, 2' above ground, steam agitated, with 54" diameter x 60" Hopper SA feed tank, 48" Conical bottom hand screw gate Bindicator, 40 lineal feet, 4" I Beam support, pipe, wiring and installation. | | 1 650 | 8 |
| 1 | Filter, U.S. Filter Corp. Model 500, horizontal #6609921, water pressure 75PSI, 200°F maximum temperature, .250 shell, .290 head chain belt drive, 1 HP gearhead motor, controls, pipe, wiring and installation. | | 6 435 | 8 |

MOSCATO

Moscato opt 2
Van Anderson opt 1

AGC
Trace        PPG

MOSCATO

VC        35

Valuation Counselors, Inc.

MKSK-FED-0000009740

ALCD-PUBCOM_0006813

| Equipment Department 511 | | Fair Market Value | Remaining Life | |
|---|---|---|---|---|
| 2 | Sand filter tank, steel 14½' diameter x 8' high, 24" wide full circumference baffle, open top, 32' x 3' grid walk way with 2 ladders, 24" diameter x 8'7" high stand pipe, pipe, foundation, installation. | $ 4 971 | 8 | *Moscato* |
| 2 | Sand filter tank pump, Gould Model 3196 nickel, Size 2 x 3" 13 250GPM, 150' head, direct drive 25HP - 1750 RPM waterproof motor, waterproof controls, pipe, foundation, wiring and installation. | 2 583 | 8 | |
| 1 | Mix tank, steel 6' diameter x 6' high open top, Lightnin 1 HP agitator 2 - 2 x 54" blade agitator, coupled with steel 6' diameter x 6' finish tank, steel I Beam base concrete platform, 5' ladder 3' platform, pipe, wiring and installation. | 1 635 | 8 | *Inland Newark.* |
| 1 | Filter pump, Gould Model 3189, nickel size 2 x 3 , 600 GPM 75' head, direct drive, 20 HP waterproof motor controls, base, piping, wiring and installation. | 1 340 | 8 | *Moscato* |
| Total Department 511 | | $176 383 | | |

*94 769*

*271 152*

MKSK-FED-0000009741

ALCD-PUBCOM_0006814



| Equipment<br>Department 512 | Fair Market<br>Value | Remaining<br>Life |
|---|---|---|

1   Brine resaturator tank, steel
    12' diameter x 14' with 10'
    conical bottom, 13,500 gallon
    upper 5' epoxy lined, Monel
    wire salt shield and screen,
    1½ insulation, piping, installation.   $ 6 450        8        Moscato

3   Sump pump Worthington 3 x 3
    direct drive, 5 HP 1750 RPM
    motor, piping, wiring and
    installation.                           1 827          8

1   Cell liquor sump tank steel 8'
    diameter 12' high, with 2 Lawrence
    3 x 3" pump, 20 HP motor, piping,
    wiring and installation.                2 720          8

2   Brine pump Duriron 4 x 6 10/76
    direct drive 7½ HP motor, piping,
    wiring and installation.                1 590          8

1   Brine pre heater nickel 15"
    diameter, steam heat single pass,
    nickel tube, piping and installa-
    tion.                                   1 790          8

1   Brine 2nd stage heater, nickel 8"
    diameter x 12' single pass steam.       1 155          8

1   Brine head tank Hetron 4' diameter
    x 8' high, piping and installation.       900          8

1   Brine head tank, Hetron 3' diameter
    x 6' high, piping and installation.       495          8

1   Resaturator Brine tank, steel 12'
    diameter x 14', 15' Conical bottom,
    piping and installation.                1 199          5

1   Bridge crane, Robbins & Myers, 5 ton
    top running 48' span, 220 runway
    double girder, motor driven hoist
    bridge and trolley, floor controls,
    3" trail track, 130 LF electric cord
    reel, 22 column saddles, 440 LF 12"
    I beam track, piping, wiring and
    installation.                           9 098          10

37

VC
Valuation Counselors, Inc.

MKSK-FED-0000009742

ALCD-PUBCOM_0006815

| Equipment Department 512 | | Fair Market Value | Remaining Life |
|---|---|---|---|
| 1 | Bridge crane, 5 ton, double girder top running 48' span motor driven bridge, 1 ton and 2 ton spur geared chain hoist. | $ 7 260 | 10 MOSCATO |
| 128 | Diaphragm cell, Hooker Model S1, concrete top and base steel cathode copper brand, cell connected in Series DC current, produces chlorine gas, cell liquor 10-12% caustic and hydrogen, feed 26½-27% sodium chloride. | 883 200 | 3-1 Cells 3 Concrete Junked |
| 36 | Diaphragm cell, Hooker Model S4B. | 459 288 | 5 One Gas In Usage MOSCATO |
| 1 | Cell diaphragm stripping booth, 3 side 6" wide concrete wall 8' high with 4' high concrete block top 44' long overall, turntable, drain and installation. | 464 | 8 MOSCATO |
| 1 | High press pump, LaBour Model DZT Size 12 - 1 x 2", #A3525 direct drive 25 HP, 3550 RPM motor, foundation, pipe and hose - nozzle, waterproof controls, wiring and installation. | 918 | 5 |
| | Total Department 512 | $1 378 354 | |

38

VC
Valuation Counselors, Inc.

| Equipment<br>Department 513 | | Fair Market<br>Value | Remaining<br>Life | |
|---|---|---|---|---|
| 1 | Caustic storage tank, steel 35' diameter x 32' high, 230,000 gallon coal tar epoxy insulation cover, 6" x 36' octagon concrete pad on 56 Class B round timber piles 45' long, 25 ton capacity, 10' x 17' loading pump pad 3'6" thick on 3 x 1 x 3' foundation; 1 Tank-O-Meter Type S gage; 2 - 6" Bayonet heaters, 75' x 2' shell man way, 18' x 2' roof way; 1 Filterite Model 54 MS03-3FD NC 150 high flow; 2 vent 6" & 4 dry conservent; 1 calcium chloride dryer; piping, wiring and installation. | $14 916 | 10 | Ioland |
| 1 | Caustic loading pump, Gould Model 3196 Nickel #798A128, Size 3 x 4-8, 26' head, 200 GPM drive, 15 HP, 1740 RPM waterproof motor, foundation, controls, wiring, pipe and installation. | 1 125 | 5 | Moscato |
| 1 | Tank, steel 12' diameter x 14' high, caustic, rubber lined, piping and installation. | 5 203 | 8 | |
| 1 | Caustic tank, steel 12' diameter x 25' high, rubber lined, concrete pad, piping, wiring and installation. | 7 314 | 8 | |
| 1 | Caustic tank, steel 16' diameter x 25' high, rubber lined, ladder, concrete pad, piping, wiring and installation. | 8 805 | 8 | |
| 1 | Transfer pump, Gould 4 x 6" Nickel, direct drive 20 HP motor, base, controls, piping, wiring and installation. | 1 293 | 5 | |
| 1 | Caustic steam heater, steel 18" diameter x 20' long, Nickel tubes double pass, 2" insulation, pipe, installation. | 1 320 | 5 | |

39

VC

Valuation Counselors, Inc.

