# Exhibit 96

# EXHIBIT A-49

**Appendix A to** OxyChem's Comments in Opposition to Proposed Consent Decree,
*United States v. Alden Leeds, Inc., et al.*, Civil Action No. 2:22-cv-07326 (D.N.J.)

ALCD-PUBCOM_0006142

00001

```
 1  THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
 2     IN AND FOR THE COUNTY OF SAN FRANCISCO
 3  ----------------------------------
 4  SAFETY-KLEEN ENVIROSYSTEMS        )
 5  COMPANY, a corporation,          )
 6                                   )
 7        Plaintiffs,                )
 8                                  ) CASE NO.
 9  V.                              ) 985528
10                                   )
11  CONTINENTAL CASUALTY COMPANY,    )
12  et al.,                         )
13           Defendants.            )
14  ----------------------------------)
15
16        DEPOSITION OF BERNARD PARTINGTON
17           WEDNESDAY, JUNE 16, 1999
18           PAGES 1 - 179; VOLUME 1
19
20
21        BEHMKE REPORTING & VIDEO SERVICES
22        BY:  MICHELLE DIPIERRO-FAIREY, CSR
23              1320 ADOBE DRIVE
24           PACIFICA, CALIFORNIA  94044
25                (650) 359-3201
```

00002

```
 1
 2  Deposition of BERNARD PARTINGTON, taken on
 3  behalf of defendant at THE HYATT REGENCY, 2
 4  Albany Road, New Brunswick, New Jersey,
 5  commencing at 9:30 a.m., Wednesday, June 16,
 6  1999, before MICHELLE DIPIERRO-FAIREY,
 7  Certified Shorthand Reporter No. XI01746
 8  pursuant to Notice.
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

00003

**Exhibit**

LegacyVulcan_

MKSK-FED-0000004177

ALCD-PUBCOM_0006143

1  APPEARANCES OF COUNSEL:
2  FOR PLAINTIFF, SAFETY-KLEEN ENVIROSYSTEMS
3  COMPANY:
4     BROBECK, PHLEGER & HARRISON, ESQS.
5     BY: TRACY S. RYNIEC, ATTORNEY AT LAW
6     Spear Street Tower
7     One Market Plaza
8     San Francisco, California 94105
9     Telephone: (415) 442-0900
10  FOR THE DEFENDANT LONDON MARKET INSURERS AND
11  UNITED STATES LIABILITY INSURANCE COMPANY:
12     HANCOCK, ROTHERT & BUNSHOFT, ESQS.
13     BY: MARY ANDERSON, ATTORNEY AT LAW
14     515 S. Figueroa Street, 17th Floor
15     Los Angeles, California 90071
16     Telephone: (213) 623-7777
17  FOR THE DEFENDANT ALLSTATE INSURANCE COMPANY
18  AS SUCCESSOR TO NORTHBROOK EXCESS AND SURPLUS
19  LINES INSURANCE COMPANY:
20     LILLICK & CHARLES, LLP
21     BY: BETH L. APPELBAUM, ATTORNEY AT LAW
22     Two Embarcadero Center
23     San Francisco, California 94111
24     Telephone: (415) 984-8200
25
00004
1  APPEARANCES OF COUNSEL CONTINUED:
2  FOR THE DEFENDANT FIRST STATE INSURANCE
3  COMPANY, NEW ENGLAND REINSURANCE CORPORATION
4  AND HARTFORD ACCIDENT AND INDEMNITY:
5     LILLICK & CHARLES, LLP
6     BY: HELEN S. HAYNES, ATTORNEY AT LAW
7     Two Embarcadero Center
8     San Francisco, California 94111
9     Telephone (415) 984-8200
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
00005
1           I N D E X
2  Wednesday, June 16, 1999

MKSK-FED-0000004178

ALCD-PUBCOM_0006144

3  BERNARD PARTINGTON            Page
4    Examination by Ms. Haynes      6
5  AFTERNOON SESSION
6    Examination by Ms. Haynes      91
7
8
9
10            EXHIBITS
11  Number      Description        Page
12  Partington-1  Resume of Bernard      16
13          Partington.
14  Partington-2  The Austin Company Site  141
15  (Retained by  Plan of Vulcan Materials
16  Counsel)      Company.
17  Partington-3  Overall Site location,  145
18          Bates stamped SKE 244057.
19
20
21
22
23
24
25
00006
1     B E R N A R D   P A R T I N G T O N
2    called as a witness, having been duly
3  sworn, testified as follows:
4  EXAMINATION BY MS. HAYNES:
5    Q. Will you state your full name for the
6  record, please?
7    A. Bernard Partington.
8    Q. Can you spell your last name for us?
9    A. P-a-r-t-i-n-g-t-o-n.
10    Q. Thank you, Mr. Partington, and, again,
11  my name is Helen Haynes. We met before your
12  deposition began. I'm with the law firm in
13  San Francisco, California by the name of
14  Lillick and Charles and we represent several
15  defendants in this case. Those defendants are
16  Hartford Accident and Indemnity Company, First
17  State Insurance Company and New England
18  Reinsurance Corporation. I'll be taking your
19  deposition today.
20    For the record, I'd like to take a moment
21  for us to go around and have counsel introduce
22  themselves and state an appearance for the
23  record.
24    MS. APPELBAUM: Good morning, Mr.
25    Partington, I'm Beth Appelbaum. I'm from
00007
1    Lillick and Charles San Francisco and I'm
2    here today representing Allstate's
3    successor to Northbrook Excess and Surplus
4    Lines Insurance Company.

MKSK-FED-0000004179

ALCD-PUBCOM_0006145

5      MS. ANDERSON:  Good morning, Mr.
6   Partington.  I'm Molly Anderson from the
7   law firm of Hancock, Rothert and Bunshoft
8   in San Francisco.  I represent London
9   Market insurer and the US Liability
10   Insurance Company.
11      MS. RYNIEC:  Good morning, Mr.
12   Partington.  My name is Tracey Ryniec from
13   Brobeck, Phleger and Harrison in San
14   Francisco.  I'm representing the McKesson
15   Corporation on behalf of Safety-Kleen
16   Envirosystems.
17   Q.  Mr. Partington, are you represented by
18 counsel here today?
19      A.  No.
20   Q.  Have you met with any counsel in
21 preparation for your deposition today?
22      A.  No.
23   Q.  Let me take a moment then to just go
24 over a couple of ground rules for the
25 deposition before we begin.
00008
1      The Court Reporter sitting next to each
2   of us is taking down all of my questions and
3   all of your answers word-for-word.  When we're
4   done with the deposition, she's going to put
5   the questions and answers into a booklet form
6   which you'll have an opportunity to look at if
7   you'd like.  When you see that booklet form,
8   if there are any corrections or changes that
9   you believe are necessary, you're allowed to
10   go ahead and make those changes, but I should
11   caution you, any changes that you would make
12   to your testimony, any counsel in this action
13   could comment upon that at trial.  Do you
14   understand that?
15      A.  Uh-huh.
16   Q.  That brings us to another very
17 important part of the deposition, which is,
18 since the Court Reporter is taking down
19 everything that you and I say, we need to make
20 sure that we give audible responses; yeses and
21 nos.  Shakes of the head, nods of the head,
22 Uh-huh and uh-uh don't come out for the Court
23 Reporter?
24      A.  Dang.
25   Q.  So she was just about to say something
00009
1 to you, but she knew that was my comment that
2 was going to happen next.  We'll try to catch
3 each other on that.
4      A.  Okay.
5   Q.  One other thing I should caution you
6 on, there will be times when I will ask you a

MKSK-FED-0000004180

ALCD-PUBCOM_0006146

7  question and you know the answer before I
8  finish the question, but in order for the
9  written record to be clear, it's helpful if
10 you can let me finish my questions and then
11 begin your answer and I won't start my next
12 question until you've completed an answer.  Is
13 that clear?
14     A.  Yes.
15     Q.  Understand that even though we're in
16 an informal setting in the conference room
17 today, the oath you've taken means that the
18 testimony that you're going to give has the
19 same force and effect as if it was given in a
20 court of law.
21     A.  Yes. I do.
22     Q.  You're required to tell the truth.
23 You understand that?
24     A.  Yes. I do.
25     Q.  We are going to be asking you about
00010
1  events that took place some time ago.  And we
2  don't expect your memory to be perfect so
3  don't feel that you have to know the answer to
4  every single question.  We don't expect that.
5  It is okay for you to say I don't know or I
6  don't remember, but if you have, based on your
7  prior experience, reason to believe
8  information is sufficient to give me an
9  estimate or an answer based on knowledge in
10 past experience, we are entitled to that
11 information if you have it.  Does that make
12 sense to you?
13     A.  Yes, it does.
14     Q.  If I ask you any questions that are
15 unclear, either I've asked you a poorly worded
16 question or you don't understand what it is
17 I'm asking you, just ask me to go ahead and
18 rephrase it.  I'll be glad to do that.
19 Otherwise, if I ask a question and you provide
20 an answer we'll assume you understood my
21 question the way I asked it.  Okay?
22     A.  Okay.
23     Q.  As I said before we started the
24 deposition, at any time if you need to take a
25 break just let me know.  It's not a marathon.
00011
1  So any time you need a break, we can stop at
2  any time.
3       Although we're entitled to the best
4  testimony that you can give us today, I should
5  caution you, we don't want you to guess or
6  speculate and I'll caution you of that in case
7  I think you might be leaning in that
8  direction.  Is there any reason why you can't

MKSK-FED-0000004181

ALCD-PUBCOM_0006147

9 competently provide testimony today?  Any
10 medications or any other reason?
11   A. No.
12   Q. Okay.  Thank you.  Mr. Partington, can
13 you state your date of birth for me?
14   A. ███████
15   Q. We almost have the same birth date.
16 Your resident address for me?
17   A. 284 ████████ Street, ████████,
18 ████████
19   Q. Mr. Partington, have you had your
20 deposition taken before?
21   A. No.  Do you mean have I ever given a
22 deposition?
23   Q. Ever.
24   A. I've had -- given depositions but not
25 relating to anything where I was employed or
00012
1 anything.
2   Q. Okay.  How many depositions have you
3 provided?
4   A. One that I know of.
5   Q. And that was not related to your
6 employment?
7   A. It was related to an accident
8 investigation.
9   Q. Was it a car accident?
10   A. No.  It was an employment accident,
11 personal.
12   Q. Were you injured?
13   A. Yes, I was.
14   Q. Did you bring a lawsuit?
15   A. No, I did not.  It was for the record
16 of what actually happened.
17   Q. Who was your employer at that time?
18   A. Walton Materials Company.
19   Q.  Do you know approximately what year
20 that was?
21   A. Somewhere in 1968, 30 years ago.
22   Q. How were you injured?
23   A. There was a mishap -- it was never
24 proven how it happened, but we had an
25 explosion and I was involved.
00013
1   Q. Was your injuries and the situation of
2 your providing deposition testimony, did that
3 resolve to your satisfaction?
4   A. At the time, yes.  Was it fair?  No.
5   Q. What about it, if you can tell me, was
6 not fair?
7   A. It's 30 -- what, 30 years ago, so
8 what's the sense?  It was an equipment failure
9 and it was sort of whitewashed, if you want to
10 put it that way.  Some other means was the

MKSK-FED-0000004182

ALCD-PUBCOM_0006148

11 final disposition of what actually transpired.
12     Q. Were you in the union at that time?
13     A. I was supervisor.
14     Q. Supervisor in the union or nonunion?
15     A. I was part of management.
16     Q. Well, as we go through your employment
17 history, we may end up coming back to that
18 period of time and that mishap, as you say,
19 with the explosion. Any other depositions or
20 any other testimony that you've ever given?
21     A. Not to my knowledge. I served on jury
22 duties but...
23     Q. Have you ever testified in court?
24     A. No. I've never been a witness, no
25 other, but I was three or four times, four
00014
1 times, I believe, I was on jury duty here in
2 New Brunswick.
3     Q. Were they all criminal cases?
4     A. No. Two accidents, insurance claims,
5 there was no personal injury. One was -- I
6 don't remember -- no criminal cases, though.
7     Q. Do you recall the nature of the
8 insurance claim?
9     A. It was a matter of who we thought was
10 at fault for a particular accident, two people
11 were suing each other, I guess, and we made
12 the determination and we awarded, made the
13 award.
14     Q. Was it a car accident?
15     A. Yeah.
16     Q. Okay.
17     A. That's about the only one I remember.
18     Q. Mr. Partington, did you go to high
19 school here in New Jersey?
20     A. Nope. No, I didn't.
21     Q. Is that -- no, I'm sorry, no to high
22 school? That was a bad question. It's
23 unclear. Is it no to high school or into New
24 Jersey?
25     A. No to New Jersey.
00015
1     Q. Where did you attend high school?
2     A. In a little town called West Nanticoke
3 Pennsylvania. Harter High School.
4     Q. Did you graduate?
5     A. Yes.
6     Q. What year was that?
7     A. You weren't born yet, ███. I'm right
8 too.
9     Q. You're right, but not as much as you
10 think.
11     A. Well, mother nature has been awful
12 good to you.

MKSK-FED-0000004183

ALCD-PUBCOM_0006149

13    Q. Thank you. And what did you do after
14 you graduated high school in 1953?
15    A. Well, went to work.
16    Q. Where did you go to work at?
17    A. General Motors in Linden, New Jersey.
18    Q. What did you do for General Motors?
19    A. I was an assembler, on an assembly
20 line, promoted to line foreman, laid off, went
21 back to Pennsylvania and enjoyed myself for a
22 year.
23    Q. So let's see, how many years did you
24 work for General Motors?
25    A. Two, three, four -- three; '55 to '58,
00016
1 I got it in.
2    Q. Do you have a resume with you?
3    A. I have, yes, I gave it to the Court
4 Reporter.
5    Q. Well, you know, we might -- when we
6 take a break we might make a copy of it. I'll
7 tell you what, I'll take you through this real
8 quickly or we can break now and use the
9 resume?
10    A. You want to review the resume?
11    Q. Why don't we take a quick break.
12       (Brief recess.)
13       (Partington-1 marked for
14    identification.)
15    Q. Go back on the record. Mr.
16 Partington, I'm going to hand to you a copy
17 of, I believe that's your resume that we've
18 had marked as Exhibit One and I've had it
19 marked as an exhibit, this way it will speed
20 things up a little bit. We can use it for
21 reference as we go through your work history.
22 There is additional information that I need to
23 ask you about, but it helps to have the
24 outline of your employment on there. It will
25 help speed us up?
00017
1    A. Okay. Fine.
2    Q. We were talking, before the break,
3 about your work at General Motors which I see
4 is at the bottom of the resume. First, I
5 should ask you, is this a resume that you
6 created yourself?
7    A. Yes.
8    Q. Do you know approximately when you
9 created the resume?
10    A. Somewhere in 19 -- which is the last
11 '97, '96 or '97. It's not up-to-date. It's
12 one of the only ones I had laying around.
13    Q. Okay?
14    A. But it is current, I mean, it's not

MKSK-FED-0000004184

ALCD-PUBCOM_0006150

15 current because of -- it lists my experiences
16 to 1996 and this is 1999, I was semi-retired
17 for a year. I went back to work as a
18 stationary engineer for the year of 1998, part
19 of '99.
20    Q. Who did you work for as a stationary
21 engineer?
22    A. For Joule and Company, they're a
23 managerial employment type of agency.
24    Q. How do you spell the name?
25    A. J-o-u-l-e, Joule, French.
00018
1    Q. Are you retired now?
2    A. Semi. At the present I am retired,
3 however, I have as I like to say some irons in
4 the fire, I have some things that I've been
5 asked to do and I am contemplating taking one
6 of the positions that are available to me
7 after the summer, of course.
8    Q. Summers off first. Right? Good
9 decision. Okay.
10    So let's start back on the resume and
11 back with General Motors and move forward.
12 How's that? We've now covered your most
13 recent employment that's not listed on the
14 resume. You finished working at General
15 Motors in 1958 and what -- I should ask you
16 first, before we leave General Motors, while
17 you worked at General Motors, did you work
18 with any chemicals or solvents during that
19 time?
20    A. With General Motors?
21    Q. Yes.
22    A. Not directly, just lubricant such as
23 grease, I wouldn't consider that -- well, I
24 guess, it is a chemical. Yes.
25    Q. Did you work with any cleaning of
00019
1 metals using solvents, anything of that
2 nature?
3    A. No. I was not in the paint department
4 or the -- I was in the assembly division.
5    Q. Okay, and then when you left General
6 Motors in 1958, next you went to work for
7 Vulcan Materials Company?
8    A. Well, the date is correct, since
9 Vulcan Materials -- or Frontier Chemical
10 Company it was back in those days, bought
11 Kolker Chemical -- so part of the package was
12 that they recognize all seniority that Kolker
13 Chemical had. Vulcan was the parent company
14 or Frontier Chemical was a subsidiary of
15 Vulcan Materials Company. Eventually it
16 became Vulcan Materials Company.

MKSK-FED-0000004185

ALCD-PUBCOM_0006151

17    Q. See --
18    A. So that's the reason for the 1958
19 start. It was -- I actually worked for Kolker
20 Chemical.
21    Q. In 1958?
22    A. Yes.
23    Q. Okay.
24    A. But to make things easier it all
25 became, for seniority purposes, meant that
00020
1 Vulcan Materials recognized all the time I put
2 in as a Kolker Chemical employee.
3    Q. Back to 1958?
4    A. Right.
5    Q. Okay. Do you know when -- strike
6 that. Did Vulcan buy out Kolker?
7    A. No. As I understand, Frontier
8 Chemical bought Kolker, which I learned later
9 on was Vulcan subsidiary. It was a subsidiary
10 of Vulcan Materials. How that came about, I
11 don't know.
12    Q. Okay. Do you know when your employer
13 became Vulcan?
14    A. Approximately 1960, now give or -- I'm
15 not -- because it was Frontier Chemical for a
16 short while and then for some reason, I don't
17 know why, it became Vulcan Materials Company,
18 which was a subsidiary of such and such. But
19 the chemical division of Vulcan Materials
20 Company was Frontier Chemical initially when I
21 was employed there.
22    Q. When you first went to work for
23 Frontier, later Vulcan in 1958, did you work
24 at a particular plant or a particular
25 location?
00021
1    A. Yes, 600 Doremus Avenue in Newark.
2    Q. We'll be referring repeatedly to that
3 particular location, the 600 Doremus Avenue in
4 Newark, New Jersey facility, so if I call that
5 the Newark plant or the Newark site, can we
6 have an understanding we're talking about the
7 same location generally?
8    A. Surely.
9    Q. Okay. Just to shorthand things a
10 little bit. What was your job title when you
11 first went to work for Frontier, later Vulcan,
12 in 1958 at the Newark, New Jersey plant?
13    A. Chemical operator.
14    Q. What were your duties as a chemical
15 operator?
16    A. Manufacturer of a product called
17 methyl chloride.
18    Q. Were you involved with the manufacture

ALCD-PUBCOM_0006152

19 of any other chemicals at that period of time?
20   A. Oh, yes.
21   Q. When you were first chemical operator
22 for Frontier?
23   A. Well, it was Kolker Chemical, they
24 sort of -- when Vulcan -- Vulcan -- Frontier
25 Chemical purchased Kolker Chemical.  They kept
00022
1 the same product lines as Kolker Chemical, so
2 as an employee of Kolker Chemical, I worked on
3 additive products, distillation of making
4 methylene chloride, carbon tetrachloroform, it
5 was all chemical operations.  Benzoic acid was
6 another one.  There were countless methyl
7 bromide -- manufacture of methyl bromide.  It
8 was all in that period.
9   Q. Okay.  And what were your duties
10 specifically as a chemical operator.  On a
11 day-to-day basis, what were your activities?
12   A. Simply to produce, it would be to
13 monitor quality, batch operations, make
14 batches, blends, drum; you name it, we did
15 everything back in those days.
16   Q. Okay.
17   A. Maintenance, we did some of our own
18 maintenance, pack pumps, you name it.
19   Q. Chemical operators did some of their
20 own maintenance?
21   A. Oh, yeah.  Simple piping duties
22 changing pumps, repairing pumps.
23   Q. When you arrived at the Newark site in
24 1958, do you recall if there was a formal
25 maintenance department?
00023
1   A. Yes, there was.
2   Q. Do you know who was in charge of that
3 department when you arrived in 1958?
4   A. I know his nickname, but I do not know
5 who he was anymore.  We used to call him
6 Whitey, Whitey and Bennie, don't ask me.  It
7 was 40 years ago.  I don't know.
8   Q. We'll come across a list of names a
9 little bit later, it might ring a bell for
10 you, but we'll see.  I just wanted to see if
11 by any chance you had any recollection on it.
12   A. And the foreman as I remember, I could
13 be wrong, was Al something -- I forget.
14   Q. This was the foreman of the
15 maintenance department?
16   A. Yeah.  Al Bercheski, I don't know, I
17 forget.  It's been a long time.
18   Q. Like I said, we'll come across a list
19 of names and some might --
20   A. I'm sure he's in the big chemistry set

MKSK-FED-0000004187

ALCD-PUBCOM_0006153

21 in the sky by now.
22   Q. No longer with us?
23   A. Yes, I'm sure he was middle fifties
24 when I was just a young pup there.
25   Q. How long were you a chemical operator?
00024
1   A. Approximately two years.
2   Q. Did your title change then?
3   A. Yeah.
4   Q. What did you do next?
5   A. They promoted me. They said I had
6 some promise. They made me a shift foreman
7 for $640 a month. And, believe me, that was
8 money back in those days.
9   Q. How did your duties change as shift
10 foreman?
11   A. Well, I was responsible for various
12 units, what they called production units,
13 which they had their own staffing of chemical
14 operators -- one, two, three, it might be
15 three or four people in one particular unit
16 and at that particular time, I had a unit,
17 methyl bromide, methyl chloride, the esters,
18 they used to call it the esters, the power
19 house, boilers, the distillation end of it and
20 the manufacture of methylene chloride. There
21 was about twelve people a shift. I was in
22 charge of these particular people.
23   Q. So approximately, it was approximately
24 twelve people that you supervised as shift
25 foreman?
00025
1   A. Approximately, yes, plus a couple of
2 maintenance mechanics.
3   Q. So you supervised a couple of the
4 maintenance folk as well?
5   A. Yeah. I was responsible for keeping
6 them busy.
7   Q. Would that be the maintenance folks
8 who worked during the shift when you were
9 foreman?
10   A. Yeah, they were shift people also.
11   Q. Was there a particular shift that you
12 worked?
13   A. We worked the seven day stagger shift
14 which was, it consisted of A, B, C and D.
15 There were four rotating shift foremen, which
16 I was one of them.
17   Q. Okay.
18   A. And the employees, the chemical
19 operators and the maintenance people who were
20 assigned to a particular shift rotated the
21 same way as the shift foreman.
22   Q. So various personnel worked shifts as

MKSK-FED-0000004188

ALCD-PUBCOM_0006154

23  if a team together?
24     A.  Yep.
25     Q.  Okay.  Was it a day shift or a night
00026
1  shift or a swing-shift?
2     A.  Twenty-four hours a day, seven days a
3  week, 365 days a year, you was a swing-shift,
4  you had days, afternoon, mids.
5     Q.  Was there a particular shift that you
6  worked?
7     A.  All three of them.  We all rotated.
8     Q.  While you were shift foreman, who did
9  you report to?
10    A.  To a maintenance -- maintenance -- to
11  a production superintendent, back in those
12  days -- let me think, we went through them so
13  fast.  Who did we have that stands out -- oh
14  my goodness.  Must not have been important
15  because I cannot remember who I reported to,
16  but it was a superintendent of production.
17    Q.  Okay.
18    A.  Which there were many, countless.
19    Q.  How about when you were a chemical
20  operator, did you report to a shift foreman?
21    A.  Yes.
22    Q.   Do you remember which shift foreman
23  you reported to?
24    A.  Well, again there were four shift
25  foremen so they sort of rotated the shifts
00027
1  kind of clockwise with the regular rotating
2  employees, philosophy was they wouldn't get
3  too chummy, wouldn't have the same people.  We
4  sort of rotated, to make it easy for you,
5  counter-clockwise, while the regular shifts
6  rotated clockwise, so we would never catch the
7  same shift per se.  We'd catch part of them,
8  maybe once every four cycles, we might catch
9  the shift that we started with, part of it.
10    Q.  So the employees and the manager --
11    A.  They sort of --
12    Q.  To keep it mixed up shifted in
13  opposite type frames?
14    A.  Right.  And the hours were different
15  too.  The salaried people worked eight to
16  four, four to twelve, twelve to eight.  And
17  the pay shift would, I mean, the hourly
18  employees would be seven to three, three to
19  eleven, eleven to seven or whatever, anyway
20  they wanted to do them.
21    Q.  Who was in charge of the entire plant?
22    A.  At that particular time?
23    Q.  When you first started in 1958, do you
24  remember?

MKSK-FED-0000004189

ALCD-PUBCOM_0006155

25    A. Oh, it was one of the Kolkers, Lee
00028
1 Kolker or Charlie Kolker; one of those. They
2 were on-site owners and plant managers. Now
3 there was Al Thomas who was a plant engineer
4 at that time and about that time I became
5 associated with Ray Gilliam, he was a power
6 plant -- or a pilot plant supervisor back in
7 those days. I think that's when I first met
8 Ray.
9    Q. In the late fifties?
10    A. Uh-huh.
11    Q. Okay. How long were you shift
12 foreman?
13    A. About two years.
14    Q. Then did your title change?
15    A. Yes. I became a maintenance foreman.
16 Which was a steady day job which I opted for,
17 and was accepted. I felt I was more
18 mechanically inclined than I was chemically
19 inclined, coming from a General Motors
20 background and what have you.
21    Q. Right. So let's see, that would put
22 us at about -- you became maintenance foreman
23 in about 1962. Would I have that right?
24    A. Somewhere around there, yeah. Because
25 when Vulcan Materials came there, I got
00029
1 promoted to air production foreman in '64,
2 that was the inorganic department.
3    Q. That was when Vulcan came in?
4    A. Yeah. Vulcan was in the picture then.
5    Q. That's a production foreman?
6    A. Yeah.
7    Q. Okay. Before we zoom up to that, I
8 want to ask you what were your job
9 responsibilities as maintenance foreman?
10    A. We had a work order system. We worked
11 -- I had a day-shift crew which consisted of
12 pipe fitters, millwrights, welders, pump
13 people which you call millwrights. Okay.
14    Q. Millwrights or he --
15    A. Electricians.
16    Q. Millwrights are pump people?
17    A. Yeah. Well, part of the duties are
18 electricians.
19    Q. Okay.
20    A. So I had a crew of approximately 20
21 people, let's say.
22    Q. And the purpose was to maintain the
23 plant facilities?
24    A. All day-to-day repairs were done by
25 us, anything of a large magnitude was, we
00030

**MKSK-FED-0000004190**

ALCD-PUBCOM_0006156

1  called, farmed out, was given to some skill
2  that we didn't possess, some expertise we'd
3  hire some engineering firm to do the more
4  technical or the more -- well, things we
5  couldn't handle, very simple.  We weren't
6  equipped, we didn't have the knowledge or
7  expertise to perform, these duties was farmed
8  out.
9      Q.  Was this -- so, in 1962 when you
10  became maintenance foreman, the plant is owned
11  by Kolker.  Is that right?
12      A.  Kolker or Vulcan -- Frontier Chemical,
13  one or the other.  I don't remember when.  You
14  may have that documented someplace else.  I
15  don't know the exact year, date.
16      Q.  Okay.  And when you became maintenance
17  foreman, who did you report to?
18      A.  I reported to, oh boy, good point,
19  person -- let me think.  Who was it?  We had
20  so many maintenance -- it was a maintenance
21  superintendent at the time.  Don't ask me his
22  name, it escapes me at the present.  I don't
23  know.
24      Q.  Okay.
25      A.  It may come back, but I doubt it.
00031
1      Q.  Now, when you say it was a -- you
2  operated under a work order system?
3      A.  Yeah.  We tried to organize rather
4  than have -- prior to, I was part of the
5  reorganization of this new plant they had too
6  many emergencies, everything, there was no
7  planning and this is their first attempt at a
8  planned maintenance routine, shall we say, to
9  eliminate the emergencies.  The emergencies
10  were killing us, simple things that should
11  have been done routinely, on a scheduled
12  basis, were not being done and this is what we
13  attempted to accomplish and, which we did
14  quite well, by the way, and the work order
15  system was simply that the production people
16  used the manufacturing facilities knew what
17  their particular problems were, so there was a
18  request system in writing to check a pump,
19  check for a leak, replace something or other
20  or some of their particular problems be it
21  mechanical, instrumentation or whatever.
22      Q.  When you say this was the first
23  attempt at plant maintenance, non-emergency
24  situation?
25      A.  Right.
00032
1      Q.  Is that when Frontier took over?
2      A.  It could --

MKSK-FED-0000004191

ALCD-PUBCOM_0006157

3    Q. What prompted the change?
4    A. Waste I would think. Down time,
5 nonproductive because of simple things that
6 weren't addressed when they should have been.
7 Breakdowns which were unscheduled, I mean --
8 well, they were breakdowns, they were
9 emergencies because PM maintenance was not
10 being performed. I would think it was around
11 Frontier's entrance into the picture because
12 prior to that it was helter skelter type of
13 maintenance. You did it when it broke down.
14    Q. And before Frontier came in that was
15 Kolker?
16    A. Kolker.
17    Q. Okay. So when Kolker was running the
18 plant day-to-day operations would result in
19 emergency or breakdowns and then folks from
20 the maintenance -- folks from the maintenance
21 department would go in and fix it, but it
22 would have to become an emergency first. Is
23 that right?
24    A. It was sort of handled under that
25 basis.
00033
1    Q. Okay. When you were maintenance
2 foreman in 1962, did you also perform, or your
3 department perform, routine maintenance at the
4 plant?
5    A. Yes.
6    Q. Was the routine maintenance conducted
7 in addition to responding to work order
8 requests?
9    A. Yes, it was.
10    Q. Did you have a schedule for your
11 routine maintenance that was conducted at the
12 plant?
13    A. Yes.
14    Q. Was it a written schedule?
15    A. Yes.
16    Q. Do you recall the activities that
17 were conducted on a routine maintenance
18 schedule?
19    A. Yes, pumps were addressed -- we had
20 what they call packed pumps, packing, and we
21 were losing a lot of product because of
22 leakage from the glands of pumps, so we had
23 pumps scheduled to be taken out of service and
24 repaired or replaced with stand-by pumps. We
25 instituted a stand-by system whereby we always
00034
1 had something to rely on and we'd either
2 alternate pumps, make the necessary repairs on
3 the pumps that were in-service, change filters
4 on the air compressors, things of this nature.

MKSK-FED-0000004192

ALCD-PUBCOM_0006158

5  Change oil routinely on compressors and pumps
6  and any other equipment that needed it;
7  electrical checks, clean cast, instrument
8  checks, zeroed in instruments routinely on a
9  monthly or bi-monthly basis.  Regular PM
10  program was instituted and it was humming like
11  a top there for awhile.
12     Q.  When you say PM, what are you --
13  what's that short for?
14     A.  PM, Preventative Maintenance.
15     Q.  Okay.
16     A.  PM.
17     Q.  And you say that things were humming
18  along for a while?
19     A.  Yeah.
20     Q.  What changed?
21     A.  Nothing.  They started to lose money,
22  I guess, because a chlorine process was
23  purchased around there sometime.  They
24  constructed a chlorine plant in 1964.  I was
25  promoted to a production foreman there,
00035
1  somewhere around there.
2     Q.  So a chlorine plant was built?
3     A.  Constructed.
4     Q.  Constructed at the facility in the
5  mid-1960s?
6     A.  No.  This was where you got me.  Now,
7  I can't remember exactly when that chlorine
8  plant was built, it was somewhere in the '60s,
9  prior to '64, I know that, so I am not
10  absolutely sure that it was constructed during
11  Kolker Chemical, or Frontier Chemical or if it
12  was a joint thing.  I do not know.
13     Q.  Okay.
14     A.  But it was in that period between 1959
15  and '62, in there someplace, because I was
16  organic maintenance foreman and there was an
17  inorganic maintenance foreman on the other
18  side of the plant.  So I would say it was in
19  the '60s, '59, '60, somewhere in there; that a
20  chlorine plant was constructed on the property
21  at 600 Doremus Avenue.  The exact year, my
22  memory fails me.  I don't remember.
23     Q.  So were you maintenance foreman for
24  about two years.  Is that right?
25     A.  Double duty.
00036
1     Q.  So would --
2     A.  I was both.  I was not compensated for
3  it, however, I was both.
4     Q.  So when you became a production
5  foreman in 1964, you were also still a
6  maintenance foreman?

MKSK-FED-0000004193

ALCD-PUBCOM_0006159

7       A. As a consultant, on a consultant basis
8   but not -- I didn't have authorization over
9   the crews anymore, but I was a supervisor.  I
10  had that authorization, but I didn't assign
11  people to do any particular task.  The
12  maintenance people I mean.
13      Q. Right?
14      A. My hands were out of that.
15      Q. Did somebody take over for you?
16      A. I was slapped a few times, yes, there
17  was a couple of people that assumed the
18  position, I don't, off the hand -- they didn't
19  last long.  I know that there were maintenance
20  foremen that were hired, maybe three or four,
21  and they stayed for short periods and they
22  left and they went to better and bigger things
23  or whatever.  They didn't stay with the
24  company.
25      You're taking me back to my teen-age days
00037
1   for crying-out-loud.  Go ahead.
2       Q. You said when you were maintenance
3   foreman you had about 20 people working for
4   you?
5       A. Approximately, give or take, more.
6   Sometimes I had the whole crew, sometimes I
7   had just my crew, but about 20 people.
8       Q. When you say your crew, is that the
9   day crew?
10      A. Yeah.
11      Q. How many folks were on the day crew?
12      A. It could, at one time, be around 30,
13  35, I would think.  Something like that.  We
14  had approximately a hundred people I think.  I
15  forget the exact number of people we had
16  altogether.
17      Q. For the day crew was that a five days
18  a week, 40-hour week?
19      A. Yes.
20      Q. And so then --
21      A. Now, that's something that -- just
22  when I worked for Kolker Chemical and part of
23  Frontier Chemical, up until the time Frontier
24  Chemical came, we had a guaranteed six-day a
25  week operation.  In other words, we were
00038
1   guaranteed by Kolker Chemical, 40 plus eight
2   hours overtime every week.  That was in the
3   contract and the laborer negotiator seen that,
4   near died.  He says, How do you do that?
5       Q. So when you first started with Kolker,
6   so that would be like 1958, '59, somewhere in
7   there, guaranteed six-day operation --
8       A. Everybody.  And they were making all

MKSK-FED-0000004194

ALCD-PUBCOM_0006160

9 kinds of goodies.
10    Q. Did everybody have to work those six
11 days?
12    A. Yeah, it was mandatory. So you could
13 get fired.
14    Q. And the plant itself, though, during
15 that time was in operation seven days a week.
16 Right?
17    A. Uh-huh.
18    Q. Okay. Now, when you were maintenance
19 foreman in 1962, you said you had about 30 to
20 35 people approximately on a day shift?
21    A. Yeah, but it was not -- I was not in
22 charge of all 35. There were two maintenance
23 foremen one in the organic and one in the
24 inorganic department. So I could at times, if
25 I was in charge of a breakdown or turn around
00039
1 wanted to call it. I could have the whole
2 crew, yes. I would -- one time -- it was
3 possible to be in charge of the whole
4 maintenance crew.
5    Q. Which were you in charge of, the
6 organic or inorganic?
7    A. Organic.
8    Q. Do you remember who was in charge of
9 the inorganic side as a maintenance foreman?
10    A. Not originally, but he was a
11 superintendent later on. Joe Hosey, you might
12 have heard his name before. I believe he
13 still worked or did work for Vulcan Materials
14 in Wichita, Kansas. He was transferred out
15 there. He might still be working for them.
16    Oh, no, he should be retired by now. He
17 was ten years older than I was. Unless he
18 found the fountain of youth.
19    Q. Now, on working on the organic side as
20 maintenance foreman, what chemical
21 manufacturing processes were you specifically
22 involved with as maintenance foreman?
23    A. Methyl bromide, Ethyl chloride,
24 Benzoic acid, Gulf products.
25    Q. Gulf?
00040
1    A. G-u-l-f, Gulf, Mobile, Gulf.
2    Q. Is there product additives for oil
3 companies?
4    A. Right. Methylene chloride,
5 chloroform, carbon tet, and some of the
6 esters. The esters were solvents and what
7 have you.
8    Q. And just so I'm clear, what's being
9 manufactured or produced on the inorganic
10 side?

MKSK-FED-0000004195

ALCD-PUBCOM_0006161

11    A. That's the chlorine plant, inorganic
12 is chlorine caustic soda. Hydrogen, bleach,
13 you can see how they're coming together, where
14 it became -- so, we're talking about organic,
15 inorganic time, then chlorine must have been
16 introduced in the '60s, '59 or '60, somewhere
17 in there. I don't know the exact time.
18    Q. Right?
19    A. Probably was not paying that much
20 attention to that part of the plant.
21    Q. That was the other side?
22    A. Uh-huh.
23    Q. Okay. So you became production
24 foreman in 1964?
25    A. Uh-huh.
00041
1    Q. And what were your duties as
2 production foreman for -- by now is it Vulcan?
3    A. Uh-huh. Well, somebody -- Jack
4 Collins was his name, was an advisor that
5 Vulcan had borrowed from their Wichita
6 facility and since Wichita, Kansas and the
7 Newark plant produced chlorine the same way,
8 the Newark facility was in trouble when Vulcan
9 purchased it. Quality-wise on constructions
10 of Hooker Chemical, S-one Cells, that will
11 take me a week to describe that -- but anyhow
12 the process that Vulcan had was the Hooker
13 Chemical, they leased the process from Hooker
14 Chemical, as I understand it, and it was an
15 electrolysis process using little gizmos that
16 we used to call cells. They were concrete
17 constructions consisting of an anode and
18 cathode compartments, with an asbestos
19 diaphragm separating the graphite from the
20 anodes, et cetera, et cetera. If you have an
21 engineer or chemical engineer in your employ
22 he'd probably shed some light on Hooker
23 Chemical's process of manufacturing chlorine.
24    Q. Okay. And the Hooker Chemical process
25 was for the manufacture of chlorine?
00042
1    A. Yes, I understand that a royalty had
2 to be paid, was paid -- now, I actually didn't
3 see the checks being signed, but the
4 understanding was they leased for X amount of
5 moneys the process from Hooker Chemical
6 entitling them to use the process.
7    Q. You said a moment ago that because
8 Vulcan had a Wichita, Kansas facility as well
9 as then purchasing the Newark, New Jersey
10 facility, that they had a quality -- a quality
11 problem. Can you explain what you mean by
12 that? I'm not sure I understand the

MKSK-FED-0000004196

ALCD-PUBCOM_0006162

13 connection.
14    A.  Well, that's the reason for my
15 promotion to a production foreman.  The
16 construction of and the service of the --
17 these particular individual cells was not up
18 to par.  In other words, as I remember it, a
19 cell life, one of these particular individual
20 cells when they are constructed, which we
21 produced ours, should have a life expectancy
22 of some 250 days actual.  In other words,
23 these particular receptacles would stand there
24 and produce chlorine for some 250 days, 220,
25 250 days, average 220 maybe.  Okay?  Prior to
00043
1 Vulcan being there, there was a quality
2 problem with the construction of these cells
3 and they were getting, like, a hundred to 110,
4 150 days.
5    Needless to say, it was becoming not
6 economically feasible to keep it going because
7 the way that was they, you know, they weren't
8 getting the quality out of their constructions
9 and it was a quality problem.
10    Q.  During the Kolker period?
11    A.  Yeah.
12    Q.  So Kolker's creation of the cells for
13 the manufacture of chlorine would not last?
14 The cells would not last as long as they
15 should have?
16    A.  No.  Uh-uh.
17    Q.  That was the quality problem?
18    A.  Right.
19    Q.  And is that -- then Vulcan arrived,
20 did they change the process?
21    A.  In that period, yeah, they sold --
22 now, see, this is where it becomes hazy.
23 Frontier Chemical was there all the while.
24 Now, whether Frontier and Kolker were
25 co-existing as business partners or managers,
00044
1 I don't know.  But Frontier Chemical all of a
2 sudden became Vulcan Materials Company and
3 Vulcan Materials Company -- thus they changed
4 the sign out in front of the plant, says now
5 Vulcan Materials Company, no more Frontier.
6 Now, how that transpired I have no idea, but
7 it did change hands.
8    Q.  And when it changed hands and became
9 Vulcan Materials Company, is that when you
10 were promoted to production foreman?
11    A.  Yeah.
12    Q.  Were you still on the organic side?
13    A.  Yep.  Maintenance foreman, as a
14 maintenance foreman, organic side.

MKSK-FED-0000004197

ALCD-PUBCOM_0006163

15   Q. Oh, okay. When you were production
16 foreman?
17   A. I was promoted.
18   Q. Right, to production foreman?
19   A. But my job was a maintenance foreman
20 on the organic side.
21   Q. Right.
22   A. When the consultant that I mentioned,
23 Jack Collins --
24   Q. Okay.
25   A. -- arrived, he assessed the potential
00045
1 of the people that they now had to deal with.
2 He singled me out as a bright-eyed young man
3 going places with a lot of possibility and did
4 a lot of talking. He talked me out of a good
5 steady day job to give him a helping hand in
6 the organic -- inorganic department and I
7 became a production foreman responsible for
8 the construction of these particular
9 troublesome cells.
10   Q. So you became in charge --
11   A. A hero.
12   Q. So were you production foreman on the
13 inorganic side?
14   A. Uh-huh.
15   Q. Okay.
16   A. So it took two years and I became in
17 charge of the whole inorganic department. How
18 about that?
19   Q. Did your title change again then?
20   A. Pardon me?
21   Q. So did your title change again?
22   A. Yeah, I was department head.
23   Q. In 1966?
24   A. Yep.
25   Q. When you were production foreman in
00046
1 the inorganic side, was somebody else in
2 charge of the maintenance department?
3   A. Yes, Mr. John Doyle, D-o-y-l-e,
4 personally I don't know if he's still alive.
5 He was about fifteen years my senior so he
6 might just be up there in the big chemical
7 plant in the sky. I don't know. I lost track
8 of him.
9   Q. Okay. Once you were promoted to
10 production foreman, did the plant, the routine
11 plant maintenance system that you put in
12 place, did that happen once you were promoted
13 to production foreman?
14   A. Uh-huh.
15   Q. Yes?
16   A. Let's not cloud the picture here. The

MKSK-FED-0000004198

ALCD-PUBCOM_0006164

17  routine maintenance plan that was put in place
18  was part of any good planned maintenance. I
19  didn't invent something. It makes me out as a
20  big hero. I was not. We just instituted it.
21  It's in any good chemical -- maintenance
22  booklet or what have you of -- it's simple
23  maintenance, that's all it is. It was the
24  simple things that weren't being done. I did
25  not in any way invent this procedure.
00047
1       Q. Okay.
2       A. Okay? I just instituted some good
3  ideas and which somebody else, many, many
4  years ago decided this was the proper way to
5  do it. It's like the old Navy adage, by the
6  book, because the person who wrote the book
7  had the experience, time, expertise and what
8  have you, to come up with this particular
9  philosophy or procedure. So I didn't -- I was
10  not the inventor.
11      Q. But in your opinion that routine
12  preventative maintenance is part of any good
13  planned maintenance?
14      A. Oh, yes. I didn't say I didn't have a
15  brain in my head. I just said I did not
16  invent this. I'd be laughed out of the State
17  of New Jersey if I said I did.
18      Q. But there wasn't such a program when
19  you first arrived in 1958. Correct?
20      A. It was organized confusion in my
21  opinion. Now, there might have been -- there
22  might have been some reasons for their
23  madness, I don't know. I didn't know the
24  whole picture but from a maintenance
25  standpoint, sure didn't make sense to me.
00048
1  Something as basic as a PM program,
2  Preventative Maintenance was laughed at,
3  scoffed at, and it could have been for
4  financial reasons. People got a lot of
5  overtime, a lot of breakdowns meant call-ins.
6  Call-ins were time-and-a-half. It was a
7  privately owned organization back in those
8  days.
9       Q. So there could have been some --
10  benefit to --
11      A. Could have been some helter skelter
12  going on around there. Could have been. I
13  don't know. I sure as hell didn't get any of
14  it.
15      Q. For the time that --
16      A. I don't know what their reasoning was
17  outside everybody was happy they were making
18  money. So the employees took it upon

MKSK-FED-0000004199

ALCD-PUBCOM_0006165

19 themselves to make money too. My opinion. I
20 don't blame them.
21    Q. From the time that you were
22 maintenance foreman, for the entire time that
23 you were at the Newark plant, was there a
24 preventative maintenance program in place that
25 you know of?
00049
1    A. No. Not until -- there was somewhat
2 because of life expectancy of certain
3 equipment, it had to be changed but it just
4 quit, you know what I mean?
5    Q. No. I'm talking about beginning from
6 the time when you were maintenance foreman --
7    A. Yeah.
8    Q. -- until the time you eventually left
9 the Newark site.
10    A. Yeah.
11    Q. Was there preventative maintenance
12 program in place that you know of?
13    A. During my period?
14    Q. Yeah.
15    A. Yes, there was.
16    Q. Okay. And then in 1966, I think you
17 said you became department head?
18    A. Uh-huh.
19    Q. In charge of the entire inorganic
20 department and then how did your job
21 responsibilities change when you went from
22 production foreman to department head?
23    A. Basically it was one of more of an
24 administrative type of duties, quality
25 control, employee safety, employee budget,
00050
1 more budgets, we worked in more of an
2 administrative type responsibility.
3    Q. How many employees did you have
4 reporting to you when you were department head
5 in 1966?
6    A. Well, I didn't, well, if you count --
7 approximately fifty. Approximately, I don't
8 know, could have been more, could have been
9 less.
10    Q. Let me ask you this, do you know
11 approximately what the total number of
12 employees was at the Newark facility when you
13 first arrived in 1958?
14    A. I would say 35, 40 in that range, not
15 much more, but it grew.
16    Q. How about by the time you became
17 maintenance foreman in 1962? About how many
18 total plant employees were there, do you
19 think?
20    A. Oh, 50 to 75.

MKSK-FED-0000004200

ALCD-PUBCOM_0006166

21     Q. And then in 1966 when you became
22 department head?
23     A. Seventy-five to a hundred, somewhere
24 around there. Now, this includes office
25 personnel everybody.
00051
1     Q. I was envisioning sort of a total
2 employee count, a rough count.
3     A. I don't believe the facility ever
4 exceeded 125.
5     Q. Okay.
6     A. Somewhere, it was a hundred.
7     Q. As department head, who did you report
8 to?
9     A. Plant manager.
10     Q. Who was that in 1966, do you remember?
11     A. Ed McKillus, have you met Mr.
12 McKillus.
13     Q. No, the name is not ringing a bell.
14 Do you know how to spell the last name?
15     A. No, McKillus. M-c -- I think it was
16 Irish fella -- and Pete -- I forget his last
17 name now. It will come to me.
18     Q. Is this somebody else who was also a
19 plant manager?
20     A. It was a couple, they went through
21 them like -- Newark was the training ground
22 for Wichita, Kansas -- I can't think of his
23 name. I had it on the tip of my tongue --
24 Fred Alers was another plant manager.
25     A.  Gadis, Pete Gadis, G-a-d-i-s,  my
00052
1 buddy, my hero.
2     Q.  Good friends with Pete?
3     A. He was the only man in place in the
4 management range as far as I was concerned
5 called an Ace an Ace, a spade a spade.  A
6 straight arrow.  A hell of a guy.
7     Q. He was another one of the plant
8 managers?
9     A. Uh-huh.
10     Q. Do you know what years he was plant
11 manager?
12     A. Pete?  Somewhere in all this mess,
13 '64, he was foreman, was I -- no, he came in
14 there about '64 he was there.  '64 to '70, I
15 would think somewhere in there, Inland
16 Chemical came in there someplace.  I forget
17 where they came in.
18     Q. Well, let's see, looking at the resume
19 it looks like you were department head for the
20 inorganic department for about four years?
21     A. Then after that all hell broke loose.
22 Then Vulcan Materials got out, Inland Chemical

MKSK-FED-0000004201

ALCD-PUBCOM_0006167

23 came in and --
24    Q.  Well, it says on your resume that in
25 1970 you became maintenance superintendent?
00053
1    A.  Here again I don't mention Inland
2 Chemical so what I kept, keep the resume
3 simple, I broke it down in that manner.  In
4 1970, that was already Inland Chemical.
5    Q.  Our information is that Inland came,
6 acquired the Newark site, as an owner anyway
7 if not an operator, in May of 1974.
8    A.  Couldn't have been.  '74?
9    Q.  That's the information we have, but is
10 it --
11    A.  Here again, it's possible, because I
12 list as '79 my experience I went to Woodbridge
13 Suites that was -- I don't know now.
14    Q.  Did you work at the Newark plant?
15    A.  Til '79.
16    Q.  For Inland?  When Inland was there?
17    A.  Oh, yeah.
18    Q.  Okay.  Was it, do you recall, were you
19 maintenance superintendent before Inland took
20 over or do you think you became maintenance
21 superintendent when Inland took over?
22    A.  See, now, I don't remember.  It's not
23 clear, dates are give or take a year.  It's
24 been a long time ago, I know that was a
25 progression of my advancement in that
00054
1 particular location, how long -- '70 -- yeah,
2 see, somewhere in the '70s both -- oh, Vul --
3 Inland came in there because I worked four
4 years for Inland Chemical and left.  I worked
5 a few years for Inland Chemical then McGleason
6 (sic) came in there someplace, McKesson,
7 McKesson came in there somewhere and I was
8 gone.
9    Q.  You were gone?
10    A.  In '79.
11    Q.  You were gone when McKesson came in?
12    A.  No.  I worked with them almost --
13 maybe six months to a year, somewhere like
14 that.  It was all confused back in those days
15 because what had happened, Inland Chemical
16 bought the place, bought the process and
17 immediately within, I don't know, a year or so
18 they started to dismantle, they stopped
19 operation in the inorganic department, the
20 chlorine department, they did away with the
21 facility.
22    Q.  Okay.
23    A.  They stopped manufacturing, let's put
24 it that way, and they sold half or that half

MKSK-FED-0000004202

ALCD-PUBCOM_0006168

25  of the plant to a meat processing outfit, as I
00055
1  remember Van Eiderstein or something got in
2  there.
3      Q.  That sounds familiar.
4      A.  So it was Inland very shortly after
5  that.  You say '74 to '79?  It could very well
6  be.  It could be because it was a situation at
7  that particular site where some of the old
8  timers, which I was considered an old timer,
9  felt, you know, the place is falling apart.
10  They are selling it out from under us.  Where
11  is the future an all of this?
12      They were just, when they came there they
13  were reclaiming chemicals and they made it a
14  junk operation as far as I was concerned.  In
15  fact, they didn't last.  I don't know how long
16  they lasted.  I got out in '79 over that.
17      Q.  At the time that Inland took over,
18  were you working on the inorganic or the
19  organic side.  Do you remember?
20      A.  In that period, I don't know who was
21  in charge.  I believe it was Inland Chemical.
22  They decided that they would not manufacture
23  chlorine at the Newark site and they closed
24  the facility down, that particular plant, that
25  particular end of the plant.  I was
00056
1  instrumental in phasing it out safely and that
2  was it.  Then they sold that particular part
3  of the plant to Van Eiderstein, I believe a
4  meat packing outfit and we had nothing to do
5  with them, or I didn't have anything to do
6  with them.
7      And Inland as I remember, it went back to
8  the organic area of the plant reclaiming
9  chemicals.  Methylene chloride, they were
10  interested in that.  They manufactured, that
11  process continued.  Methylene chloride.
12      Q.  And when Inland -- you said you were
13  instrumental in helping phase out the chlorine
14  plant side of the Newark facility for Inland,
15  and then Inland proceeded to use the organic
16  side for reclaiming chemicals?
17      A.  Right.
18      Q.  What was your job with Inland at that
19  period of time when Inland went to the organic
20  side for reclaiming chemicals?
21      A.  This was unique.  They downsized to
22  such an extent that I was reduced to a shift
23  foreman again and I was instructed to get my
24  boiler operator's license, which I did, and I
25  ran the boilers while Inland Chemical operated
00057

MKSK-FED-0000004203

ALCD-PUBCOM_0006169

1 the organic department, methylene chloride
2 separate.
3    Q. Okay.
4    A. They also were involved in a process
5 known as DMA, dimethyl aniline, they produced
6 that with part of the plant.
7    Q. Before you went back to being a shift
8 foreman for Inland, were you a maintenance
9 superintendent?
10    A. Very short.
11    Q. Okay.
12    A. Very short. That was during that
13 phase-out period.
14    Q. That's when you were maintenance
15 superintendent?
16    A. Phasing it out, they got rid of
17 everybody else.
18    Q. Did that last about a year?
19    A. No three, six months tops. It was
20 fast. It was -- well, it was planned so it
21 was --
22    Q. Okay. Did you have any other plant
23 maintenance duties other than phasing out the
24 chlorine side of the plant as maintenance
25 superintendent?
00058
1    A. No. That was probably it.
2    Q. Ready for another short break?
3    A. Yeah.
4    (At this time a short recess is taken.)
5    Q. Mr. Partington, based on the
6 information on your resume, it looks like you
7 left Vulcan Materials employment and the
8 Newark, New Jersey site in approximately 1979?
9    A. That is correct.
10    Q. And present there --
11    A. It was not Vulcan, it was Inland
12 Chemical or McKleeson (sic) they were in the
13 transition period during the time I left.
14 Downsizing again and bringing their own people
15 in.
16    Q. Just so you know the information we
17 have indicates that the final transition from
18 Inland over to McKesson was sometime in 1981.
19 Now, whether that transition began sooner we
20 don't know.
21    A. I don't know.
22    Q. Just so you know --
23    A. All I know is the dates on my resume
24 are 99.9 percent accurate, starting and
25 leaving anyhow.
00059
1    Q. So then if you left in 1979, based on
2 the information we have --

MKSK-FED-0000004204

ALCD-PUBCOM_0006170

3    A.  It would be Inland.
4    Q.  That would put it at Inland Chemical
5  owning and operating the Newark site?
6    A.  Yeah, but somehow when I retired, I
7  was going to retire early, my retirement from
8  Inland Chemical was a property of McKesson, so
9  it was part of the -- they picked up the
10  employees activity, don't ask me how because I
11  also had a problem with Vulcan Materials, I
12  put some 21 years in which I was not
13  accredited for because when I left Vulcan
14  employ, I was not 45 years of age and I was
15  not entitled to their retirement benefits
16  after 21 years.  But that's under litigation
17  because I was vested.  I have papers.  This is
18  personal now.  It was personal which isn't
19  part of this, but they disallowed my time
20  claiming that I did not have one of the
21  requirements of their pension plan, which was
22  age of 45.  I was only 44 and a half or I
23  don't know what I was, but anyhow...
24    Q.  Is that a dispute that's going on now
25  or --
00060
1    A.  Yes.  It's  not been resolved and
2  that's under, not labor relations, but the
3  federal, somebody is filing for me.
4    Q.  A government agency is  looking into
5  it for you?
6    A.  Yes.
7    Q.  Then so after you left -- in 1979 when
8  you left the Newark site, which was then under
9  Inland's ownership and operation you went to
10  Woodbridge Suites?
11    A.  Yeah.
12    Q.  There you were assistant chief
13  engineer?
14    A.  Uh-huh.
15    Q.  Was that more of an administrative job
16  at Woodbridge Suites?
17    A.  Hands-on type of an operation.  I --
18  during my tenure there with Vulcan and Inland
19  and what have you, part of the deal there
20  between Vulcan Materials, Inland Chemical when
21  they downsized, when they got rid of the
22  inorganic plant, was that we get our boiler
23  license and refrigeration license which
24  through a special mandate, a special deal, we
25  were offered membership in Local 68, which is
00061
1  an operating engineers local and I, at that
2  time, got my operating license for stationary
3  engineer and refrigeration engineer and I
4  became part of Local 68.  Local 68 was

MKSK-FED-0000004205

ALCD-PUBCOM_0006171

5  responsible to me procuring the job in
6  Woodbridge Suites since they staffed all the
7  engineering positions in New Jersey, most of
8  New Jersey during that period. I don't know
9  how far they extend now, but, also Hercules
10 was also part of Local 68. Moved, I bounced,
11 more money, moved. Merck was a chance to
12 become a supervisor again and which I went
13 there as a shift supervisor.
14     Q. Okay.
15     A. And Port Newark was Local 68. Again,
16 I got tired of the political maneuvering in
17 Merck, I moved on. And that's my whole
18 history.
19     Thank you. Now that should be it.
20     Q. We're going to need a few more
21 details. But that covers --
22     A. That cost extra.
23     Q. -- employment history.
24     A. Now, let's get to the crux of the
25 situation.
00062
1      Q. Let me ask you just real quickly so we
2  can move off the resume -- just real quick.
3      A. Sure.
4      Q. The Hercules, you went there as shift
5  engineer in 1982 to '83. What kind of company
6  was that again, for the record?
7      A. Manufactured nitrocellulose which is
8  used in explosives, gun powder, et cetera. I
9  was in the power house. I was not responsible
10 for any of the manufacturing. I was in the
11 power house operating a boiler. They brought
12 in coal fire furnaces. It was during the oil
13 crunch. Back in those days, when you had to
14 wait in line for oil -- gasoline and all that.
15 And then running a facility on oil was costly,
16 very costly. So they had some old coal fire
17 stoker-type furnaces, which I was familiar
18 with, and they got me off the street and give
19 me X number of dollars and said get them in
20 shape and I did, and lasted a year.
21     Q. Then in '83 you went to Merck in
22 Rahway, New Jersey?
23     A. Yeah. Merck was a fine outfit to work
24 for.
25     Q. What was the nature of their business?
00063
1      A. Merck? Pharmaceutical, one of their
2  finest -- you ever heard of Merck and Company,
3  Merck, Sharp and Doehm?
4      Q. I wasn't sure if it was the same.
5      A. Merck, Sharp and Dohme originally, now
6  they're Merck and somebody else. They merged.

MKSK-FED-0000004206

ALCD-PUBCOM_0006172

7  I forget who lately.
8     Q.  And you were senior supervisor for
9  them?
10     A.  Yes.  On-site services which was
11  comfort service cooling refrigeration.
12     Q.  Then in 1988, you went to work for
13  Port Newark, refrigerated warehouse in Newark,
14  New Jersey, until 1996, and you were in charge
15  of plant maintenance there as chief engineer?
16     A.  Correct.  Then I worked for Joule the
17  year of '98 or -- no, '98.  I think I
18  mentioned that before.
19     Q.  Yeah?
20     A.  Which I was  --
21     Q.  You were stationary engineer for
22  Joule?
23     A.  Right for Shiseido.  They have some
24  line of cosmetics.
25     Q.  Yes, they do.
00064
1     A.  Very, very costly.
2     Q.  Costly and good quality?
3     A.  Very good quality, Japanese outfit.
4  Nice people to work for but...
5     Q.  As a stationary engineer, did you have
6  maintenance duty for them?
7     A.  I sort of -- not -- certain things
8  broke down in the boiler room -- pertaining in
9  the boiler room or refrigeration end of it.  I
10  made minor repairs.  It was only myself so,
11  that was it.
12     Q.  Okay.
13     A.  Good.  You're ever in New Jersey
14  again, call me.
15     Q.  We're not quite there.
16     A.  I figured that.
17     Q.  Let me ask you, when you went to work
18  as a chemical operator in 1958 for Kolker,
19  when you were hired, were you trained in any
20  way?
21     A.  Yeah.  From the fellow employees.
22     Q.  So it was on-the-job training?
23     A.  Yes.
24     Q.  Were you trained how to use the
25  equipment?
00065
1     A.  On-the-job training.
2     Q.  Did the company give you any training
3  on the handling of or use of chemicals?
4     A.  Back in those days if it didn't hurt
5  you, you respected it.  If it burnt you put
6  rubber gloves on, trial and error, I mean, we
7  had no safety program to speak of.
8     Manufacture of methyl bromide was very

MKSK-FED-0000004207

ALCD-PUBCOM_0006173

9 hazardous.  It required air apparatus.  Air
10 self-contained Scott packs we used to call
11 them, and working with air mask.  That was
12 about the only safety training we ever had,
13 but as I can remember out of necessity cover
14 goggles were mandatory for handling acids and
15 alkaline stuff.  Rubber gloves were available.
16    Q.  Did you have to wear rubber gloves?
17    A.  If it required it, yes.  If it was
18 injurious to yourself not to, it was very wise
19 to wear them.
20    Q.  How did you -- how would you know,
21 come to find out, if certain chemicals would
22 be injurious to your skin or not?
23    A.  From practical experience, from using
24 them daily, sulfuric acid and caustics, I
25 guess, from a chemistry course I might have
00066
1 taken in high school.  I mean, it was not, you
2 know, foreign to me that there were substances
3 that could injure you, lye and --
4    Q.  And did you understand that those
5 chemicals that could injure you weren't toxic?
6    A.  Oh, yeah.
7    Q.  And that they could also hurt the
8 environment?
9    A.  Definitely.
10    Q.  The chemicals that you talked about
11 working with when you were a chemical
12 operator, methylene chloride, carbon tet,
13 chloroform, Benzoic acid, methyl bromide, the
14 chemicals that we've talked about so far this
15 morning, back when you were starting to work
16 with those chemicals in the late '50s, did you
17 understand that those chemicals were toxic and
18 harmful to the environment?
19    A.  Well, to what degree, no, I didn't
20 understand how bad, is that the right word,
21 they were, but I knew that grass didn't grow
22 where you dumped some of the stuff so that
23 might have told you something.  Fish died in
24 the bay where things went out in the bay.  Now
25 that would, you know, make any normal
00067
1 individual suspicious that something is wrong,
2 you know.  Smell the smell of chlorine, they
3 used chlorine, was objectionable.  Now, that's
4 not good for you, you knew that.  Methyl
5 bromide the same way.  Bromine, they used to
6 manufacture methyl bromide, had a pungent
7 smell and this was toxic, very toxic.  Toluene
8 is a solvent that is, I've since learned, you
9 know -- you learn more as you get older and
10 you get more exposed to certain things that

MKSK-FED-0000004208

ALCD-PUBCOM_0006174

11  there was no need to know back in those days.
12  I mean, you didn't have any booklet on unit
13  site of the chemicals that were used and the
14  right to know, there was no such thing.
15      Q. So you knew generally that the
16  chemicals at the plant --
17      A. Harmful, yes.
18      Q. -- were harmful?
19      A. Oh, yes.
20      Q. But the degree to which they were
21  harmful was something --
22      A. To the environment.
23      Q. -- didn't learn until later?
24      A. Later on it became obvious.
25      Q. Do you recall seeing grass at the
00068
1  Newark plant die because of the chemicals
2  being dumped on the ground?
3      A. Sure.
4      Q. Do you recall seeing fish dead in the
5  bay as a result --
6      A. Yes. We used to change filter screens
7  in the water pumps when I was in maintenance.
8  There were, you could say it happened because
9  they got caught in the filters, but they were
10  dead. There were dead fish all over the
11  place, killees floating along the dock.
12      Q. That a kind of fish?
13      A. We call them killees. They are
14  little, small, I don't know -- shrimp were
15  there that were dead.
16      Q. Did you change the filters in the
17  water there right there at the edge of the
18  bay?
19      A. The baskets were pulled out, they were
20  screen mesh that kept foreign particles being
21  drawn into the suction of the pumps which used
22  to plug up the pumps so the screening was
23  called filters, we call them. River screens,
24  there was like a lock arrangement where you
25  may have a metal grate go down in front of the
00069
1  screening portion of the filter, catch the
2  larger stuff; logs, twigs, bottles, cans,
3  stuff like this that might be in the river to
4  a small mesh, maybe a quarter-inch holes in a
5  cylinder type of basket which was refined
6  filter before the pumps pumped the water into
7  the process.
8      Q. So the operations at the Newark
9  facility used water from Newark Bay pumped
10  into -- onto the plant?
11      A. Oh, yeah.
12      Q. Was that used in a cooling water

MKSK-FED-0000004209

ALCD-PUBCOM_0006175

13  process?
14      A.  Mostly cooling water and for cleansing
15  purposes.  We'd wash things out with it, it
16  was not potable, it wasn't cross type city
17  water or drinkable water.  It was used for
18  washing floors down, chemical spills, washing
19  out vats, washing out tanks, clean up anything
20  that needed water.
21      Q.  Was the water from Newark Bay used for
22  cooling process and cleaning purposes at the
23  plant when you arrived there in 1958?
24      A.  Oh, yeah.
25      Q.  And did the water from Newark Bay
00070
 1  continue to be used for cooling and cleaning
 2  processes throughout Vulcan's tenure at the
 3  site during the '60s?
 4      A.  To make it easy for you, they all did
 5  the same thing, every outfit that was there.
 6  They incorporated the use of the river water
 7  system.  The procedures were similar if not
 8  the same.
 9      Q.  And that would be -- so that would be
10  Kolker, Vulcan and Inland?
11      A.  Yes, most certainly yes, and Frontier.
12      Q.  Okay.
13      A.  And all effluent was turned to the
14  bay.
15      Q.  So once the water was through being
16  used in the cooling process or through
17  cleaning out tanks or vats, et cetera, that
18  all just went right back into the bay?
19      A.  Plus a lot of waste.
20      Q.  That would be the waste that's being
21  cleaned out during the cleaning process,
22  product, waste product, that sort of thing?
23      A.  Spills, anything.  Anything that
24  didn't evaporate that required cleaning went
25  to the river.
00071
 1      Q.  Anything that didn't evaporate and
 2  required cleaning went to the river?
 3      A.  Yeah.
 4      Q.  And the discharge of effluent back
 5  into the bay, was that the same for all the
 6  entities, again, Kolker, Frontier, Vulcan,
 7  Inland?
 8      A.  They all did the same thing.
 9      Q.  To the extent McKesson came into the
10  picture --
11      A.  I'm not familiar of McKesson,
12  obviously, since there is a discrepancy of
13  when -- to the best of my recognition rather,
14  was that I was in between Inland and McKesson.

MKSK-FED-0000004210

ALCD-PUBCOM_0006176

15 Now you say McKesson didn't finalize 'til '74.
16    Q. McKesson didn't finalize according to
17 our records until '81.
18    A. Well, my documents prove that I was
19 out of there in '79, so -- but I do remember
20 something with McKesson, whether they were in
21 the process, they were -- I don't know.
22    Q. Okay.
23    A. But McKesson, I have no knowledge of
24 what they did there, but Inland I do.
25    Q. But as long as you were there at
00072
1 Newark, the process of pumping bay water to
2 use at the plant for cooling and cleaning and
3 the process of putting all the effluent back
4 to the bay was the same, didn't change while
5 you were there?
6    A. Same. No.
7    Q. At any time do you know if the
8 effluent that was pumped back into the bay was
9 sampled and/or tested in any way?
10    A. There was environmental people who had
11 sampling points in the effluent return piping
12 somewhere in the late '70s, I would say
13 whenever the environmental people got a little
14 too -- they started to monitor the effluent.
15    Q. Okay. Do you have any interaction
16 with any of the environmental or governmental
17 folks that came to Newark to check out the
18 property?
19    A. No, other than to show them where the
20 sample points were maybe, that was it.
21    Q. How many effluent discharge points
22 were there from the Newark property into the
23 bay?
24    A. Offhand, I think two that I know of.
25 That's it. Now, by two, I meant where piping
00073
1 was such that it went to a particular
2 discharge point, the sewers all collected and
3 went on one side of the plant on the organic
4 side and the inorganic had more or less the
5 same thing. They were piped away from the
6 inlet of the river water pumps, there were two
7 sets of river water pumps.
8    Q. Bringing water onto the plant?
9    A. Right. So the effluent naturally was
10 either downstream -- in both cases, they were
11 downstream of the inlet of the pumps, how many
12 that -- well, I'm sure we recycled our own
13 waste more than once.
14    Q. But the idea of having the discharge
15 point downstream was to not get --
16    A. Not to contaminate the water.

MKSK-FED-0000004211

ALCD-PUBCOM_0006177

17   Q. That's coming into be used by the
18 plant. Right?
19      A. Because the clarity of the water in
20 Passaic Bay was not the best.
21      Q. Was the effluent into the bay a
22 particular color?
23      A. It could be any color.
24      Q. Any color?
25      A. Yes, it could be white. It could be
00074
 1 oil. It could be charcoal, it could be
 2 whatever they produced the night before. The
 3 standing joke of that plant was when,
 4 especially when they ran the ester units.
 5 Ester units require a lot of washing of
 6 chemical batches. They put it into tanks,
 7 they save the water, water separated from the
 8 product, and if they missed it, it went out to
 9 the save-all tank. The save-all tank was
10 unfortunately Newark Bay. That's where the
11 product went.
12      Q. So the Newark Bay was called the
13 save-all tank?
14      A. That's right. I'm sure that isn't the
15 first time you heard that.
16      Q. So there were two pipe inlets that
17 brought Newark Bay water onto the plant. Is
18 that right?
19      A. There were two sets of river water
20 pumps, yes.
21      Q. River water pumps, did one bay water
22 stream go to the organic side and one to the
23 inorganic side?
24      A. Correct.
25      Q. Then the two discharge points of flow
00075
 1 went back to the bay, one was collecting all
 2 sewer system from the organic side and one was
 3 catching all the sewer systems in the
 4 inorganic side?
 5      A. Now, there was an open trench on the
 6 organic side which spilled into the bay. That
 7 was where the chlorinated wastewater went down
 8 this open trench. Now, I don't remember if
 9 they ever enclosed it or tied it into the main
10 sewer. I don't remember.
11      Q. What was the size of open trench? Do
12 you remember?
13      A. It was approximately at spots four
14 foot wide and then it tapered down, you know,
15 pitched down to a point.
16      Q. You mean there was a --
17      A. Like a trough.
18      Q. The sides came in like a trough?

MKSK-FED-0000004212

ALCD-PUBCOM_0006178

19    A. Like a trough, all the way down to the
20 bay.
21    Q. How deep was it, do you know?
22    A. Depends. There was nothing going on.
23 It was dry.
24    Q. That was a bad -- I asked you a bad
25 question. You caught me.
00076
1      How deep was the trench?
2    A. I would say approximately two-feet,
3 approximately, it could have been 30-inches.
4 I don't know. It's a long time ago. I don't
5 remember.
6    Q. Was there fluid and effluent running
7 through there on a regular basis?
8    A. Almost continuously.
9    Q. And that trench just ended up at the
10 bay and jumped --
11    A. Leached into the bay.
12    Q. And is that, the effluent running
13 through the open trench, is that the same as
14 the other effluent, could be any color depends
15 on what they were doing to the plant or since
16 it was inorganic side did it tend to be one
17 color versus another?
18    A. It was mostly white because they had
19 trouble recovering salt from the caustic plant
20 and the caustic boil out, they used to call
21 them to clean the condensers and steam chest
22 and what have you, that was white. Caustic
23 was always white. In fact, there used to be a
24 trail from the chlorine plant out towards the
25 middle of that bay and I think the Coast Guard
00077
1 came up a few times and I think they were
2 cited a few times for pollution. This was
3 when the environmental people started to get a
4 little more strict on their control of
5 effluent.
6    Q. Would that probably have been then
7 during the '70s?
8    A. Probably.
9    Q. Did you ever see effluent or discharge
10 into the bay that was purple in color?
11    A. Believe it or not, all the time I put
12 there, it was not one of my pastimes to watch
13 the sewer. Now I'm only talking at times
14 where I would be interested in it would be
15 like if there was a spill, an oil spill or
16 something, I might out of curiosity take a
17 walk to see how it's mixing with the bay and
18 at that particular time it could be God knows
19 what color. Who cared about the color. I was
20 more than concerned about the sheen on top of

MKSK-FED-0000004213

ALCD-PUBCOM_0006179

21 the water, oil floats. I was wondering how it
22 would dissipate or how long it would take to
23 dissipate. Curious, you know, of course, that
24 was during the day light hours. At night, God
25 knows. But the spills and the cleansing from
00078
1 the caustic plant, as I stated, it's not a
2 secret. They were sighted numerous times for
3 white material going down. In fact, I think a
4 couple of the boating enthusiasts in the area
5 had some suits against the company because it
6 ate the paint off the boats.
7      I'll tell you it was a cesspool, I had
8 to say that. That's being recorded. It was
9 polluted. It's unconscionable. The reason I
10 say that, I am an outdoors man, I love
11 hunting, fishing and it used to personally
12 upset me. But...
13     Q. At that time, would it upset you,
14 would you say something to the plant manager
15 or say something to anybody else?
16     A. No. I wanted my job. It was none of
17 my business would be the standard unwritten
18 rule, if you know what I mean. You didn't
19 complain. Why should you?
20     Q. Did you get the feeling that if you
21 complained, it could have cost you your job?
22     A. Could have. It could have.
23     Q. Was the plant management, plant
24 manager specifically fully aware of the
25 effluent going back into the bay?
00079
1      MS. RYNIEC: Objection. Calls for
2 speculation.
3     A. He reads the reports. He got the
4 citations from the coast guard.
5     Q. The plant manager would understand how
6 the plant ran?
7     A. I would hope so.
8     Q. Do you remember if anybody from
9 Inland's head office from Ft. Wayne came out
10 to the site?
11     A. There was various meetings there,
12 Chairman of the Board, I understand, who was
13 one of the speakers -- don't ask me his name.
14 I do not know who he was. But there was some
15 high cotton people -- we used to call them
16 high brass. Yes, there was both of Vulcan and
17 Inland Chemical, what their positions were, we
18 heard they were stockholders. We heard they
19 were owners, I don't know.
20     Q. Do you know if Vulcan or Inland's
21 upper management were meeting at the site to
22 talk about any contamination issues or issues

MKSK-FED-0000004214

ALCD-PUBCOM_0006180

23  regarding effluent into the bay?
24      MS. RYNIEC:  Objection.  Calls for
25    speculation.

00080
1      A.  I would not have privilege to that
2  kind of knowledge.  I was not up in that loop.
3      Q.  Let me ask you real quick going back
4  to the trench, the open trench, this was on
5  the inorganic side, was the trench lined with
6  anything?
7      A.  No.
8      Q.  It was just dirt?
9      A.  Uh-huh.
10      Q.  And the pipes from Newark Bay, the
11  pipes inlet which let the water onto the plant
12  facility for use in the cooling and cleaning
13  processes, do you recall what their diameter
14  was?  How big?
15      A.  Fourteen or 16-inch, they were large,
16  hung, maybe 18-inch, I don't know right
17  offhand.
18      Q.  Inch across?
19      A.  Right, in circumference.
20      Q.  Circumference, okay.
21      A.  Eighteen inches.
22      Q.  Was it the same inch pipe for the
23  piping that pumped the effluent back into the
24  bay?
25      A.  I don't know.  This is underground.

00081
1  It could have been larger, could have been 24
2  or at least 18, I don't know.  Don't make
3  sense, what goes in, you got to come out, you
4  know.
5      Q.  Those discharge?
6      A.  What  GPMs it was, I have no idea what
7  the GPMs were.  Maybe it has it in here.  This
8  here is my copy of the procedure of
9  manufacturing chlorine from the Mullen
10  Corporation, has flow sheets, documents.  This
11  is all I have.
12      Q.  I see you have some documents there.
13      MS. HAYNES:  Can we go off the record
14    for just a moment.
15      (At this time there is a discussion
16    off the record.)
17      MS. HAYNES:  Back on the record.  While
18    we were off, we talked briefly about some
19    documents that Mr. Partington brought with
20    him.  One of them is a manual of a
21    consultant used by Vulcan, which I do not
22    believe has been produced to the
23    defendants so far in the case.  It's
24    titled Chlorine Handling Process

MKSK-FED-0000004215

ALCD-PUBCOM_0006181

25    Description and Operating Instructions
00082
1    Project, number 6851, prepared for Vulcan
2    Materials, Newark, New Jersey prepared by
3    RPB. MacMullin, M-a-c-M-u-l-l-i-n,
4    Associates in Niagra Falls, New York. It
5    is dated May 7, 1968.
6        We have agreed that at some point
7    today we will send it out and have it
8    copied and produced to defendant and the
9    original returned to Mr. Partington.
10   Q. And other than the manual for Vulcan
11  Associates and the resume, those are all the
12  documents that you have in your possession,
13  Mr. Partington, that are not of a personal
14  nature. Is that correct?
15   A. That's correct.
16   Q. Thank you. Before we took our short
17  break, you had mentioned that on occasion
18  there would we an oil spill and you would go
19  out and sometimes you would go out and watch,
20  look at the effluent that went into the bay.
21   Do you have any specific recollection of
22  oil being spilled at the Newark site while you
23  were there?
24   A. Only during the period Kolker Chemical
25  was -- had a contract with Gulf Oil Company.
00083
1  They were making an additive for motor oil and
2  we had various spills around the unit and
3  mistakes were made and sometimes some of the
4  oil material which was used in the additive,
5  the final product was discharged into the
6  sewer and was out in the bay. During that
7  period is most important, that's what the --
8   Q. Is it correct to say that anything
9  that found its way to the sewer ended up in
10  the bay?
11   A. Correct. Had no settling ponds, there
12  was no reclaiming systems, anything that went
13  down the sewer eventually went to the bay. I
14  might add this was true with all of the
15  particular people after Kolker Chemical. Also
16  it seems that this was an accepted practice.
17  Not until the late '70s was there any
18  monitoring or what have you of the effluent
19  going to the sewer or into the bay.
20   Q. Do you have any specific recollection
21  of how these mistakes that you referred to
22  around the plant, do you have any specific
23  recollection of how those mistakes took place
24  that resulted in additives making its way to
25  the sewer system?
00084

MKSK-FED-0000004216

ALCD-PUBCOM_0006182

1    A. No. Operator would make a mistake, a
2 wrong valve might be opened, a tank would not
3 be checked properly and it would be full and
4 then it was overflow, things of this nature.
5 Common operating technique.
6    Q. So were -- these mistakes were common
7 and part of the day-to-day business operations
8 at the plant?
9    A. It was accepted.
10    Q. And was accepted as just part of the
11 process of doing business there?
12    A. Yes. There was some discipline taken
13 at times, if something was found to be
14 negligent or somebody not doing their job such
15 as watching a particular phase of the
16 operation, they were not attentive and because
17 of not being attentive, spills happened and
18 then there was some discipline during this --
19 if a particular person was found to be
20 negligent.
21    Q. Do you have any recollection of
22 disciplining people in that way?
23    A. Myself?
24    Q. Uh-huh.
25    A. No, I personally would not, was not
00085
1 involved.
2    Q. But as a general rule for Kolker,
3 mistakes that resulted in product or some of
4 the additive getting onto the ground making
5 its way to the sewer system, that was an
6 accepted part of doing business at the plant?
7    A. Well, no. Manufacturer considered
8 that a norm because waste is money and these
9 things did happen, leaks did happen, spills
10 did happen, and to consider it normal, I don't
11 know if that's the right word. It did happen.
12    Q. Did happen?
13    A. But, of course, as I explained a spill
14 is money and they are in business to make
15 money. So intentionally do it, no, I don't
16 believe this was part of their operating
17 technique, anybody's operating technique.
18    Q. But they would happen? The mistakes
19 would happen?
20    A. Mistakes will happen. The problem was
21 that there was no back-up. There was no way
22 of ensuring that the material would not
23 eventually end up in the bay, such as a
24 settling pond, dams or things of this nature.
25 There was none of this. Whatever hit the
00086
1 sewers, hit the bay. That was --
2    Q. Would spills, like an oil spill, would

MKSK-FED-0000004217

ALCD-PUBCOM_0006183

3  they be hosed down to the sewer system?
4      A.  Oh, yes.  Using river water 90 percent
5  of the time or city water, whichever was
6  available.
7      Q.  That's, I am speaking specifically
8  about an oil spill, would that be the same
9  with respect to any leak or spill of any
10  product?
11      A.  No.  Not necessarily.  What was done
12  they would put down some sort of absorbant to
13  absorb most of it they could because it
14  was very slippery and dangerous.  Sawdust was
15  sometimes used, but oil absorbant wasn't
16  spread on the spill, a particular spill and
17  with brooms and shovels, they clean it, put it
18  out into an open field which would be next to
19  the organic plant, an open field which
20  contained all the contaminants and then they'd
21  go back to the spill and wash down the
22  remainder, whatever was remaining to get it
23  clean would be hosed down to the sewer.  But
24  normal procedure was to put down some sort of
25  an absorbant, Speedy Dry comes to mind,
00087
1  sawdust, anything that would sometimes --
2  reaction, oil absorbant reaction, were used to
3  get the bulk of it up before they washed it
4  down.
5      But also, you know, there were times when
6  it was just hosed down, the sewer too, to be
7  honest with you.  No attempt at all was made
8  of absorbing it or damming it up or
9  reclaiming.  It was out of the question.
10      Q.  When you arrived at the site in 1958,
11  was there any procedure for cleaning up
12  spills, do you know?
13      A.  I was unaware of them.  If there was
14  what?
15      Q.  What about when you became maintenance
16  foreman in 1962, was there anything in place
17  then?
18      A.  Not as a company policy.
19      Q.  Was a company policy instituted while
20  you were maintenance foreman?
21      A.  There was some of that and that was
22  during Vulcan's day or Frontier Chemical's day
23  they brought with them safe practices that
24  they used in Wichita, Kansas, I guess.
25  Somewhere around that period, Inland, Vulcan
00088
1  started on a process of trying to contain
2  spills and there was a procedure, however, I
3  have never seen vacuum trucks or what have you
4  to clean up and dispose of properly.  No, I've

MKSK-FED-0000004218

ALCD-PUBCOM_0006184

5 never seen that at that site.
6     Q.  Did you ever see there when Vulcan had
7 some clean-up procedure, you said, were they
8 written, do you know, or was it word of mouth?
9     A.  There might have been a circular
10 poster and on a sheet of paper or something it
11 might have been in the clean-up procedure
12 written by a particular engineer or production
13 foreman, let's say, how he wanted a particular
14 situation handled.  He might have spelled it
15 out, but nothing that was company policy that
16 I can remember.
17     Q.  Did Inland have a company policy on
18 cleaning up spills, do you know?
19     A.  Inland really, best of my
20 recollection, when they first moved in there
21 they made a chemical recovery plant, they had
22 drums coming from all over the place which sat
23 leaking, leaching into the ground all through
24 that plant on the organic side.  If they had a
25 policy, they sure didn't demonstrate it to me.
00089
1 In fact, what really used to get me, they used
2 to tell solvent by taking the cap off of a
3 drum and have an employee sniff what was in
4 the drums.  Now would that make you kind of
5 leery about their procedure of -- they were
6 just a recovery outfit.  We called them a slop
7 -- they took all the drums and if it was
8 solvent by smelling it, if it smelled like a
9 solvent you put it on one side, if it's an
10 oily base, you put on another side and they
11 dumped into big drums and tanks and tried to
12 reclaim whatever was in it.  Sometimes they
13 didn't know what was in it.
14     Q.  So do you know, did Inland have a
15 spill procedure, that you know of?
16     A.  No, I never seen it.  If they did,
17 it's one of my things I overlooked.  Now, they
18 very well may have.  I don't know.
19     Q.  But based on your work with them and
20 what you saw, you didn't see any spill
21 procedure at Inland?
22     A.  Not really because when they came,
23 wasn't long after as I said sort of
24 mothballed, the inorganic side they shut it
25 down.  They were in the business of selling it
00090
1 to or releasing it whatever they did, to
2 another concern, which was Van Eiderstein, I
3 believe, a meat processing outfit.  You got to
4 remember back in those days they were not as
5 keen on environmental -- it was not, as I
6 remember it, they were not strict is the word

MKSK-FED-0000004219

ALCD-PUBCOM_0006185

7  shall I use.
8      Q.  When you were maintenance foreman in
9  1962, did you have -- was your department, the
10  maintenance department, in charge of cleaning
11  up spills and leaks?
12      A.  No.
13      Q.  Was that the responsibility of whoever
14  happened to be closest?
15      A.  Operational.  Operator did it,
16  operator cleaned.  However, they were big
17  enough that maintenance people were called for
18  yard department or somebody who did the
19  clean-up janitorial work would help.
20      Q.   Do you recall any clean-up jobs big
21  enough that involved you pulling in your
22  maintenance department in the '60s?
23      A.  Not that bad.  We've always assisted.
24  Now, they could have been in the process and
25  maintenance people were usually pretty
00091
1  conscientious people, they would lend a hand
2  without asking, you know.  So they very
3  conceivably could have helped without me
4  without my knowledge, very possible.
5      Q.  They would help out but it wasn't a
6  job responsibility?
7      A.  It was not a job assignment.  No, it
8  was not a job assignment per se.
9          MS. HAYNES:  Now is probably a good
10      time for us to take a lunch break.
11      (Luncheon recess.)
12  AFTERNOON SESSION.
13      Q.  Back on the record.  Mr. Partington,
14  you realize you're still under oath?
15      A.  Yes.
16      Q.  Before we took a lunch break, I was
17  asking you about any safety training or
18  training in the handling and use of chemicals
19  or solvents when you first came to the Newark
20  site in 1958, and the response was no to both
21  of those.  Correct?  No safety training or
22  chemical handling?
23      A.  There was not, no.
24      Q.  I would ask you the same question with
25  respect to Vulcan.  When they took over the
00092
1  plant, was there any safety training?
2      A.  There was a program which they
3  instituted.  I'm not completely familiar.
4  There was not a course, per se, for
5  supervisors or anything like that, but there
6  was a safety program which was new to us at
7  the time.
8      Q.  Was it -- what generally, what areas

MKSK-FED-0000004220

ALCD-PUBCOM_0006186

9  of safety did the program cover?
10    A. Basically your own do's and don'ts
11  about handling certain types of chemicals and
12  fire, things of this nature, work safely, a
13  lot of motos; walk, don't run type of
14  situations. Fire training, not actual
15  on-the-job training but some film, I remember
16  going to some film. That was in Vulcan's day
17  I think.
18    Q. Were there regular safety meetings
19  when Vulcan had the plant?
20    A. Towards the end there was. Initially
21  there wasn't. But I can remember having to
22  schedule people for safety meetings once a
23  month or something like that.
24    Q. When you say towards the end, was that
25  towards the end of Vulcan's tenure?
00093
1    A. Yeah. Late '70s, I guess.
2    Q. Well, if it was late '70s, it would be
3  by our calculation, it would be Inland's time?
4    A. No.
5    Q. No. You're thinking Vulcan's time for
6  sure?
7    A. Yeah.
8    Q. Okay. And those monthly safety
9  meetings that you would have people scheduled
10  for, would cover do's and don'ts of handling
11  chemicals, fire training, general worker
12  safety?
13    A. First aid, first aid training.
14    Q. Okay. Were any of the safety measures
15  for Vulcan put into an employee manual of any
16  kind and passed out?
17    A. I really can't remember if there were.
18  Certainly, in my tenure, never an individual
19  packet per se, be given to each new employee
20  or what. I don't recall any of that but there
21  was a safety department.
22    Q. There was a safety department. Okay?
23    A. Yeah, I remember the gentleman who was
24  in charge, he's now deceased, but I'll never
25  forget him. Del Parr, P-a-r-r, he was sort of
00094
1  like the personal manager, safety director or
2  some title comes to mind, but many years ago
3  so how extensive -- it must have not been that
4  extensive or it would have, you know, hit a
5  bulk.
6    Q. In your mind now --
7    A. Yes, it would have, but there was an
8  attempt let's put it that way, there was an
9  attempt. Now, how much, how frequent they
10  were in compliance, I have no idea at that

MKSK-FED-0000004221

ALCD-PUBCOM_0006187

11  time.  I certainly don't remember it being
12  uppermost in the program Vulcan had at that
13  time.
14      In other words, put it another way, it
15  didn't leave any lasting impression on me so I
16  would have been very interested in that sense.
17  I came up through the ranks and I would have
18  recognized something like that and would have
19  insisted the employees participate or make
20  sure they made the meetings or thereabouts.
21  But I do recall vaguely there was some sort of
22  a program started, how it did, I don't -- I
23  can't recall at this time or if they really,
24  you know, a lot of things were
25  tongue-in-cheek, you know?  They had, here
00095
1  read this.  No.  No real participation or what
2  have you.
3      Q.  Not a lot of follow through?
4      A.  No.
5      Q.  In other words --
6      A.  No.
7      Q.  Okay.  Was there a safety department
8  at Kolker when you first started?
9      A.  No.  You were your own safety
10  department.
11      Q.  So you were on your own safety-wise
12  during the Kolker days, in other words?
13      A.  Yeah.  Daniel Boone days, trial and
14  error.
15      Q.  What about during Inland's tenure when
16  they took over the Newark site, do you
17  remember?
18      A.  Inland more or less for a short period
19  didn't change much of what they found.  I
20  mean, there was -- they didn't come in with
21  any, they were more interested in selling half
22  the place and getting into the reclaim
23  business, they were -- it was my impression at
24  the time and obviously I was right, they got
25  out.
00096
1      Q.  Do you recall if Inland maintained
2  the safety department that Vulcan had started
3  at the Newark site?
4      A.  If they did I was unaware of it.  As I
5  said, they were more interested in downsizing
6  when they got there and moving on.  Whatever
7  they did after that, I don't know.  They were
8  interested in the methylene chloride
9  operation, and reclaiming chemicals.
10      Q.  So when Inland took over at the --
11  took over the Newark facility, is it your
12  understanding that Vulcan ran the plant for

MKSK-FED-0000004222

ALCD-PUBCOM_0006188

13  about a year?
14      A.  Something like that.  They crossed,
15  the transition was real smooth because I think
16  they were both there and Vulcan slowly got
17  from under as I remember.  They -- before you
18  knew it, you were working for Inland Chemical,
19  one of those deals.
20      Q.  And then ultimately, the operations
21  that Inland conducted at the Newark site were
22  different, correct, in that they were
23  reclaiming chemicals?
24      A.  That was their main product, I guess,
25  because they -- they must have had drums of
00097
 1  waste material.  They must have been in the
 2  waste business way back or something, because
 3  I can recall truck loads of waste drums coming
 4  in, being stored in stacks in the field and it
 5  gave one the assumption that they were in the
 6  reclaiming business, so they were chemically
 7  trying to redistill and save or whatever,
 8  whatever they did.
 9      Q.  Okay.
10      A.  We had no -- what do you call it,
11  incinerator.  There was no incinerator there,
12  so they either put it batch-wise reclaimed the
13  solvent and what they did with the waste was
14  here nor there.
15      Q.  Did Inland provide you with any
16  training as to their operations when they took
17  over the Newark plant?
18      A.  Well, here again, as I stated, they
19  were phasing out.  In other words, they were
20  more interested in dismantling the chlorine
21  operation entirely and before you knew it, it
22  was for sale.  That part of the plant was
23  sold, and the other end was the methylene
24  chloride operation which they were interested
25  in the reclaiming of chemicals.
00098
 1      Q.  Did that involve new, any new
 2  operations?
 3      A.  Not really, no.
 4      Q.  Okay.
 5      A.  They used existing equipment for their
 6  purposes.
 7      Q.  When Inland came in, did they
 8  institute any new procedures for safety that
 9  you know of?
10      A.  Not really no.  Because as I stated,
11  my recollection only, that I can remember, to
12  the best of my ability right now, is that they
13  were more interested in downsizing and getting
14  rid of the chlorine plant, especially the

MKSK-FED-0000004223

ALCD-PUBCOM_0006189

15 chlorine operation, that seemed to be the area
16 that was the biggest loser money-wise and they
17 wanted to get rid of it ASAP.
18    Q. The chlorine side?
19    A. Yeah. It was economical because they
20 couldn't afford the price of the raw material
21 coming in. Rock salt they had to truck in or
22 get in by rail, something, like, 110 gondolas
23 and I don't know what the salt price was
24 during that period, salt prices were
25 astronomical, they couldn't physically -- it
00099
1 was impossible to make any money.
2    Q. Okay.
3    A. So they get rid of it.
4    Q. When Inland came in did they institute
5 any new procedures or guidelines for how to
6 deal with spills or leaks?
7    A. No. No.
8    Q. Any new procedures for maintenance of
9 any kind?
10    A. No.
11    Q. Okay.
12    A. I think one has to look at the overall
13 picture of they are in the business to make
14 money ,and if they were not making money they
15 were going to make any adjustments they needed
16 to show a profit and what was not making
17 money, was not making a profit, was
18 discontinued, dismantled. They leased or sold
19 part of the property, I don't know which they
20 did, to this meat concern, meat packing or
21 meat -- they made fertilizer, I think they
22 made fertilizer. I don't know what they did,
23 Van Eiderstein, I believe is the name, and
24 after that they were mostly concentrating on
25 the reclaiming business as I understand it.
00100
1 They had dimethyl aniline, it was a product
2 they were trying to make and that was one of
3 their products. That was it.
4    Q. When Inland took over, did they keep
5 on -- keep the Vulcan personnel on or did they
6 bring in all new?
7    A. No. No, they kept most, they kept
8 some, but as I said they downsized.
9    Q. But the folks they kept were Vulcan
10 folks?
11    A. Oh, yeah. And some of their own
12 managerial people were brought in, of course,
13 and some of the Vulcan managerial people were
14 given a choice to stay or leave. During this
15 period is when I became a shift foreman, again
16 boiler license and refrigeration license. I

MKSK-FED-0000004224

ALCD-PUBCOM_0000190

17 was actually doing managerial work as a member
18 of Local 68 Operating Engineers.
19    Q. Right.
20    A. That's where I became an engineer.
21    Q. Did you ever work at any of Inland's
22 other facilities?
23    A. No.
24    Q. Have you ever --
25    A. Dana Venne comes to mind.
00101
1    Q. As a plant manager?
2    A. Yeah, during Inland's juncture there,
3 I believe he was a plant manager. Didn't
4 personally get along with the -- he had a
5 brother too, Edmund.
6    Q. Did you know Ed?
7    A. Yeah, he came from Puerto Rico, they
8 had a facility in Puerto Rico, same type of
9 operation, reclaim or something. I don't
10 know. Didn't really get involved.
11    Q. So, when you left the Newark facility
12 was Dana Venne the plant manager?
13    A. No. There was another manager after
14 him. It was a Uli Marini.
15    Q. Right.
16    A. And another one after him. I don't
17 know who the last guy was. I forget. I think
18 Dana was there when I left. I think. I don't
19 know. But I was working under strained
20 relations about that time.
21    Q. Okay.
22    A. I did not leave Inland under the best
23 of terms. I was phased out as everybody else
24 was.
25    Q. Phased out? Did they terminate you?
00102
1    A. Oh, yeah. How dare they. No. We all
2 did, we all expected it. It was when they
3 downsized. They downsized. After I left, I
4 understand McKesson took over after that. How
5 long was Inland there? '81? So I had been
6 out of there a couple of years. But they were
7 modernizing, downsizing, getting down to the
8 bare bone.
9    Q. How many employees at the Newark
10 facility when you left?
11    A. Oh, I'd say 35, 40 maybe, but office
12 personnel and all, I think that's all there
13 was.
14    Q. You mentioned a couple of minutes ago
15 that -- I'm sorry. Strike that. You hadn't
16 worked at any other Inland facilities?
17    A. Nope.
18    Q. Let me ask you if you recognize the

MKSK-FED-0000004225

ALCD-PUBCOM_0006191

19 name of a disposal site called Stickney
20 Landfill which is in Toledo, Ohio. Does that
21 ring a bell?
22    A. I've seen it listed, that's Strickley,
23 not Stickney.
24    Q. Stickney, S-t-i-c-k-n-e-y.
25    A. I thought it was Strickley.
00103
1    Q. This one is in Toledo, Ohio.
2    A. I heard of it.
3    Q. The Stickney Landfill?
4    A. I think it was -- I don't know what --
5    Q. How did you come to hear about it, do
6 you know?
7    A. I read it someplace, I don't remember.
8    Q. Any idea what you read about it?
9    A. I think they were cited for contempt
10 or they were fined or something, government
11 action or something. I read about it. What
12 struck a bell was in Inland's day? I believe
13 it was Inland Chemical. They trucked
14 wastewater to Sandusky, Ohio, and I believe
15 that was the same outfit they got -- I don't
16 know this for a fact, but I heard that there
17 was some violations.
18    Q.  Do you know for a fact that Inland
19 trucked wastewater to Sandusky, Ohio?
20    A. They trucked it out of the facility at
21 Newark. What they did with it, I don't know.
22 I thought it went to upstate New York.
23    Q. So wastewater left Newark?
24    A. From one of the processes it did.
25    Q. But you're not sure where it went to?
00104
1    A. Nope. I was under the impression it
2 went to New York, somewhere in New York.
3    Q.  Do you know whether Inland disposed
4 of any of its waste at a site in Toledo, Ohio?
5    A. Sandusky, Ohio rings a bell, I know
6 nothing of Toledo.
7    Q. I'll give you another name, Tyler
8 Landfill in Toledo, Ohio? No?
9    A. Uh-uh.
10    Q. What about the XX Chem site in Toledo,
11 Ohio, does that ring any bells?
12    A. No.
13    Q. What about the name Incorporated
14 Crafts in Toledo, Ohio? Does that ring any
15 bells?
16    A. No.
17    Q. A couple of moments ago you referred
18 to rock salt that had to be brought in by rail
19 car. I want to take you back to the Kolker
20 days when you first came to the Newark

MKSK-FED-0000004226

ALCD-PUBCOM_0006192

21 facility and ask you how were the chemical
22 components that were going into the
23 manufacturing process, how did the raw
24 products get to the Newark facility in 1958?
25    A. Either, rail, truck, that was it.
00105
1    Q. Either rail or truck. If they came by
2 truck were they in drums or were they in tank
3 truck?
4    A. Could be either.
5    Q. Was one more common than the other
6 drums versus tank trucks?
7    A. Tank trucks, you're talking raw
8 material now.
9    Q. Uh-huh.
10    A. Tank trucks.
11    Q. Were more common?
12    A. Yes.
13    Q. And when I say drums, I'm talking
14 about 55-gallon drums?
15    A. I know what you mean.
16    Q. Talking about the same thing?
17    A. We shipped that way.
18    Q. Shipped out off the facility that way.
19 Okay. What sorts of material arrived by rail
20 car? What types of raw materials arrived by
21 rail car?
22    A. Methylene, toluene, methanol, bromine,
23 chlorine, back in the earlier days,
24 trichloroethylene, oil.
25    Q. Oil?
00106
1    A. Number six bunker oil, there's a few
2 times somebody got a bargain on fuel oil,
3 gasoline, regular gasoline, automobile
4 gasoline, nitrogen and box cars came in with
5 containers to be packaged for methyl bromide
6 and also came in by truck.
7    Q. The first list of raw products we were
8 talking about, the methylene, toluene,
9 methanol, down to -- did those arrive in rail
10 cars in a liquid form or a gas?
11    A. Liquid.
12    Q. And then what would happen when a rail
13 car pulled in with product, how did it, was it
14 then stored somewhere at the Newark site?
15    A. It was commonly used from the tank
16 car.
17    Q. So used in the manufacturing process
18 right from the rail car?
19    A. Correct.
20    Q. Were there occasions  when raw product
21 would be stored in large tanks, storage tanks?
22    A. Oh, yeah.  I qualified that last

MKSK-FED-0000004227

ALCD-PUBCOM_0006193

23  statement I made because of railroad
24  demurrage, it was more common to store the
25  materials that could be stored, but things
00107
1  such as chlorine and bromine were normally
2  used right out of the tank cars themselves,
3  but the others, toluene, methanol were pumped
4  into storage tanks. Yes, anything that could
5  be stored on site to reduce the overhead via
6  the demurrage on railroad calls was done.
7  Trichloroethylene was also. We had a storage
8  tank for it, we had oil storage tanks. We had
9  gasoline storage tanks. We had everything, so
10  basically chlorine and bromine were the only
11  two that were commonly used right from the
12  tank car themselves until empty. Then they
13  were shipped out. Everything else was stored,
14  we had tank farm tankage for this.
15     Q. Were you, at any time throughout your
16  tenure at the Newark site, were you ever as
17  any part of your job duties responsible for
18  off-loading -- loading or off-loading rail
19  cars?
20     A. Yeah.
21     Q. What job was that part of?
22     A. It was part of being a chemical
23  operator.
24     Q. When you were first there in 1958?
25     A. Yeah. We had tank trucks of muriatic
00108
1  acid coming in and unloaded to storage tanks.
2  That was part of the process. You're
3  scratching the surface, you're digging up a
4  lot of stuff here that I put away.
5     Q. Doesn't hurt too bad, does it, I hope?
6     A. No.
7     Q. I had a feeling some more might come
8  to you. Other than during your job and duties
9  as a chemical operator, were there any other
10  job titles that you -- that would have
11  involved being involved actually, in the
12  loading and unloading of rail cars at the
13  Newark facility?
14     A. No. Not really. No. The only thing
15  I can mention there was the maintaining of, I
16  myself and two other guys -- well, I was the
17  captain of the chlorine emergency team that we
18  had under Vulcan Materials, Vulcan's day, it
19  required the going on customer complaints for
20  leakage and chlorine tank cars that we build,
21  however, belonged to the chlorine institute, I
22  could be called out on anybody's car because I
23  possessed the knowledge of how to repair these
24  cars.

MKSK-FED-0000004228

ALCD-PUBCOM_0006194

25    Q.  These are the railroad cars that were
00109
1  equipped to carry the chlorine?
2    A.  Railroad or tank truck, tank truck or
3  tank cars.
4    Q.  How did you obtain that training?
5    A.  Would you believe trial and error.
6  No.  It didn't require a lot of training,
7  except I was a very observant person, I
8  knew -- made it my business to know all about
9  the manufacture of chlorine I could for this
10  simple reason; I wanted to save my own skin.
11  The more I knew, the better, and the
12  superintendent by the name of Joe Hosey -- I
13  don't know if you ever heard of him  --
14    Q.  I think you mentioned him this
15  morning.
16    A.  But he and I were instrumental in the
17  start of the emergency team we had there at
18  the site.
19    Q.  So the two of you started the chlorine
20  emergency team?
21    A.  We didn't start it, we were it.  All
22  of a sudden we both had experience with Scott
23  packs, we were both in maintenance, we both
24  knew the construction of the railroad cars,
25  which were liquid, which were gas, how to go
00110
1  about installing emergency kits, and we were
2  both proficient in the use of Scott air packs.
3  They were forced breathing apparatus,
4  something like the firemen wear.  We were both
5  pretty good at this.  Don't ask me how, was
6  just part of the job, just from word-of-mouth
7  type of training, trial and error, had no
8  formalized training.
9    Q.  And the purpose of the emergency team
10  was obviously to deal with any emergencies
11  involving chlorine and the rail cars and the
12  tank trucks?
13    A.  Correct.
14    Q.  Do you recall any -- specifically any
15  emergencies that you handled that related to
16  chlorine?
17    A.  Oh, yeah.  Passaic Valley Sewerage, we
18  had a leaky tank car there.  We had another
19  one in a generating station, I forget the name
20  of it now, in Jersey City, a leaky chlorine
21  tank car which we canned, which I was present
22  and was instrumental in canning.  A chemical
23  outfit by the name of Arden Chemical had a
24  leaky tank truck or tank car -- tank truck, I
25  was right the first time, and we were summoned
00111

MKSK-FED-0000004229

ALCD-PUBCOM_0006195

1 to the location and we had to put on a Solvay
2 C repair kit to stop a leak.  And also leaks
3 in the plant.
4    Q.  The leaks that you were just talking
5 about now that you were listing out, those
6 were all for other companies and not at the
7 Newark site specifically.  Right?
8    A.  Right.
9    Q.  What can you tell me about any
10 emergencies that you can recall handling
11 relating to the chlorine at the Newark
12 facility?
13    A.  We were -- when it came to chlorine,
14 chlorine is a deadly gas.  As you know, it's
15 very objectionable to smell, taste, it was
16 used as a chemical in World War I, kills
17 people, very simple.  So we were tight at
18 Newark as far as chlorine leaks per se.  They
19 were pretty proficient in handling the
20 chlorine product itself.
21    Q.  When the chlorine would come in, in a
22 railroad car, was that a liquid or gas form?
23    A.  Liquid under pressure.  Boils at a
24 minus 28 degrees centigrade or F -- minus 28
25 F, so if there's any leaks in a railroad car
00112
1 where the chlorine liquid inside is under
2 pressure when it leaks, it's going to leak as
3 gas.  That's correct.
4    Q.  So any emergencies that you might
5 handle that related to chlorine and railroad
6 cars was to stop any leaks of gas from a
7 railroad car of chlorine because that could be
8 dangerous?
9    A.  Right, or liquid, it could be liquid.
10 The chlorine car is designed in such a manner
11 that there is two dip pipes that go to the
12 bottom of the car -- four valves on the
13 manway.  There's four individual valves, two
14 are gas valves and two length-wise are liquid
15 lines, we call them, they have dip pipes, they
16 are down to the bottom of the car so it could
17 be either or.  Ninety percent of the time it
18 was gas, ten percent of the time it could be
19 liquid.
20    Now, if you're unloading a liquid line
21 you could unload the liquid out of these cars
22 as long as the pressure was above condensing
23 temperature of the chlorine, not to get
24 technical, it was very simple, if the car was
25 under a hundred PSI pressure, you could
00113
1 off-load this car at X number of pounds per
2 hour to a lesser pressure vessel or container

MKSK-FED-0000004230

ALCD-PUBCOM_0006196

3 at the customer's facility, they got liquid.
4    Q.  Did Inland -- I'm sorry, anybody at
5 the Newark site while you were there store
6 chlorine in liquid form?
7    A.  Yes.  We did.
8    Q.  In tanks?
9    A.  Yeah.
10    Q.  Was is it Kolker, Vulcan and Inland?
11 All of them did?
12    A.  Yeah, until Inland pulled a plug on
13 it.
14    Q.  Of the chlorine until they shut down
15 the chlorine plant operations.  Okay.  Do you
16 have any specific recollection of chlorine gas
17 leaks at the Newark facility?
18    A.  We've had minor upsets which were
19 calming, where there was -- not calming, but
20 common, I guess you would say, necessitated
21 wearing a respirator at least, chlorine would
22 be strong enough in concentration in the
23 building, but normal upsets, normal
24 production.
25    Q.  What's a -- do you have an estimate
00114
1 for a normal size gas leak?  Any idea how much
2 is released?
3    A.  Again, in the manufacture of chlorine
4 you had a whole cell house which was
5 approximately 200 by a hundred feet, 200-feet
6 long by a hundred feet wide, full of these
7 individual cells generating chlorine which is
8 under slight vacuum suck it away and it was
9 very possible to have a leak somewhere in the
10 gas system, small leak, very small, which we
11 used to repair by taping and things of this
12 nature.  But it was part of the process.  In
13 other words, you manufacture chlorine, when
14 you walked into that plant you smelled
15 chlorine, very weak, you know, what bleach
16 smells like, that was about the odor that was
17 predominant.
18    Q.  Were the -- I'm sorry, the operations
19 relating to chlorine, did those all take place
20 inside the cell house or cell houses?
21    A.  Well, that's where the gas was
22 generated in the cell house but once it was
23 liberated inside the cells, it was collected,
24 it was dried, it was purified, it was
25 liquefied and put in storage.  That was just
00115
1 the chlorine side of it.
2    Now, the other side of it was what they
3 call cell liquor which is a like caustic and
4 salt solution.  This all was collected, went

MKSK-FED-0000004231

ALCD-PUBCOM_0006197

5  to storage tanks which was evaporated, the
6  salt was recovered and the caustic was
7  concentrated up to a sellable product, back in
8  those days it was 50 percent.  50 percent
9  caustic which was a product which was stored
10  and loaded when shipped.
11     Q.  Do you recall ever responding to a
12  neighbor's complaints about chlorine gas leaks
13  at the Newark facility?
14     A.  Not leaks but we've had emissions
15  where probably someone complained, I'm sure it
16  happened.  I don't have a particular day or
17  the only day I can remember is when I was
18  involved in one.
19     Q.  Was there one that you remember you
20  were involved in?
21     A.  Yeah.
22     Q.  Was it an  odor problem?
23     A.  Oh, it was a beauty.
24     Q.  Tell me about that.
25     A.  That was in '68, just before the air,
00116
1  '68, of the inorganic department.  We had a
2  chlorine, what they call a Green Goddess, it
3  was a purification tower, it just meant
4  recycling chlorine to itself and the gas was
5  liquefied and was forced to bubble through the
6  liquid chlorine which purified it.  Then after
7  that stage it was liquefied and put out to
8  storage.  A reboiler on the bottom of the
9  thing started to leak.  We had steam supplied
10  reboilers on the bottom.  For some reason this
11  bottom of the particular vessel contained
12  sulfuric acid and residue from the chlorine
13  process itself and we had a leak.
14     Q.  So was this a leak of sulfuric acid
15  or --
16     A.  It was a leak of chlorine.  So in an
17  attempt to depressure the particular vessel so
18  we could find out what was wrong, we were in
19  the process of stopping the production to go
20  through this and debriding it and I opened the
21  bottom valve of the bottom reboiler, it fell
22  apart, right, I was there.  Boom, I got acid
23  burns.  That's when we had an emission.
24      Now, if there was a complaint then I
25  wouldn't have known, because I spent three
00117
1  weeks in the hospital but that was me
2  relieving the pressure out of the bottom.
3  Saved from catastrophe, I was of the opinion
4  and was so told later on.
5     Q.  When you say there was an emission
6  that was a release of chlorine gas into the

MKSK-FED-0000004232

ALCD-PUBCOM_0006198

7  air or the liquid?
8     A.  Gas.  It wouldn't be liquid, it had to
9  be gas, it's a gas, liquid always evaporated
10  it boils at minus 28 degrees, as it hits the
11  atmosphere it flashes instantaneously to gas.
12  So you had a cloud and given enough area the
13  cloud --
14        MS. ANDERSON:  Dissipates?
15     A.  That's what I was looking for.  Thank
16  you.
17     Q.  Did you ever find out why there was a
18  build-up of pressure that had needed to be
19  released?  In other words, what had gone wrong
20  that you needed to release the valve for the
21  pressure?
22     A.  Plugged sparger, s-p-a-r-g-e-r --
23  see, when the waste gas off this chlorine
24  purification tower was not being utilized,
25  right, for the manufacture of bleach or
00118
1  something else, it was diverted to scrubbers.
2  They had two, five-thousand gallon tanks full
3  of 20 percent caustic solution to neutralize
4  the gas which were inadvertently dumped to the
5  river when they got spent.  So one of these
6  plugged and pressure started to build, so
7  somewhere in the process some of the gas was
8  being diverted out to the particular, we call
9  them scrubbers, vent scrubbers and vent
10  scrubber plugged and this meant the pressure
11  was being exceeded over the normal operating
12  procedure of the tower ,and the pressure had
13  to be relieved.  So that was the reason for me
14  opening the bottom of the vessel to relieve
15  the pressure out to the same vent scrubber
16  through a different source, stop going over
17  the top, it was going to come in the bottom
18  and the valve assembly fell apart in my hands
19  when I opened it.  They claim it was the wrong
20  construction of material and all that, but
21  that was neither here nor there, had nothing
22  to do with the problem.  The problem simply
23  was that one the spargers plugged up.
24     Q.  During 1968, you were a production
25  foreman.  Right?
00119
1     A.  Production or just promoted or -- no,
2  I was I was still a production.
3     Q.  Was the vent which became plugged was
4  that one of the items that was on a list for
5  routine maintenance?
6     A.  Well, not really.  They were replaced
7  routinely, like, monthly and I don't remember,
8  they weren't checked per se, they were

MKSK-FED-0000004233

ALCD-PUBCOM_0006199

9 replaced. Whether it was replaced or not, too
10 long ago. I don't know.
11    Q. Okay. Is this the -- well, let me ask
12 you this, if you hadn't released it, what do
13 you think the result would have been?
14    A. Well, we would have had a terrific
15 release when the safety valves went. The
16 safety valves were located 50-feet in the air
17 and it would have inundated the whole area.
18    Q. With chlorine gas?
19    A. Right. So I was trying to get rid of
20 a bomb.
21    Q. Is this the -- your injury with acid
22 burns, did you fully recover from that?
23    A. Uh-huh.
24    Q. Is that the injury that you had in
25 1968, that ended up in your having a
00120
1 deposition taken?
2    A. Uh-huh. Yes, I am sorry. I'm going,
3 "yep, yep."
4    Q. That was the one, I think, where you
5 said the management had decided it was an
6 equipment failure?
7    A. Yep.
8    Q. And your testimony is, it's in your
9 opinion it's not an equipment failure, it
10 was --
11    A. What?
12    Q. What would you call it?
13    A. What did I say? I didn't say it
14 wasn't equipment failure.
15    Q. I didn't mean to misstate your
16 testimony. I thought you had said that at the
17 time you were a supervisor. So, you were
18 management, not union and that other
19 management had made a decision about the cause
20 of the incident but that you disagreed?
21    A. That was the deposition, yes.
22    Q. Right. I'm just trying to figure out
23 what there was the disagreement about?
24    A. I maintained it was a design flaw,
25 poor design. Not only for the reason I got
00121
1 hurt, shouldn't have had a valve located in
2 that location without clear access, what have
3 you. That was my opinion. It was a
4 construction flaw, if anything not an
5 equipment failure.
6    Q. Okay.
7    A. But that would have opened legal doors
8 so you can imagine why I had a deposition on
9 that one.
10    Q. Did you ever see, you said sometimes

MKSK-FED-0000004234

ALCD-PUBCOM_0006200

11  the chlorine gas could leak in a liquid form?
12     A. No. Oh, yeah, it could. But as soon
13  as it hit the atmosphere it was gas.
14     Q. So you never saw it hit the ground?
15     A. No.
16     Q. Couldn't hit the ground, it would
17  evaporate before it hit the ground?
18     A. Pipelines were underground, you might
19  see the water or the area around it became
20  refrigerated but it would be a moisture type,
21  it wouldn't be chlorine. Chlorine turns --
22  it's hard to dilute liquid chlorine, it's so
23  cold it freezes everything so you wouldn't
24  puddle. That's what I'm trying to say. I
25  believe you wanted me to make the distinction
00122
1  of a puddle of chlorine? No, there is no such
2  thing. It would dissipate so fast because
3  it's so cold and it's condensing temperature
4  is minus 28 C -- or F rather, F , but the
5  liquid chlorine boils off into a gas state
6  instantaneously. The only way to keep it
7  under liquid is to keep it under pressure.
8     Q. Did I hear correctly that you had said
9  you didn't recall any neighborhood or
10  neighbors complaints about odors at the Newark
11  facility?
12     A. To me personally? No, not to me.
13     Q. Did you ever hear about any from
14  somebody else?
15     A. Oh, yes. I heard them, but no one had
16  complained to me.
17     Q. The complaints wouldn't route
18  themselves to you in the normal course of
19  your --
20     A. When I was a shift foreman, they
21  would -- I was shift foreman, plant manager,
22  plant nurse, doctor, lawyer, I was everything.
23  I was all by myself. I never recall receiving
24  any calls or any complaints. The police were
25  never called down or something like this that
00123
1  there was an emission that we were responsible
2  for. That was in my tenure. I don't know if
3  other people -- I've heard of other situations
4  that did happen, but to me personally no, I
5  was never involved.
6     Q. The odor complaints that you heard
7  about, did those take place during the Kolker
8  years? Can you place them in a decade?
9     A. All of the above. All of them.
10     Q. Kolker, Vulcan and Inland?
11     A. And McKeeson (sic), had by this time,
12  had a reputation.

MKSK-FED-0000004235

ALCD-PUBCOM_0006201

13    Q. The plant did?
14    A. Location did.
15    Q. In other words, all the businesses
16 down there in that particular area?
17    (The witness nods head in the
18 affirmative.)
19    Q. They knew where the chlorine was being
20 manufactured? They knew where the smells were
21 coming from. Okay.
22    A. True. True.
23    Q. We covered --
24    A. We covered my whole life.
25    Q. Oh, no.
00124
1    A. Is this going to movie form?
2    Q. We should have captured it on film.
3 We covered pretty thoroughly raw product
4 coming to the Newark facility by rail car in
5 the 1958 time period, and you had also said --
6    A. Tank trucks, also.
7    Q. Tank trucks were drums for tankers?
8    A. Right.
9    Q. Would also bring raw product to the
10 site?
11    A. Right.
12    Q. Was that the same types of raw product
13 that we were talking about in liquid form that
14 came by rail car; methylene, toluene,
15 methanol, bromine et cetera?
16    A. Being in business you got a better
17 price break by dealing in volume, so
18 naturally, a 55-ton chlorine car was a little
19 cheaper per pound than a 20-pound or 20-ton
20 truck, you know what I'm saying? So a matter
21 of priority, any business would go the cheap
22 way, buy by volume and it lowers your
23 overhead. Right?
24    Q. So it was a matter of economics back
25 in those days?
00125
1    A. I think it still is.
2    Q. When you were a chemical operator,
3 were you also responsible for the loading and
4 unloading of the tank trucks?
5    A. Some of them.
6    Q. Or if they came in drums on trucks?
7    A. Yep. Filled drums, too.
8    Q. Filled drums when product left?
9    A. Yeah, for shipment to a customer.
10    Q. How would the drums that arrived at
11 the site with the raw product, how would that
12 product be transferred to use in operations?
13 Would it go to a storage tank?
14    A. No. They would either pump it -- you

MKSK-FED-0000004236

ALCD-PUBCOM_0006202

15 the had little air pumps, air to a storage
16 facility or drum it at times, batch-wise.
17    Q. It would vary?
18    A. Yeah, depending on the usage. Now,
19 drum, we did mostly packaging of the raw
20 material that we made. I mean, product we
21 made was usually packaged in 55-gallon drums
22 or five-gallon buckets or tank trucks, tank
23 car, whatever, depending on the product.
24    Q. So product also left the site in the
25 same three ways that it came to the site?
00126
1    A. Yes.
2    Q. Were the drums with raw product stored
3 anywhere before they were used?
4    A. They had a warehouse, yes, there was a
5 warehouse.
6    Q. Was the warehouse, was it specifically
7 designated for the drums?
8    A. As I remember it part of building --
9 all Building One used to be drum storage for
10 methylene chloride and some solvents and we
11 had a raw material warehouse which had raw
12 materials in it and it was, part of it was
13 used as a staging area that shipped product
14 out by drums. Methylene chloride, chloroform
15 carbo-tet was stored in here in lots and was
16 loaded on trailers, taken out or boxed cars,
17 whatever so, yes, we did have areas that were
18 designated as drum loading, drum unloading, et
19 cetera.
20    Q. Did the tank trucks -- there were
21 specific loading and unloading areas for the
22 tank trucks. Is that correct?
23    A. Yes.
24    Q. Do you remember in 1958 were those
25 truck loading and unloading areas there at the
00127
1 site?
2    A. There was some. Not in the same
3 location naturally, as they expanded and made
4 the operation larger they moved.
5    Q. The truck loading and unloading area
6 that was there in 1958, do you remember what
7 the surface was like? Was it bare ground?
8 Was it covered with cement?
9    A. No. Macadam, macadam and concrete,
10 blacktop, concrete and there was one area that
11 was just dirt, rock hard surface. So you had
12 all three.
13    Q. What about the area where the drums
14 were stored?
15    A. That was concrete based.
16    Q. In Building One and the raw material

MKSK-FED-0000004237

ALCD-PUBCOM_0006203

17 warehouse?

18    A. Yes.

19    Q. Do you know if in 1958, if the floors

20 in Building One of the raw material warehouse

21 had drains in them?

22    A. To sewer, went right to the sewers.

23 Which was sewer that ran to the rear of the

24 building all the way out to the river.

25    Q. The sewer that went out to the river,

00128

1 that wasn't connected to the city sanitary

2 sewer system, was it?

3    A. Not the sanitary sewer, the sanitary

4 sewer is not located there.

5    Q. That was separate?

6    A. It was separate.

7    Q. What about the truck loading and

8 unloading area, the area that was concrete and

9 blacktop, did it have drains?

10    A. It had, off to the side it had little

11 drains, yes.

12    Q. Was there a reason why part of the

13 loading and unloading area was just dirt, why

14 part of it was not covered with concrete?

15    A. They didn't get around to doing it

16 yet. They --

17    Q. In 1958 anyway?

18    A. Right. They were expanding around

19 that period of time. There was a lot of

20 expansion going on.

21    Q. Later on, did they end up covering

22 that area with concrete?

23    A. Oh, yeah. Everything was either

24 concrete or blacktop or macadam. There was

25 only one area that I remember remained dirt

00129

1 and rock. That was the caustic loading area.

2 That was in the -- in the chlorine plant.

3    Q. Do you know why that caustic loading

4 area remained just dirt and was not covered?

5    A. I would say it was a loop, the station

6 itself was concrete, but the road leading to

7 and leading out was dirt.

8    Q. So just the road in and out was dirt?

9    A. Right. It was the area, I believe, it

10 was a large area.

11    Q. And the storage area was concrete

12 covered?

13    A. Was concrete cover on it.

14    Q. Can you put an estimate, a time frame

15 for me of when you can recall most, if not

16 all, of the site was covered in concrete or

17 asphalt?

18    A. Towards the end, I guess. In the

MKSK-FED-0000004238

ALCD-PUBCOM_0006204

19 beginning it was dirt roads.
20    Q. How about in the early to mid-60s when
21 Vulcan took over, did they concrete things?
22    A. Vulcan put some of the road work in
23 but as I remember, I'm trying to recall now,
24 some of the road was blacktop and some wasn't.
25 Now, why? I don't know, but that's the way it
00130
1 was.
2    Q. Do you remember an area around the
3 storage tanks as to whether or not the storage
4 tanks had containment areas around them?
5    A. They were all contained. They were
6 legal. They were able to hold anything that
7 spilled inside of it. The walls were high
8 enough.
9    Q. So the dikes or containment areas
10 around the tanks were large enough that if
11 there was a leak on the tank inside the
12 containment area it would hold all of it?
13    A. Right.
14    Q. Were those dikes there in 1958, do you
15 know?
16    A. They were built after the tank farms
17 were put up. Some of those tank farms were
18 new. The old tank farm was there. I don't
19 know -- I understand that they are up to code.
20 The old tank farm between Building One and
21 Building Two, it was an old tank farm, had a
22 concrete containing wall and they were legal
23 because they had insurance, you know, I mean
24 it passed, must have, the insurance company
25 would not have insured if they were not up to
00131
1 code.
2    Q. So there were dikes there for the
3 tanks that were there in 1958?
4    A. Right.
5    Q. Do you know in 1958 were those
6 containment areas, were they just dirt or were
7 they lined with anything?
8    A. No, they were concrete mostly. One
9 between Building One and Building Two, old
10 Building One and Building Two had a concrete
11 pad with tanks inside with maybe four-foot
12 wall all the way around it. That's the one I
13 say I think it was up to code --
14    Q. I'm sorry. Go ahead.
15    A. The other tank farm I'm mentioning,
16 I'm thinking about is the new one they put up
17 in front of Building One which was a concrete
18 pad here also with contained walls and they
19 had some dozen or so tanks in there. I don't
20 remember offhand, maybe 20 tanks in there and

MKSK-FED-0000004239

ALCD-PUBCOM_0006205

21  this was also with retaining walls and this
22  was all --
23      Q. Did the walls, do you have any
24  recollection of what they were constructed of?
25      A. Brick. Brick walls.
00132
1       Q. Now, as a chemical operator you said
2   you were involved with the loading and
3   unloading of the rail cars?
4       A. Uh-huh.
5       Q. Do you ever recall any incidents of
6   loading and unloading the rail cars when any
7   of the product inside the rail cars spilled on
8   the ground?
9       A. It happens routinely.  Simple as
10  disconnecting the piping, disconnecting the
11  pumping, depends on how you got it out, if you
12  got it out by pressure there was minimum
13  amount of leakage.  But pumping was another
14  story.  You might have it in the lines when
15  you disconnected it from the vessel up to the
16  valve, there'd be leaking on the ground.
17      Q. That the bare ground?
18      A. On the bare ground or in the area
19  of -- at some places there was a concrete
20  floor or concrete ditch leading to an open
21  trench leading to who knows.
22      Q. Is that the ditches leading to the
23  concrete trenches, that the open trench that
24  goes down to the bay?
25      A. Open trench, which was covered, was an
00133
1   old storm sewer like I described two-foot high
2   by two foot wide it had slabs of steel and
3   stone over some of it and in some places the
4   trench was underground for trucking purposes,
5   so -- and that went down the entire center of
6   the plant out to the bay.  It was acid lined,
7   by the way, acid brick.
8       Q. What is acid brick?
9       A. Acid brick is your normal brick, you
10  have a solvent or acid should be spilled on
11  it, it would tend to disintegrate the brick.
12  So you have a special type of brick which is
13  designed for acid solution and solvent.  It's
14  a chemically lined trench that's the -- that's
15  what it was.  They got tired of the replacing
16  the brick work.
17      Q. So that when the chemical product --
18  flowed through the trench it would dissolve
19  the brick?
20      A. Fireplace, same idea, you couldn't put
21  normal brick as fire brick in a fireplace, if
22  you didn't know that, that's the reason.  It's

MKSK-FED-0000004240

ALCD-PUBCOM_0006206

23 not built for that purpose.  It will spawled
24 on you, break apart and fall apart, this is
25 why you have high temperature fire brick in a
00134
1 fire place or in a boiler same thing.
2    That cost ten dollars extra.
3    Q.  The spills that you were just talking
4 about with respect to the loading and
5 unloading of the rail cars, can you estimate
6 for me average quantity?  Would it vary?
7    A.  How do I know?  What's a two-inch pipe
8 line hold?  I don't know.  No idea.  There
9 used to be a procedure to collect it in a
10 bucket, take a bucket and drop it into a drum
11 but it was never followed very well.  Either
12 that or the drum starts leaking.  So the drum
13 is always empty.  It was a big laugh.
14    Q.  Let's see, with respect to your duties
15 as a chemical operator in 1958 --
16    A.  That's 40-years ago, lady, 40-years
17 ago.
18    Q.  You did so good on the rail cars, I
19 just want to ask you the same question about
20 the trucks?
21    A.  Would you believe that back 40 years
22 ago that was an accepted practice and it was
23 accepted by the industry.  There was nothing,
24 dare it sound like oh my God, how can you get
25 away with it?  It was an accepted practice
00135
1 method of operation.  Dupont, anybody else,
2 did the same thing.  So it's not, I mean, it
3 sounds cruel, but it wasn't -- that was a fact
4 of life back in those days.  EPA was not as
5 strict as they are today.  You didn't have
6 environmental people.  You might have had them
7 on paper but they didn't -- they were not as
8 they are today.  There's a difference.  Clean
9 air, there was no Clean Air Act.  It's not far
10 from the horse and buggy days.  In fact,
11 where I grew up, I grew up on a farm without
12 electricity, so that's how old it was.  It was
13 old.  1935, Pennsylvania was the last to come
14 on line where I lived.  We had kerosene lamps
15 when I was six-years old.  I remember it.
16    Q.  Kind of hard to forget that, I
17 imagine?
18    A.  No.  Best years of my life.  But some
19 of the procedures that were used back in those
20 days was not as outlandish as they sound
21 today.  Even when I tell them some of the --
22 my children, grandchildren -- Poppa, you
23 didn't -- fact of life, you know?  And it was
24 legal.

ALCD-PUBCOM_0006207

25    Q. I'll tell you what, why don't we take
00136
1 a quick break?
2    A. Aren't we leaving? It's three
3 o'clock.
4       MS. HAYNES: Go off the record.
5       (Brief recess.)
6    Q. Go back on the record. Mr.
7 Partington, right before the break we were
8 talking about the spills that you said that
9 were routine, that were associated with
10 loading and unloading the rail cars while you
11 were a chemical operator?
12    A. And trucks.
13    Q. It was the same?
14    A. Yeah.
15    Q. Were the spills also routine when they
16 were associated with the tank truck loading
17 and unloading?
18    A. Yes, they were.
19    Q. Was it the same with the drums loading
20 and unloading drums?
21    A. There were natural overfills, spills,
22 not considered routine, but it happened.
23 There was discipline measured out back in the
24 Vulcan days. If it was negligence, if it was
25 a proven negligence, people were disciplined
00137
1 for spilling material.
2    Q. And that was because it was wasting
3 money. Right?
4    A. Well, yeah. Well, it was true, no
5 matter who the outfit was, it was true. You
6 know, product, you just said the magic word is
7 money so if there was a large spill, of course
8 that person didn't work there no more. But
9 little dribs and drabs would make -- it was
10 accepted, you know, little bit. How much you
11 lose? Five-gallons. Okay. That type of
12 attitude.
13    Q. Do you have any specific recollection
14 of seeing any of those spills while you were a
15 chemical operator either associated with the
16 rail car process, the truck process or the
17 drum loading and unloading process?
18    A. I certainly have.
19    Q. As you sit here today, do you have any
20 specific recollection of quantity that was
21 released in a spill associated with any of
22 those three processes?
23    A. Nothing of an excessive amount, I
24 would say, requiring corrected discipline, no.
25 I didn't see anything like that. However, I
00138

MKSK-FED-0000004242

ALCD-PUBCOM_0006208

1    am aware that some of them did happen, but I
2    personally did not observe any large loss of
3    any product via -- be it drum filling, truck
4    filling or tank car filling.
5        Q.  The spills of product that you had
6    heard about that were of, I think you said
7    they were large spills, do you have any
8    specific recollection of those that would have
9    led to corrective discipline?
10       A.  Personally, no.
11       Q.  So you don't know when those spills
12   would have taken place?
13       A.  As I understand spills that I'm making
14   reference to are still a mystery.  They were
15   unaccounted for.
16       Q.  So it's unknown who or when --
17       A.  Right.
18       Q.  -- those spills were associated with?
19       A.  Correct.  As I understand, they --
20   some investigation was prompted, they did
21   investigate and I never heard any outcome or I
22   don't remember of any employee being
23   disciplined because of a particular large
24   quantity being spilled or dumped or --
25       Q.  Do you ever recall whether any drums
00139
1    with liquid waste were poured out onto the
2    ground at the Newark site?
3        A.  Yes, in Inland's day they brought
4    drums in that were leaking, they continued to
5    leak until they were empty.  It's common.
6        Q.  Were they leaking onto the bare
7    ground?
8        A.  Onto the ground, onto the concrete,
9    there was a storage area, a field sort of
10   between the organic and inorganic plant which
11   was a field which was a storing area for such
12   drums.  In other words good drums, per se,
13   were on the left-hand side, leakers in the
14   back, way in the back on the ground that was
15   SOP as far as I was concerned.  That was my
16   instructions anyhow.
17       Q.  Your instructions?
18       A.  Yeah.
19       Q.  SOP being?
20       A.  Standard Operating Procedures, leakers
21   in the back.
22       Q.  Do you recall who told you that?
23       A.  What individual told me that?
24   Probably one of the Venne's, either --
25   probably Ed.
00140
1        Q.  Ed Venne?
2        A.  Yep.

MKSK-FED-0000004243

ALCD-PUBCOM_0006209

3    Q.  Did you ever -- did you see these
4  drums leak onto the ground?
5    A.  Yeah.  It was common.
6    Q.  Did you ever see anyone pour the
7  content of a drum out on to the soil to empty
8  it out?
9    A.  Yeah.  When they were loading they
10  used to have an outfit come in to pick up
11  empty drums and they get one with a heel -- a
12  heel being part-full, to empty, dump it on the
13  ground 'til it was empty and throw the empty
14  on to the truck.  Oh, yeah that was on -- now,
15  I do not remember whether it was the truck
16  driver and his helper who did that, or if we
17  did it helping him, but it was done.  It was
18  common practice.  Could be rain water, could
19  be product, could have been anything.
20    Q.  Now, would -- is this something that
21  the employees would do on their own or would
22  they be doing it under instruction by
23  management?
24    A.  Management wanted empty drums out of
25  the plant per se, and you were not to load
00141
1  part drums.
2    Q.  So management told personnel to empty
3  out the drums to get them loaded up on the
4  trucks?
5    A.  That's what their procedure was.
6    MS. HAYNES:  Was this -- well, let's
7  see.  Go ahead and mark this next in
8  order.
9    (Partington-2 marked for
10  identification.)
11    Q.  Mr. Partington, I'm going to hand you
12  what we've had marked as Exhibit Two.  It's a
13  map just so that maybe we can start to talk
14  about some locations at the Newark facility
15  that we've been talking about just generally.
16    I'll ask you just to look the map over.
17  It has been photocopied and used several times
18  so it is not the best looking picture, but I
19  want you to just look it over and see if
20  generally you recall this being the layout at
21  the Newark facility during Vulcan Materials
22  ownership of the site and for the record, I'll
23  identify that Exhibit Number Two does not have
24  a Bate stamp but it is entitled Site Plan,
25  Vulcan Materials Company, Newark, New Jersey.
00142
1  It appears to have the date of March 30, 1967
2  created by the Austin Company and it has also
3  been used as Exhibit 29 in Gene Mescher's
4  deposition in this litigation, as well as in

MKSK-FED-0000004244

ALCD-PUBCOM_0006210

5 other depositions.
6    Have you had a chance to review the map?
7    A. Uh-huh.
8    Q. Does that generally --
9    A. Generally.
10    Q. -- fit your recollection of the site
11 during Vulcan's ownership?
12    A. This is Vulcan.
13    Q. You pointed over to the right-hand
14 side?
15    A. Vulcan detinning.
16    Q. Detinning?
17    A. That's where the detinning plant is.
18    Q. On the map it's called Vulcan
19 Metallics, that same area?
20    A. Right now that wasn't part of our
21 facility and the Air Product hydrogen plant
22 wasn't part of our facility either.
23    Q. Vulcan didn't use that either?
24    A. No, Air Product leased or owned that
25 property and we piped hydrogen over the fence
00143
1 to them. So what the -- the new roadway, I
2 don't know what the new roadway is. That
3 wasn't there when I was there. Railroad
4 tracks, the new roadway, that was not there.
5    Q. Oh, the road up the middle off of
6 Wilson Avenue, that looks like it has the
7 title new roadway?
8    A. It says new roadway.
9    Q. That wasn't there when you were there?
10    A. That was not there.
11    Q. Do you recall the general layout of
12 this map, Exhibit Two, is this the same
13 general physical layout of the plant when you
14 were there in 1958 and it was owned and
15 operated by Kolker?
16    A. Yes, it was.
17    Q. Okay.
18    A. Tank farm B was not there. Is that
19 tank farm B the new one, I call it new.
20    Q. Oh, up right underneath the
21 administrative?
22    A. Yes.
23    Q. Administration building number 4?
24    A. That was not there. That was new
25 added too.
00144
1    Q. I can't tell whether that tank farm B
2 or number symbol. You're saying that was new?
3    A. That was new.
4    Q. When Vulcan put that in?
5    A. Correct. The boiler room is the same,
6 the warehouse, electrical shops are all right.

MKSK-FED-0000004245

ALCD-PUBCOM_0006211

7 Building Three is shift foreman's office, tank
8 farm, oil storage, cooling towers, you got it.
9 The only thing missing here is Building One.
10 Building One is not on here. It should be the
11 rear of Building Two, benzoic acid, that
12 should have been a building there, which they
13 tore down to put in the new methylene chloride
14 unit.
15    Q. So that should have been there just
16 east of Building Two?
17    A. Yep. There was a building there which
18 housed the ester unit back in those days, but
19 it's not there. It shows methylene chloride
20 after expansion, I guess. It's basically all
21 there, though.
22    Q. Let me show you one other map, we'll
23 have marked it's a later generation map, we'll
24 mark it as Exhibit Three first, then I'll hand
25 it to you?
00145
1    A. Yeah. Sure.
2    (Partington-3 marked for identification.)
3    Q. Okay. Now, Mr. Partington, I'm having
4 you look at a document, one-page document
5 we've had marked as Exhibit Three, it bears a
6 Bate stamp at the bottom SKE 244057 and the
7 legend states that it's an Overall Site
8 Location Plan. The name on there is McKesson
9 Envirosystems Company or 600 Doremus Avenue,
10 Newark, New Jersey, environmental compliance.
11 The writing is difficult to read. It's
12 difficult to tell the date, but I'll ask you
13 if this Exhibit Three map fits your
14 recollection of the layout at the Newark site
15 once Inland took over after it sold off part
16 of the Vulcan property?
17    A. Here, again, you -- the map does not
18 show the methylene chloride plant. It's gone.
19    Q. Was that in place during --
20    A. That was there when I was there, yes.
21    Q. When you were there? Okay?
22    A. It does not show the lab. That's
23 gone.
24    Q. There's a lab office boiler room at
25 the northern most part of the property. Is
00146
1 that not the lab you're thinking of?
2    A. No, this lab here.
3    Q. You're looking at the lab on Exhibit
4 Two?
5    A. Yes. That's gone. Building Seven
6 maintenance was not this configuration now. I
7 don't know what has happened. Building Two,
8 process storage and drum storage and area D-5

MKSK-FED-0000004246

ALCD-PUBCOM_0006212

9  I'm unfamiliar with. The lab off this boiler
10  room complex was not the same when I was
11  there. Area D-6, whatever that is, was not
12  there when I was and the tank farm that's all
13  along that fence is gone. You got area D-3,
14  D-4 process area was not on -- was not there
15  when I was there. Now, areas D-1, D-2, D-1A
16  that's all new. I don't know what the heck
17  that is. That's not the same as I remember
18  when I was there.
19      Q. Okay.
20      A. And I don't know what this enclosure
21  is here. It's not clear on my map. It looks
22  like some sort of an enclosure that was not
23  there when I was there.
24      Q. Why don't we --
25      A. It's quite a change.
00147
1      Q. Well, then why don't we put Exhibit
2  Three, that map, off to the side since that
3  will just confuse the issue and your
4  recollection of what was at the site when you
5  were there.
6      A. This is close to it. It should be.
7      Q. Exhibit Two is? Okay. And that's the
8  Vulcan 1967 site map?
9      A. Now, on Exhibit Two the new roadway
10  was not there. It was either proposed -- it
11  was not there when I was. In the map a former
12  dirt road location approximately -- that was
13  not there either, this is something that
14  happened after I left or something, or is it
15  proposed. I don't know. But the railroad
16  track to the Building Two area is the same.
17  The railroad track over in the chlorine area
18  is the same.
19      With the exception of these two roads,
20  this is more or less what I can recall of my
21  time there at 600 Doremus Avenue.
22  Administrative building is good, tank farm,
23  good, boiler room, okay, the warehouse
24  building, warehouse and shop, that used to be
25  the maintenance shop, that's the same. The
00148
1  electrical shop and the lunch room, that was
2  there. Building Three used to be the shift
3  foreman's office, Tank Farm Number Six was the
4  oil storage tanks for the boiler, benzoic acid
5  is the same. But in Inland Chemical's day,
6  the Benzoic acid was the unit they brought
7  down, they converted that to DMA, dimethyl
8  aniline plant. Where the Benzoic acid is,
9  that was converted to the DMA plant.
10      Q. Why don't you do me a favor, just use

MKSK-FED-0000004247

ALCD-PUBCOM_0006213

11 a pen instead of that pencil, just circle the
12 reference to the Benzoic area, Benzoic acid
13 area that you're referring to, put a circle
14 around it. Now, draw an arrow up into a blank
15 spot, if you can up, high. Put it where
16 there's no writing, out somewhere where
17 there's no writing.
18    A. DMA.
19    Q. Why don't you put Inland in
20 parenthesis after that so we're clear that's
21 during Inland's time when they used that as a
22 DMA processing area. Okay. Great. Thank
23 you.
24    Let's see, let's look at some other
25 spots. Maybe we can have you mark on the map
00149
1 so let me let you hang on to my pen for a
2 minute.
3    Before we had pulled out the maps to use
4 as exhibits you had testified that there was a
5 field area where drums were stored?
6    A. Uh-huh.
7    Q. Can you use the pen and mark that area
8 for me?
9    A. Yeah, it was right behind Building
10 Seven and the start of the chlorine plant, now
11 where is -- I see tank farm in here and we had
12 no tank farm there. New -- all right, this
13 area here which was sold off to Van
14 Eiderstein, this area over here is prior to
15 that, this was an open field from this
16 roadway, right in here this was open field.
17    Q. Okay.
18    A. This whole area, there was no tank
19 farm there either.
20    Q. Okay.
21    A. Drum storage.
22    Q. And you've, with the pen, you've made
23 a box, a rectangle I should say.
24    A. A rectangle.
25    Q. The right side of rectangle falls
00150
1 right on the line on the map is called base
2 line?
3    A. That's the base line. Is that the
4 part that this whole --
5    Q. They've just called it base line. I'm
6 not sure what it refers to just so the record
7 has a demarkation in it of where your box is
8 and we're marking on Exhibit Two and inside
9 the box you've written drum storage, paren,
10 Inland, closed paren. That's the field area
11 where you said Inland had drums stored,
12 stacked one on top of the other?

MKSK-FED-0000004248

ALCD-PUBCOM_0006214

13    A. Correct.
14    Q. Were they right on the ground or
15 pallets underneath them?
16    A. On the ground. There were pallets,
17 they were palletized and then they were
18 stacked -- either palletized or one on top of
19 each, depending.
20    Q. Okay.
21    A. They were cardboard type, they were
22 palletized, if they were the metal type they
23 usually went four high. They had drum pickers
24 and they stacked them on top of a base, as I
25 remember it.
00151
1    Q. Can you use the pen and mark for me,
2 put an X in the area where you saw people pour
3 the contents of drums out onto the ground to
4 empty out the drums?
5    A. This would be in the same area.
6    Q. Within the same drum storage area?
7    A. In that same area somewhere. Whenever
8 this -- it would be opposite the methylene
9 chloride plant, so I'm going to go exit right
10 here. This is where they were loading because
11 this was paved up through here.
12    Q. Kind of like a roadway at the top
13 there?
14    A. Yeah.
15    Q. From that X put an arrow off like up
16 into the blank area somewhere, and let's just
17 mark that as --
18    A. Now, here again let's be careful.
19 This is an area I remember, however, they
20 loaded any place.
21    Q. Okay.
22    A. As the drum storage was deleted,
23 empties were taken, they would come into the
24 whole area.
25    Q. This is the area that you specifically
00152
1 recall seeing it?
2    A. Yeah. It was opposite the methylene
3 plant because coming down the steps, I'm
4 thinking, I remember saying what in the hell
5 are they -- well, never mind.
6    But this is one area that stands out in
7 my mind.
8    Q. And for the record, you just want to
9 make it clear that that could have happened at
10 any --
11    A. Any place.
12    Q. -- point within the drum storage area?
13    A. Yup. Drum loading.
14    Q. And with the -- you have marked drum

MKSK-FED-0000004249

ALCD-PUBCOM_0006215

15  loading with an arrow and the X, the X
16  delineates the area where you saw them pour
17  the drums on the ground.
18          MS. ANDERSON:  If I could interject
19      for the record, he's marked an X just to
20      the north of where the map indicates Tank
21      Farm Number Four.
22      A.  Which I don't have a recollection of.
23      Q.  You have no recollection of Tank Farm
24  Number Four?
25      A.  Whatever that was.  Whatever it is,
00153
1  because that was right opposite the methylene
2  chloride plant as my memory serves me right,
3  that was an open field in my day.  I don't
4  know when they threw that in there.  It was
5  during '68, it was taken down.  I don't
6  remember that.  I don't remember.
7      Q.  Was that -- was that product in the
8  drums that you know of?
9      A.  I didn't sample it.  I didn't have it
10  analyzed.  I don't know what it was but it was
11  material.
12      Q.  Would that material have been dumped
13  like that without --
14      A.  It was not an open top drum.  It was a
15  closed drum with bunks on it.
16      Q.  Did they pour the product right out of
17  the bunk hole?
18      A.  They poured it right out the bunk
19  hole.
20      Q.  Would they have done that without the
21  plant manager knowing what they were doing?
22          MS. RYNIEC: Objection.  Calls for
23      speculation.
24      A.  It's very possible.  I don't know.  I
25  wasn't in charge of that particular phase.  I
00154
1  would say it was not uncommon.  The practice
2  was not uncommon, because as I stated earlier,
3  you were told to load drums.  You didn't load
4  half-full drums, quarter-full drums, you
5  loaded empty drums.  Whether it be the
6  employees of Inland Chemical or the driver and
7  his helper, I couldn't tell you who, but I did
8  see drums being emptied to the ground just off
9  of this paved area, which was all, it was all
10  landfill-type of dirt and rock and what have
11  you.
12      Q.  Where were the empty drums going to,
13  do you know?
14      A.  No idea.  I have no idea.  I heard
15  that it was some outfit -- I heard this now, I
16  don't know this, someplace in Elizabeth was

MKSK-FED-0000004250

ALCD-PUBCOM_0006216

17    taking all that they could send them.
18        Q. Elizabeth, New Jersey?
19        A. Yes. There was a drum recycling
20    center there or something, and I also heard
21    years later that the environmental people
22    closed them down. They got some stiff fines,
23    they had a mess somewhere in Elizabeth. Now,
24    I understand that's where the drums went, some
25    of them. I did not see bill of lading, I was
00155
1    not involved in the shipping, arranging,
2    scheduling or anything.
3        Q. Did you say --
4        A. So there.
5        Q. Did you say anything to anybody when
6    you saw them pouring it out on the ground, the
7    product or material?
8        A. I'm sure I did. Somebody in
9    management?
10        Q. Yeah.
11        A. Who knows. I don't know. I think
12    back in those days when Inland got there the
13    overall morale was bankrupt so, therefore, it
14    didn't matter anymore. Was one of those --
15    one of those type of situations where we could
16    see what was happening. We -- by that I mean,
17    the older people, people that were there for
18    years and sort of didn't agree what was going
19    on, but the paychecks still kept coming in.
20    The whole story.
21        Q. Can you mark on the map for me, I'll
22    hand you the pen back, I don't -- was there
23    more than one loading and unloading area for
24    the railroad cars?
25        A. Well, here again, railroad cars
00156
1    depended on what now -- opposite Building
2    Seven here, which was the warehouse for drums
3    and what have you, there was this warehouse
4    here, there was rear doors on it, track here,
5    double tracks -- there's no double tracks but
6    there was --
7        Q. It looks like there's a set of track
8    here.
9        A. And there were double tracks.
10        Q. Okay.
11        A. So this area was used for loading
12    drums mostly. They came out of this warehouse
13    or even up in here, there were double tracks
14    here, too, up by the methylene chloride plant,
15    so I would say from about here.
16        Q. Go ahead and mark that.
17        A. It was from this area here to -- where
18    am I at, down to methylene chloride, methylene

file:///qnapnas/Concordance/Concordance/Cases/03_Mckesson/09_NewarkLand/TRANSCRIPTS/Parting...  Bernard%20Oehm...  4/14/2009 9:44:30 AM

MKSK-FED-0000004251

ALCD-PUBCOM_0006217

19  chloride was right in here.  I'll include
20  that.  That was tankers, though, tank cars.
21     Q.  I want to do rail cars first, if I
22  can.
23     A.  Box cars?
24     Q.  Yeah.
25     A.  Box cars would have been anywhere up
00157
 1  to here, I guess.
 2     Q.  Tank trucks next?
 3     A.  Tank cars were also --
 4     Q.  Tank cars.  Okay.
 5     A.  -- back in this area where the
 6  methylene chloride was, there was a double set
 7  of tracks to, I believe, there was room for
 8  four cars.  There was a double set of tracks,
 9  it shows -- see it here, one set goes this way
10  and there was another set, there was double
11  tracks approximately 50 to 75-yards from the
12  end of this building back to methylene
13  chloride.  Offhand, I don't remember, I think
14  it was enough space for four tank cars, for
15  eight total.
16     Q.  So this area would be rail cars,
17  loading and unloading and this would include
18  tank car loading and unloading?
19     A.  Right.
20     Q.  Let's put an ending point where the
21  rail cars would end.
22     A.  Right.  This.  There.
23     Q.  If we called this A and B, rail cars
24  would be loaded and unloaded between, on the
25  tracks between point A and point B, would that
00158
 1  be fair?
 2     A.  Yeah.
 3     Q.  Why don't we put an A -- an A, B, and
 4  a C then, and then we can describe it and it
 5  will make sense, we can see it written out.
 6     A.  Now, see, this here was a hundred
 7  thousand gallon methylene storage tank, so
 8  this is why the loading was done here.  There
 9  was, as I stated, as best I can remember,
10  there was storage space for eight cars.  I'm
11  pretty sure.  I could be wrong, maybe only
12  six, I don't know.  But it seems to me there
13  was enough space here to do that.
14     Q.  Well, why don't -- so then it's fair
15  to say between -- on the railroad tracks
16  between the line A and line B that was the
17  rail car, railroad car loading and unloading?
18     A.  Box cars.
19     Q.  Box car loading and unloading, and
20  then between the lines on the railroad track

MKSK-FED-0000004252

ALCD-PUBCOM_0006218

21 marked B and C on that area of track, it's
22 tank cars loading and unloading?
23    A. Yeah.
24    Q. Why don't we, since you just
25 identified something else, probably be good to
00159
1 mark on the map, that tank.
2    A. It is -- that's storage tank.
3    Q. I think it says Tank Farm Number One
4 it looks like?
5    A. But that's the methylene chloride
6 storage tank.
7    Q. Let's mark that, can we put a little
8 area, what was that, a hundred thousand
9 gallons you said, methylene storage tank?
10    A. Yep, it's the chemical abbreviation.
11    Q. So for the record --
12    A. CH2CL2 storage tank.
13    Q. Just to the east of the drummed
14 storage area and slightly north is a circle
15 within a square where it says tank farm on the
16 map and we -- Mr. Partington has indicated
17 that that's CH2CL2 storage TK?
18    A. Tank.
19    Q. For the methylene chloride storage
20 tank?
21    A. Uh-huh.
22    Q. That's a hundred thousand gallons?
23    A. Right.
24    Q. Now, if we can do, similarly mark the
25 map with respect to the tank truck or the
00160
1 tractor trailer loading and unloading areas?
2    A. Well, here again, we shipped chlorine
3 via tank trucks.
4    Q. Chlorine off -- the finished product
5 off the plant?
6    A. Right. That was over here which
7 you're not even concerned with anymore.
8 Chlorine plant is gone, right, Tank Farm B is
9 it the front tank farm, trucks would load on
10 the, what, east-west-north -- this is south, I
11 think.
12    Q. Up in the upper right-hand corner is
13 north arrow.
14    A. It would be south, the south end of
15 this tank farm was a truck on loading station.
16 This tank farm here this is how the storage
17 tanks were unloaded, so that's one spot.
18 Another spot could have been east of the
19 Benzoic acid or was a DMA area. There's an
20 alley here, this used to be an ally. It's
21 still there. They used to load and unload
22 here.

MKSK-FED-0000004253

ALCD-PUBCOM_0006219

23    Q. Why don't we mark the first loading
24 and unloading area that you referenced
25 underneath the tank farm?
00161
1    A. What are we going to call it? E?
2    Q. How about L? U-L for loading,
3 unloading?
4    A. L?
5    Q. U-L.
6    A. U-L.
7    Q. Call it number one.
8    A. And this here other area L-2 area.
9    Q. L, U-L number two. How is that?
10    A. Okay.
11    Q. Okay.
12    A. Now, that was only for Inland, that
13 wasn't Benzoic acid no more. It was DMA
14 remember.
15    Q. For the loading and unloading area
16 number two?
17    A. Right. Wastewater used to be loaded
18 out here on this roadway. This is a roadway
19 all the way through here. Now that would be
20 L-V-3.
21    Q. That's another loading/unloading area,
22 I guess? Actually only unloading?
23    A. Loading, loading wastewater into it.
24 You should have a legend, L-1 means solvents
25 and L-2 means raw materials for DMA and
00162
1 production.
2    Q. Okay.
3    A. And L-3 could be the wastewater
4 storage facility. Wastewater was taken out
5 here.
6    Q. Is there -- do you know if wastewater
7 was ever stored at the Newark facility?
8    A. Just in the storage tank, that's all.
9    Q. Do you know where the wastewater
10 storage tank is located?
11    A. No. It doesn't show it here.
12    Q. Do you have a recollection as you
13 look at the map where it would be?
14    A. No, not offhand. There's nothing
15 helpful here.
16    Q. Any other loading truck --
17    A. I don't remember. See, there used to
18 be -- what's got me confused is they penciled
19 in Benzoic acid here as part of this building.
20 Now, in Inland that was true -- back before
21 Inland got there, Inland converted this to a
22 DMA manufacturing area. In fact, in this
23 building is where an employee of McKesson got
24 killed, I believe, in this Benzoic acid or DMA

MKSK-FED-0000004254

ALCD-PUBCOM_0006220

25  area.
00163
1     Q.  Was that after you left the plant?
2     A.  After I left.
3     Q.  Is that the fire and explosion in
4  19 --
5     A.  Uh-huh.  They changed the
6  configuration and I am searching, believe me,
7  my memory -- but as I recall there were tanks
8  here at one time, there were tanks in this
9  area here, there was muriatic acid tanks here.
10  There was sulfuric acid storage, methanol
11  storage and then there was in this particular
12  area here, there was a methyl chloride
13  manufacturing area which has been deleted.
14     Q.  During whose tenure, these tanks that
15  you're just talking about in this area, who?
16  Vulcan?  Inland?  Who was that?
17     A.  Vulcan and Kolker Chemical.
18     Q.  Just so that we don't lose this, for
19  the record, can you box in that storage tank
20  area and processing area that you're talking
21  about is missing on this map?
22     A.  This is missing.  It's similar to
23  this.  Because I'm taking -- these are two
24  storage tanks, I believe that's what they are,
25  the methyl chloride.  Those two little ovens
00164
1  inside the Benzoic acid lines.  They
2  discontinued this when they converted this to
3  a DMA operation.
4     Q.  The Benzoic acid portion?
5     A.  This was methyl chloride, methyl
6  chloride.
7        MS. HAYNES:  Just for the record, the
8        witness has marked a box area just south
9        of the Benzoic acid building reference to
10        the Building Number Two, Benzoic acid, the
11        Benzoic acid to the west of that Building
12        Number Two and just to the right of the
13        loading and unloading area number two and
14        he's marked inside the box --
15     A.  MECL-2.
16     Q.  MECL-2 unit, and that's the methylene
17  chloride unit that was used by Kolker and
18  Vulcan, but you're not seeing it on the map?
19     A.  No, it's not there.  That's my job
20  when I first came.
21     Q.  When you were a chemical operator?
22     A.  Yep.
23     Q.  That's the area you worked the
24  methylene chloride unit?
25     A.  Right.
00165

MKSK-FED-0000004255

ALCD-PUBCOM_0006221

1    Q.  Were there any other tank truck
2  loading and unloading areas other than the
3  number one, two and three that you put on the
4  map?
5    A.  This is just in this area.  Now, over
6  here you want to talk about the chlorine
7  plant?  The chlorine plant had its own, it had
8  a truck loading station over here somewhere,
9  there was an HCL tank cars.  Where is the
10  bleach plant?  Doesn't show the bleach plant.
11  Bleach plant is here, I believe, but this is
12  all these -- it's not a very good description
13  or a clear enough picture to really -- see
14  this.
15    Q.  Was it your recollection generally
16  that the southern half of the plant -- this is
17  related to the chlorine?
18    A.  This is all chlorine, this is all
19  chlorine, the cell houses were here.  Chlorine
20  plant was here, this is the new cell house.
21    Q.  New cell block.  Right?
22    A.  That was the expansion.
23    Q.  In the blue and it says chlorine
24  plant?
25    A.  Caustic plant.
00166
1    Q.  Caustic plant?
2    A.  That was the evaporation area, control
3  room, liquid -- this here was the rectifiers,
4  this was the yard, the transfer yard for the
5  power incoming power and there's an office
6  area right here, this was an office area, this
7  here was an office and this was a loading
8  facility, the chlorine storage tanks were
9  here.  One, two, three, these are the two
10  sniff scrubbers looks to me.
11    Q.  Why don't we mark --
12    A.  I'll go crazy here.  We'll be here
13  'til nine o'clock.
14    Q.  Just circle this area right here.
15    A.  Can you get a blow-up of this?  It
16  could be more helpful because this is limited
17  here.  It's so condensed that it's not
18  legible.
19    Q.  I might be able to have a blow-up
20  version tomorrow.
21    A.  It's not legible.  It's running into
22  one another.
23    Q.  This lower half that's referenced as
24  the chlorine plant, that's the half -- that's
25  the production side that Inland shut down when
00167
1  they took over the plant.  Right?
2    A.  From base line whatever that is over.

file:///qnapnas/Concordance/Concordance/Cases/03_Mckesson/09_NewarkLand/TRANSCRIPTS/Partington/20020Bernard%20Wolan/7/12/2019 9:54:54 AM]

MKSK-FED-0000004256

ALCD-PUBCOM_0006222

3  In fact, this new -- if you put the new up
4  against with the old they say Building Seven.
5      Q.  Looking at Exhibit Number Three
6  compared to Exhibit Number Two?
7      A.  I imagine that's the new property
8  line, is it not?
9      Q.  That's my understanding.
10      A.  That's what they cut out from Building
11  Seven, all of this is cut out and that's --
12  and the area has been changed quite a bit
13  because this area no longer, this Building Two
14  is here, but the new area in here has all been
15  changed and across the tracks are gone, this
16  is --
17      Q.  I think these are supposed for the
18  tracks, I don't know that they were used?
19      A.  Terrible draftsman.  The next case you
20  get, do not employ Sullivan Engineering Group.
21  It's pretty difficult to describe what I
22  recall from this print.
23      Q.  From the operations end of things,
24  I'll try not to ask you too many detailed
25  questions based on that.
00168
1      A.  I did damn good considering 40 years
2  ago, but to the best of my recollection this
3  is what we were describing about the drum
4  storage area.  There was an open field here
5  and I believe it is still there,  in fact, it
6  doesn't show anything there, this is probably
7  still open between Building Seven and here it
8  doesn't show anything so probably that field
9  is still there across the street from the
10  methylene chloride plant prior to -- yeah.  Is
11  that all paved now?
12      Q.  I don't know.  Let me pass me Exhibit
13  Number Three just to keep that top map, just
14  to keep that out of the way so we don't
15  confuse things.
16      I want to ask you, did -- we've been
17  talking briefly about drums and drum storage
18  during Inland's time and is it true that
19  Kolker and Vulcan used drums for product as
20  well?
21      A.  Yeah, certainly, but they were not in
22  the reclaim business.  Inland was.
23      Q.  Were there areas where Vulcan and
24  Kolker stored their drums?
25      A.  Vulcan and Kolker kept them mostly
00169
1  inside of Building Number Two and the storage
2  area number two building was methylene
3  chloride drumming facilities there.
4      Q.  Okay.

MKSK-FED-0000004257

ALCD-PUBCOM_0006223

5    A. And Kolker and Vulcan did the same.
6 They housed their drums or their methylene
7 chloride in that particular, that was mostly
8 the drumming and chloroform and carbon tet,
9 all the solvent was done in that building and
10 stored there under -- well, it wasn't out in
11 the open and some of the process orders or lot
12 numbers that were picked up by truck were
13 stored in the new warehouse which was high, I
14 believe, I don't know how high. My
15 recollection has it they were neat and
16 orderly. Clean, I even knew the foreman of
17 the warehouse facility was a meticulous
18 fellow. His name was Kenneth Adams. He was a
19 stickler for cleanliness and orderliness. He
20 was an excellent supervisor. He was the
21 warehouse foreman at that time and he was
22 about ten years older than I am, so if the
23 good Lord was good to him, he may still be
24 around. I don't know.
25    Q. The Building Number Two that you were
00170
1 referring to as the clean drum storage for
2 Kolker and Vulcan, that's just for reference
3 for the record, that's Building Number Two on
4 Exhibit Number Two, the big map that you're
5 pointing to?
6    A. Right.
7    Q. The new warehouse that you're talking
8 about, is that a warehouse that Vulcan put in?
9    A. It was an addition to the new
10 warehouse behind Building Seven that was built
11 in, Vulcan and Kolker started in, Vulcan
12 finished it. One or the other. I forget now.
13    Q. That's the area on Exhibit Number Two
14 marked Building Number Seven a warehouse?
15    A. Correct. It was considered the new
16 warehouse.
17    Q. Okay.
18    A. Because memory doesn't serve me right,
19 I don't know if Kolker was in the process of
20 it and Vulcan finished it or it was finished,
21 part of the sale. I can't remember. But I do
22 remember the supervisor in charge of the
23 facility and what have you, and he was an
24 excellent type of an individual, orderly,
25 neat, he was one of the better management
00171
1 staff.
2    Q. Did he stay on when Inland took over
3 the plant?
4    A. No. Inland -- he stayed shortly, I
5 believe, and he had a falling out very early
6 with somebody, I don't know what the

MKSK-FED-0000004258

ALCD-PUBCOM_0006224

7 particulars were.

8    Q. I want to ask you again, we've been
9 talking in detail about how product comes into
10 the Newark facility for use in operations by
11 Kolker in 1958.  We talked about the rail, the
12 box cars, the rail cars, tank trucks and
13 drums, the procedure for product to come in at
14 the Newark facility.  Were the methods and
15 procedures the same when Vulcan took over the
16 Newark facility?

17    A. No.

18    Q. If you can tell me how they were
19 different?

20    A. Vulcan sampled all incoming trucks and
21 had it checked by the lab for content, quality
22 and everything else before it left.  Vulcan
23 also did the same while loading a truck for
24 shipment or a tank car.  It had to be approved
25 by the lab before the seals were installed on

00172

1 the hatch covers or the valves or whatever,
2 before it was allowed to leave the plant.
3 There was a sense of quality control when
4 Vulcan took over.  There was some of this in
5 Kolker's day.  In other words, they would not
6 ship contaminated tank car of methylene
7 chloride.  There was product checks, but
8 incoming, no, I can't recall or had no
9 dealings with a procedure set up for all raw
10 materials coming into the plant.  If I
11 remember correctly, some were and some
12 weren't.  The rule was not really enforced as
13 much in Kolker's days but they did have some
14 of it, like fuel oil coming in, it would have
15 to be Bunker Six, the sample would be with
16 them.  Whether they sampled methylene or
17 toluene, I don't know.  There was some
18 products that came in there that I had no,
19 nothing to do with whatsoever.

20    Q. So, other than the sampling conducted
21 by Vulcan when they took over the Newark
22 plant, is there anything else that you can
23 think of procedurally that was different about
24 the operations conducted when product came
25 into the Newark facility?

00173

1    A. Well, yes.  When Inland first arrived
2 on the scene, drums came in of unknown quality
3 and, you know, we didn't know what was in
4 them.  One of the employees from the lab would
5 have to sample each individual drum to know
6 what they had.  In other words, they accepted
7 whatever was in the drums on the site and then
8 after they were on the site they were then

MKSK-FED-0000004259

ALCD-PUBCOM_0006225

9  sampled and processed via the lab.
10    Q. That the sniff testing you were
11  telling me about?
12    A. Yeah, if it smelled like solvent put
13  it in that pile. If it looked oily, put it
14  over there, and they had no idea. This is
15  when I formed the opinion that this was a slop
16  outfit, you know, just recovering, you know,
17  it was unheard of, I mean. But there was some
18  sort of a deal set up obviously.
19    Q. Anything else --
20    A. No, because.
21    Q. -- that you can think of that's
22  different about the procedure for incoming
23  product?
24    A. Not really.
25    Q. Other than what you describe for the
00174
1  Kolker years?
2    A. No. Kolker did quality checks on
3  their product before it left. Now, however,
4  they weren't that concerned with raw
5  materials. Best of my recollection, I mean, I
6  don't remember them having the same type of
7  quality control that sort of stands out in my
8  mind. Once Vulcan got there, Vulcan wanted to
9  know what they were getting, every ounce,
10  every pint, every crumb. They had, they
11  wouldn't unload the particular tank truck or
12  tank car unless the lab said it was approved.
13  It was of the quality that they had ordered or
14  expected.
15    Q. What about just the general method of
16  product coming into the Newark facility and
17  then being unloaded from rail cars, tank cars,
18  tank trucks or drums, was anything about
19  procedures used by Vulcan or Inland different
20  from what you've already described for Kolker
21  other than Vulcan was stringent about sampling
22  incoming product and Inland got, had drums of
23  product coming into the plant in a way that
24  hadn't been seen before? Anything else about
25  the way the product came in, either the
00175
1  method, the way it came in or the way it was
2  pumped into tanks?
3    A. Not really, vendors are about the
4  same. The only difference in the truckers or
5  haulers was the drum trucks coming in with
6  their flat bed trailers with a load of drums.
7    Q. That was in the Inland period?
8    A. Inland. Right.
9    Q. Were those Inland drivers?
10    A. No. I think they were over the road.

MKSK-FED-0000004260

ALCD-PUBCOM_0006226

11 Some of them might have been, I don't know.  I
12 know Inland had their own fleet but...
13    Q.  Okay.  When you were pointing at the
14 map, you had referenced this, there was a
15 wastewater loading area, was that during
16 Vulcan's tenure or Inland?
17    A.  Inland.
18    Q.  And it's loading up into a tank truck?
19    A.  Yeah, they used to truck it to New
20 York someplace, I don't know where, they
21 trucked it to New York.
22    Q.  Do you know if that wastewater was
23 ever put into a storage tank during Inland's
24 tenure?
25    A.  Oh, yeah.  They had a storage tank for
00176
 1 it and they loaded, you know, so many tank
 2 trucks, or it was from the DMA process as I
 3 remember.
 4    Q.  Was wastewater from the DMA  process?
 5    A.  Yeah.
 6    Q.  Do you know during Inland's tenure
 7 did they discharge wastewater effluent to the
 8 Newark Bay?
 9    A.  Personally did I see it?  No.  Did it
10 happen?  Probably.  I don't know.  Nothing
11 stands out in my mind.  Nothing being done
12 deliberately that I can remember.
13    Q.  Before I let you go for the day, I
14 wanted to ask you, are there any former
15 Kolker, Vulcan or Inland employees that you
16 still keep contact with?
17    A.  Yeah.
18    Q.  Who would that be?
19    A.  Steve Kapasky, K-a-p-a-s-k-y.
20    Q.  Who did he work for?
21    A.  Vulcan, Inland, Kolker, management,
22 shift foreman.
23    Q.  Does he live in this area?
24    A.  Yes, he does.
25    Q.  Do you know where he lives?
00177
 1    A.  Sure I do.
 2    Q.  Where is that?
 3    A.  I ain't gonna tell you. You want him,
 4 go find him.  He doesn't want to be bothered.
 5 He's retired.  He's enjoying himself.  He was
 6 surprised that I was called after all these
 7 years.
 8    Q.  Did you talk to Mr. Kapasky about
 9 giving your deposition?
10    A.  Yes, I did.
11    Q.  And what did you tell him?
12    A.  I told him I don't know what the hell

MKSK-FED-0000004261

ALCD-PUBCOM_0006227

13  it's all about, Steve. After all these years
14  but for some reason they want to know what I
15  know or something. I don't know. He says,
16  "Better you than me." His exact words. Don't
17  you dare tell him where I am. I tell them, I
18  know I am -- he's in the phone book.
19      Q. Is there any other former employee you
20  keep in contact with?
21      A. He's about the only one. Occasionally
22  I might run into the old employees but they
23  are all over the place. I don't socialize
24  outside of Steve. Steve and I go to Atlantic
25  City once in a while.
00178
1       Q. Are there any employees alumni
2   associations or anything that you know of?
3       A. No. I think our experiences with
4   these people were better forgotten. It
5   wasn't -- it was a living, I say that.
6   Brought a family up but...
7       Q. We are done for today and we will
8   start back up tomorrow at 11 o'clock in the
9   morning.
10      A. You said 11:30.
11      Q. No. I said 11 o'clock. It will be
12  here at the hotel and you'll need to check
13  before you leave today -- we'll check and see
14  which room. We're done. We can go ahead and
15  go off the record.
16  (At this time the deposition is adjourned.)
17
18              -----------------
19              Bernard Partington
20
21
22
23
24
25
00179
1       C E R T I F I C A T E
2      I, MICHELLE DIPIERRO-FAIREY, a Notary
3   Public and Certified Shorthand Reporter of the
4   State of New Jersey, do hereby certify that
5   prior to the commencement of the examination,
6   the witness (s) BERNARD PARTINGTON was sworn
7   by me to testify the truth the whole truth and
8   nothing but the truth.
9      I DO FURTHER CERTIFY that the foregoing is
10  a true and accurate transcript of the
11  testimony that was taken stenographically by
12  and before me at the time, place and on the
13  date herein before set forth.
14      I DO FURTHER CERTIFY that I am neither a

MKSK-FED-0000004262

ALCD-PUBCOM_0006228

15 relative nor employee nor attorney nor counsel
16 for either of the parties to this action, and
17 that I am neither a relative nor employee of
18 such attorney or counsel, and that I am not
19 financially interested in the action.
20 _____
21    MICHELLE DIPIERRO-FAIREY, CSR
22    A Notary Public of the State
23        New Jersey
24 My commission expires:
25 July 2000

MKSK-FED-0000004263

ALCD-PUBCOM_0006229

# Exhibit 97

# GOV. MURPHY'S INAUGURAL

## His Installation as New Jersey's Chief Executive.

### Urgently He Recommends Purification of the Passaic, Election Law Reform, and State Care of a Consumptive Poor.

TRENTON, N. J., Jan. 21.—The inauguration of Franklin Murphy as Governor of New Jersey took place at Taylor's Opera House at noon to-day in the presence of an audience which filled the building. The members of the two houses of the Legislature occupied seats on the stage, among those in the boxes were members of Mr. Murphy's family.

Gov. Murphy came to Trenton last evening, and he and the retiring Governor spent the night at the residence of Adjt. Gen. Oliphant. They were escorted to the opera house by the Joint Inaugural Committee of the Legislature.

The oath of office was administered by Chief Justice Gummere of the Supreme Court. Retiring Governor Voorhees, in handing to his successor the great seal of the State, spoke very briefly.

After the inaugural exercises the new Governor, Retiring Governor Voorhees, the members of the Legislature, and State officials were transferred in carriages to the reviewing stand in front of the State House to review the parade.

In this parade, including the National Guard, there were probably eight thousand men in addition to the four regiments there were two batteries and two troops of cavalry. In the civic part of the parade the Drake Zouaves of Elizabeth and the Prehnmhuysen Lancers attracted the most attention. Both had unique uniforms. The parade was a success, notwithstanding the threatening weather, and it was long after the parade was over that rain began to fall. Gov. Murphy held a reception at the State House this afternoon and evening.

In his address the Governor said, after paying a tribute to the administration of Gov. Voorhees:

"The most important subject to which I can call your attention at this time is the pollution of the Passaic River from the adjacent population, which has destroyed the use and beauty of a noble stream and gravely imperiled manufacturing and prosperity interests along its banks. The condition is merely to pay the penalty of exceeding negligence. The conclusion which permits this violation of natural conditions must be repealed by legislation.

The State's responsibilities extend to all its branches of government, and in this case the fact that political divisions do not conform to natural divisions makes it necessary for the State to provide for common action in severance by methods different from those which prevail in other functions of government.

"We have never elapsed since the Legislature first considered this question, and it is high time for final action and immediate action. The general method of State supervision on the sewers which have been adopted meets with approval; each local community should be required to regulate its sewerage as to avoid nuisance to adjoining communities; and the regulation of this subject through proper authority is the sole means of preventing disaster to the public health and of obtaining the best results for each. I strongly recommend favorable action.

"The State of New Jersey has an election law which has produced upon the whole, excellent results. Theoretically and practically, if the voters so desire, it secures a secret ballot. But however excellent the law may be, it is still possible to make it better.

"I have said the ballot is theoretically secret. Experience has demonstrated that it may be so only in theory, and that the ingenuity of the schemer is quite equal to the task of destroying its secrecy. Two ways of improvement suggest themselves. The first is by amending the present law so that no ballot shall be obtainable by the voter except from the election official, and if the law be so amended I suggest that Massachusetts form of ballot be, perhaps the best yet devised. The second is the use of the voting machine in the place of the ballot.

"I commend to the Legislature the amendment of the election law so that the ballot shall be secret in fact. In my State experiment was tried and abandoned, but in many sections and not because a majority of the people were dissatisfied with it, for in New York, (and it is so conceded,) there is no reason why it should not work well in New Jersey.

"I also recommend the passage of a primary election law. Our primaries are still under the free conduct of party conventions. It is currently reported, and perhaps generally believed, that in more than one case the popular will in the convention is rigged itself, the popular choice set aside, by practices and procedures quite beyond the methods under which party is the very serious matter. It is earnestly suggested that further legislation upon this subject be enacted, and I recommend that the primaries of the two great parties be held under the supervision of the regular Boards of Election, and that the expense of holding same be met out of the public funds.

"The finances of the State continue to be in excellent condition. The receipts of the last fiscal year were $8,850,811.30, and the disbursements were $8,468,283.18, leaving over the disbursements being $390,461.90. The expenses of the year, properly charged to current account, expenses of the State and its institutions, amounted to the large sum of $1,184,965.55, leaving as the surplus expended for the total amount of expenses, $2,349,285.10, and after the appropriation of the current year expenses, $1,480,524.56. The surplus in the Treasury on Oct. 31 was $2,551,687.17. The State is entirely free from debt.

"The disposition of a portion of the large surplus now in the treasury is an important subject. No State surplus should be allowed to accumulate. It is larger now than it should have properly been. The interests of the State require. It belongs to the people of the State and should not be held for the benefit of the next. The money which these people are entitled to will receive it now, and a reasonable portion may be used either in the reduction of annual taxes, the repair and enlargement of the institutions of the State, where such is needed, the substantial increase in the appropriation for education, (which I cannot too highly commend to you,) or in such other manner as the Legislature may decide.

"The National Guard now consists of four complete regiments of infantry. The present force should be enlarged. I think it wise that it should be increased to five regiments of infantry, of twelve companies each, and that the artillery and cavalry remain as they now are, and that the headquarters of these troops be located at Newark, Jersey City, Paterson, Trenton, and Camden.

"I am inclined to bring to your attention the subject of providing a State Hospital for the consumptive poor. It has been demonstrated that with proper treatment and the proper care in its early stages, curable isolation, fresh air, proper food, and treatment, these are the principal needs in such cases. It is a proper subject for legislative investigation and action."

The two houses of the Legislature held brief sessions this morning, after the inaugural ceremonies adjourned for the day. No business transacted except the introduction of one or three bills, one of these, by Assemblyman Lord, extends to cranberry marshes and insects can war the same tax exemption now allowed veterans of the civil war.

## Hugh McLaughlin's Fishing Trip.

Hugh McLaughlin, leader of the Kings County Democracy, is laying in a stock of fishing rods and lines for a fishing trip this Winter vacation in the South. Mr. McLaughlin will leave for Florida on Monday. He will stop at Katonah, on the Hudson River.

# Exhibit 98

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

UNITED STATES OF AMERICA,                    :
                                             :
                    Plaintiff,               : HONORABLE JOHN W. BISSELL
                                             :
          v.                                 : Civ. Action No. 89-5064 (JWB)
                                             :
OCCIDENTAL CHEMICAL CORPORATION,             :
CHEMICAL LAND HOLDINGS, INC.,                :
                                             :
                    Defendants.              :          ORDER
─────────────────────────────────           :
                                             :
STATE OF NEW JERSEY, DEPARTMENT              :
OF ENVIRONMENTAL PROTECTION,                 :
                                             :
                    Plaintiff,               :
                                             :
          v.                                 : Civ. Action No. 89-5025 (AET)
                                             :
OCCIDENTAL CHEMICAL CORPORATION,             :
CHEMICAL LAND HOLDINGS, INC.,                :
                                             :
                    Defendants.              :
─────────────────────────────────           :

          This matter having been opened to the Court by the

United States Department of Justice on behalf of the United

States Environmental Protection Agency, and the State of New

Jersey on behalf of the Department of Environmental Protection on

their joint motion, pursuant to Federal Rule of Civil Procedure

42(a), to consolidate the above-captioned matters and to enter

the Consent Decree in Civil Action No. 89-5064(JWB) and the Court

having reviewed the papers submitted,

          IT IS on this *19th* day of *December* , 1990

          ORDERED:

1.  that pursuant to Federal Rule of Civil Procedure 42(a), the above-captioned actions are hereby consolidated for all purposes under Civil Action No. 89-5064; and

2.  that the Consent Decree lodged in Civil Action No. 89-5064(JWB) is hereby entered.

JOHN W. BISSELL
United States District Judge

MAXUS018142

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA, | : |
| Plaintiff, | : |
| v. | : |
| OCCIDENTAL CHEMICAL CORPORATION, CHEMICAL LAND HOLDINGS, INC., | : |
| Defendants. | : |

— /1 .1

Civil Action No. _____

## COMPLAINT

Plaintiff, the United States of America, by authority
of the Attorney General and at the request of the Administrator
of the United States Environmental Protection Agency (hereinafter
"EPA"), alleges as follows:

### PRELIMINARY STATEMENT

1. This is a civil action brought under Sections 106
and 107 of the Comprehensive Environmental Response,
Compensation, and Liability Act of 1980, as amended ("CERCLA"),
42 U.S.C. §§ 9606 and 9607, for injunctive relief and
reimbursement of costs incurred and to be incurred by the United
States in response to releases and threatened releases of
hazardous substances into the environment from a portion of the
Diamond Alkali Superfund site.  The Diamond Alkali Superfund site
is located at 80 and 120 Lister Avenue, Newark, New Jersey and
areas which hazardous substances have migrated from these two
parcels.

MAXUS018143

- 2 -

## JURISDICTION AND VENUE

2.  This court has jurisdiction over the subject matter of this action pursuant to 42 U.S.C. §§ 9606, 9607 and 9613(b) and 28 U.S.C. §§ 1331 and 1345.

3.  Venue is proper in this judicial district pursuant to 42 U.S.C. §§ 9606, 9607 and 9613(b) and 28 U.S.C. § 1391(b) and (c), because the claims arose within the District of New Jersey.

## DEFENDANTS

4.  Defendant Occidental Chemical Corporation ("OCC") is a corporation incorporated under the laws of the State of New York.  OCC is a successor in interest to Diamond Shamrock Chemicals Company, a prior owner and operator of the 80 and 120 Lister Avenue portions of the Diamond Alkali superfund site.

5.  Defendant Chemical Land Holdings, Inc. ("CLH") is a corporation incorporated under the laws of the State of Delaware. CLH is the present owner of the Site.

## FACTUAL BACKGROUND

Site History

6.  The Diamond Alkali Superfund site includes the properties located at 80 and 120 Lister Avenue, Newark, New Jersey and the areas to which hazardous substances have migrated from these two parcels.  The "Site" for purposes of this Complaint is limited to the properties located at 80 and 120 Lister Avenue, Newark, New Jersey.  Such properties are

- 3 -

designated as Block 2438, Lots 57, 58 and 59 on the tax map of
Newark.

7.   Diamond Shamrock Corporation, which was named
Diamond Alkali Company until 1967, operated a plant situated at
the 80 Lister Avenue portion of the Diamond Alkali Superfund Site
from 1951 through 1969, where, among other chemicals, the company
manufactured 2,4-D, 2,4,5-T and 2,4,5-Trichlorophenol, from which
2,3,7,8-Tetrachlorodibenzo-p-dioxin is a by-product.   Diamond
Shamrock Corporation ceased production activities at the plant in
August, 1969.

8.   In 1971, Diamond Shamrock Corporation sold the
plant and property to Chemicaland Corporation, which conducted
certain chemical manufacturing activities for itself and others
during the several years it owned and occupied the 80 Lister
Avenue property.

9.   Walter Ray Holding Company purchased the 80 Lister
Avenue plant and property at a tax sale in 1980 and held the
premises until 1981.  Walter Ray Holding Company sold the
property in June, 1981, to Marisol, Inc. which conducted salvage
operations, including removal of certain materials to certain
off-site locations, and waste consolidation activities.

10.  In September, 1983, Diamond Shamrock Corporation
adopted a new corporate structure.  A stock holding company was
formed under the name "Diamond Shamrock Corporation."  The former
Diamond Shamrock Corporation changed its name to Diamond Shamrock

MAXUS018145

- 4 -

Chemicals company, and became a subsidiary of the new Diamond Shamrock Corporation.

11.   On April 19, 1984, Diamond Shamrock Chemicals Company acquired the property located at 120 Lister Avenue from E. M. Sergeant Pulp and Chemical Co., Inc. to assist with the cleanup of the 80 Lister Avenue property.  Similarly, Diamond Shamrock Chemicals Company acquired the plant and property at 80 Lister Avenue from Marisol, Inc. on January 27, 1986.

12.   On September 4, 1986, Diamond Shamrock Corporation sold all the outstanding stock in Diamond Shamrock Chemicals Company to Oxy-Diamond Alkali Corporation, a wholly-owned indirect subsidiary of Occidental Petroleum Corporation.  Diamond Shamrock Chemicals Company was then renamed Occidental Electrochemicals Corporation.  Title to the 80 and 120 Lister Ave properties had previously been transferred by way of an intra-Holding company transaction to Diamond Shamrock Chemical Land Holdings, Inc.

13.   Effective November 30, 1987, Occidental Electrochemicals Corporation was merged into Occidental Chemical Corporation, a wholly-owned indirect subsidiary of Occidental Petroleum Corporation.  On December 4, 1987, the name of Diamond Shamrock Chemical Land Holdings, Inc. was changed to Chemical Land Holdings, Inc.

History of Response Actions

14.   During the summer of 1983, hazardous substances were detected at various related locations in Newark, New Jersey.

MAXUS018146

- 5 -

EPA conducted removal actions at four of these related locations
known as 80 Lister Avenue, Brady Metals, Municipal Swimming Pool
and Lockwood Street.  Together these four locations are referred
to as the Diamond Alkali Superfund Site.

15.  The removal activities conducted by EPA at these
four locations included vacuuming hazardous substances from the
streets and excavating soil contaminated with hazardous
substances.  The hazardous substances were later secured on the
120 Lister Avenue site.

16.  Pursuant to an administrative consent order
entered into between the State of New Jersey Department of
Environmental Protection ("NJDEP") and Diamond Shamrock Chemicals
Company and Marisol, Inc., and authorized on March 13, 1984
(hereinafter "ACO I"), Diamond Shamrock Chemicals Company
commenced a Site Evaluation for the property located at 80 Lister
Avenue, Newark, New Jersey.

17.  EPA, pursuant to Section 105 of CERCLA, 42 U.S.C.
§ 9605, placed the Diamond Alkali Superfund Site on the National
Priorities List, which is set forth at 40 C.F.R. Part 300,
Appendix B, by publication in the Federal Register on September
21, 1984, 49 Fed. Reg. 37070.

18.  Pursuant to a second administrative consent order
entered into between NJDEP and Diamond Shamrock Chemicals
Company, et al. and authorized on December 21, 1984 ("ACO II"),
Diamond Shamrock Chemicals Company commenced a Site Evaluation
for the 120 Lister Avenue property.  ACO II also required the

MAXUS018147

- 6 -

cleanup of certain off-site properties and the transfer of
contaminated materials resulting from such action to 120 Lister
Avenue for storage.

19.    The Site Evaluations conducted pursuant to ACO I
and ACO II for the 80 and 120 Lister Avenue properties together
constitute a Remedial Investigation ("RI"), as that term is used
at 40 C.F.R. § 300.68, to determine the nature and extent of
contamination at the Site.

20.    Pursuant to ACO I and ACO II, Diamond Shamrock
Chemicals Company conducted a Feasibility Study ("FS"), as that
term is used at 40 C.F.R. § 300.68, to develop and evaluate
alternatives for the remediation of the Site and prepared an FS
Report for the Site dated October, 1985.

21.    EPA issued a Record of Decision on September 30,
1987, which documents the selection of a remedial action plan for
the cleanup of the Site.

22.    EPA has conducted other response actions at the
Site, including collecting and analyzing soil and water samples,
other investigative activities and oversight of investigative
activities conducted by the owners and operators of the Site.

23.    EPA has incurred response costs at the Site
totalling at least $2,003,018.50.  EPA previously was reimbursed
$1,834,766.57 by potentially responsible parties associated with
the Site.  The United States will continue to expend monies to
address the releases and threatened releases at the Site and to
recover the cost of the response actions taken at the Site.

MAXUS018148

- 7 -

STATUTORY PROVISIONS

24.   Subsection 106(a) of CERCLA, 42 U.S.C. § 9606(a),

provides in pertinent part:

> Sec. 106(a) - In addition to any other action taken by a
> State or local government, when the President determines
> that there may be an imminent and substantial endangerment
> to the public health or welfare or the environment because
> of an actual or threatened release of a hazardous substance
> from a facility, he may require the Attorney General of the
> United States to secure such relief as may be necessary to
> abate such danger or threat, and the district court of the
> United States in the district in which the threat occurs
> shall have jurisdiction to grant such relief as the public
> interest and the equities of the case may require.   The
> President may also, after notice to the affected State, take
> other action under this section including, but not limited.
> to, issuing such orders as may be necessary to protect
> public health and welfare and the environment.

25.   Section 107(a) of CERCLA, 42 U.S.C. § 9607(a),

provides in pertinent part:

*          *          *

> Sec. 107(a) - Notwithstanding any other provision or
> rule of law, and subject only to the defenses set forth
> in subsection (b) of this section --
>
> (1)  the owner and operator of a . . . facility;
>
> (2)  any person who at the time of disposal of any
> hazardous substance owned or operated any facility at
> which such hazardous substances were disposed of,
>
> (3)  any person who by contract, agreement, or
> otherwise arranged for disposal or treatment, or
> arranged with a transporter for transport for disposal
> or treatment, of hazardous substances owned or
> possessed by such person, by any other party or entity,
> at any facility or incineration vessel owned or
> operated by another party or entity and containing such
> hazardous substances, and
>
> (4)  any person who accepts or accepted any hazardous
> substances for transport to disposal or treatment
> facilities, incineration vessels or sites selected by
> such person, from which there is a release, or a
> threatened release which causes the incurrence of

MAXUS018149

- 8 -

response costs, of a hazardous substance, shall be liable for -

> (A)  all costs of removal or remedial action incurred by the United States Government . . . not inconsistent with the national contingency plan; .
> . . .

26.  The term "facility" is defined in Section 101(9) of CERCLA, 42 U.S.C. § 9601(9), as --

> (A)  any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock or aircraft, or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located; but does not include any consumer product in consumer use or any vessel.

27.  "Hazardous substance" is defined by Section 101(14) of CERCLA, 42 U.S.C. § 9601(14), to include:

> (A)  any substance designated pursuant to section 311(b)(2)(A) of the Federal Water Pollution Control Act, (B) any element, compound, mixture, solution, or substance designated pursuant to section 102 of this Act, (C) any hazardous waste having the characteristics identified under or listed pursuant to section 3001 of the Solid Waste Disposal Act (but not including any waste the regulation of which under the Solid Waste Disposal Act has been suspended by Act of Congress), (D) any toxic pollutant listed under section 307(a) of the Federal Water Pollution Control Act, (E) any hazardous air pollutant listed under section 112 of the Clean Air Act, and (F) any imminently hazardous chemical substance or mixture with respect to which the Administrator has taken action pursuant to section 7 of the Toxic Substance Control Act. . . .

28.  "Person" is defined in Section 101(21) of CERCLA, 42 U.S.C. § 9601(21), as "an individual, firm, corporation, association, partnership, consortium, joint venture, commercial entity, United States Government, State, municipality,

MAXUS018150

- 9 -

commission, political subdivision of a State, or any interstate
body."

29.  "Release" is defined in Section 101(22) of CERCLA,
42 U.S.C. § 9601(22), as "any spilling, leaking, pumping,
pouring, emitting, emptying, discharging, injecting, escaping,
leaching, dumping, or disposing into the environment . . . ."

FIRST CLAIM FOR RELIEF -- SECTION 107(a) of CERCLA

30.  Paragraphs 1 through 29 are realleged and
incorporated herein.

31.  The Site is a "facility" within the meaning of
Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

32.  At relevant times, a release or threatened release
of hazardous substances occurred at the Site.

33.  The United States has incurred costs for actions
taken in response to the release or threatened release of
hazardous substances from the Site.

34.  The actions taken by the United States concerning
the Site constitute "response" actions as defined in Section
101(25) of CERCLA, 42 U.S.C. § 9601(25).

35.  The response actions at the Site were not
inconsistent with the National Oil and Hazardous Substances
Pollution Contingency Plan, 40 C.F.R. Part 300.

36.  The United States has satisfied any condition
precedent to a response action and to recovery under Section 107
of CERCLA, 42 U.S.C. § 9607.

MAXUS018151

- 10 -

37.  Diamond Shamrock Chemicals Company is a person who owned and operated the Site at the time of disposal of hazardous substances at the Site.  OCC is the successor in interest to Diamond Shamrock Chemicals Company.  OCC is jointly and severally liable to the United States under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), for the costs of response actions incurred and to be incurred at the Site.

38.  CLH is the current owner of the Site.  CLH is jointly and severally liable to the United States under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), for the costs of response actions incurred and to be incurred at the Site.

### SECOND CLAIM FOR RELIEF -- SECTION 106(a) of CERCLA

39.  Paragraphs 1 through 35 are realleged and incorporated herein.

40.  There has been an actual release or threatened release of hazardous substances into the environment at and from the Site within the meaning of Section 106(a) of CERCLA, 42 U.S.C. § 9606(a).

41.  EPA has determined that there may be an imminent and substantial endangerment to the public health or welfare or the environment because of an actual or threatened release of hazardous substances at the Site.

42.  OCC and CLH are jointly and severally liable under Section 106(a) of CERCLA, 42 U.S.C. § 9606(a), for taking such actions as may be necessary to abate the imminent and substantial endangerment or threat of such endangerment at the Site.

MAXUS018152

- 11 -

PRAYER FOR RELIEF

WHEREFORE, Plaintiff the United States respectfully prays that this Court:

1.    Enter judgment against defendants, jointly and severally, in favor the United States for all previously unreimbursed response costs incurred by the United States in response to the release or threatened release of hazardous substances at the Site, which costs are currently in excess of $168,252.05, not including interest;

2.    Enter a declaratory judgment against defendants, jointly and severally pursuant to Section 113(g) of CERCLA, 42 U.S.C. § 9613(g), in favor of the United States for all costs to be incurred in the future by the United States for response activities related to the Site;

3.    Issue an injunction requiring defendants, jointly and severally, to remedy the imminent and substantial endangerment to the public health or welfare or the environment at the Site by implementing the remedial actions selected by EPA in its Record of Decision and any other action necessary to remediate conditions at the Site;

4.    Award to the United States its costs, including the costs of this enforcement action, attorneys' fees and other expenses;

5.    Grant such other relief as it may deem just and proper.

MAXUS018153

- 12 -

Respectfully submitted,

RICHARD B. STEWART
Assistant Attorney General
Land and Natural Resources Division
U.S. Department of Justice


By:

JERRY SCHWARTZ
Attorney
Environmental Enforcement Section
U.S. Department of Justice
P. O. Box 7611
Ben Franklin Station
Washington, D.C. 20044
(202) 633-4059


SAMUEL A. ALITO, JR.
United States Attorney
District of New Jersey

By:

SUSAN C. CASSELL
Deputy Chief, Civil Division
United States Attorney's Office
District of New Jersey
Federal Building, Room 502
970 Broad Street
Newark, New Jersey   07102
(201) 621-2940


OF COUNSEL:

Randye B. Stein, Esquire
Office of Regional Counsel
U.S. Environmental Protection Agency
Region II
26 Federal Plaza
New York, New York  10278

MAXUS018154

i

RECEIVED

SEP 1 ? 1997

CHEMICAL LAND HOLDINGS, INC.

TABLE OF CONTENTS

| | | Page |
|---|---|---|
| I. | JURISDICTION | 9 |
| II. | DEFINITIONS | 10 |
| III. | PARTIES BOUND | 14 |
| IV. | PURPOSE | 18 |
| V. | GENERAL PROVISIONS | 19 |
| VI. | WORK TO BE PERFORMED | 21 |
| VII. | ADDITIONAL WORK | 30 |
| VIII. | REMEDY EVALUATION TO ASSURE PROTECTION OF HUMAN HEALTH AND THE ENVIRONMENT AND TO ASSESS REMEDIAL ALTERNATIVES | 31 |
| IX. | ENDANGERMENT | 34 |
| X. | PARTIES DESIGNATED REPRESENTATIVES | 35 |
| XI. | FACILITY ACCESS | 37 |
| XII. | SAMPLING AND DATA | 39 |
| XIII. | PUBLIC INSPECTION | 40 |
| XIV. | REPORTING REQUIREMENTS | 41 |
| XV. | PLANS, REPORTS AND ITEMS REQUIRING AGENCY APPROVAL OR RESPONSE TO AGENCY COMMENTS | 44 |
| XVI. | YEARLY PROGRESS REPORTS FOR THE BENEFIT OF THIS COURT | 46 |
| XVII. | COMPLETION OF REMEDIAL CONSTRUCTION | 46 |
| XVIII. | ASSURANCE OF ABILITY TO COMPLETE WORK | 48 |
| XIX. | RETENTION OF RECORDS | 49 |
| XX. | RESPONSE AUTHORITY | 51 |

MAXUS018155

ii

|  |  | Page |
|---|---|---|
| XXI. | FORCE MAJEURE | 51 |
| XXII. | REIMBURSEMENT | 54 |
| XXIII. | STIPULATED PENALTIES | 60 |
| XXIV. | DISPUTE RESOLUTION | 65 |
| XXV. | COVENANTS NOT TO SUE | 68 |
| XXVI. | WAIVER OF ANY CLAIM-SPLITTING DEFENSE | 72 |
| XXVII. | OTHER CLAIMS | 73 |
| XXVIII. | CLAIMS AGAINST THE FUNDS | 74 |
| XXIX. | INSURANCE/FINANCIAL RESPONSIBILITY | 75 |
| XXX. | NOTICES | 76 |
| XXXI. | LODGING AND OPPORTUNITY FOR PUBLIC COMMENT | 78 |
| XXXII. | MODIFICATION | 78 |
| XXXIII. | ADMISSIBILITY OF DATA | 79 |
| XXXIV. | CONTINUING JURISDICTION | 79 |
| XXXV. | COMMUNITY RELATIONS | 80 |
| XXXVI. | OTHER PROVISIONS | 80 |

MAXUS018156

DACD:07:14:89

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

UNITED STATES OF AMERICA,              X
                                       X
THE STATE OF NEW JERSEY,               X
                                       X    CIVIL ACTION NO.
                    Plaintiffs,        X
                                       X
              v.                       X                        , J.
                                       X
OCCIDENTAL CHEMICAL CORPORATION,       X
                                       X
CHEMICAL LAND HOLDINGS, INC.,          X
                                       X
                    Defendants.        X
                                       X

CONSENT DECREE

WHEREAS, on _____, 1989, the United

States of America ("the United States"), on behalf of the

Administrator of the United States Environmental Protection

Agency ("EPA"), and the State of New Jersey, Department of

Environmental Protection ("the State"), filed a Complaint in this

matter against Occidental Chemical Corporation ("OCC"), as

successor to Diamond Shamrock Chemicals Company, and Chemical

Land Holdings, Inc. ("CLH") pursuant to the Comprehensive En-

vironmental Response, Compensation, and Liability Act of 1980, as

amended ("CERCLA"), 42 U.S.C. §9601 et seq., and the authority

vested in the Commissioner of the New Jersey Department of En-

vironmental Protection ("NJDEP") pursuant to N.J.S.A. 13:1D-1 et

MAXUS018157

DACD:07:14:89                                    2

seq., the New Jersey Water Pollution Control Act, N.J.S.A.
58:10A-1 et seq., the New Jersey Solid Waste Management Act,
N.J.S.A. 13:1E-1 et seq., the New Jersey Spill Compensation and
Control Act, N.J.S.A. 58:10-23.11a et seq., and the authority
delegated to the Assistant Director of the Responsible Party
Cleanup Element of the Division of Hazardous Waste Management of
NJDEP pursuant to N.J.S.A. 13:1B-4 for the recovery of past
response costs incurred by the United States and the State and
for conduct of remedial design, remedial construction, operation
and maintenance, remedy evaluation activities and Site stabiliza-
tion activities in response to alleged releases and substantial
threat of releases of hazardous substances into the environment
at the Diamond Alkali Superfund Site located in the City of
Newark, County of Essex, New Jersey, sometimes referred to as the
Diamond Shamrock Superfund Site;

          WHEREAS, Diamond Shamrock Corporation, which was named
Diamond Alkali Company until 1967, operated a plant situated at
the 80 Lister Avenue portion of the Diamond Alkali Superfund Site
from 1951 through 1969, where, among other chemicals, the company
manufactured 2,4-D, 2,4,5-T and 2,4,5-Trichlorophenol, from
which 2,3,7,8-Tetrachlorodibenzo-p-dioxin is a by-product.
Diamond Shamrock Corporation ceased production activities at the
Site in August, 1969.  In 1971, Diamond Shamrock Corporation sold
the plant and property to Chemicaland Corporation, which

MAXUS018158

conducted certain chemical manufacturing activities for itself
and others during the several years it owned and occupied the
Site.    Walter Ray Holding Company purchased the plant and
property at a tax sale in 1980 and held the premises until 1981.
Walter Ray Holding Company sold the property in June, 1981 to
Marisol, Inc. which conducted salvage operations, including
removal of certain materials to certain off-Site locations, and
waste consolidation activities;

        WHEREAS, in September, 1983, Diamond Shamrock
Corporation adopted a new corporate structure.    A stock holding
company was formed under the name "Diamond Shamrock Corporation."
The former Diamond Shamrock Corporation changed its name to
Diamond Shamrock Chemicals Company, and became a subsidiary of
the new Diamond Shamrock Corporation.    On April 19, 1984, Diamond
Shamrock Chemicals Company acquired the property located at 120
Lister Avenue from E. M. Sergeant Pulp and Chemical Co., Inc. to
assist with the cleanup of the Site.    Similarly, Diamond Shamrock
Chemicals Company acquired the plant and property at 80 Lister
Avenue from Marisol, Inc. on January 27, 1986;

        WHEREAS, on September 4, 1986, Diamond Shamrock
Corporation sold all the outstanding stock in Diamond Shamrock
Chemicals Company to Oxy-Diamond Alkali Corporation, a wholly-
owned indirect subsidiary of Occidental Petroleum Corporation.
Diamond Shamrock Chemicals Company was then renamed Occidental

MAXUS018159

Electrochemicals Corporation. Title to the Site had previously been transferred by way of an intraholding company transaction to Diamond Shamrock Chemical Land Holdings, Inc., a wholly-owned indirect subsidiary of Diamond Shamrock Corporation. Effective November 30, 1987, Occidental Electrochemicals Corporation was merged into Occidental Chemical Corporation, a wholly-owned indirect subsidiary of Occidental Petroleum Corporation. On December 4, 1987, the name of Diamond Shamrock Chemical Land Holdings, Inc. was changed to Chemical Land Holdings, Inc. Chemical Land Holdings, Inc., a subsidiary of Maxus Energy Corporation, is the current holder of title to the Site;

WHEREAS, EPA, pursuant to Section 105 of CERCLA, 42 U.S.C. §9605, placed the Diamond Alkali Superfund Site on the National Priorities List, which is set forth at 40 C.F.R. Part 300, Appendix B, by publication in the Federal Register on September 21, 1984, 49 Fed. Reg. 37070;

WHEREAS, in response to alleged releases and substantial threat of releases of hazardous substances into the environment at the Diamond Alkali Superfund Site, and pursuant to an administrative consent order entered into between NJDEP and Diamond Shamrock Chemicals Company and Marisol, Inc., and authorized on March 13, 1984 (hereinafter "ACO I"), Diamond Shamrock Chemicals Company commenced a Site Evaluation for the property located at 80 Lister Avenue, Newark, New Jersey.

MAXUS018160

Thereafter, pursuant to a second administrative consent order
entered into between NJDEP and Diamond Shamrock Chemicals
Company, et al. and authorized on December 21, 1984 ("ACO II"),
Diamond Shamrock Chemicals Company commenced a Site Evaluation
for the property located at 120 Lister Avenue, Newark, New
Jersey.  ACO II also required the cleanup of certain off-site
properties and the transfer of contaminated materials resulting
from such action to 120 Lister Avenue for storage.  The Site
Evaluations conducted pursuant to ACO I and ACO II for the 80 and
120 Lister Avenue properties together constitute a Remedial
Investigation ("RI"), as that term is used at 40 C.F.R. §300.68,
to determine the nature and extent of contamination at the Site;

        WHEREAS, pursuant to ACO I and ACO II, Diamond Shamrock
Chemicals Company prepared a Site Evaluation Report for the 80
Lister Avenue property dated February, 1985, a Site Evaluation
Report for the 120 Lister Avenue property dated May, 1985, and a
Site Evaluation Addendum for the 80 and 120 Lister Avenue
properties dated February, 1986.  These Reports collectively
constitute an RI Report for the Site;

        WHEREAS, pursuant to ACO I and ACO II, Diamond Shamrock
Chemicals Company conducted a Feasibility Study ("FS"), as that
term is used at 40 C.F.R. §300.68, to develop and evaluate
alternatives for the remediation of the Site;

MAXUS018161

WHEREAS, pursuant to ACO I and ACO II, Diamond Shamrock Chemicals Company prepared an FS Report for the Site dated October, 1985;

WHEREAS, on August 1, 1987, pursuant to Section 117 of CERCLA, 42 U.S.C. §9617, EPA published a notice of completion of the FS and of the proposed interim plan for remedial action, and provided opportunity for public comment to be submitted in writing to EPA by August 31, 1987, or orally at a public meeting scheduled and subsequently held in the City of Newark, New Jersey on August 11, 1987;

WHEREAS, pursuant to Section 117 of CERCLA, 42 U.S.C. §9617, EPA made and has kept a transcript of the August 11, 1987, public meeting and has made this transcript available to the public;

WHEREAS, certain persons, including a representative of OCC, provided comments on EPA's proposed remedial action plan;

WHEREAS, EPA issued a Record of Decision on September 30, 1987, which documents the selection of a remedial action plan for the cleanup of the Site, discusses EPA's reasons for adopting such plan and responds to each of the significant comments on and criticisms of the proposed remedial action plan;

WHEREAS, the State has given its concurrence to the remedial action plan selected in the Record of Decision;

WHEREAS, EPA and NJDEP consider the selected remedial action plan to be an interim remedy in view of the periodic

evaluation of the selected remedial action required under the
Record of Decision in order to assure that human health and the
environment are being protected by the Remedy, taking into
account, as provided in Section 121 of CERCLA, 42 U.S.C. §9621,
without limitation, any changes in knowledge concerning the risks
posed by dioxin and other Hazardous Materials at the Site; and to
develop, screen and assess the viability of implementing remedial
alternatives more protective of human health and the environment,
including those alternatives which are based purely on advances
in technology and those which utilize more permanent solutions;

WHEREAS, pursuant to Section 117(b) of CERCLA, 42
U.S.C. §9617(b), EPA provided notice of adoption of the selected
remedial action plan in the form of the Record of Decision,
including notice of the availability of the Record of Decision to
the public for review at EPA and NJDEP offices, and at the local
community repository at the Newark Public Library, 5 Washington
Street, Newark, New Jersey;

WHEREAS, pursuant to Section 117(d) of CERCLA, 42
U.S.C. §9617(d), EPA published such notice in a major local
newspaper of general circulation on December 7, 1987;

WHEREAS, in accordance with Section 121(f)(1)(F) of
CERCLA, 42 U.S.C. §9621(f)(1)(F), the State has had a substantial
and meaningful involvement in the initiation, development and se-
lection of the remedial action to be undertaken at the Site;

WHEREAS, the State has actively participated in negotiations leading to this settlement and is a party to this settlement;

WHEREAS, pursuant to Section 122(j) of CERCLA, 42 U.S.C. §9622(j), EPA notified the Federal natural resource trustees of negotiations with potentially responsible parties ("PRPs") on the subject of addressing releases and threatened releases of hazardous substances at the Site, and EPA encouraged the participation of the Federal natural resource trustees in such negotiations;

WHEREAS, pursuant to Section 121(d)(1), the United States, the State and OCC believe that the remedial action plan adopted by EPA and set forth in the Record of Decision is consistent with the NCP;

WHEREAS, OCC agrees to implement the Work as defined, infra, in Section II of this Consent Decree, and EPA has determined that the Work will be implemented properly by OCC and that OCC is qualified to implement the Work;

WHEREAS, Diamond Shamrock Chemicals Company's obligations under ACO I and ACO II will be fulfilled if Settling Defendants comply with this Consent Decree and complete, to the satisfaction of NJDEP, those items specified by the State in writing to be developed by the State within forty-five (45) Working Days of the entry of this Decree;

MAXUS018164

WHEREAS, OCC agrees that this Consent Decree addresses only remediation of the 80 and 120 Lister Avenue properties, and does not address performance of tasks related to the Passaic River, the bedrock aquifer and other properties;

WHEREAS, pursuant to Section 122 of CERCLA, 42 U.S.C. §9622, the United States, the State, OCC and CLH have each stipulated and agreed to the making and entry of this Consent Decree prior to the taking of any testimony, based upon the pleadings herein;

NOW THEREFORE, it is ORDERED, ADJUDGED, AND DECREED as follows:

I.

## JURISDICTION

This Court has jurisdiction over the subject matter of this action and the parties to this Consent Decree pursuant to Sections 106, 107 and 113 of CERCLA, 42 U.S.C. §§9606, 9607 and 9613, and 28 U.S.C. §1345, and pendant jurisdiction over those claims arising under the laws of the State. OCC and CLH do not admit and reserve their rights to contest the jurisdiction of this Court over, and to award relief for, subject matters or activities not expressly required by this Consent Decree. The Parties agree that nothing in this Consent Decree nor the fact that it is being entered shall constitute an admission of fact or conclusion of law.

MAXUS018165

DACD:07:14:89                              10

## II.

### DEFINITIONS

Whenever the following terms are used in this Consent
Decree and the attachments hereto, the following definitions
specified in this Section shall apply:

A. "Appendix" or "Appendices" means those attachments listed
below, which are incorporated herein and made a part of this
Consent Decree by reference:

Appendix I         -   Statement of Work

Appendix II        -   Cleanup Standards

Appendix III       -   80 Lister Avenue:   Metes and Bounds

Appendix III-1   -   120 Lister Avenue:   Metes and Bounds

Appendix III-2   -   80 and 120 Lister Avenue:  Survey Plat

B.   "CERCLA" means the Comprehensive Environmental Response,
Compensation, and Liability Act of 1980, as amended, 42 U.S.C.
§9601 et seq.

C.   "Consent Decree" means this Consent Decree, all
Appendices to this Consent Decree and all modifications to such
documents.  For convenience, all references in the attached
Appendices to this Consent Decree shall be understood to refer to
this document.

D.   "Contractor" means the company or companies retained by
OCC to perform the Work required by this Consent Decree and all
attachments hereto.

MAXUS018166

E.    "<u>Diamond Alkali Superfund Site</u>" means the real property located at 80 and 120 Lister Avenue, in the City of Newark, County of Essex, New Jersey, and those areas to which contamination originating at 80 Lister Avenue has migrated.

F.    "<u>Dioxin</u>,"   "<u>TCDD</u>"   and   "<u>2,3,7,8-TCDD</u>"   mean   2,3,7,8-Tetrachlorodibenzo-p-dioxin.

G.    "<u>EPA</u>" means the United States Environmental Protection Agency.

H.    "<u>Hazardous Materials</u>" means "hazardous substance" within the meaning of Section 101(14) of CERCLA, 42 U.S.C. §9601(14); "hazardous substances" within the meaning of Section 3 of the Spill Compensation and Control Act, N.J.S.A. 58:10-23.11.b.k.; "pollutant" within the meaning of the New Jersey Water Pollution Control Act, N.J.S.A. 58:10A-3(n); and "pollutant or contaminant" within the meaning of Section 101(33) of CERCLA, 42 U.S.C. §9601(33).

I.    "<u>National Contingency Plan</u>" shall be used as that term is used in Section 105 of CERCLA, 42 U.S.C. §9605, and the National Oil and Hazardous Substances Pollution Contingency Plan, 40 C.F.R. Part 300, and any amendments thereto.

J.    "<u>NJDEP</u>" means the State of New Jersey Department of Environmental Protection.

K.    "<u>Operation and Maintenance</u>" and "<u>O&M</u>" mean those activities required by Section H of Appendix I, as may be modified pursuant to the provisions of this Consent Decree and any schedules,

MAXUS018167

plans or reports required to be submitted pursuant hereto.

L.   "Parties" means the United States of America on behalf of the United States Environmental Protection Agency; the State of New Jersey, Department of Environmental Protection; Occidental Chemical Corporation; and Chemical Land Holdings, Inc.

M.   "Record of Decision" and "ROD" mean that document issued on September 30, 1987, to present the remedial action plan selected by the Regional Administrator of EPA Region II to address the 80 and 120 Lister Avenue portion of the Diamond Alkali Superfund Site;

N.   "RCRA" means the Resource, Conservation and Recovery Act, as amended, 42 U.S.C. §6901 et seq.

O.   "Remedy" means the selected remedial alternative set forth in the Record of Decision, as described in Section VI.B, infra, and as shall be developed, implemented and/or modified pursuant to this Consent Decree.

P.   "Remedial Construction" means those activities required by Section G of Appendix I, as may be modified pursuant to the provisions of this Consent Decree and any schedules, plans or reports required to be submitted pursuant hereto.

Q.   "Remedial Design" means those activities required by Section F of Appendix I, as may be modified pursuant to the provisions of this Consent Decree and any schedules, plans or reports required to be submitted pursuant hereto.

MAXUS018168

R.  "<u>Remedy Evaluation</u>" means those activities required by
Section I of Appendix I, as may be modified pursuant to the pro-
visions of the Consent Decree and any schedules, plans or reports
required to be submitted pursuant hereto.

S.  "<u>Settling Defendants</u>" means Occidental Chemical
Corporation, as successor to Diamond Shamrock Chemicals Company,
and Chemical Land Holdings, Inc.

T.  "<u>Site</u>" means the real property located at 80 and 120
Lister Avenue, in the City of Newark, County of Essex, New
Jersey. Such properties are designated as Block 2438, Lots 57, 58
and 59 on the Tax Map of Newark, as described by metes and bounds
in Appendices III and III-1, and the survey plat in Appendix III-
2.

U.  "<u>Site Stabilization</u>" means those activities required by
Section D of Appendix I, as may be modified pursuant to the pro-
visions of this Consent Decree and any schedules, plans or
reports required to be submitted pursuant hereto.

V.  "<u>State</u>" means the State of New Jersey.

W.  "<u>Statement of Work</u>" means that document incorporated
herein as Appendix I of this Consent Decree.

X.  "<u>Work</u>" means all work and other activities required by
this Consent Decree, including, but not limited to:  Site
Stabilization, Remedial Design, Remedial Construction, Operation
and Maintenance, Additional Work pursuant to Section VII., <u>infra</u>,

MAXUS018169

DACD:07:14:89                    14

Remedy Evaluation, and implementation of the response actions

selected pursuant to Remedy Evaluation.

Y.  "Working Day" means any day of the week except for

Saturday or Sunday, that is not a designated Federal or State

holiday.

Z.  All terms not otherwise defined herein shall have their

ordinary meanings except that those terms defined in Section 101

of CERCLA, 42 U.S.C. §9601, shall have the meanings set forth

therein.


                            III.

                        PARTIES BOUND

A.  This Consent Decree applies to and is binding upon the

undersigned Parties and their successors and assigns.  Each

undersigned representative of a party to this Consent Decree

certifies that he or she is fully authorized by the entity which

he or she represents to enter into the terms and conditions of

this Decree and to execute and legally bind that entity to it.

B.  The Parties agree that CLH is a party to this Consent

Decree for specific, limited purposes.  CLH shall allow access to

the Site as provided in Section XI, infra, and shall abide by the

agreements on conveyance and use of the property in this Section

III.

C.  OCC shall provide a copy of this Consent Decree to each

chief contractor and chief subcontractor retained to perform the

MAXUS018170

Work required by this Consent Decree.  Chief contractors or sub-
contractors shall be those contractors or subcontractors whose
contracts or subcontracts for Work performed pursuant to this
Consent Decree have a total value exceeding twenty-five thousand
dollars ($25,000).  The obligation to provide a copy of this
Consent Decree to a chief contractor or chief subcontractor shall
be triggered when the planned or actual value of Work exceeds
twenty-five thousand dollars ($25,000).  OCC shall be res-
ponsible to the United States and the State for ensuring that each
of its contractors and subcontractors perform the Work contemplated
herein in accordance with this Consent Decree.

     D.  Conveyance of the Site

        1.  Settling Defendants may convey any or all of their
interest in the Site, provided that no conveyance or transfer of
title, lease, easement or other interests in the Site shall be con-
summated without a provision permitting a continuance of the Work
pursuant to this Consent Decree, and all such conveyances of title,
grants of easements or other conveyances of any interest in the
Site shall contain a covenant to permit such Work.  At least sixty
(60) calendar days prior to any conveyance, Settling Defendants
having control of or ownership over the Site shall notify EPA and
NJDEP by registered mail of their intent to convey any interest in
the Site, and the provisions to be made allowing the continued im-
plementation of the Work.  If such property is alienated, Settling
Defendants' obligations under this Consent Decree shall continue

MAXUS018171

unless the grantee agrees to assume these obligations and both EPA
and NJDEP agree, in writing, to allow the grantee to assume the ob-
ligations of the grantor.

    2.   The restrictions and obligations set forth herein
shall run with the land and shall be binding on any and all parties
who acquire any interest in the Site.  In addition, Settling Defen-
dants shall promptly give notice to EPA and NJDEP of any actual
conveyance or transfer of any interest they may have in any pro-
perty not part of the Site but which is used to implement the
Work in the immediate vicinity of the Site, to the extent such
conveyance is known or should be known to Settling Defendants.

    3.   A notification of the existence of this Consent
Decree and where and how a copy may be obtained shall be recorded
by Settling Defendants in the Office of the Clerk of Essex
County, State of New Jersey and any other appropriate office as a
lien and encumbrance on all parcels comprising the Site.
Settling Defendants agree to execute such legal instruments and
documents, if any, as may be required to effectuate the recording
of such notice in the Office of the Clerk of Essex County, State
of New Jersey and any other appropriate office, and to pay the
costs of the preparation and recording of such documents.

    4.   Within forty-five (45) calendar days of entry by
this Court of this Consent Decree, written proof of such
recording with the Office of the Clerk of Essex County, State of
New Jersey and any other appropriate office as required pursuant

DACD:07:14:89                          17

to Section III.D.3, _supra_, shall be sent to those individuals
specified in Section XXX, _infra_.

     5.  Any deed, title or instrument of conveyance for the
Site or any part thereof shall contain a permanent deed
restriction to the benefit of EPA and NJDEP that states:

> The Owner agrees not to make any use of, or take
> any actions at, the Site inconsistent with the Work at
> the Site as set forth in the Consent Decree entered in
> _United States of America_ v. _Occidental Chemical Cor-_
> _poration_, Civil Action No.       , in the United
> States District Court for the District of New Jersey.
> The Owner also agrees to the imposition of such use
> and/or access restrictions as may be deemed necessary by
> the United States Environmental Protection Agency
> ("EPA") and the State of New Jersey Department of En-
> vironmental Protection ("NJDEP") to insure compliance
> with the referenced Consent Decree and/or the integrity
> of the Work.  The restrictions shall continue until such
> time as the Site is declared by EPA, in consultation
> with the State, to be fit for unrestricted use. The
> restrictions shall include provisions for the con-
> tinuation of access rights.  The use and access restric-
> tions are to run with the land and be for the benefit of
> and enforceable by EPA and NJDEP.  The Owner shall
> record the restrictions with the Clerk of Essex County,
> State of New Jersey immediately upon the request of EPA
> and/or NJDEP that it do so.

Settling Defendants shall include the above statements in all
leases, subleases or rental agreements relating to the Site or
any part thereof which are executed on or after the effective
date of this Consent Decree.

     6.  Any such lease or sublease for the Site or any part
thereof shall contain the permanent deed restriction described in
Section III.D.5, _supra_, until such time as the Site is declared

MAXUS018173

DACD:07:14:89                          18

by EPA, in consultation with the State, to be fit for the removal

of those restrictions set forth in Section III.D.5, supra.

    7.  Any deed restriction as described above shall run

with the land until such time the Site is declared by EPA, in

consultation with the State, to be fit for the removal of those

restrictions set forth in Section III.D.5, supra.

    E.  **Use of the Site**

    Until such time as EPA and NJDEP approve otherwise, the

use or development of the Site shall be in a manner consistent

with the terms of this Consent Decree, including the permanent

deed restrictions described in Section III.D.5, supra.


IV.

PURPOSE

    The purpose of this Consent Decree is to serve the public

interest by protecting the public health, welfare and the

environment from releases and threatened releases of Hazardous

Materials at or from the Site through the implementation of the

Work, and to settle the claims asserted by the United States and

the State against Settling Defendants in the Complaint.

MAXUS018174

DACD:07:14:89                    19

## V.

### GENERAL PROVISIONS

A.  Permits and Approvals.

1.  All activities undertaken by OCC pursuant to this
Consent Decree shall be undertaken in accordance with the
requirements of Section 121(e)(1) of CERCLA, 42 U.S.C.
§9621(e)(1), and the National Contingency Plan and any amendments
thereto.

2.  The off-site transfer, treatment, storage or
disposal of Hazardous Materials removed from the Diamond Alkali
Superfund Site by OCC must be in compliance with Section
121(d)(3) of CERCLA, 42 U.S.C. §9621(d)(3).  To the extent
applicable to it, OCC is responsible for compliance with all
requirements relating to off-site management under RCRA, and
N.J.A.C. 7:26-1.1 et seq., including fulfilling the standards
applicable to generators and transporters of hazardous waste
promulgated at 40 C.F.R. Parts 262 and 263.  In particular, this
responsibility includes using and signing manifest forms for
hazardous wastes transported from the Diamond Alkali Superfund
Site.  Furthermore, in the Site Management Plans for Remedial
Construction and for Operation and Maintenance, both of which are
required by Appendix I, OCC shall designate any facilities it
proposes to use for such off-site transfer, storage, treatment or
disposal.  OCC shall conduct off-site disposal activities in
conformance with the National Contingency Plan and any amendments

MAXUS018175

thereto, and the <u>Revised Procedures for Planning and Implementing
Off-site Response Actions</u>, EPA Office of Solid Waste and
Emergency Response, November 13, 1987, and any amendments
thereto.

3.   Approvals which may be granted by EPA, the State or
other governmental entity shall not relieve OCC from any
liability it may have arising from or relating to its acts or
omissions or the acts or omissions of any of its contractors,
subcontractors or any other person or entity acting on its behalf
in the performance of the Work or its failure to perform fully or
complete the Work.

4.   Nothwithstanding any other provision in this Consent
Decree, no Federal, State or local permits shall be required for
any portion of the Work conducted entirely at the Diamond Alkali
Superfund Site.

B.   <u>National Contingency Plan</u>.

1.   OCC shall design, implement and complete the Work in
accordance with the provisions of the National Contingency Plan,
and any amendments thereto, and any standards, specifications and
schedules of completion developed in accordance with Section VI,
<u>infra</u>, or agreed to by the Parties, or ordered by this Court.

2.   This Court finds and the Parties agree that the Work
is consistent with the National Contingency Plan.  Settling
Defendants do not waive their rights to contest the consistency

MAXUS018176

with the National Contingency Plan of any further response action
ordered pursuant to Remedy Evaluation.

C.   If the application of any amendment to CERCLA or the Na-
tional Contingency Plan after the date of lodging of this Consent
Decree would substantially alter OCC's obligations under this De-
cree, EPA, in consultation with the State, shall determine to
what extent such amendment shall be incorporated to modify those
tasks remaining to be implemented in furtherance of the Work.

D.   At places in this Consent Decree the obligations of the
Parties are calculated in terms of a specified number of calendar
days.  If performance of any responsibility under this Consent
Decree falls due on a Saturday, Sunday, or official Federal or
State holiday, the due date for such performance is automatically
extended until the end of the next day that is not a Saturday,
Sunday, or official Federal or State holiday.

## VI.

## WORK TO BE PERFORMED

A.   Commitment by OCC.

OCC agrees to finance, design, construct, operate and
maintain, and conduct periodic evaluations of the Remedy in
accordance with all terms, conditions and schedules set forth
herein and developed and approved hereunder, and to perform the
Work in accordance with Appendix I.

MAXUS018177

DACD:07:14:89                        22

B.   The following is a description of the components of the
selected remedial alternative:

1.   Construct a slurry wall tying into the silt layer
underlying the Site.  The slurry wall shall be designed and con-
structed to encircle the soil and debris at the Site which
exceeds any soil cleanup standard specified in Appendix II.
Where a cleanup standard is exceeded at or beyond the Site
boundary, the slurry wall shall extend as close as is practicable
to the Site boundary.

2.   Construct a flood wall and appurtenances to protect
the Site from the 100 year flood.  The flood wall may be designed
to incorporate the functions of the slurry wall along the Passaic
River front.  The design considerations for such flood wall shall
include the specifications and guidances of the United States
Army Corps of Engineers and NJDEP, as well as the impact of the
proposed Passaic River flood control project.

3.   To the maximum extent practicable, disassemble and
decontaminate all non-porous permanent structures and materials
to facilitate off-site reuse, recycle or disposal.  Deconta-
mination procedures shall be designed and implemented to attain
the cleanup standard for dioxin specified in Appendix II.  The
decontamination procedures shall also be protective of human
health and the environment with respect to all other Hazardous
Materials known to be present at the Site.

MAXUS018178

DACD:07:14:89                          23

4.   To the extent practicable, transport all containers
(other than those shipping containers currently stored at 120
Lister Avenue) containing Hazardous Materials, but containing
less than 1.0 ppb of dioxin, off-site, for treatment or disposal.

5.   Demolish all remaining structures on-site and secure
all materials contaminated at or above 1.0 ppb of dioxin on-site.
Secured materials shall be segregated to the maximum extent
practicable.  The placement of secured materials shall be in
accordance with the requirements specified in Appendix II.

6.   Stabilize and immobilize the contents of the
remaining containers (other than those shipping containers
currently stored at 120 Lister Avenue) of dioxin contaminated
materials.

7.   Locate and plug inactive underground conduits, and
reroute active systems.

8.   Haul, empty, spread and compact the contaminated
materials stored at 120 Lister Avenue and, to the maximum extent
practicable, decontaminate the non-porous portions of the
shipping containers for off-site reuse, recycle or disposal.
Decontamination procedures shall be designed and implemented to
attain the cleanup standard for dioxin specified in Appendix II.
The decontamination procedures shall also be protective of human
health and the environment with respect to all other Hazardous
Materials known to be present at the Site.

MAXUS018179

9.    Install, operate and maintain a ground water
withdrawal system designed to maintain a hydraulic gradient
preventing the migration of ground water from the volume
contained within the slurry wall.

10.    Install, operate and maintain a treatment system for
ground water and other aqueous liquids resulting from the Work.
The treatment system shall discharge treated wastewater either to
the Passaic Valley Sewerage Commmission treatment works or
directly to the Passaic River.  The treatment system shall be
designed, constructed, and operated and maintained to attain and
shall attain the cleanup standards (effluent limitations)
specified in Appendix II.  The treatment system shall be
designed, constructed, and operated and maintained in accordance
with the requirements (other than administrative requirements)
for discharge of treatment system effluent to navigable waters,
discharge to publicly owned treatment works and discharge to
surface waters specified in Appendix II, as appropriate.

11.    Construct a surficial cap consisting of suitable
materials designed to meet the requirements of RCRA.  The cap
shall cover the slurry wall and the entire area encircled by the
slurry wall.  The design, construction, and operation and
maintenance of the cap shall be in accordance with the
requirements specified in Appendix II.

12.    Implement suitable monitoring, contingency,
operation and maintenance, and site security plans designed to

MAXUS018180

ensure the protection of human health and the environment during the Remedial Construction and after the completion of the Remedial Construction.

13.  On-site containment of all sludge generated from the wastewater treatment processes until such time that an alternative method of sludge management is approved.

14.  Design, construct, and operate and maintain the Remedy to attain the cleanup standards listed in Appendix II.

C.  With respect to Sections VI.B.3, VI.B.4 and VI.B.8, supra, EPA, in consultation with the State, shall determine the level constituting compliance with an individual Subparagraph "to the maximum extent practicable" or "to the extent practicable," and, in so doing, shall determine what constitutes implementation of the particular component of the selected remedial alternative for the Site.

D.  Within seven (7) calendar days of the date of lodging of this Consent Decree with this Court, OCC shall commence those tasks required by Sections D and E of Appendix I and, thereafter, complete such tasks in accordance with those schedules set forth in or developed and approved under Appendix I.

E.  Schedules prepared by OCC pursuant to Appendix I shall express schedule dates in terms of periods of time following prerequisite events, rather than as calendar dates.  The entry of this Consent Decree by this Court shall be deemed a prerequisite event for activities conducted pursuant to Sections F, G, H and I

MAXUS018181

of Appendix I. The previous statement shall not, however,
preclude OCC from performing Work in accordance with Section F of
Appendix I prior to the entry of this Consent Decree, should OCC
elect to do so, if OCC obtains EPA's prior written approval.

F. The timing of compliance with the requirements of
Section VI.B, supra, with respect to the attainment of cleanup
standards shall be governed by the following:

1. With respect to any action-specific cleanup
standards specified or referenced in Appendix II, and except as
expressly provided in this Consent Decree and in plans and/or
schedules developed and approved by EPA, in consultation with the
State, OCC shall comply with the requirements of Section VI.B,
supra, during the implementation of the Work.

2. With respect to any cleanup standards specified or
referenced in Appendix II which were not being attained prior to
the commencement of the Work, OCC shall comply with the
requirements of Section VI.B, supra, regarding such cleanup
standards by not later than the completion of Remedial
Construction. Such cleanup standards are not deemed action-
specific cleanup standards with respect to any occurrences of
non-attainment which existed prior to the commencement of the
Work and continue subsequent to the commencement of the Work.

3. With respect to any cleanup standards specified or
referenced in Appendix II which were being attained prior to the

MAXUS018182

commencement of the Work, OCC shall comply with the requirements
of Section VI.B, supra, during the implementation of the Work.

   G.  With respect to the attainment of effluent limitations
required by Section VI.B.10, supra, the following shall apply:

      1.  In the event that an analysis (or a number of
anaylses) of a treatment system effluent sample (or samples)
yields a concentration value (or an average concentration value)
for an analyte which is less than or equal to the practical
quantitation limit ("PQL") value for the analytical method
employed as specified in the Sampling, Analysis and Monitoring
Plan for Remedial Design (see Section E.2.a of Appendix I), the
effluent limitation shall be deemed to have been attained for
that analyte with respect to that sample (as well as for any
average effluent limitation for that analyte with respect to that
group of samples).  However, if at any time EPA, in consultation
with the State, approves an analytical method with a lower PQL,
the achievability of such new PQL or such effluent limitation,
whichever is less stringent, shall be grounds for additional work
pursuant to Section VI.G.5, infra, unless OCC proves to the
satisfaction of EPA, in consultation with the State, that
attainment of effluent values at or below the new PQL is not
technically practicable.

      2.  In the Remedial Design Workplan required by Section
E of Appendix I, OCC shall, at a minimum, set forth plans to
conduct treatability studies to evaluate all known wastewater

treatment methods that are or may be feasible for the treatment
of those Hazardous Materials present at the Site in order to
attain the effluent limitations set forth in Appendix II.

        3.   In the event that the wastewater treatability
studies conducted pursuant to the approved Remedial Design
Workplan lead EPA, in consultation with the State, to conclude,
based on technical evidence presented to EPA and the State by OCC
and on any other relevant information, that it is not technically
practicable to attain an effluent limitation for a particular
Hazardous Material, EPA, in consultation with the State, may
direct the Remedial Design to proceed based on the most stringent
design criteria and effluent values which EPA, in consultation
with the State, determines are technically practicable; provided
that OCC proves to the satisfaction of EPA, in consultation with
the State, that the most stringent design criteria, when
implemented, will result in a reduced adverse impact on the water
quality of the Passaic River compared to the impact associated
with the unremediated ground water migration from the Site to the
Passaic River.  In the event EPA, in consultation with the State,
directs the Remedial Design to proceed as set forth above, OCC
shall not be deemed in violation of this Consent Decree for
failure to attain such effluent limitations, provided that an
effluent value which is based on the design criteria and is
specified in the Final Design Report (see Section F of Appendix

MAXUS018184

I), is attained for the Hazardous Material or parameter to which
the effluent limitation applies.

4.   If OCC does not achieve the effluent values approved
by EPA, in consultation with the State, pursuant to Sections
VI.G.1 and VI.G.3, supra, OCC shall be deemed in violation of
this Consent Decree unless OCC proves to the satisfaction of EPA,
in consultation with the State, that the attainment of such
effluent values is not technically practicable despite OCC's
evaluation and testing of all known methods to attain such
values.   If EPA, in consultation with the State, agrees that OCC
has proved that the attainment of such effluent values is not
technically practicable, the Remedial Construction and/or
Operation and Maintenance activities may continue, provided that
OCC shall, as part of the Remedy Evaluation required by Section
VIII, infra, evaluate and, if not previously tested, test all
known methods for achieving such effluent values, and provided
that OCC proves to the satisfaction of EPA, in consultation with
the State, that the Final Design Report and/or Operation and
Maintenance Plan, when implemented, will result in a reduced
adverse impact on the water quality of the Passaic River compared
to the impact associated with the unremediated ground water
migration from the Site to the Passaic River.

5.   Notwithstanding Sections VI.G.1, VI.G.2, VI.G.3 and
VI.G.4, supra, the finding of an effluent value greater than an
effluent limitation may be grounds for additional work pursuant

to Section VII, _infra_, and may be a factor considered in the determination of the appropriateness of additional response action pursuant to Section VIII.B, _infra_.

6.   The relief provided by Sections VI.G.1, VI.G.2, VI.G.3 and VI.G.4, _supra_, may be terminated by EPA, in consultation with the State, pursuant to schedules developed by or approved by EPA, in consultation with the State, to attain more stringent effluent values established and approved pursuant to Section(s) VII and/or VIII.C, _infra_.

7.   With respect to this Section VI.G, EPA, in consultation with the State, shall determine what constitutes "technically practicable" in consideration of the EPA CERCLA Compliance With Other Laws Manual, August, 1988.

## VII.

### ADDITIONAL WORK

A.   In the event EPA, in consultation with the State, and/or OCC determine(s) that additional work, including additional Remedial Design or Remedial Construction, is necessary to meet, at the Site, the cleanup standards described and/or referenced in Section VI, _supra_, and/or the Statement of Work, notification of the need for such additional work will be provided to the other parties. Additional work as defined in this Section VII shall be limited to that work which is required to achieve successful implementation of the components of the selected remedial

MAXUS018186

alternative, as set forth in Section VI.B, supra.  The per-
formance of Additional Work shall not be deemed a "modification"
within the meaning of Sections XXXII.A and XXXII.C., infra.

B.  Any additional work which OCC determines to be necessary
is subject to approval by EPA, in consultation with the State.

C.  Any additional work which is determined to be necessary
by OCC and approved by EPA, in consultation with the State, or
determined to be necessary by EPA, in consultation with the
State, to meet the cleanup standards, shall be completed by OCC
in accordance with those standards, specifications and schedules
developed by OCC and approved by EPA, in consultation with the
State.

D.  The provisions of this Section VII shall remain effec-
tive throughout the duration of this Consent Decree.

### VIII.

### REMEDY EVALUATION TO ASSURE PROTECTION OF HUMAN HEALTH
### AND THE ENVIRONMENT AND TO ASSESS REMEDIAL ALTERNATIVES

A.  OCC shall conduct a Remedy Evaluation for the Site once
every two (2) years following completion of the Remedial
Construction activities required under this Consent Decree (1) to
assure that human health and the environment are being protected
by the Remedy implemented by OCC under this Decree, taking into
account, as provided in Section 121 of CERCLA, 42 U.S.C. §9621,
without limitation, any changes in knowledge concerning the risks
posed by dioxin and other Hazardous Materials at the Site and
addressed by this Decree; and (2) to develop, screen and assess

MAXUS018187

the viability of implementing remedial alternatives more
protective of human health and the environment, including those
alternatives which are based purely on advances in technology and
those which utilize more permanent solutions.

B.  In the event that a Remedy Evaluation results in
modifications of the Remedy that may affect subsequent Remedy
Evaluations in some manner, OCC may request EPA to revise the
format or content of any subsequent Remedy Evaluation to
accomodate the modifications. EPA, in consultation with the
State, will make such revisions as it deems appropriate.

C.  EPA and the State will review each Remedy Evaluation
conducted by OCC.  If, upon such review, EPA, in consultation
with the State, determines that further response action is
necessary as a result of a Remedy Evaluation conducted pursuant
to Sections VIII.A.1 and VIII.A.2, supra, EPA will notify OCC of
its preliminary determination with respect to the need for
further study and/or remedial action.  The criteria for EPA's
determination regarding the necessity of further response action
as a result of a Remedy Evaluation conducted pursuant to Section
VIII.A.2, supra, will be the same as the criteria for the Se-
lection of appropriate remedial actions set forth in Section 121
of CERCLA, 42 U.S.C. §9621, with the exception of the criteria
set forth in Section 121(c), 42 U.S.C. §9621(c).  OCC will be
provided an opportunity to confer with EPA, which may coincide

MAXUS018188

with an opportunity for public comment, if appropriate, with
respect to any response action proposed by EPA pursuant to this
Section VIII, and to submit written comments for the record with
respect to any response action proposed by EPA.  After the
comment period closes, EPA will either affirm, modify or rescind
its proposed response action in writing, stating the reasons for
any further response action required.  OCC shall implement and
finance such response action, subject to its rights under Section
XXIV, *infra*, to dispute whether the response action selected by
EPA is consistent with the criteria specified above. OCC shall
not be liable for any stipulated penalties that may accrue during
any period of dispute resolution referred to in the preceding
sentence unless OCC's invocation of dispute resolution is
determined to be without sufficient cause.  The requirement that
such response action be performed shall not be deemed a
"modification" within the meaning of Sections XXXII.A and
XXXII.C, *infra*.

    D.  OCC agrees to reimburse the United States and the State
for those costs incurred in overseeing and reviewing OCC's Remedy
Evaluations and any subsequent remedial action conducted by OCC
under this Section VIII.

    E.  EPA and the State reserve their rights as set forth in
Section 121(f) of CERCLA, 42 U.S.C. §9621(f).

MAXUS018189

F.   The provisions of this Section VII shall terminate upon
EPA's determination that a permanent remedy has been implemented
at the Site.

## IX.

### ENDANGERMENT

A.   In the event of any action or occurrence during the term
of this Consent Decree which causes or threatens a release of
Hazardous Materials from the Site or which causes or may cause an
imminent and substantial endangerment to public health or welfare
or the environment, OCC shall immediately, upon notice or disco-
very of such action or occurrence, take all appropriate action to
prevent, abate or minimize such release or endangerment and shall
immediately notify the EPA RPM or, if that is impossible, the Re-
sponse and Prevention Branch, EPA Region II at (201) 548-8730.
OCC shall take such action in accordance with all applicable pro-
visions of the Health and Safety/Contingency Plan developed
pursuant to Appendix I and approved thereunder.

B.   In the event EPA and/or the State take action to respond
to the circumstances set forth in Section IX.A, supra, OCC shall
reimburse all costs of the response action incurred by EPA that
are not inconsistent with the National Contingency Plan and/or
incurred by the State as the State is authorized to recover by

MAXUS018190

law, subject to those defenses set forth under Section 107(b) of
CERCLA, 42 U.S.C. §9607(b).

C.   Nothing in this Consent Decree shall be deemed to limit
the power and authority of the United States, the State or this
Court to take, direct or order all appropriate action to protect
human health and the environment or to prevent, abate or minimize
an actual or threatened release of Hazardous Materials on, at or
from the Site.

X.

PARTIES' DESIGNATED REPRESENTATIVES

A.   1.   Within ten (10) calendar days of lodging of this
Consent Decree, EPA shall designate a Remedial Project Manager
("RPM") and NJDEP shall designate a Case Manager to monitor the
progress of the Work and to coordinate communications among EPA,
NJDEP and OCC.  EPA and NJDEP may each designate an alternate
representative.

2.   Within ten (10) calendar days of lodging of this
Consent Decree, OCC shall designate a Project Coordinator who
shall have primary responsibility for implementation of the Work.

B.   1.   The EPA RPM and any designated representative
exercising the authority of Section X.B.3, _infra_, shall have the
training provided for a grant of the authority set forth in 40
C.F.R. §§300.68(a)(2) and 300.33(b), or any similar provision in
future amendments or revisions to the National Contingency Plan.

MAXUS018191

2.   The EPA RPM shall work in cooperation with the NJDEP Case Manager.

3.   The EPA RPM and the NJDEP Case Manager shall each have the authority to require a cessation of the performance of the Work or any other activity at the Site that may present or contribute to an imminent and substantial endangerment to public health, welfare or the environment or cause or threaten to cause the release of Hazardous Materials from the Site.  In the event the EPA RPM or the NJDEP Case Manager suspends the Work or any other activity at the Site, EPA, in consultation with the State, may extend the compliance schedule developed under this Consent Decree as appropriate.

4.   EPA, NJDEP and OCC shall each have the right to change their respective designated representatives by notifying the other parties in writing.  OCC shall notify EPA and NJDEP of any such change at least seven (7) calendar days prior to the change. EPA and NJDEP will make reasonable efforts to notify OCC prior to any such change; however, any failure by EPA and/or NJDEP to notify OCC shall not be a breach of this Consent Decree.

C.   The EPA RPM and the NJDEP Case Manager may assign other representatives, including other EPA and NJDEP employees or contractors, to serve as their representatives for oversight of performance of daily operations during implementation of the Work.

MAXUS018192

DACD:07:14:89

D.  The EPA RPM, or the NJDEP Case Manager, acting with the concurrence of the EPA RPM, may make or authorize field modifications, consistent with the implementation of the Work, in writing, to the studies, designs, techniques or procedures undertaken or utilized in performing the Work required under this Consent Decree, provided any such modifications are consistent with Appendix I. Such field modifications shall not be deemed a modification within the meaning of Section XXXII, _infra_.

E.  The absence of OCC's Project Coordinator shall not be cause for work stoppage.

F.  To the maximum extent possible, except as specifically provided in this Consent Decree, communications among the Parties shall be between their designated representatives.

XI.

FACILITY ACCESS

A.  EPA and the State, and their representatives, including contractors and subcontractors, shall have access at all times to the Site and any other property on which the Work is being performed to the extent that access to such property is controlled by or available to Settling Defendants to enable the Parties and their representatives to conduct any activity authorized by this Consent Decree, including, but not limited to:

MAXUS018193

1.    Monitoring the progress of activities taking place;

2.    Verifying any data or information submitted to EPA
and NJDEP;

3.    Conducting investigations relating to contamination
at or near the Site;

4.    Obtaining samples at or relating to the Site; and

5.    Inspecting and copying records, operating logs, con-
tracts or other documents required to assess compliance with this
Consent Decree.

B.    All access to the Site shall be in compliance with the
applicable Health and Safety/Contingency Plan as uniformly
applied to all Parties.

C.    1.    To the extent that the Diamond Alkali Superfund Site
or other areas where the Work is to be performed hereunder is
owned by parties other than those bound by this Consent Decree,
OCC shall use best efforts to obtain access from the owners for
the purpose of implementing the requirements of this Decree in
accordance with the schedule set forth in the approved Remedial
Design Work Plan.  Such agreements shall provide access not only
for OCC, but also for EPA and the State and authorized repre-
sentatives or agents of EPA and the State.

2.    If such access agreements are not obtained within
the time specified herein, OCC shall so notify EPA and NJDEP in

MAXUS018194

accordance with the procedures set forth in Section XXX, _infra_,
and OCC shall use its best efforts to otherwise secure necessary
access.  For purpose of securing access, "best efforts" may
involve the expenditure of money and the initiation of judicial
proceedings to the extent authorized by law.

     3.  Should OCC, using its best efforts, fail to secure
access to the Site or other areas where the Work is to be
performed hereunder, EPA and the State may assist OCC in
obtaining such access.  OCC shall reimburse EPA and the State for
all expenses incurred in obtaining access, in accordance with
Section XXII, _infra_.

XII.

### SAMPLING AND DATA

    A.  Within seven (7) calendar days of a request by EPA or
the State, OCC shall make available to EPA and the State all re-
quested results of sampling and/or tests or other data generated
by or for OCC with respect to the implementation of the Work.

    B.  At the request of any party, any other party shall pro-
vide split or duplicate samples to the requesting party, or allow
split or duplicate samples to be taken by the requesting party of
any samples collected that relate in any way to the implementa-
tion of the Work.  OCC shall notify EPA and the State not less
than ten (10) calendar days in advance of any sample collection
activity.  In addition, EPA and the State shall have the right to

MAXUS018195

take any additional samples or direct OCC to take any additional
samples that EPA and the State deem necessary to determine
whether the Work is being implemented properly.

C.   Notwithstanding any other provision of this Consent De-
cree, EPA and the State hereby retain all of their information
gathering, access and inspection authorities and rights under
CERCLA, RCRA, and any other applicable Federal or State statutes
or regulations.


## XIII.

### PUBLIC INSPECTION

All data, factual information and documents submitted by
Settling Defendants to EPA and NJDEP pursuant to this Consent
Decree shall be available for public inspection.  Settling
Defendants shall not assert a claim of confidentiality regarding
any monitoring or hydrogeologic data, any information specified
under Section 104(e)(7)(F)(i) through (viii) of CERCLA, 42 U.S.C.
§9604(e)(7)(F)(i) through (viii), or any other chemical,
scientific or engineering data related to the Work or submitted
to EPA and the State pursuant to this Consent Decree.
Information entitled to protection under 18 U.S.C. §1905 is
excluded from public inspection in accordance with Section
104(e)(7) of CERCLA, 42 U.S.C. §9604(e)(7).

MAXUS018196

## XIV.

## REPORTING REQUIREMENTS

A.  Monthly Progress Reports.

In addition to any other requirement of this Consent De-
cree, OCC shall prepare and provide to EPA and the State written
monthly progress reports.  For each calendar month, or part
thereof, such monthly progress report shall:  (1) describe all
actions which have been taken to fulfill the requirements of this
Consent Decree during the prior month; (2) describe any potential
and/or actual noncompliance with this Consent Decree and other
problems encountered; (3) describe all corrective actions taken
in response to any potential and/or actual noncompliance or
problems which occurred during the prior month; (4) include all
final results of sampling, tests and all other data received or
generated by OCC during the course of implementing the Work
during the prior month; (5) describe all actions, data and plans
which are scheduled for the next two months; (6) include
information regarding percentage of completion, all delays
encountered or anticipated that may affect the future schedule
for performance of the Work, and a description of all efforts
made to mitigate those delays or anticipated delays; and
(7) include a section entitled "Summary For Submission to Court"
which summarizes items (1) through (6), supra.  Such monthly
progress reports are to be submitted to EPA and the State by the
twentieth (20th) calendar day of each succeeding month, the first

such report being due following the first full month following
lodging of this Consent Decree with this Court.

B. **Weekly Progress Reports**.

In addition to the monthly progress report required pur-
suant to Section XIV.A, *supra*, during Remedial Construction, OCC
shall prepare and provide to EPA and the State a weekly written
progress report.  For each calendar week, such weekly progress
report shall:  (1) describe all actions which have been taken
toward fulfilling the requirements of this Consent Decree; (2)
describe any potential and/or actual noncompliance with this
Consent Decree and other problems encountered; (3) describe all
corrective actions taken for any potential and/or actual
noncompliance or problems which occurred during the relevant
week; (4) describe all actions, data and plans which are
scheduled for the next three (3) consecutive weeks; and (5)
describe the types and amounts of Hazardous Materials removed or
remediated.  Such weekly Remedial Construction progress reports
shall be submitted to EPA and the State by the tenth (10th)
calendar day following each Sunday for the week ending on that
Sunday.

C. **Incomplete or Deficient Reports**.

1.  In the event that EPA deems a progress report to be
incomplete or otherwise deficient, EPA shall notify OCC of the

MAXUS018198

alleged deficiency in writing. OCC shall make the necessary re-
visions and resubmit the revised progress report with the next
scheduled progress report or, if the next progress report is due
less than fourteen (14) calendar days following OCC's receipt of
the notice of deficiency, with the subsequently scheduled
progress report.

2.   In the event EPA determines that a revised progress
report is deficient for failure to address a deficiency stated in
accordance with the procedures of Section C.1, _supra_, OCC shall
be deemed in violation of this Consent Decree.

D.   Submittal of Reports.

1.   If the date for submission of any report, item or
notification required pursuant to this Consent Decree falls upon
a weekend or Federal or State holiday, the time period for
submission of that item or notification is extended to the next
Working Day following the weekend or holiday.

2.   In the event EPA or the State requests more than one
(1) copy of any report, OCC shall provide a reasonable number of
copies as requested.

E.   1.   Upon the occurrence of any event during performance
of the Work which requires reporting to the National Response
Center pursuant to Section 103 of CERCLA, 42 U.S.C. §9603, or
which requires notification pursuant to N.J.A.C. 7:1E-1.1 _et
seq._, OCC shall also orally notify the EPA RPM and the NJDEP Case
Manager promptly.

MAXUS018199

2. In the event of the unavailability of the EPA RPM,
OCC shall promptly orally notify the Response and Prevention
Branch, EPA, Region II at (201) 548-8730, in addition to the re-
porting required by Section 103 of CERCLA, 42 U.S.C. §9603.

3. In the event of the unavailability of the NJDEP Case
Manager, OCC shall promptly notify the NJDEP Bureau of Emergency
Response at (609) 292-1075.

4. Within ten (10) calendar days of the onset of such
an event, OCC shall furnish to EPA and NJDEP a written report
setting forth the event(s) which occurred and the measure(s)
taken and to be taken in response thereto.

XV.

PLANS, REPORTS AND ITEMS REQUIRING AGENCY APPROVAL

OR RESPONSE TO AGENCY COMMENTS

A. In the event EPA disapproves any plan, report (other
than a progress report covered by Section XIV, supra), or other
item required to be submitted to EPA and NJDEP for approval
pursuant to this Consent Decree, OCC shall have a reasonable time
as specified in the notice, but not less than fourteen (14)
calendar days from the receipt of written notice of such
disapproval to correct any deficiencies and resubmit the plan,
report or other item for approval. The notice of disapproval from

EPA shall include an explanation of why the plan, report or other item is being disapproved. OCC shall address each of EPA's comments and resubmit the previously disapproved plan, report or other item along with the required changes to EPA and NJDEP within the period set forth above.

B.   In the event any comment on any report required under Appendix I is not adequately addressed by OCC in the second (2nd) submittal, OCC shall be deemed in violation of this Consent Decree, subject to the provisions of Section XV.C, infra.   In the event EPA, in consultation with the State, does not approve OCC's second (2nd) submittal, or any portion thereof, EPA retains the right to amend or develop the submittal. OCC shall implement any such submittal as amended or developed by EPA, subject to OCC's right to invoke dispute resolution under this Consent Decree.

C.   It is the intention of the Parties to engage in such discussions as may be necessary to resolve technical issues raised by EPA's comments made pursuant to Sections XV.A and XV.B, supra.  EPA, in consultation with the State, may modify its comments and/or extend the due date for a subsequent submittal as a consequence of such discussions.

D.   EPA and NJDEP will endeavor to complete their review of plans, reports and other items submitted to them for approval within the time periods specified as goals for such review and set forth in the letter from EPA to OCC dated October 17,

1989, as may be revised by subsequent letters.  Failure by EPA
and/or NJDEP to complete review in accordance with such letter(s)
shall not relieve OCC of any obligation under this Consent
Decree, nor shall it automatically extend the time for perform-
ance by OCC except to the extent that Appendix I or a schedule
approved under this Section XV requires that performance of a
particular activity commence following approval of the plan,
report or other item under review.

### XVI.

### YEARLY PROGRESS REPORTS FOR THE BENEFIT OF THIS COURT

On or before March 31st following each calendar year during
which this Court retains jurisdiction hereof pursuant to Section
XXXIV, _infra_, EPA and the State shall file with this Court a
compilation of the monthly "Summary For Submission to Court"
submitted by OCC pursuant to Section XIV.A, _supra_, during the
preceding calendar year.

### XVII.

### COMPLETION OF REMEDIAL CONSTRUCTION

A.  Within ninety (90) calendar days of completion of all
activities required pursuant to Sections G.1 through G.6 of
Appendix I, OCC shall submit to EPA and the State a written

MAXUS018202

report certifying that, subject to any exceptions identififed in
the Final Report for Remedial Construction required by Section
G.7 of Appendix I, all Remedial Construction activity components
have been completed in full satisfaction of the standards and
specifications set forth in the Final Design Report prepared and
approved pursuant to this Consent Decree. Said report shall be
signed by a New Jersey licensed professional engineer. The Final
Report for Remedial Construction required by Section G.7 of
Appendix I shall be submitted together with the written certi-
fication.

    B.   If EPA, in consultation with the State, determines that
Remedial Construction has not been completed in accordance with
the standards and specifications set forth in the Final Design
Report prepared and approved pursuant to this Consent Decree, EPA
shall notify OCC, in writing, of the specific tasks and
activities which have not been so performed. OCC shall then
implement the specified activities and tasks in accordance with
those standards, specifications and schedules approved by EPA.

    C.   1.   Any portion of the Work performed pursuant to this
Consent Decree shall not be deemed complete until it has been re-
viewed by EPA and NJDEP, and approved by EPA in writing.

         2.   At such time as EPA determines that Remedial
Construction has been completed in accordance with the standards
and specifications set forth in this Consent Decree, and that the

MAXUS018203

Remedial Construction is operating in accordance with such requirements, EPA shall notify OCC of such approval in writing.

D.  Approval of completion of the Remedial Construction work in no way limits OCC's obligations under Sections VI, VII and VIII, supra.

## XVIII.

### ASSURANCE OF ABILITY TO COMPLETE WORK

A.  Within fourteen (14) calendar days of the effective date of this Consent Decree, OCC shall submit a letter of credit to EPA for the purpose of demonstrating its ability to complete the Work and to pay all claims that arise in connection with the performance of the Work.  The letter of credit must be adequate to assure EPA and the State that it is unnecessary to require additional assurances.

B.  OCC shall submit such financial assurance annually.

C.  The Parties agree that the total of sixteen million dollars ($16,000,000) in letters of credit presently in effect pursuant to ACO I and ACO II shall be adequate financial assurance hereunder as of the effective date of this Consent Decree, provided however, that by no later than fourteen (14) calendar days after the effective date of this Decree, such letters of credit shall be

MAXUS018204

DACD:07:14:89                                49

modified to be held by OCC for the benefit of EPA and NJDEP to sa-

tisfy the requirements of this Consent Decree.

   D.  In the event EPA or the State subsequently determines such

financial assurance is inadequate, EPA shall so inform OCC in writ-

ing and OCC shall have thirty (30) calendar days from the date of

receipt of such written notice to obtain further financial assur-

ance which shall assure EPA and the State that OCC has sufficient

assets to implement and complete the Work or the requirements of

ACO I and ACO II.

   E.  OCC may petition EPA for a reduction in the amount of fi-

nancial assurance required following EPA's approval of the comple-

tion of Remedial Construction work pursuant to Section XVII.C.2,

supra, and at such time as OCC submits each Remedy Evaluation con-

ducted pursuant to Section VIII.A, supra.


                              XIX.

                      RETENTION OF RECORDS

   A.  Settling Defendants shall preserve and retain, and EPA

and the State shall use their best efforts to preserve and

retain, all records and documents now in their possession or

control and those which may come into their possession or control

(including, for OCC, those in the possession or control of Maxus

Energy Corporation) that relate in any manner to the Site or the

Work, regardless of any document retention policy to the

contrary, for not less than six (6) years after EPA certifies

MAXUS018205

approval of the Remedial Construction or six (6) years after the records or documents come into a party's possession, whichever is later.

B.   Settling Defendants shall preserve, or shall instruct their contractors, their contractors' subcontractors and anyone else acting on their behalf in connection with the Site, to preserve (in the form of originals or exact copies, or upon EPA approval, microfiche of all originals) all records and documents of whatever kind, nature or description that relate to the Site or the Work for the time period specified in Section XIX.A, supra.

C.   OCC shall, within sixty (60) calendar days of the effective date of this Consent Decree, obtain the written agreement of Maxus Energy Corporation to preserve, retain and provide to OCC on demand originals or copies of all records and documents fitting the description set forth in Section XIX.B, supra, for the time period specified in Section XIX.A, supra.   A copy of the executed agreement between OCC and Maxus Energy Corporation shall be submitted to EPA and the State within ninety (90) calendar days of the effective date of this Consent Decree.

D.   Prior to ceasing to preserve and retain any records and documents retained pursuant to Sections XIX.A, XIX.B and XIX.C,

MAXUS018206

supra, Settling Defendants shall provide at least ninety (90) ca-
lendar days written notice to EPA and the State.  EPA will there-
after notify Settling Defendants in writing with respect to the
appropriate disposition of said records and documents, which may
include transfer of said materials to EPA or the State.

    E.  Failure by EPA or the State to preserve and retain re-
cords and documents that relate to the Site or the Work shall not
be deemed a violation of this Consent Decree.

    F.  Nothing herein shall require the disclosure of informa-
tion subject to a legally applicable privilege.


## XX.

### RESPONSE AUTHORITY

    Subject to the provisions of Section XXV, infra, and
notwithstanding any other provision of this Consent Decree, EPA
and the State reserve all rights to take any and all response
actions authorized by law.


## XXI.

### FORCE MAJEURE

    A.  For the purposes of this Consent Decree, "Force Majeure"
shall mean any event arising from causes entirely beyond the con-
trol of OCC and of any entity controlled by OCC, including its
contractors and subcontractors, which delays or prevents the per-
formance of any obligation under this Consent Decree.  "Force Ma-
jeure" shall not include increased costs or expenses, or finan-

MAXUS018207

cial incapacity. OCC's inability to meet the effluent limi-
tations set forth in Appendix II for the reasons stated in
Section VI.G, supra, shall not be a Force Majeure event and shall
be resolved as set forth in Section VI.G, supra. If OCC claims
and EPA agrees that a delay or prevention of performance is or
was attributable to a Force Majeure event, any failure by OCC to
perform Work under this Consent Decree that results solely from
the Force Majeure event shall not be deemed a violation of this
Consent Decree.

B.   1.   OCC shall, within forty-eight (48) hours of when it
knows of a Force Majeure, knows or should have known of a Force
Majeure event, notify, by telephone, the EPA RPM or, in the event
of his or her unavailability, the Chief of the Site Compliance
Branch, Emergency and Remedial Response Division of EPA, Region
II at (212) 264-2649, and the NJDEP Case Manager at (609) 633-
1455 or, after business hours, the NJDEP Hotline at (609) 292-
7172.

2.   Within fourteen (14) calendar days of the date it
provides the notice specified in Section XXI.B.1, supra, OCC
shall also notify EPA and NJDEP, in writing. Such notice shall
include, to the extent such information is available to or
obtainable by OCC, the reason(s) for such delay or prevention of
performance, the anticipated duration of such delay, OCC's
rationale for interpreting such circumstances as being beyond its

MAXUS018208

control (should that be its claim), the measure(s) taken and to be taken by OCC to prevent or minimize the delay, and the time OCC estimates to implement such measure(s).  Such notice shall be accompanied by all pertinent documentation including, but not limited to, third party correspondence.

    3.  Failure to provide timely notice in accordance with Section XXI.B.2, supra, shall constitute a waiver of any claim of Force Majeure.

    C.  If OCC claims and EPA agrees that a delay or prevention of performance is or was attributable to a Force Majeure event, the affected plans or schedules incorporated in this Consent Decree may be modified by OCC, subject to EPA's approval, to provide such additional time as may be necessary to allow for completion of the specific phase of the Work and/or any succeeding phase of the Work affected by such delay, or to allow for the completion of a substitute activity in furtherance of the implementation of the Work in the event EPA, in consultation with the State, determines that a substitute activity is appropriate. The modification of such affected plans or schedules, and/or the substitution of an activity shall not be deemed a "modification" within the meaning of Sections XXXII.A and XXXII.C, infra.

    D.  EPA's determination that a delay or prevention of performance is or was attributable to a Force Majeure event shall not necessarily justify or excuse nonperformance on any subsequent day.

MAXUS018209

E.  OCC shall have the burden of proving that any failure to perform any obligation under this Consent Decree is excused by this Section XXI.

## XXII.

### REIMBURSEMENT

A.  United States.

    1.  Past Costs.

        a.  Within forty-five (45) calendar days of receipt of a demand for payment, subject to Section XXII.A.4, infra, OCC shall pay to the Hazardous Substances Superfund all costs incurred by the United States since February 1, 1985, for response actions relating to the Diamond Alkali Superfund Site.  Payment shall be made by certified or cashiers check payable to the "EPA Hazardous Substances Superfund," mailed to EPA - Region II, Attention: Superfund Accounting, P.O. Box 360188M, Pittsburgh, Pennsylvania 15251.  A copy of such check shall be sent to the Regional Counsel, Office of Regional Counsel, EPA, Region II, 26 Federal Plaza, New York, New York 10278, Attention:  Diamond Alkali Site Attorney.

        b.  As soon thereafter as is practicable, EPA shall make a demand or successive demands for payment of those remaining costs incurred by the United States as of the effective date of

MAXUS018210

DACD:07:14:89

this Consent Decree. OCC shall make payment of such costs in ac-
cordance with Section XXII.A.1.a, supra, subject to Section
XXII.A.4, infra.

    2. <u>Oversight Costs</u>.

    Within forty-five (45) calendar days of receipt from
the United States of an itemized accounting of costs incurred in
connection with its oversight functions under this Consent Decree
for a fiscal year or any part thereof, OCC shall pay to the Hazard-
ous Substances Superfund all those undisputed costs incurred by
the United States during the period in question. Such costs
shall include, but shall not be limited to, those costs incurred
by the United States in connection with its review or development
of plans, reports and other items, its oversight of the Work
implemented by OCC pursuant to this Consent Decree, its efforts
to secure access to the Site or other areas for performance of
the Work required under this Decree, and any additional response
costs, including enforcement costs, relating to matters covered
by this Decree. Such payments shall be remitted by OCC as
specified in Section XXII.A.1.a, supra.

    3. <u>Effect of Dispute Resolution</u>.

    i. During the pendency of and pending the
resolution of any dispute pursuant to Section XXIV, infra, and
subject to Section XXII.A.4, infra, OCC shall not be required to
tender payment of any disputed costs to EPA under Sections
XXII.A.1 or XXII.A.2, supra, provided that, during the pendency

MAXUS018211

of the resolution of the dispute, such disputed costs shall be paid into an interest-bearing escrow account within forty-five (45) calendar days of receipt of a demand for payment, plus any additional time for payment that may accrue pursuant to Section XXII.C, infra.

ii.   In the event OCC prevails in any dispute resolution under Section XXIV, infra, OCC shall have no liability to pay such disputed costs to EPA under Sections XXII.A.1 and XXII.A.2, supra, and the monies in the interest-bearing escrow account shall be returned to OCC.

iii.   In the event OCC does not prevail in any dispute resolution under Section XXIV, infra, OCC shall be liable to EPA for the monies in the interest-bearing escrow account, such monies to be paid to EPA within forty-five (45) calendar days of the final resolution of the dispute.

4.   The initial one million dollars ($1,000,000) of response costs set forth in Section XXII.A.1, supra, are not inconsistent with the National Contingency Plan.  The Parties are not addressing the issue of consistency with the National Contingency Plan with respect to those Section XXII.A.1 response costs, if any, which exceed one million dollars ($1,000,000).

MAXUS018212

5.   Payment by OCC of the response costs set forth in
Sections XXII.A.1 and A.2, <u>supra</u>, is not a penalty, fine or
monetary sanction.

6.   Interest shall accrue on any amounts overdue under
Sections XXII.A.1 and A.2, <u>supra</u>, in accordance with Section 107(a)
of CERCLA, 42 U.S.C. § 9607(a).   In accordance with 31 U.S.C.
§3717, a handling charge shall be assessed at the end of each
thirty (30) calendar day late period, and a six (6) percent per
annum penalty charge shall be assessed if the penalty is not paid
within ninety (90) calendar days of the due date.

B.   <u>The State of New Jersey</u>.

1.   <u>Past Costs</u>.

a.   Within forty-five (45) calendar days of receipt of
a demand for payment, OCC shall pay to the State all costs incurred
by the State as of the effective date of this Consent Decree,
for response actions relating to the Diamond Alkali Superfund
Site.   Payment shall be made by certified check payable to the
"Treasurer, State of New Jersey," mailed to the Division of
Hazardous Waste Management, New Jersey Department of
Environmental Protection, 401 East State Street - CN 028,
Trenton, New Jersey 08625-0028, Attention:   Ms. Melinda Dower.

b.   As soon thereafter as is practicable, the State
shall make a demand or successive demands for payment of those
remaining costs incurred by the State as of the effective date of

MAXUS018213

this Consent Decree.  OCC shall make payment of such costs in ac-
cordance with Section XXII.B.1.a, supra.

    2.  Oversight Costs.

        Within forty-five (45) calendar days of receipt from
the State of an itemized accounting of costs incurred in
connection with its oversight functions under this Consent Decree
and those items of work specified in the letter produced by the
State pursuant to Section XXXVI.C.2, infra, for a fiscal year or
any part thereof, OCC shall pay to NJDEP those costs incurred by
the State for the period in question.  Such costs shall include,
but shall not be limited to, those costs incurred by the State in
connection with its review or development of plans, reports and
other items, its oversight of the Work implemented by OCC
pursuant to this Consent Decree, its efforts to secure access to
the Site or other areas for performance of the Work required
under this Consent Decree, and any additional response costs,
including enforcement costs, relating to matters covered by this
Decree and those items of work specified in the letter produced
by the State pursuant to Section XXXVI.C.2, infra.  Payment shall
be remitted as specified in Section XXII.B.1.a, supra.

    3.  Payment by OCC of the response costs set forth in
Sections XXII.B.1 and XXII.B.2, supra, is not a penalty, fine or
monetary sanction.

4.   The payments due to the State under this Section XXII.B are not subject to dispute resolution under this Consent Decree.

C.   Documentation.

1.   All demands for payment made by EPA or the State pursuant to this Section XXII. will include cost documentation that verifies that the claimed costs were incurred and that the amount of the demand was properly calculated, and will include the amount, date, description of activity, entity or person to whom the costs were paid or by whom the costs were incurred.

2.   Upon receipt of written request, EPA and the State shall make the underlying cost documentation available to OCC for review, and shall designate persons with information concerning the incurrence of costs to answer reasonable questions of OCC concerning such costs, subject to any legal or statutory privilege. Any delay of greater than fourteen (14) calendar days from the date of request by OCC under this Section XXII.C.2 shall extend the due date by an equivalent number of days of delay beyond the fourteenth (14th) calendar day for the payment of those costs which are the subject of the data request, but in no event beyond an additional sixty (60) calendar days.

MAXUS018215

## XXIII.

### STIPULATED PENALTIES

A.  Subject to Section XXI, _supra_, and Section XXIV, _infra_,
Settling Defendants agree to make payments to EPA and the State
as set forth in this Section XXIII.

B.  For each and every violation of the reporting require-
ments set forth in Sections XIV.A, B, C and D, OCC shall pay
stipulated penalties to EPA and the State in the amount of five
hundred dollars ($500) per calendar day per violation.

C.  Except as otherwise specified in Section XXIII.B, _supra_,
in the event OCC or CLH fails to meet any requirement as to it
under this Consent Decree that falls after the entry of this
Decree with this Court, including, but not limited to: (1) any
requirement set forth in an approved plan which becomes incorpo-
rated in this Decree, (2) any deadline, time limit or schedule
milestone established under this Decree, and (3) any payment of
past costs, oversight costs, stipulated penalties or interest re-
quired hereunder, OCC or CLH shall pay to EPA and the State sti-
pulated penalties in the following amounts for each calendar day
of each and every violation of said requirement:

MAXUS018216

DACD:07:14:89                                    61

| Calendar Days of Delay | Penalty Per Violation Per Calendar Day |
|---|---|
| 1st through 5th day | $ 1,500 |
| 6th through 14th day | $ 5,000 |
| 15th through 30th day | $ 6,500 |
| 31st through 90th day | $ 8,500 |
| 91st day and beyond | $15,000 |

The sums shown are the total penalty owed per violation per calendar day to EPA and the State.

    D.  Stipulated penalties shall begin to accrue on the day that performance is due or noncompliance occurs, and shall continue to accrue through the final day of correction of the noncompliance. Stipulated penalties relating to the adequacy of any reports, plans or other items requiring EPA's response shall begin to accrue on the day OCC or CLH receives written notification of the violation from EPA. Nothing herein shall prevent the simultaneous accrual of separate penalties for separate violations of this Consent Decree, provided that in the event a report, plan or other item requiring EPA approval pursuant to Sections XIV or XV, supra, is disapproved for more than one (1) reason, only a single stipulated penalty shall be owed for each day of noncompliance stemming from such disapproval. This does not, however, preclude the imposition of separate stipulated penalties stemming from the disapproval of and the lateness of the same submittal.

    E.  Subject to Section XXIII.M, infra, all stipulated penalties due under this Section XXIII shall be payable to EPA and the

MAXUS018217

DACD:07:14:89                    62

State within forty-five (45) calendar days of OCC or CLH's
receipt of a notification of noncompliance.  Interest shall begin
to accrue on any unpaid balance, if any, on the first calendar
day after payment is due.

F.    Interest shall accrue on any amounts overdue under this
Section XXIII in accordance with Section 107(a) of CERCLA, 42
U.S.C. §9607(a).  In accordance with 31 U.S.C. §3717, a handling
charge shall be assessed at the end of each thirty (30) calendar
day late period, and a six (6) percent per annum penalty charge
shall be reassessed if the penalty is not paid within ninety (90)
calendar days of the due date.

G.    Those stipulated penalties which become due shall be
paid by Settling Defendants, fifty (50) percent to EPA and fifty
(50) percent to the State.

H.    Those stipulated penalties due to EPA shall be paid by
certified or cashiers check payable to "EPA Hazardous Substances
Superfund," and shall be mailed to EPA - Region II, Attention:
Superfund Accounting, P.O. Box 360188M, Pittsburgh, Pennsylvania
15251.  A copy of such check shall be sent to the Regional
Counsel, Office of Regional Counsel, EPA, Region II, 26 Federal
Plaza, New York, New York 10278, Attention:  Diamond Alkali Site
Attorney.

I.    Those stipulated penalties due to the State shall be
paid by certified check payable to the "Treasurer, State of New
Jersey," and shall be mailed to the Division of Hazardous Waste

MAXUS018218

Management, New Jersey Department of Environmental Protection,

401 East State Street - CN 028, Trenton, New Jersey 08625-0028,

Attention: Ms. Melinda Dower.

       J.  In addition to the payments set forth above, the United

States and the State specifically reserve the right to seek reme-

dies, sanctions and/or penalties which may be available to the

United States and the State by reason of OCC or CLH's failure to

comply with the requirements of this Consent Decree, including

sanctions and penalties that the United States may seek under

Section 122(l) of CERCLA, 42 U.S.C. §9622(l).  The United States

and the State, however, will not utilize such remedies to obtain

penalties inconsistent with the exercise or result of the dispute

resolution provisions of Section XXIV, _infra_.  The United States

and the State agree that this Court should consider the amount of

stipulated penalties already paid by OCC or CLH under this

Section XXIII for a particular violation, in the award of any

monetary sanctions or penalties that OCC or CLH may be required

to pay in the event that the United States or the State seeks

additional relief against OCC or CLH for the same noncompliance.

Nothing in this Section XXIII.J shall limit any remedy or action

available to the United States or the State at law or equity

(including the remedy of contempt) to enforce the terms of this

Consent Decree.

       K.  No payments under this Section shall be tax deductible.

       L.  The payment of stipulated penalties does not alter

MAXUS018219

Settling Defendants' responsibility to complete any requirement
of this Consent Decree.

   M.   Effect of Dispute Resolution.

        1.   During the pendency of and pending the resolution of
any dispute pursuant to Section XXIV, infra, OCC or CLH shall not
be required to tender payment of any stipulated penalties to EPA
and the State under this Section XXIII provided that, during the
pendency of the resolution of such dispute, those stipulated
penalties that accrue during any month shall be paid into an
interest-bearing escrow account monthly, by not later than the
fifth (5th) calendar day of each calendar month after the dispute
arises.

        2.   In the event OCC or CLH prevails in any dispute re-
solution under Section XXIV, infra, OCC or CLH shall have no lia-
bility to pay stipulated penalties to EPA and the State under
this Section XXIII with respect to the matter submitted for
dispute resolution, and the monies in the interest-bearing escrow
account shall be returned to OCC or CLH.

        3.   In the event OCC or CLH does not prevail in any
dispute resolution under Section XXIV, infra, OCC or CLH shall be
liable to EPA and the State for the monies in the interest-
bearing escrow account plus all stipulated penalties that have
accrued which have not yet been paid into the escrow account, all
such monies to be paid to EPA and the State within forty-five

MAXUS018220

(45) calendar days of the final resolution of the dispute, except

as provided in Section VIII.C, supra.

N.   EPA and the State each have the discretion to waive or

reduce payments otherwise due under this Section XXIII.


                              XXIV.

                        DISPUTE RESOLUTION

A.   As required by Section 121(e)(2) of CERCLA, 42 U.S.C.

§9621(e)(2), the Parties shall attempt to resolve expeditiously

and informally any disagreements concerning the implementation or

application of this Consent Decree or the performance of the Work

required hereunder.   Unless the Parties agree otherwise, in writ-

ing, such attempted informal resolution shall not extend beyond

thirty (30) calendar days from the date on which EPA, OCC or CLH

receives written notice of the existence of a dispute.

B.   If a dispute arising under this Consent Decree is not

resolved through informal means under Section XXIV.A, supra, the

interpretation advanced by EPA shall be considered binding unless

OCC or CLH invokes the dispute resolution provisions of this

Section XXIV.   Should OCC or CLH desire dispute resolution under

this Section XXIV, it shall give written notice to EPA within

five (5) calendar days after receipt of EPA's written interpre-

tation of the subject of the dispute.

C.   1.  Within fifteen (15) Working Days of receipt of

notice of dispute pursuant to Section XXIV.B, supra, OCC and/or

CLH shall serve on EPA and the State a written statement which
sets forth the issues in dispute, the relevant facts upon which
the dispute is based, any factual data, analysis or opinion
supporting its position, and supporting documentation
(hereinafter such written statement shall be referred to as a
"Statement of Position") on which it relies.

2.   EPA shall serve its Statement of Position on OCC or
CLH no later than thirty (30) calendar days after receipt of OCC
or CLH's Statement of Position.

3.   Within fifteen (15) calendar days of receipt of
EPA's Statement of Position, OCC or CLH may serve a Reply
Statement of Position.

4.   Within fifteen (15) calendar days of receipt of OCC
or CLH's Reply Statement of Postion, EPA may serve a Surreply
Statement of Position.

5.   EPA may extend the time periods for exchange of
Statements of Position by any party.

D.   An administrative record of any dispute under this Sec-
tion XXIV shall be maintained by EPA.  This record shall include
the written notification of such dispute, the Statements of Posi-
tion and any other relevant information.  The record shall be
available for review by the Parties.

E.   Upon review of the administrative record, the Director
of the Emergency and Remedial Response Division, EPA Region II

MAXUS018222

shall issue an Order resolving the dispute, a copy of which will
be provided to OCC or CLH.

    F.  Any such Order issued pursuant to Section XXIV.E, supra,
shall be reviewable by this Court provided that within seven (7)
calendar days of receipt of the Order, OCC or CLH files a
petition for judicial review with this Court which describes the
nature of the dispute.  Thereafter, judicial review will be
available only by instituting a new action to the extent
permitted by law.  In proceedings on any dispute between EPA and
OCC concerning matters covered by Section 113(j) of CERCLA, 42
U.S.C. §9613(j), OCC shall have the burden of demonstrating that
the position of EPA is arbitrary and capricious or otherwise not
in accordance with law.  In all other disputes, the standard of
review will be determined in accordance with applicable law.

    G.  The invocation or implementation of the procedures
stated in this Section XXIV shall not stay the accrual of stipu-
lated penalties, extend or postpone any deadline, or affect in
any way Settling Defendants' obligations (including the obliga-
tion to pay stipulated penalties) under this Consent Decree with
respect to the disputed issue unless otherwise agreed to by EPA, in
writing, or ordered by this Court, provided that this Court may
modify such schedule only if OCC or CLH both prevails in dispute
resolution and demonstrates that such schedule modification is
required by the impracticality of having to continue the Work
pending the resolution of the dispute.  In the event that a dispute

MAXUS018223

relates solely to the issue of stipulated penalties that arise in connection with an agreed upon or Court ordered schedule modification, OCC need only address the issue of the appropriateness of stipulated penalties to be paid to EPA and the State.

H.  The invocation or implementation of the procedures stated in this Section XXIV shall not stay the accrual of stipulated penalties under Section XXIII, supra.  However, such penalties shall be paid into an interest-bearing escrow account pursuant to Section XXIII.M, supra.

### XXV.

### COVENANTS NOT TO SUE

A.   OCC.

1.  In consideration of the Work which will be performed and payments which will be made by OCC under the terms of this Consent Decree, and in consideration of the work which has been performed and will be performed pursuant to ACO I and ACO II, and except as otherwise specifically provided in Sections XXV.A.2, XXV.A.3, XXV.A.4, XXV.A.5 and XXV.A.6, infra, the United States and the State covenant not to sue or to issue any administrative orders against OCC for Covered Matters.  These covenants extend only to OCC and do not release any other person from liability. For purposes of this Section XXV.A, and except as provided in Sections XXV.A.4, XXV.A.5 and XXV.A.6, infra, "Covered Matters"

MAXUS018224

include any and all civil claims available to the United States
under Sections 106(a) and 107(a) of CERCLA, 42 U.S.C. §§9606(a)
and 9607(a), and Section 7003 of RCRA, 42 U.S.C. §6973, and
available to the State under Section 107(a) of CERCLA, 42 U.S.C.
§9607(a), and N.J.S.A. 58:10-23.11a et seq., N.J.S.A. 13:1E-1 et
seq., and N.J.S.A. 58:10A-1 et seq., relating solely to the Work
performed under this Consent Decree and ACO I and ACO II, and for
the reimbursement of costs incurred by the United States and the
State prior to the effective date of this Decree, in connection
with this Site pursuant to Section XXII, supra.  This covenant
not to sue OCC shall take effect upon receipt of all payments
due, and does not extend to future liability.

       2.   This covenant not to sue OCC shall be conditioned
upon performance by OCC of its obligations under this Consent
Decree, ACO I and ACO II.

       3.   This covenant not to sue OCC does not pertain to
any matters other than Covered Matters as defined by Section
XXV.A.1, supra.

            4.   "Covered Matters" does not include:

            i.   Liability arising from Hazardous Materials re-
moved from the Diamond Alkali Superfund Site;

            ii.  Liability arising from past, present or future
disposal or release or threatened release of Hazardous Materials
outside of the Site;

MAXUS018225

iii.  Liability for damages for injury to, destruction of or loss of natural resources resulting from the release of Hazardous Materials at the Diamond Alkali Superfund Site;

iv.  Claims based on a failure by OCC to meet the requirements of this Consent Decree including, but not limited to, claims for injunctive relief or claims for civil penalties pursuant to Section 122(1) of CERCLA, 42 U.S.C. §9622(1);

v.  Liability for violations of Federal or State law which occur during implementation of the Work;

vi.  Claims based on criminal liability;

vii.  Any matter as to which the United States or the State is owed indemnification under Section XXVII.A, _infra_; and

viii.  Liability for third party claims asserted against EPA, NJDEP and the New Jersey Spill Compensation Fund, N.J.S.A. 58:10-23.11a _et seq._

5.  Notwithstanding any other provision of this Consent Decree, the United States reserves its right to institute proceedings in this action or in a new action seeking to compel OCC (1) to perform additional response actions at the Site, or (2) to reimburse the United States for response costs if:

i.  conditions at the Site, previously unknown to the United States, are discovered, or

ii.  information is received, in whole or in part, after entry of this Consent Decree,

MAXUS018226

and the Administrator of EPA or his delegate finds, based on
these unknown conditions or this information, together with any
other relevant information, that the Work is not protective of
public health or welfare or the environment.  The provisions of
this Section XXV.A.5 in no way limit OCC's obligations under
Section VIII, supra, to perform any additional response action.

        6.  Notwithstanding any other provision of this Consent
Decree, the State reserves its right to institute proceedings in
this action or in a new action seeking to compel OCC (1) to
perform additional response actions at the Site, or (2) to
reimburse the State for response costs if:

            i.  conditions at the Site, previously unknown to
the State, are discovered, or

            ii.  information is received, in whole or in part,
after entry of this Consent Decree,
and the Commissioner of NJDEP or his delegate finds, based on
these unknown conditions or this information, together with any
other relevant information, that the Work is not protective of
public health or welfare or the environment. The provisions of
this Section XXV.A.6 in no way limit OCC's obligations under
Section VIII, supra, to perform any additional response action.

    B.  Limited Covenant For CLH.

        1.  Except as otherwise specifically provided in Section
XXV.B.3., infra, the United States and the State covenant not to

sue or to issue any administrative orders against CLH for Covered
Matters as defined in Section XXV.B,2, _infra_.  These covenants
extend only to CLH and do not release any other person from lia-
bility.

2.  For purposes of this Section XXV.B, and except as
specifically provided in Section XXV.B.3, _infra_, "Covered
Matters" include those actions which will be performed by CLH
pursuant to Sections III and XI, _supra_.  This covenant not to sue
CLH shall be conditioned upon performance by CLH of its
obligations under this Consent Decree.

3.  The United States and the State reserve their rights
to take any administrative or judicial action against CLH for any
other liability which it may have pursuant to CERCLA, RCRA,
N.J.S.A. 13:1D-1 _et seq_., N.J.S.A. 58:10A-1 _et seq_., N.J.S.A.
13:1E-1 _et seq_., and N.J.S.A. 58:10-23.11a _et seq_., including,
but not limited to, any liability which CLH may have for those
matters set forth in Section XXV.A.4, _supra_.


XXVI.

## WAIVER OF ANY CLAIM-SPLITTING DEFENSE

The Parties recognize and acknowledge that the settlement
embodied in this Consent Decree is only a partial resolution of
issues related to the remediation of conditions at the Diamond

Alkali Superfund Site.  Settling Defendants hereby waive the de-

fenses of the entire controversy doctrine and claim-splitting by

the United States and the State with respect to amending of the

Complaint in this action or the filing of sequential lawsuits by

the United States and/or the State for claims involving the

Diamond Alkali Superfund Site in subsequent litigation regarding

Settling Defendants' liability for remedial action to address

off-Site areas, including, without limitation, the Passaic River

and other areas and/or payment of costs to·finance remedial

action to address the Passaic River and other areas.


### XXVII.

### OTHER CLAIMS

A.  OCC agrees to indemnify, save and hold harmless the Uni-

ted States and the State and their representatives from any and

all claims or causes of action arising from acts or omissions of

Settling Defendants and/or their contractors, subcontractors or

any other person acting on their behalf in the performance of the

Work or their failure to perform fully or complete the Work.

B.  The United States and the State are not to be construed

as parties to, and do not assume any liability for, any contract

entered into by Settling Defendants in carrying out the activi-

ties required pursuant to this Consent Decree.  The proper

completion of the Work required under this Consent Decree is the

sole responsibility of OCC.

MAXUS018229

C. Settling Defendants waive any claims for damages or reimbursement from the United States or the State or for set-off of any payments made or to be made to the United States or the State, arising from or on account of any contract, agreement or arrangement between any one or more of the Settling Defendants and any person performing the Work on or with respect to the Site, including but not limited to claims on account of construction delays.

## XXVIII.

## CLAIMS AGAINST THE FUNDS

A. In consideration of the entry of this Consent Decree, Settling Defendants waive any rights they may have to assert any claims pursuant to Sections 106(b)(2) and/or 112 of CERCLA, 42 U.S.C. §§9606(b)(2) and/or 9612, against the United States for reimbursement from the Hazardous Substances Superfund for any past costs or costs incurred by Settling Defendants in performing the Work required by this Consent Decree, and nothing in this Decree shall be construed as EPA's preauthorization of a CERCLA claim against the Hazardous Substances Superfund within the meaning of 40 C.F.R. §300.25 and any amendments thereto. Settling Defendants' waiver of any rights they may have to assert claims pursuant to Section 106(b) of CERCLA, 42 U.S.C. §9606(b), is limited to claims that may arise in the implementation of the Work.

MAXUS018230

B.  Settling Defendants waive their rights to assert any
claims against the State, including the New Jersey Spill Com-
pensation Fund, N.J.S.A. 58:10-23.11a et seq., for reimbursement
of any sum related to any past costs or costs incurred in per-
forming the Work required under this Consent Decree.

## XXIX.

### INSURANCE/FINANCIAL RESPONSIBILITY

A.  Prior to commencing any on-Site Work, Settling Defen-
dants shall procure and shall maintain or shall cause to be
procured and maintained for the duration of this Consent Decree,
general liability and automobile insurance with limits of five
million dollars ($5,000,000), and one million dollars
($1,000,000), respectively, and shall use best efforts to and
shall document and provide to EPA and the State documentation of
their efforts to have EPA and the State named as additional
insureds.  In addition, for the duration of this Consent Decree,
Settling Defendants shall satisfy all applicable laws and re-
gulations regarding the provision of workers compensation in-
surance.

B.  Prior to commencement of the Work under this Consent
Decree, OCC shall provide EPA and NJDEP with a certificate of
insurance in the required amounts.

C.  If OCC demonstrates by evidence satisfactory to EPA that
any contractor or subcontractor maintains insurance equivalent to

MAXUS018231

that described above, or insurance covering the same risks but in
a lesser amount, then, with respect to that contractor or subcon-
tractor, OCC need provide only that portion of the insurance de-
scribed above which is not maintained by the contractor or sub-
contractor.

     D.  OCC shall not be liable to EPA and the State for and
does not assume liability for any injury or damages to persons or
property resulting solely from acts or omissions of EPA or the
State or by any person acting by, through or under them or on
their behalf in carrying out any activity under this Consent
Decree.

XXX.

NOTICES

     A.  Whenever, under the terms of this Consent Decree, notice
is required to be given, a report or other document is required
to be forwarded by one party to another or any other written
communication is required, such correspondence or a copy thereof
shall be directed to the addresses and individuals specified
below, unless this Consent Decree specifies otherwise:

       1.  <u>As to the United States and/or EPA</u>:

          a.  Chief, New Jersey Superfund Branch
             Office of Regional Counsel
             United States Environmental Protection Agency,
               Region II
             26 Federal Plaza
             New York, New York  10278
             Attention:  Diamond Alkali Site Attorney

MAXUS018232

DACD:07:14:89                                77

    b.  Chief, New Jersey Compliance Branch
       United States Environmental Protection Agency,
         Region II
       26 Federal Plaza, Room 737
       New York, New York  10278
       Attention:  Diamond Alkali Project Manager

    c.  Chief, Environmental Enforcement Section Land &
       Natural Resources Division
       United States Department of Justice
       Benjamin Franklin Station
       P.O. Box 7611
       Washington, D.C.  20044
       Attention:  File No. 90-11-2-399

**2.**  <u>As to the State and/or NJDEP</u>:

    New Jersey Department of Environmental Protection
    Division of Hazardous Waste Management
    401 East State Street
    CN 028
    Trenton, New Jersey  08625-0028
    Attention:  Ms. Melinda Dower

**3.**  <u>As to OCC</u>:

    Occidental Chemical Corporation
    c/o Maxus Energy Corporation
    717 North Harwood Street
    Dallas, Texas  75201
    Attention:  Mr. William C. Hutton
              Director, Environmental Affairs

**4.**  <u>As to CLH</u>:

    Chemical Land Holdings, Inc.
    c/o Maxus Energy Corporation
    717 North Harwood Street
    Dallas, Texas  75201
    Attention:  Mr. William C. Hutton
              Director, Environmental Affairs

    B.  The United States (and, where applicable, EPA) and the

State (and, where applicable, NJDEP) agree that they will provide

each other with a copy of any notice, report or other document

MAXUS018233

directed to OCC or CLH.  Such copies shall be directed to the ad-
dresses and individuals specified in Section XXX.A, supra.

## XXXI.

### LODGING AND OPPORTUNITY FOR PUBLIC COMMENT

A.  This Consent Decree shall be lodged with this Court for
not less than thirty (30) calendar days for public notice in ac-
cordance with the requirements of Section 122(d)(1)(2) of CERCLA,
42 U.S.C. §9622(d)(1)(2), and 28 C.F.R. §50.7.

B.  The United States and the State reserve their right to
withhold consent if comments disclose facts or considerations
which indicate that this Consent Decree is inappropriate,
improper or inadequate.

## XXXII.

### MODIFICATION

A.  Except as expressly provided for in Sections VII, VIII,
X, and XXI, supra, there shall be no material modification of
this Consent Decree without written approval of all Parties to
this Decree and this Court.

B.  No oral modifications of this Consent Decree shall be
effective.

C.  Modifications that do not materially alter the require-
ments of this Consent Decree may be made upon written consent of
all Parties, which shall be filed with this Court.

MAXUS018234

## XXXIII.

### ADMISSIBILITY OF DATA

In the event that this Court is called upon to resolve a dispute concerning implementation of this Consent Decree, the Parties waive any evidentiary objection to the admissibility into evidence of the results of any analyses of samples conducted by or for a party at or in connection with the Diamond Alkali Superfund Site, or other data gathered, generated, or evaluated pursuant to this Decree, unless a party can demonstrate that there was a significant noncompliance with applicable chain of custody procedures. The Parties waive their right to contest the validity of any data unless it is established that such data has not been validated in accordance with all relevant quality assurance and quality control procedures established by or pursuant to this Consent Decree, or unless it is established that the data has not met the quality assurance and quality control criteria of the applicable approved Quality Assurance Project Plan.

## XXXIV.

### CONTINUING JURISDICTION

This Court retains jurisdiction over both the subject matter of this Consent Decree and over all Parties for the duration of the performance of the terms and provisions of this Consent Decree for the purposes of issuing such further orders or

directions as may be necessary or appropriate to construe or
modify the terms of this Decree, or to effectuate compliance with
its terms, to the extent allowed by law.

## XXXV.

### COMMUNITY RELATIONS

Settling Defendants shall cooperate with EPA and NJDEP in
providing information regarding the Work required under this Con-
sent Decree to the public.  As requested by EPA or NJDEP,
Settling Defendants shall participate in the preparation of all
appropriate information disseminated to the public and in public
meetings which may be held or sponsored by EPA and/or NJDEP to
explain activities at or concerning the Diamond Alkali Superfund
Site.

## XXXVI.

### OTHER PROVISIONS

A.   This Consent Decree shall be effective upon the date of
its entry by this Court.

B.   Notwithstanding Section XXXVI.A, supra, within seven (7)
calendar days of lodging of this Consent Decree with this Court,
each party, to the extent applicable to it, agrees to comply (ex-
cept as expressly provided elsewhere in this Decree) with the

MAXUS018236

following Sections of this Consent Decree:  V, VI, X, XIV, XV,

XIX, XXI, XXIV, XXVII, XXX, XXXII, XXXIII and XXXV.

C.  1.  OCC hereby agrees to perform the obligations imposed

upon Diamond Shamrock Chemicals Company under ACO I and ACO II.

Those provisions of ACO I and ACO II that relate to matters be-

yond the scope of the matters covered by this Consent Decree

shall remain in effect.  Those provisions of ACO I and ACO II

that relate to matters within the scope of the matters covered by

this Consent Decree are superseded.  The letters of credit

referenced in Section XVIII, supra, shall remain in effect as

provided therein, and NJDEP shall be able to draw upon said

letters of credit in order to satisfy the requirements of ACO I

and ACO II.

2.  The remaining specific items of work which were ori-

ginally to be performed pursuant to ACO I and ACO II and which

are beyond the scope of this Consent Decree shall be identified

by the State within forty-five (45) Working Days of the entry of

this Decree.  Failure by the State to provide such an identifica-

tion will not constitute a violation of this Consent Decree.  The

specific items of work which remain to be identified under ACO I

and ACO II, and NJDEP's review and approval of the implementation

and completion of such items by OCC are not subject to dispute

resolution under this Consent Decree.

D.  The provisions of State of New Jersey Executive Orders

Nos. 40 and 40 D (1983) shall remain in effect.  The Work

MAXUS018237

DACD:07:14:89                          82

performed by OCC pursuant to this Consent Decree is consistent with said Executive Order.

E.  The section headings set forth in this Consent Decree are included for convenience of reference only, and shall be disregarded in the construction and interpretation of any of the provisions of this Decree.

F.  This Consent Decree represents the entire agreement among the Parties with respect to the matters covered by this Decree, and shall supersede all drafts, writings, negotiations and discussions among the Parties.

**********

MAXUS018238

THE UNDERSIGNED PARTIES hereby enter into this Consent Decree:

**PLAINTIFFS**

FOR THE UNITED STATES:

RICHARD B. STEWART
Assistant Attorney
General
Land and Natural Resources
   Division
U.S. Department of Justice
Washington, D.C.  20530

SUSAN C. CASSELL
United States Attorney's Office
District of New Jersey
Newark, New Jersey  07102

JERRY SCHWARTZ
Attorney
Environmental Enforcement
Section
Land and Natural Resources
   Division
U.S. Department of Justice
Washington, D.C.  20530

EDWARD E. REICH
Acting Assistant Administra-
   tor for Enforcement and
   Compliance Monitoring
U.S. Environmental Protection
   Agency
Washington, D.C.  20460

MAXUS018239

DACD:07:14:89

_Randye B. Stein_
RANDYE B. STEIN
Assistant Regional Counsel
U.S. Environmental Protection
Agency
Region II
New York, New York  10278

FOR THE STATE OF NEW JERSEY:

_Carl T. Corcory_
(Signature)
Ronald T. Corcory

Type Name:

Assistant Director for
Responsible Party Cleanups
Division of Hazardous Waste
Management
State of New Jersey
Department of Environmental
Protection
Trenton, N.J.  08625

SETTLING DEFENDANTS

Settling Defendants herein, Occidental Chemical Corporation, as successor to Diamond Shamrock Chemicals Company, and Chemical Land Holdings, Inc., by the duly authorized representatives named, titled and signed hereunder, hereby consent to this Consent Decree with respect to the Diamond Alkali Superfund Site located in Newark, New Jersey, and to the filing of this Decree with the United States District Court for the District of New Jersey, and agree to be bound by the terms and conditions hereof.

Upon the lodging of this Consent Decree, Settling Defendants agree that all requirements as to service of process set forth in Federal Rule of Civil Procedure 4, including service of a

MAXUS018240

summons, and all requirements as to service of pleadings and

other papers set forth in Federal Rule of Civil Procedure 5, and

any applicable local rules of this Court, shall be deemed to be

met by service of process by mail upon the following authorized

agents:

FOR OCCIDENTAL CHEMICAL CORPORATION,
  as successor to
Diamond Shamrock Chemicals Company:

    Authorized agent for service of process:

                Michael J. Rudick
                Vice President and General Counsel
                Occidental Chemical Corporation
                5005 LBJ Freeway
                Occidental Tower
                Dallas, Texas  75244

        By:     _____
                MICHAEL J. RUDICK
                Vice President and General
                Counsel
                Occidental Chemical Corpora-
                tion

FOR CHEMICAL LAND HOLDINGS, INC.

    Authorized agent for service of process:

                D. L. Smith
                President
                Chemical Land Holdings, Inc.
                717 North Harwood Street
                Dallas, Texas  75201

        By:     _____
                D. L. SMITH
                President
                Chemical Land Holdings, Inc.

DACD:07:14:89                    86

APPROVED and ENTERED this

      day of _____, 1989.


                              _____
                              UNITED STATES DISTRICT JUDGE

MAXUS018242

# Exhibit 99

**To:**      Mugdan, Walter[Mugdan.Walter@epa.gov]; Flanagan, Sarah[Flanagan.Sarah@epa.gov]; Mellott, Deborah[Mellott.Deborah@epa.gov]
**From:**    Fajardo, Juan
**Sent:**    Tue 5/23/2017 2:15:03 PM
**Subject:** RE: Passaic

I spoke with David Mandelbaum who's client is Benjamin Moore. We had a long conversation (you don't need all the details). His idea is that EPA enter into settlements with all the PRPs but Oxy for the RD. He knows that Oxy is performing and funding the RD. His idea is that the PRPs would pay a small amount (each would pay the same amount) and then have peace of mind for a few years until the remedy needs to be implemented. I told him that seems grossly unfair to Oxy, and he said that whatever underpayment the PRPs make to the RD would be captured during the RA.

As we talked, David did raise an interesting issue. He said that this case will end in litigation because courts take into account "soft allocation factors" (fairness, knowledge of release, fault…), that EPA and DOJ don't care much about. The U.S. likes to base its decisions on waste-in lists and amount of material released and not in degree of culpability. He says that this difference results in parties choosing between go to EPA or seeking litigation. For instance, Oxy would prefer to have EPA involvement in the settlement process whereas most of the other majors want a court to decide each parties "fair" share.

I told David that I don't think there will be much interest here in pursuing a settlement with the PRPs re: the RD. I did not say that I would call him back with a response to his proposal (he got that). That said, we left the door open for further discussions down the line, and I did tell him that we expect to notify the proposed major parties before a final decision is made and provide those proposed parties with an opportunity to speak with us regarding that designation.

**From:** Mugdan, Walter
**Sent:** Tuesday, May 23, 2017 8:30 AM
**To:** Fajardo, Juan <Fajardo.Juan@epa.gov>
**Subject:** RE: Passaic

Yes, please.  Thanks.

**From:** Fajardo, Juan

**Sent:** Tuesday, May 23, 2017 8:23 AM
**To:** Flanagan, Sarah <Flanagan.Sarah@epa.gov>; Mugdan, Walter <Mugdan.Walter@epa.gov>
**Subject:** RE: Passaic

Walter,

Do you want me to call David?

Juan

**From:** Flanagan, Sarah
**Sent:** Tuesday, May 23, 2017 8:11 AM
**To:** Mugdan, Walter <Mugdan.Walter@epa.gov>
**Cc:** Fajardo, Juan <Fajardo.Juan@epa.gov>
**Subject:** RE: Passaic

Thanks Walter.  We've been receiving many such calls.

I'm copying Juan, who is typically the recipient of the calls and is a good listener.

**From:** Mugdan, Walter
**Sent:** Tuesday, May 23, 2017 8:06 AM
**To:** Flanagan, Sarah <Flanagan.Sarah@epa.gov>
**Subject:** Passaic

Hi Sarah,

Last Friday, when I was away from the office, Maureen Hickey took a phone message for me from a David Mandelbaum, attorney with Greenberg & Traurig, 215-988-7813 (or cell: 610-247-0183).  Maureen wrote:

"He knows you from ABA +/or FMC Middleport [a RCRA site].  Re: Passaic, client is Benjamin Moore.  He has an idea that you may find useful."

Perhaps you can give him a call back.

Thanks,

Walter

# Exhibit 100



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
REGION II
290 BROADWAY
NEW YORK, NEW YORK 10007-1866

April 7, 2023

<u>VIA EMAIL ONLY</u>

Larry Silver, Esq.
Langsam Stevens Silver & Hollaender, LLP
1818 Market Street, Suite 2610
Philadelphia, PA 19103
lsilver@lssh-law.com

Re:    Diamond Alkali Superfund Site, Operable Unit 4
       Unilateral Administrative Order for Remedial Design
       USEPA Region 2 CERCLA Docket No. 02-2023-2011

Dear Mr. Silver:

On March 2, 2023, the United States Environmental Protection Agency ("EPA") issued a
Unilateral Administrative Order ("UAO") under Section 106(a) of the Comprehensive
Environmental Response, Compensation, and Liability Act, as amended ("CERCLA"), 42 U.S.C.
§ 9606(a), to Occidental Chemical Corporation ("Occidental") to perform the remedial design
for the interim remedy selected in EPA's Record of Decision ("ROD") issued in September 2021
for the upper 9 miles of the Lower Passaic River, Operable Unit 4 of the Diamond Alkali
Superfund Site.

By letter dated March 10, 2023, Occidental submitted its Notice of Intent to Comply with the
UAO.  The Effective Date of the UAO is March 13, 2023.

Pursuant to Section XII, Paragraph 60 of the UAO, EPA requires Occidental to establish
financial assurance in the amount of $115 million.  As you know, the purpose of financial
assurance is to ensure the availability of funds for cleanups without using limited Superfund
resources. The Guidance on Financial Assurance in Superfund Settlement Agreements and
Unilateral Administrative Orders, April 6, 2015,[1] ("April 2015 Guidance") states that, "FA
requirements are generally designed to ensure that sufficient funds are available for the
government or another party to complete cleanup work if a PRP does not perform the required
work."[2]  The April 2015 Guidance goes on to say, "the required FA amount should capture
EPA's indirect costs and the costs of long-term measures, such as O&M."[3]  Therefore, the

---

[1] https://www.epa.gov/sites/default/files/2015-04/documents/fa-guide-2015.pdf
[2] See page 5.
[3] Id.

appropriateness of using EPA's cost estimates for the remedial design work required by the UAO is supported by EPA guidance.

While Occidental mentioned in its March 10th Notice of Intent to Comply that, in its view, the financial assurance amount should be lower than the amount that EPA required in the UAO, Occidental nonetheless stated that it "intends to provide financial assurance in compliance with and up to the amount specified in the Order" and did not avail itself of the opportunity to meet and confer on this issue with EPA prior to the effective date of the UAO. Nor did Occidental seek a modification of the financial assurance amount consistent with Paragraph 67 of the UAO, which requires a written request with an appropriate explanation of the basis for the requested changes. Rather, Occidental discussed these issues informally with EPA during a technical meeting with EPA on March 28, 2023.

EPA has considered Occidental's comments conveyed during the technical meeting regarding the appropriate amount of financial assurance. Upon further review of the underlying EPA cost estimate, EPA has made adjustments and is hereby modifying the amount of financial assurance required under the UAO to $92,655,000. In particular, as per the table below, EPA has adjusted the last three tasks under "Indirect Capital Costs" in Table 12-1 Alternative C Cost Estimate Summary (page 2 of 3) of the ROD, which provides the basis for the financial assurance amount set forth in the UAO, to reflect the estimated costs associated with the performance of the remedial design.

| Task | Units | Quantity | Unit Price | Total Cost |
|---|---|---|---|---|
| Pre-Design Investigations (PDI) | Lump Sum | 1 | $50,000,000 | $50,000,000 |
| Remedial Design (RD) | Lump Sum | 1 | $21,000,000 | $21,000,000 |
| Coordination with Agencies/Stakeholders | % | 0.5 | PDI + RD | $355,000 |
| Project Management | % | 5 | PDI + RD | $3,550,000 |
| Contingency | % | 25 | PDI + RD | $17,750,000 |
| **TOTAL Estimated Cost of the Work** | | | | **$92,655,000** |

EPA expects that this modification in the calculated financial assurance amount has resolved this matter. Please note that this modification is being made pursuant to Paragraph 67 of the UAO, and without waiving the requirements that for any request to reduce the amount of financial assurance or change the form or terms, the requirements of the UAO must be adhered to.

If you have any questions, please contact Assistant Regional Counsel, Frances M. Zizila, at (212) 637-3135.

Sincerely,


Eric Wilson
Deputy Director for Enforcement & Homeland Security

cc:    Kathy Patrick, Esq.

# Exhibit 101

🇺🇸 An official website of the United States government

🔍

MENU

**Superfund**          CONTACT US <https://epa.gov/superfund/forms/contact-us-about-superfund>

# Groundwater Technologies

Superfund groundwater cleanup technologies and strategies have evolved since the program's inception in 1980. Initially, groundwater pump and treat was the primary technology and strategy used, often as the only groundwater remedial approach. Over the years, new groundwater treatment technologies and approaches have become available allowing flexibility in how cleanup goals can be achieved. The following section provides guidance and technical information on groundwater remediation and measurement technology.

On this page:

- Groundwater Remediation Technologies and Techniques
- Groundwater Measurement and Monitoring Technologies and Techniques
- Monitored Natural Attenuation for Groundwater
- Non-Aqueous Phase Liquids (NAPLS) and Groundwater
- Reinjection of Groundwater for Remediation

---

## Related Groundwater Links

- Groundwater Introduction <https://epa.gov/superfund/superfund-groundwater-introduction>
- How Superfund Addresses Groundwater Contamination <https://epa.gov/superfund/how-superfund-addresses-groundwater-contamination>

# Groundwater Remediation Technologies and Techniques

The following section provides guidance and technical information on the technologies and techniques for treating contaminated groundwater.

## Guidance

Promotion of Innovative Technologies in Waste Management Programs (PDF) <https://semspub.epa.gov/src/document/hq/157429> (12 pp, 1.2 MB)
April 1996, OSWER Policy Directive 9380.0-25, EPA 542-F-96-012

This directive describes EPA initiatives to facilitate the testing, demonstration and use of innovative cleanup and field measurement technologies. It stresses EPA's commitment to promoting environmental technology development and commercialization.

---

## Related Links

- Remediation Technologies for Cleaning up Contaminated Sites <https://epa.gov/remedytech>
- Vapor Intrusion <https://epa.gov/vaporintrusion/vapor-intrusion-superfund-sites>

---

- Groundwater Guidance and Reports: Table of Contents <https://epa.gov/superfund/groundwater-guidance-and-reports-table-contents>
- Groundwater Cleanup Flexibilities <https://epa.gov/superfund/groundwater-cleanup-flexibilities>
- Selecting a Groundwater Remedy <https://epa.gov/superfund/selecting-groundwater-remedy>
- Completing a Groundwater Response <https://epa.gov/superfund/completing-groundwater-response>
- Ground Water Forum <https://epa.gov/superfund/ground-water-forum>

Guidance for Implementing Superfund Reform Initiative 9a: Risk Sharing (PDF)
<http://semspub.epa.gov/src/document/hq/160616>(6 pp, 290 K)
March 1998, OSWER Directive 9010.02

EPA developed this guidance to support implementation of Superfund Reform Initiative
9a: Risk Sharing. Under this initiative, EPA agrees to share the risk of implementing
innovative remediation technologies that can improve performance and reduce costs.

Superfund Remedy Report <https://epa.gov/remedytech/superfund-remedy-report>

Once every three years, EPA prepares the Superfund Remedy Report to provide
information and analyses on remedies EPA selected to address contamination,
including groundwater contamination, at Superfund National Priorities List and
Superfund Alternative Approach sites. The latest report, the 16th edition, compiles and
analyzes Superfund remedial actions selected in fiscal years (FYs) 2015, 2016 and 2017,
and provides trends since FY 1982.

# Technical Information

For technical resources concerning remediation, including technologies for
groundwater cleanup, see the following websites and documents:

CLU-IN: EPA's Hazardous Waste Cleanup Information <http://www.clu-in.org/>
CLU-IN provides a comprehensive source of information about site characterization and
remediation technologies and techniques, including those pertaining to groundwater.
Users may subscribe to receive a monthly email that announces recent documents,
training and conferences related to site assessment and remediation.

Remediation Technology Focus Area <http://www.clu-in.org/techfocus/>
Through this focus area, CLU-IN provides information on remediation technologies and
techniques. Many groundwater technologies are included.

Remedial Technology Fact Sheet — Activated Carbon-Based Technology for In Situ
Remediation (PDF) <https://semspub.epa.gov/src/document/hq/100001159>(9 pp, 915 K)
April 2018, EPA 542-F-18-001

This fact sheet provides information to practitioners and regulators on science and current practice of activated carbon-based remedial technologies for in situ applications.

Examples of Groundwater Remediation at NPL Sites (PDF)
<https://semspub.epa.gov/src/document/11/100001479>(114 pp, 2.7 MB)
May 2018, EPA 542-R-18-002

This report highlights some National Priorities List sites where EPA has used innovative and established technologies to restore groundwater for use as drinking water.

In Situ Treatment Performance Monitoring: Issues and Best Practices (PDF)
<https://semspub.epa.gov/src/document/11/100001169>(15 pp, 2 MB)
April 2018, EPA 542-F-18-002

This document discusses issues that are likely to occur in monitoring wells during and after active in situ treatment at contaminated sites. The paper discusses potential sampling and analytical issues, highlights the mechanisms and impacts on performance monitoring, and provides best practices.

In Situ Thermal Treatment Technologies: Lessons Learned (PDF)
<https://epa.gov/sites/production/files/2015-06/documents/istt_ll_issue_paper.pdf>(46 pp, 8.7 MB)
May 2014

This engineering paper summarizes information from 10 years of development and deployment of in situ thermal treatment (ISTT) technologies based on in-depth interviews with USEPA staff and ISTT vendors whose experience extends beyond federal response action sites.

Ground Water Sample Preservation at In-Situ Chemical Oxidation Sites: Recommended Guidelines (PDF) <https://clu-in.org/download/techfocus/chemox/isco-sample-preservation.pdf>(16 pp, 620 K)
August 2012, EPA 600-R-12-049

This paper provides background information, general guidelines, and specifics for methods and procedures that can be used to detect whether an oxidant (permanganate or persulfate) is present in groundwater, to approximate the oxidant concentration, and

to estimate and deliver the volume or mass of preservative required to preserve the binary mixture groundwater sample.

A Systematic Approach for Evaluation of Capture Zones at Pump and Treat Systems (PDF) <https://semspub.epa.gov/src/document/hq/131346>(166 pp, 20 MB)
January 2008, EPA 600-R-08-003

This document describes a systematic approach for performing capture zone analysis associated with groundwater pump-and-treat systems. This analysis is meant to determine the zone of hydraulic control of a pump-and-treat system.

Options for Discharging Treated Water from Pump and Treat Systems (PDF) <https://semspub.epa.gov/src/document/hq/176384>(23 pp, 355 K)
May 2007, EPA542-R-07-006

This fact sheet presents information on available options for the discharge of water that results from a P&T remedy.

Engineering Issue Paper: In-Situ Chemical Oxidation (PDF) <https://clu-in.org/download/contaminantfocus/pcb/isco-600r06072.pdf>(60 pp, 1.2 MB)
August 2006, EPA600-R-06-072

This paper, produced by the EPA Risk Management Research Laboratory and the Engineering Forum, provides an overview of in-situ chemical oxidation remediation technologies and fundamentals.

Cost-Effective Design of Pump and Treat Systems (PDF) <https://semspub.epa.gov/src/document/hq/174138>(38 pp, 423 K)
April 2005, EPA542-R-05-008

This fact sheet summarizes key aspects to consider for designing cost-effective pump and treat systems. Topics include remedy goals and performance monitoring, system design parameters, extraction system considerations, appropriate treatment technologies, discharge options, and system controls.

Evaluation of Subsurface Engineered Barriers at Waste Sites (PDF) <https://semspub.epa.gov/src/document/hq/160986>(148 pp, 1.7 MB), Volume 2, Appendix B (PDF) <https://semspub.epa.gov/src/document/hq/189831>(244 pp, 15.5 MB)

August 1998, EPA 542-R-98-005

This report provides a national retrospective analysis of subsurface barrier field performance and information on the use and evaluation of barrier systems.

Pump-And-Treat Ground-Water Remediation: A Guide for Decision Makers and Practitioners (PDF)(90 pp, 2.8 MB)
July 1996, Office of Research and Development, EPA/625/R-95/005

This guide is an introduction to pump-and-treat groundwater remediation. It presents decisionmakers with a foundation for evaluating the appropriateness of conventional or innovative approaches to pump and treat, including when it is an appropriate remediation approach, effective application, how to anticipate tailing and rebound, and recommended methods for effective hydraulic containment.

Ground Water Forum Website <https://epa.gov/remedytech/technical-support-project-cleaning-contaminated-sites-ground-water-forum>

This website contains publications on various groundwater issues developed by the Ground Water Forum, a network of EPA remedial project managers, corrective action staff, on-scene coordinators and research scientists.

---

# Groundwater Measurement and Monitoring Technologies

The following section provides technical resources for site characterization and monitoring at sites requiring groundwater cleanup.

Characterization and Monitoring Technology Focus Area <http://clu-in.org/characterization/>
CLU-IN provides information in this focus area on characterization and monitoring technologies for soil gas/air, sediment, soil and groundwater. Examples of the types of technologies included are gas chromatograph-mass spectrometer, fiberoptic chemical sensors, direct-push platforms, and groundwater passive/no purge samplers.

High-Resolution Site Characterization <https://clu-in.org/characterization/technologies/hrsc/>
High-resolution site characterization (HRSC) strategies and techniques use scale-appropriate measurement and sample density to define with greater certainty contaminant distributions and their surrounding environment. This website describes HRSC; how it can streamline and improve characterization efforts; how it is conducted; available support, resources and tools; case studies; practitioner forums; publications; training offerings; and archived training presentations.

Site Characterization Technologies for DNAPL Investigations
<https://semspub.epa.gov/src/document/11/134428>
September 2004, EPA 542-R-04-017

This report summarizes information on the state of technologies available for locating and characterizing dense non-aqueous phase liquid (DNAPL) contaminated sites.

Groundwater Sampling and Monitoring with Direct Push Technologies <https://clu-in.org/s.focus/c/pub/i/1207/>
August 2005, OSWER Publication 9200.1-51, EPA 540/R-04/005

This guidance clarifies how direct push technologies can be used to meet a variety of data quality requirements for a variety of site conditions. This document focuses on related groundwater sampling issues, particularly those regarding the quality and usability of groundwater data.

Ground-Water Sampling Guidelines for Superfund and RCRA Project Managers (PDF)
<https://semspub.epa.gov/src/document/hq/174328>(53 pp, 639 K)
May 2002, EPA 542-S-02-001

This document, developed by the Ground Water Forum, provides sampling guidelines primarily for groundwater monitoring wells that have a screen or open interval with a length of 10 feet or less and which can accept a sampling device. Procedures that minimize disturbance to the aquifer will yield the most representative groundwater samples. This document provides a summary of current and/or recommended groundwater sampling procedures.

Groundwater Issue: Low-Flow (Minimal Drawdown) Groundwater Sampling Procedures (PDF) <https://semspub.epa.gov/src/document/hq/174364>(12 pp, 79 K)
April 1996, EPA 540-S-95-504

This Ground Water Forum report provides information on the development of low-flow sampling procedures and its application under a variety of hydrogeologic settings.

Methods for Monitoring Pump-and-Treat Performance (PDF)
<http://semspub.epa.gov/src/document/hq/174486>(111 pp, 2.1 MB)
June 1994, EPA/600/R-94/123

This publication provides guidance for monitoring the effectiveness and efficiency of pump-and-treat remediation systems.

---

# Monitored Natural Attenuation

Depending on site conditions and cleanup goals, response actions may include "active" treatment or "less active" approaches. For certain sites, monitored natural attenuation, which relies on natural processes that decrease or attenuate soil and groundwater contaminant concentrations, may be used to complement or as an alternative to pump-and-treat or other active technologies. The following section provides guidance and technical information on monitored natural attenuation.

## Guidance

Use of Monitored Natural Attenuation for Inorganic Contaminants in Groundwater at Superfund Sites (PDF) <http://semspub.epa.gov/src/document/hq/177087>(83 pp, 1.3 MB)
August 2015, OSWER Directive 9283.1-36

This policy document expands on and is a companion to the 1999 monitored natural attenuation (MNA) guidance referenced directly below. Together, these two policy documents provide guidance on the consideration of MNA for a broad range of contaminants at Superfund sites. The 2015 MNA guidance recommends a phased analytical approach tailored to inorganic contaminants.

Use of Monitored Natural Attenuation at Superfund, RCRA Corrective Action, and Underground Storage Tank Sites (PDF) <http://semspub.epa.gov/src/document/hq/159152>(39 pp, 1.9 MB)
April 1999, OSWER Directive 9200.4-17P, EPA 540/R-99/009

This directive clarifies EPA's policy regarding the use of MNA for the remediation of contaminated soil and groundwater. It outlines potential advantages and disadvantages of this remedy, the conditions under which it should be selected, the type of site most suitable for this remedy, the site data required to support the decision, performance monitoring considerations, and the use of contingency remedies.

# Technical Information

Monitored Natural Attenuation of Inorganic Contaminants in Ground Water, Volume 1: Technical Basis for Assessment, Office of Research and Development (PDF)

<https://semspub.epa.gov/src/document/11/189715>(94 pp, 2.5 MB)

October 2007, EPA 600-R-04-027

This document is the first volume of three reports that address assessing the potential applicability of MNA as part of a groundwater remedy for plumes with non-radionuclide and/or radionuclide inorganic contaminants. This volume describes 1) the conceptual background for natural attenuation for inorganic contaminants, 2) the technical basis for attenuation of inorganic contaminants in groundwater, and 3) approaches to site characterization to support evaluation of MNA.

Monitored Natural Attenuation of Inorganic Contaminants in Ground Water, Volume 2: Assessment for Non-Radionuclides Including Arsenic, Cadmium, Chromium, Copper, Lead, Nickel, Nitrate, Perchlorate, and Selenium (PDF)

<https://semspub.epa.gov/src/document/11/189716>(124 pp, 2 MB)

October 2007, EPA 600-R-07-140

This document is the second of three reports that address assessing the potential applicability of MNA as part of a groundwater remedy for plumes with non-radionuclide and/or radionuclide inorganic contaminants. This volume describes the natural processes that may result in the attenuation of the listed contaminants and data requirements to be met during site characterization. A tiered analysis approach is presented to assist in organizing site characterization tasks.

Monitored Natural Attenuation of Inorganic Contaminants in Ground Water, Volume 3: Assessment for Radionuclides Including Tritium, Radon, Strontium, Technetium, Uranium, Iodine, Radium, Thorium, Cesium, and Plutonium-Americium (PDF)

<https://semspub.epa.gov/src/document/11/153375>(147 pp, 7.1 MB)

September 2010, EPA 600-R-10-093

This document is the third volume of a set of three reports that address assessing the potential applicability of MNA as part of a groundwater remedy for plumes with non-radionuclide and/or radionuclide inorganic contaminants. This volume describes the natural processes that may result in the attenuation of the listed contaminants and data requirements to be met during site characterization.

Performance Monitoring of MNA Remedies for VOCs in Groundwater (PDF)

<http://semspub.epa.gov/src/document/11/189717>(96 pp, 1.8 MB)

September 2003, OSWER 9355.4-25, EPA540R-03-004

[Also issued as EPA/600/R-04/027 in April 2004]

This report identifies data needs and evaluation methods useful for monitoring the performance of MNA remedies selected for volatile organic compounds (VOCs) in groundwater.

Technical Protocol for Evaluating Natural Attenuation of Chlorinated Solvents in Groundwater (PDF) <http://semspub.epa.gov/src/document/hq/100000022>(248 pp, 5.6 MB)

September 1998, EPA 600-R-98-128

This protocol describes the steps to understanding the rate and extent to which natural processes are reducing contaminant concentrations at sites contaminated with mixtures of chlorinated solvents and fuel hydrocarbons. Data gathered using this protocol can be used to evaluate whether MNA by itself or with other technologies is sufficient to achieve site remedial objectives, and to compare the relative effectiveness of MNA and other remedial methods.

# Non–Aqueous Phase Liquids (NAPLS) and Groundwater

NAPLs are compounds that are resistant to mixing with water. As such, they dissolve slowly, supplying potentially significant concentrations of contaminants to groundwater over very long time periods. Therefore, the presence of NAPLs will have a

significant influence on the time frame required or likelihood of achieving cleanup standards, and should be evaluated when selecting appropriate remedial actions. The following section provides guidance and technical information on NAPLS and groundwater.

# Guidance

Clarification of OSWER's 1995 Technical Impracticability Waiver Policy (PDF) <http://semspub.epa.gov/src/document/hq/175201>(4 pp, 764 K)
September 2011, OSWER Directive 9355.5-32

This memorandum clarifies the memorandum, "Superfund Groundwater RODs: Implementing Change This Fiscal Year, July 31, 1995," (OSWER Directive 9335.3-03P) regarding the use of technical impracticability waivers at sites with dense non-aqueous phase liquid (DNAPL) contamination.

Considerations in Groundwater Remediation at Superfund Sites and RCRA Facilities — Update (PDF) <http://semspub.epa.gov/src/document/11/174509>(13 pp, 76 K)
May 1992, OSWER Directive 9283.1-06

This directive clarifies and expands OSWER's 1989 directive "Considerations in Groundwater Remediation at Superfund Sites" (see "remedy selection"), especially regarding non-aqueous phase liquid (NAPL) contaminants.

Presumptive Response Strategy and Ex-Situ Treatment Technologies for Contaminated Groundwater at CERCLA Sites (PDF) <http://semspub.epa.gov/src/document/11/174592>(86 pp, 779 K)
October 1996, OSWER Publication 9283.1-12, EPA 540-R-96-023

This guidance outlines the "phased approach" for addressing contaminated groundwater. The guidance also identifies presumptive technologies for treatment of extracted groundwater, which can be used to streamline the feasibility study for sites that evaluate pump and treat.

Estimating Potential for Occurrence of DNAPL at Superfund Sites (PDF) <http://semspub.epa.gov/src/document/hq/174833>(10 pp, 470 K)
January 1992, OSWER Publication 9355.4-07FS

This fact sheet provides a guide for estimating the potential for the presence of DNAPLs at a site based on historical site use information and characterization data.

# Technical Information

DNAPL Focus Area <https://clu-in.org/contaminantfocus/default.focus/sec/dense_nonaqueous_phase_liquids_(dnapls)/cat/overview/>

Through this Focus section, CLU-IN provides a compilation of information sources on major classes of DNAPL.

Integrated DNAPL Site Characterization and Tools Selection ⧉ <https://projects.itrcweb.org/dnapl-isc_tools-selection>, ITRC, 2015

This document describes the critical concepts related to DNAPL behavior and characterization approaches and tools for collecting subsurface data at DNAPL sites.

DNAPL Remediation: Selected Projects Where Regulatory Closure Goals Have Been Achieved (PDF) <http://semspub.epa.gov/src/document/11/144052>(52 pp, 1.5 MB) August 2009, EPA 542-R-09-008

This paper highlights sites where DNAPL source reduction has been demonstrated to help meet regulatory cleanup goals. This paper updates the document, "DNAPL Remediation: Selected Projects Approaching Regulatory Closure," prepared in 2004.

Site Characterization Technologies for DNAPL Investigations (PDF) <https://semspub.epa.gov/src/document/hq/134428>(165 pp, 3 MB) September 2004, EPA 542-R-04-017

This report summarizes information on the state of technologies in 2004 available for locating and characterizing DNAPL-contaminated sites.

The DNAPL Remediation Challenge: Is There a Case for Source Depletion? (PDF) <https://semspub.epa.gov/src/document/11/134435>(129 pp, 1.3 MB) December 2003, EPA 600-R-03-143

This report contains the findings and recommendations of a panel of national and international scientists and engineers EPA selected for their expertise in DNAPL remediation. The panel was asked to conduct an independent review of the state of the

science regarding difficulties of and benefits associated with remediation of DNAPL source zones. The report also discusses research needs. It presents the views of the panel, not necessarily those of the Agency.

Groundwater Issue: Light Nonaqueous Phase Liquids (PDF)
<http://semspub.epa.gov/src/document/11/189987>(28 pp, 630 K)
July 1995, EPA 540-S-95-500

This Ground Water Forum issue paper summarizes light nonaqueous phase liquid (LNAPL) fate and transport and remediation technologies.

DNAPL Site Characterization: Quick Reference Fact Sheet (PDF)
<http://semspub.epa.gov/src/document/hq/175203>(12 pp, 685 K)
September 1994, OSWER Publication 9355.4-16FS, EPA 540-F-94-049

This fact sheet provides a strategy for investigating DNAPLs at contaminated sites.

Evaluation of the Likelihood of DNAPL Presence at NPL Sites, National Results (PDF)
<https://semspub.epa.gov/src/document/hq/175668>(114 pp, 1.1 MB)
September 1993, OSWER Publication 9355.4-13, EPA 540-R-93-073

This publication presents the results of a survey of 712 NPL sites to estimate the proportion where DNAPLs may be present. The project also assessed the usefulness of various indirect indicators of DNAPL presence associated with historical site information and groundwater contaminant information.

Groundwater Issue: Dense Nonaqueous Liquids (PDF) <https://epa.gov/remedytech/dense-nonaqueous-phase-liquids>(21 pp, 673 K)
March 1991, EPA 540-4-91-002

This Ground Water Forum issue paper provides an overview of DNAPL phase distribution, monitoring, site characterization, remediation and modeling.

# Reinjection of Groundwater

The following section provides guidance on the reinjection of treated groundwater as part of a CERCLA response action.

Applicability of RCRA Section 3020 to In-Situ Treatment of Groundwater (PDF)
<http://semspub.epa.gov/src/document/hq/131726>(6 pp, 388 K)
December 2000, OSWER/OSW Memorandum
*Attachment:* Applicability of Land Disposal Restrictions to RCRA and CERCLA Ground Water Treatment Reinjection Superfund Management Review: Recommendation No. 26 (PDF) <http://semspub.epa.gov/src/document/hq/101208>(3 pp, 317 K)
December 1989, OSWER Directive 9234.1-06

This memorandum clarifies that reinjection of treated groundwater to promote in situ treatment is allowed under RCRA section 3020(b) if certain conditions are met.

Applicability of Land Disposal Restrictions to RCRA and CERCLA Ground Water Treatment Reinjection Superfund Management Review: Recommendation No. 26 (PDF)
<http://semspub.epa.gov/src/document/hq/101208>(3 pp, 317 K)
December 1989, OSWER Directive 9234.1-06

This memorandum explains EPA's interpretation of whether the RCRA land disposal restrictions are applicable or (under CERCLA response actions only) relevant and appropriate to such reinjections or to the remediation as a whole.

Protecting Underground Sources of Drinking Water from Underground Injection (UIC)
<https://epa.gov/uic>

This EPA website contains information for owners and operators of injection wells, regulators and the public about safe injection well operations to prevent the contamination of underground sources of drinking water.

Superfund Home <https://epa.gov/superfund>

Learn About Superfund <https://epa.gov/superfund/learn-about-superfund>

Community Involvement <https://epa.gov/superfund/superfund-community-involvement>

Cleanup Support <https://epa.gov/superfund/superfund-cleanup-support>

Accomplishments & Benefits <https://epa.gov/superfund/superfund-accomplishments-and-benefits>

Cleaning up Sites <https://epa.gov/superfund/cleaning-superfund-sites>

Contaminants at Superfund Sites <https://epa.gov/superfund/contaminants-superfund-sites>

**Contaminated Media at Superfund Sites**

Abandoned Mine Lands <https://epa.gov/superfund/abandoned-mine-lands>

Contaminated Sediments <https://epa.gov/superfund/superfund-contaminated-sediments>

**Groundwater**

Soil Screening Guidance <https://epa.gov/superfund/superfund-soil-screening-guidance>

Policy, Reports & Other Documents <https://epa.gov/superfund/superfund-policy-reports-and-other-documents>

Contact Us <https://epa.gov/superfund/forms/contact-us-about-superfund> to ask a question, provide feedback, or report a problem.

LAST UPDATED ON OCTOBER 19, 2023



# Discover

• 

**Accessibility Statement** <https://epa.gov/accessibility/epa-accessibility-statement>

# Connect.

**Data** <https://epa.gov/data>

**Inspector General** <https://www.epaoig.gov/>

**Jobs** <https://epa.gov/careers>

# Ask.

**Contact EPA** <https://epa.gov/home/forms/contact-epa>

## Budget & Performance

<https://epa.gov/plandandbudget>

## Contracting

<https://epa.gov/contracts>

## EPA www Web Snapshot

<https://epa.gov/utilities/wwwepagov-snapshots>

## Grants

<https://epa.gov/grants>

## No FEAR Act Data

<https://epa.gov/ocr/whistleblower-protections-epa-and-how-they-relate-non-disclosure-agreements-signed-epa>

## Plain Writing

<https://epa.gov/web-policies-and-procedures/plain-writing>

## Privacy

<https://epa.gov/privacy>

## Privacy and Security Notice

<https://epa.gov/privacy/privacy-and-security-notice>

## Newsroom

<https://epa.gov/newsroom>

## Regulations.gov ⧉

<https://www.regulations.gov/>

## Subscribe

<https://epa.gov/newsroom/email-subscriptions-epa-news-releases>

## USA.gov ⧉

<https://www.usa.gov/>

## White House ⧉

<https://www.whitehouse.gov/>

## EPA Disclaimers

<https://epa.gov/web-policies-and-procedures/epa-disclaimers>

## Hotlines

<https://epa.gov/aboutepa/epa-hotlines>

## FOIA Requests

<https://epa.gov/foia>

## Frequent Questions

<https://epa.gov/home/frequent-questions-specific-epa-programstopics>

# Follow.



# Exhibit 102



*Transmitted Via* US Mail and Electronic Mail

December 20, 2016

United States Environmental Protection Agency
Region II
Emergency and Remedial Response Division
Diamond Alkali Superfund Site
290 Broadway, 19th Floor, Room W-20
New York, NY 10007-1866
Attention: Ms. Elizabeth Butler, Remedial Project Manager

Re:    Monthly Progress Report No. 324
       Diamond Alkali Superfund Site
       Newark, New Jersey
       Work Period: November 2016

Dear Ms. Butler:

On behalf of Occidental Chemical Corporation, submitted herewith is one (1) copy of Monthly Progress Report No. 324 for work performed during November 2016 at the Diamond Alkali Superfund Site in Newark, New Jersey. This progress report has been prepared pursuant with Section XIV.A of the Consent Decree between United States of America, The State of New Jersey, and Occidental Chemical Corporation, Civil Action No. 89-5064 (JWB) (United States District Court for the District of New Jersey).

Please call me at 732/579-7586 if you have any questions regarding this matter.

Sincerely,

Brian Mikucki
On behalf of Occidental Chemical Corporation
(as successor to Diamond Shamrock Chemicals Company)

Enclosures

Two Tower Center Blvd. 10th Floor
East Brunswick, NJ 08816

OCC-CER-S00115190

1c:    Chief, New Jersey Superfund Branch
Office of Regional Counsel
United States Environmental Protection Agency
Region II
290 Broadway, 17th Floor
New York, NY   10007-1866
Attention: Diamond Alkali Site Attorney

3c:    New Jersey Department of Environmental Protection
Bureau of Case Management, Site Remediation Program
Mail Code 401-05F
P.O. Box 420
Trenton, NJ   08625-0420
Attention: Mr. Jay Nickerson

1c:    Glenn Springs Holdings, Inc.
5 Greenway Plaza, Suite 110
Houston, TX 77046
Attention: Juan Somoano

OCC-CER-S00115191

**MONTHLY PROGRESS REPORT NO. 324**
**DIAMOND ALKALI SUPERFUND SITE**
**NEWARK, NEW JERSEY**
**WORK PERIOD:  November 2016**

Page 1 of 3

(1)    Work Performed:

(a) Tierra Solutions, Inc. (Tierra) performed operation and maintenance (O&M) activities at the Diamond Alkali Superfund Site (the Site) in accordance with the United States Environmental Protection Agency- (USEPA) approved *Operation and Maintenance Plan* (O&M Plan, Attachment G of the *Final Modified (100%) Remedial Design Report*).

(b) Inspection and monitoring activities, as required by Sections 10 through 12 in the O&M Plan, were conducted at the Site on November 11, 2016.  A checklist of the inspection and monitoring activities performed at the Site during November 2016 is included in Appendix A to this report.

(c) Tierra submitted the October 2016 Monthly Report and Discharge Monitoring Report to the USEPA on November 16, 2016.

(d) Continued to operate the Groundwater Withdrawal System (GWWS) and Groundwater Treatment System (GWTS).

(e) Effluent and process samples were collected as required.


(2)    Potential and/or Actual Noncompliances or Problems Encountered:

(a) None during this reporting period.


(3)    Corrective Actions:

(a) None during this reporting period.

(4)    Final Results of Sampling or Testing:

(a) Methane gas monitoring results for November 2016 are reported in Appendix B.

(b) Groundwater level measurements for November 2016 are reported in Appendix B.

(c) Validated effluent analytical results for November 2016 are reported in Appendix B.

**MONTHLY PROGRESS REPORT NO. 324**
**DIAMOND ALKALI SUPERFUND SITE**
**NEWARK, NEW JERSEY**
**WORK PERIOD:  November 2016**

Page 2 of 3

(5)    <u>Future Work Scheduled</u>:

    (a) Continue to operate and monitor the GWWS, GWTS, and sand layer drainage collection system.

    (b) Inspection and monitoring activities will be performed at the Site in accordance with Sections 10 through 12 in the O&M Plan.

    (c) Effluent and process samples will continue to be collected, as required.

    (d) Treated effluent from the GWTS will continue to be discharged to the Passaic River.

    (e) Continue evaluating corrective measures to restore/repair piping from EW-9 to common header.

(6)    <u>Work Completion Estimates, Delays, and Mitigation Actions</u>:

    (a) Work Completion Estimates:

        i.     Mobilization / Site preparation – 100% complete

        ii.    Slurry wall construction – 100% complete

        iii.   Floodwall construction – 100% complete

        iv.   Demolition of Structures – 100% complete

        v.    Handling of shipping containers – 100% complete

        vi.   Stabilization of drum and tank contents – 100% complete

        vii.   Underground conduit sealing – 100% complete

        viii.  Placement of secured materials construction – 100% complete

        ix.   Groundwater withdrawal system – 100% complete

OCC-CER-S00115193

**MONTHLY PROGRESS REPORT NO. 324**
**DIAMOND ALKALI SUPERFUND SITE**
**NEWARK, NEW JERSEY**
**WORK PERIOD:  November 2016**

Page 3 of 3

x.      Groundwater treatment system – 100% complete

xi.     Surficial Cap – 100% complete

xii.    Attainment of Hydraulic Gradient – 100% complete

xiii.   Demobilization – 100% complete

xiv.    Final Report for Remedial Construction – 100% complete

xv.     USEPA Approval of Final Report for Remedial Construction – 100% complete

xvi.    Preparation of REWP – 100% complete

xvii.   USEPA Approval of QAPP for the Groundwater Quality Monitoring Program – 100% complete

xviii.  USEPA Approval of REWP – 100% complete

xix.    USEPA Approval of Revisions to SAMP and QAPP Associated with the Operations and Maintenance Plan – 100% complete

xx.     Preparation of RER – 100% complete

xxi.    USEPA Approval of RER – 0% complete

(b) Delays and Mitigation Actions – None.

OCC-CER-S00115194

Appendix A

OCC-CER-S00115195

Monthly Inspection Checklist
Diamond Alkali Superfund Site
Newark, New Jersey

Date: 11/11/2016

Representative: Ryan Adair

| | Description | Yes | No | Actions | Comments |
|---|---|---|---|---|---|
| 1 | Floodwall, curbwall, and fencing along curbwall intact? | X | | No maintenance required | None |
| 2 | Perimeter and interior drains open and functional? | X | | No maintenance required | None |
| 3 | Gabions intact? | X | | No maintenance required | None |
| 4 | Perimeter fence intact? | X | | No maintenance required | None |
| 5 | Entry gates intact? | X | | No maintenance required | None |
| 6 | Paved and gravel roadways intact? | X | | No maintenance required | None |
| 7 | Piezometers and gas vents intact? | X | | No maintenance required | None |
| 8 | Surficial cap surface intact and no signs of significant ponding? | X | | No maintenance required | None |
| 9 | Extraction well chambers and interior piping intact? | X | | No maintenance required | None |
| 10 | Secondary containment intact for Tank T-1? | X | | No maintenance required | None |
| 11 | Tanks T-1 and T-8 and associated aboveground piping intact? | X | | No maintenance required | None |
| 12 | Stormwater management controls operating properly? | X | | No maintenance required | None |
| 13 | Sand Layer Drainage Collection System- Trench drains & Weirs | X | | No maintenance required | None |
| 14 | Sand Layer Drainage Collection System- Aboveground piping (floodwall & to GWTP) | X | | No maintenance required | None |
| 15 | Bubbler system operating properly for effluent tank? | NA | | No maintenance required | Frac tanks are no longer in use for storage of treated effluent |
| 16 | Effluent tanks locked appropriately? | X | | No maintenance required | None |
| 17 | Exterior of groundwater treatment system building intact? | X | | No maintenance required | None |
| 18 | Interior of groundwater treatment system building intact? | X | | No maintenance required | None |
| 19 | Secondary containment inside the groundwater treatment system building intact? | X | | No maintenance required | None |
| 20 | Floor sealant inside the groundwater treatment system building intact? | X | | No maintenance required | None |
| 21 | Sump pumps inside the groundwater treatment system building operating properly? | X | | No maintenance required | None |
| 22 | Containers stored in the residual storage area intact? | X | | No maintenance required | None |
| 23 | Groundwater measurements taken for piezometers and extraction wells? | X | | No maintenance required | Collected on 11/11/16 |
| 24 | Groundwater measurements taken from vibrating wire piezometers? | NA | | No maintenance required | No Longer Collect vibrating Wire data |
| 25 | Gas vents monitored for the presence of methane gas (inspect monthly)? | X | | No maintenance required | Collected on 11/11/16 |
| 26 | Automated security system functioning properly (inspect monthly)? | X | | No maintenance required | None |
| 27 | Floodwall visually observed with no observations of cracking, deterioration nor damage? | X | | No maintenance required | As observed from the site |

OCC-CER-S00115196

**Monthly Inspection of Interior Rooms Inside the Groundwater Treatment Building**
**Diamond Alkali Superfund Site**
**Newark, New Jersey**

1. ***Residual Storage Area***
   No issues observed, no maintenance required.
   **Odor Check**:  Normal Conditions

2. **Laboratory**
   No issues observed, no maintenance required.
   **Odor Check**:  Normal Conditions

3. ***Sludge Room***
   No issues observed, no maintenance required.
   **Odor Check**:  Normal Conditions

4. ***Bathroom***
   No issues observed, no maintenance required.
   **Odor Check**:  Normal Conditions

5. ***Locker Room***
   No issues observed, no maintenance required.
   **Odor Check**:  Normal Conditions

6. ***Decontamination Area***
   No issues observed, no maintenance required.
   **Odor Check**:  Normal Conditions

7. ***Control Room/Office/Hallway***
   No issues observed, no maintenance required.
   **Odor Check**:  Normal Conditions

8. ***Process Area***
   No issues observed, no maintenance required.
   **Odor Check**:  Normal Conditions

No issues observed, no maintenance required.

Date:        11/11/16                              Personnel: Ryan Adair

OCC-CER-S00115197

# Appendix B

OCC-CER-S00115198

# Methane Gas Monitoring Summary
## Diamond Alkali Superfund Site
### Newark, New Jersey

### November 2016

| Gas Vent | Location | CGI Reading | | | | FID Reading (ppm) | | | PID Reading (ppm) |
|---|---|---|---|---|---|---|---|---|---|
| | | CO | H2S | LEL | OXY | Initial | 1min | 2 min | Initial |
| GV-1 | NW corner- along adjacent property | 0.0 | 0.0 | 0.0 | 20.9 | 0.0 | NM | NM | 0.0 |
| GV-2 | NW corner- along Passaic River | 0.0 | 0.0 | 0.0 | 20.9 | 96.0 | 17.8 | 3.2 | 0.0 |
| GV-3 | Along Passaic River- center of lot | 0.0 | 0.0 | 0.0 | 20.9 | 276.3 | 119.3 | 14.2 | 0.0 |
| GV-4 | NE corner | 0.0 | 0.0 | 0.0 | 20.9 | 0.0 | NM | NM | 0.0 |
| GV-5 | W property line- center | 0.0 | 0.0 | 0.0 | 20.9 | 0.0 | NM | NM | 0.0 |
| GV-6 | Top of cap- NW end | 0.0 | 0.0 | 0.0 | 20.9 | 707.6 | 295.4 | 90.9 | 0.0 |
| GV-7 | Top of cap- center | 0.0 | 0.0 | 0.0 | 20.9 | 180.3 | 91.0 | 25.2 | 0.0 |
| GV-8 | Top of cap- E end | 0.0 | 0.0 | 0.0 | 20.9 | 54.3 | 19.0 | 0.0 | 0.0 |
| GV-9 | Corner of GWTP and T-8 | 0.0 | 0.0 | 0.0 | 20.9 | 0.0 | NM | NM | 0.0 |
| GV-10 | Behind T-8 | 0.0 | 0.0 | 0.0 | 20.9 | 0.0 | NM | NM | 0.0 |
| GV-11 | Between T-8 and T-1 | 0.0 | 0.0 | 0.0 | 20.9 | 0.0 | NM | NM | 0.0 |
| GV-12 | SW property line- W corner | 0.0 | 0.0 | 0.0 | 20.9 | 0.0 | NM | NM | 0.0 |
| GV-13 | SW property line- center | 0.0 | 0.0 | 0.0 | 20.9 | 0.0 | NM | NM | 0.0 |
| GV-14 | SE corner of GWTP | 0.0 | 0.0 | 0.0 | 20.9 | 0.0 | NM | NM | 0.0 |

**Notes:**

1. Combustible Gas Indicator (CGI) and Photoionization Detector (PID) was a MultiRae Plus from US Environmental

2. Flame Ionization Detector (FID) was a Photovac MicroFID from US Environmental

3. FID readings were not required at 1 minute and 2 minutes after if the presence of gas was not detected initially.

4. Methane gas monitoring performed on Nov 11, 2016.

OCC-CER-S00115199

**Diamond Alkali Superfund Site**
**Newark, New Jersey**

Summary of Groundwater Levels in Piezometers
Nov-16

| Well ID | GCP 1-1 | GCP 2-1 | GCP 3-1 | GCP 4-1 | GCP 5-1 | GCP 6-1 | GCP 7-1 | GCP 8-1 | GCP 9-1 |
|---|---|---|---|---|---|---|---|---|---|
| 8/31/2009 TOIC Elevation* | 14.14 | 15.72 | 13.86 | 12.90 | 12.86 | 14.17 | 13.84 | 13.76 | 15.07 |
| Depth to Water (ft btoc) | 13.00 | 14.67 | 12.00 | 10.00 | 8.19 | 11.17 | 10.90 | 10.81 | 12.60 |
| Total Depth | 23.95 | 27.54 | 24.35 | 13.78 | 12.64 | 15.16 | 13.94 | 14.62 | 16.06 |
| Groundwater Elevations | | | | | | | | | |
| Monitoring Date | Monitoring Time | | | | | | | | |
| 11/11/2016 | 11:03 - 11:59 | 1.14 | 1.05 | 1.86 | 2.90 | 4.67 | 3.00 | 2.94 | 2.95 | 2.47 |

| Well ID | GCP 1-2 | GCP 3-2 | GCP 4-2 | GCP 5-2 | GCP 6-2 | GCP 7-2 | GCP 8-2 | GCP 9-2 |
|---|---|---|---|---|---|---|---|---|
| 8/31/2009 TOIC Elevation* | 14.06 | 13.78 | 12.38 | 12.91 | 13.37 | 13.55 | 12.62 | 11.98 |
| Depth to Water (ft btoc) | 13.53 | 12.91 | 9.43 | 10.12 | 12.24 | 10.32 | 9.35 | 8.21 |
| Total Depth | 43.60 | 43.68 | 13.97 | 12.74 | 43.56 | 14.38 | 13.01 | 13.11 |
| Groundwater Elevations | | | | | | | | |
| Monitoring Date | Monitoring Time | | | | | | | |
| 11/11/2016 | 11:03 - 11:59 | 0.53 | 0.87 | 2.95 | 2.79 | 1.13 | 3.23 | 3.27 | 3.77 |

| Well ID | GCP 6-3 | GCP 8-3 | IP-1 | IP-2 | IP-3 | IP-4 | IP-5 | IP-6 |
|---|---|---|---|---|---|---|---|---|
| 8/31/2009 TOIC Elevation* | 13.24 | 12.96 | 0.00 | 0.00 | 0.00 | 0.00 | 23.17 | 22.65 |
| Depth to Water (ft btoc) | 9.40 | 11.83 | na | na | na | na | 20.39 | 19.88 |
| Total Depth | 14.22 | 40.80 | na | na | na | na | 24.05 | 24.05 |
| Groundwater Elevations | | | | | | | | |
| Monitoring Date | Monitoring Time | | | | | | | |
| 11/11/2016 | 11:03 - 11:59 | 3.84 | 1.13 | 0.00 | 0.00 | 0.00 | 0.00 | 2.78 | 2.77 |

**Notes:**
\* - TOIC is referenced to final PVC riser pipe elevations surveyed on August 31, 2009 by DPK Consulting
Elevations refer to groundwater levels in monitoring wells and piezometer based on NGVD 29 in feet above mean sea level (ft-amsl).
The depths of GCP 6-2 and GCP 6-3 differ from the design drawings.  GCP 6-2 is screened in the glaciofluvial sand and GCP 6-3 is screened in fill material.
"-" means no reading.
"na" - not applicable.  These four points are Vibrating Wire Piezometers and are sealed in place beneath the cap layers.
"btoc" - Below Top of Casing

# NOVEMBER 2016 SUPPLEMENTAL TABLE FOR MONTHLY DISCHARGE MONITORING REPORT

## DIAMOND ALKALI SUPERFUND SITE

## NEWARK, NEW JERSEY

| Constituent | Permit Limitation | | Sample ID: | W-TSI-EFF-110116 | W-TSI-EFF-DUP-110116 | TB-110116-705R |
|---|---|---|---|---|---|---|
| | Monthly Avg. | Daily Max | Sample Date: | 11/1/2016 | 11/1/2016 | 11/1/2016 |
| | | | SDG Number: | LISTER705R | LISTER705R | LISTER705R |
| | | | Units | Effluent | Effluent Duplicate | Trip Blank |
| Total Suspended Solids(TSS) | 30 | 50 | mg/l | 10 U | 10 U | -- |
| Total Organic Carbon (TOC) | -- | 40 | mg/l | 1.0 | 1.0 U | -- |
| Petroleum Hydrocarbons | 10 | 15 | mg/l | 5.0 UN | 5.0 UN | -- |
| pH | -- | 6 - 9 | SU | 7.3 | 7.70 | -- |
| 2,4,6-Trichlorophenol | 115 | 260 | µg/l | 5 U | 5 U | -- |
| 2-Chlorophenol | 35 | 125 | µg/l | 5 U | 5 U | -- |
| 2,4-Dichlorophenol | 23 | 150 | µg/l | 5 U | 5 U | -- |
| Phenol | 23 | 40 | µg/l | 23 U | 23 U | -- |
| 1,2,4-Trichlorobenzene | 45 | 90 | µg/l | 5.0 U | 5.0 U | 5.0 U |
| Hexachlorobenzene | 22 | 40 | µg/l | 22 U | 22 U | -- |
| 1,2-Dichlorobenzene | 40 | 110 | µg/l | 5.0 U | 5.0 U | 5.0 U |
| 1,3-Dichlorobenzene | 25 | 35 | µg/l | 5.0 U | 5.0 U | 5.0 U |
| 1,4-Dichlorobenzene | 18 | 45 | µg/l | 5.0 U | 5.0 U | 5.0 U |
| Fluoranthene | -- | 16 | µg/l | 10 U | 10 U | -- |
| Naphthalene | 35 | 105 | µg/l | 5 U | 5 U | -- |
| Phenanthrene | 35 | 105 | µg/l | 5 U | 5 U | -- |
| Benzene | 21 | 57 | µg/l | 5.0 U | 5.0 U | 5.0 U |
| Chlorobenzene | 23 | 45 | µg/l | 5.0 U | 5.0 U | 5.0 U |
| 1,2-Dichloroethane | 30 | 85 | µg/l | 5.0 U | 5.0 U | 5.0 U |
| 1,1,1-Trichloroethane | 25 | 65 | µg/l | 5.0 U | 5.0 U | 5.0 U |
| 1,1-Dichloroethane | 25 | 65 | µg/l | 5.0 U | 5.0 U | 5.0 U |
| Chloroform | 20 | 40 | µg/l | 5.0 U | 5.0 U | 5.0 U |
| 1,2-Dichloroethene (Total) | 25 | 65 | µg/l | 5 U | 5 U | -- |
| trans-1,2-Dichloroethene | 25 | 65 | µg/l | 5.0 U | 5.0 U | 5.0 U |
| Ethylbenzene | -- | 430 | µg/l | 5.0 U | 5.0 U | 5.0 U |
| Toluene | 18 | 35 | µg/l | 5.0 U | 5.0 U | 5.0 U |
| Trichloroethene | 25 | 65 | µg/l | 5.0 U | 5.0 U | 5.0 U |
| Vinyl Chloride | 25 | 65 | µg/l | 5.0 U | 5.0 U | 5.0 U |
| 4,4-DDT | -- | 0.34 | µg/l | 0.34 U | 0.34 U | -- |
| 4,4-DDE | -- | 14 | µg/l | 0.35 U | 0.35 U | -- |
| Endosulfan I | 32 | 90 | µg/l | 0.05 U | 0.05 U | -- |
| 2,4-D | 1,500 | 3,300 | µg/l | 12 U | 11 U | -- |
| 2,4-DB | 17 | 25 | µg/l | 16 UJ | 16 UJ | -- |
| Dinoseb (DNBP) | 420 | 790 | µg/l | 1.6 UJL | 1.6 UJL | -- |
| Dioxin (2,3,7,8-TCDD) | -- | 0.000081 | µg/l | 0.000081 U | 0.000081 U | -- |
| Total Recoverable Antimony | 200 | 305 | µg/l | 60 U | 60 U | -- |
| Total Recoverable Arsenic | 50 | 115 | µg/l | 10 U | 10 U | -- |
| Total Recoverable Beryllium | -- | 8.6 | µg/l | 8.6 U | 8.6 U | -- |
| Total Recoverable Cadmium | -- | 31 | µg/l | 31 U | 31 U | -- |
| Hexavalent Chromium | -- | 66 | µg/l | 44 U | 44 U | -- |
| Trivalent Chromium * | -- | 44 | µg/l | 10 U | 10 U | -- |
| Total Recoverable Copper | -- | 62 | µg/l | 62 U | 62 U | -- |
| Total Recoverable Lead | -- | 18 | µg/l | 18 U | 18 U | -- |
| Total Recoverable Mercury | -- | 3.4 | µg/l | 3.4 U | 3.4 U | -- |
| Total Recoverable Nickel | -- | 73 | µg/l | 73 U | 73 U | -- |
| Total Recoverable Silver | -- | 69 | µg/l | 69 U | 69 U | -- |
| Total Recoverable Zinc | -- | 47 | µg/l | 47 U | 47 U | -- |
| Total Cyanide | -- | 78 | µg/l | 78 U | 78 U | -- |

Notes:
mg/l - Milligrams/liter
µg/l - Micrograms/liter
SU - Standard units
-- - Not applicable
U - Constituent was not detected above the associated detection limit
UN - Constituent was not detected above the associated detection limit; Tentatively Identified Compound, analyte passed identification criteria, and is considered to be positively identified.
UJL - The material was analyzed for, but was not detected. The sample quantitation limit is an estimated quantity. Low bias is indicated.
* Trivalent Chromium Concentration is calculated based on the total and hexavalent chromium results.

OCC-CER-S00115201

# Appendix C

OCC-CER-S00115202

**SUMMARY FOR THE SUBMISSION TO THE COURT**
**MONTHLY PROGRESS REPORT NO. 324**
**DIAMOND ALKALI SUPERFUND SITE**
**NEWARK, NEW JERSEY**
**WORK PERIOD: November 2016**

Page 1 of 3

(1)   Work Performed:

    (a) Tierra Solutions, Inc. (Tierra) performed operation and maintenance (O&M) activities at the Diamond Alkali Superfund Site (the Site) in accordance with the United States Environmental Protection Agency- (USEPA) approved *Operation and Maintenance Plan* (O&M Plan, Attachment G of the *Final Modified (100%) Remedial Design Report*).

    (b) Inspection and monitoring activities, as required by Sections 10 through 12 in the O&M Plan, were conducted at the Site on November 11, 2016. A checklist of the inspection and monitoring activities performed at the Site during November 2016 is included in Appendix A to this report.

    (c) Tierra submitted the October 2016 Monthly Report and Discharge Monitoring Report to the USEPA on November 18, 2016.

    (d) Continued to operate the Groundwater Withdrawal System (GWWS) and Groundwater Treatment System (GWTS).

    (e) Effluent and process samples were collected as required.

(2)   Potential and/or Actual Noncompliances or Problems Encountered:

    (a) None during this reporting period.

(3)   Corrective Actions:

    (a) None during this reporting period.

(4)   Final Results of Sampling or Testing:

    (a) Methane gas monitoring results for November 2016 are reported in Appendix B.

    (b) Groundwater level measurements for November 2016 are reported in Appendix B.

OCC-CER-S00115203

**SUMMARY FOR THE SUBMISSION TO THE COURT**
**MONTHLY PROGRESS REPORT NO. 324**
**DIAMOND ALKALI SUPERFUND SITE**
**NEWARK, NEW JERSEY**
**WORK PERIOD: November 2016**

Page 2 of 3

(c) Validated effluent analytical results for November 2016 are reported in Appendix B.

(5) <u>Future Work Scheduled</u>:

(a) Continue to operate and monitor the GWWS, GWTS, and sand layer drainage collection system.

(b) Inspection and monitoring activities will be performed at the Site in accordance with Sections 10 through 12 in the O&M Plan.

(c) Effluent and process samples will continue to be collected, as required.

(d) Treated effluent from the GWTS will continue to be discharged to the Passaic River.

(e) Continue evaluating corrective measures to restore/repair piping from EW-9 to common header.

(6) <u>Work Completion Estimates, Delays, and Mitigation Actions</u>:

(a) Work Completion Estimates:

    i.     Mobilization / Site preparation – 100% complete

    ii.    Slurry wall construction – 100% complete

    iii.   Floodwall construction – 100% complete

    iv.   Demolition of Structures – 100% complete

    v.    Handling of shipping containers – 100% complete

    vi.   Stabilization of drum and tank contents – 100% complete

    vii.  Underground conduit sealing – 100% complete

OCC-CER-S00115204

**SUMMARY FOR THE SUBMISSION TO THE COURT**
**MONTHLY PROGRESS REPORT NO. 324**
**DIAMOND ALKALI SUPERFUND SITE**
**NEWARK, NEW JERSEY**
**WORK PERIOD: November 2016**

Page 3 of 3

    viii.    Placement of secured materials construction – 100% complete

    ix.    Groundwater withdrawal system – 100% complete

    x.    Groundwater treatment system – 100% complete

    xi.    Surficial Cap – 100% complete

    xii.    Attainment of Hydraulic Gradient – 100% complete

    xiii.    Demobilization – 100% complete

    xiv.    Final Report for Remedial Construction – 100% complete

    xv.    USEPA Approval of Final Report for Remedial Construction – 100% complete

    xvi.    Preparation of REWP – 100% complete

    xvii.    USEPA Approval of QAPP for the Groundwater Quality Monitoring Program – 100% complete

    xviii.    USEPA Approval of REWP – 100% complete

    xix.    USEPA Approval of Revisions to SAMP and QAPP Associated with the Operations and Maintenance Plan – 100% complete

    xx.    Preparation of RER – 100% complete

    xxi.    USEPA Approval of RER – 0% complete

(b) Delays and Mitigation Actions – None.

OCC-CER-S00115205