**TAB 6**

**Batson Treated OxyChem Differently Than the Settling Parties**

| Issue | Batson's treatment of settling parties | Batson's treatment of OxyChem |
|---|---|---|
| **Historic Fill**<br>OCC Cmt.77-78<br>Ref.21<br>Ref.22<br>Ref.23<br>Ref.24<br>RS.70 | Mercury, lead, and copper were detected in the soil at Benjamin Moore's site. Because the site is constructed on historic fill, Batson did not attribute any of those detections to Benjamin Moore's operations.<br><br>Batson also disregarded the PCBs detected in Benjamin Moore's soil as resulting from historic fill. But the site was constructed before PCBs were used, and New Jersey's regulations—which Batson purported to apply—do not associate PCBs with historic fill.<br><br>Batson had extensive evidence that mercury, lead, copper *and* PCBs were used extensively in Benjamin Moore's operations, but disregarded the detections of those chemicals anyway. | The former Diamond Alkali plant site was also constructed on fill. Lead and copper were detected in Lister Site soils at concentrations that New Jersey's regulations would permit attributing to historic fill.<br><br>But Batson interpreted those detections as resulting from the operations of Diamond Alkali, *not* from historic fill. He did so despite having *no* evidence lead and copper were used in Diamond Alkali's operations.<br><br>EPA admits Batson did not evaluate historic fill to Diamond Alkali plant site in the same way as the settling parties' sites, but cannot explain why Batson did so. |
| **Cooperation:** OU2 Remedy<br>OCC Cmt.29, 78-80<br>RS.27<br>Ex.21 | When selected the OU2 remedy, the settling parties notified EPA they would not even consider performing or funding EPA's remedy.<br><br>When EPA instructed OxyChem to invite other parties to assist with funding the design of EPA's OU2 remedy, every settling party refused.<br><br>Batson did not penalize the settling parties' allocation score based on their lack of cooperation with EPA on the OU2 remedy. | When EPA asked OxyChem to voluntarily agree to design the OU2 remedy in 2016, and fund the design's $165 million estimated cost, OxyChem promptly agreed to do so.<br><br>The Batson Report acknowledged OxyChem was the only party voluntarily performing the OU2 remedial design, but Batson provided no "cooperation" adjustment to OxyChem's score as a result.<br><br>EPA acknowledged this was unfair to OxyChem, but provided no further explanation. |

1

| | | |
|---|---|---|
| **Cooperation:** OU4 Remedial Investigation and Feasibility Study  OCC Cmt.80-81  RS.71 | Certain settling parties participated under a 2007 settlement with EPA in performing and funding the remedial investigation and feasibility study in OU4.  Each of those parties contributed, on average, less than $2 million toward that work.  Based on that participation, Batson favorably adjusted the score of each of those settling parties by 20%. | OxyChem and its indemnitor contributed nearly $31 million to the *same* remedial investigation performed in OU4.  But Batson only adjusted OxyChem's allocation score by 10%—half the positive adjustment awarded to each settling party, despite the substantial difference in the amount of funding provided by OxyChem and its indemnitor.  EPA acknowledged this was unfair to OxyChem, but provided no further explanation. |
| **Cooperation:** Participation in Batson Process vs. Phase I Removal  OCC Cmt.80-81  Ref.21  RS.71 | Batson rewarded the participating allocation parties by assigning a 20% penalty to OxyChem's allocation score because OxyChem declined to participate in the allocation.  This reward to the participating allocation parties was given *double* the weight of the $83.6 million removal project completed by OxyChem's indemnitor in OU2. | Batson's punishment of OxyChem for not participating in the allocation process was assigned *double* the weight of the 10% positive adjustment OxyChem was given for its indemnitor's completion of the Phase 1 Removal action, which remove *40,000* cubic yards of contaminated sediment from the Passaic River under a settlement with EPA.  Batson acknowledged the Phase I Removal benefitted all OU2 PRPs by removing substantially more COCs from OU2 than the Diamond Alkali facility contributed, for every COC except dioxin.  The Phase I Removal cost over $83.6 million to complete and was funded by OxyChem's indemnitor.  EPA acknowledged this was unfair to OxyChem because the Phase I removal "remediated the river and would have cost much more than participation in the allocation." |
| **Culpability**  OCC Cmt.81-84  RS.71 | Batson acknowledged the "wide divergence" of available information about the "culpability" of the settling parties.  Despite the lack of consistent information for each party, Batson assigned a penalty to certain parties for "culpability." But even settling parties like Legacy Vulcan, which discharged COCs directly to the Passaic River for the entirety of its operation and consistently failed to comply with limits on the amount of COCs | Batson assigned a negative adjustment of *100%* to OxyChem's allocation score as a penalty for the purported "culpability" of its predecessor Diamond Alkali.  Batson admits he allowed the settling parties to determine the "culpability" penalty assigned to OxyChem.  EPA did not respond to OxyChem's public comments regarding Batson's biased application of "culpability." |

