**Tab 9, Part 1**
**Exhibits to OxyChem's March 22, 2023 Public Comments**

**OCC Cmt. Ex.1 - OCC Cmt. Ex.30**

# EXHIBIT 1

OxyChem's Comments in Opposition to Proposed Consent Decree,
*United States v. Alden Leeds, Inc., et al.*, Civil Action No. 2:22-cv-07326 (D.N.J.)

 **UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**

**REGION II**

**290 BROADWAY**

**NEW YORK, NEW YORK 10007-1866**

MAR 3 1 2016

BY CERTIFIED MAIL,
RETURN RECEIPT REQUESTED & ELECTRONIC MAIL

To: See Attachment 1 - List of Addressees

Re:   Diamond Alkali Superfund Site, Lower 8.3 Miles of Lower Passaic River,
      Essex and Hudson Counties, New Jersey

      Notice of Potential Liability under 42 U.S.C. § 9607(a)

      Commencement of Negotiations for Remedial Design

As you know, the U.S. Environmental Protection Agency ("EPA") is charged with responding to
the release or threatened release of hazardous substances, pollutants and contaminants into the
environment and with enforcement responsibilities under the Comprehensive Environmental
Response, Compensation and  Liability Act of 1980, as amended ("CERCLA"), 42 U.S.C. §§
9601-9675 (also known as the "Superfund" law).  More information about CERCLA, including a
copy of the Superfund law, may be found at www.epa.gov/superfund.

EPA has documented the release and threatened release of hazardous substances, pollutants and
contaminants into the lower 8.3 miles of the Lower Passaic River, which is part of the Diamond
Alkali Superfund Site (the "Site"), located in Essex and Hudson Counties, New Jersey.  In
response to the release and threatened release of hazardous substances into the environment at
the Lower Passaic River Study Area, EPA has spent public funds and anticipates spending
additional public funds.

In 1983, sampling at and in the vicinity of 80 Lister Avenue and in the Passaic River revealed
high levels of dioxin. In 1984 after investigations by the state of New Jersey and the EPA, the
Site was listed on the EPA Superfund program's National Priorities List ("NPL") established
pursuant to Section 105 of CERCLA, 42 U.S.C. § 9605. Dioxin, pesticides and other hazardous
substances were found in the soil and groundwater at 80-120 Lister Avenue; and dioxin,
polychlorinated biphenyls ("PCBs"), mercury, metals and pesticides were found in sediment in
the Lower Passaic River.

In 1994, Occidental Chemicals Corporation ("OCC") signed an administrative order on consent
with EPA to investigate a six-mile stretch of the Lower Passaic River, with the work performed

ALCD-PUBCOM_0001181

by Tierra Solutions, Inc. ("Tierra") on OCC's behalf. This investigation found contaminants that originated from the Diamond Alkali facility, in particular, 2,3,7,8-TCDD and pesticides, throughout the six miles, as well as other contaminants not necessarily linked to Diamond Alkali's operations, and showed that contaminated sediments moved into and out of the six-mile stretch, leading to the conclusion that a more comprehensive study was required. In 2002, EPA expanded the scope of the investigation to include the entire 17-mile Lower Passaic River.

Subsequently, EPA identified other potentially responsible parties ("PRPs") for the Lower Passaic River besides OCC. A number of companies that owned or operated facilities from which hazardous substances were potentially discharged to the river formed the Cooperating Parties Group ("CPG"). In 2004, EPA signed a settlement agreement with the CPG in which the group agreed to pay for EPA to perform the RI/FS for 17-mile Lower Passaic River Study Area ("LPRSA"). The settlement agreement was amended in 2005 and 2007, adding more parties, for a total of over 70 parties.

Also in 2004, EPA and OCC signed an agreement in which OCC agreed to conduct a separate RI/FS of the Newark Bay Study Area (Newark Bay and portions of the Hackensack River, Arthur Kill and Kill van Kull), investigating the extent of contamination under EPA oversight. As with the 1994 agreement, Tierra is performing the work on OCC's behalf. Finally, also in 2004, EPA formed a partnership with the U.S. Army Corps of Engineers, New Jersey Department of Transportation, U.S. Fish and Wildlife Service, National Oceanic and Atmospheric Administration and NJDEP to conduct a joint study of the LPRSA. The goal of the partnership was, to the extent possible, to integrate the RI/FS being performed under the Superfund program with a Feasibility Study under the Water Resources Development Act.

From 2004 to 2007, EPA investigated contamination in sediment and water of the Lower Passaic River, and investigated the major tributaries, combined sewer overflows and stormwater outfalls to the river. In 2007, the CPG entered into a new agreement with EPA in which the group agreed to take over the performance of the 17-mile LPRSA RI/FS from EPA under EPA oversight. During the course of the 17-mile study, EPA concluded that since the lower 8.3 miles of the river contain the bulk of the contaminated sediment which is the source of most of the risk associated with the Lower Passaic River, addressing this portion of the river first would better support the overall protection of human health and the environment than would awaiting the outcome of the 17-mile RI/FS to make a decision for the entire Lower Passaic River. EPA undertook a targeted RI and focused feasibility study ("FFS") of the lower 8.3 miles. Sampling results from the RI/FFS demonstrate the presence of hazardous substances in sediments of the lower 8.3 miles of the Lower Passaic River including polychlorinated dibenzo-$p$-dioxins and furans (dioxins and furans), PCBs, polycyclic aromatic hydrocarbons, dichlorodiphenyl-trichloroethane ("DDT") and its breakdown products and other pesticides, mercury, lead and other metals. The contamination present in sediments throughout the lower 8.3 miles presents an unacceptable human health and ecological risk.

EPA issued the Record of Decision selecting a remedy for the lower 8.3 miles of the Lower Passaic River on March 4, 2016. The selected remedy includes the following elements: 1) an engineered cap will be constructed over the river bottom of the lower 8.3 miles; 2) before the cap is placed, the river will be dredged bank-to-bank (approximately 3.5 million cubic yards) so the cap can be placed without increasing flooding and to allow for continued commercial use of the federally authorized navigation channel in the 1.7 miles of the river closest to Newark Bay;

ALCD-PUBCOM_0001182

3) dredged materials will be barged or pumped to a sediment processing facility in the vicinity of the Lower Passaic River/Newark Bay shoreline for dewatering, and dewatered materials will be transported to permitted treatment facilities and landfills in the United States or Canada for disposal; 4) mudflats dredged during implementation of the remedy will be covered with an engineered cap consisting of one foot of sand and one foot of mudflat reconstruction substrate; 5) institutional controls will be implemented to protect the engineered cap, and New Jersey's existing prohibitions on fish and crab consumption will remain in place and will be enhanced with additional community outreach; 6) long-term monitoring and maintenance of the engineered cap will be required to ensure its stability and integrity; and 7) long-term monitoring of fish, crab and sediment will be performed to determine when interim remediation milestones, remediation goals and remedial action objectives are reached. The estimated cost of the cleanup project is $1.38 billion. Additional information about the Site, including the lower 8.3 miles of the Lower Passaic River, such as the RI/FFS reports and appendices, the Proposed Plan and the Record of Decision, can be found on EPA Region 2's website at http://www.ourPassaic.org

The documents that form the basis for EPA's selected remedy are contained in the administrative record, which is maintained at EPA's offices in New York City, and at the following administrative record repositories located near the Site:

> Newark Public Library
> 5 Washington Street
> Newark, New Jersey
>
> Elizabeth Public Library
> 11 South Broad Street
> Elizabeth, New Jersey

You may inspect copies of the administrative record during regular business hours at EPA's offices in New York City or at the local administrative record repositories identified above. The administrative record files can also be accessed online at: https://semspub.epa.gov/src/collection/02/AR63167

## NOTICE OF POTENTIAL LIABILITY

Under Section 107(a) of CERCLA, responsible parties may be held liable for costs incurred by EPA (including interest) in taking response actions at and around sites where hazardous substances have been released, including investigative, planning, removal, remedial, and enforcement actions. Responsible parties also may be subject to orders requiring them to take response actions themselves. Responsible parties under CERCLA include current owners or operators of a facility, past owners or operators of a facility at the time of disposal of hazardous substances, and persons who arranged for the treatment or disposal of hazardous substances which came to be located at a facility. EPA has previously notified over 100 parties of their potential liability under CERCLA for the Lower Passaic River Study Area, which includes the lower 8.3 miles. By this letter, we notify all the parties on the attached list of potential liability for the lower 8.3 miles.

3

ALCD-PUBCOM_0001183

# FRAMEWORK FOR REMEDIAL DESIGN/REMEDIAL ACTION IMPLEMENTATION AND SETTLEMENT

## REMEDIAL DESIGN ADMINISTRATIVE ORDER NEGOTIATIONS

EPA seeks to determine whether OCC will voluntarily perform the remedial design ("RD") for the remedy selected in the ROD. EPA intends to send a separate letter to OCC, enclosing a draft Administrative Order on Consent and Settlement Agreement for Remedial Design ("RD AOC"). EPA wishes to secure a commitment to perform the RD so as to ensure commencement of RD field work by the end of 2016. To that end, EPA will seek signature of an RD AOC by or before August 31, 2016.

This notice is not being given in accordance with the "special notice" procedures of Section 122(e) of CERCLA, 42 U.S.C. § 9622(e). EPA has decided not to use the special notice procedures as EPA does not believe that those procedures would facilitate an agreement or expedite remedial action at the Site.

## REMEDIAL ACTION CONSENT DECREE NEGOTIATIONS

After execution of the RD AOC, EPA plans to begin negotiation of a remedial action consent decree, under which OCC and the other major PRPs will implement and/or pay for EPA's selected remedy for the lower 8.3 miles of the Lower Passaic River and reimburse EPA's costs incurred for the Lower Passaic River. In the meantime, we encourage the major PRPs to meet and discuss a workable approach to sharing responsibility for implementation and funding of the remedy.

## OPPORTUNITY FOR CASH-OUT SETTLEMENT

Based on the information EPA has reviewed, the Agency believes that some of the parties that have been identified as PRPs under CERCLA, and some parties not yet named as PRPs, may be eligible for a cash out settlement with EPA for the lower 8.3 miles of the Lower Passaic River. Typically such a settlement would include: (1) a premium; (2) a covenant not to sue, which is a promise that EPA will not bring any future legal action against the settling party for the specific matters addressed in the settlement (i.e. concerning the lower 8.3 miles); and (3) protection from contribution claims, which provides a settling party with protection from being sued in a contribution action by other responsible parties for the specific matters addressed in the settlement. EPA intends to provide separate notice of the opportunity to discuss a cash out settlement at a later date.

Some or all of the costs associated with this notice may be covered by current or past insurance policies issued to you. Most insurance policies will require that you timely notify your carrier(s) of a claim against you. To evaluate whether you should notify your insurance carrier(s) of this demand, you may wish to review current and past policies, beginning with the date of your first contact with the Diamond Alkali Site, including the Lower Passaic River Study Area, up to the present. Coverage depends on many factors, such as the language of the particular policy and state law.

Finally, EPA has developed a fact sheet about the Small Business Regulatory Enforcement Fairness Act and information on resources for small businesses, which is available on the

ALCD-PUBCOM_0001184

Agency's website at http://www.epa.gov/compliance/small-business-resources-information-sheet.

If you have any questions regarding this letter, you may contact Juan Fajardo via email at fajardo.juan@epa.gov  or by phone at (212) 637-3132, or Sarah Flanagan at flanagan.sarah@epa.gov or by phone at (212) 637-3136.

We appreciate and look forward to your prompt response to this letter.

Sincerely yours,

*Nicoletta Di Forte*

Nicoletta Di Forte
Deputy Director for Enforcement
Emergency and Remedial Response Division

Attachment 1 - List of Addressees

cc: Brian Donohue, Esq., USDOJ
Mark Barash, Esq., USDOI
Kate Barfield, Esq., NOAA
John Dickinson, Esq., New Jersey Attorney General's Office

5

ALCD-PUBCOM_0001186

## ATTACHMENT 1

### Parties that Previously Received Notice Letters

| Company | Contact Information | Facility |
|---|---|---|
| A.E. Staley Manufacturing Co., Inc.<br>2200 E. Eldorado Street<br>Decatur, IL 62521-1578<br><br>Now Tate & Lyle Ingredients Americas LLC | John R. Holsinger, Esq.<br>Two University Plaza, Suite 300<br>Hackensack, NJ 07601<br>201-487-9000 (T)<br>johnh@jrholsinger.com<br><br>Heidi R. Balsley, Esquire<br>Corporate Counsel<br>2200 E. Eldorado Street<br>Decatur, IL 62521<br>Heidi.Balsley@tateandlyle.com | 320 Schuyler Avenue and 100 Third Avenue<br>Kearny, NJ |
| Alcan Corporation<br>Two Alliance Center<br>3560 Lenox Rd<br>Atlanta, GA 30326<br><br>Now Novelis Corp. | John Tillman, Esq.<br>North American Regional Counsel<br>Novelis Corporation<br>Two Alliance Center<br>3560 Lenox Rd<br>Atlanta, GA 30326<br>404-760-4049 (T)<br>John.tillman@novelis.com | Jacobus Ave.<br>Kearny, NJ |
| Alden Leeds Inc.<br>55 Jacobus Ave.<br>Kearny, NJ 07032 | Mark Epstein, President<br>Alden Leeds Inc.<br>55 Jacobus Ave.<br>Kearny, NJ 07032<br><br>Joseph Fiorenzo, Esq.<br>Sokol, Behot & Fiorenzo<br>Continental Plaza<br>433 Hackensack Ave.<br>Hackensack, NJ 07601<br>201-488-1300(T)<br>jbfiorenzo@sbflawfirm.com | 2145 McCarter Highway<br>Newark, NJ |
| Alliance Chemical, Inc.<br>Linden Avenue<br>Ridgefield, NJ 07657 | Fredi Pearlmutter, Esq.<br>Lindabury, McCormick, Estabrook & Cooper, P.C.<br>53 Cardinal Drive<br>Box 2369<br>Westfield, NJ 07091<br>908-233-6800 (T)<br>fpearlmutter@lindabury.com | 33 Avenue P<br>Newark, NJ |
| American Ref-Fuel Co.<br>155 Chestnut Ridge Road<br>Montvale, NJ 07645<br><br>Now Covanta Essex Company | Nancy Tammi, Esq.<br>VP, Associate General Counsel<br>Covanta<br>445 South Street<br>Morristown, NJ 07960<br>862-345-5133 | 183 Raymond Blvd & 66 Blanchard St<br>Newark, NJ |

| | Gary P. Gengel, Esq.<br>Kegan A. Brown, Esq.<br>Latham & Watkins, LLP<br>885 Third Avenue<br>New York, NY 10022-4834<br>Gary.gengel@lw.com | |
|---|---|---|
| Arkema Incorporated<br>2000 Market Street<br>Philadelphia, PA 19103-3222 | Paula Martin, Esq.<br>Doug Loutzenhiser<br>Legacy Site Services, LLC<br>468 Thomas Jones Way, Suite 150<br>Exton, PA 19341-2528<br>Paula.martin@total.com | Wallace & Tiernan<br>25 Main Street<br>Belleville, NJ |
| Ashland, Inc.<br>5200 Blazer Parkway<br>Dublin, OH 43017 | Robin E. Lampkin<br>Ashland Inc.<br>5200 Blazer Parkway<br>Dublin, OH 43017<br>Telephone: 614-790-3019<br>relampkin@ashland.com<br><br>William S. Hatfield, Esq.<br>Gibbons P.C.<br>One Gateway Center<br>Newark, NJ 07102<br>whatfield@gibbonslaw.com | 221 Foundry St.<br>Newark, NJ |
| Atlas Refining, Inc.<br>142 Lockwood Street<br>Newark, NJ 07105<br><br>Now Atlas Refinery, Inc. | Steven Schroeder, Jr., President & CEO<br>Atlas Refinery, Inc.<br>142 Lockwood Street<br>Newark, NJ 07105<br><br>Thomas Ryan, Esq.<br>Laddey, Clark & Ryan LLP<br>60 Blue Heron Road, Suite 300<br>Sparta, NJ 07871<br>973-729-1880(T)<br>tryan@lcrlaw.com | 142 Lockwood St.<br>Newark, NJ |
| Automatic Electro Plating Corp.<br>185 Foundry Street, Suite 3<br>Newark, NJ 07105 | Michael O'Rourke, President<br>Automatic Electro Plating Corp.<br>94 Colony Avenue<br>Park Ridge, NJ 07656-1047 | 185 Foundry Street Complex<br>Newark, NJ 07105<br>(Bldgs 19, 21, 22) |
| BASF Catalysts LLC<br>100 Campus Drive<br>Florham Park, NJ | Karyllan D. Mack, Esq. (see below) | Engelhard Corporation<br>One West Central Avenue<br>East Newark, NJ |

2

ALCD-PUBCOM_0001188

| BASF Corp.<br>3000 Continental Drive<br>Mount Olive, NJ 07828 | Karyllan D. Mack, Esq.<br>Environmental Counsel<br>BASF Corporation<br>100 Park Avenue<br>Florham Park, NJ 07932<br>Karyllan.mack@basf.com<br><br>David Schneider, Esquire<br>Bressler, Amery & Ross<br>Post Office Box 1980<br>Morristown, NJ 07962<br>dschneider@bressler.com | 50 Central Ave.<br>Kearny, NJ<br>&<br>150 Wagaraw Rd<br>Hawthorne, NJ |
|---|---|---|
| Belleville Industrial Center<br>681 Main Street<br>Building 43<br>Belleville, NJ 07109 | Carol Shapiro, President<br>Belleville Industrial Center<br>681 Main Street, Building 43<br>Belleville, NJ 07109<br>973-751-0400 (T)<br>shappyfam@aol.com<br><br>Ryder T. Ulon, Esq,<br>Gary F. Werner, Esq.<br>Schenck, Price, Smith & King, LLP<br>220 Park Avenue<br>Post Office Box 991<br>Florham Park, NJ 07932<br>973-540-7321 (T)<br>rtu@spsk.com<br>gfw@spsk.com | Helion Industries, Inc.<br>681 Main St.<br>Belleville, NJ |
| Benjamin Moore & Co.<br>51 Chestnut Ridge Rd.<br>Montvale, NJ 07645 | Mark Boyland, Esq.<br>Paul Sangillo, Esq.<br>Benjamin Moore & Co.<br>101 Paragon Drive<br>Montvale, NJ 07645<br>201.949.6318 (T)<br>Mark.boyland@benjaminmoore.com<br>Paul.sangillo@benjaminmoore.com<br><br>Susanne Peticolas, Esq.<br>Gibbons, PC<br>One Gateway Center<br>Newark, NJ 07102-5310<br>973-596-4751 (T)<br>speticolas@gibbonslaw.com | 134 Lister Ave.<br>Newark, NJ |

3

ALCD-PUBCOM_0001189

| | | |
|---|---|---|
| Berol Corporation<br>c/o Newell Rubbermaid Inc.<br>2707 Butterfield Road, Suite 100<br>Oak Brook, IL 60523 | Andrew Sawula, Esq.<br>Schiff Hardin LLP<br>One Westminster Place, Suite 200<br>Lake Forest, IL 60045<br>847-295-4336 (T)<br>asawula@schiffhardin.com | Faber-Castell Corporation<br>41 Dickerson Street<br>Newark, NJ |
| Campbell Foundry Company<br>800 Bergen Street<br>Harrison, NJ 07029 | Timothy J. Corriston, Esq.<br>Connell Foley LLP<br>85 Livingston Avenue<br>Roseland, NJ 07068<br>973-535-0500 (T)<br>tcorriston@connellfoley.com | 800 Bergen Street<br>Harrison, NJ |
| Canning Gum LLC<br>c/o MacDermid Incorporated<br>1401 Blake Street<br>Denver, CO 80202 | John Cordani, Esq.<br>VP, General Counsel<br>MacDermid Inc.<br>245 Freight Street<br>Waterbury, CT 06702 | Frederick Gumm Chemical Co.<br>538 Forest Street<br>Kearny, NJ |
| Celanese Ltd.<br>Route 202-206<br>P.O. Box 2500<br>Somerville, NJ 08876<br><br>CNA Holdings LLC<br>participating on behalf of<br>Celanese Ltd | Katheryn Coggon, Esq.<br>Associate General Counsel<br>Celanese International Corporation Law Department<br>1601 West LBJ Freeway<br>Dallas, TX 75234<br>972-443-4547 (T)<br>Katheryn.coggon@celanese.com<br><br>Duke K. McCall, III, Esq.<br>Bingham McCutchen LLP<br>2020 K Street, N.W.<br>Washington, DC 20006-1806<br>202-373-6607 (T)<br>duke.mccall@bingham.com | 354 Doremus Ave<br>Newark, NJ |
| Chargeurs, Inc.<br>178 Wool Road<br>Jamestown, SC 29453 | James. R. Brendel, Esq.<br>Thorp Reed & Armstrong, LLP<br>One Oxford Centre<br>301 Grant Street, 14th floor<br>Pittsburgh, PA 15219-1425<br>412-394-2373 (T)<br>jbrendel@thorpreed.com | United Piece Dye Works<br>199 and 205 Main Street and<br>42 Arnot Street<br>Lodi, NJ |

4

ALCD-PUBCOM_0001190

| Chevron Texaco Corporation 6001 Bollinger Canyon Rd. K-2056 San Ramon, CA 94583  Chevron Environmental Management Company participating for itself, Texaco, Inc. and TRMI-H LLC | Shawn Raymond DeMerse Chevron U.S.A. Inc. Law Department 1400 Smith Street, Rm 07090 Houston, TX 77002 shawndemerse@chevron.com  Louis M. DeStefano, Esq. Buchanan Ingersoll & Rooney, PC 550 Broad Street, Suite 810 Newark, NJ 07102-4517 973.273.9800 (T) louis.destefano@bipc.com | Getty Newark Terminal 86 Doremus Ave. Newark, NJ |
| Coats & Clark, Inc. 3420 Toringdon Way, Suite 301 Charlotte, NC 28277 | Dan Riesel, Esq. Jeff Gracer, Esq. Sive Paget & Riesel, P.C. 460 Park Avenue New York, NY 10022 212-421-2150 driesel@spr.com | Clark Thread Co. 260 Ogden Street Newark NJ 900 Passaic Avenue East Newark NJ 735 Broad Street Bloomfield NJ |
| Coltec Industries Inc. 5605 Carnegie Boulevard Charlotte, NC 28209 | Tom Price, Esq. EnPro Industries 5605 Carnegie Boulevard Charlotte, NC 28209 704-731-1525 (T) tom.price@enproindustries.com  Charles E. Merill, Esquire Husch Blackwell Sanders LLP 190 Carondelet Plaza, Suite 600 St. Louis, MO 63105 314-480-1952 charlie.merrill@huschblackwell.com | Crucible Steel Co. 1000 South Fourth St. Harrison, NJ |
| Congoleum Corp. 3705 Quakerbridge Road Mercerville, NJ 08619 | Russell Hewit, Esq. Dughi, Hewit & Domolewski, P.C. 340 North Avenue Cranford, NJ 07016 908-272-0200(T) rhewit@dughihewit.com | 195 Belgrove Drive Kearny, NJ |

ALCD-PUBCOM_0001191

| Cooper Industries, Inc.<br>600 Travis Street<br>Houston, TX 77002 | Ms. RosaMaria Villagomez<br>Cooper Industries<br>600 Travis Street, Suite 5600<br>Houston, TX 77002<br>RosaMaria.Villagomes@cooperindustries.com<br><br>Gerard J. Pels, Esq.<br>Locke Lord<br>2800 JPMorgan Chase Tower<br>600 Travis<br>Houston, TX 77002<br>Gpels@lockelord.com | J. Wiss & Sons Co<br>7, 13, 26 Bank Street and<br>33 Littleton Avenue (aka 400<br>West Market Street)<br>Newark, NJ |
| --- | --- | --- |
| Cooper Industries, LLC<br>600 Travis Street, Suite 5800<br>Houston, TX 77002 | (see above) | Thomas A. Edison, Inc.<br>Belleville Avenue &<br>Sherman Avenue<br>Bloomfield, NJ<br>75 Belmont Avenue<br>Belleville, NJ |
| Croda Inc.<br>300-A Columbus Circle<br>Edison, NJ 08837 | Norman Spindel, Esq.<br>Lowenstein Sandler PC<br>65 Livingston Avenue<br>Roseland, NJ 07068<br>973-597-2514(T)<br>nspindel@lowenstein.com | Hummel Lanolin<br>185 Foundry Street Complex<br>Newark, NJ<br>(Block 5005, Lot 21; Bld 39) |
| Curtiss-Wright Corp.<br>4 Becker Farm Road<br>Roseland, NJ 07068 | Diana Buongiorno<br>Chiesa Shahinian & Giantomassi, PC<br>One Boland Drive<br>West Orange, NJ 07052<br>973-530-2075(T)<br>dbuongiorno@csglaw.com | 1 Passaic St.<br>Woodridge, NJ |
| Darling International, Inc.<br>251 O'Connor Ridge Boulevard,<br>Suite 300<br>Irving, TX 75038 | Steven Singer, Esq.<br>34 Hillside Avenue<br>Montclair, NJ 07042<br>973-744-6093<br>stsinger@verizon.net | Standard Tallow Corp.<br>61 Blanchard Street,<br>Newark, NJ<br>1215 Harrison Avenue,<br>Kearny, NJ |
| DII Industries, LLC<br>c/o Halliburton<br>2101 City West Blvd.<br>Houston, TX 77042-3021 | Thomas C. Jackson, Esq.<br>Joshua Frank, Esq.<br>Baker Botts LLP<br>1299 Pennsylvania Ave., N.W.<br>Washington, DC 20004-2400<br>202-639-7710 (T)<br>Thomas.Jackson@bakerbotts.com<br>Joshua.frank@bakerbotts.com | Worthington Corp. &<br>Dresser Industries, Inc.<br>401 Worthington Avenue<br>Harrison, NJ |

6

| | | |
|---|---|---|
| DiLorenzo Properties Company<br>c/o 401 East 74th Street<br>New York, NY 10021-3919 | Steven R. Gray, Esq.<br>Waters, McPherson, McNeill<br>300 Lighting Way<br>PO Box 1560<br>Secaucus, NJ 07096<br>201-863-4400 (T)<br>sgray@lawwmm.com | American Modern Metals<br>44 Passaic Ave. (a/k/a 25<br>Belgrove Drive)<br>Kearny, NJ |
| Drum Service of Newark, Inc.<br>38 Laurel Drive<br>Wayne, NJ 07470 | Ralph Foglia<br>38 Laurel Drive<br>Wayne, NJ 07470 | Hilton-Davis<br>120 Lister Ave.<br>Newark, NJ |
| Eden Wood Corporation<br>47 Parsippany Road<br>Whippany, NJ 07981 | Warren L. Dean, Jr.<br>Thompson Coburn LLP<br>1909 K Street, N.W.<br>Suite 600<br>Washington, D.C. 20006-1167<br>202.585.6908 (T)<br>wdean@thompsoncoburn.com | Whippany Paper Board<br>1 Ackerman Avenue<br>Clifton, NJ |
| E.I. duPont de Nemours & Co.<br>1007 Market Street<br>Wilmington, DE 19898 | Bernard Reilly, Esq.<br>Chemours Legal Department<br>1007 Market Street<br>Wilmington, DE 19898<br>302-774-5445(T)<br>bernard.j.reilly@usa.dupont.com | Pitt Consol<br>191 Doremus Ave.<br>Newark, NJ |
| Elan Chemical Co.<br>268 Doremus Ave.<br>Newark, NJ 07105 | Jocelyn Kapp Manship, CEO<br>Elan Chemical Company Inc.<br>268 Doremus Avenue<br>Newark, NJ 07105<br><br>Randy Schillinger, Esq.<br>Saiber Schlesinger Staz & Goldstein<br>One Gateway Center, 13th Fl<br>Newark, NJ 07102<br>973-622-3333(T)<br>rs@saiber.com | 268 Doremus Ave.<br>Newark, NJ |
| El Paso Tennessee Pipeline Co.<br>1001 Louisiana Street<br>Houston, TX 77002<br><br>EPEC Polymers Inc.<br>participating on behalf of itself<br>and EPEC Oil Company<br>Liquidating Trust | Andrea A. Lipuma, Esquire<br>Saul Ewing LLP<br>750 College Road East<br>Suite 100<br>Princeton, NJ 08540-6617<br>Telephone: 609-452-5032<br>alipuma@saul.com | Tenneco, Inc.<br>290 River Drive<br>Garfield, NJ |

7

ALCD-PUBCOM_0001193

| EM Sergeant Pulp & Chemical Co. 6 Chelsea Road Clifton, NJ 07012 | Messrs. Scott and Alan Reisch EM Sergeant Pulp & Chemical Co. 6 Chelsea Road Clifton, NJ 07012 | 120 Lister Avenue Newark, NJ |
|---|---|---|
| Essex Chemical Corp. 2030 WMDC Midland, MI 48674 | Kenneth Mack, Esq. Linda Mack, Esq. Fox Rothschild LLP Post Office Box 5231 Princeton, NJ 08543-5231<br><br>Princeton Pike Corp. Center 997 Lenox Drive, Bldg. 3 Lawrenceville, NJ 08648 609-896-3000(T) kmack@foxrothschild.com | 330 Doremus Ave. Newark, NJ |
| Everett Smith Group, Ltd. 330 East Kilbourn Avenue, Ste 750 Milwaukee, WI 53202 | Katherine M. Behm, Esq. Assistant General Counsel Everett Smith Group, Ltd. 330 East Kilbourn Avenue, Ste 750 Milwaukee, WI 53202 414-223-1560 (T) | Blanchard Bro. & Lane, Inc. 40 Bruen Street Newark, NJ |
| Fiske Brothers Refining Co. 129 Lockwood Street Newark, NJ | Damon Sedita, Esq. Sedita, Campisano & Campisano, LLC Wayne Plaza 1 145 Route 46 West Suite 102 Wayne, NJ 07470 dsedita@scclegal.com 973-787-0299 | 129 Lockwood Street Newark, NJ |
| Flexon Industries Corp. One Flexon Plaza 366 Frelinghuysen Avenue Newark, NJ 07114 | Tom Spiesman Porzio Bromberg & Newman, PC 100 Southgate Parkway PO Box 1997 Morristown, NJ 07962 973-889-4208 (T) pbnlaw.com | 666 Washington Avenue Belleville, NJ |
| Foundry Street Corporation 260 Knoll Drive Park Ridge, NJ 07656 | Gerard Boriello Foundry Street Corporation 260 Knoll Drive Park Ridge, NJ 07656 | 185 Foundry Street Complex Newark, NJ (Block 5005, Lot 22 – Bldgs 19, 21, 22) |

8

ALCD-PUBCOM_0001194

| Fragrances North America<br>1775 Windsor Road<br>Teaneck, NJ 07666<br><br>Now Givaudan Corp. | Richard Wroblewski, P.G.<br>Environmental Specialist<br>Givaudan Fragrances Corp. 300 Waterloo<br>Valley Road<br>Mount Olive, NJ 07828<br>richard.wroblewski@givaudan.com<br><br>William Hatfield, Esq.<br>Gibbons, PC<br>One Gateway Center<br>Newark, NJ 07102-5310<br>973-596-4511 (T)<br>whatfield@gibbonslaw.com | Givaudan Fragrances<br>125 Delawanna Avenue<br>Clifton, NJ |
| Franklin Burlington Plastics,<br>Inc.<br>113 Passaic Ave.<br>Kearny, NJ 07032 | Norman Spindel, Esq.<br>Lowenstein Sandler PC<br>65 Livingston Avenue<br>Roseland, NJ 07068<br>973-597-2514(T)<br>nspindel@lowenstein.com | 113 Passaic Ave.<br>Kearny, NJ |
| Garfield Molding Company, Inc.<br>10 Midland Avenue<br>Wallington, NJ 07057 | Steve Miller, Esq.<br>Stephen W. Miller, Esq.<br>Ricci Tyrrell Johnson & Grey<br>1515 Market Street, Suite 700<br>Philadelphia, PA 19102<br>215-320-2088 (T)<br>smiller@rtjglaw.com | 10 Midland Avenue<br>Wallington, NJ |
| General Electric Company<br>3135 Easton Turnpike<br>Fairfield, CT 06828-0001 | Roger Florio, Esq.<br>General Electric<br>640 Freedom Business Center<br>King of Prussia, PA 19406<br><br>Gary Gengel, Esq.<br>Latham & Watkins, LLP<br>One Newark Center, 16th floor<br>Newark, NJ 07101<br>973-639-7287 (T)<br>gary.gengel@lw.com | 415 South 5th Street<br>& 1000 South 2nd Street<br>Harrison, NJ |
| Goodrich Corporation<br>Four Coliseum Centre<br>2730 West Tyvola Road<br>Charlotte, NC 28217 | Earl W. Phillips, Jr., Esq.<br>Robinson & Cole LLP<br>280 Trumbull Street<br>Hartford, CT 06103-3597<br>860-275-8220 (T)<br>ephillips@rc.com | Kalama Chemical<br>290 River Drive<br>Garfield, NJ |

ALCD-PUBCOM_0001195

| | | |
|---|---|---|
| Harrison Supply Company<br>800 Passaic Avenue<br>East Newark, NJ 07029 | Timothy J. Corriston, Esq.<br>Connell Foley LLP<br>85 Livingston Avenue<br>Roseland, NJ 07068<br>973-535-0500 (T)<br>tcorriston@connellfoley.com | 800 Passaic Avenue<br>East Newark, NJ |
| Hexcel Corp.<br>2 Stamford Plaza<br>Stamford, CT 06901 | Steve Leifer, Esq.<br>Baker Botts LLP<br>1299 Pennsylvania Ave., NW<br>Washington, DC 20004<br>202-639-7723(T)<br>sleifer@bakerbotts.com | 205 Main St.<br>Lodi, NJ |
| Hoffman-La Roche Inc.<br>340 Kingsland Street<br>Nutley, NJ 07110 | Ms. Mary Alice Barrett.<br>Hoffman-La Roche Inc.<br>340 Kingsland Street<br>Nutley, NJ 07110<br>973-235-4850 (T)<br>maryalice.barrett@roche.com | 340 Kingsland Road<br>Nutley, NJ |
| Honeywell International, Inc.<br>P.O. Box 2245<br>Morristown, NJ 07962 | Jeremy Karpatkin, Esq.<br>Arnold & Porter<br>555 Twelfth Street, NW<br>Washington, DC 20004-1206<br>202-942-5564 (T) | General Chemical Co.<br>65 Lodi Street/8th Street<br>Passaic, NJ |
| ISP Chemicals, Inc.<br>1361 Alps Road<br>Wayne, NJ 07470<br><br>now ISP Chemicals LLC | Robin E. Lampkin<br>Ashland Inc.<br>5200 Blazer Parkway<br>Dublin, OH 43017<br>614-790-3019 (T)<br>relampkin@ashland.com<br><br>William Hatfield, Esq.<br>Gibbons, PC<br>One Gateway Center<br>Newark, NJ 07102-5310<br>973-596-4511 (T)<br>whatfield@gibbonslaw.com | ISP Van Dyk, Inc.<br>1 Main St./11 William St.<br>Wayne, NJ |
| ITT Industries, Inc.<br>77 River Road<br>Clifton, NJ 07014<br><br>participating as Exelis Inc. for<br>itself and ITT Industries, Inc | Susanne Peticolas, Esq.<br>Gibbons, PC<br>One Gateway Center<br>Newark, NJ 07102-5310<br>973-596-4751 (T)<br>speticolas@gibbonslaw.com | 100 Kingsland Drive<br>Clifton, NJ |

10

ALCD-PUBCOM_0001196

| | | |
|---|---|---|
| Kearny Smelting & Refining<br>936 Harrison Ave #5<br>Kearny, NJ 07032 | Ms. Francine Rothschild, President<br>Kearny Smelting & Refining<br>936 Harrison Ave<br>Kearny, NJ 07032<br>201-991-7276 (T) | 936 Harrison Ave.<br>Kearny, NJ |
| Lucent Technologies<br>600 Mountain Avenue<br>Murray Hill, NJ 07974<br><br>now Alcatel-Lucent USA, Inc. | Ralph McMurry, Esq.<br>Ralph L. McMurry Law Office<br>30 Vesey Street, 15th Floor<br>New York, NY 10007<br>212-608-5444/5053 (T)<br>rlmcmurry@earthlink.net<br><br>Gary M. Fisher, Esq.<br>Alcatel-Lucent<br>Environment, Health & Safety Corporate<br>Center<br>600 Mountain Avenue<br>Room 1F-102G<br>Murray Hill, NJ 07974<br>gary.fisher@alcatel-lucent.com | AT&T/Western Electric<br>100 Central Ave.<br>Kearny, NJ |
| Mallinckrodt, Inc.<br>675 McDonnell Blvd.<br>Hazelwood, Missouri<br>63042 | William Hatfield, Esq.<br>Gibbons P.C.<br>One Gateway Center<br>Newark, NJ 07102<br>973-596-4511 (T)<br>whatfield@gibbonslaw.com<br><br>Eric Berry, Esq.<br>Vice President – Environmental Law<br>Mallinckrodt Pharmaceuticals<br>975 McDonnell Blvd<br>Hazelwood, MO 63042 | 165-167 Main St.<br>Lodi, NJ |
| Monsanto Co.<br>800 North Lindbergh Blvd.<br>St. Louis, Missouri 63167<br><br>Pharmacia Corporation (f/k/a<br>Monsanto Company) | John F. Gullace, Esq.<br>Manko, Gold, Katcher & Fox, LLP<br>401 City Avenue, Suite 500<br>Bala Cynwd, PA 19004<br>484-430-2326(T)<br>jgullace@mgkflaw.com | Monsanto Co.<br>Foot of Pennsylvania Ave.<br>Kearny, NJ |
| National-Standard Company<br>1618 Terminal Road<br>Niles, MI 49120<br><br>Now National-Standard LLC | Susanne Peticolas, Esq.<br>Gibbons, PC<br>One Gateway Center<br>Newark, NJ 07102-5310<br>973-596-4751(T)<br>speticolas@gibbonslaw.com | 714-716 Clifton Avenue<br>Clifton, NJ |

11

ALCD-PUBCOM_0001197

| | | |
|---|---|---|
| Newark Morning Ledger<br>1 Star Ledger Plaza<br>Newark, NJ 07102 | Daryl Kessler, Esq.<br>Sabin, Bermant & Gould, LLP<br>4 Times Square, 23rd floor<br>New York, NY<br>212-381-7026<br>dkessler@sbandg.com | 1 Star Ledger Plaza<br>Newark, NJ |
| Newell Rubbermaid, Inc.<br>29 E. Stephenson Street<br>Freeport, IL 60132 | Andrew Sawula, Esq.<br>Schiff Hardin LLP<br>One Westminster Place, Suite 200<br>Lake Forest, IL 60045<br>847-295-4336 (T)<br>asawula@schiffhardin.com | Goody Products<br>969 Newark Turnpike<br>Kearny, NJ |
| News America Inc.<br>767 Fifth Ave., 46th Floor<br>New York, NY 10153<br><br>fka News Publishing Australia,<br>Ltd., now Twenty-First Century<br>Fox America | Peter Simshauer, Esq.<br>Skadden, Arps, Slate, Meagher & Flom LLP<br>One Beacon Street<br>Boston, MA 02108-3194<br>617-573-4880(T)<br>psimshau@skadden.com | Chris-Craft Inc./Montrose<br>Chemical Co.<br>100 Lister Ave.<br>Newark, NJ |
| Occidental Chemical Corp.<br>Occidental Tower<br>5005 LBJ Freeway<br>Dallas, TX 75244 | Dennis F. Blake<br>Senior Vice President<br>Occidental Chemical Corp.<br>5005 LBJ Freeway<br>Dallas, TX 75244<br><br>Benjamin S. Lippard, Esq.<br>Vinson & Elkins, LLP<br>2200 Pennsylvania Avenue, Suite 500 West<br>Washington, CD 20037-1701<br>713-758-2528(T)<br>blippard@velaw.com | Diamond Shamrock<br>Chemicals Co.<br>80 and 120 Lister Ave.<br>Newark, NJ |
| The Okonite Company, Inc.<br>102 Hilltop Road<br>Ramsey, New Jersey 07446 | Francis Giuliano, Esq.<br>VP and General Counsel<br>The Okonite Company, Inc.<br>102 Hilltop Road<br>Ramsey, NJ 07446<br>201-825-0300(T) | Canal and Jefferson Streets<br>Passaic, NJ |
| Otis Elevator Co.<br>North America Operations<br>10 Farm Springs Road<br>Farmington, CT 06032 | Earl W. Phillips, Jr., Esq.<br>Robinson & Cole LLP<br>280 Trumbull Street<br>Hartford, CT 06103-3597<br>860-275-8220(T)<br>ephillips@rc.com | 1000 First St.<br>Harrison, NJ |

12

ALCD-PUBCOM_0001198

| | | |
|---|---|---|
| Pabst Brewing Company<br>9014 Heritage Parkway, Suite 308<br>Woodridge, IL  60517 | Eugene Kashper, Chairman & CEO<br>Pabst Brewing Company<br>10635 Santa Monica Blvd Ste 350<br>Los Angeles, CA 90025 | 400 Grove Street<br>Newark, NJ |
| Passaic Pioneer Properties<br>PO Box 327<br>35 Eighth Street<br>Passaic, NJ 07055 | Passaic Pioneer Properties<br>PO Box 327<br>35 Eighth Street<br>Passaic, NJ 07055<br>973-473-1050 (T) | 35 Eighth Street<br>Passaic, NJ |
| Pfizer Inc.<br>235 E. 42nd St.<br>New York, NY 10017 | Michael McThomas, Esq.<br>Michael P. McThomas PLLC<br>One Lee Hill Road<br>Andover, NJ  07821<br>973-691-4711(T)<br>973-985-3740(M)<br>mpm@mmctlaw.com | 230 Brighton Road<br>Clifton, NJ |
| PMC, Inc.<br>12243 Branford Street<br>Sun Valley, CA 91352 | Phillip Kamins, President & CEO<br>PMC Global, Inc.<br>12243 Branford St<br>Sun Valley, CA 91352<br>818-896-1101(T) | Kleer Kast<br>450 Schuyler Avenue<br>Kearny, NJ |
| Power Test of New Jersey, Inc.<br>125 Jericho Turnpike<br>Jericho, NY 11753<br><br>now Leemilt's Petroleum, Inc.,<br>successor to Power Test of NJ, Inc. | Christine Fitter, Asst Secretary<br>Leemilt's Petroleum, Inc.<br>125 Jericho Turnpike, Suite 103<br>Jericho, NY  11753<br>cfitter@gettyrealty.com<br><br>Nicole Moshang, Esq.<br>Manko, Gold Katcher & Fox LLP<br>401 City Avenue, Ste. 500<br>Bala Cynwyd, PA  19004<br>484-430-2324 (T)<br>nmoshang@mgkflaw.com | Getty Newark Terminal<br>86 Doremus Ave.<br>Newark, NJ |
| PPG Industries, Inc.<br>One PPG Place<br>Pittsburgh, PA 15272 | Peter T. Stinson, Esq.<br>Dickie McCamey & Chilcote P.C.<br>Two PPG Place, Suite 400<br>Pittsburgh, PA  15222-5402<br>412-392-5432(T)<br>pstinson@dmclaw.com | 29 Riverside Ave.<br>Newark, NJ |

ALCD-PUBCOM_0001199

| | | |
|---|---|---|
| PSE&G Corp.<br>P.O. Box 570<br>Newark, NJ 07101 | John F. Doherty, Esq.<br>Associate General Litigation Counsel<br>PSE&G Services Corporation<br>80 Park Plaza, T5D<br>Post Office Box 570<br>Newark, NJ 07102<br>973-430-6478(T)<br>John.doherty@pseg.com<br><br>Kevin R. Gardner, Esq.<br>Connell Foley<br>85 Livingston Avenue<br>Roseland, NJ 07068<br>973-535-0500(T)<br>kgardner@connellfoley.com | 155 Raymond Blvd.<br>Newark, NJ<br>&<br>4th St.<br>Harrison, NJ |
| Purdue Pharma Technologies,<br>Inc.<br>One Stamford Forum<br>Stamford, CT 06901 | James (Jay) Stewart, Esq.<br>Lowenstein Sandler PC<br>65 Livingston Avenue<br>Roseland, NJ 07068<br>973-597-2522(T)<br>jstewart@lowenstein.com | Napp Technologies<br>199 Main St.<br>Lodi, NJ |
| Quality Distribution, Inc.<br>150 East Pennsylvania Avenue<br>Suite 450<br>Downingtown, PA 19335<br><br>Quality Carriers, Inc. | Bonni Kaufman, Esq.<br>Holland & Knight, LLP<br>2099 Pennsylvania Avenue, N.W.<br>Suite 100<br>Washington, DC 20006<br>202-419-2547<br>Telecopier: 202-955-5564<br>Bonni.kaufman@hklaw.com | Chemical Leaman Tank<br>Lines<br>80 Doremus Avenue<br>Newark, NJ |
| Reilly Industries, Inc.<br>1510 Market Square Center<br>151 North Delaware St.<br>Indianapolis, IN 46204<br><br>now Vertellus Specialties Inc. | Thomas Mesevage, Esq.<br>Corporate Counsel, Environmental<br>Vertellus Specialties Inc.<br>900 Lanidex Plaza, Suite 250<br>Parsippany, NJ 07054-2739<br>973-515-8611(T)<br>973-945-7069(M)<br>tmesevage@vertellus.com<br><br>Glenn Harris, Esq.<br>Ballard Spahr Andrews & Ingersoll<br>Plaza 1000, Suite 500<br>Main Street<br>Voorhees, NJ 08043<br>856-761-3400(T)<br>harrisg@ballardspahr.com | 191 Doremus Ave.<br>Newark, NJ |

14

ALCD-PUBCOM_0001200

| | | |
|---|---|---|
| Roman Asphalt Corporation<br>14 Ogden Street<br>Newark, NJ 07104 | Michael La Morgese, President<br>Roman Asphalt Corporation<br>14 Ogden St<br>Newark, NJ 07104<br>973-482-1113(T) | 14 Ogden Street<br>Newark |
| Royce Associates<br>366 N. Broadway, Ste. 400<br>Jericho, NJ 11753 | A.J.Royce, President<br>Royce Associates, ALP<br>35 Carlton Ave<br>East Rutherford, NJ 07073<br>201-438-5200(T)<br><br>Ronald Bluestein, Esq.<br>Flamm Walton<br>794 Penllyn Pike<br>Blue Bell, PA 19422<br>267-419-1500 (T)<br>rbluestein@flammlaw.com | Royce Chemical Company<br>17 Carlton Avenue<br>East Rutherford, NJ |
| RSR Corp.<br>2777 Stemmons Freeway, Suite 1800<br>Dallas, TX 75207<br><br>now Revere Smelting and Refining Corporation | Jane C. Luxton, Esq.<br>Christopher Clare, Esq.<br>Clark Hill PLC<br>601 Pennsylvania Avenue NW<br>North Building, Suite 1000<br>Washington, DC 20004<br>202-572-8674(T)<br>703-598-3275(M)<br>jluxton@clarkhill.com<br>cclare@clarkhill.com | Revere Smelting & Refining<br>387 Avenue P<br>Newark, NJ |
| RTC Properties, Inc.<br>79 Fifth Avenue<br>New York, NY 10003 | Michael L. Rodburg, Esq.<br>Lowenstein Sandler, PC<br>65 Livingston Avenue<br>Roseland, NJ 07068<br>973-597-2466(T)<br>mrodburg@lowenstein.com | AT&T/Western Electric<br>100 Central Ave.<br>Kearny, NJ |
| S&A Realty Corp.<br>55 Passaic Avenue<br>Kearny, NJ 07032 | Jeffrey Pollock, Esq.<br>Fox Rothschild<br>P.O. Box 5231<br>Princeton, NJ 08543<br>609-896-7660(T)<br>jmpollock@foxrothschild.com | American Modern Metals<br>44 Passaic Ave. (a/k/a 25 Belgrove Drive)<br>Kearny, NJ |
| Safety Kleen Envirosystems Co.<br>1301 Gervais St.<br>Columbia, SC 29201<br><br>McKesson Corporation for itself and for Safety-Kleen Envirosystems, Inc. | John Edgcomb, Esq.<br>Law Offices of John Edgcomb<br>115 Sansome St., Suite 805<br>San Francisco, CA 94104<br>415-399-1555(T)<br>jedgcomb@edgcomb-law.com | 600 Doremus Ave.<br>Newark, NJ |

15

| | | |
|---|---|---|
| Schiffenhaus Packaging Corp.<br>c/o Rock-Tenn Company<br>504 Thrasher Street<br>Norcross, GA 30071 | Camille V. Otero, Esq.<br>Gibbons, PC<br>One Gateway Center<br>Newark, NJ 07102-5310<br>cotero@gibbonslaw.com | 204 Academy Street<br>49 Fourth Street<br>2013 McCarter Highway<br>Newark, NJ |
| Sequa Corporation<br>200 Park Avenue<br>New York, NY 10166 | Brian L. Buniva, Esq.<br>Senior Counsel & Senior Director<br>Environment, Health & Safety Sequa<br>Corporation<br>707 E. Main Street, Suite 1450<br>Richmond, VA 23219<br>845-230-7374 (Direct)<br>804-873-0610 (Mobile)<br>Brian_Buniva@sequa.com<br><br>Gary P. Gengel, Esq.<br>Kegan A. Brown, Esq.<br>Latham & Watkins, LLP<br>885 Third Avenue<br>New York, NY 10022-4834 | Sun Chemical Corporation<br>185 Foundry Street<br>Newark, NJ<br>(prior to 1987) |
| Seton Company, Inc.<br>1000 Madison Avenue<br>Norristown, PA 19403\<br><br>now Seton Tanning | Lawrence E. Bradford, Esq.<br>Cole Schotz, PC<br>PO Box 800<br>25 Main Street<br>Hackensack, NJ 07601-7015<br>201-525-6205(T)<br>lbradford@coleschotz.com | Seton Leather Company<br>849 Broadway<br>Newark, NY 07104 |
| SpectraServ, Inc.<br>75 Jacobus Avenue<br>Kearny, NJ 07032 | Diana Buongiorno, Esq.<br>Chiesa Shahinian & Giantomassi, PC<br>One Boland Dr<br>West Orange, NJ 07052<br>973-530-2075(T)<br>dbuongiorno@csglaw.com | 75 Jacobus Ave.<br>Kearny, NJ |
| STWB, Inc.<br>c/o Bayer Corporation<br>100 Bayer Road<br>Pittsburgh, PA 15205 | Timothy I. Duffy, Esq.<br>Coughlin Duffy LLP<br>Post Office Box 1917<br>350 Mount Kemble Avenue<br>Morristown, NJ 07962-1917<br>973-631-6002(T)<br>tduffy@coughlinduffy.com<br>lhall@coughlinduffy.com (Assistant) | Lehn & Fink Products Corp.<br>192-194 Bloomfield Avenue<br>Bloomfield, NJ 07003<br><br>Thomasett Colors/Sterling<br>120 Lister Ave.<br>Newark, NJ |

16

ALCD-PUBCOM_0001202

| | | |
|---|---|---|
| Sun Chemical Corporation<br>35 Waterview Boulevard<br>Parsippany, NJ 07054-1285 | Warren W. Faure, Esq.<br>EH&S Counsel<br>Sun Chemical Corporation<br>35 Waterview Boulevard<br>Parsippany, NJ 07054<br>973-404-6590(T)<br>Warren.faure@sunchemical.com<br><br>Ted Wolff, Esq.<br>Manatt, Phelps & Phillips, LLP<br>7 Times Square<br>New York, NY 10036<br>twolff@manatt.com | Sun Chemical Corporation<br>185 Foundry Street<br>Newark, NJ<br>(1987 to present) |
| Teval Corporation<br>99 Cherry Hill Road, Suite 105<br>Parsippany, NJ 07054 | Lee D. Henig-Elona, Esq.<br>Gordon & Rees<br>18 Columbia Turnpike, Suite 220<br>Florham Park, NJ 07932<br>973-549-2520(T direct)<br>973-549-2500(T office)<br>lhenig-elona@gordonrees.com | Guyon Pipe<br>900-1000 South 4th Street<br>Harrison, NJ |
| Teva Pharmaceuticals USA, Inc.<br>1090 Horsham Road<br>North Wales, PA 19454 | Gail Port, Esq.<br>Proskauer Rose LLP<br>11 Times Square<br>New York, NY 10036-8299<br>212-969-3243(T)<br>gport@proskauer.com | Biocraft Laboratories<br>12 Industrial Park<br>Waldwick, NJ |
| Textron, Inc.<br>40 Westminster Street<br>Providence, RI 02903 | Jamie Schiff, Esq.<br>Textron, Inc.<br>40 Westminster Street<br>Providence, RI 02903<br>401-457-2422 (T)<br>jschiff@textron.com | Spencer Kellogg Division<br>400 Doremus Avenue |
| The Andrew Jergens Co.<br>2535 Spring Grove Ave.<br>Cincinnati, OH 45214<br><br>now KAO U.S.A Inc. | Richard T. La Jeunesse, Esq.<br>Graydon Head & Ritchey LLP<br>1900 Fifth Third Center<br>511 Walnut Street<br>Cincinnati, OH 45202<br>513-629-2702(T)<br>rlajeunesse@graydon.com | 1 Franklin Ave.<br>Belleville, NJ |

17

ALCD-PUBCOM_0001203

| | | |
|---|---|---|
| The BOC Group, Inc.<br>575 Mountain Avenue<br>Murray Hill, NJ 07974<br><br>now Linde LLC on behalf of<br>The BOC Group, Inc. | James (Jay) Stewart, Esq.<br>Lowenstein Sandler PC<br>65 Livingston Avenue<br>Roseland, NJ 07068<br>973-597-2522(T)<br>jstewart@lowenstein.com<br><br>Mike Resh, Esq.<br>The BOC Group, Inc.<br>575 Mountain Avenue,<br>Murray Hill, NJ 07974<br>Mike.resh@boc.com | 681 Main Street<br>Belleville, NJ |
| The Hartz Mountain<br>Corporation<br>400 Plaza Drive<br>Secaucus, NJ 07094<br><br>The Hartz Consumer Group,<br>Inc. on behalf of The Hartz<br>Mountain Corporation | Curtis L. Michael, Esq.<br>VP and Assistant General Counsel<br>The Hartz Consumer Group, Inc.<br>400 Plaza Drive<br>PO Box 1515<br>Secaucus, NJ 07096-1515<br>201-272-5306 (T)<br>curt.michael@hartzmountain.com | 600/700 South 4th Street<br>Harrison, NJ |
| The Newark Group, Inc.<br>20 Jackson Drive<br>Cranford, NJ 07016 | David M. Meezan, Esq.<br>Kazmarek Mowrey Cloud Laseter LLP<br>1230 Peachtree Street N.E.<br>Suite 3600<br>Atlanta, GA 30309<br>404-969-0733<br>dmeezan@kmcllaw.com | The Newark Boxboard Co.<br>17 Blanchard Street<br>Newark, NJ |
| The Sherwin Williams Co.<br>101 Prospect Ave., N.W.<br>Cleveland, OH 44115 | Donald McConnell, Esq.<br>The Sherwin Williams Co.<br>101 Prospect Ave, NW<br>Cleveland, OH 44115<br>216-566-3741(T)<br>216-515-4400(F)<br>don.j.mcconnell@sherwin.com<br><br>Herbert (Bart) Bennett, Esq.<br>Sokol, Behot & Fiorenzo<br>229 Nassau Street<br>Princeton, NJ 08542-4601<br>609-279-0900(T)<br>hbbennett@sbflawfirm.com | 60 Lister Ave.<br>Newark, NJ |
| The Stanley Works<br>1000 Stanley Drive<br>New Britain, CT 06053<br><br>now Stanley Black & Decker,<br>Inc. | Andrew Kolesar, Esq.<br>Thompson Hine LLP<br>312 Walnut Street, 14th Floor<br>Cincinnati, OH 45202<br>513-352-6545(T)<br>andrew.kolesar@thompsonhine.com | Stanley Tools<br>140 Chapel St.<br>Newark, NJ |

18

ALCD-PUBCOM_0001204

| | | |
|---|---|---|
| Three County Volkswagen<br>701 Riverside Ave.<br>Lyndhurst, NJ 07071 | Miriam Villani, Esq.<br>Sahn Ward & Baker PLLC<br>333 Earle Ovington Blvd, Suite 601<br>Uniondale, NY 11553<br>516-228-1300(T)<br>mvillani@swcblaw.com | 701 Riverside Ave.<br>Lyndhurst, NJ |
| Tiffany & Co.<br>727 Fifth Avenue<br>New York, NY 10022 | John Klock, Esq.<br>Gibbons, PC<br>One Gateway Center<br>Newark, NJ 07102-5310<br>973-596-4757 (T)<br>jklock@gibbonslaw.com | 820 Highland Avenue<br>Newark, NJ |
| Unilever Bestfoods<br>International Plaza<br>Sylvan Avenue<br>Englewood Cliffs, NJ 07632<br><br>Conopco, Inc., d/b/a Unilever<br>(as successpr to CPC/Bestfoods,<br>former parent of the Penick<br>Corporation | Andrew Shakalis, Esq.<br>Associate General Counsel – Environmental<br>& Safety<br>Unilever<br>700 Sylvan Avenue<br>Englewood Cliffs, NJ 07632<br>201-894-2763 (T)<br>201-894-2727 (F)<br>Andrew.shakalis@unilever.com | Penick Corporation<br>540 New York Avenue<br>Lyndhurst, NJ |
| Viacom Inc.<br>11 Stanwix St.<br>Pittsburgh, PA 15222<br><br>Now CBS Corporation | Jeffrey B. Groy, Esq.<br>VP, Sr. Counsel/ Environmental<br>CBS Corporation<br>333 West Wacker Drive, 27th Floor<br>Chicago, IL 60606<br>312-288-3851(T)<br>312-288-3801(F)<br>Jeff.Groy@cbs.com | Westinghouse Electric<br>95 Orange St.<br>Newark, NJ |

19

ALCD-PUBCOM_0001205

| | | |
|---|---|---|
| Vulcan Materials Co.<br>1200 Urban Center Drive<br>Birmingham, AL 35242<br><br>Now Legacy Vulcan Corp. | Eva Fromm O'Brien, Esq.<br>Fulbright & Jaworski<br>Fulbright Tower<br>1301 McKinney<br>Suite 5100<br>Houston, TX 77010-3095<br>713-651-5321 (T)<br>713-651-5246 (F)<br>eobrien@fulbright.com<br><br>John M. Floyd, Esq.<br>Senior Attorney<br>Vulcan Materials Company<br>1200 Urban Center Drive<br>Birmingham, AL 35242<br>205-298-3745 (Direct)<br>205-492-4219 (Cell)<br>205-298-2960 (F)<br>floydj@vmcmail.com | 600 Doremus Ave.<br>Newark, NJ |
| Wiggins Plastics Inc.<br>186 Kingsland Road<br>Clifton, NJ 07014 | Glenn Tucker, Esq.<br>Sheryl Reba, Esq.<br>sreba@greenbergdauber.com<br>Greenberg Dauber<br>One Gateway Center, Suite 600<br>Newark, NJ 07102<br>973-643-3700(T)<br>973-643-1218(F)<br>gtucker@greenbergdauber.com | 180 Kingsland Road<br>Clifton, NJ |
| Wyeth<br>5 Giralda Farms<br>Madison, NJ 07940 | Ronald J. Schott, Esq.<br>Corporate Counsel<br>Pfizer<br>5 Giralda Farms<br>Madison, NJ 07940<br>973-660-6641(T)<br>973-660-7176(F)<br>ronald.schott@pfizer.com<br><br>Seth Kerschner, Esq.White & Case LLP<br>1155 Avenue of the Americas<br>New York, NY 10036-2787<br>212-819-8630(T)<br>212-354-8113(F)<br>Seth.kerschner@whitecase.com | Shulton Inc. and<br>American Cyanamid Co.<br>697 Route 46<br>Clifton, NJ |

20

ALCD-PUBCOM_0001206

**New Recipients of Notice Letters**

| | | |
|---|---|---|
| Palin Enterprises | Mr. Michael Palin<br>Palin Enterprises<br>235 Park Avenue South, #8<br>New York, NY 10003-1045 | American Modern Metals<br>44 Passaic Ave. (a/k/a 25<br>Belgrove Drive)<br>Kearny, NJ |
| Passaic Valley Sewerage Commission | Gregory A. Tramontozzi, Esq<br>Executive Director<br>Passaic Valley Sewerage Commissioners<br>600 Wilson Avenue<br>Newark, NJ 07105<br><br>Michael Witt, Esq.<br>Chasan Leyner & Lamparello, PC<br>300 Harmon Meadow Blvd.<br>Secaucus, NJ 07094<br>201-801-6093<br>mwitt@chasan.com | |
| City of Newark | Honorable Ras J. Baraka, Mayor<br>City of Newark<br>City Hall<br>920 Broad Street, Suite 200<br>Newark, New Jersey 07102<br><br>City of Newark Department of Law<br>Room 316, City Hall<br>920 Broad Street<br>Newark, NJ 07102 | |
| Borough of East Newark | Honorable Joseph R. Smith, Mayor<br>Borough of East Newark<br>34 Sherman Avenue<br>East Newark NJ 07029 | |
| Town of Harrison | Honorable James A. Fife, Mayor<br>Town of Harrison<br>318 Harrison Avenue<br>Harrison, New Jersey 07029<br><br>Mr. Paul J. Zarbetski, Esq.<br>Town of Harrison<br>318 Harrison Avenue<br>Harrison, New Jersey 07029 | |
| Town of Kearny | Honorable Alberto G. Santos, Mayor<br>Town of Kearny<br>402 Kearny Avenue<br>Kearny, NJ 07032 | |

21

ALCD-PUBCOM_0001208

# EXHIBIT 2

OxyChem's Comments in Opposition to Proposed Consent Decree,
*United States v. Alden Leeds, Inc., et al.*, Civil Action No. 2:22-cv-07326 (D.N.J.)

ALCD-PUBCOM_0001209



**Occidental Petroleum Corporation**

5 Greenway Plaza, Suite 110, Houston, Texas 77046
Telephone 713.215.7802 Fax 713.985.8934

Marcia E. Backus
Senior Vice President and General Counsel

October 12, 2017

wilson.ericj@epa.gov

Mr. Eric J. Wilson
Deputy Director for Enforcement and Homeland Security
Emergency and Remedial Response Division
United States Environmental Protection Agency
Region 2
290 Broadway
New York, NY 10007-1866

Re:    September 18, 2017 Letter Concerning Proposed Allocation Process
       for Operable Unit 2, Diamond Alkali Superfund Site
       Essex and Hudson Counties, New Jersey

Dear Mr. Wilson:

I write on behalf of Occidental Chemical Corporation ("OCC") to express its concern regarding the EPA's proposed "Allocation Process," in which it seeks to impose on potentially responsible parties (PRPs) an informal procedure to be used to allocate the costs of implementing the remedy for Operable Unit 2 of the Diamond Alkali Superfund Site. OCC first learned of this process on September 18 when it received a letter inviting OCC and certain other PRPs to attend a meeting on October 13 with EPA's chosen allocator, David Batson. Given OCC's concerns, OCC believes it will be more productive for it to attend by phone and listen quietly, rather than air these issues in an open meeting. We will shortly send Ms. Yeh notice of our attendees and appreciate the opportunity to attend by phone while EPA evaluates these concerns.

For the reasons stated below, OCC believes the proposed allocation process is premature. EPA's process will not (and cannot) offer the "transparency and fairness" that EPA has "consistently stated are of importance to the Agency." Nonetheless, in the spirit of cooperation, OCC will participate in the October 13 meeting as EPA has requested. Cooperation, however, cannot come at the expense of OCC's legal rights to obtain contribution and cost recovery from all responsible PRPs who have contaminated the sediments of the Lower Passaic River. OCC therefore reserves all of its legal rights and its attendance at the meeting does not constitute its consent to EPA's proposed allocation process.



518288

Mr. Eric J. Wilson
October 12, 2017
Page 2

**The proposed allocation process is inconsistent with the Record of Decision.**

EPA's Record of Decision (ROD) clearly and unequivocally identified *eight* chemicals of concern that drove its selection of the remedy for the Lower 8.3 miles of the Passaic River: dioxins, furans, PCBs, mercury, DDT, copper, dieldrin, PAHs, and lead.[1] According to the ROD, the data EPA studied shows that "elevated concentrations of [these] COCs are *ubiquitous* in surface sediments of the lower 8.3 miles, bank to bank."[2]

Ignoring this finding, and the voluminous record that makes clear that the remedy was selected as a result of all eight chemicals of concern, EPA's September 18 Letter indicates EPA intends to allocate the cost of implementing the remedy to parties responsible for only three chemicals: dioxins, furans, and PCBs. Having inexplicably abandoned its own finding concerning the drivers of this costly remedy, EPA's letter goes on to state that it is excluding scores of PRPs from the allocation process because they "are not responsible for the release of dioxins, furans, and/or polychlorinated biphenyls ("PCBs") into the Lower Passaic River." There is no factual record to support this statement. EPA's decision to exclude entities responsible for the discharges of all eight chemicals of concern cannot be reconciled with the ROD or the administrative record. EPA's unilateral decision to exclude key polluters is also inconsistent with EPA's public statements, which have (until now) consistently emphasized that EPA's agreement on "one singular engineering and design approach for the lower 8.3 miles ... doesn't mean that *the other 100 potentially responsible parties aren't on the hook for some of these costs. We will apportion liability ...for the whole cleanup project, not just the design.*"[3]

EPA's selected remedy was designed to address not merely the eight chemicals of concern identified in the ROD, but the other contaminants in the Lower Passaic River as well. EPA has no scientific or administrative basis on which it can now abandon the findings of the ROD—after selecting the remedy—in favor of an allocation process that will apportion costs based on only three chemicals of concern, ignoring all other contaminants and PRPs in the process.

**There is not sufficient information to arrive at an equitable allocation of the costs.**

EPA also lacks adequate information from which to derive an equitable allocation of costs. Allocation of costs is a judicial, not an administrative, function under CERCLA. Many PRPs have not provided full responses to discovery concerning the raw materials used in their industrial process, the intermediates created in their operations, or any mass balance analysis to account for all hazardous substances handled, produced or discharged from their facilities. In addition, many PRPs have not produced all relevant documents, or provided testimony from key witnesses. As

---

[1] Lower 8.3 ROD at 15-16.

[2] Lower 8.3 ROD at 17 (emphasis added).

[3] J. Hurdle. "Occidental to Pay $165 Million Toward EPA's Cleanup of Passaic River Pollution." 6 October 2016. NJ Spotlight. (Quoting Judith Enck, EPA Region 2 Administrator) (emphasis added).

ALCD-PUBCOM_0001211

explained below, implementing an allocation process now would elevate myth to the stature of facts—but facts are required before an equitable allocation can be achieved.

It is a myth that there exists a complete discovery record in the New Jersey Spill Act litigation filed by the NJDEP. The NJDEP did not join any of the third party PRPs in its state court action. Although Maxus and Tierra added certain PRPs to the case, many PRPs were never made parties to the action by anyone. Obviously, parties not joined provided no discovery at all. Even those PRPs that were joined did not provide complete discovery. Certain PRPs produced some, but not all, of their documents. In addition, as a result of a stay of discovery issued by the New Jersey Special Master, virtually no depositions of other PRPs were taken—either of custodians of records (to ensure document production was complete) or of witnesses with knowledge of production and disposal practices. As this overview makes clear, the NJDEP discovery record is limited and incomplete as it pertains to the actions of many of the PRPs EPA has identified as potentially responsible for the costs of implementing the remedy.

EPA's Administrative Record likewise does not contain sufficient evidence to arrive at an *allocation* of the cost of implementing the remedy. EPA has yet to conduct extensive (or, in some cases, any) sampling of soils at the upland and riparian sites that belong to many PRPs. There is, and can be, no assurance that the available evidence affords an adequate basis from which to assess any PRP's relative share of the cost of the remedy, much less the share to be borne by only some PRPs (and not others, whom EPA has decided to exclude entirely from the process).

**The remedy is still being designed, so its costs and the factors that drive them are not yet known.**

In September of 2016, OCC signed an Administrative Settlement Agreement and Order on Consent under which it agreed to design EPA's remedy for the Lower Passaic River. The AOC affords OCC approximately five years in which to finalize the design.

EPA is fully aware that OCC will need to conduct additional sampling and studies to finalize the design. This sampling is needed, among other things, to design a cap of appropriate thickness (a cost driver) and to identify which contaminated soils might need specialized pre- or post-removal treatment (another cost driver). These studies will also enable OCC and EPA to assess whether particular chemicals might require incineration upon removal, whereas removal and entombment elsewhere might be adequate for others. These are just a few of the significant unknowns and uncertainties that exist concerning how much the remedy will eventually cost and which *chemicals and contaminants* (in what proportions) are driving the costs.

Until the remedy is designed, OCC believes it is premature and inequitable for EPA to attempt to allocate the costs of the remedy to one PRP or another, or one chemical or another, because there is not an adequate factual basis on which EPA or its allocator can do so.

Mr. Eric J. Wilson
October 12, 2017
Page 4

**Premature allocation may create a barrier to later consensual resolutions.**

Careful, evidence-based allocation of the cost of implementing the remedy is essential as a matter of fairness and simple economics. EPA's remedy is the largest and most expensive sediment remediation project EPA has ever directed. EPA estimates it will cost $165 million to design the remedy and another $1.38 billion to implement it. Basic fairness requires that the equitable responsibility for these staggeringly large costs be ascertained carefully and with due process. As a matter of economics, single percentage inaccuracies in the allocation could shift millions of dollars in cost to parties who should not be required to bear them. EPA's selected remedy also has perpetual maintenance obligations. These costs must be borne by the parties responsible for them. They should not be shifted to other parties, simply because they assert their legal rights or decline to accept the mediator's informal attempt to allocate the costs of implementing the remedy before litigation has been filed and before discovery can be conducted.

EPA's attempt to force the early settlement of an allocation for the cost of implementing the remedy at this stage is not merely prejudicial to the PRPs. It also has the potential to impede EPA's ultimate goal of obtaining a consensual resolution on implementation of the remedy itself. Early settlements will reduce the pool of responsible parties available to fund the performance of the remedy. If EPA prejudices the rights of PRPs in this manner, it gives PRPs little reason to step up later and assume responsibility to pay costs that other PRPs would have had to bear, but for EPA's premature decision to settle with certain parties.

**OCC's concerns should be heard and considered.**

Although EPA has acknowledged that "Occidental did not directly discharge pollution into the Passaic River,"[4] OCC has repeatedly demonstrated its commitment to work cooperatively with EPA to address and resolve the legacy issues associated with the former Diamond Alkali plant, which DSCC had ceased operating seventeen years *before* OCC acquired the stock of DSCC in 1986.

Since the surprise bankruptcy of OCC's indemnitor, Maxus Energy Corporation, the U.S. subsidiary of Argentine-controlled oil giant, YPF, S.A., OCC has worked rapidly and directly with EPA to address issues at Diamond Alkali and to stabilize many other contaminated sites around the country. Among other things:

- OCC agreed to an Administrative Order on Consent to design the remedy for the Lower Passaic River at a cost of $165 million.
- OCC worked tirelessly during the Maxus bankruptcy to ensure the safe and orderly transition of *all* of the former DSCC sites, including Diamond Alkali.

---

[4] EPA Region 2 Press Release, October 5, 2016.

ALCD-PUBCOM_0001213

Mr. Eric J. Wilson
October 12, 2017
Page 5

- As a result of OCC's efforts, and its cooperation with EPA and the Natural Resource Trustees, the Maxus Bankruptcy Plan was confirmed.
- The Plan ensures that recoveries from YPF will flow directly to EPA and the Trustees, along with other environmental creditors.
- The Plan also establishes an Environmental Response and Remediation Trust through which future costs can be funded, assuming litigation against the Debtors' former parent companies are successful.

By contrast, while OCC was diligently reaching an agreement with EPA to design the OU2 remedy and stabilize other DSCC environmental sites around the country, YPF was pleading the poverty of its U.S. subsidiary in Delaware bankruptcy court, even as it used the assets it had stripped from those subsidiaries as part of a balance sheet it used to help YPF raise nearly $2B on Wall Street from American investors.

Given this history and OCC's efforts to work cooperatively with EPA at Diamond Alkali and elsewhere, EPA's September 18 Letter came as a surprise to OCC. OCC intends to continue to work cooperatively with EPA on the design of the remedy. OCC also intends to cooperate on performing the remedy, *assuming that* a reasonable design is achieved, appropriate responsible parties are available to participate in performing the remedy (and have not been released prematurely), and satisfactory terms of a consent order to perform the remedy can be agreed.

That desire to cooperate is precisely why OCC has written this letter: OCC is extremely concerned that the process, as outlined thus far, will not (and cannot) arrive at a cost allocation which ensures that *all liable PRPs pay their fair share*. We urge EPA to consider and address these concerns before it attempts to mandate this (or any other) mechanism to allocate the costs of implementing the remedy for OU2.

Very truly yours,

Marcia E. Backus

Marcia E. Backus
General Counsel, Occidental Petroleum
Corporation

cc:    Mr. Eric Schaaf (schaaf.eric@epa.gov)
       Ms. Sarah Flanagan (flanagan.sarah@epa.gov)

ALCD-PUBCOM_0001214

# EXHIBIT 3

OxyChem's Comments in Opposition to Proposed Consent Decree,
*United States v. Alden Leeds, Inc., et al.*, Civil Action No. 2:22-cv-07326 (D.N.J.)

ALCD-PUBCOM_0001215

## SMALL PARTIES GROUP

January 30, 2018

**VIA EMAIL**

Eric J. Wilson
Deputy Director for Enforcement
and Homeland Security
USEPA
Region 2
290 Broadway
New York, NY  10007-1866

Re:     **Allocation for Operable Unit 2 Remedial Action**
        **Diamond Alkali Superfund Site, Essex and Hudson Counties, New Jersey**

Dear Mr. Wilson:

This letter responds to your correspondence dated January 5, 2018 regarding the above matter, submitted on behalf of the Small Parties Group.[1]  Because of the complexity of this case, as well as the size and cost of the remedy, it is important that the allocation process provide the Allocator and the Region with sufficient information to evaluate the merits properly without engaging in unnecessary layers of process that are inefficient and unproductive.  In order to be credible, though, the allocation must be a complete and comprehensive process.  The proposed process should be restructured to increase the potential it will generate a defensible allocation, and we again urge the Region to reconsider its approach.

### ASSURING A SUFFICIENT DATABASE OF DOCUMENTS

EPA's willingness to increase the number of documents to be considered by Mr. Batson is a positive step.  And we understand that the document submission and review portion of the allocation process is not intended to duplicate the full discovery process that litigation would include.  Yet we are justifiably concerned that the document database will not contain the documents needed to perform a fair, reasonable, and credible allocation.  For example, EPA and Mr. Batson have represented that the entire State Litigation file relating to the Diamond Alkali site has been provided and is already included in the document repository.  Our review of the database of documents provided by EPA to Mr. Batson shows with certainty that this is not the case as many documents are not included.  Additional examples of fundamental defects in the database include:

---

[1] The Small Parties Group consists of more than 50 members.  This letter is not being submitted on behalf of any members who are participating in the first round cash out settlement.  Most, but not all, remaining members who were invited to participate in the allocation support this letter and the statements herein.



537581

ALCD-PUBCOM_0001216

- It fails to include documents in EPA's possession and/or about which EPA is fully aware that evidence the massive discharges of dioxins, furans and other COCs from the Diamond Alkali upland site into the river. These documents and categories of documents include:

  o Judicial opinions, both of the New Jersey Superior Court and Appellate Division, holding that Occidental Chemical Corp.'s predecessor, Diamond Alkali, intentionally and illegally discharged dioxin, furans, DDT, and other contaminants of concern from the Diamond Alkali upland site to the Passaic River;[2]

  o The documents submitted by NJDEP in the *NJDEP v. Occidental Chemical Corp.* litigation in support of its motion for summary judgment against Occidental; these documents include, in NJDEP's words, "pleadings, documentary evidence produced during discovery, and even a final judgment establishing . . . without question, that [Occidental's predecessor] intentionally discharged dioxin, DDT and other hazardous substances into the Passaic River – a practice so pervasive that [the predecessor's] employees had a name for it: 'riverize'" (Brief in Support of Plaintiffs' Motion for Partial Summary Judgment Against Occidental Chemical Corp., No. ESX-L9868-05 (May 6, 2011) at 2);

  o Attachment A to the Cooperating Parties Group's (CPG) comments on EPA's proposed plan for the lower eight miles of the Passaic River, submitted to EPA on August 20, 2014, addressing discharges from the upland site to the river; and

  o Published articles in the peer-reviewed scientific literature establishing that the Diamond Alkali upland site "is the dominant source of the 2,3,7,8-TCDD in sediments within approximately the lower 14 miles of the lower Passaic River" (James Quadrini, et al., "Fingerprinting 2,3,7,8-tetrachlorodibenzodioxin contamination within the lower Passaic River," 34 Environ. Toxicol. Chem. 1485 (2015));

- It also fails to include documents necessary to make informed determinations about many other PRPs' respective relative liability shares.

---

[2] *See Diamond Shamrock Chem. Co. v. Aetna Cas. & Surety Co.*, 258 N.J. Super. 167, 183 (App. Div. 1992) (Diamond Alkali's "waste disposal policy ... essentially amounted to 'dumping everything' into the Passaic River"); *id.* at 197 (Diamond Alkali "intentionally and knowingly discharged hazardous pollutants with full awareness of their inevitable migration to and devastating impact upon the environment"); *id.* at 212-13 ("Diamond's management knew of the hazardous nature of dioxins at a relatively early stage. ... Despite specific preventative recommendations, Diamond made a conscious decision to run the autoclave, in which chemicals were processed ..., at a higher temperature ... The only conclusion to be drawn is that Diamond's management was wholly indifferent to the consequences flowing from its decision. Profits came first.").

ALCD-PUBCOM_0001217

The process currently under discussion for supplementing the document repository leaves the relevancy of the documents to be added/produced to be determined by each individual party producing said documents. There is no agreement among the parties regarding what information is deemed relevant and must be produced. Furthermore, requiring parties to demonstrate the relevance of each document they produce at the time of production will be neither efficient nor practical. Rather, in order to ensure a consistent approach a detailed process for document production is essential, including clear criteria for selecting specific categories of documents for submission. For example, document categories may include: PRP site operations and conduct; hazardous substance discharges; pathways for hazardous substance discharges to impact the Passaic River; the lower Passaic River 8.3 mile FFS area site issues; and any factual information that participants will rely on to support submissions arguing what allocation share they or any other participant should be given, just to name a few.

Furthermore, parties should also be required to certify that a reasonable investigation of their records has been made and responsive information in their custody has been fully disclosed. A process for addressing those instances in which parties may make incomplete or deficient productions must also be developed and codified. In order to insure that a level playing field is established, all key, relevant information must be collected before the allocation process commences so that no advantage is gained by a party due to the lack of sufficient information in EPA's database or the failure of a PRP to undertake a diligent inquiry and produce relevant documents. In this regard we note particularly that some parties have to date not indicated an intention to participate in this allocation. Therefore, if these parties do not ultimately participate, no voluntary process of certifying productions of documents will apply to them, nor will they respond to any allocation questionnaire.

In order to create an appropriately comprehensive database, the document production cannot be limited by an arbitrary page limit. Even an augmented page limitation could very well be (and likely will be) disproportionate to the complexity of the allocation, the number of relevant documents existing, and the enormous costs at issue.

We believe that a complete database collection and meaningful meetings with the Allocator could be completed within the timeframe needed to expeditiously fund and implement the OU2 remedy.

## ASSURING A FULL ALLOCATION

In its January 5, 2018 letter, EPA stated that it will not consent to add more parties to the allocation at this time. EPA's refusal extends even to the Passaic Valley Sewerage Commission (PVSC) and the four municipalities already identified as potentially responsible parties. The parties are extremely concerned with proceeding with an allocation that does not include these identified PRPs, especially PVSC.

EPA justifies its refusal to include PVSC and the four municipalities by stating that they "are uniquely situated to provide in-kind services with respect to the remedy selected for Operable Unit 2 (OU2) of the Diamond Alkali Superfund Site." In eventually justifying to a District Court any settlement with these parties, EPA will bear the burden of demonstrating that "the proportion of total projected costs to be paid by the settlors" is commensurate "with the

ALCD-PUBCOM_0001218

proportion of liability attributable to them." *United States v. Montrose Chemical Corp. of Cal.*, 50 F.3d 741, 744 (9th Cir. 1995) (citing *United States v. Charles George Trucking*, 34 F.3d 1081, 1087 (1st Cir. 1994)).

Including PVSC and the municipalities in the allocation is obviously and for many reasons the fairest and most reasonable way to determine objectively "the proportion of liability attributable to them." To be clear, that proportion is very substantial, as noted in the CPG's prior correspondence on this topic, and as would be demonstrated in the allocation. For instance, EPA Region 2 has, in prior correspondence, repeatedly stated that the risk drivers for the River are dioxin, furans, and PCBs. While the Diamond Alkali site is clearly the primary source of dioxins and furans to the River, as was set forth in detail in the October 24, 2017 letter to the EPA on behalf of the CPG, PVSC has been identified as a major, if not the primary, source of PCBs to the watershed, contributing an estimated total PCB mass of 91,613 lb. to the River.

Indeed, PVSC itself has recognized that it arranged for disposal and disposed of vast amounts of hazardous substances in the Passaic River, associated with hundreds of customers that EPA has excluded from the general notice letter and allocation process. In the New Jersey State Court litigation regarding the Passaic River and Newark Bay Complex, on September 20, 2012, PVSC submitted a letter brief to the trial court in support of an order to show cause seeking a stay of third and fourth party claims in the suit to allow the parties to pursue settlement discussions. In its papers, PVSC advised the trial court that "PVSC is prepared to name an additional 500 parties to this lawsuit by the Court's September 24, 2012 deadline."[3] The letter brief states that "PVSC alone has identified approximately 500 *viable* Fourth Party Defendants" that needed to be sued and added that "[t]his number will almost certainly increase as additional Fourth Parties are identified through discovery."[4] Indeed, as of 2012, PVSC had over 2,500 customers that had not been named in the lawsuit. Prior to PVSC's submission, on August 22, 2012, Special Master Corodemus posted a list setting forth the identities of several thousand entities not currently parties in the action that have been, or potentially could be, identified in a first pleading as Fourth Parties to the litigation. While those additional parties were not added to the litigation as the trial court issued a stay to allow the third party defendants to engage in settlement discussions with the State of New Jersey, PVSC's letter brief and the Special Master's list of potential fourth parties support the conclusion that EPA has not identified all viable parties in this matter for the allocation of OU2.

Moreover, in February of 2017, William J. Hengemihle of FTI Consulting submitted correspondence on behalf of the CPG identifying a number of supplemental industrial users who are believed to have discharged, directly or indirectly, into the Lower Passaic River. By refusing to include these other parties, PVSC, or the four previously identified municipalities in the allocation process, EPA is excluding significant, primary sources of the Passaic River risk drivers from the allocation. At a minimum, EPA should allow the parties that participate in the allocation process to submit evidence to the Allocator related to PVSC, the municipalities and additional sources for inclusion in the allocation to ensure that it appropriately accounts for those sources.

---

[3] PVSC September 20, 2012 letter brief submitted by Michael D. Witt, Esq., at p.7.

[4] PVSC September 20, 2012 letter brief submitted by Michael D. Witt, Esq., at p.9 [emphasis added].

ALCD-PUBCOM_0001219

Should it become necessary to oppose a proposed consent decree between EPA and these parties on the basis that the settlement embodied in the decree does not fairly reflect these parties' proportionate liability, we will be required to inform the Court of EPA's refusal to allow the allocator to evaluate their proportionate liability (in addition to making the full demonstration of their very substantial proportionate liability). For these reasons, and the additional reasons previously identified by the CPG, we renew our request that the allocator evaluate these parties' proportionate liability. If EPA is not amenable to adding the PVSC, municipalities, or additional industrial users to the allocation process, then the parties believe that these parties' true share should be evaluated as part of the allocation despite their lack of process participation. Their exclusion from the allocation altogether would proscribe a fair and complete allocation.

## CLARIFYING SETTLEMENT CRITERIA

Finally, the parties require additional information on the assessment and evaluation that EPA undertook in order to determine which parties met the stated criteria (*i.e.*, no association with the release or disposal of any of the COCs for OU2, as identified in the ROD, into the Lower Passaic River) for cash out settlements. Since EPA stated that these criteria would be used for future cash out offers, this information will be essential in proceeding with an allocation process that allows for an early "off-ramp" for additional cash out settlements. This would also enable the participating parties to propose supplemental criteria for the cash out settlements for the EPA's and the allocator's benefit.

## CONCLUSION

We are always willing to discuss the above issues and work with EPA to develop a comprehensive allocation process, one that the participants and EPA can agree on and that the participants would remain willing to fund. To that end, we reiterate our prior request for a meeting with EPA to further discuss these issues.

This letter is intended as a good faith effort to improve this allocation's utility in settling this matter in whole or in part. Nothing in this letter should be construed as an admission or agreement by any party as to any fact or matter.

Thank you in advance for your consideration of these important issues.


cc:    David Batson, Esq., AlterEcho
       Mary Apostolico, CSRA
       Kathryn Barton, EPA - OARM

-5-

# EXHIBIT 4

OxyChem's Comments in Opposition to Proposed Consent Decree,
*United States v. Alden Leeds, Inc., et al.*, Civil Action No. 2:22-cv-07326 (D.N.J.)

ALCD-PUBCOM_0001221

 **GT GreenbergTraurig**

David G. Mandelbaum
Tel 215.988.7813
Fax 215.717.5201
mandelbaumd@gtlaw.com

**VIA EMAIL AND UPS NEXT DAY AIR**                    February 13, 2018

Juan M. Fajardo, Esquire
Office of Regional Counsel
USEPA, Region 2
290 Broadway
17th Floor
New York, NY 10002

Re:    **Lower Passaic River Site / Planned Allocation of Responsibility for Operable Unit 2**

Dear Juan:

I am writing on behalf of this firm's client, Benjamin Moore & Co., concerning the allocation
process that the Environmental Protection Agency ("EPA") has designed and is intending to
implement using David Batson as the assigned allocator ("the Batson allocation"). I make
specific reference to Eric Wilson's letter of January 5, 2018, to the Diamond Alkali – Lower 8.3
Miles Contact Group. I intend this letter to supplement the views of the Small Parties Group
("SPG"), transmitted by letter dated January 30, 2018, which Benjamin Moore endorses.

We are not aware of any evidence demonstrating that Benjamin Moore released dioxins, furans,
or polychlorinated biphenyls to the Lower Passaic River from its facility, which is located next to
the Diamond Shamrock Site on Lister Avenue. Whether EPA ultimately agrees with that
proposition or not, Benjamin Moore has reservations about the allocation process as currently
envisioned that Benjamin Moore wishes to reiterate at this time.

   a.    The Batson Process Is Not Authorized by CERCLA.

There appears to be no statutory basis for the Batson allocation –which can be summed up as an
EPA-improvised process for organizing certain information and allocating measures of OU2
responsibility in anticipation of a court-approved endorsement of settlement. But Congress has
already mandated the process for an allocation in aid of settlement – a nonbinding preliminary
allocation of responsibility ("NBAR") – in section 122(e)(3) of Comprehensive Environmental
Response, Compensation and Liability Act ("CERCLA"). EPA issued guidelines for NBARs at
52 Fed. Reg. 19,919 (May 28, 1987). Per the EPA's guidelines, an NBAR is intended only as an
aid to settlement among those parties who participate and EPA, and not as a justification for a
contested settlement. The very nature of an NBAR confirms its more limited purpose; an NBAR
is a voluntary allocation process, the results of which (i) may be adjusted by the PRPs after
preparation, and (ii) cannot be introduced in any court proceeding (including one for the entry of
a consent decree).

GREENBERG TRAURIG, LLP ■ ATTORNEYS AT LAW ■ WWW.GTLAW.COM
2700 Two Commerce Square ■ 2001 Market Street ■ Philadelphia, PA 19103 ■ Tel 215.988.7800 ■ Fax 215.988.7801


**537583**

ALCD-PUBCOM_0001222

Juan M. Fajardo, Esquire
February 5, 2018
Page 2

In contrast to an NBAR, the Batson allocation is neither voluntary nor nonbinding. While EPA and Mr. Batson on the one hand, and many of the noticed parties on the other, have talked about parties electing not to participate in the allocation process, Mr. Batson has advised that EPA has directed him to make an allocation to every noticed party unless that party was offered and accepted an early cash-out[1] or is one of the noticed parties specifically excluded from the allocation process.[2] No so-called "allocation party" has the ability to opt out of, or to adjust, this allocation, including the parties that neither consent to it nor participate.

In short, while Benjamin Moore is not endorsing an NBAR proceeding for the Passaic River allocation, Benjamin Moore is not aware of any statutory provision or regulation that permits EPA to depart from an NBAR and develop an alternative *mandatory* settlement process. Absent such a basis, the Batson allocation is not authorized by the statute, and the costs incurred to implement it are neither costs of response incurred consistent with the national contingency plan, nor reasonable enforcement costs. Moreover, rather than accepting the Batson allocation as a basis for a settlement order, a court will likely reject the Batson allocation as inconsistent with CERCLA's requirements.

To be clear, Benjamin Moore believes that parties who wish to attempt settlement can use whatever they like to help them. They just cannot force others into that process, nor can they use that process to show a resulting settlement to be fair, reasonable, or consistent with CERCLA. If Mr. Batson's process, trial by combat, or a Ouija board would help, by all means it should be used, but that is for the parties seeking the help, and not any subsequent court.

   b.  The EPA Allocation Process is Arbitrary and Promotes a Piecemeal Settlement that
       Invites Challenge.

The EPA allocation process treats similarly situated parties differently, and thus is entirely arbitrary. Nowhere is this clearer than with respect to EPA's decision to pursue an entirely separate settlement process with the Passaic Valley Sewerage Commission ("PVSC" or "the POTW") and certain municipalities. EPA has stated its decision not to pursue the PVSC's significant industrial users, which account for several thousand responsible parties. And yet, although several of the noticed allocation parties are connected to the Passaic River only through their use of the POTW, EPA has arbitrarily maintained those parties, but not PVSC, bear responsibility for purposes of this allocation. If there is a principled reason for treating the POTW separately, then that reasoning surely applies likewise to parties whose sole connection to OU2 liability is through the POTW. If that is not the case, then all parties potentially responsible for contamination to the River solely through use of the POTW, including but not limited to those noticed to date, should be included in the Batson allocation.

---

[1] This is yet another example of the unfairness of the Batson allocation. The early cash-out settlements previously offered by EPA to select parties was predicated on EPA's assessment that these parties had not released *any* contaminant of concern ("COC") to the Passaic River. Yet those selected parties who refused to accept the cash-out offer – i.e., to pay an arbitrary cash-out amount for having no liability at all – are nonetheless expected to participate in the Batson allocation at considerable expense.

[2] The parties excluded from the Batson allocation include the Passaic Valley Sewerage Commission and certain municipalities.

ALCD-PUBCOM_0001223

Juan M. Fajardo, Esquire
February 5, 2018
Page 3

A separately negotiated settlement between EPA and PVSC and others only reinforces the
appearance that EPA is only looking to justify early (in-kind) settlements, rather than to promote
a comprehensive settlement of OU2 responsibility without litigation. Under the guidelines, an
NBAR should allocate 100 percent of the costs of the remedial action – rather than carve out
costs to address in separate proceedings. Moreover, EPA's approach appears to disregard
section 113(f)(2) of CERCLA, as there is no suggestion that these early settlements will be
structured to assure a reduction in the liability of non-settling parties by the amounts of the
settlements EPA does reach in these separate proceedings.

The Batson allocation is not positioned as constructed to reach a settlement for 100 percent of the
costs of the remediation or any consensus among those who are the most responsible. Rather,
insofar as it eschews a comprehensive, unbiased, and informed allocation, the Batson allocation
appears designed solely to promote early settlements for a set of parties selected by EPA through
an exercise of discretion. If the purpose of the Batson allocation is simply to provide EPA with
justification for settlements with the parties responsible for the smallest shares, then that ought to
be the only outcome of the process. Mr. Batson can sort the parties into two groups; those who
meet EPA's criteria for cash-out offers and those that do not. Further allocation will be counter-
productive and invite litigation.

Benjamin Moore favors attempts to reach a reasonable and fair allocation of shared OU2
responsibility, consistent with CERCLA and without litigation. However, the Batson allocation
is not designed to aid settlement – which ought to be the only rationale for an allocation prepared
by EPA or on EPA's behalf. In fact, the Batson allocation will inevitably result in the very
protracted litigation that presumably all parties, including EPA and Benjamin Moore, seek to
avoid. Ultimately, it is the court, not EPA, that is qualified to prepare a binding allocation; and
any administrative settlement effort must be intended to mimic the likely judicial allocation if it
is intended to promote a consensual, rather than litigated, result. But the allocation process as
planned does very little to replicate a litigated equitable allocation (which would include review
of relevant documents and expert analysis) under section 113(f)(1) of CERCLA. While
Benjamin Moore hopes to receive a cash-out offer, the value of the offer will be diminished if it
does not withstand challenges from non-settling parties.

Benjamin Moore will participate in Mr. Batson's process if the process goes forward because it
has no choice; Mr. Batson will assign a share to Benjamin Moore whether Benjamin Moore
participates or not. Neither EPA nor any other party should interpret Benjamin Moore's active
participation as waiver of any claim, defense, or position concerning the reasonableness or
lawfulness of the allocation, the recoverability of the costs of the allocation under CERCLA or
other law, or the propriety of any settlement based upon the allocation or the allocation report.

Very truly yours,

David G. Mandelbaum

cc: David C. Batson, Esq.

ALCD-PUBCOM_0001224

# EXHIBIT 5

OxyChem's Comments in Opposition to Proposed Consent Decree,
*United States v. Alden Leeds, Inc., et al.*, Civil Action No. 2:22-cv-07326 (D.N.J.)

ALCD-PUBCOM_0001225



Kathy Patrick
Partner
kpatrick@gibbsbruns.com
713.751.5253

November 7, 2018

**BY ELECTRONIC MAIL**

Mr. John Prince
Deputy Director, Emergency and Remedial Response Division
Environmental Protection Agency Region 2
290 Broadway
New York, NY 10007-1866

Mr. Eric Schaaf
Regional Counsel
Environmental Protection Agency EPA Region 2
290 Broadway
New York, NY 10007-1866

Ms. Sara Flanagan
Chief, New Jersey Superfund Branch
Office of Regional Counsel
Environmental Protection Agency Region 2
New York, NY 10007-1866

> Re:    September 2016 Administrative Settlement Agreement and Order on Consent
> between the United States Environmental Protection Agency and Occidental Chemical
> Corporation

Dear Mr. Prince, Mr. Schaaf, and Ms. Flanagan:

I write on behalf of Occidental Chemical Corporation (Occidental) to express Occidental's concern regarding a letter sent on September 11, 2018 by Sara Flanagan, EPA's New Jersey Superfund Branch Chief, to David Erickson of Shook, Hardy & Bacon L.L.P, who is counsel to certain of the Defendants in Occidental's pending CERCLA action in the District of New Jersey.

We note that while Ms. Flanagan's letter appears to concern contribution and cost recovery claims that are reserved to Occidental under the September 2016 Administrative Settlement Agreement and Order on Consent between Occidental and EPA (the "2016 ASAOC"), the letter was not addressed to Occidental and Occidental did not receive a copy of it until it was forwarded to us later by Kathryn DeLuca of Region 2.

Messrs. Prince, Schaaf,
and Ms. Flanagan
November 7, 2018
Page 2

Both the context of the letter, and the way Mr. Erickson has read it, have caused Occidental concern.

In the 2016 ASAOC, Occidental agreed to incur the expenses necessary to design EPA's selected remedy for Operable Unit 2 of the Diamond Alkali Superfund Site. EPA estimated Occidental would incur approximately $165 million to perform this work.[1] But Occidental's exposure to these costs is not capped; it has agreed to perform the work regardless of its costs to do so. Given the risks this contract shifted from the United States and other parties to Occidental, it was essential that the 2016 ASAOC preserve Occidental's right to pursue contribution recoveries from the more than 100 other parties whom EPA has alleged may be responsible for hazardous substances in the Lower Passaic River.[2]

Occidental is the only party that has stepped up to perform the expensive, essential work to design the remedy for OU2. Occidental also provided millions of dollars of funding in the bankruptcy of its indemnitors Maxus Energy Corporation and Tierra Solutions, Inc., to pursue their parent companies, and other responsible parties, so that parties responsible for the presence of hazardous substances in the Passaic River pays their fair shares of clean-up costs. Occidental undertook these efforts, in part, because it knew it had the right to pursue claims under CERCLA Sections 107 and 113 against other responsible parties to recover the response costs Occidental incurred to design the OU2 remedy, as well as other response costs it has incurred and will incur in the future at OU2 and in other operable units of the Site.

More recently, and again *alone* among the responsible parties, Occidental has been working closely with EPA, the Passaic Valley Sewerage Commission and other governmental entities to negotiate an agreement under which Occidental will agree to design and construct a sediment processing facility for the selected OU2 remedy with land and other infrastructure and services to be provided by the PVSC and the local governments. The costs of this work to Occidental are expected to exceed $160 million.

In Ms. Flanagan's September 11 letter to Mr. Erickson, who is counsel for certain Defendants in the CERCLA action, she stated it was EPA's intention to use the "allocation process" implemented by David Batson, an EPA consultant, to attempt to "negotiate a remedial action consent decree with the major parties to implement and pay for the OU2 remedy, and to identify parties that may be eligible for a cash out settlement *for OU2*."[3] EPA's letter was silent

---

[1] This estimate was provided by EPA in a press release and is not reflected in the EPA's Record of Decision.
[2] *See* 2016 ASAOC at ¶ 101 ("nothing in this Settlement Agreement constitutes a satisfaction of, or release from, any claim or cause of action against…any person not a party to this Settlement Agreement, for any liability such person may have under CERCLA…."); *see also* ¶ 103 ("…each of the Parties expressly reserves any and all rights (including, but not limited to, claims pursuant to Section 113 of CERCLA), defenses, claims, demands, and causes of action which each Party may have with respect to any matter, transaction, or occurrence relating in any way to OU2 for the Site against any person not a Party hereto.").
[3] *See* Letter from S. Flanagan, Chief, New Jersey Superfund Branch, to D. Erickson, September 11, 2001 (emphasis added).

Messrs. Prince, Schaaf,
and Ms. Flanagan
November 7, 2018
Page 3

on whether EPA intended to use the Batson process to protect the Defendants from Occidental's claims for costs Occidental has incurred under the 2016 ASAOC.

Mr. Erickson's clients, however, have since argued to the Court that EPA's letter confirms it is EPA's position that the Batson process "is *intended* to result in settlements with EPA that would result in contribution protection, *including from Occidental's claims*."[4] In addition, in a later brief in support of a Motion for Protective Order, Defendants argued that "[t]he EPA Allocation [] may result in Participating Allocation Parties receiving *complete* contribution protection, *including from Occidental's claims here*" in Occidental's CERCLA action.[5]

Occidental hopes the Defendants have read more into Ms. Flanagan's letter than EPA intended. From Occidental's perspective, the far more sensible reading of Ms. Flanagan's letter is the one that is consistent with both CERCLA and the terms of the 2016 ASAOC: namely, that while EPA may intend to provide contribution protection to the Defendants for costs incurred by the United States, it will not purport to bar contribution claims for costs incurred by Occidental, because those claims are reserved to Occidental under CERCLA and the 2016 ASAOC. If Occidental is mistaken, and Mr. Erickson's statement of EPA's intentions is correct, then please consider the following:

First, EPA has never informed Occidental that the Batson Process was intended to or would bar Occidental's rights to recover costs Occidental itself has incurred to design the remedy. Even assuming EPA had authority to do it, such an action by EPA would be unreasonable, arbitrary and capricious, given the extent of Occidental's cooperation with EPA, the Defendants' obvious responsibility for hazardous substances in the Passaic River, and the Defendants' utter lack of any cooperation on efforts to design and implement the remedy for OU2.

Second, Occidental does not believe EPA has that authority under CERCLA. By definition, Occidental's claims for contribution are for costs incurred by Occidental; they are not for a "liability to the United States" nor are they costs incurred "by the United States Government."[6] By the plain language of Sections 113 and 122 of CERCLA, Congress did not

---

[4] *See* Letter from D. Erickson to Magistrate Judge Dickson, October 4, 2018 at 3 (emphasis added), attached as Ex. "A."

[5] The "Small Parties Group" Defendants' Brief in Support of a Protective Order for the EPA Allocation and Mediated Settlement Process, *Occidental Chemical Corp. v. 21st Century Fox, et. al*, Case No. 2:18-cv-11273, Dkt. 271, at 3 n.3.

[6] CERCLA Section 122(g) is the only provision of CERCLA that plainly allows EPA to bar private parties' claims for contribution, but that authority is limited to *de minimis* settlements. No other provision of CERCLA, including CERCLA Section 113(f)(2) or Section 122(h), contains language that expressly permits EPA to bar private parties' contribution claims, as distinct from contribution claims for "costs incurred by the United States" (Section 122(h) or contribution claims for "liability to the United States" (Section 122(f)(2)). *See e.g. United States* v. *Hardage*, 750 F. Supp. 1460, 1493 (W.D. Okla. 1990) ("CERCLA provides the United States with no authority to settle private party response cost claims."); *Akzo Coating of Am., Inc.* v. *Am. Renovating*, 842 F. Supp. 267, 271 (E.D. Mich. 1993) ("If defendants were permitted to settle with the government for part of the cleanup costs of a site, and then become immune from suit for contribution by private entities who paid for other cleanup costs, it would defeat the policy of

ALCD-PUBCOM_0001228

Messrs. Prince, Schaaf,
and Ms. Flanagan
November 7, 2018
Page 4

give EPA the prerogative to divest Occidental of its rights to seek recovery of the costs
Occidental itself has alone expended as the sole performing party on the remedial design; to the
contrary, Congress specifically afforded Occidental the exclusive legal right to sue to recover
them.

Third, Occidental intends to protect its rights to recover the costs it has expended—and
those it will expend—from the parties who have refused to bear their fair share of the costs to
design the remedy to respond to the contamination at OU2. Courts scrutinize closely whether the
"matters addressed" in a settlement exceed those for which EPA is permitted to offer relief. EPA
could force Occidental to urge the court to do so here if EPA (and interested settling parties)
purport to define "matters addressed" in a manner that would limit Occidental's rights to pursue
recoveries of response costs that Occidental—and Occidental *alone*—has incurred. Occidental
intends to test in court the legality and fairness of any consent decree or administrative
settlement between EPA and a defendant Occidental named in its CERCLA action, if the
settlement purports to compromise or inhibit Occidental's rights to seek contribution.

Finally, any purported release by EPA of *Occidental's* claims, in connection with the
EPA's settlement of its own claims, would not only violate CERCLA, but would also constitute
an unconstitutional taking of Occidental's property rights, including Occidental's statutory and
common law rights to seek contribution for its own privately-incurred costs. If EPA has already
purported to settle contribution claims for costs Occidental incurred on the Remedial Design, the
monies collected must go to Occidental, not to the United States Treasury, because Occidental is
the party that stepped up and agreed to incur *all* those costs.

In light of the position taken by the Defendants, Occidental requests a clear answer about
EPA's intentions, before Occidental agrees to undertake an additional obligation of $160 million
to design and build the sediment processing facility. We would like an opportunity to meet
promptly to discuss these issues.

Sincerely,

Kathy Patrick
Counsel to Occidental Chemical Corporation

Cc:    Ms. Marcia Backus
       Ms. Melissa Hunt
       Mr. Frank Parigi
       Mr. Mike Anderson
       Mr. Larry Silver

---

CERCLA."); *Transtech Indus., Inc.* v. *A7Z Septic Clean*, 798 F.Supp. 1079 (D.N.J. 1992) ("Section 113(f)(2)
prevents parties from having to pay twice for the same cleanups. Thus, defendant is immune from further liability
for the response costs incurred by the United States during the time … covered by the consent decree …").

ALCD-PUBCOM_0001229

# EXHIBIT 6

OxyChem's Comments in Opposition to Proposed Consent Decree,
*United States v. Alden Leeds, Inc., et al.*, Civil Action No. 2:22-cv-07326 (D.N.J.)

ALCD-PUBCOM_0001230



**Occidental Chemical Corporation** *OxyChem*
A Subsidiary of Occidental Petroleum Corporation

14555 Dallas Parkway, Suite 400
Dallas, TX 75254
Phone 713-599-4188

January 13, 2022

Ms. Lisa Garcia
Garcia.lisa@epa.gov
Administrator, Region 2
United States Environmental Protection Agency
290 Broadway
New York, NY 10001

Mr. Pat Evangelista
Evangelista.pat@epa.gov
Director, Superfund and Emergency Management Division
Region 2
United States Environmental Protection Agency
290 Broadway
New York, NY 10007

   Re: Diamond Alkali Superfund Site

Dear Administrator Garcia and Mr. Evangelista:

   I write on behalf of Occidental Chemical Corporation ("OxyChem") to discuss with you next steps at the Diamond Alkali Superfund Site.

   After evaluating the Record of Decision for the Interim Remedy for Operable Unit 4, OxyChem is willing to negotiate an appropriate Consent Decree with the United States to perform the remedial design and to implement the interim remedy set out in the 2021 Record of Decision for Operable Unit 4 ("2021 ROD") of the Site based on the following terms and conditions:

- In consideration of this broad scope of work, EPA will provide to OxyChem a full covenant not to sue under section 106 and 107 of CERCLA and agree to full contribution protection for OxyChem for all response actions and response costs incurred by any person related to the upper 9 Miles of the Lower Passaic River in Operable Unit 4;

- EPA will agree not to conclude cash out settlements with any parties for their liabilities in connection with the 2021 ROD but will, instead, allow OxyChem— as the performing party—to pursue recoveries from any responsible parties of their fair and allocable shares of the response costs OxyChem incurs to perform this work; and,



Responsible Care
A Public Commitment

ALCD-PUBCOM_0001231



**Occidental Chemical Corporation** *OxyChem*

A Subsidiary of Occidental Petroleum Corporation

14555 Dallas Parkway, Suite 400
Dallas, TX 75254
Phone 713-599-4188

- EPA will agree not to seek cash out settlements on Operable Unit 2 and Operable Unit 4 with the following parties: Public Service Electric & Gas Company, Nokia Corporation, Pharmacia/Monsanto, Givaudan Fragrances Corporation, the Sherwin-Williams Company, and Ashland LLC for its Drew Chemical facility.

If EPA accepts this proposal, OxyChem is prepared to discuss with EPA options for participation by other performing parties in implementing the 2021 ROD, including those listed immediately above.

Agreeing to these terms with OxyChem affords EPA several important and near-term benefits:

- OxyChem has a demonstrated history of delivering timely, efficient, and compliant performance of tasks it agrees to perform in the river;

- OxyChem would design the interim remedy in the 2021 ROD, thereby ensuring that the remedy is consistent with and complements the remedy OxyChem is presently designing in Operable Unit 2;

- Implementation of the interim remedy in the 2021 ROD is an important contemporaneous step to prevent any hazardous substances upriver from impairing the efficacy of the remedy downriver in OU2; and,

- Working with OxyChem on this sequence of work will accelerate rather than impede the timely conclusion of the remedial action in both operable units, as well as potentially shortening the implementation timetable than otherwise required in Operable Unit 4.

EPA's agreement not to settle with the parties identified above—and not to provide cash out settlements to any party pertaining to the 2021 ROD—is also consistent with EPA's prior statements and the limits of its record evidence for several reasons.

Declining to grant cash-out settlements to Givaudan, Sherwin-Williams, and Ashland's Drew Chemical facility in Operable Units 2 and 4 vindicates EPA's prior statements that "the private PRPs responsible for the release of dioxins, furans, and/or PCBs will *perform* the OU2 remedial action has not changed." *See e.g.*, Letter from Eric J. Wilson, EPA Region 2 September 18, 2017 (Emphasis added). The same is true for the other work parties, Public Service Electric & Gas, Pharmacia/Monsanto, and Nokia.

Requiring these parties to perform work is also supported by the abundant record evidence OxyChem has developed in the CERCLA case. This evidence would support assessing significant responsibility to each of Givaudan, Sherwin-Williams, and Ashland for the presence of dioxin and PCBs in the lower 8.3 miles of the Passaic River. Based on





**Occidental Chemical Corporation** *OxyChem*
A Subsidiary of Occidental Petroleum Corporation

14555 Dallas Parkway, Suite 400
Dallas, TX 75254
Phone 713-599-4188

when these parties produced this evidence in the litigation, it does not appear it was presented to Mr. Batson for his consideration. It also is not in the public's interest to reward these parties with cash out settlements. Readily available evidence refutes the certifications OxyChem understands each of these parties would have to provide to the United States in connection with any settlement based on the allocation process.

As to Operable Unit 4, there is neither any reason nor any basis on which EPA could or should provide cash-out settlements with any other party in Operable Unit 4 if OxyChem agrees to design and implement the 2021 ROD. Neither the private PRPs nor EPA has convened any allocation process pertaining to the upper 9 Miles of the River or the 2021 ROD. To the contrary, the allocation process EPA initiated with Mr. David Batson was limited solely to Operable Unit 2. OxyChem and other parties have previously noted their objections to that process, but there can be no dispute that the process was convened expressly and only to allocate shares of responsibility to some, but not all, parties in Operable Unit 2. It affords EPA no basis on which EPA could purport to settle liabilities upriver, in Operable Unit 4.

Finally, the request that EPA confirm it will not take action to impair or bar OxyChem's contribution claims is no more than what CERCLA Section 308 and the United States Constitution require. CERCLA's policies are vindicated when, as OxyChem seeks here, EPA preserves OxyChem's statutory right to seek contribution from other parties to recover the response costs OxyChem has borne (and those it will bear) in both Operable Units. In neither case does EPA have statutory authority to bar OxyChem's contribution claims for costs that OxyChem alone has borne or committed to bear at the Diamond Alkali Superfund Site.

In extending this offer, OxyChem emphasizes that it has consistently cooperated and collaborated with EPA to ensure efficient and rapid progress in addressing the remediation of the Diamond Alkali Superfund Site. OxyChem desires to continue that cooperative relationship. Achieving an acceptable agreement with EPA to move forward to design and implement the 2021 ROD on the terms outlined above would be another enormous step forward at the Site.

We look forward to discussing this with EPA at your earliest convenience. OxyChem reserves all rights it has at law, in equity, and under the United States Constitution.

Very truly yours,

Charles F. Weiss

Charles F. Weiss
Senior Vice President
charles_weiss@oxy.com

**Responsible Care**
A Public Commitment



**Occidental Chemical Corporation** *OxyChem*
A Subsidiary of Occidental Petroleum Corporation

14555 Dallas Parkway, Suite 400
Dallas, TX 75254
Phone 713-599-4188

Cc:     Mr. Walter Mugdan, Deputy Regional Administrator, EPA Region 2
        Mugdan.Walter@epa.gov
        Mr. Paul Simon, Acting Regional Counsel, EPA Region 2
        simon.paul@epa.gov
        Ms. Sarah Flanagan, Chief of NJ Superfund Branch, EPA Region 2
        Flanagan.Sarah@epa.gov
        Mr. Juan Fajardo, Assistant Regional Counsel, EPA Region 2
        Fajardo.juan@epa.gov
        Ms. Frances Zizila, Assistant Regional Counsel, EPA Region 2
        Zizila.Frances@epa.gov
        Mr. Michael Sivak, Chief of Mega Projects, EPA Region 2
        Sivak.Michael@epa.gov
        Ms. Diane Salkie, Remedial Project Manager, EPA Region 2
        salkie.diane@epa.gov
        Mr. Brian Donohue, U.S. Department of Justice
        Brian.Donohue@usdoj.gov
        Ms. Laura Rowley, U.S. Department of Justice
        Laura.Rowley@usdoj.gov



# EXHIBIT 7

OxyChem's Comments in Opposition to Proposed Consent Decree,
*United States v. Alden Leeds, Inc., et al.*, Civil Action No. 2:22-cv-07326 (D.N.J.)

ALCD-PUBCOM_0001235

Case 2:22-cv-07326-MCA-LDW Document 309-21 Filed 07/12/22 Page 1 of 124 PageID: 34321
Case 2:18-cv-11273-MCA-LDW Document 2160-1 Filed 07/12/22 Page 58 of 580
PageID: 14203



**Occidental Chemical Corporation** *OxyChem*

A Subsidiary of Occidental Petroleum Corporation

14555 Dallas Parkway, Suite 400
Dallas, TX 75254
Phone 713-599-4188

June 27, 2022

Mr. Michael S. Regan
Administrator
United States Environmental Protection Agency
1200 Pennsylvania Ave NW
Washington, DC 20460

Mr. Larry E. Douchand
Director
Office of Remediation and Technology Innovation
United States Environmental Protection Agency
1301 Constitution Ave NW
Washington, DC 20460

Ms. Lisa F. Garcia
Administrator, Region 2
United States Environmental Protection Agency
290 Broadway
New York, NY 10007

Ms. Alice Yeh
Remedial Project Manager
Diamond Alkali Superfund Site, Operable Unit 2
Superfund and Emergency Management Division
United States Environmental Protection Agency, Region 2
290 Broadway
New York, NY 10007

Ms. Diane Salkie
Remedial Project Manager
Diamond Alkali Superfund Site, Operable Unit 4
Superfund and Emergency Management Division
United States Environmental Protection Agency, Region
2290 Broadway
New York, NY 10007

> Re: Occidental Chemical Corporation Response to EPA Region 2 Letters
> dated March 2, 2022, and May 31, 2022

Dear Administrator Regan, Director Douchand, Administrator Garcia, Ms. Yeh and Ms. Salkie:

I write on behalf of Occidental Chemical Corporation ("OxyChem") to respond to EPA
Region 2's May 31, 2022 letter (the "May Letter") and its earlier, March 2, 2022 letter (the
"Notice Letter"), requesting that OxyChem and other work parties provide a good faith offer to
implement the remedial actions for Operable Unit 2 ("OU2") and Operable Unit 4 ("OU4") of the
Diamond Alkali Superfund Site (the "Site").



**Responsible Care***
**A Public Commitment**

ALCD-PUBCOM_0001236

OxyChem Response to EPA Notice Letters
June 27, 2022
Page Two

By letter dated January 13, 2022, OxyChem provided an earlier, good faith offer to perform the entire scope of work in OU4 so long as its right to seek contribution from other responsible parties—as enacted by Congress in CERCLA—would be preserved. This condition is what the law requires. In CERCLA, Congress granted performing parties like OxyChem the right to sue other responsible parties for contribution, with the allocation of responsibility adjudicated by a federal court in proceedings that conform to the constitutional requirements of due process. EPA is an agency of limited jurisdiction and Congress did not grant EPA authority to adjudicate responsibility among responsible parties by barring contribution claims or otherwise.

## I.     Good Faith Offer to Perform Remedial Design on OU4

Consistent with these principles, and its prior good faith offer, OxyChem makes the following good faith offer in response to EPA's Notice Letter. As EPA has requested, OxyChem offers to perform the remedial design of the interim remedy in OU4 on the following conditions (the "Required Conditions"):

1.  The United States will take no action to impair or bar OxyChem's contribution claims against the other responsible parties for work OxyChem is undertaking to perform, including, without limitation, in any settlement the United States reaches with any other party. OxyChem's rights to cost recovery under CERCLA Section 107 and to cost reimbursement under CERCLA Section 106(b)(2) shall also be preserved.

2.  The United States will provide OxyChem with a covenant not to sue under Sections 106 and 107 of CERCLA for this scope of work.

3.  Any settlement recoveries received by EPA in connection with this Operable Unit will be deposited in an Operable-Unit-specific account for performing parties to use in implementing the remedies.

4.  The agreement with EPA must include appropriate force majeure and other provisions to permit OxyChem to stop work without penalty if unforeseen conditions or litigation preclude continuation of the work.

5.  Financial assurance requirements shall be limited to the work to be performed on an annual basis and will not be cumulative either of work already performed or work contemplated in out years.

6.  Inclusion of suitable Adaptive Management provisions to permit EPA and OxyChem to make appropriate revisions as work progresses.

## II.     Proposed Sequencing of Other Work at OU4 and OU2 of the Site

EPA has also asked OxyChem and other work parties to provide a good faith offer to implement the remedies in OU4 and OU2. If EPA accepts OxyChem's offer above to perform the remedial design in OU4, then OxyChem believes we can reach agreement with the other work parties to perform specific and tailored work scopes that would implement the remedies in OU4 and OU2.

OxyChem proposes a staged process of sequential agreements in which manageable scopes of work can be defined, agreed, implemented, and evaluated in sequence, with the next agreement following when the prior phase of work is planned, designed, and implemented. This sequence could be achieved through expedited negotiations of subsequent agreements, all of which must include the Required Conditions, tracking an overall schedule to which the parties would agree with EPA. OxyChem is willing to discuss leading the implementation of this further work with other work parties, so long as the Required Conditions are met.

Based on its involvement with the OU2 design and its prior work regarding the Upland Processing Facility (the "UPF"), OxyChem believes the work sequence below is essential to an effective remedy in both operable units, consistent with the National Contingency Plan:

1. **Agreement One:** Administrative Settlement Agreement and Order on Consent ("ASAOC") for the design of the OU4 interim remedy set forth in the applicable Record of Decision ("ROD"). OxyChem will negotiate the ASAOC in good faith, subject to the Required Conditions, and consistent with OxyChem's previous offer to perform this work as set out above.

   **Target Date for Execution of ASAOC:** Within EPA Fiscal Year 2022 (by September 30, 2022).

2. **Agreement Two:** Consent Decree for construction of the UPF. OxyChem has worked to obtain agreement to this consent decree since 2018. The difficulties encountered by the Passaic Valley Sewerage Commission ("PVSC") in acquiring the required property through eminent domain have caused significant delays in this decree, as has the resulting inability of the United States and PVSC to reach agreement on consent decree terms. Subject to the Required Conditions and a condition precedent requiring that the property necessary to build the UPF is and will be made available for OxyChem's use throughout the implementation period on the material terms embodied in the draft UPF consent decree, OxyChem will negotiate in good faith (as it has done for several years) to finalize this consent decree.

   **Target Date for Execution of Consent Decree:** Lodged and in force by the time the design for the UPF and other upland facilities is completed and accepted by EPA, which is currently anticipated to occur within EPA Fiscal Year 2023 (by September 30, 2023).

3. **Agreement Three:** Consent Decree for Remedial Action in OU4. OxyChem will negotiate in good faith for a consent decree to implement with the other work parties the interim remedy in OU4, subject to the Required Conditions and the completion of work under Agreements One and Two, above.

4. **Agreement Four:** Consent Decree for remainder of the Remedial Action in OU2. Once there is significant progress in implementing Agreements Two and Three, OxyChem will negotiate in good faith with the other work parties to achieve a consent decree with EPA to implement the remainder of the remedial action in OU2, subject to the Required Conditions.

The sequence above permits EPA and the parties to discuss implementing the remedy in OU2: (i) after the remedy in OU4 has been designed and implemented, and (ii) after the UPF has been designed and constructed. This schedule makes sense for many reasons. As EPA is aware, work to implement the remedies cannot begin in earnest until the UPF is designed and built. Without that facility, there is otherwise no location at which dredged sediment from OU2 (or from OU4) can be processed. The OU4 pre-design investigation and the required design of the remedy are also essential to determine how the remedy in OU4 is best implemented. None of that work has yet been done. The remedy upriver in OU4 should also be implemented first to minimize the risk that upriver construction activities might damage or impair the remedy in OU2.

Given this, and the added fact that OU4 and OU2 encompass parts of the river up to 17 miles apart, sequencing the consent decrees for in-river work ensures clarity of scope and performance. It enables all parties to demonstrate completion of distinct milestones for the interim and final remedial goals for each operable unit. This staged approach will also expedite the design and construction of the remedies in both operable units. By creating a manageable schedule that addresses all stakeholder interests, sequencing work avoids the near certainty that resources would otherwise be wasted through inefficiencies and duplication of untargeted work.

## III.    Further Discussion of Required Conditions

OxyChem is willing to discuss alternative scopes of work in OU4 and OU2 as they arise, but it cannot and will not perform all this work alone. Nor can OxyChem undertake to provide financial assurance at the outset for all estimated costs of implementing the entirety of both remedies. The Required Conditions, described in greater detail below, address both concerns. They are essential to facilitate the timely completion of the work in accordance with the National Contingency Plan and so should be acceptable to EPA.

### A.  Preservation of Contribution Claims

Hundreds of parties are responsible for pollution in the Passaic River. As described by EPA in the OU2 ROD:

> The Passaic River was one of the major centers of the American industrial revolution starting two centuries ago. By the end of the 19th century, a multitude of industrial operations...had located along the river's banks as cities such as Newark and Paterson grew. *Industrial operations and municipalities used the river for wastewater disposal. To date, over 100 facilities have been identified as potentially responsible for discharging contaminants into the river including, but not limited to, dioxins and furans, PCBs, PAHs, DDT and other pesticides, mercury, lead, and other metals.*[1]

CERCLA's goal is to ensure that the "polluters pay," meaning that all responsible parties pay their fair and equitable shares of response costs. To ensure that they do, CERCLA affords performing parties—like OxyChem—a statutory right to pursue contribution claims against parties who have not stepped up to clean up pollution that they caused. In Section 113(f)(1) of CERCLA, Congress mandated that the United States district courts, not EPA, weigh the evidence to arrive at an equitable allocation of responsibility that binds all parties.

---

[1] *See* OU2 ROD, Section 2 pg. 3 (emphasis added).

Here, EPA has acknowledged OxyChem "did not directly discharge pollution into the Passaic River."[2] Instead, EPA alleges OxyChem's liability arises from its purchase of the stock of Diamond Shamrock Chemicals Company ("DSCC"). From the 1940s to 1969, DSCC owned and operated an agricultural chemicals plant at 80-120 Lister Avenue in Newark. During that period, the Lister Avenue plant (the "Lister Plant") manufactured DDT and, at the direction of the United States government, products for use during the Vietnam War that generated dioxin as a manufacturing byproduct. DSCC sold the plant to a third party in 1971. When an affiliate of OxyChem purchased the stock of DSCC in 1986, the Lister Plant had been closed for nine years and DSCC had not operated it for more than sixteen. In the stock purchase agreement, Diamond Shamrock Corporation (later known as Maxus Energy Corporation) agreed to defend, indemnify, and hold OxyChem harmless against all environmental liabilities associated with the former Lister Avenue Plant. Relying on this indemnity, OxyChem merged with DSCC in 1987, a transaction EPA contends made OxyChem responsible for the environmental liabilities of DSCC.

EPA has identified a total of *eight* chemicals of concern for OU2 and OU4: dioxins and furans, PCBs, DDT, dieldrin (an herbicide), poly-aromatic hydrocarbons ("PAHs"), mercury, copper, and lead.[3] The OU2 ROD makes clear that EPA mandated this remedy because the lower 8.3 miles of the Passaic River is "ubiquitously contaminated" with *all eight* COCs.[4] In OU2 alone, the ROD contemplates the permanent capping of over one hundred years of contaminated sediment and the removal from the river of approximately 24,000 pounds of mercury, 6,600 pounds of PCBs, 1,300 pounds of DDT, and 13 pounds of dioxin, subject to the remedial design.[5]

OxyChem has not disputed it bears some legal liability from its merger with DSCC. But that merger in no way makes OxyChem responsible to clean up *all* hazardous substances in the Passaic River or all dioxins found in river sediments. There is no evidence, for example, that the Lister Plant (or OxyChem) is responsible for the estimated 24,000 pounds of mercury that will be removed or remediated in the remedy for OU2, the more than 6,600 pounds of PCBs that must also be removed or remediated, or the costs to remedy contamination in the river from PAHs, dieldrin, or any of the hazardous metals. DDT was manufactured widely and was used within the Site's boundaries by, among others, the municipal entities to whom EPA also sent its Notice Letter. And finally, while the Lister Plant is alleged to be responsible for some dioxins and furans in the Site, EPA's investigation (and OxyChem's own) demonstrates there are other, significant sources that also bear responsibility for the presence of dioxins and furans in the Passaic River, including but not limited to:

- **Givaudan Fragrances Corporation**: EPA identified Givaudan as the source of the Clifton Congener, a significant contributor to dioxin in Passaic sediments that is *not* associated with the former Lister Plant.

- **Clean Earth Environmental Services**: Clean Earth is the admitted successor to S&W Waste, a company with an extensive history of environmental violations and significant dioxin contamination in the soils of its Kearny facility that is also *not* associated with the Lister Plant.

---

[2] *See* EPA Secures $165 Million Agreement with Occidental Chemical to Conduct the Work Needed to Start the Cleanup of the Lower Eight Miles of the Passaic River. News Releases from Region 2. Jan. 19, 2017.

[3] *See* Focused Feasibility Study ("FFS") for Operable Unit 4 at pp. 1-4; 2016 Record of Decision for Operable Unit 2 (the "OU2 ROD") at 14-16.

[4] *Id.* OU2 ROD Section 5.3 (OU2 Conceptual Site Model).

[5] *Id.*

- **Ashland Chemical Corporation**: Ashland's manufacturing operations at its Drew Chemical facility involved large-scale, dioxin-forming processes on an upland site that is significantly contaminated with dioxins that, again, are *not* associated with the Lister Plant.

CERCLA requires all parties responsible for the presence of these hazardous substances in the Site to pay their fair and equitable shares of the costs to remove or remediate them. After extensive study, EPA identified over 100 facilities as potentially responsible for discharging contaminants into the Passaic River.[6] Abundant record evidence in the CERCLA case in the United States District Court in New Jersey supports a significant assignment of responsibility to parties other than OxyChem for the presence of hazardous substances in OU2 and OU4.[7] EPA also assured the public, repeatedly, that it intended "to pursue additional agreements with *all* of the more than 100 parties legally responsible for the contamination to ensure that the cleanup work in the lower 8.3 miles [and in OU4] *will be carried out and paid for by those responsible for the pollution as required by the Superfund law.*"[8]

But despite the abundant evidence available to it, EPA never pursued claims against the parties EPA identified as bearing responsibility. Instead, EPA announced its intention to *release* scores of responsible parties from their cleanup liability to the United States for undisclosed amounts, leaving the five private work parties and New Jersey's taxpayers (through the in-kind contributions of the public work parties) to carry out the work alone.

EPA refuses to provide any information concerning these proposed settlements, their terms, their amounts, or why these settlements are in any way in the public interest. EPA also rejected OxyChem's Freedom of Information Act requests pertaining to these contemplated settlements. EPA's lack of transparency is not in the public interest. EPA appears poised to abandon its public commitment that all identified polluters would be required to *carry out* and *pay for* the cost of cleaning up pollution they caused, in favor of a strategy that would let significant polluters off the hook to the United States. Releasing parties from liability exposes the United States—and its taxpayers—to significant claims for reimbursement by performing parties when the remedies in OU2 and OU4 are complete. *See* 42 U.S.C. Section 9606(b)(2).

If EPA wants to settle the *United States' claims* against those parties, it can do so with court approval. But EPA's choice not to pursue full accountability from polluters does not prevent OxyChem from acting. And OxyChem has done so. It is pursuing in court, as Congress intended, contribution claims to compel the parties who caused this pollution to pay their fair shares of the costs to clean it up. It is contrary to Congress's mandate for EPA to try to prohibit OxyChem and other performing parties from pursuing *their own contribution claims*. The pursuit of these claims costs the United States nothing. And it ensures the full scope of liability of all responsible parties will be determined by the Court, as Congress again intended.

For all these reasons, CERCLA's plain language and purpose are vindicated when OxyChem's contribution and cost recovery rights are preserved. The statute does not authorize—and the Constitution does not permit—EPA to thwart the exclusive authority Congress vested in the federal district courts to allocate liability among responsible parties. Nor do they permit EPA to provide purported "contribution protection" to responsible parties the United States has never

---

[6] *See* OU2 ROD at Section 2.

[7] Neither the public nor OxyChem knows how much of the discovery in the CERCLA case (if any) was made available by the settling parties to EPA or its allocator, AlterEcho and David Batson. For these and other reasons, OxyChem reserves its right to challenge settlements by the United States with any or all parties.

[8] EPA Press Release, October 5, 2016 (emphasis added)

ALCD-PUBCOM_0001241

sued, in a manner that seeks to bar OxyChem's contribution claims for costs that OxyChem, not the United States, has incurred or will incur. Accordingly, including in the Consent Decree the Required Condition that preserves OxyChem's contribution claims imposes no burden on EPA not already inherent in the limited authority Congress granted to EPA.

### B. Financial Assurance Condition

EPA guidance states that consent decrees should be supported by financial assurance. Staging the work and tailoring financial assurance to the work to be performed each year, makes economic sense.

No company alone—and certainly not OxyChem—can *post* financial assurance for a multi-decade scope of work of this magnitude. And no company can secure an entire scope of work that spans decades and still retain sufficient financial resources and resilience to pay to perform the work each year, as the work is due, *while* EPA holds multiple years of financial assurance.

An agreement to limit financial assurance to the work to be performed in a given year ensures resources are available to perform that work. Requiring multi-year financial assurance for the entire project from the outset makes performance impossible. In sum, this Required Condition should be acceptable to EPA. It reflects economic reality.

### C. PVSC Condition Precedent

The Site Selection report approved by EPA identifies property owned or to be acquired by PVSC as the preferred location where the UPF should be built to process sediment removed from the Passaic River during the remedial actions at OU2 and OU4. This is the most cost-effective option and one preferred by EPA, as it permits negotiation of an in-kind settlement with PVSC, which EPA also prefers. Thus, this condition is one that imposes no burden on EPA and acknowledges the fact that OxyChem cannot build anything on PVSC's property without its consent.

### D. Force Majeure Condition

EPA has historically included force majeure provisions in consent decrees that implement remedial work. Given the enormous uncertainties embodied in these scopes of work, including force majeure conditions as a Required Condition imposes no burden on EPA here. Instead, it makes good sense.

No party can agree in advance to underwrite all costs of an unprecedented, decade-long construction project that is subject to inherent unknowns. The interim remedy for OU4 is not designed. The Preliminary Remediation Goals and a final remedy for OU4 are not yet determined. In addition, although the remedial design is nearly complete in OU2, it has not yet been finalized or approved by EPA. In-river implementation of any remedy—in OU2 or in OU4—also cannot begin until the required UPF is designed and built, an enormous project in itself, requiring access to government-owned property that is not yet available for that purpose. Added to these unresolved issues and unknowns are the inherent additional uncertainties of a project that contemplates miles of in-river dredging and construction, in waters of the United States and state- and privately-owned property.[9]

---

[9] Litigation by those opposed to dredging remedies is a frequent occurrence and could interpose significant delays in implementing the OU2 and OU4 remedies. Just last month, a coalition of environmental groups

Case 2:22-cv-07326-MCA-LDW Document 309-21 Filed 04/01/24 Page 65 of 580 PageID: 33328
Case 2:18-cv-11273-MCA-LDW Document 2160-1 Filed 07/12/22 Page 8 of 124 PageID: 14210

OxyChem Response to EPA Notice Letters
June 27, 2022
Page Eight

## IV.    OxyChem's Offer is in Good Faith

OxyChem's offer to perform the remedial design for OU4 and its proposal of sequential agreements for other work in the Site are in good faith and consistent with OxyChem's longstanding cooperation with EPA to advance the cleanup of the Passaic River.

### A.    OxyChem's Record of Cooperation

OxyChem's indemnitors at Maxus Energy and its affiliate, Tierra Solutions, Inc., spent approximately $300 million in response costs to perform remedies in Operable Unit 1 (the former Lister Plant site), to conduct remedial investigations in Operable Units 2 and 3 (where work by OxyChem is still ongoing), and to perform an interim removal in OU2.

When its indemnitors filed for bankruptcy protection, OxyChem immediately stepped up and agreed to perform the remedial design for the remedy EPA selected for OU2. OxyChem took this action with the understanding that it could and would—as Congress authorized under CERCLA—pursue contribution from other responsible parties to ensure they paid for their share of the costs to clean up the pollution they caused. EPA has informed OxyChem on multiple occasions that its work on the OU2 Remedial Design has been excellent.

OxyChem has performed consistently and well in remedial investigations in Operable Unit 3. And it has assisted EPA in matters related to the contemplated design and construction of the UPF.

OxyChem's January offer to perform the *entirety* of the interim Remedial Design/Remedial Action ("RD/RA") selected by EPA for OU4—at an EPA-estimated cost of $441 million— on the basic condition that OxyChem remain free to pursue contribution from the 100+ other responsible parties who should pay their fair shares is consistent with OxyChem's longstanding practice of cooperating first and seeking contribution second.

### B.    Attempts to Achieve an Agreement with Proposed Work Parties

To further cooperate with EPA, and promptly on receiving EPA's March Notice Letter, OxyChem reached out to those public and private parties who also received the Notice Letter to seek early opportunities to meet to discuss the letter and responses to it. We have met several times with each group since then.

The private parties understand—as do the public entities—that work to implement any remedy in OU2 and OU4 cannot begin without active support from, and access to essential facilities made available by, the public entities. Accordingly, on March 21, representatives of OxyChem met in person with representatives of the PVSC and the municipalities to discuss the in-kind contributions they could provide toward implementation of the work specified in the Notice Letter. OxyChem provided to the governmental entities a list of properties and potential services they might offer to further an in-kind contribution to implement the work specified in the Notice Letter. The public entities advised OxyChem, however, that they cannot respond to these requests for assistance because they lack information about what EPA would consider a *sufficient* contribution from them for purposes of a good faith offer. OxyChem remains willing to work

filed suit seeking to enjoin the dredging of the Matagorda Bay shipping channel, citing the hazards associated with disturbing contaminated sediment. *See* Case No. 1:22-cv-1470, *San Antonio Bay Estuarine Waterkeeper, et al. v. Connor, et. al.*, in the U.S. District Court for the District of Columbia. No party can undertake to perform, or be penalized for failing to perform, when the project is enjoined or tied up in litigation.

ALCD-PUBCOM_0001243

toward an agreement for in-kind contribution from these public entities, if EPA will clarify what it expects those entities to provide.

Representatives of OxyChem also met remotely on a number of occasions with representatives of three of the private work parties who also received the Notice Letter: Nokia, Pharmacia, and Public Service Electricity & Gas. Work party PMC Global refused to attend any meetings and has declined OxyChem's request to provide input on a proposed offer.

Unfortunately, beyond sharing these concerns, OxyChem's attempts to negotiate an agreed response to EPA's Notice Letter with the private work parties failed. Ignoring their own significant liabilities, those parties are adamant that they too want EPA to "cash them out" in an agreement that would allow them to walk away before the enormous, decade-long work necessary to implement the remedial actions in the OU2 and OU4 RODs has even begun. They appear to intend to urge the United States to place the entire burden of performance on a *single* party, OxyChem, despite the fact that it bears *no liability* for six of the chemicals of concern, is only partially responsible for the other two, and is not *solely* liable for *any* hazardous substance in the Passaic River.

Despite the inability to reach an agreement to date, OxyChem's efforts to negotiate with the other public and private parties that received the Notice Letter demonstrate its good faith, as EPA has recognized. *See* May 25, 2022 Email from J. Fajardo to L. Silver *et al.*; *see also* May 31, 2022 Letter from E. Wilson to OxyChem *et al.* at 1 ("EPA understands the parties participated in the convening process in good faith . . . ."). This letter continues OxyChem's ongoing, good faith actions to respond to EPA's requests for assistance in implementing the remedies at OU2 and OU4.

### C.    Good Faith is Reciprocal

OxyChem intends to continue to cooperate with EPA in a manner consistent with the twin principles Congress embodied in CERCLA; namely, that all responsible parties must pay their fair shares of the costs to clean up hazardous substances for which they are responsible and that parties who perform are entitled to pursue contribution for the costs of that performance from parties who refuse to pay their fair shares. This is a good faith offer: CERCLA squarely permits OxyChem to perform while it retains and pursues remedies the law guarantees.

If EPA accepts OxyChem's offer, OxyChem will negotiate with the work parties—with EPA's good faith and reasonable support—timely agreements to achieve the scopes of work described above. Preserving OxyChem's contribution claims provides an essential *incentive* to these agreements. It allows OxyChem to perform with the assurance that it will bear only its fair and equitable share of the costs as determined by the Court, as Congress intended. And it ensures timely cooperation by other work parties. To be blunt, in the absence of OxyChem's contribution claims, other responsible parties will continue to evade their responsibilities to clean up contamination they caused.

To accede to the private work parties' pleas to be permitted to walk away from their obligations would be contrary to EPA's guidance and its promises to the public. It would also be unsound as a matter of principle. EPA assured the public that the "ubiquitous contamination" it found in the Passaic River would be remedied by *all* responsible parties who would be required to *carry out* the work to remedy pollution they caused. No party with significant responsibility (and certainly none of the work parties identified by EPA or other parties with demonstrated significant responsibility) should be relieved of all liability or have their liability capped *before* the work mandated in OU2 and OU4 is completed.

Case 2:22-cv-07326-MCA-LDW   Document 309-21   Filed 04/01/24   Page 67 of 580
Case 2:18-cv-11273-MCA-LDW   Document 1160-9   Filed 07/22/22   Page 10 of 12 PageID:
Page 13304212

OxyChem Response to EPA Notice Letters
June 27, 2022
Page Ten

In contrast to actions that would protect polluters from the responsibility Congress imposed on them to *clean up* their own pollution, agreeing to these terms and Required Conditions with OxyChem affords EPA and communities along the Passaic River important and near-term benefits:

- OxyChem has a demonstrated history of delivering timely, efficient, and compliant performance of tasks it agrees to perform at the Site;

- OxyChem's offer to design the interim remedy in OU4 ensures that remedy will be consistent with and complement the OU2 95% Design OxyChem has already performed and submitted to EPA;

- Allowing OxyChem to coordinate the sequencing of the work in OU4 ahead of work in OU2 will minimize the risk that construction of the upriver remedy in OU4 would impair a downstream remedy in OU2; and

- OxyChem's coordinated work on both remedies will advance the timely conclusion of the remedial action in both operable units and may also shorten the implementation timetable that would otherwise be required in OU4.

EPA's agreement not to attempt to bar OxyChem's contribution claims is also in the public interest.

First, requiring responsible parties to carry out the work keeps EPA's promises to the public. *See, e.g.*, Letter from Eric J. Wilson, EPA Region 2 September 18, 2017 (EPA's view that "the private PRPs responsible for the release of dioxins, furans, and/or PCBs will *perform* the OU2 remedial action has not changed." (emphasis added)).

Second, premature settlement with other parties who bear significant responsibility for pollution in OU2 would impair the public interest. Discovery in the CERCLA case is still underway. Parties alleged to bear responsibility for polluting the Passaic River will be required to give sworn testimony pertaining to their liability in the near term. For some (and perhaps many) parties, evidence from the CERCLA case may refute the certifications OxyChem understands each party must provide to the United States in connection with any settlement, making attempts to settle with those parties a highly uncertain and legally groundless exercise for EPA.

Third, there is no basis on which EPA could or should settle with any party in OU4. Neither the private PRPs nor EPA has convened an allocation process pertaining to the interim remedy specified in OU4 ROD. To the contrary, the allocation process EPA initiated with David Batson and his firm, AlterEcho, was limited solely to OU2.

Finally, the condition that EPA must confirm it will take no action to impair or bar OxyChem's contribution claims is nothing more than what CERCLA Section 308 and the Constitution require. CERCLA's policies are vindicated when, as OxyChem seeks here, EPA preserves OxyChem's statutory right to seek contribution from other parties to recover the response costs OxyChem has borne (and those it will bear) in both operable units. In neither case does EPA have statutory authority to bar OxyChem's contribution claims for costs that OxyChem alone has borne or committed to bear at the Site.

ALCD-PUBCOM_0001245

OxyChem Response to EPA Notice Letters
June 27, 2022
Page Eleven

In extending this offer, OxyChem emphasizes its consistent cooperation with EPA. OxyChem has worked efficiently and well to design the OU2 remedy. We desire to continue that cooperative relationship. Permitting OxyChem—at its own expense—to pursue cost recovery and contribution from other responsible parties is in the public interest. It saves the United States enormous costs, holds responsible parties accountable, and eliminates the unneeded costs of pursuing unconfirmable settlements on terms that violate CERCLA. It will also expedite implementation of the remedies. And, as CERCLA mandates, it ensures all responsible parties pay their fair shares of the costs as determined by the District Court for the District of New Jersey or other federal district court.

All of this would be another enormous step forward at the Site. We look forward to discussing this with EPA at your earliest convenience.

OxyChem reserves all rights it has at law, in equity, and under the United States Constitution.

Very truly yours,

Charles F. Weiss

Charles F. Weiss
Senior Vice President of
Environmental and Sustainability
Charles_Weiss@oxy.com

ALCD-PUBCOM_0001246

Case 2:22-cv-07326-MCA-LDW Document 309-21 Filed 04/01/24 Page 69 of 580
Case 2:18-cv-11273-MCA-LDW Document 1109-9 Filed 07/12/22 Page 12 of 12 PageID: 61334214
PageID: 4214

cc:

**EPA Headquarters:**

Mr. Lawrence Starfield
Acting Assistant Administrator
Office of Enforcement and Compliance Assurance
Starfield.Lawrence@epa.gov

Mr. Barry Breen
Acting Assistant Administrator
Office of Land and Emergency Management
Breen.Barry@epa.gov

**Region 2:**

Mr. Pat Evangelista
Director, Superfund and Emergency Management Division, EPA Region 2
Evangelista.pat@Epa.gov

Mr. Walter Mugdan
Deputy Regional Administrator, EPA Region 2
Mugdan.Walter@epa.gov

Mr. Paul Simon
Regional Counsel, EPA Region 2
simon.paul@epa.gov

Ms. Sarah Flanagan
Chief of NJ Superfund Branch, EPA Region 2
Flanagan.Sarah@epa.gov

Mr. Juan Fajardo
Assistant Regional Counsel, EPA Region 2
Fajardo.juan@Epa.gov

Ms. Frances Zizila
Assistant Regional Counsel, EPA Region 2
Zizila.Frances@epa.gov

Mr. Michael Sivak
Chief of Mega Projects, EPA Region 2
Sivak.Michael@epa.gov

**DOJ:**

Mr. Brian Donohue
U.S. Department of Justice
Brian.Donohue@usdoj.gov

Ms. Laura Rowley
U.S. Department of Justice
Laura.Rowley@usdoj.gov

# EXHIBIT 8

OxyChem's Comments in Opposition to Proposed Consent Decree,
*United States v. Alden Leeds, Inc., et al.*, Civil Action No. 2:22-cv-07326 (D.N.J.)

ALCD-PUBCOM_0001248



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**

REGION 2
290 BROADWAY
NEW YORK, NY 10007-1866

September 11, 2018

**BY ELECTRONIC MAIL**

David R. Erickson, Esq.
Shook, Hardy & Bacon L.L.P.
2555 Grand Boulevard
Kansas City, MI 64108

Re:    Diamond Alkali Superfund Site - Operable Unit 2 Allocation Proceeding

Dear Mr. Erickson:

This will provide some background on the settlement framework developed by the Environmental
Protection Agency (EPA) for the lower 8.3 miles of the Lower Passaic River, which is Operable Unit 2
(OU2) of the Diamond Alkali Superfund Site (the Site), including the Agency's ongoing allocation, and
the importance of confidentiality.

On March 3, 2016, EPA issued the Record of Decision (ROD) selecting a remedy for OU2 to address
human health and environmental risks posed by contaminated sediments found in the lower 8.3 miles of
the Lower Passaic River, an area from the river's confluence with Newark Bay to River Mile 8.3 near the
border between the City of Newark and Belleville Township, New Jersey. In March 2016, EPA notified
over 100 parties that they were potentially responsible parties (PRPs) under Section 107(a) of the
Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended
(CERCLA), 42 U.S.C. § 9607(a), with respect to OU2 of the Site.

On September 30, 2016, EPA and Occidental Chemical Company (OCC) entered into Administrative
Settlement Agreement and Order on Consent for Remedial Design, CERCLA Docket No. 02-2016-
2021, for OCC to design the remedy selected in the OU2 ROD, under EPA oversight. The agreement
with OCC is an element of the EPA's settlement framework for OU2; additional elements include
EPA's intention to negotiate a remedial action consent decree with the major parties to implement and
pay for the OU2 remedy, and to identify parties that may be eligible for a cash out settlement for OU2.
The ongoing allocation is a critical component of the latter elements of EPA's settlement framework.

The allocation currently includes all OU2 PRPs, except public entities and a handful of parties to which
EPA offered an early cash out settlement. EPA entered into a contract and developed a Task Order
Statement of Work (SOW) for performance of the allocation by a neutral allocator. The allocation
commenced with an October 13, 2017, in-person kickoff meeting attended by EPA, the neutral allocator,
and OU2 PRPs. At the conclusion of the allocation process, the allocator will recommend a relative

share of responsibility for each allocation party's facility (or facilities, for those with more than one).[1] EPA plays an active role in the allocation process by providing input and comments, and by virtue of the fact that it is the sponsor of the allocation. The neutral allocator is taking EPA's comments into consideration, along with the input and comments from the PRPs participating in the allocation.

EPA designed the allocation to be a confidential process covered by the Alternative Dispute Resolution Act (ADR), 5 U.S.C. § 574, conducted with the assistance of a neutral allocator and team of technical experts, i.e. AlterEcho. Congress enacted the ADR Act to support and encourage the use of ADR in the federal government and provide explicit confidentiality pretentions for ADR processes. The Act includes a detailed confidentiality section "explicitly stating its intent to give parties in federally-related ADR proceedings assurance that their dispute resolution communications would generally be 'immune from discovery.'" ABA Ad Hoc Committee on Federal ADR Confidentiality, *Guide to Confidentiality Under the Federal Administrative Dispute Resolution Act* (March 2005).

The PRPs participating in the allocation have each signed a Confidentiality Agreement, agreeing to hold all communications and submissions related to the allocation confidential. EPA addressed confidentiality in the Agency's prime contract with CSRA (through which EPA retained the allocation team at AlterEcho), and in the SOW pursuant to which AlterEcho is performing the allocation. The SOW contains the confidentiality terms in EPA's agreement with CSRA-AlterEcho and references the ADR Act. Section 2.0 of the SOW states, in relevant part:

> Unless otherwise noted herein, all allocation related communications by the CSRA Team involving the OU2 PRPs or representatives of EPA or DOJ, individually or in groups, will be held confidential pursuant to the provisions of the ADR Act of 1996, 5 USC 574.

Section 3.0 of the SOW reads, in relevant part:

> CSRA will approach this task in accordance with the basic terms of the contract and according to the established norms and ethical standards of ADR professionals. Except as otherwise noted herein, information provided to the ADR professional by any of the parties, including EPA, communications between parties and the ADR professional, and notes and dispute resolution work product generated by the ADR professional during work pursuant to the Task Order will be maintained as confidential by the ADR professional pursuant to the provisions of the ADR Act of 1996 (Public Law 104-320; 5 USC571 et al.) and applicable federal, state and judicial requirements.

The information that is not confidential is noted in Section 4, Task 3 of the SOW, which reads, in relevant part:

> The allocation process will be designed based upon information received during consultations with EPA and OU2 PRPs on the allocation database and using all relevant non-confidential received information, including data, records, and other documents. No

---

[1] EPA invited all OU2 PRPs, except public entities, to participate in the allocation. 72 parties have chosen to participate, representing most of the allocation parties. The allocator will recommend a share for each allocation party, regardless of whether that allocation party has chosen to participate. Ten parties, including OCC, have chosen not to participate.

ALCD-PUBCOM_0001250

confidential information will be included in the allocation database. Though to be designed for purposes of conducting the allocation, the database will be designed in such a way as to allow access and use by EPA and DOJ staff for their settlement purposes following submission of the Allocation Data Reports in Task 8.

EPA's settlement framework, including the allocation, is in line with Congress' strong preference for settlements with responsible parties under CERCLA to avoid spending resources on litigation rather than on cleanup. H.R. Rep. No. 99-253, pt. 1, at 80 (1985), *reprinted in* 1986 U.S.C.C.A.N. 2835. As the court noted in *United States v. Charter Intl Oil Co.,* 83 F.3d 510, 520 (1st Cir. 1996), "[p]erhaps mindful of the huge resources going into the transaction costs of CERCLA litigation, rather than to remediating the sites, Congress sought to encourage earlier resolutions by agreement." These settlements serve to "reduce excessive litigation expenses and transaction costs, thereby preserving scarce resources for CERCLA's real goal: the expeditious cleanup of hazardous waste sites." *United States v. DiBiase,* 45 F.3d 541, 546 (1st Cir. 1995).

Because the allocation process is an important component in EPA's settlement framework, which in turn is important to timely cleanup of the lower 8.3 miles of the Lower Passaic River, EPA supports the confidentiality of documents and communications generated for the allocation, including EPA's comments and communications with the allocator, the participating PRPs' comments and communications with the allocator, the Position Briefs, and the Responsive Briefs.

We hope this letter enhances understanding of the settlement framework, including the OU2 allocation process.

Sincerely,

Sarah P. Flanagan
Chief, New Jersey Superfund Branch
Office of Regional Counsel

cc:     Allocation Parties, Appendix A
        David Batson, Esq., AlterEcho
        Brian Donohue, Esq., USDOJ
        Laura Rowley, Esq. USDOJ
        David Moora, Esq., US EPA

3

ALCD-PUBCOM_0001251

**Appendix A**
**Diamond Alkali Superfund Site – Operable Unit 2**
**Participating Allocation Parties**

1. 21st Century Fox America Inc.(21CFA)
2. Alliance Chemical Inc.
3. Arkema / Legacy Site Services
4. Ashland LLC
5. Atlantic Richfield (ARCO)
6. Atlas Refining Inc.
7. BASF Corporation
8. Benjamin Moore & Co
9. Berol Corporation
10. Campbell Foundry Company
11. Canning Gumm LLC
12. CBS Corporation
13. Celanese Ltd./CNA Holdings LLC
14. Chargeurs Inc.
15. Chevron Environmental Management Company
16. Coats and Clark Inc.
17. Congoleum Corporation
18. Conopco Inc
19. Cooper Industries LLC
20. Covanta Essex Co.
21. Croda Inc.
22. Curtiss-Wright Corporation
23. Darling Ingredients Inc.
24. DII Industries, LLC
25. Eden Wood Corporation
26. Elan Chemical Co Inc.
27. EnPro Holdings Inc.
28. EPEC Polymers
29. Essex Chemical Corporation
30. Everett Smith Group
31. Franklin –Burlington Plastics
32. Garfield Molding Company Inc.
33. General Electric Company
34. Givaudan Fragrances Corp
35. Goodrich Corp
36. Goody Products, Inc. on behalf of itself and Newell Brands Inc. (f/k/a Newell Rubbermaid Inc.)
37. Hartz Consumer Group Inc.
38. Hexcel Corporation
39. Hoffman – LaRoche Inc.
40. Honeywell International Inc.
41. ISP Chemicals LLC
42. Harris Corporation
43. Kearny Smelting
44. Leemilt's Petroleum Inc.
45. Legacy Vulcan Corporation
46. Lucent Technologies
47. National Standard LLC
48. Newark Group Inc.
49. Newark Morning Ledger Co.
50. The Okonite Company, Inc.
51. Otis Elevator Co.
52. Palin Enterprises
53. Pabst Brewing Company
54. Passaic Pioneer Properties Co
55. Pharmacia LLC
56. Pitt-Consol Chemical Company
57. PPG Industries Inc.
58. PSEG (Public Service Enterprise Group)
59. Purdue Pharma Technologies
60. Quality Carriers Inc.
61. Revere Smelting & Refining Corp/RSR Corp
62. Safety Kleen Ecirosystems Company/ McKesson Corp.
63. Sequa Corporation
64. Sherwin Williams Company
65. Spectraserv Inc.
66. Stanley Black & Decker Inc.
67. STWB Inc.
68. Sun Chemical
69. Tate & Lyle Ingredients Americas LLC
70. Teval Corporation
71. Textron Inc.
72. Tiffany and Company

# EXHIBIT 9

OxyChem's Comments in Opposition to Proposed Consent Decree,
*United States v. Alden Leeds, Inc., et al.*, Civil Action No. 2:22-cv-07326 (D.N.J.)

ALCD-PUBCOM_0001253



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
REGION 2
290 BROADWAY
NEW YORK, NY 10007-1866

November 28, 2017



518289

**CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

Ms. Marcia E. Backus
Senior Vice President and General Counsel
Occidental Petroleum Corporation
5 Greenway Plaza, Suite 110
Houston, Texas 77046

> Re:    Allocation Process for Operable Unit 2 of the Diamond Alkali Superfund Site
> Essex and Hudson Counties, New Jersey

Dear Ms. Backus:

On behalf of the U.S. Environmental Protection Agency, Region 2 (EPA or the Agency), I would like to thank you and your team for coming to our offices on Thursday, October 19, 2017, to discuss the allocation for Operable Unit 2 (OU2) of the Diamond Alkali Superfund Site (Site). Given the frank discussion that took place, we now have a better understanding of concerns raised by Occidental Chemical Corporation (OCC) regarding the proposed allocation. We are also pleased that we were able to resolve certain misunderstandings concerning EPA's enforcement framework for OU2 of the Site.

Our recent meeting was very productive and addressed many of the issues raised in your October 12, 2017 letter (Letter). This letter further responds to your Letter and addresses issues that were not discussed at our meeting.

Transparency Regarding EPA's Enforcement Approach and Timely Notification of the Proposed Allocation for OU2

With regard to EPA's communications with the responsible parties about the proposed enforcement approach, we note that as early as March 30, 2016, shortly after the Record of Decision for OU2 was signed, EPA informed the OU2 potentially responsible parties (PRPs) of the Agency's enforcement strategy for OU2 including that the Agency believed that some parties should perform the work while others should contribute to funding the work through cash-out settlements with the Agency. The Agency provided greater specificity in its "Next Steps" letter of March 30, 2017 in which we notified the parties of EPA's intention "to use the services of a third party allocator." We again informed the PRPs of our intention to use the services of a third party allocator in our letter of May 17, 2017. Then, based on comments we had received from some PRPs regarding EPA's allocation approach, EPA issued a letter on August 3, 2017, inviting

ALCD-PUBCOM_0001254

the OU2 PRPs to a meeting at EPA's New York offices to discuss the Agency's proposed allocation framework. That meeting, which took place on August 28, 2017, was attended by representatives of OCC both in-person in New York and by phone. During that meeting, parties including OCC raised questions regarding EPA's enforcement approach and discussed the relative merits of proceeding with an allocation including only "middle tier" parties or expanding the scope of the allocation to include additional parties.

In addition to these letters and the August meeting, this past summer, staff from EPA's Office of Regional Counsel spoke with representatives of OCC concerning the proposed allocation for OU2. During those discussions, OCC expressed its concern about participating in an allocation given OCC's belief that an allocation would not assure "compulsory disclosure" of all documents and information regarding PRPs' releases or potential releases into the Lower Passaic River.

Proposed Allocation and the Record of Decision for OU2

Again, we are pleased that we were able to clarify at the October 19 meeting that EPA intends to pursue all the OU2 PRPs and not simply those parties responsible for the release of dioxin, furans and/or polychlorinated biphenyls (PCBs) into the Lower Passaic River. As we stated at the meeting, EPA continues to believe that parties responsible for the release of dioxins, furans and/or PCBs into the lower 8.3 miles of Lower Passaic River Study Area should perform the remedial action for OU2 under a consent decree with the United States, and that the remaining PRPs should contribute their fair share of the costs of the remedial action by providing funding for the remedial work, and/or by providing in-kind services.

As we discussed during our October 19 meeting, whether and to what extent hazardous substances other than contaminants of concern (COCs) will be taken into consideration in the allocation is a question that should be raised with AlterEcho within the process established by the allocator for the parties to offer feedback on the design of the allocation.

The Agency intends to pursue all of the OU2 PRPs and is committed to ensuring that all of the OU2 PRPs contribute their fair share towards the costs for OU2 of the Site. While we may at a future point conclude that some PRPs – perhaps, but not necessarily, those not responsible for dioxin, furans and/or PCBs – are eligible for cash-out settlements, any such cash-out would be based on such parties' fair share (with an appropriate premium), and monies recovered would go towards funding of the OU2 remedial action. Importantly, EPA expects future cash-out settlements to be in the form of a judicial consent decree or decrees, subject to public comment and federal court review and approval.

Sufficiency of Information for the Allocation

We also had a productive conversation at our October 19 meeting regarding OCC's views and concerns with the amount, veracity, and completeness of information available for OU2 and the allocation. We understand that OCC is concerned that without the type of compelled production

ALCD-PUBCOM_0001255

3

of documents and depositions available in litigation, certain parties may not produce all relevant information. We do, however, remain optimistic given our discussion at our October 19 meeting that OCC will see the opportunities provided by the non-binding allocation process, described by David Batson at the October 13, 2017 allocation "kick off" meeting. During the allocation, OCC will have the ability to share its concerns about information with the allocator and the other participants in the allocation process. The allocator will be able to take OCC's concerns into consideration in shaping the allocation process, or bring them back to EPA, as appropriate.

Moreover, as indicated at the October 19 meeting, if gaps in the information or data available to AlterEcho threaten to impede the effectiveness of the process, the Agency will consider using its enforcement resources to supplement the information provided by the Agency and PRPs. Further, should EPA conclude that additional cash-out settlements are warranted, we will consider how to incorporate a suitable certification from the settling parties about the completeness of their disclosures.

We note, with regard to the statement in your Letter that "[a]llocation is a judicial, not an administrative, function under CERCLA" that allocation of Superfund site costs outside of court is a commonly used approach. In fact, at large multiparty sites, allocation is a conventional approach to sharing costs and responsibility. EPA has a Conflict Prevention and Resolution Center that provides alternative dispute resolution and conflict resolution services such as the use of third party neutrals.

As we have stated, we do not think that litigation is the best approach to resolving liability for OU2. While this Site has proven to be particularly challenging in that the PRPs have been unable to reach sufficient consensus to begin their own allocation for OU2, we continue to think that the resources expended in litigation coupled with the uncertainty of a legal proceeding and loss of control over the process will far outweigh the challenges associated with the allocation process.

The Allocation Should Be Completed Before Negotiations for the Remedial Action Begin

You state in the Letter that there are "significant unknowns and uncertainties that exist concerning how much the remedy will eventually cost" and that therefore "OCC believes it is premature and inequitable for EPA to attempt to allocate the costs of the remedy" until the remedial design is completed.

EPA conducted a remedial investigation and focused feasibility study for OU2 and selected the remedy for OU2 based on a very large data set, and there is a large amount of data in the record that provides a detailed understanding of both the COCs that drive the risk, and also the hazardous substances that are not COCs but may affect costs. In addition, OCC, through Tierra Solutions, Inc., has already conducted a removal action in the river and has the data from that work. Similarly, the Cooperating Parties Group capped a highly contaminated mudflat and is currently monitoring the results.

ALCD-PUBCOM_0001256

The purpose of allocation is to provide recommendations regarding the relative shares of responsibility of the parties. Parties will be assigned a percentage share of liability in relation to the other PRPs, not dollar amounts. To the extent that information gathered during the OU2 remedial design affects the ultimate costs of the remedy, EPA will be able to take that information and those additional costs into account in any potential settlements with the PRPs.

Delaying the allocation until the remedial design is completed would defeat a primary goal of the allocation, namely, to have a remedial action consent decree in place so that the remedial action work can begin without delay following completion of the remedial design. While EPA agrees that the remedial design for OU2 may provide additional information that could be relevant to the allocation, the Agency does not believe information gathered during the remedial design will materially affect the factors that drive the costs of the OU2 remedy.

Allocation Will Not Create a Barrier to Settlement

We agree that a fair, carefully structured, information-based allocation is necessary to promote settlements. This is why we initiated the allocation process. We have received numerous requests over the decade that work has been underway for an equitable resolution that would allow parties with minimal responsibility to exit the process so as not to incur transaction costs far in excess of their liability. It is not our view that the allocation, and any cash-out settlements based on the allocation, will create disincentives to any remaining PRPs to assume responsibility for the remedial action especially in light of the fact that we envision that such early settlements would include a premium. Rather than reducing the pool of responsible parties, settlements with such parties will bring funds to the remedial action, and should streamline the negotiation of a remedial action consent decree.

We appreciate OCC's concern that all costs, including long-term "maintenance obligations...must be borne by the parties responsible for them." We did discuss, at some length, OCC's concerns during our October 19 meeting and I believe those discussions were worthwhile and hope that our discussions assured OCC of the Agency's intention to pursue all of the OU2 PRPs for their fair share of OU2 costs.

As we discussed during our meeting, the proposed allocation is non-binding and participation in the allocation does not require any party to forgo its right to contribution or its cost recovery rights. Parties that participate in the allocation process will not be obliged to accept any settlement offers that EPA may make, or to refrain from challenging a settlement offer made to another party. The allocation process is structured to allow OCC and other participants to participate in the design of the allocation and the factors to be considered. And again, assuming EPA identifies additional parties for cash-out settlements, such settlements would take the form of a judicial consent decree, which would be lodged with the federal court, and would be subject to public comment and judicial review and approval. We hope these facts will address the Company's concern that the proposed allocation will "come at the expense of OCC's legal rights to obtain contribution and cost recovery from all responsible PRPs who have contaminated the sediments of the Lower Passaic River."

ALCD-PUBCOM_0001257

Most important, we understand that to be successful, the allocation must be fair, and that all PRPs, whether those responsible for the COCs driving the remedial costs or others, are more likely to enter into a settlement or settlements with the United States for implementation and/or funding of the remedial action if they find that the settlements are also fair and reasonable.

<u>The Agency is Hearing and Considering OCC's Concerns</u>

As noted, EPA appreciates OCCs concerns and we are listening. We worked with OCC and the other creditors throughout the Maxus Energy Corporation bankruptcy proceeding to achieve a positive result. We intend to continue our efforts at having an open and transparent relationship with OCC, as with other OU2 PRPs, and hope that OCC shares our goal of having the remedial design and remedial action for OU2 performed timely and effectively. As we discussed at the October 19 meeting, we encourage OCC to participate actively and fully in the allocation process and to raise its concerns with the allocator so that they can be addressed in the allocation process.

Sincerely,

Eric J. Wilson
Deputy Director for Enforcement and Homeland Security
Emergency and Remedial Response Division

cc: Brian Donohue, Esq., USDOJ

ALCD-PUBCOM_0001258

# EXHIBIT 10

OxyChem's Comments in Opposition to Proposed Consent Decree,
*United States v. Alden Leeds, Inc., et al.*, Civil Action No. 2:22-cv-07326 (D.N.J.)

ALCD-PUBCOM_0001259

UNITED STATES
ENVIRONMENTAL PROTECTION AGENCY
REGION 2

| | |
|---|---|
| IN THE MATTER OF: | ADMINISTRATIVE SETTLEMENT AGREEMENT AND ORDER ON CONSENT FOR REMEDIAL DESIGN |
| Operable Unit Two of the Diamond Alkali Superfund Site | U.S. EPA Region 2 CERCLA Docket No. 02-2016-2021 |
| In and About Essex, Hudson, Bergen and Passaic Counties, New Jersey | Proceeding Under Sections 104, 106, 107 and 122 of the Comprehensive Environmental Response, Compensation, and Liability Act, as amended, 42 U.S.C. §§ 9604, 9606, 9607 & 9622. |
| Occidental Chemical Corporation, | |
| Settling Party. | |

**453915**

ALCD-PUBCOM_0001260

ADMINISTRATIVE SETTLEMENT AGREEMENT AND ORDER ON CONSENT
REMEDIAL DESGIN
TABLE OF CONTENTS

| | | |
|---|---|---|
| I. | JURISDICTION AND GENERAL PROVISIONS | 1 |
| II. | PARTIES BOUND | 2 |
| III. | DEFINITIONS | 2 |
| IV. | EPA'S FINDINGS OF FACT | 5 |
| V. | EPA'S CONCLUSIONS OF LAW AND DETERMINATIONS | 9 |
| VI. | SETTLEMENT AGREEMENT AND ORDER | 10 |
| VII. | DESIGNATION OF PROJECT MANAGER AND COORDINATORS | 10 |
| VIII. | WORK TO BE PERFORMED | 12 |
| IX. | SITE ACCESS | 12 |
| X. | ACCESS TO INFORMATION | 13 |
| XI. | RECORD RETENTION | 14 |
| XII. | COMPLIANCE WITH OTHER LAWS | 15 |
| XIII. | PAYMENT OF RESPONSE COSTS | 15 |
| XIV. | DISPUTE RESOLUTION | 17 |
| XV. | FORCE MAJEURE | 19 |
| XVI. | STIPUTLATED PENALTIES | 20 |
| XVII. | COVENANTS BY EPA | 22 |
| XVIII. | RESERVATION OF RIGHTS BY EPA | 23 |
| XIX. | COVENANTS BY SETTLING PARTY | 24 |
| XX. | OTHER CLAIMS | 26 |
| XXI. | EFFECT OF SETTLEMENT/CONTRIBUTION | 27 |
| XXII. | INDEMNIFICATION | 28 |
| XXIII. | INSURANCE | 28 |
| XXIV. | FINANCIAL ASSURANCE | 29 |
| XXV. | INTEGRATION/APPENDICES | 32 |
| XXVI. | EFFECTIVE DATE AND SUBSEQUENT MODIFICATION | 33 |
| XXVII. | NOTICE OF COMPLETION OF WORK | 33 |

Appendix A: Record of Decision for Operable Unit Two
Appendix B: Statement of Work
Appendix C: Map of Site
Appendix D: Financial Assurance

i

# I. JURISDICTION AND GENERAL PROVISIONS

1. This Administrative Settlement Agreement and Order on Consent ("Settlement Agreement") is entered into voluntarily by the United States Environmental Protection Agency (the "EPA") and Occidental Chemical Corporation ("Settling Party"). This Settlement Agreement provides that Settling Party shall undertake a Remedial Design ("RD"), including various procedures and technical analyses, to produce a detailed set of plans and specifications for implementation of the Remedial Action selected in EPA's March 3, 2016 Record of Decision for the lower 8.3 miles of the Lower Passaic River, which is Operable Unit Two of the Diamond Alkali Superfund Site (the "Site"). In addition, Settling Party shall reimburse the United States for certain response costs, as provided herein.

2. This Settlement Agreement is issued under the authority vested in the President of the United States by Sections 104, 106, 107 and 122 of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), as amended, 42 U.S.C. §§ 9604, 9606, 9607 and 9622. This authority was delegated to the Administrator of EPA on January 23, 1987 by Executive Order 12580 (52 *Fed. Reg.* 2923, Jan. 29, 1987) and further delegated to EPA Regional Administrators by EPA Delegation No. 14-14-C. This authority was further re-delegated on November 23, 2004 by the Regional Administrator of EPA Region 2 to the Director of the Emergency and Remedial Response Division through EPA Region 2 Delegation No. 14-14-C.

3. EPA and Settling Party recognize that this Settlement Agreement has been negotiated in good faith and that the actions undertaken by Settling Party in accordance with this Settlement Agreement do not constitute an admission of any liability. Settling Party does not admit, and retains the right to controvert in any subsequent proceedings other than proceedings to implement or enforce this Settlement Agreement, the validity of the findings of fact, conclusions of law, and determinations in Sections IV and V of this Settlement Agreement. Settling Party agrees to comply with, and be bound by, the terms of this Settlement Agreement and further agrees that Settling Party will not contest the basis or validity of this Settlement Agreement or its terms.

4. The objectives of EPA and Settling Party in entering into this Settlement Agreement are to protect the public health or welfare or the environment at the Site by the design of response actions at the Site by Settling Party, to reimburse response costs of EPA, and to resolve the claims of EPA against Settling Party as provided in this Settlement Agreement.

5. In accordance with the National Oil and Hazardous Substances Pollution Contingency Plan, 40 C.F.R. Part 300, *et seq.,* as amended ("NCP"), and Sections 121(f)(1)(F) of CERCLA, 42 U.S.C. § 9621(f)(1)(F), EPA notified the State of New Jersey (the "State") on May 6, 2016, of negotiations with a potentially responsible party regarding the implementation of the remedial design for Operable Unit Two for the Site, and EPA has provided the State with an opportunity to participate in such negotiations.

ALCD-PUBCOM_0001262

6. In accordance with Section 122(j)(1) of CERCLA, 42 U.S.C. § 9622(j)(1), EPA notified the federal natural resource trustees on May 6, 2016, of negotiations with a potentially responsible party regarding the release of hazardous substances that may have resulted in injury to the natural resources under federal trusteeship and encouraged the trustees to participate in the negotiation of this Settlement Agreement.

## II. PARTIES BOUND

7. This Settlement Agreement applies to and is binding upon EPA and upon Settling Party and its successors and assigns. Any change in ownership or corporate status of Settling Party including, but not limited to, any transfer of assets or real or personal property shall not alter Settling Party's responsibilities under this Settlement Agreement. The signatories to this Settlement Agreement certify that they are authorized to execute and legally bind the parties they represent.

8. Settling Party shall ensure that its contractors, subcontractors, and representatives receive a copy of this Settlement Agreement and comply with this Settlement Agreement. Settling Party shall be responsible for any noncompliance with this Settlement Agreement by such contractors, subcontractors, and representatives. With regard to the activities undertaken pursuant to this Settlement Agreement, each contractor and subcontractor of Settling Party shall be deemed to be in a contractual relationship with Settling Party within the meaning of Section 107(b)(3) of CERCLA, 42 U.S.C. § 9607(b)(3).

## III. DEFINITIONS

9. Unless otherwise expressly provided herein, terms used in this Settlement Agreement that are defined in CERCLA or in other regulations promulgated under CERCLA shall have the meaning assigned to them in CERCLA or its implementing regulations. Whenever terms are used in this Settlement Agreement, in documents attached to this Settlement Agreement, or incorporated by reference into this Settlement Agreement, the following definitions shall apply:

a. "CERCLA" shall mean the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. § 9601, *et seq.*

b. "Day" shall mean a calendar day unless otherwise expressly stated. In computing any period of time under this Settlement Agreement, where the last day would fall on a Saturday, Sunday, or federal holiday, the period shall run until the close of business on the next working Day.

c. "Effective Date" shall be the effective date of this Settlement Agreement as provided in Section XXVI (Effective Date and Subsequent Modification).

2

d. "The EPA" or "EPA" shall mean the United States Environmental Protection Agency and any successor departments or agencies of the United States.

e. "Future Response Costs" shall mean all costs, including, but not limited to, direct and indirect costs, that the United States incurs in reviewing or developing plans, reports and other items pursuant to this Settlement Agreement, verifying the Work, or otherwise implementing, overseeing, or enforcing this Settlement Agreement, including, but not limited to, payroll costs, contractor costs, travel costs, laboratory costs, costs incurred pursuant to Paragraph 4.1 (Emergency Response and Reporting) of the SOW, costs incurred pursuant to Paragraph 54 (costs and attorneys' fees and any monies paid to secure access, including the amount of just compensation), and Paragraph 92 (Work Takeover), and Paragraph 53 (Community Involvement), and the costs incurred by the United States in enforcing the terms of this Settlement Agreement, including all costs incurred in connection with Dispute Resolution pursuant to Section XIV (Dispute Resolution) and all litigation costs.

f. "Institutional Controls" or "ICs" shall mean Proprietary Controls and state and local laws, regulations, ordinances, zoning restrictions, or other governmental controls or notices that: (a) limit land or resource use to minimize the potential for human exposure to Waste Material at or in connection with Operable Unit 2 at the Site; (b) limiting land or resource use to implement, ensure non-interference with, or ensure the protectiveness of the remedial action; and/or (c) provide information intended to modify or guide human behavior at or in connection with Operable Unit 2 at the Site.

g. "Interest" shall mean interest at the rate specified for interest on investments of EPA Hazardous Substance Superfund established by 26 U.S.C. § 9507, compounded annually on October 1 of each year, in accordance with CERCLA § 107(a), 42 U.S.C. § 9607(a). The applicable rate of interest shall be the rate in effect at the time the interest accrues. The rate of interest is subject to change on October 1 of each year.

h. "Lower Passaic River Study Area" or "LPRSA" shall mean the 17-mile stretch of the Lower Passaic River and its tributaries from the Dundee Dam to Newark Bay.

i. "NJDEP" shall mean the New Jersey Department of Environmental Protection.

j. "National Contingency Plan" or "NCP" shall mean the National Oil and Hazardous Substances Pollution Contingency Plan promulgated pursuant to Section 105 of CERCLA, 42 U.S.C. § 9605, codified at 40 C.F.R. Part 300, *et seq.,* including all amendments thereto.

k. "Operable Unit 2 (OU2)" shall mean the lower 8.3 miles of the Lower Passaic River, from RM 0, at the river's confluence with Newark Bay, to RM 8.3, near the border

3

between the City of Newark and Belleville Township, New Jersey, located in and about Essex and Hudson Counties, New Jersey.

l. "Paragraph" shall mean a portion of this Settlement Agreement identified by an Arabic numeral.

m. "Parties" shall mean EPA and Settling Party.

n. "Performance Standards" shall have the same meaning as used in the Statement of Work, Section 1.4.

o. "Proprietary Controls" shall mean easements or covenants running with the land that (a) limit land or resource use and/or provide access rights and (b) are created pursuant to common law or statutory law by an instrument that is recorded by the owner in the appropriate records office.

p. "Record of Decision for Operable Unit Two" or "OU2 ROD" shall mean EPA Record of Decision relating to Operable Unit Two for the Site, and all attachments thereto that the Regional Administrator, EPA Region 2, or her delegate, signed on March 3, 2016, and attached as Appendix A.

q. "Remedial Design" or "RD" shall mean those activities that Settling Party shall undertake to develop the final plans and specifications, up to and including the EPA-approved Final Remedial Design, for the Remedial Action pursuant to the Remedial Design Work Plan.

r. "Remedial Design Work Plan" shall mean the document developed pursuant to the Statement of Work ("SOW") approved by EPA, and any amendment thereto.

s. "Section" shall mean a portion of this Settlement Agreement identified by a Roman numeral.

t. "Settlement Agreement" shall mean this Administrative Settlement Agreement and Order on Consent, all appendices attached hereto, and all documents incorporated by reference into this document including, without limitation, EPA-approved submissions. The EPA-approved submissions (other than progress reports) are incorporated into and become a part of the Settlement Agreement upon approval by EPA. In the event of conflict between this Settlement Agreement and any appendix, this Settlement Agreement shall control.

u. "Settling Party" shall mean the Occidental Chemical Corporation.

v. "Site" shall mean the Diamond Alkali Superfund Site, including the former Diamond Alkali property located at 80 and 120 Lister Avenue, Newark, New Jersey, the Lower Passaic River Study Area, Newark Bay, and the areal extent of contamination.

4

w. "State" shall mean the State of New Jersey.

x. "Statement of Work" or "SOW" shall mean the statement of work for implementation of the Remedial Design, and any modifications thereto in accordance with this Settlement Agreement, as set forth in Appendix B of this Settlement Agreement. The Statement of Work is incorporated into this Settlement Agreement and is an enforceable part of this Settlement Agreement.

y. "Waste Material" shall mean (1) any hazardous substance under Section 101(14) of CERCLA, 42 U.S.C. § 9601(14); (2) any pollutant or contaminant under Section 101(33) of CERCLA, 42 U.S.C. § 9601(33); (3) any solid waste under Section 1004(27) of RCRA, 42 U.S.C. § 6903(27); and (4) any mixture containing any of the constituents noted in (1),(2) or (3), above.

z. "Work" shall mean all activities and obligations Settling Party is required to perform under this Settlement Agreement except those required by Section XI (Record Retention).

## IV. EPA's FINDINGS OF FACT

10. Since the late 1800s, the Lower Passaic River has been a highly industrialized waterway, receiving direct and indirect discharges from numerous industrial facilities.

11. The sediments of the Lower Passaic River contain hazardous substances, including, but not limited to, cadmium, copper, lead, mercury, nickel, zinc, polyaromatic hydrocarbons ("PAHs"), dieldrin, bis (2-ethylhexyl) phthalate, polychlorinated biphenyls ("PCBs"), dichlorodiphenyl-trichloroethane ("DDT"), polychlorinated dibenzo-p-dioxins ("PCDDs") including 2,3,7,8-tetrachloro-dibenzo-p-dioxin ("2,3,7,8-TCDD"), polychlorinated dibenzofurans ("PCDFs"), 2,4-dichlorophenoxy acetic acid ("2,4-D"), 2,4,5-trichlorophenoxy acetic acid ("2,4,5-T"), and 2,4,5-trichlorophenol ("2,4,5-TCP").

12. Between March 1951 and August 1969, the Diamond Alkali Company operated a manufacturing facility located at 80 Lister Avenue in Newark, New Jersey, which produced, among other products, DDT, 2,4-D, 2,4,5-TCP, and 2,4,5-T. A byproduct of the manufacturing process was 2,3,7,8-TCDD , which was released into the Passaic River. Production activities at the Diamond Alkali facility ceased in August 1969.

13. In 1983, hazardous substances were detected at various locations in Newark, New Jersey, including the Diamond Alkali facility located at 80 Lister Avenue and adjoining property at 120 Lister Avenue.

ALCD-PUBCOM_0001266

14. EPA, pursuant to Section 105 of CERCLA, 42 U.S.C. § 9605, placed the Diamond Alkali Superfund Site on the National Priorities List, which is set forth at 40 C.F.R. Part 300, Appendix B, by publication in the Federal Register on September 21, 1984, 49 Fed. Reg. 37070.

15. Pursuant to Administrative Orders on Consent with NJDEP, the Diamond Shamrock Chemicals Company (formerly Diamond Alkali Company) conducted investigations and response work for the Lister Avenue facility. The investigation included the sampling and assessment of sediment contamination within the Passaic River.

16. Sampling and assessment of sediments in the lower reaches of the Passaic River revealed the presence of many hazardous substances including, but not limited to, cadmium, copper, lead, mercury, nickel, zinc, PAHs, dieldrin, bis (2-ethylhexyl) phthalate, PCBs, DDT, PCDDs including 2,3,7,8-TCDD, PCDFs, 2,4-D, 2,4,5-T, and 2,4,5-TCP. Hazardous substances identified in the sediments of the Lower Passaic River included elevated concentrations of 2,3,7,8-TCDD, known to have been generated at the Diamond Alkali facility.

17. Some of the chemicals found in the sediments during the remedial investigation of the Lower Passaic River were released from the Diamond Alkali Facility portion of the Site into the Passaic River through direct discharges and ground-water and surface-water runoff.

18. On September 30, 1987, EPA issued a Record of Decision ("ROD") that set forth an interim remedy for the 80 and 120 Lister Avenue portion of the Diamond Alkali Superfund Site. Pursuant to a judicial Consent Decree with EPA and NJDEP, OCC and Chemical Land Holdings, Inc. (now known as Tierra Solutions, Inc ("Tierra")), agreed to implement the 1987 ROD. The interim remedy was completed in 2004. Tierra has owned the 80 and 120 Lister Avenue portion of the Site since 1986.

19. In 1994, OCC entered into an Administrative Order on Consent with EPA to investigate a six-mile stretch of the Passaic River from RM1 to RM7. The primary objectives of the investigation were to determine: (1) the spatial distribution and concentration of hazardous substances, both horizontally and vertically in the sediments; (2) the primary human and ecological receptors of contaminated sediments; and (3) the transport of contaminated sediment. Tierra performed the work on OCC's behalf, under the oversight of EPA.

20. Sampling results from the investigation of the six-mile area and other environmental studies demonstrated that evaluation of a larger area was necessary because sediments contaminated with hazardous substances and other potential sources of hazardous substances are present along the entire Lower Passaic River. Further, the tidal nature of the Lower Passaic River has resulted in greater dispersion of hazardous substances.

21. Sampling results show concentrations of PCDDs/PCDFs, PCBs, mercury, and other substances that significantly exceed the levels that can produce toxic effects to biota. Based on the results of monitoring and research undertaken since the mid-1970s, the State of New Jersey

6

ALCD-PUBCOM_0001267

has taken a number of steps, in the form of consumption advisories, closures, and sales bans, to limit the exposure of the fish-eating public to toxic contaminants in the Lower Passaic River, Newark Bay, the Hackensack River, the Arthur Kill and the Kill Van Kull. The initial measures prohibited the sale, and advised against the consumption, of several species of fish and eel and was based on the presence of PCB contamination in the seafood. The discovery of widespread dioxin contamination in the Lower Passaic River and Newark Bay led the State of New Jersey to issue a number of Administrative Orders in 1983 and 1984 which prohibited the sale or consumption of fish or shellfish from the tidal Passaic River, and prohibited the sale and consumption of blue crab and striped bass from Newark Bay, the tidal Hackensack River, the Arthur Kill and the Kill Van Kull. These State advisories and prohibitions are still in effect.

22. In 2002, EPA commenced a remedial investigation and feasibility study ("RI/FS") encompassing the 17-mile Lower Passaic River Study Area ("LPRSA"). In 2004, EPA and a group of potentially responsible parties ("PRPs") known as the Lower Passaic River Study Area Cooperating Parties Group ("CPG") entered into a Settlement Agreement pursuant to Section 122(h) of CERCLA to provide funds for EPA's performance of the 17-mile RI/FS. The Settlement Agreement was amended in 2005 and 2007, adding more parties. In May 2007, the CPG members entered into an Administrative Settlement Agreement and Order on Consent ("AOC") with EPA pursuant to which the settling parties agreed to complete the RI/FS for the 17-mile LPRSA. The 17-mile RI/FS is ongoing.

23. In 2004, EPA and OCC entered into an Administrative Order on Consent pursuant to which OCC agreed to perform the RI/FS for Newark Bay under the oversight of EPA. Tierra is performing the RI/FS for Newark Bay on OCC's behalf. The study of Newark Bay is ongoing.

24. In June 2008, EPA, OCC and Tierra signed an Administrative Order on Consent for a non-time-critical removal action to remove 200,000 cubic yards of contaminated sediment from the river (from RM3.0 to RM3.8) adjacent to the 80-120 Lister Avenue facility. This action is referred to as the "Tierra Removal."

25. In 2012, EPA entered into an Administrative Order on Consent with a group of PRPs that agreed to perform a time-critical removal action to address the risks posed by high concentrations of dioxins, PCBs and other contaminants found in surface and subsurface sediments in the RM 10.9 area, including in a mudflat on the east bank of the river at RM10.9 in Lyndhurst, New Jersey. This action is referred to as the "RM10.9 Removal." EPA later issued a Unilateral Administrative Order ("UAO") to OCC ordering it to participate and cooperate in the RM 10.9 Removal. OCC has performed a number of tasks under the UAO, as directed by EPA.

26. In 2011, OCC entered into an Administrative Order on Consent with EPA to sample combined sewer outfalls and stormwater outfalls discharging to the Passaic River.

27. Data collected in the Lower Passaic River, and EPA's analyses show that contaminated sediment in the lower 8.3 miles of the LPRSA are a major source of contamination

7

to the rest of the river and Newark Bay and pose an unacceptable risk to human health and the environment due to the presence of a variety of contaminants that stay in the environment for a long time and can build up in fish and shellfish. These contaminants include dioxins and furans, PCBs, PAHs, DDT and other pesticides, mercury, lead and other metals.

28.  Having identified that the majority of the contaminated sediment is found in the lower 8.3 miles of the LPRSA, EPA completed a remedial investigation/focused feasibility study ("RI/FFS") to evaluate taking action to address these sediments while the 17-mile LPRSA was underway.

29.  On April 11, 2014, in accordance with Section 117 of CERCLA, 42 U.S.C. § 9617, EPA published, in a major local newspaper of general circulation, a notice of a proposed plan to address contaminated sediments in the lower 8.3 miles of the LPRSA.

30.  On March 4, 2016, EPA issued the OU2 ROD, selecting a remedy for the lower 8.3 miles of the LPRSA. The remedy selected in the OU2 ROD includes, but is not limited to the following: 1) construction of an engineered cap over the river bottom of the lower 8.3 miles of the LPRSA bank to bank; 2) dredging of the river bank to bank (approximately 3.5 million cubic yards) so the cap can be placed without increasing the potential for flooding and to allow for the continued use of the federally-authorized navigation channel in the 1.7 miles of the river closest to Newark Bay; 3) reconstructing dredged mudflat areas and restoring mudflat habitat; 4) offsite disposal of dredged material; 5) institutional controls to protect the cap and enhanced outreach to increase awareness of NJDEP's prohibition on fish and crab consumption; and 6) long term monitoring and maintenance.

31.  On December 16, 2014, a Consent Judgment executed by NJDEP and OCC was entered in the matter of NJDEP v. Occidental Chemical Company, et al., Essex County Docket Number L9868-05, in New Jersey Superior Court, Law Division, Essex County, pursuant to which OCC has agreed to pay certain cleanup and removal costs as stated in the Consent Judgment. The Consent Judgment is subject to the jurisdiction of the courts of the State of New Jersey.

32.  On March 31, 2016, EPA issued a notice of liability to over 100 parties potentially liable for the lower 8.3 miles of the Lower Passaic River.

33.  In 1967, the Diamond Alkali Company changed its name to the Diamond Shamrock Corporation. In 1983, the Diamond Shamrock Corporation changed its name to the Diamond Shamrock Chemicals Company.

34.  On September 4, 1986, all outstanding stock in the Diamond Shamrock Chemicals Company was acquired by the Oxy-Diamond Alkali Corporation from Maxus Energy Corporation, and the Diamond Shamrock Chemicals Company name was changed to the Occidental Electrochemicals Corporation.

8

35. On November 30, 1987, the Occidental Electrochemicals Corporation was merged into Occidental Chemical Corporation.

36. The Diamond Alkali Company disposed of chemical waste, including hazardous substances, during its ownership and operation of the Lister Avenue facility, located in Newark, Essex County, New Jersey. The Diamond Alkali Company also disposed of chemical waste, including hazardous substances, in the LPRSA, which is part of the Site. EPA first notified OCC, corporate successor to the Diamond Alkali Company, of its liability for the Site on October 20, 1988.

## V. EPA's CONCLUSIONS OF LAW AND DETERMINATIONS

Based on the Findings of Fact set forth above, as well as the Administrative Record supporting this Settlement Agreement, EPA has determined that:

37. The Diamond Alkali Superfund Site is a facility as defined in Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

38. The contaminants found at the Site, as identified in the Findings of Fact above, include "hazardous substances" as defined in Section 101(14) of CERCLA, 42 U.S.C. § 9601(14).

39. Settling Party is a "person" as defined in Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

40. Settling Party is a responsible party as defined in Sections 107(a) of CERCLA, 42 U.S.C. § 9607(a), and is subject to this Settlement Agreement under Section 106(a) of CERCLA, 42 U.S.C. § 9606(a). Settling Party is liable for performance of Work under this Settlement Agreement and for payment of Future Response Costs under this Settlement Agreement. Settling Party was an "owner" and/or "operator" of the Lister Avenue portion of the Site at the time of disposal of hazardous substances, as defined by Section 101(20) of CERCLA, 42 U.S.C. § 9601(20), and within the meaning of Section 107(a)(2) of CERCLA, 42 U.S.C. § 9607(a)(2). Settling Party also arranged for disposal of hazardous substances at the LPRSA, within the meaning of Section 107(a)(3) of CERCLA, 42 U.S.C. § 9607(a)(3).

41. The conditions described in the Findings of Fact above constitute an actual or threatened "release" of hazardous substances from the facility as defined in Section 101(22) of CERCLA, 42 U.S.C. § 9601(22).

42. The actions required by this Settlement Agreement are necessary to protect the public health, welfare or the environment, are in the public interest, are consistent with CERCLA and the NCP and will expedite effective remedial action and minimize litigation.

9

## VI. SETTLEMENT AGREEMENT AND ORDER

43.  Based upon the foregoing the Findings of Fact, Conclusions of Law and Determinations, and the Administrative Record for this Site, it is hereby Ordered and Agreed that Settling Party shall comply with all provisions of this Settlement Agreement, including, but not limited to, all attachments to this Settlement Agreement and all documents incorporated by reference into this Settlement Agreement.

## VII. DESIGNATED PROJECT MANAGER AND COORDINATORS

44.  Selection of Contractors, Personnel.  All Work performed under this Settlement Agreement shall be under the direction and supervision of qualified personnel. Settling Party shall retain one or more contractor(s), including a Supervising Contractor, to perform the Work and shall notify EPA, in writing, of the name(s) and qualifications of such contractor(s), and Supervising Contractor, within 15 days of the Effective Date or such longer time as specified by EPA. Settling Party shall also notify EPA in writing of the name(s) and qualification(s) of any other contractor(s) or subcontractor(s) retained to perform the Work at least 10 days prior to the commencement of such Work. EPA will issue a notice of disapproval of the proposed Supervising Contractor or an authorization to proceed.

45.  EPA retains the right to disapprove of any or all of the contractors or subcontractors retained by Settling Party. If EPA disapproves of a selected contractor, EPA shall state its reason(s) for disapproval in a writing provided to Settling Party and Settling Party shall retain a different contractor and shall notify EPA of that contractor's name and qualifications within15days of EPA's disapproval.

46.  With respect to any contractor proposed to be Supervising Contractor pursuant to Paragraph 44, Settling Party shall demonstrate that the proposed contractor has sufficient technical expertise to supervise the Work and a quality assurance system that complies with ANSI/ASQC E4-1994, "Quality management systems for environmental information and technology programs - Requirements with guidance for use" (American Society for Quality, February 2014 or most recent version) , by submitting a copy of the proposed contractor's Quality Management Plan ("QMP"). The QMP should be prepared in accordance with "The EPA Requirements for Quality Management Plans (QA/R-2)," (EPA/240/B-01/002, March 2001, reissued May 2006, or subsequently issued guidance) or equivalent documentation as determined by EPA.

47.  Within 10 days after the Effective Date, Settling Party shall designate a Project Coordinator who shall be responsible for administration of all actions by Settling Party required by this Settlement Agreement and shall submit to EPA the designated Project Coordinator's name, address, telephone number, and qualifications. Settling Party's Project Coordinator must have sufficient technical expertise to coordinate the Work. Settling Party's Project Coordinator

10

may not be an attorney representing any Settling Party in this matter and may not act as the Supervising Contractor. To the greatest extent possible, the Project Coordinator or a designated representative shall be present on site or readily available during Operable Unit 2 Work. EPA retains the right to disapprove of the designated Project Coordinator. If EPA disapproves of the designated Project Coordinator, Settling Party shall retain a different Project Coordinator and shall notify EPA of that person's name, address, telephone number and qualifications within 10 days following EPA's disapproval. Receipt by Settling Party's Project Coordinator of any notice or communication from EPA relating to this Settlement Agreement shall constitute receipt by Settling Party.

48. EPA has designated Alice Yeh of the Emergency and Remedial Response Division, Region 2 as its Project Coordinator. EPA will notify Settling Party of a change of its designated Project Coordinator. Except as otherwise provided in this Settlement Agreement, Settling Party shall send all submissions required by this Settlement Agreement to the Project Coordinator at:

ATTN: Site Remedial Project Manager

Emergency and Remedial Response Division
U.S. Environmental Protection Agency, Region 2
290 Broadway
New York, New York 10007-1866

49. EPA's Project Coordinator shall have the authority lawfully vested in a Remedial Project Manager ("RPM") and On-Scene Coordinator ("OSC") by the NCP. In addition, EPA's Project Coordinator shall have the authority consistent with the NCP, to halt any Work required by this Settlement Agreement, and to take or direct any other necessary response action when the EPA Project Coordinator determines that conditions at the Site may present an immediate endangerment to public health or welfare or the environment. The absence of the EPA Project Coordinator from the site area shall not be cause for the stoppage or delay of Work. EPA may designate other representatives, which may include its employees, contractors and/or consultants, to oversee the Work as an Alternate Project Coordinator.

50. EPA and Settling Party shall have the right, subject to Paragraph 47, to change their respective designated Project Coordinators. Settling Party shall notify EPA 10 days before such a change is made. The initial notification may be made orally, but shall be promptly followed by a written notice.

11

ALCD-PUBCOM_0001272

## VIII. WORK TO BE PERFORMED

51.     **Performance of Work in Accordance with SOW.** Settling Party shall perform all actions necessary to implement the Statement of Work. Settling Party shall: (a) develop the RD; and (b) support EPA's periodic review efforts; all in accordance with the SOW and all EPA-approved, conditionally-approved, or modified deliverables as required by the SOW. All deliverables required to be submitted for approval under the Settlement Agreement or SOW shall be subject to approval by EPA in accordance with Paragraph 5.6 (Approval of Deliverables) of the SOW.

52.     **Emergencies and Releases.** Settling Party shall comply with the emergency and release response and reporting requirements under Paragraph 4.1 (Emergency Response and Reporting) of the SOW. Subject to Section XVII (Covenants by EPA), nothing in this Settlement Agreement, including Section 4.1 of the SOW, limits any authority of EPA: (a) to take all appropriate action to protect human health and the environment or to prevent, abate, respond to, or minimize an actual or threatened release of Waste Material on, at, or from the Site, or (b) to direct or order such action, or seek a judicial order, to protect human health and the environment or to prevent, abate, respond to, or minimize an actual or threatened release of Waste Material on, at, or from the Site. If, due to Settling Parties failure to take appropriate response action under Section 4.1 of the SOW, EPA takes such action instead, Settling Parties shall reimburse EPA under Section XIII (Payment of Response Costs) for all costs of the response action

53.     **Community Involvement.** If requested by EPA, Settling Party shall conduct community involvement activities under EPA's oversight as provided for in, and in accordance with, Section 2 (Community Involvement) of the SOW. Such activities may include, but are not limited to, designation of a Community Coordinator.

## IX. SITE ACCESS

54.     Where any action under this Settlement Agreement is to be performed in areas owned by, or in possession of, someone other than Settling Party, Settling Party shall use its best efforts to obtain all necessary access agreements within 60 days after the Effective Date, or no fewer than 120 days before access to such parcel is needed pursuant to the SOW, whichever is later, or as otherwise specified in writing by the Project Coordinator. If additional areas to which access is necessary are identified after the Effective Date, Settling Party shall use its best efforts to obtain access agreements within 60 days after learning of the need for additional access. Settling Party shall immediately notify EPA if, after using its best efforts, it is unable to obtain such agreements. For purposes of this Paragraph, "best efforts" includes the payment of reasonable sums of money in consideration of access. Settling Party shall describe in writing its efforts to obtain access. EPA may then assist Settling Party in gaining access, to the extent necessary to effectuate the response actions described herein, using such means as EPA deems appropriate. Settling Party shall reimburse EPA for all costs and attorney's fees incurred by the United States in obtaining such access, in accordance with the procedures in Section XIII (Payment of Response Costs).

12

55.  Notwithstanding any provision of this Settlement Agreement, EPA retains all of its access authorities and rights, including enforcement authorities related thereto, under CERCLA, RCRA, and any other applicable statutes or regulations.

56.  If Settling Party cannot obtain access agreements, EPA may obtain access for Settling Party, perform those tasks or activities with EPA's contractors, or terminate the Settlement Agreement. If EPA performs those tasks or activities with EPA contractors and does not terminate the Settlement Agreement, Settling Party shall perform all other activities not requiring access to that site and shall reimburse EPA for all costs incurred in performing such activities. Settling Party shall integrate the results of any such tasks undertaken by EPA into its reports and deliverables.

## X. ACCESS TO INFORMATION

57.  Settling Party shall provide to EPA and the State, upon request, copies of all documents and information within its possession or control or that of its contractors or agents relating to activities for OU2 for the Site or to the implementation of this Settlement Agreement, including, but not limited to, sampling, analysis, data bases, chain of custody records, manifests, trucking logs, receipts, reports, sample traffic routing, correspondence, or other documents or information related to the Work. Settling Party shall also make available to EPA and the State, for purposes of investigation, information gathering or testimony, its employees, agents or representatives with knowledge of relevant facts concerning the performance of the Work.

58.  Settling Party may assert business confidentiality claims covering part or all of the documents or information submitted to EPA under this Settlement Agreement to the extent permitted by and in accordance with Section 104(e)(7) of CERCLA, 42 U.S.C. § 9604(e)(7), and 40 C.F.R. § 2.203(b). Documents or information determined to be confidential by EPA will be afforded the protection specified in 40 C.F.R. Part 2, Subpart B. If no claim of confidentiality accompanies documents or information when it is submitted to EPA, or if EPA has notified Settling Party that the documents or information are not confidential under the standards of Section 104(e)(7) of CERCLA or 40 C.F.R. Part 2, Subpart B, the public may be given access to such documents or information without further notice to Settling Party. Settling Party shall segregate and clearly identify all documents or information submitted under this Settlement Agreement for which Settling Party asserts business confidentiality claims.

59.  Settling Party may assert that certain documents, records, and other information are privileged under the attorney-client privilege or any other privilege recognized by federal law or are protected as attorney work product. If the Settling Party asserts such a privilege or protection in lieu of providing documents, it shall provide EPA and the State with the following: a) the title of the document, record, or information; b) the date of the document, record, or information; c) the name and title of the author of the document, record, or information; d) the name and title of each addressee and recipient; e) a description of the contents of the document, record, or information; and f) the privilege or attorney work product protection asserted by Settling Party.

13

ALCD-PUBCOM_0001274

However, no documents, reports or other information created or generated pursuant to the requirements of this Settlement Agreement shall be withheld on the grounds that they are privileged.

60.  No claim of confidentiality shall be made with respect to any data, including, but not limited to, all sampling, analytical, monitoring, hydrogeologic, scientific, chemical, or engineering data, or any other documents or information evidencing conditions at, or around, OU2 for the Site.

## XI. RECORD RETENTION

61.  During the pendency of this Settlement Agreement and until 10 years after the Settling Party's receipt of EPA's notification that work has been completed, Settling Party shall preserve and retain all non-identical copies of documents, records, and other information (including documents, records, or other information in electronic form) now in its possession or control or which come into its possession or control that relate in any manner to the performance of the Work or the liability of any person under CERCLA with respect to OU2 for the Site, regardless of any corporate retention policy to the contrary. Until 10 years after notification that work has been completed, Settling Party shall also instruct its contractors and agents to preserve all documents, records, and other information of whatever kind, nature, or description relating to performance of the Work.

62.  At the conclusion of this document retention period, Settling Party shall notify EPA and the State at least 90 days prior to the destruction of any such documents, records, or other information and, upon request by EPA or the State, Settling Party shall deliver any such documents, records, or other information to EPA or the State. Settling Party may assert that certain documents, records, and other information are privileged under the attorney-client privilege or any other privilege recognized by federal law or are protected as attorney work product. If Settling Party asserts such a privilege or protection, it shall provide EPA with the following: a) the title of the document, record, or other information; b) the date of the document, record, or other information; c) the name and title of the author of the document, record, or other information; d) the name and title of each addressee and recipient; e) a description of the subject of the document, record, or other information; and f) the privilege or attorney work product protection asserted by Settling Party. However, no documents, records, or other information created or generated pursuant to the requirements of this Settlement Agreement shall be withheld on the grounds that they are privileged or protected.

63.  Settling Party hereby certifies that to the best of its knowledge and belief, after thorough inquiry, it has not altered, mutilated, discarded, destroyed, or otherwise disposed of any records, documents, or other information (other than identical copies) relating to its potential liability regarding OU2 for the Site since notification of potential liability by EPA or the State or the filing of suit against it regarding OU2 for the Site, and that it has fully complied with any and all EPA requests for information pursuant to Sections 104(e) and 122(e) of CERCLA, 42 U.S.C. §§ 9604(e) and 9622(e), and Section 3007 of RCRA, 42 U.S.C. § 6927.

14

## XII. COMPLIANCE WITH OTHER LAWS

64. Settling Party shall undertake all action that this Settlement Agreement requires in accordance with the requirements of all applicable local, state, and federal laws and regulations, unless an exemption from such requirements is specifically provided by law or in this Settlement Agreement. The activities conducted pursuant to this Settlement Agreement, if approved by EPA, shall be considered consistent with the NCP.

65. As provided in Section 121(e) of CERCLA, 42 U.S.C. § 9621(e), and Section 300.400(e) of the NCP, no permit shall be required for any portion of the Work conducted entirely on-site (i.e., within the areal extent of contamination or in very close proximity to the contamination and necessary for implementation of the Work). Where any portion of the Work that is not on-site requires a federal or state permit or approval, Settling Party shall submit timely and complete applications and take all other actions necessary to obtain and to comply with all such permits or approvals.

66. This Settlement Agreement is not, and shall not be construed to be, a permit issued pursuant to any federal or state statute or regulation.

## XIII. PAYMENT OF RESPONSE COSTS

67. Payment for Future Response Costs:

    a. Settling Party shall pay EPA all Future Response Costs not inconsistent with the NCP, based solely on information contained in an EPA SCORPIOS Report. On a periodic basis, EPA will send Settling Party a bill requiring payment that includes a SCORPIOS Report. Settling Party shall make all payments within 30 days of receipt of each such bill requiring payment, except as otherwise provided in Paragraph 69.

    b. Settling Party shall make all payments required by this Paragraph by wire transfer directed to the Federal Reserve Bank of New York with the following information:

     i.   EFT to be directed to: Federal Reserve Bank of New York
     ii.  Bank Routing Number for Federal Reserve Bank of New York: 021030004
     iii. Federal Reserve Bank of New York account number receiving payment: 68010727
     iv. SWIFT address: FRNYUS33
     v.  Address: Federal Reserve Bank of New York
          33 Liberty Street
          New York, NY 10045
     vi. Field Tag 4200 of the Fedwire message to read:
          D68010727 Environmental Protection Agency
     vii. Case Number: CERCLA-02-2016-2021
     viii. Amount of payment:

ALCD-PUBCOM_0001276

ix.   Name of Remitter:
x.    Site/Spill identifier: 02-96

c.  At the time of payment, Settling Party shall send notice that payment has been made which references the name and address of the party making payment, the date of the transfer, the payment amount, the name of the Site, the Docket Number CERCLA 02-2016-2021and Site/Spill ID number 02-96, to:

Alice Yeh
Project Coordinator
Emergency and Remedial Response Division
U.S. Environmental Protection Agency, Region 2
290 Broadway
New York, NY 10007

Re:  Diamond Alkali Superfund Site

And to:

Juan M. Fajardo
Assistant Regional Counsel
Office of Regional Counsel
U.S. Environmental Protection Agency, Region 2
290 Broadway, 17th Floor
New York, NY 10007

Re:  Diamond Alkali Superfund Site

U.S. Environmental Protection Agency
Cincinnati Finance Office
26 Martin Luther King Drive
Cincinnati, Ohio 45268
Attn: Finance (Elizabeth McGuffey)
Email: cinwd_acctsreceivable@epa.gov and mcguffey.elizabeth@epa.gov

d.  The total amount that Settling Party shall pay pursuant to Paragraph 67 shall be deposited in the Diamond Alkali Superfund Site Special Account within EPA Hazardous Substance Superfund to be retained and used to conduct or finance response actions at or in connection with the Site, or to be transferred by EPA to the EPA Hazardous Substance Superfund.

68.  In the event that the payments for Future Response Costs are not made within 30 days of Settling Party's receipt of a bill, Settling Party shall pay Interest on the unpaid balance.

16

The Interest on Future Response Costs shall begin to accrue on the date of the bill and shall continue to accrue until the date of payment. Payments of Interest made under this Paragraph shall be in addition to such other remedies or sanctions available to the United States by virtue of Settling Party's failure to make timely payments under this Section, including but not limited to, payment of stipulated penalties pursuant to Section XVI.

69. Settling Party may contest payment of any Future Response Costs billed under Paragraph 67, if it determines that EPA has made a mathematical error or included a cost item that is not within the definition of Future Response Costs, or if it believes EPA incurred excess costs as a direct result of an action by EPA that was inconsistent with the NCP. Such objection shall be made in writing within 30 days of receipt of the bill and must be sent to EPA Project Coordinator. Any such objection shall specifically identify the contested Future Response Costs and the basis for objection. In the event of an objection, Settling Party shall within the 30-day period pay all uncontested Future Response Costs to EPA in the manner described in Paragraph 67. Simultaneously, Settling Party shall establish an interest-bearing escrow account in a federally-insured bank duly chartered in the State of New Jersey and remit to that escrow account funds equivalent to the amount of the contested Future Response Costs. Settling Party shall send to EPA Project Manager a copy of the transmittal letter and check paying the uncontested Future Response Costs, and a copy of the correspondence that establishes and funds the escrow account, including, but not limited to, information containing the identity of the bank and bank account under which the escrow account is established as well as a bank statement showing the initial balance of the escrow account. Simultaneously with establishment of the escrow account, Settling Party shall initiate the Dispute Resolution procedures in Section XIV (Dispute Resolution). If EPA prevails in the dispute, within 5 days of the resolution of the dispute, Settling Party shall pay the sums due (with accrued interest) to EPA in the manner described in Paragraph 67. If Settling Party prevails concerning any aspect of the contested costs, Settling Party shall pay that portion of the costs (plus associated accrued interest) for which it did not prevail to EPA in the manner described in Paragraph 67. Settling Party shall be disbursed any balance of the escrow account. The dispute resolution procedures set forth in this Paragraph in conjunction with the procedures set forth in Section XIV (Dispute Resolution) shall be the exclusive mechanisms for resolving disputes regarding Settling Party's obligation to reimburse EPA for its Future Response Costs.

## XIV. DISPUTE RESOLUTION

70. Unless this Settlement Agreement expressly provides otherwise, the dispute resolution procedures of this Section shall be the exclusive mechanism for resolving disputes arising under this Settlement Agreement. The Parties shall attempt to resolve any disagreements concerning this Settlement Agreement expeditiously and informally.

71. If Settling Party objects to any EPA action taken pursuant to this Settlement Agreement, including billings for Future Response Costs, it shall notify EPA in writing of its

17

objection(s) expeditiously and in no event more than 15 days of such action, unless the objection(s) has/have been resolved informally. EPA and Settling Party shall have 30 days from EPA's receipt of Settling Party's written objection(s) to resolve the dispute through formal negotiations (the "Negotiation Period"). The Negotiation Period may be extended at the sole discretion of EPA.

72. Any agreement reached by the Parties pursuant to this Section shall be in writing and shall, upon signature by both Parties, be incorporated into and become an enforceable part of this Settlement Agreement. If the Parties are unable to reach an agreement within the Negotiation Period, the Director of the Emergency and Remedial Response Division, Region 2, will issue a written decision on the dispute to Settling Party. EPA's decision shall be incorporated into and become an enforceable part of this Settlement Agreement. Following resolution of the dispute, as provided by this Section, Settling Party shall fulfill the requirement that was the subject of the dispute in accordance with the agreement reached or with EPA's decision, whichever occurs.

73. If the dispute and its resolution, as described above cause a delay that makes it impossible for Settling Party to meet a deadline set forth in or established pursuant to this Settlement Agreement for the disputed obligation, then that deadline shall be extended by EPA by a period of time not to exceed the delay resulting from the dispute and its resolution; provided that Settling Party shall not be entitled to any such extension if the Director, Emergency and Remedial Response Division, determines that Settling Party's disagreement with the comments or determinations specified above is not in good faith or otherwise lacks a reasonable basis. Notwithstanding any of the foregoing, if Settling Party requests an extension of a deadline set forth in or established pursuant to this Settlement Agreement, and if EPA declines to grant an extension in response to such a request, any delay caused solely by the resolution of such a dispute shall not entitle Settling Party to an extension of time.

74. The invocation of formal dispute resolution procedures under this Section shall not extend, postpone, or affect in any way any obligation of Settling Party under this Settlement Agreement not directly disputed by Settling Party. Except as provided in Paragraph 83, stipulated penalties with respect to the disputed matter shall continue to accrue but payment shall be stayed pending resolution of the dispute as provided in Paragraph 83. Notwithstanding the stay of payment, stipulated penalties shall accrue from the first day of noncompliance with any applicable provision of this Settlement Agreement. In the event that Settling Party does not prevail on the disputed issue, stipulated penalties shall be assessed and paid as provided in Section XVI (Stipulated Penalties).

18

## XV. FORCE MAJEURE

75.  Settling Party agrees to perform all requirements of this Settlement Agreement within the time limits established under this Settlement Agreement, unless the performance is delayed by a *force majeure*. For purposes of this Settlement Agreement, a *force majeure* is defined as any event arising from causes beyond the control of Settling Party, or of any entity controlled by Settling Party, or of Settling Party's contractors that delays or prevents performance of any obligation under this Settlement Agreement despite Settling Party's best efforts to fulfill the obligation. The requirement that Settling Party exercise "best efforts to fulfill the obligation" includes using best efforts to address the effects of any potential *force majeure* event: (a) as it is occurring; and (b) following the potential *force majeure* event such that the delay and any adverse effect of the delay are minimized to the greatest extent possible. *Force majeure* does not include financial inability to complete the Work, or increased cost of performance.

76.  If any event occurs or has occurred that may delay the performance of any obligation under this Settlement Agreement for which Settling Party intends or may intend to assert a claim of *force majeure*,  Settling Party shall notify the EPA Project Coordinator orally or, in his or her absence, EPA's Alternate Project Coordinator or, in the event both of EPA's designated representatives are unavailable, the Director of the Emergency and Remedial Response Division, Region 2, within 24 hours of when Settling Party first knew that the event might cause a delay. Within 14 days thereafter, Settling Party shall provide to EPA in writing: an explanation and description of the reasons for the delay; the anticipated duration of the delay; all actions taken or to be taken to prevent or minimize the delay; a schedule for implementation of any measures to be taken to prevent or mitigate the delay or the effect of the delay; Settling Party's rationale for attributing such delay to a *force majeure* event ; and a statement as to whether, in the opinion of Settling Party, such event may cause or contribute to an endangerment to public health, welfare, or the environment. Settling Party shall include with any notice all available documentation supporting its claim that the delay was attributable to a *force majeure*. Settling Party shall be deemed to know of any circumstance of which Settling Party, any entity controlled by Settling Party, or Settling Party's contractors knew or should have known. Failure to comply with the above requirements regarding an event shall preclude Settling Party from asserting any claim of *force majeure* regarding that event.

77.  If EPA agrees that the delay or anticipated delay is attributable to a *force majeure* event, the time for performance of the obligations under this Settlement Agreement that are affected by the *force majeure* event will be extended by EPA for such time as is necessary to complete those obligations. An extension of the time for performance of the obligations affected by the *force majeure* event shall not, of itself, extend the time for performance of any other obligation. If EPA does not agree that the delay or anticipated delay has been or will be caused by a *force majeure* event, EPA will notify Settling Party in writing of its decision. If EPA agrees that the delay is attributable to a *force majeure* event, EPA will notify Settling Party in writing of the length of the extension, if any, for performance of the obligations affected by the *force majeure* event.

19

78.  If Settling Party elects to invoke the dispute resolution procedures set forth in Section XIV (Dispute Resolution), it shall do so no later than 10 days after receipt of EPA's notice under Paragraph 77. In any such proceeding, Settling Party shall have the burden of demonstrating by a preponderance of the evidence that the delay or anticipated delay has been or will be caused by a *force majeure event*, that the duration of the delay or the extension sought was or will be warranted under the circumstances, that best efforts were exercised to avoid and mitigate the effects of the delay, and that Settling Party complied with the requirements of Paragraphs 75 and 76. If Settling Party carries this burden, the delay at issue shall be deemed not to be a violation by Settling Party of the affected obligation of this Settlement Agreement identified to EPA.

## XVI. STIPULATED PENALTIES

79.  Settling Party shall be liable to EPA for stipulated penalties in the amounts set forth in Paragraphs 80 and 81 for failure to comply with the obligations specified in Paragraphs 80 and 81, unless excused under Section XV (*Force Majeure*). "Compliance" by Settling Party shall include completion of all obligations under this Settlement Agreement in accordance with all applicable requirements of this Settlement Agreement and within the specified time schedules established under this Settlement Agreement.

80.  Stipulated Penalty Amounts.

a.  The following stipulated penalties shall accrue per violation per day for failure to submit timely or adequate deliverable listed in Subparagraph 80.b (1)-(10), or timely comply with Subparagraph 80.b (11)-(12).

| Penalty Per Violation (Per Day) | Period of Noncompliance (Days) |
|---|---|
| $ 3,000 | 1-14 |
| $ 5,000 | 15-30 |
| $ 12,000 | 31 and beyond |

b. Compliance Milestones

| | |
|---|---|
| 1. | Project Management Plan; |
| 2. | Pre-Design Investigation Work Plan; |
| 3. | Pre-Design Investigation Evaluation Report; |
| 4. | Remedial Design Work Plan; |
| 5. | Site Selection and Evaluation Work Plan; |
| 6. | Site Selection and Evaluation Report; |
| 7. | Preliminary Remedial Design; |
| 8. | Intermediate Remedial Design; |
| 9. | Pre-Final Remedial Design; |
| 10. | Final Remedial Design; |

20

11.    Payment of Future Response Costs; and
12.    Establishment and maintenance of financial assurance in compliance with the timelines and other substantive and procedural requirements of Section XXIV (Financial Assurance).

81. <u>Stipulated Penalty Amounts</u>.

The following stipulated penalties shall accrue per violation per day for any noncompliance with a requirement of this Settlement Agreement not identified in Paragraph 80, including failure to submit other timely or adequate reports or deliverables.

| Penalty Per Violation (Per Day) | Period of Noncompliance (Days) |
| --- | --- |
| $ 3,000 | 1-14 |
| $ 5,000 | 15-30 |
| $ 10,000 | 31 and beyond |

82. In the event that EPA assumes performance of all or any portion of the Work pursuant to Paragraph 92 (Work Takeover), Settling Party shall be liable for (i) a stipulated penalty in the amount of $5,000,000, and (ii) a non-penalty prepayment of Future Response Costs in the amount of $15,000,000. Stipulated Penalties and prepayment of Future Response Costs under this Paragraph are in addition to the funding available to EPA under Paragraph 116 (Funding for Work Takeover) and Paragraph 92 (Work Takeover). Prepayment of Future Response Costs under this Paragraph shall be payable by Settling Party immediately upon receipt by Settling Party of EPA's written notice ("Work Takeover Notice") pursuant to Paragraph 92. The prepayment of Future Response Costs made under this Paragraph shall be made in accordance with Paragraph 67 (Payment of Future Response Costs) and shall be deposited in the Diamond Alkali Superfund Site Special Account within EPA Hazardous Substance Superfund.

83. All penalties shall begin to accrue on the day after the complete performance is due, or the day a violation occurs, and shall continue to accrue through the final day of the correction of the noncompliance or completion of the activity. However, stipulated penalties shall not accrue: a) with respect to a deficient submission under Section 5.6 of the SOW (Approval of Deliverables), during the period, if any, beginning on the 31st day after EPA's receipt of such submission until the date that EPA notifies Settling Party of any deficiency; and b) with respect to a decision by the Director of the Emergency and Remedial Response Division, Region 2, under Paragraph 72 of Section XIV (Dispute Resolution), during the period, if any, beginning on the 21st day after the Negotiation Period begins until the date that EPA management official issues a final decision regarding such dispute. Nothing herein shall prevent the simultaneous accrual of separate penalties for separate violations of this Settlement Agreement.

84. Following EPA's determination that Settling Party has failed to comply with a requirement of this Settlement Agreement, EPA may give Settling Party written notification of

21

the failure and describe the noncompliance. EPA may send Settling Party a written demand for payment of the penalties. However, penalties shall accrue as provided in the preceding Paragraph regardless of whether EPA has notified Settling Party of a violation.

85. Settling Party shall pay EPA all penalties accruing under this Section within 30 days of Settling Party's receipt from EPA of a demand for payment of the penalties, unless Settling Party invokes the dispute resolution procedures under Section XIV (Dispute Resolution). All stipulated penalties paid to EPA under this Section shall indicate that the payment is for stipulated penalties and shall be made in accordance with Paragraph 67 (Payment for Future Response Costs).

86. The payment of penalties and Interest, if any, shall not alter in any way Settling Party's obligation to complete performance of the Work required under this Settlement Agreement.

87. Penalties shall continue to accrue during any dispute resolution period but need not be paid until 15 days after the dispute is resolved by agreement or by receipt of EPA's decision.

88. If Settling Party fails to pay stipulated penalties when due, EPA may institute proceedings to collect the penalties, as well as Interest. Settling Party shall pay Interest on the unpaid balance, which shall begin to accrue on the date of demand made pursuant to Paragraph 85. Nothing in this Settlement Agreement shall be construed as prohibiting, altering, or in any way limiting the ability of EPA to seek any other remedies or sanctions available by virtue of Settling Party's violation of this Settlement Agreement or of the statutes and regulations upon which it is based, including, but not limited to, penalties pursuant to Sections 106(b) and 122(l) of CERCLA, 42 U.S.C. §§ 9606(b) and 9622(l), and punitive damages pursuant to Section 107(c)(3) of CERCLA, 42 U.S.C. § 9607(c)(3). Provided, however, that EPA shall not seek civil penalties pursuant to Section 106(b) or 122(l) of CERCLA or punitive damages pursuant to Section 107(c)(3) of CERCLA for any violation for which a stipulated penalty is provided herein, except in the case of a willful violation of this Settlement Agreement, or in the event that EPA assumes performance of a portion or all of the Work pursuant to Section XVIII (Reservation of Rights by EPA), Paragraph 92. Notwithstanding any other provision of this Section, EPA may, in its unreviewable discretion, waive any portion of stipulated penalties that have accrued pursuant to this Settlement Agreement.

## XVII. COVENANTS BY EPA

89. In consideration of the actions that Settling Party will perform and the payments that Settling Party will make under the terms of this Settlement Agreement, and except as otherwise specifically provided in this Settlement Agreement, EPA covenants not to sue or to take administrative action against Settling Party pursuant to Sections 106 and 107(a) of CERCLA, 42 U.S.C. §§ 9606 and 9607(a), for the Work performed under this Settlement Agreement and for recovery of Future Response Costs. These covenants shall take effect upon the Effective Date. These covenants are conditioned upon Settling Party's complete and satisfactory performance of

22

its obligations under this Settlement Agreement, including, but not limited to, Settling Party's payments of Future Response Costs pursuant to Section XIII (Payment of Response Costs) of this Settlement Agreement. These covenants extend only to Settling Party and do not extend to any other person.

## XVIII. RESERVATION OF RIGHTS BY EPA

90. Except as specifically provided in this Settlement Agreement, nothing herein shall limit the power and authority of EPA or the United States to take, direct, or order all actions necessary to protect public health, welfare, or the environment or to prevent, abate, or minimize an actual or threatened release of hazardous substances, pollutants or contaminants, or hazardous or solid waste on, at, or from the Site. Further, except as specifically provided in this Settlement Agreement, nothing herein shall prevent EPA from seeking legal or equitable relief to enforce the terms of this Settlement Agreement, from taking other legal or equitable action as it deems appropriate and necessary, or from requiring Settling Party in the future to perform additional activities pursuant to CERCLA or any other applicable law.

91. The covenant not to sue set forth in Section XVII (Covenants by EPA) above does not pertain to any matters other than those expressly identified therein. EPA reserves, and this Settlement Agreement is without prejudice to, all rights against Settling Party with respect to all other matters, including, but not limited to:

    a. claims based on a failure by Settling Party to meet a requirement of this Settlement Agreement;

    b. liability for costs not included within the definitions of Future Response Costs;

    c. liability for performance of response action other than the Work;

    d. criminal liability;

    e. liability for violations of federal or state law that occur during or after implementation of the Work;

    f. liability for damages for injury to, destruction of, or loss of natural resources, and for the costs of any natural resource damage assessments;

    g. liability arising from the past, present, or future disposal, release, or threat of release of Waste Materials outside of OU2 for the Site; and

    h. liability for costs incurred, or to be incurred, by the Agency for Toxic Substances and Disease Registry related to the Site.

23

92. <u>Work Takeover</u>. In the event EPA determines that Settling Party has ceased implementation of any portion of the Work, is seriously or repeatedly deficient or late in its performance of the Work, or is implementing the Work in a manner that may cause an endangerment to human health or the environment, EPA may issue a written notice ("Work Takeover Notice") to Settling Party and assume the performance of all or any portion(s) of the Work as EPA deems necessary ("Work Takeover"). Any Work Takeover Notice issued by EPA will specify the grounds upon which such notice was issued and will provide Settling Party a period of 10 days within which to remedy the circumstances giving rise to EPA's issuance of such notice. Settling Party may invoke the procedures set forth in Section XIV (Dispute Resolution) to dispute EPA's determination that takeover of the Work is warranted under this Paragraph. However, notwithstanding Settling Party's invocation of such dispute resolution procedures, and during the pendency of any such dispute, EPA may in its sole discretion commence and continue a Work Takeover until the earlier of the date that Settling Party remedies, to EPA's satisfaction, the circumstances giving rise to EPA's issuance of the relevant Work Takeover Notice, or the date that a written decision terminating such Work Takeover is rendered in accordance with Section XIV (Dispute Resolution). Funding of Work Takeover costs is addressed under Paragraph 116. Notwithstanding any other provision of this Settlement Agreement, EPA retains all authority and reserves all rights to take any and all response actions authorized by law.

## XIX. COVENANTS BY SETTLING PARTY

93. Settling Party covenants not to sue and agrees not to assert any claims or causes of action against the United States, or its contractors or employees, with respect to the Work, past response actions, Future Response Costs, or this Settlement Agreement, including, but not limited to:

a. any direct or indirect claim for reimbursement from the Hazardous Substance Superfund established by 26 U.S.C. § 9507, based on Sections 106(b)(2), 107, 111, 112, or 113 Superfund established by 26 U.S.C. § 9507, based on Sections 106(b)(2), 107, 111, 112, or 113 of CERCLA, 42 U.S.C. §§ 9606(b)(2), 9607, 9611, 9612, or 9613, or any other provision of law;

b. any claim arising out of response actions at, or in connection with, the Site, including any claim under the United States Constitution, the New Jersey Constitution, the Tucker Act, 28 U.S.C. § 1491, the Equal Access to Justice Act, 28 U.S.C. § 2412, as amended, or at common law; or

c. any claim against the United States pursuant to Sections 107 and 113 of CERCLA, 42 U.S.C. §§ 9607 and 9613, relating to the Work or payment of Future Response Costs.

d. this Covenant Not to Sue by Settling Party shall not extend to, and Settling Party specifically reserves, any claims or causes of action in contribution pursuant to Sections 107 and 113 of CERCLA, 42 U.S.C. §§ 9607 and 9613, against the United States as a "covered

24

person" (within the meaning Section 107(a) of CERCLA, 42 U.S.C. § 9607(a)) with respect to this Settlement Agreement, based solely on actions by the United States other than the exercise of the government's authority under CERCLA or WRDA.

94. Except as expressly provided in Paragraphs 97 (Claims Against De Micromis Parties), and 99 (Claims Against *De Minimis* and Ability to Pay Parties), these covenants shall not apply in the event the United States brings a cause of action or issues an order pursuant to any of the reservations set forth in Section XVIII (Reservation of Rights by EPA), other than in Paragraph 91.a (claims for failure to meet a requirement of the Settlement Agreement) or 91.d (criminal liability), but only to the extent that Settling Party claims arise from the same response action, response costs, or damages that the United States is seeking pursuant to the applicable reservation.

95. Settling Party reserves, and this Settlement Agreement is without prejudice to, claims against the United States subject to the provisions of Chapter 171 of Title 28 of the United States Code, and brought pursuant to any statute other than CERCLA and for which the waiver of sovereign immunity is found in a statute other than CERCLA, for money damages for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any employee of the United States while acting within the scope of his office or employment under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred. However, any such claim shall not include a claim for any damages caused, in whole or in part, by the act or omission of any person, including any contractor, who is not a federal employee as that term is defined in 28 U.S.C. § 2671; nor shall any such claim include a claim based on EPA's selection of response actions, or the oversight or approval of Settling Party's plans or activities.

96. Nothing in this Settlement Agreement shall be deemed to constitute approval or preauthorization of a claim within the meaning of Section 111 of CERCLA, 42 U.S.C. § 9611, or 40 C.F.R. § 300.700(d).

97. Claims Against De Micromis Parties. Settling Party agrees not to assert any claims and to waive all claims or causes of action (including but not limited to claims or causes of action under Sections 107(a) or 113 of CERCLA) that they may have for all matters relating to OU2 for the Site against any person where the person's liability to Settling Party with respect to OU2 is based solely on having arranged for disposal or treatment, or for transport for disposal or treatment, of hazardous substances at the Site, if all or part of the disposal, treatment, or transport occurred before April 1, 2001, and the total amount of material containing hazardous substances contributed by such person to the Site was less than 110 gallons of liquid materials or 200 pounds of solid materials.

ALCD-PUBCOM_0001286

98. The waiver in Paragraph 97 shall not apply with respect to any defense, claim, or cause of action that Settling Party may have against any person meeting the above criteria, if such person asserts a claim or cause of action relating to OU2 for the Site against Settling Party. This waiver also shall not apply to any claim or cause of action against any person meeting the above criteria, if EPA determines:

a.    that such person failed to comply with any EPA request for information or administrative subpoenas issued pursuant to Section 104(e) or 122(e) of CERCLA, 42 U.S.C. §§ 9604(e) or 9622(e), or Section 3007 of RCRA, 42 U.S.C. § 6927, or has impeded or is impeding, through action or inaction, the performance of a response action or natural resource restoration with respect to OU2 for the Site, or has been convicted of a criminal violation for the conduct to which this waiver would apply and that conviction has not been vitiated on appeal or otherwise; or

b.    that the materials containing hazardous substances contributed to the Site by such person have contributed significantly, either individually or in aggregate, to the cost of response action or natural resource restoration with respect to OU2 for the Site.

99. Claims Against *De Minimis* and Ability to Pay Parties. Settling Party agrees not to assert any claims and to waive all claims or causes of action (including but not limited to claims or causes of action under Sections 107(a) or 113 of CERCLA) that they may have for response costs relating to OU2 of the Site against any person that has entered, or in the future enters, into a final Section 122(g) *de minimis* settlement, or a final settlement based on ability to pay, with EPA with respect to OU2 for the Site. This waiver shall not apply with respect to any defense, claim, or cause of action that Settling Party may have against any person if such person asserts a claim or cause of action relating to OU2 for the Site against Settling Party.

## XX. OTHER CLAIMS

100. By issuance of this Settlement Agreement, the United States and EPA assume no liability for injuries or damages to persons or property resulting from any acts or omissions of Settling Party. The United States or EPA shall not be deemed a party to any contract entered into by Settling Party or its directors, officers, employees, agents, successors, representatives, assigns, contractors, or consultants in carrying out actions pursuant to this Settlement Agreement.

101. Except as expressly provided in Paragraphs 97 (Claims Against De Micromis Parties), 99 (Claims Against *De Minimis* and Ability to Pay Parties), and Section XVII (Covenants by EPA), nothing in this Settlement Agreement constitutes a satisfaction of, or release from, any claim or cause of action against Settling Party or any person not a party to this Settlement Agreement, for any liability such person may have under CERCLA, other statutes, or common law, including, but not limited to, any claims of the United States for costs, damages, and interest under Sections 106 and 107 of CERCLA, 42 U.S.C. §§ 9606 and 9607.

26

102. No action or decision by EPA pursuant to this Settlement Agreement shall give rise to any right to judicial review, except as set forth in Section 113(h) of CERCLA, 42 U.S.C. § 9613(h).

## XXI EFFECT OF SETTLEMENT/CONTRIBUTION

103. Except as provided in Paragraphs 97 (Claims Against De Micromis Parties), and 99 (Claims Against *De Minimis* and Ability to Pay Parties), nothing in this Settlement Agreement shall be construed to create any rights in, or grant any cause of action to, any person not a Party to this Settlement Agreement. Except as provided in Section XVII (Covenants by Settling Party), each of the Parties expressly reserves any and all rights (including, but not limited to, claims pursuant to Section 113 of CERCLA, 42 U.S.C. § 9613), defenses, claims, demands, and causes of action which each Party may have with respect to any matter, transaction, or occurrence relating in any way to OU2 for the Site against any person not a Party hereto. Nothing in this Settlement Agreement diminishes the right of the United States, pursuant to Section 113(f)(2) and (3) of CERCLA, 42 U.S.C. § 9613(f)(2) and (3), to pursue any such persons to obtain additional response costs or response action and to enter into settlements that give rise to contribution protection pursuant to Section 113(f)(2).

104. The Parties agree that this Settlement Agreement constitutes an administrative settlement pursuant to which Settling Party has, as of the Effective Date, resolved liability to the United States within the meaning of Section 113(f)(2) and 122(h)(4) of CERCLA, 42 U.S.C. § 9613(f)(2) and 9622(h)(4), and is entitled, as of the Effective Date, to protection from contribution actions or claims as provided by Sections 113(f)(2) and 122(h)(4) of CERCLA, 42 U.S.C. §§ 9613(f)(2) and 9622(h)(4), or as may be otherwise provided by law, for "matters addressed" in this Settlement Agreement. The "matters addressed" in this Settlement Agreement are the Work, and Future Response Costs.

105. The Parties further agree that this Settlement Agreement constitutes an administrative settlement pursuant to which Settling Party has, as of the Effective Date, resolved liability to the United States within the meaning of Section 113(f)(e)(B) of CERCLA, 42 U.S.C. § 9613(f)(3)(B).

106. Settling Party shall, with respect to any suit or claim brought by it for matters related to this Settlement Agreement, notify EPA in writing no later than 60 days prior to the initiation of such suit or claim. Settling Party also shall, with respect to any suit or claim brought against it for matters related to this Settlement Agreement, notify EPA in writing within 10 days after service of the complaint or claim upon it. In addition, Settling Party shall notify EPA within 10 days after service or receipt of any Motion for Summary Judgment and within 10 days after receipt of any order from a court setting a case for trial, for matters related to this Settlement Agreement.

27

107. In any subsequent administrative or judicial proceeding initiated by EPA, or by the United States on behalf of EPA, for injunctive relief, recovery of response costs, or other relief relating to the Site, Settling Party shall not assert, and may not maintain, any defense or claim based upon the principles of waiver, res judicata, collateral estoppel, issue preclusion, claim-splitting, or other defenses based upon any contention that the claims raised in the subsequent proceeding were or should have been brought in the instant case; provided, however, that nothing in this Paragraph affects the enforceability of the covenant by EPA set forth in Section XVII (Covenants by EPA).

## XXII. INDEMNIFICATION

108. Settling Party shall indemnify, save, and hold harmless the United States, its officials, agents, contractors, subcontractors, employees, and representatives from any and all claims or causes of action arising from, or on account of, negligent or other wrongful acts or omissions of Settling Party, its officers, directors, employees, agents, contractors, or subcontractors, in carrying out actions pursuant to this Settlement Agreement. In addition, Settling Party agrees to pay the United States all costs incurred by the United States, including, but not limited to, attorney fees and other expenses of litigation and settlement, arising from, or on account of, claims made against the United States based on negligent or other wrongful acts or omissions of Settling Party, its officers, directors, employees, agents, contractors, subcontractors, and any persons acting on its behalf or under its control, in carrying out activities pursuant to this Settlement Agreement. The United States shall not be held out as a party to any contract entered into, by, or on behalf of Settling Party in carrying out activities pursuant to this Settlement Agreement. Neither Settling Party nor any such contractor shall be considered an agent of the United States.

109. The United States shall give Settling Party notice of any claim for which the United States plans to seek indemnification pursuant to this Section and shall consult with Settling Party prior to settling such claim.

110. Settling Party waives all claims against the United States for damages or reimbursement or for set-off of any payments made, or to be made, to the United States, arising from, or on account of, any contract, agreement, or arrangement between Settling Party and any person for performance of Work on, or relating to, OU2 for the Site, including, but not limited to, claims on account of construction delays. In addition, Settling Party shall indemnify and hold harmless the United States with respect to any and all claims for damages or reimbursement arising from, or on account of, any contract, agreement, or arrangement between Settling Party and any person for performance of Work on, or relating to, the Site.

## XXIII. INSURANCE

111. At least 14 days prior to commencing any on-Site Work under this Settlement Agreement, Settling Party shall secure and shall maintain for the duration of this Settlement Agreement commercial general liability insurance with limits of 10 million dollars, for any one

28

occurrence, and automobile insurance with limits of 5 million dollars, combined single limit, naming EPA as an additional insured with respect to all liability arising out of activities performed by or on behalf of Settling Party pursuant to this Settlement Agreement. Within the same period, Settling Party shall provide EPA with certificates of such insurance and a copy of each insurance policy. Settling Party shall submit such certificates and copies of policies each year on the anniversary of the Effective Date. In addition, for the duration of this Settlement Agreement, Settling Party shall satisfy, or shall ensure that its contractors or subcontractors satisfy, all applicable laws and regulations regarding the provision of worker's compensation insurance for all persons performing the Work on behalf of Settling Party in furtherance of this Settlement Agreement. If Settling Party demonstrates by evidence satisfactory to EPA that any contractor or subcontractor maintains insurance equivalent to that described above, or insurance covering some or all of the same risks but in an equal or lesser amount, then Settling Party needs to provide only that portion of the insurance described above that is not maintained by such contractor or subcontractor.

## XXIV. FINANCIAL ASSURANCE

112.  In order to ensure completion of the Work, Settling Party shall establish, maintain, and submit to EPA financial assurance, initially in the amount of $41,250,000 (the "Financial Assurance Amount"), for the benefit of EPA. The financial assurance, which must be satisfactory in form and substance to EPA, shall be in the form of one or more of the following mechanisms (provided that, if Settling Party intends to use multiple mechanisms, such multiple mechanisms shall be limited to surety bonds, letter of credits, trust funds, and insurance policies):

> a.    a surety bond that provides EPA with acceptable rights as a beneficiary thereof unconditionally guaranteeing payment and/or performance of the Work;

> b.    an irrevocable letters of credit, payable to or at the direction of EPA, that is issued by an entity that has the authority to issue letters of credit and whose letter-of-credit operations are regulated and examined by a federal or state agency;

> c.    a trust fund established for the benefit of EPA that is administered by a trustee acceptable in all respects to EPA;

> d.    a policy of insurance issued that provides EPA with acceptable rights as a beneficiary thereof, is issued by an insurance carrier acceptable in all respects to EPA, and ensures the payment and/or performance of the Work;

> e.    a demonstration by Settling Party that Settling Party meets the financial test criteria of 40 C.F.R. § 264.143(f) with respect to the Financial Assurance Amount (plus the amount(s) of any other federal, state, or tribal environmental obligations financially assured through the use of a financial test or guarantee), provided that all other requirements of 40 C.F.R. § 264.143(f) and this Section are satisfied; and/or

29

       f.     a written guarantee to fund or perform the Work executed in favor of EPA provided by one of more of the following: (1) a direct or indirect parent company of Settling Party, or (2) a company that has a "substantial business relationship" (as defined in 40 C.F.R. § 264.141(h)) with Settling Party; provided, however, that any company providing such a guarantee must demonstrate to the satisfaction of EPA that it satisfies the financial test and reporting requirements for owners and operators set forth in subparagraph (1) through (8) of 40 C.F.R. § 264.143(f) and this Section with respect to the Financial Assurance Amount (plus the amount(s) of any other federal, state, or tribal environmental obligations financially assured through the use of a financial test or guarantee).

      113.  Settling Party has selected, and EPA has found satisfactory, as an initial financial assurance an irrevocable letters of credit prepared in accordance with Paragraph 112. Within 30 days after the Effective Date, or within 30 days after EPA's approval of the form and substance of Settling Party's financial assurance, whichever is later, Settling Party shall secure all executed and/or otherwise finalized mechanisms or other documents consistent with the EPA-approved form of financial assurance and shall submit such mechanisms and documents to:

        Chief, Resource Management/Cost Recovery Section
        Emergency and Remedial Response Division
        U.S. EPA Region 2
        290 Broadway 18th Floor
        New York, NY 10007-1866

      114.  If Settling Party provides or obtains financial assurance for completion of the Work by means of a demonstration or guarantee pursuant to Paragraph 112(e) or 112(f) of this Settlement Agreement, Settling Party and/or its guarantor shall also comply with the other relevant requirements of 40 C.F.R. § 264.143(f) relating to these mechanisms unless otherwise provided in this Settlement Agreement, and with the requirements of this Section, including but not limited to: (a) the initial submission of required financial reports and statements from the relevant entity's chief financial officer and independent certified public accountant to EPA no later than 30 days after the Effective Date; (b) the annual re-submission of such reports and statements within 90 days after the close of each such entity's fiscal year; and (c) the notification of EPA no later than 30 days after any such entity determines that it no longer satisfies the financial test requirements set forth 40 C.F.R. § 264.143(f)(1) and in any event within 90 days after the close of any fiscal year for which the year-end financial data show that such entity no longer satisfies such financial test requirements. Settling Party agrees that EPA may also, based on a belief that the relevant entity may no longer meet the financial test requirements of this Section, require reports of financial condition at any time from the relevant entity in addition to those specified in this Section. For purposes of the financial assurance mechanisms specified in this Section, references in 40 C.F.R. Part 264, Subpart H to: (1) the terms "current closure cost estimate," "current post-closure cost estimate," and "current plugging and abandonment cost estimate," shall also include the Financial Assurance Amount; (2) "the sum of current closure and post closure cost estimates and current plugging and abandonment cost estimates" shall mean

ALCD-PUBCOM_0001291

"the sum of all environmental obligations" (including obligations under CERCLA, RCRA, EPA's Underground Injection Control program, 40 C.F.R. Part 144, enacted as part of the Solid Waste Disposal Act, 42 U.S.C. §§ 6901 to 6992k, the Toxic Substances Control Act, 15 U.S.C. §§ 2601 to 2695d, and any other federal, state, or tribal environmental obligation) guaranteed by such company or for which such company is otherwise financially obligated in addition to the Financial Assurance Amount to be performed in accordance with this Settlement Agreement: (3) for purposes of this Paragraph, the terms "owner" and "operator" shall be deemed to refer to "Settling Party" ; and (4) the terms "facility" and "hazardous waste management facility" shall be deemed to include the Site.

115. Settling Party shall diligently monitor the adequacy of the financial assurance. In the event that EPA determines and so notifies Settling Party, or Settling Party becomes aware of information indicating, that financial assurance provided pursuant to this Section is inadequate or otherwise no longer satisfies the requirements set forth in this Section, whether due to an increase in the estimated costs of completing the Work or for any other reason, Settling Party shall notify EPA of the inadequacy within 30 days and, within 30 days after providing to or receiving from EPA such notice, shall obtain and submit to EPA for approval a proposal for a revised or alternate form of financial assurance that satisfies the requirements set forth in this Section. If EPA approves the proposal, Settling Party shall provide a revised or alternate financial assurance mechanism in compliance with and to the extent permitted by such written approval and shall submit all documents evidencing such change to EPA pursuant to the delivery instructions in Paragraph 113 within 30 days after receipt of EPA's written approval. In seeking approval for a revised or alternate form of financial assurance, Settling Party shall follow the procedures set forth in Paragraph 117. If EPA does not approve the proposal, Settling Party shall follow the procedures set forth in Paragraph 117 to obtain and submit to EPA for approval another proposal for a revised or alternate form of financial assurance within 30 days after receipt of EPA's written disapproval.

116. The issuance of a Work Takeover Notice pursuant to Paragraph 92 (Work Takeover) shall trigger EPA's right to receive the benefit of any financial assurance(s) provided pursuant to this Section. At such time, EPA shall have the right to enforce performance by the issuer of the relevant financial assurance mechanism and/or immediately access resources guaranteed under any such mechanism, whether in cash or in kind, as needed to continue and complete all or any portion(s) of the Work assumed by EPA. In the event (a) EPA is unable to promptly secure the resources guaranteed under any such financial assurance mechanism, whether in cash or in kind, necessary to continue and complete the Work assumed by EPA, or (b) the financial assurance involves a demonstration of satisfaction of the financial test criteria pursuant to Paragraph 112.e or 112.f, Settling Party shall immediately upon written demand from EPA deposit into an account specified by EPA, in immediately available funds and without setoff, counterclaim, or condition of any kind, a cash amount up to but not exceeding the estimated cost of the remaining Work to be performed as of such date, as determined by EPA. All EPA Work Takeover costs not paid pursuant to this Paragraph shall be reimbursed under Section XIII (Payment of Response Costs). In addition, if at any time EPA is notified by

31

the issuer of a financial assurance mechanism that such issuer intends to cancel the financial assurance mechanism it has issued, then, unless Settling Party provides an alternate financial assurance mechanism in accordance with this Section no later than 30 days prior to the impending cancellation date, EPA shall be entitled (as of and after the date that is 30 days prior to the impending cancellation) to draw fully on the funds guaranteed under the then-existing financial assurance.

117.   Settling Party shall not reduce the amount of, or change the form or terms of, the financial assurance until Settling Party receives written approval from EPA to do so. Settling Party may petition EPA in writing to request such a reduction or change on any anniversary of the Effective Date, or at any other time agreed by the Parties. Any such petition shall include the estimated cost of the remaining Work and the basis upon which such cost was calculated, and, for proposed changes to the form or terms of the financial assurance. If EPA notifies Settling Party that it has approved the requested reduction or change, Settling Party may reduce or otherwise change the financial assurance in compliance with and to the extent permitted by such written approval and shall submit all documents evidencing such reduction or change to EPA pursuant to the delivery instructions in Paragraph 113 within 30 days after receipt of EPA's written decision. If EPA disapproves the request, Settling Party may seek dispute resolution pursuant to Section XIV (Dispute Resolution), provided, however, that Settling Party may reduce or otherwise change the financial assurance only in accordance with an agreement reached pursuant to Section XIV or EPA's written decision resolving the dispute.

118.   Settling Party shall not release, cancel, or discontinue any financial assurance provided pursuant to this Section until:

a.     Settling Party receives written notice from EPA in accordance with Paragraph 123 that the Work has been fully and finally completed in accordance with this Settlement Agreement; or

b.     EPA otherwise notifies Settling Party in writing that it may release, cancel, or discontinue the financial assurance(s) provided pursuant to this Section. In the event of a dispute, Settling Party may seek dispute resolution pursuant to Section XIV (Dispute Resolution), and may release, cancel, or discontinue the financial assurance required hereunder only in accordance with an agreement reached pursuant to Section XIV or EPA's written decision resolving the dispute.

## XXV. INTEGRATION/APPENDICES

119.   This Settlement Agreement and any deliverables, technical memoranda, specifications, schedules, documents, plans, reports (other than progress reports), etc. that will be developed pursuant to this Settlement Agreement and become incorporated into, and enforceable under this Settlement Agreement and its appendices constitute the final, complete, and exclusive agreement and understanding among the Parties with respect to the settlement embodied in this

32

Settlement Agreement. The Parties acknowledge that there are no representations, agreements, or understandings relating to the settlement other than those expressly contained in this Settlement Agreement. The following appendices are attached to and incorporated into this Settlement Agreement:

"Appendix A" is the Record of Decision for Operable Unit Two

"Appendix B" is the Statement of Work

"Appendix C" is the Site Map

"Appendix D" Financial Assurance

In the event of a conflict between any provision of this Settlement Agreement and the provisions of any document attached to this Settlement Agreement or submitted or approved pursuant to this Settlement Agreement, the provisions of this Settlement Agreement shall control.

## XXVI. EFFECTIVE DATE AND SUBSEQUENT MODIFICATION

120.  This Settlement Agreement shall be effective on the date that the Settlement Agreement is signed by the Director of the Emergency and Remedial Response Division of EPA Region 2 or his delegate,

121.  This Settlement Agreement, including the attached SOW, may be amended by mutual agreement of EPA and Settling Party. Amendments shall be in writing and shall be effective when signed by EPA. Neither EPA Project Coordinators nor EPA RPMs have the authority to sign amendments to the Settlement Agreement.

122.  No informal advice, guidance, suggestion, or comment by the EPA Project Coordinator or other EPA representatives regarding reports, plans, specifications, schedules, or any other writing submitted by Settling Party shall relieve Settling Party of its obligation to obtain any formal approval required by this Settlement Agreement, or to comply with all requirements of this Settlement Agreement, unless it is formally modified.

## XXVII. NOTICE OF COMPLETION OF WORK

123.  When EPA determines that all Work has been fully performed in accordance with the other requirements of this Settlement Agreement, with the exception of any continuing obligations required by this Settlement Agreement, including payment of Future Response Costs or record retention, EPA will provide written notice to Settling Party. If EPA determines that any such Work has not been completed in accordance with this Settlement Agreement, EPA will notify Settling Party, provide a list of the deficiencies, and require that Settling Party modify the Work Plan if appropriate to correct such deficiencies. Settling Party shall implement the

33

ALCD-PUBCOM_0001294

modified and approved Work Plan and shall submit the required deliverables. Failure by Settling Party to implement the approved modified Work Plan shall be a violation of this Settlement Agreement.

It is so ORDERED AND AGREED this ___30th___ day of _September, 2016_.

BY: _____    DATE: _9-30-2016_

Walter E. Mugdan, Director
Emergency and Remedial Response Division
U.S. Environmental Protection Agency, Region 2

EFFECTIVE DATE: _September 30, 2016_

34

ALCD-PUBCOM_0001295

ADMINISTRATIVE SETTLEMENT AGREEMENT AND ORDER ON CONSENT
FOR REMEDIAL DESIGN

In the Matter of Operable Unit 2 of the Diamond Alkali Superfund Site
CERCLA Docket No

For Settling Party: *OCCIdENTAC CHEMICAL*

By: _____

Title: *VICE PRESIdENT*

Date: *9/29/16*

35

# APPENDIX B
# STATEMENT OF WORK

453918

ALCD-PUBCOM_0001297

**STATEMENT OF WORK**

**PRE-REMEDIAL DESIGN AND REMEDIAL DESIGN**

**LOWER 8.3 MILES OF LOWER PASSAIC RIVER**

**PART OF THE DIAMOND ALKALI SUPERFUND SITE**

**Essex and Hudson Counties, State of New Jersey**

**EPA Region 2**

**September 26, 2016**

ALCD-PUBCOM_0001298

# TABLE OF CONTENTS

1.    INTRODUCTION ...................................................................................................1

2.    COMMUNITY INVOLVEMENT ...........................................................................3

3.    REMEDIAL DESIGN .............................................................................................4

4.    EMERGENCY RESPONSE, OFF-SITE SHIPMENTS AND REPORTING ..................10

5.    DELIVERABLES ..................................................................................................12

6.    SCHEDULES .......................................................................................................20

7.    STATE PARTICIPATION .....................................................................................21

8.    REFERENCES .....................................................................................................22

ii

ALCD-PUBCOM_0001299

# 1.    INTRODUCTION

**1.1**    **Purpose of the SOW**. This Statement of Work (SOW) sets forth the procedures and requirements for implementing the pre-remedial design and remedial design work for the remedy selected in the Record of Decision (ROD) signed by the U.S. Environmental Protection Agency (EPA) on March 3, 2016 for the lower 8.3 miles of the Lower Passaic River part of the Diamond Alkali Superfund Site. Given the complexity and uncertainty involved with remediating sediment sites, especially at such a large scale, EPA expects to employ an adaptive management approach during the remedial design and implementation of the remedy. Information and experience gained as a result of earlier stages of the remedial design and remedy implementation will inform later stages of the design and implementation. This will allow for appropriate adjustments or modifications to enable efficient and effective remedy implementation, providing a means to address uncertainties promptly and inform specific design decisions.

**1.2**    **Structure of the SOW**.

- Section 2 (Community Involvement) sets forth EPA's and Settling Party's responsibilities for community involvement.

- Section 3 (Remedial Design) sets forth the process for developing the Pre-Design Investigation and Remedial Design, which includes the submission of specified primary deliverables.

- Section 4 (Emergency Response, Off-Site Shipments and Reporting) sets forth Settling Party's emergency response, off-site shipments and reporting obligations.

- Section 5 (Deliverables) describes the content of the supporting deliverables and the general requirements regarding Settling Party's submission of, and EPA's review of, approval of, comment on, and/or modification of, the deliverables.

- Section 6 (Schedules) sets forth the schedule for submitting the primary deliverables, and sets forth the schedule of milestones regarding the completion of the RD.

- Section 7 (State Participation) addresses State participation.

- Section 8 (References) provides a list of references, including URLs.

**1.3**    The Scope of the Remedy includes the actions described in Section 12 of the ROD, including the following major components:

(a)    An engineered cap will be constructed over the river bottom of the lower 8.3 miles, except in areas where backfill may be placed because all contaminated fine-grained sediments have been removed. The engineered cap will generally consist of two feet of sand and may be armored where necessary to prevent erosion of the sand.

(b)    Before the engineered cap is installed, the river will be dredged bank to bank (approximately 3.5 million cubic yards) so that the cap can be placed without increasing the potential for flooding. Depth of dredging is estimated to be 2.5 feet, except in the 1.7 miles of the federally authorized navigation channel closest to Newark Bay.

(c)     The remedy will include sufficient dredging and capping to allow for the continued commercial use of a federally authorized navigation channel in the 1.7 miles of the river closest to Newark Bay and to accommodate reasonably anticipated future recreational use above RM 1.7.

(d)     Dredged materials will be barged or pumped to a sediment processing facility in the vicinity of the Lower Passaic River/Newark Bay shoreline for dewatering. Dewatered materials will be transported to permitted treatment facilities and landfills in the United States or Canada for disposal.

(e)     Mudflats dredged during implementation of the remedy will be covered with an engineered cap consisting of one foot of sand and one foot of mudflat reconstruction (habitat) substrate.

(f)     Institutional controls will be implemented to protect the engineered cap. In addition, New Jersey's existing prohibitions on fish and crab consumption will remain in place and will be enhanced with additional community outreach to encourage greater awareness of the prohibitions until the concentrations of contaminants of concern in fish and crab tissue reach protective concentrations corresponding to remediation goals. EPA will share the data and consult with New Jersey Department of Environmental Protection about whether the prohibitions on fish and crab consumption advisories can be lifted or adjusted to allow for increased consumption as contaminant levels decline.

(g)     Long-term monitoring and maintenance of the engineered cap will be required to ensure its stability and integrity. Long-term monitoring of fish, crab and sediment will also be performed to determine when interim remediation milestones, remediation goals and remedial action objectives are reached. Other monitoring, such as water column sampling, will also be performed.

**1.4**     Performance Standards

(a)     EPA will develop Performance Standards (PS) related to remedy implementation. EPA will collaborate on an ongoing basis with Settling Party throughout the PS development process, and will consider the opinions and suggestions provided by Settling Party. The RD will be developed to achieve the PS. EPA will be the final arbiter with respect to the content of the PS.

(b)     EPA is developing the following PS:

(1)     Engineering performance standards, including but not limited to resuspension and productivity.

(2)     Quality of life performance standards, including, but not limited to, air quality, odor, noise and lighting.

**1.5**     The terms used in this SOW that are defined in the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), in regulations promulgated

2

under CERCLA, or in the Settlement Agreement and Order on Consent (Settlement Agreement), have the meanings assigned to them in CERCLA, in such regulations, or in the Settlement Agreement, except that the term "Paragraph" or "¶" means a paragraph of the SOW, and the term "Section" means a section of the SOW, unless otherwise stated.

## 2.    COMMUNITY INVOLVEMENT

**2.1    Community Involvement Responsibilities**

(a)    EPA has the lead responsibility for developing and implementing community involvement activities at the Site. Previously, during the RI/FFS phase, EPA developed a Community Involvement Plan (CIP) for the Lower Passaic River and Newark Bay. Pursuant to 40 C.F.R. § 300.435(c), EPA shall review the existing CIP and determine whether it should be revised to describe further public involvement activities during the Work that are not already addressed or provided for in the existing CIP.

(b)    If requested by EPA, Settling Party shall participate in community involvement activities, including participation in (1) the preparation of information regarding the Work for dissemination to the public, with consideration given to including mass media and/or Internet notification, and (2) public meetings that may be held or sponsored by EPA to explain activities at or relating to the Site. Settling Party's support of EPA's community involvement activities may include providing online access to submissions and updates of deliverables to (1) any Community Advisory Groups, (2) any Technical Assistance Grant recipients and their advisors, and (3) other entities to provide them with a reasonable opportunity for review and comment. EPA may describe in its CIP Settling Party's responsibilities for community involvement activities. All community involvement activities conducted by Settling Party at EPA's request are subject to EPA's oversight. Upon EPA's request, Settling Party shall establish a community information repository at or near the Site to house one copy of the administrative record.

(c)    **Settling Party's Community Coordinator**. If requested by EPA, Settling Party shall, within 15 days or such longer time as specified by EPA, designate and notify EPA of Settling Party's Community Coordinator. Settling Party may hire a contractor for this purpose. Settling Party's notice must include the name, title, and qualifications of the Settling Party's Community Coordinator. Settling Party's Community Coordinator is responsible for providing support regarding EPA's community involvement activities, including coordinating with EPA's Community Involvement Coordinator regarding responses to the public's inquiries about the Site.

3

### 3.    REMEDIAL DESIGN

**3.1    Project Management Plan.** The purpose of the Project Management Plan is to develop a strategy to complete the Remedial Design (RD) and Remedial Action (RA) successfully, including, but not limited to:

(a)    A description of the overall management strategy for performing the RD, including a proposal for phasing of design and construction, if applicable;

(b)    A description of the proposed approach to contracting, and proposed general approach to construction, operation, maintenance and monitoring of the RA as necessary to implement the Work;

(c)    A description of the responsibility and authority of, and communications strategy among, all organizations and key personnel involved with the development of the RD, including by not limited to meetings between the Settling Party's Project Coordinator and EPA's Project Coordinator;

(d)    Baseline schedule for completion of the Work, including a preliminary list of all work plans, tasks and deliverables to be prepared.

The Project Management Plan will be updated periodically to reflect changes in the project status and team members.

**3.2    Pre-Design Investigation.** The purpose of the Pre-Design Investigation (PDI) is to gather sufficient information to fully develop the Remedial Design (RD).

(a)    **PDI Work Plan.** Settling Party shall submit a PDI Work Plan (PDI WP) for EPA approval. The PDI WP shall describe activities to be conducted by Settling Party to gather sufficient information to fully develop the RD and schedule for completing the individual items. Settling Party shall perform PDI activities including, but not limited to, the following:

(1)    Sediment core collection and analysis for chemical, waste, geological and geotechnical characterization, for the purposes of designing the dredging plan and the engineered cap, and developing a plan for dredged material disposal.

(2)    Pore water sample collection and chemical analysis for the purpose of designing the engineered cap.

(3)    Sub-bottom geophysical and bathymetric surveys for the purpose of designing the dredging plan and the engineered cap.

(4)    Physical and chemical water column sampling program to establish a baseline for PS developed by EPA.

ALCD-PUBCOM_0001303

(5)    Dredge Elutriate Test and other laboratory studies on desorption of contaminants from solids to assess the potential impacts of dredging on water quality.

(6)    Fish migration/spawning study and other surveys necessary to determine fish windows and other restrictions on in-water construction.

(7)    Borrow site pre-screening and preliminary borrow material characterization to identify suitable materials for designing the engineered cap.

(8)    In-river habitat survey for the purpose of designing habitat replacement measures on the mudflats and any other habitat areas affected by implementation of the selected remedy.

(9)    A detailed survey of the bottom of the lower 8.3 miles of the Lower Passaic River for performing pre-construction debris removal and to locate utilities for protection during construction.

(10)    A survey and assessment, as it relates to the implementation of the remedy, of the integrity of existing bulkheads, natural shoreline, rip rapped areas and bridge abutments along the lower 8.3 miles of the Lower Passaic River and a determination of the extent of temporary bulkhead installation and other protective measures required for remedy implementation.

(11)    A plan for compliance with Federal and State archeological requirements, including Phase I and II cultural surveys, as required.

(12)    The following supporting deliverables described in ¶ 5.7 (Supporting Deliverables) applicable to the PDI: Health and Safety Plan, Field Sampling Plan, Quality Assurance Project Plan.

(b)    Following the PDI, Settling Party shall submit a PDI Evaluation Report for EPA comment. This report must include:

(1)    Summary of the investigations performed;

(2)    Summary of investigation results;

(3)    Summary of validated data (i.e., tables and graphics);

(4)    Data validation reports and laboratory data reports;

(5)    Narrative interpretation of data and results;

(6)    Results of statistical and modeling analyses;

5

  (7) Photographs documenting the work conducted;

  (8) Conclusions and recommendations for RD, including design parameters and criteria; and

  (9) Recommendations for additional data collection or analyses.

(c) EPA may require Settling Party to supplement the PDI Evaluation Report and/or to perform additional pre-design studies.

**3.3** **Remedial Design Work Plan**. Settling Party shall submit a Remedial Design (RD) Work Plan (RDWP) for EPA approval. The RDWP must include:

(a) Plans and technical approaches for implementing all RD activities identified in this SOW, in the RDWP, or required by EPA to be conducted to develop the RD;

(b) Descriptions of any areas requiring clarification and/or anticipated problems (e.g., data gaps);

(c) Descriptions of any applicable permitting requirements and other regulatory requirements;

(d) Description of plans for obtaining access in connection with the Work, such as property acquisition, property leases, and/or easements;

(e) Description of supporting design calculations and modeling runs to be performed in support of design;

(f) A plan for identification, screening and selection of disposal sites for Waste Material;

(g) Description of plans for obtaining Congressional action to modify the depths and deauthorize portions of the federally-authorized navigation channel in accordance with the navigation depths included in the selected remedy in the ROD;

(h) Tasks required for implementing institutional controls; and

(i) Descriptions of how the RD and RA will be implemented using the principles specified in the EPA Region 2's Clean and Green Policy.

(j) The Emergency Response Plan described in ¶ 5.7 (Supporting Deliverables).

**3.4** Settling Party shall meet regularly with EPA according to time frames identified within the Project Management Plan, or as directed or determined by EPA.

**3.5** **Site Wide Monitoring Plan**. Settling Party shall submit a Site Wide Monitoring Plan for EPA comment as described in ¶ 5.7 (Supporting Deliverables).

6

3.6     **Site Selection and Evaluation.** Settling Party shall identify and select a site or sites for the sediment processing facility.

   (a)     Settling Party shall submit a Site Selection and Evaluation Work Plan for EPA approval. The work plan will include, but not be limited to the following tasks:

      (1)     Site(s) selection criteria, identification process and selection process;

      (2)     Collection of site evaluation data to assess the suitability of the site(s) for use as a sediment processing facility and as required for bidding purposes during contractor selection, including, but not limited to geotechnical, baseline chemical conditions, habitat and cultural resources surveys, topographical survey, and utility service assessment;

      (3)     Land leasing or acquisition plan.

   (b)     Following completion of the site selection and evaluation for the sediment processing facility, Settling Party shall submit a Site Selection and Evaluation Report for EPA comment.

3.7     **Treatability Studies**

   (a)     Settling Party shall perform Treatability Studies (TS) for the following purposes, unless otherwise agreed to by EPA:

      (1)     To evaluate enhanced capping technologies, with a focus on constructability and placement techniques, such as the use of additives or amendments (e.g., activated carbon or organoclay) to create a reactive cap or thin-layer capping technologies where conditions are conducive to such approaches;

      (2)     To evaluate constructability and placement techniques for habitat substrate on the mudflats and any other habitat areas affected by implementation of the selected remedy.

   (b)     Settling Party will submit a TS Work Plan (TSWP) for EPA approval. Settling Party shall prepare the TSWP in accordance with EPA's *Guide for Conducting Treatability Studies under CERCLA, Final* (Oct. 1992), as supplemented for RD by the *Remedial Design/Remedial Action Handbook*, EPA 540/R-95/059 (June 1995).

   (c)     Following completion of the TS, Settling Party shall submit a TS Evaluation Report for EPA comment.

   (d)     EPA may require Settling Party to supplement the TS Evaluation Report and/or to perform additional treatability studies.

ALCD-PUBCOM_0001306

3.8    **Preliminary (30%) RD**. Settling Party shall submit a Preliminary (30%) RD for EPA's comment. The Preliminary RD must include:

    (a)    A design criteria report, as described in the *Remedial Design/Remedial Action Handbook*, EPA 540/R-95/059 (June 1995);

    (b)    A basis of design report, as described in the *Remedial Design/Remedial Action Handbook*, EPA 540/R-95/059 (June 1995);

    (c)    Preliminary drawings and specifications, including, but not limited to:

        (1)    An outline of general specifications

        (2)    Listing of drawings and schematics

        (3)    Description of the planned O&M requirements

        (4)    Description of how PDI data will be incorporated into the RD.

    (d)    Design elements to be addressed include, but are not limited to:

        (1)    Identification of dredging methods and equipment

        (2)    Identification of materials handling and sediment dewatering technology for the sediment processing facility

        (3)    Site layout for sediment processing facility, including transportation

        (4)    Plans for habitat replacement on the mudflats and any other habitat areas affected by implementation of the selected remedy;

        (5)    A plan for debris removal, decontamination and disposal;

        (6)    Descriptions of permit requirements, if applicable;

    (e)    A draft schedule for RA activities; and

    (f)    The following supporting deliverable described in ¶ 5.7 (Supporting Deliverables): Transportation and Off-Site Disposal Plan.

3.9    **Intermediate (60%) RD**. Settling Party shall submit the Intermediate (60%) RD for EPA's comment. The Intermediate RD must address EPA's comments regarding the Preliminary RD and value engineering study results, if the value engineering study is conducted prior to the Intermediate RD, and include the following:

    (a)    A revised basis of design report;

    (b)    Intermediate drawings and specifications, including but not limited to:

ALCD-PUBCOM_0001307

(1)    Draft specifications

(2)    Drawings and schematics

(3)    O&M description and cost estimate

(4)    Unit price lists for the RA

(5)    All relevant PDI data

(c)    Design elements to be addressed include, but are not limited to:

(1)    Updates of design elements addressed in the Preliminary RD

(2)    A description of how the RA will be implemented in a manner that minimizes environmental impacts in accordance with EPA's *Principles for Greener Cleanups* (Aug. 2009) and EPA Region 2's Clean and Green Policy;

(3)    A description of how the RA will be implemented consistent with the PS developed by EPA; and

(4)    A description of how recontamination of the cap by contaminants of concern due to remedy implementation will be minimized;

(d)    An updated draft schedule for RA activities; and

(e)    Updates, as necessary, of supporting deliverables described in ¶ 5.7 (Supporting Deliverables) previously submitted.

**3.10**    **Value Engineering Analysis**. Settling party shall implement a value engineering study, to be undertaken following the Preliminary Remedial Design but prior to the Pre-Final Remedial Design. The value engineering study will be conducted in accordance with EPA's *Value Engineering for Fund-Financed Remedial Design and Remedial Action Projects* (OSWER 9355.5-24, April 2006) and *Value Engineering* (OSWER 9355.5-24FS, November 2005). Settling Party shall submit the results of the value engineering study for EPA comment and shall address EPA comments in the Intermediate or Pre-Final RD.

**3.11**    **Pre-Final (95%) RD**. Settling Party shall submit the Pre-final (95%) RD for EPA's comment. The Pre-final RD must be a continuation and expansion of the previous design submittal and must address EPA's comments regarding the Intermediate RD and the value engineering study results. The Pre-final RD will serve as the approved Final (100%) RD if EPA approves the Pre-final RD without comments. The Pre-final RD must include:

9

ALCD-PUBCOM_0001308

(a)    A complete set of construction drawings and specifications that are: (1) certified by a registered professional engineer; (2) suitable for procurement; and (3) follow the Construction Specifications Institute's MasterFormat 2012;

(b)    A survey and engineering drawings showing existing features of OU2 of the Site, such as elements, property borders, easements, and site conditions;

(c)    Pre-Final versions of the same elements and deliverables as are required for the RD;

(d)    A specification for photographic documentation of the RA; and

(e)    Updates, as necessary, of the supporting deliverables described in ¶ 5.7 (Supporting Deliverables) previously submitted and the following additional supporting deliverables: Construction Quality Assurance/Quality Control Plan; O&M Plan; and Institutional Controls Implementation and Assurance Plan.

3.12    **Final (100%) RD.** Settling Party shall submit the Final (100%) RD for EPA approval. The Final RD must address EPA's comments on the Pre-final RD and must include final versions of all Pre-final RD deliverables.

## 4.    EMERGENCY RESPONSE, OFF-SITE SHIPMENTS AND REPORTING

4.1    **Emergency Response and Reporting**

(a)    **Emergency Response and Reporting.** If any event occurs during performance of the Work that causes or threatens to cause a release of Waste Material on, at, or from OU2 of the Site and that either constitutes an emergency situation or that may present an immediate threat to public health or welfare or the environment, Settling Party shall: (1) immediately take all appropriate action to prevent, abate, or minimize such release or threat of release; (2) immediately notify the authorized EPA officer (as specified in ¶ 4.1(c)) orally; and (3) take such actions in consultation with the authorized EPA officer and in accordance with all applicable provisions of the Health and Safety Plan and any other deliverable approved by EPA under the SOW.

(b)    **Release Reporting.** Upon the occurrence of any event during performance of the Work that Settling Party are required to report pursuant to Section 103 of CERCLA, 42 U.S.C. § 9603, or Section 304 of the Emergency Planning and Community Right-to-know Act (EPCRA), 42 U.S.C. § 11004, Settling Party shall immediately notify the authorized EPA officer orally.

(c)    The "authorized EPA officer" for purposes of immediate oral notifications and consultations under ¶ 4.1(a) and ¶ 4.1(b) is the EPA Project Coordinator, the EPA Alternate Project Coordinator (if the EPA Project Coordinator is unavailable), or the EPA Emergency Response Unit, Region 2 (if neither EPA Project Coordinator is available).

10

(d)    For any event covered by ¶ 4.1(a) and ¶ 4.1(b), Settling Party shall: (1) within 14 days after the onset of such event, submit a report to EPA describing the actions or events that occurred and the measures taken, and to be taken, in response thereto; and (2) within 30 days after the conclusion of such event, submit a report to EPA describing all actions taken in response to such event.

(e)    The reporting requirements under ¶ 4.1 are in addition to the reporting required by CERCLA § 103 or EPCRA § 304.

## 4.2    Off-Site Shipments

(a)    Settling Party may ship hazardous substances, pollutants, and contaminants from OU2 of the Site to an off-Site facility only if it complies with Section 121(d)(3) of CERCLA, 42 U.S.C. § 9621(d)(3), and 40 C.F.R. § 300.440. Settling Party will be deemed to be in compliance with CERCLA § 121(d)(3) and 40 C.F.R. § 300.440 regarding a shipment if Settling Party obtains a prior determination from EPA that the proposed receiving facility for such shipment is acceptable under the criteria of 40 C.F.R. § 300.440(b).

(b)    Settling Party may ship Waste Material from OU2 of the Site to an out-of-state waste management facility only if, prior to any shipment, it provides notice to the appropriate state environmental official in the receiving facility's state and to the EPA Project Coordinator. This notice requirement will not apply to any off-Site shipments when the total quantity of all such shipments does not exceed 10 cubic yards. The notice must include the following information, if available: (1) the name and location of the receiving facility; (2) the type and quantity of Waste Material to be shipped; (3) the schedule for the shipment; and (4) the method of transportation. Settling Party also shall notify the state environmental official referenced above and the EPA Project Coordinator of any major changes in the shipment plan, such as a decision to ship the Waste Material to a different out-of-state facility.

(c)    Settling Party may ship Investigation Derived Waste (IDW) from OU2 of the Site to an off-Site facility only if it complies with Section 121(d)(3) of CERCLA, 42 U.S.C. § 9621(d)(3), 40 C.F.R. § 300.440, *EPA's Guide to Management of Investigation Derived Waste*, OSWER 9345.3-03FS (Jan. 1992), and any IDW-specific requirements contained in the ROD. Wastes shipped off-Site to a laboratory for characterization, and RCRA hazardous wastes that meet the requirements for an exemption from RCRA under 40 CFR § 261.4(e) shipped off-site for treatability studies, are not subject to 40 C.F.R. § 300.440.

## 4.3    Progress Reports. 
Commencing with the month following the Effective Date of the Settlement Agreement and until EPA approves the Final (100%) RD, Settling Party shall submit progress reports to EPA on a quarterly basis, or as otherwise requested by EPA. The reports must cover all activities that took place during the prior reporting period, including:

11

ALCD-PUBCOM_0001310

(a)    The actions that have been taken toward achieving compliance with the Settlement Agreement;

(b)    All results of sampling, tests and all other data received or generated by Settling Party, in an interactive, searchable database (in Excel or Access format). This database will be equivalent in form and function to any database used by the Settling Party in the development of the RD;

(c)    A description of all deliverables that Settling Party submitted to EPA;

(d)    An updated RD Schedule, together with information regarding approximate percentage of completion, delays encountered or anticipated that may affect the future schedule for completion of the RD, and a description of efforts made to mitigate those delays or anticipated delays;

(e)    A description of any modifications to the work plans or other schedules that Settling Party has proposed or that have been approved by EPA; and

(f)    A description of all activities undertaken in support of the Community Involvement Plan (CIP) during the reporting period and those to be undertaken in the next reporting period.

4.4    **Notice of Progress Report Schedule Changes**. If the schedule for any activity described in the Progress Reports, including activities required to be described under ¶ 4.1(d), changes, Settling Party shall notify EPA of such change at least 7 days before performance of the activity.

4.5    **Periodic Review Support Plan (PRSP)**. Upon EPA request, Settling Party shall submit the PRSP for EPA approval. The PRSP addresses the studies and investigations that Settling Party shall conduct to support EPA's reviews of whether conditions at the Site are protective of human health and the environment in accordance with Section 121(c) of CERCLA, 42 U.S.C. § 9621(c) (also known as "Five-year Reviews"). Settling Party shall develop the plan in accordance with *Comprehensive Five-year Review Guidance*, OSWER 9355.7-03B-P (June 2001), and any other relevant five-year review guidances.

## 5.    DELIVERABLES

5.1    **Applicability**. Settling Party shall submit deliverables for EPA approval or for EPA comment as specified in the SOW. If neither is specified, the deliverable does not require EPA's approval or comment. Paragraphs 5.2 (In Writing) through 5.4 (Technical Specifications) apply to all deliverables. Paragraph 5.5 (Certification) applies to any deliverable that is required to be certified. Paragraph 5.6 (Approval of Deliverables) applies to any deliverable that is required to be submitted for EPA approval.

5.2    **In Writing**. All deliverables under this SOW must be in writing unless otherwise specified.

12

5.3     **General Requirements for Deliverables.** All deliverables must be submitted by the deadlines in the RD Schedule, as applicable. Settling Party shall submit all deliverables to EPA in electronic form. Technical specifications for sampling and monitoring data and spatial data are addressed in ¶ 5.4. All other deliverables shall be submitted to EPA in the electronic form specified by the EPA Project Coordinator. If any deliverable includes maps, drawings, or other exhibits that are larger than 8.5" by 11", Settling Party shall also provide EPA with paper copies of such exhibits, upon EPA request.

5.4     **Technical Specifications**

(a)     Sampling and monitoring data should be submitted in standard EPA Region 2 Electronic Data Deliverable (EDD) format, which can be found at https://www.epa.gov/superfund/region-2-superfund-electronic-data-submission. Other delivery methods may be allowed by EPA if electronic direct submission presents a significant burden or as technology changes.

(b)     Spatial data, including spatially-referenced data and geospatial data, should be submitted: (1) in the ESRI File Geodatabase format; and (2) as unprojected geographic coordinates in decimal degree format using North American Datum 1983 (NAD83) or World Geodetic System 1984 (WGS84) as the datum. If applicable, submissions should include the collection method(s). Projected coordinates may optionally be included but must be documented. Spatial data should be accompanied by metadata, and such metadata should be compliant with the Federal Geographic Data Committee (FGDC) Content Standard for Digital Geospatial Metadata and its EPA profile, the EPA Geospatial Metadata Technical Specification. An add-on metadata editor for ESRI software, the EPA Metadata Editor (EME), complies with these FGDC and EPA metadata requirements and is available at https://edg.epa.gov/EME/.

(c)     Each file must include an attribute name for each site unit or sub-unit submitted. Consult https://www.epa.gov/geospatial/geospatial-policies-and-standards for any further available guidance on attribute identification and naming.

(d)     Spatial data submitted by Settling Party does not, and is not intended to, define the boundaries of the Site.

5.5     **Certification.** The Pre-Design Investigation Evaluation Report, the Site Selection and Evaluation Report, the Treatability Study Evaluation Report, and the Final (100%) Remedial Design must be signed by the Settling Party's Project Coordinator, or other responsible official of Settling Party, and must contain the following statement:

I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate,

13

and complete. I have no personal knowledge that the information submitted is other than true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations.

5.6    **Approval of Deliverables**

(a)    **Initial Submissions**

(1)    After review of any deliverable that is required to be submitted for EPA approval under the Settlement Agreement or the SOW, EPA shall: (i) approve, in whole or in part, the submission; (ii) approve the submission upon specified conditions; (iii) disapprove, in whole or in part, the submission; or (iv) any combination of the foregoing.

(2)    EPA also may modify the initial submission to cure deficiencies in the submission if: (i) EPA determines that disapproving the submission and awaiting a resubmission would cause substantial disruption to the Work; or (ii) previous submission(s) have been disapproved due to material defects and the deficiencies in the initial submission under consideration indicate a bad faith lack of effort to submit an acceptable deliverable.

(b)    **Resubmissions**. Upon receipt of a notice of disapproval under ¶ 5.6(a) (Initial Submissions), or if required by a notice of approval upon specified conditions under ¶ 5.6(a), Settling Party shall, within 30 days or such longer time as specified by EPA in such notice, correct the deficiencies and resubmit the deliverable for approval. After review of the resubmitted deliverable, EPA may: (1) approve, in whole or in part, the resubmission; (2) approve the resubmission upon specified conditions; (3) modify the resubmission; (4) disapprove, in whole or in part, the resubmission, requiring Settling Party to correct the deficiencies; or (5) any combination of the foregoing.

(c)    **Material Defects**. If an initially submitted or resubmitted deliverable contains a material defect, and the deliverable is disapproved or modified by EPA under Paragraph 5.6(a) or 5.6(b) due to such material defect, then the material defect shall constitute a lack of compliance for purposes of Paragraph 79 of the Settlement Agreement. The provisions of Section XIV (Dispute Resolution) and Section XVI (Stipulated Penalties) of the Settlement Agreement shall govern the accrual and payment of any stipulated penalties regarding Settling Party's submissions under this paragraph.

(d)    **Implementation**. Upon approval, approval upon conditions, or modification by EPA under ¶ 5.6(a) (Initial Submissions) or ¶ 5.6(b) (Resubmissions), of any deliverable, or any portion thereof: (1) such deliverable, or portion thereof, will be incorporated into and enforceable under the Settlement Agreement; and (2) Settling Party shall take any action required by such deliverable, or portion thereof. The implementation of any non-deficient portion of a deliverable

14

submitted or resubmitted under ¶ 5.6(a) or ¶ 5.6(b) does not relieve Settling Party of any liability for stipulated penalties under Section XVI (Stipulated Penalties) of the Settlement Agreement.

(e)    Settling Party may propose modifications to any EPA approved schedule or work plan in writing for review and approval by EPA, outlining the basis for the requested modifications. EPA shall retain the final authority to approve or disapprove modifications to the EPA approved schedules or work plans proposed by Settling Party. The EPA Project Coordinator may authorize minor field modifications to the work plans, provided that any such modifications are consistent with the SOW and provided further that EPA's approval must be documented in writing which may be in electronic form (e-mail) submitted by Settling Party within 5 days of the field modification.

**5.7    Supporting Deliverables**. Settling Party shall submit each of the following supporting deliverables for EPA approval, except as specifically provided. Settling Party shall develop the deliverables in accordance with all applicable regulations, guidances, and policies (see Section 8 (References)). Settling Party shall update each of these supporting deliverables as necessary or appropriate during the course of the Work, and/or as requested by EPA.

(a)    **Health and Safety Plan**. The Health and Safety Plan (HASP) describes all activities to be performed to protect on-Site personnel and area residents from physical, chemical, and all other hazards posed by the Work. Settling Party shall develop the HASP in accordance with EPA's Emergency Responder Health and Safety and Occupational Safety and Health Administration (OSHA) requirements under 29 C.F.R. §§ 1910 and 1926. The HASP should cover PDI and RD activities. EPA does not approve the HASP, but will review it to ensure that all necessary elements are included and that the plan provides for the protection of human health and the environment.

(b)    **Emergency Response Plan**. The Emergency Response Plan (ERP) must describe procedures to be used in the event of an accident or emergency at OU2 of the Site (for example, damage to utilities, power outages, water impoundment failure, treatment plant failure, slope failure, etc.). The ERP must include:

(1)    Name of the person or entity responsible for responding in the event of an emergency incident;

(2)    Plan and date(s) for meeting(s) with the local community, including local, State, and federal agencies involved in the cleanup, as well as local emergency squads and hospitals;

(3)    Spill Prevention, Control, and Countermeasures (SPCC) Plan (if applicable), consistent with the regulations under 40 C.F.R. Part 112, describing measures to prevent, and contingency plans for, spills and discharges;

15

(4)     Notification activities in accordance with ¶ 4.1(b) (Release Reporting) in the event of a release of hazardous substances requiring reporting under Section 103 of CERCLA, 42 U.S.C. § 9603, or Section 304 of the Emergency Planning and Community Right-to-know Act (EPCRA), 42 U.S.C. § 11004; and

(5)     A description of all necessary actions to ensure compliance with Paragraph 52 (Emergencies and Releases) of the Settlement Agreement in the event of an occurrence during the performance of the Work that causes or threatens a release of Waste Material from OU2 of the Site that constitutes an emergency or may present an immediate threat to public health or welfare or the environment.

(c)     **Field Sampling Plan**. In accordance with the *Uniform Federal Policy for Quality Assurance Project Plans* cited below, the Field Sampling Plan (FSP) addresses all sample collection activities. The FSP must be written so that a field sampling team unfamiliar with the project would be able to gather the samples and field information required. Settling Party shall develop the FSP in accordance with *Guidance for Conducting Remedial Investigations and Feasibility Studies*, EPA/540/G 89/004 (Oct. 1988).

(d)     **Quality Assurance Project Plan**. The Quality Assurance Project Plan (QAPP) addresses sample collection, analysis and data handling regarding the Work. The QAPP must include a detailed explanation of Settling Party's quality assurance, quality control, and chain of custody procedures for all treatability, design, compliance and monitoring samples. Settling Party shall develop the QAPP in accordance with the most current version of the *Uniform Federal Policy for Quality Assurance Project Plans*, Parts 1-3, EPA/505/B-04/900A though 900C (March 2005). The QAPP also must include procedures:

(1)     To ensure that analyses, including specific laboratory methods and chemical constituents, are performed to meet the objectives of the ROD.

(2)     To ensure that EPA and its authorized representative have reasonable access to laboratories used by Settling Party in implementing the Settlement Agreement (Settling Party's Labs);

(3)     To ensure that Settling Party's Labs analyze all samples submitted by EPA pursuant to the QAPP for quality assurance monitoring;

(4)     To ensure that Settling Party's Labs perform all analyses using the latest version of EPA-accepted methods (e.g., the methods documented in SW-846; 40 CFR Part 136; 40 CFR Part 141; and *USEPA Contract Laboratory Program Statements of Work Organic Superfund Methods Multi-Media, Multi-Concentration* and *Inorganic Superfund Methods Multi-Media, Multi-Concentration*, etc.) or other methods acceptable to EPA. Any

16

modifications to the Contract Laboratory Program, SW-846 or other EPA methods must be submitted to the EPA for approval;

(5) To ensure that either (a) the QAPP is amended and resubmitted to EPA for approval prior to any field sampling event to reflect: updated sampling and analytical methods, new methods for analytical parameters, and new parameters under the Unregulated Contaminant Monitoring Rule or (b) a justification is provided to EPA for approval to utilize the existing QAPP.

(6) To ensure that Settling Party's Labs participate in an EPA-accepted QA/QC program or other program QA/QC acceptable to EPA;

(7) For Settling Party to provide EPA with notice at least 7 days prior to any sample collection activity;

(8) For Settling Party to provide split samples and/or duplicate samples to EPA upon request;

(9) For EPA to take any additional samples that it deems necessary;

(10) For EPA to provide to Settling Party, upon request, split samples and/or duplicate samples in connection with EPA's oversight sampling; and

(11) For Settling Party to submit to EPA all sampling and test results and other data in connection with the implementation of the Settlement Agreement.

(e) **Site Wide Monitoring Plan**. The purpose of the Site Wide Monitoring Plan (SWMP) is to obtain baseline information regarding the extent of contamination in affected media at OU2 of the Site; to obtain information, through short- and long- term monitoring, about the movement of and changes in contamination throughout OU2 of the Site, before and during implementation of the RA; to obtain information regarding contamination levels to determine whether interim remediation milestones, remediation goals and remedial action objectives are achieved; and to obtain information to determine whether to perform additional actions, including further OU2 Site monitoring. The SWMP must include:

(1) Description of the environmental media to be monitored;

(2) Description of the data collection parameters, including existing and proposed monitoring devices and locations, schedule and frequency of monitoring, analytical parameters to be monitored, and analytical methods employed;

(3) Description of how performance data will be analyzed, interpreted, and reported, and/or other Site-related requirements;

(4) Description of verification sampling procedures;

17

(5)    Description of deliverables that will be generated in connection with monitoring, including sampling schedules, laboratory records, monitoring reports, and monthly and annual reports to EPA and State agencies; and

(6)    Description of proposed additional monitoring and data collection actions (such as increases in frequency of monitoring, and/or installation of additional monitoring devices in the affected areas) in the event that results from monitoring devices indicate changed conditions (such as higher than expected concentrations of the contaminants of concern or groundwater contaminant plume movement).

(f)    **Construction Quality Assurance/Quality Control Plan (CQA/QCP).** The purpose of the Construction Quality Assurance Plan (CQAP) is to describe planned and systemic activities that provide confidence that the RA construction will satisfy all plans, specifications, and related requirements, including quality objectives. The purpose of the Construction Quality Control Plan (CQCP) is to describe the activities to verify that RA construction has satisfied all plans, specifications, and related requirements, including quality objectives. The CQA/QCP must:

(1)    Identify, and describe the responsibilities of, the organizations and personnel implementing the CQA/QCP;

(2)    Include a description of the PS developed by EPA;

(3)    Describe the activities to be performed: (i) to provide confidence that PS will be met; and (ii) to determine whether PS have been met;

(4)    Describe verification activities, such as inspections, sampling, testing, monitoring, and production controls, under the CQA/QCP;

(5)    Describe industry standards and technical specifications used in implementing the CQA/QCP;

(6)    Describe procedures for tracking construction deficiencies from identification through corrective action;

(7)    Describe procedures for documenting all CQA/QCP activities; and

(8)    Describe procedures for retention of documents and for final storage of documents.

(g)    **Transportation and Off-Site Disposal Plan.** The Transportation and Off-Site Disposal Plan (TODP) describes plans to ensure compliance with ¶ 4.2 (Off-Site Shipments). The TODP must include:

(1)    Proposed routes for transportation of Waste Material from the lower 8.3 miles to the sediment processing facility.

18

    (2)       Identification of disposal sites for Waste Material;

    (3)       Proposed routes for off-site shipment of Waste Material;

    (4)       Identification of communities affected by shipment of Waste Material; and

    (5)       Description of plans to minimize impacts on affected communities.

(h)    **O&M Plan**. The O&M Plan describes the requirements for inspecting, operating, and maintaining the RA. Settling Party shall develop the O&M Plan in accordance with *Operation and Maintenance in the Superfund Program*, OSWER 9200.1 37FS, EPA/540/F-01/004 (May 2001). The O&M Plan must include the following additional requirements:

    (1)       Description of activities to be performed: (i) to provide confidence that interim remediation milestones, remediation goals and remedial action objectives will be met; and (ii) to determine whether interim remediation milestones, remediation goals and remedial action objectives have been met;

    (2)       **O&M Reporting**. Description of records and reports that will be generated during O&M, such as daily operating logs, laboratory records, records of operating costs, reports regarding emergencies, personnel and maintenance records, monitoring reports, and monthly and annual reports to EPA and State agencies;

    (3)       Description of corrective action in case of systems failure, including: (i) alternative procedures to prevent the release or threatened release of Waste Material which may endanger public health and the environment or may cause a failure to achieve interim remediation milestones, remediation goals and remedial action objectives; (ii) analysis of vulnerability and additional resource requirements should a failure occur; (iii) notification and reporting requirements should O&M systems fail or be in danger of imminent failure; and (iv) community notification requirements; and

    (4)       Description of corrective action to be implemented in the event that interim remediation milestones, remediation goals and remedial action objectives are not achieved; and a schedule for implementing these corrective actions.

(i)    **Institutional Controls Implementation and Assurance Plan**. The Institutional Controls Implementation and Assurance Plan (ICIAP) describes plans to implement, maintain, and enforce the Institutional Controls (ICs) at OU2 of the Site. Settling Party shall develop the ICIAP in accordance with *Institutional Controls: A Guide to Planning, Implementing, Maintaining, and Enforcing Institutional Controls at Contaminated Sites*, OSWER 9355.0-89, EPA/540/R-09/001 (Dec. 2012), and *Institutional Controls: A Guide to Preparing*

19

*Institutional Controls Implementation and Assurance Plans at Contaminated Sites*, OSWER 9200.0-77, EPA/540/R-09/02 (Dec. 2012). The ICIAP must include the following additional requirements:

(1)     Institutional controls to protect the engineered cap identified by EPA to be implemented by the appropriate federal and State of New Jersey entities;

(2)     Tools and mechanisms to conduct enhanced outreach to increase awareness of New Jersey's prohibitions and advisories on fish and crab consumption;

(3)     Locations of recorded real property interests (e.g., easements, liens) and resource interests in the property that may affect ICs (e.g., surface, mineral, and water rights) including accurate mapping and geographic information system (GIS) coordinates of such interests; and

(4)     Legal descriptions and survey maps that are prepared according to current American Land Title Association (ALTA) Survey guidelines and certified by a licensed surveyor.

## 6.     SCHEDULES

6.1     **Applicability and Revisions**. All deliverables and tasks required under this SOW must be submitted or completed by the deadlines or within the time durations listed in the RD Schedule set forth below. Settling Party may submit proposed revised RD Schedules for EPA approval. Upon EPA's approval, the revised RD Schedule supersede the RD Schedule set forth below, and any previously-approved RD Schedule.

20

**6.2    RD Schedule**

|   | Description of Deliverable, Task | ¶ Ref. | Deadline |
|---|---|---|---|
| 1 | Designate Community Coordinator | 2.1(c) | 15 days after EPA request |
| 2 | Project Management Plan | 3.1 | 90 days after EPA's Authorization to Proceed regarding Supervising Contractor under Settlement Agreement |
| 3 | RDWP | 3.3 | 90 days after EPA's Authorization to Proceed regarding Supervising Contractor under Settlement Agreement |
| 4 | PDI WP | 3.2(a) | 60 days after EPA's approval of the RDWP |
| 5 | PDI Evaluation Report | 3.2(b) | 1 year and 180 days after EPA approval of the PDI WP |
| 6 | Site Wide Monitoring Plan | 3.5 | 60 days after EPA's approval of the RDWP |
| 7 | Site Selection and Evaluation Work Plan | 3.6(a) | 90 days after EPA's approval of the RDWP |
| 8 | Site Selection and Evaluation Report | 3.6(b) | 180 days after EPA's approval of the Site Selection and Evaluation Work Plan |
| 9 | TSWP | 3.7(b) | 90 days after EPA's approval of the PDI WP |
| 10 | TS Evaluation Report | 3.7(c) | 180 days after EPA's approval of the TSWP |
| 11 | Preliminary (30%) RD | 3.8 | 90 days after Settling Party submittal of PDI Evaluation Report |
| 12 | Intermediate (60%) RD | 3.9 | 120 days after EPA's comments on the Preliminary RD |
| 13 | Value Engineering (VE) Study Results | 3.10 | 90 days after submittal of the Intermediate RD |
| 14 | Pre-final (95%) RD | 3.11 | 90 days after EPA's comments on the Intermediate RD and VE Study |
| 15 | Final (100%) RD | 3.12 | 60 days after EPA's comments on the Pre-final RD |
| 16 | Periodic Review Support Plan | 4.5 | 30 days after EPA request |

# 7.    STATE PARTICIPATION

**7.1    Copies.** Settling Party shall, at any time it sends a deliverable to EPA, send a hard copy of such deliverable to the State. EPA shall, at any time it sends a notice, authorization, approval, disapproval, or certification to Settling Party, send a hard copy of such document to the State.

ALCD-PUBCOM_0001320

**7.2**    **Review and Comment.** The State will have a reasonable opportunity for review and comment prior to any EPA approval or disapproval under ¶ 5.6 (Approval of Deliverables) of any deliverables that are required to be submitted for EPA approval.

## 8.    REFERENCES

**8.1**    The following regulations and guidance documents, among others, apply to the Work. Any item for which a specific URL is not provided below is available on one of the three EPA Web pages listed in ¶ 8.2:

(a)    A Compendium of Superfund Field Operations Methods, OSWER 9355.0-14, EPA/540/P-87/001a (Aug. 1987).

(b)    CERCLA Compliance with Other Laws Manual, Part I: Interim Final, OSWER 9234.1-01, EPA/540/G-89/006 (Aug. 1988).

(c)    Guidance for Conducting Remedial Investigations and Feasibility Studies, OSWER 9355.3-01, EPA/540/G-89/004 (Oct. 1988).

(d)    CERCLA Compliance with Other Laws Manual, Part II, OSWER 9234.1-02, EPA/540/G-89/009 (Aug. 1989).

(e)    Guidance on EPA Oversight of Remedial Designs and Remedial Actions Performed by Potentially Responsible Parties, OSWER 9355.5-01, EPA/540/G-90/001 (Apr.1990).

(f)    Guidance on Expediting Remedial Design and Remedial Actions, OSWER 9355.5-02, EPA/540/G-90/006 (Aug. 1990).

(g)    Guide to Management of Investigation-Derived Wastes, OSWER 9345.3-03FS (Jan. 1992).

(h)    Permits and Permit Equivalency Processes for CERCLA On-Site Response Actions, OSWER 9355.7-03 (Feb. 1992).

(i)    Guidance for Conducting Treatability Studies under CERCLA, OSWER 9380.3-10, EPA/540/R-92/071A (Nov. 1992).

(j)    National Oil and Hazardous Substances Pollution Contingency Plan; Final Rule, 40 C.F.R. Part 300 (Oct. 1994).

(k)    Guidance for Scoping the Remedial Design, OSWER 9355.0-43, EPA/540/R-95/025 (Mar. 1995).

(l)    Remedial Design/Remedial Action Handbook, OSWER 9355.0-04B, EPA/540/R-95/059 (June 1995).

22

(m)    EPA Guidance for Data Quality Assessment, Practical Methods for Data Analysis, QA/G-9, EPA/600/R-96/084 (July 2000).

(n)    Operation and Maintenance in the Superfund Program, OSWER 9200.1-37FS, EPA/540/F-01/004 (May 2001).

(o)    Comprehensive Five-year Review Guidance, OSWER 9355.7-03B-P, 540-R-01-007 (June 2001).

(p)    Guidance for Quality Assurance Project Plans, QA/G-5, EPA/240/R-02/009 (Dec. 2002).

(q)    Institutional Controls: Third Party Beneficiary Rights in Proprietary Controls (Apr. 2004).

(r)    Quality management systems for environmental information and technology programs -- Requirements with guidance for use, ASQ/ANSI E4:2014 (American Society for Quality, February 2014).

(s)    Uniform Federal Policy for Quality Assurance Project Plans, Parts 1-3, EPA/505/B-04/900A though 900C (Mar. 2005).

(t)    Superfund Community Involvement Handbook, EPA/540/K-05/003 (Apr. 2005).

(u)    EPA Guidance on Systematic Planning Using the Data Quality Objectives Process, QA/G-4, EPA/240/B-06/001 (Feb. 2006).

(v)    EPA Requirements for Quality Assurance Project Plans, QA/R-5, EPA/240/B-01/003 (Mar. 2001, reissued May 2006).

(w)    EPA Requirements for Quality Management Plans, QA/R-2, EPA/240/B-01/002 (Mar. 2001, reissued May 2006).

(x)    USEPA Contract Laboratory Program Statement of Work for Inorganic Analysis, ILM05.4 (Dec. 2006).

(y)    USEPA Contract Laboratory Program Statement of Work for Organic Analysis, SOM01.2 (amended Apr. 2007).

(z)    EPA National Geospatial Data Policy, CIO Policy Transmittal 05-002 (Aug. 2008), available at https://www.epa.gov/geospatial.

(aa)    Principles for Greener Cleanups (Aug. 2009), available at https://www.epa.gov/greenercleanups/epa-principles-greener-cleanups.

(bb)    EPA Region 2 Clean and Green Policy, available at https://www.epa.gov/greenercleanups/epa-region-2-clean-and-green-policy

ALCD-PUBCOM_0001322

(cc)   USEPA Contract Laboratory Program Statement of Work for Inorganic
       Superfund Methods (Multi-Media, Multi-Concentration), ISM01.2 (Jan. 2010).

(dd)   Close Out Procedures for National Priorities List Sites, OSWER 9320.2-22
       (May 2011).

(ee)   Recommended Evaluation of Institutional Controls: Supplement to the
       "Comprehensive Five-Year Review Guidance," OSWER 9355.7-18 (Sep. 2011).

(ff)   Construction Specifications Institute's MasterFormat 2012, available from the
       Construction Specifications Institute, www.csinet.org/masterformat.

(gg)   Institutional Controls: A Guide to Planning, Implementing, Maintaining, and
       Enforcing Institutional Controls at Contaminated Sites, OSWER 9355.0-89,
       EPA/540/R-09/001 (Dec. 2012).

(hh)   Institutional Controls: A Guide to Preparing Institutional Controls Implementation
       and Assurance Plans at Contaminated Sites, OSWER 9200.0-77, EPA/540/R-
       09/02 (Dec. 2012).

(ii)   EPA's Emergency Responder Health and Safety Manual, OSWER 9285.3-12
       (July 2005 and updates), https://www.epaosc.org/_HealthSafetyManual/manual-
       index.htm.

(jj)   Broader Application of Remedial Design and Remedial Action Pilot Project
       Lessons Learned, OSWER 9200.2-129 (Feb. 2013).

(kk)   Contaminated Sediment Remediation Guidance for Hazardous Waste Sites,
       OSWER 9355.0-85 (December 2005).

(ll)   Use of Amendments for In Situ Remediation at Superfund Sediment Sites,
       OSWER 9200.2-128FS (April 2013).

(mm)   Guidelines for Using Passive Samplers to Monitor Organic Contaminants at
       Superfund Sediment Sites, OSWER 9200.1-110FS (December 2012).

(nn)   Using Fish Tissue Data to Monitor Remedy Effectiveness, OSWER 9200.1-77D
       (July 2008).

**8.2**   A more complete list may be found on the following EPA Web pages:

Laws, Policy, and Guidance   https://www.epa.gov/superfund

Test Methods Collections   https://www.epa.gov/measurements

Guidance and Policies Relating to Contaminated Sediment at Superfund Sites:

24

ALCD-PUBCOM_0001323

https://www.epa.gov/superfund/superfund-contaminated-sediments-guidance-documents-fact-sheets-and-policies

8.3    For any regulation or guidance referenced in the Settlement Agreement or SOW, the reference will be read to include any subsequent modification, amendment, or replacement of such regulation or guidance. Such modifications, amendments, or replacements apply to the Work only after Settling Party receive notification from EPA of the modification, amendment, or replacement.

25

ALCD-PUBCOM_0001324

# EXHIBIT 11

OxyChem's Comments in Opposition to Proposed Consent Decree,
*United States v. Alden Leeds, Inc., et al.*, Civil Action No. 2:22-cv-07326 (D.N.J.)

ALCD-PUBCOM_0001325



**Conflict Prevention and Resolution Services**

**Contract # 68HERH19D0033**

# Revised Work Plan and Pricing Estimate for Task Order Request #013

# Diamond Alkali-Lower Passaic River Allocation

Original submitted: September 3, 2019
Revised: September 12, 2019; September 20, 2019

Prepared for: U.S. Environmental Protection Agency, Washington, DC 20460

| EPA Customer | EPA Region 2 |
| --- | --- |
| EPA Task Order Contracting Officer's Representative (TOCOR) | Alice Yeh, EPA Region 2<br>212-637-4427<br>yeh.alice@epa.gov |
| ERG Task Order Manager (TOM) | Laura Bachle<br>703-841-1705<br>laura.bachle@erg.com |
| Period of Performance | Task Order Issuance to October 30, 2020 |

ALCD-PUBCOM_0001326

## Contents

1. Overview and Pricing Summary
2. Background
3. Assumptions
4. Project Methods and Approach
5. Work Tasks
6. Reports, Transmittals, and Deliverables
7. Staffing Plan
8. Quality Management
9. Conflict of Interest
10. Detailed Pricing Estimate

## 1.    Overview and Pricing Summary

This work plan describes ERG's approach for performing the tasks described in the statement of work (SOW). It includes a description of the activities associated with each task as well as a list of transmittals and deliverables and their due dates.

Table 1 provides a summary of ERG's proposed hours and pricing. Section 10 provides a more detailed breakout of pricing by subtask, labor categories, and other direct costs (ODCs).

Table 1. Summary of Proposed Hours and Pricing

| Contract year | Hours | Price |
|---|---|---|
| Year 1 | Not Responsive by Agreement with FOIA Requester | $1,294,305 |
| **Total Task Order, All Years** | | $1,294,305 |

## 2.    Background

The lower 8.3 miles of the Lower Passaic River are one of four Operable Units (OUs) of the Diamond Alkali Superfund site. This OU is designated as OU2. The site has been on the National Priorities List since 1984. Contaminated sediments in this portion of the river are a significant source of contamination to the rest of the river down to Newark Bay. Contaminants including dioxins, mercury, PCBs, and DDT and its breakdown products can accumulate in in aquatic life and pose an unacceptable risk to human health and the environment.

Under an administrative order on consent (AOC), Occidental Chemical Corporation (OCC) is performing the remedial design for this OU. The cost for remedial action (RA) is estimated at $1.38 billion. EPA Region 2 has issued a notice of potential liability to approximately 100 parties and has offered a first round of cash-out settlements to approximately 20 potentially responsible parties (PRPs). Region 2 will address the liability of municipalities and public entities separately.

Under this TO, a third-party allocator will support Region 2 in assigning a share of responsibility to 83 non-public, non-municipal PRPs (representing 97 facilities) not included in the first round of cash-out settlements. The Region expects to use the results of the allocation to enter into settlement agreements with the subset of PRPs with the greatest share of responsibility to perform the RA and enter into another round of cash-out settlements. This effort will be based in part on existing

ALCD-PUBCOM_0001327

information and contacts generated from previous attempts to develop a mutually acceptable allocation of liability.

This is an ongoing project with a well qualified service provider already in place under a previous contract. ERG has selected the same service provider, AlterEcho, as the most effective way to continue the work.

## 3. Assumptions

This work plan and pricing estimate are based on the following assumptions:

General Assumptions

- Activities and pricing are included for the entire 13-month period of performance.
- ERG reserves the right to adjust the amount of the budget for general task order management if the contract and task order periods of performance are extended beyond the current period of performance.
- This TO can be modified to change the statement of work or add funding.

ERG's Understanding of the Work

ERG's work plan reflects our team's understanding of what work has already been completed on this allocation project and what work remains to be done. As the project has evolved, some key numbers and factors have changed, such that this estimate may differ from previous projections regarding the level of effort needed to complete the tasks envisioned in the SOW. Specific factors that have evolved include:

- There has been an increase in the number of facilities that must be calculated an equitable share, from 83 to 92 (+11%).
- Exemption (b) (3) (A)



- The level of anticipated interaction required with PAP counsel, including the volume of comments that will be received and that will require analysis and confirmation, is substantially greater than anticipated.
- Exemption (b) (3) (A)

ALCD-PUBCOM_0001328

○                          Exemption (b) (3) (A)

Task A: Preliminary Work

- General task order management activities include development of monthly progress reports and invoices, regular status check-in calls with the TOCOR, ongoing updates of progress and financial data in ERG's project tracking system (as required under ERG's CPRS contract), and development of the task order final report.

- Not Responsive by Agreement with FOIA Requestor


- Not Responsive by Agreement with FOIA Requestor

- Not Responsive by Agreement with FOIA Requestor


Task B: Allocation Design and Production

- A maximum of 83 PRPs will be provided an opportunity to participate in or be evaluated for the purpose of determining a share of responsibility in the allocation process. They are designated herein as Allocation Parties. Ten of these PRPs are non-participating parties.

- The allocation will cover a maximum of 92 facilities associated with the 83 Allocation Parties.

- All OU2 Allocation Parties will be designated a share of responsibility in the Final Allocation Recommendation Report.

- All OU2 PRPs which have agreed or agree in the future to participate in the allocation by executing the OU2 Allocation Guide and Confidentiality Agreement (Participating Allocation Parties or PAPs) will be provided an opportunity to participate in the design of the allocation database and process and to provide additional site-related information for possible addition to the database.

- The Final Allocation Recommendation Report will divide the Allocation Parties into logical groupings of similarly-situated PRPs

- EPA will provide the ERG Team with a listing and contact information for each OU2 PAP. Reference herein to meetings or other forms of communication with the OU2 PAPs means communication with the identified representatives of such parties.

- A maximum of 593,895 pages of documents will be reviewed and utilized to conduct the allocation, including:

  ○ A maximum of 130,000 pages of documents received from EPA for ERG Team review under the previous contract.

  ○ A maximum of 413,895 extra pages of documents received from PRPs for ERG Team review

ALCD-PUBCOM_0001329

under the previous contract.

o The PAPs have indicated to the ERG Team that they have an additional 50,000 pages of relevant documents to submit over the remainder of the project.

• <span style="color:red">Exemptions (b) (3) (A) and (b) (5)</span>

• All communications by the ERG Team will be by phone or email unless a meeting is noted.
• The ERG Team estimates ___ hours of communications per PAP over the remainder of the project. This time is presented as communications in Tasks B3, B4, and B5, and meetings in Tasks B5 and B6. This partially responds to the PRP outreach requirements specified in Section II.B.2 of the SOW.
• A maximum of ___ hours of combined project status/update calls will be held by the ERG Team with EPA per month. ERG assumes these calls will be held on a weekly basis. This time is included under Task A3.
• The allocation database will be designed and organized primarily for purposes of allocation.
• Any part of a communication, attachment to a communication, presentation, or written material provided to OU2 PRPs by the ERG Team that involves a description of the site or EPA actions or activities will be provided to EPA for review and approval prior to submission to the OU2 PAPs.
• Unless otherwise noted herein, all allocation-related communications by the ERG Team involving the OU2 PAPs or representatives of EPA or DOJ, individually or in groups, will be held confidential pursuant to the provisions of the ADR Act of 1996, 5 USC 574.
• In order to ensure a common expectation of confidentiality, all PAP participants in the allocation process have entered, and EPA has appropriately acknowledged, a confidentiality agreement.

Pricing Estimate

• <span style="color:red">Not Responsive by Agreement with FOIA Requestor</span>

• <span style="color:red">Not Responsive by Agreement with FOIA Requestor</span>

• <span style="color:red">Not Responsive by Agreement with FOIA Requestor</span>

• Not Responsive by Agreement with FOIA Requestor

ALCD-PUBCOM_0001330

Not Responsive by Agreement with FOIA Requestor

- Not Responsive by Agreement with FOIA Requestor
- Not Responsive by Agreement with FOIA Requestor

- Not Responsive by Agreement with FOIA Requestor

- Not Responsive by Agreement with FOIA Requestor

## 4. Project Methods and Approach

ERG's general approach to this TO consists of the following steps:

- ERG has prepared and submitted this work plan and a pricing estimate. We will proceed to perform work described in the following SOW tasks upon issuance of the TO by the Contracting Officer.

- As agreed upon with EPA, all reports, transmittals and deliverables—with the exception of Items B-5 and B-6 in Table 3—will be submitted to the TOCOR and Project Officer (PO). Items B-2 and B-3 will be submitted with Item B-7.

- ERG will be responsible for evaluating the service provider's performance at the end of the project and during the project if it lasts through the annual contract evaluation performance schedule.

- ERG understands that during the performance of this work, Region 2 may share information with the ERG Team that is pre-decisional and deliberative or is considered to be attorney work product in preparation of potential litigation. ERG recognizes that such work is privileged to the United States and EPA under the Freedom of Information Act. While the ERG Team will conduct the allocation process in a manner transparent to the public to the extent possible, the ERG Team will consult with EPA before releasing information to the public to ensure confidential information is protected.

In conducting this work, ERG will comply with all terms in the overall contract, including—but not limited

ALCD-PUBCOM_0001331

to—the following requirements:

- ERG and subcontractor AlterEcho (ERG Team) will not interpret EPA policy on behalf of the EPA or make decisions on items of policy, regulation or statutes. The ERG Team also will not take a stand on the merits of substantive items under discussion.

- In gathering information or performing research with parties outside the EPA, ERG Team members will identify themselves as contractors to EPA and not as EPA employees.

- ERG will approach this task in accordance with the basic terms of the contract and according to the established norms and ethical standards of ADR professionals. Specifically, ERG will ensure that ADR professionals supporting this TO abide by ethical codes of conduct such as those defined in the SOW. Information provided to the ADR professional by any of the parties, communications between parties and the ADR professional, and notes and dispute resolution work product generated by the ADR professional during work pursuant to the TO will be maintained as confidential by the ADR professional pursuant to the provisions of the ADR Act of 1996 (Public Law 104-320; 5 USC 571 et al.) and applicable federal, state, and judicial requirements.

- To enhance the positive substantive, relational, and procedural outcomes from ADR cases, ERG will direct all ADR professionals providing services under this TO to do the following prior to the mediation or facilitation and throughout the process:

  o Inquire about whether individual participants have the time, financial, and logistical resources necessary to participate effectively in the process and—where resources are inadequate—assist them in identifying appropriate resources or in making necessary adjustments to the process to accommodate resource constraints.

  o Assist the participants in identifying the issues that are important to resolving any controversy and solutions that will address the needs shared by the participants.

  o Conduct the process to promote active engagement from all participants.

  o Explore with the participants appropriate ways to incorporate high quality and relevant information resources necessary to resolve the issues.

  o To support productive dialogue and effective implementation of any agreements reached by the participants, ensure that participants have appropriate authority to make commitments on behalf of their organizations.

- Obtain approval in writing for any long-distance travel.

As prime contractor, ERG will support this TO through the following activities:

- Provide monthly progress reports by the 15th of each month.
- Communicate and coordinate with the EPA TOCOR as needed.
- Coordinate with the subcontractors.
- Incorporate the principles of quality management while carrying out this task.
- Provide deliverables in electronic format (as agreed to by the TOCOR) to the EPA TOCOR.
- Notify the EPA PO and TOCOR when 75 percent of the funds provided have been expended or funding for less than six weeks of work remains.

5.    Work Tasks

ALCD-PUBCOM_0001332

Task A: Preliminary Work

*Task A1: Select Dispute Resolution Professionals*

ERG will select a team of experienced senior dispute resolution professional to provide all support under this TO, in consultation with the TOCOR and PO. Service provider selection will be based on the team's knowledge of the Superfund allocation of liability process; experience constructing allocation plans consistent with EPA settlement guidelines and legal requirements; access to resources for database design, entry, analysis, and manipulation; and, understanding of the PRP legal and technical issues and concerns in designing allocation processes. Based on these qualifications, and prior experience, ERG has selected AlterEcho as the service provider. AlterEcho provides technical continuity, historical knowledge, and relevant experience.

*Task A2: Develop Work Plan*

ERG has developed this work plan to provide a detailed explanation of all activities associated with and a proposed approach for completing each of the defined tasks. The ERG Team has identified the transmittals and deliverables and their associated due dates and developed a detailed budget, including a breakout of labor hours and other direct costs. This work plan also identifies quality assurance/quality control procedures, conflict of interest (COI) assurances for all ERG Team members, and procedures for substitution of labor categories in the event of temporary or permanent personnel changes. We will proceed to perform work described in the following SOW tasks only upon issuance of the TO by the Contracting Officer.

*Task A3: Oversee Deliverables*

In accordance with proper contract implementation, ERG and the selected subcontractor will ensure effective oversight and management of the resources and deliverables required by EPA. Specifically, the ERG TOM for this effort will:

- Ensure that all technical direction received falls into the scope of work prior to initiating any action.

- Ensure completion and maintain copies of all contract transmittals and deliverables.

- Assist in resource planning, and manage the budget and hours on a regular basis to ensure accurate and effective financial tracking.

- Oversee subcontractor activities through regular and periodic conversations with the subcontractor to ensure effective performance.

- Ensure that monthly progress and financial reports accurately record the level of effort expended, clearly articulate the work completed and work planned for the subsequent month, clarify any lagging subcontractor costs, and identify any problems encountered and activities to address them.

- Speak on an as-needed basis with the EPA TOCOR to review the financial and work status of the project. ERG assumes that conference calls will be held as often as weekly.

- Review the first progress report and invoice with the EPA TOCOR.

- Update ERG's management tracking system on an ongoing basis.

ALCD-PUBCOM_0001333

Table 2. Transmittals and Deliverables Under Task A

| Item | Title | Due no later than | Type |
|------|-------|-------------------|------|
| A-1 | Work plan | August 30, 2019 | Deliverable |
| A-2 | Monthly progress reports | 15th of each month** | Deliverable |

**ERG will not prepare or submit a progress report in months when no substantive work has been performed.

## Task B: Allocation Design and Production

### Task B1: Initial Review

Under the previous contract, EPA provided the contractor with the information, materials, and reports generated pertaining to the allocation. AlterEcho organized and reviewed this information under that contract. No further activity or level of effort is anticipated for this task.

### Task B2: PRP Outreach

Throughout the course of the allocation, the ERG Team will conduct outreach to OU2 PRPs participating in the allocation to provide them with the opportunity to comment on and correct the draft data reports produced under the previous contract and to provide input on the drafting of the allocation recommendation report. This will include:

- Ensuring that each PRP's data or information used in the allocation is correctly input into the database.
- Soliciting PRP positions on the drafting of the allocation recommendation report.
- Communicating how their input was or was not taken into consideration in developing the allocation recommendation report.

The activities and level of effort associated with the PRP outreach activities described above are directly linked to the Allocation Design and Production task described below. They are incorporated into the descriptions and estimates for those tasks.

Per Section II.B.2.b of the SOW, the ERG Team will prepare and provide to EPA a report regarding outreach efforts conducted with the OU2 PAPs during the entire project, including a list of participants in outreach efforts, a description of topics discussed, and a summary of issues or concerns raised.

This task will require the following efforts on the part of the ERG Team:

- Review and provide EPA with a generalized description of topics discussed and summary of issues or concerns raised by OU2 PAPs during conduct of the TO, without attribution to individual OU2 PAPs.
- Prepare and provide EPA an overview of conducted outreach efforts, including a list of OU2 PAPs that have participated in outreach meetings, conference calls, or individual communications with the ERG Team.

### Task B3: Searchable Database

Per Section II.B.3 of the SOW, the ERG Team will maintain and update the searchable database developed under the previous contract. The searchable database contains and organizes all of the information and data used in the allocation.

ALCD-PUBCOM_0001334

- Under the previous contract, the database was designed and initially populated with information received from EPA, including PRP disclosure statements and nexus documents from third party litigation totaling approximately 130,000 pages.

- Under the previous contract, the database was also populated with up to 413,895 pages of documents received from PRPs deemed relevant to the allocation by the previous contractor and any other information used in the allocation.

- The database is designed in such a way as to allow access and use by EPA and DOJ staff for their settlement purposes.

- Completion of database: The ERG Team will upload applicable new documents received as part of the TO activities. The PAPs have indicated to the ERG Team that they have an additional 50,000 pages of relevant documents to submit. The ERG Team will complete the database and provide the completed database to EPA when the final allocation recommendation report, described in Task B7, is complete.

### Task B4: Draft and Final Facility Data Reports

Per Section II.B.4.a of the SOW, the ERG Team will organize and conduct a technical and scientific evaluation of data in the allocation database to develop individual data reports for each of the OU2 PAP facilities for which an early settlement was not offered by EPA. Under the previous contract, 72 Draft PRP Data Reports were completed and made available to the PAPs for submission of corrections or suggestions.                    Exemptions (b) (3) (A) and (b) (5)


This will include review and evaluation of additional Facility Questionnaire information and supporting documents to be submitted and expanding the depth of data review focused on mass of contaminants associated with the facility. The reports will provide selected information regarding each OU2 PAP's relation to OU2 and OU2 contaminants of concern that will be used in conduct of the allocation. The ERG Team will establish a deadline of 10 business days from receipt of the Draft Facility Data Reports for submission of corrections or suggestions by the OU2 PAPs for improving the quality of the received Draft Facility Data Reports.

This task will require the following efforts on the part of the ERG Team:

- Conduct coding of data and loading of coded data obtained from OU2 PAPs into database.
- Review preliminary factual submission by OU2 PAPs.
- Review site data loaded into database to determine appropriate organization for allocation.
- Compile and organize site data in database to support allocation analysis and share computations.
- Organize data in allocation database into and draft individual OU2 PRP data reports for each of the OU2 PAP facilities for which an early settlement was not offered by EPA Exemptions (b)(3)(A) and (b)(5).

ALCD-PUBCOM_0001335

- Provide a copy of the Draft Facility Data Reports to the OU2 PAPs for review.

## Exemptions (b) (3) (A) and (b) (5)

Conduct of this task is dependent upon the following factors:

- Access by the ERG Team to EPA technical data regarding site conditions and the selected OU2 remedy.
- Sufficient data on identified PRPs to allow analysis of associated contaminants of concern and hazardous substance fate and transport at the site.
- Successful establishment of the allocation database.
- Receipt of additional data from OU2 PAPs for inclusion in the allocation database within established timeframes.
- As indicated in the Assumptions section of this Work Plan, it is assumed that there are an additional 50,000 pages of relevant documents to submit over the remainder of the project.

Per Section II.B.4.c of the SOW, the ERG Team will analyze corrections or suggestions for improving the quality of the Draft Facility Data Reports received from OU2 PAPs to determine whether modifications of the original draft data reports are warranted. Based on this analysis, the ERG Team will modify the data reports, as deemed appropriate. The ERG Team will then provide a copy of all of the Final Facility Data Reports to the OU2 PRPs, with an explanation of how suggested changes were, or were not, incorporated.

- This task will require the following efforts on the part of the ERG Team: Employ a rigorous approach to filling data gaps with additional information requested and obtained from EPA or the PAPs (e.g., industry resources, EPA/NJDEP files, Sanborn Fire Insurance Maps, aerial photographs and possibly supplemental 104e requests) in accordance with the protocol for handling data gaps and ambiguities included in the Allocation Methodology.
- Analyze received suggestions and corrections to Draft Facility Data Reports in relation to existing Site data and the final allocation design in order to determine appropriate modifications.
- Modify the individual data reports, as warranted based on the above analysis.
- Provide an explanation to the OU2 PAPs regarding whether, and if so how, received suggestions resulted in changes to their individual data report, including a description of why their suggestions and comments were, or were not, taken into account. Upload Final Facility Data Reports to the confidential allocation document repository.
- As required, the ERG Team will conduct communications with individual OU2 PAPs to answer questions regarding their Final Facility Data Reports.

Timing of this task is dependent upon the following factors:

- Receipt of comments from OU2 PRPs regarding their Draft Facility Data Reports within established timeframes.
- ## Exemptions (b) (3) (A) and (b) (5)

ALCD-PUBCOM_0001336

*Task B5: Allocation and Allocation Recommendation Report*

The ERG Team will ensure that each PRP's data or information used in the allocation is accurately input into the database and will solicit from the PRPs participating in the allocation positions on the drafting of the allocation recommendation report (as described below). AlterEcho will perform the allocation. The activities and level of effort associated with performing the allocation are directly linked to the subtasks described below. They are incorporated into the descriptions and estimates for those tasks.

Per Section II.B.5.a and b of the SOW, the ERG Team will prepare a first draft of the allocation recommendation report and submit it to the OU2 PAPs for review. The draft allocation report will designate shares of responsibility among the OU2 PRPs, as appropriate based on the allocation analysis. The draft allocation report will include a recommendation on the possible grouping of the OU2 PRPs into tiers of similar levels of responsibility.

This task will require the following efforts on the part of the ERG Team:

- Conduct communications, including conference calls and/or meetings, with OU2 PAPs regarding recommendations on and legal/equitable theories pertinent to conduct of the allocation raised in Position and Response Briefs received from the OU2 PAPs. The ERG Team will focus on establishing routine group communication calls and electronic updates to achieve greater efficiency in communication and as a means to reduce individual PAP-initiated calls and electronic inquiries.

- Review and consider input regarding allocation received from the OU2 PAPs and EPA.

- Review and understand the basis for EPA's selected remedy for OU2, in consultation with EPA technical and legal personnel.

- Analyze the relative toxicity of materials discharged by OU2 PRPs and other differentiating factors, including fate and transport of hazardous substances released by PRPs based on the data contained in the RI/FFS, in relation to the selected remedy.

- Compile and analyze allocation data related to each OU2 PRP, including contaminants of concern, to establish the relative impact of the actions of each OU2 PRP on the conditions that resulted in EPA selecting the OU2 remedy.

- Load compiled PRP data into allocation calculations to determine relative relationships among the OU2 PRPs.

- As appropriate, establish appropriate tiers of OU2 PRP responsibility based on calculations and consideration of equitable factors.

- Prepare the draft allocation recommendation report.

- Submit the draft report to the OU2 PAPs for review and comment.

Timing of this task is dependent upon receipt of position briefs and reply briefs regarding allocation from OU2 PAPs within established timeframes.

Per Section II.B.5.c of the SOW, the ERG Team will plan, schedule, and conduct a meeting with the OU2 PAPs as a group regarding the draft allocation recommendation report. The purpose of the meeting will be to advise the OU2 PAPs as a group regarding the draft allocation recommendation report and to obtain preliminary PAP comments regarding the draft allocation recommendation report. The ERG Team

ALCD-PUBCOM_0001337

will also communicate with the OU2 PAPs individually as necessary to obtain the input of OU2 PAPs, including those that did or were unable to attend the meeting, regarding the draft allocation recommendation report. As noted previously, the ERG Team will focus on establishing routine group communication calls and electronic updates to achieve greater efficiency in communication and as a means to reduce individual PAP initiated calls and electronic inquiries.

This task will require the following efforts on the part of the ERG Team:

- Making arrangements for a meeting in the greater New York City metropolitan area sufficient to accommodate the OU2 PAPs as a group.

- Coordination of meeting space and equipment for meetings provided by EPA or OU2 PAPs.

- Communication via email with the OU2 PAPs regarding substance, date/time, and location of meeting.

- Development of the meeting agenda.

- Development of participant materials, as needed.

- Travel of two senior staff from Washington, DC, to attend the meeting.

- Communications by a Dispute Resolution Professional via phone, email, or other electronic media with OU2 PAPs as required.

- Recording of PAP general comments regarding the draft allocation recommendation report, without attribution to individual OU2 PAP comments.

Per Section II.B.5.c of the SOW, the ERG Team will prepare a Final Allocation Recommendation Report. The Final Allocation Recommendation Report will take into consideration comments on the Draft Allocation Recommendation Report received during meetings with and received in position and reply briefs from the OU2 PAPs and during communications with EPA regarding the nature and scope of the Final Allocation Recommendation Report; address any identified ambiguities in the draft report; include references to all materials considered and relied upon, and a complete description of the allocation process and the basis upon which shares were assigned. The Final Allocation Recommendation Report will include an overview of the basis for the determinations of shares among the OU2 PRPs, including a description of the use of data sources and application of allocation factors and methodology utilized, and reason for potential vulnerabilities, if any, in the resulting allocation. The report will identify and explain the rationale, if applicable, for grouping OU2 PRPs into tiers of similar relative responsibility. The Final Allocation Recommendation Report will also address any identified ambiguities in the draft report, and provide a summary of how comments of the OU2 PRPs regarding the Draft Allocation Recommendation Report were, or were not, taken into account in the final report, without attribution to individual comments.

This task will require the following efforts on the part of the ERG Team:

- Review and consider the comments received from OU2 PAPs regarding the Draft Allocation Recommendation Report.

- Conduct communications, including conference calls and/or meetings, with OU2 PAPs regarding comments regarding the Draft Allocation Recommendation Report received from OU2 PAPs.

- Edit the Draft Allocation Recommendation Report to incorporate appropriate modifications based on received comments to produce the Final Allocation Recommendation Report.

ALCD-PUBCOM_0001338

The ERG Team will provide access the OU2 Allocation Database to identified members of the EPA Case Team. This task will require the following efforts on the part of the ERG Team:

- Submission to members of the EPA Case Team Review of credentials and instructions for accessing information in the OU2 Allocation Database.

ALCD-PUBCOM_0001339

*Task B6: Meetings or Conference Calls*

The activities and level of effort associated with performing the allocation are directly linked to the other tasks in this work plan. They are incorporated into the descriptions and estimates for those tasks as noted. The ERG Team will attend and participate in the following meetings either in person or by telephone or video conference at EPA's discretion.

- Progress meetings or conference calls. Please see Task A2 of this work plan.

- Kickoff meeting or conference call with EPA. Please see Task A2 of this work plan.

- Draft allocation recommendation report meeting or conference call with PRPs. Please see Task B5 of this work plan.

It is anticipated that all meetings will be held at EPA or PRP-provided facilities.

*Task B7: Task Order Closeout Report*

Per Section II.B.7 of the SOW, the ERG Team will design and produce the first draft of a report regarding the conduct of tasks pursuant to the TO and submit it for review by EPA. The report will not contain any confidential or sensitive information. The contents of the Draft Task Order Closeout Report will include:

- A half-page description of the project that describes the nature of the project, the parties, the process, and the outcomes.

- If appropriate, a short section reflecting on the process and procedural lessons learned and recommendation for improvements and identification of those activities conducted that contributed to the success of the process.

- A brief summary of the final costs of the project, broken out by percentage of labor hours and other direct costs.

This task will require the following efforts on the part of the ERG Team:

- Review of project activities and compilation of a project summary.

- Consideration and compilation of thoughts on lessons learned regarding this project.

- Compilation of project budget costs.

- Preparation of the Draft Task Order Closeout Report.

The ERG Team will prepare a Final Task Order Closeout Report and submit it to EPA. The Final Task Order Closeout Report will take into consideration comments received from EPA regarding the draft of the Task Order closeout report. ERG will provide one copy of the Final Task Order Closeout Report to the PO and one copy to the TOCOR in electronic format.

This task will require the following efforts on the part of the ERG Team:

- Review and consideration of comments by EPA regarding the draft Task Order Closeout Report.

- Editing, and as required redesign, of the closeout report to incorporate modifications based on EPA comments in order to produce the Final Task Order Closeout Report.

ALCD-PUBCOM_0001340

- As directed by the TOCOR, the ERG Team will participate in a post-process debriefing with EPA officials to discuss lessons learned and potential next steps.

Per discussions with EPA, while the Final Allocation Report is referenced under this task in the EPA SOW, report development is not included under this task, but rather under Task B5.

*Task B8: Post-Process Debriefing*

As directed by the EPA TOCOR, the ERG Team will participate in a post-process debriefing with EPA officials, including the PO, TOCOR, and relevant EPA management, to discuss lessons learned and next steps. It is anticipated that this meeting will take place via teleconference.

Table 3. Transmittals and Deliverables Under Task B

| Item | Title | Due no later than* | Type |
|------|-------|--------------------|------|
| B-1 | Kickoff meeting or conference call | Within 20 business days of work plan approval | Activity |
| B-2 | Completion of searchable database | Upon submission of final allocation recommendation report | Deliverable |
| B-3 | Completion of final facility data reports | Within 40 business days of work plan approval | Transmittal |
| B-4 | Perform allocation | 140 business days after completion of final facility data reports | Activity |
| B-5 | Draft allocation recommendation report | 140 business days after completion of final facility data reports | Transmittal |
| B-6 | Draft allocation recommendation report meeting | Within 20 business days of submittal of draft allocation recommendation report | Transmittal |
| B-7 | Final allocation recommendation report | 65 business days after completion of draft allocation recommendation report | Deliverable |
| B-8 | Final PRP outreach report | 10 business days after completion of final allocation recommendation report | Transmittal |
| B-9 | Draft case closure report | 10 business days after acceptance of final allocation recommendation report | Transmittal |
| B-10 | Final case closure report | 10 business days after receipt of EPA comments | Deliverable |

## 6.    Reports, Transmittals, and Deliverables

ERG will submit deliverables in accordance with the contract. As agreed upon with EPA, with the exception of Items B-5 and B-6 in Table 3, copies of all contract deliverables will be sent to both the PO and the TOCOR. Items B-2 and B-3 will be submitted with Item B-7. If oral briefings are scheduled for EPA staff, the PO will be notified in time to attend. Specific deliverables and the timing of their delivery are identified in the tables in Section 5 above.

ALCD-PUBCOM_0001341

## 7.   Staffing Plan

Not Responsive by Agreement with FOIA Requestor

Not Responsive by Agreement with FOIA Requestor

ALCD-PUBCOM_0001342



Not Responsive by Agreement with FOIA Requestor

## 8.  Quality Management

As part of routine quality assurance practices, the ERG TOM will:

- Communicate as needed with the TOCOR to review progress.
- Communicate regularly with the subcontractor(s) to receive project status updates.

ALCD-PUBCOM_0001343

In addition, all work on this TO will be performed in accordance with ERG's strict quality assurance practices including—but not limited to—incorporating quality management principles and processes described in ERG's Quality Management Plan into the development of the required transmittals, deliverables, and consulting services offered. ERG will ensure the timely delivery of all transmittals and deliverables.

## 9.   Conflict of Interest

ERG certifies that, to the best of our knowledge and belief, no real, apparent, or potential organizational or individual conflict of interest exists with this task order, based on previous or ongoing work, or other potential conflict. We recognize our continuing obligation to search and report any actual or potential personal and organizational conflicts of interest, should they arise during performance of work under this task order. ERG's official conflict of interest certification appears on the next page.

ALCD-PUBCOM_0001344

## CONFLICT OF INTEREST CERTIFICATION

### Eastern Research Group, Inc.
### EPA Contract No. 68HERH19D0033
### Task Order Request No.: 012

In accordance with EPAAR 1552.209-71 (Organizational Conflicts of Interest), EPAAR 1552.209-73 (Notification of Conflicts of Interest Regarding Personnel), and Prime Contract clause (Work Assignment Conflicts of Interest Certification), Eastern Research Group, Inc. makes the following certifications:

ORGANIZATIONAL AND PERSONAL CONFLICTS OF INTEREST:

☒　To the best of our knowledge and belief, no actual or potential organizational conflicts of interest exist. In addition, none of the individuals proposed for work under this Order has any personal conflicts of interest.

OR:

☐　To the best of our knowledge and belief, all actual or potential organizational and personal conflicts of interest have been reported to the EPA Contracting Officer.

This is to certify that our personnel who perform work under this Order, or relating to this Order, have been informed of their obligation to report personal and organizational conflicts of interest to our designated COI Official.

Eastern Research Group, Inc. recognizes its continuing obligation to search for, identify, and report any actual or potential organizational or personnel conflicts of interests that may arise during the performance of this Order or work relating to this Order.

*Laura Bachle*

_____
Authorized Signature

Laura Bachle_____
Printed Name

Task Order Manager_____
Title

August 30, 2019_____
Date

ALCD-PUBCOM_0001345

# EXHIBIT 12

OxyChem's Comments in Opposition to Proposed Consent Decree,
*United States v. Alden Leeds, Inc., et al.*, Civil Action No. 2:22-cv-07326 (D.N.J.)

ALCD-PUBCOM_0001346

*Public Version*

# Work Plan

## EPA Conflict Prevention and Resolution Services Contract

## Contract # EP-W-14-020

## Work Plan for Task Order #096

## Diamond Alkali-Lower Passaic River Allocation



**Prepared for:**

US Environmental Protection Agency
Washington, DC 20460

EPA Program Office:
EPA Task Order Contracting Officer's
Representative (TOCOR):

Region 2

Alice Yeh

CSRA Task Order Manager (TOM):

Mary Apostolico

Subcontractor Task Manager:

David Batson
TechLaw / AlterEcho

ALCD-PUBCOM_0001347

This Work Plan describes CSRA's approach for performing the tasks described in the Statement of Work. It includes a description of the activities associated with each task as well as a list of transmittals and deliverables and their due dates. A cost estimate for this Task Order Work Plan is provided as a separate attachment.

The Work Plan is organized as follows:

Section 1.0 - Background
Section 2.0 - Assumptions
Section 3.0 - Project Methodology and Approach
Section 4.0 - Work Tasks
Section 5.0 - Reports, Transmittals and Deliverables
Section 6.0 - Staffing Plan
Section 7.0 - Quality Management
Section 8.0 - Conflict of Interest
Section 9.0 - Cyber Security
Section 10.0 - Project Budget
Section 11.0 - Period of Performance

## 1.0    Background

The Diamond Alkali Site (the Site) has a long history, involving over 100 potentially responsible parties (PRPs). Since the late 1800s, the Lower Passaic River has been a highly industrialized waterway, receiving direct and indirect discharges from numerous industrial facilities. Data collected in the Lower Passaic River, and EPA's analyses, show that contaminated sediment in the lower 8.3 miles are a major source of contamination to the rest of the river and Newark Bay and pose an unacceptable risk to human health and the environment due to the presence of a variety of contaminants that stay in the environment for a long time and can build up in fish and shellfish. These contaminants include dioxins and furans, PCBs, mercury, DDT and its primary breakdown products, copper, dieldrin, PAHs, and lead.

On March 4, 2016, EPA issued a record of decision selecting the remedy for the lower 8.3 miles of the Lower Passaic River, which is Operable Unit 2 (OU2) of the Site. Currently, the remedial design (RD) for OU2 is being performed by Occidental Chemical Corporation (OCC) pursuant to an administrative order on consent. The cost of the remedial action (RA), estimated for purposes of remedy selection, is $1.38 billion.

Region 2 has issued a notice of potential liability to approximately 100 parties, informing them of their responsibility for the RD/RA for OU2. The Region has offered a first round of cash-out settlements to a group of approximately 20 PRPs. The Region expects to separately address the liability of municipalities and public entities. For the remaining PRPs, the Region expects to enter into settlement negotiations for performance and funding of the remedy with OCC and other parties (the "Major PRPs") that the Region considers to be major PRPs for OU2. The Region plans another round of cash-out settlements with "Middle Tier PRPs", i.e., not part of the phase 1 cash-out group, but also not Major PRPs. The Region requires the services of a third party allocator to develop a settlement framework and evaluate the 80 Middle Tier and Major parties within the framework. This proposal applies same allocation process to all of the private OU2 PRPs remaining after the first round of cash-out settlements, with the expectation that, in the settlement phase, the resulting allocation will enable EPA to identify the Middle Tier PRPs, eligible for a phase two cash out offer, and the Major PRPs that will be performing and/or funding the remedy.

ALCD-PUBCOM_0001348

Region 2 understands that the PRP group (the Cooperating Parties Group, or CPG) has made at least two previous attempts to develop a mutually acceptable allocation of liability to promote settlement with EPA for costs and work at the Site, however both efforts fell short of agreement. Region 2 believes that because of these previous efforts, additional information available from responses to CERCLA 104(e) letters, information available from previous litigation at the state level and numerous conversations with PRPs over the years, the project will be able to be built primarily upon existing information and contacts. Some minor augmentation of background, data and allocation factors may need to occur to develop what is hoped to be an acceptable settlement proposal and structure. In 2016, the Department of Justice retained a mediator/allocation specialist, David Batson of TechLaw/AlterEcho, to assist in settlement analysis. Those discussions and analyses have resulted in this effort.

## 2.0   Assumptions

This work plan and the attached cost estimate are based on the following assumptions, in addition to Task-specific assumptions noted in Section 4.0 of the Work Plan. All work will be conducted in accordance with the specific tasks in the Work Plan to the performance metrics specified therein.

General Assumptions:

- EPA will provide the CSRA Team with a list of parties noticed regarding their responsibility for the RD/RA for OU2, including:
    - a list of Major and Middle Tier Parties ("OU2 PRPs");
    - a list of Phase 1 cash-out parties; and
    - a list of other OU2 parties, including municipalities and other entities
- Maximum of 80 PRPs will be provided an opportunity to participate in or be evaluated for the purpose of determining a share of responsibility in the allocation process
- All OU2 PRPs will be provided an opportunity to participate in the design of the allocation database and process and to provide additional Site-related information for possible addition to the database, and will be designated a share of responsibility in the Final Allocation Recommendation Report
- The Final Allocation Recommendation Report will also divide the parties into logical groupings of similarly-situated PRPs
- EPA will provide the CSRA Team with a listing and contact information for each OU2 PRP; Reference herein to meetings or other forms of communication with the OU2 PRPs means communication with the identified representatives of such parties
- A maximum of 150,000 pages of documents will reviewed and utilized to conduct the allocation, including;
    - A maximum of 130,000 pages of documents received from EPA for CSRA Team review
    - A maximum of 20,000 extra pages of documents received from PRPs for CSRA review
- All communications by the CSRA Team will be by phone or email unless meeting noted
- Maximum of 4 hours of combined project status/update calls will be held by the CSRA Team with EPA per month
- Out-of-DC Area Meetings:
    - 3 meetings involving 2 contractor staff
- Out-of-DC area meetings will be held at the EPA Region 2 offices or other location in the greater New York City metropolitan area as determined by EPA, or OU2 PRPs they supply meeting space
- Travel for and timing of out-of-DC area meetings will be scheduled to allow CSRA Team members to travel from Washington, DC and return on the same day

ALCD-PUBCOM_0001349

- Meetings will be scheduled and held within noted timeframes
- The allocation database will be designed and organized primarily for purposes of allocation
- Space and equipment for meetings will be provided by EPA or PRPs
- The CSRA Team will provide EPA with a copy of all communications sent to OU2 PRPs regarding the subject, substance, and logistics of OU2 PRP meetings with CSRA Team members
- Any part of a communication, attachment to a communication, presentation, or written material provided to OU2 PRPs by the CSRA Team that involves a description of the Site or EPA actions or activities will be provided to EPA for review and approval prior to submission to the OU2 PRPs
- Unless otherwise noted herein, all allocation related communications by the CSRA Team involving the OU2 PRPs or representatives of EPA or DOJ, individually or in groups, will be held confidential pursuant to the provisions of the ADR Act of 1996, 5 USC 574
- In order to ensure a common expectation of confidentiality, all PRP participants in the allocation process will be required to enter, and EPA will appropriately acknowledge, a confidentiality agreement
- The CSRA Team will provide invoices to EPA at the end of each month in which a task is completed (activity, transmittal, and/or deliverable) identified in Section 5.0 of the Work Plan, with a written Progress Report detailing associated activities accomplished during the reporting period, how such activities meet Task Order performance standards, and associated labor and other direct costs

- Invoices and progress reports will be provided at the end of the month in each a task is completed. Task activities, transmittals and deliverables are described below in Section 4. Work Tasks.
- "Staffing" referenced in Section 4.0 Work Tasks refers to TechLaw staff.
- This Task Order can be modified to change the statement of work or add funding.

## 3.0    Project Methodology and Approach

The proposed methodology and approach consists of the following:
- To support this Task Order, CSRA selected TechLaw support.
- CSRA and TechLaw (the CSRA Team) will not interpret EPA policy on behalf of the EPA or make decisions on items of policy, regulation or statutes. The CSRA Team also will not take a stand on the merits of substantive items under discussion including, but not limited to, any substantive issues raised by OU2 PRPs. The CSRA Team will not interpret EPA's March 4, 2016, record of decision selecting the remedy for OU2 of the Site.
- In gathering information or performing research with parties outside the EPA, CSRA Team members will identify themselves as contractors to EPA and not as EPA employees.
- CSRA will approach this task in accordance with the basic terms of the contract and according to the established norms and ethical standards of ADR professionals. Except as otherwise noted herein, information provided to the ADR professional by any of the parties, including EPA, communications between parties and the ADR professional, and notes and dispute resolution work product generated by the ADR professional during

ALCD-PUBCOM_0001350

work pursuant to the Task Order will be maintained as confidential by the ADR professional pursuant to the provisions of the ADR Act of 1996 (Public Law 104-320; 5 USC 571 et al.) and applicable federal, state and judicial requirements.

- To enhance the positive substantive, relational, and procedural outcomes from ADR cases, CSRA will direct all ADR professionals providing ADR services under this task order to do the following prior to the mediation or facilitation and throughout the process:
  - Inquire about whether individual participants have the time, financial, and logistical resources necessary to participate effectively in the process and – where resources are inadequate – assist them in identifying appropriate resources or in making necessary adjustments to the process to accommodate resource constraints;
  - Assist the participants in identifying the issues that are important to resolving any controversy and solutions that will address the needs shared by the participants;
  - Conduct the process to promote active engagement from all participants;
  - Explore with the participants appropriate ways to incorporate high quality and relevant information resources necessary to resolve the issues; and
  - To support productive dialogue and effective implementation of any agreements reached by the participants, ensure that participants have appropriate authority to make commitments on behalf of their organizations.

As prime contractor, CSRA will support this Task Order through the following activities:
- Provide progress reports at the end of each month in which an activity, transmittal, and/or deliverable identified in Section 5.0 of the Work Plan is completed;
- Communicate and coordinate with the EPA Task Order Contracting Officer's Representative (TOCOR) by phone as needed;
- Coordinate with the subcontractor, TechLaw;
- Incorporate the principles of Quality Management while carrying out this task;
- Provide deliverables in electronic format (as agreed to by the TOCOR) to the EPA TOCOR; and
- NOTIFY THE EPA PROJECT DIRECTOR AND PROGRAM OFFICE CONTACT WHEN 75% OF THE FUNDS PROVIDED HAVE BEEN EXPENDED.

## 4.0    Work Tasks

### Task 0.0    **Task Order Management**

In accordance with proper contract implementation, CSRA and TechLaw will ensure effective management of the resources and deliverables required by EPA.

Specifically, the CSRA Task Order Manager (TOM) for this effort will:
- Ensure that all technical direction received falls into the scope of work prior to initiating any action;
- Ensure completion and maintain copies of all contract transmittals and deliverables;
- Oversee subcontractor activities through regular and periodic conversations with the subcontractor to ensure effective performance;
- Ensure that progress and financial reports accurately clearly articulate the work completed as per the approved work plan, and identify any problems encountered and activities to address them;
- Speak on an as-needed basis with the EPA TOCOR to review the financial and work status of the project;

ALCD-PUBCOM_0001351

- Review the progress report and invoice with the EPA TOCOR; and
- Update the Dashboard task order management tracking system as invoices are submitted.

The CSRA Team developed this Work Plan to provide a detailed explanation of all activities associated with and a proposed approach for completing each of the defined tasks. The CSRA Team identified the transmittals and deliverables and their associated due dates and developed a detailed fixed price budget, including a breakout of labor and travel costs.

| Item | Title | Due No Later Than[†] | Type |
|------|-------|---------------------|------|
| 0.1 | Work Plan | Within 10 days* of SOW issuance or as approved by the EPA CO | **Deliverable** |
| 0.2 | Progress Reports | Submitted after completion of each task and with submission of invoice | **Deliverable** |

[†] Or as otherwise directed by the TOCOR
* All references to "days" refer to business days

## Task 1      Preliminary Work

| Item | Title | Due No Later Than[†] | Type |
|------|-------|---------------------|------|
| 1.1 | Task Order Kick-Off Meeting | Within 20 days* of Task Order approval | Transmittal |

[†] Or as otherwise directed by the TOCOR
* All references to "days" refer to business days

The CSRA Team will prepare for and participate in a meeting with EPA to discuss tasks described in the Task Order, EPA's expectations for the project, and a plan for conducting the outreach to PRPs. Prior to the meeting, the CSRA Team will develop its overall strategy for conduct of the allocation process, including a timeline of tasks and strategy for communications with the OU2 PRPs. During the meeting, the EPA will advise the CSRA Team regarding the identity of the OU2 PRPs and the scope and nature of the selected remedy. Following the meeting, the CSRA Team will send an email summarizing the agreed-upon PRP Outreach Plan for approval of the EPA technical lead in consultation with EPA legal personnel. The developed PRP outreach plan will include a process for contacting and receiving information from PRPs, including for meetings and conference calls with the OU2 PRPs as a group, and individual OU2 PRP contacts via email, letter, or phone, and confidentiality procedures.

This task will require the following efforts on the part of the CSRA Team:
- Development of a plan for conducting outreach to OU2 PRPs that includes an opportunity for all OU2 PRPs to (1) provide feedback on the design of the allocation, including additional data, information or factors which should be considered in design of the database, (2) review their individual PRP data report for accuracy, (3) provide suggestions regarding design of the allocation process and (4) provide feedback on the allocation report. The plan will also explain how the CSRA Team will update EPA on PRP outreach efforts
- Drafting and submission of an email summarizing the agreed-upon PRP outreach plan for approval of the EPA technical lead

ALCD-PUBCOM_0001352

- The CSRA Team will supply two (2) senior staff located in Washington, DC for the meeting

Tech Law Staffing - Senior Allocation Specialist; Senior Project Manager

*Performance Standards/Metrics:*
- The CSRA Team participates in the Task Order Kick-Off Meeting
- The submitted summary of the PRP Outreach Plan provides a summary of the agreement reached at the Task Order Kick-Off Meeting regarding the plan for communications by the CSRA Team with the OU2 PRPs

### Task 2    Public Announcement of Project

| Item | Title | Due No Later Than[†] | Type |
|------|-------|---------------------|------|
| 2.1 | EPA Project Public Announcement Meeting | Within 40 days* of Task Order approval | Activity |

† Or as otherwise directed by the TOCOR
* All references to "days" refer to business days

The CSRA Team will participate in a meeting, sponsored by EPA, with the OU2 PRPs to announce and explain the allocation project, including opportunities for participation of the OU2 PRPs in the development of the allocation process. Following the project announcement meeting noted in Task 2, the CSRA Team will work to obtain and record signatures of the OU2 PRPs and acknowledgement of EPA to the Participation Agreement distributed during the project announcement meeting.

This task will require the following efforts on the part of the CSRA Team:
- Preparation of talking points and handout material for participants regarding the allocation process in consultation with the EPA technical lead in consultation with EPA legal personnel
- Preparation of a written Participation Agreement for consideration and execution of the OU2 PRPs, incorporating an explanation of relevant confidentiality protections and requirements associated with the allocation process
- The CSRA Team will supply two (2) senior staff located in Washington, DC to participate in the meeting
- Communication via email, and as required via phone, with the OU2 PRPs as a group regarding execution of and to answer questions regarding the Participation Agreement
- Recording and compilation of executed Participation Agreement signature pages

Conduct of this task is dependent upon EPA's ability to successfully make arrangements for and schedule the meeting, and communicate with OU2 PRPs regarding the meeting, and upon receipt of EPA's final approval of the PRP outreach plan agreed upon during the Task Order Kick-Off Meeting within 10 business days of the meeting.

Staffing - Senior Allocation Specialist, Senior Project Manager

*Performance Standards/Metrics:*
- Talking points and materials prepared for the meeting provide an overview of the project and opportunities for PRP participation noted in the PRP Outreach Plan developed in Task 1
- The CSRA Team participates in the Task Order Kick-Off Meeting

ALCD-PUBCOM_0001353

- A majority of the members of the OU2 PRPs execute the Participation Agreement

## Task 3    Initial Allocation Process and Database Design

| Item | Title | Due No Later Than[†] | Type |
|------|-------|---------------------|------|
| 3.1 | Submit initial allocation process and database design to EPA | Within 100 days* of Task Order approval | Transmittal |

† Or as otherwise directed by the TOCOR
* All references to "days" refer to business days

The CSRA Team will review documents received from EPA and prepare a written descriptive summary of the initial design for the allocation process, including a design of the allocation database, and submit to EPA for review.

The allocation process will be designed based upon information received during consultations with EPA and OU2 PRPs on the allocation database and using all relevant non-confidential received information, including data, records, and other documents. The initial design will include recommendations for: (1) data sources to be considered for the allocation; (2) applicable allocation factors; and (3) methodology for determination of shares.

The searchable database will be designed to have the capability to contain and organize all of the information and data used in the allocation, including received PRP disclosure statements and nexus documents from third party litigation. No confidential information will be included in the allocation database. Though to be designed for purposes of conducting the allocation, the database will be designed in such a way as to allow access and use by EPA and DOJ staff for their settlement purposes following submission of the Allocation Data Reports in Task 8. The CSRA Team will, as an interim measure, create and provide EPA access to a SharePoint site in which any site documents received from the OU2 PRPs will be maintained.

This task will require the following efforts on the part of the CSRA Team:
- Conduct a preliminary review of Site data on OU2 contaminants of concern as identified in the OU2 ROD to determine appropriate allocation data sets
- Conduct preliminary research, analysis, and determine applicable case law, legal requirements, and equitable considerations for use in conducting allocation
- Conduct initial review and analysis of EPA selected remedy for OU2 to determine method to account for differential impact of contaminants of concern and source location
- Conduct a preliminary review of information received from EPA, including PRP disclosure statements and nexus documents from third party litigation, in order to determine the appropriate design of the database required to support conduct of the allocation process
- Conduct initial coding of data and loading of coded data into database to determine credibility of database design concept
- Establish preliminary recommendations regarding allocation computations appropriate for OU2, procedures for use of data in allocation computations, and appropriate allocation methodology, and the design of a searchable database with

ALCD-PUBCOM_0001354

capability to contain and organize all of the information and data used in the allocation
- Preparation of a written descriptive summary of the initial design for the allocation process, including (1) a timeline for submission of allocation related documents, including PRP position briefs and reply briefs, and (2) a written description of the design of the database with a suggested method for providing OU2 PRPs specific information on the contents of the database, suggestions on methods for resolving data gaps in data regarding OU2 PRPs not identified in documents received from EPA, and if practical, images of anticipated data screens.
- Establish a SharePoint site that provides EPA access to documents received from OU2 PRPs

Conduct of this task is dependent upon; (1) receipt of all allocation documents and information regarding the site remedy from EPA within 20 business days of approval of the Task Order, and (2) receipt of all information from EPA as individual documents in OCR searchable pdf format to allow loading into the allocation database.

Staffing – Senior Allocation Specialist; Senior Project Manager; Database Designer

*Performance Standards/Metrics:*
- The CSRA Team submits a written descriptive summary of the initial design for the allocation process, including a database design, within the noted timeframe
- The submitted written descriptive summary of the initial design for the allocation process includes a summary of the basis of and anticipated conduct the allocation process, including preliminary recommendations on data sources to be considered for the allocation, applicable allocation factors, and methodology for determination of shares
- The submitted initial database design provides a written description of the database, including, suggested method for providing OU2 PRPs specific information on the contents of the database, suggestions on methods for resolving data gaps in data regarding OU2 PRPs not available in documents received from EPA, and if practical, images of anticipated data screens

## Task 4    Conference Call w EPA on Initial Database Design

| Item | Title | Due No Later Than[†] | Type |
|------|-------|--------------------|------|
| 4.1 | Conference Call with EPA on Initial Allocation Process and Database Design | Within 10 days* of submission of initial allocation process and database design | Activity |

† Or as otherwise directed by the TOCOR
* All references to "days" refer to business days

Task 4.1 – The CSRA Team will prepare for and participate in a conference call with EPA regarding the initial allocation process and database design. The purpose of the call will be to advise and consult with EPA regarding the submitted initial allocation process and database design and to discuss and resolve any EPA comments. Following the conference call, the CSRA Team will edit the initial allocation process and database design based on received EPA comments to create a draft design for submission to the OU2 PRPs.

ALCD-PUBCOM_0001355

This task will require the following efforts on the part of the CSRA Team:
- The CSRA Team will supply two (2) senior project staff located in Washington, DC to participate in the conference call
- Conference call assumed to be no more than two (2) hours in length

Staffing – Senior Allocation Specialist; Senior Project Manager

*Performance Standards/Metrics:*
- The CSRA Team participates in the draft Database Design conference call

**Task 5**      <u>Meeting with PRPs on Draft Allocation Process and Database Design</u>

| Item | Title | Due No Later Than[†] | Type |
|------|-------|----------------------|------|
| 5.1 | Conduct Meeting with PRPs on Draft Allocation Process and Database Design | Within 40 days* of submission of initial allocation process and database design to EPA | Activity |
| 5.2 | Conference Call with EPA on Meeting with PRPs on Draft Allocation Process and Database Design | Within 10 days* following the Meeting with PRPs on Draft Allocation Process and Database Design | Activity |

† Or as otherwise directed by the TOCOR
* All references to "days" refer to business days

Task 5.1 - The CSRA Team will plan, schedule, and conduct a meeting with the OU2 PRPs as a group regarding the draft design of the allocation process and database. The purpose of the meeting will be to advise the OU2 PRPs as a group regarding the anticipated conduct of the allocation process and the anticipated organization of data and contents of the database, and to obtain PRP comments regarding the draft allocation process and database design. The CSRA Team will also communicate with the OU2 PRPs individually to obtain the input of OU2 PRPs, including those that did or were unable to attend the outreach meeting, regarding suggestions on the effective design and conduct of the allocation process and database, and to obtain additional records and information, if any, for the allocation database. The CSRA Team will establish a deadline of 60 business days following the meeting with PRPs on draft allocation process and database design for the submission by OU2 PRPs of additional data for inclusion in the allocation database.

This task will require the following efforts on the part of the CSRA Team:
- Making arrangements for a meeting in the greater New York City metropolitan area sufficient to accommodate the OU2 PRPs as a group
- Coordination of meeting space and equipment for meetings provided by EPA or OU2 PRPs
- Communication via email with the OU2 PRPs regarding substance, date/time, and location of meeting
- Development of meeting agenda
- Development of participant materials, including a descriptive summary of Site information received from EPA and a description of the draft allocation process and database design
- Travel of two (2) senior staff from Washington, DC to attend meeting

ALCD-PUBCOM_0001356

*Public Version*

- Communications by Senior Allocation Specialist via phone, email, or other electronic media as required with OU2 PRPs; Communications will be limited to an average of 20 minutes for each OU2 PRP
- Record PRP comments regarding allocation process and database design and conduct, without attribution to individual OU2 PRP comments

Staffing – Senior Allocation Specialist; Senior Project Manager

*Performance Standards/Metrics:*
- The CSRA Team conducts a meeting with the OU2 PRPs as a group regarding design of the allocation process and database
- A majority of the members of the OU2 PRPs as a group attend the meeting either in person or remotely
- The CSRA Team copies the EPA technical lead on its email communication to the OU2 PRPs regarding substance, date/time, and location of meeting, and provides EPA with a copy of utilized meeting materials

Task 5.2 - The CSRA Team will schedule and hold, within 10 business days of holding the meeting with the OU2 PRPs on the draft allocation process and database design, a conference call with EPA regarding the findings of the meeting.

This task will require the following efforts on the part of the CSRA Team:
- Scheduling and participating in a conference call with EPA to provide EPA information on the meeting, including a list of participants at the meeting and summary of suggestions received regarding the allocation process and database design
- Conference call assumed to be no more than two (2) hours in length

Timing of this task is dependent upon the availability of assigned EPA staff to participate in a conference call within noted timeframe.

Staffing – Senior Allocation Specialist; Senior Project Manager

*Performance Standards/Metrics:*
- The CSRA Team participates in a conference call with EPA regarding the findings of the meeting following the Database Design Outreach Meeting
- In conducting the post-meeting conference call with EPA, the CSRA Team provides a summary of information and suggestions obtained from the OU2 PRPs without attribution to contributions of individual participants

## Task 6    Final Allocation Design

| Item | Title | Due No Later Than[†] | Type |
|------|-------|---------------------|------|
| 6.1 | Submit Final Allocation Design to EPA and PRPs | Within 50 days* following the Meeting with PRPs on Draft Allocation Process and Database Design | Transmittal |

† Or as otherwise directed by the TOCOR
* All references to "days" refer to business days

ALCD-PUBCOM_0001357

The CSRA Team will complete the design of the allocation process based on input received from EPA and PRPs for submission to the OU2 PRPs and EPA.

This task will require the following efforts on the part of the CSRA Team:
- Conduct coding of data and loading of coded data into database
- Communications by Senior Allocation Specialist via phone, email, or other electronic media as required with OU2 PRPs; Communications will be limited to an average of 20 minutes for each OU2 PRP
- Record, compile, and organize suggestions of OU2 PRPs regarding allocation process design and conduct without attribution to individual comments
- Edit draft allocation design based on analysis of received Site data, EPA comments on the draft allocation design, and consideration of input received from OU2 PRPs during meeting and other outreach methods to prepare a written descriptive summary of the final allocation design and submit to EPA and the OU2 PRPs

Staffing – Senior Allocation Specialist; Senior Project Manager

*Performance Standards/Metrics:*
- The CSRA Team submits a written descriptive summary of the final design for the allocation process within the noted timeframe
- The submitted written descriptive summary of the final design for the allocation process includes a description of the basis of and anticipated conduct of the allocation process, addresses any identified ambiguities in the draft report, and includes a summary of how the comments of EPA and the OU2 PRPs regarding the draft allocation design were, or were not, taken into account in the final allocation design, without attribution.

**Task 7**       **Draft PRP Data Reports**

| Item | Title | Due No Later Than† | Type |
|------|-------|---------------------|------|
| 7.1 | Submit Draft PRP Data Reports to PRPs | Within 100 days* following the Meeting with PRPs on Draft Allocation Process and Database Design | Transmittal |

† Or as otherwise directed by the TOCOR
\* All references to "days" refer to business days

The CSRA Team will organize and conduct a technical and scientific evaluation of data in the allocation database to develop individual data reports for each of the OU2 PRPs. The PRP Data Reports will provide selected information regarding each OU2 PRP's relation to OU2 and OU2 contaminants of concern that will be used in conduct of the allocation. The CSRA Team will establish a deadline of 40 business days from receipt of the data report for submission of corrections or suggestions by the OU2 PRPs for improving the quality of the received OU2 PRP's data report.

This task will require the following efforts on the part of the CSRA Team:
- Conduct coding of data and loading of coded data into database obtained from OU2 PRPs
- Review Site data loaded into database to determine appropriate organization for allocation

ALCD-PUBCOM_0001358

- Compile and organize Site data in database to support allocation analysis and share computations
- Organize data in allocation database into individual PRP data reports
- Provide a copy of the PRP data reports to the OU2 PRPs

Conduct of this task is dependent upon the following:

- Access by the CSRA Team to EPA technical data regarding Site conditions and the selected OU2 remedy
- Sufficient data on identified PRPs to allow analysis of associated contaminants of concern and hazardous substance fate and transport at the Site
- Successful establishment of the allocation database
- Receipt of additional data from OU2 PRPs for inclusion in the allocation database by 60 business days following the meeting with PRPs on draft allocation process and database design

Staffing - Data Analysts; Senior Scientist; Senior Project Manager; Senior Allocation Specialist

*Performance Standards/Metrics*

- The CSRA Team submits the PRP Data Reports to the OU2 PRPs within the noted timeframe
- The submitted written individual PRP Data Reports include a summary of information in the allocation database that is relevant to a determination regarding the associated OU2 PRP's relation to OU2 and OU2 contaminants of concern for use in conduct of the allocation
- The CSRA Team copies the EPA technical lead on the email communications to the OU2 PRPs providing a copy of their data report

## Task 8    Final Data Reports

| Item | Title | Due No Later Than[†] | Type |
|------|-------|----------------------|------|
| 8.1 | Submit Final PRP Data Reports to EPA and PRPs | Within 40 days* following the deadline for submission of corrected PRP data reports | Transmittal |
| 8.2 | Provide EPA Access to Allocation Database | Upon submission of corrected PRP data reports | Activity |

† Or as otherwise directed by the TOCOR
* All references to "days" refer to business days

The CSRA Team will analyze corrections or suggestions for improving the quality of the data reports received from OU2 PRPs to determine whether modifications of the original data reports are warranted. Based on this analysis, the CSRA Team will modify the data reports, as deemed appropriate. The CSRA Team will then provide a copy of all of the revised data reports to EPA and a revised copy of their own individual data reports to each of the OU2 PRPs, with an explanation of how suggested changes were, or were not, incorporated.

ALCD-PUBCOM_0001359

*Public Version*

This task will require the following efforts on the part of the CSRA Team:
- Analyze received suggestions and corrections to data reports in relation to existing Site data and the final allocation design in order to determine appropriate modifications
- Modify the individual data reports, as warranted based on above analysis
- Provide an explanation to the OU2 PRPs regarding whether, and if so how, received suggestions resulting in changes to their individual data report, including a description of why their suggestions and comments were, or were not, taken into account
- As required, the CSRA Team will conduct communications with individual OU2 PRPs to answer questions regarding their final data report

Timing of this task is dependent upon receipt of comments from OU2 PRPs regarding their data report within established timeframes

Staffing - Data Analysts; Senior Scientist; Senior Project Manager; Senior Allocation Specialist

*Performance Standards/Metrics*
- The CSRA Team submits the Final PRP Data Reports to EPA and OU2 PRPs within the noted timeframe
- The submitted revised Final PRP Data Reports address any identified ambiguities in the draft reports and includes a summary of how received comments regarding the draft PRP Data Reports were, or were not, taken into account in the final reports
- The CSRA Team copies the EPA technical lead on the email communications to the OU2 PRPs providing a copy of their individual data report

## Task 9    Draft Allocation Report

| Item | Title | Due No Later Than[†] | Type |
|------|-------|---------------------|------|
| 9.1 | Submit Draft Allocation Recommendation Report | Within 90 days* following submittal of final PRP Data Reports | Transmittal |

† Or as otherwise directed by the TOCOR
* All references to "days" refer to business days

The CSRA Team will prepare a first draft of the allocation recommendation report and submit to the OU2 PRPs and EPA for review.  The draft allocation report will designate shares of responsibility among the OU2 PRPs, as appropriate based on the allocation analysis.  The draft allocation report will include a recommendation on the possible grouping of the OU2 PRPs into tiers of similar levels of responsibility.

This task will require the following efforts on the part of the CSRA Team:
- Review and consideration of input regarding allocation received from the OU2 PRPs and EPA
- Review and understand the basis for EPA's selected remedy for OU2, in consultation with EPA technical and legal personnel
- Review and understand the relative toxicity of identified contaminants of concern relevant to the selection of the OU2 remedy, in consultation with EPA technical and legal personnel

ALCD-PUBCOM_0001360

- Analyze the relative toxicity of materials discharged by OU2 PRPs and other differentiating factors, including fate and transport of hazardous substances released by PRPs based on the data contained in the RI/FS, in relation to the selected remedy
- Compilation and analysis of allocation data related to each OU2 PRP, including contaminants of concern, to establish the relative impact of the actions of each OU2 PRP on the conditions that resulted in EPA selecting the OU2 remedy
- Establish appropriate allocation algorithms
- Load compiled PRP data into allocation calculations to determine relative relationships among the OU2 PRPs
- As appropriate, establish appropriate tiers of OU2 PRP responsibility based on calculations and consideration of equitable factors
- Prepare draft allocation recommendation report
- Submission of the draft report to the OU2 PRPs and EPA

Timing of this task is dependent upon receipt of position briefs and reply briefs regarding allocation from OU2 PRPs within established timeframes

Staffing - Senior Allocation Specialist; Senior Project Manager

*Performance Standards/Metrics:*
- The CSRA Team submits the Draft Allocation Recommendation Report within the noted timeframe
- The submitted written Draft Allocation Recommendation Report includes an overview of the basis for the determinations of shares among the OU2 PRPs, including a description of the use of data sources and application of allocation factors and methodology utilized, and reason for potential vulnerabilities, if any, in the resulting allocation
- The report identifies and explains the rationale, if applicable, for grouping OU2 PRPs into tiers of similar relative responsibility

**Task 10**    **Final Allocation Recommendation Report**

| Item | Title | Due No Later Than[†] | Type |
|------|-------|---------------------|------|
| 10.1 | Conference Call with EPA regarding Draft Allocation Recommendation Report | Within 10 days* of submittal of Draft Allocation Report | Transmittal |
| 10.2 | Submit Final Allocation Recommendation Report to OU2 PRPs and EPA | Within 60 days* of submittal of Draft Allocation Report | **Deliverable** |

† Or as otherwise directed by the TOCOR
* All references to "days" refer to business days

Task 10.1 - The CSRA Team will prepare for and participate in a meeting with EPA regarding the submitted draft allocation recommendation report. The purpose of the meeting will be to obtain EPA comments regarding the submitted draft allocation report, including the basis and findings of the draft allocation report and the report format.

This task will require the following efforts on the part of the CSRA Team:
- The CSRA Team will supply one (2) senior staff located in Washington, DC to participate in the conference call

ALCD-PUBCOM_0001361

- Conference call assumed to be no more than two (2) hours in length

Staffing - Senior Allocation Specialist

Performance Standards/Metrics:
> The CSRA Team participates in the meeting regarding the submitted draft allocation recommendation report

Task 10.2 - The CSRA Team will prepare a Final Allocation Recommendation Report. The Final Allocation Recommendation Report will take into consideration comments on the draft allocation recommendation report received during consultation with EPA and during meetings with and received in position and reply briefs from the OU2 PRPs.

This task will require the following efforts on the part of the CSRA Team:
- Review and consider the comments by OU2 PRPs and EPA regarding the draft allocation recommendation report
- Editing of the draft allocation recommendation report to incorporate appropriate modifications based on OU2 and EPA comments to produce the Final Allocation Recommendation Report

Staffing - Senior Allocation Specialist; Senior Project   Manager

*Performance Standards/Metrics:*
- The CSRA Team submits a Final Allocation Recommendation Report within the noted timeframe
- The submitted Final Allocation Recommendation Report includes the elements of the Draft Allocation Recommendation Report described in Task 17, addresses any identified ambiguities in the draft report, and provides a summary, without attribution to individual comments, of how comments of the OU2 PRPs and EPA regarding the Draft Allocation Recommendation Report were, or were not, taken into account in the final report, without attribution.

## Task 11      **Final PRP Outreach Report**

| Item | Title | Due No Later Than[†] | Type |
|------|-------|---------------------|------|
| 11.1 | Submit Final PRP Outreach Report | Within 10 days* of submittal of Final Allocation Report | Activity |

† Or as otherwise directed by the TOCOR
* All references to "days" refer to business days

The CSRA Team will prepare and provide to EPA a report regarding outreach efforts conducted with the OU2 PRPs, including a list of participants in outreach efforts, a description of topics discussed, and a summary of issues or concerns raised.

This task will require the following efforts on the part of the CSRA Team:
- Review and organize the comments of OU2 PRPs received during conduct of the Task Order, without attribution to individual OU2 PRPs
- Prepare and provide EPA an overview of conducted outreach efforts, including a list of OU2 PRPs that have participated in outreach meetings, conference calls, or individual communications with the CSRA Team and a summary of suggestions received from the OU2 PRPs regarding the allocation process

ALCD-PUBCOM_0001362

Staffing - Senior Allocation Specialist; Senior Project Manager

*Performance Standards/Metrics:*
- The CSRA Team submits a written summary of PRP outreach efforts within the noted timeframe
- The Final PRP Outreach Report includes a summary of conducted PRP outreach efforts, including a list of OU2 PRPs that have participated in outreach meetings, conference calls, or individual communications with the CSRA Team and a summary of suggestions received from the OU2 PRPs regarding the allocation process
- In drafting the Final PRP Outreach Report, the CSRA Team provides a summary of information and suggestions obtained from the OU2 PRPs without attribution to contributions of individual participants

## Task 12        Task Order Closeout Report

| Item | Title | Due No Later Than[†] | Type |
|------|-------|---------------------|------|
| 12.1 | Submit Draft Task Order Closeout Report | Within 10 days* of submittal of Final Allocation Report | Transmittal |
| 12.2 | Final Task Order Closeout Report | Within 10 days* of receipt of EPA's comments on Draft Task Order Closeout Report | **Deliverable** |

† Or as otherwise directed by the TOCOR
* All references to "days" refer to business days

Task 12.1 - The CSRA Team will design and produce the first draft of a report regarding the conduct of tasks pursuant to the Task Order and submit it for review by EPA. The report will not contain any confidential or sensitive information. The contents of the Draft Task Order Close-Out Report will include:
- A half-page description of the project that describes the nature of the project, the parties, the process, and the outcomes
- If appropriate, a short section reflecting on the process and procedural lessons learned and recommendation for improvements and identification of those activities conducted that contributed to the success of the process
- A brief summary of the final costs of the project broken out by percentage of labor hours and other direct costs

This task will require the following efforts on the part of the CSRA Team:
- Review of project activities and compilation of project summary
- Consideration and compilation of thoughts on lessons learned regarding project
- Compilation of project budget costs
- Preparation of the Draft Task Order Close-out Report

Staffing - Senior Allocation Specialist; Senior Project Manager

*Performance Standards/Metrics:*
- The CSRA Team submits a Draft Task Order Closeout Report within the noted timeframe
- The submitted Draft Task Order Closeout Report includes the items noted above as contents of the report

ALCD-PUBCOM_0001363

Task 12.2 - The CSRA Team will prepare a Final Task Order Closeout Report and submit to EPA. The Final Task Order Closeout Report will take into consideration comments received from EPA regarding the draft of the Task Order closeout report. CSRA will provide one (1) copy of the Final Task Order Closeout Report to the PO and one (1) copy to the TOCOR in electronic format.

This task will require the following efforts on the part of the CSRA Team:
- Review and consideration of comments by EPA regarding the draft Task Order Closeout Report
- Editing, and as required redesign, of the closeout report to incorporate modifications based on EPA comments in order to produce the Final Task Order Closeout Report

Staffing - Senior Allocation Specialist; Senior Project Manager

*Performance Standards/Metrics:*
- The CSRA Team submits a Final Task Order Closeout Report within the noted timeframe
- The submitted Final Task Order Closeout Report addresses any identified ambiguities in the draft report and includes a summary of how EPA's comments regarding the Draft Allocation Recommendation Report were, or were not, taken into account in the final report

## 5.0   Reports, Transmittals and Deliverables

CSRA will provide EPA all reports in accordance with the contract.

Copies of all contract deliverables will be sent to both the PO and the TOCOR. If oral briefings are scheduled for EPA staff, the PO will be notified in time to attend.

ALCD-PUBCOM_0001364

*Public Version*

## Schedule

| Item | Title | Due No Later Than[†] | Type |
|------|-------|---------------------|------|
| 1 | Task Order Kick-Off Meeting | Within 20 days* of Task Order approval | Transmittal |
| 2 | EPA Project Public Announcement Meeting | Within 40 days* of Task Order approval | Activity |
| 3 | Submit initial allocation process and database design to EPA | Within 100 days* of Task Order approval | Transmittal |
| 4 | Conference Call with EPA on Initial Allocation Process and Database Design | Within 10 days* of submission of initial allocation process and database design | Activity |
| 5.1 | Conduct Meeting with PRPs on Draft Allocation Process and Database Design | Within 40 days* of submission of initial allocation process and database design to EPA | Activity |
| 5.2 | Conference Call with EPA on Meeting with PRPs on Draft Allocation Process and Database Design | Within 10 days* following the Meeting with PRPs on Draft Allocation Process and Database Design | Activity |
| 6 | Submit Final Allocation Design to EPA and PRPs | Within 50 days* following the Meeting with PRPs on Draft Allocation Process and Database Design | Transmittal |
| 7 | Submit Draft PRP Data Reports to PRPs | Within 100 days* following the Meeting with PRPs on Draft Allocation Process and Database Design | Transmittal |
| 8.1 | Submit Final PRP Data Reports to EPA and PRPs | Within 40 days* following the deadline for submission of corrected PRP data reports | Transmittal |
| 8.2 | Provide EPA Access to Allocation Database | Upon submission of corrected PRP data reports | Activity |
| 9 | Submit Draft Allocation Recommendation Report | Within 90 days* following submittal of final PRP Data Reports | Transmittal |
| 10.1 | Conference Call with EPA regarding Draft Allocation Recommendation Report | Within 10 days* of submittal of Draft Allocation Report | Transmittal |
| 10.2 | Submit Final Allocation Recommendation Report to OU2 PRPs and EPA | Within 60 days* of submittal of Draft Allocation Report | **Deliverable** |
| 11 | Submit Final PRP Outreach Report | Within 10 days*  of submittal of Final Allocation Report | Activity |
| 12.1 | Submit Draft Task Order Closeout Report | Within 20 days*  of submittal of Final Allocation Report | Transmittal |
| 12.2 | Final Task Order Closeout Report | Within 10 days* of receipt of EPA's comments on Draft Task Order Closeout Report | **Deliverable** |

*All references to days in this chart refer to business days*

ALCD-PUBCOM_0001365

## 6.0    Staffing Plan

This Task Order will be staffed as follows:

| Team Member Name[†] | Role in the Project |
|---|---|
| Mary Apostolico CSRA International | Overall Contract Management, Quality Assurance, Task Order Management |
| Jennifer Cutrona CSRA | Dashboard and Financial Tracking |
| David Batson TechLaw | Senior Allocation Specialist |
| Judy Manley TechLaw | Senior Project Manager |
| Travis Kline TechLaw | Senior Toxicologist |
| Erman Evcimen TechLaw | Database Designer |
| Amber Kozacek TechLaw | Researcher |

[†]Other team members than those listed in the above table may work on this task order to complete the required work.

[*]The task order mainly will be managed by the TOM listed in the above table; however, additional team members may conduct task order management activities to ensure coverage during periods when the TOM is unavailable (e.g., vacation, illness, business travel, time constraints).

## 7.0    Quality Management

As part of its quality assurance practices, CSRA TOM will:
- Review this Work Plan with the EPA TOCOR, as requested by the TOCOR;
- Meet or hold conference calls as needed with the TOCOR to review progress; and
- Speak regularly with the subcontractor to receive project status updates.

In addition, all work on this Task Order will be performed in accordance with CSRA's strict quality assurance practices, including but not limited to incorporating quality management principles and processes into the development of the required transmittals, deliverables, and the consulting services offered. Although CSRA will ensure the timely delivery of all transmittals and deliverables, CSRA will not perform a review of these documents prepared by the subcontractor.

## 8.0    Conflict of Interest

Based on our review and understanding of the legal requirements of this work, CSRA certifies that no real, apparent, or potential organizational or individual conflict of interest exists with this assignment, based on previous or ongoing work, or other potential conflicts.

ALCD-PUBCOM_0001366

## 9.0    Cyber Security

CSRA has interpreted compliance with information assurance / security provisions contained in this contract as a requirement to provide its standard CSRA information system and procedures. CSRA contract pricing does not include or reflect any additional requirements or certification and accreditation for the CSRA information system or procedures, connectivity to the Government system(s), or storage of any Government-provided data or project data, or for stand-alone development or storage environments. Should the Government require increased or specialized information assurance security or other actions beyond those reflected in the standard CSRA information system or procedures, then the Government will notify CSRA and such revisions will be provided in accordance with the "changes" clause of this contract.

## 10.0    Project Budget

The budget for this task is provided as an Attachment.

## 11.0    Period of Performance

The task order period of performance runs through June 15, 2019.

ALCD-PUBCOM_0001367

# EXHIBIT 13

OxyChem's Comments in Opposition to Proposed Consent Decree,
*United States v. Alden Leeds, Inc., et al.*, Civil Action No. 2:22-cv-07326 (D.N.J.)

ALCD-PUBCOM_0001368

Case 2:22-cv-07326-MCA-LDW    Document 309-21    Filed 04/01/24    Page 191 of 580
Case 2:18-cv-11273-JLL-JAD    Document 37015-14436 10/24/18    Page 1 of 28 PageID: 1628
PageID: 14336

*Public Version*

# Revised Work Plan

## EPA Conflict Prevention and Resolution Services Contract

## Contract # EP-W-14-020

## Work Plan for Task Order #096

## Diamond Alkali-Lower Passaic River Allocation

**Prepared for:**

US Environmental Protection Agency
Washington, DC 20460

EPA Program Office:                         Region 2
EPA Task Order Contracting Officer's
Representative (TOCOR):                     Alice Yeh

CSRA Task Order Manager (TOM):              Mary Apostolico

Subcontractor Task Manager:                ~~David Batson~~ Judy Manley
                                           TechLaw / AlterEcho

ALCD-PUBCOM_0001369

Case 2:22-cv-07326-MCA-LDW    Document 309-21    Filed 04/01/24    Page 192 of 580
Case 2:18-cv-11273-JLL-JAD    Document 37605-1489    10/24/18    Page 2 of 28 PageID: 1629
PageID: 14337

*Public Version*

This Revised Work Plan describes CSRA's approach for performing the tasks described in the Revised Statement of Work. It includes a description of the activities associated with each task as well as a list of transmittals and deliverables and their due dates. A cost estimate for this Task Order Work Plan is provided as a separate attachment. Revisions to this work plan are presented with strike thru and in bold blue. This modification adds additional documents relevant to the allocation to be submitted by the PRPs (along with associated time to evaluate the documents for relevance), additional time for PRPs to communicate, meet, and exchange information with the allocator, and a step for early identification of PRPs who are similarly situated to the parties that received the first round of cash out settlement offers from EPA for EPA's use in making early settlement determinations.

The Work Plan is organized as follows:

Section 1.0 - Background
Section 2.0 - Assumptions
Section 3.0 - Project Methodology and Approach
Section 4.0 - Work Tasks
Section 5.0 - Reports, Transmittals and Deliverables
Section 6.0 - Staffing Plan
Section 7.0 - Quality Management
Section 8.0 - Conflict of Interest
Section 9.0 - Cyber Security
Section 10.0 - Project Budget
Section 11.0 - Period of Performance

## 1.0    Background

The Diamond Alkali Site (the Site) has a long history, involving over 100 potentially responsible parties (PRPs). Since the late 1800s, the Lower Passaic River has been a highly industrialized waterway, receiving direct and indirect discharges from numerous industrial facilities. Data collected in the Lower Passaic River, and EPA's analyses, show that contaminated sediment in the lower 8.3 miles are a major source of contamination to the rest of the river and Newark Bay and pose an unacceptable risk to human health and the environment due to the presence of a variety of contaminants that stay in the environment for a long time and can build up in fish and shellfish. These contaminants include dioxins and furans, PCBs, mercury, DDT and its primary breakdown products, copper, dieldrin, PAHs, and lead.

On March 4, 2016, EPA issued a record of decision selecting the remedy for the lower 8.3 miles of the Lower Passaic River, which is Operable Unit 2 (OU2) of the Site. Currently, the remedial design (RD) for OU2 is being performed by Occidental Chemical Corporation (OCC) pursuant to an administrative order on consent. The cost of the remedial action (RA), estimated for purposes of remedy selection, is \$1.38 billion.

Region 2 has issued a notice of potential liability to approximately 100 parties, informing them of their responsibility for the RD/RA for OU2. The Region has offered a first round of cash-out settlements to a group of approximately 20 PRPs. The Region expects to separately address the liability of municipalities and public entities. For the remaining PRPs, the Region expects to enter into settlement negotiations for performance and funding of the remedy with OCC and other parties (the "Major PRPs") that the Region considers to be major PRPs for OU2. The Region plans another round of cash-out settlements with "Middle Tier PRPs", i.e., not part of the phase 1 cash-out group, but also not Major PRPs. The Region requires the services of a third

ALCD-PUBCOM_0001370

Case 2:22-cv-07326-MCA-LDW    Document 309-21    Filed 04/01/24    Page 193 of 580
Case 2:18-cv-11273-JLL-JAD    Document 376-5    Filed 10/24/18    Page 3 of 28 PageID: 1630
PageID: 14338

*Public Version*

party allocator to develop a settlement framework and evaluate the 80 Middle Tier and Major parties within the framework.

Region 2 understands that the PRP group (the Cooperating Parties Group, or CPG) has made at least two previous attempts to develop a mutually acceptable allocation of liability to promote settlement with EPA for costs and work at the Site, however both efforts fell short of agreement. Region 2 believes that because of these previous efforts, additional information available from responses to CERCLA 104(e) letters, information available from previous litigation at the state level and numerous conversations with PRPs over the years, the project will be able to be built primarily upon existing information and contacts. Some minor augmentation of background, data and allocation factors may need to occur to develop what is hoped to be an acceptable settlement proposal and structure. In 2016, the Department of Justice retained a mediator/allocation specialist, David Batson of TechLaw/AlterEcho, to assist in settlement analysis. Those discussions and analyses have resulted in this effort.

## 2.0    Assumptions

This work plan and the attached cost estimate are based on the following assumptions, in addition to Task-specific assumptions noted in Section 4.0 of the Work Plan. All work will be conducted in accordance with the specific tasks in the Work Plan to the performance metrics specified therein.

General Assumptions:

- EPA will provide the CSRA Team with a list of parties noticed regarding their responsibility for the RD/RA for OU2, including:
  - a list of Major and Middle Tier Parties ("OU2 PRPs");
  - a list of Phase 1 cash-out parties; and
  - a list of other OU2 parties, including municipalities and other entities
- Maximum of 80 PRPs will be provided an opportunity to participate in or be evaluated for the purpose of determining a share of responsibility in the allocation process
- All OU2 PRPs will be provided an opportunity to participate in the design of the allocation database and process and to provide additional Site-related information for possible addition to the database, and will be designated a share of responsibility in the Final Allocation Recommendation Report
- The Final Allocation Recommendation Report will also divide the parties into logical groupings of similarly-situated PRPs
- EPA will provide the CSRA Team with a listing and contact information for each OU2 PRP; Reference herein to meetings or other forms of communication with the OU2 PRPs means communication with the identified representatives of such parties
- A maximum of ~~150,000~~ *290,000* pages of documents will *be* reviewed and utilized to conduct the allocation, including;
  - A maximum of 130,000 pages of documents received from EPA for CSRA Team review
  - A maximum of ~~20,000~~ *160,000* extra pages of documents received from PRPs for CSRA review
- All communications by the CSRA Team will be by phone or email unless meeting noted
- *The CSRA Team estimates 8-10 hours of communications per party over the remainder of the project. This time is presented as 2 hours per party in Tasks 5.A.1 and 6.A.4; additional meetings (5.A.1, 5.B.1, 9, 10.2); and an undefined number of calls and e-mails allowed for in remaining tasks.*
- Maximum of 4 hours of combined project status/update calls will be held by the CSRA Team with EPA per month

ALCD-PUBCOM_0001371

Case 2:22-cv-07326-MCA-LDW    Document 309-21    Filed 04/01/24    Page 194 of 580
Case 2:18-cv-11273-JLL-JAD    Document 37-05    10/24/18    Page 4 of 28 PageID: 1631
PageID: 14339

*Public Version*

- Out-of-DC Area Meetings:
  - ○ 3 6 meetings involving 2 contractor staff
- Out-of-DC area meetings will be held at the EPA Region 2 offices or other location in the greater New York City metropolitan area as determined by EPA, or OU2 PRPs they supply meeting space
- Travel for and timing of out-of-DC area meetings will be scheduled to allow CSRA Team members to travel from Washington, DC and return on the same day
- Meetings will be scheduled and held within noted timeframes
- The allocation database will be designed and organized primarily for purposes of allocation
- Space and equipment for meetings will be provided by EPA or PRPs
- The CSRA Team will provide EPA with a copy of all communications sent to OU2 PRPs regarding the subject, substance, and logistics of OU2 PRP meetings with CSRA Team members
- Any part of a communication, attachment to a communication, presentation, or written material provided to OU2 PRPs by the CSRA Team that involves a description of the Site or EPA actions or activities will be provided to EPA for review and approval prior to submission to the OU2 PRPs
- Unless otherwise noted herein, all allocation related communications by the CSRA Team involving the OU2 PRPs or representatives of EPA or DOJ, individually or in groups, will be held confidential pursuant to the provisions of the ADR Act of 1996, 5 USC 574
- In order to ensure a common expectation of confidentiality, all PRP participants in the allocation process will be required to enter, and EPA will appropriately acknowledge, a confidentiality agreement
- The CSRA Team will provide invoices to EPA at the end of each month in which a task is completed (activity, transmittal, and/or deliverable) identified in Section 4.0 of the Work Plan, with a written Progress Report detailing associated activities accomplished during the reporting period, how such activities meet Task Order performance standards, and associated labor and other direct costs
- "Staffing" referenced in Section 4.0 Work Tasks refers to TechLaw staff.
- This Task Order can be modified to change the statement of work or add funding.

## 3.0   Project Methodology and Approach

The proposed methodology and approach consists of the following:
- To support this Task Order, CSRA selected TechLaw support.
- CSRA and TechLaw (the CSRA Team) will not interpret EPA policy on behalf of the EPA or make decisions on items of policy, regulation or statutes. The CSRA Team also will not take a stand on the merits of substantive items under discussion including, but not limited to, any substantive issues raised by OU2 PRPs. The CSRA Team will not interpret EPA's March 4, 2016, record of decision selecting the remedy for OU2 of the Site.
- In gathering information or performing research with parties outside the EPA, CSRA Team members will identify themselves as contractors to EPA and not as EPA employees.
- CSRA will approach this task in accordance with the basic terms of the contract and according to the established norms and ethical standards of ADR professionals. Except as otherwise noted herein, information provided to the ADR professional by any of the parties, including EPA, communications between parties and the ADR professional, and notes and dispute resolution work product generated by the ADR professional during

ALCD-PUBCOM_0001372

Case 2:22-cv-07326-MCA-LDW   Document 309-21   Filed 04/01/24   Page 195 of 580
Case 2:18-cv-11273-JLL-JAD   Document 37075-12440 10/24/18   Page 5 of 28 PageID: 1632
PageID: 14340

*Public Version*

work pursuant to the Task Order will be maintained as confidential by the ADR professional pursuant to the provisions of the ADR Act of 1996 (Public Law 104-320; 5 USC 571 et al.) and applicable federal, state and judicial requirements.

- To enhance the positive substantive, relational, and procedural outcomes from ADR cases, CSRA will direct all ADR professionals providing ADR services under this task order to do the following prior to the mediation or facilitation and throughout the process:
    - o Inquire about whether individual participants have the time, financial, and logistical resources necessary to participate effectively in the process and – where resources are inadequate – assist them in identifying appropriate resources or in making necessary adjustments to the process to accommodate resource constraints;
    - o Assist the participants in identifying the issues that are important to resolving any controversy and solutions that will address the needs shared by the participants;
    - o Conduct the process to promote active engagement from all participants;
    - o Explore with the participants appropriate ways to incorporate high quality and relevant information resources necessary to resolve the issues; and
    - o To support productive dialogue and effective implementation of any agreements reached by the participants, ensure that participants have appropriate authority to make commitments on behalf of their organizations.

As prime contractor, CSRA will support this Task Order through the following activities:

- Provide progress reports at the end of each month in which an activity, transmittal, and/or deliverable identified in Section 5.0 of the Work Plan is completed;
- Communicate and coordinate with the EPA Task Order Contracting Officer's Representative (TOCOR) by phone as needed;
- Coordinate with the subcontractor, TechLaw;
- Incorporate the principles of Quality Management while carrying out this task;
- Provide deliverables in electronic format (as agreed to by the TOCOR) to the EPA TOCOR; and
- NOTIFY THE EPA PROJECT DIRECTOR AND PROGRAM OFFICE CONTACT WHEN 75% OF THE FUNDS PROVIDED HAVE BEEN EXPENDED.

## 4.0   Work Tasks

### Task 0.0   **Task Order Management**

In accordance with proper contract implementation, CSRA and TechLaw will ensure effective management of the resources and deliverables required by EPA.

Specifically, the CSRA Task Order Manager (TOM) for this effort will:

- Ensure that all technical direction received falls into the scope of work prior to initiating any action;
- Ensure completion and maintain copies of all contract transmittals and deliverables;
- Oversee subcontractor activities through regular and periodic conversations with the subcontractor to ensure effective performance;
- Ensure that progress and financial reports accurately clearly articulate the work completed as per the approved work plan, and identify any problems encountered and activities to address them;
- Speak on an as-needed basis with the EPA TOCOR to review the financial and work status of the project;

ALCD-PUBCOM_0001373

Case 2:22-cv-07326-MCA-LDW   Document 309-21   Filed 04/01/24   Page 196 of 580
Case 2:18-cv-11273-JLL-JAD   Document 37005-17333 10/24/18   Page 6 of 28 PageID: 1633
PageID: 14341

*Public Version*

- Review the progress report and invoice with the EPA TOCOR; and
- Update the Dashboard task order management tracking system as invoices are submitted.

The CSRA Team developed this Work Plan to provide a detailed explanation of all activities associated with and a proposed approach for completing each of the defined tasks. The CSRA Team identified the transmittals and deliverables and their associated due dates and developed a detailed fixed price budget, including a breakout of labor and travel costs.

| Item | Title | Due No Later Than† | Type |
|------|-------|--------------------|------|
| 0.1 | Work Plan | Within 10 days* of SOW issuance or as approved by the EPA CO | **Deliverable** |
| *0.1a* | *Revised Work Plan* | *Within 10 days* of SOW issuance or as approved by the EPA CO* | *Deliverable* |
| 0.2 | Progress Reports | Submitted after completion of each task and with submission of invoice | **Deliverable** |

† Or as otherwise directed by the TOCOR
* All references to "days" refer to business days

### Task 1       **Preliminary Work** - Complete

| Item | Title | Due No Later Than† | Type |
|------|-------|--------------------|------|
| 1.1 | Task Order Kick-Off Meeting | Within 20 days* of Task Order approval | Transmittal |

† Or as otherwise directed by the TOCOR
* All references to "days" refer to business days

The CSRA Team will prepare for and participate in a meeting with EPA to discuss tasks described in the Task Order, EPA's expectations for the project, and a plan for conducting the outreach to PRPs. Prior to the meeting, the CSRA Team will develop its overall strategy for conduct of the allocation process, including a timeline of tasks and strategy for communications with the OU2 PRPs. During the meeting, the EPA will advise the CSRA Team regarding the identity of the OU2 PRPs and the scope and nature of the selected remedy. Following the meeting, the CSRA Team will send an email summarizing the agreed-upon PRP Outreach Plan for approval of the EPA technical lead in consultation with EPA legal personnel. The developed PRP outreach plan will include a process for contacting and receiving information from PRPs, including for meetings and conference calls with the OU2 PRPs as a group, and individual OU2 PRP contacts via email, letter, or phone, and confidentiality procedures.

This task will require the following efforts on the part of the CSRA Team:
- Development of a plan for conducting outreach to OU2 PRPs that includes an opportunity for all OU2 PRPs to (1) provide feedback on the design of the allocation, including additional data, information or factors which should be considered in design of the database, (2) review their individual PRP data report for accuracy, (3) provide suggestions regarding design of the allocation  process and (4) provide feedback on the allocation report. The plan will also explain how the CSRA Team will update EPA on PRP outreach efforts
- Drafting and submission of an email summarizing the agreed-upon PRP outreach plan for approval of the EPA technical lead
- The CSRA Team will supply two (2) senior staff located in Washington, DC for the meeting

ALCD-PUBCOM_0001374

Case 2:22-cv-07326-MCA-LDW    Document 309-21    Filed 04/01/24    Page 197 of 580
Case 2:18-cv-11273-JLL-JAD    Document 370-5    Filed 10/24/18    Page 7 of 28 PageID: 1634
PageID: 14342

**Public Version**

Tech Law Staffing - Senior Allocation Specialist; Senior Project Manager

*Performance Standards/Metrics:*
- The CSRA Team participates in the Task Order Kick-Off Meeting
- The submitted summary of the PRP Outreach Plan provides a summary of the agreement reached at the Task Order Kick-Off Meeting regarding the plan for communications by the CSRA Team with the OU2 PRPs

**Task 2        Public Announcement of Project** - Complete

| Item | Title | Due No Later Than† | Type |
|------|-------|--------------------|------|
| 2.1 | EPA Project Public Announcement Meeting | Within 40 days* of Task Order approval | Activity |

† Or as otherwise directed by the TOCOR
* All references to "days" refer to business days

The CSRA Team will participate in a meeting, sponsored by EPA, with the OU2 PRPs to announce and explain the allocation project, including opportunities for participation of the OU2 PRPs in the development of the allocation process. Following the project announcement meeting noted in Task 2, the CSRA Team will work to obtain and record signatures of the OU2 PRPs and acknowledgement of EPA to the Participation Agreement distributed during the project announcement meeting.

This task will require the following efforts on the part of the CSRA Team:
- Preparation of talking points and handout material for participants regarding the allocation process in consultation with the EPA technical lead in consultation with EPA legal personnel
- Preparation of a written Participation Agreement for consideration and execution of the OU2 PRPs, incorporating an explanation of relevant confidentiality protections and requirements associated with the allocation process
- The CSRA Team will supply two (2) senior staff located in Washington, DC to participate in the meeting
- Communication via email, and as required via phone, with the OU2 PRPs as a group regarding execution of and to answer questions regarding the Participation Agreement
- Recording and compilation of executed Participation Agreement signature pages

Conduct of this task is dependent upon EPA's ability to successfully make arrangements for and schedule the meeting, and communicate with OU2 PRPs regarding the meeting, and upon receipt of EPA's final approval of the PRP outreach plan agreed upon during the Task Order Kick-Off Meeting within 10 business days of the meeting.

Staffing - Senior Allocation Specialist, Senior Project Manager

*Performance Standards/Metrics:*
- Talking points and materials prepared for the meeting provide an overview of the project and opportunities for PRP participation noted in the PRP Outreach Plan developed in Task 1
- The CSRA Team participates in the Task Order Kick-Off Meeting
- A majority of the members of the OU2 PRPs execute the Participation Agreement

ALCD-PUBCOM_0001375

Case 2:22-cv-07326-MCA-LDW Document 309-21 Filed 04/01/24 Page 198 of 580
Case 2:18-cv-11273-JLL-JAD Document 37-15 Filed 10/24/18 Page 8 of 28 PageID: 1635
PageID: 14343

*Public Version*

**Task 3      Initial Allocation Process and Database Design**

| Item | Title | Due No Later Than† | Type |
|------|-------|--------------------|------|
| 3.1 | Submit initial allocation process and database design to EPA | Within 100 days* of Task Order approval | Transmittal |

† Or as otherwise directed by the TOCOR
* All references to "days" refer to business days

The CSRA Team will review documents received from EPA and prepare a written descriptive summary of the initial design for the allocation process, including a design of the allocation database, and submit to EPA for review.

The allocation process will be designed based upon information received during consultations with EPA and OU2 PRPs on the allocation database and using all relevant non-confidential received information, including data, records, and other documents. The initial design will include recommendations for: (1) data sources to be considered for the allocation; (2) applicable allocation factors; and (3) methodology for determination of shares.

The searchable database will be designed to have the capability to contain and organize all of the information and data used in the allocation, including received PRP disclosure statements and nexus documents from third party litigation. No confidential information will be included in the allocation database. Though to be designed for purposes of conducting the allocation, the database will be designed in such a way as to allow access and use by EPA and DOJ staff for their settlement purposes following submission of the Allocation Data Reports in Task 8. The CSRA Team will, as an interim measure, create and provide EPA access to a SharePoint site in which any site documents received from the OU2 PRPs will be maintained.

This task will require the following efforts on the part of the CSRA Team:
- Conduct a preliminary review of Site data on OU2 contaminants of concern as identified in the OU2 ROD to determine appropriate allocation data sets
- Conduct preliminary research, analysis, and determine applicable case law, legal requirements, and equitable considerations for use in conducting allocation
- Conduct initial review and analysis of EPA selected remedy for OU2 to determine method to account for differential impact of contaminants of concern and source location
- Conduct a preliminary review of information received from EPA, including PRP disclosure statements and nexus documents from third party litigation, in order to determine the appropriate design of the database required to support conduct of the allocation process
- Conduct initial coding of data and loading of coded data into database to determine credibility of database design concept
- Establish preliminary recommendations regarding allocation computations appropriate for OU2, procedures for use of data in allocation computations, and appropriate allocation methodology, and the design of a searchable database with capability to contain and organize all of the information and data used in the allocation
- Preparation of a written descriptive summary of the initial design for the allocation process, including (1) a timeline for submission of allocation related documents,

ALCD-PUBCOM_0001376

Case 2:22-cv-07326-MCA-LDW     Document 309-21     Filed 04/01/24     Page 199 of 580
Case 2:18-cv-11273-JLL-JAD     Document 376-5     10/24/18     Page 9 of 28 PageID: 1636
PageID: 14344

*Public Version*

including PRP position briefs and reply briefs, and (2) a written description of the design of the database with a suggested method for providing OU2 PRPs specific information on the contents of the database, suggestions on methods for resolving data gaps in data regarding OU2 PRPs not identified in documents received from EPA, and if practical, images of anticipated data screens.

- Establish a SharePoint site that provides EPA access to documents received from OU2 PRPs

Conduct of this task is dependent upon; (1) receipt of all allocation documents and information regarding the site remedy from EPA within 20 business days of approval of the Task Order, and (2) receipt of all information from EPA as individual documents in OCR searchable pdf format to allow loading into the allocation database.

Staffing - Senior Allocation Specialist; Senior Project Manager; Database Designer

*Performance Standards/Metrics:*
- The CSRA Team submits a written descriptive summary of the initial design for the allocation process, including a database design, within the noted timeframe
- The submitted written descriptive summary of the initial design for the allocation process includes a summary of the basis of and anticipated conduct the allocation process, including preliminary recommendations on data sources to be considered for the allocation, applicable allocation factors, and methodology for determination of shares
- The submitted initial database design provides a written description of the database, including, suggested method for providing OU2 PRPs specific information on the contents of the database, suggestions on methods for resolving data gaps in data regarding OU2 PRPs not available in documents received from EPA, and if practical, images of anticipated data screens

### Task 4      Conference Call w EPA on Initial Database Design

| Item | Title | Due No Later Than[†] | Type |
|------|-------|---------------------|------|
| 4.1 | Conference Call with EPA on Initial Allocation Process and Database Design | Within 10 days* of submission of initial allocation process and database design | Activity |

† Or as otherwise directed by the TOCOR
* All references to "days" refer to business days

Task 4.1 – The CSRA Team will prepare for and participate in a conference call with EPA regarding the initial allocation process and database design. The purpose of the call will be to advise and consult with EPA regarding the submitted initial allocation process and database design and to discuss and resolve any EPA comments. Following the conference call, the CSRA Team will edit the initial allocation process and database design based on received EPA comments to create a draft design for submission to the OU2 PRPs.

This task will require the following efforts on the part of the CSRA Team:
- The CSRA Team will supply two (2) senior project staff located in Washington, DC to participate in the conference call
- Conference call assumed to be no more than two (2) hours in length

ALCD-PUBCOM_0001377

Case 2:22-cv-07326-MCA-LDW   Document 309-21   Filed 04/01/24   Page 200 of 580
Case 2:18-cv-11273-JLL-JAD   Document 37, 315, Filed 10/24/18   Page 10 of 28 PageID: 1637
PageID: 14345

*Public Version*

Staffing – Senior Allocation Specialist; Senior Project Manager

*Performance Standards/Metrics:*
- The CSRA Team participates in the draft Database Design conference call

**Task 5**     **Meeting with PRPs on Draft Allocation Process ~~and~~ /Database Design, and Initiation of early Settlement Process**

| Item | Title | Due No Later Than† | Type |
|------|-------|--------------------|------|
| 5.A.1 | Conduct *two* Meetings with PRPs on Draft Allocation Process and Database Design | Within 40 days* of submission of initial allocation process and database design to EPA | Activity |
| 5.A.2 | Conference Call with EPA on Meetings with PRPs on Draft Allocation Process and Database Design | Within 10 days* following the Meeting with PRPs on Draft Allocation Process and Database Design | Activity |
| *5.B.1* | *Submit guidance on preparation of allocation submissions to EPA and PRPs* | *Within 5 days of Revised Task Order Approval* | *Transmittal* |
| *5.B.2* | *Submit recommendation on relevancy of documents provided by OU2 PRPs to EPA and PRPs* | *Within 30 days of Revised Task Order Approval* | *Transmittal* |

† Or as otherwise directed by the TOCOR
* All references to "days" refer to business days

Task  5.A.1 - The CSRA Team will plan, schedule, and conduct ~~a meeting~~ *two meetings* with the OU2 PRPs as a group regarding the draft design of the allocation process and database. The purpose of the meetings will be to advise the OU2 PRPs as a group regarding the anticipated conduct of the allocation process and the anticipated organization of data and contents of the database, and to obtain PRP comments regarding the draft allocation process and database design. The CSRA Team will also communicate with the OU2 PRPs individually to obtain the input of OU2 PRPs, including those that did or were unable to attend the outreach meetings, regarding suggestions on the effective design and conduct of the allocation process and database, and to obtain additional records and information, if any, for the allocation  database.  ~~The CSRA Team will establish a deadline of 60 business days following the meeting with PRPs on draft allocation process and database design for the submission by OU2 PRPs of additional data for inclusion in the allocation database.~~

This task will require the following efforts on the part of the CSRA Team:
- Making arrangements for a meeting in the greater New York City metropolitan area sufficient to accommodate the OU2 PRPs as a group
- Coordination of meeting space and equipment for meetings provided by EPA or  OU2 PRPs
- Communication via email with the OU2 PRPs regarding substance, date/time, and location of meeting

ALCD-PUBCOM_0001378

Case 2:22-cv-07326-MCA-LDW Document 309-21 Filed 04/01/24 Page 201 of 580
Case 2:18-cv-11273-JLL-JAD Document 370-5 Filed 10/24/18 Page 11 of 28 PageID: 1638
PageID: 14346

*Public Version*

- Development of meeting agenda
- Development of participant materials, including a descriptive summary of Site information received from EPA and a description of the draft allocation process and database design
- Travel of two (2) senior staff from Washington, DC to attend meeting
- Communications by Senior Allocation Specialist via phone, email, or other electronic media as required with OU2 PRPs; ~~Communications will be limited to an average of 20 minutes for each OU2 PRP~~
- *Communications will be limited to an average of 2 hours for each OU2 PRP*
- Record PRP comments regarding allocation process and database design and conduct, without attribution to individual OU2 PRP comments

Staffing – Senior Allocation Specialist; Senior Project Manager

*Performance Standards/Metrics:*
- The CSRA Team conducts a meeting with the OU2 PRPs as a group regarding design of the allocation process and database
- A majority of the members of the OU2 PRPs as a group attend the meeting either in person or remotely
- The CSRA Team copies the EPA technical lead on its email communication to the OU2 PRPs regarding substance, date/time, and location of meeting, and provides EPA with a copy of utilized meeting materials

Task 5.*A*.2 - The CSRA Team will schedule and hold, within 10 business days of holding the meeting*s* with the OU2 PRPs on the draft allocation process and database design, a conference call with EPA regarding the findings of the meeting*s*.

This task will require the following efforts on the part of the CSRA Team:
- Scheduling and participating in ~~a~~ *two* conference call*s* with EPA to provide EPA information on the meeting*s*, including a list of participants at the meeting and summary of suggestions received regarding the allocation process and database design
- Conference call assumed to be no more than two (2) hours in length

Timing of this task is dependent upon the availability of assigned EPA staff to participate in a conference call within noted timeframe.

Staffing – Senior Allocation Specialist; Senior Project Manager

*Performance Standards/Metrics:*
- The CSRA Team participates in a conference call with EPA regarding the findings of the meeting following the Database Design Outreach Meeting
- In conducting the post-meeting conference call with EPA, the CSRA Team provides a summary of information and suggestions obtained from the OU2 PRPs without attribution to contributions of individual participants

*Task 5.B.1 - The CSRA Team will prepare a written guide regarding the format and preparation of written submissions by OU2 PRPs pursuant to the allocation process and submit to EPA and the OU2 PRPs*

ALCD-PUBCOM_0001379

Case 2:22-cv-07326-MCA-LDW Document 309-21 Filed 04/01/24 Page 202 of 580
Case 2:18-cv-11273-JLL-JAD Document 37015 Filed 10/24/18 Page 12 of 28 PageID: 1639
PageID: 14347

*Public Version*

*The preparation guide will be designed based upon information received during consultations with EPA and OU2 PRPs on the allocation process. The preparation guide will include the format and content of required allocation documents, including: (1) initial equitable factors brief; (2) preliminary factual submission; (3) document submission certification; and (4) notification of early settlement eligibility.*

*This task will require the following efforts on the part of the CSRA Team:*
- *Conduct a conference call with OU2 PRPs to announce and explain modifications to the allocation project, including opportunities for participation of the OU2 PRPs in the development of the allocation process*
- *Conduct of communications, including a meeting, with OU2 PRPs regarding recommended format and content of above noted required allocation submissions*
- *Preparation of written guide regarding the format and preparation of written submissions by OU2 PRPs pursuant to the allocation process for review by EPA*
- *Preparation of written guide based upon EPA comments and suggestions for review by OU2 PRPs.*
- *Preparation of a final written guide regarding the format and preparation of written submissions by OU2 PRPs pursuant to the allocation process based upon comments and suggestions received from the OU2 PRPS and EPA*

*Staffing - Senior Allocation Specialist; Senior Project Manager*

*Performance Standards/Metrics:*
- *The CSRA Team conducts a call with OU2 PRPs as a group to announce and explain modifications to the allocation project, including opportunities for participation of the OU2 PRPs in the development of the allocation process*
- *The CSRA Team submits a written guide regarding the format and preparation of written submissions by OU2 PRPs pursuant to the allocation process to EPA for review within the noted timeframe.*
- *The CSRA Team submits a written guide to the OU2 PRPs within the noted timeframe*
- *The submitted written guide includes the format and content of required allocation documents, including: (1) initial equitable factors brief; (2) preliminary factual submission; (3) document submission certification; and (4) notification of early settlement eligibility.*

*Task 5.B.2 – The CSRA Team will organize and conduct a review of initial indices of documents proposed for inclusion in the Allocation Document Database by OU2 PRPs to develop a recommendation on the relevancy of proposed documents to the allocation process.*

*This task will require the following efforts on the part of the CSRA Team:*
- *Conduct an analysis of document information contained in indices received from the OU2 parties to determine if the proposed documents meet established relevancy criteria for inclusion in Allocation Document Repository*
- *Drafting of a written recommendation indicating which of the recommended documents are deemed    to meet the established relevancy criteria for inclusion in Allocation Document Repository, with an explanation of the rationale for the exclusion of any recommended document*

*Staffing - Data Analysts; Senior Project Manager; Senior Allocation Specialist*

---

ALCD-PUBCOM_0001380

Case 2:22-cv-07326-MCA-LDW    Document 309-21    Filed 04/01/24    Page 203 of 580
Case 2:18-cv-11273-JLL-JAD    Document 37-35    Filed 10/24/18    Page 13 of 28 PageID: 1640
PageID: 14348

**Public Version**

*Performance Standards/Metrics*
- *The CSRA Team submits the written recommendation regarding the relevancy of OU2 PRP documents to EPA, with a copy to the OU2 PRPs, within the noted timeframe*
- *The submitted written recommendation indicates which of the documents recommended by OU2 PRPs are deemed to meet the established relevancy criteria for inclusion in Allocation Document Repository, with an explanation of the rationale for the exclusion of any recommended document*

**Task 6**      **Final Allocation Design** *and Early settlement PRP Data Reports*

| Item | Title | Due No Later Than† | Type |
|------|-------|--------------------|------|
| 6.*A* 1 | Submit Final Allocation Design to EPA and PRPs | Within 50 days* following the Meeting with PRPs on Draft Allocation Process and Database Design | Transmittal |
| *6.B.1* | *Submit draft PRP Data Reports regarding Early Settlement PRPs to PRPs and EPA* | *Within 10 days* of EPA final decision regarding additional documents for inclusion in repository* | *Transmittal* |
| *6.B.2* | *Submit final PRP Data Reports regarding Early Settlement PRPs to PRPs and EPA* | *Within 15 days of submission of Draft Early Settlement Part Data Reports* | *Transmittal* |

† Or as otherwise directed by the TOCOR
* All references to "days" refer to business days

*Task 6.A. -* The CSRA Team will complete the design of the allocation process based on input received from EPA and PRPs for submission to the OU2 PRPs and EPA.

This task will require the following efforts on the part of the CSRA Team:
- Conduct coding of data and loading of coded data into database
- Communications by Senior Allocation Specialist via phone, email, or other electronic media as required with OU2 PRPs; Communications will be limited to an average of *2 hours* 20 minutes for each OU2 PRP
- *Review of factors statements by OU2 PRPs regarding suggestions on protocol and equitable factors for use in allocation*
- Record, compile, and organize suggestions of OU2 PRPs regarding allocation process design and conduct without attribution to individual comments
- *Conduct a call with EPA to discuss suggestions received from OU2 PRPs regarding allocation process design and conduct without attribution to individual comments*
- Edit draft allocation design based on analysis of received Site data, EPA comments on the draft allocation design, and consideration of input received from OU2 PRPs during meeting and other outreach methods to prepare a written descriptive summary of the final allocation design and submit to EPA and the OU2 PRPs

Staffing - Senior Allocation Specialist; Senior Project Manager

*Performance Standards/Metrics:*

---

| Task Order #96 | Page 13 | Revised Work Plan |
|----------------|---------|-------------------|

ALCD-PUBCOM_0001381

Case 2:22-cv-07326-MCA-LDW    Document 309-21    Filed 04/01/24    Page 204 of 580
Case 2:18-cv-11273-JLL-JAD    Document 370-5    Filed 10/24/18    Page 14 of 28 PageID: 1641
PageID: 14349

*Public Version*

- The CSRA Team submits a written descriptive summary of the final design for the allocation process within the noted timeframe
- The submitted written descriptive summary of the final design for the allocation process includes a description of the basis of and anticipated conduct of the allocation process, addresses any identified ambiguities in the draft report, and includes a summary of how the comments of EPA and the OU2 PRPs regarding the draft allocation design were, or were not, taken into account in the final allocation design, without attribution.

*Task 6.B.1. - The CSRA Team will organize and conduct a technical and scientific evaluation of data in the allocation database to develop individual data reports for each of the OU2 Early Settlement PRPs. The PRP Data Reports will provide selected information regarding each OU2 Early Settlement PRP's relation to OU2 and OU2 contaminants of concern that will be used in conduct of the allocation. The CSRA Team will establish a deadline of 10 business days from receipt of the data report for submission of corrections or suggestions by the OU2 PRPs for improving the quality of the received OU2 Early Settlement PRP's data report.*

*This task will require the following efforts on the part of the CSRA Team:*
- *Conduct a call with EPA to discuss the Allocation Team recommendation regarding the relevancy to the allocation of documents provided by OU2 Early Settlement PRPs*
- *Conduct coding of data and loading of coded data into database obtained from OU2 Early Settlement PRPs*
- *Review preliminary factual submission by OU2 Early Settlement PRPs*
- *Review Site data loaded into database to determine appropriate organization for allocation*
- *Compile and organize Site data in database to support allocation analysis and share computations*
- *Organize data in allocation database and draft individual OU2 Early Settlement PRP data reports*
- *Provide a copy of the Early Settlement PRP data reports to the OU2 PRPs for review*

*Conduct of this task is dependent upon the following:*
- *Access by the CSRA Team to EPA technical data regarding Site conditions and the selected OU2 remedy*
- *Sufficient data on identified Early Settlement PRPs to allow analysis of associated contaminants of concern and hazardous substance fate and transport at the Site*
- *Successful establishment of the allocation database*
- *Receipt of additional data from OU2 Early Settlement PRPs for inclusion in the allocation database*

*Staffing - Data Analysts; Senior Scientist; Senior Project Manager; Senior Allocation Specialist*

*Performance Standards/Metrics*
- *The CSRA Team submits the PRP Data Reports to the OU2 PRPs within the noted timeframe*

---

ALCD-PUBCOM_0001382

Case 2:22-cv-07326-MCA-LDW    Document 309-21    Filed 04/01/24    Page 205 of 580
Case 2:18-cv-11273-JLL-JAD    Document 37015    Filed 10/24/18    Page 15 of 28 PageID: 1642
PageID: 14350

*Public Version*

- *The submitted written individual PRP Data Reports include a summary of information in the allocation database that is relevant to a determination regarding the associated OU2 Early Settlement PRP's relation to OU2 and OU2 contaminants of concern for use in conduct of the allocation*
- *The CSRA Team copies the EPA technical lead on the email communications to the OU2 Early Settlement PRPs providing a copy of their data report*

*Task 6.B.2. - The CSRA Team will analyze corrections or suggestions for improving the quality of the data reports received from OU2 PRPs to determine whether modifications of the original data reports are warranted. Based on this analysis, the CSRA Team will modify the data reports, as deemed appropriate. The CSRA Team will then provide a copy of all of the revised data reports to EPA and a revised copy of individual data reports will be uploaded to the document repository for access by all of the OU2 PRPs, with an explanation of how suggested changes were, or were not, incorporated.*

*This task will require the following efforts on the part of the CSRA Team:*
- *Analyze received suggestions and corrections to data reports in relation to existing Site data and the final allocation design in order to determine appropriate modifications*
- *Modify the individual data reports, as warranted based on above analysis*
- *Provide an explanation to the OU2 Early Settlement PRPs regarding whether, and if so how, received suggestions resulting in changes to their individual data report, including a description of why their suggestions and comments were, or were not, taken into account*
- *Upload final OU2 Settlement PRP data reports to allocation document repository*
- *As required, the CSRA Team will conduct communications with individual OU2 Early Settlement PRPs to answer questions regarding their final data report*

*Timing of this task is dependent upon the following:*
- *Receipt of EPA's determination regarding the relevancy to the allocation of documents provided by OU2 Early Settlement PRPs within established timeframe*
- *Receipt of comments from OU2 Early Settlement PRPs regarding their data report within established timeframes*

*Staffing - Data Analysts; Senior Scientist; Senior Project Manager; Senior Allocation Specialist*
*Performance Standards/Metrics*
- *The CSRA Team submits the Final PRP Data Reports to EPA and OU2 Early Settlement PRPs within the noted timeframe, and uploads data reports to document repository*
- *The submitted revised Final PRP Data Reports address any identified ambiguities in the draft reports and includes a summary of how received comments regarding the draft PRP Data Reports were, or were not, taken into account in the final reports*
- *Certifications regarding the completeness of document/data searches conducted by the OU2 Early Settlement PRPs are uploaded to the Allocation Document Repository*
- *The CSRA Team copies the EPA technical lead on the email communications to the OU2 Early Settlement PRPs providing a copy of their individual data report*

---

ALCD-PUBCOM_0001383

Case 2:22-cv-07326-MCA-LDW   Document 309-21   Filed 04/01/24   Page 206 of 580
Case 2:18-cv-11273-JLL-JAD   Document 37015   Filed 10/24/18   Page 16 of 28 PageID: 1643
PageID: 14351

*Public Version*

## Task 7        **Draft PRP Data Reports**

| Item | Title | Due No Later Than† | Type |
|------|-------|-------------------|------|
| *7.A.1* | *Submit recommendation on relevancy of documents provided by OU2 PRPs to EPA and PRPs* | *Within 10 days of OU2 Party submission of document indices* | *Submittal* |
| 7.A.2 | Submit Draft PRP Data Reports to PRPs | Within ~~100~~ *75* days* *of EPA final decision regarding additional documents for inclusion in repository* ~~following the Meeting with PRPs on Draft Allocation Process and Database Design~~ | Transmittal |
| *7.B* | *Submit recommendation on eligibility of PRPs for early settlement to EPA* | *Within 20 days of loading of Final Early Settlement Party Data Reports* | *Transmittal* |

† Or as otherwise directed by the TOCOR
\* All references to "days" refer to business days

*Task 7.A.1 - The CSRA Team will organize and conduct a review of indices of remaining documents proposed for inclusion in the Allocation Document Database by OU2 PRPs to develop a recommendation on the relevancy of proposed documents to the allocation process.*

*This task will require the following efforts on the part of the CSRA Team:*
- *Conduct an analysis of document information contained in indices received from the OU2 PRPs to determine if the proposed documents meet established relevancy criteria for inclusion in Allocation Document Repository*
- *Drafting of a written recommendation indicating which of the recommended documents are deemed    to meet the established relevancy criteria for inclusion in Allocation Document Repository, with an explanation of the rationale for the exclusion of any recommended document*

*Staffing - Data Analysts; Senior Project Manager; Senior Allocation Specialist*

*Performance Standards/Metrics*
- *The CSRA Team submits the written recommendation regarding the relevancy of remaining OU2 PRP documents to EPA, with a copy to the OU2 PRPs, within the noted timeframe*
- *The submitted written recommendation indicates which of the documents recommended by OU2 PRPs are deemed to meet the established relevancy criteria for inclusion in Allocation Document Repository, with an explanation of the rationale for the exclusion of any recommended document*

*Task 7.A.2* - The CSRA Team will organize and conduct a technical and scientific evaluation of data in the allocation database to develop individual data reports for each of the OU2 PRPs. The PRP Data Reports will provide selected information regarding each OU2 PRP's relation to OU2 and OU2 contaminants of concern that will be used in conduct

---

ALCD-PUBCOM_0001384

Case 2:22-cv-07326-MCA-LDW    Document 309-21    Filed 04/01/24    Page 207 of 580
Case 2:18-cv-11273-JLL-JAD    Document 3705-1   Filed 10/24/18   Page 17 of 28 PageID: 1644
PageID: 14352

*Public Version*

of the allocation. The CSRA Team will establish a deadline of 40 business days from receipt of the data report for submission of corrections or suggestions by the OU2 PRPs for improving the quality of the received OU2 PRP's data report.

This task will require the following efforts on the part of the CSRA Team:
- *Conduct a call with EPA to discuss the Allocation Team recommendation regarding the relevancy to the allocation of documents provided by OU2 PRPs*
- Conduct coding of data and loading of coded data into database obtained from OU2 PRPs
- ~~Review Site data loaded into database to determine appropriate organization for allocation~~
- ~~Compile and organize Site data in database to support allocation analysis and share computations~~
- *Review preliminary factual submission by OU2 PRPs*
- *Review Site data loaded into database to determine appropriate organization for allocation*
- *Compile and organize Site data in database to support allocation analysis and share computations*
- Organize data in allocation database into *and draft* individual *OU2* PRP data reports
- Provide a copy of the PRP data reports to the OU2 PRPs *for review*

*Timing of this task is dependent upon the following:*
- *Receipt of EPA's determination regarding the relevancy to the allocation of documents provided by OU2 PRPs within established timeframe*
- *Receipt of comments from OU2 PRPs regarding their data report within established timeframes*

Conduct of this task is dependent upon the following:
- Access by the CSRA Team to EPA technical data regarding Site conditions and the selected OU2 remedy
- Sufficient data on identified PRPs to allow analysis of associated contaminants of concern and hazardous substance fate and transport at the Site
- Successful establishment of the allocation database
- Receipt of additional data from OU2 PRPs for inclusion in the allocation database *within established timeframes* ~~by 60 business days following the meeting with PRPs on draft allocation process and database design~~

Staffing - Data Analysts; Senior Scientist; Senior Project Manager; Senior Allocation Specialist

*Performance Standards/Metrics*
- The CSRA Team submits the PRP Data Reports to the OU2 PRPs within the noted timeframe
- The submitted written individual PRP Data Reports include a summary of information in the allocation database that is relevant to a determination regarding the associated OU2 PRP's relation to OU2 and OU2 contaminants of concern for use in conduct of the allocation
- The CSRA Team copies the EPA technical lead on the email communications to the OU2 PRPs providing a copy of their data report

ALCD-PUBCOM_0001385

Case 2:22-cv-07326-MCA-LDW    Document 309-21    Filed 04/01/24    Page 208 of 580
Case 2:18-cv-11273-JLL-JAD    Document 3309-6    10/24/18    Page 18 of 28 PageID: 1645
PageID: 14353

*Public Version*

*Task 7.B - The CSRA Team will organize and conduct an analysis of information regarding the relationship of OU2 Early Settlement PRPs to the Site and Site remedy, including relevant documents in the Allocation Document Repository, PRP Data Reports, and Preliminary Submissions, to develop a recommendation on the eligibility of OU2 Early Settlement PRPs for the opportunity to enter negotiations with EPA regarding a cash-out settlement. The recommendation will be based upon eligibility criteria specified by EPA in its May 17, 2017 to OU2 PRPs on the subject; specifically that "(t)he parties that EPA identified as eligible for an early cash out settlement are those that, based on information reviewed by EPA, are not associated with the release or disposal of any of the COCs for OU2, as identified in the ROD, into the Lower Passaic River.*

*This task will require the following efforts on the part of the CSRA Team:*
- *Conducting an analysis of documents and other information submitted by OU2 Early Settlement PRPs and contained in the Allocation Document Repository to determine whether the OU2 Early Settlement PRPs meet the eligibility criteria specified by EPA.*
- *Drafting of a written recommendation indicating which of the OU2 Early Settlement PRPs are deemed to meet the specified eligibility criteria for the opportunity to enter negotiations with EPA regarding a cash-out settlement, with an explanation of the rationale for the exclusion of any OU2 Early Settlement PRP.*

*Staffing - Data Analysts; Senior Scientist; Senior Project Manager; Senior Allocation Specialist*

*Performance Standards/Metrics*
- *The CSRA Team submits the written recommendation on the eligibility of OU2 Early Settlement PRPs for the opportunity to enter negotiations with EPA regarding a cash-out settlement, within the noted timeframe*
- *The submitted written recommendation indicates which of the OU2 Early Settlement PRPs are deemed to meet the specified eligibility criteria for the opportunity to enter negotiations with EPA regarding a cash-out settlement, with an explanation of the rationale for the exclusion of any OU2 Early Settlement PRP*

**Task 8**     **Final Data Reports**

| Item | Title | Due No Later Than† | Type |
|------|-------|--------------------|------|
| 8.1 | Submit Final PRP Data Reports to EPA and PRPs | Within 40 days* ~~following the~~ *of the* deadline ~~for submission of corrected~~ *OU2 PRPs corrections to* PRP data reports | Transmittal |
| 8.2 | Provide EPA Access to Allocation Database | Upon ~~submission~~ *loading* of corrected PRP data reports | Activity |

† Or as otherwise directed by the TOCOR
* All references to "days" refer to business days

The CSRA Team will analyze corrections or suggestions for improving the quality of the data reports received from OU2 PRPs to determine whether modifications of the original data reports are warranted. Based on this analysis, the CSRA Team will modify the data reports, as deemed appropriate. The CSRA Team will then provide a copy of all of the revised data reports to EPA and a revised copy of their own individual data reports to each

---

ALCD-PUBCOM_0001386

Case 2:22-cv-07326-MCA-LDW   Document 309-21   Filed 04/01/24   Page 209 of 580
Case 2:18-cv-11273-JLL-JAD   Document 37/05   Filed 10/24/18   Page 19 of 28 PageID: 1646
PageID: 14354

*Public Version*

of the OU2 PRPs, with an explanation of how suggested changes were, or were not, incorporated.

This task will require the following efforts on the part of the CSRA Team:
- Analyze received suggestions and corrections to data reports in relation to existing Site data and the final allocation design in order to determine appropriate modifications
- Modify the individual data reports, as warranted based on above analysis
- Provide an explanation to the OU2 PRPs regarding whether, and if so how, received suggestions resulting in changes to their individual data report, including a description of why their suggestions and comments were, or were not, taken into account. *Upload final OU2 Settlement PRP data reports to allocation document repository*
- As required, the CSRA Team will conduct communications with individual OU2 PRPs to answer questions regarding their final data report

Timing of this task is dependent *upon the following:*
- Receipt of comments from OU2 PRPs regarding their data report within established timeframes

Staffing - Data Analysts; Senior Scientist; Senior Project Manager; Senior Allocation Specialist

*Performance Standards/Metrics*
- The CSRA Team submits the Final PRP Data Reports to EPA and OU2 PRPs within the noted timeframe, *and uploads data reports to document repository*
- The submitted revised Final PRP Data Reports address any identified ambiguities in the draft reports and includes a summary of how received comments regarding the draft PRP Data Reports were, or were not, taken into account in the final reports
- The CSRA Team copies the EPA technical lead on the email communications to the OU2 PRPs providing a copy of their individual data report

ALCD-PUBCOM_0001387

Case 2:22-cv-07326-MCA-LDW    Document 309-21    Filed 04/01/24    Page 210 of 580
Case 2:18-cv-11273-JLL-JAD    Document 37/05    Filed 10/24/18    Page 20 of 28 PageID: 1647
PageID: 14355

*Public Version*

**Task 9      Draft Allocation Report**

| Item | Title | Due No Later Than† | Type |
|------|-------|--------------------|------|
| 9.1 | Submit Draft Allocation Recommendation Report | Within 90 days* following submittal of *Response Briefs by PRPs* ~~final PRP Data Reports~~ | Transmittal |

† Or as otherwise directed by the TOCOR
* All references to "days" refer to business days

*Task 9* - The CSRA Team will prepare a first draft of the allocation recommendation report and submit to the OU2 PRPs and EPA for review. The draft allocation report will designate shares of responsibility among the OU2 PRPs, as appropriate based on the allocation analysis. The draft allocation report will include a recommendation on the possible grouping of the OU2 PRPs into tiers of similar levels of responsibility.

This task will require the following efforts on the part of the CSRA Team:

- *Conduct of communications, including a conference call, with OU2 PRPs regarding recommendations on and legal/equitable theories pertinent to conduct of the allocation included in Position and Response Briefs received from the OU2 PRPs*
- Review and consideration of input regarding allocation received from the OU2 PRPs and EPA
- Review and understand the basis for EPA's selected remedy for OU2, in consultation with EPA technical and legal personnel
- Review and understand the relative toxicity of identified contaminants of concern relevant to the selection of the OU2 remedy, in consultation with EPA technical and legal personnel
- Analyze the relative toxicity of materials discharged by OU2 PRPs and other differentiating factors, including fate and transport of hazardous substances released by PRPs based on the data contained in the RI/FS, in relation to the selected remedy
- Compilation and analysis of allocation data related to each OU2 PRP, including contaminants of concern, to establish the relative impact of the actions of each OU2 PRP on the conditions that resulted in EPA selecting the OU2 remedy
- Establish appropriate allocation algorithms
- Load compiled PRP data into allocation calculations to determine relative relationships among the OU2 PRPs
- As appropriate, establish appropriate tiers of OU2 PRP responsibility based on calculations and consideration of equitable factors
- Prepare draft allocation recommendation report
- Submission of the draft report to the OU2 PRPs and EPA

Timing of this task is dependent upon receipt of position briefs and reply briefs regarding allocation from OU2 PRPs within established timeframes

Staffing - Senior Allocation Specialist; Senior Project Manager

*Performance Standards/Metrics:*
- The CSRA Team submits the Draft Allocation Recommendation Report within the noted timeframe

ALCD-PUBCOM_0001388

Case 2:22-cv-07326-MCA-LDW    Document 309-21    Filed 04/01/24    Page 211 of 580
Case 2:18-cv-11273-JLL-JAD    Document 37/05    Filed 10/24/18    Page 21 of 28 PageID: 1648
PageID: 14356

*Public Version*

- The submitted written Draft Allocation Recommendation Report includes an overview of the basis for the determinations of shares among the OU2 PRPs, including a description of the use of data sources and application of allocation factors and methodology utilized, and reason for potential vulnerabilities, if any, in the resulting allocation
- The report identifies and explains the rationale, if applicable, for grouping OU2 PRPs into tiers of similar relative responsibility

**Task 10**     **Final Allocation Recommendation Report**

| Item | Title | Due No Later Than† | Type |
|------|-------|--------------------|------|
| 10.1 | ~~Conference Call~~ *Meeting* with EPA regarding Draft Allocation Recommendation Report | Within 10 days* of submittal of Draft Allocation Report | Transmittal |
| *10.2* | *Conduct Meeting with PRPs on Draft Allocation Report* | *Within 20 days of submittal of Draft Allocation Report* | *Activity* |
| *10.3* | *Conference Call with EPA on Meeting with PRPs on Draft Allocation Report* | *Within 10 days* following the Meetings with PRPs on Draft Allocation Report* | *Activity* |
| 10.~~2~~4 | Submit Final Allocation Recommendation Report to OU2 PRPs and EPA | Within 60 days* of submittal of Draft Allocation Report | **Deliverable** |

† Or as otherwise directed by the TOCOR
* All references to "days" refer to business days

Task 10.1 - The CSRA Team will prepare for and participate in a meeting with EPA regarding the submitted draft allocation recommendation report. The purpose of the meeting will be to obtain EPA comments regarding the submitted draft allocation report, including the basis and findings of the draft allocation report and the report format.

This task will require the following efforts on the part of the CSRA Team:

- The CSRA Team will supply one (2) senior staff located in Washington, DC to *attend the meeting* ~~participate in the conference call~~
- ~~Conference call assumed to be no more than two (2) hours in length~~
- *Meeting assumed to be no more than four (4) hours in length*

Staffing - Senior Allocation Specialist; *Senior Project Manager*

Performance Standards/Metrics:

- The CSRA Team participates in the meeting regarding the submitted draft allocation recommendation report

*Task 10.2 – The CSRA Team will plan, schedule, and conduct a meeting with the OU2 PRPs as a group regarding the draft allocation recommendation report. The purpose of the meeting will be to advise the OU2 PRPs as a group regarding the draft allocation recommendation report and to obtain preliminary PRP comments regarding the draft allocation recommendation report. The CSRA Team will also communicate with the OU2 PRPs individually to obtain the input of OU2 PRPs, including those that did or were unable to attend the meeting, regarding draft allocation recommendation report.*

ALCD-PUBCOM_0001389

Case 2:22-cv-07326-MCA-LDW Document 309-21 Filed 04/01/24 Page 212 of 580 PageID: 14357
Case 2:18-cv-11273-JLL-JAD Document 3-05 Filed 10/24/18 Page 22 of 28 PageID: 1649

*Public Version*

*This task will require the following efforts on the part of the CSRA Team:*
- *Making arrangements for a meeting in the greater New York City metropolitan area sufficient to accommodate the OU2 PRPs as a group*
- *Coordination of meeting space and equipment for meetings provided by EPA or OU2 PRPs*
- *Communication via email with the OU2 PRPs regarding substance, date/time, and location of meeting*
- *Development of meeting agenda*
- *Development of participant materials, a needed*
- *Travel of two (2) senior staff from Washington, DC to attend meeting*
- *Communications by Senior Allocation Specialist via phone, email, or other electronic media as required with OU2 PRPs*
- *Recording of PRP comments regarding the draft allocation recommendation report, without attribution to individual OU2 PRP comments*

*Staffing – Senior Allocation Specialist; Senior Project Manager*

*Performance Standards/Metrics:*
- *The CSRA Team conducts a meeting with the OU2 PRPs as a group regarding the draft allocation recommendation report*
- *A majority of the members of the OU2 PRPs as a group attend the meeting either in person or remotely*
- *The CSRA Team copies the EPA technical lead on its email communication to the OU2 PRPs regarding substance, date/time, and location of meeting, and provides EPA with a copy of utilized meeting materials*

*Task 10.3 - The CSRA Team will schedule and hold, within 10 business days of holding the meeting with the OU2 PRPs on the draft allocation recommendation report, a conference call with EPA regarding the findings of the meeting.*

*This task will require the following efforts on the part of the CSRA Team:*
- *Scheduling and participating in a conference call with EPA to provide EPA information on the meeting, including a list of participants at the meeting and summary of suggestions received regarding the draft allocation recommendation report*
- *Conference call assumed to be no more than two (2) hours in length*

*Timing of this task is dependent upon the availability of assigned EPA staff to participate in a conference call within noted timeframe.*

*Staffing – Senior Allocation Specialist; Senior Project Manager*

*Performance Standards/Metrics:*
- *The CSRA Team participates in a conference call with EPA regarding the findings of the meeting with PRPs regarding the draft allocation recommendation report*
- *In conducting the post-meeting conference call with EPA, the CSRA Team provides a summary of information and suggestions obtained from the OU2 PRPs without attribution to contributions of individual participants*

ALCD-PUBCOM_0001390

Case 2:22-cv-07326-MCA-LDW Document 309-21 Filed 04/01/24 Page 213 of 580
Case 2:18-cv-11273-JLL-JAD Document 370-5 Filed 10/24/18 Page 23 of 28 PageID: 1650
PageID: 14358

*Public Version*

Task 10.4 2 - The CSRA Team will prepare a Final Allocation Recommendation Report. The Final Allocation Recommendation Report will take into consideration comments on the draft allocation recommendation report received during consultation with EPA and during meetings with and received in position and reply briefs from the OU2 PRPs.

This task will require the following efforts on the part of the CSRA Team:
- Review and consider the comments by OU2 PRPs and EPA regarding the draft allocation recommendation report
- Editing of the draft allocation recommendation report to incorporate appropriate modifications based on OU2 and EPA comments to produce the Final Allocation Recommendation Report

Staffing - Senior Allocation Specialist; Senior Project Manager

*Performance Standards/Metrics:*
- The CSRA Team submits a Final Allocation Recommendation Report within the noted timeframe
- The submitted Final Allocation Recommendation Report includes the elements of the Draft Allocation Recommendation Report described in Task 17, addresses any identified ambiguities in the draft report, and provides a summary, without attribution to individual comments, of how comments of the OU2 PRPs and EPA regarding the Draft Allocation Recommendation Report were, or were not, taken into account in the final report, without attribution.

## Task 11    Final PRP Outreach Report

| Item | Title | Due No Later Than† | Type |
|------|-------|--------------------|------|
| 11.1 | Submit Final PRP Outreach Report | Within 10 days* of submittal of Final Allocation Report | Activity |

† Or as otherwise directed by the TOCOR
* All references to "days" refer to business days

The CSRA Team will prepare and provide to EPA a report regarding outreach efforts conducted with the OU2 PRPs, including a list of participants in outreach efforts, a description of topics discussed, and a summary of issues or concerns raised.

This task will require the following efforts on the part of the CSRA Team:
- Review and organize the comments of OU2 PRPs received during conduct of the Task Order, without attribution to individual OU2 PRPs
- Prepare and provide EPA an overview of conducted outreach efforts, including a list of OU2 PRPs that have participated in outreach meetings, conference calls, or individual communications with the CSRA Team and a summary of suggestions received from the OU2 PRPs regarding the allocation process

Staffing - Senior Allocation Specialist; Senior Project Manager

*Performance Standards/Metrics:*
- The CSRA Team submits a written summary of PRP outreach efforts within the noted timeframe
- The Final PRP Outreach Report includes a summary of conducted PRP outreach efforts, including a list of OU2 PRPs that have participated in outreach meetings,

ALCD-PUBCOM_0001391

Case 2:22-cv-07326-MCA-LDW    Document 309-21    Filed 04/01/24    Page 214 of 580
Case 2:18-cv-11273-JLL-JAD    Document 37015    Filed 10/24/18    Page 24 of 28 PageID: 1651
PageID: 14359

*Public Version*

conference calls, or individual communications with the CSRA Team and a summary of suggestions received from the OU2 PRPs regarding the allocation process
- In drafting the Final PRP Outreach Report, the CSRA Team provides a summary of information and suggestions obtained from the OU2 PRPs without attribution to contributions of individual participants

### Task 12    **Task Order Closeout Report**

| Item | Title | Due No Later Than† | Type |
|------|-------|--------------------|------|
| 12.1 | Submit Draft Task Order Closeout Report | Within 10 days* of submittal of Final Allocation Report | Transmittal |
| 12.2 | Final Task Order Closeout Report | Within 10 days* of receipt of EPA's comments on Draft Task Order Closeout Report | **Deliverable** |

† Or as otherwise directed by the TOCOR
\* All references to "days" refer to business days

Task 12.1 - The CSRA Team will design and produce the first draft of a report regarding the conduct of tasks pursuant to the Task Order and submit it for review by EPA. The report will not contain any confidential or sensitive information. The contents of the Draft Task Order Close-Out Report will include:
- A half-page description of the project that describes the nature of the project, the parties, the process, and the outcomes
- If appropriate, a short section reflecting on the process and procedural lessons learned and recommendation for improvements and identification of those activities conducted that contributed to the success of the process
- A brief summary of the final costs of the project broken out by percentage of labor hours and other direct costs

This task will require the following efforts on the part of the CSRA Team:
- Review of project activities and compilation of project summary
- Consideration and compilation of thoughts on lessons learned regarding project
- Compilation of project budget costs
- Preparation of the Draft Task Order Close-out Report

Staffing - Senior Allocation Specialist; Senior Project Manager

*Performance Standards/Metrics:*
- The CSRA Team submits a Draft Task Order Closeout Report within the noted timeframe
- The submitted Draft Task Order Closeout Report includes the items noted above as contents of the report

Task 12.2 - The CSRA Team will prepare a Final Task Order Closeout Report and submit to EPA. The Final Task Order Closeout Report will take into consideration comments received from EPA regarding the draft of the Task Order closeout report. CSRA will provide one (1) copy of the Final Task Order Closeout Report to the PO and one (1) copy to the TOCOR in electronic format.

ALCD-PUBCOM_0001392

Case 2:22-cv-07326-MCA-LDW    Document 309-21    Filed 04/01/24    Page 215 of 580
Case 2:18-cv-11273-JLL-JAD    Document 37/03    Filed 10/24/18    Page 25 of 28 PageID: 1652
PageID: 14360

*Public Version*

This task will require the following efforts on the part of the CSRA Team:

- Review and consideration of comments by EPA regarding the draft Task Order Closeout Report
- Editing, and as required redesign, of the closeout report to incorporate modifications based on EPA comments in order to produce the Final Task Order Closeout Report

Staffing - Senior Allocation Specialist; Senior Project Manager

*Performance Standards/Metrics:*

- The CSRA Team submits a Final Task Order Closeout Report within the noted timeframe
- The submitted Final Task Order Closeout Report addresses any identified ambiguities in the draft report and includes a summary of how EPA's comments regarding the Draft Allocation Recommendation Report were, or were not, taken into account in the final report

## 5.0    Reports, Transmittals and Deliverables

CSRA will provide EPA all reports in accordance with the contract. *If EPA responds with a request for additional information, Subcontractor is required to provide information, as requested.*

Copies of all contract deliverables will be sent to both the PO and the TOCOR. If oral briefings are scheduled for EPA staff, the PO will be notified in time to attend.

Schedule

| Item | Title | Due No Later Than† | Type |
|------|-------|--------------------|------|
| 1 | Task Order Kick-Off Meeting | Within 20 days* of Task Order approval | Transmittal |
| 2 | EPA Project Public Announcement Meeting | Within 40 days* of Task Order approval | Activity |
| 3 | Submit initial allocation process and database design to EPA | Within 100 days* of Task Order approval | Transmittal |
| 4 | Conference Call with EPA on Initial Allocation Process and Database Design | Within 10 days* of submission of initial allocation process and database design | Activity |
| 5.A.1 | Conduct *two* Meetings with PRPs on Draft Allocation Process and Database Design | Within 40 days* of submission of initial allocation process and database design to EPA | Activity |
| 5.A.2 | Conference Call with EPA on Meetings with PRPs on Draft Allocation Process and Database Design | Within 10 days* following the Meeting with PRPs on Draft Allocation Process and Database Design | Activity |

ALCD-PUBCOM_0001393

Case 2:22-cv-07326-MCA-LDW    Document 309-21    Filed 04/01/24    Page 216 of 580
Case 2:18-cv-11273-JLL-JAD    Document 372-65    Filed 10/24/18    Page 26 of 28 PageID: 1653
PageID: 14361

*Public Version*

| Item | Title | Due No Later Than† | Type |
|------|-------|--------------------|----- |
| *5.B.1* | *Submit guidance on preparation of allocation submissions to EPA and PRPs* | *Within 5 days of Revised Task Order Approval* | *Transmittal* |
| *5.B.2* | *Submit recommendation on relevancy of documents provided by OU2 PRPs to EPA and PRPs* | *Within 30 days of Revised Task Order Approval* | *Transmittal* |
| 6.*A* ~~1~~ | Submit Final Allocation Design to EPA and PRPs | Within 50 days* following the Meeting with PRPs on Draft Allocation Process and Database Design | Transmittal |
| *6.B.1* | *Submit draft PRP Data Reports regarding Early Settlement PRPs to PRPs and EPA* | *Within 10 days* of EPA final decision regarding additional documents for inclusion in repository* | *Transmittal* |
| *6.B.2* | *Submit final PRP Data Reports regarding Early Settlement PRPs to PRPs and EPA* | *Within 15 days of submission of Draft Early Settlement Part Data Reports* | *Transmittal* |
| *7.A.1* | *Submit recommendation on relevancy of documents provided by OU2 PRPs to EPA and PRPs* | *Within 10 days of OU2 Party submission of document indices* | *Submittal* |
| 7.*A.2* | Submit Draft PRP Data Reports to PRPs | Within ~~100~~ *75* days* *of EPA final decision regarding additional documents for inclusion in repository* ~~following the Meeting with PRPs on Draft Allocation Process and Database Design~~ | Transmittal |
| *7.B* | *Submit recommendation on eligibility of PRPs for early settlement to EPA* | *Within 20 days of loading of Final Early Settlement Party Data Reports* | *Transmittal* |
| 8.1 | Submit Final PRP Data Reports to EPA and PRPs | Within 40 days* ~~following the~~ *of the* deadline ~~for submission of corrected~~ *OU2 PRPs corrections to* PRP data reports | Transmittal |
| 8.2 | Provide EPA Access to Allocation Database | Upon ~~submission~~ *loading* of corrected PRP data reports | Activity |
| 9.1 | Submit Draft Allocation Recommendation Report | Within 90 days* following submittal of *Response Briefs by PRPs* ~~final PRP Data Reports~~ | Transmittal |
| 10.1 | ~~Conference Call~~ *Meeting* with EPA regarding Draft Allocation Recommendation Report | Within 10 days* of submittal of Draft Allocation Report | Transmittal |

ALCD-PUBCOM_0001394

Case 2:22-cv-07326-MCA-LDW    Document 309-21    Filed 04/01/24    Page 217 of 580
Case 2:18-cv-11273-JLL-JAD    Document 37195    Filed 10/24/18    Page 27 of 28 PageID: 1654
PageID: 14362

*Public Version*

| Item | Title | Due No Later Than[†] | Type |
|------|-------|---------------------|------|
| *10.2* | *Conduct Meeting with PRPs on Draft Allocation Report* | *Within 20 days of submittal of Draft Allocation Report* | *Activity* |
| *10.3* | *Conference Call with EPA on Meeting with PRPs on Draft Allocation Report* | *Within 10 days\* following the Meetings with PRPs on Draft Allocation Report* | *Activity* |
| 10.~~4~~ 2 | Submit Final Allocation Recommendation Report to OU2 PRPs and EPA | Within 60 days\* of submittal of Draft Allocation Report | **Deliverable** |
| | | | |
| 11 | Submit Final PRP Outreach Report | Within 10 days\* of submittal of Final Allocation Report | Activity |
| 12.1 | Submit Draft Task Order Closeout Report | Within 20 days\* of submittal of Final Allocation Report | Transmittal |
| 12.2 | Final Task Order Closeout Report | Within 10 days\* of receipt of EPA's comments on Draft Task Order Closeout Report | **Deliverable** |

*\* All references to days in this chart refer to business days*

## 6.0    Staffing Plan

This Task Order will be staffed as follows:

| Team Member Name[†] | Role in the Project |
|---------------------|---------------------|
| Mary Apostolico CSRA International | Overall Contract Management, Quality Assurance, Task Order Management |
| Jennifer Cutrona CSRA | Dashboard and Financial Tracking |
| David Batson TechLaw | Senior Allocation Specialist |
| Judy Manley TechLaw | Senior Project Manager |
| Travis Kline TechLaw | Senior Toxicologist |
| Erman Evcimen TechLaw | Database Designer |
| Amber Kozacek TechLaw | Researcher |

[†]Other team members than those listed in the above table may work on this task order to complete the required work.

\*The task order mainly will be managed by the TOM listed in the above table; however, additional team members may conduct task order management activities to ensure coverage during periods when the TOM is unavailable (e.g., vacation, illness, business travel, time constraints).

ALCD-PUBCOM_0001395

Case 2:22-cv-07326-MCA-LDW    Document 309-21    Filed 04/01/24    Page 218 of 580
Case 2:18-cv-11273-JLL-JAD    Document 37/05    Filed 10/24/18    Page 28 of 28 PageID: 1655
PageID: 14363

*Public Version*

## 7.0    Quality Management

As part of its quality assurance practices, CSRA TOM will:

- Review this Work Plan with the EPA TOCOR, as requested by the TOCOR;
- Meet or hold conference calls as needed with the TOCOR to review progress; and
- Speak regularly with the subcontractor to receive project status updates.

In addition, all work on this Task Order will be performed in accordance with CSRA's strict quality assurance practices, including but not limited to incorporating quality management principles and processes into the development of the required transmittals, deliverables, and the consulting services offered. Although CSRA will ensure the timely delivery of all transmittals and deliverables, CSRA will not perform a review of these documents prepared by the subcontractor.

## 8.0    Conflict of Interest

Based on our review and understanding of the legal requirements of this work, CSRA certifies that no real, apparent, or potential organizational or individual conflict of interest exists with this assignment, based on previous or ongoing work, or other potential conflicts.

## 9.0    Cyber Security

CSRA has interpreted compliance with information assurance / security provisions contained in this contract as a requirement to provide its standard CSRA information system and procedures. CSRA contract pricing does not include or reflect any additional requirements or certification and accreditation for the CSRA information system or procedures, connectivity to the Government system(s), or storage of any Government-provided data or project data, or for stand-alone development or storage environments. Should the Government require increased or specialized information assurance security or other actions beyond those reflected in the standard CSRA information system or procedures, then the Government will notify CSRA and such revisions will be provided in accordance with the "changes" clause of this contract.

## 10.0    Project Budget

The budget for this task is provided as an Attachment.

## 11.0    Period of Performance

The task order period of performance runs through June 15, 2019.

ALCD-PUBCOM_0001396

# EXHIBIT 14

OxyChem's Comments in Opposition to Proposed Consent Decree,
*United States v. Alden Leeds, Inc., et al.*, Civil Action No. 2:22-cv-07326 (D.N.J.)

ALCD-PUBCOM_0001397

# Revised Work Plan

## EPA Conflict Prevention and Resolution Services Contract

## Contract # EP-W-14-020

## Work Plan for Task Order #096

## Diamond Alkali-Lower Passaic River Allocation

### Submitted: May 31, 2019
Revised: March 16, 2018
*Originally submission:  June 30, 2017*

**Prepared for:**

US Environmental Protection Agency
Washington, DC 20460

| | |
|---|---|
| EPA Program Office: | Region 2 |
| EPA Task Order Contracting Officer's Representative (TOCOR): | Alice Yeh |
| Telephone Number: | 212-637-4427 |
| E-Mail Address: | yeh.alice@epa.gov |
| | |
| CSRA Task Order Manager (TOM): | Mary Apostolico |
| Telephone Number: | 517-290-4415 |
| E-Mail: | mary.apostolico@csra.com |
| | |
| Subcontractor Task Manager: | Mark Heaney |
| | TechLaw / AlterEcho |
| Telephone Number: | 703-818-3201 |
| E-mail Address: | mark.heaney@alterecho.com |

ALCD-PUBCOM_0001398

This Revised Work Plan describes CSRA's approach for performing the tasks described in the Revised Statement of Work. It includes a description of the activities associated with each task as well as a list of transmittals and deliverables and their due dates. A cost estimate for this Task Order Work Plan is provided as a separate attachment. Previous revisions to this work plan included adding additional documents relevant to the allocation to be submitted by the PRPs (along with associated time to evaluate the documents for relevance), additional time for PRPs to communicate, meet, and exchange information with the allocator, and a step for early identification of PRPs who are similarly situated to the parties that received the first round of cash out settlement offers from EPA for EPA's use in making early settlement determinations. New revisions to this work plan are presented with strike through for deletions and in bold blue for additions. They include changes related to additional documents to be submitted by the PRPs, an increase in the number of facilities being evaluated, and increased interaction with the PRPs and the allocator Exemption (b) (3) (A)

The Work Plan is organized as follows:

Section 1.0 - Background
Section 2.0 - Assumptions
Section 3.0 - Project Methodology and Approach
Section 4.0 - Work Tasks
Section 5.0 - Reports, Transmittals and Deliverables
Section 6.0 - Staffing Plan
Section 7.0 - Quality Management
Section 8.0 - Conflict of Interest
Section 9.0 - Cyber Security
Section 10.0 - Project Budget
Section 11.0 - Period of Performance

## 1.0    Background

The Diamond Alkali Site (the Site) has a long history, involving over 100 potentially responsible parties (PRPs). Since the late 1800s, the Lower Passaic River has been a highly industrialized waterway, receiving direct and indirect discharges from numerous industrial facilities. Data collected in the Lower Passaic River, and EPA's analyses, show that contaminated sediment in the lower 8.3 miles are a major source of contamination to the rest of the river and Newark Bay and pose an unacceptable risk to human health and the environment due to the presence of a variety of contaminants that stay in the environment for a long time and can build up in fish and shellfish. These contaminants include dioxins and furans, PCBs, mercury, DDT and its primary breakdown products, copper, dieldrin, PAHs, and lead.

On March 4, 2016, EPA issued a record of decision selecting the remedy for the lower 8.3 miles of the Lower Passaic River, which is Operable Unit 2 (OU2) of the Site. Currently, the remedial design (RD) for OU2 is being performed by Occidental Chemical Corporation (OCC) pursuant to an administrative order on consent. The cost of the remedial action (RA), estimated for purposes of remedy selection, is $1.38 billion.

Region 2 has issued a notice of potential liability to approximately 100 parties, informing them of their responsibility for the RD/RA for OU2. The Region has offered a first round of cash-out settlements to a group of approximately 20 PRPs. The Region expects to separately address the liability of municipalities and public entities. For the remaining PRPs, the Region expects to

ALCD-PUBCOM_0001399

enter into settlement negotiations for performance and funding of the remedy with OCC and other parties (the "Major PRPs") that the Region considers major PRPs for OU2. The Region plans another round of cash-out settlements with "Middle Tier PRPs", i.e., not part of the phase 1 cash-out group, but also not Major PRPs. The Region requires the services of a third party allocator to develop a settlement framework and evaluate the 80 Middle Tier and Major parties within the framework. This proposal applies same allocation process to all of the private OU2 PRPs remaining after the first round of cash-out settlements, with the expectation that, in the settlement phase, the resulting allocation will enable EPA to identify the Middle Tier PRPs, eligible for a phase two cash out offer, and the Major PRPs that will be performing and/or funding the remedy.

Region 2 understands that the PRP group (the Cooperating Parties Group, or CPG) has made at least two previous attempts to develop a mutually acceptable allocation of liability to promote settlement with EPA for costs and work at the Site, however both efforts fell short of agreement. Region 2 believes that because of these previous efforts, additional information available from responses to CERCLA 104(e) letters, information available from previous litigation at the state level and numerous conversations with PRPs over the years, the project will be able to be built primarily upon existing information and contacts.  Some minor augmentation of background, data and allocation factors may need to occur to develop what is hoped to be an acceptable settlement proposal and structure.  In 2016, the Department of Justice retained a mediator/allocation specialist, David Batson of TechLaw/AlterEcho, to assist in settlement analysis.  Those discussions and analyses have resulted in this effort.

## 2.0    Assumptions
This work plan and the attached cost estimate are based on the following assumptions, in addition to Task-specific assumptions noted in Section 4.0 of the Work Plan.  All work will be conducted in accordance with the specific tasks in the Work Plan to the performance metrics specified therein.
**General Assumptions:**
- EPA will provide the CSRA Team with a list of parties noticed regarding their responsibility for the RD/RA for OU2, including:
    - a list of Major and Middle Tier Parties ("OU2 PRPs");
    - a list of Phase 1 cash-out parties; and
    - a list of other OU2 parties, including municipalities and other entities
- Maximum of 80 83 PRPs will be provided an opportunity to participate in or be evaluated for determining a share of responsibility in the allocation process. Ten of these PRPs are non-participating parties.
- The allocation will cover a maximum of 97 facilities associated with the 83 PRPs.
- All OU2 PRPs will be provided an opportunity to participate in the design of the allocation database and process and to provide additional Site-related information for possible addition to the database, and will be designated a share of responsibility in the Final Allocation Recommendation Report
- The Final Allocation Recommendation Report will also divide the parties into logical groupings of similarly-situated PRPs
- EPA will provide the CSRA Team with a listing and contact information for each OU2 PRP; Reference herein to meetings or other forms of communication with the OU2 PRPs means communication with the identified representatives of such parties
- A maximum of 150,000 290,000 *506,000* pages of documents will *be* reviewed and utilized to conduct the allocation, including;
    - A maximum of 130,000 pages of documents received from EPA for CSRA Team review

ALCD-PUBCOM_0001400

- ○ A maximum of ~~20,000~~ ~~160,000~~ *376,000* extra pages of documents received from PRPs for CSRA review.  The parties have indicated that based on the evolution of the allocation approach they have additional relevant documents to submit.  This represents an increase in the number of pages to be reviewed by 216,000 or approximately 2,482 pages per 87 participating party facilities.
- All communications by the CSRA Team will be by phone or email unless meeting noted
- The CSRA Team estimates 8-10 hours of communications per party over the remainder of the project. This time is presented as 2 hours per party in Tasks 5.A.1 and 6.A.4; additional meetings (5.A.1, 5.B.1, 9, 10.2); and an undefined number of calls and e-mails allowed for in remaining tasks.  An additional approximately 45 minutes per participating party has been added to Task 7 Exemption (b) (3) (A)

- Maximum of 4 hours of combined project status/update calls will be held by the CSRA Team with EPA per month
- Out-of-DC Area Meetings:
    - ○ 6 meetings involving 2 contractor staff
- Out-of-DC area meetings will be held at the EPA Region 2 offices or other location in the greater New York City metropolitan area as determined by EPA, or OU2 PRPs they supply meeting space
- Travel for and timing of out-of-DC area meetings will be scheduled to allow CSRA Team members to travel from Washington, DC and return on the same day
- Travel and per diem costs for Not Responsive by Agreement with FOIA Requestor

- Meetings will be scheduled and held within noted timeframes
- The allocation database will be designed and organized primarily for purposes of allocation
- Space and equipment for meetings will be provided by EPA or PRPs
- ~~The CSRA Team will provide EPA with a copy of all communications sent to OU2 PRPs regarding the subject, substance, and logistics of OU2 PRP meetings with CSRA Team members~~
- Any part of a communication, attachment to a communication, presentation, or written material provided to OU2 PRPs by the CSRA Team that involves a description of the Site or EPA actions or activities will be provided to EPA for review and approval prior to submission to the OU2 PRPs
- Unless otherwise noted herein, all allocation related communications by the CSRA Team involving the OU2 PRPs or representatives of EPA or DOJ, individually or in groups, will be held confidential pursuant to the provisions of the ADR Act of 1996, 5 USC 574
- In order to ensure a common expectation of confidentiality, all PRP participants in the allocation process will be required to enter, and EPA will appropriately acknowledge, a confidentiality agreement
- The CSRA Team will provide invoices to EPA at the end of each month in which a task is completed (activity, transmittal, and/or deliverable) identified in Section 4.0 of the Work Plan, with a written Progress Report detailing associated activities accomplished during the reporting period, how such activities meet Task Order performance standards, and associated labor and other direct costs
- Not Responsive by Agreement with FOIA Requestor

ALCD-PUBCOM_0001401

- "Staffing" referenced in Section 4.0 Work Tasks refers to TechLaw staff.
- This Task Order can be modified to change the statement of work or add funding.
- Tasks 8 – 11 will not be performed within the task order Period of Performance and are no longer required under this contract. It is anticipated Tasks 8-11 will be initiated in a new task order under the follow on contract.

## 3.0    Project Methodology and Approach

The proposed methodology and approach consists of the following:
- To support this Task Order, CSRA selected TechLaw support.
- CSRA and TechLaw (the CSRA Team) will not interpret EPA policy on behalf of the EPA or make decisions on items of policy, regulation or statutes. The CSRA Team also will not take a stand on the merits of substantive items under discussion including, but not limited to, any substantive issues raised by OU2 PRPs. The CSRA Team will not interpret EPA's March 4, 2016, record of decision selecting the remedy for OU2 of the Site.
- In gathering information or performing research with parties outside the EPA, CSRA Team members will identify themselves as contractors to EPA and not as EPA employees.
- CSRA will approach this task in accordance with the basic terms of the contract and according to the established norms and ethical standards of ADR professionals. Except as otherwise noted herein, information provided to the ADR professional by any of the parties, including EPA, communications between parties and the ADR professional, and notes and dispute resolution work product generated by the ADR professional during work pursuant to the Task Order will be maintained as confidential by the ADR professional pursuant to the provisions of the ADR Act of 1996 (Public Law 104-320; 5 USC 571 et al.) and applicable federal, state and judicial requirements.
- To enhance the positive substantive, relational, and procedural outcomes from ADR cases, CSRA will direct all ADR professionals providing ADR services under this task order to do the following prior to the mediation or facilitation and throughout the process:
  - Inquire about whether individual participants have the time, financial, and logistical resources necessary to participate effectively in the process and – where resources are inadequate – assist them in identifying appropriate resources or in making necessary adjustments to the process to accommodate resource constraints;
  - Assist the participants in identifying the issues that are important to resolving any controversy and solutions that will address the needs shared by the participants;
  - Conduct the process to promote active engagement from all participants;
  - Explore with the participants appropriate ways to incorporate high quality and relevant information resources necessary to resolve the issues; and
  - To support productive dialogue and effective implementation of any agreements reached by the participants, ensure that participants have appropriate authority to make commitments on behalf of their organizations.

As prime contractor, CSRA will support this Task Order through the following activities:
- Provide progress reports at the end of each month in which an activity, transmittal, and/or deliverable identified in Section 5.0 of the Work Plan is completed;
- Communicate and coordinate with the EPA Task Order Contracting Officer's Representative (TOCOR) by phone as needed;
- Coordinate with the subcontractor, TechLaw;
- Incorporate the principles of Quality Management while carrying out this task;

ALCD-PUBCOM_0001402

- Provide deliverables in electronic format (as agreed to by the TOCOR) to the EPA TOCOR; and
- NOTIFY THE EPA PROJECT DIRECTOR AND PROGRAM OFFICE CONTACT WHEN 75% OF THE FUNDS PROVIDED HAVE BEEN EXPENDED.

## 4.0    Work Tasks

Task 0.0    **Task Order Management**

In accordance with proper contract implementation, CSRA and TechLaw will ensure effective management of the resources and deliverables required by EPA.

Specifically, the CSRA Task Order Manager (TOM) for this effort will:
- Ensure that all technical direction received falls into the scope of work prior to initiating any action;
- Ensure completion and maintain copies of all contract transmittals and deliverables;
- Oversee subcontractor activities through regular and periodic conversations with the subcontractor to ensure effective performance;
- Ensure that progress and financial reports accurately clearly articulate the work completed as per the approved work plan, and identify any problems encountered and activities to address them;
- Speak on an as-needed basis with the EPA TOCOR to review the financial and work status of the project;
- Review the progress report and invoice with the EPA TOCOR; and
- Update the Dashboard task order management tracking system as invoices are submitted.

The CSRA Team developed this Work Plan to provide a detailed explanation of all activities associated with and a proposed approach for completing each of the defined tasks. The CSRA Team identified the transmittals and deliverables and their associated due dates and developed a detailed fixed price budget, including a breakout of labor and travel costs.

*Please note:* Not Responsive by Agreement with FOIA Requestor
Not Responsive by Agreement with FOIA Requestor

| Item | Title | Due No Later Than† | Type |
|------|-------|--------------------|------|
| 0.1 | Work Plan | Within 10 days* of SOW issuance or as approved by the EPA CO | **Deliverable** |
| 0.1a | Revised Work Plan | Within 10 days* of SOW issuance or as approved by the EPA CO | Deliverable |
| *0.1b* | *Revised Work Plan* | *Within 10 days* of SOW issuance or as approved by the EPA CO* | *Deliverable* |
| 0.2 | Progress Reports | Submitted after completion of each task and with submission of invoice | **Deliverable** |

† Or as otherwise directed by the TOCOR
* All references to "days" refer to business days

## Task 1    **Preliminary Work** - Complete

ALCD-PUBCOM_0001403

| Item | Title | Due No Later Than† | Type |
|------|-------|---------------------|------|
| 1.1 | Task Order Kick-Off Meeting | Within 20 days* of Task Order approval | Transmittal |

† Or as otherwise directed by the TOCOR
* All references to "days" refer to business days

The CSRA Team will prepare for and participate in a meeting with EPA to discuss tasks described in the Task Order, EPA's expectations for the project, and a plan for conducting the outreach to PRPs. Prior to the meeting, the CSRA Team will develop its overall strategy for conduct of the allocation process, including a timeline of tasks and strategy for communications with the OU2 PRPs. During the meeting, the EPA will advise the CSRA Team regarding the identity of the OU2 PRPs and the scope and nature of the selected remedy. Following the meeting, the CSRA Team will send an email summarizing the agreed-upon PRP Outreach Plan for approval of the EPA technical lead in consultation with EPA legal personnel. The developed PRP outreach plan will include a process for contacting and receiving information from PRPs, including for meetings and conference calls with the OU2 PRPs as a group, and individual OU2 PRP contacts via email, letter, or phone, and confidentiality procedures.

This task will require the following efforts on the part of the CSRA Team:
- Development of a plan for conducting outreach to OU2 PRPs that includes an opportunity for all OU2 PRPs to (1) provide feedback on the design of the allocation, including additional data, information or factors which should be considered in design of the database, (2) review their individual PRP data report for accuracy, (3) provide suggestions regarding design of the allocation process and (4) provide feedback on the allocation report. The plan will also explain how the CSRA Team will update EPA on PRP outreach efforts
- Drafting and submission of an email summarizing the agreed-upon PRP outreach plan for approval of the EPA technical lead
- The CSRA Team will supply two (2) senior staff located in Washington, DC for the meeting

Tech Law Staffing - Senior Allocation Specialist; Senior Project Manager

*Performance Standards/Metrics:*
- The CSRA Team participates in the Task Order Kick-Off Meeting
- The submitted summary of the PRP Outreach Plan provides a summary of the agreement reached at the Task Order Kick-Off Meeting regarding the plan for communications by the CSRA Team with the OU2 PRPs

## Task 2    Public Announcement of Project - Complete

| Item | Title | Due No Later Than† | Type |
|------|-------|---------------------|------|
| 2.1 | EPA Project Public Announcement Meeting | Within 40 days* of Task Order approval | Activity |

† Or as otherwise directed by the TOCOR
* All references to "days" refer to business days

The CSRA Team will participate in a meeting, sponsored by EPA, with the OU2 PRPs to announce and explain the allocation project, including opportunities for participation of the OU2 PRPs in the development of the allocation process. Following the project announcement meeting noted in Task 2, the CSRA Team will work to obtain and record

ALCD-PUBCOM_0001404

signatures of the OU2 PRPs and acknowledgement of EPA to the Participation Agreement distributed during the project announcement meeting.

This task will require the following efforts on the part of the CSRA Team:
- Preparation of talking points and handout material for participants regarding the allocation process in consultation with the EPA technical lead in consultation with EPA legal personnel
- Preparation of a written Participation Agreement for consideration and execution of the OU2 PRPs, incorporating an explanation of relevant confidentiality protections and requirements associated with the allocation process
- The CSRA Team will supply two (2) senior staff located in Washington, DC to participate in the meeting
- Communication via email, and as required via phone, with the OU2 PRPs as a group regarding execution of and to answer questions regarding the Participation Agreement
- Recording and compilation of executed Participation Agreement signature pages

Conduct of this task is dependent upon EPA's ability to successfully make arrangements for and schedule the meeting, and communicate with OU2 PRPs regarding the meeting, and upon receipt of EPA's final approval of the PRP outreach plan agreed upon during the Task Order Kick-Off Meeting within 10 business days of the meeting.

Staffing - Senior Allocation Specialist, Senior Project Manager

*Performance Standards/Metrics:*
- Talking points and materials prepared for the meeting provide an overview of the project and opportunities for PRP participation noted in the PRP Outreach Plan developed in Task 1
- The CSRA Team participates in the Task Order Kick-Off Meeting
- A majority of the members of the OU2 PRPs execute the Participation Agreement

**Task 3        Initial Allocation Process and Database Design - Complete**

| Item | Title | Due No Later Than[†] | Type |
|------|-------|------------------|------|
| 3.1 | Submit initial allocation process and database design to EPA | Within 100 days* of Task Order approval | Transmittal |

† Or as otherwise directed by the TOCOR
* All references to "days" refer to business days

The CSRA Team will review documents received from EPA and prepare a written descriptive summary of the initial design for the allocation process, including a design of the allocation database, and submit to EPA for review.

The allocation process will be designed based upon information received during consultations with EPA and OU2 PRPs on the allocation database and using all relevant non-confidential received information, including data, records, and other documents. The initial design will include recommendations for: (1) data sources to be considered for the allocation; (2) applicable allocation factors; and (3) methodology for determination of shares.

ALCD-PUBCOM_0001405

The searchable database will be designed to have the capability to contain and organize all of the information and data used in the allocation, including received PRP disclosure statements and nexus documents from third party litigation. No confidential information will be included in the allocation database. Though to be designed for purposes of conducting the allocation, the database will be designed in such a way as to allow access and use by EPA and DOJ staff for their settlement purposes following submission of the Allocation Data Reports in Task 8. The CSRA Team will, as an interim measure, create and provide EPA access to a SharePoint site in which any site documents received from the OU2 PRPs will be maintained.

This task will require the following efforts on the part of the CSRA Team:

- Conduct a preliminary review of Site data on OU2 contaminants of concern as identified in the OU2 ROD to determine appropriate allocation data sets
- Conduct preliminary research, analysis, and determine applicable case law, legal requirements, and equitable considerations for use in conducting allocation
- Conduct initial review and analysis of EPA selected remedy for OU2 to determine method to account for differential impact of contaminants of concern and source location
- Conduct a preliminary review of information received from EPA, including PRP disclosure statements and nexus documents from third party litigation, in order to determine the appropriate design of the database required to support conduct of the allocation process
- Conduct initial coding of data and loading of coded data into database to determine credibility of database design concept
- Establish preliminary recommendations regarding allocation computations appropriate for OU2, procedures for use of data in allocation computations, and appropriate allocation methodology, and the design of a searchable database with capability to contain and organize all of the information and data used in the allocation
- Preparation of a written descriptive summary of the initial design for the allocation process, including (1) a timeline for submission of allocation related documents, including PRP position briefs and reply briefs, and (2) a written description of the design of the database with a suggested method for providing OU2 PRPs specific information on the contents of the database, suggestions on methods for resolving data gaps in data regarding OU2 PRPs not identified in documents received from EPA, and if practical, images of anticipated data screens.
- Establish a SharePoint site that provides EPA access to documents received from OU2 PRPs

Conduct of this task is dependent upon; (1) receipt of all allocation documents and information regarding the site remedy from EPA within 20 business days of approval of the Task Order, and (2) receipt of all information from EPA as individual documents in OCR searchable pdf format to allow loading into the allocation database.

Staffing - Senior Allocation Specialist; Senior Project Manager; Database Designer

*Performance Standards/Metrics:*

- The CSRA Team submits a written descriptive summary of the initial design for the allocation process, including a database design, within the noted timeframe
- The submitted written descriptive summary of the initial design for the allocation process includes a summary of the basis of and anticipated conduct the allocation

ALCD-PUBCOM_0001406

process, including preliminary recommendations on data sources to be considered for the allocation, applicable allocation factors, and methodology for determination of shares
- The submitted initial database design provides a written description of the database, including, suggested method for providing OU2 PRPs specific information on the contents of the database, suggestions on methods for resolving data gaps in data regarding OU2 PRPs not available in documents received from EPA, and if practical, images of anticipated data screens

## Task 4          Conference Call w EPA on Initial Database Design – Complete

| Item | Title | Due No Later Than† | Type |
|------|-------|--------------------|------|
| 4.1 | Conference Call with EPA on Initial Allocation Process and Database Design | Within 10 days* of submission of initial allocation process and database design | Activity |

† Or as otherwise directed by the TOCOR
* All references to "days" refer to business days

Task 4.1 – The CSRA Team will prepare for and participate in a conference call with EPA regarding the initial allocation process and database design. The purpose of the call will be to advise and consult with EPA regarding the submitted initial allocation process and database design and to discuss and resolve any EPA comments. Following the conference call, the CSRA Team will edit the initial allocation process and database design based on received EPA comments to create a draft design for submission to the OU2 PRPs.

This task will require the following efforts on the part of the CSRA Team:
- The CSRA Team will supply two (2) senior project staff located in Washington, DC to participate in the conference call
- Conference call assumed to be no more than two (2) hours in length

Staffing – Senior Allocation Specialist; Senior Project Manager

*Performance Standards/Metrics:*
- The CSRA Team participates in the draft Database Design conference call

## Task 5          Meeting with PRPs on Draft Allocation Process ~~and~~ /Database Design, and Initiation of early Settlement Process - Complete

| Item | Title | Due No Later Than† | Type |
|------|-------|--------------------|------|
| 5.A.1 | Conduct *two* Meeting*s* with PRPs on Draft Allocation Process and Database Design | Within 40 days* of submission of initial allocation process and database design to EPA | Activity |
| 5.A.2 | Conference Call with EPA on Meeting*s* with PRPs on Draft Allocation Process and Database Design | Within 10 days* following the Meeting with PRPs on Draft Allocation Process and Database Design | Activity |
| 5.B.1 | Submit guidance on | Within 5 days of Revised Task Order | Transmittal |

ALCD-PUBCOM_0001407

| | | preparation of allocation submissions to EPA and PRPs | Approval | |
|---|---|---|---|---|
| | 5.B.2 | Submit recommendation on relevancy of documents provided by OU2 PRPs to EPA and PRPs | Within 30 days of Revised Task Order Approval | Transmittal |

† Or as otherwise directed by the TOCOR
* All references to "days" refer to business days

Task 5.A.1 - The CSRA Team will plan, schedule, and conduct two meetings with the OU2 PRPs as a group regarding the draft design of the allocation process and database. The purpose of the meetings will be to advise the OU2 PRPs as a group regarding the anticipated conduct of the allocation process and the anticipated organization of data and contents of the database, and to obtain PRP comments regarding the draft allocation process and database design. The CSRA Team will also communicate with the OU2 PRPs individually to obtain the input of OU2 PRPs, including those that did or were unable to attend the outreach meetings, regarding suggestions on the effective design and conduct of the allocation process and database, and to obtain additional records and information, if any, for the allocation database.

This task will require the following efforts on the part of the CSRA Team:
- Making arrangements for a meeting in the greater New York City metropolitan area sufficient to accommodate the OU2 PRPs as a group
- Coordination of meeting space and equipment for meetings provided by EPA or OU2 PRPs
- Communication via email with the OU2 PRPs regarding substance, date/time, and location of meeting
- Development of meeting agenda
- Development of participant materials, including a descriptive summary of Site information received from EPA and a description of the draft allocation process and database design
- Travel of two (2) senior staff from Washington, DC to attend meeting
- Communications by Senior Allocation Specialist via phone, email, or other electronic media as required with OU2 PRPs
- Communications will be limited to an average of 2 hours for each OU2 PRP
- Record PRP comments regarding allocation process and database design and conduct, without attribution to individual OU2 PRP comments

Staffing – Senior Allocation Specialist; Senior Project Manager

*Performance Standards/Metrics:*
- The CSRA Team conducts a meeting with the OU2 PRPs as a group regarding design of the allocation process and database
- A majority of the members of the OU2 PRPs as a group attend the meeting either in person or remotely
- The CSRA Team copies the EPA technical lead on its email communication to the OU2 PRPs regarding substance, date/time, and location of meeting, and provides EPA with a copy of utilized meeting materials

ALCD-PUBCOM_0001408

Task 5.A.2 - The CSRA Team will schedule and hold, within 10 business days of holding the meetings with the OU2 PRPs on the draft allocation process and database design, a conference call with EPA regarding the findings of the meetings.

This task will require the following efforts on the part of the CSRA Team:
- Scheduling and participating in a two conference calls with EPA to provide EPA information on the meetings, including a list of participants at the meeting and summary of suggestions received regarding the allocation process and database design
- Conference call assumed to be no more than two (2) hours in length

Timing of this task is dependent upon the availability of assigned EPA staff to participate in a conference call within noted timeframe.

Staffing – Senior Allocation Specialist; Senior Project Manager

*Performance Standards/Metrics:*
- The CSRA Team participates in a conference call with EPA regarding the findings of the meeting following the Database Design Outreach Meeting
- In conducting the post-meeting conference call with EPA, the CSRA Team provides a summary of information and suggestions obtained from the OU2 PRPs without attribution to contributions of individual participants

Task 5.B.1 - The CSRA Team will prepare a written guide regarding the format and preparation of written submissions by OU2 PRPs pursuant to the allocation process and submit to EPA and the OU2 PRPs

The preparation guide will be designed based upon information received during consultations with EPA and OU2 PRPs on the allocation process. The preparation guide will include the format and content of required allocation documents, including: (1) initial equitable factors brief; (2) preliminary factual submission; (3) document submission certification; and (4) notification of early settlement eligibility.

This task will require the following efforts on the part of the CSRA Team:
- Conduct a conference call with OU2 PRPs to announce and explain modifications to the allocation project, including opportunities for participation of the OU2 PRPs in the development of the allocation process
- Conduct of communications, including a meeting, with OU2 PRPs regarding recommended format and content of above noted required allocation submissions
- Preparation of written guide regarding the format and preparation of written submissions by OU2 PRPs pursuant to the allocation process for review by EPA
- Preparation of written guide based upon EPA comments and suggestions for review by OU2 PRPs.
- Preparation of a final written guide regarding the format and preparation of written submissions by OU2 PRPs pursuant to the allocation process based upon comments and suggestions received from the OU2 PRPS and EPA

Staffing - Senior Allocation Specialist; Senior Project Manager

ALCD-PUBCOM_0001409

Performance Standards/Metrics:
- The CSRA Team conducts a call with OU2 PRPs as a group to announce and explain modifications to the allocation project, including opportunities for participation of the OU2 PRPs in the development of the allocation process
- The CSRA Team submits a written guide regarding the format and preparation of written submissions by OU2 PRPs pursuant to the allocation process to EPA for review within the noted timeframe
- The CSRA Team submits a written guide to the OU2 PRPs within the noted timeframe
- The submitted written guide includes the format and content of required allocation documents, including: (1) initial equitable factors brief; (2) preliminary factual submission; (3) document submission certification; and (4) notification of early settlement eligibility.

Task 5.B.2 – The CSRA Team will organize and conduct a review of initial indices of documents proposed for inclusion in the Allocation Document Database by OU2 PRPs to develop a recommendation on the relevancy of proposed documents to the allocation process.

This task will require the following efforts on the part of the CSRA Team:
- Conduct an analysis of document information contained in indices received from the OU2 parties to determine if the proposed documents meet established relevancy criteria for inclusion in Allocation Document Repository
- Drafting of a written recommendation indicating which of the recommended documents are deemed    to meet the established relevancy criteria for inclusion in Allocation Document Repository, with an explanation of the rationale for the exclusion of any recommended document

Staffing - Data Analysts; Senior Project Manager; Senior Allocation Specialist

Performance Standards/Metrics
- The CSRA Team submits the written recommendation regarding the relevancy of OU2 PRP documents to EPA, with a copy to the OU2 PRPs, within the noted timeframe
- The submitted written recommendation indicates which of the documents recommended by OU2 PRPs are deemed to meet the established relevancy criteria for inclusion in Allocation Document Repository, with an explanation of the rationale for the exclusion of any recommended document

**Task 6    Final Allocation** Design and Early settlement PRP Data Reports - *Complete*

| Item | Title | Due No Later Than[†] | Type |
|------|-------|---------------------|------|
| 6.A | Submit Final Allocation Guide to EPA and PRPs | Within 50 days* following the Meeting with PRPs on Draft Allocation Process and Database Design | Transmittal |
| 6.B.1 | Submit draft PRP Data Reports regarding Early Settlement PRPs to PRPs and EPA | Within 10 days* of EPA final decision regarding additional documents for inclusion in repository | Transmittal |

ALCD-PUBCOM_0001410

| 6.B.2 | Submit final PRP Data Reports regarding Early Settlement PRPs to PRPs and EPA | Within 15 days of submission of Draft Early Settlement Part Data Reports | Transmittal |
|---|---|---|---|

† Or as otherwise directed by the TOCOR
* All references to "days" refer to business days

Task 6.A. - The CSRA Team will complete the ~~design of the~~ allocation *guide* ~~process~~ based on input received from EPA and PRPs for submission to the OU2 PRPs and EPA.

This task will require the following efforts on the part of the CSRA Team:
- Conduct coding of data and loading of coded data into database
- Communications by Senior Allocation Specialist via phone, email, or other electronic media as required with OU2 PRPs; Communications will be limited to an average of 2 hours for each OU2 PRP
- Review of factors statements by OU2 PRPs regarding suggestions on protocol and equitable factors for use in allocation
- Record, compile, and organize suggestions of OU2 PRPs regarding allocation process design and conduct without attribution to individual comments
- Conduct a call with EPA to discuss suggestions received from OU2 PRPs regarding allocation process design and conduct without attribution to individual comments
- Edit draft allocation design based on analysis of received Site data, EPA comments on the draft allocation design, and consideration of input received from OU2 PRPs during meeting and other outreach methods to prepare a written descriptive summary of the final allocation design and submit to EPA and the OU2 PRPs

Staffing - Senior Allocation Specialist; Senior Project Manager

*Performance Standards/Metrics:*
- The CSRA Team submits a written descriptive summary of the final design for the allocation process within the noted timeframe
- The submitted written descriptive summary of the final design for the allocation process includes a description of the basis of and anticipated conduct of the allocation process, addresses any identified ambiguities in the draft report, and includes a summary of how the comments of EPA and the OU2 PRPs regarding the draft allocation design were, or were not, taken into account in the final allocation design, without attribution.

Task 6.B.1. - The CSRA Team will organize and conduct a technical and scientific evaluation of data in the allocation database to develop individual data reports for each of the OU2 Early Settlement PRPs. The PRP Data Reports will provide selected information regarding each OU2 Early Settlement PRP's relation to OU2 and OU2 contaminants of concern that will be used in conduct of the allocation. The CSRA Team will establish a deadline of 10 business days from receipt of the data report for submission of corrections or suggestions by the OU2 PRPs for improving the quality of the received OU2 Early Settlement PRP's data report.

This task will require the following efforts on the part of the CSRA Team:
- Conduct a call with EPA to discuss the Allocation Team recommendation regarding the relevancy to the allocation of documents provided by OU2 Early Settlement PRPs

ALCD-PUBCOM_0001411

- Conduct coding of data and loading of coded data into database obtained from OU2 Early Settlement PRPs
- Review preliminary factual submission by OU2 Early Settlement PRPs
- Review Site data loaded into database to determine appropriate organization for allocation
- Compile and organize Site data in database to support allocation analysis and share computations
- Organize data in allocation database and draft individual OU2 Early Settlement PRP data reports
- Provide a copy of the Early Settlement PRP data reports to the OU2 PRPs for review

Conduct of this task is dependent upon the following:
- Access by the CSRA Team to EPA technical data regarding Site conditions and the selected OU2 remedy
- Sufficient data on identified Early Settlement PRPs to allow analysis of associated contaminants of concern and hazardous substance fate and transport at the Site
- Successful establishment of the allocation database
- Receipt of additional data from OU2 Early Settlement PRPs for inclusion in the allocation database

Staffing - Data Analysts; Senior Scientist; Senior Project Manager; Senior Allocation Specialist

Performance Standards/Metrics
- The CSRA Team submits the PRP Data Reports to the OU2 PRPs within the noted timeframe
- The submitted written individual PRP Data Reports include a summary of information in the allocation database that is relevant to a determination regarding the associated OU2 Early Settlement PRP's relation to OU2 and OU2 contaminants of concern for use in conduct of the allocation
- The CSRA Team copies the EPA technical lead on the email communications to the OU2 Early Settlement PRPs providing a copy of their data report

Task 6.B.2. - The CSRA Team will analyze corrections or suggestions for improving the quality of the data reports received from OU2 PRPs to determine whether modifications of the original data reports are warranted. Based on this analysis, the CSRA Team will modify the data reports, as deemed appropriate. The CSRA Team will then provide a copy of all of the revised data reports to EPA and a revised copy of individual data reports will be uploaded to the document repository for access by all of the OU2 PRPs, with an explanation of how suggested changes were, or were not, incorporated.

This task will require the following efforts on the part of the CSRA Team:
- Analyze received suggestions and corrections to data reports in relation to existing Site data and the final allocation design in order to determine appropriate modifications
- Modify the individual data reports, as warranted based on above analysis
- Provide an explanation to the OU2 Early Settlement PRPs regarding whether, and if so how, received suggestions resulting in changes to their individual data report, including a description of why their suggestions and comments were, or were not, taken into account

ALCD-PUBCOM_0001412

- Upload final OU2 Settlement PRP data reports to allocation document repository
- As required, the CSRA Team will conduct communications with individual OU2 Early Settlement PRPs to answer questions regarding their final data report

Timing of this task is dependent upon the following:
- Receipt of EPA's determination regarding the relevancy to the allocation of documents provided by OU2 Early Settlement PRPs within established timeframe
- Receipt of comments from OU2 Early Settlement PRPs regarding their data report within established timeframes

Staffing - Data Analysts; Senior Scientist; Senior Project Manager; Senior Allocation Specialist

Performance Standards/Metrics
- The CSRA Team submits the Final PRP Data Reports to EPA and OU2 Early Settlement PRPs within the noted timeframe, and uploads data reports to document repository
- The submitted revised Final PRP Data Reports address any identified ambiguities in the draft reports and includes a summary of how received comments regarding the draft PRP Data Reports were, or were not, taken into account in the final reports
- Certifications regarding the completeness of document/data searches conducted by the OU2 Early Settlement PRPs are uploaded to the Allocation Document Repository
- The CSRA Team copies the EPA technical lead on the email communications to the OU2 Early Settlement PRPs providing a copy of their individual data report

### Task 7    Draft PRP Data Reports

| Item | Title | Due No Later Than† | Type |
|------|-------|--------------------|------|
| 7.A.1 | ~~Submit recommendation on~~ *Determine* relevancy of documents provided by OU2 PRPs ~~to EPA and PRPs~~ | Within 10 days of OU2 Party submission of document indices. **(Note that the documents will be retained in the confidential database and only available to the Allocation Team until the Final Allocation Recommendation Report is completed)** | Submittal |
| 7.A.2 | Submit Draft PRP Data Reports to PRPs | Within ~~100~~ *50* ~~5~~ days* *of parties submitting additional documents* ~~comments.~~ ~~EPA final decision regarding additional documents for inclusion in repository~~ | Transmittal |
| 7.A.3 | Summary Memo of activities completed | July 15, 2019 | Transmittal |
| 7.B | Submit recommendation on eligibility of PRPs for early settlement to EPA | Within 20 days of loading of Final Early Settlement Party Data Reports | Transmittal - *Completed* |

† Or as otherwise directed by the TOCOR
* All references to "days" refer to business days

ALCD-PUBCOM_0001413

Task 7.A.1 - The CSRA Team will organize and conduct a review of indices of remaining documents proposed for inclusion in the Allocation Document Database by OU2 PRPs to determine the relevancy of proposed documents to the allocation process.

This task will require the following efforts on the part of the CSRA Team:
- Conduct an analysis of document information contained in indices received from the OU2 PRPs to determine if the proposed documents meet established relevancy criteria for inclusion in Allocation Document Repository
- Provide a written *notification* ~~recommendation~~ to the OU2 PRPs indicating which of the recommended documents are not deemed to meet the established relevancy criteria for inclusion in Allocation Document Repository, with an explanation of the rationale for the exclusion of any recommended document
- *Provide EPA with a summary of the types of documents deemed not relevant and excluded from the document repository and a count of the number of pages of documents provided by the OU2 PRPs that will be loaded into the repositories. If the number of pages of documents submitted by a PAP is determined to be unreasonably excessive, AlterEcho will discuss the issue with EPA and propose a resolution.*

Staffing - Data Analysts; Senior Project Manager; Senior Allocation Specialist

Performance Standards/Metrics
- The CSRA Team provides EPA an email certification with a summary of the types of documents that were deemed not relevant, the total page count for the documents deemed not relevant, and a count of the number of pages of documents provided by the OU2 PRPs that were deemed relevant and loaded into the repositories.
- ~~The submitted written recommendation indicates which of the documents recommended by OU2 PRPs are deemed to meet the established relevancy criteria for inclusion in Allocation Document Repository, with an explanation of the rationale for the exclusion of any recommended document~~

Task 7.A.2 - The CSRA Team will organize and conduct a technical and scientific evaluation of data in the allocation database to develop individual data reports for each of the OU2 PRPs facilities for which an early settlement was not completed with EPA. The PRP Data Reports will provide selected information regarding each OU2 PRP's relation to OU2 and OU2 contaminants of concern that will be used in conduct of the allocation. The CSRA Team will establish a deadline of 40 business days from receipt of the data report for submission of corrections or suggestions by the OU2 PRPs for improving the quality of the received OU2 PRP's data report.

This task will require the following efforts on the part of the CSRA Team:
- ~~Conduct a call with EPA to discuss the Allocation Team recommendation regarding the relevancy to the allocation of documents provided by OU2 PRPs~~
- Employ a rigorous approach to filling data gaps with additional information requested and obtained from EPA or the Participating Allocation Parties (e.g., industry resources, EPA/NJDEP files, Sanborn Fire Insurance Maps, aerial photographs and possibly supplemental 104e requests) in accordance with the protocol for handling data gaps and ambiguities included in the Allocation Methodology.
- Conduct coding of data and loading of coded data into database obtained from OU2 PRPs

ALCD-PUBCOM_0001414

- Review preliminary factual submission by OU2 PRPs
- Review Site data loaded into database to determine appropriate organization for allocation
- Compile and organize Site data in database to support allocation analysis and share computations
- Organize data in allocation database into and draft individual OU2 PRP data reports *for each facility. Existing data reports for facilities included in the early settlement phase will be updated with new information, if necessary.*
- Provide a copy of the PRP data reports to the OU2 PRPs for review

Timing of this task is dependent upon the following:
- ~~Receipt of EPA's determination regarding the relevancy to the allocation of documents provided by OU2 PRPs within established timeframe~~
- Receipt of comments from OU2 PRPs regarding their data report within established timeframes

Conduct of this task is dependent upon the following:
- Access by the CSRA Team to EPA technical data regarding Site conditions and the selected OU2 remedy
- Sufficient data on identified PRPs to allow analysis of associated contaminants of concern and hazardous substance fate and transport at the Site
- Successful establishment of the allocation database
- Receipt of additional data from OU2 PRPs for inclusion in the allocation database within established timeframes

Staffing - Data Analysts; Senior Scientist; Senior Project Manager; Senior Allocation Specialist

*Performance Standards/Metrics*
- The CSRA Team submits the PRP Data Reports to the OU2 PRPs within the noted timeframe
- The submitted written individual PRP Data Reports include a summary of information in the allocation database that is relevant to a determination regarding the associated OU2 PRP's relation to OU2 and OU2 contaminants of concern for use in conduct of the allocation
- ~~The CSRA Team copies the EPA technical lead on the email communications to the OU2 PRPs providing a copy of their data report~~
- *To document the above two bullets, the CSRA Team provides EPA with an email certification including a summary of the types of information included in the data reports, a list of the PAPs for which a Draft Data Report was completed, and the date Draft Data Reports were submitted to the PAPs.*

*Task 7.A.3. The CSRA Team will continue to provide the following activities through July 31, 2019.*

- *Conduct of communications, including a conference call, with OU2 PRPs regarding recommendations on and legal/equitable theories pertinent to conduct of the allocation to be included in Position and Response Briefs from the OU2 PRPs*

ALCD-PUBCOM_0001415

- **Review and consideration of input regarding allocation received from the OU2 PRPs and EPA**
- **Review and understand the basis for EPA's selected remedy for OU2, in consultation with EPA technical and legal personnel**
- **Compilation and analysis of allocation data related to each OU2 PRP, including contaminants of concern, to establish the relative impact of the actions for each OU2 PRP on the conditions that resulted in EPA selecting the OU2 remedy**
- **Establish appropriate allocation algorithms**
- **Initiate preparation of draft allocation recommendation report**

Task 7.B - The CSRA Team will organize and conduct an analysis of information regarding the relationship of OU2 Early Settlement PRPs to the Site and Site remedy, including relevant documents in the Allocation Document Repository, PRP Data Reports, and Preliminary Submissions, to develop a recommendation on the eligibility of OU2 Early Settlement PRPs for the opportunity to enter negotiations with EPA regarding a cash-out settlement. The recommendation will be based upon eligibility criteria specified by EPA in its May 17, 2017 to OU2 PRPs on the subject; specifically that "(t) he parties that EPA identified as eligible for an early cash out settlement are those that, based on information reviewed by EPA, are not associated with the release or disposal of any of the COCs for OU2, as identified in the ROD, into the Lower Passaic River.

This task will require the following efforts on the part of the CSRA Team:
- Conducting an analysis of documents and other information submitted by OU2 Early Settlement PRPs and contained in the Allocation Document Repository to determine whether the OU2 Early Settlement PRPs meet the eligibility criteria specified by EPA.
- Drafting of a written recommendation indicating which of the OU2 Early Settlement PRPs are deemed   to meet the specified eligibility criteria for the opportunity to enter negotiations with EPA regarding a cash-out settlement, with an explanation of the rationale for the exclusion of any OU2 Early Settlement PRP.

Staffing - Data Analysts; Senior Scientist; Senior Project Manager; Senior Allocation Specialist

Performance Standards/Metrics
- The CSRA Team submits the written recommendation on the eligibility of OU2 Early Settlement PRPs for the opportunity to enter negotiations with EPA regarding a cash-out settlement, within the noted timeframe
- The submitted written recommendation indicates which of the OU2 Early Settlement PRPs are deemed  to meet the specified eligibility criteria for the opportunity to enter negotiations with EPA regarding a cash-out settlement, with an explanation of the rationale for the exclusion of any OU2  Early Settlement PRP

### Task 8        **Final Data Reports**

Task 8 will not be performed within the task order Period of Performance and is no longer required to be completed under this contract. It is anticipated task 8 will be initiated in a new task order under the follow on contract. It is included in this work plan for reference purposes.

ALCD-PUBCOM_0001416

| Item | Title | Due No Later Than† | Type |
|------|-------|---------------------|------|
| 8.1 | Submit Final PRP Data Reports to PRPs | Within 20 days* of the deadline OU2 PRPs corrections to PRP data reports | Transmittal |
| 8.2 | Provide EPA Access to Allocation Database | Upon *submission of the Final Allocation Recommendation Report.* ~~loading of corrected PRP data reports~~ | Activity |

† Or as otherwise directed by the TOCOR
* All references to "days" refer to business days

The CSRA Team will analyze corrections or suggestions for improving the quality of the *Revised Draft Data Reports* received from OU2 PRPs to determine whether modifications of the original data reports are warranted.  Based on this analysis, the CSRA Team will modify the data reports, as deemed appropriate.  The CSRA Team will then provide a copy of all of the Revised Draft Data Reports to ~~EPA and a revised copy of their own individual data reports to each of the~~ OU2 PRPs, with an explanation of how suggested changes were, or were not, incorporated.

This task will require the following efforts on the part of the CSRA Team:
- Analyze received suggestions and corrections to *Revised Draft Data Reports* in relation to existing Site data and the final allocation design in order to determine appropriate modifications
- Modify the individual data reports, as warranted based on above analysis
- Provide an explanation to the OU2 PRPs regarding whether, and if so how, received suggestions resulting in changes to their individual data report, including a description of why their suggestions and comments were, or were not, taken into account.  *Upload final OU2 Settlement PRP data reports to allocation document repository*
- As required, the CSRA Team will conduct communications with individual OU2 PRPs to answer questions regarding their final data report

Timing of this task is dependent upon the following:
- Receipt of comments from OU2 PRPs regarding their Revised Draft Data Report within established timeframes

Staffing - Data Analysts; Senior Scientist; Senior Project Manager; Senior Allocation Specialist

*Performance Standards/Metrics*
- The CSRA Team submits the Final PRP Data Reports to ~~EPA and~~ OU2 PRPs within the noted timeframe, and uploads data reports to document repository
- The submitted revised Final PRP Data Reports address any identified ambiguities in the draft reports and includes a summary of how received comments regarding the draft PRP Data Reports were, or were not, taken into account in the final reports
- To document the above two bullets, the CSRA Team provides EPA with an email certification including a summary of the type of identified ambiguities in the Draft Data Reports that were addressed in the Final Data Reports and a summary of how received comments regarding the draft PRP Data Reports were, or were not, taken into account in the final reports, a list of the completed Revised Draft Data Reports, and the date the reports were submitted.

ALCD-PUBCOM_0001417

- ~~The CSRA Team copies the EPA technical lead on the email communications to the OU2 PRPs providing a copy of their individual data report~~

## Task 9        Draft Allocation Report

*Task 9 will not be performed within the task order Period of Performance and is no longer required to be completed under this contract. It is anticipated Task 9 will be completed under a new task order in the follow on contract. It is included in this work plan for reference purposes.*

| Item | Title | Due No Later Than[†] | Type |
|------|-------|----------------------|------|
| 9.1 | *Submit Draft Allocation Recommendation Report* | *Within 60 days\* following submittal of Response Briefs by PRPs* | Transmittal |

† Or as otherwise directed by the TOCOR
\* All references to "days" refer to business days

Task 9 - The CSRA Team will prepare a first draft of the allocation recommendation report and submit to the OU2 PRPs ~~and EPA~~ for review. The draft allocation report will designate shares of responsibility among the OU2 PRPs, as appropriate based on the allocation analysis. The draft allocation report will include a recommendation on the possible grouping of the OU2 PRPs into tiers of similar levels of responsibility.

This task will require the following efforts on the part of the CSRA Team:
- Conduct of communications, including a conference call, with OU2 PRPs regarding recommendations on and legal/equitable theories pertinent to conduct of the allocation included in Position and Response Briefs received from the OU2 PRPs
- Review and consideration of input regarding allocation received from the OU2 PRPs and EPA
- Review and understand the basis for EPA's selected remedy for OU2, in consultation with EPA technical and legal personnel
- Review and understand the relative toxicity of identified contaminants of concern relevant to the selection of the OU2 remedy, in consultation with EPA technical and legal personnel
- Analyze the relative toxicity of materials discharged by OU2 PRPs and other differentiating factors, including fate and transport of hazardous substances released by PRPs based on the data contained in the RI/FS, in relation to the selected remedy
- Compilation and analysis of allocation data related to each OU2 PRP, including contaminants of concern, to establish the relative impact of the actions of each OU2 PRP on the conditions that resulted in EPA selecting the OU2 remedy
- Establish appropriate allocation algorithms
- Load compiled PRP data into allocation calculations to determine relative relationships among the OU2 PRPs
- As appropriate, establish appropriate tiers of OU2 PRP responsibility based on calculations and consideration of equitable factors
- Prepare draft allocation recommendation report
- Submission of the draft report to the OU2 PRPs ~~and EPA~~

Timing of this task is dependent upon receipt of position briefs and reply briefs regarding allocation from OU2 PRPs within established timeframes.

ALCD-PUBCOM_0001418

Staffing – Senior Allocation Specialist; Senior Project Manager

*Performance Standards/Metrics:*
- The CSRA Team submits the Draft Allocation Recommendation Report within the noted timeframe
- The submitted written Draft Allocation Recommendation Report includes an overview of the basis for the determinations of shares among the OU2 PRPs, including a description of the use of data sources and application of allocation factors and methodology utilized, and reason for potential vulnerabilities, if any, in the resulting allocation
- The report identifies and explains the rationale, if applicable, for grouping OU2 PRPs into tiers of similar relative responsibility
- To document the above bullets, the CSRA Team will provide EPA with an email certification that the Draft Allocation Recommendation Report has been submitted to the PAPs.

### Task 10    Final Allocation Recommendation Report

Task 10 will not be completed within the task order Period of Performance and is no longer required to be completed under this contract. It is anticipated Task 10 will be completed under a new task order in the follow-on contract. It is included in this work plan for reference purposes.

| Item | Title | Due No Later Than† | Type |
|------|-------|--------------------|------|
| ~~10.1~~ | ~~Meeting with EPA regarding Draft Allocation Recommendation Report~~ | ~~Within 10 days* of submittal of Draft Allocation Report~~ | ~~Transmittal~~ |
| 10.2 | Conduct Meeting with PRPs on Draft Allocation Report | Within 20 days of submittal of Draft Allocation Report | Activity |
| ~~10.3~~ | ~~Conference Call with EPA on Meeting with PRPs on Draft Allocation Report~~ | ~~Within 10 days* following the Meetings with PRPs on Draft Allocation Report~~ | ~~Activity~~ |
| 10.~~2~~4 | Submit Final Allocation Recommendation Report to OU2 PRPs and EPA | Within 65 ~~9~~ days* of submittal of Draft Allocation Report | **Deliverable** |

† Or as otherwise directed by the TOCOR
* All references to "days" refer to business days

~~Task 10.1 – The CSRA Team will prepare for and participate in a meeting with EPA regarding the submitted draft allocation recommendation report. The purpose of the meeting will be to obtain EPA comments regarding the submitted draft allocation report, including the basis and findings of the draft allocation report and the report format.~~

~~This task will require the following efforts on the part of the CSRA Team:~~
- ~~The CSRA Team will supply one (2) senior staff located in Washington, DC to attend the meeting~~
- ~~Meeting assumed to be no more than four (4) hours in length~~

ALCD-PUBCOM_0001419

Staffing – Senior Allocation Specialist; Senior Project Manager

Performance Standards/Metrics:
- The CSRA Team participates in the meeting regarding the submitted draft allocation recommendation report

Task 10.2 – The CSRA Team will plan, schedule, and conduct a meeting with the OU2 PRPs as a group regarding the draft allocation recommendation report. The purpose of the meeting will be to advise the OU2 PRPs as a group regarding the draft allocation recommendation report and to obtain preliminary PRP comments regarding the draft allocation recommendation report. The CSRA Team will also communicate with the OU2 PRPs individually to obtain the input of OU2 PRPs, including those that did or were unable to attend the meeting, regarding draft allocation recommendation report.
This task will require the following efforts on the part of the CSRA Team:
- Making arrangements for a meeting in the greater New York City metropolitan area sufficient to accommodate the OU2 PRPs as a group
- Coordination of meeting space and equipment for meetings provided by EPA or OU2 PRPs
- Communication via email with the OU2 PRPs regarding substance, date/time, and location of meeting
- Development of meeting agenda
- Development of participant materials, a needed
- Travel of two (2) senior staff from Washington, DC to attend meeting
- Communications by Senior Allocation Specialist via phone, email, or other electronic media as required with OU2 PRPs
- Recording of PRP comments regarding the draft allocation recommendation report, without attribution to individual OU2 PRP comments

Staffing – Senior Allocation Specialist; Senior Project Manager

Performance Standards/Metrics:
- The CSRA Team conducts a meeting with the OU2 PRPs as a group regarding the draft allocation recommendation report
- A majority of the members of the OU2 PRPs as a group attend the meeting either in person or remotely
- The CSRA Team copies the EPA technical lead on its email communication to the OU2 PRPs regarding substance, date/time, and location of meeting, and provides EPA with a copy of utilized meeting materials

Task 10.3 – The CSRA Team will schedule and hold, within 10 business days of holding the meeting with the OU2 PRPs on the draft allocation recommendation report, a conference call with EPA regarding the findings of the meeting.

This task will require the following efforts on the part of the CSRA Team:
- Scheduling and participating in a conference call with EPA to provide EPA information on the meeting, including a list of participants at the meeting and summary of suggestions received regarding the draft allocation recommendation report
- Conference call assumed to be no more than two (2) hours in length

ALCD-PUBCOM_0001420

~~Timing of this task is dependent upon the availability of assigned EPA staff to participate in a conference call within noted timeframe.~~

~~Staffing   Senior Allocation Specialist; Senior Project Manager~~

~~Performance Standards/Metrics:~~
- ~~The CSRA Team participates in a conference call with EPA regarding the findings of the meeting with PRPs regarding the draft allocation recommendation report~~
- ~~In conducting the post meeting conference call with EPA, the CSRA Team provides a summary of information and suggestions obtained from the OU2 PRPs without attribution to contributions of individual participants~~

Task 10.4 - The CSRA Team will prepare a Final Allocation Recommendation Report. The Final Allocation Recommendation Report will take into consideration comments on the draft allocation recommendation report received ~~during consultation with EPA and~~ during meetings with and received in position and reply briefs from the OU2 PRPs.

This task will require the following efforts on the part of the CSRA Team:
- Review and consider the comments by OU2 PRPs ~~and EPA~~ regarding the draft allocation recommendation report
- Editing of the draft allocation recommendation report to incorporate appropriate modifications based on OU2 ~~and EPA~~ comments to produce the Final Allocation Recommendation Report

Staffing - Senior Allocation Specialist; Senior Project   Manager

*Performance Standards/Metrics:*
- The CSRA Team submits a Final Allocation Recommendation Report within the noted timeframe
- The submitted Final Allocation Recommendation Report includes the elements of the Draft Allocation Recommendation Report described in Task 9, addresses any identified ambiguities in the draft report, and provides a summary, without attribution to individual comments, of how comments of the OU2 PRPs ~~and EPA~~ regarding the Draft Allocation Recommendation Report were, or were not, taken into account in the final report, without attribution.
- The Final Allocation Recommendation Report includes references to all materials considered and relied upon, and a complete description of the allocation process and the basis upon which shares were assigned.

## Task 11        Final PRP Outreach Report

Task 11 will not be performed within the task order Period of Performance and is no longer required to be completed under this contract.  It is anticipated Task 11 will be completed under a new task order in the follow on contract.  It is included in this work plan for reference purposes.

| Item | Title | Due No Later Than[†] | Type |
|------|-------|----------------------|------|
| 11.1 | Submit Final PRP Outreach Report | Within 10 days* of submittal of Final Allocation Report | Activity |

† Or as otherwise directed by the TOCOR
* All references to "days" refer to business days

ALCD-PUBCOM_0001421

The CSRA Team will prepare and provide to EPA a report regarding outreach efforts conducted with the OU2 PRPs, including a list of participants in outreach efforts, a description of topics discussed, and a summary of issues or concerns raised.

This task will require the following efforts on the part of the CSRA Team:

- Review and organize the comments of OU2 PRPs received during conduct of the Task Order, without attribution to individual OU2 PRPs
- Prepare and provide EPA an overview of conducted outreach efforts, including a list of OU2 PRPs that have participated in outreach meetings, conference calls, or individual communications with the CSRA Team and a summary of suggestions received from the OU2 PRPs regarding the allocation process

Staffing – Senior Allocation Specialist; Senior Project Manager

*Performance Standards/Metrics:*

- The CSRA Team submits a written summary of PRP outreach efforts within the noted timeframe
- The Final PRP Outreach Report includes a summary of conducted PRP outreach efforts, including a list of OU2 PRPs that have participated in outreach meetings, conference calls, or individual communications with the CSRA Team and a summary of suggestions received from the OU2 PRPs regarding the allocation process
- In drafting the Final PRP Outreach Report, the CSRA Team provides a summary of information and suggestions obtained from the OU2 PRPs without attribution to contributions of individual participants

## Task 12    Task Order Closeout Report

| Item | Title | Due No Later Than† | Type |
|------|-------|--------------------|------|
| 12.1 | Submit Draft Task Order Closeout Report | Within 10 days* of submittal of Final Allocation Report | Transmittal |
| 12.2 | Final Task Order Closeout Report | Within 10 days* of receipt of EPA's comments on Draft Task Order Closeout Report | **Deliverable** |

† Or as otherwise directed by the TOCOR
* All references to "days" refer to business days

Task 12.1 - The CSRA Team will design and produce the first draft of a report regarding the conduct of tasks pursuant to the Task Order and submit it for review by EPA. The report will not contain any confidential or sensitive information. The contents of the Draft Task Order Close-Out Report will include:

- A half-page description of the project that describes the nature of the project, the parties, the process, and the outcomes
- If appropriate, a short section reflecting on the process and procedural lessons learned and recommendation for improvements and identification of those activities conducted that contributed to the success of the process
- A brief summary of the final costs of the project broken out by percentage of labor hours and other direct costs

This task will require the following efforts on the part of the CSRA Team:

ALCD-PUBCOM_0001422

- Review of project activities and compilation of project summary
- Consideration and compilation of thoughts on lessons learned regarding project
- Compilation of project budget costs
- Preparation of the Draft Task Order Close-out Report

Staffing – Senior Allocation Specialist; Senior Project Manager

*Performance Standards/Metrics:*
- The CSRA Team submits a Draft Task Order Closeout Report within the noted timeframe
- The submitted Draft Task Order Closeout Report includes the items noted above as contents of the report

Task 12.2 - The CSRA Team will prepare a Final Task Order Closeout Report and submit to EPA. The Final Task Order Closeout Report will take into consideration comments received from EPA regarding the draft of the Task Order closeout report. CSRA will provide one (1) copy of the Final Task Order Closeout Report to the PO and one (1) copy to the TOCOR in electronic format.

This task will require the following efforts on the part of the CSRA Team:
- Review and consideration of comments by EPA regarding the draft Task Order Closeout Report
- Editing, and as required redesign, of the closeout report to incorporate modifications based on EPA comments in order to produce the Final Task Order Closeout Report

Staffing – Senior Allocation Specialist; Senior Project Manager

*Performance Standards/Metrics:*
- The CSRA Team submits a Final Task Order Closeout Report within the noted timeframe
- The submitted Final Task Order Closeout Report addresses any identified ambiguities in the draft report and includes a summary of how EPA's comments regarding the Final Allocation Recommendation Report were, or were not, taken into account in the final report

## 5.0    Reports, Transmittals and Deliverables

CSRA will provide EPA all reports in accordance with the contract. If EPA responds with a request for additional information, Subcontractor is required to provide information, as requested.

**As required herein,** copies of ~~all~~ contract deliverables will be sent to both the PO and the TOCOR. If oral briefings are scheduled for EPA staff, the PO will be notified in time to attend.

Schedule

| Item | Title | Due No Later Than[†] | Type |
|------|-------|---------------------|------|
| 1 | Task Order Kick-Off Meeting | Within 20 days* of Task Order approval | Transmittal – Completed |

ALCD-PUBCOM_0001423

| Item | Title | Due No Later Than[†] | Type |
|------|-------|----------------------|------|
| 2 | EPA Project Public Announcement Meeting | Within 40 days* of Task Order approval | Activity – Completed |
| 3 | Submit initial allocation process and database design to EPA | Within 100 days* of Task Order approval | Transmittal – Completed |
| 4 | Conference Call with EPA on Initial Allocation Process and Database Design | Within 10 days* of submission of initial allocation process and database design | Activity - Completed |
| 5.A.1 | Conduct *two* Meetings with PRPs on Draft Allocation Process and Database Design | Within 40 days* of submission of initial allocation process and database design to EPA | Activity – Completed |
| 5.A.2 | Conference Call with EPA on Meetings with PRPs on Draft Allocation Process and Database Design | Within 10 days* following the Meeting with PRPs on Draft Allocation Process and Database Design | Activity – Completed |
| 5.B.1 | Submit guidance on preparation of allocation submissions to EPA and PRPs | Within 5 days of Revised Task Order Approval | Transmittal – Completed |
| 5.B.2 | Submit recommendation on relevancy of documents provided by OU2 PRPs to EPA and PRPs | Within 30 days of Revised Task Order Approval | Transmittal – Completed |
| 6.A | Submit Final Allocation Design to EPA and PRPs | Within 50 days* following the Meeting with PRPs on Draft Allocation Process and Database Design | Transmittal – Completed |
| 6.B.1 | Submit draft PRP Data Reports regarding Early Settlement PRPs to PRPs and EPA | Within 10 days* of EPA final decision regarding additional documents for inclusion in repository | Transmittal – Completed |
| 6.B.2 | Submit final PRP Data Reports regarding Early Settlement PRPs to PRPs and EPA | Within 15 days of submission of Draft Early Settlement Part Data Reports | Transmittal - Completed |
| 7.A.1 | Determine relevancy of documents provided by OU2 PRPs | Within 10 days of OU2 Party submission of document indices | Submittal |
| 7.A.2 | Submit Draft PRP Data Reports to PRPs | *Within 50 days* of parties submitting additional documents* | Transmittal |
| *7.A.3* | *Summary Memo of activities completed* | *July 15, 2019* | *Transmittal* |
| 7.B | Submit recommendation on eligibility of PRPs for early settlement to EPA | Within 20 days of loading of Final Early Settlement Party Data Reports | Transmittal - Completed |

\* *All references to days in this chart refer to business days*

ALCD-PUBCOM_0001424

Please note: the following work products are not required to be completed within the period of performance of this task order. It is anticipated the following work products will be completed under a new task order in the follow on contract. It is included in this work plan for reference purposes.

| Item | Title | Due No Later Than† | Type |
|------|-------|-------------------|------|
| 8.1 | Submit Final PRP Data Reports to ~~EPA and~~ PRPs | Within ~~40~~ 20 days* of the deadline for OU2 PRPs corrections to PRP data reports | Transmittal |
| 8.2 | Provide EPA Access to Allocation Database | Upon submission of the Final Allocation Recommendation Report ~~loading of corrected PRP data reports~~ | Activity |
| 9.1 | Submit Draft Allocation Recommendation Report to PRPs | Within 60 days* following submittal of Response Briefs by PRPs | Transmittal |
| ~~10.1~~ | ~~Meeting with EPA regarding Draft Allocation Recommendation Report~~ | ~~Within 10 days* of submittal of Draft Allocation Report~~ | ~~Transmittal~~ |
| 10.2 | Conduct Meeting with PRPs on Draft Allocation Report | Within 20 days of submittal of Draft Allocation Report | Activity |
| ~~10.3~~ | ~~Conference Call with EPA on Meeting with PRPs on Draft Allocation Report~~ | ~~Within 10 days* following the Meetings with PRPs on Draft Allocation Report~~ | ~~Activity~~ |
| 10.4 | Submit Final Allocation Recommendation Report to OU2 PRPs and EPA | Within 65 ~~0~~ days* of submittal of Draft Allocation Report | **Deliverable** |
| 11 | Submit Final PRP Outreach Report | Within 10 days* of submittal of Final Allocation Report | Activity |
| 12.1 | Submit Draft Task Order Closeout Report | Within 20 days* of submittal of Final Allocation Report | Transmittal |
| 12.2 | Final Task Order Closeout Report | Within 10 days* of receipt of EPA's comments on Draft Task Order Closeout Report | **Deliverable** |

## 6.0    Staffing Plan

This Task Order will be staffed as follows:

| Team Member Name† | Role in the Project |
|-------------------|---------------------|
| Mary Apostolico CSRA International | Overall Contract Management, Quality Assurance, Task Order Management |
| Jennifer Cutrona CSRA | Dashboard and Financial Tracking |
| David Batson TechLaw | Senior Allocation Specialist |
| ~~Judy Manley~~ Mark Heaney TechLaw | Senior Project Manager |

ALCD-PUBCOM_0001425

| Team Member Name[†] | Role in the Project |
|---|---|
| ~~Travis Kline~~ Jenifer Heath TechLaw | Senior Toxicologist |
| Erman Evcimen TechLaw | Database Designer |
| ~~Amber Kozacek~~ Rachel Shay TechLaw | Researcher |

[†]Other team members than those listed in the above table may work on this task order to complete the required work.

[*]The task order mainly will be managed by the TOM listed in the above table; however, additional team members may conduct task order management activities to ensure coverage during periods when the TOM is unavailable (e.g., vacation, illness, business travel, time constraints).


## 7.0    Quality Management

As part of its quality assurance practices, CSRA TOM will:
- Review this Work Plan with the EPA TOCOR, as requested by the TOCOR;
- Meet or hold conference calls as needed with the TOCOR to review progress; and
- Speak regularly with the subcontractor to receive project status updates.

In addition, all work on this Task Order will be performed in accordance with CSRA's strict quality assurance practices, including but not limited to incorporating quality management principles and processes into the development of the required transmittals, deliverables, and the consulting services offered. Although CSRA will ensure the timely delivery of all transmittals and deliverables, CSRA will not perform a review of these documents prepared by the subcontractor.


## 8.0    Conflict of Interest

Based on our review and understanding of the legal requirements of this work, CSRA certifies that no real, apparent, or potential organizational or individual conflict of interest exists with this assignment, based on previous or ongoing work, or other potential conflicts.


## 9.0    Cyber Security

CSRA has interpreted compliance with information assurance / security provisions contained in this contract as a requirement to provide its standard CSRA information system and procedures. CSRA contract pricing does not include or reflect any additional requirements or certification and accreditation for the CSRA information system or procedures, connectivity to the Government system(s), or storage of any Government-provided data or project data, or for stand-alone development or storage environments. Should the Government require increased or specialized information assurance security or other actions beyond those reflected in the standard CSRA information system or procedures, then the Government will notify CSRA and such revisions will be provided in accordance with the "changes" clause of this contract.

ALCD-PUBCOM_0001426

## 10.0    Project Budget

The budget for this task is provided as an Attachment.

## 11.0    Period of Performance

The task order period of performance runs through September 30, 2019.

ALCD-PUBCOM_0001427

# EXHIBIT 15

OxyChem's Comments in Opposition to Proposed Consent Decree,
*United States v. Alden Leeds, Inc., et al.*, Civil Action No. 2:22-cv-07326 (D.N.J.)

ALCD-PUBCOM_0001428

Case 2:22-cv-07326-MCA-LDW   Document 309-21   Filed 04/01/24   Page 251 of 580
Case 2:22-cv-07326-MCA-LDW   Document 118-4   Filed 01/24/23   Page 17 of 94 PageID: 937
PageID: 14396



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**

REGION II

290 BROADWAY

NEW YORK, NEW YORK 10007-1866

## APR 2 6 2016

### BY REGULAR MAIL AND ELECTRONIC MAIL

Benjamin S. Lippard, Esq.
Vinson & Elkins, LLP
2200 Pennsylvania Avenue, Suite 500 West
Washington, CD 20037-1701

Re:   Diamond Alkali Superfund Site, Lower 8.3 Miles of Lower Passaic River,
      Essex and Hudson Counties, New Jersey
      Administrative Settlement Agreement and Order on Consent for Remedial Design
      USEPA Region 2 CERCLA Docket No. 02-2016-2021

Dear Mr. Lippard:

By letter dated March 31, 2016, the U.S. Environmental Protection Agency ("EPA") notified
potentially responsible parties ("PRPs"), including your client Occidental Chemical Corporation
("OxyChem"), of their potential liability for the lower 8.3 miles of the Lower Passaic River, part
of the Diamond Alkali Superfund Site. By this letter, EPA wishes to know whether OCC will
consensually perform the remedial design ("RD") for the remedy selected in the Record of
Decision ("ROD") for the lower 8.3 miles.

EPA has enclosed herewith a draft Administrative Order on Consent and Settlement Agreement
for Remedial Design ("RD AOC") and Statement of Work ("SOW"). EPA seeks commencement
of field work for the RD by the end of 2016, and to that end, EPA seeks signature of the RD
AOC by August 31, 2016.

EPA acknowledges and takes very seriously the concerns that your clients, OxyChem, Maxus
Energy Corporation ("Maxus") and Tierra Solutions, Inc. have expressed. As indicated in EPA's
letter dated March 31, 2016, EPA expects to include other major PRPs in the remedial action
negotiations, which will address the implementation of and/or payment for EPA's selected
remedy and reimbursement of EPA's costs incurred for the Lower Passaic River. In the March
31, 2016 letter, EPA stated the Agency's intent to offer certain PRPs an opportunity for a cash
out settlement with respect to this operable unit. When EPA contacts the PRPs that may be
eligible for a cash out settlement, we will simultaneously communicate with the remaining non-
cash out PRPs and encourage them to meet and discuss a workable approach to sharing
responsibility for implementation and funding of the remedy. EPA will convey very clearly, so
that there is no room for doubt, that recalcitrance will not be rewarded, and that we will expect
any PRP that is not eligible for cash-out to participate appropriately in the remedial action.

Case 2:22-cv-07326-MCA-LDW Document 309-21 Filed 04/01/24 Page 252 of 580
Case 2:22-cv-07326-MCA-LDW Document 116-4 Filed 01/24/23 Page 18 of 94 PageID: 938
PageID: 14397

Further, while it is an important EPA requirement that OxyChem be the performing party for the RD, should discussions with the other PRPs be productive, EPA is not opposed to amending the RD AOC to add settling parties that are participating as funding parties. We encourage your clients to contact other financially capable PRPs responsible for contaminants of concern for Operable Unit 2 ("OU2") of the Site, to initiate negotiations aimed at funding the remedial design.

Finally, it is EPA's practice to pursue and enlist all viable PRPs in performing and or funding response work. For site-specific reasons, as well as timing, we believe that entering into an RD AOC with OxyChem as the sole performing party is the best way to move forward with the remedial design for OU2. We are not, however, deviating from our practice and remain committed to pursuing all the OU2 PRPs. By way of example, EPA recently concluded enforcement at the Mercury Refining Site in New York. At that site, EPA pursued and reached settlements with 391 parties. While cooperating parties conducted the RD/RA, EPA pursued recalcitrant parties and achieved participation by all viable PRPs.

Please advise EPA within twenty-one (21) days of the date of this letter whether you are willing to enter into the RD AOC in substantially the same form as the enclosed draft. EPA is available to meet with your representatives at your earliest convenience to discuss this matter.

Please send your response to:

Juan Fajardo
Assistant Regional Counsel
New Jersey Superfund Branch
Office of Regional Counsel
U.S. Environmental Protection Agency, Region 2
290 Broadway, 17th Floor
New York, NY 10007-1866
fajardo.juan@epa.gov

with a copy to:

Alice Yeh
Remedial Project Manager
New York Remediation Branch
Emergency and Remedial Response Division
U.S. Environmental Protection Agency, Region 2
290 Broadway, 19th Floor
New York, NY 10007-1866
yeh.alice@epa.gov

If you have any questions regarding this letter, you may contact Mr. Fajardo via email at fajardo.juan@epa.gov or by phone at (212) 637-3132, or Assistant Regional Counsel Sarah Flanagan at flanagan.sarah@epa.gov or by phone at (212) 637-3136.

Case 2:22-cv-07326-MCA-LDW Document 309-21 Filed 04/01/24 Page 253 of 580
Case 2:22-cv-07326-MCA-LDW Document 110-4 Filed 01/24/23 Page 19 of 94 PageID: 939
PageID: 14398

We appreciate and look forward to your prompt response to this letter.

Sincerely yours,

Nicoletta DiForte
Deputy Director for Enforcement
Emergency and Remedial Response Division

Enclosures:  Draft RD AOC and SOW

cc:      William H. Hyatt, Jr., Esq., Coordinating Counsel,
         Lower Passaic River Cooperating Parties Group
         Brian Donohue, USDOJ
         Laura Rowley, USDOJ
         Mark Barash, Esq., USDOI
         Kate Barfield, NOAA
         John Dickinson, New Jersey Attorney General's Office

# EXHIBIT 16

OxyChem's Comments in Opposition to Proposed Consent Decree,
*United States v. Alden Leeds, Inc., et al.*, Civil Action No. 2:22-cv-07326 (D.N.J.)

ALCD-PUBCOM_0001432

Case 2:22-cv-07326-MCA-LDW Document 309-21 Filed 04/01/24 Page 255 of 580
Case 2:18-cv-11273-MCA-LDW Document 2100-1 Filed 07/12/22 Page 1 of 19 PageID: 62321
PageID: 14400



**Occidental Chemical Corporation** *OxyChem*

A Subsidiary of Occidental Petroleum Corporation

14555 Dallas Parkway, Suite 400
Dallas, TX 75254
Phone 713-599-4188

June 27, 2022

Mr. Michael S. Regan
Administrator
United States Environmental Protection Agency
1200 Pennsylvania Ave NW
Washington, DC 20460

Mr. Larry E. Douchand
Director
Office of Remediation and Technology Innovation
United States Environmental Protection Agency
1301 Constitution Ave NW
Washington, DC 20460

Ms. Lisa F. Garcia
Administrator, Region 2
United States Environmental Protection Agency
290 Broadway
New York, NY 10007

Ms. Alice Yeh
Remedial Project Manager
Diamond Alkali Superfund Site, Operable Unit 2
Superfund and Emergency Management Division
United States Environmental Protection Agency, Region 2
290 Broadway
New York, NY 10007

Ms. Diane Salkie
Remedial Project Manager
Diamond Alkali Superfund Site, Operable Unit 4
Superfund and Emergency Management Division
United States Environmental Protection Agency, Region
2290 Broadway
New York, NY 10007

      Re:    Occidental Chemical Corporation Response to EPA Region 2 Letters
           dated March 2, 2022, and May 31, 2022

Dear Administrator Regan, Director Douchand, Administrator Garcia, Ms. Yeh and Ms. Salkie:

     I write on behalf of Occidental Chemical Corporation ("OxyChem") to respond to EPA
Region 2's May 31, 2022 letter (the "May Letter") and its earlier, March 2, 2022 letter (the
"Notice Letter"), requesting that OxyChem and other work parties provide a good faith offer to
implement the remedial actions for Operable Unit 2 ("OU2") and Operable Unit 4 ("OU4") of the
Diamond Alkali Superfund Site (the "Site").



**Responsible Care®**
A Public Commitment

Case 2:22-cv-07326-MCA-LDW   Document 309-21   Filed 04/01/24   Page 256 of 580
Case 2:18-cv-11273-MCA-LDW   Document 2100-8   Filed 07/12/22   Page 2 of 29 PageID: 61922
PageID: 14401

OxyChem Response to EPA Notice Letters
June 27, 2022
Page Two

By letter dated January 13, 2022, OxyChem provided an earlier, good faith offer to perform the entire scope of work in OU4 so long as its right to seek contribution from other responsible parties—as enacted by Congress in CERCLA—would be preserved. This condition is what the law requires. In CERCLA, Congress granted performing parties like OxyChem the right to sue other responsible parties for contribution, with the allocation of responsibility adjudicated by a federal court in proceedings that conform to the constitutional requirements of due process. EPA is an agency of limited jurisdiction and Congress did not grant EPA authority to adjudicate responsibility among responsible parties by barring contribution claims or otherwise.

**I.     Good Faith Offer to Perform Remedial Design on OU4**

Consistent with these principles, and its prior good faith offer, OxyChem makes the following good faith offer in response to EPA's Notice Letter. As EPA has requested, OxyChem offers to perform the remedial design of the interim remedy in OU4 on the following conditions (the "Required Conditions"):

1. The United States will take no action to impair or bar OxyChem's contribution claims against the other responsible parties for work OxyChem is undertaking to perform, including, without limitation, in any settlement the United States reaches with any other party. OxyChem's rights to cost recovery under CERCLA Section 107 and to cost reimbursement under CERCLA Section 106(b)(2) shall also be preserved.

2. The United States will provide OxyChem with a covenant not to sue under Sections 106 and 107 of CERCLA for this scope of work.

3. Any settlement recoveries received by EPA in connection with this Operable Unit will be deposited in an Operable-Unit-specific account for performing parties to use in implementing the remedies.

4. The agreement with EPA must include appropriate force majeure and other provisions to permit OxyChem to stop work without penalty if unforeseen conditions or litigation preclude continuation of the work.

5. Financial assurance requirements shall be limited to the work to be performed on an annual basis and will not be cumulative either of work already performed or work contemplated in out years.

6. Inclusion of suitable Adaptive Management provisions to permit EPA and OxyChem to make appropriate revisions as work progresses.

**II.    Proposed Sequencing of Other Work at OU4 and OU2 of the Site**

EPA has also asked OxyChem and other work parties to provide a good faith offer to implement the remedies in OU4 and OU2. If EPA accepts OxyChem's offer above to perform the remedial design in OU4, then OxyChem believes we can reach agreement with the other work parties to perform specific and tailored work scopes that would implement the remedies in OU4 and OU2.

OxyChem Response to EPA Notice Letters
June 27, 2022
Page Three

      OxyChem proposes a staged process of sequential agreements in which manageable scopes of work can be defined, agreed, implemented, and evaluated in sequence, with the next agreement following when the prior phase of work is planned, designed, and implemented. This sequence could be achieved through expedited negotiations of subsequent agreements, all of which must include the Required Conditions, tracking an overall schedule to which the parties would agree with EPA. OxyChem is willing to discuss leading the implementation of this further work with other work parties, so long as the Required Conditions are met.

      Based on its involvement with the OU2 design and its prior work regarding the Upland Processing Facility (the "UPF"), OxyChem believes the work sequence below is essential to an effective remedy in both operable units, consistent with the National Contingency Plan:

1. **Agreement One:** Administrative Settlement Agreement and Order on Consent ("ASAOC") for the design of the OU4 interim remedy set forth in the applicable Record of Decision ("ROD"). OxyChem will negotiate the ASAOC in good faith, subject to the Required Conditions, and consistent with OxyChem's previous offer to perform this work as set out above.

   > **Target Date for Execution of ASAOC:** Within EPA Fiscal Year 2022 (by September 30, 2022).

2. **Agreement Two:** Consent Decree for construction of the UPF. OxyChem has worked to obtain agreement to this consent decree since 2018. The difficulties encountered by the Passaic Valley Sewerage Commission ("PVSC") in acquiring the required property through eminent domain have caused significant delays in this decree, as has the resulting inability of the United States and PVSC to reach agreement on consent decree terms. Subject to the Required Conditions and a condition precedent requiring that the property necessary to build the UPF is and will be made available for OxyChem's use throughout the implementation period on the material terms embodied in the draft UPF consent decree, OxyChem will negotiate in good faith (as it has done for several years) to finalize this consent decree.

   > **Target Date for Execution of Consent Decree:** Lodged and in force by the time the design for the UPF and other upland facilities is completed and accepted by EPA, which is currently anticipated to occur within EPA Fiscal Year 2023 (by September 30, 2023).

3. **Agreement Three:** Consent Decree for Remedial Action in OU4. OxyChem will negotiate in good faith for a consent decree to implement with the other work parties the interim remedy in OU4, subject to the Required Conditions and the completion of work under Agreements One and Two, above.

4. **Agreement Four:** Consent Decree for remainder of the Remedial Action in OU2. Once there is significant progress in implementing Agreements Two and Three, OxyChem will negotiate in good faith with the other work parties to achieve a consent decree with EPA to implement the remainder of the remedial action in OU2, subject to the Required Conditions.

Case 2:18-cv-11273-MCA-LDW   Document 2100-21   Filed 07/12/22   Page 4 of 29 PageID: 61524
Case 2:22-cv-07326-MCA-LDW   Document 309-21   Filed 04/01/24   Page 258 of 580
PageID: 14403

The sequence above permits EPA and the parties to discuss implementing the remedy in OU2: (i) after the remedy in OU4 has been designed and implemented, and (ii) after the UPF has been designed and constructed. This schedule makes sense for many reasons. As EPA is aware, work to implement the remedies cannot begin in earnest until the UPF is designed and built. Without that facility, there is otherwise no location at which dredged sediment from OU2 (or from OU4) can be processed. The OU4 pre-design investigation and the required design of the remedy are also essential to determine how the remedy in OU4 is best implemented. None of that work has yet been done. The remedy upriver in OU4 should also be implemented first to minimize the risk that upriver construction activities might damage or impair the remedy in OU2.

Given this, and the added fact that OU4 and OU2 encompass parts of the river up to 17 miles apart, sequencing the consent decrees for in-river work ensures clarity of scope and performance. It enables all parties to demonstrate completion of distinct milestones for the interim and final remedial goals for each operable unit. This staged approach will also expedite the design and construction of the remedies in both operable units. By creating a manageable schedule that addresses all stakeholder interests, sequencing work avoids the near certainty that resources would otherwise be wasted through inefficiencies and duplication of untargeted work.

## III.   Further Discussion of Required Conditions

OxyChem is willing to discuss alternative scopes of work in OU4 and OU2 as they arise, but it cannot and will not perform all this work alone. Nor can OxyChem undertake to provide financial assurance at the outset for all estimated costs of implementing the entirety of both remedies. The Required Conditions, described in greater detail below, address both concerns. They are essential to facilitate the timely completion of the work in accordance with the National Contingency Plan and so should be acceptable to EPA.

### A.   Preservation of Contribution Claims

Hundreds of parties are responsible for pollution in the Passaic River. As described by EPA in the OU2 ROD:

> The Passaic River was one of the major centers of the American industrial revolution starting two centuries ago. By the end of the 19th century, a multitude of industrial operations...had located along the river's banks as cities such as Newark and Paterson grew. *Industrial operations and municipalities used the river for wastewater disposal. To date, over 100 facilities have been identified as potentially responsible for discharging contaminants into the river including, but not limited to, dioxins and furans, PCBs, PAHs, DDT and other pesticides, mercury, lead, and other metals.*[1]

CERCLA's goal is to ensure that the "polluters pay," meaning that all responsible parties pay their fair and equitable shares of response costs. To ensure that they do, CERCLA affords performing parties—like OxyChem—a statutory right to pursue contribution claims against parties who have not stepped up to clean up pollution that they caused. In Section 113(f)(1) of CERCLA, Congress mandated that the United States district courts, not EPA, weigh the evidence to arrive at an equitable allocation of responsibility that binds all parties.

---

[1] *See* OU2 ROD, Section 2 pg. 3 (emphasis added).

Case 2:18-cv-11273-MCA-LDW    Document 2100-5    Filed 07/12/22    Page 5 of 29 PageID: 63525
Case 2:22-cv-07326-MCA-LDW    Document 309-21    Filed 04/01/24    Page 259 of 580
PageID: 14404

Here, EPA has acknowledged OxyChem "did not directly discharge pollution into the Passaic River."[2] Instead, EPA alleges OxyChem's liability arises from its purchase of the stock of Diamond Shamrock Chemicals Company ("DSCC"). From the 1940s to 1969, DSCC owned and operated an agricultural chemicals plant at 80-120 Lister Avenue in Newark. During that period, the Lister Avenue plant (the "Lister Plant") manufactured DDT and, at the direction of the United States government, products for use during the Vietnam War that generated dioxin as a manufacturing byproduct. DSCC sold the plant to a third party in 1971. When an affiliate of OxyChem purchased the stock of DSCC in 1986, the Lister Plant had been closed for nine years and DSCC had not operated it for more than sixteen. In the stock purchase agreement, Diamond Shamrock Corporation (later known as Maxus Energy Corporation) agreed to defend, indemnify, and hold OxyChem harmless against all environmental liabilities associated with the former Lister Avenue Plant. Relying on this indemnity, OxyChem merged with DSCC in 1987, a transaction EPA contends made OxyChem responsible for the environmental liabilities of DSCC.

EPA has identified a total of *eight* chemicals of concern for OU2 and OU4: dioxins and furans, PCBs, DDT, dieldrin (an herbicide), poly-aromatic hydrocarbons ("PAHs"), mercury, copper, and lead.[3] The OU2 ROD makes clear that EPA mandated this remedy because the lower 8.3 miles of the Passaic River is "ubiquitously contaminated" with *all eight* COCs.[4] In OU2 alone, the ROD contemplates the permanent capping of over one hundred years of contaminated sediment and the removal from the river of approximately 24,000 pounds of mercury, 6,600 pounds of PCBs, 1,300 pounds of DDT, and 13 pounds of dioxin, subject to the remedial design.[5]

OxyChem has not disputed it bears some legal liability from its merger with DSCC. But that merger in no way makes OxyChem responsible to clean up *all* hazardous substances in the Passaic River or all dioxins found in river sediments. There is no evidence, for example, that the Lister Plant (or OxyChem) is responsible for the estimated 24,000 pounds of mercury that will be removed or remediated in the remedy for OU2, the more than 6,600 pounds of PCBs that must also be removed or remediated, or the costs to remedy contamination in the river from PAHs, dieldrin, or any of the hazardous metals. DDT was manufactured widely and was used within the Site's boundaries by, among others, the municipal entities to whom EPA also sent its Notice Letter. And finally, while the Lister Plant is alleged to be responsible for some dioxins and furans in the Site, EPA's investigation (and OxyChem's own) demonstrates there are other, significant sources that also bear responsibility for the presence of dioxins and furans in the Passaic River, including but not limited to:

- **Givaudan Fragrances Corporation**: EPA identified Givaudan as the source of the Clifton Congener, a significant contributor to dioxin in Passaic sediments that is *not* associated with the former Lister Plant.

- **Clean Earth Environmental Services**: Clean Earth is the admitted successor to S&W Waste, a company with an extensive history of environmental violations and significant dioxin contamination in the soils of its Kearny facility that is also *not* associated with the Lister Plant.

[2] *See* EPA Secures $165 Million Agreement with Occidental Chemical to Conduct the Work Needed to Start the Cleanup of the Lower Eight Miles of the Passaic River. News Releases from Region 2. Jan. 19, 2017.

[3] *See* Focused Feasibility Study ("FFS") for Operable Unit 4 at pp. 1-4; 2016 Record of Decision for Operable Unit 2 (the "OU2 ROD") at 14-16.

[4] *Id.* OU2 ROD Section 5.3 (OU2 Conceptual Site Model).

[5] *Id.*

Case 2:22-cv-07326-MCA-LDW   Document 309-21   Filed 04/01/24   Page 260 of 580
Case 2:18-cv-11273-MCA-LDW   Document 2100-8   Filed 07/12/22   Page 6 of 19 PageID: 61926
PageID: 14405

OxyChem Response to EPA Notice Letters
June 27, 2022
Page Six

- **Ashland Chemical Corporation**: Ashland's manufacturing operations at its Drew Chemical facility involved large-scale, dioxin-forming processes on an upland site that is significantly contaminated with dioxins that, again, are *not* associated with the Lister Plant.

CERCLA requires all parties responsible for the presence of these hazardous substances in the Site to pay their fair and equitable shares of the costs to remove or remediate them. After extensive study, EPA identified over 100 facilities as potentially responsible for discharging contaminants into the Passaic River.[6] Abundant record evidence in the CERCLA case in the United States District Court in New Jersey supports a significant assignment of responsibility to parties other than OxyChem for the presence of hazardous substances in OU2 and OU4.[7] EPA also assured the public, repeatedly, that it intended "to pursue additional agreements with *all* of the more than 100 parties legally responsible for the contamination to ensure that the cleanup work in the lower 8.3 miles [and in OU4] *will be carried out and paid for by those responsible for the pollution as required by the Superfund law*."[8]

But despite the abundant evidence available to it, EPA never pursued claims against the parties EPA identified as bearing responsibility. Instead, EPA announced its intention to *release* scores of responsible parties from their cleanup liability to the United States for undisclosed amounts, leaving the five private work parties and New Jersey's taxpayers (through the in-kind contributions of the public work parties) to carry out the work alone.

EPA refuses to provide any information concerning these proposed settlements, their terms, their amounts, or why these settlements are in any way in the public interest. EPA also rejected OxyChem's Freedom of Information Act requests pertaining to these contemplated settlements. EPA's lack of transparency is not in the public interest. EPA appears poised to abandon its public commitment that all identified polluters would be required to *carry out* and *pay for* the cost of cleaning up pollution they caused, in favor of a strategy that would let significant polluters off the hook to the United States. Releasing parties from liability exposes the United States—and its taxpayers—to significant claims for reimbursement by performing parties when the remedies in OU2 and OU4 are complete. *See* 42 U.S.C. Section 9606(b)(2).

If EPA wants to settle the *United States' claims* against those parties, it can do so with court approval. But EPA's choice not to pursue full accountability from polluters does not prevent OxyChem from acting. And OxyChem has done so. It is pursuing in court, as Congress intended, contribution claims to compel the parties who caused this pollution to pay their fair shares of the costs to clean it up. It is contrary to Congress's mandate for EPA to try to prohibit OxyChem and other performing parties from pursuing *their own contribution claims*. The pursuit of these claims costs the United States nothing. And it ensures the full scope of liability of all responsible parties will be determined by the Court, as Congress again intended.

For all these reasons, CERCLA's plain language and purpose are vindicated when OxyChem's contribution and cost recovery rights are preserved. The statute does not authorize—and the Constitution does not permit—EPA to thwart the exclusive authority Congress vested in the federal district courts to allocate liability among responsible parties. Nor do they permit EPA to provide purported "contribution protection" to responsible parties the United States has never

[6] *See* OU2 ROD at Section 2.

[7] Neither the public nor OxyChem knows how much of the discovery in the CERCLA case (if any) was made available by the settling parties to EPA or its allocator, AlterEcho and David Batson. For these and other reasons, OxyChem reserves its right to challenge settlements by the United States with any or all parties.

[8] EPA Press Release, October 5, 2016 (emphasis added)

ALCD-PUBCOM_0001438

Case 2:22-cv-07326-MCA-LDW Document 309-21 Filed 04/01/24 Page 7 of 19 PageID: 6327
Case 2:18-cv-11273-MCA-LDW Document 2100-1 Filed 07/12/22 Page 7 of 19 PageID: 61527
PageID: 14406

sued, in a manner that seeks to bar OxyChem's contribution claims for costs that OxyChem, not the United States, has incurred or will incur. Accordingly, including in the Consent Decree the Required Condition that preserves OxyChem's contribution claims imposes no burden on EPA not already inherent in the limited authority Congress granted to EPA.

### B. Financial Assurance Condition

EPA guidance states that consent decrees should be supported by financial assurance. Staging the work and tailoring financial assurance to the work to be performed each year, makes economic sense.

No company alone—and certainly not OxyChem—can *post* financial assurance for a multi-decade scope of work of this magnitude. And no company can secure an entire scope of work that spans decades and still retain sufficient financial resources and resilience to pay to perform the work each year, as the work is due, *while* EPA holds multiple years of financial assurance.

An agreement to limit financial assurance to the work to be performed in a given year ensures resources are available to perform that work. Requiring multi-year financial assurance for the entire project from the outset makes performance impossible. In sum, this Required Condition should be acceptable to EPA. It reflects economic reality.

### C. PVSC Condition Precedent

The Site Selection report approved by EPA identifies property owned or to be acquired by PVSC as the preferred location where the UPF should be built to process sediment removed from the Passaic River during the remedial actions at OU2 and OU4. This is the most cost-effective option and one preferred by EPA, as it permits negotiation of an in-kind settlement with PVSC, which EPA also prefers. Thus, this condition is one that imposes no burden on EPA and acknowledges the fact that OxyChem cannot build anything on PVSC's property without its consent.

### D. Force Majeure Condition

EPA has historically included force majeure provisions in consent decrees that implement remedial work. Given the enormous uncertainties embodied in these scopes of work, including force majeure conditions as a Required Condition imposes no burden on EPA here. Instead, it makes good sense.

No party can agree in advance to underwrite all costs of an unprecedented, decade-long construction project that is subject to inherent unknowns. The interim remedy for OU4 is not designed. The Preliminary Remediation Goals and a final remedy for OU4 are not yet determined. In addition, although the remedial design is nearly complete in OU2, it has not yet been finalized or approved by EPA. In-river implementation of any remedy—in OU2 or in OU4—also cannot begin until the required UPF is designed and built, an enormous project in itself, requiring access to government-owned property that is not yet available for that purpose. Added to these unresolved issues and unknowns are the inherent additional uncertainties of a project that contemplates miles of in-river dredging and construction, in waters of the United States and state- and privately-owned property.[9]

---

[9] Litigation by those opposed to dredging remedies is a frequent occurrence and could interpose significant delays in implementing the OU2 and OU4 remedies. Just last month, a coalition of environmental groups

Case 2:22-cv-07326-MCA-LDW   Document 309-21   Filed 04/01/24   Page 8 of 19 PageID: 6328
Case 2:18-cv-11273-MCA-LDW   Document 2100-1   Filed 07/12/22   Page 8 of 19 PageID: 14407
PageID: 14407

## IV.   OxyChem's Offer is in Good Faith

OxyChem's offer to perform the remedial design for OU4 and its proposal of sequential agreements for other work in the Site are in good faith and consistent with OxyChem's longstanding cooperation with EPA to advance the cleanup of the Passaic River.

### A.  OxyChem's Record of Cooperation

OxyChem's indemnitors at Maxus Energy and its affiliate, Tierra Solutions, Inc., spent approximately $300 million in response costs to perform remedies in Operable Unit 1 (the former Lister Plant site), to conduct remedial investigations in Operable Units 2 and 3 (where work by OxyChem is still ongoing), and to perform an interim removal in OU2.

When its indemnitors filed for bankruptcy protection, OxyChem immediately stepped up and agreed to perform the remedial design of the remedy EPA selected for OU2. OxyChem took this action with the understanding that it could and would—as Congress authorized under CERCLA—pursue contribution from other responsible parties to ensure they paid for their share of the costs to clean up the pollution they caused. EPA has informed OxyChem on multiple occasions that its work on the OU2 Remedial Design has been excellent.

OxyChem has performed consistently and well in remedial investigations in Operable Unit 3. And it has assisted EPA in matters related to the contemplated design and construction of the UPF.

OxyChem's January offer to perform the *entirety* of the interim Remedial Design/Remedial Action ("RD/RA") selected by EPA for OU4—at an EPA-estimated cost of $441 million— on the basic condition that OxyChem remain free to pursue contribution from the 100+ other responsible parties who should pay their fair shares is consistent with OxyChem's longstanding practice of cooperating first and seeking contribution second.

### B.   Attempts to Achieve an Agreement with Proposed Work Parties

To further cooperate with EPA, and promptly on receiving EPA's March Notice Letter, OxyChem reached out to those public and private parties who also received the Notice Letter to seek early opportunities to meet to discuss the letter and responses to it. We have met several times with each group since then.

The private parties understand—as do the public entities—that work to implement any remedy in OU2 and OU4 cannot begin without active support from, and access to essential facilities made available by, the public entities. Accordingly, on March 21, representatives of OxyChem met in person with representatives of the PVSC and the municipalities to discuss the in-kind contributions they could provide toward implementation of the work specified in the Notice Letter. OxyChem provided to the governmental entities a list of properties and potential services they might offer to further an in-kind contribution to implement the work specified in the Notice Letter. The public entities advised OxyChem, however, that they cannot respond to these requests for assistance because they lack information about what EPA would consider a *sufficient* contribution from them for purposes of a good faith offer. OxyChem remains willing to work

filed suit seeking to enjoin the dredging of the Matagorda Bay shipping channel, citing the hazards associated with disturbing contaminated sediment. *See* Case No. 1:22-cv-1470, *San Antonio Bay Estuarine Waterkeeper, et al. v. Connor, et. al.,* in the U.S. District Court for the District of Columbia. No party can undertake to perform, or be penalized for failing to perform, when the project is enjoined or tied up in litigation.

ALCD-PUBCOM_0001440

toward an agreement for in-kind contribution from these public entities, if EPA will clarify what it expects those entities to provide.

Representatives of OxyChem also met remotely on a number of occasions with representatives of three of the private work parties who also received the Notice Letter: Nokia, Pharmacia, and Public Service Electricity & Gas. Work party PMC Global refused to attend any meetings and has declined OxyChem's request to provide input on a proposed offer.

Unfortunately, beyond sharing these concerns, OxyChem's attempts to negotiate an agreed response to EPA's Notice Letter with the private work parties failed. Ignoring their own significant liabilities, those parties are adamant that they too want EPA to "cash them out" in an agreement that would allow them to walk away before the enormous, decade-long work necessary to implement the remedial actions in the OU2 and OU4 RODs has even begun. They appear to intend to urge the United States to place the entire burden of performance on a *single* party, OxyChem, despite the fact that it bears *no liability* for six of the chemicals of concern, is only partially responsible for the other two, and is not *solely* liable for *any* hazardous substance in the Passaic River.

Despite the inability to reach an agreement to date, OxyChem's efforts to negotiate with the other public and private parties that received the Notice Letter demonstrate its good faith, as EPA has recognized. *See* May 25, 2022 Email from J. Fajardo to L. Silver *et al.*; *see also* May 31, 2022 Letter from E. Wilson to OxyChem *et al.* at 1 ("EPA understands the parties participated in the convening process in good faith . . . ."). This letter continues OxyChem's ongoing, good faith actions to respond to EPA's requests for assistance in implementing the remedies at OU2 and OU4.

## C.     Good Faith is Reciprocal

OxyChem intends to continue to cooperate with EPA in a manner consistent with the twin principles Congress embodied in CERCLA; namely, that all responsible parties must pay their fair shares of the costs to clean up hazardous substances for which they are responsible and that parties who perform are entitled to pursue contribution for the costs of that performance from parties who refuse to pay their fair shares. This is a good faith offer: CERCLA squarely permits OxyChem to perform while it retains and pursues remedies the law guarantees.

If EPA accepts OxyChem's offer, OxyChem will negotiate with the work parties—with EPA's good faith and reasonable support—timely agreements to achieve the scopes of work described above. Preserving OxyChem's contribution claims provides an essential *incentive* to these agreements. It allows OxyChem to perform with the assurance that it will bear only its fair and equitable share of the costs as determined by the Court, as Congress intended. And it ensures timely cooperation by other work parties. To be blunt, in the absence of OxyChem's contribution claims, other responsible parties will continue to evade their responsibilities to clean up contamination they caused.

To accede to the private work parties' pleas to be permitted to walk away from their obligations would be contrary to EPA's guidance and its promises to the public. It would also be unsound as a matter of principle. EPA assured the public that the "ubiquitous contamination" it found in the Passaic River would be remedied by *all* responsible parties who would be required to *carry out* the work to remedy pollution they caused. No party with significant responsibility (and certainly none of the work parties identified by EPA or other parties with demonstrated significant responsibility) should be relieved of all liability or have their liability capped *before* the work mandated in OU2 and OU4 is completed.

Case 2:22-cv-07326-MCA-LDW Document 309-21 Filed 04/01/24 Page 264 of 580
Case 2:18-cv-11273-MCA-LDW Document 1082-2 Filed 10/11/22 Page 10 of 12 PageID: 41333
PageID: 44409

OxyChem Response to EPA Notice Letters
June 27, 2022
Page Ten

In contrast to actions that would protect polluters from the responsibility Congress imposed on them to *clean up* their own pollution, agreeing to these terms and Required Conditions with OxyChem affords EPA and communities along the Passaic River important and near-term benefits:

- OxyChem has a demonstrated history of delivering timely, efficient, and compliant performance of tasks it agrees to perform at the Site;

- OxyChem's offer to design the interim remedy in OU4 ensures that remedy will be consistent with and complement the OU2 95% Design OxyChem has already performed and submitted to EPA;

- Allowing OxyChem to coordinate the sequencing of the work in OU4 ahead of work in OU2 will minimize the risk that construction of the upriver remedy in OU4 would impair a downstream remedy in OU2; and

- OxyChem's coordinated work on both remedies will advance the timely conclusion of the remedial action in both operable units and may also shorten the implementation timetable that would otherwise be required in OU4.

EPA's agreement not to attempt to bar OxyChem's contribution claims is also in the public interest.

First, requiring responsible parties to carry out the work keeps EPA's promises to the public. *See, e.g.*, Letter from Eric J. Wilson, EPA Region 2 September 18, 2017 (EPA's view that "the private PRPs responsible for the release of dioxins, furans, and/or PCBs will *perform* the OU2 remedial action has not changed." (emphasis added)).

Second, premature settlement with other parties who bear significant responsibility for pollution in OU2 would impair the public interest. Discovery in the CERCLA case is still underway. Parties alleged to bear responsibility for polluting the Passaic River will be required to give sworn testimony pertaining to their liability in the near term. For some (and perhaps many) parties, evidence from the CERCLA case may refute the certifications OxyChem understands each party must provide to the United States in connection with any settlement, making attempts to settle with those parties a highly uncertain and legally groundless exercise for EPA.

Third, there is no basis on which EPA could or should settle with any party in OU4. Neither the private PRPs nor EPA has convened an allocation process pertaining to the interim remedy specified in OU4 ROD. To the contrary, the allocation process EPA initiated with David Batson and his firm, AlterEcho, was limited solely to OU2.

Finally, the condition that EPA must confirm it will take no action to impair or bar OxyChem's contribution claims is nothing more than what CERCLA Section 308 and the Constitution require. CERCLA's policies are vindicated when, as OxyChem seeks here, EPA preserves OxyChem's statutory right to seek contribution from other parties to recover the response costs OxyChem has borne (and those it will bear) in both operable units. In neither case does EPA have statutory authority to bar OxyChem's contribution claims for costs that OxyChem alone has borne or committed to bear at the Site.

ALCD-PUBCOM_0001442

Case 2:22-cv-07326-MCA-LDW Document 309-21 Filed 04/01/24 Page 265 of 580
Case 2:18-cv-11273-MCA-LDW Document 1060-2 Filed 10/12/22 Page 11 of 12 PageID: 61531
Page ID 14410

OxyChem Response to EPA Notice Letters
June 27, 2022
Page Eleven

In extending this offer, OxyChem emphasizes its consistent cooperation with EPA. OxyChem has worked efficiently and well to design the OU2 remedy. We desire to continue that cooperative relationship. Permitting OxyChem—at its own expense—to pursue cost recovery and contribution from other responsible parties is in the public interest. It saves the United States enormous costs, holds responsible parties accountable, and eliminates the unneeded costs of pursuing unconfirmable settlements on terms that violate CERCLA. It will also expedite implementation of the remedies. And, as CERCLA mandates, it ensures all responsible parties pay their fair shares of the costs as determined by the District Court for the District of New Jersey or other federal district court.

All of this would be another enormous step forward at the Site. We look forward to discussing this with EPA at your earliest convenience.

OxyChem reserves all rights it has at law, in equity, and under the United States Constitution.

Very truly yours,

Charles F. Weiss

Charles F. Weiss
Senior Vice President of
Environmental and Sustainability
Charles_Weiss@oxy.com

ALCD-PUBCOM_0001443

Case 2:22-cv-07326-MCA-LDW Document 309-21 Filed 04/01/24 Page 266 of 580
Case 2:18-cv-11273-MCA-LDW Document 1100-2 Filed 10/12/22 Page 12 of 12 PageID:
Page ID 34411
061532

cc:

**EPA Headquarters:**

Mr. Lawrence Starfield
Acting Assistant Administrator
Office of Enforcement and Compliance Assurance
Starfield.Lawrence@epa.gov

Mr. Barry Breen
Acting Assistant Administrator
Office of Land and Emergency Management
Breen.Barry@epa.gov

**Region 2:**

Mr. Pat Evangelista
Director, Superfund and Emergency Management Division, EPA Region 2
Evangelista.pat@Epa.gov

Mr. Walter Mugdan
Deputy Regional Administrator, EPA Region 2
Mugdan.Walter@epa.gov

Mr. Paul Simon
Regional Counsel, EPA Region 2
simon.paul@epa.gov

Ms. Sarah Flanagan
Chief of NJ Superfund Branch, EPA Region 2
Flanagan.Sarah@epa.gov

Mr. Juan Fajardo
Assistant Regional Counsel, EPA Region 2
Fajardo.juan@Epa.gov

Ms. Frances Zizila
Assistant Regional Counsel, EPA Region 2
Zizila.Frances@epa.gov

Mr. Michael Sivak
Chief of Mega Projects, EPA Region 2
Sivak.Michael@epa.gov

**DOJ:**

Mr. Brian Donohue
U.S. Department of Justice
Brian.Donohue@usdoj.gov

Ms. Laura Rowley
U.S. Department of Justice
Laura.Rowley@usdoj.gov

# EXHIBIT 17

OxyChem's Comments in Opposition to Proposed Consent Decree,
*United States v. Alden Leeds, Inc., et al.*, Civil Action No. 2:22-cv-07326 (D.N.J.)

ALCD-PUBCOM_0001445

ATTACHMENT 1

Please provide all documents that reflect payments from the Environmental Protection Agency ("EPA") to the Eastern Research Group, Inc. ("ERG") relating to the Diamond Alkali-Lower Passaic River Allocation for Region 2 non-public, non-municipal potentially responsible parties ("PRPs") (the "Sub-Allocation.")

Please provide all documents that reflect payments from the EPA to AlterEcho, including but not limited to payments for AlterEcho's development of an allocation plan as a subcontractor under ERG for the Sub-Allocation.

Please provide all documents that reflect contractual dealings between ERG and AlterEcho as contractor and subtractor, including but not limited to payment structure, for services rendered by AlterEcho through the Sub-Allocation.

Please provide all documents that reflect payments from the EPA to TechLaw Consultants, Inc. ("TechLaw,") including but not limited to payments for TechLaw's development of an allocation plan as a subcontractor under ERG for the Sub-Allocation.

Please provide all documents that reflect contractual dealings between ERG and TechLaw as contractor and subtractor, including but not limited to payment structure, for services rendered by TechLaw through the Sub-Allocation.

Please provide all progress reports for the duration of the contract between the EPA and ERG, including but not limited to reports dated January 1, 2017, through the date of receipt of this request in the year 2022.

Please provide all progress reports for the duration of the contract between the EPA and AlterEcho, including but not limited to reports dated January 1, 2017, through the date of receipt of this request in the year 2022.

Please provide all progress reports for the duration of the contract between the EPA and TechLaw, including but not limited to reports dated January 1, 2017, through the date of receipt of this request in the year 2022.

## Final Invoice Approval Summary

Contract............: EPW14020
Delivery Order.......: 00096
Invoice Number.......: 1
Barcode.............: B8000125890
Date RTP-FC Recvd Inv: 09/20/2018
Vendor..............: S R A

Invoice Amount.....:      526,842.00
Suspensions:           0.00
Net Invoice Amount.:      526,842.00
Potential Discount:           0.00
Pay the Vendor.....:      526,842.00

Period of Performance: 05/16/2017-08/24/2018
RTP-FC Payment Tech..: GLENN HEARTWELL
Approving Official...: ALICE L. YEH

Current Date.......:  09/25/2018
Tech's Phone.......:  919-541-4387

| Lref | DCN | FY | Appro | Bud Org | PRC | Site Proj | Cost Org | BOC | Remaining Amt | Approved Amt |
|------|--------|----|-------|---------|--------|-----------|----------|--------|---------------|--------------|
| 1 | HE1103 | 17 | TR2B | 02D | 501EC7 | 0296AN02 | C009 | 2505 | 0.00 | 175,000.00 |
| 2 | HE1152 | 17 | TR2B | 02D | 501EC7 | 0296AN02 | C009 | 2505 | 503,619.00 | 351,842.00 |
|  |  |  |  |  |  |  |  | Totals... | 503,619.00 | 526,842.00 |

**Your work has been processed. Thank you.**
**Please PRINT NOW for your records.**

Click here to return to Invoice Selection

**Please close the browser to logout**

ALCD-PUBCOM_0001447

## Final Invoice Approval Summary

```
Contract.............: EPW14020          Invoice Amount.....:    74,957.00
Delivery Order.......: 00096
Invoice Number.......: 2                         Suspensions:         0.00
Barcode..............: B9000005220      Net Invoice Amount.:    74,957.00
Date RTP-FC Recvd Inv: 11/19/2018        Potential Discount:         0.00
Vendor...............: S R A            Pay the Vendor.....:    74,957.00

Period of Performance: 08/25/2018-10/26/2018  Current Date.......:  12/04/2018
RTP-FC Payment Tech..: GLENN HEARTWELL         Tech's Phone.......:  919-541-4387
Approving Official...: ALICE L. YEH
```

| Lref | DCN | FY | Appro | Bud Org | PRC | Site Proj | Cost Org | BOC | Remaining Amt | Approved Amt |
|------|--------|----|-------|---------|--------|-----------|----------|------|---------------|--------------|
| 2 | HE1152 | 17 | T62B | 02D | 501BC7 | 0296AN02 | C009~ | 2505 | 438,662.00 | 74,957.00 |

Your work has been processed. Thank you.
**Please PRINT NOW for your records.**

Click here to return to Invoice Selection

**Please close the browser to logout**

ALCD-PUBCOM_0001448

## Final Invoice Approval Summary

```
Contract.............: EPW14020          Invoice Amount.....:  1,662,285.00
Delivery Order.......: 00096
Invoice Number.......: 3                     Suspensions:          0.00
Barcode..............: B9000009913       Net Invoice Amount.:  1,662,285.00
Date RTP-FC Recvd Inv: 09/19/2019           Potential Discount:       0.00
Vendor...............: S R A             Pay the Vendor.....:  1,662,285.00

Period of Performance: 10/27/2018-08/23/2019  Current Date.......:  09/25/2019
RTP-FC Payment Tech..: GLENN HEARTWELL        Tech's Phone.......:  919-541-4387
Approving Official...: ALICE L. YEH
```

| Lref | DCN | FY | Appro | Bud Org | PRC | Site Proj | Cost Org | BOC | Remaining Amt | Approved Amt |
|------|--------|----|-------|---------|--------|-----------|----------|--------|---------------|--------------|
| 2 | HE1152 | 17 | TR2B | 02D | 501EC7 | 0296AN02 | C009 | 2505 | 0.00 | 428,662.00 |
| 3 | HE1111 | 18 | TR2B | 02D | 000EC7 | 0296AN02 | C009 | 0.00 | 18,528.00 |
| 4 | HE1162 | 18 | TR2B | 02D | 000EC7 | 0296AN02 | C009 | 2505 | 0.00 | 1,045,150.00 |
| 5 | HE1079 | 19 | TR2B | 02D | 000EC7 | 0296AN02 | CD09 | 2505 | 24,427.00 | 169,947.00 |
| | | | | | | | | Totals... | 24,427.00 | 1,662,285.00 |

**Your work has been processed. Thank you.**
**Please PRINT NOW for your records.**

Click here to return to Invoice Selection

**Please close the browser to logout**

ALCD-PUBCOM_0001449

## Final Invoice Approval Summary

Contract.............: EPW14020             Invoice Amount.....:      24,427.00
Delivery Order.......: 00096
Invoice Number.......: 4                        Suspensions:           0.00
Barcode..............: C0000000160          Net Invoice Amount.:      24,427.00
Date RTP-FC Recvd Inv: 11/18/2019              Potential Discount:         0.00
Vendor...............: S R A                Pay the Vendor.....:      24,427.00

Period of Performance: 08/24/2019-09/30/2019   Current Date.......:      11/25/2019
RTP-FC Payment Tech..: GLENN HEARTWELL        Tech's Phone.......:    919-541-4387
Approving Official...: ALICE YEH

| Lref | DCN | FY | Appro | Bud Org | PRC | Site Proj | Cost Org | BOC | Remaining Amt | Approved Amt |
|------|-----|----|-------|---------|-----|-----------|----------|-----|---------------|--------------|
| 5 | HE1079 | 19 | TR2B | 02D | 000EC7 | 0296AN02 | C009 | 2505 | 0.00 | 24,427.00 |

Your work has been processed. Thank you.
**Please PRINT NOW for your records.**

Click here to return to Invoice Selection

**Please close the browser to logout**

https://ocfosystem5.epa.cgipdc.net/ords/fmc2_prv/easylite.invoice_save          11/25/2019

ALCD-PUBCOM_0001450

## Final Invoice Approval Summary

| | |
|---|---|
| Contract..............: 68HERH19D0033 | Invoice Amount.....: 1,365.15 |
| Delivery Order.......: 68HERH19F0406 | |
| Invoice Number.......: 427.09-002 | Suspensions: 0.00 |
| Barcode..............: C0093879651 | Net Invoice Amount.: 1,365.15 |
| Date RTP-FC Recvd Inv: 01/23/2020 | Potential Discount: 0.00 |
| Vendor..............: EASTERN RESEARCH GROUP, INC. | Pay the Vendor.....: 1,365.15 |
| Period of Performance: 11/30/2019-12/27/2019 | Current Date.......: 01/28/2020 |
| RTP-FC Payment Tech..: BRANDI KAIGLER-JACKSON | Tech's Phone.......: 919-541-1148 |
| Approving Official...: ALICE YEH | |

| Lref | DCN | FY | Appro | Bud Org | PRC | Site Proj | Cost Org | BOC | Remaining Amt | Approved Amt |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | HE1114 | 19 | TR2B | 02D | 000EC7 | 0296AN02 | C010 | 2505 | 496,302.95 | 1,365.15 |

Your work has been processed. Thank you.
**Please PRINT NOW for your records.**

Click here to return to Invoice Selection

**Please close the browser to logout**

https://ocfosystem5.epa.cgipdc.net/ords/fmc2_prv/easylite.invoice_save          1/28/2020

ALCD-PUBCOM_0001451

## Final Invoice Approval Summary

Contract.............: 68HERH19D0033          Invoice Amount.....:        2,331.90
Delivery Order.......: 68HERH19F0406
Invoice Number.......: 427.09-001                      Suspensions:            0.00
Barcode..............: C0093815024          Net Invoice Amount.:        2,331.90
Date RTP-FC Recvd Inv: 12/17/2019           Potential
                                            Discount:                   0.00
Vendor...............: EASTERN RESEARCH      Pay the Vendor.....:        2,331.90
                       GROUP, INC.

Period of Performance: 09/24/2019-11/29/2019  Current Date.......: 01/28/2020
RTP-FC Payment Tech..: BRANDI KAIGLER-        Tech's Phone.......: 919-541-1148
                       JACKSON
Approving Official...: ALICE YEH

| Lref | DCN | FY | Appro | Bud Org | PRC | Site Proj | Cost Org | BOC | Remaining Amt | Approved Amt |
|------|-----|-----|-------|---------|-----|-----------|----------|-----|---------------|--------------|
| 1 | HE1114 | 19 | TR2B | 02D | 000EC7 | 0296AN02 | C010 | 2505 | 497,668.10 | 2,331.90 |

Your work has been processed. Thank you.
**Please PRINT NOW for your records.**

Click here to return to Invoice Selection

**Please close the browser to logout**

ALCD-PUBCOM_0001452

## Final Invoice Approval Summary

```
Contract.............: 68HERH19D0033          Invoice Amount.....:     336,387.37
Delivery Order.......: 68HERH19F0406
Invoice Number.......: 427.09-003                    Suspensions:           0.00
Barcode..............: C0093922708           Net Invoice Amount.:     336,387.37
Date RTP-FC Recvd Inv: 02/20/2020               Potential Discount:        0.00
Vendor...............: EASTERN RESEARCH GROUP, INC.  Pay the Vendor.....:  336,387.37

Period of Performance: 12/28/2019-01/31/2020    Current Date.......:  03/10/2020
RTF-FC Payment Tech..: BRANDI KAIGLER-JACKSON    Tech's Phone.......:  919-541-1148
Approving Official...: ALICE YEH
```

| Lref | DCN | FY | Appro | Bud Org | PRC | Site Proj | Cost Org | BOC | Remaining Amt | Approved Amt |
|------|--------|----|-------|---------|--------|-----------|----------|------|---------------|--------------|
| 1 | HE1114 | 19 | TR2B | 02D | 000EC7 | 0296AN02 | C010 | 2505 | 159,915.58 | 336,387.37 |

### Your work has been processed. Thank you.
### Please PRINT NOW for your records.

#### Click here to return to Invoice Selection

### Please close the browser to logout

ALCD-PUBCOM_0001453

## Final Invoice Approval Summary

```
Contract.............: 68HERH19D0033          Invoice Amount.....:      1,007.84
Delivery Order.......: 68HERH19F0406
Invoice Number.......: 427.09-004                    Suspensions:          0.00
Barcode..............: C0093963138           Net Invoice Amount.:      1,007.84
Date RTP-FC Recvd Inv: 03/17/2020             Potential Discount:          0.00
Vendor...............: EASTERN RESEARCH GROUP, INC.  Pay the Vendor.....:      1,007.84

Period of Performance: 02/01/2020-02/28/2020  Current Date.......:   03/30/2020
RTP-FC Payment Tech..: BRANDI KAIGLER-JACKSON  Tech's Phone.......:  919-541-1148
Approving Official...: ALICE YEH
```

| Lref | DCN | FY | Appro | Bud Org | PRC | Site Proj | Cost Org | BOC | Remaining Amt | Approved Amt |
|------|--------|----|-------|---------|--------|-----------|----------|------|---------------|--------------|
| 1 | HE1114 | 19 | T62B | 02D | 000BC7 | 0296AN02 | CD19 | 2505 | 158,907.74 | 1,007.84 |

Your work has been processed. Thank you.
**Please PRINT NOW for your records.**

Click here to return to Invoice Selection

**Please close the browser to logout**

ALCD-PUBCOM_0001454

## Final Invoice Approval Summary

```
Contract.............: 68HERH19D0033          Invoice Amount.....:    197,440.75
Delivery Order.......: 68HERH19F0406
Invoice Number.......: 427.09-005             Suspensions:              0.00
Barcode..............: C0094039481            Net Invoice Amount.:    197,440.75
Date RTP-FC Recvd Inv: 04/24/2020            Potential Discount:       0.00
Vendor...............: EASTERN RESEARCH GROUP, INC.  Pay the Vendor.....:  197,440.75

Period of Performance: 02/29/2020-03/27/2020  Current Date.......:  05/05/2020
RTP-FC Payment Tech..: BRANDI KAIGLER-JACKSON  Tech's Phone.......:  919-541-1148
Approving Official...: ALICE YEH
```

| Lref | DCN | FY | Appro | Bud Org | PRC | Site Proj | Cost Org | BOC | Remaining Amt | Approved Amt |
|------|-----|-----|-------|---------|-----|-----------|----------|-----|---------------|--------------|
| 1 | HE1114 | 19 | TR2B | 01D | C0CEC7 | 0296AN02 | C010 | 2505 | 0.00 | 158,907.74 |
| 2 | HE1031 | 20 | TR2B | 02D | C0CEC7 | 0296AN02 | C010 | 2505 | 755,771.99 | 38,533.01 |
| | | | | | | | | Totals... | 755,771.99 | 197,440.75 |

Your work has been processed. Thank you.
**Please PRINT NOW for your records.**

Click here to return to Invoice Selection

**Please close the browser to logout**

ALCD-PUBCOM_0001455

## Final Invoice Approval Summary

Contract.............: 68HERH19D0033          Invoice Amount.....:      93,298.75
Delivery Order.......: 68HERH19F0406
Invoice Number.......: 042709006                       Suspensions:           0.00
Barcode..............: C0080003226          Net Invoice Amount.:      93,298.75
Date RTP-FC Recvd Inv: 05/21/2020            Potential Discount:           0.00
Vendor...............: EASTERN RESEARCH GROUP, INC.  Pay the Vendor.....:      93,298.75

Period of Performance: 03/28/2020-05/01/2020  Current Date.......:  05/27/2020
RTP-FC Payment Tech..: BRANDI KAIGLER-JACKSON  Tech's Phone.......:  919-541-1148
Approving Official...: ALICE YEH

| Lref | DCN | FY | Appro | Bud Org | PRC | Site Proj | Cost Org | BOC | Remaining Amt | Approved Amt |
|------|------|----|-------|---------|-------|-----------|----------|------|---------------|--------------|
| 7 | HE1031 | 20 | T82B | 02D | 0008C7 | 0296AN02 | CD10 | 2505 | 662,473.24 | 93,298.75 |

Your work has been processed. Thank you.
**Please PRINT NOW for your records.**

Click here to return to Invoice Selection

**Please close the browser to logout**

ALCD-PUBCOM_0001456

## Final Invoice Approval Summary

| | | |
|---|---|---|
| Contract.............: 68HERH19D0033 | Invoice Amount.....: | 156,453.62 |
| Delivery Order.......: 68HERH19F0406 | | |
| Invoice Number.......: 042709007 | Suspensions: | 0.00 |
| Barcode..............: C0080004559 | Net Invoice Amount.: | 156,453.62 |
| Date RTP-FC Recvd Inv: 06/23/2020 | Potential Discount: | 0.00 |
| Vendor...............: EASTERN RESEARCH GROUP, INC. | Pay the Vendor.....: | 156,453.62 |

Period of Performance: 05/02/2020-05/29/2020     Current Date.......: 07/06/2020
RTP-FC Payment Tech..: BRANDI KAIGLER-JACKSON     Tech's Phone.......: 919-541-1148
Approving Official...: ALICE YEH

| Lref | DCN | FY | Appro | Bud Org | PRC | Site Proj | Cost Org | BOC | Remaining Amt | Approved Amt |
|---|---|---|---|---|---|---|---|---|---|---|
| 7 | HE1331 | 20 | T82B | 02D | 0008C7 | 0296AN02 | C010 | 2505 | 506,019.82 | 156,453.62 |

Your work has been processed. Thank you.
**Please PRINT NOW for your records.**

Click here to return to Invoice Selection

**Please close the browser to logout**

ALCD-PUBCOM_0001457

# Final Invoice Approval Summary

```
Contract.............: 68HERH19D0033        Invoice Amount.....:    124,090.52
Delivery Order.......: 68HERH19F0406
Invoice Number.......: 042709008                   Suspensions:          0.00
Barcode..............: C0080005919          Net Invoice Amount.:    124,090.52
Date RTP-FC Recvd Inv: 07/17/2020             Potential Discount:        0.00
Vendor...............: EASTERN RESEARCH GROUP, INC.  Pay the Vendor.....:    124,090.52

Period of Performance: 05/30/2020-06/26/2020  Current Date.......:  08/03/2020
RTP-FC Payment Tech..: BRANDI KAIGLER-JACKSON  Tech's Phone.......:  919-541-1148
Approving Official...: ALICE YEH
```

| Lref | DCN | FY | Appro | Bud Org | PRC | Site Proj | Cost Org | BOC | Remaining Amt | Approved Amt |
|------|-------|----|-------|---------|--------|-----------|----------|------|---------------|--------------|
| 7 | HE1031 | 20 | T62B | 02D | 0008C7 | 0296AN02 | C010 | 2505 | 381,929.10 | 124,090.52 |

Your work has been processed. Thank you.
**Please PRINT NOW for your records.**

Click here to return to Invoice Selection

**Please close the browser to logout**

ALCD-PUBCOM_0001458

## Final Invoice Approval Summary

```
Contract.............: 68HERH19D0033          Invoice Amount.....:      199,699.44
Delivery Order.......: 68HERH19F0406
Invoice Number.......: 042709009                     Suspensions:            0.00
Barcode..............: C0080007531          Net Invoice Amount.:      199,699.44
Date RTP-FC Recvd Inv: 08/24/2020              Potential Discount:          0.00
Vendor...............: EASTERN RESEARCH GROUP, INC.  Pay the Vendor.....:      199,699.44

Period of Performance: 06/27/2020-07/31/2020   Current Date.......:  08/31/2020
RTP-FC Payment Tech..: BRANDI KAIGLER-JACKSON   Tech's Phone.......:  919-541-1148
Approving Official...: ALICE YEH
```

| Lref | DCN | FY | Appro | Bud Org | PRC | Site Proj | Cost Org | BOC | Remaining Amt | Approved Amt |
|------|-----|-----|-------|---------|-----|-----------|----------|-----|---------------|--------------|
| 7 | HE1031 | 20 | T82B | 02D | 0008C7 | 0296AN02 | CD10 | 2505 | 142,229.66 | 199,699.44 |

Your work has been processed. Thank you
**Please PRINT NOW for your records.**

Click here to return to Invoice Selection

**Please close the browser to logout**

ALCD-PUBCOM_0001459

## Final Invoice Approval Summary

| | |
|---|---|
| Contract.............: 68HERH19D0033 | Invoice Amount.....: 162,422.52 |
| Delivery Order.......: 68HERH19F0406 | |
| Invoice Number.......: 042709010 | Suspensions: 0.00 |
| Barcode..............: C1080009843 | Net Invoice Amount.: 162,422.52 |
| Date RTP-FC Recvd Inv: 10/15/2020 | Potential Discount: 0.00 |
| Vendor...............: EASTERN RESEARCH GROUP, INC. | Pay the Vendor.....: 162,422.52 |

| | |
|---|---|
| Period of Performance: 08/01/2020-08/28/2020 | Current Date.......: 10/19/2020 |
| RTP-FC Payment Tech..: BRANDI KAIGLER-JACKSON | Tech's Phone.......: 919-541-1148 |
| Approving Official...: ALICE YEH | |

| Lref | DCN | FY | Appro | Bud Org | PRC | Site Proj | Cost Org | BOC | Remaining Amt | Approved Amt |
|---|---|---|---|---|---|---|---|---|---|---|
| 7 | HE1031 | 20 | T82B | 02D | 0008C7 | 0296AN02 | CD19 | 2505 | 19,807.14 | 162,422.52 |

Your work has been processed. Thank you.
**Please PRINT NOW for your records.**

Click here to return to Invoice Selection

**Please close the browser to logout**

ALCD-PUBCOM_0001460

## Final Invoice Approval Summary

Contract.............: 68HERH19D0033      Invoice Amount.....: 179,783.16

Delivery Order.......: 68HERH19F0406

Invoice Number.......: 042709011      Suspensions: 0.00

Barcode..............: C1080010699      Net Invoice Amount.: 179,783.16

Date RTP-FC Recvd Inv: 10/26/2020      Potential Discount: 0.00

Vendor...............: EASTERN RESEARCH GROUP, INC.      Pay the Vendor.....: 179,783.16

Period of Performance: 08/29/2020-10/02/2020      Current Date.......: 11/06/2020

RTP-FC Payment Tech..: BRANDI KAIGLER-JACKSON      Tech's Phone.......: 919-541-1148

Approving Official...: ALICE YEH

| Lref | DCN | FY | Appro | Bud Org | PRC | Site Proj | Cost Org | BOC | Remaining Amt | Approved Amt |
|------|-------|----|-------|---------|--------|-----------|----------|---------|---------------|--------------|
| 2 | HE1031 | 20 | TR2B | 01D | C00EC7 | 0296AN02 | C010 | 2505 | 0.00 | 19,807.14 |
| 3 | HE1139 | 20 | TR2B | 02D | C00EC7 | 0296AN02 | C010 | 2505 | 204,434.98 | 159,976.02 |
| | | | | | | | | Totals... | 204,434.98 | 179,783.16 |

Your work has been processed. Thank you.
**Please PRINT NOW for your records.**

Click here to return to Invoice Selection

**Please close the browser to logout**

ALCD-PUBCOM_0001461

## Final Invoice Approval Summary

```
Contract..............: 68HERH19D0033          Invoice Amount.....:        262.85
Delivery Order........: 68HERH19F0406
Invoice Number........: 042709012                     Suspensions:          0.00
Barcode...............: C1080011843           Net Invoice Amount.:        262.85
Date RTP-FC Recvd Inv: 11/17/2020              Potential Discount:          0.00
Vendor................: EASTERN RESEARCH GROUP, INC.  Pay the Vendor.....:        262.85

Period of Performance: 10/03/2020-10/30/2020   Current Date.......:  11/30/2020
RTP-FC Payment Tech..: BRANDI KAIGLER-JACKSON   Tech's Phone.......:  919-541-1148
Approving Official...: ALICE YEH
```

| Lref | DCN | FY | Appro | Bud Org | PRC | Site Proj | Cost Org | BOC | Remaining Amt | Approved Amt |
|------|-----|----|-------|---------|-----|-----------|----------|-----|---------------|--------------|
| 1- | HE1139 | 20 | TR2B | 02D | 000BC7 | 0296AN02 | CD10 | 2505 | 204,172.13 | 262.85 |

Your work has been processed. Thank you.
**Please PRINT NOW for your records.**

Click here to return to Invoice Selection

**Please close the browser to logout**

ALCD-PUBCOM_0001462

## Final Invoice Approval Summary

| | |
|---|---|
| Contract..............: 68HERH19D0033 | Invoice Amount.....:   191,046.71 |
| Delivery Order.......: 68HERH19F0406 | |
| Invoice Number.......: 042709013 | Suspensions:   0.00 |
| Barcode..............: C1080013409 | Net Invoice Amount.:   191,046.71 |
| Date RTP-FC Recvd Inv: 12/16/2020 | Potential Discount:   0.00 |
| Vendor...............: EASTERN RESEARCH GROUP, INC. | Pay the Vendor.....:   191,046.71 |

| | |
|---|---|
| Period of Performance: 10/31/2020-11/27/2020 | Current Date.......:   12/21/2020 |
| RTP-FC Payment Tech..: BRANDI KAIGLER-JACKSON | Tech's Phone.......:   919-541-1148 |
| Approving Official...: ALICE YEH | |

| Lref | DCN | FY | Appro | Bud Org | PRC | Site Proj | Cost Org | BOC | Remaining Amt | Approved Amt |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | HE1139 | 20 | TR2B | 02D | 000B27 | 0296AN02 | C81Q | 2505 | 13,125.42 | 191,046.71 |

Your work has been processed. Thank you.
**Please PRINT NOW for your records.**

Click here to return to Invoice Selection

**Please close the browser to logout**

ALCD-PUBCOM_0001463

## Final Invoice Approval Summary

```
Contract.............: 68HERH19D0033        Invoice Amount.....:    10,800.03
Delivery Order.......: 68HERH19F0406
Invoice Number.......: 042709014                  Suspensions:         0.00
Barcode..............: C1080015134         Net Invoice Amount.:    10,800.03
Date RTP-FC Recvd Inv: 01/19/2021            Potential Discount:        0.00
Vendor...............: EASTERN RESEARCH GROUP, INC.  Pay the Vendor.....:    10,800.03

Period of Performance: 11/28/2020-01/01/2021    Current Date.......: 01/25/2021
RTP-FC Payment Tech..: BRANDI KAIGLER-JACKSON   Tech's Phone.......: 919-541-1148
Approving Official...: ALICE YEH
```

| Lref | DCN | FY | Appro | Bud Org | PRC | Site Proj | Cost Org | BOC | Remaining Amt | Approved Amt |
|------|--------|----|-------|---------|--------|-----------|----------|------|---------------|--------------|
| 1 | HE1139 | 20 | T82B | 02D | 000BC7 | 0296AN00 | CD10 | 2505 | 2,325.39 | 10,800.03 |

Your work has been processed. Thank you.
**Please PRINT NOW for your records.**

Click here to return to Invoice Selection

**Please close the browser to logout**

ALCD-PUBCOM_0001464

## Final Invoice Approval Summary

```
Contract.............: 68HERH19D0033          Invoice Amount.....:     5,120.49
Delivery Order.......: 68HERH19F0406
Invoice Number.......: 042709015                     Suspensions:         0.00
Barcode..............: C1080017247          Net Invoice Amount.:     5,120.49
Date RTP-FC Recvd Inv: 02/19/2021             Potential Discount:        0.00
Vendor...............: EASTERN RESEARCH GROUP, INC.  Pay the Vendor.....:     5,120.49

Period of Performance: 01/02/2021-01/29/2021  Current Date.......: 03/01/2021
RTP-FC Payment Tech..: BRANDI KAIGLER-JACKSON Tech's Phone.......: 919-541-1148
Approving Official...: ALICE YEH
```

| Lref | DCN | FY | Appro | Bud Org | PRC | Site Proj | Cost Org | BOC | Remaining Amt | Approved Amt |
|------|--------|----|-------|---------|--------|-----------|----------|---------|---------------|--------------|
| 3 | HE1139 | 20 | TR2B | D1D | COOEC7 | 0296AN02 | C010 | 2505 | 0.00 | 2,325.39 |
| 4 | HE1016 | 21 | TR2B | D1D | COOEC7 | 0296AN02 | C010 | 2505 | 97,204.90 | 2,795.10 |
| | | | | | | | | Totals... | 97,204.90 | 5,120.49 |

Your work has been processed. Thank you.
**Please PRINT NOW for your records.**

Click here to return to Invoice Selection

**Please close the browser to logout**

ALCD-PUBCOM_0001465

# EXHIBIT 18

OxyChem's Comments in Opposition to Proposed Consent Decree,
*United States v. Alden Leeds, Inc., et al.*, Civil Action No. 2:22-cv-07326 (D.N.J.)

ALCD-PUBCOM_0001466



October 24, 2017

VIA ELECTRONIC AND REGULAR U.S. MAIL

Mr. Eric J. Wilson
Deputy Director for Enforcement and Homeland Security
Emergency and Remedial Response Division
U.S. Environmental Protection Agency, Region 2
290 Broadway
New York, NY 10007-1866
Wilson.ericj@Epa.gov

David R. Erickson

2555 Grand Blvd.
Kansas City, Missouri
64108-2613
t 816.474.6550
dd 816.559.2487
f 816.421.5547
derickson@shb.com

**518287**

**Re: Lower Passaic River OU-2 Allocation Proceedings**

Dear Mr. Wilson:

On behalf of certain members of the Cooperating Parties Group (the "CPG")[1], we are responding to: (a) your September 18, 2017 letter concerning the proposed settlement framework for the anticipated at least $1.4 billion remedy for the lower eight miles of the Passaic River; and (b) EPA's representatives' statements at the meeting it convened on October 13, 2017 among certain private potentially responsible parties ("PRPs") and David Batson. In the letter and at the meeting, EPA stated that it anticipates settling with the Passaic Valley Sewerage Commission ("PVSC") and other municipal entities[2] (the "Municipalities") separately from the allocation process that will encompass certain other PRPs (including certain members of the CPG who were notified in the letter). For the below reasons, EPA should revise its current position and include PVSC and the Municipalities in the allocation process overseen by Mr. Batson. We respectfully submit that failure to do so would be fundamentally unfair, at odds with EPA's recognition in its September 18 letter that "transparency" and "fairness" are "of importance to the Agency in this matter" (Sept. 18 letter at 1), and, at bottom, arbitrary and capricious.

---

[1] This is submitted on behalf of those CPG members who were notified and requested to participate in the allocation based on EPA's September 18, 2017 letter, and does not include CPG members identified by EPA in its March 30, 2017 letter as eligible for "early" cash out settlement and who are accepting the settlement offer.

[2] EPA's letter stated that negotiations are proceeding with the municipalities to which EPA issued notices of potential liability: the City of Newark, Borough of East Newark, Town of Harrison, and Town of Kearny. There are numerous additional municipalities that are part of the PVSC system, but for purposes of this letter, we are focusing on the four municipalities that EPA identified in its September 18, 2017 letter.

ALCD-PUBCOM_0001467

A fair settlement process should embrace all PRPs, including PVSC and the Municipalities (whose liability is already presumed by EPA and not in question). It is not fair to have one process applicable to PRPs other than PVSC and Municipalities, and a separate (and non-transparent) process used to allocate PVSC's and the Municipalities' relative liability shares. This is especially true for an equitable allocation of liability at this site, where, as discussed below, abundant evidence already exists demonstrating that PVSC and the Municipalities:

- Knowingly and willfully discharged an enormous amount of PCBs and other risk-driving COCs to the Passaic River, contrary to any legitimate "government function" and even though PVSC could have appropriately treated these wastes at its treatment plant;

- Knowingly and willfully failed in designing, implementing, operating, and maintaining their sewerage infrastructure, thus discharging additional enormous amounts of PCBs and other risk-driving COCs into the Passaic River (again independent of any "government function" and even though they could have appropriately treated these wastes); and

- Are uniquely liable for discharges attributable to entities that are defunct and thus unable to bear their share of liability (absent PVSC's and the Municipalities' liability for these discharges, they would comprise an orphan share).

The allocation process overseen by Mr. Batson will necessarily consider in detail the discharges by PVSC and the Municipalities, in light of, among other things, certain PRPs having discharged through their sewerage systems. Simply put, the PVSC's and Municipalities' discharges *will be* at issue in the allocation process overseen by Mr. Batson, and given this reality, EPA's purported justifications for excluding PVSC and the Municipalities from the allocation process, as stated at the October 13 meeting, do not have merit.

In short, and for all of the reasons explained in detail below, EPA should include PVSC and the Municipalities in the allocation process overseen by Mr. Batson (a process that may apply to at least 80 other PRPs) and give meaning to its statement that "Transparency and fairness are concepts that EPA has consistently stated are of importance to the Agency in this matter" (Sept. 18 letter at 1).

1. **Procedural and substantive fairness require that PVSC and the Municipalities be included in the allocation process encompassing other PRPs.**

Apart from early cashout settlements, EPA itself has long recognized a preference for a single settlement and allocation process where municipalities and private parties are PRPs at the same site, as stated in EPA's *Interim Policy On CERCLA Settlements Involving Municipalities' Wastes*:

> [T]he general goal and overall process for reaching settlement at sites involving municipalities or municipal wastes is the same as for other sites. . . to negotiate

2

ALCD-PUBCOM_0001468

> with PRPs to reach one settlement agreement that provides complete resolution of
> all pending CERCLA claims. . . .

OSWER Directive # 9834.13 (Dec. 6, 1989), at 14. A single process only enhances the
credibility of the allocation and participation among PRPs; conversely, "for cases in which PRPs
perceive that EPA treats municipalities differently than the other parties at the site, the allocation
process may deteriorate."[3] Excluding PVSC and the Municipalities from the other PRPs here will
result in significant inefficiencies and will yield inconsistent and unfair results. In addition, it is
unlikely that any eventual settlement with PVSC and the Municipalities stemming from a
separate process would satisfy the requirements for court approval, which include that the
settlement be both procedurally and substantively fair.

"To measure procedural fairness, a court should ordinarily look to the negotiation
process and attempt to gauge its *candor, openness, and bargaining balance*." *United States v.
Cannons Engr. Corp.*, 899 F.2d 79, 86 (1st Cir. 1990) (emphasis added) (compiling citations).
Candor and openness are not served by excluding several of the most significantly liable parties
from the allocation process and, among other things, preventing private parties from commenting
on the allocation factors and evidence to be used by EPA to determine PVSC's and the
Municipalities' fair shares. Treating PVSC and the Municipalities differently and separately also
is inconsistent with the plain language of CERCLA, which includes municipalities, commissions,
and political subdivisions of a State as "persons" that may be subject to the same liability as
corporations. 42 U.S.C. § 9601(21). At bottom, there appears to be no rational basis for EPA's
disparate and secretive treatment of PVSC and the Municipalities; instead, EPA's decision to
engage in a separate allocation process with PVSC and the Municipalities is arbitrary and
capricious.

To ensure substantive fairness in any settlement, a rational determination of comparative
fault is required. *See Arizona v. City of Tucson*, 761 F.3d 1005, 1012 (9th Cir. 2014); *see also
Cannons*, 899 F.2d at 87 ("Substantive fairness introduces into the equation concepts of
corrective justice and accountability: a party should bear the cost of the harm for which it is
legally responsible"). Exclusion of PVSC and the Municipalities, as EPA proposes here,
necessarily prevents evaluation of their contribution to the LPRSA relative to other parties'
contributions, undermining the rationality of any allocation. The required comparative analysis
to reach a rational determination of PVSC's and the Municipalities' fair shares is particularly
implausible at this stage, given that EPA currently lacks a sufficient record of *all* parties'
contributions to the LPRSA, including the substantial orphan share and the shares of non-
participating parties. Any settlement with PVSC and the Municipalities could only be
substantively fair and reasonable – and not arbitrary and capricious – if it assigns to them an
allocation share that is, based on consideration of all the available evidence, appropriate relative
to those of other parties as established in the allocation process. The need for PVSC's and the
Municipalities' shares to be assigned as part of an allocation process encompassing all PRPs is

---

[3] U.S. EPA, *Developing Allocations Among Potentially Responsible Parties for the Costs of Superfund Site
Cleanups* (October 1994), at p. 9 (summarizing interviews with expert CERCLA allocators).

ALCD-PUBCOM_0001469

especially pronounced because many other PRPs were connected to the PVSC system, such that considerations of their and PVSC's relative allocations will be essential.

All relative shares will most fairly be assigned in a transparent and open process that promotes consistency in application of allocation factors and evidence-based determinations. Excluding PVSC and the Municipalities from this process increases the potential for inconsistent and potentially unfair use of different allocation factors, determinations based on an incomplete understanding of the evidence, and differing evaluation of evidence, which also leads to differences in accounting for other, non-participating parties' contributions and shares, including the substantial orphan shares that will be part of this case. Finally, only a single allocation process will promote complete development of the record with respect to PVSC's and the Municipalities' liability. Because many PRPs at this Site were tied to sewer systems (including the Municipalities' systems) that were linked to the PVSC, these PRPs' potential shares will necessarily depend on information and evidence inextricably related to PVSC and the Municipalities, among other things. Where a group of PRPs are so factually linked together, it would be patently prejudicial to "wall off" the group of PRPs who possess the very information that would establish the presence and extent of a link to the site for each of the other PRPs.

Development of all of the relevant evidence in a transparent and fair process that involves all participating PRPs will yield a more efficient and expedient development of the factual basis for allocation, will avoid the risk of inconsistent results and unfairness to the participating parties, and will increase the chances of a settlement that can obtain court approval and allow implementation of the OU-2 remedy.

## 2. EPA's noted justifications for excluding PVSC and the Municipalities from the allocation, as stated at the October 13 meeting, do not have merit.

EPA stated at the beginning of the October 13 meeting (before leaving the room and allowing Mr. Batson to speak with PRP representatives) that including PVSC and the Municipalities in the allocation would add complexity to the allocation and would risk delaying the remedial action for the Lower Passaic River. However, any allocation process can be structured, on the same two-year schedule as presently is applicable to other PRPs, to include PVSC and the Municipalities. There is no reason to believe that Mr. Batson and his team would be unable to fairly include PVSC and the Municipalities in an allocation within a timeframe of this duration. Moreover, as set forth below, there is abundant evidence readily available for consideration as part of the allocation process anticipated to conclude in 2019. If anything is likely to add complexity and delay, it would be EPA's failure to include PVSC and the Municipalities in the allocation. Any separate settlement with PVSC and Municipalities that results from a non-transparent settlement dialogue and information exchange conducted by EPA, without input from the allocator overseeing an allocation of other parties' liability and without input from other PRPs, almost unquestionably would be the subject of protracted legal challenges (including extensive discovery) and appeals.

At the October 13 meeting, EPA also alluded to PVSC and the Municipalities being different from other PRPs because they provided government functions and their liability is tied to such functions. The same could be said of the City of New York, which is currently engaged

CHICAGO | DENVER | GENEVA | HOUSTON | KANSAS CITY | LONDON | MIAMI | ORANGE COUNTY | PHILADELPHIA | SAN FRANCISCO | SEATTLE | TAMPA | WASHINGTON, D.C.

ALCD-PUBCOM_0001470

in the EPA-prompted allocation at the Gowanus Canal Superfund Site; the City of New Haven and other municipalities who participated in a combined allocation for the Beacon Heights and Laurel Park Landfill Superfund Sites, *see Goodrich Corp. v. Town of Middlesbury*, 311 F.3d 154 (2d Cir. 2002); the City of Philadelphia and other municipalities who participated in the combined allocation for the Helen Kramer Landfill Superfund Site, *U.S. v. Kramer*, 19 F.Supp.2d 273 (D.N.J. 1998); the City of Appleton, which negotiated a settlement along with other private parties for its contributions to the Fox River Superfund Site, *see United States v. NCR Corporation*, 2014 WL 12660390 (E.D. Wisc. Dec. 12, 2014); the City of Bangor, which negotiated a settlement along with other private parties for its contributions to the Penobscot River/Dunnett's Cove Superfund Site, *City of Bangor v. Citizen Communications Co.* 2007 WL 1557426 (D. Me. May 25, 2007); and countless other governmental entities that routinely engage in CERCLA allocation processes with private parties.[4] To the extent that PVSC and Municipalities feel that they have unique equitable arguments relating to their governmental functions, they are free to present those claims in the allocation process. Their inclusion would also allow the other allocation participants to establish that the PVSC's substantial discharges of PCBs and other COCs are not attributable to its governmental function, but rather to conscious decisions made by PVSC in abdication of the responsibility it assumed to its customers and the public at large to safely and responsibly treat waste.

At the October 13 meeting, EPA additionally stated that it is evaluating the possibility of entering into a settlement with PVSC and the Municipalities (and presumably additional municipal entities), in exchange for "in kind" services. While EPA did not describe at all the nature of the services potentially at issue, it is not apparent from the Record of Decision for the Remedial Action for the Lower Passaic River what "in kind" services PVSC and/or the Municipalities might provide that would be fairly coextensive with their collective substantial liability share (and that would necessarily reduce the cost of the remedy for other PRPs). EPA's reference to "in kind" services might have been intended to convey that EPA may attempt to settle with PVSC and/or the Municipalities in exchange for them undertaking actions in the Passaic River that they are required to perform under laws other than CERCLA (for example, PVSC's and/or the Municipalities' obligations under the Clean Water Act to eliminate or substantially reduce either discharges of stormwater to the river or discharges through combined sewer overflows). However, any such settlement that attempts to absolve PVSC and/or the Municipalities of their fair allocation of liability under CERCLA for the remedial action, in exchange for them undertaking actions that are required by other laws, would be unfair, objectionable, and arbitrary and capricious.[5] *See Cannons*, 899 F.2d at 87 ("[A] party should bear the cost of the harm for which it is legally responsible.").

---

[4] This comparison is not intended to analogize PVSC and the Municipalities' relative responsibility to that of governmental entities referenced above, but rather to emphasize that public entities serving governmental functions are regularly included in CERCLA allocations and settlement negotiations alongside private parties.

[5] EPA has generally recognized that "in-kind services" are actual "services" that a municipality is often "uniquely situated to perform at a site (e.g., mowing, road maintenance, structural maintenance)". *Interim Municipal Settlement Policy*, 54 Fed. Reg. 51,071 (Dec. 12, 1989).

5

ALCD-PUBCOM_0001471

Rather than attempting to justify excluding PVSC and the Municipalities from the allocation process applicable to other PRPs, EPA should fulfill its stated commitment to transparency and fairness by including them in the allocation. Doing so also is consistent with the spirit of Administrator Pruitt's recent memorandum addressing EPA's now-ended practice of "sue and settle" arrangements. *Adhering to the Fundamental Principles of Due Process, Rule of Law, and Cooperative Federalism in Consent Decrees and Settlement Agreements* (Oct. 16, 2017). Any decision by EPA to reach a separate, secret settlement with PVSC and the Municipalities would undermine the same fundamental principles of government that the Administrator seeks to uphold: "EPA must faithfully administer the laws of the land and take actions that are tethered to the governing statutes" (*id.* at 3), and must avoid a settlement process that "empowers special interests at the expense of the public and parties that could have used their powers of persuasion to convince the agency to take an alternative action" (*id.* at 2).

### 3.  A fair and reasonable allocation would assign very substantial shares to PVSC and the Municipalities.

PVSC and the Municipalities' contributions to the harm at this Site are substantial, and these parties should not be afforded special settlement considerations due to their governmental status. PVSC and the Municipalities were not merely performing a government function — *i.e.*, providing sewerage and treatment services. Rather, abundant evidence demonstrates that PVSC both knowingly chose to discharge wastes containing risk-driving COCs to the Passaic River, and willfully failed in designing, implementing, operating, and maintaining their sewerage infrastructure. No "government function" preference can apply in these circumstances.

In an equitable allocation, PVSC and the Municipalities should be ascribed among the highest shares of all PRPs, with PVSC's demonstrated responsibility for the contamination and remediation of the Lower Passaic River, potentially second only to that of the single largest contributor of primary remedy-driver dioxin, OCC.[6]

#### a.  PVSC's lack of care in carrying out its government function warrants a significant share of liability.

PVSC's statutory mandate from the New Jersey Legislature in 1902 was to build and operate a sewer system serving the Lower Passaic River Valley, so as to prevent any discharges of sewage into the Passaic River. The legislature also prohibited further discharges to the Passaic River by any public or private entity. PVSC was required to design and operate an interceptor sewer system to carry out this mandate, and to provide a means for municipalities and many industries along the Passaic River to eliminate their discharges and send their waste to PVSC's

---

[6] *See* 42 U.S.C. § 9613(f)(1) (courts may apportion response costs among liable parties liable under CERCLA using "such equitable factors as the court determines are appropriate"); *see also* Brief for United States of America and State of California in Support of Motion to Enter Amended Consent Decree with the Settling Local Governmental Entities at pp. 6-9, *United States v. Montrose Chem. Corp. of Cal.*, No. CV 90-3122-AAH (JRx) (Apr. 8, 1999) (EPA justified a settlement with the municipal sewer operator PRPs on the basis that it represented 19% of the amount sought in all settlements collectively); Order, *United States v. Montrose Chem. Corp. of Cal.*, No. CV 90-3122-AAH (Aug. 24, 1999) (granting motion for entry of consent decree).

CHICAGO | DENVER | GENEVA | HOUSTON | KANSAS CITY | LONDON | MIAMI | ORANGE COUNTY | PHILADELPHIA | SAN FRANCISCO | SEATTLE | TAMPA | WASHINGTON, D.C.

ALCD-PUBCOM_0001472

treatment plant for treatment and discharge into New York Bay.

Since 1924, PVSC has operated an interceptor sewer trunk line intended to keep wastewater from discharging into the Passaic River by connecting into the individual municipal sewerage systems along the Lower Passaic River and conveying that wastewater to a central, PVSC-operated treatment plant for treatment and discharge into New York Harbor.[7] The Municipalities each operated existing sewer systems that were "combined" systems, containing both storm water and wastewater in the same sewer pipes, which caused overflows from the sewers during wet weather events, with such overflows being discharged via the municipality's outfalls along the Passaic River.

PVSC constructed and operated combined sewer overflow ("CSO") regulator chambers at over 70 locations along the interceptor line. These chambers mechanically and automatically redirected untreated wastewater directly to the Passaic River, prior to entry into the interceptor, when the interceptor lacked capacity. PVSC also constructed and manually operated numerous major bypass points along the length of its interceptor sewer. From these bypass points, PVSC could manually redirect flow from a sewer system prior to entry into the main interceptor, or, at certain points, directly out of the main interceptor sewer, into the Passaic River.

### (1) PVSC has never implemented its original design standard of elimination of combined sewer systems, resulting in an undersized and insufficiently maintained sewer system.

PVSC based its design and capacity of the conveyance and treatment system on an approximately 15-year estimate of the future population growth within the PVSC service area.[8] PVSC did not design the interceptor system to accept the full, future anticipated flow from the communities with combined sewers. In communities with combined sewers, including the Municipalities, PVSC made provisions in the original design to discharge excess storm-related peak flows to the Passaic River via CSOs, until the separation of sewers could be accomplished.[9] These provisions were to be temporary, due to future growth requiring greater capacity for raw sewage. The presumption in this design is that some storm water-related flows could be accommodated in the PVSC system for a limited time, but that the combined sewers would ultimately be separated (*i.e.*, a system that uses separate storm sewers and sanitary sewers) and that the storm water-caused, combined sewer overflows could be eliminated.

This presumption was part of PVSC's design as early as 1908, but elimination of combined systems for urban areas ultimately became a standard and expected practice in the industry, due to known pollution impacts on receiving waters. By 1965, it was widely recognized

---

[7] All factual statements in this letter are based upon extensive review and analysis conducted by experts retained by the CPG. Should EPA question the basis for any of these statements, the CPG can provide further support and elaboration.

[8] Passaic Valley Sewerage Commissioners Report (1908); p. 9-11.

[9] *Id.*, p. 18.

CHICAGO | DENVER | GENEVA | HOUSTON | KANSAS CITY | LONDON | MIAMI | ORANGE COUNTY | PHILADELPHIA | SAN FRANCISCO | SEATTLE | TAMPA | WASHINGTON, D.C.

ALCD-PUBCOM_0001473

and recommended by federal, state and local pollution control agencies that in all area urban sewer systems "existing combined sewers shall be eliminated wherever feasible", and that sewer systems "convey the maximum practicable amount of combined flow to and through treatment plants."[10]

Despite the growth of population and industrial activity in the area, and resulting increase in sewage flow, PVSC never implemented its critical design concept nor met the national standard for bypass and CSO elimination. Flow from the combined sewer systems (including Newark, Kearney, Harrison, and East Newark) grew to overwhelm the capacity of the PVSC main interceptor during even routine rainfall. In 1973, PVSC's own engineers declared that "*the present system usage far exceeds the concepts developed by the original design engineers.*" As described further below, this lack of capacity in the system resulting from PVSC's and the Municipalities' failure to remove combined sewers led to PVSC routinely relying on bypasses and combined sewer overflows to control and limit flow in the its system.

### (2) PVSC manually bypassed wastewater as a standard method of operation to manage flow in its system.

Good sewerage system operation practices and standards (and Clean Water Act (NPDES) wastewater discharge permits) have long discouraged and prohibited bypassing – the direct discharge of wastewater without treatment – except under only emergency conditions. But PVSC relied on bypassing as a standard mode of operation, to compensate for its failure to reduce the combined sewer flows in its system. PVSC's former Chief Engineer admitted that since at least 1950, "PVSC would bypass waste directly to the River in varying quantities in order to control the flow of waste in the trunk line and at the treatment plant."[11]

PVSC's operational records from 1950 to 1974 document frequent and intentional bypassing, including during dry weather, with nearly 1,000 documented bypass events during this period (an average of 40-50 per year). In 1975, the one year that PVSC actually monitored bypass amounts, PVSC discharged approximately 7.6 billion gallons of sewage and storm water into the Passaic River.[12]

PVSC's bypassing in the 1950s was particularly extreme, was caused in substantial part by the undersized system, and was exacerbated by PVSC's failure to maintain and upgrade its Newark Bay Pumping Station and treatment plant. PVSC relied on bypassing to overcome design limitations and to delay necessary upgrades at the Newark Bay Pumping Station. PVSC's engineers concluded in 1954 that bypasses related to the failing Newark Bay Pump Station were

---

[10] Summary of Conference (First Session), Pollution of the Interstate Waters of the Hudson River and Its Tributaries (New York-New Jersey) (September 28, 1965), p. 11.

[11] Affidavit of Seymour Lubetkin, Chief Engineer, PVSC (1994), para. 19.

[12] Elson T. Killam Associates, Inc., *Report on Overflow Analysis to Passaic Valley Sewerage Commissioners, 1976* (1976), p. xii. (measuring discharges from October 1974-October 1975).

8

ALCD-PUBCOM_0001474

"operating 60 percent of the time."[13]  Worse, PVSC would "start bypassing at some overflows before it is actually necessary to do so…", leading to "large quantities of raw sewage… being bypassed a large part of the time to the Passaic River, *a contravention of the primary function of the sewer system.*"[14]

Major sewer line repairs also resulted in significant but avoidable bypasses to the Passaic River. During these repairs, it was standard operating procedure for PVSC to keep the interceptor empty by bypassing all flow above the repair point directly into the Passaic River. PVSC could have made the repairs without bypassing untreated sewage to the river, by diverting (rerouting) the sewage around the repair point and back into the system instead, consistent with accepted operating practice employed by other area city sewer systems. But PVSC repeatedly rejected diversion as an option, despite the fact that in 1969, the State Department of Health ruled that PVSC's bypassing during repairs was unacceptable due to the resulting "imminent danger to public safety".[15]

In one of many examples where PVSC ignored this directive, PVSC used the Yantacaw bypass to discharge untreated sewage to the Passaic River for the entire month of March, 1974, during a month-long repair of a section of the main interceptor in Newark.  (The Yantacaw bypass discharged all of the untreated wastewater flow collected from Clifton, Passaic, Paterson, East Rutherford, Wallington, Garfield, Lyndhurst and Rutherford, at a rate of over 100 million gallons per day.)  PVSC discharged the entire flow from the system to the Passaic river without treatment for the full month, resulting in over **7.5 billion gallons** of sewage discharged to the river—approximately the same amount as PVSC discharged into the river in an entire year.[16] PVSC discharged millions more gallons during numerous similar repair events over the years.

### (3) PVSC failed to maintain its CSO regulators and other equipment.

Inadequate maintenance of CSO chambers and bypass outfall mechanisms can cause overflows of undiluted sewage during dry weather. Dry weather overflows have always been strictly prohibited by the Clean Water Act, in addition to state law. Yet PVSC disregarded minimum maintenance of overflow structures and its interceptor, further contributing to overflows and bypasses of untreated wastewater. Noted maintenance problems in the CSO regulators and bypass points caused dry weather bypasses in the earliest days of operation. By the early 1950's, the mechanical control features of the overflows and bypass structures were almost totally inoperable, leading to numerous discharges of raw, untreated wastewater to the Passaic River, often during dry weather.

---

[13] Bogert-Childs Engineering Associates, *Report on Repairs, Replacements and Improvements at Newark Bay Pumping Station* (May 1954), Bogert-Childs Engineering Report for PVSC (May 1954), p. 17.

[14] *Id.* (emphasis added).

[15] Federal Water Pollution Control Administration (November 1969), p. 23.

[16] Passaic Valley Sewerage Commissioners, *Annual Report for the Year 1974* (1975), p. 21-27.

CHICAGO | DENVER | GENEVA | HOUSTON | KANSAS CITY | LONDON | MIAMI | ORANGE COUNTY | PHILADELPHIA | SAN FRANCISCO | SEATTLE | TAMPA | WASHINGTON, D.C.

ALCD-PUBCOM_0001475

In 1969, the U.S. Federal Water Pollution Control Administration cited PVSC's ongoing maintenance failures, finding that PVSC's continuing bypasses were impairing water quality in the Passaic River. The agency recommended that PVSC "improve the present method of controlling combined sewer overflows in its intercepting sewer system. Existing manually operated by-pass valves [should] be replaced by an automatic regulating system."[17] The agency also singled out PVSC among its peer sewerage utilities, noting that "most of the municipalities and industries in the… area are moving to meet the conference recommendations", but that PVSC had "not initiated adequate action" to implement necessary upgrades and maintenance programs to reduce pollution to the river.[18] Despite these warnings, PVSC did not take action to automate the bypass locations until the early 1980s.

In the meantime, PVSC's CSO and bypass equipment malfunctions continued unabated. In 1976, 49 of 73 flow regulators inspected were either inoperable or had been removed, one grit chamber was completely filled with debris, 25 locations had inoperable or missing flap valves, 26 locations had broken or missing tide gates, and 11 had outfalls that were plugged or could not even be located.[19] Accepted municipal sewerage practice during this period included preventative maintenance and inspection programs that would limit equipment malfunctions. The frequency and duration of mechanical failures resulting in untreated direct discharges demonstrate that PVSC had a substandard and deficient maintenance and replacement program that contributed to greater numbers and volumes of discharges, including COCs, to the Passaic River.

### (4) PVSC and the Municipalities benefitted economically from their lack of care and continuing discharges to the River.

Reduction of combined sewer systems could have been accomplished on a gradual basis over many decades. Had PVSC insisted on sewer separation as an ongoing, gradual program of improvements starting in 1908, PVSC could have required those communities with combined sewers-- through regulation, rate design and general enforcement-- to begin the process of sewer separation at the outset. Later, as the original combined sewers needed to be upgraded or replaced to accommodate new development, or simply as a result of older lines wearing out, many of these sewers could have been gradually replaced, mitigating the economic stress of undertaking a complete sewer separation program all at once. It would have also addressed the fundamental operational problem that still causes PVSC to discharge untreated sewage to the Passaic River today.

Instead of taking these steps to implement its original design standard, PVSC incentivized inaction through its billing practices. Common industry practice is to implement billing systems that encourage good performance and discourage poor performance, such as

---

[17] *Report on Quality of the Interstate Waters of the Lower Passaic River and Upper and Lower Bays of New York Harbor*; Federal Water Pollution Control Administration; U.S. Dept. of Interior (November 1969), p. viii-xi.

[18] *Id.*

[19] Elson T. Killam Associates (1976); p. 16-19.

10

ALCD-PUBCOM_0001476

through charging higher rates to those who contribute storm water through combined sewer systems. But rather than impose charges to encourage elimination of combined sewer flows, PVSC provided billing credit adjustments to the municipal members based on the portion of wastewater discharged to the Passaic River, removing any economic incentive to make necessary improvements.

In choosing to rely on bypassing and CSOs to regulate flow, PVSC delayed and avoided capital costs for necessary improvements and addressing combined sewers, which created an economic benefit to PVSC and the District municipalities. Over 30 years ago, in 1976, PVSC conducted an evaluation of various available alternatives for elimination of overflows and bypasses. Cost estimates ranged from $650 million to $2.5 billion.[20] PVSC took no action to implement any of these options (while most other major U.S. urban combined sewer systems long ago began major sewer separation projects). To date, PVSC has never implemented any capital program for CSO and bypass elimination, and PVSC continues to bypass on a regular basis with little reduction in discharge volume or frequency.

PVSC's egregious failures over decades warrant assessment of a significant share. Given its intentional and knowing bypasses, design failures, and maintenance failures, PVSC should be assigned one of the largest shares, perhaps second only to the share of the primary discharger of dioxin to the Passaic River, OCC. *See, e.g., Gould, Inc. v. A&M Battery & Tire Serv.*, 987 F. Supp. 353 (M.D. Pa. 1997) (operator of battery recycling facility site allocated 75% due to "lack of care" and continuous failure to implement routine practices to minimize discharges, as compared to 25% allocation to generator defendants who sent batteries to site expecting them to be recycled).

### b. PVSC actively and intentionally discharged risk-enhancing and remedy-driving COCs through its intentional use of system bypasses and combined sewer overflows.

PVSC's deliberate actions and inaction are directly responsible for the contamination in the River, including but not limited to PCBs. Based on data from PVSC's own engineering studies, PVSC personnel intentionally bypassed approximately 615.6 billion gallons of untreated sewage from 1924 through 2016. It is further estimated that wet weather overflows through PVSC's and the Municipalities' CSO outfalls similarly discharged nearly 570 billion gallons during this same period, based on rainfall data and flow measurements. That is, PVSC has released, through intentional bypasses and a negligently designed and maintained, and undersized system, approximately **1.2 trillion** gallons of untreated sewage containing COCs to the River.

---

[20] *Id.*, p. xxx; *see also* Elson T. Killam Associates, *Combined Sewer Overflow Facility Plan, Phase* I, Vol.1; (1983), p. 4-1.

11

ALCD-PUBCOM_0001477

This sewage contained significant amounts of PCBs. Various data points from different locations and later times provide likely conservative estimates of PVSC's contribution of PCBs that, but for PVSC's actions and inactions, would have otherwise been conveyed to the PVSC treatment plant and kept out of the Passaic River.

Using PCB concentrations from a 1978 EPA study of PCBs in the City of Baltimore municipal sewer system – which is similar in size, treatment capacity, flow rate, drainage area, and industrial user profile – provides an instructive basis for estimating concentrations of PCBs in the PVSC system at and before 1978. Assuming similar concentrations in the PVSC system during the period 1930-1976 only (from the start of commercial PCB use until the national ban on PCB sales[21]), and based on calculated discharge amounts from PVSC discharge records, PCB discharges from PVSC's overflows and bypasses would be estimated to be:

| | |
|---|---|
| PVSC CSO Overflow PCB Mass: | 34,781 lbs. |
| PVSC Bypass PCB Mass: | 56,832 lbs. |
| **Total PVSC PCB Mass:** | **91,613 lbs.** |

This estimate, while conservative, is nearly *double* the amount of PCBs estimated by EPA to be in the sediment of the Lower 8 miles of the Passaic River – 51,809 lbs. – according to the OU-2 RI/FS.

As noted, this estimate is based upon contemporaneous data from a comparable municipal sewage system. Of course, EPA routinely applies data from other locations in evaluating conditions at sites that are the subject of remedial decisions. Indeed, EPA has considered data from other sites in connection with the remedy for the Lower Passaic River. Furthermore, this estimate is supported by site-specific data collected from sampling in the PVSC system in 1995, nearly twenty years after the national ban on PCBs. Even at that late date, significant levels of PCBs were measured in the PVSC system. While the 1995 levels undoubtedly were much lower than existed in earlier years, even if one assumed (incorrectly) that the levels measured in 1995 existed throughout 1930 to 2016, that would equate to approximately 2,500 pounds of PCBs discharged from PVSC's CSO outfalls and bypasses to the Passaic River. Even that artificially low amount would make PVSC one of the greatest PCB dischargers to the river. To be clear, PVSC's actual PCB discharge levels prior to 1995 unquestionably were much higher than those measured in that year, some two decades after the 1977 ban on PCB sales.

### 4. PVSC and the Municipalities are uniquely liable for discharges of risk-driving COCs into their systems by a large number of insolvent and defunct entities.

PVSC and the Municipalities are uniquely liable for discharges of risk-driving COCs into their systems by insolvent or defunct entities. PVSC and the Municipalities are unquestionably liable for these discharges and are themselves neither insolvent nor defunct.

---

[21] Commercial production of PCBs began in the United States in 1929. The PCB ban was implemented in 1977. *See* United Nations Environment Programme - Chemicals, *Regionally Based Assessment of Persistent Toxic Substances, North America Regional Report* (December 2002), p. 32.

CHICAGO | DENVER | GENEVA | HOUSTON | KANSAS CITY | LONDON | MIAMI | ORANGE COUNTY | PHILADELPHIA | SAN FRANCISCO | SEATTLE | TAMPA | WASHINGTON, D.C.

ALCD-PUBCOM_0001478

There are thousands of entities who discharged COCs into the PVSC system who have not been identified by EPA as PRPs. Some of these entities are now defunct or insolvent, but their share of liability would be borne by PVSC and, depending on the location of these entities, the Municipalities. PVSC (and the associated Municipality) represent the only solvent PRPs with any nexus to these insolvent or defunct entity waste streams, and would be solely liable for these shares. "[I]t would be inequitable to shift the burden of the costs associated with the quantities of hazardous waste in question, from the transporters and owner/operators who disposed of it and the absent generators who produced it to . . . generator defendants who have no connection to it." *United States v. Davis*, 31 F. Supp. 2d 45, 68 (D.R.I. 1998), *aff'd*, 261 F.3d 1 (1st Cir. 2001) (refusing to impose orphan liability on generators who had no connection to defunct entities' waste). *See also City of Bangor v. Citizens Communications Co.*, No. 02-183, Findings of Fact and Conclusions of Law (June 27, 2006), at 83 (allocating 40% share to city government sewer owner, which included entire shares of other non-party PRPs with whom city had nexus); *United States v. Consolidation Coal Co.*, 184 F. Supp. 2d 723, 732 (S.D. Ohio 2002), *vacated in part on other grounds,* 345 F.3d 409 (6th Cir. 2003) (landfill owners and operators, and not viable generator defendants, should bear defunct generator shares alone because the owners were "fully aware of [the site's] intended use as a solid waste disposal facility" and the operators "received, handled, and disposed of the [waste] on a day-to-day basis"); *United States v. Atlas Minerals & Chems., Inc.*, Civ. A. No. 91-5118, 1995 WL 510304 (E.D. Pa. 1995) (allocating defunct entity share to the sole party with nexus to that entity, not as an "orphan" share allocated to all parties).

The addition of defunct entity shares, to be identified in the allocation process, further increases the already significant liability of PVSC and the Municipalities, and further underscores the need to have PVSC and the Municipalities participate in the same allocation process encompassing all other PRPs so that their shares can be determined relative to the shares of all other participating PRPs, not in a vacuum.

## CONCLUSION

For the foregoing reasons, we request that EPA reconsider its intentions with regard to PVSC and the Municipalities, and include them in the allocation process with other participating PRPs.

We request that this letter be included in the administrative record for OU-2.

Sincerely,

David R. Erickson
SHOOK, HARDY & BACON, LLP

cc:    David Batson

13

ALCD-PUBCOM_0001479

# EXHIBIT 19

OxyChem's Comments in Opposition to Proposed Consent Decree,
*United States v. Alden Leeds, Inc., et al.*, Civil Action No. 2:22-cv-07326 (D.N.J.)

ALCD-PUBCOM_0001480

# Dioxin in the Passaic River (NJ): The Case for 2 Dioxin Sources

Edward A. Garvey,
Juliana Atmadja
Solomon S. Gbondo-Tugbawa,
Shane McDonald

The Louis Berger Group:
Morristown, NJ, Elmsford, NY & Exton, PA

*Battelle Sixth International Conference on the Remediation of Contaminated Sediments*

*New Orleans, LA*

*February 10, 2011*

     

*The Louis Berger Group, Inc.* 

ALCD-PUBCOM_0001481

# Outline

- Site Background
- Dioxin Ratios in New York Harbor.
- Dated Sediment Results for Dioxin
- Principal Components Analysis and Dioxin Ratios
- Conclusions

*Although the information in this presentation has been funded by the USEPA, it does not necessarily reflect the views of the agency and no official endorsement should be inferred.*

2

     

*The Louis Berger Group, Inc.*



ALCD-PUBCOM_0001482



ALCD-PUBCOM_0001483



ALCD-PUBCOM_0001484



ALCD-PUBCOM_0001485



ALCD-PUBCOM_0001486

# Possible Causes

- Sampling Artifact
  - (but result observed in three separate cores at approximately the same time horizon)
- Resuspension
  - (but impact limited to upper 3 cores)
  - (and other contaminants do not show impact)
- External Source
  - (but no known dischargers)

7

     

*The Louis Berger Group, Inc.*



ALCD-PUBCOM_0001487

# Dioxin ratios suggest change at time of event



     

*The Louis Berger Group, Inc.*

8



     

ALCD-PUBCOM_0001489

# First Principal Component Loadings for Dioxins and Furans in Dated Sediment Core Samples



     

*The Louis Berger Group, Inc.* 

ALCD-PUBCOM_0001490



**First Principal Component vs. Approximate Year of Deposition for High Resolution Core Samples**

Slices from RM 7.8 and RM12.6 have almost identical first principal components.

**Legend**
*High Resolution Core Slices*
- River Mile 1.4
- River Mile 2.2
- River Mile 7.8
- River Mile 11
- River Mile 12.6

*Slices with High Dioxin Concentration*
- RM 7.8, 2001 slice
- RM 11, 2001 slice
- RM 12.6, 2001 slice

**First Principal Component Shows Circa 2000 Event Pattern to be Distinct from Post-1970 Sediment Patterns**

     

*The Louis Berger Group, Inc.*



ALCD-PUBCOM_0001491



**Dioxin Ratio Shows Uniqueness of Circa 2000 Event**

*The Louis Berger Group, Inc.*



**Second Principal Component Loadings for Dioxins and Furans in Dated Sediment Core Samples**

     



The Louis Berger Group, Inc.

ALCD-PUBCOM_0001493





**Combined Principal Components Show Circa 2000 Event to Lie Between Patterns Observed Upriver and Downriver in the 1960s**

    





ALCD-PUBCOM_0001495

# Dioxin to DDT Ratio Shows Variation over Time Between Upper and Lower Reaches.

### Recent event is similar to 1960s conditions seen in the same area



(4,4'-DDD+4,4'-DDE)/2,3,7,8-TCDD Ratio
Dated Sediment Cores

16









*The Louis Berger Group, Inc.*



ALCD-PUBCOM_0001496



**Combining Ratios Identifies Unique Patterns of Current and Historical Contamination in the Upper and Lower Reaches of the Lower Passaic River**

     

*The Louis Berger Group, Inc.*

**17**

ALCD-PUBCOM_0001497

# Conclusions

- Dated sediment cores provide a detailed temporal record of relative contaminant loads to the estuary.

- Event circa 2000 is documented across three cores and can be identified as an external dioxin load, with a unique dioxin pattern.
  - Lack of response in other contaminants rules out sediment resuspension.

- Pattern observed in 2000 similar to one of 2 patterns observed in 1960s.

- Combined use of Dioxin and DDT ratios uniquely identifies upper reach contamination relative to lower reach in 1960s.

- Ratios in upper and lower reaches converge over time as sediments are mixed by tidal circulation.

- Temporary release circa 2000 has ended and estuary conditions have returned to 1990s levels.

18

     

*The Louis Berger Group, Inc.*  

ALCD-PUBCOM_0001498

# Questions???

- **www.ourpassaic.org**

- **www.ournewarkbay.org**

 USEPA

 USFWS

 USACE

 NJDEP

 NJDOT

 NOAA

*Although the information in this presentation has been funded by the USEPA, it does not necessarily reflect the views of the agency and no official endorsement should be inferred.*

**19**

      

*The Louis Berger Group, Inc.*



ALCD-PUBCOM_0001499

# EXHIBIT 20

OxyChem's Comments in Opposition to Proposed Consent Decree,
*United States v. Alden Leeds, Inc., et al.*, Civil Action No. 2:22-cv-07326 (D.N.J.)

ALCD-PUBCOM_0001500



# Memo

Date:     July 13, 2017

To:       Eugenia Naranjo
          Alice Yeh

From:     Edward Garland, P.E.

Subject:  Congener Analysis

## Introduction

This memorandum summarizes analyses performed to assess potential links between concentrations of 2,3,7,8-substituted dioxins and furans measured in the Lower Passaic River (LPR) sediments and concentrations of those chemicals in the containment cells on the former Givaudan facility in Clifton and on the former Diamond Alkali facility on Lister Avenue in Newark.

## Description of the Data Used

The data used in these analyses were collected by several groups. EPA collected samples from the former Givaudan and Diamond Alkali facilities in 2015 and from the river in 2013. The vast majority of the in-river data were collected by the Cooperating Parties Group (CPG) under EPA oversight between 2008 and 2013. Additional in-river data were collected by Tierra in 2009 in the Phase 1 removal area and in 2012 as part of their Focused Sediment Investigation. In 2011, in-river sediment data were collected at 15 locations by the Joint Defense Group.

Figure 1 presents concentrations of seventeen 2,3,7,8-substituted dioxin and furan congeners measured in three locations:

*   Upstream of Dundee Dam (referred to as background);
*   The containment cell on the former Givaudan facility in Clifton; and
*   The containment cell on the former Diamond Alkali facility on Lister Avenue in Newark.

hdrinc.com

1 International Boulevard, 10th Floor, Suite 1000, Mahwah, NJ 07495-0027
(201) 335-9300



645152

ALCD-PUBCOM_0001501

Eugenia Naranjo
Alice Yeh

July 13, 2017

Page 2

Gray shading identifies three congeners not included in the analysis; two because they are associated with combustion sources and are ubiquitous in the highly urbanized area surrounding the Lower Passaic River (1,2,3,4,6,7,8 HpCDD and OCDD), and the third (1,2,3,7,8,9-HxCDF) because a high proportion of the in-river data are non-detects.

For each of the three locations, data are shown as individual measurements (triangles), arithmetic averages (circles) and median concentrations (diamonds). Non-detected results are plotted as open symbols at the detection limit.

Individual measurements for any congener vary by more than an order of magnitude. For 2,3,7,8-TCDD, the mean concentration from the Lister Avenue cell is more than two orders of magnitude higher than the mean concentration from the Clifton cell, and the mean background concentration is lower than the Clifton cell mean concentration by over three orders of magnitude. For the penta- and hexa-dioxins, mean concentrations from the two containment cells differ by less than 35% and background concentrations average two to three orders of magnitude less than the containment cell means. For the furans, mean concentrations from the Lister Avenue containment cell are two to three orders of magnitude greater than mean concentrations from the Clifton cell for six of the nine furan congeners, and are a factor of approximately 20 to 60 times greater for the remaining three congeners. Background furan congener mean concentrations are generally one to 1.5 orders of magnitude lower than the mean Clifton concentrations. Congener concentrations were chosen to characterize the three source categories, rather than percentages of the sum of the 2,3,7,8-substituted dioxins and furans because concentrations are more appropriate in the mass balance type approach adopted for this analysis. Characterizing the congeners by percentage of the sum does not account for the order of magnitude differences in concentrations among the three sources.

Figure 1 also shows concentrations of three additional chemicals measured in the containment cells and a limited number of river sediment samples:

* Hexachlorophene (HCP)
* 1,2,4,5,7,8-Hexachloroxanthene (HCX)
* 2,4,6,8-Tetrachlorodibenzothiophene (TCDT)

Measured concentrations of HCX and HCP in the Clifton cell are approximately three orders of magnitude higher than either the Lister Avenue cell concentrations or background concentrations. Conversely, measured concentrations of TCDT in the Lister Avenue cell are approximately four orders of magnitude higher than either the Clifton cell concentrations or background concentrations. Based on these source-specific differences in concentrations, these three chemicals are referred to subsequently in this memorandum as markers.

hdrinc.com

1 International Boulevard, 10th Floor, Suite 1000, Mahwah, NJ 07495-0027
(201) 335-9300

ALCD-PUBCOM_0001502

Eugenia Naranjo
Alice Yeh                            July 13, 2017                                    Page 3

Figures 2 and 3 present the cumulative frequency distributions of the 14 dioxin and furan congeners, and the three additional chemicals (HCP, HCX, and TCDT) used in the analysis. Each panel on Figures 2 and 3 presents data for an individual congener, named in the upper left-hand corner of the panel. The ratio of the Lister Avenue cell mean concentrations to the Clifton cell mean concentrations is printed in the lower right-hand corner of each panel. Because the background data contain a substantial number of non-detect results and the detection limits varied considerably for any giver congener, the mean and median concentrations for each congener for the background data were determined with a maximum likelihood estimator (MLE) method (Kmenta, 1986), using an assumption of a log-normal distribution. The MLE estimate of the distribution of each congener is indicated by the blue line and the horizontal purple line indicates the mean background concentration used in the analysis for each congener. The variability of the concentrations, indicated by the slope of the data on the cumulative frequency distributions is similar (in log space) and suggests that concentrations could have varied over time, which would result in variable contributions to in-river concentrations.

## Approach

In order to assess potential links between the concentrations of 2,3,7,8-substituted dioxins and furans measured in LPR sediments and the concentrations of those chemicals in the Lister Avenue and Clifton cells, an equation was developed to describe the concentrations of those chemicals in the LPR sediments as a mixture of what was discharged from the former Diamond Alkali facility (as represented by the chemicals in the Lister Avenue cell), what was discharged from the former Givaudan facility (as represented by the chemicals in the Clifton cell) and what came into the LPR from over Dundee Dam (background). This equation assumes that there were no other major sources of 2,3,7,8-substituted dioxins and furans to the LPR sediments.

In this analysis, the concentrations in each of the three sources are specified as the arithmetic mean concentrations[1]. The approach adopted is to apply equation (1) to reproduce the mixture of fourteen 2,3,7,8-substituted dioxin and furan congeners in individual in-river sediment samples by blending the congener concentrations measured in the three sources. An optimization routine was used for individual in-river samples to determine values of the coefficients $a_j$, $b_j$ and $c_j$ that multiply the congener concentrations from each of the three sources to match the mixture of congeners in the in-river sample.

$$C_{i,j} = a_j C_{i,Lis\,r} + b_j C_{i,Clif\,on} + c_j C_{i,background} \tag{1}$$

---

[1] An alternate evaluation using median concentrations (rather than means) was investigated and the results were not sensitive to this change.

hdrinc.com

1 International Boulevard, 10th Floor, Suite 1000, Mahwah, NJ 07495-0027
(201) 335-9300

FAB 00129885

Eugenia Naranjo                                July 13, 2017                                    Page 4
Alice Yeh

Where:

| | | |
|---|---|---|
| $C_{i,j}$ | = | Concentration of congener ($i$) in in-river sediment sample ($j$) |
| $a_j$ | = | Multiplier of Lister waste cell congener concentration for in-river sediment sample ($j$) |
| $C_{i,Lister}$ | = | Lister waste cell concentration of congener ($i$) |
| $b_j$ | = | Multiplier of Clifton waste cell congener concentration for in-river sediment sample ($j$) |
| $C_{i,Clifton}$ | = | Clifton waste cell concentration of congener ($i$) |
| $c_j$ | = | Multiplier of background (upstream) congener concentration for in-river sediment sample ($j$) |
| $C_{i,Background}$ | = | Background concentration of congener ($i$) |

The coefficients $a_j$, $b_j$ and $c_j$, vary from in-river sample to in-river sample, but are applied to all 14 congeners to calculate concentrations of the 14 congeners for a single in-river sample. For each in-river sample ($j$), the attenuation or dilution of what was discharged from the former Diamond Alkali facility is described by the coefficient ($a_j$), which is multiplied by the concentrations of the congeners measured in the Lister Avenue cell ($C_{i,Lister}$) to calculate the concentrations in LPR sediment originating from the former Lister Avenue site. The attenuation or dilution of what was discharged from the former Givaudan facility is described as another constant ($b_j$) which is multiplied by the concentrations of the congeners measured in the Clifton cell ($C_{i,Clifton}$) to calculate the concentrations originating from the former Givaudan facility. Similarly the concentrations of the congeners measured in background sediments ($C_{i,background}$) are multiplied by a third constant ($c_j$) to calculate the concentrations originating from what flowed over Dundee Dam.

Figure 1 shows the concentrations of 2,3,7,8-substituted dioxins and furans that were measured in each containment cell: the arithmetic means shown in the figure are the $C_1$, $C_2$, $C_3$ and so on that were used in the equation. A program that solves many equations at once (Excel's Solver) was used to find the combination of $a_j$, $b_j$ and $c_j$ that, when applied to the group of fourteen congeners, would yield the best match of the pattern of 2,3,7,8-substituted dioxins and furans measured in a specific sample of LPR sediments.

The optimization of the coefficients, $a_j$, $b_j$ and $c_j$, which multiply the Lister Avenue, Clifton, and background concentrations,    was performed with Excel's Solver tool using an

hdrinc.com

1 International Boulevard, 10th Floor, Suite 1000, Mahwah, NJ 07495-0027
(201) 335-9300

ALCD-PUBCOM_0001504

objective function of the sum of the squares of the relative differences[2] between the calculated congener concentrations and data:

$$Diff_{Rl,j}{}^2 = \sum_{i=1}^{14}\left(\frac{c_{i,j,Prd} - c_{i,j,Obs}}{c_{i,j,Obs}}\right)^2 \tag{2}$$

Where:

$Diff_{Rel,j}{}^2$ = Square of relative difference for in-river sediment sample ($j$)

$C_{i,j,Pred}$ = Predicted concentration of congener ($i$) for in-river sediment sample ($j$)

$C_{i,j,Obs}$ = Observed concentration of congener ($i$) for in-river sediment sample ($j$)

## Comparison of Computed Congener Concentrations with Data

### Predicted versus Measured

For each individual in-river sample, the combination of $a_j$, $b_j$ and $c_j$, determined by the Solver optimization and the measured concentrations of each congener in the Lister Avenue and Clifton cells, plus background sediments, yields calculated concentrations of the 14 congeners in the LPR sediment sample. In order to test the results of the Solver optimization of equation (1), the calculated LPR sediment concentrations were compared to the measured LPR sediment concentrations (Figures 4 and 5). In each panel on Figures 4 and 5, a one-to-one line (perfect agreement between calculated LPR sediment concentrations and measured LPR sediment concentrations) is shown as a blue line, and a regression of predicted versus observed concentrations is indicated by the red line, with the slope and coefficient of determination ($R^2$) printed below the panel. Any non-detect data are plotted at half of the detection limit on these and subsequent figures[3].

The predicted concentrations are generally in good agreement with the data, with $R^2$ values greater than 0.9 in all but one of the regressions (the exception being 2,3,7,8-TCDF, with an $R^2$ of 0.82). Scatter around the regression line and differences between the regression and one-to one-line is expected given that only mean concentrations were used

---

[2] Alternate objective functions based on sum of 1) squares of model-data differences, 2) squares of log differences, absolute value of log differences, and maximum(model, data)/minimum(model, data). Only the use of the square of the model-data differences produced significantly different results and that option was rejected because it forced the results to be controlled by only the high concentrations.

[3] Alternate treatments of non-detects in model versus data comparisons were investigated (non-detect equals zero and non-detect equals the detection limit) and the results were not sensitive to these changes.

ALCD-PUBCOM_0001505

Eugenia Naranjo                              July 13, 2017                              Page 6
Alice Yeh

to characterize the three sources, and each showed variations in individual congener concentrations of more than an order of magnitude. For many of the congeners (e.g. 1,2,3,7,8-PeCDD, 1,2,3,4,7,8-HxCDD, and the higher chlorinated furans), the tight cluster of points near the one-to-one line over four or more orders of magnitude means that the $a_j$, $b_j$ and $c_j$, values found by the Solver do well in predicting measured LPR sediment concentrations. For other congeners (e.g. 2,3,7,8-TCDD, 1,2,3,6,7,8-HxCDD and 2,3,7,8-TCDF) the upper end of the concentration range is under-predicted, which could be caused by use of mean concentrations to characterize the three source terms.

Data for the marker chemicals were available for only a small fraction of the samples, and therefore, the marker chemicals were not included in the Solver optimization. The coefficients $a_j$, $b_j$ and $c_j$, determined by the Solver optimization, are applied to each of the 14 congeners in the three sources, but can also be applied to the mean concentration of the marker chemicals from the three sources. Predicted versus measured marker chemical concentrations are presented on the last three panels of Figure 5 and show good agreement for the majority of the HCP data. Predictions for HCX show a fair amount of scatter and a bias toward over-prediction, while TCDT concentrations are generally under-predicted, although with less scatter than HCX. The predictions for the marker chemicals could also be affected by use of a mean concentration to represent variable concentrations. These comparisons of computed and measured marker chemicals can be thought of as a validation step, in that the coefficients aj, bj and cj determined by the Solver optimization for the dioxin and furan congeners were applied directly to the marker chemicals without including the agreement for the markers in the optimization.

## Spatial Patterns

In addition to the previous evaluation of the agreement between predicted and observed congener concentrations (Figures 4 and 5) the results generated by the Solver optimization are evaluated further by assessing how the results vary in terms of spatial patterns of the contribution of a single source. Physical processes in the river are expected to influence spatial gradients in chemical concentrations discharged at different locations in a tidal estuary. This is evaluated by considering the calculated contribution of each source to the concentrations measured in river sediments, which can be calculated for each sample with the optimized coefficients, $a_j$, $b_j$ and $c_j$, and source concentrations, as:

$$F_{Lis\,r,i,j} = \frac{a_j C_{i,Lis\,r}}{a_j C_{i,Lis\,r} + b_j C_{i,Clif\,on} + c_j C_{i,Background}} \tag{3}$$

hdrinc.com

1 International Boulevard, 10th Floor, Suite 1000, Mahwah, NJ  07495-0027
(201) 335-9300

ALCD-PUBCOM_0001506

Eugenia Naranjo                                                July 13, 2017                                          Page 7
Alice Yeh

$$F_{Clifton,i,j} = \frac{b_j C_{i,Clifton}}{a_j C_{i,Lisr} + b_j C_{i,Clifton} + c_j C_{i,Background}} \qquad (4)$$

$$F_{Background,i,j} = \frac{c_j C_{i,Background}}{a_j C_{i,Lisr} + b_j C_{i,Clifton} + c_j C_{i,Background}} \qquad (5)$$

The spatial variation in the contribution of each source to each of the 14 congeners and 3 markers is summarized by the mean (plus and minus 2 standard errors) over all depth intervals versus river mile, binned by one-mile intervals for the Lister (Figure 6 and 7), Clifton (Figures 8 and 9) and background (Figures 10 and 11) components. The ratio of the mean congener concentration in the Lister Avenue cell to the mean in the Clifton cell is printed in the upper left-hand corner of each panel on Figures 6 through 11.

Spatial patterns of the calculated Lister Avenue fractional contribution to in-river congener concentrations (Figures 6 and 7) follow two general patterns. For congeners with high ratios of concentrations in the Lister Avenue cell to the Clifton cell (e.g. 2,3,7,8-TCDD and more highly chlorinated furans), the calculated fractions are high downstream, decrease gradually in the upstream direction to approximately RM 12 or 13, and then decrease sharply upstream of RM 12 or 13. For congeners with ratios of concentrations in the two cells near 1.0 (i.e. penta- and hexa-dioxins) the Lister fraction at the downstream end of the river is approximately 10% to 15% and decreases gradually in the upstream direction.

Spatial patterns of the calculated Clifton fractional contribution to in-river congener concentrations (Figures 8 and 9) also show two general patterns. For congeners with cell concentration ratios (Lister/Clifton) near 1.0, computed fractional contributions peak at approximately 50 to 75% between RM 10 and 11 and decrease rapidly upstream and gradually downstream. For congeners with higher cell concentration ratios, peak Clifton fractional contributions are generally less than 15%. The mean Clifton contribution of 2,3,7,8-TCDD decreases from approximately 15% at RM 14 to less than 10% downstream of RM 6 (Figure 8). Mean contributions to penta- and hexa-dioxins are highest between RM 9 and RM 11, and decrease sharply moving upstream, and gradually moving downstream. Downstream of RM 11, mean contributions to 1,2,3,7,8-PeCDD and 1,2,3,4,7,8-HxCDD are in the range of 60% to 75%. In this same reach, mean contributions to 1,2,3,6,7,8-HxCDD are between 40% and 55% and mean contributions to 1,2,3,7,8,9-HxCDD are between 45% and 65%. Lower contributions are computed for the furan congeners, with maximum values between RM 8 to RM 10 of near 10% for the tetra- and penta-furans and near 5% for the more-highly chlorinated furan congeners (Figure 9) (with 2,3,4,6,7,8-HxCDF having a higher peak near 15%). Downstream of RM 8, the mean Clifton contributions of the hexa-, hepta, and octa-furans is generally less than 5%.

hdrinc.com

1 International Boulevard, 10th Floor, Suite 1000, Mahwah, NJ 07495-0027
(201) 335-9300

Spatial patterns of the calculated background fractional contribution to in-river congener concentrations (Figures 10 and 11) are highest upstream, above the influence of estuarine circulation and decrease to approximately RM 9 to 10. Between RM 9 and RM 7, the fractional contributions increase and then generally decrease downstream of RM 7, but with less variation than in the reach upstream of RM 10.

These spatial patterns are reasonable given the location of the Clifton and Lister Avenue sources. The higher computed Clifton contribution to in-river 2,3,4,6,7,8-HxCDF concentrations (relative to the other hexa-, hepta, and octa-furans) is also reasonable, given the Lister Avenue to Clifton cell concentration ratio of 42 for 2,3,4,6,7,8-HxCDF (compared to ratios for other hexa-, hepta, and octa-furans ranging from 414 to almost 3700). Lastly, the spatial pattern of the computed Clifton contribution to the three marker chemicals is reasonable, with Clifton dominating the HCP and HCX concentrations and having a mean contribution to TCDT of less than 5% at all locations.

## Conclusions

The analysis described in this memorandum indicates that mixtures of fourteen 2,3,7,8-substituted dioxin and furan congeners measured in sediment of the LPR can be determined from blending the concentrations of the same 14 congeners measured in three sources: 1) the Lister Avenue cell of the former Diamond Alkali facility, 2) the Clifton cell of the former Givaudan facility, and background concentrations measured in sediments upstream of Dundee Dam. Concentrations of the 14 congeners predicted by applying Equation (1) to each in-river sediment sample fall reasonably tightly around regressions of computed versus measured concentrations (with the lowest $R^2$ of 0.83 and above 0.9 for the remaining 13 congeners). Multiple measurements of each congener in containment cells and upstream sediment show concentrations vary considerably about the mean concentrations used in this analysis, which leads to the expectation of variability in computed and measured concentrations in river sediments. For congeners more prevalent in the Clifton cell (e.g. 1,2,3,7,8-PeCDD, 1,2,3,4,7,8-HxCDD) and congeners more prevalent in the Lister Avenue cell (e.g. higher chlorinated furans), the predicted versus measured in-river concentrations form a tight cluster of points near the one-to-one line over four or more orders of magnitude, indicating that the Solver solutions for blending the three sources does well in predicting measured LPR sediment concentrations.

Given the relative magnitude of individual congener concentrations among the three sources and the location the sources, the results summarized as Clifton contribution are consistent with expected spatial patterns, considering how transport and fate processes affect discharges to a tidal estuary from spatially separated sources of different relative concentrations. For example, the Clifton contributions to congeners which represent a higher proportion of the Clifton cell data (e.g. penta- and hexa-dioxins), as compared to

hdrinc.com

1 International Boulevard, 10th Floor, Suite 1000, Mahwah, NJ 07495-0027
(201) 335-9300

the Lister Avenue cell data, are highest near the former Clifton facility and decrease gradually moving downstream.

The mean Clifton contribution of 2,3,7,8-TCDD decreases from approximately 15% at RM 14 to less than 10% downstream of RM 6. Mean contributions to penta- and hexa-dioxins are highest between RM 9 and RM 11, and decrease sharply moving upstream, and gradually moving downstream. Conversely, for congeners which represent a low proportion of the Clifton cell data (e.g. hexa- and hepta-furans), as compared to the Lister Avenue cell data, Clifton contributions of less than 10% are typically computed.

The spatial pattern of the computed Clifton contribution of the three marker chemicals, which is generated by using the coefficients $a_j$, $b_j$ and $c_j$, derived from the dioxin and furan congeners, is also reasonable, with Clifton dominating the HCP and HCX concentrations and having a mean contribution to TCDT of less than 5% at all locations. This comparison serves as a validation rather than a calibration and lends additional support to the conclusion that the analysis approach produced reasonable results.

The analyses described in this memo were conducted with alternate selections of several inputs or data treatments, and regardless of choice, the overall conclusion did not change. While the exact magnitude of contribution from the Clifton source changed with assumptions, substantial non-zero contributions to more than 50% of in-river samples were computed for penta- and hexa-dioxins. Based on each iteration in the suite of analyses, the Clifton contribution was needed to explain in-river congener concentrations.

The power in the approach is in fitting the fourteen 2,3,7,8-substituted dioxins and furan congeners included in the analysis all at once. Concentrations of a single congener could be explained by various combinations of the three sources, however, the adjustment of one source versus another carries the effect to all 14 congeners. Improvements in the agreement with data for one congener in a specific sample could degrade the agreement for another congener, if the adjustment is made to the wrong source. The Excel Solver optimization tool is ideal for performing the adjustments by adjusting all fourteen congeners from a single source by the same factor and making the adjustments to the three factors for the three sources simultaneously. The comparisons of the computed and measured concentrations indicate that the blending calculations provide reasonable predictions of the in-river congener concentrations.

## References

Kmenta, J., 1986. *Elements of Econometrics*, 2nd Edition, New York: Macmillan Publishing Company, pp. 176-187.

Eugenia Naranjo                          July 13, 2017                          Page 10
Alice Yeh



Figure 1. Concentrations measured in samples from upstream of Dundee Dam (background), and containment cells at Clifton and Lister Ave. sites.

hdrinc.com

1 International Boulevard, 10th Floor, Suite 1000, Mahwah, NJ 07495-0027
(201) 335-9300

ALCD-PUBCOM_0001510

Eugenia Naranjo
Alice Yeh

July 13, 2017

Page 11



Figure 2. Cumulative frequency distributions of data from upstream of Dundee Dam (background), and containment cells at Clifton and Lister Ave. sites. Page 1 of 2 page set.

hdrinc.com

1 International Boulevard, 10th Floor, Suite 1000, Mahwah, NJ 07495-0027
(201) 335-9300

ALCD-PUBCOM_0001511

Eugenia Naranjo
Alice Yeh

July 13, 2017

Page 12



Figure 3. Cumulative frequency distributions of data from upstream of Dundee Dam (background), and containment cells at Clifton and Lister Ave. sites. Page 2 of 2 page set.

hdrinc.com

1 International Boulevard, 10th Floor, Suite 1000, Mahwah, NJ 07495-0027
(201) 335-9300

ALCD-PUBCOM_0001512

Eugenia Naranjo
Alice Yeh

July 13, 2017                                                                                   Page 13



Figure 4. Cross-plot of predicted versus observed concentrations. Page 1 of 2 page set.

hdrinc.com

1 International Boulevard, 10th Floor, Suite 1000, Mahwah, NJ 07495-0027
(201) 335-9300

ALCD-PUBCOM_0001513

Eugenia Naranjo                                    July 13, 2017                                    Page 14
Alice Yeh



Figure 5. Cross-plot of predicted versus observed concentrations. Page 2 of 2 page set.

hdrinc.com

1 International Boulevard, 10th Floor, Suite 1000, Mahwah, NJ  07495-0027
(201) 335-9300

ALCD-PUBCOM_0001514

Eugenia Naranjo                                    July 13, 2017                                    Page 15
Alice Yeh



Figure 6. Mean +/- two standard errors of Lister fraction of in-river concentrations versus river mile, binned by one-mile intervals. Page 1 of 2 page set.

hdrinc.com

1 International Boulevard, 10th Floor, Suite 1000, Mahwah, NJ 07495-0027
(201) 335-9300

ALCD-PUBCOM_0001515

Eugenia Naranjo
Alice Yeh

July 13, 2017

Page 16



Figure 7. Mean +/- two standard errors of Lister fraction of in-river concentrations versus river mile, binned by one-mile intervals. Page 2 of 2 page set.

hdrinc.com

1 International Boulevard, 10th Floor, Suite 1000, Mahwah, NJ 07495-0027
(201) 335-9300

ALCD-PUBCOM_0001516

Eugenia Naranjo
Alice Yeh



Figure 8. Mean +/- two standard errors of Clifton fraction of in-river concentrations versus river mile, binned by one-mile intervals. Page 1 of 2 page set.

hdrinc.com

1 International Boulevard, 10th Floor, Suite 1000, Mahwah, NJ 07495-0027
(201) 335-9300

Eugenia Naranjo
Alice Yeh

July 13, 2017

Page 18



Figure 9. Mean +/- two standard errors of Clifton fraction of in-river concentrations versus river mile, binned by one-mile intervals. Page 2 of 2 page set.

hdrinc.com

1 International Boulevard, 10th Floor, Suite 1000, Mahwah, NJ 07495-0027
(201) 335-9300

ALCD-PUBCOM_0001518

Eugenia Naranjo
Alice Yeh

July 13, 2017

Page 19



Figure 10. Mean +/- two standard errors of background fraction of in-river concentrations versus river mile,
binned by one-mile intervals. Page 1 of 2 page set.

hdrinc.com

1 International Boulevard, 10th Floor, Suite 1000, Mahwah, NJ 07495-0027
(201) 335-9300

ALCD-PUBCOM_0001519

Eugenia Naranjo
Alice Yeh

July 13, 2017

Page 20



Figure 11. Mean +/- two standard errors of background fraction of in-river concentrations versus river mile, binned by one-mile intervals. Page 2 of 2 page set.

hdrinc.com

1 International Boulevard, 10th Floor, Suite 1000, Mahwah, NJ 07495-0027
(201) 335-9300

ALCD-PUBCOM_0001520

# EXHIBIT 21

OxyChem's Comments in Opposition to Proposed Consent Decree,
*United States v. Alden Leeds, Inc., et al.*, Civil Action No. 2:22-cv-07326 (D.N.J.)

ALCD-PUBCOM_0001521



WILLIAM S. HATFIELD
Director

Gibbons P.C.
One Gateway Center
Newark, New Jersey 07102-5310
Direct: (973) 596-4511 Fax: (973) 639-8320
whatfield@gibbonslaw.com

November 10, 2016

**VIA FEDEX**

Sarah Flanagan
Regional Counsel
United States Environmental Protection Agency
290 Broadway, 19th Floor
New York, NY 10007-1866



   **Re: Lower Passaic River Study Area**
     **Former Givaudan Fragrances Corp. Facility,**
     **125 Delawanna Avenue, Clifton, NJ**
     <u>**Supplemental Response to 104(e) Request for Information (November 2016)**</u>

Dear Sarah:

  Givaudan Fragrances Corp ("Givaudan") herein provides additional information to supplement its prior submissions to the United States Environmental Protection Agency ("USEPA") in response to various Requests for Information pursuant to 42 U.S.C. § 9604(e) related to the former Givaudan facility in Clifton, New Jersey (the "Clifton Site"). The initial 104(e) request was served upon Givaudan on September 15, 1983 and responded to by letter dated October 26, 1983. A second 104(e) request was served upon Givaudan on May 13, 2004 and responded to by letters dated July 12, 2004 and June 27, 2006. A third 104(e) request dated September 2, 2009 was responded to in two parts by letters dated October 14, 2009 and December 3, 2009. These prior submissions included various documents and exhibits concerning the Clifton Site.

  Enclosed you will find Givaudan's Supplemental 104(e) Response dated November 2016, as well as two (2) binders containing the exhibits referenced within the Supplemental Response. Also, for your convenience, we have provided electronic copies of this submission on two (2) disks. Please note that two exhibits, Tab No.'s 3 and 45 in Binder Volume 1, have been withheld and designated as Confidential Business Information and are being provided to you under separate cover pursuant to 42 U.S.C. § 9604(e)(7)(C). Givaudan reserves the right to provide additional information and documentation in response to the USEPA's 104(e) requests as such information and documentation may become available.

  Finally, Givaudan requests a meeting with USEPA to discuss this information and the Agency's continuing work on the Source Investigation. Please provide us with proposed dates

451924

ALCD-PUBCOM_0001522

GIBBONS P.C.

Sarah Flanagan
November 10, 2016
Page 2

for a meeting at your earliest convenience. We look forward to meeting with USEPA. Thank you for your attention to this matter.

Sincerely,

William S. Hatfield
Director

Enclosures

ALCD-PUBCOM_0001523

## GIVAUDAN FRAGRANCES CORPORATION
## SUPPLEMENTAL RESPONSE TO 104(e) REQUEST FOR INFORMATION

United States Environmental Protection Agency ("USEPA") has issued several requests for information about the former Givaudan facility in Clifton, New Jersey (the "Givaudan Site" or "Clifton Site") with regard to the Lower Passaic River Study Area. USEPA's requests have sought information regarding the following general categories: the history of the former Givaudan Site, plant production information, liquid and solid waste management, permits, material and waste testing data, plant demolition, and remedial actions, with a specific focus on the compound identified as 2,4,5 Trichlorophenol ("TCP") and a product manufactured using TCP known as Hexachlorophene (a/k/a "G-11"). Givaudan's prior responses to USEPA were based upon the information and data then available. Givaudan hereby supplements its prior 104(e) responses dated October 26, 1983, July 12, 2004, June 27, 2006, October 14, 2009 and December 3, 2009 for the Clifton Site.

Since 2009, Givaudan has met with USEPA on several occasions and has exchanged correspondence concerning the former Clifton facility and its alleged nexus to contamination in the Lower Passaic River. USEPA has expressed interest in obtaining additional information related to the Clifton Site conditions over time, including the former plant process sewer system. Specifically, USEPA has sought confirmation of when the former Givaudan Site connected to the City of Clifton sewer system, which discharges to the Passaic Valley Sewer Commission ("PVSC") main trunk line that runs parallel to the Lower Passaic River along Route 21.

In an effort to respond to USEPA's requests, Givaudan has expended considerable efforts and resources to research and compile additional information concerning the former Givaudan Site. Those efforts included obtaining and evaluating additional historical aerial photographs, available historical sewer records, and other materials from public and other sources. The additional information gathered through Givaudan's efforts are provided in this supplemental 104(e) response and include:

(1) a collection of historical aerial photos and topographic information (with interpretative notes);
(2) additional sewer maps obtained from the City of Clifton and the New Jersey Department of Transportation ("NJDOT"), detailing when the sewer lines were installed in the area surrounding the former Givaudan site; and
(3) additional documents found in public and archived files related to other topics included in USEPA's requests for information.

Givaudan supplements its prior 104(e) responses with the enclosed binders, Volume 1 (Tab No.'s 1-55) and Volume 2 (Sewer Chronology, Exhibits A-T) (also provided via disk). The following

1

is a summary of the former Clifton facility information and documentation provided in this supplemental 104(e) response.

## HISTORICAL AERIAL PHOTOGRAPHY AND TOPOGRAPHIC REVIEW CONFIRMS NO SURFACE WATER DRAINAGE PATHWAY TO THE PASSAIC RIVER FROM THE FORMER GIVAUDAN SITE

Through private vendors and archived public sources, Givaudan obtained dozens of additional aerial photographs of the Clifton Site spanning the years 1931 to 2012 (*see* Tab 1 for all Aerial Photograph and Topographic Exhibits). An emphasis was placed on securing aerials that covered the early years of plant operations up through the 1970s. This information supplements the aerial photography submitted as part of the 2009 104(e) supplemental response. The source and scale of these photographs are noted within the Aerial Photograph Exhibits in the binder included with this supplemental response.

Several of these photographs include aerial stereo pairs, which allow a trained aerial photo interpreter to view greater detail to support the interpretations presented with the aerial photographs. There are also oblique aerial photographs that provide an additional viewing angle of the former Clifton site and the surrounding area. Based on the search conducted, the 1931 photograph is the earliest aerial available for the former Clifton Site.

In addition, the attachments include an 1870-1887 historical topography map (Aerial Photograph Exhibit 3), two aerial photographs that were photo digitized to obtain topographic information on a portion of the former Clifton site (Aerial Photograph Exhibits 19 and 24), and a 1979 aerial photograph that has been overlaid with the 1982 plant topography (Aerial Photograph Exhibit 32). Note that copies of Sanborn Maps for the years 1935, 1951, 1952, 1965, 1970 and 1984 are also provided for reference, which show the plant expansion over time (*see* Tab No. 36).

Aerial Photograph Exhibit 1 shows the plant at full build-out circa 1979, as well as the surrounding area. Plant building numbers and key roads around the plant are labeled for reference on this exhibit.

Aerial Photograph Exhibit 2 shows the dates on which Givaudan purchased the various lots that make up the entirety of the former Clifton Site, which includes buildings on both the north and south sides of Delawanna Avenue (the main east/west trending road that divides the plant property). However, the remainder of the aerial photography review focuses on the south side of Delawanna Avenue where production and waste management activities took place. As part of the aerial photo interpretation, the then current property line of the former Clifton Site at the time of the photograph is shown, illustrating actual ownership and conditions onsite and in the area surrounding the property at the time of the photograph. The property line transferred onto each

2

photograph is based on the property title history and the City of Clifton title maps (*see* Tab No. 37). The property title history identifies the parcels that Givaudan purchased over time that encompass the former Clifton Site, beginning in 1924 and ending with the last purchase in 1978 for the south side and 1982 for the north side (*id.*).

Aerial Photograph Exhibit 3 is the 1870-1887 historical topography map. The red outline shows the boundary of the former Clifton Site and the yellow line shows the area where topography was developed using digital plotting on the 1954 photograph (Aerial Photograph Exhibit 18) and the 1961 photograph (Aerial Photograph Exhibit 23). Aerial Photograph Exhibit 32 shows the 1982 plant topography overlain on a 1979 aerial photo. The 1870-1887 topography shows that prior to any development, Delawanna Avenue and the rail line along the western boundary of the former Clifton Site were present and their location and orientation have not changed since that time. Both Delawanna Avenue and the rail line are at a higher elevation compared to the former Clifton Site. The configuration of River Road was the same from that time until it changed on the eastern side of the property when Route 3 and Route 21 were constructed between 1959 and 1961. Within the former Clifton Site boundary (inside the red line), the lowest elevation is to the south along the rail line at River Road, which low point remained the same throughout the development of the property. The area to the east/northeast is a natural topographic high that was partially excavated over time to allow for plant expansion, and the eastern bluff that remains there is the current location of a residential community, which is elevated approximately 20 feet above the former Clifton Site.

The area east of the former Clifton Site (within the yellow line) is topographically higher than the Givaudan Site and that elevation has remained the same over time. Using digitized topography, Aerial Photograph Exhibit 19 (1954 photo) shows that the River Road/rail line location is the low spot, with higher elevations to the east along River Road.

One key observation on all of the historical aerial photographs is that there is no visible channelized flow or surface drainage feature visible on or off of the plant property. The alleged existence of a possible surface water pathway that could have conveyed storm water flow from the former Clifton property directly to the Passaic River is *not* supported by the historical aerial photo review, or the digital topography analysis completed on the historical photos. There is no evidence of a defined drainage swale either on or off the property to the Passaic River in any of the historical aerial photos, and topographic relief is higher around the property and significantly elevated to the east, with the lowest elevation consistently identified at River Road and the rail line to the south.

There was no overland path for runoff to the east from the former Givaudan Site to the Passaic River. Aerial Photograph Exhibit 24 (1961 photo) provides digitized topography after the construction of Route 3/Route 21, which shows that fill material was used for construction of

3

that roadways' current on/off ramps. The River Road/railroad area on the southern end of the plant remains the low point at the Clifton Site. Aerial Photograph Exhibit 32 shows the 1982 topography overlaid on the 1979 aerial photo, which confirms that the River Road/railroad area remained the low point at the Clifton Site. With higher elevations to the east, and the unchanged presence of Delawanna Ave. along with the railroad on the north and west sides of the plant, the only location for surface water runoff from the former Clifton Site would have been the juncture of River Road and the rail-road at the southern end of the plant. Surface water runoff (if any) only occurred during extreme precipitation events as storm water was collected in the onsite pond or percolated into the unpaved areas at the property. Any surface runoff would have been collected in the City of Clifton storm sewer system on River Road near the railroad underpass (*see* Tab No. 50).

## FROM THE LATE 1940s THROUGH EARLY 1950s, THE FORMER CLIFTON SITE HANDLED PROCESS WASTEWATER ONSITE

The remaining aerial photographs document site development over time. Key observations include the presence of three enclosed water features on the Clifton Site. Two of these features are first visible on the 1947 aerial photograph (Aerial Photograph Exhibit 8): a thin elongated feature believed to be the Spent Acid Pit ("SAP") referred to in earlier submittals, and the area known as the storm water pond, which remains visible until the plant is closed. The third enclosed surface water feature is clearly visible on the 1949 Oblique (Aerial Photograph Exhibit 12), adjacent to the SAP and north of the storm water pond. That feature appears to be an impoundment that handled process waste water. By 1953 (Aerial Photograph Exhibit 16), the only surface water feature visible is the storm water pond. The SAP no longer contains standing liquid, and there is no remaining evidence of the third water feature. The occurrence and eventual disappearance of the SAP and third surface water feature support prior information submitted to USEPA that the plant used the SAP and third surface water feature to handle plant process waste water and possibly non-contact cooling water, while the storm water pond was consistently used for collecting rainwater until plant closure (*see* Tab No. 27, well driller logs confirming the use of onsite pits for liquid waste disposal in 1949). The documentation submitted to USEPA indicated that, prior to 1947, waste was discharged onsite into cesspools and pits. Some liquid waste (solvents) was also used as supplemental fuel in the plant boiler. The boiler house is visible on the 1947 photograph, and also may be present in the 1940 photograph.

In addition to the interpretation of aerial photography and the sewer chronology, Givaudan located a separate document from a well driller who did work at the plant, which confirms that plant waste was disposed into pits (e.g. the SAP and third water feature) (*see* Tab No. 27). Further, a 1951 Givaudan memo discusses the recovery of G-11 from the former waste pits (*see* Tab No. 48), which also supports the facility's practice of discharging and handling its process

4

ALCD-PUBCOM_0001527

waste water from G-11 on site before the plant connected to the city sewer line on River Road by 1951-52.

## THE GIVAUDAN SITE WAS CONNECTED TO THE CLIFTON CITY SEWER SYSTEM AS EARLY AS 1926 AND NO LATER THAN 1951/1952

As documented in prior submittals, the earliest engineering drawing referencing a plant sewer system for the Clifton Site is dated 1946. Until that time, the documentation indicates that process waste generated by the plant was disposed of in cesspools and pits, with some spent solvents used as supplemental fuel in the plant boiler. The installation of a dedicated plant sewer system in 1946 and the appearance of the SAP in 1947, followed by the development of a third surface water impoundment by 1949, supports the prior information that plant process waste water was initially all handled onsite. Also, an onsite storm water management system was evident by 1947 and is supported by the appearance of the storm water pond and a storm water conveyance system (1946 engineering drawing), which remained in use until the plant closed.

Regarding the Clifton Site's connection to the City of Clifton sewer system, Givaudan provides the following information along with some background documentation (*see also* attached Sewer Chronology with Exhibits A-T). The City of Clifton (formerly Acquackanonk Township) began the process of planning for a dedicated sewer system in the early 1900s. By 1911, a contract was in place with the Passaic Valley Sewerage Commission ("PVSC") to construct a sewer system that would connect to the main trunk line that PVSC planned to install parallel to the Passaic River. There is documentation in historical City of Clifton records that parts of the City had sewer access before the 1920s (*see* Tab No. 25). By the early 1920s, the City had passed several resolutions for the design and installation of a dedicated sewer system for the majority of Clifton. With the completion of the PVSC trunk sewer by 1921, the City began adding connections for the discharge of its sewage to the PVSC.

According to City of Clifton meeting notes, the majority of the City sewer system was in place and operating by 1927 (*see* Exhibit C to Sewer Chronology). Copies of sewer maps for the Delawanna area of Clifton, which include Delawanna Avenue, River Road and Oak Street in the vicinity of the former Givaudan Site, indicate that these sewers were installed by 1927. In 1930, the City passed Ordinance #989, which prohibited the discharge of sewage into the Passaic River or its Tributaries (*see* Exhibit H to Sewer Chronology). Subsequently, a series of ordinances were passed requiring hook ups by all businesses in Clifton to the City sewer when it was installed and establishing rates for sewer usage. A 1945 City Planning map shows that essentially the entirety of the City had both sanitary and storm sewers by that date (*see* Tab No. 51). There is no evidence to support any allegation that the City of Clifton sewer line could have discharged to the Yantacaw Pond, the Third River, or the Passaic River. The Clifton sewer

5

system along Delawanna Avenue, River Road, and Oak Road was connected to the PVSC system by 1926-27.

In 1951-1952, an additional sewer line was installed on Delawanna Avenue to collect domestic sewage from the residential area constructed on the bluff to the east of the former Clifton Site. One of the drawings generated as part of this construction indicates that the Givaudan Site was already serviced by a City sewer (*see* Exhibit P to Sewer Chronology), which sewer line is believed to have been in place since 1926/1927.

The connection of the plant process waste stream (Outfall 001) to the River Road sewer system appears to have been made no later than 1951-52, and perhaps several years earlier. The City of Clifton sewer maps indicate that this stretch of River Road had sewer lines installed in 1927 (*see* Attachment E to Sewer Chronology). However, Givaudan did not have access to this area until it purchased Parcel 3 in 1939 (*see* Aerial Photograph Exhibit 2). The latest a sewer connection would have been made is 1951-52, as it coincides with the absence of the large rectangular surface water impoundment and the appearance of Building 74, which is identified as part of the Clifton Site's early waste water pre-treatment system (*see* Aerial Photograph Exhibit 14). Also, the SAP is no longer visible by the 1953 aerial photo and Building 83 is present, which is designated as a Waste Neutralization System (*see* Aerial Photograph Exhibit 16). A review of New Jersey Department of Transportation ("NJDOT") engineering drawings for the Route 3/21 project show that the former plant had connected to the River Road sewer before 1955 (*see* Exhibit T to Sewer Chronology). Based on these documents, Givaudan believes that the Clifton Site may have connected to the River Road sewer line as early as 1946, but no later than 1951-52. This conclusion is supported by the aerial photo documentation, the local ordinances in place, and the NJDOT engineering drawings, as well as facility documents.

As discussed above, based on the aerial photo interpretation, there was no defined surface water runoff or pathway from the Clifton Site to the Passaic River, and that plant process waste effluent was contained on the property prior to connecting to the City sewer system. Further, based on the historical sewer documentation, it is evident that the former Givaudan Site was connected to the Delawanna Avenue sewer line as early as 1927 and to the River Road sewer line as early as 1946, but no later than 1951-52. Additional support for this conclusion is contained within Tab No. 35, which includes 1953 correspondence related to Givaudan's agreement to repair sewer lines on River Road, and a reference to 1946 correspondence related to maintenance responsibility.

## ADDITIONAL DOCUMENTS RELATED TO THE GIVAUDAN SITE OPERATIONS

In the course of reviewing archived information and other public sources, Givaudan located additional documents that are responsive to USEPA's prior 104(e) requests. The enclosed Binder

6

(Volume 1) includes those documents and provides an index and summary of each document. The following is a brief overview discussion of these additional reference materials.

## GIVAUDAN'S MANUFACTURING PROCESS AND STRICT QUALITY CONTROLS ON ITS TCP FEEDSTOCK RESULTED IN MINIMAL (IF ANY) TCDD CONTENT

Additional information from published sources indicates that it was highly unlikely that Givaudan's G-11 manufacturing process generated TCDD because it used acidic conditions and low temperatures in its process (*see* Tab No.'s 23 and 26). Documents prepared by Dow state that TCDD may be produced during use of TCP under alkaline conditions and in temperatures greater than 100 degrees centigrade, which is distinct from the acid process employed at Givaudan (see Tab No. 32). These documents provide an independent technical basis for the conclusion that the Givaudan G-11 manufacturing process would not have generated TCDD.

An independent investigation of TCP and TCDD was conducted by the National Institute for Occupational Safety and Health ("NIOSH"), led by Dr. Fingerhut. In 1983, Dr. Fingerhut studied and researched the potential threat to workers at plants that produced and/or handled TCP and related chemicals known to be associated with TCDD. The results of her work were published for each facility studied, including an evaluation of the former Givaudan Site. One of Dr. Fingerhut's key findings was that the Givaudan Site had the lowest range of TCDD in its TCP and G-11, whereas the highest concentration of TCDD was found in plants where Agent Orange was produced, such as the Diamond Alkali site in Newark, New Jersey (*see* Tab No.'s 23, 46, and 47).

Documents provided to USEPA in 1983 summarize available information on Givaudan's 1948/1949-era pilot production of TCP and the management of waste generated from that process. Those documents indicate that the TCP produced by Givaudan, and used to manufacture G-11, was purified and therefore had lower TCDD content. Based on information gathered by Givaudan in 1983, the TCP waste products were drummed for disposal and picked up by waste haulers (*see* Tab No.'s 2 and 3). A 1967 memo states that Givaudan provided its TCP production and purification process to Hooker Chemical in return for Hooker agreeing to be the primary supplier of TCP to Givaudan (*see* Tab No. 52). This agreement gave Givaudan confidence that the Clifton Site would be supplied with high quality TCP, with low TCDD content, for use in producing G-11. Historical testing of Hooker Chemical TCP process waste streams demonstrated that the TCDD generated from the production of TCP was captured in the still residue and crude charged to the still material, which purified the TCP to reduce impurities, including TCDD content (*see* Tab No.'s 10 and 11).

In August 1976, USEPA visited the former Givaudan Site and obtained three samples from the TCP material on hand for testing (*see* Tab No. 28). USEPA's testing confirmed the TCP results

ALCD-PUBCOM_0001530

that Givaudan shared for the same material, which was in the low part per billion range for TCDD (*see* Tab No. 29).

In 1977, Givaudan met and contracted with Dow as a TCP supplier, requiring Dow to meet Givaudan's specifications for TCP to manufacture its G-11 (*see* Tab No.'s 30, 31, and 32). These documents support Givaudan's consistent approach to quality control for the TCP raw material used to make G-11, which required a purified form of TCP with low impurities. In 1978, Dow TCP drums were tested and confirmed TCDD concentrations at less than 0.01ppm (*see* Tab No. 33).

A 1983 Givaudan memo states that the production of up to 2,200 pounds of G-11 was lost during the State-imposed temporary shutdown of the G-11 operation pending the results of the TCDD investigation (*see* Tab No. 40). At that time, Givaudan performed additional testing of TCP to confirm that each lot of TCP had low levels of TCDD so that it could be used when G-11 production was allowed to resume. Testing confirmed that the TCP lots contained less than 1 part per billion of TCDD. Documentation also confirms that buildings 58, 59, and 60 were cleaned and that all waste material from this work was stored in building 54 (*see* Tab No. 42). Also provided is additional documentation related to the duties of the G-11 operators, which details each step of the manufacturing process and documents how waste residues were reclaimed for reuse in the process, collected in containers for disposal, and acid waste and process water was sent to the sewer (*see* Tab No.'s 44 and 45). In addition, the G-11 process had a catch-all tank that caught solids and residues before discharging waste water to the sewer.

In its prior 104(e) responses, Givaudan provided results of TCP and G-11 testing available at that time. Routine testing of G-11 for TCDD was in place by at least 1978 (*see* Tab No. 39). Included with this submittal is additional testing data to show that Givaudan maintained tight quality control on specifications for both the TCP raw materials and G-11 product in their manufacturing process (*see* Tab No.'s 6, 7, 8, 9 and 10). Givaudan imposed similar quality control on its raw material suppliers when evaluating options for purchasing TCP (*see* Tab No. 17). Testing of G-11 was also completed in 1983 by the Food and Drug Administration (FDA) to document the quality of the material. After these tests, the FDA took no further action with respect to Givaudan's G-11 product (*see* Tab No. 43).

## GIVAUDAN'S WASTE MANAGEMENT PRACTICES PREVENTED OFFSITE MIGRATION OF CONTAMINATION

In prior 104(e) responses, Givaudan provided summary tables of the quantity and disposal locations for waste generated during the remediation. Attached documentation demonstrates that any TCDD-impacted soil identified at the Clifton Site was excavated, placed in drums and stored inside secured areas protected from the weather pending decisions on final handling of this

8

material (*see* Tab No. 4). In addition, Givaudan has located copies of receipts and waste manifest forms obtained from archived files that provide supporting documentation concerning TCP and G-11 waste drums disposed between 1978 and 1983 (*see* Tab No.'s 13, 14 and 16). Separate documentation was found for the removal and disposal of PCB oils and G-11 filter cake in 1982 (*see* Tab No. 15). In prior 104(e) responses, Givaudan provided information that waste solvents were used as a fuel supplement for the plant boilers. Additional supporting documentation is provided herein (*see* Tab No.'s 20 and 21).

## TCDD-IMPACTED SOIL REMEDIATION

In its prior submissions, Givaudan provided USEPA with the results of the 1980s TCDD soil investigation, including the reports and maps prepared as part of the remedial work completed under the Administrative Consent Order (ACO) that Givaudan entered into with the State of New Jersey. Included with this submittal are additional communications with the NJDEP related to the investigation and remediation work, which document various approvals and agreements between the parties (*see* Tab No.'s 18, 19 and 22). As noted in the March 5, 1987 Administrative Consent Order for TCDD, results of the investigation conducted by Givaudan under the supervision of NJDEP, in conjunction with investigations by USEPA and the Department of Health, confirmed that there was "no evidence that TCDD contamination has migrated off the Site." (*See* Tab No. 24, at ¶32).

## USEPA PASSAIC RIVER SOURCE INVESTIGATION

In August 2015, USEPA conducted soil sampling within the containment cell at the Clifton Site. Lockheed Martin (LM) and Scientific Engineering, Response and Analytical Services (SERAS) conducted this work and AMO Environmental Decisions was retained as the Licensed Site Remediation Professional ("LSRP"). The "Waste Cell Repair Report" provided by USEPA's LSRP noted that the asphalt cap was thicker than expected. In addition, field change forms prepared by SERAS noted that the material to be sampled was at a much greater depth than expected. Ultimately, USEPA's sampling confirmed that concentrations of TCDD within the cell at the Clifton Site were all below 10 ppb (*see* Tab No. 53). The materials that USEPA sampled in the cell are the soils around the plant that were sampled and remediated under NJDEP oversight, which resulted in the issuance of an approved No Further Action letter in 2002. USEPA's investigation confirmed that only low levels of TCDD were identified and properly remediated at the Clifton Site.

## CONCLUSION

Givaudan has provided documentation that the G-11 process wastewater was handled onsite at the plant until 1951-52 (at the latest), before it was discharged to PVSC via the Clifton City

ALCD-PUBCOM_0001532

sewer system. After Givaudan acquired land that abutted River Road as part of the plant expansion in 1939, the facility connected to the River Road sewer, which was required by local ordinance. The facility's sewer connection at Delawanna Avenue could have been made as early as 1927, as the City sewer maps indicate that the Delawanna Avenue line was installed in 1927, and later sewer maps show that a connection at the location of the former Givaudan plant was in place.

A review of City of Clifton ordinances, meeting notes, aerial photography, topography, and sewer maps confirms that Givaudan did not discharge its wastewater to Yantacaw Pond, the Third River, or the Passaic River. Further, there was no overland drainage ditch or pathway from the Clifton Site to the Passaic River. Multiple lines of evidence support the fact that the lowest point of elevation on the Givaudan Site was to the south at River Road adjacent to the rail line, and that elevations were higher to the north along Delawanna Avenue and to the east where the residential neighborhood is located, such that no surface water runoff could flow off the plant property other than the low point at River Road and the rail line.

Finally, historical documents and sampling data confirms that the TCDD level in the TCP used to make G-11, and the G-11 product itself, was carefully monitored to follow strict quality control guidelines. This conclusion is also supported by third parties that independently reviewed Givaudan's G-11 manufacturing process. These conclusions are confirmed by the historical documents and recent USEPA sampling data from its investigation of the Clifton cell in 2015.

ALCD-PUBCOM_0001533

CERTIFICATION OF SUPPLEMENTAL RESPONSE
TO REQUEST FOR INFORMATION

State of New Jersey

County of Morris

I certify under penalty of law that I have personally examined and am familiar with the
information submitted in this document (Supplemental Response to EPA Request for
Information), and that based on my inquiry of those individuals immediately responsible for
obtaining the information, I believe that the submitted information is true, accurate, and
complete, and that all documents submitted herewith are complete and authentic unless
otherwise indicated. I am aware that there are significant penalties for submitting false
information, including the possibility of fines and imprisonment. I am also aware that my
company is under a continuing obligation to supplement its response to EPA's Request for
Information if any additional information relevant to the matters addressed in EPA's Request for
Information or the company's response thereto should become known or available to the
company.

John Trombley
Givaudan Fragrances Corp.
Head of Consumer Products

SIGNATURE

Sworn to before me this 2ⁿᵈ day of November, 2016

Notary Public Signature

MEGHAN EVANS BEREZA
Notary Public
State of New Jersey
My Commission Expires Jul 19, 2017

2505270.1 111528-81674

# EXHIBIT 22

OxyChem's Comments in Opposition to Proposed Consent Decree,
*United States v. Alden Leeds, Inc., et al.*, Civil Action No. 2:22-cv-07326 (D.N.J.)

ALCD-PUBCOM_0001535

*N. C. Strebs*
*November 18, 1941*

1.
2.
3.

X. *Dahlbauch 10/21/*
X.
X. *Ms. Ansoff (Geneva)*
*12/6/68*
*H. Brandman - 12/6/77*
*J. Virgilio - 3/21/78*

## G-11 Process

### (Sodium Salt Method)

### Building 36-D.

After the condensation of 500 lbs. of Dowicide #2 with for-
maldehyde, 1,000 lbs. of ice are added to the 800 gallon steel reactor
(A) as is the present procedure.  The strong acid slurry is then
pumped into the existing 600 and 800 gallon lead-lined tanks (B)
and (C) which have been previously charged with 400 and 550 gallons
of water respectively.  The diluted slurry is pumped by means of
the same Duriron pump to a 60" acid resistant centrifuge (1).  The
acid filtrate containing 26% sulfuric acid and wash are sent to
the sewer.  The wet crude G-11 cake is discharged through the bot-
tom of the centrifuge into a cart and is transferred to building
47.  On the basis of experiments carried out in a 12" centrifuge
(RPM 1,500), the wet cake which contains 45% water at this stage
has a volume of 19 cubic feet and weighs 910 lbs.  Thus, on the
basis of a 2" cake in the centrifuge, 4 loads will be necessary.

### Building 47.

The wet G-11 cake is hoisted to a platform and dumped into
the 1,000 gallon steel tank (2) in which 750 gallons of water and
110 lbs. of caustic soda flakes have been previously heated to
about 80° C by means of live steam.  The temperature is then
raised to the boiling point by an additional amount of live steam
in order to obtain complete solution of the G-11.  The steam in-
let should be equipped with an appropriate silencer.

GIV_NBC_0664675

ALCD-PUBCOM_0001536

2.

Several pounds of Super-Cel are thrown into the hot alkaline solution. The solution is then pumped through a small washing type filter press, (4) (which has been previously heated to about 95° C), in order to remove dirt and a small amount of caustic insoluble resin. The filter should have a capacity of approximately 1 cubic foot and ample filtering area so as to permit filtration to proceed at the rate of 50 gallons per minute. (On the basis of some laboratory experiments the actual volume of cake should be only ½ cubic foot but for possible variations in the plant a volume of 1 cubic foot is suggested). The pipe lines to and from the filter press are wrapped with a copper steam coil. In addition, the live steam line connected to the bottom outlet of tank (2) is used to blow out the pipe line in either direction. The solution must be maintained above 90° C in order to prevent the precipitation of the G-11 sodium salt. If necessary, a small amount of live steam can be bled into the pump line by means of the above-mentioned steam line. (The solubility of the sodium salt can be increased by the use of an additional amount of caustic soda). The filtrate is returned to tank (2) until it becomes clear and it is then run into the 1,200 gallon steel kettle (5) which has been previously charged with 100 gallons of water.

The filter press is given a hot water wash and is blown with air. This wash water is also sent to tank (5). The press is dumped when time permits.

The pH of the hot alkaline solution is reduced to about 10.5 by means of the slow addition of approximately 95 pounds of 62% sulfuric acid from the lead-lined acid egg (8). The small lead-lined acid tank in building 45 which is no longer required for the Cuminaldehyde

GIV_NBC_0664676

ALCD-PUBCOM_0001537

3.

process can be used for this purpose. The sodium salt begins to precipitate when approximately one-half of the required amount of sulfuric acid has been added. The sodium salt precipitates in the form of long fibrous crystals which mat readily and make the slurry very thick. Therefore, very efficient and thorough agitation must be employed during the addition of the acid in order to prevent the precipitation of impurities at a lower pH which would exist in "patches" throughout the slurry if agitation is not thorough. Such impurities would be slow to redissolve on continued stirring. The acid inlet should be installed so that the acid does not run down the wall of the tank but falls clear of the sides.

The slurry is cooled to room temperature by circulating cold water through the jacket. (Steam should also be connected to this jacket in case it ever becomes necessary to heat the solution before precipitation as may be necessary after a shut down). A close fitting agitator is required for this cooling process as the sodium salt will deposit on the cooling surface and considerably retard the rate of cooling. This deposit is very soft and therefore a scraping type agitator is not necessary. (Sometimes this sodium salt deposit builds up to a thickness of more than 2" on the walls of the crystallizer located in 47 building. This crystallizer is equipped with a turbine type agitator).

After cooling to room temperature, the slurry is pumped to a 48" centrifuge (7). The pump must not be a close clearance pump as the G-11 sodium salt will not pass through the screen of a "Westco" type pump. Based on experiments in the 12" centrifuge, the G-11

GIV_NBC_0664677

ALCD-PUBCOM_0001538

4.

sodium salt cake weighs approximately 790 pounds, contains 50%
moisture and has a density of 60 pounds per cubic ft.  Thus, for
a 2" cake, 4 loads will be necessary in a 48" centrifuge.  The pH
of the filtrate is 10.5 and contains sodium sulfate and the sodium
salts of Dowicide and resinous by-products.  A bronze centrifuge
basket will probably be suitable, however, the possibility of con-
taminating the G-11 sodium salt with traces of copper should be
considered, as traces of copper are known to cause discoloration of
soap.

In this process, no attempt is made to recover the Dowicide
in the filtrate and therefore the filtrate is discharged to the
sewer.  More experiments will be made in the laboratory in order
to determine if the Dowicide content can be definitely reduced to
such a value that it will not be economical to recover it from the
filtrate and at the same time obtain a satisfactory yield.  If the
Dowicide must be recovered, additional equipment, i.e., a 1,200 gal.
lead-lined tank, pump and vacuum still will be required.

The G-11 sodium cake after washing with water in the centri-
fuge is discharged through the bottom of the centrifuge.  The cake
is hoisted to a platform and dumped into the 1,000 gallon lead-lined(9)
steel tank which has been previously charged with 800 gallons of
water.  The slurry is made acid to Congo Red by means of the addition
of approximately 80 lbs. of 62% sulfuric acid in order to decompose
the sodium salt and obtain the free acid.  Agitation in this tank
must also be thorough as the slurry is quite thick.  In addition, the
agitator must be capable of breaking up the G-11 sodium salt cake so
that the sulfuric acid can react with the individual particles and
thus insure the complete conversion of the sodium salt to the free acid.

GIV_NBC_0664678

ALCD-PUBCOM_0001539

5.

Sodium bicarbonate is then added in order to raise the pH to approximately 7.5 and the G-11 slurry is then pumped to a 48" centrifuge equipped with a bronze basket. The pump (10) should be similar to pump (6) as the G-11 clogs the strainers of Westco pumps. Based on a 2" cake approximately 5½ loads will be required to filter the batch. (Wt. wet cake - 680 lbs.; moisture 45%; density 42 lbs./1 cu. ft.). In view of the fact that more than 4 loads will be required to filter the batch, it may be advisable to use a 60" centrifuge. Experiments will be made in the laboratory to determine if the G-11 can be precipitated in a denser form and thus be able to filter the batch in less than 5 loads in a 48" centrifuge (cake thickness 2").

The filtrates from the centrifuges should run first to 200 gallon "catch all" tanks (separate one for each centrifuge) before flowing to the sewer so that in case the filter medium breaks or the filtrate does not run clear, no G-11 will be lost. The centrifuge pumps should be connected so that the cloudy filtrate in the "catch all" tank can be recirculated through the centrifuge.

After washing with water, the G-11 cake is dried in the existing vacuum shelf drier.

Capacity of Equipment.

With the exception of reactor (A), the above equipment should be capable of processing 3 batches (375 lbs. G-11 Refined per batch) or approximately 1,000 pounds per twenty-four hour day. In order to attain this production rate, at least 2 more or one larger reactor must be installed.

6.

If centrifuges cannot be obtained, consideration should be given to other types of filtration equipment such as a Vallez Filter which could replace either of the last two centrifuges (7) or (11), or a Sweetland Filter which could replace the centrifuge (7) in which the sodium salt is filtered.

H. G. Krebs

Delawanna, N. J.

November 18, 1941

GIV_NBC_0664680

ALCD-PUBCOM_0001541

# EXHIBIT 23

OxyChem's Comments in Opposition to Proposed Consent Decree,
*United States v. Alden Leeds, Inc., et al.*, Civil Action No. 2:22-cv-07326 (D.N.J.)

ALCD-PUBCOM_0001542

Patented Feb. 10, 1948

**2,435,593**

# UNITED STATES PATENT OFFICE

**2,435,593**

### PROCESS FOR MAKING BIS-(3,5,6-TRI-CHLORO-2-HYDROXYPHENYL) METHANE

Max Luthy, Ridgewood, and William S. Gump, Montclair, N. J., assignors to Burton T. Bush, Inc., New York, N. Y., a corporation of New Jersey

No Drawing. Application June 14, 1945, Serial No. 599,507

**17 Claims.    (Cl. 260—619)**

This invention relates to an improved process for making bis-(3,5,6-trichloro-2-hydroxyphenyl) methane (sometimes referred to also as 2,2'-di-hydroxy-3,5,6-3',5',6'-hexachloro diphenyl methane).

Bis-(3,5,6-trichloro-2-hydroxyphenyl) methane is a substance having desirable bactericidal and fungicidal properties. It may be employed to advantage in tooth pastes, ointments, creams, lotions and rubber goods, inter alia. In addition, when incorporated in small amounts in soaps, it exhibits the surprising quality—for a phenolic substance—of rendering such soaps germicidal.

We are aware of the prior art method for preparing bis-(3,5,6-trichloro-2-hydroxyphenyl) methane. This known method, as well as the bis-(3,5,6-trichloro-2-hydroxyphenyl) methane itself, has been patented by one of us. The known method involves the condensation of 2,4,5-trichlorophenol with formaldehyde in the presence of sulfuric acid. Large amounts of sulfuric acid are required in the patented process. Also, used therein during the condensation reaction are solvents like methyl alcohol. Moreover, the prior art condensation process calls for low temperatures, e. g., 0° to 5° C., and requires about 24 hours of reaction time.

In accordance with our present invention we avoid the use of large amounts of sulfuric acid, dispense entirely with the use of a solvent during the condensation reaction, conduct the reaction at elevated temperatures (thereby avoiding the need for expensive cooling equipment and material), and obtain substantially complete reaction within a period of minutes instead of hours. In economic terms, our present process results in savings in time and materials, reduction in costs, and increase in productivity of a given unit.

In accordance with our present invention, we react 2,4,5-trichlorophenol and a suitable formaldehyde-yielding material at an elevated temperature in the presence of a minor amount of strong sulfuric acid or oleum and over a period which need not exceed thirty minutes. The reaction products may be worked up in known manner (see U. S. Patent No. 2,250,480) to obtain bis-(3,5,6-trichloro-2-hydroxyphenyl) methane. Alternatively, the hereinafter-described novel purification method, forming a particular aspect of this invention, may be employed to yield substantially pure bis-(3,5,6-trichloro-2-hydroxy-phenyl) methane in a simple and commercially desirable manner.

Suitable formaldehyde-yielding materials which can be employed herein include paraform-aldehyde and trioxane. Any other substance which will yield formaldehyde under the reaction conditions may also be employed.

As the condensation agent, sulfuric acid may be employed in various acid concentrations. Excellent results have been obtained with sulfuric acid of 100% $H_2SO_4$ concentration up to and including oleum 20%. However, aqueous sulfuric acid solution of lower strength (e. g., 93% acid strength) and oleum of higher strength (e. g., oleum 50%) can also be employed. As will be understood by those skilled in the art, it is desired to bind the water formed during the reaction. Consequently, it is preferable to utilize oleum, e. g., oleum 20%.

The amounts of 2,4,5-trichlorophenol, formaldehyde-yielding substance and sulfuric acid employed can be varied over wide limits. It has been found advantageous to use the 2,4,5-trichlorophenol and formaldehyde-yielding substance in amounts such that there are present about 2 mols of the trichlorophenol to each mol of $CH_2O$. Especially desirable results are obtained when formaldehyde-yielding material is used in about 25% excess over that called for by the ratio of 2 mols of 2,4,5-trichlorophenol to 1 mol of $CH_2O$. When such an excess of formaldehyde-yielding material is employed it is found that there is a practically complete conversion of the trichlorophenol, thereby eliminating the necessity of having to separate or recover unreacted trichlorophenol.

One of the features of our process is the reduction in the amount of sulfuric acid used. Accordingly, it will be understood that it is desirable to use the smallest amount of sulfuric acid or oleum which is needed to accomplish the desired condensation of the trichlorophenol and $CH_2O$. We have found that especially desirable results are obtained when the quantity of acid or oleum used is of the order of about one third of the weight of the trichlorophenol employed.

The condensation may be conducted at elevated temperatures within a rather wide range. It is desirable to start the reaction at a temperature at or above the melting point of 2,4,5-trichlorophenol, and to maintain throughout the reaction period such temperature conditions as will permit of the stirring of the contents with equipment normally used for agitation. We have found that the initial temperature may be as low as 65° C. and that the temperature may be permitted to rise to 130° C. or even 150° C. during the reaction. If desired, the entire reaction may be conducted at the higher temperatures. In all

ALCD-PUBCOM_0001543

2,435,593

**3**

cases, as will be understood by those skilled in the art, means for controlling the temperature of the contents of the reaction chamber should be at hand.

Though we do not wish to be limited to any particular method of and order in bringing the 2,4,5-trichlorophenol, formaldehyde-yielding material and sulfuric acid or oleum together, we have found it desirable to introduce the 2,4,5-trichlorophenol and formaldehyde-yielding material first into the reaction vessel and then to raise the temperature to at least about 65° C. before introducing the sulfuric acid or oleum. Also, we prefer to add the sulfuric acid or oleum slowly, over a 10 to 15 minute period, though if suitable precautions are taken, e. g., to control the temperature of the contents of the reaction vessel within the aforementioned range, and if rapid dispersion of the acid is effected, the acid may be charged into the reaction vessel much more rapidly.

As will be understood by those skilled in the art, the process is not restricted to any particular length of time of reaction. Suffice it to say that the reaction should be conducted as long as it takes to convert substantially all of 2,4,5-trichlorophenol into bis-(3,5,6-trichloro-2-hydroxyphenyl) methane. The time that this will require will depend on various factors, such as the ratio and amounts of the reactants and condensation agent, the facilities available to remove the heat liberated by the reaction, and the temperature of reaction. We have found that the reaction is substantially complete in thirty minutes and, in some cases, five minutes are long enough.

As noted above, a particular aspect of the present invention involves a novel method of isolating in substantially pure form the bis-(3,5,6-trichloro - 2 - hydroxyphenyl) methane formed during the reaction. This novel method is much simpler and more commercially feasible than the known method of isolating and purifying the bis-(3,5,6-trichloro - 2 - hydroxyphenyl) methane formed by condensing 2,4,5-trichlorophenol and a formaldehyde-yielding material.

In general, the novel method involves the formation and isolation of a mono-alkali metal salt of bis-(3,5,6-trichloro-2-hydroxyphenyl) methane and the regeneration of the bis-(3,5,6-trichloro-2-hydroxyphenyl) methane by treatment of the mono-alkali metal salt with acid. Substantially pure bis-(3,5,6-trichloro-2-hydroxyphenyl) methane may be obtained from the regenerated bis-(3,5,6-trichloro-2-hydroxyphenyl) methane by crystallization from a suitable solvent, e. g., toluene or benzene.

In carrying out this novel method of isolating and purifying bis-(3,5,6-trichloro-2-hydroxyphenyl) methane the condensation of 2,4,5-trichlorophenol and formaldehyde-yielding material is effected in accordance with this invention and the contents of the reaction vessel are made alkaline by running it into an excess of an aqueous solution of a base, such as sodium or potassium hydroxide. Alkali-insoluble material is then filtered off through a suitable filter medium. Prior to filtration, the contents may be boiled for several minutes to facilitate solution of alkali-soluble material.

The pH of the alkaline solution is then brought down, preferably to about 10.3 to about 11. A suitable agent for this purpose is strong sulfuric acid, e. g., of 62% acid strength. The mono-alkali metal salt of bis-(3,5,6-trichloro-2-hydroxy-

**4**

phenol) methane precipitates out of solution at a pH within the range of about 10.3 to about 11. It is filtered and then washed with water. Unreacted 2,4,5-trichlorophenol and other impurities remain in solution. The mono-alkali-metal salt of bis-(3,5,6-trichloro-2-hydroxyphenyl) methane is then suspended in a large quantity of water and acidified, e. g. with 62% strength sulfuric acid. Bis-(3,5,6-trichloro-2-hydroxyphenyl) methane is thereby regenerated. Crystallization from a suitable solvent, e. g., toluene yields substantially pure bis-(3,5,6-trichloro-2-hydroxyphenyl) methane.

In order to explain the invention more specifically the following examples are given, but it is understood that they are for purposes of illustration and are not to be construed as limiting the scope of the invention.

*Example I*

A mixture of 198 grams of 2,4,5-trichlorophenol and 18.8 grams of paraformaldehyde were heated to 65° C. and well stirred. 65 grams of oleum 20% was added dropwise and the addition was so regulated that the temperature increased, without the application of external heat, until it reached 135° C. at the end of the acid addition, which took 10 to 15 minutes. The contents of the reaction vessel were stirred for two minutes more and then allowed to run into a solution of 100 grams of sodium hydroxide in 1000 cc. of water.

The reaction flask was washed with a solution of 25 grams of sodium hydroxide in 250 cc. of water. The combined alkaline solutions were heated to boiling for five minutes. A small amount (6 grams) of alkali-insoluble material remained and was filtered off. Sulfuric acid (62% H₂SO₄ content) was then added at room temperature dropwise under stirring to the filtrate until a pH of 10.3 was reached. This required about 80 grams of the acid. The mono sodium salt of bis-(3,5,6-trichloro-2-hydroxyphenyl) methane precipitated out of solution and was filtered and then washed with 200 cc. of water. The salt was then suspended in 2000 cc. of water and sulfuric acid (62% H₂SO₄ content) was added under stirring until the contents were acid to Congo red paper. This required about 30 grams of the acid.

The resulting bis-(3,5,6-trichloro-2-hydroxyphenyl) methane was filtered, washed with water until acid-free and dried to constant weight at 100° C. (170 grams, melting point 154°–158° C.) Crystallization of the 170 grams of dried bis-(3,5,6-trichloro-2-hydroxyphenyl) methane from 300 grams toluene yielded a first crop amounting to 105 grams of substantially pure bis-(3,5,6-trichloro-2-hydroxyphenyl) methane, having a melting point of 161°–163° C.

*Example II*

A mixture of 198 grams of 2,4,5-trichlorophenol and 18.8 grams of paraformaldehyde were heated to 65° C. and well stirred. 65 grams of oleum 20% was added dropwise and the addition was so regulated that the temperature increased, without the application of external heat, until it reached 135° C. at the end of the acid addition, which took 10 to 15 minutes. The contents of the reaction vessel were stirred for two minutes more and then allowed to run into a solution of 100 grams of sodium hydroxide in 1000 cc. of water.

The contents of the reaction vessel were stirred for 2 minutes more and then allowed to run into a solution of 150 grams of caustic potash flakes

ALCD-PUBCOM_0001544

2,435,593

5

(94% KOH) in 1000 cc. of water. The reaction flask was washed with a solution of 25 grams of caustic potash flakes in 250 cc. of water. The combined alkaline solutions were heated to boiling for 10 minutes and filtered while hot. A small amount of alkali-insoluble material remained on the filter. Sulfuric acid (62% $H_2SO_4$ content) was then added at room temperature dropwise under stirring to the filtrate until a pH of 10.3 was reached. This required about 80 grams of the acid.

The mono potassium salt of bis-(3,5,6-chloro-2-hydroxyphenyl) methane precipitated out of solution, was filtered off, and then washed with 500 cc. of water. The salt was then suspended in 2000 cc. of water and sulfuric acid (62% $H_2SO_4$ content) was added under stirring until the contents were acid to Congo red paper. This required about 30 grams of acid. The resulting bis-(3,5,6-trichloro-2-hydroxyphenyl) methane was filtered, washed with hot water until free of sulfuric acid and potassium sulfate and dried to constant weight at 100° C. (185 grams, melting point 154°–157° C.). Crystallisation of the 185 grams of dried bis-(3,5,6-trichloro-2-hydroxyphenyl) methane from 320 grams toluene yielded a first crop amounting to 115 grams of substantially pure bis-(3,5,6-trichloro-2-hydroxyphenyl) methane, having a melting point of 161°–163° C.

Similar results as to yield and product, i. e., the mono potassium salt of bis-(3,5,6-trichloro-2-hydroxyphenyl) methane, are obtained, if in this example the 150 grams of caustic potash flakes are replaced by a mixture of caustic alkalis consisting of 56 grams of caustic soda and 72 grams of caustic potash flakes.

The foregoing illustrates the practice of this invention which however is not to be limited thereby but is to be construed as broadly as permissible in view of the prior art and limited solely by the appended claims.

We claim:

1. In the process for preparing bis-(3,5,6-trichloro-2-hydroxyphenyl) methane by condensing 2,4,5-trichlorophenol with a formaldehyde-yielding substance, the improvement which comprises conducting the condensation at elevated temperatures and in the presence of a substance selected from the group consisting of sulfuric acid having at least about 93% $H_2SO_4$ content by weight and oleum, said substance being employed in an amount not substantially more than one-third the weight of the 2,4,5-trichlorophenol employed.

2. In the process for preparing bis-(3,5,6-trichloro-2-hydroxyphenyl) methane by condensing 2,4,5-trichlorophenol with a formaldehyde-yielding substance, the improvement which comprises conducting the condensation at elevated temperatures within the range of about 65° C. to about 150° C. and in the presence of a substance selected from the group consisting of sulfuric acid having at least about 93% $H_2SO_4$ content by weight and oleum, said substance being employed in an amount not substantially more than one-third the weight of the 2,4,5-trichlorophenol employed.

3. In the process for preparing bis-(3,5,6-trichloro-2-hydroxyphenyl) methane by condensing 2,4,5-trichlorophenol with a formaldehyde-yielding substance, the improvement which comprises conducting the condensation at elevated temperatures within the range of about 65° C. to about 150° C. and in the presence of a substance selected from the group consisting of sulfuric acid having at least about 93% $H_2SO_4$ content by weight and oleum, said substance being employed in an

6

amount equal to not more than one-third the weight of the 2,4,5-trichlorophenol employed.

4. The process for preparing bis-(3,5,6-trichloro-2-hydroxyphenyl) methane which comprises reacting 2,4,5-trichlorophenol with paraformaldehyde at elevated temperatures within the range of about 65° C. to about 150° C. and in the presence of a substance selected from the group consisting of sulfuric acid having at least about 93% $H_2SO_4$ content by weight and oleum, said substance being employed in an amount not substantially more than one-third the weight of the 2,4,5-trichlorophenol employed.

5. The process for preparing bis-(3,5,6-trichloro-2-hydroxyphenyl) methane which comprises reacting about 198 parts by weight of 2,4,5-trichlorophenol with about 18 parts by weight of paraformaldehyde in the presence of about 65 parts by weight of oleum 20%, at elevated temperatures within the range of about 65° C. to about 135° C.

6. The process for preparing bis-(3,5,6-trichloro-2-hydroxyphenyl) methane which comprises reacting about 198 parts by weight of 2,4,5-trichlorophenol with about 18 parts by weight of paraformaldehyde in the presence of about 65 parts by weight of oleum 20%, at elevated temperatures within the range of about 65° C. to about 135° C. for a period of about 5 to about 30 minutes.

7. In the process for preparing bis-(3,5,6-trichloro-2-hydroxyphenyl) methane by condensing 2,4,5-trichlorophenol with a formaldehyde-yielding substance, the improvement which comprises conducting the condensation at elevated temperatures and in the presence of a substance selected from the group consisting of sulfuric acid having at least about 93% $H_2SO_4$ content by weight and oleum, said substance being employed in an amount not substantially more than one-third the weight of the 2,4,5-trichlorophenol employed, and isolating the bis-(3,5,6-trichloro-2-hydroxyphenyl) methane in substantially pure form by forming and isolating the mono alkali metal salt of bis-(3,5,6-trichloro-2-hydroxyphenyl) methane from the reaction products and regenerating the bis-(3,5,6-trichloro-2-hydroxyphenyl) methane from said salt.

8. In the process for preparing bis-(3,5,6-trichloro-2-hydroxyphenyl) methane by condensing 2,4,5-trichlorophenol with a formaldehyde-yielding substance, the improvement which comprises conducting the condensation at elevated temperatures and in the presence of a substance selected from the group consisting of sulfuric acid having at least about 93% $H_2SO_4$ content by weight and oleum, said substance being employed in an amount not substantially more than one-third the weight of the 2,4,5-trichlorophenol employed, and isolating the bis-(3,5,6-trichloro-2-hydroxyphenyl) methane in substantially pure form by forming and isolating the mono sodium salt of bis-(3,5,6-trichloro-2-hydroxyphenyl) methane from the reaction products and regenerating the bis-(3,5,6-trichloro-2-hydroxyphenyl) methane from said salt.

9. The process for preparing bis-(3,5,6-trichloro-2-hydroxyphenyl) methane which comprises reacting about 198 parts by weight of 2,4,5-trichlorophenol with about 18 parts by weight of paraformaldehyde in the presence of about 65 parts by weight of oleum 20%, at elevated temperatures within the range of about 65° C. to about 150° C., and isolating the bis-(3,5,6-trichloro-2-hydroxyphenyl) methane in substan-

ALCD-PUBCOM_0001545

**2,435,593**

7

tially pure form by forming and isolating the mono sodium salt of bis-(3,5,6-trichloro-2-hydroxyphenyl) methane from the reaction products and regenerating the bis-(3,5,6-trichloro-2-hydroxyphenyl) methane from said salt.

10. The process for preparing bis-(3,5,6-trichloro-2-hydroxyphenyl) methane which comprises reacting about 198 parts by weight of 2,4,5-trichlorophenol with about 18 parts by weight of paraformaldehyde in the presence of about 65 parts by weight of oleum 20%, at elevated temperatures within the range of about 65° C. to about 150° C., and isolating the bis-(3,5,6-trichloro-2-hydroxyphenyl) methane in substantially pure form by forming and isolating the mono potassium salt of bis-(3,5,6-trichloro-2-hydroxyphenyl) methane from the reaction products and regenerating the bis-(3,5,6-trichloro-2-hydroxyphenyl) methane from said salt.

11. The process for preparing bis-(3,5,6-trichloro-2-hydroxyphenyl) methane which comprises reacting about 198 parts by weight of 2,4,5-trichlorophenol with about 18 parts by weight of paraformaldehyde in the presence of about 65 parts by weight of oleum 20%, at elevated temperatures within the range of about 65° C. to about 135° C. for a period of about 5 to about 30 minutes, and isolating the bis-(3,5,6-trichloro-2-hydroxyphenyl) methane in substantially pure form by forming and isolating the mono alkali metal salt of bis-(3,5,6-trichloro-2-hydroxyphenyl) methane from the reaction products and regenerating the bis-(3,5,6-trichloro-2-hydroxyphenyl) methane from said salt.

12. The process for preparing bis-(3, 5, 6-trichloro-2-hydroxyphenyl) methane which comprises reacting about 198 parts by weight of 2,4,5-trichlorophenol with about 18 parts by weight of paraformaldehyde in the presence of about 65 parts by weight of oleum 20%, at elevated temperatures within the range of about 65° C. to about 135° C. for a period of about 5 to 30 minutes, and isolating the bis-(3,5,6-trichloro-2-hydroxyphenyl) methane in substantially pure form by forming and isolating the mono sodium salt of bis-(3,5,6-trichloro - 2 - hydroxyphenyl) methane from the reaction products and regenerating the bis-(3,5,6-trichloro-2-hydroxyphenyl) methane from said salt.

13. The process for preparing bis-(3,5,6-trichloro-2-hydroxyphenyl) methane which comprises reacting about 198 parts by weight of 2,4,5-trichlorophenol with about 18 parts by weight of paraformaldehyde in the presence of about 65 parts by weight of oleum 20%, at elevated temperatures within the range of about 65° C. to about 135° C. for a period of about 5 to 30 minutes, and isolating the bis-(3,5,6-trichloro-2-hydroxyphenyl) methane in substantially pure form by forming and isolating the mono potassium salt of bis-(3,5,6-trichloro-2-hydroxyphenyl) methane from the reaction products and regenerating the bis-(3,5,6-trichloro-2-hydroxyphenyl) methane from said salt.

14. The process for preparing bis-(3,5,6-trichloro-2-hydroxyphenyl) methane which comprises reacting about 198 parts by weight of 2,4,5-trichlorophenol with about 18 parts by weight of paraformaldehyde in the presence of about 65 parts by weight of oleum 20%, at elevated temperatures within the range of about 65° C. to about 150° C., isolating the bis-(3,5,6-tri-

8

chloro-2-hydroxyphenyl) methane in substantially pure form by forming and isolating the mono sodium salt of bis-(3,5,6-trichloro-2-hydroxyphenyl) methane from the reaction products and regenerating the bis-(3,5,6-trichloro-2-hydroxyphenyl) methane from said salt by acidifying with sulfuric acid, and recrystallizing the bis-(3,5,6-trichloro-2-hydroxyphenyl) methane from a suitable solvent.

15. The process for preparing bis-(3,5,6-trichloro-2-hydroxyphenyl) methane which comprises reacting about 198 parts by weight of 2,4,5-trichlorophenol with about 18 parts by weight of paraformaldehyde in the presence of about 65 parts by weight of oleum 20%, at elevated temperatures within the range of about 65° C. to about 150° C., isolating the bis-(3,5,6-trichloro-2-hydroxyphenyl) methane in substantially pure form by forming and isolating the mono potassium salt of bis-(3,5,6-trichloro-2-hydroxyphenyl) methane from the reaction products and regenerating the bis-(3,5,6-trichloro-2-hydroxyphenyl) methane from said salt by acidifying with sulfuric acid, and recrystallizing the bis-(3,5,6-trichloro-2-hydroxyphenyl) methane from a suitable solvent.

16. The process for preparing bis-(3,5,6-trichloro-2-hydroxyphenyl) methane which comprises reacting about 198 parts by weight of 2,4,5-trichlorophenol with about 18 parts by weight of paraformaldehyde in the presence of about 65 parts by weight of oleum 20%, at elevated temperatures within the range of about 65° C. to about 135° C. for a period of about 5 to 30 minutes, isolating the bis-(3,5,6-trichloro-2-hydroxyphenyl) methane in substantially pure form by forming and isolating the mono sodium salt of bis-(3,5,6-trichloro-2-hydroxyphenyl) methane from the reaction products and regenerating the bis-(3,5,6-trichloro-2-hydroxyphenyl) methane from said salt by acidifying with sulfuric acid, and recrystallizing the bis-(3,5,6-trichloro-2-hydroxyphenyl) methane from a suitable solvent.

17. The process for preparing bis-(3,5,6-trichloro-2-hydroxyphenyl) methane which comprises reacting about 198 parts by weight of 2,4,5-trichlorophenol with about 18 parts by weight of paraformaldehyde in the presence of about 65 parts by weight of oleum 20%, at elevated temperatures within the range of about 65° C. to about 135° C. for a period of about 5 to 30 minutes, isolating the bis - (3,5,6-trichloro - 2 - hydroxyphenyl) methane in substantially pure form by forming and isolating the mono potassium salt of bis-(3,5,6-trichloro - 2 - hydroxyphenyl) methane from the reaction products and regenerating the bis-(3,5,6-trichloro-2-hydroxyphenyl) methane from said salt by acidifying with sulfuric acid, and recrystallizing the bis-(3,5,6-trichloro-2-hydroxyphenyl) methane from a suitable solvent.

MAX LUTHY.
WILLIAM S. GUMP.

**REFERENCES CITED**

The following references are of record in the file of this patent:

UNITED STATES PATENTS

| Number | Name | Date |
|--------|------|------|
| 2,250,480 | Gump | July 29, 1941 |

# EXHIBIT 24

OxyChem's Comments in Opposition to Proposed Consent Decree,
*United States v. Alden Leeds, Inc., et al.*, Civil Action No. 2:22-cv-07326 (D.N.J.)

ALCD-PUBCOM_0001547





State of New Jersey
Department of Environmental Protection

Return forms to:
INDUSTRIAL SURVEY PROJECT
P.O. BOX 251
TRENTON, NEW JERSEY 08602

OFFICE OF THE COMMISSIONER

SELSUB 010 0314

ID `1 3 1 7 2`
CM `0 9 0 7`
`0 9`

## SELECTED SUBSTANCE REPORT

PART I — General Plant Information

COMPLETE ONE REPORT FOR EACH PLANT SITE OR FACILITY LOCATION

1. Company Name ..... Drew Chemical Corporation

2. Division or Plant Name _ Manufacturing

3. Mailing Address (Street) __ 1106 Harrison Avenue

   (City/Town) __ Kearny _____ County __ Hudson __ State _ N J __ Zip Code __ 07032

4. Plant Location Address (Street) ___ N/A
   (If not as above)
   (City/Town) __ --- _____ County ___ --- ___ State --- __ Zip Code ___ ---

5. Date Plant Began Operations At This Location _

6. Person to Contact Regarding this Report ___ K. V. Weiss _____ Title __ Plant Manager

7. Phone Number (Area Code) 201-997-0300

8. SIC Code (Four Digit) __ 2899 _____ Standard Industrial Classification (if available)

9. Nature of Business __ Specialty Chemical Manufacturing — blending

10. Number of Production Employees at this Plant Site _ 22

11. Does this plant manufacture, process, form, repackage, release, use, dispose of or store any of the selected substances shown on Table I of the enclosed instructions? (Check One)  YES [X]  NO [ ]

    If your answer to number 11 is "YES", complete the Entire Report for your facility, sign and return.

    If your answer to number 11 is "NO", complete Question 15, sign and return.

I, HEREBY, CERTIFY THAT ALL STATEMENTS MADE BY ME IN THIS REPORT ARE TRUE, COMPLETE AND CORRECT TO THE BEST OF MY KNOWLEDGE AND THAT ESTIMATES WHERE USED HAVE BEEN MADE IN GOOD FAITH.

NAME (Print) __ M. J. Piergrossi _____ Signature _____

Title __ Vice President, Manufacturing _____ Date __ June 16, 1980
                                                         August 5, 1980

12A. Sketch (On the reverse side of this page) or attach a copy of a map indicating the exact location of the plant site.

12B. Supply your Dun & Bradstreet number if available. __ 00-121-7496

FOR OFFICIAL USE ONLY

E `5 7 2 9`   S `2 4 9 9`   N `4 5 1 1 1`

B `2 0 3`   O `1 9 7 8`   A `2`

C `0`   X `[ ]`

V `[ ]`   D & B `0 0 1 2 1 7 4 9 6`

EXHIBIT
12
8/11/22
PENGAD 800-631-6989

00254504 003   75   094   2899
DREW CHEMICAL
CORPORATION
ONE DREW CHEMICAL
PLAZA
BOONTON N J
ATT: TAX DEPT
KEARNY NJ                    07005

BAF000023

OCC-TIG-E02825931

ALCD-PUBCOM_0001548

SELSUB   010   0315     FOR DEP
USE ONLY

| | | 1 | 0 | 1 | 7 | 2 |

PART I – General Information (continued)

13. List all of the selected substances included in this report along with their CAS Numbers (From Table I of the instructions) which are manufactured, processed, formed, repackaged, released, used, disposed of or stored at the plant site:

| 71-55-6 | 1,1,1, Trichloroethane (Methyl Chloroform) |
| 106-89-8 | Epichlorohydrin |
| 302-01-2 | Hydrazine |
| 7440-47-3 | Chromium |
| 7440-50-8 | Copper |
| 7439-92-1 | Lead |
| 7440-66-6 | Zinc |
| 127-18-4 | Tetrachloroethylene |
| 95-95-4 | 2,4,5, Trichlorophenol |

14. Wastewater Discharges — Complete the following information:

A. Discharge to publicly owned treatment works (POTW):

1. Name of Utility (POTW) __Passaic Valley Sewerage Commission__    1. | 0 | 0 | 2 | 1 | 0 | 1 | 6 |

Address/Location __Newark, New Jersey__    2. | 0 | 0 | . | 0 | 5 | 1 | 0 |

2. Estimated Average Volume of Wastewater Discharged to POTW in a day    3. | 9 | 9 |

__51,000__ gallons.

3. Briefly describe any pretreatment methods __None__

4. Wastewater consists of: ( X) Process Water, ( ) Contact Cooling, ( ) Non-Contact Cooling, ( X) Domestic Sewage, ( X) Contaminated Storm Water, ( X) Washdown Water, ( X) Scrubber Water, ( ) Other;

B. Discharge to Navigable Waterway or Tributary Stream:

1. Name of Receiving Stream __N/A__

2. NPDES Permit Number __N/A__

3. Estimated average volume of wastewater discharged to receiving stream in a day
__N/A__ gallons.

4. Briefly describe any treatment methods __N/A__

5. Wastewater consists of: ( ) Process Water, ( ) Contact Cooling, ( ) Non-Contact Cooling, ( ) Domestic Sewage, ( ) Contaminated Storm Water, ( ) Washdown Water, ( ) Scrubber Water, ( ) Other;

15. Previous disposal practices (1930–1977). Has this plant previously disposed of wastes containing any of the selected substances at any land disposal site (i.e. by land spreading or burial, landfilling, lagoon or seepage pit) either on or off site?

YES ☐    NO ☒ [0 2] *[0 0]

If available provide the following information for each disposal site. Use additional pages if necessary.

Name and Location of Site _____

Time period site was used _____

| Name of selected substances disposed of at this site | Physical State | Amount of selected substance disposed at site (pounds) |

* Drew used a scavenger to dispose of limited wastes and knowledge of
disposal sites or methods is not available.

OCC-TIG-E02825932

ALCD-PUBCOM_0001549

Form COM-021 B
Rev. 2/80

**State of New Jersey**
**Department of Environmental Protection**

SELSUB  010  0316

page 1 of 9

PART II
**SELECTED SUBSTANCE REPORT**

COMPLETE ONE FORM FOR EACH SELECTED SUBSTANCE

FOR DEP USE

| | | |
|---|---|---|
| 1. Name and Location of Plant | | I.D. |
| Drew Chemical Corp., Kearny, N. J. | | 10172 |

| 2. Selected Substance Name | CAS # | | |
|---|---|---|---|
| 1,1,1 Trichloroethane | 71-55-6 | 01 | 71 55 6 |

3. Briefly Describe Its Use On The Site:

Used to formulate products for industrial and marine heating/cooling requirements.

25 ℓ palas    1 y

S-10

CHECK ONE

| | COMPLETE THE FOLLOWING INFORMATION FOR THE PLANT BASED ON 1978 USAGE | ENTER THE ACTUAL OR ESTIMATED AMOUNTS | USE THE RE-QUESTED UNITS | ACT-UAL | ESTI-MATE |
|---|---|---|---|---|---|
| THROUGH-PUT QUANTITIES | 4. QUANTITY PRODUCED ON SITE | -0- | lbs/yr. | | √ |
| | 5. QUANTITY BROUGHT ONTO SITE | 307,730 | lbs/yr. | X | |
| | 6. QUANTITY CONSUMED ON SITE | 307,730 | lbs/yr. | X | |
| | 7. QUANTITY SHIPPED OFF SITE AS (OR IN) PRODUCT | 307,730 | lbs/yr. | X | |
| | 8. MAXIMUM INVENTORY | 45,000 | lbs | X | |
| EMISSIONS | 9. TOTAL STACK EMISSIONS OF SELECTED SUBSTANCE | | lbs/yr. | | √ |
| | | | max lbs/day | | √ |
| | 10. TOTAL FUGITIVE EMISSIONS OF SELECTED SUBSTANCE | | lbs/yr. | | √ |
| | | | max lbs/day | | √ |
| DISCHARGE | 11. TOTAL DISCHARGE OF SELECTED SUBSTANCE INTO SURFACE WATER | | lbs/yr. | | √ |
| | | | max lbs/day | | √ |
| | 12. TOTAL DISCHARGE OF SELECTED SUBSTANCE INTO PUBLICLY OWNED TREATMENT WORKS | | lbs/yr. | | √ |
| | | | max lbs/day | | √ |

13. DISPOSAL OF WASTE CONTAINING THE SELECTED SUBSTANCE

| LOCATION OF FINAL DISPOSAL SITE NAME AND ADDRESS | PHYSICAL STATE TABLE A | DISPOSAL METHOD TABLE B | QUANTITY OF SELECTED SUBSTANCE DISPOSED (lbs) | FOR DEP USE |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**TABLE A**
**PHYSICAL STATE**
W-01 Solid
W-02 Liquid
W-03 Slurry
W-04 Sludge
W-09 Other (specify)

**TABLE B**
**DISPOSAL METHODS**
M-01 Composting
M-02 Evaporation
M-03 Holding Tank
M-04 Incineration
M-05 Injection Well
M-06 Lagoon

M-07 Land Burial
M-08 Land Spreading
M-09 Neutralization
M-10 Ocean
M-11 Recycling
M-12 Sanitary Landfill

M-13 Surface Water
M-14 Subsurface System
M-15 Pyrolysis
M-16 Spray Irrigation
M-17 Stored On Site
M-98 Other (specify)

OCC-TIG-E02825933

ALCD-PUBCOM_0001550

Form CCM-023-R.
Nov. 2/87

State of New Jersey
Department of Environmental Protection

page 2 of 9

SELSUB 010 0317

PART II                SELECTED SUBSTANCE REPORT
COMPLETE ONE FORM FOR EACH SELECTED SUBSTANCE.                    FOR DEP USE

1. Name and Location of Plant

Drew Chemical Corp., Kearny, N. J.                I.D.    10172

2. Selected Substance Name                CAS #
Epichlorohydrin                           106-89-8    05    106 89 8

3. Briefly Describe Its Use On The Site

Used to formulate products for industrial water treatment
industry as flocculants.

S-99

CHECK ONI

| COMPLETE THE FOLLOWING INFORMATION FOR THE PLANT BASED ON 1978 USAGE | ENTER THE ACTUAL OR ESTIMATED AMOUNTS | USE THE RE-QUESTED UNITS | ACT-UAL | EST MAT |
|---|---|---|---|---|
| 4. QUANTITY PRODUCED ON SITE | -0- | lbs/yr. | | V |
| 5. QUANTITY BROUGHT ONTO SITE | 29,100 | lbs/yr. | | |
| 6. QUANTITY CONSUMED ON SITE | -0- | lbs/yr. | | V |
| 7. QUANTITY SHIPPED OFF SITE AS (OR IN) PRODUCT | 30,100 | lbs/yr. | | V |
| 8. MAXIMUM INVENTORY | 13,000 | lbs | | V |
| 9. TOTAL STACK EMISSIONS OF SELECTED SUBSTANCE | | lbs/yr. | | V |
| | | max lbs/day | | V |
| 10. TOTAL FUGITIVE EMISSIONS OF SELECTED SUBSTANCE | | lbs/yr. | | |
| | | max lbs/day | | V |
| 11. TOTAL DISCHARGE OF SELECTED SUBSTANCE INTO SURFACE WATER | | lbs/yr. | | V |
| | | max lbs/day | | V |
| 12. TOTAL DISCHARGE OF SELECTED SUBSTANCE INTO PUBLICLY OWNED TREATMENT WORKS | | lbs/yr. | | V |
| | | max lbs/day | | V |

THROUGH-PUT QUANTITIES

AIR EMISSIONS

WASTEWATER DISCHARGE

13. DISPOSAL OF WASTE CONTAINING THE SELECTED SUBSTANCE.

| LOCATION OF FINAL DISPOSAL SITE NAME AND ADDRESS | PHYSICAL STATE TABLE A | DISPOSAL METHOD TABLE B | QUANTITY OF SELECTED SUBSTANCE DISPOSED (lbs) | FOR DEP USE |
|---|---|---|---|---|
| 1. | | | | |
| 2. | | | | |
| 3. | | | | |
| 4. | | | | |
| 5. | | | | |

TABLE A
PHYSICAL STATE
M-01 Solid
M-02 Liquid
M-03 Slurry
M-04 Sludge
M-99 Other (specify)

M-01 Composting
M-02 Evaporation
M-03 Holding Tank
M-04 Incineration
M-05 Injection Well
M-06 Lagoon

TABLE B
DISPOSAL METHODS
M-07 Land Burial
M-08 Land Spreading
M-09 Neutralization
M-10 Ocean
M-11 Recycling
M-12 Sanitary Landfill

M-13 Surface Water
M-14 Subsurface System
M-15 Pyrolysis
M-16 Spray Irrigation
M-17 Stored On Site
M-98 Other (specify)

OCC-TIG-E02825934

ALCD-PUBCOM_0001551

COM 021 B
v. 7/80

page 3 of 9

**State of New Jersey**
**Department of Environmental Protection**

ART II          SELECTED SUBSTANCE REPORT          SELSUB 010 0318

MPLETE ONE FORM FOR EACH SELECTED SUBSTANCE

FOR DEP USE

Name and Location of Plant

Drew Chemical Corp., Kearny, N. J.

I.D. | 1 0 1 7 2

Selected Substance Name                    CAS #

Hydrazine                    302-01-2      | 0 6 | 302 | 01 | 2

Briefly Describe Its Use On The Site:

Used to formulate products for industrial and marine
internal boiler water treatment.  (Used as 55% hydrazine
hydrate).

Drummed

S-10

| | | CHECK ONE |
|---|---|---|
| COMPLETE THE FOLLOWING INFORMATION FOR THE PLANT BASED ON 1978 USAGE | ENTER THE ACTUAL OR ESTIMATED AMOUNTS | USE THE RE-QUESTED UNITS | ACT-UAL | ESTI-MATED |
| 4.  QUANTITY PRODUCED ON SITE | -0- | lbs/yr. | | √ |
| 5.  QUANTITY BROUGHT ONTO SITE | 30,150 | lbs/yr. | X | |
| 6.  QUANTITY CONSUMED ON SITE | 30,150 | lbs/yr. | X | |
| 7.  QUANTITY SHIPPED OFF SITE AS (OR IN) PRODUCT | 30,150 | lbs/yr. | X | |
| 8.  MAXIMUM INVENTORY | -0- | lbs | X | |
| 9.  TOTAL STACK EMISSIONS OF SELECTED SUBSTANCE | | lbs/yr. | | √ |
| | | max lbs/day | | √ |
| 10.  TOTAL FUGITIVE EMISSIONS OF SELECTED SUBSTANCE | | lbs/yr. | | √ |
| | | max lbs/day | | √ |
| 11.  TOTAL DISCHARGE OF SELECTED SUBSTANCE INTO SURFACE WATER | | lbs/yr. | | |
| | | max lbs/day | | √ |
| 12.  TOTAL DISCHARGE OF SELECTED SUBSTANCE INTO PUBLICLY OWNED TREATMENT WORKS | | lbs/yr. | | √ |
| | | max lbs/day | | √ |

DISPOSAL OF WASTE CONTAINING THE SELECTED SUBSTANCE

| LOCATION OF FINAL DISPOSAL SITE NAME AND ADDRESS | PHYSICAL STATE TABLE A | DISPOSAL METHOD TABLE B | QUANTITY OF SELECTED SUBSTANCE DISPOSED (lbs) | FOR DEP USE |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

| TABLE A PHYSICAL STATE | | TABLE B DISPOSAL METHODS | |
|---|---|---|---|
| W-01 Sand | M-01 Composting | M-07 Land Burial | M-13 Surface Water |
| W-02 Liquid | M-02 Evaporation | M-08 Land Spreading | M-14 Subsurface System |
| W-03 Slurry | M-03 Holding Tank | M-09 Neutralization | M-15 Pyrolysis |
| W-04 Sludge | M-04 Incineration | M-10 Ocean | M-16 Spray Irrigation |
| W-09 Other (specify) | M-05 Injection Well | M-11 Recycling | M-17 Stored On Site |
| | M-06 Lagoon | M-12 Sanitary Landfill | M-98 Other (specify) |

OCC-TIG-E02825935

ALCD-PUBCOM_0001552

COM-021 B
(w. 7/781)

page __4__ of __9__

**State of New Jersey**
**Department of Environmental Protection**

ART II   SELECTED SUBSTANCE REPORT    SELSUB  010  0319

COMPLETE ONE FORM FOR EACH SELECTED SUBSTANCE

| | FOR DEP USE |
|---|---|
| Name and Location of Plant | I.D. |
| Drew Chemical Corp., Kearny, N. J. | 10172 |
| Selected Substance Name        CAS # | |
| Chromium                7440-47-3    11 | 7440473 |

Briefly Describe Its Use On The Site:

Used to formulate products for industrial internal cooling tower treatments.  Substance used as Chronic Acid, Sodium Dichromate Dihydrate and Sodium Chromate.

S-10

| COMPLETE THE FOLLOWING INFORMATION FOR THE PLANT BASED ON 1978 USAGE | ENTER THE ACTUAL OR ESTIMATED AMOUNTS | USE THE RE-QUESTED UNITS | CHECK ONE | |
|---|---|---|---|---|
| | | | ACT-UAL | ESTI-MATED |
| **QUANTITIES** 4. QUANTITY PRODUCED ON SITE | | lbs/yr. | | ✓ |
| 5. QUANTITY BROUGHT ONTO SITE | 42,800 | lbs/yr. | X | |
| 6. QUANTITY CONSUMED ON SITE | 42,800 | lbs/yr. | X | |
| 7. QUANTITY SHIPPED OFF SITE AS (OR IN) PRODUCT | 42,800 | lbs/yr. | X | |
| 8. MAXIMUM INVENTORY | 42,800 | lbs | X | |
| **EMISSIONS** 9. TOTAL STACK EMISSIONS OF SELECTED SUBSTANCE | | lbs/yr. | | ✓ |
| | | max lbs/day | | ✓ |
| 10. TOTAL FUGITIVE EMISSIONS OF SELECTED SUBSTANCE | | lbs/yr. | | ✓ |
| | | max lbs/day | | ✓ |
| **DISCHARGE** 11. TOTAL DISCHARGE OF SELECTED SUBSTANCE INTO SURFACE WATER | | lbs/yr. | | ✓ |
| | | max lbs/day | | ✓ |
| 12. TOTAL DISCHARGE OF SELECTED SUBSTANCE INTO PUBLICLY OWNED TREATMENT WORKS | | lbs/yr. | | ✓ |
| | | max lbs/day | | ✓ |

3. DISPOSAL OF WASTE CONTAINING THE SELECTED SUBSTANCE

| LOCATION OF FINAL DISPOSAL SITE NAME AND ADDRESS | PHYSICAL STATE TABLE A | DISPOSAL METHOD TABLE B | QUANTITY OF SELECTED SUBSTANCE DISPOSED (lbs) | FOR DEP USE |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

| TABLE A PHYSICAL STATE | | TABLE B DISPOSAL METHODS | |
|---|---|---|---|
| W-01 Solid | M-01 Composting | M-07 Land Burial | M-13 Surface Water |
| W-02 Liquid | M-02 Evaporation | M-08 Land Spreading | M-14 Subsurface System |
| W-03 Slurry | M-03 Holding Tank | M-09 Neutralization | M-15 Pyrolysis |
| W-04 Sludge | M-04 Incineration | M-10 Ocean | M-16 Spray Irrigation |
| W-09 Other (specify) | M-05 Injection Well | M-11 Recycling | M-17 Stored On Site |
| | M-06 Lagoon | M-12 Sanitary Landfill | M-98 Other (specify) |

OCC-TIG-E02825936

ALCD-PUBCOM_0001553

Form COW-021 B
- Rev. 2/80 -

State of New Jersey
Department of Environmental Protection

page 5 of 9



PART II                    SELECTED SUBSTANCE REPORT    SELSUB 010 0320
COMPLETE ONE FORM FOR EACH SELECTED SUBSTANCE                    FOR DEP USE

| 1. Name and Location of Plant | I.D. |
|---|---|
| Drew Chemical Corp., Kearny, N. J. | 10172 |

| 2. Selected Substance Name | CAS # | |
|---|---|---|
| Copper | 7440-50-8 | 11 |



7440 50 8

3. Briefly Describe Its Use On The Site:

Used to formulate products for industrial heating/cooling
requirements. Substance used as Copper Oxide, Cupric
Chloride dihydrate and Copper Oxychloride.

S-10

| | COMPLETE THE FOLLOWING INFORMATION FOR THE PLANT BASED ON 1978 USAGE | ENTER THE ACTUAL OR ESTIMATED AMOUNTS | USE THE REQUESTED UNITS | CHECK ONE | |
|---|---|---|---|---|---|
| | | | | ACTUAL | ESTIMATE |
| THROUGH-PUT QUANTITIES | 4. QUANTITY PRODUCED ON SITE | | lbs./yr. | | ✓ |
| | 5. QUANTITY BROUGHT ONTO SITE | 2,300 | lbs/yr. | X | |
| | 6. QUANTITY CONSUMED ON SITE | 2,300 | lbs/yr. | X | |
| | 7. QUANTITY SHIPPED OFF SITE AS (OR IN) PRODUCT | 2,300 | lbs/yr. | X | |
| | 8. MAXIMUM INVENTORY | 600 | lbs | X | |
| AIR EMISSIONS | 9. TOTAL STACK EMISSIONS OF SELECTED SUBSTANCE | | lbs/yr. | | ✓ |
| | | | max lbs/day | | ✓ |
| | 10. TOTAL FUGITIVE EMISSIONS OF SELECTED SUBSTANCE | | lbs/yr. | | ✓ |
| | | | max lbs/day | | ✓ |
| WASTEWATER DISCHARGE | 11. TOTAL DISCHARGE OF SELECTED SUBSTANCE INTO SURFACE WATER | | lbs/yr. | | ✓ |
| | | | max lbs/day | | ✓ |
| | 12. TOTAL DISCHARGE OF SELECTED SUBSTANCE INTO PUBLICLY OWNED TREATMENT WORKS | | lbs/yr. | | ✓ |
| | | | max lbs/day | | ✓ |

13. DISPOSAL OF WASTE CONTAINING THE SELECTED SUBSTANCE

| | LOCATION OF FINAL DISPOSAL SITE NAME AND ADDRESS | PHYSICAL STATE TABLE A | DISPOSAL METHOD TABLE B | QUANTITY OF SELECTED SUBSTANCE DISPOSED (lbs) | FOR DEP USE |
|---|---|---|---|---|---|
| 1. | | | | | |
| 2. | | | | | |
| 3. | | | | | |
| 4. | | | | | |
| 5. | | | | | |

TABLE A
PHYSICAL STATE

W-01 Solid
W-02 Liquid
W-03 Slurry
W-04 Sludge
A-99 Other (specify)

M-01 Composting
M-02 Evaporation
M-03 Holding Tank
M-04 Incineration
M-05 Injection Well
M-06 Lagoon

TABLE B
DISPOSAL METHODS

M-07 Land Burial
M-08 Land Spreading
M-09 Neutralization
M-10 Ocean
M-11 Recycling
M-12 Sanitary Landfill

M-13 Surface Water
M-14 Subsurface System
M-15 Pyrolysis
M-16 Spray Irrigation
M-17 Stored On Site
M-98 Other (specify)

OCC-TIG-E02825937

ALCD-PUBCOM_0001554

Form COM- 021 B
Rev. 2/80

SELSUB  010  0321

page 6 of 9

**State of New Jersey**
**Department of Environmental Protection**

PART II                    SELECTED SUBSTANCE REPORT

COMPLETE ONE FORM FOR EACH SELECTED SUBSTANCE                    **FOR DEP USE**

1. Name and Location of Plant                                    I.D.
   Drew Chemical Corp., Kearny, N. J.                            10172

2. Selected Substance Name                 CAS #
   Lead                                    7439-92-1            11  7439 92 1

3. Briefly Describe Its Use On The Site:

   Used to formulate products for modifying the burning of
   heavy fuel oils.  Substance used as 36% Lead Naphthenate.

                                                                 S-10

   Tenneco Interstate

                                                                 CHECK O

| | COMPLETE THE FOLLOWING INFORMATION FOR THE PLANT BASED ON 1978 USAGE | ENTER THE ACTUAL OR ESTIMATED AMOUNTS | USE THE REQUESTED UNITS | ACT-UAL | ES MA |
|---|---|---|---|---|---|
| THROUGH-PUT QUANTITIES | 4. QUANTITY PRODUCED ON SITE | | lbs/yr. | | ✓ |
| | 5. QUANTITY BROUGHT ONTO SITE | 47,780 | lbs/yr. | X | |
| | 6. QUANTITY CONSUMED ON SITE | 47,780 | lbs/yr. | X | |
| | 7. QUANTITY SHIPPED OFF SITE AS (OR IN) PRODUCT | 47,780 | lbs/yr. | X | |
| | 8. MAXIMUM INVENTORY | 14,000 | lbs | X | |
| AIR EMISSIONS | 9. TOTAL STACK EMISSIONS OF SELECTED SUBSTANCE | | lbs/yr. | | ✓ |
| | | | max lbs/day | | ✓ |
| | 10. TOTAL FUGITIVE EMISSIONS OF SELECTED SUBSTANCE | | lbs/yr. | | ✓ |
| | | | max lbs/day | | ✓ |
| WASTEWATER DISCHARGE | 11. TOTAL DISCHARGE OF SELECTED SUBSTANCE INTO SURFACE WATER | | lbs/yr. | | ✓ |
| | | | max lbs/day | | ✓ |
| | 12. TOTAL DISCHARGE OF SELECTED SUBSTANCE INTO PUBLICLY OWNED TREATMENT WORKS | | lbs/yr. | | ✓ |
| | | | max lbs/day | | ✓ |

13. DISPOSAL OF WASTE CONTAINING THE SELECTED SUBSTANCE

| | LOCATION OF FINAL DISPOSAL SITE NAME AND ADDRESS | PHYSICAL STATE TABLE A | DISPOSAL METHOD TABLE B | QUANTITY OF SELECTED SUBSTANCE DISPOSED (lbs) | FOR DEP USE |
|---|---|---|---|---|---|
| 1. | | | | | |
| 2. | | | | | |
| 3. | | | | | |
| 4. | | | | | |
| 5. | | | | | |

TABLE A
PHYSICAL STATE

W-01 Solid
W-02 Liquid
W-03 Slurry
W-04 Sludge
W-09 Other (specify)

TABLE B
DISPOSAL METHODS

M-01 Composting
M-02 Evaporation
M-03 Holding Tank
M-04 Incineration
M-05 Injection Well
M-06 Lagoon

M-07 Land Burial
M-08 Land Spreading
M-09 Neutralization
M-10 Ocean
M-11 Recycling
M-12 Sanitary Landfill

M-13 Surface water
M-14 Subsurface System
M-15 Pyrolysis
M-16 Spray Irrigation
M-17 Stored On Site
M-98 Other (specify)

OCC-TIG-E02825938

ALCD-PUBCOM_0001555

Form COM-021 B
Rev. 2/80

SELSUB 010 0322
page 7 of 9

State of New Jersey
Department of Environmental Protection

PART II                    SELECTED SUBSTANCE REPORT

COMPLETE ONE FORM FOR EACH SELECTED SUBSTANCE                    FOR DEP USE

1. Name and Location of Plant

Drew Chemical Corp., Kearny, N. J.                I.D.  10172

2. Selected Substance Name                CAS #
   Zinc                                   7440-66-6      11    7440 66 6

3. Briefly Describe Its Use On The Site:                          S-10

Used to formulate products for industrial internal cooling
tower treatments.  Substance used as Zinc Chloride, Zinc
Sulfate and Zinc Oxide.

1/3

CHECK O

| COMPLETE THE FOLLOWING INFORMATION FOR THE PLANT BASED ON 1978 USAGE | ENTER THE ACTUAL OR ESTIMATED AMOUNTS | USE THE RE-QUESTED UNITS | ACT-UAL | E |
|---|---|---|---|---|
| 4. QUANTITY PRODUCED ON SITE | | lbs/yr. | | √ |
| 5. QUANTITY BROUGHT ONTO SITE | 124,000 | lbs/yr. | x | |
| 6. QUANTITY CONSUMED ON SITE | 124,000 | lbs/yr. | x | |
| 7. QUANTITY SHIPPED OFF SITE AS (OR IN) PRODUCT | 124,000 | lbs/yr. | x | |
| 8. MAXIMUM INVENTORY | 42,130 | lbs | x | |
| 9. TOTAL STACK EMISSIONS OF SELECTED SUBSTANCE | | lbs/yr. | | |
| | | max lbs/day | | √ |
| 10. TOTAL FUGITIVE EMISSIONS OF SELECTED SUBSTANCE | | lbs/yr. | | √ |
| | | max lbs/day | | |
| 11. TOTAL DISCHARGE OF SELECTED SUBSTANCE INTO SURFACE WATER | | lbs/yr. | | √ |
| | | max lbs/day | | |
| 12. TOTAL DISCHARGE OF SELECTED SUBSTANCE INTO PUBLICLY OWNED TREATMENT WORKS | | lbs/yr. | | √ |
| | | max lbs/day | | √ |

THROUGH-PUT QUANTITIES

AIR EMISSIONS

WASTEWATER DISCHARGE

13. DISPOSAL OF WASTE CONTAINING THE SELECTED SUBSTANCE

| LOCATION OF FINAL DISPOSAL SITE NAME AND ADDRESS | PHYSICAL STATE TABLE A | DISPOSAL METHOD TABLE B | QUANTITY OF SELECTED SUBSTANCE DISPOSED (lbs) | FOR DEP USE |
|---|---|---|---|---|
| 1. | | | | |
| 2. | | | | |
| 3. | | | | |
| 4. | | | | |
| 5. | | | | |

TABLE A
PHYSICAL STATE

W-01 Solid
W-02 Liquid
W-03 Slurry
W-04 Sludge
W-09 Other (specify)

M-01 Composting
M-02 Evaporation
M-03 Holding Tank
M-04 Incineration
M-05 Injection Well
M-06 Lagoon

TABLE B
DISPOSAL METHODS

M-07 Land Burial
M-08 Land Spreading
M-09 Neutralization
M-10 Ocean
M-11 Recycling
M-12 Sanitary Landfill

M-13 Surface Water
M-14 Subsurface System
M-15 Pyrolysis
M-16 Spray Irrigation
M-17 Stored On Site
M-98 Other (specify)

OCC-TIG-E02825939

ALCD-PUBCOM_0001556

Form DDM-021 II
Rev. 2/80

SELSUB 010 0323

page 8 of 9

State of New Jersey
Department of Environmental Protection

PART II
SELECTED SUBSTANCE REPORT

FOR DEP USE

COMPLETE ONE FORM FOR EACH SELECTED SUBSTANCE

1. Name and Location of Plant

I.D.

Drew Chemical Corp., Kearny, N. J.    10172

2. Selected Substance Name    CAS #

Tetrachloroethylene    127-18-4    01    127  18  4

3. Briefly Describe Its Use On The Site:

Material used in manufacture of industrial water treatment
chemicals in marine industry.

S-10

CHECK ON!

| COMPLETE THE FOLLOWING INFORMATION FOR THE PLANT BASED ON 1978 USAGE | | ENTER THE ACTUAL OR ESTIMATED AMOUNTS | USE THE RE-QUESTED UNITS | ACT-UAL | EST MAT |
|---|---|---|---|---|---|
| THROUGH-PUT QUANTITIES | 4. QUANTITY PRODUCED ON SITE | -0- | lbs/yr. | | √ |
| | 5. QUANTITY BROUGHT ONTO SITE | 2,800 | lbs/yr. | | √ |
| | 6. QUANTITY CONSUMED ON SITE | 2,800 | lbs/yr. | √ | |
| | 7. QUANTITY SHIPPED OFF SITE AS (OR IN) PRODUCT | -0- | lbs/yr. | | √ |
| | 8. MAXIMUM INVENTORY | 2,800 | lbs | | √ |
| AIR EMISSIONS | 9. TOTAL STACK EMISSIONS OF SELECTED SUBSTANCE | | lbs/yr. | | √ |
| | | | max lbs/day | | √ |
| | 10. TOTAL FUGITIVE EMISSIONS OF SELECTED SUBSTANCE | | lbs/yr. | | √ |
| | | | max lbs/day | | √ |
| WASTEWATER DISCHARGE | 11. TOTAL DISCHARGE OF SELECTED SUBSTANCE INTO SURFACE WATER | | lbs/yr. | | √ |
| | | | max lbs/day | | √ |
| | 12. TOTAL DISCHARGE OF SELECTED SUBSTANCE INTO PUBLICLY OWNED TREATMENT WORKS | | lbs/yr. | | √ |
| | | | max lbs/day | | √ |

13. DISPOSAL OF WASTE CONTAINING THE SELECTED SUBSTANCE

| LOCATION OF FINAL DISPOSAL SITE NAME AND ADDRESS | PHYSICAL STATE TABLE A | DISPOSAL METHOD TABLE B | QUANTITY OF SELECTED SUBSTANCE DISPOSED (lbs) | FOR DEP USE |
|---|---|---|---|---|
| 1. | | | | |
| 2. | | | | |
| 3. | | | | |
| 4. | | | | |
| 5. | | | | |

TABLE A
PHYSICAL STATE
W-01 Solid
W-02 Liquid
W-03 Slurry
W-04 Sludge
W-05 Other (specify)

TABLE B
DISPOSAL METHODS
M-01 Composting
M-02 Evaporation
M-03 Holding Tank
M-04 Incineration
M-05 Injection Well
M-06 Lagoon

M-07 Land Burial
M-08 Land Spreading
M-09 Neutralization
M-10 Ocean
M-11 Recycling
M-12 Sanitary Landfill

M-13 Surface Water
M-14 Subsurface System
M-15 Pyrolysis
M-16 Spray Irrigation
M-17 Stored On Site
M-98 Other (specify)

OCC-TIG-E02825940

ALCD-PUBCOM_0001557

SELSUB 010 0324

page 9 of 9

State of New Jersey
Department of Environmental Protection

PART II
COMPLETE ONE FORM FOR EACH SELECTED SUBSTANCE

SELECTED SUBSTANCE REPORT

FOR DEP USE

1. Name and Location of Plant
Drew Chemical Corp., Kearny, N. J.

I.D. 10172

2. Selected Substance Name
2,4,5, Trichlorophenol

CAS # 95-95-4

02  95 95 4

3. Briefly Describe Its Use On The Site:
Material used in manufacture of water treatment chemicals as microbiocides.

*in other product line*

*Dow*

*No longer used 5-99*

CHECK ONE

| COMPLETE THE FOLLOWING INFORMATION FOR THE PLANT BASED ON 1978 USAGE | ENTER THE ACTUAL OR ESTIMATED AMOUNTS | USE THE REQUESTED UNITS | ACT-UAL | EST MAY |
|---|---|---|---|---|
| 4. QUANTITY PRODUCED ON SITE | 0 | lbs/yr. | | ✓ |
| 5. QUANTITY BROUGHT ONTO SITE | 45,000 | lbs/yr. | | ✓ |
| 6. QUANTITY CONSUMED ON SITE | 62,800 | lbs/yr. | | ✓ |
| 7. QUANTITY SHIPPED OFF SITE AS (OR IN) PRODUCT | 62,800 | lbs/yr. | | ✓ |
| 8. MAXIMUM INVENTORY | 33,000 | lbs | | ✓ |
| 9. TOTAL STACK EMISSIONS OF SELECTED SUBSTANCE | | lbs/yr. | | |
| | | max lbs/day | | |
| 10. TOTAL FUGITIVE EMISSIONS OF SELECTED SUBSTANCE | | lbs/yr. | | |
| | | max lbs/day | | |
| 11. TOTAL DISCHARGE OF SELECTED SUBSTANCE INTO SURFACE WATER | | lbs/yr. | | |
| | | max lbs/day | | |
| 12. TOTAL DISCHARGE OF SELECTED SUBSTANCE INTO PUBLICLY OWNED TREATMENT WORKS | | lbs/yr. | | |
| | | max lbs/day | | |

13. DISPOSAL OF WASTE CONTAINING THE SELECTED SUBSTANCE

| LOCATION OF FINAL DISPOSAL SITE NAME AND ADDRESS | PHYSICAL STATE TABLE A | DISPOSAL METHOD TABLE B | QUANTITY OF SELECTED SUBSTANCE DISPOSED (lbs) | FOR DEP USE |
|---|---|---|---|---|
| 1. | | | | |
| 2. | | | | |
| 3. | | | | |
| 4. | | | | |
| 5. | | | | |

TABLE A
PHYSICAL STATE
M-01 Solid
M-02 Liquid
M-03 Slurry
M-04 Sludge
M-05 Other (specify)

TABLE B
DISPOSAL METHODS
M-01 Composting
M-02 Evaporation
M-03 Holding Tank
M-04 Incineration
M-05 Injection Well
M-06 Lagoon

M-07 Land Burial
M-08 Land Spreading
M-09 Neutralization
M-10 Ocean
M-11 Recycling
M-12 Sanitary Landfill

M-13 Surface Water
M-14 Subsurface System
M-15 Pyrolysis
M-16 Spray Irrigation
M-17 Stored On Site
M-98 Other (specify)

OCC-TIG-E02825941

ALCD-PUBCOM_0001558



SELSUB  010  0325

St log Drew

OCC-TIG-E02825942

ALCD-PUBCOM_0001559

SELSUB 010 0326

Drew Chemical Corporation

ADDRESS REPLY TO

June 22, 1983

Mr. Edward Stevenson
Manager
Industrial Investigation Unit
State of New Jersey
Department of Environmental Protection
Office of Science and Research
CN 402, Trenton, NJ    08625

RE:   Request for Information
      N.J.A.C. 7:1F-1.1 et seq.

Dear Mr. Stevenson:

In compliance with your letter dated June 13, 1983, I enclose
herewith the completed Selected Substance Report on 2,4,5, trichloro-
phenol.

Should you require additional information or assistance on this matter,
please do not hesitate to contact me.

Very truly yours,

DREW CHEMICAL CORPORATION

Kurt Weiss

Kurt V. Weiss
Director of Manufacturing

KVW:cr
enclosures
CM:RRR #28045258

OCC-TIG-E02825943

ALCD-PUBCOM_0001560

State of New Jersey
Department of Environmental Protection

SELECTED SUBSTANCE REPORT                    SELSUB 010 0327

**PART II**
COMPLETE ONE FORM FOR EACH SELECTED SUBSTANCE                    FOR DEP USE

| | |
|---|---|
| 1. Name and Location of Plant | I.D. |

Drew Chemical Corporation, 1106 Harrison Avenue, Kearny, NJ  07032

2. Selected Substance Name                    CAS #

2,4,5 – Trichlorophenol                    95-95-4

3. Briefly Describe Its Use On The Site

2,4,5 – Trichlorophenol, a discontinued raw material, was used at Drew's
Kearny, NJ plant to manufacture microbiocide products for the control
of bacteria and fungi growth in industrial water systems.

| | | | | CHECK ONE | |
|---|---|---|---|---|---|
| COMPLETE THE FOLLOWING INFORMATION FOR THE PLANT BASED ON THIS USAGE | ENTER THE ACTUAL OR ESTIMATED AMOUNTS | USE THE REQUESTED UNITS | | Actual | Estimated |
| THROUGHPUT QUANTITIES | 4. Quantity Produced on Site | None | lbs/yr. | | |
| | 5. Quantity Brought onto Site | 65,850 lbs. avg. (1971 – 1979) | lbs/yr. | | X |
| | 6. Quantity Consumed on Site | None per year | lbs/yr. | | |
| | 7. Quantity Shipped off Site as (or in) Product | 65,164 lbs. avg. (1973 – 1981) | lbs/yr. | X | |
| | 8. Maximum Inventory | 43,744 lbs. 07/05/79 | lbs | | X |
| AIR EMISSIONS | 9. Total Stack Emissions of Selected Substance | None | lbs/yr. | | |
| | | | max lbs/day | | |
| | 10. Total Fugitive Emissions of Selected Substance | None | lbs/yr. | | |
| | | | max lbs/day | | |
| WASTEWATER DISCHARGE | 11. Total Discharge of Selected Substance into Surface Water | None | lbs/yr. | | |
| | | | max lbs/day | | |
| | 12. Total Discharge of Selected Substance into Publicly Owned Treatment Works | 84 lbs. avg. (1973 – 1981) | lbs/yr. | | X |
| | | | max lbs/day | | |

13. Disposal of Waste Containing the Selected Substance

| LOCATION OF FINAL DISPOSAL SITE NAME AND ADDRESS | PHYSICAL STATE TABLE A | DISPOSAL METHOD TABLE B | QUANTITY OF SELECTED SUBSTANCE DISPOSED | FOR DEP USE |
|---|---|---|---|---|
| 1. Chemical Waste Management Inc. Emelle, Alabama | W-02 | M-07 | In Biocide®207=3180 lbs 2,4,5-TCP=407 lbs. | product |
| 2. Chemical Waste Management Inc. Emelle, Alabama | W-02 | M-07 | In Biosperse®209 = 1620 lbs. 2,4,5-TCP=402 lbs. | |
| 3. Chemical Waste Management Inc. Emelle, Alabama | W-02 | M-07 | In Biocide® 285 = 14,850 lbs. 2,4,5-TCP=1,485 lbs. | |
| 4. Chemical Waste Management Inc. Emelle, Alabama | W-03 | M-07 | In Biosperse® 289 (pre-mix) = 5,610 lbs. 2,4,5-TCP = 1,750 lbs. | |
| 5. Chemical Waste Management Inc. Emelle, Alabama | W-01 | M-07 | In Biosperse® 289 = 2,000 lbs. 2,4,5 – TCP – 106 lbs. | |

| TABLE A PHYSICAL STATE | | TABLE B DISPOSAL METHODS | | |
|---|---|---|---|---|
| W-01 Solid | M-01 Composting | M-07 Land Burial | M-13 Surface Water | |
| W-02 Liquid | M-02 Evaporation | M-08 Land Spreading | M-14 Subsurface System | |
| W-03 Slurry | M-03 Holding Tank | M-09 Neutralization | M-15 Pyrolysis | |
| W-04 Sludge | M-04 Incineration | M-10 Ocean | M-16 Spray Irrigation | |
| W-09 Other (Specify) | M-05 Injection Well | M-11 Recycling | M-17 Stored On Site | |
| | M-06 Lagoon | M-12 Sanitary Landfill | M-98 Other (Specify) | |

OCC-TIG-E02825944

ALCD-PUBCOM_0001561

SELSUB 010 0328

OUTLINE

*PROCESS

Facility Name: Drew Chemical Corporation
Division: Kearny, NJ 07032

Substance:  2,4,5, Trichlorophenol

Time period of production:  Available
records show that the substance was used as
a raw material from 1973 - 1981.
Process: *(See Opposite)

Product(s):  Microbiocides

Volume:  4,430,088 pounds (1973 - 1981)
of Product

Trade name(s): Biocide™ 207, Biocide™ 285,
Biosperse® 289, Biosperse® 209,
Drewpserse® 780.

End Use of Product or substance:
To help control bacterial fungal slime growth
in paper mills, cooling towers and other
similar recirculating water systems.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Types and quantites of Waste Generated:
1. Finished Goods - (As 2,4,5 TCP)
   a)  Obsolete and off-spec material
       Biocide™ 207 (407 lbs.)
       (Continued on attached page)
Method of Disposal:

Shipped offsite to Chemical Waste Management
Inc. for land burial.

Haulers:

1.  Chemical Waste Management Inc.
    Emelle, Alabama
    (Continued on attached page)
Disposal Location:
Chemical Waste Management Inc.
P. O. Box 55
Emelle, Alabama  35459
On site facilities/disposal:

None

Waste Water Discharge:
Into Surface Water - None
Into. POTW - <100 lbs. per year (1973-1981)
average.
Other information:
Manufacture of products as listed has since
been discontinued with last production taking
place during early 1981.

E.P.A. Registration Numbers are as follows:

Biocide™ 207 - 1757-25
Biosperse® 209 - 1757-09
Biocide™ 285 - 1757-32
Biosperse® 289 - 1757-39
Drewsperse® 780 - 1757-42

Manufacturing - The process as outlined
below is typical for the five (5)
microbiocide products with minor
variations:

The major ingredient, usually water
or solvent is first charged to the
mixing tank. During agitation, the
remaining ingredients are then added
until a homogeneous solution is
obtained. Any exotherms which take
place are maintained below 1000F with
cooling water. After the blend has
been well mixed, it is tested for con-
formance to product specifications. It
is then packaged into DOT approved
containers for shipment.

Handling Practives - 2,4,5 TCP was
received at the plant, packaged in 100
lb. fiber kegs. A sample of each lot
of material was taken by the Quality
Control Laboratory Techibcian and
tested for conformance to vendor
specifications. Retain samples kept
for maximum of three (3) months were
used in the in-progress batch. The
Material Safety Data Sheet furnished
by the vendor was used as the major
source of handling information, and
was readily available to first line
supervision in centrally located
process files.

This raw material was stored in one
location in the plant's raw material
warehouse until used in production.

The fiber keg package is lined with
polyethylene sheeting which permits
the complete emptying of material. The
empty kegs were disposed of via the
regular trash removal services on an
as needed basis.

OCC-TIG-E02825945

ALCD-PUBCOM_0001562

SELSUB  010 0329

## A T T A C H M E N T

TYPES AND QUANTITIES OF WASTE GENERATED:   (CONTINUED)

     Biosperse® 209 (402 lbs.)
     Biocide™ 285 (1,485 lbs.)
     Biosperse® 289 (106 lbs.)
     Biosperse® 289 (premix) (1,750 lbs.)

2.  Raw Materials

    a)  None

HAULERS (Continued)

2.  E. T. C.
    P. O. Box 294
    Cedar Knolls, NJ

3.  Black Hill Cont.
    326 Johnson Road
    Hackettstown, NJ

OCC-TIG-E02825946

ALCD-PUBCOM_0001563



DATE: 6-11-88

AMARC BIOCIDE PROCESS VESSEL

C. Silver

SELSUB 010 0330

AGITATOR
FOR MIXING

INGREDIENTS ADDED
THROUGH MANHOLD.

TT

TT = TEMPERATURE
MEASUREMENT
DEVICE

1,000 GAL
BLEND TANK

DRUM-OFF

OCC-TIG-E02825947

ALCD-PUBCOM_0001564



SELSUB  010  0331

OCC-TIG-E02825948

ALCD-PUBCOM_0001565

 **Drew Chemical Corporation**   One Drew Chemical Plaza, Boonton, N.J. 07005/(201) 263-7600/Cable Drewchems BOON

ADDRESS REPLY TO: 1106 Harrison Avenue, Kearny, NJ 07032/(201) 997-0300

June 22, 1983

Mr. Edward Stevenson
Manager
Industrial Investigation Unit
State of New Jersey
Department of Environmental Protection
Office of Science and Research
CN 402, Trenton, NJ   08625

RE:   Request for Information
      N.J.A.C. 7:1F-1.1 et seq.

Dear Mr. Stevenson:

In compliance with your letter dated June 13, 1983, I enclose
herewith the completed Selected Substance Report on 2,4,5, trichloro-
phenol.

Should you require additional information or assistance on this matter,
please do not hesitate to contact me.

                          Very truly yours,

                          DREW CHEMICAL CORPORATION

                          Kurt Weiss

                          Kurt V. Weiss
                          Director of Manufacturing

KVW:cr
enclosures
CM:RRR #28045258

OCC-TIG-E02825949

ALCD-PUBCOM_0001566

State of New Jersey
Department of Environmental Protection

SELECTED SUBSTANCE REPORT

PART II

COMPLETE ONE FORM FOR EACH SELECTED SUBSTANCE

| | FOR DEP USE |
|---|---|
| **1. Name and Location of Plant** Drew Chemical Corporation, 1106 Harrison Avenue, Kearny, NJ   07032 | I.D. |
| **2. Selected Substance Name** 2,4,5 - Trichlorophenol | **CAS #** 95-95-4 |

**3. Briefly Describe Its Use On The Site**

2,4,5 - Trichlorophenol, a discontinued raw material, was used at Drew's Kearny, NJ plant to manufacture microbiocide products for the control of bacteria and fungi growth in industrial water systems.

| | | | | CHECK ONE | |
|---|---|---|---|---|---|
| COMPLETE THE FOLLOWING INFORMATION FOR THE PLANT BASED ON THIS USAGE | | ENTER THE ACTUAL OR ESTIMATED AMOUNTS | USE THE REQUESTED UNITS | Actual | Estimated |
| **THROUGHPUT QUANTITIES** | 4. Quantity Produced on Site | None | lbs/yr. | | |
| | 5. Quantity Brought onto Site | 65,850 lbs. avg. (1971 - 1979)  *per year* | lbs/yr. | | X |
| | 6. Quantity Consumed on Site | None | lbs/yr. | | |
| | 7. Quantity Shipped off Site as (or in) Product | 65,164 lbs. avg. (1973 - 1981) | lbs/yr. | X | |
| | 8. Maximum Inventory | 43,744 lbs. 07/05/79 | lbs | | X |
| **AIR EMISSIONS** | 9. Total Stack Emissions of Selected Substance | None | lbs/yr. | | |
| | | | max lbs/day | | |
| | 10. Total Fugitive Emissions of Selected Substance | None | lbs/yr. | | |
| | | | max lbs/day | | |
| **WASTEWATER DISCHARGE** | 11. Total Discharge of Selected Substance into Surface Water | None | lbs/yr. | | |
| | | | max lbs/day | | |
| | 12. Total Discharge of Selected Substance into Publicly Owned Treatment Works | 84 lbs. avg. (1973 - 1981) | lbs/yr. | | X |
| | | | max lbs/day | | |

**13. Disposal of Waste Containing the Selected Substance**

| LOCATION OF FINAL DISPOSAL SITE NAME AND ADDRESS | PHYSICAL STATE TABLE A | DISPOSAL METHOD TABLE B | QUANTITY OF SELECTED SUBSTANCE DISPOSED | FOR DEP USE |
|---|---|---|---|---|
| 1. Chemical Waste Management Inc. Emelle, Alabama | W-02 | M-07 | In Biocide®207=3180 lbs 2,4,5-TCP=407 lbs. | *product* |
| 2. Chemical Waste Management Inc. Emelle, Alabama | W-02 | M-07 | In Biosperse®209 = 1620 lbs. 2,4,5-TCP=402 lbs. | |
| 3. Chemical Waste Management Inc. Emelle, Alabama | W-02 | M-07 | In Biocide™ 285 = 14,850 lbs. 2,4,5-TCP=1,485 lbs. | |
| 4. Chemical Waste Management Inc. Emelle, Alabama | W-03 | M-07 | In Biosperse® 289 (pre-mix) = 5,610 lbs. 2,4,5-TCP = 1,750 lbs. | |
| 5. Chemical Waste Management Inc. Emelle, Alabama | W-01 | M-07 | In Biosperse® 289 = 2,000 lbs. 2,4,5 - TCP - 106 lbs. | |

**TABLE A**
**PHYSICAL STATE**

W-01  Solid
W-02  Liquid
W-03  Slurry
W-04  Sludge
W-09  Other (Specify)

**TABLE B**
**DISPOSAL METHODS**

M-01  Composting
M-02  Evaporation
M-03  Holding Tank
M-04  Incineration
M-05  Injection Well
M-06  Lagoon

M-07  Land Burial
M-08  Land Spreading
M-09  Neutralization
M-10  Ocean
M-11  Recycling
M-12  Sanitary Landfill

M-13  Surface Water
M-14  Subsurface System
M-15  Pyrolysis
M-16  Spray Irrigation
M-17  Stored On Site
M-98  Other (Specify)

OCC-TIG-E02825950

ALCD-PUBCOM_0001567

## OUTLINE

Facility Name: Drew Chemical Corporation
         Division: Kearny, NJ  07032

Substance:    2,4,5, Trichlorophenol

Time period of production:  Available
records show that the substance was used as
a raw material from 1973 - 1981.
Process: *(See Opposite)        Drew?

Product(s):  Microbiocides

Volume:    4,430,088 pounds (1973 - 1981)
        of Product

Trade name(s): Biocide™ 207, Biocide™ 285,
Biosperse® 289, Biosperse® 209,
Drewsperse® 780.

End Use of Product or substance:
To help control bacterial fungal slime growth
in paper mills, cooling towers and other
similar recirculating water systems.

---------------------------------------------

Types and quantites of Waste Generated:
1.  Finished Goods - (As 2,4,5 TCP)
    a)  Obsolete and off-spec material
        Biocide™ 207 (407 lbs.)
        (Continued on attached page)
Method of Disposal:
Shipped offsite to Chemical Waste Management
Inc. for land burial.

Haulers:
1.  Chemical Waste Management Inc.
    Emelle, Alabama
    (Continued on attached page)
Disposal Location:
Chemical Waste Management Inc.
P. O. Box 55
Emelle, Alabama  35459
On site facilities/disposal:

None

Waste Water Discharge:
Into Surface Water - None
Into POTW - <100 lbs. per year (1973-1981)
average.
Other information:
Manufacture of products as listed has since
been discontinued with last production taking
place during early 1981.

E.P.A. Registration Numbers are as follows:

Biocide™ 207 - 1757-25
Biosperse® 209 - 1757-09
Biocide™ 285 - 1757-32
Biosperse® 289 - 1757-39
Drewsperse® 780 - 1757-42

## *PROCESS

Manufacturing - The process as outlined
below is typical for the five (5)
microbiocide products with minor
variations:

The major ingredient, usually water
or solvent is first charged to the
mixing tank.  During agitation, the
remaining ingredients are then added
until a homogeneous solution is
obtained.  Any exotherms which take
place are maintained below 100°F with
cooling water.  After the blend has
been well mixed, it is tested for con-
formance to product specifications.  It
is then packaged into DOT approved
containers for shipment.

Handling Practives - 2,4,5 TCP was
received at the plant, packaged in 100
lb. fiber kegs.  A sample of each lot
of material was taken by the Quality
Control Laboratory Technician and
tested for conformance to vendor
specifications.  Retain samples kept
for maximum of three (3) months were
used in the in-progress batch.  The
Material Safety Data Sheet furnished
by the vendor was used as the major
source of handling information, and
was readily available to first line
supervision in centrally located
process files.

This raw material was stored in one
location in the plant's raw material
warehouse until used in production.

The fiber keg package is lined with
polyethylene sheeting which permits
the complete emptying of material.  The
empty kegs were disposed of via the
regular trash removal services on an
as needed basis.

OCC-TIG-E02825951

ALCD-PUBCOM_0001568

## A T T A C H M E N T

TYPES AND QUANTITIES OF WASTE GENERATED:   (CONTINUED)

Biosperse® 209 (402 lbs.)
Biocide™ 285 (1,485 lbs.)
Biosperse® 289 (106 lbs.)
Biosperse® 289 (premix) (1,750 lbs.)

2.  Raw Materials

a)  None

HAULERS (Continued)

2.  E. T. C.
P. O. Box 294
Cedar Knolls, NJ

3.  Black Hill Cont.
326 Johnson Road
Hackettstown, NJ

OCC-TIG-E02825952

ALCD-PUBCOM_0001569

DATE: 6-17-83

SUBJECT: MICROBIOCIDE PROCESS VESSEL

SHEET NO.

APG NO.

BY: J. SILVER

CHECKED BY:

APPROVED BY:

ENGR. NO.

DRAWING NO.



AGITATOR
FOR MIXING

INGREDIENTS ADDED
THROUGH MANHOLD. . . . . . . .

TT

TT = TEMPERATURE
MEASUREMENT
DEVICE

1,000 GAL
BLEND TANK

DRUM-OFF

OCC-TIG-E02825953

ALCD-PUBCOM_0001570



OCC-TIG-E02825954

ALCD-PUBCOM_0001571

56

OCC-TIG-E02825955

ALCD-PUBCOM_0001572

ALCD-PUBCOM_0001573

# EXHIBIT 25

OxyChem's Comments in Opposition to Proposed Consent Decree,
*United States v. Alden Leeds, Inc., et al.*, Civil Action No. 2:22-cv-07326 (D.N.J.)

ALCD-PUBCOM_0001574

Dr. H.A. Brandman
Mr. K. Aspinwall
Mr. L. Levy
Clifton, New Jersey
November 24, 1976

Dr. Dorsky
Dr. Manowitz
Mr. Eichel
Mr. Snyder
Dr. Brandman
Mr. Aspinwall
Mr. Scala

Mr. Levy
Mr. Greif
Mr. Porcaro
Mr. Gold
Dr. Vaterlaus
Dr. Sambeth
Research Circ
Technical Com
Forschungssek
EDT

2,4,5 Trichlorophenol

Meeting at Dow Chemical Company - Midland, Michigan

(November 19, 1976)

Purpose:     To discuss quality control problems and establish
             specifications for Dow's 2,4,5-TCP.

For Dow:     Russ Tree:  Manager-Dowicide Section
             Ed Saunders:  Sup't. -  "         "
             Warren Crummett:  Manager - Analytical Labs
             Bob Hudberg:  Quality Assurance Supervisor
             Che Kao:  Group Leader - Organic Chemical Research
             Joe Stearns:  Product Sales Manager - Agricultural
                                                   Products
             Ed Neitzke:  Account Manager - Agricultural Products
             Ed Freiter:  Research Specialist - Organic Chemicals
                                               and Intermediates

For Givaudan: Hal Brandman
              Ken Aspinwall
              Len Levy

Summary:     Analytical data obtained on impurities in Dow's TCP
             and various other problems arising from recent TCP ship-
             ments from Dow were discussed.  Dow's representatives in-
             dicated they would review their process and purification
             procedures in light of Givaudan's needs and contact us in
             early January, 1977 with their specifications for an up-
             graded TCP.

GIVA-FED-0000016636
ALCD-PUBCOM_0001575

– 2 –

A)  Color and Phenolic Impurities

   Using the specifications outlined in Mr. Levy's memo
to Mr. Von Essen of November 10, 1976 (attached), three major
areas were emphasized at the meeting:

  1)  Past experience at Givaudan has shown that light color
   2,4,5-TCP yields good color (W/s grade) G-11 and facili-
   tates phase separation during processing in the plant.
   The color of the TCP _per se_ as received from Dow shows
   wide variability – ranging from tan to dark brown.  To
   emphasize the color variation, several samples of Dow
   TCP (Givaudan Lot Nos. 12638-76, 12173-76 and 11040-76)
   were exhibited as well as 5% solutions of these lots.
   Samples of Hooker (no Lot No.) and ICMESA TCP (Givau-
   dan Lot No. 9260-76) were brought along for comparison
   purposes.  Dow was told that an acceptable color would
   be a Givaudan 5 (on a 5% alcoholic solution of TCP).
   Len Levy will submit the Givaudan color scale to Bob
   Hudberg.  There followed a discussion as to what might
   cause the color – Messrs. Tree and Saunders agreed to
   investigate the problem.

  2)  The presence of considerable amounts of 2,3,6-trichloro-
   phenol and isomeric dichlorophenols affects the purity
   of the hexachlorophene produced.  Dow is aware of the
   presence of these impurities in their TCP and will seek
   ways of reducing the levels of these materials.

GIVA-FED-0000016637
ALCD-PUBCOM_0001576

- 3 -

3) The presence of 2-chloro-5-methoxyphenol results in a
tan or reddish cast in the finished G-11.  Although
Dow was aware of the presence of "chloromethoxyphenols"
in their product, they had not assigned structures to
any of them.  Givaudan's isolation and identification
of 2-chloro-5-methoxyphenol was briefly outlined and
a sample (from Aldrich Chemical Company) was left with
them.

Hudberg agreed to send us samples of other "di-
chloromethoxyphenols" for analaytical purposes.  He also
presented a summary analysis of 16 lots of Dow TCP
(attached) most of which were shipped to Givaudan since
August.  (N.B. - no tetrachlorobenzene was detected).

3a) Several "extraneous" GC peaks were observed by Givau-
dan's Quality Control for Dow Lot Nos.* MM 9216 and 9286.
(These comprise part of Givaudan Lot Nos. 12173-76;
12828-76 and 12538-76).  Copies of Givaudan's GC curves
for these lots as well as those of acceptable material
were given to Hudberg.  Dow will re-analyze their re-
tained samples.  They are to let us know of their re-
sults and at that time the disposition of this material
will be determined.

* Dow's Lot No. represents the date of sampling from the TCP
holding tank.

GIVA-FED-0000016638

ALCD-PUBCOM_0001577

— 4 —

B) Net Weight of Drums

It was requested that Dow change the net weight of
the TCP drums from 600 lbs. to 500 lbs. in order to facilitate
our charging operation. This would probably only be necessary
for ~ one year at which time we anticipate running a larger batch
size. Dow responded that they might be able to do this, but it
would create some problems with regard to Dow's other customers
for this material. According to Dow, "Givaudan is their largest,
but not their only customer for this grade of TCP."

C) Lot Size

Over the past several months the shipments of TCP re-
ceived from Dow have had up to four different Dow lots, some of
which consisted of only one or two drums. In addition, the same
Dow lot has been received in several different shipments over a
period of 3 months' time. This presents Givaudan with problems
regarding sampling of the material (for Quality Control purposes)
and frustrates any attempt to correlate G-11 lots with the TCP
from which it was made. Dow agreed to ship as much as possible
from one lot in order to minimize the variability of the material
received by Givaudan [Dow's normal TCP batch size is ~ 30,000 lbs.,
but can be as much as 100,000 lbs. According to Ed Saunders, the
TCP is distilled into a holding tank and then pumped into a bulk-
ing tank in which the TCP is circulated. It is from the bulking
tank that the TCP is sampled.]

It was also agreed that Dow would supply a packing list
to accompany each shipment indicating the number of drums per lot
shipped.

GIVA-FED-0000016639
ALCD-PUBCOM_0001578

- 5 -

D)  TCDD Analysis

There was a review of the methodology used by Dow to
analyze for TCDD in their TCP and in the several samples of G-11
submitted to them for analysis.  Basically, their procedure is a
hexane extraction of an aqueous sodium hydroxide solution of G-11
followed by concentration of the extract and clean-up on a micro
column of activated neutral alumina.  The eluted fraction con-
taining the TCDD is concentrated to a volume representing 1/10
of the weight of the G-11 extracted.  This sample is analyzed on
a GC-MS instrument equipped for multiple ion detection (LKB or
Finnigan).  The lower limit of TCDD detection in the sample (as
analyzed) is about 5 ppb.

Dick Hummel, who runs the TCDD analyses, indicated
that they are using $Cl^{37}$ labelled TCDD to ensure complete extrac-
tion and minimal loss of TCDD during clean-up.  It was not clear
whether any G-11/TCDD analyses had been run with the $Cl^{37}$ tag in-
cluded.

A Lot of G-11 (No. 9326) had been analyzed by Dow and
was found to contain <1 ppb TCDD (letter from E. Freiter: August
21, 1976).  This same material was analyzed by Givaudan (Dubendorf)
and found to contain 15-20 ppb after repetitive analyses (letter
from J. Hostynek: November  1, 1976, p. 2 and N. Neuner report:
November 19, 1976, p. 6).  Since this is the G-11 on which an ex-
tensive toxicity program was run by Industrial Bio-Test (1970-1972),
Hummel was requested to re-analyze this sample using the $Cl^{37}$ TCDD
as an internal standard.  He should have completed his re-analysis
in about a week to ten days.

GIVA-FED-0000016640
ALCD-PUBCOM_0001579

- 6 -

Ed Freiter requested that three samples of G-11 (ex Dow TCP) be submitted to them for TCDD analysis.

E)  Miscellaneous

Among other subjects discussed were the following:

...... Dow is planning a new TCP facility (to be operational within 2 years and will take Givaudan's specification requirements into consideration when designing it.  They might consider supplying the TCP as pellets or "prills".  Dow will probably seek a 2 year commitment from Givaudan for their TCP. By early January, their technical people (Russ Tree, Bob Hudberg et al) expect to have completed their evaluation of Dow's ability to produce TCP meeting Givaudan's specifications.

......Len Levy and Bob Hudberg will exchange analytical methods used for quality control of TCP.  At present, Dow's QC method is based on GC only – i.e., no color tests, congealing point, iron analysis etc.  In the future, all quality control information obtained by Dow will appear on the Certificates of Analysis.

.....Dow wanted to know if Givaudan's hexachlorophene is recrystallized? Answer – No.  Does a "xanthene product" form in the manufacture of G-11?  Answer – Yes, but we know it to be less toxic than G-11 itself.

.....Joe Stearns expressed concern over TCDD levels in G-11 particularly with regard to whether a "no effect level" had been

GIVA-FED-0000016641
ALCD-PUBCOM_0001580

- 7 -

established.  Warren Crummett disclosed that Dow is conducting
a sub-acute feeding study with TCDD, but would not reveal levels
being tested.

.....If Givaudan is not Dow's only customer for TCP (see
Part B), what is it being used for and what price are others
paying?  At $2.40 - 2.50/lb. it's unlikely that anyone is making
2,4,5-T (~$1.75/lb.) from it.   Neitzke mentioned that Dow has
had several inquiries from people interested in purchasing TCP
in order to make hexachlorophene - most recently from Northeast
Pharmaceutical (Nepaco).

:dj

GIVA-FED-0000016642
ALCD-PUBCOM_0001581

SUMMARY OF 2,4,5 TRICHLOROPHENOL
LOTS 07156 - 11116

|  | $\bar{X}$ | $\sigma$ | 95% C.L. |
|---|---|---|---|
| 2,4,5-TRICHLOROPHENOL | 98.51 | 0.37 | 97.8% |
| 2,3,6-TRICHLOROPHENOL | 0.46 | 0.11 | 0.68% |
| DCP 2,4  2,5  2,6 | 0.42 | 0.29 | 0.82% |
| DCP 3,4 | 0.19 | 0.11 | 0.41% |
| TOTAL DCP | 0.51 | 0.30 | 1.21% |
| CHLOROMETHOXY PHENOL | 0.30 | 0.10 | 0.50% |
| DICHLOROMETHOXY PHENOL | 0.98 | 0.07 | 0.22% |
| 2,3,7,8 DIOXIN | <0.01 ppm | | |
| FREEZING POINT | | | |

GIVA-FED-0000016643
ALCD-PUBCOM_0001582

**G I V A U D A N**

**INTER-OFFICE MEMO**

Date  November 10, 1976

From  L. A. Levy

Div.  Q.A.

Subject  2,4,5-Trichlorophenol
Specifications

To  G. Von Essen

Copies for: K. Aspinwall    S. Gold
H. Brandman    M. Manowitz
J. Dorsky    C. Snyder
F. Eichel    J. Broderick

A discussion was held with Drs. J. Dorsky, M. Manowitz, and H. Brandman to formulate specifications for Dow 2,4,5-Trichlorophenol. These proposed specifications are enclosed.

You will note that two specifications are listed, one set for the product which we currently desire to purchase and the other for material we would like to have Dow produce in the near future. You will note that several items were described as "to be established". These items will have to be discussed with Dow.

I trust this information will be adequate for your preliminary discussions. If any further information is required, please feel free to contact me.

GIVA-FED-0000016644

ALCD-PUBCOM_0001583

## 2,4,5-TRICHLOROPHENOL SPECIFICATIONS

|  | Current Specifications | Recommended Future Specifications |
|---|---|---|
| 2,4,5-Trichlorophenol 98% | 98.5% Minimum | 99.5% Minimum |
| 2,3,6-Trichlorophenol | Less than 0.75% | Less than 0.3% |
| Total Dichlorophenols | Less than 0.5% | Less than 0.2% |
| Chloroguaicol | To be Established | To be Established |
| Congealing Point | 63°C Minimum | To be Established |
| Color (Melted Material) | Yellow to Brownish Yellow *Gardner Color 2 Maximum with a tan cast | Pale Yellow to Brownish Yellow Gardner Color 2 Maximum |
| Iron | To be Established | Less than 3 ppm |
| TCDD | Less than 10 ppb | Less than 10 ppb |
| G.C. Curve | To match control (No Extraneous Peaks) | To match control (No Extraneous Peaks) |

*Gardner color is not an extremely valuable method for determining color and a mutual color specification should be established in the future.

November 10, 1976

GIVA-FED-0000016645
ALCD-PUBCOM_0001584

# EXHIBIT 26

OxyChem's Comments in Opposition to Proposed Consent Decree,
*United States v. Alden Leeds, Inc., et al.*, Civil Action No. 2:22-cv-07326 (D.N.J.)

ALCD-PUBCOM_0001585

Page 1

1          UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF NEW JERSEY
2          NEWARK VICINAGE
           CIVIL ACTION NO. 2:18-cv-11273
3    OCCIDENTAL CHEMICAL CORPORATION,
         Plaintiff,                    DEPOSITION OF:
4        vs.                           JOHN HOFFMAN
     21ST CENTURY FOX AMERICA, INC.,
5    et al.,
         Defendants/Third-Party Plaintiffs,
6        vs.
     PASSAIC VALLEY SEWERAGE
7    COMMISSIONERS, et al.,
         Third-Party Defendants.
8    - - - - - - - - - - - - - - - -
9
10          TRANSCRIPT of the stenographic notes of
11   the proceedings in the above-entitled matter as
12   taken by and before RUTHANNE UNGERLEIDER, a
13   Certified Court Reporter and Notary Public of the
14   State of New Jersey, held at the office of GIBBONS
15   P.C., One Gateway Center, Newark, New Jersey, on
16   Thursday, August 11, 2022, commencing at
17   approximately 9:08 in the forenoon.
18
19
20
21
22
23
24
25

ALCD-PUBCOM_0001586

Page 2

```
 1  A P P E A R A N C E S :
 2
 3  GIBBS & BRUNS LLP
      1100 Louisiana, St. 5300
 4  Houston, Texas  77002
        BY:  ANTHONY N. KAIM, ESQ.
 5  Attorneys for Plaintiff
 6  GIBBONS P.C.
      One Gateway Center
 7  Newark, New Jersey  07102
        BY:  WILLIAM HATFIELD, ESQ.
 8        ADAM ARNOLD, ESQ.
        Attorneys for Ashland
 9
    PRETI FLAHERTY
10  One City Center, P.O. Box 9546
    Portland, Maine  04112
11    BY:  BENJAMIN S. PIPER, ESQ.
      Attorneys for Defendants Small Parties Group
12
13  ALSO PRESENT:
      THOMAS KEIGHLEY, Videographer
14  CHRISSY PIECHOSKI, Ashland
15
16  REMOTE PARTICIPANTS:
17  DANIELLE BAGWELL
      DAVE ERICKSON
18  GRANT GILEZAN
      JILL HORTON-MILLER
19  SOPHIA AMBERSON
      KELLY WOY
20  TREVOR TANIGUCHI
      MORRISON FAIRBAIRN
21  PATRICK McSTRAVICK
      MICHELLE SPENCER
22  JACOB GROUSER
      DAVID JOHNSON, Concierge
23
24
25
```

Page 3

```
 1        I N D E X
 2  JOHN HOFFMAN    PAGE
 3  By: Mr. Kaim  5
 4
 5
 6        E X H I B I T S
 7  NUMBER    DESCRIPTION                              PAGE
 8  Exhibit 1   Deposition Notice for Ashland            10
    Exhibit 2   Objections and Answers to                26
 9              Interrogatories
    Exhibit 3   Document ASHL-FED-5 through 100          28
10  Exhibit 4   Document OCC-TIG-E01765984 through 988  48
    Exhibit 5   Remedial Investigation Report            59
11  Exhibit 6   January 2019 Remedial Action Work Plan   64
    Exhibit 7   Figures from Remedial Action Work Plan   64
12  Exhibit 8   Document ASHL-FED-0000261965            119
    Exhibit 9   December 22, 1970 Letter                129
13  Exhibit 10  January 29, 1971 Letter                 132
    Exhibit 11  November 15, 1983 Letter                137
14  Exhibit 12  Selected Substances Report              153
    Exhibit 13  Ingredient List for Biocide 207         169
15  Exhibit 14  1972 Waste Effluent Survey              184
    Exhibit 15  1977 Waste Effluent Survey              187
16  Exhibit 16  Industrial Sewer Connection Permit      189
    Exhibit 17  Document OCC-TIG-E02825661 through 669  192
17  Exhibit 18  Sewer Connection Permit Application      198
    Exhibit 19  1976 Overflow Analysis                  201
18  Exhibit 20  June 13, 1983 Letter                    215
    Exhibit 21  September 1983 Letter                   217
19  Exhibit 22  NJDEP Memo                              218
    Exhibit 23  November 14, 1983 Letter                219
20  Exhibit 24  November 1, 1983 Letter                 223
    Exhibit 25  August 8, 1983 Report                   225
21  Exhibit 26  January 30, 2013 Memo                   228
    Exhibit 27  Analytical Results and Validation       234
22  Exhibit 28  July 19, 1982 Inspection Report         239
    Exhibit 29  Handwritten Notes                       240
23  Exhibit 30  E-mail                                  245
    Exhibit 31  Three Photographs                       246
24
25
```

Page 4

```
 1        THE VIDEOGRAPHER:  All right.  Good
 2  morning.  We're going on the record.  The time is
 3  approximately 9:08 on August 11, 2022.
 4        Please note the microphones are
 5  sensitive and may pick up whispering or private
 6  conversation.  Please mute your phones at this time.
 7        Audio and video recording will continue
 8  to take place unless all parties agree to go off the
 9  record.
10        This is media unit number one of the
11  video-recorded deposition of John Hoffman, and we're
12  here in the matter of Occidental Chemical versus
13  21st Century Fox America.  The location of this
14  deposition is Gibbons law office, which is
15  One Gateway Center, Newark, New Jersey.
16        My name is Thomas Keighley, representing
17  Veritext, and I'm the videographer.
18        Our court reporter is Ruthanne
19  Ungerleider, also with Veritext.
20        I am not related to any party in this
21  action, nor am I financially interested in the
22  outcome.
23        If any objections to proceeding, please
24  state them now.
25        Counsel and all present, everyone
```

Page 5

```
 1  including attending remotely, your appearance and
 2  affiliation will be noted on the stenographic record.
 3        If I could just ask the court reporter
 4  to please swear in the witness and we can proceed.
 5  JOHN HOFFMAN, 5 Robin Drive, Hockessin, Delaware,
 6  19707, sworn
 7  DIRECT EXAMINATION BY MR. KAIM:
 8     Q     Good morning, Mr. Hoffman.
 9     A     Good morning.
10     Q     My name is Anthony Kaim.  I'm from the
11  law firm of Gibbs & Bruns, and I represent Occi Chem,
12  the Plaintiff in this case.
13        Do you understand that?
14     A     Yes.
15     Q     And, Mr. Hoffman, you were just sworn in
16  by the court reporter.  You understand that you are
17  under oath today, just as if you were in the witness
18  stand in the courthouse?
19     A     Yes.
20     Q     If there is a point today where I ask
21  you a question, sir, and you don't understand what
22  I'm asking, could I please ask you to ask me to
23  clarify the question?
24     A     Yes.
25     Q     Mr. Hoffman, have you been deposed
```

Veritext Legal Solutions

800-227-8440                                            973-410-4040

ALCD-PUBCOM_0001587

Page 6

1 before?
2    A    Yes.
3    Q    How many times?
4    A    This is the -- this would be the fourth
5 or fifth time.
6    Q    Okay.
7         And have those depositions occurred as
8 an employee of Ashland?
9    A    Yes.
10   Q    Have you ever been a corporate
11 representative of Ashland before in a deposition?
12   A    No.
13   Q    All right.
14        Have any of those depositions, the four
15 or five depositions you have given before for
16 Ashland, involved the Kearny site?
17        And let me -- let me just clear up
18 before we begin.
19        Today when I refer to "the Kearny site,"
20 can we understand that we're referring to the site
21 that is at 1106 Harrison Avenue?
22   A    Yes.
23   Q    Did I get that address right, sir?
24   I believe I did.
25        Yeah, 1106 Harrison Avenue.  We'll refer

Page 7

1 to that today as the Kearny site.  Is that all right?
2    A    Yes.
3    Q    Okay.
4         So, I was asking, have any of your prior
5 depositions involved the Kearny site?
6    A    So, what do you mean by "involved"?
7    Q    Have any of your prior depositions
8 involved anything that occurred, took place on the
9 Kearny site, remediation of the Kearny site, injuries
10 at the Kearny site?
11   A    No.
12   Q    Okay.
13        Why don't we do this:  Can you tell me,
14 sir, about your prior depositions?  The first in
15 time, can you describe generally what it involved?
16   A    All the depositions or one, two, three?
17   Q    Why don't we start with the first in
18 time.
19   A    The first in time.
20        That would have been a deposition for an
21 NRD case.
22   Q    NRD related to a particular site?
23   A    Yes.
24   Q    Which site?
25   A    Parlin, New Jersey.

Page 8

1    Q    I'm sorry.  Mr. Hoffman, can you say
2 that again?
3    A    Parlin, New Jersey.
4    Q    Okay.
5         Was that in your personal capacity as a
6 fact witness or as a corporate representative of
7 Ashland?
8    A    Personal.
9    Q    All right.
10        How about the next deposition in time
11 that you gave on behalf of Ashland, or as an employee
12 of Ashland?
13   A    It involved the LCP site.
14   Q    Which is located where?
15   A    In Linden, New Jersey.
16   Q    And did it involve environmental matters
17 at the L -- the LCP site?
18   A    What do you mean by "involved"?
19   Q    What was the nature of the deposition,
20 what were the facts at issue in the case?
21   A    I'm not so sure it involved
22 environmental, yeah.
23   Q    What was the issue in the case?
24   A    It was more associated with the way we
25 manage our environmental reserves.

Page 9

1    Q    Okay.
2         I think we have a couple more to cover.
3         How about the next deposition in time?
4    A    The next one was the same as that second
5 one, yeah, there was two involved in that process.
6    Q    The LCP site?
7    A    Yes.
8    Q    Okay.
9         And is there one more deposition that
10 you have given as an Ashland employee?
11   A    I'm trying to think.
12        If it was, it was a long time ago, but I
13 don't remember.
14        They're the ones that I remember.
15   Q    All right, all right, thank you.
16        Now, you understand that today you're
17 here as the corporate representative of Ashland?
18   A    Yes.
19   Q    All right.
20        And so for the topics that were in the
21 corporate representative notice, you understand that
22 you'll be answering not on behalf of John Hoffman,
23 but on behalf of Ashland?
24   A    Yes.
25   Q    And are you prepared today to testify to

3 (Pages 6 - 9)

Page 10

1  Ashland's positions on the notice to corporate
2  representative topics?
3      A    Yes.
4      Q    Okay.
5          I'm going to mark an exhibit and hand
6  you what will be Exhibit 1 to your depo.
7          (Whereupon Deposition Notice for Ashland
8  is received and marked as Exhibit 1 for
9  identification.)
10         MR. KAIM:  Thank you.
11         MR. HATFIELD:  Thank you.
12     Q    Mr. Hoffman, do you see that I've handed
13 you the corporate representative deposition notice
14 for Ashland?
15     A    Yes.
16     Q    And have you seen this document before
17 today?
18     A    Yes.
19     Q    All right.
20         And have you reviewed the ten corporate
21 representative topics as part of your preparation for
22 the deposition here?
23     A    Yes.
24     Q    I want to look briefly at some of the
25 definitions, which start on the third page in.

Page 11

1          So, first, if you look at the bottom of
2  the page, do you see the deposition for Drew Chemical
3  Corporation property?
4      A    Yes.
5      Q    Okay.
6          And that is at 1106 Harrison Avenue.  So
7  we talked about, we may call that the Kearny site
8  today, right?
9      A    Yes.
10     Q    All right.
11         I may also refer to it on occasion as
12 the Drew Chemical property or the Drew property.
13         Is that all right?
14     A    Yes.
15     Q    And you understand, Mr. Hoffman, that
16 Drew Chemical Corporation operated at 1106 Harrison
17 Avenue from approximately 1970 to 1981?
18     A    Yes.
19     Q    All right.
20         And if you look at the first topic, if
21 you'll flip over to page six, please, and do you see
22 the first topic is the ownership and/or operation of
23 the Drew Chemical Corporation property during the
24 years 1970 to 2010?
25         Do you see that language?

Page 12

1      A    Yes.
2      Q    Okay.
3          And are you prepared to testify today
4  about the operation of the Drew Chemical Corporation
5  property during that time period, starting in 1970
6  and continuing on through 2010?
7          MR. HATFIELD:  Objection to form.
8      A    Can you repeat that --
9      Q    Sure.
10     A    -- question again?
11     Q    Are you prepared to testify today on the
12 operation of the Drew Chemical Corporation property
13 over that time period, 1970 to 2010?
14     A    Yes.
15     Q    Okay.
16         I want to ask you a little bit, sir,
17 about what you did to prepare for the deposition
18 today.  I'll start by asking, did you meet with any
19 current or former employees of Ashland or Drew
20 Chemical?
21     A    Yes.
22     Q    All right.
23         Who did you meet with?
24     A    Chrissy Piechoski.
25     Q    And what is Ms. Piechoski's title at

Page 13

1  Ashland?
2      A    She's a remediation project manager.
3      Q    What subjects did you speak with
4  Ms. Piechoski about?
5      A    The ongoing remediation at the site.
6      Q    Does Ms. Piechoski currently work with
7  respect to the ongoing remediation at the Kearny
8  site?
9      A    Yes.
10     Q    How long has she been working on that
11 project?
12     A    Three or four years.
13     Q    And the project has been going on, the
14 remediation project, for what now; 15 years or so?
15         MR. HATFIELD:  Objection to form.
16     A    I think you would have to describe the
17 remediation project.  What is the remediation
18 project?
19     Q    When did Ashland start remediating the
20 Kearny site?
21         MR. HATFIELD:  Objection to form.
22     A    What do you mean by "remediating"?
23     Q    When did Ashland start the current
24 remediation project at the Ashland site?
25         MR. HATFIELD:  Same objection.

4 (Pages 10 - 13)

Page 14

1    A    Can you define "remediation"?
2    Q    Why don't you tell me about the
3 remediation history that Ashland has undertook at the
4 Kearny site.
5    A    So start with the history, the very
6 beginning history, or an overall, or --
7    Q    Ashland stopped operating at the Kearny
8 site around 2010, correct?
9    A    Correct.
10    Q    All right.
11        And at that point in time, in 2010, it
12 began plans to close up, remediate, the property,
13 correct?
14    A    Yes.
15    Q    Ultimately wanting to sell the property.
16 True?
17        MR. HATFIELD:  Objection to form.
18    A    Ultimately wanting to sell the property?
19        I don't think that -- I don't think that
20 was defined as an ultimate goal.
21        MR. HATFIELD:  Counsel, I just want to
22 lodge an objection.  I don't think the intent of
23 future use of the property is among the topics for
24 examination, the ten that you identified in Exhibit
25 Number 1, and to the extent that you're going to go

Page 15

1 down this line of questioning with the witness,
2 because it's not one of the ten topics, he wasn't
3 prepared as a corporate designee.
4        You can ask the witness in his personal
5 capacity if he has knowledge about that subject area,
6 but to the extent that he testifies, it won't be to
7 bind the company.
8        MR. KAIM:  Your objection is noted.
9    Q    Has Ashland sold the property to-date?
10    A    No.
11    Q    Okay.
12        So fair to say that there -- that
13 Ashland has engaged in remediation activities at the
14 site since at least 2010?
15    A    Yes.
16    Q    All right.
17        And Ms. Piechoski, I believe you
18 testified, has been working on -- at the Kearny site
19 remediation projects for about three to four years,
20 right?
21    A    Yes.
22    Q    All right.
23        Who was working on remediation at the
24 Kearny site prior to that?
25    A    Prior to that?

Page 16

1        Shannon Lloyd.
2    Q    What is Ms. Lloyd's title at Ashland?
3    A    Mr.
4    Q    Mr.
5    A    He's a remediation project manager.
6    Q    Did you meet with Mr. Lloyd in preparing
7 for the deposition today?
8    A    Meet -- define "meet."
9    Q    Did you speak with Mr. Lloyd about the
10 deposition today?
11    A    Yes.
12    Q    All right.
13        What information did you learn from
14 Mr. Lloyd?
15    A    Just discussions on the remediation
16 project.
17    Q    Did you ask Mr. Lloyd any particular
18 questions?
19    A    Particular?
20        Again, what do you mean by "particular"?
21    Q    Did you -- do you recall any questions
22 that you asked Mr. Lloyd when you spoke with him to
23 prepare for the deposition today?
24    A    Numerous about the overall project as he
25 saw it before it came to Ms. Piechoski.

Page 17

1    Q    Anyone else that you spoke with or met
2 with to prepare for your deposition?
3    A    Just counsel.
4    Q    Okay.
5        And how long had Mr. Lloyd worked on the
6 remediation project at the Kearny site?
7    A    Approximately three to four years.
8    Q    Did you -- so you did not speak with
9 anyone at EHS in preparation for your deposition
10 today, correct?
11    A    No.
12    Q    Have you personally done work,
13 remediation work, at the Kearny site?
14    A    Define "done."
15    Q    What's your role been at Ashland with
16 respect to the Kearny site?
17    A    The remediation project managers report
18 to me.
19    Q    What is your title?
20    A    I'm the senior manager of remediation.
21    Q    So you oversee remediation at all of the
22 sites in which Ashland is remediating, is that fair?
23    A    Yes.
24    Q    How long have you had the role as senior
25 manager of remediation?

5 (Pages 14 - 17)

ALCD-PUBCOM_0001590

Page 18

1    A    Eight years.
2         Approximately eight years.
3    Q    2014 or so?
4    A    Approximately.
5    Q    How many sites are you currently
6    overseeing as the senior manager of remediation?
7    A    Approximately 170.
8    Q    In terms of hands-on decisions or work
9    that you've done with respect to the Kearny site in
10   particular over the last eight years, does anything
11   come to mind?
12        MR. HATFIELD: Objection to form.
13   A    What do you mean by "hands-on"?
14   Q    Anything that you particularly remember
15   with respect to the Kearny site where you have been
16   involved over the last eight years?
17   A    Again, what do you mean by "involved"?
18   Q    Do you have any particular memories of
19   any work that you have been involved with at the
20   Kearny site over the last eight years?
21        MR. HATFIELD: In his personal capacity?
22        MR. KAIM: Yes.
23   A    Yes.
24   Q    Okay.
25        How about -- let me make it more

Page 19

1    specific.
2         With respect to decisions about the
3    Kearny site, do you recall any decisions that you
4    have been involved with, involved in, over the last
5    eight years?
6    A    No.
7    Q    How many times have you been to the
8    Kearny site?
9    A    Once.
10   Q    When?
11   A    2000 and -- approximately 2018 or '19.
12   Q    Do you remember what took you to the
13   Kearny site in 2018 or 2019?
14   A    It was not -- we weren't -- or the trip
15   wasn't planned to go to the Kearny site. We went to
16   another site, and we drove by because we were in the
17   area.
18   Q    I see.
19        How long did you spend at the Kearny
20   site?
21   A    Fifteen, 30 minutes.
22   Q    Who do you think is the most
23   knowledgeable person at Ashland regarding the
24   operations at the Kearny site from 1970 to 2010?
25        MR. HATFIELD: Objection to form.

Page 20

1    A    So the most knowledgeable person?
2         I would not know the most knowledgeable
3    person, just what is in the documents, the names of
4    the people that are in the documents.
5    Q    All right.
6         Do you think you're the most
7    knowledgeable person at Ashland regarding the
8    operations at the Kearny site?
9         MR. HATFIELD: Objection to form.
10   A    Again, the most knowledgeable person?
11        So the operations at the Kearny site
12   pre-2010, is that what you're asking me?
13   Q    Yes.
14   A    I don't know.
15        I don't know if I am or if there is
16   somebody in the company that would be.
17   Q    Okay.
18        Ms. Piechoski, I take it, probably works
19   more on a day-to-day basis with respect to the Kearny
20   site than you do. True?
21        MR. HATFIELD: Objection to form.
22   A    Day-to-day basis may not be accurate,
23   but from the remediation perspective, she -- she
24   leads the program.
25   Q    Okay.

Page 21

1         And before that, Mr. Lloyd led the
2    remediation program with respect to the Kearny site?
3    A    Yes.
4    Q    How much time did you spend preparing
5    for this deposition today?
6    A    There was three two-hour remote
7    sessions. There was three-hour in-person session
8    yesterday. And my review of the files, or the
9    documents, approximately 40 hours.
10   Q    And the meetings, were they with
11   Mr. Hatfield?
12   A    All three meetings?
13        Yes, Mr. Hatfield was in all three
14   meetings, all three remote meetings.
15   Q    Okay.
16        And how about the in-person session?
17   A    Yes, Mr. Hatfield was in the in-person
18   session.
19   Q    Were there others in the sessions?
20   A    On the calls, I do believe Adam was
21   there. I'm not sure if he was there all three days.
22   Q    Anyone -- sorry to interrupt you.
23   A    Yeah.
24   Q    Go ahead.
25   A    No, go ahead.

6 (Pages 18 - 21)

Page 22

1    Q    Anyone other than lawyers in those
2  sessions?
3    A    Only Chrissy on the last remote call.
4    Q    And I want to ask you about the
5  documents you reviewed.
6         Are you aware that Occi Chem provided a
7  list of documents that we intend to question -- we
8  intended to question Ashland's corporate
9  representative about?
10   A    Yes.
11   Q    All right.
12        Do you know whether you reviewed any
13 documents beyond that list that Occi Chem provided?
14   A    Yes.
15   Q    All right.
16        This isn't a memory test, but do you
17 recall any specific documents that you reviewed that
18 were not on Occi Chem's list?
19   A    Would I know the name or a specific name
20 of a document?
21   Q    You could describe it, I would be fine
22 with that.
23   A    Again, I need to compare two sets of
24 files with hundreds of documents in them.  I'm sure
25 there were a handful that weren't in your files, that

Page 23

1  weren't in your documents.
2    Q    Right.
3         I'm just asking you, sitting here right
4  now, if any stand out to you, or you recall, "I know
5  this particular document which I can describe was not
6  on Occi Chem's list"?
7    A    Off the top of my head, I just could not
8  say, "Yeah, this document versus what was in your
9  guys' documents." I'm sorry, the Occi document.
10   Q    Did you review any documents in
11 preparing for the deposition that, to your knowledge,
12 have not been produced in the litigation?
13   A    Not to my knowledge.
14   Q    Okay.
15        MR. KAIM:  I'll just put on the record,
16 there is a subpoena for document request sent along
17 with the corporate rep notice.  To the extent, Bill,
18 you know, that you all reviewed any documents that
19 were not -- that have not been produced, we request
20 that they be produced.
21        MR. HATFIELD:  Understood.
22        We'll take that under advisement.
23        Sitting here today, I don't think that
24 there are any documents that have not been produced
25 or Bates-stamped that the witness has reviewed.

Page 24

1         MR. KAIM:  Okay.
2    Q    And, Mr. Hoffman, how many years have
3  you worked for Ashland?
4    A    Ashland?
5         Thirteen.
6    Q    Does it change the answer if I ask you
7  how many years you've worked for Ashland or any of
8  its successors?
9    A    Yes.
10   Q    Okay.
11        How many years have you worked for
12 Ashland or any of its successors?
13   A    Forty-two.
14   Q    All right.
15        Which successor entity did you work for?
16   A    Hercules.
17   Q    Have you always been in a remediation
18 role for those 55 years?
19   A    Fifty-five?
20        I'm not that old.
21        Forty-two.
22   Q    Oh; 42 total?
23   A    Forty-two.
24   Q    I'm sorry, I added 42 and 13.
25        Forty-two total.

Page 25

1         MR. HATFIELD:  Don't scare us.
2    A    Yeah, I lost a couple years there.
3    Q    All right, I'm with you now.
4         So over the 42 years, have you always
5  been in a remediation role?
6    A    No.
7    Q    Okay.
8         What other roles have you worked in?
9    A    Research and development.
10   Q    For products?
11   A    Correct, products.
12   Q    What type of products?
13   A    Hercules products, water soluble
14 polymers, paper chemicals, energetics.
15   Q    What are energetics?
16   A    Rocket fuel, rocket gun powder.
17        Numerous, numerous things, yeah.
18   Q    So I take it you have a science
19 background in education?
20   A    Yes.
21   Q    Can you briefly describe your education?
22   A    Yeah.  I have a degree in -- I have a BS
23 in chemistry.
24   Q    And where did you receive your BS in
25 chemistry?

7 (Pages 22 - 25)

Page 26

1    A    University of Delaware.
2         (Whereupon Objections and Answers to
3    Interrogatories is received and marked as Exhibit 2
4    for identification.)
5    Q    Okay. And, Mr. Hoffman, I've handed you
6    what I marked as Exhibit 2 to your deposition, and do
7    you see it is Ashland's Objections and Answers to
8    Interrogatories?
9         MR. JOHNSON: Anyone in the room, can
10   you hear me?
11        MR. GILEZAN: On speaker? Yes.
12        MR. JOHNSON: Yes.
13        So I'm asking if we have a digital
14   version of these exhibits so that I can introduce
15   them.
16        THE COURT REPORTER: Concierge, it's
17   very difficult to hear you, so can you speak up?
18        MR. JOHNSON: Give me one second. Let
19   me see if something is going on on my end.
20        MR. KAIM: It's fine.
21        The answer is no.
22        MR. JOHNSON: The answer is no, got it,
23   understood.
24        Can you hear me better now?
25        MR. GILEZAN: Yes.

Page 27

1         MR. JOHNSON: Thank you.
2    Q    Okay, let me retry the question.
3         Just simply, do you have now in front of
4    you, sir, as Exhibit 2, Ashland's Objections and
5    Answers to Interrogatories?
6    A    Yes.
7    Q    All right.
8         Did you review these in preparation for
9    your deposition?
10   A    Yes.
11   Q    All right.
12        The first question, easy one, on the
13   very last page there is a corporate certification
14   that is signed by Robin E. Lampkin.
15        Who is that?
16   A    Robin is internal counsel, inside
17   counsel, for Ashland.
18   Q    Okay.
19        A lawyer?
20   A    A lawyer, yes.
21   Q    Okay.
22        Let's, if you could, go to page four,
23   and on page four, do you see interrogatory number
24   two?
25   A    Yes.

Page 28

1    Q    And it asks "For each property at issue
2    identified in response to interrogatory number one,
3    describe your operations and the dates during which
4    they occurred, including any changes in the
5    operations that occurred over time."
6         Do you see that?
7    A    Number two?
8    Q    Yes, sir.
9    A    Yes.
10   Q    All right.
11        And one of the sites is the Kearny site,
12   you can see up in the answer to number one, right?
13   A    Yes.
14   Q    Okay.
15        And the answer to number two, about the
16   operations at the Kearny site, starts on page five,
17   and in the first paragraph refers to the preliminary
18   assessment document, right?
19   A    Yes.
20   Q    Okay. I'm going to hand you that
21   document, which I'm going to mark as Exhibit 3.
22        (Whereupon Document Bates-stamped
23   ASHL-FED-5 through 100 is received and marked as
24   Exhibit 3 for identification.)
25   Q    Okay. And you can see Exhibit 3 in

Page 29

1    front of you, sir, and it has the same Bates number
2    ending in 005 as the preliminary assessment that's
3    referred to in interrogatory two, correct?
4         MR. HATFIELD: Yeah, I just want to make
5    an objection, Counsel. This is not a complete copy
6    of the preliminary assessment report, and it doesn't
7    include all the Bates ranges as set forth in
8    interrogatory answer number two on page five.
9         MR. KAIM: Right.
10        And let me state for the record, this is
11   the text of the preliminary assessment report and
12   then the list of tables, or actually it includes all
13   of the tables. It does not include the figures,
14   appendices, et cetera, which I believe run on for
15   approximately 1400 pages.
16   Q    So, let me rephrase the question.
17        This is the text of the document that's
18   referred to in interrogatory number two, correct?
19   A    Yes.
20   Q    All right.
21        If you'll go with me to -- this is in
22   section two. The Bates number is 35.
23        Let me know when you're on page 35.
24   A    I am on Bates 35.
25   Q    Okay.

8 (Pages 26 - 29)

Page 30

1 And do you see on page 35 it refers to
2 historical operators, towards the top of the page?
3 A    Yes.
4 Q    Okay.
5 And it states that Harmon Color Works
6 operated the property from -- looks like 1948 -- no,
7 I'm sorry, in the early days, 1940s, right?
8 MR. HATFIELD:  I'm going to just object
9 to this line of questioning.  The deposition topics
10 for examination include operation of the site from
11 1970 to 2010 by Drew, and to the extent that you're
12 asking about prior site owners or operators, such as
13 Harmon Color, that is outside of the topic of the
14 deposition on behalf of the corporate designee of
15 Ashland.
16 To the extent that Mr. Hoffman has
17 personal knowledge about that operation, he is free
18 to answer, but that won't bind the company.
19 A    Can you repeat the question?
20 Q    Sure.
21 I was just asking about what the
22 document stated.
23 Why don't we go to Drew Chemical's
24 operations.
25 Do you see -- if you go two pages

Page 31

1 forward, on page 37, do you see where it says "Drew
2 Chemical Corporation"?
3 A    Yes.
4 Q    Okay.
5 And you are prepared to testify about
6 Drew Chemical's operations, right?
7 A    Yes.
8 Q    All right.
9 And there the -- there are two sentences
10 about Drew Chemical, right?  It says Drew purchased
11 the Kearny plant from Sun Chemical in 1970, correct?
12 A    Correct, that's what it says.
13 Q    It mentions a historical area photograph
14 of the site in 1978, right?
15 A    Correct, that's what it says.
16 Q    And then it says, "Drew's -- Drew
17 operations included the manufacturing of chemicals
18 for the marine industry," right?
19 A    Correct.
20 Q    All right.
21 Nothing else here in the historical
22 operator's section about Drew Chemical's operations
23 in the 1970s.  True?
24 MR. HATFIELD:  Objection to form.
25 A    In this whole section, there is nothing

Page 32

1 else about Drew Chemical Corporation?
2 Q    All right.
3 A    So that -- I'm asking you, you're
4 looking at this whole section?
5 Q    This section, correct.
6 A    The whole two section?
7 Q    Yes, sir.
8 (Witness reviews document.)
9 A    There is something on page 39 about
10 Ashland/Drew Marine Sales Division.
11 Q    That's under section 2.2, "Current
12 Operations," right?
13 A    Yes.
14 Q    Okay.
15 A    And all of section two, you were just
16 looking at section two, whatever that one is,
17 two-point -- 2.1.2?
18 Q    Okay.
19 A    That's what you're looking at?
20 Q    Let me ask you this:  When it says the
21 Ashland/Drew Marine Sales Division and Marketing
22 Groups -- I'm sorry, let me start that over.
23 It says, "Approximately 9 percent of the
24 products are sold to the marine industry by the
25 Ashland/Drew Marine Sales Division and Marketing

Page 33

1 Groups in the form of boiler compounds, diesel engine
2 cooling water rust inhibitors, fuel oil treatment
3 compounds, and an assortment of cleaning compounds."
4 Is that the sentence that you were
5 referring to?
6 A    Yes.
7 Q    All right.
8 Now, that is in a section, section 2.2,
9 called "Current Operations," right?
10 A    Uh-huh.
11 Q    All right.
12 Is that sentence referring to the
13 operations from 1970 to 1981?
14 A    This is referring to current operations.
15 Q    Okay.
16 All right.
17 So with respect to section two, with
18 respect to the Drew Chemical Corporation operations
19 from 1970 to 1981, was there anything that you saw in
20 your review of this section about those operations
21 other than the couple of sentences on the page Bates
22 numbered 37?
23 MR. HATFIELD:  Objection to form.
24 A    In the paragraph below, in the actual
25 link, acquired Drew.  Drew operations continued as

9 (Pages 30 - 33)

Page 34

1 Ashland Water Technologies Division.
2    Q    Okay.
3         You're talking about on page 37?
4    A    Yes. Yeah, page 37, yeah.
5    Q    Let's look at that paragraph, "Ashland
6 Inc."
7         Do you see the "Ashland Inc." in bold on
8 page 37?
9    A    Yes.
10    Q    Okay.
11         And it says, "In 1981, Ashland Oil,
12 Inc., now Ashland Inc., indirectly, through its
13 wholly-owned subsidiary, Kentucky Bitulithic, Inc.,
14 acquired Drew as part of its acquisition of the
15 United States Filter Corporation."
16         Do you see that?
17    A    Yes.
18    Q    And then it goes down, and the last
19 sentence there in that little paragraph says,
20 "Current operations are discussed in section 2.2,"
21 right?
22    A    Correct.
23    Q    And then if we turn over the page to --
24 it starts section 2.2.
25         Do you see the start there?

Page 35

1    A    Yes.
2    Q    And those -- that discussion in section
3 2.2, that is Ashland's current operations post-1981,
4 is that fair?
5    A    Yes.
6    Q    Okay.
7         So, for instance, if you look over on
8 page Bates numbered 39, in the same paragraph we were
9 talking about earlier, the second paragraph on the
10 page, and I'm going to look up one sentence, do you
11 see the sentence that states, "The facility produces
12 approximately 500 products"?
13         It's in the middle of that paragraph.
14    A    Yes.
15    Q    Okay.
16         And the sentence reads, "The facility
17 produces approximately 500 products, making up some
18 50 million pounds annually," right?
19    A    Yes, that's what the document says.
20    Q    Okay.
21         That is -- does that refer to the
22 operations from 1970 to 1981 under Drew Chemical?
23    A    No. This section is referring to the
24 current operations when the PA investigation was
25 initiated.

Page 36

1    Q    Okay.
2         And so if we could please look back at
3 Exhibit 2, which was the interrogatories. And if
4 you'll look, we were looking at the response to
5 interrogatory number two.
6         Fair to say this description of the
7 operations of the Kearny site that's on page five of
8 the interrogatories is a description of the current
9 operations, 1981 to 2010?
10         MR. HATFIELD: Objection to form.
11    A    Can you repeat your question, please?
12    Q    Yes.
13         This description or this interrogatory
14 response that's on page five, the response to
15 interrogatory number two, it's describing the current
16 operations from 1981 to 2010, correct?
17         MR. HATFIELD: Objection to form.
18    A    So current operations, current
19 operations, define "current."
20    Q    I'm actually -- when I'm defining
21 "current," it's what is talked about in sections --
22 it's the words from the preliminary assessment, 2.2,
23 "Current Operations."
24    A    So the time period is 2009-2010?
25         The PA was 2009-2010.

Page 37

1    Q    Okay.
2         Let me then -- sure.
3         I mean, is that -- so is it your
4 testimony then that the response to interrogatory
5 number two describes the operations at the Kearny
6 site from 2009 to 2010?
7         MR. HATFIELD: Objection to form.
8    A    So, again, I think this is on the
9 current, not 1970 or 1980, and I think if you look in
10 the documents, there is some additional date in those
11 documents about what the production was at the site
12 2007 -- 1970, 1980, 1990.
13         So I'm not sure that they produced 500
14 products through the whole lifetime of the facility,
15 or it was approximately 50,000 pounds annually.
16    Q    Okay.
17    A    Or 50 million pounds annually, excuse
18 me.
19    Q    Okay.
20         Nothing specific in this interrogatory
21 response about production or operations in the 1970s,
22 right?
23         MR. HATFIELD: Objection to form.
24    A    I'm sure it was very similar, but these
25 numbers may not be exactly what they were in 1970.

10 (Pages 34 - 37)

Page 38

1    Q    You were aware that the products that
2 were manufactured at the Kearny site changed over
3 time, correct?
4    A    The documents wouldn't show that they've
5 changed. Basically were principally the same.
6    Q    You were aware that the raw materials
7 that were used at the plant -- I'm sorry, at the
8 site, the Kearny site, changed over the years?
9    A    From the documents, yes.
10    Q    All right.
11        And the Kearny site was operated
12 differently in the 1970s than how it was operated in
13 the 1990s and 2000s, correct?
14        MR. HATFIELD: Objection to form.
15        Sorry. Objection to form.
16    A    Define "operated," yeah.
17        So do you mean the process, or --
18    Q    Yeah, sure, let's go through it. I
19 mean, this is -- we'll go through -- we're going to
20 go through this in detail, but different equipment
21 was used in the '70s than was used in 19 -- in the
22 1990s. True?
23        MR. HATFIELD: Objection to form.
24    A    Again, "different equipment," what type
25 of equipment? I mean, from all the documents that

Page 39

1 I've reviewed, my knowledge, it was all a batch
2 process.
3    Q    There were new aboveground storage tanks
4 installed at different times in different places.
5 True?
6        MR. HATFIELD: Objection to form.
7    A    From the documents, I do not believe any
8 of those have -- that there was -- there was new
9 buildings put in place I think at one point.
10    Q    Raw materials were stored in different
11 places in different buildings over time, correct?
12    A    Definitely raw materials were stored on
13 the -- on the facility, but I'm not sure that they
14 moved the places that the raw materials were stored.
15 Were they always stored in this location from 1970 to
16 2010?
17    Q    Okay.
18        Let me ask you if you'll look over --
19 Ashland does not dispute in this case that it is the
20 successor to Drew Chemical Corporation, correct?
21    A    Correct.
22    Q    All right.
23        And, in fact, Ashland acquired and
24 operated the Kearny site starting in 1981, correct?
25    A    Correct.

Page 40

1    Q    The employees that were working at the
2 site in the -- say in 1979 were the same employees
3 that were working at the site after Ashland acquired
4 the property in 1980 and 1981, correct?
5        MR. HATFIELD: Objection to form.
6    A    By employees, can you define
7 "employees"?
8    Q    Sure.
9        In general, the staff at the Kearny site
10 remained the same from when Drew Chemical was
11 operating it in the late '70s to when Ashland was
12 operating in the early '80s?
13    A    I would say the only one that I've seen
14 through the documents is most likely the plant
15 manager at the site.
16    Q    And did the plant manager at the site
17 remain the same?
18    A    I knew he was there during the Ashland
19 times, but I'd have to go back and look through the
20 documents to make sure he was there pre-1981.
21    Q    To your knowledge, Ashland maintained
22 the same staff at the site, in general, when it began
23 operating in 1980 from the operations in the late
24 '70s, correct?
25        MR. HATFIELD: Objection -- objection to

Page 41

1 form.
2    A    The same staff?
3        Again, define "same." Exactly the same
4 amount of people and number of people?
5    Q    In general, I said.
6    A    Yeah.
7        MR. HATFIELD: Same objection.
8    A    Yeah, the document doesn't show anything
9 but a couple of the -- of the people that ran the
10 business, you know, the plant manager.
11    Q    You're certainly not aware of Ashland
12 when it acquired the property laying off the current
13 staff, right?
14    A    I am not aware of that.
15    Q    And you're also not aware of Ashland
16 appointing a new plant manager when it acquired the
17 property, correct?
18    A    I am not aware of that either.
19    Q    And I think your testimony was, in
20 general, the operations remained the same from the
21 late 1970s to the early 1980s. True?
22        MR. HATFIELD: Objection to form.
23    A    In general?
24        I mean, I would say that the process was
25 a batch process, yeah.

11 (Pages 38 - 41)

Page 42

1    Q    It was a batch process in the late
2  1970s, batch process in the early '80s?
3    A    Correct.
4    Q    All right.
5        Going back to Exhibit 3, please, which
6  is the preliminary assessment.
7        If we could look -- I'm in the current
8  operations section now, which starts on page 38.
9        Okay.
10        And if you'll look over -- are you with
11  me, sir?
12    A    Yes.
13    Q    Okay, great.
14        If you'll look over, please, to page 39.
15  Do you see the section that starts, "Material
16  Handling"?
17    A    Yes.
18    Q    Okay.
19        I'm going to look at the second-to-last
20  sentence in that paragraph, which says, "Raw
21  materials are tested for compliance with quality
22  control standards and stored until they are required
23  for production."
24        Do you know whether in the 1970s raw
25  materials were tested for compliance with quality

Page 43

1  control standards?
2    A    There's nothing in the documents that
3  define the detail of quality control procedures
4  during that period.
5    Q    You haven't seen anything to that effect
6  in the documents?
7    A    No.
8    Q    Okay. If you'll look over to page 40,
9  please, the next page. And do you see the section
10  titled "Waste Management"?
11    A    Yes.
12    Q    Okay.
13        In the second paragraph, it starts,
14  "Representative samples of waste are collected by the
15  quality control lab for testing and analysis."
16        Do you see that?
17    A    Yes.
18    Q    Okay.
19        No indication that representative
20  samples of waste were analyzed during the 1970s
21  operations, correct?
22        MR. HATFIELD: Objection to form.
23    A    Can you repeat the question, please?
24    Q    Sure.
25        Did you see any indication that during

Page 44

1  the 1970s operations at the Kearny site wastes were
2  collected by a quality control lab and analyzed?
3        MR. HATFIELD: Same objection.
4    A    So "waste." Like, off-grade products?
5        Can you define the waste?
6    Q    Well, the document here says
7  "representative samples of waste."
8        Do you see that?
9        So I'm referring to waste in that
10  context.
11    A    So would you be in the content of the
12  paragraph above.
13    Q    If that is how you read it, sure, but
14  I'm asking you, in the 1970s, during the operations
15  of the 1970s, did Drew Chemical take samples and
16  analyze the waste?
17        MR. HATFIELD: Objection to form.
18    A    I'm trying to think through these
19  documents where there was evidence that samples were
20  disposed off site with waste samples being taken, you
21  know, whether samples, you mean analytical samples,
22  or do you just mean out-of-date material, or --
23    Q    To your knowledge, analytical samples of
24  waste were not routinely taken during the operations
25  during the 1970s, correct?

Page 45

1    A    Yeah, that's -- I didn't see anything in
2  the document to point to that.
3    Q    All right.
4        And so the next sentence here under
5  "Current Operations" says, "All samples collected are
6  recorded."
7        You didn't see any quality control log
8  book from the 1970s operations, did you?
9    A    Not in these documents.
10    Q    All right.
11        Okay. If you'll flip over to page 42,
12  please. Bates number 42. And we're in section three
13  now.
14        Do you see that?
15    A    Yes.
16    Q    Okay.
17        Now, in the second paragraph it talks
18  about a list of raw and finished bulk storage
19  products currently maintained at the facility and
20  references Table 3-1.
21        Do you see that?
22    A    Yes.
23    Q    Okay.
24        And Table 3-1 is at Bates number 83.
25        If you could please flip to that.

12 (Pages 42 - 45)

Veritext Legal Solutions

ALCD-PUBCOM_0001597

Page 46

1     Let me know when you're at Table 3-1.
2   A    "Summary of Chemical Storage in
3 Aboveground Storage Tanks."
4   Q    Okay.
5     And do you see there's a list about a
6 page long of various chemicals that are stored in the
7 aboveground storage tanks?
8   A    Yes.
9   Q    And that would be chemicals stored in
10 the 2009-2010 time period, is that accurate?
11   A    Yes.
12   Q    Okay.
13     I hand you what I'm marking as
14 Exhibit 4.
15     (Whereupon Document Bates-stamped
16 OCC-TIG-E01765984 through 988 is received and marked
17 as Exhibit 4 for identification.)
18   Q    Okay. Mr. Hoffman, do you have
19 Exhibit 4, which is a letter from Drew Chemical
20 Corporation to the Bureau of Engineering and Safety
21 at the New Jersey Department of Labor and Industry?
22   A    Yes.
23   Q    Okay.
24   MR. PIPER:  Anthony, I'm sorry, do you
25 have a Bates number on this?

Page 47

1     MR. KAIM:  Adam, would you mind handing
2 to Ben?
3     MR. PIPER:  Thank you.
4   Q    Okay.
5     And do you see the engineering manager
6 in this letter states that "We are attaching a list
7 of items which we anticipate will be stored in this
8 warehouse"?
9     Do you see that at the bottom of the
10 letter?
11   A    Yes.
12   Q    Okay.
13     And if we look over at the list of
14 chemicals to be stored in Drew's new warehouse
15 facilities at Kearny, New Jersey, right there at the
16 top, it says, "The following is a list of chemicals
17 to be stored in Drew's new warehouse facilities at
18 Kearny, New Jersey."
19     Do you see that?
20   A    Yes.
21   Q    And the date here is July 23, 1974,
22 right?
23   A    Yes.
24   Q    Okay.
25     And there is a list of two pages of

Page 48

1 chemicals, correct?
2     Approximately two pages of chemicals.
3   A    Let's say Bates number 5985 and 5986 are
4 the two pages you're asking about.
5   Q    Yes, sir.
6   A    Yes.
7   Q    Okay.
8     So I want to compare, in general, the
9 chemical list from 2009-2010 time period from the
10 preliminary assessment chemical list from 1974.
11     All right?
12   A    Okay.
13   Q    So do you have both of those in front of
14 you?
15   A    I do.
16   Q    Okay.
17     So the first chemical -- let's start
18 with 19 -- we're going to work from 1974 and then
19 look over to 2009-2010.
20     So the first chemical in 1974 that's
21 listed is Aerosol OT 7.5 percent.
22     Do you see that?
23   A    Yes.
24   Q    Okay.
25     Was that chemical stored at the -- at

Page 49

1 the Kearny site in 2009 and 2010?
2   A    The documents say it's not stored in
3 2010 -- 2009-2010.
4   Q    Okay.
5     As Ashland's corporate representative,
6 other than these documents, do you have any knowledge
7 that -- that Aerosol OT 7.5 percent was stored in
8 2009 and 2010 or are we relying on the documents?
9   A    We're relying on these documents.
10   Q    If you'll go over on the 1974 document,
11 please, Exhibit 4, on the second page of the
12 chemicals, do you see the chemical, and I'm looking
13 about three down, Stauffer N-521?
14     It's S-T-A-U-F-F-E-R.
15     Do you see that chemical?
16   A    Yes.
17     Methylene Bis Thiocyanate.
18   Q    Yes, sir.
19     And that is a form of Cyanide, correct?
20   A    I'm -- I'm not here to be an expert in
21 chemistry.
22   Q    Okay.
23     Is that chemical, the Stauffer N-521, a
24 form of Methylene Bis Thiocyanate that was stored in
25 the 1970s, was it stored at the site in 2009 and

13 (Pages 46 - 49)

ALCD-PUBCOM_0001598

Page 50

1  2010?
2        MR. HATFIELD: I'm going to object to
3  this line of questioning to the extent that those
4  chemicals are not listed in the deposition notice as
5  covered identified hazardous substances on page four
6  of the notice.
7        So to the extent that the witness has
8  personal knowledge about that, he can testify, but
9  these chemicals that you're asking about are falling
10  outside of the subject area for the corporate
11  deposition.
12        MR. KAIM: And, Bill, I'm happy for you
13  to just object outside the scope.
14        MR. HATFIELD: Okay.
15        MR. KAIM: I understand at that point
16  that he is answering in his personal capacity to the
17  extent the objection stands.
18        MR. HATFIELD: Understood.
19        Objection, outside the scope.
20        MR. KAIM: Thank you.
21    A    Okay. I'm sorry. Can you repeat the
22  question again?
23    Q    Sure.
24        I'm just asking you whether this
25  chemical, the Stauffer chemical, which was stored in

Page 51

1  1974, whether it's on the 2009 and 2010 document as
2  a chemical stored at the site in that time period?
3    A    Correct.
4    Q    It is not, correct?
5    A    It's not stored. It appears not to be
6  stored from these documents at this site in
7  2009-2010.
8    Q    Okay.
9        And if you'll go back to the 1974 list,
10  please, and I want to go back to the first page.
11        Do you see in the middle of the page
12  there are three chemicals called Dowicide, Dowicide
13  2, Dowicide B, and Dowicide G?
14        Do you see those?
15    A    Yes.
16    Q    Okay.
17        And the description for each of those is
18  Trichlorophenol, correct?
19    A    Correct.
20    Q    All right.
21        Was Trichlorophenol used at the site in
22  the 2009 and 2010 time periods?
23    A    This is a solid.
24        AST is a liquid.
25        So these would not match anyway.

Page 52

1        But from my understanding of the
2  documents, Trichlorophenal was not used on the site
3  in 2009 or 2010.
4    Q    All right.
5        But it was used on the site in the
6  1970s, correct?
7    A    Yes, as shown in the documents.
8    Q    Okay.
9        Would you agree, Mr. Hoffman, that the
10  chemicals stored on the site in the '70s and the
11  chemicals stored on the site in the 2009 and 2010
12  period are different?
13        MR. HATFIELD: Objection to form.
14    A    Again, define "different."
15    Q    Not the same.
16        MR. HATFIELD: The same objection.
17    A    Exactly the same?
18    Q    They're not exactly the same, can we
19  agree on that?
20    A    Can I restate the question and say some
21  of the chemicals that were on the site in 1970 were
22  not on the site in 2009?
23    Q    All right.
24        So you'll agree that some of the
25  chemicals that were used on site in the 1970s were

Page 53

1  not used in 2009 and 2010, correct?
2    A    That's correct.
3    Q    All right.
4        Okay. If we could go back to the
5  preliminary assessment, and if you'll go to page --
6  the document Bates numbered 42. And do you see --
7  we're in section three.
8    A    Yes.
9    Q    And if you look down, I want to talk
10  about section 3.2.
11        Do you see it says "Historic Operations"
12  here, right?
13    A    Correct, 3.2.
14    Q    Okay.
15        And the first sentence under "Historic
16  Operations" says, "Based on the operational history,
17  hazardous substances currently used at the plant are
18  likely similar to those used by previous chemical
19  manufacturers at the site."
20        Do you see that?
21    A    Yes.
22    Q    All right.
23        But I think we have established that
24  there were a number of chemicals that were used in
25  the 1970s period that were not currently used at the

14 (Pages 50 - 53)

Page 54

1  plant in the 2009 and 2010 time period.  True?
2      A    True.
3      Q    All right.
4          And was it the case, sir, that
5  identifying the hazardous substances that were used
6  at the site was important for determining which
7  chemicals to sample for during the remediation
8  process?
9          MR. HATFIELD:  Objection to form.
10     A    Can you repeat that again, please?
11     Q    Sure.
12     A    Yeah.
13     Q    When you're doing a remediation like
14  Ashland was doing here at the Kearny site in
15  2009-2010, forward, one of the things that Ashland
16  has to do is determine which contaminants to sample
17  for in the soil and the groundwater, correct?
18         MR. HATFIELD:  Objection to form.
19     A    One more time, I'm sorry.
20     Q    Okay.
21         Look, as part of the remediation
22  process, Ashland did contaminant sampling in the soil
23  and the groundwater at the Kearny site, correct?
24     A    Correct.
25     Q    Okay.

Page 55

1          And they didn't -- Ashland didn't
2  analyze for every possible contaminant known to man,
3  right?
4          MR. HATFIELD:  Objection to form.
5      A    Yes.
6      Q    Okay.
7          There was a list of contaminants that
8  Ashland analyzed the samples for.  True?
9          MR. HATFIELD:  Objection to form.
10     A    A list or lists, yes.
11     Q    All right.
12         And in determining which contaminants
13  were going to be analyzed for, Ashland had to look
14  back and see what hazardous substances were used at
15  the site historically, correct?
16         MR. HATFIELD:  Objection to form.
17     A    Correct.
18     Q    Okay.
19         And in making that determination of what
20  contaminants to analyze for, Ashland assumed that the
21  hazardous substances currently used at the plant are
22  likely similar to those used by previous chemical
23  manufacturers at the site.  True?
24         MR. HATFIELD:  Objection to form.
25     A    I think we have to define "likely

Page 56

1  similar."
2          How do you define "likely similar"?
3      Q    These are Ashland's words.
4      A    Yeah.
5      Q    I didn't pick the contaminants.
6      A    Right.
7      Q    Okay.  I'm reading the preliminary
8  assessment, and I'm asking you, as Ashland's
9  corporate representative, when Ashland was
10  determining which chemicals to analyze for in the
11  sample, it made the assumption that, based on
12  operational history, hazardous substances currently
13  used at the plant are likely similar to those used by
14  previous chemical manufacturers at the site, correct?
15     A    Right.  What it's saying is there were
16  some materials that were used through the history of
17  the facility.
18     Q    And it analyzed for those contaminants
19  that were used throughout the history, correct?
20         MR. HATFIELD:  Objection to form.
21     A    The ones that we were required to sample
22  for.
23     Q    Required by who?
24     A    NJDEP or the LSRP.
25     Q    All right.

Page 57

1          And the NJDEP and the LSRP determined
2  their requirements based on input from Ashland,
3  correct?
4          MR. HATFIELD:  Objection to form.
5      A    From input from Ashland?
6          Define "input."
7          So -- this PA?
8      Q    Sure, yes.
9      A    Yeah, whatever was in this document,
10  yes, or additional documents.
11     Q    And if you look down at the next
12  sentence, it refers to this chart, and it says, "The
13  following chemical substances were documented on
14  historic records," and then it has a chart with the
15  operator and chemical products, right?
16     A    Yes.
17     Q    Okay.
18         And do you see it talks about Harmon
19  Color, Rexall Drugs, and then the Drew Chemical, it
20  has a line item for Drew Chemical?
21         Do you see that?
22     A    Yes.
23     Q    Okay.
24         And the described chemical products for
25  the Drew Chemical operating period are solvents,

Page 58

1 correct?
2    A    Correct.
3    Q    Okay.
4         Let's look back at Exhibit 4, please.
5         And this is the list of chemicals that
6 were stored at the Drew warehouse facility in 1974.
7         There are a lot of chemicals on here
8 that are not solvents, right?
9         MR. HATFIELD:  Objection to form.
10         The witness is here as a corporate
11 representative, he's not here as an expert on
12 chemistry.  I think you maybe want to rephrase your
13 question in terms of a lay question and not an expert
14 question.
15    Q    There are a lot of chemicals on here
16 that are not solvents, right?
17         MR. HATFIELD:  Same objection.
18    A    I don't know about a lot, but there is
19 one or two here, I'd say, were not solvents.
20    Q    All right.
21         Is Trichlorophenol a solvent?
22         MR. HATFIELD:  Same objection.
23    A    Not to my knowledge.
24    Q    How about Cyanide, is Cyanide a solvent?
25         MR. HATFIELD:  Same objection.

Page 59

1    A    Cyanide.
2         MR. HATFIELD:  Also, beyond the scope.
3    A    So the material Cyanide?
4    Q    Is it a solvent?
5    A    Again, not to my knowledge.
6    Q    All right.
7         MR. KAIM:  Can we take a break?
8         Let's go off the record.
9         THE VIDEOGRAPHER:  Sure.
10         The time is approximately 10:35.  We're
11 going to go off the record.
12         MR. JOHNSON:  Folks on the Zoom, do we
13 need to be in breakout rooms?
14         MR. GILEZAN:  No, I don't think so.
15         MR. JOHNSON:  Okay.
16         (Brief recess taken.)
17         (Whereupon Remedial Investigation Report
18 is received and marked as Exhibit 5 for
19 identification.)
20         THE VIDEOGRAPHER:  The time is
21 approximately 10:51.  We are back on the record.
22    Q    Okay, Mr. Hoffman, are you ready to
23 continue your deposition?
24    A    Yes.
25    Q    Okay.

Page 60

1         When we broke we were talking about
2 sampling and chemicals that Ashland analyzed for.
3         I'd like to continue talking about that.
4         I've handed you what I've marked as
5 Exhibit 5.
6         Do you see that Exhibit 5 is the text of
7 Ashland's remedial investigation report for the
8 Kearny site dated March 1, 2017?
9    A    Yes.
10    Q    If you will flip, please, to the page
11 that ends in Bates number ending in 659.  And it's
12 page 27 of the report.
13         And actually, I'm sorry, if you go back
14 one page, we're going to get to the beginning of this
15 section.  It's section 4.6.
16         Do you see section 4.6 discusses the
17 remediation investigation activities in 2014 and
18 2015?
19    A    Yes.
20    Q    Okay.
21         And then flipping over to page 27, 4.6.1
22 discusses the soil sampling, correct?
23    A    Yes.
24    Q    Okay.
25         And if you'll look down at the second

Page 61

1 paragraph, it says, "Soil samples were analyzed for
2 the following," and it's four bullets of contaminants
3 that the samples were analyzed for, correct?
4    A    Yes, four bullets.
5    Q    Okay.
6         And those bullets, in general, describe
7 that the samples were analyzed for VOCs, SVOCs, EPHs,
8 and PCBs, correct?
9    A    Correct, SVOCs plus TIC, tentatively
10 identified compounds.
11    Q    What was the "T"?
12    A    "Tentatively."
13    Q    Okay.
14         So the soil samples were not analyzed
15 for 2,4,5-TCP, correct?
16    A    That is correct.
17    Q    Okay.
18         2,4,5-TCP was used at the site in the
19 1970s, correct?
20    A    That is correct.
21    Q    The soil samples were also not analyzed
22 for Dioxin, correct?
23         MR. HATFIELD:  Objection to form.
24         Time period?
25    Q    The soil samples described here in

16 (Pages 58 - 61)

Veritext Legal Solutions

ALCD-PUBCOM_0001601

Page 62

1  section 4.6.1 were not analyzed for Dioxin, correct?
2     A    So the time period would be the PA
3  sampling, or this RIR sampling?
4     Q    Yes, sir.
5     A    2009.
6          Correct.
7     Q    And it's the same thing with respect to
8  groundwater, which is in 4.6.2, and that is, Ashland
9  analyzed the samples for VOCs and SVOCs, correct?
10    A    Correct, SVOCs plus TICs.
11    Q    But the groundwater for the remedial
12 investigation sampling was not analyzed for
13 2,4,5-TCP, correct?
14    A    It wasn't defined here, but a TIC -- I'm
15 not an expert, but a TIC may pick 2,4,5-TCP up.
16    Q    Okay.  Let me ask this:  It is true that
17 the groundwater sampling from the remedial
18 investigation was not analyzed for Dioxin, right?
19    A    Correct.
20    Q    Okay.
21        But Ashland made the decision about what
22 contaminants to analyze for based on the historical
23 operations at the site?
24        MR. HATFIELD:  Objection to form.
25    Q    Fair?

Page 63

1         MR. HATFIELD:  Objection to form.
2     A    So define "Ashland made."
3     Q    Who -- who determined -- who made the
4  initial determination about which chemicals to
5  analyze for?
6     A    Again, "initial," what do you mean by
7  "initial"?
8     Q    Ashland -- Ashland made a recommendation
9  about what chemicals to analyze for, correct?
10        MR. HATFIELD:  Objection to form.
11    A    Well, Ashland would work through the
12 data or what they had or the information and then
13 work with the LSRP.  The LSRP would have that
14 discussion with Ashland, what should be sampled for.
15    Q    And Ashland was part of the discussion
16 about what to sample for and analyze for on -- on the
17 Kearny site?
18    A    Correct.
19    Q    All right.
20        Ashland certainly did not suggest that
21 Dioxin should be analyzed for on the Kearny site?
22    A    From these documents, no.
23    Q    And, to your knowledge, as Ashland's
24 corporate representative, Ashland never suggested
25 that Dioxin should be sampled for on the Kearny site?

Page 64

1     A    No.
2     Q    All right.
3         During the preliminary -- preliminary
4  analysis and the remedial investigation process,
5  Ashland was aware that 2,4,5-TCP was used in the
6  1970s at the Kearny site, correct?
7     A    Correct.
8         (Whereupon January 2019 Remedial Action
9  Work Plan is received and marked as Exhibit 6 for
10 identification.)
11    Q    Okay, I'm going to hand you Exhibit 6.
12        Okay.
13        Another remediation document.
14        Do you see that Exhibit 6 is the
15 Remedial Action Work Plan for the Kearny site dated
16 January 2019?
17    A    Yes.
18    Q    Okay.
19        Now, I want to talk about what was
20 sampled for and the results from that sampling.  And
21 at the same time I think it would be helpful to hand
22 you what I'm marking as Exhibit 7.
23        (Whereupon Figures from the Remedial
24 Action Work Plan is received and marked as Exhibit 7
25 for identification.)

Page 65

1     Q    Okay.
2         And I will represent to
3  you that Exhibit 7 comprises the figures from the
4  Remedial Action Work Plan.
5         All right?
6     A    Okay.
7     Q    Have you seen the figures to the
8  Remedial Action Work Plan?
9     A    Yes.
10    Q    Okay.
11    A    Not in 11-by-18s, though.
12    Q    Pretty nice.
13    A    A little easier to read.
14    Q    Yeah.
15    A    Okay.
16        If you could go to Exhibit 6 for me, the
17 Remedial Action Work Plan text, and I want to look at
18 page 19, which ends in Bates 511.
19        Okay, and here we are talking about the
20 results of the sampling analysis at the top of page
21 19, correct?
22        MR. HATFIELD:  Counsel, what section of
23 the report?
24        MR. KAIM:  I'm on page 19, the top of
25 page 19.

17 (Pages 62 - 65)

Page 66

1    This is horizontal delineation of VOCs,
2 SVOCs and PCBs.
3        MR. HATFIELD:  Section 4.1.4?
4        MR. KAIM:  Correct.
5        MR. HATFIELD:  Okay, thank you.
6    A    Yes.
7    Q    Okay.
8        And so it's saying, and it refers to
9 some figures, a figure, it says, "As shown on Figure
10 47 and Table 43, VOC exceedances of the NRDCSRS,"
11 which stands for non-residential direct contact soil
12 remediation standard, "are widespread across the
13 southeast portion of Block 284."
14        Do you see that?
15    A    Yes.
16    Q    Okay.
17        And that is a true statement, correct?
18    A    We have to define "widespread."
19    Q    I'm sorry?
20    A    We have to define "widespread."
21        I guess across the facility?
22    Q    Right.
23        And as Ashland's corporate
24 representative, you would agree "widespread" means --
25    A    Over the site.

Page 67

1    Q    -- over the entire site we see
2 exceedances of VOCs?
3        MR. HATFIELD:  Objection to form.
4    A    I wouldn't say over the entire site, but
5 over the site.
6    Q    Okay.
7        Over a large portion of the site we see
8 exceedances of the VOC standard?
9        MR. HATFIELD:  Objection to form.
10    A    "Large"?
11        I don't know what "large" means.
12        Ten percent, 20 percent, 30 percent?
13    Q    What percent would you put it at?
14    A    I wouldn't know from the documents.
15    Q    Okay.
16        You see it spread throughout the site
17 where you have samples taken with exceedances of the
18 VOC standards --
19        MR. HATFIELD:  Objection to form.
20    Q    -- correct?
21    A    Well, not throughout the site.  At areas
22 in the site we see VOC exceedances.
23    Q    Many areas, right?
24        MR. HATFIELD:  Objection to form.
25    A    Several.

Page 68

1    Q    More than ten?
2    A    I -- I don't know that either.
3    Q    Okay.
4        If you'll look at Figure 5.1 -- or 5-1,
5 it's in Exhibit 7, and it's Bates number 301.
6        Okay.
7        And these are referring to soil
8 sampling, correct?
9    A    Correct.
10    Q    Okay.
11        And the red dots indicate soil sampling
12 where VOC exceedances were indicated?
13        MR. HATFIELD:  Objection to form.
14    A    VOC exceedances of what?
15    Q    Exactly as it says, "VOC exceedances
16 to -- of impact to groundwater," right?
17    A    Correct.  VOCs impact the groundwater.
18    Q    That means the VOCs are high enough that
19 there is a concern they could actually impact
20 groundwater many feet below the surface, right?
21        MR. HATFIELD:  Objection to form.
22    A    Potentially.
23    Q    Higher than the limits that New Jersey
24 would allow, correct?
25        MR. HATFIELD:  Objection to form.

Page 69

1    A    That New Jersey limit is a default
2 limit.
3    Q    Higher than New Jersey's default limit,
4 correct?
5    A    Well, the default limit doesn't include
6 a lot of other characteristics of the geology and how
7 it migrates.
8    Q    Okay.
9        The red dots on here are all points
10 where on the Kearny site the VOCs that were sampling
11 exceed the impact to groundwater soil screening as
12 set by New Jersey?
13        MR. HATFIELD:  Objection to form.
14    A    Exceeds their generic limits, their
15 generic limits or screening limits, yeah.
16    Q    Right.
17        And so you agree at every one of these
18 points there is VOC in the soil, every one of the red
19 points?
20    A    As the document says, yeah.
21    Q    Okay.
22        And there are dozens of red samples on
23 here, correct?
24        MR. HATFIELD:  Objection to form.
25    A    More than a dozen, yeah.

18 (Pages 66 - 69)

Page 70

1    Q    More than two dozen, right?
2    A    I could count them.
3    Q    Well, you can count all the boxes,
4  right, because the boxes -- with respect to the red
5  dots, there are boxes that have the numbers for the
6  exceedances, right?
7    A    Correct.
8    Q    Okay.
9         And fair to say that VOCs were used at
10  the site in the more modern operations, 1980s through
11  2010?
12        MR. HATFIELD: Objection to form.
13    A    Can you repeat that again? "Were used"?
14    Q    Were either -- VOCs were present at the
15  site as a result of operations from 19 -- from the
16  1980 to 2010 operating period?
17        MR. HATFIELD: Objection to form.
18    A    To my knowledge, I have never seen
19  anything that there weren't solvents used on the site
20  pre-1980.
21    Q    And I'm asking you about the post-1980
22  period. They continued to be used on the site?
23    A    They were used.
24    Q    Okay.
25         So some -- I guess the solvents that are

Page 71

1  found in the soil here from the sample, does Ashland
2  know whether those solvents were put into the soil in
3  the 1970s or in the 1980 to 2010 period, or Ashland
4  just doesn't know?
5    A    Ashland doesn't know, and it may even be
6  pre-1970. I mean, this work is all for the whole
7  total operations, historic operations at the site, so
8  we're capturing all the previous owners and operators
9  at the site.
10    Q    And solvent was definitely used in the
11  '80s, '90s and 2000s, correct?
12    A    Yes.
13    Q    And it was used in the 1970s, correct?
14    A    I do believe so, yes, by the documents.
15    Q    If Ashland had sampled for the chemicals
16  that were used in the 1970s but not used in the 1980s
17  and beyond, Ashland would expect that those
18  chemicals, too, would be in the soil or the
19  groundwater?
20        MR. HATFIELD: Objection to form. Calls
21  for speculation, expert opinion.
22    A    Can you repeat that again?
23    Q    Sure.
24         We talked about Ashland -- there were
25  chemicals that were used in the 1970s that Ashland

Page 72

1  did not analyze the samples for that were taken
2  during the remedial investigation, right?
3        MR. HATFIELD: Objection to form.
4    Q    True?
5    A    One more time.
6        MR. HATFIELD: Same objection.
7    A    One more time, sorry.
8    Q    That is fine.
9         There were chemicals used in the 1970s
10  that were not used in the 1980s and beyond that
11  Ashland did not analyze for in its sampling?
12        MR. HATFIELD: Same objection.
13    A    Analyze for in soil or groundwater?
14    Q    Yes.
15    A    Yeah, there was many, yeah.
16    Q    Correct.
17         No basis to say in the 1970s the
18  chemicals from the operations on the site did not
19  make it into the soil or the groundwater, correct?
20        MR. HATFIELD: Objection to form.
21    A    I would say no, but there's no basis to
22  say that they did make it into the groundwater or
23  soil.
24    Q    Well, let's talk about that.
25    A    Yeah.

Page 73

1    Q    At some point the site was paved,
2  correct?
3    A    Correct.
4    Q    Okay.
5         And once -- once a site is paved, that
6  is at least an additional barrier to contaminants
7  reaching the soil or groundwater. True?
8    A    Correct.
9    Q    Okay.
10         For much of the 1970s a lot of the site
11  wasn't paved, correct?
12    A    Correct, a portion of the site was not
13  paved, yes.
14    Q    Okay.
15         And, in fact, and I'm reading from the
16  Remedial Action Work Plan on page 41, where it says,
17  "Impervious surfaces were installed in the late
18  1970s."
19        MR. HATFIELD: Which page, Counsel?
20        MR. KAIM: Forty-one.
21        MR. HATFIELD: Thank you.
22        MR. KAIM: Ends in Bates number 533.
23    Q    And, Mr. Hoffman, I was looking at
24  the -- the first full paragraph at the top.
25         Do you see the third sentence in it says

19 (Pages 70 - 73)

ALCD-PUBCOM_0001604

Page 74

1 "Impervious surfaces were installed in the late
2 1970s"?
3     A    Yes, I see that.
4     Q    Okay.
5          And it also says, "As a result, the
6 potential for incidental spills and leakages
7 diminished significantly."
8          Do you see that?
9     A    Yes, I see that.
10    Q    Okay.
11         And would you agree that after
12 impervious surfaces were installed there was less
13 chance for chemical spills to make it to the soil and
14 groundwater?
15    A    I agree that impervious surface would
16 stop migration to groundwater or soil.
17    Q    Right.
18         And from your experience, you know that
19 incidental spills and leakages happen, correct?
20         MR. HATFIELD: Objection to form, calls
21 for speculation.
22    A    From my experience, I -- I don't know
23 exactly when incidental spills and releases occur.
24    Q    It's certainly not Ashland's position in
25 this case that in the 1970s there were not incidental

Page 75

1 spills and leakages at the Kearny site, correct?
2         MR. HATFIELD: Objection to form, calls
3 for speculation.
4     A    Yeah, there's no evidence in these
5 documents of spills or releases at the Kearny site.
6     Q    I'm not -- I'm asking about Ashland's
7 position.
8          Is it Ashland's position, Mr. Hoffman,
9 that there were no incidental spills or leakages in
10 the 1970s at the Kearny site?
11         MR. HATFIELD: Same objection.
12    A    I can only state what I see in the
13 documents and read in the documents.
14         I have no knowledge of what happened or
15 spills that occurred in the '70s.
16    Q    So you don't know whether or not there
17 were spills or leakages, is that Ashland's position?
18         MR. HATFIELD: Objection to form, asked
19 and answered.
20    A    Yeah, I just said there is no knowledge
21 of spills or releases in the 1970s at the Ashland
22 facility.
23    Q    Okay.
24         I'll ask again, though.
25         In your experience, many decades in the

Page 76

1 remediation field, you understand that at a chemical
2 manufacturing site you are going to have incidental
3 spills and leakages?
4         MR. HATFIELD: Objection to form.  It
5 appears you are asking his personal experience and
6 not as a corporate witness, so beyond the scope.
7     A    Absolutely, there's spills and releases
8 over the years, but it depends on the type of
9 material.  The material, is it a solid, is it a
10 liquid.
11         Many different things would go into a
12 spill and a release and how that release migrates.
13    Q    And I'm not asking you about migration.
14 I'm just simply asking:  In your experience, at a
15 chemical manufacturing facility, you are going to
16 have incidental spills and leakages onto the ground?
17         MR. HATFIELD: Same objection, beyond
18 the scope, calls for speculation, and I think it
19 calls for expert opinion in the way you phrased this
20 question.
21    A    So, again, "onto the ground."
22         Is there impervious surface or not
23 impervious surface?  Is there a solid -- is it a
24 solid, is it liquid?
25         A lot of difference between the release

Page 77

1 of a solid and release of a liquid.
2     Q    I'm asking a much simpler question.
3 Okay?
4          And we have established, have we not,
5 that in the 1970s the Kearny site was not paved,
6 right?
7         MR. HATFIELD: Objection to form.
8     A    In the 1970s -- at some point in the
9 1970s the Kearny site appeared not to be paved, yeah.
10    Q    It wasn't paved until the late 1970s?
11    A    '70s, yeah, or portions of it wasn't
12 paved until the late 1970s.
13    Q    During the early and mid-1970s you would
14 expect that at a chemical manufacturing facility you
15 would have incidental spills and leakages?
16         MR. HATFIELD: Same objection, asked and
17 answered.
18    A    I don't expect anything.
19         Yeah.  Have they occurred?  Absolutely.
20 That is why we have 170 remediation sites.
21         Do they occur all the time at every
22 site?  No.
23    Q    That is not my question.
24         I'm just saying, you would expect that
25 there would be incidental spills and leakages, based

20 (Pages 74 - 77)

Page 78

1 on your experience for many decades dealing with
2 chemical sites?
3          MR. HATFIELD: I'm going to object, and
4 at this point you asked the question several times,
5 Counsel, and you're harassing the witness, so I would
6 ask you to move along.
7          He's answered this question about four
8 times. I'll have the court reporter read it all back
9 if you want, but I think you should move along.
10    Q    I'll ask it one more time.
11          MR. HATFIELD: If you ask it one more
12 time, I'm going to call the Special Master.
13          Listen, move it along. He's answered
14 this question over and over, Counsel. You're wasting
15 everyone's time. Let's move it.
16          MR. KAIM: Okay. Look --
17          MR. HATFIELD: I'm going to call the
18 Special Master.
19          MR. KAIM: Can I ask the question?
20          MR. HATFIELD: No. You've asked the
21 question.
22          MR. KAIM: I'm asking --
23          MR. HATFIELD: No. I'm going to call
24 the Special Master.
25          MR. KAIM: I'm asking a different

Page 79

1 question.
2          MR. HATFIELD: Okay, move along,
3 Counsel.
4          MR. KAIM: Okay.
5    Q    I want to ask, looking back at 5.1, all
6 these red -- red dots.
7          Okay?
8    A    Uh-huh.
9    Q    Ashland does not dispute that many --
10 that the VOCs in the soil at Ashland occurred because
11 of incidental spills and leakages, correct?
12          MR. HATFIELD: Objection to form.
13    A    Repeat one more time, please.
14    Q    Sure.
15          With respect to the VOC exceedances
16 where we have VOCs in the soil at the Kearny site,
17 Ashland does not dispute that those VOCs are there
18 because of spills or leakages?
19          MR. HATFIELD: Objection to form.
20    A    Well, again, we -- we analyze the soil
21 samples. We have no understanding of how they got
22 there, whether it's a spill, a release, a migration
23 from a different site, whatever it is, we do not
24 know. There is no source of where these came from.
25    Q    Is it Ashland's position that these VOC

Page 80

1 exceedances are from a source from a different site?
2    A    No.
3    Q    Okay.
4    A    It's a possibility, that's what I said.
5    Q    The LSRP at the Ashland site disagreed
6 with that possibility, right?
7          MR. HATFIELD: Objection to form.
8    A    I don't think any of the documents would
9 show that the LSRP disagreed with that, but the LSRP
10 would want to see -- it's independent of where the
11 spill, release, where it comes from. If it's on your
12 property, it's your obligation to define the problem
13 and how we're going to solve the problem.
14    Q    Well, at a minimum, Ashland does not
15 dispute that the VOCs that were on its property are
16 related to its use of VOCs over a multi-decade
17 period, is it?
18          MR. HATFIELD: Objection to form.
19    A    We don't understand where these came
20 from. They could have been pre-1970. We're not
21 sure.
22    Q    Okay. I want to go back to the
23 preliminary assessment, Exhibit 3.
24          Okay. If you will, go to page 43.
25 It's -- I'm sorry, Bates number 43.

Page 81

1          MR. HATFIELD: Bates 43.
2    A    Okay, Bates.
3    Q    Okay, and on Bates 43, do you see
4 section four, "Process Waste Streams"?
5    A    Yes.
6    Q    Okay.
7          And in 4.1, it starts that "The
8 permitted industrial wastewater discharge is composed
9 of blowdown from boiler, wash water from vessels, lab
10 sink drainage, and line flush, except zinc is
11 captured and reused."
12          Do you see that?
13    A    Yes, the first sentence.
14    Q    Okay.
15          And that would be permitted industrial
16 wastewater that was discharged into the sewer system,
17 correct?
18    A    Correct.
19    Q    All right.
20          And there's a list there, "Blowdown from
21 boiler, wash water from vessels, lapse in drainage
22 and line flush."
23          How about floor spills and sweepings,
24 those two would go to the sewer, correct?
25          MR. HATFIELD: Objection to form.

21 (Pages 78 - 81)

ALCD-PUBCOM_0001606

Page 82

1    A    So floor drains and sweepings --
2    Q    Floor spills -- floor spills and
3 sweepings that went into a drain.
4        MR. HATFIELD:  Same objection.
5    A    Again, the question is not -- most
6 likely not all spills and sweepings went into the
7 sewer system.
8    Q    Okay.  Some?
9    A    Yeah.
10   Q    Okay.
11   A    I don't know.  I'm saying likely not all
12 of them, yeah.
13       Maybe all of them were recovered or
14 swept up, maybe there is different things, I just
15 don't know whether it made it into the sewer or not.
16   Q    All right.  Well, if you look at the
17 next paragraph, and the second sentence says,
18 "Stormwater, process wastewater and spills which may
19 occur are combined within the collection system and
20 flow to the facility's wastewater treatment system
21 for treatment prior to discharge to the PVSC."
22       Do you see that?
23   A    Yes.
24   Q    All right.  So spills that go down floor
25 drains at the Kearny site make it to the sewer

Page 83

1 system, correct?
2    A    Yeah.  First to the facility's
3 wastewater treatment system.
4    Q    We'll talk about that in a second, but
5 is the answer to my question yes?
6        MR. HATFIELD:  Objection to form.
7    A    Yes.
8    Q    All right.
9        The facility's wastewater treatment
10 system does one thing and one thing only, and that is
11 monitor for pH, correct?
12       MR. HATFIELD:  Objection to form.
13   A    During this -- during this period?
14       What period?
15   Q    Oh, right.
16       Yeah.  Starting in the 1980s, the
17 facility had a wastewater treatment system that
18 monitored for pHs, correct?
19   A    Correct.
20   Q    Okay.
21       Didn't do any other treatment other than
22 pH treatment.  True?
23       MR. HATFIELD:  Objection -- objection to
24 form.
25   A    Correct.

Page 84

1    Q    And in the 1970s there was no water
2 treatment system prior to reaching the sewer
3 whatsoever, correct?
4    A    Correct.
5    Q    Okay.
6        Let's look at Figure 4, which is in
7 Exhibit 7.
8        And Figure 4 depicts the sewer system,
9 correct?
10       I'm sorry.
11       MR. HATFIELD:  Which figure?
12   Q    I meant -- I meant Figure 3-4.
13       MR. HATFIELD:  Okay.
14       MR. KAIM:  Thanks.
15   Q    You got 3-4?
16   A    I have 3-4.
17   Q    Okay.
18   A    "Drainage System Layout."
19   Q    Thank you.
20       And so the lines -- the purple lines on
21 this page represent the sewer system at the site,
22 true?
23   A    True.
24   Q    Okay.
25       Let me start by noting that there are

Page 85

1 four off-site discharge points, right, three along
2 Harrison Avenue and then one on Greenfield Avenue?
3    A    Can you identify them?
4    Q    One is at the -- okay.  So, north is on
5 Harrison Avenue, correct?  The direction north would
6 be up towards Harrison Avenue.  True?
7    A    Northwest, right.  Is that what you're
8 saying?
9    Q    Yeah.
10   A    This top box, northwest.
11       Sanitary stormwater.
12   Q    Okay.  So you're looking at the sanitary
13 stormwater box that is closest to the corner of
14 Harrison Avenue and Greenfield Avenue, correct?
15       Okay.
16       So let's call that one number three.
17   A    Oh, I'm sorry, I'm not looking at the
18 north.
19       There is three on the north border.
20 Okay.
21   Q    Perfect.
22       There is one on the west border.
23   A    On the west, labeled "stormwater."
24   Q    Yes, sir.
25       So we have four off-site discharge

22 (Pages 82 - 85)

ALCD-PUBCOM_0001607

Page 86

1 points, right?
2        Now, the one that is on Harrison Avenue
3 in the middle, which is labeled "combined stormwater
4 and industrial," do you see that one?
5    A    Yes.
6    Q    Okay.
7        And that one flows -- the line goes
8 right next to the two main operational buildings at
9 the site, correct?
10   A    Correct.
11   Q    And you can see in those buildings, we
12 got floor drains, FD, a number of floor drains
13 identified, right?
14   A    Correct.
15   Q    And we have manholes outside those
16 buildings, right?
17   A    Correct.
18   Q    Okay.
19       And the floor drains from those
20 buildings and the manholes outside all drain to
21 the -- the sewer that goes to the combined stormwater
22 and industrial discharge point on Harrison Avenue,
23 correct?
24   A    Correct.
25   Q    All right.

Page 87

1        And from Harrison Avenue, they would go
2 into the -- the PVSC system.  True?
3    A    Correct.
4    Q    And this site is in the Worthington CSO
5 district?
6        MR. HATFIELD:  Objection to form.
7    A    I -- I can't speak of the Passaic.
8    Q    Okay.  We'll look at a document later,
9 but you don't -- you don't know that, sitting here
10 today.
11       Okay.
12       I want to look at the sanitary
13 stormwater off-site discharge point that's close --
14 on Harrison Avenue and closest to Greenfield Avenue.
15   A    So the bottom one to the left?
16   Q    Yes, sir.
17   A    Yeah, sure.
18   Q    Do you know where in the facility --
19 what water that captures or where that comes from?
20   A    That one captures water from the parking
21 lot for the building, the main office building.
22   Q    Okay.
23       And are you aware that there is a
24 60-inch storm sewer that runs along Harrison Avenue?
25       MR. HATFIELD:  Objection to form.

Page 88

1    A    60-inch storm sewer?
2        I don't know if it's 60-inch.  I know
3 that there is a utility corridor there.
4    Q    Right.
5        Do you know whether this discharge point
6 at the northwest corner here on Harrison Avenue
7 connects to the storm sewer or the municipal sewer
8 lines?
9        MR. HATFIELD:  Objection to form.
10   A    It's my understanding that this one here
11 connects to the sanitary sewer, yeah, sanitary
12 stormwater, yeah.
13   Q    And I'll represent to you that I haven't
14 seen anything that would indicate that.
15       Do you -- can you point me to what your
16 basis is for that connecting -- for that connection
17 point at the northwest corner of Harrison Avenue
18 connecting to the sanitary sewer?
19   A    Just the label, that it's labeled
20 "Sanitary Stormwater," and I do believe, with the
21 additional work that's going on, all these have been
22 identified, and where they go, and where that utility
23 corridor goes also.
24   Q    And would that be in a remediation
25 document?

Page 89

1    A    It is, but it's still a draft.
2    Q    Okay.
3        Do you know when that is planning to be
4 finalized?
5    A    I -- I don't know the exact date.
6        Probably within the next year.
7    Q    With respect to the stormwater discharge
8 point that's on the west side, is it true that that
9 would collect stormwater from a drainage swale on
10 Boylan Avenue, which is just south of there?
11   A    The purpose -- well, I don't know about
12 Boylan Avenue, but our drainage from our parking lot
13 there goes to that stormwater detention basin.
14   Q    Do you know where it goes from that
15 stormwater catch point?
16   A    I would assume to the large stormwater
17 main that you said.
18   Q    All right.
19       And that storm sewer main that goes on
20 Harrison Avenue, it discharges into Frank's Creek,
21 correct?
22       MR. HATFIELD:  Objection to form.
23   A    I'm not sure of that, I have no
24 knowledge of it, exactly where that discharges at.
25   Q    Okay.

23 (Pages 86 - 89)

ALCD-PUBCOM_0001608

Page 90

1    Is it true that there is a pump house
2 for that 60-inch storm sewer that's just east of the
3 site that pumps to Frank's Creek?
4    A    Yeah, I have no knowledge of that.
5    Q    So with respect to the combined
6 stormwater and industrial discharge point on Harrison
7 Avenue, the middle discharge point, it is the case
8 that line flushes from the product lines would go
9 into that sewer discharge, correct?
10    A    Correct.
11    Q    As would wash-downs of the production
12 vessels, wash-down water from the vessels?
13    A    Correct.
14    Q    Lab sink drainage as well would go into
15 that sewer stormwater industrial discharge point,
16 correct?
17    A    As per the document.
18    Q    And that is true in the 1970s as well?
19    A    Yes. It was hooked to the sewer system
20 in the 1970s, or at least the documents say -- the
21 documents that I saw evidence of early '70s, '72 at
22 least it was connected to the sewer system.
23    Q    Okay.
24    I want to ask you -- if we can look at
25 the preliminary assessment again, Exhibit 3.

Page 91

1    And if you could please go to Bates
2 number 68.
3    And this is in section 5.3.5, "Storm
4 Sewer Collection Systems."
5    Do you see that?
6    A    Yes, 5.3.5.
7    Q    Yes, sir.
8    And down on the bottom paragraph, looks
9 like Ashland made an OPRA request from the PVSC in
10 mid-2009, right?
11    A    Correct.
12    Q    It says -- it says files were archived
13 in off-site storage.
14    And then I'm going to go down two
15 sentences, the sentence that says, "There was a call,
16 and URS inquired as to the initial sewer connection
17 of the plant."
18    And it says, "According to the PVSC, the
19 initial sewer connection for this area of Kearny was
20 not initiated until the late 1970's."
21    Do you see that?
22    A    I do, yes.
23    Q    Okay.
24    So is it the case that before the late
25 1970s the sewer lines did not connect to the PVSC?

Page 92

1    MR. HATFIELD: Objection to form.
2    A    Yeah, I have no knowledge of when the
3 sewer was connected to the PVSC. There was a sewer
4 outflow from the facility in the early '70s. PVSC
5 did a new permit in the late '70s. That doesn't mean
6 there wasn't a permit before that.
7    Q    Do you know where wastewater and
8 industrial wastewater that went into the sewer
9 connection from the Kearny site went prior to the
10 sewer connection in this area with the PVSC?
11    MR. HATFIELD: Objection to form.
12    A    Yeah, I don't know exactly where it left
13 the facility, but there are sewer surveys in the
14 documents.
15    Q    Well, I'm not asking where it left the
16 facility. Okay? I understand that this is the --
17 when we were looking at Figure 3-4, that was the
18 drainage layout of the property.
19    I'm asking about after it leaves the
20 property.
21    If it's the case that the initial sewer
22 connection for this area of Kearny was not initiated
23 until the late 1970s, when the process wastewater
24 left the site, say, in the mid-1970s, do you know
25 where it went?

Page 93

1    A    I have no knowledge of where it went.
2    Q    All right.
3    A    Besides what's in the documents.
4    Q    Have you seen or reviewed any documents
5 about where it went prior to going to the PVSC
6 treatment facility?
7    A    Yeah -- no. The only documents I have
8 seen are sewer surveys that whoever sent that, Drew,
9 they filled them out, sent them back in.
10    Q    All right.
11    So Drew was -- the Drew Chemical site
12 was connected to the sewer system as of the early
13 1970s, correct?
14    A    Correct.
15    Q    All right.
16    You just don't know whether once it made
17 it into the sewer system it went to a PVSC treatment
18 plant or not?
19    MR. HATFIELD: Objection to form.
20    A    Correct.
21    Q    Okay. I want to ask you now if you
22 could go back -- and I appreciate you jumping around
23 with me.
24    A    That is fine.
25    Q    I know there are a lot of documents

24 (Pages 90 - 93)

Page 94

1 here. If you could please go back to the Remedial
2 Action Work Plan, which is Exhibit 6.
3        Okay.
4        In the Remedial Action Work Plan, if
5 you'll go to Bates -- well, let's start with 496.
6        Okay.
7        And do you see in section 2.2.1, the
8 second paragraph, where it notes that the nearest
9 surface water body is Frank's Creek, which is
10 approximately 170 feet east of the site, correct?
11    A    2.2.1, right.
12    Q    Yes, sir.
13        The second paragraph.
14    A    Yes.
15    Q    Okay.
16        And you agree Frank's Creek is a
17 tributary to the Passaic, right?
18    A    Yes.
19    Q    And Frank's Creek, as it flows by the
20 Kearny site, flows north to south to the Passaic
21 River, correct?
22        MR. HATFIELD: Objection to form.
23    A    I would say that it flows north to south
24 for a portion of the time because it is tidal.
25    Q    All right.

Page 95

1        That is right.
2        So -- well, let me put it this way: We
3 can agree it's a tributary to the Passaic River,
4 right?
5    A    Yes.
6    Q    And it flows, generally, north to south,
7 correct?
8    A    Yes.
9    Q    Okay.
10        Now, there is -- and I'm looking on page
11 three of the document, Bates 495 is the prior page,
12 under the site description. And it might help to
13 also look at Figure 2-1 in Exhibit 7, just to orient
14 ourselves, which is -- it's the first big picture.
15    A    2-1?
16    Q    Yeah, the first color picture.
17        There you go.
18        Okay.
19        After the bullet points in the Remedial
20 Action Work Plan on page three, it talks about a
21 drainage swale that is south of the site.
22        All right.
23        And that drainage swale is along Boylan
24 Avenue, correct?
25    A    And where is this in the document? It's

Page 96

1 in 2.1?
2    Q    2.1, after the bullets.
3    A    After the bullets.
4        Yep.
5    Q    Okay.
6        And so on this picture, when we're
7 talking about south of the site, we're talking about
8 that there is a drainage swale along Boylan Avenue,
9 right?
10    A    Correct.
11    Q    Okay.
12        And, in fact, that drainage swale
13 captures runoff from the site, correct?
14        MR. HATFIELD: Objection to form.
15    A    The dates that it captured runoff from
16 the site?
17    Q    What dates did it capture runoff from
18 the site, Mr. Hoffman?
19    A    I don't know the exact date, but there
20 was a concrete barrier put up there at some point,
21 maybe in the '80s.
22    Q    '80s?
23    A    Yeah.
24    Q    Right.
25        So stormwater runoff from the site

Page 97

1 flowed to the swale prior to secondary containment,
2 like a concrete barrier, that was put in in the '80s.
3 True?
4    A    Correct.
5    Q    Okay.
6        So during the '70s stormwater runoff
7 from the site would have gone into the drainage swale
8 along Boylan Avenue, correct?
9    A    Potentially, yes.
10    Q    Okay.
11        Actually, it did, as Ashland has
12 represented there, right?
13    A    Okay.
14    Q    It says, "The drainage swale south of
15 the site captures runoff from the site."
16        And that is true. We know that happened
17 in the '70s, correct?
18    A    Correct. But it doesn't give a date
19 here, right?
20    Q    Okay.
21        But -- that is why I'm asking you.
22    A    Yeah.
23        Prior to the concrete barrier.
24    Q    Okay. So prior to the concrete barrier,
25 runoff from the site, in fact, flowed into the

25 (Pages 94 - 97)

ALCD-PUBCOM_0001610

Page 98

1 drainage swale along Boylan Avenue?
2    A    Okay.
3        Yes.
4    Q    All right.
5        The -- drainage swale -- the water
6 in the drainage swale along Boylan Avenue would --
7 would go, I guess, north to Harrison Avenue, the way
8 it drained would be north towards Harrison Avenue, is
9 that correct?
10   A    The drainage swale would, if it
11 overflowed, right. Sometimes there is standing water
12 in there, from my understanding, right.
13   Q    Okay.
14   A    There's standing water there. If it
15 overflows, it's caught at the stormwater catchment
16 basin on Greenfield Avenue.
17   Q    To the north?
18   A    To the north, yeah.
19   Q    And that either goes into the municipal
20 sewer system --
21       MR. HATFIELD: Objection to form.
22   Q    -- or into the 60-inch stormwater line
23 on Harrison?
24       MR. HATFIELD: Objection to form.
25   Q    Is that accurate?

Page 99

1    A    It would go into the stormwater
2 catchment basin on Greenfield Avenue. After that, I
3 have no knowledge of where it goes. But from the
4 work that we're doing now, it appears maybe, again,
5 when that document is out, that it would go to the
6 stormwater system.
7    Q    All right.
8        And if you could go with me in the
9 Remedial Action Work Plan, Exhibit 6, to Bates 532.
10   A    Say the Bates number again, please.
11   Q    532.
12   A    532.
13   Q    I'm in Exhibit 6.
14   A    Yeah.
15   Q    And it's page -- it's page 40 of the
16 document, if that is quicker.
17   A    Oh, okay.
18   Q    Okay.
19       Are you there?
20   A    I'm there, yes.
21   Q    All right.
22       And this is in section 2.2, which starts
23 on the prior page, but I want to ask you about the
24 top paragraph on page 40.
25       The second sentence of the first full

Page 100

1 paragraph says, "Based on information available on
2 the Town of Kearny's website, storm sewers in the
3 site vicinity direct runoff into Frank's Creek."
4        Do you see that language?
5    A    Yes.
6    Q    Okay.
7        And Ashland does not dispute that fact,
8 correct?
9        MR. HATFIELD: Objection to form.
10       Objection to form.
11   A    That's what the document says.
12   Q    Okay.
13       And so that is consistent with
14 stormwater runoff from the site in the 1970s that
15 flowed into Boylan Avenue, that stormwater would run
16 off into the storm drain and into Frank's Creek,
17 correct?
18       MR. HATFIELD: Objection to form.
19   A    Yeah.
20       When is the date of this information by
21 the Town of Kearny?
22       Yeah -- so pre this information?
23       All I could say is that when this
24 information was put in here, that is what it says, it
25 was directed to Frank's Creek.

Page 101

1    Q    All right.
2        And along Boylan Avenue, at the site, in
3 the 1970s there are a number of aboveground storage
4 tanks, correct?
5    A    Correct.
6    Q    Okay.
7        And today, that tank farm there along
8 Boylan Avenue has dikes around it, correct?
9    A    Correct.
10   Q    But it did not in the 1970s. True?
11   A    There -- there was some diking in 1970.
12   Q    In the early and mid-1970s?
13   A    Actually, yep, if you go to Bates 046 in
14 Exhibit 3, third paragraph, "According to Town of
15 Kearny records, Drew Chemical obtained a permit on
16 October 22, 1974 to construct tank foundations and
17 diking for nine ASTs."
18   Q    So in -- in October, at the end of 1974,
19 Drew Chemical obtained a permit to construct tank
20 foundations and diking, correct?
21   A    Correct.
22   Q    Okay.
23       So prior to October of 1974, we can say
24 with certainty no diking around the aboveground
25 storage tanks. True?

26 (Pages 98 - 101)

Page 102

```
 1        MR. HATFIELD:  Objection to form.
 2    A    Please restate your question again.
 3    Q    Sure.
 4        Prior to October of 1974 there was not
 5  diking or tank foundations around the aboveground
 6  storage tanks?
 7        MR. HATFIELD:  Same objection.
 8    A    To the knowledge that is in the
 9  documents?
10        Again, 5.1.1, "These tanks replace
11  historical AST in similar locations on sites which
12  may or may not have secondary containment."
13    Q    Okay.
14        Nothing you can point us to that would
15  indicate secondary containment prior to October of
16  1974?
17    A    Correct.  And nothing that I could point
18  to say there wasn't.
19    Q    But Drew Chemical did seek a permit to
20  construct diking in October of 1974, right?
21    A    That is correct.
22    Q    And do you know when it was actually
23  constructed?
24    A    I do not know the exact date it was
25  constructed.
```

Page 103

```
 1    Q    Okay.
 2        And just so we don't confuse it, though,
 3  the retaining wall along Boylan Avenue that separated
 4  the site from the drainage swale was not installed
 5  until the '80s, correct?
 6    A    That is correct.
 7    Q    Okay.
 8        All right.  If I could get you to jump
 9  back with me to Exhibit 6, the remedial action work
10  plan.
11        I want to ask now about -- I'm going to
12  focus now on groundwater.
13    A    Okay.
14    Q    Okay.
15        If you could go to page seven of the
16  document.  It's Bates 499.
17        Let's see if we can knock this out.
18        In the overview.
19        It's section 2.5.1.
20        And I'm looking at the second paragraph,
21  and the first sentence says, "The groundwater system
22  is well-understood and considered stable with
23  groundwater present under unconfined conditions
24  within the shallow intermediate and deep zones with
25  flow to the north-northeast and discharge to the
```

Page 104

```
 1  utility corridor in Frank's Creek."
 2        Do you see that?
 3    A    Yes.
 4    Q    Okay.
 5        And so the way the Kearny site works is,
 6  the groundwater in both -- in all of the shallow and
 7  intermediate and deep zones flows to the
 8  north-northeast towards Harrison Avenue, where there
 9  is a utility corridor, and once the groundwater
10  reaches the utility corridor it flows to Frank's
11  Creek.
12        Is that accurate?
13        MR. HATFIELD:  Objection to form.
14    A    That's what's written in this document,
15  that's what the document says, but work that we're
16  going -- ongoing now is not so positive that is the
17  case.  That's what was the understanding at this
18  time.
19    Q    And that's what Ashland represented to
20  the New Jersey DEP at this time, correct?
21        MR. HATFIELD:  Objection to form.
22    A    That's what was written in this document
23  in 2019.
24    Q    And if you look at the figures in
25  Exhibit 7 to your deposition, Figure 3-14, which is
```

Page 105

```
 1  at Bates 287, and this is a depiction of the
 2  groundwater flow direction, correct, and it's the
 3  blackout arrow pointing north to Harrison Avenue,
 4  correct?
 5        MR. HATFIELD:  Objection to form.
 6    A    Say that again, please.
 7    Q    This Figure 3-14 is a visual depiction
 8  of the groundwater flow direction north towards
 9  Harrison Creek, correct?
10        MR. HATFIELD:  Objection to form.
11    A    At what time?
12    Q    Harrison Avenue.
13    A    At what time?
14    Q    Well, the map was drawn on June 19,
15  2015.
16    A    Yes, as of June 19, 2015, or the date it
17  was taken before June 19, 2015 and represented on
18  this figure as of June 19, 2015.
19    Q    Okay.
20        Sir, are you telling me that it's
21  Ashland's position that as of June 2015 groundwater
22  flowed north on the site to Harrison Avenue?
23    A    That's what this information said at
24  that time, yes.
25    Q    Right, but that's -- my question is a
```

27 (Pages 102 - 105)

Page 106

1  little bit different.
2      A    Okay.
3      Q    Okay.
4          I'm asking, is it Ashland's position
5  that in the year 2015 the direction of the
6  groundwater flow at the site was north to Harrison
7  Avenue?
8          MR. HATFIELD:  Objection to form.
9      A    That's what Ashland represented on this
10 map with the date and the information that we had at
11 that time.
12     Q    I'm asking Ashland's position right now.
13         MR. HATFIELD:  Today?
14         MR. KAIM:  Yes.
15     A    Oh, as of today.
16     Q    So let me ask it again, okay, and I'm
17 saying -- there was groundwater at the site in 2015,
18 right?
19     A    Yeah.
20     Q    Now, I want to know where it went during
21 the year of 2015, and sitting here today, Ashland's
22 position is that during the year 2015 the groundwater
23 at the site flowed north to Harrison Avenue, correct?
24     A    With the information on this -- at this
25 date, this is the way the metric map was drawn.  So

Page 107

1  on this date in 2015, our understanding, Ashland's
2  understanding, that this was the groundwater flow at
3  that time.
4      Q    I get the feeling I'm about to learn
5  something new that I have not seen and has not been
6  produced in the case based on the way you're
7  answering my question, because I'm not asking about
8  what Ashland's -- Ashland's position at this time,
9  I'm asking you Ashland's position sitting here today.
10     A    Right.
11     Q    Okay.
12         So I'll ask it again.
13         Ashland's position, sitting here today,
14 about how its groundwater flowed at the site over the
15 last ten years, is it the case that Ashland's
16 position is that groundwater flowed north to Harrison
17 Avenue?
18     A    So Ashland's position now is this
19 groundwater map may or may not be totally correct,
20 with the ongoing studies we're doing, with the access
21 that other individual companies in the area are
22 asking us for, because their groundwater flow seems
23 to be coming from north to south, from right above us
24 on Harrison Avenue, right?
25         So there is a lot of things; access,

Page 108

1  other people's commingled plumes in this area, a lot
2  of things that we're doing to try to understand the
3  exact groundwater model and how we're going to solve
4  the groundwater issues that we have on our site.
5      Q    Who is working on that currently for
6  Ashland?
7      A    Chrissy Piechoski.
8      Q    Is there a particular consultant that
9  Ms. Piechoski and Ashland are working with?
10     A    There was probably EHS and then also
11 Geosyntec.
12     Q    And EHS prepared the remedial action
13 work plan and the figures that we're looking at,
14 right?
15     A    They did, yes.
16     Q    Okay.
17         "Geosyntec," did you say?
18     A    Geosyntec, yes.
19     Q    Is that a new consultant?
20     A    Geosyntec is a new consultant at the
21 site probably within the last year or so.
22     Q    And were they hired specifically to look
23 at this groundwater issue?
24     A    They were -- they were hired to look at
25 several -- several of these issues leading up to the

Page 109

1  remedy.
2      Q    When were they hired?
3      A    Probably about a year ago, approximately
4  a year ago.
5      Q    Are they involved, to your knowledge, in
6  any way consulting on the litigation?
7          MR. HATFIELD:  Objection to form.  To
8  the extent it calls for work product, I instruct the
9  witness not to answer.
10         MR. KAIM:  And I'm not asking him for
11 anything they communicated with counsel or yourself
12 with respect to the litigation, I'm just asking as a
13 fact, fact matter, are they consulting on the
14 litigation.
15         MR. HATFIELD:  Yeah, same objection.
16         Also, objection, outside the scope.
17     Q    You can answer.
18         THE WITNESS:  Can I answer?
19         MR. HATFIELD:  If it goes to work
20 product, you're instructed not to answer.
21         MR. KAIM:  Whether they're working on
22 the litigation cannot be work product.
23         MR. HATFIELD:  I can represent to you
24 they're not working on the litigation, yeah.
25     A    To my knowledge, they're working on the

28 (Pages 106 - 109)

ALCD-PUBCOM_0001613

Page 110

1  technical aspects of the site.
2     Q    Okay.
3     A    And if they have had any discussion with
4  Bill or any other of the law group, I have no idea.
5     Q    Okay.
6          And I think you testified their work
7  product is expected within a year or so?
8     A    This groundwater piece, probably within
9  a year or so, yeah.
10    Q    Can you describe for me one more time
11 the scope of Geosyntec's work with respect to the
12 groundwater?
13    A    To understand the groundwater, where
14 it's coming from, where it's flowing to, and
15 obviously the ultimate goal is to put a groundwater
16 remedy in place.
17    Q    All right.
18         Are they looking -- is Geosyntec looking
19 at any contaminants beyond VOCs?
20    A    Again, what do you mean -- can you
21 define "looking at"?
22    Q    With respect to the groundwater remedy
23 that you just referred to, what contaminants is
24 Geosyntec analyzing that remedy in order to deal
25 with?

Page 111

1     A    Yeah, to my knowledge, they're using the
2  existing data of all the investigational work. So
3  they're not analyzing for -- they're not doing any
4  more analysis of groundwater. They're using this
5  data to put their remedy together.
6     Q    All right.
7          So they're using the initial sampling
8  and what it was analyzed for historically, or in the
9  past?
10    A    Correct.
11    Q    With respect to the current groundwater
12 work -- let me rephrase that.
13         With respect to the groundwater work and
14 analysis that EHS had done through the Remedial
15 Action Plan in January 2019, they had looked at
16 primarily -- was it chlorobenzenes and one other type
17 of contaminant?
18         MR. HATFIELD:  Is that a question,
19 Counsel?
20         MR. KAIM:  Yep.
21    A    So the list of contaminants that were
22 looked at through the investigation would be -- there
23 should be a list in the PA.
24    Q    All right, but with respect to the
25 ground -- the ground -- the groundwater flow, isn't

Page 112

1  it the case that EHS looked at chloroethanes and
2  chlorobenzenes in particular?
3     A    They were part of the investigation,
4  yes.
5     Q    All right.
6          They did not -- they did not consider
7  PCBs, correct?
8          MR. HATFIELD:  Objection to form.
9     A    So EHS did not consider PCBs during
10 their efforts at this site.
11    Q    Okay.
12         Is Geosyntec considering PCBs?
13    A    No.  They would just be working -- there
14 were PCBs at this site, or in consideration at this
15 site.
16    Q    Right.
17         And, in fact, on Lot 282 there were PCBs
18 that exceeded the groundwater standards, correct?
19         It's Figure 5-3.
20         MR. HATFIELD:  That's Exhibit 7,
21 Counsel?
22         MR. KAIM:  Yeah.
23         MR. HATFIELD:  Bates numbered 2303.
24         THE WITNESS:  2303?
25         MR. KAIM:  Correct.

Page 113

1          MR. HATFIELD:  Okay.
2     A    Correct.  Again, they exceeded the
3  generic groundwater -- impact to groundwater soils
4  screening levels.
5     Q    Right.
6          And the screening level is 0.2, right,
7  as shown in the chart on Figure 5-3?
8     A    Correct.
9     Q    And the levels identified on Lot 282 for
10 one of the samples was 1.1, right?
11         Or I can't tell if that is 11 or 1.1.
12    A    Correct, SBA46Q3.
13    Q    Correct.
14         So that's, you know, 5X the screening
15 level, correct?
16         MR. HATFIELD:  Objection to form.
17    A    The impact to groundwater screening
18 level, which is a generic number, it has nothing to
19 do with what the final impact to groundwater
20 screening numbers are, yeah.
21    Q    My question is a lot simpler.
22         My question is simply that it is five
23 times the default impact to groundwater soil
24 screening level, correct?
25    A    Correct, 5.5, yes.

29 (Pages 110 - 113)

Page 114

1    Q    Yes, okay, 5.5 times for PCBs.
2         And there were two other soil samples on
3   Lot 282 that exceeded the default impact to
4   groundwater soil screening levels for PCBs, correct?
5    A    Correct.
6    Q    All right.
7         Has there been any analysis of the
8   groundwater flow for Lot 282?
9    A    Yes.  Figure 3.1.4 shows that the
10  groundwater -- there is a modern well on Lot 282, is
11  the smaller triangle lot, yeah.
12   Q    Right.
13        And so with respect to Lot 282, based on
14  Figure 3.1.4, you would likewise expect that the
15  groundwater flow is north to the utility corridor on
16  Harrison Avenue, correct?
17        MR. HATFIELD:  Objection to form.
18   A    I think this is the same discussion we
19  had before, that as of this date, with this
20  information, what we've talked about, the work that
21  is ongoing now.
22   Q    Okay.
23        But as of the work that Ashland did over
24  the years leading up to the Remedial Action Work
25  Plan, the groundwater flow for both Lot 282 and Lot

Page 115

1   283 was north to the utility corridor of Harrison
2   Avenue?
3    A    Correct.
4         MR. HATFIELD:  Objection to form.
5    A    It was inferred to go north-northeast.
6    Q    Okay.
7         And, in fact, EHS described the
8   groundwater system at the Kearny site as
9   well-understood in its January 2019 remedial action
10  work plan, correct?
11   A    Where at?
12   Q    On page seven.
13   A    That's what the document says.
14   Q    All right.
15        And with respect to PCBs, you would not
16  expect PCBs to dechlorinate or degrade in the same
17  way as you might expect chloroethanes or
18  chlorobenzenes to do so?
19        MR. HATFIELD:  Objection to form, calls
20  for expert testimony.
21   A    Yeah, I -- I have no knowledge of that.
22   Q    Okay.
23        Based on your decades of remediation
24  experience, you understand that PCBs are persistent
25  in the soils?

Page 116

1         MR. HATFIELD:  Objection to form.  Calls
2   for expert testimony and beyond the scope.
3    A    Yeah, I have -- I have no knowledge,
4   but, again, I can say what PCBs -- there's hundreds
5   of PCBs, they all have different degradation rates.
6    Q    The degradation rates are lengthy for
7   PCBs.  True?
8         Decades.  Correct?
9         MR. HATFIELD:  Same objections.
10   A    Lengthy?
11        I don't know what "lengthy" means.
12   Q    Decades.
13   A    Yes, again, I have no knowledge of
14  whether some are lengthy, decades, or some are not
15  decades.
16   Q    Okay.  So you just don't know?
17   A    I don't know.
18   Q    All right.
19        MR. KAIM:  Okay, why don't we break for
20  lunch.
21        THE VIDEOGRAPHER:  The time is 12:19.
22  We're going to go off the record.
23        (Luncheon recess taken.)
24        THE VIDEOGRAPHER:  The time is
25  approximately 1:17, and we are back on the record.

Page 117

1    Q    Sir, you ready to continue with your
2   deposition?
3    A    Yes.
4    Q    Okay.
5         Before we broke, earlier in the day we
6   were talking about the VOC exceedances on the Kearny
7   property and the soil, and I was asking you about
8   whether the source of those VOCs were the operations
9   on the Kearny property itself.
10        Do you remember that line of
11  questioning?
12   A    Yes.
13   Q    Okay.
14        And I had asked you whether the LSRP at
15  the site ever indicated to Ashland that those VOCs
16  did, in fact, come from the operations on the -- the
17  Ashland property itself.
18        Do you recall whether he did so?
19        MR. HATFIELD:  Objection to form.
20   A    Again, one more time with the question.
21   Q    Let me -- let me ask a better question.
22   A    Yeah.
23   Q    Let me go back to -- maybe see if I can
24  shortcut this.
25        Is it Ashland's position that the VOCs

30 (Pages 114 - 117)

Veritext Legal Solutions

800-227-8440                                                    973-410-4040

Page 118

1  that are in the soil on the Kearny site come from the
2  Drew/Ashland operations?
3      A    I think it would be Ashland's position
4  that they're recognized that they're in the soil, but
5  there's no source -- known source to them.
6          Again, the operations potentially could
7  have caused those, but some of those exceedances
8  could be caused from operations over the century or
9  two that the site was operated.
10     Q    All right.
11         So it's not Ashland's position that they
12  come from off-site sources; that is, the VOCs in the
13  soil on the Kearny site?
14     MR. HATFIELD:  Objection to form.
15     A    I don't think Ashland would say that
16  some of those exceedances on the boundaries of the
17  property, if they're in soil, couldn't have migrated
18  from another site onto this site.  Again, the source
19  of those soil exceedances are unknown, we have to
20  investigate them, and we have to clean them up,
21  right, but at the end of the day, we don't know the
22  source.  Maybe potentially there was migration from
23  soil from another property.
24     Q    All right.  Let me -- let me hand you
25  Exhibit 8.

Page 119

1          (Whereupon Document Bates-Stamped
2  ASHL-FED-0000261965 is received and marked as Exhibit
3  8 for identification.
4      Q    And let's just go over the players here.
5          This is an e-mail from a gentleman named
6  Mark Foley, correct?
7      A    Correct.
8      Q    And Mark Foley was the licensed site
9  remediation professional for the Kearny site, true?
10     A    Correct.
11     Q    And he's e-mailing here Mr. Lloyd, he
12  CCs Mr. Lloyd of Ashland, who, at the time in 2017,
13  was the remediation manager for the site.  True?
14     A    Correct.
15     Q    And also a Ms. Stayrook from EHS, right?
16     A    Correct.
17     Q    Okay.
18         Now, he is e-mailing about the RIR, the
19  remedial investigation report, is that right?
20     A    Correct.
21     Q    And he's providing a comment about the
22  groundwater section, and there was a conclusion, it
23  appears, that he quotes here.  He says, "The
24  conclusion that," quote, "the presence of
25  chloroethenes, chlorobenzenes, and benzene appear to

Page 120

1  be attributable, at least in part, to off-site
2  upgradient sources south of the site."
3          So he notes that conclusion that was in
4  the draft of the report, correct?
5      A    So the second -- essentially, the second
6  paragraph, first couple of sentences.
7      Q    Correct.
8      A    Correct.
9      Q    Do you recall Ashland taking the
10  position with respect to this site that the presence
11  of chloroethenes, chlorobenzenes, and benzene appear
12  to be attributable, at least in part, to off-site
13  upgradient sources?
14     A    Okay.  Your question one more time,
15  please.
16     Q    Right.
17         Do you recall Ashland taking the
18  position that the presence of chloroethenes,
19  chlorobenzenes, and benzene appear to be
20  attributable, at least in part, to off-site
21  upgradient sources south of the site?
22     A    Yes.
23     Q    All right.
24         And, in fact, the LSRP for the site, at
25  this time Mr. Foley, rejected that conclusion,

Page 121

1  correct?
2      A    Yes, by this document.
3      Q    Right.
4          And he says that has to come out, it
5  shall be deleted from the RIR, right?
6      A    Correct.
7      Q    And it came out of the RIR, in fact.
8  True?
9      A    Correct.
10     Q    Okay.
11         And Mr. Foley explained his reasoning
12  for why he disagreed with that conclusion, and he
13  explains that the majority of these materials,
14  chloroethenes, chlorobenzenes, and benzene, if not
15  all, were used or stored at the subject facility.
16  Most were stored or used in close proximity to the
17  monitoring well exhibiting the highest concentration
18  of these materials.
19         Do you see that?
20     A    Yes.
21     Q    Okay.
22         So at the time in 2017 the LSRP on the
23  site believed that the chloroethenes, chlorobenzenes
24  and benzene that were present in the soil at the
25  Kearny site were from the operations on the Kearny

31 (Pages 118 - 121)

Page 122

1 site, right?
2          MR. HATFIELD: Objection to form,
3 mischaracterizes the document.
4     A    Can you ask the question again, please?
5     Q    Sure.
6          And I'm asking you as Ashland's
7 corporate representative what the position was of its
8 LSRP about this groundwater issue, and the position
9 of the LSRP was that the chloroethenes,
10 chlorobenzenes and benzene present in the soil on the
11 Kearny site were from the operations on that site.
12          MR. HATFIELD: Same objection.
13     A    Well, the LSRP, as we know, is not part
14 of Ashland, he's working for the regulatory agency.
15 This was his opinion or his look at the review of the
16 data and saying, "Yeah, you had operations there.
17 There's concentrations in the soil. I believe that
18 it came from your facility."
19     Q    Right. That's my question.
20          It was Mr. Foley's belief, as the LSRP
21 on the site, that the VOCs that were present in the
22 soil at the Kearny site were from the operations on
23 that site, that was his belief, right?
24     A    At the time, but he also said in this
25 letter that if you think they're not, there's a way

Page 123

1 to go about doing that, right?
2     Q    But ultimately, in the documents we've
3 looked at, the remedial investigation, the
4 preliminary assessment, et cetera, it does not
5 attribute the VOCs to upgradient sources south of the
6 site, right?
7     A    Right, at this time, with this document,
8 yes.
9     Q    All right.
10          And that's true to-date?
11     A    Again, to-date, there's a bunch of
12 different things going on with the groundwater
13 program that we're trying to understand. People have
14 asked us for access because New Jersey has required
15 them to sample on our property. So, obviously, it
16 looks like there is a bunch of commingled plumes in
17 that area for groundwater.
18     Q    So let me rephrase the question.
19          With respect to the reports that have
20 been issued to-date, there is nothing that can point
21 to an upgradient source for the contaminants on the
22 Kearny property?
23          MR. HATFIELD: Objection to form.
24     A    So the date -- these reports do not show
25 an upgradient source with the information that we had

Page 124

1 at that time, yeah.
2     Q    And just to clarify, these reports,
3 we're talking about the reports we've looked at
4 today, you know, Exhibit 6, Exhibit 5, Exhibit 3.
5     A    Uh-huh.
6     Q    One thing I want to ask you, it says
7 here -- when it refers to off-site upgradient
8 sources, it indicates that those would be south of
9 the site, right?
10     A    South of the site, but there also may
11 be, from what we understand, another source north of
12 the site, like we were talking about earlier. The
13 groundwater, they're saying, is flowing from north to
14 south, from their facility toward the utility
15 corridor.
16     Q    I'm not asking about what somebody else
17 is saying now. I'm saying, at this time, and in the
18 draft of the RIR in 2017, Ashland's position or
19 Ashland's thought at the time was that the upgradient
20 sources were south of the site?
21     A    Correct.
22     Q    All right.
23          Now, with respect to -- you've
24 referenced a number of times a site north of -- north
25 of the Kearny site. What site is that?

Page 125

1     A    I don't recall the name, I just know
2 that we've been asked -- requested access for them to
3 sample on our site.
4     Q    Do you know the owner?
5     A    I -- I don't recall the owner's name.
6     Q    How far north of the site?
7     A    A quarter of a mile, half a mile.
8     Q    Have they shared with you any data?
9     A    Not that I'm aware of.
10     Q    So you -- you said something about mixed
11 plumes.
12          Is that just from what they've told you,
13 they haven't shared that data with you?
14     A    I have not seen any data.
15     Q    Okay.
16          You did not review any data that Ashland
17 may have from this potential site north of the
18 property in preparation for your deposition today?
19     A    I have not. I just recalled the
20 discussions that they've asked for access, and it
21 would be part of the whole overall program of
22 understanding the groundwater flow and all that as it
23 stands right now.
24     Q    Have they gotten -- have they taken
25 advantage of that access? Have they come on the

32 (Pages 122 - 125)

ALCD-PUBCOM_0001617

Page 126

1 Kearny property?

2   A   We have not given them access yet.

3   Q   Okay.  So they haven't done any

4 investigation?

5   A   Not on our property.

6   Q   Okay.

7       So this would be extremely early on in

8 that investigation?

9   A   Correct.

10  Q   Okay.

11      Later in 2017, following this e-mail we

12 looked at in Exhibit 8, Ashland decided to fire

13 Mr. Foley as its LSRP, correct?

14      MR. HATFIELD:  Objection to form.

15  A   I don't know if "fire" is the right

16 word.

17  Q   How would you describe it?

18  A   We released him from his LSRP duties.

19  Q   Okay.

20      That was Ashland's decision, right?

21  A   Yeah.

22  Q   Okay.

23      And was that -- did Ashland -- does

24 Ashland pay its LSRP?  Does the LSRP's payment come

25 from Ashland or the State?

Page 127

1   A   Like all the LSRPs, the parties pay.

2   Q   Okay.

3       And, so, when Ashland made the decision

4 to release Mr. Foley, it stopped paying him, right?

5   A   Absolutely.

6   Q   Yeah.

7       Okay.

8       So Ashland did decide to fire Mr. Foley

9 as its LSRP?

10      MR. HATFIELD:  Objection to form.

11  A   We released Mr. Foley from his duties as

12 LSRP.

13  Q   Okay.

14      That was not a mutual decision to renew

15 Mr. Foley, right, it was a decision on Ashland's

16 part?

17  A   Ashland made a decision, Mr. Foley

18 didn't object.

19  Q   Could he have objected?

20      I mean --

21  A   Well, he didn't object because he was

22 doing a lot of work for us, he was probably

23 overworked, and essentially him and the project

24 manager had a poor relationship.

25  Q   But you released Mr. Foley not just at

Page 128

1 the Kearny site, also the Belleville site.  True?

2   A   The same project manager.

3   Q   Okay.

4       Did Mr. Foley continue working as the

5 LSRP on any other Ashland sites?

6   A   Yes, he did.

7   Q   Does he currently -- does he still,

8 through today?

9   A   No.  Mr. Foley has moved on to a

10 private -- to a private company.

11  Q   Okay, I see.

12      All right.

13      Who was involved in making the decision

14 to release Mr. Foley from his LSRP role for the

15 Kearny site?

16  A   The major decision-maker would be

17 Shannon Lloyd.

18  Q   And was it Mr. Lloyd that had the poor

19 relationship with Mr. Foley?

20  A   Yes.

21  Q   Who is the new LSRP at the Kearny site?

22  A   The new SLR -- LSRP is Dave Russell, I

23 do believe, I recall in the documents, David Russell.

24  Q   Okay, yeah.

25      At AECOM?

Page 129

1   A   AECOM, correct.

2   Q   Why did Mr. Lloyd move off as the

3 remediation manager at the Kearny site?

4   A   Well, we reshuffled a lot of the

5 projects.  Actually, Chrissy came onto the -- into

6 the group in that 2017 time frame.  Shannon is based

7 in Dublin, Ohio.  Chrissy, in Wilmington, Delaware.

8   Q   Does Mr. Lloyd -- is Mr. Lloyd still

9 with Ashland today?

10  A   Yes, he is.

11      (Whereupon December 22, 1970 Letter is

12 received and marked as Exhibit 9 for identification.)

13      MR. HATFIELD:  Nine?

14      MR. KAIM:  Yeah.

15      MR. HATFIELD:  Exhibit 9?

16      MR. KAIM:  Yeah.

17  Q   All right, Mr. Hoffman, I've handed you

18 what I have marked as Exhibit 9, which is a

19 December 22, 1970 letter.

20      Do you see that?

21  A   Yes.

22  Q   Okay.

23      And it's a letter from Drew Chemical

24 Corporation from somebody named F.C. Simons to the

25 Kearny Fire Department, right?

33 (Pages 126 - 129)

Veritext Legal Solutions

800-227-8440                                                           973-410-4040

Page 130

1    A    Correct.
2    Q    Okay. The first thing I want to ask you
3  about this, do you see the Bates number at the
4  bottom, it starts with an OCC Bates label, and so
5  Occi, the Plaintiff, produced this document in the
6  case.
7    A    Uh-hum.
8    Q    And correct me if I'm wrong, and I'm
9  sure Bill will as well, but I do not believe that
10  Ashland has produced this document.
11        We're going to look at a number of
12  documents contemporaneous with this one produced by
13  Occi that I do not believe Ashland has produced.
14        Do you know why -- well, let me ask
15  this: Do you know if Ashland has records relating to
16  the operations at the site during the 1970s?
17    A    Any records of the operations?
18    A    Yeah. I mean, they were produced in the
19  documents. Whether it's a source survey or, you
20  know, production amounts, they were in the documents.
21    Q    Let me ask it more generally.
22        Could you describe if Ashland has boxes
23  or volumes of documents, in storage or elsewhere,
24  related to the 1970 operations at the site?
25        MR. HATFIELD: Objection, not -- not a

Page 131

1  scope, but the witness can answer if he has personal
2  knowledge.
3    A    I have no knowledge of any information
4  about the site except what the documents which have
5  been -- have been given to me.
6    Q    Okay.
7        All right.
8        So this document indicates that Drew
9  Chemical was notifying the fire department that they
10  had taken over the plant in November of 1970, right?
11    A    Second paragraph, yes.
12    Q    And is that consistent with Ashland's
13  understanding of the historical operations?
14    A    Yes.
15    Q    And he says, "The operations now and
16  hence forward will be the manufacture of water
17  treatment chemicals."
18        And, in general, the plant manufactured
19  water treatment chemicals in this period, from 1970
20  to 1981. True?
21    A    True.
22    Q    And the beginning operations used the
23  existing equipment as is, according to this letter,
24  right?
25    A    Correct.

Page 132

1    Q    And that would include, as he says here
2  in the second paragraph, the tank farm -- the
3  existing tank farm storage vessels?
4    A    Correct.
5    Q    So at that point in time the -- the
6  storage vessels were not new.
7        Does Ashland have a position on how old
8  they were when Drew Chemicals started using them?
9    A    No, I have seen no information on that.
10    Q    All right.
11        (Whereupon January 29, 1971 Letter is
12  received and marked as Exhibit 10 for
13  identification.)
14    Q    Okay. I'm going to hand you Exhibit 10.
15        I'm going to go forward just a month, I
16  guess, from the last letter. A company called
17  Singmaster & Breyer, Inc. is writing a letter to the
18  building inspector of Kearny.
19        Do you see that in Exhibit 10?
20    A    Yes.
21    Q    Okay.
22        I'm going to go to the second paragraph,
23  in the bottom of the second paragraph.
24        Actually, I'll start at the top.
25        He first notes that they're going to --

Page 133

1  they're working on some construction, they're not
2  going to put in any new buildings at the site, right?
3    A    Yes.
4    Q    "Drew plans to continue to use the
5  existing main process building for their own
6  processing function and to also use offices,
7  warehouse, machine shop for the same functions as
8  previously existed," correct?
9    A    Correct.
10    Q    Except in the next sentence, "The
11  process building, number 713, which was used for
12  manufacturing by Sun, will now be utilized as a
13  drumming building for products manufactured in the
14  main process building."
15        So Drew is going to start to move the
16  finished product from the main process building and
17  drum it in building 713, right?
18    A    That's what the document says.
19    Q    Okay.
20        And is Ashland's position that that is
21  how the operations generally occurred during the
22  1970s?
23        MR. HATFIELD: Objection to form.
24    A    So can you repeat the question, please?
25    Q    Sure.

34 (Pages 130 - 133)

Page 134

1    During the 1970s you would expect --
2  Ashland would expect -- that once the chemical was
3  manufactured in building 720, that it would be moved
4  to building 713 for drumming?
5    A    Where -- I would assume, yep, where the
6  product was being drummed, if it was being drummed.
7    Q    Right.
8    In other words, you got to transport it
9  from where it's manufactured to where it's being
10  drummed, correct?
11    A    Transport -- define "transport."
12    Q    Move.
13    A    Conveyance line?
14    Q    I'm not -- I'm not asking you how it was
15  transported, we'll get there. I'm just telling you,
16  the product has got to move from the process building
17  where it's manufactured to the building where it's
18  being drummed?
19    A    Correct.
20    Q    Okay.
21    Okay. Now, moving more specifically to
22  the process, this letter states that, and I'm on the
23  second page, the second paragraph, "The majority of
24  the processing operations conducted at the plant will
25  consist of simple blending and mixing operations in

Page 135

1  which solid or liquid raw material is fed into an
2  agitated tank and dissolved or dispersed in a solvent
3  or carrier," right?
4    A    Correct.
5    Q    And in order to dissolve or mix
6  chemicals, the process would involve heating. True?
7    MR. HATFIELD:  Objection to form.
8    A    Repeat, please. I'm sorry.
9    Q    Let me make it more specific.
10    Did Drew's operations on the site in the
11  1970s for their products involve heating?
12    MR. HATFIELD:  Objection to form.
13    A    For some of their products.
14    Q    All right.
15    Which products did not involve heating?
16    A    Out of the 500, I wouldn't know which
17  ones didn't, but I would assume it was a simple
18  mixing operation. To disburse, sometimes you need
19  heat, sometimes you don't need heat.
20    Q    All right.
21    The Drew Chemical plant didn't make 500
22  products in the '70s, right?
23    A    I don't know what the number was. It
24  was probably in the hundreds, I would guess, but it
25  grew as the production got larger.

Page 136

1    Q    Okay. The next sentence says, "The
2  solvents are usually water or alcohol or
3  petroleum-based liquids and the operations, with few
4  exceptions, are conducted at atmospheric pressure at
5  low to medium temperatures, ambient to 350 degrees
6  Fahrenheit."
7    Do you see that?
8    A    I do, yes.
9    Q    Okay.
10    And is that an accurate statement about
11  the temperatures that were used on the Drew Chemical
12  site?
13    A    That's what the document says.
14    Q    Okay.
15    And, in fact, the equipment at the site
16  was designed to reach 350 degrees Fahrenheit at
17  least?
18    MR. HATFIELD:  Objection to form.
19    A    I would assume some of the equipment at
20  least. At least some of the equipment.
21    Q    All right.
22    So you would expect that some of the
23  blending and mixing operations involved equipment
24  that could reach 350 degrees Fahrenheit?
25    A    Yes.

Page 137

1    Q    All right.
2    Okay.
3    And then according to this letter, from
4  January of 1971, I'm skipping down a paragraph, "The
5  plant effluent into the sewer system will consist
6  primarily of floor washdowns with water, and once
7  through cooling water through vessel jackets."
8    So plant effluent at this point in time
9  beginning in the 1970s went through the sewer system,
10  correct?
11    A    That's what the document says.
12    Q    Right.
13    And you would expect that, for instance,
14  washwaters from the process vessels would have gone
15  to the sewer system at this point in time?
16    A    Yes.
17    Q    And you would likewise expect once there
18  were pipes to connect production to drumming or
19  elsewhere that line flushes of those pipes would go
20  to the sewer system?
21    A    Yes.
22    Q    All right.
23    (Whereupon November 15, 1983 Letter is
24  received and marked as Exhibit 11 for
25  identification.)

35 (Pages 134 - 137)

Veritext Legal Solutions

Page 138

```
1    Q    I'm going to hand you Exhibit 11.
2         Okay.  Now, this document is from the
3  early '80s, okay, and I'm going to ask you to look at
4  the letter that's dated November 15, 1983.
5         Do you see that?
6    A    I do.
7    Q    Okay.
8         And it's a letter from Kurt V. Weiss,
9  the director of manufacturing at Drew Chemical
10  Corporation.
11         Have you seen his name on documents?
12    A    Yes.
13    Q    Okay.
14         Do you know how long Mr. Weiss continued
15  to work for Drew Chemical and Ashland?
16    A    I do not know the exact time period, and
17  I did not see any of that in the documents, I just
18  saw his name.
19    Q    All right.
20         So you never met Mr. Weiss?
21    A    I never met Mr. Weiss, no.
22    Q    Okay.
23    A    Even though I have worked 55 years.
24         MR. HATFIELD:  That was coming back to
25  you.
```

Page 139

```
1         MR. KAIM:  That was good.
2    Q    Okay.
3         The genesis of this letter we'll talk
4  about in a little bit, which was a back-and-forth
5  exchange between Drew Chemical and the NJDEP over
6  Dioxin sampling, but what I want to focus on now is
7  the recommendation -- Drew Chemical's recommendation
8  on where to sample, which is under number one there
9  on the first page -- let me know when you get there.
10    A    Okay.
11    Q    All right.
12         So Drew recommends taking a total of
13  five composite samples from the locations listed in A
14  through E.
15         So A is samples at each manhole of
16  vessels A, C, D and F.
17         Do you know where those manholes are on
18  the property?
19    A    Yeah.  I would have to find the figure.
20    Q    Let me see if I can -- and I'll tell you
21  the reason I ask is in some of these figures -- so,
22  for instance, Figure 3-4 -- the manholes are numbered
23  instead of lettered.
24    A    Right.
25         The same with 3-5.
```

Page 140

```
1    Q    Right.
2         So that's -- that's the reason I'm
3  asking.
4         And if you don't know where, you know,
5  the particular vessels are, that's -- that's fine.
6    A    Yeah, I would assume vessels A, C, D and
7  F were in the production building.
8    Q    Yeah.
9         Okay.  B says -- says "Floor drains by
10  the third floor building 720" -- that's the
11  production building, right?
12    A    Correct.
13    Q    Oh, I'm sorry, where the process vessels
14  are located.
15         All right.
16         So the suggestion is to sample by the
17  floor drains in building 720 and at the manhole, each
18  manhole of these vessels, correct?
19    A    Correct.
20    Q    All right.
21         And then C, the recommendation is to
22  sample by the floor drains by the second floor of
23  building 725 where washwaters from the process
24  vessels are discharged into the sewer.
25         And so this confirms that the vessels,
```

Page 141

```
1  the process vessels, when they were washed down, the
2  washwaters went into the sewer, correct?
3    A    Correct.
4    Q    All right.
5         And then this document also suggests
6  sampling at the floor drains by the first floor of
7  building 720 where drumming off operations were
8  conducted.
9         And you would agree that it's the case
10  that in drumming operations you would expect that
11  there would occasionally be spills?
12         MR. HATFIELD:  Objection to form.
13    A    I wouldn't -- I don't know if "expect"
14  is the right word.
15         Is there potential to be spills?
16    Q    Let's start there.
17    A    Yeah.
18    Q    There are potential to be spills in a
19  drumming operation?
20    A    Sure.
21    Q    All right.  And, in fact, at this point
22  in 1983 it was recommended to sample for Dioxin
23  around the floor drains of building 720 where there
24  was the potential for spills because of drumming
25  operations, right?
```

36 (Pages 138 - 141)

Page 142

1      MR. HATFIELD:  Objection to form.
2    A    Yes.
3    Q    Okay.
4        And then there was also a recommendation
5  to sample near Greenfield Avenue, which is on the
6  west side of the property, right?
7    A    Yes.
8    Q    Where runoffs accumulate?
9    A    As per the document, yes.
10   Q    Okay.
11       And so you would expect that when there
12  were -- when there were spills, you would have
13  runoffs of those spills onto this area to the
14  property near Greenfield Avenue?
15       MR. HATFIELD:  Objection to form.
16   A    No.
17       Runoff from the operations?
18   Q    Correct.
19   A    No.  This is at the other side of the
20  parking lot.
21   Q    What type of runoffs would you expect
22  over there?
23   A    Over land flow, soils, but from the
24  operations, it was all contained within the sewer
25  system.

Page 143

1    Q    Why, then, was Drew Chemical
2  recommending to do Dioxin soil sampling on --
3    A    Well, first let's --
4    Q    -- on this side of the property?
5    A    First let's just say it's not Ashland's
6  recommendations, it's a joint recommendation from
7  NJDEP and Ashland.
8    Q    All right.
9    A    So maybe they wanted to sample the soils
10  in that area like they were sampled earlier in that
11  year, or the year before, near Ashland's site.
12   Q    Do you know if there was any storage of
13  finished product on that part of the site?
14   A    Not that I'm aware of.
15   Q    Where was the product stored?
16   A    Several buildings through here, tanks,
17  the drumming area, then there was some other little
18  storage areas around the area, but not that I know on
19  that parking lot.
20   Q    Okay.
21       Building 723 is right next to that
22  parking lot, right?
23       Figure 2.2.
24   A    723.
25   Q    Okay.

Page 144

1        So you agree building 723 is right next
2  to the parking lot on Greenfield Avenue?
3    A    Correct.
4    Q    Okay.
5        And building 723 was used for storage at
6  some points, correct?
7    A    Correct.
8    Q    Okay.
9        And so runoff from storage in building
10  723 had the potential to go into the parking lot?
11       MR. HATFIELD:  Objection to form.
12   A    There's no knowledge that materials left
13  the building across the parking lot to this area.
14   Q    Okay.
15       My question was, as you suggested on
16  many occasions, there was the potential for that to
17  occur?
18       MR. HATFIELD:  Objection to form.
19   A    I don't think I ever said there was a
20  potential for materials to leave building 723 and end
21  up in the grassy area of Greenfield Avenue.
22   Q    Sir, it is Ashland's position that there
23  is not a potential for materials to leave building
24  723 and end up in the parking lot of Greenfield
25  Avenue?

Page 145

1    A    Not that I would be aware of or any of
2  the documents.
3        It's Ashland's position that all of the
4  areas were collected into the sewer system.  All the
5  buildings, all the operations, were collected and
6  material transported to the on-site treatment center.
7    Q    Okay.  Let me ask you a different
8  question.
9        Well, did building 723 have any
10  connection to the sewer system?
11   A    There's -- if you look, it's bid 25,
12  there is a J here in the right-hand corner, so the
13  south -- southeast corner.
14   Q    Uh-huh.
15       So is that a catch basin or is that just
16  pointing to those lines that are outside building
17  723?
18   A    Yeah, I'm not sure.
19   Q    Okay.
20       So you don't know, one way or the other,
21  whether there is a sewer connection to building 723?
22   A    To that building.
23   Q    Is that right?
24   A    Correct.
25   Q    Okay.

37 (Pages 142 - 145)

ALCD-PUBCOM_0001622

Page 146

1      All right.
2      But is Ashland disputing that there's a
3  possibility that runoff from building 723 could go
4  into the parking lot on Greenfield Avenue?
5      MR. HATFIELD:  Objection to form, asked
6  and answered.
7      THE WITNESS:  I'm sorry, Bill?
8      MR. HATFIELD:  I said objection to form,
9  asked and answered.
10     A    Is there a probability?  Yes, there's
11  always a probability, but it's contained in the
12  building.  I don't know how that would get out of the
13  building, across the parking lot, to Greenfield
14  Avenue.
15     Q    Well, I'm not talking -- it doesn't even
16  actually make it to Greenfield Avenue, I'm just
17  talking about the parking lot area.
18     A    Yeah, I don't know how it would get out
19  of the building.
20     Q    Okay.
21     What's in the building is in the
22  building, what's out of the building is out of the
23  building.  Is that what I'm hearing?
24     MR. HATFIELD:  Objection to form.
25     A    Can you restate the question?

Page 147

1      Q    Sure.
2      If it's in the building, and there's not
3  a sewer connection, there's no way for it to get out
4  of the building.  Is that the position?
5      A    No, that's not what I said.  I said the
6  probability is low.
7      Typically, to transport something, there
8  has to be a conveyance line or an opening in the
9  building or a way to get out of the building.
10     So there's no knowledge that any of
11  those existed.
12     Q    How is raw material -- okay, let's talk
13  about something specific.  Let's talk about
14  2,4,5-TCP, the raw material, how is it transported
15  around the site?
16     A    It was in totes.
17     Q    Right.
18     A    It was in bags, solids.
19     Q    Okay.
20     So it would have need to have been
21  manually moved?
22     MR. HATFIELD:  Objection to form.
23     A    Manually, yes, by a piece of equipment,
24  yes.
25     Q    Right.

Page 148

1      Over the property?
2      A    Yes.
3      Q    So if it were to get into building 723,
4  it would have to have come from outside building 723,
5  correct?
6      A    Upon delivery?
7      Q    Yes.
8      A    Yes.
9      Q    Okay.
10     So that would be one way that material
11  could go in or out of building 723?
12     A    Moved in or out, but not a release in or
13  out.
14     Q    Okay.
15     It's certainly possible that when you're
16  moving totes of this stuff around the property that
17  you have a spill?
18     MR. HATFIELD:  Objection to form.
19     A    It's possible.  Absolutely, it's
20  possible.
21     Q    Okay.
22     And, in fact, --
23     A    Probable.
24     Q    -- it's probable, isn't it?
25     A    No, it's not probable.  Probable and

Page 149

1  absolute are two different things.  Probable are
2  things that may happen, it doesn't mean it can
3  happen.
4      Q    I'm saying it is probable that if you
5  were manually moving totes of 2,4,5-TCP around the
6  property, you'll have a spill?
7      MR. HATFIELD:  Objection to form.
8      A    No.
9      There is a chance that it could happen.
10  Whether it happened or not, there's no evidence in
11  any of these documents that it did happen.
12     Q    There are, like, six documents that
13  exist about the operations in the '70s.
14     MR. HATFIELD:  Objection to form,
15  argumentative.
16     Q    Right?
17     A    Yes.
18     Do any of them describe spills?
19     Q    So you're telling me that because the
20  documents no longer exist that we can sit here and
21  conclude that it is not probable that spills
22  occurred?
23     MR. HATFIELD:  Objection to form.
24     MR. PIPER:  Objection to form.
25     A    All I can say is I reviewed the

38 (Pages 146 - 149)

Page 150

1  documents.  There was no evidence of spills that
2  occurred or totes of TCP that were dropped and
3  spilled on the site.
4      Q    In your best estimation, sitting here
5  right now, how many documents did you review that
6  were contemporaneous to the 1970s operations?
7      A    Ten, 15, 20.
8      Q    In what part -- okay.  So between ten
9  and 20?
10      A    I don't know.  I have no idea, yeah.
11  I have looked at 250 documents.
12      Q    I'm just asking you, to the best you can
13  right now, approximately how many documents did you
14  review contemporaneous to the 1970 operations at the
15  Kearny site?
16      MR. HATFIELD:  Objection to form, asked
17  and answered.
18      A    Yeah, ten to 20.  Estimated, ten to 20.
19      Q    Okay.
20      And of those estimated ten to 20
21  documents, did you see any that Ashland produced?
22      A    Yes.
23      Q    Which one?
24      A    There was a couple of sewer surveys, I
25  do believe, that I saw in the first set of documents.

Page 151

1      Q    Okay.
2      Beyond the couple of sewer surveys, the
3  remainder of the ten to 20 documents were produced by
4  Occi Chem, correct?
5      MR. HATFIELD:  Objection to form.
6      A    Yes.
7      Q    All right.
8      A    Likely.
9      Yeah, I don't recall every document I
10  looked at and who produced it.
11      MR. HATFIELD:  Yeah, just for the
12  record, there are a number of documents that were
13  produced by both sides, and I don't believe that
14  you've provided Bates-stamped documents that have
15  been produced by Ashland in the case.  So there are
16  duplicate documents that have been produced by Occi
17  that Ashland has produced, and vice versa, and I
18  don't think you have done an accurate accounting of
19  that.
20      MR. KAIM:  I'll say, for the record,
21  with respect to the contemporaneous documents for the
22  1970s, I looked and I have seen one version, and it's
23  the version that Occi has produced.
24      MR. HATFIELD:  I suggest you go back and
25  review the productions, Counsel.

Page 152

1      MR. KAIM:  The production will speak for
2  itself, obviously.
3      Q    Okay.  Let's look back.  I want to ask
4  you one more question about Exhibit 11, and if you'll
5  go -- we were looking at the first page of the
6  November 15 letter.
7      Could you look at the second page?
8  There's a second list of one through five leading up
9  to the end of the letter, and it says at the top of
10  that, "The following documents are also attached for
11  your records."
12      Do you see that reference?
13      A    Yes.
14      Q    And number three is raw materials safety
15  data sheet of 2,4,5-TCP from Dow Chemical.
16      Do you agree that Dow Chemical was the
17  supplier of Drew Chemical's 2,4,5-TCP?
18      MR. HATFIELD:  Objection to form.
19      A    It was a supplier of at least the
20  portion of them.  I have seen their name in some of
21  the documents that I've looked at.
22      Q    Do you know any other suppliers of
23  2,4,5-TCP to the Drew Chemical operations?
24      A    I did not see any evidence, but I did
25  not see any evidence that they were the sole

Page 153

1  supplier.
2      Q    Okay.
3      No evidence, though, to indicate any
4  other suppliers?
5      A    Correct.
6      Q    All right.
7      (Whereupon Selected Substances Report is
8  received and marked as Exhibit 12 for
9  identification.)
10      Q    Okay.  Do you have in front of you,
11  Mr. Hoffman, Exhibit 12, which is a Selected
12  Substances Report?
13      A    Yes.
14      Q    Okay.
15      And this was sent to Drew Chemical by
16  the NJDEP, is that right?
17      A    Say that -- from Drew Chemical to NJDEP?
18      Q    Yeah, this is -- well, let me rephrase
19  the question.
20      This is an NJDEP form that Drew Chemical
21  filled out.  Accurate?
22      A    Correct.
23      Q    Okay.
24      And Drew Chemical filled out the first
25  form in here on June 16, 1980, which is down the

39 (Pages 150 - 153)

ALCD-PUBCOM_0001624

Page 154

1  bottom right.
2         Do you see that?
3    A    Yes.
4    Q    And it was filled out by someone named
5  M.J. Piergrossi, right?
6         Do you know who that is?
7    A    Correct.
8         I do not know who that is.
9    Q    Okay.
10        If you'll flip to the second page, in
11  part 13 there, which is at the very top, it says,
12  "List all of the selected substances included in this
13  report, along with their CAS number ..."
14        And do you see that Ashland listed about
15  nine chemicals there?
16   A    Yes.
17   Q    The sixth one down is lead, right?
18   A    Correct.
19   Q    And then the one on the bottom is
20  2,4,5-TCP.  True?
21   A    Correct.
22   Q    Okay.
23        And as of 1980, in the next section
24  down, section 14, Drew Chemical estimated that
25  average volume of wastewater discharged to the public

Page 155

1  works was 51,000 gallons a day, correct?
2    A    That's what the document says.
3    Q    Okay.
4         No reason to dispute that on Ashland's
5  behalf, right?
6    A    Correct.
7    Q    Okay.
8         If you flip over with me to page six, 9,
9  it's Bates 938.  And this is the report specific to
10  lead.
11        Do you see that page?
12   A    Yes.
13   Q    And in number three, it says, "Briefly
14  describe its use on the site."
15  Ashland filled out, "Used to formulate
16  products for modifying of burning of heavy fuel oils,
17  a substance used as 36 percent Lead Naphthenate."
18        Do you know how lead was used on the
19  site in the '70s?
20   A    It was formulated in the products.
21   Q    What does it mean to formulate products
22  for modifying the burning of heavy fuel oils?
23   A    I'm not an expert in the production or
24  manufacturing of products, but lead products, just
25  like they use leaded gas back in the '80s.

Page 156

1    Q    Do you know what products lead was used
2  for that were manufactured on the site?
3    A    I do not know the exact products.
4    Q    Do you know the processes used for
5  manufacturing any lead products on the site?
6    A    I don't know the exact process, but I
7  assume it was a batch mixing process.
8    Q    Okay.
9         If you'll flip over a couple of pages to
10  nine of nine, which is the 2,4,5-TCP report.
11        Do you see that?
12   A    Yes.
13   Q    And, again, here, do you see, on the
14  middle of the page, "Dow" is written in with a square
15  around it?
16   A    Yes.
17   Q    And, again, that indicates that the
18  supplier for 2,4,5-TCP was Dow?
19        MR. HATFIELD:  Objection to form.
20   A    That it was at least one of the
21  suppliers.
22   Q    No other supplier is listed on the
23  selected substances report?
24   A    Right.
25   Q    Okay.

Page 157

1         Okay.  If you'll go now, please, over
2  two more pages to a June 22, 1983 letter from
3  Mr. Weiss again to the NJDEP.
4         You see that?
5    A    I do.
6    Q    And he's writing in response to a letter
7  dated June 13, 1983, and he encloses a completed
8  Selected Substances Report, this time specific to
9  2,4,5-TCP.
10        Do you see that in the letter?
11   A    Yes.
12   Q    Okay.
13        Let's look at the attached 2,4,5-TCP
14  Selected Substances Report.
15        Okay.
16        So let's look at part two, number three,
17  which is the top of the page, and it asks -- the form
18  asks for Ashland to briefly describe its use on the
19  site of 2,4,5-TCP, and Ashland writes in, "2,4,5-TCP,
20  a discontinued raw material, was used at Drew's
21  Kearny, New Jersey, plant to manufacture microbiocide
22  products for the control of bacteria and fungi growth
23  in industrial water systems."
24        Is that an accurate statement of the use
25  of 2,4,5-TCP?

40 (Pages 154 - 157)

ALCD-PUBCOM_0001625

Page 158

1    A    Yes.
2    Q    Okay.
3         And it notes that 2,4,5-TCP was
4  discontinued.
5         If you'll flip over to the next page, at
6  the top, do you see where it says, "Time period of
7  production," and it says, "Available records show the
8  substance was used as a raw material from 1973 to
9  1981"?
10        So for a nine-year period.
11        Is that accurate?
12   A    Yes, that's what the document says, yes.
13   Q    All right.
14        Okay.
15        If you'll go back to the prior page,
16  please.
17        And I know that's what the document
18  says, but Ashland does not have any reason to dispute
19  that, correct?
20   A    No.
21   Q    Okay.
22        If you'll look down in the chart, the
23  top chart on the page, number five is for quantity
24  brought onto the site, and it states that
25  65,850 pounds per year, on average, were brought onto

Page 159

1  the site from 1971 to 1979.
2         Is that accurate?
3    A    Yes.
4    Q    Okay.
5         And then quantity shipped off of the
6  site is for a period from 1973 to 1981, which
7  indicates that while Drew may have stopped shipping
8  product onto the site, it continued manufacturing
9  with 2,4,5-TCP through 1981, correct?
10        MR. HATFIELD: Objection to form.
11   A    Can you repeat, please?
12   Q    Right.
13        Quantities of 2,4,5-TCP were brought
14  onto the site through 1979, right?
15   A    Correct.
16   Q    But Ashland continued to use 2,4,5-TCP
17  on the site through 1981, correct?
18        MR. HATFIELD: Objection to form.
19   A    Well, "used" may not be the right word.
20  Maybe the product was already manufactured and
21  drummed. So maybe they were shipping off the last
22  inventory that they had.
23   Q    To be fair, on the next page, as we
24  looked at, it said, "Available records showed that
25  the substance was used as a raw material from 1973 to

Page 160

1  1981."
2         So that would indicate that production
3  operations using 2,4,5-TCP continued through 1981,
4  right?
5         MR. HATFIELD: Objection to form.
6    A    Yep, you can interpret it as that, it
7  may be used as material that is still drummed, being
8  ready to ship off site.
9    Q    Okay.
10        Well, I'm asking you, as Ashland's
11  corporate representative, wasn't it the case that
12  2,4,5-TCP continued to be used on the site through
13  1981?
14   A    Yeah, it was used as per manufactured or
15  sold from material in inventory.
16   Q    And in any event, I think we can agree
17  that 2,4,5-TCP remained on the property at least
18  through 1981?
19   A    Yes.
20   Q    Okay.
21        And the largest inventory at the site,
22  the max inventory, is very specific here, it was on
23  July 5, 1979, right?  43,744 pounds, correct?
24   A    Correct.
25   Q    Okay.

Page 161

1         Now, I want to go down to number 12, and
2  it states, "Total discharge of selected substance
3  into the publicly-owned treatment works."
4         Do you see that?
5    A    Section 12, yes.
6    Q    And it provides that 84 pounds per year,
7  on average, from 1973 to 1981, a nine-year period, of
8  2,4,5-TCP was discharged into the sewer, correct?
9         MR. HATFIELD: Objection to form.
10   A    The average was 84 pounds per year.
11   Q    So the answer to my question is, an
12  average of 84 pounds a year of 2,4,5-TCP was
13  discharged into the sewer system from the Kearny
14  site, correct?
15        MR. HATFIELD: Objection to form.
16   A    Correct.
17   Q    All right.
18        And that was from 1973 to 1981, so
19  that's nine years, and nine years at 84 pounds a year
20  is approximately 750 pounds of 2,4,5-TCP that was
21  discharged into the sewer system from the Kearny
22  site, right?
23        MR. HATFIELD: Objection to form.
24   A    That would be the calculation.
25   Q    All right.

41 (Pages 158 - 161)

ALCD-PUBCOM_0001626

Page 162

1    And Ashland does not dispute, does it,
2  that 750-plus pounds of 2,4,5-TCP were discharged
3  directly into the sewer system from the Kearny site?
4        MR. HATFIELD:  Objection to form,
5  mischaracterizes the document.
6    A    It was discharged to the publicly-owned
7  treatment works.
8    Q    Right.
9        And Ashland does not dispute that that
10  2,4,5-TCP, 750 pounds, was discharged into the sewer
11  system, the municipal sewer system, correct?
12        MR. HATFIELD:  Objection to form,
13  mischaracterizes the document.
14    A    This document says 84 pounds a year were
15  discharged to the POTW from 1973 to 1981.
16    Q    All right.
17        And you, as Ashland's corporate
18  representative, do not have any basis or reason to
19  dispute what this contemporaneous document says,
20  correct?
21        MR. HATFIELD:  Objection to form.
22    A    Correct.
23    Q    All right.
24        And it makes sense that 2,4,5-TCP was
25  discharged into the municipal sewer system, right,

Page 163

1  because we've talked about process vessel washwater
2  would include some of the raw materials, would it
3  not?
4        MR. HATFIELD:  Objection to form, calls
5  for speculation and expert opinion.
6    A    Yeah, I don't know how the sources of
7  it, but this is what they're saying, it went to the
8  POTW.
9    Q    Well, let me ask this:  Line flushes
10  occurred on the property, correct?
11    A    Correct.
12    Q    Okay.
13        And you would expect -- when you do a
14  line flush, the reason you do a line flush is to
15  clear the line of the prior product.  True?
16    A    Correct.
17        MR. HATFIELD:  Objection to form.
18    Q    And we know from the documents that the
19  line flush with the prior product went into the
20  municipal sewer system, right?
21        MR. HATFIELD:  Objection to form.
22    A    Correct.
23    Q    Okay.
24        And so if line flush with the prior
25  product in it went into the municipal sewer system,

Page 164

1  you would expect because 2,4,5-TCP was used as a raw
2  material that it would be discharged from the site
3  into the municipal sewer system, correct?
4        MR. HATFIELD:  Objection to form.
5    A    Correct, at 84 pounds per year average.
6    Q    Right.
7        Okay.
8        Let's talk about the products that
9  2,4,5-TCP was used to manufacture.
10        It was the case that 2,4,5-TCP was used
11  as a raw material in a product called Biocide 207,
12  correct?
13        And I'm looking -- I'm looking at the
14  bottom of Bates 944.
15    A    Biocide 207, yes.
16    Q    Okay.
17        The same with Biosperse 209, 2,4,5-TCP
18  was a -- was a raw material, correct?
19        And, again, I'm kind of at the bottom of
20  the prior page.
21    A    The ones at the bottom of the page are
22  ones that were discontinued with the last production,
23  so the production would be in the top corner left
24  here.
25        So there's Biocide 207, and then you

Page 165

1  said Biosperse 209, that is a trade name too, this is
2  up here.
3    Q    Okay.
4        I'm sorry.  Where on -- what page are
5  you on?
6    A    I'm on Bates 25945.
7    Q    Okay, I see.
8        Right.
9        So it manufactured -- where you're
10  looking on Bates 945, "Manufacture of products as
11  listed has since been discontinued with last
12  production taking place during early 1981."
13        Okay, well, that answers a question we
14  had earlier.  There was actual production in 1981,
15  right?
16    A    Uh-huh.
17    Q    True?
18    A    Yep.
19    Q    Okay.
20        And the products that were manufactured
21  up to 1981 were those listed there, Biocide 207,
22  Biosperse 209, Biocide 285, Biosperse 289, and
23  Drewsperse 780, correct?
24    A    Correct.
25    Q    And those all would have contained

42 (Pages 162 - 165)

Page 166

1  2,4,5-TCP.
2       Is that accurate?
3    A    I'm checking on the next page too.
4       Yes.
5    Q    Okay.
6       And if you look back at the page with
7  Bates 945, the total volume of products -- of those
8  products that Ashland manufactured was approximately
9  4.4 million pounds?
10      That is up in the top left column.
11   A    Correct.
12   Q    Okay.
13      All right.
14      And then on the right-hand column on
15 that same page, it talks about the process, the
16 manufacturing process.
17   A    Uh-huh.
18   Q    And it says, "This is typical for the
19 five microbiocide products."
20      So, first, water or a solvent would be
21 put in the mixing tank.  Is that an accurate way to
22 read the first step?
23   A    Yes.
24   Q    And it's agitated, and the remaining
25 ingredients are added until a homogenous solution is

Page 167

1  obtained, right?
2    A    Correct.
3    Q    And with 2,4,5-TCP, the mixing process
4  requires heat, correct?
5       MR. HATFIELD:  Objection to form.
6    A    I don't know if it requires heat, but it
7  appeared, obviously, they heated this.
8    Q    In fact, it's typical for manufacturers
9  to melt 2,4,5 TCP before mixing it.  Isn't that true?
10      MR. HATFIELD:  Objection to form.
11   A    I have no knowledge of that.
12   Q    Okay.
13      Do you know whether Ashland melted the
14 2,4,5 TCP before mixing it?
15   A    I think this last paragraph of that
16 section would show that they did not melt it.
17   Q    And what in there indicates to you that
18 they did not melt it?
19   A    "The fiber keg package is lined with
20 polyethylene sheeting, which permits the complete
21 emptying of material."
22      So it was charged through a manhole.
23   Q    I'm sorry.  Mr. Hoffman, can you say
24 that last part again?
25   A    It was charged through the manhole as a

Page 168

1  solid from the fiber drum.
2    Q    Okay.
3       Looking back up at the paragraph about
4  the manufacturing process, it talks about any
5  exotherms which take place.
6       Exotherms would be when you're reacting
7  two chemicals together, the heat, they could create
8  heat, correct?
9       Is that a fair understanding of what an
10 exotherm is?
11   A    Well, an exotherm is a generation heat,
12 but there is no reaction here.  I mean, it's just a
13 dissolution.
14   Q    Why do you say that?
15   A    Water, and solvent, and TCP -- again,
16 outside of my expertise, but there is not going to be
17 a reaction, it's just a dissolution.  Just like
18 putting salt or sugar in water.
19   Q    I want to show you -- because I see that
20 it says that they put water or solvent in the tank,
21 but then they say, "During agitation the remaining
22 ingredients are added."
23      Do you see that?
24      And I guess my question is, do you know
25 what the remaining ingredients were for, say, Biocide

Page 169

1  207?
2    A    If there's any, I have never seen
3  anything in the document except TCP.
4    Q    Okay.
5       I'm going to hand you what I'm marking
6  as Exhibit 13.
7       (Whereupon Ingredient List for Biocide
8  207 is received and marked as Exhibit 13 for
9  identification.)
10   Q    And this is just from a database that I
11 think you can access on the Internet, but it appears
12 to list the ingredient list for Biocide 207.
13      So do you know, one way or the other,
14 whether the ingredients for Biocide 207 are Nabam,
15 isopropyl alcohol, PCP, and 2,4,5-TCP?
16      MR. HATFIELD:  Yeah, I'm going to object
17 to this document, it's outside of the list, I think,
18 that you provided to us in your letter of August 1,
19 so the witness hasn't reviewed this document.
20   Q    And I'm just asking, do you know whether
21 these are the ingredients of Biocide 207?
22   A    I have never seen this document before.
23   Q    Understood, and I understand that, but
24 I'm just asking you:  Sitting here today, do you know
25 what the ingredients are of Biocide 207?

43 (Pages 166 - 169)

Page 170

1    A    Yes. I have never seen any of the
2 documents to describe the total ingredients in
3 that -- in that product.
4    Q    Okay.
5         Let me ask you this -- well, super basic
6 question: PCP, do you see PCP listed there at the
7 bottom of the page?
8    A    Your question is --
9    Q    My question is --
10   A    -- do I see it?
11   Q    Yes -- no.
12        My question is, do you -- PCP is an
13 acronym for Pentachlorophenol, is that accurate?
14        MR. HATFIELD: Objection to form, calls
15 for expert testimony.
16   A    Yeah, it could be. I mean, it could be
17 an acronym for Pentachlorophenol, PCP.
18   Q    Let me ask a more general question.
19   A    Yeah.
20   Q    Have you seen Pentachlorophenol referred
21 to as PCP before?
22   A    Yes.
23   Q    Okay.
24        All right. If you'll just assume with
25 me for the moment that these are the ingredients, the

Page 171

1 ingredients in Exhibit 13, to Biocide 207.
2         MR. HATFIELD: Yeah, objection to form.
3 And, again, I object to this document and further
4 line of questioning on it. It wasn't provided to us.
5 It's from a website called Pesticide Action Network
6 North America, which we don't have the province for.
7 I'm not sure if any of this is accurate, it's outside
8 the scope, and if you're going to continue to ask the
9 witness questions on this, it will be in his personal
10 capacity because this is not an Ashland document,
11 it's not a Drew document, it's outside the corporate
12 knowledge. And, again, if you want to ask the
13 witness a question on it, he's free to answer in his
14 personal capacity, but any of his testimony will not
15 bind the company.
16        MR. KAIM: An outside-the-scope
17 objection would have just been fine.
18        MR. HATFIELD: Yeah, I just want to make
19 clear --
20        MR. KAIM: That would have taken about
21 two seconds and avoided --
22        MR. HATFIELD: I just want to make
23 clear --
24        MR. KAIM: Hold on, hold on. I want to
25 make clear --

Page 172

1         MR. HATFIELD: Hold on. I'm entitled to
2 my objection.
3         I just want to make clear, Occidental
4 went forward with all these depositions early, before
5 it produced all of its documents, and it did so on a
6 specific agreement that it would provide a list ten
7 days beforehand of all the documents that it would
8 use, and you're providing a document that you didn't
9 provide on the list. So I'm taking the time to make
10 my objection to say that Occidental has not met its
11 commitment to do that, and I object to this line of
12 questioning.
13        You can continue.
14        MR. KAIM: An outside-the-scope
15 objection would have taken about two seconds. It
16 would have been just as effective.
17        MR. HATFIELD: But it's not outside the
18 scope of the deposition topics in Exhibit Number 1,
19 it's outside the scope of the documents that you
20 committed that Occidental would provide ten days
21 before the deposition so that the witness could be
22 properly prepared and that we could lodge objections
23 as to the document.
24        This document also does not have any
25 Bates Stamp as being produced in this case. It's not

Page 173

1 Bates-stamped by Ashland, not Bates-stamped by
2 Occidental, and not Bates-stamped by TIG, so it's
3 outside the scope of the case.
4         So if you were going to use this
5 document, Occidental had an obligation, based upon
6 all of the prior discussions in our meet-and-confers,
7 and Occidental's representations to the Special
8 Master that you would provide this information before
9 the dep, and I am lodging my objection that you
10 failed to do so, Counsel.
11        You can continue.
12        MR. KAIM: All right. Thanks, Counsel.
13   Q    Okay. I'm asking in your personal
14 capacity --
15        MR. KAIM: If you don't want him to
16 answer, you can just tell him that. I guess we can
17 deal with it later.
18   Q    But I'm going to tell you now, I'm
19 asking you in your personal capacity about a document
20 on the Internet. Okay?
21   A    Okay.
22   Q    All right.
23        Which I didn't know it was so
24 objectionable.
25        But if you will assume with me, please,

44 (Pages 170 - 173)

Page 174

1  for the purposes of this question, that these are the
2  ingredients of Biocide 207 as listed in Exhibit 13.
3      Will you make that assumption with me
4  for the purposes of this question?
5      MR. HATFIELD:  Object to the form.
6  A    Go ahead.
7      I don't know why I would assume that
8  these are accurate, though.
9  Q    I'm not asking you to.
10 A    Let's get on the record that they may
11 not be accurate.
12 Q    I'm asking you to assume.  Okay?
13 A    Okay.
14 Q    I'm also not a chemist.
15 A    Yeah.
16 Q    All right.
17     If those are the ingredients to Biocide
18 207, would any of these, if mixed together, result in
19 exotherms, to your knowledge?
20     MR. HATFIELD:  Objection to form, calls
21 for expert testimony, outside the scope, and my prior
22 objection, without having to go through it all on the
23 record.
24 A    I would have no idea.
25 Q    Okay.

Page 175

1      That is all I needed to know.
2      Thanks.
3      Okay.
4      Also, with respect to 2,4,5-TCP, if it's
5  mixed with other ingredients, like the ones in
6  Exhibit 13, do you have knowledge, in your personal
7  capacity, as to whether they would need to be heated
8  beyond a hundred degrees Fahrenheit in order to mix
9  and become a homogeneous solution?
10     MR. HATFIELD:  The same objections.
11 A    Well, again, I'm not an expert in it,
12 but all these reactions that Ashland, all the
13 documents say that they used water-cooling jackets to
14 keep the reaction below a hundred degrees F.
15 Q    Okay.
16     Well, you said "all of these documents."
17 This is the only document.
18 A    There was some other documents, and it
19 may have been the same exact document with a
20 different Bates Stamp on it.
21 Q    Okay.  All right.
22     So within this -- within Exhibit 12?
23 A    Yeah.
24 Q    Okay, fair enough.
25     I think we talked about -- here, it

Page 176

1  talks about handling practices.
2      Do you see that paragraph?
3  A    Yes.
4  Q    And we talked before about how they were
5  stored in fiber kegs.
6      It refers to a material safety data
7  sheet, and did Ashland have the material safety data
8  sheet in the '70s, to your knowledge?
9  A    I'm sure there was a corporate
10 requirement for them to have the MSDS on site.
11 Q    All right.
12     And it says, "The raw material was
13 stored in one location in the plant's raw material
14 warehouse until used in production."
15     And like we talked about before, it
16 would have to be moved on forklifts or manually some
17 way from the raw material warehouse to the production
18 building, correct?
19 A    Correct.
20 Q    Okay.
21     And then, as we talked about, the fiber
22 keg package was emptied into the vessel, right?
23 A    Correct.
24 Q    And then the empty kegs had to be,
25 themselves, moved again to wherever the trash was

Page 177

1  stored on the property, correct?
2  A    Correct, but it looks like first maybe
3  the inner packing was taken out.  Maybe not.  The
4  polyethylene sheeting.
5  Q    Okay.
6      Would the polyethylene sheeting then be
7  trashed, do you know?
8  A    It doesn't say.
9  Q    All right.
10 A    It just says that the emptied kegs were
11 disposed of.
12 Q    And then after the -- the final product
13 had been manufactured, it then would be moved to
14 storage tanks, correct?
15 A    Yep, storage tanks or drummed.
16 Q    All right.
17     And in order to get to the drumming
18 location or the location of the storage tanks, it
19 would need to go through pipes?
20 A    It would have to be moved, yes.
21 Q    Is it Ashland's position that during the
22 '70s the product was moved from the production
23 vessels to either aboveground storage or the drumming
24 area through pipes or some other way?
25 A    Either through pipes or drummed on site,

45 (Pages 174 - 177)

Page 178

1 maybe right from the reactor.
2    Q    All right.
3        Well, you do recall we saw the drumming
4 building was separate, correct?
5    A    Yeah.
6        Yeah.
7    Q    So it would need to be moved from the --
8 building 720, the production building, over to the
9 drumming building?
10    A    Some of the processes, though, it looked
11 like they drummed immediately on site too.
12    Q    Okay.
13        Why do you say that?
14    A    There was some about -- there were some
15 things in the document about the drumming right below
16 the reactor.  I don't know whether it was this
17 product, not -- Biocide or not.
18    Q    All right.
19        With respect to the 2,4,5-TCP that
20 Ashland used as raw material, is Ashland aware that
21 it, itself, contained Dioxin?
22        MR. HATFIELD:  Objection to form.
23    A    So all the documents that I reviewed,
24 none of them said that there was any analysis of the
25 Dow material or not, Dowicide 2 or G or F or

Page 179

1 whatever, there was no analysis of that.
2    Q    By Ashland?
3    A    By Ashland or Drew.
4    Q    Or Drew.
5        So neither Drew nor Ashland did any
6 diligence in the period of the 1970s as to whether
7 the 2,4,5-TCP that it was using on the site contained
8 2,3,7,8-TCDD?
9        MR. HATFIELD:  Objection to form.
10    A    Nothing in the documents showed me -- I
11 saw nothing in the documents that they knew or
12 analyzed the incoming raw material for 2,3,8,7-TTD --
13 TCDD.
14    Q    All right.
15        Does Ashland dispute that Dow's spec
16 sheet for TCP provided that it had a 100 parts per
17 billion maximum for 2,3,7,8-TCDD?
18        MR. HATFIELD:  Objection to form.
19    A    I don't think I saw a spec sheet for
20 Dowicide in any of these documents that I can recall.
21    Q    Wasn't it public knowledge in the '70s
22 that TCP contained Dioxin?
23        MR. HATFIELD:  Objection to form,
24 outside the scope.
25    A    Public information?

Page 180

1        I'm not sure.  I mean, from the
2 documents, obviously, you can see that New Jersey was
3 looking to find out where TCP was -- TCP was used,
4 but I don't know anything about the public
5 information.
6    Q    All right.
7        Has Ashland done any investigation
8 since, as part of the remediation process on its
9 site, to determine whether the 2,4,5-TCP that it was
10 using on the site and discharging into the municipal
11 sewer contained Dioxin?
12        MR. HATFIELD:  Objection to form.
13    A    Can you repeat, please?
14    Q    Sure.
15        As part of the remediation work that's
16 been ongoing at the Kearny site for the last decade,
17 has Ashland done any investigation into whether the
18 2,4,5-TCP that it used on the Kearny site and
19 discharged into the municipal sewer contained Dioxin?
20        MR. HATFIELD:  Objection to form.
21    A    TCP is not a COC at the site, so we
22 would have done no investigational efforts of TCP,
23 for TCP.
24    Q    Are you surprised that 2,4,5-TCP is
25 expected to contain Dioxin?

Page 181

1        MR. HATFIELD:  Objection to form.
2    A    Yeah.  I mean, I have no knowledge or
3 information what it did or not contain, what those
4 products did or not contain.
5        I mean, the only thing I see is the MSDS
6 sheet.  I don't see the spec sheet.
7    Q    Do you -- would you have expected that
8 Drew had the spec sheet in the 1970s?
9        MR. HATFIELD:  Objection to form, calls
10 for speculation.
11    A    Yes, I would assume that they would ask
12 for their material specs, yeah.
13    Q    All right.
14        But, to your knowledge, neither Drew nor
15 Ashland has ever done any investigating into whether
16 the 2,4,5-TCP that it used on the site contained
17 Dioxin?
18        MR. HATFIELD:  Objection to form.
19    A    Well, TCP, again, wouldn't be a COC
20 discharged to the sewer, not in soil, not in
21 groundwater, not discharged to groundwater,
22 product -- no notice of spill releases.
23        2,3,8 -- 7,8-TCDD was sampled by the
24 State in the soil by the facility and found to be
25 non-detect.

46 (Pages 178 - 181)

Page 182

1    Again, all those things led the team and
2 the LSRP to say this wasn't a COC at the site.
3    MR. KAIM: Objection. Nonresponsive.
4    Q    I'm just asking -- because Dioxin is a
5 COC for the Passaic River, right?
6    A    We're talking about the remediation at
7 the site?
8    Q    That is right.
9    A    Dioxin is not a COC for the remediation
10 at the site.
11    Q    Right.
12    And -- look, maybe my question is way
13 simpler. I just need to know and understand what
14 Ashland did or did not do with respect to
15 investigating.
16    Has Ashland, for any purpose, ever
17 investigated or been concerned that the 2,4,5-TCP
18 that it used for a decade, nine years, at the site
19 contained Dioxin?
20    MR. HATFIELD: Objection to form.
21    A    Well, there was the 1983 request to
22 sample from NJDEP, they're all in the documents, and
23 sampling that occurred by Ashland in 1983 for
24 2,3,8,7-TCDD.
25    Q    We'll talk about the sampling at the

Page 183

1 site, but that doesn't indicate -- does Ashland know,
2 one way or the other, whether Dioxin was in the
3 2,4,5-TCP that it was receiving from Dow?
4    MR. HATFIELD: Objection to form, asked
5 and answered.
6    A    None of the documents I read, none of
7 that information was included in those, that Ashland
8 knew at the time that there was 2,3,7,8-TCDD in the
9 TCP that they were using.
10    Q    And has Ashland ever gone to look for or
11 seek out the spec sheet for Dow's TCP from the 1970s?
12    A    All I can say is I didn't see anything
13 in the documents that were produced to me.
14    Q    Again, we're talking about the
15 litigation documents.
16    I'm talking about, has Ashland ever gone
17 and tried to get the spec sheet for Dow's TCP?
18    A    I have no information on that.
19    MR. KAIM: Okay. Let's take a break.
20    THE VIDEOGRAPHER: The time is 2:48.
21 We're going to go off the record.
22    (Brief recess taken.)
23    THE VIDEOGRAPHER: The time is 3:12, and
24 we are back on the record.
25    Q    Mr. Hoffman, you ready to continue with

Page 184

1 your depo?
2    A    Yes.
3    Q    All right.
4    Okay. Let's talk about the municipal
5 sewer system.
6    I think you referenced this document a
7 time or two today.
8    A    Thank you.
9    Q    Okay.
10    1972 Waste Effluent Survey filled out by
11 Drew Chemical Corporation on the Kearny site, right?
12    A    Correct.
13    Q    Okay.
14    And that is Exhibit 14.
15    (Whereupon 1972 Waste Effluent Survey is
16 received and marked as Exhibit 14 for
17 identification.)
18    Q    Is that what I handed you?
19    I'm just double-checking for myself
20 here.
21    A    Yes, yes.
22    Q    Okay, great.
23    Thanks.
24    Okay.
25    And, so, we know that Drew Chemical was

Page 185

1 discharging industrial wastewater to the municipal
2 sewer system, you know, as of early 1970s, is that
3 fair?
4    A    Fair.
5    Q    Okay.
6    In terms of the waste analysis, which is
7 on the page Bates numbered 936, at this time they did
8 not analyze for Dioxin, right?
9    A    That is correct.
10    Q    Okay.
11    There are chlorides in the waste. True?
12    A    Correct.
13    Q    Okay.
14    In terms of volume, if you'll go over on
15 the prior page that ends in Bates 935, it identifies
16 water use in 1981, and it looks like it's handwritten
17 in there "80,477 gallons."
18    Does that indicate per day?
19    MR. HATFIELD: I'm sorry. Did you say
20 '81 or 1971?
21    MR. KAIM: 1971.
22    MR. HATFIELD: 1971.
23    I'm sorry, maybe I can't hear.
24    Q    1971.
25    And do you see the handwritten number?

47 (Pages 182 - 185)

Page 186

1    How do you interpret that number,
2 Mr. Hoffman?
3    A    I would assume -- again, I can't read
4 what the units are -- I would assume gallons per day.
5    Q    Okay.
6       And, look, I mean, that is consistent
7 with the documents -- other documents we have seen.
8       The reason I ask is on the next page,
9 you see Bates 936, at the bottom right, it says,
10 "Approximately 20-gallons per day," and that seems to
11 me to be a typo, but would you agree that the plant
12 was using more than 20-gallons per day of water?
13       MR. HATFIELD:  You're at the bottom of
14 936, Counsel?
15    A    936.
16       MR. KAIM:  Yeah.
17    Q    And, actually, let me -- let me rephrase
18 the question.
19       It says here explain the hours, method
20 of discharge of waste to the sanitary sewer and peak
21 flow rate, and then Drew filled in a response.
22       Does Ashland have a position on what --
23 what the response there means?
24    A    Twenty gallons per day, approximately
25 20-gallons per day.

Page 187

1    Q    Of -- yeah, that's what I'm asking
2 about.
3    A    Yeah.
4       I -- that's what the document says, but,
5 obviously, if you look at the other page, it doesn't
6 correspond.
7       I saw this document before, and I assume
8 maybe that was just the sanitary portion of it.
9    Q    Yeah.
10    A    But there's no way to tease that out.
11    Q    Okay.
12       Because 20-gallons per day overall
13 discharge of water would not -- that would be
14 inconsistent with the operations that we know were
15 occurring at the plant at that time.  True?
16    A    Correct.
17    Q    Okay.
18       Okay.
19       (Whereupon 1977 Waste Effluent Survey is
20 received and marked as Exhibit 15 for
21 identification.)
22    Q    I show you Exhibit 15.
23       Move forward here five years.  I will
24 represent to you that this is the next document I saw
25 with respect to PVSC forms, Passaic Valley Sewage

Page 188

1 Commission.  And this form in Exhibit 15 is another
2 Waste Effluent Survey, correct?
3    A    Well, it's a review of some previous
4 Waste Effluent Survey.
5    Q    I'm sorry, say that again, please.
6    A    So it's a review of a previous Waste
7 Effluent Survey.
8    Q    Why do you say that?
9    A    "A review of the waste" -- second
10 paragraph.
11       "A review of the Waste Effluent Survey
12 which you recently submitted to PVSC indicated that
13 your industrial waste" -- on and on and on.
14    Q    Right, but then if you look and go on to
15 the next pages, it looks like on Bates 657 there's a
16 date of March 14, 1975, and it looks like there was
17 a -- there was some analysis done of the waste,
18 right, at that time?
19    A    Correct.
20       That's when the sample was, yes.
21    Q    Okay.
22       And, again, that sample was not analyzed
23 for Dioxin, correct?
24    A    No.  And it wouldn't have been for this
25 study because they were only looking for metals.

Page 189

1    Q    Right.
2    A    Yeah.
3    Q    And then if you go to the next page,
4 ending in 659, there it indicates in number four that
5 the volume of water discharged into the sewer system
6 is 87.5000-gallons per day, right?
7    A    In 404A.  Correct.
8    Q    Okay.
9       All right.
10       (Whereupon Industrial Sewer Connection
11 Permit is received and marked as Exhibit 16 for
12 identification.)
13    Q    And this is Exhibit 16, and this is from
14 19 -- May of 1977.
15       You can see that date on the signature
16 page on page three?
17       And this is an industrial sewer
18 connection permit, correct?
19    A    Correct.
20    Q    All right.
21       And is this the first permit that you
22 have seen with respect to the Kearny site's
23 connection to the municipal sewer?
24       MR. HATFIELD:  Objection.
25       Object to form.

48 (Pages 186 - 189)

Page 190

1    A    This is the first permit -- this is the
2  first permit that we saw to -- or the hookup permit,
3  the connection application, to PVSC, but obviously we
4  have seen Waste Effluent Surveys like the two
5  documents we just reviewed from the PVSC.
6    Q    Right.
7        But there may not have been an earlier
8  permit, is all I'm asking.
9    A    Yeah, whether there was a permit to
10 replace the documents, I don't see any permits.
11   Q    Okay.
12       And here, at this time in May of 1977,
13 the discharge amount is stated as 86,400-gallons per
14 day, correct?
15       That is on Bates 962.
16   A    Yep, five days a week.
17   Q    All right.
18       And as we have seen before, the
19 discharge connection is located on Harrison Avenue,
20 on the north side of the site, right?
21       MR. HATFIELD:  I'm sorry, Counsel, where
22 you looking, what page?
23       MR. KAIM:  962.
24       MR. HATFIELD:  962.
25   Q    It says --

Page 191

1    A    Oh, I'm looking at the figure on 961.
2  962?
3    Q    It requests a permit to use an
4  industrial sewer connection to discharge into the
5  18-inch Kearny sewer located at Harrison Avenue.
6    A    This is on 963?
7    Q    962.
8    A    Oh, got it.
9    Q    Is that correct?
10   A    That is correct.
11   Q    Okay.
12       And, just quickly, I want to point out
13 to you, if you flip back to Bates 965, it's a letter,
14 jumping to 1982, but the letter is from John
15 Orlowski, the plant manager for Drew Chemical
16 Corporation, to the PVSC, and he states, "Please be
17 advised that Drew Chemical Corporation's Kearny plant
18 has initiated a program of wastewater neutralization
19 as of the week of November 10."
20       And so is it accurate that that is the
21 first time that the neutralization treatment of
22 wastewater was put in place?
23       MR. HATFIELD:  Objection to form.
24   A    As of November 10, 1982, they initiated
25 neutralization in their wastewater system, yeah.

Page 192

1    Q    All right.
2        And prior to that, prior to November of
3  1982, there wasn't any pre-treatment at the Kearny
4  site of the wastewater that went into the municipal
5  sewer, right?
6        MR. HATFIELD:  Objection to form.
7    A    I'm sorry.  Again, please.
8    Q    Sure.
9        Prior to November 1982, there was no
10 pre-treatment of the industrial wastewater that went
11 into the municipal sewer system?
12       MR. HATFIELD:  Same objection.
13   A    Correct, not in any of the documents
14 that I reviewed.
15   Q    All right.
16       (Whereupon Document Bates-stamped
17 OCC-TIG-E02825661 through 669 is received and marked
18 as Exhibit 17 for identification.)
19   Q    Okay.  I've marked as Exhibit 17, this
20 is a June 1981 letter from Drew Chemical to the PVSC.
21       I will note for you on the first page
22 that the letter attaches a sewer connection
23 application, which we'll look at, and I also want to
24 note that it talks about water conservation measures
25 that were put into effect in April, April of 1981.

Page 193

1        Do you see that referenced on the
2  letter?
3    A    Yes.
4    Q    Okay.
5        And if you look over onto the
6  application itself, if you'll look at the second page
7  of the application, which is Bates 663, do you see
8  the water received in 1981, it does, in fact, go down
9  considerably after the first quarter, right?  It goes
10 from 4.2 million-gallons to approximately 2.8
11 thereafter.
12   A    Yes.
13   Q    And then there is an explanation for
14 that on -- two pages over, in paragraph 25, where it
15 says, "Describe any processes used to recycle water."
16       It says, "Cooling water previously
17 discharged as being incorporated in product
18 formulations."
19       And, so, before April of 1981 the
20 cooling water was discharged into the municipal
21 sewer, right?
22   A    Correct.
23   Q    All right.
24       Now, for section E, right below there,
25 the sewer connection information, it identifies three

49 (Pages 190 - 193)

ALCD-PUBCOM_0001634

Page 194

1 outlets, one, two, and three. And number two
2 contains industrial waste, right?
3    A    Yes.
4    Q    All right.
5         MR. HATFIELD: I'm sorry, Counsel. Are
6 you on 665?
7         MR. KAIM: Yeah.
8         MR. HATFIELD: Number 26?
9         MR. KAIM: Yep.
10        MR. HATFIELD: Okay, thank you.
11    Q    And you can actually look over at the
12 map on the next page, and two is the sewer line that
13 runs right to the west of the process building, if
14 you're able to see that.
15    A    That's number two?
16    Q    Yes, sir.
17    A    Yes.
18    Q    Okay.
19         And do you recall earlier when we were
20 looking at the -- the drainage system figure that
21 there were four off-site discharge points? There was
22 the wastewater point to the west?
23         MR. HATFIELD: Can you refer to the --
24    A    To the west is --
25    Q    Yeah, we were looking at --

Page 195

1    A    -- Greenfield Avenue?
2    Q    Sorry to interrupt you.
3    A    To the west is Greenfield Avenue?
4    Q    Yes, sir.
5    A    Okay.
6    Q    Do you remember we were looking at the
7 drainage system, which is Figure 3.4 of Exhibit 7?
8         Do you recall looking at Figure 3.4
9 earlier today?
10    A    Yes.
11    Q    Okay.
12         And we talked about the stormwater
13 off-site discharge point along Greenfield Avenue.
14         Do you see that there?
15    A    Yes.
16    Q    Okay.
17         And if you look back at the permit from
18 1981, there were only three permitted sewer
19 connections, right? All of which are on the map
20 along Harrison Avenue. True?
21    A    Correct.
22    Q    Okay.
23         So at least as of 1981 this stormwater
24 discharge point was not connected to the municipal
25 sewer?

Page 196

1         MR. HATFIELD: Objection to form.
2    A    Again, please.
3         Sorry.
4    Q    Sure.
5         As of 1981, the permit application in
6 Exhibit 17, this stormwater off-site discharge point
7 along Greenfield Avenue was not connected to the
8 municipal sewer?
9         MR. HATFIELD: Objection to form.
10    A    I can't speak whether it was connected
11 to the municipal sewer or not, but obviously there's
12 only three shown on this picture, yeah.
13    Q    Right.
14         Well, so I guess we can at least say
15 it's not a permitted sewer connection as of 1981?
16         MR. HATFIELD: Objection to form.
17    A    Well, I don't know whether it needed to
18 be permitted. I mean, once it hits that stormwater
19 catchment basin, it's not ours, right? It belongs to
20 the municipality.
21    Q    Okay.
22         The sanitary stormwater sewer, the
23 combined stormwater, industrial sewer, and the
24 sanitary stormwater sewer connections along Harrison
25 Avenue were all permitted, right?

Page 197

1    A    All permitted, yes.
2    Q    All right.
3    A    As of this document in 1980 --
4    Q    One.
5    A    '81, yeah.
6    Q    But the stormwater off-site discharge
7 point along Greenfield Avenue is not permitted as of
8 1981?
9    A    Correct, not in that document.
10    Q    And for outlet number two, which is the
11 combined stormwater and industrial sewer outlet, it
12 contains industrial waste, correct?
13    A    By the document? Yes.
14    Q    Okay.
15    A    Yes.
16    Q    And that would include the approximately
17 84 pounds a year of 2,4,5-TCP, correct?
18         MR. HATFIELD: Objection to form.
19    A    Yeah, a plant effluent would include the
20 TCP into the POTW.
21    Q    Okay.
22         If we look at Bates number ending 667, a
23 couple of pages over, there's a chart of some
24 analysis of samples that were collected.
25         Do you see that?

50 (Pages 194 - 197)

ALCD-PUBCOM_0001635

Page 198

```
1     A    Yes, two tables.
2     Q    Yes, sir.
3          And it looks like the report indicated
4  that there was lead in the process waste sewage,
5  correct?
6     A    Yes.
7     Q    Zinc as well, right?
8     A    Yes.
9     Q    And, again, here, the wastewater
10 discharge was not analyzed for Dioxin, correct?
11    A    Correct.
12    Q    Okay.
13         (Whereupon Sewer Connection Permit
14 Application is received and marked as Exhibit 18 for
15 identification.)
16    Q    Okay.  Exhibit 18, this is a document --
17 it looks like another application for a sewer
18 connection permit filled out by Drew.
19         Do you see that, Mr. Hoffman?
20    A    Yes.
21    Q    Okay.
22         And the date on this one, if you go to
23 Bates 947, it is signed on February 8, 1991, right?
24    A    Yes.
25    Q    By Mr. Orlowski.
```

Page 199

```
1          Did you know -- have you met
2  Mr. Orlowski?
3     A    I did not meet Mr. Orlowski.
4     Q    We're getting closer in time here.
5     A    I hear you, I hear you, yeah.
6     Q    Okay.
7          I'd like to ask about this document.
8          It looks like Ashland filled out a table
9  where they checked the appropriate boxes for
10 pollutants that may be present in the -- in their
11 waste effluent.  It starts on Bates 948.  And if
12 you'll go to the second page of that, it's 949, do
13 you see that at the bottom of the right-hand column
14 2,3,7,8-TCDD is listed there, and column C is
15 checked?
16    A    Yes.
17    Q    Okay.
18         And column C indicates that the
19 pollutant is known to be absent.
20         Do you see that?
21         The legend is at the bottom left.
22    A    Yes.
23    Q    All right.
24         Do you know how Ashland -- on what basis
25 it determined that 2,3,7,8-TCDD was not present in
```

Page 200

```
1  their waste effluent?
2     A    This is 1991?
3     Q    Correct.
4     A    So the materials or the compounds that
5  are not present weren't used in the process.
6     Q    And by this point in time Ashland had
7  discontinued use of 2,4,5-TCP, right?
8     A    Yes.
9     Q    Okay.
10         But do you know whether Ashland did --
11 did any sampling analysis to make that determination
12 or was this just based on the fact that it determined
13 none of the raw ingredients it was using contained
14 Dioxin?
15    A    This is based on process knowledge.
16    Q    All right.  Process knowledge.
17         Okay.
18         And so, for instance -- and then if you
19 go to the back --
20    A    And I should add to that a little bit.
21    Q    Sure.
22    A    The ones that they do say "suspect to be
23 present" are based on analytical data that you see
24 through all these documents.
25    Q    Right.
```

Page 201

```
1          So I was going to ask.
2          There is analytical data for certain
3  potential contaminants attached to this document that
4  start at Bates 954, right?
5          So is it the case that certain
6  contaminants were analyzed for through sample?
7     A    Yes.
8     Q    Okay.
9          And those would be the ones that are
10 indicated here at the end of the document, correct?
11    A    Correct.
12    Q    And --
13    A    I don't know if they're all that was
14 analyzed, but these are the ones that are reported.
15    Q    And for the reported contaminants that
16 were analyzed for at this time in 1991, Ashland did
17 not analyze for Dioxin, correct?
18    A    Correct.
19    Q    Okay.
20         Okay.  Earlier today I asked you whether
21 the Kearny site is in the Washington Avenue combined
22 sewer outfall district.  So I want to show you a
23 document about that.
24         (Whereupon 1976 Overflow Analysis is
25 received and marked as Exhibit 19 for
```

51 (Pages 198 - 201)

Page 202

1 identification.)
2    Q    I've handed you Exhibit 19, which is a
3 Passaic Valley Sewage Commission overflow analysis
4 from 1976 for Worthington Avenue and Harrison.
5    Do you see that?
6    A    Yes.
7    Q    Okay. If you'll flip to the last page
8 with me, there is a map.
9    A    Is that 700?
10    Q    Correct.
11    And the -- you'll see at the -- in the
12 legend, the last symbol in the legend is the hashmark
13 line, for lack of a better term, which indicates the
14 Worthington Avenue collection system, and you can
15 see, on the map, it -- the -- 1106 Harrison Avenue is
16 within the Worthington Avenue collection system.
17    Do you see that?
18    MR. HATFIELD: Yeah, I object to the
19 form, and this document is not an Ashland or a Drew
20 document, and to the extent it calls for an expert
21 opinion or interpretation of this figure, this
22 witness is here as a layperson testifying on behalf
23 of the company, -- it's also outside of the scope of
24 the subject areas of the deposition.
25    I don't believe the PVSC system falls

Page 203

1 inside of any of the ten identified subject areas.
2    MR. KAIM: Okay, it absolutely does,
3 and, look, I mean, I think Mr. Hoffman can answer
4 these questions regardless and then you and I will
5 just have an issue as to whether it's within the
6 scope of the notice or not, but I'll tell you right
7 now, number six is, "any discharge routes from the
8 Drew Chemical Corporation property to the Passaic
9 River."
10    Obviously, I mean, you got millions of
11 gallons of sewage leaving through the PVSC system. I
12 think this squarely falls under a potential discharge
13 route from the Drew Chemical property to the Passaic.
14    MR. HATFIELD: Yeah, my objection
15 stands.
16    Q    Okay. Now that we have gotten that on
17 the record, let me re-ask the question.
18    Do you see on this map that 1106
19 Harrison Avenue is within the Worthington Avenue
20 collection system?
21    MR. HATFIELD: The same objections.
22    A    This map?
23    Q    That's the one.
24    A    I don't even see 1106 Harrison.
25    Q    Okay.

Page 204

1    A    I cannot read that map.
2    Q    You can't?
3    A    No.
4    Q    Really?
5    A    No.
6    Q    Okay.
7    A    If you could pinpoint it, that would be
8 great.
9    Q    Let me see if I can help you out here.
10    If you'll go to Exhibit 7, which was the
11 figures. If you look at the very front, the small
12 page, that is page one of Exhibit 7, just to orient
13 you -- look, you guys are going to have to help me
14 out, this is not my neighborhood, but this road here,
15 is that a Turnpike, or something else?
16    MR. HATFIELD: I think you're pointing
17 to the railroad.
18    MR. KAIM: Is that a railroad, is that
19 what that is?
20    Okay. Thanks, Bill.
21    MR. HATFIELD: I think you've just
22 explained that you need to be an expert to read the
23 map.
24    MR. KAIM: Or at least from around the
25 north, which everyone else here at the table is.

Page 205

1    Q    Also, I can read the Passaic River part
2 right there.
3    Okay.
4    I'm not an expert, and it is pretty
5 clear to me that there's -- that the railroad is
6 visible there. You have the Passaic just south of
7 the railroad, and you have the Harrison area just
8 north of the railroad, and then you've got the
9 Worthington Avenue collection system, which is
10 circled around where the site would be in relation to
11 the Passaic River.
12    MR. HATFIELD: Yeah, again, Counsel, my
13 objection stands. I think we probably need a better
14 map, but I think you may need an expert
15 interpretation of this map.
16    MR. KAIM: Well, I would like to hear
17 from the witness.
18    A    Let me orient myself here first a little
19 bit.
20    Q    Sure.
21    A    You're asking a lot.
22    Q    All right.
23    A    Yeah, I wish I had a blow-up of this.
24    Q    Let me ask -- look, we have the
25 documents that we have.

52 (Pages 202 - 205)

Page 206

1    Are you able to identify the Passaic
2 River?
3    A    Yep.
4    Q    Okay.  Great.
5    A    Right here, right here.
6    Q    Very good.
7        And are you able to identify what
8 Mr. Hatfield has informed me is a railroad?
9    A    Yep, right here.
10    Q    Okay, perfect.
11        And then on the figures, the Exhibit 7
12 figures, the Kearny site here is in red, obviously,
13 and it's just north of the river, and it's on
14 Harrison Avenue, which, you know, my read of this map
15 is Harrison Avenue being the east/west street -- the
16 major east/west street north of the river.
17        MR. HATFIELD:  Counsel, I think you
18 should have blown this one up to 11-and-a-half by 17,
19 like the other ones.
20        MR. KAIM:  You're exactly right about
21 that.
22        MR. HATFIELD:  It would be better.
23    A    Okay, I'm sorry, so back to the
24 question.
25    Q    Okay.  Here is the question:  Are you

Page 207

1 able to see from this map that the Kearny site is
2 within the Worthington Avenue collection system as
3 outlined by the PVSC here?
4        MR. HATFIELD:  Same objection.
5    A    I don't like to guess.
6    Q    Okay.
7        Let me ask a simpler question then.
8    A    Yeah.
9    Q    This map, in particular with the
10 portions that are north of the Passaic River, cover
11 the area in which the Kearny site is located, right?
12    A    Okay.
13    Q    Do you agree with that?
14        MR. HATFIELD:  Objection to form.
15    A    This map right here?
16    Q    Yes.
17    A    It would appear to.
18    Q    Okay.
19    A    Yeah.
20    Q    All right.
21        It's also an independently verifiable
22 fact out there that someone could determine, by
23 looking at documents, as to whether the Kearny site
24 was within the Worthington Avenue collection system
25 for the PVSC, correct?

Page 208

1        MR. HATFIELD:  Objection, same
2 objections.
3    A    Yeah, absolutely, somebody could.
4    Q    Somebody could.
5        All right.
6        All right.  Let's look -- I want to look
7 and ask you about the document itself, some of the
8 text in there.
9        With respect to the Worthington Avenue
10 collection system, if you look at -- I'm looking at
11 the page that ends Bates 695, and looks like a firm,
12 I can't read it, but some -- Elson T. Killam
13 Associates, Inc., it looks like.
14        If I had to guess, it would be
15 A-L-S-O-N.
16        THE WITNESS:  It's on the first page.
17        MR. HATFIELD:  Elson.
18    Q    Elson, E-L-S-O-N, T. Killam Associates,
19 environmental and hydraulic engineers, they have done
20 some analysis, and it's an overflow data extract.
21        Do you see that page?
22    A    695?
23    Q    Correct.
24        Okay.
25        And they described the overflow chamber

Page 209

1 status.  And the overflow chamber for the Washington
2 Avenue collection system is to an open ditch leading
3 to the Passaic.
4        Do you see that?
5    A    Worthington, not Washington.
6 Worthington Avenue.
7    Q    Thank you.
8        MR. HATFIELD:  Objection to form.  On
9 this whole line of questioning, my prior objection
10 stands.  This isn't an Ashland document.  And I
11 believe this is outside of the deposition topics.
12 The witness isn't here as an expert witness.  And to
13 the extent that this isn't within Ashland's corporate
14 knowledge, this entire line of questioning that
15 you're asking would be based upon the witness'
16 personal knowledge because it's outside the corporate
17 documentation or information.  This is -- these --
18 this entire line of questioning is more appropriate
19 to go to someone from the PVSC or the Kearny
20 municipality, not to Ashland.
21        But with those objections, you can ask
22 the witness a question and he can answer it if he has
23 knowledge.
24        MR. KAIM:  All right.  I feel compelled
25 to put on the record, first, I would appreciate it if

53 (Pages 206 - 209)

Page 210

1 we could just keep it to outside the scope, and then
2 we could move on.
3        MR. HATFIELD: I want to make sure
4 because this is a corporate representative
5 deposition, and we've had rules of the road that all
6 the parties have agreed to in the deposition
7 protocol, and as I said before, Occi has not followed
8 those rules.
9        MR. KAIM: Okay.
10        MR. HATFIELD: And I believe this is
11 outside of the scope in asking for this witness on
12 behalf of the corporation to testify about a document
13 that's not part of the Ashland documents or the Drew
14 documents. So you're asking this witness to do
15 something that's not required by Rule 30(b).6. So I
16 want it to be very clear on the record where you are,
17 Counsel, because you're outside the lines.
18        MR. KAIM: Okay.
19        And, look, Bill, not surprisingly, I
20 totally disagree with you. Okay?
21        MR. HATFIELD: So we disagree.
22        MR. KAIM: Because I need now to put on
23 the record why.
24        Okay?
25        This is squarely within topic number

Page 211

1 six, which talk about discharge routes from the site
2 to the Passaic River. And this is a documented route
3 to the Passaic River from the site.
4        Now, I get it, you guys may have a bunch
5 of experts about what the words on the page here
6 mean, but I'm entitled to ask your corporate
7 representative about the company's position about
8 this documented discharge route from the site. I
9 don't know who -- I mean, that is the purpose of a
10 corporate representative.
11        Ashland filled out PVSC forms,
12 applications, permits. They had a permitted
13 connection. And now I'm entitled to ask your
14 corporate representative about Ashland's position
15 about whether the sewage and the 2,4,5-TCP that went
16 into that sewage made it to the Passaic through this
17 documented connection.
18        MR. HATFIELD: I guess that is where we
19 disagree, Counsel, because you can ask Ashland about
20 Drew's permits or Ashland's permits to PVSC and what
21 happened at the Ashland facility on Harrison Avenue,
22 but you're asking Ashland questions about what PVSC
23 or the municipality did, and that is outside of
24 Ashland's knowledge. And you're asking for expert
25 testimony, and this witness is not here for expert

Page 212

1 testimony. And I think this is where our
2 disagreement is.
3        You can ask us about discharge routes
4 from the site, but once it goes into the sewage
5 system, it's not Ashland's ownership or operation,
6 it's another party and another Defendant in the case.
7        It's improper as part of this
8 deposition, I don't believe it's inside the topics,
9 and to the extent that you're going to continue to
10 ask the witness anything about the subject area, he's
11 not testifying on behalf of the company, he's
12 testifying only in his personal, you know, capacity,
13 and he's not binding the company because it's
14 outside, you're outside the lines. And I want to
15 make that very clear on the record.
16        So you can continue to use your time in
17 this deposition to do this, but it's not going to
18 bind the company.
19        MR. KAIM: Okay.
20        I disagree. I'm going to ask the
21 questions, we're going to get the answers, and as to
22 whether it binds the company or not, we shall see.
23        I find it very interesting that
24 Ashland's position is once it puts its hazardous
25 substances into the municipal sewer lines it can wash

Page 213

1 its hands of it. I don't think that's the law. But,
2 in any event, I think we disagree and we'll just have
3 to see the --
4        MR. HATFIELD: My objections stand.
5    Q    Okay. Back to you, Mr. Hoffman, with
6 respect to this page, Bates 695.
7        All right.
8        Is it Ashland's position that during wet
9 weather there were periods of time when the sewage
10 that it was putting into the municipal sewer was
11 diverted by the PVSC and went straight to the Passaic
12 River?
13        MR. HATFIELD: Same objections.
14    A    I'm going to answer for myself, personal
15 knowledge.
16    Q    My position on that is, that's to be
17 determined.
18    A    Yeah.
19        I have no knowledge of how the PVSC
20 works or the sewer systems around it or anything.
21 All I have done so far is study what Ashland and Drew
22 have done up to that discharge point. So I don't
23 know anything about where the sewers go, where the
24 discharge points are, where the overflow points are
25 from PVSC, I have not studied these.

54 (Pages 210 - 213)

Page 214

1    This document wasn't part of the
2 documents that I've reviewed.
3    Q    Okay.
4        I'm sorry, now I'm talking for the
5 record here.
6        This was on the list that Occi Chem
7 provided in advance of the deposition.
8    A    Do we know what number this was or what
9 tab this was, because I don't remember seeing this.
10 I don't recall seeing this document in the binders
11 that I got.
12   Q    I'll ask you a different question.
13       To your knowledge, did Ashland ever do
14 any analysis, during the 1970s operations or the
15 1980s operations, into whether the waste that it was
16 putting into the sewer system was going to the
17 Passaic River?
18       MR. HATFIELD:  Objection to form.
19   A    So all the documents that I reviewed,
20 none of those have any information about where the
21 waste left after -- besides that it went to the PVSC.
22 Those permits are the only thing I know.  Right?
23   Q    So based on --
24   A    After that, I don't understand the PVSC
25 system, I don't understand the municipal sewer

Page 215

1 system, I don't understand any of that.  All right?
2    Q    Sir --
3    A    I don't have any information on that.
4    Q    And now I'm asking about Ashland's --
5 Ashland's corporate knowledge with respect to once it
6 put the sewage into the municipal sewer system, it
7 didn't do any further analysis about where it went,
8 based on the documents that you have seen and the
9 knowledge within Ashland?
10   A    I have seen no documents, no.  No
11 knowledge that I have seen in the documents that I've
12 reviewed.
13   Q    Okay.
14       And no one you talked to can indicate
15 that Ashland did any diligence or analysis of where
16 the waste went once it put its waste into the
17 municipal sewer system?
18   A    No Ashland documents that I've reviewed.
19   Q    Okay.
20       I'm going to hand you what I'm marking
21 as Exhibit 20.
22       (Whereupon June 13, 1983 Letter is
23 received and marked as Exhibit 20 for
24 identification.)
25   Q    Okay.

Page 216

1        In 1983 the EP -- I'm sorry -- the NJDEP
2 reached out to Ashland and requested that it do
3 Dioxin sampling because of its history of using
4 2,4,5-TCP, correct?
5    A    Correct.
6    Q    All right.
7        Was this, to your knowledge, the initial
8 communication about that request?
9    A    That's what I recall is the initial
10 documentation to Ashland.
11   Q    Right.
12       And as a matter of fact, earlier today
13 we looked at Ashland's response to that letter.  I'm
14 not going to ask you any further questions about it,
15 but in Exhibit 12, do you recall we looked at a
16 June 22 letter that responded to the June 13 letter
17 that enclosed the Selected Substances Report on
18 2,4,5-TCP?
19       MR. HATFIELD:  I'm sorry.  Was that 12?
20       MR. KAIM:  It's Exhibit 12 at Bates 943.
21       MR. HATFIELD:  Okay.
22       Do you recall that?
23   A    Yes.
24   Q    Okay.
25       And now I'm going to hand you what I've

Page 217

1 marked as Exhibit 21.
2        And this is a further letter regarding
3 the sampling request dated September of 1983, and
4 it's from the NJDEP to Ashland, right?
5        (Whereupon September 1983 Letter is
6 received and marked as Exhibit 21 for
7 identification.)
8        MR. HATFIELD:  To Drew Chemical.
9    A    To Drew Chemical.
10   Q    Right.
11       And just to be clear, I think we have
12 gone over this, but Ashland is the successor to Drew
13 Chemical, correct?
14   A    Correct.
15       MR. HATFIELD:  Yeah, I'm just saying
16 that this letter is not to Ashland, it's to Drew
17 Chemical.
18       I just want the record to be clear when
19 you're going through these documents, Counsel, you're
20 not always clear about the words on the page, so I'm
21 just correcting you to make sure that there is no
22 confusion later.
23       MR. KAIM:  I was asking a simple
24 question.
25   Q    In this letter in September of 1983, the

55 (Pages 214 - 217)

Page 218

1 NJDEP, in the third paragraph, says, "The purpose of
2 this site survey, sampling and analysis is to
3 determine the presence of TCDD," and then it requests
4 that Drew develop a sampling plan, right?
5     A    Correct.
6     Q    And the second-to-last sentence on the
7 page says, "The sample collection and the chain of
8 custody will be supervised by a representative of the
9 NJDEP."
10         Do you see that?
11    A    Correct, yes.
12    Q    Okay.
13         This is Exhibit 22.
14         (Whereupon NJDEP November 14, 1983 Memo
15 is received and marked as Exhibit 22 for
16 identification.)
17    Q    Now we're in November of 1983.
18         And it's an NJDEP memo, and if you'll go
19 down -- well, first of all, in the comments, the
20 middle sentence of the comments, there is a single
21 sentence between two paragraphs, and it says, "The
22 use of 2,4,5-TCP was eliminated in 1975."
23         We know that that is not accurate,
24 right?
25         We have seen the actual production

Page 219

1 records indicating that TCP was used through 1981.
2 True?
3     A    Correct.
4     Q    Okay.
5         If you look down at the conclusions, it
6 says, "Mr. Weiss of Drew Chemical agreed in concept
7 to sample at the Kearny facility for 2,3,7,8-TCDD,"
8 correct?
9     A    Correct.
10    Q    And that was in November in which Drew
11 agreed in concept?
12         (Whereupon November 14, 1983 Letter is
13 received and marked as Exhibit 23 for
14 identification.)
15    Q    I hand you Exhibit 23.
16         Okay.  So Drew then retained the
17 services of a company called Environmental Testing
18 and Certification in order to do the analysis of the
19 samples, right?
20    A    Correct.
21    Q    It notes that Drew personnel will
22 undertake the actual sampling work.
23         It's the last sentence of the first
24 paragraph.
25    A    Yes.

Page 220

1     Q    Okay.
2         If you'll go in this document back to
3 Bates ending 002.
4         Sir, these documents that start at 002
5 and end at 011, what are they?
6     A    002 is a sample point information form.
7     Q    Okay.
8     A    It shows where the sample was taken.
9     Q    All right.
10        Was there a sample taken pursuant to
11 this form?
12    A    The next page you'll see the chain of
13 custody, and that is for D7380.
14        So through this form you'll see a sample
15 point information form.
16        Let's say 004.
17    Q    Uh-huh.
18    A    "Wipes from three floor drains, first
19 floor, building 7200."
20    Q    Okay.
21    A    And then the chain of custody would be
22 next for that sample.
23    Q    I see.
24        Okay.
25        And the samples, it looks like they were

Page 221

1 taken in December of 1983, actually December 13,
2 1983, is that accurate?
3     A    Yes.
4     Q    Okay.
5         And then I guess there's one more floor
6 drain on the third floor?
7     A    That's --
8     Q    008?
9     A    006 was another one.
10    Q    Uh-huh.
11    A    A sample point.
12        008 was another sample point.
13    Q    Okay.
14    A    0010 was a sample point.
15    Q    So, who took these samples?
16        Do you know who took these samples?
17    A    It says Drew personnel would undertake
18 the actual sampling.
19        I do believe, if you look at the other
20 documents, that sampling was also -- NJDEP people
21 were on site during the sampling.
22        I think there are some other documents
23 that say NJDEP were on site, if I recall correctly.
24    Q    Okay.
25        Well, I'll tell you, I haven't seen

56 (Pages 218 - 221)

Page 222

1  those documents.
2      A    I thought I recalled one in one of the
3  documents I saw that NJDEP was present during the
4  sampling too.
5          I may be wrong, but that's what I recall
6  for these samples here.
7      Q    Okay.
8          We'll have to see if we can turn up that
9  document.
10         Have you seen sampling analysis results
11 from these samples?
12     A    No.
13     Q    Okay.
14         So we don't know if Dioxin was indicated
15 on the site from these samples or not, correct?
16     A    We don't even know where the sample
17 results are. I think both sides did a FOIA for these
18 things and didn't find anything.
19     Q    Okay.
20         So, to the best we know, while the
21 samples, it looks like they were taken, they may
22 never have been analyzed?
23     A    Yeah, that is where the record ends.
24         My guess would be if we took samples and
25 New Jersey was party to this, it wouldn't have ended

Page 223

1  there.
2          So wherever those documents are, for
3  some reason they can't be found, yeah.
4          I doubt if New Jersey would allow us to
5  sample and say, "Hey, they took samples, they were
6  never found, never analyzed, and never come back to
7  us."
8      Q    Let me just show you Exhibit 24.
9          (Whereupon November 17, 1983 Letter is
10 received and marked as Exhibit 24 for
11 identification.)
12     Q    It is the case that on November 17,
13 1983, in Exhibit 24, the assistant general counsel of
14 Drew said that -- told NJDEP that all further
15 communications regarding the sampling were to go to
16 him, correct?
17     A    Correct.
18     Q    Okay.
19         Have you ever met Harry Levin?
20     A    No, I have not.
21     Q    Got to try.
22     A    Yeah.
23         Like I said, you're getting closer.
24     Q    So that is what we know, that's it,
25 that's all Ashland knows about this sampling?

Page 224

1      A    Yeah.
2          I just know that the samples were taken
3  after this note too. This is the 17th of November.
4  Samples were collected December 13.
5      Q    But then we have no idea whether they
6  were actually analyzed?
7          MR. HATFIELD:  Objection to form.
8      A    We have no idea after that point, yeah.
9      Q    And if they were analyzed, you don't
10 know what the detection limits were that were used,
11 right?
12     A    No.
13         We wouldn't even know -- well, the
14 detection limits would be easy to find out, just
15 check the lab what the detection limits were, but we
16 don't have the data for it.
17     Q    Can't get that far.
18     A    Yeah.
19         MR. KAIM:  I need some more stickers,
20 but why don't we go off the record just for a couple
21 of minutes.
22         THE VIDEOGRAPHER:  The time is 4:09.
23 We're going to go off the record.
24         (Brief recess taken.)
25         THE VIDEOGRAPHER:  The time is 4:17, and

Page 225

1  we are back on the record.
2          (Whereupon August 8, 1983 Report is
3  received and marked as Exhibit 25 for
4  identification.)
5      Q    So, this is Exhibit 25 to your
6  deposition, Mr. Hoffman.
7          By the way, are you ready to continue?
8      A    Yes.
9      Q    And do you see that Exhibit 25 is a
10 report from August 8 of 1983?
11     A    Yes.
12     Q    Okay.
13         And that -- that is before the chain of
14 custody documents from Drew Chemical suggesting that
15 it might have taken some samples in December of 1983,
16 right?
17     A    Correct.
18     Q    Okay.
19         Mainly what I want to ask you about is
20 Ashland's position as to where these samples were
21 taken.
22         So if you look on the second page of the
23 document, and you look at sample -- the ETC number,
24 the first column, C8132, states "Front east."
25         Is Ashland able to identify where that

57 (Pages 222 - 225)

Page 226

1 location -- that sampling location was?
2    A    I'm sorry.  The location again?
3    Q    Yeah.
4        It's -- well, the ETC number.
5    A    A C number, right?
6    Q    Yeah.  It's C8132.
7    A    8132.
8        I mean, the only information to the
9 samples that are collected in the Drew area are on
10 Bates 021.
11    Q    Well, actually, Bates 021 indicates --
12 gives the locations for four samples, but it doesn't
13 give the locations for the remaining samples that
14 were taken, does it?
15    A    Right.
16    Q    So --
17    A    That's why I don't know where the
18 samples were taken.
19    Q    Right.
20        We don't know -- so, for instance, front
21 east, we don't know if that's the front east area
22 right off the front east portion of the Drew site,
23 right?
24    A    Yeah, we don't know where those samples
25 were taken.

Page 227

1    Q    Okay.
2    A    Yeah, this is an NJDEP document,
3 correct?
4    Q    Correct.
5        Was Ashland involved in this sampling,
6 to your knowledge?
7    A    Not to my knowledge.
8    Q    Okay.
9        Let me just rephrase that.
10        With respect to Ashland's position in
11 this case, was Ashland involved in this sampling?
12    A    No, Ashland was not part of this
13 sampling.
14    Q    Okay.
15        Does Ashland dispute that there were
16 Dioxin hits from this sampling in the vicinity of the
17 Kearny site?
18        MR. HATFIELD:  Objection to form.
19    A    The Kearny site, the Drew site?
20    Q    Yes.
21    A    The only two or four samples that are
22 noted on this page, the ones that are next to Drew,
23 is 8 -- C8137 and C8129.  The other samples, we don't
24 know where in Kearny they were taken.
25    Q    But they could have been next to the

Page 228

1 Drew site, we just don't know from this document, is
2 that Ashland's position?
3        MR. HATFIELD:  Objection to form.
4    A    Again, I don't know where the other
5 samples were taken.
6    Q    Okay.
7    A    The only thing that I could talk to is
8 this map, that's what's in the document, that says
9 these two samples are next to the Ashland facility,
10 one on Greenfield Avenue, one on Harrison.
11    Q    And so, for instance, C8134, the
12 description for that sample is "sump."
13        We don't know if that's -- well,
14 Ashland's position is, "We don't know if that was a
15 sump near the -- or outside -- right outside of the
16 Drew Chemical site"?
17        MR. HATFIELD:  Objection to form, asked
18 and answered.
19    A    Just by this map, I do believe there is
20 a follow-up piece of information or document in the
21 files that New Jersey put some kind of summary to all
22 these samples.
23        (Whereupon January 30, 2013 Memo is
24 received and marked as Exhibit 26 for
25 identification.)

Page 229

1    Q    Okay.  Exhibit 26, this is a memo that's
2 describing, you'll see in the first sentence there,
3 drainage and pipeline cleanout and inspection
4 activities.
5        And so is Ashland -- Ashland did some --
6 they cleaned out the pipelines and their drainage
7 system here at -- in December of 2012, correct?
8    A    Correct.
9    Q    So, for instance, just in the very
10 beginning here, the second sentence in the document
11 says, "Clean Harbors and Progressive Pipeline
12 Management collaborated efforts to successfully wash,
13 clean, and inspect via video camera, all necessary
14 stormwater systems leading offsite and determine
15 stormwater flow direction."
16        Do you see that language?
17    A    The second sentence?
18    Q    Right.
19    A    Yes.
20    Q    And so this -- this company came in and,
21 as you'll see throughout the document, power washed
22 and jet cleaned the various floor drains and
23 pipelines throughout the site, correct?
24    A    Correct.
25    Q    All right.

58 (Pages 226 - 229)

Page 230

1    Before that was done, before the jet
2  cleaning and the power washing happened, did Ashland
3  take any samples, wipe samples, of the drains or the
4  pipes?
5    A    Not to my knowledge.
6    Q    Okay.
7    So I guess what we have is, in 1983,
8  Ashland's position is that there were some wipe
9  samples taken around the site, but we don't know what
10 happened to them or whether they were ever analyzed,
11 correct?
12   MR. HATFIELD:  Objection to form, asked
13 and answered.
14   A    Correct.
15   Can I go back to that document?
16   Q    Yeah, of course.
17   A    So if you look in this document further,
18 if you look actually the sampling point information.
19   Q    Can you just tell me --
20   A    I'm sorry.  It's 23, Exhibit 23.
21   Q    Thank you.
22   A    On Bates 7002.
23   Q    Yes.
24   A    We had a discussion about Drew personnel
25 undertook the sampling.

Page 231

1    Q    Yes.
2    A    But if you look at the employer at the
3  bottom of that information, it says DEP.  So it would
4  appear that NJDEP did the sampling.
5    Q    Okay.
6    In any event, we don't know what
7  happened to those samples, and we don't know whether
8  they were ever analyzed, right?
9    A    Right.  At that we lose -- that is the
10 end point right there.
11   Q    And then here we are, this is much
12 later, like, in the remediation phase of the
13 property, and now, after December of 2012, the
14 drainage system is jet cleaned and power washed,
15 right?
16   A    Correct.
17   Q    Without any sampling done before that
18 happens?
19   A    Let me -- let me rephrase.
20   I can't recall if there was sampling,
21 but if we look in the RIR, there may be some samples
22 of the sediments taken from the sumps.  I just don't
23 recall, yeah.
24   Q    Okay.
25   But to the extent that there were

Page 232

1  sediment samples taken from the sumps on the site,
2  Ashland has not analyzed them for Dioxin, correct?
3    A    That would be correct.
4    Q    Would those be stored and preserved
5  somewhere to the extent that Ashland took samples
6  from a sump during the RIR process?
7    A    You mean still available today?
8    Q    Yes.
9    A    My guess would be -- again, I'm not the
10 lab expert.
11   My guess would be there is probably a
12 whole time of one or two years for samples like that.
13   Q    And you're saying that if they were
14 taken with -- in the RIR process, that would have
15 been before this December 2012 power washing?
16   A    Right.
17   Q    Okay.
18   A    And the lab would have disposed of them.
19   Q    All right.
20   And are you aware that in August of 2020
21 a company called The Intelligence Group came and took
22 samples at the Kearny site?
23   A    Yes.
24   Q    Was any -- was anyone from Ashland
25 present when they took the samples?

Page 233

1    A    I do believe, yes.
2    There was no documents of that, but I
3  think we split the samples that day, or there were
4  split samples taken that day.
5    Q    Okay.
6    Do you know who was there for Ashland?
7    A    I do not know who was there that day,
8  yeah.
9    Q    Okay.
10   Anything that happened, from Ashland's
11 perspective, that was out of order or not routine
12 during the collection of those samples?
13   MR. HATFIELD:  Objection form, calls for
14 expert testimony.
15   A    Yeah, I wouldn't know what out of the
16 norm would be, but nobody -- I had no discussion with
17 somebody about problems during the sampling, but
18 whatever out of the norm would be, I'm not sure.
19   Q    All right.
20   And one of the sampling locations was a
21 catch basin just east of building 722.  That would
22 have been an area that would have been subject to
23 power washing and jet cleaning in December of 2012,
24 right?
25   A    I'm not sure.

59 (Pages 230 - 233)

Page 234

1     MR. HATFIELD:  Objection to form.
2   A    Do I have access to that document?
3   Q    I'll mark it right now.
4   A    Yeah, it would probably be good that I
5   could take a look at it.
6         (Whereupon Analytical Results and
7   Validation is received and marked as Exhibit 27 for
8   identification.)
9   A    Thank you.
10  Q    Okay.  So I marked as Exhibit 27 the
11  analytical results and validation of the samples that
12  were taken from the Kearny site in August of 2020.
13        MR. HATFIELD:  This is 27?
14        MR. KAIM:  Right.
15  Q    I mean, my -- one of the site -- let
16  me -- let me ask a new question, if I could.
17        One of the sites that was sampled was a
18  floor drain inside of building 720.
19        So the floor drain was part of the
20  drainage system in the -- at the site, correct?
21  A    Correct.
22  Q    And it would have been one of the areas
23  that would have been power cleaned in December of
24  2012?
25  A    And I'm going back to Exhibit 26.

Page 235

1   Q    So look on Exhibit 26.
2   A    635, building 720 production.
3   Q    Right.
4         And so do you see in that paragraph they
5   note the five floor drains and a slop sink and note
6   that PPM performed jet cleaning activities as well as
7   camera inspections throughout all the piping
8   components?
9   A    Correct.
10        I'm sorry.
11        So your question again, please?
12  Q    Sure.
13        So on this -- I'm sorry, just to -- so I
14  don't lose my train of thought here, the question was
15  that this floor drain inside of building 720 would
16  have been an area that would have been power cleaned
17  in this cleanout in December of 2012?
18  A    Well, I don't know if it was jetted out,
19  power cleaned.  "Jetted" usually is a term to use for
20  there is a blockage, whatever, washed down, or
21  whatever, yeah.
22  Q    Jet cleaned?
23  A    Yeah, yeah.
24  Q    Okay.
25        And then in August of 2020, when a

Page 236

1   sample was taken, 2,3,7,8-TCDD was still detected,
2   correct?
3         MR. HATFIELD:  Objection to form.
4   A    And that data is?
5   Q    And that is on Bates 993 in Exhibit 27.
6   A    And this is the data from -- taken by
7   OCC.
8         Taken by GHD for OCC.
9   Q    Right.
10  A    And you're saying that TCDD was
11  detected.
12  Q    In the floor drain inside building 720.
13        Is that right?
14  A    It was detected at -- detected at 18
15  parts per trillion.
16  Q    Right.
17        And it's not Ashland's position, is it,
18  that that 2,3,7,8-TCDD came from some up -- upland
19  source or somewhere else other than operations on the
20  Kearny site, is it?
21        MR. HATFIELD:  Objection to form.  It
22  calls for expert testimony.
23  A    So, again, the question, please.
24  Q    Sure.
25        Is it Ashland's position that this

Page 237

1   2,3,7,8-TCDD that was detected in the floor drain
2   inside of building 720 came from somewhere other than
3   the operations on the Kearny site?
4         MR. HATFIELD:  Same objection.
5   A    It would be Ashland's knowledge that we
6   have no -- we have no knowledge of the source of the
7   2,3,7,8 TCDD detected.
8   Q    Okay.  So just saying "We don't know" is
9   the answer, Ashland just doesn't know about the TCDD?
10  A    No.  We see that the TCDD was detected,
11  but we don't know the source of the TCDD.
12  Q    And Ashland has not investigated its use
13  of 2,4,5-TCP as a possible source of the Dioxin that
14  was detected inside of the floor drain at building
15  720, right?
16  A    2,3,7,8-TCDD was not part of the COCs
17  for the investigation.
18  Q    So the answer to my question is no?
19  A    Yeah.  Ashland did not include
20  2,3,7,8-TCDD in the investigation -- in the remedial
21  investigation of the site.
22  Q    All right.
23        I know you told me you're doing some
24  additional work, Ashland is doing additional work now
25  with respect to groundwater because of new data.

60 (Pages 234 - 237)

Page 238

1    Is Ashland doing any additional work now
2 with respect to 2,3,7,8-TCDD because of additional
3 data?
4    A    The COCs that were found out in the
5 PA -- PAA initial -- 2017 RIR report, they're being
6 carried through.
7    At this point, there is no additional
8 COCs.
9    Q    Okay.
10    So Ashland has not added 2,3,7,8-TCDD as
11 an additional contaminant it needs to analyze for on
12 the site based on any of the new evidence that it has
13 seen?
14    MR. HATFIELD:  Objection to form.
15    A    Ashland has not added 2,3,7,8-TCDD -- or
16 the LSRP has not added 2,3,7,8-TCDD to the work
17 that's ongoing at the site.
18    Q    If the Dow inspection for 2,4,5-TCP
19 indicates that the TCP contains Dioxin up to a
20 hundred parts per billion in the 1970s period where
21 that substance was used at the Kearny site, would
22 that indicate to Ashland that it needs to analyze for
23 2,3,7,8-TCDD on the property?
24    MR. HATFIELD:  Objection to form.
25    A    I -- it would be up to the LSRP to look

Page 239

1 at the process, see where the, again, the spills go.
2 Has it been released to the environment?
3    If it was released, maybe TCP was
4 released to the sewer, discharged to the sewer, but
5 it was released to the environment.
6    Again, a lot of factors go in to then
7 just say that material was used on site.
8    Q    Okay, let me show you Exhibit 28.
9    (Whereupon July 19, 1982 Inspection
10 Report is received and marked as Exhibit 28 for
11 identification.)
12    Q    Okay.
13    This is dated -- an inspection of the
14 site dated July 19, 1982 by, looks like, Bob Dante
15 from the NJDEP.
16    Do you see that at the top?
17    A    Yes.
18    Q    Okay.
19    The first finding of the inspection was
20 that housekeeping at the facility is poor.
21    Do you see that?
22    MR. HATFIELD:  Where are you, Counsel?
23    MR. KAIM:  "Findings of Inspection" at
24 the top of page one.
25    A    5970, right.

Page 240

1    Q    Correct?
2    A    Yes, I see that.
3    Q    Okay.
4    And the inspector explains that more
5 care needs to be taken of products and raw material
6 drums.
7    Do you see that?
8    A    And where is that at?
9    Q    Right under -- it's the next sentence.
10    The first page here of Exhibit 28.
11    A    Right.  Okay.  Yep.
12    Q    "Housekeeping at the facility is poor.
13 More care needs to be taken of products and raw
14 material drums."
15    That is what the inspector noted in
16 1982, correct?
17    A    Correct.
18    Q    Okay.
19    I'm going to hand you Exhibit 29.
20    (Whereupon Handwritten Notes is received
21 and marked as Exhibit 29 for identification.)
22    Q    And this is a handwritten document by
23 somebody named C. Hawkinson that Ashland has produced
24 from its files describing aerial photos of the site.
25    Do you see that?

Page 241

1    A    Yes.
2    Q    Okay.
3    And if you go down to, in the date
4 column, to March 26, 1976.
5    Do you see that?
6    A    Yes.
7    Q    And the description of the aerial photo
8 from 1976 says, "Three large buildings with possible
9 drums scattered around the buildings."
10    And that is -- if there are drums
11 scattered around the buildings, that is consistent
12 with the inspector's comment that housekeeping is
13 poor, right?
14    MR. HATFIELD:  Objection to form.
15    A    I don't know what "scattered around the
16 buildings" mean.
17    Q    All right.
18    Certainly, Ashland's position in this
19 case is that drums should not be scattered around the
20 building, right?
21    MR. HATFIELD:  Objection to form.
22    A    Well, again, I don't know what
23 "scattered" means, but there was drum storage
24 outside -- outside the buildings.
25    Q    Okay.

61 (Pages 238 - 241)

Page 242

1    The inspector, in 1982, also noted, as
2 we have talked about, that more care needs to be
3 taken of products and raw material drums, right?
4    We saw that in the inspector report?
5    A    Yes.
6    Q    Okay.
7    So if the inspector is noting that more
8 care needs to be taken about the raw material drums,
9 I think -- is it fair to say that if the drums are
10 scattered around the building, it would be consistent
11 that it would be poor housekeeping?
12    MR. HATFIELD:  Objection to form.
13    A    Again, I would speculate what
14 "scattered" means, and I would speculate what "poor
15 housekeeping" means, and, again, this is after the
16 time frame of TCP, and also -- yeah, this is 1982, so
17 TCP is not stored on site in 1982, and TCP wouldn't
18 be stored outside because it was in fiber drums.
19    Q    TCP was used at the site in 1976, the
20 date of the aerial photo, right?
21    A    Yeah, but not in the site of this '82
22 inspection, RCRA inspection.
23    Q    Right, a few years later, I understand
24 that, but bad habits can sometimes carry on for some
25 years.

Page 243

1    MR. HATFIELD:  Objection to Counsel's
2 colloquy and characterization.  The documents speak
3 for themselves.
4    Q    And in the 1978 description of the 19 --
5 I'm sorry.
6    In the description of the 1978 aerial
7 photo, Exhibit 29 states, "The buildings are still
8 present, a hill is still present, with possible drums
9 to north and south."
10    So there is still drums outside,
11 correct?
12    A    That's what the document says, yes.
13    Q    And finished product could have been
14 stored in those drums outside, right?
15    MR. HATFIELD:  Objection to form, calls
16 for speculation.
17    A    Yeah.  Finished or raw materials, I'm
18 not sure.
19    Q    Right.
20    And drums just stored outside certainly
21 have the potential to leak?
22    MR. HATFIELD:  Objection to form.
23    A    Potential.
24    Q    Yes.
25    A    Anywhere from zero to a hundred, which

Page 244

1 means -- "potential" means they have potential not to
2 leak also.
3    Q    Okay.
4    Is it best practices to store drums
5 outside?
6    MR. HATFIELD:  Objection to form.
7    A    I'm not an expert.  My guess would be,
8 in the 1960's or '70s, absolutely they had drum
9 storage areas.
10    Q    And today it's best practices to not
11 store drums outside, right?
12    MR. HATFIELD:  Objection to form.  Calls
13 for expert testimony.
14    A    Yeah, I'm not an expert, yeah.
15    Q    Do you know -- do you know, from your
16 decades of experience in remediation work, whether
17 today it's best practices to store drums outside?
18    MR. HATFIELD:  Yeah, same objection, and
19 also outside the scope.
20    Q    You can answer.
21    A    Well, my decades, I don't have decades
22 of remediation work, but I have seen drums stored
23 outside over my 42 years at Hercules, yes.
24    Q    You wouldn't recommend today that drums
25 be stored outside, would you?

Page 245

1    MR. HATFIELD:  Same objection, outside
2 the scope, it calls for opinion, and this witness is
3 here to testify as to facts with respect to the Drew
4 site, so out of scope.
5    A    Typically, now you'll see them under
6 cover.
7    Q    Okay.  I want to ask you about a lime
8 pit to the south of the property.
9    Did you see reference to that in the
10 documents?
11    A    Yes.
12    (Whereupon E-mail is received and marked
13 as Exhibit 30 for identification.)
14    MR. HATFIELD:  While he's marking that
15 exhibit, can I get a time check?
16    THE VIDEOGRAPHER:  Yeah.
17    Five hours, 54 minutes.
18    MR. HATFIELD:  Thank you.
19    Q    I have a couple of minutes to ask you
20 about the lime pit.  I'm glad we made it, because I'm
21 curious about it.
22    So I'm going to hand you Exhibit 30.
23    Okay.
24    And this is an e-mail -- I'm going to
25 start with the bottom e-mail from Mr. Foley to

62 (Pages 242 - 245)

Page 246

1 Mr. Russell, to Mr. Russell at AECOM, and I think
2 this is during the transition from -- from your LSRP.
3 But he makes some comments, and one of the things
4 that he notes in particular was this lime pit, and
5 he's got three bullet points in his e-mail about
6 historical photos that show the lime pit.
7      So I'm going to mark the photos that
8 he's referring to as exhibit -- where we at; 32?
9      MR. ARNOLD:  31.
10      MR. KAIM:  31.
11      (Whereupon Three Photographs is received
12 and marked as Exhibit 31 for identification.)
13      MR. HATFIELD:  Exhibit 31 is the three
14 photos --
15      MR. KAIM:  Yes.
16      MR. HATFIELD:  -- Counsel?
17      And can you give me the dates of the
18 photos?
19      MR. KAIM:  We're about to do that.
20      Q    Okay.  So in Mr. Foley's e-mail, he
21 refers to a 1963 photo, which is the last page in
22 Exhibit 31, and do you see the date, 1963, on the
23 right-hand side?
24      MR. HATFIELD:  I'm sorry, I'm not -- the
25 last page is not an aerial photo.

Page 247

1      MR. KAIM:  Right.  He says "1963 Rexall
2 Drugs facility drawing in the first bullet.
3      MR. HATFIELD:  "Facility drawing," okay.
4      A    Yeah.
5      Q    Okay.
6      And do you see the date 1963 there, and
7 Rexall Drugs?
8      A    Yeah, JG nip shield, 2/28/63.
9      Q    And if you look up at the facility
10 drawing, it references the lime pit on the south side
11 of the drawing.
12      MR. HATFIELD:  So I'm going to object to
13 this line of questioning as outside of the scope of
14 the topics for examination which specifically list,
15 in Exhibit 1, which was the dep notice, that the
16 topics relate to the years of 1970 to 2010 about the
17 ownership and operation of Drew Chemical Corporation
18 property, and this line of questioning goes -- it
19 predates that period.
20      So to the extent that you're going to
21 ask the witness anything about anything that happened
22 pre-1970, he's not testifying on behalf of the
23 company, it's out of scope.
24      So you can ask him his personal
25 understanding about it, but whatever he is saying is

Page 248

1 not binding -- or the testimony is not binding on the
2 company because it's outside the scope and he's not
3 been prepared for that.
4      MR. KAIM:  I think I've asked you about
5 five times today, "out of the scope" takes about
6 one-tenth of that time.
7      MR. HATFIELD:  Well, I want to make sure
8 that the record is clear that you continue to ask
9 questions, Counsel, outside of the lines of what was
10 agreed to in the dep notice and outside of your
11 representations that have been made to me and to the
12 Special Master, but you can continue to do that in
13 the last two or three minutes of your time, but this
14 is not corporate testimony, it's testimony based upon
15 the witness' personnel knowledge, if he has any, but
16 you can proceed.
17      MR. KAIM:  Okay.
18      Q    And, sir, I'm going to be asking you
19 about whether this lime pit existed in 1974, okay,
20 and the best evidence we have of it, I can point to
21 you right now, is these pictures that predate 1970.
22 It certainly doesn't mean it didn't exist after that,
23 and so I would like the company's position on that,
24 that is why I'm showing you this evidence.
25      I think a very clear photo of the lime

Page 249

1 pit is in the 1953 photo, aerial photo, which is the
2 first page in Exhibit 31, and do you see the large
3 lime pit that is just to the south of the site along
4 what is now Boylan Avenue?
5      A    Where would that be?
6      Here is the railroad track.
7      Here is the site here?
8      We're looking at these maps, again, that
9 aren't that very detailed.
10      Q    Yeah.
11      I'll point it to you, and you can tell
12 me your view, but I believe that is the lime pit.
13      And then if you look at the next photo
14 from 1947, you can see the lime pit in the bottom
15 right-hand corner of the photo alongside Boylan
16 Avenue.
17      So does Ashland have a position or does
18 Ashland know whether the lime pit continued to exist
19 into the Drew operations in the 1970s?
20      A    Well, if you look at this map, the lime
21 pit isn't even on the Drew property.
22      Q    Did the lime pit continue to exist
23 adjacent to the Drew property in the 1970s during the
24 Drew Chemical operations?
25      A    I have no knowledge that it did.

63 (Pages 246 - 249)

Page 250

1    Q    All right.

2        Mr. Foley, your LSRP mentions that there

3  appears to be a raised pipe leading from the facility

4  buildings to the lime pit, and he is referencing the

5  1947 photo.

6        My question to you is, does Ashland have

7  a position as to whether a pipe from the Kearny

8  property to the lime pit continued to exist into Drew

9  Chemical's operations in the 1970s?

10       MR. HATFIELD:  Same objections.

11   A    There is no knowledge of it.

12   Q    Okay.

13       Don't know, one way or the other?

14   A    There is no knowledge that it existed.

15   Q    Based on the available records?

16   A    Based on the available record and the

17  overheads, the dates of the overheads, in these

18  pictures even.

19   Q    Go ahead.

20       Do you know when it was removed?

21       Let me clarify that question.

22       Do you know when the pipe to the lime

23  pit was removed?

24       MR. HATFIELD:  Same objection.

25   A    There is no knowledge in these documents

Page 251

1  if it was removed or if it was removed in 1948 or '52

2  or '57.

3    Q    Or '75, right?

4        MR. HATFIELD:  Objection to form.

5    A    No knowledge that it even existed after

6  1964, '63.

7        MR. HATFIELD:  Time check?

8        THE VIDEOGRAPHER:  6:02 on the record.

9        MR. KAIM:  I'll spare you the -- I'm

10  going to do you a favor and spare you the objection,

11  and we'll go off the record.

12       Pass the witness.

13       MR. HATFIELD:  Off the record.

14       THE VIDEOGRAPHER:  We're going to go off

15  for a moment?

16       MR. HATFIELD:  Yeah, off the record.

17       MR. KAIM:  No, actually, I'll pass the

18  witness.

19       MR. HATFIELD:  Okay.

20       Anyone on the Zoom have any questions

21  for the witness?

22       Hearing none, I assume that is a no.

23       I think we're concluded for the day.

24       Thank you, Mr. Hoffman.

25       THE VIDEOGRAPHER:  The time is 4:55.

Page 252

1  We're going to go off the record for August 11, 2022.

2        (Proceedings concluded at 4:55 p.m.)

Page 253

1        C E R T I F I C A T E

2

3        I, RUTHANNE UNGERLEIDER, a Certified Court

4  Reporter and Notary Public of the State of New

5  Jersey, certify that the foregoing is a true and

6  accurate transcript of the stenographic notes of the

7  deposition of said witness who was first duly sworn

8  by me, on the date and place hereinbefore set forth.

9        I FURTHER CERTIFY that I am neither

10  attorney, nor counsel for, nor related to or

11  employed by, any of the parties to the action in

12  which this deposition was taken, and further that I

13  am not a relative or employee of any attorney or

14  counsel in this case, nor am I financially

15  interested in this case.

16

17

18

19

20

    RUTHANNE UNGERLEIDER, C.C.R., C.R.R.

21  LICENSE NO. XIO1634, XIO0115

22

23

24

25

64 (Pages 250 - 253)

Page 254

```
1              ERRATA SHEET
          VERITEXT/NEW YORK REPORTING, LLC
2
    CASE NAME: Occidental Chemical Corporation v. 21St Century Fox
    America
3   DATE OF DEPOSITION: 8/11/2022
    WITNESSES' NAME: John Hoffman
4
5   PAGE  LINE (S)    CHANGE        REASON
6   ____|_____|_____|_____
       |        |                    |
7   ____|_____|_____|_____
       |        |                    |
8   ____|_____|_____|_____
       |        |                    |
9   ____|_____|_____|_____
       |        |                    |
10  ____|_____|_____|_____
       |        |                    |
11  ____|_____|_____|_____
       |        |                    |
12  ____|_____|_____|_____
       |        |                    |
13  ____|_____|_____|_____
       |        |                    |
14  ____|_____|_____|_____
       |        |                    |
15  ____|_____|_____|_____
       |        |                    |
16  ____|_____|_____|_____
       |        |                    |
17  ____|_____|_____|_____
       |        |                    |
18  ____|_____|_____|_____
       |        |                    |
19  ____|_____|_____|_____
       |        |                    |
20  ____|_____|_____|_____
21          _____
              John Hoffman
22  SUBSCRIBED AND SWORN TO BEFORE ME
    THIS ____ DAY OF _____, 20__.
23
24
    _____
25  (NOTARY PUBLIC)          MY COMMISSION EXPIRES:
```

Veritext Legal Solutions

800-227-8440                                    973-410-4040

ALCD-PUBCOM_0001650

**&**

**&** 2:3 5:11
132:17

**0**

**0.2** 113:6
**0000261965** 3:12
119:2
**0010** 221:14
**002** 220:3,4,6
**004** 220:16
**005** 29:2
**006** 221:9
**008** 221:8,12
**011** 220:5
**021** 226:10,11
**04112** 2:10
**046** 101:13
**07102** 2:7

**1**

**1** 3:8 10:6,8
14:25 60:8
169:18 172:18
247:15
**1.1** 113:10
**1.1.** 113:11
**10** 3:8,13 132:12
132:14,19
191:19,24
**100** 3:9 28:23
179:16
**10:35** 59:10
**10:51** 59:21
**11** 1:16 3:13 4:3
65:11 113:11
137:24 138:1
152:4 206:18
252:1

**1100** 2:3
**1106** 6:21,25
11:6,16 202:15
203:18,24
**11273** 1:2
**11883** 253:19
**119** 3:12
**12** 3:14 153:8,11
161:1,5 175:22
216:15,19,20
**129** 3:12
**12:19** 116:21
**13** 3:14,18 24:24
154:11 157:7
169:6,8 171:1
174:2 175:6
215:22 216:16
221:1 224:4
**132** 3:13
**137** 3:13
**14** 3:15,19
154:24 184:14
184:16 188:16
218:14 219:12
**1400** 29:15
**15** 3:13,15 13:14
137:23 138:4
150:7 152:6
187:20,22 188:1
**153** 3:14
**16** 3:16 153:25
189:11,13
**169** 3:14
**17** 3:16,20
192:18,19 196:6
206:18 223:9,12
**170** 18:7 77:20
94:10

**17th** 224:3
**18** 3:17 191:5
198:14,16
236:14
**184** 3:15
**187** 3:15
**189** 3:16
**18s** 65:11
**19** 3:17,22 19:11
38:21 48:18
65:18,21,24,25
70:15 105:14,16
105:17,18
189:14 201:25
202:2 239:9,14
243:4
**192** 3:16
**1940s** 30:7
**1947** 249:14
250:5
**1948** 30:6 251:1
**1953** 249:1
**1960's** 244:8
**1963** 246:21,22
247:1,6
**1964** 251:6
**1970** 3:12 11:17
11:24 12:5,13
19:24 30:11
31:11 33:13,19
35:22 37:9,12,25
39:15 52:21
71:6 80:20
101:11 129:11
129:19 130:24
131:10,19
150:14 247:16
247:22 248:21

**1970's** 91:20
**19707** 5:6
**1970s** 31:23
37:21 38:12
41:21 42:2,24
43:20 44:1,14,15
44:25 45:8
49:25 52:6,25
53:25 61:19
64:6 71:3,13,16
71:25 72:9,17
73:10,18 74:2,25
75:10,21 77:5,8
77:9,10,12,13
84:1 90:18,20
91:25 92:23,24
93:13 100:14
101:3,10,12
130:16 133:22
134:1 135:11
137:9 150:6
151:22 179:6
181:8 183:11
185:2 214:14
238:20 249:19
249:23 250:9
**1971** 3:13 132:11
137:4 159:1
185:20,21,22,24
**1972** 3:15 184:10
184:15
**1973** 158:8 159:6
159:25 161:7,18
162:15
**1974** 47:21 48:10
48:18,20 49:10
51:1,9 58:6
101:16,18,23

ALCD-PUBCOM_0001651

[1974 - 2019]                                                          Page 2

102:4,16,20
248:19
**1975**   188:16
218:22
**1976**   3:17 201:24
202:4 241:4,8
242:19
**1977**   3:15 187:19
189:14 190:12
**1978**   31:14 243:4
243:6
**1979**   40:2 159:1
159:14 160:23
**198**   3:17
**1980**   37:9,12
40:4,23 70:16,20
70:21 71:3
153:25 154:23
197:3
**1980s**   41:21
70:10 71:16
72:10 83:16
214:15
**1981**   11:17 33:13
33:19 34:11
35:3,22 36:9,16
39:24 40:4,20
131:20 158:9
159:6,9,17 160:1
160:3,13,18
161:7,18 162:15
165:12,14,21
185:16 192:20
192:25 193:8,19
195:18,23 196:5
196:15 197:8
219:1

**1982**   3:22 191:14
191:24 192:3,9
239:9,14 240:16
242:1,16,17
**1983**   3:13,18,18
3:19,20,20
137:23 138:4
141:22 157:2,7
182:21,23
215:22 216:1
217:3,5,25
218:14,17
219:12 221:1,2
223:9,13 225:2
225:10,15 230:7
**1990**   37:12
**1990s**   38:13,22
**1991**   198:23
200:2 201:16
**1:17**   116:25

**2**

**2**   3:8 26:3,6 27:4
36:3 51:13
178:25
**2,3,7,8**   179:8,17
183:8 199:14,25
219:7 236:1,18
237:1,7,16,20
238:2,10,15,16
238:23
**2,3,8**   181:23
**2,3,8,7**   179:12
182:24
**2,4,5**   61:15,18
62:13,15 64:5
147:14 149:5
152:15,17,23

154:20 156:10
156:18 157:9,13
157:19,19,25
158:3 159:9,13
159:16 160:3,12
160:17 161:8,12
161:20 162:2,10
162:24 164:1,9
164:10,17 166:1
167:3,9,14
169:15 175:4
178:19 179:7
180:9,18,24
181:16 182:17
183:3 197:17
200:7 211:15
216:4,18 218:22
237:13 238:18
**2-1**   95:13,15
**2.1**   96:1,2
**2.1.2**   32:17
**2.2**   32:11 33:8
34:20 35:3
36:22 99:22
**2.2.**   34:24 143:23
**2.2.1**   94:7,11
**2.5.1.**   103:19
**2.8**   193:10
**2/28/63**   247:8
**20**   3:18 67:12
150:7,9,18,20
151:3 186:10,12
186:25 187:12
215:21,23
254:22
**2000**   19:11
**2000s**   38:13
71:11

**2007**   37:12
**2009**   37:6 49:1,8
49:25 51:1,22
52:3,11,22 53:1
54:1 62:5 91:10
**2009-2010**   36:24
36:25 46:10
48:9,19 49:3
51:7 54:15
**201**   3:17
**2010**   11:24 12:6
12:13 14:8,11
15:14 19:24
20:12 30:11
36:9,16 37:6
39:16 49:1,3,8
50:1 51:1,22
52:3,11 53:1
54:1 70:11,16
71:3 247:16
**2012**   229:7
231:13 232:15
233:23 234:24
235:17
**2013**   3:21 228:23
**2014**   18:3 60:17
**2015**   60:18
105:15,16,17,18
105:21 106:5,17
106:21,22 107:1
**2017**   60:8 119:12
121:22 124:18
126:11 129:6
238:5
**2018**   19:11,13
**2019**   3:11 19:13
64:8,16 104:23
111:15 115:9

ALCD-PUBCOM_0001652

**[2020 - 52]**

Page 3

**2020**  232:20 234:12 235:25
**2022**  1:16 4:3 252:1
**207**  3:14 164:11 164:15,25 165:21 169:1,8 169:12,14,21,25 171:1 174:2,18
**209**  164:17 165:1 165:22
**21**  3:18 217:1,6
**215**  3:18
**217**  3:18
**218**  3:19
**219**  3:19
**21st**  1:4 4:13 254:2
**22**  3:12,19 101:16 129:11 129:19 157:2 216:16 218:13 218:15
**223**  3:20
**225**  3:20
**228**  3:21
**23**  3:19 47:21 219:13,15 230:20,20
**2303**  112:23,24
**234**  3:21
**239**  3:22
**24**  3:20 223:8,10 223:13
**240**  3:22
**245**  3:23
**246**  3:23

**25**  3:20 145:11 193:14 225:3,5,9
**250**  150:11
**25945**  165:6
**26**  3:8,21 194:8 228:24 229:1 234:25 235:1 241:4
**27**  3:21 60:12,21 234:7,10,13 236:5
**28**  3:9,22 239:8 239:10 240:10
**282**  112:17 113:9 114:3,8,10,13,25
**283**  115:1
**284**  66:13
**285**  165:22
**287**  105:1
**289**  165:22
**29**  3:13,22 132:11 240:19 240:21 243:7
**2:18**  1:2
**2:48**  183:20

**3**

**3**  3:9 28:21,24,25 42:5 80:23 90:25 101:14 124:4
**3-1**  45:20,24 46:1
**3-14**  104:25 105:7
**3-4**  84:12,15,16 92:17 139:22

**3-5**  139:25
**3.1.4**  114:9,14
**3.2.**  53:10,13
**3.4**  195:7,8
**30**  3:21,23 19:21 67:12 210:15 228:23 245:13 245:22
**301**  68:5
**31**  3:23 246:9,10 246:12,13,22 249:2
**32**  246:8
**35**  29:22,23,24 30:1
**350**  136:5,16,24
**36**  155:17
**37**  31:1 33:22 34:3,4,8
**38**  42:8
**39**  32:9 35:8 42:14
**3:12**  183:23

**4**

**4**  3:10 46:14,17 46:19 49:11 58:4 84:6,8
**4.1**  81:7
**4.1.4**  66:3
**4.2**  193:10
**4.4**  166:9
**4.6**  60:16
**4.6.**  60:15
**4.6.1**  60:21 62:1
**4.6.2**  62:8
**40**  21:9 43:8 99:15,24

**404a**  189:7
**41**  73:16
**42**  24:22,24 25:4 45:11,12 53:6 244:23
**43**  66:10 80:24 80:25 81:1,3
**43,744**  160:23
**47**  66:10
**48**  3:10
**495**  95:11
**496**  94:5
**499**  103:16
**4:09**  224:22
**4:17**  224:25
**4:55**  251:25 252:2

**5**

**5**  3:3,9,10 5:5 28:23 59:18 60:5,6 124:4 160:23
**5-1**  68:4
**5-3**  112:19 113:7
**5.1**  68:4 79:5
**5.1.1**  102:10
**5.3.5**  91:3
**5.3.5.**  91:6
**5.5**  113:25 114:1
**50**  35:18 37:17
**50,000**  37:15
**500**  35:12,17 37:13 135:16,21
**51,000**  155:1
**511**  65:18
**52**  251:1

ALCD-PUBCOM_0001653

[521 - accurate]                                                           Page 4

**521**  49:13,23
**5300**  2:3
**532**  99:9,11,12
**533**  73:22
**54**  245:17
**55**  24:18 138:23
**57**  251:2
**59**  3:10
**5970**  239:25
**5985**  48:3
**5986**  48:3
**5x**  113:14

**6**

**6**  3:11 64:9,11,14
  65:16 94:2 99:9
  99:13 103:9
  124:4 210:15
**60**  87:24 88:1,2
  90:2 98:22
**63**  251:6
**635**  235:2
**64**  3:11,11
**65,850**  158:25
**657**  188:15
**659**  60:11 189:4
**663**  193:7
**665**  194:6
**667**  197:22
**669**  3:16 192:17
**68**  91:2
**695**  208:11,22
  213:6
**6:02**  251:8

**7**

**7**  3:11 64:22,24
  65:3 68:5 84:7
  95:13 104:25

112:20 195:7
  204:10,12
  206:11
**7,8**  181:23
**7.5**  48:21 49:7
**700**  202:9
**7002**  230:22
**70s**  38:21 40:11
  40:24 52:10
  75:15 77:11
  90:21 92:4,5
  97:6,17 135:22
  149:13 155:19
  176:8 177:22
  179:21 244:8
**713**  133:11,17
  134:4
**72**  90:21
**720**  134:3 140:10
  140:17 141:7,23
  178:8 234:18
  235:2,15 236:12
  237:2,15
**7200**  220:19
**722**  233:21
**723**  143:21,24
  144:1,5,10,20,24
  145:9,17,21
  146:3 148:3,4,11
**725**  140:23
**75**  251:3
**750**  161:20 162:2
  162:10
**77002**  2:4
**780**  165:23

**8**

**8**  3:12,20 118:25
  119:3 126:12
  198:23 225:2,10
  227:23
**8/11/2022**  254:3
**80,477**  185:17
**80s**  40:12 42:2
  71:11 96:21,22
  97:2 103:5
  138:3 155:25
**81**  185:20 197:5
**8132**  226:7
**82**  242:21
**83**  45:24
**84**  161:6,10,12
  161:19 162:14
  164:5 197:17
**86,400**  190:13
**87.5000**  189:6

**9**

**9**  3:12 32:23
  129:12,15,18
  155:8
**90s**  71:11
**935**  185:15
**936**  185:7 186:9
  186:14,15
**938**  155:9
**943**  216:20
**944**  164:14
**945**  165:10 166:7
**947**  198:23
**948**  199:11
**949**  199:12
**954**  201:4

**9546**  2:10
**961**  191:1
**962**  190:15,23,24
  191:2,7
**963**  191:6
**965**  191:13
**988**  3:10 46:16
**993**  236:5
**9:08**  1:17 4:3

**a**

**able**  194:14
  206:1,7 207:1
  225:25
**aboveground**
  39:3 46:3,7
  101:3,24 102:5
  177:23
**absent**  199:19
**absolute**  149:1
**absolutely**  76:7
  77:19 127:5
  148:19 203:2
  208:3 244:8
**access**  107:20,25
  123:14 125:2,20
  125:25 126:2
  169:11 234:2
**accounting**
  151:18
**accumulate**
  142:8
**accurate**  20:22
  46:10 98:25
  104:12 136:10
  151:18 153:21
  157:24 158:11
  159:2 166:2,21

ALCD-PUBCOM_0001654

[accurate - appears]                                                    Page 5

170:13 171:7
174:8,11 191:20
218:23 221:2
253:6
**acquired**  33:25
34:14 39:23
40:3 41:12,16
**acquisition**
34:14
**acronym**  170:13
170:17
**action**  1:2 3:11
3:11 4:21 64:8
64:15,24 65:4,8
65:17 73:16
94:2,4 95:20
99:9 103:9
108:12 111:15
114:24 115:9
171:5 253:11
**activities**  15:13
60:17 229:4
235:6
**actual**  33:24
165:14 218:25
219:22 221:18
**adam**  2:8 21:20
47:1
**add**  200:20
**added**  24:24
166:25 168:22
238:10,15,16
**additional**  37:10
57:10 73:6
88:21 237:24,24
238:1,2,7,11
**address**  6:23

**adjacent**  249:23
**advance**  214:7
**advantage**
125:25
**advised**  191:17
**advisement**
23:22
**aecom**  128:25
129:1 246:1
**aerial**  240:24
241:7 242:20
243:6 246:25
249:1
**aerosol**  48:21
49:7
**affiliation**  5:2
**agency**  122:14
**agitated**  135:2
166:24
**agitation**  168:21
**ago**  9:12 109:3,4
**agree**  4:8 52:9
52:19,24 66:24
69:17 74:11,15
94:16 95:3
141:9 144:1
152:16 160:16
186:11 207:13
**agreed**  210:6
219:6,11 248:10
**agreement**  172:6
**ahead**  21:24,25
174:6 250:19
**al**  1:5,7
**alcohol**  136:2
169:15
**allow**  68:24
223:4

**alongside**  249:15
**amberson**  2:19
**ambient**  136:5
**america**  1:4 4:13
171:6 254:2
**amount**  41:4
190:13
**amounts**  130:20
**analysis**  3:17
43:15 64:4
65:20 111:4,14
114:7 178:24
179:1 185:6
188:17 197:24
200:11 201:24
202:3 208:20
214:14 215:7,15
218:2 219:18
222:10
**analytical**  3:21
44:21,23 200:23
201:2 234:6,11
**analyze**  44:16
55:2,20 56:10
62:22 63:5,9,16
72:1,11,13 79:20
185:8 201:17
238:11,22
**analyzed**  43:20
44:2 55:8,13
56:18 60:2 61:1
61:3,7,14,21
62:1,9,12,18
63:21 111:8
179:12 188:22
198:10 201:6,14
201:16 222:22
223:6 224:6,9

230:10 231:8
232:2
**analyzing**
110:24 111:3
**annually**  35:18
37:15,17
**answer**  24:6
26:21,22 28:12
28:15 29:8
30:18 83:5
109:9,17,18,20
131:1 161:11
171:1 173:16
203:3 209:22
213:14 237:9,18
244:20
**answered**  75:19
77:17 78:7,13
146:6,9 150:17
183:5 228:18
230:13
**answering**  9:22
50:16 107:7
**answers**  3:8 26:2
26:7 27:5
165:13 212:21
**anthony**  2:4 5:10
46:24
**anticipate**  47:7
**anyway**  51:25
**appear**  119:25
120:11,19
207:17 231:4
**appearance**  5:1
**appeared**  77:9
167:7
**appears**  51:5
76:5 99:4

[appears - asked]                                                                Page 6

119:23 169:11
250:3
**appendices**
29:14
**application**   3:17
190:3 192:23
193:6,7 196:5
198:14,17
**applications**
211:12
**appointing**
41:16
**appreciate**   93:22
209:25
**appropriate**
199:9 209:18
**approximately**
1:17 4:3 11:17
17:7 18:2,4,7
19:11 21:9
29:15 32:23
35:12,17 37:15
48:2 59:10,21
94:10 109:3
116:25 150:13
161:20 166:8
186:10,24
193:10 197:16
**april**   192:25,25
193:19
**archived**   91:12
**area**   15:5 19:17
31:13 50:10
91:19 92:10,22
107:21 108:1
123:17 142:13
143:10,17,18
144:13,21

146:17 177:24
205:7 207:11
212:10 226:9,21
233:22 235:16
**areas**   67:21,23
143:18 145:4
202:24 203:1
234:22 244:9
**argumentative**
149:15
**arnold**   2:8 246:9
**arrow**   105:3
**ashl**   3:9,12 28:23
119:2
**ashland**   2:8,14
3:8 6:8,11,16
8:7,11,12 9:10
9:17,23 10:7,14
12:19 13:1,19,23
13:24 14:3,7
15:9,13 16:2
17:15,22 19:23
20:7 24:3,4,7,12
27:17 30:15
32:10,21,25 34:1
34:5,7,11,12
39:19,23 40:3,11
40:18,21 41:11
41:15 54:14,15
54:22 55:1,8,13
55:20 56:9 57:2
57:5 60:2 62:8
62:21 63:2,8,8
63:11,14,15,20
63:24 64:5 71:1
71:3,5,15,17,24
71:25 72:11
75:21 79:9,10,17

80:5,14 91:9
97:11 100:7
104:19 106:9
108:6,9 114:23
117:15,17 118:2
118:15 119:12
120:9,17 122:14
125:16 126:12
126:23,24,25
127:3,8,17 128:5
129:9 130:10,13
130:15,22 132:7
134:2 138:15
143:7 146:2
150:21 151:15
151:17 154:14
155:15 157:18
157:19 158:18
159:16 162:1,9
166:8 167:13
171:10 173:1
175:12 176:7
178:20,20 179:2
179:3,5,15 180:7
180:17 181:15
182:14,16,23
183:1,7,10,16
186:22 199:8,24
200:6,10 201:16
202:19 209:10
209:20 210:13
211:11,19,21,22
213:21 214:13
215:9,15,18
216:2,10 217:4
217:12,16
223:25 225:25
227:5,11,12,15

228:9 229:5,5
230:2 232:2,5,24
233:6 237:9,12
237:19,24 238:1
238:10,15,22
240:23 249:17
249:18 250:6
**ashland's**   10:1
22:8 26:7 27:4
35:3 49:5 56:3,8
60:7 63:23
66:23 74:24
75:6,8,17 79:25
105:21 106:4,12
106:21 107:1,8,8
107:9,13,15,18
117:25 118:3,11
122:6 124:18,19
126:20 127:15
131:12 133:20
143:5,11 144:22
145:3 155:4
160:10 162:17
177:21 209:13
211:14,20,24
212:5,24 213:8
215:4,5 216:13
225:20 227:10
228:2,14 230:8
233:10 236:17
236:25 237:5
241:18
**asked**   16:22
75:18 77:16
78:4,20 117:14
123:14 125:2,20
146:5,9 150:16
183:4 201:20

ALCD-PUBCOM_0001656

**[asked - based]**                                                                 Page 7

| | | | b |
|---|---|---|---|

228:17 230:12
248:4
**asking** 5:22 7:4
12:18 20:12
23:3 26:13
30:12,21 32:3
44:14 48:4 50:9
50:24 56:8
70:21 75:6 76:5
76:13,14 77:2
78:22,25 92:15
92:19 97:21
106:4,12 107:7,9
107:22 109:10
109:12 117:7
122:6 124:16
134:14 140:3
150:12 160:10
169:20,24
173:13,19 174:9
174:12 182:4
187:1 190:8
205:21 209:15
210:11,14
211:22,24 215:4
217:23 248:18
**asks** 28:1 157:17
157:18
**aspects** 110:1
**assessment**
28:18 29:2,6,11
36:22 42:6
48:10 53:5 56:8
80:23 90:25
123:4
**assistant** 223:13
**associated** 8:24

**associates**
208:13,18
**assortment** 33:3
**assume** 89:16
134:5 135:17
136:19 140:6
156:7 170:24
173:25 174:7,12
181:11 186:3,4
187:7 251:22
**assumed** 55:20
**assumption**
56:11 174:3
**ast** 51:24 102:11
**asts** 101:17
**atmospheric**
136:4
**attached** 152:10
157:13 201:3
**attaches** 192:22
**attaching** 47:6
**attending** 5:1
**attorney** 253:10
253:13
**attorneys** 2:5,8
2:11
**attributable**
120:1,12,20
**attribute** 123:5
**audio** 4:7
**august** 1:16 3:20
4:3 169:18
225:2,10 232:20
234:12 235:25
252:1
**available** 100:1
158:7 159:24
232:7 250:15,16

**avenue** 6:21,25
11:6,17 85:2,2,5
85:6,14,14 86:2
86:22 87:1,14,14
87:24 88:6,17
89:10,12,20 90:7
95:24 96:8 97:8
98:1,6,7,8,16
99:2 100:15
101:2,8 103:3
104:8 105:3,12
105:22 106:7,23
107:17,24
114:16 115:2
142:5,14 144:2
144:21,25 146:4
146:14,16
190:19 191:5
195:1,3,13,20
196:7,25 197:7
201:21 202:4,14
202:15,16
203:19,19 205:9
206:14,15 207:2
207:24 208:9
209:2,6 211:21
228:10 249:4,16
**average** 154:25
158:25 161:7,10
161:12 164:5
**avoided** 171:21
**aware** 22:6 38:1
38:6 41:11,14,15
41:18 64:5
87:23 125:9
143:14 145:1
178:20 232:20

**b** 3:6 51:13
140:9 210:15
**back** 36:2 40:19
42:5 51:9,10
53:4 55:14 58:4
59:21 60:13
78:8 79:5 80:22
93:9,22 94:1
103:9 116:25
117:23 138:24
139:4 151:24
152:3 155:25
158:15 166:6
168:3 183:24
191:13 195:17
200:19 206:23
213:5 220:2
223:6 225:1
230:15 234:25
**background**
25:19
**bacteria** 157:22
**bad** 242:24
**bags** 147:18
**bagwell** 2:17
**barrier** 73:6
96:20 97:2,23,24
**based** 53:16
56:11 57:2
62:22 77:25
100:1 107:6
114:13 115:23
129:6 136:3
173:5 200:12,15
200:23 209:15
214:23 215:8
238:12 248:14

ALCD-PUBCOM_0001657

**[based - brief]**    Page 8

250:15,16
**basic** 170:5
**basically** 38:5
**basin** 89:13
98:16 99:2
145:15 196:19
233:21
**basis** 20:19,22
72:17,21 88:16
162:18 199:24
**batch** 39:1 41:25
42:1,2 156:7
**bates** 23:25
28:22 29:1,7,22
29:24 33:21
35:8 45:12,24
46:15,25 48:3
53:6 60:11
65:18 68:5
73:22 80:25
81:1,2,3 91:1
94:5 95:11 99:9
99:10 101:13
103:16 105:1
112:23 119:1
130:3,4 151:14
155:9 164:14
165:6,10 166:7
172:25 173:1,1,2
175:20 185:7,15
186:9 188:15
190:15 191:13
192:16 193:7
197:22 198:23
199:11 201:4
208:11 213:6
216:20 220:3
226:10,11

230:22 236:5
**began** 14:12
40:22
**beginning** 14:6
60:14 131:22
137:9 229:10
**behalf** 8:11 9:22
9:23 30:14
155:5 202:22
210:12 212:11
247:22
**belief** 122:20,23
**believe** 6:24
15:17 21:20
29:14 39:7
71:14 88:20
122:17 128:23
130:9,13 150:25
151:13 202:25
209:11 210:10
212:8 221:19
228:19 233:1
249:12
**believed** 121:23
**belleville** 128:1
**belongs** 196:19
**ben** 47:2
**benjamin** 2:11
**benzene** 119:25
120:11,19
121:14,24
122:10
**best** 150:4,12
222:20 244:4,10
244:17 248:20
**better** 26:24
117:21 202:13
205:13 206:22

**beyond** 22:13
59:2 71:17
72:10 76:6,17
110:19 116:2
151:2 175:8
**bid** 145:11
**big** 95:14
**bill** 23:17 50:12
110:4 130:9
146:7 204:20
210:19
**billion** 179:17
238:20
**bind** 15:7 30:18
171:15 212:18
**binders** 214:10
**binding** 212:13
248:1,1
**binds** 212:22
**biocide** 3:14
164:11,15,25
165:21,22
168:25 169:7,12
169:14,21,25
171:1 174:2,17
178:17
**biosperse** 164:17
165:1,22,22
**bis** 49:17,24
**bit** 12:16 106:1
139:4 200:20
205:19
**bitulitchic** 34:13
**blackout** 105:3
**blending** 134:25
136:23
**block** 66:13

**blockage** 235:20
**blow** 205:23
**blowdown** 81:9
81:20
**blown** 206:18
**bob** 239:14
**body** 94:9
**boiler** 33:1 81:9
81:21
**bold** 34:7
**book** 45:8
**border** 85:19,22
**bottom** 11:1
47:9 87:15 91:8
130:4 132:23
154:1,19 164:14
164:19,21 170:7
186:9,13 199:13
199:21 231:3
245:25 249:14
**boundaries**
118:16
**box** 2:10 85:10
85:13
**boxes** 70:3,4,5
130:22 199:9
**boylan** 89:10,12
95:23 96:8 97:8
98:1,6 100:15
101:2,8 103:3
249:4,15
**break** 59:7
116:19 183:19
**breakout** 59:13
**breyer** 132:17
**brief** 59:16
183:22 224:24

ALCD-PUBCOM_0001658

[briefly - charged]    Page 9

**briefly** 10:24
25:21 155:13
157:18
**broke** 60:1 117:5
**brought** 158:24
158:25 159:13
**bruns** 2:3 5:11
**bs** 25:22,24
**building** 87:21
87:21 132:18
133:5,11,13,14
133:16,17 134:3
134:4,16,17
140:7,10,11,17
140:23 141:7,23
143:21 144:1,5,9
144:13,20,23
145:9,16,21,22
146:3,12,13,19
146:21,22,22,23
147:2,4,9,9
148:3,4,11
176:18 178:4,8,8
178:9 194:13
220:19 233:21
234:18 235:2,15
236:12 237:2,14
241:20 242:10
**buildings** 39:9
39:11 86:8,11,16
86:20 133:2
143:16 145:5
241:8,9,11,16,24
243:7 250:4
**bulk** 45:18
**bullet** 95:19
246:5 247:2

**bullets** 61:2,4,6
96:2,3
**bunch** 123:11,16
211:4
**bureau** 46:20
**burning** 155:16
155:22
**business** 41:10

**c**

**c** 2:1 139:16
140:6,21 199:14
199:18 226:5
240:23 253:1,1
**c.c.r.** 253:20
**c.r.r.** 253:20
**c8129** 227:23
**c8132** 225:24
226:6
**c8134** 228:11
**c8137** 227:23
**calculation**
161:24
**call** 11:7 22:3
78:12,17,23
85:16 91:15
**called** 33:9 51:12
132:16 164:11
171:5 219:17
232:21
**calls** 21:20 71:20
74:20 75:2
76:18,19 109:8
115:19 116:1
163:4 170:14
174:20 181:9
202:20 233:13
236:22 243:15

244:12 245:2
**camera** 229:13
235:7
**capacity** 8:5
15:5 18:21
50:16 171:10,14
173:14,19 175:7
212:12
**capture** 96:17
**captured** 81:11
96:15
**captures** 87:19
87:20 96:13
97:15
**capturing** 71:8
**care** 240:5,13
242:2,8
**carried** 238:6
**carrier** 135:3
**carry** 242:24
**cas** 154:13
**case** 5:12 7:21
8:20,23 39:19
54:4 74:25 90:7
91:24 92:21
104:17 107:6,15
112:1 130:6
141:9 151:15
160:11 164:10
172:25 173:3
201:5 212:6
223:12 227:11
241:19 253:14
253:15 254:2
**catch** 89:15
145:15 233:21
**catchment** 98:15
99:2 196:19

**caught** 98:15
**caused** 118:7,8
**ccs** 119:12
**center** 1:15 2:6
2:10 4:15 145:6
**century** 1:4 4:13
118:8 254:2
**certain** 201:2,5
**certainly** 41:11
63:20 74:24
148:15 241:18
243:20 248:22
**certainty** 101:24
**certification**
27:13 219:18
**certified** 1:13
253:3
**certify** 253:5,9
**cetera** 29:14
123:4
**chain** 218:7
220:12,21
225:13
**chamber** 208:25
209:1
**chance** 74:13
149:9
**change** 24:6
254:5
**changed** 38:2,5,8
**changes** 28:4
**characteristics**
69:6
**characterization**
243:2
**charged** 167:22
167:25

ALCD-PUBCOM_0001659

[chart - comment]                                                    Page 10

chart  57:12,14
  113:7 158:22,23
  197:23
check  224:15
  245:15 251:7
checked  199:9
  199:15
checking  166:3
  184:19
chem  5:11 22:6
  22:13 151:4
  214:6
chem's  22:18
  23:6
chemical  1:3
  4:12 11:2,12,16
  11:23 12:4,12,20
  31:2,10,11 32:1
  33:18 35:22
  39:20 40:10
  44:15 46:2,19
  48:9,10,17,20,25
  49:12,15,23
  50:25,25 51:2
  53:18 55:22
  56:14 57:13,15
  57:19,20,24,25
  74:13 76:1,15
  77:14 78:2
  93:11 101:15,19
  102:19 129:23
  131:9 134:2
  135:21 136:11
  138:9,15 139:5
  143:1 152:15,16
  152:23 153:15
  153:17,20,24
  154:24 184:11

184:25 191:15
  191:17 192:20
  203:8,13 217:8,9
  217:13,17 219:6
  225:14 228:16
  247:17 249:24
  254:2
chemical's  30:23
  31:6,22 139:7
  152:17 250:9
chemicals  25:14
  31:17 46:6,9
  47:14,16 48:1,2
  49:12 50:4,9
  51:12 52:10,11
  52:21,25 53:24
  54:7 56:10 58:5
  58:7,15 60:2
  63:4,9 71:15,18
  71:25 72:9,18
  131:17,19 132:8
  135:6 154:15
  168:7
chemist  174:14
chemistry  25:23
  25:25 49:21
  58:12
chlorides  185:11
chlorobenzenes
  111:16 112:2
  115:18 119:25
  120:11,19
  121:14,23
  122:10
chloroethanes
  112:1 115:17
chloroethenes
  119:25 120:11

120:18 121:14
  121:23 122:9
chrissy  2:14
  12:24 22:3
  108:7 129:5,7
circled  205:10
city  2:10
civil  1:2
clarify  5:23
  124:2 250:21
clean  118:20
  229:11,13
cleaned  229:6,22
  231:14 234:23
  235:16,19,22
cleaning  33:3
  230:2 233:23
  235:6
cleanout  229:3
  235:17
clear  6:17
  163:15 171:19
  171:23,25 172:3
  205:5 210:16
  212:15 217:11
  217:18,20 248:8
  248:25
close  14:12
  87:13 121:16
closer  199:4
  223:23
closest  85:13
  87:14
coc  180:21
  181:19 182:2,5,9
cocs  237:16
  238:4,8

collaborated
  229:12
collect  89:9
collected  43:14
  44:2 45:5 145:4
  145:5 197:24
  224:4 226:9
collection  82:19
  91:4 202:14,16
  203:20 205:9
  207:2,24 208:10
  209:2 218:7
  233:12
colloquy  243:2
color  30:5,13
  57:19 95:16
column  166:10
  166:14 199:13
  199:14,18
  225:24 241:4
combined  82:19
  86:3,21 90:5
  196:23 197:11
  201:21
come  18:11
  117:16 118:1,12
  121:4 125:25
  126:24 148:4
  223:6
comes  80:11
  87:19
coming  107:23
  110:14 138:24
commencing
  1:16
comment  119:21
  241:12

ALCD-PUBCOM_0001660

[comments - contaminants]                                          Page 11

comments
  218:19,20 246:3
commingled
  108:1 123:16
commission
  188:1 202:3
  254:25
commissioners
  1:7
commitment
  172:11
committed
  172:20
communicated
  109:11
communication
  216:8
communications
  223:15
companies
  107:21
company  15:7
  20:16 30:18
  128:10 132:16
  171:15 202:23
  212:11,13,18,22
  219:17 229:20
  232:21 247:23
  248:2
company's  211:7
  248:23
compare  22:23
  48:8
compelled
  209:24
complete  29:5
  167:20

completed  157:7
compliance
  42:21,25
components
  235:8
composed  81:8
composite
  139:13
compounds  33:1
  33:3,3 61:10
  200:4
comprises  65:3
concentration
  121:17
concentrations
  122:17
concept  219:6,11
concern  68:19
concerned
  182:17
concierge  2:22
  26:16
conclude  149:21
concluded
  251:23 252:2
conclusion
  119:22,24 120:3
  120:25 121:12
conclusions
  219:5
concrete  96:20
  97:2,23,24
conditions
  103:23
conducted
  134:24 136:4
  141:8

confers  173:6
confirms  140:25
confuse  103:2
confusion
  217:22
connect  91:25
  137:18
connected  90:22
  92:3 93:12
  195:24 196:7,10
connecting
  88:16,18
connection  3:16
  3:17 88:16
  91:16,19 92:9,10
  92:22 145:10,21
  147:3 189:10,18
  189:23 190:3,19
  191:4 192:22
  193:25 196:15
  198:13,18
  211:13,17
connections
  195:19 196:24
connects  88:7,11
conservation
  192:24
consider  112:6,9
considerably
  193:9
consideration
  112:14
considered
  103:22
considering
  112:12
consist  134:25
  137:5

consistent
  100:13 131:12
  186:6 241:11
  242:10
construct  101:16
  101:19 102:20
constructed
  102:23,25
construction
  133:1
consultant  108:8
  108:19,20
consulting  109:6
  109:13
contact  66:11
contain  180:25
  181:3,4
contained
  142:24 146:11
  165:25 178:21
  179:7,22 180:11
  180:19 181:16
  182:19 200:13
containment
  97:1 102:12,15
contains  194:2
  197:12 238:19
contaminant
  54:22 55:2
  111:17 238:11
contaminants
  54:16 55:7,12,20
  56:5,18 61:2
  62:22 73:6
  110:19,23
  111:21 123:21
  201:3,6,15

contemporane...
130:12 150:6,14
151:21 162:19
content 44:11
context 44:10
continue 4:7
59:23 60:3
117:1 128:4
133:4 171:8
172:13 173:11
183:25 212:9,16
225:7 248:8,12
249:22
continued 33:25
70:22 138:14
159:8,16 160:3
160:12 249:18
250:8
continuing 12:6
control 42:22
43:1,3,15 44:2
45:7 157:22
conversation 4:6
conveyance
134:13 147:8
cooling 33:2
137:7 175:13
193:16,20
copy 29:5
corner 85:13
88:6,17 145:12
145:13 164:23
249:15
corporate 6:10
8:6 9:17,21 10:1
10:13,20 15:3
22:8 23:17
27:13 30:14

49:5 50:10 56:9
58:10 63:24
66:23 76:6
122:7 160:11
162:17 171:11
176:9 209:13,16
210:4 211:6,10
211:14 215:5
248:14
corporation 1:3
11:3,16,23 12:4
12:12 31:2 32:1
33:18 34:15
39:20 46:20
129:24 138:10
184:11 191:16
203:8 210:12
247:17 254:2
corporation's
191:17
correct 14:8,9,13
17:10 25:11
29:3,18 31:11,12
31:15,19 32:5
34:22 36:16
38:3,13 39:11,20
39:21,24,25 40:4
40:24 41:17
42:3 43:21
44:25 48:1
49:19 51:3,4,18
51:19 52:6 53:1
53:2,13 54:17,23
54:24 55:15,17
56:14,19 57:3
58:1,2 60:22
61:3,8,9,15,16
61:19,20,22 62:1

62:6,9,10,13,19
63:9,18 64:6,7
65:21 66:4,17
67:20 68:8,9,17
68:24 69:4,23
70:7 71:11,13
72:16,19 73:2,3
73:8,11,12 74:19
75:1 79:11
81:17,18,24 83:1
83:11,18,19,25
84:3,4,9 85:5,14
86:9,10,14,17,23
86:24 87:3
89:21 90:9,10,13
90:16 91:11
93:13,14,20
94:10,21 95:7,24
96:10,13 97:4,8
97:17,18 98:9
100:8,17 101:4,5
101:8,9,20,21
102:17,21 103:5
103:6 104:20
105:2,4,9 106:23
107:19 111:10
112:7,18,25
113:2,8,12,13,15
113:24,25 114:4
114:5,16 115:3
115:10 116:8
119:6,7,10,14,16
119:20 120:4,7,8
121:1,6,9 124:21
126:9,13 129:1
130:1,8 131:25
132:4 133:8,9
134:10,19 135:4

137:10 140:12
140:18,19 141:2
141:3 142:18
144:3,6,7 145:24
148:5 151:4
153:5,22 154:7
154:18,21 155:1
155:6 158:19
159:9,15,17
160:23,24 161:8
161:14,16
162:11,20,22
163:10,11,16,22
164:3,5,12,18
165:23,24
166:11 167:2,4
168:8 176:18,19
176:23 177:1,2
177:14 178:4
184:12 185:9,12
187:16 188:2,19
188:23 189:7,18
189:19 190:14
191:9,10 192:13
193:22 195:21
197:9,12,17
198:5,10,11
200:3 201:10,11
201:17,18
202:10 207:25
208:23 216:4,5
217:13,14 218:5
218:11 219:3,8,9
219:20 222:15
223:16,17
225:17 227:3,4
229:7,8,23,24
230:11,14

ALCD-PUBCOM_0001662

[correct - defendant]

231:16 232:2,3
234:20,21 235:9
236:2 240:1,16
240:17 243:11
**correcting**
217:21
**correctly** 221:23
**correspond**
187:6
**corridor** 88:3,23
104:1,9,10
114:15 115:1
124:15
**counsel** 4:25
14:21 17:3
27:16,17 29:5
65:22 73:19
78:5,14 79:3
109:11 111:19
112:21 151:25
173:10,12
186:14 190:21
194:5 205:12
206:17 210:17
211:19 217:19
223:13 239:22
246:16 248:9
253:10,14
**counsel's** 243:1
**count** 70:2,3
**couple** 9:2 25:2
33:21 41:9
120:6 150:24
151:2 156:9
197:23 224:20
245:19
**course** 230:16

**court** 1:1,13 4:18
5:3,16 26:16
78:8 253:3
**courthouse** 5:18
**cover** 9:2 207:10
245:6
**covered** 50:5
**create** 168:7
**creek** 89:20 90:3
94:9,16,19 100:3
100:16,25 104:1
104:11 105:9
**cso** 87:4
**curious** 245:21
**current** 12:19
13:23 32:11
33:9,14 34:20
35:3,24 36:8,15
36:18,18,19,21
36:23 37:9
41:12 42:7 45:5
111:11
**currently** 13:6
18:5 45:19
53:17,25 55:21
56:12 108:5
128:7
**custody** 218:8
220:13,21
225:14
**cv** 1:2
**cyanide** 49:19
58:24,24 59:1,3

**d**

**d** 3:1 139:16
140:6

**d7380** 220:13
**danielle** 2:17
**dante** 239:14
**data** 63:12 111:2
111:5 122:16
125:8,13,14,16
152:15 176:6,7
200:23 201:2
208:20 224:16
236:4,6 237:25
238:3
**database** 169:10
**date** 15:9 37:10
44:22 47:21
89:5 96:19
97:18 100:20
102:24 105:16
106:10,25 107:1
114:19 123:10
123:11,20,24
188:16 189:15
198:22 241:3
242:20 246:22
247:6 253:8
254:3
**dated** 60:8 64:15
138:4 157:7
217:3 239:13,14
**dates** 28:3 96:15
96:17 246:17
250:17
**dave** 2:17 128:22
**david** 2:22
128:23
**day** 20:19,19,22
20:22 117:5
118:21 155:1
185:18 186:4,10

186:12,24,25
187:12 189:6
190:14 233:3,4,7
251:23 254:22
**days** 21:21 30:7
172:7,20 190:16
**deal** 110:24
173:17
**dealing** 78:1
**decade** 80:16
180:16 182:18
**decades** 75:25
78:1 115:23
116:8,12,14,15
244:16,21,21
**december** 3:12
129:11,19 221:1
221:1 224:4
225:15 229:7
231:13 232:15
233:23 234:23
235:17
**dechlorinate**
115:16
**decide** 127:8
**decided** 126:12
**decision** 62:21
126:20 127:3,14
127:15,17
128:13,16
**decisions** 18:8
19:2,3
**deep** 103:24
104:7
**default** 69:1,3,5
113:23 114:3
**defendant** 212:6

ALCD-PUBCOM_0001663

[defendants - disagreed]                                                    Page 14

defendants   1:5,7
  2:11
define   14:1 16:8
  17:14 36:19
  38:16 40:6 41:3
  43:3 44:5 52:14
  55:25 56:2 57:6
  63:2 66:18,20
  80:12 110:21
  134:11
defined   14:20
  62:14
defining   36:20
definitely   39:12
  71:10
definitions   10:25
degradation
  116:5,6
degrade   115:16
degree   25:22
degrees   136:5,16
  136:24 175:8,14
delaware   5:5
  26:1 129:7
deleted   121:5
delineation   66:1
delivery   148:6
dep   104:20
  173:9 231:3
  247:15 248:10
department
  46:21 129:25
  131:9
depends   76:8
depiction   105:1
  105:7
depicts   84:8

depo   10:6 184:1
deposed   5:25
deposition   1:3
  3:8 4:11,14 6:11
  7:20 8:10,19 9:3
  9:9 10:7,13,22
  11:2 12:17 16:7
  16:10,23 17:2,9
  21:5 23:11 26:6
  27:9 30:9,14
  50:4,11 59:23
  104:25 117:2
  125:18 172:18
  172:21 202:24
  209:11 210:5,6
  212:8,17 214:7
  225:6 253:7,12
  254:3
depositions   6:7
  6:14,15 7:5,7,14
  7:16 172:4
describe   7:15
  13:16 22:21
  23:5 25:21 28:3
  61:6 110:10
  126:17 130:22
  149:18 155:14
  157:18 170:2
  193:15
described   57:24
  61:25 115:7
  208:25
describes   37:5
describing   36:15
  229:2 240:24
description   3:7
  36:6,8,13 51:17
  95:12 228:12

241:7 243:4,6
designed   136:16
designee   15:3
  30:14
detail   38:20 43:3
detailed   249:9
detect   181:25
detected   236:1
  236:11,14,14
  237:1,7,10,14
detection   224:10
  224:14,15
detention   89:13
determination
  55:19 63:4
  200:11
determine   54:16
  180:9 207:22
  218:3 229:14
determined   57:1
  63:3 199:25
  200:12 213:17
determining
  54:6 55:12
  56:10
develop   218:4
development
  25:9
diesel   33:1
difference   76:25
different   38:20
  38:24 39:4,4,10
  39:11 52:12,14
  76:11 78:25
  79:23 80:1
  82:14 106:1
  116:5 123:12
  145:7 149:1

175:20 214:12
differently   38:12
difficult   26:17
digital   26:13
dikes   101:8
diking   101:11,17
  101:20,24 102:5
  102:20
diligence   179:6
  215:15
diminished   74:7
dioxin   61:22
  62:1,18 63:21,25
  139:6 141:22
  143:2 178:21
  179:22 180:11
  180:19,25
  181:17 182:4,9
  182:19 183:2
  185:8 188:23
  198:10 200:14
  201:17 216:3
  222:14 227:16
  232:2 237:13
  238:19
direct   5:7 66:11
  100:3
directed   100:25
direction   85:5
  105:2,8 106:5
  229:15
directly   162:3
director   138:9
disagree   210:20
  210:21 211:19
  212:20 213:2
disagreed   80:5,9
  121:12

ALCD-PUBCOM_0001664

[disagreement - doing]                                          Page 15

**disagreement**
212:2
**disburse**   135:18
**discharge**   81:8
82:21 85:1,25
86:22 87:13
88:5 89:7 90:6,7
90:9,15 103:25
161:2 186:20
187:13 190:13
190:19 191:4
194:21 195:13
195:24 196:6
197:6 198:10
203:7,12 211:1,8
212:3 213:22,24
**discharged**
81:16 140:24
154:25 161:8,13
161:21 162:2,6
162:10,15,25
164:2 180:19
181:20,21 189:5
193:17,20 239:4
**discharges**   89:20
89:24
**discharging**
180:10 185:1
**discontinued**
157:20 158:4
164:22 165:11
200:7
**discussed**   34:20
**discusses**   60:16
60:22
**discussion**   35:2
63:14,15 110:3
114:18 230:24

233:16
**discussions**
16:15 125:20
173:6
**dispersed**   135:2
**disposed**   44:20
177:11 232:18
**dispute**   39:19
79:9,17 80:15
100:7 155:4
158:18 162:1,9
162:19 179:15
227:15
**disputing**   146:2
**dissolution**
168:13,17
**dissolve**   135:5
**dissolved**   135:2
**district**   1:1,1
87:5 201:22
**ditch**   209:2
**diverted**   213:11
**division**   32:10
32:21,25 34:1
**document**   3:9,10
3:12,16 10:16
22:20 23:5,8,16
28:18,21,22
29:17 30:22
32:8 35:19 41:8
44:6 45:2 46:15
49:10 51:1 53:6
57:9 64:13
69:20 87:8
88:25 90:17
95:11,25 99:5,16
100:11 103:16
104:14,15,22

115:13 119:1
121:2 122:3
123:7 130:5,10
131:8 133:18
136:13 137:11
138:2 141:5
142:9 151:9
155:2 158:12,17
162:5,13,14,19
169:3,17,19,22
171:3,10,11
172:8,23,24
173:5,19 175:17
175:19 178:15
184:6 187:4,7,24
192:16 197:3,9
197:13 198:16
199:7 201:3,10
201:23 202:19
202:20 208:7
209:10 210:12
214:1,10 220:2
222:9 225:23
227:2 228:1,8,20
229:10,21
230:15,17 234:2
240:22 243:12
**documentation**
209:17 216:10
**documented**
57:13 211:2,8,17
**documents**   20:3
20:4 21:9 22:5,7
22:13,17,24 23:1
23:9,9,10,18,24
37:10,11 38:4,9
38:25 39:7
40:14,20 43:2,6

44:19 45:9 49:2
49:6,8,9 51:6
52:2,7 57:10
63:22 67:14
71:14 75:5,13,13
80:8 90:20,21
92:14 93:3,4,7
93:25 102:9
123:2 128:23
130:12,19,20,23
131:4 138:11,17
145:2 149:11,12
149:20 150:1,5
150:11,13,21,25
151:3,12,14,16
151:21 152:10
152:21 163:18
170:2 172:5,7,19
175:13,16,18
178:23 179:10
179:11,20 180:2
182:22 183:6,13
183:15 186:7,7
190:5,10 192:13
200:24 205:25
207:23 210:13
210:14 214:2,19
215:8,10,11,18
217:19 220:4
221:20,22 222:1
222:3 223:2
225:14 233:2
243:2 245:10
250:25
**doing**   54:13,14
99:4 107:20
108:2 111:3
123:1 127:22

ALCD-PUBCOM_0001665

[doing - east]                                                               Page 16

237:23,24 238:1
**dots** 68:11 69:9
  70:5 79:6
**double** 184:19
**doubt** 223:4
**dow** 152:15,16
  156:14,18
  178:25 183:3
  238:18
**dow's** 179:15
  183:11,17
**dowicide** 51:12
  51:12,13,13
  178:25 179:20
**downs** 90:11
**dozen** 69:25 70:1
**dozens** 69:22
**draft** 89:1 120:4
  124:18
**drain** 82:3 86:20
  100:16 221:6
  234:18,19
  235:15 236:12
  237:1,14
**drainage** 81:10
  81:21 84:18
  89:9,12 90:14
  92:18 95:21,23
  96:8,12 97:7,14
  98:1,5,6,10
  103:4 194:20
  195:7 229:3,6
  231:14 234:20
**drained** 98:8
**drains** 82:1,25
  86:12,12,19
  140:9,17,22
  141:6,23 220:18

229:22 230:3
  235:5
**drawing** 247:2,3
  247:10,11
**drawn** 105:14
  106:25
**drew** 11:2,12,12
  11:16,23 12:4,12
  12:19 30:11,23
  31:1,6,10,10,16
  31:22 32:1,10,21
  32:25 33:18,25
  33:25 34:14
  35:22 39:20
  40:10 44:15
  46:19 57:19,20
  57:25 58:6 93:8
  93:11,11 101:15
  101:19 102:19
  118:2 129:23
  131:8 132:8
  133:4,15 135:21
  136:11 138:9,15
  139:5,7,12 143:1
  152:17,23
  153:15,17,20,24
  154:24 159:7
  171:11 179:3,4,5
  181:8,14 184:11
  184:25 186:21
  191:15,17
  192:20 198:18
  202:19 203:8,13
  210:13 213:21
  217:8,9,12,16
  218:4 219:6,10
  219:16,21
  221:17 223:14

225:14 226:9,22
  227:19,22 228:1
  228:16 230:24
  245:3 247:17
  249:19,21,23,24
  250:8
**drew's** 31:16
  47:14,17 135:10
  157:20 211:20
**drewsperse**
  165:23
**drive** 5:5
**dropped** 150:2
**drove** 19:16
**drugs** 57:19
  247:2,7
**drum** 133:17
  168:1 241:23
  244:8
**drummed** 134:6
  134:6,10,18
  159:21 160:7
  177:15,25
  178:11
**drumming**
  133:13 134:4
  137:18 141:7,10
  141:19,24
  143:17 177:17
  177:23 178:3,9
  178:15
**drums** 240:6,14
  241:9,10,19
  242:3,8,9,18
  243:8,10,14,20
  244:4,11,17,22
  244:24

**dublin** 129:7
**duly** 253:7
**duplicate** 151:16
**duties** 126:18
  127:11

**e**

**e** 2:1,1 3:1,6,23
  27:14 49:14
  119:5,11,18
  126:11 139:14
  193:24 208:18
  245:12,24,25
  246:5,20 253:1,1
**e01765984** 3:10
  46:16
**e02825661** 3:16
  192:17
**earlier** 35:9
  117:5 124:12
  143:10 165:14
  190:7 194:19
  195:9 201:20
  216:12
**early** 30:7 40:12
  41:21 42:2
  77:13 90:21
  92:4 93:12
  101:12 126:7
  138:3 165:12
  172:4 185:2
**easier** 65:13
**east** 90:2 94:10
  206:15,16
  225:24 226:21
  226:21,22
  233:21

800-227-8440                                                        973-410-4040

ALCD-PUBCOM_0001666

**[easy - exhibit]**

**easy** 27:12
224:14
**education** 25:19
25:21
**effect** 43:5
192:25
**effective** 172:16
**effluent** 3:15,15
137:5,8 184:10
184:15 187:19
188:2,4,7,11
190:4 197:19
199:11 200:1
**efforts** 112:10
180:22 229:12
**ehs** 17:9 108:10
108:12 111:14
112:1,9 115:7
119:15
**eight** 18:1,2,10
18:16,20 19:5
**either** 41:18 68:2
70:14 98:19
177:23,25
**eliminated**
218:22
**elson** 208:12,17
208:18
**employed**
253:11
**employee** 6:8
8:11 9:10
253:13
**employees** 12:19
40:1,2,6,7
**employer** 231:2
**emptied** 176:22
177:10

**empty** 176:24
**emptying** 167:21
**enclosed** 216:17
**encloses** 157:7
**ended** 222:25
**ends** 60:11 65:18
73:22 185:15
208:11 222:23
**energetics** 25:14
25:15
**engaged** 15:13
**engine** 33:1
**engineering**
46:20 47:5
**engineers** 208:19
**entire** 67:1,4
209:14,18
**entitled** 1:11
172:1 211:6,13
**entity** 24:15
**environment**
239:2,5
**environmental**
8:16,22,25
208:19 219:17
**ep** 216:1
**ephs** 61:7
**equipment** 38:20
38:24,25 131:23
136:15,19,20,23
147:23
**erickson** 2:17
**errata** 254:1
**esq** 2:4,7,8,11
**essentially** 120:5
127:23
**established**
53:23 77:4

**estimated**
150:18,20
154:24
**estimation** 150:4
**et** 1:5,7 29:14
123:4
**event** 160:16
213:2 231:6
**everyone's** 78:15
**evidence** 44:19
75:4 90:21
149:10 150:1
152:24,25 153:3
238:12 248:20
248:24
**exact** 89:5 96:19
102:24 108:3
138:16 156:3,6
175:19
**exactly** 37:25
41:3 52:17,18
68:15 74:23
89:24 92:12
206:20
**examination** 5:7
14:24 30:10
247:14
**exceed** 69:11
**exceedances**
66:10 67:2,8,17
67:22 68:12,14
68:15 70:6
79:15 80:1
117:6 118:7,16
118:19
**exceeded** 112:18
113:2 114:3

**exceeds** 69:14
**exceptions** 136:4
**exchange** 139:5
**excuse** 37:17
**exhibit** 3:8,8,9
3:10,10,11,11,12
3:12,13,13,14,14
3:15,15,16,16,17
3:17,18,18,19,19
3:20,20,21,21,22
3:22,23,23 10:5
10:6,8 14:24
26:3,6 27:4
28:21,24,25 36:3
42:5 46:14,17,19
49:11 58:4
59:18 60:5,6
64:9,11,14,22,24
65:3,16 68:5
80:23 84:7
90:25 94:2
95:13 99:9,13
101:14 103:9
104:25 112:20
118:25 119:2
124:4,4,4 126:12
129:12,15,18
132:12,14,19
137:24 138:1
152:4 153:8,11
169:6,8 171:1
172:18 174:2
175:6,22 184:14
184:16 187:20
187:22 188:1
189:11,13
192:18,19 195:7
196:6 198:14,16

ALCD-PUBCOM_0001667

[exhibit - figure]                                                      Page 18

201:25 202:2
204:10,12
206:11 215:21
215:23 216:15
216:20 217:1,6
218:13,15
219:13,15 223:8
223:10,13 225:3
225:5,9 228:24
229:1 230:20
234:7,10,25
235:1 236:5
239:8,10 240:10
240:19,21 243:7
245:13,15,22
246:8,12,13,22
247:15 249:2
**exhibiting**
121:17
**exhibits** 26:14
**exist** 149:13,20
248:22 249:18
249:22 250:8
**existed** 133:8
147:11 248:19
250:14 251:5
**existing** 111:2
131:23 132:3
133:5
**exotherm** 168:10
168:11
**exotherms** 168:5
168:6 174:19
**expect** 71:17
77:14,18,24
114:14 115:16
115:17 134:1,2
136:22 137:13

137:17 141:10
141:13 142:11
142:21 163:13
164:1
**expected** 110:7
180:25 181:7
**experience** 74:18
74:22 75:25
76:5,14 78:1
115:24 244:16
**expert** 49:20
58:11,13 62:15
71:21 76:19
115:20 116:2
155:23 163:5
170:15 174:21
175:11 202:20
204:22 205:4,14
209:12 211:24
211:25 232:10
233:14 236:22
244:7,13,14
**expertise** 168:16
**experts** 211:5
**expires** 254:25
**explain** 186:19
**explained**
121:11 204:22
**explains** 121:13
240:4
**explanation**
193:13
**extent** 14:25
15:6 23:17
30:11,16 50:3,7
50:17 109:8
202:20 209:13
212:9 231:25

232:5 247:20
**extract** 208:20
**extremely** 126:7

**f**

**f** 49:14,14
139:16 140:7
175:14 178:25
253:1
**f.c.** 129:24
**facilities** 47:15
47:17
**facility** 35:11,16
37:14 39:13
45:19 56:17
58:6 66:21
75:22 76:15
77:14 83:17
87:18 92:4,13,16
93:6 121:15
122:18 124:14
181:24 211:21
219:7 228:9
239:20 240:12
247:2,3,9 250:3
**facility's** 82:20
83:2,9
**fact** 8:6 39:23
73:15 96:12
97:25 100:7
109:13,13
112:17 115:7
117:16 120:24
121:7 136:15
141:21 148:22
167:8 193:8
200:12 207:22
216:12

**factors** 239:6
**facts** 8:20 245:3
**fahrenheit** 136:6
136:16,24 175:8
**failed** 173:10
**fair** 15:12 17:22
35:4 36:6 62:25
70:9 159:23
168:9 175:24
185:3,4 242:9
**fairbairn** 2:20
**falling** 50:9
**falls** 202:25
203:12
**far** 125:6 213:21
224:17
**farm** 101:7
132:2,3
**favor** 251:10
**fd** 86:12
**february** 198:23
**fed** 3:9,12 28:23
119:2 135:1
**feel** 209:24
**feeling** 107:4
**feet** 68:20 94:10
**fiber** 167:19
168:1 176:5,21
242:18
**field** 76:1
**fifteen** 19:21
**fifth** 6:5
**fifty** 24:19
**figure** 66:9,9
68:4 84:6,8,11
84:12 92:17
95:13 104:25
105:7,18 112:19

ALCD-PUBCOM_0001668

[figure - form]                                                    Page 19

113:7 114:9,14
139:19,22
143:23 191:1
194:20 195:7,8
202:21
**figures**  3:11
29:13 64:23
65:3,7 66:9
104:24 108:13
139:21 204:11
206:11,12
**files**  21:8 22:24
22:25 91:12
228:21 240:24
**filled**  93:9
153:21,24 154:4
155:15 184:10
186:21 198:18
199:8 211:11
**filter**  34:15
**final**  113:19
177:12
**finalized**  89:4
**financially**  4:21
253:14
**find**  139:19
180:3 212:23
222:18 224:14
**finding**  239:19
**findings**  239:23
**fine**  22:21 26:20
72:8 93:24
140:5 171:17
**finished**  45:18
133:16 143:13
243:13,17
**fire**  126:12,15
127:8 129:25

131:9
**firm**  5:11 208:11
**first**  7:14,17,19
11:1,20,22 27:12
28:17 48:17,20
51:10 53:15
73:24 81:13
83:2 95:14,16
99:25 103:21
120:6 130:2
132:25 139:9
141:6 143:3,5
150:25 152:5
153:24 166:20
166:22 177:2
189:21 190:1,2
191:21 192:21
193:9 205:18
208:16 209:25
218:19 219:23
220:18 225:24
229:2 239:19
240:10 247:2
249:2 253:7
**five**  6:15 24:19
28:16 29:8 36:7
36:14 113:22
139:13 152:8
158:23 166:19
187:23 190:16
235:5 245:17
248:5
**flaherty**  2:9
**flip**  11:21 45:11
45:25 60:10
154:10 155:8
156:9 158:5
191:13 202:7

**flipping**  60:21
**floor**  81:23 82:1
82:2,2,24 86:12
86:12,19 137:6
140:9,10,17,22
140:22 141:6,6
141:23 220:18
220:19 221:5,6
229:22 234:18
234:19 235:5,15
236:12 237:1,14
**flow**  82:20
103:25 105:2,8
106:6 107:2,22
111:25 114:8,15
114:25 125:22
142:23 186:21
229:15
**flowed**  97:1,25
100:15 105:22
106:23 107:14
107:16
**flowing**  110:14
124:13
**flows**  86:7 94:19
94:20,23 95:6
104:7,10
**flush**  81:10,22
163:14,14,19,24
**flushes**  90:8
137:19 163:9
**focus**  103:12
139:6
**foia**  222:17
**foley**  119:6,8
120:25 121:11
126:13 127:4,8
127:11,15,17,25

128:4,9,14,19
245:25 250:2
**foley's**  122:20
246:20
**folks**  59:12
**follow**  228:20
**followed**  210:7
**following**  47:16
57:13 61:2
126:11 152:10
**foregoing**  253:5
**forenoon**  1:17
**forklifts**  176:16
**form**  12:7 13:15
13:21 14:17
18:12 19:25
20:9,21 31:24
33:1,23 36:10,17
37:7,23 38:14,15
38:23 39:6 40:5
41:1,22 43:22
44:17 49:19,24
52:13 54:9,18
55:4,9,16,24
56:20 57:4 58:9
61:23 62:24
63:1,10 67:3,9
67:19,24 68:13
68:21,25 69:13
69:24 70:12,17
71:20 72:3,20
74:20 75:2,18
76:4 77:7 79:12
79:19 80:7,18
81:25 83:6,12,24
87:6,25 88:9
89:22 92:1,11
93:19 94:22

ALCD-PUBCOM_0001669

**[form - go]**                                                          Page 20

96:14 98:21,24
100:9,10,18
102:1 104:13,21
105:5,10 106:8
109:7 112:8
113:16 114:17
115:4,19 116:1
117:19 118:14
122:2 123:23
126:14 127:10
133:23 135:7,12
136:18 141:12
142:1,15 144:11
144:18 146:5,8
146:24 147:22
148:18 149:7,14
149:23,24
150:16 151:5
152:18 153:20
153:25 156:19
157:17 159:10
159:18 160:5
161:9,15,23
162:4,12,21
163:4,17,21
164:4 167:5,10
170:14 171:2
174:5,20 178:22
179:9,18,23
180:12,20 181:1
181:9,18 182:20
183:4 188:1
189:25 191:23
192:6 196:1,9,16
197:18 202:19
207:14 209:8
214:18 220:6,11
220:14,15 224:7

227:18 228:3,17
230:12 233:13
234:1 236:3,21
238:14,24
241:14,21
242:12 243:15
243:22 244:6,12
251:4
**former**  12:19
**forms**  187:25
211:11
**formulate**
155:15,21
**formulated**
155:20
**formulations**
193:18
**forth**  29:7 139:4
253:8
**forty**  24:13,21
24:23,25 73:20
**forward**  31:1
54:15 131:16
132:15 172:4
187:23
**found**  71:1
181:24 223:3,6
238:4
**foundations**
101:16,20 102:5
**four**  6:14 13:12
15:19 17:7
27:22,23 50:5
61:2,4 78:7 81:4
85:1,25 189:4
194:21 226:12
227:21

**fourth**  6:4
**fox**  1:4 4:13
254:2
**frame**  129:6
242:16
**frank's**  89:20
90:3 94:9,16,19
100:3,16,25
104:1,10
**free**  30:17
171:13
**front**  27:3 29:1
48:13 153:10
204:11 225:24
226:20,21,22
**fuel**  25:16 33:2
155:16,22
**full**  73:24 99:25
**function**  133:6
**functions**  133:7
**fungi**  157:22
**further**  171:3
215:7 216:14
217:2 223:14
230:17 253:9,12
**future**  14:23

**g**

**g**  51:13 178:25
**gallons**  155:1
185:17 186:4,10
186:12,24,25
187:12 189:6
190:13 193:10
203:11
**gas**  155:25
**gateway**  1:15 2:6
4:15

**general**  40:9,22
41:5,20,23 48:8
61:6 131:18
170:18 223:13
**generally**  7:15
95:6 130:21
133:21
**generation**
168:11
**generic**  69:14,15
113:3,18
**genesis**  139:3
**gentleman**  119:5
**geology**  69:6
**geosyntec**
108:11,17,18,20
110:18,24
112:12
**geosyntec's**
110:11
**getting**  199:4
223:23
**ghd**  236:8
**gibbons**  1:14 2:6
4:14
**gibbs**  2:3 5:11
**gilezan**  2:18
26:11,25 59:14
**give**  26:18 97:18
226:13 246:17
**given**  6:15 9:10
126:2 131:5
**gives**  226:12
**glad**  245:20
**go**  4:8 14:25
19:15 21:24,25
27:22 29:21
30:23,25 38:18

ALCD-PUBCOM_0001670

[go - handed]

38:19,20 40:19
49:10 51:9,10
53:4,5 59:8,11
60:13 65:16
76:11 80:22,24
81:24 82:24
87:1 88:22 90:8
90:14 91:1,14
93:22 94:1,5
95:17 98:7 99:1
99:5,8 101:13
103:15 115:5
116:22 117:23
119:4 123:1
132:15,22
137:19 144:10
146:3 148:11
151:24 152:5
157:1 158:15
161:1 174:6,22
177:19 183:21
185:14 188:14
189:3 193:8
198:22 199:12
200:19 204:10
209:19 213:23
218:18 220:2
223:15 224:20
224:23 230:15
239:1,6 241:3
250:19 251:11
251:14 252:1
**goal**  14:20
110:15
**goes**  34:18 86:7
86:21 88:23
89:13,14,19
98:19 99:3

109:19 193:9
212:4 247:18
**going**  4:2 10:5
13:13 14:25
26:19 28:20,21
30:8 35:10
38:19 42:5,19
48:18 50:2
55:13 59:11
60:14 64:11
76:2,15 78:3,12
78:17,23 80:13
88:21 91:14
93:5 103:11
104:16 108:3
116:22 123:12
130:11 132:14
132:15,22,25
133:2,15 138:1,3
168:16 169:5,16
171:8 173:4,18
183:21 201:1
204:13 212:9,17
212:20,21
213:14 214:16
215:20 216:14
216:25 217:19
224:23 234:25
240:19 245:22
245:24 246:7
247:12,20
248:18 251:10
251:14 252:1
**good**  4:1 5:8,9
139:1 206:6
234:4
**gotten**  125:24
203:16

**grade**  44:4
**grant**  2:18
**grassy**  144:21
**great**  42:13
184:22 204:8
206:4
**greenfield**  85:2
85:14 87:14
98:16 99:2
142:5,14 144:2
144:21,24 146:4
146:13,16 195:1
195:3,13 196:7
197:7 228:10
**grew**  135:25
**ground**  76:16,21
111:25,25
**groundwater**
54:17,23 62:8,11
62:17 68:16,17
68:20 69:11
71:19 72:13,19
72:22 73:7
74:14,16 103:12
103:21,23 104:6
104:9 105:2,8,21
106:6,17,22
107:2,14,16,19
107:22 108:3,4
108:23 110:8,12
110:13,15,22
111:4,11,13,25
112:18 113:3,3
113:17,19,23
114:4,8,10,15,25
115:8 119:22
122:8 123:12,17
124:13 125:22

181:21,21
237:25
**group**  2:11
110:4 129:6
232:21
**groups**  32:22
33:1
**grouser**  2:22
**growth**  157:22
**guess**  66:21
70:25 98:7
132:16 135:24
168:24 173:16
196:14 207:5
208:14 211:18
221:5 222:24
230:7 232:9,11
244:7
**gun**  25:16
**guys**  23:9 204:13
211:4

**h**

**h**  3:6
**habits**  242:24
**half**  125:7
206:18
**hand**  10:5 28:20
46:13 64:11,21
118:24 132:14
138:1 145:12
166:14 169:5
199:13 215:20
216:25 219:15
240:19 245:22
246:23 249:15
**handed**  10:12
26:5 60:4

ALCD-PUBCOM_0001671

129:17 184:18
202:2
**handful**   22:25
**handing**   47:1
**handling**   42:16
176:1
**hands**   18:8,13
213:1
**handwritten**
3:22 185:16,25
240:20,22
**happen**   74:19
149:2,3,9,11
**happened**   75:14
97:16 149:10
211:21 230:2,10
231:7 233:10
247:21
**happens**   231:18
**happy**   50:12
**harassing**   78:5
**harbors**   229:11
**harmon**   30:5,13
57:18
**harrison**   6:21,25
11:6,16 85:2,5,6
85:14 86:2,22
87:1,14,24 88:6
88:17 89:20
90:6 98:7,8,23
104:8 105:3,9,12
105:22 106:6,23
107:16,24
114:16 115:1
190:19 191:5
195:20 196:24
202:4,15 203:19
203:24 205:7

206:14,15
211:21 228:10
**harry**   223:19
**hashmark**
202:12
**hatfield**   2:7
10:11 12:7
13:15,21,25
14:17,21 18:12
18:21 19:25
20:9,21 21:11,13
21:17 23:21
25:1 29:4 30:8
31:24 33:23
36:10,17 37:7,23
38:14,23 39:6
40:5,25 41:7,22
43:22 44:3,17
50:2,14,18 52:13
52:16 54:9,18
55:4,9,16,24
56:20 57:4 58:9
58:17,22,25 59:2
61:23 62:24
63:1,10 65:22
66:3,5 67:3,9,19
67:24 68:13,21
68:25 69:13,24
70:12,17 71:20
72:3,6,12,20
73:19,21 74:20
75:2,11,18 76:4
76:17 77:7,16
78:3,11,17,20,23
79:2,12,19 80:7
80:18 81:1,25
82:4 83:6,12,23
84:11,13 87:6,25

88:9 89:22 92:1
92:11 93:19
94:22 96:14
98:21,24 100:9
100:18 102:1,7
104:13,21 105:5
105:10 106:8,13
109:7,15,19,23
111:18 112:8,20
112:23 113:1,16
114:17 115:4,19
116:1,9 117:19
118:14 122:2,12
123:23 126:14
127:10 129:13
129:15 130:25
133:23 135:7,12
136:18 138:24
141:12 142:1,15
144:11,18 146:5
146:8,24 147:22
148:18 149:7,14
149:23 150:16
151:5,11,24
152:18 156:19
159:10,18 160:5
161:9,15,23
162:4,12,21
163:4,17,21
164:4 167:5,10
169:16 170:14
171:2,18,22
172:1,17 174:5
174:20 175:10
178:22 179:9,18
179:23 180:12
180:20 181:1,9
181:18 182:20

183:4 185:19,22
186:13 189:24
190:21,24
191:23 192:6,12
194:5,8,10,23
196:1,9,16
197:18 202:18
203:14,21
204:16,21
205:12 206:8,17
206:22 207:4,14
208:1,17 209:8
210:3,10,21
211:18 213:4,13
214:18 216:19
216:21 217:8,15
224:7 227:18
228:3,17 230:12
233:13 234:1,13
236:3,21 237:4
238:14,24
239:22 241:14
241:21 242:12
243:1,15,22
244:6,12,18
245:1,14,18
246:13,16,24
247:3,12 248:7
250:10,24 251:4
251:7,13,16,19
**hawkinson**
240:23
**hazardous**   50:5
53:17 54:5
55:14,21 56:12
212:24
**head**   23:7

ALCD-PUBCOM_0001672

**hear** 26:10,17,24
  185:23 199:5,5
  205:16
**hearing** 146:23
  251:22
**heat** 135:19,19
  167:4,6 168:7,8
  168:11
**heated** 167:7
  175:7
**heating** 135:6,11
  135:15
**heavy** 155:16,22
**held** 1:14
**help** 95:12 204:9
  204:13
**helpful** 64:21
**hercules** 24:16
  25:13 244:23
**hereinbefore**
  253:8
**hey** 223:5
**high** 68:18
**higher** 68:23
  69:3
**highest** 121:17
**hill** 243:8
**hired** 108:22,24
  109:2
**historic** 53:11,15
  57:14 71:7
**historical** 30:2
  31:13,21 62:22
  102:11 131:13
  246:6
**historically**
  55:15 111:8

**history** 14:3,5,6
  53:16 56:12,16
  56:19 216:3
**hits** 196:18
  227:16
**hockessin** 5:5
**hoffman** 1:4 3:2
  4:11 5:5,8,15,25
  8:1 9:22 10:12
  11:15 24:2 26:5
  30:16 46:18
  52:9 59:22 65:2
  73:23 75:8
  96:18 129:17
  153:11 167:23
  183:25 186:2
  198:19 203:3
  213:5 225:6
  251:24 254:3,21
**hold** 171:24,24
  172:1
**homogeneous**
  175:9
**homogenous**
  166:25
**hooked** 90:19
**hookup** 190:2
**horizontal** 66:1
**horton** 2:18
**hour** 21:6,7
**hours** 21:9
  186:19 245:17
**house** 90:1
**housekeeping**
  239:20 240:12
  241:12 242:11
  242:15

**houston** 2:4
**huh** 33:10 79:8
  124:5 145:14
  165:16 166:17
  220:17 221:10
**hum** 130:7
**hundred** 175:8
  175:14 238:20
  243:25
**hundreds** 22:24
  116:4 135:24
**hydraulic**
  208:19

**i**

**idea** 110:4
  150:10 174:24
  224:5,8
**identification**
  10:9 26:4 28:24
  46:17 59:19
  64:10,25 119:3
  129:12 132:13
  137:25 153:9
  169:9 184:17
  187:21 189:12
  192:18 198:15
  202:1 215:24
  217:7 218:16
  219:14 223:11
  225:4 228:25
  234:8 239:11
  240:21 245:13
  246:12
**identified** 14:24
  28:2 50:5 61:10
  86:13 88:22
  113:9 203:1

**identifies** 185:15
  193:25
**identify** 85:3
  206:1,7 225:25
**identifying** 54:5
**immediately**
  178:11
**impact** 68:16,17
  68:19 69:11
  113:3,17,19,23
  114:3
**impervious**
  73:17 74:1,12,15
  76:22,23
**important** 54:6
**improper** 212:7
**inch** 87:24 88:1
  88:2 90:2 98:22
  191:5
**incidental** 74:6
  74:19,23,25 75:9
  76:2,16 77:15,25
  79:11
**include** 29:7,13
  30:10 69:5
  132:1 163:2
  197:16,19
  237:19
**included** 31:17
  154:12 183:7
**includes** 29:12
**including** 5:1
  28:4
**incoming** 179:12
**inconsistent**
  187:14
**incorporated**
  193:17

**independent**
80:10
**independently**
207:21
**indicate**  68:11
88:14 102:15
153:3 160:2
183:1 185:18
215:14 238:22
**indicated**  68:12
117:15 188:12
198:3 201:10
222:14
**indicates**  124:8
131:8 156:17
159:7 167:17
189:4 199:18
202:13 226:11
238:19
**indicating**  219:1
**indication**  43:19
43:25
**indirectly**  34:12
**individual**
107:21
**industrial**  3:16
81:8,15 86:4,22
90:6,15 92:8
157:23 185:1
188:13 189:10
189:17 191:4
192:10 194:2
196:23 197:11
197:12
**industry**  31:18
32:24 46:21
**inferred**  115:5

**information**
16:13 63:12
100:1,20,22,24
105:23 106:10
106:24 114:20
123:25 131:3
132:9 173:8
179:25 180:5
181:3 183:7,18
193:25 209:17
214:20 215:3
220:6,15 226:8
228:20 230:18
231:3
**informed**  206:8
**ingredient**  3:14
169:7,12
**ingredients**
166:25 168:22
168:25 169:14
169:21,25 170:2
170:25 171:1
174:2,17 175:5
200:13
**inhibitors**  33:2
**initial**  63:4,6,7
91:16,19 92:21
111:7 216:7,9
238:5
**initiated**  35:25
91:20 92:22
191:18,24
**injuries**  7:9
**inner**  177:3
**input**  57:2,5,6
**inquired**  91:16
**inside**  27:16
203:1 212:8

234:18 235:15
236:12 237:2,14
**inspect**  229:13
**inspection**  3:22
229:3 238:18
239:9,13,19,23
242:22,22
**inspections**
235:7
**inspector**  132:18
240:4,15 242:1,4
242:7
**inspector's**
241:12
**installed**  39:4
73:17 74:1,12
103:4
**instance**  35:7
137:13 139:22
200:18 226:20
228:11 229:9
**instruct**  109:8
**instructed**
109:20
**intelligence**
232:21
**intend**  22:7
**intended**  22:8
**intent**  14:22
**interested**  4:21
253:15
**interesting**
212:23
**intermediate**
103:24 104:7
**internal**  27:16
**internet**  169:11
173:20

**interpret**  160:6
186:1
**interpretation**
202:21 205:15
**interrogatories**
3:9 26:3,8 27:5
36:3,8
**interrogatory**
27:23 28:2 29:3
29:8,18 36:5,13
36:15 37:4,20
**interrupt**  21:22
195:2
**introduce**  26:14
**inventory**
159:22 160:15
160:21,22
**investigate**
118:20
**investigated**
182:17 237:12
**investigating**
181:15 182:15
**investigation**
3:10 35:24
59:17 60:7,17
62:12,18 64:4
72:2 111:22
112:3 119:19
123:3 126:4,8
180:7,17 237:17
237:20,21
**investigational**
111:2 180:22
**involve**  8:16
135:6,11,15
**involved**  6:16
7:5,6,8,15 8:13

ALCD-PUBCOM_0001674

8:18,21 9:5
18:16,17,19 19:4
19:4 109:5
128:13 136:23
227:5,11
**isopropyl**  169:15
**issue**  8:20,23
28:1 108:23
122:8 203:5
**issued**  123:20
**issues**  108:4,25
**item**  57:20
**items**  47:7

**j**

**j**  145:12
**jackets**  137:7
175:13
**jacob**  2:22
**january**  3:11,13
3:21 64:8,16
111:15 115:9
132:11 137:4
228:23
**jersey**  1:1,14,15
2:7 4:15 7:25
8:3,15 46:21
47:15,18 68:23
69:1,12 104:20
123:14 157:21
180:2 222:25
223:4 228:21
253:5
**jersey's**  69:3
**jet**  229:22 230:1
231:14 233:23
235:6,22

**jetted**  235:18,19
**jg**  247:8
**jill**  2:18
**john**  1:4 3:2 4:11
5:5 9:22 191:14
254:3,21
**johnson**  2:22
26:9,12,18,22
27:1 59:12,15
**joint**  143:6
**july**  3:22 47:21
160:23 239:9,14
**jump**  103:8
**jumping**  93:22
191:14
**june**  3:18 105:14
105:16,17,18,21
153:25 157:2,7
192:20 215:22
216:16,16

**k**

**kaim**  2:4 3:3 5:7
5:10 10:10 15:8
18:22 23:15
24:1 26:20 29:9
47:1 50:12,15,20
59:7 65:24 66:4
73:20,22 78:16
78:19,22,25 79:4
84:14 106:14
109:10,21
111:20 112:22
112:25 116:19
129:14,16 139:1
151:20 152:1
171:16,20,24
172:14 173:12

173:15 182:3
183:19 185:21
186:16 190:23
194:7,9 203:2
204:18,24
205:16 206:20
209:24 210:9,18
210:22 212:19
216:20 217:23
224:19 234:14
239:23 246:10
246:15,19 247:1
248:4,17 251:9
251:17
**kearny**  6:16,19
7:1,5,9,9,10 11:7
13:7,20 14:4,7
15:18,24 17:6,13
17:16 18:9,15,20
19:3,8,13,15,19
19:24 20:8,11,19
21:2 28:11,16
31:11 36:7 37:5
38:2,8,11 39:24
40:9 44:1 47:15
47:18 49:1
54:14,23 60:8
63:17,21,25 64:6
64:15 69:10
75:1,5,10 77:5,9
79:16 82:25
91:19 92:9,22
94:20 100:21
101:15 104:5
115:8 117:6,9
118:1,13 119:9
121:25,25
122:11,22

123:22 124:25
126:1 128:1,15
128:21 129:3,25
132:18 150:15
157:21 161:13
161:21 162:3
180:16,18
184:11 189:22
191:5,17 192:3
201:21 206:12
207:1,11,23
209:19 219:7
227:17,19,24
232:22 234:12
236:20 237:3
238:21 250:7
**kearny's**  100:2
**keep**  175:14
210:1
**keg**  167:19
176:22
**kegs**  176:5,24
177:10
**keighley**  2:13
4:16
**kelly**  2:19
**kentucky**  34:13
**killam**  208:12,18
**kind**  164:19
228:21
**knew**  40:18
179:11 183:8
**knock**  103:17
**know**  20:2,14,15
22:12,19 23:4,18
29:23 41:10
42:24 44:21
46:1 58:18

ALCD-PUBCOM_0001675

67:11,14 68:2
71:2,4,5 74:18
74:22 75:16
79:24 82:11,15
87:9,18 88:2,2,5
89:3,5,11,14
92:7,12,24 93:16
93:25 96:19
97:16 102:22,24
106:20 113:14
116:11,16,17
118:21 122:13
124:4 125:1,4
126:15 130:14
130:15,20
135:16,23
138:14,16 139:9
139:17 140:4,4
141:13 143:12
143:18 145:20
146:12,18
150:10 152:22
154:6,8 155:18
156:1,3,4,6
158:17 163:6,18
167:6,13 168:24
169:13,20,24
173:23 174:7
175:1 177:7
178:16 180:4
182:13 183:1
184:25 185:2
187:14 196:17
199:1,24 200:10
201:13 206:14
211:9 212:12
213:23 214:8,22
218:23 221:16

222:14,16,20
223:24 224:2,10
224:13 226:17
226:20,21,24
227:24 228:1,4
228:13,14 230:9
231:6,7 233:6,7
233:15 235:18
237:8,9,11,23
241:15,22
244:15,15
249:18 250:13
250:20,22
**knowledge** 15:5
23:11,13 30:17
39:1 40:21
44:23 49:6 50:8
58:23 59:5
63:23 70:18
75:14,20 89:24
90:4 92:2 93:1
99:3 102:8
109:5,25 111:1
115:21 116:3,13
131:2,3 144:12
147:10 167:11
171:12 174:19
175:6 176:8
179:21 181:2,14
200:15,16
209:14,16,23
211:24 213:15
213:19 214:13
215:5,9,11 216:7
227:6,7 230:5
237:5,6 248:15
249:25 250:11
250:14,25 251:5

**knowledgeable**
19:23 20:1,2,7
20:10
**known** 55:2
118:5 199:19
**knows** 223:25
**kurt** 138:8

### l

**l** 8:17 208:15,18
**lab** 43:15 44:2
81:9 90:14
224:15 232:10
232:18
**label** 88:19
130:4
**labeled** 85:23
86:3 88:19
**labor** 46:21
**lack** 202:13
**lampkin** 27:14
**land** 142:23
**language** 11:25
100:4 229:16
**lapse** 81:21
**large** 67:7,10,11
89:16 241:8
249:2
**larger** 135:25
**largest** 160:21
**late** 40:11,23
41:21 42:1
73:17 74:1
77:10,12 91:20
91:24 92:5,23
**law** 4:14 5:11
110:4 213:1

**lawyer** 27:19,20
**lawyers** 22:1
**lay** 58:13
**laying** 41:12
**layout** 84:18
92:18
**layperson**
202:22
**lcp** 8:13,17 9:6
**lead** 154:17
155:10,17,18,24
156:1,5 198:4
**leaded** 155:25
**leading** 108:25
114:24 152:8
209:2 229:14
250:3
**leads** 20:24
**leak** 243:21
244:2
**leakages** 74:6,19
75:1,9,17 76:3
76:16 77:15,25
79:11,18
**learn** 16:13
107:4
**leave** 144:20,23
**leaves** 92:19
**leaving** 203:11
**led** 21:1 182:1
**left** 87:15 92:12
92:15,24 144:12
164:23 166:10
199:21 214:21
**legend** 199:21
202:12,12
**lengthy** 116:6,10
116:11,14

| | | | |
|---|---|---|---|
| **letter** 3:12,13,13 | **linden** 8:15 | 165:21 170:6 | **look** 10:24 11:1 |
| 3:18,18,19,20 | **line** 15:1 30:9 | 174:2 199:14 | 11:20 34:5 35:7 |
| 46:19 47:6,10 | 50:3 57:20 | **listen** 78:13 | 35:10 36:2,4 |
| 122:25 129:11 | 81:10,22 86:7 | **lists** 55:10 | 37:9 39:18 |
| 129:19,23 | 90:8 98:22 | **litigation** 23:12 | 40:19 42:7,10,14 |
| 131:23 132:11 | 117:10 134:13 | 109:6,12,14,22 | 42:19 43:8 |
| 132:16,17 | 137:19 147:8 | 109:24 183:15 | 47:13 48:19 |
| 134:22 137:3,23 | 163:9,14,14,15 | **little** 12:16 34:19 | 53:9 54:21 |
| 138:4,8 139:3 | 163:19,24 171:4 | 65:13 106:1 | 55:13 57:11 |
| 152:6,9 157:2,6 | 172:11 194:12 | 139:4 143:17 | 58:4 60:25 |
| 157:10 169:18 | 202:13 209:9,14 | 200:20 205:18 | 65:17 68:4 |
| 191:13,14 | 209:18 247:13 | **llc** 254:1 | 78:16 82:16 |
| 192:20,22 193:2 | 247:18 254:5 | **lloyd** 16:1,6,9,14 | 84:6 87:8,12 |
| 215:22 216:13 | **lined** 167:19 | 16:17,22 17:5 | 90:24 95:13 |
| 216:16,16 217:2 | **lines** 84:20,20 | 21:1 119:11,12 | 104:24 108:22 |
| 217:5,16,25 | 88:8 90:8 91:25 | 128:17,18 129:2 | 108:24 122:15 |
| 219:12 223:9 | 145:16 210:17 | 129:8,8 | 130:11 138:3 |
| **lettered** 139:23 | 212:14,25 248:9 | **lloyd's** 16:2 | 145:11 152:3,7 |
| **level** 113:6,15,18 | **link** 33:25 | **llp** 2:3 | 157:13,16 |
| 113:24 | **liquid** 51:24 | **located** 8:14 | 158:22 166:6 |
| **levels** 113:4,9 | 76:10,24 77:1 | 140:14 190:19 | 182:12 183:10 |
| 114:4 | 135:1 | 191:5 207:11 | 186:6 187:5 |
| **levin** 223:19 | **liquids** 136:3 | **location** 4:13 | 188:14 192:23 |
| **license** 253:21 | **list** 3:14 22:7,13 | 39:15 176:13 | 193:5,6 194:11 |
| **licensed** 119:8 | 22:18 23:6 | 177:18,18 226:1 | 195:17 197:22 |
| **lifetime** 37:14 | 29:12 45:18 | 226:1,2 | 203:3 204:11,13 |
| **likewise** 114:14 | 46:5 47:6,13,16 | **locations** 102:11 | 205:24 208:6,6 |
| 137:17 | 47:25 48:9,10 | 139:13 226:12 | 208:10 210:19 |
| **lime** 245:7,20 | 51:9 55:7,10 | 226:13 233:20 | 219:5 221:19 |
| 246:4,6 247:10 | 58:5 81:20 | **lodge** 14:22 | 225:22,23 |
| 248:19,25 249:3 | 111:21,23 152:8 | 172:22 | 230:17,18 231:2 |
| 249:12,14,18,20 | 154:12 169:7,12 | **lodging** 173:9 | 231:21 234:5 |
| 249:22 250:4,8 | 169:12,17 172:6 | **log** 45:7 | 235:1 238:25 |
| 250:22 | 172:9 214:6 | **long** 9:12 13:10 | 247:9 249:13,20 |
| **limit** 69:1,2,3,5 | 247:14 | 17:5,24 19:19 | **looked** 111:15 |
| **limits** 68:23 | **listed** 48:21 50:4 | 46:6 138:14 | 111:22 112:1 |
| 69:14,15,15 | 139:13 154:14 | **longer** 149:20 | 123:3 124:3 |
| 224:10,14,15 | 156:22 165:11 | | 126:12 150:11 |

151:10,22
152:21 159:24
178:10 216:13
216:15
**looking** 32:4,16
32:19 36:4
49:12 73:23
79:5 85:12,17
92:17 95:10
103:20 108:13
110:18,18,21
152:5 164:13,13
165:10 168:3
180:3 188:25
190:22 191:1
194:20,25 195:6
195:8 207:23
208:10 249:8
**looks** 30:6 91:8
123:16 177:2
185:16 188:15
188:16 198:3,17
199:8 208:11,13
220:25 222:21
239:14
**lose** 231:9
235:14
**lost** 25:2
**lot** 58:7,15,18
69:6 73:10
76:25 87:21
89:12 93:25
107:25 108:1
112:17 113:9,21
114:3,8,10,11,13
114:25,25
127:22 129:4
142:20 143:19

143:22 144:2,10
144:13,24 146:4
146:13,17
205:21 239:6
**louisiana** 2:3
**low** 136:5 147:6
**lsrp** 56:24 57:1
63:13,13 80:5,9
80:9 117:14
120:24 121:22
122:8,9,13,20
126:13,18,24
127:9,12 128:5
128:14,21,22
182:2 238:16,25
246:2 250:2
**lsrp's** 126:24
**lsrps** 127:1
**lunch** 116:20
**luncheon** 116:23

**m**

**m.j.** 154:5
**machine** 133:7
**mail** 3:23 119:5
126:11 245:12
245:24,25 246:5
246:20
**mailing** 119:11
119:18
**main** 86:8 87:21
89:17,19 133:5
133:14,16
**maine** 2:10
**maintained**
40:21 45:19
**major** 128:16
206:16

**majority** 121:13
134:23
**maker** 128:16
**making** 35:17
55:19 128:13
**man** 55:2
**manage** 8:25
**management**
43:10 229:12
**manager** 13:2
16:5 17:20,25
18:6 40:15,16
41:10,16 47:5
119:13 127:24
128:2 129:3
191:15
**managers** 17:17
**manhole** 139:15
140:17,18
167:22,25
**manholes** 86:15
86:20 139:17,22
**manually** 147:21
147:23 149:5
176:16
**manufacture**
131:16 157:21
164:9 165:10
**manufactured**
38:2 131:18
133:13 134:3,9
134:17 156:2
159:20 160:14
165:9,20 166:8
177:13
**manufacturers**
53:19 55:23
56:14 167:8

**manufacturing**
31:17 76:2,15
77:14 133:12
138:9 155:24
156:5 159:8
166:16 168:4
**map** 105:14
106:10,25
107:19 194:12
195:19 202:8,15
203:18,22 204:1
204:23 205:14
205:15 206:14
207:1,9,15 228:8
228:19 249:20
**maps** 249:8
**march** 60:8
188:16 241:4
**marine** 31:18
32:10,21,24,25
**mark** 10:5 28:21
119:6,8 234:3
246:7
**marked** 10:8
26:3,6 28:23
46:16 59:18
60:4 64:9,24
119:2 129:12,18
132:12 137:24
153:8 169:8
184:16 187:20
189:11 192:17
192:19 198:14
201:25 215:23
217:1,6 218:15
219:13 223:10
225:3 228:24
234:7,10 239:10

ALCD-PUBCOM_0001678

[marked - msds]                                                                     Page 29

240:21 245:12
246:12
**marketing** 32:21
32:25
**marking** 46:13
64:22 169:5
215:20 245:14
**master** 78:12,18
78:24 173:8
248:12
**match** 51:25
**material** 42:15
44:22 59:3 76:9
76:9 135:1
145:6 147:12,14
148:10 157:20
158:8 159:25
160:7,15 164:2
164:11,18
167:21 176:6,7
176:12,13,17
178:20,25
179:12 181:12
239:7 240:5,14
242:3,8
**materials** 38:6
39:10,12,14
42:21,25 56:16
121:13,18
144:12,20,23
152:14 163:2
200:4 243:17
**matter** 1:11 4:12
109:13 216:12
**matters** 8:16
**max** 160:22
**maximum**
179:17

**mcstravick** 2:21
**mean** 7:6 8:18
13:22 16:20
18:13,17 37:3
38:17,19,25
41:24 44:21,22
63:6 71:6 92:5
110:20 127:20
130:18 149:2
155:21 168:12
170:16 180:1
181:2,5 186:6
196:18 203:3,10
211:6,9 226:8
232:7 234:15
241:16 248:22
**means** 66:24
67:11 68:18
116:11 186:23
241:23 242:14
242:15 244:1,1
**meant** 84:12,12
**measures** 192:24
**media** 4:10
**medium** 136:5
**meet** 12:18,23
16:6,8,8 173:6
199:3
**meetings** 21:10
21:12,14,14
**melt** 167:9,16,18
**melted** 167:13
**memo** 3:19,21
218:14,18
228:23 229:1
**memories** 18:18
**memory** 22:16

**mentions** 31:13
250:2
**met** 17:1 138:20
138:21 172:10
199:1 223:19
**metals** 188:25
**method** 186:19
**methylene** 49:17
49:24
**metric** 106:25
**michelle** 2:21
**microbiocide**
157:21 166:19
**microphones** 4:4
**mid** 77:13 91:10
92:24 101:12
**middle** 35:13
51:11 86:3 90:7
156:14 218:20
**migrated** 118:17
**migrates** 69:7
76:12
**migration** 74:16
76:13 79:22
118:22
**mile** 125:7,7
**miller** 2:18
**million** 35:18
37:17 166:9
193:10
**millions** 203:10
**mind** 18:11 47:1
**minimum** 80:14
**minutes** 19:21
224:21 245:17
245:19 248:13
**mischaracterizes**
122:3 162:5,13

**mix** 135:5 175:8
**mixed** 125:10
174:18 175:5
**mixing** 134:25
135:18 136:23
156:7 166:21
167:3,9,14
**model** 108:3
**modern** 70:10
114:10
**modifying**
155:16,22
**moment** 170:25
251:15
**monitor** 83:11
**monitored** 83:18
**monitoring**
121:17
**month** 132:15
**morning** 4:2 5:8
5:9
**morrison** 2:20
**move** 78:6,9,13
78:15 79:2
129:2 133:15
134:12,16
187:23 210:2
**moved** 39:14
128:9 134:3
147:21 148:12
176:16,25
177:13,20,22
178:7
**moving** 134:21
148:16 149:5
**msds** 176:10
181:5

ALCD-PUBCOM_0001679

[multi - number]                                                    Page 30

multi 80:16
municipal 88:7
  98:19 162:11,25
  163:20,25 164:3
  180:10,19 184:4
  185:1 189:23
  192:4,11 193:20
  195:24 196:8,11
  212:25 213:10
  214:25 215:6,17
municipality
  196:20 209:20
  211:23
mute 4:6
mutual 127:14

**n**

n 2:1,4 3:1 49:13
  49:23 208:15,18
nabam 169:14
name 4:16 5:10
  22:19,19 125:1,5
  138:11,18
  152:20 165:1
  254:2,3
named 119:5
  129:24 154:4
  240:23
names 20:3
naphthenate
  155:17
nature 8:19
near 142:5,14
  143:11 228:15
nearest 94:8
necessary
  229:13

need 22:23 59:13
  135:18,19
  147:20 175:7
  177:19 178:7
  182:13 204:22
  205:13,14
  210:22 224:19
needed 175:1
  196:17
needs 238:11,22
  240:5,13 242:2,8
neighborhood
  204:14
neither 179:5
  181:14 253:9
network 171:5
neutralization
  191:18,21,25
never 63:24
  70:18 138:20,21
  169:2,22 170:1
  222:22 223:6,6,6
new 1:1,14,15
  2:7 4:15 7:25
  8:3,15 39:3,8
  41:16 46:21
  47:14,15,17,18
  68:23 69:1,3,12
  92:5 104:20
  107:5 108:19,20
  123:14 128:21
  128:22 132:6
  133:2 157:21
  180:2 222:25
  223:4 228:21
  234:16 237:25
  238:12 253:4
  254:1

newark 1:2,15
  2:7 4:15
nice 65:12
nine 101:17
  129:13 154:15
  156:10,10
  158:10 161:7,19
  161:19 182:18
nip 247:8
njdep 3:19 56:24
  57:1 139:5
  143:7 153:16,17
  153:20 157:3
  182:22 216:1
  217:4 218:1,9,14
  218:18 221:20
  221:23 222:3
  223:14 227:2
  231:4 239:15
non 66:11
  181:25
nonresponsive
  182:3
norm 233:16,18
north 85:4,5,18
  85:19 94:20,23
  95:6 98:7,8,17
  98:18 103:25
  104:8 105:3,8,22
  106:6,23 107:16
  107:23 114:15
  115:1,5 124:11
  124:13,24,24
  125:6,17 171:6
  190:20 204:25
  205:8 206:13,16
  207:10 243:9

northeast 103:25
  104:8 115:5
northwest 85:7
  85:10 88:6,17
notary 1:13
  253:4 254:25
note 4:4 192:21
  192:24 224:3
  235:5,5
noted 5:2 15:8
  227:22 240:15
  242:1
notes 1:10 3:22
  94:8 120:3
  132:25 158:3
  219:21 240:20
  246:4 253:6
notice 3:8 9:21
  10:1,7,13 23:17
  50:4,6 181:22
  203:6 247:15
  248:10
notifying 131:9
noting 84:25
  242:7
november 3:13
  3:19,20 131:10
  137:23 138:4
  152:6 191:19,24
  192:2,9 218:14
  218:17 219:10
  219:12 223:9,12
  224:3
nrd 7:21,22
nrdcsrs 66:10
number 3:7 4:10
  14:25 27:23
  28:2,7,12,15

ALCD-PUBCOM_0001680

29:1,8,18,22
36:5,15 37:5
41:4 45:12,24
46:25 48:3
53:24 60:11
68:5 73:22
80:25 85:16
86:12 91:2
99:10 101:3
113:18 124:24
130:3,11 133:11
135:23 139:8
151:12 152:14
154:13 155:13
157:16 158:23
161:1 172:18
185:25 186:1
189:4 194:1,8,15
197:10,22 203:7
210:25 214:8
225:23 226:4,5
**numbered**  33:22
35:8 53:6
112:23 139:22
185:7
**numbers**  37:25
70:5 113:20
**numerous**  16:24
25:17,17

**o**

**o**  208:15,18
**oath**  5:17
**object**  30:8 50:2
50:13 78:3
127:18,21
169:16 171:3
172:11 174:5

189:25 202:18
247:12
**objected**  127:19
**objection**  12:7
13:15,21,25
14:17,22 15:8
18:12 19:25
20:9,21 29:5
31:24 33:23
36:10,17 37:7,23
38:14,15,23 39:6
40:5,25,25 41:7
41:22 43:22
44:3,17 50:17,19
52:13,16 54:9,18
55:4,9,16,24
56:20 57:4 58:9
58:17,22,25
61:23 62:24
63:1,10 67:3,9
67:19,24 68:13
68:21,25 69:13
69:24 70:12,17
71:20 72:3,6,12
72:20 74:20
75:2,11,18 76:4
76:17 77:7,16
79:12,19 80:7,18
81:25 82:4 83:6
83:12,23,23 87:6
87:25 88:9
89:22 92:1,11
93:19 94:22
96:14 98:21,24
100:9,10,18
102:1,7 104:13
104:21 105:5,10
106:8 109:7,15

109:16 112:8
113:16 114:17
115:4,19 116:1
117:19 118:14
122:2,12 123:23
126:14 127:10
130:25 133:23
135:7,12 136:18
141:12 142:1,15
144:11,18 146:5
146:8,24 147:22
148:18 149:7,14
149:23,24
150:16 151:5
152:18 156:19
159:10,18 160:5
161:9,15,23
162:4,12,21
163:4,17,21
164:4 167:5,10
170:14 171:2,17
172:2,10,15
173:9 174:20,22
178:22 179:9,18
179:23 180:12
180:20 181:1,9
181:18 182:3,20
183:4 189:24
191:23 192:6,12
196:1,9,16
197:18 203:14
205:13 207:4,14
208:1 209:8,9
214:18 224:7
227:18 228:3,17
230:12 233:13
234:1 236:3,21
237:4 238:14,24

241:14,21
242:12 243:1,15
243:22 244:6,12
244:18 245:1
250:24 251:4,10
**objectionable**
173:24
**objections**  3:8
4:23 26:2,7 27:4
116:9 172:22
175:10 203:21
208:2 209:21
213:4,13 250:10
**obligation**  80:12
173:5
**obtained**  101:15
101:19 167:1
**obviously**
110:15 123:15
152:2 167:7
180:2 187:5
190:3 196:11
203:10 206:12
**occ**  3:10,16
46:16 130:4
192:17 236:7,8
**occasion**  11:11
**occasionally**
141:11
**occasions**  144:16
**occi**  5:11 22:6,13
22:18 23:6,9
130:5,13 151:4
151:16,23 210:7
214:6
**occidental**  1:3
4:12 172:3,10,20
173:2,5 254:2

ALCD-PUBCOM_0001681

[occidental's - okay]                                                          Page 32

**occidental's**
  173:7
**occur**  74:23
  77:21 82:19
  144:17
**occurred**  6:7 7:8
  28:4,5 75:15
  77:19 79:10
  133:21 149:22
  150:2 163:10
  182:23
**occurring**
  187:15
**october**  101:16
  101:18,23 102:4
  102:15,20
**office**  1:14 4:14
  87:21
**offices**  133:6
**offsite**  229:14
**oh**  24:22 83:15
  85:17 99:17
  106:15 140:13
  191:1,8
**ohio**  129:7
**oil**  33:2 34:11
**oils**  155:16,22
**okay**  6:6 7:3,12
  8:4 9:1,8 10:4
  11:5 12:2,15
  15:11 17:4
  18:24 20:17,25
  21:15 23:14
  24:1,10 25:7
  26:5 27:2,18,21
  28:14,20,25
  29:25 30:4 31:4
  32:14,18 33:15

34:2,10 35:6,15
35:20 36:1 37:1
37:16,19 39:17
42:9,13,18 43:8
43:12,18 45:11
45:16,23 46:4,12
46:18,23 47:4,12
47:24 48:7,12,16
48:24 49:4,22
50:14,21 51:8,16
52:8 53:4,14
54:20,25 55:6,18
56:7 57:17,23
58:3 59:15,22,25
60:20,24 61:5,13
61:17 62:16,20
64:11,12,18 65:1
65:6,10,15,19
66:5,7,16 67:6
67:15 68:3,6,10
69:8,21 70:8,24
73:4,9,14 74:4
74:10 75:23
77:3 78:16 79:2
79:4,7 80:3,22
80:24 81:2,3,6
81:14 82:8,10
83:20 84:5,13,17
84:24 85:4,12,15
85:20 86:6,18
87:8,11,22 89:2
89:25 90:23
91:23 92:16
93:21 94:3,6,15
95:9,18 96:5,11
97:5,10,13,20,24
98:2,13 99:17,18
100:6,12 101:6

101:22 102:13
103:1,7,13,14
104:4 105:19
106:2,3,16
107:11 108:16
110:2,5 112:11
113:1 114:1,22
115:6,22 116:16
116:19 117:4,13
119:17 120:14
121:10,21
125:15 126:3,6
126:10,19,22
127:2,7,13 128:3
128:11,24
129:22 130:2
131:6 132:14,21
133:19 134:20
134:21 136:1,9
136:14 137:2
138:2,3,7,13,22
139:2,10 140:9
142:3,10 143:20
143:25 144:4,8
144:14 145:7,19
145:25 146:20
147:12,19 148:9
148:14,21 150:8
150:19 151:1
152:3 153:2,10
153:14,23 154:9
154:22 155:3,7
156:8,25 157:1
157:12,15 158:2
158:14,21 159:4
160:9,20,25
163:12,23 164:7
164:16 165:3,7

165:13,19 166:5
166:12 167:12
168:2 169:4
170:4,23 173:13
173:20,21
174:12,13,25
175:3,15,21,24
176:20 177:5
178:12 183:19
184:4,9,13,22,24
185:5,10,13
186:5 187:11,17
187:18 188:21
189:8 190:11
191:11 192:19
193:4 194:10,18
195:5,11,16,22
196:21 197:14
197:21 198:12
198:16,21 199:6
199:17 200:9,17
201:8,19,20
202:7 203:2,16
203:25 204:6,20
205:3 206:4,10
206:23,25 207:6
207:12,18
208:24 210:9,18
210:20,24
212:19 213:5
214:3 215:13,19
215:25 216:21
216:24 218:12
219:4,16 220:1,7
220:20,24 221:4
221:13,24 222:7
222:13,19
223:18 225:12

ALCD-PUBCOM_0001682

[okay - p.o.]                                                    Page 33

225:18 227:1,8
227:14 228:6
229:1 230:6
231:5,24 232:17
233:5,9 234:10
235:24 237:8
238:9 239:8,12
239:18 240:3,11
240:18 241:2,25
242:6 244:3
245:7,23 246:20
247:3,5 248:17
248:19 250:12
251:19
**old** 24:20 132:7
**once** 19:9 73:5,5
93:16 104:9
134:2 137:6,17
196:18 212:4,24
215:5,16
**ones** 9:14 56:21
135:17 164:21
164:22 175:5
200:22 201:9,14
206:19 227:22
**ongoing** 13:5,7
104:16 107:20
114:21 180:16
238:17
**open** 209:2
**opening** 147:8
**operated** 11:16
30:6 38:11,12,16
39:24 118:9
**operating** 14:7
40:11,12,23
57:25 70:16

**operation** 11:22
12:4,12 30:10,17
135:18 141:19
212:5 247:17
**operational**
53:16 56:12
86:8
**operations** 19:24
20:8,11 28:3,5
28:16 30:24
31:6,17,22 32:12
33:9,13,14,18,20
33:25 34:20
35:3,22,24 36:7
36:9,16,18,19,23
37:5,21 40:23
41:20 42:8
43:21 44:1,14,24
45:5,8 53:11,16
62:23 70:10,15
71:7,7 72:18
117:8,16 118:2,6
118:8 121:25
122:11,16,22
130:16,17,24
131:13,15,22
133:21 134:24
134:25 135:10
136:3,23 141:7
141:10,25
142:17,24 145:5
149:13 150:6,14
152:23 160:3
187:14 214:14
214:15 236:19
237:3 249:19,24
250:9

**operator** 57:15
**operator's** 31:22
**operators** 30:2
30:12 71:8
**opinion** 71:21
76:19 122:15
163:5 202:21
245:2
**opra** 91:9
**order** 110:24
135:5 175:8
177:17 219:18
233:11
**orient** 95:13
204:12 205:18
**orlowski** 191:15
198:25 199:2,3
**ot** 48:21 49:7
**outcome** 4:22
**outfall** 201:22
**outflow** 92:4
**outlet** 197:10,11
**outlets** 194:1
**outlined** 207:3
**outside** 30:13
50:10,13,19
86:15,20 109:16
145:16 148:4
168:16 169:17
171:7,11,16
172:14,17,19
173:3 174:21
179:24 202:23
209:11,16 210:1
210:11,17
211:23 212:14
212:14 228:15
228:15 241:24

241:24 242:18
243:10,14,20
244:5,11,17,19
244:23,25 245:1
247:13 248:2,9
248:10
**overall** 14:6
16:24 125:21
187:12
**overflow** 3:17
201:24 202:3
208:20,25 209:1
213:24
**overflowed**
98:11
**overflows** 98:15
**overheads**
250:17,17
**oversee** 17:21
**overseeing** 18:6
**overview** 103:18
**overworked**
127:23
**owned** 34:13
161:3 162:6
**owner** 125:4
**owner's** 125:5
**owners** 30:12
71:8
**ownership** 11:22
212:5 247:17

**p**

**p** 2:1,1
**p.c.** 1:15 2:6
**p.m.** 252:2
**p.o.** 2:10

ALCD-PUBCOM_0001683

**pa**  35:24 36:25
57:7 62:2
111:23 238:5
**paa**  238:5
**package**  167:19
176:22
**packing**  177:3
**page**  3:2,7 10:25
11:2,21 27:13,22
27:23 28:16
29:8,23 30:1,2
31:1 32:9 33:21
34:3,4,8,23 35:8
35:10 36:7,14
42:8,14 43:8,9
45:11 46:6
49:11 50:5
51:10,11 53:5
60:10,12,14,21
65:18,20,24,25
73:16,19 80:24
84:21 95:10,11
95:20 99:15,15
99:23,24 103:15
115:12 134:23
139:9 152:5,7
154:10 155:8,11
156:14 157:17
158:5,15,23
159:23 164:20
164:21 165:4
166:3,6,15 170:7
185:7,15 186:8
187:5 189:3,16
189:16 190:22
192:21 193:6
194:12 199:12
202:7 204:12,12

208:11,16,21
211:5 213:6
217:20 218:7
220:12 225:22
227:22 239:24
240:10 246:21
246:25 249:2
254:5
**pages**  29:15
30:25 47:25
48:2,4 156:9
157:2 188:15
193:14 197:23
**paper**  25:14
**paragraph**  28:17
33:24 34:5,19
35:8,9,13 42:20
43:13 44:12
45:17 61:1
73:24 82:17
91:8 94:8,13
99:24 100:1
101:14 103:20
120:6 131:11
132:2,22,23
134:23 137:4
167:15 168:3
176:2 188:10
193:14 218:1
219:24 235:4
**paragraphs**
218:21
**parking**  87:20
89:12 142:20
143:19,22 144:2
144:10,13,24
146:4,13,17

**parlin**  7:25 8:3
**part**  10:21 34:14
54:21 63:15
112:3 120:1,12
120:20 122:13
125:21 127:16
143:13 150:8
154:11 157:16
167:24 180:8,15
205:1 210:13
212:7 214:1
227:12 234:19
237:16
**participants**
2:16
**particular**  7:22
16:17,19,20
18:10,18 23:5
108:8 112:2
140:5 207:9
246:4
**particularly**
18:14
**parties**  2:11 4:8
127:1 210:6
253:11
**parts**  179:16
236:15 238:20
**party**  1:5,7 4:20
212:6 222:25
**pass**  251:12,17
**passaic**  1:6 87:7
94:17,20 95:3
182:5 187:25
202:3 203:8,13
205:1,6,11 206:1
207:10 209:3
211:2,3,16

213:11 214:17
**patrick**  2:21
**paved**  73:1,5,11
73:13 77:5,9,10
77:12
**pay**  126:24
127:1
**paying**  127:4
**payment**  126:24
**pcbs**  61:8 66:2
112:7,9,12,14,17
114:1,4 115:15
115:16,24 116:4
116:5,7
**pcp**  169:15
170:6,6,12,17,21
**peak**  186:20
**pentachloroph...**
170:13,17,20
**people**  20:4 41:4
41:4,9 123:13
221:20
**people's**  108:1
**percent**  32:23
48:21 49:7
67:12,12,12,13
155:17
**perfect**  85:21
206:10
**performed**  235:6
**period**  12:5,13
36:24 43:4
46:10 48:9 51:2
52:12 53:25
54:1 57:25
61:24 62:2
70:16,22 71:3
80:17 83:13,14

[period - point]                                                              Page 35

131:19 138:16
158:6,10 159:6
161:7 179:6
238:20 247:19
**periods** 51:22
213:9
**permit** 3:16,17
92:5,6 101:15,19
102:19 189:11
189:18,21 190:1
190:2,2,8,9
191:3 195:17
196:5 198:13,18
**permits** 167:20
190:10 211:12
211:20,20
214:22
**permitted** 81:8
81:15 195:18
196:15,18,25
197:1,7 211:12
**persistent**
115:24
**person** 19:23
20:1,3,7,10 21:7
21:16,17
**personal** 8:5,8
15:4 18:21
30:17 50:8,16
76:5 131:1
171:9,14 173:13
173:19 175:6
209:16 212:12
213:14 247:24
**personally** 17:12
**personnel**
219:21 221:17
230:24 248:15

**perspective**
20:23 233:11
**pesticide** 171:5
**petroleum** 136:3
**ph** 83:11,22
**phase** 231:12
**phones** 4:6
**photo** 241:7
242:20 243:7
246:21,25
248:25 249:1,1
249:13,15 250:5
**photograph**
31:13
**photographs**
3:23 246:11
**photos** 240:24
246:6,7,14,18
**phrased** 76:19
**phs** 83:18
**pick** 4:5 56:5
62:15
**picture** 95:14,16
96:6 196:12
**pictures** 248:21
250:18
**piece** 110:8
147:23 228:20
**piechoski** 2:14
12:24 13:4,6
15:17 16:25
20:18 108:7,9
**piechoski's**
12:25
**piergrossi** 154:5
**pinpoint** 204:7
**pipe** 250:3,7,22

**pipeline** 229:3
229:11
**pipelines** 229:6
229:23
**piper** 2:11 46:24
47:3 149:24
**pipes** 137:18,19
177:19,24,25
230:4
**piping** 235:7
**pit** 245:8,20
246:4,6 247:10
248:19 249:1,3
249:12,14,18,21
249:22 250:4,8
250:23
**place** 4:8 7:8
39:9 110:16
165:12 168:5
191:22 253:8
**places** 39:4,11
39:14
**plaintiff** 1:3 2:5
5:12 130:5
**plaintiffs** 1:5
**plan** 3:11,11
64:9,15,24 65:4
65:8,17 73:16
94:2,4 95:20
99:9 103:10
108:13 111:15
114:25 115:10
218:4
**planned** 19:15
**planning** 89:3
**plans** 14:12
133:4

**plant** 31:11 38:7
40:14,16 41:10
41:16 53:17
54:1 55:21
56:13 91:17
93:18 131:10,18
134:24 135:21
137:5,8 157:21
186:11 187:15
191:15,17
197:19
**plant's** 176:13
**players** 119:4
**please** 4:4,6,23
5:4,22 11:21
36:2,11 42:5,14
43:9,23 45:12,25
49:11 51:10
54:10 58:4
60:10 79:13
91:1 94:1 99:10
102:2 105:6
120:15 122:4
133:24 135:8
157:1 158:16
159:11 173:25
180:13 188:5
191:16 192:7
196:2 235:11
236:23
**plumes** 108:1
123:16 125:11
**plus** 61:9 62:10
162:2
**point** 5:20 14:11
32:17 39:9 45:2
50:15 73:1 77:8
78:4 86:22

ALCD-PUBCOM_0001685

87:13 88:5,15,17
89:8,15 90:6,7
90:15 96:20
102:14,17
123:20 132:5
137:8,15 141:21
191:12 194:22
195:13,24 196:6
197:7 200:6
213:22 220:6,15
221:11,12,14
224:8 230:18
231:10 238:7
248:20 249:11
**pointing** 105:3
145:16 204:16
**points** 69:9,18
69:19 85:1 86:1
95:19 144:6
194:21 213:24
213:24 246:5
**pollutant** 199:19
**pollutants**
199:10
**polyethylene**
167:20 177:4,6
**polymers** 25:14
**poor** 127:24
128:18 239:20
240:12 241:13
242:11,14
**portion** 66:13
67:7 73:12
94:24 152:20
187:8 226:22
**portions** 77:11
207:10

**portland** 2:10
**position** 74:24
75:7,8,17 79:25
105:21 106:4,12
106:22 107:8,9
107:13,16,18
117:25 118:3,11
120:10,18 122:7
122:8 124:18
132:7 133:20
144:22 145:3
147:4 177:21
186:22 211:7,14
212:24 213:8,16
225:20 227:10
228:2,14 230:8
236:17,25
241:18 248:23
249:17 250:7
**positions** 10:1
**positive** 104:16
**possibility** 80:4
80:6 146:3
**possible** 55:2
148:15,19,20
237:13 241:8
243:8
**post** 35:3 70:21
**potential** 74:6
125:17 141:15
141:18,24
144:10,16,20,23
201:3 203:12
243:21,23 244:1
244:1
**potentially**
68:22 97:9
118:6,22

**potw** 162:15
163:8 197:20
**pounds** 35:18
37:15,17 158:25
160:23 161:6,10
161:12,19,20
162:2,10,14
164:5 166:9
197:17
**powder** 25:16
**power** 229:21
230:2 231:14
232:15 233:23
234:23 235:16
235:19
**ppm** 235:6
**practices** 176:1
244:4,10,17
**pre** 20:12 40:20
70:20 71:6
80:20 100:22
192:3,10 247:22
**predate** 248:21
**predates** 247:19
**preliminary**
28:17 29:2,6,11
36:22 42:6
48:10 53:5 56:7
64:3,3 80:23
90:25 123:4
**preparation**
10:21 17:9 27:8
125:18
**prepare** 12:17
16:23 17:2
**prepared** 9:25
12:3,11 15:3
31:5 108:12

172:22 248:3
**preparing** 16:6
21:4 23:11
**presence** 119:24
120:10,18 218:3
**present** 2:13
4:25 70:14
103:23 121:24
122:10,21
199:10,25 200:5
200:23 222:3
232:25 243:8,8
**preserved** 232:4
**pressure** 136:4
**preti** 2:9
**pretty** 65:12
205:4
**previous** 53:18
55:22 56:14
71:8 188:3,6
**previously** 133:8
193:16
**primarily**
111:16 137:6
**principally** 38:5
**prior** 7:4,7,14
15:24,25 30:12
82:21 84:2 92:9
93:5 95:11 97:1
97:23,24 99:23
101:23 102:4,15
158:15 163:15
163:19,24
164:20 173:6
174:21 185:15
192:2,2,9 209:9
**private** 4:5
128:10,10

ALCD-PUBCOM_0001686

**probability**
146:10,11 147:6
**probable** 148:23
148:24,25,25
149:1,4,21
**probably** 20:18
89:6 108:10,21
109:3 110:8
127:22 135:24
205:13 232:11
234:4
**problem** 80:12
80:13
**problems** 233:17
**procedures** 43:3
**proceed** 5:4
248:16
**proceeding** 4:23
**proceedings**
1:11 252:2
**process** 9:5
38:17 39:2
41:24,25 42:1,2
54:8,22 64:4
81:4 82:18
92:23 133:5,11
133:14,16
134:16,22 135:6
137:14 140:13
140:23 141:1
156:6,7 163:1
166:15,16 167:3
168:4 180:8
194:13 198:4
200:5,15,16
232:6,14 239:1
**processes** 156:4
178:10 193:15

**processing** 133:6
134:24
**produced** 23:12
23:19,20,24
37:13 107:6
130:5,10,12,13
130:18 150:21
151:3,10,13,15
151:16,17,23
172:5,25 183:13
240:23
**produces** 35:11
35:17
**product** 90:8
109:8,20,22
110:7 133:16
134:6,16 143:13
143:15 159:8,20
163:15,19,25
164:11 170:3
177:12,22
178:17 181:22
193:17 243:13
**production**
37:11,21 42:23
90:11 130:20
135:25 137:18
140:7,11 152:1
155:23 158:7
160:2 164:22,23
165:12,14
176:14,17
177:22 178:8
218:25 235:2
**productions**
151:25
**products** 25:10
25:11,12,13

32:24 35:12,17
37:14 38:1 44:4
45:19 57:15,24
133:13 135:11
135:13,15,22
155:16,20,21,24
155:24 156:1,3,5
157:22 164:8
165:10,20 166:7
166:8,19 181:4
240:5,13 242:3
**professional**
119:9
**program** 20:24
21:2 123:13
125:21 191:18
**progressive**
229:11
**project** 13:2,11
13:13,14,17,18
13:24 16:5,16,24
17:6,17 127:23
128:2
**projects** 15:19
129:5
**properly** 172:22
**property** 11:3,12
11:12,23 12:5,12
14:12,15,18,23
15:9 28:1 30:6
40:4 41:12,17
80:12,15 92:18
92:20 117:7,9,17
118:17,23
123:15,22
125:18 126:1,5
139:18 142:6,14
143:4 148:1,16

149:6 160:17
163:10 177:1
203:8,13 231:13
238:23 245:8
247:18 249:21
249:23 250:8
**protocol** 210:7
**provide** 172:6,9
172:20 173:8
**provided** 22:6
22:13 151:14
169:18 171:4
179:16 214:7
**provides** 161:6
**providing**
119:21 172:8
**province** 171:6
**proximity**
121:16
**public** 1:13
154:25 179:21
179:25 180:4
253:4 254:25
**publicly** 161:3
162:6
**pump** 90:1
**pumps** 90:3
**purchased** 31:10
**purple** 84:20
**purpose** 89:11
182:16 211:9
218:1
**purposes** 174:1
174:4
**pursuant** 220:10
**put** 23:15 39:9
67:13 71:2 95:2
96:20 97:2

100:24 110:15
111:5 133:2
166:21 168:20
191:22 192:25
209:25 210:22
215:6,16 228:21
**puts** 212:24
**putting** 168:18
213:10 214:16
**pvsc** 82:21 87:2
91:9,18,25 92:3
92:4,10 93:5,17
187:25 188:12
190:3,5 191:16
192:20 202:25
203:11 207:3,25
209:19 211:11
211:20,22
213:11,19,25
214:21,24

**q**

**quality** 42:21,25
43:3,15 44:2
45:7
**quantities**
159:13
**quantity** 158:23
159:5
**quarter** 125:7
193:9
**question** 5:21,23
12:10 22:7,8
27:2,12 29:16
30:19 36:11
43:23 50:22
52:20 58:13,13
58:14 76:20

77:2,23 78:4,7
78:14,19,21 79:1
82:5 83:5 102:2
105:25 107:7
111:18 113:21
113:22 117:20
117:21 120:14
122:4,19 123:18
133:24 144:15
145:8 146:25
152:4 153:19
161:11 165:13
168:24 170:6,8,9
170:12,18
171:13 174:1,4
182:12 186:18
203:17 206:24
206:25 207:7
209:22 214:12
217:24 234:16
235:11,14
236:23 237:18
250:6,21
**questioning** 15:1
30:9 50:3
117:11 171:4
172:12 209:9,14
209:18 247:13
247:18
**questions** 16:18
16:21 171:9
203:4 211:22
212:21 216:14
248:9 251:20
**quicker** 99:16
**quickly** 191:12
**quote** 119:24

**quotes** 119:23

**r**

**r** 2:1 49:14 253:1
**railroad** 204:17
204:18 205:5,7,8
206:8 249:6
**raised** 250:3
**ran** 41:9
**ranges** 29:7
**rate** 186:21
**rates** 116:5,6
**raw** 38:6 39:10
39:12,14 42:20
42:24 45:18
135:1 147:12,14
152:14 157:20
158:8 159:25
163:2 164:1,11
164:18 176:12
176:13,17
178:20 179:12
200:13 240:5,13
242:3,8 243:17
**rcra** 242:22
**reach** 136:16,24
**reached** 216:2
**reaches** 104:10
**reaching** 73:7
84:2
**reacting** 168:6
**reaction** 168:12
168:17 175:14
**reactions** 175:12
**reactor** 178:1,16
**read** 44:13 65:13
75:13 78:8
166:22 183:6

186:3 204:1,22
205:1 206:14
208:12
**reading** 56:7
73:15
**reads** 35:16
**ready** 59:22
117:1 160:8
183:25 225:7
**really** 204:4
**reason** 139:21
140:2 155:4
158:18 162:18
163:14 186:8
223:3 254:5
**reasoning**
121:11
**recall** 16:21 19:3
22:17 23:4
117:18 120:9,17
125:1,5 128:23
151:9 178:3
179:20 194:19
195:8 214:10
216:9,15,22
221:23 222:5
231:20,23
**recalled** 125:19
222:2
**receive** 25:24
**received** 10:8
26:3 28:23
46:16 59:18
64:9,24 119:2
129:12 132:12
137:24 153:8
169:8 184:16
187:20 189:11

ALCD-PUBCOM_0001688

**[received - remote]**                                                Page 39

192:17 193:8
198:14 201:25
215:23 217:6
218:15 219:13
223:10 225:3
228:24 234:7
239:10 240:20
245:12 246:11
**receiving** 183:3
**recess** 59:16
116:23 183:22
224:24
**recognized**
118:4
**recommend**
244:24
**recommendation**
63:8 139:7,7
140:21 142:4
143:6
**recommendati...**
143:6
**recommended**
141:22
**recommending**
143:2
**recommends**
139:12
**record** 4:2,9 5:2
23:15 29:10
59:8,11,21
116:22,25
151:12,20
174:10,23
183:21,24
203:17 209:25
210:16,23
212:15 214:5

217:18 222:23
224:20,23 225:1
248:8 250:16
251:8,11,13,16
252:1
**recorded** 4:11
45:6
**recording** 4:7
**records** 57:14
101:15 130:15
130:17 152:11
158:7 159:24
219:1 250:15
**recovered** 82:13
**recycle** 193:15
**red** 68:11 69:9
69:18,22 70:4
79:6,6 206:12
**refer** 6:19,25
11:11 35:21
194:23
**reference** 152:12
245:9
**referenced**
124:24 184:6
193:1
**references** 45:20
247:10
**referencing**
250:4
**referred** 29:3,18
110:23 170:20
**referring** 6:20
33:5,12,14 35:23
44:9 68:7 246:8
**refers** 28:17 30:1
57:12 66:8
124:7 176:6

246:21
**regarding** 19:23
20:7 217:2
223:15
**regardless** 203:4
**regulatory**
122:14
**rejected** 120:25
**relate** 247:16
**related** 4:20 7:22
80:16 130:24
253:10
**relating** 130:15
**relation** 205:10
**relationship**
127:24 128:19
**relative** 253:13
**release** 76:12,12
76:25 77:1
79:22 80:11
127:4 128:14
148:12
**released** 126:18
127:11,25 239:2
239:3,4,5
**releases** 74:23
75:5,21 76:7
181:22
**relying** 49:8,9
**remain** 40:17
**remainder** 151:3
**remained** 40:10
41:20 160:17
**remaining**
166:24 168:21
168:25 226:13
**remedial** 3:10,11
3:11 59:17 60:7

62:11,17 64:4,8
64:15,23 65:4,8
65:17 72:2
73:16 94:1,4
95:19 99:9
103:9 108:12
111:14 114:24
115:9 119:19
123:3 237:20
**remediate** 14:12
**remediating**
13:19,22 17:22
**remediation** 7:9
13:2,5,7,14,17
13:17,24 14:1,3
15:13,19,23 16:5
16:15 17:6,13,17
17:20,21,25 18:6
20:23 21:2
24:17 25:5 54:7
54:13,21 60:17
64:13 66:12
76:1 77:20
88:24 115:23
119:9,13 129:3
180:8,15 182:6,9
231:12 244:16
244:22
**remedy** 109:1
110:16,22,24
111:5
**remember** 9:13
9:14 18:14
19:12 117:10
195:6 214:9
**remote** 2:16 21:6
21:14 22:3

ALCD-PUBCOM_0001689

**remotely** 5:1
**removed** 250:20
  250:23 251:1,1
**renew** 127:14
**rep** 23:17
**repeat** 12:8
  30:19 36:11
  43:23 50:21
  54:10 70:13
  71:22 79:13
  133:24 135:8
  159:11 180:13
**rephrase** 29:16
  58:12 111:12
  123:18 153:18
  186:17 227:9
  231:19
**replace** 102:10
  190:10
**report** 3:10,14
  3:20,22 17:17
  29:6,11 59:17
  60:7,12 65:23
  119:19 120:4
  153:7,12 154:13
  155:9 156:10,23
  157:8,14 198:3
  216:17 225:2,10
  238:5 239:10
  242:4
**reported** 201:14
  201:15
**reporter** 1:13
  4:18 5:3,16
  26:16 78:8
  253:4
**reporting** 254:1

**reports** 123:19
  123:24 124:2,3
**represent** 5:11
  65:2 84:21
  88:13 109:23
  187:24
**representations**
  173:7 248:11
**representative**
  6:11 8:6 9:17,21
  10:2,13,21 22:9
  43:14,19 44:7
  49:5 56:9 58:11
  63:24 66:24
  122:7 160:11
  162:18 210:4
  211:7,10,14
  218:8
**represented**
  97:12 104:19
  105:17 106:9
**representing**
  4:16
**request** 23:16,19
  91:9 182:21
  216:8 217:3
**requested** 125:2
  216:2
**requests** 191:3
  218:3
**required** 42:22
  56:21,23 123:14
  210:15
**requirement**
  176:10
**requirements**
  57:2

**requires** 167:4,6
**research** 25:9
**reserves** 8:25
**reshuffled** 129:4
**residential** 66:11
**respect** 13:7
  17:16 18:9,15
  19:2 20:19 21:2
  33:17,18 62:7
  70:4 79:15 89:7
  90:5 109:12
  110:11,22
  111:11,13,24
  114:13 115:15
  120:10 123:19
  124:23 151:21
  175:4 178:19
  182:14 187:25
  189:22 208:9
  213:6 215:5
  227:10 237:25
  238:2 245:3
**responded**
  216:16
**response** 28:2
  36:4,14,14 37:4
  37:21 157:6
  186:21,23
  216:13
**restate** 52:20
  102:2 146:25
**result** 70:15 74:5
  174:18
**results** 3:21
  64:20 65:20
  222:10,17 234:6
  234:11

**retained** 219:16
**retaining** 103:3
**retry** 27:2
**reused** 81:11
**review** 21:8
  23:10 27:8
  33:20 122:15
  125:16 150:5,14
  151:25 188:3,6,9
  188:11
**reviewed** 10:20
  22:5,12,17 23:18
  23:25 39:1 93:4
  149:25 169:19
  178:23 190:5
  192:14 214:2,19
  215:12,18
**reviews** 32:8
**rexall** 57:19
  247:1,7
**right** 4:1 6:13,23
  7:1 8:9 9:15,15
  9:19 10:19 11:8
  11:10,13,19
  12:22 14:10
  15:16,20,22
  16:12 20:5
  22:11,15 23:2,3
  24:14 25:3 27:7
  27:11 28:10,12
  28:18 29:9,20
  30:7 31:6,8,10
  31:14,18,20 32:2
  32:12 33:7,9,11
  33:16 34:21
  35:18 37:22
  38:10 39:22
  41:13 42:4 45:3

ALCD-PUBCOM_0001690

45:10 47:15,22
48:11 51:20
52:4,23 53:3,12
53:22 54:3 55:3
55:11 56:6,15,25
57:15 58:8,16,20
59:6 62:18
63:19 64:2 65:5
66:22 67:23
68:16,20 69:16
70:1,4,6 72:2
74:17 77:6 80:6
81:19 82:16,24
83:8,15 85:1,7
86:1,8,13,16,25
88:4 89:18
91:10 93:2,10,15
94:11,17,25 95:1
95:4,22 96:9,24
97:12,19 98:4,11
98:12 99:7,21
101:1 102:20
103:8 105:25
106:12,18
107:10,23,24
108:14 110:17
111:6,24 112:5
112:16 113:5,6
113:10 114:6,12
115:14 116:18
118:10,21,24
119:15,19
120:16,23 121:3
121:5 122:1,19
122:23 123:1,6,7
123:9 124:9,22
125:23 126:15
126:20 127:4,15

128:12 129:17
129:25 131:7,10
131:24 132:10
133:2,17 134:7
135:3,14,20,22
136:21 137:1,12
137:22 138:19
139:11,24 140:1
140:11,15,20
141:4,14,21,25
142:6 143:8,21
143:22 144:1
145:12,23 146:1
147:17,25
149:16 150:5,13
151:7 153:6,16
154:1,5,17 155:5
156:24 158:13
159:12,14,19
160:4,23 161:17
161:22,25 162:8
162:16,23,25
163:20 164:6
165:8,15 166:13
166:14 167:1
170:24 173:12
173:22 174:16
175:21 176:11
176:22 177:9,16
178:1,2,15,18
179:14 180:6
181:13 182:5,8
182:11 184:3,11
185:8 186:9
188:14,18 189:1
189:6,9,20 190:6
190:17,20 192:1
192:5,15 193:9

193:21,23,24
194:2,4,13
195:19 196:13
196:19,25 197:2
198:7,23 199:13
199:23 200:7,16
200:25 201:4
203:6 205:2,22
206:5,5,9,20
207:11,15,20
208:5,6 209:24
213:7 214:22
215:1 216:6,11
217:4,10 218:4
218:24 219:19
220:9 224:11
225:16 226:5,15
226:19,22,23
228:15 229:18
229:25 231:8,9
231:10,15
232:16,19
233:19,24 234:3
234:14 235:3
236:9,13,16
237:15,22
239:25 240:9,11
241:13,17,20
242:3,20,23
243:14,19
244:11 246:23
247:1 248:21
249:15 250:1
251:3

rir 62:3 119:18
121:5,7 124:18
231:21 232:6,14
238:5

river 94:21 95:3
182:5 203:9
205:1,11 206:2
206:13,16
207:10 211:2,3
213:12 214:17
road 204:14
210:5
robin 5:5 27:14
27:16
rocket 25:16,16
role 17:15,24
24:18 25:5
128:14
roles 25:8
room 26:9
rooms 59:13
route 203:13
211:2,8
routes 203:7
211:1 212:3
routine 233:11
routinely 44:24
rule 210:15
rules 210:5,8
run 29:14
100:15
runoff 96:13,15
96:17,25 97:6,15
97:25 100:3,14
142:17 144:9
146:3
runoffs 142:8,13
142:21
runs 87:24
194:13
russell 128:22,23
246:1,1

**[rust - second]**

**rust** 33:2
**ruthanne** 1:12
  4:18 253:3,20

**s**

**s** 2:1,11 3:6
  49:14 208:15,18
  254:5
**safety** 46:20
  152:14 176:6,7
**sales** 32:10,21,25
**salt** 168:18
**sample** 54:7,16
  56:11,21 63:16
  71:1 123:15
  125:3 139:8
  140:16,22
  141:22 142:5
  143:9 182:22
  188:20,22 201:6
  218:7 219:7
  220:6,8,10,14,22
  221:11,12,14
  222:16 223:5
  225:23 228:12
  236:1
**sampled** 63:14
  63:25 64:20
  71:15 143:10
  181:23 234:17
**samples** 43:14
  43:20 44:7,15,19
  44:20,21,21,23
  45:5 55:8 61:1,3
  61:7,14,21,25
  62:9 67:17
  69:22 72:1
  79:21 113:10

114:2 139:13,15
197:24 219:19
220:25 221:15
221:16 222:6,11
222:15,21,24
223:5 224:2,4
225:15,20 226:9
226:12,13,18,24
227:21,23 228:5
228:9,22 230:3,3
230:9 231:7,21
232:1,5,12,22,25
233:3,4,12
234:11
**sampling** 54:22
  60:2,22 62:3,3
  62:12,17 64:20
  65:20 68:8,11
  69:10 72:11
  111:7 139:6
  141:6 143:2
  182:23,25
  200:11 216:3
  217:3 218:2,4
  219:22 221:18
  221:20,21 222:4
  222:10 223:15
  223:25 226:1
  227:5,11,13,16
  230:18,25 231:4
  231:17,20
  233:17,20
**sanitary** 85:11
  85:12 87:12
  88:11,11,18,20
  186:20 187:8
  196:22,24

**saw** 16:25 33:19
  90:21 138:18
  150:25 178:3
  179:11,19 187:7
  187:24 190:2
  222:3 242:4
**saying** 56:15
  66:8 77:24
  82:11 85:8
  106:17 122:16
  124:13,17,17
  149:4 163:7
  217:15 232:13
  236:10 237:8
  247:25
**says** 31:1,10,12
  31:15,16 32:20
  32:23 34:11,19
  35:19 42:20
  44:6 45:5 47:16
  53:11,16 57:12
  61:1 66:9 68:15
  69:20 73:16,25
  74:5 82:17
  91:12,12,15,18
  97:14 100:1,11
  100:24 103:21
  104:15 115:13
  119:23 121:4
  124:6 131:15
  132:1 133:18
  136:1,13 137:11
  140:9,9 152:9
  154:11 155:2,13
  158:6,7,12,18
  162:14,19
  166:18 168:20
  176:12 177:10

186:9,19 187:4
190:25 193:15
193:16 218:1,7
218:21 219:6
221:17 228:8
229:11 231:3
241:8 243:12
247:1
**sba46q3** 113:12
**scare** 25:1
**scattered** 241:9
  241:11,15,19,23
  242:10,14
**science** 25:18
**scope** 50:13,19
  59:2 76:6,18
  109:16 110:11
  116:2 131:1
  171:8,16 172:14
  172:18,19 173:3
  174:21 179:24
  202:23 203:6
  210:1,11 244:19
  245:2,4 247:13
  247:23 248:2,5
**screening** 69:11
  69:15 113:4,6,14
  113:17,20,24
  114:4
**second** 9:4 26:18
  35:9 42:19
  43:13 45:17
  49:11 60:25
  82:17 83:4 94:8
  94:13 99:25
  103:20 120:5,5
  131:11 132:2,22
  132:23 134:23

ALCD-PUBCOM_0001692

[second - sewer]                                                                                    Page 43

134:23 140:22
152:7,8 154:10
188:9 193:6
199:12 218:6
225:22 229:10
229:17
**secondary** 97:1
102:12,15
**seconds** 171:21
172:15
**section** 29:22
31:22,25 32:4,5
32:6,11,15,16
33:8,8,17,20
34:20,24 35:2,23
42:8,15 43:9
45:12 53:7,10
60:15,15,16 62:1
65:22 66:3 81:4
91:3 94:7 99:22
103:19 119:22
154:23,24 161:5
167:16 193:24
**sections** 36:21
**sediment** 232:1
**sediments**
231:22
**see** 10:12 11:2
11:21,25 19:18
26:7,19 27:23
28:6,12,25 30:1
30:25 31:1 34:7
34:16,25 35:11
42:15 43:9,16,25
44:8 45:1,7,14
45:21 46:5 47:5
47:9,19 48:22
49:12,15 51:11

51:14 53:6,11,20
55:14 57:18,21
60:6,16 64:14
66:14 67:1,7,16
67:22 73:25
74:3,8,9 75:12
80:10 81:3,12
82:22 86:4,11
91:5,21 94:7
100:4 103:17
104:2 117:23
121:19 128:11
129:20 130:3
132:19 136:7
138:5,17 139:20
150:21 152:12
152:24,25 154:2
154:14 155:11
156:11,13 157:4
157:10 158:6
161:4 165:7
168:19,23 170:6
170:10 176:2
180:2 181:5,6
183:12 185:25
186:9 189:15
190:10 193:1,7
194:14 195:14
197:25 198:19
199:13,20
200:23 202:5,11
202:15,17
203:18,24 204:9
207:1 208:21
209:4 212:22
213:3 218:10
220:12,14,23
222:8 225:9

229:2,16,21
235:4 237:10
239:1,16,21
240:2,7,25 241:5
245:5,9 246:22
247:6 249:2,14
**seeing** 214:9,10
**seek** 102:19
183:11
**seen** 10:16 40:13
43:5 65:7 70:18
88:14 93:4,8
107:5 125:14
132:9 138:11
151:22 152:20
169:2,22 170:1
170:20 186:7
189:22 190:4,18
215:8,10,11
218:25 221:25
222:10 238:13
244:22
**selected** 3:14
153:7,11 154:12
156:23 157:8,14
161:2 216:17
**sell** 14:15,18
**senior** 17:20,24
18:6
**sense** 162:24
**sensitive** 4:5
**sent** 23:16 93:8,9
153:15
**sentence** 33:4,12
34:19 35:10,11
35:16 42:20
45:4 53:15
57:12 73:25

81:13 82:17
91:15 99:25
103:21 133:10
136:1 218:6,20
218:21 219:23
229:2,10,17
240:9
**sentences** 31:9
33:21 91:15
120:6
**separate** 178:4
**separated** 103:3
**september** 3:18
217:3,5,25
**services** 219:17
**session** 21:7,16
21:18
**sessions** 21:7,19
22:2
**set** 29:7 69:12
150:25 253:8
**sets** 22:23
**seven** 103:15
115:12
**sewage** 187:25
198:4 202:3
203:11 211:15
211:16 212:4
213:9 215:6
**sewer** 3:16,17
81:16,24 82:7,15
82:25 84:2,8,21
86:21 87:24
88:1,7,7,11,18
89:19 90:2,9,15
90:19,22 91:4,16
91:19,25 92:3,3
92:8,10,13,21

ALCD-PUBCOM_0001693

[sewer - site]                                                      Page 44

93:8,12,17 98:20
137:5,9,15,20
140:24 141:2
142:24 145:4,10
145:21 147:3
150:24 151:2
161:8,13,21
162:3,10,11,25
163:20,25 164:3
180:11,19
181:20 184:5
185:2 186:20
189:5,10,17,23
191:4,5 192:5,11
192:22 193:21
193:25 194:12
195:18,25 196:8
196:11,15,22,23
196:24 197:11
198:13,17
201:22 212:25
213:10,20
214:16,25 215:6
215:17 239:4,4
**sewerage** 1:6
**sewers** 100:2
213:23
**shallow** 103:24
104:6
**shannon** 16:1
128:17 129:6
**shared** 125:8,13
**sheet** 152:15
176:7,8 179:16
179:19 181:6,6,8
183:11,17 254:1
**sheeting** 167:20
177:4,6

**shield** 247:8
**ship** 160:8
**shipped** 159:5
**shipping** 159:7
159:21
**shop** 133:7
**shortcut** 117:24
**show** 38:4 41:8
80:9 123:24
158:7 167:16
168:19 187:22
201:22 223:8
239:8 246:6
**showed** 159:24
179:10
**showing** 248:24
**shown** 52:7 66:9
113:7 196:12
**shows** 114:9
220:8
**side** 89:8 142:6
142:19 143:4
190:20 246:23
247:10
**sides** 151:13
222:17
**signature** 189:15
253:19
**signed** 27:14
198:23
**significantly**
74:7
**similar** 37:24
53:18 55:22
56:1,2,13 102:11
**simons** 129:24
**simple** 134:25
135:17 217:23

**simpler** 77:2
113:21 182:13
207:7
**simply** 27:3
76:14 113:22
**single** 218:20
**singmaster**
132:17
**sink** 81:10 90:14
235:5
**sir** 5:21 6:23
7:14 12:16 27:4
28:8 29:1 32:7
42:11 48:5
49:18 54:4 62:4
85:24 87:16
91:7 94:12
105:20 117:1
144:22 194:16
195:4 198:2
215:2 220:4
248:18
**sit** 149:20
**site** 6:16,19,20
7:1,5,9,9,10,22
7:24 8:13,17 9:6
11:7 13:5,8,20
13:24 14:4,8
15:14,18,24 17:6
17:13,16 18:9,15
18:20 19:3,8,13
19:15,16,20,24
20:8,11,20 21:2
28:11,16 30:10
30:12 31:14
36:7 37:6,11
38:2,8,8,11
39:24 40:2,3,9

40:15,16,22 44:1
44:20 49:1,25
51:2,6,21 52:2,5
52:10,11,21,22
52:25 53:19
54:6,14,23 55:15
55:23 56:14
60:8 61:18
62:23 63:17,21
63:25 64:6,15
66:25 67:1,4,5,7
67:16,21,22
69:10 70:10,15
70:19,22 71:7,9
72:18 73:1,5,10
73:12 75:1,5,10
76:2 77:5,9,22
79:16,23 80:1,5
82:25 84:21
85:1,25 86:9
87:4,13 90:3
91:13 92:9,24
93:11 94:10,20
95:12,21 96:7,13
96:16,18,25 97:7
97:15,15,25
100:3,14 101:2
103:4 104:5
105:22 106:6,17
106:23 107:14
108:4,21 110:1
112:10,14,15
115:8 117:15
118:1,9,12,13,18
118:18 119:8,9
119:13 120:1,2
120:10,12,20,21
120:24 121:23

121:25 122:1,11
122:11,21,22,23
123:6 124:7,9,10
124:12,20,24,25
124:25 125:3,6
125:17 128:1,1
128:15,21 129:3
130:16,24 131:4
133:2 135:10
136:12,15
143:11,13 145:6
147:15 150:3,15
155:14,19 156:2
156:5 157:19
158:24 159:1,6,8
159:14,17 160:8
160:12,21
161:14,22 162:3
164:2 176:10
177:25 178:11
179:7 180:9,10
180:16,18,21
181:16 182:2,7
182:10,18 183:1
184:11 190:20
192:4 194:21
195:13 196:6
197:6 201:21
205:10 206:12
207:1,11,23
211:1,3,8 212:4
218:2 221:21,23
222:15 226:22
227:17,19,19
228:1,16 229:23
230:9 232:1,22
234:12,15,20
236:20 237:3,21

238:12,17,21
239:7,14 240:24
242:17,19,21
245:4 249:3,7
**site's** 189:22
**sites** 17:22 18:5
28:11 77:20
78:2 102:11
128:5 234:17
**sitting** 23:3,23
87:9 106:21
107:9,13 150:4
169:24
**six** 11:21 149:12
155:8 203:7
211:1
**sixth** 154:17
**skipping** 137:4
**slop** 235:5
**slr** 128:22
**small** 2:11
204:11
**smaller** 114:11
**soil** 54:17,22
60:22 61:1,14,21
61:25 66:11
68:7,11 69:11,18
71:1,2,18 72:13
72:19,23 73:7
74:13,16 79:10
79:16,20 113:23
114:2,4 117:7
118:1,4,13,17,19
118:23 121:24
122:10,17,22
143:2 181:20,24
**soils** 113:3
115:25 142:23

143:9
**sold** 15:9 32:24
160:15
**sole** 152:25
**solid** 51:23 76:9
76:23,24 77:1
135:1 168:1
**solids** 147:18
**soluble** 25:13
**solution** 166:25
175:9
**solve** 80:13
108:3
**solvent** 58:21,24
59:4 71:10
135:2 166:20
168:15,20
**solvents** 57:25
58:8,16,19 70:19
70:25 71:2
136:2
**somebody** 20:16
124:16 129:24
208:3,4 233:17
240:23
**sophia** 2:19
**sorry** 8:1 21:22
23:9 24:24 30:7
32:22 38:7,15
46:24 50:21
54:19 60:13
66:19 72:7
80:25 84:10
85:17 135:8
140:13 146:7
165:4 167:23
185:19,23 188:5
190:21 192:7

194:5 195:2
196:3 206:23
214:4 216:1,19
226:2 230:20
235:10,13 243:5
246:24
**source** 79:24
80:1 117:8
118:5,5,18,22
123:21,25
124:11 130:19
236:19 237:6,11
237:13
**sources** 118:12
120:2,13,21
123:5 124:8,20
163:6
**south** 89:10
94:20,23 95:6,21
96:7 97:14
107:23 120:2,21
123:5 124:8,10
124:14,20
145:13 205:6
243:9 245:8
247:10 249:3
**southeast** 66:13
145:13
**spare** 251:9,10
**speak** 13:3 16:9
17:8 26:17 87:7
152:1 196:10
243:2
**speaker** 26:11
**spec** 179:15,19
181:6,8 183:11
183:17

ALCD-PUBCOM_0001695

[special - study]

special 78:12,18
78:24 173:7
248:12
specific 19:1
22:17,19 37:20
135:9 147:13
155:9 157:8
160:22 172:6
specifically
108:22 134:21
247:14
specs 181:12
speculate 242:13
242:14
speculation
71:21 74:21
75:3 76:18
163:5 181:10
243:16
spencer 2:21
spend 19:19 21:4
spill 76:12 79:22
80:11 148:17
149:6 181:22
spilled 150:3
spills 74:6,13,19
74:23 75:1,5,9
75:15,17,21 76:3
76:7,16 77:15,25
79:11,18 81:23
82:2,2,6,18,24
141:11,15,18,24
142:12,13
149:18,21 150:1
239:1
split 233:3,4
spoke 16:22 17:1

spread 67:16
square 156:14
squarely 203:12
210:25
st 2:3
stable 103:22
staff 40:9,22
41:2,13
stamp 172:25
175:20
stamped 23:25
28:22 46:15
119:1 151:14
173:1,1,2 192:16
stand 5:18 23:4
213:4
standard 66:12
67:8
standards 42:22
43:1 67:18
112:18
standing 98:11
98:14
stands 50:17
66:11 125:23
203:15 205:13
209:10
start 7:17 10:25
12:18 13:19,23
14:5 32:22
34:25 48:17
84:25 94:5
132:24 133:15
141:16 201:4
220:4 245:25
started 132:8
starting 12:5
39:24 83:16

starts 28:16
34:24 42:8,15
43:13 81:7
99:22 130:4
199:11
state 1:14 4:24
29:10 75:12
126:25 181:24
253:4
stated 30:22
190:13
statement 66:17
136:10 157:24
states 1:1 30:5
34:15 35:11
47:6 134:22
158:24 161:2
191:16 225:24
243:7
status 209:1
stauffer 49:13
49:23 50:25
stayrook 119:15
stenographic
1:10 5:2 253:6
step 166:22
stickers 224:19
stop 74:16
stopped 14:7
127:4 159:7
storage 39:3
45:18 46:2,3,7
91:13 101:3,25
102:6 130:23
132:3,6 143:12
143:18 144:5,9
177:14,15,18,23
241:23 244:9

store 244:4,11
244:17
stored 39:10,12
39:14,15 42:22
46:6,9 47:7,14
47:17 48:25
49:2,7,24,25
50:25 51:2,5,6
52:10,11 58:6
121:15,16
143:15 176:5,13
177:1 232:4
242:17,18
243:14,20
244:22,25
storm 87:24 88:1
88:7 89:19 90:2
91:3 100:2,16
stormwater
82:18 85:11,13
85:23 86:3,21
87:13 88:12,20
89:7,9,13,15,16
90:6,15 96:25
97:6 98:15,22
99:1,6 100:14,15
195:12,23 196:6
196:18,22,23,24
197:6,11 229:14
229:15
straight 213:11
streams 81:4
street 206:15,16
studied 213:25
studies 107:20
study 188:25
213:21

**stuff**  148:16
**subject**  15:5
50:10 121:15
202:24 203:1
212:10 233:22
**subjects**  13:3
**submitted**
188:12
**subpoena**  23:16
**subscribed**
254:22
**subsidiary**  34:13
**substance**
155:17 158:8
159:25 161:2
238:21
**substances**  3:14
50:5 53:17 54:5
55:14,21 56:12
57:13 153:7,12
154:12 156:23
157:8,14 212:25
216:11
**successfully**
229:12
**successor**  24:15
39:20 217:12
**successors**  24:8
24:12
**sugar**  168:18
**suggest**  63:20
151:24
**suggested**  63:24
144:15
**suggesting**
225:14
**suggestion**
140:16

**suggests**  141:5
**summary**  46:2
228:21
**sump**  228:12,15
232:6
**sumps**  231:22
232:1
**sun**  31:11 133:12
**super**  170:5
**supervised**  218:8
**supplier**  152:17
152:19 153:1
156:18,22
**suppliers**  152:22
153:4 156:21
**sure**  8:21 12:9
21:21 22:24
30:20 37:2,13,24
38:18 39:13
40:8,20 43:24
44:13 50:23
54:11 57:8 59:9
71:23 79:14
80:21 87:17
89:23 102:3
122:5 130:9
133:25 141:20
145:18 147:1
171:7 176:9
180:1,14 192:8
196:4 200:21
205:20 210:3
217:21 233:18
233:25 235:12
236:24 243:18
248:7
**surface**  68:20
74:15 76:22,23

94:9
**surfaces**  73:17
74:1,12
**surprised**  180:24
**surprisingly**
210:19
**survey**  3:15,15
130:19 184:10
184:15 187:19
188:2,4,7,11
218:2
**surveys**  92:13
93:8 150:24
151:2 190:4
**suspect**  200:22
**svocs**  61:7,9 62:9
62:10 66:2
**swale**  89:9 95:21
95:23 96:8,12
97:1,7,14 98:1,5
98:6,10 103:4
**swear**  5:4
**sweepings**  81:23
82:1,3,6
**swept**  82:14
**sworn**  5:6,15
253:7 254:22
**symbol**  202:12
**system**  81:16
82:7,19,20 83:1
83:3,10,17 84:2
84:8,18,21 87:2
90:19,22 93:12
93:17 98:20
99:6 103:21
115:8 137:5,9,15
137:20 142:25
145:4,10 161:13

161:21 162:3,11
162:11,25
163:20,25 164:3
184:5 185:2
189:5 191:25
192:11 194:20
195:7 202:14,16
202:25 203:11
203:20 205:9
207:2,24 208:10
209:2 212:5
214:16,25 215:1
215:6,17 229:7
231:14 234:20
**systems**  91:4
157:23 213:20
229:14

**t**

**t**  3:6 49:14 61:11
208:12,18 253:1
253:1
**tab**  214:9
**table**  45:20,24
46:1 66:10
199:8 204:25
**tables**  29:12,13
198:1
**take**  4:8 20:18
23:22 25:18
44:15 59:7
168:5 183:19
230:3 234:5
**taken**  1:12 44:20
44:24 59:16
67:17 72:1
105:17 116:23
125:24 131:10

ALCD-PUBCOM_0001697

[taken - things]                                                                    Page 48

171:20 172:15
177:3 183:22
220:8,10 221:1
222:21 224:2,24
225:15,21
226:14,18,25
227:24 228:5
230:9 231:22
232:1,14 233:4
234:12 236:1,6,8
240:5,13 242:3,8
253:12
**takes**  248:5
**talk**  53:9 64:19
  72:24 83:4
  139:3 147:12,13
  164:8 182:25
  184:4 211:1
  228:7
**talked**  11:7
  36:21 71:24
  114:20 163:1
  175:25 176:4,15
  176:21 195:12
  215:14 242:2
**talking**  34:3 35:9
  60:1,3 65:19
  96:7,7 117:6
  124:3,12 146:15
  146:17 182:6
  183:14,16 214:4
**talks**  45:17
  57:18 95:20
  166:15 168:4
  176:1 192:24
**taniguchi**  2:20
**tank**  101:7,16,19
  102:5 132:2,3

135:2 166:21
168:20
**tanks**  39:3 46:3
  46:7 101:4,25
  102:6,10 143:16
  177:14,15,18
**tcdd**  179:8,13,17
  181:23 182:24
  183:8 199:14,25
  218:3 219:7
  236:1,10,18
  237:1,7,9,10,11
  237:16,20 238:2
  238:10,15,16,23
**tcp**  61:15,18
  62:13,15 64:5
  147:14 149:5
  150:2 152:15,17
  152:23 154:20
  156:10,18 157:9
  157:13,19,19,25
  158:3 159:9,13
  159:16 160:3,12
  160:17 161:8,12
  161:20 162:2,10
  162:24 164:1,9
  164:10,17 166:1
  167:3,9,14
  168:15 169:3,15
  175:4 178:19
  179:7,16,22
  180:3,3,9,18,21
  180:22,23,24
  181:16,19
  182:17 183:3,9
  183:11,17
  197:17,20 200:7
  211:15 216:4,18

218:22 219:1
237:13 238:18
238:19 239:3
242:16,17,17,19
**team**  182:1
**tease**  187:10
**technical**  110:1
**technologies**
  34:1
**tell**  7:13 14:2
  113:11 139:20
  173:16,18 203:6
  221:25 230:19
  249:11
**telling**  105:20
  134:15 149:19
**temperatures**
  136:5,11
**ten**  10:20 14:24
  15:2 67:12 68:1
  107:15 150:7,8
  150:18,18,20
  151:3 172:6,20
  203:1
**tentatively**  61:9
  61:12
**tenth**  248:6
**term**  202:13
  235:19
**terms**  18:8 58:13
  185:6,14
**test**  22:16
**tested**  42:21,25
**testified**  15:18
  110:6
**testifies**  15:6
**testify**  9:25 12:3
  12:11 31:5 50:8

210:12 245:3
**testifying**  202:22
  212:11,12
  247:22
**testimony**  37:4
  41:19 115:20
  116:2 170:15
  171:14 174:21
  211:25 212:1
  233:14 236:22
  244:13 248:1,14
  248:14
**testing**  43:15
  219:17
**texas**  2:4
**text**  29:11,17
  60:6 65:17
  208:8
**thank**  9:15 10:10
  10:11 27:1 47:3
  50:20 66:5
  73:21 84:19
  184:8 194:10
  209:7 230:21
  234:9 245:18
  251:24
**thanks**  84:14
  173:12 175:2
  184:23 204:20
**thing**  62:7 83:10
  83:10 124:6
  130:2 181:5
  214:22 228:7
**things**  25:17
  54:15 76:11
  82:14 107:25
  108:2 123:12
  149:1,2 178:15

ALCD-PUBCOM_0001698

[things - transport]    Page 49

182:1 222:18
246:3
**think** 9:2,11
13:16 14:19,19
14:22 19:22
20:6 23:23 37:8
37:9 39:9 41:19
44:18 53:23
55:25 58:12
59:14 64:21
76:18 78:9 80:8
110:6 114:18
118:3,15 122:25
144:19 151:18
160:16 167:15
169:11,17
175:25 179:19
184:6 203:3,12
204:16,21
205:13,14
206:17 212:1
213:1,2 217:11
221:22 222:17
233:3 242:9
246:1 248:4,25
251:23
**thiocyanate**
49:17,24
**third** 1:5,7 10:25
73:25 101:14
140:10 218:1
221:6
**thirteen** 24:5
**thomas** 2:13
4:16
**thought** 124:19
222:2 235:14

**three** 3:23 7:16
13:12 15:19
17:7 21:6,7,12
21:13,14,21
45:12 49:13
51:12 53:7 85:1
85:16,19 95:11
95:20 152:14
155:13 157:16
189:16 193:25
194:1 195:18
196:12 220:18
241:8 246:5,11
246:13 248:13
**thursday** 1:16
**tic** 61:9 62:14,15
**tics** 62:10
**tidal** 94:24
**tig** 3:10,16 46:16
173:2 192:17
**time** 4:2,6 6:5
7:15,18,19 8:10
9:3,12 12:5,13
14:11 21:4 28:5
36:24 38:3
39:11 46:10
48:9 51:2,22
54:1,19 59:10,20
61:24 62:2
64:21 72:5,7
77:21 78:10,12
78:15 79:13
94:24 104:18,20
105:11,13,24
106:11 107:3,8
110:10 116:21
116:24 117:20
119:12 120:14

120:25 121:22
122:24 123:7
124:1,17,19
129:6 132:5
137:8,15 138:16
157:8 158:6
172:9 183:8,20
183:23 184:7
185:7 187:15
188:18 190:12
191:21 199:4
200:6 201:16
212:16 213:9
224:22,25
232:12 242:16
245:15 248:6,13
251:7,25
**times** 6:3 19:7
39:4 40:19 78:4
78:8 113:23
114:1 124:24
248:5
**title** 12:25 16:2
17:19
**titled** 43:10
**today** 5:17,20
6:19 7:1 9:16,25
10:17 11:8 12:3
12:11,18 16:7,10
16:23 17:10
21:5 23:23
87:10 101:7
106:13,15,21
107:9,13 124:4
125:18 128:8
129:9 169:24
184:7 195:9
201:20 216:12

232:7 244:10,17
244:24 248:5
**told** 125:12
223:14 237:23
**top** 23:7 30:2
47:16 65:20,24
73:24 85:10
99:24 132:24
152:9 154:11
157:17 158:6,23
164:23 166:10
239:16,24
**topic** 11:20,22
30:13 210:25
**topics** 9:20 10:2
10:21 14:23
15:2 30:9
172:18 209:11
212:8 247:14,16
**total** 24:22,25
71:7 139:12
161:2 166:7
170:2
**totally** 107:19
210:20
**totes** 147:16
148:16 149:5
150:2
**town** 100:2,21
101:14
**track** 249:6
**trade** 165:1
**train** 235:14
**transcript** 1:10
253:6
**transition** 246:2
**transport** 134:8
134:11,11 147:7

ALCD-PUBCOM_0001699

**transported**
134:15 145:6
147:14
**trash** 176:25
**trashed** 177:7
**treatment** 33:2
82:20,21 83:3,9
83:17,21,22 84:2
93:6,17 131:17
131:19 145:6
161:3 162:7
191:21 192:3,10
**trevor** 2:20
**triangle** 114:11
**tributary** 94:17
95:3
**trichlorophenal**
52:2
**trichlorophenol**
51:18,21 58:21
**tried** 183:17
**trillion** 236:15
**trip** 19:14
**true** 14:16 20:20
31:23 38:22
39:5 41:21 54:1
54:2 55:8,23
62:16 66:17
72:4 73:7 83:22
84:22,23 85:6
87:2 89:8 90:1
90:18 97:3,16
101:10,25 116:7
119:9,13 121:8
123:10 128:1
131:20,21 135:6
154:20 163:15
165:17 167:9

185:11 187:15
195:20 219:2
253:5
**try** 108:2 223:21
**trying** 9:11
44:18 123:13
**ttd** 179:12
**turn** 34:23 222:8
**turnpike** 204:15
**twenty** 186:24
**two** 7:16 9:5
21:6 22:23
24:13,21,23,25
27:24 28:7,15
29:3,8,18,22
30:25 31:9 32:6
32:15,16,17
33:17 36:5,15
37:5 47:25 48:2
48:4 58:19 70:1
81:24 86:8
91:14 114:2
118:9 149:1
157:2,16 168:7
171:21 172:15
184:7 190:4
193:14 194:1,1
194:12,15
197:10 198:1
218:21 227:21
228:9 232:12
248:13
**type** 25:12 38:24
76:8 111:16
142:21
**typical** 166:18
167:8

**typically** 147:7
245:5
**typo** 186:11

### u

**u** 49:14
**uh** 33:10 79:8
124:5 130:7
145:14 165:16
166:17 220:17
221:10
**ultimate** 14:20
110:15
**ultimately** 14:15
14:18 123:2
**unconfined**
103:23
**understand** 5:13
5:16,21 6:20
9:16,21 11:15
50:15 76:1
80:19 92:16
108:2 110:13
115:24 123:13
124:11 169:23
182:13 214:24
214:25 215:1
242:23
**understanding**
52:1 79:21
88:10 98:12
104:17 107:1,2
125:22 131:13
168:9 247:25
**understood**
23:21 26:23
50:18 103:22
115:9 169:23

**undertake**
219:22 221:17
**undertook** 14:3
230:25
**ungerleider** 1:12
4:19 253:3,20
**unit** 4:10
**united** 1:1 34:15
**units** 186:4
**university** 26:1
**unknown** 118:19
**upgradient**
120:2,13,21
123:5,21,25
124:7,19
**upland** 236:18
**urs** 91:16
**use** 14:23 80:16
133:4,6 155:14
155:25 157:18
157:24 159:16
172:8 173:4
185:16 191:3
200:7 212:16
218:22 235:19
237:12
**usually** 136:2
235:19
**utility** 88:3,22
104:1,9,10
114:15 115:1
124:14
**utilized** 133:12

### v

**v** 138:8 254:2
**validation** 3:21
234:7,11

ALCD-PUBCOM_0001700

[valley - weather]                                                    Page 51

**valley** 1:6 187:25
 202:3
**various** 46:6
 229:22
**verifiable**
 207:21
**veritext** 4:17,19
 254:1
**versa** 151:17
**version** 26:14
 151:22,23
**versus** 4:12 23:8
**vessel** 137:7
 163:1 176:22
**vessels** 81:9,21
 90:12,12 132:3,6
 137:14 139:16
 140:5,6,13,18,24
 140:25 141:1
 177:23
**vice** 151:17
**vicinage** 1:2
**vicinity** 100:3
 227:16
**video** 4:7,11
 229:13
**videographer**
 2:13 4:1,17 59:9
 59:20 116:21,24
 183:20,23
 224:22,25
 245:16 251:8,14
 251:25
**view** 249:12
**visible** 205:6
**visual** 105:7
**voc** 66:10 67:8
 67:18,22 68:12

68:14,15 69:18
 79:15,25 117:6
**vocs** 61:7 62:9
 66:1 67:2 68:17
 68:18 69:10
 70:9,14 79:10,16
 79:17 80:15,16
 110:19 117:8,15
 117:25 118:12
 122:21 123:5
**volume** 154:25
 166:7 185:14
 189:5
**volumes** 130:23
**vs** 1:4,6

**w**

**wall** 103:3
**want** 10:24
 12:16 14:21
 22:4 29:4 48:8
 51:10 53:9
 58:12 64:19
 65:17 78:9 79:5
 80:10,22 87:12
 90:24 93:21
 99:23 103:11
 106:20 124:6
 130:2 139:6
 152:3 161:1
 168:19 171:12
 171:18,22,24
 172:3 173:15
 191:12 192:23
 201:22 208:6
 210:3,16 212:14
 217:18 225:19
 245:7 248:7

**wanted** 143:9
**wanting** 14:15
 14:18
**warehouse** 47:8
 47:14,17 58:6
 133:7 176:14,17
**wash** 81:9,21
 90:11,12 212:25
 229:12
**washdowns**
 137:6
**washed** 141:1
 229:21 231:14
 235:20
**washing** 230:2
 232:15 233:23
**washington**
 201:21 209:1,5
**washwater**
 163:1
**washwaters**
 137:14 140:23
 141:2
**waste** 3:15,15
 43:10,14,20 44:4
 44:5,7,9,16,20
 44:24 81:4
 184:10,15 185:6
 185:11 186:20
 187:19 188:2,4,6
 188:9,11,13,17
 190:4 194:2
 197:12 198:4
 199:11 200:1
 214:15,21
 215:16,16
**wastes** 44:1

**wastewater** 81:8
 81:16 82:18,20
 83:3,9,17 92:7,8
 92:23 154:25
 185:1 191:18,22
 191:25 192:4,10
 194:22 198:9
**wasting** 78:14
**water** 25:13 33:2
 34:1 81:9,21
 84:1 87:19,20
 90:12 94:9 98:5
 98:11,14 131:16
 131:19 136:2
 137:6,7 157:23
 166:20 168:15
 168:18,20
 175:13 185:16
 186:12 187:13
 189:5 192:24
 193:8,15,16,20
**way** 8:24 76:19
 95:2 98:7 104:5
 106:25 107:6
 109:6 115:17
 122:25 145:20
 147:3,9 148:10
 166:21 169:13
 176:17 177:24
 182:12 183:2
 187:10 225:7
 250:13
**we've** 114:20
 123:2 124:3
 125:2 163:1
 210:5
**weather** 213:9

ALCD-PUBCOM_0001701

[website - yeah]                                                                                Page 52

| | | | |
|---|---|---|---|
| **website** 100:2 | 172:21 202:22 | 108:5,9 109:21 | 85:9 87:17 |
| 171:5 | 205:17 208:16 | 109:24,25 | 88:11,12 90:4 |
| **week** 190:16 | 209:12,12,15,22 | 112:13 122:14 | 92:2,12 93:7 |
| 191:19 | 210:11,14 | 128:4 133:1 | 95:16 96:23 |
| **weiss** 138:8,14 | 211:25 212:10 | **works** 20:18 | 97:22 98:18 |
| 138:20,21 157:3 | 245:2 247:21 | 30:5 104:5 | 99:14 100:19,22 |
| 219:6 | 248:15 251:12 | 155:1 161:3 | 106:19 109:15 |
| **went** 19:15 82:3 | 251:18,21 253:7 | 162:7 213:20 | 109:24 110:9 |
| 82:6 92:8,9,25 | **witnesses'** 254:3 | **worthington** | 111:1 112:22 |
| 93:1,5,17 106:20 | **word** 126:16 | 87:4 202:4,14,16 | 113:20 114:11 |
| 137:9 141:2 | 141:14 159:19 | 203:19 205:9 | 115:21 116:3 |
| 163:7,19,25 | **words** 36:22 | 207:2,24 208:9 | 117:22 122:16 |
| 172:4 192:4,10 | 56:3 134:8 | 209:5,6 | 124:1 126:21 |
| 211:15 213:11 | 211:5 217:20 | **woy** 2:19 | 127:6 128:24 |
| 214:21 215:7,16 | **work** 3:11,11 | **writes** 157:19 | 129:14,16 |
| **west** 85:22,23 | 13:6 17:12,13 | **writing** 132:17 | 130:18 139:19 |
| 89:8 142:6 | 18:8,19 24:15 | 157:6 | 140:6,8 141:17 |
| 194:13,22,24 | 48:18 63:11,13 | **written** 104:14 | 145:18 146:18 |
| 195:3 206:15,16 | 64:9,15,24 65:4 | 104:22 156:14 | 150:10,18 151:9 |
| **wet** 213:8 | 65:8,17 71:6 | **wrong** 130:8 | 151:11 153:18 |
| **whatsoever** 84:3 | 73:16 88:21 | 222:5 | 160:14 163:6 |
| **whispering** 4:5 | 94:2,4 95:20 | | 169:16 170:16 |
| **wholly** 34:13 | 99:4,9 103:9 | **x** | 170:19 171:2,18 |
| **widespread** | 104:15 108:13 | **x** 3:1,6 | 174:15 175:23 |
| 66:12,18,20,24 | 109:8,19,22 | **xio0115** 253:21 | 178:5,6 181:2,12 |
| **william** 2:7 | 110:6,11 111:2 | **xio1634** 253:21 | 186:16 187:1,3,9 |
| **wilmington** | 111:12,13,15 | | 189:2 190:9 |
| 129:7 | 114:20,23,24 | **y** | 191:25 194:7,25 |
| **wipe** 230:3,8 | 115:10 127:22 | **yeah** 6:25 8:22 | 196:12 197:5,19 |
| **wipes** 220:18 | 138:15 180:15 | 9:5 21:23 23:8 | 199:5 202:18 |
| **wish** 205:23 | 219:22 237:24 | 25:2,17,22 29:4 | 203:14 205:12 |
| **witness** 5:4,17 | 237:24 238:1,16 | 34:4,4 38:16,18 | 205:23 207:8,19 |
| 8:6 15:1,4 23:25 | 244:16,22 | 41:6,8,25 45:1 | 208:3 213:18 |
| 32:8 50:7 58:10 | **worked** 17:5 | 54:12 56:4 57:9 | 217:15 222:23 |
| 76:6 78:5 109:9 | 24:3,7,11 25:8 | 65:14 69:15,20 | 223:3,22 224:1,8 |
| 109:18 112:24 | 138:23 | 69:25 72:15,15 | 224:18 226:3,6 |
| 131:1 146:7 | **working** 13:10 | 72:25 75:4,20 | 226:24 227:2 |
| 169:19 171:9,13 | 15:18,23 40:1,3 | 77:9,11,19 82:9 | 230:16 231:23 |
| | | 82:12 83:2,16 | |

233:8,15 234:4
235:21,23,23
237:19 242:16
242:21 243:17
244:14,14,18
245:16 247:4,8
249:10 251:16
**year** 89:6 106:5
106:21,22
108:21 109:3,4
110:7,9 143:11
143:11 158:10
158:25 161:6,7
161:10,12,19
162:14 164:5
197:17
**years** 11:24
13:12,14 15:19
17:7 18:1,2,10
18:16,20 19:5
24:2,7,11,18
25:2,4 38:8 76:8
107:15 114:24
138:23 161:19
161:19 182:18
187:23 232:12
242:23,25
244:23 247:16
**yep** 96:4 101:13
111:20 134:5
160:6 165:18
177:15 190:16
194:9 206:3,9
240:11
**yesterday** 21:8
**york** 254:1

**z**

**zero** 243:25
**zinc** 81:10 198:7
**zones** 103:24
104:7
**zoom** 59:12
251:20

ALCD-PUBCOM_0001703

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

# EXHIBIT 27

OxyChem's Comments in Opposition to Proposed Consent Decree,
*United States v. Alden Leeds, Inc., et al.*, Civil Action No. 2:22-cv-07326 (D.N.J.)

ALCD-PUBCOM_0001706



**ETC** ENVIRONMENTAL
TESTING and CERTIFICATION

KEARNY STREETS

*August 8, 1983*

# TECHNICAL REPORT

for

## NJDEP
## Division of Waste Management
## 8 East Hanover Street
## Trenton, NJ 08625

| Chain of Custody Data Required for ETC Data Management Summary Reports | | | | | | |
|---|---|---|---|---|---|---|
| C8129-C8137 | NJDEP | KEARNY | | 830728 | | Elapsed |
| ETC Sample No. | Company | Facility | Sample Point | Date | Time | Hours |

*ENVIRONMENTAL TESTING and CERTIFICATION CORPORATION*

Denis C. K. Lin, Ph.D.
*Vice President*
*Research and Operations*

BAF000006

OCC-TIG-E01766018
ALCD-PUBCOM_0001707

Lab: ETC Corp.

TCDD Data Report - Page 1

Date: 08/04/83
GC Column: 60M SP2340
          50M CP-Sil-88

| ETC Number | Sample Number | E/C | Grams Wet Weight | Ppb TCDD | D.L. | Analytical Date | Analytical Time | 320/322 | 332/334 | Surrogate Percent Accuracy | Area 320 | Area 322 | Area 257 | Area 328+ | Area 332 | Area 334 | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| MB82 | MB | J/AD | 0 00 | ND | 0.03 | 830802 | 2240 | - | - | 98 | 544 | 333 | - | 708 | 768 | 986 | |
| C6849S | QA SPIKE | J/AD | 10.00 | 1.0 | 0 | 830803 | 1530 | 0.86 | - | 94 | - | - | 219 | 1430 | 1613 | 2091 | |
| C8099 (formerly C5588) | QA REP | J/AD | 10.62 | ND | 0.31 | 830803 | 1850 | - | - | 101 | 184 | 481 | 108 | 1589 | 1666 | 2138 | |
| C8099R (formerly C5588R) | QA REP | J/AD | 10.22 | ND | 1.5 | 830803 | 1935 | - | 0.86 | 116 | - | - | - | 31 | 30 | 35 | |
| C8129 | CHARARVR | J/AD | 10.67 | ND | 0.03 | 830803 | 1355 | - | 0.80 | 107 | - | - | - | 5597 | 6117 | 7594 | |
| C8130 | SANFORD | J/AD | 10.18 | ND | 0.03 | 830803 | 1550 | - | 0.78 | 102 | - | - | - | 7394 | 8381 | 10716 | |
| C8131 | SANANN | J/AD | 11.08 | ND | 0.02 | 830803 | 1705 | - | 0.78 | 102 | 1163 | 1589 | 503 | 5060 | 5702 | 7322 | |
| C8132 | FRONTEAST | J/AD | 10.37 | 0.60 | - | 830803 | 1835 | 0.73 | 0.78 | 99 | 559 | 369 | 110 | 4663 | 5448 | 6997 | |
| C8133 | RRFENCE | J/AD | 11.08 | 0.33 | - | 830803 | 1920 | 0.76 | 0.78 | 97 | 1596 | 225 | 617 | 2082 | 6873 | 8185 | |
| C8134 | SUMP | J/AD | 12.65 | 0.57 | - | 830803 | 2005 | 0.71 | 0.78 | 99 | 644 | 853 | 391 | 5005 | 7553 | 8875 | |
| C8135 | FRONTWEST | J/AD | 10.38 | 0.25 | - | 830803 | 2125 | 0.75 | 0.78 | 97 | 891 | 1068 | 367 | 6391 | 7762 | 9701 | |
| C8136 | DRIVEWAY | J/AD | 10.23 | 0.32 | - | 830803 | 2200 | 0.83 | 0.78 | 95 | 567 | 785 | - | 6395 | 8137 | 9977 | |
| C8137 | STREETDREW | J/AD | 10.59 | ND | 0.12 | 830803 | 2230 | - | 0.78 | 98 | - | - | - | 6901 | - | 10395 | |

+Corrected for contribution by native TCDD (Subtract 0.009 of m/e 322).

H = High Resolution
ND = Not Detected
D L = Detection Limit
D J = Jar Extraction
S = Soxhlet Extraction

MB = Method Blank
P = Partial Scan
N = Native TCDD Spike
D = Duplicate (Intralab)
FB = Field Blank

A, B, C, D- Clean Up Option (or any combination)

OCC-TIG-E01766019

ALCD-PUBCOM_0001708



OCC-TIG-E01766020

ALCD-PUBCOM_0001709

OCC-TIG-E01766021

ALCD-PUBCOM_0001710



Side Street / Drew

OCC-TIG-E01766022

ALCD-PUBCOM_0001711



SANANN

OCC-TIG-E01766023
ALCD-PUBCOM_0001712





OCC-TIG-E01766024

ALCD-PUBCOM_0001713



SANFORD

OCC-TIG-E01766025

ALCD-PUBCOM_0001714



OCC-TIG-E01766026

ALCD-PUBCOM_0001715



St. by Drew

OCC-TIG-E01766027

ALCD-PUBCOM_0001716

Company: Kearny and Vicinity
Address:
Objective:

Primary Laboratory:
Secondary Laboratory: ETC

## Laboratory Results

| Primary Laboratory Designation ETC # | Results (ppb) | Date | Secondary Laboratory Designation | Results | Date | Location and/or Sampling Plan Designation |
|---|---|---|---|---|---|---|
| C8129 | ND | 7/27/83 | - | - | | CBHARAVRR |
| C8130 | ND | " | - | - | | Sandford |
| C8131 | ND | " | - | - | | Sanann |
| C8132 | 0.60 | " | - | - | | Front East |
| C8133 | 0.33 | " | - | - | | RR Fence |
| C8134 | 0.57 | " | - | - | | Sump |
| C8135 | 0.25 | " | - | - | | Front West |
| C8136 | 0.32 | " | - | - | | Driveway |
| C8137 | ND | " | - | - | | Street Drew |



OCC-TIG-E01766028
ALCD-PUBCOM_0001717

Ashland Chem                    isopropanal
Drew Chem — Kearny              wetting agents

purchased from Sun        Exp   Santillan
1970                              Proc Eng
built 1948

        Marine          Defoamers
        Process         Water treatment
        Specialties
                        Combustion additives
        Hydrazine       Tank cleaners
                        Boilers Generators
Slimacides              Heat exchange
                        Rust preventions
Diathio carbamate       WW Treatment
MBT

        of   Blend & pkg.

Same eqpt

DOW         B   PcP
        →   G   T
            2   245 TCP

## Prop Sample locations

1 Vessel Charging Manhole        A C, P, F
                                    composite

2, 4          Floor drain   1, 2, 3 floor,

3     Composite of 5 pt   to 2"
              run off   low area

Documentation —   Which Reactors
         "            Raw Mat Phys for

OCC-TIG-E01766030

ALCD-PUBCOM_0001719



E. R. W. Weiss

Drew Chemical Corporation

RETURN RECEIPT REQUESTED

Mr. Edward Stevenson
Manager
Industrial Investigation Unit
State of New Jersey
Department of Environmental Protection
Office of Science and Research
CN 402, Trenton, NJ  08625

CERTIFIED
P02 8045258
MAIL

OCC-TIG-E01766031

ALCD-PUBCOM_0001720

OCC-TIG-E01766032
ALCD-PUBCOM_0001721

**50**

OCC-TIG-E01766033
ALCD-PUBCOM_0001722

# EXHIBIT 28

OxyChem's Comments in Opposition to Proposed Consent Decree,
*United States v. Alden Leeds, Inc., et al.*, Civil Action No. 2:22-cv-07326 (D.N.J.)

ALCD-PUBCOM_0001723

 **Drew Chemical Corporation**    One Drew Chemical Plaza, Boonton, N.J. 07005. 201-263-7600 Cable Drew Chem, Boonton

ADDRESS REPLY TO: 1106 Harrison Avenue, Kearny, NJ 07032 (201-997-3300)

November 14, 1983

Environmental Testing & Certification
284 Raritan Center Parkway
Edison, N.J.  08837

Attention:  Mr. Swep Davis

Dear Mr. Davis:

This is to confirm our conversation today that Drew Chemical (Kearny) is retaining your services in testing approximately five composite soil and wipe samples to determine the presence of 2,3,7,8 TCDD at our facility located at 1106 Harrison Avenue, Kearny, N.J.   As discussed, Drew personnel will undertake the actual sampling work and would appreciate if you can send us the empty sealed sample jars and other required reagents.

We will issue the required Purchase Order to cover the above as soon as we receive your formal quotation for same.

If we need further information, we will let you know.

Very truly yours,

DREW CHEMICAL CORPORATION

*Kurt V. Weiss*

Kurt V. Weiss
Director of Manufacturing

KVW/rb

ASHL-FED-0000296994
ALCD-PUBCOM_0001724

ASHL-FED-0000296995

**DREW CHEMICAL CORPORATION**

**PDR**

**PRODUCTION DATA RECORD**

K 2220

| LOCATION CODE | BATCH NUMBER | CODE | PRIMARY PRODUCT NAME |
|---|---|---|---|
| NAME | | | |
| Kearny  GKC 033 F | 6783-00-6 | | Biocide 289 Premix |

| DATE | COST CENTERS | CHECK IF APPROPRIATE | TYPE | CHECK ONE ✓ |
|---|---|---|---|---|
| STARTED  DISCHARGED  PRIME  NO. 2  NO. 3  PKG. | REWORKED BATCH ► | NEW PDR (2) ► | ✓ |
| 3/2/76  3/4/76  301  501 | MATERIAL SUBS. ► | CANCELLATION (1) ► | |
| HOURS  5.5  4.0 | | | |
| 5.0 | | | |

**MATERIAL USED SECTION**

| BATCH/CODE | ITEM DESCRIPTION | REMARKS | CONTAINER | LOT NUMBER | NO. OF UNITS | NET WGT. | TOTAL WEIGHT | OPER. INITIAL |
|---|---|---|---|---|---|---|---|---|
| 2096-80-9  Row 2 | | 26 DRUM WKA 138 TOT MM | | 3 | 425 | 1275 | Jm |
| | | KEGS  V8755A  31 | | 28 | 100 | 2714 | Jm |
| | | (Stainless W445) | " " | 20 | 20 | 120 | 2639 | Jm |
| | | | " " | 2 | 500 | 1031 | Jm |
| | | LE DRUM 55M035 | | 2 | 400 | 800 | Jm |
| | | Part | " | 231 | 1 | 231 | |
| | | Part | " | 15 | 1 | 15 | |

**CONTAINER SECTION**

| | | | | | TOTALS ► | 301 | | 8705 |

| QUALITY CON REPORT NO. | FINISHED PRODUCT CODE | PRODUCT NAME | NO. OF UNITS | UNIT WGT. | TOTAL WEIGHT | SOURCE | |
|---|---|---|---|---|---|---|---|
| 3/4 | 01  6783-26-1 | BIOSPERSE 289 PREMIX | 17 | 510 | 8670 | 555/5 DRUMS | |

| YIELD CALCULATION | | TOTALS ► | 17 | | 8670 |

KP-15

98.9% = YIELD

**APPROVALS**
SCALE
DRUM CNTR.
YIELD CALC.

ASHL–FED–0000298996

**DREW CHEMICAL CORPORATION** — PDR

**PRODUCTION DATA RECORD**

K  14616

| LOCATION | | BATCH NUMBER | PRIMARY PRODUCT | |
|---|---|---|---|---|
| NAME | CODE | | CODE | NAME |
| Kenn. | | 1KB-025-F | 5231-00-6 | Biocide 285 |

| DATE | | COST CENTERS | | | | CHECK IF APPROPRIATE | TYPE (CHECK ONE ✓) |
|---|---|---|---|---|---|---|---|
| STARTED | DISCHARGED | PRIME | NO. 2 | NO. 3 | PKG. | REWORKED BATCH → | NEW PDR (2) → ✓ |
| 23 | 2/4/81 | 22 | | | 5(1) | MATERIAL SUBS. → | CANCELLATION (1) → |
| HOURS | VESSEL LABOR | | | | 2.0 | | |

| MATERIAL CODE | ITEM DESCRIPTION | REMARKS | CONTAINER | LOT NUMBER | NO. OF UNITS | NET WGT. | TOTAL WEIGHT | OPER. INITIAL |
|---|---|---|---|---|---|---|---|---|
| | | (cont) | Polmer | - | 10 | 418 | 4086 | 7h |
| | | | Kens | - | 4 | 120 | 459 | 7h |
| | | | " | - | 9 | 100 | 900 | 7h |
| 2096-00-9 | Biocide 2 | | Drew | 1KA-18 | 450 | | 450 | 7h |
| | | | Repomo | 90DR10 | 5 | 375 | 1800 | 7h |
| | | | " | - | 3 | 515 | 1305 | 7h |
| | | | | | 20 | | 0 | |
| | | TOTALS ▶ | | | | | 9000 | |

| QUALITY CON. | | FINISHED PRODUCT CODE | PRODUCT NAME | NO. OF UNITS | UNIT WGT. | TOTAL WEIGHT | SOURCE |
|---|---|---|---|---|---|---|---|
| REPORT NO. | DISP. CODE | | | | | | |
| 2/6 | 02 | 5231-00-1 | BIOCIDE 285 | 19 | 450 | 8550 | 55 GAL DT |
| | | 5231-00-6 | BIOCIDE 285 | 410 | 1 | 410 | PART T |
| | | | TOTALS ▶ | 429 | | 8960 | |

YIELD CALCULATION

(Total lbs. output) / (Total lbs. input) × 100 = 99.5 % YIELD

APPROVALS
- SCALE
- DRUM CNTR.
- YIELD CALC.

ES-96 REV. B

ORIGINAL-DATA PROC. WHITE · COST CONTROL: YELLOW·PROD. CONTROL PINK · FILE COPY

ALCD-PUBCOM_0001726

ASHL-FED-0000296997

PRODUCTION DATA FILE

PRIMARY PRODUCT

| LOCATION | | BATCH NUMBER | | CODE | NAME | | DREW CHEMICAL CORPORATION | PDR |
|---|---|---|---|---|---|---|---|---|
| NAME | CODE | | | | | | | |
| Leachy a. | 41c U.S.A | 8-1041-00-1 | | Biosperse 209 | | | | |

| DATE | | COST CENTERS | | | CHECK IF APPROPRIATE | TYPE (CHECK ONE ✓) | PRODUCTION DATA RECORD |
|---|---|---|---|---|---|---|---|
| STARTED | DISCHARGED | PRIME | NO. 2 | NO. 3 | PKG. | REWORKED BATCH → | NEW PDR (2) → |
| 3/19/7 | 3/21/79 | 221 | | | 55 0 0 2 0 | MATERIAL SUBS. → | CANCELLATION (1) → |
| HOURS | | VESSEL 2 0 | | | | | |
| | | LABOR 5 0 | | | | | |

K    10149

MATERIAL AND PACKAGE

| MATERIAL CODE | ITEM DESCRIPTION | REMARKS | CONTAINER | LOT NUMBER | NO. OF UNITS | NET WGT. | TOTAL WEIGHT | OPER. INITIAL |
|---|---|---|---|---|---|---|---|---|
| | | | | | 3048 | 1 | 3000 | FS |
| | | | DREW DRUMS | | 1080 | 5 | 1000 | FS |
| 3496-80-4 sec 2 | | | KEGS | | 22 | 100 | 2800 | FS |
| | | | | | 9 | 100 | 900 | FS |
| | | | VENDOR | | 1 | 413 | 700 | FS |
| | | | | | 1 | 460 | 150 | FS |
| | | | 9 T | | 900 | 1 | 600 | FS |
| | | PART | | 9RA 055 AX | 20 | 1 | 20 | TH |
| | | | | | 15 | | 0 | |
| 2440-01-4 | CODE # 41 | | | | | | | |
| | | | **TOTALS** → | | | | 8720 | |

| QUALITY CON. PORT NO. | DISP. CODE | FINISHED PRODUCT CODE | PRODUCT NAME | NO. OF UNITS | UNIT WGT. | TOTAL WEIGHT | SOURCE | APPROVALS |
|---|---|---|---|---|---|---|---|---|
| 22 | C | 8-1041-00 | Biosperse 209 | 15 | 540 | 8100 | 55 GAL B | SCALE AA |
| | C | 8-1041-00-1 | Biosperse 209 | 435 | 1 | 435 | PART | DRUM CNTR. Tm |
| YIELD CALCULATION | | | **TOTALS** → | 450 | | 8535 | | YIELD CALC. Tm |
| Total in drums × 100 = 97.9 % YIELD | | | | | | | | ES 85 REV. 3 |

35

ORIGINAL DATA PROC. WHITE  COST CONTROL  YELLOW PROD CONTROL  PINK  FILE COPY

CONFIDENTIAL

| NAME | CODE | | CODE | | NAME | DREW CHEMICAL CORPORATION | PDR |
|------|------|---|------|---|------|-----------|-----|
| SEMENY | 001 | RKK-066-CKY | 5224-00-1 | | BIOSPERSE 209 | | |

**PRODUCTION DATA RECORD**

| DATE | | COST CENTERS | | | | CHECK IF APPROPRIATE | TYPE (CHECK ONE ✓) |
|------|--|--------------|--|--|--|----------------------|---------------------|
| STARTED | DISCHARGED | PRIME | NO. 2 | NO. 3 | PKG. | REWORKED BATCH ➤ | NEW PDR (2) ➤ |
| 10/10/78 | 10/11/78 | 203 | | | 501 | MATERIAL SUBS. ➤ | CANCELLATION (1) ➤ |

| HOURS | VESSEL | 5.8 | | 0.0 |
|-------|--------|-----|--|-----|
| | LABOR | | | 5.8 |

**K    9021**

MATERIAL ISSUE SECTION

| MATERIAL CODE | ITEM DESCRIPTION | REMARKS | CONTAINER | LOT NUMBER | NO. OF UNITS | NET WGT. | TOTAL WEIGHT | OPER. INITIAL |
|---------------|------------------|---------|-----------|------------|--------------|----------|--------------|---------------|
| | | | ST. | — | 300 | | 3000 | LC |
| | | | R. DRUM CYLST. | VKN | 1 | 700 | 700 | LC |
| 2096-80-9 | DOW 2 | 09287N | NANDZ KEGS. | 09287N | 20 | 100 | 2000 | LC |
| | | (Dow 2) | '' | NONE | 8 | 100 | 802 | LC |
| | | E.D.A | NANDZ DRUM | NONE | 1 | 413 | 385 | LC |
| | | | '' | 664 | 1 | 460 | 162 | LC |
| | | | ST. | — | 80 | | 80 | LC |
| | | | | | 150 | 1 | 150 | FS |
| | | | | | 15 | 1 | 10 | |

BOTTOM SECTION

**TOTALS** ➤    | | 8217

BLEND SECTION

| QUALITY CON. | | FINISHED PRODUCT CODE | PRODUCT NAME | NO. OF UNITS | UNIT WGT. | TOTAL WEIGHT | SOURCE |
|--------------|--|------------------------|--------------|--------------|-----------|--------------|--------|
| REPORT NO. | DISP. CODE | | | | | | |
| 10-10 | 01 | 5224-26-6 | BIOSPERSE 209 | 15 | 540 | 8100 | SS GAL B.T. DR |

| APPROVALS |
|-----------|
| SCALE  R.T |
| DRUM CNTR. |
| YIELD CALC. |

**YIELD CALCULATION:**

$$\frac{\text{(Total lbs. output)}}{\text{(Total lbs. input)}} \times 100 = 98.6 \text{ \% YIELD}$$

**TOTALS** ➤    15    8100

KP-1

ORIGINAL-DATA PROC.- WHITE · COST CONTROL- YELLOW-PROD. CONTROL- PINK · FILE COPY

E8-98 REV. 3

ASHL-FED-0000296998

ALCD-PUBCOM_0001728

DREW CHEMICAL CORPORATION

**PDR**

PRIMARY PRODUCT

NAME ___ CODE ___ ___ CODE ___ NAME

KEARNY CCI BRH 15' AX 5457-00-8 DREWCHERSE 2EC

CHECK IF APPROPRIATE | TYPE | CHECK ONLY

REWORKED BATCH → NEW PDR 21 →

MATERIAL SUBS. → CANCELLATION (1) →

PRODUCTION DATA RECORD

K 8632

DATE STARTED 8/10/76 DISCHARGED 8/22/76

LITERS NO. 3 PKG.

SCI 6.5

VESSEL 3

LABOR 3

HOURS

**MATERIAL USED SECTION**

| MATERIAL | ITEM DESCRIPTION | REMARKS | CONTAINER | LOT NUMBER | NO. OF UNITS | NET WGT. | TOTAL WEIGHT | OPER. INITIAL |
|---|---|---|---|---|---|---|---|---|
| | | | SI | — | 4412 | 1 | 4412 | W |
| | | 133 gal | ST | — | 1850 | 1 | 1850 | W |
| | | | Di | 608 | 1 | 410 | 180 | W |
| | | | D1 | — | 1 | 700 | 700 | W |
| | | | DRU | — | 2 | 700 | 1000 | W |
| | 2396-8-2 DEWICIDE 2 | | KELS | — | 5 | 423 | 423 | W |
| | | | 39 | — | 9 | 100 | 810 | W |
| | | | | | 20 | 1 | 20 | |
| | | | | | 305 | 1 | 305 | |
| | | | | | 18 | | 0 | |

**TOTALS ▶** 9200

**OUTPUT DATA SECTION**

| QUALITY CON. REPORT (NR. CODE) | FINISHED PRODUCT CODE | PRODUCT NAME | NO. OF UNITS | UNIT WGT. | TOTAL WEIGHT | SOURCE |
|---|---|---|---|---|---|---|
| 8-21 | | 22-3 DREWCHERSE 2EC | 18 | 510 | 9180 | OIT |

**TOTALS ▶** 9180

YIELD

**APPROVALS**

SCALE

DRUM CNTR.

YIELD CALC.

ASHL-FED-0000296999

ALCD-PUBCOM_0001729

**DREW CHEMICAL CORPORATION** PDR

**PRODUCTION DATA RECORD**

**K   11674**

| LOCATION NAME | CODE | BATCH NUMBER CODE | PRIMARY PRODUCT NAME |
|---|---|---|---|
| Kr(lcu) | | 9KK 105 D   5222-00-5 | Biocide 207 |

| DATE | | COST CENTERS | | | CHECK IF APPROPRIATE | TYPE (CHECK ONE ✓) |
|---|---|---|---|---|---|---|
| STARTED | DISCHARGED | PRIME | NO.2 | NO.3 | PKG. | REWORKED BATCH ▶   NEW PDR (2) ▶ |
| 10/15 | 10/7/77 | | | | | MATERIAL SUBS. ▶   CANCELLATION (1) ▶ |
| HOURS | | VESSEL 7.5   LABOR 4.0 | | 2.0 | | |

**MATERIAL INPUT SECTION**

| MATERIAL CODE | ITEM DESCRIPTION | REMARKS | CONTAINER | LOT NUMBER | NO. OF UNITS | NET WGT. | TOTAL WEIGHT | OPER. INITIAL |
|---|---|---|---|---|---|---|---|---|
| | | | ST | — | 848 | 1 | 848 | DA |
| | | VENDOR | DRUM | 83R 4A | 1 | 460 | 101 | DA |
| | | DREW | DRUM | 9RA 78 TW | 6 | 500 | 3000 | DA |
| | | | KEGS | 93R 17 | 14 | 100 | 1419 | DA |
| | | | KEGS | 46R 36 | 13 | 100 | 1289 | DA |
| 2096-80-9 | Dowicide 2 | | DREW DRUM | 9KK 010-ST | 604 | | 604 | DA |
| | | | ST | — | 1006 | 1 | 1006 | DA |
| | | lumped | | | 2 | 50 | 100 | |
| | | Part | | 927 089-C | 185 | 1 | 185 | |
| | | | | | 3 | 55 | 165 | |
| | | | | | 19 | | | |
| | | | **TOTALS** ▷ | | | | 10455 | |

**OUTPUT SECTION**

| QUALITY CON. REPORT NO. | DISP. CODE | FINISHED PRODUCT CODE | PRODUCT NAME | NO. OF UNITS | UNIT WGT. | TOTAL WEIGHT | SOURCE |
|---|---|---|---|---|---|---|---|
| 10/16 | 01 | 5222-36-0 | Biocide 207 | 18 | 530 | 9540 | 55 Gal D.T. |
| | | 5222-00-5 | Biocide 207 | 380 | 1 | 380 | Port |
| YIELD CALCULATION | | 977 | **TOTALS** ▷ | | | 9920 | |

Total lbs. output / Total lbs. input × 100 = % YIELD

| APPROVALS |
|---|
| SCALE   A.B. |
| DRUM CNTR.   Tucci |
| YIELD CALC.   A.B. |

VERIFIED

ORIGINAL-DATA PROC. WHITE   COST CONTROL: YELLOW · PROD. CONTROL: PINK · FILE COPY

E8-98 REV. 9

ASHL-FED-0000297000

ALCD-PUBCOM_0001730



ASHL-FED-0000297001

**ETC** ENVIRONMENTAL
TESTING and CERTIFICATION

*D7380*
ETC Sample No.:

## SAMPLE POINT INFORMATION FORM (CC2)

### FIELD MEASUREMENT DATA

Select up to 3 parameters to be recorded by entering the appropriate code letter in the first space for each of the 3 data entry fields provided. Enter the actual measurement data (in the units specified) for the three parameters you have selected.

**PARAMETERS**

Flow (CFS) — A
Volume (Gal) — B
Sample Depth (Ft) — C
Depth to Water (Ft) — D
Discharge Rate (GPM) — E
Depth to Bottom (Ft) — F
Event Time (2400-Hr Clock) — G
Depth to Screen (Ft) — H

**ACTUAL** (left justify)

**EXAMPLE**

C 2 5
F 5 0
G 1 1 0 3

### FIELD TEST DATA

DO (Mg/L) | | | | |          Sample Temp. (°C) | | | | |

pH     | | | | |                | | | | |                | | | | |                | | | | |
        Single Measurement    2nd of Quadruplicate    3rd of Quadruplicate    4th of Quadruplicate

Specific Conductance (uMHOS/CM)
        | | | | |                | | | | |                | | | | |                | | | | |
        Single Measurement    2nd of Quadruplicate    3rd of Quadruplicate    4th of Quadruplicate

### THE FOLLOWING DATA IS FOR YOUR RECORDS ONLY

#### SAMPLING METHOD (choose one)

AIR-LIFT PUMP ( )          PERISTALTIC PUMP ( )          THIEF ( )
AUGER ( )                  PETERSEN ( )                  TRIER ( )
BAILER ( )                 PISTON PUMP ( )               VOHMEYER ( )
BOTTLE ( )                 SCOOP/SHOVEL ( )              OTHER
COLIWASA ( )               SQUEEZE PUMP ( )
DIPPER ( )                 SUBMERSIBLE PUMP ( )
KEMMERER ( )               SUCTION LIFT PUMP ( )
NISKIN ( )                 SURBER ( )

#### SAMPLE TYPE (choose one)

GRAB ( )          COMPOSITE (✓)                          OTHER ( )

*6 points soil*
*yard run off area*
                    (describe)

WEATHER
*cold wet*

SAMPLE DESCRIPTION (e.g. color, odor)
*various soils*
*mud*
                    (describe)                                            (describe)

Form Prepared By: *ES*                         Employer: *dep*
                    name (print)

ETC Form CC2 6/1/82

ASHL-FED-0000297002
ALCD-PUBCOM_0001732

ETC

**CHAIN OF CUSTODY FORM (CC1)**

ETC Number

Sealed By: _Schuctut_

**SHIP TO:**

Company: **Drew Chemicals**
Facility/Site: **1106 Harrison Ave**
Address: **Kearny NJ 07032**

Attn: **Kurt Weiss**
Phone: (    )    -

## SAMPLE IDENTIFICATION

Facility/Site Code: | D | R | E | W | K | E | A | R | N | Y |

**Source Codes:**

| Well | —— | (W) | River/Stream | —— | (R) | Surface Impoundment | —— | (I) | Lake/Ocean | —— | (L) |
| Soil | —— | (S) | Bottom Sediment | —— | (B) | Pretreatment Facility | —— | (P) | Treatment Facility | —— | (T) |
| Outfall | —— | (O) | Generation Point | —— | (G) | Leachate Collection Sys. | —— | (C) | Other | —— | (X) |

| | S | | Y | A | R | D | R | U | N | O | F | F | | 1 | 2 | 1 | 3 | 8 | 3 | | 1 | 2 | 0 | 0 | | | | | |
| Source Code (from above) | | Your Sample Point ID (left justify) | | Start Date (mo/day/yr) | | Start Time (2400 hr. clock) | | Elapsed Hours (composite) |

Example: | W | | 1 | 0 | 1 | J | 2 | 6 | 3 | P | | | 0 | 5 | 1 | 5 | 8 | 1 | 1 | 0 | 9 | 3 | 0 | 1 | 3 |

## SHUTTLE CONTENTS

| Sample Bottle | Condition | Sample Bottle | Condition |
|---|---|---|---|
| D7380    A1 | | | |

## CHAIN OF CUSTODY CHRONICLE

**1.** Shuttle Opened By: (print) _____ Date: _____ Time: _____
Signature: _____ Seal #: _____ Intact: _____

**2.** I have received these materials in good condition from the above person.
Name: _____ Signature: _____
Date: _____ Time: _____ Remarks: _____

**3.** I have received these materials in good condition from the above person.
Name: _____ Signature: _____
Date: _____ Time: _____ Remarks: _____

**4.** I have received these materials in good condition from the above person.
Name: _____ Signature: _____
Date: _____ Time: _____ Remarks: _____

**5.** Shuttle Sealed By: (print) _____ Date: _____ Time: _____
Signature: _____ Seal #: _____

**ETC USE ONLY** Opened By: _____ Date: _____ Time: _____
Seal #: _____ Condition: _____

ASHL-FED-0000297003
ALCD-PUBCOM_0001733

**ETC** ENVIRONMENTAL
TESTING and CERTIFICATION

D7381

ETC Sample No.:

## SAMPLE POINT INFORMATION FORM (CC2)

### FIELD MEASUREMENT DATA

Select up to 3 parameters to be recorded by entering the appropriate code letter in the first space for each of the 3 data entry fields provided. Enter the actual measurement data (in the units specified) for the three parameters you have selected.

| PARAMETERS | | ACTUAL (left justify) | EXAMPLE |
|---|---|---|---|
| Flow (CFS) | A | | C 2 5 |
| Volume (Gal) | B | | |
| Sample Depth (Ft) | C | | F 5 0 |
| Depth to Water (Ft) | D | | |
| Discharge Rate (GPM) | E | | G 1 1 0 3 |
| Depth to Bottom (Ft) | F | | |
| Event Time (2400-Hr Clock) | G | | |
| Depth to Screen (Ft) | H | | |

### FIELD TEST DATA

DO (Mg/L) [    ]          Sample Temp. (°C) [    ]

pH    [    ]          [    ]          [    ]          [    ]
      Single Measurement    2nd of Quadruplicate    3rd of Quadruplicate    4th of Quadruplicate

Specific
Conductance    [    ]          [    ]          [    ]          [    ]
(uMHOS/CM)    Single Measurement    2nd of Quadruplicate    3rd of Quadruplicate    4th of Quadruplicate

---

THE FOLLOWING DATA IS FOR YOUR RECORDS ONLY

#### SAMPLING METHOD (choose one)

| | | |
|---|---|---|
| AIR-LIFT PUMP ( ) | PERISTALTIC PUMP ( ) | THIEF ( ) |
| AUGER ( ) | PETERSEN ( ) | TRIER ( ) |
| BAILER ( ) | PISTON PUMP ( ) | VEHMEYER ( ) |
| BOTTLE ( ) | SCOOP/SHOVEL ( ) | OTHER |
| COLIWASA ( ) | SQUEEZE PUMP ( ) | _____ |
| DIPPER ( ) | SUBMERSIBLE PUMP ( ) | _____ |
| KEMMERER ( ) | SUCTION LIFT PUMP ( ) | |
| NISKIN ( ) | SURBER ( ) | |

#### SAMPLE TYPE (choose one)

GRAB ( )          COMPOSITE (✓)          OTHER ( )

*wipes from 3 floor drains*
*first floor Bldg 720*
(describe)                    (describe)

WEATHER                    SAMPLE DESCRIPTION (e.g., color, odor)

_____          _____
_____          _____
_____          _____
(describe)                    (describe)

Form Prepared By: _____          Employer: _____
                  name (print)

ETC Form CC2 6/1/82

ASHL-FED-0000297004
ALCD-PUBCOM_0001734

**CHAIN OF CUSTODY FORM (CC1)**

Seal Date: _____
Sealed By: _Schuckt_

### SHIP TO:

**Company:** Drew Chemicals
**Facility/Site:** 1106 Harrison Ave
**Address:** Kearny NJ 07032

**Attn:** Kurt Weiss
**Phone:** ( ) -

### SAMPLE IDENTIFICATION

**Facility/Site Code:** | D | R | E | W | K | E | A | R | N | Y |

**Source Codes:**

| | | |
|---|---|---|
| Well _____ (W) | River/Stream _____ (R) | Surface Impoundment _____ (I) | Lake/Ocean _____ (L) |
| Soil _____ (S) | Bottom Sediment _____ (B) | Pretreatment Facility _____ (P) | Treatment Facility _____ (T) |
| Outfall _____ (O) | Generation Point _____ (G) | Leachate Collection Sys. _____ (C) | Other _____ (X) |

| [X] | 7|2|0|F|I|R|S|T|F|L | 1|2|1|3|8|3 | 1|2|1|0 | | |
|---|---|---|---|---|
| **Source Code** (from above) | **Your Sample Point ID** (left justify) | **Start Date** (mo/day/yr) | **Start Time** (2400 hr. clock) | **Elapsed Hours** (composite) |

**Example:** | W | | 1|1|0|/|J|2|6|3|P|1 | | 0|5|1|5|8|1 | | 0|9|3|0 | | 1|3 |

### SHUTTLE CONTENTS

| Sample Bottle | Condition | Sample Bottle | Condition |
|---|---|---|---|
| D7381 | A | | |

### CHAIN OF CUSTODY CHRONICLE

| | | | |
|---|---|---|---|
| **1.** | Shuttle Opened By: (print) _____ | Date: _____ | Time: _____ |
| | Signature: _____ | Seal #: _____ | Intact: _____ |

**2.** I have received these materials in good condition from the above person.
Name: _____  Signature: _____
Date: _____  Time: _____  Remarks: _____

**3.** I have received these materials in good condition from the above person.
Name: _____  Signature: _____
Date: _____  Time: _____  Remarks: _____

**4.** I have received these materials in good condition from the above person.
Name: _____  Signature: _____
Date: _____  Time: _____  Remarks: _____

**5.** Shuttle Sealed By: (print) _____  Date: _____  Time: _____
Signature: _____  Seal #: _____

**ETC USE ONLY** Opened By: _____  Date: _____  Time: _____
Seal #: _____  Condition: _____

ASHL-FED-0000297005
ALCD-PUBCOM_0001735

**ETC** ENVIRONMENTAL
TESTING and CERTIFICATION

D7382
ETC Sample No.:

## SAMPLE POINT INFORMATION FORM (CC2)

### FIELD MEASUREMENT DATA

Select up to 3 parameters to be recorded by entering the appropriate code letter in the first space for each of the 3 data entry fields provided. Enter the actual measurement data (in the units specified) for the three parameters you have selected.

| PARAMETERS | ACTUAL (left justify) | EXAMPLE |
|---|---|---|

Flow (CFS) — A
Volume (Gal) — B
Sample Depth (Ft) — C
Depth to Water (Ft) — D
Discharge Rate (GPM) — E
Depth to Bottom (Ft) — F
Event Time (2400-Hr Clock) — G
Depth to Screen (Ft) — H

Example: C 2 5 | F 5 0 | G 1 1 0 3

### FIELD TEST DATA

DO (Mg/L) | | | | |      Sample Temp. (°C) | | | |

pH
Single Measurement | 2nd of Quadruplicate | 3rd of Quadruplicate | 4th of Quadruplicate

Specific Conductance (uMHOS/CM)
Single Measurement | 2nd of Quadruplicate | 3rd of Quadruplicate | 4th of Quadruplicate

### THE FOLLOWING DATA IS FOR YOUR RECORDS ONLY

#### SAMPLING METHOD (choose one)

AIR-LIFT PUMP ( )          PERISTALTIC PUMP ( )          THIEF ( )
AUGER ( )                  PETERSEN ( )                  TRIER ( )
BAILER ( )                 PISTON PUMP ( )               VEHMEYER ( )
BOTTLE ( )                 SCOOP/SHOVEL ( )              OTHER
COLIWASA ( )               SQUEEZE PUMP ( )              _____
DIPPER ( )                 SUBMERSIBLE PUMP ( )          _____
KEMMERER ( )               SUCTION LIFT PUMP ( )
NISKIN ( )                 SURBER ( )

#### SAMPLE TYPE (choose one)

GRAB ( )        COMPOSITE (✓)        OTHER ( )

_wypes from 3 floor drains_
_second floor Bldg 720_
(describe)                    (describe)

WEATHER                       SAMPLE DESCRIPTION (e.g. color, odor)

_____       _____
_____       _____
_____       _____
(describe)                    (describe)

Form Prepared By: _____        Employer: _____
name (print)

ETC Form CC2 6/1/82

ASHL-FED-0000297006
ALCD-PUBCOM_0001736

# EGH 3730 - 07/8B IDENTIFICATION

## CHAIN OF CUSTODY FORM (CC1)

Sealed By: _Schuctut_

**SHIP TO:**

Company: **Drew Chemicals**

Facility/Site: **1106 Harrison Ave**

Address: **Kearny NJ 07032**

Attn: **Kurt Weiss**

Phone: ( ) -

## SAMPLE IDENTIFICATION

Facility/Site Code: **D R E W K E A R N Y**

**Source Codes:**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Well | (W) | River/Stream | (R) | Surface Impoundment | (I) | Lake/Ocean | (L) |
| Soil | (S) | Bottom Sediment | (B) | Pretreatment Facility | (P) | Treatment Facility | (T) |
| Outfall | (O) | Generation Point | (G) | Leachate Collection Sys. | (C) | Other | (X) |

| | | | |
|---|---|---|---|
| [X] | 7 2 0 5 E C O N D | 1 2 1 3 8 3 | 1 2 2 0 | | | |
| Source Code (from above) | Your Sample Point ID (left justify) | Start Date (mo/day/yr) | Start Time (2400 hr. clock) | Elapsed Hours (composite) |

Example: [W] | 1 0 1 J 2 6 3 P | 0 5 1 5 8 1 | 0 9 3 0 | 1 3 |

## SHUTTLE CONTENTS

| Sample Bottle | Condition | Sample Bottle | Condition |
|---|---|---|---|
| D7382   A | | | |
| | | | |
| | | | |
| | | | |

## CHAIN OF CUSTODY CHRONICLE

**1.** Shuttle Opened By: (print) _____  Date: _____  Time: _____

Signature: _____  Seal #: _____  Intact: _____

**2.** I have received these materials in good condition from the above person.

Name: _____  Signature: _____

Date: _____  Time: _____  Remarks: _____

**3.** I have received these materials in good condition from the above person.

Name: _____  Signature: _____

Date: _____  Time: _____  Remarks: _____

**4.** I have received these materials in good condition from the above person.

Name: _____  Signature: _____

Date: _____  Time: _____  Remarks: _____

**5.** Shuttle Sealed By: (print) _____  Date: _____  Time: _____

Signature: _____  Seal #: _____

## ETC USE ONLY

Opened By: _____  Date: _____  Time: _____

Seal #: _____  Condition: _____

**ETC** ENVIRONMENTAL
TESTING and CERTIFICATION

D7383

ETC Sample No.:

## SAMPLE POINT INFORMATION FORM (CC2)

### FIELD MEASUREMENT DATA

Select up to 3 parameters to be recorded by entering the appropriate code letter in the first space for each of the 3 data entry fields provided. Enter the actual measurement data (in the units specified) for the three parameters you have selected.

| PARAMETERS | | ACTUAL (left justify) | EXAMPLE |
|---|---|---|---|
| Flow (CFS) | A | | C 2 5 |
| Volume (Gal) | B | | |
| Sample Depth (ft) | C | | F 5 0 |
| Depth to Water (ft) | D | | |
| Discharge Rate (GPM) | E | | G 1 1 0 3 |
| Depth to Bottom (ft) | F | | |
| Event Time (2400-Hr Clock) | G | | |
| Depth to Screen (ft) | H | | |

### FIELD TEST DATA

DO (Mg/L) ☐☐☐☐        Sample Temp. (°C) ☐☐☐☐

pH  ☐☐☐☐  ☐☐☐☐  ☐☐☐☐  ☐☐☐☐
    Single Measurement  2nd of Quadruplicate  3rd of Quadruplicate  4th of Quadruplicate

Specific Conductance (uMHOS/CM)  ☐☐☐☐☐  ☐☐☐☐☐  ☐☐☐☐☐  ☐☐☐☐☐
    Single Measurement  2nd of Quadruplicate  3rd of Quadruplicate  4th of Quadruplicate

### THE FOLLOWING DATA IS FOR YOUR RECORDS ONLY

#### SAMPLING METHOD (choose one)

AIR-LIFT PUMP ( )          PERISTALTIC PUMP ( )          THIEF ( )
AUGER ( )                  PETERSEN ( )                  TRIER ( )
BAILER ( )                 PISTON PUMP ( )               VEHMEYER ( )
BOTTLE ( )                 SCOOP/SHOVEL ( )              OTHER _____
COLIWASA ( )               SQUEEZE PUMP ( )
DIPPER ( )                 SUBMERSIBLE PUMP ( )
KEMMERER ( )               SUCTION LIFT PUMP ( )
NISKIN ( )                 SURBER ( )

#### SAMPLE TYPE (choose one)

GRAB ( )          COMPOSITE ( ✓ )          OTHER ( )

*wipes 3 floor drains*
*third floor*
(describe)                                (describe)

WEATHER                          SAMPLE DESCRIPTION (e.g., color, odor)

_____          _____
_____          _____
_____          _____
(describe)                          (describe)

Form Prepared By: _____          Employer: _____
                   name (print)

ETC Form CC2 6/1/82

ASHL-FED-0000297008
ALCD-PUBCOM_0001738

# CHAIN OF CUSTODY FORM (CC1)

Sealed By: _Schuster_

## SHIP TO:

| | |
|---|---|
| **Company:** Drew Chemicals | **Attn.:** Kurt Weiss |
| **Facility/Site:** 1106 Harrison Ave | |
| **Address:** Kearny NJ 07032 | **Phone:** (   )   - |

## SAMPLE IDENTIFICATION

**Facility/Site Code:** D R E M K E A R N Y

**Source Codes:**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Well | —— (W) | River/Stream | —— (R) | Surface Impoundment | —— (I) | Lake/Ocean | —— (L) |
| Soil | —— (S) | Bottom Sediment | —— (B) | Pretreatment Facility | —— (P) | Treatment Facility | —— (T) |
| Outfall | —— (O) | Generation Point | —— (G) | Leachate Collection Sys. | —— (C) | Other | —— (X) |

| [X] | 7 2 0 T H 1 R D F L | 1 2 1 3 8 3 | 1 2 4 0 | | | | | |
|---|---|---|---|---|---|---|---|---|
| Source Code (from above) | Your Sample Point ID (left justify) | Start Date (mo/day/yr) | Start Time (2400 hr. clock) | Elapsed Hours (composite) |

| **Example:** [W] | 1 1 0 / J 2 6 3 P 1 | 0 5 1 5 8 1 | 0 9 3 0 | 1 3 1 |
|---|---|---|---|---|

## SHUTTLE CONTENTS

| Sample Bottle | Condition | Sample Bottle | Condition |
|---|---|---|---|
| D7383     A | | | |
| | | | |
| | | | |

## CHAIN OF CUSTODY CHRONICLE

**1.** Shuttle Opened By: (print) _____   Date: _____   Time: _____

Signature: _____   Seal #: _____   Intact: _____

**2.** I have received these materials in good condition from the above person.

Name: _____   Signature: _____

Date: _____   Time: _____   Remarks: _____

**3.** I have received these materials in good condition from the above person.

Name: _____   Signature: _____

Date: _____   Time: _____   Remarks: _____

**4.** I have received these materials in good condition from the above person.

Name: _____   Signature: _____

Date: _____   Time: _____   Remarks: _____

**5.** Shuttle Sealed By: (print) _____   Date: _____   Time: _____

Signature: _____   Seal #: _____

## ETC USE ONLY

Opened By: _____   Date: _____   Time: _____

Seal #: _____   Condition: _____

ASHL-FED-0000297009

ALCD-PUBCOM_0001739

**ETC** ENVIRONMENTAL
TESTING and CERTIFICATION

ETC Sample No.: D7384

## SAMPLE POINT INFORMATION FORM (CC2)

### FIELD MEASUREMENT DATA

Select up to 3 parameters to be recorded by entering the appropriate code letter in the first space for each of the 3 data entry fields provided. Enter the actual measurement data (in the units specified) for the three parameters you have selected.

| PARAMETERS | | ACTUAL (left justify) | EXAMPLE |
|---|---|---|---|
| Flow (CFS) | A | | C 2 5 |
| Volume (Gal) | B | | |
| Sample Depth (Ft) | C | | F 5 0 |
| Depth to Water (Ft) | D | | |
| Discharge Rate (GPM) | E | | G 1 1 0 3 |
| Depth to Bottom (Ft) | F | | |
| Event Time (2400-Hr Clock) | G | | |
| Depth to Screen (Ft) | H | | |

### FIELD TEST DATA

DO (Mg/L) [ | | | ]                    Sample Temp. (°C) [ | | | ]

pH    [Single Measurement]  [2nd of Quadruplicate]  [3rd of Quadruplicate]  [4th of Quadruplicate]

Specific
Conductance    [Single Measurement]  [2nd of Quadruplicate]  [3rd of Quadruplicate]  [4th of Quadruplicate]
(uMHOS/CM)

### THE FOLLOWING DATA IS FOR YOUR RECORDS ONLY

#### SAMPLING METHOD (choose one)

| | | |
|---|---|---|
| AIR-LIFT PUMP ( ) | PERISTALTIC PUMP ( ) | THIEF ( ) |
| AUGER ( ) | PETERSEN ( ) | TRIER ( ) |
| BAILER ( ) | PISTON PUMP ( ) | VOHMEYER ( ) |
| BOTTLE ( ) | SCOOP/SHOVEL ( ) | OTHER |
| COLIWASA ( ) | SQUEEZE PUMP ( ) | _____ |
| DIPPER ( ) | SUBMERSIBLE PUMP ( ) | _____ |
| KEMMERER ( ) | SUCTION LIFT PUMP ( ) | |
| NISKIN ( ) | SURBER ( ) | |

#### SAMPLE TYPE (choose one)

GRAB ( )        COMPOSITE ( )        OTHER ( )

*wipes 4 reactor manholes* _____

(describe)          (describe)

WEATHER          SAMPLE DESCRIPTION (e.g. color, odor)

_____          _____

_____          _____

_____          _____

(describe)          (describe)

Form Prepared By: *E.S.*          Employer: *dep*

name (print)

ETC Form CC2 6/1/82

ASHL-FED-0000297010
ALCD-PUBCOM_0001740

## CHAIN OF CUSTODY FORM (CC1)

Date Seal: **7/13/83**
Sealed By: **Schuster**

### SHIP TO:

Company: **Drew Chemicals**
Facility/Site: **1106 Harrison Ave**
Address: **Kearny NJ 07032**

Attn: **Kurt Weiss**
Phone: ( ) -

### SAMPLE IDENTIFICATION

Facility/Site Code: **D R E W K E A R N Y**

Source Codes:

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Well | (W) | River/Stream | (R) | Surface Impoundment | (I) | Lake/Ocean | (L) |
| Soil | (S) | Bottom Sediment | (B) | Pretreatment Facility | (P) | Treatment Facility | (T) |
| Outfall | (O) | Generation Point | (G) | Leachate Collection Sys. | (C) | Other | (X) |

| Source Code (from above) | Your Sample Point ID (left justify) | Start Date (mo/day/yr) | Start Time (2400 hr. clock) | Elapsed Hours (composite) |
|---|---|---|---|---|
| X | 7 2 0 R E A C T O R | 1 2 1 3 8 3 | 1 2 5 0 | |

Example:

| W | 1 0 J 2 6 3 P | 0 5 1 5 8 1 | 0 9 3 0 | 1 3 |
|---|---|---|---|---|

### SHUTTLE CONTENTS

| Sample Bottle | Condition | Sample Bottle | Condition |
|---|---|---|---|
| D7384 | A1 | | |
| | | | |
| | | | |
| | | | |

### CHAIN OF CUSTODY CHRONICLE

**1.** Shuttle Opened By: (print) _____ Date: _____ Time: _____

Signature: _____ Seal #: _____ Intact: _____

**2.** I have received these materials in good condition from the above person.

Name: _____ Signature: _____

Date: _____ Time: _____ Remarks: _____

**3.** I have received these materials in good condition from the above person.

Name: _____ Signature: _____

Date: _____ Time: _____ Remarks: _____

**4.** I have received these materials in good condition from the above person.

Name: _____ Signature: _____

Date: _____ Time: _____ Remarks: _____

**5.** Shuttle Sealed By: (print) _____ Date: _____ Time: _____

Signature: _____ Seal #: _____

### ETC USE ONLY

Opened By: _____ Date: _____ Time: _____

Seal #: _____ Condition: _____

ASHL-FED-0000297011
ALCD-PUBCOM_0001741

# EXHIBIT 29

OxyChem's Comments in Opposition to Proposed Consent Decree,
*United States v. Alden Leeds, Inc., et al.*, Civil Action No. 2:22-cv-07326 (D.N.J.)

ALCD-PUBCOM_0001742



Antea USA, Inc.
1031 US Highway 22, Suite 100
Bridgewater, New Jersey 08807 USA
www.anteagroup.com

## MEMORANDUM

**To:**    Michelle Stayrook – EHS Support

**From:**    Christopher Gorski – Antea Group

**Date:**    January 30, 2013

**Re:**    **Christopher Gorski**
**Antea Group**
**1031 U.S. Highway 22**
**Bridgewater, New Jersey**

**CC:**    Carla Nascimento – Antea Group

---

**Ashland – 1106 Harrison Avenue, Kearny New Jersey – Drain and Pipeline Cleanout and Inspection**

From November 26 through December 3, 2012, Antea Group conducted oversight activities at the Ashland Kearny, NJ site, during drainage and pipeline cleanout and inspection activities. Clean Harbors and Progressive Pipeline Management (PPM) collaborated efforts to successfully wash, clean, and inspect via video camera all necessary storm water systems leading offsite, and determine storm water flow direction. However, several inspection videos collected by PPM were corrupted during a file transfer, and as a result, re-inspection and clarification of specific storm water lines was conducted on January 7th and 8th 2013. Descriptions of each storm water system, integrity, and any issues experienced during the cleanout and inspection are provided below.

**1.    Building 706 - Maintenance Shop**

The Building 706 Maintenance Shop (Bldg. 706) consisted of floor drains 706 FD-1 and 706 FD-2, and slop sinks 706 SINK-1 and 706 SINK-2. During inspection of the building, it was determined that 706 SINK-1 and 706 SINK-2 were connected via piping through the wall, and that 706 FD-2 was abandoned by filling its basin with concrete. On November 27, 2012, PPM performed jet cleaning activities as well as camera inspection within Bldg. 706 from 706 FD-1 towards 706 SINK-1. The distance between 706 FD-1 and 706 SINK-1 was 19 feet. Various pieces of debris and hardened material made it difficult to determine the makeup of the piping. However, no visible cracks or disjointed sections were encountered during the camera inspection. The storm water flow direction appeared to be headed north towards the slop sinks and out through an overhead line, however, floor drains or sinks may have been evacuated by use of sump pump depending on their level of activity. The original November 27 2012 video file was lost during a file transfer, and as a result 706 FD-1 to 706 SINK-1 was re-inspected on January 7, 2013. No changes from the original inspection were observed during the inspection.



ASHL-FED-0000288634
ALCD-PUBCOM_0001743

2.  **Building 714 - Boiler House**

The Building 714 Boiler House contained a grated trench drain identified as 714 TD-1, a slop sink (714 SINK-1), and a sump (714 SUMP-1). During inspection of the building, it was determined that 714 SINK-1 and 714 TD-1 drained directly towards 714 SUMP-1. The sump was evacuated by use of a sump pump and an overhead line, which fed directly towards Catch Basin 3 (CB-3) on the drum storage pad located outside of the building. The segment conditions appeared to be fair, however, Clean Harbors voiced difficulty in maintaining dry trench drains, potentially due to groundwater or storm water infiltration. Video inspection was not performed in this location because each was exposed at ground level.

3.  **Building 717 - Compressor Building**

The Building 717 Compressor building was observed to contain two floor drains, 717 FD-1 and 717 FD-2. During inspection of the building, it was determined that 717 FD-1 drained directly towards 717 FD-2. On November 27, 2012, PPM performed jet cleaning activities as well as camera inspection from 717 FD-2 towards 717 FD-1. Various pieces of debris and hardened material made it difficult to determine the makeup of the piping. No visible cracks or disjointed sections were encountered during the camera inspection. While jetting and inspecting, PPM encountered a hard wall or blockage in the line, about 1 foot in from the beginning of 717 FD-1. From the inspection, it appeared to be abandoned or blocked intentionally by concrete or cement of some form. Also during the inspection, an unknown line was discovered (originally not located on the work plan map), heading toward a Dike 3 on the outside of the building from 717 FD-2. PPM proceeded to jet clean and video inspect this line. The line was filled with a hardened material, and 15 feet from 717 FD-2 a 90 degree right-bend was encountered which exhibited a major crack on the outside of the pipe. Due to the sharp bend in the line, PPM was unable to inspect any further, leaving an uncertainty as to where the line ended.

4.  **Building 720 – Production**

Building 720 Production contained five floor drains and one slop sink, identified as 720 FD-1 through 720 FD-5, and 720 SINK-1 respectively. During inspection of the building, it was determined that 720 FD-1 drained towards 720 FD-2, 720 SINK-1 drained towards 720 FD-2, 720 FD-2 drained towards 720 FD-3, the floor pit between 720 FD-2 and 720 FD-3 drained towards 720 FD-3, 720 FD-3 drained towards 720 FD-4, and 720 FD-5 drained towards 720 FD-4. On November 29, 2012, PPM performed jet cleaning activities as well as camera inspection throughout all piping components. All lines within Building 720 contained a greasy, thick viscous material that was unidentifiable, making it fairly difficult to clean. The distances between each line were measured as follows; 720 FD-1 towards 720 FD-2 was 21 feet, 720 FD-2 towards 720 FD-3 was 27 feet, the floor pit between 720 FD-2 and 720 FD-3 towards 720 FD-3 was 7 feet, the distance between 720 FD-3 towards 720 FD-4 was 21 feet, and the distance between 720 FD-4 towards 720 FD-5 was 32 feet. No visible cracks or disjointed sections were encountered during the camera inspection of the building. While performing the video inspection, PPM encountered several unknown lines not originally placed on the work plan map, forming 90 degree bends. One was located seven feet in heading from 720 FD-3 to 720 FD-4, another was located 19 feet in heading from 720 FD-4 to 720 FD-5. These unknown pipes appear to line up with drainage lines connected to the second floor or higher. Due to the sharpness of the bend, PPM was unable to inspect these unknown lines.

Also during the inspection, an unknown line not originally located on the work plan map was discovered, heading in the direction of 720 FD-1 from 720 FD-5. PPM proceeded to jet clean and video inspect this line. The line was clear, however, a blockage that appeared to look like a flange was encountered 14 feet in from 720 FD-5, leading PPM to believe the location was previously abandoned.

Several issues were encountered when attempting to clean and inspect 720 FD-4 towards Manhole 3 (MH-3). Large amounts of grease were encountered while cleaning the pipe, making the video inspection slightly unclear. Small white pieces of material, associated with the production aspect of the building, were also encountered from 720 FD-4 leaving the building. The line leading from 720 FD-4 out of Building 720 hits a 90 degree turn, which is located under the staircase in the adjoining room. Due to this sharp turn, PPM could not inspect or clean any further. This 90 degree turn lead PPM to clean and inspect from MH-3 towards Building 720, however, PPM never reached the location with a 90 degree turn. An unknown line was later discovered in the upper sections of Manhole 4 (MH-4) leading towards the

ASHL-FED-0000288635
ALCD-PUBCOM_0001744

building. During its inspection, the same greasy material and white production materials were encountered. It was determined after the inspection that MH-4 and 720 FD-4 in Building 720 were connected; however MH-3 was not connected to 720 FD-4. The original November 29, 2012 Building 720 video files were lost during a file transfer. As a result the Building 720 components were re-inspected on January 7, 2013. No changes from the original inspection were observed during the re-inspection.

**5. Building 721 – Drumming Room**

Building 721 Drumming Room contained open trench drains, 721 TD-1 through 721 TD-4. During inspection of the building, it was determined that 721 TD-3 and 721 TD-4 were connected to 721 TD-1, and that 721 TD-1 flowed towards 721 TD-2 and out of Building 721 into Catch Basin 22 (CB-22). On November 28, 2012, Clean Harbors performed power washing and inspection activities on the opened trench drains. Various pieces of debris and grease-like material were encountered while cleaning the piping, making it slightly difficult to inspect. No visible cracks or disjointed sections were encountered during the inspection. One small section of the trench drains was inspected by video camera from 721 TD-1 towards 721 TD-2 because of an identified small enclosed section. However, no issues were found during the video inspection.

**6. Sales Office**

The sales office (B001) contained one floor drain, B001-FD-1. The floor drain in B0001 was jet cleaned by PPM on November 27 2012. While jet cleaning the pipes, it was determined that the line was actually a sanitary sewer line, and it was connected to several sinks. As a result, based on the use of this line it was not video inspected.

**7. Lift Station #1**

Lift station #1 consisted of six catch basins, CB-1 through CB-6. During inspection of the area, it was determined that CB-1 drained towards CB-2, CB-2 drained towards CB-3, CB-3 drained towards CB-5, CB-4 drained towards CB-5, and CB-6 drained towards CB-5. On November 26, 2012, PPM performed camera inspections from CB-1 to CB-2, and CB-2 to CB-3. The distance between CB-1 and CB-2 was measured to be 55 feet. Various pieces of debris and vegetation were encountered while performing the inspection. The inspection from CB-2 towards CB-3 identified flooding and mud within the pip, making it very difficult to see and document the integrity of the pipe. However, no visible cracks or disjointed sections were encountered during any of the camera inspections. As a result of the flooding observed near CB-3, and surrounding CB-4, CB-5 and CB-6, PPM decided to continue the inspection at a later time. On November 27, 2012, PPM vacuumed and jet cleaned CB-2 to CB-3, CB-5 to CB-3, and CB-5 to CB-4. The vacuuming allowed for a successful video inspection of CB-2 to CB-3, however, severe flooding caused from the drainage swale next to CB-6 caused constant flooding of the piping network, and hindered the crew from completing video inspections from CB-4, CB-5, and CB-6. The original November 26th and 27th 2012 video files were lost during a file transfer. As a result CB-1 to CB-2 and CB-2 to CB-3 were re-inspected on January 7, 2013. Catch basins CB-4, CB-5, and CB-6 were covered by a thick sheet of ice, and again could not be accessed. No changes were observed during the re-inspection as compared to the initial inspection.

**8. Dike #5**

Dike #5 consisted of two catch basins, CB-7 and CB-8, and one manhole, MH-1. During inspection of Dike #5, it was determined that CB-7 drained towards CB-8, and CB-8 drained towards MH-1. On November 26, 2012, PPM performed camera inspections from CB-7 to CB-8, as well as from CB-8 towards several other areas that were previously not recorded on the original work plan map. The distance between CB-7 and CB-8 was measured to be 37 feet, due to two 45 degree sweeps that occurred 10 feet in and 25 feet in from CB-7. Debris, hardened material, and muddy conditions were encountered while performing the video inspection of this line, making it very difficult to see the piping. Due to the conditions of the lines, PPM vacuumed and jetted the lines in order to determine their actual condition. On November 30, 2012, PPM vacuumed, jet cleaned, and video inspected lines stemming off of CB-8, which included CB-8 towards CB-7, CB-8 towards an unknown line, which was observed in the direction of Dike #3, CB-8 towards the DI Building drainage point, CB-8 towards MH-1, and CB-8 toward an unknown line, which was observed in the direction of Dike #6. CB-7

ASHL-FED-0000288636
ALCD-PUBCOM_0001745

towards CB-8 still contained hardened material even after jetting activities, however, the inspection was much more visible as other debris was cleared. During the inspection of CB-8 towards unknown line running in the direction of Dike #3, several small holes were discovered 14 feet from CB-8, and appeared to be punctured about every foot after that until the end of the line was reached. PPM could not determine where this pipeline ended. The total distance reached was 26 feet. The inspection of the lines from CB-8 towards the DI Building drain and CB-8 towards an unknown line running in the direction of Dike #6 indicated no issues or damage existed. Video inspection was also performed from CB-8 towards MH-1. The total distance was 75 feet, and no issues were encountered during the inspection of this line.

**9. Lift Station #2**

Lift Station #2 consisted of two catch basins, CB-9 and CB-10. During inspection of the lift station, it was determined that CB-9 drained towards CB-10. On November 30, 2012, PPM vacuumed, jet cleaned, and video inspected the line from CB-9 to CB-10. The total distance between CB-9 and CB-10 was measured to be 25 feet. No issues or visible cracks were encountered during the inspection of these lines.

**10. Lift Station #3**

Lift station #3 consisted of one catch basin, CB-11. During inspection of the lift station, it was determined that CB-11 drained through an overhead line by potentially using a sump pump, or some other method. On November 30, 2012, PPM vacuumed CB-11, to rid the catch basin of water and debris. No underground lines were discovered in the catch basin, so no jet cleaning or video inspection was completed.

**11. Lift Station #4**

Lift station #4 consisted of three catch basins, CB-12, CB-13, and CB-14, and two manholes, MH-2 and MH-3. During inspection of the lift station, it was determined that CB-12 drained towards MH-2, MH-2 drained towards CB-13, CB-13 drained towards CB-14, and CB-14 drained towards MH-3. On November 26, 2012, PPM performed video inspection of MH-2, CB-12, and CB-13. The inspection of the line from MH-2 to CB-12 provided good video footage, however, debris and mud within the piping from MH-2 towards CB-13 indicated the line needed to jet cleaned. On November 28, 2012, PPM vacuumed, jet cleaned, and video inspected CB-14 towards MH-3. The total distance from CB-14 to MH-3 was measured to be 18 feet, and no visual issues or cracks were encountered during the inspection. On December 3, 2012, PPM performed jet cleaning and video inspection activities from MH-2 towards CB-13, and CB-13 towards CB-14. No visual issues or cracks were observed, however, the line MH-2 towards CB-13 appeared to have slightly disjointed sections of piping. No water or soil sediment was found leaking in. The video files collected in Lift Station #4 were lost during a file transfer. As a result the lift station's components were re-inspected on January 7, and 8, 2013. No changes from the previous investigations were observed during the re-inspection of these lines.

**12. Loading Dock**

The loading dock consisted of three catch basins, CB-15, CB-16A, and CB-16B. During the inspection of the loading dock, it was determined that the CB-16 series flowed directly towards CB-15, which drained into Manhole 3 (MH-3) located in the lift station #4 area. On November 28, 2012, PPM performed jet cleaning and video inspection activities on lines from CB-15 to CB-16A, and CB-16A to CB-16B. The distance between CB-15 and CB-16A was measured to be 27 feet, and the distance between CB-16A and CB-16B was measured to be 17 feet. Broken joints were encountered in both sets of inspections. A broken joint was encountered 25 feet in from CB-15 heading towards CB-16A. The second broken joint was encountered 15 feet in from CB-16A heading towards CB-16B. The video files collected from the loading dock were lost during a file transfer. As a result the loading dock's components were re-inspected on January 7, 2013. No changes were observed during the re-inspection from the previous investigation.

**13. Alley**

The alley contained two manholes located on the northernmost end of the lift station #4, MH-3 and MH-4, and six catch basins, CB-17 through CB-22. During the inspection, several alterations were discovered, therefore modifying the original

ASHL-FED-0000288637
ALCD-PUBCOM_0001746

work plan drainage map. The drainage throughout the alley way was identified to be as follows: MH-3 drains directly into MH-4, MH-4 drains directly into CB-20, FD-4 in Building 720 drains into MH-4, CB-17 drains into CB-18, CB-18 drains into CB-19, CB-19, drains into CB-20, CB-20 drains into CB-21, CB-22 drains into CB-21, and an unknown square catch basin directly in line with the SINK-1 located inside Building 720 drains into CB-21. On November 28, 2012, PPM conducted jet cleaning and video inspection activities throughout the alley way network. The distance between MH-3 to MH-4 was measured to be 13 feet, and no visual issues were encountered during the inspection. The work plan's original map showed MH-4 connecting to CB-17, however, the inspection confirmed that MH-4 connects directly to CB-20. Jet cleaning activities were performed several times from MH-4 towards CB-20 due to excessive debris, grease, and mud. The video inspection for MH-4 towards CB-20 displayed three off-set joints and one potential small hole. Catch basins CB-17, CB-18, and CB-19 were connected, and drained towards CB-20. The distance from CB-17 to CB-18, CB-18 to CB-19, and CB-19 to CB-20, was measured as 55 feet, 39 feet, and 11 feet respectively. No issues or cracks were encountered while performing the inspection from CB-17 through CB-20. The distance between CB-21 and CB-22 was 8 feet, and no issues or crack were encountered during the inspection, however, hardened material was adhered to the piping. An unknown catch basin near CB-20 was encountered, which drains into CB-21. The total distance between the unknown catch basin and CB-21 was 6 feet, and no visual issues were encountered during the inspection. On November 29, 2012, PPM continued working in the Alley way, starting with CB-20 to CB-21 due to flooding issues. The distance between CB-20 and CB-21 was 9 feet. The shape of the pipe was rectangular. No visual issues or crack were encountered during the inspection. The video files collected from the alley way were lost during a file transfer. As a result the loading dock's components were re-inspected on January 7 and 8, 2013. No changes were observed during the re-inspection as compared to the previous results.

**14.  End Basin/Vault**

The end basin consisted of one connection, which was CB-21 towards the vault leaving the property. On November 28, 2012, PPM attempted to jet clean the piping leading from CB-21 towards the vault. Unfortunately, while attempting the cleanout, it appeared that the jet hose was hitting a barricade. It was stated in earlier meetings that a valve may have been turned on, successfully closing off the line. In order to confirm this, PPM sent the video camera down to inspect the line. The video displayed a severely disjointed or crushed pipe, which would not allow either the camera or the jet hose to pass through due to its size. This curtailed all work that would have been performed in this section, including the cleanout and the video inspection.

# EXHIBIT 30

OxyChem's Comments in Opposition to Proposed Consent Decree,
*United States v. Alden Leeds, Inc., et al.*, Civil Action No. 2:22-cv-07326 (D.N.J.)



# Memorandum

October 5, 2020
Revised October 7, 2020

| To: | Paul Brzozowski [pbrzozowski@intell-group.com] | Ref. No.: | 11217776 |
|---|---|---|---|
| | x5 | | |
| From: | Susan Scrocchi/adh/1 | Tel: | 716-205-1984 |
| CC: | Miriam Thau [mthau@intell-group.com] | | |
| Subject: | **Analytical Results and Validation - High Resolution Upland Site Sampling Ashland LLC/Drew Chemical Corp. Site 1106 Harrison Avenue, Kearney, New Jersey August 2020** | | |

## 1. Introduction

This document details a validation of analytical results for sediment samples collected in August 2020 by TIG Environmental at the Ashland LLC/Drew Chemical Corp. Site at 1106 Harrison Avenue, Kearny, New Jersey. Samples were submitted to SGS North America, Inc. located in Wilmington, North Carolina. A sample collection and analysis summary is presented in Table 1. The validated analytical results are summarized in Table 2. A summary of the analytical methodology is presented in Table 3.

Full Contract Laboratory Program (CLP) equivalent raw data deliverables were provided by the laboratory. The sample delivery groups covered in the report are identified in Table 1. Evaluation of the data was based on information obtained from the finished data sheets, raw data, chain of custody forms, calibration data, blank data, and recovery data from surrogate spikes/laboratory control samples (LCS). The assessment of analytical and in-house data included checks for: data consistency, adherence to accuracy and precision criteria, and transmittal errors.

The Quality Assurance/Quality Control (QA/QC) criteria by which these data have been assessed are outlined in the analytical methods referenced in Table 3 and applicable guidance from the documents entitled:

i) Uniform Federal Policy - Quality Assurance Project Plan (UFP-QAPP) "Defendant Upland Site Sampling", October 2019

ii) EPA Region 2 Standard Operating Procedure (SOP) HW-25

Item ii) will subsequently be referred to as the "SOPs" in this Memorandum. Data validation was performed as specified in Worksheet #36 of the UFP-QAPP.

**GHD**
2055 Niagara Falls Boulevard Niagara Falls New York 14304 USA
T 716 297 6150   F 716 297 2265   W www.ghd.com



**ISO 9001**



## 2.    Sample Holding Time and Preservation

Samples were stored frozen from the time of collection. The sample holding time criteria for the analyses are summarized in Table 3. Sample chain of custody documents and analytical reports were used to determine sample holding times. All samples were prepared and analyzed within the required holding times.

All samples were properly preserved, delivered on ice, and stored by the laboratory at the required temperature (0-6°C).

## 3.    Gas Chromatography/Mass Spectrometry (GC/MS) – Tuning and Mass Calibration (Instrument Performance Check)

Prior to polychlorinated dibenzodioxins/polychlorinated dibenzo-p-furans (PCDDs/PCDFs) analyses, GC/MS instrumentation is tuned to ensure optimization over the mass range of interest. To evaluate instrument tuning, the method requires the analysis of the specific tuning compound perfluorokerosene (PFK). The resulting spectra must meet the criteria cited in the method before analysis is initiated. Analysis of the tuning compound must then be repeated every 12 hours throughout sample analysis to ensure the continued optimization of the instrument.

The tuning compound was analyzed at the required frequency throughout the analysis periods. All tuning criteria were met, indicating that proper optimization of the instrumentation was achieved.

## 4.    Initial Calibration

To quantify PCDDs/PCDFs of interest in samples, calibration of the GC/MS over a specific concentration range must be performed. Initially, a minimum of a five-point calibration curve containing all compounds of interest is analyzed to characterize instrument response for each analyte over a specific concentration range. Linearity of the calibration curve and instrument sensitivity are evaluated against the criteria cited in the methods.

The initial calibration data were reviewed. All compounds met the method criteria for sensitivity and linearity.

## 5.    Continuing Calibration

To ensure that instrument calibration for the analyses is acceptable throughout the sample analysis period, continuing calibration standards must be analyzed and compared to the initial calibration curve every 12 hours.

Calibration standards were analyzed at the required frequency. All results met the method criteria for instrument sensitivity and stability.

CONFIDENTIAL                                     OCC-CER-SD000075987

ALCD-PUBCOM_0001750



## 6.    Laboratory Blank Analyses

Method blanks are prepared from a purified matrix and analyzed with the investigative samples to determine the existence and magnitude of sample contamination introduced during the analytical procedures.

For this study, laboratory method blanks were analyzed at a minimum frequency of 1 per 20 investigative samples and/or 1 per analytical batch.

All method blank results were non-detect, indicating that laboratory contamination was not a factor for this investigation.

## 7.    Spiked C-13 Labeled PCDD/PCDF

In accordance with the methods employed, all samples, blanks, and QC samples analyzed for PCDDs/PCDFs are spiked with labeled congeners prior to extraction to be an internal standard for the quantitation of native congeners, and to serve as surrogates for the assessment of method performance in the sample matrix.

All samples submitted for PCDDs/PCDFs determinations were spiked with the appropriate number of labeled compounds prior to sample extraction and analysis.

Labeled congener recoveries were assessed against method control limits. All recoveries were acceptable.

## 8.    Cleanup Standard Recoveries

C-13 labeled cleanup standards are added to all samples, blanks, and QC samples subsequent to extraction, but prior to the cleanup procedures to assess the efficiency of the cleanup procedures.

Cleanup standards were added to all samples, blanks, and QC samples prior to cleanup. All PCDD/PCDF recoveries were within the method acceptance ranges.

## 9.    Ongoing Precision and Recovery (OPR) Sample Analyses

OPR/Ongoing Precision and Recovery Duplicates (OPRD) are prepared and analyzed as samples to assess the analytical efficiencies of the methods employed, independent of sample matrix effects. The relative percent difference (RPD) of the OPR/OPRD recoveries is used to evaluate analytical precision.

For this study, OPR/OPRD were analyzed at a minimum frequency of 1 per 20 investigative samples and/or 1 per analytical batch.

CONFIDENTIAL                                          OCC-CER-SD000075988
                                                                ALCD-PUBCOM_0001751



The OPR/OPRD contained all compounds of interest. All OPR recoveries and RPDs were within the method control limits, demonstrating acceptable analytical accuracy and precision.

## 10.   Field QA/QC Samples

The field QA/QC consisted of two field blank samples and one field duplicate sample set.

### 10.1    Field Blank Sample Analysis

To assess field decontamination procedures, ambient conditions at the site, and cleanliness of sample containers, two field blanks were submitted for analysis, as identified in Table 1. All results were non-detect for the analytes of interest.

### 10.2    Field Duplicate Sample Analysis

To assess the analytical and sampling protocol precision, one field duplicate sample set was collected and submitted "blind" to the laboratory, as specified in Table 1. The RPDs associated with these duplicate samples must be less than 50 percent for sediment samples.

All field duplicate results were within acceptable agreement, demonstrating acceptable sampling and analytical precision.

## 11.   Analyte Reporting

The laboratory reported detected results down to the laboratory's method detection limit (MDL) for each analyte. Positive analyte detections less than the reporting limit (RL) but greater than the MDL were qualified as estimated (J) in Table 2. Non-detect results were presented as non-detect at the RL in Table 2.

All sediment results were reported on a dry weight basis.

## 12.   Target Compound Identification/Sample Quantitation

To minimize erroneous compound identification during organic analyses, qualitative criteria including compound retention time, ion abundance ratio, and chromatography were evaluated according to the identification criteria established by the methods. An erroneous identification can be either a false-positive (reporting a target compound when it is not present in the sample) or false-negative (not reporting a compound that is present in the sample).

The samples identified in Table 1 were reviewed. Most organic compounds reported adhered to the specified identification criteria.

11217776Memo-1

4

CONFIDENTIAL



Some sample results were reported as positive hits although the ion abundance ratio was not met. The associated results were qualified as the estimated maximum possible concentration. A summary of these qualified data is presented in Table 4.

## 13.  Conclusion

Based on the assessment detailed in the foregoing, the data summarized in Table 2 are acceptable with the specific qualifications noted herein.

CONFIDENTIAL

OCC-CER-SD000075990
ALCD-PUBCOM_0001753

Table 1

**Sample Collection and Analysis Summary**
**Update Site Sampling**
**Ashland LLC/Drew Chemical Corp. Site**
**1106 Harrison Avenue, Kearney, New Jersey**
**August 2020**

|  |  | | |  | | Analysis/Parameters |  |
|---|---|---|---|---|---|---|---|
| Sample Delivery Group | Sample Identification | Location | Matrix | Collection Date (mm/dd/yyyy) | Collection Time (hr:min) | PCDD/PDCF | Comments |
| B4565 | ASH-SE-001 | Floor drain FD-4 inside Building 720 | Sediment | 08/18/2020 | 12:40 | X |  |
| B4565 | ASH-SE-002 | Manhole MH-4, west of Building 720 | Sediment | 08/18/2020 | 12:10 | X |  |
| B4565 | ASH-SE-004 | Catch basin near former lift station | Sediment | 08/19/2020 | 11:20 | X |  |
| B4565 | ASH-SE-006 | Catch basin east of Building 722 | Sediment | 08/18/2020 | 11:00 | X |  |
| B4565 | FIELD DUPLICATE | Catch basin east of Building 722 | Sediment | 08/18/2020 | 11:00 | X | FD(ASH-SE-006) |
| B4566 | FIELD BLANK-001 | - | Water | 08/18/2020 | 10:33 | X | FIELD BLANK |
| B4566 | FIELD BLANK-002 | - | Water | 08/19/2020 | 10:45 | X | FIELD BLANK |

Notes:

FD     - Field Duplicate Sample of sample in parenthesis
PCDD/PCDF     - Polychlorinated Dibenzodioxins/Polychlorinated Dibenzofurans
-     - Not applicable

GHD 11217778\Memo-1-Tbls

CONFIDENTIAL

OCC-CER-SD000075991
ALCD-PUBCOM_0001754

**Table 2**

**Analytical Results Summary**
**Upland Site Sampling**
**Ashland LLC/Drew Chemical Corp. Site**
**1106 Harrison Avenue, Kearney, New Jersey**
**August 2020**

| Parameters | Unit | Catch basin east of Building 722 ASH-SE-006 08/18/2020 | Catch basin east of Building 722 FIELD DUPLICATE 08/18/2020 Duplicate | Catch basin near former lift station ASH-SE-004 08/19/2020 |
|---|---|---|---|---|
| **PCDDs and PCDFs** | | | | |
| 1,2,3,4,6,7,8,9-Octachlorodibenzo-p-dioxin (OCDD) | pg/g | 13800 | 15200 | 32900 |
| 1,2,3,4,6,7,8,9-Octachlorodibenzofuran (OCDF) | pg/g | 328 | 403 | 702 |
| 1,2,3,4,6,7,8-Heptachlorodibenzo-p-dioxin (HpCDD) | pg/g | 1340 | 1420 | 3920 |
| 1,2,3,4,6,7,8-Heptachlorodibenzofuran (HpCDF) | pg/g | 214 | 254 | 351 |
| 1,2,3,4,7,8,9-Heptachlorodibenzofuran (HpCDF) | pg/g | 11.4 J | 12.6 J | 25.3 J |
| 1,2,3,4,7,8-Hexachlorodibenzo-p-dioxin (HxCDD) | pg/g | 18.7 | 23.9 | 40.7 |
| 1,2,3,4,7,8-Hexachlorodibenzofuran (HxCDF) | pg/g | 21.2 | 25.1 | 37 |
| 1,2,3,6,7,8-Hexachlorodibenzo-p-dioxin (HxCDD) | pg/g | 47.7 | 52.8 | 119 |
| 1,2,3,6,7,8-Hexachlorodibenzofuran (HxCDF) | pg/g | 11.9 | 13.7 | 26.6 |
| 1,2,3,7,8,9-Hexachlorodibenzo-p-dioxin (HxCDD) | pg/g | 49 | 60 | 97.2 |
| 1,2,3,7,8,9-Hexachlorodibenzofuran (HxCDF) | pg/g | 5 U | 4.96 U | 24.4 U |
| 1,2,3,7,8-Pentachlorodibenzo-p-dioxin (PeCDD) | pg/g | 19 | 23 | 25.3 J |
| 1,2,3,7,8-Pentachlorodibenzofuran (PeCDF) | pg/g | 3.59 J | 3.99 J | 12.9 J |
| 2,3,4,6,7,8-Hexachlorodibenzofuran (HxCDF) | pg/g | 14.6 | 15.9 | 30.3 |
| 2,3,4,7,8-Pentachlorodibenzofuran (PeCDF) | pg/g | 8.82 | 9.3 | 20.5 J |
| 2,3,7,8-Tetrachlorodibenzo-p-dioxin (TCDD) | pg/g | 17.5 | 24 J | 20.1 |
| 2,3,7,8-Tetrachlorodibenzofuran (TCDF) | pg/g | 3.3 J | 4.66 | 47.9 |
| Total heptachlorodibenzo-p-dioxin (HpCDD) | pg/g | 2580 | 2820 | 7850 |
| Total heptachlorodibenzofuran (HpCDF) | pg/g | 409 | 466 | 679 |
| Total hexachlorodibenzo-p-dioxin (HxCDD) | pg/g | 482 | 600 | 1130 |
| Total hexachlorodibenzofuran (HxCDF) | pg/g | 243 | 284 | 440 |
| Total pentachlorodibenzo-p-dioxin (PeCDD) | pg/g | 117 | 143 | 162 |
| Total pentachlorodibenzofuran (PeCDF) | pg/g | 62.7 | 61.9 | 281 |
| Total tetrachlorodibenzo-p-dioxin (TCDD) | pg/g | 98.9 | 154 | 115 |
| Total tetrachlorodibenzofuran (TCDF) | pg/g | 69.4 | 77.1 | 284 |

GHD 11217776Memo-1-Tbls

OCC-CER-SD000075992
ALCD-PUBCOM_0001755

Table 2

**Analytical Results Summary**
**Upland Site Sampling**
**Ashland LLC/Drew Chemical Corp. Site**
**1106 Harrison Avenue, Kearney, New Jersey**
August 2020

| Location ID: Sample Name: Sample Date: | Unit | Floor drain FD-4 inside Building 720 ASH-SE-001 08/18/2020 | Manhole MH-4, west of Building 720 ASH-SE-002 08/18/2020 |
|---|---|---|---|
| **Parameters** | | | |
| **PCDDs and PCDFs** | | | |
| 1,2,3,4,6,7,8,9-Octachlorodibenzo-p-dioxin (OCDD) | pg/g | 25300 | 21300 |
| 1,2,3,4,6,7,8,9-Octachlorodibenzofuran (OCDF) | pg/g | 589 | 683 |
| 1,2,3,4,6,7,8-Heptachlorodibenzo-p-dioxin (HpCDD) | pg/g | 9030 | 4910 |
| 1,2,3,4,6,7,8-Heptachlorodibenzofuran (HpCDF) | pg/g | 261 | 262 |
| 1,2,3,4,7,8,9-Heptachlorodibenzofuran (HpCDF) | pg/g | 15.9 J | 217 J |
| 1,2,3,4,7,8-Hexachlorodibenzo-p-dioxin (HxCDD) | pg/g | 97.8 | 37.4 |
| 1,2,3,4,7,8-Hexachlorodibenzofuran (HxCDF) | pg/g | 13.5 | 19.1 |
| 1,2,3,6,7,8-Hexachlorodibenzo-p-dioxin (HxCDD) | pg/g | 329 | 131 |
| 1,2,3,6,7,8-Hexachlorodibenzofuran (HxCDF) | pg/g | 12.1 | 14.5 |
| 1,2,3,7,8,9-Hexachlorodibenzo-p-dioxin (HxCDD) | pg/g | 256 | 63.1 |
| 1,2,3,7,8,9-Hexachlorodibenzofuran (HxCDF) | pg/g | 5.01 U | 4.9 U |
| 1,2,3,7,8-Pentachlorodibenzo-p-dioxin (PeCDD) | pg/g | 52.3 | 17.1 |
| 1,2,3,7,8-Pentachlorodibenzofuran (PeCDF) | pg/g | 5.61 | 5.7 |
| 2,3,4,6,7,8-Hexachlorodibenzofuran (HxCDF) | pg/g | 22.9 | 21 |
| 2,3,4,7,8-Pentachlorodibenzofuran (PeCDF) | pg/g | 9.11 | 19.4 |
| 2,3,7,8-Tetrachlorodibenzo-p-dioxin (TCDD) | pg/g | 18.4 | 11.2 |
| 2,3,7,8-Tetrachlorodibenzofuran (TCDF) | pg/g | 8.67 | 4.46 |
| Total heptachlorodibenzo-p-dioxin (HpCDD) | pg/g | 17100 | 9310 |
| Total heptachlorodibenzofuran (HpCDF) | pg/g | 708 | 747 |
| Total hexachlorodibenzo-p-dioxin (HxCDD) | pg/g | 3810 | 1050 |
| Total hexachlorodibenzofuran (HxCDF) | pg/g | 362 | 405 |
| Total pentachlorodibenzo-p-dioxin (PeCDD) | pg/g | 732 | 126 |
| Total pentachlorodibenzofuran (PeCDF) | pg/g | 193 | 250 |
| Total tetrachlorodibenzo-p-dioxin (TCDD) | pg/g | 196 | 45.9 |
| Total tetrachlorodibenzofuran (TCDF) | pg/g | 139 | 107 |

Notes:

J - Estimated concentration
U - Not detected at the associated reporting limit
PCDDs - Polychlorinated Dibenzodioxins
PCDFs - Polychlorinated Dibenzofurans

GHD 11217776Memo-1-Tbls

OCC-CER-SD000075993

ALCD-PUBCOM_0001756

**Table 3**

**Analytical Methods**
**Update Site Sampling**
**Ashland LLC/Drew Chemical Corp. Site**
**1106 Harrison Avenue, Kearney, New Jersey**
**August 2020**

| Parameter | Method | Matrix | Holding Time | |
|---|---|---|---|---|
| | | | Collection to Extraction (Days) | Collection or Extraction to Analysis (Days) |
| Polychlorinated Dibenzodioxins (PCDDs) & Polychlorinated Dibenzofurans (PCDFs) | EPA1613B | Sediment | 365 | 365 |

Notes:
Method Reference:
EPA    - United States Environmental Protection Agency, Analytical Methodology (October 2007)

GHD 11217778Memo-1-Tbls

**Table 4**

**Qualified Sample Results Due to Outlying Identification Criteria**
**Update Site Sampling**
**Ashland LLC/Drew Chemical Corp. Site**
**1106 Harrison Avenue, Kearney, New Jersey**
**August 2020**

| Parameter | Analyte | Associated Sample ID | Qualified Result | Units |
|---|---|---|---|---|
| PCDD/PCDF | 1,2,3,4,7,8,9-Heptachlorodibenzofuran (HpCDF) | ASH-SE-006 | 11.4 J | pg/g |
| | 1,2,3,4,7,8,9-Heptachlorodibenzofuran (HpCDF) | FIELD DUPLICATE | 12.6 J | pg/g |
| | 2,3,7,8-Tetrachlorodibenzofuran (TCDF) | ASH-SE-006 | 3.3 J | pg/g |
| | 2,3,7,8-Tetrachlorodibenzo-p-dioxin (TCDD) | FIELD DUPLICATE | 24 J | pg/g |
| | 1,2,3,4,7,8,9-Heptachlorodibenzofuran (HpCDF) | ASH-SE-002 | 21.7 J | pg/g |
| | 1,2,3,4,7,8,9-Heptachlorodibenzofuran (HpCDF) | ASH-SE-001 | 15.9 J | pg/g |
| | 1,2,3,4,7,8,9-Heptachlorodibenzofuran (HpCDF) | ASH-SE-004 | 25.3 J | pg/g |
| | 1,2,3,7,8-Pentachlorodibenzo-p-dioxin (PeCDD) | ASH-SE-004 | 25.3 J | pg/g |

Notes:

J          - Estimated concentration
PCDD/PCDF  - Polychlorinated Dibenzodioxins/Polychlorinated Dibenzofurans

GHD 11217776Memo-1-Tbls

CONFIDENTIAL

OCC-CER-SD000075995
ALCD-PUBCOM_0001758