**Tab 9, Part 2**
**Exhibits to OxyChem's March 22, 2023 Public**
**Comments**

**OCC Cmt. Ex.31 - OCC Cmt. Ex.46**

# EXHIBIT 31

OxyChem's Comments in Opposition to Proposed Consent Decree,
*United States v. Alden Leeds, Inc., et al.*, Civil Action No. 2:22-cv-07326 (D.N.J.)

ALCD-PUBCOM_0001759



FIGURE 1-1
SITE LOCATION MAP
ASHLAND LLC
FORMER ASHLAND HERCULES WATER
TECHNOLOGIES (AHWT)
1106 HARRISON AVENUE, KEARNY, NJ.
PI#14954; ISRA#20090080

| Quad: | Elizabeth/Orange |
|-------|------------------|
| Year: | 1995 |
| Series: | 7.5 |
| Scale: | 1:24000 |
| Lat: | 40.7483 |
| Long: | 74.1403 |

EHS Support
consider it done

EXHIBIT
7

ASHL-FED-0000002266

ALCD-PUBCOM_0001760



ISRA SUBJECT PARCEL INFORMATION

FIGURE 2-1

ASHLAND LLC
FORMER ASHLAND HERCULES WATER TECHNOLOGIES (AHWT)
1106 HARRISON AVENUE
KEARNY, NEW JERSEY
PI #014964; ISRA #20090080

ASHL-FED-0000002267
ALCD-PUBCOM_0001761



FIGURE 2-2
SITE LAYOUT MAP

ASHLAND LLC
FORMER ASHLAND HERCULES
WATER TECHNOLOGIES (AHWT)
1105 HARRISON AVENUE
KEARNY, NJ.
PI#014954; ISRA#20090080

ASHL-FED-0000002268
ALCD-PUBCOM_0001762



ASHLAND LLC
FORMER ASHLAND HERCULES WATER TECHNOLOGIES (AHWT)
1106 HARRISON AVENUE, KEARNY, NJ
PI#014954; ISRA#20090980

SURROUNDING LAND USE

FIGURE 2-3

ASHL-FED-0000002289
ALCD-PUBCOM_0001763



HISTORIC FILL MAP

FIGURE 2-4

EHS Support — ASHLAND LLC — FORMER ASHLAND HERCULES WATER TECHNOLOGIES (AHWT) 1106 HARRISON AVENUE, KEARNY, NJ — PI#014954; ISRA#20090080

ASHL-FED-0000002270
ALCD-PUBCOM_0001764



LEGEND

| | |
|---|---|
| A1 | AOC ID |
| | PROPERTY LINE |
| | LEASED AREA |

CURRENT SITE FEATURES

| | |
|---|---|
| A | DIKED BULK STORAGE AREAS |
| B | LOADING / UNLOADING AREAS |
| C | DRUM/TOTE STORAGE AREAS |
| | DUMPSTER |
| E1 | CHEMICAL STORAGE CABINETS |
| | FLOOR DRAINS/ TRENCH DRAINS |
| O | LAB SINK |
| | OFFSITE DRAINAGE SWALE |
| J | INDUSTRIAL / STORM SEWER SYSTEM |
| | UNDERGROUND LINE |
| | OVERHEAD LINE |
| K1 | ELECTRICAL TRANSFORMERS |
| L | COMPRESSOR BUILDING |
| | ROOF TOP AIR HANDLING SYSTEM |
| N1 | ELEVATOR |
| F1 | PIPE TRESTLE (OVERHEAD PIPING) |
| S | HISTORIC FILL (SITE WIDE) |

HISTORICAL SITE FEATURES

| | |
|---|---|
| A | FORMER BULK STORAGE AREAS |
| O | FORMER SUSPECT UST |
| P | FORMER RAIL CAR UNLOADING |
| C | FORMER DRUM / TOTE STORAGE AREAS |
| Q1 | HISTORICAL SOIL IMPACTS |
| R | FORMER HYDRAULIC LIFTS |

REFERENCE:
Ashland Drawings:
Figure - 3 Drew Division of Ashland Chemical Truck
Load/Unload Areas; Drawing No. 6905-ZD-003 Rev. 1

Figure 5-1 through 5-4 (Areas of Concern) Block 283, URS
Corporation, August 20, 2009

SCALE IN FEET
30'    0    30'    60'

| REVISIONS | | | |
|---|---|---|---|
| Rev. | By: | Date: | |
| Rev. | By: | Date: | |
| Rev. | By: | Date: | |
| Rev. | By: | Date: | |

EHS Support
consider it done

ASHLAND LLC
FORMER ASHLAND HERCULES
WATER TECHNOLOGIES (AHWT)
1106 HARRISON AVENUE
KEARNY, NJ
PI#014954; ISRA#20090080

FIGURE 2-5
AOC LOCATIONS
BLOCK 283 AND OFF-SITE

| | | | |
|---|---|---|---|
| Drawn By: | BLC | Date Drawn: | 11/05/2014 |
| Reviewed By: | MSS | Date Reviewed: | 02/2017 |
| Scale: | 1" = 30' | Plot Date: | 02/2017 |
| Project Number: C00351 | | FIGURE 2-5 | |

ALCD-PUBCOM_0001765



N

SCALE IN FEET
30    0    30

## LEGEND

Q3    HISTORICAL SOIL IMPACTS (NJDEP 93-2-5-1248-55)

—·—·—    PROPERTY LINE

NOTES:
HISTORIC FILL PRESENT ACROSS SITE

| EHS Support *consider it done* | REVISIONS | | | | ASHLAND LLC FORMER ASHLAND HERCULES WATER TECHNOLOGIES (AHWT) 1106 HARRISON AVENUE KEARNY, NJ. PI#014954; ISRA#20090060 | FIGURE 2-6 AOC LOCATION BLOCK 282 | Drawn By: MDO | Date Drawn: 10/6/2015 |
|---|---|---|---|---|---|---|---|---|
| | Rev. | By: | Disc.: | Date: | | | Reviewed By: MSS | Date Reviewed: 02/2017 |
| | Rev. | By: | Disc.: | Date: | | | Scale: 1" = 30' | Plot Date: 02/2017 |
| | Rev. | By: | Disc.: | Date: | | | Project Number : C00351 | FIGURE 2-6 |

Figure 2-6 AOC Location Block 282 REV1.dwg

ASHL-FED-0000002272
ALCD-PUBCOM_0001766



FIGURE 2-7
SOIL BORING LOCATION MAP

ASHLAND LLC
FORMER ASHLAND HERCULES
WATER TECHNOLOGIES (AHWT)
1106 HARRISON AVENUE
KEARNY, NJ.
Pl#014954; ISRA#2009080

| Drawn By: | MDO | Date Drawn: | 12/2016 |
| Reviewed By: | MSS | Date Reviewed: | 02/2017 |
| Scale: | 1" = 70' | Plot Date: | 02/2017 |
| Project Number: C00351 | | FIGURE 2-7 |

ASHL-FED-0000002273
ALCD-PUBCOM_0001767



**SURFACE WATER FEATURES**

FIGURE 3-1

EHS Support
*consider it done*

ASHLAND LLC
FORMER ASHLAND HERCULES WATER TECHNOLOGIES (AHWT)
1105 HARRISON AVENUE, KEARNY, NJ
PI#014954; ISRA#20090980

ASHL-FED-0000002274
ALCD-PUBCOM_0001768



| EHS Support<br>consider it done | ASHLAND LLC<br>FORMER ASHLAND HERCULES WATER TECHNOLOGIES (AHWT)<br>1105 HARRISON AVENUE, KEARNY, NJ<br>PI#014954; ISRA#20090080 | AERIAL RADIUS MAP | FIGURE 3-2 |

ASHL-FED-0000002275
ALCD-PUBCOM_0001769



FIGURE 3-4
DRAINAGE SYSTEM LAYOUT

ASHLAND LLC
FORMER ASHLAND HERCULES
WATER TECHNOLOGIES (AHWT)
1106 HARRISON AVENUE
KEARNY, NJ
PI8014954; ISRA#20090080

ASHL-FED-0000002277
ALCD-PUBCOM_0001770



FIGURE 3-5
DRAINAGE SYSTEM LAYOUT AND SOIL BORING LOCATIONS

ALCD-PUBCOM_0001771



Adapted from: NJDEP NJGS Surficial
Geology of the Elizabeth Quadrangle
(OFM 42, 2002)

**EHS Support** *consider it done*

ASHLAND LLC
FORMER ASHLAND HERCULES WATER TECHNOLOGIES (AHWT)
1105 HARRISON AVENUE, KEARNY, NJ
PI#014954; ISRA#20090080

REGIONAL SURFICIAL GEOLOGY AND GEOLOGIC CROSS SECTION

FIGURE 3-6

ASHL-FED-0000002279
ALCD-PUBCOM_0001772



ASHL-FED-0000002280
ALCD-PUBCOM_0001773



NOTES:
UPSTREAM REFERS TO FRANK'S CREEK GAGING STATION FCN (NORTHEAST OF THE SITE)
DOWNSTREAM REFERS TO FRANK'S CREEK GAGING STATION FCS (EAST OF THE SITE)
USGS REFERS TO PASSAIC RIVER GAGE 01392650 (SOUTHEAST OF THE SITE)

| EHS Support | ASHLAND LLC FORMER ASHLAND HERCULES WATER TECHNOLOGIES (AHWT) 1106 HARRISON AVENUE, KEARNY, NJ FI#014954; ISRA#20090080 | •FRANK'S CREEK AND PASSAIC RIVER HYDROGRAPHS – SEPTEMBER 3 – 4, 2016 | FIGURE 3-3 |

ASHL-FED-0000002276

ALCD-PUBCOM_0001774



ALCD-PUBCOM_0001775

FIGURE 3-8
HYDROGEOLOGIC CROSS SECTION B - B'

ASHL-FED-0000002282

ALCD-PUBCOM_0001776

FIGURE 3-10
HYDROGEOLOGIC CROSS SECTION C - C'

ASHL-FED-0000002283

ALCD-PUBCOM_0001777



ESTIMATED PEAT THICKNESS

FIGURE 3-11

ASHLAND LLC
FORMER ASHLAND HERCULES WATER TECHNOLOGIES (AHWT)
1106 HARRISON AVENUE, KEARNY, NJ
PI#014954; ISRA#20090080

ASHL-FED-0000002284
ALCD-PUBCOM_0001778



LEGEND

NOTES:

REFERENCE:

| REVISIONS | | | | | ASHLAND LLC | FIGURE 3-12 | Drawn By: | MDO | Date Drawn: | 09/2015 |
|---|---|---|---|---|---|---|---|---|---|---|
| Rev. | By: | Disc.: | Date: | | FORMER ASHLAND HERCULES WATER TECHNOLOGIES (AHWT) 1106 HARRISON AVENUE KEARNY, NJ. PI#014954; ISRA#20090080 | MONITORING WELL LOCATION MAP | Reviewed By: | MSS | Date Reviewed: | 02/2017 |
| Rev. | By: | Disc.: | Date: | | | | Scale: | 1" = 70' | Plot Date: | 02/2017 |
| Rev. | By: | Disc.: | Date: | | | | Project Number: C00351 | | FIGURE 3-12 | |
| Rev. | By: | Disc.: | Date: | | | | | | | |

EHS Support
consider it done

ASHL-FED-0000002285
ALCD-PUBCOM_0001779



**FIGURE 3-13**
**HYDROGRAPH OF SHALLOW MONITORING WELLS**
ASHLAND LLC
FORMER ASHLAND HERCULES WATER TECHNOLOGIES (AHWT)
1106 HARRISON AVENUE, KEARNY, NJ
PI#014954 ISRA#200090080

ASHL-FED-0000002286

ALCD-PUBCOM_0001780



**Legend**

Shallow Monitoring Well
(Groundwater elevation in ft msl)
Groundwater Elevation Contour
Groundwater Flow Direction
Property Line

Notes:
Only site wells used in contour interpretation.
Wells marked with an * were not used for contouring

| EHS Support *consider it done* | ASHLAND LLC<br>FORMER ASHLAND HERCULES WATER TECHNOLOGIES (AHWT)<br>1106 HARRISON AVENUE, KEARNY, NJ<br>PW#14954; ISRA#20090080 | POTENTIOMETRIC SURFACE MAP (SHALLOW)<br>JUNE 19, 2015 | FIGURE 3-14 |

ASHL-FED-0000002287
ALCD-PUBCOM_0001781



POTENTIOMETRIC SURFACE MAP (SHALLOW)
SEPTEMBER 3, 2015

FIGURE 3-15

ASHLAND LLC
FORMER ASHLAND HERCULES WATER TECHNOLOGIES (AHWT)
1106 HARRISON AVENUE, KEARNY, NJ
PI#014964; ISRA#20090080

ASHL-FED-0000002288
ALCD-PUBCOM_0001782



POTENTIOMETRIC SURFACE MAP (SHALLOW)
NOVEMBER 9, 2016

FIGURE 3-16

ASHLAND LLC
FORMER ASHLAND HERCULES WATER TECHNOLOGIES (AHWT)
1100 HARRISON AVENUE, KEARNY, NJ
PI#014954; ISRA#20090080

ASHLAND-FED-0000002289
ALCD-PUBCOM_0001783



FIGURE 3-17
HYDROGRAPH OF INTERMEDIATE/DEEP MONITORING WELLS
ASHLAND LLC
FORMER ASHLAND HERCULES WATER TECHNOLOGIES (AHWT)
1106 HARRISON AVENUE, KEARNY, NJ
PI#014954 ISRA#200090080

ASHL-FED-0000002290

ALCD-PUBCOM_0001784



**POTENTIOMETRIC SURFACE MAP (DEEP)**
**JUNE 19, 2015**

ASHLAND LLC
FORMER ASHLAND HERCULES WATER TECHNOLOGIES (AHWT)
1106 HARRISON AVENUE, KEARNY, NJ
PI#014954; ISRA#20090088

**FIGURE 3-18**

ASHL-FED-0000002291
ALCD-PUBCOM_0001785



POTENTIOMETRIC SURFACE MAP (DEEP)
SEPTEMBER 3, 2015

FIGURE 3-19

ASHL-FED-0000002292

ALCD-PUBCOM_0001786



**Legend**

- Deep Monitoring Well (Groundwater elevation in ft msl)
- Surface Water Location (Water elevation in ft msl)
- Groundwater Elevation Contour
- Groundwater Flow Direction
- Property Line

Notes:
Only site wells used in contour interpretation. Wells marked with an * were not used for contouring

**ASHLAND LLC**
FORMER ASHLAND HERCULES WATER TECHNOLOGIES (AHWT)
1106 HARRISON AVENUE, KEARNY, NJ
PI#014994; ISRA#20090080

**POTENTIOMETRIC SURFACE MAP (DEEP)**
**NOVEMBER 9, 2016**

**FIGURE 3-20**

EHS Support
consider it done

ASHL-FED-0000002293
ALCD-PUBCOM_0001787



ASHL-FED-0000002294

ALCD-PUBCOM_0001788



ASHL-FED-0000002295

ALCD-PUBCOM_0001789



ASHL-FED-0000002296

ALCD-PUBCOM_0001790



ASHL-FED-0000002297

ALCD-PUBCOM_0001791



SITE MONITORING WELLS AND FRANK'S CREEK
GROUNDWATER AND SURFACE WATER ELEVATIONS
TIDAL STUDY SEPT 12 -16, 2016

SELECT SITE WELLS AND FRANKS CREEK HYDROGRAPH

FIGURE
3-25

ASHL-FED-0000002298

ALCD-PUBCOM_0001792



Reference: Groundwater Remedial Investigation Report, Vinnie's Sunoco Service, Kearny, New Jersey, August 2015 (JMZ Geology)

| EHS Support *consider it done* | ASHLAND LLC FORMER ASHLAND HERCULES WATER TECHNOLOGIES (AHWT) 1105 HARRISON AVENUE, KEARNY, NJ PI#014954; ISRA#20090080 | INDEPENDENT STUDY ON GROUNDWATER FLOW DIRECTIONS IN THE VICINITY OF HARRISON AVENUE | FIGURE 3-26 |

ASHL-FED-0000002299

ALCD-PUBCOM_0001793



CONCEPTUALIZED GROUNDWATER FLOW REGIME

FIGURE 3-27

ASHLAND LLC
FORMER ASHLAND HERCULES WATER TECHNOLOGIES (AHWT)
1105 HARRISON AVENUE, KEARNY, NJ
PI#014954; ISRA#20090080

ASHL-FED-0000002300

ALCD-PUBCOM_0001794



**FIGURE 5-1**
VOC EXCEEDANCES OF IMPACT TO GROUNDWATER
SOIL SCREENING LEVELS (0 - 5 FEET BELOW GRADE)

ASHLAND LLC
FORMER ASHLAND HERCULES
WATER TECHNOLOGIES (AHWT)
1106 HARRISON AVENUE
KEARNY, NJ.
PI#014954, ISRA#20090080

Drawn By: MDO — Date Drawn: 09/2015
Reviewed By: MSS — Date Reviewed: 02/2017
Scale: 1" = 70' — Plot Date: 02/2017
Project Number: C00351 — FIGURE 5-1



FIGURE 5-2
SVOC EXCEEDANCES OF IMPACT TO GROUNDWATER
SOIL SCREENING LEVELS (0 - 5 FEET BELOW GRADE)

ASHLAND LLC
FORMER ASHLAND HERCULES WATER
TECHNOLOGIES (AHWT)
1108 HARRISON AVENUE
KEARNY, NJ.
PI#014954; ISRA#20090080

ASHL-FED-0000002302
ALCD-PUBCOM_0001796



FIGURE 5-3
PCB EXCEEDANCES OF IMPACT TO GROUNDWATER
SOIL SCREENING LEVELS (0 - 5 FEET BELOW GRADE)

ASHL-FED-0000002303
ALCD-PUBCOM_0001797



**FIGURE 5-4**

VOC EXCEEDANCES OF RESIDENTIAL AND NON-RESIDENTIAL SOIL REMEDIATION STANDARDS (0 - 60 FEET BELOW GRADE)

ASHLAND LLC
FORMER ASHLAND HERCULES
WATER TECHNOLOGIES (AHWT)
1106 HARRISON AVENUE
KEARNY, NJ.
PI#014954; ISRA#20090060

ASHL-FED-0000002304
ALCD-PUBCOM_0001798



ASHL-FED-0000002305
ALCD-PUBCOM_0001799



FIGURE 5-6
PCB EXCEEDANCES OF RESIDENTIAL AND NON-RESIDENTIAL
SOIL REMEDIATION STANDARDS (0 - 20 FEET BELOW GRADE)

ASHLAND LLC
FORMER ASHLAND HERCULES
WATER TECHNOLOGIES (AHWT)
1106 HARRISON AVENUE
KEARNY, NJ.
PI#C14994; ISRA#20090080

ASHL-FFD-0000002306
ALCD-PUBCOM_0001800



FIGURE 5-7
TPH / EPH EXCEEDANCES OF ECOLOGICAL BASED SCREENING
CRITERIA (0 - 60 FEET BELOW GRADE)

ASHLAND LLC
FORMER ASHLAND HERCULES
WATER TECHNOLOGIES (AHWT)
1106 HARRISON AVENUE
KEARNY, NJ.
PI#014954; ISRA#20090080

ASHI-FFD-0000002307
ALCD-PUBCOM_0001801



FIGURE 5-8
EPH EXCEEDANCES OF CALCULATED RESIDENTIAL AND NON-RESIDENTIAL CATEGORY 2 HEALTH BASED SCREENING CRITERIA (0 - 60 FEET BELOW GRADE)

ASHLAND LLC
FORMER ASHLAND HERCULES
WATER TECHNOLOGIES (AHWT)
1105 HARRISON AVENUE
KEARNY, NJ.
P18014954; ISRA#20090080

ASHL-FED-0000002308
ALCD-PUBCOM_0001802



ASHLAND INC.
1106 HARRISON AVENUE
KEARNY, NEW JERSEY
PI#014954; ISRA#20090080

SB-123D BORING LOG

FIGURE 5-9

ASHLFED-0000002309
ALCD-PUBCOM_0001803



**FIGURE 8-1**
PAH EXCEEDANCES OF IMPACT TO GROUNDWATER
SOIL SCREENING LEVELS (0 - 5 FEET BELOW GRADE)

ASHLAND INC.
1105 HARRISON AVENUE
KEARNY, NJ.
PI#014954; ISRA#20090080

ASHLEFD-0000002310
ALCD-PUBCOM_0001804



FIGURE 8-2A
PAH EXCEEDANCES OF RESIDENTIAL AND NON-RESIDENTIAL
SOIL REMEDIATION STANDARDS (0 - 20 FEET BELOW GRADE)
2009 - 2015

ASHLAND LLC
FORMER ASHLAND HERCULES
WATER TECHNOLOGIES (AHWT)
1106 HARRISON AVENUE
KEARNY, NJ.
PI#014954; ISRA#20090080

ASHL-FED-0000002311
ALCD-PUBCOM_0001805



FIGURE 8-2B

ASHLAND LLC
FORMER ASHLAND HERCULES
WATER TECHNOLOGIES (AHWT)
1105 HARRISON AVENUE
KEARNY, NJ.
PI#014954; ISRA#000090080

PAH EXCEEDANCES OF RESIDENTIAL AND NON-RESIDENTIAL
SOIL REMEDIATION STANDARDS (0 - 50 FEET BELOW GRADE)

ASHL-FED-0000002312
ALCD-PUBCOM_0001806



FIGURE 8-3
METAL EXCEEDANCES OF IMPACT TO GROUNDWATER
SOIL SCREENING LEVELS (0 - 5 FEET BELOW GRADE)

ASHLAND LLC
FORMER ASHLAND HERCULES
WATER TECHNOLOGIES (AHWT)
1106 HARRISON AVENUE
KEARNY, NJ.
PI#014954; ISRA#20090080

ASHL-FED-0000002313
ALCD-PUBCOM_0001807



ASHL-FED-0000002314
ALCD-PUBCOM_0001808



FIGURE 8-5
TOTAL METALS AND PAH EXCEEDANCES OF
GROUNDWATER QUALITY STANDARDS
(2009 - 2016)

ASHLAND LLC
FORMER ASHLAND HERCULES
WATER TECHNOLOGIES (AHWT)
1106 HARRISON AVENUE
KEARNY, NJ.
PI#014964; ISRA#00090080

ASHL-FED-0000002315
ALCD-PUBCOM_0001809



FIGURE 9-1
VOC EXCEEDANCES OF GROUNDWATER QUALITY STANDARDS
2009 - 2016

ASHL-FED-0000002316
ALCD-PUBCOM_0001810



ASHL-FED-0000002317
ALCD-PUBCOM_0001811



ASHL-FED-0000002318
ALCD-PUBCOM_0001812



FIGURE 10-2
INDOOR AIR SAMPLING LOCATIONS

ASHL-FED-0000002320
ALCD-PUBCOM_0001813



FIGURE 10-1
SUB SLAB SOIL GAS LOCATIONS AND EXCEEDANCES OF
SOIL GAS SCREENING LEVELS
APRIL 2012

ASHLAND LLC
FORMER ASHLAND HERCULES
WATER TECHNOLOGIES (AHWT)
1100 HARRISON AVENUE
KEARNY, NJ
PI#01:4954; ISRA#20090060

ALCD-PUBCOM_0001814



EHS Support — consider it done

ASHLAND INC.
1106 HARRISON AVENUE
KEARNY, NEW JERSEY
PI#014954; ISRA#20090080

RECEPTOR EVALUATION

FIGURE 12-1

ASHL-FED-0000002321
ALCD-PUBCOM_0001815



**SURROUNDING LAND USE**

**FIGURE 12-2**

ASHL-FED-0000002322
ALCD-PUBCOM_0001816



| ASHLAND LLC<br>FORMER ASHLAND HERCULES WATER TECHNOLOGIES (AHWT)<br>1106 HARRISON AVENUE, KEARNY, NJ<br>PI#014954; ISRA#20090080 | RADIUS WELL SEARCH | FIGURE 12-5 |

ASHL-FED-0000002323
ALCD-PUBCOM_0001817



ASHL-FED-0000002324

ALCD-PUBCOM_0001818



TOWN OF KEARNY SCHUYLER AVENUE REDEVELOPMENT AREA

FIGURE 12-4

ASHL-FED-0000002325

ALCD-PUBCOM_0001819



**Legend**

✳ Source Location

**Well Search Results**

● Domestic (2)
● Industrial (13)
● Non-Public (0)
● Public Non-Community (1)
⊙ Permit Only
▭ Property Line
▭ 1,000 ft Radius
▨ Focused Search Area
▭ Atlas Grid

**Notes:**
Focused search area based on a
NW Groundwater flow direction and
250' upgradient, 500' sidegradient
and 1,000 feet downgradient from source.

| | | EHS Support consider it done | ASHLAND LLC FORMER ASHLAND HERCULES WATER TECHNOLOGIES (AHWT) 1106 HARRISON AVENUE, KEARNY, NJ PI#014954; ISRA#20090080 | FOCUSED SEARCH AREA | FIGURE 12-6 |

ASHL-FED-0000002326
ALCD-PUBCOM_0001820



Notes:
- The extent of CEA coverage is as follows:
  - North - Northern edge of Harrison Ave
  - South/West - Southern property boundary and then parallel to Harrison Avenue to the east of the Site
  - East – west bank of Franks Creek
- Groundwater contours were developed based on November 9, 2016 groundwater elevations presented in the Remediation Investigation Report
- The known and predicted extent of the most mobile and persistent ground water contaminants is based on the lateral extent of chlorinated compounds based on analytical data from Site wells.
- Only site wells used in contour interpretation. Wells marked with an * were not used for contouring

Legend
- Shallow Monitoring Well (Groundwater elevation in ft msl)
- Deep Monitoring Well
- Groundwater Elevation Contour
- Prevailing GW Flow Direction
- CEA Boundary
- 100' buffer of CEA
- 200' buffer of CEA
- Maximum Predicted Extent of Organic Contaminant Plume
- Site Boundary
- Parcel Boundaries (with lot number)
- Block Boundaries (with block number)

150  75  0  150
Feet

EHS Support
consider it done

ASHLAND LLC
FORMER ASHLAND HERCULES WATER TECHNOLOGIES (AHWT)
1106 HARRISON AVENUE, KEARNY, NJ
PI#014954; ISRA#20090880

RECEPTOR EVALUATION - VAPOR INTRUSION

FIGURE 12-7

ASHI-FFD-0000002327
ALCD-PUBCOM_0001821

# EXHIBIT 32

OxyChem's Comments in Opposition to Proposed Consent Decree,
*United States v. Alden Leeds, Inc., et al.*, Civil Action No. 2:22-cv-07326 (D.N.J.)

ALCD-PUBCOM_0001822



# Revised Draft Remedial Investigation Report

Ashland Inc.
1106 Harrison Avenue
Kearny, Hudson County, New Jersey
Program Interest #014954
ISRA #E20090080

Prepared For:

Ashland LLC.
5200 Blazer Parkway
Dublin, Ohio 43017

Prepared by:
**EHS Support LLC**

EHS Support
*consider it done*

**XX XX, 2017**

ASHL-FED-0000269732
ALCD-PUBCOM_0001823

**TABLE OF CONTENTS**

1    Introduction ........................................................................................................... 9
    1.1    Purpose ........................................................................................................ 9
    1.2    Regulatory Background ............................................................................... 9
        1.2.1    Remediation Timeframe ................................................................ 10
        1.2.2    Public Notification and Outreach .................................................. 10
        1.2.3    Revised General Information Notice .............................................. 10
        1.2.4    No Further Action Approvals ........................................................ 10
        1.2.5    Areas of Concern Not Previously Identified ................................. 11
    1.3    Remedial Investigation Report Components ............................................. 11

2    Background ......................................................................................................... 12
    2.1    Site Description .......................................................................................... 12
    2.2    Site History ................................................................................................ 12
    2.3    Block 283 (Plant Site) ............................................................................... 12
    2.4    Block 282 ................................................................................................... 13
    2.5    Infrastructure and Utilities ........................................................................ 14
        2.5.1    Sanitary and Storm Sewer ............................................................. 14
        2.5.2    Water Source ................................................................................. 14
        2.5.3    Fire Suppression System ............................................................... 14
        2.5.4    Power Station ................................................................................ 14
        2.5.5    Boiler House .................................................................................. 14
    2.6    Surrounding Land Use ............................................................................... 14
    2.7    ISRA Investigation History ....................................................................... 15
        2.7.1    Preliminary Assessment (2009) .................................................... 15
        2.7.2    Site Investigation (2009) ............................................................... 15
        2.7.3    Remedial Investigation (2009-2010) ............................................ 15
        2.7.4    Initial Vapor Intrusion Screening (2012-2013) ........................... 16
    2.8    Constituents of Concern ............................................................................ 16
    2.9    Initial Receptor Evaluation ....................................................................... 16

3    Environmental Setting ........................................................................................ 18

4    Remediation Standards and Data Quality Objectives ........................................ 19
    4.1    Soil Remediation Standards ....................................................................... 19
        4.1.1    Impact to Groundwater Soil Screening Levels .............................. 19
        4.1.2    Residential and Non-Residential Direct Contact Soil Remediation
                Standards ....................................................................................... 19
        4.1.3    Extractable Petroleum Hydrocarbon Soil Remediation Criteria ... 19
                4.1.3.1 Calculated Human Health Based Soil Remediation Criteria ............... 20
        4.1.4    Ecological Screening Criteria ........................................................ 20
    4.2    Groundwater Remediation Standards ........................................................ 20
    4.3    Vapor Screening Levels ............................................................................. 21
    4.4    Remedial Investigation Work Plans .......................................................... 21
    4.5    Remedial Investigation Activities 2012-2013 ........................................... 21
    4.6    Remediation Investigation Activities 2014-2015 ...................................... 21
        4.6.1    Soil Sampling ................................................................................ 22
        4.6.2    Groundwater Sampling .................................................................. 22
        4.6.3    Modifications from the Approved 2014-2015 Scope of Work .......... 23

ASHL-FED-0000269733
ALCD-PUBCOM_0001824

4.7    Remediation Investigation Activities 2016 ................................................................. 23
    4.7.1    Soil Sampling ................................................................................................. 24
    4.7.2    Groundwater Sampling ................................................................................ 24
    4.7.3    Modifications from the Proposed 2016 Scope of Work ....................... 25
4.8    Data Discussion ............................................................................................................ 25
4.9    Data Quality Review .................................................................................................... 25
    4.9.1    2014-2015 Data Collection .......................................................................... 25
    4.9.2    2016 Data Collection .................................................................................... 26

5    Soil Investigation Block 283 ................................................................................................... 27

6    Soil Investigation Block 282 ................................................................................................... 28

7    Off-Site AOC Investigation .................................................................................................... 29

8    Historic Fill Investigation (AOC-S) ...................................................................................... 30

9    Groundwater Investigation (AOC-T) ................................................................................... 31

10    Vapor Intrusion Investigation ............................................................................................... 32

11    Ecological Evaluation .............................................................................................................. 33

12    Receptor Evaluation ................................................................................................................ 34

13    Conclusions .............................................................................................................................. 35

14    Recommendations .................................................................................................................... 36

15    References ............................................................................................................................... 131

ASHL-FED-0000269734
ALCD-PUBCOM_0001825

## LIST OF FIGURES

Figure 1-1    Site Location Map
Figure 2-1    ISRA Subject Parcel Information
Figure 2-2    Site Layout Map
Figure 2-3    Surrounding Land Use
Figure 2-4    Historic Fill Map
Figure 2-5    AOC Locations - Block 283 and Off-Site
Figure 2-6    AOC Locations- -Block 282
Figure 2-7    Soil Boring Location Map
Figure 3-1    Cross Section Plan View
Figure 3-2    Geologic Cross Section A-A'
Figure 3-3    Geologic Cross Section B-B'
Figure 3-4    Geologic Cross Section C-C'
Figure 3-5    Surface Water Features
Figure 3-6    Aerial Radius Map
Figure 3-7    Drainage System Layout
Figure 3-8    Drainage System and Soil Boring Locations
Figure 5-1    VOC Exceedances of Impact to Groundwater Soil Screening Levels (0-5 feet below grade)
Figure 5-2    SVOC Exceedances of Impact to Groundwater Soil Screening Levels (0-5 feet below grade)
Figure 5-3    PCBs Exceedances of Impact to Groundwater Soil Screening Levels (0-5 feet below grade)
Figure 5-4    *Left Blank Intentionally*
Figure 5-5    VOC Exceedances of Residential and Non-Residential Soil Remediation Standards (0-20 feet below grade)
Figure 5-6    SVOC Exceedances of Residential and Non-Residential Soil Remediation Standards (0-20 feet below grade)
Figure 5-7    PCBs Exceedances of Residential and Non-Residential Soil Remediation Standards (0-20 feet below grade)
Figure 5-8    *Left Blank Intentionally*
Figure 5-9    TPH/EPH Exceedances of Ecological Based Screening Levels (0-20 feet below grade)
Figure 5-10   EPH Exceedances of Calculated Residential and Non-Residential Category 2 Health Based Screening Criteria (0-20 feet below grade)
Figure 8-1    PAH Exceedances of Impact to Groundwater Soil Screening Levels (0-5 feet below grade)
Figure 8-2    PAH Exceedances of Residential and Non-Residential Soil Remediation Standards (0-20 feet below grade)
Figure 8-3    Metals Exceedances of Impact to Groundwater Soil Screening Levels (0-5 feet below grade)
Figure 8-4    Metals Exceedances of Residential and Non-Residential Soil Remediation Standards (0-20 feet below grade)
Figure 9-1    Monitoring Well Location Map
Figure 9-2    Historic VOC Exceedances of Groundwater Quality Standards (2009-2012)
Figure 9-3    Historic SVOC Exceedances of Groundwater Quality Standards (2009-2012)
Figure 9-4    Historic Dissolved Metals Exceedances of Groundwater Quality Standards (2009-2012)
Figure 9-5    Historic Exceedances of Vapor Intrusion Screening Levels (2009-2012)
Figure 9-6    Potentiometric Surface Map – Shallow Zone June 19, 2015
Figure 9-7    Potentiometric Surface Map – Intermediate/Deep Zone June 19, 2015
Figure 9-8    Potentiometric Surface Map –Shallow Zone September 3, 2015

ASHL-FED-0000269735
ALCD-PUBCOM_0001826



Figure 9-9      Potentiometric Surface Map – Intermediate/Deep September 3, 2015
Figure 9-10     VOC Exceedances of Groundwater Quality Standards 2015
Figure 9-11     SVOC Exceedances of Groundwater Quality Standards 2015
Figure 9-12     VOC Exceedances of Vapor Intrusion Groundwater Screening Levels 2015
Figure 10-1     Sub Slab Soil Gas Locations and Exceedances of Soil Gas Screening Levels April 2012
Figure 10-2     Indoor Air Sampling Locations
Figure 12-1     Receptor Evaluation
Figure 12-2     Results of Radius Well Search
Figure 12-3     Focused Well Search Area (1,000 Foot Buffer)
Figure 14-1     Proposed Supplemental Soil Boring Locations
Figure 14-2     Drainage System and Proposed Soil Boring Locations

## LIST OF TABLES

Table 2-1       Summary of Areas of Concern
Table 2-2-1     Summary of Soil Sampling Program – Block 283
Table 2-2-2     Summary of Soil Sampling Program – Block 282
Table 2-2-3     Summary of Soil Sampling Program – Off-Site
Table 2-3       Soil Analytical Results (2009-2010)
Table 2-4       Summary of Groundwater Sampling Program
Table 2-5       Groundwater Analytical Results (2009-2012) - GWQS
Table 2-6       Groundwater Analytical Results (2009-2012) - VIGSLs
Table 2-7       Constituents of Concern by Media
Table 5-1       Soil Analytical Results (2014-2015) – Bock 283
Table 6-1       Soil Analytical Results (2014-2015) – Block 282
Table 7-1       Soil Analytical Results (2014-2015) – Off-Site
Table 9-1       Monitoring Well Construction
Table 9-2       Summary of Groundwater Elevation Data
Table 9-3       Groundwater Analytical Results (2015) - GWQS
Table 9-4       Groundwater Analytical Results (2015) - VIGSLs
Table 10-1      Vapor Analytical Results (2012-2013)
Table 12-1      Well Search Results
Table 14-1      Proposed Supplemental Investigation Activities – Horizontal Delineation
Table 14-2      Proposed Supplemental Investigation Activities – Vertical Delineation
Table 14-3      Proposed Supplemental Investigation Activities – Building Interiors, Drainage Systems, Other

## LIST OF APPENDICES

Appendix A      Soil Boring Logs
Appendix B      Photographic Log
Appendix C      AOC Boundary Maps
Appendix D      Soil Laboratory Data Reports
Appendix E      Historical Aerial Photographs
Appendix F      Sewer Inspection Data
Appendix G      Model Deed Notice (Template)
Appendix H      CEA Model Data
Appendix I      Groundwater Sampling Forms Data
Appendix J      Well Construction Logs
Appendix K      Monitoring Well Certification Form A / Form B
Appendix L      Groundwater Laboratory Data Reports
Appendix M      Building Surveys
Appendix N      Soil Vapor Implant Schematic

ASHL-FED-0000269736
ALCD-PUBCOM_0001827

Appendix O        Vapor Laboratory Data Reports
Appendix P        Data Validation Reports
Appendix Q        Ecological Evaluation
Appendix R        Receptor Evaluation Form

**ACRONYMS**

| | |
|---|---|
| af | artificial fill |
| AHWT | Ashland Hercules Water Technologies |
| AOCs | Areas of Concern |
| ARRCS | Administrative Requirements for the Remediation of Contaminated Sites |
| Ashland | Ashland LLC. |
| ASTs | above ground storage tanks |
| BEE | Baseline Ecological Evaluation |
| Borbas | Borbas Surveying and Mapping |
| COC | constituent of concern |
| COEPCs | Constituents of potentially ecological concern |
| DCA | dichloroethane |
| DCB | dichlorobenzene |
| DCE | dichloroethene |
| DO | dissolved oxygen |
| DRO | diesel range organics |
| Drew | Drew Chemical Corporation |
| EDR | Environmental Database Resource |
| EE | Ecological Evaluation |
| EHS Support | EHS Support LLC |
| EPH | Extractable Petroleum Hydrocarbons |
| ESNRs | Environmentally Sensitive Natural Resources |
| FSPM | Field Sampling Procedures Manual |
| GAOC | geographic area of concern |
| GIN | General Information Notice |
| GRO | gasoline range organics |
| GWQS | groundwater quality standard |
| GWSLs | Groundwater Screening Levels |
| IDW | Investigation Derived Waste |
| ISRA | Industrial Site Recovery Act |
| LFPS | low-flow purging and sampling |
| LSRP | Licensed Site Remediation Professional |
| MSL | mean sea level |
| µg/L | micrograms per liter |
| mg/kg | milligrams per kilogram |
| ml/min | milliliters per minute |
| ms/cm | millisiemens per centimeter |

5

ASHL-FED-0000269737
ALCD-PUBCOM_0001828

| | |
|---|---|
| mV | millivolts |
| N.J.A.C. | New Jersey Administrative Code |
| NJDEP | New Jersey Department of Environmental Protection |
| NJGS | New Jersey Geological Survey |
| OFM | Open File Map |
| ORP | oxygen reduction potential |
| PA | Preliminary Assessment |
| PAHs | polycyclic aromatic hydrocarbons |
| PCBs | Polychlorinated biphenyls |
| PCE | tetrachloroethene |
| PID | photo-ionization detector |
| POTW | Publicly Owned Treatment Works |
| PVC | polyvinyl chloride |
| PVSC | Passaic Valley Sewage Commissioners |
| Qal | post glacial alluvial sands / alluvium |
| QA/QC | quality assurance/quality control |
| Qbnl | glacial lake-bottom deposits |
| Qm | estuarine and salt marsh sediments |
| Qr | Rahway till |
| RI | Remedial Investigation |
| SI | Site Investigation |
| Site /Facility | Ashland Site |
| SRP | Site Remediation Program |
| SRRA | Site Remediation Reform Act |
| SVOC | semi volatile organic compound |
| TAL | Target Analyte List |
| TCE | trichloroethene |
| TCL | target compound list |
| TICs | tentatively identified compounds |
| TCA | trichloroethane |
| TMB | trichlorobenzene |
| USCS | Unified Soil Classification System |
| USEPA | United States Environmental Protection Agency |
| UST | underground storage tank |
| VC | vinyl chloride |
| VI | Vapor Intrusion |
| VIGSLs | Vapor Intrusion Groundwater Screening Levels |
| VOCs | volatile organic compounds |

ASHL-FED-0000269738
ALCD-PUBCOM_0001829

Case 2:22-cv-07326-MCA-LDW   Document 309-22   Filed 04/01/24   Page 73 of 468
PageID: 14798
EHS Support
consider it done

## STATEMENT OF LIMITATIONS

This Revised Draft Remedial Investigation Report (RI Report) is intended for the sole use of Ashland LLC. (Ashland). The scope of services performed during this investigation may not be appropriate to satisfy the needs of other users, and any use or re-use of this document or of the findings, conclusions, or recommendations presented herein is at the sole risk of said user. Background information and other data have been furnished to EHS Support LLC (EHS Support) by Ashland and/or third parties, which EHS Support has been used in preparing this RI Report.

Opinions presented herein apply to the existing and reasonably foreseeable site conditions at the time of our assessment. They cannot apply to site changes of which Ashland or its contractors are unaware and has not had the opportunity to review. Changes in site conditions may occur with time due to natural processes or works of man at the site or on adjacent properties. Changes in applicable standards may also occur as a result of legislation or the broadening of knowledge. Accordingly, the findings of this RI Report may be invalidated, wholly or in part, by changes that may occur in the future which are beyond our control.

ASHL-FED-0000269739
ALCD-PUBCOM_0001830

**EXECUTIVE SUMMARY**

ASHL-FED-0000269740
ALCD-PUBCOM_0001831

# 1    INTRODUCTION

This report presents the results of RI activities completed at the former AHWT facility at 1000 and 1106 Harrison Avenue, Kearny, Hudson County, New Jersey (Site). A Site Location Map is provided as **Figure 1-1**. A GIN was submitted to the NJDEP on April 6, 2009. The PA and SI Reports were submitted to NJDEP on August 20, 2009. Remedial investigation activities were completed between November 2009 and December 2016. The work was conducted pursuant to the applicable NJDEP SRP and ISRA rules published at the time of implementation. In November 2009, NJDEP adopted the SRRA. Components of SRRA included phasing in of revised technical guidance and rules; therefore, the data presented within this RI Report is representative of requirements at the time of data collection.

Investigation activities completed between 2009 and 2016were completed pursuant to the technical guidance documents listed below:

- Ecological Evaluation Technical Guidance, February 2015
- Extractable Petroleum Hydrocarbon (EPH) Protocols, (Various, March 2010)
- N.J.A.C. 7:9D Well Construction and Maintenance; Sealing of Abandoned Wells, April 2, 2007.
- N.J.A.C. 7:26B ISRA Rules, May 7, 2012
- N.J.A.C. 7:26C Administrative Requirements for the Remediation of Contaminated Sites, May 4, 2015
- N.J.A.C. 7:26E Technical Requirements for Site Remediation, May 7, 2012
- NJDEP Site Remediation Program Historic Fill Material Technical Guidance, April 29, 2013
- NJDEP Site Remediation Program Technical Guidance for Site Investigation of Soil, Remedial Investigation of Soil, Remediation Action Verification Sampling for Soil, August 1, 2012, (*Revised March 2015*)
- NJDEP Site Remediation Program Groundwater Technical Guidance, Site Investigation, Remedial investigation, Remediation Action Performance Monitoring, April, 3, 2012
- NJDEP Site Remediation Program Technical Guidance for Investigation of Underground Storage Tanks Systems, July 31, 2012
- NJDEP Site Remediation Program Well Search Guidance
- NJDEP Field Sampling Procedures Manual (FSPM), April, 11, 2011
- NJDEP Sheen Remediation Guidance, February 1, 2006
- Vapor Intrusion Guidance, October 2005/March 2013

## 1.1    Purpose

The purpose of this RI Report is to present the results of the RI activities completed to evaluate the nature and extent of impacts based on historical operations at the Site. Recommendations for remedial action and/or supplemental investigations as part of remedial action are provided in the conclusions and recommendations section of this report.

## 1.2    Regulatory Background

Based on the pending adoption of the SRRA and Administrative Requirements for the Remediation of Contaminated Sites (ARRCS) Rules, the State did not assign a NJDEP case manager for this project site. Pursuant to NJDEP's request on September 8, 2009, RI activities continued in accordance with the technical requirements for site remediation (N.J.A.C. 7:26E).

Ashland retained Mr. Mark Foley of WSP Environmental as the Licensed Site Remediation Professional (LSRP #513292) on July 9, 2011. On December 2, 2013, the LSRP submitted initial comments on the

ASHL-FED-0000269741
ALCD-PUBCOM_0001832

PA Report, SI Report and Remediation Status Reports for activities completed through 2010. A summary of critical timeframes, remedial activities completed since 2010, and approvals for no further action is discussed below.

## 1.2.1    Remediation Timeframe

Ashland issued a public release of its decision to close operations on March 31, 2009. According to N.J.A.C. 7:26E-4.10 (a)(1)(ii)(1) for multiple media contaminants, the regulatory timeframe for a complete RI and RI Report is March 1, 2017. The mandatory timeframe is March 1, 2019 (2 years after regulatory timeframe).

## 1.2.2    Public Notification and Outreach

Pursuant to N.J.A.C. 7:26C-1.7, biennial public notification of RI activities was initially provided to properties within a 200-foot buffer of the Site in 2009.. The public notice was provided in letter format through 2014. In 2016, Ashland provided public notification via Site signage. Documentation of public notification was submitted to city and county officials on June 27, 2016.

## 1.2.3    Revised General Information Notice

In March 2014, a revised GIN was submitted to the NJDEP Bureau of Initial Notice. The notice identified the New Jersey Transit leased parcel on Block 280 Lot 1 within the ISRA subject property. This parcel is part of a historical lease agreement between Ashland (and its predecessors) and New Jersey Transit Railroad formerly Erie Lackawanna Railroad Company (URS 2009a).

## 1.2.4    No Further Action Approvals

On December 2, 2013, the LSRP approved no further action for the AOCs listed in the table below. These AOCs are considered closed and; therefore, will not be referenced in the remainder of this report (with the exception of AOC-C7 which was investigated in 2016 based on historical operations).

| AOC-ID | Description |
|---|---|
| AOC-A13 | Fire Pump House |
| AOC-B2 | North Loading Dock Building 721 |
| AOC-C7 | Laboratory Sample Jar Storage Area |
| AOC-C8 | Laboratory Storage Area |
| AOC-C14 | Lab and Raw Material Warehouse |
| AOC-D1 | Dumpster D1 |
| AOC-D2 | Dumpster D2 |
| AOC-E1 through E4 | Chemical Storage Cabinet |
| AOC-G | Process Area Sink |
| AOC-K2 and K3 | Pole Mounted Transformers |
| AOC-N1 and N2 | Elevators |
| AOC-Q2 | Comment NJDEP 92-8-11-1555-31-3 |

ASHL-FED-0000269742
ALCD-PUBCOM_0001833

EHS Support
consider it done

## 1.2.5    Areas of Concern Not Previously Identified

Six (6) additional AOCs were included in the most recent RI activities based on the LSRP's review and comment on the PA report. The AOCs are listed in the table below.

| AOC ID | Description |
|--------|-------------|
| AOC-A15 | Former Storage Tank (3,500-gallon methanol) |
| AOC-A16 | Former Storage Tank (3,000-gallon hydrochloric acid) |
| - | Former Building No. 710 Storage Tanks (Caustic and Sulfuric Acid) (included with AOC-C16) |
| - | Former Building No. 705 Laboratory (included with AOC-B5) |
| AOC-A17 | Former Building No. 714 Storage Tank (1,000-gallon fuel oil) and Blow Down |
| AOC-O3 | Former Underground Storage Tanks (two 1,000-gallon recovered Toluol) |

## 1.3    Remedial Investigation Report Components

This report includes the following primary components:
- Background
- Hydrogeologic Framework
- Historical Investigation Activities
- Soil Investigation Activities
- Groundwater Investigation Activities
- Vapor Intrusion Investigation Activities
- Ecological Evaluation
- Receptor Evaluation
- Conceptual Site Model of Nature and Extent of Impacts
- Conclusions and Recommendations

11

ASHL-FED-0000269743
ALCD-PUBCOM_0001834

## 2    BACKGROUND

The Site is located at 1000 and 1106 Harrison Avenue, Kearny, Hudson County, New Jersey. The ISRA subject Site boundary is defined as City Block 282, Lots 1 through 7, City Block 283 Lots 1 through 5, and a portion of City Block 280, Lot 1 (**Figure 2-1**). Ashland currently owns Block 282 and 283 and leases a portion of Block 280, Lot 1 from New Jersey Transit. Historical activities on each Block vary, and where appropriate, are discussed separately throughout this report. The entire Site has been inactive since 2010 (approximately seven years).

### 2.1    Site Description

Block 283 is approximately 4.7 acres and is located southeast of Harrison Avenue and Greenfield Avenue (1106 Harrison Avenue). The property currently contains nine Site buildings, multiple bulk storage tanks and drum/tote storage areas, and two bulk tank truck-loading areas. This block is entirely paved with an impervious surface of buildings, concrete, or asphalt. This portion of the Site is referred to as the "plant" Site and/or as plant operations (**Figure 2-1**).

The eastern portion of the plant Site is identified as Block 280, Lot 1 and is owned by New Jersey Transit Railroad. This area is a part of a historical lease with the railroad and is located within the Site fence line (approximately 30 feet wide by 650 feet long). Site features within the lease area include Building 706 (Maintenance Shop), Building 714 (Boiler House), bulk storage areas, and employee parking (**Figure 2-1**). The railroad siding immediately east of the Site is identified as AOC-P and serviced the Site until the mid-1980s. The drainage swale immediately south of the Site is identified as AOC-I. Historical photographs depicts Site operations with the present day swale (i.e., AOC-A11).

Block 282 is approximately 0.5 acres and is located west of the plant Site and Greenfield Avenue (1000 Harrison Avenue). The north side of the property along Harrison Avenue is currently developed with a single-story concrete block building and paved parking lot. Prior to facility closure in April 2010, the building was used as a sales office and equipment storage. The south side of the property is green space. Portions of the green space were used for residential purposes up until 2010. (**Figure 2-1**).

### 2.2    Site History

A brief overview of the Site history is provided below. A comprehensive Site history, including a list of historical owners, operators and building permits is provided in the 2009 PA Report. (URS, 2009a).

### 2.3    Block 283 (Plant Site)

Operations on Block 283 date back to the early 1900s (Lots 4 and 5) and have remained industrial in nature primarily along the southern and eastern portions of the Site. In 1981, Ashland Oil, Inc. (now Ashland LLC.) indirectly through its wholly owned subsidiary, Kentucky Bitulithic, Inc., acquired Drew Chemical Corporation (Drew) as part of its acquisition of the United States Filter Corporation. Drew operations continued as Ashland Water Technologies Division of Ashland Inc. In November 2008, Ashland purchased Hercules Incorporated, thereby renaming the active business to AHWT. (URS, 2009a). In 2016, Ashland Inc. become Ashland LLC following the divesture of Valvoline.

Under Ashland ownership, the plant occupied all of Block 283. Raw materials were brought into the plant by tank truck (and historically by railcar) and were stored in above ground bulk storage tanks (328,675 gallons of bulk storage capacity). Production was described as batch-quality controlled

ASHL-FED-0000269744
ALCD-PUBCOM_0001835

manufacturing (mixing). Reactors and mix tanks had a total capacity of 38,300 gallons. The plant produced approximately 500 products making up some 50 million pounds annually. Approximately 9% of the products were sold to the marine industry by the Ashland Drew Marine Sales Division and Marketing Groups in the form of boiler compounds, diesel engine cooling water rust inhibitors, fuel oil treatment compounds and an assortment of cleaning compounds. The remaining 91% were supplied to industrial users via the Ashland Drew Industrial Chemicals Division (URS, 2009a).

According to the City Directory, Harmon Color Works Chemical operated at the Site (Lot 4 and Lot 5) in 1948 and 1952. (**Figure 2-1**) Subsequent operators included BF Goodrich Chemical Company (1956), Carnegies Fine Chemicals (1962), Rexall Drug and Chemical Company (1966) and Sun Chemical (1966-1970). In 1970, Drew Chemical Company (Drew) purchased Lots 4 and 5 from Sun Chemical. In 1973, Drew purchased Lot 3 from Celutone Plastics. In 1974, Drew purchased the two remaining dwellings on Lots 1 and 2 (14 and 16 Greenfield Avenue). Drew (was the sole operator on Block 283 since 1974. (URS, 2009a). On March 31, 2009, Ashland issued a public release of its decision to close operations. In Spring 2010, the facility closed.

Facility configurations changed over the operational period of the Site. An effort was made during the PA to obtain an understanding of the Site's operational history including material and waste handling procedures and building construction/demolition activities. Based on the longevity of Site history and multiple Site owners and operators, a complete description is not available. For this reason, RI investigation activities were implemented to collect data that is representative of Site conditions overtime and throughout the Site.

## 2.4    Block 282

Under Ashland ownership, Block 282 (1000 Harrison Avenue) was primarily used for employee parking for the plant Site on Block 283. No chemicals were stored or processed in this block. At the time of the initial Site reconnaissance, the building was used as a sales office and storage of archived documents and miscellaneous unused equipment. The Site layout is provided as **Figure 2-2**.

Historical ownership information dating back to 1908 indicates Block 282 was used for residential use through the mid-1970s with the exception of Lot 1 (1000 Harrison Avenue). Lot 1 is located in the northwest corner of Block 282 (**Figure 2-1**). According the 1938 and 1942 City Directories, 1000 Harrison Avenue was occupied by a series of service stations (Barry JJ Gasoline and O'Grady C Gasoline). The presence of former fueling stations are suspect as City addresses along Harrison Avenue appear to have changed over the course of development along Harrison Avenue and evidence of service stations on the north side of Harrison Avenue are documented. (URS, 2009a). City building permits indicate the building at 1000 Harrison Avenue was constructed as a machine shop in 1956 and later converted into a food service establishment on or about 1973. (URS, 2009a)

The 1962 and 1970 City Directories indicate 1000 Harrison Avenue was occupied by West Hudson Manufacturing Company. In the mid-1970s, New King Trucking Corporation acquired Lots 1, 2, 3, 4 and 7 (**Figure 2-1**). In June 1984, F&J Realty Company acquired these lots from New King Trucking Corporation. Information pertaining to West Hudson Manufacturing Company and F&J Realty Company operations are not known. In February 1993, Ashland Chemical, Inc. purchased these lots from F&J Realty Company. (URS, 2009a).

Ashland Inc. purchased residential Lot 6 in 2000 and Lot 5 in 2008 (**Figure 2-1**). The dwellings were subsequently demolished. The last dwelling on Lot 5 (9 Greenfield Avenue) was demolished in 2010 prior to facility closure. (URS, 2009a)

ASHL-FED-0000269745
ALCD-PUBCOM_0001836

## 2.5    Infrastructure and Utilities

The Site is serviced by public utilities (i.e., electric, water, gas, sanitary sewer, and storm sewer utilities). Provided below is the current understanding of the Site utilities.

### 2.5.1    Sanitary and Storm Sewer

Public sanitary sewer and storm sewer utilities running beneath Greenfield Avenue and Harrison Avenue service the Site. City engineering drawings provided as **Appendix X**, depict the Harrison Avenue utility corridor ranging from 8 to 10 feet in depth in the vicinity of the Site. Ashland operated a combined storm water and process wastewater conveyance system within the plant Site. Combined storm water and industrial sewer service is provided by the Passaic Valley Sewage Commissioner (PVSC), with administration offices at 600 Wilson Avenue, Newark, New Jersey 07105. This is a Publicly Owned Treatment Works (POTW). The drainage swale south of the Site captures runoff from the adjoining R&L Trucking property to the south. (**Figure 2-1**).

No septic systems are known to have existed on either Site property.

### 2.5.2    Water Source

Water and gas utilities enter the property from Harrison Avenue.

### 2.5.3    Fire Suppression System

At the time of the initial reconnaissance, the plant Site maintained a fire suppression system (AOC-A13) between Building 721 and Building 723. (**Figure 2-2**).

### 2.5.4    Power Station

The plant Site maintained a powerhouse on the south side of the Block 283 (AOC-K1). The power station was installed after 1978 supplied electricity to the plant Site. Two pole-mounted transformers are located on the east side of Greenfield Avenue (AOC-K2 and AOC-K3). (**Figure 2-2**)

### 2.5.5    Boiler House

The plant Site maintained a boiler house (Building 714) in the southeast corner of Block 283. Historical aerial photographs depict the boiler house in 1947 and off-loading of coal from the railroad to the east. The boiler house was used generate steam for plant production and may have been a source of heat in the earlier years of operation. The coal-fired boiler was modified over time to use No. 2 fuel oil, then No. 6 fuel oil (AOC-A8 and AOC-Q2). Currently the boiler house is out of service. (**Figure 2-2**)

## 2.6    Surrounding Land Use

The area immediately surrounding the Site is industrial in nature dating back to the early 1900s. Aerial decade photographs from 1947, 1959, 1969, and 1978 depicted heavy industry immediately north, northeast and east of the Site, and lighter industrial operations south, southwest, and west. Areas to the northwest of the Site were commercial and residential. Surrounding land uses were modified overtime as industries changed. With the exception of Kearny Smelting to the north, the properties immediately surrounding the Site are now commercial (Walmart, United States Postal Service, R&L Trucking). A current surrounding property land use map is provided as **Figure 2-3**. A comprehensive summary of

14

ASHL-FED-0000269746
ALCD-PUBCOM_0001837

historical land use based on aerial photographs, topographic maps and Sanborn maps is provided in the 2009 PA Report. (URS, 2009a).

The Site and surrounding region are characterized with glacial and postglacial deposits including alluvium, estuarine, and salt marsh deposits. Landfilling of indigenous material on the alluvium and salt marsh deposits began shortly after permanent European settlement for constructing railroads, industrial facilities, and trash disposal primarily along the Newark and Elizabeth waterfronts. (URS, 2009b). **Figure 2-4** depicts the aerial extent of historic fill beneath and surrounding the Site and is based on the historic fill mapping provided by the NJDEP Land Use Management and New Jersey Geological Survey Elizabeth and Orange Quadrangles (NJDEP, 2004a and b). The Site Environmental Setting is discussed in **Section 3.0**.

## 2.7    ISRA Investigation History

### 2.7.1    Preliminary Assessment (2009)

On March 31, 2009, Ashland issued a public release of its decision to close operations. On April 3, 2009, Ashland submitted a GIN to NJDEP pursuant to N.J.A.C. 7:26B Subchapter 3. The Site was assigned ISRA project number E2009-0080. The results of the PA were summarized in the August 20, 2009 PA Report, (URS 2009a).

Seventy-one (71) potential historical and active AOCs were identified in the PA. A table listing each AOC is provided as **Table 2-1.** Sixty-seven (67) AOCs were identified on Block 283 (plant Site), one (1) AOC on Block 282 (AOC-Q3), and three (3) AOCs (AOC-A11, AOC-I, and AOC-P) were identified off-site and immediately adjacent to the property. The location of each AOC is shown on **Figure 2-5** (Block 283 and Off-Site) and **Figure 2-6** (Block 282).

### 2.7.2    Site Investigation (2009)

Site investigation activities were initiated in June 2009. Forty-seven (47) soil borings (SB1 through SB47) were completed. Sixty-two (62) soil samples were analyzed for target compound list (TCL) volatile organic compounds (VOCs), TCL semi-volatile organic compounds (SVOCs), plus the tentatively identified compounds (TICs), priority pollutant metals, and petroleum hydrocarbons (including gasoline range and diesel range organic compounds). An isolated AOC (AOC Q3) on Block 282 was additionally analyzed for polychlorinated biphenyls (PCBs). Soil boring locations are shown on **Figure 2-7**.

The results of the initial Site investigation were submitted in the SI Report, dated August 20, 2009 (URS, 2009b). Exceedances above the December 2009 Impact to Groundwater Standards and June 2008 Residential and Non-Residential Soil Clean-up Criteria were identified in the majority of soil samples.

### 2.7.3    Remedial Investigation (2009-2010)

Remedial investigation activities were initiated in November 2009 to further assess AOC-A1, AOC-A10, AOC-A12, AOC-C4, AOC-C16, AOC-O1 and AOC-O2. Twenty-nine (29) soil borings were completed and fifty-four (54) soil samples were collected for laboratory analysis. Four (4) shallow monitoring wells were installed (MW-1 through MW-4). Monitoring well MW-3 was installed in the area of highest known soil impacts. Monitoring wells were installed at locations suspected to be up gradient (MW-1 and MW-2) and downgradient (MW-4) of the Site operations. Soil boring and monitoring well locations are shown on **Figure 2-7**.

ASHL-FED-0000269747
ALCD-PUBCOM_0001838

Case 2:22-cv-07326-MCA-LDW    Document 309-22    Filed 04/01/24    Page 82 of 468
PageID: 14807
EHS Support
consider it done

Initial groundwater samples were collected in December 2009. Groundwater samples were collected from the mid-point of each five-foot section of the 10-foot screen interval. Groundwater samples were analyzed for TCL VOCs, TCL SVOCs, plus TICs, priority pollutant metals (total and dissolved), and total petroleum hydrocarbons (including gasoline range and diesel range organic compounds). The groundwater sample from monitoring well MW-1 (within AOC-Q3) was additionally analyzed for PCBs.

In July 2010, RI activities resumed following plant closure. Eleven (11) soil borings were completed and 22 soil samples were collected beneath tank farms AOC-A1 and AOC-A12 and within AOC-C16. Five (5) shallow monitoring wells were installed across the Site (MW-5 through MW-9). Groundwater samples were collected from wells MW-1 to MW-9 in August and December 2010. Soil boring and monitoring well locations are shown on **Figure 2-7**

A summary of RI activities were presented in three Semi-Annual Remediation Status Reports submitted to NJDEP on December 21, 2009 (URS, 2009c), June 20, 2010 (URS, 2010a), and December 29, 2010 (URS, 2010b).

The historical soil sample program by Block 283, Block 282 and off-site is provided in **Table 2-2**. Soil analytical results from the 2009 and 2010 investigations were compared to the most current soil remediation standards and are presented by AOC in **Table 2-3.**

The historical groundwater sample program is provided in **Table 2-4**. Groundwater analytical results from 2009 through 2010 were compared to the most current NJDEP groundwater quality standards (GWQS) and NJDEP Vapor Intrusion Groundwater Screening Levels (VIGSLs) and are presented in **Table 2-5** and **Table 2-6**, respectively.

Due to slight variances in compound lists over multiple years of sampling, analytical data is presented by investigation phase, then AOC.

### 2.7.4    Initial Vapor Intrusion Screening (2012-2013)

In March 2012, Ashland initiated a Vapor Intrusion (VI) investigation pursuant to the Sub-Slab Soil Vapor Investigation Work Plan, dated January 12, 2011 (EHS, 2011a). Permanent soil gas vapor points were installed in accessible buildings concurrently to evaluate sources of vapor. Sub-slab soil vapor samples were collected in April 2012. Exceedances of sub-slab soil vapor screening levels were identified. Indoor air samples were collected from Site buildings in March 2013, following cleaning of Site floor drain conveyance systems. No exceedances were reported above the March 2013 Indoor Air Screening Levels or Rapid Action Levels. No immediate environmental concerns were identified. The results of VI assessment activities are discussed further in **Section 10.0** of this report.

### 2.8    Constituents of Concern

The primary multi-media COCs related to Site-specific industrial operations, include chlorinated and petroleum hydrocarbons. The COCs detected in soil and groundwater attributed to historic fill include PAHs and metals. A summary of COCs by media is provided as **Table 2-7**.

### 2.9    Initial Receptor Evaluation

An initial Receptor Evaluation was submitted in February 2011. No sensitive populations were identified on Site or within 200 feet of the Site with the exception of Frank's Creek. Frank's Creek was identified within the 200-foot boundary east of the Site. Based on available Site data, Frank's Creek was considered

ASHL-FED-0000269748
ALCD-PUBCOM_0001839

EHS Support
consider it done

up gradient of the Site. No sensitive receptors were identified on Site based on the draft Baseline Ecological Evaluation completed by URS Corporation in June 2010 (URS, 2010). No remedial investigation of ecological receptors was warranted.

In February 2015, NJDEP SRP published the revised Ecological Evaluation Technical Guidance. An updated Ecological Evaluation and Receptor Evaluation was completed using the most current investigation data and is discussed in **Section 11.0** and **Section 12.0** of this report, respectively.

Well searches completed in 2009 and 2015 did not identify potable wells within the search radius.

A vapor intrusion assessment was not completed at the time of the initial receptor evaluation was submitted in 2011.

17

ASHL-FED-0000269749
ALCD-PUBCOM_0001840

EHS Support
consider it done

3    ENVIRONMENTAL SETTING

ASHL-FED-0000269750
ALCD-PUBCOM_0001841

## 4    REMEDIATION STANDARDS AND DATA QUALITY OBJECTIVES

This section of the RI report provides a summary of remediation standards identified for the Site.  At this time, Ashland is screening data against the default screening criteria.  However, the use of alternate remediation standards may be evaluated as part of the remedial action evaluation (feasibility study).

### 4.1    Soil Remediation Standards

Soil analytical data was compared to the following soil remediation standards:
- Impact to Groundwater Soil Screening Levels, November 2013
- Residential and Non-Residential Direct Contact Soil Remediation Standards, May 2012
- Extractable Petroleum Hydrocarbon Soil Remediation Criteria, August 2010
- Ecological Screening Criteria, March 2009

In accordance with N.J.A.C. 7:26E-4.2, when the future use of an area under investigation will be restricted and the property owner has agreed to place a deed notice on the property appropriately restricting its use, the horizontal and vertical delineation of the soil contamination may be limited to the non-residential direct contact soil remediation standards.  However, the use of a deed notice does not provide relief from the requirement to delineate to the applicable impact to ground water criteria in the unsaturated soil zone.

The current and proposed future land use is commercial/industrial.   The average depth to water across the Site is 4.5 feet below grade.  For conservative purposes, the unsaturated soil zone is defined as 0 to 5 feet below grade.

**For discussion purposes references to "surface soil samples" are for soil samples collected within the top two feet (0-2 feet) below grade and "subsurface soil samples" are for soil samples collected greater than two feet below grade (2+ feet).**

### 4.1.1    Impact to Groundwater Soil Screening Levels

Soil samples within the upper five feet were compared to the impact to groundwater soil screening levels published in November 2013.

### 4.1.2    Residential and Non-Residential Direct Contact Soil Remediation Standards

All soil analytical data were compared to the residential and non-residential soil remediation standards published in May 2012 and readopted on April 27, 2015.   In general, soil samples for laboratory analysis were collected between 0 and 60feet below grade.

### 4.1.3    Extractable Petroleum Hydrocarbon Soil Remediation Criteria

Data collected between 2014 and 2016 was analyzed in accordance with the NJDEP SRP *Protocol for Addressing Extractable Petroleum Hydrocarbon*s (Version 5.0) August 9, 2010.   Soil samples were analyzed by NJDEP EPH Method Revision 3 Fractionation (Category 2).  Per the protocol, Category 2 is applicable when there is a potential for petroleum hydrocarbon discharges from unknown sources.

Review of analytical EPH data for Site soil indicates that the petroleum hydrocarbons are dominated by heavy molecular weight aliphatic compounds. This hydrocarbon composition is consistent with the

ASHL-FED-0000269751
ALCD-PUBCOM_0001842

petroleum products listed under Category 2 (for example crude oils). General oils, polymers, paraffin oils and heavy fuel oil No.6 are all common products handled at this Site and would by their molecular weight be classified as Category 2 materials. No waste oils or PCB containing oils (apart from potential dielectric fluids) were handled or stored at the facility. Further, based on the longevity and variability of Site operations and the associated uncertainty, Category 2 classification is also considered appropriate.

### 4.1.3.1    *Calculated Human Health Based Soil Remediation Criteria*

As an initial screening tool, analytical data was compared to the EPH ecological based screening criteria of 1,700 mg/kg. Per the protocol, the human health based EPH soil remediation criteria is calculated for the applicable residential and/or non-residential scenarios for soil samples exceeding the ecological screening criteria of 1,700 mg/kg. Sample specific human health based EPH SRC was calculated using the EPH calculator tool provided by NJDEP. The results of EPH-calculator tool is provided in **Appendix C-1**.

The data was also compared to the default Category 2 residual product (free product) value of 17,000 mg/kg. Required remedial actions and/or the need to complete further contingency analysis is based on lower of the calculated sample-specific EPH SRC and the default residual product value.

Contingency analysis pursuant to Table 2-1 of the Technical Requirements for Site Remediation, was included as part of the Site-wide comprehensive sampling program and included analysis for VOCs, SVOCs, plus TICs. Soil samples analyzed in 2009 and 2010 were previously analyzed for priority pollutant metals (2009) and Target Analyte Metals (TAL) metals (2010). The presence of metals in soil (and groundwater) was determined to be associated with documented historic fill; therefore, no additional metals analysis was completed during 2014-2016 investigation activities.

Soil samples collected in 2009 and 2010 were analyzed for total petroleum hydrocarbons, specifically diesel DRO and GRO. For conservative purposes, these values were also compared to the ecological based screening criteria of 1,700 mg/kg and EPH (Category 2) residual product value (17,000 mg/kg).

For the purpose of delineation, the target concentrations of EPH in unsaturated zone (0-5 feet below grade) is 1,700 mg/kg.

### 4.1.4    Ecological Screening Criteria

The Ecological Evaluation specifically focused on analytical data collected within surface soil (0-2 feet below grade). This data was compared to the NJDEP SRP Ecological Screening Criteria (ESC) updated on March 10, 2009. The Ecological Evaluation is summarized in **Section 11.0** of this report.

### 4.2    Groundwater Remediation Standards

Groundwater analytical data was compared to the following soil remediation standards:
- Groundwater Quality Standards (GWQS) published in July 22, 2010 (N.J.A.C. 7:9C) with published updates in November 2015
- Generic Vapor Intrusion Groundwater Screening Levels (VIGSLs) published in March 2013.
- Ecological Screening Criteria, March 2009

Frank's Creek located approximately 170 feet east of the Site is classified as a freshwater steam therefore, groundwater analytical results were compared to ESC for Freshwater (FW2) Criteria (Aquatic Chronic).

ASHL-FED-0000269752
ALCD-PUBCOM_0001843

### 4.3    Vapor Screening Levels

Soil gas analytical results were compared to Soil Gas Screening Levels published in March 2013. Indoor air analytical results were compared to Indoor Air Screening Levels and Rapid Actions Levels published in March 2013.

### 4.4    Remedial Investigation Work Plans

Remedial investigation activities discussed in this RI report were completed in accordance with the scopes of work proposed in the following project documents:

- Site Investigation Report (Section 7.0 Recommendations), August 20, 2009
- Remediation Status Reports, December 21, 2009, June 30, 2010, and December 29, 2010
- Sub-Slab Soil Vapor Investigation Work Plan, January 12, 2012
- RI Work Plan Memorandum, November 7, 2014
- Draft Remediation Investigation Report, March 4, 2016
- Sampling and Analysis Plan Memorandum, September 13, 2016

The 2014 RI Work Plan Memorandum was submitted to the LSRP on November 7, 2014. Additional comment and response was provided on December 3, 2014 and December 5, 2014, respectively. The RI Work Plan was conditionally accepted on December 9, 2014.

Supplemental field investigation activities were proposed in the draft March 2016 RI Report. The proposed scope of work was revised following initial feedback provided by the LSRP on July 6, 2016 and subsequent on-Site meeting held on August 16, 2016. Supplemental RI activities were completed between September and December 2016. The results of sampling are discussed throughout this report. A high-level summary of RI activities not previously submitted to NJDEP is provided below.

### 4.5    Remedial Investigation Activities 2012-2013

Vapor intrusion (VI) investigation activities completed in accordance with the approved Sub-Slab Soil Vapor Investigation Work Plan referenced above. Sub-slab vapor and indoor air concentrations were evaluated for each Site building in 2012 and 2013, respectively. Air samples were analyzed for VOCs using TO+15 method by TestAmerica in Burlington, Vermont. No immediate environmental conditions were identified. A summary of VI investigation activities (including modifications from the proposed scope of work, if any) is provided in **Section 10.0** of this report.

### 4.6    Remediation Investigation Activities 2014-2015

Field investigation activities were completed between December 10, 2014 and September 21, 2015. Ninety-two (92) soil borings were completed. Fifty-three (53) soil borings were completed on a grid pattern across the Site (SB83 through SB130, SB163 through SB167) on approximate 50-foot centers and 39 AOC-specific soil borings SB131 to SB162 were completed beneath and/or in proximity to AOCs. Soil boring locations are presented on **Figure 2-7**.

Each soil boring was completed using a direct push Geoprobe® rig to 20 feet below ground surface. Soil borings were advanced using a 2-inch diameter, 5-foot long macrocore barrel equipped with soil sample acetate liner. Soils were screened with a photo-ionization detector (PID) and logged by a field geologist in accordance with Unified Soil Classification System (USCS). Soil logs describe soil texture, moisture

ASHL-FED-0000269753
ALCD-PUBCOM_0001844

content, color, stratification, fabric, structure, analytical sample collection. A copy of the completed soil boring logs are provided in **Appendix A**.

### 4.6.1   Soil Sampling

A surface soil sample was collected from the 0-6 inches below ground cover (asphalt, concrete, sub-base gravel) to evaluate surface soil conditions. Subsurface samples were collected from the six-inch interval identified with the highest headspace reading. If no elevated readings above background were detected, the soil sample was collected from a sample depth similar to proximal historic soil sampling to facilitate horizontal delineation. Subsurface soil samples were collected regardless of the water table interface.

Soil samples were analyzed for the following:
- TCL VOCs plus TICs using United States Environmental Protection Agency (USEPA) Method 8260C;
- TCL SVOCs (BNA) plus TICs using U.S. EPA Method 8270D;
- EPH NJDEP EPH Method Revision 3 [Category 2 or Category 1(where applicable)]; and,
- PCBs using U.S. EPA Method 8082A (limited).

Discrete soil samples for VOC analysis were collected using Encore Sampler®. Soil samples collected for analytical parameters other than VOCs were homogenized in a clean stainless steel bowl using disposal trowel or clean stainless trowel/scoop and placed directly into the laboratory-supplied glassware.

Soil samples collected on Block 282 were also analyzed for PCBs in an effort to delineate impact associated with AOC-Q3. Subsurface sample analyses (generally between 5.0-5.5 and 5.5-6.0 ft) for PCBs were placed on hold pending the result of surface soil sample analytical results. If an exceedance was identified in the surface soil, the subsurface soil sample was analyzed.

Analysis for metals was not a requirement as it was previously determined to be associated with historical fill during previous investigation events completed in 2009 and 2010. For completeness of data presentation, analytical results for metals (and PAHs) are presented in **Section 8.0** (Historic Fill). A summary of the soil-sampling program is provided on **Table 2-2**. All soil samples were analyzed by TestAmerica of Edison, New Jersey (NELAP #12028). Copies of soil analytical reports are provided in **Appendix D**.

Each borehole was abandoned in accordance with FSPM Section 6.2.5.2 using a bentonite grout/slurry.

Downhole equipment and equipment in contact with soil and groundwater was decontaminated before and after each borehole in accordance with FSPM Section 2.4. Heavy equipment including the drill rig and downhole tooling were decontaminated using high-pressure heated (steam) wash in a dedicated decontamination area established at the Site. Non-disposable soil sampling equipment (including sampling trowels, bowls) were decontaminated in accordance with FSPM Section 2.4.2.

Investigation derived waste (IDW) (i.e. soil cuttings, decontamination water, Personal Protective Equipment (PPE)) was placed in separate 55-gallon steel drums. All IDW was manifested as non-hazardous waste and transported by Nexeo Solutions LLC to an Ashland approved disposal facility.

### 4.6.2   Groundwater Sampling

Groundwater samples were analyzed for the following:
- TCL VOCs plus TICs using USEPA Method 8260C

ASHL-FED-0000269754
ALCD-PUBCOM_0001845

- TCL SVOCs (BNA) plus TICs using US EPA Method 8270D
- Select Ion Mode (SIM) analysis

Groundwater samples were collected no sooner than 14-days following well installation. Groundwater samples were collected by low-flow purging and sampling (LFPS) using a positive-displacement bladder pump with disposable bladders and Teflon® lined polyethylene tubing in accordance with the NJDEP FSPM, Section 6.9.2.2. Groundwater samples were collected from least to most impacted wells (as applicable). Each sample was from the mid-point of the submerged well screen.

All downhole equipment and equipment in contact with groundwater was properly decontaminated before and after use. This included the water level meter, bladder pump, water quality parameter meter. The tubing and pump bladder were discarded between each sample location.

A summary of the groundwater sampling program is provided on **Table 2-4**. All groundwater samples were analyzed by TestAmerica of Edison, New Jersey. Copies of groundwater analytical reports are provided in **Appendix L**.

### 4.6.3    Modifications from the Approved 2014-2015 Scope of Work

Provided below is a summary of modifications and the justification for each.
- Boreholes were offset from the planned grid locations based on presence of subsurface utilities and/or above grade obstructions (i.e., buildings, storage tanks, containment berms).
- Concrete and asphalt surfaces were penetrated by saw cutting the pavement. Each soil boring was completed by advancing the direct push tooling approximately 12-18 inches below grade to collect a surface soil sample. Next, the borehole was cleared via vacuum extraction (soft dig) to a minimum of five feet below grade. As a result, no samples were collected between 1.5 to 5 feet below grade.
- In some instances, two or three subsurface soil samples were collected to delineate field observations and the potential for impact.
- Field geologist utilized a Munsell color chart for bedrock to classify soil cores in error.
- Electronic borings logs were adjusted where slough was suspect and intermixed with the peat lens at depth.
- Monitoring well MW-3B was installed using sonic drilling technology due to concerns surrounding sustained headspace readings. As a result, only one of two proposed sampling events was completed prior to drafting the initial RI report.
- SIM analysis was inadvertently completed on groundwater samples collected in June 2015 groundwater samples.

### 4.7    Remediation Investigation Activities 2016

Field investigation activities were completed between September and December 2016. Sixty-four (64) soil borings (SB171 through SB227 and SB25D, S2B26D, SB123D, SB173R and SB219D) were completed and included 10 soil borings within the New Jersey Transit property immediately east of the Site. Delineation soil borings proposed south of the Site within R&L Trucking Property (Block 279, Lot 30i) were not complete due to access limitations. Soil boring locations are presented on **Figure 2-7**.

Each soil boring was completed using a direct push Geoprobe® rig. Soil borings were advanced using a 2-inch diameter, 4 or 5-foot long macrocore barrel equipped with soil sample acetate liner. Soils were screened with a PID and logged by a field geologist in accordance with USCS. Soil logs describe soil

ASHL-FED-0000269755
ALCD-PUBCOM_0001846

texture, moisture content, color, stratification, fabric, structure, analytical sample collection. A copy of the completed soil boring logs are provided in **Appendix A**.

### 4.7.1    Soil Sampling

Soil samples were collected at pre-determined depth intervals to support vertical and/or horizontal delineation. Surface soil samples were collected from the 0-6 inches below ground cover (asphalt, concrete, sub-base gravel) to evaluate surface soil conditions. Subsurface samples were collected from a six-inch interval identified greater than two feet below grade. Where applicable, additional soil samples were collected based on the highest headspace reading.

Soil samples were analyzed for the following:
- TCL VOCs plus TICs using USEPA Method 5035A/8260C;
- TCL SVOCs (BNA) plus TICs using U.S. EPA Method 8270D;
- EPH NJDEP EPH Method Revision 3 (Category 2);
- Target Analyte Metals (TAL) using U.S. EPA Methods 6010C and 7471B
- PCBs using U.S. EPA Method 8082A.

Discrete soil samples for VOC analysis were collected using Terracore kits. Soil samples collected for analytical parameters other than VOCs were homogenized in a clean stainless steel bowl using disposal trowel or clean stainless trowel/scoop and placed directly into the laboratory-supplied glassware.

Per the remedial investigation protocols, metals and PCBs analysis were limited to soil samples associated AOC-P (Railroad siding).

A summary of the soil-sampling program is provided on **Table 2-2**. All soil samples were analyzed by TestAmerica of Edison, New Jersey. Copies of soil analytical reports are provided in **Appendix D**.

Each borehole was abandoned in accordance with FSPM Section 6.2.5.2 using a bentonite grout/slurry.

Downhole equipment and equipment in contact with soil and groundwater was decontaminated before and after each borehole in accordance with FSPM Section 2.4. Heavy equipment including the drill rig and downhole tooling were decontaminated using high-pressure heated (steam) wash in a dedicated decontamination area established at the Site. Non-disposable soil sampling equipment (including sampling trowels, bowls) were decontaminated in accordance with FSPM Section 2.4.2.

Investigation derived waste was placed in separate 55-gallon steel drums. All IDW was manifested as non-hazardous waste and transported by Nexeo Solutions LLC to an Ashland approved disposal facility.

### 4.7.2    Groundwater Sampling

Groundwater samples were analyzed for the following:
- TCL VOCs plus TICs using USEPA Method 8260C
- TCL SVOCs (BNA) plus TICs using US EPA Method 8270D
- Metals using US EPA Method 6020A and 7470A
- SIM analysis

Groundwater samples were collected by LFPS using a positive-displacement bladder pump with disposable bladders and Teflon® lined polyethylene tubing in accordance with the NJDEP FSPM, Section

ASHL-FED-0000269756
ALCD-PUBCOM_0001847

6.9.2.2. Groundwater samples were collected from least to most impacted wells (as applicable). Each sample was from the mid-point of the submerged well screen.

All downhole equipment and equipment in contact with groundwater was properly decontaminated before and after use. This included the water level meter, bladder pump, water quality parameter meter. The tubing and pump bladder were discarded between each sample location.

A summary of the groundwater sampling program is provided on **Table 2-4.** All groundwater samples were analyzed by TestAmerica of Edison, New Jersey. Copies of groundwater analytical reports are provided in **Appendix L**.

### 4.7.3   Modifications from the Proposed 26016 Scope of Work

Provided below is a summary of modifications and the justification for each.
- Boreholes on site were offset from the planned locations based on presence of subsurface utilities and/or above grade obstructions (i.e., buildings, storage tanks, containment berms).
- Boreholes within the off-site railroad siding were adjusted based on above grade obstructions (i.e., vegetative overgrowth, site debris, parked vehicles, roadway).
- Boreholes proposed south of the site within RL property, were not completed due to unsuccessful access agreement negotiations.
- Installation of proposed monitoring well locations was placed on-hold pending completion of groundwater CSM.

### 4.8   Data Discussion

The results of RI activities by media are discussed in the following Sections:
- Section 5.0 – Soil Investigation Block 283
- Section 6.0 – Soil Investigation Block 282
- Section 7.0 – Soil Investigation Off-Site
- Section 8.0 – Historic Fill Investigation
- Section 9.0 – Groundwater Investigation
- Section 10.0 – Vapor Intrusion Investigation
- Section 11.0 – Ecological Evaluation
- Section 12.0 – Receptor Evaluation
- Section 13.0 – Conceptual Site Model on Contaminant Nature and Extent Discussion (place holder)

For completeness in presentation, all available data collected during site investigation and RI activities is discussed. In instances where analytical results from one AOC abut or share boundaries of another AOC, the analytical may be used to complete characterization of multiple AOCs. For spatial (Site-wide) comparison, analytical results are presented regardless of AOC boundary. However, AOC data boundary maps are referenced within and are provided as **Appendix C**.

25

ASHL-FED-0000269757
ALCD-PUBCOM_0001848

## 4.9    Data Quality Review

### 4.9.1    2014-2015 Data Collection

No critical deficiencies were identified. A summary of Quality Assurance sampling for each groundwater-sampling event is provided in Section 9.0. Based on the volumes of soil data, a high-level summary is provided below.

Laboratory data packages received from the laboratory were reviewed for completeness against the chain of custody. Errors, omissions or clarification on samples received from the field were generally identified and remedied prior to issuance of the final report.

Laboratory summary tables presents all analytical data including multiple dilutions if necessary. In most cases, samples were run at the lowest reporting limits below the remediation standards with exception of samples exceeding the laboratory calibration limits.

In some instances, deep interval samples (greater than 15 feet below grade) were collected and placed on hold pending receipt of results from the sample above. Soil samples collected between 15.0-20.0 feet below grade were analyzed at the following soil sample locations: SB121 (18.0-18.5), SB123 (17.0-17.5), SB124 (17.5-18.0), SB125 (18.0-18.5), SB126 (18.0-18.5), SB127 (19.5-20.0), SB138-A6 (16.5-17.0), SB161-O3 (19.5-20.0), SB162-O3 (18.5-19.0), SB164 (19.0-19.5), and SB166 (19.0-19.5).

### 4.9.2    2016 Data Collection

No critical deficiencies were identified. A summary of Quality Assurance sampling for each groundwater-sampling event is provided in Section 9.0. Based on the volumes of soil data, a high-level summary is provided below.

Laboratory data packages received from the laboratory were reviewed for completeness against the chain of custody. Errors, omissions or clarification on samples received from the field were generally identified and remedied prior to issuance of the final report.

Laboratory summary tables presents all analytical data including multiple dilutions if necessary. In most cases, samples were run at the lowest reporting limits below the remediation standards with exception of samples exceeding the laboratory calibration limits.

In some instances, deep interval samples were collected and placed on hold pending receipt of results from the sample above. In this instance, overlying samples were expedited to meet the holding requirements of held samples.

26

**5     SOIL INVESTIGATION BLOCK 283**

ASHL-FED-0000269759
ALCD-PUBCOM_0001850

EHS Support
consider it done

# 6    SOIL INVESTIGATION BLOCK 282

ASHL-FED-0000269760
ALCD-PUBCOM_0001851

EHS Support
consider it done

# 7    OFF-SITE AOC INVESTIGATION

ASHL-FED-0000269761
ALCD-PUBCOM_0001852

# 8    HISTORIC FILL INVESTIGATION (AOC-S)

ASHL-FED-0000269762
ALCD-PUBCOM_0001853

EHS Support
consider it done

**9    GROUNDWATER INVESTIGATION (AOC-T)**

ASHL-FED-0000269763
ALCD-PUBCOM_0001854

EHS Support
consider it done

**10   VAPOR INTRUSION INVESTIGATION**

ASHL-FED-0000269764
ALCD-PUBCOM_0001855

**11 ECOLOGICAL EVALUATION**

ASHL-FED-0000269765
ALCD-PUBCOM_0001856

EHS Support
consider it done

# 12   RECEPTOR EVALUATION

ASHL-FED-0000269766
ALCD-PUBCOM_0001857

EHS Support
consider it done

# 13   CONCLUSIONS

ASHL-FED-0000269767
ALCD-PUBCOM_0001858

EHS Support
consider it done

## 14    RECOMMENDATIONS

ASHL-FED-0000269768
ALCD-PUBCOM_0001859

EHS Support
consider it done

## 15  REFERENCES

ASHL-FED-0000269769
ALCD-PUBCOM_0001860

**FIGURES**

ASHL-FED-0000269770
ALCD-PUBCOM_0001861

**TABLES**

ASHL-FED-0000269771
ALCD-PUBCOM_0001862

EHS Support
consider it done

**APPENDIX A**
**SOIL BORING LOGS**

ASHL-FED-0000269772
ALCD-PUBCOM_0001863

**APPENDIX B**
**PHOTOGRAPHIC LOG**

ASHL-FED-0000269773
ALCD-PUBCOM_0001864

**APPENDIX C**
**AOC BOUNDARY MAPS**

**APPENDIX D**
**SOIL LABORATORY DATA REPORTS**

EHS Support
consider it done

**APPENDIX E**
**HISTORICAL AERIAL PHOTOGRAPHS**

ASHL-FED-0000269776
ALCD-PUBCOM_0001867

**APPENDIX F**
**SEWER INSPECTION DATA**

ASHL-FED-0000269777
ALCD-PUBCOM_0001868

EHS Support
consider it done

**APPENDIX G**
**MODEL DEED NOTICE (TEMPLATE)**

ASHL-FED-0000269778
ALCD-PUBCOM_0001869

EHS Support
consider it done

**APPENDIX H**
**CEA MODEL DATA**

ASHL-FED-0000269779
ALCD-PUBCOM_0001870

**APPENDIX I**
**GROUNDWATER SAMPLING FORMS DATA**

ASHL-FED-0000269780
ALCD-PUBCOM_0001871

EHS Support
consider it done

# APPENDIX J
# WELL CONSTRUCTION LOGS

**APPENDIX K**
**MONITORING WELL CERTIFICATION FORM A / FORM B**

EHS Support
consider it done

**APPENDIX L**
**GROUNDWATER LABORATORY DATA REPORTS**

**APPENDIX M
BUILDING SURVEYS**

ASHL-FED-0000269784
ALCD-PUBCOM_0001875

EHS Support
consider it done

**APPENDIX N**
**SOIL VAPOR IMPLANT SCHEMATICS**

ASHL-FED-0000269785
ALCD-PUBCOM_0001876

EHS Support
*consider it done*

**APPENDIX O**
**VAPOR LBORATORY DATA REPORTS**

ASHL-FED-0000269786
ALCD-PUBCOM_0001877

EHS Support
consider it done

**APPENDIX P**
**DATA VALIDATION REPORTS**

ASHL-FED-0000269787
ALCD-PUBCOM_0001878

**APPENDIX Q**
**ECOLOGICAL EVALUATION**

ASHL-FED-0000269788
ALCD-PUBCOM_0001879

**APPENDIX R**
**RECEPTOR EVALUATION FORM**

ASHL-FED-0000269789
ALCD-PUBCOM_0001880

# EXHIBIT 33

OxyChem's Comments in Opposition to Proposed Consent Decree,
*United States v. Alden Leeds, Inc., et al.*, Civil Action No. 2:22-cv-07326 (D.N.J.)

ALCD-PUBCOM_0001881

REPORT UPON

# OVERFLOW ANALYSIS

TO

PASSAIC VALLEY SEWERAGE COMMISSIONERS

PASSAIC RIVER OVERFLOWS

WORTHINGTON AVENUE. HARRISON
NPDES. NO. 016/H-007

# 1976

ELSON T KILLAM ASSOCIATES INC
*Environmental and Hydraulic Engineers*   *48 ESSEX STREET MILLBURN NEW JERSEY 07041*

KLL016632

OCC-TIG-E02827693
ALCD-PUBCOM_0001882

PASSAIC VALLEY SEWERAGE COMMISSIONERS

PASSAIC RIVER OVERFLOWS

WORTHINGTON AVENUE, HARRISON
NPDES NO. 016/H-007

## TABLE OF CONTENTS

Overflow Data Extract                                          Page

    Chamber Location and Description                    1

    Area Served and Dry Weather Flow                    5

    Storm Water Overflows                               7

    Storm Water Overflow Characteristics               11

    APPENDIX                                           13


List of Illustrations

    Plate A  Plan and Profile                           2

    Plate B  Construction Details                       3

    Plate C  Schematic                                  4

    Plate D  Plan of Collection System                  6

    Table 1  Overflow Observations                      8

KLL016633

OCC-TIG-E02827694
ALCD-PUBCOM_0001883

ELSON T KILLAM ASSOCIATES, INC.

### OVERFLOW DATA EXTRACT

WORTHINGTON AVENUE OVERFLOW CHAMBER

NPDES NO. 016/H-007

HARRISON

**Chamber Location and Description**

| | |
|---|---|
| Overflow Chamber Status: | Active |
| Overflow to: | open ditch leading to Passaic River |
| Character of District Served: | primarily industrial;  some residential |
| Overflow Location (See Plate A): | in Worthington Avenue at southerly terminus before railroad and start of meadows |
| District Outlet Sewer (See Plates A and B): | 24" diameter VTP sewer |
| Outfall to River (See Plates A and B): | 24" diameter VTP sewer |
| Outfall Condition: | obstructed (1350 ft. + in length through meadows to open ditch) |
| Tidal Effects: | none observed |
| Surcharge Effects: | surcharge observed due to outfall obstructions |
| Overflow and Regulator Operation  (See Plates B and C): | Under normal dry weather flow conditions, the flow is diverted to the PVSC interceptor via the regulator.  During periods of rainfall, a portion of the combined flow enters the interceptor, with the balance overflowing the stop logs and being discharged through the outfall line into the Passaic River. |

NOTE: Overflow estimated based on outfall pipe capacity

1

KLL016634

OCC-TIG-E02827695
ALCD-PUBCOM_0001884

PLATE A

PASSAIC VALLEY SEWERAGE COMMISSIONERS

OVERFLOW CHAMBER № 016/H-007
WORTHINGTON AVENUE, HARRISON
PLAN AND PROFILE

ELSON & BILIAN ASSOCIATES, INC.

PROFILE

HORIZ SCALE IN FEET
VERT SCALE IN FEET

KEY MAP

SCALE IN FEET

NOTES
1. ALL SIDE PIPELINES EXCEPT PVSC MAIN INTERCEPTOR ARE OMITTED IN PROFILE FOR CLARITY
2. REGULATOR IS LOCATED AT WORTHINGTON AVENUE AND HARRISON AVENUE (SEE KEY MAP)

LEGEND
→ = DIRECTION OF FLOW
S.C. = SAND CATCHER
T.G. = TIDE GATE
UP STR = UPSTREAM
DN STR = DOWNSTREAM
N.T.S. = NOT TO SCALE
V.T.P. = VITRIFIED TILE PIPE
⊛ = OVERFLOW LOCATION

PASSAIC RIVER

PLAN

SCALE IN FEET

LOCATION PLAN

SCALE IN FEET

KLL016635

(2)

OCC-TIG-E02827696

ALCD-PUBCOM_0001885



KLL016636

OCC-TIG-E02827697

ALCD-PUBCOM_0001886



PASSAIC VALLEY SEWERAGE COMMISSIONERS

WORTHINGTON AVENUE,    HARRISON

SCHEMATIC

ELSON T. KILLAM ASSOCIATES, INC.
Environmental and Hydraulic Engineers    40 ESSEX STREET MILLBURN NEW JERSEY 07041

PLATE C.

OCC-TIG-E02827698

ALCD-PUBCOM_0001887

ELSON T. KILLAM ASSOCIATES, INC.

WORTHINGTON AVENUE OVERFLOW CHAMBER (NPDES NO. 016/H-007) (Cont'd.)

|  |  |
|---|---|
| Condition of Regulator: | appears inoperable |
| Special Actions Required: | none |
| Overflow Stop Log/Dam Condition: | stop logs located in downstream end of sand catcher just before opening to first tide gate chamber |
| Tide Gate Condition: | both tide gates noted as leaking |
| Note: | During the investigation, the Overflow chambers were examined, verifying information and dimensions pertinent to this study. The verified information has been recorded on Plate B (See boxed annotations). |

Area Served and Dry Weather Flow

|  |  |
|---|---|
| Combined Area Served (See Plate D): | 0.277 square miles-177 acres |
| Average Daily Flow | |
| Seasonal Dry Weather: | 2.0 MGD (estimated) |
| Seasonal Wet Weather: | 2.8 MGD (estimated) |
| Estimated Combined Flow to Produce an Overflow: | 5.9 MGD |
| Approximate Length of Combined Sewers Serving District: | 32,100 linear feet |

5

KLL016638

OCC-TIG-E02827699
ALCD-PUBCOM_0001888



KLL016639

OCC-TIG-E02827700
ALCD-PUBCOM_0001889

**84**

OCC-TIG-E02827701
ALCD-PUBCOM_0001890

# EXHIBIT 34

OxyChem's Comments in Opposition to Proposed Consent Decree,
*United States v. Alden Leeds, Inc., et al.*, Civil Action No. 2:22-cv-07326 (D.N.J.)

ALCD-PUBCOM_0001891

RCRA INSPECTION REVIEW SHEET

HW/EF
10-153

Name of Facility - Drew chemical corp
RCRA ID= - NJD053518536
Date of Inspection - 7-19-82
Type of Inspection:    (Generator)    Transporter    (TSD)
Name of EPA/State Inspector - Bob Dante/NJDEP

Findings of Inspection: Housekeeping at the facility is poor
more care needs to be taken of products and raw material
drums. Violations were as follows 265.14(c)

Action(s) Taken: NONE

Action(s) Recommended: N.O.U. for above violation.


EXHIBIT
28

BAF000030

OCC-TIG-E02825970

ALCD-PUBCOM_0001892

RCRA GENERATOR INSPECTION FORM

COMPANY NAME: Drew Chemical Corp.    EPA I.D. NUMBER:
NJ 0053518536

COMPANY ADDRESS: 1106 Harrison Ave
Kearny

COMPANY CONTACT OR OFFICIAL: John Orlowski    INSPECTOR'S NAME: Bob Dante
Kurt Weiss

TITLE: Plant Engineer    BRANCH/ORGANIZATION: NJDEP
Plant manager's :T

CHECK IF FACILITY IS ALSO A TSD    DATE OF INSPECTION: 7-15-82
FACILITY ✓

|  | YES | NO | DON'T KNOW |
|---|---|---|---|

(1) Is there reason to believe that the facility has hazardous
    waste on site?  Yes    ✓

    a. If yes, what leads you to believe it is hazardous waste?
       Check appropriate box:

    ✓ Company admits that its waste is hazardous during the
      inspection.

    ✓ Company admitted the waste is hazardous in its RCRA
      notification and/or Part A Permit Application.

    ✓ The waste material is listed in the regulations as a
      hazardous waste from a nonspecific source (§261.31)

    ☐ The waste material is listed in the regulations as a
      hazardous waste from a specific source (§261.32)

    ✓ The material or product is listed in the regulations as a
      discarded commercial chemical product (§261.33)

    ☐ EPA testing has shown characteristics of ignitability,
      corrosivity, reactivity or extraction procedure toxicity,
      or has revealed hazardous constituents (please attach
      analysis report)

    ☐ Company is unsure but there is reason to believe that waste
      materials are hazardous.  (Explain)

OCC-TIG-E02825971

ALCD-PUBCOM_0001893

2

YES    NO    DON'T
             KNOW

b. Is there reason to believe that there are hazardous wastes on-site which the company claims are merely products or raw materials?                    ___ ✓ ___

Please explain:

c. Identify the hazardous wastes that are on-site, and estimate approximate quantities of each.  2 ½ gallons
Waste flammable solvents – 2 ½ gallons

d. Describe the activities that result in the generation of hazardous waste.
Q. C. Testing and off spec material.

(2) Is hazardous waste stored on site?                    ✓ ___ ___

a. What is the longest period that it has been accumulated?
less than 90 day

b. Is the date when drums were placed in storage marked on each drum?                    ✓ ___ ___

(3) Has hazardous waste been shipped from this facility since November 19, 1980?                    ✓ ___ ___

a. If "yes," approximately how many shipments were made?
5 of waste generated

(4) Approximately how many hazardous waste shipments off site have been made since November 19, 1980?

a. Does it appear from the available information that there is a manifest copy available for each hazardous waste shipment that has been made?                    ✓ ___ ___

b. If "no" or "don't know," please elaborate.

3

| | YES | NO | DON'T KNOW |
|---|---|---|---|

c. Does each manifest (or a representative sample) have the following information?

- a manifest document number — ✓ __ __

- the generator's name, mailing address, telephone number, and EPA identification number — ✓ __ __

- the name, and EPA identification number of each transporter — ✓ __ __

- the name, address and EPA identification number of the designated facility and an alternate facility, if any: — ✓ __ __

- a description of the wastes (DOT) — ✓ __ __

- the total quantity of each hazardous waste by units of weight or volume, and the type and number of containers as loaded into or onto the transport vehicle — ✓ __ __

- a certification that the materials are properly classified, described, packaged, marked, and labeled, and are in proper condition for transportation under regulations of the Department of Transportation and the EPA — __ ✓ __

(5) Were there any hazardous wastes stored on site at the time of the inspection? — ✓ __ __

a. If "yes," do they appear properly packaged (if in containers) or, if in tanks, are the tanks secure? — ✓ __ __

b. If not properly packaged or in secure tanks, please explain.

c. Are containers clearly marked and labelled? . . . . — ✓ __ __

d. Do any containers appear to be leaking? . . . . — __ ✓ __

e. If "yes," approximately how many?

OCC-TIG-E02825973

ALCD-PUBCOM_0001895





*(6) Has the generator submitted an annual report to EPA covering the previous calendar year?                           N.A

    a. How do you know?

(7) Has the generator received signed copies (from the TSD facility) of all manifests for wastes shipped off site more than 35 days ago?

    a. If "no," have Exception Reports been submitted to EPA covering these shipments?

(8) General comments.

Many product drums on site appear to be ageing, company needs to improve house keeping, also facility has drums on site where they are trying to determine their contents.

---

*  The effective date for this requirement is March 1, 1981.

OCC-TIG-E02825974

ALCD-PUBCOM_0001896

RCRA TREATMENT, STORAGE AND DISPOSAL FACILITY INSPECTION FORM
FOR TSD FACILITIES ONLY

COMPANY NAME: Drew Chemical Corp    EPA I.D. Number: NJD053518536

COMPANY ADDRESS: 1106 Harrison Ave./ Kearny

COMPANY CONTACT OR OFFICIAL:    OTHER ENVIRONMENTAL PERMITS HELD
    John Orlowski
                                BY FACILITY: ☐ NPDES

TITLE: Plant Manager                         ☑ AIR

                                             ☐ OTHER

INSPECTOR'S NAME: Bob Danic    DATE OF INSPECTION: 7-15-81

BRANCH/ORGANIZATION: NJDEP    TIME OF DAY INSPECTION TOOK PLACE:
                                                1:00 pm

(1) Is there reason to believe that the facility has hazardous
    waste on site?

    a.  If yes, what leads you to believe it is hazardous waste?
        Check appropriate box:

        ☑ Company admits that its waste is hazardous during the
          inspection.

        ☑ Company admitted the waste is hazardous in its RCRA notification
          and/or Part A Permit Application.

        ☐ The waste material is listed in the regulations as a
          hazardous waste from a nonspecific source (§261.31)

        ☐ The waste material is listed in the regulations
          as a hazardous waste from a specific source (§261.32)

        ☐ The material or product is listed in the regulations as a
          discarded commercial chemical product (§261.33)

        ☐ EPA testing has shown characteristics of ignitability,
          corrosivity, reactivity or extraction procedure toxicity,
          or has revealed hazardous constituents (please attach
          analysis report)

        ☐ Company is unsure but there is reason to believe that waste
          materials are hazardous. (Explain)

                                        YES    NO    DON'T
                                                     KNOW
    b.  Is there reason to believe that there are
        hazardous wastes on-site which the company
        claims are merely products or raw materials?    ___  ✓  ___

        Please explain:

    c.  Identify the hazardous wastes that are on-site,
        and estimate approximate quantities of each.    solvents
                  2½ gallons of waste

(2) Does the facility generate hazardous waste?        ✓  ___  ___

(3) Does the facility transport hazardous waste?       ___  ✓  ___

(4) Does the facility treat, store or dispose of
    hazardous waste?                                   ___  ___  ✓
        Company dropping TSD classification

OCC-TIG-E02825975

ALCD-PUBCOM_0001897

VISUAL OBSERVATIONS

(5) SITE SECURITY (§265.14)                          YES   NO   DON'T KNOW

   a. Is there a 24-hour surveillance system?

   b. Is there a suitable barrier which completely
     surrounds the active portion of the facility?   yes/Fence

   c. Are there "Danger-Unauthorized Personnel Keep-
     Out" signs posted at each entrance to the
     facility?                                        ___  ✓

(6) Are there ignitable, reactive or incompatible
   wastes on site? (§265.27)                           ✓   ___  ___

   a. If "YES", what are the approximate quantities?
                    2 ½ gallons
   b. If "YES", have precautions been taken to prevent
     accidental ignition or reaction of ignitable
     or reactive waste?                               ✓   ___  ___

   c. If "YES", explain   sealed drum

   d. In your opinion, are proper precautions taken so
     that these wastes do not:

     - generate extreme heat or pressure, fire
       or explosion, or violent reaction?            ✓   ___  ___

     - produce uncontrolled toxic mists, fumes,
       dusts, or gases in sufficent quantities
       to threaten human health?                      ✓   ___  ___

     - produce uncontrolled flammable fumes or
       gases in sufficient quantities to pose a
       risk of fire or explosions?                    ✓   ___  ___

     - damage the structural integrity of the
       device or facility containing the waste?       ✓   ___  ___

     - threaten human health or the environment?     ✓   ___  ___

Please explain your answers, and comment if necessary.

   e. Are there any additional precautions which you
     would recommend to improve hazardous waste
     handling procedures at the facility?  no

(7) Does the facility comply with preparedness and
   prevention requirements including maintaining:
   (§265.32)

2

OCC-TIG-E02825976

ALCD-PUBCOM_0001898

|  | YES | NO | DON'T KNOW |
|---|---|---|---|
| - an internal communications or alarm system? | ✓ | — | — |
| - a telephone or other device to summon emergency assistance from local authorities? | ✓ | — | — |
| - portable fire equipment? | ✓ | — | — |
| - adequate aisle space? | ✓ | — | — |
| - in your opinion, do the types of wastes on site require all of the above procedures, or are some not needed? Explain. | ✓ | — | — |

- They have all of the above

In your opinion, do the types of wastes on site require all of the above procedures, or are some not needed? Explain.   see above

*(8)   Have you inspected to verify that the groundwater   N/A __ __
monitoring wells (if any) mentioned in the facility's
groundwater monitoring plan (see no. 19 below) are
properly installed?

If you have, please comment, as appropriate.   __ __ __

(9) a. Is there any reason to believe that groundwater   __ ✓ __
contamination already exists from this facility?
If "YES", explain.

   b. Do you believe that operation of this facility   __ ✓
may affect groundwater quality?

   c. If "YES", explain.

RECORDS INSPECTION

(10)   Has the facility received hazardous waste from   N/A __ __
an off-site source since Nov. 15, 1980 (effective
date of the regulations)?

   a. If "YES", does it appear that the facility has
a copy of a manifest for each hazardous waste
load received?   __ __ __

   b. How many post-November 19 manifests does it
have? (If the number is large, you may estimate)

      5 of waste generated

   c. Does each manifest (or a representative sample)
have the following information?

      - a manifest document number   ✓ __ __

         3

* This requirement applies only after November 19, 1981.

OCC-TIG-E02825977

ALCD-PUBCOM_0001899

|  | YES | NO | K.N |
|---|---|---|---|

- the generator's name, mailing address, telephone number, and EPA identification number — ✓

- the name, and EPA identification number of each transporter — ✓

- the name, address and EPA identification number of the designated facility and an alternate facility, if any; — ✓

- a DOT description of the wastes — ✓

- the total quantity of each hazardous waste by units of weight or volume, and the type and number of containers as loaded into or onto the transport vehicle — ✓

- a certification that the materials are properly classified, described, packaged, marked, and labeled, and are in proper condition for transportation under regulations of the Department of Transportation and the EPA — ✓

d. Are there any indications that unmanifested hazardous wastes have been received since November 19, 1980? If YES, explain. — ✓ (NO)

(11) Does the facility have a written waste analysis plan specifying test methods, sampling methods and sampling frequency? (§265.13) — ✓

   a. Does the character of wastes handled at the facility change from day to day, week to week, etc., thus requiring frequent testing? (You may check more than one)
Waste characteristics vary _____
All wastes are basically the same ✓
Company treats all waste as hazardous _____
Don't Know _____

   b. Does hazardous waste come to this facility from off-site sources? — ✓ (NO)

   c. If waste comes from an off-site source, are there procedures in the plan to insure that wastes received conform to the accompanying manifest? — N/A

(12) INSPECTIONS (§265.15)

   a. Does the facility have a written inspection schedule? — ✓

   b. Does the schedule identify the types of problems to be looked for and the frequency for inspections? — ✓

   c. Does the owner/operator record inspections in a log? — ✓

   d. Is there evidence that problems reported in the inspection log have not been remedied? If "YES," please explain. — ✓ (NO)

ALCD-PUBCOM_0001900

(13) PERSONNEL TRAINING (§265.16)

a.  Is there written documentation of the following:

- job title for each position at the facility
related to hazardous waste management and the
name of the employee filling each job? ✓ __ __

- type and amount of training to be given to
personnel in jobs related to hazardous waste
management? ✓ __ __

- actual training or experience received by
personnel? ✓ __ __

(14) Does the facility have a written contingency plan
for emergency procedures designed to deal with
fires, explosion or any unplanned release of
hazardous waste?
(§265.51) ✓ __ __

-a.  Does the plan describe arrangements made with
local authorities? ✓ __ __

b.  Has the contingency plan been submitted
to local authorities? ✓ __ __

How do you know?  official told me ✓

c.  Does the plan list names, addresses, and
phone numbers of Emergency Coordinators? ✓ __ __

d.  Does the plan have a list of what emergency
equipment is available? ✓ __ __

e.  Is there a provision for evacuating facility
personnel? ✓ __ __

f.  Was an Emergency Coordinator present or on
call at the time of the inspection? ✓ __ __

(15) Does the owner/operator keep a written operating
record with: (§265.73)

- a description of wastes received with methods
and dates of treatment, storage or disposal? NA __ __

- location and quantity of each waste? NA __ __

- detailed records and results of waste analysis and
treatability tests performed on wastes coming into the
facility? NA __ __

- detailed operating summary reports and description
of all emergency incidents that required the implementa-
tion of the facility contingency plan? NA __ __

*(16) Does the facility have written closure and
post-closure plans? (§265.110) ✓ __ __

a.  Does the written closure plan include:

- a description of how and when the facility
will be partially (if applicable) and
ultimately closed? NA __ __

* Effective date for this requirement is May 19, 1981.

OCC-TIG-E02825979

ALCD-PUBCOM_0001901

- an estimate of the maximum inventory of
  wastes in storage or treatment at any
  time during the life of the facility?            ✓ __ __

- a description of the steps necessary to
  decontaminate facility equipment during
  closure?                                         ✓ __ __

- a schedule for final closure including
  the anticipated date when wastes will
  no longer be received and when final
  closure will be completed?                       NP __ __

b.  What is the anticipated date for final
    closure?                                       WP __ __

†c. Does the owner/operator have a written
    post-closure plan identifying the activities
    which will be carried on after closure and
    the frequency of these activities?             NA __ __

d.  Does the written post-closure plan include:

- a description of planned groundwater
  monitoring activities and their frequencies
  during post-closure?                             __ __ __

- a description of planned maintenance activities
  and frequencies to ensure integrity of final
  cover during post-closure?                       __ __ __

- the name, address and phone number of a
  person or office to contact during
  post-closure?                                    __ __ __

*(17) Does the owner/operator have a written estimate
      of the cost of closing the facility? (§265.142)
      What is it?        $7,464                     ✓ __ __

*(18) Does the owner/operator have a written
      estimate of the cost for post-closure
      monitoring and maintenance?
      What is it? (§265.144)                        NP __ __

*(19) Has a groundwater monitoring plan been submitted
      to the Regional Administrator for facilities con-
      taining a surface impoundment, landfill or land
      treatment process? (This requirement does not
      apply to recycling facilities.) (§265.90)

      a.  Does the plan indicate that at least one monitoring
          well has been installed hydraulically upgradient from
          the limit of the waste management area?  __ __ __

      b.  Does the plan indicate that there are at least three
          monitoring wells installed hydraulically downgradient
          at the limit of the waste management area?  __ __ __

† This section applies only to disposal facilities.

* Effective date for this requirement is May 19, 1981.

OCC-TIG-E02825980

ALCD-PUBCOM_0001902

## SITE-SPECIFIC

Please circle all appropriate activities and answer questions
on indicated pages for all activities circled. When you submit your report,
include only those site-specific pages that you have used.

| STORAGE | TREATMENT | DISPOSAL |
|---|---|---|
| Waste Pile p. 9 | Tank p. 8 | Landfill pp. 10-11 |
| Surface Impoundment p. 8 | Surface Impoundment pp. 8-9 | Land Treatment pp. 9, 10 |
| Container p. 7 | Incineration pp. 12-13 | Surface Impoundment p. 8 |
| Tank, above ground p. 8 | Thermal Treatment pp. 12-13 | Other |
| Tank, below ground p. 8 | Land Treatment pp. 9-10 | |
| Other | Chemical, Physical p. 13 and Biological Treatment (other than in tanks, surface impoundment or land treatment facilities)   YES   NO   DON'T KNOW | |
| | Other | |

## CONTAINERS (§265.170)

1. Are there any leaking containers?
   If "YES", explain.                                        ___ ✓ ___

2. Are there any containers which appear in danger
   of leaking?
   If "YES", explain.                                        ___ ✓ ___

3. Do wastes appear compatible with container
   materials?                                                ✓ ___ ___

4. Are all containers closed except those in use?           ✓ ___ ___

5. Do containers appear to be opened, handled
   or stored in a manner which may rupture the
   containers or cause them to leak?                         ___ ✓ ___

6. How often does the plant manager claim to inspect
   container storage areas?        monthly

7. Does it appear that incompatible wastes are being
   stored in close proximity to one another?
   If "YES", explain.                                        ___ ✓ ___

8. Are containers holding ignitable or reactive
   wastes located at least 15 meters (50 feet) from
   the facility's property line?                             ✓ ___ ___

9. What is the approximate number and size of
   containers with hazardous wastes?
                          & 1-5 gallon container
                    see jones-tor comment sheet

OCC-TIG-E02825981

ALCD-PUBCOM_0001903

62

OCC-TIG-E02825982

ALCD-PUBCOM_0001904

ALCD-PUBCOM_0001905

# EXHIBIT 35

OxyChem's Comments in Opposition to Proposed Consent Decree,
*United States v. Alden Leeds, Inc., et al.*, Civil Action No. 2:22-cv-07326 (D.N.J.)

ALCD-PUBCOM_0001906

# Remedial Action Workplan
Former Ashland Hercules Water
Technologies (AHWT) Site
1106 Harrison Avenue, Kearny,
Hudson County, New Jersey

Program Interest #014954
ISRA #E20090-080

Prepared for:



Prepared by:

EHS Support

January 2019

ASHL-FED-0000106480
ALCD-PUBCOM_0001907

Case 2:22-cv-07326-MCA-LDW    Document 309-22    Filed 04/01/24    Page 151 of 468
PageID: 14876

Remedial Action Workplan
Former Ashland Hercules Water Technologies (AHWT) Site
Table of Contents



# Table of Contents

1    Introduction ...................................................................................................1
  1.1    Remedial Action Objectives ...................................................1
  1.2    Report Organization...............................................................1
  1.3    Variances.................................................................................2

2    Background ....................................................................................................3
  2.1    Site Description .......................................................................3
    2.1.1    Site Operation and Ownership History.......................3
  2.2    Physical Setting ......................................................................4
    2.2.1    Physiography and Topography ...................................4
    2.2.2    Geology and Hydrogeology.........................................4
  2.3    AOC Descriptions ...................................................................5
  2.4    Interim Remedial Measures....................................................7
  2.5    Summary of 2017 Remedial Investigation Report................7
    2.5.1    Overview.......................................................................7
    2.5.2    Soil.................................................................................8
      2.5.2.1  Soil Delineation......................................................8
    2.5.3    Groundwater.................................................................9
    2.5.4    Vapor Intrusion ..........................................................10
    2.5.5    Ecological Evaluation .................................................11
      2.5.5.1  On-site ESNRs........................................................11
      2.5.5.2  Off-site ESNRs .......................................................11
  2.6    Pre-Design Investigation Activities .....................................12

3    Remediation Standards..............................................................................14
  3.1    Soil.........................................................................................14
    3.1.1    Direct Contact.............................................................14
    3.1.2    Impact to Groundwater..............................................14
    3.1.3    EPH ..............................................................................14
  3.2    Groundwater..........................................................................15

4    Soil Delineation and Extent of Remedial Action ....................................16
  4.1    Delineation.............................................................................16
    4.1.1    Horizontal and Vertical Delineation of Historic Fill...........16
    4.1.2    Vertical Delineation of VOCs, SVOCs, and PCBs to Direct Contact ..........17
      4.1.2.1  On-site Vertical Delineation to NRDCSRS ............17
      4.1.2.2  Off-site Vertical Delineation to RDCSRS .............17
    4.1.3    Horizontal and Vertical Delineation of EPH .......................18
      4.1.3.1  Horizontal and Vertical Delineation of Category 2 EPH.....................18
    4.1.4    Horizontal Delineation of VOC, SVOC, and PCB to Direct Contact ............18
      4.1.4.1  On-site Delineation to NRDCSRS...........................18

ASHL-FED-0000106481
ALCD-PUBCOM_0001908



|  | 4.1.4.2 Off-site Delineation to RDCSRS | 19 |
| 4.1.5 | Horizontal and Vertical Delineation to Impact to Groundwater | 19 |
|  | 4.1.5.1 Total PCBs | 19 |
|  | 4.1.5.2 VOCs | 20 |
|  | 4.1.5.3 SVOCs | 20 |
| 4.2 | Compliance Averaging | 20 |
| 4.2.1 | Compliance Averaging of Direct Contact Pathway | 21 |
|  | 4.2.1.1 Functional Areas and Vertical Intervals | 21 |
|  | 4.2.1.2 Lead and Benzo(a)pyrene in Block 282 | 21 |
| 4.2.2 | Compliance Averaging of Impact to Groundwater Pathway | 22 |
|  | 4.2.2.1 Functional Areas | 22 |
|  | 4.2.2.2 Vertical Intervals | 22 |
|  | 4.2.2.3 Excluded Areas | 22 |
|  | 4.2.2.4 VOCs | 24 |
|  | 4.2.2.5 SVOCs | 25 |
|  | 4.2.2.6 Total PCBs | 25 |
| 4.3 | Extent of Soil Remedial Action | 25 |
| 4.3.1 | Extent of Remedial Action for Direct Contact | 26 |
| 4.3.2 | Extent of Remedial Action for Impact to Groundwater | 26 |

| **5** | **Groundwater Delineation and Extent of Remedial Action** | **27** |
| 5.1 | Groundwater Monitoring Network | 27 |
| 5.2 | Hydrogeologic Framework | 28 |
| 5.3 | Historical Remedial Investigation Groundwater Monitoring | 28 |
| 5.3.1 | Geochemical Indicator Parameters | 28 |
| 5.3.2 | Groundwater COCs | 28 |
|  | 5.3.2.1 Volatile Organic Compounds | 29 |
|  | 5.3.2.2 Semi-Volatile Organic Compounds | 30 |
|  | 5.3.2.3 Total Petroleum Hydrocarbons | 30 |
| 5.3.3 | Nature and Extent of Groundwater Impacts | 30 |
|  | 5.3.3.1 Shallow Zone | 31 |
|  | 5.3.3.2 Intermediate/Deep Zone | 31 |
| 5.4 | Recent Remedial Action Pre-Design Investigation and Groundwater Monitoring | 32 |
| 5.4.1 | Potential Residual Sources in Groundwater | 32 |
| 5.4.2 | Key Groundwater COCs | 32 |
| 5.5 | Groundwater Fate and Transport | 33 |
| 5.5.1 | Parent and Daughter Products | 33 |
| 5.5.2 | Intrinsic Natural Degradation Mechanisms | 35 |
| 5.6 | Extent of Remedial Action for Groundwater | 36 |

| **6** | **Conceptual Site Model** | **38** |
| 6.1 | Site Background and Investigation History | 38 |
| 6.2 | Physical Setting | 39 |
| 6.3 | Known Releases, IRMs, and Current Conditions | 40 |
| 6.4 | COCs, Pathways, and Receptors | 43 |

ASHL-FED-0000106482
ALCD-PUBCOM_0001909



7    Description of Proposed Remedial Action ........................................................................ 46
   7.1    Remedial Action Selection ....................................................................................... 46
      7.1.1    Soil ............................................................................................................... 46
         7.1.1.1  Deed Notice ...................................................................................... 46
         7.1.1.2  Excavation and Off-site Disposal ..................................................... 46
         7.1.1.3  Capping ............................................................................................ 46
         7.1.1.4  Selected Remedies ........................................................................... 47
      7.1.2    Groundwater ............................................................................................... 47
         7.1.2.1  Physical Barrier ................................................................................ 48
         7.1.2.2  Pump and Treat ............................................................................... 48
         7.1.2.3  In-Situ Chemical Oxidation .............................................................. 49
         7.1.2.4  In-Situ Thermal Treatment .............................................................. 49
         7.1.2.5  In-Situ Biostimulants ....................................................................... 50
         7.1.2.6  Monitored Natural Attenuation ....................................................... 51
         7.1.2.7  Selected remedies ........................................................................... 51
   7.2    Remedial Action Goals ............................................................................................ 51
   7.3    Description of Soil Remedial Action ........................................................................ 52
      7.3.1    General Requirements ................................................................................. 52
         7.3.1.1  Pre-Mobilization Tasks ..................................................................... 52
         7.3.1.2  Mobilization and Site Layout ........................................................... 53
         7.3.1.3  Pre-construction Tasks ..................................................................... 53
         7.3.1.4  Pre-Excavation Sampling ................................................................. 54
         7.3.1.5  Equipment Decontamination ........................................................... 54
      7.3.2    Soil Remedial Action Off-site and On-Site Leased Area .............................. 54
         7.3.2.1  Boylan Avenue and Block 279, Lot 30 .............................................. 54
         7.3.2.2  Leased Portion of Block 280 ............................................................. 55
         7.3.2.3  East of Leased Portion of Block 280 ................................................. 55
      7.3.3    Soil Remedial Action On-site in Block 283 ................................................... 55
         7.3.3.1  Buildings 720, 721, and 722 ............................................................. 56
         7.3.3.2  Main Tank Truck Loading Building .................................................... 57
         7.3.3.3  Excavation and Off-site Disposal ..................................................... 57
         7.3.3.4  Capping Soil ...................................................................................... 57
   7.4    Description of Groundwater Remedial Action .......................................................... 59
      7.4.1    General Requirements ................................................................................. 59
         7.4.1.1  Pre-mobilization Tasks ..................................................................... 59
         7.4.1.2  Mobilization and Site Layout ........................................................... 59
      7.4.2    Proposed Supplemental Data Collection ..................................................... 60
      7.4.3    Injection Plan .............................................................................................. 60
         7.4.3.1  Groundwater Remedy Treatment Layout ........................................ 60
         7.4.3.2  Amendment Dosing and Longevity .................................................. 61
      7.4.4    Monitoring Requirements for Amendment Distribution ............................... 61
         7.4.4.1  Infrastructure ................................................................................... 62
         7.4.4.2  Analytes ........................................................................................... 63
         7.4.4.3  Frequency ........................................................................................ 63
         7.4.4.4  Duration ........................................................................................... 64

ASHL-FED-0000106483
ALCD-PUBCOM_0001910

Remedial Action Workplan
Former Ashland Hercules Water Technologies (AHWT) Site
Table of Contents



**8    Project Plans** ..................................................................................................... **65**

    8.1    Perimeter Air Monitoring Plan ................................................................ 65
        8.1.1    Remedial Action Summary ........................................................ 65
        8.1.2    Technical Approach ................................................................... 65
                8.1.2.1  Monitored Parameters .............................................. 65
                8.1.2.2  Prevailing Wind Direction ......................................... 66
                8.1.2.3  Monitoring Locations ................................................ 66
                8.1.2.4  Monitoring Schedule ................................................. 67
                8.1.2.5  Monitoring Equipment .............................................. 67
                8.1.2.6  Quality Assurance/Quality Control ............................ 68
        8.1.3    Preventative Measures – Dust ................................................. 68
        8.1.4    Action Levels and Response Actions ......................................... 69
    8.2    Fill Use Plan .......................................................................................... 71
        8.2.1    Imported Clean Fill ................................................................... 71
        8.2.2    On-site Soil .............................................................................. 71
        8.2.3    Characterization of Concrete ................................................... 72
    8.3    Site Restoration Plan ............................................................................. 73
    8.4    Waste Management ............................................................................... 73
        8.4.1    Waste Generator Status ........................................................... 73
        8.4.2    Investigation Derived Wastes ................................................... 74
    8.5    Remedy Effectiveness ............................................................................ 74
        8.5.1    Groundwater ........................................................................... 74
        8.5.2    Capping Areas .......................................................................... 75
    8.6    Quality Assurance Project Plan .............................................................. 75

**9    Permits** ............................................................................................................. **76**

    9.1    Remediation Permits ............................................................................. 76
        9.1.1    Flood Hazard Area Permit ........................................................ 76
        9.1.2    Well Permits ............................................................................ 76
        9.1.3    Construction Stormwater General Permit ................................ 76
        9.1.4    Soil Erosion and Sediment Control Plan ................................... 76
        9.1.5    Discharge to Groundwater Permit-by-Rule .............................. 77
        9.1.6    Local Permits ........................................................................... 77
                9.1.6.1  Hudson County Construction Permit .........................77
                9.1.6.2  Kearny Township ...................................................... 77
    9.2    NJDEP Post-Remediation Permits .......................................................... 78
        9.2.1    Soil Remedial Action Permits ................................................... 78
        9.2.2    Groundwater Remedial Action Permit ..................................... 78

**10   Schedule and Organization Chart** ................................................................... **79**

**11   References** ........................................................................................................ **80**

ASHL-FED-0000106484
ALCD-PUBCOM_0001911

Remedial Action Workplan
Former Ashland Hercules Water Technologies (AHWT) Site
Table of Contents



## List of Tables

Table 1-1        Summary of Areas of Concern
Table 3-1        N.J.A.C. 7:9C Specific Ground Water Quality Criteria - Class II-A
Table 4-1        Historic Fill Delineation to NRDCSRS
Table 4-2        Total EPH Delineation to Category 2 Screening Criteria of 1,700 mg/kg
Table 4-3        VOCs Delineation to NRDCSRS
Table 4-4        SVOCs Delineation to NRDCSRS
Table 4-5        VOCs Delineation to SSIGWSRS
Table 4-6        SVOCs Delineation to SSIGWSRS
Table 5-1        Monitoring Well Construction Details

## List of Figures

Figure 1-1       Site Location Map

Figure 2-1       ISRA Subject Parcel Information
Figure 2-2       Site Features
Figure 2-3       Surrounding Land Use
Figure 2-4       Historic Fill Map
Figure 2-5       AOC Locations Block 283 and Off-site
Figure 2-6       AOC Location Block 282

Figure 4-1       Historic Fill Delineation to NRDCSRS
Figure 4-2       Evaluation of Vertical Delineation On-site to NRDCSRS
Figure 4-3       Evaluation of Vertical Delineation Off-site to RDCSRS
Figure 4-4       Total EPH Delineation to Category 2 Screening Criteria of 1,700 mg/kg
Figure 4-5       Total EPH Delineation to Sample-Specific Category 2 Health Based Screening
                 Criteria
Figure 4-6       Total PCBs Delineation to NRDCSRS
Figure 4-7       VOCs Delineation to NRDCSRS
Figure 4-8       SVOCs Delineation to NRDCSRS
Figure 4-9       Perimeter and Off-site Soil Delineation to RDCSRS
Figure 4-10      Total PCBs Delineation to SSIGWSRS
Figure 4-11      VOCs Delineation to SSIGWSRS
Figure 4-12      SVOCs Delineation to SSIGWSRS
Figure 4-13      Compliance Averaging Results for NRDCSRS Exceedances of Lead (Block 282)
Figure 4-14      Compliance Averaging Results for NRDCSRS Exceedances of Benzo(a)pyrene
                 (Block 282)
Figure 4-15      Compliance Averaging Functional Areas for VOCs
Figure 4-16      Compliance Averaging Functional Areas for SVOCs
Figure 4-17      Compliance Averaging Results for SSIGWSRS Exceedances of VOCs
Figure 4-18      Compliance Averaging Results for SSIGWSRS Exceedances of SVOCs
Figure 4-19      Compliance Averaging Results for SSIGWSRS Exceedances of PCBs (Block 282)
Figure 4-20      Overall Extent of Remedial Action for NRDCSRS and EPH for SRC
Figure 4-21      Overall Extent of Remedial Action for SSIGWSRS

ASHL-FED-0000106485
ALCD-PUBCOM_0001912

Remedial Action Workplan
Former Ashland Hercules Water Technologies (AHWT) Site
Table of Contents



| Figure 5-1 | Monitoring Well Location Map |
|---|---|
| Figure 5-2 | Potentiometric Surface Map (Shallow) – December 27, 2017 |
| Figure 5-3 | Potentiometric Surface Map (Intermediate/Deep) – December 27, 2017 |
| Figure 5-4 | Cross Section Base Map |
| Figure 5-5 | Cross Section A-A' with Soil Analytical Results |
| Figure 5-6 | Cross Section B-B' with Soil Analytical Results |
| Figure 5-7 | VOC Exceedances of Groundwater Quality Standards (2009-2018) |
| Figure 5-8 | SVOC Exceedances of Groundwater Quality Standards (2009-2018) |
| Figure 5-9 | Total Metals and PAH Exceedances of Groundwater Quality Standards (2009-2016) |

| Figure 7-1 | Proposed Extent of Excavation |
|---|---|
| Figure 7-2 | Proposed Limits and Type of Caps |
| Figure 7-3 | Horizontal and Vertical Limits of Soil Removal under Buildings 720-722 |
| Figure 7-4 | Proposed Sampling within Buildings 720-722 |
| Figure 7-5 | Typical Low-Permeability Cap |
| Figure 7-6 | Conceptual Remedy Plan View |
| Figure 7-7 | Conceptual Remedy A to A' Section View |
| Figure 7-8 | Conceptual Remedy B to B' Section View |
| Figure 7-9 | Generalized Performance Monitoring Well Network *(In Text Figure)* |

| Figure 8-1 | Monthly Wind Direction |
|---|---|
| Figure 8-2 | Proposed Air Monitoring Locations |

| Figure 10-1 | Former Ashland Hercules Water Technologies Site Remedial Action Organization Chart |
|---|---|

## List of Appendices

| Appendix A | Pre-Design Investigation Report |
|---|---|
| Appendix B | Analytical Data Tables |
| Appendix C | EPH Category 2 Sample-Specific Human Health Soil Remediation Criterion (SRC) Calculations |
| Appendix D | Compliance Averaging Calculations for VOCs and SVOCs Exceedances of SSIGWSRS |
| Appendix E | Assessment of Natural and Enhanced Biological Attenuation of Chlorinated Ethenes and Chlorinated Benzenes |
| Appendix F | Quality Assurance Project Plan |

ASHL-FED-0000106486
ALCD-PUBCOM_0001913

Remedial Action Workplan
Former Ashland Hercules Water Technologies (AHWT) Site
Acronyms



## Acronyms

| | |
|---|---|
| µg/L | micrograms per Liter |
| 1,1-DCA | 1,1-dichloroethane |
| 1,1-DCE | 1,1-dichloroethene |
| 1,2,4-TCB | 1,2,4-trichlorobenzene |
| 1,4-DCB | 1,4-dichlorobenzene |
| AHWT | Ashland Hercules Water Technologies |
| AOC | Areas of Concern |
| AST | aboveground storage tank |
| AT | Averaging Time |
| ATSDR | Agency for Toxic Substances and Disease Registry |
| CA | (mono)chloroethane |
| CalEPA | California Environmental Protection Agency |
| CAS | Chemical Abstracts Service |
| CB | chlorobenzene |
| CEA | classification exception area |
| CFR | Code of Federal Regulations |
| cis-1,2-DCE | cis-1,2-dichloroethene |
| cm/s | centimeter per second |
| COC | constituent of concern |
| COPEC | Constituents of Potential Ecological Concern |
| CPT | Cone Penetrometer Testing |
| cSat | default soil saturation |
| CSM | Conceptual Site Model |
| DCB | Dichlorobenzene |
| DCE | Dichloroethene |
| DGW | Discharge to Ground Water |
| DO | dissolved oxygen |
| DRO | diesel range organics |
| ED | Exposure Duration |
| EE | ecological evaluation |
| EF | Exposure Frequency |
| EPH | Extractable Petroleum Hydrocarbon |
| ESC | ecological screening criteria |
| ESNR | Environmentally Sensitive Natural Resource |
| ET | Exposure Time |
| EVO | emulsified vegetable oil |

EHS Support LLC

ASHL-FED-0000106487
ALCD-PUBCOM_0001914

Remedial Action Workplan
Former Ashland Hercules Water Technologies (AHWT) Site
Acronyms

| | |
|---|---|
| FHA | Flood Hazard Area |
| ft | feet |
| ft bgs | feet below ground surface |
| ft/ft | foot per foot |
| ft msl | feet above mean sea level |
| GIN | General Information Notice |
| GIS | Geographic Information System |
| GRO | gasoline range organics |
| GWQS | Groundwater Quality Standards |
| HASP | health and safety plan |
| IDW | investigation derived waste |
| IGWSRS | Impact to Groundwater Soil Remediation Standards |
| IGWSSL | Impact to Groundwater Soil Screening Levels |
| IRIS | Integrated Risk Information System |
| IRM | interim remedial measure |
| ISRA | Industrial Site Recovery Act |
| LSRP | Licensed Site Remediation Professional |
| mg/kg | milligrams per kilogram |
| mg/L | milligrams per Liter |
| mg/m$^3$ | milligrams per cubic meter |
| MIP | Membrane Interface Probing |
| MNA | monitored natural attenuation |
| mS/cm | milliSiemens per centimeter |
| msl | mean sea level |
| NAAQS | National Ambient Air Quality Standard |
| NIST | National Institute of Standards and Technology |
| N.J.A.C. | New Jersey Administrative Code |
| NJDEP | New Jersey Department of Environmental Protection |
| NJGS | New Jersey Geological Survey |
| NRDCSRS | Non-Residential Direct Contact Soil Remediation Standards |
| ORP | oxidation reduction potential |
| OSHA | Occupational Safety and Health Administration |
| PA | Preliminary Assessment |
| PAH | polycyclic aromatic hydrocarbons |
| PAM | perimeter air monitoring |
| PBR | Permit-By-Rule |
| PCB | polychlorinated biphenyls |
| PCE | Tetrachloroethene |

EHS Support LLC

ASHL-FED-0000106488
ALCD-PUBCOM_0001915

Remedial Action Workplan
Former Ashland Hercules Water Technologies (AHWT) Site
Acronyms

| | |
|---|---|
| PCP | pentachlorophenol |
| PDI | Pre-Design Investigation |
| PI | Program Interest |
| PID | photoionization detector |
| ppb | parts per billion |
| PPE | personal protective equipment |
| ppm | parts per million |
| PPRTV | Provisional Peer-Reviewed Toxicity Values |
| PVSC | Passaic Valley Sewer Commission |
| QA/QC | Quality Assurance / Quality Control |
| QAPP | Quality Assurance Project Plan |
| RA | Remedial Action |
| RAO | Response Action Outcome |
| RAP | Remedial Action Permit |
| RAR | Remedial Action Report |
| RAW | Remedial Action Workplan |
| RCRA | Resource Conservation and Recovery Act |
| RDCSRS | Residential Direct Contact Soil Remediation Standards |
| RfC | reference concentration |
| RI | Remedial Investigation |
| RIR | Remedial Investigation Report |
| SESC | Soil Erosion and Sediment Control |
| SI | Site Investigation |
| Site | Former Ashland Hercules Water Technologies Site |
| SRC | Soil Remediation Criterion |
| SRP | Site Remediation Program |
| SRRA | Site Remediation Reform Act |
| SRS | Soil Remediation Standards |
| SSIGWSRS | site-specific impact to groundwater soil remediation standards |
| SVOC | semi-volatile organic compound |
| SWQS | surface water quality standards |
| TCB | Trichlorobenzene |
| TCE | Trichloroethene |
| TEA | terminal electron acceptors |
| TIC | tentatively identified compound |
| TPH | Total Petroleum Hydrocarbon |
| TR | Target Risk |
| trans-1,2-DCE | trans-1,2-dichloroethene |

EHS Support LLC

ASHL-FED-0000106489
ALCD-PUBCOM_0001916

Remedial Action Workplan
Former Ashland Hercules Water Technologies (AHWT) Site
Acronyms

| | |
|---|---|
| TRSR | Technical Requirements for Site Remediation |
| TSCA | Toxic Substances Control Act |
| URF | unit risk factor |
| USEPA | United States Environmental Protection Agency |
| USGS | United States Geological Survey |
| UST | underground storage tank |
| VC | vinyl chloride |
| VOC | volatile organic compound |
| WRA | well restriction area |

EHS Support LLC                                                                                        x

ASHL-FED-0000106490
ALCD-PUBCOM_0001917

Remedial Action Workplan
Former Ashland Hercules Water Technologies (AHWT) Site
Statement of LImitations



## Statement of Limitations

This Remedial Action Workplan (RAW) is intended for the sole use of Ashland LLC ("Ashland"). The scope of services performed during this phase of work may not be appropriate to satisfy the needs of other users, and any use or re-use of this document or of the findings, conclusions, or recommendations presented herein is at the sole risk of said user. Background information and other data have been furnished to EHS Support LLC ("EHS Support") by Ashland and/or third parties, which EHS Support has used in preparing this RAW.

Opinions presented herein apply to the existing and reasonably foreseeable site conditions at the time of our assessment. They cannot apply to site changes of which Ashland or its contractors are unaware and has not had the opportunity to review. Changes in site conditions may occur with time due to natural processes or works of man at the site or on adjacent properties. Changes in applicable standards may also occur from new legislation, regulation, or policy. Accordingly, the findings of this RAW may be subject to change, wholly or in part, by events that may occur in the future which are beyond our control.

ASHL-FED-0000106491
ALCD-PUBCOM_0001918

Remedial Action Workplan
Former Ashland Hercules Water Technologies (AHWT) Site
Executive Summary



# Executive Summary

This Remedial Action Work Plan (RAW) presents the proposed remedial action for soil and groundwater at the former Ashland Hercules Water Technologies (AHWT) facility at 1106 Harrison Avenue, Kearny, Hudson County, New Jersey (Site). The Kearny Site is comprised of three land parcels (Blocks 280, 282, and 283), separated by Greenfield Avenue, that occupy approximately 5.2 acres of industrial land in a mixed industrial, commercial, and residential setting. Block 280 is owned by New Jersey Transit, but is leased to the Site. A total of 78 areas of concern (AOCs) are associated with the Site, including on-site and off-site AOCs.

This RAW describes the proposed remedial actions for soil and groundwater. The overall goals of the remedial actions are to address soil and groundwater concentrations that are above the applicable Remediation Standards New Jersey Administrative Code [N.J.A.C.] 7:26D) (N.J.A.C., 2018b) and implement a remedy that is protective of human health and the environment, in accordance with N.J.A.C. 7:26E 5.1[a] (N.J.A.C., 2018a). The proposed remedial actions were developed from the evaluation of site-specific data and information collected during the Site Investigation (SI) and Remedial Investigation (RI) and a pre-design investigation in late 2017. Volatile organic compounds (VOCs), extractable petroleum hydrocarbon (EPH), and limited semi-volatile organic compounds (SVOCs) and polychlorinated biphenyls (PCBs) consistent with historical industrial operations at the Site exceed the Remediation Standards in soil and/or groundwater. In addition, polycyclic aromatic hydrocarbons (PAHs) and metals related to regional impacts associated with historic fill exceed the Remediation Standards in soil and/or groundwater. PCBs with limited extent on the site are not constituents of concern (COCs) that drive remedial action decision-making and concentrations do not trigger United States Environmental Protection Agency (USEPA) Toxic Substances Control Act (TSCA) requirements. The Site is a Category 2 EPH release based on lines of evidence collected during the RI. The RAW does not address impacts on the New Jersey Transit property that are not related to Site activities.

The proposed remedial action for soil above the Remediation Standards includes excavation, engineering controls (capping of soil with asphalt pavement), and institutional controls (deed notice to mitigate direct contact exposure and potential leaching of COCs in soil to groundwater. The proposed remedial action for groundwater above the Remediation Standards includes an institutional control (groundwater classification exception area (CEA)), in-situ treatment of the residual source area combined with emplacement of colloidal active carbon biomatrix barriers and monitored natural attenuation.

ASHL-FED-0000106492
ALCD-PUBCOM_0001919

Remedial Action Workplan
Former Ashland Hercules Water Technologies (AHWT) Site
Introduction



# 1    Introduction

EHS Support LLC ("EHS Support") has prepared this Remedial Action Workplan (RAW) on behalf of
Ashland LLC ("Ashland") to detail the proposed remedial actions for the Former Ashland Hercules Water
Technologies (AHWT) site (Site). The Site is located at 1106 Harrison Avenue, Kearny, Hudson County,
New Jersey (**Figure 1-1**). The Site was assigned Industrial Site Recovery Act (ISRA) project #E2009-0080
and New Jersey Department of Environmental Protection (NJDEP) Site Remediation Program (SRP)
Program Interest (PI) #014954.

This RAW has been prepared in accordance with the NJDEP Technical Requirements for Site
Remediation (TRSR), New Jersey Administrative Code (N.J.A.C.) 7:26E-5.5 (N.J.A.C., 2018a), and
applicable NJDEP guidance documents including but not limited to:

- Introduction to Site-Specific Impact to Ground Water Soil Remediation Standards Guidance
  Documents (December 2008)
- Guidance for Characterization of Concrete and Clean Material Certification for Recycling
  (January 2010)
- Groundwater Technical Guidance: Site Investigation, Remedial Investigation, Remedial Action
  Performance Monitoring (April 2012)
- Technical Guidance for the Attainment of Remediation Standards and Site-Specific Criteria
  (September 2012)
- Monitored Natural Attenuation Technical Guidance (March 2012)
- Fill Material Guidance for SRP Sites (April 2015)
- In Situ Remediation: Design Considerations and Performance Monitoring Technical Guidance
  Document (October 2017)
- Vapor Intrusion Technical Guidance (January 2018)
- Technical Guidance on the Capping of Sites Undergoing Remediation (July 2014)
- Capping of Inorganic and Semi-volatile Contaminants for the Impact to Groundwater Pathway
  (March 2014)
- Capping of Volatile Contaminants for the Impact to Groundwater Pathway (August 2018)
- Historic Fill Technical Guidance (April 2013)

## 1.1    Remedial Action Objectives

Remedial actions are proposed to address soil and groundwater concentrations above the Remediation
Standards (N.J.A.C. 7:26D) (N.J.A.C., 2018b). No remedial actions are currently required for vapor
intrusion. The overall goal of the remedial action is to protect human health and the environment,
consistent with future non-residential use of the Site.

## 1.2    Report Organization

This RAW is organized as follows based on applicable NJDEP regulations (N.J.A.C. 7:26C and 7:26E
[N.J.A.C., 2018a]) and NJDEP technical guidance:

ASHL-FED-0000106493
ALCD-PUBCOM_0001920

Remedial Action Workplan
Former Ashland Hercules Water Technologies (AHWT) Site
Introduction



- **Section 2 Background** details the site history, physical setting, descriptions of areas of concern (AOCs), interim remedial measures (IRMs), and a summary of the 2017 Remedial Investigation Report (RIR) (EHS Support, 2017).
- **Section 3 Remediation Standards** presents the Remediation Standards used to define the extent of site-related COCs in soil, groundwater and vapor.
- **Section 4 Soil Delineation and Extent of Remedial Action** updates the soil delineation of site-related COCs based on additional data collected since the RIR was issued and provides an assessment of the proposed extent of remedial actions for soil based on the updated delineation and use of compliance averaging methods for selected COCs.
- **Section 5 Groundwater Delineation and Extent of Remedial Action** updates the groundwater delineation of site-related COCs based on additional data collected since the RIR was issued and provides an assessment of the proposed extent of remedial actions for groundwater.
- **Section 6 Conceptual Site Model** provides a summary of the Conceptual Site Model (CSM).
- **Section 7 Description of Proposed Remedial Action** describes the proposed implementation of the remedial actions for soil and groundwater.
- **Section 8 Project Plans** describes project-related plans and how remedy effectiveness will be evaluated.
- **Section 9 Permits** identifies permits that are expected to be required to implement the remedial actions.
- **Section 10 Schedule and Organization Chart** presents the intended remedial action schedule and organization chart.
- **Section 11 References** lists the references cited in this report.

## 1.3 Variances

Variances from the TRSR and deviations from NJDEP technical guidance documents are summarized below, in accordance with N.J.A.C 7:26E 1.6(b)4 and 1.7 (N.J.A.C., 2018a).

1. N.J.A.C. 7:26E-1.6(b)8 requires isopleth maps when data for more than 25 samples are presented for an AOC. No single AOC has more than 25 soil samples with the exception of AOC-C16. For AOC-16, while there are more than 25 samples presented for soil, isopleth maps are not included because the remedial action proposed will excavate or cap soil across most of AOC-C16 and the limits of the remedial action are based on soil sample locations. Isopleth maps will not provide information needed to determine the extent of the remedial action or information about the post-remediation distribution of site COCs; the soil delineation maps and maps provided with the deed notice will provide this information. **Section 4** describes how the extent of the remedial action was determined and **Section 7** describes how the limits of excavation or capping will be based on analysis of soil samples and how deeper impacts will be addressed.
2. N.J.A.C. 7:26E-5 requires a RAW to describe the proposed remedial actions by AOC. Due to the size of the Site, number of overlapping AOCs, and similar COCs in multiple AOCs, the proposed remedial action addresses all AOCs within the plant Site (Block 283) that require remediation with the same selected remedial action. For this reason, a discussion of remedial actions by AOC would be repetitive and a less effective presentation of the selected remedies. **Section 4** of the RAW describes the AOCs in the plant Site and how the delineation and extent of the remedial action within the plant Site will address Site AOCs.

ASHL-FED-0000106494
ALCD-PUBCOM_0001921

Remedial Action Workplan
Former Ashland Hercules Water Technologies (AHWT) Site
Background



## 2  Background

A General Information Notice (GIN), Preliminary Assessment (PA) Report (URS, 2009a) and Site Investigation (SI) Report (URS, 2009b) were submitted to the NJDEP in 2009. Remedial investigation (RI) activities were completed between 2009 and 2016 and the RIR was submitted to the NJDEP in March 2017 (EHS Support, 2017). Pre-Design Investigation (PDI) activities were conducted in 2017 to support the development of this RAW; the PDI Report is provided as **Appendix A**.

### 2.1  Site Description

The Site is comprised of three parcels: City Block 282, Lots 1 through 7; City Block 283, Lots 1 through 5; and a portion of City Block 280, Lot 1 (**Figure 2-1**). Ashland currently owns Blocks 282 and 283 and leases the portion of Block 280 Lot 1 from New Jersey Transit.

- Block 282 is approximately 0.5 acre and is located west of the plant Site and Greenfield Avenue at 1000 Harrison Avenue. The north side of the property along Harrison Avenue was developed with a single-story concrete block building and paved parking lot. Prior to facility closure in April 2010, the building was used as a sales office and equipment storage. The south side of this property is green space.
- Block 283 is approximately 4.7 acres and is located south of Harrison Avenue. This area historically contained nine Site buildings, multiple bulk storage tanks and drum/tote storage areas, and two bulk tank truck loading areas. This Block is currently paved with an impervious surface of buildings, concrete or asphalt. This portion of the Site is referred to as the plant Site.
- Block 280, Lot 1 is owned by New Jersey Transit Railroad. The portion of Lot 1 that is part of the Site is part of a historical lease with the railroad and is approximately 20 ft wide by 640 ft long. The leased area is located within the plant Site fence line. Former site features within the leased area included Building 706 (Maintenance Shop), bulk storage areas, and employee parking (**Figure 2-2**). The railroad spur immediately east of the Site and the leased portion of Lot 1 (AOC-P) serviced the Site until the mid-1980s.

The Site is serviced by public utilities (i.e., electric, water, gas, sanitary sewer, and storm sewer utilities). There is a large utility corridor along Harrison Avenue (public sanitary sewer, water lines, gas lines, and storm sewer). The utility corridor ranges from 8 to 10 feet below ground surface (ft bgs) in the vicinity of the Site. The drainage swale south of the Site captures runoff from the site and the adjoining Paramount Transportation (R&L Carriers) property to the south (**Figure 2-3**).

The Site vicinity is primarily used for commercial and industrial purposes (**Figure 2-3**). To the east of the site is the New Jersey Transit Railroad property and then Walmart. To the south and west of the site is Paramount Transportation. To the north of the site is SOS Glass, A.L. Wilson (SRP PI #026254, RIR due May 7, 2019), Kearny Smelting and Refining Company (SRP PI #134679, Remedial Action Report [RAR] due May 6, 2019), and former Vinnie's Sunoco Station (SRP PI #023701).

### 2.1.1  Site Operation and Ownership History

Operations at the Site primarily included various chemical manufacturing that dates to the early 1900s. Site owners have primarily included Harmon Color Works Chemical (1940s), BF Goodrich Chemical

ASHL-FED-0000106495
ALCD-PUBCOM_0001922

Remedial Action Workplan
Former Ashland Hercules Water Technologies (AHWT) Site
Background



Company (1950s), Carnegies Fine Chemicals (1960s), Rexall Drug and Chemical Company (1960s), Sun Chemical (1960s), Drew Chemical Company (Drew) (1970-1980s), and Ashland (1981-current). Ashland's operations primarily included production of products that were sold to the marine industry such as boiler compounds, diesel engine cooling water rust inhibitors, fuel oil treatment compounds, and an assortment of cleaning compounds. Material were stored and transferred via multiple aboveground storage tanks (ASTs) and overhead piping. Production was described as batch-quality controlled manufacturing (mixing) in reactors and mix tanks. Ashland ceased operations at the Site in April 2010. Previous Site-specific features are shown on **Figure 2-2** and additional ownership information is summarized in the 2017 RIR (EHS Support, 2017).

## 2.2   Physical Setting

This section of the report provides a summary of the physical conditions of the Site, additional detail can be found in the 2017 RIR (EHS Support, 2017).

### 2.2.1   Physiography and Topography

The Site is located approximately 0.5 miles north of the Passaic River in a generally topographically flat region of the Atlantic coastal plain of New Jersey within a formerly, low-lying marsh wetland that was backfilled as part of development activities in the late 1800s/early 1900s. As shown on **Figure 2-1**, the entire plant Site (Block 283) is covered by impervious surfaces (asphalt, concrete, or buildings). Portions of Block 280 and 282 are paved (north) and grass covered (south). The Site is generally flat with a slight downward slope toward the southeast. The average elevation across the Site is 4.5 ft above mean sea level (msl).

There are no surface water features on the Site. The nearest surface water body is Frank's Creek, located approximately 170 ft east of the Site. Frank's Creek is a tributary of the Passaic River and flows generally north to south from Kearny Freshwater Marsh to the Passaic River.

### 2.2.2   Geology and Hydrogeology

Soil borings advanced at the Site encountered estuarine, fluvial, and lacustrine sedimentary deposits overlain by historic fill. Geology beneath the site is divided into three depositional environments:

- The artificial historic fill generally extends from land surface to an average of 6 to 8 ft bgs with isolated areas extending to depths of 15 ft as a function of Site development activities. The fill contains varying amounts of anthropogenic material including brick, mortar, slag, glass, porcelain, and other debris. **Figure 2-4** depicts the aerial extent of historic fill beneath and surrounding the Site.
- Estuarine and salt-marsh deposits, described collectively as "peat", underlie the artificial fill material. These organic sedimentary deposits range in depth from 5 to 11 ft bgs and have a thickness generally ranging from 0.5 to over 4 ft. Peat was identified at 20 ft bgs within the elevated railroad right-of-way east of the Site.
- Fluvial deposits underlie the estuarine and salt-marsh deposits. These deposits consist of predominately fine sand and silty sand with minor coarser grained materials and interbedded silt and clay. The sedimentary sequences indicate variable transport energy and associated sediment deposition by the glacial meltwater-fed Passaic River.

EHS Support LLC                                                                                                4

ASHL-FED-0000106496
ALCD-PUBCOM_0001923

Remedial Action Workplan
Former Ashland Hercules Water Technologies (AHWT) Site
Background



- Fluvial sedimentary deposits transition to finer-grained lacustrine deposits at approximately 30 ft bgs. The lacustrine deposits are comprised of interbedded silt, clay, and sandy silt. Finer-grained material within the lacustrine deposits are important geologic controls for COC distribution.
- Below the lacustrine silt and clay deposits, a basal clay layer was identified around 60 ft bgs. This basal clay is characterized as low plasticity clay/silt with minor fractions of sand and gravel. The top of regional bedrock beneath the Site may vary between 150 and 200 ft bgs and has not been encountered during Site investigation activities.

These varying depositional environments and weathering processes have resulted in a complex distribution of fine to coarse-grained materials that are important factors in controlling groundwater movement, historical contaminant migration, and ongoing fate and transport processes. Groundwater is divided into three zones (Shallow, Intermediate, and Deep), as summarized below:

- The Shallow Zone includes shallow fluvial deposits and fill/peat/alluvium interactions (approximately 10-20 ft in depth) and groundwater elevations range from approximately 1.18 ft to -1.32 ft above mean sea level (ft msl). Despite local variability, the prevailing groundwater flow direction within the Shallow Zone continues to exhibit a northerly/northeasterly trend toward the utility corridor discharge boundary along Harrison Avenue, with a horizontal hydraulic gradient of approximately 0.002 foot per foot (ft/ft).
- The Intermediate Zone includes upper lacustrine deposits (approximately 30-35 ft in depth).
- The Deep Zone includes lower lacustrine deposits (approximately 40-60 ft in depth, near or at the contact with the basal clay).
- Groundwater elevations in the Intermediate/Deep Zones range from approximately -0.07 ft to -1.35 ft msl. The prevailing groundwater flow direction continues to be to the north/northeast toward the utility corridor discharge boundary along Harrison Avenue, with a horizontal hydraulic gradient of approximately 0.002 ft/ft.

Vertical groundwater movement between the zones is fairly limited across the Site with upward hydraulic gradients observed as groundwater approaches the utility corridor.

## 2.3   AOC Descriptions

A total of 78 AOCs were identified at the Site as shown on **Figures 2-5** and **2-6**. A total of 49 AOCs require remedial action and are discussed below.

1. Block 283 – on-site surface soil in production area(s), north to south
   a. AOC-A1 is associated with above grade bulk storage of hazardous materials in the southeast portion of the plant Site and is inclusive of AOC-B3.
   b. AOC-A6 is associated with above grade bulk storage and handling of hazardous materials southwest of Building 723 and is inclusive of AOC-A15, AOC-B4, and AOC-C12.
   c. AOC-A7 is associated with above grade bulk storage of hazardous materials on the north side of the Site, due west of Building 721, and is referred to as Dike 7.
   d. AOC-A8 is associated with above grade bulk storage of hazardous materials on the east side of the Site, due south of Building 706, and is referred to as Dike 8. AOC-A8 is located on both Block 283 and Block 280.
   e. AOC-A9 is associated with eight bulk storage tanks (D1 through D8) and were maintained in Building 721.

EHS Support LLC                                                                                    5

Remedial Action Workplan
Former Ashland Hercules Water Technologies (AHWT) Site
Background



f.  AOC-A10 is defined by the series of historic bulk storage ASTs along the eastern property boundary and is inclusive of AOC-C6, AOC-R, AOC-A8, and partial AOC-C4 (which is located on Blocks 283 and 280).

g.  AOC-A11 is associated with historical bulk storage of four ASTs in the swale to the southwest of the Site, within Boylan Avenue.

h.  AOC-A12 is defined by the series of historic bulk storage ASTs along the southern property boundary and present-day bulk storage tanks farms AOC-A2 through AOC-A5, and AOC-C12.

i.  AOC-A14 includes a hot oil surge tank and hot oil heater contained within a concrete dike area immediate east of Dike 7.

j.  AOC-C2 includes the west gate storage area in the southwest corner of the Site.

k.  AOC-C4 includes above grade bulk storage of hazardous materials (totes/drums) and operation of the boiler house and is inclusive of AOC-A17.

l.  AOC-C7 is associated with laboratory sample jar storage area within Building 722A.

m.  AOC-C8 is associated with the laboratory storage area within Building 722.

n.  AOC-C10 is defined as hazardous waste storage within Building 722.

o.  AOC-C11 is defined as southeast storage area in the vicinity of the former Building 713 and is inclusive of AOC-B6.

p.  AOC-C13 is defined as the main finished goods warehouse within Building 723.

q.  AOC-C14 is defined as the laboratory and raw material warehouse located on the second floor of Building 722.

r.  AOC-C15 includes the historical drum and tote storage area along the west side of the Site.

s.  AOC-C16 is defined as historical tank storage or in the vicinity of the present day Truck Loading Bay and is inclusive of AOC-A16, AOC-B5, AOC-C3, AOC-C5, and AOC-C9.

t.  AOC-C17 is historic satellite drum storage in the eastern side of the plant Site, north of AOC-A10 and in the area of the present day Building 706. AOC-C-17 is located on both Block 283 and Block 280.

u.  AOC-C18 (northern alley) is defined by historic satellite drum storage in the west side of Building 721 and in the area of the present-day fire pump house (AOC-A13), hot oil storage (aboveground) tank (AOC-A14) and two waste water neutralization (aboveground) tanks (AOC-A7).

v.  AOC-F1 is defined as the interconnected floor drains within Building 720 (Production).

w.  AOC-F2 is defined as the interconnected open trench floor drains within Building 721 (Drumming room).

x.  AOC-F3 is defined as the open trench floor drains and two sump pits within Building 714 (Boiler House).

y.  AOC-F4 includes the compressor building floor drains within Building 717 and is inclusive of AOC-L.

z.  AOC-I includes the stormwater drainage swale located to the southwest of the Site also known as Boylan Avenue.

aa.  AOC-LF1/LF2/J/CB locations (southern alley) – LF1 is associated with an above grade process line used to flush process wastewater from production operations in Building 720. LF2 is associated with the drumming room line flush. AOC-J is defined as the interconnected stormwater conveyance system at the plant Site.

bb.  AOC-O2 is an isolated AOC consisting of one former 2,000-gallon gasoline UST and potential pump island due west of Building 706 (Maintenance Shop).

cc.  AOC-O3 includes a suspected historical UST, however no evidence of tank present, located within area of AOC-C16.

ASHL-FED-0000106498
ALCD-PUBCOM_0001925

Remedial Action Workplan
Former Ashland Hercules Water Technologies (AHWT) Site
Background



dd. GAOC-8 includes the area away from the process areas in the northeast of Block 283.
2. Block 283 surface soil away from process areas
    a. GAOC-3 – northwest side of plant site
3. Block 282 on-site and off-site surface soil away from process areas
    a. GAOC-2 – area away from process areas
4. Off-site – Block 280, Lot 1 (NJ Transit Lease Area)
    a. AOC-P – inactive railroad spur
5. Site-wide Groundwater
    a. AOC-T
6. Historic Fill
    a. AOC-S

## 2.4   Interim Remedial Measures

Two limited soil removal actions were previously completed and were identified as AOC-Q2 (NJDEP Case Number 92-8-11-1555-31-31) and AOC-Q3 (NJDEP Case Number 93-2-5-1248-55) in the 2009 PA Report (URS, 2009a). These AOCs are discussed further in the 2017 RIR (EHS Support, 2017) and are included as AOCs to be remediated.

## 2.5   Summary of 2017 Remedial Investigation Report

The RIR summary is taken from the Executive Summary and Conclusions and Recommendations sections of the 2017 RIR (EHS Support, 2017). Activities completed after the RI phase are provided in the 2018 PDI (**Appendix A**) and are noted below, if applicable.

### 2.5.1   Overview

Historically, the plant Site (Block 283) was used for manufacturing operations while the non-plant Site (Block 282) was used for parking, office use, and unused equipment storage. The presence and distribution of COCs are reflective of these historic site uses; with greater extents of impacts present in the plant Site. The focus of RI activities was primarily on Block 283. As detailed below, the delineation of soil impacts has generally been achieved at the Site boundaries and at a depth of less than 15 ft bgs with isolated soil impacts identified between 28 and 30 ft bgs within saturated soil (AOC-C16). Further delineation of AOC-C16 was completed in November and December 2017, during a pre-design investigation, as discussed in **Section 2.6** and **Appendix A.**

The groundwater system is well understood and considered stable with groundwater present under unconfined conditions within the Shallow, Intermediate, and Deep zones with flow to the north/northeast and discharge to the utility corridor and Frank's Creek. Knowledge of the operational history of the Site indicates that the primary sources of releases have been either removed or decommissioned and therefore, potential Site sources for the introduction of additional COC mass have been removed.

ASHL-FED-0000106499
ALCD-PUBCOM_0001926

Remedial Action Workplan
Former Ashland Hercules Water Technologies (AHWT) Site
Background



## 2.5.2  Soil

Soil sampling was conducted to evaluate the nature and extent of soil contamination associated with 78 AOCs (including off-site AOCs adjacent to the Site), many of which are either directly adjacent or overlying one another. Volatile organic compound (VOC) and extractable petroleum hydrocarbons (EPH) impacts (and limited semi-volatile organic compounds [SVOCs]) are consistent with historical industrial operations at the Site with polycyclic aromatic hydrocarbons (PAHs) and metals related to regional impacts associated with historic fill. While polychlorinated biphenyl (PCB) impacts were identified in a discrete area of Block 282 (non-plant site) they are not key COCs driving remedial action decision-making.

### 2.5.2.1  Soil Delineation

Tetrachloroethene (PCE) and trichloroethene (TCE) were detected in surface soil above the Default Impact to Groundwater Soil Screening Level (IGWSSL) in areas away from plant operations (plant and non-plant Sites). Vertical delineation is complete and horizontal delineation is complete to the west, east and south. Horizontal delineation to the north was not complete during RI activities as limitations within city right-of-way prohibit successful delineation to the north along Harrison Avenue. These concentrations are in unsaturated soil and are under an impervious surface.

Within the plant Site, vertical delineation of VOCs within saturated zone soil to Non-Residential Direct Contact Soil Remediation Standards (NRDCSRS) is complete. Based on the number of overlapping AOCs and COC distribution across Lot 4 and Lot 5 in the southern and eastern portions of the Site, the targeted delineation boundary within unsaturated zone soil is the property boundary, including the leased parcel to the east (Block 280, Lot 1). Horizontal delineation of VOCs below impact to groundwater soil screening levels within unsaturated zone soil is complete at the property boundary, except for the isolated areas identified in the following table.

| AOC | Soil Boring | Constituent Concentration (mg/kg) | IGWSSL (mg/kg) | Location |
|---|---|---|---|---|
| AOC-A10 | SB143-A8 (1.0-1.5) | PCE (0.0057) | 0.005 | East |
| | SB218-P (14.5-15.0) SB218-P (17.0-17.5) | PCE (0.094J) Benzene (0.14) | | |
| GAOC-2 | SB171 (1.0-1.5) SB172 (1.0-1.5) SB84 (1.0-1.5) SB85 (1.0-1.5) | PCE (0.032) PCE (0.068) PCE (0.035) PCE (0.0064) | 0.005 | Block 282 North |

EHS Support LLC

8

ASHL-FED-0000106500
ALCD-PUBCOM_0001927

Remedial Action Workplan
Former Ashland Hercules Water Technologies (AHWT) Site
Background



| AOC | Soil Boring | Constituent Concentration (mg/kg) | IGWSSL (mg/kg) | Location |
|---|---|---|---|---|
| GAOC-3 | SB-95 | PCE (0.081) | PCE 0.005 | Block 283 Northwest |
| | | PCE (9.9) | | |
| | SB173 (1.0-1.5) | TCE (1.5) | | |
| | | PCE/TCE (NE) | | |
| | SB173R (1.0-1.5) | PCE (0.021) | | |
| | SB173R (4.5-5.0) | | | |

Locations delineated during RA/PDI activities removed from table (**Appendix A**).
AOC = Area of Concern
J = Estimated
mg/kg = milligrams per kilogram
NE = Non-Exceedance
PCE = Tetrachloroethene
IGWSSL = Default Impact to Groundwater Soil Screening Levels
TCE = Trichloroethene

## 2.5.3  Groundwater

Groundwater within the Shallow, Intermediate, and Deep zones behaves as a single aquifer unit under water table conditions bounded below by the fine-grained lake bottom deposits. Flow at the Site is predominantly to the north/northeast with groundwater from all zones discharging into the Harrison Avenue utility corridor. The Deep Zone is bounded vertically by the lake bottom deposits, which act as a low permeability flow boundary below the alluvium.

Groundwater analytical data collected between December 2009 and December 2016 indicate VOCs in groundwater above the Class IIA Groundwater Quality Standards (GWQS) are generally stable or decreasing. The constituents identified above GWQS in one or more wells and sampling events are listed below, including regional historic fill COCs (PAHs and Metals):
- Aromatic hydrocarbons: benzene and toluene
- Chloroethenes: PCE; TCE; 1,1-dichloroethene (1,1-DCE); cis-1,2-dichloroethene (cis-1,2-DCE); trans-1,2-dichloroethene (trans-1,2-DCE); and vinyl chloride (VC)
- Chloroethanes: (mono)chloroethane (CA)
- Chlorobenzenes: 1,2,4-trichlorobenzene (1,2,4-TCB); 1,4-dichlorobenzene (1,4-DCB); and chlorobenzene (CB)
- Semi-Volatile Compounds: 1,4-dioxane; hexachlorobenzene; 2-methylnapthalene; naphthalene; and pentachlorophenol
- Regional Historic Fill Constituent:
  - PAHs: benzo[a]anthracene, benzo[a]pyrene, and benzo[b]fluoranthene
  - Metals: aluminum, antimony, arsenic, iron, lead, manganese, and sodium

The primary COCs in groundwater are:
- Aromatic hydrocarbons: benzene
- Chloroethenes: PCE; TCE; cis-1,2-DCE; and VC
- Chlorobenzenes: 1,2,4-TCB; 1,4-DCB; and CB;

EHS Support LLC                                                                                      9

ASHL-FED-0000106501
ALCD-PUBCOM_0001928

Remedial Action Workplan
Former Ashland Hercules Water Technologies (AHWT) Site
Background



- 1,4-dioxane

Natural degradation processes are contributing to mass reduction based on the following:
- Daughter products for the chloroethenes and chlorobenzenes groups are more widespread and present at greater concentrations than associated parent products.
- The groundwater geochemistry is well established with reducing conditions expected to continue as a result of aerobic biological processes that consume oxygen given the presence of ubiquitous natural and anthropogenic carbon sources (e.g., peat and aromatic hydrocarbons).

Groundwater flow data from properties north of Harrison Avenue indicate groundwater flows south toward Harrison Avenue and the Ashland Site (EHS Support, 2017). These properties are also completing groundwater investigations within the same regulatory timeframe for similar COCs (PCE). As a result, multiple sources may be contributing to the corridor and ultimately the off-site receptor.

A CEA was approved for site-related COCs in Shallow and Intermediate/Deep Zone groundwater by NJDEP in 2018 (NJDEP, 2018c). The CEA includes the Site Boundary, Greenfield Avenue, and extends to north and northeast to the perceived hydraulic plume boundaries. The completed CEA application is provided in the 2017 RIR (EHS Support, 2017). The CEA was approved for VOCs and SVOCs detected above the GWQS in 2018. Historic fill compounds were approved within a second site-wide CEA for PAHs and metals by NJDEP in 2018 (NJDEP, 2018d).

## 2.5.4 Vapor Intrusion

Vapor intrusion was assessed during the RI after analytical data from the 2009 and 2010 groundwater sampling events identified exceedances above the NJDEP March 2007 Generic Vapor Intrusion Ground Water Screening Levels. Sub-slab soil vapor and indoor air sampling was completed to evaluate potentially complete exposure pathways at the Site. During sampling activities, the site was inactive, heating systems were not operational, and no immediate environmental conditions were identified for vapor intrusion. While sub-slab soil vapor concentrations exceeded the acceptable screening levels, no exceedances were identified in indoor air. The primary VOCs driving risk in sub-slab soil vapor are:
- PCE
- TCE
- chloroform
- 1,1-dichloroethane (1,1-DCA)
- 1,1,2-trichloroethane
- benzene
- 1,4-dichlorobenzene (1,4-DCB)
- vinyl chloride (VC)

Each compound was detected above the non-residential soil gas screening levels. No exceedances above the applicable Indoor Air Screening Levels or Rapid Action Levels were detected within each building sampled.

Site conditions related to vapor intrusion have not changed since the 2017 RIR and the buildings remain unoccupied (EHS Support, 2017). The planned remedial activities will not impact soil beneath Building 723 and planned groundwater activities are not within the footprint of the building. All remaining

ASHL-FED-0000106502
ALCD-PUBCOM_0001929

Remedial Action Workplan
Former Ashland Hercules Water Technologies (AHWT) Site
Background



buildings at the site will be demolished. If Building 723 is going to be put back into use, indoor air will be assessed according to the NJDEP *Vapor Intrusion Technical Guidance Version 4.1* (NJDEP, 2018b), including indoor air sampling. Any future development on Block 282 would also require compliance with the *Vapor Intrusion Technical Guidance* (NJDEP, 2018b).

No building structures are present within 100 ft of groundwater impacts to the east and southwest. Building structures north of the Site and Harrison Avenue are within 100 ft of the property boundary and within 100-ft of impacted Site boundary monitoring wells. However, based on groundwater discharge from the Site into the Harrison Avenue utility corridor, potential vapors associated with volatile COCs within groundwater are limited to the Site and immediate vicinity of the utility corridor. Based on the presence of a groundwater discharge boundary along Harrison Avenue, vapor intrusion investigation activities have been focused on the Site.

## 2.5.5   Ecological Evaluation

A detailed Ecological Evaluation (EE) was prepared for the Site in accordance with N.J.A.C. 7:26E (N.J.A.C, 2018a). The EE was conducted to examine the site for the co-occurrence of the following:

- Environmentally Sensitive Natural Resources (ESNRs) on, adjacent to, or potentially affected by the site
- Presence of Constituents of Potential Ecological Concern (COPECs) at the site or AOCs and in the ESNRs
- Presence of a COPEC migration pathway (historical or existing) from the site to the ESNR, or evidence of affected material having been placed directly into an ESNR

### 2.5.5.1   On-site ESNRs

Based on the documented results, no further EE was appropriate or recommended on-site. The following provides the justification for this determination:

- No ESNRs were identified on Site.
  - The Site is located in an historical industrial area, and the Site and the adjacent areas are expected to remain industrial for the foreseeable future.
  - The Site is predominantly covered by pavement, or other infrastructures that prevent exposure of the surficial soils to ecological terrestrial receptors. Block 282 contains limited landscaped area where urban flora and fauna may exist; but is not considered a breeding or primary foraging area for species.
  - The Site is located in an area of historic fill that includes elevated PAH and metal COPECs.
  - The only exposed surficial soil area is located in a background area where historical industrial activities did not occur.
- COPECs
  - Metals associated with the historic fill were the only COPECs exceeding the ecological screening criteria.

### 2.5.5.2   Off-site ESNRs

Potential COPEC migration pathways to off-site ESNRs were considered for groundwater, the only potentially complete migration pathway from the Site, via discharge to Frank's Creek either through the

ASHL-FED-0000106503
ALCD-PUBCOM_0001930

Remedial Action Workplan
Former Ashland Hercules Water Technologies (AHWT) Site
Background



utility corridor to the north or off-site groundwater flow to the east. Based on the documented results, further EE for groundwater is appropriate or recommended. The following provides the justification for this determination:

- Frank's Creek has been identified as an off-site ESNR.
- Site COPEC concentrations (limited to VOCs) in groundwater exceed the Fresh Water Aquatic Screening Criteria (Chronic Scenario) at the downgradient boundary of the Site.
- Historic Fill COPEC concentrations (limited to metals) in groundwater exceed the Fresh Water Aquatic Screening Criteria (Chronic Scenario) at the downgradient boundary of the Site.
- The predominant groundwater flow direction beneath the Site is to the north/northeast and discharges into the Harrison Avenue Utility Corridor (immediately adjacent to the north property boundary) and Frank's Creek (approximately 170 ft east of the Site). Frank's Creek is the discharge point for groundwater within the utility corridor, at least episodically (due to tidal fluctuations).

The comparison of groundwater data to ecological screening criteria (ESCs) for off-site surface water is highly conservative and does not account for attenuation in the utility corridor or off-site groundwater. Further evaluation of the potentially complete migration pathway for groundwater discharging into surface water is discussed in **Section 6**.

## 2.6    Pre-Design Investigation Activities

Additional investigation activities were completed in 2017 as summarized in the PDI Report to close out existing data gaps (**Appendix A**). Additional data was collected to evaluate background conditions south of the Site (i.e., upgradient and off-site) and to support soil delineation to the residential direct contact soil remediation standards (RDCSRS). No off-site soil samples exceeded the Default IGWSSL or the calculated site-specific impact to groundwater soil remediation standards (SSIGWSRS) for VOCs or the screening value for EPH. Delineation to the south is considered to be complete. Soil sampling was also conducted to support development of SSIGWSRS and to delineate IGWSSL exceedances along the property boundary near GAOC-2 and GAOC-3. Delineation of exceedances of SSIGWSRS to the north of GAOC-2 and GAOC-3 was not achieved. However, further sampling was not feasible due to underground utilities within the sidewalk and Harrison Avenue and no access per the city of Kearny.

Sampling was also conducted to delineate the horizontal extent of VOC exceedances of NRDCSRS in the soil sample collected from SB-123D at 28 to 28.5 ft bgs. Delineation of the 28 to 28.5 ft bgs exceedances of NRDCSRS at SB-123D is complete to the south (by MW-14B and MW-13B), to the east (by SB-219D, SB-222, SB-235), and to the west (by SB-243). Exceedances were observed at MW-12B and SB-236 at comparable depths to the SB-123D exceedances. While horizontal delineation to NRDCSRS was not achieved to the north, sufficient data was collected to further define and characterize the extent of potential residual source impacts (including to the north) to assist with the future evaluation of remedial options. Additional information is included in **Appendix A**.

The nature and extent of groundwater impacts within the deeper alluvium and off-site investigation activities to evaluate groundwater quality south/upgradient were further evaluated during the PDI activities in November and December 2017. A comprehensive groundwater sampling event was conducted in December 2017 at existing and new monitoring well locations as well as in March 2018,

ASHL-FED-0000106504
ALCD-PUBCOM_0001931

Remedial Action Workplan
Former Ashland Hercules Water Technologies (AHWT) Site
Background



with the exception of off-site upgradient monitoring wells. Additional information is included in
**Appendix A**.

ASHL-FED-0000106505
ALCD-PUBCOM_0001932

Remedial Action Workplan
Former Ashland Hercules Water Technologies (AHWT) Site
Remediation Standards



# 3    Remediation Standards

This section of the RAW provides a summary of Remediation Standards identified for the Site as required in N.J.A.C. 7:26E-5.5 (b) 5 (N.J.A.C., 2018a).

## 3.1    Soil

Remediation Standards for soil on-site include NRDCSRS, IGWSSL, SSIGWSRS, and EPH Category 2 Soil Remediation Criterion. Remediation Standards for soils off-site include RDCSRS, IGWSSL, SSIGWSRS, and EPH Category 2 Soil Remediation Criterion. To assess compliance, constituent concentrations are compared to the applicable soil Remediation Standards.

### 3.1.1    Direct Contact

The Site use is non-residential and future use is anticipated to remain non-residential. Therefore, the applicable direct contact soil remediation standards for both the saturated and unsaturated zones for the site are the NRDCSRS. Numerical Remediation Standards for the direct contact exposure pathways of ingestion-dermal and inhalation are listed in Tables 1A and 1B of Appendix 1 of the Remediation Standards (N.J.A.C., 7:26D) (N.J.A.C., 2018b). Soil samples collected off-site and adjacent to the property boundary were compared to the RDCSRS to establish that soil meets the RDCSRS off-site; however, remediation on-site will be to the NRDCSRS.

### 3.1.2    Impact to Groundwater

For several VOCs, SSIGWSRS were calculated pursuant to N.J.A.C. 7:26D-1.1(b) (N.J.A.C., 2018b) and NJDEP guidance Introduction to Site-Specific Impact to Ground Water Soil Remediation Standards Guidance Documents (NJDEP, 2008). SSIGWSRS were determined during pre-design investigations for COCs detected at the site above the IGWSSL during pre-design investigations.  As presented in the PDI, only TCE resulted in a SSIGWSRS above the IGWSSL (**Appendix A**).  The TCE SSIGWSRS is 0.42 mg/kg and is applicable to soil in the unsaturated zone.  For the remaining constituents, the IGWSSL are adopted as the site's remediation standards.

Data is screened against the IGWSSL for COCs except TCE (SSIGWSRS 0.42 milligrams per kilogram [mg/kg]).   The IGWSSL are found in Table 1 of the NJDEP Guidance Document Development of Site-Specific Impact to Groundwater Soil Remediation Standards Using the Soil-Water Partition Equation (NJDEP, 2013).  The TCE standard of 0.42 mg/kg and the default IGWSSL adopted for the other constituents are collectively referred to in the RAW as the SSIGWSRS.

### 3.1.3    EPH

For the purpose of delineation, the EPH concentration both on-site and off-site were compared to a Category 2 screening value of 1,700 mg/kg and the free-product limit of 17,000 mg/kg. Details on the Category 2 EPH selection are provided in the 2017 RIR (EHS Support, 2017). Where EPH concentration exceeded the screening value of 1,700 mg/kg, a sample-specific human health soil remediation criterion (SRC) was calculated using an NJDEP spreadsheet calculator for the residential and non-residential

ASHL-FED-0000106506
ALCD-PUBCOM_0001933

Remedial Action Workplan
Former Ashland Hercules Water Technologies (AHWT) Site
Remediation Standards



scenarios. Consistent with the intended, institutionally-controlled non-residential future use of the site, on-site EPH soil results exceeding the screening value of 1,700 mg/kg were compared to non-residential sample-specific human health SRC, and off-site EPH soil results were compared to residential sample-specific human health SRC. The results of the EPH-calculator tool are provided in the 2017 RIR (EHS Support, 2017).

## 3.2    Groundwater

The applicable groundwater Remediation Standards are GWQS (N.J.A.C. 7:9C) published in July 22, 2010 (N.J.A.C., 2010) with published updates in November 2015, September 2017, and August 2018 (N.J.A.C., 2018b); these standards are summarized in **Table 3-1**.

EHS Support LLC                                                                                                    15

ASHL-FED-0000106507
ALCD-PUBCOM_0001934

Remedial Action Workplan
Former Ashland Hercules Water Technologies (AHWT) Site
Soil Delineation and Extent of Remedial Action



# 4    Soil Delineation and Extent of Remedial Action

**Section 4** presents the vertical and horizontal delineation of soil, by constituent groups, to the applicable Remediation Standards, as updated after the PDI. The PDI completed in 2017 collected additional data to refine the delineation presented in the 2017 RIR (EHS Support, 2017) and a summary of the investigation scope related to delineation is provided in **Section 4.1**. The constituent groups are historic fill (inorganics and some SVOCs), EPH, VOCs, SVOCs, and PCBs. The site contains historic fill, which is presumed to contain constituents exceeding soil Remediation Standards. For this reason, the horizontal and vertical delineation of constituents associated with historic fill is presented in **Section 4.2**, separate from the horizontal and vertical delineation of constituents not associated with historic fill. The horizontal and vertical delineation of EPH is also presented separately from VOCs, SVOCs, and PCBs because of the NJDEP protocol specific to the evaluation of EPH.

The delineation figures provided in this section show color-coded sample locations and delineation to the applicable Remediation Standards.   Because of the large number of sample locations and analyses shown on some figures, the laboratory data could not be presented on the figures.  Instead, the laboratory data is presented on a separate table.  The color-coded sample locations on the figures depict relative concentrations, as follows:
- Yellow depicts a location where one or more constituent exceeded the applicable soil screening levels for EPH or Remediation Standards for other constituents.
- Green depicts a location where one or more constituent was detected, but at concentrations equal to or below the applicable soil Remediation Standards or screening level for EPH.
- Blue depicts a location where laboratory analysis did not detect constituents.
- No color (unfilled circle) depicts a location where soil samples were collected for analysis and field data obtained, but laboratory analysis for the constituent or constituent group shown on the figure was not completed.

The soil screening and delineation figures have been updated (since the 2017 RIR [EHS Support, 2017] submittal) to reflect data collected during the PDI.  Updated data tables organized by media are provided in **Appendix B**.  The extent of remedial action is based on the delineation and the results of compliance averaging for selected COCs and exposure pathways as presented in **Section 4.3**.

## 4.1    Delineation

### 4.1.1    Horizontal and Vertical Delineation of Historic Fill

According to NJDEP technical guidance, historic fill is presumed contaminated above the RDCSRS unless sampling can demonstrate constituents associated with the historic fill are below RDCSRS. For this site, historic fill is presumed to contain constituents above the RDCSRS and delineation to the RDCSRS is not required. With this presumption, a site-wide deed notice will be required to document the nature and extent of the historic fill and establish an institutional control preventing future residential land use. According to the guidance, further delineation of historic fill by sampling and analysis to the NRDCSRS is required to determine if additional remediation is necessary. This section presents the on-site delineation of historic fill to the NRDCSRS.

EHS Support LLC

16

ASHL-FED-0000106508
ALCD-PUBCOM_0001935

Remedial Action Workplan
Former Ashland Hercules Water Technologies (AHWT) Site
Soil Delineation and Extent of Remedial Action



The following constituents are associated with historic fill:

- benzo[a]anthracene
- benzo[a]pyrene
- benzo[b]fluoranthene
- dibenz(a,h)anthracene
- indeno(1,2,3-cd)pyrene
- arsenic
- lead

The vertical delineation of these constituents is to the base of the historic fill, which was observed to be approximately 8 ft bgs with some areas of disturbance down to 11 ft bgs (AOC-C16) (EHS Support, 2017). The horizontal delineation is based on soil sampling completed across the site and is shown on **Figure 4-1** and **Table 4-1**. Historic fill contains exceedances of the NRDCSRS for one or more constituents in Blocks 282 and 283. The leased portion of Block 280 has one location with exceedances of the NRDCSRS and this location is delineated by samples to the north and south and the boundary of the leased portion of Block 280 to the east. Consistent with NJDEP technical guidance for historic fill, horizontal delineation of COCs within historical fill is not required beyond the site boundary.

## 4.1.2 Vertical Delineation of VOCs, SVOCs, and PCBs to Direct Contact

N.J.A.C 7:26E-5.5(b)3.i. requires vertical delineation to the applicable direct contact soil remediation standard. On-site the applicable standard is the NRDCSRS, and off-site the applicable standard is the RDCSRS. Vertical delineation was evaluated by comparing laboratory analysis results from soil in the deepest interval of each soil boring to the applicable direct contact remediation standards. If soil in the deepest interval met the applicable soil remediation standards, vertical delineation was completed. Otherwise, laboratory analysis results from adjacent sample locations were reviewed to determine if soil in a deeper interval was below the applicable soil remediation standards and vertical delineation was completed.

Note that analysis of PCBs at sample SB55-Q3 (total PCBs of 0.26 mg/kg) was collected as a confirmation sample on 11/11/2009 of the result at SB46-Q3 (total PCBs of 1.1 mg/kg) collected on 6/25/2009 (EHS Support, 2017). Results for SB55-Q3 were used in this evaluation.

### 4.1.2.1 On-site Vertical Delineation to NRDCSRS

**Figure 4-2** presents vertical delineation of VOC, SVOC, and PCB in on-site samples to the NRDCSRS. At five locations, the deepest interval analyzed contained one or more exceedances of the NRDCSRS. The data boxes on the figure identify the COCs and depth that exceeded the NRDCSRS and the location of adjacent deeper samples where the same COCs met the NRDCSRS. Because each exceedance depicted in yellow had adjacent and deeper samples meeting the NRDCSRS, vertical delineation is completed.

### 4.1.2.2 Off-site Vertical Delineation to RDCSRS

**Figure 4-3** presents vertical delineation of VOC, SVOC, and PCB in off-site samples to the RDCSRS. At location SB219-P, located beyond the southeast corner of the site, 1,4-Dichlorobenzene exceeded the

EHS Support LLC                                                                                                    17

ASHL-FED-0000106509
ALCD-PUBCOM_0001936

Remedial Action Workplan
Former Ashland Hercules Water Technologies (AHWT) Site
Soil Delineation and Extent of Remedial Action



RDCSRS at 19.5 to 20 ft bgs. At adjacent location SB-219D, 1,4-Dichlorobenzene was not detected at 28 to 28.5 ft bgs, completing vertical delineation.

### 4.1.3 Horizontal and Vertical Delineation of EPH

The remedial investigation concluded the petroleum releases at the site were Category 2 releases and the delineation of EPH according to the NJDEP EPH Protocol is a multi-step process. The EPH results are first compared to the screening level of 1,700 mg/kg. If EPH is less than 1,700 mg/kg, no remediation is required for human health. If the result is equal to or greater than 1,700 mg/kg, analysis for hydrocarbon fractions is required and a sample specific human health EPH soil remediation criterion (SRC) is calculated based on the exposure scenario. In calculating the EPH SRC, on-site sample locations used a non-residential exposure scenario and off-site sample locations used a residential exposure scenario. If the EPH result is less than the sample specific EPH SRC, no remediation is required for EPH. Sample locations where EPH exceeded the sample specific EPH SRC were delineated by sample locations with EPH less than 1,700 mg/kg or less than the sample-specific EPH SRC.

#### 4.1.3.1 Horizontal and Vertical Delineation of Category 2 EPH

EPH results were less than the Category 2 free-product limit of 17,000 mg/kg and no remediation to treat or remove residual petroleum hydrocarbons to the extent practicable is required.

**Figure 4-4** and **Table 4-2** shows the comparison of EPH results to the Category 2 screening level of 1,700 mg/kg. EPH exceeded the screening value at 31 sample locations and sample specific EPH SRCs for all 31 locations were calculated using the NJDEP provided spreadsheet (NJDEP, 2010a). The completed spreadsheets are included as **Appendix C**.

As shown on **Figure 4-5**, on-site locations with EPH greater than 1,700 mg/kg had EPH results less than the sample-specific EPH SRCs for non-residential exposure scenario and there were no on-site exceedances of EPH to delineate. EPH at off-site sample location SB148B-A11 was 4,700 mg/kg at 0.5 to 1 ft bgs, exceeding the sample-specific EPH SRC for a residential exposure scenario of 2,800 mg/kg. EPH was horizontally delineated by the property boundary of Block 283 and surrounding samples where EPH did not exceed the 1,700 mg/kg screening level. EPH at off-site location SB148B-A11 (0.5-1 ft bgs) was vertically delineated by a sample collected at SB-239R where EPH was 730 mg/kg at 3.5-4 ft bgs.

### 4.1.4 Horizontal Delineation of VOC, SVOC, and PCB to Direct Contact

#### 4.1.4.1 On-site Delineation to NRDCSRS

**Total PCBs**

Total PCBs results range from non-detect (0.01)-0.5 mg/kg and did not exceed the NRDCSRS, thus delineation is complete (**Figure 4-6**).

**VOCs**

EHS Support LLC

18

ASHL-FED-0000106510
ALCD-PUBCOM_0001937

Remedial Action Workplan
Former Ashland Hercules Water Technologies (AHWT) Site
Soil Delineation and Extent of Remedial Action



As shown on **Figure 4-7** and **Table 4-3**, VOC exceedances of the NRDCSRS are widespread across the southeast portion of Block 283. Specifically, the delineation was driven by benzene, TCE and PCE. While other VOCs were present at levels above the NRDCSRS, they were within the delineation of benzene, TCE, and PCE.

There are no VOC exceedances in Block 282 and the leased portion of Block 280. The delineation of VOCs to the NRDCSRS in Block 282 is completed by on-site sampling and the property boundary.

## SVOCs

As shown on **Figure 4-8** and **Table 4-4**, there were four locations with SVOC exceedances of the NRDCSRS on Block 283. The delineation at all four locations was completed by surrounding soil samples. There are no exceedances in Block 282 or the leased portion of Block 280.

### 4.1.4.2    Off-site Delineation to RDCSRS

Outside the property boundary, N.J.A.C 7:26E-4.2(a)2 requires delineation of soil contamination from a site-related AOC to the RDCSRS. To evaluate whether a site-related AOC may have resulted in off-site exceedances of the RDCSRS and whether delineation was completed, samples collected off-site and along the property boundary were compared to the RDCSRS.

**Figure 4-9** shows that there are VOC exceedances of the RDCSRS at three locations off-site, east of the leased portion of Block 280, at locations SB219-P, SB-222, and SB-217. The table on **Figure 4-9** identifies the VOCs and the depths. All three locations have been delineated by nearby sample locations to the east, SB-223 and SB-224, with detections below the RDCSRS.

### 4.1.5   Horizontal and Vertical Delineation to Impact to Groundwater

N.J.A.C 7:26E-4.2(a)3 requires horizontal and vertical delineation of the unsaturated zone to the SSIGWSRS without regard to the property boundary. The thickness of the unsaturated zone from the south to the north of the site varies from about 3 to 5 ft thick and vertical delineation is completed at the depth to the top of the saturated zone. Site buildings at elevated grade (i.e., Building 723) and the elevated railroad spur east of the site (AOC-P) have a thicker unsaturated soil horizon. In this instance, the unsaturated soil horizon was extended from 5 ft to 10-15 ft for consideration when comparing soil to impact to groundwater soil screening levels. The horizontal delineation was completed by on-site sampling, off-site sampling and lines of evidence.

### 4.1.5.1    Total PCBs

**Figure 4-10** shows the delineation of total PCB to the SSIGWSRS of 0.2 mg/kg. Total PCBs exceed the SSIGWSRS in Block 282, at locations SB-55 and SB-90, where total PCBs were 0.26 mg/kg and 0.5 mg/kg, respectively. On-site sample locations where total PCBs were less than 0.2 mg/kg or not detected complete the delineation.

EHS Support LLC                                                                                                      19

ASHL-FED-0000106511
ALCD-PUBCOM_0001938

Remedial Action Workplan
Former Ashland Hercules Water Technologies (AHWT) Site
Soil Delineation and Extent of Remedial Action



### 4.1.5.2   VOCs

**Figure 4-11** and **Table 4-5** show the delineation of VOCs to the SSIGWSRS. There are widespread exceedances of the SSIGWSRS at the southeast portion of Block 283 and at two areas along the northern site boundary in Blocks 282 and 283. Delineation is completed by on-site and off-site sampling locations except north of the site boundary, into Harrison Avenue. While the Town of Kearny would not allow sampling north of the property boundary, including in the sidewalk between the property boundary and Harrison Avenue, the following lines of evidence complete the delineation at the site boundary:

- The unsaturated zone is approximately 5 ft bgs along Harrison Avenue.
- The depth of utilities installed and maintained under Harrison Avenue is likely deeper than 5 ft bgs and previous road work may have removed unsaturated soil north of the property boundary.
- Properties to the north of Harrison Avenue have soil with VOC impacts related to releases at these properties and delineation of VOC impacts from on-site AOCs by sampling on properties north of Harrison Avenue would not be feasible.

### 4.1.5.3   SVOCs

**Figure 4-12** and **Table 4-6** show the delineation of SVOCs to the SSIGWSRS. The four discrete areas with exceedances are delineated with on-site and off-site sampling locations. In Block 282, isophorone is the only SVOC that exceeds the SSIGWSRS.

## 4.2   Compliance Averaging

This section presents the results of compliance averaging completed according to NJDEP *Technical Guidance for the Attainment of Remediation Standards and Site-Specific Criteria* for VOCs, SVOCs, and total PCBs (NJDEP, 2012a). This technical guidance describes allowable methods to demonstrate attainment of remediation standards after delineation is completed. The methods address both the direct contact and impact to groundwater pathways and determine the extent of remedial action required to attain remediation standards.  The extent of remedial action for direct contact and impact to groundwater pathways was assessed by compliance averaging using spatially weighted averages or arithmetic mean, as described in Appendix A of the technical guidance document.

Compliance averaging requires AOCs to be separated into horizontal functional areas and vertical intervals. The technical guidance specifies the size and shape of the functional areas and the minimum vertical intervals, which are different for the direct contact and impact to groundwater pathways. Each functional area and vertical interval are evaluated using only laboratory data from within the functional area and vertical interval. Compliance averaging using the spatially weighted average or arithmetic mean is completed for individual COCs within each functional area and vertical interval. Compiling the results for all COCs determines the overall extent of remedial action for each pathway.

To determine if a remedial action is required within a functional area using the spatially weighted average method, the initial or pre-remedy spatially weighted average for each constituent was calculated using available laboratory data.  For this step, remedial action is required if the spatially weighted average is above the soil remediation standard.  For non-detect results, the pre-remedy spatially weighted average was based on the MDL reported by the laboratory.  The MDL is the

ASHL-FED-0000106512
ALCD-PUBCOM_0001939

Remedial Action Workplan
Former Ashland Hercules Water Technologies (AHWT) Site
Soil Delineation and Extent of Remedial Action



concentration at which the laboratory can identify the constituent as being present and the actual concentration in a non-detect sample is less than the MDL. For this reason, the pre-remedy spatially weighted average using MDLs was conservatively high and would properly identify functional areas and vertical intervals that require remedial action. This method differs from other compliance averaging methods that use a value of zero or less than the MDL for non-detect samples.

If the pre-remedy spatially weighted average showed that remedial action was required, the iterative steps outlined in the technical guidance were completed using laboratory analysis of clean fill provided by a supplier. Because the iterative steps quantify the extent of remedial action based on calculated averages, the laboratory reporting limits were used for non-detect values. The reporting limit is the lowest concentration the laboratory can report that meets the required accuracy and precision. Using the reporting limits for the iterative steps ensures that the extent of the remedial action is not under estimated.

### 4.2.1   Compliance Averaging of Direct Contact Pathway

Compliance averaging used the spatially weighted average method. The technical approach and summary of results are presented below.

#### 4.2.1.1   Functional Areas and Vertical Intervals

Compliance averaging of the direct contact pathway under a non-residential exposure scenario was completed in Block 282 for the historic fill constituents that exceeded the NRDCSRS in individual samples. Block 282 is a 0.9-acre, triangular shaped property at the northwest corner of the site. Within Block 282, lead and benzo(a)pyrene exceeded the NRDCSRS. Block 282 is less than the specified non-residential functional area size of two acres and in accordance with the technical guidance was evaluated as one functional area.

Two vertical intervals within the historic fill were selected. Lead and benzo(a)pyrene exceedances within the historic fill were delineated vertically at 9 ft bgs in sample SB50-BG where both lead and benzo(a)pyrene were detected but did not exceed the NRDCSRS. This depth is consistent with the thickness of historic fill reported in the RIR. The two selected intervals were 0-2 ft bgs, which is the interval required by the technical guidance for direct contact compliance averaging, and 2-9 ft bgs.

#### 4.2.1.2   Lead and Benzo(a)pyrene in Block 282

Compliance averaging by spatially weighted averages showed that remedial action is required for lead and benzo(a)pyrene, as shown on **Figures 4-13** and **4-14**. In the surface interval of 0-2 ft bgs, lead requires remediation in the 4,778 square ft polygon representing sample location SB49-BG. No remedial action is required for the surface interval of 0-2 ft bgs for benzo(a)pyrene as the weighted average is below the NRDCSRS. In the subsurface interval of 2 ft bgs to the bottom of sampled depth of historic fill of 9 ft bgs, lead requires remediation in the 19,193 square ft polygon representing sample location SB-55 and benzo(a)pyrene requires remediation in the 2,663 square ft polygon representing sample location SB-90. The combined subsurface extent of remediation is approximately 20,000 square ft.

EHS Support LLC

21

ASHL-FED-0000106513
ALCD-PUBCOM_0001940

Remedial Action Workplan
Former Ashland Hercules Water Technologies (AHWT) Site
Soil Delineation and Extent of Remedial Action



## 4.2.2  Compliance Averaging of Impact to Groundwater Pathway

Compliance averaging for VOCs and SVOCs used the spatially weighted average method, and for total PCBs used the arithmetic mean method. The technical approach and summary of results are presented below. **Appendix D** provides the complete presentation of the technical approach to the spatially weighted average method and figures showing the results for each constituent. Because of the large number of COCs that had to be evaluated, the evaluation of individual VOCs and SVOCs is presented in **Appendix D** and only a summary of the technical approach and combined results for all VOCs and SVOCs is discussed in this section.

### 4.2.2.1  Functional Areas

The technical guidance specifies that functional areas will be 100 ft wide in the direction parallel to groundwater flow and to the delineated extent of contamination in all other directions. Groundwater flows generally to the north across the site and 100-foot wide functional areas parallel to Harrison Avenue would meet this requirement of the technical guidance, as discussed further in **Section 5.2**. The functional areas would extend to the east and west to the delineated extent of extent of contamination compared to SSIGWSRS. As shown in **Figures 4-15** and **4-16**, the functional areas for VOCs and SVOC are different because the delineated extent for VOCs is larger than the delineated extent for SVOCs.

### 4.2.2.2  Vertical Intervals

The technical guidance requires compliance averaging in the interval from 2 feet above the water table to the water table as the critical interval for the impact to groundwater pathway and one or more vertical intervals above the critical interval. For this site, one vertical interval from the ground surface to the top of the water table is appropriate, as a variance to technical guidance, for the following reasons:

- The top of the water table across the site is shallow, from 3 to 5 ft bgs and at the southern portion of Block 283 where most exceedances of the SSIGWSRS are present, the top of the water table is 3 ft bgs.
- The top 1 to 2 ft bgs across much of Block 283 consists of asphalt pavement, concrete slabs, and other structures such that the interval from the ground surface to 2 ft above the water table would only have a thin layer of soil.
- Where excavation and off-site disposal is the selected remedy, using one interval will result in excavation and off-site disposal of the entire unsaturated zone.

### 4.2.2.3  Excluded Areas

With a shallow water table across the site, some existing structures physically separate soil in the unsaturated zone because foundation walls and footings would extend into the saturated zone. The area of these structures was excluded from the extent of remedial action based on site-wide compliance averaging, as shown on **Figures 4-15** and **4-16**. This section discusses why Buildings 720 to 723 were excluded from site-wide compliance averaging and whether a remedial action is required within the footprint of these buildings. **Section 7.1** describes how the remedial action will address soil within the footprint of buildings.

ASHL-FED-0000106514
ALCD-PUBCOM_0001941

Remedial Action Workplan
Former Ashland Hercules Water Technologies (AHWT) Site
Soil Delineation and Extent of Remedial Action



## Building 723

Building 723 is a former warehouse with elevated truck loading/unloading docks. Building 723 will remain as part of potential re-development of the site. As shown on **Figure 4-17**, this building is in functional areas 2 and 3 where the depth to the water table is approximately 5 ft bgs. The building has an elevated slab that is about 4 ft above the surrounding ground surface. The building would have perimeter foundation walls and footings that would be below the frost line and may extend into the saturated zone, separating the soil under the elevated slab and within the building perimeter from unsaturated soil surrounding the building. With soil under the slab separated from surrounding soil by foundation walls, the extent of the remedial action is not determined by site-wide compliance averaging.

Soil samples collected from below the elevated concrete slab to the top of the water table show that there are no VOC or SVOC exceedances of the SSIGWSRS (see **Figures 4-11** and **4-12**). No remedial action for impact to groundwater is required under Building 723.

## Buildings 720 to 722

Building 720 is the former Main Process Building. Building 721 is the drumming building, where materials manufactured in Building 720 were drummed and sealed for storage in Building 723. Building 722 was the raw material storage building. Buildings 720 to 722 have elevated truck loading/unloading docks and slabs. The above slab portion of these buildings will be demolished before the remedial action. Construction of these buildings is similar to Building No. 723, with elevated concrete slabs for the truck loading/unloading docks and perimeter foundation walls. Because soil under the elevated slab is approximately four feet higher than the surrounding ground surface and unsaturated soil is separated by foundation walls, the extent of the remedial action under these buildings is not to be determined by site-wide compliance averaging.

Soil samples collected from immediately under the elevated slab showed there are VOC and SVOC exceedances of the SSIGWSRS within Building 720 and the southern portions of Buildings 721 and 722 (see **Figures 4-11** and **4-12**). The remedial action for soil below Buildings 720-722 is discussed in **Section 7.3.4.**

## Main Tank Truck Loading Building

The main tank truck loading building is in functional areas 4 and 5 where the depth to the water table is 3 to 4 ft bgs. Below grade pits in the central portion of the building occupy the unsaturated zone and no soil is present. The perimeter foundation walls and footings would extend below the frost line into the saturated zone, physically separating unsaturated soil from outside the building from soil within the building and the extent of the remedial action will not be determined by site-wide compliance averaging.

During the RI, samples were not collected from within this building because of overhead obstructions. Additional sampling will be completed after building and concrete slab demolition and remedial action of soil below this building is discussed in **Section 7.3.4.**

EHS Support LLC

23

ASHL-FED-0000106515
ALCD-PUBCOM_0001942

Remedial Action Workplan
Former Ashland Hercules Water Technologies (AHWT) Site
Soil Delineation and Extent of Remedial Action



**AST Area Containments**

The concrete containments around the ASTs located along the southern property boundary consist of a concrete slab and perimeter retaining wall. Soil borings SB-72 to SB-79 documented that the thicknesses of the concrete slabs were between 18 and 24 inches thick, occupying much of the unsaturated zone. Analysis of soil samples collected below the slabs showed there are exceedances of SSIGWSRS and the entire area of the containments will be remediated. For this reason, the area of the AST containments was excluded from site-wide compliance averaging; the remedial action for soil below the containments is discussed in **Section 7.3.4**.

4.2.2.4   VOCs

VOCs do not require remedial action for the impact to groundwater pathway if attainment of the SSIGWSRS can be demonstrated by compliance averaging. The following VOCs exceed the SSIGWSRS and the need for remedial action outside the excluded areas was evaluated by spatially weighted averages in each functional area:
- 1,1-dichloroethane
- 1,1-dichloroethene
- 1,2,4-trichlorobenzene
- 1,2-dichloroethane
- 1,4-dichlorobenzene
- Benzene
- Chlorobenzene
- Chloroform
- cis-1,2-dichloroethene
- Tetrachloroethylene
- Trans-1,2-dichloroethene
- Trichloroethylene
- Vinyl chloride

The results of compliance averaging are presented in **Appendix D**, which contains a description of the approach, figures showing the Thiessen polygons that require remediation for each VOC, functional areas, and the spatially weighted average calculations.

The overall extent of the remedial action for VOCs based on site-wide compliance averaging is shown on **Figure 4-17**. The overall extent of remedial action is driven by three VOCs: benzene, TCE and PCE. While the other VOCs require remedial action, their extent is within the horizontal extent of these three COCs and will be remediated as a result of the overlap. The following VOCs require remedial action:
- 1,1-dichloroethane
- 1,1-dichloroethene
- 1,2,4-trichlorobenzene
- 1,2-dichloroethane
- 1,4-dichlorobenzene
- Benzene
- Chlorobenzene
- Chloroform

EHS Support LLC

24

Remedial Action Workplan
Former Ashland Hercules Water Technologies (AHWT) Site
Soil Delineation and Extent of Remedial Action



- cis-1,2-dichloroethene
- Tetrachloroethylene
- Trichloroethylene
- Vinyl chloride

### 4.2.2.5    SVOCs

SVOCs do not require remedial action for the impact to groundwater pathway if attainment of the SSIGWSRS can be demonstrated by compliance averaging. The following SVOCs exceeded the SSIGWSRS and the need for remedial action outside the excluded areas was evaluated by spatially weighted averages in each functional area:
- Phenol
- Isophorone

The results of compliance averaging are presented in **Appendix D**, which contains a description of the approach, figures showing the Thiessen polygons that require remediation for each SVOC, functional areas, and the spatially weighted average calculations.

The overall extent of the remedial action for SVOCs is shown on **Figure 4-18**. Compared to VOCs, the extent of remedial action covers a much smaller area and is within the overall extent of the remedial action for VOCs. The following SVOCs require remedial action:
- Phenol
- Isophorone

### 4.2.2.6    Total PCBs

Total PCBs exceed the SSIGWSRS in Block 282 at two locations (see **Figure 4-19**) within functional area 1. **Figure 4-19** shows the five sample locations and the calculation of the arithmetic mean of 0.2 mg/kg, which meets the SSIGWSRS of 0.2 mg/kg.  Note that while SB-93 was used in the delineation extent it was not included in the arithmetic mean calculation as it falls outside of the 100-foot functional area. No remedial action for total PCBs is required.

## 4.3    Extent of Soil Remedial Action

This section presents the overall extent of the soil remedial action for the direct contact and impact to groundwater pathways. This is a necessary step in preparing the RAW because the remedies for the two pathways may be different. The overall extent of the remedial action for direct contact considers the delineation to the applicable direct contact soil remediation standards in both historic fill and soil impacted by site COCs, delineation of EPH to SRCs, and the results of compliance averaging for lead and benzo(a)pyrene in Block 282. The overall extent of the remedial action for impact to groundwater considers the results of compliance averaging for VOCs, SVOCs and total PCBs. For the building areas excluded from compliance averaging, which includes soil under buildings 720 to 723, the Main Truck Loading Building, and the AST containments, a remedial action is required because there are exceedances of applicable remediation standards; the extent and approach in these areas is presented in **Section 7.3.4**.

EHS Support LLC

25

ASHL-FED-0000106517
ALCD-PUBCOM_0001944

Remedial Action Workplan
Former Ashland Hercules Water Technologies (AHWT) Site
Soil Delineation and Extent of Remedial Action



### 4.3.1  Extent of Remedial Action for Direct Contact

**Figure 4-20** shows the overall horizontal extent of the remedial action for the direct contact pathway. The extent within each area of the site is discussed below.

Within Block 282, remedial action is required in approximately 24,000 square ft, with 4,778 square ft for lead in the surface interval from 0-2 ft bgs and approximately 20,000 square ft for lead and benzo(a)pyrene in the subsurface interval from 2 to 9 ft bgs. Because the extent was determined by spatially weighted averages, the extent shown will be the final extent unless additional laboratory data is obtained and the spatially weighted averages are re-evaluated.

Within Block 283 and the leased portion of Block 280, remedial action is required over approximately 140,000 square ft, with the overall extent determined by NRDCSRS exceedances in historic fill. Within the leased portion of Block 280, arsenic or lead associated with historic fill exceeded the NRDCSRS in two subsurface samples, SB37-A10 and SB35R-A10. At adjacent sample locations, arsenic or lead did not exceed the NRDCSRS in surface soil samples, collected from between 0 to 2 ft bgs, and the extent of the remedial action in the leased portion of Block 280 is only in subsurface soil.

As shown on **Figure 4-9**, to the east of the leased portion of Block 280, VOCs exceed the RDCSRS at sample locations SB219-P a depth of 19.5 to 20 ft bgs, SB-222 at a depth of 12.5 to 13 ft bgs, and SB-217 at depths of 12.5 to 13 ft bgs and 14.5 to 15 ft bgs. These samples were collected from the saturated zone. As required by the N.J.A.C 7:26E, the exceedances were delineated to the RDCSRS and the proposed remedial action is discussed in **Section 7.3.2**.

### 4.3.2  Extent of Remedial Action for Impact to Groundwater

**Figure 4-21** shows the overall horizontal extent of the remedial action for the impact to groundwater pathway, which is driven by VOCs. Remedial action is required off-site in portions of Boylan Avenue and Block 279, Lot 30. Much of the area in Block 283 is currently covered by buildings, concrete slabs and asphalt pavement.

ASHL-FED-0000106518
ALCD-PUBCOM_0001945

Remedial Action Workplan
Former Ashland Hercules Water Technologies (AHWT) Site
Groundwater Delineation and Extent of Remedial Action



# 5    Groundwater Delineation and Extent of Remedial Action

**Section 5** summarizes the horizontal and vertical delineation of COCs in groundwater compared to the GWQS, evaluates plume stability, and identifies predominant COC mass reduction mechanisms.

Groundwater sampling activities were conducted from 2009 to 2018 as part of remedial investigation and remedial action pre-design investigation activities and were performed by a New Jersey-certified laboratory during the multiple investigation phases (URS Corporation 2009-2012, Antea Group 2015, Arcadis 2016, EHS Support 2017-2018) as reported in the 2017 RIR (EHS Support, 2017) and **Appendix A**.

## 5.1    Groundwater Monitoring Network

A total of 20 monitoring wells comprise the monitoring network, as summarized below:
- 13 Shallow Zone (0 to 20 ft bgs) monitoring wells: MW-1, MW-2, MW-3, MW-4, MW-5, MW-6, MW-7, MW-8, MW-9, MW-10, MW-11, MW-12, MW-13.
- Four Intermediate Zone (25 ft to 40 ft bgs) monitoring wells: MW-7B, MW-12B, MW-13B, and MW-14B.
- Three Deep Zone (below 40 ft bgs) monitoring wells: MW-1B, MW-3B, and MW-10B.

A monitoring well location map is provided as **Figure 5-1**. Well construction details and soil boring/well construction logs for newly installed wells are included in **Table 5-1** and **Appendix A**, respectively.

In November 2009, four monitoring wells were initially installed to evaluate groundwater conditions at the suspected upgradient (MW-1 and MW-2), downgradient (MW-4), and highest known soil impacted area (MW-3). A summary of monitoring well installation activities and sampling completed in November/December 2009 was discussed in the December 21, 2009 Semi-Annual Remediation Status Report (URS, 2009c).

In July 2010, five shallow monitoring wells (MW-5 to MW-9) were installed around the Site periphery to characterize groundwater conditions including evaluation of groundwater gradients and flow direction. A summary of groundwater investigation activities completed in 2010 was presented in the December 29, 2010 Semi-Annual Remediation Status Report (URS, 2010).

Six monitoring wells (MW-1B, MW-3B, MW-7B, MW-10, MW-10B, and MW-11) were installed in February and August 2015 by Bucks County Well Drilling of Washington Crossing, Pennsylvania and Summit Drilling of Bridgewater, New Jersey in accordance with the N.J.A.C. 7:9D *Well Construction and Maintenance; Sealing of Abandoned Wells*, April, 2, 2007 as Category 3 Resource Evaluation Wells using conventional well drilling methods (i.e., hollow stem auger and rotosonic) (N.J.A.C., 2007). Shallow Zone monitoring wells MW-10 and MW-11 were installed west and south of Building 723, respectively. Monitoring well MW-11 was installed in the location of former production Building 713. Intermediate and Deep Zone monitoring wells MW-1B, MW-3B, MW-7B, and MW-10B were installed adjacent to existing shallow monitoring wells to evaluate the vertical distribution of COCs within the shallow unconfined groundwater system.

ASHL-FED-0000106519
ALCD-PUBCOM_0001946

Remedial Action Workplan
Former Ashland Hercules Water Technologies (AHWT) Site
Groundwater Delineation and Extent of Remedial Action



Five monitoring wells (MW-12, MW-12B, MW-13, MW-13B, and MW-14B) were installed in December 2017 by Summit Drilling. Two monitoring wells (MW-13 and MW-13B) were installed south of the Site, on the RLR Trucking property located at 50 Harrison Avenue, Kearny, New Jersey (Block 279, Lot 30). Three monitoring wells (MW-12, MW-12B and MW-14B), were installed on-site. Note that MW-14B (originally intended to be installed off-site) was installed as an intermediate well near MW-3 and MW-3B in the vicinity of AOC-C16. MW-12 was installed in the Shallow Zone and MW-12B and MW-14B were installed in the Intermediate Zone of the shallow unconfined groundwater system.

## 5.2  Hydrogeologic Framework

Groundwater within the Shallow, Intermediate, and Deep Zones behave as a single aquifer unit under water table conditions bounded below by lacustrine basal clay. Flow at the Site is predominantly to the north/northeast with groundwater from the Shallow, Intermediate, and Deep Zones discharging into the Harrison Street utility corridor and Frank's Creek to the east, as shown on **Figures 5-2** and **5-3** (note that potentiometric surfaces are provided for the December 2017 sampling event as that was the most recent comprehensive event, due to access restrictions with off-site monitoring wells). Vertical groundwater movement between the zones is fairly limited across the Site with upward hydraulic gradients observed as groundwater approaches the utility corridor at the MW-1/1B and MW-7/7B well pairs as shown in the cross-sections provided as **Figure 5-4** through **5-6** (also discussed in **Appendix A** and **Section 7.4**). The predominantly neutral to upward hydraulic gradients observed at the Site limit downward dissolved-phase COC transport through advective processes.

Due to the sorptive capacity of the peat, the impacts to groundwater from historical surface and near-surface Site releases and ongoing COC flux from shallow Site soils are inherently limited to back diffusion processes. Aside from COC flux within the saturated zone from the potential residual source area (**Section 5.4.1**), groundwater COC concentrations are expected to be stable or declining as a function of historical Site impacts.

## 5.3  Historical Remedial Investigation Groundwater Monitoring

The following discussion summarizes the groundwater data collected from 2009 to 2016 and reported in the RIR (EHS Support, 2017).

### 5.3.1  Geochemical Indicator Parameters

Water quality indicator parameters in the Shallow Zone and Intermediate/Deep Zone indicate that pH levels are relatively neutral and conductivity measurements are generally indicative of fresh to slightly brackish water (approximately 0.5 to 1.9 milliSiemens per centimeter [mS/cm]) at the Site. Dissolved oxygen (DO) and oxidation reduction potential (ORP) measurements indicate groundwater is in anaerobic state (low DO and negative ORP values).

### 5.3.2  Groundwater COCs

Exceedances of GWQS by constituent group (i.e., VOCs, SVOCs, and metals) are shown on **Figure 5-7** through **Figure 5-9**, respectively, and tabulated in **Appendix B**. As shown on **Figure 5-7** through **Figure 5-**

ASHL-FED-0000106520
ALCD-PUBCOM_0001947

Remedial Action Workplan
Former Ashland Hercules Water Technologies (AHWT) Site
Groundwater Delineation and Extent of Remedial Action



**9**, the COCs identified above GWQS in one or more wells and sampling events are listed below. For the purpose of completeness, historic fill COCs (PAHs and metals) are listed.

VOCs (**Figure 5-7**):
- Aromatic hydrocarbons: benzene and toluene
- Chloroethenes: PCE; TCE; 1,1-DCE; cis-1,2-DCE; trans-1,2-Dichloroethene; and VC
- Chloroethanes: CA
- Chlorobenzenes: 1,2,4-TCB; 1,4-DCB; and CB
- 1,4-dioxane

SVOCs (**Figure 5-8**):
- Benzo[a]anthracene
- Benzo[a]pyrene
- Benzo[b]fluoranthene
- Hexachlorobenzene
- 2-methylnapthalene
- Naphthalene
- Pentachlorophenol

Metals (**Figure 5-9**):
- Aluminum
- Antimony
- Arsenic
- Iron
- Lead
- Manganese
- Sodium

## 5.3.2.1 Volatile Organic Compounds

As shown on **Figure 5-7**, the chloroethenes and chlorobenzenes groups of constituents are the most widespread COCs within groundwater and are present at the highest concentrations in Shallow and Intermediate/Deep Zone wells. One or more chloroethenes were detected above GWQS at all Site wells during at least one monitoring event. One or more chlorobenzenes were detected above GWQS at nine Site wells during at least one monitoring event (and excluded MW-4, MW-6, MW-8, MW-10, MW-1B).

Benzene and toluene were generally detected at low levels below GWQS with the notable exceptions of Shallow Zone wells MW-3 and MW-5 and Intermediate/Deep Zone wells MW-3B, MW-7B, and MW-10B where either one or both COCs were detected an order of magnitude or more above the respective GWQS. Chloroethane was detected at a much lower frequency and generally at concentrations near detection limits. Given the stringent screening level, 1,4-dioxane was detected above GWQS at all Site wells during at least one monitoring event with the exception of wells MW-1, MW-6 and MW-8.

A broad range of VOC tentatively identified compounds (TICs) were also identified in groundwater at the Site. The VOC TIC concentrations ranging from non-detect (MW-6, MW-8, and MW-9) to total VOC TIC

EHS Support LLC

29

ASHL-FED-0000106521
ALCD-PUBCOM_0001948

Remedial Action Workplan
Former Ashland Hercules Water Technologies (AHWT) Site
Groundwater Delineation and Extent of Remedial Action



concentrations of 39,170 micrograms per Liter (µg/L) (MW-3). The highest TICs concentrations are coincident with the highest chloroethene and chlorobenzene concentrations.

### 5.3.2.2   Semi-Volatile Organic Compounds

As shown on **Figure 5-8**, SVOCs were present at low concentrations near detection limits intermittently in Shallow Zone wells only. With the exception of pentachlorophenol (PCP), SVOCs are attributed to the surficial placement of the historic fill. Limited detections of PCP, a commonly used biocide/fungicide, were observed once in monitoring wells MW-2, MW-4, and MW-5 above GWQS during separate sampling events completed between 2009 and 2016. These impacts appear to be highly localized with concentrations ranging from non-detect to 1.7 µg/L above the GWQS of 0.3 µg/L. SVOCs were not detected in Intermediate/Deep Zone wells.

SVOC TICs were identified in all groundwater samples with the greatest concentrations of SVOC TICs identified in MW-3 (19,425 µg/L) and MW-3B (11,319 µg/L). These concentrations are generally one to two orders of magnitude greater than other Site monitoring wells.

### 5.3.2.3   Total Petroleum Hydrocarbons

Monitoring wells were also analyzed for petroleum hydrocarbons diesel range organics (DRO) and gasoline range organics (GRO) during the initial sampling events (MW-1 through MW-4 in 2009, MW-5 through MW-9 in 2010). The highest GRO concentrations were reported in monitoring well MW-3 (10,000 µg/L), MW-4 (10,000 µg/L), MW-5 (1,800 µg/L), and MW-7 (4,900 µg/L). The highest DRO concentrations were reported in monitoring wells MW-3 (1.0 milligram per liter [mg/L]), MW-4 (1 mg/L), MW-5 (5.1 mg/L) and MW-7 (7.2 mg/L). No published criteria for petroleum hydrocarbons are available. DRO and GRO concentrations are presented in **Appendix B**.

### 5.3.3   Nature and Extent of Groundwater Impacts

Based on the data presented in the RIR (EHS Support, 2017) and summarized above, the key COCs/groups detected above GWQS are considered:
- Aromatic hydrocarbons: benzene
- Chloroethenes: PCE, TCE, cis-1,2-DCE, and VC
- Chlorobenzenes: 1,2,4-TCB, 1,4-DCB, and CB
- 1,4-dioxane

All other detected constituents are not perceived to drive remedial decision-making based on one of the following criteria:
- Attributed to historic fill
- Present in low concentrations within discrete wells
- Present at lower concentrations or less frequently detected in areas already impacted by the key COCs identified above

To further evaluate the nature and extent of the key COC groups identified above, isoconcentration maps were developed in the RIR (EHS Support, 2017) using the November 2016 data for each key COC for Shallow and Intermediate/Deep Zone wells exceeding the GWQS. Soil concentrations exceeding

EHS Support LLC                                                                                                    30

Remedial Action Workplan
Former Ashland Hercules Water Technologies (AHWT) Site
Groundwater Delineation and Extent of Remedial Action



IGWSSLs were also evaluated to develop the isoconcentration maps. The isoconcentration maps are provided in the RIR (EHS Support, 2017).

### 5.3.3.1    Shallow Zone

The distribution of key COCs within Shallow Zone groundwater is predominantly focused in two areas of the Site: Block 282 and the southeast portion of Block 283 with limited impacts in the western portion of Block 283. While the upgradient extent could not be defined during the remedial investigation due to access limitations, both the Block 282 and 283 plume areas are bounded laterally (by either clean wells or discharge boundaries) and the downgradient extent is defined by the discharge boundaries of the Harrison Avenue utility corridor to the north and Frank's Creek to the northeast.

The plume footprints for the chloroethene and chlorobenzene groups exhibit the same general signature: daughter product plumes (cis-1,2-DCE/VC and 1,4-DCB/CB) are larger than the parent product plumes (PCE/TCE and 1,2,4-TCB) consistent with the higher solubility and solute transport velocities of the daughter products. The relatively small (and low concentration) parent product plumes also provide an indication that the plumes are mature and natural degradation is depleting parent products. Further, the low-strength parent product plumes support the conceptualization that potential ongoing COC flux from Site soils is minimal and limited to discrete areas. Similarly, the absence of high concentrations of parent products at upgradient well MW-3 indicates that contamination from potential upgradient, off-site sources to the Block 283 area also appears to be limited.

### 5.3.3.2    Intermediate/Deep Zone

The isoconcentration maps for the Intermediate/Deep Zone exhibit similar constituent distribution to the Shallow Zone with chloroethene COCs focused in both Block 282 and the eastern portion of Block 283 and the other key COCs predominantly limited to the eastern portion of Block 283. Off-site, upgradient sources also appear to affect groundwater quality in the Deep Zone considering the magnitude of concentrations of chloroethene at near-upgradient boundary well MW-3B and the absence of similar concentrations at MW-3 and downward vertical gradients to drive contamination from shallow, Site-related soil impacts into the Intermediate/Deep Zone. The Intermediate/Deep Zone plumes are bounded by the same features as the Shallow Zone wells with downgradient discharge into the Harrison Avenue utility corridor and Frank's Creek. The Deep Zone is bounded vertically by the lacustrine basal clay, which acts as a relatively impermeable boundary.

Consistent with the Shallow Zone distribution for the chloroethene and chlorobenzene groups, daughter product plumes within the Intermediate/Deep Zone have broader footprints than parent product plumes. All chlorobenzenes exhibit lower concentrations at MW-3B than MW-3 and may indicate that the potential source(s) of chlorobenzenes in the Deep Zone is depleting while the potential source(s) of chloroethenes persist. Further discussion is provided in the PDI Report (**Appendix A**).

Of particular interest to the distribution of COCs in the Intermediate/Deep Zone on-site, is the increase in all chloroethenes concentrations at MW-7B compared to upgradient well MW-3B. The increase in concentrations are perceived to be a result of horizontal chloroethene COC migration from the AOC-C16 area where PCE was identified at SB-123D in soil at concentrations indicative of a potential residual source area at the same elevation as the MW-7B screen interval. The relatively high daughter product concentrations compared to parent product concentrations at MW-7B suggests that robust

EHS Support LLC                                                                                             31

ASHL-FED-0000106523
ALCD-PUBCOM_0001950

Remedial Action Workplan
Former Ashland Hercules Water Technologies (AHWT) Site
Groundwater Delineation and Extent of Remedial Action



dechlorination is occurring and the rate of natural attenuation of chloroethenes is exceeding the COC flux from the AOC-C16 area. Further discussion of plume stability and mass reductions mechanisms is provided in the following sections as part of the summary of ongoing groundwater investigation activities completed following the remedial investigation as part of pre-remedial design.

## 5.4    Recent    Remedial    Action    Pre-Design    Investigation    and    Groundwater Monitoring

The following discussion summarizes the groundwater data collected in 2017 and 2018 and associated findings reported in the PDI Report (**Appendix A**) and Assessment of Natural and Enhanced Biological Attenuation of Chlorinated Ethenes and Chlorinated Benzenes report (MNA Report; **Appendix E**), respectively.

### 5.4.1  Potential Residual Sources in Groundwater

The potential presence of residual sources identified in the AOC-C16 area during remedial investigation activities (**Section 5.3**) was assessed in the PDI Report (**Appendix A**) using the following lines of evidence approach consistent with NJDEP Site Remedial Program Groundwater Technical Guidance (NJDEP, 2012b) and other relevant guidance documents cited therein. It is noted that no residual sources have been directly observed to date; the lines of evidence approach is:

- Groundwater analytical data greater than 1 percent of effective water solubility for parent compounds PCE and 1,2,4-TCB
- Soil analytical data compared to default soil saturation (cSat) values (NJDEP, http://www.nj.gov/dep/srp/guidance/rs/chemproperties.pdf)

The PDI Report (**Appendix A**) concluded that these indirect lines of evidence indicate that Site conditions exist for the potential presence of residual sources that are not mobile, migrating, or recoverable and are naturally depleting. These conditions predominantly exist near or below the 30 feet horizon, with further downward migration impeded by the finer-grained soils present at depth. The lines of evidence indicate that the MW-3 area may be a potential historical residual source area, although other potential residual sources may be present given the different chemical signatures observed at depth compared to shallower zones in the MW-3 area. Based on these lines of evidence, the potential extent of residual sources is depicted in plan view on and cross-section view in **Appendix A** and discussed further in **Section 7.4**.

### 5.4.2  Key Groundwater COCs

Consistent with the groundwater data presented in the RIR, the key COCs/groups detected above GWQS during the 2017 and 2018 events are:

- Aromatic hydrocarbons: benzene
- Chloroethenes: PCE; TCE; cis-1,2-DCE; and VC
- Chlorobenzenes: 1,2,4-TCB; 1,4-DCB; and chlorobenzene
- 1,4-dioxane

ASHL-FED-0000106524
ALCD-PUBCOM_0001951

Remedial Action Workplan
Former Ashland Hercules Water Technologies (AHWT) Site
Groundwater Delineation and Extent of Remedial Action



The following provides a summary of the December 2017 and March 2018 groundwater sampling event data (tabulated in **Appendix B**) in the context of the plume stability and natural degradation discussion presented in the RIR:

- Overall, COC concentrations in existing wells continue to exhibit stable or declining concentrations.
- Daughter products for the chloroethene and chlorobenzene groups in existing wells continue to be more widespread and present at greater concentrations than associated parent products.
- Shallow Zone wells MW-3 and MW-12 exhibit relatively low concentrations in comparison to co-located Intermediate Zone wells MW-14B and MW-12B, further supporting the conclusion presented in the RIR that vertical COC flux from shallow soils is not significantly contributing to concentrations of COCs in groundwater at the Site.
- Intermediate Zone wells MW-12B and MW-14B exhibit higher concentrations and greater proportions of parent products than all other wells installed to date. COC concentrations at these wells are attributed to the proximity to potential residual sources.
- Deep Zone well MW-3B exhibits relatively low COC concentrations in comparison to co-located Intermediate well MW-14B, further supporting the conclusion that the vertical extent of potential residual sources is limited within the fine-grained lacustrine deposits.
- Off-site upgradient wells MW-13 and MW-13B exhibit lower concentrations than downgradient on-site wells (MW-3 and MW-14B) and exhibit greater proportions of chloroethene parent products compared to daughter products. The low magnitude of concentrations and parent-daughter chloroethene proportions are suggestive of an off-site, upgradient low-strength back-diffusion source.

Overall, groundwater data collected during remedial action pre-design activities verified the findings presented in the RIR (EHS Support, 2017) and provided better resolution of the potential residual source area discussed further in **Section 5.6** and **Appendix A**.

## 5.5   Groundwater Fate and Transport

### 5.5.1   Parent and Daughter Products

Knowledge of the operational history of the Site indicates that the primary sources of COC releases have been either removed or decommissioned (e.g., tank closures, Site upgrades, and eventual decommissioning in 2010) which is consistent with the stable and/or declining groundwater concentrations observed over time.

The spatial distribution of parent and daughter products indicates that the plumes are mature, continuing on-site sources to groundwater are limited, and the rate of degradation of parent products is greater than the rate of mass flux due to back diffusion (from COCs remaining adsorbed to or trapped within the finer-grained soils) and/or partitioning from potential residual sources present predominantly at depth within the Intermediate Zone.

To further evaluate the natural attenuation processes associated with the chloroethene and chlorobenzene constituent groups, pie charts were prepared in the PDI Report (**Appendix A**) to illustrate the relative proportions of parent to daughter products for the chlorobenzene and chloroethene constituent groups. The resulting pie charts provide a visual tool for assessing the degree of degradation

EHS Support LLC                                                                                          33

ASHL-FED-0000106525
ALCD-PUBCOM_0001952

Remedial Action Workplan
Former Ashland Hercules Water Technologies (AHWT) Site
Groundwater Delineation and Extent of Remedial Action



on a well-by-well basis for each constituent group based on the proportions of parent products (PCE/TCE and trichlorobenzene [TCB] isomers), intermediate daughter products (dichloroethene [DCE] and dichlorobenzene [DCB] isomers), and least chlorinated daughter products (VC and chlorobenzene). When the pie charts are displayed in plan and cross-section views along with the magnitude of concentrations between wells (**Appendix A**) they enable a Site-wide evaluation of potential COC sources and degradation processes within groundwater.

Consistent with the evaluation of the chloroethenes and chlorobenzenes discussed in the RIR (EHS Support, 2017) and summarized in **Section 5.3.3**, the pie charts for the Shallow Zone clearly depict the two discrete groundwater areas of interest in Block 282 and the eastern portion of Block 283 (**Appendix A**). The pie charts show that the Block 282 plume (MW-9 and MW-1) is dominated by moderate concentrations of PCE/TCE with limited generation of daughter products and low concentrations of DCBs (below GWQS) indicative of a low-strength source (potentially back diffusion of these COCs from fine-grained soil horizons). The pie charts for the eastern portion of Block 283 further support the discussion in the RIR (EHS Support, 2017) that the sources of both chloroethenes and chlorobenzenes are being depleted.

As shown on the pie charts for MW-3 (**Appendix A**), the chloroethenes and chlorobenzenes signatures are daughter-product dominated. The dominance of daughter products is also evident at downgradient wells MW-5, MW-7, and MW-12 further indicating that potential residual sources and back-diffusion areas within the Shallow Zone are being depleted. Higher concentrations at MW-7 compared to upgradient wells MW-12 and MW-5 likely reflect both the absence of residual sources within shallow soils in these areas and the contributions of dissolved-phase COCs from deeper intervals (given upward flow toward the utility corridor in the MW-7 area). The pie charts for MW-13 further indicate that upgradient off-site sources of COCs are depleting given the dominance of daughter products and low magnitude of concentrations; therefore, mass flux from upgradient is expected to diminish over time.

The pie charts for Intermediate Zone wells MW-12B and MW-14B (**Appendix A**) support the findings of the potential residual sources assessment that these wells are located proximal to potential residual sources given the dominant PCE/TCE and 1,2,4-TCB fractions and magnitude of concentrations. Consistent with the behavior observed in the Shallow Zone, MW-7B is depleted in parent products indicating that reductive dechlorination is occurring. Similarly, the pie charts for MW-13B indicate that upgradient off-site sources of COCs are depleting given the dominance of daughter products and low magnitude of concentrations.

Deep Zone well MW-3B (**Appendix A**) is also daughter-product dominated and supports the findings of the potential residual sources evaluation that while limited residual source material may have migrated within the fine-grained lacustrine deposits at depths greater than 30 ft, it is limited in extent, and the residual sources are nearly degraded (dominated by daughter products).

Overall, the pie charts illustrate that despite the presence of back-diffusion and potential residual sources, natural degradation mechanisms are robust enough to almost completely naturally dechlorinate parent products to daughter products by the time groundwater reaches the utility corridor. Therefore, assuming biogeochemical conditions remain favorable for continued natural mass reduction, groundwater concentrations are expected to decrease over time.

EHS Support LLC

ASHL-FED-0000106526
ALCD-PUBCOM_0001953

Remedial Action Workplan
Former Ashland Hercules Water Technologies (AHWT) Site
Groundwater Delineation and Extent of Remedial Action



## 5.5.2  Intrinsic Natural Degradation Mechanisms

The MNA Report (**Appendix E**) was developed to further assess natural degradation processes at the site. The MNA Report considers site analytical results through March 2018 to assess the degree of protective natural attenuation of chloroethenes and chlorobenzenes at the site in a manner consistent with the provisions of NJDEP Site Remediation Program's Monitored Natural Attenuation Technical Guidance (MNA Guidance) dated March 1, 2012 (NJDEP, 2012c). In addition, the MNA Report evaluates the prospect for enhancing microbiological (biotic) natural remediation of chloroethenes and chlorobenzenes at the site through further plume and/or potential residual source control measures.

Consistent with the NJDEP MNA Guidance (NJDEP, 2012c), the following requisite lines of evidence were evaluated to assess the degree of protective natural attenuation of chloroethenes and chlorobenzenes:

- Primary Line of Evidence – Evaluation of Plume Characteristics:
  - Calculation of intrinsic point attenuation (aka degradation) rates for chloroethenes and chlorobenzenes (parent compounds and major degradation daughter compounds) to assess temporal trends and stability at each well.
  - Calculation of intrinsic bulk attenuation (aka degradation) rates for chloroethenes and chlorobenzenes (parent compounds and major degradation daughter compounds) to assess spatial trends and overall plume stability.
  - Degradation of parent PCE and 1,2,4-TCB to daughter chlorinated compounds and non-toxic end products.
- Secondary Line of Evidence – Geochemical Conditions:
  - Terminal Electron Acceptors (TEAs)
  - Electron donors
  - Redox conditions
  - Field-measured analytes
  - Degradation by-products

The MNA Report determined that multiple lines of evidence indicate that meaningful natural remediation of chloroethenes and chlorobenzenes occur in Shallow and Intermediate/Deep Zones at the site. Based on the strength of the chloroethene and chlorobenzene concentrations and associated biogeochemical conditions, three key areas were identified within the Shallow and Intermediate/Deep Zones:

1. Potential residual source area
2. Downgradient of potential residual source area
3. All other site areas

Within and downgradient of the potential residual source area, parent compound concentrations are stable or decreasing. The presence of non-toxic by-products provides proof that complete dechlorination of parent compounds is occurring through a combination of biotic and abiotic mechanisms. Iron reduction appears to be the prevailing redox condition, which enables hydrogen producing fermentation of naturally-occurring carbon that further enables biological reductive dechlorination of dissolved chloroethenes and chlorobenzenes. Given the abundant supply of essential iron and fermentable organic carbon from the aquifer matrix, anthropogenic carbon sources (e.g., biogenic benzene and toluene from chlorobenzenes degradation), and dead microbial cell mass, it is

EHS Support LLC                                                                                                           35

ASHL-FED-0000106527
ALCD-PUBCOM_0001954

Remedial Action Workplan
Former Ashland Hercules Water Technologies (AHWT) Site
Groundwater Delineation and Extent of Remedial Action



reasonable to assume that ongoing degradation of chloroethenes and chlorobenzenes will continue to occur indefinitely.

However, despite the occurrence of meaningful amounts of natural remediation within and downgradient of the potential residual source area, bulk degradation rates indicate that natural mechanisms are insufficient to naturally achieve GWQS for all chloroethenes and chlorobenzenes in the short term. The natural detoxification rate limiting step within the potential residual source area appears to be the transformation of parent compounds to daughter compounds. The natural remediation rate limiting steps downgradient of the potential residual source area appear to be transformation of chlorinated daughter compounds to non-toxic end products. This type of rate behavior suggests that the primary geochemical parameter that limits the site's capacity to naturally remediate PCE and 1,2,4-TCB to non-toxic endpoints is the site's natural electron donor supply (as evidenced by the dissolved organic carbon concentrations and ORP readings). In addition, given the presence of potential residual sources of parent product dissolution to groundwater, reduction in source mass is essential to reducing long-term COC flux. Further discussion on potential enhancements to the natural system to increase degradation rates thereby increasing the rate of potential residual source depletion is provided in **Section 7.4**.

Within all other areas of the site, parent and daughter compound concentrations are stable or decreasing indicating that natural mechanisms are sufficient to reduce chloroethene and chlorobenzene concentrations (for both parent and daughter compounds) to below GWQS in the short term. In most cases, parent and daughter concentrations are already near or below GWQS. Consistent with the geochemistry observed within and downgradient of the potential residual source area, conditions appear conducive to ongoing natural remediation of chloroethenes and chlorobenzenes as evidenced by the presence of non-toxic end products. Therefore, for all other areas beyond and downgradient of the potential residual source area, MNA is reasonably assumed to serve as an effective remedy. Further discussion on remedial considerations for the areas beyond and downgradient of the potential residual source are provided in **Section 7.4**.

## 5.6   Extent of Remedial Action for Groundwater

The spatial distribution of COC data supports the assertion that the various COC plumes are well defined and natural degradation processes are contributing to mass reduction. The groundwater analytical results provide convincing primary and secondary lines of evidence of natural degradation, but additional synergistic enhancements would be required to meet GWQS at all Site wells in a reasonable timeframe (defined herein as 30 years or less) and eliminate potential future risks associated with groundwater (at the Site and within the utility corridor) and surface water exposure (in Frank's Creek).

Therefore, active remedial action is necessary in the potential residual source area and downgradient areas. Within all other areas (away from the potential residual source area) conditions already are conducive to a protective MNA remedy without further active remedial action. The horizontal extent of the potential residual source area is shown in plan view on **Figure 5-4** and cross-section views on **Figure 5-5** and **Figure 5-6**, respectively. The potential residual source area is approximately 150 ft in width and elongated downgradient from the southern property boundary approximately 200 ft to the north. The predominant vertical extent of remedial action for groundwater is approximately 20 – 55 ft bgs.

EHS Support LLC                                                                                               36

ASHL-FED-0000106528
ALCD-PUBCOM_0001955

Remedial Action Workplan
Former Ashland Hercules Water Technologies (AHWT) Site
Groundwater Delineation and Extent of Remedial Action



ASHL-FED-0000106529
ALCD-PUBCOM_0001956

Remedial Action Workplan
Former Ashland Hercules Water Technologies (AHWT) Site
Conceptual Site Model



# 6    Conceptual Site Model

The CSM is a composited narrative of the information presented in the 2017 RIR (EHS Support, 2017), the 2018 PDI (**Attachment A**), the MNA Report (**Appendix E**), and this RAW with supporting information provided in tables, figures, and appendices. The CSM summarizes the site background and investigation history, physical setting, potential sources of contamination, current COCs, and migration and exposure pathways that could potentially impact human or ecological receptors.

## 6.1    Site Background and Investigation History

The former AHWT Site is comprised of two land parcels occupying approximately 5.2 acres of industrial land in a mixed industrial and commercial setting. The site was engaged in the batch-quality controlled manufacturing (mixing) of specialty chemicals used in marine and general industry from 1981 to 2010. The eastern property at the site (Block 283 and leased portion of Block 280) comprised the plant operations (plant Site). Building decommissioning and demolition is expected to occur in the fourth quarter of 2018. The plant Site is surrounded by an approximately 8-ft high, chain-link fence with locked gates, which serves as an engineering control.

The western property (Block 282) was used for employee parking with a single building used as a sales office and equipment storage (non-Plant Site). Building decommissioning and demolition began on the non-Plant Site in August 2018 and is currently ongoing with expected completion in December 2018. The non-plant Site is bounded by an approximately 4-ft high chain-link fence to the north, which serves as an engineering control. Boylan Avenue is located to the south/southwest of the Site, is not in service, and is currently a drainage ditch. Block 279, Lot 30 is located to the south/southwest of the site and is currently owned by RLR Investments.

The RI phase commenced in 2009 and continued through 2016 with PDI activities completed in 2017 and natural degradation assessment activities completed in 2018 to support the RAW. During the PA and RI, 78 AOCs were identified based on multiple Site configurations over a 100-year operating period (early 1900s to 2010). In most cases, the footprints of historical AOCs and present day AOCs overlap (**Figure 2-5** and **2-6**). This complex history, the small size of the AOCs and their proximity (in many cases abutting) to other AOCs, limited the ability to define the horizontal extent of impacts from individual AOCs. The proposed remedial action combines AOCs that require remediation with the same selected remedial action.

The Site is situated in an urban area approximately 0.5 miles north of the Passaic River in a generally topographically flat region of New Jersey as shown on **Figure 1-1** within a low-lying marsh wetland that was backfilled as part of development activities in the late 1800s/early 1900s. The site does not lie within the 100-year floodplain. The properties surrounding the Site were historically industrial, but are now commercial (Walmart, United States Postal Service, Paramount Transportation [R&L Carriers]), with the exception of Kearny Smelting to the north. Based on the NJDEP 2009 Historic Fill Geographic Information System (GIS) layer and extensive subsurface investigations performed on-site and off-site, the former AHWT Site is located within an area of historic fill (**Figure 2-4**).

EHS Support LLC                                                                                                          38

ASHL-FED-0000106530
ALCD-PUBCOM_0001957

Remedial Action Workplan
Former Ashland Hercules Water Technologies (AHWT) Site
Conceptual Site Model



## 6.2  Physical Setting

The Site and surrounding region are characterized by glacial and postglacial deposits. Landfilling of indigenous material began shortly after permanent European settlement for constructing railroads, industrial facilities, and trash disposal primarily along the Newark and Elizabeth waterfronts (URS, 2009b). Fluvial deposits underlie the historic fill and/or peat and are comprised predominantly of fine sands and silty sands to a depth of approximately 30 ft where the lithology transitions to lacustrine deposits comprised of silt, clay, and sandy silt interbeds with occasional fine to coarse sand zones. The finer-grained soils encountered between 27 ft to 45 ft bgs are important geologic controls for COC distribution. A basal clay layer underlies the lacustrine silts and clays and is encountered between 57 ft to 59.5 ft bgs and characterized as low plasticity clay/silt with minor fractions of sand and gravel.

The key hydrogeologic conclusions presented in the 2017 RIR (EHS Support, 2017) and confirmed in the PDI Report (**Appendix A**) include:

- Site stratigraphy of the shallow unconfined groundwater system is a product of deposition in lacustrine, fluvial, and estuarine environments and placement of historic fill.
- These environments and associated variable depositional and weathering processes have resulted in a complex distribution of fine to coarse-grained materials that are important factors controlling groundwater movement, historical COC migration, and ongoing fate and transport processes. Specifically, the fining downward sequence and the transition from coarser-grained fluvial soils to finer-grained lacustrine soils at depths ranging from approximately 25 to 30 ft bgs is an important geologic control on vertical COC distribution.
- The basal clay identified at approximately 60 ft bgs is an important lower confining unit for the shallow unconfined groundwater system at the Site.
- The presence of the utility corridor and Frank's Creek act as discharge boundaries for groundwater within the shallow unconfined groundwater system.

Based on the depositional setting, the following water-bearing zones within the unconfined shallow aquifer system have been identified:

- Shallow Zone – Shallow fluvial deposits and fill/peat/alluvium interactions (approximately 10-20 ft in depth).
- Intermediate Zone – Upper lacustrine deposits (approximately 30-35 ft in depth).
- Deep Zone – Lower lacustrine deposits (approximately 40-60 ft in depth, near or at the contact with the basal clay).

The monitoring network is comprised of 20 monitoring wells (**Figure 5-1**):

- 13 Shallow Zone (0 to 20 ft bgs) monitoring wells: MW-1, MW-2, MW-3, MW-4, MW-5, MW-6, MW-7, MW-8, MW-9, MW-10, MW-11, MW-12, MW-13.
- 3 Intermediate Zone (25 to 40 ft bgs) monitoring wells: MW-7B, MW-12B, MW-13B, and MW-14B.
- 3 Deep Zone (below 40 ft bgs) monitoring wells: MW-1B, MW-3B, and MW-10B.

Groundwater within the Shallow, Intermediate, and Deep zones behave as a single aquifer unit under water table conditions bounded below by lacustrine basal clay. Groundwater flow at the Site is predominantly to the north/northeast with groundwater from all zones discharging into the Harrison Street utility corridor and Frank's Creek. Vertical groundwater movement between the zones is fairly

ASHL-FED-0000106531
ALCD-PUBCOM_0001958

Remedial Action Workplan
Former Ashland Hercules Water Technologies (AHWT) Site
Conceptual Site Model



limited across the Site with upward hydraulic gradients observed as groundwater approaches the utility corridor as shown in **Figure 5-4** through **5-6**.

Due to the urban setting, direct groundwater recharge from precipitation is limited to surface infiltration within unpaved areas while stormwater from overland flow is directed into municipal stormsewers and discharged to surface water bodies. Based on information available on the Town of Kearny's website (http://kearnynj.org/Sewer), stormsewers in the Site vicinity direct runoff into Frank's Creek. Stormwater on Block 283 was historically managed through a stormwater conveyance system designed with overhead and subsurface piping and a series of mechanical lift stations. Stormwater (and combined process wastewater) was discharged via sanitary sewer to the Passaic Valley Sewer Commission (PVSC) under permit during plant operations. Since Site closure (2010), evaporation is the primary mechanism of stormwater management as the conveyance system is not operable.

The site is located within the Lower Passaic River watershed and generally flat with a slight downward slope toward the southeast. The average elevation across the Site is 4.5 ft msl. There are no natural surface water features on the Site. The nearest surface water body is Frank's Creek, located approximately 170 ft east of the Site. Frank's Creek is a tributary of the Passaic River and flows generally north to south from Kearny Freshwater Marsh to the Passaic River. Information obtained from the New Jersey Meadowlands Commission indicates Frank's Creek flow is controlled by a series of tidal gates along its flow path from the Kearny Freshwater Marsh (northeast of the Site) and the Passaic River (south of the Site). The purpose of these tidal gates is to Block saline water from flowing upstream. However, based on field reconnaissance, a number of the tidal gates are in disrepair, which allows saline water into upstream segments of Frank's Creek.

## 6.3 Known Releases, IRMs, and Current Conditions

No documented spills or releases within the plant Site were reported during the due diligence period of the PA. A sufficient number of soil samples were collected to evaluate potential releases from each AOC per the NJDEP SRP Technical Guidance for Site Investigation of Soil to identify incidental spills or releases associated with operations. Knowledge of the operational history of the Site indicates that the likely primary sources of releases have been either removed or decommissioned (e.g., tank closures, Site upgrades and eventual decommissioning) and therefore, potential Site sources for the introduction of additional COC mass have been removed. No Interim Remedial Actions were previously conducted at the Site.

Two minor soil removal actions were previously completed and were identified as AOC-Q2 (NJDEP 92-8-11-1555-31-31) and AOC-Q3 (NJDEP Case Number 93-2-5-1248-55) in the 2009 PA Report (URS, 2009a). Remedial Action in AOC-Q2, a former AST on the plant Site, included soil removal and post-excavation sampling. The results of post-excavation sampling were provided as Appendix E-2 in the 2009 PA Report (*Groundwater Technology, Results of Post-Excavation Sampling*, dated September 10, 1992).

In AOC-Q3, the results of the 1993 Phase II Environmental Site Assessment identified the presence of soil and groundwater impacts in exceedance of the NJDEP residential soil clean-up standards for total petroleum hydrocarbons. Impacted soil was reportedly removed prior to paving the area with asphalt. PCBs, chrysene, and lead were detected in soil above residential soil standards, but below industrial soil standards. Benzene and chlorobenzene were detected in groundwater above the Groundwater Quality

EHS Support LLC                                                                                               40

ASHL-FED-0000106532
ALCD-PUBCOM_0001959

Remedial Action Workplan
Former Ashland Hercules Water Technologies (AHWT) Site
Conceptual Site Model



Standards. It was concluded the COCs were related to an off-site source (URS, 2009a). No corrective action was recommended.

Plant operations prior to Ashland/Drew ownership (since 1981) were primarily conducted within Lot 4 and Lot 5 (**Figure 2-1**) as early as 1900. With few exceptions, the results of investigation show that VOC exceedances of concern are primarily located within these pre-Ashland/Drew operational areas. Impervious surfaces were installed in the late 1970s, and as a result, the potential for incidental spills and leakages diminished significantly. Information regarding specific releases or emergency responses have not been identified via historical records review, supporting the conceptualization that impacts are a function of small volume leakages over the long operational history of the Site.

This release conceptualization is supported by the lateral distribution of the majority of impacts immediately adjacent to historical bulk and container storage areas, loading/unloading areas, and historical manufacturing and factory locations (e.g., AOC-C4, AOC-C11, AOC-C16). The vertical distribution of COCs further supports surficial or near-surface incidental spills as the primary release mechanisms from the various historical operational areas. Aside from COC flux within the saturated zone from the potential residual source area (**Figure 5-7** through **Figure 5-9**), groundwater COC concentrations are expected to be stable or declining. The predominantly neutral to upward hydraulic gradients observed at the Site further limit downward dissolved-phase COC transport through advective processes.

The potential presence of residual sources (predominantly at depth within the Intermediate Zone) identified in the AOC-C16 area during remedial investigation activities was further assessed in the PDI Report (**Appendix A**) using lines of evidence approach consistent with NJDEP *Site Remediation Program Groundwater Technical Guidance* (NJDEP, 2012b) and other relevant guidance documents cited therein. The PDI Report concluded that no residual sources have been directly observed and indirect lines of evidence indicate that Site conditions exist for the potential presence of residual sources that are not mobile, migrating, or recoverable and are naturally depleting. These conditions predominantly exist near or below the 30 ft horizon, with further downward migration impeded by the finer-grained soils present at depth. The lines of evidence indicate that the MW-3 area may be a potential historical residual source area, although other potential residual sources may be present given the different chemical signatures observed at depth compared to shallower zones in the MW-3 area.

Key COCs/groups detected above GWQS based on groundwater data from 2009 to 2018 are:
- Aromatic hydrocarbons: benzene
- Chloroethenes: PCE; TCE; cis-1,2-DCE; and VC
- Chlorobenzenes: 1,2,4-TCB; 1,4-DCB; and chlorobenzene
- 1,4-dioxane

The spatial distribution of parent and daughter products indicates that the plumes are mature, continuing on-site sources to groundwater are limited, and the rate of degradation of parent products is greater than the rate of mass flux due to back diffusion (from COCs remaining adsorbed to or trapped within the finer-grained soils) and/or partitioning from potential residual sources. Despite the presence of back-diffusion and potential residual sources, natural degradation mechanisms are robust enough to almost completely naturally dechlorinate parent products to daughter products by the time groundwater reaches the utility corridor. Therefore, assuming biogeochemical conditions remain

EHS Support LLC                                                                                           41

Remedial Action Workplan
Former Ashland Hercules Water Technologies (AHWT) Site
Conceptual Site Model



favorable for continued natural mass reduction, groundwater concentrations are expected to decrease over time.

The MNA Report (**Appendix E**) was developed to further assess natural degradation processes at the site. The MNA Report considers site analytical results through March 2018 to assess the degree of protective natural attenuation of chloroethenes and chlorobenzenes at the site in a manner consistent with the provisions of NJDEP MNA Guidance (NJDEP, 2012c). In addition, the MNA Report evaluates the prospect for enhancing microbiological (biotic) natural remediation of chloroethenes and chlorobenzenes at the site through further plume and/or potential residual source control measures.

The MNA Report determined that multiple lines of evidence indicate that meaningful natural remediation of chloroethenes and chlorobenzenes occurs in shallow and intermediate/deep water-bearing zones at the site. Based on the strength of the chloroethene and chlorobenzene concentrations and associated biogeochemical conditions, three key areas were identified within the Shallow and Intermediate/Deep water-bearing zones:
- Potential residual source area
- Downgradient of potential residual source area
- All other site areas

Within and downgradient of the potential residual source area, parent compound concentrations are stable or decreasing. The presence of non-toxic by-products provides proof that complete dechlorination of parent compounds is occurring through a combination of biotic and abiotic mechanisms. Iron reduction appears to be the prevailing redox condition, which enables hydrogen producing fermentation of naturally-occurring carbon that further enables biological reductive dechlorination of dissolved chloroethenes and chlorobenzenes. Given the abundant supply of essential iron and fermentable organic carbon from the aquifer matrix, anthropogenic carbon sources (e.g., biogenic benzene and toluene from chlorobenzenes degradation), and dead microbial cell mass, it is reasonable to assume that ongoing degradation of chloroethenes and chlorobenzenes will continue to occur indefinitely.

However, despite the occurrence of meaningful amounts of natural remediation within and downgradient of the potential residual source area, bulk degradation rates indicate that natural mechanisms are insufficient to naturally achieve GWQS for all chloroethenes and chlorobenzenes in the short term. The natural remediation rate limiting step within the potential residual source area appears to be the transformation of parent compounds to daughter compounds. The natural remediation rate limiting steps downgradient of the potential residual source area appear to be transformation of chlorinated daughter compounds to non-toxic end products. This type of rate behavior suggests that the primary geochemical parameter that limits the site's capacity to naturally detoxify PCE and 1,2,4-TCB to non-toxic endpoints is the site's natural electron donor supply (as evidenced by the dissolved organic carbon concentrations and ORP readings). In addition, given the presence of potential residual sources of parent product dissolution to groundwater, reduction in source mass is essential to reducing long-term COC flux.

Within all other areas of the site, parent and daughter compound concentrations are stable or decreasing indicating that natural mechanisms are sufficient to reduce chloroethene and chlorobenzene concentrations (for both parent and daughter compounds) to below GWQS in the short term. In most

EHS Support LLC

42

ASHL-FED-0000106534
ALCD-PUBCOM_0001961

Remedial Action Workplan
Former Ashland Hercules Water Technologies (AHWT) Site
Conceptual Site Model



cases, parent and daughter concentrations are already near or below GWQS. Consistent with the geochemistry observed within and downgradient of the potential residual source area, conditions appear conducive to ongoing natural remediation of chloroethenes and chlorobenzenes as evidenced by the presence of non-toxic end products.

## 6.4   COCs, Pathways, and Receptors

Based on the results of soil and groundwater sampling, the non-Plant Site (Block 282) has limited PCBs, VOCs, EPH, and SVOCs above NJDEP soil remediation standards and limited VOCs and SVOCs exceedances of GWQS standards in groundwater; analytical data tables are provided in **Appendix B**. Based on the results of soil and groundwater sampling, the Plant Site has VOCs, EPH, SVOCs, and metals above NJDEP soil remediation standards and exceedances of GWQS standards in groundwater.

To facilitate an evaluation of risks, potential exposure pathways and human receptors that may be exposed to site-related COCs detected in environmental media were identified. Discussion regarding potential receptors, exposure areas, exposure routes, and the basis for identifying potentially unacceptable risks is provided below. An unacceptable risk is defined by a complete exposure pathway with the following three conditions being satisfied:

1. Constituent(s) exceeding a protective concentration
2. Receptor that may be impacted by constituent(s) currently or in the future
3. Complete exposure route(s) that expose a receptor to a constituent (e.g., dermal contact, ingestion, inhalation)

Based on the long commercial/industrial history of the Site and the current zoning designation, the Site is expected to continue to be used for commercial and/or industrial use in the foreseeable future. As described in **Section 6.1**, land use in the vicinity of the Site is light industrial and commercial and is expected to continue to be used as such in the foreseeable future.

Potable water supply is provided by the Kearny Water Department. The Kearny Water Department source of water is the Wanaque Reservoir located approximately 20 miles northwest of the Site. There are no water wells maintained on the Site property and well searches conducted in 2010 and 2015 through NJDEP did not identify groundwater pumping wells within a one-half mile radius of the Site (EHS Support, 2017). In addition, there are no wellhead protection areas near the Site.

The following potential receptors and exposure routes have been identified for current and future land use scenarios for the on-site and off-site exposure areas based on depth to groundwater at the Site (approximately 5 ft bgs), the land uses described above, and the distribution of impacts. Identification of current or potential future unacceptable risks support the proposal for remedial action discussed in **Section 7**.

### *On-site (Inclusive of Plant Site, Non-Plant Site, and Leased Area)*

**Soil:** There are no current potentially complete exposure pathways for human receptors because COCs in soil underlie pavement within the plant and non-plant properties. Access to the plant Site and non-plant Site is restricted by a fence and locked gate, which serves as an engineering control. However,

EHS Support LLC

43

Remedial Action Workplan
Former Ashland Hercules Water Technologies (AHWT) Site
Conceptual Site Model



construction workers and/or trespassers may be exposed to COCs in soil in the future via incidental contact with impacted soils during future development activities.

**Groundwater:** Due to the absence of groundwater extraction on-site and depth to groundwater (approximately 5 ft bgs), there are no current human receptors to impacted groundwater on-site. However, construction workers and/or trespassers may be exposed to COCs in groundwater in the future via incidental contact with impacted groundwater during future development activities.

**Soil Gas:** There are no current potentially complete exposure pathways for human receptors because current activities are limited to short-duration demolition activities on the non-plant Site. Access to the plant Site and non-plant Site is restricted by a fence and locked gate, which serves as an engineering control. Commercial/Industrial workers, construction workers, and/or trespassers may be potentially exposed to COCs in soil gas via vapor intrusion of impacted soil vapors and inhalation during future development and use of the Site.

There are no current or potential future complete exposure pathways for ecological receptors for any on-site media because the EE (presented in the 2017 RIR [EHS Support, 2017]) concluded there are no on-site ESNRs.

*Off-site*

**Soil:** Minor off-site soil impacts are present along Boylan Avenue drainage area to the South of the Site. Access to this Boylan Avenue area is restricted by a fence and locked gate, which serves as an engineering control. However, construction workers and/or trespassers may be exposed to COCs in soil in the future via incidental contact with impacted soils during future development activities.

**Groundwater:** Groundwater emanating from the Site discharges into the Harrison Avenue utility corridor and Frank's Creek. Construction workers may be exposed to COCs potentially exceeding GWQS in groundwater within the utility corridor in the future via incidental contact with impacted groundwater during maintenance and/or construction activities.

Frank's Creek has been altered through man-made culverts to support surrounding land development. Information obtained from the New Jersey Meadowlands Commission indicates Frank's Creek flow is controlled by a series of tidal gates along its flow path from the Kearny Freshwater Marsh (northeast of the Site) and the Passaic River (south of the Site). The purpose of these tidal gates is to block saline water from flowing upstream. However, based on field reconnaissance, a number of the tidal gates are in disrepair, which allows saline water into upstream segments of Frank's Creek. Visual inspection of Frank's Creek immediately east of the Site and south of Harrison Avenue during remedial investigation activities indicates it is highly degraded with debris such as tires, shopping carts, and miscellaneous trash (EHS Support, 2017).

Therefore, current human exposure to COCs potentially exceeding NJDEP Surface Water Quality Standards (SWQS) is considered unlikely. However, recreational users or trespassers may be potentially exposed to COCs exceeding SWQSs in surface water (via discharge of impacted groundwater) within Frank's Creek in the future via incidental contact with impacted surface water.

EHS Support LLC

44

ASHL-FED-0000106536
ALCD-PUBCOM_0001963

Remedial Action Workplan
Former Ashland Hercules Water Technologies (AHWT) Site
Conceptual Site Model



Given the developed and highly degraded nature of Frank's Creek in the vicinity of the Site, current exposure for ecological receptors to COCs potentially exceeding SWQSs is considered unlikely. However, because the EE (presented in the 2017 RIR [EHS Support, 2017]) concluded it was an ESNR, there is the potential for future exposure for ecological receptors to COCs potentially exceeding SWQSs should the condition of Frank's Creek improve.

**Soil Gas:** Construction workers may be potentially exposed to COCs in the future via vapor intrusion of impacted soil vapors and inhalation within the utility corridor during maintenance and/or construction activities.

Based on the assessment above, there are no currently unacceptable risks to human or ecological receptors. However, without further institutional controls, engineering controls, and/or active remedial action there may be unacceptable risks to human or ecological receptors in the future. Therefore, the identification of potential future unacceptable risks supports the proposal for remedial action discussed in **Section 7**, including institutional controls such as a Deed Notice and a CEA.

EHS Support LLC

45

ASHL-FED-0000106537
ALCD-PUBCOM_0001964

Remedial Action Workplan
Former Ashland Hercules Water Technologies (AHWT) Site
Description of Proposed Remedial Action



# 7   Description of Proposed Remedial Action

This section evaluates remedy options, identifies the selected remedy technologies and approaches for soil and groundwater, and describes the scope of the remedial actions for soil and groundwater. Because the site has historic fill and existing buildings and pavement that will remain, the remedy options include the use of existing concrete slabs and asphalt pavement as engineering controls. The description of the remedial actions present remedial action objectives, requirements, and conceptual design. The final design, including specific means and methods, will be completed by the selected remedial action contractor.

## 7.1   Remedial Action Selection

### 7.1.1  Soil

#### 7.1.1.1   Deed Notice

A deed notice can be the selected remedy when soil has exceedances of the RDCSRS but no exceedances of the NRDCSRS.  With a deed notice, the property owner can restrict use of the property for only non-residential use to address the exceedances of only the RDCSRS.  A deed notice is also required as part of the remedy that includes engineering controls to address exceedances of the NRDCSRS.

#### 7.1.1.2   Excavation and Off-site Disposal

Excavation and off-site disposal are appropriate for small soil volumes where the soil is readily accessible to excavation equipment using conventional techniques and when the soil can be disposed of off-site at permitted landfills. NJDEP refers to these areas as discrete area discharges. Excavation and off-site disposal are generally not suitable for widespread contamination, such as historic fill or at a site where there are numerous discrete area discharges such that excavation and off-site disposal would be required across a large area and volume of soil. Excavation and off-site disposal may not be the best option when excavation would require dewatering, shoring, or protecting existing utilities or structures from damage.

Excavation and off-site disposal are appropriate for remedial actions to unrestricted use standards or remediation to restricted use standards with only institutional controls. By removing all soil to the most stringent of the applicable remediation standards, no engineering control is necessary to prevent direct contact or impact to groundwater.

#### 7.1.1.3   Capping

Capping is appropriate for remediation of widespread contamination, such as a site with historic fill or a site with overlapping AOCs requiring remedial action that cover a large portion of the site. As of August 2018, capping of VOCs may be a selected remedy under the conditions described in NJDEP Technical Guidance *Capping of Volatile Contaminants for the Impact to Ground Water Pathway* (NJDEP, 2018a), the *Capping of Inorganic and Semivolatile Contaminants for the Impact to Ground Water Pathway* (NJDEP, 2014b), and the *Technical Guidance on the Capping of Sites Undergoing Remediation* (NJDEP,

ASHL-FED-0000106538
ALCD-PUBCOM_0001965

Remedial Action Workplan
Former Ashland Hercules Water Technologies (AHWT) Site
Description of Proposed Remedial Action



2014b). A cap is an engineering control and requires a deed notice restricting site use and a remedial action permit. Because the site has the potential for re-use, capping will be considered in areas of the site where an engineering control will not affect anticipated use of the site.

Capping includes both permeable and low-permeable caps. Permeable and low-permeable caps can be the remedy for the direct contact pathway while low-permeable caps are required to remedy the impact to groundwater pathway. Existing concrete or asphalt pavement can be used for the cap if it meets performance requirements of the technical guidance.

### 7.1.1.4   Selected Remedies

The site is mostly paved with concrete or asphalt and capping is the preferred remedy for the direct contact and impact to groundwater pathways. Excavation and off-site disposal is the selected remedy at areas of the site were engineering controls may affect future use of the site or close-out of a lease and where there are discrete area discharges. s. The impacts at discrete area discharges, such as EPH, are generally shallow and within unsaturated soil. The water table across the site is generally 3 to 5 ft bgs and isolated areas where unsaturated soil exceeds impact to groundwater remediation standards can be considered discrete area discharges and excavated for off-site disposal.

Specific to the Kearny site, excavation and off-site disposal of soil is the selected remedy where removal of the soil improves site conditions for potential re-use compared to site conditions with a cap, complies with the terms of the lease associated with the leased portion of Block 280, and remediates areas off-site. Excavation and off-site disposal of soil to attain both the applicable direct contact standards and the impact to groundwater standards ensures that no engineering control will be required in the following areas:
- Block 282
- Leased portion of Block 280
- Portions of Boylan Avenue and Block 279, Lot 30

In Block 283, excavation and off-site disposal of soil is the selected remedy in areas where removal of unsaturated soil reduces the area of a low-permeable cap or provides additional assurance that capping will be protective of human health. The low-permeable cap can use existing asphalt or concrete pavement or newly constructed asphalt or concrete pavement. Existing pavement used as a cap will be inspected and repaired or replaced as necessary to meet performance requirements for capping. Capping for the direct contact pathway can consider permeable caps, such as existing pavement that may not be low permeable, building slabs and soil caps. COCs associated with both historic fill and the numerous and overlapping AOCs are widespread. After remediating discrete area discharges and selected areas by excavation and off-site disposal, the selected remedy for all remaining exceedances of applicable standards is capping. A low permeable cap is required where unsaturated soil contains exceedances of SSIGWSRS.

### 7.1.2  Groundwater

This section evaluates remedy options and identifies the selected remedy technologies for remediation of groundwater. The remedy options evaluated for groundwater include:
- Physical Barrier

EHS Support LLC

47

ASHL-FED-0000106539
ALCD-PUBCOM_0001966

Remedial Action Workplan
Former Ashland Hercules Water Technologies (AHWT) Site
Description of Proposed Remedial Action



- Pump and Treat
- In-Situ Chemical Oxidation
- In-Situ Thermal Treatment
- Bioremediation
- Natural Attenuation

The treatment options discussed below are evaluated on their perceived ability to effectively reduce COC mass, be implementable given Site conditions, and address potential future unacceptable risks discussed in **Section 6.4**. Options that are retained are reasonably expected to achieve the response action outcome (RAO) for groundwater (**Section 1.1**).

The following discussion of alternatives is focused on remedial options for the potential residual source area and downgradient areas because all other areas of the Site are expected to achieve GWQS through MNA without further active remedial action (**Section 5.5**).

### 7.1.2.1    Physical Barrier

Site investigations suggest that construction of a physical barrier around the potential residual source area and/or at the downgradient property boundary may be implementable. Candidate barriers are subsurface sheet pile walls and subsurface trenched-in walls, such as slurry walls. Such walls would conceptually key into the basal clay layer beginning at approximately 60 ft bgs.

However, a physical barrier would only contain the existing contamination within the bounded area; it would not treat or destroy the COCs. In addition, a physical barrier could affect the stability of the groundwater regime potentially leading to an unwanted shift in groundwater flow direction and/or surface ponding of shallow groundwater without water management provisions. Further, a physical barrier has the potential to degrade or deteriorate over time and, given that groundwater concentrations within the potential residual source area are likely to persist under current conditions for a long time (potentially on the order of hundreds of years), it would likely not be effective for long-term containment. A physical barrier would also involve a large amount of heavy construction and soil disposal and would impede future development of the site.

Therefore, a physical barrier is unlikely to be effective in reducing COC mass and serving as a long-term protective barrier and is removed from further consideration as a candidate remedial component for groundwater at the site.

### 7.1.2.2    Pump and Treat

Installation of a pump and treatment system via a series of extraction wells within the saturated zone in the potential residual source area and/or downgradient areas is reasonably expected to be implementable. The system would remove contaminated groundwater, treat dissolved COCs, and discharge treated water under requisite permits. However, given the fine-grained nature of site soils within the potential residual source area (seepage velocity in the Intermediate/Deep Zone of 1.3 ft/yr) a pump and treat system is unlikely to be effective. Pump and treat systems are effective when pumping increases the hydraulic gradient thereby increasing the seepage velocity and rate of dissolution of COCs into groundwater. In fine-grained soils like those at the Site, however, the effect of pumping is highly

EHS Support LLC

48

Remedial Action Workplan
Former Ashland Hercules Water Technologies (AHWT) Site
Description of Proposed Remedial Action



localized to the immediate vicinity of the extraction well significantly limiting the ability to increase the rate of dissolution into groundwater. In addition, the rate of dissolution of COCs into groundwater decreases over time as concentrations within potential residual sources approaches concentrations within groundwater. This reduced rate of diffusion significantly increases the duration that a pump and treat system would need to operate to meet GWQS.

Therefore, a pump and treat remedy is unlikely to be effective in reducing COC mass in a reasonable timeframe (defined herein as 30 years or less) and is removed from further consideration as a candidate remedial component for groundwater at the site.

### 7.1.2.3   In-Situ Chemical Oxidation

Emplacement of low-viscosity remediation grade chemical oxidants into the shallow unconfined aquifer system up to a depth of 60 ft bgs (the nominal depth of the basal clay) within the potential residual source area and/or downgradient areas is reasonably expected to be implementable. In this geologic setting, where relatively high-permeability aquifer material (like sand and gravel) is interbedded with lower-permeability material (like silt and clay) emplacement of amendments with water-like viscosity by direct-push injection or by screened emplacement wells at the site can reasonably be expected to be preferentially distributed into the more-permeable zones and not so much within the less-permeable zones that may harbor back-diffusing chloroethenes and chlorobenzenes. With appropriate remedial design, amendments are reasonably expected to be distributed at interfaces of silty/clayey zones and sandy zones.

However, given that the majority of COC mass is within the fine-grained lacustrine soils, it is unlikely that emplacement of remediation grade chemical oxidants, such as persulfate, will effectively reduce COC mass. The main reason for this conclusion is that the relatively short life span (days to several weeks, with stabilizers) of emplaced chemical oxidants significant impedes success because the contact time of the oxidant with the target COCs is very limited given the low seepage velocities at the Site. In addition, chemical oxidation in the potential residual source area is sure to weaken, at least temporarily, the site's demonstrated meaningful anaerobic natural remediation of dissolved chloroethenes and chlorobenzenes.

Therefore, in-situ chemical oxidation is unlikely to be effective in reducing COC mass and is removed from further consideration as a candidate remedial component for groundwater at the site.

### 7.1.2.4   In-Situ Thermal Treatment

Installation of an in-situ thermal treatment system in the potential residual source area may be implementable. The system would heat contaminated groundwater and vaporize the contaminated groundwater and treat the vapors through soil vapor extraction and treatment. However, given the shallow depth of groundwater at the site (nominally 5 ft bgs), dewatering and associated significant water management would likely be required to support effective soil vapor extraction efforts. In addition, removal of residual source 1,2,4-TCB by heating the subsurface to temperatures approaching or exceeding its boiling point is impracticable because the boiling point of 1,2,4-TCB is 418°F (214°C), which is about two times greater than the maximum temperature achievable below the water table by conventional in-situ thermal treatment methods. This remedy would also involve a large amount of time to implement (i.e., heating groundwater) and would require significant infrastructure that would likely

EHS Support LLC

49

ASHL-FED-0000106541
ALCD-PUBCOM_0001968

Remedial Action Workplan
Former Ashland Hercules Water Technologies (AHWT) Site
Description of Proposed Remedial Action



impede future development of the site. In addition, thermal treatment in the potential residual source area is sure to weaken, at least temporarily, the site's demonstrated meaningful anaerobic natural remediation of dissolved chloroethenes and chlorobenzenes.

Therefore, in-situ thermal treatment is unlikely to be effective in reducing COC mass and is removed from further consideration as a candidate for the remedial component for groundwater at the site.

### 7.1.2.5    In-Situ Biostimulants

Emplacement of low-viscosity remediation grade bioremediation products into the shallow unconfined aquifer system up to a depth of 60 ft bgs (the nominal depth of the basal clay) in the residual source area and/or downgradient areas is reasonably expected to be implementable acknowledging the same geologic constraints described above for in-situ chemical oxidization (**Section 7.1.2.3**). In contrast to emplacement of chemical oxidants, commercially-available long-lasting biostimulants are likely to persist for years in the subsurface, enabling greater contact time with COCs to enhance documented natural degradation through biotic anaerobic dechlorination and microbially mediated abiotic mechanisms.

Potential residual source area treatment by emplacement of emulsified vegetable oil (EVO) is likely to be effective given the documented evidence of natural degradation, ability for EVO to overcome identified degradation rate limiting factors (bioavailable carbon sources and redox conditions; **Section 5.5.2**), and recognizing the multi-year lifespan of EVO and the desire to minimize the need for reapplication. For perspective, enhancement of potential residual source dissolution with such bioremedial methods have been found to range from less than two times natural conditions to something on the order of four or five times that attainable via natural remediation.

In addition, given low groundwater seepage velocities and potentially long potential residual source reduction timeframes (i.e., potentially greater than 30 years), emplacement of a colloidal-activated carbon matrix would 1) rapidly reduce dissolved VOC mass flux migration from the potential residual source area toward the downgradient property line, 2) mitigate potential increases in dissolved VOC mass flux from a potential residual source treatment zone, and 3) serve as a long-term biobarrier for dissolved VOC mass flux migration from the treatment zone toward the downgradient property line. The concept behind emplacement of colloidal activated carbon barriers is to garner not only immediate reduction in dissolved COCs due to physical sorption and reduced COC flux through the barrier, but also to provide long-term) treatment of groundwater flowing through it because activated carbon provides a hospitable habitat for high-density bacteria colonization that affords a plentiful and renewable platform for COCs to degrade.

It is possible that enhanced biodegradation could lead to unwanted accumulation of methane gas within the vadose zone. However, a performance monitoring program that includes monitoring groundwater and soil vapor would provide data necessary to determine if future mitigation would be necessary.

Therefore, in-situ biostimulation in the form of EVO emplacement in the potential residual source area and emplacement of a colloidal activated carbon matrix downgradient of the potential residual source area is likely to be effective in reducing COC mass and is retained for further consideration as candidate remedial components for groundwater at the site.

EHS Support LLC                                                                                          50

ASHL-FED-0000106542
ALCD-PUBCOM_0001969

Remedial Action Workplan
Former Ashland Hercules Water Technologies (AHWT) Site
Description of Proposed Remedial Action



### 7.1.2.6    Monitored Natural Attenuation

The historical groundwater analytical results provide convincing primary and secondary lines of evidence that natural biotic and abiotic mechanisms degrade chloroethenes and chlorobenzenes to non-toxic endpoints (**Section 5.5.2**) and therefore a natural attenuation remedy would be readily implementable. However, within and downgradient of the potential residual source area, degradation rates are currently insufficient to achieve GWQS at the downgradient property boundary in a reasonable timeframe (i.e., 30 years or less). Within all other areas (away from and downgradient of the potential residual source area) conditions already appear conducive to a protective MNA remedy without further enhancements.

Therefore, conditions are conducive to support a phased remedial approach for the potential residual source area and downgradient areas comprising emplacement of amendments to increase degradation rates and reduce source mass, as described earlier through in-situ biostimulation (**Section 7.1.2.5**) followed by MNA. Within all other areas, MNA without further enhancements is likely to be effective in reducing COC mass within a reasonable timeframe (i.e., 30 years or less).

### 7.1.2.7    Selected remedies

Treatment in the potential residual source area through aqueous biostimulation intended to enhance residual product dissolution into groundwater where dissolved COCs are then detoxified through biotic and/or abiotic transformation greatly complements the concept of a combined remedial approach. The recommended conceptual approach envisions combining:

1. Biologically-enhanced potential residual source area depletion through emplacement of EVO
2. Biological and physical treatment of dissolved chloroethenes and chlorobenzenes through emplacement of two colloidal activated carbon biomatrix barriers, one immediately downgradient of the potential residual source area and one immediately upgradient of the downgradient property boundary
3. Ongoing monitored natural attenuation of all other areas

## 7.2    Remedial Action Goals

Remedial action goals guide how the selected remedies are implemented at the site. The goals are listed below:

- Remediate the impact to groundwater pathway as a potential source of groundwater contamination on all on-site and off-site areas.
- Transfer the leased portion of Block 280 to the property owner with a limited use soils only response action outcome, which means a deed notice, but no engineering control.
- Remediate EPH and VOCs within Boylan Avenue and Block 279, Lot 30 such that an unrestricted use soil response action outcome can be issued.
- Establish conditions in Block 283 that are favorable to re-use of the site.
- Treat residuals in saturated soil to the extent practicable.
- Treat groundwater to maintain conditions favorable for a future MNA remedy for groundwater.

The soil and groundwater remedial actions are described below.

ASHL-FED-0000106543
ALCD-PUBCOM_0001970

Remedial Action Workplan
Former Ashland Hercules Water Technologies (AHWT) Site
Description of Proposed Remedial Action



## 7.3   Description of Soil Remedial Action

The soil remedial action addresses the NJDEP direct contact and impact to groundwater pathways by excavation and off-site disposal of soil, capping soil, and institutional controls. The soil remedial action is presented by discussing general requirements and then requirements in the following areas of the site: Block 279, Lot 30; Boylan Avenue; leased portion of Block 280; Block 282; and Block 283. A summary of the remedial action within each area follows:

- Block 279, Lot 30: Excavation and off-site disposal
- Boylan Avenue: Excavation and off-site disposal
- Leased portion of Block 280: Excavation, off-site disposal and institutional controls
- Block 282: Excavation, relocation of historic fill to Block 283, and institutional controls
- Block 283: Excavation, off-site disposal, capping, and engineering and institutional controls

Aboveground demolition of selected buildings and structures will be completed before the remedial action starts and is not in the scope of the RAW.  The remedial action contractor will inspect the site after demolition is completed to assess site conditions and determine the exact sequence of work.  The general sequence of excavation and off-site disposal of soil will be off-site areas, the leased portion of Block 280, followed by areas in Blocks 282 and 283. This sequence completes excavation and disposal from the south to the north ensuring equipment used to excavate and haul soil does not travel over previously remediated areas. After excavation and relocation of historic fill is completed, remaining soil within the overall extent of the remedial action will be capped to complete onsite remedial action for the impact to groundwater and direct contact pathways.  Existing pavement within the capping area will be inspected and either repaired to meet requirements of the technical guidance or replaced with new pavement.  Within areas where unsaturated soil was excavated, the cap will be new concrete or asphalt pavement.

**Figure 7-1** shows the extent where excavation is the selected remedy. All excavated soil will be disposed of off-site except for the excavation in Block 282, where historic fill will be re-located to Block 283. **Figure 7-2** shows the extent where capping is the selected remedy, with the extent of the low permeability cap for the impact to groundwater pathway shown.  A discussion of excavation, off-site disposal, and capping within each of the areas follows starting with **Section 7.3.2**.  In addition, deed notices will be developed for Block 282, Block 283, leased portion of Block 280, and Block 279, Lot 30.

### 7.3.1   General Requirements

#### 7.3.1.1   Pre-Mobilization Tasks

The following pre-mobilization tasks will be completed:

- Obtain access agreements to Boylan Avenue and Block 279, Lot 30. Access to these properties will be from Block 282.
- Prepare health and safety plan (HASP) for remedial actions.
- Prepare erosion and sediment control plan and obtain required approvals from county and state agencies.
- Obtain local permits.

ASHL-FED-0000106544
ALCD-PUBCOM_0001971

Remedial Action Workplan
Former Ashland Hercules Water Technologies (AHWT) Site
Description of Proposed Remedial Action



- Document pre-work site conditions, including condition of Harrison Avenue pavement and sidewalks, off-site locations where remedial action is required, and on-site structures that remain.
- Inspect the condition of existing asphalt and concrete pavement within the proposed limits of low permeable pavement and identify areas that need to be repaired or replaced.
- Obtain Licensed Site Remediation Professional (LSRP) approval of the pre-excavation sampling plan to refine extent of remedial action.
- Determine if concrete designated for removal can be self-certified as clean without sampling or if concrete requires sampling. Prepare a concrete sampling plan for LSRP review and approval.
- Prepare and submit beneficial use application to NJDEP Bureau of Landfill and Hazardous Waste Permitting.

### 7.3.1.2    Mobilization and Site Layout

Mobilization includes the following:
- Transport equipment and temporary facilities to the site.
- Install temporary power, if required.
- Set up temporary facilities, including field offices, storage containers, and sanitary facilities.
- Establish areas for privately owned vehicle parking and construction equipment parking.

Site Layout includes the following
- Mark work zones according to the site HASP.
- Survey property boundaries and the eastern boundary of the leased portion of Block 280.
- Mark traffic routes and truck staging, loading, and inspection areas.
- Designate area for staging of waste containers, if used to transport waste off-site.
- Complete subsurface investigations for utilities, including New Jersey One Call.

### 7.3.1.3    Pre-construction Tasks

Pre-construction tasks must be completed before remedial action can start within a defined area of the site. Before construction starts, a meeting will be held with the LSRP to confirm the following pre-construction tasks have been completed, as appropriate to the area of the site:
- Pre-excavation soil and concrete sampling was completed and the extent of remedial action refined by compliance averaging.
- Concrete classification was completed and concrete for off-site recycle, off-site disposal, and beneficial use was identified.
- Limits of excavation or newly constructed caps were surveyed and marked.
- Wastes for off-site disposal have a current waste profile and have been accepted at a disposal facility.
- Equipment and materials necessary to complete the work are on-site and inspected.
- Temporary erosion and sediment control and stormwater control measures are installed.
- Safety hazards have been identified and measures taken to mitigate safety risks.
- Required perimeter air monitoring equipment is on-site, installed according to the Dust, Vapor, and Odor Control Plan, and operating.
- Notifications required by permits or New Jersey One Call have been completed.

ASHL-FED-0000106545
ALCD-PUBCOM_0001972

Remedial Action Workplan
Former Ashland Hercules Water Technologies (AHWT) Site
Description of Proposed Remedial Action



#### 7.3.1.4    Pre-Excavation Sampling

Where the soil remedial action extends off-site because of VOC exceedances of SSIGWSRS or EPH exceeds EPH SRCs for a residential use scenario, additional soil samples will be collected for laboratory analysis. For VOCs, the results will be used to re-calculate spatially weighted averages and refine the extent of the remedial action within the functional areas the samples were collected from. For EPH, the results will be used to calculate a sample specific EPH SRC and determine the final extent of excavation. Before excavating soil, the LSRP will review and approve all revisions to the excavation limits shown in this RAW.

To excavate soil, existing concrete building slabs and foundation walls must be removed. Concrete identified for potential recycling or beneficial use will be sampled in-situ at locations where visual inspection of the concrete indicates possible contamination. If there is no visual indication of contamination and concrete cannot be self-certified as clean without sampling, two samples will be collected within each building or concrete slab. Concrete will be sampled by taking chips from the top 1-inch of concrete. Samples will be analyzed for target compound list VOCs, SVOCs, and target analyte list inorganics to determine if there are exceedances of the RDCSRS. The Fill Use Plan in **Section 8.2** discusses how concrete may be used on-site or managed off-site based on the results of the analysis. A pre-excavation soil and concrete sampling plan will be prepared for review and approval by the site LSRP. Excavation or removal of soil and concrete will start after obtaining LSRP approval.

#### 7.3.1.5    Equipment Decontamination

Equipment that has been used to excavate soil will be decontaminated before it crosses areas of the site that do not require remedial action. At a minimum, soil will be removed by hand tools, brooms, or brushes.

Before demobilizing equipment off-site, equipment will be cleaned with a pressure washer to remove all soil. A temporary decontamination pad constructed immediately next to the excavation will collect all water and solids. The water will be separated from solids and disposed of off-site in 55-gallon drums. Solids will be disposed of off-site either with excavated soil or in separate 55-gallon drums. Equipment will be inspected by the site safety and health officer before it leaves the site.

### 7.3.2    Soil Remedial Action Off-site and On-Site Leased Area

#### 7.3.2.1    Boylan Avenue and Block 279, Lot 30

At the southeast corner of the site, within Boylan Avenue and Block 279, Lot 30, the selected remedy to attain the SSIGWSRS for VOCs and Category 2 SRCs under residential use scenario for EPH is excavation and off-site disposal of soil. The limits of excavation for VOCs are defined by Thiessen polygons and no verification sampling is required. Excavation will be from the ground surface to the depth of the top of the water table, as indicated on **Figure 4-17**. The initial limits of excavation for EPH are shown on **Figure 4-20** and pre-excavation sampling will collect additional samples to verify the extent of excavation.

Excavation equipment will access the work area from Block 283. Excavation will proceed from the outside limits of the excavation toward the property boundary of Block 283 so that equipment will not

EHS Support LLC                                                                                      54

Remedial Action Workplan
Former Ashland Hercules Water Technologies (AHWT) Site
Description of Proposed Remedial Action



travel or work over areas previously excavated. Trucks hauling soil to the off-site disposal facility will remain in Block 283.

### 7.3.2.2    Leased Portion of Block 280

The selected remedy to attain the SSIGWSRS within the leased portion of Block 280 is excavation and off-site disposal of soil. The limits of excavation are defined by Thiessen polygons and no verification sampling is required. Excavation will be from the ground surface to the depth of the top of the water table, as indicated on **Figure 4-17**. Excavated soil can be direct loaded onto trucks or staged within the horizontal limits of excavation in Block 283 and removed from the site during soil excavation in Block 283.

The selected remedy to address historic fill with arsenic and lead exceedances of the NRDCSRS in subsurface soil is a deed notice. The deed notice will identify the location and depth of all exceedances of the RDCSRS and the restrictions within shallower soil that will mitigate the direct contact pathway.

### 7.3.2.3    East of Leased Portion of Block 280

As discussed in **Section 4.1.4**, VOCs in saturated soil exceed the RDCSRS at three locations to the east of the leased portion of Block 280. These exceedances are at depths exceeding 12 ft bgs. The proposed remedial action is a deed notice to address exceedances of RDCSRS. Soil Remedial Action On-site in Block 282

The selected remedy to attain the NRDCSRS in surface soil (0-2 ft bgs) is excavation of soil containing lead. The limits of excavation are defined by Thiessen polygons and no verification sampling is required. The excavation will be backfilled with imported clean fill. The selected remedy to attain the NRDCSRS in subsurface soil containing benzo(a)pyrene and lead is a deed notice. Both benzo(a)pyrene and lead are associated with the confirmed presence of historic fill.  No soil remedial action is required to address SSIGWSRS following the compliance averaging evaluation.

Historic fill removed from Block 282 will be used as backfill in Block 283 where excavations are within areas where historic fill exceedances of the NRDCSRS will be remediated by capping with asphalt pavement. The Fill Use Plan in **Section 8.2** discusses requirements for the relocation of historic fill within the site.

### 7.3.3   Soil Remedial Action On-site in Block 283

This section describes the general sequence of work for the soil remedial action in Block 283. The soil remedial action in Block 283 is more complicated than in other portions of the site for the following reasons:

- Buildings 720, 721, and 722 have elevated concrete slabs where soil below the slab has VOCs exceeding SSIGWSRS. The extent of the remedial action for soil within the foundation walls of these buildings was not determined by spatially weighted averages and is presented in this section.
- Building 723 covers approximately 20 percent of the area of Block 283 and will remain. Soil adjacent to its foundation walls must be excavated to the top water table.

EHS Support LLC

55

Remedial Action Workplan
Former Ashland Hercules Water Technologies (AHWT) Site
Description of Proposed Remedial Action



- Block 283 is substantially covered by asphalt pavement or concrete structures. Demolition of concrete slabs and removal of asphalt pavement will be required to excavate or sample underlying soil.

### 7.3.3.1   Buildings 720, 721, and 722

The foundation walls of these buildings separate soil present under the elevated concrete slabs from unsaturated soil surrounding the buildings. Based on the elevations of soil borings and the height of loading docks, the concrete slabs are approximately four feet higher than the surrounding grade. The soil remedy will address exceedances of SSIGWSRS in unsaturated soil from immediately below the elevated concrete slabs to the top of the water table by excavation and off-site disposal and exceedances of NRDCSRS by capping (both historic fill and non-historic fill constituents).

If the concrete slabs are not removed during building demolition, the elevated concrete slabs of Buildings 720, 721, and 722 will be removed and the concrete will be managed according to NJDEP *Guidance for Characterization of Concrete and Clean Material Certification for Recycling* (see Fill Use Plan in **Section 8.2**) (NJDEP, 2010b). Soil excavation to the top of the water table will be completed in steps with excavation of soil inside foundation walls to the ground surface, removal of foundation walls to ground surface, and excavation of soil from ground surface to the water table.

Based on sampling and analysis previously completed and sampling and analysis completed as part of the remedial action, soil from below the concrete slab to the top of the ground surface will either be removed and disposed of off-site or retained for use as backfill within the footprint of the buildings. **Figure 7-3** shows the initial horizontal and vertical limits of soil to be removed for off-site disposal from the elevated slab to the ground surface. The final limits of soil removed for disposal will be verified by sidewall and base samples collected according to New Jersey technical guidance. The remaining soil, assumed to be clean, from above the ground surface will be stockpiled east of Building 722 and used to re-grade the area within Buildings 720, 721, and 722 after excavation below the ground surface is completed; foundation walls will be removed to 2 ft bgs.

From the ground surface to the top of the water table, there is insufficient analytical data to accurately define the initial limits of soil exceeding SSIGWSRS to be removed for off-site disposal. **Figure 7-4** shows the approximate location of sampling to define the initial excavation limits from the ground surface to the top of the water table. At each location, one soil sample will be collected for VOC analysis from between the ground surface and the top of the water table. The interval for sampling will be from the 6-inch interval with the highest photoionization detector (PID) reading. If PID readings are all similar, the sample will be collected from the interval defined as 2 feet above the water table. The depth to the top of the water table is shown on **Figure 4-17**. The final limits of soil removed for off-site disposal will be determined from the pre-excavation sample results and analysis compared to SSIGWSRS or by compliance averaging within the footprint of the buildings. After excavation below ground surface is completed, the previously clean stockpiled soil will be used to re-grade the area within the footprint of the buildings. Based on delineation shown on **Figure 4-20**, soil below ground surface and within the building footprints exceeding the NRDCSRS is mostly historic fill and the footprint of the buildings will be capped as described in **Section 7.3.4.4**.

EHS Support LLC

56

ASHL-FED-0000106548
ALCD-PUBCOM_0001975

Remedial Action Workplan
Former Ashland Hercules Water Technologies (AHWT) Site
Description of Proposed Remedial Action



### 7.3.3.2    Main Tank Truck Loading Building

During the RI, soil samples were collected along the outside perimeter of the building, but not inside the building. Inside the building are two truck scales and below grade pits separating the scales. Pre-remedial action demolition will remove the truck scales and covers over the pits. Based on field measurements, the depth of the pits and bottom of the scales is over three feet meaning the building slab is at or slightly below the top of the water table and no unsaturated soil remains within the footprint of the building. The building slab will be broken in place and backfilled to subgrade elevation with compacted fill from an offsite source or onsite material approved for beneficial use. New asphalt or concrete pavement will be constructed to final grade as an engineering control over historic fill present below the building slab.

### 7.3.3.3    Excavation and Off-site Disposal

While capping is the primary remedy for the impact to groundwater pathway, unsaturated soil in portions of Block 283 will be excavated and disposed of off-site for one or more of the following reasons:

- Soil is not currently capped with existing pavement
- Soil is in a small or isolated area
- Removal of VOCs from the unsaturated zone before capping provides additional assurance that conditions for MNA can be established as required by the technical guidance *Capping of Volatile Contaminants for the Impact to Groundwater Pathway*.

The overall horizontal and vertical limits of excavation and off-site disposal within areas of Block 283 and the leased portion of Block 280 are defined by Thiessen polygons. Excavation will be from the ground surface to the depth of the top of the water table (the depth to the top of the water table is shown on **Figure 4-17**). Asphalt pavement will be removed and recycled. Pavement base and sub-base aggregates will be disposed of with excavated soil. Based on the results of in-situ sampling and analysis of concrete, it will be recycled, disposed of off-site as a solid waste, or used on-site as backfill. Disposal or beneficial use of concrete is further discussed in the Fill Use Plan, **Section 8.2**.

The exact sequence of excavation will be determined by the remedial action contractor, but the general sequence will be from the southeast corner of Block 283 to the north to ensure equipment and vehicles do not travel over previously remediated areas. Soil will be loaded directly from the excavation onto trucks or containers that will transport the soil to an off-site disposal facility.

### 7.3.3.4    Capping Soil

Soil requires capping within Block 283 for the following reasons:

- Unsaturated soil adjacent to the property boundary with Boylan Avenue has VOCs and SVOCs exceeding SSIGWSRS and low permeable capping is the selected remedy. While addressing the impact to groundwater pathway for historic fill is not required, this cap will also address the impact to groundwater pathway for metals and PAHs in the historic fill.
- Historic fill present to depths of approximately nine feet bgs contains metals and PAHs exceeding the NRDCSRS and capping is the selected remedy.

EHS Support LLC                                                                                          57

ASHL-FED-0000106549
ALCD-PUBCOM_0001976

Remedial Action Workplan
Former Ashland Hercules Water Technologies (AHWT) Site
Description of Proposed Remedial Action



- Soil contains VOCs and SVOCs exceeding the NRDCSRS and SSIGWSRS, and capping is the selected remedy for unsaturated soils.

The caps will be existing pavement, existing concrete slabs, or newly constructed asphalt pavement over open portions of Block 283 as part of preparing the site for re-use. Where existing or newly constructed asphalt pavement is an engineering control for exceedances of SSIGWSRS, the pavement will have a maximum permeability of $10^{-6}$ centimeters per second (cm/s) and must meet construction and stormwater management requirements of NJDEP's Technical Guidance *Capping of Volatile Contaminants for the Impact to Ground Water Pathway* (NJDEP, 2018a) and the *Capping of Inorganic and Semi-volatile Contaminants for the Impact to Ground Water Pathway* (NJDEP, 2014a). The proposed limits and type of caps are shown on **Figure 7-2.**

The condition of existing asphalt pavement used for low permeable capping will be inspected and based on the condition of the pavement, the following repairs or improvement options are available:
- Existing pavement does not have large cracks or potholes: Apply pavement sealant according to manufacturer instructions.
- Existing pavement has cracks: Apply crack sealant followed by a pavement sealant.
- Existing pavement has isolated potholes or small areas of loose asphalt: Repair potholes and areas of loose asphalt with new hot mix asphalt and apply pavement sealant.
- Existing pavement is highly degraded with widespread potholes or areas of loose pavement: Remove asphalt pavement, re-grade and compact base course, and place and compact 4 inches of new hot mix asphalt.

Newly constructed asphalt pavement will consist of a sub-base, base, and surface course, as shown on **Figure 7-5.** The mix design for the hot mix asphalt will have air voids of seven percent or less. Permeability testing of laboratory compacted cores over a range of densities will establish the minimum compaction required to achieve a permeability of $10^{-6}$ cm/s. Field density tests will be completed at a frequency of one test per 2,000 square ft of pavement. Pavement designated as a low permeable cap and not meeting the minimum density will be corrected by one of the two options:
- Define the limit of defective pavement with additional density tests and then saw cut, remove, and replace the pavement.
- Apply an asphalt sealant to the defective pavement.

As shown on **Figure 7-2,** the extent of new or existing asphalt as an engineering control for exceedances of NRDCSRS in historic fill extends beyond the limits of asphalt pavement as a low permeability engineering control for exceedances of the SSIGWSRS. To ensure the low permeable cap extends beyond the boundary of the exceedances of the SSIGWSRS, all asphalt pavement will be constructed from a mix design that meets $10^{-6}$ cm/s. The asphalt pavement will be sloped to promote runoff of precipitation to designated stormwater collection points. At the southeastern portion of Block 283, a new catch basin with a lift pump will be installed at the location of the former stormwater lift station. The former lift station pumped stormwater to a manhole that gravity drained to the Kearny stormsewer system on Harrison Avenue. The catch basin and pump will collect and convey stormwater from the southeast portion of the site to a manhole that gravity drains to the Kearny stormsewer system, essentially restoring the former stormwater collection system. Stormwater from building roof drains and unpaved portions of the site will be directed away from the edges of the asphalt pavement to prevent

EHS Support LLC

ASHL-FED-0000106550
ALCD-PUBCOM_0001977

Remedial Action Workplan
Former Ashland Hercules Water Technologies (AHWT) Site
Description of Proposed Remedial Action



sheet flow across the site from laterally migrating under the asphalt pavement. The site grading plan and as-built drawings will be submitted with the Remedial Action Report for the soil remedial action.

Following capping of VOCs and treatment of residuals in the saturated zone, a 2-year monitoring period will be conducted to confirm MNA is a protective groundwater remedy. If MNA is protective, applications for both a soil remedial action permit for the deed notices and capping conditions and a groundwater remedial action permit for MNA will be submitted to the NJDEP.

## 7.4    Description of Groundwater Remedial Action

The groundwater remedial action targets the potential residual source area and downgradient areas in combination with natural biotic and abiotic mechanisms degrading COCs to nontoxic endpoints. The remedy as proposed, in combination with institutional and/or engineering controls, is reasonably acceptable to reduce mass, is implementable at the Site, and can reduce risks to groundwater and surface water. The groundwater remedial action is presented by discussing general requirements.

The recommended conceptual approach, as shown on **Figure 7-6** (plan view) and **Figure 7-7** and **Figure 7-8** (section views), envisions combining:
1. Biologically-enhanced potential residual source area depletion through emplacement of EVO.
2. Biological and physical treatment of dissolved chloroethenes and chlorobenzenes through emplacement of two colloidal activated carbon biomatrix barriers, one immediately downgradient of the potential residual source area and one immediately upgradient of the downgradient property boundary.
3. Ongoing monitored natural attenuation of all other areas.

### 7.4.1    General Requirements

#### 7.4.1.1    Pre-mobilization Tasks

The following pre-mobilization tasks will be completed:
- Prepare HASP for groundwater remedial actions.
- Obtain local permits.
- Obtain injection permits.

#### 7.4.1.2    Mobilization and Site Layout

Mobilization includes the following:
- Transport equipment and temporary facilities to the site.
- Set up required temporary facilities.
- Establish areas for privately owned vehicle parking and construction equipment parking.

Site layout includes the following:
- Mark work zones according to the site HASP.
- Complete subsurface investigations for utilities, including New Jersey One Call.

EHS Support LLC                                                                                  59

Remedial Action Workplan
Former Ashland Hercules Water Technologies (AHWT) Site
Description of Proposed Remedial Action



## 7.4.2  Proposed Supplemental Data Collection

Prior to finalizing the design for the groundwater remedy, supplemental data collection tasks are proposed. The intent is to refine the remedy given the complex, interbedded nature of the geologic units within the target treatment zones and associated low groundwater velocities. The objectives of these tests include determining factors that would impact distribution and contact of the amendments with COCs and evaluating reaction chemistry for site-specific conditions. Proposed tasks include:

- Further characterization of the potential residual source zone with high-resolution direct-push methods. The intent is to refine the extent of the potential residual source treatment area, determine optimal placement of colloidal activated carbon barrier #1, and further inform remedial design. The proposed technique combines Membrane Interface Probing (MIP) (with halogen specific detector) and Cone Penetrometer Testing (CPT) to further define COC distribution spatially and by soil type.
- Implement bench and pilot biotreatability tests prior to finalization of the remedial design. The intent is to refine the remedial design given the complex, interbedded nature of the geologic units within the target treatment zones and associated low groundwater velocities. Proposed techniques include:
  - Maximum emulsified oil retention bench test at three intervals to refine delivery volumes in various soil units (**Figure 7-7**):
    - Sandy braided fluvial deposits (approximately 20-30 ft below ground surface)
    - Lacustrine silts and clays (approximately 30-60 ft below ground surface)
    - Sandy interbeds (approximately 30-60 ft below ground surface).
  - In-situ microcosm testing with a down-hole Bio-Trap device within potential residual source well MW-12B to assess degradation rates of parent compounds PCE and 1,2,4-TCB (depending on commercial availability of 1,2,4-TCB Bio-trap device) under natural conditions and enhanced conditions using candidate biostimulant amendments.
  - Aqueous amendment delivery pilot test to better understand the ability of the aquifer to accept amendments (with water-like viscosity) to refine delivery volumes and spacing.

## 7.4.3  Injection Plan

The injection plan details the general conceptual design of the treatment layout and amendment dosing and longevity. The injection plan will be refined following the supplemental data collection and finalized for review prior to implementation.

### 7.4.3.1  Groundwater Remedy Treatment Layout

The recommended conceptual treatment layout is shown on **Figure 7-6** (plan view) and **Figure 7-7** and **Figure 7-8** (section views). The emplacement of the bioremediation reagent, EVO, and colloidal activated carbon will be injected via direct-push methods. The bottom-up emplacement injections will be spaced on 15-foot centers, with a maximum depth of 60 ft bgs, the target depth of the basal clay.

The potential residual source zone treatment comprises the emplacement of long lasting (aka slow dissolving) anaerobically fermentable carbon electron donor material, like EVO, into the more-permeable portions of the potential residual source zone. Based on the results of the bench and pilot testing, the amendment recipe will be finalized and may include bionutrients (phosphorus and

EHS Support LLC

ASHL-FED-0000106552
ALCD-PUBCOM_0001979

Remedial Action Workplan
Former Ashland Hercules Water Technologies (AHWT) Site
Description of Proposed Remedial Action



nitrogen), a B12 cofactor, a bioaugmentation culture (like SDC-9TM and KB 1TM), a pH buffering agent, and an oxygen scavenger.

The plume treatment area downgradient of the potential residual source area treatment comprises the emplacement of colloidal (liquified) activated carbon biobarriers (like PlumeStop$^{TM}$ by Regenesis) at the downgradient edge of the potential residual source zone and immediately upgradient of the downgradient property boundary. Based on the results of the bench and pilot testing, the biobarriers injection scheme will be finalized. For conceptual purposes the nominal lengths of the barrier in the direction of groundwater flow are 30 feet (i.e., two rows of injection points on 15-foot centers).

### 7.4.3.2    Amendment Dosing and Longevity

The amendment dosing within the potential residual source zone and plume treatment area will be determined after completion of the bench scale and/or pilot biotreatability tests. After analysis of the bench scale and pilot biotreatability tests, the volume, concentrations, and amendment delivery into the aquifer will be designed. Insufficient loading rates increase the probability that the amendments will not be adequately distributed and reduce the likelihood of achieving RAOs. Conversely, excess amendments can create undesirable changes in the aquifer, which can compromise the efficacy of the remedy.

## 7.4.4  Monitoring Requirements for Amendment Distribution

The following provides recommendations for suggested infrastructure, analytes, sampling frequency, and sampling duration for performance monitoring within and downgradient of the potential residual source area (following delivery of amendments and activated colloidal carbon biobarriers).

Groundwater monitoring to satisfy NJDEP's requirement for MNA monitoring for all other areas of the site (at monitoring wells MW-1, MW-1B, MW-2, MW-4, MW-6, MW-8, MW-9, MW-10, MW-10B, and MW-11) will follow the NJDEP MNA Guidance (NJDEP, 2012c).

In developing the proposed performance monitoring program for the delivery of amendments and activated colloidal carbon biobarriers within and downgradient of the potential residual source area, consideration was given to what NJDEP terms "process monitoring" (performed during treatment to optimize the process) and "performance monitoring" (performed to compare conditions before and after treatment) (NJDEP, 2017a and NJDEP, 2017b). However, given the short-term nature of conceptual amendment delivery (on the order of weeks or months) and the slow groundwater velocities (on the order of ft per year), process and performance monitoring can be coupled together to effectively evaluate remedy performance. For simplicity, the term "performance monitoring" is used hereafter to be inclusive of both process monitoring and performance monitoring.

In addition to the proposed performance monitoring program, performance metrics are proposed to monitor the success of the potential residual source and downgradient remedies with the ultimate goal of transitioning to MNA for these areas to achieve GWQS.

EHS Support LLC

61

ASHL-FED-0000106553
ALCD-PUBCOM_0001980

Remedial Action Workplan
Former Ashland Hercules Water Technologies (AHWT) Site
Description of Proposed Remedial Action



### 7.4.4.1  Infrastructure

Proposed infrastructure for performance monitoring within and downgradient of the potential residual source areas include the following groundwater monitoring wells consistent with the conceptual performance monitoring network shown on **Figure 7-9** (taken from NJDEP, 2017). Proposed additional wells are shown on **Figure 7-6**.

- Background wells:
  - Existing (three wells): MW-8, MW-13, and MW-13B (if access to MW-13/MW-13B well pair can be negotiated with property owner)
  - Proposed (one well): one Intermediate Zone well co-located with MW-8
- Potential Residual Source Area Wells:
  - Existing (five wells): MW-3, MW-3B, MW-12, MW-12B, and MW-14B
- Plume/Plume Fringe wells:
  - Existing (three wells): MW-5, MW-7, and MW-7B
  - Proposed (seven wells): one Intermediate Zone well co-located with MW-5, one Shallow Zone/Intermediate Zone well pair located downgradient of MW-5 and colloidal activated carbon barrier #1, one Shallow Zone/Intermediate Zone well pair located downgradient of potential residual source area and upgradient of colloidal activated carbon barrier #1, and one Shallow Zone/Intermediate Zone well pair located downgradient of potential residual source area and colloidal activated carbon barrier #1.
- Sentinel wells:
  - Proposed (two wells): One Shallow Zone/Intermediate Zone well pair located downgradient of MW-7 and colloidal activated carbon barrier #2 and upgradient of property boundary.



**Figure 7-9    Generalized Performance Monitoring Well Network**

In addition, given the potential increased generation of methane gas as a function of enhanced degradation, vapor probes are proposed in the vadose zone adjacent to existing potential residual source zone monitoring wells MW-3 and MW-12.

EHS Support LLC    62

ASHL-FED-0000106554
ALCD-PUBCOM_0001981

Remedial Action Workplan
Former Ashland Hercules Water Technologies (AHWT) Site
Description of Proposed Remedial Action



### 7.4.4.2    Analytes

The following analytes are proposed to monitor groundwater for effective amendment delivery and longevity, to compare conditions before and after treatment, and support evaluation of remedy performance via the proposed metric below:

- VOCs
- Electron Donors:
  - Dissolved organic carbon
- Degradation by-products:
  - Ethene
  - Ethane
  - Methane
  - Acetylene
  - Chloride ion
  - Carbon dioxide
- Field-Measured Analytes:
  - DO
  - ORP
  - pH
  - Temperature
  - Specific conductance

Depending on the performance of the remedy over time, additional analytes, such as microbial targets, geochemical indicator parameters, and metabolic acids may be considered if necessary.

Proposed vapor monitoring will consist of collecting field-measurements of methane, carbon dioxide, and oxygen using a multi-gas meter.

### 7.4.4.3    Frequency

Prior to amendment delivery sampling of all performance monitoring wells (**Section 7.4.4.1**) for the complete suite of analytes (**Section 7.4.4.2**) is proposed to establish baseline conditions.  Approximately 1 month and 6 months after amendment delivery sampling of Potential Residual Source Area Wells (**Section 7.4.4.1**) for dissolved organic carbon and field-measured analytes (**Section 7.4.4.2**) is proposed to evaluate amendment emplacement and changes in groundwater geochemistry.  Given the slow groundwater velocities and associated long timeframe (potentially decades) for total potential residual source depletion, annual sampling, commencing approximately 1 year after amendment delivery, at all performance monitoring wells (**Section 7.4.4.1**) for the complete suite of analytes (**Section 7.4.4.2**) is proposed to evaluate long-term remedy performance. Once the performance metrics identified in **Section 8.5.1** are met, monitoring frequency would follow the requirements prescribed in the NJDEP MNA Guidance (NJDEP, 2012c).

ASHL-FED-0000106555
ALCD-PUBCOM_0001982

Remedial Action Workplan
Former Ashland Hercules Water Technologies (AHWT) Site
Description of Proposed Remedial Action



7.4.4.4    Duration

Annual performance monitoring is indicated until such time as the proposed performance metrics
identified in **Section 8.5.1** are met and monitoring moves into a demonstration of MNA in accordance
with the requirements prescribed in the NJDEP MNA Guidance (NJDEP, 2012c).

ASHL-FED-0000106556
ALCD-PUBCOM_0001983

Remedial Action Workplan
Former Ashland Hercules Water Technologies (AHWT) Site
Project Plans



# 8    Project Plans

This section provides the project plans required by N.J.A.C 7:26E-5 and plans that are appropriate for the proposed remedial actions, including a perimeter air monitoring plan for dust, vapor, and odor control; fill use; site restoration; and waste management. This section also describes the methods that will be used to demonstrate remedy effectiveness and provides an overview of the Quality Assurance Project Plan (QAPP) (**Appendix F**).

## 8.1    Perimeter Air Monitoring Plan

This Perimeter Air Monitoring (PAM) plan was prepared to meet the requirements of the N.J.A.C. 7:26E (N.J.A.C., 2018a) for the implementation of the remedial soil excavation actions for the AHWT Site. The PAM plan was prepared in accordance with the *NJDEP SRP Draft PAM Guidance for Sites Undergoing Remedial Action* (NJDEP, 2010c), and additional NJDEP and United States Environmental Protection Agency (USEPA) guidance, as applicable. The PAM plan goal is to monitor and prevent unacceptable exposure to off-site receptors from the inhalation of airborne COCs resulting from the soil excavation remedial actions. This PAM plan is not intended for on-site worker (occupational) exposure, which is covered by Occupational Safety and Health Administration (OSHA)-compliant hazard assessment and HASP documents.

### 8.1.1    Remedial Action Summary

As presented in **Section 7**, the remedial actions proposed for the AHWT Site include the excavation and off-site disposal of soil, capping soil, and engineering and institutional controls. The remedial actions that will result in soil disturbance and potential generation of airborne COCs will be two separate soil excavations: one will be conducted in Block 282 and one conducted in Block 283, both to be completed in 30 days. The schedule and organization chart for these remedial actions is provided in **Section 10**.

### 8.1.2    Technical Approach

The PAM plan provides for the real-time sampling of the concentrations of airborne COCs at the site perimeter resulting from the remedial actions. The real-time data will be compared to site-specific action levels to determine if additional emission control measures are necessary. The following sections present the detailed methodologies and analyses that will be implemented to achieve the goal of the PAM plan.

#### 8.1.2.1    Monitored Parameters

The COCs monitored in the PAM plan that is driving the focus of the remedial actions in Block 282 is lead. The COCs driving the focus of remedial actions in Block 283, including planned activities on Blocks 280, 279, and Boylan Avenue, site soil include:
- Benzene
- Chlorobenzene
- Chloroform
- Dichlorobenzene - 1,4-DCB

ASHL-FED-0000106557
ALCD-PUBCOM_0001984

Remedial Action Workplan
Former Ashland Hercules Water Technologies (AHWT) Site
Project Plans



- Dichloroethane - 1,1-DCA
- Dichloroethane - 1,2-DCA
- Dichloroethene, 1,1-
- Dichloroethene, 1,2-cis-
- Isophorone
- Phenol
- Tetrachloroethylene
- Total petroleum hydrocarbon (TPH) High aliphatic (EPH C16-C28)
- TPH High aromatic (EPH C21-C35)
- Trichlorobenzene - 1,2,4-TCB
- Trichloroethylene
- Vinyl Chloride

In addition, particulates (dust) will be monitored. A meteorological monitoring station will be established to monitor weather conditions throughout the duration of the remedial actions.

### 8.1.2.2    Prevailing Wind Direction

Prevailing wind directions based on historical meteorological data were collected from WeatherSpark.com. The historical weather data was reviewed to assist with conceptually locating the monitoring stations. The predominant average hourly wind direction in Kearny varies throughout the year. The wind is most often from the south for 2.2 months, from July 22 to September 28, with a peak percentage of 36 percent on July 28. The wind is most often from the west for 9.8 months, from September 28 to July 22, with a peak percentage of 46 percent on January 1. Wind direction graphs (Kearny, NJ) of historical prevailing wind directions for the peak months are provided in **Figure 8-1**.

### 8.1.2.3    Monitoring Locations

For Block 282, which soil excavation is scheduled for January 2019 (west prevailing wind), four sample locations identified as PAM-P1 through PAM-P4 will be positioned on intervals along Block 282 perimeter at the approximate locations shown on **Figure 8-2**. To satisfy project-specific quality assurance and quality control (QA/QC) sampling requirements, a duplicate station (PAM-P4D) will be co-located at the PAM-4 location. Station PAM-4 is the predominant downwind location (east of site) from the remedial actions.

For Block 283, including planned activities on Blocks 280, 279, and Boylan Avenue, which soil excavation is scheduled for January 2019 (west prevailing wind), five sample locations identified as PAM-P5 through PAM-P9 will be positioned on intervals along the Block 282 perimeter at approximate locations shown on **Figure 8-2**. A duplicate station (PAM-P9D) will be located on downwind location on the east side of the Block 282.

Placement of the PAM-P stations will be based on locating them along each primary site boundary corresponding to the site orientation while also incorporating the configuration of the property and the predominant wind direction. Samples will be collected from approximately 4 to 6 ft off the ground to represent the breathing zone. The PAM-P locations selected should provide representative data of ambient air quality at the perimeter of the site. The perimeter sample locations will be used to identify

EHS Support LLC                                                                                          66

Remedial Action Workplan
Former Ashland Hercules Water Technologies (AHWT) Site
Project Plans



an exceedance of an action level, and the implementation of emission control measures. The work zone monitor will provide a worst-case scenario for advance warning of potential exceedances of the action levels at the perimeter sample locations.

A local meteorological station will be located on Block 283 at an approximate location shown on **Figure 8-2**. This location will be used to collect meteorological data for both the Block 282 and Block 283 perimeter air monitoring sampling locations.

### 8.1.2.4    Monitoring Schedule

Baseline real-time monitoring will also be conducted to establish pre-remedial action air quality before any emission generating activities. The objective of pre-remedial action baseline sampling is to document typical air quality at the site before the start of remedial activities. The pre-remedial action baseline sampling will be performed 24 hours per day for 1 day before the start of remedial actions, and the data will be used to compare pre-remedial action air quality data with air quality conditions measured during remedial actions.

Real-time monitoring will be conducted for 24 hours per day for the first three days of soil excavation at Block 283. The Block 282 soil excavation is scheduled to only take three days. This sampling data will be used to assess whether real-time monitoring is required only during work hours while soil is being excavated or whether monitoring during excavation must be continued on a 24-hour per day sampling period. The purpose of the 3-day assessment is to verify if emissions occur predominantly during the periods of active remedial action (i.e., soil disturbance). If emissions occur only during active remedial action, then the real-time monitoring only will be conducted at the start of each work day and throughout the work day on an approximate hourly basis (in general) until the end of each work day.

### 8.1.2.5    Monitoring Equipment

Real-time monitoring for VOCs will be conducted using a ppbRAE or MiniRAE portable PID with a 10.6ev lamp (or equivalent, as appropriate). The PID will be used to non-selectively monitor VOC concentrations at the perimeter and work zone PAM stations. The PID will generally have a detection limit of 1.0 part per billion (ppb). The PID will be used to monitor air quality along the perimeter. The PID air quality measurements will be collected from the "breathing zone" (4 ft to 6 ft above ground surface) at each PAM station. The field technician will point the instrument toward the open excavation or any stockpile area, and the instrument will be allowed to equilibrate. Instrument readings will be measured over a 1-minute sample interval at each location, and the average concentration will be recorded manually to field data sheets.

Real-time particulate monitoring will be performed using a MIE dataRAM Model DR-4000 real-time particulate monitor, MetOne E-BAM monitor, or equivalent. Each Model DR-4000 monitor is equipped with a temperature conditioning heater and in-line impactor head to monitor and record particulate concentrations with a mean diameter less than 10 micrometers (PM10). The MetOne E-BAM uses beta attenuation as a measurement technique. The environmental enclosure and omnidirectional inlet will be used. The mass of suspended particulate is measured by the decrease in the number of beta particles passed over a particulate filtering medium due to absorption by the particulate. Particulate monitoring will typically be conducted at all PAM stations for approximately 10 hours daily, from 7 a.m. to 5 p.m.,

EHS Support LLC                                                                                                67

Remedial Action Workplan
Former Ashland Hercules Water Technologies (AHWT) Site
Project Plans



during excavation activities. Additional site activities may warrant a longer monitoring period. Particulate data will be recorded and averaged by the instruments' dataloggers every 15 minutes.

Calibrations and maintenance will be conducted at the frequency and in accordance with the procedures recommended by the manufacturer. All calibrations will be recorded.

A Davis Instruments self-contained digital meteorological system (or equivalent) will be used to measure and record wind speed, wind direction, ambient temperature, relative humidity, precipitation as rain, and barometric pressure at 10-second intervals. The recorded measurements will be averaged over 60-minute increments by the system's internal software. The 60-minute average measurements for each meteorological parameter will be stored in the Weatherlink data logger and downloaded periodically. The available information will be documented with the hourly real-time documentation. The meteorological system will be mounted on either a 10-ft aluminum mast or a 10-ft tripod (or equivalent) depending upon the monitoring location selected. The monitoring location will be selected to minimize interferences from surrounding natural or man-made obstructions. The mast or tripod mounted system will be equipped with a lightning rod and grounding system. The system is solar powered and uses backup batteries. Installation and operation of the meteorological monitoring system will be conducted in accordance with manufacturer specifications. Data collected during the monitoring program will be routinely screened for potential operational problems. General weather conditions will also be recorded daily on the air monitoring field forms.

### 8.1.2.6    Quality Assurance/Quality Control

Laboratory QC will be in accordance with the requirements for the specified analytical methods. Laboratory analytical data packages including QC batch summaries with control limits will be provided for all analyses completed by the laboratory. Field QC samples will be collected as part of the QA procedures to ensure that quality objectives are met. One set of duplicate samples will be collected during the real-time sampling events. Duplicate sample sets will be collected at the co-located station PAM-P4D and PAM-P9D at a minimum 10 percent frequency rate of sampling at all PAM stations.

Periodic calibrations and checks are required on the PID field instruments and equipment to be used for the ambient air monitoring program. Daily instrument calibrations, or calibration checks, will be conducted at the beginning of each shift. The calibration results will be recorded in calibration log form. The PID will be calibrated daily using 100 parts per million (ppm) isobutylene calibration gas and in accordance with the manufacturer's guidelines. Span checks will be completed as necessary throughout the day to verify calibration of the instrument. Instrument calibration will be recorded on the calibration log form. Meteorological sensors will be National Institute of Standards and Technology (NIST)-calibrated by the manufacturer or supplier and properly oriented in accordance with manufacturer instructions. Weather conditions will be recorded hourly on the air monitoring field forms and the meteorological data will also be stored in the system data logger.

### 8.1.3   Preventative Measures – Dust

The following techniques have been shown to be effective for controlling the generation and migration of dust during construction activities under low- to moderate-wind conditions. The continuous

EHS Support LLC

ASHL-FED-0000106560
ALCD-PUBCOM_0001987

Remedial Action Workplan
Former Ashland Hercules Water Technologies (AHWT) Site
Project Plans



monitoring of weather conditions is necessary for proper fugitive dust control, as the following
measures may need to be increased based on results of monitoring compared to action levels.

- Wetting equipment and excavation faces
- Spraying water on buckets during excavation and dumping
- Hauling materials in properly tarped or watertight containers
- Restricting vehicle speeds to 10 miles per hour
- Covering stockpiles soil
- Reducing the excavation size and/or number of excavations

When techniques involving water application are used, care must be taken not to use excess water,
which can result in unacceptably wet conditions. Using atomizing sprays will prevent overly wet
conditions and conserve water, while providing an effective means of dust suppression.

## 8.1.4  Action Levels and Response Actions

Site-specific action levels for real-time air monitoring were calculated for Block 282 and Block 283 and
associated areas planned remedial action periods. Real-time monitoring action levels were selected to
maintain perimeter air quality at an acceptable level during remedial activities. The action levels have
been established to identify occasions when additional emissions mitigation measures will be required
to control site emissions sufficiently such that the air quality is not adversely affected.

The site-specific action levels were calculated using risk-based exposure equations for inhalation
presented in the *NJDEP SRP Draft PAM Guidance for Sites Undergoing Remedial Action* (NJDEP, 2010c).
The exposures (3 or 30 days) is considered short-term or subchronic. Therefore, in accordance with the
Draft PAM Guidance, non-carcinogenic subchronic reference concentration (RfC) toxicity values are
appropriate to use to calculate the action levels. If a subchronic RfC is not available, a chronic RfC must
be used.

For Block 282, the length of time the soil will be disturbed is estimated to be three days. The COC
monitored in the PAM plan that is driving the focus of the remedial actions in Block 282 is lead. Lead
does not have a subchronic or chronic RfC (USEPA, 2018). Because the non-carcinogenic or subchronic
lead RfC is not available, the carcinogenic unit risk factor (URF) of $1.2 \times 10^{-5}$ $(\mu g/m^3)^{-1}$ (CalEPA, 2018) was
used to calculate the action level (NJDEP, 2010c). The action level for lead is derived using the following
equation and exposure assumptions:

$$Action\ Level = TR \times AT\ /\ Soil\ Concentration \times CF \times URF \times ED \times EF \times ET$$

Where:

TR = Target Risk = $1 \times 10^{-6}$
AT = Averaging Time = 70 years
Soil Concentration = 95 percent upper confidence limit of the mean (mg/kg)
CF = $1kg/10 \times 10^{6}$ mg
URF = unit risk factor $(\mu g/m^3)^{-1}$
ET = Exposure Time = Work shift length (10 hours/24 hours)
EF = Exposure Frequency = Length of actual excavation (3 days/365 days)
ED = Exposure Duration = 1 year

EHS Support LLC

ASHL-FED-0000106561
ALCD-PUBCOM_0001988

Remedial Action Workplan
Former Ashland Hercules Water Technologies (AHWT) Site
Project Plans



The 95 percent upper confidence limit could not be calculated due to insufficient number of samples in the excavation area. Therefore, the weighted concentration of 1,661 mg/kg for lead from the compliance averaging (**Figure 4-13**) was used. An action level of 1,025 milligram per cubic meter (mg/m$^3$) was calculated for lead in Block 282. However, the Draft PAM Guidance limits the PM$_{10}$ action level to 150 µg/m$^3$ based on the 24-hour National Ambient Air Quality Standard (NAAQS). For an 8-hour time weighted average period and correcting for a New Jersey annual ambient PM$_{10}$ background concentration, an action level of 270 µg/m$^3$ was established. Therefore, this is the action level for PM$_{10}$ for Block 282.

For Block 283, the length of time the soil will be disturbed is estimated to be 30 days. The COCs monitored in the PAM plan that are driving the focus of the remedial actions in Block 282 are VOCs. Because the PID only measures total VOCs, the action level selected for VOCs in Block 282 was based on the lowest RfC of the VOCs monitored. The following table presents the subchronic and chronic RfCs available for the VOCs (USEPA, 2018). The source of the EPH fractions are from a category 2 release, which is petroleum release other than diesel and No. 2 fuel oil (e.g., mineral oil, waste oil, hydraulic oil).

| CAS Number | Chemical | Subchronic RfC (mg/m$^3$) | Source | Chronic RfC (mg/m$^3$) | Source |
|---|---|---|---|---|---|
| 71-43-2 | Benzene | 8.0E-02 | PPRTV | 3.0E-02 | IRIS |
| 108-90-7 | Chlorobenzene | 5.0E-01 | PPRTV | 5.0E-02 | PPRTV |
| 67-66-3 | Chloroform | 2.4E-01 | ATSDR | 9.8E-02 | ATSDR |
| 106-46-7 | Dichlorobenzene, 1,4- | 1.2E+00 | ATSDR | 8.0E-01 | IRIS |
| 75-34-3 | Dichloroethane, 1,1- | NC | NA | NC | NA |
| 107-06-2 | Dichloroethane, 1,2- | 7.0E-02 | PPRTV | 7.0E-03 | PPRTV |
| 75-35-4 | Dichloroethylene, 1,1- | 7.9E-02 | ATSDR | 2.0E-01 | IRIS |
| 156-59-2 | Dichloroethylene, 1,2-cis- | NC | NA | NC | NA |
| 78-59-1 | Isophorone | NC | NA | 2.0E+00 | CalEPA |
| 108-95-2 | Phenol | NC | NA | 2.0E-01 | CALEPA |
| 127-18-4 | Tetrachloroethylene | NC | NA | 4.0E-02 | IRIS |
| NA | TPH High aliphatic (EPH C16-C28) | NC | NA | NC | NA |
| NA | TPH High aromatic (EPH C21-C35) | NC | NA | NC | NA |
| 120-82-1 | Trichlorobenzene, 1,2,4- | NC | NC | 2.00E-03 | PPRTV |
| 79-01-6 | Trichloroethylene | NC | NC | 2.00E-03 | IRIS |
| 75-01-4 | Vinyl Chloride | 7.7E-02 | ATSDR | 1.0E-01 | IRIS |

ATSDR = Agency for Toxic Substances and Disease Registry
CalEPA = California Environmental Protection Agency
CAS = Chemical Abstracts Service
EPH = Extractable Petroleum Hydrocarbons
IRIS = Integrated Risk Information System
mg/m$^3$ = milligrams per cubic meter
NA = not applicable
NC = no criteria
PPRTV = Provisional Peer-Reviewed Toxicity Values

EHS Support LLC

70

ASHL-FED-0000106562
ALCD-PUBCOM_0001989

Remedial Action Workplan
Former Ashland Hercules Water Technologies (AHWT) Site
Project Plans



TPH = Total Petroleum Hydrocarbons

The action levels for VOCs are derived using the following equation and exposure assumptions:

$$Action\ Level = RfC \times AT / ED \times EF \times ET$$

Where:

RfC = Reference Concentration = Contaminant-specific ($\mu g/m^3$)
AT = Averaging Time = 1 year
ET = Exposure Time = Work shift length (10 hours/24 hours)
EF = Exposure Frequency = Length of actual excavation (21 days/365 days)
ED = Exposure Duration = 1 year

An action level of 0.058 mg/m$^3$ was calculated for VOCs for Block 282 based on 1,2,4 trichlorobenzene and trichloroethylene having the lowest RfC, both of which were chronic toxicity criteria.

## 8.2   Fill Use Plan

This section describes the requirements for imported clean fill, the use of on-site soil to re-grade the site, and the characterization of demolished concrete.

### 8.2.1   Imported Clean Fill

Imported soil will meet the clean fill requirements of the Fill Material Guidance for SRP Sites (NJDEP, 2015). Clean fill that does not contain VOCs furthers the remedial action goals of eliminating the impact to groundwater pathway and establishing conditions favorable for an MNA remedy for groundwater. As part of completing compliance averaging, a supplier of clean fill with non-detectable VOCs was identified; the supplier is DunRite Sand and Gravel in Vineland, New Jersey (included in **Appendix D**).

### 8.2.2   On-site Soil

After the soil remedy under buildings 720-722 is completed and the sampling proposed on **Figure 7-4**, remaining soil with concentrations below the NRDCSRS and SSIGWSRS from under the elevated concrete slab will be used to re-grade the areas within the foundation walls. Managing soil within the footprint of the buildings means there are no donor and receiving AOCs and the soil is not alternate fill.

Section 5.3 of NJDEP Technical Guidance *Fill Material Guidance for SRP Sites* (NJDEP, 2015), allows for the relocation of historic fill within a site without meeting the like-on-like and 75th percentile requirements under the following conditions:

- Relocation will not result in an increase in groundwater contamination.
- Placement is protective of human health and the environment.
- All historic fill at the site is remediated according to the TRSR.

The proposed use of historic fill as backfill meets these requirements because the historic fill will be used as backfill where historic fill was previously excavated and disposed of off-site. This relocation will consolidate the extent of historic fill exceeding the NRDCSRS because the remedial action surface soil in

EHS Support LLC

71

ASHL-FED-0000106563
ALCD-PUBCOM_0001990

Remedial Action Workplan
Former Ashland Hercules Water Technologies (AHWT) Site
Project Plans



Block 282 will meet the NRDCSRS. The historic fill will be placed under asphalt pavement in Block 283 in an area already containing historic fill, which will reduce infiltration and not result in an increase in groundwater contamination. The asphalt pavement will be an engineering control, protective of human health and the environment. In summary, after the remedial action all historic fill at the site with exceedances of the NRDCSRS will be in Block 283 and capped by an engineering control.

## 8.2.3  Characterization of Concrete

Concrete slabs, walls, or structures to be removed will be characterized according to NJDEP *Guidance for Characterization of Concrete and Clean Material Certification for Recycling* (NJDEP, 2010b). The goal of characterizing concrete is to minimize the amount of concrete disposed of as a solid waste by off-site recycling or on-site beneficial use. On-site beneficial use will require submittal and NJDEP Bureau of Landfill and Hazardous Waste Permitting approval of an application for a beneficial use project. Instructions for completing the application are found at the following website: https://www.state.nj.us/dep/dshw/rrtp/benuseap.htm.

Before demolition or removal, concrete will be classified as either concrete that can be self-certified as clean without sampling or concrete that requires sampling. Self-certification as clean without sampling requires a review of historical uses and construction features at the site. This information is available in the Preliminary Assessment Report (URS, 2009a) and a pre-mobilization site inspection can evaluate site features. Subject to a review of historical uses and an inspection, concrete that may be self-certified as clean without sampling includes sidewalks, concrete steps, floor slabs in buildings with no history of manufacturing or storage of hazardous materials, and below slab concrete foundation walls and footings.

After the site inspection, a concrete sampling plan will be prepared and submitted to the LSRP. The plan will identify concrete that requires sampling and provide details about sampling and analysis. Sample locations will be biased to known or suspected area of contamination, such as visual stains or discoloration and manufacturing, drumming, and other activities that may have contaminated the concrete. Laboratory analysis will comply with requirements in Section V of NJDEP *Guidance for Characterization of Concrete and Clean Material Certification for Recycling* (NJDEP, 2010b) and analysis requirements for a beneficial use project found at https://www.state.nj.us/dep/dshw/rrtp/benuseap.htm.

If the site is approved as a beneficial use project, concrete can be managed as follows:
- Concrete self-certified as clean without sampling or that has no exceedances of the RDCSRS can be recycled off-site or reduced in size and used to bring the site to final grades. The concrete does not have to be placed within areas where asphalt pavement will be an engineering control.
- Concrete that has exceedances of the RDCSRS but not the NRDCSRS can be disposed of off-site as a solid waste or reduced in size and used to bring the site to final grades. With a deed notice, the concrete does not have to be placed within areas where asphalt pavement will be an engineering control.
- Concrete that has exceedances of the NRDCSRS can be disposed of off-site as a waste or reduced in size and used to bring the site to final grades within areas where asphalt pavement will be an engineering control for direct contact.

EHS Support LLC

72

Remedial Action Workplan
Former Ashland Hercules Water Technologies (AHWT) Site
Project Plans



If the site is not approved as a beneficial use project, all concrete with exceedances of the NRDCSRS must be disposed of off-site as a solid waste.

## 8.3  Site Restoration Plan

The ground surfaces on-site and off-site are currently either vegetated, covered with gravel, or paved. Following cap installation and all other construction activities and disturbances, the site surface features will be restored with surface similar to pre-remediation (i.e., grass areas will be re-seeded, gravel areas will receive gravel, and removed asphalt will be replaced). For disturbed areas to be re-seeded, stabilization will be conducted via temporary seeding and mulching in accordance with *New Jersey Stormwater Best Management Practices Technical Manual* (NJDEP, 2004). Pre-final and final inspections will confirm stabilization is completed. A 6-month inspection will look at vegetation and identify areas that need re-seeding. The permanent stormwater management features will be inspected within 30 to 90 days to identify corrective actions, if needed. All erosion and sediment control measures will remain in place until the risk of erosion no longer exists based on inspection results and the establishment of permanent vegetation.

After all remediation is completed, the post-remediation condition of Harrison Street will be inspected and compared to pre-remediation conditions. Damage caused by trucks or other remediation-related traffic will be identified. If any damage is noted, the Town of Kearny will be notified of the damage and proposed repairs and, after obtaining approval from the Town of Kearny, the damage will be repaired.

## 8.4  Waste Management

This section describes the anticipated wastes and required activities to manage the waste from the point of generation to the disposal facility.

There are not anticipated to be any Resource Conservation and Recovery Act (RCRA) hazardous wastes generated when the soil is removed from the site or from exposure to investigation derived waste (IDW) during field work activities. EPH is not listed as characteristic hazardous wastes under RCRA (as identified in 40 Code of Federal Regulations [CFR] 261). Waste cannot be identified on one of four lists (the F, K, P and U lists) found in 40 CFR 261, and is not anticipated to be a characteristic hazardous waste for toxicity, ignitability, corrosivity, or reactivity. Soil will be sampled and analyzed for RCRA characteristics and other parameters, as required by the selected disposal facilities. Non-hazardous soils will be managed in accordance with N.J.A.C. 7:26-2.1 et seq (N.J.A.C., 2017).

The waste is not anticipated to be a listed or characteristic hazardous waste; however, if it is determined that the waste is hazardous under RCRA, it will be managed as a hazardous waste.

### 8.4.1  Waste Generator Status

As described in in the previous section, the AHWT site will only be considered a generator of RCRA hazardous waste if any hazardous waste is generated. It is not anticipated that any RCRA hazardous waste will be generated. The facility's USEPA generator identification number for disposal of any hazardous waste that may be encountered will be established prior to any disposal activities.

ASHL-FED-0000106565
ALCD-PUBCOM_0001992

Remedial Action Workplan
Former Ashland Hercules Water Technologies (AHWT) Site
Project Plans



*8.4.2  Investigation Derived Wastes*

The remedial action will generate IDW, including water, soil, and used personal protective equipment (PPE). None of the IDW generated at the site is anticipated to be a RCRA hazardous waste. Wastes will be sampled and analyzed for RCRA characteristics and other parameters, as required by the selected disposal facilities.

The anticipated IDW liquid waste from the remedial action will include decontamination water. Liquid wastes will be characterized for disposal and disposed of off-site and are not anticipated to be a RCRA hazardous waste. Excess soil will be capped as part of the remedial action.

In general, PPE will be managed in the same fashion as the waste that contacted the PPE. PPE is anticipated to be designated as non-hazardous PPE and will be placed in transparent trash bags and disposed of in the on-site industrial dumpster.

## 8.5  Remedy Effectiveness

### 8.5.1  Groundwater

The success of the groundwater remedy shall be based on the proposed performance metrics to monitor effectiveness of amendment delivery, consider additional applications of biostimulants, and ultimately transition to an MNA remedy for the potential residual source area and downgradient areas:

- **Potential residual source depletion:**
  - o  Increased generation of intermediate daughter compounds and non-toxic end products as measured in potential residual source area wells.
  - o  Shift in parent PCE and 1,2,4-TCB degradation rates from neutral to negative as an indicator of successful source depletion.
- **Plume remediation:**
  - o  Point degradation rates for all chloroethenes and chlorobenzenes reflect decreasing concentrations over time.
  - o  Dissolved chloroethenes and chlorobenzenes reach or approach their GWQS at the downgradient property boundary as measured by changes in concentrations over time in wells MW-7 and MW-7B, and/or other potential future wells as may be determined to be suitable, within a time period that reflects at least twice the advective water travel time needed to travel from the center of any treatment zone to its downgradient monitoring point.
- **Readiness for Transition to MNA** as the polishing component of the combined technologies remedy:
  - o  Candidate success metrics include:
    - ▪  Two years of decreasing concentrations over time for all chloroethenes and chlorobenzenes
    - ▪  Bulk attenuation rates (k) for chloroethenes and chlorobenzenes are within USEPA's "generally useful" range (i.e, $k = 0.04$ $yr^{-1}$ for 10% of the sites studied to $k = 0.32$ for 90% of the sites studied; USEPA, 2006) .

ASHL-FED-0000106566
ALCD-PUBCOM_0001993

Remedial Action Workplan
Former Ashland Hercules Water Technologies (AHWT) Site
Project Plans



MNA as the sole remaining remedial component for the potential residual source area and downgradient areas will be appropriate when the provisions of N.J.A.C. 7:26E, Technical Requirements for Site Remediation (Technical Rules) (N.J.A.C., 2018a) are met after completion of potential residual source depletion/control measures to allow natural conditions to return to equilibrium or whose future natural behavior may be otherwise estimated.

## 8.5.2  Capping Areas

The initial effectiveness of the asphalt cap at preventing direct contact and infiltration will be established by QC testing and by pre-remediation and post-remediation surveys. The long-term effectiveness of the asphalt caps will be determined by routine inspections and maintenance established in and required by the remedial action permits for soil. Upon LSRP approval of the Soil Remedial Action Report and filing the deed notice, an application for a soil remedial action permit will be submitted for all deed notices and capping except capping of VOCs for the impact to groundwater pathway. Upon demonstration that MNA is protective, a soil remedial action permit modification will be submitted for capping of VOCs for the impact to groundwater pathway.

QC testing of the aggregate base and asphalt mix design and compaction testing during construction will ensure the cap is effective. Laboratory testing of compacted asphalt cores of one or more mix designs will determine the minimum density required to achieve required permeability. The aggregate base will be tested to ensure it meets specified grain size distribution and determine the moisture content range needed to achieve specified compaction. Acceptance of completed construction will be based on density testing of the compacted aggregate base and compacted asphalt at random locations of each completed lift.

Pre-remediation and post-remediation surveys will confirm the cap is constructed to the design thickness and provides protection against direct contact.

Inspection and maintenance to ensure the long-term effectiveness of the cap may include the following:

- Routine inspection of asphalt pavement for cracks or low points that accumulate standing water
- Crack repair using fillers or sealers
- Controlling the growth of vegetation at the edges of the pavement to prevent infiltration at the edges of the cap
- Submittal of biennial reports
- Establishment of financial assurance

## 8.6  Quality Assurance Project Plan

The QAPP was updated for the upcoming remedial action, pursuant to N.J.A.C. 7:26E-1.6(a)4 (N.J.A.C., 2018a). The purpose of the QAPP is to ensure that scientific data are acquired according to established methods and procedures designed to obtain results that are objective, true, reproducible, and of known accuracy. The QAPP is included as **Appendix F**.

ASHL-FED-0000106567
ALCD-PUBCOM_0001994

Remedial Action Workplan
Former Ashland Hercules Water Technologies (AHWT) Site
Permits



# 9   Permits

This section describes the anticipated permits that may be required as part of the remedial action activities including NJDEP and local permits and approvals. The applicability of each of the permits is discussed below.

## 9.1   Remediation Permits

### 9.1.1   Flood Hazard Area Permit

The remedial action does not take place within the flood hazard area and does not require an Individual Flood Hazard Area Permit from NJDEP pursuant to the NJ Flood Hazard Area (FHA) Control Act (N.J.S.A. 58:16A) and associated Rules (N.J.A.C. 7:13 [N.J.A.C, 2018c]).

### 9.1.2   Well Permits

All proposed installation and abandonment of wells during the remedial action will be performed by a well driller and sealer licensed to operate in the State of New Jersey. The well driller will submit all applicable well permits/abandonment requests to NJDEP for approval prior to site activities. In addition, all well locations will be surveyed by a New Jersey licensed surveyor following installation in accordance with NJDEP Data Collection Standards and applicable well construction and maintenance regulations at N.J.A.C. 7:9D (N.J.A.C., 2007). Once wells are installed, the well location form and the construction detail form will be submitted to the NJDEP.

### 9.1.3   Construction Stormwater General Permit

The remedial action will disturb more than one acre of land, thus a Request for Authorization for the NJDEP Stormwater Construction General Permit (5G3) is required in conjunction with a certified Soil Erosion and Sediment Control (SESC) plan.

### 9.1.4   Soil Erosion and Sediment Control Plan

In accordance with the SESC Act of New Jersey (N.J.S.A. 4:24-39), a project disturbing more than 5,000 square ft requires a SESC Plan certified by the Soil Conservation District. A SESC plan for the project, with a complete drainage report, will be prepared and submitted to the Hudson Essex Passaic Soil Conservation District for approval prior to the construction activities. The District will review the plan within 30 days. The certification is valid for 3.5 years.

The proposed remedial actions and use of the site for remediation support operations will disturb approximately 3.75 acres of land, of which approximately 2.3 acres will be impervious area. The disturbed area will be graded to promote positive drainage. Non-structural stormwater management strategies (i.e., minimizing land disturbance, disconnecting runoff over impervious surfaces, protecting natural drainage features and vegetation) will be incorporated into the site design. The erosion controls implemented will mitigate the impacts that the proposed remedial actions may bring to the water quality downstream.

EHS Support LLC

76

Remedial Action Workplan
Former Ashland Hercules Water Technologies (AHWT) Site
Permits



An SESC plan will show locations of erosion control measures and include construction sequence, SESC notes, and details of erosion control measures. Stability and erosion control calculations will be part of the submission. All erosion controls will meet *The Standards for Soil Erosion and Sediment Control in New Jersey* (NJDEP, 2017c) and include, but may not be limited to, the installation of stabilized construction entrance, silt fences, sediment traps, erosion and sediment control blankets, and seeding as required. Upon completion of the project, the erosion and sediment control measures will be removed, and the areas disturbed during this process will be re-stabilized in accordance with the approved plan.

## 9.1.5   Discharge to Groundwater Permit-by-Rule

Discharges to groundwater that occur during a site remediation that is being conducted in accordance with the Technical Requirements for Site Remediation, N.J.A.C. 7:26E (N.J.A.C., 2018a) require written NJDEP pre-approval including public notice. The conceptual remedial approach for the VOC exceedances in the saturated zone at the site includes injection of EVO, a NJDEP Discharge to Ground Water (DGW) by Permit-By-Rule (PBR) Authorization is required prior to implementation. NJDEP approved public notice will be published at least 45 days prior to the proposed startup date of the groundwater discharge, if active discharge will exceed 180 days. The DGW PBR application will be submitted after the bench scale and/or pilot biotreatability tests determine the injection program specifications.

## 9.1.6   Local Permits

Prior to construction, all construction/work permits and approvals will be obtained from local and/or county regulatory authorities, as needed. Local permits may include, but may not be limited to, those listed in the following subsections.

### 9.1.6.1   Hudson County Construction Permit

The proposed remedial action construction activities will be performed by a contractor registered and licensed to operate in the State of New Jersey. If road closing is required, a traffic control plan showing the detour should be submitted to the Hudson County Department of Public Works for approval by the County Engineer. If required, local police should be contacted for traffic control at least 48 hours in advance. A selected contractor must follow all County, New Jersey Department of Transit, and OSHA standards, rules, and regulations.

### 9.1.6.2   Kearny Township

Prior to remedial action construction activities, a Zoning Grading Permit will be submitted to the Town of Kearny's Construction Code Office. SESC measures will be provided in the SESC plan submitted to Hudson Essex Passaic Soil Conservation District. If road closing is required, Town of Kearny Street Obstructions code will be followed and permission of the Street Commissioner will be attained beforehand.

EHS Support LLC                                                                                                      77

ASHL-FED-0000106569
ALCD-PUBCOM_0001996

Remedial Action Workplan
Former Ashland Hercules Water Technologies (AHWT) Site
Permits



## 9.2  NJDEP Post-Remediation Permits

### 9.2.1  Soil Remedial Action Permits

A Remedial Action Permit for Soil is required because engineering and institutional controls are needed to meet soil remediation standards. After implementing the remedial action, preparing and submitting the LSRP-approved RAR, and filing the deed notice with Hudson County, a soil remedial action permit (RAP) will be applied for. Within 30 days after the deed notice is recorded, the following will be submitted to NJDEP SRP: initial Soil Remedial Action Permit application for soil on the signed NJDEP application form; fee; copy of the deed notice; copies of each no further action issued for the AOCs at the site; copy of the RAR; and a GIS shapefile or CAD file showing the deed notice boundary. Because an engineering control is used, financial assurance for the engineering control will need to be established prior to filing the permit application. The financial assurance must be for the duration of time the engineering control is in place. Because the engineering control will be required for an indefinite  period of time, a 30-year period of financial assurance will be required.

Because the remedy includes capping VOCs for the impact to groundwater pathway, upon demonstrating that MNA is protective, the remedial action permit will be modified for maintaining capping conditions until unsaturated soil meets the SSIGWSRS.

### 9.2.2  Groundwater Remedial Action Permit

A Ground Water Remedial Action Permit is required because the concentrations of COCs in groundwater will remain above the Ground Water Quality Standards, N.J.A.C. 7:9C (N.J.A.C., 2010) for an extended period of time. Two CEAs have already been proposed for the Site, the CEAs were approved by NJDEP in 2018 (NJDEP, 2018c; NJDEP, 2018d). Once the groundwater remedial action has been implemented and the groundwater RAR is submitted, the following will be submitted to the NJDEP SRP: Initial Ground Water Remedial Action Permit application for MNA on the signed NJDEP application form; fee; copy of the RAR; revised CEA/well restriction area (WRA) fact sheet; groundwater monitoring plan; site map; schedule; and a GIS map of the proposed revised CEA boundary and monitoring wells.

ASHL-FED-0000106570
ALCD-PUBCOM_0001997

Remedial Action Workplan
Former Ashland Hercules Water Technologies (AHWT) Site
Schedule and Organization Chart



# 10 Schedule and Organization Chart

The remedial action activities proposed in this RAW, referred to in this section as the Project, schedule begins upon submission of the RAW to the NJDEP. The project starts with the electronic upload of the RAW to the NJDEP by the LSRP.

Soil-related remedial activities are scheduled to be completed in 2019.
- Project activities include permit applications, evaluation of scope by the remedial action contractors, and the remedial action contractor's schedule.
- Additional soil sampling activities will be completed prior to soil excavation.
- The Project will be managed using the remedial action contractor's schedule for the soil excavation work.

Groundwater-related remedial activities will begin in 2019 following completion of above-grade and shallow subsurface site work in the following order:
- Additional monitoring well installation
- Bench and pilot biotreatability tests prior to finalization of the remedial design
- Submission of the Discharge to Groundwater Permit-by-Rule Authorization Request
- Groundwater injection activities
- Groundwater monitoring activities.

The LSRP of record for the former AHWT Site is David J. Russell, P.E., BCEE, LSRP of AECOM (LSRP License #574867). Quarterly Progress Reports to the LSRP will include remedial action progress and schedule updates. **Figure 10-1** provides a high-level organization chart for the Kearny Site remedial action.

According to N.J.A.C 7:26E-5.8 (N.J.A.C., 2018a), the regulatory timeframe to submit the RAR is five years after the earliest regulatory date for submission of the RIR as specified in 7:26E-4.10. The earliest regulatory date for the RIR was March 1, 2017; therefore, the regulatory date to issue the RAO is February 28, 2022. The mandatory date to issue the RAO is two years after the regulatory date, or February 28, 2024. The soil and groundwater RAR will be completed and submitted to the LSRP and NJDEP, followed by the soil and groundwater remedial action permits and a RAO issued upon receipt of required remedial action permits.

ASHL-FED-0000106571
ALCD-PUBCOM_0001998



# 11 References

EHS Support, 2017. Remedial Investigation Report. March 1, 2017.

N.J.A.C., 2007. N.J.A.C. 7:9D Well Construction and Maintenance; Sealing of Abandoned Wells, April, 2, 2007.

N.J.A.C., 2010. N.J.A.C. 7:9C Groundwater Quality Standards, July 22, 2010.

N.J.A.C., 2017. N.J.A.C. 7:26-2.1 Solid Waste Regulations Disposal, September 2017.

N.J.A.C., 2018a. N.J.A.C. 7:26E Technical Requirements for Site Remediation, August 8, 2018.

N.J.A.C., 2018b. N.J.A.C. 7:26D Remediation Standards, August 2018.

N.J.A.C., 2018c. N.J.A.C. 7:13 Flood Hazard Area Control Act Rules, April 2018.

NJDEP, Chemical Properties for Calculation of Impact to Ground Water Soil Remediation Standards. Retrieved online. https://www.nj.gov/dep/srp/guidance/rs/chemproperties.pdf

NJDEP, 2002. NJDEP Division of Science, Research and Technology, New Jersey Geological Survey, Surficial Geology of the Elizabeth Quadrangle, Essex, Passaic, and Bergen Counties, New Jersey Open File Map OFM 42, 2002.

NJDEP-NJGS, 2002. NJDEP New Jersey Geological Survey Surficial Geology of the Elizabeth Quadrangle (OFM 42). 2002.

NJDEP, 2004. New Jersey Stormwater Best Management Practices Technical Manual. April 2004.

NJDEP, 2008. Introduction to Site-Specific Impact to Ground Water Soil Remediation Standards Guidance Documents. December 2008.

NJDEP, 2010a. Protocol for Addressing Extractable Petroleum Hydrocarbons. Version 5.0. August 9, 2010.

NJDEP, 2010b. Guidance for Characterization of Concrete and Clean Material Certification for Recycling. January 12, 2010.

NJDEP, 2010c. NJDEP SRP Draft PAM Guidance for Sites Undergoing Remedial Action. 2010.

NJDEP, 2012a. Technical Guidance for the Attainment of Remediation Standards and Site-Specific Criteria. Version 1.0. September 24, 2012.

NJDEP, 2012b. NJDEP Site Remediation Program Groundwater Technical Guidance: Site Investigation, Remedial Investigation, Remediation Action Performance Monitoring. April 3, 2012.

ASHL-FED-0000106572
ALCD-PUBCOM_0001999

Remedial Action Workplan
Former Ashland Hercules Water Technologies (AHWT) Site
References



NJDEP, 2012c. Monitored Natural Attenuation Technical Guidance. March 1, 2012.

NJDEP, 2013. NJDEP Master Table Generic Vapor Intrusion Screening Levels. March 2013.

NJDEP, 2014a. Capping of Inorganic and Semivolatile Contaminants for the Impact to Ground Water
    Pathway. March 2014.

NJDEP, 2014b.  Technical Guidance on the Capping of Sites Undergoing Remediation.  July 2014.

NJDEP, 2015. Fill Material Guidance for SRP Sites. Version 3.0. April 2015.

NJDEP, 2017a. In Situ Remediation: Design Considerations and Performance Monitoring Technical
    Guidance Document. October 2017.

NJDEP, 2017b. Training: In Situ Remedial Action Design Consideration and Performance Monitoring.
    November.

NJDEP, 2017c. The Standards for Soil Erosion and Sediment Control in New Jersey. 7th Edition. July 2017.

NJDEP, 2018a. Capping of Volatile Contaminants for the Impact to Ground Water Pathway. August 30,
    2018.

NJDEP, 2018b. Vapor Intrusion Technical Guidance Version 4.1 – Site Remediation and Waste
    Management Program: New Jersey Department of Environmental Protection. January 2018.

NJDEP, 2018c. Classification Exception Area/Well Restriction Area. October 19, 2018.

NJDEP, 2018d. Classification Exception Area/Well Restriction Area Associated with Historic Fill. October
    17, 2018.

URS, 2009a. URS Corporation. Preliminary Assessment Report, August 6, 2009.

URS, 2009b. URS Corporation. Site Investigation Report, August 20, 2009.

URS, 2009c. URS Corporation. Remediation Status Report, December 21, 2009.

URS, 2010. URS Corporation. Remediation Status Report, December 29, 2010.

USGS, 1996, United States Geological Survey Bedrock Geologic Map of Northern New Jersey. 1996.

ASHL-FED-0000106573
ALCD-PUBCOM_0002000

Remedial Action Workplan
Former Ashland Hercules Water Technologies (AHWT) Site



Tables

ASHL-FED-0000106574
ALCD-PUBCOM_0002001

Remedial Action Workplan
Former Ashland Hercules Water Technologies (AHWT) Site

Figures

EHS Support LLC

Remedial Action Workplan
Former Ashland Hercules Water Technologies (AHWT) Site



Appendix A        Pre-Design Investigation Report

EHS Support LLC

ASHL-FED-0000106576
ALCD-PUBCOM_0002003

Remedial Action Workplan
Former Ashland Hercules Water Technologies (AHWT) Site



Appendix B     Analytical Data Tables

EHS Support LLC

Remedial Action Workplan
Former Ashland Hercules Water Technologies (AHWT) Site



Appendix C        EPH Category 2 Sample-Specific Human Health Soil
              Remediation Criterion (SRC) Calculations

EHS Support LLC

ASHL-FED-0000106578
ALCD-PUBCOM_0002005

Remedial Action Workplan
Former Ashland Hercules Water Technologies (AHWT) Site



Appendix D        Compliance Averaging Calculations for VOCs and SVOCs
Exceedances of SSIGWSRS

ASHL-FED-0000106579
ALCD-PUBCOM_0002006

Remedial Action Workplan
Former Ashland Hercules Water Technologies (AHWT) Site



# Appendix E    Assessment of Natural and Enhanced Biological Attenuation of Chlorinated Ethenes and Chlorinated Benzenes

EHS Support LLC

ASHL-FED-0000106580
ALCD-PUBCOM_0002007

Remedial Action Workplan
Former Ashland Hercules Water Technologies (AHWT) Site



Appendix F        Quality Assurance Project Plan

EHS Support LLC

# EXHIBIT 36

OxyChem's Comments in Opposition to Proposed Consent Decree,
*United States v. Alden Leeds, Inc., et al.*, Civil Action No. 2:22-cv-07326 (D.N.J.)



Langsam Stevens Silver & Hollaender LLP

ENVIRONMENTAL, REAL ESTATE, BUSINESS AND INSURANCE LAW

March 11, 2022

*By email and regular mail*

Sarah P. Flanagan, Esq. (flanagan.sarah@epa.gov)
United States Environmental Protection Agency, Region 2
290 Broadway, 17th Floor
New York, NY 10007

**Re: Diamond Alkali Superfund Site**

Dear Ms. Flanagan,

We represent Occidental Chemical Corporation ("Occidental") with regard to the Diamond Alkali Superfund Site ("Site"). Occidental requests that the Environmental Protection Agency issue to Clean Earth of North Jersey, Inc. ("Clean Earth") a General Notice Letter of potential liability at the Site for Clean Earth's facility at 101-115 Jacobus Avenue, Kearny, New Jersey and a former facility at 53 Pennsylvania Avenue, Kearny, New Jersey (see attachment 1, page 5, showing address of earlier location). Clean Earth is the successor to S&W Waste, Inc. (see attachment 2, page 8 (response to Interrogatory # 1)).

1.    **Clean Earth Disposed of Dioxin at its Upland Facility and Discharged it to the Passaic**

Since 1972, S&W Waste/Clean Earth has operated a hazardous waste treatment, storage, and disposal (TSD) facility at the two facilities, processing solid and liquid wastes for resale or disposal (see attachment 2, page 9 (response to Interrogatory # 2) and attachment 3, pp. CENJ-FED-0000045720-21)). S&W Waste/Clean Earth analyzes incoming wastes from different industries to characterize the type of waste before treatment or shipment for disposal. From 1984 to 1989, the waste was first staged at a location called "**the Former QA Dock**" (see attachment 4, p. 9 (excerpt from 2007 Remedial Investigation Report)).

Dioxin/furan samples from the Former QA Dock were analyzed, and 2,3,7,8-TCDD concentrations were up to 6,450 ng/kg (see attachment 4, Table 3A). To put this concentration in perspective, the ROD-designated Preliminary Remediation Goal (PRG) for 2,3,7,8-TCDD is 8.3 ng/kg. The spatial distribution of the 2,3,7,8-TCDD at the Former QA Dock, on the eastern edge of the property and not adjacent to the Passaic River, is inconsistent with distributions that would have resulted from site flooding from the River. There is thus no logical explanation the presence of 2,3,7,8-TCDD in onsite soil samples on Clean Earth's property *other than* that is the result of Clean Earth's waste handling operations.

Larry Silver
Attorney at Law
Member PA, CA, DC Bars
lsilver@lssh-law.com

Philadelphia Office
1818 Market Street, Suite 2430
Philadelphia, PA 19103-5319
T 215.732.3255   F 215.732.3260

New Jersey Office
65 South Main Street, Suite B102
Pennington, NJ 08534
T 856.727.0057   F 856.727.0315

www.lssh-law.com

ALCD-PUBCOM_0002010

Sarah P. Flanagan, Esq.
March 11, 2022
Page 2

Dioxin/furan profiles (i.e., fingerprints) of 2,3,7,8-TCDD at the Former QA Dock match the profiles in the river sediment, specifically in the sediment located directly at the Pennsylvania Avenue storm sewer outfalls (coefficient of determination $R^2$ is 96%; a statistical match). See Figure 1, comparing dioxin/furan site analysis results (from attachment 4, Table 3A, sample QA-5A) to the Passaic River sediment results (sediment sample LPR-0239-04-20-25). This means that the source of dioxins and furans in the sediment at the storm sewer outfalls is almost certainly Clean Earth's operations at the Former QA Dock. See attachment 5 (plan taken from 2007 draft Remedial Action Report) for the location of the outfalls.

Despite these levels of 2,3,7,8-TCDD, Clean Earth has produced no information in OxyChem's pending CERCLA litigation to indicate that it has taken any action to remedy or remove it from its upland soils or from the Passaic River.



Figure 1. A statistical match between dioxins/furans at Clean Earth Site soil and Passaic River sediment.

## 2. Clean Earth Disposed of Lead at its Upland Facility and Discharged it to the Passaic

The Clean Earth facility also had astronomically high levels of lead in its soil. A 1996 "hot spot" investigation and removal action revealed that several samples had lead levels above the non-residential standard of 800 mg/kg (inhalation-dermal exposure pathway). Two samples had lead levels of 74,139 and 19,322 mg/kg, respectively. This means that those two samples consisted of about 7 % and 2 % lead by weight. The former sample had almost 100 times the 800 mg/kg soil remediation standard for New Jersey. N.J.A.C. 7:26D, Table 2. See attachment 6, page CENJ-FED-0000036435 (soil removal report).

Clean Earth's lead found its way to the Passaic River. 0.44 pounds per year – a bit less than half a pound – was released every year to surface water through storm water runoff. See attachment 7, page 2 of 5 (2007 Toxics Release Inventory for Clean Earth's Jacobus Avenue plant). The only candidate for the "surface water" into which the lead is released is the Passaic River. There are two outfalls leading directly from the Clean Earth facility to the Passaic River. See attachment 5).

ALCD-PUBCOM_0002011

Sarah P. Flanagan, Esq.
March 11, 2022
Page 3

Even after the "hot spot" removal in 1996, lead levels in soil remained above non-residential limits. See attachment 3, page CENJ-FED-0000045736 (2012 Remedial Investigation Report). All eight ROD–designated COCs[1] for the Passaic River were detected in the Clean Earth's soil, with lead, PCBs and PAHs all exceeding their respective industrial standard. See attachment 3, pp. CENJ-FED-0000045734-38.[2]

Lead and other metals were released from the Clean Earth facility into the Passaic River through groundwater as well as surface water. Groundwater metal levels, including lead, were orders of magnitude higher than applicable standards at Clean Earth's facility. See attachment 8, pp. CENJ-FED-0000036338-41. Groundwater flow is towards the Passaic River, meaning the lead-contaminated groundwater, dioxins, furans and other COCs at the facilities also contaminated the Passaic River, and continue to do so. See attachment 9 (taken from 2007 draft Remedial Action Report).

Clean Earth of North Jersey, Inc. is a responsible party under CERCLA at the Diamond Alkali Superfund Site and EPA should send Clean Earth of North Jersey, Inc. a General Notice Letter of potential liability. Please do not hesitate to contact me if you have any questions and seek additional information regarding the above.

Sincerely,
**Langsam Stevens Silver & Hollaender LLP**

Larry Silver

cc (email only):     Mr. Pat Evangelista (evangelista.pat@epa.gov)
                     Juan M. Fajardo, Esq. (fajardo.juan@epa.gov)
                     Frances M. Zizila, Esq. (zizila.frances@epa.gov)
                     Brian Donohue, Esq. (brian.donohue@usdoj.gov)
                     Laura Rowley, Esq. (laura.rowley@usdoj.gov)

---

[1] Dioxins and furans; PCBs; mercury; DDT and breakdown products; copper; dieldrin; PAHs; and lead.

[2] The PAHs that exceed the non-residential standard are benzo(a)pyrene and benzo(b)fluoranthene. See p. CENJ-FED-0000045734.

ALCD-PUBCOM_0002012

# EXHIBIT 37

OxyChem's Comments in Opposition to Proposed Consent Decree,
*United States v. Alden Leeds, Inc., et al.*, Civil Action No. 2:22-cv-07326 (D.N.J.)

ALCD-PUBCOM_0002013

| Parties | COC | Total Gmass | A% | Dmass | Tmass | Relative Contribution | RRN | COC BS | CUF | COF | Total Adjustment |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 21st Century Fox America, Inc. (21CFA) | DDx | 486.72 | 1.018817% | 4.96 | 27,000 | 0.00018 | 1.37 | 0.00025 | 5% | -20% | 85% |
| 21st Century Fox America, Inc. (21CFA) | Dieldrin | 1.11 | 1.018817% | 0.01 | 390 | 0.00003 | 0.13 | 0.00006 | 5% | -20% | 85% |
| 21st Century Fox America, Inc. (21CFA) | LPAHs | 567.02 | 1.018817% | 5.78 | 170,000 | 0.00003 | 0.05 | 0.00005 | 5% | -20% | 85% |
| 21st Century Fox America, Inc. (21CFA) | HPAHs | 0.77 | 1.018817% | 0.01 | 240,000 | 0.00000 | 0.05 | - | 5% | -20% | 85% |
| 21st Century Fox America, Inc. (21CFA) | Dioxins_Furans | 0 | 1.018817% | 0.00 | 38 | - | 83.92 | - | 5% | -20% | 85% |
| 21st Century Fox America, Inc. (21CFA) | PCBs | 0 | 1.018817% | 0.00 | 26,000 | - | 12.87 | - | 5% | -20% | 85% |
| 21st Century Fox America, Inc. (21CFA) | Lead | 0 | 1.018817% | 0.00 | 3,200,000 | - | 0.01 | - | 5% | -20% | 85% |
| 21st Century Fox America, Inc. (21CFA) | Mercury | 0 | 1.018817% | 0.00 | 42,000 | - | 0.95 | - | 5% | -20% | 85% |
| 21st Century Fox America, Inc. (21CFA) | Copper | 0 | 1.018817% | 0.00 | 2,100,000 | - | 0.69 | - | 5% | -20% | 85% |
| Alden Leeds 2 - 100 Hackensack Ave | HPAHs | 53.96 | 1.018817% | 0.55 | 240,000 | 0.00000 | 0.05 | 0.00006 | 5% | 20% | 125% |
| Alden Leeds 3 - 2145 McCarter Ave | HPAHs | 32.58 | 1.018817% | 0.33 | 240,000 | 0.00000 | 0.05 | 0.00006 | 0% | 20% | 125% |
| Alden Leeds 2 - 100 Hackensack Ave | LPAHs | 35.97 | 1.018817% | 0.37 | 170,000 | 0.00000 | 0.05 | 0.00000 | 0% | 20% | 125% |
| Alden Leeds 3 - 2145 McCarter Ave | LPAHs | 21.72 | 1.018817% | 0.22 | 170,000 | 0.00000 | 0.01 | 0.00000 | 0% | 20% | 120% |
| Alden Leeds 1 - 55 Jacobus Ave | Dieldrin | 0 | 1.018817% | 0.00 | 390 | - | 0.13 | - | 5% | 20% | 125% |
| Alden Leeds 1 - 55 Jacobus Ave | DDx | 0 | 1.018817% | 0.00 | 27,000 | - | 1.37 | - | 5% | 20% | 125% |
| Alden Leeds 1 - 55 Jacobus Ave | Dioxins_Furans | 0 | 1.018817% | 0.00 | 38 | - | 83.92 | - | 5% | 20% | 125% |
| Alden Leeds 1 - 55 Jacobus Ave | Mercury | 0 | 1.018817% | 0.00 | 42,000 | - | 0.95 | - | 5% | 20% | 125% |
| Alden Leeds 1 - 55 Jacobus Ave | PCBs | 0 | 1.018817% | 0.00 | 26,000 | - | 12.87 | - | 5% | 20% | 125% |
| Alden Leeds 1 - 55 Jacobus Ave | Copper | 0 | 1.018817% | 0.00 | 2,100,000 | - | 0.69 | - | 5% | 20% | 125% |
| Alden Leeds 1 - 55 Jacobus Ave | Lead | 0 | 1.018817% | 0.00 | 3,200,000 | - | 0.01 | - | 5% | 20% | 125% |
| Alden Leeds 1 - 55 Jacobus Ave | LPAHs | 0 | 1.018817% | 0.00 | 170,000 | - | 0.01 | - | 5% | 20% | 125% |
| Alden Leeds 1 - 55 Jacobus Ave | HPAHs | 0 | 1.018817% | 0.00 | 240,000 | - | 0.05 | - | 5% | 20% | 125% |
| Alden Leeds 2 - 100 Hackensack Ave | Dieldrin | 0 | 1.018817% | 0.00 | 390 | - | 0.13 | - | 5% | 20% | 125% |
| Alden Leeds 2 - 100 Hackensack Ave | DDx | 0 | 1.018817% | 0.00 | 27,000 | - | 1.37 | - | 5% | 20% | 125% |
| Alden Leeds 2 - 100 Hackensack Ave | Dioxins_Furans | 0 | 1.018817% | 0.00 | 38 | - | 83.92 | - | 5% | 20% | 125% |
| Alden Leeds 2 - 100 Hackensack Ave | Mercury | 0 | 1.018817% | 0.00 | 42,000 | - | 0.95 | - | 5% | 20% | 125% |
| Alden Leeds 2 - 100 Hackensack Ave | PCBs | 0 | 1.018817% | 0.00 | 26,000 | - | 12.87 | - | 5% | 20% | 125% |
| Alden Leeds 2 - 100 Hackensack Ave | Copper | 0 | 1.018817% | 0.00 | 2,100,000 | - | 0.69 | - | 5% | 20% | 125% |
| Alden Leeds 2 - 100 Hackensack Ave | Lead | 0 | 1.018817% | 0.00 | 3,200,000 | - | 0.01 | - | 5% | 20% | 125% |
| Alden Leeds 3 - 2145 McCarter Highway | Dieldrin | 0 | 1.018817% | 0.00 | 390 | - | 0.13 | - | 0% | 20% | 120% |
| Alden Leeds 3 - 2145 McCarter Highway | DDx | 0 | 1.018817% | 0.00 | 27,000 | - | 1.37 | - | 0% | 20% | 120% |
| Alden Leeds 3 - 2145 McCarter Highway | Dioxins_Furans | 0 | 1.018817% | 0.00 | 38 | - | 83.92 | - | 0% | 20% | 120% |
| Alden Leeds 3 - 2145 McCarter Highway | Mercury | 0 | 1.018817% | 0.00 | 42,000 | - | 0.95 | - | 0% | 20% | 120% |
| Alden Leeds 3 - 2145 McCarter Highway | PCBs | 0 | 1.018817% | 0.00 | 26,000 | - | 12.87 | - | 0% | 20% | 120% |
| Alden Leeds 3 - 2145 McCarter Highway | Copper | 0 | 1.018817% | 0.00 | 2,100,000 | - | 0.69 | - | 0% | 20% | 120% |
| Alden Leeds 3 - 2145 McCarter Highway | Lead | 0 | 1.018817% | 0.00 | 3,200,000 | - | 0.01 | - | 0% | 20% | 120% |
| Alliance Chemical Inc. | PCBs | 5.54 | 1.018817% | 0.06 | 26,000 | 0.00000 | 12.87 | 0.00003 | 10% | 0% | 110% |
| Alliance Chemical Inc. | HPAHs | 11901.07 | 1.018817% | 121.25 | 240,000 | 0.00051 | 0.05 | 0.00005 | 10% | 0% | 110% |
| Alliance Chemical Inc. | Copper | 3086.96 | 1.018817% | 31.45 | 2,100,000 | 0.00001 | 0.69 | 0.00001 | 10% | 0% | 110% |
| Alliance Chemical Inc. | LPAHs | 7955.64 | 1.018817% | 81.05 | 170,000 | 0.00048 | 0.05 | 0.00000 | 10% | 0% | 110% |
| Alliance Chemical Inc. | Mercury | 20.44 | 1.018817% | 0.21 | 42,000 | 0.00000 | 0.95 | 0.00000 | 10% | 0% | 110% |
| Alliance Chemical Inc. | Lead | 892.44 | 1.018817% | 9.09 | 3,200,000 | 0.00000 | 0.01 | 0.00000 | 10% | 0% | 110% |
| Alliance Chemical Inc. | Dieldrin | 0 | 1.018817% | 0.00 | 390 | - | 0.13 | - | 10% | 0% | 110% |
| Alliance Chemical Inc. | DDx | 0 | 1.018817% | 0.00 | 27,000 | - | 1.37 | - | 10% | 0% | 110% |
| Alliance Chemical Inc. | Dioxins_Furans | 0 | 1.018817% | 0.00 | 38 | - | 83.92 | - | 10% | 0% | 110% |
| Arkema Inc. | Copper | 489.95 | 1.018817% | 4.99 | 2,100,000 | 0.00000 | 0.69 | - | 10% | -20% | 90% |
| Arkema Inc. | PCBs | 0.21 | 1.018817% | 0.00 | 26,000 | 0.00000 | 12.87 | - | 10% | -20% | 90% |
| Arkema Inc. | Mercury | 2.51 | 1.018817% | 0.03 | 42,000 | 0.00000 | 0.95 | 0.00000 | 10% | -20% | 90% |
| Arkema Inc. | HPAHs | 79.14 | 1.018817% | 0.81 | 240,000 | 0.00000 | 0.05 | 0.00000 | 10% | -20% | 90% |
| Arkema Inc. | LPAHs | 51.74 | 1.018817% | 0.53 | 170,000 | 0.00000 | 0.05 | 0.00000 | 10% | -20% | 90% |
| Arkema Inc. | Lead | 174.72 | 1.018817% | 1.78 | 3,200,000 | 0.00000 | 0.01 | 0.00000 | 10% | -20% | 90% |
| Arkema Inc. | Dieldrin | 0 | 1.018817% | 0.00 | 390 | - | 0.13 | - | 10% | -20% | 90% |
| Arkema Inc. | DDx | 0 | 1.018817% | 0.00 | 27,000 | - | 1.37 | - | 10% | -20% | 90% |
| Arkema Inc. | Dioxins_Furans | 0 | 1.018817% | 0.00 | 38 | - | 83.92 | - | 10% | -20% | 90% |
| Ashland Inc. | LPAHs | 604.36 | 1.018817% | 6.16 | 170,000 | 0.00004 | 0.05 | 0.00004 | 10% | -20% | 90% |
| Ashland Inc. | HPAHs | 62.04 | 1.018817% | 0.63 | 240,000 | 0.00000 | 0.05 | - | 10% | -20% | 90% |
| Ashland Inc. | Dieldrin | 0 | 1.018817% | 0.00 | 390 | - | 0.13 | - | 10% | -20% | 90% |
| Ashland Inc. | DDx | 0 | 1.018817% | 0.00 | 27,000 | - | 1.37 | - | 10% | -20% | 90% |
| Ashland Inc. | Dioxins_Furans | 0 | 1.018817% | 0.00 | 38 | - | 83.92 | - | 10% | -20% | 90% |
| Ashland Inc. | Mercury | 0 | 1.018817% | 0.00 | 42,000 | - | 0.95 | - | 10% | -20% | 90% |
| Ashland Inc. | PCBs | 0 | 1.018817% | 0.00 | 26,000 | - | 12.87 | - | 10% | -20% | 90% |
| Ashland Inc. | Copper | 0 | 1.018817% | 0.00 | 2,100,000 | - | 0.69 | - | 10% | -20% | 90% |
| Ashland Inc. | Lead | 0 | 1.018817% | 0.00 | 3,200,000 | - | 0.01 | - | 10% | -20% | 90% |
| Atlantic Richfield (ARCO) | PCBs | 5.03 | 1.018817% | 0.05 | 26,000 | 0.00000 | 12.87 | 0.00003 | 0% | -20% | 80% |
| Atlantic Richfield (ARCO) | HPAHs | 347.06 | 1.018817% | 3.54 | 240,000 | 0.00000 | 0.05 | 0.00000 | 0% | -20% | 80% |
| Atlantic Richfield (ARCO) | LPAHs | 239.2 | 1.018817% | 2.44 | 170,000 | 0.00001 | 0.05 | 0.00000 | 0% | -20% | 80% |
| Atlantic Richfield (ARCO) | DDx | 0 | 1.018817% | 0.00 | 27,000 | - | 1.37 | - | 0% | -20% | 80% |
| Atlantic Richfield (ARCO) | Dioxins_Furans | 0 | 1.018817% | 0.00 | 38 | - | 83.92 | - | 0% | -20% | 80% |
| Atlantic Richfield (ARCO) | Mercury | 0 | 1.018817% | 0.00 | 42,000 | - | 0.95 | - | 0% | -20% | 80% |
| Atlantic Richfield (ARCO) | Copper | 0 | 1.018817% | 0.00 | 2,100,000 | - | 0.69 | - | 0% | -20% | 80% |
| Atlantic Richfield (ARCO) | Lead | 0 | 1.018817% | 0.00 | 3,200,000 | - | 0.01 | - | 0% | -20% | 80% |
| Atlas Refining Inc. | HPAHs | 4397.19 | 1.018817% | 44.80 | 240,000 | 0.00019 | 0.05 | 0.00001 | 0% | 20% | 110% |
| Atlas Refining Inc. | Copper | 526.45 | 1.018817% | 5.36 | 2,100,000 | 0.00000 | 0.69 | 0.00000 | 0% | 20% | 110% |
| Atlas Refining Inc. | LPAHs | 2931.46 | 1.018817% | 29.87 | 170,000 | 0.00018 | 0.05 | 0.00000 | 0% | 20% | 110% |
| Atlas Refining Inc. | Mercury | 0.3 | 1.018817% | 0.00 | 42,000 | 0.00000 | 0.95 | - | 0% | 20% | 110% |
| Atlas Refining Inc. | Lead | 1796.69 | 1.018817% | 18.30 | 3,200,000 | 0.00000 | 0.01 | - | 0% | 20% | 110% |
| Atlas Refining Inc. | Dioxins_Furans | 0 | 1.018817% | 0.00 | 38 | - | 83.92 | - | 0% | 20% | 110% |
| Atlas Refining Inc. | Dieldrin | 0 | 1.018817% | 0.00 | 390 | - | 0.13 | - | 0% | 20% | 110% |
| Atlas Refining Inc. | DDx | 0 | 1.018817% | 0.00 | 27,000 | - | 1.37 | - | 0% | 20% | 110% |
| Atlas Refining Inc. | PCBs | 0 | 1.018817% | 0.00 | 26,000 | - | 12.87 | - | 0% | 20% | 110% |
| Automatic Electro Plating Corp. (Foundry Street Complex) | Dieldrin | 0 | 1.018817% | 0.00 | 390 | - | 0.13 | - | 0% | 30% | 130% |
| Automatic Electro Plating Corp. (Foundry Street Complex) | DDx | 0 | 1.018817% | 0.00 | 27,000 | - | 1.37 | - | 0% | 30% | 130% |
| Automatic Electro Plating Corp. (Foundry Street Complex) | Dioxins_Furans | 0 | 1.018817% | 0.00 | 38 | - | 83.92 | - | 0% | 30% | 130% |
| Automatic Electro Plating Corp. (Foundry Street Complex) | PCBs | 0 | 1.018817% | 0.00 | 26,000 | - | 12.87 | - | 0% | 30% | 130% |
| Automatic Electro Plating Corp. (Foundry Street Complex) | Mercury | 0 | 1.018817% | 0.00 | 42,000 | - | 0.95 | - | 0% | 30% | 130% |
| Automatic Electro Plating Corp. (Foundry Street Complex) | Lead | 0 | 1.018817% | 0.00 | 3,200,000 | - | 0.01 | - | 0% | 30% | 130% |
| Automatic Electro Plating Corp. (Foundry Street Complex) | LPAHs | 0 | 1.018817% | 0.00 | 170,000 | - | 0.05 | - | 0% | 30% | 130% |
| Automatic Electro Plating Corp. (Foundry Street Complex) | Copper | 0 | 1.018817% | 0.00 | 2,100,000 | - | 0.69 | - | 0% | 30% | 130% |
| Automatic Electro Plating Corp. (Foundry Street Complex) | HPAHs | 0 | 1.018817% | 0.00 | 240,000 | - | 0.05 | - | 0% | 30% | 130% |
| BASF Catalysts LLC | Mercury | 17.21 | 1.018817% | 0.18 | 42,000 | 0.00000 | 0.95 | 0.00000 | 10% | -20% | 90% |
| BASF Catalysts LLC | PCBs | 0.02 | 1.018817% | 0.00 | 26,000 | 0.00000 | 12.87 | - | 10% | -20% | 90% |
| BASF Catalysts LLC | Copper | 28.92 | 1.018817% | 0.29 | 2,100,000 | 0.00000 | 0.69 | 0.00000 | 10% | -20% | 90% |
| BASF Catalysts LLC | HPAHs | 2.69 | 1.018817% | 0.03 | 240,000 | 0.00000 | 0.05 | - | 10% | -20% | 90% |
| BASF Catalysts LLC | LPAHs | 4.84 | 1.018817% | 0.05 | 170,000 | 0.00000 | 0.05 | - | 10% | -20% | 90% |
| BASF Catalysts LLC | Lead | 63.18 | 1.018817% | 0.64 | 3,200,000 | 0.00000 | 0.01 | - | 10% | -20% | 90% |
| BASF Catalysts LLC | Dieldrin | 0 | 1.018817% | 0.00 | 390 | - | 0.13 | - | 10% | -20% | 90% |
| BASF Catalysts LLC | DDx | 0 | 1.018817% | 0.00 | 27,000 | - | 1.37 | - | 10% | -20% | 90% |
| BASF Catalysts LLC | Dioxins_Furans | 0 | 1.018817% | 0.00 | 38 | - | 83.92 | - | 10% | -20% | 90% |
| BASF Corporation | PCBs | 283.88 | 1.018817% | 2.87 | 26,000 | 0.00011 | 12.87 | 0.00142 | 0% | -20% | 80% |
| BASF Corporation | Mercury | 34.59 | 1.018817% | 0.35 | 42,000 | 0.00001 | 0.95 | 0.00001 | 0% | -20% | 80% |
| BASF Corporation | HPAHs | 97.28 | 1.018817% | 0.99 | 240,000 | 0.00000 | 0.05 | 0.00000 | 0% | -20% | 80% |
| BASF Corporation | LPAHs | 327.8 | 1.018817% | 3.34 | 170,000 | 0.00002 | 0.05 | 0.00000 | 0% | -20% | 80% |
| BASF Corporation | Lead | 61.19 | 1.018817% | 0.62 | 3,200,000 | 0.00000 | 0.01 | 0.00000 | 0% | -20% | 80% |
| BASF Corporation | Dieldrin | 0 | 1.018817% | 0.00 | 390 | - | 0.13 | - | 0% | -20% | 80% |
| BASF Corporation | DDx | 0 | 1.018817% | 0.00 | 27,000 | - | 1.37 | - | 0% | -20% | 80% |
| BASF Corporation | Dioxins_Furans | 0 | 1.018817% | 0.00 | 38 | - | 83.92 | - | 0% | -20% | 80% |
| BASF Corporation | Copper | 0 | 1.018817% | 0.00 | 2,100,000 | - | 0.69 | - | 0% | -20% | 80% |
| Benjamin Moore & Co. | PCBs | 12.78 | 1.018817% | 0.13 | 26,000 | 0.00001 | 12.87 | 0.00006 | 10% | -20% | 90% |

| Facility | Contaminant | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Benjamin Moore & Co. | HPAHs | 23.92 | 1.018817% | 0.24 | 240.000 | | 0.05 | 0.00000 | 10% | -20% | 90% |
| Benjamin Moore & Co. | LPAHs | 77.79 | 1.018817% | 0.79 | 170.000 | 0.00000 | 0.01 | 0.00000 | 10% | -20% | 90% |
| Benjamin Moore & Co. | Dioxins_Furans | 0.00 | 1.018817% | 0.00 | 38 | | 83.92 | | 10% | -20% | 90% |
| Benjamin Moore & Co. | Lead | 0 | 1.018817% | 0.00 | 3,200.000 | | 0.01 | | 10% | -20% | 90% |
| Benjamin Moore & Co. | Copper | 0 | 1.018817% | 0.00 | 2,100.000 | | 0.69 | | 10% | -20% | 90% |
| Benjamin Moore & Co. | Dieldrin | 0 | 1.018817% | 0.00 | 390 | | 0.13 | | 10% | -20% | 90% |
| Benjamin Moore & Co. | DDx | 0 | 1.018817% | 0.00 | 27.000 | | 1.37 | | 10% | -20% | 90% |
| Benjamin Moore & Co. | Mercury | 0 | 1.018817% | 0.00 | 42.000 | | 0.95 | | 10% | -20% | 90% |
| Berol Corporation | HPAHs | 2027.56 | 1.018817% | 20.66 | 240.000 | 0.00009 | 0.05 | 0.00000 | 0% | -20% | 80% |
| Berol Corporation | LPAHs | 1351.58 | 1.018817% | 13.77 | 170.000 | 0.00008 | 0.01 | 0.00000 | 0% | -20% | 80% |
| Berol Corporation | Dieldrin | 0 | 1.018817% | 0.00 | 390 | | 0.13 | | 0% | -20% | 80% |
| Berol Corporation | DDx | 0 | 1.018817% | 0.00 | 27.000 | | 1.37 | | 0% | -20% | 80% |
| Berol Corporation | Dioxins_Furans | 0 | 1.018817% | 0.00 | 38 | | 83.92 | | 0% | -20% | 80% |
| Berol Corporation | Mercury | 0 | 1.018817% | 0.00 | 42.000 | | 0.95 | | 0% | -20% | 80% |
| Berol Corporation | PCBs | 0 | 1.018817% | 0.00 | 26.000 | | 12.87 | | 0% | -20% | 80% |
| Berol Corporation | Copper | 0 | 1.018817% | 0.00 | 2,100.000 | | 0.69 | | 0% | -20% | 80% |
| Berol Corporation | Lead | 0 | 1.018817% | 0.00 | 3,200.000 | | 0.01 | | 0% | -20% | 80% |
| Campbell Foundry Company | PCBs | 2.64 | 1.018817% | 0.03 | 26.000 | 0.00000 | 12.87 | 0.00001 | 5% | 0% | 105% |
| Campbell Foundry Company | Copper | 53.04 | 1.018817% | 0.54 | 2,100.000 | 0.00000 | 0.69 | 0.00000 | 5% | 0% | 105% |
| Campbell Foundry Company | Mercury | 0.19 | 1.018817% | 0.00 | 42.000 | 0.00000 | 0.95 | 0.00000 | 5% | 0% | 105% |
| Campbell Foundry Company | Lead | 591.76 | 1.018817% | 6.03 | 3,200.000 | 0.00000 | 0.01 | 0.00000 | 5% | 0% | 105% |
| Campbell Foundry Company | HPAHs | 7.71 | 1.018817% | 0.08 | 240.000 | 0.00000 | 0.05 | 0.00000 | 5% | 0% | 105% |
| Campbell Foundry Company | LPAHs | 4.2 | 1.018817% | 0.04 | 170.000 | 0.00000 | 0.01 | 0.00000 | 5% | 0% | 105% |
| Campbell Foundry Company | Dieldrin | 0 | 1.018817% | 0.00 | 390 | | 0.13 | | 5% | 0% | 105% |
| Campbell Foundry Company | DDx | 0 | 1.018817% | 0.00 | 27.000 | | 1.37 | | 5% | 0% | 105% |
| Campbell Foundry Company | Dioxins_Furans | 0 | 1.018817% | 0.00 | 38 | | 83.92 | | 5% | 0% | 105% |
| Canning Gumm LLC | Mercury | 0.22 | 1.018817% | 0.00 | 42.000 | | 0.95 | | 0% | -10% | 90% |
| Canning Gumm LLC | Copper | 7.72 | 1.018817% | 0.08 | 2,100.000 | | 0.69 | | 0% | -10% | 90% |
| Canning Gumm LLC | HPAHs | 0.62 | 1.018817% | 0.01 | 240.000 | | 0.05 | | 0% | -10% | 90% |
| Canning Gumm LLC | LPAHs | 0.41 | 1.018817% | 0.01 | 170.000 | | 0.01 | | 0% | -10% | 90% |
| Canning Gumm LLC | Lead | 0.88 | 1.018817% | 0.01 | 3,200.000 | | 0.01 | | 0% | -10% | 90% |
| Canning Gumm LLC | Dieldrin | 0 | 1.018817% | 0.00 | 390 | | 0.13 | | 0% | -10% | 90% |
| Canning Gumm LLC | DDx | 0 | 1.018817% | 0.00 | 27.000 | | 1.37 | | 0% | -10% | 90% |
| Canning Gumm LLC | Dioxins_Furans | 0 | 1.018817% | 0.00 | 38 | | 83.92 | | 0% | -10% | 90% |
| Canning Gumm LLC | PCBs | 0 | 1.018817% | 0.00 | 26.000 | | 12.87 | | 0% | -10% | 90% |
| CBS Corporation | Copper | 17545.86 | 1.018817% | 178.76 | 2,100.000 | 0.00009 | 0.69 | 0.00006 | 0% | -20% | 80% |
| CBS Corporation | HPAHs | 11131.57 | 1.018817% | 113.41 | 240.000 | 0.00047 | 0.05 | 0.00002 | 0% | -20% | 80% |
| CBS Corporation | PCBs | 0.95 | 1.018817% | 0.01 | 26.000 | 0.00000 | 12.87 | 0.00000 | 0% | -20% | 80% |
| CBS Corporation | LPAHs | 7420.57 | 1.018817% | 75.60 | 170.000 | 0.00044 | 0.01 | 0.00000 | 0% | -20% | 80% |
| CBS Corporation | Mercury | 14.38 | 1.018817% | 0.15 | 42.000 | 0.00000 | 0.95 | 0.00000 | 0% | -20% | 80% |
| CBS Corporation | Lead | 7649.34 | 1.018817% | 77.93 | 3,200.000 | 0.00002 | 0.01 | 0.00000 | 0% | -20% | 80% |
| CBS Corporation | Dieldrin | 0 | 1.018817% | 0.00 | 390 | | 0.13 | | 0% | -20% | 80% |
| CBS Corporation | DDx | 0 | 1.018817% | 0.00 | 27.000 | | 1.37 | | 0% | -20% | 80% |
| CBS Corporation | Dioxins_Furans | 0 | 1.018817% | 0.00 | 38 | | 83.92 | | 0% | -20% | 80% |
| Chevron Environmental Management Co. | PCBs | 8.02 | 1.018817% | 0.08 | 26.000 | 0.00000 | 12.87 | 0.00004 | 0% | -20% | 80% |
| Chevron Environmental Management Co. | LPAHs | 66.01 | 1.018817% | 0.67 | 170.000 | 0.00000 | 0.01 | 0.00000 | 0% | -20% | 80% |
| Chevron Environmental Management Co. | HPAHs | 3.18 | 1.018817% | 0.03 | 240.000 | 0.00000 | 0.05 | 0.00000 | 0% | -20% | 80% |
| Chevron Environmental Management Co. | Dieldrin | 0 | 1.018817% | 0.00 | 390 | | 0.13 | | 0% | -20% | 80% |
| Chevron Environmental Management Co. | DDx | 0 | 1.018817% | 0.00 | 27.000 | | 1.37 | | 0% | -20% | 80% |
| Chevron Environmental Management Co. | Dioxins_Furans | 0 | 1.018817% | 0.00 | 38 | | 83.92 | | 0% | -20% | 80% |
| Chevron Environmental Management Co. | Mercury | 0 | 1.018817% | 0.00 | 42.000 | | 0.95 | | 0% | -20% | 80% |
| Chevron Environmental Management Co. | Copper | 0 | 1.018817% | 0.00 | 2,100.000 | | 0.69 | | 0% | -20% | 80% |
| Chevron Environmental Management Co. | Lead | 0 | 1.018817% | 0.00 | 3,200.000 | | 0.01 | | 0% | -20% | 80% |
| CNA 3 - 354 Doremus Ave | PCBs | 20.71 | 1.018817% | 0.21 | 26.000 | 0.00001 | 12.87 | 0.00010 | 5% | -15% | 90% |
| CNA 2 - 290 Ferry Street | HPAHs | 24305.29 | 1.018817% | 247.63 | 240.000 | 0.00103 | 0.05 | 0.00005 | 0% | -15% | 85% |
| CNA 2 - 290 Ferry Street | LPAHs | 16203.53 | 1.018817% | 165.08 | 170.000 | 0.00097 | 0.01 | 0.00001 | 0% | -15% | 85% |
| CNA 3 - 354 Doremus Ave | Mercury | 4.4 | 1.018817% | 0.04 | 42.000 | 0.00000 | 0.95 | 0.00000 | 5% | -15% | 90% |
| CNA 3 - 354 Doremus Ave | DDx | 1.41 | 1.018817% | 0.01 | 27.000 | 0.00000 | 1.37 | 0.00000 | 5% | -15% | 90% |
| CNA 1 - 226 Rome Street | HPAHs | 313.67 | 1.018817% | 3.20 | 240.000 | 0.00001 | 0.05 | 0.00000 | 0% | -15% | 85% |
| CNA 2 - 290 Ferry Street | Copper | 195.1 | 1.018817% | 1.99 | 2,100.000 | 0.00000 | 0.69 | 0.00000 | 0% | -15% | 85% |
| CNA 1 - 226 Rome Street | LPAHs | 209.11 | 1.018817% | 2.13 | 170.000 | 0.00001 | 0.01 | 0.00000 | 0% | -15% | 85% |
| CNA 3 - 354 Doremus Ave | HPAHs | 199.93 | 1.018817% | 2.04 | 170.000 | 0.00001 | 0.01 | 0.00000 | 5% | -15% | 90% |
| CNA 3 - 354 Doremus Ave | LPAHs | 36.46 | 1.018817% | 0.37 | 240.000 | 0.00000 | 0.05 | 0.00000 | 5% | -15% | 90% |
| CNA 2 - 290 Ferry Street | Copper | 2.32 | 1.018817% | 0.02 | 2,100.000 | 0.00000 | 0.69 | 0.00000 | 0% | -15% | 85% |
| CNA 2 - 290 Ferry Street | Mercury | 0.02 | 1.018817% | 0.00 | 42.000 | 0.00000 | 0.95 | 0.00000 | 0% | -15% | 85% |
| CNA 2 - 290 Ferry Street | Lead | 83.18 | 1.018817% | 0.85 | 3,200.000 | 0.00000 | 0.01 | 0.00000 | 0% | -15% | 85% |
| CNA 3 - 354 Doremus Ave | Lead | 10.59 | 1.018817% | 0.11 | 3,200.000 | 0.00000 | 0.01 | 0.00000 | 5% | -15% | 90% |
| CNA 1 - 226 Rome Street | Dieldrin | 0 | 1.018817% | 0.00 | 390 | | 0.13 | | 0% | -15% | 85% |
| CNA 1 - 226 Rome Street | DDx | 0 | 1.018817% | 0.00 | 27.000 | | 1.37 | | 0% | -15% | 85% |
| CNA 1 - 226 Rome Street | Mercury | 0 | 1.018817% | 0.00 | 42.000 | | 0.95 | | 0% | -15% | 85% |
| CNA 1 - 226 Rome Street | PCBs | 0 | 1.018817% | 0.00 | 26.000 | | 12.87 | | 0% | -15% | 85% |
| CNA 1 - 226 Rome Street | Copper | 0 | 1.018817% | 0.00 | 2,100.000 | | 0.69 | | 0% | -15% | 85% |
| CNA 1 - 226 Rome Street | Lead | 0 | 1.018817% | 0.00 | 3,200.000 | | 0.01 | | 0% | -15% | 85% |
| CNA 2 - 290 Ferry Street | Dieldrin | 0 | 1.018817% | 0.00 | 390 | | 0.13 | | 0% | -15% | 85% |
| CNA 2 - 290 Ferry Street | DDx | 0 | 1.018817% | 0.00 | 27.000 | | 1.37 | | 0% | -15% | 85% |
| CNA 2 - 290 Ferry Street | Dioxins_Furans | 0 | 1.018817% | 0.00 | 38 | | 83.92 | | 0% | -15% | 85% |
| CNA 2 - 290 Ferry Street | PCBs | 0 | 1.018817% | 0.00 | 26.000 | | 12.87 | | 0% | -15% | 85% |
| CNA 3 - 354 Doremus Ave | Dieldrin | 0 | 1.018817% | 0.00 | 390 | | 0.13 | | 5% | -15% | 90% |
| CNA 3 - 354 Doremus Ave | Dioxins_Furans | 0 | 1.018817% | 0.00 | 38 | | 83.92 | | 5% | -15% | 90% |
| Coats & Clark 2 - 900 Passaic Ave/ 260 Ogden St | Copper | 276.65 | 1.018817% | 2.82 | 2,100.000 | 0.00000 | 0.69 | 0.00000 | 0% | -20% | 80% |
| Coats & Clark 1 - 735 Broad Street | Copper | 140.82 | 1.018817% | 1.43 | 2,100.000 | 0.00000 | 0.69 | 0.00000 | 0% | -20% | 80% |
| Coats & Clark 1 - 735 Broad Street | HPAHs | 41.19 | 1.018817% | 0.42 | 240.000 | 0.00000 | 0.05 | 0.00000 | 0% | -20% | 80% |
| Coats & Clark 1 - 735 Broad Street | LPAHs | 58.58 | 1.018817% | 0.60 | 170.000 | 0.00000 | 0.01 | 0.00000 | 0% | -20% | 80% |
| Coats & Clark 2 - 900 Passaic Ave/ 260 Ogden St | Lead | 579.79 | 1.018817% | 5.91 | 3,200.000 | 0.00000 | 0.01 | 0.00000 | 0% | -20% | 80% |
| Coats & Clark 1 - 735 Broad Street | Lead | 255.02 | 1.018817% | 2.60 | 3,200.000 | 0.00000 | 0.01 | 0.00000 | 0% | -20% | 80% |
| Coats & Clark 2 - 900 Passaic Ave/ 260 Ogden St | HPAHs | 1.78 | 1.018817% | 0.02 | 240.000 | 0.00000 | 0.05 | 0.00000 | 0% | -20% | 80% |
| Coats & Clark 1 - 735 Broad Street | LPAHs | 4.9 | 1.018817% | 0.05 | 170.000 | 0.00000 | 0.01 | 0.00000 | 0% | -20% | 80% |
| Coats & Clark 1 - 735 Broad Street | Dieldrin | 0 | 1.018817% | 0.00 | 390 | | 0.13 | | 0% | -20% | 80% |
| Coats & Clark 1 - 735 Broad Street | DDx | 0 | 1.018817% | 0.00 | 27.000 | | 1.37 | | 0% | -20% | 80% |
| Coats & Clark 1 - 735 Broad Street | Mercury | 0 | 1.018817% | 0.00 | 42.000 | | 0.95 | | 0% | -20% | 80% |
| Coats & Clark 1 - 735 Broad Street | PCBs | 0 | 1.018817% | 0.00 | 26.000 | | 12.87 | | 0% | -20% | 80% |
| Coats & Clark 2 - 900 Passaic Ave/ 260 Ogden St | Dieldrin | 0 | 1.018817% | 0.00 | 390 | | 0.13 | | 0% | -20% | 80% |
| Coats & Clark 2 - 900 Passaic Ave/ 260 Ogden St | DDx | 0 | 1.018817% | 0.00 | 27.000 | | 1.37 | | 0% | -20% | 80% |
| Coats & Clark 2 - 900 Passaic Ave/ 260 Ogden St | Dioxins_Furans | 0 | 1.018817% | 0.00 | 38 | | 83.92 | | 0% | -20% | 80% |
| Coats & Clark 2 - 900 Passaic Ave/ 260 Ogden St | Mercury | 0 | 1.018817% | 0.00 | 42.000 | | 0.95 | | 0% | -20% | 80% |
| Coats & Clark 2 - 900 Passaic Ave/ 260 Ogden St | PCBs | 0 | 1.018817% | 0.00 | 26.000 | | 12.87 | | 0% | -20% | 80% |
| Conglomom Corp. | PCBs | 382.96 | 1.018817% | 3.90 | 26.000 | 0.00015 | 12.87 | 0.00193 | 5% | -20% | 85% |
| Conglomom Corp. | HPAHs | 2826.87 | 1.018817% | 28.80 | 240.000 | 0.00012 | 0.05 | 0.00001 | 5% | -20% | 85% |
| Conglomom Corp. | Copper | 982.92 | 1.018817% | 10.01 | 2,100.000 | 0.00000 | 0.69 | 0.00000 | 5% | -20% | 85% |
| Conglomom Corp. | Mercury | 13.71 | 1.018817% | 0.14 | 42.000 | 0.00000 | 0.95 | 0.00001 | 5% | -20% | 85% |
| Conglomom Corp. | LPAHs | 1905.07 | 1.018817% | 19.41 | 170.000 | 0.00011 | 0.01 | 0.00000 | 5% | -20% | 85% |
| Conglomom Corp. | DDx | 1.56 | 1.018817% | 0.02 | 27.000 | 0.00000 | 1.37 | 0.00002 | 5% | -20% | 85% |
| Conglomom Corp. | Lead | 1369.24 | 1.018817% | 13.95 | 3,200.000 | 0.00000 | 0.01 | 0.00000 | 5% | -20% | 85% |
| Conglomom Corp. | Dieldrin | 0 | 1.018817% | 0.00 | 390 | | 0.13 | | 5% | -20% | 85% |
| Conglomom Corp. | Dioxins_Furans | 0 | 1.018817% | 0.00 | 38 | | 83.92 | | 5% | -20% | 85% |
| Conopco, Inc. | DDx | 88.48 | 1.018817% | 0.90 | 27.000 | 0.00003 | 1.37 | 0.00005 | 10% | -20% | 90% |
| Conopco, Inc. | Copper | 1893.74 | 1.018817% | 19.29 | 2,100.000 | 0.00001 | 0.69 | 0.00001 | 10% | -20% | 90% |
| Conopco, Inc. | HPAHs | 1370.66 | 1.018817% | 13.96 | 240.000 | 0.00006 | 0.05 | 0.00000 | 10% | -20% | 90% |
| Conopco, Inc. | LPAHs | 1662.93 | 1.018817% | 16.94 | 170.000 | 0.00010 | 0.01 | 0.00000 | 10% | -20% | 90% |

ALCD-PUBCOM_0000015

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Conopco, Inc. | Mercury | 4.23 | 1.018817% | 0.04 | 42,000 | 0.00000 | 0.95 | 0.00000 | 10% | -20% | 90% |
| Conopco, Inc. | PCBs | 0.12 | 1.018817% | 0.00 | 26,000 | 0.00000 | 12.87 | 0.00000 | 10% | -20% | 90% |
| Conopco, Inc. | Dieldrin | 0.02 | 1.018817% | 0.00 | 390 | 0.00000 | 0.13 | 0.00000 | 10% | -20% | 90% |
| Conopco, Inc. | Lead | 256.63 | 1.018817% | 2.61 | 3,200,000 | 0.00000 | 0.01 | 0.00000 | 10% | -20% | 90% |
| Conopco, Inc. | Dioxins, Furans | 0 | 1.018817% | 0.00 | 38 | 83.92 | - | - | 10% | -20% | 90% |
| Cooper 3 - 75 Belmont Avenue | Mercury | 2731.35 | 1.018817% | 27.83 | 42,000 | 0.00066 | 0.95 | 0.00063 | 10% | -20% | 90% |
| Cooper 3 - 75 Belmont Avenue | Copper | 59307.03 | 1.018817% | 604.23 | 2,100,000 | 0.00029 | 0.69 | 0.00070 | 10% | -20% | 90% |
| Cooper 2 - 33 Littleton Avenue | PCBs | 1.7 | 1.018817% | 0.02 | 26,000 | 0.00000 | 12.87 | 0.00001 | 10% | -20% | 90% |
| Cooper 2 - 33 Littleton Avenue | Mercury | 3.88 | 1.018817% | 0.04 | 42,000 | 0.00000 | 0.95 | 0.00000 | 10% | -20% | 80% |
| Cooper 3 - 75 Littleton Avenue | Lead | 1893.31 | 1.018817% | 19.29 | 3,200,000 | 0.00000 | 0.01 | 0.00000 | 10% | -20% | 90% |
| Cooper 2 - 33 Littleton Avenue | LPAHs | 28.65 | 1.018817% | 0.29 | 170,000 | 0.00000 | 0.01 | 0.00000 | 0% | -20% | 80% |
| Cooper 2 - 33 Littleton Avenue | Copper | 1.37 | 1.018817% | 0.01 | 2,100,000 | 0.00000 | 0.69 | 0.00000 | 0% | -20% | 80% |
| Cooper 2 - 33 Littleton Avenue | Lead | 73.65 | 1.018817% | 0.75 | 3,200,000 | 0.00000 | 0.01 | 0.00000 | 0% | -20% | 80% |
| Cooper 3 - 75 Belmont Avenue | HPAHs | 0.38 | 1.018817% | 0.00 | 240,000 | 0.00000 | 0.05 | 0.00000 | 0% | -20% | 80% |
| Cooper 1 - 7,13 & 26 Bank Street | Lead | 0.58 | 1.018817% | 0.01 | 3,200,000 | 0.00000 | 0.01 | 0.00000 | 0% | -20% | 80% |
| Cooper 1 - 7,13 & 26 Bank Street | Dieldrin | 0 | 1.018817% | 0.00 | 390 | - | 0.13 | - | 0% | -20% | 80% |
| Cooper 1 - 7,13 & 26 Bank Street | DDx | 0 | 1.018817% | 0.00 | 27,000 | - | 1.37 | - | 0% | -20% | 80% |
| Cooper 1 - 7,13 & 26 Bank Street | Dioxins, Furans | 0 | 1.018817% | 0.00 | 38 | - | 83.92 | - | 0% | -20% | 80% |
| Cooper 1 - 7,13 & 26 Bank Street | Mercury | 0 | 1.018817% | 0.00 | 42,000 | - | 0.95 | - | 0% | -20% | 80% |
| Cooper 1 - 7,13 & 26 Bank Street | PCBs | 0 | 1.018817% | 0.00 | 26,000 | - | 12.87 | - | 0% | -20% | 80% |
| Cooper 1 - 7,13 & 26 Bank Street | Copper | 0 | 1.018817% | 0.00 | 2,100,000 | - | 0.69 | - | 0% | -20% | 80% |
| Cooper 1 - 7,13 & 26 Bank Street | LPAHs | 0 | 1.018817% | 0.00 | 170,000 | - | 0.01 | - | 0% | -20% | 80% |
| Cooper 1 - 7,13 & 26 Bank Street | HPAHs | 0 | 1.018817% | 0.00 | 240,000 | - | 0.05 | - | 0% | -20% | 80% |
| Cooper 2 - 33 Littleton Avenue | Dieldrin | 0 | 1.018817% | 0.00 | 390 | - | 0.13 | - | 0% | -20% | 80% |
| Cooper 2 - 33 Littleton Avenue | DDx | 0 | 1.018817% | 0.00 | 27,000 | - | 1.37 | - | 0% | -20% | 80% |
| Cooper 2 - 33 Littleton Avenue | PCBs | 0 | 1.018817% | 0.00 | 26,000 | - | 12.87 | - | 0% | -20% | 80% |
| Cooper 2 - 33 Littleton Avenue | LPAHs | 0 | 1.018817% | 0.00 | 170,000 | - | 0.01 | - | 0% | -20% | 80% |
| Cooper 2 - 33 Littleton Avenue | HPAHs | 0 | 1.018817% | 0.00 | 240,000 | - | 0.05 | - | 0% | -20% | 80% |
| Cooper 3 - 75 Littleton Avenue | Dieldrin | 0 | 1.018817% | 0.00 | 390 | - | 0.13 | - | 10% | -20% | 90% |
| Cooper 3 - 75 Belmont Avenue | DDx | 0 | 1.018817% | 0.00 | 27,000 | - | 1.37 | - | 10% | -20% | 90% |
| Cooper 3 - 75 Belmont Avenue | Dioxins, Furans | 0 | 1.018817% | 0.00 | 38 | - | 83.92 | - | 10% | -20% | 90% |
| Covanta Essex Company | Lead | 15.98 | 1.018817% | 0.16 | 3,200,000 | 0.00000 | 0.01 | 0.00000 | 5% | -20% | 85% |
| Covanta Essex Company | Dieldrin | 0 | 1.018817% | 0.00 | 390 | - | 0.13 | - | 5% | -20% | 85% |
| Covanta Essex Company | DDx | 0 | 1.018817% | 0.00 | 27,000 | - | 1.37 | - | 5% | -20% | 85% |
| Covanta Essex Company | Dioxins, Furans | 0 | 1.018817% | 0.00 | 38 | - | 83.92 | - | 5% | -20% | 85% |
| Covanta Essex Company | Mercury | 0 | 1.018817% | 0.00 | 42,000 | - | 0.95 | - | 5% | -20% | 85% |
| Covanta Essex Company | PCBs | 0 | 1.018817% | 0.00 | 26,000 | - | 12.87 | - | 5% | -20% | 85% |
| Covanta Essex Company | Copper | 0 | 1.018817% | 0.00 | 2,100,000 | - | 0.69 | - | 5% | -20% | 85% |
| Covanta Essex Company | LPAHs | 0 | 1.018817% | 0.00 | 170,000 | - | 0.01 | - | 5% | -20% | 85% |
| Covanta Essex Company | HPAHs | 0 | 1.018817% | 0.00 | 240,000 | - | 0.05 | - | 5% | -20% | 85% |
| Curtiss-Wright Corporation | PCBs | 18.69 | 1.018817% | 0.19 | 26,000 | 0.00001 | 12.87 | 0.00009 | 5% | 0% | 105% |
| Curtiss-Wright Corporation | Mercury | 46.01 | 1.018817% | 0.47 | 42,000 | 0.00001 | 0.95 | 0.00001 | 5% | 0% | 105% |
| Curtiss-Wright Corporation | Copper | 1808.44 | 1.018817% | 18.42 | 2,100,000 | 0.00001 | 0.69 | 0.00001 | 5% | 0% | 105% |
| Curtiss-Wright Corporation | Lead | 12804.43 | 1.018817% | 130.16 | 3,200,000 | 0.00000 | 0.01 | 0.00000 | 5% | 0% | 105% |
| Curtiss-Wright Corporation | HPAHs | 124.7 | 1.018817% | 1.27 | 240,000 | 0.00001 | 0.05 | 0.00000 | 5% | 0% | 105% |
| Curtiss-Wright Corporation | LPAHs | 100.57 | 1.018817% | 1.02 | 170,000 | 0.00001 | 0.01 | 0.00000 | 5% | 0% | 105% |
| Curtiss-Wright Corporation | Dieldrin | 0 | 1.018817% | 0.00 | 390 | - | 0.13 | - | 5% | 0% | 105% |
| Curtiss-Wright Corporation | DDx | 0 | 1.018817% | 0.00 | 27,000 | - | 1.37 | - | 5% | 0% | 105% |
| Curtiss-Wright Corporation | Dioxins, Furans | 0 | 1.018817% | 0.00 | 38 | - | 83.92 | - | 5% | 0% | 105% |
| DII Industries, LLC | Copper | 3023.03 | 1.018817% | 30.80 | 2,100,000 | 0.00001 | 0.69 | 0.00001 | 0% | -20% | 80% |
| DII Industries, LLC | PCBs | 1.54 | 1.018817% | 0.02 | 26,000 | 0.00000 | 12.87 | 0.00001 | 0% | -20% | 80% |
| DII Industries, LLC | Mercury | 1.75 | 1.018817% | 0.02 | 42,000 | 0.00000 | 0.95 | 0.00000 | 0% | -20% | 80% |
| DII Industries, LLC | HPAHs | 9.18 | 1.018817% | 0.09 | 240,000 | 0.00000 | 0.05 | 0.00000 | 0% | -20% | 80% |
| DII Industries, LLC | Lead | 391.51 | 1.018817% | 3.99 | 3,200,000 | 0.00000 | 0.01 | 0.00000 | 0% | -20% | 80% |
| DII Industries, LLC | LPAHs | 1.06 | 1.018817% | 0.01 | 170,000 | 0.00000 | 0.01 | 0.00000 | 0% | -20% | 80% |
| DII Industries, LLC | Dieldrin | 0 | 1.018817% | 0.00 | 390 | - | 0.13 | - | 0% | -20% | 80% |
| DII Industries, LLC | DDx | 0 | 1.018817% | 0.00 | 27,000 | - | 1.37 | - | 0% | -20% | 80% |
| DII Industries, LLC | Dioxins, Furans | 0 | 1.018817% | 0.00 | 38 | - | 83.92 | - | 0% | -20% | 80% |
| Drum Service of Newark Inc. | Dieldrin | 0 | 1.018817% | 0.00 | 390 | - | 0.13 | - | 5% | -20% | 125% |
| Drum Service of Newark Inc. | DDx | 0 | 1.018817% | 0.00 | 27,000 | - | 1.37 | - | 5% | -20% | 125% |
| Drum Service of Newark Inc. | Dioxins, Furans | 0 | 1.018817% | 0.00 | 38 | - | 83.92 | - | 5% | -20% | 125% |
| Drum Service of Newark Inc. | PCBs | 0 | 1.018817% | 0.00 | 26,000 | - | 12.87 | - | 5% | -20% | 125% |
| Drum Service of Newark Inc. | Mercury | 0 | 1.018817% | 0.00 | 42,000 | - | 0.95 | - | 5% | -20% | 125% |
| Drum Service of Newark Inc. | Lead | 0 | 1.018817% | 0.00 | 3,200,000 | - | 0.01 | - | 5% | -20% | 125% |
| Drum Service of Newark Inc. | LPAHs | 0 | 1.018817% | 0.00 | 170,000 | - | 0.01 | - | 5% | -20% | 125% |
| Drum Service of Newark Inc. | HPAHs | 0 | 1.018817% | 0.00 | 240,000 | - | 0.05 | - | 5% | -20% | 125% |
| Drum Service of Newark Inc. | Copper | 0 | 1.018817% | 0.00 | 2,100,000 | - | 0.69 | - | 5% | -20% | 125% |
| Elan Chemical Co. Inc. | HPAHs | 6.59 | 1.018817% | 0.07 | 240,000 | 0.00000 | 0.05 | 0.00000 | 5% | 0% | 105% |
| Elan Chemical Co. Inc. | LPAHs | 1.39 | 1.018817% | 0.01 | 170,000 | 0.00000 | 0.01 | 0.00000 | 5% | 0% | 105% |
| Elan Chemical Co. Inc. | DDx | 0 | 1.018817% | 0.00 | 27,000 | - | 1.37 | - | 5% | 0% | 105% |
| Elan Chemical Co. Inc. | Dieldrin | 0 | 1.018817% | 0.00 | 390 | - | 0.13 | - | 5% | 0% | 105% |
| Elan Chemical Co. Inc. | Dioxins, Furans | 0 | 1.018817% | 0.00 | 38 | - | 83.92 | - | 5% | 0% | 105% |
| Elan Chemical Co. Inc. | Mercury | 0 | 1.018817% | 0.00 | 42,000 | - | 0.95 | - | 5% | 0% | 105% |
| Elan Chemical Co. Inc. | PCBs | 0 | 1.018817% | 0.00 | 26,000 | - | 12.87 | - | 5% | 0% | 105% |
| Elan Chemical Co. Inc. | Lead | 0 | 1.018817% | 0.00 | 3,200,000 | - | 0.01 | - | 5% | 0% | 105% |
| Elan Chemical Co. Inc. | Copper | 0 | 1.018817% | 0.00 | 2,100,000 | - | 0.69 | - | 5% | 0% | 105% |
| EnPro Holdings, Inc. | HPAHs | 1971766.87 | 1.018817% | 20088.70 | 240,000 | 0.08370 | 0.05 | 0.00419 | 0% | -20% | 80% |
| EnPro Holdings, Inc. | LPAHs | 1314993.14 | 1.018817% | 13397.37 | 170,000 | 0.07881 | 0.01 | 0.00079 | 0% | -20% | 80% |
| EnPro Holdings, Inc. | Copper | 52163.83 | 1.018817% | 531.45 | 2,100,000 | 0.00025 | 0.69 | 0.00017 | 0% | -20% | 80% |
| EnPro Holdings, Inc. | PCBs | 4.11 | 1.018817% | 0.04 | 26,000 | 0.00000 | 12.87 | 0.00002 | 0% | -20% | 80% |
| EnPro Holdings, Inc. | Mercury | 9.87 | 1.018817% | 0.10 | 42,000 | 0.00000 | 0.95 | 0.00000 | 0% | -20% | 80% |
| EnPro Holdings, Inc. | Lead | 43724.02 | 1.018817% | 445.47 | 3,200,000 | 0.00014 | 0.01 | 0.00000 | 0% | -20% | 80% |
| EnPro Holdings, Inc. | Dieldrin | 0 | 1.018817% | 0.00 | 390 | - | 0.13 | - | 0% | -20% | 80% |
| EnPro Holdings, Inc. | DDx | 0 | 1.018817% | 0.00 | 27,000 | - | 1.37 | - | 0% | -20% | 80% |
| EnPro Holdings, Inc. | Dioxins, Furans | 0 | 1.018817% | 0.00 | 38 | - | 83.92 | - | 0% | -20% | 80% |
| EPEC Polymers, Inc. | Copper | 14449.22 | 1.018817% | 147.21 | 2,100,000 | 0.00007 | 0.69 | 0.00005 | 0% | -20% | 80% |
| EPEC Polymers, Inc. | PCBs | 2.99 | 1.018817% | 0.03 | 26,000 | 0.00000 | 12.87 | 0.00002 | 0% | -20% | 80% |
| EPEC Polymers, Inc. | Mercury | 29.89 | 1.018817% | 0.30 | 42,000 | 0.00001 | 0.95 | 0.00001 | 0% | -20% | 80% |
| EPEC Polymers, Inc. | Lead | 2342 | 1.018817% | 23.86 | 3,200,000 | 0.00001 | 0.01 | 0.00000 | 0% | -20% | 80% |
| EPEC Polymers, Inc. | HPAHs | 18.8 | 1.018817% | 0.19 | 240,000 | 0.00000 | 0.05 | 0.00000 | 0% | -20% | 80% |
| EPEC Polymers, Inc. | LPAHs | 28.79 | 1.018817% | 0.29 | 170,000 | 0.00000 | 0.01 | 0.00000 | 0% | -20% | 80% |
| EPEC Polymers, Inc. | Dieldrin | 0 | 1.018817% | 0.00 | 390 | - | 0.13 | - | 0% | -20% | 80% |
| EPEC Polymers, Inc. | DDx | 0 | 1.018817% | 0.00 | 27,000 | - | 1.37 | - | 0% | -20% | 80% |
| EPEC Polymers, Inc. | Dioxins, Furans | 0 | 1.018817% | 0.00 | 38 | - | 83.92 | - | 0% | -20% | 80% |
| Essex Chemical Corporation | Mercury | 0.43 | 1.018817% | 0.00 | 42,000 | 0.00000 | 0.95 | 0.00000 | 10% | -20% | 90% |
| Essex Chemical Corporation | HPAHs | 2.86 | 1.018817% | 0.03 | 240,000 | 0.00000 | 0.05 | 0.00000 | 10% | -20% | 90% |
| Essex Chemical Corporation | Copper | 1.1 | 1.018817% | 0.01 | 2,100,000 | 0.00000 | 0.69 | 0.00000 | 10% | -20% | 90% |
| Essex Chemical Corporation | Lead | 70.09 | 1.018817% | 0.71 | 3,200,000 | 0.00000 | 0.01 | 0.00000 | 10% | -20% | 90% |
| Essex Chemical Corporation | LPAHs | 1.81 | 1.018817% | 0.02 | 170,000 | 0.00000 | 0.01 | 0.00000 | 10% | -20% | 90% |
| Essex Chemical Corporation | DDx | 0 | 1.018817% | 0.00 | 27,000 | - | 1.37 | - | 10% | -20% | 90% |
| Essex Chemical Corporation | Dioxins, Furans | 0 | 1.018817% | 0.00 | 38 | - | 83.92 | - | 10% | -20% | 90% |
| Essex Chemical Corporation | PCBs | 0 | 1.018817% | 0.00 | 26,000 | - | 12.87 | - | 10% | -20% | 90% |
| Everett Smith Group | Dieldrin | 0 | 1.018817% | 0.00 | 390 | - | 0.13 | - | 0% | 0% | 100% |
| Everett Smith Group | DDx | 0 | 1.018817% | 0.00 | 27,000 | - | 1.37 | - | 0% | 0% | 100% |
| Everett Smith Group | Dioxins, Furans | 0 | 1.018817% | 0.00 | 38 | - | 83.92 | - | 0% | 0% | 100% |
| Everett Smith Group | Mercury | 0 | 1.018817% | 0.00 | 42,000 | - | 0.95 | - | 0% | 0% | 100% |
| Everett Smith Group | PCBs | 0 | 1.018817% | 0.00 | 26,000 | - | 12.87 | - | 0% | 0% | 100% |
| Everett Smith Group | Copper | 0 | 1.018817% | 0.00 | 2,100,000 | - | 0.69 | - | 0% | 0% | 100% |
| Everett Smith Group | Lead | 0 | 1.018817% | 0.00 | 3,200,000 | - | 0.01 | - | 0% | 0% | 100% |

ALCD-PUBCOM_0002016

| Name | Chemical | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Everett Smith Group | LPAHs | 0 | 1.018817% | 0.00 | 170.000 | | 0.01 | | 0% | 100% |
| Everett Smith Group | HPAHs | 0 | 1.018817% | 0.00 | 240.000 | | 0.05 | | 0% | 100% |
| Foundry Street Corporation (Foundry Street Complex) | Dieldrin | 0 | 1.018817% | 0.00 | 390 | | 0.13 | | -20% | 120% |
| Foundry Street Corporation (Foundry Street Complex) | DDx | 0 | 1.018817% | 0.00 | 27.000 | | 1.37 | | -20% | 120% |
| Foundry Street Corporation (Foundry Street Complex) | Mercury | 0 | 1.018817% | 0.00 | 42.000 | | 0.95 | | -20% | 120% |
| Foundry Street Corporation (Foundry Street Complex) | PCBs | 0 | 1.018817% | 0.00 | 26.000 | | 12.87 | | -20% | 120% |
| Foundry Street Corporation (Foundry Street Complex) | Copper | 0 | 1.018817% | 0.00 | 2.100.000 | | 0.69 | | -20% | 120% |
| Foundry Street Corporation (Foundry Street Complex) | Lead | 0 | 1.018817% | 0.00 | 3.200.000 | | 0.01 | | -20% | 120% |
| Foundry Street Corporation (Foundry Street Complex) | LPAHs | 0 | 1.018817% | 0.00 | 170.000 | | 0.01 | | -20% | 120% |
| Foundry Street Corporation (Foundry Street Complex) | HPAHs | 0 | 1.018817% | 0.00 | 240.000 | | 0.05 | | -20% | 120% |
| Franklin Burlington Plastics Inc. | PCBs | 0.46 | 1.018817% | 0.00 | 26.000 | 0.00000 | 12.87 | 0.00000 | 10% | 90% |
| Franklin Burlington Plastics Inc. | HPAHs | 281.18 | 1.018817% | 2.86 | 240.000 | 0.00001 | 0.05 | 0.00000 | 10% | 90% |
| Franklin Burlington Plastics Inc. | Copper | 157.98 | 1.018817% | 1.61 | 2.100.000 | 0.00000 | 0.69 | 0.00000 | 10% | 90% |
| Franklin Burlington Plastics Inc. | Mercury | 1.97 | 1.018817% | 0.02 | 42.000 | 0.00000 | 0.95 | 0.00000 | 10% | 90% |
| Franklin Burlington Plastics Inc. | LPAHs | 641.94 | 1.018817% | 6.54 | 170.000 | 0.00004 | 0.01 | 0.00000 | 10% | 90% |
| Franklin Burlington Plastics Inc. | Lead | 567.53 | 1.018817% | 5.78 | 3.200.000 | 0.00000 | 0.01 | 0.00000 | 10% | 90% |
| Franklin Burlington Plastics Inc. | Dieldrin | 0 | 1.018817% | 0.00 | 390 | | 0.13 | | 10% | 90% |
| Franklin Burlington Plastics Inc. | DDx | 0 | 1.018817% | 0.00 | 27.000 | | 1.37 | | 10% | 90% |
| Franklin Burlington Plastics Inc. | Dioxins_Furans | 0 | 1.018817% | 0.00 | 38 | | 83.92 | | 10% | 90% |
| Garfield Molding Company, Inc. | HPAHs | 241.956 | 1.018817% | 2.465 | 240.000 | 0.00010 | 0.05 | 0.00001 | 5% | 85% |
| Garfield Molding Company, Inc. | Copper | 537.06 | 1.018817% | 5.47 | 2.100.000 | 0.00000 | 0.69 | 0.00000 | 5% | 85% |
| Garfield Molding Company, Inc. | LPAHs | 1637.99 | 1.018817% | 16.48 | 170.000 | 0.00010 | 0.01 | 0.00000 | 5% | 85% |
| Garfield Molding Company, Inc. | Mercury | 0.44 | 1.018817% | 0.00 | 42.000 | 0.00000 | 0.95 | 0.00000 | 5% | 85% |
| Garfield Molding Company, Inc. | Lead | 197.46 | 1.018817% | 2.01 | 3.200.000 | 0.00000 | 0.01 | 0.00000 | 5% | 85% |
| Garfield Molding Company, Inc. | Dieldrin | 0 | 1.018817% | 0.00 | 390 | | 0.13 | | 5% | 85% |
| Garfield Molding Company, Inc. | DDx | 0 | 1.018817% | 0.00 | 27.000 | | 1.37 | | 5% | 85% |
| Garfield Molding Company, Inc. | Dioxins_Furans | 0 | 1.018817% | 0.00 | 38 | | 83.92 | | 5% | 85% |
| Garfield Molding Company, Inc. | PCBs | 0 | 1.018817% | 0.00 | 26.000 | | 12.87 | | 5% | 85% |
| GE 1 - 415 South 5th Street | HPAHs | 17361.34 | 1.018817% | 176.88 | 240.000 | 0.00074 | 0.05 | 0.00004 | -20% | 85% |
| GE 1 - 415 South 5th Street | LPAHs | 11574.23 | 1.018817% | 111.92 | 170.000 | 0.00069 | 0.01 | 0.00001 | -20% | 85% |
| GE 1 - 415 South 5th Street | PCBs | 0.36 | 1.018817% | 0.00 | 26.000 | 0.00000 | 12.87 | 0.00000 | -20% | 85% |
| GE 2 - 1000 South 2nd Street | HPAHs | 102.54 | 1.018817% | 1.04 | 240.000 | 0.00000 | 0.05 | 0.00000 | -20% | 80% |
| GE 2 - 1000 South 2nd Street | Mercury | 0.57 | 1.018817% | 0.01 | 42.000 | 0.00000 | 0.95 | 0.00000 | -20% | 80% |
| GE 2 - 1000 South 2nd Street | LPAHs | 68.56 | 1.018817% | 0.70 | 170.000 | 0.00000 | 0.01 | 0.00000 | -20% | 80% |
| GE 1 - 415 South 5th Street | Copper | 3.52 | 1.018817% | 0.04 | 2.100.000 | 0.00000 | 0.69 | 0.00000 | -20% | 85% |
| GE 1 - 415 South 5th Street | Lead | 6.21 | 1.018817% | 0.06 | 3.200.000 | 0.00000 | 0.01 | 0.00000 | -20% | 85% |
| GE 1 - 415 South 5th Street | Dieldrin | 0 | 1.018817% | 0.00 | 390 | | 0.13 | | -20% | 85% |
| GE 1 - 415 South 5th Street | DDx | 0 | 1.018817% | 0.00 | 27.000 | | 1.37 | | -20% | 85% |
| GE 1 - 415 South 5th Street | Dioxins_Furans | 0 | 1.018817% | 0.00 | 38 | | 83.92 | | -20% | 85% |
| GE 2 - 1000 South 2nd Street | Dieldrin | 0 | 1.018817% | 0.00 | 390 | | 0.13 | | -20% | 80% |
| GE 2 - 1000 South 2nd Street | DDx | 0 | 1.018817% | 0.00 | 27.000 | | 1.37 | | -20% | 80% |
| GE 2 - 1000 South 2nd Street | Dioxins_Furans | 0 | 1.018817% | 0.00 | 38 | | 83.92 | | -20% | 80% |
| GE 2 - 1000 South 2nd Street | Mercury | 0 | 1.018817% | 0.00 | 42.000 | | 0.95 | | -20% | 80% |
| GE 2 - 1000 South 2nd Street | PCBs | 0 | 1.018817% | 0.00 | 26.000 | | 12.87 | | -20% | 80% |
| GE 2 - 1000 South 2nd Street | Lead | 0 | 1.018817% | 0.00 | 3.200.000 | | 0.01 | | -20% | 80% |
| Givaudan Fragrances Corp. | Dioxins_Furans | 0.1 | 1.018817% | 0.00 | 38 | 0.00003 | 83.92 | 0.00275 | 10% | 90% |
| Givaudan Fragrances Corp. | Mercury | 115.95 | 1.018817% | 1.18 | 42.000 | 0.00003 | 0.95 | 0.00003 | 10% | 90% |
| Givaudan Fragrances Corp. | PCBs | 2.85 | 1.018817% | 0.03 | 26.000 | 0.00000 | 12.87 | 0.00001 | 10% | 90% |
| Givaudan Fragrances Corp. | Copper | 2627.25 | 1.018817% | 26.77 | 2.100.000 | 0.00000 | 0.69 | 0.00001 | 10% | 90% |
| Givaudan Fragrances Corp. | Lead | 65292.87 | 1.018817% | 665.21 | 3.200.000 | 0.00021 | 0.01 | 0.00000 | 10% | 90% |
| Givaudan Fragrances Corp. | HPAHs | 134.16 | 1.018817% | 1.37 | 240.000 | 0.00001 | 0.05 | 0.00000 | 10% | 90% |
| Givaudan Fragrances Corp. | LPAHs | 59.42 | 1.018817% | 0.61 | 170.000 | 0.00000 | 0.01 | 0.00000 | 10% | 90% |
| Givaudan Fragrances Corp. | Dieldrin | 0 | 1.018817% | 0.00 | 390 | | 0.13 | | 10% | 90% |
| Givaudan Fragrances Corp. | DDx | 0 | 1.018817% | 0.00 | 27.000 | | 1.37 | | 10% | 90% |
| Goodrich Corporation | Copper | 436.78 | 1.018817% | 4.45 | 2.100.000 | 0.00000 | 0.69 | 0.00000 | 5% | 85% |
| Goodrich Corporation | HPAHs | 298.95 | 1.018817% | 3.05 | 240.000 | 0.00001 | 0.05 | 0.00000 | 5% | 85% |
| Goodrich Corporation | PCBs | 0.12 | 1.018817% | 0.00 | 26.000 | 0.00000 | 12.87 | 0.00000 | 5% | 85% |
| Goodrich Corporation | LPAHs | 199.15 | 1.018817% | 2.03 | 170.000 | 0.00001 | 0.01 | 0.00000 | 5% | 85% |
| Goodrich Corporation | Mercury | 0.06 | 1.018817% | 0.00 | 42.000 | 0.00000 | 0.95 | 0.00000 | 5% | 85% |
| Goodrich Corporation | Lead | 52.26 | 1.018817% | 0.53 | 3.200.000 | 0.00000 | 0.01 | 0.00000 | 5% | 85% |
| Goodrich Corporation | Dieldrin | 0 | 1.018817% | 0.00 | 390 | | 0.13 | | 5% | 85% |
| Goodrich Corporation | DDx | 0 | 1.018817% | 0.00 | 27.000 | | 1.37 | | 5% | 85% |
| Goodrich Corporation | Dioxins_Furans | 0 | 1.018817% | 0.00 | 38 | | 83.92 | | 5% | 85% |
| Goody Products Inc. | HPAHs | 4098.57 | 1.018817% | 41.76 | 240.000 | 0.00017 | 0.05 | 0.00001 | -20% | 90% |
| Goody Products Inc. | LPAHs | 2729.83 | 1.018817% | 27.81 | 170.000 | 0.00016 | 0.01 | 0.00000 | -20% | 90% |
| Goody Products Inc. | Copper | 144.61 | 1.018817% | 1.47 | 2.100.000 | 0.00000 | 0.69 | 0.00000 | -20% | 90% |
| Goody Products Inc. | Mercury | 0.6 | 1.018817% | 0.01 | 42.000 | 0.00000 | 0.95 | 0.00000 | -20% | 90% |
| Goody Products Inc. | Lead | 737.76 | 1.018817% | 7.52 | 3.200.000 | 0.00000 | 0.01 | 0.00000 | -20% | 90% |
| Goody Products Inc. | Dieldrin | 0 | 1.018817% | 0.00 | 390 | | 0.13 | | -20% | 90% |
| Goody Products Inc. | DDx | 0 | 1.018817% | 0.00 | 27.000 | | 1.37 | | -20% | 90% |
| Goody Products Inc. | Dioxins_Furans | 0 | 1.018817% | 0.00 | 38 | | 83.92 | | -20% | 90% |
| Goody Products Inc. | PCBs | 0 | 1.018817% | 0.00 | 26.000 | | 12.87 | | -20% | 90% |
| Harris Corporation | Copper | 403.38 | 1.018817% | 4.11 | 2.100.000 | 0.00000 | 0.69 | 0.00000 | 0% | 80% |
| Harris Corporation | Lead | 382.8 | 1.018817% | 3.90 | 3.200.000 | 0.00000 | 0.01 | 0.00000 | 0% | 80% |
| Harris Corporation | Mercury | 0.01 | 1.018817% | 0.00 | 42.000 | 0.00000 | 0.95 | 0.00000 | 0% | 80% |
| Harris Corporation | HPAHs | 0.06 | 1.018817% | 0.00 | 240.000 | 0.00000 | 0.05 | 0.00000 | 0% | 80% |
| Harris Corporation | LPAHs | 0.13 | 1.018817% | 0.00 | 170.000 | 0.00000 | 0.01 | 0.00000 | 0% | 80% |
| Harris Corporation | Dieldrin | 0 | 1.018817% | 0.00 | 390 | | 0.13 | | 0% | 80% |
| Harris Corporation | DDx | 0 | 1.018817% | 0.00 | 27.000 | | 1.37 | | 0% | 80% |
| Harris Corporation | Dioxins_Furans | 0 | 1.018817% | 0.00 | 38 | | 83.92 | | 0% | 80% |
| Harris Corporation | PCBs | 0 | 1.018817% | 0.00 | 26.000 | | 12.87 | | 0% | 80% |
| Hartz Consumer Group, Inc. | HPAHs | 1.51 | 1.018817% | 0.02 | 240.000 | 0.00000 | 0.05 | 0.00000 | 0% | 90% |
| Hartz Consumer Group, Inc. | LPAHs | 1.01 | 1.018817% | 0.01 | 170.000 | 0.00000 | 0.01 | 0.00000 | 0% | 90% |
| Hartz Consumer Group, Inc. | Lead | 0.54 | 1.018817% | 0.01 | 3.200.000 | | 0.05 | | 0% | 90% |
| Hartz Consumer Group, Inc. | Mercury | 0 | 1.018817% | 0.00 | 42.000 | | 0.95 | | 0% | 90% |
| Hartz Consumer Group, Inc. | Dieldrin | 0 | 1.018817% | 0.00 | 390 | | 0.13 | | 0% | 90% |
| Hartz Consumer Group, Inc. | DDx | 0 | 1.018817% | 0.00 | 27.000 | | 1.37 | | 0% | 90% |
| Hartz Consumer Group, Inc. | Copper | 0 | 1.018817% | 0.00 | 2.100.000 | | 0.69 | | 0% | 90% |
| Hartz Consumer Group, Inc. | PCBs | 0 | 1.018817% | 0.00 | 26.000 | | 12.87 | | 0% | 90% |
| Hexcel Corp. | PCBs | 895.59 | 1.018817% | 9.12 | 26.000 | 0.00035 | 12.87 | 0.00452 | 10% | 90% |
| Hexcel Corp. | Mercury | 23.55 | 1.018817% | 0.24 | 42.000 | 0.00001 | 0.95 | 0.00001 | 10% | 90% |
| Hexcel Corp. | Copper | 12.26 | 1.018817% | 0.12 | 2.100.000 | 0.00000 | 0.69 | 0.00000 | 10% | 90% |
| Hexcel Corp. | HPAHs | 11.74 | 1.018817% | 0.12 | 170.000 | 0.00000 | 0.01 | 0.00000 | 10% | 90% |
| Hexcel Corp. | Lead | 28.91 | 1.018817% | 0.29 | 3.200.000 | 0.00000 | 0.01 | 0.00000 | 10% | 90% |
| Hexcel Corp. | HPAHs | 0.04 | 1.018817% | 0.00 | 240.000 | 0.00000 | 0.05 | 0.00000 | 10% | 90% |
| Hexcel Corp. | Dieldrin | 0 | 1.018817% | 0.00 | 390 | | 0.13 | | 10% | 90% |
| Hexcel Corp. | DDx | 0 | 1.018817% | 0.00 | 27.000 | | 1.37 | | 10% | 90% |
| Hexcel Corp. | Dioxins_Furans | 0 | 1.018817% | 0.00 | 38 | | 83.92 | | 10% | 90% |
| Hoffmann-La Roche Inc. | PCBs | 63.47 | 1.018817% | 0.65 | 26.000 | 0.00002 | 12.87 | 0.00032 | 5% | 85% |
| Hoffmann-La Roche Inc. | Copper | 821.93 | 1.018817% | 8.37 | 2.100.000 | 0.00000 | 0.69 | 0.00000 | 5% | 85% |
| Hoffmann-La Roche Inc. | Mercury | 8.39 | 1.018817% | 0.09 | 42.000 | 0.00000 | 0.95 | 0.00000 | 5% | 85% |
| Hoffmann-La Roche Inc. | HPAHs | 15.82 | 1.018817% | 0.16 | 240.000 | 0.00000 | 0.05 | 0.00000 | 5% | 85% |
| Hoffmann-La Roche Inc. | Lead | 529.87 | 1.018817% | 5.40 | 3.200.000 | 0.00000 | 0.01 | 0.00000 | 5% | 85% |
| Hoffmann-La Roche Inc. | LPAHs | 8.1 | 1.018817% | 0.08 | 170.000 | 0.00000 | 0.01 | 0.00000 | 5% | 85% |
| Hoffmann-La Roche Inc. | Dieldrin | 0 | 1.018817% | 0.00 | 390 | | 0.13 | | 5% | 85% |
| Hoffmann-La Roche Inc. | DDx | 0 | 1.018817% | 0.00 | 27.000 | | 1.37 | | 5% | 85% |
| Hoffmann-La Roche Inc. | Dioxins_Furans | 0 | 1.018817% | 0.00 | 38 | | 83.92 | | 5% | 85% |
| Honeywell International, Inc. | Mercury | 0.43 | 1.018817% | 0.00 | 42.000 | 0.00000 | 0.95 | 0.00000 | 0% | 80% |

| Entity | Contaminant | Value | Factor | | Max | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Honeywell International, Inc. | HPAHs | 0.73 | 1.018817% | 0.01 | 240.000 | 0.00000 | 0.05 | 0.00000 | | 0% | -20% | 80% |
| Honeywell International, Inc. | LPAHs | 1.86 | 1.018817% | 0.02 | 170.000 | 0.00000 | 0.01 | 0.00000 | | 0% | -20% | 80% |
| Honeywell International, Inc. | Dieldrin | 0 | 1.018817% | 0.00 | 390 | - | 0.13 | - | | 0% | -20% | 80% |
| Honeywell International, Inc. | DDx | 0 | 1.018817% | 0.00 | 27.000 | - | 1.37 | - | | 0% | -20% | 80% |
| Honeywell International, Inc. | Dioxins_Furans | 0 | 1.018817% | 0.00 | 38 | - | 83.92 | - | | 0% | -20% | 80% |
| Honeywell International, Inc. | PCBs | 0 | 1.018817% | 0.00 | 26.000 | - | 12.87 | - | | 0% | -20% | 80% |
| Honeywell International, Inc. | Copper | 0 | 1.018817% | 0.00 | 2.100.000 | - | 0.69 | - | | 0% | -20% | 80% |
| Honeywell International, Inc. | Lead | 0 | 1.018817% | 0.00 | 3.200.000 | - | 0.01 | - | | 0% | -20% | 80% |
| ISP Chemicals LLC | PCBs | 524.43 | 1.018817% | 5.34 | 26.000 | 0.00021 | 12.87 | 0.00254 | | 0% | -20% | 80% |
| ISP Chemicals LLC | Mercury | 5.97 | 1.018817% | 0.06 | 42.000 | 0.00000 | 0.95 | 0.00000 | | 0% | -20% | 80% |
| ISP Chemicals LLC | HPAHs | 0.37 | 1.018817% | 0.00 | 240.000 | 0.00000 | 0.05 | 0.00000 | | 0% | -20% | 80% |
| ISP Chemicals LLC | LPAHs | 0.65 | 1.018817% | 0.01 | 170.000 | 0.00000 | 0.01 | 0.00000 | | 0% | -20% | 80% |
| ISP Chemicals LLC | Lead | 9.92 | 1.018817% | 0.10 | 3.200.000 | 0.00000 | 0.01 | 0.00000 | | 0% | -20% | 80% |
| ISP Chemicals LLC | Dieldrin | 0 | 1.018817% | 0.00 | 390 | - | 0.13 | - | | 0% | -20% | 80% |
| ISP Chemicals LLC | DDx | 0 | 1.018817% | 0.00 | 27.000 | - | 1.37 | - | | 0% | -20% | 80% |
| ISP Chemicals LLC | Dioxins_Furans | 0 | 1.018817% | 0.00 | 38 | - | 83.92 | - | | 0% | -20% | 80% |
| ISP Chemicals LLC | Copper | 0 | 1.018817% | 0.00 | 2.100.000 | - | 0.69 | - | | 0% | -20% | 80% |
| Kearny Smelting & Refining | Copper | 13196.61 | 1.018817% | 134.45 | 2.100.000 | 0.00006 | 0.69 | 0.00004 | | 10% | 0% | 110% |
| Kearny Smelting & Refining | PCBs | 5.57 | 1.018817% | 0.06 | 26.000 | 0.00000 | 12.87 | 0.00003 | | 10% | 0% | 110% |
| Kearny Smelting & Refining | Mercury | 2.42 | 1.018817% | 0.02 | 42.000 | 0.00000 | 0.95 | 0.00000 | | 10% | 0% | 110% |
| Kearny Smelting & Refining | Lead | 496.53 | 1.018817% | 5.057 | 3.200.000 | 0.00000 | 0.01 | 0.00000 | | 10% | 0% | 110% |
| Kearny Smelting & Refining | HPAHs | 4.46 | 1.018817% | 0.05 | 240.000 | 0.00000 | 0.05 | 0.00000 | | 10% | 0% | 110% |
| Kearny Smelting & Refining | LPAHs | 4.8 | 1.018817% | 0.05 | 170.000 | 0.00000 | 0.01 | 0.00000 | | 10% | 0% | 110% |
| Kearny Smelting & Refining | Dieldrin | 0 | 1.018817% | 0.00 | 390 | - | 0.13 | - | | 10% | 0% | 110% |
| Kearny Smelting & Refining | DDx | 0 | 1.018817% | 0.00 | 27.000 | - | 1.37 | - | | 10% | 0% | 110% |
| Kearny Smelting & Refining | Dioxins_Furans | 0 | 1.018817% | 0.00 | 38 | - | 83.92 | - | | 10% | 0% | 110% |
| Leemilt's Petroleum, Inc. | PCBs | 6.7 | 1.018817% | 0.07 | 26.000 | 0.00000 | 12.87 | 0.00003 | | 0% | -20% | 80% |
| Leemilt's Petroleum, Inc. | HPAHs | 64.4 | 1.018817% | 0.66 | 240.000 | 0.00000 | 0.05 | 0.00000 | | 0% | -20% | 80% |
| Leemilt's Petroleum, Inc. | LPAHs | 44.26 | 1.018817% | 0.45 | 170.000 | 0.00000 | 0.01 | 0.00000 | | 0% | -20% | 80% |
| Leemilt's Petroleum, Inc. | Dieldrin | 0 | 1.018817% | 0.00 | 390 | - | 0.13 | - | | 0% | -20% | 80% |
| Leemilt's Petroleum, Inc. | DDx | 0 | 1.018817% | 0.00 | 27.000 | - | 1.37 | - | | 0% | -20% | 80% |
| Leemilt's Petroleum, Inc. | Dioxins_Furans | 0 | 1.018817% | 0.00 | 38 | - | 83.92 | - | | 0% | -20% | 80% |
| Leemilt's Petroleum, Inc. | Mercury | 0 | 1.018817% | 0.00 | 42.000 | - | 0.95 | - | | 0% | -20% | 80% |
| Leemilt's Petroleum, Inc. | Copper | 0 | 1.018817% | 0.00 | 2.100.000 | - | 0.69 | - | | 0% | -20% | 80% |
| Leemilt's Petroleum, Inc. | Lead | 0 | 1.018817% | 0.00 | 3.200.000 | - | 0.01 | - | | 0% | -20% | 80% |
| Legacy Vulcan Corporation | PCBs | 56.29 | 1.018817% | 0.57 | 26.000 | 0.00002 | 12.87 | 0.00078 | | 5% | -20% | 85% |
| Legacy Vulcan Corporation | HPAHs | 23.18 | 1.018817% | 0.24 | 240.000 | 0.00000 | 0.05 | 0.00000 | | 5% | -20% | 85% |
| Legacy Vulcan Corporation | LPAHs | 48.73 | 1.018817% | 0.50 | 170.000 | 0.00000 | 0.01 | 0.00000 | | 5% | -20% | 85% |
| Legacy Vulcan Corporation | Lead | 81.43 | 1.018817% | 0.83 | 3.200.000 | 0.00000 | 0.01 | 0.00000 | | 5% | -20% | 85% |
| Legacy Vulcan Corporation | Dieldrin | 0 | 1.018817% | 0.00 | 390 | - | 0.13 | - | | 5% | -20% | 85% |
| Legacy Vulcan Corporation | DDx | 0 | 1.018817% | 0.00 | 27.000 | - | 1.37 | - | | 5% | -20% | 85% |
| Legacy Vulcan Corporation | Dioxins_Furans | 0 | 1.018817% | 0.00 | 38 | - | 83.92 | - | | 5% | -20% | 85% |
| Legacy Vulcan Corporation | Mercury | 0 | 1.018817% | 0.00 | 42.000 | - | 0.95 | - | | 5% | -20% | 85% |
| Legacy Vulcan Corporation | Copper | 0 | 1.018817% | 0.00 | 2.100.000 | - | 0.69 | - | | 5% | -20% | 85% |
| National Standard LLC | Lead | 23.66 | 1.018817% | 0.24 | 3.200.000 | 0.00000 | 0.01 | 0.00000 | | 5% | -20% | 85% |
| National Standard LLC | LPAHs | 0 | 1.018817% | 0.00 | 170.000 | - | 0.01 | - | | 5% | -20% | 85% |
| National Standard LLC | HPAHs | 0 | 1.018817% | 0.00 | 240.000 | - | 0.05 | - | | 5% | -20% | 85% |
| National Standard LLC | Dieldrin | 0 | 1.018817% | 0.00 | 390 | - | 0.13 | - | | 5% | -20% | 85% |
| National Standard LLC | DDx | 0 | 1.018817% | 0.00 | 27.000 | - | 1.37 | - | | 5% | -20% | 85% |
| National Standard LLC | Dioxins_Furans | 0 | 1.018817% | 0.00 | 38 | - | 83.92 | - | | 5% | -20% | 85% |
| National Standard LLC | Mercury | 0 | 1.018817% | 0.00 | 42.000 | - | 0.95 | - | | 5% | -20% | 85% |
| National Standard LLC | PCBs | 0 | 1.018817% | 0.00 | 26.000 | - | 12.87 | - | | 5% | -20% | 85% |
| National Standard LLC | Copper | 0 | 1.018817% | 0.00 | 2.100.000 | - | 0.69 | - | | 5% | -20% | 85% |
| Neu Holdings (Eden Wood Corporation) | Copper | 111.3 | 1.018817% | 1.13 | 2.100.000 | 0.00000 | 0.69 | 0.00000 | | 10% | 0% | 110% |
| Neu Holdings (Eden Wood Corporation) | Mercury | 0.05 | 1.018817% | 0.00 | 42.000 | 0.00000 | 0.95 | 0.00000 | | 10% | 0% | 110% |
| Neu Holdings (Eden Wood Corporation) | Lead | 1.17 | 1.018817% | 0.01 | 3.200.000 | 0.00000 | 0.01 | 0.00000 | | 10% | 0% | 110% |
| Neu Holdings (Eden Wood Corporation) | Dieldrin | 0 | 1.018817% | 0.00 | 390 | - | 0.13 | - | | 10% | 0% | 110% |
| Neu Holdings (Eden Wood Corporation) | DDx | 0 | 1.018817% | 0.00 | 27.000 | - | 1.37 | - | | 10% | 0% | 110% |
| Neu Holdings (Eden Wood Corporation) | Dioxins_Furans | 0 | 1.018817% | 0.00 | 38 | - | 83.92 | - | | 10% | 0% | 110% |
| Neu Holdings (Eden Wood Corporation) | PCBs | 0 | 1.018817% | 0.00 | 26.000 | - | 12.87 | - | | 10% | 0% | 110% |
| Neu Holdings (Eden Wood Corporation) | LPAHs | 0 | 1.018817% | 0.00 | 170.000 | - | 0.01 | - | | 10% | 0% | 110% |
| Neu Holdings (Eden Wood Corporation) | HPAHs | 0 | 1.018817% | 0.00 | 240.000 | - | 0.05 | - | | 10% | 0% | 110% |
| Newark Morning Ledger Co. | Mercury | 6.83 | 1.018817% | 0.07 | 42.000 | 0.00000 | 0.95 | 0.00000 | | 0% | 0% | 100% |
| Newark Group, Inc. | Copper | 446.89 | 1.018817% | 4.55 | 2.100.000 | 0.00000 | 0.69 | 0.00000 | | 0% | -20% | 80% |
| Newark Group, Inc. | Mercury | 2.63 | 1.018817% | 0.03 | 42.000 | 0.00000 | 0.95 | 0.00000 | | 0% | -20% | 80% |
| Newark Morning Ledger Co. | HPAHs | 78.76 | 1.018817% | 0.80 | 240.000 | 0.00000 | 0.05 | 0.00000 | | 0% | 0% | 100% |
| Newark Group, Inc. | LPAHs | 20.92 | 1.018817% | 0.21 | 2.100.000 | 0.00000 | 0.69 | 0.00000 | | 0% | -20% | 80% |
| Newark Morning Ledger Co. | LPAHs | 52.51 | 1.018817% | 0.53 | 170.000 | 0.00000 | 0.01 | 0.00000 | | 0% | 0% | 100% |
| Newark Group, Inc. | Lead | 126.18 | 1.018817% | 1.29 | 3.200.000 | 0.00000 | 0.01 | 0.00000 | | 0% | -20% | 80% |
| Newark Morning Ledger Co. | Lead | 10.59 | 1.018817% | 0.11 | 3.200.000 | 0.00000 | 0.01 | 0.00000 | | 0% | 0% | 100% |
| Newark Group, Inc. | Dieldrin | 0 | 1.018817% | 0.00 | 390 | - | 0.13 | - | | 0% | -20% | 80% |
| Newark Group, Inc. | DDx | 0 | 1.018817% | 0.00 | 27.000 | - | 1.37 | - | | 0% | -20% | 80% |
| Newark Group, Inc. | Dioxins_Furans | 0 | 1.018817% | 0.00 | 38 | - | 83.92 | - | | 0% | -20% | 80% |
| Newark Group, Inc. | PCBs | 0 | 1.018817% | 0.00 | 26.000 | - | 12.87 | - | | 0% | -20% | 80% |
| Newark Group, Inc. | LPAHs | 0 | 1.018817% | 0.00 | 170.000 | - | 0.01 | - | | 0% | -20% | 80% |
| Newark Group, Inc. | HPAHs | 0 | 1.018817% | 0.00 | 240.000 | - | 0.05 | - | | 0% | -20% | 80% |
| Newark Morning Ledger Co. | Dieldrin | 0 | 1.018817% | 0.00 | 390 | - | 0.13 | - | | 0% | 0% | 100% |
| Newark Morning Ledger Co. | DDx | 0 | 1.018817% | 0.00 | 27.000 | - | 1.37 | - | | 0% | 0% | 100% |
| Newark Morning Ledger Co. | Dioxins_Furans | 0 | 1.018817% | 0.00 | 38 | - | 83.92 | - | | 0% | 0% | 100% |
| Newark Morning Ledger Co. | PCBs | 0 | 1.018817% | 0.00 | 26.000 | - | 12.87 | - | | 0% | 0% | 100% |
| Nokia-Lucent Technologies | PCBs | 11010.36 | 1.018817% | 112.18 | 26.000 | 0.00431 | 12.87 | 0.05553 | | 5% | -20% | 85% |
| Nokia-Lucent Technologies | Mercury | 5.91 | 1.018817% | 0.06 | 42.000 | 0.00000 | 0.95 | 0.00000 | | 5% | -20% | 85% |
| Nokia-Lucent Technologies | HPAHs | 12.8 | 1.018817% | 0.13 | 240.000 | 0.00000 | 0.05 | 0.00000 | | 5% | -20% | 85% |
| Nokia-Lucent Technologies | LPAHs | 26.09 | 1.018817% | 0.27 | 170.000 | 0.00000 | 0.01 | 0.00000 | | 5% | -20% | 85% |
| Nokia-Lucent Technologies | DDx | 0 | 1.018817% | 0.00 | 27.000 | - | 1.37 | - | | 5% | -20% | 85% |
| Nokia-Lucent Technologies | Dieldrin | 0 | 1.018817% | 0.00 | 390 | - | 0.13 | - | | 5% | -20% | 85% |
| Nokia-Lucent Technologies | Dioxins_Furans | 0 | 1.018817% | 0.00 | 38 | - | 83.92 | - | | 5% | -20% | 85% |
| Nokia-Lucent Technologies | Copper | 0 | 1.018817% | 0.00 | 2.100.000 | - | 0.69 | - | | 5% | -20% | 85% |
| Nokia-Lucent Technologies | Lead | 0 | 1.018817% | 0.00 | 3.200.000 | - | 0.01 | - | | 5% | -20% | 85% |
| Occidental Chemical Corp. | Dioxins_Furans | 3729.71 | 1.018817% | 38.00 | 38 | 0.99997 | 83.92 | 83.91761 | | 100% | 0% | 200% |
| Occidental Chemical Corp. | DDx | 1938.72 | 1.018817% | 19.75 | 27.000 | 0.00073 | 1.37 | 0.00100 | | 100% | 0% | 200% |
| Occidental Chemical Corp. | PCBs | 120.2 | 1.018817% | 1.22 | 26.000 | 0.00005 | 12.87 | 0.00061 | | 100% | 0% | 200% |
| Occidental Chemical Corp. | Mercury | 2.61 | 1.018817% | 0.03 | 42.000 | 0.00000 | 0.95 | 0.00000 | | 100% | 0% | 200% |
| Occidental Chemical Corp. | Dieldrin | 0.14 | 1.018817% | 0.00 | 390 | 0.00000 | 0.13 | 0.00000 | | 100% | 0% | 200% |
| Occidental Chemical Corp. | HPAHs | 185.41 | 1.018817% | 1.89 | 240.000 | 0.00000 | 0.05 | 0.00000 | | 100% | 0% | 200% |
| Occidental Chemical Corp. | Copper | 51.58 | 1.018817% | 0.53 | 2.100.000 | 0.00000 | 0.69 | 0.00000 | | 100% | 0% | 200% |
| Occidental Chemical Corp. | LPAHs | 58.55 | 1.018817% | 0.60 | 170.000 | 0.00000 | 0.01 | 0.00000 | | 100% | 0% | 200% |
| Occidental Chemical Corp. | Lead | 162.51 | 1.018817% | 1.66 | 3.200.000 | 0.00000 | 0.01 | 0.00000 | | 100% | 0% | 200% |
| Okonite Company | HPAHs | 26904 | 1.018817% | 274.51 | 240.000 | 0.00114 | 0.05 | 0.00006 | | 5% | -10% | 95% |
| Okonite Company | Copper | 5821.01 | 1.018817% | 59.31 | 2.100.000 | 0.00003 | 0.69 | 0.00002 | | 5% | -10% | 95% |
| Okonite Company | LPAHs | 13972.44 | 1.018817% | 143.11 | 170.000 | 0.00008 | 0.01 | 0.00001 | | 5% | -10% | 95% |
| Okonite Company | Mercury | 27.24 | 1.018817% | 0.28 | 42.000 | 0.00001 | 0.95 | 0.00001 | | 5% | -10% | 95% |
| Okonite Company | Lead | 27164.42 | 1.018817% | 276.76 | 3.200.000 | 0.00009 | 0.01 | 0.00000 | | 5% | -10% | 95% |
| Okonite Company | Dieldrin | 0 | 1.018817% | 0.00 | 390 | - | 0.13 | - | | 5% | -10% | 95% |
| Okonite Company | DDx | 0 | 1.018817% | 0.00 | 27.000 | - | 1.37 | - | | 5% | -10% | 95% |
| Okonite Company | Dioxins_Furans | 0 | 1.018817% | 0.00 | 38 | - | 83.92 | - | | 5% | -10% | 95% |
| Okonite Company | PCBs | 0 | 1.018817% | 0.00 | 26.000 | - | 12.87 | - | | 5% | -10% | 95% |
| Otis Elevator Co. | Mercury | 12.39 | 1.018817% | 0.13 | 42.000 | 0.00000 | 0.95 | 0.00000 | | 10% | -20% | 90% |
| Otis Elevator Co. | HPAHs | 1082.47 | 1.018817% | 11.03 | 240.000 | 0.00005 | 0.05 | 0.00000 | | 10% | -20% | 90% |
| Otis Elevator Co. | Copper | 259.75 | 1.018817% | 2.65 | 2.100.000 | 0.00000 | 0.69 | 0.00000 | | 10% | -20% | 90% |
| Otis Elevator Co. | LPAHs | 724.26 | 1.018817% | 7.38 | 170.000 | 0.00004 | 0.01 | 0.00000 | | 10% | -20% | 90% |

| Company | Contaminant | Value | Pct | Value | Value | Value | Value | Value | A | B | C |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Otis Elevator Co. | Lead | 229.32 | 1.081817% | 2.34 | 3,200.000 | 0.000000 | 0.01 | 0.000000 | 10% | -20% | 90% |
| Otis Elevator Co. | Dieldrin | 0 | 1.081817% | 0.00 | 390 | | 0.13 | - | 10% | -20% | 90% |
| Otis Elevator Co. | DDx | 0 | 1.081817% | 0.00 | 27.000 | | 1.37 | - | 10% | -20% | 90% |
| Otis Elevator Co. | Dioxins_Furans | 0 | 1.081817% | 0.00 | 38 | | 83.92 | - | 10% | -20% | 90% |
| Otis Elevator Co. | PCBs | 0 | 1.081817% | 0.00 | 26.000 | | 12.87 | - | 10% | -20% | 90% |
| Pabst Brewing Company | Dieldrin | 0 | 1.081817% | 0.00 | 390 | | 0.13 | - | 0% | -10% | 90% |
| Pabst Brewing Company | DDx | 0 | 1.081817% | 0.00 | 27.000 | | 1.37 | - | 0% | -10% | 90% |
| Pabst Brewing Company | Dioxins_Furans | 0 | 1.081817% | 0.00 | 38 | | 83.92 | - | 0% | -10% | 90% |
| Pabst Brewing Company | PCBs | 0 | 1.081817% | 0.00 | 26.000 | | 12.87 | - | 0% | -10% | 90% |
| Pabst Brewing Company | Mercury | 0 | 1.081817% | 0.00 | 42.000 | | 0.95 | - | 0% | -10% | 90% |
| Pabst Brewing Company | Copper | 0 | 1.081817% | 0.00 | 2,100.000 | | 0.69 | - | 0% | -10% | 90% |
| Pabst Brewing Company | Lead | 0 | 1.081817% | 0.00 | 3,200.000 | | 0.01 | - | 0% | -10% | 90% |
| Pabst Brewing Company | LPAHs | 0 | 1.081817% | 0.00 | 170.000 | | 0.01 | - | 0% | -10% | 90% |
| Pabst Brewing Company | HPAHs | 0 | 1.081817% | 0.00 | 240.000 | | 0.05 | | 0% | -10% | 90% |
| Passaic Pioneer Properties Co. | Mercury | 0.71 | 1.081817% | 0.01 | 42.000 | 0.000000 | 0.95 | 0.000000 | 5% | 0% | 105% |
| Passaic Pioneer Properties Co. | Copper | 20.68 | 1.081817% | 0.21 | 2,100.000 | 0.000000 | 0.69 | 0.000000 | 5% | 0% | 105% |
| Passaic Pioneer Properties Co. | Lead | 7.44 | 1.081817% | 0.08 | 3,200.000 | 0.000000 | 0.01 | 0.000000 | 5% | 0% | 105% |
| Passaic Pioneer Properties Co. | Dieldrin | 0 | 1.081817% | 0.00 | 390 | | 0.13 | - | 5% | 0% | 105% |
| Passaic Pioneer Properties Co. | DDx | 0 | 1.081817% | 0.00 | 27.000 | | 1.37 | - | 5% | 0% | 105% |
| Passaic Pioneer Properties Co. | Dioxins_Furans | 0 | 1.081817% | 0.00 | 38 | | 83.92 | - | 5% | 0% | 105% |
| Passaic Pioneer Properties Co. | PCBs | 0 | 1.081817% | 0.00 | 26.000 | | 12.87 | - | 5% | 0% | 105% |
| Passaic Pioneer Properties Co. | LPAHs | 0 | 1.081817% | 0.00 | 170.000 | | 0.01 | - | 5% | 0% | 105% |
| Passaic Pioneer Properties Co. | HPAHs | 0 | 1.081817% | 0.00 | 240.000 | | 0.05 | | 5% | 0% | 105% |
| Pharmacia LLC | PCBs | 6134.35 | 1.081817% | 62.50 | 26.000 | 0.00240 | 12.87 | 0.03094 | 5% | -20% | 85% |
| Pharmacia LLC | Mercury | 45.85 | 1.081817% | 0.47 | 42.000 | 0.00001 | 0.95 | 0.00001 | 5% | -20% | 85% |
| Pharmacia LLC | HPAHs | 12.09 | 1.081817% | 0.12 | 240.000 | 0.00000 | 0.05 | 0.00000 | 5% | -20% | 85% |
| Pharmacia LLC | LPAHs | 12.64 | 1.081817% | 0.13 | 170.000 | 0.00000 | 0.01 | 0.00000 | 5% | -20% | 85% |
| Pharmacia LLC | Dieldrin | 0 | 1.081817% | 0.00 | 390 | | 0.13 | - | 5% | -20% | 85% |
| Pharmacia LLC | DDx | 0 | 1.081817% | 0.00 | 27.000 | | 1.37 | - | 5% | -20% | 85% |
| Pharmacia LLC | Dioxins_Furans | 0 | 1.081817% | 0.00 | 38 | | 83.92 | - | 5% | -20% | 85% |
| Pharmacia LLC | Copper | 0 | 1.081817% | 0.00 | 2,100.000 | | 0.69 | - | 5% | -20% | 85% |
| Pharmacia LLC | Lead | 0 | 1.081817% | 0.00 | 3,200.000 | | 0.01 | - | 5% | -20% | 85% |
| Pitt Consol Chemical Company | PCBs | 447.23 | 1.081817% | 4.56 | 26.000 | 0.00018 | 12.87 | 0.00276 | 10% | -20% | 90% |
| Pitt Consol Chemical Company | Mercury | 293.13 | 1.081817% | 2.99 | 42.000 | 0.00007 | 0.95 | 0.00007 | 10% | -20% | 90% |
| Pitt Consol Chemical Company | HPAHs | 11104.08 | 1.081817% | 113.13 | 240.000 | 0.00047 | 0.05 | 0.00000 | 10% | -20% | 90% |
| Pitt Consol Chemical Company | LPAHs | 24369.81 | 1.081817% | 248.28 | 170.000 | 0.00146 | 0.01 | 0.00001 | 10% | -20% | 90% |
| Pitt Consol Chemical Company | Copper | 3890.15 | 1.081817% | 39.63 | 2,100.000 | 0.00002 | 0.69 | 0.00001 | 10% | -20% | 90% |
| Pitt Consol Chemical Company | Lead | 22931.66 | 1.081817% | 233.63 | 3,200.000 | 0.00007 | 0.01 | 0.00000 | 10% | -20% | 90% |
| Pitt Consol Chemical Company | Dieldrin | 0 | 1.081817% | 0.00 | 390 | | 0.13 | - | 10% | -20% | 90% |
| Pitt Consol Chemical Company | DDx | 0 | 1.081817% | 0.00 | 27.000 | | 1.37 | - | 10% | -20% | 90% |
| Pitt Consol Chemical Company | Dioxins_Furans | 0 | 1.081817% | 0.00 | 38 | | 83.92 | - | 10% | -20% | 90% |
| PMC, Inc. | HPAHs | 1859487.41 | 1.081817% | 18944.77 | 240.000 | 0.07894 | 0.05 | 0.00395 | 10% | -20% | 130% |
| PMC, Inc. | LPAHs | 1239658.31 | 1.081817% | 12629.85 | 170.000 | 0.07429 | 0.01 | 0.00074 | 10% | -20% | 130% |
| PMC, Inc. | Copper | 49358.02 | 1.081817% | 502.87 | 2,100.000 | 0.00024 | 0.69 | 0.00017 | 10% | -20% | 130% |
| PMC, Inc. | Mercury | 290.85 | 1.081817% | 2.96 | 42.000 | 0.00007 | 0.95 | 0.00007 | 10% | -20% | 130% |
| PMC, Inc. | Lead | 40948.42 | 1.081817% | 411.19 | 3,200.000 | 0.00013 | 0.01 | 0.00000 | 10% | -20% | 130% |
| PMC, Inc. | Dieldrin | 0 | 1.081817% | 0.00 | 390 | | 0.13 | - | 10% | -20% | 130% |
| PMC, Inc. | DDx | 0 | 1.081817% | 0.00 | 27.000 | | 1.37 | - | 10% | -20% | 130% |
| PMC, Inc. | Dioxins_Furans | 0 | 1.081817% | 0.00 | 38 | | 83.92 | - | 10% | -20% | 130% |
| PMC, Inc. | PCBs | 0 | 1.081817% | 0.00 | 26.000 | | 12.87 | - | 10% | -20% | 130% |
| PPG Industries Inc. | PCBs | 0.38 | 1.081817% | 0.00 | 26.000 | 0.00000 | 12.87 | 0.00000 | 5% | -20% | 85% |
| PPG Industries Inc. | Copper | 32.69 | 1.081817% | 0.33 | 2,100.000 | 0.00000 | 0.69 | 0.00000 | 5% | -20% | 85% |
| PPG Industries Inc. | Mercury | 0.31 | 1.081817% | 0.00 | 42.000 | 0.00000 | 0.95 | 0.00000 | 5% | -20% | 85% |
| PPG Industries Inc. | Lead | 283.93 | 1.081817% | 2.89 | 3,200.000 | 0.00000 | 0.01 | 0.00000 | 5% | -20% | 85% |
| PPG Industries Inc. | LPAHs | 5.26 | 1.081817% | 0.05 | 170.000 | 0.00000 | 0.01 | 0.00000 | 5% | -20% | 85% |
| PPG Industries Inc. | HPAHs | 0.83 | 1.081817% | 0.01 | 240.000 | 0.00000 | 0.05 | 0.00000 | 5% | -20% | 85% |
| PPG Industries Inc. | Dieldrin | 0 | 1.081817% | 0.00 | 390 | | 0.13 | - | 5% | -20% | 85% |
| PPG Industries Inc. | DDx | 0 | 1.081817% | 0.00 | 27.000 | | 1.37 | - | 5% | -20% | 85% |
| PPG Industries Inc. | Dioxins_Furans | 0 | 1.081817% | 0.00 | 38 | | 83.92 | - | 5% | -20% | 85% |
| PSE&G 1 - 4th Street | HPAHs | 256483.6 | 1.081817% | 2613.10 | 240.000 | 0.01089 | 0.05 | 0.00054 | 10% | -20% | 90% |
| PSE&G 1 - 4th Street | LPAHs | 265391.31 | 1.081817% | 2705.87 | 170.000 | 0.01591 | 0.01 | 0.00016 | 10% | -20% | 90% |
| PSE&G 1 - 4th Street | PCBs | 10.16 | 1.081817% | 0.10 | 26.000 | 0.00000 | 12.87 | 0.00005 | 10% | -20% | 90% |
| PSE&G 2 - 155 Raymond Blvd | Copper | 5838.11 | 1.081817% | 59.48 | 2,100.000 | 0.00003 | 0.69 | 0.00002 | 5% | -20% | 85% |
| PSE&G 1 - 4th Street | Copper | 5585.41 | 1.081817% | 52.83 | 2,100.000 | 0.00003 | 0.69 | 0.00002 | 10% | -20% | 90% |
| PSE&G 2 - 155 Raymond Blvd | PCBs | 1.97 | 1.081817% | 0.02 | 26.000 | 0.00000 | 12.87 | 0.00001 | 5% | -20% | 85% |
| PSE&G 1 - 4th Street | Mercury | 39.3 | 1.081817% | 0.40 | 42.000 | 0.00001 | 0.95 | 0.00001 | 10% | -20% | 90% |
| PSE&G 2 - 155 Raymond Blvd | HPAHs | 235.86 | 1.081817% | 2.40 | 240.000 | 0.00000 | 0.05 | 0.00000 | 5% | -20% | 85% |
| PSE&G 2 - 155 Raymond Blvd | LPAHs | 299.62 | 1.081817% | 3.05 | 170.000 | 0.00000 | 0.01 | 0.00000 | 5% | -20% | 85% |
| PSE&G 1 - 4th Street | Lead | 569.32 | 1.081817% | 5.80 | 3,200.000 | 0.00000 | 0.01 | 0.00000 | 10% | -20% | 90% |
| PSE&G 1 - 4th Street | Dieldrin | 0 | 1.081817% | 0.00 | 390 | | 0.13 | - | 10% | -20% | 90% |
| PSE&G 1 - 4th Street | DDx | 0 | 1.081817% | 0.00 | 27.000 | | 1.37 | - | 10% | -20% | 90% |
| PSE&G 1 - 4th Street | Dioxins_Furans | 0 | 1.081817% | 0.00 | 38 | | 83.92 | - | 10% | -20% | 90% |
| PSE&G 2 - 155 Raymond Blvd | Dieldrin | 0 | 1.081817% | 0.00 | 390 | | 0.13 | - | 5% | -20% | 85% |
| PSE&G 2 - 155 Raymond Blvd | DDx | 0 | 1.081817% | 0.00 | 27.000 | | 1.37 | - | 5% | -20% | 85% |
| PSE&G 2 - 155 Raymond Blvd | Dioxins_Furans | 0 | 1.081817% | 0.00 | 38 | | 83.92 | - | 5% | -20% | 85% |
| PSE&G 2 - 155 Raymond Blvd | Mercury | 0 | 1.081817% | 0.00 | 42.000 | | 0.95 | - | 5% | -20% | 85% |
| PSE&G 2 - 155 Raymond Blvd | Lead | 0 | 1.081817% | 0.00 | 3,200.000 | | 0.01 | - | 5% | -20% | 85% |
| Purdue Pharma Technologies Inc. | Copper | 150.67 | 1.081817% | 1.54 | 2,100.000 | 0.000000 | 0.69 | 0.000000 | 5% | -20% | 85% |
| Purdue Pharma Technologies Inc. | Mercury | 0.19 | 1.081817% | 0.00 | 42.000 | 0.000000 | 0.95 | 0.000000 | 5% | -20% | 85% |
| Purdue Pharma Technologies Inc. | HPAHs | 17.53 | 1.081817% | 0.18 | 240.000 | 0.000000 | 0.05 | 0.000000 | 5% | -20% | 85% |
| Purdue Pharma Technologies Inc. | LPAHs | 13.19 | 1.081817% | 0.13 | 170.000 | 0.000000 | 0.01 | 0.000000 | 5% | -20% | 85% |
| Purdue Pharma Technologies Inc. | Lead | 47.48 | 1.081817% | 0.48 | 3,200.000 | 0.000000 | 0.01 | 0.000000 | 5% | -20% | 85% |
| Purdue Pharma Technologies Inc. | Dieldrin | 0 | 1.081817% | 0.00 | 390 | | 0.13 | - | 5% | -20% | 85% |
| Purdue Pharma Technologies Inc. | DDx | 0 | 1.081817% | 0.00 | 27.000 | | 1.37 | - | 5% | -20% | 85% |
| Purdue Pharma Technologies Inc. | Dioxins_Furans | 0 | 1.081817% | 0.00 | 38 | | 83.92 | - | 5% | -20% | 85% |
| Purdue Pharma Technologies Inc. | PCBs | 0 | 1.081817% | 0.00 | 26.000 | | 12.87 | - | 5% | -20% | 85% |
| Quality Carriers, Inc./Quala Systems | PCBs | 0.39 | 1.081817% | 0.00 | 26.000 | | 12.87 | 0.00000 | 5% | -20% | 85% |
| Quality Carriers, Inc./Quala Systems | Copper | 4.3 | 1.081817% | 0.04 | 2,100.000 | 0.00000 | 0.69 | 0.00000 | 5% | -20% | 85% |
| Quality Carriers, Inc./Quala Systems | LPAHs | 5.08 | 1.081817% | 0.05 | 170.000 | | 0.01 | 0.00000 | 5% | -20% | 85% |
| Quality Carriers, Inc./Quala Systems | Dieldrin | 0 | 1.081817% | 0.00 | 390 | | 0.13 | - | 5% | -20% | 85% |
| Quality Carriers, Inc./Quala Systems | DDx | 0 | 1.081817% | 0.00 | 27.000 | | 1.37 | - | 5% | -20% | 85% |
| Quality Carriers, Inc./Quala Systems | Dioxins_Furans | 0 | 1.081817% | 0.00 | 38 | | 83.92 | - | 5% | -20% | 85% |
| Quality Carriers, Inc./Quala Systems | Mercury | 0 | 1.081817% | 0.00 | 42.000 | | 0.95 | - | 5% | -20% | 85% |
| Quality Carriers, Inc./Quala Systems | Lead | 0 | 1.081817% | 0.00 | 3,200.000 | | 0.69 | - | 5% | -20% | 85% |
| Revere Smelting & Refining Corp. | Copper | 524.24 | 1.081817% | 5.34 | 2,100.000 | 0.000000 | 0.69 | 0.000000 | 0% | -20% | 80% |
| Revere Smelting & Refining Corp. | PCBs | 0.07 | 1.081817% | 0.00 | 26.000 | 0.000000 | 12.87 | 0.000000 | 0% | -20% | 80% |
| Revere Smelting & Refining Corp. | Mercury | 0.16 | 1.081817% | 0.00 | 42.000 | 0.000000 | 0.95 | 0.000000 | 0% | -20% | 80% |
| Revere Smelting & Refining Corp. | Lead | 92.5 | 1.081817% | 0.94 | 3,200.000 | 0.000000 | 0.01 | 0.000000 | 0% | -20% | 80% |
| Revere Smelting & Refining Corp. | HPAHs | 0.03 | 1.081817% | 0.00 | 240.000 | | 0.05 | - | 0% | -20% | 80% |
| Revere Smelting & Refining Corp. | LPAHs | 0.08 | 1.081817% | 0.00 | 170.000 | | 0.01 | - | 0% | -20% | 80% |
| Revere Smelting & Refining Corp. | Dieldrin | 0 | 1.081817% | 0.00 | 390 | | 0.13 | - | 0% | -20% | 80% |
| Revere Smelting & Refining Corp. | DDx | 0 | 1.081817% | 0.00 | 27.000 | | 1.37 | - | 0% | -20% | 80% |
| Revere Smelting & Refining Corp. | Dioxins_Furans | 0 | 1.081817% | 0.00 | 38 | | 83.92 | - | 0% | -20% | 80% |
| Roman Asphalt Corporation | HPAHs | 95.19 | 1.081817% | 0.97 | 240.000 | 0.000000 | 0.05 | 0.00000 | 10% | -20% | 130% |
| Roman Asphalt Corporation | LPAHs | 63.46 | 1.081817% | 0.65 | 170.000 | 0.000000 | 0.01 | 0.00000 | 10% | -20% | 130% |
| Roman Asphalt Corporation | Dieldrin | 0 | 1.081817% | 0.00 | 390 | | 0.13 | - | 10% | -20% | 130% |
| Roman Asphalt Corporation | DDx | 0 | 1.081817% | 0.00 | 27.000 | | 1.37 | - | 10% | -20% | 130% |
| Roman Asphalt Corporation | Dioxins_Furans | 0 | 1.081817% | 0.00 | 38 | | 83.92 | - | 10% | -20% | 130% |
| Roman Asphalt Corporation | Mercury | 0 | 1.081817% | 0.00 | 42.000 | | 0.95 | - | 10% | -20% | 130% |
| Roman Asphalt Corporation | PCBs | 0 | 1.081817% | 0.00 | 26.000 | | 12.87 | - | 10% | -20% | 130% |

| Entity | Contaminant | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Roman Asphalt Corporation | Copper | 0 | 1.018817% | 0.00 | 2,100.000 | | 0.69 | - | 10% | 20% | 130% |
| Roman Asphalt Corporation | Lead | 0 | 1.018817% | 0.00 | 3,200.000 | | 0.01 | - | 10% | 20% | 130% |
| Royce Associates | PCBs | 4.16 | 1.018817% | 0.04 | 26.000 | 0.00000 | 12.87 | 0.00002 | 10% | 20% | 130% |
| Royce Associates | HPAHs | 5695.72 | 1.018817% | 58.03 | 240.000 | 0.00024 | 0.05 | 0.00001 | 10% | 20% | 130% |
| Royce Associates | LPAHs | 3797.15 | 1.018817% | 38.69 | 170.000 | 0.00023 | 0.01 | 0.00001 | 10% | 20% | 130% |
| Royce Associates | Copper | 213.59 | 1.018817% | 2.18 | 2,100.000 | 0.00000 | 0.69 | 0.00000 | 10% | 20% | 130% |
| Royce Associates | Mercury | 1.33 | 1.018817% | 0.01 | 42.000 | 0.00000 | 0.95 | 0.00000 | 10% | 20% | 130% |
| Royce Associates | Lead | 58.33 | 1.018817% | 0.59 | 3,200.000 | 0.00000 | 0.01 | 0.00000 | 10% | 20% | 130% |
| Royce Associates | Dieldrin | 0 | 1.018817% | 0.00 | 390 | - | 0.13 | - | 10% | 20% | 150% |
| Royce Associates | DDx | 0 | 1.018817% | 0.00 | 27.000 | - | 1.37 | - | 10% | 20% | 130% |
| Royce Associates | Dioxins_Furans | 0 | 1.018817% | 0.00 | 38 | | 83.92 | | 10% | 20% | 130% |
| Safety Kleen Envirosystems Co./McKesson Corp. | PCBs | 7.06 | 1.018817% | 0.07 | 26.000 | 0.00000 | 12.87 | 0.00004 | 10% | 20% | 90% |
| Safety Kleen Envirosystems Co./McKesson Corp. | Copper | 396.76 | 1.018817% | 4.04 | 2,100.000 | 0.00000 | 0.69 | 0.00000 | 10% | 20% | 90% |
| Safety Kleen Envirosystems Co./McKesson Corp. | Mercury | 1.05 | 1.018817% | 0.01 | 42.000 | 0.00000 | 0.95 | 0.00000 | 10% | 20% | 90% |
| Safety Kleen Envirosystems Co./McKesson Corp. | LPAHs | 193.75 | 1.018817% | 1.97 | 170.000 | 0.00000 | 0.01 | 0.00000 | 10% | 20% | 90% |
| Safety Kleen Envirosystems Co./McKesson Corp. | Lead | 1316.38 | 1.018817% | 13.41 | 3,200.000 | 0.00000 | 0.01 | 0.00000 | 10% | 20% | 90% |
| Safety Kleen Envirosystems Co./McKesson Corp. | HPAHs | 1.7 | 1.018817% | 0.02 | 240.000 | 0.00000 | 0.05 | 0.00000 | 10% | 20% | 90% |
| Safety Kleen Envirosystems Co./McKesson Corp. | Dieldrin | 0 | 1.018817% | 0.00 | 390 | - | 0.13 | - | 10% | 20% | 90% |
| Safety Kleen Envirosystems Co./McKesson Corp. | DDx | 0 | 1.018817% | 0.00 | 27.000 | - | 1.37 | - | 10% | 20% | 90% |
| Safety Kleen Envirosystems Co./McKesson Corp. | Dioxins_Furans | 0 | 1.018817% | 0.00 | 38 | | 83.92 | | 10% | 20% | 90% |
| Schiffenhaus 3 - 2013 McCarter Highway | Copper | 4159.6 | 1.018817% | 42.38 | 2,100.000 | 0.00002 | 0.69 | 0.00001 | 10% | 20% | 130% |
| Schiffenhaus 2 - 204 Academy Street | Copper | 1221.95 | 1.018817% | 12.45 | 2,100.000 | 0.00001 | 0.69 | 0.00001 | 0% | 20% | 120% |
| Schiffenhaus 1 - 49 4th Street | Copper | 1059.03 | 1.018817% | 10.79 | 2,100.000 | 0.00001 | 0.69 | 0.00000 | 0% | 20% | 130% |
| Schiffenhaus 3 - 2013 McCarter Highway | Mercury | 1.12 | 1.018817% | 0.01 | 42.000 | 0.00000 | 0.95 | 0.00000 | 10% | 20% | 130% |
| Schiffenhaus 1 - 49 4th Street | Mercury | 0.33 | 1.018817% | 0.00 | 42.000 | 0.00000 | 0.95 | 0.00000 | 0% | 20% | 130% |
| Schiffenhaus 2 - 204 Academy Street | Mercury | 0.28 | 1.018817% | 0.00 | 42.000 | 0.00000 | 0.95 | 0.00000 | 0% | 20% | 120% |
| Schiffenhaus 3 - 2013 McCarter Highway | Lead | 43.79 | 1.018817% | 0.45 | 3,200.000 | 0.00000 | 0.01 | 0.00000 | 10% | 20% | 130% |
| Schiffenhaus 1 - 49 4th Street | Lead | 12.86 | 1.018817% | 0.13 | 3,200.000 | 0.00000 | 0.01 | 0.00000 | 0% | 20% | 130% |
| Schiffenhaus 2 - 204 Academy Street | Lead | 11.15 | 1.018817% | 0.11 | 3,200.000 | 0.00000 | 0.01 | 0.00000 | 0% | 20% | 120% |
| Schiffenhaus 1 - 49 4th Street | Dieldrin | 0 | 1.018817% | 0.00 | 390 | - | 0.13 | - | 0% | 20% | 120% |
| Schiffenhaus 1 - 49 4th Street | DDx | 0 | 1.018817% | 0.00 | 27.000 | - | 1.37 | - | 0% | 20% | 120% |
| Schiffenhaus 1 - 49 4th Street | Dioxins_Furans | 0 | 1.018817% | 0.00 | 38 | | 83.92 | | 0% | 20% | 120% |
| Schiffenhaus 1 - 49 4th Street | PCBs | 0 | 1.018817% | 0.00 | 26.000 | | 12.87 | | 0% | 20% | 120% |
| Schiffenhaus 1 - 49 4th Street | LPAHs | 0 | 1.018817% | 0.00 | 170.000 | | 0.01 | | 0% | 20% | 120% |
| Schiffenhaus 1 - 49 4th Street | HPAHs | 0 | 1.018817% | 0.00 | 240.000 | | 0.05 | | 0% | 20% | 120% |
| Schiffenhaus 2 - 204 Academy Street | Dieldrin | 0 | 1.018817% | 0.00 | 390 | - | 0.13 | - | 0% | 20% | 120% |
| Schiffenhaus 2 - 204 Academy Street | DDx | 0 | 1.018817% | 0.00 | 27.000 | - | 1.37 | - | 0% | 20% | 120% |
| Schiffenhaus 2 - 204 Academy Street | Dioxins_Furans | 0 | 1.018817% | 0.00 | 38 | | 83.92 | | 0% | 20% | 120% |
| Schiffenhaus 2 - 204 Academy Street | PCBs | 0 | 1.018817% | 0.00 | 26.000 | | 12.87 | | 0% | 20% | 120% |
| Schiffenhaus 2 - 204 Academy Street | LPAHs | 0 | 1.018817% | 0.00 | 170.000 | | 0.01 | | 0% | 20% | 120% |
| Schiffenhaus 2 - 204 Academy Street | HPAHs | 0 | 1.018817% | 0.00 | 240.000 | | 0.05 | | 0% | 20% | 120% |
| Schiffenhaus 3 - 2013 McCarter Highway | Dieldrin | 0 | 1.018817% | 0.00 | 390 | - | 0.13 | - | 10% | 20% | 130% |
| Schiffenhaus 3 - 2013 McCarter Highway | DDx | 0 | 1.018817% | 0.00 | 27.000 | - | 1.37 | - | 10% | 20% | 130% |
| Schiffenhaus 3 - 2013 McCarter Highway | Dioxins_Furans | 0 | 1.018817% | 0.00 | 38 | | 83.92 | | 10% | 20% | 130% |
| Schiffenhaus 3 - 2013 McCarter Highway | PCBs | 0 | 1.018817% | 0.00 | 26.000 | | 12.87 | | 10% | 20% | 130% |
| Schiffenhaus 3 - 2013 McCarter Highway | LPAHs | 0 | 1.018817% | 0.00 | 170.000 | | 0.01 | | 10% | 20% | 130% |
| Schiffenhaus 3 - 2013 McCarter Highway | HPAHs | 0 | 1.018817% | 0.00 | 240.000 | | 0.05 | | 10% | 20% | 130% |
| Sequa Corporation (Foundry Street Complex) | Dieldrin | 0 | 1.018817% | 0.00 | 390 | - | 0.13 | - | 0% | 20% | 80% |
| Sequa Corporation (Foundry Street Complex) | DDx | 0 | 1.018817% | 0.00 | 27.000 | - | 1.37 | - | 0% | 20% | 80% |
| Sequa Corporation (Foundry Street Complex) | Dioxins_Furans | 0 | 1.018817% | 0.00 | 38 | | 83.92 | | 0% | 20% | 80% |
| Sequa Corporation (Foundry Street Complex) | PCBs | 0 | 1.018817% | 0.00 | 26.000 | | 12.87 | | 0% | 20% | 80% |
| Sequa Corporation (Foundry Street Complex) | Mercury | 0 | 1.018817% | 0.00 | 42.000 | | 0.95 | | 0% | 20% | 80% |
| Sequa Corporation (Foundry Street Complex) | Copper | 0 | 1.018817% | 0.00 | 2,100.000 | | 0.69 | | 0% | 20% | 80% |
| Sequa Corporation (Foundry Street Complex) | LPAHs | 0 | 1.018817% | 0.00 | 170.000 | | 0.01 | | 0% | 20% | 80% |
| Sequa Corporation (Foundry Street Complex) | HPAHs | 0 | 1.018817% | 0.00 | 240.000 | | 0.05 | | 0% | 20% | 80% |
| Sequa Corporation (Foundry Street Complex) | Lead | 0 | 1.018817% | 0.00 | 3,200.000 | | 0.01 | | 0% | 20% | 80% |
| Seton Company, Inc. (Seton Tanning) | HPAHs | 115568.7 | 1.018817% | 1177.44 | 240.000 | 0.00491 | 0.05 | 0.00025 | 10% | 20% | 130% |
| Seton Company, Inc. (Seton Tanning) | LPAHs | 77046.46 | 1.018817% | 784.96 | 170.000 | 0.00462 | 0.01 | 0.00004 | 10% | 20% | 130% |
| Seton Company, Inc. (Seton Tanning) | Mercury | 159.46 | 1.018817% | 1.62 | 42.000 | 0.00004 | 0.95 | 0.00004 | 10% | 20% | 130% |
| Seton Company, Inc. (Seton Tanning) | Copper | 7856.08 | 1.018817% | 79.84 | 2,100.000 | 0.00004 | 0.69 | 0.00003 | 10% | 20% | 130% |
| Seton Company, Inc. (Seton Tanning) | Lead | 16245.05 | 1.018817% | 196.07 | 3,200.000 | 0.00006 | 0.01 | 0.00000 | 10% | 20% | 130% |
| Seton Company, Inc. (Seton Tanning) | Dieldrin | 0 | 1.018817% | 0.00 | 390 | - | 0.13 | - | 10% | 20% | 130% |
| Seton Company, Inc. (Seton Tanning) | DDx | 0 | 1.018817% | 0.00 | 27.000 | - | 1.37 | - | 10% | 20% | 130% |
| Seton Company, Inc. (Seton Tanning) | Dioxins_Furans | 0 | 1.018817% | 0.00 | 38 | | 83.92 | | 10% | 20% | 130% |
| Seton Company, Inc. (Seton Tanning) | PCBs | 0 | 1.018817% | 0.00 | 26.000 | | 12.87 | | 10% | 20% | 130% |
| Sherwin Williams Co. | Mercury | 320.28 | 1.018817% | 3.26 | 42.000 | 0.00008 | 0.95 | 0.00007 | 5% | 20% | 85% |
| Sherwin Williams Co. | Copper | 3219.08 | 1.018817% | 32.80 | 2,100.000 | 0.00002 | 0.69 | 0.00001 | 5% | 20% | 85% |
| Sherwin Williams Co. | PCBs | 0.92 | 1.018817% | 0.01 | 26.000 | 0.00000 | 12.87 | 0.00000 | 5% | 20% | 85% |
| Sherwin Williams Co. | Lead | 10284.83 | 1.018817% | 104.78 | 3,200.000 | 0.00003 | 0.01 | 0.00000 | 5% | 20% | 85% |
| Sherwin Williams Co. | HPAHs | 10.58 | 1.018817% | 0.11 | 240.000 | 0.00000 | 0.05 | 0.00000 | 5% | 20% | 85% |
| Sherwin Williams Co. | DDx | 0.02 | 1.018817% | 0.00 | 27.000 | 0.00000 | 1.37 | 0.00000 | 5% | 20% | 85% |
| Sherwin Williams Co. | LPAH | 1.17 | 1.018817% | 0.01 | 170.000 | 0.00000 | 0.01 | 0.00000 | 5% | 20% | 85% |
| Sherwin Williams Co. | Dieldrin | 0 | 1.018817% | 0.00 | 390 | - | 0.13 | - | 5% | 20% | 85% |
| Sherwin Williams Co. | Dioxins_Furans | 0 | 1.018817% | 0.00 | 38 | | 83.92 | | 5% | 20% | 85% |
| SpectraServ, Inc. | Copper | 9869.13 | 1.018817% | 100.55 | 2,100.000 | 0.00005 | 0.69 | 0.00003 | 5% | 0% | 105% |
| SpectraServ, Inc. | PCBs | 1.2 | 1.018817% | 0.01 | 26.000 | 0.00000 | 12.87 | 0.00001 | 5% | 0% | 105% |
| SpectraServ, Inc. | Lead | 7950.1 | 1.018817% | 80.59 | 3,200.000 | 0.00001 | 0.01 | 0.00000 | 5% | 0% | 105% |
| SpectraServ, Inc. | Mercury | 0.13 | 1.018817% | 0.00 | 42.000 | 0.00000 | 0.95 | 0.00000 | 5% | 0% | 105% |
| SpectraServ, Inc. | HPAHs | 1.64 | 1.018817% | 0.02 | 240.000 | 0.00000 | 0.05 | 0.00000 | 5% | 0% | 105% |
| SpectraServ, Inc. | LPAHs | 1.79 | 1.018817% | 0.02 | 170.000 | 0.00000 | 0.01 | 0.00000 | 5% | 0% | 105% |
| SpectraServ, Inc. | Dieldrin | 0 | 1.018817% | 0.00 | 390 | - | 0.13 | - | 5% | 0% | 105% |
| SpectraServ, Inc. | DDx | 0 | 1.018817% | 0.00 | 27.000 | - | 1.37 | - | 5% | 0% | 105% |
| SpectraServ, Inc. | Dioxins_Furans | 0 | 1.018817% | 0.00 | 38 | | 83.92 | | 5% | 0% | 105% |
| Stanley Black & Decker, Inc. | PCBs | 2.19 | 1.018817% | 0.02 | 26.000 | 0.00000 | 12.87 | 0.00001 | 0% | 20% | 80% |
| Stanley Black & Decker, Inc. | HPAHs | 3425.67 | 1.018817% | 34.90 | 240.000 | 0.00015 | 0.05 | 0.00001 | 0% | 20% | 80% |
| Stanley Black & Decker, Inc. | Copper | 1021.89 | 1.018817% | 10.41 | 2,100.000 | 0.00000 | 0.69 | 0.00000 | 0% | 20% | 80% |
| Stanley Black & Decker, Inc. | LPAHs | 2300.58 | 1.018817% | 23.44 | 170.000 | 0.00014 | 0.01 | 0.00000 | 0% | 20% | 80% |
| Stanley Black & Decker, Inc. | Lead | 7629.7 | 1.018817% | 77.73 | 3,200.000 | 0.00002 | 0.01 | 0.00000 | 0% | 20% | 80% |
| Stanley Black & Decker, Inc. | Mercury | 0.38 | 1.018817% | 0.00 | 42.000 | 0.00000 | 0.95 | 0.00000 | 0% | 20% | 80% |
| Stanley Black & Decker, Inc. | DDx | 0.02 | 1.018817% | 0.00 | 27.000 | 0.00000 | 1.37 | 0.00000 | 0% | 20% | 80% |
| Stanley Black & Decker, Inc. | Dioxins_Furans | 0 | 1.018817% | 0.00 | 38 | | 83.92 | | 0% | 20% | 80% |
| Stanley Black & Decker, Inc. | Dieldrin | 0 | 1.018817% | 0.00 | 390 | - | 0.13 | - | 0% | 20% | 80% |
| STWB 2 - 192 & 194 Bloomfield Ave | Copper | 34.62 | 1.018817% | 0.35 | 2,100.000 | 0.00000 | 0.69 | - | 5% | 20% | 80% |
| STWB 2 - 192 & 194 Bloomfield Ave | HPAHs | 5.06 | 1.018817% | 0.05 | 240.000 | 0.00000 | 0.05 | - | 5% | 20% | 80% |
| STWB 2 - 192 & 194 Bloomfield Ave | LPAHs | 3.37 | 1.018817% | 0.03 | 170.000 | 0.00000 | 0.01 | - | 5% | 20% | 80% |
| STWB 2 - 192 & 194 Bloomfield Ave | Lead | 0.75 | 1.018817% | 0.01 | 3,200.000 | 0.00000 | 0.01 | - | 5% | 20% | 80% |
| STWB 1 - 120 Lister Ave | Dieldrin | 0 | 1.018817% | 0.00 | 390 | - | 0.13 | - | 5% | 20% | 85% |
| STWB 1 - 120 Lister Ave | DDx | 0 | 1.018817% | 0.00 | 27.000 | - | 1.37 | - | 5% | 20% | 85% |
| STWB 1 - 120 Lister Ave | Dioxins_Furans | 0 | 1.018817% | 0.00 | 38 | | 83.92 | | 5% | 20% | 85% |
| STWB 1 - 120 Lister Ave | Mercury | 0 | 1.018817% | 0.00 | 42.000 | | 0.95 | | 5% | 20% | 85% |
| STWB 1 - 120 Lister Ave | PCBs | 0 | 1.018817% | 0.00 | 26.000 | | 12.87 | | 5% | 20% | 85% |
| STWB 1 - 120 Lister Ave | Lead | 0 | 1.018817% | 0.00 | 3,200.000 | | 0.01 | | 5% | 20% | 85% |
| STWB 1 - 120 Lister Ave | LPAHs | 0 | 1.018817% | 0.00 | 170.000 | | 0.01 | | 5% | 20% | 85% |
| STWB 1 - 120 Lister Ave | HPAHs | 0 | 1.018817% | 0.00 | 240.000 | | 0.05 | | 5% | 20% | 85% |
| STWB 1 - 120 Lister Ave | Copper | 0 | 1.018817% | 0.00 | 2,100.000 | | 0.69 | | 5% | 20% | 85% |
| STWB 2 - 192 & 194 Bloomfield Ave | Dieldrin | 0 | 1.018817% | 0.00 | 390 | - | 0.13 | - | 5% | 20% | 80% |
| STWB 2 - 192 & 194 Bloomfield Ave | DDx | 0 | 1.018817% | 0.00 | 27.000 | - | 1.37 | - | 5% | 20% | 80% |
| STWB 2 - 192 & 194 Bloomfield Ave | Mercury | 0 | 1.018817% | 0.00 | 42.000 | | 0.95 | | 5% | 20% | 80% |
| STWB 2 - 192 & 194 Bloomfield Ave | PCBs | 0 | 1.018817% | 0.00 | 26.000 | | 12.87 | | 5% | 20% | 80% |
| Sun Chemical Corporation (Foundry Street Complex) | PCBs | 0.4 | 1.018817% | 0.00 | 26.000 | 0.00000 | 12.87 | 0.00000 | 5% | 20% | 85% |

ALCD-PUBCOM_0002020

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Sun Chemical Corporation (Foundry Street Complex) | Mercury | 0.01 | 1.018817% | 0.00 | 42.000 | 0.00000 | 0.95 | 0.00000 | 5% | -20% | 85% |
| Sun Chemical Corporation (Foundry Street Complex) | Copper | 0.34 | 1.018817% | 0.00 | 2.100.000 | 0.00000 | 0.69 | 0.00000 | 5% | -20% | 85% |
| Sun Chemical Corporation (Foundry Street Complex) | HPAHs | 0.06 | 1.018817% | 0.00 | 240.000 | 0.00000 | 0.05 | 0.00000 | 5% | -20% | 85% |
| Sun Chemical Corporation (Foundry Street Complex) | LPAHs | 0.05 | 1.018817% | 0.00 | 170.000 | 0.00000 | 0.01 | 0.00000 | 5% | -20% | 85% |
| Sun Chemical Corporation (Foundry Street Complex) | Lead | 0.28 | 1.018817% | 0.00 | 3.200.000 | 0.00000 | 0.01 | 0.00000 | 5% | -20% | 85% |
| Sun Chemical Corporation (Foundry Street Complex) | Dieldrin | 0 | 1.018817% | 0.00 | 390 | - | 0.13 | - | 5% | -20% | 85% |
| Sun Chemical Corporation (Foundry Street Complex) | DDx | 0 | 1.018817% | 0.00 | 27.000 | - | 1.37 | - | 5% | -20% | 85% |
| Sun Chemical Corporation (Foundry Street Complex) | Dioxins_Furans | 0 | 1.018817% | 0.00 | 38 | - | 83.92 | - | 5% | -20% | 85% |
| Tate & Lyle 1 - 100 3rd Ave | Mercury | 0.85 | 1.018817% | 0.01 | 42.000 | 0.00000 | 0.95 | 0.00000 | 0% | -20% | 80% |
| Tate & Lyle 1 - 100 3rd Ave | Copper | 31.8 | 1.018817% | 0.32 | 2.100.000 | 0.00000 | 0.69 | 0.00000 | 0% | -20% | 80% |
| Tate & Lyle 1 - 100 3rd Ave | HPAHs | 0.32 | 1.018817% | 0.00 | 240.000 | 0.00000 | 0.05 | 0.00000 | 0% | -20% | 80% |
| Tate & Lyle 1 - 100 3rd Ave | Lead | 12.53 | 1.018817% | 0.13 | 3.200.000 | 0.00000 | 0.01 | 0.00000 | 0% | -20% | 80% |
| Tate & Lyle 1 - 100 3rd Ave | LPAHs | 0.21 | 1.018817% | 0.00 | 170.000 | 0.00000 | 0.01 | 0.00000 | 0% | -20% | 80% |
| Tate & Lyle 1 - 100 3rd Ave | Dieldrin | 0 | 1.018817% | 0.00 | 390 | - | 0.13 | - | 0% | -20% | 80% |
| Tate & Lyle 1 - 100 3rd Ave | DDx | 0 | 1.018817% | 0.00 | 27.000 | - | 1.37 | - | 0% | -20% | 80% |
| Tate & Lyle 1 - 100 3rd Ave | Dioxins_Furans | 0 | 1.018817% | 0.00 | 38 | - | 83.92 | - | 0% | -20% | 80% |
| Tate & Lyle 1 - 100 3rd Ave | PCBs | 0 | 1.018817% | 0.00 | 26.000 | - | 12.87 | - | 0% | -20% | 80% |
| Tate & Lyle 2 - 320 Schuyler Ave | Dieldrin | 0 | 1.018817% | 0.00 | 390 | - | 0.13 | - | 0% | -20% | 80% |
| Tate & Lyle 2 - 320 Schuyler Ave | DDx | 0 | 1.018817% | 0.00 | 27.000 | - | 1.37 | - | 0% | -20% | 80% |
| Tate & Lyle 2 - 320 Schuyler Ave | Dioxins_Furans | 0 | 1.018817% | 0.00 | 38 | - | 83.92 | - | 0% | -20% | 80% |
| Tate & Lyle 2 - 320 Schuyler Ave | Mercury | 0 | 1.018817% | 0.00 | 42.000 | - | 0.95 | - | 0% | -20% | 80% |
| Tate & Lyle 2 - 320 Schuyler Ave | PCBs | 0 | 1.018817% | 0.00 | 26.000 | - | 12.87 | - | 0% | -20% | 80% |
| Tate & Lyle 2 - 320 Schuyler Ave | Copper | 0 | 1.018817% | 0.00 | 2.100.000 | - | 0.69 | - | 0% | -20% | 80% |
| Tate & Lyle 2 - 320 Schuyler Ave | Lead | 0 | 1.018817% | 0.00 | 3.200.000 | - | 0.01 | - | 0% | -20% | 80% |
| Tate & Lyle 2 - 320 Schuyler Ave | LPAHs | 0 | 1.018817% | 0.00 | 170.000 | - | 0.01 | - | 0% | -20% | 80% |
| Tate & Lyle 2 - 320 Schuyler Ave | HPAHs | 0 | 1.018817% | 0.00 | 240.000 | - | 0.05 | - | 0% | -20% | 80% |
| Teval/Guyon | PCBs | 19.77 | 1.018817% | 0.20 | 26.000 | 0.00001 | 12.87 | 0.00010 | 0% | 0% | 100% |
| Teval/Guyon | Mercury | 4.03 | 1.018817% | 0.04 | 42.000 | 0.00000 | 0.95 | 0.00000 | 0% | 0% | 100% |
| Teval/Guyon | Copper | 170.86 | 1.018817% | 1.74 | 2.100.000 | 0.00001 | 0.69 | 0.00000 | 0% | 0% | 100% |
| Teval/Guyon | Lead | 1467.3 | 1.018817% | 14.95 | 3.200.000 | 0.00000 | 0.01 | 0.00000 | 0% | 0% | 100% |
| Teval/Guyon | HPAHs | 1.21 | 1.018817% | 0.01 | 240.000 | 0.00000 | 0.05 | 0.00000 | 0% | 0% | 100% |
| Teval/Guyon | LPAHs | 0.81 | 1.018817% | 0.01 | 170.000 | 0.00000 | 0.01 | 0.00000 | 0% | 0% | 100% |
| Teval/Guyon | Dieldrin | 0 | 1.018817% | 0.00 | 390 | - | 0.13 | - | 0% | 0% | 100% |
| Teval/Guyon | DDx | 0 | 1.018817% | 0.00 | 27.000 | - | 1.37 | - | 0% | 0% | 100% |
| Teval/Guyon | Dioxins_Furans | 0 | 1.018817% | 0.00 | 38 | - | 83.92 | - | 0% | 0% | 100% |
| Textron Inc. | Mercury | 9.46 | 1.018817% | 0.10 | 42.000 | 0.00000 | 0.95 | 0.00000 | 0% | -10% | 90% |
| Textron Inc. | LPAHs | 10.09 | 1.018817% | 0.10 | 170.000 | 0.00000 | 0.01 | 0.00000 | 0% | -10% | 90% |
| Textron Inc. | HPAHs | 2.47 | 1.018817% | 0.03 | 240.000 | 0.00000 | 0.05 | 0.00000 | 0% | -10% | 90% |
| Textron Inc. | Lead | 4.73 | 1.018817% | 0.05 | 3.200.000 | 0.00000 | 0.01 | 0.00000 | 0% | -10% | 90% |
| Textron Inc. | Dieldrin | 0 | 1.018817% | 0.00 | 390 | - | 0.13 | - | 0% | -10% | 90% |
| Textron Inc. | DDx | 0 | 1.018817% | 0.00 | 27.000 | - | 1.37 | - | 0% | -10% | 90% |
| Textron Inc. | Dioxins_Furans | 0 | 1.018817% | 0.00 | 38 | - | 83.92 | - | 0% | -10% | 90% |
| Textron Inc. | PCBs | 0 | 1.018817% | 0.00 | 26.000 | - | 12.87 | - | 0% | -10% | 90% |
| Textron Inc. | Copper | 0 | 1.018817% | 0.00 | 2.100.000 | - | 0.69 | - | 0% | -10% | 90% |
| Tiffany and Company | HPAHs | 10129.7 | 1.018817% | 105.20 | 240.000 | 0.00043 | 0.05 | 0.00002 | 0% | -20% | 80% |
| Tiffany and Company | Copper | 1688.28 | 1.018817% | 17.20 | 2.100.000 | 0.00001 | 0.69 | 0.00001 | 0% | -20% | 80% |
| Tiffany and Company | LPAHs | 6753.13 | 1.018817% | 68.80 | 170.000 | 0.00040 | 0.01 | 0.00000 | 0% | -20% | 80% |
| Tiffany and Company | Dieldrin | 0 | 1.018817% | 0.00 | 390 | - | 0.13 | - | 0% | -20% | 80% |
| Tiffany and Company | DDx | 0 | 1.018817% | 0.00 | 27.000 | - | 1.37 | - | 0% | -20% | 80% |
| Tiffany and Company | Dioxins_Furans | 0 | 1.018817% | 0.00 | 38 | - | 83.92 | - | 0% | -20% | 80% |
| Tiffany and Company | Mercury | 0 | 1.018817% | 0.00 | 42.000 | - | 0.95 | - | 0% | -20% | 80% |
| Tiffany and Company | PCBs | 0 | 1.018817% | 0.00 | 26.000 | - | 12.87 | - | 0% | -20% | 80% |
| Tiffany and Company | Lead | 0 | 1.018817% | 0.00 | 3.200.000 | - | 0.01 | - | 0% | -20% | 80% |

ALCD-PUBCOM_0002021

| Party (Short Name) | Total Base Score | Adjusted Base Score | Allocation Percent |
|---|---|---|---|
| Occidental | 83.91922397 | 167.8384479 | 0.999396129 |
| Nokia-Lucent | 0.055528237 | 0.047199002 | 0.000281047 |
| Pharmacia | 0.030947011 | 0.026304959 | 0.000156633 |
| PMC, | 0.004923317 | 0.006400313 | 3.81107E-05 |
| EnPro | 0.00517224 | 0.004137792 | 2.46385E-05 |
| Hexcel | 0.004522061 | 0.004069855 | 2.4234E-05 |
| Pitt | 0.002374922 | 0.00213743 | 1.27274E-05 |
| ISP | 0.002646153 | 0.002116923 | 1.26052E-05 |
| Givaudan | 0.002302264 | 0.002072038 | 1.2338E-05 |
| Congoleum | 0.001945764 | 0.0016539 | 9.84817E-06 |
| BASF Corporation | 0.001429938 | 0.001286944 | 7.66312E-06 |
| Cooper | 0.000837516 | 0.000753764 | 4.4883E-06 |
| PSE&G | 0.000811277 | 0.000730149 | 4.34768E-06 |
| Seton | 0.000355066 | 0.000461586 | 2.74852E-06 |
| Hoffman-La | 0.000324829 | 0.000276104 | 1.64407E-06 |
| Legacy | 0.00028396 | 0.000241366 | 1.43721E-06 |
| 21st | 0.000255724 | 0.000217365 | 1.2943E-06 |
| CNA | 0.000169143 | 0.000152229 | 9.06447E-07 |
| Curtiss-Wright | 0.000111647 | 0.000117229 | 6.98041E-07 |
| Teva | 0.000101253 | 0.000101253 | 6.02915E-07 |
| Okonite | 9.45889E-05 | 8.98594E-05 | 5.35069E-07 |
| Alliance | 7.30398E-05 | 8.03438E-05 | 4.78408E-07 |
| Kearny | 7.29946E-05 | 8.0294E-05 | 4.78112E-07 |
| Sherwin | 8.95841E-05 | 7.61465E-05 | 4.53415E-07 |
| CBS | 9.51582E-05 | 7.61265E-05 | 4.53296E-07 |
| Benjamin | 6.45488E-05 | 5.80939E-05 | 3.45921E-07 |
| EPEC | 7.04681E-05 | 5.63745E-05 | 3.35683E-07 |
| Conopco, | 5.76415E-05 | 5.18774E-05 | 3.08904E-07 |
| Royce | 3.63678E-05 | 4.72782E-05 | 2.81519E-07 |
| SpectraServ, | 3.93754E-05 | 4.13442E-05 | 2.46185E-07 |
| GE | 4.6004E-05 | 3.91034E-05 | 2.32842E-07 |
| Safety | 3.73364E-05 | 3.36027E-05 | 2.00088E-07 |
| Chevron | 4.04923E-05 | 3.23939E-05 | 1.9289E-07 |
| Schiffenhaus | 2.19609E-05 | 2.85492E-05 | 1.69997E-07 |
| Leemilt's | 3.39523E-05 | 2.71618E-05 | 1.61735E-07 |
| Tiffany | 3.11994E-05 | 2.49595E-05 | 1.48622E-07 |
| Atlantic | 2.6247E-05 | 2.09976E-05 | 1.25031E-07 |
| Stanley | 2.3456E-05 | 1.87648E-05 | 1.11735E-07 |
| DII | 1.8322E-05 | 1.46576E-05 | 8.7279E-08 |
| Atlas | 1.29787E-05 | 1.42765E-05 | 8.50099E-08 |
| Campbell | 1.3573E-05 | 1.42516E-05 | 8.48614E-08 |
| Goody | 1.09812E-05 | 9.88308E-06 | 5.88489E-08 |
| Garfield | 8.01078E-06 | 6.80917E-06 | 4.05453E-08 |
| Otis | 6.46369E-06 | 5.81732E-06 | 3.46393E-08 |
| Berol | 5.11315E-06 | 4.09052E-06 | 2.43571E-08 |
| Franklin | 4.30227E-06 | 3.87204E-06 | 2.30561E-08 |

ALCD-PUBCOM_0002022

| | | | |
|---|---|---|---|
| BASF Catalysts LLC | 4.17428E-06 | 3.75685E-06 | 2.23702E-08 |
| Arkema | 3.48216E-06 | 3.13394E-06 | 1.86611E-08 |
| Goodrich | 2.83669E-06 | 2.41119E-06 | 1.43574E-08 |
| Textron | 2.19147E-06 | 1.97232E-06 | 1.17442E-08 |
| Newark Morning Ledger Co. | 1.84296E-06 | 1.84296E-06 | 1.09739E-08 |
| PPG | 2.11122E-06 | 1.79454E-06 | 1.06856E-08 |
| Revere | 2.14786E-06 | 1.71829E-06 | 1.02316E-08 |
| Newark Group, Inc. | 2.10608E-06 | 1.68486E-06 | 1.00325E-08 |
| Quality | 1.979E-06 | 1.68215E-06 | 1.00164E-08 |
| Sun | 2.02087E-06 | 1.71774E-06 | 7.67121E-09 |
| Coats | 1.55326E-06 | 1.24261E-06 | 7.39912E-09 |
| Harris | 1.36503E-06 | 1.09202E-06 | 6.50246E-09 |
| Purdue | 5.94783E-07 | 5.05566E-07 | 3.0104E-09 |
| Ashland | 4.93878E-07 | 4.4449E-07 | 2.64672E-09 |
| Foundry | 0 | 0 | 2.55707E-09 |
| Neu | 3.79532E-07 | 4.17485E-07 | 2.48592E-09 |
| Roman | 2.40076E-07 | 3.12099E-07 | 1.8584E-09 |
| Alden | 2.18258E-07 | 2.72823E-07 | 1.62453E-09 |
| Passaic | 2.33081E-07 | 2.44735E-07 | 1.45728E-09 |
| Tate | 3.03536E-07 | 2.42828E-07 | 1.44592E-09 |
| STWB | 1.28675E-07 | 1.0294E-07 | 6.1296E-10 |
| Essex | 1.12161E-07 | 1.00945E-07 | 6.01078E-10 |
| Honeywell | 1.01756E-07 | 8.1405E-08 | 4.84727E-10 |
| Canning | 7.8131E-08 | 7.03179E-08 | 4.18709E-10 |
| Elan | 1.48205E-08 | 1.55616E-08 | 9.26616E-11 |
| Hartz | 3.82752E-09 | 3.06201E-09 | 1.82328E-11 |
| National | 7.53288E-10 | 6.40295E-10 | 3.81264E-12 |
| Covanta | 5.08772E-10 | 4.32456E-10 | 2.57506E-12 |
| Automatic | 0 | 0 | 0 |
| Drum | 0 | 0 | 0 |
| Everett | 0 | 0 | 0 |
| Pabst | 0 | 0 | 0 |
| Sequa | 0 | 0 | 0 |

ALCD-PUBCOM_0002023

| Party | Allocation Percent | 100X | /100 | X 100000 |
|---|---|---|---|---|
| Occidental | 0.999396129 | 0.949948 | 0.999982 | 0.929386 |
| Nokia-Lucent | 0.000281047 | 0.026663 | 2.81E-06 | 0.032796 |
| Pharmacia | 0.000156633 | 0.01486 | 1.57E-06 | 0.018316 |
| PMC, | 3.81107E-05 | 0.000359 | 3.81E-07 | 0.001518 |
| EnPro | 2.46385E-05 | 0.000212 | 2.47E-07 | 0.000714 |
| Hexcel | 2.4234E-05 | 0.002299 | 2.42E-07 | 0.00285 |
| Pitt | 1.27274E-05 | 0.001189 | 1.27E-07 | 0.00178 |
| ISP | 1.26052E-05 | 0.001196 | 1.26E-07 | 0.001476 |
| Givaudan | 1.2338E-05 | 3.79E-05 | 1.21E-05 | 0.000189 |
| Congoleum | 9.84817E-06 | 0.000931 | 9.85E-08 | 0.00117 |
| BASF Corporation | 7.66312E-06 | 0.000727 | 7.67E-08 | 0.000926 |
| Cooper | 4.4883E-06 | 0.000426 | 4.49E-08 | 0.003688 |
| PSE&G | 4.34768E-06 | 7.4E-05 | 4.35E-08 | 0.000235 |
| Seton | 2.74852E-06 | 5.83E-05 | 2.75E-08 | 0.000404 |
| Hoffman-La | 1.64407E-06 | 0.000156 | 1.65E-08 | 0.000207 |
| Legacy | 1.43721E-06 | 0.000136 | 1.44E-08 | 0.000168 |
| 21st | 1.2943E-06 | 0.000123 | 1.3E-08 | 0.001758 |
| CNA | 9.06447E-07 | 5.61E-05 | 9.07E-09 | 7.8E-05 |
| Curtiss-Wright | 6.98041E-07 | 6.6E-05 | 6.98E-09 | 0.000155 |
| Teva | 6.02915E-07 | 5.72E-05 | 6.03E-09 | 7.67E-05 |
| Okonite | 5.35069E-07 | 1.63E-05 | 5.35E-09 | 0.000113 |
| Alliance | 4.78408E-07 | 2.77E-05 | 4.79E-09 | 9.57E-05 |
| Kearny | 4.78112E-07 | 4.54E-05 | 4.78E-09 | 0.000223 |
| Sherwin | 4.53415E-07 | 4.3E-05 | 4.54E-09 | 0.000369 |
| CBS | 4.53296E-07 | 3.1E-05 | 4.54E-09 | 0.000209 |
| Benjamin | 3.45921E-07 | 3.28E-05 | 3.46E-09 | 4.03E-05 |
| EPEC | 3.35683E-07 | 3.18E-05 | 3.36E-09 | 0.000195 |
| Conopco, | 3.08904E-07 | 2.74E-05 | 3.09E-09 | 0.000275 |
| Royce | 2.81519E-07 | 1.67E-05 | 2.82E-07 | 2.54E-05 |
| SpectraServ, | 2.46185E-07 | 2.34E-05 | 2.46E-09 | 0.000147 |
| GE | 2.32842E-07 | 2.09E-06 | 2.33E-09 | 2.81E-06 |
| Safety | 2.00088E-07 | 1.89E-05 | 2E-09 | 2.85E-05 |
| Chevron | 1.9289E-07 | 1.83E-05 | 1.93E-09 | 2.25E-05 |
| Schiffenhaus | 1.69997E-07 | 1.61E-05 | 1.7E-09 | 0.000117 |
| Leemilt's | 1.61735E-07 | 1.53E-05 | 1.62E-09 | 1.88E-05 |
| Tiffany | 1.48622E-07 | 3.18E-06 | 1.49E-09 | 1.9E-05 |
| Atlantic | 1.25031E-07 | 1.15E-05 | 1.25E-09 | 1.41E-05 |
| Stanley | 1.11735E-07 | 6.9E-06 | 1.12E-09 | 1.9E-05 |
| DII | 8.7279E-08 | 8.27E-06 | 8.73E-10 | 3.9E-05 |
| Atlas | 8.50099E-08 | 1.55E-06 | 8.51E-10 | 9.01E-06 |
| Campbell | 8.48614E-08 | 8.04E-06 | 8.49E-10 | 1.08E-05 |
| Goody | 5.88489E-08 | 6.14E-07 | 5.89E-10 | 2.82E-06 |
| Garfield | 4.05453E-08 | 1.07E-06 | 4.06E-10 | 6.85E-06 |
| Otis | 3.46393E-08 | 1.97E-06 | 3.47E-10 | 1.67E-05 |
| Berol | 2.43571E-08 | 1.26E-07 | 2.44E-10 | 1.22E-07 |
| Franklin | 2.30561E-08 | 1.72E-06 | 2.31E-10 | 5.64E-06 |

ALCD-PUBCOM_0002024

| | | | |
|---|---|---|---|
| BASF Catalysts LLC | 2.23702E-08 | 2.12E-06 | 2.24E-10 | 1.9E-05 |
| Arkema | 1.86611E-08 | 1.67E-06 | 1.87E-10 | 9.41E-06 |
| Goodrich | 1.43574E-08 | 1.02E-06 | 1.44E-10 | 5.5E-06 |
| Textron | 1.17442E-08 | 1.11E-06 | 1.18E-10 | 1.02E-05 |
| Newark Morning Ledger Co. | 1.09739E-08 | 9.35E-07 | 1.1E-10 | 8.49E-06 |
| PPG | 1.06856E-08 | 1.01E-06 | 1.07E-10 | 1.87E-06 |
| Revere | 1.02316E-08 | 9.71E-07 | 1.02E-10 | 6.07E-06 |
| Newark Group, Inc. | 1.00325E-08 | 9.52E-07 | 1E-10 | 7.41E-06 |
| Quality | 1.00164E-08 | 9.45E-07 | 1E-10 | 1.16E-06 |
| Sun | 7.67121E-09 | 7.28E-07 | 7.68E-11 | 9.04E-07 |
| Coats | 7.39912E-09 | 6.47E-07 | 7.4E-11 | 4.67E-06 |
| Harris | 6.50246E-09 | 6.17E-07 | 6.51E-11 | 4.46E-06 |
| Purdue | 3.0104E-09 | 2.65E-07 | 3.01E-11 | 1.95E-06 |
| Ashland | 2.64672E-09 | 1.38E-08 | 2.65E-11 | 1.34E-08 |
| Foundry | 2.55707E-09 | 2.43E-07 | 2.56E-11 | 3.01E-07 |
| Neu | 2.48592E-09 | 2.36E-07 | 2.49E-11 | 1.71E-06 |
| Roman | 1.8584E-09 | 9.59E-09 | 1.86E-11 | 9.27E-09 |
| Alden | 1.62453E-09 | 8.38E-09 | 1.63E-11 | 8.11E-09 |
| Passaic | 1.45728E-09 | 1.38E-07 | 1.46E-11 | 1.19E-06 |
| Tate | 1.44592E-09 | 1.37E-07 | 1.45E-11 | 1.16E-06 |
| STWB | 6.1296E-10 | 5.27E-08 | 6.13E-12 | 3.77E-07 |
| Essex | 6.01078E-10 | 5.36E-08 | 6.01E-12 | 4.9E-07 |
| Honeywell | 4.84727E-10 | 4.48E-08 | 4.85E-12 | 4.13E-07 |
| Canning | 4.18709E-10 | 3.9E-08 | 4.19E-12 | 3.32E-07 |
| Elan | 9.26616E-11 | 4.77E-10 | 9.27E-13 | 4.61E-10 |
| Hartz | 1.82328E-11 | 1.01E-10 | 1.82E-13 | 1.72E-10 |
| National | 3.81264E-12 | 3.62E-10 | 3.81E-14 | 3.81E-09 |
| Covanta | 2.57506E-12 | 2.44E-10 | 2.58E-14 | 2.57E-09 |
| Automatic | 0 | 0 | 0 | 0 |
| Drum | 0 | 0 | 0 | 0 |
| Everett | 0 | 0 | 0 | 0 |
| Pabst | 0 | 0 | 0 | 0 |
| Sequa | 0 | 0 | 0 | 0 |

ALCD-PUBCOM_0002025

| / 1,000,000 | Original Mass | x 100 | ÷ 100 | x 1,000,000 |
|---|---|---|---|---|
| 0.999987934 | $1,998,792,258.22 | $1,899,896,162.20 | $1,999,964,026.45 | $1,858,771,565.58 |
| 2.81219E-10 | $562,094.09 | $53,226,978.95 | $5,624.34 | $65,592,080.39 |
| 1.56729E-10 | $313,266.41 | $29,720,196.14 | $3,134.56 | $36,631,058.61 |
| 3.8134E-11 | $76,221.48 | $717,669.52 | $762.68 | $3,036,858.27 |
| 2.46536E-11 | $49,277.07 | $424,355.62 | $493.07 | $1,427,540.17 |
| 2.42488E-11 | $48,468.00 | $4,598,251.91 | $484.97 | $5,699,266.31 |
| 1.27351E-11 | $25,454.71 | $2,378,244.91 | $254.70 | $3,559,128.05 |
| 1.26129E-11 | $25,210.48 | $2,391,769.35 | $252.26 | $2,951,344.26 |
| 1.20651E-05 | $24,675.95 | $75,739.13 | $24,135.73 | $377,299.82 |
| 9.85419E-12 | $19,696.33 | $1,862,145.56 | $197.08 | $2,340,400.68 |
| 7.66781E-12 | $15,326.25 | $1,453,645.01 | $153.36 | $1,852,491.44 |
| 4.49104E-12 | $8,976.60 | $851,611.11 | $89.82 | $7,375,318.51 |
| 4.35034E-12 | $8,695.36 | $147,952.64 | $87.01 | $469,380.78 |
| 2.7502E-12 | $5,497.04 | $116,685.38 | $55.00 | $807,029.52 |
| 1.64507E-12 | $3,288.13 | $311,916.98 | $32.90 | $414,353.69 |
| 1.43809E-12 | $2,874.43 | $272,631.83 | $28.76 | $335,305.24 |
| 1.29509E-12 | $2,588.61 | $245,276.55 | $25.90 | $3,515,523.08 |
| 9.07001E-13 | $1,812.89 | $112,100.17 | $18.14 | $155,907.15 |
| 6.98468E-13 | $1,396.08 | $132,084.69 | $13.97 | $310,325.62 |
| 6.03283E-13 | $1,205.83 | $114,396.22 | $12.07 | $153,417.62 |
| 5.35396E-13 | $1,070.14 | $32,548.47 | $10.71 | $226,266.10 |
| 4.787E-13 | $956.82 | $55,485.10 | $9.57 | $191,452.59 |
| 4.78404E-13 | $956.22 | $90,704.38 | $9.57 | $446,516.12 |
| 4.53692E-13 | $906.83 | $86,011.83 | $9.07 | $737,064.90 |
| 4.53574E-13 | $906.59 | $62,014.94 | $9.07 | $418,668.79 |
| 3.46132E-13 | $691.84 | $65,542.83 | $6.92 | $80,603.28 |
| 3.35888E-13 | $671.37 | $63,644.97 | $6.72 | $389,528.72 |
| 3.09093E-13 | $617.81 | $54,857.55 | $6.18 | $550,284.82 |
| 2.81691E-13 | $563.04 | $33,464.90 | $5.63 | $50,743.41 |
| 2.46335E-13 | $492.37 | $46,706.98 | $4.93 | $294,363.92 |
| 2.32984E-13 | $465.68 | $4,181.70 | $4.66 | $5,615.64 |
| 2.0021E-13 | $400.18 | $37,850.50 | $4.00 | $56,968.18 |
| 1.93008E-13 | $385.78 | $36,560.13 | $3.86 | $44,961.11 |
| 1.70101E-13 | $339.99 | $32,255.87 | $3.40 | $233,333.99 |
| 1.61834E-13 | $323.47 | $30,548.84 | $3.24 | $37,566.92 |
| 1.48713E-13 | $297.24 | $6,364.16 | $2.97 | $37,977.46 |
| 1.25107E-13 | $250.06 | $22,971.67 | $2.50 | $28,239.23 |
| 1.11803E-13 | $223.47 | $13,807.99 | $2.24 | $38,076.08 |
| 8.73324E-14 | $174.56 | $16,543.47 | $1.75 | $77,941.97 |
| 8.50618E-14 | $170.02 | $3,096.84 | $1.70 | $18,028.06 |
| 8.49133E-14 | $169.72 | $16,080.76 | $1.70 | $21,655.61 |
| 5.88849E-14 | $117.70 | $1,228.30 | $1.18 | $5,643.30 |
| 4.05701E-14 | $81.09 | $2,148.86 | $0.81 | $13,695.58 |
| 3.46605E-14 | $69.28 | $3,946.01 | $0.69 | $33,363.08 |
| 2.43719E-14 | $48.71 | $251.35 | $0.49 | $243.06 |
| 2.30702E-14 | $46.11 | $3,431.25 | $0.46 | $11,274.57 |

ALCD-PUBCOM_0002026

| | | | | |
|---|---|---|---|---|
| 2.23839E-14 | $44.74 | $4,236.34 | $0.45 | $38,048.62 |
| 1.86725E-14 | $37.32 | $3,349.50 | $0.37 | $18,821.32 |
| 1.43662E-14 | $28.71 | $2,039.62 | $0.29 | $10,997.61 |
| 1.17514E-14 | $23.49 | $2,217.54 | $0.24 | $20,445.96 |
| 1.09806E-14 | $21.95 | $1,870.01 | $0.22 | $16,985.37 |
| 1.06921E-14 | $21.37 | $2,023.07 | $0.21 | $3,744.02 |
| 1.02378E-14 | $20.46 | $1,941.29 | $0.20 | $12,143.33 |
| 1.00387E-14 | $20.07 | $1,903.61 | $0.20 | $14,821.54 |
| 1.00225E-14 | $20.03 | $1,889.50 | $0.20 | $2,323.54 |
| 7.6759E-15 | $15.34 | $1,455.46 | $0.15 | $1,808.14 |
| 7.40364E-15 | $14.80 | $1,293.49 | $0.15 | $9,349.16 |
| 6.50644E-15 | $13.00 | $1,233.63 | $0.13 | $8,918.93 |
| 3.01224E-15 | $6.02 | $530.24 | $0.06 | $3,891.31 |
| 2.64834E-15 | $5.29 | $27.65 | $0.05 | $26.74 |
| 2.55863E-15 | $5.11 | $485.15 | $0.05 | $602.71 |
| 2.48744E-15 | $4.97 | $471.69 | $0.05 | $3,412.18 |
| 1.85953E-15 | $3.72 | $19.18 | $0.04 | $18.54 |
| 1.62552E-15 | $3.25 | $16.76 | $0.03 | $16.21 |
| 1.45817E-15 | $2.91 | $276.51 | $0.03 | $2,384.08 |
| 1.44681E-15 | $2.89 | $273.67 | $0.03 | $2,329.10 |
| 6.13334E-16 | $1.23 | $105.40 | $0.01 | $754.70 |
| 6.01446E-16 | $1.20 | $107.17 | $0.01 | $980.47 |
| 4.85023E-16 | $0.97 | $89.70 | $0.01 | $826.14 |
| 4.18965E-16 | $0.84 | $77.95 | $0.01 | $664.94 |
| 9.27182E-17 | $0.19 | $0.95 | $0.00 | $0.92 |
| 1.8244E-17 | $0.04 | $0.20 | $0.00 | $0.34 |
| 3.81497E-18 | $0.01 | $0.72 | $0.00 | $7.61 |
| 2.57664E-18 | $0.01 | $0.49 | $0.00 | $5.14 |
| 0 | $0.00 | $0.00 | $0.00 | $0.00 |
| 0 | $0.00 | $0.00 | $0.00 | $0.00 |
| 0 | $0.00 | $0.00 | $0.00 | $0.00 |
| 0 | $0.00 | $0.00 | $0.00 | $0.00 |
| 0 | $0.00 | $0.00 | $0.00 | $0.00 |

ALCD-PUBCOM_0002027

| ÷ 1,000,000 | | ÷ 1,000,000 | ÷ 100 | Original Mass |
|---|---|---|---|---|
| $1,999,975,868.54 | **OxyChem** | $1,999,975,868.54 | $1,999,964,026.45 | $1,998,792,258.22 |
| $0.56 | **All Others** | $24,131.46 | $35,973.55 | $1,207,741.78 |
| $0.31 | | | | |
| $0.08 | | | | |
| $0.05 | | | | |
| $0.05 | | | | |
| $0.03 | | | | |
| $0.03 | | | | |
| $24,130.27 | | | | |
| $0.02 | | | | |
| $0.02 | | | | |
| $0.01 | | | | |
| $0.01 | | | | |
| $0.01 | | | | |
| $0.00 | | | | |
| $0.00 | | | | |
| $0.00 | | | | |
| $0.00 | | | | |
| $0.00 | | | | |
| $0.00 | | | | |
| $0.00 | | | | |
| $0.00 | | | | |
| $0.00 | | | | |
| $0.00 | | | | |
| $0.00 | | | | |
| $0.00 | | | | |
| $0.00 | | | | |
| $0.00 | | | | |
| $0.00 | | | | |
| $0.00 | | | | |
| $0.00 | | | | |
| $0.00 | | | | |
| $0.00 | | | | |
| $0.00 | | | | |
| $0.00 | | | | |
| $0.00 | | | | |
| $0.00 | | | | |
| $0.00 | | | | |
| $0.00 | | | | |
| $0.00 | | | | |
| $0.00 | | | | |
| $0.00 | | | | |
| $0.00 | | | | |
| $0.00 | | | | |
| $0.00 | | | | |
| $0.00 | | | | |

$0.00
$0.00
$0.00
$0.00
$0.00
$0.00
$0.00
$0.00
$0.00
$0.00
$0.00
$0.00
$0.00
$0.00
$0.00
$0.00
$0.00
$0.00
$0.00
$0.00
$0.00
$0.00
$0.00
$0.00
$0.00
$0.00
$0.00
$0.00
$0.00
$0.00
$0.00
$0.00
$0.00
$0.00

ALCD-PUBCOM_0002029

| x 100 | x 1,000,000 |
|---|---|
| $1,899,896,162.20 | $1,858,771,565.58 |
| $100,103,837.80 | $141,228,434.42 |

ALCD-PUBCOM_0002030



# EXHIBIT 38

OxyChem's Comments in Opposition to Proposed Consent Decree,
*United States v. Alden Leeds, Inc., et al.*, Civil Action No. 2:22-cv-07326 (D.N.J.)

ALCD-PUBCOM_0002032

AGRICULTURAL CHEMICALS DIVISION - NEWARK PLANT
OPERATING COMMENTS
NOVEMBER 1969

### PRODUCTION

Production activity was limited to the cleaning of tanks and the shipping of
raw materials and products. The final shipments to Des Moines of miscella-
neous products and some raw materials were made at the end of November.

The only products still in inventory are the items labelled for W. R. Grace
and the Swift Formula #2. Sales is to advise this week a warehouse desti-
nation for these materials and they will be shipped by December 15th.

Considerable progress was made on the disposal of the remaining raw materials.
After much delay, Mercury finally started to take large quantities of the al-
cohols and had removed all the butyl and isopropyl alcohols by November 26th.
They subsequently have taken the remaining methanol and the acetic mix and
should be in today to take the 2-EH alcohol, completing removal of these items.
Sale of the flake caustic to Kramer Chemicals was negotiated and they have
now taken some 79,000 pounds. Customers to whom they are moving the caustic
have complained about the condition of the drums and there is some question
whether they will take the remaining 52,000 pounds --- Sales is currently try-
ing to work this out with Kramer. Some miscellaneous materials were sold at
nominal value to avoid having to dispose of them.

The few miscellaneous chemicals remaining will be discarded except for a few
innocuous items such as activated carbon, calcium chloride, etc., which will
be abandoned on the site. We also will be leaving some 1,000 gallons of kero-
sene and 9,000 gallons of Bunker "C" fuel in their respective tanks.

Shipments made plus write-down of items in inventory but to be sold at less
than cost further reduced our month-end inventory as follows:

|  | October 1969 | November 1969 |
|---|---|---|
| Raw Materials | $26,615 | $ 3,868 |
| Containers | 526 | - 0 - |
| Products | 17,846 | 10,446 |

### MAINTENANCE AND UTILITIES

The boilers were shut down November 20th and the system has been dried out.
Trays of lime have been placed in both boilers to keep them dry --- these should
be changed about every three months. Sprinkler systems to all buildings were
shut down November 26th following the removal of the last alcohol and F.I.A.
notified of this fact. The fire loop and hydrants will be left active.

Packing of equipment and supplies was a major activity in November. A full
truck load was shipped to Greens Bayou on November 20th, and several small
shipments were also made to other plants. The bulk of the items going to
Greens Bayou have now been shipped. Storeroom items remaining are being dis-
tributed to the local plants.

DS 00024651

**CONFIDENTIAL**

CONFIDENTIAL

MAXUS0331013
ALCD-PUBCOM_0002033

- 2 -

Instrument cabinets are being covered with plastic and shafts and couplings
on all moving equipment heavily greased to retard deterioration. Most equip-
ment is relatively clean, but some items in the acid units, particularly the
ester drop tanks and flakers, contain solids; however, at this late date, we
neither have the personnel nor time to clean them.

## TECHNICAL

The only routine technical activity was some additional work directed toward
reformulating our product line to meet the newly-proposed ester specifications
using Dow esters. Emulsifier samples from Retzloff which are on the approved
list have been tested. Their performance with the Dow esters was essentially
the same as with the Witco AC23-99 series --- bloom is OK but the emulsions
have poor stability in soft water. Stepan sent in samples which are based on
calcium salts so these won't be tested at present. The expected samples from
Witco tailored for use with the Dow esters have not yet been received.

Without heat, the Lab is now untenable for normal work. Henceforth, we will
direct total effort in this area to cleaning up and packing of the remaining
items. Much of the equipment and supplies will go to Harrison who are picking
them up this week.

## SHUTDOWN

In addition to the items previously mentioned, some other efforts were direct-
ed toward the shutdown and sale of the property:

1. Meetings were held with several real estate brokers relative to the sale
   of the property. All indicated little background in sale of chemical
   properties, said property should be promoted to speed sale, and recom-
   mended an exclusive listing to achieve broker attention.

2. Companies contacted independently were recontacted. The only one still
   interested in the site is Standard Chlorine, though several might be in-
   terested in the equipment.

3. The lists of installed and uninstalled equipment available at the Plant
   were finally completed and distributed to interested parties.

4. The personnel situation continues the same. One Chemist and two secre-
   taries remain available for transfer; however, progress has been made on
   placing two of these individuals. All personnel have been notified of
   the imminent shutdown of the Plant. Hourly personnel may be released on
   the 19th, but currently it looks like the 26th may be a more realistic
   final date.

5. Work to close all open appropriations in December and complete other ad-
   ministrative matters continues. Detailed recommendations and requirements
   will be forwarded shortly.

DS 00024652

# CONFIDENTIAL

MAXUS0331014
ALCD-PUBCOM_0002034

- 3 -

The following appropriations were closed in November:

| Number | Description | Amount Expended |
|--------|-------------|-----------------|
| 6766 | Safety Showers | $ 1,745 |
| 1012 | Exhaust Fan | 570 |
| 1015 | HCl Loading Station | 4,174 |
| 1031 | Lead-Lining a Tank | 3,204 |
| 1034 | DCP Loading Line | 1,121 |
| 1038 | Office Machines | 945 |
|  | TOTAL = | $11,759 |

F. GORDON STEWARD

FGS/nr

12/10/69

DS 00024653

**CONFIDENTIAL**

MAXUS0331015
ALCD-PUBCOM_0002035

# EXHIBIT 39

OxyChem's Comments in Opposition to Proposed Consent Decree,
*United States v. Alden Leeds, Inc., et al.*, Civil Action No. 2:22-cv-07326 (D.N.J.)

ALCD-PUBCOM_0002036

*Exhibit*
*#14*
*I.D.*
*2-20-87*
*Ko*

AGRICULTURAL CHEMICALS DIVISION - NEWARK PLANT
OPERATING COMMENTS
DECEMBER 1969

The Newark Plant is now only a few days away from final closing --- the last hourly personnel have been released, departure of the remaining salaried personnel is set for early January, and inventory of raw materials and products is now $0.00. Therefore, this is the last operational report to be submitted by the Newark Plant.

## PRODUCTION

Activity in this area solely involved shipping of raw material and product remaining on the site. The final product shipment consisted of Swift Formula #2 and various items labelled for W. R. Grace, which were shipped to the Standard Warehouse and Distributing Company, Camden, N.J., to await sale in the East.

Raw material inventories were eliminated with the sale of the remaining recovered methanol, 2-ethyl hexyl alcohol, acetic mix, and flaked caustic soda. Movement of the caustic was a particular relief, since we started the month with over 70,000 pounds in inventory. A few miscellaneous items were also sold for nominal value.

All other hazardous chemicals: gunk from tanks, part cans of product, lab reagents not required elsewhere, etc., were discarded. As indicated in November, the only chemicals to be left on the site are the kerosene and Bunker "C" fuel left in the tanks, and a few innocuous items such as carbon black and calcium chloride which are in the warehouse.

Shipments in December reduced the November month-end inventory of $14,314 to $0.00.

## MAINTENANCE AND UTILITIES

The remaining shop equipment was packed and shipped to Greens Bayou, together with some air-operated valves and safety equipment. Some $9,000 of uninstalled equipment was transferred to the Chemetals Division Plant in Baltimore. Many of the remaining storeroom supplies were transferred to Kearny, Jersey City, and Harrison --- except for pump parts, most of the items now remaining in Stores are specific spare parts for installed equipment.

The onset of cold weather has already shown us to be vulnerable to some freeze-ups of water lines. The most troublesome was the failure of a valve in the fire line to the Process Building, which caused the 8" fire loop to be shut down at the street.

Some maintenance work which was beyond our capabilities must be done in January, using outside contractors. The principle jobs to be done are: lift river water strainer from river, replace acid building roof panels to close roof, and relocate gate to Sergeant Chemical's property.

## TECHNICAL

There was no normal technical activity at Newark during December. Milt Rosenfeld did, however, spend one week at Des Moines assisting in the reformulation of our product line.

CONFIDENTIAL

53921

MAXUS043208

- 2 -

The main "technical" effort was directed toward the complete cleaning of
the lab. Many of the supplies were given to Harrison. The lab records and
emulsifier samples accumulated over the years were packed for shipment to
Des Moines. Other items in the lab were either sold or discarded.

SHUTDOWN

In addition to items previously mentioned, efforts were directed toward the
shutdown and sale of the property:

1. Several persons expressing interest either in the property or equip-
ment toured the Plant. None of the parties appeared to be a good
prospect for an early sale.

2. Requests for some of our installed equipment were received. Recommen-
dations that the requested items be removed were forwarded to Cleveland
--- we currently are awaiting a decision as to whether we will proceed
with the removal.

3. Arrangements were made with Kearny to provide continuing routine main-
tenance when required.

4. Personnel action was completed with the release of all employees either
in December or early January. The (5) remaining hourly personnel were
released Friday, December 26th. Two were retired, two laid off, and
one, ████████ was placed on temporary disability. Since he will
remain on the payroll until the extent of his disability is established,
arrangements have been made to have Kearny pay the supplemental bene-
fits due him. Release of all salaried personnel is also set: J. Wolf
and J. Brennan have departed and will report to Jersey City and Kearny,
respectively, upon completion of 1969 vacations; M. Rosenfeld declined
a transfer to the Research Center and is being terminated January 2, 1970,
and N. Ralph and H. Mooney, who also were not placed with Diamond, are
being terminated on January 2nd and January 9th, respectively.

5. Considerable effort was given to completing most administrative work.
A separate summary of the administrative situation is being sent to
those concerned.

6. All open appropriations were closed in December. Supplements were iss-
ued where required and the assets capitalized accordingly. The follow-
ing appropriations were closed in December:

| Number | Description | Amount Expended |
|---|---|---|
| 6760 | 2,4,5-T Settling Tank | $27,084 |
| 1003 | TCP Mother Liquor Recovery | 5,805 |
| 1007 | 2,4-D Flaker Fume Scrubber | 5,540 |
| 1016 | TCP Transfer Equipment | 2,961 |
| 1021 | Glass-Lined Steel Tee | 748 |
| 1027 | Methylate Feed Pump | 2,613 |
| 1028 | MCA --- Dilution and Storage Equipment | 46,310 |
| | TOTAL = | $91,061 |

*F. Gordon Steward* (signature)
F. GORDON STEWARD

FGS/nr
1/2/70

CONFIDENTIAL

MAXUS043209

ALCD-PUBCOM_0002038

# EXHIBIT 40

OxyChem's Comments in Opposition to Proposed Consent Decree,
*United States v. Alden Leeds, Inc., et al.*, Civil Action No. 2:22-cv-07326 (D.N.J.)

ALCD-PUBCOM_0002039

# 1965
Annual Report

# Diamond Alkali Company



GREENING-22
3/4/87

MAXUS4858780
ALCD-PUBCOM_0002040



MAXUS4858781
ALCD-PUBCOM_0002041

ANNUAL REPORT

*to the stockholders of*

# Diamond Alkali Company

*for the year ended December 31, 1965*

CONTENTS

Highlights of the 1965 Report                      2
A Message to Our Stockholders                      3
Review of Operations                               6
Chemicals You Live By                             21
Review of Operations Continued                    25
Financial Review                                  26
Consolidated Statement of Income                  31
Consolidated Statement of Financial Position      32
Historical Financial Information                  34
Notes to 1965 Financial Statements                38
Opinion of Independent Accountants.               39
Board of Directors                                40
Management Personnel                              41

General Offices  300 Union Commerce Building. Cleveland.
Ohio 44115  In accordance with the by-laws of the Company
the annual meeting of stockholders will be held at the principal
office of the Company Cleveland. Ohio on April 21 1966 and
the management contemplates that it will solicit proxies for
such meeting and that the proxy statement and form of proxy
will be mailed to stockholders on or about March 18 1966

1

MAXUS4858782
ALCD-PUBCOM_0002042

# HIGHLIGHTS OF THE 1965 REPORT

| A TWO-YEAR COMPARISON | 1965 | 1964 |
|---|---|---|
| *Including Harte & Company, Inc. for 1965 and 1964; and adjusted for stock split in 1965.* | | |
| NET SALES . . . . . . . . . . . . . . . | $208,593,000 | $190,296,000 |
| NET INCOME . . . . . . . . . . . . . . | $ 16,363,000 | $ 13,750,000 |
| PER SHARE after deducting the annual dividend requirement on the preferred shares outstanding at December 31, 1965 . . . . . . | $ 2.48 | $2.05 |
| CASH DIVIDENDS PER COMMON SHARE . | $1.025 | $.925 |
| Current annual dividend rate per common share | $ 1.10 | $1.00 |
| Common shares outstanding . . . . . . . | 6,025,571 | 6,009,746 |
| BOOK VALUE per share of common stock assuming conversion of all $4.00 Preferred Stock into Diamond common shares . . . . . | $20.18 | $18.89 |
| CAPITAL EXPENDITURES. . . . . . . . . | $ 28,717,000 | $ 14,535,000 |
| NUMBER OF STOCKHOLDERS | | |
| PREFERRED . . . . . . . . . . . | 1,523 | 1,482 |
| COMMON . . . . . . . . . | 10,838 | 9,543 |
| NUMBER OF EMPLOYEES . . . . . . | 6,122 | 6,009 |

MAXUS4858783
ALCD-PUBCOM_0002043



At the T R Evans Research Center (l to r) Raymond F Evans. Chairman. James A. Hughes Vice Chairman. and Arthur B Tillman. President. observe technician Gary Osborne

## TO OUR STOCKHOLDERS:

Sales and earnings in 1965 were again at record levels. Sales for the first time crossed the $200,000,000 mark and were up 10 percent over the prior year at $208,593,000. Earnings rose even more to $16,363,000, 19 percent above 1964.

Earnings per share reached a record $2.48, up 21 percent from last year, based on the shares outstanding following the two-for-one stock split in November.

Dividends also set records, amounting to $1.025 per share. The anticipated annual rate, based on the dividend increase announced in the fourth quarter, is currently $1.10 per share.

Achievement of these results was due in part to the high level of general economic activity prevailing during the year, but not to be overlooked is the growing importance of the up-graded products and new proprietaries and specialties which we have been emphasizing for the past several years. We estimate that these products accounted for approximately 40 percent of sales in 1965, and it is one of our continuing corporate goals to push this percentage higher in future years.

Of interest to stockholders is the fact that alkalies now account for only 27 percent of our sales, and it is obvious that the word "Alkali" in our name no longer does justice to the breadth of our product line.

MAXUS4858784
ALCD-PUBCOM_0002044



MAXUS4858785

ALCD-PUBCOM_0002045

A key development during 1965 was the acquisition of the remaining 60 percent interest in Harte & Company, Inc., one of the country's largest producers of vinyl and polyethylene film and sheeting. With Harte as a wholly-owned subsidiary, Diamond is now integrated all the way from its basic raw material, common salt in the ground, through the various manufacturing and conversion steps to such end products as plastic wall covering, upholstery, bath mats and the like.

To help sustain the momentum of our growth in non-commodity chemicals, the specialty chemicals business of the Industrial Chemicals Division has been consolidated, as of January 1, 1966, in a new and separate Specialty Chemicals Division. By pinpointing performance responsibility in this area we expect to accelerate penetration of existing markets and the development of profitable new specialty products. The new division, using advanced and aggressive marketing techniques, is expected to show substantial growth in the years ahead.

Capital expenditures in 1965 amounted to $28,700,000, with approximately two-thirds devoted to expenditures for new and expanded facilities, while one-third was devoted to improving production efficiency and reducing costs. Our capital budget for 1966 is at approximately the same level.

It is satisfying to be able to report that the flow of products from our plants has continued for the sixteenth consecutive year without interruption from labor disputes. This record is a source of great strength and security for the Company, its customers and employees.

We move into 1966 with significantly expanded plant capacity, a broader product line and greater opportunities than any year in our history. We look forward with confidence that 1966 will again produce new sales and earnings records.

Raymond F. Evans
Chairman of the Board and
Chief Executive Officer

March 4, 1966

5

MAXUS4858786

ALCD-PUBCOM_0002046

REVIEW OF OPERATIONS INDUSTRIAL CHEMICALS DIVISION



William L. McFadden (left) Vice President and Frank W. Jarvis, Vice President and General Manager, Industrial Chemicals Division, in cell room of chlorine plant at Painesville Works

MAXUS4858787
ALCD-PUBCOM_0002047



In 1965 sales of this Division, incorporating the Company's basic commodity chemicals plus intermediates and proprietary specialties derived from these chemicals, reached an all-time high. Both the heavy chemicals and specialty chemicals areas of the business increased by about eight percent.

Earnings of the Division, while reaching near record levels, were not as high as might have been expected. Price pressure continued on chlorine, caustic soda and chlorinated solvents as new competing facilities came into production. The Company's new chlorine-caustic soda plant in Delaware City was about three months late going on stream because of shortages of skilled labor and delays in delivery of critical equipment. Electrical equipment failures occurred at other chlorine-caustic soda plants being operated at unusually high production levels. As a result products had to be purchased from outside to meet delivery commitments, adding to sales volume but generating little profit.

The Delaware City plant is now operating at its design capacity of 150 tons of chlorine a day. In addition, modifications taking place in other chlorine-caustic soda plants will further increase capacity, and we are in an excellent position to meet customer demands in 1966. The year should result in another increase in sales and profits.

The specialty chemicals area of our business had another year of record sales and of heavy investment in new product development and new marketing programs.

A chrome plating specialty was introduced for plating gravure plates and rolls, and other chrome plating products for aluminum and stainless steel are being test marketed this year.

An important development during the year was the introduction of a new dry cleaning detergent. Added to our existing line of detergent and solvent specialties, it strengthens our position as the most important supplier of chemicals to the textile care industry. Several additional new detergent specialties are being test marketed this year.

Other developments in 1965 included the introduction of a new paper grade of calcium carbonate, and the first in a new series of leather tanning specialties.

Meanwhile the work of building special new marketing groups went forward under a high priority. New salesmen were hired to serve specialized markets and were trained intensively in advanced marketing techniques. They are working effectively with distributor organizations to build sales volume.

In order to give further impetus to the growth of the specialty business a new and separate Specialty

**PLANTS**

Mobile
Muscle Shoals
Alabama
Delaware City
Delaware
Chicago, Illinois
Edgewood, Maryland
Jersey City, Kearny,
New Jersey
Lockport, New York
Cincinnati
Painesville, Ohio
Dallas
Deer Park, Texas
Belle West Virginia

**PRODUCTS MADE**

Anhydrous Hydrogen
Chloride, Bicarbonate
of Soda, Bichromate
of Soda, Boxboard
Adhesive Specialties,
Carbon Tetrachloride,
Caustic Soda,
Chlorinated Methanes
and Other
Chlorinated Organics,
Chlorinated Paraffins,
Chrome, Chrome
Plating Specialties,
Chrome Tanning
Specialties,
Chromic Acid,
Detergent
Specialties, Diamond
Soda Crystals,
Ethylene Dichloride,
Foundry Specialties,
Hydrogen, Caustic
Potash—in various
forms and packages,
Liquid Sodium
Silicates,
Muriatic Acid,
Perchlorethylene.

Potassium Bichromate
Potassium Carbonate
Precipitated
Calcium Carbonates
Special Alkalies
Soda Ash
Sodium Chromate
Sodium Metasilicate
and Orthosilicate,
Sodium Methylate
Sodium Sulphate

**FOR THESE INDUSTRIES**

Boxboard, Building
Materials,
Chemicals,
Cleansers and
Detergents, Cutting
Oils and Lubricants,
Corrosion Prevention,
Drycleaning, Drugs,
Food Processing,
Fuel Additives,
Glass, Laundry,
Leather, Iron and
Steel Foundry
Metals, Missile
Fuels, Metal
Degreasing,
Non-Ferrous Metals,
Paints and Pigments,
Paper and Pulp,
Petrochemicals,
Petroleum,
Pharmaceuticals,
Pigments,
Photographic Film,
Plastics, Plating,
Oil Well Drilling
and Refining, Rubber,
Refrigeration,
Rayon Solvent
Extraction, Soap,
Textiles,
Water and Sewage
Treatment,
Wood Preservative

Chemicals Division of the Company was established as of January 1, 1966. The new Division will accelerate the development of new proprietary products and hard-hitting marketing programs to sell them successfully. It has already begun to reorganize its sales and technical service groups in order to increase the productivity of new product development work.

The current year is expected to show another increase in sales of specialty chemicals. In the long run, this area of business represents one of the Company's greatest potentials for profitable growth

7

MAXUS4858788
ALCD-PUBCOM_0002048

# PLASTICS DIVISION



Harry E Connors Jr  General Manager Plastics Division  and Frank Chrencik, Vice President,
(right) study results of experimental extrusion of rigid PVC profile at Divisional Technical Center.

D    53471
MAXUS4858789
ALCD-PUBCOM_0002049



**PLANTS**
Deer Park Texas
Delaware City Del

**PRODUCTS
MADE**
DIAMOND®
Polyvinyl Chloride
Resins and Copolymers
DACOVIN®
Polyvinyl Chloride
Compounds

**FOR THESE
INDUSTRIES**
Producers of
Vinyl Film and
Sheeting for Packaging
Furniture Upholstery
Automotive Uses
Wearing Apparel
Wall Coverings and
Household Uses
Extruders of Plastic Pipe
and Building Components
Electrical Wire
Insulation Profiles
Plastic Hose
Molders of Containers
Electrical Fittings
Toys Industrial Parts
Shoe Soles
Phonograph Records
and Manufacturers
of all types of
Vinyl Floor
Coverings

The Plastics Division had another year of record sales and earnings  Sales increased substantially to outperform the PVC industry as a whole  Earnings were up sharply.

Sales of DACOVIN rigid PVC compounds doubled 1964 volume. These compounds account for an increasingly large portion of total PVC sales  Substantial gains were also made by specialty resins and general purpose resins  Sales of products introduced in the last three years accounted for 20 percent of this year's total sales volume.

The Division has consolidated its leadership position in compounds for producing blow molded PVC bottles. The first such bottles to reach the market on a commercial scale were produced from DACOVIN compounds. A major effort was also made in developing and introducing several new compounds for the extrusion of film and sheet for packaging applications.

Prices for general purpose resins were off slightly in 1965, but prices for specialty resins and compounds held up well. Despite some concern in the industry about overexpansion, the Division's plants operated at capacity during the year and production efficiency was increased by several process improvements.

Construction of the new resin plant at Delaware City, Delaware, is on schedule and the facility is expected to go on stream in April. Its initial capacity will be over 50 million pounds a year  Compounding facilities at Deer Park, Texas, will be expanded again during 1966. The Plastics Division Sales and Applications Laboratory at the Company's Technical Center is now being enlarged to improve technical service to customers and to step up development of new applications for Diamond resins and compounds.

The Company continues its work on fluorocarbon polymers and polymercaptans. These products, which show excellent promise, are in the test marketing stage.

The outlook for 1966 is for another good year. Demand for PVC continues to be strong and by mid-year our new resin plant will be capable of full production  Growth is looked for in both established and new uses.

9

MAXUS4858790
ALCD-PUBCOM_0002050

## AGRICULTURAL CHEMICALS DIVISION



Agricultural Chemicals Division General Manager, John S. Cort, Jr., in biochemicals laboratory at T. R. Evans Research Center.

MAXUS4858791
ALCD-PUBCOM_0002051



PLANTS
Atlanta Illinois
Des Moines Iowa
Newark New Jersey
Greens Bayou Texas

PRODUCTS
MADE
2 4-D and 2 4 5-T
BHC
CROP RIDER®
DACAGIN
DACAMINE® DACFIA®
DACONATE,
DACTHAL®
DDT Chloral
Chloral Hydrate
Chloral Hydrate U S P
DIAMOND 80-20™®
FENCE RIDER®
HERITAGE HOUSE®
home and
garden products
LINE RIDER®
VACATE® ®
and other
Agricultural
Products

FOR THESE
INDUSTRIES
Agricultural
Chemicals, Farming
and Pharmaceutical

The second full year as a separate Division of the Company was marked by an increase in both sales and earnings. The improvement in sales volume reflects increased sales of both bulk products such as DDT and phenoxy herbicides and substantial gains in sales of the Company's own proprietary specialties.

Earnings are up principally because of increased sales volume in higher-profit proprietaries together with reduced manufacturing costs. Costs were lower as a result of near capacity operation of plants and manufacturing process improvements.

During the year the market for DACTHAL, the Company's proprietary pre-emergence herbicide, was expanded by new label clearances for many crops. It is now the most widely used herbicide of its kind on the market. Sales of DACAMINE, a post emergence herbicide of the 2,4-D class, also increased satisfactorily. The market for this product was expanded from principally the small grain crops to include substantial sales for such applications as on rice and orchards.

During the year the Newark, New Jersey, plant was expanded to increase its production capacity and add facilities to produce a new form of 2,4-D acid. Just before the turn of the year construction was begun on a new plant in Des Moines. It will manufacture synthetic granular pesticides under a patented process which adds toxicants during the formation of the granule. This is a marked improvement over the commonly used method of coating a preformed granule with a toxicant. The new process gives excellent granule uniformity and can control the release of toxicants. The Division will market its own herbicides in the new granule form and will custom formulate products for other chemical manufacturers.

The Research and Development section of this report outlines the current status of two highly promising new "broad spectrum" fungicides. Field tests indicate that they have a large potential market, and the first product is expected to be introduced for turf and ornamental crops early in 1966.

The organization of the Division was strengthened during the year by the addition of manpower and by starting to regionalize the technical services the Division provides to its customers. This will make technical personnel immediately available to sales personnel and customers in chief agricultural centers around the country. The first regional assignment was made for California and Arizona late in 1965.

Toward the end of 1965 prices for DDT and other agricultural chemicals increased. This, together with expected increases in sales of these products, should help improve results in 1966. In addition, we look for continuing success in expanding our line of proprietary products.

During the year Heritage House Products became a unit of the Agricultural Chemicals Division and its headquarters was moved from Pittsburgh to Cleveland. Intensive marketing efforts continue and the unit currently sells its line of consumer products for lawn and garden care in 40 states. The performance of Heritage House, while still not up to expectations, improved in 1965 and should continue to do so in 1966.

MAXUS4858792
ALCD-PUBCOM_0002052

WESTERN DIVISION



Donald S Catterson General Manager, and Otto Trechter Production Manager Western Division
confer in recently constructed Anion Specialty Resin Department at Redwood City California plant



**PLANTS**
Emeryville
Redwood City
California

**PRODUCTS MADE**
DUOLITE® Ion
Exchange Resins
DION® Polyester Resins
DION® Polymer Products
Adhesives
Silicate of Soda
and Detergents

**FOR THESE INDUSTRIES**
Water treating
chemical food and
drug processing
construction
recreation
forest products.
dairy food and
bottling
laundries

During 1965 the Western Division increased its penetration of the market area and established new records in sales and earnings for the fourth consecutive year.

All of the Division's product lines shared in the gains. Sales of both DUOLITE ion exchange resins and DION polymer products increased as expanded production facilities were completed.

A program of engineering improvements and automation of production facilities for anion and cation exchange resins was completed. These innovations contribute to improved product quality and uniformity—both essential for meeting current demands for better ion exchange performance in the fields of water conditioning, sugar processing, nuclear power, hydro-metallurgy and many other process uses.

Sales of silicates and detergents, produced at the Emeryville, California plant, were also up significantly and plant expansion completed in 1964 is being utilized to capacity.

The staff of the Division's Industrial Chemical Department was increased substantially during the year and both sales and profits rose. This Department, responsible for all of Diamond's industrial chemical sales in the Western states, is competing strongly and successfully with long-established West Coast chemical producers and is making Diamond an increasingly important force in this regional market.

Early in 1966, the Company announced the first new facility in a recently acquired 50 acre industrial site at Oxnard, adjacent to the Los Angeles market area. The plant, which will produce sodium silicates, is expected to be in production late this year and will be followed by additional production and distribution facilities. Production and sales of industrial chemicals within this market area are expected to grow substantially in the years ahead.

The Division's research and development program yielded two highly promising new products during the year. A new flame retardant polyester resin is undergoing test marketing. It has a very low flammability rating and should find wide acceptance in such diverse applications as boats, translucent building panels, wastebaskets and air ducting. A new corrosion resistant polyester resin is being tested for a wide variety of protective applications in corrosive atmospheres. Other promising new products are about to reach the test marketing stage.

Diamond's impact on Western markets is growing rapidly. With expanded product lines, stepped-up marketing efforts and new manufacturing facilities, the Western Division expects to increase both sales and earnings again in 1966.

13

MAXUS4858794
ALCD-PUBCOM_0002054

# CEMENT-COKE DIVISION



Cement-Coke Division General Manager L T Welshans at the
modernized Bessemer Cement Plant Bessemer Pennsylvania

MAXUS4858795
ALCD-PUBCOM_0002055



PLANTS
Bessemer Pennsylvania
Painesville Ohio

PRODUCTS
MADE
BESSEMER:
Portland Cements Mortar,
High Early Strength
Plastic Waterproof
Foundry and
Industrial Coke
Light Oils
Tar and
Crude
Ammonia

FOR THESE
INDUSTRIES
Building Concrete
Products and
Highway Construction
Foundries
Coal Tar and
Organic Chemicals

In 1965 the Cement-Coke Division benefited from the major modernization program at its Bessemer Plant which was started in 1961. Earnings for the Division improved on approximately the same sales volume as in previous years.

The Company has been in the vanguard of the cement industry in its program to consolidate production facilities while expanding its marketing area. Upon completion of the current expansion program, Bessemer will have increased its capacity from 2.9 million barrels of cement a year to 4.7 million barrels. At the same time, reduced costs resulting from modernization are enabling the Company to expand profitably its marketing area. The Company now sells Bessemer cement in 108 counties in Ohio, Pennsylvania, New York, Maryland, and West Virginia. In the last 18 months, 20 new counties have been added. In addition to the Bessemer plant, a distribution terminal at Painesville and a newly-opened terminal near Cleveland are serving customers efficiently. Studies are currently under way to increase distribution facilities by means of new terminals and by the use of new high-capacity railroad freight cars.

The performance of the Division would have been better had the additional capacity of the Bessemer Plant been available at the original target date of September, 1965. However, delay was occasioned by a shortage of skilled steel and electrical workers in the area. The new capacity is scheduled to go on stream in the Spring.

The cement industry generally continues to operate at about 75 percent of capacity. The competition for markets and the price weakness continue to be a problem. However, the cement market is expanding by about four percent per year, and cement is increasing its percentage of the construction dollar. The Bessemer Plant was operated at capacity in 1965, and through aggressive marketing efforts, its expanded capacity in 1966 is expected to be fully utilized.

The production of a high-grade foundry coke continued at capacity levels during 1965, and the operation turned in a satisfactory profit.

The outlook for 1966 is excellent. We have taken the steps necessary to compete favorably in the changing and highly competitive markets. With the added production capacity in cement, we expect a year of increased sales and profits.

15

MAXUS4858796
ALCD-PUBCOM_0002056

HARTE & COMPANY, INC.



Fred S Strauss President (background) and Production Manager Jake Strauss examine vinyl
film from one of the huge calenders at Harte & Company's Brooklyn. New York plant.

MAXUS4858797
ALCD-PUBCOM_0002057



PLANTS
Brooklyn New York
Mountaintop Pennsylvania

PRODUCTS
WATASEAL®
and WATAHYDE®
Vinyl Film and Sheeting
WATASEAL® All-Vinyl
Bathtub Mats
Olympic Vinyl Car Mats
VISTA VINYL®
Wallcoverings
PLICOSE® Polyethylene
Film. Sheeting
Tubing. Bags

FOR THESE MARKETS
AND INDUSTRIES
Home and Commercial
Housewares and
Furnishings
Apparel
Luggage and Sundries
Swimming Pools
Automotive interiors
and Accessories
Agriculture
Construction
Commercial and
Industrial Packaging

During the year Diamond purchased the remaining 60 percent interest in Harte & Company. Inc., which is now a wholly-owned subsidiary of the Company. Fred S. Strauss, Harte's co-founder, will continue as President. The 1964 and 1965 operating results of Harte are consolidated in this report.

Harte is one of the largest manufacturers of polyvinyl chloride and polyethylene film and sheeting in the country. It has a long record of steady growth and 1965 was no exception. Sales and profits were higher than the previous year The Company's entire product line participated in the increases.

Harte designs and produces decorative PVC film and sheeting for a wide variety of fabricators of finished products used in the manufacture of furniture, wallcovering, juvenile products, shower curtains and closet accessories. It also produces polyethylene film for industrial, building construction and agricultural applications such as drum liners, vapor barriers and silo covers.

During 1965 Harte started to manufacture and market a line of PVC bath mats and automobile floor mats for the consumer market. These are sold directly to outlets such as mail order houses and retail chains. This part of Harte's business is being rapidly expanded.

Harte's main plants are in Brooklyn, New York. Construction went forward in 1965 on a modern manufacturing facility near Wilkes-Barre, Pennsylvania. This plant, scheduled for start-up in 1966, will increase overall production capacity by one-third and open up new markets for the Company's products.

Harte's marketing and distribution network includes branch sales offices and warehouses in Chicago and Los Angeles. During 1965 two new warehouses were opened in Dallas and Atlanta. The sales organization will be expanded this year to match increased production and distribution capacity These factors, together with a continuing strong demand in the market-place, indicate that the current year should be another one of substantial progress.

17

MAXUS4858798
ALCD-PUBCOM_0002058

# RESEARCH AND DEVELOPMENT



Research and development expenditures for 1965 totaled $6,800,000, as compared with $5,900,000 for the preceding year.

Our effort continues to be directed primarily toward the introduction of new proprietary products, to expand existing product lines and fill specific needs of our markets.

During 1965 strong emphasis continued in the area of agricultural chemicals. Field testing on two new fungicide formulations confirms that both are effective against a wide range of plant diseases. The first to reach the market will be FORTURF for use on turf and ornamental crops. U. S. Department of Agriculture clearance is being sought and the product will be test marketed in 1966. The second product called DACONIL 2787, is a broad spectrum foliage protectant fungicide. It is being tested with success on a variety of food crops such as potatoes, tomatoes, and cucumbers. The testing is being done on a world-wide basis. The appeal of this product is its wide range of effectiveness and its ease of use. The potential market is large, both in the U. S. and in Europe.

DALVOR*, a fluorocarbon dispersion polymer, has undergone extensive testing during the year. To assist in developing markets for DALVOR, formulated compositions of this polymer have been developed called DALBON. Coatings made with DALVOR display exceptional weathering, chemical and abrasion resistance. The coatings also have outstanding flexibility and good heat resistance. A market for DALBON was developed as a coating for lining drums and pails. Other market areas where coatings made with DALVOR are being evaluated in the field include interiors of appliances, process equipment, coil coatings and building products.

The DION Polymercaptans are a new family of resins, that show promise in a number of areas. They were test marketed in 1965 for sealant and calkant applications in the construction industry and will be evaluated this year in adhesives and epoxy markets as well.

Several vinyl chloride copolymers are in the advance stages of development and show promise for engineered plastic products.

First field tests of a new product named SANURIL will begin this year. SANURIL is a waste treatment system specifically for effluent from sewage treatment plants.

A family of chlorinated xylene specialties has progressed from the laboratory stage and is going into field tests. Their primary use is as intermediates in the production of pharmaceuticals and other chemicals.

MAXUS4858799
ALCD-PUBCOM_0002059

Chemicals You Live By 







During the past decade, during which time sales have nearly doubled, Diamond has steadily developed and marketed a wide variety of new industrial specialties and proprietary chemical products.

Diamond's research and development teams are responsible for such widely known products as DACTHAL, the best available pre-emergent herbicide. Other successes result from the alteration of a standard basic chemical—such as chromic acid—enabling it to do a specific job better than could be done previously

ECONO-CHROME, a high-quality chrome plating specialty, was developed in this manner. Still other new products come from the acquisition of outside companies. Decorative vinyl film and sheeting, for example, joined the Diamond product line last year when Harte & Company, Inc. became a wholly-owned subsidiary.

Illustrated on the following pages are only a few of the Diamond products and their uses, introduced during the past ten years. They all contribute to the Company's prosperity.

21

MAXUS4858800
ALCD-PUBCOM_0002060

# Wonderful things come to you
## from the world of
## DIAMOND CHEMICALS...



Dacthal herbicide, a pre-emergent weed-killer safely and economically keeps a wide variety of weeds and grasses out of vegetables agronomic crops and ornamentals.

One of the nation's leading producers of vinyl film and sheeting, Harte & Co produces upholstery materials, wall coverings, shower and window curtains, drapes, bath mats and automobile mats.

Designed to meet the most exacting paint formulations, 21 different chlorinated paraffins and hydro-carbons are produced by Diamond, assuring smoother brushing, washability, flame retardance and chemical resistance.

Diamond's Econo-Chrome and Duramir chrome plating processes are used extensively by quality appliance automobile accessory and industrial manufacturers

MAXUS4858801
ALCD-PUBCOM_0002061



A complete line of Heritage House lawn and garden foods, weed killers and grass seed are marketed in many areas of the United States.

The fast-growing recreation market is supplied with Dion iso-resins by the Western Division for use in the manufacture of reinforced fiberglas surf boards, pleasure boats, automobile bodies and truck cabs.

The only U.S. manufacturer of laundry alkalies and dry cleaning solvents and specialties. Diamond offers a complete line of products and technical services to the textile care industry.

23

MAXUS4858802
ALCD-PUBCOM_0002062



...tive post-emergent weed killer



Dacovin® powder compounds
for blow-molded bottles



Resins for water softening,
renovation and deionization



...rs and sanitizers
for bottling industry



All-purpose leather tanning chemical

Inner-coating for metal drums



...e sealant and
caulking compounds



Swimming pool sanitizer



Self-setting foundry binder

Diamond has invested millions of dollars in the construction, modernization and improvement of plants to produce better products more economically.

Accelerated research and development have created an array of new products, and sophisticated marketing approaches have established

an excellent vantage point for continued progress.

Diamond's strength in basic chemicals and its continuing diversity in newer, dynamic products and markets are setting the pace for tomorrow's **CHEMICALS YOU LIVE BY.**



MAXUS4858803
ALCD-PUBCOM_0002063

## OUR EMPLOYEES



We had 6,122 employees at the end of the year, an increase of 616 over 1964. Most of the increase is represented by the employees of Harte & Company, Inc., now a wholly-owned subsidiary.

Employees were paid $51,263,000 during the year in wages and salaries and the Company contributed $3,893,000 under its pension and insurance plans.

Since 1960 our requirements for technically and professionally trained college graduates have grown four-fold. We continue to refine and develop our recruiting and management development programs in order to have the trained manpower we will need as the Company expands.

New graduates are placed in training programs which give them six to nine months' experience in several divisions and departments of the Company before they are assigned to their first regular jobs. Our employees continually receive formal and informal training to prepare them for promotion. These efforts, along with a well-established and productive Management Development Program, will provide us with the skilled personnel to fill both middle and top management jobs in the years ahead.

Employee communications have been stepped up during the year as part of a Company-wide expansion of its public relations program. A new employee newsletter is being published and a program to keep employees fully informed on employee benefit programs is under way.

About half of those employees eligible, or 2,650, are now enrolled in the Thrift Plan under which they save money towards the purchase of the Company's stock.

Diamond continues to be an active participant in the Plans for Progress program which supports equal employment opportunities.

We passed our sixteenth consecutive year without a work stoppage as relationships with our employees continue to be excellent. New labor contracts were signed at four plants Bessemer, Pennsylvania; Jersey City, Kearny, and Newark, New Jersey. In addition new long-term pension plan agreements were negotiated at several plants. We have no other labor contracts terminating until mid-1967.

Belle, West Virginia; Des Moines, Iowa; Greens Bayou, Texas; Lockport, New York; Jersey City and Newark, New Jersey, plants received awards from the Manufacturing Chemists' Association for completing the year without a lost-time accident.

## MANAGEMENT CHANGES

At the January, 1966, Board meeting, Fred S Strauss, President of Harte & Company, Inc., a subsidiary of the Company, was elected a director replacing William H. McConnell, who resigned effective December 31, 1965.

Warren Dusenbury, formerly Manager of Marketing Specialty Sales, was appointed General Manager of a newly established Specialty Chemicals Division effective January, 1966. This appointment emphasizes the growth and importance of our specialty business which has now been accorded a divisional status.

On May 1, C. C. Brumbaugh, Vice President, retired after 28 years of productive and faithful service.

Robert C Sutter was appointed Assistant to the President and Francis H. Rockwell replaced him as Director of Engineering.

25

MAXUS4858804
ALCD-PUBCOM_0002064

# FINANCIAL REVIEW

Sales in 1965 were $208.593.000, a new high for the seventh consecutive year
Comparative sales by quarter were

| Quarter ended | | 1965 (1) | 1964 (1) |
|---|---|---|---|
| March 31 | | $ 47.002.000 | $ 43.111.000 |
| June 30 | | 56.125.000 | 48.611.000 |
| September 30 | | 52.281.000 | 50.055.000 |
| December 31 | | 53.185.000 | 48.519.000 |
| For the year | | $208.593,000 | $190.296.000 |

(1) All 1965 and 1964 figures in this financial review include the results of
Harte & Company, Inc.. now a wholly owned subsidiary

Earnings for 1965 were $16.363,000. also a new high. This is equivalent to
$2.48 a share after deducting the annual dividend requirements on both issues
of preferred shares outstanding This represents an increase of $.43 per share
over the previous year Earnings by quarter adjusted to reflect the 2 for 1 stock
split in November. 1965 were:

| Quarter Ended | | Earnings in 1965 | | Earnings in 1964 | |
|---|---|---|---|---|---|
| | | Total | A Share | Total | A Share |
| March 31 | | $ 3.401,000 | $ .51 | $ 2.525.000 | $ .36 |
| June 30 | | 4,421,000 | .67 | 3,905,000 | .59 |
| September 30 | | 3,829,000 | .58 | 3,509.000 | .52 |
| December 31 | | 4.712,000 | .72 | 3.811.000 | .58 |
| For the year. | | $16.363,000 | $2.48 | $13.750.000 | $2.05 |

## DIVIDEND INCREASE

In the fourth quarter of the year, the dividend on common stock, after reflecting
the two for one stock split, was increased to $.27½ per share. This is the second
consecutive year the dividend has been increased. The new anticipated annual
rate is $1.10 compared to the $1.00 formerly paid.

This past year was the thirty-third consecutive year dividends have been
paid on our common shares. A total of $6,221,000 was paid on common shares,
and $1,124,000 was paid on the $4.00 convertible preferred stock during the
year. Preferred dividends in 1966 will be $1,417,000.

## WORKING CAPITAL

Working capital declined $18,408,000 to $38,946,000 at year end. This resulted
from our major capital expansion program and additional investments in associ-
ated companies. The year-end ratio of current assets to current liabilities was
2.0 to 1.

Our long-term debt at year end was $43.763,000, a reduction of $2,161,000
On page 29 of the report we have shown a two-year comparative summary
of the changes in our working capital.

## EXPANSION AND DIVERSIFICATION

During the year we spent $28,717,000 on expansion, modernization, and
diversification of our manufacturing facilities.

The chlorine-caustic soda plant near Delaware City, Delaware, came on
stream in August and is operating at capacity

A new polyvinyl chloride plastics plant, which will increase our capacity by
50%, is being constructed at Delaware City It is expected to be on stream early
in the second quarter of 1966

Due to a shortage of skilled mechanics in the area, the Bessemer cement plant

MAXUS4858805
ALCD-PUBCOM_0002065

**Diamond Alkali Company** 

expansion was not completed on schedule. It is now expected to be in operation in the Spring.

Major modernization projects were completed on the Muscle Shoals, Alabama, and Deer Park, Texas, chlorine cell rooms. These expenditures will reduce operating costs and improve efficiencies.

During the year a substantial minority interest was purchased in a new corporation. Terra Chemicals International, Inc., which will manufacture and market ammonia fertilizers. Terra is currently building a large plant near Sioux City, Iowa.

## TAXES AND DEPRECIATION

Federal and foreign income taxes for the year 1965 amounted to $11,350,000 equal to $1.88 a share. These taxes resulted in an effective tax rate of 41% compared to a 42.6% rate for the year 1964. The investment credit on property acquired in 1965 amounted to $1,600,000 compared to $420,000 in the year 1964.

Charges against income for depreciation amounted to $15,001,000 in 1965 as compared with $16,042,000 in 1964. The previous year included $2,050,000 depreciation on the obsolete cement plant at Painesville which was sold in 1964.

## CAPITAL STOCK

To improve the marketability and widen the distribution of our common stock, our Directors authorized a two-for-one split effective for stockholders of record November 19, 1965.

During the year we purchased 47,600 shares of our stock on the open market and issued or sold 63,106 shares to employees under incentive, thrift and option plans.

Ninety-five thousand shares of Series B, $4.00 cumulative convertible preferred stock were issued in exchange for the remaining 60% of Harte & Company, Inc.

## LITIGATION

The two actions against the Company by the Federal Government referred to in last year's Annual Report are still unresolved. In the Federal Trade Commission proceeding charging a violation of the Clayton Act by reason of our acquisition in 1961 of The Bessemer Limestone and Cement Company, the full Commission, to which we had appealed the adverse decision of a hearing examiner, upheld its hearing examiner's determination of a violation of the Act but did not order divestiture or any other form of relief. Instead, the Commission requested the parties to propose alternative relief orders for its consideration. This has not yet been done by either party. Should the Commission eventually enter an order which is unsatisfactory to the Company, we intend to appeal to the courts.

The civil case filed in Philadelphia in 1964 by the Justice Department charging nine corporate defendants, including Diamond, with conspiring to eliminate price competition in the marketing of chlorine, caustic soda and soda ash, and requesting an injunction against continuing certain practices, has not yet come to trial or been disposed of otherwise. During the year, the Cities of Detroit and Philadelphia, which were later joined by the City of Pittsburgh and Allegheny County Sanitary Authority, also filed a civil complaint against the same nine corporate defendants and one other alleging that they were overcharged on purchases of the chemicals named above by reason of the same violations alleged in the Justice Department case, and asking treble damages (the exact amount, however, not being named). We believe both of these actions are without merit and intend to defend our position vigorously.

27

MAXUS4858806

ALCD-PUBCOM_0002066

# FINANCIAL REVIEW



NET INCOME AND CASH DIVIDENDS 1956-1965

TRENDS OF SALES PRICES AND LABOR COSTS 1956-1965

MAXUS4858807
ALCD-PUBCOM_0002067

# Diamond Alkali Company 

## CHANGES IN WORKING CAPITAL

|  | 1965 | 1964 |
|---|---|---|
| Working Capital Beginning of Year | $57 3 | $33 0 |
| **Additions to Working Capital** | | |
| Net Income | 16 4 | 13 8 |
| Depreciation | 15 0 | 16 0 |
| Future Income Tax | 2.3 | 3 4 |
| Additional Long-Term Debt | | 30 0 |
| Disposal of Facilities. etc | 1 1 | 1 4 |
| Sale of Stock to Employees | 1 3 | 2 |
| | $36.1 | $64 8 |
| **Deductions from Working Capital** | | |
| Cash Dividends | $ 7.3 | $ 6.7 |
| Capital Expenditures | 28.7 | 14.5 |
| Increase in Other Investments | 14 9 | 2.2 |
| Repayment of Long-Term Debt | 2.2 | 16.5 |
| Purchase of Treasury Stock | 1.4 | .6 |
| | $54 5 | $40.5 |
| Working Capital at End of Year | $38 9 | $57 3 |
| Increase or (Decrease) in Working Capital | $(18 4) | $24 3 |

Includes Marte & Company, Inc., in both periods.



CASH FLOW 1956-1965                                    DOLLARS IN MILLIONS

PROVISION FOR FUTURE INCOME TAXES

DEPRECIATION

NET INCOME

1956  '57  58  '59  60  '61  62  '63  '64  '65

29

MAXUS4858808
ALCD-PUBCOM_0002068

# FINANCIAL REVIEW



MAXUS4858809
ALCD-PUBCOM_0002069

# Diamond Alkali Company 

## CONSOLIDATED STATEMENT OF INCOME
### and retained earnings

| | Year ended December 31, | |
| --- | --- | --- |
| | **1965** | **1964\*** |
| **REVENUES** | | |
| Sales of products | $208,592,930 | $190,295,891 |
| Interest, dividends, royalties, etc. | 2,142,226 | 1,634,149 |
| | 210,735,156 | 191,930,040 |
| **COSTS AND EXPENSES** | | |
| Cost of products sold | 153,131,839 | 140,424,148 |
| Selling and administrative | 21,059,682 | 19,673,799 |
| Research and development | 6,761,269 | 5,910,113 |
| Interest | 2,069,834 | 1,948,482 |
| | 183,022,624 | 167,956,542 |
| **INCOME BEFORE TAX PROVISION** | 27,712,532 | 23,973,498 |
| Provision for Federal and foreign income taxes | | |
| Current | 9,050,000 | 6,761,000 |
| Future | 2,300,000 | 3,462,000 |
| | 11,350,000 | 10,223,000 |
| **NET INCOME FOR THE YEAR** | 16,362,532 | 13,750,498 |
| Prior years retained earnings | 67,325,599 | 60,236,978 |
| | 83,688,131 | 73,987,476 |
| Dividends: | | |
| Preferred: | | |
| Initial Series—$4.00 a share | 1,037,781 | 1,041,037 |
| Series B —$ .91 a share | 86,450 | |
| Common—$1.025 a share | 6,221,381 | 5,620,840 |
| | 7,345,612 | 6,661,877 |
| **RETAINED EARNINGS** | $ 76,342,519 | $ 67,325,599 |
| Depreciation included in costs and expenses (note 5) | $ 15,000,743 | $ 16,042,206 |

\*As restated, see note 1

MAXUS4858810
ALCD-PUBCOM_0002070

# CONSOLIDATED STATEMENT OF FINANCIAL POSITION

|  | December 31, | |
| --- | --- | --- |
| **ASSETS** | **1965** | **1964\*** |
| **CURRENT ASSETS** | | |
| Cash . . . . . . . . . . . . . . . . . . . | $ 6,255,903 | $ 12,566,557 |
| Marketable securities at cost, approximately market . | 7,747,937 | 13,444,847 |
| Notes and accounts receivable, less allowance for doubtful items . . . . . . . . . . . . . . | 33,866,942 | 28,333,131 |
| Inventories, at the lower of cost (partly lifo) or market: | | |
| Raw materials . . . . . . . . . . . . | 6,649,688 | 6,342,586 |
| Supplies . . . . . . . . . . . . . . | 5,908,191 | 4,985,333 |
| Finished and in process materials . . . . . . | 14,817,773 | 16,141,969 |
|  | 27,375,652 | 27,469,888 |
| Prepaid insurance, etc. . . . . . . . . . . | 1,274,373 | 1,372,790 |
|  | 76,520,807 | 83,187,213 |
| **INVESTMENTS** in and receivables from domestic and foreign associated companies, etc., at cost . . . | 28,127,319 | 13,183,972 |
| **PLANTS AND EQUIPMENT**, at cost | | |
| Plant sites and mineral reserves . . . . . . . . | 6,267,888 | 6,170,890 |
| Buildings, machinery and equipment . . . . . . | 256,120,058 | 234,665,776 |
|  | 262,387,946 | 240,836,666 |
| Less—Accumulated depreciation and depletion . . | 144,151,872 | 135,934,344 |
|  | 118,236,074 | 104,902,322 |
| **INTANGIBLE ASSETS** | | |
| Patents, trademarks, formulae, processes, etc. at cost, less amortization . . . . . . . . . . . | 1,582,884 | 1,789,609 |
| Excess of cost over value of net assets of companies acquired since 1960 . . . . . . . . . . | 7,616,040 | 7,616,040 |
|  | 9,198,924 | 9,405,649 |
| **DEFERRED CHARGES** . . . . . . . . . . | 1,732,861 | 1,672,497 |
|  | $233,815,985 | $212,351,653 |

\*As restated, see note 1

*OPEN HERE* _____

MAXUS4858811
ALCD-PUBCOM_0002071

Diamond Alkali Company 

| | December 31, | |
|---|---|---|
| **LIABILITIES** | **1965** | **1964**\* |
| CURRENT LIABILITIES | | |
| Notes payable . . . . . . . . . . . | $ 1,237,000 | |
| Long-term debt payable within one year | 847,375 | $ 1,244,905 |
| Accounts payable . . . . . . . . . . | 12,062,623 | 10,019,110 |
| Federal and foreign income taxes . . . | 7,812,839 | 6,411,745 |
| Employee Thrift Plan savings . . . . . | 1,627,643 | 1,523,748 |
| Other . . . . . . . . . . . . . . | 13,988,118 | 6,634,462 |
| | 37,575,598 | 25,833,970 |
| DEFERRED INCENTIVE COMPENSATION (net) . . | 691,663 | 530,321 |
| LONG TERM DEBT (less amounts due in 1966) | | |
| 3½% debentures due 1970-1978 . . . . | 11,096,000 | 12,410,000 |
| 4.65% Notes due 1970-1989 . . . . . | 30,000,000 | 30,000,000 |
| 3% Notes due 1967-1968 . . . . . . | 2,000,000 | 2,800,000 |
| Other . . . . . . . . . . . . . | 667,122 | 714,494 |
| | 43,763,122 | 45,924,494 |
| RESERVE FOR FUTURE FEDERAL INCOME TAXES . . . . . . . . . . . . . | 11,200,000 | 8,900,000 |
| STOCKHOLDERS' EQUITY | | |
| Preferred stock (notes 1 and 2) | | |
| Authorized 500,000 shares, no par value | | |
| Issued—$4.00 Preferred, convertible | | |
| 354,330 shares, $13 stated value . . . . . . . . | 4,606,290 | 4,607,993 |
| Common Stock (notes 2 and 3) | | |
| Authorized 9,000,000 shares, no par value | | |
| Issued—6,190,845 . . . . . . . . | 64,077,804 | 64,249,566 |
| Retained earnings per accompanying statement . . . . . . . . . . . | 76,342,519 | 67,325,599 |
| | 145,026,613 | 136,183,158 |
| Less—Common treasury stock— | | |
| 149,284 shares at cost . . . . . . . | 4,441,011 | 5,020,290 |
| | 140,585,602 | 131,162,868 |
| | $233,815,985 | $212,351,653 |

\*As restated, see note 1

33

MAXUS4858812
ALCD-PUBCOM_0002072

# Diamond Alkali Company

## HISTORICAL PROFIT AND LOSS INFORMATION

(In thousands of dollars, except per share of common stock and book value of common stock)

| | 1965 | 1964 | 1963 | 1962 | 1961 | 1960 | 1959 | 1958 | 1957 | 1956 |
|---|---|---|---|---|---|---|---|---|---|---|
| Sales of products | $208,593 | $178,497 | $160,076 | $158,731 | $148,994 | $138,301 | $137,874 | $114,186 | $122,635 | $121,262 |
| Interest, dividends, royalties, etc | 2,142 | 1,578 | 1,144 | 1,005 | 952 | 1,436 | 732 | 442 | 680 | 908 |
| Total | 210,735 | 180,075 | 161,220 | 159,736 | 149,946 | 139,737 | 138,606 | 114,628 | 123,315 | 122,170 |
| Cost of products sold | 153,131 | 131,435 | 119,456 | 118,119 | 110,155 | 100,757 | 100,071 | 87,631 | 92,729 | 86,636 |
| Selling and administrative expenses | 21,060 | 18,246 | 16,626 | 14,374 | 12,959 | 11,504 | 10,537 | 9,401 | 9,082 | 8,678 |
| Research and development expenses | 6,761 | 5,518 | 5,562 | 5,051 | 4,820 | 4,020 | 3,989 | 3,650 | 3,614 | 2,515 |
| Interest | 2,070 | 1,905 | 1,440 | 1,419 | 973 | 1,016 | 1,137 | 1,311 | 1,299 | 1,189 |
| Other deductions | | | | | | | | 417 | 1,568 | 1,145 |
| Total | 183,022 | 157,104 | 143,084 | 138,963 | 128,907 | 117,297 | 115,734 | 102,410 | 108,292 | 100,183 |
| Profit before income taxes | 27,713 | 22,971 | 18,136 | 20,773 | 21,039 | 22,440 | 22,872 | 12,218 | 15,023 | 21,987 |
| Provision for Federal and foreign income taxes | 11,350 | 9,780 | 7,470 | 9,800 | 10,166 | 10,700 | 11,540 | 5,743 | 7,988 | 11,607 |
| Net Income | $16,363 | $13,191 | $10,666 | $10,973 | $10,673 | $11,740 | $11,332 | $6,475 | $7,015 | $10,380 |
| Depreciation included in costs and expenses | $15,001 | $15,549 | $13,703 | $11,511 | $11,762 | $10,086 | $9,689 | $9,774 | $10,194 | $9,933 |
| Actual shares outstanding at year end | | | | | | | | | | |
| Preferred | 354,310 | 259,461 | 261,120 | 266,212 | 270,269 | | | | | |
| Common | 6,025,571 | 3,005,873 | 3,004,327 | 2,999,073 | 3,033,191 | 3,030,626 | 2,906,352 | 2,796,421 | 2,784,873 | 2,691,906 |
| Net income per common share (a) | $2.48 | $2.02 | $1.60 | $1.65 | $1.58 | $1.94 | $1.89 | $1.09 | $1.19 | $1.75 |
| Cash dividend per common share (a) | $1.02½ | $.92½ | $.90 | $.90 | $.90 | $.90 | $.87 | $.87 | $.85 | $.72 |
| Book value per common share (a) | $20.10(b) | $18.88(b) | $17.90(b) | $17.30(b) | $16.80(b) | $16.15 | $15.07 | $13.98 | $13.72 | $13.14 |
| Approximate market price range per common share (a) | 16-26 | 16-25 | 21-22 | 31-19 | 37-29 | 32-25 | 31-22 | 23-14 | 27-14 | 27-19 |
| Number of employees | 6,122 | 5,506 | 5,112 | 5,355 | 5,554 | 5,321 | 5,260 | 5,202 | 5,875 | 5,802 |
| Number of registered stockholders | | | | | | | | | | |
| Common | 10,818 | 9,541 | 9,843 | 10,267 | 10,193 | 10,358 | 8,316 | 7,184 | 6,364 | 5,498 |
| Preferred | 1,523 | 1,482 | 1,477 | 1,416 | 1,432 | | | | | |

(a) Adjusted for 2 for-1 split in 1965 and stock dividends in prior periods

(b) Assuming conversion of $4.00 Preferred Stock into Common

The results of Harte & Company, Inc are included for the year 1965 only

MAXUS4858813
ALCD-PUBCOM_0002073

# HISTORICAL BALANCE SHEET INFORMATION
(In thousands of dollars)

| ASSETS | 1965 | 1964 | 1963 | 1962 | 1961 | 1960 | 1959 | 1958 | 1957 | 1956 |
|---|---|---|---|---|---|---|---|---|---|---|
| **CURRENT ASSETS** | | | | | | | | | | |
| Cash and marketable securities | $ 14,004 | $ 24,453 | $ 5,827 | $ 5,033 | $ 7,654 | $ 11,011 | $ 14,658 | $ 6,031 | $ 6,651 | $ 14,691 |
| Receivables, less reserves | 31,867 | 26,161 | 21,185 | 19,979 | 19,385 | 15,553 | 18,989 | 14,262 | 13,494 | 11,056 |
| Inventories | 27,176 | 25,868 | 25,593 | 24,665 | 22,346 | 20,412 | 18,099 | 19,308 | 21,473 | 18,426 |
| Prepaid insurance, etc | 1,274 | 1,294 | 1,291 | 972 | 1,119 | 1,017 | 946 | 946 | 626 | 1,039 |
| | 76,521 | 71,776 | 51,836 | 50,649 | 51,184 | 43,993 | 51,906 | 40,547 | 42,244 | 47,212 |
| **INVESTMENTS** | 28,127 | 18,505 | 16,348 | 13,690 | 3,515 | 2,728 | 2,664 | 4,063 | 2,597 | 3,155 |
| **PLANT AND EQUIPMENT** | | | | | | | | | | |
| Plant sites and mineral reserves | 6,268 | 5,842 | 5,942 | 5,785 | 5,264 | 4,488 | 2,851 | 2,831 | 2,871 | 2,664 |
| Buildings, machinery and equipment | 256,108 | 228,908 | 230,993 | 212,895 | 205,041 | 180,051 | 170,212 | 163,810 | 162,165 | 141,708 |
| | 262,108 | 234,810 | 236,639 | 218,680 | 210,305 | 184,539 | 173,063 | 166,641 | 165,036 | 145,942 |
| Less Accumulated depreciation, amortization, etc | 144,112 | 132,933 | 126,659 | 115,841 | 105,143 | 93,166 | 85,794 | 78,378 | 71,827 | 62,852 |
| | 118,316 | 101,857 | 104,228 | 102,815 | 105,162 | 91,373 | 87,269 | 88,263 | 93,209 | 83,100 |
| **INTANGIBLE ASSETS** | 9,199 | | 6,402 | 6,190 | 7,459 | | 1,065 | | 980 | 263 |
| **DEFERRED CHARGES** | 1,270 | 1,648 | 1,419 | 1,074 | 1,112 | 867 | 1,065 | 851 | 980 | 263 |
| | $231,816 | $205,628 | $181,701 | $175,018 | $168,432 | $142,861 | $142,904 | $133,726 | $139,030 | $131,970 |
| **LIABILITIES** | | | | | | | | | | |
| **CURRENT LIABILITIES** | | | | | | | | | | |
| Notes payable | $ 2,084 | $ 1,200 | $ 5,389 | $ 4,535 | $ 2,444 | $ 2,444 | $ 2,632 | $ 5,944 | $ 7,694 | $ 144 |
| Accounts payable | 12,063 | 9,513 | 7,608 | 6,992 | 6,330 | 5,281 | 5,421 | 3,824 | 3,390 | 4,441 |
| Federal and foreign income taxes | 1,811 | 6,017 | 5,534 | 6,246 | 9,411 | 7,283 | 11,023 | 5,731 | 7,116 | 11,417 |
| Other current liabilities | 15,615 | 7,724 | 5,689 | 6,903 | 6,051 | 4,306 | 5,139 | 4,449 | 3,844 | 1,310 |
| | 17,575 | 24,314 | 24,210 | 24,386 | 24,236 | 19,314 | 24,315 | 19,950 | 21,664 | 18,314 |
| **DEFERRED INCENTIVE COMPENSATION** | 692 | 510 | 299 | 167 | 449 | 704 | 642 | 159 | 240 | 640 |
| **LONG-TERM DEBT** | 41,761 | 45,210 | 31,755 | 30,619 | 29,194 | 24,730 | 27,222 | 30,383 | 34,611 | 15,806 |
| **FUTURE FEDERAL INCOME TAX** | 11,200 | 8,900 | 5,618 | 3,200 | | | | | | |
| **STOCKHOLDERS' EQUITY** | | | | | | | | | | |
| Preferred stock | 4,606 | 1,333 | 3,194 | 3,461 | 3,514 | 10,561 | 29,198 | 28,086 | 28,003 | 27,107 |
| Common stock | 64,018 | 64,250 | 64,787 | 64,746 | 30,785 | 29,310 | 23,523 | 18,483 | 18,294 | 16,145 |
| Capital surplus | 76,341 | 61,826 | 57,245 | 53,042 | 33,306 | 39,309 | 38,032 | 16,871 | 15,420 | 13,444 |
| Retained earnings | 4,441 | 4,935 | 4,837 | 4,509 | 48,831 | 19,047 | 90,125 | 81,224 | 81,515 | 406 |
| Less Common treasury stock | 140,586 | 126,474 | 120,009 | 116,246 | 114,293 | 98,213 | 90,125 | 81,224 | 81,515 | 78,090 |
| | $231,816 | $205,628 | $181,701 | $175,018 | $168,432 | $142,861 | $142,904 | $133,726 | $139,030 | $131,970 |
| **WORKING CAPITAL** | $ 18,946 | $ 53,262 | $ 29,716 | $ 28,065 | $ 26,648 | $ 28,679 | $ 27,691 | $ 20,197 | $ 19,380 | $ 28,418 |
| **CAPITAL EXPENDITURES** | $ 20,711 | $ 14,009 | $ 15,205 | $ 10,613 | $ 16,806 | $ 15,150 | $ 9,559 | $ 6,905 | $ 20,145 | $ 11,757 |

The accounts of Hate & Company, Inc. are included only in the year 1965

MAXUS4858814
ALCD-PUBCOM_0002074

## NOTES TO 1965 FINANCIAL STATEMENTS

### NOTE 1

In September 1965, Diamond acquired the remaining sixty percent of the shares of Harte & Company, Inc., in exchange for 95,000 shares of $4.00 Preferred Stock—Series B. Previously, in May, 1962, Diamond had acquired forty percent of the shares of Harte for cash.

In the accompanying financial statements the September, 1965, transaction is treated as a "pooling of interests", and the May, 1962, transaction as a purchase. Accordingly, the consolidated financial statements combine the accounts and results of operations of Diamond and Harte for the years 1965 and 1964, with appropriate elimination of that part of Harte retained earnings applicable to the forty percent interest prior to the purchase by Diamond.

### NOTE 2

The $4.00 Preferred Stock—Initial Series and Series B are voting, cumulative, and convertible into Common at the rate of 2.6 shares of Common for each share of Preferred. The Initial Series is callable on or after September 1, 1966, at $100 a share. The Series B is callable on or after October 1, 1970, at $100 a share. At December 31, 1965, 921,258 shares of Common were reserved for conversion of the $4.00 Preferred.

### NOTE 3

The 1965 transactions in connection with the stock option plans were as follows, in shares, adjusted for stock split in 1965:

|  | Stock Option Plan | | Employee Thrift Plan | |
|  | Under Option | Available for Option | Under Option | Available for Option |
|---|---|---|---|---|
| December 31, 1964 . . . . . . | 38,460 | 64,812 | 170,954 | 81,824 |
| Granted, $31.75 a share . . . |  |  | 4,082 | (4,082) |
| Exercised . . . . . . . . . | (5,510) |  | (51,264) |  |
| Cancelled . . . . . . . . . | (980) | 980 | (14,967) | 14,967 |
| December 31, 1965 . . . . . | 31,970 | 65,792 | 108,805 | 92,709 |
| Price range of shares under option, equal to the market price on dates options were granted | $23.50 to $28.25 | | $24.94 to $31.75 | |

### NOTE 4

In accordance with the terms of the Incentive Compensation Plan adopted by the stockholders at the 1953 annual meeting, $670,000 was charged to income for the year 1965. In January, 1966, 15,585 shares of treasury stock were allocated to the 1965 incentive compensation awards.

### NOTE 5

Depreciation has been computed on the same basis for both years. The decrease in 1965, compared with 1964, is attributable to the inclusion of $2,050,000 depreciation in 1964 for the Painesville Cement Plant which was sold in that year.

### NOTE 6

At December 31, 1965, Diamond had long-term leases for (a) tank cars and barges with annual rentals of $1,201,000 for an average of seven years, (b) for the Mobile Plant with an average rental of $380,000 for seventeen years, and (c) for office space, warehouses, etc., with annual rentals of $677,000 for an average of seven years. In addition, rentals under short term leases, principally tank cars, approximated $465,000 annually for three years.

Diamond was contingently liable in the amount of $1,545,000 for loan guarantees. Authorization and contracts for new plant facilities approximated $28,300,000 at December 31, 1965.

### NOTE 7

Reference is made to Page 2 for information regarding the litigation brought by the Federal Trade Commission and Justice Department.

MAXUS4858815
ALCD-PUBCOM_0002075

# OPINION OF INDEPENDENT ACCOUNTANTS

TO THE STOCKHOLDERS AND THE BOARD OF DIRECTORS
OF DIAMOND ALKALI COMPANY

In our opinion, the accompanying statement of financial position and the statement of
income and retained earnings for 1965, present fairly the consolidated financial position
of Diamond Alkali Company and subsidiary companies at December 31, 1965 and the
consolidated results of their operations for the year then ended, in conformity with
generally accepted accounting principles applied on a basis consistent with that of
the preceding year restated as indicated in Note 1 Our examination of these statements
was made in accordance with generally accepted auditing standards and accordingly
included such tests of the accounting records and such other auditing procedures as we
considered necessary in the circumstances

Cleveland, Ohio
February 14, 1966

*Price Waterhouse & Co.*

39

MAXUS4858816
ALCD-PUBCOM_0002076

BOARD OF DIRECTORS

RAYMOND F. EVANS*
*Chairman of the Board*

WILLIAM H. EVANS
*Limited Partner*
*Ball, Burge & Kraus*
*Cleveland, Ohio*

JAMES A. HUGHES*
*Vice Chairman of the Board*

ALBERT H. INGLEY
*Formerly Executive Vice President*

JOHN A. MAYER*
*President*
*Mellon National Bank and Trust Company*
*Pittsburgh, Pennsylvania*

WILLIAM H. McCONNELL
*(Resigned December 31, 1965)*
*Formerly Executive Vice President*

WALLACE R. PERSONS, JR. *
*Chairman*
*Emerson Electric Company*
*St. Louis, Missouri*

ALEXIS E. POST
*Consultant*
*Formerly President*
*Chemical Process Company*
*now the Western Division of the Company*
*San Francisco, California*

JOHN W. REAVIS*
*Managing Partner*
*Jones, Day, Cockley & Reavis*
*Cleveland, Ohio*

FRED S. STRAUSS
*(Elected January 20, 1966)*
*President*
*Harte & Company, Inc.*
*A subsidiary of the Company*
*New York, New York*

ARTHUR B. TILLMAN*
*President*

JOHN C. VIRDEN*
*Chairman of the Board*
*Eaton Yale & Towne, Inc.*
*Cleveland, Ohio*

*EXECUTIVE COMMITTEE

MAXUS4858817
ALCD-PUBCOM_0002077

**Diamond Alkali Company** 

## MANAGEMENT PERSONNEL

| | |
|---|---|
| **OFFICERS** | RAYMOND F EVANS, *Chairman of the Board and Chief Executive Officer* |
| | JAMES A. HUGHES, *Vice Chairman of the Board* |
| | ARTHUR B TILLMAN, *President* |
| | FRANK CHRENCIK, *Vice President* |
| | FRANK W JARVIS, *Vice President* |
| | WILLIAM L MCFADDEN, *Vice President* |
| | RAYMOND H ARMOR, *Controller* |
| | WILLIAM A CRICHLEY, *Treasurer* |
| | JOHN A WILSON, *Secretary and General Counsel* |
| | ROBERT K BUETTNER, *Assistant Treasurer* |
| | PETER J. JOYCE, *Assistant Controller* |
| | EDWARD J MASEK, *Assistant Secretary* |
| | JAMES E. SPAUDE, *Assistant Controller* |
| **DIVISION GENERAL MANAGERS** | DONALD S CATTERSON, *Western Division* |
| | HARRY E CONNORS, JR., *Plastics Division* |
| | JOHN S CORT, JR., *Agricultural Chemicals Division* |
| | WARREN DUSENBURY, *Specialty Chemicals Division* |
| | FRANK W JARVIS, *Industrial Chemicals Division* |
| | S S SAVAGE, *International Division* |
| | L. T WELSHANS, *Cement-Coke Division* |
| **WORKS MANAGERS** | W J BUTLER, *Houston-Deer Park Plant* |
| | M O KIRP, *Painesville Plant* |
| **STAFF EXECUTIVES** | C R BROWN, *Director of Employee and Public Relations* |
| | HENRY B CLARK, *Director of Marketing— Industrial Chemicals Division* |
| | HOWARD E. EVERSON, *Director of Research* |
| | CHESTER D. JONES, *Director of Purchasing* |
| | ANDREW G KRIDL, *Director of Development* |
| | JOHN W MANTZ, *Director of Trade Development* |
| | STEVE PUSCHAVER, *Director of Operations— Industrial Chemicals Division* |
| | FRANCIS H. ROCKWELL, *Director of Engineering* |
| | ROBERT C SUTTER, *Assistant to the President* |
| | JOHN H. WILHARM, *Director of Transportation* |
| Independent Accountants | Price Waterhouse & Co , Cleveland, Ohio |
| Transfer Agents, Common and $4 00 Preferred Stocks | Mellon National Bank & Trust Company, Pittsburgh, Pa Bankers Trust Company, New York, New York |
| Registrars, Common and $4 00 Preferred Stocks | Pittsburgh National Bank, Pittsburgh, Pa. Chemical Bank New York Trust Company, New York, New York |
| Stock Listing | New York Stock Exchange |

Printed in U S A

MAXUS4858818

ALCD-PUBCOM_0002078

# EXHIBIT 41

OxyChem's Comments in Opposition to Proposed Consent Decree,
*United States v. Alden Leeds, Inc., et al.*, Civil Action No. 2:22-cv-07326 (D.N.J.)

ALCD-PUBCOM_0002079

Diamond Shamrock Corporation Annual Report 1967

OCCN0005968

ALCD-PUBCOM_0002080

**Diamond Shamrock Corporation Annual Report 1967**

**Highlights of 1967**

| | 1967 | 1966[1] |
|---|---|---|
| **Net Sales** | $411,171,000 | $396,957,000 |
| **Net Income** | $34,742,000[2] | $34,369,000 |
| **Per Share** *based on average shares outstanding after preferred dividends* | $2.32[2] | $2.30 |
| **Dividends Per Common Share** | | |
| *Paid* | $1.25 | $1.125 |
| *Current annual rate* | $1.40 | $1.20 |
| **Common Shares Outstanding** | | |
| *At year-end* | 11,723,513 | 11,684,573 |
| *Average for the year* | 11,700,214 | 11,618,546 |
| **Book Value** *per share of common stock assuming conversion of all preferred stock* | $17.65 | $16.67 |
| **Capital Expenditures** | $69,931,000 | $53,195,000 |
| **Number of Stockholders** | | |
| *Preferred* | 16,587 | 1,584[3] |
| *Common* | 28,136 | 15,086[3] |
| **Number of Employees** | 9,381 | 6,550[3] |

[1] *Restated to include companies merged into Diamond in 1967*
[2] *Before extraordinary items*
[3] *Diamond Alkali Company only*

OCCNJ0005969

ALCD-PUBCOM_0002081



*Left to right: C. A. Cash, executive
vice president of the corporation
and president, Diamond Shamrock Oil
and Gas Company; Arthur B. Tillman,
executive vice president of the
corporation and president, Diamond
Shamrock Chemical Company; James
A. Hughes, president of the
corporation; Raymond F. Evans,
chairman and chief executive officer;
J. H. Dunn, chairman of the
executive committee.*

OCCNJ0005970

ALCD-PUBCOM_0002082

## To Our Stockholders and Employees

During 1967 we made substantial progress toward our long-term corporate objectives. As a result of several significant transactions, all of which were linked to our growth strategy, we were able to expand our position in chemical specialties, broaden our line of plastics and provide a solid foundation for further development of our position in petrochemicals.

Item: In May the merger of Nopco Chemical Company into Diamond Alkali Company gave us a strong position as a supplier of a wide range of chemical specialties to the textile, paper, leather and many other industries, as a producer of urethane plastics and as a supplier of fine chemicals such as vitamins and animal health products.

Item: In August the acquisition of the polypropylene resin and film plants of Alamo Industries, Inc. put us into a new and rapidly growing area of the plastics industry where our marketing and technical skills in polyvinyl chloride can be applied advantageously to the development of a position in polypropylene.

Item: In December the merger of The Shamrock Oil and Gas Corporation into Diamond gave us the oil and gas producing, processing and refining capability and the hydrocarbon raw material position which, when coupled with our marketing abilities, provide the basis for a strong position in petrochemicals.

### A New Look

As a result of these developments your company has acquired a new look. Only a year ago about 60% of our sales were in heavy commodity chemicals, products characterized by relatively slow growth, severe price competition and heavy capital requirements. Today our business is much better balanced. Based upon forecasts for 1968 our sales break down into five broad areas as follows: commodity chemicals, 29%; plastics and resins, 20%; specialty chemicals, 15%; agricultural chemicals, 12%; oil and gas products, 24%.

### A New Name

In order to accent the new look, and because the word Alkali no longer does justice to the breadth and scope of our business, we adopted in December the name Diamond Shamrock Corporation. At the same time we made a number of organizational adjustments, described elsewhere in this report, which give full scope to the abilities and skills of our people.

### Financial Results

Earnings per share in 1967 established another record, reaching $2.32 after preferred dividends, compared to $2.30 per share for 1966, restated to give effect to the mergers described above. On this basis, 1967 was the sixth consecutive year of gains in earnings per share. Sales rose by 3.6% to $411,171,000 another new high.

Dividends on common stock were again increased, for the fourth consecutive year, and amounted to $1.25 per share. In December the dividend was increased to $1.40 annual rate.

### People

We take this opportunity to welcome the new employees and stockholders who joined us in 1967, especially the 2,800 employees and 15,000 stockholders of Nopco and Shamrock. The loyalty and devotion to duty of the 9,381 men and women who now comprise the Diamond Shamrock organization are our greatest strength.

### Outlook

We look forward to an exciting and challenging year in 1968, as we develop the opportunities resulting from the mergers and the acquisition of last year. Barring a substantial weakening in the economy, we look for further gains in sales and earnings.

Raymond F. Evans, *Chairman of the Board*

Cleveland, Ohio    February 27, 1968

3

OCCNJ0005971

ALCD-PUBCOM_0002083





*Diamond Shamrock is an important factor in the expanding agricultural life of the Texas panhandle and nearby states. The anhydrous ammonia plant in the background (above) provides nitrogen-rich fertilizer to increase productivity of land irrigated by means of pumps powered by Diamond Shamrock natural gas.*

*From storage tanks like this one (right) of 20,000 tons capacity at the McKee, Texas plant, Diamond Shamrock supplies Nitromite*, its brand of anhydrous ammonia fertilizer, in a network of dealers serving Texas, Colorado, Kansas, Oklahoma, Nebraska and New Mexico.*

*At the McKee refinery, stocks of refined products (facing page) await transmission by pipeline to jobbers and dealers. Products include motor fuel, aviation gasoline, jet fuel and turbine fuel.*

OCCNJ0005972

ALCD-PUBCOM_0002084

## Major Expansions Mark the Year

Three major expansions of the corporation's business were completed in 1967. They were the merger with Nopco Chemical Company, the merger with The Shamrock Oil and Gas Corporation and the acquisition of the polypropylene business of Alamo Industries, Inc. These transactions represent an important step toward the achievement of the corporation's long range objectives, which include a leadership position in profitable growth in the total chemical industry and a reduction in cyclical variations in corporate performance.

The events of the year laid a solid foundation for steady growth in sales and profitability in the years ahead. The expansions add greatly to our business in organic specialty chemicals and plastics, and give us strong positions in several new markets, including fertilizers and animal health products. In addition, the Shamrock merger guarantees us a supply of natural gas in the ground large enough to meet requirements for the foreseeable future.

Diamond Shamrock is for all practical purposes a new company, with an entirely different product balance from that described in last year's report. The portion of our business in specialty and proprietary products, as contrasted with basic commodities, has sharply increased. Proprietary products in our specialty chemicals, plastics and agricultural chemicals operations are an increasingly important part of the total and represent both a promise of rapid growth and a potential level of profitability consistent with our targets. The new diversification of the company also brings with it a much broader customer base.

### Shamrock



The former Shamrock operations now constitute Diamond Shamrock Oil and Gas Company. Headquartered in Amarillo, Texas, it engages in all phases of the oil and gas business, including exploring for, producing, refining, marketing and transporting oil, gas and petroleum products. It also produces and sells anhydrous ammonia. Its markets for these products include Texas, New Mexico, Colorado, Oklahoma, Arizona, Kansas, Nebraska, Wyoming and Utah. Details on the Oil and Gas Company operations for the year appear elsewhere in this report.

Shamrock brings to the corporation important product diversification, increased financial strength and new skills.

With the growth in recent years of the corporation's plastics, agricultural chemicals, and organic specialty chemicals business, it became apparent that a basic source of organic raw materials would eventually be required. Shamrock, with its proven reserves of oil and gas, integrates the corporation from hydrocarbon raw materials to finished products in the field of organic chemistry.

In processing natural gas, liquid hydrocarbons such as propane and butanes are produced. At the present time, Diamond Shamrock Oil and Gas Company utilizes much of its natural gas liquids in refining operations to produce automobile and aviation fuels for sale under the Shamrock trademark. These natural gas liquids, however, may also be used in the production of organic chemicals. They can be converted into products such as ethylene, a raw material used in the production of established company products such as polyvinyl chloride and chlorinated solvents. Other raw materials which could be made available from refining and natural gas processing operations would be suitable for the manufacture of aromatics such as xylene and benzene which are intermediates in the production of agricultural chemical products.

The combining of the skills of the two merged companies in hydrocarbon chemistry will help the Oil and Gas Company upgrade its basic hydrocarbon raw materials to build more varied and profitable markets.

Shamrock also brings to the corporation a well-established position in the agricultural market of its region. Diamond, Nopco and Shamrock have all been active in different ways in farm and agricultural sales, Shamrock primarily in fuels and fertilizers, Diamond primarily in insecticides, herbicides and fungicides and Nopco primarily in animal feed and health products. Diamond Shamrock, by combining these efforts, can supply a more complete line of products through an expanded marketing network.

5

OCCNJ0005973
ALCD-PUBCOM_0002085

One of Diamond's goals has been the upgrading of its own basic chemicals into specialty and proprietary products. The merger with Nopco Chemical Company represents a major step forward in this direction. The Nopco Division's product line has for the first time given us a significant position in organic specialties.

The division, with headquarters in Newark, New Jersey, produces specialty chemicals developed for specific end use applications in industry and also fine chemicals such as vitamins and animal feed supplements.

Some Nopco specialties supplement and broaden the company's existing line of chemicals used in the production of paper, textiles and leather. Nopco's marketing, product development and research will be major factors in facilitating further expansion of the corporation's specialty chemicals business.

Nopco Division's fine chemicals represent an essentially new market for Diamond Shamrock. Vitamins for human consumption are an entirely new business for us, while animal feed supplements combining vitamins, antibiotics and other materials relate to the company's existing agricultural chemical markets.

Nopco urethane foam products, now transferred to a newly formed Resinous Products Division, give Diamond Shamrock another important plastic product line. These foams are sold for cushioning and bedding, as textile innerlinings and for a variety of industrial uses.

**Polypropylene Resins and Film**

The third key addition to Diamond Shamrock's business during 1967 was the purchase from Alamo Industries, Inc. of facilities near Houston, Texas, for the manufacture of polypropylene resins and of a Stratford, Connecticut, plant making packaging film. Polypropylene is the fastest growing large volume thermoplastic material. In ten years, the market is expected to grow to several times its present size.

The principal uses for the resins are molded parts for the automotive and appliance industries and fibers for carpeting and rope. Polypropylene film is used for food, textile and other packaging.

Our plastic business now includes polyvinyl chloride resins and compounds, urethane foam, polyethylene and polyvinyl chloride sheet and film, polypropylene resins and film, and polyester resins. Through its Harte & Company, Inc. subsidiary, Diamond Shamrock also produces finished consumer products such as automobile floor mats and kitchen accessories made of polyvinyl chloride.

## Chemical Sales Remain Steady

Overall, dollar sales and volume of the company's chemical products were about the same as in 1966. Profits eased as prices weakened and unit production costs continued to rise. The company's chemical selling price index dropped 3%. Plants operated at approximately 86% of rated capacity, as opposed to 91% of a slightly smaller total capacity last year.

**Industrial Chemicals Group**

Demand for chlorine was off, partially as a result of weaknesses in the demand for vinyl monomer. Caustic soda and muriatic acid sales dropped moderately. However, modest increases were recorded for potassium hydroxide, potassium carbonate and solvents.

Production and sale of soda ash and sodium bichromate remained at high levels, utilizing plant capacity to the fullest.

During the year, the Industrial Chemicals group, which includes the Electro Chemicals and Soda Products Divisions, added significantly to production capacity. A 200-ton a day expansion of the Delaware City, Delaware, chlorine-caustic soda plant came on stream in December.

At Deer Park, Texas, a major expansion of perchlorethylene facilities and a new trichlorethylene plant are nearing completion. These will expand combined production of the two products to 150 million pounds a year. Methylene chloride and chloroform output will be doubled by an expansion at Belle, West Virginia, to be completed this year.



*The McKee refinery (above) with twin catalytic cracking towers at the left, has a capacity of 35,000 barrels of crude oil daily. Most of the motor fuel it produces is marketed through a network of about 1,200 Shamrock service stations (far right).*

*At Diamond Shamrock's gas plant (right) liquid hydrocarbons are removed from natural gas and fractionated into such materials as propane and butanes.*

**OCCNJ0005974**

ALCD-PUBCOM_0002086







7

OCCNJ0005975

ALCD-PUBCOM_0002087



OCCNJ0005976

ALCD-PUBCOM_0002088





Through process improvements soda ash and chromic acid production capacities have also been increased.

The Industrial Chemicals group continues to build markets by innovations in shipping and handling techniques. Last year a new plastic-lined corrugated box for the shipment of dry caustic was introduced to replace conventional drums. It offers advantages of cost and handling and has given us an excellent competitive position. Industry is also enthusiastically receiving the Source to Silo™ bulk handling system for dry caustic soda introduced in 1966.

We are working with several major steel producers to develop economically feasible methods for the recovery of iron and chloride from ferrous chloride wastes. This work shows excellent promise of yielding a profitable and productive solution to a major waste disposal problem faced by the steel industry.

The company continues to improve manufacturing technology for basic products like chlorine and caustic soda.

### Specialty Chemicals

Sales of the Specialty Chemicals group, comprising the Nopco Division and the Specialty Chemicals Division, held steady.

Nopco's Fine Chemicals Department continued to build sales in dairy acid and chlortetracyclene products. A new water-soluble chlortetracyclene product for use in poultry feeding systems was introduced and a number of other animal health products were developed. Increases in these product areas more than offset greatly reduced sales of methionine, the use of which is down because of the competition of fish meal.

Two new Fine Chemicals plants went on stream in 1967: a choline chloride plant at Louisville and a mixing and packaging plant at Fresno, California. Additional capacity for vitamin production at the Harrison, New Jersey, plant was achieved through process improvements.

During the year Nopco introduced new specialties tailored especially for use in the sugar beet processing, textile finishing, paper coating, rubber and plastic compounding, metalworking and agricultural chemicals industries. A continuing program of new equipment installation at all plants makes it possible to get newly developed specialties into production rapidly and efficiently.

In chrome specialties the Specialty Chemicals Division increased its share of the market despite strong competition. Sales of specialty products to the food processing, laundry, boxboard and foundry industries showed excellent growth and profit performance. For some of the less specialized products in the division there were marked weaknesses in demand. For example, there were sharp declines in bichromates for the manufacture of shoe leather, price weaknesses in perchlorethylene and slumps in both the chlorinated paraffin and chromic acid markets.

Many new products were launched during 1967 by the Specialty Chemicals Division, including a series of detergents for cleaning operations in breweries; five new laundry sours for commercial laundry operations; a new water repellent sizing for the dry cleaning trade, and a line of brighteners and chromate conversion coatings for the electroplating chemicals line.

Consolidation of the Nopco and the Diamond Leather Chemicals departments has been completed, resulting in a broader and stronger position in the leather field. A new light-fast syntan and a new line of cationic polymers were marketed during the year.

### Agricultural Chemicals

For the Agricultural Chemicals Division, 1967 was a year of solid gains.

During the year the price of Dacthal™, a proprietary pre-emergence herbicide, was substantially reduced. At the same time plans were announced for the construction of a major new production facility for this product that will more than double our present capacity and substantially reduce production costs when it goes on stream late in

*Animal feed ingredients (facing page) produced by the Nopco Chemical Division find their way into the diets of various farm animals to help build the country's food supply. In Nopco's Agricultural Research and Development laboratory (top) the effects of antibiotics, vitamins, amino acids and other nutritional additives on growth, egg production and feed utilization are studied. Diamond Shamrock is one of the largest manufacturers of nutritional supplements and animal health products.*

*Strands of yarn (above) are checked for their reaction to friction in a Nopco laboratory. Nopco textile lubricants are specially formulated to improve fabrics for rugs, clothes and furniture. The merger with Nopco has increased the company's business in such specialty chemicals several fold.*

OCCNJ0005977
ALCD-PUBCOM_0002089



OCCNJ0005978

ALCD-PUBCOM_0002090



1968. These moves were made to enable Dacthal to penetrate for the first time the huge herbicide market represented by soybeans and cotton crops. Results of this effort will begin to be realized during 1969.

A new non-mercurial fungicide, effective against a broad spectrum of fungus diseases in plants, was successfully introduced for turf and ornamental markets during 1967. Called Daconil 2787®, it is a very promising product. Clearance for use in this country on specific food crops is expected in 1968.

A new product to control diseases in ornamental plants grown in greenhouses has also been introduced. Called Termil®, it comes in a unique tablet form that gives off a superfine vapor dust when heated, eliminating the need for spraying. It is being tested on a variety of plants and broader applications are being developed.

Early in 1967 a new multi-million pound capacity arsonate plant was put on stream in Greens Bayou, Texas. It is increasing production of Daconate®, the company's proprietary arsonate-surfactant mix. These arsonates are used as post-emergence herbicides in cotton and to control unwanted vegetation in non-crop areas.

Heritage House, part of the Agricultural Chemicals Division, producing and marketing lawn and garden care products, continued to improve operations during the year. Eleven new products were developed in preparation for the 1968 season. For the first time the Heritage House product line is complete and it is being backed by a strong advertising and sales promotion campaign in certain sections of the country.

Diamond Shamrock Oil and Gas Company's production of anhydrous ammonia fertilizer increased by 65% over the previous year. It continued to expand its dealer organization in the agricultural area of the Texas Panhandle, West Texas, Colorado, Kansas, Oklahoma, Nebraska and New Mexico. By year-end the number of dealers selling Nitromite®, the company's brand of ammonia, had increased significantly.

## Plastics Sales Continue Growth

In 1967 sales increases were achieved for nearly all of the company's plastics product lines. Including the new polypropylene resin, film and sheet business, overall sales were up 7%. Demand was especially strong for special purpose PVC resins. However, extreme price weaknesses for general purpose PVC resins resulted in a decline in plastics profits.

### Plastics Division

During the year several important new PVC products were introduced by the Plastics Division. A series of non-dusting compounds, named Intamix™, offers customers increased output together with ease and economy of handling. Introduced in January of 1967, Intamix compounds already account for the majority of the company's rigid PVC compound sales. Another newly introduced product with great potential is a PVC compound with improved weatherability designed for the extrusion of siding and trim for outdoor use.

The division introduced a new PVC bottle compound that combines substantially increased impact resistance with high clarity. Sales of bottle compounds have increased and the company maintains its position as the major supplier of raw materials to PVC bottle producers.

Facilities at Deer Park for producing Intamix compounds were expanded and a new dispersion paste resin facility, increasing capacity for this type of product by 75%, went on stream at Delaware City.

The newly acquired polypropylene operations are the responsibility of the Plastics Division. Alamo Industries has agreed to purchase a gradually decreasing portion of the resin produced by these facilities, while we are strengthening our technical capabilities and building markets in the polypropylene area. Capacity of the Monument, Texas, resin plant has been doubled to approximately 70 million pounds a year and a new polypropylene applications research and development facility is under construction at our Research Center located at Concord, Ohio.

### Resinous Products Division

During the year a new Resinous Products Division was formed by consolidating the Nopcofoam® urethane operations of the Nopco Division with the Dion® polyester and the Duolite® Ion Exchange resin operations of the former Western Division.

*Acquisition of this plant (left and above) at Monument, Texas, put Diamond Shamrock into the polypropylene business in a substantial way. The fastest growing large volume thermoplastic material, polypropylene is finding increasing uses in food and textile packaging, molded parts for automobiles and appliances and fibers for carpeting and rope.*





One of the company's most recent consumer product innovations is a strikingly patterned vinyl quilt (above) for automobile or home from Harte & Company, Inc. Harte's line of consumer products is marketed nationwide through department stores and large national chains.

A new calender at Harte's plant at Manasquan, Pennsylvania (right) transforms vinyl compound by heat and pressure into film and sheeting in an unmatched range of gauges and widths. Automated controls (facing page) are one of the many technical advances engineered into this model new plant.

OCCNJ0005980

ALCD-PUBCOM_0002092

Urethanes and polyesters are both thermosetting plastics with overlapping technologies, a factor which will help the new division increase efficiencies in the production, product development and marketing of these products.

The division will also have the job of building a national market for Dion polyester resins which are now marketed principally in the West.

Construction of a new polyester resin facility at Oxnard, California, is now under way. It will double the division's polyester capacity when it goes on stream during 1968. A series of newly developed fire retardant resins will be produced at the new facility, as will orthophthalic and isophthalic polyesters for the Southern California market.

Dion FR ® fire retardant resins show advantages over existing polyesters, including better physical properties and lower flame spread ratings. In addition, they require less modification by customers. The division has also developed a series of Dion Cor-Res® polyester resins showing outstanding corrosion resistance. Field testing of both the fire retardant and corrosion resistant resins is now in the final stages. Both have been well received in the market place and will be made commercially available when the Oxnard facility is completed.

The first pollution control ducting system made of fiberglass-reinforced Dion Cor-Res is being installed this year. It will collect and dispose of highly corrosive fumes in an industrial operation. Many other industrial applications of this nature, using equipment fabricated from these new specialty polyesters, are expected in the near future.



Active expansion of our Duolite ion exchange resins business continues at home and abroad. Important fields of applications include water conditioning for homes and industry, processing sugar, glycerin, wine and dairy products, concentrating radioactive wastes and removing organic contaminants from water supplies. Recent experimental work done by the division shows Duolite adsorbent resins to be more effective than conventional earth filters in the removal of color from streams polluted by organic matter. Potentially, pollution abatement represents an important market for our ion exchange resin products.

The recent emphasis on aircraft and automotive safety has influenced the direction of product development in the urethane foam area. Semi-flexible systems with stringent energy absorption characteristics were developed during the year and introduced to automobile makers. A new non-burning foam was marketed and is the only one of its type now being accepted by a leading aircraft manufacturer. This development will be increasingly important during the next several years as the furniture upholstering market turns to non-burning material. New equipment installed during the year is increasing the productivity of urethane foam operations and several changes in the product line have reduced production costs.

### Harte & Company, Inc.

During the year, Harte & Company, Inc., a wholly owned subsidiary which is one of the world's largest producers of PVC and polyethylene film and sheeting, again achieved major advances in the development of new products for consumer markets. Vistaquilt®, a decorative quilted PVC sheeting, used in juvenile and closet accessories, has met with excellent response. Strikingly patterned vinyl mats for the car, kitchen and bath are now being introduced at the retail level. Harte's consumer products are marketed through major department stores and other outlets throughout the country, including large national chain stores.

Capacity at Harte's new Mountaintop, Pennsylvania, plant was expanded during the year by the installation of new equipment. The addition of new equipment at Plicose Manufacturing Corporation, a Harte subsidiary, resulted in increased production capacity for polyethylene film, sheeting and bags. During the final quarter of the year, production in the company's Venezuela plant was also stepped up and was expanded to include new items.

### Oil and Gas Company Sales, Profits Increase

Sales of Diamond Shamrock Oil and Gas Company amounted to about 24% of the corporation's total and were at record levels, increasing 11% over the previous year. Earnings rose even more—by almost 19%—as sales volumes increased and prices of refined products were generally better than in 1966.

13

OCCNJ0005981
ALCD-PUBCOM_0002093

## Exploration and Development

Expenditures for exploration and development were increased by approximately 30% in an expansion of the company's drilling program. A total of 115 net new wells were completed, of which 44 were oil wells, 44 were gas wells and 27 were dry holes. This represents an increase of 21 producing wells over 1966 results with an increase of only 5 dry holes.

At the end of the year the company held leases covering approximately 1,094,600 net acres not including Colombia. Leases considered proven for oil and gas production totalled about 393,600 acres.

During the year the company opened a new exploration office in Calgary, Canada, and acquired a 20% interest in concessions and applications covering more than one million acres in Colombia, South America. Exploratory programs will be continued in both Canada and Colombia during 1968.

## Crude Oil Production and Refining

Net interest crude oil production averaged about 6,500 barrels daily, a 4% increase over 1966 levels. Refinery operations were up more than 8% as the company continued to increase crude oil refining capacity to meet growing market demands. A daily average of 33,600 barrels of crude oil were processed during 1967, compared with 31,000 barrels in 1966.

## Refined Product Sales

Total sales of refined products were also up 8% over the previous year. Sales averaged 36,900 barrels daily.. Motor fuels amounted to 24,800 barrels a day of which almost 80% was marketed through 1,234 Shamrock branded service stations in Texas, Oklahoma, Colorado, Kansas, New Mexico, Arizona, Utah, Nebraska and Wyoming.

Shamrock's credit card program continued to contribute to increasing motor fuel sales. Over half a million credit card holders boosted credit card sales by 28% over the previous year.

In the preliminary planning stage is a products pipeline to extend approximately 600 miles from our refinery near Amarillo across Texas to the Gulf Coast. Initially, its purpose would be to serve the Austin, San Antonio and Houston areas.

## Natural Gas and Natural Gas Liquids

Processing and sales of natural gas and natural gas liquids remained about even with 1966 levels, while the company prepared for increased capacity and sales during 1968.

Net interest natural gas production for the year averaged 262 million cubic feet per day. At the end of the year the company owned 666 net gas wells.

An average of 10,000 barrels daily of natural gas liquids were recovered in the company's natural gas processing operation. Part of the butanes and all of the pentanes and heavier products recovered, amounting to about 4,800 barrels daily, were used in the company's refining operations. The remainder of the butanes and the propane recovered were sold.

New gas processing facilities now under construction will initially increase the recoveries of natural gas liquids by approximately 65%.

## Other Products

In 1967 the corporation's other products, principally cement and coke, represented approximately 4% of total sales.

Cement sales were down 22% during the year as a two-month strike in the construction industry drastically reduced the demand for cement in our marketing area. Profits were also adversely affected. After the strike, cement sales returned to the volume normally expected during the construction season. Coke operations continued steady.

In October, following several years of proceedings, the Federal Trade Commission ordered the company to divest itself of the cement operations at Bessemer, Pennsylvania. Early in January, 1968, agreement was reached to sell the cement operations to the Louisville Cement Company. Although the corporation had appealed the FTC

14



*A proprietary product for chrome
plating plastic parts undergoes
development at the company's
Technical Center. Proprietaries,
aimed at filling specific needs of the
marketplace, enable the company
to upgrade its basic chemicals into
specialties which offer excellent
potential for steady, profitable growth.*

OCCNJ0005983
ALCD-PUBCOM_0002095





During 1967 several new polyvinyl chloride products were developed (above). One of these, a new compound for PVC bottles offering increased clarity and impact resistance, strengthened the company's position as the leading supplier of PVC raw materials to bottle producers.

Test equipment (facing page) deposits platinum-carbon on PVC samples. This enables researchers to predict, by means of electronic microscopy, the performance of the material under end-use conditions.

New applications for Diamond Shamrock's Duranic BK® black chrome plating (right) are developed at the Technical Center. This unique specialty product provides a handsome black finish which can reduce reflectivity of plated parts by up to 90 percent. It is being marketed for use in twin-glare and decorative applications in automotive parts, sporting equipment, office machinery and military and household hardware.

OCCNJ0005984

ALCD-PUBCOM_0002096

order to the county, this sale of the facilities avoids prolonged litigation and enables the corporation to devote the capital made available by the sale to profitable uses in other areas of its business.

## Foreign Markets Expand

The corporation's foreign operations showed good gains in 1967.

A new metal plating plant in Mexico and a new Mexican tanning facility both started up and are on their way to profitable operation. The chlorine-caustic soda plant in Brazil improved its performance, while Dia-Prosim, an ion exchange resin and water treating compound producer in France, reported another excellent year in sales and profits.

Export sales of plastics and agricultural chemicals increased and new markets for specialty chemicals opened up in Canada.

During the year the International Division established regional sales offices in Nicaragua, Brazil and Italy, while headquarters staff for Europe was strengthened.

Arrangements are progressing for the manufacture in Japan of Daconil 2787, the company's new fungicide, through a joint venture with Japanese interests. The product, which is cleared for use on important food crops in several major foreign countries, will be sold to large markets in Southeast Asia, and should have a major impact on the company's overseas business.

Sales of the foreign affiliated companies of the Nopco Division were up 20% over 1966. Nopco's international programs concentrate on specialty chemicals used by the textile, paint, paper, leather and animal feed industries in the more highly industrialized countries. Our French affiliate, Dolltau-Sepura, S.A. supplied a sizeable tonnage of emulsifier detergent for the removal of crude oil deposited on the coastline from the wreckage of an oil tanker.

## Long-Range Planning and Research



During the year the functions of corporate planning, research and development were formally coordinated for the first time under the direct supervision of a single company officer. This move has resulted in research and planning geared to long-range goals. It adds new strength to the corporation's expansion and diversification activity.

The Corporate Planning Department is responsible for the planning system, business research and economic evaluations.

In 1967 the corporation's research expenditures totaled $9.1 million. This is an increase of 6% over the previous year. The emphasis continues to be placed on developing proprietary products in the areas of agricultural chemicals, specialty chemicals and plastics, and on process improvements.

Development work continued on several important new products. Dalvor®, a polyvinyl fluoride resin for use in high-performance coating formulations, has now moved successfully into commercial markets. Research on other fluorocarbon polymers is continuing.

Polymercaptans also moved from experimental to commercial status in 1967. Basically a high-performance synthetic rubber, the material is finding excellent market acceptance in caulks, sealants and adhesives.

A new air-set foundry binder was test marketed in 1967 with very promising results. Called Safire®, it is expected to go into full scale production in 1968.

For several years the company has been working on a major new product for the pretreatment of metal. Called Dacromet®, the product is being field tested during the current year. It shows much better corrosion protection than commercial conversion coatings and units coated can be welded and postformed.

With the corporation's entry into the polypropylene field, a research and development group to specialize in this area has been formed and a new facility for this purpose is being constructed. Research on hydrocarbons is being intensified to take full technological advantage of the merger with Shamrock.

Diamond Shamrock's research and development staff now totals 650 people.

OCCNJ0005985

ALCD-PUBCOM_0002097

# Diamond Shamrock Employees Number Almost 10,000

At year end, there were 9,331 employees on the Diamond Shamrock payroll. This compares with 6,550 for the previous year, the major increase being accounted for by the mergers with Nopco and Shamrock and the acquisition of the polypropylene business.

Total payroll for the year was $81,135,000. Pension and insurance plans cost an additional $5,683,000.

There are now regional employee relations managers in four geographical areas offering faster and better service to the company's plants, which now total 46 and are located in 19 states.

We continue to enjoy excellent relations with our employees at 24 union and 22 non-union plants.

During 1967 ten of our plants received awards from the Manufacturing Chemists Association for completing the year without a lost time accident.

## Management Changes

Several significant management changes were made during the year.

James A. Hughes, formerly vice chairman, became president of Diamond Shamrock Corporation and J. H. Dunn, previously Shamrock chairman, was named chairman of the executive committee of the Board of Directors. With the organization of two major operating units, Arthur B. Tillman, former Diamond president, became executive vice president of the corporation and president of Diamond Shamrock Chemical Company. In a parallel move, C. A. Cash, formerly president of Shamrock, became president of Diamond Shamrock Oil and Gas Company and an executive vice president of the corporation.

Fred S. Strauss, president of Harte & Company, George G. Stier, formerly president of Nopco Chemical Company and Frank Chrenelk, formerly vice president of Diamond, were named vice presidents of the corporation. Four corporate staff vice presidents were appointed. G. G. Pirrone was named vice president, corporate planning and research and C. R. Brown became vice president, employee and public relations. J. Avery Rush, Jr., formerly executive vice president of Shamrock became vice president, finance. John A. Wilson, who had been secretary and general counsel for Diamond, was named vice president and secretary of Diamond Shamrock.

Messrs. Dunn, Cash, Rush and Stier were elected to the Board of Directors as were R. G. Morrison, Jr., and V. P. Patterson, both formerly directors of Shamrock.

Vice President E. W. Jarvis of Diamond Shamrock Chemical Company was assigned overall responsibility for that company's departments of transportation and distribution, purchasing, engineering, trade development and advertising.

Harry E. Connors, Jr., was named vice president of Diamond Shamrock Chemical Company and general manager of the Plastics Division. Donald S. Catterson was appointed vice president of the company and general manager of the newly-created Resinous Products Division.



*Coatings utilizing Diamond Shamrock's Dalvor® polyvinyl fluoride resin bond tightly to test panels even after scoring and post-forming (above) and prolonged exposure to a corrosive environment (right).*

OCCNJ0005986

ALCD-PUBCOM_0002098



OCCNJ0005987

ALCD-PUBCOM_0002099

# Financial Review

All the information submitted in this financial review includes the results of Nopco Chemical Company and The Shamrock Oil and Gas Corporation, which were merged into Diamond during the year.

Sales in 1967 were $411,171,000, a new high for the ninth consecutive year.

Comparative sales by quarter were:

|  | 1967 | 1966 |
|---|---|---|
| March 31 | $ 98,827,000 | $ 94,348,000 |
| June 30 | 106,628,000 | 102,601,000 |
| September 30 | 102,636,000 | 100,465,000 |
| December 31 | 103,080,000 | 99,543,000 |
| For the year | $411,171,000 | $396,957,000 |

Earnings for 1967, before extraordinary items resulting in a net credit of $606,000, were $34,742,000. This is equivalent to $2.32 a common share after deducting preferred dividends, an increase of $.02 from the previous year. Earnings by quarter were:

|  | 1967 | | 1966 | |
|---|---|---|---|---|
|  | TOTAL | A SHARE | TOTAL | A SHARE |
| March 31 | $ 7,879,000 | $ .51 | $ 7,691,000 | $ .50 |
| June 30 | 9,789,000 | .67 | 9,189,000 | .63 |
| Sept. 30 | 8,102,000 | .53 | 8,421,000 | .56 |
| Dec. 31 | 8,972,000 | .61 | 9,068,000 | .61 |
|  | $34,742,000 | $2.32 | $34,369,000 | $2.30 |

The extraordinary credit of $606,000 or $.05 a share resulted from a gain of $1,971,000 on the sale of stock held as an investment, net of income taxes, less a charge of $1,365,000 to establish a reserve for foreign investments.

Certain adjustments were made to 1967 and 1966 as well as the prior years' data shown in the historical sections. These adjustments were made to comply with the opinion on income taxes recently issued by the Accounting Principles Board of the American Institute of Certified Public Accountants, and to eliminate the inconsistencies resulting from different accounting procedures being followed by the merged companies, such as accounting for investments in partly owned foreign subsidiaries on an equity basis. The effect of these were to reduce 1967 income by $848,000 or $.07 per common share and 1966 by $742,000 or $.06 per share.

As noted elsewhere, our Bessemer Cement business was sold early in 1968. During 1967 net sales of cement totaled $10,450,000.

If all preferred stock were converted into common, 1967 earnings per share before the extraordinary credit would have been $2.27, compared to $2.26 in 1966.

## Dividend Increase

In the fourth quarter of the year the dividend on Diamond common stock was increased to $.35 per share. This is the fourth consecutive year the dividend has been increased. The new anticipated annual rate is $1.40 compared to the previous rate of $1.20. In 1967 $1.25 was paid.

Dividends have been paid on Diamond common stock for thirty-five consecutive years. In 1967 Diamond paid $7,697,000 on common shares; $1,369,000 on the $4.00 convertible preferred stock and $1,150,000 on the $2.00 convertible preferred stock. In addition, Nopco and Shamrock paid $10,569,000 in common dividends prior to the mergers.

## Working Capital and Debt

Working capital at year end was $65,206,000, a decrease of $7,634,000 from 1966. Current ratio at year end was 1.9 to 1.

A two-year comparative summary of the changes in our working capital is shown below:

## Changes in Working Capital
*(Dollars in thousands)*

|  | 1967 | 1966 |
|---|---|---|
| WORKING CAPITAL |  |  |
| BEGINNING OF YEAR | $72,840 | $ 60,288 |
| ADDITIONS TO WORKING CAPITAL |  |  |
| Net income | 35,348 | 34,369 |
| Depreciation and depletion | 31,034 | 28,425 |
| Future Federal income tax | 2,315 | 1,584 |
| Additional long-term debt | 10,437 | 42,619 |
| Sale of stock to employees | 1,207 | 2,429 |
| Disposal of investments, facilities, etc. | 10,445 | 3,307 |
|  | 90,786 | 112,733 |
| DEDUCTIONS FROM |  |  |
| WORKING CAPITAL |  |  |
| Cash dividends | 20,785 | 16,809 |
| Capital expenditures | 69,931 | 53,195 |
| Purchase of Nopco common stock and other investments | — | 26,069 |
| Repayment of long-term debt | 7,704 | 4,108 |
|  | 98,420 | 100,181 |
| WORKING CAPITAL END OF YEAR | $65,206 | $ 72,840 |
| INCREASE OR (DECREASE) IN WORKING CAPITAL | ($ 7,634) | $ 12,552 |

Long-term debt at the year end was $142,246,000 excluding current portions, an increase of $2,733,000. During the year as short-term funds were required, we borrowed from banks or sold our own notes. As of year-end $16,210,000 of these borrowed funds remained unpaid.

## Expansion and Diversification

Our capital expenditures for 1967 established a new high of $69,931,000, compared to $53,195,000 the previous year. Of this amount, $44,392,000 was spent for new plants and expansion of existing facilities, $14,104,000 for rehabilitation and modernization of present plants, and $11,435,000 for oil and gas development.

In addition to specific expansions mentioned elsewhere in the report, we recently completed a major expansion of our plant at Newark, New Jersey to produce 2-4-D and 2-4-5T and weed control chemicals.

A new plant at Delaware City, Delaware to produce anhydrous caustic is under construction and is expected to commence production in the third quarter of 1968.

OCCNJ0005988

ALCD-PUBCOM_0002100



**Net sales** (see note)
*(In millions of dollars)*

**Capital Expenditures & Depreciation** (see note)
*(In millions of dollars)*



CAPITAL EXPENDITURES

DEPRECIATION



**Research & Development Expenditures** (see note)
*(In millions of dollars)*

**Net Income & Cash Dividends** (see note)
*(In millions of dollars)*



CASH DIVIDENDS

NET INCOME

NOTE:

1958–1962 data represent Diamond
Alkali Company as previously
reported.

1963–1967 data are restated to include
companies merged into Diamond
in 1967 and accounted for on a pooling
of interests basis.

**Cash Flow** (see note)
*(In millions of dollars)*



PROVISION FOR FUTURE TAXES

DEPRECIATION

NET INCOME

24

OCCNJ0005989

ALCD-PUBCOM_0002101

## Taxes and Depreciation

Federal and foreign income taxes for the year amounted to $16,621,000, equivalent to $1.42 a common share. The investment credit on eligible capital additions was $3,675,000, an increase of $920,000 over the previous year.

Charges against income for depreciation, depletion and amortization amount to $31,034,000 in 1967, compared to $28,425,000 in 1966.

## Capital Stock

During the year substantial changes were made in the capital stock accounts.

921,842 shares of a new $2.00 cumulative convertible preferred stock were issued for the outstanding common shares of Nopco Chemical Company excluding treasury shares and shares owned by Diamond. Late in December we were in the process of issuing 5,546,748 shares of common stock and 3,697,832 shares of a $1.20 cumulative convertible preferred stock for the outstanding shares of common stock of The Shamrock Oil and Gas Corporation. Diamond issued or sold 39,316 common shares to employees under incentive, thrift and option plans, of which 22,897 shares were for the 1966 Thrift Plan.

## Opinion of Independent Accountants

TO THE STOCKHOLDERS AND BOARD OF DIRECTORS
OF DIAMOND SHAMROCK CORPORATION

In our opinion, based on our examination and the report of other independent accountants on the results of operations of The Shamrock Oil and Gas Corporation and subsidiaries (Note 1) for their 1967 fiscal year, the accompanying statements of financial position, income and retained earnings and the statement of changes in working capital present fairly the consolidated financial position of Diamond Shamrock Corporation and subsidiary companies at December 31, 1967, the consolidated results of their operations and the supplementary information on funds for the year, in conformity with generally accepted accounting principles applied on a basis consistent with that of the preceding year, as restated. Our examination of these statements was made in accordance with generally accepted auditing standards and accordingly included such tests of the accounting records and such other auditing procedures as we considered necessary in the circumstances.

*Price Waterhouse & Co.*

PRICE WATERHOUSE & CO.   Cleveland, Ohio   February 12, 1968

OCCN00005990
ALCD-PUBCOM_0002102

**Diamond Shamrock Corporation Consolidated Statement of Income**
*Year ended December 31*

|  | 1967 | 1966 |
|---|---:|---:|
| REVENUES |  |  |
| Sales of products | $411,171,000 | $396,957,000 |
| Interest, dividends, royalties, etc. | 5,202,000 | 4,042,000 |
|  | 416,373,000 | 400,999,000 |
|  |  |  |
| COSTS AND EXPENSES |  |  |
| Cost of products sold | 307,216,000 | 293,930,000 |
| Selling and administrative | 40,636,000 | 38,664,000 |
| Research and development | 9,108,000 | 8,602,000 |
| Interest | 8,050,000 | 6,550,000 |
|  | 365,010,000 | 347,746,000 |
|  |  |  |
| INCOME BEFORE TAX PROVISION | 51,363,000 | 53,253,000 |
| Provision for Federal and foreign income taxes: |  |  |
| Current | 14,306,000 | 17,300,000 |
| Future | 2,315,000 | 1,584,000 |
|  | 16,621,000 | 18,884,000 |
|  |  |  |
| INCOME BEFORE EXTRAORDINARY ITEMS | 34,742,000 | 34,369,000 |
| Gain on sale of investment after deducting applicable income tax of $657,000, less provision of $1,365,000 for foreign investments | 606,000 | — |
|  |  |  |
| NET INCOME | $ 35,348,000 | $ 34,369,000 |
|  |  |  |
| Earnings per common share after preferred dividend requirements: |  |  |
| Before extraordinary items | $2.32 | $2.30 |
| Extraordinary items | .05 | — |
| Net income | $2.37 | $2.30 |
| Earnings per common share assuming conversion of all preferred stock: |  |  |
| Before extraordinary items | $2.27 | $2.26 |
| Extraordinary items | .04 | — |
| Net income | $2.31 | $2.26 |
|  |  |  |
| Depreciation and depletion included in costs and expenses | $ 31,034,000 | $ 28,425,000 |

OCCNJ0005991
ALCD-PUBCOM_0002103

**Diamond Shamrock Corporation Consolidated Statement of Financial Position**
*December 31*

| Assets | 1967 | 1966 |
|---|---|---|
| **CURRENT ASSETS** | | |
| Cash and short-term securities | $ 9,465,000 | $ 17,671,000 |
| Notes and accounts receivable | 69,517,000 | 58,489,000 |
| Inventories, at the lower of cost or market: | | |
| Raw materials | 14,512,000 | 15,158,000 |
| Supplies | 9,001,000 | 8,846,000 |
| Finished and in process materials | 33,464,000 | 29,886,000 |
| | 56,977,000 | 53,890,000 |
| Prepaid insurance, etc. | 1,723,000 | 1,541,000 |
| | 137,682,000 | 131,591,000 |
| **INVESTMENTS** *(Note 3)* | 27,882,000 | 35,546,000 |
| **PLANTS AND EQUIPMENT,** *at cost* | | |
| Plant sites and mineral reserves | 106,251,000 | 96,751,000 |
| Buildings, machinery and equipment | 506,886,000 | 455,356,000 |
| | 613,137,000 | 552,107,000 |
| Less—Accumulated depreciation and depletion | 292,028,000 | 267,563,000 |
| | 321,109,000 | 284,544,000 |
| **INTANGIBLE ASSETS** | | |
| Patents, trademarks, formulae, processes, etc. at cost, less amortization | 1,062,000 | 1,366,000 |
| Intangibles resulting from acquisitions | 21,283,000 | 21,283,000 |
| | 22,345,000 | 22,649,000 |
| **DEFERRED CHARGES** | 3,259,000 | 3,241,000 |
| | $512,277,000 | $477,571,000 |

OCCNJ0005992
ALCD-PUBCOM_0002104

| Liabilities | 1967 | 1966 |
|---|---:|---:|
| CURRENT LIABILITIES | | |
| Notes payable | $ 16,210,000 | $    500,000 |
| Long-term debt payable within one year | 6,460,000 | 4,883,000 |
| Accounts payable | 27,326,000 | 26,916,000 |
| Federal and foreign income taxes | 4,184,000 | 13,472,000 |
| Employee Thrift Plan savings | 1,711,000 | 399,000 |
| Other | 16,585,000 | 12,581,000 |
| | 72,476,000 | 58,751,000 |
| LONG-TERM DEBT *(Note 4)* | 142,246,000 | 139,513,000 |
| DEFERRALS AND RESERVES | | |
| Federal income taxes | 21,878,000 | 19,467,000 |
| Other | 3,759,000 | 4,164,000 |
| STOCKHOLDERS' EQUITY | | |
| Preferred Stock *(Note 5)* | 20,826,000 | 20,555,000 |
| Common Stock, no par value *(Notes 5 and 6)* Authorized—18,000,000 shares Issued—11,837,816 shares | 89,952,000 | 88,923,000 |
| Retained earnings per accompanying statement | 163,492,000 | 149,151,000 |
| | 274,270,000 | 258,629,000 |
| Less—Common treasury stock—77,044 shares at cost | 2,352,000 | 2,953,000 |
| | 271,918,000 | 255,676,000 |
| | $512,277,000 | $477,571,000 |

25

OCCNJ0005993
ALCD-PUBCOM_0002105

# Diamond Shamrock Corporation Consolidated Statement of Retained Earnings

*Year ended December 31*

|  | 1967 | 1966 |
|---|---:|---:|
| RETAINED EARNINGS *at beginning of year* |  |  |
| Diamond Alkali Company | $ 86,469,000 | $ 76,343,000 |
| The Shamrock Oil and Gas Corporation | 62,971,000 | 58,480,000 |
| Nopco Chemical Company | 11,827,000 | 9,888,000 |
| Transfer by Shamrock for stock split and adjustment connected with Nopco merger | (6,279,000) | (5,950,000) |
| Adjustments applicable to prior years to conform accounting practices *(Note 2)* | (5,837,000) | (6,495,000) |
|  | 149,151,000 | 132,266,000 |
| NET INCOME *for the year* | 35,348,000 | 34,369,000 |
|  | 184,499,000 | 166,635,000 |
| Dividends: |  |  |
| Preferred |  |  |
| $4.00 series—$4.00 a share | 1,369,000 | 1,392,000 |
| $2.00 series—$1.25 a share | 1,150,000 | — |
| Common—$1.25 a share ($1.125 in 1966) | 7,697,000 | 6,842,000 |
| Paid by Shamrock and Nopco prior to mergers | 10,569,000 | 8,575,000 |
| Other | 222,000 | 675,000 |
|  | 21,007,000 | 17,484,000 |
| RETAINED EARNINGS | $163,492,000 | $149,151,000 |

# Diamond Shamrock Corporation Notes to Financial Statements

## Note 1: Mergers

The merger of The Shamrock Oil and Gas Corporation into Diamond Alkali Company became effective on December 19, 1967 and the name was changed to Diamond Shamrock Corporation. Under the merger agreement 3,697,832 shares of $1.20 Series D Preferred Stock and 5,546,748 shares of Common Stock were issued in exchange for the Shamrock Common Stock then outstanding after cancellation of 6,000 treasury shares, on the basis of ½ share of Series D Preferred Stock and ¾ share of Common Stock for each share of Shamrock Common Stock.

The merger of Nopco Chemical Company into Diamond became effective on May 1, 1967. Under the merger agree-

ment 921,842 shares of $2.00 Series C Preferred Stock were issued in exchange for the Nopco Common Stock then outstanding after cancellation of 3,100 treasury shares held by Nopco and 497,557 shares owned by Diamond, on the basis of one share of Series C Preferred Stock for each share of Nopco Common Stock.

For accounting purposes, the mergers with Shamrock and Nopco are treated as "poolings of interest" and accordingly the consolidated financial statements combine the accounts and results of operations of Diamond, Shamrock and Nopco for 1967 and 1966 with appropriate elimination of approximately 35% of Nopco income applicable to the 497,557 shares of Nopco purchased by Diamond.

OCCNJ0005994

ALCD-PUBCOM_0002106

## Note 2: Accounting Adjustments

In accordance with the recently issued opinion of the Accounting Principles Board of the American Institute of Certified Public Accountants, adjustments were made in the accompanying financial statements to extend the principle of providing for deferred income taxes for current tax reductions resulting principally from the excess of tax depreciation over book depreciation. These adjustments, together with the relatively minor effect of conforming the accounting for investments in less than 100% owned foreign subsidiaries to the basis of underlying equities, reduced 1967 net income by $848,000 and 1966 by $742,000.

## Note 3: Investments

|  | DECEMBER 31, 1967 | DECEMBER 31, 1966 |
|---|---|---|
| Investments and advances to affiliated and 50% owned companies, at equity in underlying net assets | $ 3,548,000 | $ 3,614,000 |
| Other securities, at cost: | | |
| Terra Chemicals International, Inc. | 10,000,000 | 10,000,000 |
| Other domestic | 8,961,000 | 16,488,000 |
| Foreign, less reserve in 1967 | 2,846,000 | 3,251,000 |
| Miscellaneous | 2,527,000 | 2,193,000 |
|  | $ 27,882,000 | $ 35,546,000 |

## Note 4: Long-term debt

|  | DECEMBER 31, 1967 | DECEMBER 31, 1966 |
|---|---|---|
| Sinking fund debentures: | | |
| 3⅜% due 1971-1978 | $ 10,347,000 | $ 11,006,000 |
| 4⅜% due 1968-1987 | 24,103,000 | 25,000,000 |
| Notes: | | |
| 6% due 1969-1973 | 22,500,000 | 22,500,000 |
| 4.65% due 1970-1989 | 30,000,000 | 30,000,000 |
| 4¾% due 1968-1971 | 13,000,000 | 15,000,000 |
| 4½% due 1968-1987 | 7,500,000 | 7,500,000 |
| Lease purchase agreement | 16,766,000 | 6,813,000 |
| Purchase money obligations | 24,490,000 | 26,577,000 |
|  | 148,706,000 | 144,396,000 |
| Less—due within one year | 6,460,000 | 4,883,000 |
|  | $142,246,000 | $139,513,000 |

## Note 5: Preferred Stock

At December 31, 1967, 5,500,000 shares of cumulative convertible preferred stock without par value were authorized. Shares outstanding at that date are shown below:

|  | SHARES OUTSTANDING | STATED VALUE | LIQUIDATION VALUE | CONVERSION BASIS* |
|---|---|---|---|---|
| $4.00 Initial Series | 247,003 | $ 3,211,000 | $ 24,700,000 | 2.6 |
| 4.00 Series B | 95,000 | 1,235,000 | 9,500,000 | 2.6 |
| 2.00 Series C | 923,540 | 9,368,000 | 38,789,000 | 1.15 |
| 1.20 Series D | 3,697,832 | 7,012,000 | 77,654,000 | .45 |
|  |  | $20,826,000 | $150,643,000 | |

*Represents shares of Common into which each share of Preferred is convertible*

At December 31, 1967, 3,653,044 shares of Common Stock were reserved for conversion of the outstanding Preferred Stock, including Preferred shares issuable under stock options.

## Note 6: Stock Options

The 1967 share transactions under the stock option plans, after giving effect retroactively to the mergers, are summarized below:

|  | DECEMBER 31, 1966 | EXERCISED | CANCELLED | DECEMBER 31, 1967 |
|---|---|---|---|---|
| COMMON STOCK: | | | | |
| Options outstanding: | | | | |
| Stock Option Plan | 68,903 | (9,350) | (1,500) | 58,053 |
| Employee Thrift Plan | 155,448 | (22,897) | (21,679) | 110,872 |
| Shamrock Option Plan | 94,149 | (1,350) | (675) | 92,124 |
| Available for option: | | | | |
| Stock Option Plan | 24,112 | | 1,500 | 25,612 |
| Employee Thrift Plan | 24,549 | | 21,679 | 46,228 |
| Total Reserved | 367,161 | (33,597) | (675) | 332,889 |
| PREFERRED STOCK: | | | | |
| Options outstanding: | | | | |
| Series C | 42,523 | (8,821) | (24,915) | 8,787 |
| Series D | 62,766 | (900) | (450) | 61,416 |

Prices on Common Stock Options range from $23.50 to $35.56 a share. In the Shamrock merger outstanding options to purchase Shamrock Common Stock at $28.17 a share became options to purchase the same number of Option Units (each unit comprising ¾ share of Common Stock and ½ share of Series D Preferred Stock) at $28.17 a unit. In the Nopco merger outstanding options to purchase Nopco Common Stock became options for the same number of shares of Series C Preferred Stock at the same prices which range from $23.50 to $39.50 a share.

## Note 7: Incentive Compensation Plan

In accordance with the terms of the Incentive Compensation Plan adopted by the stockholders at the 1953 annual meeting, $560,000 was charged to income for the year 1967. In January, 1968, 7,330 shares of treasury stock were allocated to the 1967 incentive compensation awards.

## Note 8: Pension Plans

The charges to income for pension costs of the several pension plans were $3,526,000 in 1967 and $3,454,000 in 1966, which amounts are funded currently. These charges include amortization of past service costs over periods ranging from twenty to thirty years.

## Note 9: Commitments and Contingent Liabilities

At December 31, 1967 Diamond Shamrock had long-term leases for (a) tank cars and barges with annual rentals of $1,770,000 for an average of 8 years, (b) for the Mobile, Alabama plant with an average rental of $380,000 for 15 years, and (c) for office space, warehouses, service stations, etc. with annual rentals of $1,480,000 for an average of 6 years. In addition, rentals under short-term leases, principally tank cars, approximated $1,327,000 annually for three years.

Diamond was contingently liable for loan guarantees in the amount of $4,305,000. Authorization and contracts for new plant facilities approximated $28,150,000 at December 31, 1967.

**Diamond Shamrock Corporation Historical Information**
*(In thousands of dollars, except per share of common stock
and book value of common stock)*

|  | 1967 | 1966 | 1965 |
|---|---|---|---|
| **RESULTS OF OPERATIONS (A)** | | | |
| Sales of products | $411,171 | $396,957 | $356,030 |
| Net income | 34,742[(c)] | 34,369 | 28,465 |
| Net income per average share outstanding | 2.32[(c)] | 2.30 | 1.80 |
| | | | |
| **FINANCIAL POSITION (A)** | | | |
| Total assets | $512,277 | $477,571 | $428,699 |
| Working capital | 65,206 | 72,840 | 60,288 |
| Net plant and equipment | 321,109 | 284,544 | 262,587 |
| Long-term debt | 142,246 | 139,513 | 101,001 |
| Stockholders' equity | 271,918 | 255,676 | 235,542 |

|  | 1967 | 1966 | 1965 |
|---|---|---|---|
| **RESULTS OF OPERATIONS (B)** | | | |
| Sales of products | $411,171 | $233,039 | $208,593 |
| Net income | 34,742[(c)] | 19,245 | 16,770 |
| Net income per average share outstanding (E) | 2.32 | 2.95 | 2.56 |
| Cash dividends per share (E) | 1.25 | 1.125 | 1.025 |
| | | | |
| **FINANCIAL POSITION (B)** | | | |
| Total assets | $512,277 | $276,246 | $234,468 |
| Working capital | 65,206 | 46,149 | 38,946 |
| Net plant and equipment | 321,109 | 129,870 | 118,236 |
| Long-term debt | 142,246 | 75,321 | 43,763 |
| Stockholders' equity | 271,918 | 155,109 | 141,891 |
| | | | |
| **OTHER DATA (B)** | | | |
| Capital expenditures | $ 69,931 | $ 29,719 | $ 28,717 |
| Depreciation and depletion | 31,034 | 16,962 | 15,001 |
| Book value per share assuming conversion of preferred stock (E) | 17.65 | 21.96 | 20.36 |
| Approximate market price range per common share (E) | 42-30 | 49-25 | 36-26 |
| Common shares outstanding at year end | 11,723,513 | 6,134,675 | 6,025,571 |
| Number of common shareholders | 28,136 | 15,086 | 10,838 |
| Number of preferred shareholders | 16,587 | 1,584 | 1,523 |
| Number of employees | 9,381 | 6,550 | 6,122 |

(A) *Restated to include data for all periods for mergers accounted for on a pooling of interest basis.*
(B) *1966 and prior years are as previously reported, adjusted for changes in accounting in 1967.*
(C) *Excludes extraordinary gain of $606,000, or $.05 per share.*
(D) *Excludes extraordinary loss of $2,413,000 or $.21 per share.*
(E) *Restated for 2 for 1 stock split in 1965 and stock dividends in prior periods.*

28

| 1964 | 1963 | 1962 | 1961 | 1960 | 1959 | 1958 |
|---|---|---|---|---|---|---|
| $330,389 | $298,999 | | | | | |
| 25,046[a] | 22,127 | | | | | |
| 1.50[b] | 1.25 | | | | | |
| $393,811 | $371,982 | | | | | |
| 77,462 | 49,498 | | | | | |
| 242,083 | 247,024 | | | | | |
| 100,727 | 87,460 | | | | | |
| 221,802 | 214,119 | | | | | |
| $178,497 | $160,076 | $158,731 | $148,994 | $138,301 | $137,874 | $114,186 |
| 13,402 | 10,533 | 10,957 | 10,879 | 11,894 | 11,561 | 6,340 |
| 2.05 | 1.58 | 1.64 | 1.61 | 1.98 | 1.94 | 1.07 |
| .925 | .90 | .90 | .90 | .90 | .87 | .87 |
| $206,062 | $181,971 | $175,309 | $168,662 | $142,961 | $142,904 | $133,726 |
| 53,262 | 29,736 | 26,063 | 26,648 | 28,679 | 27,691 | 20,597 |
| 101,857 | 104,278 | 102,835 | 105,162 | 91,373 | 87,269 | 88,263 |
| 45,210 | 31,757 | 30,639 | 29,194 | 24,730 | 27,722 | 30,383 |
| 127,372 | 120,776 | 117,066 | 115,089 | 98,843 | 90,801 | 83,481 |
| $ 14,020 | $ 15,715 | $ 11,671 | $ 16,806 | $15,150 | $ 9,559 | $ 6,905 |
| 15,549 | 13,703 | 13,511 | 11,762 | 10,086 | 9,689 | 9,774 |
| 19.01 | 18.01 | 17.42 | 16.92 | 16.26 | 15.15 | 14.03 |
| 30-25 | 27-22 | 35-19 | 37-29 | 32-25 | 31-22 | 23-14 |
| 3,005,873 | 3,004,327 | 2,999,073 | 3,033,191 | 3,030,626 | 2,906,352 | 2,796,421 |
| 9,543 | 9,843 | 10,267 | 10,393 | 10,358 | 8,316 | 7,184 |
| 1,482 | 1,477 | 1,476 | 1,432 | — | — | — |
| 5,506 | 5,312 | 5,355 | 5,554 | 5,321 | 5,260 | 5,202 |

29

GENERAL OFFICES
300 Union Commerce Building
Cleveland, Ohio 44115

INDEPENDENT ACCOUNTANTS
Price Waterhouse & Co., Cleveland, Ohio

TRANSFER AGENTS, COMMON AND PREFERRED STOCKS
Mellon National Bank and Trust Company,
Pittsburgh, Pa.
Bankers Trust Company, New York, New York

REGISTRARS, COMMON AND PREFERRED STOCKS
Pittsburgh National Bank, Pittsburgh, Pa.
Chemical Bank New York Trust Company,
New York, New York

STOCK LISTINGS
New York Stock Exchange
Pacific Coast Stock Exchange *(common stock only)*

*Mexico D.F., Mexico*
Diamond Chemicals de Mexico, S.A. de C.V.
*Mexico D.F., Mexico*
Nopco Industrial, S.A.
*Mexico D.F., Mexico*
Insecticidas Diamond de Chihuahua,
S.A. de C.V.
*Ciudad Delicias, Mexico*
Insecticidas Diamond de Michoacan,
S.A. de C.V.
*Apatzingan, Mexico*

Petroquímica Colombiana, S.A.
*Bogotá, Colombia*
Nopco Venezolana S.A.
*Caracas, Venezuela*
Polifilm de Venezuela S.A.
*Caracas, Venezuela*
Nopco Hess Ltd.
*Leeds, England*
Dia-Prosim, S.A.
*Vitry-sur-Seine, France*

*Tampere, Finland*
Nopco (India) Private Ltd.
*Bombay, India*
Japan Nopco Co., Ltd.
*Osaka, Japan*
San Nopco, Ltd.
*Kyoto, Japan*
John Beith, Ltd.
*Sydney, Australia*
Nopco Beith Pty., Ltd.
*Sydney, Australia*

30

OCCNJ0005998
ALCD-PUBCOM_0002110

## Diamond Shamrock Corporation

**BOARD OF DIRECTORS**

Raymond F. Evans*
*Chairman of the Board and*
*Chief Executive Officer*

James A. Hughes*
*President*

C. A. Cash
*Executive Vice President*

J. H. Dunn*
*Chairman of the Executive Committee*

William H. Evans
*Limited Partner*
*Ball, Burge & Kraus*
*Cleveland, Ohio*

Edgar S. Lewis
*Vice President*
*Mellon National Bank and Trust*
*Company*
*Pittsburgh, Pennsylvania*

R. G. Morrison, Jr.
*Trustee*
*Thomas Morrison Trusts*
*El Dorado, Kansas*

V. P. Patterson
*Chairman of the Board*
*The First National Bank of Amarillo*
*Amarillo, Texas*

Wallace R. Persons, Jr.*
*Chairman of the Board and*
*Chief Executive Officer*
*Emerson Electric Company*
*St. Louis, Missouri*

Alexis E. Post
*Consultant*
*San Francisco, California*

John W. Reavis*
*Managing Partner*
*Jones, Day, Cockley & Reavis*
*Cleveland, Ohio*

J. Avery Rush, Jr.
*Vice President, Finance*

Horace A. Shepard*
*President*
*TRW Inc.*
*Cleveland, Ohio*

George G. Stier
*Vice President*

Fred S. Strauss
*Vice President*

Arthur B. Tillman
*Executive Vice President*

John C. Virden*
*Chairman of the Executive Committee*
*Eaton Yale & Towne, Inc.*
*Cleveland, Ohio*

*\*Executive Committee*

**OFFICERS**

Raymond F. Evans
*Chairman of the Board and*
*Chief Executive Officer*

James A. Hughes
*President*

J. H. Dunn
*Chairman of the Executive Committee*

C. A. Cash
*Executive Vice President*

Arthur B. Tillman
*Executive Vice President*

C. Richard Brown
*Vice President, Employee and*
*Public Relations*

Frank Chrencik
*Vice President*

Gaetano G. Pirrone
*Vice President, Corporate Planning and*
*Research*

J. Avery Rush, Jr.
*Vice President, Finance*

George G. Stier
*Vice President*

Fred S. Strauss
*Vice President*

John A. Wilson
*Vice President and Secretary*

William A. Crichley
*Treasurer*

Raymond H. Armor
*Controller*

Julius J. Denzler
*Assistant Secretary*

Peter J. Joyce
*Assistant Controller*

Edward J. Masek
*Assistant Secretary*

Bill J. Montgomery
*Assistant Secretary*

James R. Sanders
*Assistant Secretary*

James E. Spaude
*Assistant Controller*

Charles E. Trolinger
*Assistant Secretary*

J. Lynn Fordham
*Director of Research*

## Diamond Shamrock Chemical Company

Arthur B. Tillman
*President*

Frank Chrencik
*Group Vice President*

George G. Stier
*Group Vice President*

Donald S. Catterson
*Vice President*

Harry E. Connors, Jr.
*Vice President*

Frank W. Jarvis
*Vice President*

William L. McFadden
*Vice President*

**SUBSIDIARY**

Fred S. Strauss
*President*
*Harte & Company, Inc.*

**DIVISION GENERAL MANAGERS**

Harry A. Batley
*Nopco Chemical*

Donald S. Catterson
*Resinous Products*

Henry B. Clark
*Soda Products*

Harry E. Connors, Jr.
*Plastics*

John S. Cort, Jr.
*Agricultural Chemicals*

Warren Dusenbury
*Specialty Chemicals*

Steve Puschaver
*Electro Chemicals*

S. S. Savage
*International*

L. T. Welshans
*Cement*

**WORKS MANAGERS**

W. J. Butler
*Houston—Deer Park Plant*

M. O. Kirp
*Painesville Plant*

**STAFF EXECUTIVES**

Howard E. Everson
*Technical Director*

Chester D. Jones
*Director of Purchasing*

John W. Mantz
*Director of Trade Development*

Francis H. Rockwell
*Director of Engineering*

Warren R. Ross
*Director of Transportation and*
*Distribution*

Robert C. Sutter
*Assistant to the President*

DIAMOND SHAMROCK CORPORATION
GENERAL OFFICES:
300 UNION COMMERCE BUILDING
CLEVELAND, OHIO 44115

*Address correction requested.*
*Forwarding and return postage guaranteed.*

OCCNJ0006000
ALCD-PUBCOM_0002112

# EXHIBIT 42

OxyChem's Comments in Opposition to Proposed Consent Decree,
*United States v. Alden Leeds, Inc., et al.*, Civil Action No. 2:22-cv-07326 (D.N.J.)

ALCD-PUBCOM_0002113

# Diamond Shamrock Corporation Annual Report 1969



*The Strength of a Corporation Like That of a Nation is in the Scope of its Resources — Natural, Technological and Human*

MAXUS0114297
ALCD-PUBCOM_0002114

# Diamond Shamrock Corporation

### Diamond Shamrock — A Resource Company

Diamond Shamrock today is a broadly based resource company. Our business begins with taking such natural resources as salt, oil and gas and minerals from the ground. It ends with products for the home, for the farm and for virtually every major industry. The steps in between are accomplished by our other major resource, our people, who develop the technology required to upgrade our natural resources into useful products. In short, as our cover symbolizes, Diamond Shamrock combines the abundance of nature with the ingenuity of man to provide products and ideas which improve the quality of life.

## contents

Highlights                                1
Stockholder's Letter                      2
Report on Operations                      4
Financial Review                         19
Opinion of Independent Accountants       20
Financial Statements                     21
Notes to Financial Statements            24
Historical Financial Information         26
Officers and Directors                   29

MAXUS0114298
ALCD-PUBCOM_0002115

# Annual Report 1969

## Highlights of 1969

|  | 1969 | 1968 |
|---|---|---|
| NET SALES | $541,259,000 | $524,784,000 |
| NET INCOME[1] | $ 30,671,000 | $ 34,569,000 |
| Per share, based on average common shares outstanding | $1.54 | $1.83 |
| DIVIDENDS PER COMMON SHARE | $1.40 | $1.40 |
| COMMON SHARES OUTSTANDING | | |
| At year-end | 14,571,815 | 14,442,412 |
| Average for the year | 14,497,709 | 14,320,633 |
| BOOK VALUE, per share of common stock assuming conversion of all preferred stock | $19.70 | $19.57 |
| CAPITAL EXPENDITURES | $ 41,763,000 | $ 55,035,000 |
| STOCKHOLDERS OF RECORD | | |
| Preferred | 21,491 | 20,847 |
| Common | 38,814 | 36,176 |
| Special Common | 2,049 | 2,297 |
| NUMBER OF EMPLOYEES | 11,154 | 11,082 |

(1) Before extraordinary items in 1968.

In accordance with the by-laws of the corporation,
the annual meeting of stockholders will be held at
the principal office of the corporation, Cleveland, Ohio,
on April 16, 1970, and the management will solicit
proxies for such meeting and contemplates that
the proxy statement and form of proxy will be mailed
to stockholders on or about March 18, 1970.

1

MAXUS0114299
ALCD-PUBCOM_0002116

## TO OUR STOCKHOLDERS:

Sales in 1969 rose 3 percent to a new high of $541,259,000. Net income, however, fell 11 percent to $30,671,000 or $1.54 per share.

Needless to say, these results were disappointing in spite of strong performances in some areas of our businesses. The past year was characterized by periodic indications of improvement which failed to materialize. Throughout the year sales compared favorably with 1968 but earnings were penalized by abnormal plant startup difficulties, a lengthy strike at the Wabush mines, and delays in realizing the benefits of posted price increases. And like many companies we were hurt by the loss of the investment credit and by the rise in interest costs during the year. We also spent more on research during 1969, but we consider this to be a sound investment in the future of the company.

In total, these adverse factors outweighed a strong performance by our plastics and resins business and another record year for petroleum refining and marketing. We also made excellent progress in commercialization of the dimensionally stable anode, far exceeding our first-year marketing goal.

As we enter the new year startup costs are, for the most part, behind us. The Wabush strike is history, with a 2½-year agreement having been signed in September. We are also realizing the effects of price increases for a number of commodity products.

Price weakness has been a problem area for the company over the past several years. This is particularly true in chemicals where prices have not risen to reflect increased costs in the recent inflationary period. In view of the increased costs of labor, money and new plants, it is encouraging that our chemical business has performed as well as it has.

Obviously, inflation is of paramount concern both to us who manage your company and to you as individuals. While we must do all we can to raise the prices of our products to meet our increasing

costs, we fully recognize our responsibility to exercise a proper degree of restraint to avoid fueling the fires of inflation. Frankly, this is a dilemma for which there is no easy solution. However, in light of a substantial decline in the price index covering a large portion of our products in recent years, we feel no need to apologize for any further price advances in these areas.

In 1969, we took a number of steps to strengthen the company, such as the expansion of the executive office to include the three executive vice presidents of the corporation and the election of three new operating unit presidents. Named to the executive office were Arthur B. Tillman, C. A. Cash, and Keith S. Benson, who were also elected chairmen of their respective operating units. Succeeding them as presidents of the operating units are G. G. Pirrone, president of the Chemical Company, J. Avery Rush, Jr., president of the Oil and Gas Company, and Robert S. Carey, president of Pickands Mather. These changes will provide a better balance between corporate responsibility and operating unit autonomy.

Diamond Shamrock is stronger financially as a result of our $45 million debenture sale in August. Proceeds of the 25-year, 7¾ percent sinking fund debentures were used to reduce outstanding short and intermediate term loans and, along with our substantial cash flow from operations, to finance capital expenditures.

We also began a series of moves last year to withdraw from marginally profitable businesses and to close facilities that do not meet our standards for return on investment. To date we have closed our flexible urethane foam plant in Plainfield, New Jersey, and our Newark, New Jersey, herbicide plant which produced 2,4-D and 2,4,5-T. Construction is beginning on a new, modern chrome chemicals plant which will replace two older, less efficient plants. We also discontinued our line of cleaners and

2

MAXUS0114300
ALCD-PUBCOM_0002117

sanitizers for the food, dairy and beverage industries. In January of this year, our self-unloading Great Lakes vessel was sold because it was not practical to operate a single vessel of this type. Other areas of our business are currently being studied to determine if they should be discontinued.

In assessing Diamond Shamrock's prospects for the future, it should be borne in mind that in its present form, the company is just a little over one year old. As does any new enterprise, we have experienced our share of growing pains and, at times, frustration over the rate of our progress. However, we are a stronger company and are much better prepared to cope with these difficulties than any one of the individual units was prior to becoming a part of the corporation. Most of our businesses are related, or can be, and there are potential benefits to be derived by each from the experience and know-how of the others. It is difficult to conceive of a family of products more essential to our economy, both now and in the future, than chemicals, oil, gas and minerals.

We are dedicated to continue to help solve the problems which confront our society, particularly in the areas of employment of the disadvantaged and improvement of the environment. Industry can flourish only in a healthy social climate. We therefore intend to expand our efforts to improve the health of our society as we expand our capability to do so through the growth of our human and technological resources.

*On January 15, 1970, James A. Hughes, president of Diamond Shamrock Corporation since 1967, also became chief executive officer of the corporation succeeding Raymond F. Evans. Mr. Evans, chief executive officer for the past 22 years, continues as chairman of the board.*

Raymond F. Evans
*Chairman of the Board*

James A. Hughes
*President*

Cleveland, Ohio
February 13, 1970

3

MAXUS0114301
ALCD-PUBCOM_0002118

# REPORT ON OPERATIONS



*Our research and development staff continues to look for new ways to upgrade our resources into new and useful products. A steady flow of new products and processes is essential to the future growth of the company.*

## CHEMICAL OPERATIONS

Sales of Diamond Shamrock Chemical Company rose to a new record of $349,527,000 in 1969, up 4 percent. Operating profits, however, declined 4 percent from those of the previous year. Heavy startup costs at new plants and a continuation of depressed prices for certain commodity chemicals, coupled with the cost of discontinuing less profitable operations, held earnings down. While price increases for a number of important chemical products were announced during the latter part of the year, some did not become fully effective until January 1, 1970.

### INDUSTRIAL CHEMICALS

Sales of industrial chemicals were above last year's level while profits held at the same level. This area of our business continued to feel the adverse effects of pricing pressures coupled with rising costs. However, price increases for several commodity products were announced during 1969 and are holding.

Our 1970 results should reflect the full impact of these increases.

Demand for caustic soda, soda ash and bichromates was strong and chlorinated solvents demand also improved. While we experienced surplus capacity in sodium silicates, price increases held and we expect improved demand in 1970.

Along with the effects of the pricing situation, results were adversely affected by heavy startup costs for two major chlorinated solvents plant expansions. These problems have been resolved and the facilities will contribute positively to 1970 results.

Another development expected to favorably influence long-range results is the expansion of our chromium chemicals capabilities with the construction of a new plant in Wilmington, North Carolina. Scheduled for completion in 1971, the new plant will have greater capacity than the two older and less efficient plants it is replacing. Also, it will incorporate the latest in environmental control technology.

### Electrode Corporation Off to Good Start

The Electrode Corporation, in which we have a majority interest, was formed in 1968 to produce and market dimensionally stable anodes which are capable of achieving substantial savings in the cost of producing chlorine.

The success of our program to commercialize this important development is shown by the fact that to date we have concluded agreements covering leasing of anodes with nine domestic chlorine producers. We have leases covering a significant portion of the ten million ton domestic chlorine market, which is well ahead of our original plan established in the beginning of 1969. Although we are aware of probable competition in this market, we have a long lead and a strong proprietary position. We are continuing our efforts to penetrate the chlorine market and, at the same time, are involved in basic R & D work to commercialize other potential applications for the anode. Experimental anodes are currently on test in processes outside the chlorine field.

### PLASTICS AND RESINS

Plastics and resins sales and profits rose substantially from the previous year. As a result of improved sales and prices for general purpose polyvinyl chloride (PVC) resins and a higher percentage of sales in specialty resins and compounds, our PVC business improved sharply from 1968. Expansion of PVC resin capacity was completed and expansion of compounding capacity was begun.

4

Contrary to the industry trend, our PVC paste resins sales increased. Heavy export demand prevailed during most of the year and sales of special purpose PVC to the pipe and packaging industries increased.

In response to growing market demand in Latin America, our Colombian affiliate is initiating a PVC plant expansion and we are entering a joint venture with our Brazilian affiliate for a new PVC plant to be built in Brazil.

Polypropylene resins sales also rose in 1969. Although less favorable market conditions developed at the end of 1969 and have carried over into the current year, these conditions are believed to be temporary.

The long-range outlook for polypropylene continues to be good. During the year, we completed an expansion of our polypropylene resin plant, raising the capacity of that facility nearly 30 percent to 90 million pounds a year with a relatively small capital investment.

We recently introduced a new specialty grade of polypropylene. Developed by our research staff, it is a plateable grade which finds application in the automotive and appliance industries as a replacement for metallic parts.

Our fluorocarbon resins, marketed under the name, Dalvor, have been transferred from research to the Plastics Division for commercialization. These specialty polymers in solid and dispersion forms are designed for applications such as wire insulation and metal coatings where corrosion resistance and high performance characteristics are required.

Polyester resins and urethane systems also showed improvement with profits increasing in both areas. Our new proprietary Dion FR polyester resin has been classified as a non-flammable building material because of its superior flame retardant properties, the only clear polyester to be so designated. The resin is used in translucent building panels, boats and industrial applications where fire retardant properties are of critical importance.

Our urethane foam business declined slightly in 1969. After careful study of the Eastern market trends in flexible foam, we decided to close our Plainfield, New Jersey, foam plant. We will concentrate on serving the growing furniture, textile, automotive and industrial markets in the South and Midwest from our plant in Chattanooga, Tennessee.

In the ion exchange resin business, capacity was increased and we are continuing to develop new products for growing markets including deionization of water, municipal water softening and decontamination of effluent water from nuclear reactors.



*One of the many benefits of the close coordination between our sales and technical service staff is the ability to develop and formulate products to meet specific customer needs.*

5

MAXUS0114303
ALCD-PUBCOM_0002120

*Internal development programs and consultation with outside experts help our people stay current in their fields which include production as well as sales, marketing, engineering and administration.*





Harte & Company, Inc., maker of plastic film and sheeting and vinyl consumer products for the automobile and home, improved its operating results on sales volume which was approximately the same as in 1968. Harte continued to build its product line, introducing a new type of PVC film for credit cards, vacuum formed trays and other packaging applications.

## SPECIALTIES

One of the most promising growth areas for Diamond Shamrock, is the specialty chemical products of the Nopco Chemical Division and the Chemetals Division.

Sales of the Nopco Chemical Division improved slightly. Profits were down because of some cost-price squeezes and the cost of discontinuing a portion of business that did not show an adequate return on investment.

Sales to the textile and paper industries were about equal to those of the previous year, however, we believe that our newly reorganized marketing organization will be successful in improving our market share and increasing future sales and profits.

Nopco's international operations again made excellent progress as both sales and profits exceeded the goals for the year. A number of expansion programs currently underway are expected to result in a continuation of our growth in international markets.

During the year, construction was begun on our new administration-laboratories building in Morris Township, New Jersey. Work on a new technical service laboratory and manufacturing unit in Charlotte, North Carolina, which will serve the Southern textile and paper industries, is about to begin. The completion of these new facilities will contribute to the future of the Nopco Division.

To combat the lower profit margins experienced by most departments due to increased material and production costs, price increases were put into effect for a number of products during the last quarter of 1969. These increases plus new product development should result in increased specialty and proprietary chemical sales and profits during 1970.

## Strong Start for Division

The Chemetals Division, formed in 1969, consolidated the chemicals and metals producing capabilities of three former Pickands Mather & Co. operations.

The division turned in an improved performance in 1969, posting increased sales and profits in most areas. Particularly gratifying were our sales of Massive Manganese, which held up well for the year despite a long strike against the nickel producers and the resultant decline in stainless steel production.

New products introduced during the year included a photo grade hydroquinone. The early acceptance of this new product is especially gratifying in view of the fact that quality requirements in this market are exceedingly high.

6

MAXUS0114304

ALCD-PUBCOM_0002121



*In the field, our customer service extends from helping growers increase their yields to advice on how to improve production in such industries as paper, textiles, metals, chemicals and plastics.*

## BIOCHEMICALS

Biochemicals sales were approximately equivalent to those of the previous year but profits declined principally because of setbacks in agricultural chemicals.

Startup problems at our new Dacthal herbicide plant materially affected these results. The problems have been resolved and we look forward to improved results in the current year.

Other factors which should favorably influence our performance in 1970 include the reorganization and strengthening of our marketing organization and the discontinuance of certain marginally profitable operations. Our Newark, New Jersey plant, which produced 2, 4-D and 2, 4, 5-T herbicides has been closed.

High priorities are being placed on the development and commercialization of proprietary agricultural products such as Daconil 2787 fungicide, which advanced to the commercial stage last year. FDA clearance for use on potatoes in addition to prior clearance for turf applications has been obtained and label clearance for more food crops will be sought this year. In the meantime, our joint venture Daconil production facility in Japan has come on stream, giving us commercial quantities for delivery this year.

Heritage House Products, which produces and markets our consumer line of lawn and garden products, showed improvement in sales.

### Excellent Year for Fine Chemicals

Our Fine Chemicals Division enjoyed the best year in its history. Sales and profits improved markedly, with volume increasing. This trend should continue in the current year.

Currently, we are in process of obtaining approvals for two new animal health products. To further strengthen our position in the animal health product market, we are building a plant in Ft. Smith, Arkansas, bringing us closer to an important market area. Overseas, through a joint venture with Societa Prodotti Antibiotici in Italy, we will become a producer of the antibiotic, chlortetracycline, a basic product in the formulation of feed supplements and pharmaceuticals. The development of additional proprietary animal health products is one of our principal research and development goals.

7

MAXUS0114305
ALCD-PUBCOM_0002122





*Geologists evaluate core samples from our active exploration program to develop new sources of oil and gas to supply our modern refining and processing facilities.*

## OIL AND GAS OPERATIONS

Diamond Shamrock Oil and Gas Company again achieved record sales of $119,331,000, an increase of 3 percent over 1968. Although gains in sales as well as operating profits were realized in our refining and marketing operations, the industry-wide oversupply of ammonia and liquefied petroleum gas resulted in lower prices for these products during most of the year. As a consequence, the overall operating profit of the Oil and Gas Company declined slightly from 1968.

An active exploration program for oil and gas was carried out during the year with additions of substantial new oil and gas producing properties. Through our program this year and an accelerated exploration program planned for 1970, we expect to increase production of both crude oil and natural gas.

Programs for a balanced increase in our manufacturing and marketing capabilities continue to be implemented. In connection with our long-range refinery expansion program, work has begun on modernization and expansion projects designed to expand the processing capacity of our refinery from 38,000 barrels daily to about 45,000 barrels of crude oil per day by the end of 1970. Additional crude oil gathering pipeline extensions were made during the year to ensure an increasing supply of crude oil for the refinery.

The first segment of a new products pipeline to extend from our McKee plants in the Texas Panhandle to the Gulf Coast was completed to the Fort Worth-Dallas area, and initial deliveries of refined products were made in July, 1969. Work on the Fort Worth-Houston section of the pipeline is underway, and completion of this section of the line is expected by the middle of 1970.

### Exploration for Oil and Gas Progresses

Our active exploration and development program was continued in 1969 with drilling operations during the year resulting in the completion of 20 net oil wells, 32 net gas wells and 27 net dry holes. A major part of our drilling operations during the year was located in Arkansas, Oklahoma, the Texas Panhandle and Wyoming. We were also active with drilling operations in the Gulf Coast area, Canada and Utah. During 1970 drilling will be continued in all of these areas with increased emphasis in Canada, Montana and Wyoming.

We are increasingly optimistic about our prospects in the deep Hunton gas activity in the Panhandle of Texas, our oil prospects in the Powder River Basin of Wyoming, and our oil and gas exploration in Canada. Leases acquired during the year are located primarily in the states of Arkansas, Montana, North Dakota, Oklahoma, Texas, Utah and Wyoming, and in the Provinces of Alberta and British Columbia, Canada.

8



*A familiar sight in the Southwest is the company's 1,300 Shamrock branded service stations.*

We intend to continue acquisition of leases on attractive prospects in all of these areas and others during 1970. At the end of 1969, we held leases covering approximately 1,262,000 net acres, not including our 20 percent interest in acreage in Colombia, South America. Leases considered proven for oil and gas production totaled about 420,000 net acres.

Increasing emphasis was placed on geophysical exploration activities during the year and this emphasis is expected to continue into future years. These activities were mainly centered in the Texas Panhandle, in the Williston Basin of Montana and North Dakota and in British Columbia, Canada.

### New Records for Refined Products

Again in 1969, refinery throughput set a new record. High operating levels and improved prices for refined products resulted in continued improvement in the profit contribution from these operations.

Several significant projects were undertaken in 1969 aimed at our goals of improving manufacturing efficiencies, expanding capacity and upgrading product mix. Similar projects are planned for 1970. Our new inline gasoline blending facilities were placed in service this year, giving greater flexibility and capacity in our blending operations. Construction on the modernization and expansion of the alkylation unit is nearing completion. The alkylation unit will improve refinery efficiency by providing a more valuable product mix and cost reductions.

Emphasis continued to be placed in 1969 on developing dealer and jobber distribution of Shamrock branded products. This year 91 percent of the total motor fuel sold was marketed through 1,300 branded service stations, as compared with 78 percent in 1968. In addition to evaluating opportunities to expand into new markets, plans call for continued penetration of our present marketing area through the addition of more retail outlets.

### Natural Gas Liquids Production Increased

As anticipated, our new gasoline plant, placed on stream in September, 1968, substantially increased our recoveries and sales of natural gas liquids. The volume of liquefied petroleum gas sold during 1969 increased 75 percent over last year and averaged about 11,300 barrels daily, excluding amounts used in our own refining operations. Prices for these products were severely depressed during the latter part of 1968 and most of 1969 due primarily to high inventories of propane throughout the industry. Prices declined to their lowest level during the second quarter of 1969, but falling inventories brought price increases in September and again in November. We expect substantially improved prices for 1970.

Underground storage facilities for liquefied petroleum gas were completed this year at Barbers Hill near Houston and at our McKee plant in the Texas Panhandle. These facilities with completion of our products pipeline to the Gulf Coast, will enable us to store substantial quantities of propane during the low-demand seasons.

### Ammonia

Production of ammonia, used principally for fertilizer, increased over 1968 due primarily to utilization of new ammonia storage facilities during seasonally low-demand periods.

The unfavorable supply-demand condition in the ammonia industry, which contributed to a drastic deterioration of prices in 1968, deepened in 1969 and resulted in further price declines. There was some strengthening in ammonia prices in our marketing area during the latter half of the year and we believe that improving demand for ammonia will continue to support better prices in 1970 and future years.

### Seed Company Acquired

In February, 1969, Diamond Shamrock acquired Taylor-Evans Seed Company. Taylor-Evans, headquartered in the Texas Panhandle, is in the business of contracting for the growing of, processing, packaging and selling seed — predominantly hybrid grain sorghum seed but including corn and cotton seed. Sales are made through distributors located in about twenty-five states and to markets in several foreign countries. Taylor-Evans also distributes animal health and fertilizer products and pesticides in portions of Texas, New Mexico, Colorado, Kansas and Oklahoma.

9

MAXUS0114307
ALCD-PUBCOM_0002124





*Our world-wide search for new sources of minerals carries exploration teams to remote areas of countries such as Australia and Ivory Coast.*

## MINERAL OPERATIONS

Revenues for Pickands Mather & Co. for 1969 were $72,401,000, 3 percent below the 1968 level. Operating profits were down 12 percent. Factors which held down results included a 128-day strike at the Wabush Mines iron ore operations, strikes and other adverse supply conditions in the coal fields.

### Strike Hurts Mining Operations

Total iron ore production at the seven facilities managed by PM was 19,354,000 gross tons. Of this total, 17,316,000 tons were pellets.

A strike that also affected the two other major iron ore properties in Eastern Canada closed down Wabush Mines from early May until mid-September. Pickands Mather has an ownership interest in this property in addition to managing it, and the strike reduced the 6 million tons of production projected for the year by nearly 50 percent. This not only cut proportionally the tonnage of our ownership share available for sale, but also substantially increased its cost. The new labor contract runs to March, 1972.

Late in the year, we increased from 12 percent to 24 percent our ownership interest in the Savage River Mines iron ore pelletizing project in Tasmania, Australia. The facility is designed to produce 2.25 million tons of pellets annually for the Japanese steel industry.

Mechanical problems that have kept Savage River Mines below its design pellet capacity have, for the most part, been corrected. Production exceeded rated capacity in the last quarter of the year.

Production activities of Pickands Mather's Coal Division were expanded in November by the acquisition of a developed underground mine at Eau Claire in western Pennsylvania. The present capacity of steam coal from this property, named the Brookes Mine, is 300,000 tons annually.

Output from the Chisholm Mine, a metallurgical coal property we manage in Kentucky, exceeded 2 million tons.

Early in 1969, Pickands Mather took over the experimental mining of mercury at two properties in Texas and Alaska that had been initiated by Diamond Shamrock Chemical Co. The results to date are being evaluated to determine whether the potential profitability justifies their continued operation.

### Exploration Activities Promising

Pickands Mather continued its exploration activities in North America and overseas, seeking new sources of nonferrous metals and iron ore. The results to date

10

MAXUS0114308
ALCD-PUBCOM_0002125

of the iron ore investigation by the company in the
Republic of Ivory Coast in Africa are encouraging.
Both the size and characteristic of the deposit indicate
strong potential for a major pellet project. Accordingly,
this program is being stepped up during the current
year to include further drilling, bulk sampling
and preliminary engineering.

Programs to find nonferrous minerals in various parts
of Australia, in which we have substantial interest,
have been sufficiently promising to warrant their being
continued in 1970, including drilling where indications
of nickel have been found on surface.

**Vessel and Dock Operations Active**

The total volume of iron ore, coal and limestone
carried by the Interlake Steamship Co. fleet and
Pickands Mather's Canadian vessel subsidiary in 1969
was approximately 10,973,000 tons, about 280,000 less
than the previous year. The decline in tonnage is due
in large measure to strikes at the eastern Canadian mines
which sharply curtailed the operations of the two vessels
in the Canadian fleet. Although total tonnage was
down, an increase in freight rates for iron ore and coal
initiated by Interlake Steamship in August offset
substantially higher costs, primarily for labor, to the
point where financial results for 1969 were only about
5 percent below those for the previous year.

In January of the current year Interlake sold its
self-unloader, the only such ship in its 19 vessel fleet.
This resulted from the decision to concentrate on
developing Interlake's traditional bulk freighter
trades in iron ore, coal and limestone to their
maximum potential.

**Limestone Operations Expand**

Demand for the limestone, block and brick products
of The Carbon Limestone Company continued strong
and sales increased substantially.

**Coke Operations**

As a result of continuing heavy demand for foundry
coke, sales of foundry and metallurgical coke produced
by Milwaukee Solvay Coke Co. were 6 percent
greater than the year before and profits were
considerably higher.

**Broker and Commission Sales**

Gross earnings on overall brokerage and commission
sales were about 4 percent above 1968. Coal earnings
were depressed due to the short supply, however,
pig iron, ferroalloy and coke results were well above
the prior year. The results of commercial iron ore
sales also improved over 1968.





*Our mining, production and transportation of iron
ore, coal and limestone provide the world's steel
industry with high-grade raw materials.*

11

MAXUS0114309
ALCD-PUBCOM_0002126

## RESEARCH AND DEVELOPMENT

The development of products and processes which give us an exclusive market position and provide a higher return on investment continues to be the chief objective of our research efforts. In 1969, research concentrated on biochemicals, polymers and specialty chemicals, with increasing emphasis on electrochemistry and process development.

Our proprietary metal coating system, Dacromet, was successfully proven out in large scale testing and will soon be brought to market. The Dacromet system has widespread potential as a corrosion resistant coating for metal in the automotive and fastener markets and plans for its commercialization are being developed by the recently formed New Ventures Department.

Our activities in the water management field include the testing of proprietary polyelectrolytes for flocculation of solid wastes in pulp and paper plant effluents. Our maintenance-free system for sanitizing sewage, successfully tested in small sewage plants in 1969, will be marketed by licensees in the current year.

In other areas, a program is underway to develop new electrochemical applications for our dimensionally stable anode technology. Also, opportunities are being sought to upgrade Oil and Gas Company raw materials to more valuable chemicals.

## WORKING FOR A BETTER ENVIRONMENT

The foundation on which Diamond Shamrock has been built consists of natural resources and therefore the company is particularly aware of the need to preserve our most essential resources of air and water. The challenge that this country faces is to apply the same ingenuity in upgrading the quality of our air and water that is evident in the upgrading of such raw materials as salt, minerals, oil and gas.

Diamond Shamrock has worked diligently responding to this challenge. A recent example of our efforts to fight pollution is the installation of an air pollution control system at our zinc plant in Bristol, Pennsylvania. Installed at a cost of over $200,000, it is operating at 99.9 percent efficiency and has virtually eliminated zinc dust emission.

The reclamation of a former limestone quarry operated by Pickands Mather is an excellent example of our activities in the area of land conservation and restoration. Crystal Lake, located in western Pennsylvania, once a 21-foot deep quarry, is today a 100-acre body of water surrounded by tree-shaded hills providing an ideal recreation area.

### Foresight is Key

A lack of foresight as to the potential impact on the environment of any new product or process is at the root of many environmental problems. Diamond Shamrock has for many years reviewed all new products and processes in an effort to determine the possible effect on the environment.

In the construction of new production facilities, Diamond Shamrock's policy is to design the plant in such a way that nothing is emitted which will pollute either air or water. We are dedicated to this ideal in view of the urgent need to preserve and restore our precious resources.

## MANAGEMENT CHANGES

A number of important executive changes occurred during the year. A brief summary of the changes not mentioned elsewhere in this report is given below:

*Corporate Office*  Allen H. Ford was elected vice president — Finance. He was formerly treasurer. Robert McInnes, previously general counsel of the Corporation, was elected treasurer, succeeding Ford. Donald S. Catterson was named vice president — New Ventures, a new position.

*Chemical Company* The following group vice presidents were named: Roger P. Batchelor, Jr. — Plastics and Specialties; W. H. Bricker — Biochemicals; and Steve Puschaver — Industrial Chemicals. George G. Stier was named vice president — Administration and Marketing. Melvin Hochberg was named vice president — development — Life Sciences.

*Oil and Gas Company* Bill J. Montgomery was named executive vice president.

*Pickands Mather* William E. Conway was named executive vice president. J. S. Abdnor and Leonard J. Gee were named vice presidents.

12



**Diamond Shamrock's resources ultimately take many forms,**
contributing to the enjoyment and enrichment of our lives
in an infinite variety of ways. Beginning with supplying
man's basic needs of food, clothing and shelter and
extending through the exploration of space, our products
play an important role in all major aspects of life.

13

MAXUS0114311
ALCD-PUBCOM_0002128



**In food,** Diamond Shamrock products are used every step of the way from growing through processing and packaging. Our biochemicals control insects and weeds to boost crop yields . . . our fertilizers fortify the soil in vast agricultural fields and home gardens alike . . . the health and nutrition of man and animals are enhanced with our fine chemicals and vitamins . . . our industrial chemicals include key ingredients for the manufacture of rugged containers used for shipment of foods . . .

meat and produce are kept fresh in clear packaging films made from our plastic resins and compounds.

**In clothing,** our chemicals contribute importantly to the durability and beauty of textiles made from both natural and synthetic fibers and play a key role in making leather goods more versatile . . . Diamond Shamrock drycleaning solvents and other textile care products clean and preserve fabrics.

14

MAXUS0114312
ALCD-PUBCOM_0002129



**In shelter,** our products are basic in the production of exterior and interior building materials including steel, glass and wallboard, and are used in the formulation of paints and protective coatings . . . our plastics and resins are used in the manufacture of structural components and sealants, flooring, wire and cable insulation.

At home, on the road and at play, Diamond Shamrock products add to the comfort and convenience of modern life.

**At home,** our natural gas helps cook the family dinner . . . our chemicals and resins purify and treat water . . . our lawn and garden care products help beautify the outdoors.

15

MAXUS0114313
ALCD-PUBCOM_0002130



**On the road,** our motor fuels and other refined products keep cars and trucks rolling . . . in automobiles, Diamond Shamrock products can be found from the ground up, beginning with iron ore, coal and limestone for the production of steel to chemicals used in manufacturing tires and extending through resins for upholstery and vinyl tops. **At play,** Diamond Shamrock adds to the fun of life with plastics and resins used in boat hulls, surf boards, beach balls and toys, and with chemicals used in the manufacture of leather and rubber sporting goods.

**In space exploration,** Diamond Shamrock's chemical products perform critical functions in the lunar lander and other space vehicles as man charts our newest frontier. Here on earth, our aviation fuels power aircraft that move people and products around the world.

As these illustrations show, Diamond Shamrock is deeply involved in all facets of everyday living, our products serving a very fundamental purpose by providing the ingredients for building a better life.

16

MAXUS0114314
ALCD-PUBCOM_0002131

## Financial Review

Sales of products and operating revenues in 1969 were $541,259,000, a new high for the eleventh consecutive year.

Comparative sales of products and operating revenues by quarter were:

|  | 1969 | 1968 |
|---|---|---|
| March 31 . . . . . . . . . . | $123,185,000 | $121,582,000 |
| June 30 . . . . . . . . | 143,082,000 | 136,805,000 |
| September 30 . . . . . . . | 139,774,000 | 135,980,000 |
| December 31 . . . . . . . . | 135,218,000 | 130,417,000 |
| For the year . . . . . . . . . | $541,259,000 | $524,784,000 |

Earnings for 1969 were $30,671,000. This is equivalent to $1.54 per common share after deducting preferred dividends, a decrease of $.29 from the previous year. Earnings by quarter were:

|  | 1969 | | 1968 | |
|---|---|---|---|---|
|  | Total | Per Share | Total | Per Share |
| March 31 . . . . | $ 7,526,000 | $ .38 | $ 7,919,000 | $ .41 |
| June 30 . . . . | 8,828,000 | .46 | 10,226,000 | .57 |
| September 30 . . . | 8,246,000 | .43 | 8,976,000 | .48 |
| December 31 . . . | 6,071,000 | .27 | 7,448,000 | .37 |
| For the year . . . | $30,671,000 | $1.54 | $34,569,000 | $1.83 |

### Operating Results by Units
*(In thousands of dollars)*

|  | Sales and Operating Revenues | | Operating Profit | |
|---|---|---|---|---|
| UNITS | 1969 | 1968 | 1969 | 1968 |
| Diamond Shamrock Chemical Co. . . . . | $349,527 | $334,907 | $36,522 | $38,093 |
| Diamond Shamrock Oil & Gas Co. . . . . | 119,331 | 115,594 | 18,066 | 18,731 |
| Pickands Mather & Co. . . . | 72,401 | 74,283 | 7,996 | 9,070 |
|  | $541,259 | $524,784 | 62,584 | 65,894 |
| Corporate expense — research, interest, etc. . . . . | | | 17,298 | 13,951 |
| Provision for federal and foreign income taxes . . . | | | 14,615 | 17,374 |
| Income before extraordinary items . . . . . . . | | | $30,671 | $34,569 |

17

MAXUS0114315
ALCD-PUBCOM_0002132

**Dividends**

Dividends have been paid on Diamond common stock for thirty-seven consecutive years. In 1969 Diamond paid $19,502,000 on common shares and $8,357,000 on preferred shares.

**Sources and Uses of Funds**

(In thousands of dollars)

|  | 1969 | 1968 |
|---|---|---|
| **Funds Generated** | | |
| Net income . . . . . . . . . . . | $30,671 | $34,987 |
| Depreciation and depletion . . . . . . . . | 35,919 | 35,268 |
| Deferred federal income tax . . . . . . . | 3,989 | 3,469 |
| Net addition to long-term debt . . . . . . | 9,262 | — |
| Disposal of investments, facilities, etc. . . . . | 1,591 | 19,815 |
|  | $81,432 | $93,539 |
| **Funds Used** | | |
| Capital expenditures . . . . . . . . . | $41,763 | $55,035 |
| Dividends paid . . . . . . . . . . | 27,859 | 27,306 |
| Net repayment of long-term debt . . . . . | — | 8,568 |
| Increase in working capital . . . . . . . | 11,810 | 2,630 |
|  | $81,432 | $93,539 |

Working capital at year end was $98,456,000 compared with $86,646,000 a year ago. Current ratio at year end was 2 to 1.

**Long-Term Debt**

At year end, long-term debt excluding amounts due within one year was $154,933,000, an increase of $9,262,000. In 1969 we sold $45,000,000 ($2,700,000 delivered in February, 1970) 7¾% Sinking Fund Debentures due 1976-1994 and proceeds were used to retire certain bank borrowings due 1969-1975, short-term notes and to increase working capital.

**Investments in Expansion and Development**

Our capital expenditures for 1969 totaled $41,763,000, compared to $55,035,000 the previous year. A comparison of expenditures by unit shows:

|  | 1969 | 1968 |
|---|---|---|
| Chemical Company . . . . . . . . | $ 16,718,000 | $ 24,095,000 |
| Oil & Gas Company . . . . . . . . | 20,050,000 | 27,743,000 |
| Pickands Mather & Co. . . . . . . . | 4,995,000 | 3,197,000 |
| TOTAL . . . . . . . . . | $ 41,763,000 | $ 55,035,000 |

The major facility expansions in 1969 were a new flexible compound plant at Delaware City, Delaware and the alkylation plant expansion at our McKee, Texas, facility. An addition was made to the company's steamship fleet. Construction commenced on a new chromium chemicals plant at Wilmington, North Carolina and on a new research and technical service center at Morristown, New Jersey. Oil, gas, and mineral development expenditures were $11,934,000.

**Taxes**

Federal and foreign income taxes for the year amounted to $14,615,000, equivalent to $1.01 a common share. The investment credit on eligible capital additions was $1,616,000 a decrease of $1,689,000 from the previous year.

MAXUS0114316
ALCD-PUBCOM_0002133









*NOTE: Restated to include companies merged into Diamond and accounted for on a pooling of interests basis.*

19

MAXUS0114317
ALCD-PUBCOM_0002134

## Product Mix

Percent of Sales 1969



## Opinion of Independent Accountants

TO THE STOCKHOLDERS AND BOARD OF DIRECTORS
OF DIAMOND SHAMROCK CORPORATION

In our opinion the accompanying statements of financial position, income and retained earnings and the statement of sources and uses of funds present fairly the consolidated financial position of Diamond Shamrock Corporation and subsidiary companies at December 31, 1969, the consolidated results of their operations and the supplementary information on funds for the year, in conformity with generally accepted accounting principles applied on a basis consistent with that of the preceding year, as restated. Our examination of these statements was made in accordance with generally accepted auditing standards and accordingly included such tests of the accounting records and such other auditing procedures as we considered necessary in the circumstances.

Cleveland, Ohio
February 13, 1970

*Price Waterhouse & Co.*

20

MAXUS0114318
ALCD-PUBCOM_0002135

**Diamond Shamrock Corporation Consolidated Statement of Income**
*Year ended December 31*

|  | 1969 | 1968 |
|---|---|---|
| **REVENUES** | | |
| Sales of products and operating revenues . . . . . . . . | $541,259,000 | $524,784,000 |
| Management fees, sales commissions, dividends, royalties, etc. . | 13,434,000 | 13,490,000 |
|  | 554,693,000 | 538,274,000 |
| **COST AND EXPENSES** | | |
| Cost of products sold . . . . . . . . . . . | 432,288,000 | 413,044,000 |
| Selling and administrative . . . . . . . . . . | 56,296,000 | 54,766,000 |
| Research and development . . . . . . . . . . | 10,125,000 | 9,246,000 |
| Interest . . . . . . . . . . . . . . | 10,698,000 | 9,275,000 |
|  | 509,407,000 | 486,331,000 |
| **INCOME BEFORE TAX PROVISION** . . . . . . . | 45,286,000 | 51,943,000 |
| Provision for federal and foreign income taxes: (Note 9) | | |
| Current . . . . . . . . . . . . . | 10,626,000 | 13,905,000 |
| Deferred . . . . . . . . . . . . . | 3,989,000 | 3,469,000 |
|  | 14,615,000 | 17,374,000 |
| **INCOME BEFORE EXTRAORDINARY ITEMS** . . . . . | 30,671,000 | 34,569,000 |
| Extraordinary items (Note 10) . . . . . . . . . | — | 418,000 |
| **NET INCOME** . . . . . . . . . . . | $ 30,671,000 | $ 34,987,000 |
| Earnings per common share after preferred dividend requirements: | | |
| Before extraordinary items . . . . . . . . . | $1.54 | $1.83 |
| Extraordinary items . . . . . . . . . . | — | .03 |
| Net income . . . . . . . . . . . | $1.54 | $1.86 |

On a fully diluted basis, earnings per share were $1.53 in 1969 and $1.81 in 1968.

21

MAXUS0114319
ALCD-PUBCOM_0002136

## Diamond Shamrock Corporation Consolidated Statement of Financial Position
*December 31*

| Assets | 1969 | 1968 |
|---|---:|---:|
| **CURRENT ASSETS** | | |
| Cash and short-term securities | $ 13,860,000 | $ 21,673,000 |
| Notes and accounts receivable | 98,947,000 | 93,417,000 |
| Inventories at the lower of cost or market: | | |
| Finished and in process materials | 44,828,000 | 39,111,000 |
| Supplies | 10,414,000 | 9,721,000 |
| Raw materials | 21,013,000 | 19,600,000 |
| | 76,255,000 | 68,432,000 |
| Prepaid insurance, etc. | 3,627,000 | 2,680,000 |
| Total current assets | 192,689,000 | 186,202,000 |
| | | |
| **INVESTMENTS** *(Note 2)* | 49,120,000 | 46,312,000 |
| | | |
| **PROPERTIES AND EQUIPMENT**, at cost less | | |
| depreciation and depletion *(Note 3)* | 386,724,000 | 384,460,000 |
| | | |
| **INTANGIBLE ASSETS** | | |
| Patents, trademarks, formulae, processes, etc., | | |
| at cost less amortization | 573,000 | 876,000 |
| Intangibles resulting from acquisitions | 23,553,000 | 23,553,000 |
| | 24,126,000 | 24,429,000 |
| | | |
| **DEFERRED CHARGES** | 4,144,000 | 3,275,000 |
| | $656,803,000 | $644,678,000 |

MAXUS0114320
ALCD-PUBCOM_0002137

| Liabilities | 1969 | 1968 |
|---|---:|---:|
| **CURRENT LIABILITIES** | | |
| Notes payable . . . . . . . . . . . . | $ 13,980,000 | $ 25,446,000 |
| Long-term debt payable within one year . . . . . | 8,413,000 | 10,367,000 |
| Accounts payable . . . . . . . . . . | 41,455,000 | 37,154,000 |
| Federal and foreign income taxes . . . . . . | 3,492,000 | 5,988,000 |
| Employee Thrift Plan savings . . . . . . . | 2,371,000 | 547,000 |
| Accrued taxes, payrolls, interest, etc. . . . . . . | 24,522,000 | 20,054,000 |
| Total current liabilities . . . . . . . . | 94,233,000 | 99,556,000 |
| | | |
| **LONG-TERM DEBT** *(Note 4)* . . . . . . . . . | 154,933,000 | 145,671,000 |
| | | |
| **DEFERRALS AND RESERVES** | | |
| Federal income taxes . . . . . . . . . | 35,561,000 | 31,467,000 |
| Other . . . . . . . . . . . . . . | 4,135,000 | 4,623,000 |
| | 39,696,000 | 36,090,000 |
| | | |
| **STOCKHOLDERS' EQUITY** | | |
| Preferred Stock *(Note 5)* . . . . . . . . | 35,754,000 | 35,683,000 |
| Special Common Stock *(Note 6)* . . . . . . . | 2,955,000 | 2,717,000 |
| Common Stock *(Note 6)* . . . . . . . . | 104,400,000 | 102,947,000 |
| Retained earnings per accompanying statement . . . . . | 224,855,000 | 222,043,000 |
| | 367,964,000 | 363,390,000 |
| Less — Common treasury stock — 799 shares at cost . . . . | 23,000 | 29,000 |
| | 367,941,000 | 363,361,000 |
| | $656,803,000 | $644,678,000 |

23

## Diamond Shamrock Corporation Consolidated Statement of Retained Earnings
*Year ended December 31*

|  | 1969 | 1968 |
|---|---|---|
| RETAINED EARNINGS at beginning of year *(Note 1)* . . . . | $222,043,000 | $214,810,000 |
| NET INCOME for the year . . . . . . . . . . . . | 30,671,000 | 34,987,000 |
|  | 252,714,000 | 249,797,000 |
| Dividends: |  |  |
| Preferred |  |  |
| $4.00 series . . . . . . . . . . . . | 1,339,000 | 1,366,000 |
| $2.00 series . . . . . . . . . . . . | 1,853,000 | 1,850,000 |
| $1.20 series . . . . . . . . . . . . | 4,464,000 | 4,628,000 |
| $1.15 series . . . . . . . . . . . . | 701,000 | — |
| Common — $1.40 a share . . . . . . . . . . | 19,502,000 | 16,467,000 |
| Paid by merged companies . . . . . . . . . . | — | 2,995,000 |
| Other . . . . . . . . . . . . . . . . | — | 448,000 |
|  | 27,859,000 | 27,754,000 |
| RETAINED EARNINGS . . . . . . . . . . . . | $224,855,000 | $222,043,000 |

## Notes to Financial Statements

**Note 1: Consolidation Policy**

It is the policy of Diamond to consolidate all domestic sub-sidiary companies, except one 60% owned subsidiary which is included at Diamond's equity, and all wholly-owned foreign subsidiary companies. In addition, Diamond follows the practice of carrying its investments in 50% owned domestic companies and foreign companies and foreign subsidiaries not wholly-owned on the basis of its equity in the underlying net assets.

Effective February 19, 1969, Diamond issued 220,000 shares of Common Stock (including 68,000 treasury shares) in exchange for the outstanding shares of Taylor-Evans Seed Company. For accounting purposes this transaction was treated as a pooling of interests. Accordingly, the retained earnings of Taylor-Evans ($101,000) were added to the retained earnings of Diamond and the excess ($1,076,000) of cost of the treasury shares over the stated value of the shares received in exchange has been charged to retained earnings as of January 1, 1968.

MAXUS0114322
ALCD-PUBCOM_0002139

## Note 2: Investments

| | December 31, 1969 | 1968 |
|---|---|---|
| Investments and advances to affiliated and 50% owned companies, at equity in underlying net assets .......... | $ 9,533,000 | $ 6,664,000 |
| Other securities at cost: | | |
| Interlake Steel Corporation (market value $10,273,000) .. | 8,127,000 | 8,127,000 |
| Terra Chemicals International, Inc. .......... | 10,000,000 | 10,000,000 |
| Other domestic ............. | 7,983,000 | 8,322,000 |
| Foreign ................... | 10,089,000 | 9,144,000 |
| Miscellaneous .............. | 4,618,000 | 5,381,000 |
| | 50,350,000 | 47,638,000 |
| Less — Reserve for loss on investments ............... | 1,230,000 | 1,326,000 |
| | $49,120,000 | $46,312,000 |

## Note 3: Properties

| | December 31, 1969 | 1968 |
|---|---|---|
| Oil, gas and other raw material resources .......... | $142,818,000 | $137,458,000 |
| Processing facilities .......... | 400,326,000 | 389,694,000 |
| Lake transport vessels .......... | 70,496,000 | 69,909,000 |
| Other transportation, marketing and general facilities ......... | 125,879,000 | 117,758,000 |
| Construction in progress ........ | 16,357,000 | 11,656,000 |
| | 755,876,000 | 726,475,000 |
| Less — Accumulated depreciation and depletion .............. | 369,152,000 | 342,015,000 |
| | $386,724,000 | $384,460,000 |

The provision for depreciation, depletion and amortization was $35,919,000 for 1969 and $35,268,000 for 1968. Oil and gas, lake transport and other transportation, marketing and general facilities are depreciated and depleted generally on the straight-line method. Chemical processing equipment is also depreciated on the straight-line method except for additions during the years 1954-1967 which are depreciated on an accelerated method. For all facilities, accelerated depreciation has been used for income tax purposes where permitted and appropriate provision has been made for the resulting deferred taxes.

## Note 4: Long-term debt

| | December 31, 1969 | 1968 |
|---|---|---|
| Sinking fund debentures: | | |
| 3⅞% due 1972-1978 ........ | $ 9,669,000 | $ 9,967,000 |
| 4⅝% due 1970-1987 ........ | 21,543,000 | 22,436,000 |
| 7¾% due 1976-1994 ........ | 42,300,000 | — |
| Notes: | | |
| Revolving credit loans ....... | — | 27,500,000 |
| 5% due 1970-1972 .......... | 6,000,000 | 8,000,000 |
| 4.65% due 1970-1989 ....... | 30,000,000 | 30,000,000 |
| 4¾% due 1970-1971 ........ | 9,000,000 | 11,000,000 |
| 4½% due 1970-1987 ........ | 6,750,000 | 7,125,000 |
| Lease purchase agreement .... | 15,875,000 | 16,281,000 |
| Purchase money obligations and other loans .............. | 22,209,000 | 23,729,000 |
| | 163,346,000 | 156,038,000 |
| Less — Due within one year .... | 8,413,000 | 10,367,000 |
| | $154,933,000 | $145,671,000 |

## Note 5: Preferred Stock

At December 31, 1969, 6,000,000 shares of cumulative convertible Preferred Stock without par value were authorized. Shares outstanding at that date are shown below:

| | Shares Outstanding | Stated Value | Liquidation Value | Conversion Basis* |
|---|---|---|---|---|
| $4.00 Initial Series | 237,908 | $ 3,093,000 | $ 23,791,000 | 2.6 |
| 4.00 Series B | 94,805 | 1,233,000 | 9,481,000 | 2.6 |
| 2.00 Series C | 926,476 | 9,460,000 | 38,912,000 | 1.15 |
| 1.20 Series D | 3,721,130 | 7,339,000 | 78,144,000 | .45 |
| 1.15 Series E | 585,072 | 14,629,000 | 15,358,000 | .75 |
| | 5,565,391 | $35,754,000 | $165,686,000 | |

*Represents shares of Common into which each share of Preferred is convertible.

At December 31, 1969, 4,059,660 shares of Common Stock were reserved for conversion of the outstanding Preferred Stock including Preferred shares issuable under stock options.

Changes in the outstanding shares of Preferred Stock during the year are summarized below:

| | Shares | Stated Value |
|---|---|---|
| Balance at December 31, 1968 ... | 5,560,620 | $35,683,000 |
| Issued on exercise of options .... | 13,253 | 182,000 |
| Converted into Common shares ... | (8,482) | (111,000) |
| Balance at December 31, 1969 ... | 5,565,391 | $35,754,000 |

## Note 6: Common and Special Common Stock

At December 31, 1969, 21,000,000 shares of Common Stock and 700,000 shares of Special Common Stock with no par value were authorized. Changes in shares are shown below.

| | Common Stock | | Special Common Stock | |
|---|---|---|---|---|
| | Shares | Stated Value | Shares | Stated Value |
| Dec. 31, 1968 As previously reported | 13,760,570 | $101,447,000 | 569,859 | $2,717,000 |
| Taylor-Evans | 152,000 | 1,500,000 | — | — |
| Exercise of stock options | 85,267 | 1,335,000 | 20,357 | 238,000 |
| Conversion of Preferred Stock | 20,254 | 111,000 | — | — |
| Other changes | — | 7,000 | — | — |
| Dec. 31, 1969 | 14,018,091 | $104,400,000 | 590,216 | $2,955,000 |

The summary above includes 35,693 Common shares held for incentive compensation awards.

The Special Common Stock is a voting stock on which no cash dividend may be paid to stockholders of record prior to December 1, 1972, but dividends thereafter will be at the same rates for both the Special Common and Common shares. Diamond may at its sole option convert the Special Common into Common Stock on a share for share basis and 618,733 shares of Common are reserved for that purpose, including provision for 28,517 shares of Special Common issuable under stock options.

## Note 7: Stock Options

| | Common Stock | | Special Common Stock | Preferred Stock |
|---|---|---|---|---|
| | Thrift Plans | Other Plans | | |
| Balance December 31, 1968 | 199,894 | 302,587 | 55,418 | 52,289 |
| Granted | — | 60,800 | — | — |
| Exercised | (29) | (85,238) | (20,357) | (13,253) |
| Cancelled | (69,658) | (49,000) | (6,544) | (7,970) |
| Balance December 31, 1969 | 130,207 | 229,149 | 28,517 | 31,066 |

At December 31, 1969, 57,611 Common shares are reserved for future grants under Common Stock option plans. Under the current Thrift Plan the option price is $32.88 per share. Under other Common Stock plans, option prices range from $22.06 to $35.56 a share, except that under the options assumed from Shamrock the price is $28.17 per option unit (each unit comprising ¾ of a share of Common Stock and ½ of a share of Series D Preferred Stock) and under the options assumed from Pickands Mather the prices range from $10.00 to $27.50 an option unit (each unit comprising .8 of a share of Common Stock and .25 of a share of Special Common Stock).

## Note 8: Pension Costs

The charges to income for pension costs of the several pension plans were $5,384,000 in 1969 and $4,774,000 in 1968, which amounts are funded currently. These charges include amortization of past service costs over periods ranging from 25 to 40 years.

## Note 9: Income Taxes

The provision for current federal and foreign income taxes has been reduced by investment credits of $1,616,000 in 1969 and $3,305,000 in 1968. The provision for deferred taxes represents taxes relating principally to the excess of depreciation for income tax purposes over depreciation reflected in the accompanying financial statements.

## Note 10: Extraordinary Items

The extraordinary items in 1968 represent the gain of $918,000 on the sale of the Bessemer cement plant and business after deducting $2,106,000 of applicable income tax and investment credit to be repaid and a provision of $500,000 for investments.

## Note 11: Commitments and Contingent Liabilities

At December 31, 1969 the Company had long-term leases for certain railroad tank cars, barges, service stations, and other facilities. The aggregate rentals thereon approximate $3,803,000 annually for an average of 10 years.

In connection with its investments in the Wabush and Savage River Projects, both large iron ore mining ventures, a subsidiary of Diamond has contracted, among other things, to pay (whether or not ore is produced) its ownership share of Wabush costs and to maintain a portion of the working capital of one of the joint venture corporations in the Savage River Project.

Loan guarantees amounted to $5,112,000. Authorization and contracts for new plant facilities approximate $43,946,000 at December 31, 1969.

25

**Diamond Shamrock Corporation Historical Information**
*(In thousands of dollars, except per share of common stock
and book value of common stock)*

| | 1969 | 1968 | 1967 | 1966 | 1965 | 1964 | 1963 | 1962 | 1961 | 1960 |
|---|---|---|---|---|---|---|---|---|---|---|
| RESULTS OF OPERATIONS[A] | | | | | | | | | | |
| Sales of products and operating revenues | $541,259 | $524,784 | $498,295 | $484,589 | $441,385 | $397,467 | $363,556 | $354,684 | $328,983 | $325,849 |
| Net income | 30,671 | 34,569[B] | 41,529[C] | 41,748 | 35,422 | 31,712[D] | 26,518 | 25,395 | 24,338 | 27,718 |
| Net income per average share outstanding | 1.54 | 1.83[B] | 2.34[C] | 2.38 | 1.94 | 1.68[D] | 1.30 | 1.22 | 1.14 | 1.39 |
| | | | | | | | | | | |
| FINANCIAL POSITION[A] | | | | | | | | | | |
| Total assets | $656,803 | $644,678 | $629,900 | $586,623 | $525,127 | $484,436 | $458,138 | $435,521 | $407,987 | $374,821 |
| Working capital | 98,456 | 86,646 | 84,016 | 87,408 | 80,727 | 93,575 | 64,565 | 63,429 | 60,504 | 64,150 |
| Net plant and equipment | 386,724 | 384,460 | 382,692 | 339,658 | 305,676 | 285,258 | 289,543 | 274,997 | 262,454 | 239,205 |
| Long-term debt | 154,933 | 145,671 | 154,239 | 146,460 | 106,740 | 105,927 | 93,670 | 89,212 | 81,286 | 79,886 |
| Stockholders' equity | 367,941 | 363,361 | 351,862 | 330,542 | 304,807 | 286,358 | 275,155 | 267,436 | 256,666 | 230,725 |
| | | | | | | | | | | |
| OTHER DATA | | | | | | | | | | |
| Capital expenditures[A] | $ 41,763 | $ 55,035 | $ 80,156 | $ 68,772 | $ 51,578 | $ 37,430 | $ 37,965 | $ 40,298 | $ 44,858 | $ 40,343 |
| Depreciation, depletion and amortization[A] | 35,919 | 35,268 | 34,640 | 31,354 | 29,241 | 30,797 | 27,906 | 26,339 | 23,411 | 20,073 |
| Book value per share assuming conversion of preferred stock | 19.70 | 19.65 | 17.65 | 21.96 | 20.36 | 19.01 | 18.01 | 17.42 | 16.92 | 16.26 |
| Approximate market price range per common share | 36-18 | 37-28 | 42-30 | 49-25 | 36-26 | 30-25 | 27-22 | 35-19 | 37-29 | 32-25 |
| Common shares outstanding at year-end | 14,571,815 | 14,222,412 | 11,723,513 | 6,134,675 | 6,025,571 | 3,005,873 | 3,004,327 | 2,999,073 | 3,033,191 | 3,030,626 |
| Common stockholders of record | 38,814 | 36,176 | 28,136 | 15,086 | 10,838 | 9,543 | 9,843 | 10,267 | 10,393 | 10,358 |
| Special common stockholders of record | 2,049 | 2,297 | — | — | — | — | — | — | — | — |
| Preferred stockholders of record | 21,491 | 20,847 | 16,587 | 1,584 | 1,523 | 1,482 | 1,477 | 1,476 | 1,432 | — |
| Number of employees | 11,154 | 11,082 | 9,381 | 6,550 | 6,122 | 5,506 | 5,312 | 5,355 | 5,554 | 5,321 |

(A) Restated to include data for all periods for mergers accounted for on a pooling of interests basis.
(B) Excludes extraordinary gain of $418,000 or $.01 per share.
(C) Excludes extraordinary gain of $1,006,000 or $.07 per share.
(D) Excludes extraordinary loss of $2,413,000 or $.17 per share.

26

27

MAXUS0114324

ALCD-PUBCOM_0002141

## Diamond Shamrock Chemical Company



*300 Union Commerce Bldg.*
*Cleveland, Ohio 44115*

A diversified producer of organic and inorganic
chemicals and chemical specialties, plastics and plastic
products, and biochemical products for the health and
nutrition of man, plants and animals.

**Officers**

Arthur B. Tillman
*Chairman*

G. G. Pirrone
*President*

Roger P. Batchelor, Jr.
*Group Vice President*

W. H. Bricker
*Group Vice President*

Steve Puschaver
*Group Vice President*

George G. Stier
*Vice President — Administration*
*and Marketing*

Harry A. Batley
*Vice President*

Harry E. Connors, Jr.
*Vice President*

Melvin Hochberg
*Vice President*

William L. McFadden
*Vice President*

S. S. Savage
*Vice President*

R. C. Sutter
*Vice President*

Fred S. Strauss
*President*
*Harte & Company, Inc.*

## Diamond Shamrock Oil and Gas Company



*First National Bank Bldg.*
*Amarillo, Texas 79105*

An integrated producer engaged in all phases of
the oil and gas business including exploration for,
developing, transporting, refining and marketing of
petroleum and its products.

**Officers**

C. A. Cash
*Chairman*

J. Avery Rush, Jr.
*President*

Bill J. Montgomery
*Executive Vice President*

Harry M. Britt, Jr.
*Vice President*

Thomas S. Clopton
*Vice President*

Riley M. Epps
*Vice President*

W. E. Notestine
*Vice President*

E. T. Rogers
*Vice President*

Charles E. Trolinger
*Vice President*

C. D. Van Vliet
*Vice President*

B. A. Wulfman
*Vice President*

## Pickands Mather & Co. *(A Subsidiary)*



*2000 Union Commerce Bldg.*
*Cleveland, Ohio 44115*

An international company engaged in the exploration
for minerals and management of mineral properties,
the operation of Great Lakes and St. Lawrence Seaway
fleets, production and sale of coke and limestone
products, and agency and broker sales of various
commodities and products.

**Officers**

Keith S. Benson
*Chairman*

Robert S. Carey
*President*

William E. Conway
*Executive Vice President*

George S. Lockwood, Jr.
*Senior Vice President*

J. S. Abdnor
*Vice President*

Bernard F. Borgel
*Vice President*

Donald M. Chisholm
*Vice President*

John S. Crawford, II
*Vice President*

Leonard J. Gee
*Vice President and Treasurer*

Elton Hoyt, III
*Vice President*

R. L. Saunders
*Vice President*

Robert H. Chisholm
*President, The Carbon*
*Limestone Company*

28

MAXUS0114325
ALCD-PUBCOM_0002142

# Diamond Shamrock Corporation

**Board of Directors**

Keith S. Benson
*Executive Vice President*

C. A. Cash
*Executive Vice President*

E. M. de Windt*
*Chairman*
*Eaton Yale & Towne Inc.*
*Cleveland, Ohio*

J. Richardson Dilworth
*Rockefeller Family & Associates*
*New York, New York*

J. H. Dunn
*Ranching and Investments*
*Amarillo, Texas*

Raymond F. Evans*
*Chairman of the Board*

William H. Evans
*Limited Partner*
*Ball, Burge & Kraus*
*Cleveland, Ohio*

James A. Hughes*
*President and*
*Chief Executive Officer*

Edgar S. Lewis
*Vice President*
*Mellon National Bank and Trust Co.*
*Pittsburgh, Pennsylvania*

R. G. Morrison, Jr.
*Trustee*
*Thomas Morrison Trusts*
*El Dorado, Kansas*

V. P. Patterson
*Chairman of the Board*
*The First National Bank of Amarillo*
*Amarillo, Texas*

Wallace R. Persons*
*Chairman and*
*Chief Executive Officer*
*Emerson Electric Company*
*St. Louis, Missouri*

John W. Reavis*
*Managing Partner*
*Jones, Day, Cockley & Reavis*
*Cleveland, Ohio*

J. Avery Rush, Jr.
*President*
*Diamond Shamrock Oil and Gas Company*

Horace A. Shepard*
*Chairman*
*TRW Inc.*
*Cleveland, Ohio*

John Sherwin*
*Retired Chairman of the Board*
*Pickands Mather & Co.*

George G. Stier
*Vice President*

Fred S. Strauss
*Vice President*

Arthur B. Tillman
*Executive Vice President*

Robert E. Williams
*Vice Chairman*
*Lykes-Youngstown Corporation*
*and President of its subsidiary,*
*Youngstown Sheet and Tube Company*
*Youngstown, Ohio*

*Executive Committee

**Officers**

Raymond F. Evans*
*Chairman of the Board*

James A. Hughes*
*President and*
*Chief Executive Officer*

Keith S. Benson*
*Executive Vice President*

C. A. Cash*
*Executive Vice President*

Arthur B. Tillman*
*Executive Vice President*

C. Richard Brown
*Vice President, Employee Relations*

Donald S. Catterson
*Vice President, New Ventures*

Allen H. Ford
*Vice President, Finance*

J. Lynn Fordham
*Vice President*
*Research & Corporate Development*

G. G. Pirrone
*President*
*Diamond Shamrock Chemical Company*

J. Avery Rush, Jr.
*President*
*Diamond Shamrock Oil and Gas Company*

George G. Stier
*Vice President*

Fred S. Strauss
*Vice President*

John A. Wilson
*Vice President and Secretary*

Robert McInnes
*Treasurer*

Peter J. Joyce
*Controller*

William A. Crichley
*President*
*Diamond Shamrock Pension Trusts*

* Executive Office

GENERAL OFFICES
300 Union Commerce Building
Cleveland, Ohio 44115
Telephone (216) 621-6100

INDEPENDENT ACCOUNTANTS
Price Waterhouse & Co., Cleveland, Ohio

TRANSFER AGENTS, COMMON AND PREFERRED STOCKS
Mellon National Bank and Trust Company
Pittsburgh, Pennsylvania
Bankers Trust Company, New York, New York

REGISTRARS, COMMON AND PREFERRED STOCKS
Pittsburgh National Bank, Pittsburgh, Pennsylvania
Chemical Bank, New York, New York

STOCK LISTINGS
New York Stock Exchange (DIA)
Pacific Coast Stock Exchange *(common stock only)*

Daconil 2787, Dacromet, Dacthal, Dalvor, Dion, Heritage House,
Massive Manganese are registered trade names of
Diamond Shamrock Corporation.

29

# Diamond Shamrock Corporation

*300 Union Commerce Building · Cleveland, Ohio 44115*



MAXUS0114327
ALCD-PUBCOM_0002144

# EXHIBIT 43

OxyChem's Comments in Opposition to Proposed Consent Decree,
*United States v. Alden Leeds, Inc., et al.*, Civil Action No. 2:22-cv-07326 (D.N.J.)

ALCD-PUBCOM_0002145

Diamond Shamrock
*Annual Report 1983*



OCCN00000531
ALCD-PUBCOM_0002146

## Highlights

| Financial (dollars in thousands, except per share) | 1983 | 1982 | 1981 | 1980 | 1979 |
|---|---|---|---|---|---|
| Sales and operating revenues | $4,026,107 | $3,177,379 | $3,376,215 | $3,145,394 | $2,312,635 |
| Income (loss) from continuing operations | (60,217) | 149,543 | 230,156 | 213,246 | 160,439 |
| Net income (loss) | (56,163) | 185,091 | 121,265 | 208,386 | 181,690 |
| Depreciation, depletion, and amortization | 482,703 | 217,787 | 171,143 | 149,666 | 143,582 |
| Funds provided by operations (cash flow) | 476,877 | 446,527 | 462,899 | 423,926 | 360,353 |
| Capital expenditures and investments | 466,853 | 660,193 | 590,945 | 449,882 | 310,413 |
| Stockholders' equity | 2,743,327 | 1,407,231 | 1,349,735 | 1,329,162 | 1,101,446 |
| Total assets | 6,024,441 | 3,194,013 | 3,016,385 | 2,895,457 | 2,514,541 |
| Debt as % of total capitalization | 37.8% | 34.9% | 34.7% | 35.4% | 37.8% |
| Per common share | | | | | |
|   Income from continuing operations | $ (.76) | $ 2.37 | $ 3.68 | $ 3.48 | $ 2.72 |
|   Net income | (.71) | 2.94 | 1.94 | 3.40 | 3.08 |
|   Stockholders' equity | 20.50 | 22.14 | 21.48 | 21.29 | 18.55 |
|   Total assets | 45.03 | 50.25 | 47.99 | 46.38 | 42.34 |
|   Dividends paid | 1.76 | 1.76 | 1.70 | 1.62 | 1.51 |
|   Market price range | 26⅜-18⅜ | 25¼-16½ | 39⅝-23¾ | 38⅞-23⅛ | 31½-19 |
| Average common shares outstanding | 85,998,124 | 62,900,574 | 62,612,062 | 61,215,673 | 59,032,147 |
| Number of stockholders | 68,516 | 52,078 | 49,200 | 48,701 | 46,841 |
| | | | | | |
| **Operations** (all figures net) | | | | | |
| Proved reserves | | | | | |
|   Crude oil and condensate (millions of bbls.) | 120.2 | 33.3 | 36.0 | 36.0 | 37.3 |
|   Natural gas (millions of oil-equivalent bbls.) | 152.5 | 146.6 | 155.2 | 148.9 | 144.3 |
|   Natural gas (billions cu. ft.) | 915.2 | 879.5 | 931.3 | 893.5 | 865.9 |
| Average daily production | | | | | |
|   Crude oil and condensate (bbls.) | 31,963 | 10,426 | 10,461 | 9,599 | 9,171 |
|   Natural gas (oil-equivalent bbls.) | 43,852 | 46,702 | 51,443 | 50,460 | 50,264 |
|   Natural gas (thousands cu. ft.) | 263,113 | 280,212 | 308,658 | 302,760 | 301,584 |
| Refined products sales (bbls./day) | 130,986 | 90,324 | 83,595 | 84,481 | 68,574 |
| Natural gas liquids recovered (bbls./day) | 20,711 | 23,008 | 23,705 | 23,316 | 24,005 |
| Number of employees (Dec. 31) | 13,364 | 10,880 | 13,545 | 13,952 | 13,788 |

### Index

Letter to Shareholders — 3
Diamond Shamrock Exploration Company — 7
Natomas Company — 10
Diamond Shamrock Refining and Marketing Company — 15
Diamond Shamrock Coal Company — 18
Diamond Shamrock Chemicals Company — 21

Management's Discussion and Analysis
  of Financial Position and Results of Operations — 24
Consolidated Statement of Income — 27
Consolidated Balance Sheet — 28
Consolidated Statement of Stockholders' Equity — 29
Consolidated Statement
  of Changes in Financial Position — 30
Financial Summary — 31
Report of Independent Accountants — 45
Report of the Company — 46
Supplementary Information — 47
Historical Information — 56
Corporate Officers — 58
Board of Directors — 60
General Information (inside back cover)

OCCNJ0006532
ALCD-PUBCOM_0002147

Today's Diamond Shamrock has been repositioned as an energy company to offer our shareholders attractive, long-term opportunities for investment growth.

Our transformation into a domestic integrated oil and gas company has resulted from a managed plan of investment in our strengths.

Over the past five years, we have assembled an inventory of oil, natural gas, and coal prospects that hold exciting potential for future earnings.

At the same time, we have structured our refining and marketing as well as chemical businesses to provide the strong cash flow necessary to aggressively pursue and develop those opportunities on a continuing basis.

More specifically, in the last five years we have:

- increased daily oil production 500% through drilling and acquisitions in North America, Indonesia, and the North Sea.
- expanded natural gas production capacity by one-third.
- added 50% more oil-equivalent reserves.
- enlarged by six and a half times our net leasehold acreage worldwide.
- more than doubled refinery output.
- acquired one of the nation's largest independent fuel marketers.

- increased Diamond Shamrock-branded fuel outlets by one-third.
- built one of the most efficient and profitable coal businesses in the world.
- tripled coal reserves.
- streamlined and focused our chemical operations, among the nation's largest and most efficient.
- added an "alternative energy" business, as 50% owner of the world's largest geothermal energy project.

Our strong asset base, our energy prospects, and our financial strength attractively position Diamond Shamrock for the future.

OCCNJ0006533
ALCD-PUBCOM_0002148

**Sales and operating revenues**
*(in millions)*

$2,312.6  $3,145.4  $3,376.2  $3,117.4  $4,026.1




79  80  81  82  83

**Income from continuing operations**
*(in millions)*

$160.4  $213.2  $220.2  $149.5  $(69.2)





79  80  81  82  83

**Earnings per common share
from continuing operations**

$2.72  $3.68  $3.68  $2.37  $(1.76)



79  80  81  82  83

**Dividends per common share**
*Indicated annual dividend = $1.76*

$1.51  $1.62  $1.70  $1.76  $1.76



79  80  81  82  83

**Return on stockholders' equity**
*(percent)*

15.4  17.5  17.2  10.8  (3.1)



79  80  81  82  83

**Return on capital employed**
*(percent)*

9.5  10.9  9.9  5.7  (1.6)

79  80  81  82  83

2

OCCNJ0006534
ALCD-PUBCOM_0002149

**To Our Shareholders:**



William H. Bricker

**Financial strength maintained.**

**Write-offs result in loss for year.**

OCCNJ0006535
ALCD-PUBCOM_0002150



J. L. Jackson

**Increase in oil production tops operating achievements.**

Our Exploration Company set a new record for crude oil output, increasing oil production 6% from properties owned prior to the merger with Natomas.

Combined with four months of oil production contributed by Natomas, our total crude oil output rose 20% to 31,963 barrels per day averaged over the entire year. Oil production will increase dramatically again in 1984 as we benefit from a full 12 months of output from Natomas properties.

We increased our exposure to potentially significant new oil and gas reserves by acquiring additional exploratory prospects in the Gulf of Mexico, in Colombia, offshore Tunisia, and in the China Sea and the Dutch North Sea.

We continued to increase our natural gas production capacity, building total deliverability to 400 million cubic feet per day. The location and cost-effectiveness of our production and our contract mix could allow us to substantially increase gas volumes and profitability in the next two years, given a sustained, even modest, increase in demand.

We further upgraded our refineries, increased refining capacity, added a near-record number of branded fuel outlets, and sold a record number of gallons of refined products in 1983.

We began aggressively seeking long-term contract customers for a one-billion-ton Alaskan coal resource, in which we are operator and 50% interest owner. Several years of study has confirmed that we could become the lowest cost supplier of energy to rapidly expanding Pacific Rim economies.

These developments represent opportunities to find, produce, and deliver substantial new supplies of oil, gas, and coal in 1984 and beyond.

**Solid performance expected in 1984 as investments continue to pay off.**

As an investor, what can you expect from Diamond Shamrock in 1984? Good performance.

In exploration and production, we will continue the same kind of highly focused drilling program that gave us record U.S. production in 1983. We will develop our most promising acreage while seeking outstanding exploratory prospects.

New domestic oil tracts already on stream will, we believe, result in a solid increase in crude oil volumes during 1984, while our Indonesian operations should increase the high production levels achieved in 1983. Our domestic natural gas production capability has increased substantially, although we expect only a modest increase in delivered volumes for the year due to continuing excess deliverability nationwide.

4

OCCNJ0006536
ALCD-PUBCOM_0002151

We will increase capital spending for exploration and development to $500 million worldwide. Given the lower cost of drilling and our rifle-shot approach to exploration, that investment bodes well for future production.

In refining and marketing, the competitive environment will keep pressure on profit margins. We will enhance profitability by enlarging our market share through an expanded number of company-owned and jobber outlets. Since we operated our refineries near 100% of capacity, as sales rise we also plan to increase refining capacity through incremental expansions.

We expect a repetition of last year's excellent performance in coal, based on our long-term sales contracts and efficient mining operations.

Our chemical businesses will show substantial improvement as the industrial economy expands, and will continue to provide attractive cash flow to the company.

Finally, our geothermal operations should show increased earnings as prices and capacity utilization rise.

The strong cash flow from these operations and from other sources, such as redeployment of assets, should reach an all-time high of over $1 billion — more than adequate to fund record capital spending and investments of more than $700 million, support our dividend, and pay down debt.

In short, we anticipate net positive results from all our businesses. Diamond Shamrock's earnings should rise substantially above the level reached in 1983 before write-offs and adjustments.

As we look to the year ahead, we believe you can expect solid performance from Diamond Shamrock.

William H. Bricker
Chairman and Chief Executive Officer

L. L. Jackson
President and Chief Operating Officer

J. Avery Rush, Jr.
Vice Chairman

*February 16, 1984*



J. Avery Rush, Jr.

OCCNJ0006537
ALCD-PUBCOM_0002152



*Oil production from properties we owned prior to the Natomas merger rose 6% in 1983, reaching a record level. Wells brought on stream at year end and drilling in 1984 will substantially boost oil output again.*

6

## DIAMOND SHAMROCK
## EXPLORATION COMPANY

**Exceptional achievements despite tough challenges.**
It was a year of uncommon challenges for Diamond Shamrock Exploration Company: Natural gas production remained severely curtailed nationwide, world crude oil prices fell, and our Mukluk exploratory prospect in Alaska's Beaufort Sea was proven dry, resulting in a $194.3 million charge against earnings and a $73.9 million operating loss for the Exploration Company.

But 1983 was also a year of exceptional achievements and solid progress toward long-term earnings growth:
■ Including four months of non-Indonesian production acquired with Natomas, Exploration Company crude oil output reached a new high, rising 30% over 1982 to 13,571 barrels per day.
■ Natural gas production capacity also increased substantially, to 400 million cubic feet per day; and, while customer curtailments lowered 1983 deliveries to an average of 263 million cubic feet per day, as we entered 1984 deliveries had increased substantially.
■ At year-end 1983, Exploration Company oil-equivalent reserves, including non-Indonesian reserves acquired with Natomas, were up 10% from year-end 1982 at 198 million barrels. *
■ Our search for significant new sources of oil and gas in frontier areas around the world continued to expand.
■ The Exploration Company achieved record sales of $294.8 million compared to $254.5 million the year before. Excluding the Mukluk write-off, 1983 operating profit was $120.4 million, compared to the previous year's $135.2 million which included a $30 million gain from sale of leases and the contribution of a royalty interest to the company's pension plans.

*Year-end reserve and production data do not include properties to be sold in 1984 under an agreement in principle signed in January with Apache Petroleum Company.*

Over the coming year, we believe Diamond Shamrock Exploration Company will significantly increase its profitability and long-term potential for earnings growth through increasing crude oil production, higher natural gas volumes, and an expanded program of selective exploratory and development drilling.

**Efficiency of drilling program improves.**
Drilling about half as many wells in 1983 as in 1982, we concentrated on our highest-potential prospects onshore and on increasing production at four major platforms offshore.

As a result, we significantly increased reserve additions per well, and the percentage of productive wells improved to 75%, versus 66% in 1982. Not counting reserves acquired with Natomas, we replaced all of the oil and a substantial portion of the gas we produced in 1983.

The cost-effectiveness of these higher quality wells was further enhanced by intense competition among oilfield service and equipment suppliers, which lowered drilling costs.

**Oil production reaches all-time high.**
Exclusive of production acquired from Natomas, we increased average oil output to 11,063 barrels per day for the year, 6% above the 1982's 10,426 barrels per day.

Most new production came from our Main Pass 72/74 offshore platforms, and from new oilfields in the Powder River Basin of Wyoming. In addition, we brought on new production in the East Texas Basin, the Permian Basin of West Texas, and in Northwest Kansas.

Including the Natomas properties, which were made part of the Exploration Company on August 31, 1983, average daily oil production for the entire year rose to 13,571 barrels.


Exploration Company operating profit (in millions)


Exploration Company sales (in millions)

7



Exploration Company
oil-equivalent production
(in barrels per day)

Alberta    Alaska




Natural gas
Crude oil
Synthetic crude gas
Fuel oil

Exploration Company
net acreage
(in thousands)

Exploration Company
North American
drilling and acreage
*Counties & areas with
significant lease holdings*
*Areas of significant
drilling activity - 1984*





Foreign developed
Foreign undeveloped
U.S. developed
U.S. undeveloped

Exploration Company
net proved reserves
(millions of barrels)



Oil and condensate
Natural Gas (oil equivalents)
(6,000 cubic feet gas
(1 bbl. oil)

### Oil production, revenues expected to rise.

### Natural gas offers strong earnings potential.

8

OCCNJ0006540
ALCD-PUBCOM_0002155



Exploration Company
spending for drilling
*(in thousands)*

Net well completions

Exploration Company
average oil price
*(per barrel)*



**Drilling budgets to double.**



Exploration Company
average natural gas price
*(per thousand cubic feet)*

Exploration Company
U.S. offshore
drilling and acreage
Undeveloped
Producing
Development or
exploratory drilling
Completed, mature
on market

OCCNJ0006541
ALCD-PUBCOM_0002156

With our deserving successes in this recent [illegible], we are expanding tracts acquired during 1983 in the Borneo and parts sections of the North Sea, with a 12.5% working interest and 28% [illegible] in Gross oil, Liberal interest in India [illegible] [illegible] interest

Of special interest will be the exploration of three tracts acquired in 1983 covering 849,000 net acres on the eastern flank of the Colombian Andes. The prospect appears geologically similar to a significant producing formation nearby.

In addition, we are evaluating a 237,000-acre block in the South China Sea acquired in 1983, one of the few concessions granted to American companies by the Peoples Republic of China. We have a 25% interest in the block.

And we are continuing to evaluate and explore acreage offshore Australia.

We will continue to consider other means of enhancing returns on our overall investment, through trading of properties, joint ventures, acquisitions, or sale of limited-income-producing oil and gas assets for redeployment in drilling projects of potentially greater return.

### Oil and gas: An investment in the future.

For more than a decade, the world has not replaced its oil and gas reserves as fast as it is consumed them, especially in the United States. Now U.S. oil and gas demand, which has lagged the general economic recovery, appears to be rising again. The world will need more energy and we believe that for many years to come, oil and gas will provide attractive profit opportunities for properly positioned companies.

Over the years we have assembled a strong asset base. We have steadily increased the size and scope of our search for significant new sources of oil and gas in balance with continually developing

[illegible column]

## NATOMAS COMPANY

### Merger expands energy business.

Our merger with Natomas Company on August 31, 1983 was the major achievement of the year.

Natomas brought us substantial international oil and gas businesses, a portfolio of energy businesses, including producing properties in Canada, the United States, and the British North Sea, and international exploration opportunities across Colombia, Tunisia, and the China Sea.

We have grouped the Indonesian oil and gas operations and the geothermal energy business together as Diamond Shamrock's Natomas Company. The other oil and gas assets, a gasoline and home heating oil business in Canada, and coal mining operations are reflected in the operating results of appropriate companies at Diamond Shamrock.

In its four months as a Diamond Shamrock subsidiary in 1983, Natomas contributed operating profit of $22.8 million — $16.8 million from Indonesian operations and $6 million from geothermal — on sales of $211 million.

### Natomas boosts Diamond Shamrock oil reserves, production.

Through its Ivory Division, Natomas holds interests in two offshore oil and gas contract areas in Indonesia: 53% of the contractor's interest in the Southeast Sumatra area, where it is the operator, and 34% of a more extensive contract area in Northwest Java, operated by the Atlantic Richfield Company.

The contract areas are characterized by prolific reservoirs close to the surface. Together, these contract areas have contributed [illegible]

**Natomas gross production**
*thousands of barrels per day*

Southeast Sumatra oil
Northwest Java
Oil
Liquefied petroleum gas

**Natomas net production**
*thousands of barrels per day*

Southeast Sumatra oil
Northwest Java
Oil
Liquefied petroleum gas

OCCNJ0006542
ALCD-PUBCOM_0002157

ighly skilled at finding and producing oil in
Indonesia. Natomas produces 52,000 net barrels
per day – a level we expect to increase in 1984.



*Our Natomas Company subsidiary achieved record net oil production and reserves in 1983. Among Natomas' primary objectives in 1984 is to identify new contract areas for future exploration and development.*

11

OCCNJ0006543

ALCD-PUBCOM_0002158

than tripled our oil reserves and increased
our oil production more than fivefold.

In 1983, Natomas' Indonesian operations
increased full-year net oil and gas liquids
production to 19.2 million barrels, or
52,500 barrels per day, slightly above a
record 18.8 million barrels, or 51,600 bar-
rels per day in 1982. During the same
period, net oil and gas liquids reserves
increased 9% to 73.9 million barrels.

Since we are accounting for the Natomas
merger as a purchase, only its reserve and
production statistics after August 31, 1983
are included in Diamond Shamrock's con-
solidated statistics.

**Sumatra depletion offset
by new projects and discoveries.**
Southeast Sumatra is the smaller and
more fully developed of Natomas' two
Indonesian contract areas. Gross full-year
1983 oil production from this area was
36.4 million barrels, with 9 million barrels
net to Natomas, compared to a gross
40.5 million and a net 10 million barrels
in 1982.

Since production from Southeast
Sumatra's reservoirs declines rapidly, our
IIAPCO division has focused on bringing
new areas and reserves into production
quickly. Two new areas, the Duma and
the Karmila — both discovered in the first
quarter of 1983 — were brought onto pro-
duction during the third quarter.

In addition, IIAPCO intensified its work-
over program throughout the year, boost-
ing production from old wells and
stemming the normal, expected decline.

As a result of both the new areas and the
workover efforts, gross production at
year-end 1983 reached 105,000 barrels per
day, up significantly from mid-year and
near 1982 average levels.

IIAPCO also initiated a major secondary
recovery project — the first of its kind in
Indonesia — during the first quarter of
1984. A new waterflood facility is process-
ing and injecting more than 200,000 bar-
rels of water per day into productive



**Natomas average oil price**
*(per barrel of
Indonesian production)*

79  80  81  82  83



**Natomas net proved reserves**
*(millions of barrels)*

79  80  81  82  83

*Southeast Sumatra oil
Northwest Java
Oil
Liquefied petroleum gas*



Java Sea

China
India
New
Guinea
Sumatra
Indonesia
Java
Australia

**Natomas production areas**
*Southeast Sumatra contract area
Northwest Java contract area*
■ *Areas of production*

12

OCCNJ0006544
ALCD-PUBCOM_0002159

reservoirs. This project is expected to significantly retard production declines, with initial results becoming evident by mid-1984.

**Java net production reaches record high.**
In Northwest Java, full-year 1983 gross production was 50.7 million barrels, with 10.1 million barrels net to Natomas, compared to 51 million gross, or 8.8 million net barrels, in 1982. Java production has included about 1.2 million net barrels of liquified natural gas in each of the last five years.

As a result of new discoveries and additional production facilities completed in the fourth quarter, production reached 195,000 barrels of oil and 20,000 barrels of natural gas liquids per day at the beginning of 1984, a rate equivalent to 78.5 million gross barrels annually.

**Production outlook steady.**
As we look for additional oil sources in 1984, Natomas' spending for drilling and development is expected to surpass $260 million.

All told, we expect to increase 1983's high level of production capacity this year. Anticipated declines in production capacity in Sumatra will, we are confident, be more than offset by production capacity increases in Java. The Java contract area contains large, undeveloped areas in known producing basins, offering many opportunities for significant increases in production.

**Exploration program seeks new contract areas.**
We have, in addition, budgeted $25 million to identify promising unawarded contract areas in Indonesia, enlisting our years of experience there, our skilled personnel, and good working relationship with Pertamina, the Indonesian government-owned oil company.

This plan is in keeping with our belief that Indonesia represents one of the best places in the world, politically and geologically, to explore for, find, and produce a barrel of oil.

**Diamond Shamrock enters a profitable "alternative" energy business.**
As 50% owner of the world's largest geothermal energy project, Natomas adds a profitable, growing new dimension to Diamond Shamrock's expanding profile in energy production.

Natomas and Union Oil Company of California, the project operator, find and produce steam from naturally heated underground reservoirs at The Geysers in Northern California and supply it to generating plants operated by Pacific Gas and Electric Company (PG&E).

Geothermal energy provides an economical, long-term source of supply, with a pricing formula that keeps geothermal costs under PG&E's average for fossil and nuclear fuels.

For Diamond Shamrock, geothermal offers an attractive source of earnings and cash flow. We have contracted to supply steam for 50 years after the last PG&E generating plant is built.

**Earnings, production rise to record level.**
During 1983, geothermal operating profit for the full year set a record of $51.8 million, 65% over the prior year, reflecting substantial increases in the price of steam and in plant capacity.

Natomas' share of steam generated 2.5 million megawatt-hours of electricity in 1983, equal on a Btu basis to about 4.4 million barrels of oil, or enough electricity to supply half the needs of a city the size of San Francisco. This 32% rise over 1982 resulted primarily from start-up of two new 119-megawatt generating plants, one in late 1982, the other in early 1983.



Natomas' average share of geothermal capacity
(in megawatt-hours)



Share of capacity utilized
(in megawatt-hours)



Steam price
(mills per kilowatt-hour)

OCCNJ0006545
ALCD-PUBCOM_0002160

**G**eothermal steam production and operating profit rose to record levels in 1983. We anticipate further increases in 1984.



*In 1983, Natomas supplied enough geothermal steam to generate half the electricity for a city the size of San Francisco. Natomas explores for and produces steam from naturally heated reservoirs in which the company has a 50% interest.*

OCCNJ0006546
ALCD-PUBCOM_0002161

In addition, utilization of plant capacity increased despite sustained, above-normal precipitation in Northern California, which acted to curtail geothermal energy production in favor of cheaper hydroelectric power.

**Further gains expected.**
In 1984, no capacity will be added from new plants, and hydro-curtailments will continue to restrict steam sales. However, we expect earnings to grow due to modest increases in the steam price and in anticipated plant utilization. Beyond 1984, PG&E's use of nuclear fuel could moderate steam prices, although the timing of any effects remains uncertain.

Among our principal objectives in 1984 is the maximizing of plant output through a cooperative program with PG&E to improve reliability and maintenance efficiency of PG&E's generating equipment. We also are working closely with the utility in its planning of two new generating plants to ensure efficiency of design and operation.

Since we are paid for steam based on the amount of electricity generated, increased efficiency at the customer's plant shows up in our bottom line.

In addition, we will continue to study experimental water reinjection to extend the life of our steam reserves.

**Plant construction, drilling to expand future production.**
Drilling during 1984 will target development of reserves previously proven for a new 119-megawatt plant PG&E has under way. Start-up of the Unit 20 plant is scheduled for year-end 1985. Reserves also have been proven for another 119-megawatt plant set to come on line in 1988. Together, the plants will increase our customer's generating capacity at The Geysers by 25%.

Through exploratory drilling in 1984, we will continue to evaluate the potential for establishing additional reserves for future generating plants at The Geysers. We also will be evaluating plans for developing our Hawaiian geothermal prospect, where we have drilled two exploratory wells, and for another prospect in Northern California where we began drilling a second exploratory well in January of this year.

**Geothermal complements our energy businesses.**
Besides contributing diversity to our energy businesses, geothermal energy provides technology and experience with which we can consider other alternative energy sources in the future.

And much like our other businesses, our geothermal operation is a low-cost producer, providing solid earnings and cash flow and strong growth potential for many years to come.

## DIAMOND SHAMROCK REFINING AND MARKETING COMPANY

**Solid performance in a very tough year.**
We projected that Diamond Shamrock Refining and Marketing Company would face some tough challenges going into 1983. We were right.

Vigorous competition at both the retail and wholesale levels caused severe pressures on profit margins throughout the year. Results were also affected by our continual review of asset performance, with 1983 earnings including $8.9 million of pre-tax adjustments and asset write-downs.

We ended the year generating $66.2 million in operating profit – solid performance under the circumstances – but significantly below last year's $122.3 million. Sales increased to $2.2 billion in



Refining and Marketing Company operating profit
(in millions)

$98.6   $190.0   $195.8   $122.3   $66.2
79    80    81    82    83



Refining and Marketing Company sales
(in millions)

$82.3   $1,494.6   $1,997.8   $1,931.0   $2,249.5
79    80    81    82    83

OCCNJ0006547
ALCD-PUBCOM_0002162



**Refining and Marketing Company
product sales**
*(barrels per day)*

'79 '80 '81 '82 '83

Motor Gasoline
Diesel
Aviation Fuel
Other



**Motor fuel outlets**
*(on Dec. 31)*

'79 '80 '81 '82 '83

Jobber-owned branded
stations
Company-owned branded
stations
Company-owned other stations
National total (thousands
of stations*)
'79 '80 '81 '82 '83
*National Petroleum News
estimates



**Refinery capacity**
*(barrels per day of crude oil
throughput)*

'79 '80 '81 '82 '83

'79 '80 '81 '82 '83

1983 versus $1.5 billion the previous year, largely due to addition of the Sigmor businesses in January 1983.

## Sigmor acquisition enhances competitive ability.

1983 saw the completion of Diamond Shamrock's acquisition of Sigmor Corporation, the restructuring of our refining and marketing organization, and its relocation of headquarters to San Antonio. We effectively completed the meshing of two organizations into one cost-effective company, capable of competing profitably in today's environment through aggressive retailing and efficient refining and distribution.

## Marketing network expands.

We benefitted from addition of retail profits at the 550 stations acquired with Sigmor and preserved our motor fuel market share during a period when demand remained virtually flat. Merchandise sales in the outlets acquired with Sigmor went up 24% over the previous year.

Our wholesale jobber network expanded 12% to 1,438 independently owned Diamond Shamrock-branded stations

We also entered Nebraska, Mississippi, and new areas of Arkansas, emerging branded wholesale marketing to 11 states concentrated in the nation's growing Southwestern and Rocky Mountain regions.

Success brought us 1983 entry into Canada, which profitably market motor fuels in the Canadian provinces of Ontario and Quebec, and a prosperous retail heating oil business serving 7,000 households in Ontario.

## Refined products output increases.

With the addition of Sigmor's refinery at Three Rivers in South Texas, we increased motor gasoline production capacity 45% to 95,000 barrels per day at year-end. Our crude charge capacity increased 65% to over 117,000 barrels per day.

At the Three Rivers plant we enhanced our motor gasoline production capacity with the completion of a deasphalting unit to convert low-value residual fuel oil into feedstock for producing motor fuels. We also began producing military jet fuel at Three Rivers and at the McKee refinery in the Texas Panhandle during 1983.



**Motor fuel outlets**
*Jobber-owned
branded stations
Company-owned
branded stations
Company-owned
other stations*

16

OCCNJ0006548
ALCD-PUBCOM_0002163

Efficient refining, aggressive marketing, and a well-placed distribution network keep our Refining and Marketing business strong and growing.



*Our sign was raised over an additional 152 motor fuel outlets (net) in 1983, the fifth straight year of increases. Having concentrated our marketing area in growing Southwestern and Rocky Mountain states, we expect sales of our products to rise in 1984.*

17

OCCNJ0006549

ALCD-PUBCOM_0002164

In natural gas processing, curtailments of residue gas purchases by interstate pipeline companies resulted in lower natural gas liquids production and higher natural gas costs. The effect on operating profit was partially offset, however, by higher ethane and propane prices.

**An aggressive posture.**
Our strategy for the year ahead is to energetically strengthen our competitiveness in the refining, distribution, and marketing of petroleum products.

We will continue to acquire feedstocks for our refineries at the lowest possible prices, continue to improve the energy efficiency of our plants, and maximize operating efficiency throughout the organization.

Although we expect 1984 to be characterized by intense competition and flat consumer demand for refined products, we intend to expand fuel sales volumes as we pursue an accelerated remodeling and reidentification program to enhance the image of our outlets. We also will add new company-owned retail outlets in our existing marketing area.

We will solicit additional Diamond Shamrock jobber business in our marketing area, and we will expand our product pipelines from the refineries to our strategically located product terminals to increase distribution channels to our customers.

**Increased volumes and earnings expected.**
We have weathered what may have been the worst downturn in the history of the refining and marketing industry. Many of our competitors did not. More than 100 refineries nationwide have closed since January 1981, reducing much of the industry's excess capacity.

Current market conditions provide opportunities for businesses with efficient refining, aggressive marketing, and geographic advantages. Ours is such a company. Though profit margins will remain slim throughout the industry, we expect to achieve increased volumes, increased earnings, and a record market share in 1984.

## DIAMOND SHAMROCK
## COAL COMPANY

**Strong earnings defy weak industry conditions.**
For the second year in a row, poor economic conditions in 1983 severely depressed coal markets.

And once again Diamond Shamrock Coal Company was among the coal industry leaders, turning in operating profit of $41.2 million, compared to a record $51.9 million the previous year. Earnings in 1983 were affected by year-end charges of $3.7 million pre-tax, related primarily to a disputed sales contract. Sales were $278.1 million in 1983 compared to $335.1 million the year before, reflecting sharply lower spot market sales volumes.

This solid performance testifies to the soundness of our business strategies, the premium quality of our reserves, and our leadership in mining efficiency. These are the strengths that make our coal business a viable source of long-term earnings growth as well as strong near-term earnings and cash flow.

**Solid performance expected.**
In 1984, we expect flat, but solid, performance from our coal business, although it will be another challenging year for the industry. U.S. coal demand and prices should trail the national economic upturn due to the slower recovery and excess capacity in steel manufacture and electricity generation, and to those industries' surplus of coal inventories.

In addition, the coal industry must renew its labor contract, which expires in September, with the United Mine Workers of America. UMWA employees represent


**Coal Company operating profit**
*(in millions)*

$52.3  $51.2  $54.7  $51.9  $41.2
79  80  81  82  83

**Coal Company sales**
*(in millions)*

$275.0  $280.0  $290.0  $335.1  $278.1
79  80  81  82  83

18

OCCNJ0006550
ALCD-PUBCOM_0002165

ighly efficient in mining quality steam and
metallurgical coals, we consistently rank as an
industry leader in operating performance.



Most of our low-sulfur, high-Btu coal is sold
through long-term contracts with electric utilities.
A 100,000 ton stockpile of steam coal mined
by our Amherst Division fuels Dayton Power
& Light's Killen Plant near Manchester, Ohio.

19

OCCNJ0006551
ALCD-PUBCOM_0002166

64% of our coal mining workforce, principally at the Amherst and Gateway divisions. Labor contracts covering the remainder of our bargaining employees expire in 1985.

In export markets, demand for U.S. coal will remain generally depressed due to slow economic recovery, high interest rates, the dollar's high rate of exchange, and escalating production and domestic transportation costs. Although competition will remain strenuous from low-priced Polish and South African coal in Europe and from Australian coal in the Pacific, we believe exports provide some of the greatest long-term opportunities to substantially increase coal earnings.

**Alaskan coal exports offer dramatic potential.**
We are rapidly moving ahead with development plans for reserves just off Alaska's Cook Inlet, where we are operator and own 50% interest in an estimated 1-billion-ton coal resource.

During 1983, we conducted extensive tests to assess shipping and burning characteristics of coal samples mined at the site and continued preparation of mining plans that would allow us to begin full-scale operations in four to five years.

We have launched an active marketing program to identify potential customers for these low-sulfur reserves. Targeting the rapidly expanding Pacific Rim, we could become a major supplier of steam coal to nations such as Japan, Korea, and Taiwan, at prices competitive with any in the world.

**Long-term contracts, efficiency provide earnings strength.**
Fundamental to our past and long-term success is a strategy of building our earnings base on long-term sales contracts. These agreements assure our customers a stable supply of quality coal at a reasonable price while providing Diamond Shamrock a dependable source of profit.

In 1983, we sold 90% of our high-Btu, low-sulfur steam and metallurgical coal production through such contracts, mostly to electric utilities and steel makers. Maintaining this stable earnings base through additional long-term contracts will continue to be our primary marketing objective.

A key competitive advantage is operating efficiency, in which it appears we again outpaced the industry in 1983. Our achievements included significantly raising potential for increased profitability at our Amherst Division with new equipment and an improved maintenance program. Throughout our operations, we increased cost-effectiveness by training our cost-center managers to regard themselves as profit-center managers, measuring their effectiveness in terms of return on assets – equipment and people.

We are implementing similar efficiency programs at the small mining operations in Kentucky and Utah we acquired through the Natomas merger.

Another competitive edge is our reserve base of over 1.5 billion tons, including 315 million tons of lignite. We produce some of the world's best metallurgical and quality steam coals – low in sulfur, high in heat-generating capability. Most of our production is mined near the largest U.S. coal markets.

We continually reassess the value of these coal assets to maximize returns from them. That means maintaining the flexibility both to increase or decrease development of selective resources as the market demands and to liquidate assets lacking the present or potential performance we require.

In short, efficiency, strategically located reserves, and premium quality product have allowed Diamond Shamrock Coal Company to lead the industry in virtually

**Coal Company**
**coal production and shipments**
*(tons in 000s)*





79  80  81  82  83
*Shipments*
□ *Production*

20

OCCNJ0006552
ALCD-PUBCOM_0002167

every performance measure. As we view
coal to be a long-term source of earnings
growth, these competitive strengths
promise to keep us a profitable, low-cost,
world supplier of steam and metallurgical
coal for many years to come.

DIAMOND SHAMROCK
CHEMICALS COMPANY

**Chemicals investment consolidated.**
Major changes in our chemical opera-
tions, dictated by investment strategy and
economic challenges, have more sharply
defined the focus of this business.

During 1983 we reduced our participation
in some of our proprietary chemical busi-
nesses, and we continued to streamline
our commodity chemical operations, fur-
ther lowering the break-even point in
these strong, cash-generating businesses.

At year-end, we charged against earnings
$58.6 million in pre-tax write-offs
and other adjustments relating mostly
to businesses associated with Diamond
Shamrock's divestiture program. The
charge reduced Chemical Company oper-
ating profit to $12 million for the year.
Sales were $942.1 million.

As the dust of change settled, Diamond
Shamrock Chemicals Company was
focused as a highly efficient, profitable,
leading U.S. chemical producer. Having
maintained profitability during the worst
two years in modern chemical industry
history, these businesses are clearly on
the upswing, and we believe their earn-
ings potential is as sound as ever.

**Commodities show strong improvement.**
Reflecting better conditions in the indus-
trial economy, capacity utilization at our
chlorine and caustic soda plants – our
largest chemical business – rose an aver-
age of 15% in 1983.

Operating profit in commodities rose
63% to $45 million before write-offs
and adjustments.

Products in these businesses serve as key
components in the manufacture of many
durable goods, especially those related to
building construction and manufacture of
automobiles.

We expect demand for commodities to
grow, keeping this business a profitable,
strong net generator of cash for Diamond
Shamrock. Significantly, most of the
industrywide production capacity shut
down during the last two years will
probably never emerge from mothballs,
helping to firm prices and margins as de-
mand rises.

Diamond Shamrock is the only major
U.S. chlor-alkali chemicals producer that
has not been forced to shut down capacity
in the last seven years.

**Efficiencies enhance competitiveness.**
Efficiency has been and will continue
to be the key to competitiveness in our
chemical businesses. We have that edge in
manufacturing, distribution, and customer
service.

Although our plants are among the most
modern in the industry, in many cases
employing state-of-the-art technology
developed by Diamond Shamrock, in
1983 we made additional efficiency
improvements through better utilization
of manpower, improved work flow, and
better control of working capital.

Most significant among our efficiencies,
1983 marked the first full year of opera-
tion at our 200-megawatt cogeneration
facility – a highly important factor in con-
trolling costs in the chlor-alkali business.

The cogeneration facility provides a se-
cure, cost-effective energy source to our
largest chlorine and caustic soda plant,
supplying 100% of its electricity and
steam needs. Electricity is a major cost
in making these products.



Chemicals Company
operating profit
(in millions)

$103.3  $132.4  $171.3  $71.3  $12.0

79  80  81  82  83



Chemicals Company sales
(in millions)

$990.6  $1,151.0  $1,210.9  $1,035.3  $942.1

79  80  81  82  83

OCCNJ0006553
ALCD-PUBCOM_0002168

ur Chemical Company – with strong cash
generating businesses – is among the nation's
largest and most efficient chemical producers



*Chlorine and caustic soda barges move past our
Deer Park Works' loading docks in the huge
Houston Ship Channel petrochemical complex.
Our bulk transport fleet, among the chemical
industry's largest, gives us an edge in meeting
customer needs.*

OCCNJ0006554
ALCD-PUBCOM_0002169

**Marketing flexibility, size provide competitive strengths.**

We've honed another competitive edge by focusing on the customer's unique needs – by maintaining the manufacturing flexibility to match a customer's product specifications, and, with one of the largest bulk transportation fleets among U.S. chemical companies, to better satisfy delivery requirements.

As a result, against difficult circumstances and stiff competition, all our chemical businesses have maintained or improved their market share:

■ We are the nation's third largest merchant of chlorine and caustic soda – our biggest chemical business. Our production capacity is concentrated on the Gulf coast, source of the strongest demand for these products.

■ In sodium silicates we rank second nationally. We have the competitive advantage of efficiency through the industry's most modern technology. With plants placed near major markets, we further maximize our competitiveness through distribution efficiency.

■ We are the nation's largest manufacturer of chrome chemicals and a leading supplier to world chrome markets. Our chrome chemicals plant is the largest and most technologically advanced in the world.

■ And we rank first nationally in potassium-alkali chemicals.

**Proprietary businesses.**

At mid-year we joint-ventured our worldwide agricultural chemicals and animal health businesses with Showa Denko, K.K., a leading Japanese chemicals and pharmaceuticals firm, to form SDS Biotech Corporation.

Headed by Allan J. Tomlinson, formerly president and chief operating officer of Diamond Shamrock, the 50-50 joint venture company will sell agrichemical products worldwide, with emphasis on expanding Pacific Rim markets.

By capitalizing on both parent companies' product lines, research capabilities, and marketing expertise, these businesses can enhance their potential for long-term, self-sustaining growth.

The partial year of earnings from agricultural chemicals and animal health operations prior to the joint venture were $24.6 million, on sales of $131 million. These results are reported as part of Diamond Shamrock Chemicals Company. Diamond Shamrock's share of SDS Biotech operating results after June 30, 1983 are included in equity earnings.

Also during 1983, we considered the sale of other proprietary businesses, principally the solidly profitable Process Chemicals and Metal Coatings divisions. However, we were unable to reach an acceptable agreement.

Because these specialty chemicals businesses showed strong earnings improvements in 1983 and are generating some of the highest returns on capital employed in the corporation, we have elected to support and aggressively run them, with emphasis on further improving their returns.

Operating profit from specialty chemicals rose 35% in 1983 to $15 million on sales of $301 million, compared to $298.9 million the previous year.

**Diamond Shamrock:
A major chemical producer.**

Our Chemical Company by itself would rank among the "Fortune 500" group of companies. As a dependable, efficient, long-term supplier, our chemical businesses will continue to provide an important source of earnings and cash flow to Diamond Shamrock.



Commodity chemicals
operating profit*
(in millions)

$89.4  $85.3  $106.8  $57.6  $15.0

79  80  81  82  83

* excludes write-offs
and adjustments



Specialty chemicals
operating profit
(in millions)

$10.4  $15.6  $17.3  $11.1  $15.0

79  80  81  82  83

23

OCCNJ0006555
ALCD-PUBCOM_0002170

**Management's Discussion and Analysis
of Financial Position and Results of Operations**

FINANCIAL POSITION

For the full year 1983, the Company posted an after-tax loss from operations of $60,217,000, the result of a $111,700,000 after tax write-off of investments in the Mukluk No. 1 exploratory well and five associated leases in the Alaskan Beaufort Sea, as well as $62,100,000 in additional year-end after-tax charges, primarily in chemical operations.

Most of these charges reflect outflows of cash prior to 1983, and therefore do not affect funds from operations for the year. Total funds provided by operations during 1983 was $476,877,000 compared with $446,527,000 in 1982 and $462,899,000 in 1981. After covering dividends, operations provided $329,200,000 for capital spending and investment in 1983, compared with $336,229,000 in 1982 and $359,984,000 in 1981. Including proceeds from the sale of investments and facilities, internal sources funded 94% of the Company's capital spending and investment in 1983, compared with 61% in 1982 and 84% in 1981.

At $466,853,000, 1983 capital spending and investment was 29% below 1982 levels, and 21% below 1981 levels. Management presently anticipates capital spending and investment in 1984 to increase to more than $700,000,000, reflecting full-year exploration and production spending for Natomas Company as well as a near doubling from 1983 levels of exploration and production expenditures for the Company's other oil and gas properties. The Company acquired Natomas in August 1983, resulting in the issuance of new common and preferred stock and an increase in the Company's net long-term assets of $1,367,660,000.

As in 1983, management expects internal sources to essentially fund operations, projected capital spending and investments and dividends in 1984. Internal sources of funds are expected to include the proceeds resulting from the proposed sale by Natomas North America, a subsidiary of the Company, of its producing and non-producing oil and gas properties in the continental United States, excluding Federal offshore leases, to Apache Petroleum Company for $160,000,000 cash. These properties are therefore recorded as current assets in the accompanying Consolidated Financial Statements.

In January 1983, the Company acquired Sigmor Corporation for cash and newly issued preferred stock, increasing net long-term assets by $92,147,000. In addition, in July 1983, the Company formed SDS Biotech Corporation with Showa Denko, K. K., a Japanese company, and contrib-

uted to the 50/50 joint venture the current and long-term assets and liabilities associated with its primary agricultural chemicals and animal health businesses, reducing total debt of the Company by $149,786,000.

Although each of the above transactions has had an effect on the Company's working capital, the net result has been essentially level, year-to-year, with 1983 year-end working capital at $321,372,000 compared with 1982 year-end working capital of $313,288,000. 1982 working capital was below the year-end 1981 level of $472,007,000 due to decreased sales, sale of receivables and an emphasis on inventory control.

At December 31, 1983, the Company's relationship of current assets to current liabilities (Current Ratio) was 1.4 compared to 1.7 at year-end 1982 and 2.0 at year-end 1981, while the relationship of cash and receivables to current liabilities (Quick Ratio) was 0.7 compared with 0.9 at year-end 1982 and 1.1 at year-end 1981. Current liabilities include certain costs and expenses associated with both the Natomas acquisition and year-end charges which do not reflect anticipated ongoing business activity. Management is confident the above measures of liquidity will move upward as increasing business activity strengthens current assets.

During the second quarter of 1983, the Company used proceeds from the issuance of 3,442,378 shares of Common Stock to reduce variable-rate debt. At the same time, an additional 1,057,622 shares of Common Stock were exchanged for debt, which was then retired. The Company also sold $250,000,000 of fixed-rate debt securities during the second quarter, using the net proceeds to retire variable-rate debt.

For the full year, total debt increased $938,306,000 due to the acquisitions of Sigmor and Natomas, which brought $995,694,000 in previously outstanding debt to the Company. The acquisitions increased stockholders' equity by $1,450,710,000. At December 31, 1983, total debt was 37.8% of total capitalization, including deferred taxes, compared to 34.9% at December 31, 1982, and 34.7% at December 31, 1981.

The Company presently has unused lines of credit totaling $1,000,000,000, of which $523,800,000 was supporting commerical paper, bankers acceptances and money market borrowings at December 31, 1983. With debt within the

OCCNJ0006556

ALCD-PUBCOM_0002171

range of 35%-40% of total capitalization, which management considers appropriate for the Company, sufficient available lines of credit, and expectations of ample internal sources of funds, as noted above, management is of the opinion that the Company has the financial resources required to meet anticipated needs.

A discussion of the effects of inflation on the Company is found under "Inflation Adjusted Financial Data" in the Supplementary Information section of this Annual Report.

OPERATING RESULTS

For the full year 1983, sales and operating revenues were 27% above 1982 levels, and 19% above 1981 levels, the result of the acquisition of Sigmor on January 14, 1983 and of Natomas on August 31, 1983. Sigmor's operations have been included in the Company's refining and marketing segment, along with the Canadian refined products marketing operations acquired with Natomas. Natomas' Indonesian, U.S. and other foreign oil and gas producing businesses are included in the Company's exploration and production segment, while its U.S. coal businesses have been placed in the Company's coal segment.

As both acquisitions were accounted for as purchases, their sales and operating revenues and earnings are not reflected in the Company's results prior to their dates of acquisition. However, a pro forma presentation of the combined results of the Company, Natomas and Sigmor for the full years 1983 and 1982 is included in the "Financial Summary" section of this Annual Report.

As anticipated, severe weakness in energy and industrial markets during the first half of 1983 depressed earnings substantially. Although business conditions improved somewhat during the second half, results from operations for the year were far below past performance. Prior to the year-end charges discussed under "Financial Position" above, after-tax income from operations was $113,583,000, including a $15,904,000 LIFO benefit from inventory reductions. Comparable income from continuing operations was $149,543,000 in 1982, including $30,101,000 in pre-tax gains from lease sales and the contribution of a royalty interest to the Company's pension plans, and $230,156,000 in 1981.

Including year-end charges and extraordinary gains totaling $4,054,000 from early retirement of Natomas Energy Company debt and an exchange of stock for debentures during the year, the Company posted a net loss of $56,163,000 for 1983. This compares with net income of $185,091,000 for 1982 (which includes a $35,548,000 extra-

ordinary gain from a stock/debenture exchange) and $121,265,000 for 1981 (which includes a $108,891,000 charge for discontinued operations).

The Company's exploration and production segment posted 1983 operating profits of $32,975,000 after a pre-tax write-off of $194,300,000 for the Mukluk No. 1 well and five associated leases. The segment's operating profits were $135,192,000 in 1982 and $145,664,000 in 1981.

Exploration and production results include $106,848,000 in operating profits from four months of production at Natomas' Indonesian holdings. As noted above, no Natomas earnings are included in prior-year operating results. As the Indonesian operations entered 1984, their crude oil production was at an all-time high, and are expected to be a major source of operating profits for the coming year. The Company's other foreign exploration and production operations generated $4,464,000 in operating profits versus $10,571,000 in 1982, and $9,518,000 in 1981. The decline was principally due to increased dry hole expenses.

The Company's domestic exploration and production operations generated $115,963,000 in operating profits prior to the Mukluk write-off, compared with $124,621,000 in 1982 and $136,146,000 in 1981. 1982 results included $30,101,000 in profits from sale of leases and contribution of a royalty interest to the Company's pension plans.

Domestically, although crude oil prices were below 1982 levels, production volumes began to steadily increase at mid-year, and entered 1984 well above previous records. As a result, earnings in the coming year are expected to benefit from substantially higher domestic oil volumes. Although natural gas prices received by the Company increased 19% in 1983 versus 1982, following the trend of a 21% increase in natural gas prices between 1982 and 1981, excess supply in domestic markets resulted in significant reductions in average production volumes during the year. 1983 natural gas sales volumes averaged 263,113,000 cubic feet per day compared with 280,212,000 in 1982 and 308,658,000 in 1981. While natural gas volumes had grown significantly at year-end due to several severe cold waves in the United States, it is difficult at this time to determine if these effects will last. As a result, management presently expects only modest increases in natural gas volumes and prices for 1984.

OCCNJ0006557

ALCD-PUBCOM_0002172

In refining and marketing, full-year operating profits of $66,182,000 include $8,900,000 in pre-tax charges, primarily reflecting the write-down of a pipeline. 1982 operating profits were $122,298,000, while 1981 results were $155,759,000.

The substantial drop versus prior-year earnings primarily reflects intense competition in the first quarter, which eliminated profit margins at the refining and wholesale level, and sharply narrowed them at retail. During the second and third quarters, margins strengthened and volumes improved throughout the business. Although margins again came under severe pressure in the fourth quarter, volumes remained high. Management anticipates steadily increasing volumes through 1984, with margins strengthening through the spring and summer driving seasons. As noted above, Sigmor operating results are not included in this segment's reported operating profits for 1982 and 1981, although 21% of Sigmor results are included in the Company's equity earnings for those years.

The refining and marketing segment's natural gas processing operations posted substantially lower results in 1983 versus prior years, as restricted volumes and higher unit costs for raw materials more than offset increased product prices. The segment's feedstocks businesses continued to be adversely affected by low margins throughout the year.

In the coal segment, operating profits of $41,234,000 included a pre-tax charge of $3,700,000, primarily reflecting costs associated with a past contract dispute. This compares to operating profits of $51,860,000 in 1982 and $34,656,000 in 1981. The 1983 decline essentially reflects extreme softness in spot markets for coal. Although coal markets are expected to remain soft through 1984 and a labor agreement with the United Mine Workers of America covering 64% of our mine workforce is scheduled to expire in September of 1984, the segment's long-term sales contracts combined with continued attention to cost control and mining efficiency are expected to maintain 1984 operating profits at or above 1983 levels.

Full-year operating profits of $12,023,000 for the Company's chemicals segment include $58,600,000 in pre-tax write-offs and other adjustments relating mostly to businesses associated with the Company's divestiture program. 1982 chemicals operating profits were $71,282,000, and 1981 chemicals operating profits were $171,882,000. 1983 chemicals operating results reflect poor business conditions in the first quarter. Demand improved significantly

during subsequent quarters, suggesting strong earnings performance from this segment in 1984. In addition, 1982 and 1981 chemicals results include full-year earnings from businesses contributed to the SDS Biotech joint venture discussed under "Financial Position" above. Subsequent to July 1983, the Company's 50% ownership of these businesses has been reflected in its equity earnings.

As expected, the Company's ongoing chemicals operations have had steadily increasing volumes through the year, and have seen some price strengthening as they move into 1984. Management expects a significant increase in operating profits from chemicals in 1984, compared to 1983 operating results prior to the year-end charges discussed above.

The acquisition of Natomas brought the Company a new business segment late in the third quarter – geothermal energy. This business drills for and supplies naturally generated steam to electrical power plants owned and operated by a California utility. During the four months the geothermal segment was part of the Company, it generated $16,001,000 in operating profits. As noted above, prior-year segment reports do not include comparable results. In 1982 and 1983, increases in production capacity and prices allowed year-to-year earnings gains, despite utilization reductions due to unusually strong production from cheaper, competing hydroelectric capacity. In 1984, increased capacity utilization and further price gains are expected to continue this trend.

Although management expects the competitive environment to remain challenging through 1984, the prospects for increased volumes throughout most of its operations and increased prices in many during 1984 should result in a significant increase in operating earnings in the coming year compared to 1983 results prior to year-end charges described above.

OCCNJ0006558
ALCD-PUBCOM_0002173

**Consolidated Statement of Income**
*(dollars in thousands, except per share)*

| | Year Ended December 31, | | |
| --- | ---: | ---: | ---: |
| | 1983 | 1982 | 1981 |
| **Revenues** | | | |
| Sales and operating revenues | $4,026,107 | $3,177,379 | $3,376,215 |
| Equity earnings (losses) | (15,445) | (11,684) | 7,192 |
| Other revenues, net | 24,620 | 58,290 | 22,509 |
| | 4,035,282 | 3,223,985 | 3,405,916 |
| **Costs and Expenses** | | | |
| Cost of products sold and operating expenses | 3,056,989 | 2,272,444 | 2,353,147 |
| Exploration costs, including dry holes | 73,067 | 72,544 | 56,626 |
| Depreciation, depletion and amortization | 482,703 | 217,787 | 171,143 |
| Selling and administrative | 216,480 | 213,736 | 216,499 |
| Research and development | 23,764 | 46,453 | 51,479 |
| Taxes other than income taxes | 111,993 | 96,705 | 105,325 |
| Interest | 100,703 | 72,873 | 75,441 |
| | 4,065,699 | 2,992,542 | 3,029,660 |
| **Income (Loss) Before Tax Provision** | (30,417) | 231,443 | 376,256 |
| **Provision for Income Taxes** | | | |
| Current | 8,150 | 10,469 | 56,596 |
| Deferred | 21,650 | 71,431 | 89,504 |
| | 29,800 | 81,900 | 146,100 |
| **Income (Loss) from Continuing Operations** | (60,217) | 149,543 | 230,156 |
| **(Loss) from Discontinued Operations** | – | – | (108,891) |
| **Extraordinary Item** | 4,054 | 35,548 | – |
| **Net Income (Loss)** | $ (56,163) | $ 185,091 | $ 121,265 |
| **Per Common Share** | | | |
| Continuing operations | $ (.76) | $ 2.37 | $ 3.68 |
| Discontinued operations | – | – | (1.74) |
| Extraordinary item | .05 | .57 | – |
| Net income (loss) | $ (.71) | $ 2.94 | $ 1.94 |

*The Financial Summary is an integral part of this and related Consolidated Financial Statements.*

OCCNJ0006559

ALCD-PUBCOM_0002174

**Consolidated Balance Sheet**
*(dollars in thousands)*

| | December 31, | | |
|---|---|---|---|
| | 1983 | 1982 | 1981 |
| **Assets** | | | |
| **Current Assets** | | | |
| Cash and temporary cash investments | $ 153,533 | $ 82,565 | $ 66,176 |
| Receivables, less doubtful receivables | 439,161 | 325,227 | 472,873 |
| Inventories | 369,360 | 348,573 | 362,447 |
| Assets held for sale | 160,000 | — | — |
| Prepaids and other current assets | 45,409 | 32,212 | 61,837 |
| Total Current Assets | 1,167,463 | 788,577 | 963,333 |
| Properties and Equipment, less depreciation and depletion | 4,448,847 | 2,114,436 | 1,765,651 |
| Investments | 247,960 | 193,306 | 182,521 |
| Intangible Assets, less amortization | 132,584 | 70,822 | 82,835 |
| Deferred Charges | 27,587 | 26,872 | 22,045 |
| | $6,024,441 | $3,194,013 | $3,016,385 |
| **Liabilities and Stockholders' Equity** | | | |
| **Current Liabilities** | | | |
| Notes payable | $ 21,645 | $ 10,527 | $ 13,188 |
| Long-term debt payable within one year | 38,468 | 8,600 | 8,964 |
| Accounts payable | 414,659 | 301,015 | 299,128 |
| Taxes payable | 74,868 | 68,524 | 62,805 |
| Accrued liabilities | 296,451 | 86,623 | 107,241 |
| Total Current Liabilities | 846,091 | 475,289 | 491,326 |
| Long-Term Debt | 1,797,855 | 894,170 | 822,317 |
| Long-Term Capital Lease Obligations | 25,302 | 30,927 | 32,412 |
| Deferred Income Taxes | 364,656 | 364,094 | 305,993 |
| Other Liabilities and Deferred Credits | 247,210 | 22,302 | 14,602 |
| Stockholders' Equity | | | |
| Preferred Stock, $1.00 par value | | | |
| Authorized shares – 100,000,000 | | | |
| Issued shares – 6,682,333 | 6,683 | — | — |
| Common Stock, $1.00 par value | | | |
| Authorized shares – 300,000,000 | | | |
| Issued shares – 126,961,585; 63,565,110; and 62,878,401 | 126,962 | 380,501 | 366,556 |
| Paid-in capital | 1,803,210 | — | — |
| Retained earnings | 854,282 | 1,058,122 | 994,636 |
| Cumulative translation adjustment | (38,788) | (31,369) | (10,847) |
| Common Treasury Stock, at cost – 400,000; 1,000; and 24,345 shares | (9,022) | (23) | (610) |
| Total Stockholders' Equity | 2,743,327 | 1,407,231 | 1,349,735 |
| | $6,024,441 | $3,194,013 | $3,016,385 |

See "Commitments and Contingencies"

*The Financial Summary, which includes a description of the successful efforts method
of accounting for the Company's oil and gas producing activities, is an integral part
of this and related Consolidated Financial Statements.*

OCCNJ0006560

ALCD-PUBCOM_0002175

**Consolidated Statement of Stockholders' Equity**
*(dollars in thousands)*

| | 1983 | | 1982 | | 1981 | |
|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | Shares | Amount |
| **$2.07 Preferred Stock, $1.00 par value** | | | | | | |
| January 1, | – | $    – | | | | |
|   Acquisition of Sigmor Corporation | 4,184,749 | 79,981 | | | | |
|   Conversion to $1.00 par value | – | (75,762) | | | | |
|   Conversion to Common Stock | (2,216) | (36) | | | | |
| December 31, | 4,182,533 | $    4,183 | | | | |
| **$4.00 Preferred Stock, $1.00 par value** | | | | | | |
| January 1, | – | $    – | | | | |
|   Acquisition of Natomas Company | 2,500,000 | 2,500 | | | | |
|   Conversion to Common Stock | (200) | – | | | | |
| December 31, | 2,499,800 | $    2,500 | | | | |
| **Common Stock, $1.00 par value** | | | | | | |
| January 1, | 63,565,110 | $  380,501 | 62,878,401 | $  366,556 | 62,434,575 | $352,944 |
|   Employee benefit plans' purchases | 159,685 | 3,752 | 673,875 | 13,832 | 390,277 | 12,258 |
|   Exercise of stock options | 125,727 | 956 | 12,834 | 113 | 53,549 | 1,354 |
|   Newly issued | 4,500,000 | 99,788 | – | – | – | – |
|   Conversion to $1.00 par value | – | (416,298) | – | – | – | – |
|   Acquisition of Natomas | 58,625,700 | 58,626 | – | – | – | – |
|   Conversion from $2.07 Preferred | 2,216 | 36 | – | – | – | – |
|   Conversion from $4.00 Preferred | 245 | – | – | – | – | – |
|   Cancellation of Common Treasury Stock | (17,098) | (399) | – | – | – | – |
| December 31, | 126,961,585 | $  126,962 | 63,565,110 | $  380,501 | 62,878,401 | $366,556 |
| **Paid-In Capital** | | | | | | |
| January 1, | | $    – | | | | |
|   Conversion of Common Stock to $1.00 par value | | 416,298 | | | | |
|   Conversion of $2.07 Preferred Stock to $1.00 par value | | 75,762 | | | | |
|   Acquisition of Natomas Company | | 1,309,603 | | | | |
|   Exercise of stock options | | 1,547 | | | | |
| December 31, | | $1,803,210 | | | | |
| **Retained Earnings** | | | | | | |
| January 1, | | $1,058,122 | | $  994,636 | | $976,286 |
|   Net income (loss) | | (56,163) | | 185,091 | | 121,265 |
|   Dividends on Common Stock | | (143,755) | | (110,298) | | (102,915) |
|   Dividends on Preferred Stock | | (3,922) | | – | | – |
|   Sale of Common Treasury Stock | | – | | (11,307) | | – |
| December 31, | | $  854,282 | | $1,058,122 | | $994,636 |
| **Cumulative Translation Adjustment** | | | | | | |
| January 1, | | $  (31,369) | | $  (10,847) | | $  3,791 |
|   Translation adjustments | | (7,419) | | (20,522) | | (14,638) |
| December 31, | | $  (38,788) | | $  (31,369) | | $(10,847) |
| **Common Treasury Stock** | | | | | | |
| January 1, | (1,000) | $    (23) | (24,345) | $    (610) | (5,063) | $    (68) |
|   Purchase of Common Treasury Stock | (530,931) | (12,077) | (3,041,900) | (72,139) | (22,500) | (618) |
|   Employee benefit plans' purchases | 114,578 | 2,673 | 29,344 | 697 | 2,255 | 63 |
|   Deferred incentive awards | 255 | 6 | 901 | 23 | 963 | 13 |
|   Sale of Common Treasury Stock | – | – | 3,035,000 | 72,006 | – | – |
|   Cancelled | 17,098 | 399 | – | – | – | – |
| December 31, | (400,000) | $  (9,022) | (1,000) | $    (23) | (24,345) | $    (610) |

*The Financial Summary is an integral part of this and related Consolidated Financial Statements.*

OCCNJ0006561
ALCD-PUBCOM_0002176

**Consolidated Statement of Changes in Financial Position**
*(dollars in thousands)*

| | Year Ended December 31, | | |
| --- | ---: | ---: | ---: |
| | 1983 | 1982 | 1981 |
| **Funds Provided** | | | |
| Continuing operations | | | |
| Income (loss) | $ (60,217) | $ 149,543 | $230,156 |
| Add – Income charges (credits) not requiring | | | |
| (providing) current resources | | | |
| Depreciation, depletion and amortization | 482,703 | 217,787 | 171,143 |
| Deferred income taxes | 21,650 | 71,431 | 89,504 |
| Equity (earnings) losses, net of dividends received | 16,779 | 14,416 | (2,887) |
| Other, net | 15,962 | (6,650) | (222) |
| Continuing operations | 476,877 | 446,527 | 487,694 |
| Discontinued operations | – | – | (24,795) |
| **Operations** | 476,877 | 446,527 | 462,899 |
| Financing and other sources | | | |
| Increase in long-term debt and capital lease obligations | 1,049,246 | 736,076 | 181,827 |
| Sale/issuance of Common Stock | 1,383,826 | 75,364 | 13,688 |
| Issuance of Preferred Stock | 175,606 | – | – |
| Proceeds from sale of investments and facilities | 108,488 | 69,059 | 138,271 |
| Other, net | 43,281 | (12,955) | 4,713 |
| **Financing and Other Sources** | 2,760,447 | 867,544 | 338,499 |
| Working capital | | | |
| Decrease (increase) in receivables | (113,934) | 147,646 | 34,356 |
| Decrease (increase) in inventories | (20,787) | 13,874 | 25,934 |
| Decrease (increase) in assets held for sale | (160,000) | – | |
| Decrease (increase) in prepaids and other current assets | (13,197) | 29,625 | (48,956) |
| Increase (decrease) in notes payable | 11,118 | (2,661) | (276) |
| Increase (decrease) in long-term debt payable within one year | 29,868 | (364) | 1,500 |
| Increase (decrease) in accounts payable | 113,644 | 1,887 | 30,068 |
| Increase (decrease) in taxes payable | 6,344 | 5,719 | 10,127 |
| Increase (decrease) in accrued liabilities | 209,828 | (20,618) | 11,923 |
| **Working Capital** | 62,884 | 175,108 | 64,676 |
| **Total Funds Provided** | 3,300,208 | 1,489,179 | 866,074 |
| **Funds Utilized** | | | |
| Acquisition of Natomas Company | | | |
| Properties and equipment | 2,245,646 | -- | – |
| Goodwill | 75,000 | – | – |
| Long-term debt | (770,873) | – | – |
| Other long-term liabilities, net | (182,113) | – | – |
| Acquisition of Sigmor Corporation | | | |
| Properties and equipment | 292,356 | – | – |
| Long-term debt | (224,821) | – | – |
| Other long-term assets, net | 24,612 | – | – |
| Expenditures for properties and equipment | 412,794 | 612,698 | 549,746 |
| Investments | 54,059 | 47,495 | 41,199 |
| Dividends | 147,677 | 110,298 | 102,915 |
| Purchase of Common Stock | 12,077 | 72,139 | 618 |
| Reduction of long-term debt and capital lease obligations | 1,142,826 | 630,160 | 170,116 |
| **Total Funds Utilized** | 3,229,240 | 1,472,790 | 864,594 |
| Increase in cash and temporary cash investments | $ 70,968 | $ 16,389 | $ 1,480 |

*The Financial Summary is an integral part of this and related Consolidated Financial Statements.*

OCCNJ0006562
ALCD-PUBCOM_0002177

**Financial Summary**
*(dollar amounts in tables are in thousands, except per share)*

The accompanying Consolidated Financial Statements have been prepared in conformity with generally accepted accounting principles, the most significant of which are described below. These, along with the remainder of the Financial Summary, are an integral part of the Consolidated Financial Statements.

## SIGNIFICANT ACCOUNTING POLICIES

**Consolidation and Equity Accounting.**
The Consolidated Financial Statements include the accounts of Diamond Shamrock Corporation and all domestic and foreign subsidiaries ("the Company"). The Company uses the equity method to account for its investments in affiliates and joint ventures ("associated companies"), except that non-corporate joint ventures in oil, gas and geothermal exploration and production are consolidated on a pro rata basis. Under the equity method, the Company recognizes its proportionate share of the net income or loss of associated companies currently, rather than when realized through dividends or disposal.

All significant intercompany accounts and transactions have been eliminated. Foreign subsidiaries and associated companies are included principally on the basis of fiscal years ending November 30.

**Translation of Foreign Currencies.**
The foreign currency accounts of the Company and associated companies, not having the United States dollar as their functional currency, are translated into United States dollars as follows: asset and liability accounts at the prevailing year-end exchange rates; income and expense items at the average monthly exchange rates in effect during the year. Translation gains and losses are included as a component of stockholders' equity.

**Inventory Valuation.**
Inventories are valued at the lower of cost or market. Cost for crude oil, petroleum products and chemicals is determined principally by the last-in, first-out ("LIFO") method. Coal, merchandise, supplies and foreign inventories are valued at average cost.

**Properties and Equipment.**
Properties and equipment are carried at cost. Major additions are capitalized; expenditures for repairs and maintenance are charged against earnings.

The Company uses the successful efforts method of accounting for the costs incurred in the acquisition, exploration, development and production of oil and gas reserves.

Under this method, all geological and geophysical costs are expensed; all development costs, whether or not successful, are capitalized as costs of proved properties; exploratory drilling costs are initially capitalized, but if the effort is determined to be unsuccessful, the costs are then charged against earnings; depletion is computed based on an aggregation of properties with common geological structural features or stratigraphic conditions, such as reservoirs or fields; and unproved properties, both onshore and offshore, are periodically assessed and a valuation allowance (included as an element of depletion) is provided by a charge against earnings where impairment exists. Costs attributable to the acquisition, exploration and development of geothermal reserves are capitalized.

**Interest.**
The Company capitalizes the interest cost associated with major property additions and mineral development projects while in progress, such amounts being amortized over the useful lives of the related assets.

**Depreciation, Depletion and Amortization.**
Properties and equipment are depreciated generally on the straight-line basis over their estimated useful lives. Coal, oil, gas, geothermal and other raw material resources are depleted on the unit-of-production basis generally over estimated aggregate recoverable reserves. Intangible assets are amortized on a straight-line basis over their legal or estimated useful lives, not to exceed 40 years. Goodwill amounts which resulted from acquisitions prior to 1970 ($17,436,000 at December 31, 1983) are not amortized.

**Pensions.**
The Company has a number of trusteed pension plans, both contributory and noncontributory, covering substantially all full-time employees, other than employees engaged in the mining of coal who participate in miners' benefit plans. The Company also has an unfunded, noncontributory, supplemental retirement plan for certain officers. Pension cost is comprised of current service cost and amortization of past service cost over periods ranging from 10 to 40 years. Accrued pension cost is funded on a current basis.

**Income Taxes.**
Income taxes are provided during the year in which transactions affect the determination of financial statement income, regardless of when they are recognized for tax purposes. Deferred income taxes are provided for timing differences. Investment tax credits are accounted for using the flow-through method.

OCCNJ0006563
ALCD-PUBCOM_0002178

**Earnings Per Common Share.**

Earnings per Common share are based on earnings (after Preferred dividends in 1983) divided by the weighted average number of shares of Common Stock outstanding in each year (85,998,124 shares in 1983, 62,900,574 shares in 1982 and 62,612,062 shares in 1981).

**Reclassifications.**

Certain amounts in 1982 and 1981 have been reclassified to conform to the presentation adopted in 1983. These reclassifications had no effect on net income or stockholders' equity.

## HOLDING COMPANY FORMED (REORGANIZATION)

Stockholders, at a special meeting held on August 30, 1983, approved the Plan and Agreement of Reorganization and the Plan and Agreement of Merger (the "Plans") whereby Diamond Shamrock Chemicals Company (formerly named Diamond Shamrock Corporation) became a wholly-owned subsidiary of New Diamond (subsequently renamed Diamond Shamrock Corporation). At the time of the merger, each outstanding share of Common and $2.07 Preferred Stock of Diamond Shamrock Chemicals Company ("Chemicals Company") became one share of Common Stock and one share of $2.07 Preferred Stock, respectively, of the new Diamond Shamrock Corporation.

The Certificate of Incorporation of the new Diamond Shamrock Corporation ("Parent") adopted under the Plans authorizes the Company to issue two classes of capital stock divided into 300,000,000 shares of Common Stock with $1.00 par value and 100,000,000 shares of Preferred Stock with $1.00 par value. (See "Acquisition of Natomas Company".)

The Chemicals Company transferred ownership of certain subsidiaries engaged in the exploration for and production of crude oil and natural gas, the refining of crude oil and sale of refined petroleum products and the mining of coal to its Parent as of January 26, 1984. Concurrent with such transfer the Chemicals Company assigned to and its Parent assumed liability for substantially all of the Chemicals Company's then outstanding domestic long-term debt.

## ACQUISITION OF NATOMAS COMPANY

Effective August 31, 1983, a wholly-owned subsidiary of the Company was merged into Natomas Company, which then became a wholly-owned subsidiary of the Company. Natomas is principally engaged in the exploration for and

production of crude oil and natural gas, geothermal exploration and production and coal mining. Under the terms of the merger agreement, each common share of Natomas was converted into 1.05 Common shares of the Company and each preferred share of Natomas was converted into a share of the Company's $4.00 Preferred Stock. A total of 58,625,700 shares of Common Stock and 2,500,000 shares of $4.00 Preferred Stock were issued. The total cost of the acquisition was $1,471,106,000.

The acquisition of Natomas was accounted for as a purchase. Natomas' assets and liabilities were recorded at their fair values, with the excess of cost over the fair values of the net assets acquired ($75,000,000) being amortized over 40 years. The results of Natomas' operations have been included in the Company's 1983 Consolidated Statement of Income since the date of acquisition. (See "Pro Forma Results of Operations".)

## ACQUISITION OF SIGMOR CORPORATION

Effective January 14, 1983, Sigmor Corporation, one of the United States' largest independent gasoline retailers, was merged into a wholly-owned subsidiary of the Company. Under the terms of the merger agreement, holders of 4,086,186 shares of Sigmor common stock elected to receive $17.50 per share while other Sigmor stockholders elected to receive 0.44 of a share of the Company's $2.07 Preferred Stock for each share of Sigmor common stock owned, a total of 4,184,749 Preferred shares. The total cost of the acquisition was $161,875,000. The Company had owned 21 percent of Sigmor's common stock since 1978. The acquisition of Sigmor was accounted for as a purchase. Sigmor's assets and liabilities were recorded at their fair values. The results of Sigmor's operations have been included in the Company's 1983 Consolidated Statement of Income since the date of acquisition. (See "Pro Forma Results of Operations".)

Subsequent to its acquisition of Sigmor and as contemplated in the merger agreement, the Company sold certain of the acquired Sigmor assets to Tetco, Inc., a company wholly owned by the Turner family (the former majority owners of Sigmor). The sales proceeds ($43,201,000) were used to reduce the then outstanding borrowings under Sigmor's bank credit agreement. (See "Long-Term Debt and Credit Arrangements".)

## PRO FORMA RESULTS OF OPERATIONS

Pro forma combined results of operations (unaudited) for 1983 and 1982 (as though the acquisitions of Natomas and

32

Sigmor had taken place on January 1, 1982) would have been as follows:

|  | 1983 | 1982 |
|---|---|---|
| Sales and operating revenues | $4,624,730 | $5,325,259 |
| Income (loss) from continuing operations | (74,286) | 99,665 |
| Net income (loss) | (69,415) | 135,213 |
| Per Common share |  |  |
| Continuing operations | $    (.69) | $    .74 |
| Net income (loss) | (.65) | 1.03 |

The pro forma combined results of operations are not necessarily indicative of the actual results that would have occurred had the acquisitions taken place January 1, 1982, or of the future results of the combined companies.

## ACQUISITION OF AMHERST COAL COMPANY

At a special meeting held on August 4, 1981, the stockholders of Amherst Coal Company approved an Agreement and Plan of Merger providing for the merger of a wholly-owned subsidiary of the Company into Amherst, which then became a wholly-owned subsidiary of the Company. Under the terms of the Agreement, each Amherst stockholder received 333.588 shares of the Company's Common Stock for each share of Amherst common stock owned (a total of 6,200,000 Common shares). The acquisition of Amherst was accounted for as a pooling of interests.

## DISCONTINUED OPERATIONS

At June 30, 1981, the Company provided for estimated losses on the discontinuance of its Plastics and Animal Nutrition businesses, including $69,177,000 for anticipated operating losses. The loss from discontinued operations in the accompanying Consolidated Statement of Income includes this provision and the results of operations prior to discontinuance. Sales and operating revenues of discontinued operations were $187,572,000 in 1981.

The loss from discontinued operations was as follows:

|  | 1981 |
|---|---|
| Loss from operations, before tax benefit | $ 30,445 |
| Income tax benefit | (13,060) |
| Loss from operations | $ 17,385 |
| Estimated loss from disposal, before tax benefit | $134,775 |
| Income tax benefit | (43,269) |
| Estimated loss from disposal | $ 91,506 |
| Loss from discontinued operations | $108,891 |

## EXTRAORDINARY ITEM – EARLY EXTINGUISHMENT OF DEBT

On September 26, 1983, the Company repurchased $7,830,000 principal amount of 8⅞% Sinking Fund Debentures due March 15, 1997, issued by Natomas Energy Company, a subsidiary of the Company. The extinguishment of this debt resulted in an extraordinary gain of $804,000, net of applicable income taxes of $684,000.

On April 27, 1983, the Company exchanged 1,057,622 shares of newly issued Common Stock to retire $27,500,000 principal amount of its 7¾% Sinking Fund Debentures due August 1, 1994. The exchange resulted in an extraordinary gain of $3,250,000 after deducting related expenses. The transaction was non-taxable for income tax purposes.

On March 30, 1982, the Company exchanged 3,035,000 shares of Common Treasury Stock to retire $97,081,000 principal amount of various sinking fund debentures. The exchange resulted in an extraordinary gain of $35,548,000 after deducting related expenses. The transaction was non-taxable for income tax purposes.

## DIVIDENDS

Dividends have been paid on the Company's Common Stock for fifty-one consecutive years. The current annual dividend rate is $1.76 per Common share. The Company paid dividends of $1.76 per Common share in 1983 and 1982 and $1.70 per Common share in 1981. The Company paid dividends of $.34 per share of $2.07 Preferred Stock and $1.00 per share of $4.00 Preferred Stock. Total dividends paid were $147,677,000 in 1983, $110,298,000 in 1982 and $102,915,000 in 1981, including dividends paid by Amherst of $1,673,000 in 1981.

## BUSINESS AND GEOGRAPHIC SEGMENTS

The Company's revenues are principally derived from five business segments: Exploration and Production, Refining and Marketing, Coal, Geothermal and Chemicals. Exploration and Production is engaged in the exploration for and production of crude oil and natural gas. Refining and Marketing is engaged in the processing of crude oil and natural gas and the sale of refined petroleum products and natural gas. Coal is engaged in the mining and sale of coal for steam generation and metallurgical applications. Geothermal is engaged in the exploration for and development of geothermal reserves and the sale of geothermal steam used to produce electricity. Chemicals is engaged in the manufacture and sale of a variety of commodity and specialty chemicals.

OCCNJ0006565
ALCD-PUBCOM_0002180

## Business Segments

### 1983

| | Exploration and Production | Refining and Marketing | Coal | Geothermal | Chemicals | Corporate | Consolidated Financial Statements |
|---|---|---|---|---|---|---|---|
| Sales and operating revenues | | | | | | | |
| Outside customers | $ 474,610 | $2,249,478 | $278,063 | $ 31,170 | $ 942,072 | $ 50,714 | $4,026,107 |
| Intersegment | 143,692 | 2,859 | 77 | – | 735 | 683 | |
| Total | $ 618,302 | $2,252,337 | $278,140 | $ 31,170 | $ 942,807 | $ 51,397 | |
| Operating profit | 32,975 | 66,182 | 41,234 | 16,001 | 12,023 | (183,387) | (14,972) |
| Equity earnings (losses) | – | (4,979) | (924) | – | (9,542) | – | (15,445) |
| Identifiable assets | 2,939,039 | 823,740 | 297,343 | 749,860 | 1,062,974 | 151,485 | 6,024,441 |
| Investment in equity affiliates | – | 1,047 | 66,510 | – | 118,066 | 4,791 | 190,414 |
| Expenditures for properties and equipment | 276,922 | 37,829 | 20,418 | 14,770 | 33,341 | 29,514 | 412,794 |
| Depreciation, depletion, and amortization | 360,026 | 33,252 | 14,314 | 7,490 | 60,649 | 6,972 | 482,703 |

### 1982

| | Exploration and Production | Refining and Marketing | Coal | Chemicals | Corporate | Consolidated Financial Statements |
|---|---|---|---|---|---|---|
| Sales and operating revenues | | | | | | |
| Outside customers | $ 254,532 | $1,530,531 | $335,058 | $1,035,337 | $ 21,921 | $3,177,379 |
| Intersegment | 129,867 | 7,058 | – | 1,096 | – | |
| Total | $ 384,399 | $1,537,589 | $335,058 | $1,036,433 | $ 21,921 | |
| Operating profit | 135,192 | 122,298 | 51,860 | 71,282 | (137,505) | 243,127 |
| Equity earnings (losses) | – | (7,705) | (431) | (2,980) | (568) | (11,684) |
| Identifiable assets | 1,161,790 | 431,669 | 252,311 | 1,094,025 | 254,218 | 3,194,013 |
| Investment in equity affiliates | – | 44,408 | 50,551 | 73,291 | 1,557 | 169,807 |
| Expenditures for properties and equipment | 439,223 | 24,429 | 30,405 | 102,946 | 15,695 | 612,698 |
| Depreciation, depletion, and amortization | 122,272 | 11,664 | 14,617 | 59,857 | 9,377 | 217,787 |

### 1981

| | Exploration and Production | Refining and Marketing | Coal | Chemicals | Corporate | Consolidated Financial Statements |
|---|---|---|---|---|---|---|
| Sales and operating revenues | | | | | | |
| Outside customers | $ 257,814 | $1,597,820 | $290,018 | $1,213,913 | $ 16,650 | $3,376,215 |
| Intersegment | 110,897 | 12,058 | – | 1,394 | – | |
| Total | $ 368,711 | $1,609,878 | $290,018 | $1,215,307 | $ 16,650 | |
| Operating profit | 145,664 | 155,759 | 34,656 | 171,882 | (138,897) | 369,064 |
| Equity earnings (losses) | – | 6,939 | 276 | (688) | 665 | 7,192 |
| Identifiable assets | 859,482 | 454,144 | 221,292 | 1,215,864 | 265,603 | 3,016,385 |
| Investment in equity affiliates | – | 52,313 | 35,142 | 67,904 | 2,245 | 157,604 |
| Expenditures for properties and equipment | 317,488 | 40,726 | 25,948 | 140,451 | 25,133 | 549,746 |
| Depreciation, depletion, and amortization | 85,241 | 10,079 | 8,743 | 59,663 | 7,417 | 171,143 |

OCCNJ0006566

ALCD-PUBCOM_0002181

## Geographic Segments

| 1983 | United States | Indonesia | Other Foreign | Consolidated Financial Statements |
|---|---|---|---|---|
| Sales and operating revenues | $3,521,430 | $ 179,813 | $324,864 | $4,026,107 |
| Operating profit (loss) | (148,988) | 114,179 | 19,837 | (14,972) |
| Assets | 4,192,701 | 1,389,062 | 442,678 | 6,024,441 |

| 1982 | United States | Foreign | Consolidated Financial Statements |
|---|---|---|---|
| Sales and operating revenues | $2,898,022 | $279,357 | $3,177,379 |
| Operating profit | 222,315 | 20,812 | 243,127 |
| Assets | 2,909,018 | 284,995 | 3,194,013 |

| 1981 | United States | Foreign | Consolidated Financial Statements |
|---|---|---|---|
| Sales and operating revenues | $3,073,969 | $302,246 | $3,376,215 |
| Operating profit | 335,749 | 33,315 | 369,064 |
| Assets | 2,639,032 | 377,353 | 3,016,385 |

Intersegment sales and operating revenues are generally derived from transactions made at prevailing market rates or arms-length negotiated transactions.

Business segment operating profit is sales and operating revenues less applicable segment operating expenses. In determining business segment operating profit none of the following is included: equity earnings, interest, Corporate expense and discontinued operations.

Identifiable assets, expenditures for properties and equipment, and depreciation, depletion and amortization relate to those assets that are utilized by the respective segment. Corporate assets are principally cash, investments and other assets that cannot be directly associated with the operations or activities of a segment, including the assets of discontinued operations.

Sales to Sigmor, an associated company prior to January 14, 1983, amounted to $419,140,000 in 1982 and $501,649,000 in 1981, 13% and 15%, respectively, of consolidated sales and operating revenues. (See "Acquisition of Sigmor Corporation".)

Net foreign assets, including the Company's investment in associated companies accounted for by the equity method were $1,184,307,000 at December 31, 1983, $221,674,000 at December 31, 1982 and $271,770,000 at December 31, 1981.

Results of foreign operations, after applicable local taxes, which includes earnings of subsidiaries and associated companies included in income from continuing operations, amounted to earnings of $39,374,000 in 1983, a loss of $4,496,000 in 1982 and earnings of $2,488,000 in 1981. Foreign currency transaction gains and losses, resulting from fluctuations in exchange rates, reflected in current earnings amounted to losses of $1,967,000 and $2,030,000 in 1983 and 1982, respectively, and a gain of $367,000 in 1981.

### TAXES

Income (loss) before tax provision was comprised of earnings from the following:

| | 1983 | 1982 | 1981 |
|---|---|---|---|
| United States | $(152,487) | $214,513 | $355,619 |
| Foreign | 122,070 | 16,930 | 20,637 |
| | $ (30,417) | $231,443 | $376,256 |

The Company's worldwide provision for income taxes was comprised of the following:

| | 1983 | 1982 | 1981 |
|---|---|---|---|
| Current | | | |
| Federal | $(41,961) | $(9,561) | $ 35,971 |
| State and local | 845 | 3,983 | 4,090 |
| Foreign | 49,266 | 16,047 | 16,535 |
| | $ 8,150 | $10,469 | $ 56,596 |
| Deferred | | | |
| Federal | $(15,292) | $67,964 | $ 87,002 |
| State and local | 1,828 | 3,417 | 4,842 |
| Foreign | 35,114 | 50 | (2,340) |
| | $ 21,650 | $71,431 | $ 89,504 |
| | $ 29,800 | $81,900 | $146,100 |

OCCNJ0006567
ALCD-PUBCOM_0002182

The principal reasons for the difference between the statutory Federal income tax rate and the Company's worldwide provision for income taxes were:

|  | 1983 | 1982 | 1981 |
|---|---|---|---|
| Tax provision (credit) at statutory Federal rate (46%) | $(13,991) | $106,463 | $173,078 |
| Increase (reduction) resulting from | | | |
| Excess foreign income taxes | 56,900 | 10,720 | 712 |
| Investment tax credits | (9,638) | (20,601) | (28,418) |
| Excess statutory percentage depletion | (13,394) | (9,907) | (6,948) |
| Equity (earnings) losses | 7,105 | 5,375 | (3,309) |
| Federal minimum tax | 3,906 | – | 2,208 |
| Capital gains | – | (4,367) | (2,349) |
| Other, net | (1,088) | (5,783) | 11,126 |
|  | $ 29,800 | $ 81,900 | $146,100 |

The provision for deferred income taxes was comprised of the tax effects of timing differences as follows:

|  | 1983 | 1982 | 1981 |
|---|---|---|---|
| Intangible drilling costs | $29,618 | $28,630 | $52,263 |
| Accelerated depreciation | 29,122 | 29,581 | 20,337 |
| Capitalized interest | 14,735 | 15,109 | 10,879 |
| Development wells and related items | 1,239 | 7,460 | (1,036) |
| Coal minimum royalties | 4,746 | 6,405 | 3,197 |
| Asset write-offs | (36,058) | – | – |
| Foreign income taxes | (16,122) | – | – |
| Other, net | (5,630) | (15,754) | 3,864 |
|  | $21,650 | $71,431 | $89,504 |

At December 31, 1983, the Company had $36,200,000 of unused investment tax credits for Federal income tax purposes which expire between 1995 and 1998.

At December 31, 1983, there were accumulated undistributed earnings after applicable local taxes of foreign subsidiaries, associated companies and the Company's domestic international sales corporations of $66,124,000 for which no provision was necessary for foreign withholding or other income taxes because that amount had been reinvested in properties and equipment and working capital.

Taxes other than income taxes were comprised of the following:

|  | 1983 | 1982 | 1981 |
|---|---|---|---|
| Windfall profit | $ 17,652 | $18,159 | $ 32,583 |
| Gross production | 30,285 | 26,904 | 22,941 |
| Real and personal property | 25,093 | 18,836 | 20,621 |
| Payroll | 22,955 | 19,165 | 18,640 |
| Other | 16,008 | 13,641 | 10,540 |
|  | $111,993 | $96,705 | $105,325 |

PENSIONS

The charge against earnings for pension cost, including officers' supplemental pensions, but excluding contributions to coal miners' benefit plans, was $23,915,000 in 1983, $22,531,000 in 1982 and $19,148,000 in 1981 of which approximately 91% related to United States employees.

In March 1982, the Company contributed its overriding royalty interest in certain properties located in Henderson County, Texas (the Opelika field) to the collective investment trust for several of its employee pension plans. The overriding royalty interest had a fair market value of $18,000,000 as determined by a firm of independent petroleum engineers. Prior to consummating this transaction, the Company received an opinion from an independent fiduciary that the contribution would be in the best interests of the plans' participants and that the terms of the transaction were at least as favorable to the plans as those an unrelated party would receive in an arms-length transaction. The effect of the contribution was to increase the Company's 1982 income before tax provision by $18,000,000 (included in other revenues, net) and to reduce the Company's accrued pension liability by the same amount.

In 1981, for its United States Retirement Income Pension Plan, the Company changed its actuarial cost method from

OCCNJ0006568
ALCD-PUBCOM_0002183

"Entry Age Normal" to "Projected Unit Credit". The effect of the change was to reduce 1981 pension cost by $3,444,000 and increase net income by approximately $1,860,000 ($.03 per share).

A comparison of accumulated plan benefits and plan net assets as of the latest valuation date for the Company's United States pension plans was as follows:

| | Chemicals Company | Natomas |
|---|---|---|
| | December 31, 1983 | May 31, 1983 |
| Assumed rates of return | 8% | 8 - 14% |
| Actuarial present value | | |
| of accumulated | | |
| plan benefits | | |
| Vested | $129,943 | $15,943 |
| Nonvested | 4,647 | 1,559 |
| | $134,590 | $17,502 |
| Net assets available | | |
| for benefits | $122,190 | $24,695 |

The Company's foreign pension plans are not required to report to United States governmental agencies pursuant to the Employee Retirement Income Security Act and do not otherwise determine the actuarial present value of accumulated plan benefits. For foreign plans, the actuarially computed value of vested benefits was substantially fully funded.

The Company's collective bargaining agreements with its coal miners require contributions to miners' benefit plans, certain of which plans cover multiple employers. Company pension contributions, including past service costs were $4,459,000 in 1983, $4,595,000 in 1982 and $4,546,000 in 1981. The Employee Retirement Income Security Act of 1974, as amended, holds an employer liable upon complete or partial withdrawal from or termination of a multi-employer plan, and for the continued funding of its proportionate share of that plan's unfunded vested benefits liability. The actuaries for the multiemployer plans to which the Company contributes have estimated that the Company's share of such unfunded vested benefits liability approximated $21,050,000 at December 31, 1983. The Company has not withdrawn nor does it presently intend to withdraw from any multiemployer plan nor is it aware of the intention to terminate any such plan.

## PERFORMANCE INCENTIVE PLAN

The Company's Performance Incentive Plan, administered by the Compensation Committee of the Board of Directors, provides for incentive payments to officers and key employees based upon an annually approved formula. For the three years ended December 31, 1983, the approved formula related to return on stockholders' equity, with no incentive fund being available in any year in which such return was less than 10%.

In 1983, no incentive fund was available; in 1982, of the $3,542,000 available for incentive payments, $3,211,000 in awards were granted; and in 1981, of the $7,183,000 available for incentive payments, $6,135,000 in awards were granted.

## 1983 SPECIAL PERFORMANCE AWARDS

The Company's Board of Directors, upon the recommendation of its Compensation Committee, granted special performance awards totaling $2,417,000 to officers and key employees.

## EMPLOYEE SAVINGS PLAN

Under the Chemicals Company's Employee Savings Plan, eligible participating employees may elect to contribute up to 6% of their salaries to a trust for investment in either a corporate stock fund (Common Stock of the Company) or a government securities fund. The Company contributes an amount equal to 50% of the participant's monthly contribution, which is invested in the corporate stock fund. Participants are at all times fully vested in their contributions and the Company contributions become fully vested to the participant after three years of continued employment. The Plan Trustee may purchase shares of the Company's Common Stock for the corporate stock fund from the Company at a price equal to the closing market price on the New York Stock Exchange on the date of purchase. The Company's contributions to the Plan amounted to $3,134,000 in 1983, $3,565,000 in 1982 and $3,121,000 in 1981.

OCCNJ0006569
ALCD-PUBCOM_0002184

Under the Natomas Thrift Plan, eligible participating employees may elect to contribute up to 16% of their monthly salaries, the initial 6% on a before tax basis. Contributions are made to a trust for investment into three different funds including a Company stock fund. The Company contributes an amount equal to 100% of the participant's initial 6% monthly contribution. Participants are at all times fully vested in their contributions and become fully vested in the Company's contributions over a three year period. The Company's contribution to the Natomas Plan amounted to $508,000 in 1983.

At December 31, 1983, 3,215,216 Common shares were reserved for issuance under the Plans.

## RECEIVABLES

| | December 31, | | |
|---|---|---|---|
| | 1983 | 1982 | 1981 |
| Notes and accounts receivable | $442,758 | $328,333 | $476,899 |
| Less—Allowance for doubtful receivables | 3,597 | 3,106 | 4,026 |
| | $439,161 | $325,227 | $472,873 |

A summary of the changes in the allowance for doubtful receivables follows:

| | 1983 | 1982 | 1981 |
|---|---|---|---|
| January 1, | $3,106 | $4,026 | $4,652 |
| Additions charged against earnings | 3,301 | 2,497 | 1,562 |
| Write-offs, net of recoveries | (2,810) | (3,417) | (2,188) |
| December 31, | $3,597 | $3,106 | $4,026 |

## INVENTORIES

| | December 31, | | |
|---|---|---|---|
| | 1983 | 1982 | 1981 |
| Finished and in-process materials | $201,507 | $215,319 | $185,079 |
| Supplies | 82,176 | 70,725 | 65,803 |
| Raw materials | 85,677 | 62,529 | 111,565 |
| | $369,360 | $348,573 | $362,447 |

The current cost of inventories valued under the LIFO cost method (approximately 47%, 64% and 60% of total inventories at December 31, 1983, 1982 and 1981, respectively) exceeded their LIFO carrying values by $69,159,000, $118,510,000 and $111,675,000 at December 31, 1983, 1982 and 1981, respectively.

During 1983 and 1982, the Company reduced certain of its inventory quantities. The reduction resulted in a liquidation of LIFO inventory quantities carried at the lower costs that prevailed in prior years. The effect of the inventory reduction was to decrease the 1983 loss from continuing operations and to increase 1982 income from continuing operations by $15,904,000 ($.18 per share) and $883,000 ($.01 per share), respectively.

## ASSETS HELD FOR SALE

Assets held for sale at December 31, 1983 are comprised of all of the United States oil and gas producing and non-producing properties, excluding Federal offshore leases, of Natomas North America, Inc., a subsidiary of the Company. Such assets are valued at their estimated realizable value, based upon an agreement in principle for their sale.

## PROPERTIES AND EQUIPMENT

| | December 31, | | |
|---|---|---|---|
| | 1983 | 1982 | 1981 |
| Exploration and production | $4,152,389 | $1,528,268 | $1,155,465 |
| Refining and marketing | 770,880 | 339,498 | 285,405 |
| Coal | 229,870 | 182,059 | 155,338 |
| Geothermal | 760,359 | – | – |
| Chemicals | 899,310 | 1,031,253 | 1,028,657 |
| Corporate | 82,097 | 100,495 | 95,794 |
| | $6,894,905 | $3,181,573 | $2,720,659 |
| Less – Accumulated depreciation and depletion | 2,446,058 | 1,067,137 | 955,008 |
| | $4,448,847 | $2,114,436 | $1,765,651 |

Authorized expenditures under approved appropriations for additions to properties and equipment over the next several years were $397,414,000 at December 31, 1983, after deducting expenditures through that date.

The provision for depreciation and depletion was $476,423,000 in 1983 (including $179,946,000 for the impairment of five leases in the Beaufort Sea associated with the Mukluk No. 1 exploratory well); $210,531,000 in 1982 and $163,785,000 in 1981. At December 31, 1983, costs of $127,685,000 attributable to geothermal reserves not yet in production were not subject to depletion.

The charge against earnings for maintenance and repairs was $112,051,000 in 1983, $110,729,000 in 1982 and $119,096,000 in 1981.

38

OCCNJ0006570
ALCD-PUBCOM_0002185

## INVESTMENTS

On July 14, 1983, the Company and Showa Denko, K.K., a Japanese company, formed SDS Biotech Corporation, a 50/50 joint venture to carry on a worldwide agricultural chemicals business. The operations of the joint venture include the Company's former agricultural chemicals and animal health businesses, together with its research facilities at Concord Township, Ohio, and related support functions. These assets were transferred to the joint venture at their book value, and the joint venture assumed certain indebtedness of the Company related to the businesses totaling $149,786,000 and other liabilities arising out of these businesses.

Effective June 30, 1982, the Company and Switzerland based Chemnor Corporation formed an electrochemical technology joint venture, Eltech Systems Corporation. The Company holds a 49% interest in the joint venture, to which it either sold or contributed various assets including the stock of subsidiary corporations, manufacturing facilities, electrochemical technology and international marketing expertise. The joint venture also assumed various liabilities. Upon formation of the joint venture the Company realized $65,000,000 in cash. The Company retained the patents and licenses related to its metallic catalytically-activated electrodes. Eltech and its affiliates are, however, licensees of that technology.

|  | December 31, | | |
|---|---|---|---|
|  | 1983 | 1982 | 1981 |
| Investments and advances to associated companies, at equity | | | |
| Unincorporated | | | |
| Montco Coal Partnership (⅔) | $ 20,167 | $ 14,913 | $ 10,000 |
| Diamond Shamrock Chuitna Coal Joint Venture (½) | 24,458 | 14,627 | 5,361 |
| Tenneco Entex Falcon Joint Venture (¼) | 12,426 | 10,333 | 8,282 |
| Incorporated | | | |
| SDS Biotech Corporation (50%) | 37,547 | – | – |
| SDS Biotech K.K. (50%) | 7,519 | 6,171 | 6,455 |
| Sigmor Corporation (21%) | – | 40,645 | 48,983 |
| Carbocloro S.A. Industrias Quimicas (50%) | 33,386 | 37,276 | 37,244 |
| Eltech Systems Corporation (49%) | 21,619 | 10,408 | – |
| Hawkeye Coal Company (50%) | 3,849 | 5,179 | 5,567 |
| Other | 29,443 | 30,255 | 35,712 |
|  | $190,414 | $169,807 | $157,604 |
| Investments, at cost, and long-term receivables | | | |
| The 1600 Corporation | 29,946 | – | – |
| Other | 27,600 | 23,499 | 24,917 |
|  | $247,960 | $193,306 | $182,521 |

Effective January 14, 1983, the Company acquired the remaining 79% of Sigmor. (See "Acquisition of Sigmor Corporation".)

The 1600 Corporation is the successor to the pipe business of Sigmor. (See "Commitments and Contingencies".)

## INTANGIBLE ASSETS

|  | December 31, | | |
|---|---|---|---|
|  | 1983 | 1982 | 1981 |
| Intangibles resulting from acquisitions – excess of cost over fair value of net assets acquired | $105,611 | $ 31,481 | $ 38,643 |
| Patents, trademarks, formulae, processes, etc., purchased | 67,341 | 76,615 | 85,063 |
|  | $172,952 | $108,096 | $123,706 |
| Less – Amortization | 40,368 | 37,274 | 40,871 |
|  | $132,584 | $ 70,822 | $ 82,835 |

The provision for amortization was $6,280,000 in 1983, $7,256,000 in 1982 and $7,358,000 in 1981.

OCCNJ0006571

ALCD-PUBCOM_0002186

## LONG-TERM DEBT AND CREDIT ARRANGEMENTS

| | December 31, | | |
|---|---|---|---|
| | 1983 | 1982 | 1981 |
| **Parent** | | | |
| Borrowings supported by unused revolving credit agreement | | | |
| Commercial paper/money market | $ 323,800 | | |
| Bankers acceptances | 200,000 | | |
| Bank term loan/credit agreement | 150,000 | | |
| | $ 673,800 | | |
| **Chemicals Company** | | | |
| Sinking Fund Debentures | | | |
| 5% | $ – | $ 5,231 | $ 5,231 |
| 7¾% | – | 28,904 | 31,489 |
| 8¼% | – | 40,753 | 47,053 |
| 9% due 1985-1999 | 70,195 | 70,195 | 75,000 |
| 9⅛% due 1985-2000 | 100,000 | 100,000 | 100,000 |
| 7.70% due 1991-2001 | 88,687 | 88,687 | 125,000 |
| 8½% due 1997-2008 | 99,684 | 99,663 | 148,964 |
| 11¼% due 1994-2013 | 149,615 | – | – |
| Notes | | | |
| 4.65% | – | 10,500 | 12,000 |
| 4⅛% | – | 1,875 | 2,250 |
| 10⅝% due 1993 | 99,794 | – | – |
| Pollution control/Industrial revenue financings | 47,287 | 53,736 | 45,314 |
| Bank term loan/credit agreement | – | 200,000 | 200,000 |
| Commercial paper supported by unused revolving credit agreement | – | 177,150 | 9,961 |
| Other loans | 27,574 | 26,076 | 29,019 |
| | $ 682,836 | $902,770 | $831,281 |
| **Natomas** | | | |
| Debentures | | | |
| 8⅛% due 1991-1997 | $ 17,272 | | |
| 15½% due 1989 | 84,652 | | |
| Notes | | | |
| 15% due 1985 | 51,764 | | |
| 15¾% due 1986 | 53,424 | | |
| 7¾% due 1986 (Sfr 50,000,000) | 36,100 | | |
| 8¼% due 1987 (Sfr 50,000,000) | 26,000 | | |
| Bonds | | | |
| 8% due 1984 | 9,711 | | |
| 7½% due 1990 (Sfr 75,000,000) | 29,700 | | |
| Institutional loans | 161,124 | | |
| Bank and other loans | 9,940 | | |
| | $ 479,687 | | |
| | $1,836,323 | $902,770 | $831,281 |
| Less – Due within one year | 38,468 | 8,600 | 8,964 |
| | $1,797,855 | $894,170 | $822,317 |

OCCNJ0006572

ALCD-PUBCOM_0002187

The loan agreements and indentures covering Chemicals Company Notes and Debentures contain conventional restrictions on declaration and payment of dividends and acquisition of the Chemicals Company's Common Stock. The most restrictive of these provisions relate to the 9⅛% Sinking Fund Debentures due November 15, 2000; under such provisions the amount of consolidated Chemicals Company retained earnings free of such restrictions was approximately $872,080,000 at December 31, 1983. Effective January 26, 1984, with the assumption of all of the Chemicals Company's sinking fund debentures, notes and $42,272,000 principal amount of pollution control/industrial revenue financings and other loans by its Parent, these debt restrictions became those of the Company. (See "Holding Company Formed (Reorganization)".)

Included in the Company's consolidated retained earnings at December 31, 1983, were undistributed equity earnings of associated companies of $2,742,000.

The aggregate maturities of long-term debt outstanding at December 31, 1983 for the next five years were as follows: 1984 – $38,468,000; 1985 – $98,882,000; 1986 – $151,849,000; 1987 – $44,976,000; and 1988 – $56,652,000.

In June 1981, the Company entered into a Bank Term Loan/Credit Agreement. The term loan provides for the borrowing of up to $200,000,000. Borrowings can be repaid at any time with a final maturity at the earlier of June 15, 1987 or the date on which the unpaid principal amount thereunder is less than $50,000,000. The Agreement provides that at maturity any outstanding borrowings under the term loan are convertible, at the Company's option, into a four year credit loan repayable in four equal annual installments. Interest on such borrowings is based upon, at the Company's option, the prime rate, Eurodollar rate or certificate of deposit rate. Borrowings outstanding under this Agreement were $150,000,000 at December 31, 1983 and $200,000,000 at December 31, 1982 and 1981.

In November 1982, in anticipation of its acquisition of Sigmor, the Company entered into a Revolving Credit and Term Loan Agreement with a group of financial institutions that were parties to a similar credit agreement with Sigmor. The November 1982 Agreement which became effective at the time of the Sigmor acquisition, provided for the borrowing of up to $200,000,000 on a revolving credit basis and would have matured December 31, 1987.

On January 14, 1983, concurrent with its acquisition of Sigmor, the Company borrowed $151,157,000 under the Agreement to refund the then outstanding balance of Sigmor's credit agreement with those same financial institutions. In October 1983, borrowings outstanding under this Agreement were repaid and the Agreement cancelled.

In May 1983, the Company sold $150,000,000 of 11¼% Sinking Fund Debentures due May 1, 2013 at 99.735% and $100,000,000 of 10⅝% Notes due May 1, 1993 at 99.78%. The net proceeds of the issues were used to refinance the Company's commercial paper and money market borrowings.

In November 1983, the Company entered into a new Revolving Credit and Term Loan Agreement, replacing various revolving credit agreements then in effect. The 1983 Revolving Credit Agreement provides for the borrowing of up to $1,000,000,000 on a revolving credit basis and matures November 14, 1988. Borrowings outstanding at the maturity date are convertible, at the option of the Company, into a three year term loan. Interest on borrowings is based upon, at the Company's option, the prime rate, Eurodollar rate or certificate of deposit rate. The 1983 Revolving Credit Agreement also provides for a commitment fee of ⅜% for the first $350,000,000 of unused commitment and ¼% for the remainder. At December 31, 1983, there were no borrowings outstanding under this Agreement.

Notes payable at December 31, 1983, 1982 and 1981 consisted of debt obligations of foreign subsidiaries at an average interest rate of 12.2%, 18.5% and 14.1%, respectively. The maximum amount of notes payable outstanding, principally the Company's commercial paper and short-term bank debt in 1982 and 1981, was $21,645,000 during 1983, $77,040,000 during 1982 and $47,943,000 during 1981. The average amount of notes payable outstanding was $13,112,000 during 1983, $13,634,000 during 1982 and $56,112,000 during 1981 at an average interest rate of 13.4%, 12.2% and 16.5%, respectively.

Total interest costs incurred were as follows:

|  | 1983 | 1982 | 1981 |
|---|---|---|---|
| Interest expense | $100,703 | $ 72,873 | $75,441 |
| Capitalized interest | 42,862 | 32,846 | 23,650 |
|  | $143,565 | $105,719 | $99,091 |

OCCN10006573

ALCD-PUBCOM_0002188

## PREFERRED STOCK

At December 31, 1983, 100,000,000 shares of Preferred Stock with $1.00 par value, were authorized and 4,182,533 shares of $2.07 Cumulative Convertible Preferred Stock and 2,499,800 shares of $4.00 Cumulative Convertible Preferred Stock were issued. At December 31, 1982 and 1981, there were no shares of Preferred Stock issued. The rights and preferences of shares of authorized but unissued Preferred Stock are to be established by the Company's Board of Directors at the time of issuance.

In conjunction with the acquisition of Natomas, the Company's Board of Directors authorized the creation of a series of Preferred Stock to consist of a maximum of 2,500,000 shares with $1.00 par value, being designated the $4.00 Cumulative Convertible Preferred Stock. Each outstanding share is entitled to one vote per share, is convertible at any time into 1.228 shares of the Company's Common Stock, shall receive a cash dividend of $4.00 per share, is callable at $52.80 per share ($131,989,000 in the aggregate) and has a liquidation value of $50.00 per share ($124,990,000 in the aggregate) plus accrued but unpaid dividends, if any. (See "Acquisition of Natomas Company".)

In conjunction with the acquisition of Sigmor, the Company's Board of Directors authorized the creation of a series of Preferred Stock to consist of a maximum of 4,183,374 shares with $1.00 par value, being designated the $2.07 Cumulative Convertible Preferred Stock. Each outstanding share is entitled to one vote, is convertible at any time into the Company's Common Stock on a one-for-one basis, shall receive a cash dividend of $2.07 per share (.34 per share in 1983) and has a liquidation value of $31.82 per share ($133,088,000 in the aggregate) plus accrued but unpaid dividends, if any. (See "Acquisition of Sigmor Corporation".)

## COMMON STOCK

At December 31, 1983, 300,000,000 shares of Common Stock with $1.00 par value were authorized. At December 31, 1983, 1982 and 1981, 126,961,585, 63,565,110 and 62,878,401 shares, respectively, were issued.

In May 1983, the Company sold 3,442,378 shares of newly issued Common Stock at $22.875 per share. The net proceeds of the sale were used to repay the Company's commercial paper borrowings. In April 1983, the Company exchanged 1,057,622 shares of newly issued Common Stock to retire $27,500,000 principal amount of its 7¾% Sinking Fund Debentures due August 1, 1994. (See "Extraordinary Item – Early Extinguishment of Debt".)

## COMMON TREASURY STOCK

At its meeting on October 15, 1981, the Board of Directors authorized the purchase of up to 2,000,000 shares of the Company's Common Stock. During 1981, the Company purchased 22,500 shares of its Common Stock at an average cost of $27.46 per share. On February 9, 1982, the Company completed the purchase of the remaining 1,977,500 shares in open market transactions at an average cost of $25.02 per share. On March 1, 1982, the Board of Directors authorized the purchase of up to 2,000,000 additional shares of the Company's Common Stock. During 1982, the Company purchased 1,064,400 shares of its Common Stock in open market transactions at an average cost of $21.29 per share. (See "Extraordinary Item – Early Extinguishment of Debt".)

During the first quarter of 1983, the Company acquired 130,931 shares of its Common Stock at an average cost of $23.33 (129,556 of the shares were received as payment for assets sold). During the fourth quarter of 1983, the Company purchased 400,000 shares of its Common Stock in open market transactions at an average cost of $22.55 per share.

## STOCK OPTIONS

The Company's 1980 Long-Term Incentive Plan, administered by the Compensation Committee of the Board of Directors, is intended to provide officers and key employees with an incentive to remain in the employ of and enhance the long-term performance of the Company through the use of stock options, Stock Appreciation Rights ("SARs") and Performance Units. Under the terms of the 1980 Plan, options are granted at prices equal to the market price of the Company's Common Stock at the dates of grant, become exercisable in varying installments and expire 10 years from date of grant. Options and SARs may no longer be granted under the superseded 1971 Stock Option Plan; however, any options or SARs outstanding thereunder remain in effect.

OCCNJ0006574
ALCD-PUBCOM_0002189

The holder of an option which includes SARS may sur-render such option, when exercisable, and receive, at the discretion of the Company, Common Stock and/or cash equal to the difference between the option price and the Common Stock's market price on the date of sur-render. Options surrendered upon exercise of SARS are not available for regrant. Performance Units were granted concurrently with certain options and SARS for an award period of three years, with an achievable value which cannot exceed the fair market value of the Company's Common Stock at the date of grant. The value actually assigned the Performance Units upon completion of the ensuing award period is contingent on achieving specific performance objectives in excess of minimum targets.

The grant or exercise of an option does not result in a charge against the Company's earnings. However, any ex-cess of Common Stock market price over the option price of options which include SARS does result in a charge against the Company's earnings; a subsequent decline in market price results in a credit to earnings, but only to a maximum of the earnings charges incurred in prior years on unexercised SARS. The charge against earnings for SARS was $117,000 in 1983 and the credit to earnings for SARS was $308,000 in 1982 and $1,049,000 in 1981. There was no charge against earnings for Performance Units, as the Units earned no value in the 1983 and 1982 award periods.

At December 31, 1983, 894,143 Common shares were re-served for future grants under the 1980 Plan, and options representing 1,112,678 Common shares were exercisable. Detail of options outstanding follows:

| January 1, | Shares | | |
|---|---|---|---|
| | 1983 | 1982 | 1981 |
| January 1, | 1,680,622 | 1,375,562 | 1,160,386 |
| Granted | 392,900 | 419,750 | 303,430 |
| Natomas options assumed | 232,815 | – | – |
| Exercised | (138,729) | (12,834) | (53,549) |
| Cancelled | (513,472) | (101,856) | (34,705) |
| December 31, | 1,654,136 | 1,680,622 | 1,375,562 |

Exercise prices of options outstanding at December 31, 1983 ranged from $9.05 to $38.69 per share.

## LEASE COMMITMENTS

The Company leases certain transportation and marketing facilities, office space and machinery and equipment under cancellable and non-cancellable leases, most of which ex-pire within 20 years and may be renewed by the Company.

The Company's properties and equipment under capital lease principally relate to its chemicals segment and were as follows:

| | December 31, | | |
|---|---|---|---|
| | 1983 | 1982 | 1981 |
| Processing facilities | $21,584 | $26,326 | $26,788 |
| Transportation, marketing and general facilities | 20,377 | 26,529 | 26,010 |
| | $41,961 | $52,855 | $52,798 |
| Less–Accumulated depreciation | 21,967 | 27,775 | 26,061 |
| | $19,994 | $25,080 | $26,737 |

Included in the provision for depreciation and depletion was depreciation applicable to assets under capital lease of $2,307,000 in 1983, $2,481,000 in 1982 and $2,749,000 in 1981.

Minimum annual rentals at December 31, 1983 were as follows:

| | Capital Leases | Operating Leases |
|---|---|---|
| 1984 | $ 4,796 | $ 85,192 |
| 1985 | 4,947 | 77,455 |
| 1986 | 4,831 | 68,153 |
| 1987 | 4,850 | 43,237 |
| 1988 | 3,690 | 39,918 |
| 1989 and thereafter | 20,127 | 254,695 |
| | $43,241 | $568,650 |
| Less– | | |
| Executory costs | 74 | |
| Interest equivalents | 15,288 | |
| Present value | $27,879 | |
| Less–Current portion | 2,577 | |
| Long-term capital lease obligations | $25,302 | |

Rental expense for operating leases was as follows:

| | 1983 | 1982 | 1981 |
|---|---|---|---|
| Total rentals | $92,632 | $82,437 | $62,680 |
| Less–Sublease rental income | 7,085 | 3,957 | 1,847 |
| Rental expense | $85,547 | $78,480 | $60,833 |

43

OCCNJ0006575
ALCD-PUBCOM_0002190

COMMITMENTS AND CONTINGENCIES

The Company owns a 50% interest in Diamond Shamrock Alberta Gas Ltd. ("DSAG"), an associated company in Canada. DSAG is engaged in the production and sale of polyvinyl chloride resins and has been included in discontinued operations. DSAG arranged financing in the amount of $72,680,000 ($68,406,000 remained unpaid at December 31, 1983) with two United States insurance companies, the loan being secured by a mortgage on DSAG's plant and equipment. The Company and its venture partner have committed to the lenders that they will purchase from DSAG all of the polyvinyl chloride resin produced.

The Company also owns a 50% interest in Carbocloro S.A. Industrias Quimicas, an associated company in Brazil which is engaged in the production and sale of chlorine and caustic soda. Carbocloro has completed an expansion doubling its capacity for the production of those products. Carbocloro arranged financing for the expansion in the amount of $100,000,000 ($88,889,000 remained unpaid at December 31, 1983) with a group of international banks. The loan is secured by a mortgage on the assets acquired for the expansion. The loan agreement requires Carbocloro to meet specific financial criteria which had not been achieved at December 31, 1983. The Company and its venture partner have committed to the lenders that the specified financial criteria will be achieved as contemplated in the loan agreement.

At December 31, 1983, the Company was a party to several coal leases, production from which has not commenced. The agreements, having terms of generally 20 years, call for aggregate minimum royalty payments (whether or not coal is produced) of approximately $15,526,000 annually. Such minimum royalty payments may be offset against royalties payable on future production.

In 1981, Natomas was advised by the Indonesian government, that in its view, Natomas was obligated to pay additional amounts relating to pre-1978 crude oil liftings by Natomas in excess of its annual allocation. Natomas has reached a settlement with the Indonesian government that requires it to make a series of payments estimated as follows: $59,729,000 in 1988; $31,942,000 in 1989; $24,508,000 in 1990; and $24,394,000 in 1991.

A subsidiary of the Company, together with several other companies, is a defendant in several hundred lawsuits in which the plaintiffs allege personal injury from exposure to "Agent Orange" and other herbicides composed in whole or in part of 2,4,5-trichlorophenoxyacetic acid or containing some amount of dioxin. Those herbicides (hereinafter "Agent Orange") were sold to the United States Government by the subsidiary and the other defendants for use by the United States during military operations in Vietnam. The suits, which seek substantial amounts in damages, have been transferred to the United States District Court for the Eastern District of New York for coordinated or consolidated pretrial proceedings. In December 1983, that Court formally certified a class action in which the plaintiff class consists of present and former servicemen who were in the United States, New Zealand or Australian Armed Forces assigned to Vietnam at any time from 1961 to 1972 who were injured while in or near Vietnam by exposure to Agent Orange. The class also includes spouses, parents, and children of the servicemen born before January 1, 1984, directly or derivatively injured as a result of the exposure. The Court specifically noted that the class definition does not imply a conclusion that anyone in the class was injured as a result of exposure to Agent Orange. A separate class action was certified with respect to plaintiffs' claims for punitive damages. Trial of the claims of certain representative plaintiffs is scheduled to commence before the Court and a jury in May 1984. The Court has preliminarily determined that the claims and defenses in the class action will be governed by a "Federal or national consensus common law," the rules of which remain to be enunciated by the Court. In view of numerous unresolved issues, including the unsettled question of the substantive law that will be applied to determine liability, and the extensive pre-trial discovery that remains to be taken on the issue of whether Agent Orange caused any of the injuries alleged by the plaintiffs, it is not possible to make an informed judgment as to the outcome or to quantify the potential liability, if any, of the Company. The Company intends to continue to defend the litigation vigorously.

A subsidiary of the Company is a defendant in a purported class action lawsuit alleging liability as a result of the manufacture of herbicides at its former Newark, New Jersey plant. The defendants also include all subsequent owners of the property after such subsidiary sold it in 1971. The plaintiffs purport to bring this action on behalf of former employees of the subsidiary and residents of

OCCNJ0006576

ALCD-PUBCOM_0002191

Newark in the vicinity of the former plant who allege personal injuries resulting from alleged exposure to dioxin. In addition, the plaintiffs include certain businesses and property owners which allege damages as a result of the discovery of dioxin at the site. No specific monetary damages are alleged. Since the suit is only in an early stage, and since in the opinion of the Company there is no reliable medical evidence which connects dioxin to any illness or injury other than chloracne, it is not possible to make any informed judgment as to the outcome or quantify the potential liability, if any, of the Company. The Company intends to defend the litigation vigorously.

The Company and The B.F. Goodrich Company are parties to a Federal Trade Commission administrative complaint that alleges that the acquisition by Goodrich of the Company's Plastics subsidiary would illegally reduce competition in the domestic production of vinyl chloride monomer and polyvinyl chloride resins. The Company and Goodrich believe the sale was entirely lawful and they are contesting the complaint vigorously. The Company has agreed, however, that if a final judgment of a Federal appeals court requires Goodrich to divest itself of the acquired assets and they are not sold to a third party, the Company will reacquire them.

The Company is also a party to a number of other lawsuits, the outcomes of which are not expected to have a material effect on the Company's operations or financial position.

Loan guarantees associated with indebtedness of associated companies and other entities amounted to $1,966,000 at December 31, 1983. The Company is also contingently liable in the amount of $46,501,000 for notes receivable sold with recourse, such notes arising from the sale of the pipe business of Sigmor.

The Company's commitments for future purchases are for quantities not in excess of anticipated requirements and at prices which will not result in a loss. The Company anticipates that it will sustain no losses in the fulfillment of its existing sales commitments.

## Report of Independent Accountants

To the Stockholders and Board of Directors
Diamond Shamrock Corporation

In our opinion, the accompanying consolidated balance sheet and the related consolidated statements of income, stockholders' equity and changes in financial position present fairly the financial position of Diamond Shamrock Corporation and its subsidiaries at December 31, 1983, 1982 and 1981, and the results of their operations and the changes in their financial position for the years then ended, in conformity with generally accepted accounting principles consistently applied. Our examinations of these statements were made in accordance with generally accepted auditing standards and accordingly included such tests of the accounting records and such other auditing procedures as we considered necessary in the circumstances.

*Price Waterhouse*

*Dallas, Texas*
*February 16, 1984*

OCCNJ0006577

ALCD-PUBCOM_0002192

## Report of the Company

To the Stockholders
Diamond Shamrock Corporation

The Company is responsible for all information and representations contained in the accompanying Consolidated Financial Statements and other portions of this Annual Report. In the preparation of the information contained in this Annual Report, it has been necessary to make estimates and judgments based on data provided by the Company's accounting and control systems. The accompanying Consolidated Financial Statements have been prepared in conformity with generally accepted accounting principles and have been examined by Price Waterhouse, independent accountants, whose report thereon is included in this Annual Report.

In meeting its responsibility for the reliability of the Consolidated Financial Statements, the Company depends on its accounting and control systems. These systems are designed to provide reasonable assurance that assets are safeguarded against loss from unauthorized use and that transactions are executed in accordance with the Company's authorizations and are recorded properly. The Company believes that its accounting and control systems provide reasonable assurance that errors or irregularities that could be material to the Consolidated Financial Statements are prevented or would be detected within a timely period.

The Board of Directors pursues its oversight role for the Consolidated Financial Statements through the Audit Committee which is composed solely of directors who are not employees of the Company. The Audit Committee meets with the Company's financial management and operations auditors periodically to review the work of each

and to monitor the discharge of their responsibilities. The Audit Committee also meets periodically with the Company's independent accountants, who have free access to the Audit Committee without representatives of the Company present, to discuss accounting, control, auditing and financial reporting matters.

The independent accountants provide an objective review as to the Company's reported operating results and financial position. The Company also has an active operations auditing program which monitors the functioning of the Company's accounting and control systems and provides additional assurance that the Company's operations are conducted in a manner which is consistent with applicable laws.

R. M. Ahlstrom, Vice President, Finance
Chief Financial Officer

R. W. Arp, Controller
Principal Accounting Officer

*Dallas, Texas*
*February 16, 1984*

OCCNJ0006578
ALCD-PUBCOM_0002193

**Supplementary Information** *(unaudited)*
*(dollar amounts in tables are in thousands, except per share)*

QUARTERLY DATA

| | 1983 | | | | |
|---|---|---|---|---|---|
| | March 31, | June 30, | September 30, | December 31, | For the Year |
| Sales and operating revenues | $855,433 | $978,374 | $1,014,533 | $1,177,767 | $4,026,107 |
| Operating profit (loss) | 12,141 | 45,839 | 85,964 | (158,916) | (14,972) |
| Income (loss) from continuing operations | 4,634 | 26,271 | 38,909 | (130,031) | (60,217) |
| Extraordinary item | – | 3,250 | 804 | | 4,054 |
| Net income (loss) | 4,634 | 29,521 | 39,713 | (130,031) | (56,163) |
| Per Common share | | | | | |
|    Continuing operations | $   .07 | $   .38 | $   .42 | $   (1.05) | $   (.76) |
|    Extraordinary item | – | .05 | .01 | – | .05 |
|    Net income (loss) | .07 | .43 | .43 | (1.05) | (.71) |
|    Dividends | .44 | .44 | .44 | .44 | 1.76 |
|    Market price | | | | | |
|      High | 26⅛ | 25¾ | 26⅝ | 25¾ | 26⅝ |
|      Low | 20⅜ | 20⅝ | 21¼ | 18⅝ | 18⅝ |

| | 1982 | | | | |
|---|---|---|---|---|---|
| | March 31, | June 30, | September 30, | December 31, | For the Year |
| Sales and operating revenues | $791,135 | $857,709 | $773,196 | $755,339 | $3,177,379 |
| Operating profit (loss) | 42,302 | 49,256 | 75,576 | 75,993 | 243,127 |
| Income from continuing operations | 29,149 | 31,926 | 42,272 | 46,196 | 149,543 |
| Extraordinary item | 35,548 | – | – | – | 35,548 |
| Net income | 64,697 | 31,926 | 42,272 | 46,196 | 185,091 |
| Per Common share | | | | | |
|    Continuing operations | $   .47 | $   .51 | $   .66 | $   .73 | $   2.37 |
|    Extraordinary item | .57 | – | – | – | .57 |
|    Net income | 1.04 | .51 | .66 | .73 | 2.94 |
|    Dividends | .44 | .44 | .44 | .44 | 1.76 |
|    Market price | | | | | |
|      High | 25¾ | 22⅝ | 20⅞ | 24¼ | 25¾ |
|      Low | 19⅛ | 17¼ | 16½ | 18⅝ | 16½ |

| | 1981 | | | | |
|---|---|---|---|---|---|
| | March 31, | June 30, | September 30, | December 31, | For the Year |
| Sales and operating revenues | $872,650 | $810,448 | $820,569 | $872,548 | $3,376,215 |
| Operating profit | 96,974 | 86,866 | 90,841 | 94,383 | 369,064 |
| Income from continuing operations | 60,774 | 55,248 | 54,401 | 59,733 | 230,156 |
| (Loss) from discontinued operations | (9,656) | (99,235) | – | – | (108,891) |
| Net income (loss) | 51,118 | (43,987) | 54,401 | 59,733 | 121,265 |
| Per Common share | | | | | |
|    Continuing operations | $   .97 | $   .88 | $   .87 | $   .96 | $   3.68 |
|    Discontinued operations | (.15) | (1.59) | – | – | (1.74) |
|    Net income | .82 | (.71) | .87 | .96 | 1.94 |
|    Dividends | .42 | .42 | .42 | .44 | 1.70 |
|    Market price | | | | | |
|      High | 36¼ | 39⅝ | 38⅞ | 29¾ | 39⅝ |
|      Low | 30 | 27¾ | 23¾ | 25¼ | 23¾ |

Due to the August 31, 1983 acquisition of Natomas, the average number of Common shares outstanding used in calculating the fourth quarter earnings per Common share was significantly higher than the weighted average number of Common shares outstanding used in calculating earnings per Common share in each of the first three quarters and for the year. As a consequence of these share differences, along with the wide variation in quarterly earnings, calculated earnings per Common share for the year 1983 does not equal the sum of the four quarters.

OCCNJ0006579

ALCD-PUBCOM_0002194

Price Waterhouse have made a limited review of the quarterly data presented above, in accordance with standards established by the American Institute of Certified Public Accountants. However, such limited review procedures do not constitute an examination in accordance with generally accepted auditing standards and accordingly, Price Waterhouse express no opinion thereon.

## OIL AND GAS PRODUCING ACTIVITIES

In November 1982, the Financial Accounting Standards Board ("FASB") issued Standard No. 69, "Disclosures about Oil and Gas Producing Activities". This Standard continues the previous disclosure requirements of the FASB and the Securities and Exchange Commission ("SEC") concerning proved oil and gas reserve quantities, capitalized costs, costs incurred and the method of accounting used, and requires new disclosures about the results of operations from oil and gas producing activities and a standardized measure of discounted future net cash flow relating to proved oil and gas reserves.

**Results of Operations.**
Results of operations from oil and gas producing activities were as follows:

| | 1983 | | | |
|---|---|---|---|---|
| | United States | Indonesia | Other Foreign | Worldwide |
| Sales | $259,761 | $179,813 | $35,036 | $474,610 |
| Transfers | 143,692 | – | – | 143,692 |
| | $403,453 | $179,813 | $35,036 | $618,302 |
| Production costs | | | | |
| Windfall profit tax | $ 17,652 | $ – | $ – | $ 17,652 |
| Gross production tax | 24,806 | – | 4,090 | 28,896 |
| Other | 37,254 | 36,862 | 4,286 | 78,402 |
| Exploration costs | 57,189 | 2,228 | 13,650 | 73,067 |
| Depreciation and depletion | 325,805 | 26,409 | 6,878 | 359,092 |
| Gain on sale of leases | (780) | – | – | (780) |
| | $461,926 | $ 65,499 | $28,904 | $556,329 |
| Income (loss) before tax provision | $(58,473) | $114,314 | $ 6,132 | $ 61,973 |
| Provision for income taxes | (30,414) | 64,016 | 10,427 | 44,029 |
| Results of operations | $(28,059) | $ 50,298 | $(4,295) | $ 17,944 |

| | 1982 | | |
|---|---|---|---|
| | United States | Foreign | Worldwide |
| Sales | $235,185 | $19,347 | $254,532 |
| Transfers | 129,867 | – | 129,867 |
| | $365,052 | $19,347 | $384,399 |
| Production costs | | | |
| Windfall profit tax | $ 18,159 | $ – | $ 18,159 |
| Gross production tax | 19,429 | 3,046 | 22,475 |
| Other | 32,846 | 750 | 33,596 |
| Exploration costs | 68,434 | 4,110 | 72,544 |
| Depreciation and depletion | 120,975 | 714 | 121,689 |
| Gain on sale of leases | | | |
| Opelika field | (18,000) | – | (18,000) |
| Other | (12,101) | – | (12,101) |
| | $229,742 | $ 8,620 | $238,362 |
| Income before tax provision | $135,310 | $10,727 | $146,037 |
| Provision for income taxes | 49,917 | 7,306 | 57,223 |
| Results of operations | $ 85,393 | $ 3,421 | $ 88,814 |

| | 1981 | | |
|---|---|---|---|
| | United States | Foreign | Worldwide |
| Sales | $239,558 | $18,256 | $257,814 |
| Transfers | 110,897 | – | 110,897 |
| | $350,455 | $18,256 | $368,711 |
| Production costs | | | |
| Windfall profit tax | $ 32,583 | $ – | $ 32,583 |
| Gross production tax | 18,880 | 2,865 | 21,745 |
| Other | 22,377 | 586 | 22,963 |
| Exploration costs | 51,427 | 5,199 | 56,626 |
| Depreciation and depletion | 84,198 | 636 | 84,834 |
| Gain on sale of leases | (3,116) | – | (3,116) |
| | $206,349 | $ 9,286 | $215,635 |
| Income before tax provision | $144,106 | $ 8,970 | $153,076 |
| Provision for income taxes | 62,330 | 6,119 | 68,449 |
| Results of operations | $ 81,776 | $ 2,851 | $ 84,627 |

OCCNJ0006580
ALCD-PUBCOM_0002195

**Capitalized Costs.**

Included in properties and equipment are capitalized amounts applicable to the Company's oil and gas producing activities. Such capitalized amounts include the cost of mineral interests in properties, completed and incomplete wells, and related support equipment as follows:

| December 31, 1983* | United States | Indonesia | Other Foreign | Worldwide |
|---|---|---|---|---|
| Proved properties | $1,196,634 | $1,403,852 | $135,820 | $2,736,306 |
| Unproved properties | 449,956 | 723,900 | 27,848 | 1,201,704 |
| | $1,646,590 | $2,127,752 | $163,668 | $3,938,010 |
| Less – Accumulated depreciation and depletion | 686,834 | 938,561 | 10,950 | 1,636,345 |
| | $ 959,756 | $1,189,191 | $152,718 | $2,301,665 |

*Excludes costs related to assets held for sale. (See "Assets Held for Sale".)

| December 31, 1982 | United States | Foreign | Worldwide |
|---|---|---|---|
| Proved properties | $1,028,681 | $12,035 | $1,040,716 |
| Unproved properties | 413,176 | 5,974 | 419,150 |
| | $1,441,857 | $18,009 | $1,459,866 |
| Less – Accumulated depreciation and depletion | 438,753 | 4,657 | 443,410 |
| | $1,003,104 | $13,352 | $1,016,456 |

| December 31, 1981 | United States | Foreign | Worldwide |
|---|---|---|---|
| Proved properties | $ 802,792 | $10,235 | $ 813,027 |
| Unproved properties | 260,635 | – | 260,635 |
| | $1,063,427 | $10,235 | $1,073,662 |
| Less – Accumulated depreciation and depletion | 344,890 | 3,946 | 348,836 |
| | $ 718,537 | $ 6,289 | $ 724,826 |

**Costs Incurred.**

Costs incurred by the Company in its oil and gas producing activities (whether capitalized or expensed) were as follows:

| 1983* | United States | Indonesia | Other Foreign | Worldwide |
|---|---|---|---|---|
| Property acquisition costs | $158,063 | $1,223,290 | $142,955 | $1,524,308 |
| Exploration costs | 68,616 | 35,596 | 15,689 | 119,901 |
| Development costs | 87,037 | 68,730 | 2,698 | 158,465 |
| | $313,716 | $1,327,616 | $161,342 | $1,802,674 |

*Excludes costs related to assets held for sale. (See "Assets Held for Sale".)

| 1982 | United States | Foreign | Worldwide |
|---|---|---|---|
| Property acquisition costs | $190,879 | $ – | $190,879 |
| Exploration costs | 113,977 | 8,632 | 122,609 |
| Development costs | 165,584 | 3,226 | 168,810 |
| | $470,440 | $11,858 | $482,298 |

| 1981 | United States | Foreign | Worldwide |
|---|---|---|---|
| Property acquisition costs | $ 90,563 | $ – | $ 90,563 |
| Exploration costs | 92,175 | 5,331 | 97,506 |
| Development costs | 149,671 | 1,087 | 150,758 |
| | $332,409 | $ 6,418 | $338,827 |

OCCNJ0006581
ALCD-PUBCOM_0002196

**Oil and Gas Reserves.**
The Company's net interests in estimated quantities of proved developed and undeveloped reserves of crude oil, including condensate (in thousands of barrels), and natural gas (in millions of cubic feet) at December 31, 1983, 1982 and 1981, and changes in such estimated quantities in 1983, 1982 and 1981 were as follows:

| | United States | | Indonesia | | Other Foreign | | Worldwide | |
|---|---|---|---|---|---|---|---|---|
| | Oil | Gas | Oil | Gas | Oil | Gas | Oil | Gas |
| **Proved developed and undeveloped reserves** | | | | | | | | |
| January 1, 1981 | 35,868 | 861,567 | | | 93 | 31,926 | 35,961 | 893,493 |
| Revisions of previous estimates | (746) | (17,609) | | | 4 | 1,293 | (742) | (16,316) |
| Extensions, discoveries and other additions | 4,599 | 151,885 | | | 30 | 14,921 | 4,629 | 166,806 |
| Production | (3,806) | (108,975) | | | (12) | (3,684) | (3,818) | (112,659) |
| December 31, 1981 | 35,915 | 886,868 | | | 115 | 44,456 | 36,030 | 931,324 |
| Revisions of previous estimates | (6,287) | (8,990) | | | (18) | (8,502) | (6,305) | (17,492) |
| Extensions, discoveries and other additions | 7,354 | 70,181 | | | 7 | 1,020 | 7,361 | 71,201 |
| Production | (3,793) | (98,791) | | | (11) | (3,489) | (3,804) | (102,280) |
| Sale of reserves in place | (17) | (3,252) | | | – | – | (17) | (3,252) |
| December 31, 1982 | 33,172 | 846,016 | – | – | 93 | 33,485 | 33,265 | 879,501 |
| Purchase of reserves in place | 2,220 | 33,095 | 80,646 | 4,684 | 10,500 | 60,198 | 93,366 | 97,977 |
| Revisions of previous estimates | 368 | (20,235) | – | – | (709) | (1,261) | (341) | (21,496) |
| Extensions, discoveries and other additions | 2,257 | 49,533 | – | – | 1,044 | 1,087 | 3,301 | 50,620 |
| Enhanced recovery | 2,044 | 1,474 | – | – | – | – | 2,044 | 1,474 |
| Production | (4,170) | (84,903) | (6,706) | (272) | (520) | (4,665)* | (11,396) | (89,840) |
| Sale of reserves in place | (67) | (3,076) | – | – | – | – | (67) | (3,076) |
| December 31, 1983* | 35,824 | 821,904 | 73,940 | 4,412 | 10,408 | 88,844 | 120,172 | 915,160 |
| **Proved developed reserves** | | | | | | | | |
| January 1, 1981 | 25,948 | 785,175 | – | – | 80 | 25,480 | 26,028 | 810,655 |
| December 31, 1981 | 30,963 | 820,605 | – | – | 86 | 30,025 | 31,049 | 850,630 |
| December 31, 1982 | 26,403 | 807,160 | – | – | 82 | 30,882 | 26,485 | 838,042 |
| December 31, 1983* | 29,368 | 791,099 | 61,652 | 4,412 | 10,297 | 79,694 | 101,317 | 875,205 |

*Excludes reserves related to assets held for sale. (See "Assets Held for Sale".)*

50

OCCNJ0006582

ALCD-PUBCOM_0002197

## Future Net Cash Flow.

Presented below is the standardized measure of discounted future net cash flow ("standardized measure") relating to the Company's proved oil and gas reserves. The Company cautions that this standardized measure is not a measure of fair market value, and that the standardized measure presented for the Company's proved oil and gas reserves is not representative of their value. The standardized measure is intended to assist financial statement users in making comparisons between companies. The Company believes that the fair market value of its proved oil and gas reserves is substantially in excess of such standardized measure.

As prescribed by Standard No. 69, the standardized measure has been prepared assuming year-end selling prices adjusted for future fixed and determinable contractual price changes, year-end development and production costs, year-end statutory tax rates adjusted for future tax rates already legislated and a 10% annual discount rate.

| December 31, 1983 | United States | Indonesia | Other Foreign | Worldwide |
|---|---|---|---|---|
| Future revenues | $3,395,166 | $2,096,000 | $605,432 | $6,096,598 |
| Future production and development costs | (854,450) | (876,300) | (173,859) | (1,904,609) |
| Future income taxes | (1,096,330) | (519,100) | (191,141) | (1,806,571) |
| Future net cash flow | $1,444,386 | $ 700,600 | $240,432 | $2,385,418 |
| Annual discount at 10% rate | (517,861) | (161,300) | (95,903) | (775,064) |
| Standardized measure of discounted future net cash flow | $ 926,525 | $ 539,300 | $144,529 | $1,610,354 |

| December 31, 1982 | United States | Foreign | Worldwide |
|---|---|---|---|
| Future revenues | $3,244,994 | $179,719 | $3,424,713 |
| Future production and development costs | (924,865) | (50,905) | (975,770) |
| Future income taxes | (989,558) | (56,957) | (1,046,515) |
| Future net cash flow | $1,330,571 | $ 71,857 | $1,402,428 |
| Annual discount at 10% rate | (508,466) | (23,686) | (532,152) |
| Standardized measure of discounted future net cash flow | $ 822,105 | $ 48,171 | $ 870,276 |

| December 31, 1981 | United States | Foreign | Worldwide |
|---|---|---|---|
| Future revenues | $2,803,318 | $203,764 | $3,007,082 |
| Future production and development costs | (689,753) | (45,131) | (734,884) |
| Future income taxes | (886,731) | (74,493) | (961,224) |
| Future net cash flow | $1,226,834 | $ 84,140 | $1,310,974 |
| Annual discount at 10% rate | (470,489) | (34,976) | (505,465) |
| Standardized measure of discounted future net cash flow | $ 756,345 | $ 49,164 | $ 805,509 |

OCCNJ0006583
ALCD-PUBCOM_0002198

The following are the principal sources of change in the standardized measure of the discounted future net cash flow:

| | 1983 | 1982 | 1981 |
|---|---|---|---|
| January 1, | $ 870,276 | $ 805,509 | $ 678,973 |
| Purchase of reserves in place | 896,839 | – | – |
| Sales and transfers of oil and gas produced, net of production costs | (473,370) | (310,284) | (291,599) |
| Net changes in prices and production costs | 139,171 | 159,502 | 154,711 |
| Extensions, discoveries, and improved recovery, less related costs | 140,056 | 165,982 | 276,210 |
| Previously estimated development costs | 139,661 | 50,790 | 46,682 |
| Revisions of previous quantity estimates | 13,743 | (45,680) | (59,700) |
| Accretion of discount | 159,559 | 137,244 | 116,672 |
| Net change in income taxes | (166,575) | (57,565) | (79,184) |
| Opelika field | – | (18,000) | – |
| Other | (109,006) | (17,222) | (37,256) |
| December 31, | $1,610,354 | $ 870,276 | $ 805,509 |

## GEOTHERMAL RESERVES

The Company's estimated quantities (in thousands of equivalent barrels of oil) of proved and probable geothermal reserves at December 31, 1983 and changes in such estimated quantities and average realized price in 1983, were as follows:

| | 1983 |
|---|---|
| January 1, | – |
| Purchase of reserves in place | 172,799 |
| Production | (1,847) |
| December 31, | 170,952 |
| Average realized price (per megawatt hour) | $37.04 |

## COAL RESERVES

The Company's estimated quantities (in thousands of tons) of recoverable proved and probable coal reserves (excluding lignite) at December 31, 1983, 1982, 1981 and 1980 and changes in such estimated quantities and average realized price in 1983, 1982, 1981 and 1980 were as follows:

| The Company | 1983 | 1982 | 1981 | 1980 |
|---|---|---|---|---|
| January 1, | 654,209 | 630,623 | 475,204 | 418,637 |
| Purchase of reserves in place | 111,756 | 31,907 | 190,008 | 64,145 |
| Revisions of previous estimates | – | – | (3,434) | – |
| Production | (6,913) | (7,134) | (6,123) | (7,578) |
| Sale of reserves in place | (214) | (1,187) | (25,032) | – |
| December 31, | 758,838 | 654,209 | 630,623 | 475,204 |
| **Associated Companies** | | | | |
| January 1, | 389,918 | 382,418 | 202,955 | – |
| Purchase of reserves in place | – | – | 179,701 | 203,000 |
| Revisions of previous estimates | (40) | 8,041 | – | – |
| Production | (230) | (541) | (238) | (45) |
| December 31, | 389,648 | 389,918 | 382,418 | 202,955 |
| Average realized price (per ton) | $36.92 | $36.70 | $34.77 | $30.31 |

Average realized price reflects sales of both steam and metallurgical coal (excluding sub-bituminous coal, none of which was sold) at a wide range of prices.

OCCNJ0006584

ALCD-PUBCOM_0002199

INFLATION ADJUSTED FINANCIAL DATA

In the opinion of some, inflation of the magnitude that existed in years prior to 1982 reduced the usefulness and comparability of the historical dollar financial statements that companies have traditionally prepared. In an effort to enhance usefulness, as well as provide comparability by mitigating the impact of inflation, the Financial Accounting Standards Board issued its Standard No. 33 which requires the presentation of specific financial data adjusted to a constant dollar and current cost basis.

The constant dollar basis adjusts historical cost into dollars having the same general purchasing power. The constant dollar data presented was arrived at by restating the Company's historical cost inventories, properties and equipment, cost of products sold and operating expenses and depreciation and depletion to average 1983 dollars by applying the "Consumer Price Index for All Urban Consumers".

The current cost basis adjusts historical costs to reflect changes in specific prices of the assets consumed by the Company's operations, as if all products sold were produced in the current year and as if all properties and equipment were completely revalued and depreciation and depletion calculated on those current year prices. The current cost of properties and equipment, excluding mineral resources, was calculated by using engineering estimates and external industry price indexes. For mineral resources, external industry price indexes were used as well as engineering estimates and the current price of similar leaseholds. Depreciation and depletion was computed by the same method as was used in preparing the historical Consolidated Financial Statements. Inventories were adjusted to current prices by using gross inventories, before deduction of the LIFO reserve. Income from continuing operations adjusted for changing prices follows:

| | 1983 | | |
|---|---|---|---|
| | Consolidated Financial Statements (Historical Cost) | Adjusted For General Inflation (Constant Dollar) | Adjusted for Changes in Specific Prices (Current Cost) |
| Sales and operating revenues | $4,026,107 | $4,026,107 | $4,026,107 |
| Other revenues | .9,175 | 9,175 | 9,175 |
| | $4,035,282 | $4,035,282 | $4,035,282 |
| Less – | | | |
| Cost of products sold and operating expenses | 3,056,989 | 3,081,316 | 3,086,440 |
| Exploration costs, including dry holes | 73,067 | 73,067 | 73,067 |
| Depreciation, depletion and amortization | 482,703 | 596,954 | 646,104 |
| Selling and administrative | 216,480 | 216,480 | 216,480 |
| Research and development | 23,764 | 23,764 | 23,764 |
| Taxes other than income taxes | 111,993 | 111,993 | 111,993 |
| Interest | 100,703 | 100,703 | 100,703 |
| Provision for income taxes | 29,800 | 29,800 | 29,800 |
| | $4,095,499 | $4,234,077 | $4,288,351 |
| (Loss) from continuing operations | $ (60,217) | $ (198,795) | $ (253,069) |
| Gain from decline in purchasing power of net amounts owed | | 62,930 | 62,930 |
| Decrease in excess of specific prices over general inflation | | | |
| Inventories | | | (34,813) |
| Properties and equipment | | | (321,858) |
| Net change in stockholders' equity from the above | $ (60,217) | $ (135,865) | $ (546,810) |
| Per Common share | $ (.76) | $ (1.63) | $ (6.41) |

OCCNJ0006585

ALCD-PUBCOM_0002200

The drilling cost index used to value the current cost of producing properties fell 9% during the year while the Consumer Price Index used for the constant dollar valuation continued to rise. This was a major cause in the decrease in the excess of specific prices over general inflation of $321,858,000 for properties and equipment as shown above.

The loss from continuing operations for 1983 was increased by $138,578,000 on a constant dollar basis and $192,852,000 on a current cost basis. The reductions were mainly attributable to the increased depreciation and depletion charged against earnings from the upward revaluation of properties and equipment from historical dollars to dollars as measured on the constant dollar and current cost bases. The Company's use of the LIFO method of valuing inventories charges current costs against earnings, and mitigates the differences between earnings reported on the historical, constant dollar and current cost bases. Also, the Company's tax provision was not restated to reflect a deduction for depreciation on an inflation-adjusted basis in accordance with current Federal income tax regulations.

The gain of $62,930,000 in 1983 from the decline in the purchasing power of net amounts owed is a measure of the impact of inflation on monetary items that will be converted into fixed amounts of dollars regardless of price changes. As the Company was in a net monetary liability position, a gain was reported since its obligations will be repaid with dollars having less purchasing power. This gain partially offsets the reduction in earnings on a constant dollar basis and on a current cost basis.

The change in stockholders' equity on both the constant dollar and current cost bases results from the revaluation of inventories and properties and equipment.

The Company is constantly seeking ways to cope with the impact of inflation, including periodically assessing the performance goals which it has established for its businesses and the adoption, where appropriate, of accounting methods (e.g. LIFO) that better match current costs with current revenues.

Since constant dollar and current cost are subjective data, the Company cautions that it be used as a relative measure of performance rather than as a precise measure of performance between business entities.

54

OCCNJ0006586

ALCD-PUBCOM_0002201

**Selected Supplementary Financial Data**
(in historical dollars unless otherwise indicated) follows:

| | 1983 | 1982 | 1981 | 1980 | 1979 |
|---|---|---|---|---|---|
| Sales and operating revenues | $4,026,107 | $3,177,379 | $3,376,215 | $3,145,394 | $2,312,635 |
| Constant dollar | 4,026,107 | 3,278,457 | 3,698,558 | 3,803,024 | 3,174,367 |
| Depreciation and depletion | 476,423 | 210,531 | 163,785 | 142,818 | 136,854 |
| Constant dollar | 590,674 | 300,173 | 263,983 | 281,602 | 281,987 |
| Current cost | 639,824 | 345,751 | 306,010 | 325,003 | 313,453 |
| Income (loss) from continuing operations | (60,217) | 149,543 | 230,156 | 213,246 | 160,439 |
| Constant dollar | (198,795) | 71,356 | 167,569 | 148,906 | 126,083 |
| Current cost | (253,069) | 25,778 | 125,543 | 105,505 | 94,617 |
| Income (loss) from continuing operations, per Common share | (.76) | 2.37 | 3.68 | 3.48 | 2.72 |
| Constant dollar | (2.37) | 1.13 | 2.67 | 2.44 | 2.14 |
| Current cost | (3.00) | .41 | 2.00 | 1.72 | 1.60 |
| Dividends per Common share | 1.76 | 1.76 | 1.70 | 1.62 | 1.51 |
| Constant dollar | 1.76 | 1.82 | 1.87 | 1.96 | 2.07 |
| Inventories | 369,360 | 348,573 | 362,447 | 388,381 | 320,439 |
| Constant dollar | 444,446 | 453,056 | 471,697 | 556,802 | 503,240 |
| Current cost | 438,519 | 481,942 | 510,051 | 584,583 | 524,268 |
| Properties and equipment, net | 4,448,847 | 2,114,436 | 1,765,651 | 1,634,988 | 1,410,697 |
| Constant dollar | 5,193,676 | 2,819,903 | 2,576,198 | 2,611,943 | 2,425,073 |
| Current cost | 5,491,952 | 3,440,037 | 3,316,041 | 3,048,611 | 2,837,056 |
| Excess of current cost over constant dollar cost | | | | | |
| Inventories | (5,927) | 28,886 | 38,354 | 27,781 | 21,028 |
| Properties and equipment, net | 298,276 | 620,134 | 739,843 | 436,668 | 411,983 |
| Long-term debt and capital lease obligations at December 31, | 1,823,157 | 925,097 | 854,729 | 844,975 | 750,916 |
| Gain from decline in purchasing power of net amounts owed | 62,930 | 49,718 | 99,430 | 124,744 | 138,917 |
| Total assets at December 31, | 6,024,441 | 3,194,013 | 3,016,385 | 2,895,457 | 2,514,541 |
| Stockholders' equity at December 31, | 2,743,327 | 1,407,231 | 1,349,735 | 1,329,162 | 1,101,446 |
| Per Common share | 20.50 | 22.14 | 21.48 | 21.29 | 18.55 |
| Constant dollar | 3,563,242 | 2,217,181 | 2,269,532 | 2,474,538 | 2,298,623 |
| Per Common share | 26.63 | 34.88 | 36.11 | 39.64 | 38.70 |
| Current cost | 3,855,591 | 2,866,201 | 3,047,729 | 2,938,987 | 2,731,634 |
| Per Common share | 28.81 | 45.09 | 48.49 | 47.08 | 45.99 |
| Market price per Common share at December 31, | 19.88 | 20.88 | 25.38 | 35.38 | 31.50 |
| Constant dollar | 19.88 | 21.54 | 26.89 | 40.85 | 40.89 |
| Average consumer price index (1967 equals 100) | 298.4 | 289.2 | 272.4 | 246.8 | 217.4 |

OCCNJ0006587

ALCD-PUBCOM_0002202

**Historical Information** *Continuing Operations*
*(dollars in thousands, except per share)*

|  | 1983 | 1982 | 1981 |
|---|---|---|---|
| **Operations** | | | |
| Sales and operating revenues | $4,026,107 | $3,177,379 | $3,376,215 |
| Earnings (losses) | (60,217) | 149,543 | 230,156 |
| | | | |
| **Financial Position** | | | |
| Current assets | $1,167,463 | $ 788,577 | $ 963,333 |
| Current liabilities | 846,091 | 475,289 | 491,326 |
| Properties and equipment, less depreciation and depletion | 4,448,847 | 2,114,436 | 1,765,651 |
| Total assets | 6,024,441 | 3,194,013 | 3,016,385 |
| | | | |
| **Capital Structure** | | | |
| Long-term debt | $1,797,855 | $ 894,170 | $ 822,317 |
| Long-term capital lease obligations | 25,302 | 30,927 | 32,412 |
| Deferred income taxes | 364,656 | 364,094 | 305,993 |
| Stockholders' equity | 2,743,327 | 1,407,231 | 1,349,735 |
| Total | $4,931,140 | $2,696,422 | $2,510,457 |
| | | | |
| **Other Data** | | | |
| Capital expenditures | $ 466,853 | $ 660,193 | $ 590,945 |
| Dividends | 147,677 | 110,298 | 102,915 |
| Depreciation, depletion and amortization | 482,703 | 217,787 | 171,143 |
| Funds provided by operations | 476,877 | 446,527 | 487,694 |
| | | | |
| **Per Common Share** | | | |
| Earnings (loss) | $ (.76) | $ 2.37 | $ 3.68 |
| Dividends | 1.76 | 1.76 | 1.70 |
| Book value | 20.50 | 22.14 | 21.48 |
| | | | |
| **Financial Ratios** | | | |
| Current ratio | 1.4 | 1.7 | 2.0 |
| Earnings as a percent of sales and operating revenues | (1.5)% | 4.7% | 6.8% |
| Total debt as a percent of total capital | 37.8 | 34.9 | 34.7 |
| Dividends per share as a percent of earnings per share | – | 74.3 | 46.2 |
| Percent return on average capital employed | (1.6) | 5.7 | 9.9 |
| Percent return on average stockholders' equity | (3.1) | 10.8 | 17.2 |
| Effective tax rate | – | 35.5 | 39.0 |

OCCNJ0006588
ALCD-PUBCOM_0002203

| | 1980 | 1979 | 1978 | 1977 | 1976 | 1975 | 1974 | 1973 |
|---|---|---|---|---|---|---|---|---|
| | $3,145,394 | $2,312,635 | $1,783,168 | $1,595,008 | $1,361,765 | $1,161,375 | $ 971,423 | $ 620,707 |
| | 213,246 | 160,439 | 123,487 | 169,005 | 146,698 | 130,009 | 101,555 | 36,291 |
| | | | | | | | | |
| | $ 973,187 | $ 857,885 | $ 667,914 | $ 585,526 | $ 510,035 | $ 445,128 | $ 369,319 | $ 283,982 |
| | 437,984 | 428,157 | 321,837 | 275,626 | 249,659 | 201,665 | 241,199 | 171,892 |
| | 1,634,988 | 1,410,697 | 1,344,120 | 1,176,807 | 948,700 | 724,922 | 622,865 | 467,789 |
| | 2,895,457 | 2,514,541 | 2,214,575 | 1,941,050 | 1,607,623 | 1,269,024 | 1,088,150 | 852,554 |
| | | | | | | | | |
| | $ 809,847 | $ 712,544 | $ 672,628 | $ 569,881 | $ 439,986 | $ 366,709 | $ 269,288 | $ 196,780 |
| | 35,128 | 38,372 | 40,783 | 41,629 | 39,226 | – | – | – |
| | 259,614 | 198,523 | 164,572 | 131,775 | 92,401 | 74,743 | 58,443 | 55,018 |
| | 1,329,162 | 1,101,446 | 984,457 | 894,780 | 759,310 | 609,276 | 502,701 | 412,943 |
| | $2,433,751 | $2,050,885 | $1,862,440 | $1,638,065 | $1,330,923 | $1,050,728 | $ 830,432 | $ 664,741 |
| | | | | | | | | |
| | $ 449,882 | $ 310,413 | $ 381,408 | $ 438,579 | $ 400,058 | $ 213,182 | $ 216,939 | $ 132,993 |
| | 91,910 | 78,009 | 65,263 | 55,515 | 44,535 | 37,532 | 30,798 | 24,646 |
| | 149,666 | 143,582 | 129,216 | 97,052 | 92,024 | 76,686 | 53,215 | 51,149 |
| | 399,617 | 310,380 | 255,883 | 280,782 | 260,267 | 216,746 | 147,999 | 82,447 |
| | | | | | | | | |
| | $ 3.48 | $ 2.72 | $ 2.11 | $ 3.06 | $ 2.69 | $ 2.51 | $ 1.98 | $ .60 |
| | 1.62 | 1.51 | 1.42 | 1.175 | .95 | .80 | .6125 | .5125 |
| | 21.29 | 18.55 | 16.75 | 15.38 | 13.83 | 11.85 | 10.54 | 8.51 |
| | | | | | | | | |
| | 2.2 | 2.0 | 2.1 | 2.1 | 2.0 | 2.2 | 1.5 | 1.7 |
| | 6.8% | 6.9% | 6.9% | 10.6% | 10.8% | 11.2% | 10.5% | 5.9% |
| | 35.4 | 37.8 | 40.1 | 38.2 | 37.5 | 35.6 | 36.8 | 33.4 |
| | 46.6 | 55.5 | 67.3 | 38.4 | 35.3 | 31.9 | 30.9 | 85.4 |
| | 10.9 | 9.5 | 8.1 | 12.8 | 13:5 | 15.0 | 14.6 | 5.8 |
| | 17.5 | 15.4 | 13.1 | 20.4 | 21.4 | 23.4 | 22.2 | 9.0 |
| | 38.5 | 34.0 | 31.0 | 38.0 | 38.5 | 37.5 | 37.5 | 30.0 |

OCCNJ0006589

ALCD-PUBCOM_0002204

**Corporate Officers**


William H. Bricker


Charles E. Stewart


Riley M. Epps


Roger R. Hemminghaus


Richard W. Arp


J. L. Jackson


Richard M. Ahlstrom


Robert E. Garbesi


James F. Kelley


Timothy J. Fretthold


J. Avery Rush, Jr.


Gerald G. Carlton


C. Barton Groves


C. Dale McDoulett, Jr.


Donald C. Mielke

58

OCCNJ0006590
ALCD-PUBCOM_0002205

**William H. Bricker**
Chairman and Chief Executive Officer, joined Diamond Shamrock in 1969 as vice president and general manager of the Biochemicals Division. He has served as corporate vice president and president of the corporation's chemical company, and as executive vice president, chief operating officer, and president and chief executive officer of the corporation. Mr. Bricker, 52, earned B.S. and M.S. degrees from Michigan State University.

**J. L. Jackson**
President and Chief Operating Officer, was most recently executive vice president and president of the Coal Unit, a position he assumed upon the merger with Falcon Seaboard in 1979. At Falcon Seaboard he served as corporate executive vice president, president of the Falcon Coal Co. subsidiary, and director of the parent company. Mr. Jackson, 52, has a B.S. from The University of Texas.

**J. Avery Rush, Jr.**
Vice Chairman, joined Shamrock Oil and Gas Corp. in 1953 as an attorney. He became general counsel, vice president, and executive vice president. In 1967, he was elected vice president, finance, for the newly formed Diamond Shamrock Corp., and subsequently president of the Oil and Gas Unit and corporate executive vice president. Mr. Rush, 61, has B.A. and LL.B. degrees from The University of Texas.

**Charles E. Stewart**
Corporate Executive Vice President and President of Diamond Shamrock Chemicals Co., joined Diamond Alkali Co. in 1957 as a sales trainee. He served in several management positions in the Electro Chemicals and Soda Products divisions, including vice president and general manager of Soda Products and vice president and general manager of the Process Chemicals Division. He has been corporate vice president for planning and development and president of the International Technology Unit. Mr. Stewart, 48, is a graduate of Marquette University.

**Richard M. Ahlstrom**
Corporate Vice President, Finance, joined Diamond Alkali Co. in 1960 as a trainee. He has served in several financial and planning positions, as chief financial officer and treasurer of a South American subsidiary, manager of administration in the Specialty Chemicals Division, assistant treasurer of the corporation; treasurer, and vice president and treasurer. Mr. Ahlstrom, 49, received an A.B. from Harvard.

**Gerald G. Carlton**
Corporate Vice President, Administration, joined Diamond Alkali Co. in 1961 as an accountant. He subsequently held several employee relations positions within the company's chemical operations before being named a group employee relations manager, then corporate director of employee relations. Mr. Carlton, 48, is a graduate of Ohio University.

**Riley M. Epps**
Corporate Vice President and President of Diamond Shamrock Refining and Marketing Co., joined Shamrock Oil and Gas Corp. in 1959 as assistant to the vice president in charge of sales. There, he was named general manager of marketing and vice president in charge of sales. He subsequently became group vice president – sales and raw materials for the Oil and Gas Unit. Mr. Epps, 55, holds a B.S. degree from Texas A&M University.

**Robert E. Garbesi**
Corporate Vice President and President of Diamond Shamrock Coal Co., was most recently executive vice president of the Coal Unit. He came to Diamond Shamrock in that position upon the merger with Falcon Seaboard in 1979, and was formerly senior vice president of Consolidation Coal Co. Mr. Garbesi, 58, has a B.S. degree from Miami University (Ohio).

**C. Barton Groves**
Corporate Vice President and President of Diamond Shamrock Exploration Co., joined the Oil and Gas Unit in 1973 as a geophysicist. He became division exploration manager, unit vice president – exploration, and unit executive vice president. Mr. Groves, 46, holds a B.S. degree from Texas Tech University.

**Roger R. Hemminghaus**
Corporate Vice President, Planning and Development, joined Diamond Shamrock in February 1984. Previously, he was vice president, planning, United Energy Resources, Inc., where he also had been vice president, planning/ United Gas Pipeline, and vice president, supplemental supply. He has held management positions with Energy Cooperative, Inc. and Exxon Company, USA. Mr. Hemminghaus, 47, has a B.S. degree from Auburn University.

**James F. Kelley**
Corporate Vice President and General Counsel, joined Diamond Shamrock in March 1981. He was previously deputy general counsel of United Technologies Corporation, having served that corporation as vice president and general counsel of its United Technologies International subsidiary and as chief administrative officer of that subsidiary. A graduate of Yale University, Mr. Kelley, 42, also has a J.D. from the University of Chicago.

**C. Dale McDoulett, Jr.**
Corporate Vice President and Chairman and Chief Executive Officer of Diamond Shamrock's Natomas Co. subsidiary, was most recently corporate vice president for development. He came to Diamond Shamrock in 1979, upon the merger with Falcon Seaboard, as vice president, administration of the Coal Unit. He became vice president, marketing and development, for the unit, then corporate director, development. Mr. McDoulett, 39, holds B.B.A. and J.D. degrees from the University of Oklahoma.

**Richard W. Arp**
Controller, joined Diamond Alkali Co. in 1961 as a tax accountant and served in similar capacities for TRW, Inc., and DeSoto, Inc., from 1965 to 1969. Named assistant tax manager for Diamond Shamrock in 1969, Mr. Arp became manager of tax administration, corporate tax manager, corporate director of taxes, assistant controller, and assistant division manager of plastics. Mr. Arp, 47, has a B.S. degree from Kent State University and an M.B.A. from Case Western Reserve University.

**Timothy J. Fretthold**
Secretary, joined Diamond Shamrock in 1977 following service as an attorney for the Securities and Exchange Commission. He has served as a corporate attorney, assistant secretary, and senior counsel. Mr. Fretthold, 34, has a B.A. degree from Yale University and a J.D. from Case Western Reserve University.

**Donald C. Mielke**
Treasurer, joined Diamond Alkali Co. in 1963 as a trainee. He has served as an accountant in the Industrial Chemicals Division, financial analyst for the Electro Chemicals Division, manager of administration of the Electrode Corporation subsidiary, staff assistant in the Treasury Department, and assistant treasurer. Mr. Mielke, 41, is a graduate of Penn State University.

59

OCCNJ0006591

ALCD-PUBCOM_0002206

## Board of Directors

**B. Charles Ames**
Chairman and Chief Executive Officer of Acme-Cleveland Corporation, machine tools manufacturer, Cleveland, Ohio; director since 1979; age 58. (1*, 2)

**J. David Barnes**
Chairman and Chief Executive Officer of Mellon National Corporation and Mellon Bank, Pittsburgh, Pennsylvania; director since 1971; age 54. (3, 4)

**William H. Bricker**
Chairman and Chief Executive Officer of Diamond Shamrock Corporation, Dallas, Texas; director since 1974; age 52. (1, 4*, 5*)

**W. L. Lyons Brown, Jr.**
Chairman and Chief Executive Officer of Brown-Forman Corporation, a consumer products company, Louisville, Kentucky; director since 1977; age 47. (3*, 4)

**Philip E. Coldwell**
Chairman of Coldwell Financial Consultants, Washington, D.C., financial consultant to banks and other financial organizations; former member of the Board of Governors, Federal Reserve System; director since 1980; age 61. (1, 2)

**Gene Edwards**
Chairman and Chief Executive Officer of The First National Bank of Amarillo, Amarillo, Texas; director since 1979, age 59. (1, 2*)

**Raymond A. Hay**
Chairman and Chief Executive Officer of The LTV Corporation, engaged in steel, aerospace, and energy businesses, Dallas, Texas; director since 1979; age 55. (2, 4, 5)

**Allen C. Holmes**
National Managing Partner of Jones, Day, Reavis & Pogue law firm, Cleveland, Ohio; director since 1977; age 63. (3, 5)

**J. L. Jackson**
President and Chief Operating Officer, Diamond Shamrock Corporation, Dallas, Texas; director since 1983; age 52. (1, 4, 5)

**John T. Kimbell**
Independent business consultant; former Vice Chairman and director of Baxter Laboratories, manufacturer of medical care products, Lake Forest, Illinois; director since 1974; age 58. (2, 4)

**Wallace Macgregor**
Independent metals and minerals consultant, Tiburon, California; former director of Natomas Company; director since 1983; age 66.

**Richard W. Manderbach**
Independent energy consultant, South Pasadena, California; former Senior Vice President-Energy-Worldwide of Bank of America; former director of Natomas Company; director since 1983; age 66.

**J. Avery Rush, Jr.**
Vice Chairman of Diamond Shamrock Corporation, Dallas, Texas; director since 1982; age 61. (4)

**W. Thomas York**
Chairman and Chief Executive Officer of AMF Incorporated, manufacturer of leisure and industrial products, White Plains, New York; director since 1978; age 50. (1, 3)

1 Member of the Board Composition Committee
2 Member of the Audit Committee
3 Member of the Compensation Committee
4 Member of the Executive Committee
5 Member of the Administration Committee

* Committee chairman

Book Design: Pirtle Design   Printed in U.S.A.

OCCNJ0006592

ALCD-PUBCOM_0002207

## General Information

**Toll-free stockholder information line.**

*Stockholder Services:* For information about your stockholder account, the dividend reinvestment program, or other stockholder services, call the toll-free number below and ask for Stockholder Services.

*Investor Relations:* For general information about Diamond Shamrock, for investment data, or for information about the company's business performance, ask for Investor Relations.

The toll-free numbers are 800/527-7822 (outside Texas) and 800/442-7289 (in Texas).

**Annual Meeting.**
Diamond Shamrock stockholders are encouraged to attend the company's Annual Meeting in the Plaza Ballroom, Plaza of the Americas Hotel, 703 North Pearl Boulevard, Dallas, Texas, at noon Dallas time, Thursday, April 19, 1984. Proxy statements and proxy forms for the meeting have been mailed to stockholders with this Annual Report.

**Investor Supplement and Form 10-K.**
Additional operating statistics and information, together with the company's 1983 Annual Report to the Securities and Exchange Commission on Form 10-K, are available in the 1983 Investor Supplement to this Annual Report. Stockholders may obtain a copy of the Supplement free of charge by writing to the Director of Investor Relations at our headquarters in Dallas.

**Principal markets.**
Common stock market symbol: *DIA*
New York Stock Exchange
Pacific Stock Exchange
Frankfurt Stock Exchange (Federal Republic of Germany)
Basel Stock Exchange (Switzerland)
Geneva Stock Exchange (Switzerland)
Zurich Stock Exchange (Switzerland)

**Transfer agent and registrar.**
AmeriTrust Company
900 Euclid Avenue
Cleveland, Ohio 44101
Telephone 216/687-5000

**Independent accountants.**
Price Waterhouse
Dallas, Texas

**Equal opportunity employer.**
Diamond Shamrock fully supports the concept and practice of providing equal employment opportunities for all persons. It is our policy to recruit, hire, compensate, train, promote, transfer, and retain all qualified employees without regard to race, color, religion, sex, age, national origin, handicap, or veteran status.

**Principal offices.**
Diamond Shamrock Corporation
World Headquarters
Diamond Shamrock Tower
717 North Harwood Street
Dallas, Texas 75201
Telephone 214/922-2000

Diamond Shamrock Chemicals Company
Diamond Shamrock Building
351 Phelps Court
Irving, Texas 75061-1433
Telephone 214/659-7000

Diamond Shamrock Coal Company
1200 First Security Plaza
Lexington, Kentucky 40507
Telephone 606/231-5300

Diamond Shamrock Exploration Company
Diamond Shamrock Building
112 West 8th Street
Amarillo, Texas 79173
Telephone 806/378-3500

Diamond Shamrock Refining and Marketing Company
3643 East Commerce
San Antonio, Texas 78220-0267
Telephone 512/223-2631

Natomas Company
International Building
601 California Street
San Francisco, California 94108
Telephone 415/981-5700

OCCNJ0006593

ALCD-PUBCOM_0002208

**Diamond Shamrock**

*The Resourceful Company*

Diamond Shamrock Corporation
World Headquarters
Diamond Shamrock Tower
717 North Harwood Street
Dallas, Texas 75201
U.S.A.

OCCNJ0006594
ALCD-PUBCOM_0002209

# EXHIBIT 44

OxyChem's Comments in Opposition to Proposed Consent Decree,
*United States v. Alden Leeds, Inc., et al.*, Civil Action No. 2:22-cv-07326 (D.N.J.)

ALCD-PUBCOM_0002210

## INSTRUMENT OF CONVEYANCE
## AND ASSIGNMENT

This Instrument of Conveyance and Assignment dated July 14, 1983, is made and delivered by Diamond Shamrock Corporation, a Delaware corporation ("Transferor") to SDS Biotech Corporation, a Delaware close corporation ("Transferee"), pursuant to the Transfer and Assumption Agreement dated as of July 1, 1983 (the "DSC Transfer Agreement") by and between Transferor and Transferee and Showa Denko, K.K., a Japanese corporation ("SDK").

KNOW ALL MEN BY THESE PRESENTS, that Transferor, for good and sufficient consideration, the receipt of which is hereby acknowledged, does hereby contribute, grant, assign, transfer, convey and deliver unto Transferee, its successors and its assigns forever all of Transferor's right, title and interest in and to all of the Assets (as defined in the DSC Transfer Agreement), of whatever kind and wherever situated of Transferor, as of the close of business on the date hereof, used in, directly related to or directly associated with the manufacturing and marketing of agricultural chemical and animal health products, the development of agricultural chemical and animal health products and the research activity related to the discovery or identification of chemicals for development as agricultural chemical and animal health products (the "Business"), including, without limitation, the following:

(a)  All machinery, spare parts, equipment, motor vehicles, tools, and furniture used in the Business;

(b)  All accounts receivable for products or services related to the Business;

(c)  All inventories of raw materials, supplies, work-in-process and finished goods held in connection with the Business;

(d)  All technology, processes, ideas, concepts, know-how, trade secrets, improvements, design information, drawings, plans, formulations, technical data and engineering information used in, directly related to, or directly associated with the Business;

(e)  All assignable contracts to the extent directly related to the Business;

(f)  All transferable governmental licenses, permits, approvals, registrations, exemptions, classifications and certificates used in, related directly to, or directly associated with the Business;

(g)  A copy of all books, records, files, and papers related to the Business, including, but not limited to, drawings, engineering information, price lists, manuals and data, sales and advertising materials, mailing lists, sales and purchase correspondence, catalogues, market surveys, customer lists, accounting records, records related to compliance with environmental regulations, production data, purchasing records and data, and quality control records;

(h)  All prepaid expenses, employee advances, and deposits related directly to the Business;

(i)  All assignable or transferable rights accruing to Transferor at law or under all contracts, warranties, representations and guaranties directly associated with the Business; and

(j)  All other tangible or intangible personal property,

all as more fully described and provided for in the DSC Transfer Agreement, and excluding those Assets listed on Schedule 4.2 of the DSC Transfer Agreement.

TO HAVE AND TO HOLD, all and singular, the Assets unto Transferee, its successors and its assigns, to and for its and their own use and behoof forever.

1.  Transferor does hereby constitute and appoint Transferee, its successors, and its assigns as Transferor's true and lawful attorney or attorneys, with full power of substitution, for it and in its name, place and stead or otherwise, but on behalf of and for the benefit of Transferee, its successors and its assigns to demand and receive from time to time any and all of the Assets, wherever situated and to give receipts and releases for and in respect of the same and part thereof, and from time to time to institute and prosecute in the name of Transferor or otherwise, but at the expense and for the benefit of Transferee, its successors and its assigns, any and all proceedings at law, in equity or otherwise, which

Transferee, its successors or its assigns, may deem proper in order to collect, assert or enforce any claims, rights or title of any kind in and to the Assets and to defend and compromise any and all actions, suits or proceedings in respect of any of the Assets and to do any and all such acts and things in relation thereto as Transferee, its successors or its assigns, shall deem advisable, Transferor hereby declaring that the appointment hereby made and the powers hereby granted are coupled with an interest and are and shall be irrevocable by Transferor in any manner or for any reason.

2. In case for any reason Transferee shall not be authorized or qualified to receive any specific property or contract, claim, demand or right owned by Transferor and to be transfered hereunder or the transfer hereunder is otherwise ineffective or incomplete, Transferor further covenants to execute appropriate deeds, acts, transfers, assignments, instruments and conveyances of any such property, claim, contract, demand or right now owned by it when and as Transferee shall be authorized or qualified to receive the same.

3. Transferor shall warrant and defend the transfer of the Assets hereby made unto Transferee, its successors and its assigns, against all persons lawfully claiming the whole or any part of the Assets.

4. This Instrument of Conveyance and Assignment and the covenants and agreements herein contained shall inure to the benefit of and shall bind Transferor, its successors and its assigns.

IN WITNESS WHEREOF, Transferor has executed this Instrument of Conveyance and Assignment the day and year first above set forth.

DIAMOND SHAMROCK CORPORATION

By _____
James F. Kelley
Vice President and
General Counsel

ATTEST: _____

ALCD-PUBCOM_0002215

# EXHIBIT 45

OxyChem's Comments in Opposition to Proposed Consent Decree,
*United States v. Alden Leeds, Inc., et al.*, Civil Action No. 2:22-cv-07326 (D.N.J.)

ALCD-PUBCOM_0002216

## AGRICULTURAL CHEMICALS PESTICIDE
## REGISTRATION ASSIGNMENT

WHEREAS, DIAMOND SHAMROCK CORPORATION, a Delaware corporation having its principal office at 717 North Harwood Street, Dallas, Texas 75201 (hereinafter "DSC") is the owner of certain pesticide registrations accepted and issued pursuant to the Federal Insecticide, Fungicide and Rodenticide Act (hereinafter the "Registrations"); and

WHEREAS, SDS BIOTECH CORPORATION, a Delaware corporation having its principal office at 7528 Auburn Road, Concord Township, Ohio (hereinafter "SDS") is desires of acquiring the Registrations;

NOW, THEREFORE, for good and valuable consideration the sufficiency of which is hereby acknowledged DSC does hereby unconditionally and irrevocably assign, convey, grant, bargain, sell, transfer, set-over, deliver and confirm unto SDS its successors and assigns forever all of DSC's right, title and interest in and to the Registrations identified in Exhibit I of this Assignment.

Notwithstanding any other agreement between DSC and SDS to contrary, DSC makes no representation, guaranty or warranty either express or implied as to the suitability, completeness or accuracy of the information or data on which the Registration is based.

Upon the execution and delivery of this Assignment the Registrations shown on Exhibit I shall be transferred to and become the property of SDS.

IN WITNESS WHEREOF, DSC has caused this Assignment to be signed, sealed and acknowledged by its duly authorized representatives effective July 1, 1983.

DIAMOND SHAMROCK CORPORATION

By _____
J. F. Kelley

STATE OF OHIO         )
                      )  SS:
COUNTY OF CUYAHOGA )

Before me, a Notary Public in and for said county and state personally appeared the above named J. F. Kelley, Vice President of Diamond Shamrock Corporation who acknowledged that he did sign the foregoing Assignment dated as of July 1, 1983 and of the same is the free act and deed of said corporation and the free act and deed of himself as such officer.

In testimony whereof, I hereunto set my hand and official seal at Cleveland, Ohio this 14th day of July, 1983.

_____
Notary Public
KAREN G. LEARY
Notary Public, State of Ohio - Cuya. Cty
My Commission Expires Nov. 19, 1986

**Confidential**

OCCNJ0089403

ALCD-PUBCOM_0002217

AGRICULTURAL CHEMICALS DIVISION

EPA REGISTERED PRODUCTS (ALPHABETICALLY)

| PRODUCT | ANSUL REG. NO. | D.S.C. REG. NO. |
|---|---|---|
| 1. A-6 MCPA AMINE (USE) | | 677-424 |
| 2. A-6 MCPA AMINE (MFG. USE) | | 677-430 |
| 3. AMINE 4D | | 677-296 |
| 4. AMINE 6D | | 677-130 |
| 5. ANSAR DSMA LIQUID | 6308-33 | 677-345 |
| 6. ANSAR 3AG HERBICIDE MSMA LIQUID | 6308-32 | 677-346 |
| 7. ANSAR 170 H.C. HERBICIDE | 6308-60 | 677-351 |
| 8. ANSAR 170 H.C. HERBICIDE (FL) | 6308-86 | 677-357 |
| 9. ANSAR 170 HERBICIDE | 6308-12 | 677-339 |
| 10. ANSAR 184 HERBICIDE DSMA POWDER | 6308-23 | 677-341 |
| 11. ANSAR 529 H.C./MSMA 88 H.C. HERBICIDE | 6308-29 | 677-344 |
| 12. ANSAR 529 H.C. HERBICIDE (WESTERN FORM.) | 6308-77 | 677-354 |
| 13. ANSAR 529 H.C. HERBICIDE (FL) | 6308-85 | 677-356 |
| 14. ANSAR 529 HERBICIDE/MSMA 88 HERBICIDE | 6308-18 | 677-340 |
| 15. ANSAR 8100 HERBICIDE DSMA POWDER | 6308-54 | 677-349 |
| 16. ANSAR 8100 HERBICIDE (FL) | 6308-84 | 677-355 |
| 17. ARSONATE LIQUID | | 677-204 |
| 18. BP-LO-VOL 4D | | 677-321 |
| 19. BRAVO W-75 | | 677-282 |
| 20. BRAVO 500/BRAVONIL | | 677-313 |
| 21. BUENO | | 677-231 |
| 22. BUENO 6 | | 677-269 |
| 23. BUTYL 4D | | 677-294 |
| 24. BUTYL 6D | | 677-302 |
| 25. 75% CHLOROTHALONIL | | 677-293 |
| 26. CHLOROTHALONIL FLOWABLE 2.88 | | 677-236 |
| 27. CHLOROTHALONIL FLOWABLE 3 | | 677-331 |
| 28. CHLOROTHALONIL FLOWABLE 500 | | 677-330 |
| 29. CROP RIDER 2.67D | | 677-105 |
| 30. CROP RIDER 3.34D | | 677-120 |
| 31. CROP RIDER 6D/0S | | 677-021 |
| 32. CROP RIDER LV/4D | | 677-110 |
| 33. CROP RIDER 20% AQUA GRANULAR | | 677-137 |
| 34. CROP RIDER "45" | | 677-161 |
| 35. D PLUS DP | | 677-448 |
| 36. DSMA LIQUID | | 677-289 |
| 37. DSMA POWDER | | 677-203 |
| 38. DACAMINE | | 677-201 |
| 39. DACAMINE 360D | | 677-438 |
| 40. DACAMINE 4D | | 677-200 |
| 41. DACAMINE SOLUTION | | 677-443 |
| 42. DACAMINE TURF HERBICIDE | | 677-276 |
| 43. DACONATE | | 677-199 |
| 44. DACONATE 6 | | 677-268 |
| 45. DACONATE 6 TURF HERBICIDE | | 677-317 |
| 46. DACONIL 2787 FUNGICIDE | | 677-229 |
| 47. DACONIL 2787 FLOWABLE FUNGICIDE | | 677-315 |
| 48. DACTHAL G-2.5 | | 677-218 |

Confidential

```
49. DACTHAL G-5                                                      677-227
50. DACTHAL FLOWABLE TURF                                           677-318
51. DACTHAL W-75                                                    577-166
52. DACTHAL W-75 FOR TURF (75% WETTABLE POWDER)                     677-262
53. DALAPON 85                                                      677-358
54. 50% DIMETHYL-T                                                 677-284
55. 75% DIMETHYL-T                                                 677-290
56. DISODIUM METHANEARSONATE                          6308-26      677-342
57. EXOTHERM TERMIL                                                 677-271
58. KACANATE                                                        677-445
59. KACONIL                                                         677-449
60. KLEEN TURF (MCPP + 2,4-D AMINE-DILL)                           677-436
61. LO-VOL 4D                                                       677-295
62. LO-VOL 6D                                                       677-304
63. LV-4 MCPA BEE                                                  677-425
64. MCPA-NA-2                                                       677-428
65. MCPP-D-4 (USE)                                                  677-442
66. MCPP + 2,4-D (1 PLUS 1)                                        677-437
67. MCPP TURF HERBICIDE                                            677-434
68. MAD HERBICIDE (MSMA PLUS 2,4-D)                   6308-64      677-352
69. MONEX HERBICIDE (MSMA LIQUID PLUS DIURION)        6308-39      677-347
70. MONEX 3 HERBICIDE                                 6308-72      677-353
71. MONOSODIUM ACID METHANEARSONATE (TECHNICAL GRADE) 6308-59      677-350
72. PHYBAN H.C. RAILROAD AND INDUSTRIAL               6308-37      677-348
73. PICKALL
74. POST-EMERGE GRASS & WEED KILLER & LAWN RENOVATOR  6308-28
75. SHAMROX (LV-4 MCPA)
76. SHAMROX 27G
77. SHAMROX WP
78. SUPER ARSONATE
79. TECHNICAL MCPA BEE
80. TECHNICAL MCPA IOE
81. TECHNICAL BUTYL-D
82. TECHNICAL CHLOROTHALONIL FUNGICIDE
83. TECHNICAL DACONIL 2787 FUNGICIDE
84. TECHNICAL DIMETHYLAMINE-D
85. TECHNICAL ISOOCTYL-D                                           677-255
86. TECHNICAL ISOPROPYL-D                                         677-249
87. TECHNICAL 2-ETHYLHEXYL-D                                       677-251
88. TERMIL TABLETS                                                 677-236
89. TRAILWAY 4D                                                    677-239
90. TRAILWAY R                                                     677-288
91. TRIBAN-D                                                       677-439
92. TURF HERBICIDE "D"                                            677-435
93. 2,4-D + DICAMBA                                               677-446
94. 2,4-D ACID TECHNICAL FLAKE                                    677-266
95. 2,4-D 20% TERRA G                                             677-300
96. 2 PLUS 2 (MCPP + 2,4-D AMINE)                                677-451
97. VACATE                                                         677-298
```

**Confidential**

```
49. DACTHAL G-5                                                  677-227
50. DACTHAL FLOWABLE TURF                                        677-318
51. DACTHAL W-75                                                 577-166
52. DACTHAL W-75 FOR TURF (75% WETTABLE POWDER)                  677-262
53. DALAPON 85                                                   677-358
54. 50% DIMETHYL-T                                               677-284
55. 75% DIMETHYL-T                                               677-290
56. DISODIUM METHANEARSONATE                          6308-26    677-342
57. EXOTHERM TERMIL                                              677-271
58. KACANATE                                                     677-445
59. KACONIL                                                      677-449
60. KLEEN TURF (MCPP + 2,4-D AMINE-DILL)                         677-436
61. LO-VOL 4D                                                    677-295
62. LO-VOL 6D                                                    677-304
63. LV-4 MCPA BEE                                                677-425
64. MCPA-NA-2                                                    677-428
65. MCPP-D-4 (USE)                                               677-442
66. MCPP + 2,4-D (1 PLUS 1)                                      677-437
67. MCPP TURF HERBICIDE                                          677-434
68. MAD HERBICIDE (MSMA PLUS 2,4-D)                   6308-64    677-352
69. MONEX HERBICIDE (MSMA LIQUID PLUS DIURION)        6308-30    677-347
70. MONEX 3 HERBICIDE                                 6308-72    677-353
71. MONOSODIUM ACID METHANEARSONATE (TECHNICAL GRADE) 6308-59    677-350
72. PHYBAN H.C. RAILROAD AND INDUSTRIAL               6308-37    677-348
73. PICKALL                                                      677-450
74. POST-EMERGE GRASS & WEED KILLER & LAWN RENOVATOR  6308-28    677-343
75. SHAMROX (LV-4 MCPA)                                          677-426
76. SHAMROX 27G                                                  677-307
77. SHAMROX WP                                                   677-285
78. SUPER ARSONATE                                               677-314
79. TECHNICAL MCPA BEE                                           677-427
80. TECHNICAL MCPA IOE                                           677-429
81. TECHNICAL BUTYL-D                                            677-252
82. TECHNICAL CHLOROTHALONIL FUNGICIDE                           677-308
83. TECHNICAL DACONIL 2787 FUNGICIDE                             677-283
84. TECHNICAL DIMETHYLAMINE-D                                    677-246
85. TECHNICAL ISOOCTYL-D                                         677-255
86. TECHNICAL ISOPROPYL-D                                        677-249
87. TECHNICAL 2-ETHYLHEXYL-D                                     677-251
88. TERMIL TABLETS                                               677-236
89. TRAILWAY 4D                                                  677-239
90. TRAILWAY R                                                   677-288
91. TRIBAN-D                                                     677-439
92. TURF HERBICIDE "D"                                           677-435
93. 2,4-D + DICAMBA                                              677-446
94. 2,4-D ACID TECHNICAL FLAKE                                   677-266
95. 2,4-D 20% TERRA G                                            677-300
96. 2 PLUS 2 (MCPP + 2,4-D AMINE)                                677-451
97. VACATE                                                       677-298
```

**Confidential**

# EXHIBIT 46

OxyChem's Comments in Opposition to Proposed Consent Decree,
*United States v. Alden Leeds, Inc., et al.*, Civil Action No. 2:22-cv-07326 (D.N.J.)

ALCD-PUBCOM_0002221



**Diamond Shamrock**

James F. Kelley
Vice President and
General Counsel

April 4, 1986

Dr. Ray Irani
President
Occidental Petroleum Corp.
10889 Wilshire Blvd.
Los Angeles, California  90024

Dear Ray:

When we were in California we discussed several issues
relating to the environmental and legal liabilities of
Diamond Shamrock Chemicals and how they might be handled in
a transaction with Oxy.  Subsequently we have had
discussions with other potential purchasers which have
raised many of these same issues.

Recognizing that the disposition of these issues will have a
significant effect on the overall value of the transaction
to a purchaser, we have thought it appropriate to clarify
and expand Diamond Shamrock's position with respect to these
issues.  I enclose for your information a copy of the terms
and conditions relating to these issues, which we are also
providing to other purchasers, and would ask that you
include these in your continuing consideration of this
possible transaction.

Needless to say I'd be happy to clarify any of these points
or answer any related questions you or your staff may have.

Sincerely yours,

Jim

James F. Kelley

DEPOSITION
EXHIBIT

Bricker

:dw

enc.

cc:  W. H. Bricker
     P. A. Hesse
     C. E. Stewart

RECEIVED

APR  8 1986

RAY R. IRANI

Diamond Shamrock Corporation
World Headquarters, 717 North Harwood Street, Dallas, Texas 75201  Phone 214 922-2715

OCC 002965
CONFIDENTIAL

JOINT
EXHIBIT
5

Confidential

OCCNJ0027238

ALCD-PUBCOM_0002222

4/4/86

## SALE OF DIAMOND SHAMROCK CHEMICALS

In considering the acquisition of Diamond Shamrock Chemicals
Company (DSCC), the following terms and conditions relating
to liabilities will apply:

1.  The closing of the sale of the DSCC shares will pass to
the purchaser all liabilities of DSCC, whether fixed,
accrued, contingent, unknown or otherwise, including pending
litigation, potential environmental claims and cleanup
costs, except those arising from operations of DSCC which
have previously been sold or discontinued or products no
longer manufactured or sold, as more fully described below.

2.  Liabilities for cleanup costs mandated by any
environmental protection law or regulation are excluded to
the extent they arise out of or relate to (a) any site now
owned by Diamond Shamrock or DSCC at which manufacturing
operations have been permanently abandoned and (b) any site
not now owned by Diamond Shamrock or DSCC which has been or
may within three years from the date of closing be
designated a Superfund site as a result of activities of
DSCC while owned by Diamond Shamrock, in each case only to
the extent Diamond Shamrock or DSCC may be legally
responsible for cleanup costs at such site.

3.  Also excluded are damages, judgments and costs,
including attorneys fees, which arise out of the following
litigation against Diamond Shamrock or DSCC (whether now
pending or filed in the future):

    (a)  All litigation arising out of or relating to the
    manufacture and sale by Diamond Shamrock of Agent
    Orange and similar herbicides to the U. S. Government
    for use in Vietnam.

    (b)  All litigation arising out of DSCC's
    manufacturing operations at 80 Lister Avenue, Newark,
    New Jersey, and other sites where manufacturing
    operations have been permanently abandoned, including
    claims for property damage and personal injury arising
    from the cleanup of such sites.

    (c)  Litigation relating to products or operations of
    DSCC which had been permanently discontinued or sold to
    third parties on or before April 1, 1986, including but
    not limited to agricultural chemicals, functional
    polymers, PVC/VCM and polyester resins.

OCC 002966
CONFIDENTIAL

4.  Excluded from the transaction are all damages, judgments
and recoveries which Diamond Shamrock or DSCC may secure as
a result of any litigation, whether now pending or
subsequently filed, brought by them against Aetna Insurance
Company or any of their other insurers to recover for any
liability retained by them pursuant to paragraphs 1, 2 and 3
above.

5.  Immediately upon the execution by the purchaser and
Diamond Shamrock of a letter of intent with respect to the
transaction, the purchaser will be afforded full access to
DSCC's plants, records and personnel for the purpose of
carrying out a "due diligence" examination of the health,
safety, environmental and legal liabilities of DSCC.
Diamond Shamrock will provide the purchaser with estimates
of the amount of such liabilities.  The purchaser will use
its best efforts to complete this examination within 30 days
of the execution of such letter of intent.  Not later than
such 30th day the purchaser will provide Diamond Shamrock a
written list of issues arising from such examination which
the purchaser proposes to negotiate in the definitive
purchase agreement.  Diamond Shamrock in its sole discretion
will have the right to terminate negotiations with the
purchaser if it considers such issues unduly burdensome.

6.  All liabilities and expenditures resulting from
compliance with environmental protection laws or regulations
with respect to the business of DSCC which become payable at
any time during the three-year period immediately following
closing of the transaction, except for liabilities retained
by Diamond Shamrock pursuant to paragraph 2 above, will be
shared by Diamond Shamrock and the purchaser (after
application of available insurance proceeds) in accordance
with the following formula:

| Date Liability Becomes Payable | % Paid by Purchaser | % Paid by Diamond Shamrock |
|---|---|---|
| Up to 1 year after closing | 25 | 75 |
| During 2nd year after closing | 50 | 50 |
| During 3rd year after closing | 75 | 25 |
| After 3 years from the date of closing | 100 | 0 |

OCC 002967
CONFIDENTIAL

All liabilities described in this paragraph 6 will be deemed a liability for the purpose of such formula on the date they become payable, regardless of when they arose or came into existence and regardless of whether they were due to the acts of DSCC or a third party, and will be shared by Diamond Shamrock and the purchaser according to the foregoing formula.

7.   In order to monitor expenditures which may be liabilities under the above formula, at the closing the purchaser and Diamond Shamrock will establish an environmental review committee consisting of not less than two qualified environmental personnel from each company. Such committee shall meet at least quarterly to review all DSCC's environmental compliance programs, cleanup programs and expenditures and liabilities which may be subject to the foregoing formula. For this purpose Diamond Shamrock representatives will have access to all documents, facilities and personnel of DSCC as they may request.  All liabilities and expenditures approved by such committee shall automatically be included in such formula.  In the event of disagreement among the members of such committee as to the necessity of making such payments, the purchaser will have the right to include in such formula up to $1,000,000 of disputed liabilities in each of the three years immediately following the closing.

OCC 002968
CONFIDENTIAL

Confidential

OCCNJ0027241
ALCD-PUBCOM_0002225