MKSK-FED-0000009744

ALCD-PUBCOM_0006817

| Equipment Department 513 | | Fair Market Value | Remaining Life |
|---|---|---|---|
| 1 | Caustic steam heater, Nickel 24" diameter x 72", Nickel tube double pass. Not in use. | $ 540 | 3  Iswaws Newark |
| 1 | Tank, steel 10' diameter x 10', spose, covered, steel leg, piping and installation. | 885 | 5  Moscato |
| 1 | Tank, Graver, steel 25' diameter x 30' high, API STD 12C silica storage #EDF7999-1960, capacity 2,448 barrels (42 gallon) 36" diameter manhole, open top, 6" pipe valve drain, 28 LF 4" diameter pipe, 30 LF 2" diameter pipe feeder controls, piping and installation. | 8 775 | 6  Moscato Iswaws Van Ioerstine |
| 1 | Tank, Graver, steel 25' diameter x 30' high, API STD 12C silica storage #EDF7998-1960, capacity 2,448 barrels (42 gallon) 36" diameter manhole, open top, 6" pipe valve drain, 28 LF 4" diameter pipe, 30 LF 2" diameter pipe feeder controls, piping and installation; ladder. | 8 775 | 6  Moscato Iswaws Van Ioerstine |
| 1 | Tank, Graver, steel 25' diameter x 30' high, API STD 12C silica storage #EDF8001-1960, capacity 2,448 barrels (42 gallon) 36" diameter manhole, open top, 6" pipe valve drain, 28 LF 4" diameter pipe, 30 LF 2" diameter pipe feeder controls, piping and installation; ladder, domed cover, steam heated, Bayonet type. | 9 225 | 6  Moscato Iswaws Van Ioerstine |
| 1 | Tank, Graver, steel 25' diameter x 30' high, API STD 12C silica storage #EDF8000-1960, capacity 2,448 barrels (42 gallon) 36" diameter manhole, open top, 6" pipe valve drain, 28 LF 4" diameter pipe, 30 LF 2" diameter pipe feeder controls, piping and installation. | 9 225 | 6  '' '' |

40

VC
Valuation Counselors, Inc.

MKSK-FED-0000009745

ALCD-PUBCOM_0006818

| Equipment Department 513 | Fair Market Value | Remaining Life |
|---|---|---|
| 1  Tank, Graver, steel 25' diameter x 30' high, API STD 12C silica storage #4260, 110,000 gallon, built 1962, RDM Steel Co. | $ 9 225 | 6  *Moscato* *Inland* *Van Ioerstine* |
| 1  Pump, LaBour, 1½ x ½ stainless steel caustic FC155 direct drive 7½ HP, 1745 RPM weatherproof motor, speed reducer, controls, piping, wiring and installation. | 597 | 8  *Inland* *New Castle* |
| 1  Pump, Gould, Fig. No. PB-202-19, 4" stainless steel Item No. 105A, Model 3196 drive 7½ HP, 1745 RPM weather proof motor, speed reducer, controls, piping, wiring and installation. | 756 | 8  *Inland* *New Castle* |
| 1  Pump, Gould, Fig. No. PB-202-19, 7½ HP motor, speed reducer, controls, piping, wiring and installation. | 756 | 8  *Moscato* |
| 1  Sump pump, Galigher, Model Di5SRD300 #SP68537, belt drive 5 HP, 1750 RPM weatherproof motor, float valve, pit, pipe, controls, wiring and installation. | 951 | 8  *Inland* *Junk* |
| 1  Centrifuge, Bird, 36" diameter x 48" horizontal centrifugal #LB1581, 46" x 58" steel housing, 1,000 RPM, 8 strand V belt drive, 60 HP, 1180 RPM, corrosion proof motor, controls, foundation, pipe valves, wiring and installation. | 20 865 | 5  *Perry* *Equip.* |
| 1  Centrifuge, Bird, 36" diameter x 48" horizontal centrifugal #LB1562, 46" x 58" steel housing, 1,000 RPM, 8 strand V belt drive, 60 HP, 1180 RPM, corrosion proof motor, controls, foundation, pipe valves, wiring and installation. | 20 865 | 5  *Perry* *Equip.* |
| Centrifuge, Sharples Type CF-6-61-3, 488439, Super D centrifugal #68-C27-279 bowl speed 1550 @ 195°F maximum V belt drive, 75 HP, 1775 RPM motor, 1 Brown & Sharpe No. 1, x 1 1/3" delivery pump direct drive 3 HP, 1150 RPM motor, stainless steel chute and pipe delivery, pipe controls, foundation, wiring and controls, installation. | 16 524 | 3  *Moscato* |

41

VC
Valuation Counselors, Inc.

| Equipment Department 513 | Fair Market Value | Remaining Life |
|---|---|---|
| 1  Centrifuge, Sharples Type CF-6-61-3, 488439, Super D centrifugal #68-C27-279 bowl speed 1550 @ 195°F maximum V belt drive, 75 HP, 1775 RPM motor, 1 Brown & Sharpe No. 1½ x 1 1/3" delivery pump direct drive 3 HP, 1150 RPM motor, stainless steel chute and pipe delivery, pipe controls, foundation, wiring and controls, installation. | $16 524 | 3  Moscato |
| 1  Centrifuge, Sharples Type CF-6-61-3, 488439, Super D centrifugal #32-C27-386 bowl speed 1550 @ 195°F maximum V belt drive, 75 HP, 1775 RPM motor, 1 Brown & Sharpe No. 1½ x 1 1/3" delivery pump direct drive 3 HP, 1150 RPM motor, stainless steel chute and pipe delivery, pipe controls, foundation, wiring and controls, installation. | 16 524 | 3  Moscato |
| 1  Chain hoist, Budgit ½ ton spin geared, 4 wheel trolley 10' - 6" I beam track. | 185 | 5  Tuland Oneida |
| 1  Bridge crane, 2 ton, top running, 2 2 ton spur gear chain hoist, 4 wheel trolley, 2 - 4 wheel carriers, 20' 12" I beam bridge track hand operated 80 LF 3" trail track and 12" I beam support. | 1 375 | 5  Moscato |
| 1  Low concentrate settling tank, Nickel 7' diameter x 8' high cone base 84" long, 84" diameter to 7" discharge, 1 Hydraflo cone feeder, 2" insulation 4 - 6' x 6" I beam leg supports on 8 x 8 x 18" concrete piers, pipe, valves and installation. | 2 762 | 8  Moscato |
| 1  Pump, Gould Model 3196 Nickel forward Size 3 x 4 ID, 250 GPM, 70' head direct drive 15 HP, 1770 RPM motor, controls, pipe and valves, foundation, wiring, installation. | 1 410 | 8  Moscato |

43

VC
Valuation Counselors, Inc

MKSK-FED-0000009747

ALCD-PUBCOM_0006820

Equipment
Department 513

| | | Fair Market Value | Remaining Life |
|---|---|---|---|

1   Pump, Gould Model 3196 Nickel forward Size 3 x 4 ID, 250 GPM 79' head direct drive 10 HP, 1770 RPM motor, controls, pipe and valves, foundation, wiring, installation.        $ 1 388     8     *Moscato*

1   Third effect evaporator tank, 12' diameter x 20' high Nickel 12' cone 12' to 8" diameter, 1" insulation, 3 sight holes, 1 manhole; 1 - 66" diameter x 16' steam chest welded steel 2 pass 10' tubes 2" insulation 60 LF 30" diameter nickel pipe, 2" insulation steel base, piping, wiring and installation.        11 331     8

1   Second effect evaporator tank, 12' diameter x 20' high Nickel 12' cone 12' to 8" diameter, 1" insulation, 3 sight holes, 1 manhole; 1 - 66" diameter x 16' steam chest welded steel 2 pass 10' tubes 2" insulation 60 LF 30" diameter nickel pipe, 2" insulation steel base, piping, wiring and installation.        11 331     8

1   Third effect circulating pump, Ingersoll-Rand Size 20 APL nickel #0567-360, 10,000 GPM 10.28' head, 895 RPM, 60 HYD test 1.31 Sp. Gr. BRG No. SKF-6315 SKF 7317DB, direct drive, 75 HP, 710 RPM motor, weather proof controls, concrete foundation, piping, wiring and installation.        3 780     8

1   Second effect circulating pump, Ingersoll-Rand Size 20 APL #0567-359 75 HP motor, weatherproof controls, concrete foundation, piping, wiring and installation.        3 780     8

1   Third effect forwarding pump, Gould Model 3196, 250 GPM 50' head, Size 2 x 3 direct drive 10 HP, 1735 RPM weatherproof motor, controls, pipe valve, wiring, installation.        618     8



43

Valuation Counselors, Inc.