2

| | | |
|---|---|---|
| | in its wastewater, were assigned *at most* a 10% "culpability" penalty to their allocation score. | |
| **Documents Considered**<br><br>OCC Brief at §III(C)(4) | Batson did nothing to ensure the same types of documents were considered about the Lister Site and about the settling parties' operations (for example, by either (a) requiring the settling parties to submit the same types of documents about their own operations, or (b) by limiting his consideration of Lister Site documents to the categories required to be submitted about the settling parties' sites).<br><br>Instead, he considered and relied on the voluminous, wide-ranging documents about the Lister Site operations.<br><br>Batson profited from the settling parties' submissions about Lister Site operations by using the volume of those submissions to justify increasing the price of the allocation. | Regarding Diamond Alkali's operations, Batson evaluated a "large volume of data" submitted by *other PRPs* who had a strong interest in increasing OxyChem's liability.<br><br>These documents included interoffice memoranda, deposition transcripts, and other documents are outside the scope of what other PRPs submitted on their own behalf. |
| **Expert Reports**<br><br>OCC Brief at §III(C)(4) | When evaluating the settling parties, Batson relied only on *defensive* expert reports submitted by those parties to minimize the share allocated to their operations. | For OxyChem, Batson accepted and relied on an *offensive* expert report (the "Parette Report") submitted by the settling parties and purporting to offer opinions regarding the operations of OxyChem's predecessor and OxyChem's liability.<br><br>The Parette Report was submitted *ex parte* to Batson and has not been provided to OxyChem or EPA. |
| **Interpretation of evidence**<br><br>OCC Cmt. 86<br>OCC Cmt. B.9 at 18, 20<br>Ref.21<br>Ref.22<br>Ref.31 | Batson used data from soil sampling at the settling parties' sites to calculate how much of each COC was purportedly discharged into the Passaic River.<br><br>Batson frequently ignored samples with high concentrations of a COC and either attributed none of that COC to a site or substituted a sample with a much lower concentration.<br><br>For example, when evaluating the site where settling party EnPro operated for decades using large quantities of PCBs and other hazardous substances, Batson ignored an entire portion of the site where PCBs were detected in soil at high concentrations up to 240 mg/kg. Instead, Batson used "maximum" soil | Batson was far less generous when attributing COCs detected in soil to Diamond Alkali's operations and calculating the amount discharged into the river from the Diamond Alkali plant.<br><br>For example, Batson attributed to Diamond Alkali's operations detections of dieldrin that were not even detected on the Diamond Alkali plant site—they were detected at other sites located several blocks away.<br><br>Batson's purported basis for associating those detections with Diamond Alkali's operations is no more credible. He cites an advertisement, provided by the settling parties, for a |

3

| | | |
|---|---|---|
| RS.103 | concentrations of 3.8 mg/kg and 5.97 mg/kg. By excluding the highest concentrations of PCBs found on the EnPro site, Batson substantially reduced the share of liability for PCBs assigned to EnPro.<br><br>EPA speculated Batson "may have" had a reason for ignoring the portion of EnPro's site where the highest concentrations of PCBs were detected, but ultimately cannot explain Batson's oversight. | dieldrin-containing product that has *no relationship* to the Diamond Alkali site operations.<br><br>Even Batson equivocates that "it is possible" that dieldrin was used based on the advertisement, but calculates 37-years of dieldrin discharges from the Diamond Alkali plant anyway. |
| **Inferences where lacking evidence**<br>OCC Cmt.140-41<br>Ref.33<br>Ref.21 | When lacking evidence about the settling parties' operations, Batson consistently applied favorable inferences.<br><br>For example, Batson accepted Givaudan's claim that it had no monitoring reports, which were required to report the dioxin content in its wastewater discharges. To fill that gap, Batson generated a representative average of annual discharges. | When lacking evidence about the operations of OxyChem's predecessor, Batson consistently applied unfavorable inferences.<br><br>For example, Batson also had limited information on dioxin content in Diamond Alkali's discharges. But, unlike for Givaudan, he chose to invent a figure for the dioxin content in Diamond's effluent based on a single datapoint. Batson used that single datapoint to reach conclusions about Diamond's entire period of operation. |