MKSK-FED-0000009748

ALCD-PUBCOM_0006821

| Equipment<br>Department 513 | Fair Market<br>Value | Remaining<br>Life |
|---|---|---|
| 1   Second effect forwarding pump, Gould Model 3196, 250 GPM 50' head, Size 2 x 3 direct drive 10 HP, 1735 RPM weatherproof motor, controls, pipe valve, wiring, installation. | $ 618 | 8 |
| 1   Third effect condensate tank, steel 48" diameter x 72" long, 2" insulation steel frame base, piping, valves, installation. | 654 | 8 |
| 1   Second effect condensate pot, steel 24" diameter x 48" vertical, 2" insulation, piping and installation. | 450 | 8 |
| 1   Condenser, steel, 7' diameter x 16' high, Barometric, with Croll Reynolds Type 215-JB Evactor air pump #19694, 20# pressure D & S, pipe valves, installation. | 2 097 | 8 |
| 1   Salt collector tank, Nickel high concentrate 48" diameter x 72" high 4 baffles, cover, foundation, pipe valves, controls, installation. | 752 | 4 |
| 1   Pump, Gould Model 3169 Nickel Size 770A41, 250 GPM 126' head, direct drive 25 HP, 1170 RPM motor, weather proof controls, pipe and valves, wiring, concrete foundation, installation. | 839 | 5 |
| 1   Settling tank, Nickel, 6' diameter x 10' high, 4' conical bottom, 6' to 8" diameter, 2" insulation, 4 - 4'8" I beam support, overflow, piping, installation. | 2 090 | 5 |
| 1   1st effect evaporating tank, Blaw Knox Buffalovac Nickel #14325, Size 6' diameter x 18' high, 220°F maximum temperature, 2" insulation, conical 4' base, 6' diameter to 8" diameter; 1 - 36" diameter x 14', 2 pass horizontal steam chest 10' tubes, baffle, bolted dished ends, 1" insulation, 30 LF 16" nickel pipe covered, 10 LF 12" nickel pipe bare, base, piping, wiring and installation. | 10 440 | 5 |



MOSCATO

INLAND



MOSCATO





MOSCATO

44

VC
Valuation Counselors, Inc.

MKSK-FED-0000009749

ALCD-PUBCOM_0006822



|  | Equipment<br>Department 513 | Fair Market<br>Value | Remaining<br>Life |  |
|---|---|---|---|---|
| 1 | 1B effect evaporating tank, Nickel 8' diameter x 20' high, 220°F maximum temperature, 2" insulation, conical 4' base, 6' diameter; 1 - 36" diameter x 14', 2 pass horizontal steam chest 10' tubes, baffle, bolted dished ends, 1" insulation, 30 LF 16" nickel pipe covered, 10 LF 12" nickel pipe bare, base, piping, wiring and installation. | $ 12 165 | 5 | Mosca70 |
| 1 | 1A effect circulating pump, Morris 12 x 12 nickel, direct drive 50 HP, 710 RPM motor, weatherproof control, foundation, piping and installation. | 3 390 | 5 | P.R INland 6-20 |
| 1 | 1B effect circulating pump, Morris 12 x 12 nickel, 50 HP motor, weather proof control, foundation, piping and installation. | 3 390 | 5 | P.R. Island 6-20 |
| 1 | Flash chamber pump, Gould Model 3196 nickel Size 2 x 3-10 #707A467, 160 GPM 82' head, direct drive 10 HP motor weatherproof control, foundation, pipe valves, wiring and installation. | 1 515 | 5 | Mosca70 |
| 1 | Slurry pump, Gould 3196, 10 HP motor. | 1 515 | 5 | Mosca70 |
| 1 | 1A effect forward pump, Gould Model 3196 nickel Size 1½ x 3-10, 5 HP motor 750 GPM 8' head, weatherproof controls, pipe valve, wiring and installation. | 692 | 5 | PPG |
| 1 | 1B effect forward pump, Gould Model 3196 nickel Size 1½ x 3-10, 5 HP motor 750 GPM 8' head, weatherproof controls, pipe valve, wiring and installation. | 692 | 5 | PPG |
| 1 | Slurry pump, Gould 3196, 5 HP motor. | 692 | 5 | Mosca70 |
| 1 | Condensate pump, 1A and 1B, Gould Model 3196 nickel Size 1½ x 3-10, 5 HP motor. | 692 | 5 |  |
| 1 | Flash chamber Nickel 3' diameter x 10' high, conical 3' base, 36" diameter to 8", 2" insulation, pipe, installation. | 1 520 | 8 |  |

45

Valuation Counselo



| Equipment Department 513 | | Fair Market Value | Remaining Life |
|---|---|---|---|
| 1 | First stage caustic cooler, steel shell, 16" diameter x 30' long, 1½" diameter seamless tubes, water cooled 210,000#/lbs., piping, wiring and installation. | $ 4 016 | 5 |
| 1 | 1A and 1B condensate tank, steel, Kennedy 4' diameter x 6' high, dish head and base, 2" insulation, piping, controls and installation. | 555 | 5 |
| 1 | First stage cooler tank, steel, 13' diameter x 25' high, 12' cone bottom, ¼" x 4' steel baffle, 4 - 8" x 18' I beam supports on 12 x 18 x 30" concrete piers, 1" insulation, domed top, 30" manhole, piping, and installation. | 7 980 | 7 |
| 1 | Cooler circulating pump, Gould Model 3196 Nickel Size 3 x 4, direct drive 25 HP, 1170 RPM, weatherproof motor, controls, foundation, piping, wiring and installation. | 1 455 | 5 |
| 1 | Slurry pump, Gould Model 3196 Nickel Size 1½ x 3", 5 HP motor drive, piping, wiring and installation. | 692 | 5 |
| 1 | C10 cooler tank, steel 8' diameter x 10' high, 8' conical bottom, 8' diameter to 8" diameter, full cover, 6 - 8" x 7' I beam supports on 12 x 12 x 30" concrete piers, pipe valves gage, installation. | 3 135 | 8 |
| 1 | Cooler pump, LaBour Style DT2, Size 30-4" #95960 Nickel, direct drive 30 HP, 1760 RPM, weatherproof motor, control, piping, foundations, wiring and installation. | 1 182 | 5 |
| 2 | Second stage coolers, steel U tube, 15" diameter x 15' long, river water and refrigerated water coolant, 30' 8" diameter, 20' - 4" diameter nickel pipe, valves, installation. | 3 486 | 8 |

MOSCATO

46

VC
Valuation Counselors, Inc.

MKSK-FED-0000009751

ALCD-PUBCOM_0006824

| Equipment Department 513 | | Fair Market Value | Remaining Life |
|---|---|---|---|
| 1 | Second stage cooler pump, LaBour Style DTZ Size 4 x 6", direct drive 30 HP, 1750 RPM, weatherproof motor, controls, piping, foundation, wiring and installation. | $ 3 458 | 8  INLAND |
| 1 | Bank 3 Trombone cooler, 10" diameter by 20' steel pipe, Nickel, single pass U tube, installation. | 3 681 | 5  MOSCATO |
| 1 | Overflow settling tank, Nickel, 6' diameter x 8' high, conical bottom 6' diameter to 8", cover, foundation, piping and installation. | 1 950 | 4  MOSCATO |
| 1 | Overflow pump, Chicago, Size 3 x 4 Nickel direct drive 7½ HP, 1740 RPM motor, piping, wiring and installation. | 705 | 5  MOSCATO |
| 3 | Settling tanks, C-12-13-14, Nickel 9' diameter x 10' high, 8' conical bottom, 9' diameter to 4" covered top, 24" manhole, 4 - 6" x 7' I beam leg supports on 12 x 12 x 24" concrete piers, pipe valve and installation. | 11 556  770↵  325↵ | 8  2 MOSCATO TO INLAND. 1- INLAND. HEO OUT. |
| 1 | Settling tank pump, LaBour Style DTZ Size 15 - 2" Nickel #A14299, direct drive 10 HP, 1740 RPM, weatherproof motor, piping, controls, wiring and installation. | 855 | 3  MOSCATO |
| 1 | Settling to filter pump, Gould Model 3196, Size 2 x 3", direct drive 10 HP, 1750 RPM motor, pipe valves, foundation, controls, wiring and installation. | 732 | 5  INLAND |
| 1 | Sump pump, Gould Model 3171, Size X172X, #4062, 50 GPM 50' head, 3 HP motor, contols, piping, wiring and installation. | 387 | 5  INLAND |
| 1 | Filter press, Duriron Durco #E11913-67, 60" diameter x 84" long dished heads, 24 Monel 48" x 42" vertical screens Model 60 HC600 50 PSI at 300°F 15]B-1700, air operated end door, mounted on trail track 4 - 6" diameter steel wheels, platform, pipe valves, controls and installation. | 10 049  305↵ | 8  LINDEN CHLORINE 47 |

Chlorine 6500

VC  Valuation Counselors, Inc.

MKSK-FED-0000009752

ALCD-PUBCOM_0006825

| Equipment<br>Department 513 | Fair Market<br>Value | Remaining<br>Life |
|---|---|---|
| 1  Filter pump, Gould Model 3196 Nickel<br>Size 3 x 3, direct drive 7½ HP,<br>1745 RPM, weatherproof motor, controls,<br>piping, foundation, wiring and instal-<br>lation. | $  813 | 8  MOSCATO |
| 1  Coating tank, stainless steel, 6'<br>diameter x 6' high, full cover, 24"<br>manhole, Lightnin 1 HP mixer, piping,<br>foundation, wiring and installation. | 1 268 | 8 |
| 1  Caustic coating pump, Aurora, Size<br>2 x 3", direct drive, 30 HP, 1760 RPM<br>motor, base, piping, controls, wiring<br>and installation. | 813 | 5 |
| 1  Polishing tank, stainless steel, 42"<br>diameter x 54" high, 2" insulation,<br>concrete foundation, pipe valve, cover<br>and installation. | 639 | 5 |
| 1  Polish pump, LaBour, Size 2 x 6" with<br>double separator traps, direct drive<br>15 HP, 1750 RPM, weatherproof motor,<br>foundation, controls, piping, wiring<br>and installation. | 714 | 5 |
| 1  Soft slurry tank, stainless steel 6'<br>diameter x 7' high, 3' conical bottom<br>6' diameter to 24" diameter with gate<br>6" pipe, cover, 4 – 4" x 6' I beam leg<br>support on 12" x 12" x 18" concrete<br>piers, 80 LF 8" stainless steel pipe,<br>valve, installation. | 1 785 | 8 |
| 1  Slurry pump, Gould Model 3196 Nickel<br>Size 2 x 3, 260 GPM 50' head, direct<br>drive 5 HP, 1750 RPM motor, controls,<br>piping, foundation, wiring and instal-<br>lation. | 584 | 8 |
| 1  Slurry pump, Gould Model 3196 Nickel<br>Size 1½ x 3', direct drive 5 HP motor,<br>controls, piping, wiring and installation. | 554 | 8 |



48

VC
Valuation Counselors, Inc.

MKSK-FED-0000009753

ALCD-PUBCOM_0006826

| Equipment Department 513 | Fair Market Value | Remaining Life | |
|---|---|---|---|
| 1 Slurry tank, stainless steel, 10' diameter x 6' high, 2 compartment with 5 HP right angle drive agitator, 6 paddle, foundation, pipe valves, wiring and installation. | $ 2 798 | 8 | Mosca70 |
| 1 Slurry pump, Gould Model 3196, Size 2 x 3-10 Nickel, direct 10 HP, 1750 RPM, weatherproof motor, controls, pipe valves, wiring and installation. | 809 | 8 | |
| 1 Slurry pump, Galigher Model D2VRG200 "Vac Seal" #P737386, V belt drive 20 HP, 1750 RPM motor, 1½ x 2", controls, pipe valves, wiring and installation. | 893 | 8 | INLAND |
| 1 Slurry tank, stainless steel, 8' diameter x 78" high, with 5 HP right angle drive agitator, 6 paddle, controls, foundation, pipe valves, wiring and installation. | 2 736 | 8 | Mosca70 |
| 2 Slurry pumps, LaBour Type DZT, Size 14 - 1½ x 2" Nickel, direct drive 5 HP motor, controls, piping, foundation, wiring and installation. | 1 230 | 8 | |
| 1 Slurry tank, stainless steel, 3' diameter x 4' high, 2' conical bottom, 4' diameter to 2", 4 - 6" x 42" I beam legs, controls, pipe valve, foundation and installation. | 558 | 8 | |
| 1 Water chiller, Worthington, 118 ton with 2 R22 compressors, common drive 150 HP motor, Model CDS424 condenser 20" diameter x 12' evaporator steel frame support, concrete foundation, controls, piping, wiring and installation. | 9 735 | 5 | |
| 1 Chill water tank, steel, 78" diameter by 84" high, 2" insulation, controls, pipe valves, concrete foundation, manhole, installation. | 632 | 8 | |



49

VC
Valuation Counselors, Inc.

| Equipment<br>Department 513 | Fair Market<br>Value | Remaining<br>Life |
|---|---|---|
| 3   Chill water pumps, Gould Model 3196<br>Nickel Size 3 x 4-8, 230 GPM 50' head<br>direct drive 7½ HP motor, controls,<br>pipe valves, wiring and installation. | $ 2 439 | 8 |
| 1   Condensate tank, steel, 8' diameter<br>by 10' high, open top, platform grate,<br>ladder, concrete foundation, pipe<br>valves and controls, installation. | 969 | 8 |
| 1   Condensate pump, Gould Model 3196<br>Size 2 x 3 Nickel direct drive 30 HP<br>1750 RPM, weatherproof motor, controls,<br>pipe valves, wiring and installation. | 807 | 8 |
| 1   Item steel desk, chair, hose, ladders,<br>fire extinguisher. | 395 | 5 |
| Total Department 513 | $350 196 | |

*(handwritten annotations throughout: "Moncito", "Pump Trip - Single motor only", "charge 11-28", "300.00", "Moscato - Motor Only", "Inland", "Piping", "47384Y", "824038", "Air Compressor Dwyer, used ... 10 HP", "charge 11-28-20", "400.00", "5")*

Valuation Counselors, Inc.

MKSK-FED-0000009755

ALCD-PUBCOM_0006828



| Equipment<br>Department 516 | Fair Market<br>Value | Remaining<br>Life |
|---|---|---|
| 1 HCL burner tower, open steel construction, 53' high x 20' x 10', steel grid platforms at 15', 26'-38' and 48' levels with 1 - 19 and 3 - 16' tread grid stairway with 2" pipe railing.<br>4 - 8" Wide Flange 24# x 26' I Beam Support.<br>4 - 6" Wide Flange 15½# x 22' I Beam Support.<br>8 - 8" Wide Flange 17# x 10' I Beam Support.<br>8 - 8" Wide Flange 17# x 18' I Beam Support.<br>96' steel 7" Wide Flange 15# x Member Support.<br>48' steel 5" Wide Flange 10½ Member Support.<br>48' - .4 x 3 x ¼L's Member Support.<br>480 Square feet grid platform. Installation. | $ 8 217 | 8 |
| 1 Two stage Demineralizer, Permutit with 1 - 16" diameter Q-L cation exchanger, 28,000 gallon/regeneration 3/4" meter with alarm.<br>1 - 16" diameter DeAcidite Ancon Exchanger, 34,000 gallon/regeneration and type RE Solubridge pipe control, wiring and installation. | 8 744 | 5 |
| 1 Permutit Demineralizer with 1 - 16" diameter Q-L cation exchanger, 28,000 gallon/regeneration 3/4" meter with alarm.<br>1 - 16" diameter DeAcidite Ancon Exchanger, 34,000 gallon/regeneration and type RE Solubridge pipe control, wiring and installation. | 8 744 | 8 |
| 2 Pump, Worthington 1½ x 1½ rotary geared, direct drive 1½ HP-1750 RPM motor. | 507 | 8 |



51

VC
Valuation Counselors, Inc.

| Equipment Department 516 | | Fair Market Value | Remaining Life |
|---|---|---|---|
| 2 | Rotometer Brooks | $ 264 | 5 |
| 2 | Filter Filterite Model L-204-3/4 | 195 | 5 |
| 1 | Tank, stainless steel 3' diameter x 6', open top float valve control, 1" water meter, piping, wiring and installation | 650 | 8 |
| 1 | HCL combustion chamber, National Carbon 33" diameter x 27' high, water cooled, Karbate 22 burner nozzle size No. 8, 3 Silica coated burner caps, reinforced ployester siding, pipe, controls, wired, installation. | 15 426 | 8 |
| 1 | Primary absorber, 12" diameter x 20' steel shell Karbate tube single pass, pipe, installation. | 1 770 | 8 |
| 1 | Acid storage tank, fibreglass 36" diameter x 60  pipe, installation. | 336 | 8 |
| 2 | Acid pump National Carbon Model 31FBF, Karbate type F, size 2" x 1½" direct drive, 5 HP 1800 RPM enclosed motor controls, pipe, wiring and installation. | 1 497 | 5 |
| 1 | Secondary absorber, steel 12" diameter x 10' housing single pass Karbate tubes, cooling water, piping and installation. | 1 695 | 5 |
| 1 | Tails Tower, Karbate 20" diameter x 72" high 3' packing, demineralized absorption falling water, piping and installation | 4 485 | 5 |
| 1 | Steam ejector, Steam Croll 215JB, top of tower, piping and installation. | 345 | 8 |
| 1 | Barometric condenser steel 10" diameter x 36" long, piping and installation. | 1 668 | 5 |

INLAND
ONEIDA
MOSCATO



52

Valuation Counselors, Inc.

| Equipment<br>Department 516 | Fair Market<br>Value | Remaining<br>Life |
|---|---|---|
| 2   HCL storage tank, steel 12'<br>diameter x 20' rubber lined,<br>outside painted, horizontal<br>mounted on 14' x 18" x 6'<br>concrete saddles, platform<br>15,000 gallon, piping, wiring<br>and installation. | $ 7 620 | 7 |
| 3   Pump, Karbate type F - 1½ x 2"<br>acid direct drive 5 HP 1750 RPM<br>motor, enclosed, piping, wiring<br>and installation. | 2 246 | 5 |
| 2   HCL storage tank, steel 12'<br>diameter x 35' high rubber lined<br>vertical, painted, ladder con-<br>crete platform, 32,000 gallon<br>20" diameter manhole, piping and<br>installation. | 9 300 | 7 |
| Total - Department 516 | $ 73 709 | |



*Moscato*

53

VC
Valuation Counselors, Inc.

| Equipment Department 517 | | Fair Market Value | Remaining Life |
|---|---|---|---|
| 1 | Liquifier Tower, steel I Beam construction, 50' high, 8' x 10' open frame, steel deck platform at 8'-16'-24'-36' and 44', open grid platforms at 16' and 24', 6 - 10' steel ladder, 4 - 8" x 44' I Beam supports, 4 - 6" x 10' I Beam supports, 12 - 8" x 8' I Beam supports, 12 - 8" x 10' I Beam supports, 10 - 42' 3" L's x member supports. | | |
| | 1 - Concrete 11' x 9' x 3' Base, installation. | $ 7 875 | 8 |
| 2 | Recirculating water pump, Gould Model 3189, size 3 x 4 - 11, 600 GPM 75' head, 20 HP-1750 RPM waterproof motor, controls, pipe, wiring and installation. | 2 514 | 8 |
| 1 | Water pump LaBour 2 x 3" direct drive 7½ HP-1750 RPM waterproof motor, controls, pipe, wiring and installation. | 590. | 5 |
| 1 | Cooling tower, Fluor Model 10150 Series 3 induced draft counterflo size 13 x 13, 1 - Hartzell 4 blade propeller fan, 7½ HP motor, 1 - 14 x 14' concrete basin, piping, wiring and installation. | 2 964 | 5 |
| 2 | Cooler, chlorine primary steel 20" diameter x 20' high, Hooker 36" Hetron heads, 152 - 1" x 13' - 20 ga. Titanium tubes, 516 square feet heat surface, 580 GPM river water cooling, pipe, installation. 150'-20" Hetron pipe. 40' -14" pipe for above. 150'-12" pipe for above. | 15 606 | 5 |
| 1 | Direct contact cooler, plastic 42" diameter PEFG tower 28' long, 7' high bed 1½" Intalox Saddles, 3,840 square feet contact surface, pipe, installation. | 8 970 | 10 |



Mosca70

54

VC
Valuation Counselors, Inc.

MKSK-FED-0000009759

ALCD-PUBCOM_0006832

| Equipment<br>Department 517 | Fair Market<br>Value | Remaining<br>Life |
|---|---|---|

1   Chlorine water cooler, steel 15"
diameter x 20' long, 2nd stage
insulated, Titanium tubes, river
water, piping and installation.    $ 6 750    10   M<small>OSCATO</small>

1   Chlorine pump, Duriron Size 1½
x 1½   74/71, direct drive 3 HP
motor, controls, pipe, wiring
and installation.    705    8

1   Demister, wet chlorine, Hetron
72' polyester, 2' diameter x 63"
high pipe, 23" OD x 6" Teflon
Demister Pad Titanium grids,
installation.    5 577    5

2   Acid drying tower, 1st & 2nd stage
steel 54" diameter x 16' high, 42"
diameter ID acid brick lined and 7'
bed of 1½" Intalox saddles, pipe,
foundation, installation.    8 100    8

4   Pump, Duriron, 2 x 1½" Series X3,
RDR-70 drive 5 HP motor, pipe,
controls, wiring and installation.    3 060    5



1   Spent acid pump, Duriron 1 x 1½"
rotary direct drive 2 HP enclosed
motor, pipe, controls, wiring and
installation.    555    5   I<small>NLAND</small>

1   3rd Stage, acid dryer, steel 42"
diameter x 16' high 7' bed, 1½
Intalox saddles packing pipe,
foundation, installation.    3 825    6   M<small>OSCATO</small>

1   3rd stage heat exchanger, steel
15" diameter x 20' long Karbate
2 pass water cooled, pipe, in-
stallation.    5 125    8

1   Item chlorine piping
12" steel pipe 200'
6" steel pipe 120' - 45'
4" steel pipe 90' - 40'
2" steel pipe 60'
1½" steel pipe 20'
3" steel pipe 260'.    2 074    8



55

VC
Valuation Counselors, Inc.

MKSK-FED-0000009760

ALCD-PUBCOM_0006833



| | Equipment<br>Department 517 | Fair Market<br>Value | Remaining<br>Life |
|---|---|---|---|
| 4 | Chlorine compressor, Nash HC7 direct drives 125 HP, 1750 motor, 490 CFM cell gas at 35 PSIG, controls, foundation, pipe, wiring and installation. | 14 580 | 5 |
| 4 | Acid separator, steel 24" diameter x 84", pipe, concrete foundation, installation | 1 824 | 4 |
| 3 | Freon 22 refrigeration compressor Frick NH3 size 9 x 9 #AG73016 drive, 125 HP-1150 RPM motors with 3 oil separations 24" diameter x 42" guards, foundation, pipe, controls, wiring and installation. | 16 983 | 5 |
| 2 | Gas Booster compressor, Frick 8OB2F2-39 Rotary direct drive, 100 HP-1160 RPM motor, piping, wiring and installation. | 7 800 | 5 |
| 1 | Sulfuric acid Surge Tank, steel 7' diameter x 12' horizontal F. & D. end, pipe, installation. | 1 586 | 8 |
| 4 | 98% Sulfuric acid cooler, steel 18" diameter 18' long, shell 6 pass acid, 2 pass water acid shell tube, 2,720 square feet surface, 764,000 BTU/M, pipe, installation. | 16 170 | 8 |
| 1 | Dry chlorine demister, steel 30" diameter x 10' high, foundation, 3" insulated pipe, installation. | 5 793 | 8 |
| 2 | Freon condenser, Frick #27-236 square feet, 14" diameter x 2" water cooled #53-8%, temperature -20 + 200°F, platform, pipe, installation. | 3 941 | 8 |
| 1 | Freon receiver, Frick 30" diameter x 15', pipe, installation. | 1 469 | 8 |
| 1 | Purification Tower, steel 24" diameter 15' high, 6 tray bubble caps, 3" insulation up-flow & falling liquid, Glycol base jacket, pipe, installation. | 7 650 | 8 |

*Handwritten annotations:* COMPRESSOR—VULCAN MOTORS—MASCO70 ; MOSCO70

56

MKSK-FED-0000009761

ALCD-PUBCOM_0006834

| Equipment<br>Department 517 | | Fair Market<br>Value | Remaining<br>Life |
|---|---|---|---|
| 1 | Liquifier, steel 30" diameter x 15', single up-flow vertical shell, 1,463 square feet surface, 1½ x 13 gage x 15' steel tubes, single pass, refrigerated, pipe, installation. | $ 9 153 | 8 |
| 1 | Accumulator, steel R22, 30" diameter x 6', model LL-3B-2F, level control, pipe, installation. | 1 155 | 8 |
| 2 | Knockout pot, steel 18" diameter x 72" high, insulated, drain valve, pipe, installation. | 1 452 | 8 |
| 3 | Chlorine storage tank, steel, 8' diameter x 35', horizontal, 14,032 gallon, 3" insulation, 1,880 cubic feet; concrete saddle, steel saddle resting on load cell weigher; piping, wiring and installation. | 16 470 | 5 |
| 1 | Chlorine tank car loading station with auxiliary tank, truck loader, steel double side pipe valves, controls, wiring and installation. | 8 750 | 8 |
| 1 | Spent acid tank, steel 8' diameter x 14' long, lined; concrete saddle concrete 20 x 10 x 6" pad, 2 - 8' x 1' x 3' concrete pier, 8' x 3' x 10' high platform, truck pipe loading unit. | 11 336 | 8 |
| 1 | Spent acid pump, Gould model 3196, size 3 x 4 - 8C, direct drive, 7½ HP-1750 RPM motor, concrete foundation, piping, wiring and installation. | 1 879 | 8 |
| 1 | Sulfuric acid tank, steel 7' diameter x 18' long, electric heater traced, 2" insulation, top mounted Lawrence 1½ x 2½ HBD-H pump, 30 GPM 7½ HP-1750 RPM motor, steel saddle, concrete piers, Reflex LTR-7 liquid level gage, pipe, wiring and installation. | 17 946 | 10 |

Hose470

57

Valuation Counselors, Inc.

MKSK-FED-0000009762

ALCD-PUBCOM_0006835

| Equipment<br>Department 517 | Fair Market<br>Value | Remaining<br>Life |
|---|---|---|
| 1    Railroad Tank car track scale,<br>Howe 210,000# capacity, with<br>mechanoprint attachment. | $ 12 750 | 8 |
| Total Department 517 | $232 987 | |

*Hosea & Co*
*Inland*
*Van Iderstine*

284 306    6

517 v83

*Prepins*

58

VC
Valuation Counselors, Inc

MKSK-FED-0000009763

ALCD-PUBCOM_0006836

Equipment
Department 521

| | | Fair Market Value | Remaining Life |
|---|---|---|---|
| 1 | Caustic storage tank, steel 10' diameter x 20' high, 15,000 gallon concrete block base, piping, wiring and installation. | $ 3 078 | 5 |
| 1 | 20% caustic solution heat exchanger, steel 16" diameter x 18' nickel tube river water, single pass, pipe, installation. | 2 040 | 5 |
| 1 | Pump, Gould Model 3196--1½ x 3 -10, 150 GPM 100' head, direct drive 10 HP-1750 RPM motor, foundation, pipe, controls, wiring and installation. | 654 | 5 |
| 1 | Fume scrubber, steel 20" diameter x 48", spray rinse, pipe, installation, foundation. | 1 361 | 5 |
| 1 | Bleach storage tank, steel 10' diameter x 18' high, 15,000 gallon rubber lined, concrete pad, installation. | 5 256 | 6 |
| 1 | Bleach storage tank, steel 10' diameter x 14' high, rubber lined, 10,000 gallon, installation. | 4 020 | 6 |
| 1 | Reactor tank, fibreglass 12' diameter x 15' high, 12,000 gallon, concrete pad, installation. | 4 350 | 8 |
| 1 | Reactor tank, steel 12' diameter x 15' high, rubber lined, 12,000 gallon, concrete pad, piping, wiring and installation. | 4 530 | 6 |
| 2 | Bleach circulating pump, Doar Oliver, Model 122J4-1511-10, 3" x 3", direct drive 15 HP-1750 RPM motor, controls, concrete pad, pipe, wiring and installation. | 1 548 | 8 |

59

Valuation Counselors, Inc.

MKSK-FED-0000009764

ALCD-PUBCOM_0006837

| Equipment Department 521 | Fair Market Value | Remaining Life |
|---|---|---|
| 1  Bleach plate heat exchanger, American Heat Reclaiming Co., DIV-1, #7993-1970, pipe, installation. | $  1 110 | 8 |
| Total Department 521 | $ 27 947 | |

Valuation Counselors, Inc.

MKSK-FED-0000009765

ALCD-PUBCOM_0006838

| Equipment<br>Department 536 | | Fair Market<br>Value | Remaining<br>Life |
|---|---|---|---|
| 6 | Tank, welded steel storage, 9'<br>diameter x 24' high, 15,066 gallon<br>capacity, concrete foundation,<br>pipe, installation. | $ 15 930 | 8  INLAND |
| 5 | Pump, Worthington Model ICNG62<br>Group 56049, size 1½ x 2"<br>transfer, direct drive 7½ HP<br>1740 RPM waterproof motor,<br>control, pipe, wired, installa-<br>tion. | 3 038 | 5  INLAND |
| | Total Department 536 | $ 18 968 | |

61

VC
Valuation Counselors, Inc.

MKSK-FED-0000009766

ALCD-PUBCOM_0006839



| | Equipment<br>Department 538 | Fair Market<br>Value | Remaining<br>Life |
|---|---|---|---|
| 1 | Storage tank, welded steel, 9'<br>diameter x 18' vertical, 13,000<br>gallon capacity, pipe, foundation,<br>installation. | $  2 145 | 8 |
| 1 | Storage tank, welded steel, 9'<br>diameter x 16' high, 10,000<br>gallon capacity, pipe, installa-<br>tion. | 1 800 | 8 |
| 2 | Storage tank, welded steel, 9'<br>diameter x 24' high, 15,066<br>gallon capacity, pipe, installa-<br>tion. | 5 310 | 8 |
| 1 | Pump Gould 3 x 4" transfer, direct<br>drive 10 HP-1750 RPM motor, control,<br>pipe, wiring and installation. | 855 | 5 |
| 1 | Pump, Buffalo Size 1½ CH, transfer<br>#257070, direct drive 5 HP water-<br>proof motor, 140 GPM 48' head,<br>control, pipe, wiring and installa-<br>tion. | 456 | 8 |
| 1 | Storage tank, welded steel 9'<br>diameter x 20' high, 13,000 gallon<br>capacity, foundation, pipe, in-<br>stallation. | 2 145 | 8 |
| 1 | Storage tank, welded steel 9'<br>diameter x 20' high, 13,000 gallon<br>capacity, foundation, pipe, in-<br>stallation. | 2 145 | 8 |
| 1 | Storage tank, welded steel 9'<br>diameter x 24', 15,066 gallon<br>capacity, foundation, pipe, in-<br>stallation. | 2 655 | 8 |
| 1 | Storage tank, welded steel 10'<br>diameter x 24' high, 20,000 gallon<br>capacity, foundation, pipe, in-<br>stallation. | 2 993 | 8 |
| 2 | Storage tank, welded steel 9'<br>diameter x 24' high, 15,066 gallons,<br>foundation, pipe and installation. | 5 310 | 8 |

62

VC
Valuation Counselors, Inc.

MKSK-FED-0000009767

ALCD-PUBCOM_0006840

| Equipment<br>Department 538 | | Fair Market<br>Value | Remaining<br>Life |
|---|---|---|---|
| 1 | Pump, Ingersoll Rand Type 1½<br>R2N 5 Model C, transfer, #B655904,<br>150 GPM 90' head drive, 5HP-<br>3525 RPM waterproof motor, controls,<br>pipe, wiring and installation. | $ 1 349 | 8 |
| 1 | Pump, Ingersoll Rand type 2 RVN-<br>7½ transfer #09705189, 150 GPM<br>90' head drive, 7½ HP-3475 RPM<br>waterproof motor, controls, pipe,<br>wiring and installation. | 1 463 | 8 |
| 1 | Pump, Gould Model 3196, transfer<br>#711B445, size 1½ x 3 - 8, 75 GPM<br>260' head, drive 20HP-1750 RPM motor,<br>controls, pipe, wiring and installa-<br>tion. | 1 853 | 8 |
| 1 | Pump, Worthington 1½ x 1½ transfer<br>drive, 7½ HP-3460 RPM motor, controls,<br>pipe, wiring and installation. | 1 114 | 5 |
| Total Department 538 | | $31 593 | |

*INLAND* (handwritten annotation)

Valuation Counselors, Inc.

MKSK-FED-0000009768

ALCD-PUBCOM_0006841

| | Equipment<br>Department 560 | Fair Market<br>Value | Remaining<br>Life |
|---|---|---|---|
| 1 | Lift Truck, Yale Model G83P-049-SWS-DSG, propane gas powered, #P4205573, 8,000# capacity, 154" lift, 48" fork, operator guard. | $  4 839 | 8 |
| 1 | Lift truck, Yale Model 651C-050-GFT, propane gas powered #P159640, 6,000# x 148" lift, barrel grab, operator guard. | 4 538 | 5 |
| 1 | Lift truck, Yale Model 651C-050-GFT, #AJ15108, 6,000# x 148" lift, guard. | 4 538 | 3 |
| 2 | Stencil machine Diagraph 1" & ½". | 400 | 5 |
| 1 | File, steel 5 drawer letter. | 63 | 5 |
| 2 | Fire extinguisher 20# CO2. | 60 | 5 |
| 1 | Truck, steel hook type barrel. | 98 | 5 |
| 1 | Dock board, magnesium, 3 x 4. | 110 | 5 |
| 1 | Steel storage rack, 2 section 6 arm. | 78 | 5 |
| 36 | Lineal feet wood 3 x 6' stock rack, 3 shelf. | 144 | 5 |
| 1 | Truck, steel warehouse full strap. | 28 | 5 |
| 64 | Rack, steel 3 x 1 x 7', 5 shelf. | 1 216 | 5 |
| 3 | Cabinet, steel 36 x 18 x 78", 2 door. | 105 | 5 |
| 2 | Cabinet, steel 24 x 18 x 78", 1 door. | 42 | 5 |
| 1 | Desk, steel 60 x 30", single pedestal linoleum top. | 100 | 5 |
| 1 | File, steel 5 drawer letter lock. | 68 | 5 |
| 1 | Chair, wood plastic swivel arm. | 33 | 5 |
| 1 | Chair, wood plastic side arm. | 23 | 5 |
| | Total  Department 560 | $16 483 | |

*(handwritten annotation near third lift truck: Puerto Rico 11-15-75)*

64

VC
Valuation Counselors, Inc.

MKSK-FED-0000009769

ALCD-PUBCOM_0006842

| Equipment<br>Department 580 | | Fair Market<br>Value | Remaining<br>Life |
|---|---|---|---|
| 11 | Desk, steel 60 x 30" double pedes-<br>tal, linoleum top. | $ 1,320 | 5 |
| 2 | Desk, steel 60 x 30" single pedes-<br>tal 48" return. | 310 | 5 |
| 3 | Desk, walnut 70 x 36" double<br>pedestal executive. | 540 | 5 |
| 4 | File, steel 2 drawer letter portable. | 150 | 5 |
| 5 | File, steel 5 drawer letter lock. | 338 | 5 |
| 13 | File, steel 4 drawer letter lock. | 683 | 5 |
| 2 | File, steel 4 drawer legal safe. | 495 | 5 |
| 3 | File, steel 4 drawer legal lock. | 192 | 5 |
| 3 | Chair, walnut naugahyde swivel arm. | 143 | 5 |
| 20 | Chair, walnut naugahyde side arm. | 600 | 5 |
| 11 | Chair, steel plastic arm. | 303 | 5 |
| 5 | Chair, steel vinyl steno. | 115 | 5 |
| 2 | Table, walnut 48 x 20" drawer. | 110 | 5 |
| 5 | Table, steel 60 x 30" formica top. | 400 | 5 |
| 4 | Chair, steel plastic side. | 60 | 5 |
| 11 | Chair, steel plastic swivel arm. | 440 | 5 |
| 1 | Desk, walnut 60 x 30" single pedestal<br>48" return. | 183 | 5 |
| 1 | Sectional, green naugahyde 48" 2 piece. | 80 | 5 |
| 1 | Sofa, Walnut leather 3 cushion. | 225 | 5 |
| 5 | Cabinet, steel 36 x 18 x 72" 2 doors. | 163 | 5 |
| 5 | Cabinet, steel 36 x 18 x 78" 2 doors. | 178 | 5 |
| 1 | Cabinet, steel 36 x 20 x 36" 2 doors. | 28 | 5 |

85

Valuation Counselors, Inc.

MKSK-FED-0000009770

ALCD-PUBCOM_0006843

| | Equipment<br>Department 580 | Fair Market<br>Value | Remaining<br>Life |
|---|---|---|---|
| 1 | Rack, steel 36 x 18 x 84" 6 shelf. | $ 23 | 5 |
| 1 | Desk, steel 54 x 20" single pedestal 3 drawer. | 45 | 5 |
| 1 | Fire extinguisher, 10 lbs, CO2. | 25 | 5 |
| 2 | Fire extinguisher, 2½ gallon S/A. | 35 | 5 |
| 2 | File, steel 6 tray card. | 80 | 5 |
| 2 | Desk, steel 72 x 36" Executive. | 375 | 5 |
| 1 | Desk, steel 72 x 30" Executive. | 180 | 5 |
| 1 | Credenza, steel 54 x 20" 2 drawer. | 95 | 5 |
| 3 | Chair, walnut arm. | 84 | 5 |
| 1 | Kitchen set, steel 60" table 6 chair. | 75 | 5 |
| 1 | Sofa, naugahyde 60" 2 cushion. | 118 | 5 |
| 1 | Table, walnut formica 96 x 42", stainless steel leg. | 175 | 5 |
| 8 | Chair, chrome orange naugahyde arm. | 440 | 5 |
| 1 | Calculator Olivetti Multisumma 22. | 84 | 5 |
| 1 | Typewriter, IBM 15" Selectric 5563714. | 174 | 5 |
| 1 | Typewriter, IBM 13" standard, 1671871. | 168 | 5 |
| 1 | Typewriter, IBM 13" standard, 1671870. | 168 | 5 |
| 1 | Typewriter, IBM 13" standard, 6291973. | 168 | 5 |
| 1 | Adder Victor 10871 #3610-589. | 45 | 5 |
| 1 | Duplicator A. B. Dick 227, 952233. | 206 | 5 |
| 1 | Adder, Monroe 10-11-011R #150802. | 89 | 5 |
| 1 | Calculator, Friden STW10, #571126. | 149 | 5 |
| 3 | Air Mask, MSA 401. | 135 | 5 |

66

VC
Valuation Counselors, Inc.

MKSK-FED-0000009771

ALCD-PUBCOM_0006844

| | Equipment<br>Department 580 | Fair Market<br>Value | Remaining<br>Life |
|---|---|---|---|
| 1 | Table, walnut 10' x 4' panel legs. | $ 138 | 8 |
| 8 | Chair, steel vinyl folding. | 29 | 8 |
| 12 | Chair, steel folding tablet arm. | 50 | 8 |
| 1 | Chalkboard, green 5 x 4 oak frame. | 24 | 8 |
| 2 | Bookcase, steel 3 x 1 x 7', 6 shelf. | 28 | 8 |
| 1 | Magazine Rack, steel 4 x 1 x 5, 8 slant shelves. | 18 | 8 |
| 1 | Chair, steel plastic steno. | 14 | 8 |
| 1 | Desk, steel box 30" single pedestal 48" return. | 108 | 8 |
| 1 | Double desk, walnut 10' x 30" top 3 - 3 drawer pedestal. | 89 | 8 |
| 3 | Chair, steel plastic arm. | 54 | 8 |
| 1 | Chair, steel fabric swivel arm. | 27 | 8 |
| 2 | File, steel 4 drawer letter. | 54 | 8 |
| 2 | Bookcase, walnut 3 section glass doors. | 108 | 8 |
| 1 | File, steel 4 drawer legal lock. | 38 | 8 |
| 12 | Locker, steel 12 x 18 x 72". | 79 | 4 |
| 1 | Bank, 10 steel lockers 12 x 30 x 72", 2 door. | 11 | 8 |
| 2 | Bench, wood 12 x 1' pipe leg. | 36 | 8 |
| 6 | Desk, steel 60 x 30" double pedestal linoleum top. | 432 | 5 |
| 2 | Desk, walnut 66 x 36" double pedestal linoleum top. | 174 | 5 |
| 1 | Desk, oak 60 x 30" double pedestal formica top. | 62 | 5 |

67

Valuation Counselors, Inc.

MKSK-FED-0000009772

ALCD-PUBCOM_0006845



| | Equipment<br>Department 580 | Fair Market<br>Value | Remaining<br>Life |
|---|---|---|---|
| 6 | Chair, steel plastic swivel arm. | $  162 | 5 |
| 2 | Chair, steel plastic side arm. | 30 | 5 |
| 1 | Chair, steel plastic swivel arm. | 11 | 5 |
| 7 | File, steel 5 drawer letter | 273 | 5 |
| 7 | File, steel 4 drawer letter. | 189 | 5 |
| 1 | File, steel 5 drawer legal. | 48 | 5 |
| 1 | Bookcase, wood 3 section glass door. | 29 | 5 |
| 2 | Bookcase, wood 3 section glass door. | 78 | 5 |
| 4 | Table, wood 66 x 30". | 180 | 5 |
| 1 | Blu-Ray blueprint machine #146. | 185 | 5 |
| 1 | Calculator, Monroe CAIO #501364. | 105 | 5 |
| 3 | Water cooler, electric bottle type. | 194 | 5 |
| 5 | File, steel 5 drawer blueprint. | 240 | 5 |
| 1 | Drafting table, oak 60 x 38". | 62 | 5 |
| | Total   Department 580 | $13 494 | |

68

Valuation Counselors, Inc.

MKSK-FED-0000009773

ALCD-PUBCOM_0006846

Equipment
Department 583

| | | Fair Market Value | Remaining Life |
|---|---|---|---|
| 1 | Vapor Fractometer, Perkin Elmer 154, 017645. | $ 2 250 | 5 |
| 1 | Muffle furnace, Blue M Model M15A-1A, electric, 1.75 KW. | 57 | 5 |
| 1 | Vacuum pump, Welch Duo Seal 29945-5, ½ HP motor. | 62 | 5 |
| 1 | Oven, PS Thelco Model 10. | 68 | 5 |
| 2 | Balance, Ainsworth Right A Weight single pan, Model SC. | 462 | 5 |
| 1 | Vacuum pump, Gelman 13152 Little Giant, 1/12 HP. | 48 | 5 |
| 1 | Calculator, Victor 12-1101, #3941-197. | 128 | 5 |
| 1 | Spectrophotometer, Beckman DW power supply lamp. | 2 340 | 5 |
| 1 | Colorimeter, Klett Summerson 800-3 #37814. | 113 | 5 |
| 1 | Balance, Mettler P2000, 2000G. | 294 | 5 |
| 1 | Balance, Mettler P162, 160G. | 323 | 5 |

Total Department 583

$6 145

69

Valuation Counselors, Inc.

MKSK-FED-0000009774

ALCD-PUBCOM_0006847

# Exhibit 95

# *Attachment A*

## Summary of Remedial Investigation Activities



OU2_SKE0005090

*Phase II RI Results*

- Site-wide evaluation of soil quality performed in comparison to risk-based screening criteria identified a total of fifteen COCs, consisting of nine VOCs and six SVOCs.

- Because metallic constituents detected in the soil and in the groundwater during the Phase I and Phase II RI were determined not to be related to post-1952 operations at the site, metals were excluded as potential site-related COCs and were not further evaluated.

- Impacted soil zones were delineated for PCBs at concentrations of both 2 ppm and 50 ppm. Concentrations of PCBs in soils that exceeded 50 ppm were detected in the vicinity of Phase I RI soil boring SB-24.

- Intermittent occurrences of NAPL had been previously detected in small to trace amounts in three shallow groundwater monitoring wells (MP-2S, MP-3S, and MP-5S). No NAPL was detected during recovery tests performed at any of these wells. The hydrophobic dye shake test observations indicated the possible presence of NAPL in five soil samples collected from soil borings SB-33, SB-34, SB-36, SB-38, and SB-47.

- The existing groundwater quality data indicated that the ongoing process of natural attenuation has resulted in an order of magnitude or more decrease in concentration of COCs in the past 12 years.

- Hydrogeologic information obtained during the Phase II RI confirmed that the shallow fill unit is not a suitable potable water source due its low saturated thickness, and naturally occurring high TDS and chloride concentrations.

- The results of the comparison of COC concentrations in groundwater to the more stringent of the human health and aquatic life groundwater MCSs under average and worst conditions indicate that, although certain COCs are present at concentrations which exceed NJDEP Class II-A GWQC in the shallow groundwater, the levels at which these COCs exist do not pose an unacceptable degree of risk to potential and human ecological receptors in Newark Bay.

*Phase II RI Conclusions*

- The most appropriate remedial alternative for PCB-impacted soils is excavation and offsite disposal of soils containing concentrations of PCBs in excess of the 50 ppm level to satisfy Toxic Substances Control Act (TSCA) requirements.

- Following the excavation of PCB-impacted soils, other site soils impacted by residual levels of COCs can be addressed with remedial alternatives, which isolate the soils to avoid potential direct contact/incidental ingestion exposure scenarios. The proposed remedial activities included installation of engineering controls over site soils and establishment of a Deed Notice.

- The surface water receptor of potentially impacted site shallow groundwater is Newark Bay. However, comparison of up-river and down-river surface-water samples indicated that the detected levels of COCs were below background levels in Newark Bay. Results of quantitative analyses indicate that potential receptors in Newark Bay have not been adversely impacted by site-related COCs discharging from the site shallow groundwater. The remedies

OU2_SKE0005095