**Tab 9, Part 3**
**Exhibits to OxyChem's March 22, 2023 Public Comments**

**OCC Cmt. Ex.47 - OCC Cmt. Ex.50**

# EXHIBIT 47

OxyChem's Comments in Opposition to Proposed Consent Decree,
*United States v. Alden Leeds, Inc., et al.*, Civil Action No. 2:22-cv-07326 (D.N.J.)

ALCD-PUBCOM_0002226

[Execution Copy]

STOCK PURCHASE AGREEMENT

By and Among

DIAMOND SHAMROCK CORPORATION

OCCIDENTAL PETROLEUM CORPORATION

OCCIDENTAL CHEMICAL HOLDING CORPORATION

and

OXY-DIAMOND ALKALI CORPORATION

dated

September 4, 1986



OCC 032905

Confidential

OCCNJ0026349
ALCD-PUBCOM_0002227

TABLE OF CONTENTS

PAGE

ARTICLE I

Purchase and Sale of Shares

Section 1.01    Purchase and Sale . . . . . . . .    2
Section 1.02    Purchase Price . . . . . . . . .    2
Section 1.03    Assumed Obligations . . . . . .    4
Section 1.04    Net Working Capital . . . . . .    4
Section 1.05    Net Book Value of the Equity
                Companies . . . . . . . . . . .    7
Section 1.06    Carbocloro and DS Chile . . . . .    8

ARTICLE II

Representations and Warranties
of Seller

Section 2.01    Organization of Seller . . . . . .    9
Section 2.02    Organization of DSCC . . . . . . .    9
Section 2.03    Subsidiaries . . . . . . . . . .    12
Section 2.04    Ownership of Shares . . . . . .    12
Section 2.05    Corporate Power . . . . . . . .    14
Section 2.06    No Conflicts . . . . . . . . . .    15
Section 2.07    Litigation; Compliance with Laws . .    18
Section 2.08    Financial Statements . . . . . .    24
Section 2.09    Conduct of Business; No
                Material Adverse Change . . . . .    26
Section 2.10    Material Assets . . . . . . . .    26
Section 2.11    Real Property Interests . . . . .    28
Section 2.12    Leases of Personal Property . . .    32
Section 2.13    Bank Accounts . . . . . . . . .    33
Section 2.14    Taxes . . . . . . . . . . . .    33
Section 2.15    Employee Matters . . . . . . . .    37
Section 2.16    Contracts . . . . . . . . . .    41
Section 2.17    Intellectual Property . . . . . .    44
Section 2.18    Insurance . . . . . . . . . .    46
Section 2.19    Labor Relations . . . . . . . .    47
Section 2.20    Brokers . . . . . . . . . . .    48

Note: This Table of Contents shall not, for any purpose, be
deemed to be part of this Agreement.

i

OCC 032906

Confidential

|  |  | PAGE |
|---|---|---|
| Section 2.21 | SEC Reports . . . . . . . . . | 49 |
| Section 2.22 | Cogeneration . . . . . . . . . | 49 |
| Section 2.23 | The Reorganization . . . . . . | 52 |
| Section 2.24 | Governmental Regulations . . . . . . | 53 |
| Section 2.25 | Effect of Certain Representations and Warranties . . . . . . . . . . | 54 |

## ARTICLE III

### Representations and Warranties of Buyer, Oxy-Chem and OPC

| Section 3.01 | Organization of Buyer, Oxy-Chem and OPC . . . . . . . . . | 55 |
| Section 3.02 | Corporate Power . . . . . . . . . | 55 |
| Section 3.03 | No Conflicts . . . . . . . . . | 56 |
| Section 3.04 | Litigation . . . . . . . . . | 58 |
| Section 3.05 | Brokers . . . . . . . . . . | 59 |
| Section 3.06 | OPC Savings Plan . . . . . . . . . | 59 |
| Section 3.07 | Buyer's Financial Capacity . . . . . | 59 |
| Section 3.08 | Oxy-Chem Net Worth . . . . . . . . | 60 |
| Section 3.09 | Effect of Certain Representations and Warranties . . . . . . . . . . | 60 |
| Section 3.10 | Acquisition Purposes . . . . . . . . | 61 |

## ARTICLE IV

### Personnel and Benefit Plans

| Section 4.01 | Basic Employment Matters . . . . . . | 61 |
| Section 4.02 | Pension Plans . . . . . . . . . | 62 |
| Section 4.03 | Savings Plan . . . . . . . . . | 63 |
| Section 4.04 | Represented Employees . . . . . . | 65 |
| Section 4.05 | Other Plans . . . . . . . . . | 69 |
| Section 4.06 | Separation Benefits . . . . . . . . | 72 |

## ARTICLE V

### Closing

| Section 5.01 | The Closing . . . . . . . . . . | 73 |

ii

OCC 032907

Confidential

OCCNJ0026351

ALCD-PUBCOM_0002229

PAGE

ARTICLE VI

Conditions to Obligations of Buyer, OPC and
Oxy-Chem to Consummate the Transaction

Section 6.01    Opinion of Counsel . . . . . . . . .    74
Section 6.02    Accuracy of Representations and
                Warranties; Compliance with
                Covenants  . . . . . . . . . . . .    74
Section 6.03    Material Change . . . . . . . . . .    75
Section 6.04    No Injunction . . . . . . . . . . .    76
Section 6.05    Approvals and Consents . . . . . . .    76
Section 6.06    Accounts Receivable Free of Liens  .    77
Section 6.07    Cogeneration Purchase Agreement
                Closing . . . . . . . . . . . . . .    77
Section 6.08    Insurance . . . . . . . . . . . . .    77
Section 6.09    No Events of Default . . . . . . . .    77


ARTICLE VII

Conditions to Obligations of Seller
to Consummate the Transaction

Section 7.01    Opinion of Counsel . . . . . . . . .    79
Section 7.02    Accuracy of Representations and
                Warranties; Compliance with
                Covenants  . . . . . . . . . . . .    79
Section 7.03    No Injunction . . . . . . . . . . .    80
Section 7.04    Approvals and Consents . . . . . . .    80
Section 7.05    Cogeneration Purchase Agreement
                Closing . . . . . . . . . . . . . .    80


ARTICLE VIII

Covenants

Section 8.01    Compliance with HSR Act  . . . . . .    81
Section 8.02    Injunctions . . . . . . . . . . . .    82
Section 8.03    Access to Information  . . . . . . .    83
Section 8.04    No Extraordinary Actions by
                Seller . . . . . . . . . . . . . . .    87
Section 8.05    Best Efforts . . . . . . . . . . . .    92
Section 8.06    Notice of Failure of Condition . . .    95

iii

OCC 032908

|                |                                                                       | PAGE |
|----------------|-----------------------------------------------------------------------|------|
| Section 8.07   | Intercompany Accounts . . . . . . .                                    | 95   |
| Section 8.08   | Assumed Obligations . . . . . . . .                                    | 96   |
| Section 8.09   | Transfer of Property . . . . . . . .                                   | 98   |
| Section 8.10   | Schedules and Exhibits . . . . . . .                                   | 100  |
| Section 8.11   | Audited Financial Statements . . . .                                   | 101  |
| Section 8.12   | Post-Closing Antitrust Litigation .                                    | 102  |
| Section 8.13   | Insurance . . . . . . . . . . . .                                      | 103  |
| Section 8.14   | Claims Against Current Carriers . .                                    | 108  |
| Section 8.15   | Replacement of Surety Bonds; Guaranties; Letters of Credit; Comfort Letters . . . . . . | 109  |
| Section 8.16   | Taxes . . . . . . . . . . . . . . .                                    | 110  |
| Section 8.17   | Carbocloro and DS Chile . . . . . .                                    | 118  |
| Section 8.18   | Change and Use of Names . . . . . .                                    | 118  |
| Section 8.19   | Compliance with ECRA . . . . . . . .                                   | 120  |
| Section 8.20   | Transfer or Reissuance of Environmental Permits . . . . . . .          | 122  |
| Section 8.21   | Waste Removal . . . . . . . . . . .                                    | 122  |

ARTICLE IX

Survival and Indemnification

| Section 9.01   | Survival of Representations and Warranties . . . . . . . . . . . . . . | 124  |
| Section 9.02   | Limitations on Indemnification . . .                                   | 124  |
| Section 9.03   | Indemnification . . . . . . . . . .                                    | 127  |
| Section 9.04   | Defense of Claims . . . . . . . . .                                    | 137  |
| Section 9.05   | Pass-Through Purchasers . . . . . .                                    | 142  |

ARTICLE X

Environmental Costs Sharing

| Section 10.01  | Environmental Costs . . . . . . . .                                    | 145  |
| Section 10.02  | Payment . . . . . . . . . . . . . .                                    | 148  |
| Section 10.03  | Application of Insurance Proceeds .                                    | 149  |

ARTICLE XI

Termination and Amendment

| Section 11.01  | Termination . . . . . . . . . . . .                                    | 150  |
| Section 11.02  | Obligations Shall Cease . . . . . .                                    | 151  |
| Section 11.03  | Fees and Expenses . . . . . . . . .                                    | 151  |

iv

OCC 032909

                                                        PAGE

                        ARTICLE XII

                       Miscellaneous

Section 12.01    Headings . . . . . . . . . . . . .    151
Section 12.02    Notices  . . . . . . . . . . . . .    152
Section 12.03    Successors . . . . . . . . . . . .    154
Section 12.04    Other Action . . . . . . . . . . .    154
Section 12.05    Entire Agreement . . . . . . . . .    155
Section 12.06    Third Parties  . . . . . . . . . .    156
Section 12.07    Right of Seller to Proceed
                 Against Certain Parties . . . . . .   156
Section 12.08    Counterparts . . . . . . . . . . .    157
Section 12.09    Governing Law  . . . . . . . . . .    157
Section 12.10    Other Matters  . . . . . . . . . .    157
Section 12.11    Historical Obligations . . . . . .    158
Section 12.12    Rules of Construction  . . . . . .    160

v

OCC 032910

Table of Schedules and Exhibits

| Schedule | | Page |
|---|---|---|
| 1.02 | Assumed Obligations | 2 |
| 1.05 | Equity Companies | 7 |
| 2.02 | Business Units Description | 10 |
| 2.03 | Subsidiaries; Significant Subsidiaries; DSCC Officers & Directors | 12 |
| 2.04 | Other DSCC Investments | 14 |
| 2.05 | Related Documents | 14 |
| 2.06 | Exceptions to Seller's Representations as to Conflicts, Consents, Violations | 15 |
| 2.07 | Litigation; Compliance with Laws; Permits and Licenses | 18 |
| 2.07(g) | Superfund Sites | 23 |
| 2.08 | Financial Statements | 24 |
| 2.09 | Conduct of Business | 26 |
| 2.11 | Real Property Interests | 28 |
| 2.12 | Leases of Personal Property | 32 |
| 2.13 | Bank Accounts | 33 |
| 2.14 | Contested Taxes; Tax Returns; Other Tax Matters | 34 |

---

Note:  This Table of Schedules and Exhibits shall not, for any purpose, be deemed to be a part of this Agreement.

vi

OCC 032911

Confidential

OCCNJ0026355

ALCD-PUBCOM_0002233

| 2.15 | Employee Matters | 37 |
| 2.16 | Contracts | 41 |
| 2.17 | Intellectual Property | 44 |
| 2.18 | Insurance | 46 |
| 2.19 | Labor Agreements | 47 |
| 2.22 | Cogeneration Agreement; Related Cogeneration Contracts; Certificates | 50 |
| 2.23 | Historical Obligations | 53 |
| 4.03 | Savings Plan | 65 |
| 6.09 | Certain Events of Default | 78 |
| 8.03 | Information Withheld | 85 |
| 8.04 | Exceptions to Prohibited Actions by Seller; 1986 Capital Budget | 91 |
| 8.09(a) | Transfer of Assets from DSCC | 98 |
| 8.09(b) | Transfer of Assets to DSCC | 98 |
| 8.15 | Surety Bonds; Guaranties; Letter of Credit; Comfort Letters | 109 |
| 8.16 | Allocation of Purchase Price; Transferee's Statements | 115 |
| 9.01 | Survival of Representations and Warranties | 124 |
| 9.03(a)(iv) | Inactive Sites | 130 |
| 10.01 | Active Sites | 146 |

vii

OCC 032912

Confidential

OCCNJ0026356

ALCD-PUBCOM_0002234

<u>Exhibit</u>

| | | |
|---|---|---|
| 1.04 | Net Working Capital | 4 |
| 1.06(a) | Carbocloro | 8 |
| 1.06(b) | DS Chile | 8 |
| 2.02 | Cogeneration Asset Purchase Agreement | 10 |
| 4.06 | Separation Benefits | 72 |
| 6.01 | Opinion of Seller's Counsel | 74 |
| 7.01 | Opinion of Buyer's Counsel | 79 |
| 8.08 | Assumption Instruments | 97 |
| 8.13 | Power of Attorney | 106 |
| 12.04 | DSCC Undertaking | 155 |

OCC 032913

Confidential

OCCNJ0026357
ALCD-PUBCOM_0002235

TABLE OF DEFINITIONS

|  | Section | Page |
|---|---|---|
| 1934 Act Report | 2.21 | 49 |
| 1984 Balance Sheet | 2.08(a) | 24 |
| 1985 Balance Sheet | 2.08(a) | 24 |
| 1985 Financial Statements | 2.08(a) | 24 |
| Accountants | 1.04(c) | 6 |
| ACO | 2.06 | 15 |
| Acquisition Transactions | 8.04 | 90 |
| Active Sites | 10.01 | 145 |
| Agreement | Preamble | 1 |
| Assumed Obligations | 1.02 | 2 |
| Assumed Value | 1.05(a) | 7 |
| Assumption Instruments | 8.08(b) | 97 |
| Audited 1985 Financial Statements | 8.11 | 101 |
| Audited Balance Sheets | 8.11 | 101 |
| Base Amount | 1.02 | 3 |
| BFG | 8.16(a) | 117 |
| Business Units | 2.02(b) | 11 |
| Buyer | Preamble | 1 |
| Buyer's Hourly Plan | 4.04(c) | 67 |
| Buyer's Pension Plans | 4.04(c) | 67 |
| Buyer's Process Plan | 4.04(c) | 67 |
| Buyer's Savings Plan | 4.04(b) | 66 |
| Carbocloro | 1.06 | 9 |
| Cash Portion | 1.02 | 2 |
| CERCLA | 2.07(f) | 23 |
| Chemical Plant Site | 10.01(c) | 146 |
| Chemicals Business | 2.02(b) | 10 |
| Closing Date Balance Sheet | 1.04(a) | 4 |
| Closing Date | 5.01(a) | 73 |
| Closing | 5.01(a) | 73 |
| Closing Value | 1.05(b) | 8 |
| Code | 2.14(d) | 35 |
| Cogeneration Purchase Agreement | 2.02(b) | 10 |
| Cogeneration Agreement | 2.22(a) | 49 |
| Cogeneration Business Unit | 2.02(b) | 11 |

Note: This Table of Definitions shall not, for any purpose, be deemed to be part of this Agreement.

ix

OCC 032914

Confidential

OCCNJ0026358

ALCD-PUBCOM_0002236

| | | |
|---|---|---|
| Cogeneration Facilities | 2.22(b) | 50 |
| Confidential Information | 8.03(b) | 86 |
| Consolidated Group | 2.14(e) | 36 |
| Contracts | 2.16 | 41 |
| Convent | 8.16(h) | 116 |
| Current Carriers | 8.13(a) | 104 |
| Current Policy | 2.18 | 46 |
| Current Portion | 1.02 | 3 |
| DEP | 8.19(a) | 120 |
| Diamond Companies | 2.02(b) | 10 |
| Direct Claim | 9.04(c) | 140 |
| DSCC | Preamble | 1 |
| DSCC Companies | 2.02(b) | 10 |
| DSCC Pension Plans | 4.04(c) | 67 |
| DSCC Plans | 2.15(a) | 38 |
| DS Chile | 1.06 | 9 |
| ECRA | 2.06 | 15 |
| Employees | 2.15(a) | 38 |
| Entity | 2.02(b) | 11 |
| Environmental Costs | 10.01(c) | 146 |
| Environmental Laws | 2.07(f) | 22 |
| Environmental Laws | 10.01(e) | 148 |
| Environmental Permits | 2.07(e) | 21 |
| Equity Companies | 1.05(a) | 7 |
| ERISA | 2.15(a) | 37 |
| ERISA Plans | 2.15(b) | 38 |
| ESIP | 4.03 | 63 |
| Excluded Assets | 8.09(a) | 98 |
| Excluded Liabilities | 8.09(a) | 98 |
| Existing Claims | 8.14 | 108 |
| Existing Policies | 8.13(a) | 104 |
| Federal Superfund Litigation | 9.03(a) | 129 |
| Financial Statements | 2.08(a) | 24 |
| Fuel Use Act | 2.22(d) | 52 |
| GAAP | 1.04(a) | 4 |
| Governmental Agency | 2.07(b) | 19 |
| hazardous waste | 8.21 | 122 |
| Historical Obligations | 2.23(b) | 52 |
| HLP | 2.22(a) | 49 |
| Hours Plan | 2.15(b) | 40 |
| HSR Act | 2.06 | 15 |
| H-10 Election | 8.16(b) | 111 |
| IBM | 8.16(h) | 116 |
| Inactive Sites | 9.03(a) | 130 |
| Includible Subsidiaries | 2.14(e) | 36 |

x

OCC 032915

Confidential

| | | |
|---|---|---|
| Indemnifiable Losses | 9.03(a) | 128 |
| Indemnifying Party | 9.03(i) | 137 |
| Indemnitee | 9.03(h) | 137 |
| Indemnity Payment | 9.03(g) | 137 |
| Insured Parties | 8.13(b) | 105 |
| Interest Rate | 1.04(b) | 5 |
| Interim Balance Sheet | 2.08(a) | 24 |
| Interim Financial Statements | 2.08(a) | 24 |
| Inventions | 2.17(a) | 44 |
| IRS | 2.14(b) | 34 |
| knowledge of Buyer, OPC and Oxy-Chem | 3.09 | 60 |
| knowledge of Seller | 2.25(a) | 54 |
| Laws | 2.06 | 17 |
| Lease | 2.11(e) | 31 |
| Liens | 2.04(a) | 13 |
| Litigation | 2.07(b) | 20 |
| long-term indebtedness | 8.04 | 91 |
| Miscellaneous Waste | 8.21 | 123 |
| Net Working Capital | 1.04(a) | 4 |
| New Jersey Facilities | 8.19(a) | 120 |
| NLRB | 2.19 | 47 |
| OPC | Preamble | 1 |
| OPC Plans | 4.01(b) | 61 |
| OPC Savings Plan | 3.06 | 59 |
| Oxy-Chem | Preamble | 1 |
| Pass-through Obligations | 9.05(c) | 144 |
| Pass-through Purchaser | 9.05(a) | 143 |
| Pass-through Unit | 9.05(a) | 143 |
| PBGC | 2.15(b) | 39 |
| Permitted Liens | 2.11(d) | 30 |
| Plan | 2.15(a) | 37 |
| Polluting Substances | 2.07(f) | 23 |
| Process Plan | 2.15(b) | 40 |
| Purchase Price | 1.02 | 2 |
| RCRA | 2.07(f) | 23 |
| Regulations | 8.16(b) | 111 |
| Reimbursable Parties | 10.01(a) | 145 |
| Related Cogeneration Contracts | 2.22(b) | 51 |
| Related Documents | 2.05 | 15 |
| Reorganization | 2.23(a) | 52 |
| Represented Employees | 4.01(b) | 61 |
| Resource Plan | 4.05(b) | 69 |

OCC 032916

Confidential

OCCNJ0026360

ALCD-PUBCOM_0002238

| RIP | 4.02(a) | 62 |
| Rule 402 | 2.25(a) | 54 |
| Seller | Preamble | 1 |
| Seller Indemnifiable Losses | 9.02 | 125 |
| Seller's Designee | 8.09(a) | 98 |
| Seller's Pension Plans | 4.02(a) | 62 |
| Seller's Plans | 2.15(a) | 38 |
| Seller's Share | 10.01(a) | 145 |
| Shares | Preamble | 1 |
| short-term indebtedness | 8.04 | 91 |
| Significant Subsidiary | 2.02(b) | 11 |
| Subsidiaries' Shares | 2.04(a) | 12 |
| Subsidiary | 2.02(b) | 11 |
| Superfund Sites | 2.07(g) | 23 |
| Taxes | 2.14(f) | 36 |
| Tax Lease | 8.16(h) | 116 |
| Third Party | 8.04 | 89 |
| Third Party Claim | 9.04(a) | 136 |

xii

OCC 032917

**Confidential**

**OCCNJ0026361**
ALCD-PUBCOM_0002239

STOCK PURCHASE AGREEMENT

This STOCK PURCHASE AGREEMENT ("Agreement")
made as of the 4th day of September, 1986, by and among
DIAMOND SHAMROCK CORPORATION, a Delaware corporation
("Seller"), OCCIDENTAL PETROLEUM CORPORATION, a Delaware
corporation ("OPC"), OCCIDENTAL CHEMICAL HOLDING CORPORA-
TION, a California corporation ("Oxy-Chem"), and OXY-
DIAMOND ALKALI CORPORATION, a Delaware corporation ("Buy-
er");

W I T N E S S E T H:

WHEREAS, each of Oxy-Chem and Buyer is an indi-
rect wholly owned subsidiary of OPC; and

WHEREAS, Seller is the record and beneficial
owner of 1,000 shares, being all of the issued and out-
standing shares, of Common Stock, par value $1.00 per
share (the "Shares"), of Diamond Shamrock Chemicals Com-
pany, a Delaware corporation ("DSCC"); and

WHEREAS, pursuant to this Agreement Buyer de-
sires to acquire from Seller and Seller desires to trans-
fer to Buyer substantially all of the Chemicals Business
of the DSCC Companies, other than the Cogeneration Busi-
ness Unit (as all of those terms are defined in Section

OCC 032918

2.02 hereof), and, in furtherance thereof, Seller desires
to sell and transfer the Shares to Buyer and Buyer de-
sires to purchase and acquire the Shares from Seller, all
upon the terms and subject to the conditions hereinafter
set forth; and

WHEREAS, OPC and Oxy-Chem have entered into
this Agreement in order to induce Seller to enter into
this Agreement.

NOW, THEREFORE, it is agreed as follows:

### ARTICLE I
### Purchase and Sale of Shares

Section 1.01  Purchase and Sale.  Subject to
the conditions set forth in Articles VI and VII hereof,
at the Closing (as defined in Section 5.01 hereof), Buyer
shall purchase and accept from Seller, and Seller shall
sell, transfer and deliver to Buyer, the Shares for the
Purchase Price (as defined in Section 1.02 hereof).

Section 1.02  Purchase Price.  The aggregate
consideration for the Shares shall be $411,132,672 (the
"Purchase Price"), consisting of (a) the assumption of
the financial obligations described in Schedule 1.02 (the
"Assumed Obligations") and (b) a cash payment (the "Cash
Portion") equal to the Purchase Price less the amount of

2

OCC 032919

Confidential

OCCNJ0026363

ALCD-PUBCOM_0002241

the Assumed Obligations.  For purposes of this Agreement,
the amount of the Assumed Obligations shall be deemed to
be equal to (i) the aggregate unpaid principal or the
capitalized lease amount and any unamortized premiums of
or related to the Assumed Obligations (the "Base Amount")
less (ii) the portion thereof payable within one year
(the "Current Portion"), all as reflected on the account-
ing records of Seller or DSCC, as applicable, and comput-
ed as of the Closing Date (as defined in Section 5.01
hereof) consistent with Schedule 1.02.  Seller represents
that Schedule 1.02 sets forth both the Base Amount re-
flected on said accounting records and the actual unpaid
principal or capitalized lease amount and any unamortized
premiums of or related to each of the Assumed Obliga-
tions, and the Current Portion as of July 31, 1986, to-
gether with a payment and amortization schedule through
December 31, 1987.  At the Closing, Buyer shall pay to
Seller the Cash Portion as determined in accordance with
this Article I, including Schedule 1.02, by wire transfer
of immediately available funds to a bank account desig-
nated by Seller to Buyer prior to the Closing Date.

3

OCC 032920

Confidential

Section 1.03  Underline{Assumed Obligations}.  Prior to the Closing, Seller shall cause DSCC to assume the As-sumed Obligations in accordance with Section 8.08 hereof.

Section 1.04  <u>Net Working Capital</u>.

(a)  The Purchase Price has been determined on the assumption that, as of the Closing Date, the Net Working Capital (as defined in Exhibit 1.04) as reflected on the accounting records of DSCC will be $100,000,000.  Buyer shall cause the accounting re-cords of the DSCC Companies to be closed as of the Clos-ing Date.  Not later than 90 calendar days after the Closing Date, Buyer shall cause DSCC to prepare a balance sheet of DSCC as of the Closing Date (the "Closing Date Balance Sheet") and a statement of changes in financial position for the month or period ending on the Closing Date.  The Closing Date Balance Sheet shall reflect, subject to Exhibit 1.04, all events occurring through the end of the Closing Date.  The Net Working Capital shall be computed by deducting the current liabilities from the current assets set forth in the Closing Date Balance Sheet, which shall be prepared in conformity with gener-ally accepted accounting principles applied on a consis-tent basis ("GAAP"), as clarified, and subject to the adjustments indicated, in Exhibit 1.04.  Without limiting

4

OCC 032921

Confidential

OCCNJ0026365
ALCD-PUBCOM_0002243

the generality of any other provision hereof, Seller
shall be entitled to observe physical inventories, if
any, and other procedures employed by DSCC in preparing
the Closing Date Balance Sheet; provided, however, that
Seller shall have the sole responsibility to make its own
arrangements for and to carry out such observation.  A
copy of the Closing Date Balance Sheet and the related
statement of changes in financial position shall be de-
livered to Seller and Seller shall have full access to
accounting records, trial balances and reports from which
the Net Working Capital computation was derived.

        (b)  Subject to Section 1.04(c) hereof,
if the Net Working Capital as of the Closing Date as so
computed is (i) less than $100,000,000, Seller shall pay
promptly to DSCC an amount by wire transfer of immediate-
ly available funds equal to the deficiency, together with
interest thereon for each day after the Closing Date to
the date of such payment at a per annum rate equal to the
prime rate of Chemical Bank, N.A. (the "Interest Rate"),
to an account to be designated in writing by DSCC to
Seller, or (ii) greater than $100,000,000, DSCC shall pay
promptly to Seller an amount by wire transfer of immedi-
ately available funds equal to the excess, together with
interest thereon for each day after the Closing Date to

<div align="center">5</div>

OCC 032922

Confidential

OCCNJ0026366

ALCD-PUBCOM_0002244

the date of such payment at the Interest Rate, to an account to be designated in writing by Seller to DSCC.

(c) If, within 30 calendar days after DSCC's delivery of the computation of Net Working Capital to Seller pursuant to Section 1.04(a) hereof, Seller determines in good faith that the amount of Net Working Capital so computed is inaccurate, Seller shall give notice to DSCC within such 30 calendar-day period, (i) setting forth Seller's determination of the amount of Net Working Capital and (ii) specifying in reasonable detail Seller's basis for its disagreement with DSCC's computation. The failure by Seller so to express its disagreement within such 30 calendar-day period shall constitute acceptance of the amount of Net Working Capital so computed pursuant to Section 1.04(a) hereof. If Seller and DSCC are unable to resolve their disagreement within 30 calendar days after receipt by DSCC of notice of such disagreement, the items in dispute shall be referred for determination to a "Big 8" independent accounting firm (other than Arthur Andersen & Co. or Price Waterhouse) agreed upon by Seller and DSCC (the "Accountants") within such 30 calendar-day period. The Accountants shall make a determination as to each of the items in dispute, which determination shall be (i) in writing, (ii) furnished to

6

OCC 032923

Confidential

each of Seller and DSCC as promptly as practicable after the items in dispute have been referred to the Accountants, (iii) made in accordance with the accounting principles and procedures set forth in Exhibit 1.04, and (iv) conclusive and binding upon each of the parties hereto. The fees and expenses of the Accountants shall be shared equally by Seller and DSCC. Within three business days after the date on which the Accountants furnish to Seller and DSCC such firm's written determination, the appropriate party shall make payment in accordance with Section 1.04(b) hereof.

Section 1.05  <u>Net Book Value of the Equity Companies</u>.

(a)  The Purchase Price has been determined on the assumption that, as of the Closing Date, the aggregate net book value determined in accordance with GAAP (as reflected on the books of DSCC) of those Subsidiaries (as defined in Section 2.02 hereof) and those assets which are listed in Schedule 1.05 (collectively, the "Equity Companies") will be $43,132,672 (the "Assumed Value").

7

OCC 032924

Confidential

(b)  Within 30 calendar days after the
Closing Date, Buyer shall cause DSCC to compute the net
book value (the "Closing Value") in accordance with GAAP
of the Equity Companies (as then reflected on the books
of DSCC) as of the Closing Date and to deliver to Seller
such computation; and, within six calendar days after
such delivery, either Seller (if the Closing Value is
less than the Assumed Value) or Buyer (if the Closing
Value exceeds the Assumed Value) shall make payment to
the other in an amount equal to the difference between
the actual Closing Value so computed and the Assumed
Value, by wire transfer of immediately available funds,
together with interest thereon at the Interest Rate for
each day after the Closing Date to the date of such pay-
ment, to an account to be designated in writing by the
party entitled to such payment.  Any dispute concerning
the amount of such difference shall be determined by the
Accountants in the same manner as a dispute concerning
the computation of Net Working Capital in accordance with
Section 1.04(c) hereof.

Section 1.06  Carbocloro and DS Chile.  Not-
withstanding any other provision of this Article I, the
parties hereto shall take the actions, if any, set forth
in Exhibits 1.06(a) and 1.06(b) with respect to Carbo-

8

OCC 032925

OCCNJ0026369

ALCD-PUBCOM_0002247

cloro S.A. Industrias Quimicas ("Carbocloro") and Diamond Shamrock de Chile S.A.I. ("DS Chile"), respectively.

## ARTICLE II

### Representations and Warranties of Seller

Seller hereby represents and warrants to Buyer, Oxy-Chem and OPC as follows:

Section 2.01  Organization of Seller.  Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware. Seller has the requisite corporate power and authority to own, operate and lease its properties and to carry on its business as now being conducted.

Section 2.02  Organization of DSCC.

(a)  Each of DSCC and each Significant Subsidiary (as hereinafter defined) is a corporation or other organization duly organized, validly existing and, if applicable, in good standing under the laws of its jurisdiction of incorporation or organization.  Each of DSCC and each Significant Subsidiary has the requisite corporate or similar power and authority to own, operate and lease its properties and to carry on its business as now being conducted.  Each of the DSCC Companies is duly licensed or qualified to do business as a foreign corpo-

9

**OCC 032926**

Confidential

ration and, if applicable, is in good standing, in all
jurisdictions in which the character of the properties
owned or leased by it or the nature of the business con-
ducted by it requires it to be so licensed or qualified,
other than such jurisdictions in which the failure to be
so licensed or qualified or in good standing would not
have a material adverse effect on the business, financial
condition or results of operations of the Chemicals Busi-
ness or of any Business Unit (as hereinafter defined).

(b)  For purposes of this Agreement:
(i) the "DSCC Companies" shall mean DSCC and the Subsid-
iaries; (ii) the "Diamond Companies" shall mean Seller
and its subsidiaries (including, without limitation,
prior to the Closing, the DSCC Companies; but, following
the Closing, excluding the DSCC Companies); (iii) the
"Chemicals Business" shall mean the DSCC Companies taken
as a whole and the Business Units taken as a whole, and
the business being conducted by them in the aggregate as
of the date of this Agreement, after giving effect to the
changes up to the Closing Date permitted or contemplated
by this Agreement (except for the consummation of the
transactions contemplated by the Cogeneration Assets
Purchase Agreement, in the form set forth in Exhibit 2.02
(the "Cogeneration Purchase Agreement")); (iv) the "Busi-

10

OCC 032927

**Confidential**

**OCCNJ0026371**

ALCD-PUBCOM_0002249

ness Units" of the Chemicals Business shall be deemed to
consist of the principal lines of business of the Chemi-
cals Business relating to each of the following:
(A) Chlor-alkali, (B) Soda Products other than Chrome,
(C) Process Chemicals, (D) Chrome, and (E) Cogeneration;
(v) an "Entity" shall mean any person, firm, corporation,
joint venture, general or limited partnership or other
entity; (vi) "Subsidiary" shall mean an Entity other than
an Excluded Asset (as defined in Section 8.09 hereof),
49% or more of the equity interests of which DSCC is,
directly or indirectly, the record or beneficial owner;
(vii) "Significant Subsidiary" shall mean each Subsidiary
designated as such on Schedule 2.03; and (viii) the "Co-
generation Business Unit" shall mean the business and
assets defined as such in the Cogeneration Purchase
Agreement.  Prior to the date of this Agreement, Seller
has delivered to Buyer copies of the Certificate of In-
corporation and By-laws, or comparable governing docu-
ments, of each of DSCC and each Significant Subsidiary as
presently in effect.  For the purpose of clarification
but not limitation, a summary description of each Busi-
ness Unit is set forth in Schedule 2.02.

11

OCC 032928

Confidential

OCCNJ0026372

ALCD-PUBCOM_0002250

Section 2.03  Subsidiaries.  Schedule 2.03 lists the name and jurisdiction of incorporation or organization of each Subsidiary.  Schedule 2.03 also sets forth, as to each Subsidiary, (a) whether it is active or inactive, (b) certain financial information as of June 30, 1986 and (c) the Business Units to which it relates, if active.  DSCC has no Subsidiary, other than Carbocloro, which is material to the business, financial condition or results of operations of the Chemicals Business or of any Business Unit.

Section 2.04  Ownership of Shares.

(a)  Seller owns the Shares, which constitute all the issued and outstanding shares of capital stock of DSCC, and DSCC owns directly or through another Subsidiary, or owns beneficially as to nominee qualifying shares identified on Schedule 2.03, the number of shares of capital stock of, or other equity interests in, each Subsidiary as set forth in Schedule 2.03 (the "Subsidiaries' Shares").  The Subsidiaries' Shares constitute the percentage equity interest so owned by DSCC in each Subsidiary as set forth in Schedule 2.03.  Except as set forth in Schedule 2.03, the Shares and the Subsidiaries' Shares are so owned free and clear of all liens, mortgages, charges, security interests, encumbrances (includ-

12

OCC 032929

ing, but not limited to, adverse claims), options or other restrictions or limitations of any kind whatsoever (individually and collectively, "Liens").

(b)  Except as set forth on Schedule 2.03, upon delivery of and payment for the Shares as provided for in this Agreement, (i) if and to the extent Buyer is a bona fide purchaser with respect to the Shares, Buyer will acquire good and marketable title to the Shares, free and clear of all Liens, (ii) the DSCC Companies collectively have and, on the Closing Date will have, good and marketable title to the Subsidiaries' Shares, free and clear of all Liens, in each case other than Liens created, directly or indirectly by Buyer or OPC or any of their respective subsidiaries or affiliates, (iii) the Shares and the Subsidiaries' Shares are validly issued, fully paid and nonassessable, and (iv) there are no outstanding convertible or exchangeable securities, subscriptions, calls, commitments, preemptive rights, preferential rights, options, warrants, rights (contractual or arising by operation of law, including, without limitation, rights of first refusal) or other agreements relating to the purchase, other acquisition or voting (pursuant to a voting agreement or trust or otherwise) by any Entity of any shares of capital stock or

13

OCC 032930

Confidential

OCCNJ0026374

ALCD-PUBCOM_0002252

other equity or ownership interest in DSCC or any Significant Subsidiary (other than any such shares of capital stock or other equity or ownership interests which are owned by an Entity other than a Diamond Company).

(c)  Except (i) for the Subsidiaries' Shares, (ii) as set forth in Schedule 2.04, and (iii) for the interests in the Excluded Assets (as defined in Section 8.09(a) hereof), DSCC does not own, directly or indirectly, any outstanding capital stock of, or other equity or ownership interest (or securities, rights or other interests convertible into capital stock or other equity or ownership interest) in any other Entity.

(d)  Schedule 2.03 sets forth a list of all officers and directors of DSCC and of each Significant Subsidiary as of the date hereof.

Section 2.05  Corporate Power.  Seller has the requisite corporate power and authority to execute, deliver and perform this Agreement and to consummate the transactions contemplated hereby.  Each Diamond Company has the requisite corporate power and authority to execute, deliver and perform all other agreements and instruments described in this Agreement and to be executed and delivered by it at or prior to the Closing, if any, as described in Schedule 2.05, in connection with the

14

OCC 032931

transactions contemplated hereby (the "Related Docu-
ments"), and to consummate the transactions contemplated
thereby.  All corporate action on the part of each Dia-
mond Company necessary to approve or to authorize the
execution, delivery and performance of this Agreement and
the Related Documents, and the consummation of the trans-
actions contemplated hereby and thereby has been duly
taken.  This Agreement is a valid and binding obligation
of, enforceable in accordance with its terms against,
Seller.  Each of the Related Documents is, or upon execu-
tion and delivery thereof will be, a valid and binding
obligation of, enforceable in accordance with its terms
against, each Diamond Company which is a party to such
Related Document.

Section 2.06  No Conflicts.  Except (a) for
applicable requirements of the Hart-Scott-Rodino Anti-
trust Improvements Act of 1976, as amended (the "HSR
Act"), (b) for the receipt of an administrative consent
order (the "ACO") under the New Jersey Environmental
Cleanup Responsibility Act, N.J. Stat. Ann. § 8 13.1K-6
to 13.1K14 ("ECRA"), with respect to DSCC's plants and
facilities located in the State of New Jersey, and (c) as
set forth in Schedule 2.06, neither the execution, deliv-
ery or performance by Seller of this Agreement or by any

15

OCC 032932

Diamond Company of any Related Document to which it is or
will be a party, nor the consummation by Seller of the
transactions contemplated hereby or by any Diamond Compa-
ny of the transactions contemplated thereby, will:

(i) conflict with or result
in a breach of any provision of the Certificate
of Incorporation or By-laws, or comparable
governing documents, of Seller or any DSCC
Company;

(ii) violate, constitute an
event of default under, permit the termination
of, give rise to a right to accelerate any
indebtedness under, or otherwise breach or
conflict with, any of the Assumed Obligations,
any Contract (as defined in Section 2.16 here-
of) listed or required to be listed in Schedule
2.16 hereto, any Lease (as defined in Section
2.11 hereof) listed or required to be listed in
Schedule 2.11, 2.12 or 2.16 hereto or any gov-
ernmental permit to which any of Seller or any
DSCC Company is a party, is maker or guarantor,
or by which any of them or any of their respec-
tive properties is bound, or result in the
creation of any Lien upon the securities, prop-

16

OCC 032933

Confidential

OCCNJ0026377
ALCD-PUBCOM_0002255

erties, assets or businesses of Seller, DSCC or
any Significant Subsidiary other than Permitted
Liens (as defined in Section 2.11 hereof) and
such Liens that may be imposed by or as a re-
sult of any action of Buyer, OPC, Oxy-Chem or
any of their respective subsidiaries or affili-
ates;

(iii)  violate any order,
writ, injunction, decree, judgment, ruling,
law, statute, rule or regulation of any govern-
mental, judicial, legislative, executive, ad-
ministrative or regulatory authority of the
United States, or of any state, local or for-
eign government or any subdivision thereof, or
of any Governmental Agency (as defined in Sec-
tion 2.07 hereof) (individually and collective-
ly "Laws"), applicable to Seller (to the extent
applicable to the Chemicals Business) or any
DSCC Company or by which Seller (to the extent
applicable to the Chemicals Business) or any
DSCC Company or any of their respective proper-
ties is bound; or

17

OCC 032934

**Confidential**

**OCCNJ0026378**

ALCD-PUBCOM_0002256

                (iv)  require any consent,

approval, authorization or other order or ac-

tion of, or notice to, or declaration, filing

or registration with, any third party or any

Governmental Agency;

in each case other than such of the foregoing matters

which, or the absence of which, would not, either indi-

vidually or when taken together with all other related

matters, have a material adverse effect on the business,

financial condition or results of operations of Seller,

the Chemicals Business or of any Business Unit.  Notwith-

standing any other provision of this Agreement (includ-

ing, without limitation, this Section 2.06 or Section

2.07 hereof), no representation is made by Seller with

respect to the effect of the HSR Act or any other anti-

trust or similar Law on the consummation of the transac-

tions contemplated by this Agreement or any of the Relat-

ed Documents.

      Section 2.07   Litigation; Compliance with Laws.

      (a)  Except as set forth in

Schedule 2.07, no DSCC Company is in violation of any

applicable Law, other than Environmental Laws (as herein-

after defined) for which provision is made in Section

2.07(e) hereof, or any permits, licenses, franchises or

18

OCC 032935

**Confidential**

**OCCNJ0026379**

ALCD-PUBCOM_0002257

other governmental authorizations issued or required to
be obtained thereunder, where the penalty for, or any
other effect of, any such violation would, either indi-
vidually or when taken together with the effects and
penalties of all related violations, have a material
adverse effect on the business, financial condition or
results of operations of the Chemicals Business, of the
Cogeneration Business Unit or of any other Business Unit.

(b)  Except as set forth in Schedule
2.07, there is no Litigation (as hereinafter defined) by
or before any (i) court, (ii) governmental body or other
regulatory or administrative agency or commission, domes-
tic or foreign ("Governmental Agency"), or (iii) arbitra-
tor, in each case pending or, to the knowledge of Seller,
threatened, to which any DSCC Company or (to the extent
relating to the Chemicals Business) Seller, is a party or
by which any of its assets or properties may be bound or
affected, other than (x) Litigation involving claims for
money damages alone of less than $50,000 with respect to
any single claim, or $500,000 in the aggregate with re-
spect to any related claims, and (y) any and all other
Litigation (none of which exists to the knowledge of
Seller), none of which if adversely decided, either indi-
vidually or when taken together with all related Litiga-

19

OCC 032936

Confidential

tion, would have a material adverse effect on the busi-
ness, financial condition or results of operations of the
Chemicals Business or of any Business Unit. For purposes
of this Agreement, "Litigation" shall mean any action,
suit, claim, proceeding, investigation or written govern-
mental inquiry.

(c) There is no Litigation by or before
any (i) court, (ii) Governmental Agency, or (iii) arbi-
trator, in each case pending or, to the knowledge of
Seller, threatened, which seeks to restrain, enjoin,
prevent the consummation of, or otherwise challenge this
Agreement, any of the Related Documents, or any of the
transactions contemplated hereby or thereby; subject,
however, to the last sentence of Section 2.06 hereof or
any Litigation commenced by a federal Governmental Agency
related thereto.

(d) Except as set forth in Schedule
2.07, no DSCC Company is bound by any judgment, ruling,
order or decree applicable to its business where the
effect, either individually or when taken together with
all others, would have a material adverse effect on the
business, financial condition or results of operations of
the Chemicals Business or of any Business Unit, or, as to
any matter involving any Environmental Law, of any Active

20

OCC 032937

Confidential

OCCNJ0026381

ALCD-PUBCOM_0002259

Site (as defined in Section 10.01 hereof) designated with an asterisk on Schedule 10.01.

(e) Except as set forth in Schedule 2.07, each DSCC Company is in substantial compliance with all applicable Environmental Laws and has obtained and is in compliance with all permits, licenses and other authorizations ("Environmental Permits") required under any such Environmental Laws, except where failure to comply with such Environmental Laws or to obtain and comply with any Environmental Permit would not have any material adverse effect on the business, financial condition or results of operations of the Chemicals Business or of any Business Unit or of any Active Site. Except as set forth in Schedule 2.07, to the knowledge of Seller, after making the type of inquiry contemplated by Section 2.25 hereof including, without limitation, inquiry of any employee of any of the Diamond Companies (i) as to domestic sites, who has environmental compliance management responsibility over environmental matters for any Active Site, and (ii) as to foreign sites, whose principal responsibility is the management of environmental compliance, there is no past or present event, condition or circumstance that is likely to interfere substantially with any DSCC Company's compliance or continued compli-

21

OCC 032938

Confidential

OCCNJ0026382

ALCD-PUBCOM_0002260

ance with the Environmental Laws or constitute a viola-
tion thereof, except where any such interference with
compliance, or any such violation, would not have any
material adverse effect on the business, financial condi-
tion or results of operation of the Chemicals Business or
of any Business Unit or of any Active Site.  Notwith-
standing any other provision of this Agreement, no Dia-
mond Company shall have any liability or obligation under
any provision of this Agreement, other than Article X
hereof, relating to, resulting from or arising out of any
matter the costs and expenses with regard to which would
constitute Environmental Costs (as defined in Section
10.01(c) hereof), by reason of Seller's representations
and warranties contained in this Section 2.07(e); provid-
ed, however, that nothing contained in this sentence
shall affect Seller's obligations, if any, under Sections
9.03(a)(ii) through (ix) hereof, inclusive.

       (f)  For purposes of this Agreement
other than Article X hereof, "Environmental Laws" shall
mean existing Laws relating to pollution or protection of
the environment (including ambient air, surface water,
groundwater, land surface and subsurface strata), includ-
ing without limitation the Comprehensive Environmental
Response, Compensation and Liability Act of 1980, as

<center>22</center>

OCC 032939

**Confidential**

OCCNJ0026383

ALCD-PUBCOM_0002261

amended ("CERCLA"), the Resource Conservation and Recovery Act of 1976, as amended ("RCRA"), and other Laws relating to (i) emissions, discharges or releases or threatened releases of pollutants, contaminants, chemicals, or industrial, toxic or hazardous substances or wastes (collectively "Polluting Substances") or (ii) the manufacture, processing, distribution, use, treatment, handling, storage, disposal or transportation of Polluting Substances.

(g)  Schedule 2.07(g) sets forth a list, as of the date hereof, of (i) all Inactive Sites and other properties covered by Section 9.03(a)(iii) hereof which are included on the "national priority list" under CERCLA ("Superfund Sites") and (ii) all Inactive Sites as to which, to the knowledge of Seller, any DSCC Company is subject to a proceeding under any federal or state Environmental Law which imposes financial obligations substantially similar to CERCLA with respect to any release, storage, disposal or clean-up of Polluting Substances.

23

OCC 032940

Confidential

OCCNJ0026384

ALCD-PUBCOM_0002262

Section 2.08  <u>Financial Statements</u>.

(a)  Schedule 2.08 sets forth the pro forma consolidated balance sheets of the Chemicals Business as at December 31, 1984 (the "1984 Balance Sheet"), December 31, 1985 (the "1985 Balance Sheet") and March 31, 1986 (the "Interim Balance Sheet"), and the related pro forma consolidated statements of income for the periods ended December 31, 1985 and March 31, 1986 and changes in financial position for the periods ended December 31, 1985 and March 31, 1986, including footnotes for the 1985 Balance Sheet and the Interim Balance Sheet and related pro forma consolidated statements of income and changes in financial position (collectively, with the balance sheets, the "Financial Statements").  Certain assets of the Chemicals Business identified in the footnotes for the 1985 Balance Sheet are excluded from the Financial Statements.  The Financial Statements as at, and for the period ending on, December 31, 1985 are sometimes referred to herein as the "1985 Financial Statements", and the Financial Statements as at and for the period ending on March 31, 1986 are sometimes referred to herein as the "Interim Financial Statements."  The 1984 Balance Sheet and the 1985 Financial Statements have been audited by Price Waterhouse, which firm's opinion thereon

24

OCC 032941

OCCNJ0026385

ALCD-PUBCOM_0002263

is included in Schedule 2.08. In the opinion of Seller the accounting and control systems of DSCC are adequate to provide reasonable assurance that there are no material errors in the Financial Statements. The Financial Statements present fairly the pro forma consolidated financial position of the Chemicals Business as of the respective dates, and the results of operations for the periods then ending, and changes in financial position for the periods ending December 31, 1985 and March 31, 1986, in conformity with GAAP.

(b)  To the knowledge of Seller, no DSCC Company has any liabilities (whether absolute or contingent) which are not reflected in the 1985 Financial Statements, except (i) matters expressly identified or referred to in any Exhibit or Schedule, (ii) matters which are not required to be expressly so identified or referred to in any such Exhibit or Schedule by reason of any express limitation or exclusion in any representations, warranty, covenant, agreement or undertaking contained in this Agreement, (iii) contingent liabilities or obligations arising after December 31, 1985 in the ordinary course of business of the Chemicals Business, and (iv) such liabilities or obligations which individually, or with respect to a series of related matters, would not

25

OCC 032942

**Confidential**

have a material adverse effect on the business, financial condition or results of operations of the Chemicals Business.

Section 2.09  Conduct of Business; No Material Adverse Change.

(a)  Except as expressly permitted or contemplated by this Agreement and except as set forth in Schedule 2.09, since December 31, 1985, the business of each of DSCC and each Significant Subsidiary, and each of the businesses deemed included in each of the Business Units, has been conducted only in the ordinary course consistent with past practice.

(b)  Except (i) as set forth in Schedule 2.09, (ii) as expressly permitted or contemplated by this Agreement, or (iii) for changes in general economic conditions, since June 30, 1986, there has not been any material adverse change in or effect on the business, results of operations or financial condition of the Chemicals Business or of any Business Unit.

Section 2.10  Material Assets.  Except as set forth in Schedule 8.09(b), the DSCC Companies collectively have good and marketable title to, a leasehold interest in or the right to use all of the assets which are material to the business, financial condition or results

26

OCC 032943

of operation of the Chemicals Business or of any Business
Unit (other than interests in real property for which
provision is made in Section 2.11 hereof) free and clear
of all Liens other than Permitted Liens.  The DSCC Compa-
nies prior to the Closing collectively will have good and
marketable title to all of the assets to be transferred
to the DSCC Companies prior to or concurrently with the
Closing which are listed on Schedule 8.09(b) free and
clear of all Liens other than Permitted Liens.  All of
the tangible assets owned, leased or used by any DSCC
Company which are material to the business, financial
condition or results of operations of the Chemicals Busi-
ness or of any Business Unit, are, in the aggregate, in
good and serviceable condition in accordance with indus-
try practice, normal wear and tear excepted, and as such
are adequate in the aggregate to conduct the businesses
of the Chemicals Business and of each Business Unit as
presently conducted.  As of the Closing, except with
respect to, and to the extent of, the transfers contem-
plated by Sections 8.09 and 8.17 hereof and subject to
the transactions contemplated by the Cogeneration Pur-
chase Agreement, the rights, properties and other assets
owned, leased or licensed by each DSCC Company will in-
clude all rights, properties and other assets used in or

27

OCC 032944

**Confidential**

necessary to permit the DSCC Companies to conduct their businesses in all material respects in the same manner as their businesses are being conducted prior to the date hereof.

Section 2.11  Real Property Interests.

(a)  Schedule 2.11 contains a brief description of all real property owned by any DSCC Company or owned by any Diamond Company and to be transferred to a DSCC Company prior to or concurrently with the Closing, and a brief description of each interest in real property held under a Lease (as hereinafter defined) to which any DSCC Company is a party, or to which any Diamond Company is a party and which is to be assigned to a DSCC Company prior to or concurrently with the Closing (including as to each Lease the annual amount payable, a brief summary of or reference to any other financial obligations, the expiration date and any renewal options and the location of the property covered), in each case excluding such interests which do not have a value or require annual payments in excess of $100,000. Each Lease listed or required to be listed in Schedule 2.11 constitutes a valid and binding obligation enforceable in accordance with its terms, except as enforcement against third parties may be limited by bankruptcy, insolvency or

28

OCC 032945

**Confidential**

other similar Laws affecting the enforcement of credi-
tors' rights generally and except that the availability
of equitable remedies against third parties, including
specific performance, is subject to the discretion of the
court before which any proceeding therefor may be
brought.

(b)   No Diamond Company or, to the
knowledge of Seller, any other party, is in default in
any material respect under any such Lease, or related
guarantee; no event has occurred, and no condition ex-
ists, which with the passage of time or giving of notice,
or both, would constitute such a default by any Diamond
Company or, to the knowledge of Seller, any other party
which has not been cured; and, to the knowledge of Sell-
er, no condemnation proceedings have been instituted with
respect to any real property owned or leased by any DSCC
Company or by any Diamond Company and to be transferred
to any DSCC Company prior to or concurrently with the
Closing.

(c)   Except as set forth in Schedule
2.11, one of the DSCC Companies has good and marketable
title to the real property described in Schedule 2.11 as
being owned by such DSCC Company, free and clear of all
Liens except for Permitted Liens.

29

OCC 032946

OCCNJ0026390

ALCD-PUBCOM_0002268

(d)  For purposes of this Agreement, the term "Permitted Liens" shall mean with respect to any properties or assets (i) Liens shown in the Financial Statements as securing specified liabilities or obligations with respect to which no default exists, (ii) minor imperfections of title, if any, none of which materially detracts from the value, impairs the marketability of title or materially impairs the use or operation of the property or asset subject thereto, or materially impairs the business, financial condition or results of operations of the Chemicals Business or of any Business Unit, (iii) Liens for current Taxes (as defined in Section 2.14 hereof), assessments and other governmental charges not yet due, or which may thereafter be paid without penalty, or which are being contested in good faith by Seller or a DSCC Company, (iv) mechanics', carriers', workers', repairmen's or other like liens (inchoate or otherwise) or Liens on leasehold interests with respect to equipment leases listed on Schedule 2.12 or which are not required to be so listed because they do not require annual rental payments to the lessor in excess of $100,000, in each case arising or incurred in the ordinary course of business in respect of obligations which are not overdue or which are being contested in good faith by Seller or a

30

OCC 032947

Confidential

DSCC Company, (v) easements, covenants, rights of way, mineral reservations and other similar restrictions or conditions of record, if any, none of which impairs the use or operation of the property as it is presently being used or operated, (vi) zoning and other restrictions as a matter of law, (vii) Liens listed in Schedule 2.11, (viii) Liens for which the liabilities and obligations related thereto have been fully discharged, satisfied and performed and (ix) Liens against any of the Cogeneration Assets (as defined in the Cogeneration Purchase Agreement) which are created or imposed as a result of the consummation of the transactions contemplated by the Cogeneration Purchase Agreement.

(e)  For purposes of this Agreement, "Lease" shall mean any lease, sublease, sub-sublease, prime lease, easement (other than a Permitted Lien), license, right-of-way or similar interest in real or personal property under which any DSCC Company is a party or holds or operates such property, or under which any Diamond Company is a party or holds or operates such property and which is to be assigned to a DSCC Company prior to or concurrently with the Closing.

31

OCC 032948

**Confidential**

Section 2.12  <u>Leases of Personal Property</u>.
Schedule 2.12 contains a list of all Leases pursuant to
which any DSCC Company leases personal property, or pur-
suant to which any Diamond Company leases personal prop-
erty and which are to be assigned to a DSCC Company prior
to or concurrently with the Closing, and, in each case,
which require annual rental and other payments to the
Lessor in excess of $100,000.  Except as set forth in
Schedule 2.12, (a) each such Lease constitutes a valid
and binding obligation enforceable in accordance with its
terms, except as enforcement against third parties may be
limited by bankruptcy, insolvency or other similar Laws
affecting the enforcement of creditors' rights generally
and except that the availability of equitable remedies
against third parties, including specific performance, is
subject to the discretion of the court before which any
proceeding therefor may be brought, (b) each such Lease
is in full force and effect, (c) there are no existing
material defaults by any Diamond Company, or to the
knowledge of Seller, any other party, thereunder, and (d)
no event has occurred nor does there exist any condition,
which with the passage of time or giving of notice, or
both, would constitute such a material default by any
Diamond Company or, to the knowledge of Seller, any other

32

OCC 032949

party.  Except as set forth in Schedule 2.12, no DSCC Company has assigned any of its rights or interests under any such Lease.

Section 2.13  <u>Bank Accounts</u>.  Except as indicated thereon, Schedule 2.13 sets forth the names and locations of all banks, trust companies, savings and loan associations and other financial institutions at which DSCC or any Significant Subsidiary maintains safe deposit boxes, lock boxes or bank accounts of any nature and the names of all persons authorized to draw thereon, make withdrawals therefrom or have access thereto.

Section 2.14  <u>Taxes</u>.

(a)  Except as to taxing jurisdictions (other than the federal government of the United States) in which no license or qualification is required (as contemplated by the representation as to licenses and qualifications set forth in Section 2.02 hereof), all Tax (as hereinafter defined) reports and returns required to be filed by or on behalf of each DSCC Company have been duly filed, and all Taxes required to be paid by each DSCC Company have been duly paid, except to the extent of (i) reserves reflected in the Interim Balance Sheet (including reserves for current Taxes not yet due) and in the respective balance sheets of the Equity Companies,

33

OCC 032950

(ii) Taxes that have become due (and are not overdue) since the dates of the Interim Balance Sheet and of the respective balance sheets of the Equity Companies, and (iii) Taxes that are being contested in good faith by Seller or a DSCC Company as described on Schedule 2.14. The reserves for accrued liabilities for Taxes reflected in the Interim Balance Sheet and the respective balance sheets of the Equity Companies were adequate in the aggregate for the payment of all unpaid Taxes, whether or not disputed, for the period ended as of the date thereof or for any period or year prior thereto, and for which any DSCC Company may be liable in its own right, as a withholding agent or as transferee of the assets of, or successor to, any Entity.

(b)   The tax returns of each DSCC Company have been examined by the Internal Revenue Service ("IRS") and by each such domestic state and local taxing authority that routinely conducts periodic audits in respect of income and franchise tax returns, for all periods to and including those set forth with respect to each such Entity in Schedule 2.14. Except to the extent shown in Schedule 2.14, all deficiencies asserted as a result of such examinations have been paid or finally settled, and no issue relating to DSCC or any Significant

34

OCC 032951

Confidential

Subsidiary has been raised by the IRS or any such state
or local taxing authority with respect to any tax year in
any such examination which, to the knowledge of Seller,
by application of the same or substantially similar prin-
ciples, reasonably could be expected to result in a mate-
rial tax deficiency for any other period not so examined.

(c)  Except to the extent set forth in
Schedule 2.14, there are no outstanding agreements or
waivers extending the statutory period of limitation
applicable to any return of any DSCC Company for any
period in respect of any income or franchise tax require-
ment of the United States or any state thereof.  All such
income and franchise tax returns for such DSCC Companies
in respect of all years not barred by the statute of
limitations are listed in Schedule 2.14.  Seller will
provide to Buyer copies of income and franchise tax re-
turns not barred by statute, as listed on Schedule 2.14,
on or before Closing.

(d)  Neither Seller nor any DSCC Company
has, with regard to any assets or property held, acquired
or to be acquired by any of them, filed a consent to the
application of Section 341(f)(2) of the Internal Revenue
Code of 1954, as amended (the "Code").

35

OCC 032952

OCCNJ0026396
ALCD-PUBCOM_0002274

(e)  Prior to September, 1983, DSCC as the parent of a consolidated return group (the "Consolidated Group") and together with each of its subsidiaries includible within such Consolidated Group (the "Includible Subsidiaries") filed consolidated federal income tax returns.  In 1983, Seller, without terminating the prior Consolidated Group, replaced DSCC as the parent of the Consolidated Group pursuant to the Reorganization (as defined in Section 2.23 hereof), and continued to file consolidated federal income tax returns which included DSCC and the Includible Subsidiaries.

(f)  For purposes of this Agreement, "Taxes" shall mean all taxes, charges, fees, levies or other assessments imposed by any federal, state, local or foreign taxing authority, including without limitation, income, excise, property, sales, occupation, use, service, service use, leasing, leasing use, value added, transfer, payroll and franchise taxes and all other similar taxes (including any interest, penalties or additions to tax attributable to or imposed on or with respect to any such assessment).

36

OCC 032953

Confidential

OCCNJ0026397

ALCD-PUBCOM_0002275

(g)  All representations and warranties in this Section 2.14 with respect to any Equity Company are made to the knowledge of Seller.

Section 2.15  <u>Employee Matters</u>.

(a)  For purposes of this Agreement, "Plan" shall mean any bonus, deferred compensation, incentive compensation, severance or termination pay, hospitalization or other medical, stock purchase, stock option, pension, life or other insurance, S.U.B., profit sharing or retirement plan or agreement or policy or other arrangement providing employment-related benefits (including, without limitation, "employee-pension benefit plans" and "employee welfare benefit plans" as defined in the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations promulgated thereunder ("ERISA")).  Schedule 2.15 contains a list of each Plan established in the United States maintained by or contributed to, or with respect to which costs are incurred or liabilities accrued by, any Diamond Company, for the benefit of any employees of any DSCC Company on the Closing Date, including any employees of Seller whose functions relate to the operations of any DSCC Company and who are transferred to a DSCC Company prior to the Closing Date, and including such employees who are on the

37

OCC 032954

Confidential

OCCNJ0026398

ALCD-PUBCOM_0002276

Closing Date on short-term disability, sick leave or
other leave of absence, but excluding such employees who
are on the Closing Date on long-term disability and ex-
cluding employees who retire from or otherwise terminate
employment with any DSCC Company before the Closing Date
(collectively, the "Employees") (such Plans are hereinaf-
ter called "Seller's Plans"). No DSCC Company has any
announced plan or legally binding commitment to create
any additional Seller's Plans or to modify or change any
existing Seller's Plans except as described in Schedule
2.15. Each of Seller's Plans that is not sponsored by
Seller, but is instead sponsored by a DSCC Company, is
designated as such on Schedule 2.15 and such Seller's
Plans are collectively called herein the "DSCC Plans."

(b)  Except as set forth in Schedule
2.15, (i) none of the Seller's Plans which is an "employ-
ee pension benefit plan," as such term is defined in
Section 3 of ERISA (collectively, the "ERISA Plans"), is
a "multiemployer pension plan" as that term is defined in
Section 3(37) of ERISA, or a "multiple employer pension
plan" described in Section 4063 of ERISA, (ii) to the
knowledge of Seller, neither any DSCC Company nor any of
the ERISA Plans, nor any trust created thereunder, nor
any trustee or administrator thereof, has engaged in a

38

OCC 032955

**Confidential**

transaction in connection with which any DSCC Company is subject to the lawful imposition of either a civil penalty assessed pursuant to Section 502(i) of ERISA, or a tax imposed pursuant to Section 4975 of the Code, (iii) to the knowledge of Seller, no liability under Title IV of ERISA has been incurred by any DSCC Company or ERISA Plan since the effective date of ERISA which has not been satisfied in full, other than liability for premiums that are not yet due and payable to the Pension Benefit Guaranty Corporation ("PBGC"), and there exists no fact or circumstance which is expected to result in such liability, (iv) neither any Diamond Company nor the PBGC has instituted proceedings to terminate any of the ERISA Plans that are single employer plans subject to Title IV of ERISA, (v) full payment has been made, or will be made in accordance with Section 404(a)(6) of the Code, of all amounts which any DSCC Company is required to pay under the terms of each of the ERISA Plans as a contribution to the ERISA Plans, and none of the ERISA Plans nor any trust established thereunder has incurred any "accumulated funding deficiency" (as defined in Section 302 of ERISA and Section 412 of the Code), whether or not waived, (vi) Seller has delivered to Buyer a true and complete copy of the most recent actuarial report for

39

OCC 032956

OCCNJ0026400
ALCD-PUBCOM_0002278

each of the Seller's Pension Plans (as defined in Section
4.02(a)) and, to the knowledge of Seller, such actuarial
reports are accurate and complete as of the date thereof,
(vii) Seller has delivered to Buyer a copy of Seller's
Employee Shareholding and Investment Plan, Pension Plan
for Employees of Process Chemicals Division Represented
by Collective Bargaining Agents ("Process Plan") and
Pension Plan for Hourly-Rated Employees ("Hourly Plan")
as currently in effect and of the most recent determina-
tion letter for each of said plans, and, to the knowledge
of Seller, there exists no fact or circumstance that
would adversely affect the qualified status of said
plans, (viii) with respect to those ERISA Plans which are
"multiemployer pension plans", (A) no DSCC Company has,
since September 26, 1980, made or suffered a "complete
withdrawal" or a "partial withdrawal", as such terms are
respectively defined in Sections 4203 and 4205 of ERISA,
(B) to the knowledge of Seller, no event has occurred
which presents a material risk of a "partial withdrawal"
under Section 4205(a)(1) of ERISA, and (C) Seller has
provided Buyer with a copy of the estimated withdrawal
liability worksheet and the contribution history trans-
mitted by the applicable Plan administrator by a letter
dated July 24, 1986, and (ix) there is no material pend-

40

OCC 032957

Confidential

ing or, to the knowledge of Seller, threatened Litigation
by or on behalf of any of Seller's Plans, by any Employee
or beneficiary covered under any of Seller's Plans, or
otherwise involving any of Seller's Plans (other than
routine claims for benefits).

(c)  With respect to each Plan estab-
lished outside the United States, maintained by or con-
tributed to, or with respect to which costs are incurred
by, any Diamond Company for the benefit of any Employees,
to the knowledge of Seller, each majority owned Diamond
Company is in compliance with all applicable Laws and
with all its obligations under such Plans.

Section 2.16  Contracts.  Schedule 2.16 lists
all notes, bonds, mortgages, indentures, deeds of trust,
licenses, franchises, contracts, agreements, instruments
and guarantees (individually or collectively, "Con-
tracts") to which any DSCC Company is a party or by which
any of them or any of their respective assets is bound,
or to which any Diamond Company is a party or any of them
or any of their respective properties is bound and which
is to be assigned to a DSCC Company prior to or concur-
rently with the Closing, which (a) by their terms call
for payments to be made or received in any one year from
and after the date hereof of more than $1,000,000, or

41

OCC 032958

Confidential

have a term of over one year from and after the date
hereof and by their terms call for payments to be made or
received in any one year from and after the date hereof
of more than $250,000, (b) are with any Employee and
provide for compensation in any year of more than
$50,000, including, without limitation, employment con-
tracts of the foregoing nature (not terminable at will)
with any Employee, but not including any item listed on
Schedule 2.15, (c) contain any covenants limiting the
freedom of any DSCC Company to compete in any line of
business or with any Entity in any geographical area
which is in either case material to the business of the
Chemicals Business or of any Business Unit, (d) relate to
the proposed purchase or sale of any property (other than
in the ordinary course of business) for an aggregate
price of more than $1,000,000, (e) require the provision
of capital or funds by way of a loan or advance of funds
or capital contribution to, or other investment in, or
guaranty of, the obligations of any Entity in excess of
$1,000,000, or (f) constitute or secure any of the As-
sumed Obligations.  Except as set forth in Schedule 2.16,
(i) all such Contracts listed or required to be listed
pursuant to subparagraphs (a), (d), (e) and (f) above are
valid and binding obligations enforceable in accordance

42

OCC 032959

Confidential

OCCNJ0026403

ALCD-PUBCOM_0002281

with their respective terms, and (ii) all such Contracts
listed or required to be listed pursuant to subparagraphs
(b) and (c) above are, to the knowledge of Seller, valid
and binding obligations enforceable in accordance with
their respective terms, and in the case of clauses (i)
and (ii) above, except as enforcement against third par-
ties may be limited by bankruptcy, insolvency or other
similar Laws affecting the enforcement of creditors'
rights generally and except that the availability of
equitable remedies against third parties, including spe-
cific performance, is subject to the discretion of the
court before which any proceeding therefor may be
brought.  Except as set forth in Schedule 2.16, no Dia-
mond Company is in default in any material respect under
any such Contract; nor, to the knowledge of Seller, is
any other party to any such Contract in default in any
material respect thereunder; nor does there exist any
event or condition which, with the passage of time or
giving of notice, or both, would constitute such a de-
fault by any Diamond Company or, to the knowledge of
Seller, any other party thereto.

43

OCC 032960

**Confidential**

**OCCNJ0026404**

ALCD-PUBCOM_0002282

Section 2.17  <u>Intellectual Property</u>.

(a)  Schedule 2.17 lists those trade-
marks, trade names, licenses, service marks, copyrights,
patents and patent applications which Seller reasonably
deems to be material to the Chemicals Business or any
Business Unit.  The DSCC Companies collectively own, are
licensed or otherwise have the right to use each item of
technology, know-how and processes, and each trademark or
service mark or application therefor, trade name, copy-
right, patent or application therefor, and any license
relating thereto and any machines, articles of manufac-
ture, composition of matter, processes and other inven-
tions (collectively, "Inventions") covered thereby, free
and clear of all Liens except Permitted Liens, which are
material to the business, financial condition or results
of operations of the Chemicals Business or of any Busi-
ness Unit as presently conducted.  Except as otherwise
set forth in Schedule 2.17 hereto, neither Seller nor any
DSCC Company has been notified in writing that the con-
duct of the businesses of the DSCC Companies infringes
upon any trademark, service mark, trade name, copyright,
patent, or rights in technology, know-how or processes,
of any nonaffiliated Entity.

44

OCC 032961

**Confidential**

OCCNJ0026405

ALCD-PUBCOM_0002283

(b) All patents, patent applications, trademarks, service marks, trademark applications and service mark applications listed in Schedule 2.17, if any, have been duly issued, registered or filed (as the case may be) in the United States Patent and Trademark Office or, as to other countries, in the corresponding offices of such other countries and have been properly maintained and renewed in all material respects in accordance with all applicable legal requirements.  Except as set forth in Schedule 2.17, the DSCC Companies have the right to use, without the payment of royalties, the names and marks, if any, listed in Schedule 2.17 in the geographic areas in which they are presently being used.

(c) No claims have been asserted which are presently pending against any Diamond Company in any Litigation by any Entity of an adverse right to the use of any such patented and unpatented Inventions listed in Schedule 2.17, or challenging or questioning the validity of any such patent or the validity or effectiveness of any such license or agreement listed in Schedule 2.17; and, to the knowledge of Seller, there is no valid basis for any such claim and the use of such Inventions by any DSCC Company does not infringe on the patent, trademark, service mark or proprietary information rights or other

45

OCC 032962

rights of any other Entity, in each case other than such claims which would not, individually or when taken together with all other related matters, have a material adverse effect on the business, financial condition or results of operations of the Chemicals Business or of any Business Unit.

Section 2.18   Insurance.   Schedule 2.18 sets forth a description (specifying the insurer, the policy number or covering note number with respect to binders) of all Current Policies (as hereinafter defined), if any, of fire, liability, product liability, worker's compensation, vehicular, directors' and officers' liability, crime, fiduciary, builders' risk, boiler and machinery, property (including business interruption), marine (including hull and machinery, protection/indemnity, war risk, water pollution, warfingers and charterers' liability), cargo (both inland and marine), errors and omissions, aviation, contractor's liabilities, seepage and pollution, performance and surety bonds and letters of credit and other insurance held by or on behalf of, or providing coverage for, any DSCC Company.  For purposes of this Agreement "Current Policy" shall mean any policy or binder (other than binders which have been replaced by subsequently received policies) which covers events or

46

OCC 032963

OCCNJ0026407
ALCD-PUBCOM_0002285

occurrences or requires payment of any premiums on or
after the date of this Agreement.  Schedule 2.18 also
sets forth a similar description of all policies and
binders providing coverage for any of the DSCC Companies
other than Current Policies which Seller, after a dili-
gent search of the records maintained by the appropriate
Diamond Company relating to the DSCC Companies and after
appropriate inquiry of its insurance brokers, has been
able to locate.  Except as set forth on Schedule 2.18,
all such policies and binders are, as of the date of this
Agreement, in full force and effect.

     Section 2.19  <u>Labor Relations</u>.  No DSCC Company
is a party to any collective bargaining agreement or
published personnel policy generally applicable to domes-
tic Employees other than those listed on Schedule 2.19,
copies of which have heretofore been delivered to Buyer.
Except to the extent set forth in Schedule 2.19, (a)
there is no unfair labor practice charge or complaint
against any DSCC Company pending before the National
Labor Relations Board ("NLRB"), (b) there is no labor
strike, or organized dispute, slowdown or work stoppage
actually pending or, to the knowledge of Seller, threat-
ened against or affecting any DSCC Company which would
have a material adverse effect on the business, financial

47

OCC 032964

Confidential

OCCNJ0026408

ALCD-PUBCOM_0002286

condition or results of operations of the Chemicals Business or of any Business Unit, (c) there is no union representation claim or petition pending before the NLRB with respect to Employees of any DSCC Company, (d) no grievance or arbitration proceeding arising out of or under a collective bargaining agreement is pending and, to the knowledge of Seller, no claim therefor exists, which in either event would have a material and adverse effect on the business, financial condition or results of operations of the Chemicals Business or of any Business Unit, and (e) no DSCC Company has experienced any organized work stoppage in excess of ten working days in the past five years.

Section 2.20  <u>Brokers</u>.  No Diamond Company has retained any broker or finder, and no broker or finder has acted on behalf of any Diamond Company, in connection with this Agreement or any of the Related Documents or the transactions provided for hereby or thereby, except that Seller has retained and agreed to pay the fees of The First Boston Corporation in connection with this Agreement and the transactions contemplated hereby.

48

OCC 032965

Confidential

OCCNJ0026409

ALCD-PUBCOM_0002287

Section 2.21  SEC Reports.  Each of Seller and
DSCC has previously filed with the Securities and Ex-
change Commission all reports required to be filed by it
pursuant to the Securities Exchange Act of 1934, as
amended ("1934 Act Reports").  None of the 1934 Act Re-
ports (including financial statements contained or incor-
porated therein) contains an untrue statement of a mate-
rial fact or omits to state any material fact necessary,
in light of the circumstances under which it was made, in
order to make the statements therein not misleading.
Since December 31, 1985, there has been no material ad-
verse change in the business, financial condition or
results of operation of the Diamond Companies (not taking
into account the DSCC Companies, provision for which is
made elsewhere herein), taken as a whole, except for
changes generally affecting the industries in which the
Diamond Companies are engaged in business and for matters
which have been disclosed publicly by Seller.

Section 2.22  Cogeneration.

(a)  The Cogeneration Agreement between
DSCC and Houston Lighting & Power Company ("HLP"), dated
August 6, 1984 (the "Cogeneration Agreement"), is a valid
and binding obligation, enforceable in accordance with
its terms, except as enforcement against third parties

49

OCC 032966

may be limited by bankruptcy, insolvency or other simi-
liar Laws affecting the enforcement of creditors' rights
generally and except that the availability of equitable
remedies against third parties, including specific per-
formance, is subject to the discretion of the court be-
fore which any proceeding therefor may be brought.  DSCC
is not in default under the Cogeneration Agreement in any
material respect; nor, to the knowledge of Seller, is HLP
in material default thereunder; nor does there exist any
event or condition, which upon the giving of notice or
the lapse of time or both, would constitute a material
default or event of default on the part of either DSCC or
HLP.  Except as set forth in Schedule 2.22, neither Sell-
er nor DSCC is a party to any legally binding agreement,
letter, memorandum of understanding or other document
that amends or clarifies the Cogeneration Agreement or
any provision therein.

     (b)  Schedule 2.22 lists all Contracts,
legally binding arrangements and understandings, leases
or rental agreements, substantially relating to the fa-
cilities located at DSCC's Deer Park Plant at 1101 Tidal
Road, Deer Park, Texas and at DSCC's Battleground Plant
at 2800 Battleground Road, La Porte, Texas (the "Cogener-
ation Facilities") to which any Diamond Company is a

<center>50</center>

OCC 032967

OCCNJ0026411
ALCD-PUBCOM_0002289

party or by which any of its properties is bound and
which are material to the Cogeneration Business Unit
(collectively, the "Related Cogeneration Contracts").  No
Diamond Company is in default under any of the Related
Cogeneration Contracts in any material respect, nor does
there exist any event or condition, which upon the giving
of notice or the lapse of time or both, would constitute
a material default or event of default by any Diamond
Company under any of the Related Cogeneration Contracts.
Except as disclosed in Schedule 2.22, no Diamond Company
is a party to any legally binding agreement, letter,
memorandum of understanding or other document that amends
or clarifies any Related Cogeneration Contract or any
provisions therein in any material respect.

(c)  Schedule 2.22 sets forth a copy of
the self-qualifying certificates filed in respect of each
of the Cogeneration Facilities with the Federal Energy
Regulatory Commission under the Public Utility Regulatory
Policies Act of 1978, as amended, and the regulations
thereunder, which certificates are not the subject of any
pending or, to the knowledge of Seller, threatened Liti-
gation.  No response was received from the Federal Energy
Regulatory Commission within 90 calendar days after the
filing of such certificates.  Each of the Cogeneration

51

OCC 032968

Confidential

OCCNJ0026412
ALCD-PUBCOM_0002290

Facilities is a "qualified cogeneration facility" within the meaning of (i) the Texas Public Utility Regulatory Act, (ii) the rules of the Public Utility Commission of Texas and (iii) the Public Utility Regulatory Policies Act of 1978, as amended.

(d)   Each of the Cogeneration Facilities is free from the requirements of the Powerplant and Industrial Fuel Use Act of 1978 (the "Fuel Use Act") because each Cogeneration Facility is not now an "electric powerplant" as that term is defined in the Fuel Use Act.

Section 2.23   <u>The Reorganization</u>.

(a)   Seller has advised Buyer that during 1983 and 1984 Seller, DSCC and certain other of the Diamond Companies consummated a corporate reorganization, one of the results of which was that DSCC became a wholly owned subsidiary of Seller (the "Reorganization") and that, prior to the Reorganization, DSCC was engaged, directly or through one or more subsidiaries or other Entities, in various businesses in addition to the Chemicals Business.

(b)   For purposes of this Agreement, "Historical Obligations" shall mean those obligations, liabilities, guarantees and contingent liabilities of the DSCC Companies, or any of them, which arose prior to or

52

OCC 032969

OCCNJ0026413
ALCD-PUBCOM_0002291

in connection with the Reorganization and which relate to
any business, asset or property other than those of the
Chemicals Business.  Schedule 2.23 sets forth a descrip-
tion of certain specific Historical Obligations and de-
scribes by category all other Historical Obligations.
Except as so described in Schedule 2.23, to the knowledge
of Seller, there are no other Historical Obligations of
the DSCC Companies, except for obligations, liabilities,
guarantees or contingent liabilities which are not mate-
rial to the business, financial condition or results of
operations of the Chemicals Business or of any Business
Unit.

Section 2.24  Governmental Regulations.  No
DSCC Company is (a) an investment company within the
meaning of the Investment Company Act of 1940, as amend-
ed, (b) a public utility company or a holding company
within the meaning of the Public Utility Holding Company
Act of 1935, as amended, (c) a public utility within the
meaning of the Federal Power Act, or (d) a common carrier
within the meaning of the Interstate Commerce Act.

53

OCC 032970

Confidential

OCCNJ0026414

ALCD-PUBCOM_0002292

Section 2.25  Effect of Certain Representations and Warranties.

(a)  For purposes of this Agreement, references to the "knowledge of Seller" shall constitute only references to (i) the actual knowledge of any executive officer (as defined in Rule 402 of Regulation S-K promulgated under the Securities Exchange Act of 1934, as amended ("Rule 402")) of Seller; (ii) information made available to any such executive officer as a result of his making due inquiry of responsible officials of Seller and the appropriate Diamond Companies in connection with this Agreement and the transactions contemplated hereby; provided, however, that the appropriate executive officer shall be deemed hereby to be required to make a reasonable due inquiry of the applicable subject matter; or (iii) the information which would have been made reasonably available to any such executive officer had he made such reasonable due inquiry.

(b)  No liability, loss contingency, obligation, asset, right, condition, event or occurrence shall be deemed material to or otherwise affect any Business Unit except to the extent that such liability, loss contingency, obligation, asset, right, condition, event or occurrence or its effect relates to the business,

54

OCC 032971

Confidential

financial condition or results of operations of such Business Unit. In determining the standard by which materiality with respect to any Business Unit shall be judged, the business, financial condition, results of operation and value of the assets of such Business Unit as of the Closing shall control.

ARTICLE III

Representations and Warranties

of Buyer, Oxy-Chem and OPC

Section 3.01. Organization of Buyer, Oxy-Chem and OPC. Each of Buyer, Oxy-Chem and OPC represents and warrants to Seller that each of them is a corporation duly organized, validly existing and in good standing under the laws of its state of incorporation and has the requisite corporate power and authority to own, operate and lease its properties and to carry on its business as now being conducted.

Section 3.02 Corporate Power. Each of Buyer, Oxy-Chem and OPC represents and warrants to Seller as follows: (a) each of them has the requisite corporate power and authority to execute, deliver and perform this Agreement and the Related Documents to which it is or will be a party and to consummate the transactions con-

55

OCC 032972

Confidential

templated hereby and thereby, (b) all corporate action on
its part necessary to approve or to authorize the execu-
tion, delivery and performance of this Agreement and any
of the Related Documents to which it is a party and the
consummation of the transactions contemplated hereby and
thereby has been duly taken, (c) this Agreement is a
valid and binding obligation of, enforceable in accor-
dance with its terms against, each of Buyer, OPC and Oxy-
Chem and (d) each of the Related Documents is, or upon
execution and delivery thereof will be, a valid and bind-
ing obligation of, enforceable in accordance with its
terms against, each of Buyer, OPC, Oxy-Chem and each of
their respective subsidiaries which is a party to any of
the Related Documents.

Section 3.03  No Conflicts.  Each of Buyer,
Oxy-Chem and OPC represents and warrants to Seller as
follows:  Except for applicable requirements of the HSR
Act, neither the execution, delivery or performance by
Buyer, Oxy-Chem or OPC of this Agreement or the Related
Documents nor the consummation by any of them of the
transactions contemplated hereby or thereby, will:

56

OCC 032973

**Confidential**

OCCNJ0026417

ALCD-PUBCOM_0002295

(i)  conflict with or result in a breach of any provision of the Certificate of Incorporation or By-laws of Buyer, Oxy-Chem or OPC;

(ii)  violate, constitute an event of default under, permit the termination of, give rise to a right to accelerate any indebtedness under, or otherwise breach or conflict with, any contract, lease, or govern-mental permit to which Buyer or Oxy-Chem is a party, is maker or guarantor, or by which ei-ther of them is bound, or result in the cre-ation of any Lien upon the securities, proper-ties, assets or businesses of Buyer or Oxy-Chem other than Permitted Liens and such Liens that may be imposed by or as a result of any action of any Diamond Company;

(iii)  violate any order, writ, injunction, decree, judgment, ruling or Law applicable to Buyer or Oxy-Chem or by which Buyer or Oxy-Chem or any of their respective properties is bound; or

57

OCC 032974

**Confidential**

(iv)  require any consent, approval, authorization or other order or action of, or notice to, or declaration, filing or registration with, any third party or any Governmental Agency;

in each case other than such of the foregoing matters which, or the absence of which, would not, individually or when taken together with all other such related matters, have a material adverse effect on the business, financial condition or results of operations of Buyer or Oxy-Chem.  Notwithstanding any other provision of this Agreement (including, without limitation, this Section 3.03 or Section 3.04 hereof), no representation is made by Buyer, Oxy-Chem or OPC with respect to the effect of the HSR Act or any other antitrust or similar Law on the consummation of the transactions contemplated by this Agreement or any of the Related Documents.

Section 3.04  Litigation.  Each of Buyer and OPC represents and warrants to Seller as follows:  there is no Litigation by or before any (i) court, (ii) Governmental Agency, or (iii) arbitrator, in each case pending or, to the knowledge of Buyer and OPC, threatened, which seeks to restrain, enjoin, prevent the consummation of, or otherwise challenge this Agreement, any of the Related

58

OCC 032975

OCCNJ0026419

ALCD-PUBCOM_0002297

Documents, or any of the transactions contemplated hereby or thereby; subject, however, to the last sentence of Section 3.03 hereof or any Litigation commenced by a federal Governmental Agency related thereto.

Section 3.05  Brokers.  Each of Buyer, Oxy-Chem and OPC represents and warrants to Seller as follows: none of them or any of their subsidiaries has retained any broker or finder, and no broker or finder has acted on behalf of any of them, in connection with this Agreement or any of the Related Documents or the transactions provided for hereby or thereby, except that OPC has retained, and Seller shall have no responsibility for any fees that may be payable to, Drexel Burnham Lambert Incorporated in connection with this Agreement and the transactions contemplated hereby.

Section 3.06  OPC Savings Plan.  OPC represents and warrants to Seller that it has delivered to Seller a copy of the Occidental Petroleum Corporation Savings Plan (the "OPC Savings Plan") as currently in effect and of the most recent determination letter for said plan.

Section 3.07  Buyer's Financial Capacity.  OPC represents and warrants to Seller that, on the Closing Date, Buyer shall have the financial capacity to pay the Cash Portion of the Purchase Price and to perform its

59

OCC 032976

Confidential

OCCNJ0026420

ALCD-PUBCOM_0002298

obligations, if any, under Sections 1.04, 1.05 and 1.06 hereof.

Section 3.08  Oxy-Chem Net Worth.  OPC repre-sents and warrants to Seller that OPC owns directly or indirectly 100% of the issued and outstanding capital stock of Oxy-Chem, and that on the Closing Date Oxy-Chem will have a net worth determined in accordance with GAAP of not less than $800,000,000.

Section 3.09  Effect of Certain Representations and Warranties.  For purposes of this Agreement, refer-ences to the "knowledge" of Buyer, OPC or Oxy-Chem shall constitute only references to (i) the actual knowledge of any executive officer (as defined in Rule 402) of Buyer, OPC or Oxy-Chem; (ii) information made available to any such executive officer as a result of his making due inquiry of responsible officials of Buyer, OPC or Oxy-Chem in connection with this Agreement and the transac-tions contemplated hereby; provided, however, that the appropriate executive officer shall be deemed to be re-quired to make a reasonable due inquiry of the applicable subject matter; or (iii) the information which would have been made reasonably available to any such executive officer had he made such reasonable due inquiry.

60

OCC 032977

Confidential

Section 3.10  Acquisition Purposes.  Each of Buyer and OPC represents and warrants to Seller as follows:  Buyer is not acquiring the Shares with a view to the distribution or resale thereof, except in compliance with the Securities Act of 1933, as amended.

ARTICLE IV

Personnel and Benefit Plans

Section 4.01  Basic Employment Matters.

(a)  The employment of any of the Employees by any of the DSCC Companies shall not terminate on, or as of, the Closing Date by virtue of the sale of the Shares.

(b)  Effective as of the Closing and except as otherwise provided in this Article IV, (i) OPC shall permit all Employees, other than Employees represented by a union and covered by a collective bargaining agreement ("Represented Employees"), to participate in the Plans and personnel policies which apply to similarly situated employees of OPC and its subsidiaries and affiliates (collectively, "OPC Plans"), and (ii) OPC shall cause each of the OPC Plans to recognize, for purposes of eligibility and vesting but not for purposes of benefit calculations (other than for purposes of vacation policy

61

OCC 032978

Confidential

OCCNJ0026422

ALCD-PUBCOM_0002300

and short-term disability), the respective period of employment of each of such Employees that was recognized as of the Closing Date in the analogous Seller's Plans and personnel policies.

Section 4.02  Pension Plans.

(a)  Employees who participate in Seller's Retirement Income Plan for Chemical Company Employees ("RIP"), Process Plan or Hourly Plan (collectively, "Seller's Pension Plans") shall, as of the Closing Date, cease accruing benefits under such Seller's Pension Plans.

(b)  Subject to the provisions of Section 4.04(c), Seller shall be responsible for the RIP on and after the Closing Date, and shall amend the RIP to provide that service (by Employees who are, on the Closing Date, participants under the RIP) with any DSCC Company or Pass-Through Purchaser on and after the Closing Date shall be recognized for purposes of:  (i) meeting the vesting requirements, (ii) qualification for Early Retirement Income versus Vested Retirement Income (or Deferred Vested Retirement Income) and (iii) qualification for Pre-Benefit Commencement Death Benefit to Spouse for Deaths after August 22, 1984.  Seller shall also amend the RIP to provide that, for purposes of eligibil-

62

OCC 032979

Confidential

ity to commence payment of benefits, a participating Employee shall not be deemed to have terminated employment with Seller until such Employee terminates employment with any DSCC Company or any Pass-Through Purchaser.

(c)  OPC and Buyer shall cause DSCC (and shall use their best efforts to cause any Pass-Through Purchaser) to:

(i)  provide and/or verify such pre-Closing Date information which is required for the calculation of the accrued benefit in accordance with Seller's standard procedures, including, but not limited to, work history (including hours and months of service) salary history and properly documented proof of birth date; and

(ii)  deliver monthly to Seller such post-Closing Date service information so that Seller may properly fulfill its responsibility under this Section.

Section 4.03  <u>Savings Plan</u>.  As of the Closing Date, Seller shall cause each Employee who is a participant to be fully vested in his account balance under Seller's Employee Shareholding and Investment Plan ("ESIP").  OPC shall permit participation by Employees,

63

OCC 032980

**Confidential**

other than Represented Employees in the OPC Savings Plan,
to commence on the Closing Date. Both the ESIP and the
OPC Savings Plan shall permit a direct trustee to trustee
transfer of assets in cash (and transfer of applicable
loan accounts) from the ESIP to the OPC Savings Plan.
Both Seller and OPC shall permit each of the Employees
who are participants in the ESIP on the Closing Date
individually to elect, at such time as Seller and DSCC
shall agree, but in any event within 30 calendar days of
the Closing Date, to direct the trustee of the ESIP to
(a) transfer the value of such Employee's accounts under
the ESIP in cash, and the outstanding balance of any Loan
Account of such Employee under the ESIP, to the trustee
of the OPC Savings Plan or (b) pay to such Employee the
vested amount of his account balance in the ESIP as a
voluntary in-service distribution under applicable provi-
sions of the ESIP (except that the amount subject to
Section 401(k) of the Code shall be available only as
permitted under the applicable provisions of the ESIP and
the Code). Seller, Buyer and OPC shall each use its best
efforts, including but not limited to the filing of Form
5310 within 30 calendar days after the Closing Date, so
that such transfers may occur as soon as practicable
after the Closing. In no event shall such transfer be

64

OCC 032981

Confidential

made sooner than 30 calendar days after the filing of
both Forms 5310, or later than December 31, 1986, or 90
calendar days after the Closing Date, whichever occurs
later.  If such transfer is not made by the later of
December 31, 1986, or 90 calendar days after the Closing
Date, Buyer shall pay to Seller the amounts set forth on
Schedule 4.03.

Section 4.04  Represented Employees.

(a)  Buyer shall assume, or shall cause
or, in the case of less than majority-owned Entities,
shall use its best efforts to cause, the appropriate DSCC
Company to continue to perform, as of the Closing Date
all obligations of Seller or any DSCC Company under the
collective bargaining agreements listed in Schedule 2.19,
including but not limited to obligations to provide bene-
fits that are substantially identical to those currently
being provided under any one or more of Seller's Plans.
Buyer's responsibility under the immediately preceding
sentence shall include but not be limited to the estab-
lishment of Plans that are substantially identical to
those of Seller's Plans that are identified in such col-
lective bargaining agreements, unless Buyer successfully
negotiates substitution for such Seller's Plans or remov-
al of such obligations.  In order to facilitate the pro-

65

OCC 032982

OCCNJ0026426
ALCD-PUBCOM_0002304

vision of the benefits described in this Section 4.04(a) to Represented Employees, Seller shall permit Buyer, throughout the period prior to the Closing Date, to meet with Represented Employees or their duly recognized collective bargaining representatives for the purpose of (i) notifying the Represented Employees of the terms and conditions of employment being offered by Buyer and (ii) entering into such agreements between Buyer and the collective bargaining representatives as may be deemed necessary or desirable; provided that Seller shall receive reasonable prior notice of such meeting and shall be entitled to attend and participate therein.

(b) If Buyer elects to establish an employee thrift plan similar to the ESIP for, or makes an existing thrift plan applicable to, the Represented Employees (in either case, "Buyer's Savings Plan"), Seller and Buyer shall cause a trustee to trustee transfer of assets on behalf of Represented Employees from the ESIP to Buyer's Savings Plan on the same terms and conditions specified in Section 4.03 hereof. If a Buyer's Savings Plan is not established or made available to a Represented Employee, Seller shall treat the sale of the Shares as a termination of employment of such Represented Employee for purposes of distributing his accounts under the ESIP.

66

OCC 032983

Confidential

(c)  Pursuant to Section 4.04(a) hereof,
Buyer shall establish Plans which are substantially iden-
tical to the Process Plan and the Hourly Plan (Buyer's
substantially identical Plans are hereinafter called
"Buyer's Process Plan" and "Buyer's Hourly Plan," respec-
tively) which in the aggregate shall cover all Represent-
ed Employees, and Seller and Buyer shall cause a transfer
of assets and liabilities from the Process Plan and the
Hourly Plans follows:  Buyer's Process Plan and Buyer's
Hourly Plan (collectively "Buyer's Pension Plans") shall
be effective as of the Closing Date and shall be identi-
cal in their substantive terms to the Process Plan and
the Hourly Plan respectively (collectively, the "DSCC
Pension Plans"); the Represented Employees shall be given
credit in Buyer's Pension Plans for past service for all
purposes (including, but not limited to, eligibility,
vesting and benefit accrual) to the same extent that such
past service credit was recognized under the DSCC Pension
Plans; Seller shall cause to be transferred, and Buyer
shall cause to be received, from the DSCC Pension Plans
to the Buyer's Pension Plans the liability for all ac-
crued benefits of the Represented Employees under the
DSCC Pension Plans as of the Closing Date.  Seller shall
cause to be transferred, and Buyer shall cause to be

67

OCC 032984

received, from the trustee of the DSCC Pension Plans to
the trustee of the Buyer's Pension Plans, an amount in
cash attributable to such accrued benefits of the Repre-
sented Employees as of the Closing Date as required under
Section 414(1) of the Code as determined by the Buyer's
and Seller's actuary.  Seller and Buyer shall each use
its best efforts, including but not limited to the filing
of Forms 5310 within 30 calendar days after the Closing
Date, so that such transfers may occur as soon as practi-
cable after the Closing.  Such transfers shall occur on
such date as Seller and Buyer shall agree; provided,
however, that in no event shall such transfers be made
sooner than 30 calendar days after the later of the fil-
ing of both Forms 5310 or Seller's receipt of a copy of
determination letters indicating that Buyer's Pension
Plans are qualified Plans under the Code (or a written
opinion of Buyers' counsel, reasonably satisfactory to
Seller, to the same effect).  The amount of such trans-
fers shall be based on all the actuarial assumptions,
used for the DSCC Pension Plans, as set forth in the
actuarial reports for such DSCC Pension Plans as of De-
cember 31, 1985 except that the assumed interest rate
shall be 8% per annum.  The amount of such transfers
shall also include interest at the rate earned by the

68

OCC 032985

RepublicBank Dallas Short-Term Securities Trust Fund (or its successor) from the date as of which the asset value of the accrued benefits are determined hereunder to the date of transfer.

Section 4.05   Other Plans.

(a)   Seller shall cause the accounts of Employees under Seller's Employee Stock Ownership Plan to be maintained as of the Closing Date and to be distributed to Employees in the time and manner permitted by applicable law and provisions of the plan; provided, however, that contributions to such plan on behalf of the Employees shall cease as of the Closing Date.

(b)   As of the Closing Date, no additional amounts shall be deducted from a participating Employee's compensation or credited to a participating Employee's accounts under Seller's Resource Account Plan (the "Resource Plan").  Subject to the immediately preceding sentence, from and after the Closing Date, Seller shall honor and pay, pursuant to the terms of the Resource Plan and on behalf of Seller, claims by Employees for benefits relating to qualifying expenses incurred by Employees at any time during 1986, whether before or after the Closing Date.

69

OCC 032986

Confidential

(c)  Except as otherwise provided in this Article IV, all of Seller's Plans that are not DSCC Plans shall cease to apply to the Employees, and the Employees shall not accrue benefits under such Plans, on and after the Closing Date.  All of Seller's Plans that are DSCC Plans shall be the responsibility of Buyer, through DSCC or the applicable Subsidiary, on and after the Closing Date.

(d)  Notwithstanding any provision herein to the contrary, Seller shall be responsible for payment of any claim for retiree medical benefits or retiree life insurance by any employee of any Diamond Company who is not an Employee and Buyer shall be responsible for payment of any claim for retiree medical benefits or retiree life insurance by any Employee.

(e)  Buyer shall be responsible for payment of all salary or wages and vacation pay that become payable to Employees on or after the Closing Date, regardless whether all or any portion of such amounts accrued or relate the period before the Closing Date.

(f)  Except as otherwise provided in this Article IV, Seller shall honor or cause its insurance carriers or other agents to honor all claims for benefits under each of Seller's Plans that (i) are not

70

OCC 032987

Confidential

OCCNJ0026431
ALCD-PUBCOM_0002309

DSCC Plans and (ii) are employee welfare benefit plans as defined in ERISA, relating to events which have occurred prior to the Closing Date (regardless of whether such claims are filed before or after the Closing Date, but provided that such claims are filed timely under the terms of the respective plans), in accordance with the terms of such plans.  For purposes of the immediately preceding sentence, as applied to medical, dental and other Plans that reimburse expenses of Employees, the date of the relevant event shall be the date on which such expenses were incurred by the Employee.  Buyer shall cause or, in the case of less than majority-owned Entities, shall use its best efforts to cause, DSCC personnel to furnish to Employees, and to process, claim forms for such plans as reasonably directed by Seller.

(g)  Buyer shall be responsible for payment of all sick pay and short-term disability pay that becomes payable after the Closing Date to an Employee whose period of absence from work includes the Closing Date; provided, however, that if the period of absence of any such Employee continues for more than 60 calendar days after the Closing Date, Seller shall reimburse Buyer for the amount of sick pay or short-term disability pay paid to such employee for the period of absence beginning

71

OCC 032988

Confidential

OCCNJ0026432

ALCD-PUBCOM_0002310

on the sixty-first calendar day following the Closing
Date and ending with the one hundred eightieth calendar
day following the Closing Date; provided, further, that
no such Employee shall receive sick pay or short-term
disability pay for a total period (before and after the
Closing Date) exceeding six months.  If the total period
of absence (before and after the Closing Date) of any
such Employee exceeds six months, his eligibility for
benefits under Seller's Long-Term Disability Plan shall
not be adversely affected by virtue of the sale of the
Shares.

Section 4.06  Separation Benefits.  For a peri-
od commencing on the Closing Date and ending 12 months
thereafter, (a) all salaried Employees and (b) all Em-
ployees who are not Represented Employees at the plant
locations set forth in Exhibit 4.06 shall be covered by
the severance benefits policy set forth in Exhibit 4.06.
For purposes of calculating benefits of any Employee
under said severance benefit policy, the period of em-
ployment of such Employee that was recognized by the
analogous Seller's Plan as of the Closing Date shall be
included.  Seller shall be responsible for provision of,
and payment for, severance benefits to any employees of
any DSCC Company whose employment is terminated prior to

72

OCC 032989

Confidential

OCCNJ0026433

ALCD-PUBCOM_0002311

the Closing Date.  Buyer shall be responsible for provi-
sion of, and payment for, all severance benefits to Em-
ployees whose employment is terminated on or after the
Closing Date.

## ARTICLE V

### Closing

Section 5.01  The Closing.

(a)  The closing of the transactions
contemplated by this Agreement (the "Closing") shall be
held on such date (the "Closing Date"), and at such time
as may mutually be agreed upon by the parties hereto at
the offices of OPC, or at such other place as may mutual-
ly be agreed upon by the parties hereto.

(b)  At the Closing, (i) Seller shall
deliver to Buyer certificates representing all of the
Shares, which certificates shall be duly endorsed for
transfer or accompanied by duly executed stock powers,
(ii) Buyer shall deliver to Seller the Cash Portion of
the Purchase Price pursuant to Article I hereof,
(iii) Seller shall deliver to Buyer resignations, dated
as of the Closing Date or a date prior thereto, executed
by such of the directors and officers of DSCC and, to the
extent that they have been designated or appointed, di-

73

OCC 032990

Confidential

rectly or indirectly by DSCC, of each Significant Subsid-
iary, as Buyer shall request in writing prior to the
Closing, or an instrument duly removing such persons from
office, and (iv) the appropriate parties shall take all
other actions not previously taken but required to be
taken hereunder on or prior to the Closing Date.

ARTICLE VI
Conditions to Obligations of Buyer, OPC
and Oxy-Chem to Consummate the Transaction

The obligations of each of Buyer, OPC and Oxy-
Chem to be performed at the Closing shall be subject to
the satisfaction, or the waiver in writing by Buyer, OPC
and Oxy-Chem, on or prior to the Closing of the following
conditions:

Section 6.01  Opinion of Counsel.  Buyer and
OPC shall have received the written opinion of W.E. No-
testine, Deputy General Counsel of Seller, or other legal
counsel for Seller acceptable to Buyer, dated the Closing
Date, in the form of Exhibit 6.01.

Section 6.02  Accuracy of Representations and
Warranties; Compliance with Covenants.  The representa-
tions and warranties of Seller contained in this Agree-
ment shall be correct in all material respects on and as
of the Closing Date with the same force and effect as

74

OCC 032991

Confidential

though such representations and warranties were made at the Closing except for changes expressly permitted or contemplated by this Agreement; each and all of the covenants required to be performed by Seller on or prior to the Closing pursuant to the terms of this Agreement shall have been duly performed in all material respects; and Seller shall deliver a certificate executed by an executive officer of Seller, addressed to Buyer, OPC and Oxy-Chem and dated the Closing Date, certifying to all of the foregoing and to the effect set forth in Section 6.03 hereof.

Section 6.03  <u>Material Change</u>.  Except with respect to the transactions contemplated by the Cogeneration Purchase Agreement, as set forth in Schedule 2.09 as of the date hereof, or for changes in general economic conditions, from June 30, 1986 to the Closing Date, neither the Chemicals Business nor any of the Business Units shall have suffered any material adverse change (whether or not such change is referred to or described in any supplement to any Schedule or Exhibit hereto) in its business, financial condition or results of operations.

75

OCC 032992

**Confidential**

**OCCNJ0026436**

ALCD-PUBCOM_0002314

Section 6.04  <u>No Injunction</u>.  No judgment,
order or decree shall have been rendered in any Litiga-
tion which has the effect of (a) enjoining the consumma-
tion of the transactions contemplated by this Agreement,
or (b) subject to compliance with  Section 8.01 hereof,
enjoining the transfer of any stock, assets or businesses
of any DSCC Company by Buyer or OPC, or directly by Sell-
er or DSCC, to Buyer or OPC or any subsidiary or affili-
ate of Buyer or OPC, or requiring DSCC, OPC, or Buyer or
any subsidiary or affiliate of OPC or Buyer to hold any
of such stock, assets or businesses separately from oth-
ers owned or operated by any such party.

Section 6.05  <u>Approvals and Consents</u>.  All
applicable waiting periods under the HSR Act shall have
expired or been terminated.  The consents and approvals
identified (by marking with an appropriate mark and foot-
note) as being required on Schedules 2.06, 2.11, 2.12 and
2.16, if any, to permit the consummation of the transac-
tions contemplated hereby (including, but not limited to,
the ECRA ACO identified in Section 8.19 hereof and the
Environmental Permits required, if any, to be reissued or
transferred prior to the Closing Date), shall have been
obtained.

76

OCC 032993

Confidential

OCCNJ0026437

ALCD-PUBCOM_0002315

Section 6.06  <u>Accounts Receivable Free of
Liens</u>.  All accounts receivable of any DSCC Company as-
signed to Citibank, N.A. or any of its affiliates or any
other Entity shall be reassigned to the applicable DSCC
Company and shall be unencumbered by any Lien with re-
spect to any obligation, duty or indebtedness of any
Diamond Company (other than one of the DSCC Companies).

Section 6.07  <u>Cogeneration Purchase Agreement
Closing</u>.  The Cogen Closing (as defined in the Cogenera-
tion Purchase Agreement) shall have occurred immediately
prior to or simultaneously with the Closing.

Section 6.08  <u>Insurance</u>.  Each of the Current
Policies described in Schedule 2.18, or adequate replace-
ments therefor with substantially the same deductibles,
coverages and limits, shall have been in full force and
effect without any interruption in coverage; and all
premiums with respect thereto shall have been fully paid
or caused to be paid by Seller and DSCC for all periods
up to and including the Closing Date.

Section 6.09  <u>No Events of Default</u>.  No default
or event of default or event or condition which with the
passage of time or giving of notice, or both, would con-
stitute such a default or event of default, shall have
occurred, or, as a result of the consummation of the

77

OCC 032994

**OCCNJ0026438**

ALCD-PUBCOM_0002316

transactions contemplated by this Agreement or any of the Related Documents, will occur with respect to the Assumed Obligations or other debt instruments (a) to which any DSCC Company is a party, maker or guarantor, (b) by which any of them or any of their respective properties is bound or (c) to which, to the extent relating to the Chemicals Business or the Assumed Obligations, Seller is a party, maker guarantor, or by which it or its properties is bound, other than such defaults or events of default (i) under the Carbocloro Credit Agreement or the DS Chile Credit Agreement (as such terms are defined in Exhibits 1.06 (a) and 1.06 (b), respectively), (ii) as described in Schedule 6.09, (iii) as a result of the consummation of the transactions contemplated by the Cogeneration Purchase Agreement, (iv) as may result from the business or legal or regulatory status of OPC or any of its subsidiaries, or (v) which have been cured and with respect to which requisite waivers have been obtained.

78

OCC 032995

**Confidential**

OCCNJ0026439

ALCD-PUBCOM_0002317

ARTICLE VII

Conditions to Obligations of Seller
to Consummate the Transaction

The obligations of Seller to be performed at the Closing shall be subject to the satisfaction, or the waiver in writing by Seller, on or prior to the Closing of the following conditions:

Section 7.01  Opinion of Counsel.  Seller shall have received the written opinion of Raymond Gill, Associate General Counsel of OPC, or other legal counsel acceptable to Seller, dated the Closing Date, in the form of Exhibit 7.01.

Section 7.02  Accuracy of Representations and Warranties; Compliance with Covenants.  The representations and warranties of Buyer, Oxy-Chem, and OPC contained in this Agreement shall be correct in all material respects on and as of the Closing Date with the same force and effect as though such representations and warranties were made at the Closing except for changes expressly permitted or contemplated by this Agreement; each and all of the covenants to be performed by Buyer, Oxy-Chem and OPC on or prior to the Closing pursuant to the terms of this Agreement shall have been duly performed in all material respects; and each of Buyer, Oxy-Chem and OPC shall deliver a certificate executed by an executive

79

**OCC 032996**

**Confidential**

**OCCNJ0026440**

ALCD-PUBCOM_0002318

officer of each of Buyer, Oxy-Chem and OPC, addressed to Seller and dated the Closing Date, certifying to all of the foregoing.

Section 7.03  No Injunction.  No judgment, order or decree shall have been rendered in any Litigation which has the effect of enjoining the consummation of the transactions contemplated by this Agreement.

Section 7.04  Approvals and Consents.  All applicable waiting periods under the HSR Act shall have expired or been terminated.  The consents and approvals identified (by marking with an appropriate mark and footnote) as being required on Schedules 2.06, 2.11, 2.12 and 2.16, if any, to permit the consummation of the transactions contemplated hereby (including, without limitation, the ECRA ACO identified in Section 8.19 hereof and the Environmental Permits required, if any, to be reissued or transferred prior to the Closing Date), shall have been obtained.

Section 7.05  Cogeneration Purchase Agreement Closing.  The Cogen Closing shall have occurred immediately prior to or simultaneously with the Closing.

80

OCC 032997

Confidential

OCCNJ0026441
ALCD-PUBCOM_0002319

ARTICLE VIII

Covenants

Section 8.01  Compliance with HSR Act.

(a)  Each of Seller and OPC has hereto-
fore made all initial filings with the appropriate Gov-
ernmental Agencies of the information and documents re-
quired by the HSR Act with respect to the transactions
contemplated by this Agreement.  Each of Seller and OPC
shall (i) use its best efforts to comply as expeditiously
as possible with all lawful requests of the Governmental
Agencies for additional information and documents pursu-
ant to the HSR Act, (ii) not (A) extend any waiting peri-
od under the HSR Act or (B) enter into any agreement with
any Governmental Agency not to consummate the transac-
tions contemplated by this Agreement, except with the
prior consent of both Seller and OPC, and (iii) cooperate
with each other and use its best efforts to cause the
lifting or removal of any temporary restraining order or
preliminary injunction which may be entered in connection
with the transactions contemplated by this Agreement,
including the execution, delivery and performance by the
appropriate Entity of such divestiture agreements or
other actions, as the case may be, with regard to the
Chemicals Business as may be necessary to secure the

81

OCC 032998

Confidential

OCCNJ0026442

ALCD-PUBCOM_0002320

expiration or termination of the applicable waiting periods under the HSR Act or the removal, dissolution, stay or dismissal of any injunction, restraining order or other judicial or administrative order which prevents the consummation of the transactions contemplated hereby or requires as a condition thereto that all or any part of the business and assets of DSCC be held separate.

(b)    Notwithstanding anything to the contrary contained in this Agreement:  (i) none of Seller, Buyer, Oxy-Chem, DSCC or OPC shall be required pursuant to this Section 8.01 or otherwise (A) to accept any such hold-separate order as a condition to the consummation of such transactions, or (B) to agree to any divestiture; and (ii) nothing contained in this Section 8.01 shall limit the respective rights of the parties to terminate this Agreement pursuant to Section 11.01, or limit or otherwise affect the respective conditions to the obligations of the parties set forth in Articles VI and VII hereof.

Section 8.02   Injunctions.  In addition to actions required by Section 8.01 and 8.12 hereof, if any federal, state, local or foreign court having jurisdiction over Seller, any DSCC Company, Buyer, Oxy-Chem or OPC, issues or otherwise promulgates any restraining

82

OCC 032999

Confidential

OCCNJ0026443

ALCD-PUBCOM_0002321

order, injunction, decree or similar order (other than as

contemplated by Section 8.01 hereof) which prohibits the

consummation of any of the transactions contemplated

hereby, the parties hereto shall use their respective

best efforts to have such restraining order, injunction,

decree or similar order dissolved or otherwise eliminated

as promptly as possible and to pursue the underlying

Litigation diligently and in good faith.  Notwithstanding

anything to the contrary contained in this Agreement, .

nothing contained in this Section 8.02 shall limit the

respective rights of the parties to terminate this Agree-

ment pursuant to Section 11.01 or shall limit or other-

wise affect the respective conditions to the obligations

of the parties set forth in Articles VI and VII hereof.

Section 8.03  <u>Access to Information</u>.

(a)  Between the date of this Agreement

and the Closing Date, Seller shall, and shall cause or,

in the case of less than majority owned Entities, shall

use its best efforts to cause, each DSCC Company, upon

reasonable request by Buyer, to (i) provide Buyer, OPC

and Oxy-Chem and their respective accountants, counsel

and other authorized representatives full access, during

normal business hours and under reasonable circumstances,

to any and all premises, properties, Contracts, commit-

83

OCC 033000

Confidential

OCCNJ0026444

ALCD-PUBCOM_0002322

ments, books, records and other information (including
Tax returns filed and those in preparation) of each DSCC
Company and (ii) cause their officers to furnish to Buy-
er, OPC and Oxy-Chem and their respective authorized
representatives any and all financial, technical and
operating data and other information pertaining to the
business of each DSCC Company, as Buyer, OPC or Oxy-Chem
shall from time to time reasonably request; provided,
however, that (A) such access may be limited to the loca-
tion at which the relevant information is normally main-
tained and shall not unreasonably interfere with the
businesses of Seller or any DSCC Company, (B) such access
shall be only with prior notice to Seller, (C) in the
reasonable opinion of Seller, the providing of such in-
formation will not cause Seller to be in violation of any
Law, and (D) no classified or technical information, nor
information subject to a requirement of confidentiality
on the part of Seller or any DSCC Company, shall be pro-
vided to Buyer, OPC or Oxy-Chem except in a manner which
complies with applicable Laws or agreements.  Notwith-
standing the foregoing, no Diamond Company may withhold
any information pursuant to Sections 8.03(a)(C) and (D)
which would be materially adverse to the business, finan-
cial condition or results of operations of the Chemicals

84

OCC 033001

Confidential

Business or of any Business Unit.  Information withheld
pursuant to Sections 8.03(a)(C) and (D) is described by
category in Schedule 8.03.

       (b)  Each of the parties hereto will,
and will instruct its affiliates, employees, agents and
representatives to, hold in strict confidence, all Confi-
dential Information (as hereinafter defined), and not
disclose the same to any person without the prior consent
of the other parties hereto, unless compelled to disclose
any such Confidential Information by judicial or adminis-
trative process or, in a written opinion of its counsel a
copy of which is delivered to the other parties hereto,
by other requirements of any Law, except to the extent
contained in a private offering memorandum circulated in
accordance with the customary practices of Drexel Burnham
Lambert Incorporated as may be reasonably required in
connection with obtaining any of the financing required
to consummate the transactions contemplated by the Cogen-
eration Purchase Agreement.  Upon consummation of the
Closing, any Confidential Information relating to the
Chemicals Business may be retained by Buyer, OPC and Oxy-
Chem and may be used as they deem fit.  If this Agreement
is terminated, each party hereto shall promptly return to
the other parties hereto all documents (including all

85

OCC 033002

Confidential

copies thereof) furnished to such other parties and their
respective affiliates, employees, agents and representa-
tives in connection with the transactions contemplated by
this Agreement containing such Confidential Information.
For purposes of this Agreement, "Confidential Informa-
tion" shall mean all information of any kind concerning
any party hereto, wherever obtained, except information
(i) ascertainable or obtained from public or published
information, (ii) received from a third party not known
to the party receiving such information to be under an
obligation to any other party hereto to keep such infor-
mation confidential, (iii) which is or becomes known to
the public (other than through a breach of this Agree-
ment), (iv) which the party in possession of such infor-
mation can demonstrate was in its possession prior to
disclosure thereof to such party in connection with this
Agreement or the Related Documents and the consummation
of the transactions contemplated hereby and thereby, or
(v) which the party in possession of such information can
demonstrate was independently developed by it.

86

OCC 033003

OCCNJ0026447

ALCD-PUBCOM_0002325

Section 8.04  No Extraordinary Actions by Sell-
er.  In each case except as (a) otherwise contemplated by
Sections 2.09, 8.07, 8.08, 8.09, 8.17 and 8.20 hereof,
(b) set forth on Schedule 8.04, (c) otherwise consented
to or approved by Buyer in writing, or (d) required by
this Agreement or the Related Documents, from the date
hereof until the Closing, Seller shall (but only with
respect to paragraphs (vi), (ix) and (x) set forth be-
low), and shall cause or, in the case of less than major-
ity owned Entities, shall use its best efforts to cause,
each DSCC Company to:

(i)  conduct its business,
operations, activities and practices only in
the usual and ordinary course of business and
consistent with past practice and use its best
efforts to (A) preserve intact its present
business organization, (B) keep available the
services of its present management and employ-
ees, and (C) preserve its relationships with
customers, suppliers and others having business
dealings with it so that its goodwill and ongo-
ing business shall not be materially impaired;

87

OCC 033004

Confidential

OCCNJ0026448
ALCD-PUBCOM_0002326

(ii)  with respect to each DSCC Company, not amend its Certificate of Incorporation or By-laws, or comparable governing documents as in effect on the date hereof;

(iii)  with respect to DSCC, not declare, pay or set aside for payment any dividends on or make other distributions in respect of its capital stock, except for cash dividends which do not reduce Net Working Capital below $90 million as of the Closing Date and except as a result of Seller's cash management program applicable to the Chemicals Business;

(iv)  not, directly or indirectly, sell, pledge, dispose of or encumber any of its material assets (including, without limitation, forgiving or transferring any indebtedness owed to DSCC or any Significant Subsidiary or any claims held by DSCC or any Significant Subsidiary);

(v)  not, directly or indirectly, issue, grant or sell, or authorize or propose the issuance of, or split, combine, reclassify or redeem, purchase or otherwise

88

OCC 033005

OCCNJ0026449

ALCD-PUBCOM_0002327

acquire or propose the purchase of, any shares
of any class of its capital stock or issue any
securities convertible into, or rights to sub-
scribe to, or warrants or options (including
employee stock options) to acquire, or enter
into any contract with respect to the issuance
of, any such shares or other convertible secu-
rities, or make any other changes in its equity
capital structure;

   (vi) except as contemplated
by the Cogeneration Purchase Agreement, not,
directly or indirectly, solicit or initiate
discussions or negotiations with, or provide
any information to, any Entity (other than
Buyer, OPC, Oxy-Chem or any affiliate or asso-
ciate of any of the foregoing or an officer,
partner, employee or other authorized represen-
tative of any of the foregoing or such affili-
ate or associate) ("Third Party") concerning
any proposed merger, reorganization, sale of a
substantial portion of assets, sale of any
shares of capital stock or other equity inter-
est or other business combination or similar
transaction to which any DSCC Company would be

89

OCC 033006

Confidential

a party and involving a substantial part of the
Chemicals Business (all such transactions being
referred to herein as "Acquisition Transac-
tions") and instruct its officers, employees,
representatives and agents that (A) no such
person shall, directly or indirectly, solicit
or initiate any discussions or negotiations
with, or provide any information to, a Third
Party concerning an Acquisition Transaction and
(B) any such person shall promptly communicate
to Seller (and Seller shall, in turn, communi-
cate to Buyer and OPC) the terms of any propos-
al which such person may receive or learn of in
respect of an Acquisition Transaction;

   (vii)  not acquire or agree to
acquire by merging or consolidating with or
into, purchasing substantially all of the as-
sets or stock of, or otherwise, any business or
any corporation, partnership, association or
other business organization or division there-
of;

   (viii)  not (A) make capital
expenditures or legally binding commitments
with respect thereto, except for capital expen-

90

OCC 033007

Confidential

OCCNJ0026451

ALCD-PUBCOM_0002329

ditures committed to prior to the date of this
Agreement which have been previously disclosed
to Buyer in writing and except as contemplated
by the 1986 Capital Budget, a copy of which is
set forth in Schedule 8.04 or (B) incur, assume
or guarantee (x) any long-term indebtedness (as
hereinafter defined) or (y) except in the ordi-
nary course of business and consistent with
past practice, any short-term indebtedness (as
hereinafter defined).  For purposes of this
Agreement, "long-term indebtedness" shall mean
any indebtedness for money borrowed maturing
more than one year after the date of the incur-
rence, assumption or guarantee thereof, and
"short-term indebtedness" shall mean any in-
debtedness for money borrowed maturing one year
or less after the date of the incurrence, as-
sumption or guarantee thereof (including, with-
out limitation, the current portion of long-
term indebtedness) and which is included in Net
Working Capital;

(ix)  not adopt or amend in
any material respect any collective bargaining,
employee pension, profit-sharing, retirement,

91

OCC 033008

Confidential

OCCNJ0026452

ALCD-PUBCOM_0002330

insurance, incentive compensation, severance, vacation or other plan, agreement, trust, fund or written policy of general application to categories of Employees except as contemplated by Article IV hereof; or

       (x)  enter into a legally binding commitment to do any of the matters referred to in subparagraphs (ii) through (ix) above.

  Section 8.05  <u>Best Efforts</u>.

      (a)  Upon the terms and subject to the conditions hereof, each of the parties hereto agrees to take or cause to be taken, all action and to do, or cause to be done, all things necessary, proper or advisable to consummate and make effective the transactions contemplated by this Agreement and the Related Documents.

      (b)  Except as otherwise expressly provided for in this Agreement, (i) each of Buyer, Oxy-Chem and Seller shall, and shall cause or, in the case of less than majority owned Entities, shall use its best efforts to cause, each of their respective subsidiaries to, use its and their best efforts to obtain at the earliest practicable date, whether before or after the Closing Date, all consents required to be obtained by it for the

92

OCC 033009

Confidential

OCCNJ0026453

ALCD-PUBCOM_0002331

consummation of the transactions contemplated by this
Agreement and the Related Documents, and (ii) Seller
shall, and shall cause or, in the case of less than ma-
jority owned Entities, shall use its best efforts to
cause, each of the appropriate other Diamond Companies
to, use its and their best efforts to obtain, whether
before or after the Closing Date, any amendments, nova-
tions, releases, waivers, consents or approvals with
respect to all outstanding debt instruments, guarantees
and other Contracts or Leases of Seller or any DSCC Com-
pany which are necessary (A) to cure any defaults there-
under existing immediately prior to the Closing Date and
(B) for the consummation of the transactions contemplated
by this Agreement and the Related Documents; provided,
however, that (x) in obtaining any such amendments, nova-
tions, releases, waivers, consents or approvals, no party
hereto shall, or shall permit any of its subsidiaries to,
agree to any amendment of any such instrument which im-
poses any obligation or liability on another party with-
out the prior written consent of such other party, and
(y) except as otherwise expressly provided by this Agree-
ment, no party hereto shall be obligated to execute any
guarantees or undertakings or otherwise incur or assume
any liability in connection with obtaining any such re-

93

OCC 033010

Confidential

OCCNJ0026454

ALCD-PUBCOM_0002332

lease, novation, approval, consent, authorization or waiver.

(c)  Each of Buyer, OPC, Oxy-Chem and Seller shall provide such information and cooperate fully with each other party hereto and each Diamond Company in making such applications, filings, and other submissions which may be required or reasonably necessary in order to obtain all approvals, consents, authorizations and waivers as may be required from any Governmental Agency and others in connection with the transactions contemplated by this Agreement and the Related Documents.

(d)  Except as otherwise expressly provided for in this Agreement, each of Buyer, OPC, Oxy-Chem and Seller shall promptly take all actions necessary to make each filing, including without limitation, any supplemental filing, which any of them may be required to make with any Governmental Agency as a condition to or consequence of the consummation of the transactions contemplated by this Agreement or any Related Document, and each of the other parties hereto shall use its best efforts to assist in making such required filings.

(e)  Subject to the terms and conditions hereof, Oxy-Chem shall cause Buyer to perform the obliga-

94

OCC 033011

OCCNJ0026455
ALCD-PUBCOM_0002333

tions set forth in this Agreement to be performed by Buyer at or prior to the Closing.

Section 8.06  <u>Notice of Failure of Condition</u>. Each party hereto shall as promptly as reasonably practicable notify the others in writing of the occurrence of any event of which it obtains knowledge which will result in the failure to satisfy the conditions specified in Article VI hereof in the case of events relating to Seller and Article VII hereof in the case of events relating to Buyer, Oxy-Chem or OPC.

Section 8.07  <u>Intercompany Accounts</u>.  Immediately prior to the Closing, Seller shall, and shall cause or, in the case of less than majority owned Entities, shall use its best efforts to cause, each DSCC Company to, settle all intercompany accounts as of the Closing Date between or among each of the Diamond Companies (other than the DSCC Companies) and each of the DSCC Companies by netting intercompany receivable accounts against intercompany payable accounts and closing the net amount to the equity account, with the result that all of the liabilities and obligations reflected in such intercompany receivable and payable accounts as of the Closing Date shall be fully discharged and satisfied without any actual disbursement of funds and shall be disregarded in

95

OCC 033012

Confidential

the computation of Net Working Capital.  Goods and ser-
vices sold or furnished by a Diamond Company to a DSCC
Company, or vice versa, after the Closing Date shall not
be affected by this Section 8.07.

Section 8.08  Assumed Obligations.

(a)  Between the date of this Agreement
and the Closing, Seller shall, and shall cause or, in the
case of less than majority owned Entities, shall use its
best efforts to cause, each of the other Diamond Compa-
nies to, be and remain in compliance with its and their
respective obligations under and related to all of the
Assumed Obligations and, following the Closing, Seller
shall and shall cause or, in the case of less than major-
ity owned Entities, shall use its best efforts to cause,
each of the other Diamond Companies to remain in compli-
ance with its and their respective obligations under and
related to each of the Assumed Obligations to the extent
any of them has any obligations thereon or relating
thereto and under the Assumption Instruments (as herein-
after defined).

(b)  On or prior to the Closing Date,
Seller shall, or shall cause the appropriate Diamond
Company to, and shall cause DSCC to, execute an instru-
ment or instruments of assignment and assumption substan-

96

OCC 033013

Confidential

tially in the form or forms set forth in Exhibit 8.08 (the "Assumption Instruments").

(c)  From and after the Closing Date, Oxy-Chem shall cause DSCC to remain in compliance with all of its obligations under the Assumed Obligations and the Assumption Instruments, and if any direct or indirect subsidiary of OPC becomes a Pass-Through Purchaser (as defined in Section 9.05 hereof) of any Business Unit, Oxy-Chem shall cause such subsidiary to assume and remain in compliance with all of DSCC's obligations under such of the Assumed Obligations and the Assumption Instruments that pertain to such Business Unit.

(d)  Each of Buyer and Oxy-Chem shall cooperate fully with Seller, whether before or after the Closing Date, in Seller's efforts to obtain any amendments, novations, releases, waivers, consents or approvals necessary to make DSCC the primary obligor on each of the Assumed Obligations and to have each of the Diamond Companies released from any obligations and liabilities under the Assumed Obligations; provided, however, that, except as otherwise expressly set forth in this Agreement, neither of Buyer or Oxy-Chem shall be obligated to execute any guarantees or undertakings or otherwise incur or assume any liability in connection with obtaining any

97

OCC 033014

Confidential

OCCNJ0026458

ALCD-PUBCOM_0002336

such amendments, novations, releases, waivers, consents or approvals.

Section 8.09  <u>Transfer of Property</u>.  Prior to the Closing,

(a)  Seller shall, all without any adverse financial consequences to the Chemicals Business as reflected in the Financial Statements:  (i) cause the appropriate DSCC Company to transfer to Seller or to the subsidiaries listed on Schedule 8.09(a) ("Seller's Designee"), and Seller or Seller's Designee shall accept and acquire from such DSCC Company the properties, securities, assets, rights and entitlements owned by the DSCC Companies and set forth in Schedule 8.09(a) (collectively, the "Excluded Assets"), (ii) cause the appropriate DSCC Company to assign to Seller or Seller's Designee, and Seller or Seller's Designee shall assume from the appropriate DSCC Company, all obligations and liabilities associated with the Excluded Assets (the "Excluded Liabilities"), and (iii) cause the appropriate DSCC Company to enter into the agreements and take the other actions described in Schedule 8.09(b).  Notwithstanding any other provision hereof, the purchase price payable to DSCC pursuant to the Cogeneration Purchase Agreement shall be

98

OCC 033015

Confidential

OCCNJ0026459

ALCD-PUBCOM_0002337

paid to Seller as a dividend to Seller as the sole stock-
holder of DSCC immediately prior to the Closing.

(b)   Notwithstanding anything to the
contrary contained in Section 8.09(a) hereof, if any
consents, licenses or permits are required to so transfer
any Excluded Asset and such consents, licenses or permits
have not been obtained on or prior to the Closing Date,
then the legal title to such Excluded Asset shall be
retained by the appropriate DSCC Company for the account
of Seller, and Seller shall cause the business operation
or activity of such Excluded Asset, to the extent lawful,
to be continued and carried out by a Diamond Company with
all costs, expenses, liabilities, Taxes and other finan-
cial obligations and operating profits or losses being
for the account of, and payable by or to (as the case may
be), such Diamond Company until all such required con-
sents, licenses and permits are obtained, at which time
Buyer shall cause such DSCC Company to transfer, without
additional consideration and at Seller's cost and ex-
pense, such Excluded Asset to Seller or Seller's Desig-
nee, along with any amounts with respect to such Excluded
Assets held for the account of such Diamond Company which
had not been previously paid to such Diamond Company or
upon payment of any amounts with respect to such Excluded

99

OCC 033016

Confidential

Assets owed by Seller (as the case may be), it being
understood that Seller shall be fully responsible for the
performance by any such Diamond Company of its obliga-
tions hereunder.  If any co-owner of any Excluded Asset
purchases the interest therein of any DSCC Company, the
net purchase price paid to the DSCC Company (less any and
all costs and expenses incurred by it related thereto)
shall be paid to Seller.  In connection with any such
transfer of the Excluded Assets and Excluded Liabilities,
Seller or Seller's Designee shall, and Seller shall cause
the appropriate subsidiary (including DSCC prior to the
Closing Date) to execute an instrument of assignment and
assumption in a form reasonably acceptable to Buyer.

 Section 8.10 <u>Schedules and Exhibits</u>.  As
promptly as practical following the end of each calendar
month after the date of this Agreement and immediately
prior to the Closing, Seller shall supplement or amend
all Schedules and Exhibits to this Agreement with respect
to any matter hereafter arising which, if existing or
occurring at the date of this Agreement, would have been
required to be set forth or described in a Schedule or
Exhibit to this Agreement.  Any such supplement or amend-
ment of any Schedule or Exhibit to this Agreement made
pursuant to this Section 8.10 which purports to correct

<div align="center">100</div>

<div align="center">OCC 033017</div>

**Confidential**

<div align="right">OCCNJ0026461

ALCD-PUBCOM_0002339</div>

any prior representation or cure the breach of any prior warranty made in this Agreement shall, but only if consented to in writing by Buyer and OPC, be deemed to correct such representation and cure the breach of such warranty for purposes of Section 6.02 and Article IX of this Agreement.

Section 8.11  Audited Financial Statements. Prior to the Closing Date, Seller shall deliver to Buyer and OPC (i) audited pro forma consolidated balance sheets of the Chemicals Business as at December 31, 1984 and December 31, 1985 (the "Audited Balance Sheets"), (ii) as to the fiscal year ended December 31, 1985, the related audited pro forma consolidated statements of operations, and changes in financial position for the year then ended (together with the December 31, 1985 Audited Balance Sheet, the "Audited 1985 Financial Statements"), all audited by Price Waterhouse, in accordance with generally accepted auditing standards, together with their unqualified opinion on the Audited 1985 Financial Statements other than qualifications referred to in Schedule 8.11, and (iii) unaudited consolidated pro forma balance sheets of the Chemicals Business for each fiscal quarter beginning with the fiscal quarter ended on March 31, 1986 through the Closing Date and the related unaudited state-

101

OCC 033018

**OCCNJ0026462**

ALCD-PUBCOM_0002340

ments of operations, and changes in financial position
for the fiscal quarters then ended.  The Audited Balance
Sheets and the Audited 1985 Financial Statements shall be
prepared in conformity with GAAP.  The unaudited finan-
cial statements referred to in this Section 8.11 shall be
prepared in conformity with the standards applicable to
Interim Financial Statements set forth in Section 2.08
hereof.  Seller shall also deliver to Buyer as promptly
as practicable following the end of each calendar month
following the date hereof copies of the internal state-
ments of monthly results prepared for DSCC which shall be
derived from the books and records of DSCC and prepared
in the ordinary course of the business of DSCC.

Section 8.12  Post-Closing Antitrust Litiga-
tion.  If, following the Closing, (a) the consummation of
the transactions contemplated by this Agreement or by any
of the Related Documents is challenged, or (b) the trans-
fer subsequent to the Closing by Buyer of any of the
securities, business or assets of Buyer or any DSCC Com-
pany to (i) OPC or any subsidiary or affiliate of OPC or
(ii) any third party (with respect to which Seller has no
independent liability) is challenged, in each case on
antitrust grounds, through Litigation in which any Dia-
mond Company is named as a party defendant, the parties

102

OCC 033019

Confidential

OCCNJ0026463

ALCD-PUBCOM_0002341

hereto agree to contest diligently such Litigation through the available levels of appeal up to the United States Court of Appeals (or, if such Litigation is being maintained by a party other than the Federal Trade Commission, the comparable level of appeal); provided, however, that (A) OPC or its designated subsidiary shall assume the lead role in any such Litigation and Oxy-Chem shall bear all reasonable expenses thereof incurred by any Diamond Company, (B) if a Governmental Agency is the complaining party in such Litigation, Oxy-Chem shall bear all liabilities resulting therefrom and (C) if a party other than a Governmental Agency is the complaining party in such Litigation, each party will bear its own liabilities resulting therefrom.

Section 8.13    Insurance.

(a)  Seller shall use its best efforts to renew the Current Policies (or to procure replacement policies and binders of substantially the same cost and nature) and maintain all such policies and binders in full force and effect at all times up to and including the Closing Date and to pay all premiums, deductibles and retro-adjustment billings with respect thereto covering all periods, and ensuring coverage of the DSCC Companies, up to and including the Closing Date.  Seller shall re-

103

OCC 033020

Confidential

OCCNJ0026464

ALCD-PUBCOM_0002342

tain custody of all insurance policies which provide
coverage for the Diamond Companies (or separate coverage
for any one or more of the DSCC Companies) for all peri-
ods up to and including the Closing Date.  Prior to the
Closing, Seller shall furnish to Buyer microfilm copies
of all Existing Policies (as hereinafter defined) located
prior to Closing and, following the Closing, shall fur-
nish to Buyer promptly microfilm copies of all Existing
Policies located after the Closing.  For purposes of this
Agreement, "Existing Policies" shall mean (i) those poli-
cies and binders providing coverage for any one or more
of the Diamond Companies listed on Schedule 2.18 and (ii)
other of such policies and binders as are obtained or
located by Seller or any DSCC Company after the date
hereof.  Subject to the last sentence of this Section
8.13(a), Seller shall, with respect to the Existing Poli-
cies, provide continuing policy administration, pay all
policy premiums, deductibles and retro-adjustment bill-
ings and shall maintain policy endorsements and condi-
tions as in effect at the Closing.  Except as provided in
Section 8.14 hereof, DSCC shall be responsible for filing
and pursuing claims under any Existing Policy with re-
spect to any matter which becomes or remains the respon-
sibility of DSCC, Buyer, OPC, Oxy-Chem or any Pass-

104

OCC 033021

Through Purchaser pursuant to this Agreement after the Closing. DSCC shall promptly deliver to Seller a copy of any notice or other document sent to, or received from, any of the insurance carriers providing coverage under the Existing Policies (the "Current Carriers") with respect to any such claim. Each of Seller and each of the DSCC Companies shall each bear and be responsible for any deductible or retention relating to any claims for which it is responsible for indemnification under this Agreement; and DSCC shall promptly reimburse Seller for any amount paid to any Current Carrier by Seller for the account of any DSCC Company with its approval (which shall not be unreasonably withheld), in connection with any such deductible or retention.

(b)  Whenever Seller becomes aware that a claim against any Current Carrier under any of the Existing Policies exists, with respect to a matter for which Seller has liability directly or pursuant to the provisions of this Agreement, then Seller shall be entitled to pursue such claim in any reasonable manner which it deems expedient (including Litigation) in the name of any one or more of the parties, including any DSCC Company, which are provided coverage under such Existing Policy ("Insured Parties"), as Seller may elect; provided,

105

OCC 033022

OCCNJ0026466
ALCD-PUBCOM_0002344

however, that Seller shall keep all of the Insured Par-
ties on whose behalf such claim is being pursued reason-
ably apprised on an ongoing basis of the status of such
claim. Any amount paid by any such Current Carrier (as a
result of any claim filed by any Insured Party whether
before or after the Closing Date), to any Entity other
than the Entity responsible under the provisions of this
Agreement for the liability to which the claim relates,
shall be paid over promptly by the recipient of such
amount to the Entity responsible therefor, or as to mat-
ters contemplated by Article X hereof, shall be distrib-
uted to the parties in accordance therewith.

(c) Buyer shall, and shall cause DSCC
to, (i) furnish Seller a power of attorney in substan-
tially the form of Exhibit 8.13 at the Closing, and
thereafter each DSCC Company shall provide Seller such
other powers of attorney or authorizations as Seller may
reasonably request to permit Seller to perform all acts
and to execute all documents relating to the maintenance
and administration of the Existing Policies and the pros-
ecution of such claims and Litigation, (ii) furnish any
information and documents required for this purpose, and
(iii) cooperate fully and promptly (at Seller's expense)
with Seller in the prosecution of any claims and Litiga-

106

OCC 033023

Confidential

OCCNJ0026467

ALCD-PUBCOM_0002345

tion pursued by Seller including, without limitation, the provision of witnesses as necessary or appropriate. DSCC shall, and shall cause or, in the case of less than majority owned Entities, shall use its best efforts to cause, the appropriate DSCC Company upon request to assign to Seller the applicable claims under Existing Policies with respect to a matter for which Seller has liability directly or pursuant to the provisions of this Agreement.

(d) Seller shall (i) cooperate fully and promptly (at DSCC's expense) with DSCC, in the prosecution of any claims and Litigation pursued by DSCC including, without limitation, the provision of witnesses as necessary or appropriate, and Seller shall, upon request, assign to DSCC the applicable claims under Existing Policies with respect to a matter for which DSCC has liability directly or DSCC, Buyer, OPC, Oxy-Chem or any Pass-Through Purchaser has liability pursuant to the provisions of this Agreement or the Related Documents and (ii) furnish any information and documents required for this purpose.

107

OCC 033024

Confidential

OCCNJ0026468

ALCD-PUBCOM_0002346

Section 8.14  <u>Claims Against Current Carriers</u>.
Seller shall have the right, and DSCC shall cause or, in
the case of less than majority owned Entities, shall use
its best efforts to cause, the appropriate DSCC Company
to cooperate fully in the exercise of such right, to
continue or to settle pending Litigation or claims filed
against any of the Current Carriers prior to the Closing
(including, without limitation, <u>Diamond Shamrock Chemi-
cals Company vs. The Aetna Casualty and Surety Company</u>,
No. C-3939-84, now pending in the Superior Court of New
Jersey, Chancery Division, Morris County, New Jersey)
("Existing Claims") for the payment of amounts allegedly
due to any Diamond Company on account of losses suffered
by any Diamond Company as a result of its products or
damage to the environment or persons caused by the opera-
tion of any DSCC Company's production facilities prior to
the Closing Date.  As to claims which cover insurable
occurrences, events or accidents, both before and after
the Closing Date, Seller and DSCC shall cooperate and
exercise a right of joint control with respect to any
resulting Litigation.  Seller will keep Buyer apprised of
the status of all settlement negotiations as to Existing
Claims.  Any insurance proceeds paid in respect of the
matters contemplated by Article IX hereof shall be dis-

108

OCC 033025

Confidential

OCCNJ0026469
ALCD-PUBCOM_0002347

tributed to the Indemnifying Party (as defined in Article
IX) to the extent of the Indemnity Payment on account of
any Indemnifiable Loss (as defined in Article IX) paid by
such Indemnifying Party under and in accordance with
Article IX. Any such insurance proceeds paid in respect
of the Environmental Costs (as defined in Article X here-
of) shall be distributed to the parties under and in
accordance with Article X. From and after the Closing
Date, DSCC authorizes Seller to act in the name and on
behalf of DSCC and each other DSCC Company, in releasing
such Existing Claims; provided, however, that such re-
lease does not include an agreement to the termination of
further coverage under the Existing Policies in connec-
tion with any such settlement (other than in respect of
the Existing Claim to which the settlement relates or a
release which does not adversely affect a DSCC Company)
unless made with Buyer's approval, which approval shall
not be unreasonably withheld.

Section 8.15  <u>Replacement of Surety Bonds;</u>
<u>Guaranties; Letters of Credit; Comfort Letters</u>.  Schedule
8.15 sets forth a list of all outstanding performance and
surety bonds, letter of credit obligations, guarantees
and comfort letters issued by Seller and relating to the
Chemicals Business.  Buyer and Oxy-Chem each shall use

109

OCC 033026

OCCNJ0026470

ALCD-PUBCOM_0002348

its respective best efforts to obtain and have issued
replacements for each such bond, letter of credit obliga-
tion, guarantee and comfort letter, each of which shall
be substantially similar to that being so replaced and to
obtain any amendments, novations, releases, waivers,
consents or approvals necessary to release each of the
Diamond Companies (other than the DSCC Companies) there-
under.  If reasonably necessary in the circumstances, the
obligation of each of Buyer and Oxy-Chem to use its best
efforts shall include, without limitation, providing its
guarantee in consideration for the granting or obtaining
of any such amendments, novations, releases, waivers,
consents or approvals.  DSCC shall be responsible for any
costs or liabilities arising out of acts or omissions
attributable to any DSCC Company subsequent to the Clos-
ing Date with respect thereto until all bonds, letters of
credit, guarantees and comfort letters have been replaced
and all obligations thereunder have been released.

Section 8.16  Taxes

(a)  Seller shall have sole responsibil-
ity for, and shall pay or cause to be paid, all (i) Taxes
arising out of (A) the consummation of the transactions
contemplated by the Cogeneration Purchase Agreement,
except for any state and local transfer and excise taxes

110

OCC 033027

Confidential

("Transfer Taxes") incurred as a result of such consumma-
tion, which Transfer Taxes Buyer shall pay or cause to be
paid, (B) the transfers contemplated by Sections 8.09 and
8.17 hereof, (C) the deemed sale of the assets of the
DSCC Companies pursuant to an H-10 Election (as hereinaf-
ter defined), and (D) any other transaction permitted or
contemplated by this Agreement and the Related Documents
to which any Diamond Company is a party, and (ii) Taxes,
other than foreign Taxes which are dealt with under sub-
paragraph (c) of this Section 8.16, for which any DSCC
Company is liable (A) for periods ending with, or on the
Closing Date, or (B) with respect to the operations con-
ducted by, and the transactions of, any DSCC Company up
to and including the Closing Date.  Any payment made by
Seller under this Section 8.16 (a) shall be treated as a
reduction in the Purchase Price by Buyer and Seller,
unless such treatment is clearly contrary to the Law of
the applicable jurisdiction.

(b)  Buyer and Seller shall make a joint
election under Section 338(h)(10) of Code and the regula-
tions thereunder (the "Regulations") and any similar
state, local or other Law ("H-10 Election").  Pursuant to
the Regulations, Buyer and Seller shall jointly execute
and file IRS Form 8023 and the separate H-10 Election

111

OCC 033029

Confidential

OCCNJ0026472
ALCD-PUBCOM_0002350

statement pursuant to Section 1.338(h)(10)-1T(d)(6) of
the Regulations, and shall take any and all other action
necessary to effectuate such election within the time
prescribed by such Section 338(h)(10) and the Regula-
tions. Pursuant to such H-10 Election, Seller shall
include the deemed purchase and sale of the assets of
DSCC and "affiliated subsidiaries" (as defined in Section
1504(a) of the Code) in Seller's consolidated federal
income tax return for 1986. There shall be attached to
IRS Form 8023 a regular exclusion election for excludible
foreign target affiliates pursuant to Section 1.338-
5T(c)(2)(v) of the Regulations. Seller shall elect the
MADSP formula for determining the price at which the
assets of DSCC and its affiliated subsidiaries are sold
pursuant to Section 1.338(h)(10)-1T(f)(2) of the Regula-
tions. Seller shall deliver to Buyer within 30 calendar
days after the Closing (i) a fully executed Form 8023,
(ii) a separate H-10 Election statement and (iii) any
other documents necessary in order to effectuate the
elections referred to in this Section 8.16(b) or reason-
ably requested by Buyer, OPC or Oxy-Chem in connection
therewith, and take any and all action necessary to ef-
fectuate such elections or reasonably requested by Buyer,
OPC or Oxy-Chem in connection therewith (including, with-

112

OCC 033030

Confidential

OCCNJ0026473

ALCD-PUBCOM_0002351

out limitation, executing, delivering or filing any docu-
ments, whether before or after the Closing), in a timely
and reasonably appropriate manner.

        (c)  Seller shall prepare and file all
federal, state or local Tax reports and returns for Tax
periods applicable to the DSCC Companies other than the
Equity Companies up to and through the Closing Date, and
Seller shall use its best efforts to ensure the prepara-
tion and filing of such returns for the Equity Companies.
In the event the Tax laws of any jurisdiction prohibit
Seller from  filing any such return for a Tax period
ending at the close of business on the Closing Date,
Seller shall assist Buyer, DSCC, OPC or Oxy-Chem, as
appropriate, in preparing returns which include periods
prior to the Closing Date and Seller shall promptly pay
its share of any unpaid federal, state and local Taxes
for such periods within ten calendar days of receipt of
written notice from Buyer or OPC.  Buyer shall, or shall
cause the appropriate foreign Subsidiaries of DSCC to,
prepare and file all foreign Tax returns or reports for
Tax periods that include the Closing Date or periods
prior to the Closing Date and that have not been filed as
of the Closing Date.  In the event the accrued liability
for foreign Taxes included in the computation of Net

113

OCC 033031

Confidential

Working Capital is less than the foreign Taxes due in the aggregate for periods up to and through the Closing Date, and with respect to the operations conducted by, and the transactions of, any such Subsidiary up to and including the Closing Date, then Seller shall promptly pay any excess of foreign Taxes due over such accrued liability for such periods within 10 calendar days of receipt of written notice from Buyer or OPC. Taxes based on the ownership of property (i.e., property taxes, franchise taxes, business license taxes) shall be prorated through the Closing Date. All other Taxes for periods including the Closing Date shall be fairly apportioned.

(d) Any overpayments of federal, state or local Taxes by any DSCC Company for periods ending on or before the Closing Date (including refunds, estimated Taxes and prepaid Taxes paid by Seller or any such DSCC Company) shall be paid over to Seller by OPC, Oxy-Chem, Buyer or the appropriate DSCC Company promptly and in any event within ten calendar days after notice from Seller. Seller shall have the right to control audits of any DSCC Company that is a majority owned Subsidiary of DSCC by Taxing authorities with respect to periods ending on or prior to the Closing Date and Buyer shall have the right to participate in any such audit. Seller shall have the

114

OCC 033032

**OCCNJ0026475**
ALCD-PUBCOM_0002353

right to participate in any tax audit of any DSCC Company
that is a majority owned Subsidiary of DSCC with respect
to periods ending after the Closing Date, but reflecting
Taxes levied on  transactions occurring prior to the
Closing  Date or ownership of property prior to the Clos-
ing Date, and any issues raised with respect to items
occurring prior to the Closing Date in such audits shall
be litigated or settled by Seller with the consent of
OPC, which consent shall not be unreasonably withheld.

(e)  The allocation of the Purchase
Price shall be as set forth in Schedule 8.16 and for all
purposes the parties hereto shall treat the transactions
contemplated hereby in a manner consistent with such
allocation.

(f)  Seller shall indemnify and hold
harmless each of Buyer, each DSCC Company, Oxy-Chem, OPC
and each member of the "affiliated  group" (within the
meaning of Section 1504 of the Code) of which OPC is the
common parent from any and all claims, demands or liabil-
ity for payment of any of the Taxes described in or con-
templated by Sections 8.16(a), (b) and (c) hereof as
being the responsibility of Seller and from any Taxes
imposed on Buyer as a result of its receipt of any pay-
ments from the Seller pursuant to this Section 8.16.

115

OCC 033033

**Confidential**

Oxy-Chem shall indemnify each of Seller and each member
of Seller's "affiliated group" from and against all Taxes
described in Section 8.16(d) hereof as being the respon-
sibility of OPC, Oxy-Chem, Buyer or the appropriate DSCC
Company, as the case may be.

     (g)  In connection with (i) the prepara-
tion of any Tax returns required to be filed by Seller or
Buyer on behalf of each DSCC Company and (ii) any audit
examinations of each DSCC Company by any governmental
taxing authority, Seller, each DSCC Company, Buyer, OPC
and Oxy-Chem will cooperate fully with each other, in-
cluding but not limited to the furnishing or making
available of records, books of account, powers of attor-
ney or other materials reasonably necessary for the prep-
aration of returns or defense against the assertion of
any taxing authority as to the imposition of any Taxes
for such periods.

     (h)  All the obligations and liabilities
of DSCC or Seller under that certain agreement dated as
of November 9, 1981 (the "Tax Lease") between Convent
Chemical Corporation, a New York corporation ("Convent"),
and International Business Machines Corporation, a New
York corporation ("IBM"), to which DSCC and Seller are
subject by virtue of that certain Consent and Indemnifi-

116

OCC 033034

cation Agreement dated as of November 27, 1985 by and among IBM, Convent, The B.F. Goodrich Company, a New York corporation ("BFG"), DSCC and Seller shall remain the obligations and liabilities of Seller to the extent that any claim under any such obligation or liability arises under or is attributable to any facts or circumstances related to, or any act or omission of (i) BFG, (ii) Seller, including, without limitation, the inaccuracy or insufficiency for its intended purpose of the Transferee's Statement (as hereinafter defined) or (iii) any DSCC Company, in each case at any time prior to the Closing Date. Within ten calendar days after receipt of the Transferee's Statement from DSCC pursuant to this Section 8.16(h), Seller shall (A) furnish to the tax lessor named in the Tax Lease the appropriate Transferee's Statement theretofore executed by DSCC as transferee, and (B) provide evidence to DSCC that such action has been taken by Seller in a timely manner. Upon the Closing, DSCC will take title to any assets described in the Tax Lease subject to the obligations and liabilities of the Tax Lease to the extent that any claim under any such obligations and liabilities arises under or is attributable to any facts or circumstances related to, or any act or omission of, any DSCC Company occurring after the Closing Date.

117

OCC 033035

**Confidential**

DSCC shall (x) within 30 calendar days after the Closing, complete, execute and deliver to Seller, for furnishing to the tax lessor pursuant to this Section 8.16(h) the forms (the "Transferee's Statements") included in Schedule 8.16, and (y) file the Transferee's Statements with the timely filed federal income tax return which includes DSCC for the taxable year in which the transfer contemplated by this Agreement occurs.

Section 8.17  Carbocloro and DS Chile.  The parties shall take the actions specified, if any, in Exhibits 1.06(a) and 1.06 (b) with respect to Carbocloro and DS Chile, respectively.

Section 8.18  Change and Use of Names.

(a)  As soon as reasonably practicable after the Closing, Buyer shall cause or, in the case of less than majority owned Entities, shall use its best efforts to cause, the charter documents of each DSCC Company to be amended to change the name of each DSCC Company to a name which does not include (i) the word "Shamrock" or (ii) the word "Diamond" unless used in combination with the word "Alkali," and Buyer shall cause or, in the case of less than majority owned Entities, shall use its best efforts to cause, each DSCC Company to cease using any written materials, including without

118

OCC 033036

Confidential

limitation, labels, packing materials, letterhead, adver-
tising materials and forms, which include (A) the word
"Shamrock", (B) the word "Diamond" unless used in combi-
nation with the word "Alkali" and (C) Seller's corporate
logotype, in the case of:

      (1)  Subsidiaries incorporated
in any United States jurisdiction, within 45
calendar days after the Closing Date;

      (2)  Subsidiaries incorporated
in foreign jurisdictions, within 120 calendar
days after the Closing Date; and

      (3)  Subsidiaries which are
partnerships, joint ventures or other entities,
within 120 calendar days after the Closing
Date, subject, however, to the agreements to
which they are subject;

provided, however, that the DSCC Companies may, without
modification, use inventory, product literature and sales
literature (but not including letterhead, business cards,
invoices or the like) in existence as of the Closing Date
until the earlier of the exhaustion of such materials or
a date six months from the Closing Date.

119

OCC 033037

Confidential

OCCNJ0026480
ALCD-PUBCOM_0002358

(b)   The DSCC Companies may use and, effective as of the Closing, Seller, on behalf of itself and the other Diamond Companies (other than the DSCC Companies), hereby assigns to DSCC, all rights they or any of them may have in the name "Diamond Alkali," the related corporate logotype previously used by the DSCC Companies and not now used by Seller, and all related trademarks, trade names and brand names.

Section 8.19   Compliance with ECRA.

(a)   With respect to the facilities located at Berry Avenue and Route 17N, Carlstadt, Bergen County, New Jersey; Essex and First Street, Harrison, Hudson County, New Jersey; 651 Tonnele Avenue, Jersey City, Hudson County, New Jersey; and 350 Mt. Kemble Avenue, Morris, Morris County, New Jersey (the "New Jersey Facilities"), DSCC has entered into the ECRA ACO with the New Jersey Department of Environmental Protection (the "DEP"), naming DSCC as the respondent, and has provided to the DEP, at Seller's expense, such financial assurances, if any, as were required by the ACO.  All costs and expenses incurred in connection with the ACO by DSCC following the Closing Date shall be deemed Environmental Costs and shall be shared as provided in Article X hereof.

120

OCC 033038

Confidential

(b)  Following the Closing, DSCC shall
(i) take such steps, if any, as may then be required with
regard to the initial ECRA notice, (ii) prepare the ECRA
sampling plan, (iii) obtain the DEP's approval of the
sampling plan, (iv) through DSCC's agents, contractors,
or representatives, conduct the approved sampling plan,
(v) prepare the ECRA cleanup plan, (vi) obtain DEP ap-
proval of the cleanup plan, and (vii) otherwise comply
with the provisions of ECRA and the ACO.  The approval
and carrying out of the cleanup plan shall be implemented
or caused to be implemented by DSCC following the Closing
Date.  Seller shall provide Buyer copies of all filings
and other materials submitted to the DEP by Seller or,
prior to the Closing, DSCC upon filing or submittal
thereof to the DEP.  Seller shall also provide Buyer
promptly with copies of all correspondence received by
Seller or, prior to the Closing, DSCC from the DEP relat-
ing to ECRA or the ACO.  Following the Closing, Seller
shall cooperate with DSCC its efforts to complete the
actions required by the ACO and the DEP.

121

OCC 033039

Confidential

OCCNJ0026482

ALCD-PUBCOM_0002360

Section 8.20 <u>Transfer or Reissuance of Envi-ronmental Permits</u>. Prior to the Closing, Seller shall commence and continue until the Closing the actions required (i) to effect the reissuance to the appropriate DSCC Company or to the owner or operator of the Cogeneration Business Unit of all permits, licenses and other authorizations that were issued to any Diamond Company other than a DSCC Company prior to the Closing Date pursuant to any Environmental Law ("Environmental Permits"), and (ii) for each said DSCC Company to obtain any Environmental Permit, to the extent necessary for the continued operation of the assets and the business of any DSCC Company after the Closing Date. Following the Closing, Seller shall cooperate with Buyer in its efforts to complete the actions required to obtain such Environmental Permits.

Section 8.21 <u>Waste Removal</u>. Seller, at its sole expense, shall remove or cause to be removed from each of the Active Sites located in the United States all hazardous waste generated prior to the Closing that have been designated for off-site disposal, or would be designated for off-site disposal, in either case in the ordinary course of business, by Seller or any DSCC Company.

122

OCC 033040

**Confidential**

Such hazardous waste will be treated, for purposes of this Agreement, in two categories: (a) the hazardous waste described in Schedule 8.21 (the "Scheduled Waste") and (b) all other such hazardous waste (the "Miscellaneous Waste"). All of the Scheduled Waste shall be so removed not later than 30 calendar days following the Closing Date; and all of the Miscellaneous Waste shall be so removed not later than 10 calendar days following the later of (i) the Closing Date and (ii) the receipt of the required approvals, if any, from the appropriate Governmental Agency. Seller shall use its best efforts before and after the Closing to obtain any such approvals as promptly as practicable and DSCC shall cooperate with Seller in such efforts. Effective as of the Closing, all right, title and interest of any DSCC Company in and to all hazardous waste which is the subject matter of this Section 8.21 shall pass to and become the sole property and responsibility of Seller. Prior to the Closing Seller shall cause all Scheduled Waste, if stored in drums or other containers, to be marked "Property of Diamond Shamrock Corporation"; and, if not so stored, to be isolated to the extent practicable by fencing or barricades and marked with similarly worded signs in appropriate places. For the purpose of this Section 8.21, "hazardous waste"

<div align="center">123</div>

<div align="center">OCC 033041</div>

**Confidential**

shall have the meaning given to such term by RCRA, the regulations implementing RCRA and all applicable Laws governing hazardous waste management.  Seller shall cause such hazardous waste to be removed from the relevant Active Site and transported, treated, stored, handled or disposed of in substantial compliance with all applicable Laws.

ARTICLE IX

Survival and Indemnification

Section 9.01    Survival of Representations and Warranties.

(a)    Each of the representations and warranties contained in Articles II and III hereof shall survive and remain in full force and effect after the Closing for the periods set forth in Schedule 9.01, or shall terminate and be of no further force and effect after the Closing, in each case as set forth in Schedule 9.01.

(b)    Unless a specific period is set forth in this Agreement (in which event such specified period shall control), all covenants contained in this Agreement shall survive the Closing and remain in effect indefinitely.

Section 9.02    Limitations on Indemnification.

(a)    Except as specifically provided in Section 8.16 hereof, (i) no Indemnitee shall be entitled to make a claim against an Indemnifying Party for an Indemnity Payment in respect of an Indemnifiable Loss (as

124

OCC 033042

all of those terms are defined in Section 9.03 hereof)
pursuant to this Article IX unless the aggregate amount
of Indemnifiable Loss, for a single claim or a group of
related claims, exceeds $20,000, (ii) except for any
claim against Seller which an Indemnitee may have in its
capacity as a Pass-Through Purchaser, no Indemnitee shall
be entitled to assert any claim against an Indemnifying
Party for an Indemnity Payment in respect of an Indemni-
fiable Loss pursuant to this Article IX unless and until
(A) in the case of Seller as the Indemnifying Party, the
aggregate amount of claims which may be asserted against
Seller under Section 9.03(a) hereof for Indemnifiable
Losses ("Seller Indemnifiable Losses") exceeds
$3,000,000, or (B) in the case of Buyer, DSCC, OPC or
Oxy-Chem or any of them as the Indemnifying Party, the
aggregate amount of claims which may be asserted against
Buyer, DSCC, OPC and Oxy-Chem or any of them under Sec-
tions 9.03(b), (c), (d), (e) and (f) hereof for Idemni-
fiable Losses exceeds $3,000,000, in which event any
Indemnitee may assert its rights hereunder to the full
extent of its aggregate Indemnifiable Losses, and (iii)
no Pass-Through Purchaser (in its capacity as a Pass-
Through Purchaser) shall be entitled to assert any claim
against Seller for an Indemnity Payment in respect of an

125

OCC 033043

Confidential

OCCNJ0026486

ALCD-PUBCOM_0002364

Indemnifiable Loss pursuant to this Article IX unless and until (A) the aggregate amount of Indemnifiable Losses which have been incurred by such Pass-Through Purchaser (in its capacity as a Pass-Through Purchaser) exceeds $1,000,000, or (B) the aggregate amount of claims which may be asserted for Seller Indemnifiable Losses exceeds $3,000,000, in which event such Pass-Through Purchaser may assert its rights hereunder to the full extent of its aggregate Indemnifiable Losses. Seller shall have no liability to any Indemnitee in respect of any Third Party Claim (as defined in Section 9.04 hereof) for an Indemnifiable Loss asserted against such Indemnitee by any Pass-Through Purchaser to the extent that Seller would not have any liability hereunder to either any Indemnitee or such Pass-Through Purchaser if it were to assert a Direct Claim (as defined in Section 9.04 hereof) against Seller hereunder or otherwise for such Indemnifiable Loss.

(b) The amount of any Indemnity Payment payable by Seller in respect of any Indemnifiable Loss shall be reduced by the amount of any unused reserves for current liabilities of the category involved in such Indemnifiable Loss included in the computation of Net Working Capital as of the Closing Date in accordance with Section 1.04 hereof and the amount of such reserve shall

126

OCC 033044

OCCNJ0026487

ALCD-PUBCOM_0002365

likewise be deemed to be reduced, in each case until the amount of such reserves is reduced to zero.

(c) Except as otherwise expressly provided in this Agreement, Article IX shall be exclusive with respect to any of the matters covered thereby. Nothing in this Article IX shall be deemed to limit or supercede any insurance coverage available to or provided on behalf of any party hereto by any of the Existing Policies.

Section 9.03 <u>Indemnification</u>. Subject to the terms and limitations set forth in Sections 9.01, 9.02, 9.04 and 9.05 hereof:

(a) Seller shall indemnify, defend and hold harmless each of OPC, Oxy-Chem, Buyer, each of the DSCC Companies and each Pass-Through Purchaser, each of their respective subsidiaries and affiliates and each of their respective directors, officers, agents and representatives, from and against any and all claims, demands or suits (by any Entity, including, without limitation, any Governmental Agency), losses, liabilities, damages, obligations, payments, costs and expenses, paid or incurred, whether or not relating to, resulting from or arising out of any Third Party Claim (including, without limitation, the reasonable cost and expenses of any and

127

OCC 033045

Confidential

all actions, suits, proceedings, demands, assessments, judgments, settlements and compromises relating thereto and reasonable attorneys' fees in connection therewith), and whether for property damage, natural resource damage, bodily injury (including, without limitation, damage and injury related to products and injury to any person living or dead on the date hereof or born hereafter), governmental fines or penalties (including, without limitation, for the violation of permits), pollution, threat to the environment, environmental remediation, or otherwise (individually and collectively "Indemnifiable Losses") relating to, resulting from or arising out of any of the following:

    (i)    any material breach of any of the representations or warranties of any Diamond Company (including, without limitation, any DSCC Company) contained in this Agreement or any Related Document as of the Closing Date but excluding matters expressly covered by Article X hereof;

    (ii)    any Litigation, whether commenced before or after the Closing Date but prior to the expiration of 12 years following the Closing Date, relating to any actions or

128

OCC 033046

Confidential

omissions of any Diamond Company (including, without limitation, any DSCC Company) or any predecessor-in-interest thereof prior to the Closing Date, or any occurrences, accidents, incidents or events prior to the Closing Date, relating to the business or activity of any Diamond Company (including, without limitation, any DSCC Company) or any predecessor-in-interest thereof, including, without limitation, the Litigation identified in Schedule 2.07, but excluding (A) matters expressly covered by Section 9.03(a)(i) which do not involve Third Party Claims, Section 9.03(a)(iii) or Article X hereof and (B) all matters with respect to which Litigation is commenced after the expiration of 12 years following the Closing Date;

(iii)  any (A) Superfund Site and (B) any Litigation commenced after the Closing pursuant to the provisions of CERCLA or RCRA with respect to any release, storage or disposal of Polluting Substances at any commercial waste disposal facility ("Federal Superfund Litigation") to the extent, but only to

129

OCC 033047

Confidential

OCCNJ0026490

ALCD-PUBCOM_0002368

the extent, that such Federal Superfund Litiga-
tion relates to, results from or arises out of
the actions or omissions of any Diamond Company
(including, without limitation, any DSCC Compa-
ny) or any predecessor-in-interest thereof
prior to the Closing, but excluding matters
expressly covered by Article X hereof;

      (iv)  the "Inactive Sites"
(which for purposes of this Agreement, shall
mean those former chemical plants and commer-
cial waste disposal sites listed on Schedule
9.03(a)(iv) and all other properties which were
previously, but which, as of the Closing Date,
are not, owned, leased, operated or used in
connection with the business or operations of
any Diamond Company, including, without limita-
tion, any DSCC Company, or any predecessor-in-
interest thereof), including, without limita-
tion, any matter relating to any of the Inac-
tive Sites for which (A) any Diamond Company
(including, without limitation, any DSCC Compa-
ny) on or prior to the Closing Date agreed to
indemnify, defend or hold harmless any Entity,

130

OCC 033048

OCCNJ0026491

ALCD-PUBCOM_0002369

or (B) any Diamond Company may otherwise be
held liable;

(v)  any of the Excluded
Assets;

(vi)  any of the Excluded
Liabilities;

(vii)  any indebtedness for
borrowed money assumed, incurred or guaranteed
by any Diamond Company (including, without
limitation, any DSCC Company prior to the Clos-
ing) other than (A) the Assumed Obligations,
(B) indebtedness which is otherwise expressly
assumed by any DSCC Company, Buyer, OPC or Oxy-
Chem under this Agreement or under any Related
Document or (C) indebtedness which is reflected
in Net Working Capital;

(viii)  the Historical Obliga-
tions and any other obligations or liabilities
(absolute or contingent) of any Diamond Company
(including, without limitation, any DSCC Compa-
ny prior to the Closing) or any predecessor-in-
interest thereof or of any DSCC Company unre-
lated to the Chemicals Business, including,
without limitation, obligations and liabilities

131

OCC 033049

Confidential

arising out of, resulting from or incurred in connection with, any ownership, use or operation of the business or assets of any Diamond Company other than a DSCC Company, whether before or after the Closing Date; and

(ix) any Third Party Claim in which it is asserted that there has been a failure by any Diamond Company prior to the Closing to maintain insurance coverage which is sufficient for compliance (A) with the requirements of any Law applicable to the DSCC Companies, (B) in all material respects with any Contract or Lease to which any DSCC Company is a party or by which any of them or their respective properties is bound, and (C) with any agreement relating to the Assumed Obligations; provided, however, that the relevant DSCC Company shall use all reasonable efforts to resist the assertion of any claim that any such non-compliance exists; and provided further that, except with respect to the Assumed Obligations relating to the Convent Plant, any such Third Party Claim shall have been asserted prior to the second anniversary of the Closing Date.

132

OCC 033050

OCCNJ0026493

ALCD-PUBCOM_0002371

(b)  Buyer shall indemnify, defend and hold harmless each of the Diamond Companies (other than the DSCC Companies) and each of their respective subsidiaries and affiliates, and each of their respective directors, officers, agents and representatives, from and against any and all Indemnifiable Losses relating to, resulting from or arising out of any of the following:

(i)  any material breach of any of the representations or warranties of Buyer contained in this Agreement or any Related Document but excluding matters expressly covered by Article X hereof;

(ii)  any obligations or liabilities of Buyer or any subsidiary of Buyer (other than any DSCC Company) prior to the Closing Date; and

(iii)  any liabilities or obligations of Buyer resulting from the existence of withdrawal liability under Part 1 of Subtitle E of Part IV of ERISA with respect to any multiemployer plan to the extent that any such liability or obligation shall have accrued by reason of some act or omission of Buyer subsequent to the Closing Date or shall have

133

OCC 033051

Confidential

resulted from the voluntary partial or complete
withdrawal of Buyer from such multiemployer
plan subsequent to the Closing Date.

(c)  OPC shall indemnify, defend and
hold harmless each of the Diamond Companies (other than
the DSCC Companies) and each of their respective subsid-
iaries and affiliates and each of their respective direc-
tors, officers, agents and representatives, from and
against any and all Indemnifiable Losses relating to,
resulting from or arising out of any of the following:

(i)  any material breach of
any of the representations or warranties of OPC
contained in this Agreement or any Related
Document but excluding matters specifically
covered by Article X hereof; and

(ii)  any obligations or li-
abilities of OPC or any subsidiary of OPC (oth-
er than any DSCC Company) prior to the Closing
Date.

(d)  Oxy-Chem shall indemnify, defend
and hold harmless each of the Diamond Companies (other
than the DSCC Companies) and each of their respective
subsidiaries and affiliates and each of their respective
directors, officers, agents and representatives, from and

134

OCC 033052

Confidential

against any and all Indemnifiable Losses relating to, resulting from or arising out of any material breach of any of the representations or warranties of Oxy-Chem contained in this Agreement or any Related Document but excluding matters specifically covered by Article X hereof.

(e) DSCC shall indemnify, defend and hold harmless each of the Diamond Companies (other than the DSCC Companies) and each of their respective subsidiaries and affiliates and each of their respective directors, officers, agents and representatives, from and against any and all Indemnifiable Losses relating to, resulting from or arising out of any of the following:

(i) any of the Assumed Obligations or any other indebtedness for borrowed money expressly assumed by any DSCC Company, Buyer, OPC or Oxy-Chem under this Agreement or under any Related Document or which is reflected in Net Working Capital, other than any liabilities or obligations arising from any breach, default or any other noncompliance with the terms of any such Assumed Obligation or indebtedness by any Diamond Company (including, without limitation, any DSCC Company prior to

135

OCC 033053

Confidential

the Closing) occurring before or after the
Closing, but excluding matters, if any, specif-
ically covered by Section 1.06 hereof or listed
in Schedule 6.09; and

        (ii)   any liabilities or obli-
gations of any DSCC Company resulting from the
existence of withdrawal liability under Part 1
of Subtitle E of Part IV of ERISA with respect
to any multiemployer plan to the extent that
any such liability or obligation shall have
accrued by reason of some act or omission of
any DSCC Company subsequent to the Closing Date
or shall have resulted from the voluntary par-
tial or complete withdrawal of any DSCC Company
from such multiemployer plan subsequent to the
Closing Date.

Oxy-Chem hereby agrees to guarantee the performance by
DSCC of its obligations under this subparagraph (e).

        (f)   DSCC shall indemnify, defend and
hold harmless Seller from and against all reasonable
costs and expenses (including reasonable attorney's fees)
paid or incurred in connection with any Litigation com-
menced at any time within 12 years following the Closing
Date, relating to any actions or omissions of any DSCC

136

OCC 033054

OCCNJ0026497

ALCD-PUBCOM_0002375

Company subsequent to the Closing Date, or any occur-
rences, accidents, incidents or events subsequent to the
Closing Date relating to the business of or activity of
any DSCC Company in which Seller is involved by reason of
its having owned or operated the Chemicals Business prior
to the Closing but excluding matters expressly covered by
Article X hereof.  Oxy-Chem hereby agrees to guarantee
the performance by DSCC of its obligations under this
Subparagraph (f).

(g)  For purposes of this Agreement,
"Indemnity Payment" shall mean any amounts of Indemnifia-
ble Losses required to be paid pursuant to this Section
9.03.

(h)  For purposes of this Agreement,
"Indemnitee" shall mean any Entity entitled to indemnifi-
cation under this Agreement.

(i)  For purposes of this Agreement,
"Indemnifying Party" shall mean any Entity required to
provide indemnification under this Agreement.

Section 9.04  Defense of Claims.

(a)  If an Indemnitee receives notice of
the assertion of any claim or of the commencement of any
action or proceeding by any Entity who is not a party to
this Agreement (a "Third Party Claim") against such In-

137

OCC 033055

Confidential

OCCNJ0026498

ALCD-PUBCOM_0002376

demnitee, with respect to which an Indemnifying Party is obligated to provide indemnification under Section 9.03 of this Agreement, the Indemnitee shall give such Indemnifying Party reasonably prompt written notice thereof, but in any event not later than 30 calendar days after receipt of such notice of such Third Party Claim. Such notice shall describe the Third Party Claim in reasonable detail, and shall indicate the estimated amount, if practicable, of the Indemnifiable Loss that has been or may be sustained by the Indemnitee. The Indemnifying Party shall have the right to participate in or, by giving written notice to the Indemnitee, to elect to assume the defense of any Third Party Claim at such Indemnifying Party's own expense and by such Indemnifying Party's own counsel (reasonably satisfactory to the Indemnitee), and the Indemnitee shall cooperate in good faith in such defense.

(b) If within 10 calendar days after an Indemnitee receives written notice from an Indemnifying Party that such Indemnifying Party has elected to assume the defense of any Third Party Claim as provided in the last sentence of Section 9.04(a) hereof, the Indemnifying Party shall not be liable for any legal expenses subsequently incurred by the Indemnitee in connection with the

138

OCC 033056

OCCNJ0026499

ALCD-PUBCOM_0002377

defense thereof; provided, however, that if the Indemni-
fying Party fails to take reasonable steps necessary to
defend diligently such Third Party Claim within 10 calen-
dar days after receiving notice from the Indemnitee that
the Indemnitee believes the Indemnifying Party has failed
to take such steps, the Indemnitee may assume its own
defense, and the Indemnifying Party shall be liable for
any reasonable expenses therefor.  Without the prior
written consent of the Indemnitee, the Indemnifying Party
shall not enter into any settlement of any Third Party
Claim which would lead to liability or create any finan-
cial or other obligation on the part of the Indemnitee
for which the Indemnitee is not entitled to reimbursement
hereunder.  If a firm offer is made to settle a Third
Party Claim without leading to liability or the creation
of a financial or other obligation on the part of the
Indemnitee for which the Indemnitee is not entitled to
reimbursement hereunder and the Indemnifying Party de-
sires to accept and agree to such offer, the Indemnifying
Party shall give written notice to the Indemnitee to that
effect.  If the Indemnitee fails to consent to such firm
offer within 10 calendar days after its receipt of such
notice, the Indemnitee may continue to contest or defend
such Third Party Claim and, in such event, the maximum

139

OCC 033057

**Confidential**

liability of the Indemnifying Party as to such Third
Party Claim shall be limited to and shall not exceed the
amount of such settlement offer, plus reasonable costs
and expenses paid or incurred by the Indemnitee up to the
date of such notice.

      (c)  Any claim by an Indemnitee on ac-
count of an Indemnifiable Loss which does not result from
a Third Party Claim (a "Direct Claim") shall be asserted
by giving the Indemnifying Party reasonably prompt writ-
ten notice thereof, but in any event not later than 30
calendar days after the Indemnitee becomes aware of such
Direct Claim, and the Indemnifying Party shall have a
period of 30 calendar days within which to respond to
such Direct Claim.  If the Indemnifying Party does not so
respond within such 30 calendar day period, the Indemni-
fying Party shall be deemed to have rejected such claim,
in which event the Indemnitee shall be free to pursue
such remedies as may be available to the Indemnitee under
any applicable Laws, subject to the terms of this Agree-
ment, including, without limitation, the enforcement of
the Indemnitee's rights under this Agreement.

140

OCC 033058

Confidential

OCCNJ0026501

ALCD-PUBCOM_0002379

(d)  A failure to give timely notice as
provided in this Section 9.04 shall not affect the rights
or obligations of any party hereunder except and only to
the extent that, as a result of such failure, any party
which was entitled to receive such notice was deprived of
its right to recover any payment under its applicable
insurance coverage or incurred an obligation or liability
which otherwise would have been avoided.

(e)  If the amount of any Indemnifiable
Loss, at any time subsequent to the making of an Indemni-
ty Payment, shall be reduced by recovery, settlement or
otherwise under or pursuant to any insurance coverage, or
pursuant to any claim, recovery, settlement or payment by
or against any other Entity, the amount of such reduc-
tion, less any costs, expenses or premiums incurred in
connection therewith (together with interest thereon from
the date of payment thereof at the Interest Rate), shall
promptly be repaid by the Indemnitee to the Indemnifying
Party.  Upon making any Indemnity Payment the Indemnify-
ing Party shall, to the extent of such Indemnity Payment,
be subrogated to all rights of the Indemnitee against any
third party in respect of the Indemnifiable Loss to which
the Indemnity Payment relates; provided, however, that
(i) the Indemnifying Party shall then be in compliance

141

OCC 033059

Confidential

with its obligations under this Agreement in respect of such Indemnifiable Loss, and (ii) until the Indemnitee recovers full payment of its Indemnifiable Loss, any and all claims of the Indemnifying Party against any such third party on account of said Indemnity Payment is hereby made expressly subordinated and subjected in right of payment to the Indemnitee's rights against such third party. Without limiting the generality of any other provision hereof, each such Indemnitee and Indemnifying party shall duly execute upon request all instruments reasonably necessary to evidence and perfect the above-described subrogation and subordination rights.

Section 9.05  <u>Pass-Through Purchasers</u>.

(a)  Upon the delivery by Buyer or OPC to Seller at any time prior to the second anniversary of the Closing Date of (i) notice that (A) Buyer or any DSCC Company has entered into a definitive agreement with any Entity for the purchase by such Entity, through the transfer of assets or stock, from Buyer or a DSCC Company of substantially all (but not less than substantially all) of the business and assets, and to assume among other things the Pass-Through Obligations (as hereinafter defined) for which Oxy-Chem and DSCC shall have no further liability following such purchase pursuant to Sec-

142

OCC 033060

Confidential

tion 9.05(c) to the extent related thereto, of the lines of business of the Chemicals Business comprising any one or more of the Business Units (individually, or collectively a "Pass-Through Unit"), and (B) such Entity (1) has, or its obligations in connection with such purchase are guaranteed by some other Entity which has, publicly traded equity securities having an aggregate market value greater than $250,000,000 or (2) if not so publicly traded or guaranteed, has, or its obligations in connection with such purchase are guaranteed by some other Entity which has, a verifiable net worth determined in accordance with GAAP greater than $90,000,000 after giving effect to such purchase, and (ii) evidence in form and substance reasonably satisfactory to Seller of the transfer to such Entity of the business and assets of a Pass-Through Unit and the assumption by such Entity of the Pass-Through Obligations, such Entity (but not its successors-in-interest, whether by sale, other transfer, operation of law or otherwise) shall be deemed, for purposes of this Agreement, a "Pass-Through Purchaser" with respect to such Pass-Through Unit.

143

OCC 033061

**Confidential**

OCCNJ0026504

ALCD-PUBCOM_0002382

(b)  Each Pass-Through Purchaser
(i) shall be entitled to rely on the representations,
warranties and covenants of Seller contained in this
Agreement to the extent related to such Pass-Through Unit
and (ii) shall have the benefit of all rights to Indemni-
ty Payments for Indemnifiable Losses and, subject to any
allocation made pursuant to Section 10.01(d)(ii) hereof,
reimbursement of Environmental Costs by Seller contained
in Articles IX and X hereof to the same extent (except as
otherwise expressly provided herein) as if such Pass-
Through Purchaser were a party hereto.

(c)  Notwithstanding any assumption of
any liability hereunder or otherwise by any Pass-Through
Purchaser, each of Buyer, Oxy-Chem and OPC shall remain
liable under this Agreement and under each Related Docu-
ment for all of its respective obligations and liabil-
ities under this Agreement and the Related Documents (to
the extent herein provided), including, without limita-
tion, those applicable to the related Pass-Through Unit
in the event of a breach thereof by any Pass-Through
Purchaser; provided, however, that upon the assumption by
a Pass-Through Purchaser of the obligations and liabil-
ities provided for in Section 9.03(f) (the "Pass-Through
Obligations") relating to its Pass-Through Unit, Oxy-Chem

144

OCC 033062

**Confidential**

and DSCC shall have no further liability with respect to such Pass-Through Obligations. No Diamond Company shall have any liability under this Section 9.05 to any Entity other than a Pass-Through Purchaser.

ARTICLE X

Environmental Costs Sharing

Section 10.01 Environmental Costs.

(a) Subject to Section 10.01(d) hereof, Seller shall reimburse each DSCC Company and each of OPC, Oxy-Chem, Buyer and each Pass-Through Purchaser (individually and collectively, the "Reimbursable Parties") for 50% of each and every amount of Environmental Costs (as hereinafter defined) paid by them or any of them at any time following the Closing Date ("Seller's Share").

(b) For purposes of this Agreement, "Active Site" shall mean: (a) any Chemical Plant Site (as hereinafter defined) and (b) any other property owned, leased, operated or used by any DSCC Company in the conduct of the Chemicals Business as of the Closing Date and which is used by any DSCC Company for any period of time following the Closing Date (except solely pursuant to Section 8.21 hereof) (i) for the production, manufacture, sale or distribution of products in the Chemical

145

OCC 033063

Business, or (ii) for the release, storage or disposal of Polluting Substances. For the purposes of this Agreement, "Chemical Plant Site" shall mean the real property contained within the physical boundary or boundaries (whether or not individual parcels within such boundary or boundaries are separated by public or private roads, easements, access ways or similar interests) of each of DSCC's chemical plants including, without limitation, those chemical plants listed (together with other Active Sites) on Schedule 10.01.

(c) For purposes of this Agreement, "Environmental Costs" shall mean any and all costs and expenses paid or incurred by any of the Reimbursable Parties by reason of, relating to, resulting from or arising out of any damage to a natural resource, threat to the environment, pollution or the presence of hazardous wastes or other Polluting Substances on, under or over the surface of any Active Site, or emanating therefrom by reason of, or caused in whole or in part by, any event, condition or circumstance occurring or existing at any Active Site at any time before or after the Closing. Environmental Costs shall include, without limitation, all costs, expenses, governmental fines or penalties relating to: (i) environmental remediation (including,

146

OCC 033064

OCCNJ0026507

ALCD-PUBCOM_0002385

without limitation, the removal, clean-up, disposal, restraint of migration, encapsulation and ground water remediation of Polluting Substances), and (ii) actions, equipment, systems, process additions or revisions (including, without limitation, engineering or other studies, construction and installation) reasonably required to bring any Active Site or any area damaged by emanations of Polluting Substances from any Active Site into and to maintain compliance with any Environmental Law, or to mitigate future claims, losses, liabilities, costs, or governmental fines or penalties as contemplated by any Environmental Law.

(d) Seller's obligations under this Article X shall apply to all Environmental Costs relating to, resulting from or arising out of conditions, events or circumstances acknowledged in writing by Seller or discovered by any Reimbursable Party and as to which Seller is provided written notice by such Reimbursable Party prior to the expiration of ten years following the Closing Date; provided, however, that (i) Seller's Share shall be limited in the aggregate to $75,000,000, and (ii) either Buyer or OPC, at its sole election and discretion, may allocate all or any portion of said $75,000,000 which has not been previously reimbursed by

147

OCC 033065

Seller pursuant to Section 10.02 hereof to any one or
more of the Pass-Through Purchasers; provided further,
however, that either OPC or Buyer shall give Seller writ-
ten notice of each such allocation not later than the
second anniversary of the Closing Date.

(e)  For purposes of this Article X, the
term "Environmental Laws" shall mean Environmental Laws
as defined in Section 2.07(f) hereof including changes
made to such Environmental Laws after the date of this
Agreement and changes made to such Environmental Laws but
as to which compliance periods have not yet expired at
the expiration of the ten-year period following the Clos-
ing Date.

Section 10.02  Payment.

(a)  Within 30 calendar days after re-
ceiving written notice from a Reimbursable Party to the
effect that any Environmental Costs have been paid by or
on behalf of the Reimbursable Party, accompanied by ap-
propriate documentation evidencing the payment thereof,
certified as being true and correct by the Reimbursable
Party, Seller shall reimburse such Reimbursable Party for
Seller's Share of any Environmental Costs paid by or on
behalf of such Reimbursable Party.

148

OCC 033066

**Confidential**

(b)  Each Reimbursable Party shall provide Seller and its agents the right of reasonable access to its facilities and records and audit of any engineering or other technical studies and accounting or other records in such Reimbursable Party's possession that are reasonably necessary for Seller to verify the amount of any Environmental Costs for which such Reimbursable Party has claimed payment.  Any payment made by Seller pursuant to this Section 10.02 shall be made without prejudice to Seller's right to protest the propriety of such payment. If Seller shall not make any reimbursement due hereunder within such 30 calendar day period and Seller subsequently makes such reimbursement or is found to be responsible therefor, Seller shall pay to the Reimbursable Party interest at the Interest Rate on the amount of such reimbursement from the expiration of such period until the date of reimbursement.

Section 10.03  <u>Application of Insurance Proceeds</u>.

Any amount paid by any Current Carrier (as a result of any claim filed by any Insured Party whether before or after the Closing Date) with respect to any Environmental Costs paid at any time following the Clos-

149

OCC 033067

Confidential

OCCNJ0026510

ALCD-PUBCOM_0002388

ing shall be paid over promptly by the recipient of such amount to DSCC and Seller in equal amounts.

## ARTICLE XI

### Termination and Amendment

Section 11.01  Termination.  This Agreement may be terminated at any time prior to the Closing:

(a)  by mutual consent of the parties hereto;

(b)  upon written notice by any party hereto, if (i) any court of competent jurisdiction in the United States or any other United States Governmental Agency shall have issued an order, decree or ruling or taken any other action restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement or any of the Related Documents and (ii) such order, decree, ruling or other action shall have become final and nonappealable; and

(c)  upon written notice at any time on or after October 31, 1986 by any party hereto, if the Closing has not occurred by October 31, 1986; provided, however, that the failure to close is not the result of a breach of this Agreement by the terminating party.

150

OCC 033068

Confidential

Section 11.02  <u>Obligations Shall Cease</u>.  In the event that this Agreement shall be terminated pursuant to Section 11.01 hereof, all obligations of the parties hereto under this Agreement shall terminate and there shall be no liability of any party hereto to any other party except (a) for the obligations with respect to confidentiality contained in Section 8.03 hereof, (b) as set forth in Section 11.03 hereof, and (c) with respect to terminations pursuant to Section 11.01(c) hereof, as to any party whose breach of this Agreement resulted in the failure to close.

Section 11.03  <u>Fees and Expenses</u>.  Each party hereto shall pay all of the fees and expenses incurred by it in connection herewith.

<div align="center">

ARTICLE XII

<u>Miscellaneous</u>

</div>

Section 12.01  <u>Headings</u>.  The descriptive headings of the several Articles and Sections of this Agreement are inserted for convenience only and do not constitute a part of this Agreement.

<div align="center">

151

</div>

OCC 033069

Section 12.02  <u>Notices</u>.  Any notices or other communications required or permitted hereunder shall be given in writing and shall be delivered or sent by next day delivery service, personal delivery or certified or registered mail, postage prepaid, addressed as follows:

If to OPC, to:

 Occidental Petroleum Corporation
 10889 Wilshire Boulevard
 Los Angeles, California  90024
 Attention:  Gerald M. Stern, Esq.

If to Oxy-Chem, to:

 Occidental Chemical Holding Corporation
 c/o Occidental Chemical Corporation
 800 Connecticut Avenue
 Norwalk, Connecticut  06850
 Attention:  President

 With copy to OPC

If to Buyer, to:

 Oxy-Diamond Alkali Corporation
 c/o Occidental Petroleum Corporation
 10889 Wilshire Boulevard
 Los Angeles, California  90024
 Attention:  Gerald M. Stern, Esq.

If to DSCC following the Closing, to:

 Diamond Shamrock Chemicals Company
 c/o Occidental Chemical Corporation
 800 Connecticut Avenue
 Norwalk, Connecticut  06850
 Attention:  President

 With copy to OPC

152

OCC 033070

Confidential

OCCNJ0026513
ALCD-PUBCOM_0002391

If to OPC, Oxy-Chem or Buyer, or if to DSCC
following the Closing, copies to:

    Skadden, Arps, Slate, Meagher & Flom
    919 Third Avenue
    New York, New York  10022
    Attention:  Jeffrey W. Tindell, Esq.

    and

    Skadden, Arps, Slate, Meagher & Flom
    515 S. Figueroa Street
    Los Angeles, California  90071
    Attention:  Jerome L. Coben, Esq.

If to Seller, to:

    Diamond Shamrock Corporation
    717 North Harwood Street
    Dallas, Texas  75201
    Attention:  James F. Kelley, Esq.

Copy to:

    Jones, Day, Reavis & Pogue
    2300 LTV Center
    2001 Ross Avenue
    Dallas, Texas 75201
    Attention:  Robert A. Profusek, Esq.

or to such other address as shall be furnished in writing
by such party, and any such notice or communication shall
be effective and be deemed to have been given as of the
date so dispatched, delivered or mailed; provided, that,
any notice or communications changing any of the address-
es set forth above shall be effective and deemed given
only upon its receipt.

153

OCC 033071

Confidential

OCCNJ0026514

ALCD-PUBCOM_0002392

Section 12.03  <u>Successors</u>.  This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns, but neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any of the parties hereto without the prior written consent of the other parties, except (a) that without any such prior written consent, Buyer may assign any or all of its rights, interests and obligations hereunder to any directly or indirectly wholly owned subsidiary of OPC, provided, however, that, any such subsidiary agrees in writing to be bound by all of the terms, conditions and provisions contained herein and that each of Buyer, OPC and Oxy Chem shall remain liable under its respective obligations set forth in this Agreement notwithstanding any such assignment; and (b) as contemplated by Articles IX and X hereto.

Section 12.04  <u>Other Action</u>.  Consistent with the terms and conditions hereof and subject to the limitations set forth in Section 8.05(b) hereof, each party hereto will execute and deliver such instruments, certificates and other documents and take such other action as any other party hereto may reasonably require in order to

154

OCC 033072

carry out this Agreement or any of the Related Documents
and the transactions contemplated hereby and thereby. As
to all cases in which DSCC has a post-Closing obligation
set forth in this Agreement or any Related Document, at
the Closing Buyer shall cause DSCC to execute an under-
taking in the form set forth in Exhibit 12.04 to perform
such obligation. After the Closing Date, Seller and
Buyer shall cooperate in good faith to determine whether
any assets held by any of the DSCC Companies immediately
after the Closing are not related to the Chemicals Busi-
ness, in which event Buyer shall cause DSCC at Seller's
expense to transfer such assets to the Diamond Company
designated by Seller.

Section 12.05 Entire Agreement. Each of the
Schedules and Exhibits referred to herein, whether or not
attached hereto, are hereby incorporated in and made a
part of this Agreement as if set forth in full herein.
This Agreement and the Related Documents constitute the
sole and entire agreement among the parties hereto and
thereto with respect to the subject matter hereof and
thereof, and supersede all prior arrangements or under-
standings with respect thereto; and there are no express
or implied restrictions, agreements, promises, represen-
tations, warranties, covenants or undertakings other than

155

OCC 033073

Confidential

OCCNJ0026516

ALCD-PUBCOM_0002394

those expressly set forth herein or therein.  Notwith-standing any other provision of this Agreement, this Agreement shall not affect the rights and obligations of the parties to each other which existed prior to March 12, 1986, except as set forth in this Section 12.05.

Section 12.06  <u>Third Parties</u>.  Except as spe-cifically set forth or referred to herein (including, without limitation, Articles IX and X and Section 12.03 hereof), nothing herein expressed or implied is intended or shall be construed to confer upon or give any Entity, other than the parties hereto and their successors and permitted assigns, any rights or remedies under or by reason of this Agreement.

Section 12.07  <u>Right of Seller to Proceed Against Certain Parties</u>.  In the event of any breach of this Agreement, for which breach two or more of Buyer, OPC, Oxy-Chem and DSCC are responsible, Seller may pro-ceed against any such responsible party without first or simultaneously proceeding against any other responsible party.

156

OCC 033074

Confidential

OCCNJ0026517

ALCD-PUBCOM_0002395

Section 12.08  Counterparts.  This Agreement may be executed in two or more counterparts all of which shall be considered one and the same agreement and each of which shall be deemed an original.

Section 12.09  Governing Law.  This Agreement shall be governed by the laws of the State of Delaware (regardless of the laws that might be applicable under principles of conflict of laws) as to all matters, including, but not limited to, matters of validity, construction, effect and performance.

Section 12.10  Other Matters.

(a)  The parties hereto agree that for a period of twelve years following the Closing Date they will or, in the case of less than majority owned Entities, will use their best efforts to, take all necessary action to ensure that all corporate books and records of the DSCC Companies with respect to periods ending on or before the Closing Date in the possession or control of any of them shall be open for inspection by representatives of each other party at any time during regular business hours and that each other party may during such period at its expense make such excerpts therefrom as it may reasonably request.

157

OCC 033075

Confidential

(b)  For a period of twelve years fol-
lowing the Closing Date (or for such longer period as may
be required by law or governmental regulation), no party
hereto shall destroy or give up possession of any origi-
nal or final copy of any of the books and records relat-
ing to environmental matters at any facility of any DSCC
Company without first offering Seller the opportunity, at
its expense, to obtain such original or final copy or a
copy thereof.  During such period, each party shall use
its best efforts to cooperate with each other party and
make available such books and records to the employees of
such other party, its subsidiaries and the DSCC Companies
to the extent that such other party may reasonably re-
quire for its corporate and other business purposes (in-
cluding, without limitation, attendance at depositions or
legal proceedings, or audits requested by such other
party to be performed by such other party's independent
accountants for any period through the Closing Date).

Section 12.11  <u>Historical Obligations</u>.

(a)  Seller shall, and shall cause or,
in the case of less than majority owned Entities, shall
use its best efforts to cause, each of the other Diamond
Companies to, use its and their best efforts to obtain at
the earliest practicable date, whether before or after

158

OCC 033076

Confidential

the Closing Date, any amendments, novations, releases, waivers, consents or approvals necessary to have each of the DSCC Companies released from its obligations and liabilities under the Historical Obligations. Seller shall, and shall cause or, in the case of less than majority owned Entities, shall use its best efforts to cause, each of the other Diamond Companies to, remain in compliance with its and their respective obligations under each of the Historical Obligations to the extent any Diamond Company remains obligated or has any liabilities thereon.

(b)   If reasonably necessary in the circumstances, Seller's obligations to use its best efforts shall include, without limitation, providing its guarantee or the guarantee of any of the other appropriate Diamond Companies (other than the DSCC Companies) in consideration for the granting or obtaining of any such amendments, novations, releases, waivers, consents or approvals.

(c)   Each of Buyer and Oxy-Chem shall provide such information and cooperate fully with each Diamond Company in obtaining any such amendments, novations, releases, waivers, consents or approvals to effect any release of a DSCC Company as provided in Section

159

OCC 033077

Confidential

12.11(a) hereof; provided, however, that neither of Buyer or Oxy-Chem shall be obligated to execute any guarantees or undertakings or otherwise incur or assume any liability in connection with obtaining any such amendments, novations, releases, waivers, consents or approvals.

Section 12.12  Rules of Construction.  Unless the context otherwise requires (a) each term defined in this Agreement has the meaning assigned to it, (b) each accounting term not otherwise defined in this Agreement has the meaning assigned to it in accordance with GAAP, (c) "or" is disjunctive but not necessarily exclusive, and (d) words in the singular include the plural and in the plural include the singular.  No provision of this Agreement shall be construed in favor of, or against, any of the parties hereto by reason of the extent to which any such party or its counsel participated in its drafting or by reason of the extent to which this Agreement or

160

OCC 033078

Confidential

OCCNJ0026521
ALCD-PUBCOM_0002399

any such provision hereof is inconsistent with any prior draft hereof or thereof.

IN WITNESS WHEREOF, each of the parties hereto has caused this Agreement to be executed by its duly authorized officers as of the day and year first above written.

Seller:                    DIAMOND SHAMROCK CORPORATION

                           By _____
                              Name:   James F. Kelley
                              Title:  Senior Vice President


OPC:                       OCCIDENTAL PETROLEUM CORPORATION

                           By _____
                              Name:   Dale R. Laurance
                              Title: Executive Vice President


Buyer:                     OXY-DIAMOND ALKALI CORPORATION

                           By _____
                              Name:   R. B. Casriel
                              Title: Vice President & Treasurer


Oxy-Chem:                  OCCIDENTAL CHEMICAL HOLDING
                           CORPORATION

                           By _____
                              Name:   R. B. Casriel
                              Title: Vice President & Treasurer


161

OCC 033079

Confidential

OCCNJ0026522

ALCD-PUBCOM_0002400

<u>EXHIBIT 1.04</u>

Agreement,
Dated September 4, 1986 (the "Agreement"),
By and Among
Diamond Shamrock Corporation,
Occidental Petroleum Corporation,
Occidental Chemical Holding Corporation
and
Oxy-Diamond Alkali Corporation

<u>NEW WORKING CAPITAL</u>

2846g

OCC 033080

Confidential

Exhibit 1.04

For purposes of the Agreement and this Exhibit, "Net Working Capital" shall mean DSCC's consolidated (i) current assets, including the sum of "cash and temporary cash investments," "marketable securities," "receivables," "inventories," "prepaid expenses," and "other current assets" less (ii) current liabilities, including the sum of "short-term notes payable," that portion of "long-term debt" and "capital lease obligations" payable within one year, "accounts payable" and "accrued liabilities," all determined in accordance with GAAP, except for and subject to the following adjustments and clarifications:

(a)   Prepaid expenses and accrued liabilities shall include only items that are contemplated by the Agreement to remain assets or liabilities of any DSCC Company (specifically excluding all Excluded Assets and all Excluded Liabilities) as of the Closing, such as rent, deposits (including, without limitation, deposits on contracts), wages and salaries, severance and vacation pay, foreign taxes (to include all amounts accrued or prepaid on income earned up to the Closing Date), interest accrued but unpaid on the Assumed Obligations as of

OCC 033081

Confidential

OCCNJ0026524

ALCD-PUBCOM_0002402

the Closing Date and unused royalties. Prepaid expenses and accrued liabilities shall exclude prepaid insurance on the insurance policies, if any, that do not apply to any DSCC Company after the Closing and all prepaid and accrued property, sales, income, franchise and other taxes paid, deemed paid or payable to any U.S. state, local or federal government (including deferred taxes), which are to remain the responsibility of Seller. Notwithstanding any other provision in the Agreement, the current portion of the deferred taxes or prepaid taxes related to the Tax Lease in the amount of $6,794,000 as reflected in the "other prepaid expenses" account on the books of DSCC shall be excluded from the computation of Net Working Capital.

(b) Subject to Paragraphs (d) and (e) hereof, all domestic inventories of raw materials, finished goods and work-in-process shall be valued at the lower of LIFO cost or market and all other inventories shall be valued at the lower of carrying cost or market.

(c) The allowance for doubtful accounts (the "Allowance") recorded by Seller in the accounting records as of the Closing Date shall be used in the working capital computation. All accounts receivable balances, including, without limitation, employee receiv-

2

OCC 033082

ables and advances to employees, over 120 days past due
and receivables from former employees ("Past Due Receiv-
ables") will be applied to reduce the Allowance starting
with the oldest balance first; any excess of the amount
of the Past Due Receivables over the balance of the Al-
lowance shall reduce the Net Working Capital amount com-
puted as of the Closing Date and any excess of the Allow-
ance over the amount of the Past Due Receivables shall
increase the Net Working Capital amount. DSCC shall
maintain records of all Past Due Receivables that were
used to reduce the Net Working Capital as above and shall
use reasonable efforts to collect payment therefor. DSCC
shall provide Seller with a monthly report on the status
of the Past Due Receivables and shall reimburse Seller
for any monies so collected relating to accounts excluded
within 120 days after the Closing Date.

(d) For Obsolete Inventories or Off-
specification Inventories, excluding Factory Stores and
Supplies Inventory, the excess of cost over Net Realiz-
able Value (as defined below) shall be determined by
Seller and recorded in the accounting and inventory re-
cords of DSCC prior to Closing Date. Obsolete Inven-
tories shall be written down to no value, and Off Speci-
fication Inventories shall be written down to Net Realiz-

3

OCC 033083

Confidential

OCCNJ0026526

ALCD-PUBCOM_0002404

able Value ("Net Realizable Value" shall mean realizable value less rework cost if the product can be reworked to meet specifications for a salable product).

(e)  In the case of Factory Stores and Supplies Inventory, a reserve equal to 20% of the value in such inventory account as of the Closing Date shall be recorded in the books of DSCC and be applied to reduce the Net Working Capital amount as of the Closing Date. "Factory Stores and Supplies Inventory" shall mean parts and machinery on hand at any DSCC Company which are intended to be used in the repair of machinery and equipment of and supplies for such DSCC Company.  The adjustment provided for in this Paragraph (e) shall be binding upon the parties to the agreement and the Accountants. No further adjustment shall be made to factory stores and supplies inventory.

(f)  "Obsolete Inventories" shall mean items in inventory no longer salable or usable in the operations of DSCC in the ordinary course.  "Off-specification Inventory" shall mean items in inventory that do not meet current specifications for a product to be sold through normal channels in the ordinary course of the Chemicals Business.

(g)  If within 30 calendar days following

4

OCC 033084

Confidential

the Closing Date, DSCC and Seller have failed to agree on the amounts of Obsolete Inventory and Off-specification Inventories, each of DSCC and Seller shall give written notice to the other within 60 calendar days following the Closing Date, which notice, shall, to the extent practicable, set forth in reasonable detail its computation of the relevant amount and the basis for its computation. Both such computations shall be referred for final determination by the Accountants. The Accountants shall make a determination as to each of the items in dispute, which determination shall be (A) in writing, (B) furnished to each of Seller and DSCC as promptly as practicable after the items in dispute have been referred to the Accountants, (C) made in accordance with the principles and procedures set forth above and (D) conclusive and binding upon each of Buyer, Seller and DSCC. The fees and expenses of the Accountants shall be shared equally by DSCC and Seller.

5

OCC 033085

Confidential

EXHIBIT 1.06(a)

Agreement,
Dated September 4, 1986 (the "Agreement"),
By and Among
Diamond Shamrock Corporation,
Occidental Petroleum Corporation,
Occidental Chemical Holding Corporation
and
Oxy-Diamond Alkali Corporation

CARBOCLORO

2846g

OCC 033086

Confidential

OCCNJ0026529

ALCD-PUBCOM_0002407

EXHIBIT 1.06(a)

(a)  Carbocloro is the borrower under a
Credit Agreement, dated December 22, 1977, among Carbocloro,
Citicorp International Bank Limited, as agent, and various
other banks (the "Banks").  Seller presently has certain
obligations with respect to one-half of the amounts borrowed
under such Credit Agreement pursuant to a Guaranty
Agreement, dated December 22, 1977, between DSCC and the
Banks, a Completion Agreement, dated December 22, 1977,
among DSCC, Unipar-Uniao de Industrias Petroquimicas S.A.,
and the Banks, various amendments and supplements thereto,
and the instruments set forth in Attachment 1 hereto (the
"Default Resolution").  Such Credit Agreement, Guaranty
Agreement and Completion Agreement, as amended and
supplemented prior to the date hereof, and the Default
Resolution are referred to collectively as the "Carbocloro
Credit Agreement."  Carbocloro is presently in default under
the Carbocloro Credit Agreement.

(b)  Following the Closing, DSCC and
Oxy-Chem shall use their respective best efforts to
consummate the transactions contemplated by the Default
Resolution.

(c)  Carbocloro will be included as one
of the Equity Companies at the Closing.

(d)  Following the Closing, Seller
shall, and shall cause each of the Diamond Companies to, use
its best efforts to consummate the transactions contemplated
by the Default Resolution.

(e)  DSCC shall (i) indemnify Seller
against each and all of the financial obligations, if any,
undertaken or contemplated to be undertaken by Seller in
favor of the Banks pursuant to the Default Resolution, (ii)
satisfy each and all of the financial obligations, if any,
undertaken or contemplated to be undertaken by DSCC or OPC
in favor of the Banks pursuant to the Default Resolution,
(iii) assume the financial risk that the Banks may fail to
consummate the transactions contemplated by the Default
Resolution, notwithstanding the best efforts of DSCC,
Oxy-Chem and Seller and (iv) indemnify Seller against any
and all obligations and liabilities (regardless of the date
on which the event giving rise to such liability or obligation
occurs) to the Banks under the Carborcloro Credit Agreement,
which Seller pays or incurs, caused by, resulting from or
arising out  of the failure of the transactions contemplated
by the Default Resolution to be consummated.  Oxy-Chem
shall guarantee the performance by DSCC of its obligations
under this paragraph (e).

OCC 033087

<u>EXHIBIT 1.06(a)</u>

<u>Attachment 1 - "Default Resolution"</u>


        The attached copies of letters, telexes
and other correspondence are incorporated herein and made a
part of this Attachment 1.


Leg-8903

OCC 033088

**Confidential**

**OCCNJ0026531**

ALCD-PUBCOM_0002409

RCV18192                          09:31 09/04/86



VIA WUI
ZCZC
888401 MIDBKP G

FROM MIDLAND BANK PLC. INTERNATIONAL DIVISION LONDON
TO:R                                           REC'D: 9-4-86

                                               TIME: 945AM

   I I  I I I I                                C'VEN TO: HAVERT
R
888401 MIMID G                                 CC.


TO:DIAMGND SHAMROCK CORPORATION. DALLAS, TEXAS
TELEX NO:730337 DIA SHAM DAL  DATE:4.9.86R
TELEGRAPHIC ADDRESS " TGWN: I DALLAS
--------------------------------------------------------
ATTENTION:CPUCK DONNELLY

TO:OCCIDENTAL PETROLEUM CORP., LOS ANGELES: U.S.A.
LELEX NO:673389 GXY PETEILSA DATE:4.9.86
TELEGRAPHIC ADDRESS " TOWN:  LOS ANGELES
--------------------------------------------------------
ATLECTION:JIM HAVERT

COPY TO:CITICORP ICVESTVENT BANK
NEW YORK  U.S.A.
TELEX NO:6714889 MAIBOP UW    DATE:4.9.86R
TELEGRAPHIC ADDRESS " TOWN:   CEW YORK
--------------------------------------------------------
ATTENTION:O. SILVA

FROM: IMIDLAND BACK PLC  INTERNATIONAL BANKING SECTORR
      LONDOC

RE:  CARBOCLORO S.A.  US DLRS 100,000,000 CREDIT AGREEMENT
 I   DATED AS GF DECEMBER 22, 1977 AS AMENDED
--------------------------------------------------------

WE ACKNOWLEDGE RECEIPT OF YOUR TELEX OF SEPTEVBER 2, 1986
REQUESTING OUR B
ANK'S CONCURRENCE TO A FINAL PROPOSAL
CONCERNING THE CAPTIONED FINANCING, AS SUCH PROPOSAL IS
OUTLINED IN A LETTER FROM DIAMOND SHAMROCK CORPORATION.
ADDRESSED TO CITICORP INVESTMENT BANK DATED JULY 31, 1986
AND SUPPLEMENTED BY A LETTER FROM DIAMOND SHAMROCK
CORPORATION ADDRESSED TO CITICORP INVESTMENT BANK DATED
SEPTEMBER 2, 1986 (THE 'CARBOCLORO PRGPOSAL').

-MORE-


                                        OCC 033089

Confidential

R

WE HEREBY CONFIRM TO YOU OUR APPROVAL TO THE CARBOCLORO
PROPOSAL, SUBJECT TO NEGOTIATION AND EXECUTI
ON OF
SATISFACTORY LOAN DOCUMENTATION. IN REFERENCE TO THE OPTION
DESCRIBED IN DIAMOND SHAMRGCK'S LETTER TG CITICORP
INVESTMENT BANK OF SEPTEMBER 2, 1986 WE HEREBY CONFIRM THAT
WE WILL NGTIFY YOUIOF THE ELECTION OF SUCH OPTION NOT LATER
THAN 12 A.M. (N.Y. TIME) SEPLEVBER 5, 1986 AND, IF WE SHALL
HAVE FAILED TO SG NOTIFY YOU OF SUCH ELECLION, WE WILL BE
DEEMED TO HAVE ACCEPTED THE FEE SET FORTH IN PARAGRAPH 6) INR
LIEU OF EXERCISING SUCH OPTION.

WE ALSO CONSENT AND AGREE LO WAIVE ANY R
IGHTS UNDER THE
CREDIT AGREEMENT, COMPLETION AGREEMENT AND GUARANTY
AGREEMENT (AND ANY OTHER AGREEMENT ASSOCIATED WITH LHER
CARBOCLORO FINANCING WHICH MAY ARISE AS A DIRECT RESULT OF
SUCH TRANSFER, INCLUDING WITHGUT LIMITATION ANY RIGHTS UNDER
SECTION 6:01(K) OF THE CREDIT AGREEMENT AND A BREACH OF THE
CGVENANT CGNTAINED IN SECTION 11(C) OF LHE COMPLETION
AGREEMENT AS A RESULT OF THE TRANSFER GF DIAMOND SHAMROCK'S
50 PER CENT INTEREST IN CARBOCLORG TO OCCIDENTAL PETROLEUV
OR A SUBSIDIARY
THEREOF.   WE ARE GRANTING OUR APPROVAL OF
THEIPROPOSAL ACD OUR CONSENT AND WAIVER BASED OC OUR
UNDERSTANDING WITH YOU THAT (I) NEITHER SUCH APPROVAL NOR
SUCH CGNSENT AND WAIVER SHALL BE CONSTRUED AS A WAIVER OFR
ANY RIGHTS WITH RESPECT TO SUCH AGREEMENTS (INCLUDING BUL
NOT LIVITED TO THEIRIGHTS LO REQUIRE AFTER SEPTEMBER 30,
1986 THE PURCHASE OF THE NOTES PER SECTION 4 OF THE
COMPLETION AGREEMECT) RELATING THERELO AND ANY RIGHTS WITH
RESPECT TO THE DIAMOND SHAMROCK GUARANTY AND THEIUNIPA
R
GUARANTY, (II) SUCH AGREEMENTS AND SUCH OTHER AGREEMENTS AND
EACH OF LHE DIAMGND SHAMROCK GUARANTY AND THE UNIPAR
GUARANTY SHALL CONTINUE IN FULL FORCE AND EFFECT AND (III)
ALL BANKS GRANT SUCH APPROVAL ACD SUCH WAIVERIAND CONSENT.

BEST REGARDS
R
G.H; PIERCER
AREA MANAGERR
LONDON BUSINESS UNIT
LATIN AMERICAN REGION
MIDLAND BANK PLC
INTERNATIONAL BANKING SECTOR

OCC 033090

Confidential

Rev: 02IM/3.00155. Line: 3

TO:          DIAMOND SHAMROCK CORPORATION, DALLAS, TEXAS
TELEX NO.:   730337  DIA SHAM DAL
ATTN:        CHUCK DONNELLY

TO:          OCCIDENTAL PETROLEUM CORP., LOS ANGELES
TELEX NO.:   673389 OXY PETE LSA
ATTN:        JIM HAVERT

TO:          CITICORP INVESTMENT BANK, NEW YORK
TELEX NO.:   6714889 NAIBOP UW
ATTN:        OSCAR SILVA

FROM:        LLOYDS BANK PLC, DALLAS
DATE:        SEPTEMBER 3, 1986
RE:          CARBOCLORO, S.A.
             US DLRS 100,000,006 CREDIT AGREEMENT
             DATED AS OF DECEMBER 22, 1977, AS AMENDED

999/FREE FORMAT
:20 /TRANS REF:
LP0000LB
:79 /NARRATIVE:

WE ACKNOWLEDGE RECEIPT OF YOUR TELEX OF SEPTEMBER 2,
1986, REQUESTING OUR BANK'S CONCURRENCE TO A FINAL
PROPOSAL CONCERNING THE CAPTIONED FINANCING, AS SUCH
PROPOSAL IS OUTLINED IN A LETTER FROM DIAMOND SHAMROCK
CORPORATION, ADDRESSED TO CITICORP INVESTMENT BANK DATED
JULY 31, 1986, AND SUPPLEMENTED BY A LETTER FROM DIAMOND
SHAMROCK CORPORATION ADDRESSED TO CITICORP INVESTMENT
BANK DATED SEPTEMBER 2, 1986 (THE 'CARBOCLORO
PROPOSAL').

WE HEREBY CONFIRM TO YOU OUR APPROVAL TO THE CARBOCLORO
PROPOSAL, SUBJECT TO NEGOTIATION AND EXECUTION OF
SATISFACTORY LOAN DOCUMENTATION.  IN REFERENCE TO THE
OPTION DESCRIBED IN DIAMOND SHAMROCK'S LETTER TO
CITICORP INVESTMENT BANK OF SEPTEMBER 2, 1986, WE HEREBY
CONFIRM THAT WE ELECT TO RECEIVE OUR PRO-RATA SHARE OF
THE FEE SET FORTH IN PARAGRAH 5).  WE ALSO CONSENT AND
AGREE TO WAIVE ANY RIGHTS UNDER THE CREDIT AGREEMENT,
COMPLETION AGREEMENT AND GUARANTY AGREEMENT (AND ANY
OTHER AGREEMENT ASSOCIATED WITH THE CARBOCLORO FINANCING
WHICH MAY ARISE AS A DIRECT RESULT OF SUCH TRANSFER,
INCLUDING WITHOUT LIMITATION ANY RIGHTS UNDER SECTION
6.01 (K) OF THE CREDIT AGREEMENT AND A BREACH OF THE
COVENANT CONTAINED IN SECTION 11 (C) OF THE COMPLETION
AGREEMENT AS A RESULT OF THE TRANSFER OF DIAMOND
SHAMROCK'S 50 PERCENT INTEREST IN CARBOCLORO TO
OCCIDENTAL PETROLEUM OR A SUBSIDIARY THEREOF.  WE ARE
GRANTING OUR APPROVAL OF THE PROPOSAL AND OUR CONSENT
AND WAIVER BASED ON OUR UNDERSTANDING WITH YOU THAT (I)
NEITHER SUCH APPROVAL NOR SUCH CONSENT AND WAIVER SHALL
BE CONSTRUED AS A WAIVER OF ANY RIGHTS WITH RESPECT TO

OCC 033091

Confidential

SUCH AGREEMENTS (INCLUDING BUT NOT LIMITED TO THE RIGHTS
TO REQUIRE AFTER SEPTEMBER 30, 1986, THE PURCHASE OF THE
NOTES PER SECTION 4 OF THE COMPLETION AGREEMENT) RELATED
THERETO AND ANY RIGHTS WITH RESPECT TO THE DIAMOND
SHAMROCK GUARANTY AND THE UNIPAR GUARANTY, (II) SUCH
AGREEMENTS AND SUCH OTHER AGREEMENTS AND EACH OF THE
DIAMOND SHAMROCK GUARANTY AND THE UNIPAR GUARANTY SHALL
CONTINUE IN FULL FORCE AND EFFECT AND (III) ALL BANKS
GRANT SUCH APPROVAL AND SUCH WAIVER AND CONSENT.

BEST REGARDS


BRIAN M. SMITH
VP AND MANAGER
LLOYDS BANK DALLAS

NNNN
Time: 10:09 09/03/86 CDT
Connect Time :     92 seconds

OCC 033092

**Confidential**

OCCNJ0026535

ALCD-PUBCOM_0002413

✓ copy (10)

RCV18176                              15:09 09/03/86

LLOYDS BK DAL
MSG LG446

TO:         DIAMOND SHAMROCK CORPORATION, DALLAS, TEXAS
TELEX NO.:  730337  DIA SHAM DAL
ATTN:       CHUCK DONNELLY

REC'D: 9-3-86

TO:         OCCIDENTAL PETROLEUM CORP., LOS ANGELES
TELEX NO.:  673389  OXY PETE LSA
ATTN:       JIM HAVERT

TIME: 355PM
GIVEN TO: Havert

TO:         CITICORP INVESTMENT BANK, NEW YORK
TELEX NO.:  6714889  NAIBOP UW
ATTN:       OSCAR SILVA

CC:

FROM:       LLOYDS BANK PLC, DALLAS
DATE:       SEPTEMBER 3, 1986
RE:         CARBOCLORO, S.A.
            US DLRS 100,000,000 CREDIT AGREEMENT
            DATED AS OF DECEMBER 22, 1977, AS AMENDED

999/FREE FORMAT
:20 /TRANS REF:
LPOOOOL8
:79 /NARRATIVE:

WE ACKNOWLEDGE RECEIPT OF YOUR TELEX OF SEPTEMBER 2,
1986, REQUESTING OUR BANK'S CONCURRENCE TO A FINAL
PROPOSAL CONCERNING THE CAPTIONED FINANCING, AS SUCH
PROPOSAL IS OUTLINED IN A LETTER FROM DIAMOND SHAMROCK
CORPORATION, ADDRESSED TO CITICORP INVESTMENT BANK DATED
JULY 31, 1986, AND SUPPLEMENTED BY A LETTER FROM DIAMOND
SHAMROCK CORPORATION ADDRESSED TO CITICORP INVESTMENT
BANK DATED SEPTEMBER 2, 1986 (THE 'CARBOCLORO
PROPOSAL').

WE HEREBY CONFIRM TO YOU OUR APPROVAL TO THE CARBOCLORO
PROPOSAL, SUBJECT TO NEGOTIATION AND EXECUTION OF
SATISFACTORY LOAN DOCUMENTATION.  IN REFERENCE TO THE
OPTION DESCRIBED IN DIAMOND SHAMROCK'S LETTER TO
CITICORP INVESTMENT BANK OF SEPTEMBER 2, 1985, WE HEREBY
CONFIRM THAT WE ELECT TO RECEIVE OUR PRO-RATA SHARE OF
THE FEE SET FORTH IN PARAGRAH 6).  WE ALSO CONSENT AND
AGREE TO WAIVE ANY RIGHTS UNDER THE CREDIT AGREEMENT,
COMPLETION AGREEMENT AND GUARANTY AGREEMENT (AND ANY
OTHER AGREEMENT ASSOCIATED WITH THE CARBOCLORO FINANCING
WHICH MAY ARISE AS A DIRECT RESULT OF SUCH TRANSFER,
INCLUDING WITHOUT LIMITATION ANY RIGHTS UNDER SECTION
6.01 (K) OF THE CREDIT AGREEMENT AND A BREACH OF THE
COVENANT CONTAINED IN SECTION 11 (C) OF THE COMPLETION
AGREEMENT AS A RESULT OF THE TRANSFER OF DIAMOND

OCC 033093

Confidential

OCCNJ0026536

ALCD-PUBCOM_0002414

SHAMROCK'S 50 PERCENT INTEREST IN CARBOCLORO TO
OCCIDENTAL PETROLEUM OR A SUBSIDIARY THEREOF.    WE ARE
GRANTING OUR APPROVAL OF THE PROPOSAL AND OUR CONSENT
AND WAIVER BASED ON OUR UNDERSTANDING WITH YOU THAT (I)
NEITHER SUCH APPROVAL NOR SUCH CONSENT AND WAIVER SHALL
BE CONSTRUED AS A WAIVER OF ANY RIGHTS WITH RESPECT TO
SUCH AGREEMENTS (INCLUDING BUT NOT LIMITED TO THE RIGHTS
TO REQUIRE AFTER SEPTEMBER 30, 1986, THE PURCHASE OF THE
NOTES PER SECTION 4 OF THE COMPLETION AGREEMENT) RELATED
THERETO AND ANY RIGHTS WITH RESPECT TO THE DIAMOND
SHAMROCK GUARANTY AND THE UNIPAR GUARANTY, (II) SUCH
AGREEMENTS AND SUCH OTHER AGREEMENTS AND EACH OF THE
DIAMOND SHAMROCK GUARANTY AND THE UNIPAR GUARANTY SHALL
CONTINUE IN FULL FORCE AND EFFECT AND (III) ALL BANKS
GRANT SUCH APPROVAL AND SUCH WAIVER AND CONSENT.

BEST REGARDS

BRIAN M. SMITH
VP AND MANAGER
LLOYDS BANK DALLAS

NNNN

LLOYDS BK DAL
. . . . .
1804 09/03
PLS REPLY VIA TRT

OCC 033094

Confidential

OCCNJ0026537

ALCD-PUBCOM_0002415

✓copy ②

R0030

RX-LN1 1401 PDT 09/03/86
ZCZC 2058 LLU620 2057 ITA900
PP LAS
.631
 JWK0749
 LAS
. LAS ZJU998 IN 03/16:46 OUT 03/16:54

REC'D: 9/3/80
TIME: 701
GIVEN TO: _Havert_
CC:

ZCZ? NES717 SD  CHA6571

POSSIBLE DUPLICATE

CHA
177828

4994168:NY8609030042280021Ø1=NY 277/NCISCL+ OXYPETE LAS
BT
FROM: CHEMICAL BANK OF NEW YORK
TO:   OCCIDENTAL PETROLEUM CORP.
CITY: LOS ANGELES
OUR REF: NY-860903-004228-002
UNTESTED MESSAGE

THIS IS CHEMICAL BANK NEW YORK
SEPT 3, 1986 FF

ATTN: CHUCK DONNELLEY
      DIAMOND SHAMROCK CORPORATION
      717 NORTH HARDWOOD STREET, 33RD FLOOR
      DALLAS TEXAS 75102
ATTN: JIM HAVERT, OCCIDENTAL PETROLEUM CORP
      10889 WILSHIRE BOULEVARD
      LOS ANGELES, CALIFORNIA 90024
FROM: RON POTTER, VICE PRESIDENT
      CHEMICAL BANK, 277 PARK AVENUE
      NEW YORK, NY 10172

    WE HEREBY CONFIRM TO YOU OUR APPROVAL TO THE CARBOCLORO
PROPOSAL, SUBJECT TO NEGOTIATION AND EXECUTION OF SATISFACTORY LOAN
DOCUMENTATION. IN REFERENCE TO THE OPTION DESCRIBED IN DIAMOND
SHAMROCK'S LETTER TO CITICORP INVESTMENT BANK OF SEPTEMBER 2, 1986
WE HEREBY CONFIRM THAT WE WILL NOTIFY YOU OF THE ELECTION OF SUCH
OPTION NOT LATER THAN 12:00 A.M. (N.Y.TIME) SEPTEMBER 5, 1986 AND,
IF WE SHALL HAVE FAILED TO SO NOTIFY YOU OF SUCH ELECTION, WE WILL
BE DEEMED TO HAVE ACCEPTED THE FEE SET FORTH IN PARAGRAPH (6) IN
LIEU OF EXERCISING SUCH OPTION. WE ALSO CONSENT AND AGREE TO WAIVE
ANY RIGHTS UNDER THE CREDIT AGREEMENT, COMPLETION AGREEMENT AND
GUARANTY AGREEMENT (AND ANY OTHER AGREEMENT ASSOCIATED WITH THE
CARBOCLORO FINANCING WHICH MAY ARISE AS A DIRECT RESULT OF SUCH
TRANSFER, INCLUDING WITHOUT LIMITATION ANY RIGHTS UNDER SECTION
6.01 (K) OF THE CREDIT AGREEMENT AND A BREACH OF THE COVENANT
CONTAINED IN SECTION 11 (C) OF THE COMPLETION AGREEMENT AS A

RECEIVED
SEP 03 1986

OCC 033095

Confidential

RESULT OF THE TRANSFER OF DIAMOND SHAMROCK'S 58 PERCENT INTEREST
IN CARBOCLORO TO OCCIDENTAL PETROLEUM OR A SUBSIDIARY THEREOF. WE
ARE GRANTING OUR APPROVAL OF THE PROPOSAL AND OUR CONSENT AND
WAIVER BASED ON OUR UNDERSTANDING WITH YOU THAT (1) NEITHER SUCH
APPROVAL NOR SUCH CONSENT AND WAIVER SHALL BE CONSTRUED AS A WAIVER
OF ANY RIGHTS WITH RESPECT TO SUCH AGREEMENTS (INCLUDING BUT NOT
LIMITED TO THE RIGHTS TO REQUIRE AFTER SEPTEMBER 30, 1986 THE
PURCHASE OF THE NOTES PER SECTION 4 OF THE COMPLETION AGREEMENT)
RELATED THERETO AND ANY RIGHTS WITH RESPECT TO THE DIAMOND SHAMROCK
GUARANTY AND THE UNIPAR GUARANTY, (11) SUCH AGREEMENTS AND SUCH
OTHER AGREEMENTS AND EACH OF THE DIAMOND SHAMROCK GUARANTY AND
THE UNIPAR GUARANTY SHALL CONTINUE IN FULL FORCE AND EFFECT AND
(111) ALL BANKS GRANT SUCH APPROVAL AND SUCH WAIVER AND CONSENT.


CC: CITICORP - 55 WATER STREET
    NEW YORK CITY
    ATTENTION: O. SILVA
REPLY TO: 177828 CHEM UT

END OF MESSAGE
NNNNMMMMM
1655 09/03

2059030986
NNNN

OCC 033096

Confidential

*copy (9*

R0037

RX-LN1 1541 PDT 09/03/86
ZCZC 2239 LLU626 2237 ITA928
PP LAS
.651
 JWK0757
 LAS
. LAS JCD691 IN 03/18:27 OUT 03/18:35

REC'D: 9-3-86
TIME: 355 PM
GIVEN TO: Havert
CC:

VII0605101-0712(NY)
TLA014 4994168
 NFX001 COR1712 NY860903004668002I01
TLN
.NCISCL (NY 277)
4994168 OXYPETE LAS

FROM: CHEMICAL BANK OF NEW YORK
TO:   OCCIDENTAL PETROLEUM CORP.
CITY: LOS ANGELES
OUR REF: NY-860903-004668-002
UNTESTED MESSAGE

THIS IS CHEMICAL BANK NEW YORK
SEPT 3, 1986 FF

ATTN:

CHUCK DONNELLEY
DIAMOND SHAMROCK CORPORATION
717 NORTH HARWOOD STREET, 33RD FLOOR
DALLAS, TEXAS 75201

JIM HAVERT
OCCIDENTAL PETROLEUM CORP.
10889 WILSHIRE BOULEVARD
LOS ANGELES, CALIFORNIA 90024

CC: O. SILVA
    CITICORP, 55 WATER STREET
    NEW YORK CITY

FROM: RON POTTER, VICE PRESIDENT
      CHEMICAL BANK, 277 PARK AVENUE
      NEW YORK, NEW YORK 10172

    WE HEREBY CONFIRM TO YOU OUR APPROVAL TO THE CARBOCLORO
PROPOSAL, SUBJECT TO NEGOTIATION AND EXECUTION OF SATISFACTORY LOAN
DOCUMENTATION. IN REFERENCE TO THE OPTION DESCRIBED IN DIAMOND
SHAMROCK'S LETTER TO CITICORP INVESTMENT BANK OF SEPTEMBER 2, 1986
WE HEREBY CONFIRM THAT WE WILL NOTIFY YOU OF THE ELECTION OF SUCH
OPTION NOT LATER THAN 12:00 A.M. (N.Y. TIME) SEPTEMBER 5, 1986 AND,
IF WE SHALL HAVE FAILED TO SO NOTIFY YOU OF SUCH ELECTION, WE WILL
BE DEEMED TO HAVE ACCEPTED THE FEE SET FORTH IN PARAGRAPH (6) IN
LIEU OF EXERCISING SUCH OPTION. WE ALSO CONSENT AND AGREE TO WAIVE

OCC 033097

Confidential

ANY RIGHTS UNDER THE CREDIT AGREEMENT, COMPLETION AGREEMENT AND
GUARANTY AGREEMENT (AND ANY OTHER AGREEMENT ASSOCIATED WITH THE
CARBOCLORO FINANCING WHICH MAY ARISE AS A DIRECT RESULT OF SUCH
TRANSFER, INCLUDING WITHOUT LIMITATION ANY RIGHTS UNDER SECTION
6.01 (K) OF THE CREDIT AGREEMENT AND A BREACH OF THE COVENANT
CONTAINED IN SECTION 11 (C) OF THE COMPLETION AGREEMENT AS A RESULT
OF THE TRANSFER OF DIAMOND SHAMROCK'S 58 PERCENT INTEREST IN
CARBOCLORO TO OCCIDENTAL PETROLEUM OR A SUBSIDIARY THEREOF. WE ARE
GRANTING OUR APPROVAL OF THE PROPOSAL AND OUR CONSENT AND WAIVER
BASED ON OUR UNDERSTANDING WITH YOU THAT (I) NEITHER SUCH APPROVAL
NOR SUCH CONSENT AND WAIVER SHALL BE CONSTRUED AS A WAIVER OF ANY
RIGHTS WITH RESPECT TO SUCH AGREEMENTS (INCLUDING BUT NOT LIMITED
TO THE RIGHTS TO REQUIRE AFTER SEPTEMBER 30, 1986 THE PURCHASE OF
THE NOTES PER SECTION 4 OF THE COMPLETION AGREEMENT) RELATED
THERETO AND ANY RIGHTS WITH RESPECT TO THE DIAMOND SHAMROCK
GUARANTY AND THE UNIPAR GUARANTY, (II) SUCH AGREEMENTS AND SUCH
OTHER AGREEMENTS AND EACH OF THE DIAMOND SHAMROCK GUARANTY AND
THE UNIPAR GUARANTY SHALL CONTINUE IN FULL FORCE AND EFFECT AND
(III) ALL BANKS GRANT SUCH APPROVAL AND SUCH WAIVER AND CONSENT.
REPLY TO: 420120 CBC UI

END OF MESSAGE


. . . . .

2239030986
NNNN

OCC 033098

Confidential

OCCNJ0026541

ALCD-PUBCOM_0002419

✓Copy ③

RCV18171                              14:04 09/03/86

RCA SEP 03 1650                      REC'D: 9/3/86
212361 NCB UR                        TIME: 204
MSG DKA036                           GIVEN TO: Hurst

TO: OCCIDENTAL PETROLEUM CORP., LOS ANGELES
FM: NATIONAL CITY BANK, CLEVELAND, OHIO
                                     CC:

////////// POSSIBLE DUPLICATE - AVOID DUPLICATION //////////

MSG REF: GDS - 36 WEDNESDAY, SEPTEMBER 3, 1986

ATTN: O. SILVA

DATE: SEPTEMBER 3, 1986

RE: CARBOCLORO S.A.
    US DLRS. 100,000,000 CREDIT AGREEMENT
    DATED AS OF DECEMBER 22, 1977, AS AMENDED

WE ACKNOWLEDGE RECEIPT OF YOUR TELEX OF SEPTEMBER 2, 1986
REQUESTING OUR BANK'S CONCURRENCE TO A FINAL PROPOSAL
CONCERNING THE CAPTIONED FINANCING, AS SUCH PROPOSAL IS
OUTLINED IN A LETTER FROM DIAMOND SHAMROCK CORPORATION,
ADDRESSED TO CITICORP INVESTMENT BANK DATED JULY 31, 1986
AND SUPPLEMENTED BY A LETTER FROM DIAMOND SHAMROCK CORPORATION
ADDRESSED TO CITICORP INVESTMENT BANK DATED SEPTEMBER 2, 1986
(THE CARBOCLORO PROPOSAL').

WE HEREBY CONFIRM TO YOU OUR APPROVAL TO THE CARBOCLORO
PROPOSAL, SUBJECT TO NEGOTIATION AND EXECUTION OF SATISFACTORY
LOAN DOCUMENTATION. IN REFERENCE TO THE OPTION DESCRIBED IN
DIAMOND SHAMROCK'S LETTER TO CITICORP INVESTMENT BANK OF
SEPTEMBER 2, 1986 WE HEREBY CONFIRM THAT WE WILL NOTIFY YOU
OF THE ELECTION OF SUCH OPTION NOT LATER THAN 12 A.M.
(N.Y. TIME) SEPTEMBER 5, 1986 AND, IF WE SHALL HAVE FAILED TO
SO NOTIFY YOU OF SUCH ELECTION, WE WILL BE DEEMED TO HAVE
ACCEPTED THE FEE SET FORTH IN PARAGRAPH (6) IN LIEU OF
EXERCISING SUCH OPTION. WE ALSO CONSENT AND AGREE TO WAIVE
ANY RIGHTS UNDER THE CREDIT AGREEMENT, COMPLETION AGREEMENT
AND GUARANTY AGREEMENT (AND ANY OTHER AGREEMENT ASSOCIATED
WITH THE CARBOCLORO FINANCING WHICH MAY ARISE AS A DIRECT
RESULT OF SUCH TRANSFER, INCLUDING WITHOUT LIMITATION ANY
RIGHTS UNDER SECTION 6.01 (K) OF THE CREDIT AGREEMENT AND A
BREACH OF THE COVENANT CONTAINED IN SECTION 11 (C) OF THE
COMPLETION AGREEMENT AS A RESULT OF THE TRANSFER OF DIAMOND
SHAMROCK'S 50 PERCENT INTEREST IN CARBOCLORO TO OCCIDENTAL
PETROLEUM OR A SUBSIDIARY THEREOF. WE ARE GRANTING OUR
APPROVAL OF THE PROPOSAL AND OUR CONSENT AND WAIVER BASED
ON OUR APPROVAL OF THE PROPOSAL AND OUR CONSENT AND WAIVER
BASED ON OUR UNDERSTANDING WITH YOU THAT (I) NEITHER SUCH

OCC 033099

Confidential

APPROVAL NOR SUCH CONSENT AND WAIVER SHALL BE CONSTRUED
AS A WAIVER OF ANY RIGHTS WITH RESPECT TO SUCH AGREEMENTS
(INCLUDING BUT LIMITED TO THE RIGHTS TO REQUIRE AFTER
SEPTEMBER 30, 1986 THE PURCHASE OF THE NOTES PER
SECTION 4 OF THE COMPLETION AGREEMENT) RELATED THERETO AND
ANY RIGHTS WITH RESPECT TO THE DIAMOND SHAMROCK GUARANTY
AND THE UNIPAR GUARANTY, (II) SUCH AGREEMENTS AND SUCH
OTHER AGREEMENTS AND EACH OF THE DIAMOND SHAMROCK GUARANTY
AND THE UNIPAR GUARANTY SHALL CONTINUE IN FULL FORCE AND
EFFECT AND (III) ALL BANKS GRANT SUCH APPROVAL AND SUCH
WAIVER AND CONSENT.

REGARDS,

GARY D. SLADEK, ACCOUNT OFFICER
INTERNATIONAL DIVISION
NATIONAL CITY BANK

212361 NCB UR
. . . . .

OCC 033100

**Confidential**

**OCCNJ0026543**

ALCD-PUBCOM_0002421

RCV18172                                    14:17 09/03/86

EASYLINK 9329524C002 3SEP86 16:04/16:04 EST       REC'D: 9/3/80
FROM: 9102401321 CONTINENTAL UQ
         CONTINENTAL BANK                          TIME: 2:17
TO:    673389                                      GIVEN TO: Havect

FROM: CONTINENTAL BANK                             RECEIVED
                                                   SEP 03 1986
DATE: SEPTEMBER 3, 1986

RE: CARBOCLORO S.A.                                CC:

US DLRS. 100,000,000 CREDIT AGREEMENT DATED AS OF DECEMBER 22, 1977,
AS

AMENDED WE ACKNOWLEDGE RECEIPT OF YOUR TELEX OF SEPTEMBER 2, 1986

REQUESTING OUR BANK'S CONCURRENCE TO A FINAL PROPOSAL CONCERNING THE

CAPTIONED FINANCING, AS SUCH PROPOSAL IS OUTLINED IN A LETTER FROM

DIAMOND SHAMROCK CORPORATION, ADDRESSED TO CITICORP INVESTMENT BANK

DATED JULY 31, 1986 AND SUPPLEMENTED BY A LETTER FROM DIAMOND
SHAMROCK

CORPORATION ADDRESSED TO CITICORP INVESTMENT BANK DATED SEPTEMBER 2,

1986 (THE "CARBOCLORO PROPOSAL").


WE HEREBY CONFIRM TO YOU OUR APPROVAL TO THE CARBOCLORO PROPOSAL,

SUBJECT TO NEGOTIATION AND EXECUTION OF SATISFACTORY LOAN DOCUMENTATI
ON.

IN REFERENCE TO THE OPTION DESCRIBED IN DIAMOND SHAMROCK'S LETTER TO

CITICORP INVESTMENT BANK OF SEPTEMBER 2, 1986 WE HEREBY CONFIRM THAT
WE WILL

NOTIFY YOU OF THE ELECTION OF SUCH OPTION NO LATER THAN 12 P.M. (NY
TIME)

SEPTEMBER 5, 1986 AND, IF WE SHALL HAVE FAILED TO SO NOTIFY YOU OF
SUCH

ELECTION, WE WILL BE DEEMED TO HAVE ACCEPTED THE FEE SET FORTH IN

PARAGRAPH 6) IN LIEU OF EXERCISING SUCH OPTION.   WE ALSO CONSENT AND

OCC 033101

Confidential                                    OCCNJ0026544

ALCD-PUBCOM_0002422

AGREE TO WAIVE ANY RIGHTS UNDER THE CREDIT AGREEMENT, COMPLETION

AGREEMENT AND GUARANTY AGREEMENT (AND ANY OTHER AGREEMENT ASSOCIATED

WITH HE CARBOCLORO FINANCING WHICH MAY ARISE AS A DIRECT RESULT OF
SUCH TRANSFER,

INCLUDING WITHOUT LIMITATION ANY RIGHTS UNDER SECTION 6.01 (K) OF THE

CREDIT AGREEMENT AND A BREACH OF THE COVENANT CONTAINED IN SECTIOION
11 (C) OF TH COMPLETION

AGREEMENT AS A RESULT OF THE TRANSFER OF DIAMOND SHAMROCK'S 50
PERCEINTEREST

IN CARBOCLORO TO OCCIDENTAL PETROLEUM OR A SUBSIDIARY THEREOF.  WE
ARE GRANTING

OUR APPROVAL OF THE PROPOSAL AND OUR CONSENT AND WAIVER BASED ON OUR

UNDERSTANDING WITH YOU THAT (I) NEITHER SUCH APPROVAL NOR SUCH
CONSENT AND WAIVER (SHAVER) SHALL BE CONSTRUED AS A WAIVER OF ANY
RIGHTS WITH RESPECT TO SUCH

AGREEMENTS (INCLUDING BUT NOT LIMITED TO THE RIGHTS TO REQUIRE AFTER

SEPTEMBER 30, 1986 THE PURCHASE OF THE NOTES PER SECTION 4 OF THE

COMPLETION AGREEMENT) RELATED THERETO AND ANY RIGHTS WITH RESPECT TO
THE

DIAMOND SHAMROCK GRUARANTY AND THE UNIPAR GUARANTY SHALL CONTINUE IN

FULL FORCE AND EFFECT AND (III) ALL BANKS GRANT SUCH APPROVAL AND

SUCH WAIVER AND CONSENT

BEST REGARDS,

KATHY M. LYNN

VICE PRESIDENT

MMMM

,(II) SUCH AGREEMENTS
AND SUCH OTHER AGREEMENTS
AND EACH OF THE DIAMOND
SHAMROCK GUARANTY AND THE
UNIPAR GUARANTY

OCC 033102

Confidential

OCCNJ0026545

ALCD-PUBCOM_0002423

RCV18174                              14:39 09/03/86

MEL BNK PGH
OCCIDENTAL PETROLEUM CORP.
LOS ANGELES, CA
ATTN:  JIM HAVERT                         REC'D: 9/3/86
FOLLOWING IS A COPY OF TELEX SENT TO:
POSSIBLE DUPLICATE                        TIME: 239
DUE TO GARBLING
SORRY AND THANKS                          GIVEN TO: Harket
SEPTEMBER 3, 1986
DIAMOND SHAMROCK CORPORATION              CC:
DALLAS, TEXAS
ATTN:  CHUCK DONNELLY
RE:  CARBOCLORO S.A.
     US DLRS. 100,000,000 CREDIT AGREEMENT
     DATED AS OF DECEMBER 22, 1977, AS AMENDED

WE ACKNOWLEDGE RECEIPT OF YOUR TELEX OF SEPTEMBER 2, 1986 REQUESTING
OUR BANK'S CONCURRENCE TO A FINAL PROPOSAL CONCERNING THE CAPTIONED
FINANCING, AS SUCH PROPOSAL IS OUTLINED IN A LETTER FROM DIAMOND
SHAMROCK CORPORATION, 1986, AS AMENDED AND/OR SUPPLEVENTED BY A
LETTER FROM DIAMOND SHAMROCK CORPORATION ADDRESSED TO CITICORP
INVESTMENT BANK DATED SEPTEMBER 2, 1986 (THE ''CARBOCLORO
PROPOSAL''). WE HEREBY CONFIRM TO YOU OUR APPROVAL TO THE CARBOCLORO
PROPOSAL, SUBJECT TO NEGOTIATION AND EXECUTION OF LOAN DOCUMENTATION
SATISFACTORY TO ALL BANKS (I.E. 100PCT OF EXISTING BANK GROUP). IN
REFERENCE TO THE OPTION DESCRIBED IN DIAMOND SHAMROCK'S LETTER TO
CITICORP INVESTMENT BANK OF SEPTEMBER 2, 1986 WE HEREBY CONFIRM THAT
WE WILL NOTIFY YOU OF THE ELECTION OF SUCH OPTION NOT LATER THAN 12
NOON (N.Y. TIME) SEPTEMBER 5, 1986 AND, IF WE SHALL HAVE FAILED TO SO
NOTIFY YOU OF SUCH ELECTION, WE WILL BE DEEMED TO HAVE ACCEPTED THE
FEE SET FORTH IN PARAGRAPH 6) IN LIEU OF EXERCISING SUCH OPTION.  WE
ALSO CONSENT AND AGREE TO WAIVE ANY RIGHTS UNDER THE CREDIT
AGREEMENT, COMPLETION AGREEMENT AND GUARANTY AGREEMENT (AND ANY OTHER
AGREEMENT ASSOCIATED WITH THE CARBOCLORO FINANCING) WHICH MAY ARISE
AS A DIRECT RESULT OF SUCH TRANSFER, INCLUDING WITHOUT LIMITATION ANY
RIGHTS UNDER SECTION 6.01 (K) OF THE CREDIT AGREEMENT AND A BREACH OF
THE COVENANT CONTAINED IN SECTION 11 (C) OF THE COMPLETION AGREEMENT
AS A RESULT OF THE TRANSFER OF DIAMOND SHAMROCK'S 50 PERCENT INTEREST
IN CARBOCLORO TO OCCIDENTAL PETROLEUM OR A SUBSIDIARY THEREOF.  WE
ARE GRANTING OUR APPROVAL OF THE PROPOSAL AND OUR CONSENT AND WAIVER
WITH THE CONDITIONS THAT:  (I)  NEITHER SUCH APPROVAL NOR SUCH
CONSENT AND WAIVER SHALL BE CONSTRUED AS A WAIVER OF ANY OTHER RIGHTS
WITH RESPECT TO SUCH AGREEMENTS (INCLUDING BUT NOT LIMITED TO THE
RIGHTS TO REQUIRE AFTER SEPTEMBER 30, 1986, THE PURCHASE OF THE NOTES
PER SECTION 4 OF THE COMPLETION AGREEMENT) RELATED THERETO AND ANY
RIGHTS WITH RESPECT TO THE DIAMOND SHAMROCK GUARANTY AND THE UNIPAR
GUARANTY, (II) SUCH AGREEMENTS AND SUCH OTHER AGREEMENTS AND EACH OF
THE DIAMOND SHAMROKC GUARANTY AND THE UNIPAR GUARANTY SHALL CONTINUE
IN FULL FORCE AND EFFECT AND (III) ALL BANKS GRANT SUCH APPROVAL AND
SUCH WAIVER AND CONSEN, ALL BANKS AGREE TO THE TERMS AND CONDITIONS
OF THE AFOREMENTIONED ''CARBOCLORO PROPOSAL'': AND ALL BANKS RECEIVE

                                     OCC 033103

Confidential                                    OCCNJ0026546

                                                          ALCD-PUBCOM_0002424

EQUAL TREATMENT.

BEST REGARDS,
KAY A.W. GUERCI
FOR JEFFREY R. DICKSON
VICE PRSIDENT
MELLON BANK PITTSBURGH


MEL BNK PGH
. . . . .
1733 09/03
PLS REPLY VIA TRT

OCC 033104

Confidential

OCCNJ0026547
ALCD-PUBCOM_0002425

*copy* (4)

R0028

RX-LN1 1343 PDT 09/03/86
ZCZC 2041 LLU618 2040 ITA894
PP LAS
.627
  JWK0747
  LAS
. LAS ZJR936 IN 03/16:30 OUT 03/16:37

REC'D: 9/3/86
TIME: 143
GIVEN TO:
CC:
*Havert*

RECEIVED
SEP 03 1986

CHAMAN BK HOU
CIAMOND SHAMROCK CORP.
DALLAS, TEXAS

CC:  OCCIDENTAL PETROLEUM CORP
     LOS ANGELES, CA

SEPT 3, 1986

RE:  CARBOCLORO S.A.
     US DLRS 100,000,000 CREDIT AGREEMENT
     DATED AS OF DECEMBER 22, 1977, AS AMENDED

WE ACKNOWLEDGE RECEIPT OF YOUR TELEX OF SEPTEMBER 2, 1986 REQUESTING
OUR BANK'S CONCURRENCE TO A FINAL PROPOSAL CONCERNING THE CAPTIONED
FINANCING, AS SUCH PROPOSAL IS OUTLINED IN A LETTER FROM DIAMOND
SHAMROCK CORPORATION, ADDRESSED TO CITICORP INVESTMENT BANK DATED
JULY 31, 1986 AND SUPPLEMENTED BY A LETTER FROM DIAMOND SHAMROCK
CORPORATION ADDRESSED TO CITICORP INVESTMENT BANK DATED SEPTEMBER
2, 1986 (THE 'CARBOCLORO PROPOSAL').

WE HEREBY CONFIRM TO YOU OUR APPROVAL TO THE CARBOCLORO PROPOSAL,
SUBJECT TO NEGOTIATION AND EXECUTION OF SATISFACTORY LOAN
DOCUMENTATION.   IN REFERENCE TO THE OPTION DESCRIBED IN DIAMOND
SHAMROCK'S LETTER TO CITICORP INVESTMENT BANK OF SEPTEMBER 2, 1986
WE HEREBY CONFIRM THAT WE WILL NOTIFY YOU OF THE ELECTION OF SUCH
OPTION NOT LATER THAN 12:00 NOON (N.Y. TIME) SEPTEMBER 5, 1986 AND,
IF WE SHALL HAVE FAILED TO SO NOTIFY YOU OF SUCH ELECTION, WE WILL
BE DEEMED TO HAVE ACCEPTED THE FEE SET FORTH IN PARAGRAPH (6) IN
LIEU OF EXERCISING SUCH OPTION.   WE ALSO CONSENT AND AGREE TO WAIVE
ANY RIGHTS UNDER THE CREDIT AGREEMENT, COMPLETION AGREEMENT AND
GUARANTY AGREEMENT (AND ANY OTHER AGREEMENT ASSOCIATED WITH THE
CARBOCLORO FINANCING WHICH MAY ARISE AS A DIRECT RESULT OF SUCH
TRANSFER, INCLUDING WITHOUT LIMITATION ANY RIGHTS UNDER SECTION 6.01
(K) OF THE CREDIT AGREEMENT AND A BREACH OF THE COVENANT CONTAINED
IN SECTION 11 (C) OF THE COMPLETION AGREEMENT AS A RESULT OF THE
TRANSFER OF DIAMOND SHAMROCK'S 50 PERCENT INTEREST IN CARBOCLORO
TO OCCIDENTAL PETROLEUM OR A SUBSIDIARY THEREOF.   WE ARE GRANTING
OUR APPROVAL OF THE PROPOSAL AND OUR CONSENT AND WAIVER BASED ON
OUR UNDERSTANDING WITH YOU THAT (I) NEITHER SUCH APPROVAL NOR SUCH
CONSENT AND WAIVER SHALL BE CONSTRUED AS A WAIVER OF ANY RIGHTS
WITH RESPECT TO SUCH AGREEMENTS (INCLUDING BUT NOT LIMITED TO THE
RIGHTS TO REQUIRE AFTER SEPTEMBER 30, 1986 THE PURCHASE OF THE
NOTES PER SECTION 4 OF COMPLETION AGREEMENT) RELATED THERETO
AND ANY RIGHTS WITH RESPECT TO THE DIAMOND SHAMROCK GUARANTY AND
THE UNIPAR GUARANTY, (II) SUCH AGREEMENTS AND SUCH OTHER AGREEMENTS

OCC 033105

ALCD-PUBCOM_0002426

AND EACH OF THE DIAMOND SHAMROCK GUARANTY AND THE UNIPAR GUARANTY
SHALL CONTINUE IN FULL FORCE AND EFFECT AND (III) ALL BANKS GRANT
SUCH APPROVAL AND SUCH WAIVER AND CONSENT.

BEST REGARDS,

GARY L. STONE
VICE PRESIDENT
CHASE HOUSTON

CHAMAN BK HOU

CHAMAN BK HOU
.....
1638 09/03

2042030986
NNNN

OCC 033106

Confidential

RCV18167                                    12:43 09/03/86

RCA SEP 03 1529
212525 SNB UR
MSG. RG135
OCCIDENTAL PETROLEUM CORP
LOS ANGELES, CALIFORNIA                     REC'D: 9/3/86

SEPTEMBER 3 1986                            TIME: 1243

ATTN: JIM HAVERT                            GIVEN TO: Havert

                                            CC:

FROM: SOCIETY NATIONAL BANK
DATE: SEPTEMBER 3, 1986
  RE: CARBOCLORO S.A.
      US DLRS. 100,000,000 CREDIT AGREEMENT
      DATED AS OF DECEMBER 22, 1977, AS AMENDED
WE ACKNOWLEDGE RECEIPT OF YOUR TELEX OF SEPTEMBER 2, 1986
REQUESTING OUR BANK'S CONCURRENCE TO A FINAL PROPOSAL
CONCERNING THE CAPTIONED FINANCING, AS SUCH PROPOSAL IS
OUTLINED IN A LETTER FROM DIAMOND SHAMROCK CORPORATION,
ADDRESSED TO CITICORP INVESTMENT BANK DATED JULY 31,
1986 AND SUPPLEMENTED BY A LETTER FROM DIAMOND SHAMROCK
CORPORATION ADDRESSED TO CITICORP INVESTMENT BANK DATED
SEPTEMBER 2, 1986 (THE CARBOCLORO PROPOSAL).

WE HEREBY CONFIRM TO YOU OUR APPROVAL TO THE CARBOCLORO
PROPOSAL, SUBJECT TO NEGOTIATION AND EXECUTION OF SATIS-
FACTORY LOAN DOCUMENTATION. IN REFERENCE TO THE OPTION
DESCRIBED IN DIAMOND SHAMROCK'S LETTER TO CITICORP IN-
VESTMENT BANK OF SEPTEMBER 2, 1986 WE HEREBY CONFIRM
THAT WE WILL NOTIFY YOU OF THE ELECTION OF SUCH OPTION
NOT LATER THAN 12 A.M. (N.Y. TIME) SEPTEMBER 5, 1986
AND, IF WE SHALL HAVE FAILED TO SO NOTIFY YOU OF SUCH
ELECTION, WE WILL BE DEEMED TO HAVE ACCEPTED THE FEE
SET FOURTH IN PARAGRAPH 6) IN LIEU OF EXERCISING SUCH
OPTION. WE ALSO CONSENT AND AGREE TO WAIVE ANY RIGHTS
UNDER THE CREDIT AGREEMENT, COMPLETION AGREEMENT AND
GUARANTY AGREEMENT (AND ANY OTHER AGREEMENT ASSOCIATED
WITH THE CARBOCLORO FINANCING WHICH MAY ARISE AS A
DIRECT RESULT OF SUCH TRANSFER, INCLUDING WITHOUT LIMI-
TATION ANY RIGHTS UNDER SECTION 6.01 (K) OF THE CREDIT
AGREEMENT AND A BREACH OF THE COVENANT CONTAINED IN
SECTION 11 (C) OF THE COMPLETION AGREEMENT AS A RESULT
OF THE TRANSFER OF DIAMOND SHAMROCK'S 50 PERCENT INTEREST
IN CARBOCLORO TO OCCIDENTAL PETROLEUM OR A SUBSIDIARY
THEREOF. WE AR GRANTING OUR APPROVAL OF THE PROPOSAL
AND OUR CONSENT AND WAIVER BASED ON OUR UNDERSTANDING
WITH YOU THAT (I) NEITHER SUCH APPROVAL NOR SUCH CONSENT
AND WAIVER SHALL BE CONSTRUED AS A WAIVER OF ANY RIGHTS
WITH RESPECT TO SUCH AGREEMENTS (INCLUDING BUT NOT
LIMITED TO THE RIGHTS TO REQUIRE AFTER SEPTEMBER 30, 1986
THE PURCHASE OF THE NOTES PER SECTION 4 OF THE COMPLETION

OCC 033107

Confidential

AGREEMENT) RELATED THERETO AND ANY RIGHTS WITH RESPECT TO THE
DIAMOND SHAMROCK GUARANTY AND THE UNIPAR GUARANTY, (II) SUCH
AGREEMENTS AND SUCH OTHER AGREEMENTS AND EACH OF THE DIAMOND
SHAMROCK GUARANTY AND THE UNIPAR GUARANTY SHALL CONTINUE IN
FULL FORCE AND EFFECT AND (III) ALL BANKS GRANT SUCH APPROVAL
AND SUCH WAIVER AND CONSENT.
BEST REGARDS,
FRANZ PUSSEL
VICE PRESIDENT
SOCIETY NATIONAL BANK
CLEVELAND OHIO
RCA TLX NO. 212525

212525 SNB UR
. . . . .

OCC 033108

Confidential

OCCNJ0026551

ALCD-PUBCOM_0002429

RCV18175                                      14:55 09/03/86

VIA WUI
UNIBANCO6801263

TLX. NO. 5416 SEPT 3/86

TO:      DIAMOND SHAMROCK CORPORATION, DALLAS, TEXAS
TELEX NO: 730337  DIA SHAM DAL
ATTN:    CHUCK DONNELLY

CC:      OCCIDENTAL PETROLEUM CORP., LOS ANGELES
TELEX NO: 673389 OXY PETE LSA
ATTN:    JIM HAVERT

CC:      CITICORP
TELEX NO: 6714889 NAIBOP UW
ATTN:    O. SILVA

FROM:    UNIBANCO - UNIAO DE BANCOS BRASILEIROS, S/A.
DATE:    SEPT. 3/86
RE:      CARBOCLORO S. A.
         US DLRS. 100,000,000 CREDIT AGREEMENT
         DATED AS OF DECEMBER 22, 1977, AS AMENDED
WE ACKNOWLEDGE RECEIPT OF YOUR TELEX OF SEPTEMBER 2, 1986
REQUESTING OUR BANK'S CONCURRENCE TO A FINAL PROPOSAL
CONCERNING THE CAPTIONED FINANCING, AS SUCH PROPOSAL IS
OUTLINED IN A LETTER FROM DIAMOND SHAMROCK CORPORATION,
ADDRESSED TO  CITICORP INVESTMENT BANK DATED JULY 31,
1986 AND SUPPLEMENTED BY A LETTER FROM DIAMOND SHAMROCK
CORPORATION ADDRESSED TO CITICORP INVESTMENT BANK DATED
SEPTEMBER 2, 1986 (THE 'CARBOCLORO PROPOSAL').

WE HEREBY CONFIRM TO YOU OUR APPROVAL TO THE CARBOCLORO
PROPOSAL, SUBJECT TO NEGOTIATION AND EXECUTION OF SATIS-
FACTORY LOAN DOCUMENTATION; IN  REFERENCE TO THE OPTION
DESCRIBED IN DIAMOND SHAMROCK'S LETTER TO CITICORP IN-
VESTMENT BANK OF SEPTEMBER 2, 1986 WE HEREBY CONFIRM
THAT WE WILL NOTIFY YOU OF THE ELECTION OF SUCH OPTION
NOT LATER THAN 12 A.M. (N.Y. TIME) SEPTEMBER 5, 1986
AND, IF WE SHALL HAVE FAILED TO SO NOTIFY YOU OF SUCH
ELECTION, WE WILL BE DEEMED TO HAVE ACCEPTED THE FEE
SET FORTH IN PARAGRAPH 6) IN LIEU OF EXERCISING SUCH
OPTION. WE ALSO CONSENT AND AGREE TO WAIVE ANY RIGHTS
UNDER THE CREDIT AGREEMENT, COMPLETION AGREEMENT AND
GUARANTY AGREEMENT (AND ANY OTHER AGREEMENT ASSOCIATED
WITH THE CARBOCLORO FINANCING WHICH MAY ARISE AS A
DIRECT RESULT OF SUCH TRANSFER, INCLUDING WITHOUT LIMI-
TATION ANY RIGHTS UNDER SECTION 6.01 (K) OF THE CREDIT
AGREEMENT AND A BREACH OF THE COVENANT CONTAINED IN
SECTION 11 (C) OF THE COMPLETION AGREEMENT AS A RESULT
OF THE TRANSFER OF DIAMOND SHAMROCK'S 50 PERCENT INTEREST
IN CARBOCLORO TO OCCIDENTAL PETROLEUM OR A SUBSIDIARY

REC'D: 9-3-86
TIME: 305PM
GIVEN TO: HAVERT
CC:

RECEIVED
SEP 03 1986

OCC 033109

Confidential

THEREOF. WE ARE GRANTING OUR APPROVAL OF THE PROPOSAL
AND OUR CONSENT AND WAIVER BASED ON OUR UNDERSTANDING
WITH YOU THAT (I) NEITHER SUCH APPROVAL NOR SUCH CONSENT
AND WAIVER SHALL BE CONSTRUED AS A WAIVER OF ANY RIGHTS
WITH RESPECT TO SUCH AGREEMENTS (INCLUDING BUT NOT
LIMITED TO THE RIGHTS TO REQUIRE AFTER SEPTEMBER 30, 1986
THE PURCHASE OF THE NOTES PER SECTION 4 OF THE COMPLETION
AGREEMENT) RELATED THERETO AND ANY RIGHTS WITH RESPECT TO THE
DIAMOND SHAMROCK GUARANTY AND THE UNIPAR GUARANTY, (II) SUCH
AGREEMENTS AND SUCH OTHER AGREEMENTS AND EACH OF THE DIAMOND
SHAMROCK GUARANTY AND THE UNIPAR GUARANTY SHALL CONTINUE IN
FULL FORCE AND EFFECT AND (III) ALL BANKS GRANT SUCH APPROVAL
AND SUCH WAIVER AND CONSENT.

BEST REGARDS,


MAURICE SALAMANCA / G. R. LIEBLEIN
MANAGER              DEPUTY GENERAL MANAGER
UNIBANCO — UNIAO DE BANCOS BRASILEIROS S.A.
NEW YORK BRANCH


UNIBANCO6801263
.....

OCC 033110

Confidential

OCCNJ0026553
ALCD-PUBCOM_0002431

RCV18177                              15:37 09/03/86

1821 EDT

AMERTRST CLVA
CLEVELAND OHIO SEPT  3 1986                    REC'D: 9-3-86

                                              TIME: 3:55 PM
OCCIDENTAL PETROLEUM CORP
LOS ANGELES CALIFORNIA                        GIVEN TO: Havert

ATTN JIM HAVERT                               CC:

FROM: AMERITRUST COMPANY NATIONAL ASSOCIATION
DATE: SEPTEMBER 3, 1986
RE:   CARBOCLORO S.A.
      8U.S. DLRS. 100,000,000 CREDIT AGREEMENT
      DATED AS OF DECEMBER 22, 1977, AS AMENDED

WE ACKNOWLEDGE RECEIPT OF YOUR TELEX OF SEPTEMBER 2, 1986 REQUESTING
OUR BANK'S CONCURRENCE TO A FINAL PROPOSAL CONCERNING THE CAPTIONED
FINANCING, AS SUCH PROPOSAL IS OUTLINED IN A LETTER FROM DIAMOND
SHAMROCK CORPORATION, ADDRESSED TO CITICORP INVESTMENT BANK DATED
JULY 31, 1986 AS AMENDED, AND SUPPLEMENTED BY A LETTER FROM DIAMOND
SHAMROCK CORPORATION ADDRESSED TO CITICORP INVESTMENT BANK DATED
SEPTEMBER 2, 1986 (THE 'CARBOCLORO PROPOSAL').

WE HEREBY CONFIRM TO YOU OUR APPROVAL TO THE CARBOCLORO PROPOSAL,
SUBJECT TO NEGOTIATION AND EXECUTION OF LOAN DOCUMENTATION
SATISFACTORY TO ALL BANKS, I.E. 100 PERCENT OF THE EXISTING BANK
GROUP, AND PROVIDED THAT THE CARBOCLORO PROPOSAL IS MODIFIED FOR
PURPOSED OF CLARIFICATION AS FOLLOWS:

    ITEM NO. 6 SHALL READ AS FOLLOWS:
    ''AS A FEE FOR ACCEPTING THAT PROPOSAL, WE OFFER 4.5 MILLION IN
    U.S. DOLLARS IN NEW YORK, TO BE DISTRIBUTED AMONG THE BANKS
    RATABLY ACCORDING TO THE PERCENTAGE WHICH EACH BANK'S ORIGINAL
    PORTION OF THE TOTAL COMMITMENTS OF ALL BANKS, LESS ALL
    AMOUNTS (IF ANY) RELENT BY SUCH BANK  BEARS TO THE TOTAL OF
    ALL BANKS' ORIGINAL COMMITMENTS, LESS THE AGGREGATE OF ALL
    AMOUNTS RELENT BY ALL BANKS.

    ITEMS NO. 7 SHALL READ AS FOLLOWS:
    EACH BANK HAS THE OPTION TO SUBSTITUTE FOR THE FEE UNDER (6)
    ABOVE, THE RIGHT TO PUT TO CITICORP INTERNATIONAL BANK S.A.
    (CIBSA) (HERE CONTINUE AS IN ORIGINAL PROPOSAL)

IN REFERENCE TO THE OPTION DESCRIBED IN DIAMOND SHAMROCK'S LETTER TO
CITICORP INVESTMENT BANK OF SEPTEMBER 2, 1986, WE HEREBY CONFIRM THA-
T
WE WILL NOTIFY YOU OF THE ELECTION OF SUCH OPTION NOT LATER  THAN
12:00 NOON (N.Y. TIME) SEPTEMBER 5, 1986 AND, IF WE SHALL HAVE FAILE-
D
TO SO NOTIFY YOU OF SUCH ELECTION, WE WILL BE DEEMED TO HAVE

                                              OCC 033111

Confidential                                  OCCNJ0026554

ALCD-PUBCOM_0002432

CEPTED THE FEE SET FORTH IN PARAGRAPH (6) IN LIEU OF EXERCISING SUC-
H
OPTION. WE ALSO CONSENT AND AGREE TO WAIVE ANY RIGHTS UNDER THE
CREDIT AGREEMENT, COMPLETION AGREEMENT AND GUARANTY AGREEMENT (AND
ANY OTHER AGREEMENT ASSOCIATED WITH THE CARBOCLORO FINANCING) WHICH
VAY ARISE AS A DIRECT RESULT OF SUCH TRANSFER, INCLUDING WITHOUT
LIMITATION ANY RIGHTS UNDER SECTION 6.01 (K) OF THE CREDIT AGREEMENT
AND A BREACH OF THE COVENANT CONTAINED IN SECTION 11 (C) OF THE
COMPLETION AGREEMENT AS A RESULT OF THE TRANSFER OF DIAMOND
SHAMROCK'S 50 PERCENT INTEREST IN CARBOCLORO TO OCCIDENTAL PETROLEUM
OR A SUBSIDIARY THEROF. WE ARE GRANTING OUR APPROVAL OF THE PROPOSAL
AND OUR CONSENT AND WAIVER OF ANY OTHER RIGHTS BASED ON OUR
UNDERSTANDING WITH YOU THAT (I) NEITHER SUCH APPROVAL NOR SUCH
CONSENT AND WAIVER SHALL BE CONSTRUED AS A WAIVER OF ANY RIGHTS WITH
RESPECT TO SUCH AGREEMENTS (INCLUDING BUT NOT LIMITED TO THE RIGHTS
TO REQUIRE AFTER SEPTEMBER 30, 1986 THE PURCHASE OF THE NOTES PER
SECTION 4 OF THE COMPLETION AGREEMENT) RELATED THERETO AND ANY RIGHT-
S
WITH RESPECT TO THE DIAMOND SHAMROCK GUARANTY AND THE UNIPAR GUARANT-
Y
(II) SUCH AGREEMENTS AND SUCH OTHER AGREEMENTS AND EACH OF THE
DIAMOND SHAMROCK GUARANTY AND THE UNIPAR GUARANTY SHALL CONTINUE IN
FULL FORCE AND EFFECT AND (III) ALL BANKS GRANT SUCH APPROVAL AND
SUCH WAIVER AND CONSENT, AND ALL BANKS AGREE TO THE TERMS AND
CONDITIONS OF THE AFOREMENTIONED CARBOCLORO PROPOSAL

REGARDS
MARIANNE T. CANARIO, INTERNATIONAL BANKING OFFICER
AMERITRUST COMPANY NATIONAL ASSOCIATION
CC: DIAMOND SHAMROCK CORPORATION — CHUCK DONNELLY
    CITICORP, NEW YORK—O. SILVA


AMERTRST CLVA
.....
REPLY TO 4332027 IN THE USA USING ACCESS CODE 023
FOR LATEST NEWS SPORTS BUSINESS INFO AND MORE KEY 023472222"

OCC 033112

Confidential

OCCNJ0026555

ALCD-PUBCOM_0002433

R0038

RX-LN1 1549 PDT 09/03/86
ZCZC 2247 LLU627 2245 ITA932
PP LAS
.654
 JWK0758
 LAS
. LAS ZJP507 IN 03/18:33 OUT 03/18:43

REC'D: 9/3/86
TIME: 349
GIVEN TO: Havert
CC:

62814MHTPARK UW

9-3  SRH 4257H

TO:  DIAMOND SHAMROCK CORPORATION, DALLAS TEXAS

TELEX NO:  730337 DIA SHAM DAL

ATTN:  CHUCK DONNELLY

TO::  OCCIDENTAL PETROLEUM CORP. LOS ANGELES

TELEX NO:  673389 OXY PETE LSA

ATTN:  JIM HAVERT

FROM:  MANUFACTURERS HANOVER TRUST COMPANY, NEW YORK

DATE:  SEPTEMBER 3, 1986

RE:  CARBOCLORO S.A.
     USDLRS. 100,000,000 CREDIT AGREEMENT
     DATED AS OF DECEMBER 22, 1977, AS AMENDED


WE ACKNOWLEDGE RECEIPT OF YOUR TELEX OF SEPTEMBER 2, 1986
REQUESTING OUR BANK'S CONCURRENCE TO A FINAL PROPOSAL CONCERNING
THE CAPTIONED FINANCING, AS SUCH PROPOSAL IS OUTLINED IN A
LETTER FROM DIAMOND SHAMROCK CORPORATION, ADDRESSED TO CITICORP
INVESTMENT BANK DATED JULY 31, 1986 AND SUPPLEMENTED BY A
LETTER FROM DIAMOND SHAMROCK CORPORATION ADDRESSED TO CITICORP
INVESTMENT BANK DATED SEPTEMBER 2, 1986 (THE ' ' CARBOCLORO
PROPOSAL' ' ).

WE HEREBY CONFIRM TO YOU OUR APPROVAL TO THE CARBOCLORO
PROPOSAL, SUBJECT TO NEGOTIATION AND EXECUTION OF SATIS-
FACTORY LOAN DOCUMENTATION.  IN REFERENCE TO THE OPTION
DESCRIBED IN DIAMOND SHAMROCK'S LETTER TO CITICORP
INVESTMENT BANK OF SEPTEMBER 2, 1986 WE HEREBY CONFIRM
THAT WE WILL NOTIFY YOU OF THE ELECTION OF SUCH OPTION NOT
LATER THAN 12 A.M. (N.Y. TIME) SEPTEMBER 5, 1986 AND, IF
WE SHALL HAVE FAILED TO SO NOTIFY YOU OF SUCH ELECTION, WE
WILL BE DEEMED TO HAVE ACCEPTED THE FEE SET FORTH IN PARAGRAPH
6) IN LIEU OF EXERCISING

OCC 033113

Confidential

CONTINUED                                      PAGE 1
                                               PAGE 2

SUCH OPTION.  WE ALSO CONSENT AND AGREE TO WAIVE ANY RIGHTS
UNDER THE CREDIT AGREEMENT, COMPLETION AGREEMENT AND GUARANTY
AGREEMENT (AND ANY OTHER AGREEMENT ASSOCIATED WITH THE CARBOCLORO
FINANCING) WHICH MAY ARISE AS A DIRECT RESULT OF SUCH TRANSFER,
INCLUDING WITHOUT LIMITATION ANY RIGHTS UNDER SECTION 6.01 (K) OF
THE CREDIT AGREEMENT AND A BREACH OF THE COVENANT CONTAINED IN
SECTION 11 (C) OF THE COMPLETION AGREEMENT AS A RESULT OF THE
TRANSFER OF DIAMOND SHAMROCK'S 50 PERCENT INTEREST IN CARBOCLORO
TO OCCIDENTAL PETROLEUM OR A SUBSIDIARY THEREOF.  WE ARE GRANTING
OUR APPROVAL OF THE PROPOSAL AND OUR CONSENT AND WAIVER BASED ON
OUR UNDERSTANDING WITH YOU THAT (I) NEITHER SUCH APPROVAL NOR
SUCH CONSENT AND WAIVER SHALL BE CONSTRUED AS A WAIVER OF ANY
RIGHTS WITH RESPECT TO SUCH AGREEMENTS (INCLUDING BUT NOT LIMITED
TO THE RIGHTS TO REQUIRE AFTER SEPTEMBER 30, 1986 THE PURCHASE OF
THE NOTES PER SECTION 4 OF THE COMPLETION AGREEMENT) RELATED
THERETO AND ANY RIGHTS WITH RESPECT TO THE DIAMOND SHAMROCK
GUARANTY AND THE UNIPAR GUARANTY, (II) SUCH AGREEMENTS AND SUCH
OTHER AGREEMENTS AND EACH OF THE DIAMOND SHAMROCK GUARANTY AND
THE UNIPAR GUARANTY SHALL CONTINUE IN FULL FORCE AND EFFECT AND
(III) ALL BANKS GRANT SUCH APPROVAL AND SUCH WAIVER AND CONSENT.

FURTHER, WE UNDERSTAND THAT ' ' AFTER TAKING INTO ACCOUNT' '  IN
PARAGRAPH 6 OF THE LETTER DATED SEPT. 2, 1986 TO CITICORP FROM
DIAMOND SHAMROCK (THE CARBOCLORO PROPOSAL) MEANS MINUS AMOUNTS
ONLENT BY EACH BANK.

BEST REGARDS,
JOHN D. LANDERS, SENIOR VICE PRESIDENT AND REGIONAL MANAGER
DALILA N. RODRIGUEZ
VICE PRESIDENT
MANUFACTURERS HANOVER TRUST COMPANY, NEW YORK

END OF TEXT

NNNN

OCC 033114

√COPY ⑫

RX-TLX 2008 CDT 09:03:06

VIA WUI
DIASHAM DAL

CIB SPECFIN NYK

PTEMBER 2, 1986
OS CARBOCLORO DISK 4 DOCUMENT 15
TO:    DIAMOND SHAMROCK CORPORATION, DALLAS, TEXAS
TELEX NO: 730337  DIA SHAM DAL
ATTN:   CHUCK DONNELLY

FROM:   CITIBANK, N.A.
DATE:   SEPTEMBER 3, 1986
RE:     CARBOCLORO S.A.
        US DLRS. 100,000,000 CREDIT AGREEMENT
        DATED AS OF DECEMBER 22, 1977, AS AMENDED
WE ACKNOWLEDGE RECEIPT OF YOUR TELEX OF SEPTEMBER 2, 1986
REQUESTING OUR BANK'S CONCURRENCE TO A FINAL PROPOSAL
CONCERNING THE CAPTIONED FINANCING, AS SUCH PROPOSAL IS
OUTLINED IN A LETTER FROM DIAMOND SHAMROCK CORPORATION,
ADDRESSED TO CITICORP INVESTMENT BANK DATED JULY 31,
1986 AND SUPPLEMENTED BY A LETTER FROM DIAMOND SHAMROCK
CORPORATION ADDRESSED TO CITICORP INVESTMENT BANK DATED
SEPTEMBER 2, 1986 (THE 'CARBOCLORO PROPOSAL').

WE HEREBY CONFIRM TO YOU OUR APPROVAL TO THE CARBOCLORO
PROPOSAL, SUBJECT TO NEGOTIATION AND EXECUTION OF SATIS-
FACTORY LOAN DOCUMENTATION. IN REFERENCE TO THE OPTION
DESCRIBED IN DIAMOND SHAMROCK'S LETTER TO CITICORP IN-
VESTMENT BANK OF SEPTEMBER 2, 1986 WE HEREBY CONFIRM
THAT WE WILL NOTIFY YOU OF THE ELECTION OF SUCH OPTION
NOT LATER THAN 12 A.M. (N.Y. TIME) SEPTEMBER 5, 1986
AND, IF WE SHALL HAVE FAILED TO SO NOTIFY YOU OF SUCH
ELECTION, WE WILL BE DEEMED TO HAVE ACCEPTED THE FEE
SET FORTH IN PARAGRAPH 6) IN LIEU OF EXERCISING SUCH
OPTION. WE ALSO CONSENT AND AGREE TO WAIVE ANY RIGHTS
UNDER THE CREDIT AGREEMENT, COMPLETION AGREEMENT AND
GUARANTY AGREEMENT (AND ANY OTHER AGREEMENT ASSOCIATED
WITH THE CARBOCLORO FINANCING WHICH MAY ARISE AS A
DIRECT RESULT OF SUCH TRANSFER, INCLUDING WITHOUT LIMI-
TATION ANY RIGHTS UNDER SECTION 4.01 (K) OF THE CREDIT
AGREEMENT AND A BREACH OF THE COVENANT CONTAINED IN
SECTION 11 (C) OF THE COMPLETION AGREEMENT AS A RESULT
OF THE TRANSFER OF DIAMOND SHAMROCK'S 50 PERCENT INTEREST
IN CARBOCLORO TO OCCIDENTAL PETROLEUM OR A SUBSIDIARY
THEREOF. WE ARE GRANTING OUR APPROVAL OF THE PROPOSAL
AND OUR CONSENT AND WAIVER BASED ON OUR UNDERSTANDING
WITH YOU THAT (I) NEITHER SUCH APPROVAL NOR SUCH CONSENT
AND WAIVER SHALL BE CONSTRUED AS A WAIVER OF ANY RIGHTS
WITH RESPECT TO SUCH AGREEMENTS (INCLUDING BUT NOT
LIMITED TO THE RIGHTS TO REQUIRE AFTER SEPTEMBER 30, 1986
THE PURCHASE OF THE NOTES PER SECTION 4 OF THE COMPLETION
AGREEMENT) RELATED THERETO AND ANY RIGHTS WITH RESPECT TO THE
DIAMOND SHAMROCK GUARANTY AND THE UNIPAR GUARANTY, (II) SUCH
AGREEMENTS AND SUCH OTHER AGREEMENTS AND EACH OF THE DIAMOND
SHAMROCK GUARANTY AND THE UNIPAR GUARANTY SHALL CONTINUE IN
FULL FORCE AND EFFECT AND (III) ALL BANKS GRANT SUCH APPROVAL
AND SUCH WAIVER AND CONSENT.

BEST REGARDS,

RAYMOND O'KEEFE

CITIBANK, N.A.
SAO PAULO

DIASHAM DAL

CIB SPECFIN NYK
.....
THEY DISCONNECT
Elapsed time 00:07:39

OCC 033115

Confidential

RCV18179                          18:24 09/03/86

VIA WUI
CIB SPECFIN NYK

                                              REC'D: 9/3/80
SEPTEMBER 2. 1986                             TIME: 1024
OS CARBOCLORO DISK 4 DOCUMENT 15              GIVEN TO: Havert

TO:      OCCIDENTAL PETROLEUM CORP., LOS ANGELES
TELEX NO: 673389 OXY PETE LSA                 CC:
ATTN:    JIM HAVERT

FROM:    CITIBANK, N.A.
DATE:    SEPTEMBER 3, 1986
RE:      CARBOCLORO S.A.
         US DLRS. 100,000,000 CREDIT AGREEMENT
         DATED AS OF DECEMBER 22, 1977, AS AMENDED
WE ACKNOWLEDGE RECEIPT OF YOUR TELEX OF SEPTEMBER 2, 1986
REQUESTING OUR BANK'S CONCURRENCE TO A FINAL PROPOSAL
CONCERNING THE CAPTIONED FINANCING, AS SUCH PROPOSAL IS
OUTLINED IN A LETTER FROM DIAMOND SHAMROCK CORPORATION,
ADDRESSED TO CITICORP INVESTMENT BANK DATED JULY 31,
1986 AND SUPPLEMENTED BY A LETTER FROM DIAMOND SHAMROCK
CORPORATION ADDRESSED TO CITICORP INVESTMENT BANK DATED
SEPTEMBER 2, 1986 (THE 'CARBOCLORO PROPOSAL').

WE HEREBY CONFIRM TO YOU OUR APPROVAL TO THE CARBOCLORO
PROPOSAL, SUBJECT TO NEGOTIATION AND EXECUTION OF SATIS-
FACTORY LOAN DOCUMENTATION. IN REFERENCE TO THE OPTION
DESCRIBED IN DIAMOND SHAMROCK'S LETTER TO CITICORP IN-
VESTMENT BANK OF SEPTEMBER 2, 1986 WE HEREBY CONFIRM
THAT WE WILL NOTIFY YOU OF THE ELECTION OF SUCH OPTION
NOT LATER THAN 12 A.M. (N.Y. TIME) SEPTEMBER 5, 1986
AND, IF WE SHALL HAVE FAILED TO SO NOTIFY YOU OF SUCH
ELECTION, WE WILL BE DEEMED TO HAVE ACCEPTED THE FEE
SET FORTH IN PARAGRAPH 6) IN LIEU OF EXERCISING SUCH
OPTION. WE ALSO CONSENT AND AGREE TO WAIVE ANY RIGHTS
UNDER THE CREDIT AGREEMENT, COMPLETION AGREEMENT AND
GUARANTY AGREEMENT (AND ANY OTHER AGREEMENT ASSOCIATED
WITH THE CARBOCLORO FINANCING WHICH MAY ARISE AS A
DIRECT RESULT OF SUCH TRANSFER, INCLUDING WITHOUT LIMI-
TATION ANY RIGHTS UNDER SECTION 6.01 (K) OF THE CREDIT
AGREEMENT AND A BREACH OF THE COVENANT CONTAINED IN
SECTION 11 (C) OF THE COMPLETION AGREEMENT AS A RESULT
OF THE TRANSFER OF DIAMOND SHAMROCK'S 50 PERCENT INTEREST
IN CARBOCLORO TO OCCIDENTAL PETROLEUM OR A SUBSIDIARY
THEREOF. WE ARE GRANTING OUR APPROVAL OF THE PROPOSAL
AND OUR CONSENT AND WAIVER BASED ON OUR UNDERSTANDING
WITH YOU THAT (I) NEITHER SUCH APPROVAL NOR SUCH CONSENT
AND WAIVER SHALL BE CONSTRUED AS A WAIVER OF ANY RIGHTS
WITH RESPECT TO SUCH AGREEMENTS (INCLUDING BUT NOT
LIMITED TO THE RIGHTS TO REQUIRE AFTER SEPTEMBER 30, 1986

                                        OCC 033116

Confidential

THE PURCHASE OF THE NOTES PER SECTION 4 OF THE COMPLETION
AGREEMENT) RELATED THERETO AND ANY RIGHTS WITH RESPECT TO THE
DIAMOND SHAMROCK GUARANTY AND THE UNIPAR GUARANTY, (II) SUCH
AGREEMENTS AND SUCH OTHER AGREEMENTS AND EACH OF THE DIAMOND
SHAMROCK GUARANTY AND THE UNIPAR GUARANTY SHALL CONTINUE IN
FULL FORCE AND EFFECT AND (III) ALL BANKS GRANT SUCH APPROVAL
AND SUCH WAIVER AND CONSENT.

BEST REGARDS,

RAYMOND O'KEEFE

CITIBANK, N.A.
SAO PAULO

CIB SPECFIN NYK
.....

OCC 033117

Confidential

OCCNJ0026560
ALCD-PUBCOM_0002438

R065

RX-TLX 0733 CDT 09/03/86

DIAGHAM DAL

ZCZC LOV449 YIC828

VIA TWP CSS UT
177731

0730237;CAR-022+ DIA SHAM DAL
ATTN (WILLIAM EVANS/CHUCK DONNELLY)
    DIAMOND SHAMROCK CORPORATION-DALLAS, TEXAS
BT
SEPTEMBER 2, 1986

RE:   CARBOCLORO S.A. INDUSTRIAS QUIMICAS
      U.S.D. 100 MILLION CREDIT AGREEMENT
      DATED AS OF DECEMBER 22, 1977

AS HAS BEEN DISCUSSED WITH YOU BY TELEPHONE, WE HAVE RECEIVED
THE FOLLOWING FINAL PROPOSAL FROM CARBOCLORO'S SHAREHOLDERS AND
OCCIDENTAL PETROLEUM CORP.  THE FORM OF THE PROPOSAL IS SET
FORTH BELOW AND SUPPLEMENTS THE MATERIAL DISTRIBUTED AT THE
BANK MEETING ON AUGUST 7, 1986.  YOUR CONCURRENCE TO THIS
FINAL PROPOSAL, SUBJECT TO EXECUTION OF SATISFACTORY LOAN
DOCUMENTATION, IS REQUESTED BEFORE 5 P.M. (NY TIME) ON
SEPTEMBER 3, 1986 FOR THE REASONS OUTLINED BELOW.  CARBOCLORO'S
SHAREHOLDERS AND OCCIDENTAL PETROLEUM CORP. RESERVE THE RIGHT
TO WITHDRAW THE PROPOSAL AT ANY TIME THEREAFTER IF ONE OR MORE
BANKS HAVE NOT CONCURRED THEREWITH AT SUCH TIME.  IF YOU
AGREE TO THE PROPOSAL OUTLINED BELOW, PLEASE SEND US YOUR
APPROVAL BY TELEX IN THE FORM ATTACHED BELOW.

QUOTE
SEPTEMBER 2, 1986

MR. HUGO VERDEGAAL
VICE PRESIDENT
CITICORP INVESTMENT BANK
55 WATER STREET
NEW YORK, NY 10043

RE: CARBOCLORO SA
    USDLRS 100 MILLION CREDIT AGREEMENT
    DATED AS OF DECEMBER 22, 1977, AS AMENDED

DEAR HUGO:

SUBSEQUENT TO THE BANK GROUP MEETING OF AUGUST 7, 1986 AND
VARIOUS DISCUSSIONS, BELOW I HAVE OUTLINED THE REVISIONS THE
PROJECT SPONSORS AND CARBOCLORO WOULD LIKE TO PROPOSE TO OUR
LETTER TO YOU DATED JULY 31, 1986.  THESE CHANGES ALSO HAVE
THE SUPPORT OF OCCIDENTAL PETROLEUM CORPORATION.

OCC 033118

Confidential

OCCNJ0026561

ALCD-PUBCOM_0002439

Worldwide

Worldwide Communications via *TRT*

Worldwide Communications via *TRT*

ns via *TRT*

tions via *TRT*

Worldwide

Worldwide

1. THE APPROXIMATELY USDLRS 33.3 MILLION OF UNPAID PRINCIPAL WILL BE AMORTIZED IN THREE SEMI-ANNUAL INCREMENTS OF 11.1 MILLION DOLLARS COMMENCING DECEMBER 30, 1986, PER THE PRESENT AGREEMENT, AS AMENDED.

2. THE OUTSIDE 'PUT DATE' FOR SUSPENDED GUARANTOR OBLIGATIONS UNDER THE INTERIM DEPOSIT ARRANGEMENT WILL BE DECEMBER 31, 1991. FOR AN ACCOUNT, IT WILL BE DECEMBER 31, 1987.

3. THE QUICK ASSET AND CURRENT RATIO COVENANTS WILL BE DELETED.

4. CARBOCLORO WILL BE GRANTED BORROWING CAPACITY OF UP TO USDLRS 18 MILLION EQUIVALENT IN SHORT OR LONG TERM INDEBTEDNESS.

5. A MORTGAGE WILL NOT BE GRANTED TO THE BANKS BY CARBOCLORO, BUT THE NEGATIVE PLEDGE COVENANT WILL CONTINUE.

6. FOR ACCEPTING THIS PROPOSAL, WE ARE PREPARED TO OFFER 4.5 MILLION IN U.S. DOLLARS IN NEW YORK, TO BE DISTRIBUTED AMONG THE BANKS ACCORDING TO THEIR PERCENTAGE PARTICIPATION IN THE CREDIT AGREEMENT AFTER TAKING INTO ACCOUNT AMOUNTS ONLENT BY EACH BANK.

7. EACH BANK HAS THE OPTION TO SUBSTITUTE THE FEE UNDER 6) ABOVE FOR THE RIGHT TO PUT TO CITICORP INTERNATIONAL BANK S.A. (CIBSA) AT PAR (PLUS ACCRUED INTEREST) OF A PRINCIPAL AMOUNT OF PHASE III DEPOSITS (I.E. INTERIM DEPOSITS ESTABLISHED WITH THE CENTRAL BANK OF BRAZIL IN RESPECT OF PAYMENTS BY BRAZILIAN BORROWERS DURING 1985 WHICH ARE EXPECTED TO BECOME SUBJECT TO AMENDMENT NO. 1 TO THE DEPOSIT FACILITY AGREEMENT DATED JULY 25, 1986) EQUAL TO ITS RELEVANT FEE AMOUNT DIVIDED BY .225. ALL RIGHTS TO ACCRUED AND UNPAID INTEREST SHALL PASS TO CIBSA. UPON SUCH PURCHASE BY CIBSA, DIAMOND SHAMROCK WILL PAY TO CIBSA A FEE EQUAL TO THE FEE APPLICABLE TO THE BANK EXERCISING SUCH OPTION.

DUE TO THE FACT THAT THE CLOSING FOR THE SALE OF OUR CHEMICALS BUSINESS TO OCCIDENTAL PETROLEUM IS NOW SCHEDULED FOR SEPTEMBER 4, 1986, WE WOULD APPRECIATE RECEIVING THE WRITTEN ACCEPTANCE OF EACH BANK TO THIS PROPOSAL AND THE CONSENT AND WAIVER SET FORTH IN THE FORM OF THE TELEX RESPONSE NOT LATER THAN 5 P.M. N.Y. TIME) ON SEPTEMBER 3.

IN LIGHT OF THE PAST CONSIDERATION RECEIVED BY THE BANK GROUP PER THE ORIGINAL PRICING WHICH REFLECTED FULL ACCEPTANCE OF SOVEREIGN RISK, WE BELIEVE THE ABOVE PROPOSAL AND CONSIDERATION OFFERED IS A VERY FAIR AND EQUITABLE RESOLUTION TO THE ISSUES.

REGARDS,

C.E. DONNELLY
GENERAL MANAGER TREASURY OPERATIONS
UNQUOTE

QUOTE

FORM OF TELEX
TO:      DIAMOND SHAMROCK CORPORATION, DALLAS, TEXAS
TELEX NO: 730337  DIA SHAM DAL
ATTN:    CHUCK DONNELLY

OCC 033119

Confidential

OCCNJ0026562

ALCD-PUBCOM_0002440

09/03/86     09:43     DIASHAM CORP DAL     #15     NO. 001     005/004

BEST REGARDS,

=BANK OFFICER'S NAME AND TITLE=
=BANK NAME=

CC:     E714889 NAIBOP UW
        CITICORP
        ATTN: O. SILVA

UNQUOTE
OSCAR E. SILVA
CITICORP INVESTMENT BANK
NEW YORK

(D9EE)
0825 EDT 09/03/86
NNNN

DIASHAM DAL
MMMM
0854 09/03
PLS REPLY VIA TRT

THEY DISCONNECT
Elapsed time 00:19:25

PRINTED AT 0754 CDT 09/03/86

OCC 033120

Confidential

OCCNJ0026563
ALCD-PUBCOM_0002441



**Diamond Shamrock**

July 31, 1986

Mr. Hugo P. Verdegaal
Citicorp Investment Bank
55 Water Street
New York, New York  10043

Dear Hugo:

Earlier this year, Diamond Shamrock Corporation was discussing with you the restructuring of the indebtedness of Carbocloro S.A. Industrias Quimicas under the December 22, 1977 Credit Agreement. These discussions were suspended in June when Diamond Shamrock's negotiations with Occidental Petroleum Corporation expanded to include the possible acquisition by Occidental of the stock of Carbocloro presently owned by Diamond Shamrock.

Both Diamond Shamrock and Occidental now feel that the pending restructuring of the Carbocloro debt will have to be completed before the sale of Carbocloro can take place. In an effort to bring the restructuring to a mutually satisfactory conclusion, we have reviewed the Summary of Terms prepared earlier this year, Diamond Shamrock's June 2, 1986 letter to the banks in the Carbocloro credit, and our subsequent discussions with you. Based on that review, we would like to suggest that the existing agreements be modified substantially as follows:

1. <u>Completion of the Project</u>. The Completion Agreement Termination Date shall be permitted to occur as contemplated in Section I of the Summary of Terms, except that the necessary engineer's certification will be based on any seven consecutive days in the first six months of 1986 rather than in 1985. The occurrence of the Completion Agreement Termination Date will result, among other things, in the release of the obligations of Diamond Shamrock and UNIPAR under the existing Completion Agreement and Guaranty Agreements. All testing and approvals necessary for the banks to determine completion will take place prior to the acquisition by Occidental.

2. <u>Principal Payments</u>.

(i) All obligations of Carbocloro, UNIPAR and Diamond Shamrock or Occidental will be completely discharged with respect to the approximately $33.3 million which has been paid to the Central Bank under Deposit Facility Agreements. When the approximately $33.3 million which is presently on deposit with the

**Diamond Shamrock Corporation**
World Headquarters, 717 North Harwood Street, Dallas, Texas 75201 Phone: 214 922-2000

OCC 033121

**Confidential**

Mr. Hugo P. Verdegaal
July 31, 1986
Page 2

Central Bank under Interim Deposit Arrangements is converted to a deposit under a Deposit Facility Agreement, their obligations will likewise be discharged as to that amount.

(ii)   The appropriate payment schedule for the approximately $33.3 million of unpaid principal will be proposed at an upcoming bank meeting.

(iii)  All future principal payments made by Carbocloro under a Deposit Facility Agreement will fully discharge the obligations of Carbocloro, UNIPAR and Diamond Shamrock or Occidental with respect thereto.

(iv)  If a Deposit Facility Agreement is not in place with respect to a required payment, payments may be made by Carbocloro under an Interim Deposit Arrangement, which will be converted into a deposit under a Deposit Facility Agreement when such an agreement comes into place. If no Interim Deposit Arrangement is in place with respect to a required payment, the payment may be made into an Account with Citibank in Sao Paulo, which will be converted into a deposit under an Interim Deposit Arrangement or a Deposit Facility Agreement when they become available.

3.  Interest.

(i)   The interest rate will increase by one-eighth percent to LIBOR plus 2-3/8%.

(ii)  Carbocloro will continue to be required to pay interest on the unpaid principal in dollars in New York City. If a principal payment is made to the Brazilian Central Bank under an Interim Deposit Arrangement, the amount of the payment will not be deemed to have been paid to the banks and thus will continue to bear interest at LIBOR plus 2-3/8%. Carbocloro will receive credit for any amounts paid to the banks in dollars in New York by the Brazilian Central Bank, however, the obligation of Carbocloro to pay the balance, if any, of such interest will be suspended. If a Deposit Facility Agreement comes into existence with respect to any payment made under any Interim Deposit Arrangement, any suspended interest obligation will terminate.

(iii) Principal installments with respect to which payments are made into an Account will also continue to bear interest at LIBOR plus 2-3/8%.

4.  Adjustments to Accounts. If any Account is established, Carbocloro periodically will pay into the Account any additional amounts required to cause the amount on deposit to equal the Brazilian currency equivalent of the principal paid into the Account plus accrued interest, if such amount on deposit falls

OCC 033122

Confidential

Mr. Hugo P. Verdegaal
July 31, 1986
Page 3

below 95% of that equivalent.  If the amount on deposit increases to more than 105% of that equivalent, Carbocloro shall have the right periodically to withdraw the excess of such amount on deposit over that equivalent.

5. Guaranty.

(i)    Diamond Shamrock or Occidental will guarantee the unpaid principal of approximately $16.7 million on the Series B Notes, plus interest accruing thereon, and UNIPAR will give a corresponding guaranty of the Series A Notes.

(ii)   If Carbocloro is prevented by an Event of Inconvertibility from paying dollars in New York City and no Deposit Facility Agreement is in place, all obligations of Diamond Shamrock or Occidental with respect to both principal and interest will nonetheless be suspended until December 31, 1993 to the extent an appropriate deposit is made under an Interim Deposit Arrangement, and to December 31, 1989 to the extent a deposit is made under an Account.

(iii)  Diamond Shamrock or Occidental and UNIPAR will have the right to purchase the Series B and Series A Notes, respectively, for an amount of U.S. dollars equal to the unpaid principal amounts plus accrued interest.  All amounts paid under a Deposit Facility Agreement will, as indicated in Section 2(i), be credited against the unpaid principal of the Notes.

6. Credit Agreement Amendments.  The Credit Agreement, as previously amended, will be revised as follows:

(i)    Occidental will be permitted to own Diamond Shamrock's interest in Carbocloro.

(ii)   The "quick asset", current ratio and short term debt provisions in the Credit Agreement will be revised once the amortization schedule of the $33.3 million of unpaid principal has been resolved.

(iii)  Carbocloro will "top off" the 432 account before any dividends can be remitted to the Shareholders.

(iv)   The other provisions of the Credit Agreement will be revised substantially as contemplated by the Diamond Shamrock Summary of Terms and the June 2, 1986 supplement.

7. Security.  A mortgage will be granted to the banks by Carbocloro when the restructuring is effective.

8. Remuneration.  In the interest of resolving this matter promptly, we will agree to a payment of $1,000,000 at closing in local Brazilian currency, to be distributed among the banks

OCC 033123

Confidential

Mr. Hugo P. Verdegaal
July 31, 1986
Page 4

according to their percentage participation in the Credit Agreement.

It is our understanding that the waiver which has presently been requested from the banks will expire at the end of September. We presently expect that this will provide sufficient time for consummation of the agreements between Occidental and Diamond Shamrock, obtaining approval from the Central Bank of Brazil and completing the other necessary transactions and approvals.

We look forward to discussing the Carbocloro loan with you shortly, with a view to resolving the entire situation in the immediate future.

Very truly yours,

C. E. Donnelly
General Manager, Treasury Operations
Diamond Shamrock Corporation

James R. Havert
Assistant Treasurer
Occidental Petroleum Corporation

OCC 033124

Confidential

OCCNJ0026567

ALCD-PUBCOM_0002445

**CITICORP⊕INVESTMENT BANK**

Citibank, N.A.
55 Water Street
44th Floor
New York, N.Y.
10043

TO:   All PARTICIPATING BANKS

RE:   Carbocloro S.A. Industrias Quimicas - U.S. $ 100,000,000
      Credit Agreement Dated as of December 22, 1977

DATE:  June 6, 1986

Following the delivery on April 18, 1986 of a Summary of Terms detailing
the restructuring plan for Carbocloro and its subsequent review by the
Banks, several discussions have been held with the syndicate.

With a view towards finalizing Carbocloro's restructuring, Diamond Shamrock
Corporation ("Diamond Shamrock"), Unipar-Uniao de Industrias Petroquimicas
S.A. ("Unipar") and Carbocloro have proposed several revisions to the Sum-
mary of Terms previously sent to you.  Said revisions are described in a
letter from Diamond Shamrock, on behalf of Diamond Shamrock, UNIPAR and
Carbocloro, dated June 2, 1986 and attached to this letter.  The attached
letter also spells out the position of Diamond Shamrock, UNIPAR and Carbo-
cloro in respect to the assumption of sovereign risks by the Banks.

In reference to the changes to the dividend covenant explained in the
attached letter, please note that the 432 account is a U.S. Dollar denomin-
ated account with the Central Bank of Brazil pursuant to Resolution 432
which provides hedging against foreign exchange variations.

Please send us your written approval to the Summary of Terms, as amended by
the attached letter, subject to satisfactory loan documentation, not later
than June 16th.  It is the intention of Carbocloro, Diamond Shamrock and
UNIPAR to reach an agreement in principle prior to the next principal
payment date of June 30, 1986.  Furthermore, it is the intention of Carbo-
cloro to remit the proposed rescheduled principal amount of U.S. $ 5,555,575
plus interest on June 30, 1986 and to open deposits for an additional
amount of  up to U.S. $ 5,555,575 pursuant to Resolution 432 of the Central
Bank of Brazil.

In order to allow time to finish and execute the legal documentation of
this transaction and to obtain pertinent approvals from the Central Bank of
Brazil, Diamond Shamrock and UNIPAR have requested the Banks a 60 day
waiver of their obligations to purchase the Notes under Section 5 of the
Completion Agreement until September 1, 1986.

Please communicate your response to Telex No. 6720643 CIB SPECFIN NYK,
Attention: Hugo Verdegaal/Oscar E. Silva.  If you have any questions,
please contact the undersigned (212-825-8759).

Regards,

Oscar Silva
Citibank, N.A.,
as Agent

OCC 033125

**Confidential**



**Diamond Shamrock**

June 2, 1986

TO:  ALL BANKS PARTICIPATING IN THE
     CARBOCLORO SA INDUSTRIAS QUIMICAS CREDIT FACILITY

Gentlemen:

Subsequent to the distribution of the Summary of Terms proposal
and its review by the banks, further discussions have been held
either in person or via telephone with the syndicate regarding
the issues.   Our assessment of these issues can be broadly
categorized into three areas:

(1)  Commercial risk –   While important, they are clearly
                         solvable.

(2)  Sovereign risk – Varied positions given banks' size,
                      international portfolio, and policy
                      toward Brazil.

(3)  Remuneration – Related to issue #2 but also reflective of
                    the work involved in completing the
                    restructuring.

Given the sensitivity and importance of sovereign risk to this
transaction in the current environment, it is important that the
position of the Shareholders with regard to this issue be stated
again at this time.

Sovereign Risk

While not explicitly addressed in the original documentation, it
is the banks' contention that sovereign risk is presently for the
account of the Shareholders since the Completion Agreement has
not been satisfied.  Subsequent to completion, sovereign risk was
to be clearly for the banks account, which is reflected in the
pricing of LIBOR + 2-3/8% p.a.  This point is further supported
by the Letter Agreements signed dealing with the deposits created
under the Deposit Facility Agreements for 1983 and 1984,
respectively, where D.F.A. deposits were deemed payment for both
Carbocloro and the Shareholders provided we eventually met
completion.   In essence, the banks are using the failure of
Carbocloro of satisfying the commercial risk (i.e. meeting the

**Diamond Shamrock Corporation**
World Headquarters, 717 North Harwood Street, Dallas, Texas 75201 Phone: 214 922-2000

OCC 033126

Carbocloro SA Industrias Químicas
Page 2

cash flow test within the Completion Agreement) to hold the
Shareholders responsible for the sovereign risk.

Revisions to Proposed Summary of Terms

In an effort towards finalizing the restructuring, the
Shareholders and Carbocloro offer the following revisions to the
Summary of Terms:

(A)  Dividends - Carbocloro will "top off" the 432 account before
     any dividends could be remitted to the Shareholders.

(B)  Mortgage - A mortgage will be granted to the banks until:

                (1)  The debt gets paid either in New York or
                     deposited into a Deposit Facility
                     Agreement; or

                (2)  if there is an acceleration against the
                     Guarantors.

(C)  Current Ratio - The Current Ratio will revert back to 1
     to 1.

(D)  Sovereign Risk

     (1)  Guarantors are released of any further obligation if
          Carbocloro makes payment of principal under a D.F.A.

     (2)  Guarantors obligation for both principal and interest
          is suspended under an Interim Deposit Arrangement
          until:

          (a)  The I.D.A. converts to a D.F.A.; or

          (b)  December 31, 1993.

     (3)  Guarantors obligation for both principal and interest
          is suspended under an Account Arrangement until:

          (a)  The Account Arrangement converts to a D.F.A.; or

          (b)  December 31, 1989.

(E)  Remuneration:

     (1)  Restructuring Fee - $350,000 payable at closing in
          local Brazilian currency to be distributed amongst the
          banks per their percentage participation.

     (2)  Increase in Loan Spread - 1/8% p.a. scheduled to occur
          at Completion per original Credit Agreement.

OCC 033127

Carbocloro SA Indus e Comercio
Page 3

Other changes will undoubtedly need to be made to the Summary of Terms to parallel the above revisions.

<u>Action Plan</u>

Given the June 30th deadline, we need your response by June 16th. It is unlikely at this point to expect to have formal documentation executed and approval from the Central Bank of Brazil by June 30th. Nevertheless, it is our objective to reach an agreement in principal within that time frame and have Carbocloro remit the rescheduled amount of $5.5 million in principal plus interest on the payment date.

In order to document the transaction and receive local approval within Brazil, we are also requesting an additional 60-day waiver period from 6/30/86 in order to accomplish the above.

Sincerely,

C. E. Donnelly
General Manager, Treasury Operations

On behalf of Diamond Shamrock Corporation, Unipar, and Carbocloro.

OCC 033128

Confidential

OCCNJ0026571

ALCD-PUBCOM_0002449

**CITICORP⊕INVESTMENT BANK**

Citibank, N.A.
55 Water Street
New York, N.Y.
10043

April 18, 1986

TO: All Participating Banks

RE: Carbocloro S.A. Industrias Quimicas - U.S. $ 100,000,000
Credit Agreement dated as of December 22, 1977

We refer to (i) the Credit Agreement dated December 22, 1977, as amended
(the "Credit Agreement"), among Carbocloro S.A. Industrias Quimicas
("Carbocloro"), the Banks parties thereto (the "Banks") and Citibank, N.A.,
as Agent (the "Agent") for the Banks, and (ii) the Completion Agreement
dated December 22, 1977, as amended (the "Completion Agreement"), among
Diamond Shamrock Corporation ("Diamond Shamrock"), Unipar - Uniao de
Industrias Petroquimicas S.A. ("UNIPAR"), the Agent and the Banks.

As you know, the Carbocloro plant expansion has been constructed ahead of
schedule and below budgeted cost. We have been informed by Carbocloro that
the plant has the capacity to produce the specified amounts of chlorine and
caustic soda and has been operating at capacity since February, 1985. A
chart provided by Carbocloro which details the sales and profit performance
as well as the plant performance for the periods 1981 through 1985 is
enclosed with this letter. We have been informed by Carbocloro that, due
to the economic recession in Brazil, high inflation, foreign exchange
accounting treatment and limited allowance for price increases for
Carbocloro's main products, net income and cash flow have been adversely
affected throughout the period since 1981, negatively impacting Carbocloro's
liquidity and ability to service its debt.

For these reasons, Carbocloro, Diamond Shamrock and UNIPAR have proposed a
restructuring plan. The restructuring plan contemplates, among other things,
various amendments to the Credit Agreement and Completion Agreement. In
exchange for the termination of the Completion Agreement, the shareholders
have offered guarantees of the remaining unpaid principal balance of the
loan of $ 41.4 million. Following the effective date of the guarantees,
the loan spread will increase by 1/8% p.a. to a total of 2-3/8% p.a. over
LIBOR. Various other provisions are proposed to be amended to reflect the
Deposit Facility Arrangements and the Interim Deposit Arrangement which
have been in effect for 1983, 1984, and 1985, and which may apply in the
future. The details of the restructuring plan are more fully described in
the enclosed Summary of Terms.

Carbocloro's financial statements as of December 31, 1985 are also enclosed.
In addition, financial projections for Carbocloro for the 1986-89 period
are also enclosed with this letter. The financial projections reflect the

OCC 033129

Confidential

OCCNJ0026572

ALCD-PUBCOM_0002450

-2-

restructuring plan outlined in the enclosed Summary of Terms. Such projections include a summary of economic assumptions related to the future economic and technical performance of Carbocloro.

Diamond Shamrock's Annual Report for 1985, including financial statements as of December 31, 1985, and UNIPAR's financial statements as of December 31, 1985 are also enclosed with this letter.

Relatedly, as you know, pursuant to a Letter Agreement dated as of December 31, 1985, the Banks were requested to grant to Diamond Shamrock and UNIPAR a waiver through July 1, 1986 with respect to the mandatory note purchase requirement under Section 4(e) of the Completion Agreement, resulting from the failure of the Completion Agreement Termination Date to have occurred by January 1, 1986. Also, pursuant to a Letter Waiver dated as of December 31, 1985, the Banks were requested to grant a waiver to Carbocloro through July 1, 1986 of the covenant contained in Section 5.01(c) of the Credit Agreement to maintain a current ratio of at least 1.0 to 1.0 provided that Carbocloro maintain a current ratio of at least .5 to 1.0 during such waiver period. We would expect to have the formal Amendment to the Credit and Completion Agreements in place by July 1, 1986.

We have been requested to transmit the Summary of Terms to each of you for your consideration. If you have any questions regarding this proposal, please contact the undersigned (212-825-6112) or Oscar E. Silva (212-825-8759) (Telex 6720643 CIB SPECFIN NYK). Given that any restructuring plan must meet with the approval of the Central Bank of Brazil, time is of the essence. You are requested to respond to us with any comments you may have by May 2, 1986. It is our intent that the Summary of Terms and the associated legal documents will be completed no later than May 15th.

Regards,

Hugo P. Verdegaal

Enclosures:

- Status of Carbocloro
- Summary of Terms
- Carbocloro's financial statements as of December 31, 1985
- Carbocloro's financial projections
- Diamond Shamrock's Annual Report for 1985
- UNIPAR's financial statements as of December 31, 1985

OCC 033130

Confidential

STATUS OF CARBOCLORO PROJECT
January 21, 1986

1. **EXPANSION PROJECT**

| | |
|---|---|
| Project Budget | USD 151.4 Million |
| Actual Project Cost | USD 118.1 Million |

| | |
|---|---|
| Expected Startup Date | June/81 |
| Actual Startup Date | Dec/80 |

2. **SALES AND PROFIT PERFORMANCES**

SALES VOLUMES (MT)

| | 1981 | 1982 | 1983 | 1984 | 1985 |
|---|---|---|---|---|---|
| Chlorine | 98,013 | 110.887 | 131,012 | 147,158 | 156,952 |
| Caustic (Inc Resale) | 133.993 | 151,204 | 202,192 | 214,132 | 222,557 |
| HCL | 75,261 | 84,307 | 93,547 | 108,164 | 122,163 |
| Soda Bleach | 16,087 | 29,695 | 49,935 | 64,291 | 70,898 |

INCOME STATEMENTS (USD MILLIONS)

| | 1981 | 1982 | 1983 | 1984 | 1985 |
|---|---|---|---|---|---|
| Net Sales | 61.9 | 74.9 | 73.7 | 70.6 | 72.1 |
| Gross Profit | 6.8 | 13.5 | 11.1 | 12.0 | 14.2 |
| Operating Profit | 3.2 | 9.7 | 8.2 | 8.8 | 10.1 |
| Profit Before Transl. | (9.3) | (2.6) | (0.8) | 5.3 | 8.2 |
| Net Profit (Loss) | (9.5) | (6.1) | (7.5) | (2.4) | 2.5 |

NET CASH GENERATION
(USD MILLIONS)

| | 1981 | 1982 | 1983 | 1984 | 1985 |
|---|---|---|---|---|---|
| Excluding Debt Service | 14.2 | 17.7 | 17.1 | 22.9 | 24.3 |

3. **PLANT PERFORMANCE**

| | 1981 | 1982 | 1983 | 1984 | 1985 |
|---|---|---|---|---|---|
| Avg. Plant Capacity (PCT) | 58.4 | 65.9 | 80.1 | 89.6 | 98.1 |
| Power Consumption (KWH Per MT of CL2) | 3,965 | 3,798 | 3,776 | 3,794 | 3,727 |
| Salt Consumption (MT per MT of CL2) | 1,793 | 1,792 | 1,780 | 1,770 | 1,731 |
| Current Efficiency (PCT) | | | | | |
| Mercury Plant | 94.2 | 94.6 | 95.2 | 96.4 | 97.2 |
| Diaphragm Plant | 90.5 | 94.2 | 94.1 | 93.9 | 94.4 |

OCC 033131

**Confidential**

OCCNJ0026574
ALCD-PUBCOM_0002452

<u>SUMMARY OF TERMS</u>

I.    <u>Completion Agreement</u>.

A.  The financial condition concerning Available Cash Flow to
Maximum Quarterly Debt Service contained in Section 5(a)(v)
of the Completion Agreement will be excluded from the
conditions necessary to achieve the Completion Agreement
Termination Date.

B.  Pursuant to clause (f) of the definition of "Complete",
the Certifying Engineer is required to certify that the
conditions in clauses (d) and (e) of such definition have
been satisfied and that such certification has been made on
the basis of engineering tests performed within two months
prior to the date of such certification.  Clause (f) of such
definition will be amended to permit the Certifying Engineer
to base its certification on production records (rather than
on engineering tests) for any period of seven consecutive
days (the "Base Production Period") in calendar year 1985
(rather than for a period of seven consecutive days within
two months prior to the date of such certification).  The
officer of each of Diamond Shamrock and UNIPAR who delivers
the certificate pursuant to clause (vi) of Section 5(a) of
the Completion Agreement will be required to certify, in
addition to the other matters presently called for under said
clause (vi), that no material adverse change has occurred in
(i) the amount of Specification Grade chlorine or caustic
soda produced by any cell circuit of the Project or (ii) the
Project production facilities, in each case since the
termination of the Base Production Period.  Carbocloro,
Diamond Shamrock and UNIPAR propose that the Certifying
Engineer shall be the firm of Jaakko Poyry Engenharia.

C.  Diamond Shamrock, UNIPAR and Carbocloro expect to deliver
the necessary documents, at or shortly following signature of
the amending agreements described in this Summary of Terms,
establishing that the Completion Agreement Termination Date
has occurred, whereupon the obligations of Diamond Shamrock
and UNIPAR under the Completion Agreement, and the
obligations of Diamond Shamrock under its existing guaranty
which covers interest payable by Carbocloro on the Series B
Note and of UNIPAR under its existing guaranty which covers
interest payable by Carbocloro on the Series A Note, shall
terminate in accordance with the terms of the Completion
Agreement, such guaranty of Diamond Shamrock or such guaranty
of UNIPAR, as the case may be.

OCC 033132

Confidential

OCCNJ0026575

ALCD-PUBCOM_0002453

II.   Credit Agreement.

A.   The unpaid principal amount owed under the Credit
Agreement will be stated to be (1) if a Deposit Facility
Agreement (as defined in subparagraph (4) of Section IV of
this Summary of Terms) shall be in effect for 1985 maturities
on the date on which the amendment to the Credit Agreement
shall become effective, U.S.$44,444,600, which gives credit
for the deposits made under the 1983 Deposit Facility
Agreement, the 1984 Deposit Facility Agreement and such 1985
Deposit Facility Agreement or (2) if a Deposit Facility
Agreement shall not be in effect for 1985 maturities on the
date on which the amendment to the Credit Agreement shall
become effective, U.S.$66,666,900, which gives credit only
for the deposits made under the 1983 Deposit Facility
Agreement and the 1984 Deposit Facility Agreement.  If a
Deposit Facility Agreement shall not be in effect for 1985
maturities, defaults shall exist under the Credit Agreement
as a result of the failure of Carbocloro to make payment to
the Agent in U.S. dollars in New York City of the principal
amounts required to be paid in 1985 in accordance with the
terms of the Credit Agreement.  (See Section III.F. of this
Summary of Terms.)

B.   The principal amount outstanding under the Credit
Agreement, other than 1985 maturities which are in default
(and will not be rescheduled pursuant to the terms of the
amendment to the Credit Agreement) if a Deposit Facility
Agreement shall not be in effect for such maturities, will be
scheduled to be repaid in eight consecutive substantially
equal semi-annual installments, commencing on June 30, 1986
and ending on December 30, 1989.  The Credit Agreement
presently requires repayment of such outstanding principal
amount in four consecutive substantially equal semi-annual
installments, ending on December 30, 1987.  Such rescheduling
of post-1985 maturities shall not constitute, nor shall the
same be deemed to constitute, a waiver of defaults which
exist under the Credit Agreement as a result of the failure
of Carbocloro to make payment to the Agent in U.S. dollars in
New York City of the principal amounts required to be paid in
1985 if no Deposit Facility Agreement shall be in effect for
1985 maturities.

C.   As presently provided in the Credit Agreement, the
interest rate will be increased by 1/8% to 2-3/8% above the
LIBO Rate after the Completion Agreement Termination Date.

D.   Carbocloro shall continue to be required to pay interest
to the Agent in U.S. dollars in New York City on the unpaid
principal amount (including interest at the non-default rate
specified in the Credit Agreement on any principal amount

OCC 033133

Confidential

OCCNJ0026576

ALCD-PUBCOM_0002454

3

which is not paid when due to the Agent in U.S. dollars in
New York City as a result solely of the Failure to Pay Due to
an Event of Inconvertibility (as defined in subparagraph (5)
of Section IV of this Summary of Terms), notwithstanding that
the conditions for the suspension of the obligations of each
of Diamond Shamrock and UNIPAR under its guaranty referred to
in Section III.A. of this Summary of Terms with respect to
such principal payment shall be satisfied as provided in
Section III.D. of this Summary of Terms), except to the
extent that the Banks have received such interest in U.S.
dollars in New York City from the Central Bank of Brazil, as
may be the case if deposits are established pursuant to an
Interim Deposit Arrangement (as defined in subparagraph (6)
of Section IV of this Summary of Terms); provided, however,
if the conditions for the release of each of Diamond Shamrock
and UNIPAR from the obligations under its guaranty referred
to in Section III.A. of this Summary of Terms with respect to
a principal amount shall be satisfied as provided in Section
III.C. of this Summary of Terms, interest shall continue to
accrue (at the non-default rate specified in the Credit
Agreement) on such principal amount after the deposit
contemplated in Section III.C., but the obligation of
Carbocloro to pay to the Agent in U.S. dollars in New York
City interest accruing after the deposit contemplated in
Section III.C. in respect of such principal amount shall be
suspended until the date on which the Notes shall be
accelerated as provided in the Credit Agreement.  In the
event that an Interim Deposit Arrangement is established in
respect of a principal amount, the Banks shall have the right
to receive interest paid by the Central Bank in respect of
each such deposit, and Carbocloro's suspended obligation
would represent the difference between the amount which would
be payable by Carbocloro under the Credit Agreement at the
non-default rate and the amount of interest paid by the
Central Bank.  If a Deposit Facility Agreement shall become
effective covering such principal amount, the obligation of
Carbocloro to pay such accrued interest (which shall have
been suspended as contemplated in the second immediately
preceding sentence) shall terminate.

E.  Carbocloro shall continue to be required to repay
principal to the Agent in U.S. dollars in New York City.  In
the event that Carbocloro shall fail to pay to the Agent in
U.S. dollars in New York City, as and when required to be
paid under the terms of the Credit Agreement, any amount of
principal required to be paid by it under the Credit
Agreement, Carbocloro shall nevertheless be released from its
obligation under the Credit Agreement with respect to such
principal payment and any interest accruing on such principal
amount after the conditions referred to in clause (2) below

OCC 033134

Confidential

4

shall be satisfied, if the following conditions shall be
satisfied:

(1)  The failure by Carbocloro to so make such payment
constitutes a Failure to Pay Due to an Event of
Inconvertibility; and

(2)  A Deposit Facility Agreement covering such principal
payment exists at such time and:

(a)  Carbocloro shall deliver to the Central Bank of
Brazil on the affected payment date the Brazilian
currency equivalent, as of the affected payment
date, of such payment; and

(b)  The Central Bank of Brazil shall deliver in New
York City to the Agent a Deposit Confirmation (as
defined in subparagraph (3) of Section IV of this
Summary of Terms) with respect to such payment.

F.  Section 5.01(c) of the Credit Agreement, concerning
maintenance of working capital and current ratio, which was
amended by the Amendment and Waiver dated as of February 11,
1982, will be further amended to change the minimum ratio of
current assets to current liabilities to be not less than 0.8
to 1.0.  The Credit Agreement currently requires that the
ratio of current assets to current liabilities be not less
than 1.0 to 1.0.

G.  Because repayment of the loan shall be changed from four
semi-annual payments to eight semi-annual payments and the
amount of cash build-up for each principal payment will be
reduced correspondingly, Section 5.01(d) of the Credit
Agreement, which was previously amended by the Amendment and
Waiver dated as of February 11, 1982, will be further amended
to change the amount of quick assets (currently defined as
basically cash plus readily marketable securities) required
to be maintained by Carbocloro for each month prior to a
Principal Payment Date ("PPD") as follows:

| Month Prior to a PPD | Existing Obligation | Proposed Obligation |
|---|---|---|
| 6 | $3,000,000 | $2,000,000 |
| 5 | $6,000,000 | $4,000,000 |
| 4 | $6,000,000 | $4,000,000 |
| 3 | $9,000,000 | $6,000,000 |
| 2 | $12,000,000 | $8,000,000 |
| 1 | $15,000,000 | $10,000,000 |

OCC 033135

**Confidential**

5

H.  Section 5.01(m) of the Credit Agreement (requiring that
Carbocloro grant a mortgage on or prior to the Completion
Agreement Termination Date) shall be deleted.  The
corresponding default provision of Section 6.01(l) of the
Credit Agreement shall also be deleted.

I.  Section 5.02(d) of the Credit Agreement will be amended
to permit Carbocloro to pay cash dividends to Diamond
Shamrock and UNIPAR in any fiscal year of Carbocloro (the
"Current Year") if:

   (1) and to the extent that the quotient obtained by
   dividing (a) the aggregate amount of (i) Carbocloro's net
   income after taxes from operations for the fiscal year
   (the "Base Year") next preceding the Current Year, plus
   (ii) interest paid or scheduled to have been paid by
   Carbocloro on all debt of Carbocloro for the Base Year,
   plus (iii) the aggregate amount of depreciation of fixed
   assets of Carbocloro and amortization of intangible
   assets of Carbocloro set forth in the income statement of
   Carbocloro for the Base Year by (b) the aggregate amount
   of (i) interest (based upon then current interest rates,
   in the event of debt bearing interest at fluctuating
   interest rates, and assuming then current exchange rates)
   and principal on all debt of Carbocloro paid or scheduled
   to be paid by Carbocloro during the Current Year, plus
   (ii) the amount of such expected dividend payment, plus
   (iii) the amount of all other cash dividends paid by
   Carbocloro during the Current Year, shall be 1.2 or
   higher;

   (2) no Event of Default (other than an Event of Default
   occurring solely as a result of a Failure to Pay Due to
   an Event of Inconvertibility), or event which with the
   giving of notice or the passage of time, or both, would
   constitute an Event of Default (other than an Event of
   Default occurring solely as a result of a Failure to Pay
   Due to an Event of Inconvertibility), shall have occurred
   and be continuing on the date of the declaration or
   payment of such proposed dividend or shall result from
   the declaration or payment of such proposed dividend;

   (3) if an Event of Default shall have occurred solely as
   a result of a Failure to Pay Due to an Event of
   Inconvertibility and be continuing on the date of the
   declaration or payment of such proposed dividend, or if
   an event which with the giving of notice or the passage
   of time, or both, would constitute such an Event of
   Default shall have occurred and be continuing on such
   date and, if such an Event of Default shall have occurred
   with respect to a principal payment, the conditions for

**OCC 033136**

the release of each of Diamond Shamrock and UNIPAR from its obligations under its guaranty with respect to such principal payment shall be satisfied as provided in Section III.C. of this Summary of Terms or if such Event of Default shall have occurred with respect to a principal or interest payment, the conditions for the suspension of the obligations of each of Diamond Shamrock and UNIPAR under its guaranty with respect to such payment shall be satisfied as provided in Section III.D. or III.E. of this Summary of Terms; and

(4) if any Account (as defined in subparagraph (1) of Section IV of this Summary of Terms) shall exist on the date of the declaration or payment of such proposed dividend, the Amount of Collateral (as defined in subparagraph (2) of Section IV of this Summary of Terms) in such Account is the Brazilian currency equivalent of at least 100% of the U.S. dollar amount of the affected payment covered by such Account.

For purposes solely of Section 5.02(d) of the Credit Agreement, a principal or interest payment shall be considered to have been paid by Carbocloro if, in the case of a principal payment, the conditions for the release of each of Diamond Shamrock and UNIPAR from its obligations under its guaranty with respect to such principal payment shall be satisfied as provided in Section III.C. of this Summary of Terms or if, in the case of a principal or interest payment, the conditions for the suspension of the obligations of each of Diamond Shamrock and UNIPAR under its guaranty with respect to such payment shall be satisfied as provided in Section III.D. or III.E. of this Summary of Terms.

J.   Section 6.01(a) of the Credit Agreement will be amended to provide that an Event of Default shall occur if Carbocloro shall fail to pay any amount of principal of, or interest on, any Note when due or, prior to the termination of the obligations of each of Diamond Shamrock and UNIPAR under its guaranty referred to in Section III.A. of this Summary of Terms, within ten days after written notice thereof shall have been given to Carbocloro, Diamond Shamrock and UNIPAR by the Agent or the Majority Banks.  Section 6.01(a) currently provides that, prior to the Completion Agreement Termination Date, an Event of Default shall occur 15 days after such written notice shall have been so given.  Section 6.01(g) of the Credit Agreement shall be amended to apply to Diamond Shamrock and UNIPAR during such time as the Diamond Shamrock Guaranty and the UNIPAR Guaranty referred to in Section III.A. of this Summary of Terms shall be in effect.  In addition, Section 6.01 of the Credit Agreement shall be amended to provide that the Notes may only be accelerated, so

OCC 033137

7

long as the Diamond Shamrock Guaranty and the UNIPAR Guaranty
referred to in Section III.A. of this Summary of Terms shall
be in effect, if any of the events specified in subparagraphs
(a), (c), (e), (f), (g) or (k) shall have occurred and be
continuing.   Section 6.01 currently provides for acceleration
prior to the Completion Agreement Termination Date only if
any of the events specified in the same subparagraphs shall
have occurred and be continuing.

K.   Various other provisions of the Credit Agreement will be
amended to reflect the terms summarized herein.


III.    Guaranty.

A.   Each of Diamond Shamrock and UNIPAR will execute and
deliver a separate guarantee pursuant to which Diamond
Shamrock and UNIPAR, as the case may be, will each
unconditionally guarantee the payment in U.S. dollars in New
York City of 50% of the outstanding principal amount of the
loan (namely U.S.$44,444,600) which comes due, under the
amendment to the Credit Agreement, in 1986 and thereafter
(i.e., the guaranties will not cover the 1985 maturities even
if a Deposit Facility Agreement shall not be in effect for
such maturities on the date on which the amendment to the
Credit Agreement shall become effective), plus interest on
such principal amount.   Each such guaranty shall provide that
Diamond Shamrock and UNIPAR shall be obligated thereunder to
make each such payment required to be made thereunder 10 days
following notice to Carbocloro, Diamond Shamrock and UNIPAR,
as the case may be, from the Agent or the Majority Banks that
~~Carbocloro has failed~~ to pay any principal or interest when
due under the Credit Agreement if such default shall then be
continuing.   Each such guaranty shall be effective from the
Completion Agreement Termination Date.

B.   Neither Diamond Shamrock nor UNIPAR will be obligated
under its guaranty with respect to any amount required to be
paid by Carbocloro under the Credit Agreement, if Carbocloro
shall have been released from its obligation under the Credit
Agreement with respect to such payments as provided in
Section II.E. of this Summary of Terms.

C.   In the event that Carbocloro shall fail to pay to the
Agent in U.S. dollars in New York City, as and when required
to be paid under the terms of the Credit Agreement, any
amount of principal required to be paid by it under the
Credit Agreement and such principal payment shall not be
covered by a Deposit Facility Agreement, each of Diamond
Shamrock and UNIPAR will be released from its obligations
under its guaranty with respect to such principal payment and

OCC 033138

8

any interest accruing on such principal amount after the conditions referred to in clause (2) below shall be satisfied, if the following conditions shall be satisfied:

(1)  The failure by Carbocloro to so make such payment constitutes a Failure to Pay Due to an Event of Inconvertibility; and

(2)  An Interim Deposit Arrangement covering such principal payment exists at such time and:

(i)  Carbocloro shall deliver to the Central Bank of Brazil on the affected payment date the Brazilian currency equivalent, as of the affected payment date, of such payment; and

(ii)  The Central Bank of Brazil shall deliver in New York City to the Agent a Deposit Confirmation with respect to such payment.

D.  In the event that Carbocloro shall fail to pay to the Agent in U.S. dollars in New York City, as and when required to be paid under the terms of the Credit Agreement, any amount of principal required to be paid by it under the Credit Agreement and such principal payment shall not be covered by a Deposit Facility Agreement or an Interim Deposit Arrangement, the obligations of Diamond Shamrock under the Diamond Shamrock Guaranty and the obligations of UNIPAR under the UNIPAR Guaranty with respect of such principal payment shall be suspended for the period of time during which an Account shall be in effect to secure the obligation of Carbocloro in respect of such principal payment and the requirement referred to in the first sentence of Section III.K. of this Summary of Terms shall be satisfied with respect to such Account, if the following conditions shall be satisfied:

(1)  The failure by Carbocloro to so make such payment constitutes a Failure to Pay Due to an Event of Inconvertibility;

(2)  Carbocloro shall deliver to Citibank Sao Paulo on the affected payment date the Brazilian currency equivalent, as of the affected payment date, of such payment;

(3)  Citibank Sao Paulo shall receive irrevocable instructions from Carbocloro to deposit immediately on the affected payment date such Brazilian currency equivalent in an Account with Citibank Sao Paulo and to invest immediately thereafter all amounts in such Account

OCC 033139

Confidential

9

in Permitted Investments (as defined in subparagraph (7) of Section IV of this Summary of Terms); and

(4)  Carbocloro shall deliver to Citibank Sao Paulo, on the affected payment date, for prompt delivery by Citibank Sao Paulo to the Agent in New York City, an executed copy of a Pledge Agreement (as defined in subparagraph (8) of Section IV of this Summary of Terms) with respect to such Account, together with (i) an instrument, endorsed in blank, representing or evidencing such Account and (ii) all instruments, endorsed in blank, representing or evidencing the Permitted Investments in such Account.

E.  In the event that Carbocloro shall fail to pay to the Agent in U.S. dollars in New York City, as and when required to be paid under the terms of the Credit Agreement, any amount of interest required to be paid by it under the Credit Agreement and the Central Bank of Brazil has not paid such amount as contemplated by Section II.D. of this Summary of Terms, the obligation of Diamond Shamrock under the Diamond Shamrock Guaranty and the obligation of UNIPAR under the UNIPAR Guaranty with respect of such interest payment shall be suspended for the period of time during which an Account shall be in effect to secure the obligation of Carbocloro in respect of such interest payment and the requirement referred to in the first sentence of Section III.K. of this Summary of Terms shall be satisfied with respect to such Account, if the following conditions shall be satisfied:

(1)  The failure by Carbocloro to so make such payment constitutes a Failure to Pay Due to an Event of Inconvertibility;

(2)  Carbocloro shall deliver to Citibank Sao Paulo on the affected payment date the Brazilian currency equivalent, as of the affected payment date, of such payment;

(3)  Citibank Sao Paulo shall receive irrevocable instructions from Carbocloro to deposit immediately on the affected payment date such Brazilian currency equivalent in an Account with Citibank Sao Paulo and to invest immediately thereafter all amounts in such Account in Permitted Investments; and

(4)  Carbocloro shall deliver to Citibank Sao Paulo, on the affected payment date, for prompt delivery by Citibank Sao Paulo to the Agent in New York City, an executed copy of a Pledge Agreement, together with (i) an instrument, endorsed in blank, representing or evidencing

OCC 033140

Confidential

such Account and (ii) all instruments, endorsed in blank, representing or evidencing the Permitted Investments in such Account.

F.   Notwithstanding the establishment of deposits pursuant to an Interim Deposit Arrangement as described in Section III.C. or deposits into an Account as described in Section III.D. and Section III.E., after the giving of notice and the passage of time an Event of Default under the Credit Agreement shall have occurred as a result of the failure of Carbocloro to make payment to the Agent in U.S. dollars in New York City in accordance with the terms of the Credit Agreement, and the Agent and the Banks shall have the right to exercise all rights and remedies provided for in the Credit Agreement as a consequence of the occurrence of such Event of Default.   The establishment of deposits in respect of an affected payment pursuant to an Interim Deposit Arrangement or deposit of the Brazilian currency equivalent of an affected payment in an Account shall not constitute, nor shall the same be deemed to constitute, a waiver of an Event of Default or any other default under the Credit Agreement.

G.   In the event that UNIPAR shall fail to pay to the Agent in U.S. dollars in New York City, as and when required to be paid under the terms of the UNIPAR Guaranty, any amount in respect of principal required to be paid by it under the UNIPAR Guaranty, UNIPAR shall nevertheless be released from its obligation under the UNIPAR Guaranty with respect to such principal payment if the following conditions shall be satisfied:

   (1)   The failure by UNIPAR to so make such payment constitutes a Failure to Pay Due to an Event of Inconvertibility; and

   (2)   A Deposit Facility Agreement covering such payment by UNIPAR exists at such time and:

      (a)   UNIPAR shall deliver to the Central Bank of Brazil on the affected payment date the Brazilian currency equivalent, as of the affected payment date, of such payment; and

      (b)   The Central Bank of Brazil shall deliver in New York City to the Agent a Deposit Confirmation with respect to such payment.

H.   In the event that UNIPAR shall fail to pay to the Agent in U.S. dollars in New York City, as and when required to be paid under the terms of the UNIPAR Guaranty, any amount in

OCC 033141

Confidential

OCCNJ0026584

ALCD-PUBCOM_0002462

respect of principal or interest required to be paid by it under the UNIPAR Guaranty and, with respect to such principal amount, no Deposit Facility Agreement shall then be in effect covering it, the obligation of UNIPAR under the UNIPAR Guaranty in respect of such amount shall be suspended for the period of time during which an Interim Deposit Arrangement or an Account shall be in effect to secure the obligation of UNIPAR in respect of such payment, if the following conditions shall be satisfied:

(1)  The failure by UNIPAR to so make such payment constitutes a Failure to Pay Due to an Event of Inconvertibility; and

(2)  An Interim Deposit Arrangement covering such principal amount exists at such time and:

(i)  UNIPAR shall deliver to the Central Bank of Brazil on the affected payment date the Brazilian currency equivalent, as of the affected payment date, of such payment; and

(ii)  The Central Bank of Brazil shall deliver to the Agent in New York City a Deposit Confirmation with respect to such payment; or

(3)  No Interim Deposit Arrangement is in effect covering the affected payment and:

(i)  UNIPAR shall deliver to Citibank Sao Paulo on the affected payment date the Brazilian currency equivalent, as of the affected payment date, of such payment;

(ii) Citibank Sao Paulo shall receive irrevocable instructions from UNIPAR to deposit immediately on the affected payment date such Brazilian currency equivalent in an Account with Citibank Sao Paulo and to invest immediately thereafter all amounts in such Account in Permitted Investments; and

(iii) UNIPAR shall deliver to Citibank Sao Paulo, on the affected payment date, for prompt delivery by Citibank Sao Paulo to the Agent in New York City, an executed copy of a Pledge Agreement, together with (x) an instrument, endorsed in blank, representing or evidencing such Account and (y) all instruments, endorsed in blank, representing or evidencing the Permitted Investments in such Account.

I.  Diamond Shamrock or UNIPAR shall have the right to purchase the Series A Notes or the Series B Notes.

OCC 033142

Confidential

12

respectively.  The purchase price of each such Series of
Notes shall be equal to the outstanding principal amount of
such Notes and all accrued interest to the date of purchase,
without giving effect to any deposits made into an Account.
The purchase price shall be paid to the Agent in U.S. dollars
in New York City.  Upon such purchase, all amounts in an
Account in respect of amounts payable under such Notes shall
be assigned to the purchaser of such Notes.

J.  Amounts on deposit in an Account shall be, to the extent
practicable, continuously invested and reinvested in
Permitted Investments until such time or times as said
amounts shall be required to be released to Carbocloro or
UNIPAR, as the case may be, pursuant to Section III.L. of
this Summary of Terms, provided, that in no event, shall an
amount in excess of 10% of the Amount of Collateral in the
Account not be so invested at any time.

K.  In the event that, on any Valuation Date (as defined in
subparagraph (9) of Section IV of this Summary of Terms)
after an affected payment date, the Amount of Collateral in
an Account shall, for any reason (including, but not limited
to, fluctuations in the official exchange rate, withdrawals
or releases for any reason other than to effect payment to
Banks, unless otherwise consented to by the Banks, and any
loss or cost in connection with liquidating any investments
in the Account), be less than 95% of the Brazilian currency
equivalent of the sum of the U.S. dollar amount of the
affected payment plus, if such affected payment were to have
been a principal payment, interest accrued (as provided in
Section II.D. of this Summary of Terms) on such principal
payment, the Agent shall request that Carbocloro, in the case
of an Account established by Carbocloro pursuant to Section
III.D. or Section III.E. of this Summary of Terms, and if so
requested Carbocloro shall, within 7 days, deliver to
Citibank Sao Paulo for deposit in such Account, a Brazilian
currency amount which, together with the Amount of Collateral
in such Account, is the Brazilian currency equivalent, as of
the date of the new deposit, of the U.S. dollar amount of the
affected payment plus, if such affected payment were to have
been a principal payment, interest so accrued thereon to such
date.  In the event that at any time the Amount of Collateral
in an Account established by Carbocloro shall be more than
105% of the Brazilian currency equivalent of the sum of the
U.S. dollar amount of the affected payment plus, if such
affected payment were to have been a principal payment,
interest accrued (as provided in Section II.D. of this
Summary of Terms) on such principal payment, then Carbocloro,
in the case of an Account established by Carbocloro pursuant
to Section III.D. or Section III.E. of this Summary of Terms,
shall be entitled at its request to receive payment from such

OCC 033143

Confidential

Account of a Brazilian currency amount which, as of the date of withdrawal, is the excess of the Amount of Collateral in the Account over the Brazilian currency equivalent of the U.S. dollar amount of the affected payment plus, if such affected payment were to have been a principal payment, interest so accrued to such date. The Diamond Shamrock Guaranty and the UNIPAR Guaranty will cover the obligation of Carbocloro described in this Section III.K. The failure of Diamond Shamrock or UNIPAR to make the payment described in this Section III.K. shall constitute an Event of Default under the Credit Agreement and the Banks and the Agent shall have the right to exercise all rights and remedies provided for in the Credit Agreement.

L. If a deposit has been made pursuant to an Interim Deposit Arrangement, and a Deposit Facility Agreement becomes effective which covers the principal payment in respect of which such deposit was made under the Interim Deposit Arrangement, then Carbocloro or UNIPAR, as the case may be, shall take such action as may be required to establish such deposit as a deposit under the Deposit Facility Agreement. If a deposit has been made in an Account in accordance with Section III.D., Section III.E. or Section III.H. of this Summary of Terms at a time when there was no Deposit Facility Agreement or Interim Deposit Arrangement in effect, and a Deposit Facility Agreement or Interim Deposit Arrangement becomes effective which covers the principal payment in respect of which such deposit was established, then the deposit so established shall be released to Carbocloro or UNIPAR, as the case may be, if the deposit required to be made under the Deposit Facility Agreement or the Interim Deposit Arrangement, as the case may be, shall have been made in accordance with the Deposit Facility Agreement or the Interim Deposit Arrangement, as the case may be, and the Central Bank of Brazil shall have delivered to the Agent in New York City a Deposit Confirmation with respect to such amount. If a deposit has been made in an Account in accordance with Section III.D., Section III.E. or Section III.H. of this Summary of Terms at a time where there was no Deposit Facility Agreement or Interim Deposit Arrangement in effect, and a mechanism becomes effective or the means exist whereby the payment in respect of which such Account was established may be made to the Agent in U.S. dollars in New York City, then the deposit so established shall be released to Carbocloro or UNIPAR, as the case may be, upon receipt of assurance satisfactory to the Banks that such payment shall be so made.

M. If the Notes are accelerated as a result of an Event of Default (other than an Event of Default solely as a result of a Failure to Pay Due to an Event of Inconvertibility and

OCC 033144

Confidential

Carbocloro shall have taken such action contemplated in Section III.C., Section III.D. or Section III.E., as the case may be), the Diamond Shamrock Guaranty and the UNIPAR Guaranty shall guarantee the payment of an amount equal to (i) the unpaid principal amount of the applicable series of Notes (after giving credit for deposits established pursuant to a Deposit Facility Agreement as contemplated by Section II.E. of this Summary of Terms) minus (ii) the deposits established under an Interim Deposit Arrangement in respect of any payment of such Notes.  If (i) the Notes are accelerated as a result of the occurrence of an Event of Default solely as a result of a Failure to Pay Due to an Event of Inconvertibility and (ii) Carbocloro shall have taken such action contemplated in Section III.C., Section III.D. or Section III.E., as the case may be, the Diamond Shamrock Guaranty and the UNIPAR Guaranty shall not guarantee the payment of the accelerated principal amount.  If the Notes are accelerated as described in the immediately preceding sentence, the Diamond Shamrock Guaranty and the UNIPAR Guaranty shall continue to guarantee the payment of any unpaid principal amount which was due and payable prior to such acceleration in respect of which an Account shall have been established by Carbocloro, the interest accrued on such principal amount and the obligation of Carbocloro referred to in the first sentence of Section III.K. of this Summary of Terms.

IV.    <u>Definitions</u>.

The following terms used herein shall have the meanings set forth below:

(1) "<u>Account</u>" shall mean an account established at Citibank Sao Paulo in which Carbocloro or UNIPAR, as the case may be, shall deposit the Brazilian currency equivalent of an affected payment together with the Permitted Investments purchased with amounts on deposit in such Account.

(2) "<u>Amount of Collateral</u>" shall mean, with respect to an Account and as of a Valuation Date, the sum of (a) ~~the~~ the credit balance of such Account on such Valuation Date and (b) the aggregate principal amount of all Permitted Investments outstanding on such Valuation Date.

(3) "<u>Deposit Confirmation</u>" shall mean, with respect to any payment required to be made by Carbocloro under the Credit Agreement or by UNIPAR under the UNIPAR Guaranty which is covered by a Deposit Facility Agreement or an Interim Deposit Arrangement, a confirmation of the

OCC 033145

**Confidential**

Central Bank of Brazil, delivered in New York City to the
Agent, to the effect that a deposit account has been
opened in favor of each of the Banks in an amount in U.S.
dollars (unless, with respect to such Bank, otherwise
consented to) equal to such Bank's pro rata share of such
payment, which account is, pursuant to such Deposit
Facility Agreement or Interim Deposit Arrangement, (a)
governed by New York law, (b) denominated in U.S. dollars
(unless, with respect to such Bank, otherwise consented
to), (c) payable in New York (unless, with respect to
such Bank, otherwise consented to) at some stated
maturity date or on demand and (d) guaranteed by the
Federative Republic of Brazil.

(4) "Deposit Facility Agreement" shall mean an agreement
which (a) provides for the deposit of Brazilian currency
with the Central Bank of Brazil by Brazilian debtors, and
for the opening by the Central Bank of Brazil of deposits
in the name of each Bank denominated in U.S. dollars
(unless, with respect to any of the Banks, otherwise
consented to), which is governed by New York law, payable
in New York (unless, with respect to any of the Banks,
otherwise consented to) at some stated maturity date or
on demand and guaranteed by the Federative Republic of
Brazil, (b) is embodied in a written agreement to which
the Federative Republic of Brazil, the Central Bank of
Brazil, each of the Banks and other banks are parties and
(c) expressly provides that payments into such deposit
accounts shall be considered or deemed payment of the
affected debt, as contemplated by Section 2.01(e) the
1983 Deposit Facility Agreement and Section 2.01(e) of
the 1984 Deposit Facility Agreement.

(5) "Failure to Pay Due to an Event of Inconvertibility"
shall mean any failure by Carbocloro or UNIPAR to pay to
the Agent in U.S. dollars in New York City, as and when
required to be paid under the terms of the Credit
Agreement or the UNIPAR Guaranty, as the case may be, any
amount payable by it under the Credit Agreement or the
UNIPAR Guaranty, as the case may be, which results solely
from restrictions imposed by the government of Brazil on
the transfer of foreign currency out of Brazil or
otherwise results solely from the inability of or failure
by the Central Bank of Brazil, for whatever reason, to
make available to Carbocloro or UNIPAR, as the case may
be, U.S. dollars for the purpose of making such payment
(and such failure does not result, in whole or in part,
from any action or inaction on the part of Carbocloro or
UNIPAR, as the case may be, including, without
limitation, any failure by Carbocloro or UNIPAR, as the
case may be, to comply with any relevant law, rule or
regulation of the government of Brazil).

OCC 033146

Confidential

(6) "Interim Deposit Arrangement" shall mean any arrangement which (a) satisfies each of the conditions in clause (a) of the definition of "Deposit Facility Agreement" set forth in subparagraph 4 of this Section IV, (b) does not satisfy the condition set forth in either of clause (b) or (c) or in both of clause (b) and (c) of such definition and (c) is embodied in a written communication from the Federative Republic of Brazil or the Central Bank of Brazil.

(7) "Permitted Investment" shall mean any instrument which (a) [specific categories of investments will be specified in the final documentation] and (b) is represented or evidenced by an instrument which is (i) under Brazilian law, a negotiable instrument and (ii) payable to bearer.

(8) "Pledge Agreement" shall mean a pledge agreement governed by New York law, in form and substance reasonably satisfactory to the Agent and the Banks, pursuant to which Carbocloro or UNIPAR, as the case may be, shall grant to the Agent, on behalf of the Banks, a first priority security interest in an Account and Permitted Investments and all instruments evidencing such Account and Permitted Investments to secure the payment and performance of all obligations of Carbocloro under the Credit Agreement or of UNIPAR under the UNIPAR Guaranty, as the case may be.

(9) "Valuation Date" shall mean the date on which the Agent shall determine the Amount of Collateral in the Account, which date shall occur quarterly on the last day of each calendar quarter and upon the reasonable request of Carbocloro for the purpose of determining whether a dividend shall be permitted to be paid in accordance with Section 5.02(d) of the Credit Agreement.

**OCC 033147**

Confidential

CARBOCLORO S.A. - INDÚSTRIAS QUÍMICAS

FINANCIAL STATEMENTS IN U.S. DOLLARS
DECEMBER 31, 1985 AND 1984

CONTENTS

Opinion of independent accountants

Exhibit   I - Balance sheet

Exhibit  II - Statement of income and accumulated deficit

Exhibit III - Statement of changes in financial position

Notes to the financial statements

Abbreviations used

| | | |
|---|---|---|
| Cr$ | - | Cruzeiros |
| US$ | - | U.S. dollars |
| LIBOR | - | London Interbank Offer Rate |
| ICM | - | Value added sales tax |
| PIS | - | Social Integration Program |
| FINSOCIAL | - | Social Investment Fund |



OCC 033148

Confidential

OCCNJ0026591
ALCD-PUBCOM_0002469

*Price Waterhouse*



OPINION OF INDEPENDENT ACCOUNTANTS

January 15, 1986

To the Board of Directors
Carbocloro S.A. - Indústrias Químicas

We have examined the balance sheets of Carbocloro S.A. - Indústrias
Químicas as of December 31, 1985 and 1984 and the related statements
of income and accumulated deficit and of changes in financial position
for the years then ended, expressed in United States dollars. Our
examinations were made in accordance with generally accepted auditing
standards and accordingly included such tests of the accounting
records and such other auditing procedures as we considered necessary
in the circumstances.

The company's accounting records are maintained in cruzeiros and were
remeasured and adjusted into United States dollars on the bases stated
in Note 1 and prescribed by Diamond Shamrock Corporation for the
preparation of its consolidated financial statements. The
remeasurements and adjustments have been made on a consistent basis.

In our opinion, the financial statements examined by us, expressed in
United States dollars on the basis mentioned in the preceding
paragraph, present fairly the financial position of Carbocloro S.A. -
Indústrias Químicas at December 31, 1985 and 1984 and the results of
its operations and the changes in its financial position for the years
then ended, in conformity with accounting principles generally
accepted in the United States of America consistently applied.

PRICE WATERHOUSE
Auditores Independentes
CRC-SP-160

Paulo Giuliano
Contador
CRC-SP-100.962

2

OCC 033149

Confidential

OCCNJ0026592

ALCD-PUBCOM_0002470

Rua General Jardim 33
Caixa Postal 1975
01051 São Paulo SP  Brasil

*Price Waterhouse*

OPINION OF INDEPENDENT ACCOUNTANTS

January 15, 1986

To the Board of Directors
Carbocloro S.A. - Indústrias Químicas

We have examined the balance sheets of Carbocloro S.A. - Indústrias Químicas as of December 31, 1985 and 1984 and the related statements of income and accumulated deficit and of changes in financial position for the years then ended, expressed in United States dollars.  Our examinations were made in accordance with generally accepted auditing standards and accordingly included such tests of the accounting records and such other auditing procedures as we considered necessary in the circumstances.

The company's accounting records are maintained in cruzeiros and were remeasured and adjusted into United States dollars on the bases stated in Note 1 and prescribed by Diamond Shamrock Corporation for the preparation of its consolidated financial statements.   The remeasurements and adjustments have been made on a consistent basis.

In our opinion, the financial statements examined by us, expressed in United States dollars on the basis mentioned in the preceding paragraph, present fairly the financial position of Carbocloro S.A. - Indústrias Químicas at December 31, 1985 and 1984 and the results of its operations and the changes in its financial position for the years then ended, in conformity with accounting principles generally accepted in the United States of America consistently  applied.

PRICE WATERHOUSE
Auditores Independentes
CRC-SP-160

Paulo Giuliano
Contador
CRC-SP-100.962

2

OCC 033150

**Confidential**

EXHIBIT 1

CARBOCLORO S.A. - INDUSTRIAS QUIMICAS

BALANCE SHEET AT DECEMBER 31, 1985 AND 1984
In thousands of U.S. dollars

ASSETS

| | 1985 | 1984 |
|---|---|---|
| **CURRENT ASSETS** | | |
| Cash and banks | 29 | 264 |
| Marketable securities | 306 | 2,059 |
| Deposits in foreign currency in Brazilian Central Bank | 2,837 | 8,706 |
| Trade accounts receivable | 10,163 | 9,479 |
| Trade bills discounted | ( 2,834) | ( 648) |
| Deferred income tax | | 2,134 |
| Other accounts receivable | 2,220 | 1,291 |
| Inventories | 5,679 | 3,982 |
| Prepaid expenses | 1,625 | 1,573 |
| | 20,025 | 28,840 |
| **LONG-TERM RECEIVABLES** | | |
| Investments and deposits for tax incentives | 651 | 690 |
| Compulsory loans | 390 | 345 |
| Deferred income tax | 1,104 | 1,503 |
| | 2,145 | 2,538 |
| **PROPERTY, PLANT AND EQUIPMENT** | | |
| Land | 7,320 | 7,320 |
| Buildings and improvements | 9,216 | 9,142 |
| Machinery and equipment | 158,717 | 158,079 |
| Other | 1,480 | 1,497 |
| | 176,733 | 176,038 |
| Accumulated depreciation | 87,172 | ( 72,785) |
| | 89,561 | 103,253 |
| Construction in progress | 4,625 | 2,223 |
| | 94,186 | 105,476 |
| **DEFERRED CHARGES** | | |
| Start-up costs for expansion project | 2,065 | 1,944 |
| | 118,421 | 138,798 |

LIABILITIES

| | 1985 | 1984 |
|---|---|---|
| **CURRENT LIABILITIES** | | |
| Suppliers | 4,217 | 3,036 |
| Salaries and social security contributions | 755 | 622 |
| Value added sales and excise taxes | 2,336 | 1,996 |
| Bank loans | 22,279 | 23,490 |
| Other payables and accruals | 2,759 | 1,333 |
| | 32,346 | 30,477 |
| **LONG-TERM DEBT** | 22,222 | 44,444 |
| **DEFERRED INCOME TAX** | 1,104 | 3,637 |
| **STOCKHOLDERS' EQUITY** | | |
| Capital | 79,813 | 79,813 |
| Accumulated deficit | ( 17,064) | ( 19,521) |
| | 62,749 | 60,240 |
| | 118,421 | 138,798 |

The accompanying notes are an integral part of these financial statements.

3

OCC 033151

Confidential

EXHIBIT II

**CARBOCLORO S.A. - INDUSTRIAS QUIMICAS**

STATEMENT OF INCOME AND ACCUMULATED DEFICIT
FOR THE YEARS ENDED DECEMBER 31
In thousands of U.S. dollars

|  | 1985 | 1984 |
|---|---|---|
| SALES | 88.625 | 88,891 |
| Less: | | |
| . Taxes on sales (I.C.M., PIS, FINSOCIAL) | 14,574 | 14,538 |
| . Discounts and other deductions | 1,979 | 3,743 |
|  | 16,553 | 18,281 |
| Net sales | 72,072 | 70,610 |
| COST OF SALES | (57,854) | (58,611) |
| Gross profit | 14,218 | 11,999 |
| GENERAL AND ADMINISTRATIVE EXPENSES | ( 3,829) | ( 2,899) |
| AMORTIZATION OF DEFERRED START-UP COSTS | ( 315) | ( 315) |
| Operating profit | 10,074 | 8,785 |
| INTEREST EXPENSE, NET | ( 1.861) | ( 3,544) |
| TRANSLATION LOSS | ( 4,208) | ( 7,610) |
| INCOME (LOSS) BEFORE INCOME TAX AND EXTRAORDINARY ITEM | 4,005 | ( 2,369) |
| DEFERRED INCOME TAX | ( 1,496) | ( 1,503) |
| INCOME (LOSS) BEFORE EXTRAORDINARY ITEM | 2,509 | ( 3,872) |
| EXTRAORDINARY ITEM | _____ | 1,503 |
| NET INCOME (LOSS) FOR THE YEAR | 2,509 | ( 2,369) |
| ACCUMULATED DEFICIT AT THE BEGINNING OF THE YEAR | (19,573) | (17,934) |
| PRIOR YEAR ADJUSTMENT | _____ | 730 |
| ACCUMULATED DEFICIT AT THE END OF THE YEAR | (17,064) | (19,573) |

The accompanying notes are an integral part of these financial statements.



OCC 033152

Confidential

EXHIBIT III

CARBOCLORO S.A. - INDÚSTRIAS QUÍMICAS

STATEMENT OF CHANGES IN FINANCIAL POSITION
FOR THE YEARS ENDED DECEMBER 31
In thousands of U.S. dollars

|  | 1985 | 1984 |
|---|---|---|
| FINANCIAL RESOUCES WERE PROVIDED BY: |  |  |
| Net income (loss) for the year | 2,509 | ( 2,369) |
| Expenses (income) not affecting working capital |  |  |
| . Depreciation, amortization of deferred charges and of long-term deferred income tax asset | 15,412 | 15,089 |
| . Disposals of fixed assets | 225 | 313 |
| . Increase in deferred income tax |  | 3,637 |
| . Translation gain on long-term deferred income tax liability | ( 2,533) |  |
| TOTAL RESOURCES PROVIDED | 15,613 | 16,670 |
| FINANCIAL RESOURCES WERE USED FOR: |  |  |
| Increase in long-term receivables | 55 | 1,571 |
| Additions to property, plant and equipment | 3,584 | 2,071 |
| Current maturities of long term debt | 22,222 | 23,223 |
| Additions to deferred charges | 436 |  |
| TOTAL RESOURCES USED | 26,297 | 26,865 |
| DECREASE IN WORKING CAPITAL | (10,684) | (10,195) |
| CHANGES IN WORKING CAPITAL |  |  |
| Increase (decrease) in current assets: |  |  |
| . Cash and banks | ( 235) | 29 |
| . Marketable securities | ( 1,753) | ( 2,640) |
| . Deposits in foreign currency | ( 5,869) | ( 8,772) |
| . Trade accounts receivable | ( 1,502) | ( 1,388) |
| . Deferred income tax | ( 2,134) | 2,134 |
| . Other accounts receivable | 929 | 556 |
| . Inventories | 1,697 | ( 1,157) |
| . Prepaid expenses | 52 | 1,459 |
|  | ( 8,815) | ( 9,779) |
| Decrease (increase) in current liabilities |  |  |
| . Suppliers | ( 1,181) | 516 |
| . Salaries and social security contributions | ( 133) | ( 38) |
| . Value added sales and excise taxes | ( 340) | ( 129) |
| . Bank loans | 1,211 | ( 636) |
| . Other payables and accruals | ( 1,426) | ( 129) |
|  | ( 1,869) | ( 416) |
| DECREASE IN WORKING CAPITAL | (10,684) | (10,195) |

The accompanying notes are an integral part of these financial statements.

OCC 033153

Confidential

CARBOCLORO S.A. - INDÚSTRIAS QUÍMICAS

NOTES TO THE FINANCIAL STATEMENTS IN U.S. DOLLARS
AT DECEMBER 31, 1985 AND 1984

1    SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

(a)  Basis of adjustment and translation and prior year adjustment

The company's books and accounts are maintained in Brazilian
cruzeiros.  The cruzeiro amounts have been adjusted as described in
Note 7 and translated into U.S. dollars in accordance with Statement
of Financial Accounting Standards no. 52 as applicable to highly
inflationary economies.  In accordance with the Statement, assets and
liabilities are translated at year-end exchange rates, except
inventories, deferred charges, property, plant and equipment and
investments which are translated at exchange rates prevailing when the
assets were acquired; income and expenses are translated at the
average exchange rate for the year except for cost of products sold,
depreciation, amortization of deferred charges and gains or losses on
property, plant and equipment retired which are translated at
historical rates.

(b)  Marketable securities

Marketable securities are stated at cost plus accrued interest which
approximates their market value.

(c)  Inventories

Inventories are principally valued at the lower of average cost or
market.

(d)  Property, plant and equipment

Property, plant and equipment are carried at cost and are depreciated
over their estimated useful lives using the straight-line method.
Expenditures for maintenance and repairs are charged to income as
incurred.  Major improvements increasing the estimated useful life of
an asset are capitalized.

The cost and related accumulated depreciation of assets sold or
retired are eliminated from the accounts and gains or losses on
disposition are included in income for the year.



6

OCC 033154

Confidential

(e)  Deferred charges

Start-up costs related to the Cubatão plant expansion project were
deferred during the construction period and are being amortized over
ten years from March 1981.

2    INVENTORIES

|  | US$(000) | |
|---|---|---|
|  | 1985 | 1984 |
| Finished products | 471 | 493 |
| Work-in-process | 294 | 201 |
| Raw materials | 1,428 | 592 |
| Maintenance and other materials | 3,486 | 2,696 |
|  | 5,679 | 3,982 |

3    LONG-TERM DEBT

|  | US$(000) | |
|---|---|---|
|  | 1985 | 1984 |
| In foreign currency | 44,444 | 66,667 |
| In cruzeiros | 57 | 1,267 |
|  | 44,501 | 67,934 |
| Less: | | |
| . Short-term portion | (22,279) | (23,490) |
|  | 22,222 | 44,444 |

The loan of US$ (000) 44,444 (1984 - US$(000) 66,667), which is
payable in semiannual installments, is the balance of the
US$ (000) 100,000 loan for the Cubatão plant expansion project
obtained from a group of international banks and bears an average
annual rate of interest of 2,25% above LIBOR.  The loan agreement
requires certain minimum financial ratios, restricts annual
capitalization to US$ 3 million and contains restrictions as to the
payment of cash dividends. The loan is secured by the expansion
project assets.



7

OCC 033155

Confidential

OCCNJ0026598

ALCD-PUBCOM_0002476

The company has affectively prepaid part of its foreign currency debt by depositing the cruzeiro equivalent of US$(000) 2,837 (1984 - US$(000) 8.706) at the Central Bank of Brazil. These deposits earn interest equal to the interest payable to the lender banks and the Central Bank bears all exchange losses.

Long-term loans at December 31, 1985 fall due in 1987 (1984: US$ (000) 22,222 in 1986 and US$ (000) 22,222 in 1987).

4    DEFERRED INCOME TAX

During 1984, for fiscal purposes only, the company recognized the accelerated depreciation available to it in respect of investment projects approved by the Industrial Development Board. This accelerated depreciation charge in the tax books was also responsible for generating a tax loss in that year. Accordingly, deferred income tax in 1984 was represented by:

|  | US$ (000) |
|---|---|
| Long-term deferred tax liability arising from accelerated depreciation | 3,637 |
| Current deferred tax asset arising from recognition of the future benefit of tax losses | 2,134 |
| Net charge to income of 1984 | 1,503 |

As stated in Note 7, deferred exchange losses of Cr$ 107 billion were written - off in 1984 for purposes of the accompanying U.S. dollar financial statements. The future tax benefits of these were recognized in 1984 as an extraordinary item (US$ (000) 1503) to the extent that their realization was assured via the amortization of the future tax liability.

In 1985, the long-term deferred tax liability arising from the accelerated depreciation was reduced from US$ (000) 3,637 to US$ (000) 1,104 as a result of currency devaluation.

The 1984 tax losses were utilized in 1985 and the balance of the current deferred tax asset of US$ (000) 1,097 (after a translation loss for the year of US$ (000) 1,037) was duly amortized in the 1985 income statement, together with US$ (000) 399 of the long-term deferred tax benefit of the exchange losses in order for the deferred tax asset not to exceed the deferred tax liability at December 31, 1985.

q

OCC 033156

Confidential

5    CAPITAL

Authorized and subscribed capital comprises 136.149.973.250 (1984 -
42.873.783.786) ordinary shares of Cr$ 1 each, consisting of
68.074.986.593 class A, 68.074.986 593 class B and 64 class C shares.
The class A and B shares are nominative and the class C shares are
bearer.

As of December 31, 1985, capital was held as follows:

|  | Shares outstanding | Percentage |
|---|---|---|
| UNIPAR - União de Indústrias Petroquímica S.A. | 68.074.986.593 | 50,00 |
| DIAPAR - Diamond Shamrock Empreendimentos e Participações Ltda. | 94.936.514.181 | 40,35 |
| Diamond Shamrock Chemical Company | 13.138.472.412 | 9,65 |
| Other | 64 | |
|  | 136.149.973.250 | 100,00 |

6    CONTINGENT LIABILITIES

Income tax returns are subject to review by the Brazilian tax
authorities for a period of five years from the filing dates.   As a
result of such reviews, additional taxes may be assessed, which would
be subject to interest, penalties and monetary restatement.   The
company's tax returns for the years ended December 31, 1979 to
December 31, 1984, inclusive, are open for review by the tax
authorities.

7    OUT-OF-BOOK ADJUSTMENT

In order to bring them more into line with accounting principles
generally aceepted in the United States of America, the 1984 local
currency financial statements were adjusted prior to translation into
U.S. dollars to charge against income exchange losses of Cr$ 107
billion deferred in the local books in 1983 for tax reasons.   Although
these exchange losses have no U.S. dollar equivalent, they have
affected the deferred income tax provision as stated in Note 4 above.

During 1985 the deferred exchange losses have been restated in
cruzeiros for local book purposes and at December 31, 1985 amount to
Cr$ 315 billion.

\*                  \*                  \*

o



OCC 033157



**CARBOCLORO S/A.**
**INDÚSTRIAS QUÍMICAS**

São Paulo, April 10, 1986
ADFI-037/86

C.E. Donnelly
Diamond Shamrock Corporation
World Headquarters
717 N. Harwood Street
Dallas, Texas 75201
U. S. A.

Dear Chuck:

Enclosed are Carbocloro's revised financial projections for the period 1986/1989.

Following are the most important assumptions:

1) <u>Sales volumes</u>: full capacity for the entire period.

2) <u>Selling prices</u>: constant in US$.

3) <u>Inflation & devaluation</u>: none. If any, prices should follow closely eventual cost increases and devaluation should keep pace with inflation.

4) <u>Interest rates</u>: 10.5% per year (libor + spread) constant.

Please let me know if you need further information.

Sensitivity analysis on current ratios will be transmitted to you by telex no later than Monday, April 14th.

Best regards,

P.C. Barreto



OCC 033158

PCB:smm

**Confidential**

OCCNJ0026601

ALCD-PUBCOM_0002479

CARBOCLORO

**STATEMENT OF INCOME (LOSS)**
(EXPRESSED IN US 000)

BUDGET - 1986
89-04-06

| DESCRIPTION | ACTUAL JAN | ACTUAL FEB | ACTUAL MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SALES | 8,098 | 7,487 | 8,828 | 7,785 | 8,065 | 7,540 | 7,729 | 7,261 | 7,487 | 7,825 | 7,530 | 7,893 | 92,004 |
| Sales Taxes | 1,253 | 1,144 | 1,291 | 1,182 | 1,237 | 1,114 | 1,171 | 1,104 | 1,135 | 1,187 | 1,116 | 1,200 | 14,133 |
| Social Development Plan | 44 | 84 | 84 | 88 | 80 | 84 | 84 | 84 | 84 | 49 | 84 | 84 | 1,059 |
| Discounts, Freights and Others | 148 | 104 | 184 | 17 | 100 | 100 | 84 | 84 | 54 | 80 | 80 | 80 | 1,201 |
| NET SALES | 6,454 | 6,155 | 5,525 | 6,416 | 6,597 | 6,214 | 6,370 | 5,906 | 6,203 | 6,449 | 6,242 | 6,505 | 74,462 |
| Cost of Goods Sold | 5,228 | 5,085 | 5,527 | 5,419 | 5,469 | 5,367 | 5,425 | 5,984 | 5,263 | 5,367 | 5,128 | 5,237 | 62,029 |
| GROSS PROFIT | 1,230 | 1,070 | 1,092 | 997 | 1,120 | 847 | 953 | 889 | 940 | 1,000 | 1,084 | 1,268 | 12,634 |
| Selling and Administrative Exp. | 341 | 326 | 365 | 342 | 362 | 362 | 372 | 372 | 372 | 348 | 348 | 348 | 4,345 |
| Amortization of Pre-operating | 36 | 38 | 78 | 17 | 34 | 36 | 34 | 36 | 34 | 37 | 36 | 37 | 430 |
| OPERATING PROFIT | 841 | 344 | 305 | 404 | 404 | 844 | 547 | 404 | 541 | 470 | 464 | 884 | 7,817 |
| Interest Expense | 717 | 445 | 643 | 547 | 731 | 650 | 547 | 484 | 463 | 470 | 464 | 886 | 4,607 |
| Interest Income and Other | 275 | 247 | (4) | 36 | 46 | 36 | 372 | 36 | 287 | 37 | 242 | 254 | 724 |
| PROFIT (LOSS) AFTER FINANCIAL EXP. | 417 | 360 | 443 | 549 | 251 | 329 | 333 | 316 | 279 | 287 | 262 | 254 | 3,844 |
| Gain or (Loss) on Translation | | | 49 | | | | | | | | | | (529) |
| Monetary Loss (CEV/CIO) | (299) | (296) | (292) | | | | | | | | | | (2901) |
| NET PROFIT BEFORE INCOME TAX | 118 | 22 | (155) | 131 | 421 | 447 | 253 | 344 | 310 | 440 | 444 | 470 | 3,021 |
| Income Tax | 118 | 22 | (155) | 131 | 421 | 447 | 253 | 344 | 310 | 440 | 444 | 470 | 3,021 |
| NET PROFIT (LOSS) | | | | | | | | | | | | | |

OCC 033159

Confidential

CARBOCLORO

**BALANCE SHEETS**
(Expressed in US$ 000)

BUDGET 1996
10-Apr-96

| DESCRIPTION | ACTUAL JAN | ACTUAL FEB | ACTUAL MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | | | | | | | |
| **CURRENT ASSETS** | | | | | | | | | | | | |
| Cash | | | | | | | | | | | | |
| Less Deposit | | | | | | | | | | | | |
| Accounts Receivable | | | | | | | | | | | | |
| Inventories | | | | | | | | | | | | |
| Other | | | | | | | | | | | | |
| Total Current Assets | | | | | | | | | | | | |
| OTHER ASSETS (LONG TERM) | | | | | | | | | | | | |
| FIXED ASSETS (NET) | | | | | | | | | | | | |
| DEFERRED CHARGES | | | | | | | | | | | | |
| TOTAL ASSETS | | | | | | | | | | | | |
| **LIABILITIES & EQUITY** | | | | | | | | | | | | |
| **CURRENT LIABILITIES** | | | | | | | | | | | | |
| Current Maturity of Long Term Debt | | | | | | | | | | | | |
| Local Debt | | | | | | | | | | | | |
| Accounts Payable | | | | | | | | | | | | |
| Income Tax | | | | | | | | | | | | |
| Total Current Liabilities | | | | | | | | | | | | |
| **LONG TERM DEBT** | | | | | | | | | | | | |
| Century | | | | | | | | | | | | |
| Other | | | | | | | | | | | | |
| Total Long Term Debt | | | | | | | | | | | | |
| **STOCKHOLDERS EQUITY** | | | | | | | | | | | | |
| Common Stock | | | | | | | | | | | | |
| Retained Earnings | | | | | | | | | | | | |
| Total Stockholders Equity | | | | | | | | | | | | |
| TOTAL LIABILITIES & EQUITY | | | | | | | | | | | | |

OCC 033160

Confidential

CARBOCLORO

**FINANCIAL INDEXES CITICOMP**

BUDGET - 1
10-Apr

| DESCRIPTION | ACTUAL JAN | ACTUAL FEB | ACTUAL MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **SECTION 5.01 (C)** | | | | | | | | | | | | |
| **CURRENT RATIO** | | | | | | | | | | | | |
| Minimum Required | 0.800 | 0.800 | 0.800 | 0.800 | 0.800 | 0.800 | 0.800 | 0.800 | 0.800 | 0.800 | 0.800 | 0. |
| Acquired | 0.647 | 0.790 | 0.757 | 1.123 | 1.191 | 1.066 | 1.063 | 1.127 | 1.178 | 1.270 | 1.100 | 1. |
| **SECTION 5.01 (D)** | | | | | | | | | | | | |
| **MAINTENANCE OF QUICK ASSETS** | | | | | | | | | | | | |
| Minimum Required - NUS$ | 3000 | 6000 | 6000 | 9000 | 12000 | 2000 | 4000 | 4000 | 6000 | 8000 | 10000 | 2 |
| Acquired - NUS$ | 3574 | 6943 | 8773 | 9824 | 12063 | 3192 | 5466 | 7442 | 8465 | 10369 | 12137 | 64 |
| **SECTION 5.02 (B)** | | | | | | | | | | | | |
| **AGGREGATE LONG-TERM DEBT** | | | | | | | | | | | | |
| Maximum Allowed - NUS$ | 7000 | 7000 | 7000 | 7000 | 7000 | 7000 | 7000 | 7000 | 7000 | 7000 | 7000 | 70 |
| Acquired - NUS$ | 2193 | 4953 | 3873 | 2100 | 2900 | 0 | 0 | 0 | 0 | 0 | 0 | |
| **SECTION 5.02 (B)** | | | | | | | | | | | | |
| **AGGREGATE SHORT-TERM DEBT** | | | | | | | | | | | | |
| Maximum Allowed - NUS$ | 121670 | 121567 | 119522 | 119825 | 120729 | 121116 | 121674 | 122134 | 122806 | 123719 | 124691 | 126M |
| Required - NUS$ | 41594 | 39594 | 39594 | 38843 | 34159 | 34397 | 34526 | 32600 | 31240 | 29404 | 27718 | 27C |

OCC 033161

Confidential



CARBOCLORO

**STATEMENT OF INCOME (LOSS)**
(EXPRESSED IN US $000)

| DESCRIPTION | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **SALES** | | | | | | | | | | | | | |
| Sales | | | | | | | | | | | | | |
| Sales Taxes | | | | | | | | | | | | | |
| Social Development Plan | | | | | | | | | | | | | |
| Discounts, Freights and Others | | | | | | | | | | | | | |
| **NET SALES** | | | | | | | | | | | | | |
| Cost of Goods Sold | | | | | | | | | | | | | |
| **GROSS PROFIT** | | | | | | | | | | | | | |
| Selling and Administrative Exp. | | | | | | | | | | | | | |
| Amortization of Pre-operating | | | | | | | | | | | | | |
| **OPERATING PROFIT** | | | | | | | | | | | | | |
| Interest Expense | | | | | | | | | | | | | |
| Interest Income and Other | | | | | | | | | | | | | |
| **PROFIT (LOSS) AFTER FINANCIAL EXP.** | | | | | | | | | | | | | |
| Gain or (Loss) on Translation | | | | | | | | | | | | | |
| **NET PROFIT BEFORE INCOME TAX** | | | | | | | | | | | | | |
| Income Tax | | | | | | | | | | | | | |
| **NET PROFIT (LOSS)** | | | | | | | | | | | | | |

OCC 033162

**CARBOCLORO**

**BALANCE SHEETS**
*(Expressed in US$ 000)*

| DESCRIPTION | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | | | | | | | |
| **CURRENT ASSETS** | | | | | | | | | | | | |
| Cash | | | | | | | | | | | | |
| Bank Deposit | | | | | | | | | | | | |
| Accounts Receivable | | | | | | | | | | | | |
| Inventories | | | | | | | | | | | | |
| Other | | | | | | | | | | | | |
| Total Current Assets | | | | | | | | | | | | |
| OTHER ASSETS LONG TERM | | | | | | | | | | | | |
| FIXED ASSETS (NET) | | | | | | | | | | | | |
| DEFERRED CHARGES | | | | | | | | | | | | |
| **TOTAL ASSETS** | | | | | | | | | | | | |
| **LIABILITIES & EQUITY** | | | | | | | | | | | | |
| **CURRENT LIABILITIES** | | | | | | | | | | | | |
| Current Portion of Long Term Debt | | | | | | | | | | | | |
| Accounts Payable | | | | | | | | | | | | |
| Income Tax | | | | | | | | | | | | |
| Total Current Liabilities | | | | | | | | | | | | |
| LONG TERM DEBT | | | | | | | | | | | | |
| Other | | | | | | | | | | | | |
| Total Long Term Debt | | | | | | | | | | | | |
| **STOCKHOLDERS EQUITY** | | | | | | | | | | | | |
| Common Stock | | | | | | | | | | | | |
| Retained Earnings | | | | | | | | | | | | |
| Total Stockholders Equity | | | | | | | | | | | | |
| **TOTAL LIABILITIES & EQUITY** | | | | | | | | | | | | |

OCC 033163

Confidential

OCCNJ0026606

ALCD-PUBCOM_0002484

CARBOCLORO

**8**

FINANCIAL ANCLES CUTOFF?

BUDGET - 1961
YR-AV-61

| DESCRIPTION | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| (SECTION 5.01 (C) CURRENT Ratio) Minimum Required | 1.000 | 1.000 | 1.000 | 1.000 | 1.000 | 1.000 | 1.000 | 1.000 | 1.000 | 1.000 | 1.000 | 1.000 |
| | .882 | 1.077 | 1.255 | 1.094 | 1.127 | 1.078 | 1.667 | 1.901 | 2.176 | 2.427 | 3.221 | 2.25 |
| (SECTION 5.01 (D) MAINTENANCE OF QUICK ASSETS) Minimum Required - MS\$ | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| (SECTION 5.02 (A) AGGREGATE SHORT-TERM DEBT) Maximum Allowed - MS\$ | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| (SECTION 5.02 (B) AGGREGATE LONG-TERM DEBT) Maximum Allowed - MS\$ | | | | | | | | | | | | |
| | | | | | | | | | | | | |

OCC 033164

CARBOCLORO

**STATEMENT OF INCOME (LOSS)**

(EXPRESSED IN US 000)

BUDGET - 1990

| DESCRIPTION | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| S A L E S | 7,327 | 7,262 | 7,708 | 7,629 | 7,232 | 7,722 | 7,716 | 7,784 | 7,745 | 7,794 | 7,630 | 7,971 | 92,624 |
| Sales Taxes | 99 | 97 | 99 | 99 | 99 | 99 | 99 | 99 | 99 | 99 | 99 | 100 | |
| Social Development Plan | 370 | 370 | 370 | 370 | 370 | 370 | 370 | 370 | 370 | 370 | 370 | 370 | |
| Discounts, Freights and Others | 26 | 26 | 26 | 26 | 26 | 26 | 26 | 26 | 26 | 26 | 26 | 26 | |
| N E T  S A L E S | 915 | 1,014 | 1,201 | 1,214 | 1,041 | 1,207 | 1,303 | 1,432 | 1,324 | 1,497 | 1,253 | 1,420 | |
| Cost of Goods Sold | 5,167 | 5,722 | 5,128 | 5,073 | 4,917 | 5,075 | 5,146 | 5,502 | 4,490 | 4,589 | 4,279 | 4,560 | 60,975 |
| G R O S S  P R O F I T | 4,459 | 5,724 | 6,447 | 6,282 | 5,960 | 4,344 | 6,524 | 5,582 | 6,400 | 6,509 | 6,289 | 6,549 | 74,384 |
| Selling and Administrative Exp. | 912 | 633 | 912 | 879 | 734 | 1,017 | 1,160 | 1,224 | 1,155 | 1,365 | 1,197 | 1,344 | 12,435 |
| Amortization of Pre-Operating | 43 | 21 | 11 | 94 | 76 | 132 | 161 | 199 | 225 | 271 | 340 | 348 | |
| O P E R A T I N G  P R O F I T | 20 | 36 | 24 | 24 | 24 | 24 | 24 | 24 | 24 | 24 | 24 | 24 | |
| Interest Expense | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| Interest Income and Other | 912 | 633 | 912 | 879 | 734 | 1,017 | 1,160 | 1,224 | 1,155 | 1,365 | 1,197 | 1,344 | 12,435 |
| P R O F I T (L O S S) AFTER FINANCIAL EXP. | 912 | 633 | 912 | 879 | 734 | 1,017 | 1,160 | 1,224 | 1,155 | 1,365 | 1,197 | 7,155 | |
| Gain or (loss) on Translation | | | | | | | | | | | | | |
| N E T  P R O F I T  B E F O R E  I N C O M E  T A X | 912 | 633 | 912 | 879 | 734 | 1,017 | 1,160 | 1,224 | 1,155 | 1,365 | 1,197 | (5,791) | |
| Income Tax | | | | | | | | | | | | | |
| N E T  P R O F I T  (L O S S) | 912 | 633 | 912 | 879 | 734 | 1,017 | 1,160 | 1,224 | 1,155 | 1,365 | 1,197 | 7,155 | |

OCC 033165

Confidential

CARBOCLORO

## BALANCE SHEETS
### (amounts in US$ 000)

| DESCRIPTION / ASSETS | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | BUDGET 1986 DEC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|

CURRENT ASSETS
Cash
Loan Deposit
Accounts Receivable
Inventories
Other

Total Current Assets

OTHER ASSETS IN LONG TERM
FIXED ASSETS (NET)
INCREASED CHARGES

TOTAL ASSETS

LIABILITIES & EQUITY

CURRENT LIABILITIES
Current Maturity of Long Term Debt
Local Debt
Accounts Payable
Income Tax

Total Current Liabilities

LONG TERM DEBT
Citicorp
Other

STOCKHOLDERS EQUITY
Common Stock
Retained Earnings

Total Stockholders Equity

TOTAL LIABILITIES & EQUITY

OCC 033166

Confidential

CARBOCLORO

FINANCIAL FORECAST CATEGORY

BUDGET - 1998
19-Nov-96

| DESCRIPTION | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|

OCC 033167



PageID: 15458

CARBOCLORO

BUDGET - 1989

10-Apr-88

## STATEMENT OF INCOME (LOSS)

(EXPRESSED IN US $000)

| DESCRIPTION | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SALES | 7,837 | 7,202 | 7,700 | 7,629 | 7,232 | 7,722 | 7,916 | 7,986 | 7,745 | 7,994 | 7,630 | 7,971 | 92,674 |
| Sales Taxes | 1,191 | 1,095 | 1,104 | 1,160 | 1,099 | 1,174 | 1,203 | 1,214 | 1,160 | 1,215 | 1,160 | 1,212 | 14,066 |
| Social Development plan | 89 | 82 | 80 | 87 | 82 | 88 | 90 | 91 | 88 | 91 | 87 | 91 | 1,053 |
| Discounts, Freights and Others | 98 | 90 | 97 | 95 | 90 | 97 | 99 | 100 | 97 | 100 | 95 | 100 | 1,150 |
| NET SALES | 6,459 | 5,936 | 6,419 | 6,287 | 5,960 | 6,364 | 6,524 | 6,582 | 6,400 | 6,589 | 6,289 | 6,569 | 76,374 |
| Cost of Goods Sold | 5,147 | 4,922 | 5,138 | 5,073 | 4,919 | 5,075 | 5,140 | 5,150 | 5,076 | 5,150 | 5,035 | 5,149 | 60,975 |
| GROSS PROFIT | 1,312 | 1,014 | 1,281 | 1,214 | 1,041 | 1,289 | 1,383 | 1,432 | 1,324 | 1,439 | 1,253 | 1,420 | 15,401 |
| Selling and Administrative Exp. | 370 | 370 | 370 | 370 | 370 | 370 | 370 | 370 | 370 | 370 | 370 | 370 | 4,444 |
| Amortization of Pre-Operating | 26 | 26 | 26 | 26 | 26 | 26 | 26 | 26 | 26 | 26 | 26 | 26 | 312 |
| OPERATING PROFIT | 915 | 617 | 884 | 818 | 645 | 892 | 987 | 1,035 | 927 | 1,042 | 857 | 1,024 | 10,645 |
| Interest Expense | 8 | 7 | 8 | 8 | 7 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 93 |
| Interest Income and Other | 300 | 400 | 427 | 459 | 483 | 515 | 541 | 576 | 609 | 641 | 677 | 711 | 6,426 |
| PROFIT (LOSS) AFTER FINANCIAL EXP. | 1,208 | 1,010 | 1,303 | 1,269 | 1,121 | 1,400 | 1,520 | 1,603 | 1,529 | 1,676 | 1,526 | 1,727 | 16,980 |
| Gain or (Loss) on Translation | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| NET PROFIT BEFORE INCOME TAX | 1,208 | 1,010 | 1,303 | 1,269 | 1,121 | 1,400 | 1,520 | 1,603 | 1,529 | 1,676 | 1,526 | 1,727 | 16,980 |
| Income Tax | | | | | | | | | | | | 10,802 | 10,802 |
| NET PROFIT (LOSS) | 1,208 | 1,010 | 1,303 | 1,269 | 1,121 | 1,400 | 1,520 | 1,603 | 1,529 | 1,676 | 1,526 | (9,075) | 6,178 |

OCC 033168

Confidential
OCCNJ0026611
ALCD-PUBCOM_0002489

CARBOCLORO

**BALANCE SHEETS**
Expressed in US$ 000

| DESCRIPTION | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC '90-91 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|

ASSETS

Current Assets
Cash
Short Term Deposit
Accounts Receivable
Inventories
Other

Total Current Assets

Other Assets Long Term
Fixed Assets (Net)
Deferred Charges

TOTAL ASSETS

LIABILITIES & EQUITY

Current Liabilities
Current Portion of Long Term Debt
Local Debt
Accounts Payable
Other

Total Current Liabilities

Long Term Debt
Category
Other

Total Long Term Debt

Stockholders Equity
Common Stock
Retained Earnings

Total Stockholders Equity

TOTAL LIABILITIES & EQUITY

OCC 033169

Confidential

CARBOCLORO

**FINANCIAL INDICES CRITIQUE**

| DESCRIPTION | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| (SECTION 5.01 (C)) Revenue Required | 1.000 | 1.000 | 1.000 | 1.000 | 1.000 | 1.000 | 1.000 | 1.000 | 1.000 | 1.000 | 1.000 | 1.000 |
| CURRENT RATIO Revenue Received | 1.805 | 1.765 | 2.000 | 2.106 | 2.222 | 2.323 | 2.430 | 2.590 | 2.676 | 2.800 | 2.790 | |
| (SECTION 5.01 (D)) Revenue Required | 1.000 | 1.000 | 1.000 | 1.000 | 1.000 | 1.000 | 1.000 | 1.000 | 1.000 | 1.000 | 1.000 | |
| MAINTENANCE OF WHOLE ASSETS Revenue Received - MOSS | 2790 | 3034 | 4672 | 4247 | 4524 | 4028 | 4525 | 4427 | 4725 | 4556 | 5100 | |
| (SECTION 5.02 (B)) Revenue Required - MOSS | 7000 | 7000 | 7000 | 7000 | 7000 | 7000 | 7000 | 7000 | 7000 | 7000 | 7000 | |
| AGGREGATE LONG-TERM DEBT Revenue Allowed - MOSS | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| (SECTION 5.02 (B)) Revenue Required - MOSS | | | | | | | | | | | | |
| AGGREGATE SHORT-TERM DEBT Revenue Allowed - MOSS | 32900 | 36027 | 36930 | 36629 | 36916 | 37145 | 37050 | 38026 | 38647 | 38434 | | |

OCC 033170

Confidential

CARBOCLORO

**STATEMENT OF CHANGES IN FINANCIAL POSITION**
**(EXPRESSED IN US$ 000)**

Columns: DEC/85 · JUN/86 · DEC/86 · JUN/87 · DEC/87 · JUN/88 · DEC/88 · JUN/89 · DEC/89

**SOURCE OF FUNDS**
- NET INCOME
- DEPRECIATION
- WRITE-OFF FIXED ASSETS
- AMORTIZED GOODWILL
- PRIOR YEAR INCOME TAX ADJUSTMENT

**USE OF FUNDS**
- ADDITIONS TO FIXED ASSETS
- EXISTING PLANT
- DEFERRED CHARGES
- ADDITIONS TO OTHER ASSETS
- CURRENT MATURITIES OF LONG TERM DEBT
- INCOME TAX OF LONG TERM DEBT

**INCREASE (DECREASE) IN WORKING CAPITAL**

**CHANGES IN WORKING CAPITAL**
- CASH
- BRAZILIAN TREASURY BONDS
- LOAN DEPOSIT - CENTRAL BANK OF BRAZIL
- ACCOUNTS RECEIVABLE-TRADE (LESS)
- DISCOUNTED RECEIVABLES
- OTHER ACCOUNTS RECEIVABLE
- DEFERRED INCOME TAX
- PREPAID EXPENSE

**INCREASE (DECREASE) IN CURRENT ASSETS**
- SUPPLIER
- SALARIES AND SOCIAL SECURITY
- SALES TAX AND OTHER
- LOCAL CURRENCY LOAN
- OTHER BANK LOAN
- OTHER PAYABLES AND ACCRUALS

**INCREASE (DECREASE) IN CURRENT LIABILITIES**

**TOTAL CHANGES**

OCC 033171

Confidential

OCCNJ0026614

ALCD-PUBCOM_0002492

## EXHIBIT 1.06(b)

Agreement,
Dated September 4, 1986 (the "Agreement"),
By and Among
Diamond Shamrock Corporation,
Occidental Petroleum Corporation,
Occidental Chemical Holding Corporation
and
Oxy-Diamond Alkali Corporation

## DS CHILE

2846g

OCC 033172

Confidential

OCCNJ0026615
ALCD-PUBCOM_0002493

## EXHIBIT 1.06(b)

(a)   DS Chile is the borrower under a Eurodollar Credit Agreement, dated as of August 28, 1980, between DS Chile and The First National Bank of Boston (the "Bank"). Seller is presently a guarantor of the obligations of DS Chile thereunder pursuant to a Guaranty dated as of August 28, 1980, between DSCC and the Bank. Such Eurodollar Credit Agreement and Guaranty, as amended and supplemented to the date hereof, together with the instrument set forth in Attachment 1 hereto (the "Default Resolution") are referred to collectively as the "DS Chile Credit Agreement." The Bank has demanded payment of all amounts loaned under the DS Chile Credit Agreement, but has agreed to waive all existing defaults of DS Chile thereunder during the period ended November 3, 1986.

(b)   Following the Closing, DSCC and Oxy-Chem shall use their respective best efforts to consummate the transactions contemplated by the Default Resolution.

(c)   DS Chile will be included as one of the DSCC Companies at the Closing.

(d)   Following the Closing, Seller shall, and shall cause each of the Diamond Companies to, use its best efforts to consummate the transactions contemplated by the Default Resolution.

(e)   DSCC shall (i) indemnify Seller against each and all of the financial obligations, if any, undertaken or contemplated to be undertaken by Seller in favor of the Bank pursuant to the Default Resolution, (ii) satisfy each and all of the financial obligations, if any, undertaken or contemplated to be undertaken by DSCC or OPC in favor of the Bank pursuant to the Default Resolution, (iii) assume the financial risk that the Bank may fail to consummate the transactions contemplated by the Default Resolution, notwithstanding the best efforts of DSCC, Oxy-Chem and Seller, and (iv) indemnify Seller against any and all obligations and liabilities (regardless of the date on which the event giving rise to such liability or obligation occurs) to the Bank, under the DS Chile Credit Agreement, which Seller pays or incurs, caused by, resulting from or arising out of the failure of the transactions contemplated by the Default Resolution to be consummated. Oxy-Chem shall guarantee the performance by DSCC of its obligations under this paragraph (e).

OCC 033173

Confidential

EXHIBIT 1.06(b)

Attachment 1 - "Default Resolution"

The attached copy of a letter is incorporated herein and made part of this Attachment 1.

Leg-8902

OCC 033174

Confidential

OCCNJ0026617
ALCD-PUBCOM_0002495



## THE FIRST NATIONAL BANK OF BOSTON
### BOSTON, MASSACHUSETTS 02110

September 2, 1986

Diamond Shamrock de Chile S.A.I.
c/o Diamond Shamrock Corporation
717 North Harwood Street
Dallas, Texas 75201

Attention:        R.C. Becker, Assistant Treasurer

Re:   Eurodollar Credit Agreement

Gentlemen:

Reference is hereby made to the Eurodollar Credit Agreement, dated as of August 28, 1980 (the "Credit Agreement"), between Diamond Shamrock de Chile S.A.I., a corporation organized and existing under the laws of the Republic of Chile ("DS Chile"), and The First National Bank of Boston (the "Bank"). The obligations of DS Chile under the Credit Agreement are guaranteed by Diamond Shamrock Corporation, a Delaware corporation ("DSC"), pursuant to the terms of a Guaranty, dated as of August 28, 1980 (the "Guaranty"). Capitalized terms used herein and not otherwise defined which are defined in or by reference in the Credit Agreement shall have the same respective meanings herein as therein.

You have advised us that DSC proposes to enter into a transaction with Occidental Petroleum Corporation ("Occidental") pursuant to which, among other things, all of the outstanding capital stock of DS Chile will be transferred to a subsidiary of Occidental. You have requested that we waive the Event of Default that will arise under Section 5.01(g) of the Credit Agreement as a result of the consummation of such proposed transfer. You have also requested that we waive the Event of Default arising under Sections 5.01(a) and 6.02 of the Credit Agreement as a result of the deposit of Chilean pesos made by DS Chile with the Banco Central de Chile (the "Central Bank") on or about August 28, 1985, which resulted in a deposit of U.S. $1,000,000 being created in the Bank's name in the Central Bank. In addition, you have requested us to extend the due date for the U.S. $2,500,000 payment of principal due under the Credit Agreement on August 28, 1986 (which we have

OCC 033175

Confidential

OCCNJ0026618

ALCD-PUBCOM_0002496

THE FIRST NATIONAL BANK OF BOSTON

Diamond Shamrock de Chile S.A.I.
September 3, 1986
Page 2

previously extended to September 26, 1986) until November 3, 1986. We are willing to grant such requested waivers and extension, but solely to the extent, and upon the terms and conditions, set forth below:

A.   **Grant of Waivers and Extension of Due Date.**

1.   Subject to the terms and conditions set forth in this letter of agreement, the Bank hereby waives, during the period from September 3, 1986 until November 3, 1986, any Event of Default that may arise under Section 5.01(a) of the Credit Agreement solely as a result of the transfer of the capital stock of DS Chile to a subsidiary of Occidental.

2.   Subject to the terms and conditions set forth in this letter of agreement, including, without limitation, DSC's entering into with the Bank a participation purchase agreement upon the terms set forth in paragraph 1 of Section B below, the Bank hereby waives, during the period from September 3, 1986 until September 15, 1986, the Event of Default arising under Sections 5.01(a) and 6.02 of the Credit Agreement with respect to the deposit of Chilean pesos made by DS Chile with the Central Bank, which resulted in the creation of a deposit of U.S. $1,000,000 on or about August 28, 1985 in the Bank's name in the Central Bank.

3.   Subject to the terms and conditions set forth in this letter of agreement, the Bank hereby extends the due date for the principal installment of the Note in the amount of U.S. $2,500,000 which, pursuant to the terms of the Credit Agreement and the Note, is due August 28, 1986, to November 3, 1986. During the period from August 28, 1986 until November 3, 1986, such installment of principal shall bear interest at the annual rate equal to the rate announced by the Bank from time to time as its "Base Rate". DSC hereby acknowledges that such installment of principal, together with all interest accrued thereon pursuant to the Credit Agreement or this letter of agreement, is and shall continue to be a part of the "Obligations" under and as defined in the Guaranty.

OCC 033176

Confidential

OCCNJ0026619

ALCD-PUBCOM_0002497

THE FIRST NATIONAL BANK OF BOSTON

Diamond Shamrock de Chile S.A.I.
September 3, 1986
Page 3

B. **Covenants and Agreements of DS and DS Chile.** Each of DSC and DS Chile hereby agree, jointly and severally, as follows:

1. As promptly as practicable after the date hereof, and in any event not later than September 15, 1986, DSC shall enter into with the Bank a participation purchase agreement (the "Third Participation Agreement") upon terms substantially similar to the agreements entered into by the Bank and DSC dated May 30, 1984 (the "First Participation Agreement") and as of January 25, 1985 (the "Second Participation Agreement"), pursuant to which the Bank shall accept the deposit of Chilean pesos made by DS Chile to the Central Bank, which resulted in a deposit of U.S. $1,000,000 on or about August 28, 1985 in the Bank's name in the Central Bank.

2. As promptly as practicable following the execution of the Third Participation Agreement, DSC shall purchase from the Bank, for an amount in cash and in United States dollars equal to the face value thereof plus all accrued interest thereon to the date of purchase, each of the deposits which are the subject of the First, Second and Third Participation Agreements (collectively, the "Deposits"). In the alternative, if, at the request of DSC, the Bank sells the Deposits in one or more transactions to one or more third parties, DSC shall promptly pay to the Bank an amount in cash and in United States dollars equal to the difference between the face value of the Deposits plus all accrued interest thereon to the date of purchase and the amount or amounts received by the Bank in connection with such sale or sales. In effecting any such sales, the Bank agrees to use its best efforts to sell the Deposits at the highest available rates in the appropriate market or markets therefor.

3. As promptly as practicable following the date hereof, and in any event prior to November 3, 1986, DSC will cause Bankers Trust Company, or such other buyer as may be designated by DSC, to purchase from the Bank, without recourse to the Bank, and pursuant to documentation satisfactory to the Bank in form and substance, a 100% participation in all of the Bank's rights under the Credit Agreement, for an amount in cash and in

OCC 033177

THE FIRST NATIONAL BANK OF BOSTON

Diamond Shamrock de Chile S.A.I.
September 3, 1986
Page 4

United States dollars equal to the unpaid principal balance of the Note, together with all accrued interest thereon to the date of purchase and all reasonable out-of-pocket expenses incurred by the Bank with respect thereto, including, without limitation, reasonable attorney's fees incurred in connection with the preparation of this letter of agreement and the consummation of the transactions described herein.

By your execution hereof, each of you acknowledge and agree that the failure to consummate the transactions described in paragraph 1 of Section B of this letter of agreement on or prior to September 15, 1986, or the failure to consummate the transactions described in paragraphs 2 and 3 of Section B of this letter of agreement on or prior to November 3, 1986 shall, without the requirement of any further notice or action on the part of any party, constitute an Event of Default under the Credit Agreement. Each of you further acknowledges that, except as otherwise provided in this letter of agreement, all of your obligations under the Credit Agreement, the Note and the Guaranty shall continue in full force and effect in accordance with the terms and provisions thereof.

This letter of agreement shall be governed by, and construed in accordance with, the laws of the Commonwealth of Massachusetts.

If you are in agreement with the terms and conditions of this letter of agreement, kindly acknowledge your agreement by executing and returning to the Bank three executed counterparts hereof not later than September 5, 1986. Upon the Bank's receipt of such executed counterparts from each of DS Chile and DSC not later than September 5, 1986, the agreements of the parties made hereby shall become effective as of the date hereof. The Bank will thereafter provide to each signatory hereto a conformed copy hereof.

Very truly yours,

THE FIRST NATIONAL BANK
OF BOSTON

By: _____
Title: Assistant Vice President

OCC 033178

Confidential

THE FIRST NATIONAL BANK OF BOSTON

Diamond Shamrock de Chile S.A.I.
September 3, 1986
Page 5


Accepted and Agreed to
this    day of September, 1986

DIAMOND SHAMROCK DE CHILE S.A.I.

By: _____  Vice President
    Title: _____


Accepted and Agreed to
this    day of September, 1986

DIAMOND SHAMROCK CORPORATION

By: _____  Assistant Treasurer
    Title: _____

4781M

OCC 033179

OCCNJ0026622
ALCD-PUBCOM_0002500

<u>EXHIBIT 2.02</u>

Agreement,
Dated September 4, 1986 (the "Agreement"),
By and Among
Diamond Shamrock Corporation,
Occidental Petroleum Corporation,
Occidental Chemical Holding Corporation
and
<u>Oxy-Diamond Alkali Corporation</u>

<u>COGENERATION ASSET PURCHASE AGREEMENT</u>

2846g

OCC 033180

**Confidential**

OCCNJ0026623
ALCD-PUBCOM_0002501

This ASSET PURCHASE AGREEMENT ("Agreement")
made as of the 4th day of September, 1986, by and between
DIAMOND SHAMROCK CHEMICALS COMPANY, a Delaware corpora-
tion ("DSCC"), and OXY-ALKALI COGENERATION CORPORATION, a
Delaware corporation ("Oxy-Cogen");

### WITNESSETH:

WHEREAS, Diamond Shamrock Corporation, a Dela-
ware corporation of which DSCC is a wholly owned subsid-
iary ("Diamond"), Occidental Petroleum Corporation, a
Delaware corporation ("OPC"), Occidental Chemical Holding
Corporation, a California corporation and an indirect
wholly owned subsidiary of OPC ("Oxy-Chem"), and Oxy-
Diamond Alkali Corporation, a Delaware corporation and an
indirect wholly owned subsidiary of OPC ("Oxy-Sub"), have
entered into a Stock Purchase Agreement made as of the
4th day of September, 1986 (the "Stock Purchase Agree-
ment"), upon the terms and subject to the conditions of
which Diamond has agreed to sell all of the outstanding
shares of capital stock of DSCC to Oxy-Sub; and

WHEREAS, pursuant to the Stock Purchase Agree-
ment, Diamond has agreed, upon the terms and subject to
the conditions of this Agreement, to cause DSCC to trans-
fer to Oxy-Cogen immediately prior to the closing under

OCC 033181

Confidential

the Stock Purchase Agreement, the Cogeneration Business
Unit (as defined in Section 1.02 hereof); and

WHEREAS, DSCC desires to sell and transfer the
Cogeneration Business Unit to Oxy-Cogen, and Oxy-Cogen
desires to purchase and acquire the Cogeneration Business
Unit from DSCC, all upon the terms and subject to the
conditions hereinafter set forth.

NOW, THEREFORE, it is agreed as follows:

ARTICLE I

Purchase and Sale

SECTION 1.01  Purchase and Sale of the
Cogeneration Business Unit.  Upon the terms and subject
to the conditions of this Agreement, at the Cogen Closing
(as defined in Section 4.01 hereof), DSCC shall sell,
transfer, convey, assign and deliver to Oxy-Cogen, and
Oxy-Cogen shall purchase, acquire and accept from DSCC,
all of DSCC's right, title and interest in and to the
Cogeneration Business Unit.

SECTION 1.02  The Cogeneration Business Unit.
For purposes of this Agreement, the "Cogeneration Busi-
ness Unit" shall mean (in each case excluding land,
buildings, foundations and underground piping) (a) the
items of machinery, piping, equipment and other property

2

OCC 033182

Confidential

used in connection with DSCC's cogeneration facilities located at DSCC's Deer Park Plant at 1101 Tidal Road, Deer Park, Texas and DSCC's Battleground Plant at 2800 Battleground Road, La Porte Texas (collectively, the "Facilities"), (b) all licenses and other rights (collectively, the "Rights") of DSCC required, necessary or convenient for the use of all devices, equipment, processes and apparatuses included in or constituting a part of the Facilities or useful in the operation thereof, (c) all contracts or other instruments (collectively, the "Contracts") substantially relating to the Facilities (including, without limitation, the Cogeneration Agreement dated August 6, 1984 (the "HL&P Contract"), between DSCC and Houston Lighting & Power Company ("HL&P")), as such Contracts have been amended, modified and interpreted from time to time prior to the date hereof, together with all rights and benefits under any representation, warranty, guaranty, indemnity or agreement with respect to the Facilities from or with any manufacturer, supplier, contractor or subcontractor and any other claims (whether existing on the date hereof or arising hereafter) which DSCC may now or hereafter have against any such manufacturer, supplier, contractor or subcontractor or any other person with respect to the Facilities (col-

3

OCC 033183

Confidential

lectively, the "Contract Rights"), (d) all plans and
specifications for the construction of the Facilities,
together with all operating manuals, process descrip-
tions, piping and instrumentation drawings, equipment
descriptions and lists, operating instructions and other
technical information relating to the construction and
operation of the Facilities (collectively, the "Miscella-
neous Assets") and (e) all business operations of DSCC
relating to the Facilities, the Rights, the Contracts,
the Contract Rights and the Miscellaneous Assets.  The
Facilities, the Rights, the Contracts, the Contract
Rights and the Miscellaneous Assets are sometimes re-
ferred to herein collectively as the "Cogeneration As-
sets."

     SECTION 1.03  <u>The Purchase Price</u>.  In consider-
ation of the purchase and sale of the Cogeneration Busi-
ness Unit, at the Cogen Closing, (a) Oxy-Cogen shall pay
to DSCC $450,000,000 (the "Purchase Price") in immediate-
ly available funds to an account of Diamond designated by
DSCC to Oxy-Cogen prior to the Closing Date (as defined
in Section 4.01 hereof), and (b) DSCC shall deliver to
Oxy-Cogen such instruments of transfer and consent as are
necessary or appropriate to transfer to Oxy-Cogen all of

<div align="center">4</div>

<div align="right">OCC 033184</div>

DSCC's right, title and interest in and to the Cogeneration Business Unit.

## ARTICLE II

### Representations and Warranties of DSCC

DSCC hereby represents and warrants to Oxy-Cogen as follows:

SECTION 2.01  Organization of DSCC.

DSCC is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware.  DSCC has the requisite corporate power and authority to own, operate and lease its properties (including, without limitation, the Cogeneration Assets) and to carry on its business as now being conducted.  DSCC is duly licensed or qualified to do business as a foreign corporation and is in good standing in all jurisdictions in which the character of the properties owned or leased by it or the nature of the business conducted by it requires it to be so licensed or qualified, other than such jurisdictions in which the failure to be so licensed or qualified or in good standing would not have a material adverse effect on the business, financial condition or results of operations of the Cogeneration Business Unit.

5

OCC 033185

Confidential

OCCNJ0026628

ALCD-PUBCOM_0002506

SECTION 2.02  <u>Corporate Power</u>.  DSCC has the requisite corporate power and authority to execute, deliver and perform this Agreement and all other agreements and instruments described in this Agreement to be executed and delivered by it at or prior to the Cogen Closing in connection with the transactions contemplated hereby (the "Cogen Related Documents"), and to consummate the transactions contemplated hereby and thereby.  All corporate action on the part of DSCC necessary to approve or to authorize the execution, delivery and performance of this Agreement and the Cogen Related Documents to which it is or will be a party and the consummation of the transactions contemplated hereby and thereby has been duly taken.  Each of this Agreement and each Cogen Related Document to which it is or will be a party is a valid and binding obligation of, enforceable in accordance with its terms against, DSCC.

SECTION 2.03  <u>No Conflicts</u>.  Except as set forth in Schedule 2.03 and subject to the provisions of the Stock Purchase Agreement, neither the execution, delivery or performance by DSCC of this Agreement or of any Cogen Related Document to which it is or will be a party, nor the consummation by DSCC of the transactions contemplated hereby or thereby, will:

6

OCC 033186

Confidential

           (i)   conflict with or result
in a breach of any provision of the Certificate
of Incorporation or By-Laws of DSCC;

           (ii)   violate, constitute an
event of default under, permit the termination
of, give rise to a right to accelerate any
indebtedness under, or otherwise breach or
conflict with, any material contract, agreement
or other instrument or any governmental permit
to which DSCC is a party, is maker or guaran-
tor, or by which DSCC or any part of the Cogen-
eration Business Unit is bound, or result in
the creation of any Lien (as defined in Section
2.05 hereof) upon any part of the Cogeneration
Business Unit other than Permitted Liens (as
defined in Section 2.05 hereof) and such Liens
that may be imposed by or as a result of any
action of Oxy-Cogen or any of its subsidiaries
or affiliates;

           (iii)   violate any order,
writ, injunction, decree, judgment, ruling,
law, statute, rule or regulation of any govern-
mental, judicial, legislative, executive, ad-
ministrative or regulatory authority, of the

7

OCC 033187

Confidential

United States, or of any state, local or for-
eign government or any subdivision thereof, or
of any Governmental Agency (as defined in Sec-
tion 2.04 hereof) (individually and
collectively, "Laws"), applicable to DSCC, the
Cogeneration Business Unit or either Facility
or by which any of DSCC, the Cogeneration Busi-
ness Unit or either Facility is bound; or

(iv)  require any consent,
approval, authorization or other order or ac-
tion of, or notice to, or declaration, filing
or registration with, any third party or any
Governmental Agency;

in each case other than such of the foregoing matters
which, or the absence of which, would not, either indi-
vidually or when taken together with all other related
matters, have a material adverse effect on the business,
financial condition or results of operations of the Co-
generation Business Unit.  Notwithstanding any other
provision of this Agreement (including, without limita-
tion, this Section 2.03 or Section 2.04 hereof), no rep-
resentation is made by DSCC with respect to the effect of
any antitrust or similar Law on the consummation of the

8

OCC 033188

Confidential

(c)    There is no Litigation by or before
any (i) court, (ii) Governmental Agency, or (iii) arbi-
trator, in each case pending or, to the knowledge of
DSCC, threatened, which seeks to restrain, enjoin, pre-
vent the consummation of, or otherwise challenge this
Agreement, any of the Cogen Related Documents or any of
the transactions contemplated hereby or thereby; subject,
however, to the last sentence of Section 2.03 hereof or
any Litigation commenced by a federal Governmental Agency
related thereto.

(d)    There is no judgment, ruling, order
or decree applicable to the Cogeneration Business Unit
where the effect, either individually or when taken to-
gether with all others, would have a material adverse
effect on the business, financial condition or results of
operations of the Cogeneration Business Unit.

SECTION 2.05  Cogeneration Assets.

(a)    DSCC has good and marketable title
to, a leasehold interest in, or the right to use all of
the assets which are material to the business, financial
condition or results of operation of the Cogeneration
Business Unit, free and clear of all Liens other than
Permitted Liens.  All of the tangible assets which are
material to the business, financial condition or results

10

OCC 033189

Confidential

of operations of the Cogeneration Business Unit are, in the aggregate, in good and serviceable condition in accordance with industry practice, normal wear and tear excepted, and as such will be adequate in the aggregate to conduct the business relating to the Facilities and HL&P Contract as presently conducted. Subject to the provisions of Section 7.02(e) hereof, as of the Cogen Closing, the Cogeneration Assets together with the land and buildings located at the Facilities include all rights, properties and other assets used in or necessary to permit Oxy-Cogen to conduct the business of the Cogeneration Business Unit in all material respects in the same manner as the business relating to the Facilities and the HL&P Contract is being conducted by DSCC prior to the date hereof.

(b)  For purposes of this Agreement, "Liens" shall mean all liens, mortgages, charges, security interests, encumbrances (including, but not limited to, adverse claims), options or other restrictions or limitations of any kind whatsoever.

(c)  For purposes of this Agreement, "Permitted Liens" shall mean with respect to any of the Cogeneration Assets (i) minor imperfections of title, if any, none of which materially detracts from the value,

11

OCC 033190

Confidential

impairs the marketability of title or materially impairs
the use or operation of any of the Cogeneration Assets
subject thereto, or materially impairs the business,
financial condition or results of operations of the Co-
generation Business Unit, (ii) Liens for current taxes,
assessments and other governmental charges not yet due,
or which may thereafter be paid without penalty, or which
are being contested in good faith by DSCC, (iii) mechan-
ics', carriers', workers', repairmen's or other like
Liens (inchoate or otherwise) or Liens on leasehold in-
terests with respect to equipment leases arising or in-
curred in the ordinary course of business in respect of
obligations which are not overdue or which are being
contested in good faith by DSCC, (iv) easements, cove-
nants, rights of way, mineral reservations and other
similar restrictions or conditions of record, if any,
none of which materially impairs the use or operation of
the Cogeneration Assets as they are presently being used
or operated, (v) zoning and other restrictions as a mat-
ter of law, (vi) Liens for which the liabilities and
obligations related thereto have been fully discharged,
satisfied and performed and (vii) Liens against any of
the Cogeneration Assets which are created or imposed as a

12

OCC 033191

Confidential

OCCNJ0026634

ALCD-PUBCOM_0002512

result of the consummation of the transactions contemplated by this Agreement.

SECTION 2.06  <u>Contracts; The Facilities</u>.

(a)  The Contracts are valid and binding obligations enforceable in accordance with their respective terms, except as enforcement against third parties may be limited by bankruptcy, insolvency or other similar Laws affecting the enforcement of creditors' rights generally and except that the availability of equitable remedies against third parties, including specific performance, is subject to the discretion of the court before which any proceeding therefor may be brought.  DSCC is not in default in any material respect under any such Contract; nor, to the knowledge of DSCC, is any other party to any such Contract in default in any material respect thereunder; nor does there exist any event which, with the passage of time or giving of notice, or both, would constitute such a default by DSCC or, to the knowledge of DSCC, any other party thereto.

(b)  Schedule 2.06 sets forth a copy of the self-qualifying certificates filed on behalf of each of the Facilities with the Federal Energy Regulatory Commission ("FERC") under the Public Utility Regulatory Policies Act of 1978, as amended, and the regulations

13

OCC 033192

Confidential

OCCNJ0026635

ALCD-PUBCOM_0002513

thereunder ("PURPA"), which certificates are not the subject of any pending or, to the knowledge of DSCC, threatened Litigation.  No response was received from FERC within 90 calendar days after the filing of such certificates.  Each of the Facilities is a "qualified cogeneration facility" within the meaning of (i) the Texas Public Utility Regulatory Act, (ii) the rules of the Public Utility Commission of Texas and (iii) PURPA.

(c)  Each of the Facilities is free from the requirements of the Powerplant and Industrial Fuel Use Act of 1978 (the "Fuel Use Act") because each Facility is not now an "electric powerplant" as that term is defined in the Fuel Use Act.

SECTION 2.07  <u>Brokers</u>.  DSCC has not retained any broker or finder, and no broker or finder has acted on its behalf in connection with this Agreement or any of the Cogen Related Documents or the transactions provided for hereby or thereby, except that Diamond has retained and agreed to pay the fees of The First Boston Corporation in connection with the Stock Purchase Agreement and the transactions contemplated thereby.

14

OCC 033193

Confidential

OCCNJ0026636

ALCD-PUBCOM_0002514

SECTION 2.08  <u>Effect of Certain Representations and Warranties</u>.  For purposes of this Agreement, references to the "knowledge of DSCC" shall constitute only references to (i) the actual knowledge of any executive officer (as defined in Rule 402 of Regulation S-K promulgated under the Securities Exchange Act of 1934, as amended) of DSCC, (ii) information made available to any such executive officer as a result of his making due inquiry of responsible officials of DSCC or any of its affiliates in connection with this Agreement and the transactions contemplated hereby; provided, however, that the appropriate executive officer shall be deemed hereby to be required to make a reasonable due inquiry of the applicable subject matter; or (iii) the information which would have been made reasonably available to any such executive officer had he made such due inquiry.


## ARTICLE III

## <u>Representations and Warranties of Oxy-Cogen</u>

Oxy-Cogen hereby represents and warrants to DSCC as follows:


15

OCC 033194

Confidential

OCCNJ0026637

ALCD-PUBCOM_0002515

SECTION 3.01  <u>Organization of Oxy-Cogen</u>.  Oxy-Cogen is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware.  All the issued and outstanding shares of capital stock of Oxy-Cogen have been duly authorized by all necessary corporate action and are validly issued, fully paid and nonassessable.

SECTION 3.02  <u>Authorization, Etc</u>.  Oxy-Cogen has the requisite corporate power and authority to execute, deliver and perform this Agreement and the Cogen Related Documents to which it is or will be a party and to consummate the transactions contemplated hereby and thereby.  All corporate action on the part of Oxy-Cogen necessary to approve or to authorize the execution, delivery and performance of this Agreement and each Cogen Related Document to which it is or will be a party and the consummation of the transactions contemplated hereby and thereby has been duly taken.  Each of this Agreement and each Cogen Related Document to which it is or will be a party is a valid and binding obligation of, enforceable in accordance with its terms against, Oxy-Cogen.

16

OCC 033195

Confidential

OCCNJ0026638

ALCD-PUBCOM_0002516

SECTION 3.03  <u>No Conflicts</u>.  Subject to the provisions of the Stock Purchase Agreement, neither the execution, delivery or performance by Oxy-Cogen of this Agreement or of any Cogen Related Document to which it is or will be a party, nor the consummation by Oxy-Cogen of the transactions contemplated hereby or thereby, will:

(i)  conflict with or result in a breach of any provision of the Certificate of Incorporation or By-Laws of Oxy-Cogen;

(ii)  violate, constitute an event of default under, permit the termination of, give rise to a right to accelerate any indebtedness under, or otherwise breach or conflict with, any material contract, agreement or other instrument or any governmental permit to which Oxy-Cogen is a party, is maker or guarantor, or by which DSCC or any of its prop-erties is bound, or result in the creation of any Lien upon any of its properties other than Permitted Liens and such Liens that may be imposed by or as a result of any action of DSCC or any of its subsidiaries or affiliates;

17

OCC 033196

Confidential

OCCNJ0026639

ALCD-PUBCOM_0002517

      (iii)  violate any Law applicable to Oxy-Cogen or by which any of its properties is bound; or

      (iv)  require any consent, approval, authorization or other order or action of, or notice to, or declaration, filing or registration with, any third party or any Governmental Agency;

in each case other than such of the foregoing matters which, or the absence of which, would not, either individually or when taken together with all other related matters, have a material adverse effect on the business, financial condition or results of operations of Oxy-Cogen.  Notwithstanding any other provision of this Agreement (including, without limitation, this Section 3.03), no representation is made by Oxy-Cogen with respect to the effect of any antitrust or similar law on the consummation of the transactions contemplated by this Agreement or any of the Cogen Related Documents.

    SECTION 3.04  No Prior Activities. Oxy-Cogen has not incurred, directly or through any subsidiary, any liabilities or obligations, except those incurred in connection with its incorporation or the Cogeneration Business Unit.  Oxy-Cogen has not engaged in any business

18

OCC 033197

Confidential

OCCNJ0026640

ALCD-PUBCOM_0002518

or activities of any type or kind whatsoever and has not entered into any agreements or arrangements with any person or entity, and is not subject to or bound by any obligation or undertaking, which is not related to the Cogeneration Business Unit.

ARTICLE IV

Closing

SECTION 4.01   The Closing.

(a)   The closing of the transactions contemplated by this Agreement (the "Cogen Closing") shall be held on such date (the "Closing Date"), and at such time as may mutually be agreed upon by the parties hereto at the offices of OPC, or at such other place as may be mutually agreed upon by the parties hereto.

(b)   At the Cogen Closing, DSCC shall deliver to Oxy-Cogen (i) all transfer instruments neces-sary to transfer ownership to Oxy-Cogen of the Cogenera-tion Assets, including, without limitation, the Assign-ment and Assumption Agreement attached hereto as Exhibit A (the "Assignment and Assumption Agreement"), providing for the assignment by DSCC and the assumption by Oxy-Cogen of the Cogeneration Assets, including, without limitation, the HL&P Contract, and (ii) all other previ-

19

OCC 033198

Confidential

OCCNJ0026641

ALCD-PUBCOM_0002519

ously undelivered documents required to be delivered by DSCC to Oxy-Cogen at or prior to the Closing in connection with the transactions contemplated by this Agreement.

(c)  At the Cogen Closing, Oxy-Cogen shall deliver to DSCC (i) the consideration payable to DSCC pursuant to Section 1.01 hereof and (ii) the Assignment and Assumption Agreement.

ARTICLE V

Conditions to Obligations of Oxy-Cogen
to Consummate the Transaction

The obligations of Oxy-Cogen to be performed at the Cogen Closing shall be subject to the satisfaction, or the waiver in writing by Oxy-Cogen, on or prior to the Cogen Closing, of the following conditions:

SECTION 5.01  Accuracy of Representations and Warranties; Compliance with Covenants.  The representations and warranties of DSCC contained in this Agreement shall be correct in all material respects on and as of the Closing Date with the same force and effect as though such representations and warranties were made at the Cogen Closing except for changes expressly permitted or contemplated by this Agreement; each and all of the covenants required to be performed by DSCC on or prior to the

20

OCC 033199

Confidential

OCCNJ0026642

ALCD-PUBCOM_0002520

Cogen Closing pursuant to the terms of this Agreement shall have been duly performed in all material respects; and DSCC shall deliver to Oxy-Cogen a certificate executed by an executive officer of DSCC, addressed to Oxy-Cogen and dated the Closing Date, certifying to all of the foregoing and to the effect set forth in Section 5.03 hereof.

SECTION 5.02  No Injunction.  No judgment, order or decree shall have been rendered in any Litigation which has the effect of enjoining the consummation of the transactions contemplated by this Agreement.

SECTION 5.03  Material Change.  From the date hereof to the Closing Date, the Cogeneration Business Unit shall have suffered no material adverse change in its business, financial condition or results of operations.

SECTION 5.04  Stock Purchase Agreement.  The conditions applicable to the obligations of Oxy-Sub, OPC and Oxy-Chem to proceed with the closing under the Stock Purchase Agreement shall have been satisfied or duly waived immediately prior to or simultaneously with the Cogen Closing.

21

OCC 033200

Confidential

OCCNJ0026643

ALCD-PUBCOM_0002521

SECTION 5.05  <u>Approvals and Consents</u>.  All consents and approvals necessary to permit the consummation of the transactions contemplated hereby, if any, shall have been obtained.


ARTICLE VI

Conditions to Obligations of DSCC
<u>to Consummate the Transaction</u>

The obligations of DSCC to be performed at the Cogen Closing shall be subject to the satisfaction, or the waiver in writing by DSCC, on or prior to the Cogen Closing, of the following conditions:

SECTION 6.01  <u>Accuracy of Representations and Warranties; Compliance with Covenants</u>.  The representations and warranties of Oxy-Cogen contained in this Agreement shall be correct in all material respects on and as of the Closing Date with the same force and effect as though such representations and warranties were made at the Cogen Closing except for changes expressly permitted or contemplated by this Agreement; each and all of the covenants required to be performed by Oxy-Cogen on or prior to the Cogen Closing pursuant to the terms of this Agreement shall have been duly performed in all material respects; and Oxy-Cogen shall deliver to DSCC a certifi-

22

OCC 033201

cate executed by an executive officer of Oxy-Cogen, ad-
dressed to DSCC and dated the Closing Date, certifying to
all of the foregoing.

SECTION 6.02   No Injunction.  No judgment,
order or decree shall have been rendered in any Litiga-
tion which has the effect of enjoining the consummation
of the transactions contemplated by this Agreement.

SECTION 6.03   Stock Purchase Agreement.  The
conditions applicable to Diamond's obligations to proceed
with the closing under the Stock Purchase Agreement shall
have been satisfied or duly waived immediately prior to
or simultaneously with the Cogen Closing.

SECTION 6.04   Approvals and Consents.  All
consents and approvals necessary to permit the consumma-
tion of the transactions contemplated hereby, if any,
shall have been obtained.

23

OCC 033202

Confidential

OCCNJ0026645

ALCD-PUBCOM_0002523

## ARTICLE VII

### Covenants

SECTION 7.01  Injunctions.  If any federal, state, local or foreign court having jurisdiction over DSCC or Oxy-Cogen, issues or otherwise promulgates any restraining order, injunction, decree or similar order which prohibits the consummation of any of the transactions contemplated hereby, the parties hereto shall use their respective best efforts to have such restraining order, injunction, decree or similar order dissolved or otherwise eliminated as promptly as possible and to pursue the underlying Litigation diligently and in good faith.  Notwithstanding anything to the contrary contained in this Agreement, nothing contained in this Section 7.01 shall limit the respective rights of the parties to terminate this Agreement pursuant to Section 8.01 hereof or shall limit or otherwise affect the respective conditions to the obligations of the parties set forth in Articles V and VI hereof.

SECTION 7.02  Best Efforts.

(a)  Upon the terms and subject to the conditions hereof, each of the parties hereto agrees to take or cause to be taken, all action and to do, or cause to be done, all things necessary, proper or advisable to

24

OCC 033203

consummate and make effective the transactions contem-
plated by this Agreement and the Cogen Related Documents.

(b)    Except as otherwise expressly pro-
vided for in this Agreement, (i) each of Oxy-Cogen and
DSCC shall, and shall cause each of their respective
subsidiaries to, use its and their best efforts to obtain
at the earliest practicable date, whether before or after
the Closing Date, all consents required to be obtained by
it for the consummation of the transactions contemplated
by this Agreement and the Cogen Related Documents and
(ii) DSCC shall, and shall cause each of its affiliates
(to the extent necessary) to, use its and their best
efforts to obtain, whether before or after the Closing
Date, any amendments, novations, releases, waivers, con-
sents or approvals with respect to all outstanding debt
instruments, guarantees and Contracts of DSCC and which
are necessary, (A) to cure any defaults thereunder exist-
ing immediately prior to the Closing Date and (B) for the
consummation of the transactions contemplated by this
Agreement and the Cogen Related Documents; provided,
however, that (x) in obtaining any such amendments, nova-
tions, releases, waivers, consents or approvals, no party
hereto shall, or shall permit any of its subsidiaries to,
agree to any amendment of any such instrument which im-

25

OCC 033204

Confidential

poses any obligation or liability on another party with-
out the prior written consent of such other party, and
(y) except as otherwise expressly provided by this Agree-
ment, no party hereto shall be obligated to execute any
guarantees or undertakings or otherwise incur or assume
any liability in connection with obtaining any such re-
lease, novation, approval, consent, authorization or
waiver.

(c)  Each of Oxy-Cogen and DSCC shall
provide such information and cooperate fully with each
other in making such applications, filings and other
submissions which may be required or reasonably necessary
in order to obtain all approvals, consents, authoriza-
tions and waivers as may be required from any Governmen-
tal Agency and others in connection with the transactions
contemplated by this Agreement and the Cogen Related
Documents.

(d)  Except as otherwise expressly pro-
vided for in this Agreement, each of Oxy-Cogen and DSCC
shall promptly take all actions necessary to make each
filing, including, without limitation, any supplemental
filing, which any of them may be required to make with
any Governmental Agency as a condition to or consequence

26

OCC 033205

Confidential

OCCNJ0026648

ALCD-PUBCOM_0002526

of the consummation of the transactions contemplated by this Agreement or any Cogen Related Document.

(e)   In the event that a consent, approval, authorization, license, permit or waiver required to transfer any of the Cogeneration Assets to Oxy-Cogen or to carry out any business operation or activity relating to the Facilities or the HL&P Contract has not been obtained prior to the Cogen Closing:

(i)   DSCC will transfer to Oxy-Cogen only such interest (beneficial or other) in such Cogeneration Asset that will not cause a loss of any part of such Cogeneration Asset and will not ultimately result in the violation of any Law or applicable regulation. All remaining interests in such Cogeneration Asset shall be retained by DSCC as trustee for Oxy-Cogen until the required consent, approval, authorization, license, permit or waiver is obtained; and

(ii)   Such business operation or activity will, to the extent it can be done lawfully, be continued and carried out for the benefit of Oxy-Cogen by DSCC as trustee for Oxy-Cogen with all operating profits or losses

27

OCC 033206

Confidential

OCCNJ0026649

ALCD-PUBCOM_0002527

being for the account of Oxy-Cogen until the
required consent, approval, authorization,
license, permit or waiver is obtained, at which
time the interests not previously transferred
and all rights to carry out the business opera-
tion or activity will be vested in Oxy-Cogen
under the terms of this Agreement.

SECTION 7.03  Notice of Failure of Condition.
Each party hereto shall as promptly as reasonably practi-
cable notify the other in writing of the occurrence of
any event of which it obtains knowledge which will result
in the failure to satisfy the conditions specified in
Article V hereof in the case of events relating to DSCC
and Article VI hereof in the case of events relating to
Oxy-Cogen.

SECTION 7.04  Schedules and Exhibits.  As
promptly as practical following the end of each calendar
month after the date of this Agreement and prior to the
Cogen Closing, DSCC shall supplement or amend all Sched-
ules and Exhibits to this Agreement with respect to any
matter hereafter arising which, if existing or occurring
at the date of this Agreement, would have been required
to be set forth or described in a Schedule or Exhibit to
this Agreement.  Any such supplement or amendment of any

28

OCC 033207

Confidential

Schedule or Exhibit to this Agreement made pursuant to this Section 7.04 which purports to correct any prior representation or cure the breach of any prior warranty made in this Agreement shall, but only if consented to by Oxy-Cogen, be deemed to correct such representation and cure the breach of such warranty for purposes of Section 5.01 of this Agreement.

SECTION 7.05  Insurance.  DSCC shall use its best efforts to renew the insurance policies, if any, relating to the Cogeneration Business Unit currently in effect (or to procure replacement policies and binders of substantially the same cost and nature) and maintain all such policies and binders in full force and effect at all times up to and including the Closing Date, and to pay all premiums, deductibles and retro-adjustment billings with respect thereto covering all periods, and insuring coverage of the Cogeneration Assets up to and including the Closing Date.

SECTION 7.06  Course of Conduct.  Between the date of this Agreement and until the Cogen Closing, DSCC shall (a) maintain the status of each of the Facilities as a "Qualifying Facility" under PURPA and as a "qualified cogeneration facility" under the Texas Public Utility Regulatory Act and the rules of the Public Utility

29

OCC 033208

Confidential

OCCNJ0026651

ALCD-PUBCOM_0002529

Commission of Texas, (b) maintain the status of each of
the Facilities as being free from the requirements of the
Fuel Use Act, (c) operate the Facilities in the ordinary
course consistent with past practice, (d) maintain the
compliance by DSCC and each Facility with all permits,
licenses, franchises and all other governmental authori-
zations for the ownership, construction, improvement,
equipment, operation and maintenance of such Facility
other than such noncompliance as would not have a materi-
al adverse effect on the business, financial condition or
results of operations of the Facilities, and (e) promptly
provide Oxy-Cogen notice of any material adverse develop-
ments or threatened material adverse developments in the
business, financial condition or results of operations of
either of the Cogeneration Business Unit.

SECTION 7.07   HL&P Consent.

(a)  DSCC shall use its best efforts,
whether before or after the Closing Date, to obtain the
consent of HL&P to (i) assignment of the HL&P Contract
and the transfer of the Cogeneration Assets contemplated
hereby, and (ii) such amendments, novations, releases,
waivers, consents or approvals necessary to release DSCC
thereunder and under any agreement or understanding re-
lated thereto.   If reasonably necessary in the circum-

30

OCC 033209

Confidential

stances, the obligation of DSCC to use its best efforts
shall include, without limitation, providing its guaran-
tee, or the guarantee of any of its subsidiaries and
affiliates, in consideration for the granting or obtain-
ing of any such amendments, novations, releases, waivers,
consents or approvals.

      (b)  DSCC shall cooperate reasonably
with Oxy-Cogen and its representatives in their discus-
sions with HL&P in respect of any assignment or amendment
of the HL&P Contract.

     SECTION 7.08  <u>Allocation of Purchase Price</u>.
The allocation of the Purchase Price shall be as set
forth below and for all purposes the parties hereto shall
treat the transactions contemplated hereby in a manner
consistent with such allocation.

<u>Cogeneration Business Unit</u>

<u>Allocation of Purchase Price</u>

| | |
|---|---|
| The Cogeneration Assets (other than the HL&P Contract) | $152,800,000 |
| HL&P Contract | 297,200,000 |
| Total | $450,000,000 |

31

OCC 033210

**Confidential**

ARTICLE VIII

Termination and Amendment

SECTION 8.01    Termination.    This Agreement may
be terminated at any time prior to the Cogen Closing:

(a)  by mutual consent of the parties
hereto; and

(b)  by either party hereto upon written
notice to the other upon termination of the Stock Pur-
chase Agreement pursuant to Section 11.01 thereof.

SECTION 8.02    Obligations Shall Cease.    In the
event that this Agreement shall be terminated pursuant to
Section 8.01 hereof, all obligations of the parties here-
to under this Agreement shall terminate and there shall
be no liability of any party hereto to any other party,
except (a) as set forth in Section 8.03 hereof and
(b) with respect to terminations pursuant to
Section 8.01(b) hereof as a result of a termination of
the Stock Purchase Agreement under Section 11.01(c)
thereof, as to any party whose breach of this Agreement
resulted in the failure to close.

SECTION 8.03    Fees and Expenses.    Each party
hereto shall pay all of the fees and expenses incurred by
it in connection herewith.

32

OCC 033211

ARTICLE IX

Miscellaneous

SECTION 9.01  Headings.  The descriptive head-
ings of the several Articles and Sections of this Agree-
ment are inserted for convenience only and do not consti-
tute a part of this Agreement.

SECTION 9.02  Notices.  Any notices or other
communications required or permitted hereunder shall be
given in writing and shall be delivered or sent by next
day delivery service, personal delivery or certified or
registered mail, postage prepaid, addressed as follows:

If to Oxy-Cogen, to:

 Oxy-Alkali Cogeneration Corporation
 c/o Occidental Petroleum Corporation
 10889 Wilshire Boulevard
 Los Angeles, California  90024
 Attention:  Gerald M. Stern, Esq.

If to DSCC, to:

 Diamond Shamrock Chemicals Company
 c/o Diamond Shamrock Corporation
 717 North Harwood Street
 Dallas, Texas 75201
 Attention:  James F. Kelley, Esq.

With a copy to:

 Jones, Day, Reavis & Pogue
 2300 LTV Center
 2001 Ross Avenue
 Dallas, Texas 75201
 Attention:  Robert A. Profusek, Esq.

33

OCC 033212

Confidential

OCCNJ0026655

ALCD-PUBCOM_0002533

If to DSCC following the Closing, to:

    Diamond Shamrock Chemicals Company
    c/o Occidental Chemical Corporation
    800 Connecticut Avenue
    Norwalk, Connecticut 06850
    Attention:  President

With a copy to OPC

If to Oxy-Cogen, or if to DSCC following the
Closing, copies to:

    Skadden, Arps, Slate, Meagher & Flom
    919 Third Avenue
    New York, New York 10022
    Attention:  Jeffrey W. Tindell, Esq.

    and

    Skadden, Arps, Slate, Meagher & Flom
    515 S. Figueroa Street
    Los Angeles, California 90071
    Attention:  Jerome L. Coben, Esq.

or to such other address as shall be furnished in writing

by such party, and any such notice or communication shall

be effective and be deemed to have been given as of the

date so dispatched, delivered or mailed; provided, that,

any notice or communications changing any of the address-

es set forth above shall be effective and deemed given

only upon its receipt.

    SECTION 9.03  Successors.  This Agreement and

all of the provisions hereof shall be binding upon and

inure to the benefit of the parties hereto and their

respective successors and permitted assigns, but neither

this Agreement nor any of the rights, interests or obli-

<div align="center">34</div>

<div align="right">OCC 033213</div>

Confidential

gations hereunder shall be assigned by any party hereto without the prior written consent of the other party.

SECTION 9.04    Other Action.  Consistent with the terms and conditions hereof, each party hereto will execute and deliver such instruments, certificates and other documents and take such other action as the other party hereto may reasonably require in order to carry out this Agreement or any of the Cogen Related Documents and the transactions contemplated hereby and thereby.

SECTION 9.05    Entire Agreement.  Each of the Schedules and Exhibits referred to herein, whether or not attached hereto, are hereby incorporated in and made a part of this Agreement as if set forth in full herein. This Agreement and the Cogen Related Documents constitute the sole and entire agreement among the parties hereto and thereto with respect to the subject matter hereof and thereof, and supersede all prior arrangements or under-standings with respect thereto; and there are no restrictions, agreements, promises, representations, warranties, covenants or undertakings other than those expressly set forth herein or therein.

35

OCC 033214

Confidential

OCCNJ0026657

ALCD-PUBCOM_0002535

SECTION 9.06  <u>Third Parties</u>.  Except as specif-
ically set forth or referred to herein (including, with-
out limitation, Section 9.03 hereof) nothing herein ex-
pressed or implied is intended or shall be construed to
confer upon or give any entity other than the parties
hereto and their successors and permitted assigns, any
rights or remedies under or by reason of this Agreement.

SECTION 9.07  <u>Counterparts</u>.  This Agreement may
be executed in two or more counterparts all of which
shall be considered one and the same agreement and each
of which shall be deemed an original.

SECTION 9.08  <u>Governing Law</u>.  This Agreement
shall be governed by the laws of the State of Delaware
(regardless of the laws that might be applicable under
principles of conflict of laws) as to all matters, in-
cluding, but not limited to, matters of validity, con-
struction, effect and performance.

SECTION 9.09  <u>Bulk Sales</u>.  Oxy-Cogen waives
compliance by DSCC with the provisions of the so-called
bulk sales law of any state.  DSCC shall indemnify and
hold harmless Oxy-Cogen and its affiliates against all
loss, damage and expense suffered by any such persons as
a result of non-compliance by DSCC with any such bulk

36

OCC 033215

Confidential

OCCNJ0026658

ALCD-PUBCOM_0002536

sales laws, this indemnity being in addition to the in-demnity provided elsewhere herein.

SECTION 9.10  <u>Rules of Construction</u>.  Unless the context otherwise requires (a) all capitalized terms not otherwise defined herein have the meaning assigned to them in the Stock Purchase Agreement, (b) "or" is disjunctive but not necessarily exclusive, and (c) words in the singular include the plural and in the plural include the singular.  No provision of this Agreement shall be construed in favor of, or against, any of the parties hereto by reason of the extent to which any such party or its counsel participated in its drafting or by reason of the extent to which this Agreement or any such provision hereof is inconsistent with any prior draft hereof or thereof.

37

OCC 033216

**Confidential**

OCCNJ0026659

ALCD-PUBCOM_0002537

IN WITNESS WHEREOF, each of the parties hereto has caused this Agreement to be executed by its duly authorized officer as of the day and year first above written.

DIAMOND SHAMROCK CHEMICALS
CORPORATION

By_____
   Name:
   Title:

OXY-ALKALI COGENERATION
CORPORATION

By_____
   Name:
   Title:

38

OCC 033217

Confidential

<u>EXHIBIT 4.06</u>

Agreement,
Dated September 4, 1986 (the "Agreement"),
By and Among
Diamond Shamrock Corporation,
Occidental Petroleum Corporation,
Occidental Chemical Holding Corporation
and
<u>Oxy-Diamond Alkali Corporation</u>


<u>SEPARATION BENEFITS</u>

2846g

OCC 033218

Confidential

EXHIBIT 4.06

<u>Separation Benefits</u>

Battleground, TX
Belle, WV
Convent, LA
Deer Park, TX
Delaware City, DE
Muscle Shoals, AL
Mobile, AL
Castle Hayne, NC
Dallas, TX
Duncanville, AL
Franklin Park, IL
Lockport, NY
Oxnard, CA
Ashtabula, OH
Richmond, CA
Morristown, NJ
Pasadena, TX

8462G

OCC 033219

**Confidential**

**OCCNJ0026662**
ALCD-PUBCOM_0002540

Diamond Shamrock

D 396-1D          HRIV - 08

| | SECTION |
| --- | --- |
| **Human Resources Policies and Administrative Guidelines** | COMPENSATION |
| | SUBJECT |
| | SEPARATION PAY |

**Eligibility for Separation Pay**

A regular full-time employee will be eligible for separation pay and other benefits under this policy guideline if (1) the employee's employment is terminated for any reason other than death, voluntary termination (including retirement), failure to return from a leave of absence, or discharge for reasons of criminal activity, willful misconduct, gross negligence in the performance of duties, or violation of Corporation policy, or (2) the employee's position is eliminated, as determined by the Corporation, and he/she is not offered another position at the same grade level or above within 35 miles of such employee's job location. Any employee who voluntarily terminates his/her employment before his/her scheduled termination date, as determined by the Corporation, is not eligible for separation pay or other benefits under this policy guideline.

The Corporation may or may not, at its sole option, provide advance notice of separation to the employee. If advance notice is provided to the employee, the Corporation may, at its sole option, reduce the separation pay and any other benefits under this policy guideline by the amount of advance notice provided.

If (a) Diamond Shamrock sells or otherwise transfers ownership of the business in which an employee is employed and (b) the new owner of such business offers to employ the employee upon his/her termination from Diamond Shamrock at a salary at least equal to his/her final salary with Diamond Shamrock and at a location not more than 35 miles from that of his/her final Diamond Shamrock job, then such employee shall not be eligible for separation pay under this policy guideline or any other policy of the Corporation.

This policy guideline also does not apply to an employee who is entitled to receive separation pay pursuant to Policy Guideline 10.

OCC 033220

Date  June 25, 1986                           Page 1 of 5

Confidential

OCCNJ0026663

ALCD-PUBCOM_0002541

Diamond Shamrock                                    D 398-1D        HRIV - 08

| | SECTION | COMPENSATION |
|---|---|---|

**Human Resources
Policies and
Administrative Guidelines**

| | SUBJECT | SEPARATION PAY |
|---|---|---|

Questions concerning application or interpretation of this policy guideline, including questions about the application of this policy guideline in situations where a job will be eliminated, should be referred to the Corporate Human Resources Department.

This policy guideline does not constitute a contract or guarantee of employment to anyone. The Corporation reserves the right to change or terminate this policy guideline for any reason. This policy guideline, together with Policy Guideline 10, replaces and supersedes any separation pay policy issued prior hereto.

<u>Separation Pay Formula</u>

Each eligible employee will receive separation pay in accordance with the following standard separation pay formula:

(1) <u>For less than six months' service:</u>
Through Job Class 21 - one week's pay; Job Class 22 and above - two weeks pay.

(2) <u>For service of six months to one year:</u>
Through Job Class 21 - two weeks' pay; Job Class 22 and above - four weeks' pay.

(3) <u>For service in excess of one year, but less than 20 years:</u> Through Job Class 21 - one week's pay for each year of employment (minimum shall be two weeks' pay); Job Class 22 and above - two weeks' pay for each year of employment (minimum shall be four weeks' pay).

(4) <u>For service in excess of 19 years:</u>
Through Job Class 21 - one week's pay for each year of employment for each of the first 19 years, plus two weeks' pay for each year in excess of 19 years; Job Class 22 and above - two weeks' pay for each year of employment.

OCC 033221

Confidential

OCCNJ0026664

ALCD-PUBCOM_0002542

HRIV - 08

**Diamond Shamrock**

D 396-1D

| | |
|---|---|
| **Human Resources Policies and Administrative Guidelines** | SECTION  COMPENSATION |
| | SUBJECT  SEPARATION PAY |

In addition to the preceding standard separation pay formula, eligible employees in Job Class levels 27 and above shall receive three months' pay.

Vacation compensation, earned and unused at the time of separation, shall be paid in addition to the amounts set forth above.

In instances where an eligible employee's position has been eliminated and he/she is not offered another position as set forth under "Eligibility for Separation Pay" above, such employee will receive a separation pay benefit which is enhanced as follows:

(1) <u>For less than six months' service:</u>
Through Job Class 21 - additional one week's pay; Job Class 22 and above - additional two weeks' pay.

(2) <u>For service of six months to one year:</u>
Through Job Class 21 - additional two weeks' pay; Job Class 22 and above - additional four weeks' pay.

(3) <u>For service in excess of one year:</u>
Through Job Class 21 - the minimum separation pay is raised to four weeks' pay; Job Class 22 and above - the minimum separation pay is raised to eight weeks' pay.

<u>In no case will any employee receive more than 52 weeks' separation pay.</u>

<u>Timing of Separation Payments</u>

Separation pay is not included as earnings for the purpose of calculating benefits under the retirement plans or any other employee benefit plans of the Corporation.

OCC 033222

Date  June 25, 1986

Page  3  of  5

Confidential

OCCNJ0026665

ALCD-PUBCOM_0002543

Diamond Shamrock                          D 398-1D        HRIV - 08

| | SECTION | |
| --- | --- | --- |
| **Human Resources Policies and Administrative Guidelines** | COMPENSATION | |
| | SUBJECT | |
| | SEPARATION PAY | |

The separation payment is made from operating funds and not from any employee benefit plan funds.

Separation pay will be paid in a lump sum on the date of termination or promptly thereafter.

**Benefits**

All benefits of the eligible employee will cease upon termination, except as follows:

The eligible employee and his/her dependents will be covered by the Basic Medical Benefit Plan for a period equivalent to the total number of weeks of separation pay that the employee will receive (including the three months' additional pay for Job Class levels 27 and above). For example, an employee who receives eight weeks' separation pay (four weeks' under the standard formula and an additional four weeks' due to job elimination) would receive Basic Medical Benefit Plan coverage for a period of eight weeks. If an eligible employee's Basic Medical Benefit coverage would terminate on a day prior to the last day of a month, such benefit coverage will be extended to the last day of such month. In no case will the Basic Medical Benefit Plan coverage provided under this policy guideline continue beyond the last day of the sixth month following such employee's termination. Furthermore, at any such time as the employee commences coverage under another medical benefit plan, including coverage as a dependent, his/her Medical Benefit Plan under this policy guideline will terminate.

Such employee may convert to an individual medical insurance policy at any time prior to termination of his/her coverage, in accordance with the Corporation's medical benefits program.

OCC 033223

Date  June 25, 1986                              Page 4 of 5

Confidential

Diamond Shamrock                                    D 398-1D        HRIV - 08

| SECTION | COMPENSATION |
| --- | --- |

**Human Resources
Policies and
Administrative Guidelines**

| SUBJECT | SEPARATION PAY |
| --- | --- |

Coverage under the Basic Life Insurance Program
will continue for 30 days following the eligible
employee's termination date, during which period
such employee may convert to an individual policy
in accordance with the Corporation's life
insurance program.

Retirement service credits cease upon the eligible
employee's date of termination. However, an
employee with at least 10 years of service is
eligible for a vested retirement benefit. An
employee age 55 or older at date of termination
will be eligible to apply for a retirement benefit
in accordance with the retirement plan that
applies to him/her.

Participation in the Employee Shareholding and
Investment Plan and Employee Stock Ownership Plan
will cease upon the eligible employee's date of
termination. Vested amounts credited to such
employee's accounts in such plans will be
distributed to him/her in accordance with the
terms of such plans.

On the date of termination, the eligible employee
will cease coverage or participation in the Dental
Assistance Plan and Disability Income Program
(including the Salary Continuation Plan and the
Long-Term Disability Plan).

In instances of job elimination, at the sole
discretion of the Corporation, outplacement
counseling may be provided to the eligible
employee.

OCC 033224

Date  June 25, 1986                                    Page  5  of  5

Confidential

OCCNJ0026667

ALCD-PUBCOM_0002545

<u>EXHIBIT 6.01</u>

Agreement,
Dated September 4, 1986 (the "Agreement"),
By and Among
Diamond Shamrock Corporation,
Occidental Petroleum Corporation,
Occidental Chemical Holding Corporation
and
<u>Oxy-Diamond Alkali Corporation</u>

<u>OPINION OF SELLER'S COUNSEL</u>

2846g

OCC 033225

**Confidential**

OCCNJ0026668

ALCD-PUBCOM_0002546



Corporate Law Department

**W. E. Notestine**
Vice President and
Deputy General Counsel

**Diamond Shamrock**

September 4, 1986

Oxy-Diamond Alkali Corporation
c/o Occidental Petroleum Corporation
10889 Wilshire Boulevard
Los Angeles, California  90024

Occidental Petroleum Corporation
10889 Wilshire Boulevard
Los Angeles, California  90024

Gentlemen:

I am Vice President and Deputy General Counsel of, and have acted as one of counsel for, Diamond Shamrock Corporation, a Delaware corporation ("Seller"), in connection with the Stock Purchase Agreement, dated as of September 4, 1986 (the "Agreement"), by and among Seller, Occidental Petroleum Corporation, Occidental Chemical Holding Company, and Oxy-Diamond Alkali Corporation ("Buyer") providing for the sale by Seller to Buyer of all of the issued and outstanding Shares of Diamond Shamrock Chemicals Company, a Delaware corporation ("DSCC"), on the terms and conditions set forth therein.  This opinion is being furnished to you pursuant to Section 6.01 of the Agreement.  Terms used in this opinion which are defined in the Agreement are used herein as so defined.

I have examined originals, or photostatic or certified copies, of such corporate records and documents of Seller and its subsidiaries, public documents, certificates of officers or representatives of Seller and its subsidiaries, certificates of public officials, and such other instruments and documents as I have deemed relevant and necessary as a basis for the opinions hereinafter expressed.  In making such examinations, I have assumed the genuineness of all signatures and the authenticity of all documents submitted to me as originals, the conformity to the original documents of all documents submitted to me as certified or photostatic copies, and the authenticity of the originals of such latter documents.

I am a member of the Bar of the State of Texas and do not purport to be an expert on, generally familiar with or qualified to express legal conclusions based on, laws other than the laws of the State of Texas and the substantive laws of

OCC 033226

**Diamond Shamrock Corporation**
World Headquarters, 717 North Harwood Street, Dallas, Texas 75201 Phone: 214 922-2706

**Confidential**

OCCNJ0026669

ALCD-PUBCOM_0002547

the State of Delaware. Accordingly, the opinions expressed below are specifically limited to the laws of the State of Texas and the substantive laws of the State of Delaware.

On the basis of the foregoing, and relying upon the statements of fact contained in the documents I have examined, I am of the opinion that:

1.    Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware. Seller has the requisite corporate power and authority (a) to own, operate and lease its properties and to carry on its business as now being conducted and (b) to execute, deliver and perform the Agreement and each of the Related Documents to which it is a party and to consummate the transactions contemplated thereby.

2.    The execution, delivery and performance by Seller of the Agreement and each of the Related Documents to which it is a party, and the consummation by Seller of the transactions contemplated thereby, have been duly authorized by requisite corporate action on the part of Seller. Each of the Agreement and each of the Related Documents to which Seller is a party is a valid and binding obligation of, enforceable in accordance with its terms against, Seller, except that (a) such enforcement may be subject to bankruptcy, insolvency, reorganization, moratorium or other similar laws now or hereafter in effect relating to creditors' rights generally and (b) the remedy of specific performance and injunctive and other forms of equitable relief may be subject to equitable defenses and to the discretion of the court before which any proceeding therefor may be brought.

3.    DSCC is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware. DSCC has the requisite corporate power and authority to own, operate and lease its properties and to carry on its business as now being conducted. DSCC has the requisite corporate or similar power and authority to execute, deliver and perform each of the Related Documents to which it is a party and to consummate the transactions contemplated thereby.

4.    The execution, delivery and performance by DSCC of each of the Related Documents to which it is a party, and the consummation by DSCC of the transactions contemplated thereby, have been duly authorized by requisite corporate action on the part of DSCC. Each of the Related Documents to which DSCC is a party is a valid and binding obligation of,

-2-

OCC 033227

Confidential

enforceable in accordance with its terms against, DSCC, except that (a) such enforcement may be subject to bankruptcy, insolvency, reorganization, moratorium or other similar laws now or hereafter in effect relating to creditors' rights generally and (b) the remedy of specific performance and injunctive and other forms of equitable relief may be subject to equitable defenses and to the discretion of the court before which any proceeding therefor may be brought.

5.    The authorized capital stock of DSCC consists of 1,000 shares of Common Stock, par value $1.00 per share. The Shares constitute all the issued and outstanding shares of capital stock of DSCC, all of which Shares are owned of record by Seller. The Shares have been validly issued and are fully paid and non-assessable. There are no outstanding convertible or exchangeable securities, subscriptions, calls, commitments, preemptive rights, preferential rights, options, warrants, rights (contractual or arising by operation of law, including, without limitation, rights of first refusal) or other agreements relating to the purchase, other acquisition or voting (pursuant to a voting agreement or trust or otherwise) by any person or entity of any shares of capital stock or other equity or ownership interest in DSCC.

Very truly yours,

2796g

-3-

OCC 033228

Confidential

OCCNJ0026671

ALCD-PUBCOM_0002549

<u>EXHIBIT 7.01</u>

Agreement,
Dated September 4, 1986 (the "Agreement"),
By and Among
Diamond Shamrock Corporation,
Occidental Petroleum Corporation,
Occidental Chemical Holding Corporation
and
Oxy-Diamond Alkali Corporation

<u>OPINION OF BUYER'S COUNSEL</u>

2846g

OCC 033229

**Confidential**

**OCCNJ0026672**
ALCD-PUBCOM_0002550

## OCCIDENTAL PETROLEUM CORPORATION

10889 WILSHIRE BOULEVARD, SUITE 1500
LOS ANGELES, CALIFORNIA 90024
(213) 208-8800 • (213) 879-1700

RAYMOND GILL
ASSOCIATE GENERAL COUNSEL

September 4, 1986

Diamond Shamrock Corporation
717 North Harwood Street
Dallas, Texas 75201

Attention:  James F. Kelley, Esq.

Gentlemen:

I am Associate General Counsel of Occidental Petroleum Corporation ("OPC"); and I (with the assistance of other members of the legal staffs of OPC and its subsidiary corporations) have acted as counsel to OPC and its three indirectly wholly owned subsidiary corporations, Occidental Chemical Holding Corporation ("Oxy-Chem"), Oxy-Diamond Alkali Corporation ("Buyer") and Oxy-Alkali Cogeneration Corporation ("Oxy-Alkali"), in connection with the negotiation, execution and delivery of the following agreements (the "Agreements") all dated September 4, 1986.

(a)  the "Stock Purchase Agreement" by and among Diamond Shamrock Corporation ("Seller"), OPC, Oxy-Chem and Buyer; and

(b)  The "Related Documents" (as defined in the Stock Purchase Agreement).

Unless otherwise defined herein, all capitalized terms used herein shall have the meanings assigned thereto in the Stock Purchase Agreement.

I am familiar with the corporate proceedings taken by OPC, Oxy-Chem, Buyer and Oxy-Alkali (collectively the "Occidental Entities") in connection with the negotiation and authorization of the Agreements, and the transactions contemplated thereby. In addition, I have examined (or caused to be examined) such corporate records of each of the Occidental Entities and such other documents and such questions of law and fact as I have considered necessary or appropriate to render the opinions hereinafter expressed. Based upon and subject to the foregoing, and subject to the qualifications exceptions and limitations expressed below, it is my opinion that:

1.  Each of OPC, Buyer and Oxy-Alkali is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware.  Oxy-Chem is a corporation duly organized, validly existing and in good standing under the laws of the State of California.  Each of the Occidental Entities has the requisite

OCC 033230

Page 2

corporate power and authority (a) to own, operate and lease its
properties and to carry on its business as now being conducted and
(b) to execute, deliver and perform each of the Agreements to which
it is a party and to consummate the transactions contemplated
thereby.

2.  The execution, delivery and performance by each of the
Occidental Entities of each of the Agreements to which it is a party,
and the consummation by each of the Occidental Entities of the
transactions contemplated thereby, have been duly authorized by
requisite corporate action on the part of each of them.  Each of the
Agreements is a valid and binding obligation of, enforceable in
accordance with its terms against, each of the Occidental Entities
which is a party thereto except that (a) such enforcement may be
subject to bankruptcy, insolvency, reorganization, moratorium or
other similar laws now or hereafter in effect relating to creditors'
rights generally and (b) the remedy of specific performance and
injunctive and other forms of equitable relief may be subject to
equitable defenses and to the discretion of the court before any
proceeding therefor may be brought.

I am a member of only the California, New York and Georgia
Bars; and, for purposes of this opinion, I do not hold myself out
as an expert on, nor do I express any opinion as to the laws of any
other jurisdiction.

With your approval, I have relied, as to certain matters of
fact, on information obtained from public officials, officers of
OPC and its subsidiaries, and other sources believed by me to be
responsible; and I have assumed that the signatures on all
documents examined by me are genuine, that all documents submitted
to me as originals are authentic and that all documents submitted
to me as copies conform with the originals, which assumptions I
have not veried independently.

Very truly yours

Raymond Gill

RG:bh
Leg-8821

OCC 033231

Confidential

<u>EXHIBIT 8.08</u>

Agreement,
Dated September 4, 1986 (the "Agreement"),
By and Among
Diamond Shamrock Corporation,
Occidental Petroleum Corporation,
Occidental Chemical Holding Corporation
and
<u>Oxy-Diamond Alkali Corporation</u>

<u>ASSUMPTION INSTRUMENTS</u>

2846g

OCC 033232

OCCNJ0026675
ALCD-PUBCOM_0002553

ASSIGNMENT AND ASSUMPTION AGREEMENT

This ASSIGNMENT AND ASSUMPTION AGREEMENT ("Agreement") made as of the 4th day of September, 1986, by and between DIAMOND SHAMROCK CORPORATION, a Delaware corporation ("Seller"), and DIAMOND SHAMROCK CHEMICALS COMPANY, a Delaware corporation ("DSCC");

WITNESSETH

WHEREAS, Seller, Occidental Petroleum Corporation, a Delaware corporation ("OPC"), Occidental Chemical Holding Corporation, a California corporation and an indirect wholly owned subsidiary of OPC ("Oxy-Chem"), and Oxy-Diamond Alkali Corporation, a Delaware corporation and an indirect wholly owned subsidiary of OPC ("Buyer"), have entered into a certain Stock Purchase Agreement made as of the 4th day of September, 1986 (the "Stock Purchase Agreement"), upon the terms and subject to the conditions of which Seller has agreed to sell to Buyer, and Buyer has agreed to purchase from Seller, all of the outstanding shares of capital stock of DSCC; and

OCC 033233

**Confidential**

WHEREAS, pursuant to Sections 1.03 and 8.08 of the Stock Purchase Agreement, Seller has agreed to assign or cause to be assigned to DSCC, and to cause DSCC to assume, prior to the Closing (as defined in Section 5.01 of the Stock Purchase Agreement), each of the financial obligations described in Schedule 1.02 of the Stock Purchase Agreement (the "Assumed Obligations"); and

WHEREAS, upon the terms and subject to the conditions of this Agreement, Seller desires to assign to DSCC, and DSCC desires to assume from Seller, certain of the Assumed Obligations.

NOW, THEREFORE, it is agreed as follows:

Section 1.  Seller hereby assigns, transfers, conveys and delivers to DSCC, all of its right, title, interest and estate in, to and under each of the agreements listed on Schedule 1 hereto (the "Subject Agreements"). Seller hereby represents and warrants to DSCC that, prior to the date hereof, it has not assigned or otherwise transferred any of its right, title, interest or estate in, to or under any of the Subject Agreements except such right, title, interest or estate, if any,

2

OCC 033234

**Confidential**

previously transferred pursuant to the Sharing Agreements
listed on Schedule 2 hereto (the "Sharing Agreements").

Section 2.  DSCC hereby accepts the foregoing
assignment and assumes and agrees to perform all of the
duties, obligations and agreements of Seller under the
Subject Agreements arising on and after the Closing Date
(as defined in Section 5.01 of the Stock Purchase Agree-
ment); provided, however, that nothing contained in this
Agreement shall be deemed to release or otherwise dis-
charge Seller from any of its duties, obligations or
agreements under or, directly or indirectly related to,
any of the Subject Agreements to the extent that such
duties, obligations and agreements are not assigned to
DSCC or are otherwise unaffected, pursuant to the terms
of the Subject Agreements or applicable law, by the as-
signment provided for in Section 1 of this Agreement.
DSCC undertakes the aforementioned obligations absolutely
and unconditionally.

Section 3.  Seller hereby represents, warrants
and convenants that (i) prior to the Closing Date, no
action has been taken, or omitted to be taken, that would
cause the interest on any bonds or other evidences of

3

OCC 033235

indebtedness issued pursuant to the Subject Agreements (the "Bonds") to be subject to taxation under the Internal Revenue Code of 1954, as amended (the "Code") (other than when held by a substantial user or related person, as such terms are defined in Section 103 of the Code), (ii) the Internal Revenue Service (the "IRS") has made no assertion or determination that the interest on the Bonds is or will be subject to taxation under the Code, (iii) so long as any of the Bonds are outstanding it will take no action, or omit to take any action, that would cause the interest on the Bonds to be so taxable, and (iv) the transactions contemplated by this Agreement will not cause interest on the Bonds to be subject to taxation under the Code nor cause a default pursuant to the Subject Agreements.

Section 4.   DSCC hereby represents, warrants and convenants that so long as any of the Bonds are outstanding it will take no action, or omit to take any action, that would cause the interest on the Bonds to be subject to taxation under the Code (other than when held by a substantial user or related person, as such terms are defined in Section 103 of the Code).

4

OCC 033236

Confidential

OCCNJ0026679

ALCD-PUBCOM_0002557

Section 5.  Until such time as each of the
Subject Agreements has been fully performed, discharged
and satisfied, Seller shall, and shall cause each of its
subsidiaries to, perform and remain in compliance with
its and their respective duties, obligations and agree-
ments under, and, directly or indirectly, related to,
each of the Subject Agreements, to the extent that such
duties, obligations and agreements are not assigned to
DSCC or are otherwise unaffected, pursuant to the terms
of the Subject Agreements or applicable law, by the as-
signment provided for in Section 1 of this Agreement.
Seller undertakes the aforementioned obligations abso-
lutely and unconditionally.

Section 6.  As promptly as practicable after
the date hereof, Seller shall notify the appropriate
parties under each of the Subject Agreements to request
that a copy of any notice, request, consent, demand,
certificate or other communication (individually and
collectively, "Communications") given to Seller pursuant
to each of the Subject Agreements shall also be given to
DSCC at the address specified in Section 22 hereof and in
the same manner and on the same terms as Communications
are required to be given to Seller thereunder.  Within

5

OCC 033237

Confidential

OCCNJ0026680

ALCD-PUBCOM_0002558

five business days of receipt of any Communications,
Seller and DSCC shall each forward to the other party a
copy thereof.  Each of Seller and DSCC shall provide the
other with a copy of any Communication given by it at the
time it is given or is required to be given pursuant to
any of the Subject Agreements, at least five business
days prior to the date such Communication is to be given.
All such Communications required to be given pursuant to
this Section 6 shall be given in accordance with the
provisions of Section 22 hereof.

     Section 7.  Until such time as each of the
Subject Agreements has been fully performed, discharged
and satisfied, each of Seller and DSCC shall maintain its
corporate existence and qualification to do business in
each jurisdiction required by each of the Subject Agree-
ments and shall not merge or consolidate with any other
corporation or sell or dispose of all or substantially
all of its assets, unless (a)(i) it is the surviving
corporation, or (ii) the surviving or successor corpora-
tion is a corporation organized and existing under the
laws of the United States of America or a state thereof
or is a Pass Through Purchaser (as defined in Section
9.05 of the Stock Purchase Agreement) and such corpora-

6

OCC 033238

tion or Pass Through Purchaser expressly assumes, in a
written instrument delivered to the other party, the
punctual performance and observance of all of the cove-
nants and conditions of this Agreement and each of the
Subject Agreements to be performed by such party; and
(b) such party or such surviving or successor corporation
or such Pass Through Purchaser, as the case may be, shall
not, immediately after such merger, consolidation, sale
or disposition, be in default in the performance of any
covenants or conditions under this Agreement or under any
of the Subject Agreements.

Section 8.  Without the prior written consent
of DSCC, Seller shall not exercise any option available
to it under any of the Subject Agreements or amend, modi-
fy, waive or otherwise change any of the terms of any of
the Subject Agreements.  Upon the written request of
DSCC, and upon deposit by DSCC of sufficient monies or
other obligations as may be required under the applicable
Subject Agreements, Seller shall exercise any option
available to it under any of the Subject Agreements and
shall assign to DSCC all of its right, title, interest
and estate in, to or under such option, in each case to
the extent provided in such written request, and in each

7

OCC 033239

Confidential

OCCNJ0026682

ALCD-PUBCOM_0002560

case subject to the terms and conditions of any of the applicable Sharing Agreements.

Section 9.  Subject to the provisions of Section 21, Seller shall, in accordance with the procedures set forth in Section 9.04 of the Stock Purchase Agreement, indemnify, defend and hold harmless each of OPC, Oxy-Chem, Buyer, each of the DSCC Companies (as defined in Section 2.02 of the Stock Purchase Agreement) and each Pass Through Purchaser, each of their respective subsidiaries and affiliates and each of their respective directors, officers, agents and representatives, from and against any and all Indemnifiable Losses (as defined in Section 9.03 of the Stock Purchase Agreement) relating to, resulting from or arising out of:

(a)  any breach of any of its representations, warranties or obligations contained in this Agreement;

(b)  any of the Subject Agreements or any agreements or instruments relating thereto or made in connection therewith, arising or resulting in any manner from the actions or omissions of (i) any DSCC Company prior to the Closing Date or (ii) Seller, any Diamond Company (as defined in Section 2.02 of the Stock Purchase

8

OCC 033240

OCCNJ0026683
ALCD-PUBCOM_0002561

Agreement) or any other party thereto (excluding the DSCC
Companies and their successors and assigns, but includ-
ing, without limitation, any party to the Sharing Agree-
ments), whether before or after the Closing Date; or

          (c)  (i) a determination by the IRS or
any, court or other competent authority, or (ii) a claim
by any Bondholder that the interest on the Bonds is sub-
ject to taxation under the Code (other than when held by
a substantial user or related person, as such terms are
defined in Section 103 of the Code), in each case as a
result of a breach of Seller's representations, warran-
ties or convenants under Section 3 hereof.

        Section 10.  Subject to the provisions of Sec-
tion 21, DSCC shall, in accordance with the procedures
set forth in Section 9.04 of the Stock Purchase Agree-
ment, indemnify, defend and hold harmless Seller, its
subsidiaries and affiliates and each of their respective
directors, officers, agents and representatives, from and
against any and all Indemnifiable Losses relating to,
resulting from or arising out of:

          (a)  any breach of any of its obligations
contained in this Agreement;

9

OCC 033241

(b)   any of the Subject Agreements arising or resulting in any manner from the actions or omissions of any DSCC Company after the Closing Date; or

(c)   (i) a determination by the IRS or any court or other competent authority, or (ii) a claim by any Bondholder that the interest on the Bonds is subject to taxation other under the Code (other than when held by a substantial user or related person, as such terms are defined in Section 103 of the Code), in each case as a result of a breach of DSCC's representations, warranties or convenants under Section 4 hereof.

Section 11.   The remedies provided in this Agreement shall be cumulative and shall not preclude the assertion by any party hereto of any other rights or the seeking of any and all other remedies against any other party hereto, including, without limitation, any rights to indemnity contained in the Stock Purchase Agreement and any action for breach of a covenant under this Agreement or the Stock Purchase Agreement.

OCC 033242

Confidential

OCCNJ0026685

ALCD-PUBCOM_0002563

Section 12.   This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns, but neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned (other than to a Pass Through Purchaser) by any of the parties hereto without the prior written consent of the other party.

Section 13.   This Agreement may be amended only by an instrument in writing duly executed by each of the parties hereto.

Section 14.   Consistent with the terms and conditions hereof, each party hereto will execute and deliver such instruments, certificates and other documents and take such other action as any other party hereto may reasonably require in order to carry out this Agreement and the transactions contemplated hereby.

Section 15.   This Agreement shall be governed by the laws of the State of Delaware (regardless of the laws that might be applicable under principles of conflict of laws) as to all matters, including, but not

11

OCC 033243

Confidential

limited to, matters of validity, construction, effect and performance.

Section 16.  Any waiver by any party hereto of any breach of, or failure to comply with, any provision of this Agreement by any other party hereto shall not be construed as, or constitute, a continuing waiver of such provision, or a waiver of any other breach of, or failure to comply with, any other provision of this Agreement.

Section 17.  If any provision of this Agreement is declared void or unenforceable by any court of competent jurisdiction, the validity of any other provision of this Agreement shall not be affected thereby.

Section 18.  This Agreement may be executed in two or more counterparts, all of which shall be considered one and the same agreement and each of which shall be deemed an original.

Section 19.  Schedules 1 and 2 to this Agreement are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  This Agreement, together with the provisions of the Stock Purchase

12

OCC 033244

Confidential

OCCNJ0026687
ALCD-PUBCOM_0002565

Agreement referred to herein (but only to the extent
referred to herein), constitute the sole and entire
agreement between the parties hereto with respect to the
subject matter hereof and thereof, and supersede all
prior arrangements or understandings with respect there-
to; and there are no restrictions, agreements, promises,
representations, warranties, covenants or undertakings
other than those expressly set forth herein or therein.

Section 20.  Except as specifically set forth
or referred to herein, nothing herein expressed or im-
plied is intended or shall be construed to confer upon or
give any person or entity other than the parties hereto
and their successors and permitted assigns, any rights or
remedies under or by reason of this Agreement.

Section 21.  Upon making any payment for an
Indemnifiable Loss hereunder (as defined in Section 9.03
of the Stock Purchase Agreement) ("Indemnity Payment"),
the Indemnifying Party (as defined in Section 9.03 of the
Stock Purchase Agreement) shall to the extent of such
Indemnity Payment, be subrogated to all rights of the
Indemnitee (as defined in Section 9.03 of the Stock Pur-
chase Agreement) against any third party including,
without limitation, any party to any Sharing Agreement in

13

OCC 033245

Confidential

OCCNJ0026688

ALCD-PUBCOM_0002566

respect of the Indemnifiable Loss to which the Indemnity Payment relates; provided, however, that (a) the Indemnifying Party shall then be in compliance with its obligations under this Agreement in respect of such Indemnifiable Loss, and (b) until the Indemnitee recovers full payment of its Indemnifiable Loss, any and all claims of the Indemnifying Party against any such third party on account of said Indeminity Payment are hereby made expressly subordinated and subjected in right of payment to the Indemnitee's rights against such third party.  Without limiting the generality of any other provision hereof, each such Indemnitee and Indemnifying Party shall duly execute upon request all instruments reasonably necessary to evidence and perfect the above described subrogation and subordination rights.

Section 22.  Any Communications (including, without limitation, Communications required to be given to DSCC pursuant to Section 6 hereof) required or permitted hereunder shall be given in writing and shall be delivered or sent by next day delivery service, personal delivery or certified or registered mail, postage prepaid, addressed as follows:

14

OCC 033246

**Confidential**

If to DSCC:

> Diamond Shamrock Chemicals Company
> c/o Occidental Chemical Corporation
> 800 Connecticut Avenue
> Norwalk, Connecticut  06850
> Attention:  President

> With copies to:

> Occidental Petroleum Corporation
> 10889 Wilshire Boulevard
> Los Angeles, California  90024
> Attention:  Gerald M. Stern, Esq.

> and

> Skadden, Arps, Slate, Meagher & Flom
> 919 Third Avenue
> New York, New York  10022
> Attention:  Jeffrey W. Tindell, Esq.

> and

> Skadden, Arps, Slate, Meagher & Flom
> 515 S. Figueroa Street
> Los Angeles, California  90071
> Attention:  Jerome L. Coben, Esq.

If to Seller, to:

> Diamond Shamrock Corporation
> 717 North Harwood Street
> Dallas, Texas  75201
> Attention:  James F. Kelley, Esq.

> With a copy to:

> Jones, Day, Reavis & Pogue
> 2300 LTV Center
> 2001 Ross Avenue
> Dallas, Texas  75201
> Attention:  Robert A. Profusek, Esq.

or to such other address as shall be furnished in writing

by such party, and any such notice or communication shall

15

OCC 033247

Confidential

OCCNJ0026690

ALCD-PUBCOM_0002568

be effective and be deemed to have been given as of the date so dispatched, delivered or mailed; provided, that, any notice or communications changing any of the addresses set forth above shall be effective and deemed given only upon its receipt.

Section 23.    EXCEPT FOR THE WARRANTIES SPECIFICALLY PROVIDED IN ARTICLE II OF THE STOCK PURCHASE AGREEMENT, SELLER MAKES NO WARRANTY OR REPRESENTATION, EITHER EXPRESS OR IMPLIED, AS TO THE DESIGN OR CONDITION OF, OR AS TO THE QUALITY OF THE MATERIAL, EQUIPMENT OR WORKMANSHIP IN ANY FACILITIES ACQUIRED OR LEASED WITH PROCEEDS FROM THE SUBJECT AGREEMENT HEREBY ASSIGNED, AND MAKES NO WARRANTY OF MERCHANTABILITY OR FITNESS OF SUCH FACILITIES FOR ANY PARTICULAR PURPOSE.

16

OCC 033248

Confidential

OCCNJ0026691

ALCD-PUBCOM_0002569

IN WITNESS WHEREOF, each of the parties hereto has caused this Agreement to be executed by its duly authorized officers as of the day and year first above written.

DIAMOND SHAMROCK CORPORATION

By: _____
    Name:
    Title:

ATTEST:

_____


DIAMOND SHAMROCK CHEMICALS COMPANY

By: _____
    Name:
    Title:

ATTEST:

_____


17

OCC 033249

**Confidential**

OCCNJ0026692
ALCD-PUBCOM_0002570

STATE OF _____ )
                              ) SS.
COUNTY OF _____ )

On _____ before me, the undersigned, a Notary Public in and for said State, personally appeared _____, residing at _____ known to me to be the _____ President, and _____, residing at _____ known to me to be _____ Secretary of the corporation that executed the within Instrument, known to me to be the persons who executed the within Instrument on behalf of the corporation therein named, and acknowledged to me that such corporation executed the within Instrument pursuant to its by-laws or a resolution of its board of directors and as such corporation's free act and deed.

WITNESS my hand and official seal.


_____
Notary Public


STATE OF _____ )
                              ) SS.
COUNTY OF _____ )


On _____ before me, the undersigned, a Notary Public in and for said State, personally appeared _____, residing at _____ known to me to be the _____ President, and _____, residing at _____ known to me to be _____ Secretary of the corporation that executed the within Instrument, known to me to be the persons who executed the within Instrument on behalf of the corporation therein named, and acknowledged to me that such corporation executed the within Instrument pursuant to its by-laws or a resolution of its board of directors and as such corporation's free act and deed.

WITNESS my hand and official seal.


_____
Notary Public

OCC 033250

ASSIGNMENT AND ASSUMPTION AGREEMENT


This ASSIGNMENT AND ASSUMPTION AGREEMENT
("Agreement") made as of the 4th day of September, 1986,
by and between DIAMOND SHAMROCK CORPORATION, a Delaware
corporation ("Seller"), and DIAMOND SHAMROCK CHEMICALS
COMPANY, a Delaware corporation ("DSCC");


WITNESSETH


WHEREAS, Seller, Occidental Petroleum Corpora-
tion, a Delaware corporation ("OPC"), Occidental Chemical
Holding Corporation, a California corporation and an
indirect wholly owned subsidiary of OPC ("Oxy-Chem"), and
Oxy-Diamond Alkali Corporation, a Delaware corporation
and an indirect wholly owned subsidiary of OPC ("Buyer"),
have entered into a certain Stock Purchase Agreement made
as of the 4th day of September, 1986 (the "Stock Purchase
Agreement"), upon the terms and subject to the conditions
of which Seller has agreed to sell to Buyer, and Buyer
has agreed to purchase from Seller, all of the outstand-
ing shares of capital stock of DSCC; and


OCC 033251

Confidential

OCCNJ0026694

ALCD-PUBCOM_0002572

WHEREAS, pursuant to Sections 1.03 and 8.08 of the Stock Purchase Agreement, Seller has agreed to assign or cause to be assigned to DSCC, and to cause DSCC to assume, prior to the Closing (as defined in Section 5.01 of the Stock Purchase Agreement), each of the financial obligations described in Schedule 1.02 of the Stock Purchase Agreement (the "Assumed Obligations"); and

WHEREAS, upon the terms and subject to the conditions of this Agreement, Seller desires to assign to DSCC, and DSCC desires to assume from Seller, certain of the Assumed Obligations.

NOW, THEREFORE, it is agreed as follows:

Section 1.  Seller hereby assigns, transfers, conveys and delivers to DSCC, all of its right, title, interest and estate in, to and under each of the agreements listed on Schedule 1 hereto (the "Subject Agreements").  Seller hereby represents and warrants to DSCC that, prior to the date hereof, it has not assigned or otherwise transferred any of its right, title, interest or estate in, to or under any of the Subject Agreements.

2

OCC 033252

**Confidential**

Section 2. DSCC hereby accepts the foregoing assignment and assumes and agrees to perform all of the duties, obligations and agreements of Seller under the Subject Agreements arising on and after the Closing Date (as defined in Section 5.01 of the Stock Purchase Agreement); provided, however, that nothing contained in this Agreement shall be deemed to release or otherwise discharge Seller from any of its duties, obligations or agreements under or, directly or indirectly related to, any of the Subject Agreements to the extent that such duties, obligations and agreements are not assigned to DSCC or are otherwise unaffected, pursuant to the terms of the Subject Agreements or applicable law, by the assignment provided for in Section 1 of this Agreement. DSCC undertakes the aforementioned obligations absolutely and unconditionally.

Section 3. Until such time as each of the Subject Agreements has been fully performed, discharged and satisfied, Seller shall, and shall cause each of its subsidiaries to, perform and remain in compliance with its and their respective duties, obligations and agreements under, and, directly or indirectly, related to, each of the Subject Agreements, to the extent that such

3

OCC 033253

Confidential

duties, obligations and agreements are not assigned to
DSCC or are otherwise unaffected, pursuant to the terms
of the Subject Agreements or applicable law, by the as-
signment provided for in Section 1 of this Agreement.
Seller undertakes the aforementioned obligations abso-
lutely and unconditionally.

Section 4.   As promptly as practicable after
the date hereof, Seller shall notify the appropriate
parties under each of the Subject Agreements to request
that a copy of any notice, request, consent, demand,
certificate or other communication (individually and
collectively, "Communications") given to Seller pursuant
to each of the Subject Agreements shall also be given to
DSCC at the address specified in Section 20 hereof and in
the same manner and on the same terms as Communications
are required to be given to Seller thereunder.   Within
five days of receipt of any Communication, Seller and
DSCC shall each forward to the other party a copy there-
to.   Each of Seller and DSCC shall provide the other with
a copy of any Communication given by it at the time it is
given or is required to be given pursuant to any of the
Subject Agreements, at least five business days prior to
the date such Communication is to be given.   All such

4

OCC 033254

Confidential                                    OCCNJ0026697
                                           ALCD-PUBCOM_0002575

Communications required to be given pursuant to this
Section 4 shall be given in accordance with the provi-
sions of Section 20 hereof.

Section 5.   Until such time as each of the
Subject Agreements has been fully performed, discharged
and satisfied, each of Seller and DSCC shall maintain its
corporate existence and qualification to do business in
each jurisdiction required by each of the Subject Agree-
ments and shall not merge or consolidate with any other
corporation or sell or dispose of all or substantially
all of its assets, unless (a)(i) it is the surviving
corporation, or (ii) the surviving or successor corpora-
tion is a corporation organized and existing under the
laws of the United States of America or a state thereof
or is a Pass Through Purchaser (as defined in Section
9.05 of the Stock Purchase Agreement) and such corpora-
tion or Pass Through Purchaser expressly assumes, in a
written instrument delivered to the other party, the
punctual performance and observance of all of the cove-
nants and conditions of this Agreement and each of the
Subject Agreements to be performed by such party; and
(b) such party or such surviving or successor corporation
or such Pass Through Purchaser, as the case may be, shall

5

OCC 033255

Confidential

OCCNJ0026698

ALCD-PUBCOM_0002576

not, immediately after such merger, consolidation, sale or disposition, be in default in the performance of any covenants or conditions under this Agreement or under any of the Subject Agreements.

Section 6.  Without the prior written consent of DSCC, Seller shall not exercise any option available to it under any of the Subject Agreements or amend, modify, waive or otherwise change any of the terms of any of the Subject Agreements.  Upon the written request of DSCC, and upon deposit by DSCC of sufficient monies or other obligations as may be required under the applicable Subject Agreements, Seller shall exercise any option available to it under any of the Subject Agreements and shall assign to DSCC all of its right, title, interest and estate in, to or under such option, in each case to the extent provided in such written request, and in each case subject to the terms and conditions of any of the applicable Sharing Agreements.

Section 7.  Subject to Section 19, Seller shall, in accordance with the procedures set forth in Section 9.04 of the Stock Purchase Agreement, indemnify, defend and hold harmless each of OPC, Oxy-Chem, Buyer,

6

OCC 033256

Confidential

OCCNJ0026699

ALCD-PUBCOM_0002577

each of the DSCC Companies (as defined in Section 2.02 of the Stock Purchase Agreement) and each Pass Through Purchaser, each of their respective subsidiaries and affiliates and each of their respective directors, officers, agents and representatives, from and against any and all Indemnifiable Losses (as defined in Section 9.03 of the Stock Purchase Agreement) relating to, resulting from or arising out of:

 (a) any breach of any of its representations, warranties or obligations contained in this Agreement; or

 (b) any of the Subject Agreements or any agreements or instruments relating thereto or made in connection therewith, arising or resulting in any manner from the actions or omissions of (i) any DSCC Company prior to the Closing Date or (ii) Seller, any Diamond Company (as defined in Section 2.02 of the Stock Purchase Agreement) or any other party thereto (excluding the DSCC companies and their successors and assigns), whether before or after the Closing Date.

 Section 8. Subject to Section 19, DSCC shall, in accordance with the procedures set forth in Section 9.04 of the Stock Purchase Agreement, indemnify, defend and hold harmless Seller, its subsidiaries and affiliates and each of

7

OCC 033257

their respective directors, officers, agents and representatives, from and against any and all Indemnifiable Losses relating to, resulting from or arising out of:

       (a)  any breach of any of its obligations contained in this Agreement; or

       (b)  any of the Subject Agreements arising or resulting in any manner from the actions or omissions of any DSCC Company after the Closing Date.

Section 9.  The remedies provided in this Agreement shall be cumulative and shall not preclude the assertion by any party hereto of any other rights or the seeking of any and all other remedies against any other party hereto, including, without limitation, any rights to indemnity contained in the Stock Purchase Agreement and any action for breach of a covenant under this Agreement or the Stock Purchase Agreement.

Section 10.  This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns, but neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned (other than to a Pass Through Purchas-

8

OCC 033258

Confidential

OCCNJ0026701
ALCD-PUBCOM_0002579

er) by any of the parties hereto without the prior writ-
ten consent of the other party.

Section 11.  This Agreement may be amended only
by an instrument in writing duly executed by each of the
parties hereto.

Section 12.  Consistent with the terms and
conditions hereof, each party hereto will execute and
deliver such instruments, certificates and other docu-
ments and take such other action as any other party here-
to may reasonably require in order to carry out this
Agreement and the transactions contemplated hereby.

Section 13.  This Agreement shall be governed
by the laws of the State of Delaware (regardless of the
laws that might be applicable under principles of con-
flict of laws) as to all matters, including, but not
limited to, matters of validity, construction, effect and
performance.

Section 14.  Any waiver by any party hereto of
any breach of, or failure to comply with, any provision
of this Agreement by any other party hereto shall not be

9

OCC 033259

**Confidential**

construed as, or constitute, a continuing waiver of such provision, or a waiver of any other breach of, or failure to comply with, any other provision of this Agreement.

Section 15.  If any provision of this Agreement is declared void or unenforceable by any court of competent jurisdiction, the validity of any other provision of this Agreement shall not be affected thereby.

Section 16.  This Agreement may be executed in two or more counterparts, all of which shall be considered one and the same agreement and each of which shall be deemed an original.

Section 17.  Schedule 1 to this Agreement is hereby incorporated in and made a part of this Agreement as if set forth in full herein.  This Agreement, together with the provisions of the Stock Purchase Agreement referred to herein (but only to the extent referred to herein), constitute the sole and entire agreement between the parties hereto with respect to the subject matter hereof and thereof, and supersede all prior arrangements or understandings with respect thereto; and there are no restrictions, agreements, promises, representations,

10

OCC 033260

Confidential

OCCNJ0026703
ALCD-PUBCOM_0002581

warranties, covenants or undertakings other than those expressly set forth herein or therein.

Section 18.   Except as specifically set forth or referred to herein, nothing herein expressed or implied is intended or shall be construed to confer upon or give any person or entity other than the parties hereto and their successors and permitted assigns, any rights or remedies under or by reason of this Agreement.

Section 19.   Upon making any payment for an Indemnifiable Loss hereunder (as defined in Section 9.03 of the Stock Purchase Agreement) ("Indemnity Payment"), the Indemnifying Party (as defined in Section 9.03 of the Stock Purchase Agreement) shall to the extent of such Indemnity Payment, be subrogated to all rights of the Indemnitee (as defined in Section 9.03 of the Stock Purchase Agreement) against any third party in respect of the Indemnifiable Loss to which the Indemnity Payment relates; provided, however, that (a) the Indemnifying Party shall then be in compliance with its obligations under this Agreement in respect of such Indemnifiable Loss, and (b) until the Indemnitee recovers full payment of its Indemnifiable Loss, any and all claims of the Indemnifying Party against any such third party on ac-

11

OCC 033261

Confidential

count of said Indemnity Payment are hereby made expressly subordinated and subjected in right of payment to the Indemnitee's rights against such third party.  Without limiting the generality of any other provision hereof, each such Indemnitee and Indemnifying Party shall duly execute upon request all instruments reasonably necessary to evidence and perfect the above described subrogation and subordination rights.

Section 20.  Any Communications (including, without limitation, Communications required to be given to DSCC pursuant to Section 4 hereof) required or permitted hereunder shall be given in writing and shall be delivered or sent by next day delivery service, personal delivery or certified or registered mail, postage prepaid, addressed as follows:

If to DSCC:

        Diamond Shamrock Chemicals Company
        c/o Occidental Chemical Corporation
        800 Connecticut Avenue
        Norwalk, Connecticut  06850
        Attention:  President

        With copies to:

        Occidental Petroleum Corporation
        10889 Wilshire Boulevard
        Los Angeles, California  90024
        Attention:  Gerald M. Stern, Esq.

        and

12

OCC 033262

Confidential

OCCNJ0026705
ALCD-PUBCOM_0002583

Skadden, Arps, Slate, Meagher & Flom
919 Third Avenue
New York, New York  10022
Attention:  Jeffrey W. Tindell, Esq.

and

Skadden, Arps, Slate, Meagher & Flom
515 S. Figueroa Street
Los Angeles, California  90071
Attention:  Jerome L. Coben, Esq.

If to Seller, to:

Diamond Shamrock Corporation
717 North Harwood Street
Dallas, Texas  75201
Attention:  James F. Kelley, Esq.

With a copy to:

Jones, Day, Reavis & Pogue
2300 LTV Center
2001 Ross Avenue
Dallas, Texas  75201
Attention:  Robert A. Profusek, Esq.

or to such other address as shall be furnished in writing
by such party, and any such notice or communication shall
be effective and be deemed to have been given as of the
date so dispatched, delivered or mailed; provided, that,
any notice or communications changing any of the ad-
dresses set forth above shall be effective and deemed
given only upon its receipt.

Section 21.  EXCEPT FOR THE WARRANTIES SPECIFI-
CALLY PROVIDED IN ARTICLE II OF THE STOCK PURCHASE AGREE-
MENT, SELLER MAKES NO WARRANTY OR REPRESENTATION, EITHER

13

OCC 033263

EXPRESS OR IMPLIED, AS TO THE DESIGN OR CONDITION OF, OR
AS TO THE QUALITY OF THE MATERIAL, EQUIPMENT OR WORKMAN-
SHIP IN, ANY FACILITIES ACQUIRED OR LEASED WITH PROCEEDS
FROM THE SUBJECT AGREEMENT HEREBY ASSIGNED, AND MAKES NO
WARRANTY OF MERCHANTABILITY OR FITNESS OF SUCH FACILITIES
FOR ANY PARTICULAR PURPOSE.

14

OCC 033264

**Confidential**

OCCNJ0026707

ALCD-PUBCOM_0002585

IN WITNESS WHEREOF, each of the parties hereto has caused this Agreement to be executed by its duly authorized officers as of the day and year first above written.

DIAMOND SHAMROCK CORPORATION

By: _____
       Name:
       Title:

ATTEST:

_____

DIAMOND SHAMROCK CHEMICALS COMPANY

By: _____
       Name:
       Title:

ATTEST:

_____

15

OCC 033265

Confidential

STATE OF _____ )
                           )  SS.
COUNTY OF _____ )

On _____ before me, the
undersigned, a Notary Public in and for said State, per-
sonally appeared _____, residing at
_____, known to me to be the
_____ President, and
_____, residing at
_____, known to me to be
_____ Secretary of the corporation
that executed the within Instrument, known to me to be
the persons who executed the within Instrument on behalf
of the corporation therein named, and acknowledged to me
that such corporation executed the within Instrument
pursuant to its by-laws or a resolution of its board of
directors and as such corporation's free act and deed.

WITNESS my hand and official seal.


_____
Notary Public


STATE OF _____ )
                           )  SS.
COUNTY OF _____ )


On _____ before me, the
undersigned, a Notary Public in and for said State, per-
sonally appeared _____, residing at
_____, known to me to be the
_____ President, and
_____, residing at
_____, known to me to be
_____ Secretary of the corporation
that executed the within Instrument, known to me to be
the persons who executed the within Instrument on behalf
of the corporation therein named, and acknowledged to me
that such corporation executed the within Instrument
pursuant to its by-laws or a resolution of its board of
directors and as such corporation's free act and deed.

WITNESS my hand and official seal.


_____
Notary Public                          OCC 033266


Confidential

INDEMNIFICATION AGREEMENT

This INDEMNIFICATION AGREEMENT ("Agreement")
made as of the 4th day of September, 1986, by and between
DIAMOND SHAMROCK CORPORATION, a Delaware corporation
("Seller"), and DIAMOND SHAMROCK CHEMICALS COMPANY, a
Delaware corporation ("DSCC");

WITNESSETH

WHEREAS, Seller, Occidental Petroleum Corpora-
tion, a Delaware corporation ("OPC"), Occidental Chemical
Holding Corporation, a California corporation and an
indirect wholly owned subsidiary of OPC ("Oxy-Chem"), and
Oxy-Diamond Alkali Corporation, a Delaware corporation
and an indirect wholly owned subsidiary of OPC ("Buyer"),
have entered into a certain Stock Purchase Agreement made
as of the 4th day of September, 1986 (the "Stock Purchase
Agreement"), upon the terms and subject to the conditions
of which Seller has agreed to sell to Buyer, and Buyer
has agreed to purchase from Seller, all of the outstand-
ing shares of capital stock of DSCC; and

OCC 033267

**Confidential**

OCCNJ0026710
ALCD-PUBCOM_0002588

WHEREAS, Seller, DSCC, The B. F. Goodrich Company and Convent Chemical Corporation ("Convent") have entered into a Bond Obligation Assumption Agreement, dated as of November 27, 1985 (the "Bond Agreement") relating to certain Bonds listed on Exhibit A hereto, pursuant to which DSCC assumed the obligations of Convent with respect to such Bonds; and

WHEREAS, in order to complete the transactions contemplated by the Stock Purchase Agreement, DSCC is required to enter into this Agreement.

NOW, THEREFORE, it is agreed as follows:

Section 1.  Until such time as each of the agreements listed on Schedule 1 hereof, the Bond Agreement and the agreements, documents and other instrument referred to in the Bond Agreement or executed in connection therewith (collectively, the "Subject Agreements") has been fully performed, discharged and satisfied, DSCC shall, and shall cause each of its subsidiaries to, perform and remain in compliance with its and their respective duties, obligations and agreements under, and, directly or indirectly, related to, each of the Subject

2

OCC 033268

Confidential

OCCNJ0026711

ALCD-PUBCOM_0002589

Agreements.  DSCC undertakes the aforementioned obliga-
tions absolutely and unconditionally.

Section 2.  Seller hereby represents, warrants
and convenants that (i) prior to the Closing Date, no
action has been taken, or omitted to be taken, that would
cause the interest on any bonds or other evidences of
indebtedness issued pursuant to the Subject Agreements
(the "Bonds") to be subject to taxation under the Inter-
nal Revenue Code of 1954, as amended (the "Code") (other
than when held by a substantial user or related person,
as such terms are defined in Section 103 of the Code),
(ii) the Internal Revenue Service (the "IRS") has made no
assertion or determination that the interest on the Bonds
is or will be subject to taxation under the Code, (iii)
so long as any of the Bonds are outstanding it will take
no action, or omit to take any action, that would cause
the interest on the Bonds to be so taxable, and (iv) the
transactions comtemplated by this Agreement will not
cause interest on the Bonds to be subject to taxation
under the Code nor cause a default pursuant to the Sub-
ject Agreements.

3

OCC 033269

Confidential

OCCNJ0026712
ALCD-PUBCOM_0002590

Section 3.  DSCC hereby represents, warrants and convenants that so long as any of the Bonds are outstanding it will take no action, or omit to take any action, that would cause the interest on the Bonds to be subject to taxation under the Code (other than when held by a substantial user or related person, as such terms an defined in Section 103 of the Code).

Section 4.  Until such time as each of the Subject Agreements has been fully performed, discharged and satisfied, each of Seller and DSCC shall maintain its corporate existence and qualification to do business in each jurisdiction required by each of the Subject Agreements and the Bond Agreement and shall not merge or consolidate with any other corporation or sell or dispose of all or substantially all of its assets, unless (a)(i) it is the surviving corporation, or (ii) the surviving or successor corporation is a corporation organized and existing under the laws of the United States of America or a state thereof or is a Pass Through Purchaser (as defined in Section 9.05 of the Stock Purchase Agreement) and such corporation or Pass Through Purchaser expressly assumes, in a written instrument delivered to the other party, the punctual performance and observance of all of

4

OCC 033270

Confidential

the covenants and conditions of this Agreement and each
of the Subject Agreements to be performed by such party;
and (b) such party or such surviving or successor corpo-
ration or such Pass Through Purchaser, as the case may
be, shall not, immediately after such merger, consolida-
tion, sale or disposition, be in default in the perfor-
mance of any covenants or conditions under this Agreement
or under any of the Subject Agreements.

Section 5.  Subject to Section 17, Seller
shall, in accordance with the procedures set forth in
Section 9.04 of the Stock Purchase Agreement, indemnify,
defend and hold harmless each of OPC, Oxy-Chem, Buyer,
each of the DSCC Companies (as defined in Section 2.02 of
the Stock Purchase Agreement) and each Pass Through Pur-
chaser, each of their respective subsidiaries and affili-
ates and each of their respective directors, officers,
agents and representatives, from and against any and all
Indemnifiable Losses (as defined in Section 9.03 of the
Stock Purchase Agreement) relating to, resulting from or
arising out of:

(a)  any breach of any of the representa-
tions, warranties or obligations contained in this Agree-
ment;

5

OCC 033271

OCCNJ0026714
ALCD-PUBCOM_0002592

(b)  any of the Subject Agreements or any agreements or instruments relating thereto or made in connection therewith, arising or resulting in any manner from the actions or omissions of (i) any DSCC Company prior to the Closing Date or (ii) Seller, any Diamond Company (as defined in Section 2.02 of the Stock Purchase Agreement) or any other party thereto (excluding the DSCC Companies and their successors and assigns) whether before or after the Closing Date; or

(c)  (i) a determination by the IRS or any court or other competent authority, or (ii) a claim by any Bondholder that the interest on the Bonds is subject to taxation under the Code (other than when held by a substantial user or related person, as such terms are defined in Section 103 of the Code), in each case as a result of a breach of Seller's representations, warranties or convenants under Section 2 hereof.

Section 6.  Subject to Section 17, DSCC shall, in accordance with the procedures set forth in Section 9.04 of the Stock Purchase Agreement, indemnify, defend and hold harmless Seller, its subsidiaries and affiliates and each of their respective directors, officers, agents

6

OCC 033272

Confidential

OCCNJ0026715
ALCD-PUBCOM_0002593

and representatives, from and against any and all Indem-
nifiable Losses relating to, resulting from or arising
out of:

(a)   any breach of any of its obligations
contained in this Agreement;

(b)   any of the Subject Agreements arising
or resulting in any manner from the actions or omissions
of any DSCC Company after the Closing Date, or

(c)   (i) a determination by the IRS or
any, court or other competent authority, or (ii) a claim
by any Bondholder that the interest on the Bonds is sub-
ject to taxation under the Code (other than by a substan-
tial user or a related person, as such terms are defined
in Section 103 of the Code), in each case as a result of
a breach of DSCC's representations, warranties or conven-
ants under Section 3 hereof.

Section 7.   The remedies provided in this
Agreement shall be cumulative and shall not preclude the
assertion by any party hereto of any other rights or the
seeking of any and all other remedies against any other
party hereto, including, without limitation, any rights
to indemnity contained in the Stock Purchase Agreement

7

OCC 033273

Confidential

and any action for breach of a covenant under this Agreement or the Stock Purchase Agreement.

Section 8.  This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns, but neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned (other than to a Pass Through Purchaser) by any of the parties hereto without the prior written consent of the other party.

Section 9.  This Agreement may be amended only by an instrument in writing duly executed by each of the parties hereto.

Section 10.  Consistent with the terms and conditions hereof, each party hereto will execute and deliver such instruments, certificates and other documents and take such other action as any other party hereto may reasonably require in order to carry out this Agreement and the transactions contemplated hereby.

8

OCC 033274

Confidential

Section 11.  This Agreement shall be governed by the laws of the State of Delaware (regardless of the laws that might be applicable under principles of conflict of laws) as to all matters, including, but not limited to, matters of validity, construction, effect and performance.

Section 12.  Any waiver by any party hereto of any breach of, or failure to comply with, any provision of this Agreement by any other party hereto shall not be construed as, or constitute, a continuing waiver of such provision, or a waiver of any other breach of, or failure to comply with, any other provision of this Agreement.

Section 13.  If any provision of this Agreement is declared void or unenforceable by any court of competent jurisdiction, the validity of any other provision of this Agreement shall not be affected thereby.

Section 14.  This Agreement may be executed in two or more counterparts, all of which shall be considered one and the same agreement and each of which shall be deemed an original.

9

OCC 033275

Confidential

Section 15.  Exhibit A and Schedules 1 and 2 to this Agreement are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  This Agreement, together with the provisions of the Stock Purchase Agreement referred to herein (but only to the extent referred to herein), constitute the sole and entire agreement between the parties hereto with respect to the subject matter hereof and thereof, and supersede all prior arrangements or understandings with respect thereto; and there are no restrictions, agreements, promises, representations, warranties, covenants or undertakings other than those expressly set forth herein or therein.

Section 16.  Except as specifically set forth or referred to herein, nothing herein expressed or implied is intended or shall be construed to confer upon or give any person or entity other than the parties hereto and their successors and permitted assigns, any rights or remedies under or by reason of this Agreement.

Section 17.  Upon making any payment for an Indemnifiable Loss hereunder (as defined in Section 9.03 of the Stock Purchase Agreement) ("Indemnity Payment"), the Indemnifying Party (as defined in Section 9.03 of the Stock Purchase Agreement) shall to the extent of

10

OCC 033276

Confidential

OCCNJ0026719

ALCD-PUBCOM_0002597

such Indemnity Payment, be subrogated to all rights of the Indemnitee (as defined in Section 9.03 of the Stock Purchase Agreement) against any third party in respect of the Indemnifiable Loss to which the Indemnity Payment relates; provided, however, that (a) the Indemnifying Party shall then be in compliance with its obligations under this Agreement in respect of such Indemnifiable Loss, and (b) until the Indemnitee recovers full payment of its Indemnifiable Loss, any and all claims of the Indemnifying Party against any such third party on account of said Indemnity Payment are hereby made expressly subordinated and subjected in right of payment to the Indemnitee's rights against such third party.  Without limiting the generality of any other provision hereof, each such Indemnitee and Indemnifying Party shall duly execute upon request all instruments reasonably necessary to evidence and perfect the above described subrogation and subordination rights.

Section 18.  Any Communications required or permitted hereunder shall be given in writing and shall be delivered or sent by next day delivery service, personal delivery or certified or registered mail, postage prepaid, addressed as follows:

11

OCC 033277

Confidential

OCCNJ0026720
ALCD-PUBCOM_0002598

If to DSCC:

    Diamond Shamrock Chemicals Company
    c/o Occidental Chemical Corporation
    800 Connecticut Avenue
    Norwalk, Connecticut  06850
    Attention:  President

    With copies to:

    Occidental Petroleum Corporation
    10889 Wilshire Boulevard
    Los Angeles, California  90024
    Attention:  Gerald M. Stern, Esq.

    and

    Skadden, Arps, Slate, Meagher & Flom
    919 Third Avenue
    New York, New York  10022
    Attention:  Jeffrey W. Tindell, Esq.

    and

    Skadden, Arps, Slate, Meagher & Flom
    515 S. Figueroa Street
    Los Angeles, California  90071
    Attention:  Jerome L. Coben, Esq.

If to Seller, to:

    Diamond Shamrock Corporation
    717 North Harwood Street
    Dallas, Texas  75201
    Attention:  James F. Kelley, Esq.

    With a copy to:

    Jones, Day, Reavis & Pogue
    2300 LTV Center
    2001 Ross Avenue
    Dallas, Texas  75201
    Attention:  Robert A. Profusek, Esq.

or to such other address as shall be furnished in writing

by such party, and any such notice or communication shall

12

OCC 033278

Confidential

OCCNJ0026721

ALCD-PUBCOM_0002599

be effective and be deemed to have been given as of the
date so dispatched, delivered or mailed; provided, that,
any notice or communications changing any of the ad-
dresses set forth above shall be effective and deemed
given only upon its receipt.

13

OCC 033279

Confidential

OCCNJ0026722
ALCD-PUBCOM_0002600

IN WITNESS WHEREOF, each of the parties hereto has caused this Agreement to be executed by its duly authorized officers as of the day and year first above written.

DIAMOND SHAMROCK CORPORATION

By: _____
    Name:
    Title:

ATTEST:

_____

DIAMOND SHAMROCK CHEMICALS COMPANY

By: _____
    Name:
    Title:

ATTEST:

_____

14

OCC 033280

Confidential

OCCNJ0026723
ALCD-PUBCOM_0002601

INDEMNIFICATION AGREEMENT


This INDEMNIFICATION AGREEMENT ("Agreement") made as of the 4th day of September, 1986, by and between DIAMOND SHAMROCK CORPORATION, a Delaware corporation ("Seller"), and DIAMOND SHAMROCK CHEMICALS COMPANY, a Delaware corporation ("DSCC");


WITNESSETH


WHEREAS, Seller, Occidental Petroleum Corporation, a Delaware corporation ("OPC"), Occidental Chemical Holding Corporation, a California corporation and an indirect wholly owned subsidiary of OPC ("Oxy-Chem"), and Oxy-Diamond Alkali Corporation, a Delaware corporation and an indirect wholly owned subsidiary of OPC ("Buyer"), have entered into a certain Stock Purchase Agreement made as of the 4th day of September, 1986 (the "Stock Purchase Agreement"), upon the terms and subject to the conditions of which Seller has agreed to sell to Buyer, and Buyer has agreed to purchase from Seller, all of the outstanding shares of capital stock of DSCC; and

OCC 033281

Confidential

OCCNJ0026724

ALCD-PUBCOM_0002602

WHEREAS, in order to complete the transactions contemplated by the Stock Purchase Agreement, DSCC is required to enter into this Agreement.

NOW, THEREFORE, it is agreed as follows:

Section 1.    Until such time as each of the agreements listed on Schedule 1 hereof, and the agreements, documents and other instrument executed in connection therewith (collectively, the "Subject Agreements") has been fully performed, discharged and satisfied, DSCC shall, and shall cause each of its subsidiaries to, perform and remain in compliance with its and their respective duties, obligations and agreements under, and, directly or indirectly, related to, each of the Subject Agreements.    DSCC undertakes the aforementioned obligations absolutely and unconditionally.

Section 2.    Until such time as each of the Subject Agreements has been fully performed, discharged and satisfied, each of Seller and DSCC shall maintain its corporate existence and qualification to do business in each jurisdiction required by each of the Subject Agreements and shall not merge or consolidate with any other

2

OCC 033282

Confidential

OCCNJ0026725

ALCD-PUBCOM_0002603

corporation or sell or dispose of all or substantially
all of its assets, unless (a)(i) it is the surviving
corporation, or (ii) the surviving or successor corpora-
tion is a corporation organized and existing under the
laws of the United States of America or a state thereof
or is a Pass Through Purchaser (as defined in Section
9.05 of the Stock Purchase Agreement) and such corpora-
tion or Pass Through Purchaser expressly assumes, in a
written instrument delivered to the other party, the
punctual performance and observance of all of the cove-
nants and conditions of this Agreement and each of the
Subject Agreements to be performed by such party; and
(b) such party or such surviving or successor corporation
or such Pass Through Purchaser, as the case may be, shall
not, immediately after such merger, consolidation, sale
or disposition, be in default in the performance of any
covenants or conditions under this Agreement or under any
of the Subject Agreements.

    Section 3.  Subject to Section 15, Seller
shall, in accordance with the procedures set forth in
Section 9.04 of the Stock Purchase Agreement, indemnify,
defend and hold harmless each of OPC, Oxy-Chem, Buyer,
each of the DSCC Companies (as defined in Section 2.02 of

3

OCC 033283

OCCNJ0026726
ALCD-PUBCOM_0002604

the Stock Purchase Agreement) and each Pass Through Pur-
chaser, each of their respective subsidiaries and affili-
ates and each of their respective directors, officers,
agents and representatives, from and against any and all
Indemnifiable Losses (as defined in Section 9.03 of the
Stock Purchase Agreement) relating to, resulting from or
arising out of:

(a)  any breach of any of the representa-
tions, warranties or obligations contained in this Agree-
ment; or

(b)  any of the Subject Agreements or any
agreements or instruments relating thereto or made in
connection therewith, arising or resulting in any manner
from the actions or omissions of (i) any DSCC Company
prior to the Closing Date or (ii) Seller, any Diamond
Company (as defined in Section 2.02 of the Stock Purchase
Agreement) or any other party thereto (excluding the DSCC
Companies), whether before or after the Closing Date.

Section 4.  Subject to Section 15, DSCC shall,
in accordance with the procedures set forth in Section
9.04 of the Stock Purchase Agreement, indemnify, defend
and hold harmless Seller, its subsidiaries and affiliates
and each of their respective directors, officers, agents

4

OCC 033284

**Confidential**

OCCNJ0026727

ALCD-PUBCOM_0002605

and representatives, from and against any and all Indem-
nifiable Losses relating to, resulting from or arising
out of:

(a)  any breach of any of its obligations
contained in this Agreement; or

(b)  any of the Subject Agreements arising
or resulting in any manner from the actions or omissions
of any DSCC Company after the Closing Date.

Section 5.  The remedies provided in this
Agreement shall be cumulative and shall not preclude the
assertion by any party hereto of any other rights or the
seeking of any and all other remedies against any other
party hereto, including, without limitation, any rights
to indemnity contained in the Stock Purchase Agreement
and any action for breach of a covenant under this Agree-
ment or the Stock Purchase Agreement.

Section 6.  This Agreement and all of the pro-
visions hereof shall be binding upon and inure to the
benefit of the parties hereto and their respective suc-
cessors and permitted assigns, but neither this Agreement
nor any of the rights, interests or obligations hereunder
shall be assigned (other than to a Pass Through Purchas-

5

OCC 033285

er) by any of the parties hereto without the prior writ-
ten consent of the other party.

Section 7.  This Agreement may be amended only
by an instrument in writing duly executed by each of the
parties hereto.

Section 8.  Consistent with the terms and con-
ditions hereof, each party hereto will execute and deliv-
er such instruments, certificates and other documents and
take such other action as any other party hereto may
reasonably require in order to carry out this Agreement
and the transactions contemplated hereby.

Section 9.  This Agreement shall be governed by
the laws of the State of Delaware (regardless of the laws
that might be applicable under principles of conflict of
laws) as to all matters, including, but not limited to,
matters of validity, construction, effect and perfor-
mance.

Section 10.  Any waiver by any party hereto of
any breach of, or failure to comply with, any provision
of this Agreement by any other party hereto shall not be

6

OCC 033286

Confidential

OCCNJ0026729

ALCD-PUBCOM_0002607

construed as, or constitute, a continuing waiver of such
provision, or a waiver of any other breach of, or failure
to comply with, any other provision of this Agreement.

Section 11.   If any provision of this Agreement
is declared void or unenforceable by any court of compe-
tent jurisdiction, the validity of any other provision of
this Agreement shall not be affected thereby.

Section 12.   This Agreement may be executed in
two or more counterparts, all of which shall be consid-
ered one and the same agreement and each of which shall
be deemed an original.

Section 13.   Schedule 1 to this Agreement is
hereby incorporated in and made a part of this Agreement
as if set forth in full herein.   This Agreement, together
with the provisions of the Stock Purchase Agreement re-
ferred to herein (but only to the extent referred to
herein), constitute the sole and entire agreement between
the parties hereto with respect to the subject matter
hereof and thereof, and supersede all prior arrangements
or understandings with respect thereto; and there are no
restrictions, agreements, promises, representations,

7

OCC 033287

warranties, covenants or undertakings other than those
expressly set forth herein or therein.

Section 14.  Except as specifically set forth
or referred to herein, nothing herein expressed or im-
plied is intended or shall be construed to confer upon or
give any person or entity other than the parties hereto
and their successors and permitted assigns, any rights or
remedies under or by reason of this Agreement.

Section 15.  Upon making any payment for an
Indemnifiable Loss hereunder (as defined in Section 9.03
of the Stock Purchase Agreement) ("Indemnity Payment"),
the Indemnifying Party (as defined in Section 9.03 of the
Stock Purchase Agreement) shall to the extent of such
Indemnity Payment, be subrogated to all rights of the
Indemnitee (as defined in Section 9.03 of the Stock Pur-
chase Agreement) against any third party in respect of
the Indemnifiable Loss to which the Indemnity Payment
relates; provided, however, that (a) the Indemnifying
Party shall then be in compliance with its obligations
under this Agreement in respect of such Indemnifiable
Loss, and (b) until the Indemnitee recovers full payment
of its Indemnifiable Loss, any and all claims of the
Indemnifying Party against any such third party on ac-

8

OCC 033288

Confidential

count of said Indeminity Payment are hereby made express-
ly subordinated and subjected in right of payment to the
Indemnitee's rights against such third party.  Without
limiting the generality of any other provision hereof,
each such Indemnitee and Indemnifying Party shall duly
execute upon request all instruments reasonably necessary
to evidence and perfect the above described subrogation
and subordination rights.

Section 16.   Any Communications required or
permitted hereunder shall be given in writing and shall
be delivered or sent by next day delivery service, per-
sonal delivery or certified or registered mail, postage
prepaid, addressed as follows:

If to DSCC:

Diamond Shamrock Chemicals Company
c/o Occidental Chemical Corporation
800 Connecticut Avenue
Norwalk, Connecticut  06850
Attention:  President

With copies to:

Occidental Petroleum Corporation
10889 Wilshire Boulevard
Los Angeles, California  90024
Attention:  Gerald M. Stern, Esq.

and

9

OCC 033289

Confidential

OCCNJ0026732

ALCD-PUBCOM_0002610

Skadden, Arps, Slate, Meagher & Flom
919 Third Avenue
New York, New York  10022
Attention:  Jeffrey W. Tindell, Esq.

and

Skadden, Arps, Slate, Meagher & Flom
515 S. Figueroa Street
Los Angeles, California  90071
Attention:  Jerome L. Coben, Esq.

If to Seller, to:

Diamond Shamrock Corporation
717 North Harwood Street
Dallas, Texas  75201
Attention:  James F. Kelley, Esq.

With a copy to:

Jones, Day, Reavis & Pogue
2300 LTV Center
2001 Ross Avenue
Dallas, Texas  75201
Attention:  Robert A. Profusek, Esq.

or to such other address as shall be furnished in writing
by such party, and any such notice or communication shall
be effective and be deemed to have been given as of the
date so dispatched, delivered or mailed; provided, that,
any notice or communications changing any of the ad-
dresses set forth above shall be effective and deemed
given only upon its receipt.

10

OCC 033290

Confidential

IN WITNESS WHEREOF, each of the parties hereto has caused this Agreement to be executed by its duly authorized officers as of the day and year first above written.

DIAMOND SHAMROCK CORPORATION

By: _____
      Name:
      Title:

ATTEST:

_____

DIAMOND SHAMROCK CHEMICALS COMPANY

By: _____
      Name:
      Title:

ATTEST:

_____

11

OCC 033291

Confidential

OCCNJ0026734
ALCD-PUBCOM_0002612

EXHIBIT 8.13

Agreement,
Dated September 4, 1986 (the "Agreement"),
By and Among
Diamond Shamrock Corporation,
Occidental Petroleum Corporation,
Occidental Chemical Holding Corporation
and
Oxy-Diamond Alkali Corporation

POWER OF ATTORNEY

2846g

OCC 033292

Confidential

OCCNJ0026735
ALCD-PUBCOM_0002613

Exhibit 8.13

KNOW ALL MEN BY THESE PRESENTS, that, pursuant
to Section 8.13(c) of the Stock Purchase Agreement, made
as of the _____ day of September, 1986 (the "Stock Pur-
chase Agreement"), by and among Diamond Shamrock corpora-
tion, a Delaware corporation ("Seller"), Occidental Pe-
troleum Corporation, a Delaware Corporation, Occidental
Chemical Holding Corporation, a California corporation,
and Oxy-Diamond Alkali Corporation, a Delaware corpora-
tion ("Buyer"), each of Buyer and Diamond Shamrock Chemi-
cals Company, a Delaware corporation, hereby appoints,
subject to the provisions of Sections 8.13 and 8.14 of
the Stock Purchase Agreement, Seller its true and lawful
attorney in fact, for it in its name, place and stead, to
perform all acts and to execute all documents relating to
the maintenance and administration of the Existing Poli-
cies (as defined in the Stock Purchase Agreement) and to
pursue in its name in any reasonable manner which Seller
deems expedient any claim, including without limitation,
any Existing Claim (as defined in the Stock Purchase
Agreement), against any Current Carrier (as defined in
the Stock Purchase Agreement) under any of the Existing
Policies with respect to a matter for which Seller has
liability directly or pursuant to the provisions of the
Stock Purchase Agreement.

Dated September __, 1986

                    OXY-DIAMOND ALKALI CORPORATION

            By:     _____
                    Name:
                    Title:


                    DIAMOND SHAMROCK CHEMICALS
                    COMPANY

            By:     _____
                    Name:   James F. Kelley
                    Title:  Senior Vice President


                                    OCC 033293

Confidential                          OCCNJ0026736

                                    ALCD-PUBCOM_0002614

EXHIBIT 12.04

Agreement,
Dated September 4, 1986 (the "Agreement"),
By and Among
Diamond Shamrock Corporation,
Occidental Petroleum Corporation,
Occidental Chemical Holding Corporation
and
Oxy-Diamond Alkali Corporation

DSCC UNDERTAKING

2846g

OCC 033294

Confidential

OCCNJ0026737

ALCD-PUBCOM_0002615

UNDERTAKING

This UNDERTAKING ("Undertaking") made as of the 4th day of September, 1986, by and between DIAMOND SHAMROCK CORPORATION, a Delaware corporation ("Seller"), and DIAMOND SHAMROCK CHEMICALS COMPANY, a Delaware corporation ("DSCC");

WITNESSETH

WHEREAS, Seller, Occidental Petroleum Corporation, a Delaware corporation ("OPC"), Occidental Chemical Holding Corporation, a California corporation and an indirect wholly owned subsidiary of OPC ("Oxy-Chem"), and Oxy-Diamond Alkali Corporation, a Delaware corporation and an indirect wholly owned subsidiary of OPC ("Buyer"), have entered into a certain Stock Purchase Agreement made as of the 4th day of September, 1986 (the "Stock Purchase Agreement"), upon the terms and subject to the conditions of which Seller has agreed to sell to Buyer, and Buyer has agreed to purchase from Seller, all of the outstanding shares of capital stock of DSCC; and

WHEREAS, pursuant to Section 12.04 of the Stock Purchase Agreement, Buyer has agreed to cause DSCC to undertake to perform all of its post-Closing obligations (the "Post-Closing Obligations") set forth in the Stock Purchase Agreement or any Related Document (as defined in the Stock Purchase Agreement); and

WHEREAS, pursuant to this Agreement DSCC desires to undertake to perform all of its Post-Closing Obligations.

NOW, THEREFORE, in consideration of the Seller's representations, warranties and covenants contained in the Stock Purchase Agreement and the sum of $10, receipt of which is hereby acknowledged, and other good and valuable consideration, DSCC hereby agrees to perform all of its Post-Closing Obligations.

IN WITNESS WHEREOF, each of the parties hereto has caused this Undertaking to be executed by its duly authorized officers as of the day and year first above written.

DIAMOND SHAMROCK CORPORATION

By: _____                    ATTEST:
    Name:  James F. Kelley
    Title: Senior Vice President              _____


DIAMOND SHAMROCK CHEMICALS COMPANY

By: _____                    ATTEST:
    Name:
    Title:                                    _____


                                              OCC 033295

Confidential                                      OCCNJ0026738

ALCD-PUBCOM_0002616

<u>SCHEDULE 1.02</u>


Agreement,
Dated September 4, 1986 (the "Agreement"),
By and Among
Diamond Shamrock Corporation,
Occidental Petroleum Corporation,
Occidental Chemical Holding Corporation
and
<u>Oxy-Diamond Alkali Corporation</u>


<u>ASSUMED OBLIGATIONS</u>

8703G

OCC 033296

**Confidential**

**OCCNJ0026739**
ALCD-PUBCOM_0002617

Notes to Schedule 1.02

1.  Difference between unpaid principal and DSCC book
    value is attributable to amounts held by trustee in
    construction and acquisition fund

2.  Does not include provisions for prepayment or
    redemption; adjustments shall be made at or
    immediately following the Closing in the event of any
    such prepayment or redemption .

3.  Assumes timely payment in accordance with past
    practice (excepting DS Chile)

4.  $18,000,000 (of which $15,000,000 is classified as
    long term and $3,000,000 is classified as current
    liability)

5.  The amortization is as per attached Item A

6.  The sum of the amortization for the two issues is
    equal to the sum of the amortizations set forth at
    Items B and C

8680G

OCC 033297

Confidential    **OCCNJ0026740**
ALCD-PUBCOM_0002618

## CAPITAL LEASES

Diamond Shamrock Chemical Company
Schedule 2 of Assumed Obligations
July 31, 1986
Exhibit 1.02

| DESCRIPTION | FINAL MATURITY | INTEREST RATE | UNPAID PRINCIPAL | DSCC BOOK VALUE LTD | DSCC BOOK VALUE STD | UNAMORTIZED (DISC)/PREM | TOTAL DEBT |
|---|---|---|---|---|---|---|---|
| Lease dated as of September 1, 1966 by and between the Delaware Industrial Building Commission and Diamond Alkali Company | 01-Sep-86 | 5.250% | 1,164,240 | 1,037,632 | 126,608 | | 1,164,240 |
| Lease Agreement (Industrial) dated as of December 1, 1974 by and between the Industrial Development Board of the City of Muscle Shoals and Diamond Shamrock Corporation | 01-Dec-94 | 7.150% | 925,000 | 850,000 | 75,000 | | 925,000 |
| Lease Agreement (Pollution Control) dated as of December 1, 1974 by and between the Industrial Development Board of the City of Muscle Shoals and Diamond Shamrock Corporation | 01-Dec-99 | 7.250% | 2,200,000 | 2,100,000 | 100,000 | | 2,200,000 |
| Lease Agreement dated as of October 1, 1971 by and between North Alabama Environmental Improvement Authority and Diamond Shamrock Corporation | 01-Oct-91 | 6.600% | 810,000 | 700,000 | 110,000 | | 810,000 |
| Lease Agreement dated as of October 1, 1971 by and between West Alabama Environmental Improvement Authority and Diamond Shamrock Corporation | 01-Oct-92 | 6.600% | 415,000 | 355,000 | 60,000 | | 415,000 |
| Lease Agreement by and between Development Authority of Polk County, Georgia and Diamond Shamrock Corporation dated as of October 1, 1971 | 01-Oct-92 | 5.750% | 440,000 | 550,000 | 80,000 | | 440,000 |
| Lease Agreement by and between County Commission of Kanawha County, West Virginia (a Public Corporation under the laws of the State of West Virginia) and Diamond Shamrock Corporation dated as of December 1, 1979 | 01-Dec-04 | 7.875% | 1,000,000 | 1,000,000 | | | 1,000,000 |
| Bareboat Charter/Lease Agreement dated as of April 26, 1973 by and between Lone Star Barge Co., Inc. and Diamond Shamrock Corporation | 1988-90 | -- | 1,559,004 | 1,153,786 | 415,220 | | 1,559,006 |
| Master Lease Agreement dated as of October 12, 1984 by and between Condisco, Inc. and Diamond Shamrock Chemicals Company | 01-Dec-87 | -- | 324,944 | 226,998 | 97,948 | | 324,944 |
| Master Car Service Contract dated as of October 25, 1974 by and between General American Transportation Corporation and Diamond Shamrock Corporation (Rider #20 dated July 2, 1981) | 01-Dec-93 | -- | 146,207 | 134,771 | 11,436 | | 146,207 |
| Lease Agreement dated as of April 13, 1982 by and between 310quip, Inc. and Diamond Shamrock Corporation | 01-Feb-87 | -- | 3,200 | 574 | 2,634 | | 3,200 |
| Equipment Lease Agreement dated as of November 16, 1982 by and between Phillips Information Systems, Inc. and Diamond Shamrock Corporation | 01-Dec-87 | -- | 7,168 | 2,275 | 4,893 | | 7,168 |
| Equipment Lease Agreement dated as of February 27, 1984 by and between Diamond Shamrock Corporation and Phillips Information Systems, Inc. | 01-Jan-87 | -- | 3,704 | 2,460 | 1,244 | | 3,704 |
| Supplemental Equipment Lease dated as of March 15, 1982 by and between Chancellor Corporation and Diamond Shamrock Corporation | 01-Jul-87 | -- | 37,254 | 8,887 | 28,367 | | 37,254 |
| TOTAL CAPITAL LEASES | | | 9,245,721 | 8,132,381 | 1,113,350 | 0 | 9,245,731 |

2

OCC 033298

Confidential

OTHER LONG TERM DEBT

| DESCRIPTION | FINAL MATURITY | INTEREST RATE | UNPAID PRINCIPAL | DSCC BOOK VALUE LTD | DSCC BOOK VALUE STD | UNAMORTIZED (DISC)/PREM | TOTAL |
|---|---|---|---|---|---|---|---|
| Pollution Control Contract dated as of February 1, 1974, by and between the Gulf Coast Waste Disposal Authority and Diamond Shamrock as amended April 11, 1974 and March 20, 1975 | 01-Apr-00 | 7.375% | 2,700,000 | 2,585,000 | 115,000 | | 2,700,000 |
| Installment Sales Agreement by and between Department of Community Affairs and Economic Development of the State of Delaware and Diamond Shamrock Corporation dated as of April 1, 1975 (relating to $2,700,000 Pollution Control Revenue Bonds, Series A) | 01-Apr-00 | 7.500% | 1,436,336 | 1,406,798 | 29,538 | | 1,436,336 |
| Installment Sales Agreement by and between Department of Community Affairs and Economic Development of the State of Delaware and Diamond Shamrock Corporation dated as of April 1, 1975 (relating to $1,000,000 Industrial Development Revenue Bonds, Series A) | 01-Apr-95 | 7.500% | 915,000 | 910,000 | 5,000 | | 915,000 |
| Financing Agreement between County Commission of Kanawha County, West Virginia : a Public Corporation under the laws of the State of West Virginia) and Diamond Shamrock Corporation dated as of December 1, 1979 | 01-Feb-09 | 6.000% | 6,850,000 | 6,850,000 | | | 6,850,000 |
| Air and Water Pollution Control Facilities and Installment Sales Agreement between Gulf Coast Waste Disposal Authority and Diamond Shamrock Corporation dated as of February 1, 1977 | 01-Jun-09 | 6.750% | 8,250,000 | 8,250,000 | | | 8,250,000 |
| Installment Sales Agreement dated as of March 1, 1981 by and between Niagara County Industrial Development Agency and Diamond Shamrock Corporation | 01-Dec-04 | 7.875% | 3,500,000 | 3,500,000 | | | 3,500,000 |
| Air and Water Pollution Control and Solid Waste Disposal Facilities and Installment Sales Agreement between Gulf Coast Waste Disposal Authority and Diamond Shamrock Corporation dated as of June 1, 1979 | 01-Mar-01 | 10.500% | 2,800,000 | 2,800,000 | | | 2,800,000 |
| Loan Agreement (Industrial Development) between the New Hanover County Industrial Facilities and Pollution Control Financing Authority and Diamond Shamrock Corporation dated as of July 1, 1981 | 01-Jul-11 | 11.450% | 1,000,000 | 1,000,000 | | | 1,000,000 |
| Loan Agreement (Pollution Control) between the New Hanover County Industrial Facilities and Pollution Control Financing Authority and Diamond Shamrock Corporation dated as of July 1, 1981 | 01-Jul-11 | 12.500% | 1,700,000 | 1,700,000 | | | 1,700,000 |
| Lease Agreement dated as of March 1, 1982 between the Parish of St. James, State of Louisiana and Convent Chemical Corporation | 01-Jul-02 | 14.500% | 19,500,000 | 19,500,000 | | 4,395,227 | 23,895,227 |
| Lease Agreement dated as of December 1, 1981 between the Parish of St. James, State of Louisiana and Convent Chemical Corporation | 01-Dec-96 | 14.500% | 27,000,000 | 27,000,000 | | 6,200,249 | 33,200,249 |
| Lease Agreement between Convent Chemical Corporation and the South Louisiana Port Commission, State of Louisiana, dated December 1, 1981 | 01-Dec-96 | 14.500% | 1,000,000 1 | 423,513 1 | 241,960 | 665,473 | |
| Promissory Note of Diamond Shamrock Corporation dated as of April 1, 1977 issued to Lillian Estelle Schaeffer, Nancy M. Schaeffer and Carol Elaine Schaeffer Miller | 01-Apr-07 | 8.00% | 18,000 | 18,000 | 18,000 | | 18,000 |
| Promissory Note of Diamond Shamrock Corporation dated as of December 1, 1982 and issued to Martin Marietta Corporation | 01-Dec-86 | -- | 200,000 | 200,000 | 200,000 | | 200,000 |
| Chlorine Supply Agreement dated as of November 27, 1985 by and between B.F. Goodrich, Convent Chemical and Diamond Shamrock Chemical Company | | | 18,000,000 | 15,000,000 | 3,000,000 | | 18,000,000 |
| TOTAL OTHER LONG TERM DEBT | | | 101,669,336 | 97,735,311 | 3,367,523 | 10,837,436 | 111,930,285 |

3

OCC 033299

## FOREIGN DEBT

| DESCRIPTION | FINAL MATURITY | INTEREST RATE | UNPAID PRINCIPAL | DSCC BOOK VALUE LTD | DSCC BOOK VALUE STD | DSCC UNAMORTIZED (DISC)/PREM | TOTAL |
|---|---|---|---|---|---|---|---|
| Eurodollar Credit Agreement dates as of August 28, 1980 between Diamond Shamrock de Chile S.A.I. and the First National Bank of Boston | 28-Aug-87 | 100% +.75 | 5,000,000 | 2,500,000 | 2,500,000 | | 5,000,000 |
| DS France - LTD with Groupement des Industries Chimiques | 1990 | 11.50% | 365,760 | 292,650 | 73,110 | | 365,760 |
| Lease Agreement (dated as of July 23, 1976) by and between Societe Lyonnaise Immobiliere pour l'Industrie et le Commerce-Silmidco and Diamond Shamrock France S.A. as amended | 1992 | 13.510% | 431,538 | 380,047 | 51,491 | | 431,538 |
| TOTAL FOREIGN DEBT | | | 5,797,298 | 3,172,697 | 2,624,601 | 0 | 5,797,298 |
| TOTAL DEBT TO BE ASSUMED | | | 116,712,265 | 109,090,289 | 7,195,449 | 10,837,434 | 124,973,314 |

OCC 033300

Confidential

DIAMOND SHAMROCK CHEMICALS COMPANY
PAYMENT AND AMORTIZATION SCHEDULE  2, 3
AUGUST, 1986 - DECEMBER, 1987

| DESCRIPTION | PAYMENT DATE | DUE DATE | PRINCIPAL | INTEREST | TOTAL PAYMENT |
|---|---|---|---|---|---|
| Lease dated as of September 1, 1966 by and between the Delaware Industrial Building Commission and Diamond Alkali Company | 01-Mar-87<br>01-Sep-87 | 20-Feb-87<br>21-Aug-87 | 1,937,632.00 | 27,237.84<br>27,237.84 | 27,237.84<br>1,964,869.84 |
| Lease Agreement (Industrial) dated as of December 1, 1974 by and between the Industrial Development Board of the City of Muscle Shoals and Diamond Shamrock Corporation | 01-Dec-86<br>01-Jun-87<br>01-Dec-87 | 01-Dec-86<br>01-Jun-87<br>01-Dec-87 | 75,000.00 | 35,075.00<br>32,393.75<br>32,393.75 | 110,075.00<br>32,393.75<br>107,393.75 |
| Lease Agreement (Pollution Control) dated as of December 1, 1974 by and between the Industrial Development Board of the City of Muscle Shoals and Diamond Shamrock Corporation | 01-Dec-86<br>01-Jun-87<br>01-Dec-87 | 01-Dec-86<br>01-Jun-87<br>01-Dec-87 | 100,000.00 | 85,250.00<br>81,375.00<br>81,375.00 | 185,250.00<br>81,375.00<br>181,375.00 |
| Lease Agreement dated as of October 1, 1971 by and between North Alabama Environmental Improvement Authority and Diamond Shamrock Corporation | 01-Oct-86<br>01-Apr-87<br>01-Oct-87 | 19-Sep-86<br>20-Mar-87<br>18-Sep-87 | 110,000.00 | 26,730.00<br>23,100.00<br>23,100.00 | 136,730.00<br>23,100.00<br>143,100.00 |
| Lease Agreement dated as of October 1, 1971 by and between West Alabama Environmental Improvement Authority and Diamond Shamrock Corporation | 01-Oct-86<br>01-Apr-87<br>01-Oct-87 | 19-Sep-86<br>20-Mar-87<br>18-Sep-87 | 60,000.00 | 13,695.00<br>11,715.00<br>11,715.00 | 73,695.00<br>11,715.00<br>74,715.00 |
| Lease Agreement by and between Development Authority of Polk County, Georgia and Diamond Shamrock Corporation dated as of October 1, 1971 | 01-Dec-86<br>01-Jun-87<br>01-Dec-87 | 28-Nov-86<br>29-May-87<br>27-Nov-87 | 80,000.00 | 18,662.50<br>16,362.50<br>16,362.50 | 98,662.50<br>16,362.50<br>96,362.50 |
| Lease Agreement by and between County Commission of Kanawha County, West Virginia (a Public Corporation under the laws of the State of West Virginia) and Diamond Shamrock Corporation dated as of December 1, 1979 | 23-Aug-86<br>23-Sep-86<br>23-Oct-86<br>23-Nov-86<br>23-Dec-86<br>23-Jan-87<br>23-Feb-87<br>23-Mar-87<br>23-Apr-87<br>23-May-87<br>23-Jun-87<br>23-Jul-87<br>23-Aug-87<br>23-Sep-87<br>23-Oct-87<br>23-Nov-87<br>23-Dec-87 | 20-Aug-86<br>20-Sep-86<br>20-Oct-86<br>20-Nov-86<br>20-Dec-86<br>20-Jan-87<br>20-Feb-87<br>20-Mar-87<br>20-Apr-87<br>20-May-87<br>20-Jun-87<br>20-Jul-87<br>20-Aug-87<br>20-Sep-87<br>20-Oct-87<br>20-Nov-87<br>20-Dec-87 | 25,068.75<br>40,088.19<br>31,067.18<br>25,068.75<br>40,088.19<br>31,067.18<br>25,068.75<br>40,088.19<br>31,067.18<br>25,068.75<br>40,088.19<br>31,067.18<br>25,068.75<br>40,088.19<br>31,067.18<br>25,068.75<br>40,088.19 | 9,840.37<br>16,886.92<br>11,977.99<br>9,840.37<br>16,886.92<br>11,977.99<br>9,840.37<br>16,886.92<br>11,977.99<br>9,840.37<br>16,886.92<br>11,977.99<br>9,840.37<br>16,886.92<br>11,977.99<br>9,840.37<br>16,886.92 | 34,909.12<br>59,775.11<br>43,045.17<br>34,909.12<br>59,775.11<br>43,045.17<br>34,909.12<br>59,775.11<br>43,045.17<br>34,909.12<br>59,775.11<br>43,045.17<br>34,909.12<br>59,775.11<br>43,045.17<br>34,909.12<br>59,775.11 |
| Bareboat Charter/Lease Agreement dated as of April 24, 1972 by and between Lone Star Barge Co., Inc. and Diamond Shamrock Corporation | 23-Nov-87<br>23-Dec-87 | 20-Nov-87<br>20-Dec-87 | 31,067.18<br>25,068.75 | 11,977.99<br>9,840.37 | 43,045.17<br>34,909.12 |

5

OCC 033301

Confidential

| Agreement | | | |
|---|---|---|---|
| Master Lease Agreement dated as of October 12, 1984 by and between Condisco, Inc. and Diamond Shamrock Chemicals Company | 01-Aug-86 | 01-Aug-86 | 7,606.34 | 4,235.64 | 11,825.00 |
| | 01-Sep-86 | 01-Sep-86 | 7,707.64 | 4,117.35 | 11,825.00 |
| | 01-Oct-86 | 01-Oct-86 | 7,810.38 | 4,014.62 | 11,825.00 |
| | 01-Nov-86 | 01-Nov-86 | 7,914.58 | 3,910.42 | 11,825.00 |
| | 01-Dec-86 | 01-Dec-86 | 8,020.25 | 3,804.75 | 11,825.00 |
| | 01-Jan-87 | 01-Jan-87 | 8,127.43 | 3,697.57 | 11,825.00 |
| | 01-Feb-87 | 01-Feb-87 | 8,236.13 | 3,588.87 | 11,825.00 |
| | 01-Mar-87 | 01-Mar-87 | 8,346.37 | 3,478.63 | 11,825.00 |
| | 01-Apr-87 | 01-Apr-87 | 8,458.17 | 3,366.84 | 11,825.00 |
| | 01-May-87 | 01-May-87 | 8,571.59 | 3,253.41 | 11,825.00 |
| | 01-Jun-87 | 01-Jun-87 | 8,686.61 | 3,138.39 | 11,825.00 |
| | 01-Jul-87 | 01-Jul-87 | 8,803.28 | 3,021.72 | 11,825.00 |
| | 01-Aug-87 | 01-Aug-87 | 8,921.60 | 2,903.40 | 11,825.00 |
| | 01-Sep-87 | 01-Sep-87 | 9,041.61 | 2,783.39 | 11,825.00 |
| | 01-Oct-87 | 01-Oct-87 | 9,163.31 | 2,661.68 | 11,825.00 |
| | 01-Nov-87 | 01-Nov-87 | 9,286.80 | 2,538.20 | 11,825.00 |
| | 01-Dec-87 | 01-Dec-87 | 9,412.03 | 2,412.97 | 11,825.00 |
| Master Car Service Contract dated as of October 25, 1974 by and between General American Transportation Corporation and Diamond Shamrock Corporation (Rider #36 dated July 2, 1981) | 01-Aug-86 | 01-Aug-86 | 868.35 | 1,913.05 | 2,781.40 |
| | 01-Sep-86 | 01-Sep-86 | 868.35 | 1,913.05 | 2,781.40 |
| | 01-Oct-86 | 01-Oct-86 | 868.35 | 1,913.05 | 2,781.40 |
| | 01-Nov-86 | 01-Nov-86 | 868.35 | 1,913.05 | 2,781.40 |
| | 01-Dec-86 | 01-Dec-86 | 868.35 | 1,913.05 | 2,781.40 |
| | 01-Jan-87 | 01-Jan-87 | 1,013.62 | 1,767.78 | 2,781.40 |
| | 01-Feb-87 | 01-Feb-87 | 1,013.62 | 1,767.78 | 2,781.40 |
| | 01-Mar-87 | 01-Mar-87 | 1,013.62 | 1,767.78 | 2,781.40 |
| | 01-Apr-87 | 01-Apr-87 | 1,013.62 | 1,767.78 | 2,781.40 |
| | 01-May-87 | 01-May-87 | 1,013.62 | 1,767.78 | 2,781.40 |
| | 01-Jun-87 | 01-Jun-87 | 1,013.62 | 1,767.78 | 2,781.40 |
| | 01-Jul-87 | 01-Jul-87 | 1,013.62 | 1,767.78 | 2,781.40 |
| | 01-Aug-87 | 01-Aug-87 | 1,013.62 | 1,767.78 | 2,781.40 |
| | 01-Sep-87 | 01-Sep-87 | 1,013.62 | 1,767.78 | 2,781.40 |
| | 01-Oct-87 | 01-Oct-87 | 1,013.62 | 1,767.78 | 2,781.40 |
| | 01-Nov-87 | 01-Nov-87 | 1,013.62 | 1,767.78 | 2,781.40 |
| | 01-Dec-87 | 01-Dec-87 | 1,013.62 | 1,767.78 | 2,781.40 |
| Lease Agreement dated as of April 13, 1982 by and between XTQuip, Inc. and Diamond Shamrock Corporation | 01-Aug-86 | 01-Aug-86 | 444.87 | 57.49 | 502.36 |
| | 01-Sep-86 | 01-Sep-86 | 444.87 | 57.49 | 502.36 |
| | 01-Oct-86 | 01-Oct-86 | 444.87 | 57.49 | 502.36 |
| | 01-Nov-86 | 01-Nov-86 | 444.87 | 57.49 | 502.36 |
| | 01-Dec-86 | 01-Dec-86 | 444.87 | 57.49 | 502.36 |
| Equipment Lease Agreement dated as of November 18, 1982 by and between Phillips Information Systems, Inc. and Diamond Shamrock Corporation | 01-Aug-86 | 01-Aug-86 | 371.35 | 100.55 | 471.90 |
| | 01-Sep-86 | 01-Sep-86 | 376.16 | 95.74 | 471.90 |
| | 01-Oct-86 | 01-Oct-86 | 381.02 | 90.88 | 471.90 |
| | 01-Nov-86 | 01-Nov-86 | 385.96 | 85.94 | 471.90 |
| | 01-Dec-86 | 01-Dec-86 | 390.96 | 80.94 | 471.90 |
| | 01-Jan-87 | 01-Jan-87 | 396.01 | 75.89 | 471.90 |
| | 01-Feb-87 | 01-Feb-87 | 401.14 | 70.76 | 471.90 |
| | 01-Mar-87 | 01-Mar-87 | 406.33 | 65.57 | 471.90 |

6

OCC 033302

Confidential

OCCNJ0026745

ALCD-PUBCOM_0002623

7

**Equipment Lease Agreement dated as of February 27, 1984 by and between Diamond Shamrock Corporation and Phillips Information Systems, Inc.**

| | | | | |
|---|---|---|---|---|
| 01-Apr-87 | 30-Apr-87 | 65.31 | 65.31 | 71.90 |
| 01-May-87 | 31-May-87 | 65.31 | 54.29 | 71.90 |
| 01-Jun-87 | 30-Jun-87 | 422.31 | 46.59 | 71.90 |
| 01-Jul-87 | 31-Jul-87 | 627.78 | 44.12 | 71.90 |
| 01-Aug-87 | 31-Aug-87 | 433.22 | 38.53 | 71.90 |
| 01-Sep-87 | 30-Sep-87 | 438.22 | 32.28 | 71.99 |
| 01-Oct-87 | 31-Oct-87 | 444.60 | 27.36 | 71.90 |
| 01-Nov-87 | 30-Nov-87 | 450.36 | 21.54 | 71.90 |
| 01-Dec-87 | 31-Dec-87 | 456.19 | 15.71 | 71.90 |

**Supplemental Equipment Lease dated as of March 15, 1982 by and between Chancellor Corporation and Diamond Shamrock Corporation**

| | | | | |
|---|---|---|---|---|
| 01-Aug-86 | 01-Aug-86 | | | 0.00 |
| 01-Sep-86 | 01-Sep-86 | | | 0.00 |
| 01-Oct-86 | 01-Oct-86 | | | 161.70 |
| 01-Nov-86 | 01-Nov-86 | | | 161.70 |
| 01-Dec-86 | 01-Dec-86 | | | 161.70 |
| 01-Jan-87 | 01-Jan-87 | | | 161.70 |
| 01-Feb-87 | 01-Feb-87 | | | 161.70 |
| 01-Mar-87 | 01-Mar-87 | | | 161.70 |
| 01-Apr-87 | 01-Apr-87 | | | 161.70 |
| 01-May-87 | 01-May-87 | | | 161.70 |
| 01-Jun-87 | 01-Jun-87 | | | 161.70 |
| 01-Jul-87 | 01-Jul-87 | | | 161.70 |
| 01-Aug-87 | 01-Aug-87 | | | 161.70 |
| 01-Sep-87 | 01-Sep-87 | | | 161.70 |
| 01-Oct-87 | 01-Oct-87 | | | 161.70 |
| 01-Nov-87 | 01-Nov-87 | | | 161.70 |
| 01-Dec-87 | 01-Dec-87 | | | 161.70 |

**Pollution Control Contract dated as of February 1, 1974, by and between the Gulf Coast Waste Disposal Authority and Diamond Shamrock as amended April 11, 1974 and March 20, 1975**

| | | | | |
|---|---|---|---|---|
| 01-Oct-86 | 30-Sep-86 | 3,185.14 | 324.66 | 3,710.00 |
| 01-Sep-86 | 30-Sep-86 | 3,185.14 | 324.66 | 3,710.00 |
| 01-Oct-86 | 31-Oct-86 | 3,185.14 | 324.66 | 3,710.00 |
| 01-Nov-86 | 30-Nov-86 | 3,185.14 | 324.66 | 3,710.00 |
| 01-Dec-86 | 31-Dec-86 | 3,185.14 | 133.05 | 3,710.00 |
| 01-Jan-87 | 31-Jan-87 | 3,576.95 | 133.05 | 3,710.00 |
| 01-Feb-87 | 28-Feb-87 | 3,576.95 | 133.05 | 3,710.00 |
| 01-Mar-87 | 31-Mar-87 | 3,576.95 | 133.05 | 3,710.00 |
| 01-Apr-87 | 30-Apr-87 | 3,576.95 | 133.05 | 3,710.00 |
| 01-May-87 | 31-May-87 | 3,576.95 | 133.05 | 3,710.00 |
| 01-Jun-87 | 30-Jun-87 | 3,576.95 | 133.05 | 3,710.00 |
| 01-Jul-87 | 31-Jul-87 | 3,576.81 | 34.41 | 3,700.86 |

**Pollution Control Contract** (continued)

| | | | | |
|---|---|---|---|---|
| 01-Oct-86 | 30-Sep-86 | 115,000.00 | 99,355.20 | 214,355.20 |
| 01-Apr-87 | 31-Mar-87 | | 93,311.27 | 93,311.27 |

**Installment Sales Agreement by and between Department of Community Affairs and Economic Development of the State of Delaware and Diamond Shamrock Corporation dated as of April 1, 1975 (relating to $2,700,000 Pollution Control Revenue Bonds, Series A)**

| | | | | |
|---|---|---|---|---|
| 01-Oct-86 | 30-Sep-86 | 58,905.00 | 62,463.84 | 62,463.84 |
| 01-Apr-87 | 31-Mar-87 | | 60,254.91 | 121,360.64 |

**Installment Sales Agreement by and between Department of Community Affairs and Economic Development of the State of Delaware and Diamond Shamrock Corporation dated as of April 1, 1975 (relating to $1,000,000 Industrial Development Revenue Bonds, Series A)**

| | | | | |
|---|---|---|---|---|
| 01-Oct-86 | 30-Sep-86 | 5,000.00 | 34,312.50 | 34,312.50 |
| 01-Apr-87 | 31-Mar-87 | | 34,312.50 | 34,312.50 |
| 01-Oct-87 | 30-Sep-87 | | 34,125.00 | 34,125.00 |

Confidential

OCC 033303

OCCNJ0026746

ALCD-PUBCOM_0002624

| Agreement | Date | Date | Amount | Amount |
|---|---|---|---|---|
| Air and Water Pollution Control Facilities and Installment Sites Agreement between Gulf Coast Waste Disposal Authority and Diamond Shamrock Corporation dated as of February 1, 1977 | 01-Feb-87 / 01-Aug-87 | 01-Feb-87 / 01-Aug-87 | 265,120.00 / 235,620.00 | 265,625.00 / 265,620.00 |
| Air and Water Pollution Control and Solid Waste Disposal Facilities and Installment Sales Agreement between Gulf Coast Waste Disposal Authority and Diamond Shamrock Corporation dated as of June 1, 1979 | 01-Dec-86 / 01-Jun-87 / 01-Dec-87 | 01-Dec-86 / 01-Jun-87 / 01-Dec-87 | 278,459.16 / 278,459.16 / 278,451.16 | 278,459.16 / 278,459.16 / 278,451.16 |
| Financing Agreement between County Commission of Kanawha County, West Virginia (a Public Corporation under the laws of the State of West Virginia) and Diamond Shamrock Corporation dated as of December 1, 1979 | 01-Dec-86 / 29-May-87 / 01-Dec-87 | 01-Dec-86 / 29-May-87 / 01-Dec-87 | 137,812.50 / 137,812.50 / 137,812.50 | 137,812.50 / 137,812.50 / 137,812.50 |
| Installment Sites Agreement dated as of March 1, 1981 by and between Niagra County Industrial Development Agency and Diamond Shamrock Corporation | 01-Sep-86 / 02-Mar-87 / 02-Sep-87 | 01-Sep-86 / 02-Mar-87 / 02-Sep-87 | 141,000.00 / 141,000.00 / 141,000.00 | 141,000.00 / 141,000.00 / 141,900.00 |
| Air and Water Pollution Control Facilities and Installment Sales Agreement between Gulf Coast Waste Disposal Authority and Diamond Shamrock Corporation dated as of June 1, 1982 | 01-Dec-86 / 01-Jun-87 / 01-Dec-87 | 01-Dec-86 / 01-Jun-87 / 01-Dec-87 | 106,250.00 / 106,250.00 / 106,250.00 | 106,250.00 / 106,250.00 / 106,250.00 |
| Promissory Note of Diamond Shamrock Corporation dated as of April 1, 1977 issued to Lillian Estelle Schaeffer, Nancy M. Schaeffer and Carol Elaine Schaeffer Miller | 01-Apr-87 | 01-Apr-87 | 18,000.00 / 1,440.00 | 15,440.00 |
| Loan Agreement (Industrial Development) between the New Hanover County Industrial Facilities and Pollution Control Financing Authority and Diamond Shamrock Corporation | 02-Jan-87 / 01-Jul-87 | 02-Jan-87 / 01-Jul-87 | 59,250.00 / 59,250.00 | 59,250.00 / 59,250.00 |
| Loan Agreement (Pollution Control) between the New Hanover County Industrial Facilities and Pollution Control Financing Authority and Diamond Shamrock Corporation | 01-Jan-87 / 01-Jul-87 | 01-Jan-87 / 01-Jul-87 | 272,550.00 / 272,550.00 | 272,550.00 / 272,550.00 |
| Lease Agreement dated as of March 1, 1982 between the Parish of St. James, State of Louisiana and Convent Chemical Corporation | 01-Dec-86 / 01-Jun-87 / 01-Dec-87 | 30-Nov-86 / 29-May-87 / 30-Nov-87 | 72,500.00 / 72,500.00 / 72,500.00 | 72,500.00 / 72,500.00 / 72,500.00 |
| Lease Agreement dated as of December 1, 1981 between the Parish of St. James, State of Louisiana and Convent Chemical Corporation | 01-Dec-86 / 01-Jun-87 / 01-Dec-87 | 30-Nov-86 / 29-May-87 / 30-Nov-87 | 1,952,462.50 / 1,952,462.50 / 1,952,462.50 | 1,952,462.50 / 1,952,462.50 / 1,952,462.50 |
| Lease Agreement between Convent Chemical Corporation and the South Louisiana Port Commission, State of Louisiana, dated December 1, 1981 | 01-Dec-86 | 30-Nov-86 | 1,404,000.00 / 1,404,000.00 / 1,404,000.00 | 1,404,000.00 / 1,404,000.00 / 1,404,000.00 |
| Lease Agreement between Convent Chemical Corporation and the South Louisiana Port Commission, State of Louisiana, dated December 1, 1982 and issued to Martin Marietta Corporation | 01-Dec-86 | 01-Dec-86 | 200,000.00 | 200,000.00 |
| Chlorine Supply Agreement dated as of November 27, 1995 by and between B.F. Goodrich, Convent Chemical and Diamond Shamrock Chemical Company | 03-Nov-86 | 03-Nov-86 | variable | N/A [4] |
| Eurodollar Credit Agreement dated as of August 28, 1990 between Diamond Shamrock de Chile S.A.I. and the First National Bank of Boston | 28-May-87 | 28-May-87 | 2,500,000.00 / 2,500,000.00 | 2,500,000.00 / 2,500,000.00 |
| DS France - LTD with Groupement des Industries Chimiques | 09-Apr-87 | 09-Apr-87 | 504,000.00 / 91,000.00 | 783,000.00 / 105,000.00 |
| Lease Agreement dated as of July 23, 1970 by and between Societe Lyonnaise Immobiliere pour l'Industrie et le Commerce-Sliminco and Diamond Shamrock France S.A. as amended | 20-Jan-87 / 21-Jul-87 | 20-Jan-87 / 21-Jul-87 | 279,000.00 / 14,000.00 | 410,000.00 / 410,000.00 |

8

OCC 033304

Item A

B. F. GOODRICH POLLUTION CONTROL AND INDUSTRIAL DEVELOPMENT BONDS
NET PRESENT VALUE AT 10.875%

$1,000.000 - 14.5%

| DATE: | | Monthly Interest Accrual Face Int. Rate | Effective Interest Expense | Revaluation Amortization | Revaluation Balance | Carrying Value of Debt |
|-------|------|------|------|------|------|------|
| TO | FROM | | | | | |
| 27-Nov-85 | 01-Dec-85 | | | | | |
| | | $1,611.11 | $1,508.40 | $102.71 | $248,215.29 | $1,248,215.29 |
| 01-Dec-85 | 01-Jan-86 | $12,083.33 | $11,311.95 | $771.38 | | |
| 01-Jan-86 | 01-Feb-86 | $12,083.33 | $11,311.95 | $771.38 | | |
| 01-Feb-86 | 01-Mar-86 | $12,083.33 | $11,311.95 | $771.38 | | |
| 01-Mar-86 | 01-Apr-86 | $12,083.33 | $11,311.95 | $771.38 | | |
| 01-Apr-86 | 01-May-86 | $12,083.33 | $11,311.95 | $771.38 | | |
| 01-May-86 | 01-Jun-86 | $12,083.33 | $11,311.95 | $771.38 | | |
| | | $72,500.00 | $67,871.71 | $4,628.29 | $243,586.99 | $1,243,586.99 |
| 01-Jun-86 | 01-Jul-86 | $12,083.33 | $11,270.01 | $813.33 | | |
| 01-Jul-86 | 01-Aug-86 | $12,083.33 | $11,270.01 | $813.33 | | |
| 01-Aug-86 | 01-Sep-86 | $12,083.33 | $11,270.01 | $813.33 | | |
| 01-Sep-86 | 01-Oct-86 | $12,083.33 | $11,270.01 | $813.33 | | |
| 01-Oct-86 | 01-Nov-86 | $12,083.33 | $11,270.01 | $813.33 | | |
| 01-Nov-86 | 01-Dec-86 | $12,083.33 | $11,270.01 | $813.33 | | |
| | | $72,500.00 | $67,620.04 | $4,879.96 | $238,707.03 | $1,238,707.03 |
| 01-Dec-86 | 01-Jan-87 | $12,083.33 | $11,225.78 | $857.55 | | |
| 01-Jan-87 | 01-Feb-87 | $12,083.33 | $11,225.78 | $857.55 | | |
| 01-Feb-87 | 01-Mar-87 | $12,083.33 | $11,225.78 | $857.55 | | |
| 01-Mar-87 | 01-Apr-87 | $12,083.33 | $11,225.78 | $857.55 | | |
| 01-Apr-87 | 01-May-87 | $12,083.33 | $11,225.78 | $857.55 | | |
| 01-May-87 | 01-Jun-87 | $12,083.33 | $11,225.78 | $857.55 | | |
| | | $72,500.00 | $67,354.69 | $5,145.31 | $233,561.73 | $1,233,561.73 |
| 01-Jun-87 | 01-Jul-87 | $12,083.33 | $11,179.15 | $904.18 | | |
| 01-Jul-87 | 01-Aug-87 | $12,083.33 | $11,179.15 | $904.18 | | |
| 01-Aug-87 | 01-Sep-87 | $12,083.33 | $11,179.15 | $904.18 | | |
| 01-Sep-87 | 01-Oct-87 | $12,083.33 | $11,179.15 | $904.18 | | |
| 01-Oct-87 | 01-Nov-87 | $12,083.33 | $11,179.15 | $904.18 | | |
| 01-Nov-87 | 01-Dec-87 | $12,083.33 | $11,179.15 | $904.18 | | |
| | | $72,500.00 | $67,074.92 | $5,425.08 | $228,136.65 | $1,228,136.65 |
| 01-Dec-87 | 01-Jan-88 | $12,083.33 | $11,129.99 | $953.34 | | |
| 01-Jan-88 | 01-Feb-88 | $12,083.33 | $11,129.99 | $953.34 | | |
| 01-Feb-88 | 01-Mar-88 | $12,083.33 | $11,129.99 | $953.34 | | |
| 01-Mar-88 | 01-Apr-88 | $12,083.33 | $11,129.99 | $953.34 | | |
| 01-Apr-88 | 01-May-88 | $12,083.33 | $11,129.99 | $953.34 | | |
| 01-May-88 | 01-Jun-88 | $12,083.33 | $11,129.99 | $953.34 | | |
| | | $72,500.00 | $66,779.93 | $5,720.07 | $222,416.58 | $1,222,416.58 |
| 01-Jun-88 | 01-Jul-88 | $12,083.33 | $11,078.15 | $1,005.18 | | |
| 01-Jul-88 | 01-Aug-88 | $12,083.33 | $11,078.15 | $1,005.18 | | |
| 01-Aug-88 | 01-Sep-88 | $12,083.33 | $11,078.15 | $1,005.18 | | |
| 01-Sep-88 | 01-Oct-88 | $12,083.33 | $11,078.15 | $1,005.18 | | |
| 01-Oct-88 | 01-Nov-88 | $12,083.33 | $11,078.15 | $1,005.18 | | |
| 01-Nov-88 | 01-Dec-88 | $12,083.33 | $11,078.15 | $1,005.18 | | |
| | | $72,500.00 | $66,468.90 | $6,031.10 | $216,385.48 | $1,216,385.48 |
| 01-Dec-88 | 01-Jan-89 | $12,083.33 | $11,023.49 | $1,059.84 | | |
| 01-Jan-89 | 01-Feb-89 | $12,083.33 | $11,023.49 | $1,059.84 | | |

A-1

OCC 033305

Confidential

OCCNJ0026748

ALCD-PUBCOM_0002626

B. F. GOODRICH POLLUTION CONTROL AND INDUSTRIAL DEVELOPMENT BONDS
NET PRESENT VALE AT 10.875%

$1,000.000 - 14.5%

| DATE: | | Monthly Interest Accrual Face Int. Rate | Effective Interest Expense | Revaluation Amortization | Revaluation Balance | Carrying Value of Debt |
|-------|-----|-----|-----|-----|-----|-----|
| TO | FROM | | | | | |
| 01-Feb-89 | 01-Mar-89 | $12,083.33 | $11,023.49 | $1,059.84 | | |
| 01-Mar-89 | 01-Apr-89 | $12,083.33 | $11,023.49 | $1,059.84 | | |
| 01-Apr-89 | 01-May-89 | $12,083.33 | $11,023.49 | $1,059.84 | | |
| 01-May-89 | 01-Jun-89 | $12,083.33 | $11,023.49 | $1,059.84 | | |
| | | $72,500.00 | $66,140.96 | $6,359.04 | $210,026.44 | $1,210,026.44 |
| 01-Jun-89 | 01-Jul-89 | $12,083.33 | $10,965.86 | $1,117.47 | | |
| 01-Jul-89 | 01-Aug-89 | $12,083.33 | $10,965.86 | $1,117.47 | | |
| 01-Aug-89 | 01-Sep-89 | $12,083.33 | $10,965.86 | $1,117.47 | | |
| 01-Sep-89 | 01-Oct-89 | $12,083.33 | $10,965.86 | $1,117.47 | | |
| 01-Oct-89 | 01-Nov-89 | $12,083.33 | $10,965.86 | $1,117.47 | | |
| 01-Nov-89 | 01-Dec-89 | $12,083.33 | $10,965.86 | $1,117.47 | | |
| | | $72,500.00 | $65,795.19 | $6,704.81 | $203,321.63 | $1,203,321.63 |
| 01-Dec-89 | 01-Jan-90 | $12,083.33 | $10,905.10 | $1,178.23 | | |
| 01-Jan-90 | 01-Feb-90 | $12,083.33 | $10,905.10 | $1,178.23 | | |
| 01-Feb-90 | 01-Mar-90 | $12,083.33 | $10,905.10 | $1,178.23 | | |
| 01-Mar-90 | 01-Apr-90 | $12,083.33 | $10,905.10 | $1,178.23 | | |
| 01-Apr-90 | 01-May-90 | $12,083.33 | $10,905.10 | $1,178.23 | | |
| 01-May-90 | 01-Jun-90 | $12,083.33 | $10,905.10 | $1,178.23 | | |
| | | $72,500.00 | $65,430.61 | $7,069.39 | $196,252.24 | $1,196,252.24 |
| 01-Jun-90 | 01-Jul-90 | $12,083.33 | $10,841.04 | $1,242.30 | | |
| 01-Jul-90 | 01-Aug-90 | $12,083.33 | $10,841.04 | $1,242.30 | | |
| 01-Aug-90 | 01-Sep-90 | $12,083.33 | $10,841.04 | $1,242.30 | | |
| 01-Sep-90 | 01-Oct-90 | $12,083.33 | $10,841.04 | $1,242.30 | | |
| 01-Oct-90 | 01-Nov-90 | $12,083.33 | $10,841.04 | $1,242.30 | | |
| 01-Nov-90 | 01-Dec-90 | $12,083.33 | $10,841.04 | $1,242.30 | | |
| | | $72,500.00 | $65,046.22 | $7,453.78 | $188,798.46 | $1,188,798.46 |
| 01-Dec-90 | 01-Jan-91 | $12,083.33 | $10,773.49 | $1,309.85 | | |
| 01-Jan-91 | 01-Feb-91 | $12,083.33 | $10,773.49 | $1,309.85 | | |
| 01-Feb-91 | 01-Mar-91 | $12,083.33 | $10,773.49 | $1,309.85 | | |
| 01-Mar-91 | 01-Apr-91 | $12,083.33 | $10,773.49 | $1,309.85 | | |
| 01-Apr-91 | 01-May-91 | $12,083.33 | $10,773.49 | $1,309.85 | | |
| 01-May-91 | 01-Jun-91 | $12,083.33 | $10,773.49 | $1,309.85 | | |
| | | $72,500.00 | $64,640.92 | $7,859.08 | $180,939.37 | $1,180,939.37 |
| 01-Jun-91 | 01-Jul-91 | $12,083.33 | $10,702.26 | $1,381.07 | | |
| 01-Jul-91 | 01-Aug-91 | $12,083.33 | $10,702.26 | $1,381.07 | | |
| 01-Aug-91 | 01-Sep-91 | $12,083.33 | $10,702.26 | $1,381.07 | | |
| 01-Sep-91 | 01-Oct-91 | $12,083.33 | $10,702.26 | $1,381.07 | | |
| 01-Oct-91 | 01-Nov-91 | $12,083.33 | $10,702.26 | $1,381.07 | | |
| 01-Nov-91 | 01-Dec-91 | $12,083.33 | $10,702.26 | $1,381.07 | | |
| | | $72,500.00 | $64,213.58 | $8,286.42 | $172,652.95 | $1,172,652.95 |
| 01-Dec-91 | 01-Jan-92 | $12,083.33 | $10,627.17 | $1,456.17 | | |
| 01-Jan-92 | 01-Feb-92 | $12,083.33 | $10,627.17 | $1,456.17 | | |
| 01-Feb-92 | 01-Mar-92 | $12,083.33 | $10,627.17 | $1,456.17 | | |
| 01-Mar-92 | 01-Apr-92 | $12,083.33 | $10,627.17 | $1,456.17 | | |
| 01-Apr-92 | 01-May-92 | $12,083.33 | $10,627.17 | $1,456.17 | | |
| 01-May-92 | 01-Jun-92 | $12,083.33 | $10,627.17 | $1,456.17 | | |

OCC 033306

A-2

B. F. GOODRICH POLLUTION CONTROL AND INDUSTRIAL DEVELOPMENT BONDS
NET PRESENT VALUE AT 10.875%

$1,000,000 - 14.5%

| DATE: TO | FROM | Monthly Interest Accrual Face Int. Rate | Effective Interest Expense | Revaluation Amortization | Revaluation Balance | Carrying Value of Debt |
|---|---|---|---|---|---|---|
| | | $72,500.00 | $63,763.00 | $8,737.00 | $163,915.96 | $1,163,915.96 |
| 01-Jun-92 | 01-Jul-92 | $12,083.33 | $10,547.99 | $1,535.34 | | |
| 01-Jul-92 | 01-Aug-92 | $12,083.33 | $10,547.99 | $1,535.34 | | |
| 01-Aug-92 | 01-Sep-92 | $12,083.33 | $10,547.99 | $1,535.34 | | |
| 01-Sep-92 | 01-Oct-92 | $12,083.33 | $10,547.99 | $1,535.34 | | |
| 01-Oct-92 | 01-Nov-92 | $12,083.33 | $10,547.99 | $1,535.34 | | |
| 01-Nov-92 | 01-Dec-92 | $12,083.33 | $10,547.99 | $1,535.34 | | |
| | | $72,500.00 | $63,287.93 | $9,212.07 | $154,703.89 | $1,154,703.89 |
| 01-Dec-92 | 01-Jan-93 | $12,083.33 | $10,464.50 | $1,618.83 | | |
| 01-Jan-93 | 01-Feb-93 | $12,083.33 | $10,464.50 | $1,618.83 | | |
| 01-Feb-93 | 01-Mar-93 | $12,083.33 | $10,464.50 | $1,618.83 | | |
| 01-Mar-93 | 01-Apr-93 | $12,083.33 | $10,464.50 | $1,618.83 | | |
| 01-Apr-93 | 01-May-93 | $12,083.33 | $10,464.50 | $1,618.83 | | |
| 01-May-93 | 01-Jun-93 | $12,083.33 | $10,464.50 | $1,618.83 | | |
| | | $72,500.00 | $62,787.02 | $9,712.98 | $144,990.91 | $1,144,990.91 |
| 01-Jun-93 | 01-Jul-93 | $12,083.33 | $10,376.48 | $1,706.85 | | |
| 01-Jul-93 | 01-Aug-93 | $12,083.33 | $10,376.48 | $1,706.85 | | |
| 01-Aug-93 | 01-Sep-93 | $12,083.33 | $10,376.48 | $1,706.85 | | |
| 01-Sep-93 | 01-Oct-93 | $12,083.33 | $10,376.48 | $1,706.85 | | |
| 01-Oct-93 | 01-Nov-93 | $12,083.33 | $10,376.48 | $1,706.85 | | |
| 01-Nov-93 | 01-Dec-93 | $12,083.33 | $10,376.48 | $1,706.85 | | |
| | | $72,500.00 | $62,258.88 | $10,241.12 | $134,749.79 | $1,134,749.79 |
| 01-Dec-93 | 01-Jan-94 | $12,083.33 | $10,283.67 | $1,799.66 | | |
| 01-Jan-94 | 01-Feb-94 | $12,083.33 | $10,283.67 | $1,799.66 | | |
| 01-Feb-94 | 01-Mar-94 | $12,083.33 | $10,283.67 | $1,799.66 | | |
| 01-Mar-94 | 01-Apr-94 | $12,083.33 | $10,283.67 | $1,799.66 | | |
| 01-Apr-94 | 01-May-94 | $12,083.33 | $10,283.67 | $1,799.66 | | |
| 01-May-94 | 01-Jun-94 | $12,083.33 | $10,283.67 | $1,799.66 | | |
| | | $72,500.00 | $61,702.02 | $10,797.98 | $123,951.81 | $1,123,951.81 |
| 01-Jun-94 | 01-Jul-94 | $12,083.33 | $10,185.81 | $1,897.52 | | |
| 01-Jul-94 | 01-Aug-94 | $12,083.33 | $10,185.81 | $1,897.52 | | |
| 01-Aug-94 | 01-Sep-94 | $12,083.33 | $10,185.81 | $1,897.52 | | |
| 01-Sep-94 | 01-Oct-94 | $12,083.33 | $10,185.81 | $1,897.52 | | |
| 01-Oct-94 | 01-Nov-94 | $12,083.33 | $10,185.81 | $1,897.52 | | |
| 01-Nov-94 | 01-Dec-94 | $12,083.33 | $10,185.81 | $1,897.52 | | |
| | | $72,500.00 | $61,114.88 | $11,385.12 | $112,566.69 | $1,112,566.69 |
| 01-Dec-94 | 01-Jan-95 | $12,083.33 | $10,082.64 | $2,000.70 | | |
| 01-Jan-95 | 01-Feb-95 | $12,083.33 | $10,082.64 | $2,000.70 | | |
| 01-Feb-95 | 01-Mar-95 | $12,083.33 | $10,082.64 | $2,000.70 | | |
| 01-Mar-95 | 01-Apr-95 | $12,083.33 | $10,082.64 | $2,000.70 | | |
| 01-Apr-95 | 01-May-95 | $12,083.33 | $10,082.64 | $2,000.70 | | |
| 01-May-95 | 01-Jun-95 | $12,083.33 | $10,082.64 | $2,000.70 | | |
| | | $72,500.00 | $60,495.81 | $12,004.19 | $100,562.50 | $1,100,562.50 |
| 01-Jun-95 | 01-Jul-95 | $12,083.33 | $9,973.85 | $2,109.49 | | |
| 01-Jul-95 | 01-Aug-95 | $12,083.33 | $9,973.85 | $2,109.49 | | |
| 01-Aug-95 | 01-Sep-95 | $12,083.33 | $9,973.85 | $2,109.49 | | |

A-3

OCC 033307

Confidential

B. F. GOODRICH POLLUTION CONTROL AND INDUSTRIAL DEVELOPMENT BONDS
NET PRESENT VALE AT 10.875%

$1,000,000 - 14.5%

| DATE: | | Monthly Interest Accrual Face Int. Rate | Effective Interest Expense | Revaluation Amortization | Revaluation Balance | Carrying Value of Debt |
|-------|------|------|------|------|------|------|
| TO | FROM | | | | | |
| 01-Sep-95 | 01-Oct-95 | $12,083.33 | $9,973.85 | $2,109.49 | | |
| 01-Oct-95 | 01-Nov-95 | $12,083.33 | $9,973.85 | $2,109.49 | | |
| 01-Nov-95 | 01-Dec-95 | $12,083.33 | $9,973.85 | $2,109.49 | | |
| | | $72,500.00 | $59,843.09 | $12,656.91 | $87,905.59 | $1,087,905.59 |
| 01-Dec-95 | 01-Jan-96 | $12,083.33 | $9,859.14 | $2,224.19 | | |
| 01-Jan-96 | 01-Feb-96 | $12,083.33 | $9,859.14 | $2,224.19 | | |
| 01-Feb-96 | 01-Mar-96 | $12,083.33 | $9,859.14 | $2,224.19 | | |
| 01-Mar-96 | 01-Apr-96 | $12,083.33 | $9,859.14 | $2,224.19 | | |
| 01-Apr-96 | 01-May-96 | $12,083.33 | $9,859.14 | $2,224.19 | | |
| 01-May-96 | 01-Jun-96 | $12,083.33 | $9,859.14 | $2,224.19 | | |
| | | $72,500.00 | $59,154.87 | $13,345.13 | $74,560.46 | $1,074,560.46 |
| 01-Jun-96 | 01-Jul-96 | $12,083.33 | $9,738.20 | $2,345.13 | | |
| 01-Jul-96 | 01-Aug-96 | $12,083.33 | $9,738.20 | $2,345.13 | | |
| 01-Aug-96 | 01-Sep-96 | $12,083.33 | $9,738.20 | $2,345.13 | | |
| 01-Sep-96 | 01-Oct-96 | $12,083.33 | $9,738.20 | $2,345.13 | | |
| 01-Oct-96 | 01-Nov-96 | $12,083.33 | $9,738.20 | $2,345.13 | | |
| 01-Nov-96 | 01-Dec-96 | $12,083.33 | $9,738.20 | $2,345.13 | | |
| | | $72,500.00 | $58,429.22 | $14,070.78 | $60,489.68 | $1,060,489.68 |
| 01-Dec-96 | 01-Jan-97 | $12,083.33 | $9,610.69 | $2,472.65 | | |
| 01-Jan-97 | 01-Feb-97 | $12,083.33 | $9,610.69 | $2,472.65 | | |
| 01-Feb-97 | 01-Mar-97 | $12,083.33 | $9,610.69 | $2,472.65 | | |
| 01-Mar-97 | 01-Apr-97 | $12,083.33 | $9,610.69 | $2,472.65 | | |
| 01-Apr-97 | 01-May-97 | $12,083.33 | $9,610.69 | $2,472.65 | | |
| 01-May-97 | 01-Jun-97 | $12,083.33 | $9,610.69 | $2,472.65 | | |
| | | $72,500.00 | $57,664.13 | $14,835.87 | $45,653.81 | $1,045,653.81 |
| 01-Jun-97 | 01-Jul-97 | $12,083.33 | $9,476.24 | $2,607.10 | | |
| 01-Jul-97 | 01-Aug-97 | $12,083.33 | $9,476.24 | $2,607.10 | | |
| 01-Aug-97 | 01-Sep-97 | $12,083.33 | $9,476.24 | $2,607.10 | | |
| 01-Sep-97 | 01-Oct-97 | $12,083.33 | $9,476.24 | $2,607.10 | | |
| 01-Oct-97 | 01-Nov-97 | $12,083.33 | $9,476.24 | $2,607.10 | | |
| 01-Nov-97 | 01-Dec-97 | $12,083.33 | $9,476.24 | $2,607.10 | | |
| | | $72,500.00 | $56,857.43 | $15,642.57 | $30,011.23 | $1,030,011.23 |

A-4

OCC 033308

OCCNJ0026751
ALCD-PUBCOM_0002629

<u>Item B</u>

B. F. GOODRICH POLLUTION CONTROL AND INDUSTRIAL DEVELOPMENT BONDS
NET PRESENT VALE AT 10.875%

$11,830,000 - 14.25%

| DATE: | | Monthly Interest Accrual | Effective Interest | Revaluation Amortization | Revaluation Balance | Carrying Value of Debt |
|---|---|---|---|---|---|---|
| TO | FROM | Face Int. Rate | Expense | | | |
| 27-Nov-85 | 01-Dec-85 | | | | | |
| | | $18,730.83 | $17,482.16 | $1,248.67 | $2,636,748.33 | $14,466,748.33 |
| 01-Dec-85 | 01-Jan-86 | $140,481.25 | $131,104.91 | $9,376.34 | | |
| 01-Jan-86 | 01-Feb-86 | $140,481.25 | $131,104.91 | $9,376.34 | | |
| 01-Feb-86 | 01-Mar-86 | $140,481.25 | $131,104.91 | $9,376.34 | | |
| 01-Mar-86 | 01-Apr-86 | $140,481.25 | $131,104.91 | $9,376.34 | | |
| 01-Apr-86 | 01-May-86 | $140,481.25 | $131,104.91 | $9,376.34 | | |
| 01-May-86 | 01-Jun-86 | $140,481.25 | $131,104.91 | $9,376.34 | | |
| | | $842,887.50 | $786,629.44 | $56,258.06 | $2,580,490.27 | $14,410,490.27 |
| 01-Jun-86 | 01-Jul-86 | $140,481.25 | $130,595.07 | $9,886.18 | | |
| 01-Jul-86 | 01-Aug-86 | $140,481.25 | $130,595.07 | $9,886.18 | | |
| 01-Aug-86 | 01-Sep-86 | $140,481.25 | $130,595.07 | $9,886.18 | | |
| 01-Sep-86 | 01-Oct-86 | $140,481.25 | $130,595.07 | $9,886.18 | | |
| 01-Oct-86 | 01-Nov-86 | $140,481.25 | $130,595.07 | $9,886.18 | | |
| 01-Nov-86 | 01-Dec-86 | $140,481.25 | $130,595.07 | $9,886.18 | | |
| | | $842,887.50 | $783,570.41 | $59,317.09 | $2,521,173.18 | $14,351,173.18 |
| 01-Dec-86 | 01-Jan-87 | $140,481.25 | $130,057.51 | $10,423.74 | | |
| 01-Jan-87 | 01-Feb-87 | $140,481.25 | $130,057.51 | $10,423.74 | | |
| 01-Feb-87 | 01-Mar-87 | $140,481.25 | $130,057.51 | $10,423.74 | | |
| 01-Mar-87 | 01-Apr-87 | $140,481.25 | $130,057.51 | $10,423.74 | | |
| 01-Apr-87 | 01-May-87 | $140,481.25 | $130,057.51 | $10,423.74 | | |
| 01-May-87 | 01-Jun-87 | $140,481.25 | $130,057.51 | $10,423.74 | | |
| | | $842,887.50 | $780,345.04 | $62,542.46 | $2,458,630.72 | $14,288,630.72 |
| 01-Jun-87 | 01-Jul-87 | $140,481.25 | $129,490.72 | $10,990.53 | | |
| 01-Jul-87 | 01-Aug-87 | $140,481.25 | $129,490.72 | $10,990.53 | | |
| 01-Aug-87 | 01-Sep-87 | $140,481.25 | $129,490.72 | $10,990.53 | | |
| 01-Sep-87 | 01-Oct-87 | $140,481.25 | $129,490.72 | $10,990.53 | | |
| 01-Oct-87 | 01-Nov-87 | $140,481.25 | $129,490.72 | $10,990.53 | | |
| 01-Nov-87 | 01-Dec-87 | $140,481.25 | $129,490.72 | $10,990.53 | | |
| | | $842,887.50 | $776,944.30 | $65,943.20 | $2,392,687.52 | $14,222,687.52 |
| 01-Dec-87 | 01-Jan-88 | $140,481.25 | $128,893.11 | $11,588.14 | | |
| 01-Jan-88 | 01-Feb-88 | $140,481.25 | $128,893.11 | $11,588.14 | | |
| 01-Feb-88 | 01-Mar-88 | $140,481.25 | $128,893.11 | $11,588.14 | | |
| 01-Mar-88 | 01-Apr-88 | $140,481.25 | $128,893.11 | $11,588.14 | | |
| 01-Apr-88 | 01-May-88 | $140,481.25 | $128,893.11 | $11,588.14 | | |
| 01-May-88 | 01-Jun-88 | $140,481.25 | $128,893.11 | $11,588.14 | | |
| | | $842,887.50 | $773,358.63 | $69,528.87 | $2,323,158.65 | $14,153,158.65 |
| 01-Jun-88 | 01-Jul-88 | $140,481.25 | $128,263.00 | $12,218.25 | | |
| 01-Jul-88 | 01-Aug-88 | $140,481.25 | $128,263.00 | $12,218.25 | | |
| 01-Aug-88 | 01-Sep-88 | $140,481.25 | $128,263.00 | $12,218.25 | | |
| 01-Sep-88 | 01-Oct-88 | $140,481.25 | $128,263.00 | $12,218.25 | | |
| 01-Oct-88 | 01-Nov-88 | $140,481.25 | $128,263.00 | $12,218.25 | | |
| 01-Nov-88 | 01-Dec-88 | $140,481.25 | $128,263.00 | $12,218.25 | | |
| | | $842,887.50 | $769,578.00 | $73,305.50 | $2,249,849.15 | $14,079,849.15 |
| 01-Dec-88 | 01-Jan-89 | $140,481.25 | $127,598.63 | $12,882.62 | | |
| 01-Jan-89 | 01-Feb-89 | $140,481.25 | $127,598.63 | $12,882.62 | | |

B-1

OCC 033309

**Confidential**

**OCCNJ0026752**

ALCD-PUBCOM_0002630

B. F. GOODRICH POLLUTION CONTROL AND INDUSTRIAL DEVELOPMENT BONDS
NET PRESENT VALUE AT 10.975%

$11,850,000 - 14.25%

| DATE: | | Monthly Interest Accrual | Effective Interest | Revaluation Amortization | Revaluation Balance | Carrying Value of Debt |
|---|---|---|---|---|---|---|
| TO | FROM | Face Int. Rate | Expense | | | |
| 01-Feb-89 | 01-Mar-89 | $140,481.25 | $127,598.63 | $12,882.62 | | |
| 01-Mar-89 | 01-Apr-89 | $140,481.25 | $127,598.63 | $12,882.62 | | |
| 01-Apr-89 | 01-May-89 | $140,481.25 | $127,598.63 | $12,882.62 | | |
| 01-May-89 | 01-Jun-89 | $140,481.25 | $127,598.63 | $12,882.62 | | |
| | | $842,887.50 | $765,591.80 | $77,295.70 | $2,172,553.45 | $14,002,553.45 |
| 01-Jun-89 | 01-Jul-89 | $140,481.25 | $126,898.14 | $13,583.11 | | |
| 01-Jul-89 | 01-Aug-89 | $140,481.25 | $126,898.14 | $13,583.11 | | |
| 01-Aug-89 | 01-Sep-89 | $140,481.25 | $126,898.14 | $13,583.11 | | |
| 01-Sep-89 | 01-Oct-89 | $140,481.25 | $126,898.14 | $13,583.11 | | |
| 01-Oct-89 | 01-Nov-89 | $140,481.25 | $126,898.14 | $13,583.11 | | |
| 01-Nov-89 | 01-Dec-89 | $140,481.25 | $126,898.14 | $13,583.11 | | |
| | | $842,887.50 | $761,388.84 | $81,498.66 | $2,091,054.79 | $13,921,054.79 |
| 01-Dec-89 | 01-Jan-90 | $140,481.25 | $126,159.56 | $14,321.69 | | |
| 01-Jan-90 | 01-Feb-90 | $140,481.25 | $126,159.56 | $14,321.69 | | |
| 01-Feb-90 | 01-Mar-90 | $140,481.25 | $126,159.56 | $14,321.69 | | |
| 01-Mar-90 | 01-Apr-90 | $140,481.25 | $126,159.56 | $14,321.69 | | |
| 01-Apr-90 | 01-May-90 | $140,481.25 | $126,159.56 | $14,321.69 | | |
| 01-May-90 | 01-Jun-90 | $140,481.25 | $126,159.56 | $14,321.69 | | |
| | | $842,887.50 | $756,957.35 | $85,930.15 | $2,005,124.65 | $13,835,124.65 |
| 01-Jun-90 | 01-Jul-90 | $140,481.25 | $125,380.82 | $15,100.43 | | |
| 01-Jul-90 | 01-Aug-90 | $140,481.25 | $125,380.82 | $15,100.43 | | |
| 01-Aug-90 | 01-Sep-90 | $140,481.25 | $125,380.82 | $15,100.43 | | |
| 01-Sep-90 | 01-Oct-90 | $140,481.25 | $125,380.82 | $15,100.43 | | |
| 01-Oct-90 | 01-Nov-90 | $140,481.25 | $125,380.82 | $15,100.43 | | |
| 01-Nov-90 | 01-Dec-90 | $140,481.25 | $125,380.82 | $15,100.43 | | |
| | | $842,887.50 | $752,284.90 | $90,602.60 | $1,914,522.05 | $13,744,522.05 |
| 01-Dec-90 | 01-Jan-91 | $140,481.25 | $124,559.73 | $15,921.52 | | |
| 01-Jan-91 | 01-Feb-91 | $140,481.25 | $124,559.73 | $15,921.52 | | |
| 01-Feb-91 | 01-Mar-91 | $140,481.25 | $124,559.73 | $15,921.52 | | |
| 01-Mar-91 | 01-Apr-91 | $140,481.25 | $124,559.73 | $15,921.52 | | |
| 01-Apr-91 | 01-May-91 | $140,481.25 | $124,559.73 | $15,921.52 | | |
| 01-May-91 | 01-Jun-91 | $140,481.25 | $124,559.73 | $15,921.52 | | |
| | | $842,887.50 | $747,358.39 | $95,529.11 | $1,818,992.94 | $13,648,992.94 |
| 01-Jun-91 | 01-Jul-91 | $140,481.25 | $123,694.00 | $16,787.25 | | |
| 01-Jul-91 | 01-Aug-91 | $140,481.25 | $123,694.00 | $16,787.25 | | |
| 01-Aug-91 | 01-Sep-91 | $140,481.25 | $123,694.00 | $16,787.25 | | |
| 01-Sep-91 | 01-Oct-91 | $140,481.25 | $123,694.00 | $16,787.25 | | |
| 01-Oct-91 | 01-Nov-91 | $140,481.25 | $123,694.00 | $16,787.25 | | |
| 01-Nov-91 | 01-Dec-91 | $140,481.25 | $123,694.00 | $16,787.25 | | |
| | | $842,887.50 | $742,163.99 | $100,723.51 | $1,718,269.43 | $13,548,269.43 |
| 01-Dec-91 | 01-Jan-92 | $140,481.25 | $122,781.19 | $17,700.06 | | |
| 01-Jan-92 | 01-Feb-92 | $140,481.25 | $122,781.19 | $17,700.06 | | |
| 01-Feb-92 | 01-Mar-92 | $140,481.25 | $122,781.19 | $17,700.06 | | |
| 01-Mar-92 | 01-Apr-92 | $140,481.25 | $122,781.19 | $17,700.06 | | |
| 01-Apr-92 | 01-May-92 | $140,481.25 | $122,781.19 | $17,700.06 | | |
| 01-May-92 | 01-Jun-92 | $140,481.25 | $122,781.19 | $17,700.06 | | |

B-2

OCC 033310

Confidential

OCCNJ0026753

ALCD-PUBCOM_0002631

B. F. GOODRICH POLLUTION CONTROL AND INDUSTRIAL DEVELOPMENT BONDS
NET PRESENT VALUE AT 10.875%

$11,830,000 - 14.25%

| DATE: TO | FROM | Monthly Interest Accrual Face Int. Rate | Effective Interest Expense | Revaluation Amortization | Revaluation Balance | Carrying Value of Debt |
|---|---|---|---|---|---|---|
| | | $842,887.50 | $736,687.15 | $106,200.35 | $1,612,069.08 | $13,442,069.08 |
| 01-Jun-92 | 01-Jul-92 | $140,481.25 | $121,818.75 | $18,662.50 | | |
| 01-Jul-92 | 01-Aug-92 | $140,481.25 | $121,818.75 | $18,662.50 | | |
| 01-Aug-92 | 01-Sep-92 | $140,481.25 | $121,818.75 | $18,662.50 | | |
| 01-Sep-92 | 01-Oct-92 | $140,481.25 | $121,818.75 | $18,662.50 | | |
| 01-Oct-92 | 01-Nov-92 | $140,481.25 | $121,818.75 | $18,662.50 | | |
| 01-Nov-92 | 01-Dec-92 | $140,481.25 | $121,818.75 | $18,662.50 | | |
| | | $842,887.50 | $730,912.51 | $111,974.99 | $1,500,094.08 | $13,330,094.08 |
| 01-Dec-92 | 01-Jan-93 | $140,481.25 | $120,803.98 | $19,677.27 | | |
| 01-Jan-93 | 01-Feb-93 | $140,481.25 | $120,803.98 | $19,677.27 | | |
| 01-Feb-93 | 01-Mar-93 | $140,481.25 | $120,803.98 | $19,677.27 | | |
| 01-Mar-93 | 01-Apr-93 | $140,481.25 | $120,803.98 | $19,677.27 | | |
| 01-Apr-93 | 01-May-93 | $140,481.25 | $120,803.98 | $19,677.27 | | |
| 01-May-93 | 01-Jun-93 | $140,481.25 | $120,803.98 | $19,677.27 | | |
| | | $842,887.50 | $724,823.87 | $118,063.63 | $1,382,030.45 | $13,212,030.45 |
| 01-Jun-93 | 01-Jul-93 | $140,481.25 | $119,734.03 | $20,747.22 | | |
| 01-Jul-93 | 01-Aug-93 | $140,481.25 | $119,734.03 | $20,747.22 | | |
| 01-Aug-93 | 01-Sep-93 | $140,481.25 | $119,734.03 | $20,747.22 | | |
| 01-Sep-93 | 01-Oct-93 | $140,481.25 | $119,734.03 | $20,747.22 | | |
| 01-Oct-93 | 01-Nov-93 | $140,481.25 | $119,734.03 | $20,747.22 | | |
| 01-Nov-93 | 01-Dec-93 | $140,481.25 | $119,734.03 | $20,747.22 | | |
| | | $842,887.50 | $718,404.16 | $124,483.34 | $1,257,547.10 | $13,087,547.10 |
| 01-Dec-93 | 01-Jan-94 | $140,481.25 | $118,605.90 | $21,875.35 | | |
| 01-Jan-94 | 01-Feb-94 | $140,481.25 | $118,605.90 | $21,875.35 | | |
| 01-Feb-94 | 01-Mar-94 | $140,481.25 | $118,605.90 | $21,875.35 | | |
| 01-Mar-94 | 01-Apr-94 | $140,481.25 | $118,605.90 | $21,875.35 | | |
| 01-Apr-94 | 01-May-94 | $140,481.25 | $118,605.90 | $21,875.35 | | |
| 01-May-94 | 01-Jun-94 | $140,481.25 | $118,605.90 | $21,875.35 | | |
| | | $842,887.50 | $711,635.37 | $131,252.13 | $1,126,294.98 | $12,956,294.98 |
| 01-Jun-94 | 01-Jul-94 | $140,481.25 | $117,416.42 | $23,064.83 | | |
| 01-Jul-94 | 01-Aug-94 | $140,481.25 | $117,416.42 | $23,064.83 | | |
| 01-Aug-94 | 01-Sep-94 | $140,481.25 | $117,416.42 | $23,064.83 | | |
| 01-Sep-94 | 01-Oct-94 | $140,481.25 | $117,416.42 | $23,064.83 | | |
| 01-Oct-94 | 01-Nov-94 | $140,481.25 | $117,416.42 | $23,064.83 | | |
| 01-Nov-94 | 01-Dec-94 | $140,481.25 | $117,416.42 | $23,064.83 | | |
| | | $842,887.50 | $704,498.54 | $138,388.96 | $987,906.02 | $12,817,906.02 |
| 01-Dec-94 | 01-Jan-95 | $140,481.25 | $116,162.27 | $24,318.98 | | |
| 01-Jan-95 | 01-Feb-95 | $140,481.25 | $116,162.27 | $24,318.98 | | |
| 01-Feb-95 | 01-Mar-95 | $140,481.25 | $116,162.27 | $24,318.98 | | |
| 01-Mar-95 | 01-Apr-95 | $140,481.25 | $116,162.27 | $24,318.98 | | |
| 01-Apr-95 | 01-May-95 | $140,481.25 | $116,162.27 | $24,318.98 | | |
| 01-May-95 | 01-Jun-95 | $140,481.25 | $116,162.27 | $24,318.98 | | |
| | | $842,887.50 | $696,973.64 | $145,913.86 | $841,992.16 | $12,671,992.16 |
| 01-Jun-95 | 01-Jul-95 | $140,481.25 | $114,839.93 | $25,641.32 | | |
| 01-Jul-95 | 01-Aug-95 | $140,481.25 | $114,839.93 | $25,641.32 | | |
| 01-Aug-95 | 01-Sep-95 | $140,481.25 | $114,839.93 | $25,641.32 | | |

B-3

OCC 033311

Confidential

OCCNJ0026754

ALCD-PUBCOM_0002632

B. F. GOODRICH POLLUTION CONTROL AND INDUSTRIAL DEVELOPMENT BONDS
NET PRESENT VALE AT 10.875%

$11,830,000 - 14.25%

| DATE: | | Monthly Interest Accrual Face Int. Rate | Effective Interest Expense | Revaluation Amortization | Revaluation Balance | Carrying Value of Debt |
|---|---|---|---|---|---|---|
| TO | FROM | | | | | |
| 01-Sep-95 | 01-Oct-95 | $140,481.25 | $114,839.93 | $25,641.32 | | |
| 01-Oct-95 | 01-Nov-95 | $140,481.25 | $114,839.93 | $25,641.32 | | |
| 01-Nov-95 | 01-Dec-95 | $140,481.25 | $114,839.93 | $25,641.32 | | |
| | | $842,887.50 | $689,039.57 | $153,847.93 | $688,144.23 | $12,518,144.23 |
| 01-Dec-95 | 01-Jan-96 | $140,481.25 | $113,445.68 | $27,035.57 | | |
| 01-Jan-96 | 01-Feb-96 | $140,481.25 | $113,445.68 | $27,035.57 | | |
| 01-Feb-96 | 01-Mar-96 | $140,481.25 | $113,445.68 | $27,035.57 | | |
| 01-Mar-96 | 01-Apr-96 | $140,481.25 | $113,445.68 | $27,035.57 | | |
| 01-Apr-96 | 01-May-96 | $140,481.25 | $113,445.68 | $27,035.57 | | |
| 01-May-96 | 01-Jun-96 | $140,481.25 | $113,445.68 | $27,035.57 | | |
| | | $842,887.50 | $680,674.09 | $162,213.41 | $525,930.82 | $12,355,930.82 |
| 01-Jun-96 | 01-Jul-96 | $140,481.25 | $111,975.62 | $28,505.63 | | |
| 01-Jul-96 | 01-Aug-96 | $140,481.25 | $111,975.62 | $28,505.63 | | |
| 01-Aug-96 | 01-Sep-96 | $140,481.25 | $111,975.62 | $28,505.63 | | |
| 01-Sep-96 | 01-Oct-96 | $140,481.25 | $111,975.62 | $28,505.63 | | |
| 01-Oct-96 | 01-Nov-96 | $140,481.25 | $111,975.62 | $28,505.63 | | |
| 01-Nov-96 | 01-Dec-96 | $140,481.25 | $111,975.62 | $28,505.63 | | |
| | | $842,887.50 | $671,853.74 | $171,033.76 | $354,897.06 | $12,184,897.06 |

B-4

OCC 033312

**Confidential**

Item C

B. F. GOODRICH POLLUTION CONTROL AND INDUSTRIAL DEVELOPMENT BONDS
NET PRESENT VALUE AT 10.875%

$34,670,000 - 14.5%

| DATE: | | Monthly Interest Accrual Face Int. Rate | Effective Interest Expense | Revaluation Amortization | Revaluation Balance | Carrying Value of Debt |
|---|---|---|---|---|---|---|
| TO | FROM | | | | | |
| 27-Nov-85 | 01-Dec-85 | | | | | |
| | | $55,857.22 | $51,897.69 | $3,959.54 | $8,275,950.46 | $42,945,850.46 |
| 01-Dec-85 | 01-Jan-86 | $418,929.17 | $389,196.77 | $29,732.40 | | |
| 01-Jan-86 | 01-Feb-86 | $418,929.17 | $389,196.77 | $29,732.40 | | |
| 01-Feb-86 | 01-Mar-86 | $418,929.17 | $389,196.77 | $29,732.40 | | |
| 01-Mar-86 | 01-Apr-86 | $418,929.17 | $389,196.77 | $29,732.40 | | |
| 01-Apr-86 | 01-May-86 | $418,929.17 | $389,196.77 | $29,732.40 | | |
| 01-May-86 | 01-Jun-86 | $418,929.17 | $389,196.77 | $29,732.40 | | |
| | | $2,513,575.00 | $2,335,180.62 | $178,394.38 | $8,097,456.08 | $42,767,456.08 |
| 01-Jun-86 | 01-Jul-86 | $418,929.17 | $387,580.07 | $31,349.10 | | |
| 01-Jul-86 | 01-Aug-86 | $418,929.17 | $387,580.07 | $31,349.10 | | |
| 01-Aug-86 | 01-Sep-86 | $418,929.17 | $387,580.07 | $31,349.10 | | |
| 01-Sep-86 | 01-Oct-86 | $418,929.17 | $387,580.07 | $31,349.10 | | |
| 01-Oct-86 | 01-Nov-86 | $418,929.17 | $387,580.07 | $31,349.10 | | |
| 01-Nov-86 | 01-Dec-86 | $418,929.17 | $387,580.07 | $31,349.10 | | |
| | | $2,513,575.00 | $2,325,480.42 | $188,094.58 | $7,909,361.51 | $42,579,361.51 |
| 01-Dec-86 | 01-Jan-87 | $418,929.17 | $385,875.46 | $33,053.70 | | |
| 01-Jan-87 | 01-Feb-87 | $418,929.17 | $385,875.46 | $33,053.70 | | |
| 01-Feb-87 | 01-Mar-87 | $418,929.17 | $385,875.46 | $33,053.70 | | |
| 01-Mar-87 | 01-Apr-87 | $418,929.17 | $385,875.46 | $33,053.70 | | |
| 01-Apr-87 | 01-May-87 | $418,929.17 | $385,875.46 | $33,053.70 | | |
| 01-May-87 | 01-Jun-87 | $418,929.17 | $385,875.46 | $33,053.70 | | |
| | | $2,513,575.00 | $2,315,252.78 | $198,322.22 | $7,711,039.29 | $42,381,039.29 |
| 01-Jun-87 | 01-Jul-87 | $418,929.17 | $384,078.17 | $34,851.00 | | |
| 01-Jul-87 | 01-Aug-87 | $418,929.17 | $384,078.17 | $34,851.00 | | |
| 01-Aug-87 | 01-Sep-87 | $418,929.17 | $384,078.17 | $34,851.00 | | |
| 01-Sep-87 | 01-Oct-87 | $418,929.17 | $384,078.17 | $34,851.00 | | |
| 01-Oct-87 | 01-Nov-87 | $418,929.17 | $384,078.17 | $34,851.00 | | |
| 01-Nov-87 | 01-Dec-87 | $418,929.17 | $384,078.17 | $34,851.00 | | |
| | | $2,513,575.00 | $2,304,469.01 | $209,105.99 | $7,501,933.30 | $42,171,933.30 |
| 01-Dec-87 | 01-Jan-88 | $418,929.17 | $382,183.15 | $36,746.02 | | |
| 01-Jan-88 | 01-Feb-88 | $418,929.17 | $382,183.15 | $36,746.02 | | |
| 01-Feb-88 | 01-Mar-88 | $418,929.17 | $382,183.15 | $36,746.02 | | |
| 01-Mar-88 | 01-Apr-88 | $418,929.17 | $382,183.15 | $36,746.02 | | |
| 01-Apr-88 | 01-May-88 | $418,929.17 | $382,183.15 | $36,746.02 | | |
| 01-May-88 | 01-Jun-88 | $418,929.17 | $382,183.15 | $36,746.02 | | |
| | | $2,513,575.00 | $2,293,098.87 | $220,476.13 | $7,281,457.18 | $41,951,457.18 |
| 01-Jun-88 | 01-Jul-88 | $418,929.17 | $380,185.08 | $38,744.09 | | |
| 01-Jul-88 | 01-Aug-88 | $418,929.17 | $380,185.08 | $38,744.09 | | |
| 01-Aug-88 | 01-Sep-88 | $418,929.17 | $380,185.08 | $38,744.09 | | |
| 01-Sep-88 | 01-Oct-88 | $418,929.17 | $380,185.08 | $38,744.09 | | |
| 01-Oct-88 | 01-Nov-88 | $418,929.17 | $380,185.08 | $38,744.09 | | |
| 01-Nov-88 | 01-Dec-88 | $418,929.17 | $380,185.08 | $38,744.09 | | |
| | | $2,513,575.00 | $2,281,110.48 | $232,464.52 | $7,048,992.66 | $41,718,992.66 |
| 01-Dec-88 | 01-Jan-89 | $418,929.17 | $378,078.37 | $40,850.80 | | |
| 01-Jan-89 | 01-Feb-89 | $418,929.17 | $378,078.37 | $40,850.80 | | |

C-1

OCC 033313

Confidential

OCCNJ0026756

ALCD-PUBCOM_0002634

B. F. GOODRICH POLLUTION CONTROL AND INDUSTRIAL DEVELOPMENT BONDS
NET PRESENT VALE AT 10.875%

$34,670,000 - 14.5%

| DATE: | | Monthly Interest Accrual Face Int. Rate | Effective Interest Expense | Revaluation Amortization | Revaluation Balance | Carrying Value of Debt |
|---|---|---|---|---|---|---|
| TO | FROM | | | | | |
| 01-Feb-89 | 01-Mar-89 | $418,929.17 | $378,078.37 | $40,850.80 | | |
| 01-Mar-89 | 01-Apr-89 | $418,929.17 | $378,078.37 | $40,850.80 | | |
| 01-Apr-89 | 01-May-89 | $418,929.17 | $378,078.37 | $40,850.80 | | |
| 01-May-89 | 01-Jun-89 | $418,929.17 | $378,078.37 | $40,850.80 | | |
| | | $2,513,575.00 | $2,268,470.23 | $245,104.77 | $6,803,887.88 | $41,473,887.88 |
| 01-Jun-89 | 01-Jul-89 | $418,929.17 | $375,857.11 | $43,072.06 | | |
| 01-Jul-89 | 01-Aug-89 | $418,929.17 | $375,857.11 | $43,072.06 | | |
| 01-Aug-89 | 01-Sep-89 | $418,929.17 | $375,857.11 | $43,072.06 | | |
| 01-Sep-89 | 01-Oct-89 | $418,929.17 | $375,857.11 | $43,072.06 | | |
| 01-Oct-89 | 01-Nov-89 | $418,929.17 | $375,857.11 | $43,072.06 | | |
| 01-Nov-89 | 01-Dec-89 | $418,929.17 | $375,857.11 | $43,072.06 | | |
| | | $2,513,575.00 | $2,255,142.65 | $258,432.35 | $6,545,455.54 | $41,215,455.54 |
| 01-Dec-89 | 01-Jan-90 | $418,929.17 | $373,515.07 | $45,414.10 | | |
| 01-Jan-90 | 01-Feb-90 | $418,929.17 | $373,515.07 | $45,414.10 | | |
| 01-Feb-90 | 01-Mar-90 | $418,929.17 | $373,515.07 | $45,414.10 | | |
| 01-Mar-90 | 01-Apr-90 | $418,929.17 | $373,515.07 | $45,414.10 | | |
| 01-Apr-90 | 01-May-90 | $418,929.17 | $373,515.07 | $45,414.10 | | |
| 01-May-90 | 01-Jun-90 | $418,929.17 | $373,515.07 | $45,414.10 | | |
| | | $2,513,575.00 | $2,241,090.39 | $272,484.61 | $6,272,970.93 | $40,942,970.93 |
| 01-Jun-90 | 01-Jul-90 | $418,929.17 | $371,045.67 | $47,883.49 | | |
| 01-Jul-90 | 01-Aug-90 | $418,929.17 | $371,045.67 | $47,883.49 | | |
| 01-Aug-90 | 01-Sep-90 | $418,929.17 | $371,045.67 | $47,883.49 | | |
| 01-Sep-90 | 01-Oct-90 | $418,929.17 | $371,045.67 | $47,883.49 | | |
| 01-Oct-90 | 01-Nov-90 | $418,929.17 | $371,045.67 | $47,883.49 | | |
| 01-Nov-90 | 01-Dec-90 | $418,929.17 | $371,045.67 | $47,883.49 | | |
| | | $2,513,575.00 | $2,226,274.04 | $287,300.96 | $5,985,669.98 | $40,655,669.98 |
| 01-Dec-90 | 01-Jan-91 | $418,929.17 | $368,442.01 | $50,487.16 | | |
| 01-Jan-91 | 01-Feb-91 | $418,929.17 | $368,442.01 | $50,487.16 | | |
| 01-Feb-91 | 01-Mar-91 | $418,929.17 | $368,442.01 | $50,487.16 | | |
| 01-Mar-91 | 01-Apr-91 | $418,929.17 | $368,442.01 | $50,487.16 | | |
| 01-Apr-91 | 01-May-91 | $418,929.17 | $368,442.01 | $50,487.16 | | |
| 01-May-91 | 01-Jun-91 | $418,929.17 | $368,442.01 | $50,487.16 | | |
| | | $2,513,575.00 | $2,210,652.06 | $302,922.94 | $5,682,747.03 | $40,352,747.03 |
| 01-Jun-91 | 01-Jul-91 | $418,929.17 | $365,696.77 | $53,232.40 | | |
| 01-Jul-91 | 01-Aug-91 | $418,929.17 | $365,696.77 | $53,232.40 | | |
| 01-Aug-91 | 01-Sep-91 | $418,929.17 | $365,696.77 | $53,232.40 | | |
| 01-Sep-91 | 01-Oct-91 | $418,929.17 | $365,696.77 | $53,232.40 | | |
| 01-Oct-91 | 01-Nov-91 | $418,929.17 | $365,696.77 | $53,232.40 | | |
| 01-Nov-91 | 01-Dec-91 | $418,929.17 | $365,696.77 | $53,232.40 | | |
| | | $2,513,575.00 | $2,194,180.62 | $319,394.38 | $5,363,352.65 | $40,033,352.65 |
| 01-Dec-91 | 01-Jan-92 | $418,929.17 | $362,802.26 | $56,126.91 | | |
| 01-Jan-92 | 01-Feb-92 | $418,929.17 | $362,802.26 | $56,126.91 | | |
| 01-Feb-92 | 01-Mar-92 | $418,929.17 | $362,802.26 | $56,126.91 | | |
| 01-Mar-92 | 01-Apr-92 | $418,929.17 | $362,802.26 | $56,126.91 | | |
| 01-Apr-92 | 01-May-92 | $418,929.17 | $362,802.26 | $56,126.91 | | |
| 01-May-92 | 01-Jun-92 | $418,929.17 | $362,802.26 | $56,126.91 | | |

C-2

OCC 033314

**Confidential**

**OCCNJ0026757**

ALCD-PUBCOM_0002635

B. F. GOODRICH POLLUTION CONTROL AND INDUSTRIAL DEVELOPMENT BONDS
NET PRESENT VALUE AT 10.875%

$34,670,000 - 14.5%

| DATE: | | Monthly Interest Accrual Face Int. Rate | Effective Interest Expense | Revaluation Amortization | Revaluation Balance | Carrying Value of Debt |
|---|---|---|---|---|---|---|
| TO | FROM | | | | | |
| | | $2,513,575.00 | $2,176,813.55 | $336,761.45 | $5,026,591.20 | $39,696,591.20 |
| 01-Jun-92 | 01-Jul-92 | $418,929.17 | $359,750.36 | $59,178.81 | | |
| 01-Jul-92 | 01-Aug-92 | $418,929.17 | $359,750.36 | $59,178.81 | | |
| 01-Aug-92 | 01-Sep-92 | $418,929.17 | $359,750.36 | $59,178.81 | | |
| 01-Sep-92 | 01-Oct-92 | $418,929.17 | $359,750.36 | $59,178.81 | | |
| 01-Oct-92 | 01-Nov-92 | $418,929.17 | $359,750.36 | $59,178.81 | | |
| 01-Nov-92 | 01-Dec-92 | $418,929.17 | $359,750.36 | $59,178.81 | | |
| | | $2,513,575.00 | $2,158,502.15 | $355,072.85 | $4,671,518.35 | $39,341,518.35 |
| 01-Dec-92 | 01-Jan-93 | $418,929.17 | $356,532.51 | $62,396.66 | | |
| 01-Jan-93 | 01-Feb-93 | $418,929.17 | $356,532.51 | $62,396.66 | | |
| 01-Feb-93 | 01-Mar-93 | $418,929.17 | $356,532.51 | $62,396.66 | | |
| 01-Mar-93 | 01-Apr-93 | $418,929.17 | $356,532.51 | $62,396.66 | | |
| 01-Apr-93 | 01-May-93 | $418,929.17 | $356,532.51 | $62,396.66 | | |
| 01-May-93 | 01-Jun-93 | $418,929.17 | $356,532.51 | $62,396.66 | | |
| | | $2,513,575.00 | $2,139,195.06 | $374,379.94 | $4,297,138.41 | $38,967,138.41 |
| 01-Jun-93 | 01-Jul-93 | $418,929.17 | $353,139.69 | $65,789.47 | | |
| 01-Jul-93 | 01-Aug-93 | $418,929.17 | $353,139.69 | $65,789.47 | | |
| 01-Aug-93 | 01-Sep-93 | $418,929.17 | $353,139.69 | $65,789.47 | | |
| 01-Sep-93 | 01-Oct-93 | $418,929.17 | $353,139.69 | $65,789.47 | | |
| 01-Oct-93 | 01-Nov-93 | $418,929.17 | $353,139.69 | $65,789.47 | | |
| 01-Nov-93 | 01-Dec-93 | $418,929.17 | $353,139.69 | $65,789.47 | | |
| | | $2,513,575.00 | $2,118,838.15 | $394,736.85 | $3,902,401.56 | $38,572,401.56 |
| 01-Dec-93 | 01-Jan-94 | $418,929.17 | $349,562.39 | $69,366.78 | | |
| 01-Jan-94 | 01-Feb-94 | $418,929.17 | $349,562.39 | $69,366.78 | | |
| 01-Feb-94 | 01-Mar-94 | $418,929.17 | $349,562.39 | $69,366.78 | | |
| 01-Mar-94 | 01-Apr-94 | $418,929.17 | $349,562.39 | $69,366.78 | | |
| 01-Apr-94 | 01-May-94 | $418,929.17 | $349,562.39 | $69,366.78 | | |
| 01-May-94 | 01-Jun-94 | $418,929.17 | $349,562.39 | $69,366.78 | | |
| | | $2,513,575.00 | $2,097,374.33 | $416,200.67 | $3,486,200.90 | $38,156,200.90 |
| 01-Jun-94 | 01-Jul-94 | $418,929.17 | $345,790.57 | $73,138.60 | | |
| 01-Jul-94 | 01-Aug-94 | $418,929.17 | $345,790.57 | $73,138.60 | | |
| 01-Aug-94 | 01-Sep-94 | $418,929.17 | $345,790.57 | $73,138.60 | | |
| 01-Sep-94 | 01-Oct-94 | $418,929.17 | $345,790.57 | $73,138.60 | | |
| 01-Oct-94 | 01-Nov-94 | $418,929.17 | $345,790.57 | $73,138.60 | | |
| 01-Nov-94 | 01-Dec-94 | $418,929.17 | $345,790.57 | $73,138.60 | | |
| | | $2,513,575.00 | $2,074,743.42 | $438,831.58 | $3,047,369.32 | $37,717,369.32 |
| 01-Dec-94 | 01-Jan-95 | $418,929.17 | $341,813.66 | $77,115.51 | | |
| 01-Jan-95 | 01-Feb-95 | $418,929.17 | $341,813.66 | $77,115.51 | | |
| 01-Feb-95 | 01-Mar-95 | $418,929.17 | $341,813.66 | $77,115.51 | | |
| 01-Mar-95 | 01-Apr-95 | $418,929.17 | $341,813.66 | $77,115.51 | | |
| 01-Apr-95 | 01-May-95 | $418,929.17 | $341,813.66 | $77,115.51 | | |
| 01-May-95 | 01-Jun-95 | $418,929.17 | $341,813.66 | $77,115.51 | | |
| | | $2,513,575.00 | $2,050,881.96 | $462,693.04 | $2,584,676.28 | $37,254,676.28 |
| 01-Jun-95 | 01-Jul-95 | $418,929.17 | $337,620.50 | $81,308.66 | | |
| 01-Jul-95 | 01-Aug-95 | $418,929.17 | $337,620.50 | $81,308.66 | | |
| 01-Aug-95 | 01-Sep-95 | $418,929.17 | $337,620.50 | $81,308.66 | | |

C-3

OCC 033315

OCCNJ0026758

ALCD-PUBCOM_0002636

B. F. GOODRICH POLLUTION CONTROL AND INDUSTRIAL DEVELOPMENT BONDS
NET PRESENT VALUE AT 10.875%

$34,670,000 - 14.5%

| DATE: | | Monthly Interest Accrual | Effective Interest | Revaluation Amortization | Revaluation Balance | Carrying Value of Debt |
|---|---|---|---|---|---|---|
| TO | FROM | Face Int. Rate | Expense | | | |
| 01-Sep-95 | 01-Oct-95 | $418,929.17 | $337,620.50 | $81,308.66 | | |
| 01-Oct-95 | 01-Nov-95 | $418,929.17 | $337,620.50 | $81,308.66 | | |
| 01-Nov-95 | 01-Dec-95 | $418,929.17 | $337,620.50 | $81,308.66 | | |
| | | $2,513,575.00 | $2,025,723.02 | $487,851.98 | $2,096,824.30 | $36,766,824.30 |
| 01-Dec-95 | 01-Jan-96 | $418,929.17 | $333,199.35 | $85,729.82 | | |
| 01-Jan-96 | 01-Feb-96 | $418,929.17 | $333,199.35 | $85,729.82 | | |
| 01-Feb-96 | 01-Mar-96 | $418,929.17 | $333,199.35 | $85,729.82 | | |
| 01-Mar-96 | 01-Apr-96 | $418,929.17 | $333,199.35 | $85,729.82 | | |
| 01-Apr-96 | 01-May-96 | $418,929.17 | $333,199.35 | $85,729.82 | | |
| 01-May-96 | 01-Jun-96 | $418,929.17 | $333,199.35 | $85,729.82 | | |
| | | $2,513,575.00 | $1,999,196.07 | $514,378.93 | $1,582,445.37 | $36,252,445.37 |
| 01-Jun-96 | 01-Jul-96 | $418,929.17 | $328,537.79 | $90,391.38 | | |
| 01-Jul-96 | 01-Aug-96 | $418,929.17 | $328,537.79 | $90,391.38 | | |
| 01-Aug-96 | 01-Sep-96 | $418,929.17 | $328,537.79 | $90,391.38 | | |
| 01-Sep-96 | 01-Oct-96 | $418,929.17 | $328,537.79 | $90,391.38 | | |
| 01-Oct-96 | 01-Nov-96 | $418,929.17 | $328,537.79 | $90,391.38 | | |
| 01-Nov-96 | 01-Dec-96 | $418,929.17 | $328,537.79 | $90,391.38 | | |
| | | $2,513,575.00 | $1,971,226.72 | $542,348.28 | $1,040,097.09 | $35,710,097.09 |

C-4

OCC 033316

**OCCNJ0026759**

ALCD-PUBCOM_0002637

<u>SCHEDULE 1.05</u>

Agreement,
Dated September 4, 1986 (the "Agreement"),
By and Among
Diamond Shamrock Corporation,
Occidental Petroleum Corporation,
Occidental Chemical Holding Corporation
and
<u>Oxy-Diamond Alkali Corporation</u>

<u>EQUITY COMPANIES</u>

8542G

OCC 033317

**Confidential**

**OCCNJ0026760**
ALCD-PUBCOM_0002638

EQUITY COMPANIES

| Subsidiaries: | Assumed Aggregate Net Book Value (1) |
|---|---|
| Carbocloro S/A Industrias Quimicas | $34,280,794 |
| Diamond Shamrock Italia S.p.A. | 162,998 |
| Korea Potassium Chemicals Co., Ltd. | 3,541,585 (2) |
| Nopco Colombiana, S.A. | 478,131 |
| Nopco Industrial S.A. de C.V. | 410,641 |
| San Nopco Limited | 4,151,468 |

| Assets: | |
|---|---|
| Trona Deposits (3) | 107,055 (2) |
| | |
| Total Assumed Value: | 43,132,672 |

---

(1) Book values at July 31, 1986, except for those designated (2).

(2) Book values at August 31, 1986.

(3) All leases of real estate situated in the State of Wyoming held for the prospective value of the Trona deposits.

8663G

OCC 033318

OCCNJ0026761

ALCD-PUBCOM_0002639

SCHEDULE 2.02

Agreement,
Dated September 4, 1986 (the "Agreement"),
By and Among
Diamond Shamrock Corporation,
Occidental Petroleum Corporation,
Occidental Chemical Holding Corporation
and
Oxy-Diamond Alkali Corporation

BUSINESS UNITS DESCRIPTION

Terms defined in the Agreement are used herein as so defined.

The following is a summary description of each Business Unit provided for the purpose of clarification but not limitation, including as to each Business Unit its principal (but not exclusive) product lines and the domestic physical plant facilities and the foreign Subsidiaries that are significantly (but not exclusively) associated with such Business Unit (excepting in all cases the Excluded Assets). The Business Unit summary description does not include certain components of DSCC's operations, including but not limited to (i) the DSCC headquarters facility, sales offices or technical service or customer service centers (collectively, the "Corporate Facilities") and (ii) certain Subsidiaries or direct or indirect subsidiaries of DSCC which act as holding

OCC 033319

companies, as trading companies or in certain other functions (the "Other Subsidiaries"). The Corporate Facilities and the Other Subsidiaries provide support and other services to all the Business Units and relate to all the Business Units, but are not separately listed as relating to any particular Business Unit.

A.    Chlor-Alkali

The Chlor-Alkali Business Unit is principally (but not exclusively) engaged in the production of the following product lines:

        (i)    chlorine;
       (ii)    caustic soda;
      (iii)    chlorinated paraffins;
       (iv)    chlorinated solvents;
        (v)    hydrogen; and
       (vi)    potassium chemicals.

The domestic physical plant facilities and the foreign Subsidiaries that are significantly (but not exclusively) associated with the operation of the Chlor-Alkali Business Unit are the following:

        (i)    Battleground Plant;
       (ii)    Belle Plant;
      (iii)    Convent Plant;
       (iv)    Deer Park Plant;
        (v)    Delaware City Plant;
       (vi)    Mobile Plant;
      (vii)    Muscle Shoals Plant;
     (viii)    Diamond Shamrock de Chile S.A.I.;
       (ix)    Carbocloro S.A. Industrias Quimicas; and
        (x)    Korea Potassium Chemical Co., Ltd.

-2-

OCC 033320

Confidential

OCCNJ0026763

ALCD-PUBCOM_0002641

B.    Soda Products other than Chrome

The Soda Products other than Chrome Business Unit (the "SP Business Unit") is principally (but not exclusively) engaged in the production of the following product lines:

    (i)  silicates; and
    (ii)  laundry chemicals.

The domestic physical plant facilities and the foreign Subsidiaries that are significantly (but not exclusively) associated with the operation of the SP Business Unit are the following:

    (i)  Catonsville Plant;
    (ii)  Duncanville Plant;
   (iii)  Franklin Park Plant;
    (iv)  Dallas Plant;
    (v)  Lockport Plant;
    (vi)  Cincinnati Plant;
   (vii)  Jersey City Plant;
  (viii)  Oxnard Plant;
    (ix)  Chicago Plant; and
    (x)  Mobile Plant.

C.    Process Chemicals

The Process Chemicals Business Unit is principally (but not exclusively) engaged in the production of specialty chemicals. The domestic physical plant facilities and the foreign Subsidiaries that are significantly (but not exclusively) associated with the operation of the Process Chemicals Business Unit are the following:

    (i)  Ashtabula Plant;
    (ii)  Carlstadt Plant;
   (iii)  Cedertown Plant;
    (iv)  Charlotte Plant;

-3-

OCC 033321

Confidential

OCCNJ0026764

ALCD-PUBCOM_0002642

```
     (v)  Harrison Plant;
    (vi)  Morristown Office;
   (vii)  Richmond Plant;
  (viii)  Diamond Shamrock France S.A.;
    (ix)  Diamond Shamrock Eytesa S.A.;
     (x)  Diamond Shamrock Canada Ltd.;
    (xi)  Diamond Shamrock Taiwan Ltd.;
   (xii)  Diamond Shamrock (Australia) Pty. Ltd.;
  (xiii)  Diamond Shamrock Chemical Products A.G.;
   (xiv)  Diamond Shamrock Process Chemicals Europe Inc.;
    (xv)  Diamond Shamrock Process Chemicals Ltd.;
   (xvi)  Diamond Shamrock Scandinavia A/S;
  (xvii)  Diamond Shamrock Scandinavia OY;
 (xviii)  Diamond Shamrock Scandinavia AB;
   (xix)  Diamond Shamrock Chimie S.A.;
    (xx)  Diamond Shamrock Trading Corporation;
   (xxi)  Diamond Shamrock Chemicals (Deutschland) GmbH;
  (xxii)  San Nopco Limited;
 (xxiii)  Nopco Industrial S.A. de C.V.;
  (xxiv)  Diamond Shamrock Italia S.p.A.; and
   (xxv)  Nopco Colombiana S.A.
```

D.    Chrome

The Chrome Business Unit is principally (but not exclusively) engaged in the production of chrome chemicals. The domestic physical plant facility and the foreign Subsidiary that are significantly (but not exclusively) associated with the operation of the Chrome Business Unit are the Castle Hayne Plant and Thai Diamond Shamrock Chrome Ltd.

E.    Cogeneration

The Cogeneration Business Unit is principally (but not exclusively) engaged in the production of electricity and steam through cogeneration. The domestic physical plant facilities that are significantly (but not exclusively) associated with

-4-

OCC 033322

Confidential

OCCNJ0026765

ALCD-PUBCOM_0002643

the operation of the Cogeneration Business Unit are the
following:

      (i)  Battleground Plant; and
    (ii)  Deer Park Plant.

7733G

–5–

OCC 033323

Confidential

OCCNJ0026766

ALCD-PUBCOM_0002644

SCHEDULE 2.03

Agreement,
Dated September 4, 1986 (the "Agreement"),
By and Among
Diamond Shamrock Corporation,
Occidental Petroleum Corporation,
Occidental Chemical Holding Corporation
and
Oxy-Diamond Alkali Corporation

SUBSIDIARIES; SIGNIFICANT SUBSIDIARIES;
DSCC OFFICERS & DIRECTORS

Terms defined in the Agreement are used herein as so defined.

Attached hereto is a list of (a) the name and jurisdiction of incorporation or organization of each Subsidiary, together with certain additional information relating to each Subsidiary, including (b) the Subsidiaries' Shares, (c) the percentage equity interest in each Subsidiary, including those nominee qualifying shares held by representative directors, attorneys, employees or other nominees, (d) as to each active Subsidiary, the Business Unit to which it significantly (but not exclusively) relates, if any, (e) restrictions, and (f) the approximate net worth of each Subsidiary, if available, as of June 30, 1986 as derived from the books and records of DSCC and prepared for informational purposes only.  No representation or warranty is made hereby as to the accuracy of such net worth calculation or as to the principles or procedures used in

**OCC 033324**

Confidential

connection with the calculation thereof.  Also set forth on this Schedule 2.03 is a list of all officers and directors of DSCC and of each Significant Subsidiary as of the date hereof.

Significant Subsidiaries are designated with three asterisks (***); active Subsidiaries are designated with two A's (AA); inactive Subsidiaries are designated with two I's (II).

In some cases where required by local law, directors' qualifying shares have been pledged with the company to secure their fiduciary responsibilities.

7722G

-2-

OCC 033325

Confidential

OCCNJ0026768
ALCD-PUBCOM_0002646

A.   DSCC

<u>Officers and Directors</u>

C. E. Stewart – Director, President, CEO and COO
M. J. Dumeny – Director, Vice President, General
                Counsel and Secretary
W. L. Abele – Vice President
J. R. Clinton – Vice President
C. L. Mears – Vice President
T. A. Holland – Vice President and Treasurer
J. B. Talpas – Vice President
L. R. Domenici – Controller
R. E. Weber – Vice President
J. T. Kamm – Vice President
Y. Motoyama – Vice President
*J. F. Kelley – Vice President
T. A. Holland – Vice President
*M. Middlebrook – Vice President
*T. J. Fretthold – Assistant Secretary
*W. Hutton – Assistant Secretary
*E. J. Masek – Assistant Secretary
*W. A. Skinner – Assistant Secretary
J. N. Uranga – Assistant Secretary
*W. E. Notestine – Assistant Secretary
*R. C. Becker – Assistant Treasurer

_____

*    Will resign or be removed on the Closing Date.

OCC 033326

**Confidential**

OCCNJ0026769
ALCD-PUBCOM_0002647

B.   Subsidiaries

1.   D.S. Ventures, Inc. (II)

     a.   Jurisdiction of Organization - Texas (Corporation)

     b.   Equity Interest Owned - DSCC holds 100 shares

     c.   Percent Equity Interest Owned - 100%

     d.   Approximate Net Worth - $4,768,000

-2-

OCC 033327

Confidential

OCCNJ0026770
ALCD-PUBCOM_0002648

2.  Diamond Alkali Inter-American Corporation (II)

    a.  Jurisdiction of Organization - Delaware (Corporation)

    b.  Equity Interest Owned - DSCC holds 50 shares

    c.  Percent Equity Interest Owned - 100%

-3-

OCC 033328

Confidential

OCCNJ0026771

ALCD-PUBCOM_0002649

3.   Diamond Shamrock Atlantic Corporation (II)

    a.   Jurisdiction of Organization - Delaware (Corporation)

    b.   Equity Interest Owned - DSCC holds 1,000 shares

    c.   Percent Equity Interest Owned - 100%

-4-

OCC 033329

Confidential

OCCNJ0026772
ALCD-PUBCOM_0002650

4. Diamond Shamrock (Australia) Pty. Limited (***) (AA)

   a. Jurisdiction of Organization – Australia (Corporation)

   b. Equity Interest Owned – DSCC (Class A)   312,500 shs.
                                  DSCC (Class B)   312,499 shs.
                                    DS Int. H. Ltd.
                                    (Class B)          1 sh.
                                    Total         625,000 shs.

   c. Percent Equity Interest Owned – 100%

   d. Approximate Net Worth – $3,274,000

   e. Officers and Directors –

                J.R. Clinton – Director
                J.T. Kamm – Director
                H.W. Gross – Director
                F.B. Martin – Director and Assistant General
                              Manager
                B.D. Parker – Director
                J.H. Matthews – Director, General Manager,
                              Secretary and Public Officer
                P.J.L. King – Alternative Director and Secretary

   f. Business Unit – Process Chemicals

–5–

OCC033330

Confidential

OCCNJ0026773

ALCD-PUBCOM_0002651

5.  Diamond Shamrock Canada Ltd. (***) (AA)

    a.   Jurisdiction of Organization -   Canada (Ontario Corporation)

    b.   Equity Interest Owned - DSCC holds 1,400,000 shares

    c.   Percent Equity Interest Owned - 100%

    d.   Approximate Net Worth - $2,937,000

    e.   Officers and Directors -

           H.W. Gross - Director and President
           J.R. Clinton - Director and Vice President
           D.A. Knowler - Director and Vice President
           J. Foglietta - Director and Controller
           K.T. Burgoine - Director and Vice President
           P.R. Mahaney - Treasurer
           M.J. Dumeny - Secretary

    f.   Business Unit - Process Chemicals

OCC033331

Confidential

OCCNJ0026774
ALCD-PUBCOM_0002652

6.   Diamond Shamrock Chemical Products A.G. (AA)

    a.   Jurisdiction of Organization – Switzerland
                                               (Corporation)

    b.   Equity Interest Owned – DSCC            1,000 shs.
                           DS Chimie S.A.      999 shs.
                           J. Ward             1 sh.
                           Total            2,000 shs.

    c.   Percent Equity Interest Owned – 100%

    d.   Approximate Net Worth – $225,000

    e.   Business Unit – Process Chemicals

–7–

OCC033332

Confidential

OCCNJ0026775

ALCD-PUBCOM_0002653

7. Diamond Shamrock Chemicals Company Pty. Limited* (II)

    a.   Jurisdiction of Organization - Australia (Corporation)

    b.   Equity Interest Owned - DSCC            1 sh.
                                 DS Int. H. Ltd.    1 sh.
                                 Total             2 shs.

    c.   Percent Equity Interest Owned - 100%

---

\* Procedures to dissolve this company have been initiated

-8-

OCC033333

Confidential

OCCNJ0026776

ALCD-PUBCOM_0002654

8. Diamond Shamrock Chemicals (Deutschland) GmbH (AA)

   a. Jurisdiction of Organization - Federal Republic of
                     Germany (Corporation)

   b. Equity Interest Owned - DSCC holds 1 share

   c. Percentage Equity Interest Owned - 100%

   d. Approximate Net Worth - $110,000

   e. Business Unit - Process Chemicals

-9-

OCC033334

Confidential

OCCNJ0026777

ALCD-PUBCOM_0002655

9.   Diamond Shamrock Chile de S.A.I. * (***) (AA)

    a.   Jurisdiction of Organization - Chile (Corporation)

    b.   Equity Interest Owned - DSCC            1,584 shs.
                              DS Atlantic Corp.     16 shs.
                              Total           1,600 shs.

    c.   Percent Equity Interest Owned - 100%

    d.   Approximate Net Worth - $7,540,000

    e.   Officers and Directors -

            J.R. Clinton - Director and President
            J.D. Miller - Director and Vice President
            B. Palau O. - Director and General Manager
            H.J. Martinez V. - Adm. & Finance Manager and
                            Alternate Director
            F. Rubio T. - Alternate Director
            D.E. Wilson - Alternate Director

    f.   Business Unit - Chlor-Alkali

---

*   On July 31, 1986, Diamond Shamrock de Chile S.A.I. filed a
Conservador de Bienes Raices

OCC033335

Confidential

OCCNJ0026778
ALCD-PUBCOM_0002656

10. Diamond Shamrock Chimie S.A. (II)

    a.    Jurisdiction of Organization – Switzerland
(Corporation)

    b.    Equity Interest Owned – DSCC

| | |
|---|---|
| DSCC | 4,245 shs. |
| A. Krattinger | 1 sh. |
| H. W. Gross | 1 sh. |
| J. R. Clinton | 1 sh. |
| P. von der Weid | 1 sh. |
| J. E. Ward | 1 sh. |
| Total | 4,250 shs. |

    c.    Percent Equity Interest Owned – 100%

    d.    Approximate Net Worth – $545,000

-11-

OCC033336

**Confidential**

11. Diamond Shamrock China Limited (AA)

    a.    Jurisdiction of Organization - Hong Kong (Corporation)

    b.    Equity Interest Owned - DSCC           49,999 shs.
                                    DS Int. H., Ltd.        1 sh.
                                    Total           50,000 shs.

    c.    Percent Equity Interest Owned - 100%

    d.    Approximate Net Worth - $84,000

    e.    Business Unit - All

-12-

OCC033337

Confidential

OCCNJ0026780
ALCD-PUBCOM_0002658

12. Diamond Shamrock Eytesa S.A. (***) (AA)

    a.    Jurisdiction of Organization - Spain (Corporation)

    b.    Equity Interest Owned - DSCC holds 468 shares

    c.    Percent Equity Interest Owned - 100%

    d.    Approximate Net Worth - $2,626,000

    e.    Officers and Directors -

            R.L. Olivier - Director
            H.W. Gross - Director
            M. Caragol Mas-Baga - Director
            J.R. Clinton - Director
            A.P. Escura - Director and Secretary
            N.V. Bastiaens - Director and President
            R. Martinez Roura - General Manager

    f.    Business Unit - Process Chemicals

-13-

OCC033338

Confidential

OCCNJ0026781
ALCD-PUBCOM_0002659

13. Diamond Shamrock Far East Limited (AA)

    a.    Jurisdiction of Organization - Hong Kong (Corporation)

    b.    Equity Interest Owned - DSCC           9,999 shs.
                                   DS Int. H., Ltd.        1 sh.
                                   Total            10,000 shs.

    c.    Percent Equity Interest Owned - 100%

    d.    Approximate Net Worth - $155,000*

    e.    Business Unit - All

---

\*    Including Singapore Branch

-14-

OCC033339

Confidential

OCCNJ0026782
ALCD-PUBCOM_0002660

14. Diamond Shamrock France S.A. (***) (AA)

    a.   Jurisdiction of Organization - France (Corporation)

    b.   Equity Interest Owned -

| | |
|---|---:|
| DS Chimie S.A. | 79,497 shs. |
| DSCC | 45,494 shs. |
| J.R. Clinton | 2 shs. |
| N. Bastiaens | 2 shs. |
| H.W. Gross | 1 sh. |
| R.L. Olivier | 2 shs. |
| L. Vandenbergen | 2 shs. |
| Total | 125,000 shs. |

    c.   Percent Equity Interest Owned - 100%

    d.   Approximate Net Worth - $7,343,000

    e.   Officers and Directors -

        N. Bastiaens - President
        J.R. Clinton - Director
        L. Vandenbergen - Director
        DSCC - Director, with Permanent Representative
          H.W. Gross
        DS Chimie S.A. - Director, with Permanent
          Representative R.L. Olivier
        R.L. Olivier - General Manager

    f.   Business Unit - Process Chemicals

-15-

OCC033340

Confidential

OCCNJ0026783
ALCD-PUBCOM_0002661

15. Diamond Shamrock International Holdings Limited (II)

    a.   Jurisdiction of Organization – Delaware (Corporation)

    b.   Equity Interest Owned –  DSCC holds 10 shares

    c.   Percent Equity Interest Owned – 100%

OCC033341

Confidential

OCCNJ0026784
ALCD-PUBCOM_0002662

16. Diamond Shamrock Pacific Ltd. (AA)

    a.    Jurisdiction of Organization – Delaware (Corporation)

    b.    Equity Interest Owned – DSCC holds 2,000 shares

    c.    Percent Equity Interest Owned – 100%

    d.    Approximate Net Worth – $2,539,000

    e.    Business Unit – All

-17-

OCC033342

Confidential

OCCNJ0026785

ALCD-PUBCOM_0002663

17. Diamond Shamrock Process Chemicals Europe Inc. (AA)

    a.    Jurisdiction of Organization - Delaware (Corporation)

    b.    Equity Interest Owned - DSCC holds 100 shares

    c.    Percent Equity Interest Owned - 100%

    d.    Approximate Net Worth - ($128,000)

    e.    Business Unit - Process Chemicals

-18-

OCC033343

Confidential

OCCNJ0026786

ALCD-PUBCOM_0002664

18. Diamond Shamrock Process Chemicals Limited (AA)

    a.   Jurisdiction of Organization - England (Corporation)

    b.   Equity Interest Owned -

| | |
|---|---:|
| DSCC | 319,999 shs. |
| DS Inter. H. Ltd. | 1 sh. |
| Total | 320,000 shs. |

    c.   Percent Equity Interest Owned - 100%

    d.   Approximate Net Worth - $575,000

    e.   Business Unit - Process Chemicals

OCC033344

Confidential

OCCNJ0026787

ALCD-PUBCOM_0002665

19. Diamond Shamrock Scandinavia AB (AA)

    a.    Jurisdiction of Organization - Sweden (Corporation)

    b.    Equity Interest Owned - DSCC holds 500 shares

    c.    Percent Equity Interest Owned - 100%

    d.    Business Unit - Process Chemicals

OCC033345

Confidential

OCCNJ0026788

ALCD-PUBCOM_0002666

20. Diamond Shamrock Scandinavia ApS (II)

    a.    Jurisdiction of Organization - Denmark (Corporation)

    b.    Equity Interest Owned - DSCC holds       shares

    c.    Percent Equity Interest Owned - 100%

OCC033346

Confidential

OCCNJ0026789

ALCD-PUBCOM_0002667

21. Diamond Shamrock Scandinavia A/S (AA)

    a.    Jurisdiction of Organization - Norway (Corporation)

    b.    Equity Interest Owned - DS Chimie S.A.    499 shs.
                                         DSCC          499 shs.
                                         Total        998 shs.

    c.    Percent Equity Interest Owned - 100%

    d.    Approximate Net Worth - $1,985,000

    e.    Business Unit - Process Chemicals

OCC033347

Confidential

OCCNJ0026790
ALCD-PUBCOM_0002668

22. Diamond Shamrock Scandinavia OY (AA)

    a.    Jurisdiction of Organization - Finland (Corporation)

    b.    Equity Interest Owned - DSCC    30 shs.
                         DS Chimie S.A.  <u>30 shs.</u>
                         Total  <u>60 shs.</u>

    c.    Percent Equity Interest Owned - 100%

    d.    Business Unit - Process Chemicals

-23-

OCC033348

Confidential

OCCNJ0026791
ALCD-PUBCOM_0002669

23. Diamond Shamrock Taiwan Ltd. (***) (AA)

    a.   Jurisdiction of Organization - Taiwan (Corporation)

    b.   Equity Interest Owned - 

| | | |
|---|---|---|
| DSCC | 48,881 | shs. |
| DS Pac. Ltd. | 10 | shs. |
| D Alkalai Inter-<br>  Amer. Corp. | 10 | shs. |
| DS Atlantic<br>  Corp. | 1 | sh. |
| DS Int. H. Ltd. | 1 | sh. |
| H.W. Gross | 1 | sh. |
| *C.E. Stewart | 1 | sh. |
| Total | 48,905 | shs. |

    c.   Percent Equity Interest Owned - 100%

    d.   Approximate Net Worth - $2,857,000

    e.   Officers and Directors -

            **   J. Kamm - Chairman
                 H.W. Gross - Director
           ***  C.E. Stewart - Director
                 J.R. Clinton - Director
         **** P. Chang - President
                 F.S. Lin - Vice President
                 P. Lin - Vice President

    f.   Business Unit - Process Chemicals

Diamond Shamrock Taiwan Ltd. is presently negotiating the
purchase of the Diamond Shamrock Trading Corp. shares held by
C.T. Chen

---

\*    K. Mitchell previously held this share; legal procedures
have been initiated to transfer this share

\*\*   Y. Motoyama previously held this postion; legal procedures
have been initiated to name J. Kamm to this position

\*\*\*  K. Mitchell previously held this position; legal
procedures have been initiated to name C.E. Stewart to
this position

\*\*\*\* E.Y. Yin previously held this position; legal procedures
have been initiated to name P. Chang to this position

OCC033349

Confidential                                                OCCNJ0026792
                                                      ALCD-PUBCOM_0002670

24. Diamond Shamrock Trading Corporation (AA)

    a.   Jurisdiction of Organization - Taiwan (Corporation)

    b.   Equity Interest Owned - DSCC

| | |
|---|---|
| DSCC | 107,000 shs. |
| DS Pac. Ltd. | 460 shs. |
| E.Y. Yin | 500 shs. |
| *C.T. Chen | 2,010 shs. |
| P.S. Lin | 10 shs. |
| D Alk. Int. Am. | 10 shs. |
| DS Int. H. Ltd. | 10 shs. |
| Total | 110,000 shs. |

    c.   Percent Equity Interest Owned - 98.17%

    d.   Approximate Net Worth - $470,000

    e.   Business Unit - Process Chemicals

---

*    Diamond Shamrock Taiwan Ltd. is presently negotiating the purchase of the shares held by C.T. Chen

-25-

OCC033350

Confidential

OCCNJ0026793

ALCD-PUBCOM_0002671

25. Diapar-Diamond Shamrock Empreendimentos e Participacoes
    Ltda.* (II)

    a.   Jurisdiction of Organization - Brazil (Corporation)

    b.   Equity Interest Owned -
                          DSCC          62,274,126,181 qts.
                          J. Almeida                62 qts.
                          N. Rotenberg              62 qts.
                          Total         62,274,126,305 qts.

    c.   Percent Equity Interest Owned - 100%

    _____

    * Diapar-Diamond Shamrock Empreendimentos e Participacoes
      Ltda. also holds other small investments derived from
      fiscal incentives

OCC033351

Confidential                    OCCNJ0026794
                                      ALCD-PUBCOM_0002672

26. Sanital Comercio e Empreendimentos Ltda. (II)

    a.    Jurisdiction of Organization - Brazil (Corporation)

    b.    Equity Interest Owned -

| | |
|---|---|
| Carbocloro S.A. Industrias Chemicas | 3,418,727,513 shs. |
| N. Aranjo | 19 shs. |
| J. Regazzini | 19 shs. |
| Total | 3,418,727,551 shs. |

    c.    Percent Equity Interest Owned - 50%

-27-

OCC033352

Confidential

OCCNJ0026795
ALCD-PUBCOM_0002673

27. Thai Diamond Shamrock Chrome Limited (AA)

   a.   Jurisdiction of Organization - Thailand (Corporation)

   b.   Equity Interest Owned - DSCC holds 117,600 Class A
        Shares

   c.   Percent Equity Interest Owned - 49%

   d.   Approximate Net Worth - $442,000

   e.   Restrictions - Right of First Refusal

   f.   Business Unit - Chrome

-28-

OCC033353

Confidential

OCCNJ0026796
ALCD-PUBCOM_0002674

28. Thai Diamond Shamrock Ltd. (AA)

    a.    Jurisdiction of Organization - Thailand (Corporation)

    b.    Equity Interest Owned - DSCC           9,799 shs.
                              *W. H. Bricker         1 sh.
                              Total           9,800 shs.

    c.    Percent Equity Interest Owned - 49%

    d.    Restrictions - Board of Director's Consent to
                         Transfer; Right of First Refusal

    e.    Business Unit - All

---

   * Procedures have been initiated to transfer this share.

-29-             OCC033354

Confidential

OCCNJ0026797
ALCD-PUBCOM_0002675

29. Carbocloro S.A. Industrias Quimicas (***) (AA)

    a.   Jurisdiction of Organization - Brazil (Corporation)

    b.   Equity Interest Owned - DSCC

| | |
|---|---|
| DSCC | 41,960,709 shs. |
| Diapar Diamond Shamrock Empre-endimentos e Participacoes Ltda. | 175,452,288 shs. |
| Bearer | 2 shs. |
| Total | 217,413,000 shs. |

    c.   Percent Equity Interest Owned - 50%

    d.   Approximate Net Worth - $34,036,000

    e.   Restrictions - Right of First Refusal; Preemptive Rights

    f.   Officers and Directors -

            J.A. de Camargo - Member of the Board
            S. Gouloubeff - Chairman of the Board
            P.F. Geyer - Member of the Board
            A.A. Mayer - Member of the Board
            A.J. Schaeffer, Jr. - President
            A.C. Whitaker de Carvalho - Vice President
            V. Gabriel - Commercial Director
            M.A. Cilento - Industrial Director
            P.C. Barreto - Financial and Administrative Director

    g.   Business Unit - Chlor-Alkali

OCC033355

Confidential

OCCNJ0026798
ALCD-PUBCOM_0002676

30. Diamond Shamrock Italia S.p.A. (AA)

    a.   Jurisdiction of Organization - Italy (Corporation)

    b.   Equity Interest Owned - DS Chimie S.A.
                              Holds 1,000 shares

    c.   Percent Equity Interest Owned - 50%

    d.   Approximate Net Worth - $554,000

    e.   Restrictions - Right of First Refusal

    f.   Business Unit - Process Chemicals

OCC033356

Confidential

OCCNJ0026799

ALCD-PUBCOM_0002677

31. Korea Potassium Chemical Co., Ltd. (AA)

    a.    Jurisdiction of Organization - Korea (Corporation)

    b.    Equity Interest Owned - DSCC holds 5,670,342 shares

    c.    Percent Equity Interest Owned - 50%

    d.    Approximate Net Worth - $3,700,000

    e.    Restrictions - Preemptive Rights; Right of First Refusal

    f.    Business Unit - Chlor-Alkali

OCC033357

Confidential

OCCNJ0026800

ALCD-PUBCOM_0002678

32. Nopco Colombiana S.A. (AA)

    a.   Jurisdiction of Organization - Colombia (Corporation)

    b.   Equity Interest Owned - DSCC       110,540 shs.

                                      C. Urrutia         2,256 shs.
                                                      112,796 shs.

    c.   Percent Equity Interest Owned - 50%

    d.   Approximate Net Worth - $471,000

    e.   Restrictions - Right of First Refusal

    f.   Business Unit - Process Chemicals

-33-

OCC033358

Confidential

OCCNJ0026801

ALCD-PUBCOM_0002679

33. Nopco Industrial S.A. de C.V. (AA)

    a.    Jurisdiction of Organization - Mexico (Corporation)

    b.    Equity Interest Owned - DSCC       19,599 shs.
                                    H. Cisneros        401 shs.
                                                  20,000 shs.

    c.    Percent Equity Interest Owned - 50%

    d.    Approximate Net Worth - $822,000

    e.    Restrictions - Right of First Refusal

    f.    Business Unit - Process Chemicals

OCC033359

Confidential

OCCNJ0026802

ALCD-PUBCOM_0002680

34. San Nopco Limited (AA)

    a.    Jurisdiction of Organization - Japan (Corporation)

    b.    Equity Interest Owned - DSCC holds 17,500 shares

    c.    Percent Equity Interest Owned - 50%

    d.    Approximate Net Worth - $3,071,000

    e.    Restrictions - Right of First Refusal

    f.    Business Unit - Process Chemicals

7968G

-35-

OCC033360

**Confidential**

OCCNJ0026803

ALCD-PUBCOM_0002681

<u>SCHEDULE 2.04</u>


Agreement,
Dated September 4, 1986 (the "Agreement"),
By and Among
Diamond Shamrock Corporation,
Occidental Petroleum Corporation,
Occidental Chemical Holding Corporation
and
<u>Oxy-Diamond Alkali Corporation</u>


<u>OTHER DSCC INVESTMENTS</u>

8706G

OCC033361

**Confidential**

**OCCNJ0026804**
ALCD-PUBCOM_0002682

| Name | Amount* and Nature of Ownership Interest |
|---|---|
| 1. Plant Resources Venture Fund, a Massachusetts limited partnership | 4% equity interest owned by D.S. Ventures, Inc. |
| 2. APA Venture Capital Fund Ltd., a Channel Islands corporation | 2.5% equity interest (preference shares) owned by D.S. Ventures, Inc. |
| 3. Dougery, Jones & Wilder, a California limited partnership | 4% equity interest owned by D.S. Ventures, Inc. |
| 4. CH Partners II Limited Partnership, a Washington limited partnership | 3% equity interest owned by D.S. Ventures, Inc. |
| 5. Taylor and Turner, a California limited partnership | 2% equity interest owned by D.S. Ventures, Inc. |
| 6. Sunwestern Investment Fund, a Texas limited partnership | 4.5% equity interest owned by D.S. Ventures, Inc. |
| 7. Sunwestern Investment Fund II, a Texas limited partnership | 2% equity interest owned by D.S. Ventures, Inc. |
| 8. Summit Ventures, a Delaware limited partnership | 0.5% equity interest owned by D.S. Ventures, Inc. |
| 9. Venture Capital Fund of America, a New York limited partnership | 25%** equity interest owned by D.S. Ventures, Inc. |
| 10. Allied Chemical Soda Ash Company, a New Jersey partnership | 26% equity interest owned by DSCC |

---

\*  All designations of percentage equity interest owned are approximations

\*\*  At current funding levels; funding to continue through April 1987

2311g

OCC033362

Confidential

OCCNJ0026805

ALCD-PUBCOM_0002683

SCHEDULE 2.05


Agreement,
Dated September 4, 1986 (the "Agreement"),
By and Among
Diamond Shamrock Corporation,
and
Occidental Petroleum Corporation,
Occidental Chemical Holding Corporation
and
Oxy-Diamond Alkali Corporation


RELATED DOCUMENTS


8026G

OCC033363

Confidential

OCCNJ0026806
ALCD-PUBCOM_0002684

1. Cogeneration Asset Purchase Agreement

2. Assumption Instruments

3. Designation of Account

8026G

OCC033364

-2-

Confidential

OCCNJ0026807

ALCD-PUBCOM_0002685

SCHEDULE 2.06


Agreement,
Dated September 4, 1986 (the "Agreement"),
By and Among
Diamond Shamrock Corporation,
Occidental Petroleum Corporation,
Occidental Chemical Holding Corporation
and
Oxy-Diamond Alkali Corporation


CONFLICTS


OCC033365

Confidential

OCCNJ0026808

ALCD-PUBCOM_0002686

<u>GOVERNING DOCUMENTS</u>

Carbocloro, San Nopco, DS Italia, DS Energy Reserves

<u>Assumed obligations, contracts, leases, etc.</u>

| | |
|---|---|
| Diamond Shamrock (Australia) Pty. Limited | Nippon Dacro Shamrock Agreement<br>Metal Coatings International Agreement<br>Sanyo Chemicals Industries Agreement<br>Eltech Systems Limited Agreement |
| Diamond Shamrock de Chile S.A.I. | Bank of Boston Agreement and related documents |
| Carbocloro | Citibank Loan Agreement and related documents |
| KPCC | Certain related documents to Chase Manhattan Loan Agreement |
| Diamond Shamrock Pacific | Aoi Kigyo K.K. Lease |
| DSCC | Ca Quimica Integrada "Intequim" License and Terminal Assistance Agreement<br><br>Ca Quimica Integrada "Intequim" Trademark License Agreement<br><br>International Business Machines Lease Agreement (Tax lease)<br><br>Phillips Information Systems, Inc. Lease (1984) |

OCC033366

**Confidential**

**OCCNJ0026809**
ALCD-PUBCOM_0002687

Gas Sales Contract, dated October 4, 1985, between
DSCC and Amoco Gas Company ("AGC")

Gas Sales Contract, dated October 1, 1985, between
DSCC and Amoco Production Company

Gas Transportation and/or Exchange Agreement
effective January 1, 1985, as amended, between DSCC
and AGC

Short Term Industrial Marketing Program Gas Sales
Contract, dated June 1, 1986, between DSCC and AGC

The Agreement between DSCC, Brown & Root, Inc. and
Brown & Root U.S.A., Inc., dated May 1, 1984

Filings with respect to Permit No. C-9492, issued
by the Texas Air Control Board to DSCC authorizing
the construction of a gas turbine cogeneration
facility

Filings with respect to Permit No. R-7647, issued
by the Texas Air Control Board to Diamond Shamrock
Corporation allowing for the operation of a
combined cycle power generating facility

Consents
and
waivers

Filings contemplated by Sections 8.09, 8.20 and
8.21 and the Schedules related thereto

2710g

OCC033367

Confidential   OCCNJ0026810

ALCD-PUBCOM_0002688

<u>SCHEDULE 2.07</u>


Agreement,
Dated September 4, 1986 (the "Agreement"),
By and Among
Diamond Shamrock Corporation,

Occidental Petroleum Corporation,
Occidental Chemical Holding Corporation
and
<u>Oxy-Diamond Alkali Corporation</u>



LITIGATION; COMPLIANCE WITH LAWS;
<u>PERMITS AND LICENSES</u>


8547G

OCC033368

**Confidential**

**OCCNJ0026811**
ALCD-PUBCOM_0002689

SCHEDULE 2.07

2.07(a)    All information called for by subsection (a) of
Section 2.07 of the Agreement is included in
sections (b), (d) and (e) of this Schedule


2.07(b)    To the extent that any matters disclosed elsewhere
in this Schedule 2.07, including but not limited to
matters involving violations of Environmental Laws,
the obtaining and compliance with all Environmental
Permits, or the existence of any judgment, ruling,
order or decree, may be deemed to constitute
Litigation as that term is defined in Section
2.07(b) as a result of any action taken, claim
made, administrative proceeding, or investigation
initiated or written inquiry made by any
Governmental Agency, all such matters are hereby so
designated as Litigation required to be disclosed
herein


2.07(b)    Threatened Litigation

On January 17, 1986, an explosion occurred at the
Ashtabula Plant which resulted in the deaths of two
DSCC employees and injuries to other persons
including several persons who are not employed by
DSCC

On February 27, 1986, at the Convent Plant four
employees were discharged. One or more of such
employees may file an administrative claim or civil
action with respect to their discharge

On August 18, 1986, DSCC received a letter from
Heubach, Inc. demanding $351,000 in damages
resulting from an alledged breach of warranty
relating to the sale of chromate

Attached to an attachment designated Attachment LIT
is a list of DSCC employees involved in recent
lost-time accidents. Such accidents may result in
an administrative claim or civil action

OCC033369

Confidential

2.07(b)     Additional Litigation matters are disclosed on
            Attachment LIT


2.07(d)     Judgments, orders and decrees described on Schedule
            2.23 are incorporated by reference


2.07(d)     Order, In the Matter of Diamond Shamrock
            Corporation, issued March 18, 1974 by the Federal
            Trade Commission

            Final Judgment, United States of America v.
            Pennsalt Chemicals Corporation et al. [including
            Diamond Alkali Company], Civil Action No. 37123,
            judgment entered January 13, 1967


2.07(d)     Applicable Orders Not
            Involving Any Active Sites

            Administrative Consent Order, New Jersey Department
            of Environmental Protection (NJDEP), In the Matter
            of Diamond Shamrock Chemicals Company and Marisol,
            Inc., dated March 13, 1984; Evaluation and
            Feasibility Study for 80 Lister Avenue, Newark, N.J.

            Administrative Consent Order, NJDEP, In the Matter
            of Diamond Shamrock Chemicals Company, 120 Lister
            Avenue, dated December 21, 1984

            Administrative Consent Order, NJDEP, In the Matter
            of SDS Biotech Corporation, Environmental Cleanup
            Responsibility Act (ECRA) Case #84118, dated
            May 16, 1986

            Administrative Consent Order, Docket No.
            V-W-3013-2, U.S. EPA - Region V, dated July 14,
            1983, to close former Painesville Chrome plant.
            July 22, 1986, letter from U.S. EPA, Region V,
            alleging violation of Order and directing
            corrective action.  Response by Diamond Shamrock
            Corporation on August 8, 1986, indicating
            corrective action to be taken


                              -2-

                                        OCC033370

**Confidential**                                    **OCCNJ0026813**

                                                   ALCD-PUBCOM_0002691

Administrative Consent Order, NJDEP, In the Matter
of Hudson County Chromium Offsites, dated June, 1986

DSCC entered into an agreement to conduct a Toxic
Substances Control Act (TSCA) audit on July 15,
1985, as required by a Consent Order referenced as
Docket No. TSCA-85-H-03, for which it received
amnesty for all reported and corrected violations

2.07(d)    Applicable Orders Involving
Asterisked Active Sites

Administrative Consent Order, NJDEP, In the Matter
of Diamond Shamrock Chemicals Company, ECRA Cases
#86334, #86335, #86336, #86337, dated August 29,
1986

Agreement and Final Order, EPA, In the Matter of
Diamond Shamrock Chemical Company, Docket No.
85-39-R, issued December 10, 1985 and Certificate
of Service dated December 12, 1985, relating to
Mobile plant

Administrative Order and Notice of Civil
Administrative Penalty Assessment, NJDEP, dated
April 29, 1986, imposing $400 fine for failure to
operate scrubber at Harrison plant

Orders, rulings and decrees referred in Schedule
2.07(e)

2.07(e)    List of Pending Permits

    The following schedule sets forth those
Environmental Permits which DSCC or any Subsidiary
is in the process of obtaining:

1)   Ashtabula, Ohio

   - Ohio EPA National Pollution Discharge
     Elimination System (NPDES) permit renewal
   - EPA and Ohio EPA Part B Permit

-3-

OCC033371

OCCNJ0026814
ALCD-PUBCOM_0002692

2) <u>Battleground, Texas</u>

- Gulf Coast Area Landfill Texas Water
  Commission RCRA Part B Permit (includes TACB
  approval)
- Gulf Coast Area Landfill Texas Water
  Commission NPDES Permit

3) <u>Carlstadt, New Jersey</u>

- Application to be filed for discharge to
  regional privately owned treatment works
  (POTW)
- Renewal of approximately ten (10) temporary
  air permits to operate plant
- ECRA notice to be filed

4) <u>Castle Hayne, North Carolina</u>

- NPDES permit renewal by State
- Modification of air permit to expand chromic
  acid production
- State redesignation of groundwater
- Negotiation of order for remediation plan for
  plant and adjoining quarrys

5) <u>Catonsville, Maryland</u>

- Transfer to name of DSCC

6) <u>Cedartown, Georgia</u>

- Air permit to modify oxide process
- NPDES permit modification request

7) <u>Morristown, New Jersey</u>

- ECRA notice to be filed

8) <u>Cincinnati, Ohio</u>

- Ohio EPA air permit renewal for dissolvers
  and furnace
- Ohio EPA permit to construct glass crusher

9) <u>Convent, Louisiana</u>

- State permit for Ethylene Dichloride (EDC)
  stormwater pond

-4-

OCC033372

Confidential

OCCNJ0026815

ALCD-PUBCOM_0002693

10) <u>Deer Park, Texas</u>

- Amendment to Sodium Methylate Texas Air Control Board (TACB) permit exemption
- Final operating permit for Cogeneration Plant not issued by TACB (Plant validly operating under construction permit)
- Negotiation for higher temperature limits on outfall

11) <u>Delaware City, Delaware</u>

- State and EPA RCRA Part B permit

12) <u>Franklin Park, Illinois</u>

- Illinois EPA air permit renewal for mixers/dust collectors
- Transfer to name of DSCC

13) <u>Harrison, New Jersey</u>

- Permit to discharge to Paisaic Valley Sewer Commission
- NJDEP air permit modification to direct vent a POTW reactor
- ECRA notice to be filed

14) <u>Jersey City, New Jersey</u>

- NJDEP air permit for glass furnace
- NJDEP authorization to store hazardous waste less than 90 days
- ECRA notice to be filed

15) <u>Lockport, New York</u>

- Authorization to become a temporary non-industrial discharger to sewer

16) <u>Mobile, Alabama</u>

- Post Closure Part B permit for brine lagoon

-5-

OCC033373

Confidential

OCCNJ0026816

ALCD-PUBCOM_0002694



Confidential

OCCNJ0026817
ALCD-PUBCOM_0002695

ATTACHMENT LII

PENDING LITIGATION

| Case Reference | Court | Product or Location | Type of Action | Claimed Damages |
|---|---|---|---|---|
| Davis | Superior Ct. of L.A., CA | Trichloroethylene | Personal Injury | Not specified |
| Lovell | Superior Ct. of L.A., CA | Trichloroethylene | Personal Injury | In excess of $1 million |
| Hyrtue | Superior Ct. of L.A., CA | Trichloroethylene | Personal Injury | In excess of $1 million |
| Von Heubschman | Superior Ct. of L.A., CA | Trichloroethylene | Personal Injury | In excess of $1 million |
| Meyer | Superior Ct. of L.A., CA | Trichloroethylene | Personal Injury | Not specified |
| Barkyoumb | Superior Ct. of L.A., CA | Trichloroethylene | Personal Injury | In excess of $1 million |
| Anderson | Superior Ct. of L.A., CA | Trichloroethylene | Personal Injury | In excess of $1 million |
| Perkins | Superior Ct. of L.A., CA | Trichloroethylene | Personal Injury | In excess of $1 million |
| Downey | Superior Ct. of L.A., CA | Trichloroethylene | Personal Injury | In excess of $1 million |
| Squitante | Superior Ct. of L.A., CA | Trichloroethylene | Personal Injury | In excess of $1 million |
| Pfeifer | Superior Ct. of L.A., CA | Trichloroethylene | Personal Injury | In excess of $1 million |
| Jenks | Superior Ct. of L.A., CA | Trichloroethylene | Personal Injury | In excess of $1 million |
| Podkona | Superior Ct. of L.A., CA | Trichloroethylene | Personal Injury | In excess of $1 million |
| Ward | Superior Ct. of L.A., CA | Trichloroethylene | Personal Injury | In excess of $1 million |
| Zermino | Superior Ct. of L.A., CA | Trichloroethylene | Personal Injury | Not specified |
| Gill | Superior Ct. of L.A., CA | Trichloroethylene | Personal Injury | Not specified |
| Crowley, H. | Superior Ct. of L.A., CA | Trichloroethylene | Personal Injury | Not specified |
| Goldberg | Superior Ct. of L.A., CA | Trichloroethylene | Personal Injury | Not specified |
| Jaouhari | Superior Ct. of L.A., CA | Trichloroethylene | Personal Injury | Not specified |
| Chiaramonte | Superior Ct. of L.A., CA | Trichloroethylene | Personal Injury | Not specified |

OCC033375

Confidential

OCCNJ0026818

ALCD-PUBCOM_0002696

| Case Reference | Court | Product or Location | Type of Action | Relief Sought |
|---|---|---|---|---|
| Berger | Superior Ct. of L.A., CA | Trichloroethylene | Personal injury | Not specified |
| Barnette | Superior Ct. of L.A., CA | Trichloroethylene | Personal injury | Not specified |
| Avery | Superior Ct. of L.A., CA | Trichloroethylene | Personal injury | Not specified |
| Crowley | Superior Ct. of L.A., CA | Trichloroethylene | Personal injury | Not specified |
| Hayslett | Superior Ct. of L.A., CA | Trichloroethylene | Personal injury | $200,000 compensatory; $200,000 punitive |
| Smith | Superior Ct. of L.A., CA | Trichloroethylene | Personal injury | Not specified |
| Stark | Superior Ct. of L.A., CA | Trichloroethylene | Personal injury | Not specified |
| Atwood | Cir. Ct., McHenry Cty., IL | Trichloroethylene | Personal injury | Not specified |
| Jaworski | 10th Circuit | Caustic soda | Personal injury | $400,000 |
| Mesler | U.S.D.C., S.D., TX | Deer Park | Personal injury | $1 million compensatory; $2 million punitive |
| Burback | District Court of Dakota County, MN | Carbon Tetrachloride | Personal injury | In excess of $800,000 compensatory; in excess of $100,000 punitive |
| State of NJ | Superior Court of Mercer County, NJ | Textile Care | Indictment | $760,000 |
| City of St. Paul | U.S.D.C., MN | Chlor-Alkali | Antitrust | Unspecified |
| Harriford | U.S.D.C., LA | Convent | Discrimination | $250,000 |
| Maguire | U.S. Court of Appeals, Third Circuit | Morristown | Wrongful Discharge | Unspecified |
| Simmons et al. | U.S.D.C., MO | St. Louis | Severance Pay | |
| Madeiros | Superior Ct. of CA, Alameda County | BCME | Wrongful death | In excess of $11,000,000 |
| Moss | Superior Ct. of CA, Alameda County | BCME | Personal injury | In excess of $11,000,000 |

-2-

OCC033376

Confidential

OCCNJ0026819

ALCD-PUBCOM_0002697

| Case Reference | Court | Product or Location | Type of Action | Relief Sought |
|---|---|---|---|---|
| Ramsey et al. | Pikeville Clr. Ct. Pikeville, KY | | Breach of Contract | Unspecified |
| Edwards | High Court of Justice, Queens Bench Division Liverpool, England | Leeds, U.K. | Personal injury | Unspecified |
| Le Coz | Court d' Appeal de Paris | Paris | Unfair dismissal | FF 70,602 |
| Ministerio Publico | Cubatao | Sao Paulo | Environmental | Unspecified |
| *Chapa | District Ct., Harris County, TX | Greens Bayou | Wrongful death | Unspecified |
| *Jordan | District Ct., Harris County, TX | | | |
| *Mustata | District Ct., Harris County, TX | | | |
| *Prior | Circuit Ct., Arlington County, VA | Doconil | Wrongful death | $6,000,000 compensatory; $10,000,000 punitive |
| *Wendt | Texas Court of Civil Appeals (Corpus Christi) | Vapona | | |
| *Tsolas | Pageou Magistrate's Ct. | Doconil (Greece) | | |

* These suits are subject to a Transfer and Assumption Agreement, dated July 1, 1983, between DSCC, SDS Biotech Corporation and Showa Denko K.K. Pursuant to such Agreement, DSCC has agreed to share in the cost of settlement and/or any judgement resulting from such suits.

-3-

OCC033377

Confidential

## CERTAIN PENDING ADMINISTRATIVE MATTERS

| Case Reference | Agency | Location | Type of Action | Relief Sought |
|---|---|---|---|---|
| 1. Balint | EEOC; Ohio Bureau of Employment Services | Ashtabula | Discrimination; claim for unemployment benefits | Unspecified |
| 2. Meister | EEOC | Irving | Discrimination | Unspecified |
| 3. White | EEOC | Harrison | Discrimination | Unspecified |

## PENDING ARBITRATION AND GRIEVANCE MATTERS

| Case Reference | Location |
|---|---|
| 1. ICS | Delaware City (breach of contract --American Arbitration Assoc.) |
| 2. Leach & Spinear (No. 4-86) | Chicago (Union grievance) |
| 3. Rager (No. 5-86) | Chicago (Union grievance) |
| 4. IUERMM, Local 427 | Harrison (Union grievance) |
| 5. IUERMM, Local 427 | Harrison (Union grievance) |
| 6. IUERMM, Local 427 | Harrison (Union grievance) |
| 7. Pet., Construction Workers, Local 311 | Cantonsville (Union grievance) |

-4-

8666G

OCC033378

Confidential

OCCNJ0026821

ALCD-PUBCOM_0002699

LITIGATION SUMMARY LISTING
LITIGATION TRACKING SYSTEM
DIAMOND SHAMROCK CORPORATION

DATE: 8/31/86

PAGE: 1

L00200

| CASE NAME | FORUM | FILE DT | SERVE DT | DIS COMPANY |
|---|---|---|---|---|

**ALDREDGE, WILLIAM W. VS DS AGRICULTURAL CHEMICAL**

CAUSE: PLTF. ALLEGES AGE DISCRIMINATION AND SEEKS INJUNCTIVE ORDER OF REINSTATEMENT
BREKS FRONT PAY, COMPENSATORY, PUNITIVE AND STATUTORY LIQUIDATED DAMAGES.
JURY DEMAND

EEOC/M                 5/28/85   5/28/85   0   OY CHEMICAL UNIT

**AMITON V DSCC, ET AL. (18)**

CAUSE: PLAINTIFF'S DECEDENT WAS EMPLOYED BY R & D BLOWNE MANUFACTURING COMPANY AS A
MACHINIST ENGAGED IN THE MANUFACTURE OF PLASTIC PIPE FITTINGS AND DIED ON
12/16/83 OF LEIOMYOSARCOMA WHICH WAS ALLEGEDLY CAUSED BY DECEDENT'S EXPOSURE
TO PVC MANUFACTURED BY ONE OR MORE OF THE 17 PVC MANUFACTURING DEFENDANTS.

LA CENTRAL SUP CT, CA        12/14/84   0/00/00   0   OY CHEMICAL UNIT

**ANDERS, RANDAL VS. DOW CHEMICAL CO., INC. DSC**

CAUSE: FOR EACH OF 71 PLTFS $10,000,000.00 PUNITIVE DAMAGES CLAIMED IN EACH OF 7
COUNTS, $5,000,000.00 COMPENSATORY DAMAGES CLAIMED IN EACH OF 7 COUNTS,
$5,000,000.00 DAMAGES FOR BREACH OF WARRANTY CLAIM IN EACH OF 3 COUNTS
FOR ILLNESS AND WRONGFUL DEATH AS A RESULT OF CONTACT WITH HERBICIDE BEARING
IN VIETNAM.

CIR CRT BALTIMORE CITY, MD     5/13/86   5/13/86   0   OY CHEMICAL UNIT

**ANDERSON, G V HONEY PRODUCTS V DSCC, ET AL. (2)**

CAUSE: PLAINTIFF IS A CHILD WHOSE FATHER PURCHASED A BOTTLE OF "DR BENJAM"
MANUFACTURED BY DEFENDANT HONEY PRODUCTS. PLAINTIFF RECEIVED UNSPECIFIED
PERMANENT INJURIES WHEN THE BOTTLE EXPLODED ON 9/1/83. HONEY PRODUCTS HAS
FILED A THIRD-PARTY CLAIM AGAINST DIAMOND, WHICH ALLEGEDLY SOLD A DEFOAMING
AGENT INCLUDED IN THE SEALANT, AND AGAINST CADY COMPANY, WHICH SOLD A CRACK
FILLING AGENT.

SUP CRT, SUFFOLK CITY, NY     12/02/85   12/03/85   0   OY CHEMICAL UNIT

**ANTIFOREX V. DIAMOND SHAMROCK, ET AL. (33)**

CAUSE: FROM JUNE 1976 - MARCH 1984 - PLAINTIFF WAS EMPLOYED BY NORTHERN CHEMICAL
COMPANY AND HAD ALLEGEDLY SUFFERED SEVERE AND PERMANENT INJURY TO HER NERVOUS
AND RESPIRATORY SYSTEMS AS A RESULT OF THE WORKPLACE EXPOSURE TO SOME 30
NAMED CHEMICALS, INCLUDING ETHYLENE DICHLORIDE, CAUSTIC SODIUM, SODIUM
METASILICATE AND MURIATIC ACID.

CIRCUIT CT, COOK CITY, IL     3/27/86   3/28/86   0   OY CHEMICAL UNIT

**AREVALO, ROBERTO ETC., ET AL VS THE FROM INCL DSC 197TH JUD DIS DRI CAMERON CNTY   7/19/85   7/22/85**

CAUSE: SUIT SEEKING DAMAGES IN AN UNSPECIFIED AMOUNT ALLEGING NEGLIGENCE OF DEFT'S
WHEN A PRODUCT AND CHEMICAL, STORAGE COMPLEX CAUGHT FIRE AND POLLUTED THE
AIR, PLTFS AND THEIR PROPERTY. THIS IS AN ENG CASE, HOWEVER, ENDICOTT BEING UPDATED BY ANDREUS

OCC033379

Confidential

DATE: 8/31/86

LITIGATION SUMMARY LISTING
DIAMOND LITIGATION TRACKING SYSTEM
DIAMOND SHAMROCK CORPORATION

L08200
PAGE: 2

**CASE NAME** — **FIRM** — **FILE.DT SERVE.DT DIS COMPANY**

ATCHISON TOPEKA AND SANTA FE RR CO VS DSC
CAUSE: SEEKING $5,339.00, FOR FAILURE TO PAY DFN ACCOUNT
   4/02/86   4/03/86   0   09 CHEMICAL UNIT

ATKINSON V DSCC, ET AL. (8)
CAUSE: PLAINTIFF WORKED FOR ETHYL CORP., FOR A NUMBER OF YEARS, AND IS SUFFERING FROM LIVER DISEASE ALLEGEDLY CAUSED BY EXPOSURE TO VARIOUS CHLORINATED SOLVENTS, LEAD COMPOUNDS, AROMATIC COMPOUNDS AND OTHER SUBSTANCES.
   DIST CT, HARRIS CTY, TX   12/03/85   0/00/00   0   09 CHEMICAL UNIT

ATWOOD GEORGE VS ETHYL CORP., INCLUD DSC
CAUSE: ALLEGED PERSONAL INJURIES SUSTAINED DUE TO EXPOSURE TO CERTAIN HAZARDOUS CHEMICALS WHICH PRODUCED VARIOUS FORMS OF HAZARDOUS AND TOXIC WASTE INCLUDING HAZARDOUS WASTEWATER RESULTING FROM DEFTS. NEGLIGENCE. SEEKING UNSPECIFD AMT.
   CIR CRT 19TH J.C. MCHENRY ILL   7/23/84   7/23/84   0   09 CHEMICAL UNIT

AZZARELLO ET AL (26) V ALLIED,BEINLER,ET AL (20) V DSCC, ET AL (10)
CAUSE: THIS IS ONE OF SEVERAL RELATED ACTIONS. FIRST NAMED PLAINTIFFS IN OTHER ACTIONS ARE ENDCOTE, CAHILL AND HOWELL. PLAINTIFFS ARE EMPLOYEES OF WESTERN ELECTRIC, KEARNEY, NEW JERSEY PLANT ALLEGING INJURIES IN PROXIMITY TO TOXIC WASTE INCLUDING EXPOSURE VARIOUS CHEMICALS. DIAMOND IS INVOLVED VIA THIRD PARTY ACTIONS BY DISTRIBUTOR BENKER CHEMICAL CO WHO ALLEGEDLY SOLD SOME DIAMOND CHROMIC ACID TO WESTERN ELECTRIC IN THE 1970'S
   5/20/81   0/00/00   0   09 CHEMICAL UNIT

BAILEY WILLIAM V DIAMOND
CAUSE: EXPOSURE COMMENCING APRIL 11, 1985 - PLAINTIFF WORKED FOR A PERIOD OF TIME FROM APRIL 11, 1985 FOR SEA RAY BOATS, INC. IN KNOXVILLE, TN. PLAINTIFF'S JOB WAS TO INSTALL ELECTRICAL WIRING AND HE WORKED IN PROXIMITY TO CARPET INSTALLERS WHO USED BTIX 84 SPRAY ADHESIVE FOR THEIR WORK. PLAINTIFF ALLEGES THAT HE HAS DEVELOPED HEMPTYSIS AND PERMANENT ASTHMA AS A RESULT OF EXPOSURE TO THE VAPORS OF THE ADHESIVE.
   CIRCUIT CT, KNOX CTY, TN   5/07/86   5/08/86   0   09 CHEMICAL UNIT

BAJZEL V DSCC, ET AL. (4)
CAUSE: PLAINTIFF WORKED FOR A NUMBER OF YEARS FOR AK TOOL SERVICE COMPANY IN WILLOUGHBY, OHIO PRIMARILY AS A PLATER, A JOB INVOLVING THE IMMERSION OF METAL INTO A SOLUTION OF CHROMIC ACID AND SULFURIC ACID TO ACHIEVE A CHROME FINISH. PLAINTIFF SUFFERED FROM NOSEBLEEDS AND A PERFORITY OF HIS NASAL TIP ALLEGEDLY CAUSED BY THE EXPOSURE TO CHROMIC ACID AND/OR SULFURIC ACID.
   CT COM PLD, CUYAHOGA CTY, OH   12/09/85   12/12/85   0   09 CHEMICAL UNIT

BAKER V GOLDRUS DRILLING COMPANY, ET AL.
CAUSE: PLAINTIFF'S DECEDENT WAS FATALLY INJURED ON MAY 6, 1982 BY AN EXPLOSION WHICH OCCURRED WHEN HE WAS MIXING SODIUM BICHROMATE AND POTASSIUM HYDROXIDE. DEFENDANTS FAILED TO WARN OF THE EXPLOSIVE NATURE OF THE CHEMICALS WHEN MIXED.
   DIST CT, JEFFERSON CTY, TX   4/05/84   0/00/00   0   09 CHEMICAL UNIT

OCC033380

Confidential
OCCNJ0026823
ALCD-PUBCOM_0002701

LITIGATION SUMMARY LISTING
LITIGATION TRACKING SYSTEM
DIAMOND SHAMROCK CORPORATION

L00200
PAGE: 3

DATE: 8/31/86

| CASE NAME | FORUM | FILE DT | SERV DT | BIB COMPANY |
|---|---|---|---|---|
| BARNA, ET AL V EXXON CORP., ET AL AND DSCC<br>CAUSE: SUIT HAS BEEN FILED NAMING DSCC AS DEFENDANT BUT, WE HAVE NOT BEEN SERVED WITH COMPLAINT. | | 0/00/00 | 0/00/00 | 0   09 CHEMICAL UNIT |
| BEATTY OTTO V8 UNIFLEX ET AL INCL. DSC<br>CAUSE: ALLEGED BREACH OF WARRANTY DUE TO NEGLIGENCE RE DEFECTIVE DESIGN/MANUFACTURE OF BOAT. AMOUNT CLAIMED $9,900.00 PLUS INTEREST AND COSTS. | DRY COMMON PLEAS FRANKLIN CNTY | 5/15/86 | 5/20/86 | 0   09 CHEMICAL UNIT |
| BREKER, DONALD L., ET AL, V8 DSCC<br>CAUSE: PLTF. PURCHASED 32 FOOT VALIANT SAILBOAT AND LATER DISCOVERED BLISTERING ON FIBERGLASS HULL AND DECK. NO DOLLAR AMOUNT SHOWN IN PRAYER | US DIS CT WEST DIST OF WA | 4/19/85 | 4/24/85 | 0   09 CHEMICAL UNIT |
| BRODERICK V DESBBER INDUSTRIES, INC.<br>CAUSE: CLAIM IS BROUGHT BY A FORMER DIAMOND EMPLOYEE WHO WAS SEVERELY BURNED ON 6/7/82 BY HOT LIQUID SODIUM SILICATE WHEN HE OPENED A REACTOR WHICH WAS STILL UNDER PRESSURE. PRESSURE GAUGE MANUFACTURED BY DEFENDANT DESBBER INDUSTRIES INCORRECTLY INDICATED ZERO PRESSURE IN REACTOR. DESBBER CLAIMS FOR CONTRIBUTION AGAINST DIAMOND, AS IS PERMITTED UNDER ILLINOIS LAW, ALLEGING THAT DIAMOND FAILED TO PROPERLY MAINTAIN THE GAUGE, INSTALLED A GAUGE WHICH WAS NOT SUITABLE FOR USE IN A CAUSTIC ENVIRONMENT, AND FAILED TO PROPERLY TRAIN AND SUPERVISE PLAINTIFF IN SAFE WORK PRACTICES. | CIRC CT, COOK COUNTY, ILLINOIS | 5/18/84 | 0/00/00 | 0   09 CHEMICAL UNIT |
| BRICKOR, D. V8. ALLIED CHEMICAL CORP., INCL. DSC<br>CAUSE: SUIT SEEKING $10,000.00, ALLEGING WRONGFUL DEATH CAUSED BY EXPOSURE TO CHROMIC OXIDE AND OTHER PLATING COMPOUNDS. | WESTERN DIST.,TX., SAN ANTONIO | 9/21/84 | 10/04/84 | 0   09 CHEMICAL UNIT |
| BULLOCK, TERRELL V DSCC, ET AL (15)<br>CAUSE: PLAINTIFF WAS EMPLOYED AT THE NAVAL AIR STATION IN ALAMEDA CA BETWEEN 1964- 1981. PLAINTIFF ALLEGES THAT AS A RESULT OF EXPOSURE DURING THIS PERIOD TO 1,1,1-TRICHLOROETHANE, PERCHLOROETHYLENE, EPICHLOROHYDRIN, TORCO RENZME STRIPPER AND OTHER UNSPECIFIED CHEMICALS, HE HAS DEVELOPED RENAL FAILURE AND OTHER UNSPECIFIED ILLNESSES. | SUP. CT, ALAMEDA CITY, CA | 4/17/86 | 5/12/86 | 0   09 CHEMICAL UNIT |
| BURBACK V DIAMOND SHAMROCK, ET AL.<br>CAUSE: PLAINTIFF WAS EMPLOYED BY DEFENDANT VORELIN OPTICAL AS A GLASS INSPECTOR FROM 1968 TO 1974, AND WAS EXPOSED TO CARBON TETRACHLORIDE, PERCHLOROETHYLENE, TRICHLOROETHYLENE AND OTHER CHLORINATED SOLVENTS, ALLEGEDLY AS A RESULT OF SUCH EXPOSURE, PLAINTIFF'S DAUGHTER WAS BORN 6/20/73 WITH SEVERE CEREBRAL DYSFUNCTION | DIST CT DAKOTA COUNTY, MN | 6/18/86 | 6/20/86 | 0   09 CHEMICAL UNIT |

Confidential

OCC033381

OCCNJ0026824

ALCD-PUBCOM_0002702

LITIGATION SUMMARY LISTING
LITIGATION TRACKING SYSTEM
DIAMOND SHAMROCK CORPORATION

L00200
PAGE: 4

DATE: 8/31/86

| CASE NAME | | FORUM | FILE DT | SERVE DT | | | |
|---|---|---|---|---|---|---|---|
| CANDELA, ARNELLI V. DIAMOND SHAMROCK (4) | | SUPREME COURT FOR KINGS COUNTY | 5/09/80 | 0/00/00 | 0 | 09 | CHEMICAL UNIT |
| | CAUSE: PLAINTIFF'S DECEDENT DIED ON 9/6/79 AS A RESULT OF LACERATIONS SUFFERED FROM BROKEN WINDOW GLASS DURING A HURRICANE AT PLAINTIFF'S PLACE OF WORK, WASTE A COMPANY, 7 COMMERCIAL STREET, BROOKLYN, N.Y. PLAINTIFF SEEKS $1,000,000 IN DAMAGES, ALLEGING CAUSES OF ACTION AGAINST THE CITY OF NEW YORK FAILING TO RESPOND TO EMERGENCY CALL FOR FIRST AID AND AMBULANCE (HOME TO CITY'S 911 NUMBER), COMMERCIAL STREET REALTY, OWNER OF BUILDING (FAILURE TO MAINTAIN WINDOW), AND DIAMOND SHAMROCK (ALLEGED ALTER EGO OF COMMERCIAL). | | | | | | |
| CARLISLE, G. V8. BOS BIOTECH CORP, INCL., INC | | HARRIS CNTY.IX 33380 J.DIS.CT. | 10/09/84 | 10/10/84 | 0 | 09 | CHEMICAL UNIT |
| | CAUSE: PLAINTIFF SEEKS $300,000.00 FOR INJURIES SUSTAINED BY PLAINTIFF WHEN THE UPPER HALF OF HIS BODY WAS MARKED BY A CHEMICAL SPILL ALLEGEDLY RESULTING FROM NEGLIGENCE OF DEFENDANT BY ALLOWING A DANGEROUS CONDITION TO EXIST. PLUS COSTS | | | | | | |
| CARREN, D.AZIMMERMANN,F. V8. DSCC | | CIR.CT.ANNE ARUNDEL CNTY.MD | 1/22/85 | 1/28/85 | 0 | 09 | CHEMICAL UNIT |
| | CAUSE: $4,000,000.00 TOTAL DAMAGES FOR COUNTS A THROUGH 9 CLAIMED FOR NEGLIGENCE AND BREACH OF WARRANTY FOR PROVIDING DEFECTIVE FIRE RETARDANT RESIN FOR BUILDINGS | | | | | | |
| CARREN, D., ET AL V8 DSCC | | CIR.CT.ANNE ARUNDEL CNTY.MD | 2/19/85 | 2/25/85 | 0 | 09 | CHEMICAL UNIT |
| | CAUSE: DEMAND FOR A JURY TRIAL. CERTIFICATE OF SERVICE. PLAINTIFF ELECT TO HAVE THEIR CASE TRIED BEFORE A JURY. PLEASE REFER TO SERVICE OF PROCESS TRANSMITTAL DATED 1/22/85 | | | | | | |
| CHAPLIN, GLORIA V8 EXXON COMPANY INCL., DSC | | U8 DIS CR1 SOUTH DIS HORTON | 4/14/85 | 4/17/85 | 0 | 09 | CHEMICAL UNIT |
| | CAUSE: SUIT REGARDING UNSAFE AND ILLEGAL DUMPING AND DISPOSAL OF CONTAMINATED MATERIALS INCL. TOXIC CHEMICALS WASTED IN HARRIS CO., TX. EACH MEMBER OF CLASS SEEKING AMT. TO WHICH THEY ARE JUSTLY ENTITLE PLUS INJUNCTIVE RELIEF TO | | | | | | |
| CHARGE, ET AL V KRAS TOOL V HUBBARD-HALL, CHEN CO   V DSCC, ET AL (3) | | | 12/17/84 | 0/00/00 | 0 | 09 | CHEMICAL UNIT |
| | CAUSE: PLAINTIFF PURCHASED LAND, DRILLED A WELL, AND OPENED AN AUTO BODY SHOP IN LINCOLN CITY, CT IN 1980. IN 1983, IT WAS DETERMINED THAT THE WATER FROM THE WELL WAS CONTAMINATED WITH TRICHLOROETHYLENE AND PLAINTIFF HAD BEEN COMPELLED TO INSTALL A FILTRATION SYSTEM AND MAY BE REQUIRED TO DRILL A NEW WELL. PLAINTIFF HAS SUED THE MANUFACTURING PROPERTY OWNER, A METAL FABRICATING COMPANY, WHICH ALLEGEDLY DUMPED VARIOUS WASTE SOLVENTS ON ITS GROUNDS, FOR DAMAGES IN EXCESS OF $15,000, THE SUPPLIER OF THE SOLVENTS, AND THEIR CORPORATE DISTRIBUTORS, HUBBARD-HALL, INTO THE ACTION, AND HUBBARD-HALL HAS IN TURN IMPLEADED DIAMOND, PPG AND ETHYL, KRAS TOOL ALLEGES THAT HUBBARD-HALL PROVIDED NO INSTRUCTIONS CONCERNING SAFE DISPOSAL OF SOLVENTS. THE COMPLAINT NAMED BLACO-TRI AND BLACO-TINNE AS THE SOLVENTS USED BY KRAS TOOL. | | | | | | |

OCC033382

Confidential

OCCNJ0026825
ALCD-PUBCOM_0002703

DATE: 8/31/86

LITIGATION SUMMARY LISTING
LITIGATION TRACKING SYSTEM
DIAMOND SHAMROCK CORPORATION

L002200
PAGE: 5

CASE NAME

---

**CHERYL, HAYBLETT V. DIAMOND SHAMROCK ET AL (3)**
CAUSE: PLAINTIFF, AN EMPLOYEE OF PIQUA ENGINEERING, INC., ALLEGES THAT AS A RESULT OF EXPOSURE TO TRICHLOROETHYLENE SHE SUFFERED FROM NAUSEA, WEIGHT LOSS, ENLARGED LYMPH NODES (SINCE SURGICALLY REMOVED), AND EMOTIONAL DISTRESS. DIAMOND IS ALLEGED TO HAVE SOLD TCE TO PIQUA ENGINEERING THROUGH GEN CITY CHEMICALS OF DAYTON, OHIO.
COMMON PLEAS CT, MIAMI CITY, OH   8/04/86   8/07/86   0   09 CHEMICAL UNIT

**CHILDERS, H.E. V DSCC ET AL (6)**
CAUSE: PLAINTIFF WAS EMPLOYED BY FIRST TOLEDO CLUTCH AND BRAKE FROM 1961 TO 1983 AND WAS EXPOSED TO VARIOUS DEGREASING CHEMICALS INCLUDING 1,1,1-TRICHLOROETHANE, PERCHLOROETHYLENE AND TRICHLOROETHYLENE. PLAINTIFF CLAIMS THAT THIS EXPOSURE CAUSED HIM TO DEVELOP "CHEMICAL CATARACTS" ON BOTH EYES WHICH HAVE BEEN RENDERED, LEAVING HIM WITH VISION CORRECTIBLE TO 20/40.
CUYAHOGA CNTY, OH., CT, COM PL   2/12/85   2/15/85   0   09 CHEMICAL UNIT

**CLEMONS V DSCC, ET AL (7)**
CAUSE: PLAINTIFF WORKED AT TENNECO PLANT IN NEW JERSEY FROM 1967 TO 1982, AND CLAIMS UNSPECIFIED DAMAGES FOR UNSPECIFIED INJURIES ALLEGEDLY CAUSED BY HIS WORKPLACE EXPOSURE TO CHLOROFORM, METHANOL, XYLENE, TRIMETHYLB, BENZYLCHLORIDE, AND PHOSPHORIC ACID.
BUF CT, MIDDLESEX CITY, NJ   0/00/00   11/18/85   0   09 CHEMICAL UNIT

**COLLINS V DSCC, ET AL**
CAUSE: PLAINTIFF USED SODIUM BICHROMATE, SULFURIC ACID, HYDROFLURIC ACID, PHOSPHORIC ACID AND OTHER CHEMICALS TO CLEAN CONDITIONERS AT THE SAN JOSE, CA PLANT OF ITT-JENNINGS IN 1974-1980. PLAINTIFF ALLEGES THAT EXPOSURE TO CHEMICAL FUMES AND OCCASIONAL CHEMICAL SPLASHES CAUSED A LIP CANCER WHICH WAS SURGICALLY REMOVED IN 1982.
BUF CT, SANTA CLARA CITY, CA   10/20/85   0/00/00   0   09 CHEMICAL UNIT

**COLTON, DOUGLAS ET AL V DSCC**
CAUSE: PLTF. PURCHASED 40 FOOT VALIANT SAILBOAT AND LATER DISCOVERED BLISTERING ON FIBERGLASS HULL AND DECK. NO DOLLAR AMOUNT SHOWN IN PRAYER.
U S DIS CT WEST, DIS WA   6/19/85   6/24/85   0   09 CHEMICAL UNIT

**COOPER, JEANETTE W. VS DSCC**
CAUSE: SUIT SEEKING $3,800,000.00 ETC. FOR WRONGFUL DEATH OF DAVID LEE WEST FEBRUARY 15, 1985 [0-7-85] INTERVENTION PETITION OF UNITED STATES FIDELITY AND GUARANTY COMPANY SEEKING RECOVERY OF $660,473.84 MONIES PAID TO PLAINTIFF FOR WORKERS COMPENSATION BENEFITS AND MEDICAL EXPENSES.
THIRD DIS CRT LINCOLN PARISH   8/08/85   8/12/85   0   09 CHEMICAL UNIT

OCC033383

Confidential

OCCNJ0026826

ALCD-PUBCOM_0002704

DATE: 8/31/86

LITIGATION SUMMARY LISTING
LITIGATION TRACKING SYSTEM
DIAMOND SHAMROCK CORPORATION

L00200
PAGE 6

| CASE NAME | FORUM | FILE.DI | SERVE.DI | DIS COMPANY |
|---|---|---|---|---|
| COMMENTS; UN VB DSCC | US DIS CRT U. DIS OF WASHINGTON 6/19/85 6/24/85 0 09 CHEMICAL UNIT | | | |
| CAUSE1 PLAINTIFF PURCHASED 40 FOOT VALIANT SAILBOAT AND LATER DISCOVERED BLISTERING ON FIBERGLASS HULL AND DECK. NO DOLLAR AMOUNT SHOWN IN PRAYER | | | | |
| COX V DSCC, ET AL (6) | US DIST CT, WESTERN DIST, OK | 0/00/00 | 0 | 09 CHEMICAL UNIT |
| CAUSE1 DIAMOND SOLD DRY CAUSTIC SODA TO NORTH AMERICAN MGB, INC, WHICH NORTH AMERICAN MGB RESOLD TO PLAINTIFF'S EMPLOYER, LITTLE DUSTER DRILLING COMPANY PRIOR TO THE 7/5/81 ACCIDENT. PLAINTIFF WAS MIXING CAUSTIC SODA WITH WATER WHEN CAUSTIC SODA CAME INTO CONTACT WITH INCOMPATIBLE MATERIAL (APPARENTLY PARAFORMALDEHYDE) WHICH WAS AT BOTTOM OF BARREL. BEFORE PLAINTIFF ADDED WATER AND CAUSTIC, WHEN EXPLOSION OCCURRED RESULTING IN SEVERE BURNS TO PLAINTIFF'S BODY AND EYES. PLAINTIFF HAD A SUCCESSFUL CORNEAL TRANSPLANT OPERATION AND HIS VISION IS APPARENTLY SUBSTANTIALLY RESTORED. CO-DEFENDANT CELANESE (MANUFACTURER OF PARAFORMALDEHYDE) HAS PERFORMED TEST WHICH INDICATES THAT EXPLOSIVE REACTION COULD NOT OCCUR BETWEEN CAUSTIC AND FORMALDEHYDE. | | | | |
| DAMES & MOORE VB DIAMOND SHAMROCK CORPORATION | HARRIS COUNTY, TX 165 JUD DIST 4/03/82 4/23/82 C 09 CHEMICAL UNIT | | | |
| CAUSE1 CLAIM FOR EXTRA WORK ALLEGEDLY AUTHORIZED BY DSCC IN COURSE OF ENGINEERING SERVICES PERFORMED AT CASTLE HAYNE CHROME PLANT. BY DSC MAJ DEFAULT FR DSCPE DSC WORK WAS RED ALLEG AUT BY DSC. AND CR INCUR ALLEG NOT PD BY DSC. | | | | |
| DAMLIN, D VB DS CHEMICALS COMPANY | DIST CRT CNTY COLORADO RIO DRA 2/24/85 2/24/85 0 09 CHEMICAL UNIT | | | |
| CAUSE1 PLAINTIFF ALLEGED DEFENDANT MAY HAVE SOME INTEREST IN PROPERTY WHICH HE SEEKS TO QUIET TITLE UH. PLTF. SEEKS DEFENDANTS SET FORTH NATURE OF CLAIM, AND THEN BE BARRED AND ENJOINED FROM ANY FURTHER INTEREST IN PROPERTY PLUS COSTS | | | | |
| DENDINGER V CHRYSLER V DSCC, ET AL (10) | US DIB CT NORTHERN DIS OHIO 4/25/85 5/01/85 0 09 CHEMICAL UNIT | | | |
| CAUSE1 PLAINTIFF WAS EMPLOYED FROM 1968 TO 1980 AT CHRYSLER PLASTICS SANDUSKY, OHIO FACILITY AND HAS CONTRACTED A CANCER WHICH WAS ALLEGEDLY CAUSED BY HIS EXPOSURE TO VCM AND PVC RESIN MANUFACTURED BY ONE OR MORE OF THE TEN PVC MANUFACTURING DEFENDANTS. | | | | |
| DESJARDIEN V. DIAMOND SHAMROCK ET AL. (6) | U.S. DIST. CT., EASTERN DIST OF 4/19/85 4/25/85 0 09 CHEMICAL UNIT | | | |
| CAUSE1 SUIT BY NEIGHBORS OF STRASBURG LANDFILL IN CHESTER COUNTY, PA FOR INJUNCTIVE RELIEF TO ABATE ALLEGEDLY HAZARDOUS CONDITION CREATED BY INFILTRATION OF LANDFILL LEACHATE CONTAINING RESIDUAL VINYL CHLORIDE MONOMER INTO GROUNDWATER SUPPLYING PLAINTIFFS WATER SUPPLY. | | | | |

OCC033384

Confidential

OCCNJ0026827

ALCD-PUBCOM_0002705

LITIGATION SUMMARY LISTING
LITIGATION TRACKING SYSTEM
DIAMOND SHAMROCK CORPORATION

DATE: 8/31/86

L00200
PAGE: 7

**CASE NAME** — **FORUM** — **FILE DE BERNE DE BIB COMPANY**

**DIAMOND SHAMROCK V LAKE UNDERGROUND STORAGE**   CT OF COM PLS, LAKE CITY, OH   0/00/00   0/00/00   0   09 CHEMICAL UNIT

CAUSE:
FORECLOSURE ACTION ON THE 1900+ ACRES IN LAKE COUNTY, OHIO. DEFENDANT HAS COUNTERCLAIMED FOR SPECIFIC PERFORMANCE OF ALLEGED SETTLEMENT AGREEMENT OR, IN THE ALTERNATIVE, FOR COMPENSATORY AND PUNITIVE DAMAGE IN THE AMOUNT OF SOME $60 MILLION.

**DINADOKER, RALPH VS DSC**   214TH JUD DIS CRT NEUCES CNTY   5/15/85   5/20/85   C   09 CHEMICAL UNIT

CAUSE:
PLAINTIFF WAS WORKED IN CLOSE PROXIMITY TO NUMEROUS UNSPECIFIED CHEMICALS MANUFACTURED BY THE 24 CHEMICAL MANUFACTURING DEFENDANTS. PLAINTIFF ALLEGES THAT THESE CHEMICALS WERE UNREASONABLY DANGEROUS AND THAT THEY CAUSED HIM UNSPECIFIED PERSONAL INJURIES DAMAGING HIM IN AN UNSPECIFIED AMOUNT.

**DSCC V CONTINENTAL DISC CORP.**   USDIST CT FOR SOUTH.DIST,TX   1/10/86   1/10/86   0   09 CHEMICAL UNIT

CAUSE:
FAILURE OF RUPTURE DISC MANUFACTURED BY DEFENDANT RESULTING IN DAMAGE AND LOSS OF PRODUCTION AT GREENS BAYOU PLANT

**DSCC V ITC**   DIST CT, HARRIS CITY, TEXAS   8/23/85   8/23/85   0   09 CHEMICAL UNIT

CAUSE:
LIQUID CAUSTIC SODA PRODUCED AT THE DEER PARK PLANT WAS STORED AT DEFENDANT'S TERMINAL WHERE IT WAS CONTAMINATED AND RENDERED UNMARKETABLE. DIAMOND IS CLAIMING DAMAGES IN THE AMOUNT OF $950,000.00 PLUS INTEREST, OF WHICH IT HAS ALREADY RECEIVED PAYMENT IN THE AMOUNT OF $444,000 FROM ITS PROPERTY INSURER, WHICH WILL BE SUBROGATED TO 2/3 OF THE AMOUNT RECOVERED IN THE LITIGATION AGAINST THE TERMINAL OPERATOR.

**DSCC V M/V DINA**   US DIST CT,(HOUST DIV), TX   7/20/84   0/00/00   0   09 CHEMICAL UNIT

CAUSE:
M/V DINA COLLIDED WITH THE DEER PARK CAUSTIC LOADING DOCK ON 7/10/84 AND CAUSED DAMAGE TO DOCK INVOLVING A REPAIR COST IN EXCESS OF $52,700.

**DSCC V WAXLER TOWING**   U.S.DIST CT,SO DIST, TEXAS   0/00/00   0/00/00   0   09 CHEMICAL UNIT

CAUSE:
THE TUGBOAT M/V RAY WAXLER COLLIDED WITH DIAMOND SHAMROCK'S CAUSTIC LOADING DOCK AT THE DEER PARK PLANT ON SEPTEMBER 10, 1983, CAUSING DAMAGE FOR WHICH DIAMOND'S COST OF REPAIR TOTALED $17,905.08

**DSCC V. SUPERIOR ZINC**   BHP CT, NJ, BERGEN CITY   8/14/85   8/14/85   0   09 CHEMICAL UNIT

CAUSE:
PLAINTIFF DSCC IS SEEKING APPROXIMATELY $169,000 PLUS INTEREST AND COSTS OF SUIT IT WAS REQUIRED TO SPEND TO CLEAN UP A SPILL OF ZINC SLUDGE CAUSED BY THE NEGLIGENCE OF DEFENDANT'S TRUCK DRIVER IN FAILING TO PROPERLY CLOSE AND SECURE TAILGATE ON HIS TRUCK AFTER LOADING ZINC SLUDGE, FAILING TO PROPERLY MAINTAIN AND REPAIR THE TRUCK IN QUESTION), SPILL IN QUESTION WAS A BREACH OF DEFENDANT'S CONTRACTUAL RESPONSIBILITY.

OCC033385

Confidential

OCCNJ0026828

ALCD-PUBCOM_0002706

LITIGATION SUMMARY LISTING
LITIGATION TRACKING SYSTEM
DIAMOND SHAMROCK CORPORATION

L00200
PAGE: 8

DATE: 8/31/84

| CASE NAME | FORUM | FILE DT | SERVE DT | BIG COMPANY |
|---|---|---|---|---|

DSCC V. SHEFCO TUBE CORPORATION ET AL.        CIR CT, COLBERT CTY, AL.   4/30/84   4/30/84   0   OY CHEMICAL UNIT

CAUSE: DEFENDANT SUPPLIED 7,500 FEET OF SIX INCH DIAMETER HDPE, PIPE WHICH WAS TO BE USED TO TRANSPORT LIQUID CAUSTIC SODA. ON MAY 22, 1984, THE PIPE RUPTURED, CAUSING DIAMOND COSTS FOR REPLACEMENT OF THE FAILED SECTION, CLEANUP AND BUSINESS INTERRUPTION. DIAMOND CLAIMS THAT THE PIPE WAS NOT MANUFACTURED TO ITS SPECIFICATIONS, AND THAT DEFENDANT'S FAILURE TO MEET THE SPECIFICATIONS CAUSED THE RUPTURE.

DSCC V. WESTERN PLASTICS        NOT YET IN LITIGATION   0/00/00   0/00/00   0   OY CHEMICAL UNIT

CAUSE: CLAIM AGAINST REX GERMAN, OWNER OF WESTERN PLASTICS, ON PERSONAL GUARANTEE OF PAYMENT OF MONIES DUE DIAMOND FROM WESTERN PLASTICS.

EARLEY V DSCC (1)        DIST CT, HARRIS CTY, TX   5/27/84   0/00/00   0   OY CHEMICAL UNIT

CAUSE: PLAINTIFF WAS WORKING AS AN EMPLOYEE OF THERMAL INDUSTRIAL INSULATION AT DIAMOND'S BEER PARK PLANT IN THE EVAPORATOR AREA, SECTION 12 ON 2/22/84 AND SUFFERED A FALL, AS A RESULT OF CERTAIN RAILINGS BEING IN AN UNSAFE CONDITION.

EPSTEIN, SYL ET AL VS MON, ET AL INCL DSC        SUP CRT CALIF CNTY LOS ANGELES   3/08/85   0/00/00   0   OY CHEMICAL UNIT

CAUSE: PLAINTIFF WAS EMPLOYED AS A FILM TECHNICIAN AT MGM LABORATORIES FROM 1952 TO 1982 AND WAS EXPOSED TO TRICHLOROETHYLENE, PERCHLOROETHYLENE AND OTHER SOLVENTS. PLAINTIFF'S DEATH ON 7/3/83 WAS ALLEGEDLY CAUSED BY HIS LONG-TERM EXPOSURE TO SUCH CHEMICALS.

FED LAND BK OF WICHITA VS CARL STRIGGOW ET AL        US DIS CRT DIST OF KANSAS   4/02/85   4/08/85   0   OY CHEMICAL UNIT

CAUSE: NOTICE OF BANKRUPTCY AND ISSUANCEOF AUTOMATIC STAY ORDER

FISHER V DIAMOND SHAMROCK, ET AL. (3)        US DIS CRT WEST, DIS WASH SEAT   9/27/85   1/02/85   0   OY CHEMICAL UNIT

CAUSE:        NO CAUSE ON FILE

FITZSIMMONS, EDWARD V MURRAY INDUS. ET AL DSC        DIST CT, HARRIS CTY, TX   1/21/84   2/24/84   0   OY CHEMICAL UNIT

CAUSE: PLAINTIFF WAS WORKING ON DATE OF ACCIDENT AS A DRIVER FOR HBI TRANSPORTS, DELIVERING A TANK TRUCK OF NAPTHALENE TO CEMENTSAN PLANT. INDEE ATTACHED TO TRUCK FOR UNLOADING BURST LOOSE AND SPRAYED PLAINTIFF WITH HOT NAPTHA. ALLEGEDLY AS A RESULT OF FAULTY DSCC PUMP WHICH DSCC OPERATOR LEFT UNATTENDED.

IN 1979 PLAINTIFF PURCHASED A 40 FOOT VALIANT SAILBOAT, HULL NO. 222. IN 199 ..., THE FIBERGLASS HULL BEGAN TO BLISTER. NO DOLLAR AMOUNT SHOWN.

OCC033386

Confidential

OCCNJ0026829

ALCD-PUBCOM_0002707

LITIGATION SUMMARY LISTING
LITIGATION TRACKING SYSTEM
DIAMOND SHAMROCK CORPORATION

L00200
PAGE: 4

DATE: 8/31/84

| CASE NAME | CLAIM | FILE DT | BERM DT | DIS | DIS COMPANY |
|---|---|---|---|---|---|
| FITZSIMMONS, EDWARD VS MURRAY INDUSTRIES INCL DSC US DIR CMT MEDI DIS MASH BEATT | 9/27/85 | 10/02/85 | 0 | 09 | CHEMICAL UNIT |
| CLAIM: IN 1979 PLAINTIFFS PURCHASED A 40-FOOT VALIANT SAILBOAT, HULL NO. 222., IN 1984, THE FIBERGLASS HULL BEGAN TO BLISTER. NO DOLLAR AMOUNT SHOWN. | | | | | |
| FORDYCE ALLEN O. VS DSC | CAMPBELL CNTY DIST CT 6TH J.D. | 5/16/86 | 6/20/86 | 0 | 09 CHEMICAL UNIT |
| CLAIM: WRONGFUL TRESPASS; JUDGMENT AMOUNT UNSPECIFIED | | | | | |
| FOXCROFT SQ. PAVILLION VS DSCC, ET AL. (5) | COM PLS MONTGOMERY CNTY PA | 5/29/85 | 6/03/85 | 0 | 09 CHEMICAL UNIT |
| CLAIM: AT SOME TIME BETWEEN 4/25/68 AND 4/24/69, URETHANE MANUFACTURED BY THE MPCD DIVISION OF DIAMOND SHAMROCK (THE URETHANE BUSINESS HAVING BEEN ACQUIRED BY DIAMOND IN 1968 WHEN IT ACQUIRED NOPCO AND SOLD BY DIAMOND TO STEPAN CO IN 1972), WAS INSTALLED IN THE CEILING OF THE BENJAMIN FOX PAVILLION, A BUILDING OWNED BY THE PLAINTIFF. ON 4/1/83, A FIRE OCCURRED WHEN ONE OF DIAMOND'S CO-DEFENDANTS IN THIS ACTION WAS ENGAGED IN WELDING WORK IN AND AROUND THE CEILING OF THE BUILDING. PLAINTIFF CLAIMS THAT THE URETHANE WAS AN UNREASONABLY DANGEROUS PRODUCT, SOLD WITHOUT PROPER WARNINGS, ETC. | | | | | |
| FRITTS V BROWN & ROOT, INC AND DIAMOND SHAMROCK | DIST CT, HARRIS CTY, TX | 10/19/84 | 10/22/84 | 0 | 09 CHEMICAL UNIT |
| CLAIM: PLAINTIFF SUFFERED CAUSTIC SODA BURNS TO HIS FEET WHILE WORKING AT BATTLEGROUND PLANT ON 6/25/83 FOR DIAMOND'S CONTRACTOR JERRYCO MACHINE & BUTLER WORKS, INC. | | | | | |
| GARRLAND V CONESTOGA FUELS, DS, ET AL. (5) | CT OF COM PLS, PHILADELPHIA,PA 12/16/84 | | 0/00/00 | 0 | 09 CHEMICAL UNIT |
| CLAIM: DIAMOND SOLD CHLORDIMAX 70 TO E. W. KAUFMAN COMPANY, WHICH RESOLD TO PLAINTIFF'S EMPLOYER, MANNINGTON WORLD INDUSTRIES PRIOR TO 1/24/83 ACCIDENT. PLAINTIFF'S TORSO AND FACE WERE BURNED WHEN A MIXTURE OF TOLUENE AND CHLORDIMAX EXPLODED INSIDE A MIXER TENDED BY PLAINTIFF. | | | | | |
| GEORGE ATMOOR ET AL. (105) V DSCC ET AL. (9) | CIR CT FOR MCHENRY CTY, IL | 7/09/86 | 7/23/86 | 0 | 09 CHEMICAL UNIT |
| CLAIM: PLAINTIFFS CLAIM IMMUNE SYSTEM DYSREGULATION, INJURY TO THEIR CENTRAL NERVOUS SYSTEM, AND CARDIOVASCULAR DAMAGE AS A RESULT OF THE PRESENCE IN THEIR DRINKING WATER OF TRICHLOROETHYLENE, 1,1,1-TRICHLOROETHANE AND PERCHLOROETHYLENE. THESE CHEMICALS WERE ALLEGEDLY PURCHASED FROM DIAMOND, DOW, ETHYL, AND STAFFER BY WAGNER ELECTRIC BRAKE AND CLUTCH, WHICH HAS A PLANT AND DISPOSAL SITE IN THE VICINITY OF PLAINTIFFS' HOMES. | | | | | |
| GERBEN,BOWER,MILLER V DIAMOND SHAMROCK CORP | ST.LOUIS CTY CIR CT, MO | 10/08/81 | 10/19/81 | 0 | 09 CHEMICAL UNIT |
| CLAIM: CLAIM FOR SEPARATION AND UNUSED VACATION PAY AS A RESULT OF THE SALE OF VITEX AMERICAN BUSINESS. PLAINTIFFS CONTINUED THEIR EMPLOYMENT WITH MALLINCKRODT, THE BUYER. | | | | | |

OCC033387

DATE: 8/31/86

LITIGATION SUMMARY LISTING
LITIGATION TRACKING SYSTEM
DIAMOND SHAMROCK CORPORATION

L00200
PAGE: 10

| CASE NAME | FORUM | FILE DT | SERVE DT | BIG COMPANY |
|---|---|---|---|---|
| GRABOWSKI ET AL. V DIAMOND SHAMROCK ET AL (5) | CT OF COMM PLEAS,CUYAHOGA CTY | 3/13/86 | 3/27/86 | 0   OY CHEMICAL UNIT |

CASE: PLAINTIFF WAS EMPLOYED AS A SHEET METAL WORKER INSTALLING HVAC DUCTS AT THE CLEVELAND CLINIC AND WAS USING AN UNIDENTIFIED SOLVENT IN AN UNMARKED CAN ON SCAFFOLDING TO REMOVE GLUE FROM ALUMINUM DUCTS WHEN HE WAS OVERCOME BY THE SOLVENT VAPOR AND FELL 10'. SUFFERING ALLEGELY PERMANENT DISABLING INJURIES. PLAINTIFF ALLEGES THAT THE CHEMICAL INVOLVED WAS METHYLENE CHLORIDE MANUFACTURED BY DIAMOND SHAMROCK AND DISTRIBUTED BY FARLEY CHEMICAL COMPANY AND LIBERTY SOLVENTS UNDER THE TRADE NAME LIBITE.

| CASE NAME | FORUM | FILE DT | SERVE DT | BIG COMPANY |
|---|---|---|---|---|
| GODDARD V DSCC (3) | DIST CT, MUSCATINE, IOWA | 3/22/83 | 0/00/00 | 0   OY CHEMICAL UNIT |

CASE: ON 3/23/81, WHILE EMPLOYED BY LINECHE COMPANY, PLAINTIFF WAS INJURED WHILE USING DIAMOND SHAMROCK CAUSTIC SODA BEADS TO CLEAN THE INSIDE OF A TANK CAR. WHILE MIXING THE CAUSTIC SODA WITH HOT WATER PREVIOUSLY PLACED IN THE TANK CAR, AND WITHOUT WEARING ANY SAFETY CLOTHING, PLAINTIFF WAS BURNED WHEN THE SODA REACTED VIOLENTLY WITH THE WATER. ADDITIONAL DEFENDANTS ARE PLAINTIFF'S SUPERVISOR AND PLANT MANAGER.

| CASE NAME | FORUM | FILE DT | SERVE DT | BIG COMPANY |
|---|---|---|---|---|
| GRIMM V FORD MOTOR, DSCC, ET AL | CIRC CT, MACOMB CTY, MICHIGAN | 8/15/83 | 0/00/00 | C   OY CHEMICAL UNIT |

CASE: PLAINTIFF'S DECEDENT DIED ON 8/18/80 OF BREAST CANCER CONTRACTED WHILE LIVING, FROM 1943-1980, IN THE VICINITY OF FORD'S MT. CLEMENS, MICHIGAN PLANT, AS A RESULT OF EXPOSURE TO VCM M&TB AND FUMES EMANATING FROM PVC RESIN SUPPLIED TO FORD BY DIAMOND AND 9 OTHER PVC MANUFACTURERS.

| CASE NAME | FORUM | FILE DT | SERVE DT | BIG COMPANY |
|---|---|---|---|---|
| GULL COVE ENTERPRISES VS DSC | LAKE COUNTY,OH CY COM. PLEAS | 2/21/85 | 2/25/85 | 0   OY CHEMICAL UNIT |

CASE: ALLEGED BREACH OF CONTRACT. SEEKING A PRELIMINARY AND PERMANENT INJUNCTION ORDERING DEFTS. TO PERFORM THEIR SETTLEMENT AGREEMENT. AMOUNT CLAIMED) $36,000,000. PLUS INTEREST AND COSTS.

| CASE NAME | FORUM | FILE DT | SERVE DT | BIG COMPANY |
|---|---|---|---|---|
| HAERTLING V STONE OIL CO, ET AL | DIST CT, CAMERON PARISH, LA | 9/05/84 | 0/00/00 | 0   OY CHEMICAL UNIT |

CASE: DURING THE COURSE OF EMPLOYMENT ON 9/7/83 PLAINTIFF ALLEGEDLY RECEIVED THIRD DEGREE BURNS OVER HIS BODY WHILE PICKING UP AND REMOVING BAGS ALLEGEDLY CONTAINING CAUSTIC SODA. PLAINTIFF CLAIMING PRODUCTS LIABILITY, PERSONAL INJURY AND NEGLIGENCE.

| CASE NAME | FORUM | FILE DT | SERVE DT | BIG COMPANY |
|---|---|---|---|---|
| HARRINGTON V DIAMOND SHAMROCK | CIR CT, CY LYNCHBURG, VA | 1/26/82 | 0/00/00 | 0   OY CHEMICAL UNIT |

CASE: PVC PELLET COMPOUND SOLD TO HARRINGTON IN 1978 AND 1979 WAS DEFECTIVE RESULT-ING IN FIELD FAILURE OF FREEBNISE FITTINGS MANUFACTURED BY HARRINGTON AND SUBSEQUENT CLAIMS AGAINST HARRINGTON.

OCC033388

Confidential

OCCNJ0026831

ALCD-PUBCOM_0002709

LITIGATION SUMMARY LISTING
LITIGATION TRACKING SYSTEM
DIAMOND SHAMROCK CORPORATION

DATE: 8/31/86

L0D200
PAGE: 11

| CASE NAME | FORUM | FILE DT | SERV DT | BIB COMPANY |
|---|---|---|---|---|

HAVERLETT, CHERYL & FIGHA ENGINEERING

FORUM: NO COMPLAINT

CAUSE: RECEIVED LETTER FROM DEFENDANT ATTORNEY STATING SHE SUSTAINED SEVERE PHYSICAL INJURIES AS A RESULT OF WORKING WITH THE CHEMICAL TRICHLOROETHYLENE, WHICH WAS ALLEGEDLY DISTRIBUTED BY GEN CITY CHEMICAL, INC., A DSCC DISTRIBUTOR

0/00/00    0/00/00    0    0Y CHEMICAL UNIT

HERRING V CONRAIL V DSCC

FORUM: US DIST CT, PHILADELPHIA, PA    8/05/83    0/00/00    0    0Y CHEMICAL UNIT

CAUSE: PLAINTIFF IS A CONTRACTOR EMPLOYED BY CONRAIL. ON JUNE 23, 1983, WHILE WORKING NEAR A SIDETRACK ON THE PROPERTY OF THE DELAWARE CITY PLANT, PLAINTIFF SLIPPED ON CAUSTIC SODA BEADS WHICH HAD SPILLED NEAR THE TRACK, AND HIT HIS HEAD AGAINST A RAILROAD CAR, SUSTAINING A LACERATION TO THE SCALP AND HIS HIB CORROSION, PLAINTIFF HAS CLAIMED AN AMOUNT IN EXCESS OF $50,000 FROM CONRAIL UNDER THE FELA, AND CONRAIL HAS FILED A THIRD PARTY ACTION AGAINST DIAMOND UNDER A COMMON LAW INDEMNITY THEORY.

HO, CHESTER V DIAMOND SHAMROCK ET AL. (23)

FORUM: SUP CT OF LOS ANGELES, CA    2/07/86    3/07/86    0    0Y CHEMICAL UNIT

CAUSE: FROM 1952 TO ABOUT 1985, PLAINTIFF WORKED AS A FILM LABORATORY TECHNICIAN AT TECHNICOLOR, HANDLING TRICHLOROETHYLENE, PERCHLOROETHYLENE, METHYL CHLORO- FORM, AND FORMALDEHYDE. PLAINTIFF CLAIMS HE HAS SUFFERED UNSPECIFIED GRIEVOUS PERSONAL INJURY AS A RESULT OF HIS EXPOSURE TO SUCH CHEMICALS.

HORIZONS INTERNATIONAL, INC. VS FMC CORP INC, INC.

FORUM: U.S. DIST CRT EAST DIST PENN    2/14/86    2/20/86    0    0Y CHEMICAL UNIT

CAUSE: FOR DAMAGES AND INJUNCTIVE RELIEF BY REASON OF THE VIOLATIONS BY SAID DEFENDANTS OF THE ANTITRUST LAWS OF THE UNITED STATES.

HUGO ALAN HAERTLING VS STONE OIL COMPANY ET AL DSC 3B JUD DIS CRT PAR. CAMERON LA 10/10/85 10/10/85    0    0Y CHEMICAL UNIT

CAUSE: ANSWER AND CROSS CLAIM OF STONE PETROLEUM CORPORATION SEEKING INDEMNIFICATION IN EVENT OF AWARD IN FAVOR OF PLAINTIFF IN MAIN DEMAND, ALTERNATIVELY FOR CONTRIBUTION

HULL, FRANK, VS, UNIFLITE, INC., INCL, DSC

FORUM: US DIS CT, WESTERN WASHINGTON    5/20/85    5/23/85    0    0Y CHEMICAL UNIT

CAUSE: BREACH OF CONTRACT, FRAUD, MISREPRESENTATION, BREACH OF WARRANTIES, VIOLATION OF WASHINGTON RICO, ETC. RE: HULL AND DECK OF VALIANT 40 BEGAN TO CRACK AND BLISTER. NO DOLLAR AMOUNT SHOWN IN ANSWER

HUNTER, J.R., VS, DIAMOND SHAMROCK CORP.

FORUM: HARRIS CNTY, TX, 165TH DIS, CT    2/15/85    2/19/85    0    0Y CHEMICAL UNIT

CAUSE: PLAINTIFF WAS EMPLOYED, APPARENTLY BY AN INDEPENDENT CONTRACTOR, AT DEER PARK ON 11/16/84 AND WAS IN THE PROCESS OF CONSTRUCTING SCAFFOLDING WITHIN A TANK WHEN HE SLIPPED AND FELL, DUE TO INADEQUATE LIGHTING AND VENTILATION, AND SLIPPERY CONDITIONS. PLAINTIFF ALLEGES SERIOUS BODILY INJURIES, INCLUDING LACERATIONS TO HIS LEFT ARM.

OCC033389

Confidential

OCCNJ0026832
ALCD-PUBCOM_0002710

LITIGATION SUMMARY LISTING
LITIGATION TRACKING SYSTEM
DIAMOND SHAMROCK CORPORATION

DATE: 8/31/86

L00200
PAGE: 12

CASE NAME | FORUM | FILE DT | SERV DT | BIG COMPANY

INTERCONTINENTAL CHEM SERVICES, INC., V DSCC
CASE: AMERICAN ARBITRATION, DALLAS   8/08/86   8/08/86   0   OY CHEMICAL UNIT
PLAINTIFF'S TERMINAL SERVICES AGREEMENT WITH DSCC DATED 6/1/84 PROVIDED FOR A FIVE-YEAR EXTENSION OF THE AGREEMENT FROM 10/1/86 TO 9/30/91 UNLESS DSCC GAVE PLAINTIFF NOTICE OF TERMINATION ON OR BEFORE 3/31/86. DSCC AND PLAINTIFF AGREED IN WRITING TO EXTEND THE TERMINATION DEADLINE TO 4/30/86 TO PERMIT DSCC TO REVIEW BIDS FROM SEVERAL PARTIES. PLAINTIFF CLAIMS THAT ITS AGREEMENT TO EXTEND DEADLINE WAS CONDITIONED ON DSCC'S PROMISE TO REVIEW ALTERNATIVE BIDS WITH PLAINTIFF, DSCC DENIES THIS CONDITION, AND TERMINATED CONTRACT ON 4/39/86. PLAINTIFF CLAIMS LOST PROFITS UNDER EXISTING CONTRACT FOR PERIOD 1986-1991, TOTALLING UP TO $600,000, ACCORDING TO DSCC'S ESTIMATE.

JAMROSKI V DSCC, ET AL. (2)
CASE: US DIST CT, WEST DIST, OK   9/03/84   0/00/00   0   OY CHEMICAL UNIT
DIAMOND'S CAUSTIC SODA BEADS "KRIPPED", STRIKING PLAINTIFF IN THE FACE AND CAUSING SEVERE INJURIES, INCLUDING CORNEAL SCARRING AND PERMANENT LOSS OF VISION, AFTER PLAINTIFF OPENED A 100LB POLYETHYLENE BAG CONTAINING THE BEADS BY USING A SCREWDRIVER AND PULLING THE BAG APART. PLAINTIFF HAS SUED DIAMOND AND THE BAG MANUFACTURER, CLAIMING THAT THE BAG WAS DESIGNED AND CONTAINED NO INSTRUCTIONS FOR SAFE OPENING.

JENKINS, MARY V DEKLITE INTERNATIONAL LIMITED
CASE: WRONGFUL DEATH CASE -- BEING HANDLED FROM LONDON   0/00/00   0/00/00   0   OY CHEMICAL UNIT

JOHNSON V DSC
CASE: 11TH AND DIST CT,HARRIS CTY,TX   2/07/86   3/12/86   0   OY CHEMICAL UNIT
WRONGFUL TERMINATION OF EMPLOYMENT, SLANDER, AND LIBEL.

JONES, STACY A. VS. CRAIG DEVELOPMENT CORP.
CASE: BLP CRT CALIF COUNTY OF ORANGE   2/24/85   3/14/85   0   OY CHEMICAL UNIT
PROPERTY OWNERS IN CALIFORNIA SUED DEVELOPER AND PREVIOUS OWNERS FOR DAMAGE CAUSED BY ALLEGEDLY INADEQUATE DESIGN AND MAINTENANCE OF EROSION CONTROLS. DSCC ACQUIRED PROPERTY FOR SHORT PERIOD FROM TRANSFERRING EMPLOYEE.

KAUFMANN, ET AL VS DSC
CASE: US CIR CT DIST MARYLAND   5/07/85   5/13/85   0   OY CHEMICAL UNIT
BURNS AND COMPLAINT

KENNEY, J.F., VS. SCIENTIFIC, INC., INCL, DSC
CASE: MIDDLESEX CNTY, SUP. CT. N.J   9/28/84   10/04/84   0   OY CHEMICAL UNIT
PLAINTIFFS LIVE IN THE VICINITY OF THE KIN-BUC LANDFILL IN EDISON, NEW JERSEY AND ARE BRING ALL GENERATORS OF INDUSTRIAL WASTE DISPOSED AT THE LANDFILL, ALONG WITH THE OWNERS AND OPERATORS OF THE LANDFILL FOR VARIOUS ILLNESSES AND FOR REDUCTION IN PROPERTY VALUES CAUSED BY IMPROPER DISPOSAL PRACTICES.

OCC033390

Confidential

OCCNJ0026833

ALCD-PUBCOM_0002711

LITIGATION SUMMARY LISTING
LITIGATION TRACKING SYSTEM
DIAMOND SHAMROCK CORPORATION

DATE: 8/31/86

L00200
PAGE: 13

| CASE NAME | FILED | FILE DT | SERV DT | DIS COMPANY |
|---|---|---|---|---|

KLINGENMAIER, HERMAN VS. UNIFLITE INC., INC, DSC  US DIS CT WESTERN WASHINGTON  5/21/85  5/24/85  0  09 CHEMICAL UNIT
CAUSE: BREACH OF CONTRACT, FRAUD, MISREPRESENTATION, BREACH OF WARRANTIES, VIOLATION
OF MAGNUSON MOSS WARRANTY ACT, ETC. REI HULL AND DECK OF VALIANT 40 BEGUN TO
CRACK AND BLISTER. NO DOLLAR AMOUNT SHOWN IN PRAYER

KREML V, DSC  U.S. DIST. CT, NO ILLINOIS  2/18/86  3/05/86  0  09 CHEMICAL UNIT
CAUSE: ACTION ALLEGING FRAUD AND MISREPRESENTATION DEPRIVING KREML OF BENEFITS OF
EARLY RETIREMENT PROGRAM, MISREPRESENTATION OF ABAD AND GROUP
INSURANCE BENEFITS

KUBAL, R. VS. UNIFLITE,ET AL IN. DSC  BROWARD CNTY.CT.FLORIDA  10/23/84  10/29/84  0  09 CHEMICAL UNIT
PLTF@: BKEX IN EXCESS OF $5,000.00 PLUS INTEREST AND COSTS ALLEGING NEGLIGENCE
CAUSE: DEFECTIVE RESULTING IN FIELD FAILURES OF FRESBUE FITTINGS MANUFACTURED BY A
IN THE MANUFACTURE OF CERTAIN FIRE RETARDANT RESIN USED IN THE MANUFACTURE OF
CERTAIN VESSEL UNIFLITE 37' (NRF0739P49PJ-J-CC03) WHICH WAS DEFECTIVE
WHICH CAUSED VESSEL TO CRACK AND BLISTER

LARGO DIV (PHILLIPS INDS) V DSC  BKP CT, CTY OF FL, CA  11/27/83  0/00/00  0  09 CHEMICAL UNIT
CAUSE: PVC PELLET COMPOUND SOLD BY DIAMOND TO PLAINTIFF BETWEEN 1979 AND 1981 WAS
DEFECTIVE
PLAINTIFF AND SUBSEQUENT CLAIMS AGAINST PLAINTIFF.

LEE V DSCC, ET AL (10)  CIRCUIT COURT,WAYNE CTY, MI  4/18/84  0/00/00  0  09 CHEMICAL UNIT
CAUSE: PLAINTIFFS DECEDENT WAS EMPLOYED AS AN INSPECTOR IN FORD'S VINYL PLANT AT
MT. CLEMENS, MICHIGAN FROM  THROUGH HIS DEATH ON 5/8/83 FROM
GRANULOCYTIC LEUKEMIA, ALLEGEDLY RESULTING FROM EXPOSURE TO THE TEN
MANUFACTURING DEFENDANTS' PVC RESIN SOLD TO FORD. PLAINTIFF DEMANDS $5
MILLION IN PUNITIVE DAMAGES.

LILLEY ANNA M. VS DSC ET AL.  U.S. DIST. CRT EAST DIS N.Y.  7/03/85  0/00/00  0  09 CHEMICAL UNIT
CAUSE: ANNA LILLEY SUES ON BEHALF OF HER DECEASED HUSBAND, JOHN LILLEY, A VIETNAM
VETERAN WHO WAS EXPOSED TO THE HERBICIDE AGENT ORANGE WHILE HE WAS IN VIETNAM

LIPATREU; BABETTE VS. FARNAM CO. INCL. DSCC  DIS CNT CNTY DENVER COLORADO  7/17/85  7/23/85  0  09 CHEMICAL UNIT
CAUSE: PLAINTIFF ALLEGES DEFENDANT NEGLIGENCE IN WARNING OF POTENTIAL INJURIES TO
ANIMALS ON CERTAIN PRODUCTS RESULTED IN DAMAGES.

LOPEZ SANTIAGO V CHEVRON ET AL INCL. DSCC  SUP CRT OF CALIF CNTY VENTURA  1/07/86  1/20/86  0  09 CHEMICAL UNIT
CAUSE: PLAINTIFF ALLEGES THAT HE SUSTAINED PERSONAL INJURIES DUE TO EXPOSURE TO VARIO
US CHEMICALS INCLUDING DACTHAL AND BRAVO DURING THE PERIOD COMMENCING MARCH
1979 THROUGH DECEMBER 1984

OCC033391

LITIGATION SUMMARY LISTING
LITIGATION TRACKING SYSTEM
DIAMOND SHAMROCK CORPORATION

LSR2200
PAGE: 14

DATE: 8/31/84

FORM

| CASE NAME | FILE.DT SERVE.DT SETD COMPANY |
|---|---|

**LUND, R.E., ET AL VS DSCC**
CASE: BREACH OF CONTRACT REI VALIANT 40 SAILBOAT NO DOLLAR AMOUNT SHOWN IN PRAYER
U. DIST. OF WA., US. DIST. CT. 1/07/85 1/14/85 0 0Y CHEMICAL UNIT

**MAKEIROS, LYDIA VS DIAMOND SHAMROCK**
WORKERS COMP. APPEALS BOARD 3/18/85 3/19/85 0 0Y CHEMICAL UNIT
CASE: TO THE CUSTODIAN OF RECORDS OF DIAMOND SHAMROCK CHEMICALS COMPANY YOU ARE
HEREBY COMMANDED TO APPEAR BEFORE A NOTARY PUBLIC AT EIGHMAN ATTORNEY SERVICE
449 15TH ST., STE 103, OAKLAND, CA 94612 ON 4/12/85 AT 10:00 A.M., AND PRODUCE
THE FOLLOWING RECORDS AS DESCRIBED IN THE ATTACHED EXHIBIT

**MAGUIRE,C.W. VS. W.R.GRACE & DSC**
U.S.DIST.CT., N.JERSEY 10/15/84 10/29/84 0 0Y CHEMICAL UNIT
CASE: WRONGFUL TERMINATION, INTERFERENCE WITH CONTRACTUAL RELATIONS, CIVIL
CONSPIRACY, ARISING OUT OF MAGUIRE'S TERMINATION AS GENERAL MANAGER OF FCD

**MASTERS, RICHARD VS HATFIELD TERMINALS INC., DSC**
US DIST. CRT., EST. DIST KY 2/25/85 3/01/85 0 0Y CHEMICAL UNIT
CASE: ALLEGED NEGLIGENCE RESULTING IN PERSONAL INJURIES. AMOUNT CLAIMED
$300,000.00

**MCKELLAR V DSCC, ET AL (2)**
BUF CT., HUDSON CTY, NJ 9/28/83 0/00/00 0 0Y CHEMICAL UNIT
CASE: PLAINTIFF WORKED AT MAXWELL HOUSE (GENERAL FOODS) FROM 1944 TO 1983. FROM
1977 TO 1981, HE WORKED AS AN EVAPORATOR OPERATOR, USING A HEATING AND
EVAPORATING PROCESS TO REMOVE METHYLENE CHLORIDE FROM WASTEWATER PRIOR TO
DISCHARGE OF THE WATER INTO THE SEWER SYSTEM. ON 1/12/81, A RELIEF VALVE
FAILED AND PLAINTIFF WAS DRENCHED WITH A SOLUTION OF METHYLENE CHLORIDE WHILE
ATTEMPTING TO REMOVE A CLOGGED FILTER. PLAINTIFF CLAIMS THAT AS A RESULT OF
THIS INCIDENT, AND AS A RESULT OF GENERAL EXPOSURE TO METHYLENE CHLORIDE, HE
WAS COMPELLED TO RETIRE AT AGE 60 IN 1983 DUE TO CORONARY DISABILITY.

**MCMILLION, JOHN V, DS (2)**
CINC CT., KANAWHA CTY, W VA 5/21/80 0/00/00 0 0Y CHEMICAL UNIT
CASE: ON 12/17/79, IN BELLE, WEST VIRGINIA, PLAINTIFF WAS INJURED WHILE TRAVERSING A
RAILROAD CROSSING UPONSITE THE BELLE PLANT. THE CROSSING WAS UNDERGOING
REPAIRS BY DIAMOND'S CONTRACTOR AND/OR DEFENDANT, LAND AND TIMBER DEVELOPMENT
COMPANY. PLAINTIFF CLAIMS THAT THE CROSSING WAS POORLY LIT, AND
DEMANDS $100M IN COMPENSATORY DAMAGES.

**MENGCE V DIAMOND SHAMROCK, ET AL (26)**
BUF CT., PASSAIC CTY, NJ 3/12/86 4/03/86 0 0Y CHEMICAL UNIT
CASE: PLAINTIFF'S DECEASED HUSBAND WAS EMPLOYED BY FANTADOTE, WAS ALLEGEDLY EXPOSED
TO VINYL CHLORIDE MANUFACTURED BY THE 26 DEFENDANT PVC MANUFACTURERS, AND DIED
OF ANGIOSARCOMA OF THE LIVER ALLEGEDLY AS A RESULT OF SUCH EXPOSURE

OCC033392

OCCNJ0026835
ALCD-PUBCOM_0002713

Confidential

LITIGATION SUMMARY LISTING
LITIGATION TRACKING SYSTEM
DIAMOND SHAMROCK CORPORATION

DATE: 8/31/86

LDC0200
PAGE: 15

| CASE NAME | FORUM | FILE.DT | SERVE.DT | BIG COMPANY |
|---|---|---|---|---|
| **MERCY SAN JUAN HOSP. VS DSCC**<br>CAUSE: HOSPITAL INCURRED MORE IN LAUNDRY COSTS THAN ALLEGELY GUARANTEED BY DSCC. | SUP.CT CALIF, CNTY:SACRAMENTO | 10/09/84 | 10/17/84 | C 09 CHEMICAL UNIT |
| **MERLER V DSCC, ET AL (2)**<br>CAUSE: PLAINTIFF WAS WORKING IN THE DEER PARK PLANT ON MARCH 24, 1982 AS AN EMPLOYEE OF A CONTRACTOR, COMMERCIAL BIDING & MAINTENANCE COMPANY, WHEN HE FELL FROM A SCAFFOLD. PLAINTIFF CLAIMS THE SCAFFOLD WAS DEFECTIVE AND THAT HE ASKED FOR, AND WAS REFUSED, A SAFETY LINE PRIOR TO THE ACCIDENT. INJURIES ARE NOT SPECIFIED. | US DIST CT, SO DIST, TX | 3/02/84 | 0/00/00 | C 09 CHEMICAL UNIT |
| **MEYER, PAUL, & LEONA V DSCC, ET AL (3)**<br>CAUSE: PLAINTIFF, EMPLOYEE OF TRIANGLE PWG, ALLEGELY SUFFERED SECOND DEGREE BURNS OVER 29% OF HIS BODY WHEN FILLING TANK WITH SULFURIC ACID. | CIRT CT, MARSHALL CTY, W VA | 4/08/83 | 0/00/00 | C 09 CHEMICAL UNIT |
| **MID-LAKES, ET AL VS. DSCC**<br>CAUSE: JEROME BICHINGER ALLEGED THAT, ACHERIDAN, IDENTIFIED AS 240 WAS DEFECTIVE WHEN SOLD BY MID-LAKES FE COOPERATIVE, ... ALLEGING THAT SAID CHEMICAL WAS DEFECTIVELY MANUFACTURED BY THIRD PARTY DEFT., DIAMOND SHAMROCK COMPANY | CIR.CT.MONTIODGC CNTY.WI | 1/23/85 | 1/28/85 | C 09 CHEMICAL UNIT |
| **MOORE, ELIZABETH VS VELSICOL CHEMICAL CORP**<br>CAUSE: YOU ARE COMMANDED TO APPEAR TO TESTIFY AT CERTIFIED COURT REPORTERS, 950 CITIZENS BLDG., 850 EUCLID AVENUE, CLEVELAND, OHIO AND BRING WITH YOU ALL DOCUMENTS SET FORTH ON "EXHIBIT A" | CIR.CT.(MONTIODGC CNTY.WI) | 3/07/85 | 3/12/85 | C 09 CHEMICAL UNIT |
| **MORLEY V DSCC ET AL (30)**<br>CAUSE: PLAINTIFF WAS CONTRACTED ADENO-CARCINOMA ALLEGELY RESULTING FROM DCCLFA-CHEMICAL,B. PLAINTIFF WORKED IN A NEW ORLEANS COFFEE PLANT FROM 1945 TO MAY, 1984 AND WAS EXPOSED 7 MCL SUPPLIERS. | DIST CT PARISH OF ORLEANS LA | 2/20/84 | 3/06/84 | 0 09 CHEMICAL UNIT |
| **MORB, ARTHUR VS. DIAMOND SHAMROCK CORPORATION**<br>CAUSE: ALLEGED NEGLIGENCE RESULTING IN PERSONAL INJURIES | SUP CRT CALIF CNTY ALAMEDA | 10/04/85 | 10/14/85 | 0 09 CHEMICAL UNIT |
| **HYLAND V DSCC, ET AL (17)**<br>CAUSE: ON 10/20/80 PLAINTIFF, A MINOR CHILD, WAS EXPOSED TO A DIAMOND SHAMROCK CONTAINING COMPOUND (HELD BY DEFENDANT FOLYCAP OF CALIFORNIA IN THE COURSE OF FOLYCAP'S SPRAYING OF FATHERS) AND FOLYURETHANE FOAM ON THE ROOF OF LONGAGDO SCHOOL IN HAYWARD, CA. PLAINTIFF SUFFERED DERMATITIS, AND IRRITATION TO HIS EYES AND LUNGS AS A RESULT OF EXPOSURE TO DIAMOND'S AND THE NUMEROUS OTHER DEFENDANTS CHEMICALS. | SUP. CT, ALAMEDA CITY, CA | 4/30/82 | 0/00/00 | 0 09 CHEMICAL UNIT |

OCC033393

Confidential

DATE: 8/31/86

LITIGATION SUMMARY LISTING
LITIGATION TRACKING SYSTEM
DIAMOND SHAMROCK CORPORATION

LG02200
PAGE: 16

**CASE NAME**     **FILE DT**    **SERVE DT**    **BIG COMPANY**

DCYPONE, INC., ET AL. VS DSCC    US DIS CT WESTERN DIS WA   4/19/85   4/24/85   0 09 CHEMICAL UNIT
CAUSE: PLTF. PURCHASED 40 FOOT VALIANT RAILROAD AND LATER DISCOVERED BLISTERING
FIBERGLAS HULL AND DECK. NO DOLLAR AMOUNT SHOWN IN PRAYER

ODELTREE V DSCC, ET AL. (B)    BUP CT, CAMDEN CITY, NJ   7/08/82   0/00/00   0 09 CHEMICAL UNIT
CAUSE: PLAINTIFF'S DECEDENT WORKED AS A PUNCH PRESS OPERATOR FROM 5/27/65 TO 11/17/79
ALLEGEDLY AS A RESULT OF EXPOSURE TO TCE, MR. ODELTREE DEVELOPED CANCER OF THE
LUNGS, SPINE, AND LIVER WHICH CAUSED HIS DEATH. PLAINTIFF WAS DIAGNOSED 11/14/79 AND OF WHICH HE DIED ON
11/17/80 AT AGE 44. PLAINTIFF WAS SUED DIAMOND, F45 AND HOOKER, AS WELL AS
MR. ODELTREE'S EMPLOYER, AND TCE DISTRIBUTOR. DIAMOND SOLD FOUR DRUMS OF TCE
TO DISTRIBUTOR IN 1969.

PADDOCK POOL EQUIPMENT COMPANY V DSCC   GEN CRT MECKLENBURG CNTY, NC   10/04/85   10/08/85   0 09 CHEMICAL UNIT
CAUSE: TO RECOVER $25,104.00 FOR DEIONIZATION SYSTEM PURCHASED 1/85 WHICH DID NOT
OPERATE TO MEET PLAINTIFFS NEEDS

PADDOCK POOL V DSCC      10/01/85   10/08/85   0 09 CHEMICAL UNIT
CAUSE: PLAINTIFF ALLEGES DSCC OWES $25,104.00 TO PLTF WHITE WATER CONDITIONING CO.
(A DIVISION OF PADDOCK POOL) FOR DEIONIZATION SYSTEM WHICH DSCC FEELS DID NOT
OPERATE TO MEET OUR NEEDS AND WITH CONTRACTED SPECIFICATIONS

PALOZOLA V DSCC    CIR CT, ST LOUIS CITY, MO   7/27/84   0/00/00   0 09 CHEMICAL UNIT
CAUSE: PLAINTIFF WAS FATALLY OVERCOME ON 7/29/81 BY METHLENE CHLORIDE FUMES WHILE
USING HC TO CLEAN VINYL FLASTISOL OFF THE WALLS OF AN 8' X 4' TANK.

PARILLO, RAYMOND V. DIAMOND SHAMROCK ET AL. (CA)   SUP CT FOR LOS ANGELES CTY, CA   11/09/84   3/11/86   0 09 CHEMICAL UNIT
CAUSE: PLAINTIFF WORKED AS A FILM LAB TECHNICIAN AT DEFENDANT MGM LABORATORIES
BETWEEN 1964 AND 1983, AND IS CURRENTLY SUFFERING FROM MALIGNANT LYMPHOMA,
RESTRICTIVE LUNG DISEASE AND TOXIC ENCEPHALO PATHY ALLEGEDLY CAUSED BY
OCCUPATIONAL EXPOSURE TO BENZENE, TRICHLOROETHYLENE, PERCHLOROETHYLENE, METHYL
CHLOROFORM AND FORMALDEHYDE.

PFIZER INC. VS. FALEK Photos, PS INTERNATIONAL   CIR CT FIRST INSTANCE OF B4088   5/06/86   5/06/86   0 09 CHEMICAL UNIT
CAUSE: THE DEFENDANT CONTENDS ON THE OTHER HAND THAT THE SHOULD HAVE BEEN GUILTY OF
INFRINGEMENT FOR THE SALES TO THE FALECH COMPANIES STRONA, SEVRA, AND BEANO AND
TO THE RUSLH COMPANY HENDRIX VOEZAIS ON THE GROUND THAT THE PRODUCT WAS NOT
ACTUALLY (OR HELUIAM TERRITORY, THE DELIVERIES AT THE OUTSET HAVING BEEN EFFECT
ED FROM A STOCK LOCATED IN ROTTEROAM

OCC033394

Confidential

OCCNJ0026837

ALCD-PUBCOM_0002715

LITIGATION SUMMARY LISTING
LITIGATION TRACKING SYSTEM
DIAMOND SHAMROCK CORPORATION

DATE: 8/31/86

L00200
PAGE: 17

| CASE NAME | FORUM | FILE DI | SERVE DI | DIS | BTR | COMPANY |
|---|---|---|---|---|---|---|
| POLETTI V DSCC (2) V FULLER COMPANY (2) | SUP CT, HUDSON CTY, NJ | 11/22/82 | 0/00/00 | 0 | 09 | CHEMICAL UNIT |

CAUSE: PLAINTIFF CLAIMS ACUTE EXPOSURE TO METHYLENE CHLORIDE WHILE WORKING AT MAXWELL HOUSE ON 11/17/80, AS THE RESULT OF A MALFUNCTIONING ROTATING DISC COLUMN. DIAMOND WAS IMPLEADED MANUFACTURER OF MALFUNCTIONING EQUIPMENT

| POSEY V DSCC | CT COMM PLEAS FRANKLIN CTY OH | 2/27/86 | 3/05/86 | 0 | 09 | CHEMICAL UNIT |

CAUSE: PLAINTIFF WORKED AS A CHRONIC ACID OPERATOR AT PAINESVILLE PLANT FROM 1952 TO 1974 AND HAS DEVELOPED SMALL CELL CARCINOMA OF THE LUNG ALLEGEDLY AS A RESULT OF EXPOSURE TO CHROMIC ACID FUMES. PLAINTIFF'S ACTION BASED ON BLANKENSHIP DOCTRINE.

| PRUDENTIAL INS. CO. V. JAMES NELSON & DSC | DIST.CT. SALINE CNTY, KS | 10/15/84 | 10/19/84 | 0 | 09 | CHEMICAL UNIT |

CAUSE: DISCLAIMER OF INTEREST OF DEFT., THE FARMERS UNION ELEVATOR COMPANY OF LINDSBORG, KANSAS

| RAMOS V DSCC, ET AL. (7) | CT OF COM PLS, CUYAHOGA CTY,OH | 2/05/85 | 0/00/00 | 0 | 09 | CHEMICAL UNIT |

CAUSE: PLAINTIFF'S DECEDENT WAS EMPLOYED AS A MACHINIST FOR 34 YEARS AND HIS EXPOSURE TO PERCHLORETHYLENE DURING THAT TIME PERIOD ALLEGEDLY CAUSED CANCER OF THE LIVER WHICH WAS DIAGNOSED IN AUGUST 1983 AND RESULTED IN DECEDENT'S DEATH ON SEPTEMBER 9, 1983.

| REED, WALLACE B., ET AL V8 DSCC | US DIS CT W. DIS WASHINGTON | 4/19/85 | 4/24/85 | 0 | 09 | CHEMICAL UNIT |

CAUSE: PLTF. PURCHASED 40 FOOT VALIANT SAILBOAT AND LATER DISCOVERED BLISTERING ON FIBERGLAS HULL AND DECK. NO DOLLAR AMOUNT SHOWN IN PRAYER

| RANDY, DON F. V. DSCC | HARRIS CTY, DIST. CT., TX | 3/27/80 | 4/25/80 | 0 | 09 | CHEMICAL UNIT |

CAUSE: ALLEGED VIOLATION OF TX STATUTE ART. 8307C-WORKMENS DISCHARGE FOR FILING WORKER'S COMP. CLAIM

| RICH SUPPLY HOUSE V8, DSC | US. BNK.CT.N. DIST.ILL | 10/04/84 | 10/17/84 | 0 | 09 | CHEMICAL UNIT |

CAUSE: TRUSTEE/PLTF, FRANK FORESHER AVOIDING TRANSFER OF THE PREFERENTIAL PAYMENT IN THE SUM OF $4,000 MADE TO DIAMONDSHAMROCK, ENTER JUDGEMENT DIAMOND SHAMROCK IN AN AMOUNT TO SAID PREFERENTIAL PAYMENT; ALLEGES THE TRANSFER OF SAID PREFERENTIAL PAYMENT CONSTITUTES A PREFERENCE PURSUANT TO SECTION 547 (B)OF THE U.S. BANKRUPTCY CODE AND IS VOIDABLE BY THE TRUSTEE

| SHREVE, ALICE EXEC. V8 DSC | CUYAHOGA CNTY COM PLEAS | 7/18/83 | 7/20/83 | 0 | 09 | CHEMICAL UNIT |

CAUSE: HAZARDOUS LEVELS OF CHROMATE USE AND/OR CHEMICAL DERIVATIVES OF CHROMATE USE HUSBAND, FRANK SHREVE, WHO WAS EMPLOYED AT DSCC'S PLANT IN PAINESVILLE DURING THE YEARS 1950-1974 AND WHERE HE WAS REGULARLY AND CONTINUOUSLY EXPOSED TO

OCC033395

Confidential

DATE: 8/31/86

LITIGATION SUMMARY LISTING
LITIGATION TRACKING SYSTEM
DIAMOND SHAMROCK CORPORATION

LOG200
PAGE: 18

**CASE NAME**

**SMITH, KAREN V DSCC, ET AL (78)**
BEGIN: US DIST CT, EAST DEPT, TX
FILE.DT 9/05/85   SERVE.DT 0/00/00   BIS COMPANY 09 CHEMICAL UNIT
CAUSE: PLAINTIFF'S DECEDENT WAS EMPLOYED BY FORT IRWIN OF FORT ARTHUR, TX AS A DRUM
CLEANER AND INSPECTOR FROM 1949 TO 1983. HE DIED OF CANCER ON 9/5/83,
ALLEGEDLY AS A RESULT OF EXPOSURE TO PETROLEUM PRODUCTS, PESTICIDES AND
ADDITIVES WHICH ARE NOT SPECIFIED IN THE COMPLAINT.

**SMITH, M., ET AL VS DSCC**
BEGIN: CITY ST.LOUIS,MO.,DIV.1
FILE.DT 12/21/84   SERVE.DT 12/27/84   C   09 CHEMICAL UNIT
CAUSE: PLAINTIFF LOST SIGHT IN RIGHT EYE WHEN DETERGENT FOR ALLEGEDLY DESIGNED BY DSC
AND CONTAINING DSCC ALKALINE CHEMICAL BURST OPEN AND SPRAYED CHEMICAL ON
PLAINTIFF.

**SMITH, PAUL V DSCC, ET AL (20)**
BEGIN: SUP CT, CTY OF LOS ANGELES, CA
FILE.DT 7/08/83   SERVE.DT 0/00/00   O   09 CHEMICAL UNIT
CAUSE: PLAINTIFF WAS EMPLOYED AS A FILM TECHNICIAN AT MGM LABORATORIES FROM 9/5/72
THROUGH 8/12/80 AND WAS EXPOSED TO TRICHLOROETHYLENE, PERCHLOROETHYLENE, METHYL
CHLOROFORM AND OTHER SOLVENTS. PLAINTIFF WAS SATURATED WITH ONE OR MORE OF
THESE SOLVENTS ON 8/12/80 AS A RESULT OF A SPILL, THROUGH A VENT DIRECTLY OVER
PLAINTIFF'S WORKBENCH. SUCH EXPOSURE HAS ALLEGEDLY CAUSED PLAINTIFF SEVERE
INJURIES. DAMAGES ARE UNSPECIFIED. THE COMPLAINT IS AGAINST MGM LABS
AND ITS PARENT MGM FILM CO FOR FAILURE TO MAINTAIN SAFE WORKPLACE.
MANUFACTURERS ARE CHARGED WITH INADEQUATE WARNING.

**BORZ ET AL. V. DIAMOND SHAMROCK, ET AL. (2)**
BEGIN: COMMON PLEAS CT,CUYAHOGA CTY,
FILE.DT 12/30/85   SERVE.DT 0/00/00   O   09 CHEMICAL UNIT
CAUSE: DEFENDANTS DSC AND ITS REALTOR, MGM HILLTOP REALTORS, ALLEGEDLY SOLD TO THE
PLAINTIFFS A WICKLIFFE, OHIO HOUSE WHICH DEFENDANTS KNEW TO HAVE LEAKING
BASEMENT WALLS, WHICH CONDITION WAS ALLEGEDLY NOT DISCLOSED TO THE BUYER.

**SOTO, D.R. VS. DSCC**
BEGIN: SUPERIOR CNTY,LOS ANGELES
FILE.DT 12/05/84   SERVE.DT 12/07/84   O   09 CHEMICAL UNIT
CAUSE: ALLEGED NEGLIGENCE RESULTING IN PERSONAL INJURIES

**SPURGEON, W. P. VS DSCC**
FILE.DT 0/00/00   SERVE.DT 0/00/00   O   09 CHEMICAL UNIT
CAUSE: AGENT ORANGE CLAIM

**STARK, ALI D., JR. V DSCC**
BEGIN: SUP CT OF CA, CITY OF LA
FILE.DT 5/07/86   SERVE.DT 5/07/86   O   09 CHEMICAL UNIT
CAUSE: ONE OF 29 RELATED FILM INDUSTRY CASES ALLEGING EXPOSURE TO VARIOUS CHEMICALS

**STEVENS, HEATHER L., VS DSC**
BEGIN: 256TH JUD DIS CT DALLAS COUNTY
FILE.DT 6/03/86   SERVE.DT 6/03/86   O   09 CHEMICAL UNIT
CAUSE: MOVANT PRAYS THE COURT TO SET MOTION OF HEARING TO AUTHORIZE RESPONDENT AND EM
PLOYER TO WHICH EMPLOYER WITHHELD FROM THE DISPOSABLE EARNINGS OF RESPONDENT E
EACH PAY PERIOD AN AMOUNT SUFFICIENT TO PAY AND DISCHARGE THE CHILD
SUPPORT OBLIGATIONS OF RESPONDENT, PAST, PRESENT AND FUTURE.

OCC033396

Confidential

OCCNJ0026839

ALCD-PUBCOM_0002717

DATE: 8/31/86

LITIGATION SUMMARY LISTING
LITIGATION TRACKING SYSTEM
DIAMOND SHAMROCK CORPORATION

LDG200
PAGE: 19

| CASE_NAME | FORUM | FILE_DT | SERVE_DT | BIS COMPANY |
|---|---|---|---|---|
| STOTTS, CHARLES F. ET AL., VS DSCC: | US DIS CT WESTERN DIST OF WA | 8/20/85 | 0 | 09 CHEMICAL UNIT |
| CAUSE: PLTF. PURCHASED 40 FOOT VALIANT SAILBOAT AND LATER DISCOVERED BLISTERING ON FIBERGLASS HULL AND DECK. NO DOLLAR AMOUNT SHOWN IN PRAYER. | | | | |
| TAYLOR V DSCC | GEN CT:SUP CT DIV.INC, CITY OF | 11/13/85 | 11/19/85 | 0 | 09 CHEMICAL UNIT |
| CAUSE: ALLEGED LOST WAGES FOR WRONGFUL DISCHARGE OCCURRING AFTER PLAINTIFF SUFFERED INJURIES ON THE JOB AND HAD TO MISS WORK. | | | | |
| TAYLOR, MILDRED VS DSC | COM CRT PLS CUYAHOGA CNTY OHIO | 8/08/83 | 8/10/83 | 0 | 09 CHEMICAL UNIT |
| CAUSE: COMPLAINT AND JURY DEMAND. | | | | |
| THEIM, STEPHEN G., JR. VS DSCC: | US DIS CT W. DIST WASHINGTON | 4/19/85 | 4/24/85 | 0 | 09 CHEMICAL UNIT |
| CAUSE: PLAINTIFF PURCHASED 40 FOOT SAILBOAT AND LATER DISCOVERED BLISTERING ON FIBERGLASS HULL AND DECK. NO DOLLAR AMOUNT SHOWN IN PRAYER. | | | | |
| TURNER AT AL V DSCC | SUP CT, NEWCASTLE CITY, DE | 1/06/86 | 1/07/86 | 0 | 09 CHEMICAL UNIT |
| CAUSE: 10A PLAINTIFFS SEEK SEVERANCE PAY AS THE RESULT OF THE SALE OF THE PLASTICS BUSINESS TO ETHYL CORP. IN APRIL 1982. PLAINTIFFS WERE NOT PAID SEVERANCE BECAUSE THEY KEPT THEIR JOBS WITH ETHYL. | | | | |
| U.S. V NEW CASTLE CTY, ICI ET AL. | U.S. DIST. CT, DIST OF DE | 7/12/85 | 7/12/85 | 0 | 09 CHEMICAL UNIT |
| CAUSE: 1/1/69-7/31/71 - CERCLA ACTION FOR COST OF CLEAN-UP AT TYBOUTS CORNER SITE WITHIN MILE OF DELAWARE CITY PLASTICS PLANT. DIAMOND IS ONE OF THE SOME 30 THIRD-PARTY DEFENDANTS BROUGHT INTO ACTION BY DEFENDANT ICI AMERICAS, INC. DIAMOND'S RECORDS AND INTERVIEWS INDICATE THAT ONLY PAPER WASTES, NO INDUSTRIAL WASTES, WERE TRANSPORTED TO TYBOUTS IN 1969-1971 TIME PERIOD. | | | | |
| U.S.A. OF AMERICA VS. NEW CASTLE COUNTY ET AL | | 7/01/85 | 7/09/85 | 0 | 09 CHEMICAL UNIT |
| CAUSE: STIPULATIONS EXTENDING TIME | | | | |
| VATIHONER V DSCC, ET AL. (10) | COM PLS, PHILADELPHIA CTY, PA | 7/17/85 | 0/00/00 | 0 | 09 CHEMICAL UNIT |
| CAUSE: PLAINTIFF WORKED IN THE LEATHER PROCESSING INDUSTRY FROM 1980 TO 1983, IN HIS MID-50'S AND IS SUFFERING FROM BLADDER CANCER ALLEGEDLY CAUSED BY OCCUPATIONAL EXPOSURE TO PERCHLOROETHYLENE. | | | | |
| WALKER, LILLIAN, ET AL (5) V DSCC, ET AL | DIST CT, HARRISON CTY, TX | 3/20/83 | 0/00/00 | 0 | 09 CHEMICAL UNIT |
| CAUSE: MRS. WALKER AND THE FOUR OTHER PLAINTIFFS WERE EMPLOYED BY STENCO MANUFACTURING COMPANY IN LONGVIEW, TX FOR DIFFERENT PERIODS OF TIME BETWEEN 1967 AND 1981. PLAINTIFFS CLAIM THAT DIAMOND AND OTHER DEFENDANTS SOLD THE CL AND TCE TO DELTA SOLVENTS & CHEMICALS CO., WHICH WERE RESOLD TO STENCO AND EXPOSURE TO WHICH CAUSED PLAINTIFFS' VARIOUS DISABLING, PRIMARILY RESPIRATORY, INJURIES. | | | | |

OCC033397

Confidential

DATE: 8/31/86

LITIGATION SUMMARY LISTING
LITIGATION TRACKING SYSTEM
DIAMOND SHAMROCK CORPORATION

L00200
PAGE: 20

| CASE NAME | FORUM | FILE DT | SERVE DT | BIB COMPANY |
|---|---|---|---|---|
| WALL V DSCC, ET AL (8) | SUP CT, NORFOLK CITY, MASS | 10/15/85 | 0/00/00 | 0 09 CHEMICAL UNIT |

CAUSE: PLAINTIFF WAS EMPLOYED FROM OCTOBER 1981 TO JANUARY 10, 1984 AS A MACHINIST BY SORBO ELECTRONICS, INC. AND WAS EXPOSED TO 1,1,1-TRICHLOROETHANE MANUFACTURED BY DOW AND PPG AND SOLD TO SORBO THROUGH A DISTRIBUTOR, GENERAL CHEMICAL, BY DIAMOND (DOW PRODUCT) AND ICI (PPG PRODUCT). PLAINTIFF CLAIMS BREACH OF WARRANTY AND FAILURE TO WARN OF TOXIC PROPERTIES OF THE PRODUCT, INCLUDING TOXIC EFFECTS ON THE CENTRAL NERVOUS SYSTEM AND VISUAL IMPAIRMENT.

| CASE NAME | FORUM | FILE DT | SERVE DT | BIB COMPANY |
|---|---|---|---|---|
| WALLACE, ET AL V DSC | US DIST CT NO DIST OF OHIO | 0/00/00 | 0/00/00 | 0 09 CHEMICAL UNIT |

CAUSE: NO CAUSE ON FILE

| CASE NAME | FORUM | FILE DT | SERVE DT | BIB COMPANY |
|---|---|---|---|---|
| WEIGAND, A.J., INC., V DSCC, ET AL (2) | CT OF COM PLS, FRANKLIN CTY,OH | 7/31/84 | 0/00/00 | 0 09 CHEMICAL UNIT |

CAUSE: WHILE WEIGAND WAS TRANSPORTING A LOAD OF SPENT SULPHURIC ACID FOR DIAMOND FROM THE BELLE PLANT, WEIGAND'S TANK TRUCK BUCKLED IN THE MIDDLE, RELEASING 270 GALLONS OF ACID INTO THE ATMOSPHERE IN NELSONVILLE, OHIO. THE LEAK IS ALLEGED TO HAVE OCCURRED AS A RESULT OF DIAMOND'S SHIPPING ACID WITH A HIGHER CHARACTERISTIC THAN ALLOWED BY THE U.S. BUREAU OF MOTOR CARRIERS. WEIGAND SEEKS TO RECOVER $40M IN DAMAGES INCURRED IN LOSS OF THE TRUCK, AND PAYMENT OF CLAIMS TO THIRD PARTIES INJURED BY THE SPILL. (FREEWAY, DIAMOND'S CO-DEFENDANT IS SUED FOR MANUFACTURING A TRUCK SUSCEPTIBLE TO CORROSION BY ACID, KNOWING THAT THE TRUCK WOULD BE USED TO TRANSPORT ACID).

| CASE NAME | FORUM | FILE DT | SERVE DT | BIB COMPANY |
|---|---|---|---|---|
| WENDT V DIAMOND SHAMROCK, ET AL (2) | DIST CT, MATAGORDA CITY, TX | 4/21/82 | 0/00/00 | 0 09 CHEMICAL UNIT |

CAUSE: PLAINTIFF WAS SECURED A $12.4MM JUDGMENT FOR DEATH OF FRIZE BALL CAUSED BY APPLICATION OF UNFURA

| CASE NAME | FORUM | FILE DT | SERVE DT | BIB COMPANY |
|---|---|---|---|---|
| WILSON MRSH D. V8 UNIFLITE INCLUDING DSCC | SUP CRT WASHINGTON KING COUNTY | 3/29/85 | 4/04/85 | 0 09 CHEMICAL UNIT |

CAUSE: BREACH OF CONTRACT RE, VALIANT 40 SAILBOAT, NO DOLLAR AMOUNT SHOWN IN PRAYER

| CASE NAME | FORUM | FILE DT | SERVE DT | BIB COMPANY |
|---|---|---|---|---|
| WITECZEK, CHRISTINA V8 DSCC | CT COM PLS CUYAHOGA CNTY OHIO | 4/07/85 | 4/12/85 | 0 09 CHEMICAL UNIT |

CAUSE: PLAINTIFF'S DECEDENT DIED ON JUNE 1, 1983 AT AGE 45 AS A RESULT OF A BRAIN TUMOR ALLEGEDLY CAUSED BY HIS EXPOSURE, WHILE EMPLOYED IN THE DSC HERBICIDE AND PESTICIDE DEPARTMENT, TO HAZARDOUS CHEMICALS INCLUDING PYRIDAZINONE

| CASE NAME | FORUM | FILE DT | SERVE DT | BIB COMPANY |
|---|---|---|---|---|
| 4M LINEN & UNIFORM SUPPLY CO., INC. V8. DSC | 212 J.D. COURT GALVESTON CNTY | 5/30/86 | 6/03/86 | 0 09 CHEMICAL UNIT |

CAUSE: BREACH OF WARRANTY

OCC033398

OCCNJ0026841

ALCD-PUBCOM_0002719

DATE: 8/31/86

LITIGATION SUMMARY LISTING
LITIGATION TRACKING SYSTEM
DIAMOND SHAMROCK CORPORATION

L00200
PAGE: 21

CASE_NAME
4H LINEN V UNITRON SUPPLY, ET AL (2)

COURT
DIST CT OF GALVESTON CTY, TX

FILE_DT    SERVE_DT    BIB COMPANY
5/20/86    5/20/86    0    09 CHEMICAL UNIT

CAUSE:
PLAINTIFF CLAIMS THAT IN EARLY 1982, DIAMOND (TC1) AND ITS DISTRIBUTOR, U. P.
BALLARD AND COMPANY, INC., SOLD PLAINTIFF CERTAIN LAUNDRY PRODUCTS INCLUDING
TEX-STAT WHICH WERE WARRANTED AS ABLE TO KILL MILDEW. PLAINTIFF CLAIMS IT
BUFFERED $190,085.00 IN DAMAGES FROM STAINING, LOSS OF LINEN, AND RECYCLING
COSTS DUE TO MILDEW. PLAINTIFF SEEKS TO HAVE IT DAMAGES
TREBLED UNDER THE TEXAS DECEPTIVE PRACTICES ACT, AND ALSO SEEKS
$25,000 IN ATTORNEYS' FEES ($40,000 IF THERE IS AN APPEAL).

TOTAL # OF CASES: 143

OCC033399

Confidential

OCCNJ0026842

ALCD-PUBCOM_0002720

DATE: 9/01/86

LITIGATION SUMMARY LISTING
LITIGATION TRACKING SYSTEM
DIAMOND SHAMROCK CORPORATION

LU03200
PAGE: 1

| CASE NAME | EDGUM | FILE_DI SERVE_DI BIS CDEFENY |
|---|---|---|

**ARZ ACRES INC V6. SATELLITE BUSINESS SYSTEMS**
CAUSE: DISMISSAL WITHOUT PREJUDICE AS TO DEFENDANT DIAMOND SHAMROCK CORPORATION
CONN PLB COURT CUYAHOGA CTY OH   7/17/86   7/21/86   0   00 CORPORATE

**AGENT ORANGE MDL**
CAUSE:
0/00/00   0/00/00   0   00 CORPORATE
NO CAUSE ON FILE
0/00/00   0/00/00   0   00 CORPORATE

**BRADY IRON & METAL INC. V6 DSC**
CAUSE: PLAINTIFF DEMANDS JUDGMENT FOR PUNITIVE & COMPENSATORY DAMAGES, COSTS
INTERESTS. ALLEGES DAMAGES SUSTAINED DUE TO CLOSURE OF ITS FACILITY THROUGH
CONTAMINATION OF CERTAIN MATERIALS KNOWN AS DIOXIN SUPPLIED BY DEFENDANTS
BUP CRT NEW JERSEY ESSEX CNTY   4/25/84   4/29/84   C   00 CORPORATE

**BRENNAN, J. ET AL V6 DSC**
CAUSE: PLAINTIFF REQUESTS A PRELIMINARY & PERMANENT INJUNCTION REQUIRING DEFENDANT TO
REMOVE ALL TOXIC & HAZARDOUS SUBSTANCES FROM THE ENVIRONMENT SURROUNDING 80
LISTER AVENUE IN ESSEX COUNTY, NEW JERSEY
BUP CRT NJ, JERSEY ESSEX CNTY   4/17/85   4/24/85   0   00 CORPORATE

**CALKINS V DIAMOND S INC. ET AL**
CAUSE: WRONGFUL DEATH, NEGLIGENCE, ULTRA-HAZARDOUS ACTIVITY, TRESPASS, NUISANCE,
ABSOLUTE LIABILITY, BATTERY, VIOLATION OF STATUTE, WILLFUL WANTON AND RECKLESS
CONDUCT, INTENTIONAL AND NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS.
SAN FRANCISCO SUPERIOR COURT   1/11/85   0/00/00   0   00 CORPORATE

**DB COAL CORPORATION**
CAUSE:
0/00/00   0/00/00   0   00 CORPORATE
NO CAUSE ON FILE

**DSCC V AETNA CASUALTY AND SURETY CO.**
CAUSE: CIVIL ACTION COMPLAINT
BUP. CRT NEW JERSEY CO HURS CN   9/19/84   9/19/84   0   00 CORPORATE

**DSCC V. AETNA (UNFILTED)**
CAUSE: COMPLAINT FOR DECLARATORY RELIEF
BUP. CRT ST CA CNTY SAN FRAN.   4/28/85   4/28/85   0   00 CORPORATE

OCC033400

Confidential

```
                                    LITIGATION SUMMARY LISTING
                                    LITIGATION TRACKING SYSTEM
                                    DIAMOND SHAMROCK CORPORATION

DATE:  9/01/86                                                                          PAGE: 2
                                                                                        L00200

CASE NAME                              FORUM                          FILE DI   RESVE DI  BIB COMPANY

DSCC, V. GIBRALTAR CASUALTY COMPANY, ET AL.    DIS CRT TRAVIS CY TX 147 JD    1/30/86   1/30/86   0  00 CORPORATE
    CAUSE:  DECLARATION THAT THE CONTRACTS OF INSURANCE
            FULLY ENFORCEABLE AND PROVIDE COVERAGE.  PLTF ALSO SEEKS AFFIRMATIVE RELIEF
            UNDER STATUTORY AND COMMON LAW OF TEXAS

DSCC VS AETNA CASUALTY AND SURETY COMPANY      SUP CT NEW JERSEY MORRIS CNTY   9/19/84   9/19/84   0  00 CORPORATE
    CAUSE:  CIVIL ACTION COMPANY

GRAY N. VS DIAMOND SHAMROCK CORP., ET AL        SUP CRT NEW  JERSEY ESSEX CNTY  3/21/85   3/29/85   0  00 CORPORATE
    CAUSE:  EXPOSURE TO DIOXIN AND OTHER CHEMICALS DURING EMPLOYMENT AT 80 LISTER AVENUE,
            NEW JERSEY BETWEEN 1750 AND 1757

HUES, ELTON JR., ET AL VS WARREN PETROLEUM COMPANY   344 JUD DIS CRT CHAMBERS CY TX   9/26/85  1/01/85   0  00 CORPORATE
    CAUSE:  SEEKING $20,000,000.00 FOR DAMAGES SUSTAINED BY PLTF. DUE TO NOXIOUS GASSES AT
            SURFACE LEVELS IN EXPLOSIVE QUANTITIES DUE TO NEGLIGENCE OF DEFENDANT IN STORI
            NO PROPANE AND ETHANE IN WELLS IN THE HONT BELVIEU SALT DOME

HUES, ELTON VS WARREN PETROLEUM CO INCL, DSC         344TH JUD DIST CRT CHAMBERS CN  3/11/85  3/12/85   0  00 CORPORATE
    CAUSE:  PLAINTIFF ALLEGING DEFENDANTS NEGLIGENCE IN OPERATING THEIR PITS IN SUCH
            A MANNER AS TO ALLOW THE INTRODUCTION OF OXYGEN INTO THE BRINE,  SEEKING
            DAMAGES IN THE SUM OF $20,000,000.00

IRONBOUND HEALTH RIGHTS ADVISORY COMMISSION VS. DS SUPR. CRT. N. J. CH. DIV ES CY   8/01/83   8/03/83   0  00 CORPORATE
    CAUSE:  MULTIPLE

JOHNSON THOMAS & LUCINDA VS. GENSCO             13TH J.D.C. NAVARRO CNTY TX     6/11/76   6/12/86   0  00 CORPORATE
    CAUSE:  PERSONAL INJURY SUIT AS THE RESULT OF AN AUTOMOBILE COLLISION, SEEKING DAMAGE
            IN AN UNSTATED AMOUNT.

JURGEN INDEPENDENT SCHOOL DISTRICT VS. GENSCO   BEXAR COUNTY TEXAS DISTRICT CT  6/04/86   6/24/76   0  00 CORPORATE
    CAUSE:  PLTF. REQUEST THAT THEY BE RELEASED AND DISCHARGED FROM ALL LIABILITY TO DEFT
            ON ACCOUNT OF ANY ARISING OUT OF FINAL PAYMENT FUND REI SPECIAL EDUCATION
            CENTER BUILDING PROJECT ALSO SEEKS ATTY FEES.

KNEHL RINI J. VS DIAMOND SHAMROCK CORPORATION   DSRC NORTHERN DIST ILLINOIS ED  3/05/86   3/06/86   0  00 CORPORATE
    CAUSE:  A SUIT SEEKING UNSTATED AMOUNT, ALLEGING DECEPTIVE TRADE PRACTICES CONCERNING
            REPRESENTATIONS MADE CONCERNING A RETIREMENT PLAN
```

OCC033401

LITIGATION SUMMARY LISTING
LITIGATION TRACKING SYSTEM
DIAMOND SHAMROCK CORPORATION

L00200
PAGE: 3

| CASE NAME | FORUM | FILE DT | RECV. DT | | BIG COMPANY |
|---|---|---|---|---|---|
| LANDREAUX, RALPH ET AL V. DSC | SUP. CRT. OF NEW JERSEY EB CY | 4/13/83 | 4/13/83 | 0 | 00 CORPORATE |
| CAUSE: COMPLAINT AND DEMAND FOR JURY TRIAL - CIVIL ACTION-CLASS ACTION | | | | | |
| LAURIE ALFRED W. VS. DIAMOND SHAMROCK CORP. | SUP CRT OF CALIF CNTY ALAMEDA | 4/28/86 | 4/30/86 | 0 | 00 CORPORATE |
| CAUSE: COMPLAINT FOR ALLEGED NEGLIGENCE RESULTING IN PERSONAL INJURIES | | | | | |
| HARDIES, MICHAEL VS DSC | SUP CT NEW JERSEY ESSEX CNTY | 11/10/83 | 11/22/83 | 0 | 00 CORPORATE |
| CAUSE: COMPLAINT AND DEMAND FOR JURY | | | | | |
| HUDLEY DONALD V FALCON SEABOARD INC. | 133RD JUD DIST HARRIS CNTY TX | 8/20/85 | 8/25/85 | 0 | 00 CORPORATE |
| CAUSE: | | NO CAUSE ON FILE | | | |
| MORRISSEY CHARLES VS DSC | SUP CT NEW JERSEY MONMOUTH CY | 5/09/84 | 5/30/84 | 0 | 00 CORPORATE |
| CAUSE: COMPLAINT AND DEMAND FOR TRIAL BY JURY | | | | | |
| MUDEHE JAMES V DIAMOND SHAMROCK CORPORATION | U.S. DIST CRT NORTH DIS TX DAL | 5/11/84 | 5/11/84 | 0 | 00 CORPORATE |
| CAUSE: AGE DISCRIMINATION, ETC | | | | | |
| SHELL OIL V. WINTERTHUR INCL. DSC | SAN MATEO SUPERIOR COURT | 7/17/86 | 7/22/86 | 0 | 00 CORPORATE |
| CAUSE: SUIT AGAINST PRIMARY AND COMPANIES AND OTHER OF ITS PRIMARY AND EXCESS CARRIERS WHICH ISSUED GENERAL LIABILITY INSURANCE TO SHELL FROM APPROXIMATELY 1940 TO 1943. SHELL SEEKS A DECLARATION REGARDING ITS COVERAGE FOR CERTAIN POL. INCI | | | | | |
| SNYDER VS. DIAMOND SHAMROCK CORP. | JEFFERSON CITY, OHIO | 2/01/85 | 2/07/85 | 0 | 00 CORPORATE |
| CAUSE: ALLEGED NEGLIGENCE RESULTING IN PERSONAL INJURIES, SEEKING INDEMNIFICATION | | | | | |
| STANDARD MACHINE & EQUIPMENT CO VS. DSC | LAKE COUNTY COMMON PLEAS | 6/17/96 | 6/27/86 | 0 | 00 CORPORATE |
| CAUSE: DEFENDANT HAS BREACHED THE AGREEMENT BY REMOVING PROPERTY AND AS A RESULT THE PLAINTIFF HAS NOT BEEN ABLE TO USE THE STORAGE WHICH WAS ABLE TO BE LEASED BY THE PLAINTIFF IN THE PAST AS AGREED IN THE LEASE CONTRACT. | | | | | |
| STANDARD MACHINE & EQUIPMENT CO. VS DSC | CRT OF COMM PLEAS LAKE CNTY OH | 6/17/86 | 6/27/86 | 0 | 00 CORPORATE |
| CAUSE: DEF'T HAS BREACHED THE AGREEMENT BY REMOVING PROPERTY AND AS A RESULT THE PLTF HAS NOT BEEN ABLE TO USE THE STORAGE WHICH WAS ABLE TO BE LEASED BY THE PLTF IN THE PAST AS AGREED IN THE LEASE CONTRACT. | | | | | |

OCC033402

Confidential

OCCNJ0026845

ALCD-PUBCOM_0002723

DATE: 9/01/86

LITIGATION SUMMARY LISTING
LITIGATION TRACKING SYSTEM
DIAMOND SHAMROCK CORPORATION

L00200
PAGE: 4

| CASE NAME | FORUM | FILE.DT | RESVE.DT | SIS | | COMPANY |
|---|---|---|---|---|---|---|
| VUOCOLO, MARY ANN AD PROB EST. OF LUCY VUOCOLO CASE: MULTIPLE, PROPERTY DAMAGES | SUP. CRT N.J., ESSEX CNTY | 7/12/85 | 7/15/85 | 0 | 00 | CORPORATE |
| WALBROOK INSURANCE CO VS. DIAMOND SHAMROCK CORP., CASE: UNDERWRITERS REPRESENTED BY WALBROOK, NOR JERSEY PHILLIPS, OR ANY OTHER LLOYDS UNDERWRITER HAS ANY LIABILITY UNDER ANY POLICY TO INDEMNIFY DFND. FOR ANY | USDC SOUTHERN DIV TX GALVESTON | 9/04/85 | 9/04/85 | 0 | 00 | CORPORATE |
| WILLIAMS BERT ET AL VS DOW CHEMICAL COMPANY INCL D CASE: CLASS ACTION ALLEGING DAMAGES TO PLTFS. REAL PROPERTY DUE TO TOXIC PESTICIDES MANUFACTURED BY THE DEFENDANTS, SEEKING DAMAGES IN THE SUM OF $5,000,000.00 PLUS OTHER RELIEF, INJUNCTIVE RELIEF TO ENJOIN DEFTS. ENGAGING IN FUTURE COND | BRAZORIA CNTY TEXAS 239TH JDC | 7/01/86 | 7/03/86 | 0 | 00 | CORPORATE |

TOTAL # OF CASES:    32

OCC033403

DATE: 9/01/86

LITIGATION SUMMARY LISTING
LITIGATION TRACKING SYSTEM
DIAMOND SHAMROCK CORPORATION

L00200
PAGE 1

**CASE NAME** / FORUM / FILE DT / SERVE DT / BIB / COMPANY

7 V. COMMONWEALTH PETROLEUM, INC.
  CASE: (SUIT FILE #827-J) STATEMENTS OF LIEN
  5/17/82  0/00/00  0  04 EXPLORATION AND PRODUCTIO

ALBRIDGE, BEVERLY N. ET AL V. DSC ET AL
  CASE: (SUIT FILE #271) FAILURE TO PAY ROYALTIES ON PLAINTIFF'S 50% WORKING INTEREST IN THAT CERTAIN OIL & GAS MINING LEASE DATED 2/04/38.
  29TH D.C., ERATH CO., TX   0/00/00  5/03/78  0  04 EXPLORATION AND PRODUCTIO

ALSTON, JOHN ET AL V. DSC ET AL
  CASE: (SUIT FILE #795) THIS IS A SUIT FOR INTEREST FOR FRAUDULENTLY WITHHOLDING ROYALTY PAYMENTS AND FOR INCREASED ROYALTY.
  CHI.C. FRANKLIN CO., OZARK DIST   0/00/00 10/12/81  0  04 EXPLORATION AND PRODUCTIO

APACHE CORP. V. DAVID B. ENGLE, ET AL
  CASE: (SUIT FILE #1012) DEFENDANTS HAVE FAILED TO ASSIGN WORKING INTEREST IN FEDERAL LEASE W-81893 TO PLAINTIFF IN ACCORDANCE WITH TERMS OF FARMOUT AGREEMENT.
  U.S.D.C., DIST. OF WY   9/16/85  0/00/00  0  04 EXPLORATION AND PRODUCTIO

ARCTIC SLOPE REG. CONST. CO., INC., ET AL V. BOMID H+B.D.C. DIST. OF ALASKA
  CASE: (SUIT FILE #739) PLAINTIFF SEEKS PAYMENT FOR SUMS PLAINTIFF TO BE UNDER CONTRACT FOR CONSTRUCTION OF MUKLUK ISLAND. DEFENDANT HAD COUNTERCLAIMED FOR ALLEGED DAMAGES TO ITS TUGS AND BARGES USED IN THE CONSTRUCTION OPERATION.
  4/15/84  0/00/00  0  04 EXPLORATION AND PRODUCTIO

ARNOLD, DORIS ADAMS ET AL V. BAR H PETRO. CO., ET   11TH J.D.C., WEBB CO., TX
  CASE: (SUIT FILE #800) ACTION TO CANCEL LEASE; FAILURE OF LESSEE TO OPERATE AND DEVELOP LEASE.
  5/26/83  0/00/00  0  04 EXPLORATION AND PRODUCTIO

ATKINSON, J. L. V. APACHE CORP. V. DSEC OF CANADA   J.D.C. CALGARY, ALBERTA
  CASE: (SUIT FILE #997) PLAINTIFF SEEKS TO ESTABLISH OWNERSHIP OF ORRI AND ACCOUNTING FOR SAME (ESTIMATED TO BE VALUED AT $390,000 AS OF 10-1-83) TOGETHER WITH OTHER ROYALTIES FOUND DUE AND PAYABLE AND INTEREST, AND COSTS. SUIT COMPLI- CATED BY INTERVAL STRUCTURE OF NNA AND ITS DEALINGS WITH APACHE AND MERGER OF NNA INTO DSI.
  0/00/00  0/00/00  0  04 EXPLORATION AND PRODUCTIO

BASIN EXPLORATION V# DSC
  CASE: SUIT TO QUIET TITLE IN LAND IN LARAMIE COUNTY, WYOMING, IN WHICH DEFENDANT IS ALLEGED TO HAVE AN INTEREST
  LARAMIE CNTY. DIST. CT 1ST JD   10/03/84 10/09/84  0  04 EXPLORATION AND PRODUCTIO

BISTATE OIL CO. V. DSC
  CASE: (SUIT FILE #930) CONTROVERSY INVOLVING AMOUNT DUE FROM PLAINTIFF TO DEFENDANT ARISING OUT OF PLAINTIFF'S ABSORPTION OF INTEREST FROM THIRD PARTY.
  U.S.D.C. SOUTHERN DIST, NY   0/00/00  5/18/84  0  04 EXPLORATION AND PRODUCTIO

OCC033404

Confidential

DATE: 9/01/86

LITIGATION SUMMARY LISTING
LITIGATION TRACKING SYSTEM
DIAMOND SHAMROCK CORPORATION

L002200
PAGE: 2

| CASE NAME | FORUM | FILE DI | SERVE DI | BUS | COMPANY |
|---|---|---|---|---|---|
| BONNER, PHYLLIS ET VIR V. DGC & DGEC | U.S.D.C. EASTERN DIST, LA | 0/00/00 | 8/30/84 | 0  04 | EXPLORATION AND PRODUCTIO |
| CAUSE: (SUIT FILE #948) SUIT FOR PERSONAL INJURIES AND DAMAGES ALLEGEDLY SUSTAINED ON OR ABOUT 9-4-83 ABOARD A PRODUCTION PLATFORM OFFSHORE LOUISIANA. | | | | | |
| BOURGEAUX, RODDY V. PENNZOIL COMPANY | U.S.D.C. EASTERN DIST, LA | 5/15/85 | 0/00/00 | 0  04 | EXPLORATION AND PRODUCTIO |
| CAUSE: (SUIT FILE #991) OFFSHORE PERSONAL INJURY SUIT UNDER THE GENERAL MARITIME LAW ON A PENNZOIL OPERATED PLATFORM. | | | | | |
| BOYDSTUN, KEITH F. V. MORAN BROS, INC. | U.S.D.C. DIST, OF KS | 0/00/00 | 0/00/00 | 0  04 | EXPLORATION AND PRODUCTIO |
| CAUSE: (SUIT FILE #789) PERSONAL INJURIES - DS NOT A PARTY TO SUIT. DEFENSE TENDERED TO US UNDER AN INDEMNIFICATION PARAGRAPH CONTAINED IN OUR DRILLING CONTRACT WITH MORAN BROS., INC. DATED 7/07/80 COVERING THE DRILLING OF OUR HARVEY C. FIELDMAN NO. 2 WELL, MEADE COUNTY, KS. | | | | | |
| BRADDOCK, PAUL G. ET AL V. DGC | 69TH D.C., BRENHAM CO., TX | 12/20/78 | 1/05/79 | 0  04 | EXPLORATION AND PRODUCTIO |
| CAUSE: (SUIT FILE #447) PLAINTIFF SEEK PAYMENT FOR ADDITIONAL ROYALTIES ON NATURAL GAS CLAIMED DUE UNDER TERMS OF OIL, GAS AND MINERAL LEASES COVERING LANDS IN OCHILTREE COUNTY, TEXAS | | | | | |
| CAUSE: (SUIT FILE #...) ... FIRST STATE BANK OF STRATFORD, TEXAS, AS IND. EXECUTOR AND TESTAMENTARY TRUSTEE OF THE ESTATE AND UNDER THE WILL OF ARLYN HAILE, DECEASED | | | | | |
| BRANDEN, DALE B. V. DGC | 24TH D.C., POPE CO., ARK | 0/00/00 | 8/23/85 | 0  04 | EXPLORATION AND PRODUCTIO |
| CAUSE: (SUIT FILE #998) CLAIM FOR UNPAID ROYALTIES | | | | | |
| BRADFORD'S OILFIELD EQUIP. CO., INC. V. DGC ET AL | 39TH J.D.C. RED RIVER P., LA | 4/08/82 | 0/00/00 | 0  04 | EXPLORATION AND PRODUCTIO |
| CAUSE: (SUIT FILE #823) UNIT OF SEQUESTRATION ORDERING SHERIFF BY AN ORDER GRANTED 4/08/82 TO TAKE, SEQUESTER AND KEEP IN CUSTODY THE FOLLOWING PROPERTY: RUSH, ET AL NO. 1 WELL, ALL MATERIALS, SUPPLIES AND EQUIPMENT, ETC. LOCATED THEREIN AND SEEKING THE SUM OF $24,299.44, ETC. | | | | | |
| BREHSING, GEORGIA V. AL V. DGC, ET AL | D.C. KIOWA CO., KS | 9/30/85 | 10/03/85 | 0  04 | EXPLORATION AND PRODUCTIO |
| CAUSE: (SUIT FILE #1004) QUIET TITLE SUIT ON REAL ESTATE IN KIOWA CO., KS IN WHICH WE MAY CLAIM AN INTEREST. | | | | | |
| BROWN, ELSIE I. ET AL V. ACME OIL CORP., ET AL | D.C. KIOWA CO., KS | 0/00/00 | 12/28/81 | C  04 | EXPLORATION AND PRODUCTIO |
| CAUSE: (SUIT FILE #908) SUIT TO DISSOLVE THE NICHOLS UNIT AND TO CANCEL VARIOUS OIL AND GAS LEASES FOR FAILURE TO PRODUCE IN PAYING QUANTITIES AND FOR FAILURE TO REASONABLY DEVELOP THE UNIT. | | | | | |

OCC033405

Confidential

OCCNJ0026848

ALCD-PUBCOM_0002726

DATE: 9/01/86

| CASE NAME | FORUM | FILE DT SERVE DT BID COMPANY |
|---|---|---|
| BROWN, O.G. ET AL V. MOBIL OIL CORPORATION, ET AL. | D.C. STEVENS CO., KS | 0/00/00 4/29/71 0 04 EXPLORATION AND PRODUCTIO |
| CAUSE: (SUIT FILE #3941 SEEKING ROYALTIES FOR HELIUM OR CANCELLATION OF OIL AND GAS LEASES. | | |
| BRIER, WESLEY G. ET AL V. REICHHOLD ENERGY CORP. | CIR.C. COLUMBIA CO., OR | 12/20/84 0/00/00 0 04 EXPLORATION AND PRODUCTIO |
| CAUSE: (SUIT FILE #9643 1. ACTION BROUGHT ALLEGING BREACH OF CONTRACT FOR FAILURE TO PAY CERTAIN OVERRIDING ROYALTIES. DECLARATORY RELIEF ALSO SOUGHT. 2. COUNTER-CLAIM BROUGHT ALLEGING BREACH OF CONTRACT, REQUESTING QUIET TITLE, MONETARY & DECLARATORY RELIEF. | | |
| BYRD, CORTEZ, ET AL V. PARKER ENERGY RESOURCES, IN | 22ND J.D.C., WASH. PARISH, LA | 10/01/85 0/00/00 0 04 EXPLORATION AND PRODUCTIO |
| CAUSE: (SUIT FILE #10151 PETITION FOR DECLARATORY JUDGMENT SEEKING UNSPECIFIED AMOUNT FOR BREACH OF CONTRACT. | | |
| CANKLA, WM. WEBB V. DALLEY SERVICES, INC., ET AL | U.S.D.C. EASTERN DIST, LA | 0/00/00 0/00/00 0 04 EXPLORATION AND PRODUCTIO |
| CAUSE: (SUIT FILE #992) INSURANCE SUIT | | |
| CELERON OIL & GAS CO. V. RSC (INC. USED) | D.C. TRAVIS CO., TX | 9/20/85 0/00/00 0 04 EXPLORATION AND PRODUCTIO |
| CAUSE: (SUIT FILE #1008) PLAINTIFF DEMANDS THAT THE RSC HOLD A HEARING ON HIGH PERFORATIONS. | | |
| CHALFANT JAMES W VS DB EXPLORATION CO | DIB CRT RODER HILLS CNTY DK | 1/10/84 1/13/84 0 04 EXPLORATION AND PRODUCTIO |
| CAUSE: PLAINTIFF PRAYS FOR DAMAGES IN THE SUM OF $50,000.00 DUE TO THE PROPERTY DAMAGE DURING DRILLING OPERATIONS LOCATED IN RODER HILLS COUNTY, OKLAHOMA | | |
| CLARTY, ROBERT LEE V. DSC | U.S.D.C. WESTERN DIST, LA | 5/30/85 0/00/00 0 04 EXPLORATION AND PRODUCTIO |
| CAUSE: (SUIT FILE #990) SUIT FOR PERSONAL INJURIES UNDER THE GENERAL MARITIME LAW ON A DB OPERATED PLATFORM. | | |
| COLUMBIA SAVINGS ASSN. V. THOMAS H. PILLOW, ET AL | D.C. DECATUR CO., KS | 10/28/85 0/00/00 0 04 EXPLORATION AND PRODUCTIO |
| CAUSE: (SUIT FILE #1013) MORTGAGE FORECLOSURE ON REAL ESTATE IN DECATUR COUNTY, KS IN WHICH DEFENDANTS MAY CLAIM AN INTEREST. | | |
| COOK, CLAYTON B. ET UX V. MOBIL OIL CORPORATION | U.S.D.C. W. DIST LA, ALEXANDRI | 3/02/84 0/00/00 0 04 EXPLORATION AND PRODUCTIO |
| CAUSE: (SUIT FILE #230) PLAINTIFF CLAIMS PERSONAL INJURIES WHILE WORKING ON THE FIXED PLATFORM IN THE FEDERAL OCS BLOCK, MAIN PASS 73, "A" PLATFORM. | | |

OCC033406

Confidential

DATE: 9/01/86

LITIGATION SUMMARY LISTING
LITIGATION TRACKING SYSTEM
DIAMOND SHAMROCK CORPORATION

L00200
PAGE: 4

| CASE NAME | FORUM | FILE.DT | SERVE.DT | BIB | COMPANY |
|---|---|---|---|---|---|
| COON, DARLENE L. V. DSEC, ET AL | S.C. ARIZONA, MARICOPA CO. | 0/00/00 | 7/31/85 | 0 | 04 EXPLORATION AND PRODUCTIO |
| CASE: (SUIT FILE #994) PLAINTIFF SEEKS DAMAGES AND ALLEGES NEGLIGENCE RESULTING IN INJURIES AS A RESULT OF COLLISION OF VEHICLES ON 4/25/83 IN GUADALUPE CO., NM, ON I-40 NEAR THE 264 EXIT. | | | | | |
| COOPER, JEANNETTE W. ET AL. V. DSEC, ET AL. | 3RD D.C. LINCOLN PARISH, LA | 0/00/00 | 7/23/85 | 0 | 04 EXPLORATION AND PRODUCTIO |
| CASE: (SUIT FILE #997) SUIT FOR PERSONAL INJURIES AND WRONGFUL DEATH OF DAVID LEE WEST IN EXPLOSION ON 2/15/85. | | | | | |
| CRAFT, RICHARD ET UX V. PREEF DRILLING, INC. ET AL | U.S.D.C., EASTERN DIST. LA | 0/00/00 | 0/00/00 | 0 | 04 EXPLORATION AND PRODUCTIO |
| CASE: (SUIT FILE #993) OFFSHORE PERSONAL INJURY FILED UNDER THE JONES ACT AND GENERAL MARITIME LAW ON A MOBIL OPERATED PLATFORM. | | | | | |
| DAVIS, BRIAN K. V. DSEC | U.S.D.C., E. D. LA, NEW ORLEANS | 0/00/00 | 1/25/84 | 0 | 04 EXPLORATION AND PRODUCTIO |
| CASE: (SUIT FILE #909) COMPLAINT FOR DAMAGES, ALLEGING PERSONAL INJURY ON OR ABOUT 4/19/83 WHILE PLAINTIFF WAS EMPLOYED AS PRODUCTION PUMPER ON FIXED OIL PLAT-FORM IN VERMILION BLOCK 37. | | | | | |
| DECANE EXPLORATION ASSN., INC., V. DSEC | BOTH J.D.C. HARRIS CO., TX | 4/16/83 | 0/00/00 | 0 | 04 EXPLORATION AND PRODUCTIO |
| CASE: (SUIT FILE #02) 1. ACTION FOR NON-PAYMENT UNDER AGREEMENT FOR GEOPHYSICAL INTERPRETATION SERVICES. 2. COUNTERCLAIM BY DS - BREACH OF AGREEMENT AND DECEPTIVE ACT OR PRACTICE ($4,000,000) | | | | | |
| DENEHAW, FRED V. DYNA-SEA, INC., ET AL | U.S.D.C. EASTERN DIST. OF LA | 2/07/85 | 0/00/00 | C | 04 EXPLORATION AND PRODUCTIO |
| DINGER, DENNIS F. ET AL V. DSEC | D.C. TREGO CO., KS | 2/04/85 | 2/11/85 | 0 | 04 EXPLORATION AND PRODUCTIO |
| CASE: (SUIT FILE #774) OFFSHORE PERSONAL INJURY UNDER THE JONES ACT AND GENERAL MARITIME LAW TO RECOVER DAMAGES OCCURRING ON 9-13-84 ON A PLATFORM OPERATED BY MOHAWK EXPLORATION COMPANY. | | | | | |
| DSEC V. ANDERSON, EDMUND A. ET UX | 72ND D.C., LUBBOCK CO., TX | 0/00/00 | 0/00/00 | 0 | 04 EXPLORATION AND PRODUCTIO |
| CASE: (SUIT FILE #771) PLAINTIFF DSEC DSEC CONTENDS ITS LEASES ARE SUPERIOR IN TITLE TO THE MORTGAGE IN THE AMOUNT OF $700,000. DSEC CONTENDS ITS LEASES ARE SUPERIOR IN TITLE TO THE MORTGAGE. | | | | | |
| DSEC V. ANDERSON, EDMUND A. ET UX | | 0/00/00 | 0/00/00 | 0 | 04 EXPLORATION AND PRODUCTIO |
| CASE: (SUIT FILE #771) DAMAGE OF LAND BY MOVING A DRILLING RIG, DIGGING SLUSH PITS, ETC. | | | | | |

OCC033407

Confidential

OCCNJ0026850
ALCD-PUBCOM_0002728

LITIGATION SUMMARY LISTING
LITIGATION TRACKING SYSTEM
DIAMOND SHAMROCK CORPORATION

DATE: 9/01/84

LGR200
PAGE: 5

| CASE NAME | FILED | FILE DT | SERVE DT | BIG | COMPANY |
|---|---|---|---|---|---|
| **DBEC V. PINION OIL COMPANY** CAUSE: (SUIT FILE #0045) COLLECTION OF UNPAID ACCOUNTS ARISING OUT OF JOINT DRILLING VENTURES. U.S.D.C. WESTERN DIST., OK | 9/22/82 | 0/00/00 | 0 | 04 | EXPLORATION AND PRODUCTIO |
| **DBC V. ZINKE & TRUMBO, LTD.** CAUSE: (SUIT FILE #0359) ORIGINALLY BEGAN AS A COLLECTION SUIT FOR UNPAID PORTION OF COSTS OF DRILLING AND COMPLETING A GAS WELL. DEFENDANTS COUNTERCLAIMED ALLEGING GROSS NEGLIGENCE IN COMPLETION PROCEEDINGS, DRAINAGE, ETC. U.S.D.C. WESTERN DIST., OK | 8/31/82 | 0/00/00 | 0 | 04 | EXPLORATION AND PRODUCTIO |
| **DBCC & DBEC V. MORAN BROS., INC.** CAUSE: (SUIT FILE #0980) PLAINTIFFS SEEK INDEMNITY FROM MORAN BROS., INC. FOR JUDGMENT RESULTING FROM KEITH E. BOYDSTUN V. MORAN BROS. (SUIT FILE #0789) AND COSTS AND EXPENSES INCURRED IN SUCH SUIT. 108TH D.C. POTTER CO., TX | 0/00/00 | 0/00/00 | 0 | 04 | EXPLORATION AND PRODUCTIO |
| **DBEC & POGO PRODUCING CO. V. WOOD & LOCKER, INC.** CAUSE: (SUIT FILE #0753) INTERPLEADER ACTION TO LET THE COURT DETERMINE WHICH OF THE CONFLICTING DEMANDS SHOULD BE MET TO ASSIGN THE FARMOUT ACREAGE AND FROM SOME OF THE LESSORS TO RELEASE THEIR LEASES. U.S.D.C. WESTERN DIST., TX | 0/00/00 | 10/09/84 | 0 | 04 | EXPLORATION AND PRODUCTIO |
| **DBEC V. CONE, B. E., JR.** CAUSE: (SUIT FILE #0647) QUIET TITLE ACTION 287TH J.D.C. LUBBOCK CO., TX | 0/00/00 | 6/16/81 | 0 | 04 | EXPLORATION AND PRODUCTIO |
| **DBEC V. RAFO PRODUCTION CORP., ET AL** CAUSE: (SUIT FILE #0461) DBEC SEEKS AN AMOUNT IN EXCESS OF $100,000 FOR GAS WHICH TWO OPERATORS HAVE ILLEGALLY DRAINED, PUNITIVE DAMAGES, AND INJUNCTIVE RELIEF. 69TH D.C. MOORE CO., TX | 0/00/00 | 11/19/84 | 0 | 04 | EXPLORATION AND PRODUCTIO |
| **DBEC V. RAW HIDE OIL AND GAS, INC.** CAUSE: (SUIT FILE #10101) DAMAGES FOR CONVERSION OF GAS. 69TH D.C. MOORE CO., TX | 0/00/00 | 0/00/00 | 0 | 04 | EXPLORATION AND PRODUCTIO |
| **DBEC V. TROGS EXPLORATION CO., ET AL** CAUSE: (SUIT FILE #0995) TROGS OWES DBEC FOR THE DRILLING AND COMPLETION OF THE GLEN JONES #1-20, WILLIE TAYLOR #1-16 AND FLOY M. BARTON #1-21 GAS WELLS. SUIT IS ON AN OPEN ACCOUNT FOR PAST-DUE AMOUNTS UNDER THESE TWO SEPARATE JOINT OPERATING AGREEMENTS. DBEC SEEKS RECOVERY OF PAST-DUE AMOUNTS PLUS INTEREST AND ATTORNEYS FEES. U.S.D.C. WESTERN DIST., ARK | 0/00/00 | 8/22/85 | 0 | 04 | EXPLORATION AND PRODUCTIO |

OCC033408

Confidential

OCCNJ0026851

ALCD-PUBCOM_0002729

DATE: 9/01/86

LITIGATION SUMMARY LISTING
LITIGATION TRACKING SYSTEM
DIAMOND SHAMROCK CORPORATION

LRG200
PAGE: 6

| CASE_NAME | FORUM | FILE_DT | SERVE_DT | BIG | COMPANY |
|---|---|---|---|---|---|
| DECC V. UNITED ENERGY RESOURCES, INC., ET AL. | 55TH J.D.C. HARRIS CO., TX | 0/00/00 | 8/05/85 | 0 | 04 EXPLORATION AND PRODUCTIO |
| CAUSE: (SUIT FILE #999) TAKE-OR-PAY DISPUTE | | | | | |
| DUDLEY, T. A. ET AL V. AMOCO PRODUCTION COMPANY | 26TH J.D.C. STEVENS CO., KS | 0/00/00 | 0/00/00 | 0 | 04 EXPLORATION AND PRODUCTIO |
| CAUSE: (SUIT FILE #925) SUIT BY ROYALTY OWNER, INDIVIDUALLY AND AS REPRESENTATIVE OF A CLASS OF ROYALTY OWNERS, INCLUDING DSECC, OLEUM, DSCC (AND PERHAPS EVEN OTHER OF OUR ENTITIES) FOR COLLECTION OF INTEREST FROM AMOCO PRODUCTION CO. ON ACCOUNT OF PRESUMABLY SUSPENDED FUNDS WITHHELD BY AMOCO AND SUSPENDED AS A RESULT OF FEDERAL POWER COMMISSION ACTION. | | | | | |
| ENDICOTT, WM. THOS. V. DECC & CINCO EXPLORATION | 30TH J.D.C. KINGMAN CO., KS | 3/19/85 | 3/26/85 | 0 | 04 EXPLORATION AND PRODUCTIO |
| CAUSE: SEEKS JUDGMENT IN EXCESS OF $10,000 AND FOR PUNITIVE DAMAGES IN EXCESS OF $10,000. ALLEGES DAMAGES AS A RESULT OF DEFTS. FAILURE TO DRILL A WELL ON PLTFS. PROPERTY WITH FULL KNOWLEDGE THAT DRAINAGE WOULD OCCUR FROM PLTFS LAND (SUIT FILE #976) | | | | | |
| F.L.B. WICHITA V. BANGLE, WILLIAM A. ET AL. | D.C. GRAHAM CO., KS | 10/01/85 | | 0 | 04 EXPLORATION AND PRODUCTIO |
| CAUSE: (SUIT FILE #1004) MORTGAGE FORECLOSURE ON REAL ESTATE IN GRAHAM CO., KS IN WHICH DEFENDANT MAY CLAIM AN INTEREST. | | | | | |
| F.L.B. WICHITA V. KAISER, JOHN J. ET AL | D.C. GOVE CO., KS | 10/07/85 | 10/14/85 | 0 | 04 EXPLORATION AND PRODUCTIO |
| CAUSE: (SUIT FILE #1005) MORTGAGE FORECLOSURE ON REAL ESTATE IN GOVE CO., KS IN WHICH DEFENDANT MAY CLAIM AN INTEREST. | | | | | |
| F.L.B. WICHITA V. RITTER, BERNARD ET AL. | D.C. SHERIDAN CO., KS | 0/00/00 | 8/15/85 | C | 04 EXPLORATION AND PRODUCTIO |
| CAUSE: (SUIT FILE #996) MORTGAGE FORECLOSURE ON REAL ESTATE IN SHERIDAN CO., KS IN WHICH DEFENDANT MAY CLAIM AN INTEREST. | | | | | |
| F.L.B. WICHITA V. ROBE, ET AL DECC | LOGAN CNTY.KS. DISTRICT COURT | 9/21/84 | 9/28/84 | C | 04 EXPLORATION AND PRODUCTIO |
| CAUSE: (SUIT FILE #943) MORTGAGE FORECLOSURE AGAINST A DSEC LESSOR | | | | | |
| F.L.B. WICHITA V. ZIMMERMAN, EUGENE ET AL. | D.C. SHERIDAN CO., KS | 10/04/84 | 10/15/84 | 0 | 04 EXPLORATION AND PRODUCTIO |
| CAUSE: MORTGAGE FORECLOSURE ON REAL ESTATE IN SHERIDAN COUNTY, KANSAS IN WHICH DEFENDANT MAY CLAIM AN INTEREST. (SUIT FILE #954) | | | | | |
| FED LAND BANK OF WICHITA VS WILLIAM A. BANGLE | D18 CKT GRAHAM CNTY KANSAS | 1/01/85 | 1/04/85 | 0 | 04 EXPLORATION AND PRODUCTIO |
| CAUSE: MORTGAGE FORECLOSURE ON REAL ESTATE IN GRAHAM COUNTY, KANSAS IN WHICH DEFENDANT MAY CLAIM AN INTEREST | | | | | |

OCC033409

Confidential

OCCNJ0026852

ALCD-PUBCOM_0002730

DATE: 9/01/86

LITIGATION SUMMARY LISTING
LITIGATION TRACKING SYSTEM
DIAMOND SHAMROCK CORPORATION

L00200
PAGE: 7

| CASE NAME | ISSUE | FILE_DT | SERV_DT | BIG COMPANY |
|---|---|---|---|---|

**FIRST NATIONAL BANK FT. SMITH V. DSC & DULF OIL** — CH.C. CRAWFORD CO., AR — 0/00/00 — 9/30/85 — 0 — 04 EXPLORATION AND PRODUCTIO
CAUSE: (SUIT FILE #896) PLAINTIFFS DEMAND RELEASE AND CANCELLATION OF A PORTION OF A LEASE IN SECTION 6-7TH-R29W, CRAWFORD CO., ARKANSAS. DSEC REFUSED TO RELEASE BECAUSE IT HAD ALREADY ASSIGNED THE DISPUTED INTEREST TO DULF OIL CORP. PLAINTIFFS CONTEND THEY RELIED ON DSEC'S ORAL STATEMENTS THAT IT COULD AND WOULD RELEASE THE INTEREST, AND THAT DSEC'S REFUSAL CAUSED THEM TO LOSE AN OFFER FOR $24,000.

**FORTENBERRY, BILLYE BOLDEN ET AL V. STATE OF LA** — 19TH J.D.C. LA, E, BATON ROUGE — 7/12/85 — 7/12/85 — C — 04 EXPLORATION AND PRODUCTIO
CAUSE: (SUIT FILE #793) THE PLAINTIFF SEEKS TO REQUIRE THE COMMISSIONER OF CONSERVA-TION TO CHANGE THE EFFECTIVE DATE OF A UNIT ORDER, SEEKING TO CAUSE DS AS OPERATOR TO DISTRIBUTE THE PROCEEDS FROM THE UNIT WELL BEGINNING FROM THE DATE OF THE APPLICATION OR UNITIZATION.

**FOSTER CONSTRUCTION CO., INC. V. HIGH SUMMIT DAD** — 7TH J.D.C. NATRONA CO., WY — 0/00/00 — 4/11/85 — C — 04 EXPLORATION AND PRODUCTIO
CAUSE: (SUIT FILE #791) FORECLOSURE OF LIEN

**FOX, ROY O. ET UX V. DSC** — CH. C. SEBASTIAN CO., AR — 0/00/00 — 12/13/82 — C — 04 EXPLORATION AND PRODUCTIO
CAUSE: (SUIT FILE #861) SPECIFIC PERFORMANCE OF A TOPLEASE AGREEMENT

**GAULT, JESSE V. ENERGETICS OPERATING CO., ET AL** — 9TH J.D.C. SABINE CO., WY — 12/14/84 — 12/17/84 — 0 — 04 EXPLORATION AND PRODUCTIO
CAUSE: (SUIT FILE #745) FORECLOSURE OF LIEN

**GOLDSMITH, ROBERT O. ET UX V. DSC** — F.D.C., W. DIST AR, FT. SMITH — 0/00/00 — 10/14/83 — C — 04 EXPLORATION AND PRODUCTIO
CAUSE: (SUIT FILE #898) SUIT FOR SPECIFIC PERFORMANCE OF A TOPLEASE AGREEMENT

**GOODWIN, JOHN H. ET AL V. DSC** — 69TH J.D.C., MOORE CO., TX — 3/08/79 — 3/08/79 — C — 04 EXPLORATION AND PRODUCTIO
CAUSE: (SUIT FILE #856) PLAINTIFFS SEEK THE DIFFERENCE IN ROYALTIES PAID AND ROYALTIES DUE.

**GORE, WYLIE R. ET AL V. AMERADA HESS CORP., ET AL** — U.S.D.C. DIST. OF KS — 0/00/00 — 0/00/00 — C — 04 EXPLORATION AND PRODUCTIO
CAUSE: (SUIT FILE #969) HELIUM CLASS ACTION

**GRANIER, MIKE V. DSC** — U.S.D.C. WESTERN DIST, LA — 0/00/00 — 0/00/00 — 0 — 04 EXPLORATION AND PRODUCTIO
CAUSE: (SUIT FILE #922) PLAINTIFF WAS EMPLOYED BY CAD CONSTRUCTION COMPANY AND WAS WORKING AT A DS PLATFORM IN VERMILLION BLOCK 157 AS A GAUGER, WHEN HE SLIPPED AND FELL IN AN OIL SUBSTANCE.

OCC033410

Confidential

OCCNJ0026853

ALCD-PUBCOM_0002731

DATE: 9/01/86

LITIGATION SUMMARY LISTING
LITIGATION TRACKING SYSTEM
DIAMOND SHAMROCK CORPORATION

L00200
PAGE: 8

| CASE/NAME | ISSUE | FILE.DT SERVE.DT | BIG COMPANY |
|---|---|---|---|

**HERMAN, ALDENE CALEY ET AL V. DSC**
CAUSE: (SUIT FILE #985) PLAINTIFFS CLAIM DAMAGE FOR DRAINAGE FROM WELLS OFFSETTING THEIR LEASE.
84TH J.D.C., OCHILTREE CO., TX   5/30/85   0/00/00   04 EXPLORATION AND PRODUCTIO

**HENNON, EDNA J. ET AL V. DSC**
CAUSE: (SUIT FILE #628) MARKET VALUE SUIT ON GAS ROYALTY.
84TH J.D.C., OCHILTREE CO., TX   5/18/78   5/22/78   04 EXPLORATION AND PRODUCTIO

**HENTON OIL CO. V. MAG CO. & DSEC**
CAUSE:
U.S.BKY.C. NORTHER DIST, OK   0/00/00   C   04 EXPLORATION AND PRODUCTIO

**HILL, TOM AND SALLY BELLE CORNUTT V. DSC**
CAUSE: (SUIT FILE #999)
31ST J.D.C. HEMPHILL CO., TX   1/12/83   0/00/00   0   04 EXPLORATION AND PRODUCTIO

**HARBER, W. E. V. TEXACO & DSC**
CAUSE: (SUIT FILE #643) (SUIT FILE ALLEGES) INJURY WHILE EMPLOYED BY NOBLE DRILLING COMPANY AS A ROUSTABOUT ON A FIXED OFFSHORE PLATFORM OWNED BY DEFENDANTS (SUIT FILE #760)
J.D.B.C. EASTERN DIST, LA   10/19/84 10/23/84   0   04 EXPLORATION AND PRODUCTIO

**JEGTER, HUGH F. V. UNION OIL CO. OF CALIFORNIA**
CAUSE: (SUIT FILE #799) OFFSHORE PERSONAL INJURY ALLEGELY SUSTAINED 4-3-83 WHILE ABOARD THE PRODUCTION PLATFORM HIGH ISLAND 443-A OPERATED BY UNION OIL COMPANY OF CALIFORNIA.
FBIST J.D.C., HARRIS CO., TX   0/00/00   3/14/85   0   04 EXPLORATION AND PRODUCTIO

**JOHNSON, CHARLES ET UX V. PHILLIPS PET. CO., ET AL**
CAUSE: (SUIT FILE #742) SALT WATER WELL POLLUTION
316TH D.C., HUTCHISON CO., TX   0/00/00   3/23/84   0   04 EXPLORATION AND PRODUCTIO

**JONES, GLEN V. J. HOWARD HOOPER, ET AL**
CAUSE: (SUIT FILE #985) PLAINTIFF SEEKS $40,000 PLUS CANCELLATION OF OIL, GAS AND MINERAL LEASE, ALLEGING DEFENDANTS' FAILURE TO BURY PIPELINE, ETC.
39TH J.D.C., RED RIVER P., LA   2/11/83   0/00/00   04 EXPLORATION AND PRODUCTIO

**KIDD, ROLAND JR. ET AL V. RANGER OIL CO., ET AL**
CAUSE: (SUIT FILE #646) PETITIONERS STATE THAT DEFENDANT HAS DISREGARD, WRONGFULLY, MINERAL RENTS AND ROYALTIES ATTRIBUTABLE TO CERTAIN PROPERTY OF PETITIONERS TO PERSONS OTHER THAN PETITIONERS.
23RD J.D.C., ASSUMPTION P., LA   0/00/00   1/23/79   04 EXPLORATION AND PRODUCTIO

OCC033411

DATE: 9/01/86

LITIGATION SUMMARY LISTING
LITIGATION TRACKING SYSTEM
DIAMOND SHAMROCK CORPORATION

L00200
PAGE: 9

| CASE, NAME | EXIGH | FILE.DT BERNE.DT BIG COMPANY |
|---|---|---|

KORTIEG, TUIVO V. DREG, ET AL                16TH J.D.C., FALLON CO., MT        9/20/85   0/00/00   0   04 EXPLORATION AND PRODUCTIO
CAUSE: (SUIT FILE #1000) PLAINTIFF SEEKS UNSPECIFIED DAMAGES FOR PERSONAL INJURIES SUSTAINED 3/9/85 WHEN HE DROVE OVER A NEGLIGENTLY DESIGNED, INSTALLED OR MAINTAINED CULVERT ON US PROPERTY NORTH OF BAKER, MONTANA.

LADIMAR V. ERA & DOE                          U.S.C.APP, 5TH CIRCUIT              0/00/00   0/00/00   D   04 EXPLORATION AND PRODUCTIO
CAUSE: (SUIT FILE #951)

LAWSON, ROBERT LEE JR. ET AL V. BO-MICK CONSTRUCT, U.S.D.C., EASTERN DIST. LA    3/07/84   0/00/00   D   04 EXPLORATION AND PRODUCTIO
CAUSE: (SUIT FILE #919) SEAMAN'S COMPLAINT SEEKING FOR PERSONAL INJURIES AND DAMAGES ALLEGEDLY SUSTAINED ON OR ABOUT 11/6/83 ABOARD THE M/V BLUE STREAK V.

MONREL, ROBERT ET UX V. HUGHES TOOL CO., ET AL   BOTH J.D.C., HARRIS CO., TX     9/04/80   0/00/00   C   04 EXPLORATION AND PRODUCTIO
CAUSE: (SUIT FILE #741) PLAINTIFF SEEKS DAMAGES FOR PERSONAL INJURIES SUSTAINED WHILE A MEMBER OF A CASING CREW.

MARATHON PETROLEUM CO. V. STATE OF LOUISIANA     19TH J.D.C. E. BATON ROUGE PAR   0/00/00   3/26/85   D   04 EXPLORATION AND PRODUCTIO
CAUSE: (SUIT FILE #78) USE TAX CHALLENGE MATTER

MASON, THOS. KENNETH V. POPICH BROS. WATER TRANS.   21ST J.D.C. DIV. B, TANGIPAHOA  2/11/85  0/00/00   D   04 EXPLORATION AND PRODUCTIO
CAUSE: (SUIT FILE #775) PERSONAL INJURY CLAIM UNDER THE JONES ACT AND GENERAL MARITIM LAW FOR INJURIES ALLEGEDLY SUSTAINED ON MAIN PASS BLOCK 73 OPERATED BY MOBIL.

MCELVEEN, PAUL V. ERA HELICOPTERS & ANADARKO PROD.  U.S.D.C., EASTERN DIST. OF TX   8/03/84  0/00/00   D   04 EXPLORATION AND PRODUCTIO
CAUSE: (SUIT FILE #771) PERSONAL INJURY CLAIM FOR ALLEGED INJURIES SUFFERED ON ANADARKO-OPERATED PLATFORM ON HIGH ISLAND BLOCK 8-376.

MCLEOD, J.F. V. DSC                               CIR CT YAMHILL CNTY, OREGON     2/05/85   2/19/85   C   04 EXPLORATION AND PRODUCTIO
CAUSE: ASKING FOR FORECLOSURE OF CONTRACT OF SALE ON CERTAIN PROPERTY IN YAMHILL COUNTY (WHEREIN DSC WHICH DIAMOND SHAMROCK MAY HAVE AN INTEREST)
(SUIT FILE #72)

MOFFATT, R. J. V. DSC                             4TH J.D.C., OUACHITA PARISH LA  9/17/84   0/00/00   04 EXPLORATION AND PRODUCTIO
CAUSE: RULE AND ORDER TO SHOW CAUSE WHY YOU SHOULD NOT ANSWER THE INTERROGATORIES SERVED UPON YOU BY DEFENDANT ON OR ABOUT JUNE 15, 1984 (SUIT FILE #881)

OCC033412

Confidential

OCCNJ0026855

ALCD-PUBCOM_0002733

DATE: 9/01/86

LITIGATION SUMMARY LISTING
LITIGATION TRACKING SYSTEM
DIAMOND SHAMROCK CORPORATION

L00200
PAGE: 10

| CASE NAME | FORUM | FILE DT | RESOL DT | BIB COMPANY |
|---|---|---|---|---|

MUTUAL BENEFIT LIFE INS. CO. V. HAROLD L. COLLINS    D.C., HARVEY CO., KS    4/05/85  4/11/85  C  04 EXPLORATION AND PRODUCTIO
CAUSE: (SUIT FILE #986) MORTGAGE FORECLOSURE

NATIONAL HELIUM CORPORATION V. PANHANDLE EASTERN    U.S.D.C., DIST. OF KS    1/16/67  0/00/00  C  04 EXPLORATION AND PRODUCTIO
CAUSE: (SUIT FILE #106) INTERPLEADER ACTION TO DETERMINE OWNERSHIP OF HELIUM FUND FOR
HELIUM PROCESSED FROM NATURAL GAS BETWEEN LANDOWNERS, PRODUCERS AND NATURAL
GAS PURCHASERS.

NATIONAL SUPPLY CO. V. ENERGETICS, INC. ET AL (DBC 4TH J.D.C., JOHNSON CO., WY    12/05/84 12/13/84  0  04 EXPLORATION AND PRODUCTIO
CAUSE: (SUIT FILE #942) ENTRY OF APPEARANCE BY NEIL J.SHORT ON BEHALF OF AMERICAN
PETROLEUM DRILLING PROGRAM 1982 B-1 LTD. FORECLOSURE SUIT

NORRIS, KELLY LEE V. MOBIL OIL CORPORATION, ET AL    U.S.D.C. EASTERN DIST. LA    5/25/82  0/00/00  0  04 EXPLORATION AND PRODUCTIO
CAUSE: (SUIT FILE #031) SEEKING $7500,000 FOR PERSONAL INJURIES ALLEGEDLY SUSTAINED ON
OR ABOUT 5/24/81.

OLEUM INCORPORATED V. SWATCO ENERGIES, INC.    24TH J.D.C., CALHOUN CO., TX    0/00/00  0/00/00  0  04 EXPLORATION AND PRODUCTIO
CAUSE: (SUIT FILE #677) SUIT FOR RIGHTFUL SHARE OF OVERRIDING ROYALTY INTEREST IN
OIL, GAS AND MINERAL LEASES UNDER JOINT VENTURE AGREEMENT.

OLTRODGE, VICTOR, EXECUTOR V. DBC AND DBC    49TH J.D.C. MOORE CO., TX    11/07/00  0/00/00  0  04 EXPLORATION AND PRODUCTIO
CAUSE: (SUIT FILE 1016) PLAINTIFFS SEEK TERMINATION OF LEASE AND DAMAGE FOR BREACH
OF COVENANT.

PARKS ROBERT V. DBC    CHANCERY CT OF LOGAN CNTY ARK    2/24/85  2/28/85  C  04 EXPLORATION AND PRODUCTIO
CAUSE: SUIT SEEKING CANCELLATION OF AN OIL & GAS LEASE DATED 2-24-77 TO PROPERTY LOCA
TED IN LOGAN COUNTY, SUIT ALLEGES LEASE WAS NOT SIGNED BY PLAINTIFFS AND IS A
FORGERY (SUIT FILE #973)

PENNZOIL RESOURCES CORP. V. DBC    U.S.DKT.C., WESTERN DIST., OK    0/00/00  9/28/83  0  04 EXPLORATION AND PRODUCTIO
CAUSE: (SUIT FILE #095) SUIT TO RELEASE REVENUES ON WELL.

PHILLIPS PETROLEUM CO. V. PANHANDLE EASTERN    9/09/81  0/00/00  0  04 EXPLORATION AND PRODUCTIO
CAUSE: (SUIT FILE #841) ADMINISTRATIVE HEARING BEFORE TEXAS RAILROAD COMMISSION IN
REGARD TO WHITE OIL ISSUE

OCC033413

DATE: 9/01/84

LITIGATION SUMMARY LISTING
LITIGATION TRACKING SYSTEM
DIAMOND SHAMROCK CORPORATION

LRG200
PAGE: 11

| CASE NAME | FORUM | FILE DT BEKNE DT BIB COMPANY |
|---|---|---|
| PHILLIPS, EVERETT C. ET UX V. DEC ET AL. | CH.C., JOHNSON CO., AR | 0/00/00   4/24/81   C   04 EXPLORATION AND PRODUCTIO |
| CAUSE: (SUIT FILE #780) PLAINTIFFS ASKED FOR AN INJUNCTION AND $10,000 IN DAMAGES BECAUSE A COMPRESSOR NEAR THEIR HOME WAS MAKING NOIS AND DISTURBING THEM. | | |
| PIERRE, IRVING JR. V. MARINE DRILLING CO., ET AL. | U.S.D.C., EASTERN D TX, BEAUNT | 0/00/00   0/00/00   0   04 EXPLORATION AND PRODUCTIO |
| CAUSE: (SUIT FILE #872) PLAINTIFF WAS INJURED WHILE WORKING WITH CASING CREW ON JACK-UP RIG LOCATED OFF THE COAST NEAR VENICE, LA. JUST INSIDE THE 3-MILE TERRITOR-IAL LIMIT. | | |
| PLAQUEMINES PARISH COMM. COUNCIL V. MARINE DRILLING 25TH J.D.C. LA, PLAQ. PARISH | | 8/14/83   0/00/00   C   04 EXPLORATION AND PRODUCTIO |
| CAUSE: (SUIT FILE #1003) PLAINTIFF IS AUTHORIZED TO COLLECT THE PLAQUEMINES PARISH SALES AND/OR USE TAX THROUGH AN ORDINANCE ADOPTED 11/16/77. THE $108,000 IS ATTRIBUTABLE TO THE RIG J. STORM XII UNDER CONTRACT TO DSEC FOR THE DRILLING OF LOUISIANA BL 8498 (SOUTH PASS 61) AND BL 8498 (MAIN PASS 61). | | |
| PRICE, JACK V. DON F. LEVY, INC. ET AL. | U.S.D.C., WESTERN DIST, LA | 3/27/84   3/29/84   C   04 EXPLORATION AND PRODUCTIO |
| CAUSE: (SUIT FILE #928) PLAINTIFF WAS EMPLOYED BY DON F. LEVY, INC. AND LEVY-MELLON MARINE ABOARD THE BARGE MISSC ON 3/28/83 IN THE GULF OF MEXICO, WHILE IN THE COURSE AND SCOPE OF HIS EMPLOYMENT SUSTAINED SEVERE, PERMANENT, DISABLING INJURIES TO HIS BACK WHILE PULLING A MUD HOSE. | | |
| PRUDENTIAL INS. CO. V. JAMES NELSON INCL. DEC | BWANEE CO., KS D.C. | 9/28/84   10/04/84   C   04 EXPLORATION AND PRODUCTIO |
| CAUSE: MORTGAGE FORECLOSURE ON REAL ESTATE IN HOTCHISON COUNTY AND SALINE COUNTY, KANSAS IN WHICH DEFENDANT MAY CLAIM AN INTEREST (SUIT FILE #954). | | |
| REICHHOLD ENERGY CORP. A DREC V. STATE OF OREGON | COLUMBIA CO., OR | 12/14/84   0/00/00   0   04 EXPLORATION AND PRODUCTIO |
| CAUSE: (SUIT FILE #930) INTERPLEADER ACTION BROUGHT BY REICHHOLD, EG & OREGON NATURAL GAS TO DETERMINE OWNERSHIP OF CERTAIN ROYALTY INTERESTS. | | |
| REICHHOLD ENERGY CORP. V. STATE OF OREGON, ET AL. | C. APP., STATE OF OR | 6/09/84   0/00/00   C   04 EXPLORATION AND PRODUCTIO |
| CAUSE: (SUIT FILE #1001) APPEAL OF FINAL ORDER IN A FORCE-POOLING ACTION AS TO SETTLEMENT FOR PROCEEDS OF PRODUCTION TO OWNERS OF UNLEASED MINERAL INTERESTS. | | |
| RISTER, EDDIE RAY V. OFFSHORE EXPRESS, INC. ET AL. | U.S.D.C., EASTERN DIST, LA | 0/00/00   7/12/84   C   04 EXPLORATION AND PRODUCTIO |
| CAUSE: (SUIT FILE #937) COMPLAINT FOR DAMAGES ALLEGEDLY SUSTAINED IN AN ACCIDENT IN DECEMBER 1982 WHILE WORKING ABOARD THE M/V MONTROSE EXPRESS. | | |

OCC033414

DATE: 9/01/84

LITIGATION SUMMARY LISTING
LITIGATION TRACKING SYSTEM
DIAMOND SHAMROCK CORPORATION

L00200
PAGE: 12

CASE: NAME | FORUM | FILE DT | SERVE DT | DIS | COMPANY

ROBERTS, MEDIA E., ET AL V. DSC
CASE: (SUIT FILE #8111 LEASE CANCELLATION FOR FAILURE TO PRODUCE IN PAYING QUANTI-
TIES) AND RECOVERY OF ATTORNEYS' FEES UNDER ARTICLE 2226.
BATH D.C. OCHILTREE CO., TX   1/20/82   0/00/00   0   04 EXPLORATION AND PRODUCTIO

RULE DAN B. VS. DIAMOND SHAMROCK CORPORATION
CASE: WRONGFUL DRILLING OF OIL AND GAS WELL AND PRODUCTION OF OIL, GAS AND HYDRO-
CARBONS, JUDGMENT SUM UNSPECIFIED
CAMPBELL CNTY DIS CRT 6TH JD   4/08/84   4/15/84   0   04 EXPLORATION AND PRODUCTIO

SEALS, K.P., V. DS PETROLEUM CORPORATION
CASE: ANSWER AND CROSS CLAIM OF PRODUCTION MANAGEMENT CORPORATION ALLEGING A SUPER-
VISOR FOR DIAMOND SHAMROCK PETROLEUM HAD INSTRUCTED THE PLAINTIFF TO TEACH
A FIGUREANT FROM GULF COAST CONTRACTORS HOW TO OPERATE THE H/U WANISA, AND
DENYING NEGLIGENCE  (SUIT FILE #94)
U.S.D.C. EASTERN DIST. LA   9/24/84   9/25/84   0   04 EXPLORATION AND PRODUCTIO

SHAPIRO SIDNEY K. V. DSCC AND DS EXPLORATION
CASE: ACTION FOR DAMAGES FOR ALLEGED WASTE AND TORTIOUS BREACH OF CONTRACT UNDER OIL
AND GAS LEASES. TOTAL CLAIM IS $6,300,000.
D.C. SW J.D. CNTY BILLINGS N.D   2/13/86   2/14/86   0   04 EXPLORATION AND PRODUCTIO

BRSELL, JON B. V. COMPLETION WELL TESTERS ET AL
CASE: (SUIT FILE #93) PLAINTIFF SEEKING DAMAGES FOR AN INJURY ALLEGED TO HAVE
OCCURRED IN AN OFFSHORE OPERATION IN WHICH DS WAS UTILIZING LLOG ENERGY
PLUM'' OUT OF VENICE, LA.
U.S.D.C. WESTERN DIST. LA   0/00/00   5/18/84   0   04 EXPLORATION AND PRODUCTIO

BING, ELLEN ANN V. MARINE DRILLING CO., ET AL
CASE: (SUIT FILE #931) PERSONAL INJURIES ALLEGED TO HAVE BEEN SUSTAINED BY WILLIAM
J. BING, JR., THE DECEASED HUSBAND OF THE PLAINTIFF, UNDER VARIOUS STATUTES,
INCLUDING THE JONES ACT, AS A RESULT OF HIS ALLEGED WORK AS A CREW MEMBER ON
THE J STORM XII IN CONNECTION DRILLING ON VERMILION BLOCK 57, OFFSHORE LA.
U.S.D.C., EASTERN D. TX, BEAUMONT   0/00/00   2/13/84   0   04 EXPLORATION AND PRODUCTIO

BING, PATRICIA L.D. V. MARINE DRILLING CO., ET AL
CASE: (SUIT FILE #921) PERSONAL INJURIES ALLEGED TO HAVE BEEN SUSTAINED BY WILLIAM
J. BING, JR., THE DECEASED FATHER OF THE J STORM XII IN CONNECTION WITH DRILL-
HIS ALLEGED WORK AS A CREW MEMBER ON THE J STORM XII IN CONNECTION WITH DRILL-
ING THAT WAS OCCURRING ON VERMILION BLOCK 57, OFFSHORE LA.
U.S.D.C., EASTERN D. TX, BEAUMONT   1/07/85   1/15/85   C   04 EXPLORATION AND PRODUCTIO

STATE OF OREGON ACTING V. R. HAUN, DSC DBA DSCC
CASE: AIKINS FORECLOSURE OF MORTGAGE AGAINST PROPERTY IN CLATSOP COUNTY, OREGON, IN
WHICH DIAMOND SHAMROCK MAY HAVE SOME INTEREST)  (SUIT FILE #93)
CLATSOP CO., OREGON   1/15/85   C   04 EXPLORATION AND PRODUCTIO

OCC033415

Confidential

DATE: 9/01/86

LITIGATION SUMMARY LISTING
LITIGATION TRACKING SYSTEM
DIAMOND SHAMROCK CORPORATION

L00200
PAGE: 13

| CASE_NAME | FORUM | FILE_DT | SERVE_DT | BTB COMPANY |
|---|---|---|---|---|
| STEWART, C.A. ET AL V. DSC | 6TH D.C., MOORE CO., TX | 10/21/83 | 0/00/00 | 04 EXPLORATION AND PRODUCTIO |
| CAUSE: (SUIT FILE #899) BREACH OF IMPLIED COVENANT TO PROTECT AGAINST DRAINAGE, IN THE ALTERNATIVE, BREACH OF THE IMPLIED COVENANT TO REASONABLY DEVELOP THE LEASEHOLD PREMISES, AND BREACH OF IMPLIED COVENANT TO USE EVERY MECHANICAL AND ENGINEERING MEANS AVAILABLE TO INCREASE AND ENHANCE PRODUCTION. | | | | |
| STOBIE, WILLIAM MICHAEL V. BEN OAB COMPANY | U.B.D.C., WESTERN DIST., TX | 7/18/85 | 0/00/00 | 04 EXPLORATION AND PRODUCTIO |
| CAUSE: (SUIT FILE #1002) PLAINTIFF ALLEGES INJURIES TO UPPER RIGHT ARM, NECK, SHOULDER AND INJURIES TO BODY GENERALLY DUE TO SLIPPING ON AN UNLIT STAIRWAY AND FALLING AT THE FIXED PLATFORM FROM THE HELIPORT FOR WEST CAMERON BLOCK 639 OPERATED BY BEN | | | | |
| STOCKSTILL, BRUNER SCOTT ET UX V. MARINE DRILLING | U.B.D.C., EASTERN DIST., LA | 4/24/84 | 0/00/00 | 04 EXPLORATION AND PRODUCTIO |
| CAUSE: (SUIT FILE #921) PLAINTIFF ALLEGEDLY INJURED 7/9/81 WHILE PERFORMING SERVICES ABOARD THE RIG J. STORM XII.  THIRD PARTY COMPLAINT OF MARINE DRILLING COMPANY SEEKING RECOVERY OVER IN THE EVENT OF JUDGMENT IN FAVOR OF PLAINTIFF IN MAIN DEMAND. | | | | |
| BEN OIL CO., ET AL V. BROWN & ROOT, INC., ET AL | U.B.D.C., EASTERN DIST. OF LA | 0/00/00 | 0/00/00 | 04 EXPLORATION AND PRODUCTIO |
| CAUSE: (SUIT FILE #776) | | | | |
| THOMPSON, PHILLIP V. DSC & ANADARKO PROD. CO. | 6TH J.D.C., MOORE CO., TX | 2/11/85 | 2/11/85 | 04 EXPLORATION AND PRODUCTIO |
| CAUSE: (SUIT FILE #970) PLAINTIFFS SEEK LEASE CANCELLATION OR, IN THE ALTERNATIVE, DAMAGES DUE TO DEFENDANTS' ALLEGED FAILURE TO PROTECT AGAINST DRAINAGE AND TO REASONABLY DEVELOP. | | | | |
| TOLAR, THOMAS ET UX V. MCKERAN OFFSHORE PRODUCTION | U.B.D.C., WESTERN DIST. OF LA | 9/11/85 | 0/00/00 | 04 EXPLORATION AND PRODUCTIO |
| CAUSE: (SUIT FILE #1010) PLAINTIFF ALLEGES PERSONAL INJURIES AND DAMAGES SUSTAINED ON OR ABOUT DECEMBER 30, 1984 WHEN HE FELL FROM A LADDER LEADING FROM THE DECK OF A CRANE ACCESS PLATFORM TO THE CRANE ON HIGH ISLAND A 474A. | | | | |
| TRANSWORLD DRILLING CO V. TEXAS GENERAL RESOURCES | CIV. D.C. FAR POBFEALA-HACNE | 7/11/85 | 7/11/85 | 04 EXPLORATION AND PRODUCTIO |
| CAUSE: NOTICE TO APPOINT AND APPRAISE PROPERTY SEIZED IN THE ABOVE SUIT AND TO NOTIFY SHERIFF AT LEAST 7 DAYS PRIOR TO SELL (SUIT FILE #847) | | | | |
| TUT EXPLORATION, INC. V. W.E. BAUER AND DSC | CENTRAL DIV., UTAH U.B.DKY.C. | 9/24/84 | 10/12/84 | 04 EXPLORATION AND PRODUCTIO |
| CAUSE: BAUER OBTAINED A JUDGMENT AGAINST PLAINTIFF AND SENT OUT WRITS OF GARNISHMENT TO DIAMOND WHICH WAS PAID TO BAUER. PLAINTIFF IS NOW CLAIMING THAT THESE FUNDS SHOULD BE RETURNED AND CONSIDERED ASSETS OF THE BANKRUPTCY ESTATE. (SUIT FILE #932) | | | | |

OCC033416

LITIGATION SUMMARY LISTING
LITIGATION TRACKING SYSTEM
DIAMOND SHAMROCK CORPORATION

DATE: 9/01/86

LGU200
PAGE: 14

| CASE_NAME | FORUM | FILE_DT | SERVE_DT | SIB | COMPANY |
|---|---|---|---|---|---|
| UNION, MOBIL & DEC V. R/V POINT DOVER & POINT MAR U.S.D.C., SOUTHERN D., HOUSTON | | 0/00/00 | 0/00/00 | C | 04 EXPLORATION AND PRODUCTIO |
| CASE: (SUIT FILE #867) RECOVERY FOR DAMAGE TO 6" PIPELINE OFF THE COAST OF TEXAS IN THE GULF OF MEXICO ON HIGH ISLAND BLOCK A-433 | | | | | |
| VINSON SUPPLY CO., V. ENERGETICS OPERATING CO., ET 9TH J.D.C., BURKETTE CO., WY | | 0/00/00 | 10/23/84 | 0 | 04 EXPLORATION AND PRODUCTIO |
| CASE: (SUIT FILE #958) LIEN FORECLOSURE | | | | | |
| WAGENHEN, FRED B. V. RAYMOND CHERNEY, ET AL. 6TH J.D.C., CAMPBELL CO., WY | | 10/03/85 | 0/00/00 | 0 | 04 EXPLORATION AND PRODUCTIO |
| CASE: (SUIT FILE #1007) CANCELLATION OF DEFENDANTS' INTEREST IN OIL AND GAS LEASE, JUDGMENT AMOUNT UNSPECIFIED. | | | | | |
| WALTON, PHILLIP L., SR. V. FREEPORT-MCMORAN, INC. U.S.D.C., E. DIST. OF LA | | 9/20/85 | 0/00/00 | 0 | 04 EXPLORATION AND PRODUCTIO |
| CASE: (SUIT FILE #1009) SUIT SEEKING APPROXIMATELY $3,200,000 FOR PERSONAL INJURIES ALLEGEDLY SUSTAINED ON OR ABOUT 9/20/84. | | | | | |
| WARD, L. D. ET AL V. KENNETH BALL, ET AL INC DSC D.C. GARFIELD CO., OK | | 0/00/00 | 4/14/82 | 0 | 04 EXPLORATION AND PRODUCTIO |
| CASE: (SUIT FILE #819) WARD BROUGHT THIS LAWSUIT AS OPERATOR OF A WELL, CLAIMING THAT DEFENDANTS DEPOSED DRILLING ADDITIONAL WELLS SO THAT PLAINTIFFS' LEASES WOULD EXPIRE AND DEFENDANTS' TOP LEASES WOULD BECOME EFFECTIVE. | | | | | |
| WILLIAMS, CALVIN V. METAL BUILDING PROD., ET AL 24TH J.D.C., JEFFERSON PAR, LA | | 4/03/84 | 0/00/00 | 0 | 04 EXPLORATION AND PRODUCTIO |
| CASE: (SUIT FILE #982) PERSONAL INJURY CLAIM RESULTING FROM A FALL FROM A HELIPORT ONSHORE CONNECTED WITH THE HATHODGON ISLAND BLOCK 713-9 PLATFORM OPERATED BY MCMORAN. | | | | | |
| ZIEGLER, GEORGE T. ET AL V. CINCO EXPL CO., ET AL D.C. SHERIDAN CO., KS | | 6/04/84 | 0/00/00 | 0 | 04 EXPLORATION AND PRODUCTIO |
| CASE: (SUIT FILE #934) LEASE TERMINATION FOR FAILURE TO PRODUCE IN PAYING QUAN- TITIES; IN THE ALTERNATIVE, SEEKING FURTHER DEVELOPMENT OF THE LEASEHOLD PREMISES. INVOLVES LEASE NO. 15-0540. | | | | | |

TOTAL # OF CASES:   118

OCC033417

Confidential

OCCNJ0026860
ALCD-PUBCOM_0002738

Case 2:22-cv-07326-MCA-LDW    Document 309-23    Filed 04/01/24    Page 515 of 1022
PageID: 15708

DATE: 9/01/86

LITIGATION SUMMARY LISTING
LITIGATION TRACKING SYSTEM
DIAMOND SHAMROCK CORPORATION

LOG200
PAGE 1

| CASE NAME | ISSUE | FILE DI RESVE DI BIG COMPANY |
|---|---|---|
| AMERICAN NATIONAL BANK VS. CARL WELLS, INCL. DSC | CREEK CTY, OKLA., J. DIST CRT | 10/01/82  0/00/00  D  07 REFINING/MARKETING UNIT |
| CAUSE: SUIT TO DECLARE DEFENDANT WELL'S PROPERTY EXEMPT FROM DIAMOND SHAMROCK'S JUDGMENT LIEN OBTAINED IN THE ORIGINAL SUIT AGAINST WELLS. (SUIT FILE 642) | | |
| ANCELET, WILHELMINE VS. SIGNOR NO. 297 AND NFIDO | PARISH OF CALCASIEU, J.D. CT. | 3/24/86  3/30/86  D  07 REFINING/MARKETING UNIT |
| CAUSE: PLAINTIFF SEEKS DAMAGE FOR PERSONAL INJURIES SUSTAINED IN A FALL AT SIGNOR STATION IN SULPHUR, LOUISIANA. (SUIT FILE 1279) **** | | |
| ANDERSON, CECIL M. VS. DIAMOND SHAMROCK, INC. | HARRIS CTY, J. DIST. COURT | 4/23/85  0/00/00  D  07 REFINING/MARKETING UNIT |
| CAUSE: PLAINTIFF SUES FOR DAMAGES DUE TO ALLEGED WRONGFUL CRIMINAL COMPLAINT. (SUIT FILE 1226) **** | | |
| ANDERSON, HAZEL R. VS. DIAMOND SHAMROCK CORP. | BELL CTY., J. DIST. COURT | 6/11/84  0/00/00  D  07 REFINING/MARKETING UNIT |
| CAUSE: EX-EMPLOYEE SUING FOR DAMAGES DUE TO SLANDEROUS REMARKS MADE BY DEFENDANT (EMPLOYEE). (SUIT FILE 1190) **** | | |
| ARGONAUT SOUTHWEST INS.CO. VS. WACO TANK LINES | TARRANT CTY., J. DIST. COURT | 2/22/85  0/00/00  D  07 REFINING/MARKETING UNIT |
| CAUSE: PLAINTIFF SUES WACO TANK LINES FOR DAMAGE RESULTING IN INJURIES TO CLIENT. (SUIT FILE 1225) **** | | |
| AUMAN, MINTY VS. WHITE & SONS CONST. & DSC | POTTER CTY., DISTRICT COURT | 2/06/84  2/26/84  C  07 REFINING/MARKETING UNIT |
| CAUSE: PLAINTIFF SEEKS DAMAGES FOR INJURIES TO A MAKE WHEN SHE FELL INTO A DITCH DUG BY DEFENDANT WHITE & SONS FOR DIAMOND SHAMROCK. (SUIT FILE 1265) **** | | |
| AUSTIN, GLEN A. VS. TEXACO, ET AL DIAMOND SHAMROCK CORP. | HARRIS CTY., J. DIST. CT. | 4/05/84  0/00/00  C  07 REFINING/MARKETING UNIT |
| CAUSE: PLAINTIFF SUING FOR DAMAGES DUES TO LUNG CANCER HE CONTRACTED AND ALLEGED WAS CAUSED BY CHEMICALS MANUFACTURED AND PRODUCED BY DEFENDANTS. (SUIT FILE 1175) **** | | |
| AUSTIN, LILLIE VS. DIAMOND SHAMROCK CORP. | HARRIS CTY., J. DIST. COURT | 10/24/84  10/26/84  C  07 REFINING/MARKETING UNIT |
| CAUSE: PLAINTIFF SEEKS DAMAGES FOR PERSONAL INJURIES SUSTAINED IN A FALL AT SIGNOR #208 IN HOUSTON, TEXAS. (SUIT FILE 1207) **** | | |
| BAKER, DANA VS. SIGNOR CORPORATION ET AL | PARISH OF LA FOURCHE J. DIST. | 8/30/85  9/05/85  D  07 REFINING/MARKETING UNIT |
| CAUSE: PLAINTIFF SEEKS DAMAGES FOR PERSONAL INJURIES SUSTAINED IN A FALL AT SIGNOR #614 IN THIBODAUX, LOUISIANA. (SUIT FILE 1247) **** | | |

OCC033418

Confidential

OCCNJ0026861

ALCD-PUBCOM_0002739

DATE: 9/01/86

LITIGATION SUMMARY LISTING
LITIGATION TRACKING SYSTEM
DIAMOND SHAMROCK CORPORATION

L08200
PAGE 2

| CASE NAME | FORUM | FILE DT | SERVE DT | BIG COMPANY |
|---|---|---|---|---|
| BALTAZAR, EUGELIO ET AL. VS. BIGNOR CORP., ET AL. | BEE CTY., J. DIST. COURT | 9/27/83 | 0/00/00 | C 07 REFINING/MARKETING UNIT |
| CAUSE: PLAINTIFF SEEKS DAMAGES FOR PERSONAL INJURIES SUSTAINED WHEN MINOR SON DRANK PEPSI BOTTLE PURCHASED AT BIGNOR #37 IN BEEVILLE, TEXAS AND IT EXPLODED. (SUIT FILE 1140) **** | | | | |
| BARROW, JOBE VS. BIGNOR CORPORATION | NAECES CTY., J. DIST. COURT | 2/24/84 | 2/27/84 | C 07 REFINING/MARKETING UNIT |
| CAUSE: PLAINTIFF SEEKS DAMAGES FOR PERSONAL INJURIES SUSTAINED IN A FALL AT BIGNOR # 974 IN CORPUS CHRISTI, TEXAS. (SUIT FILE 1264) **** | | | | |
| BENAVIDES, ESMERALDA VS. MISSION PETROLEUM CARRIER JIM WELLS CTY., J. DIST. CRT. | | 6/14/84 | 6/21/84 | C 07 REFINING/MARKETING UNIT |
| CAUSE: PLAINTIFF SEEKS DAMAGES FOR PERSONAL INJURIES AND PROPERTY DAMAGE SUSTAINED IN AUTO ACCIDENT. (SUIT FILE 1193) **** | | | | |
| BENAVIDES, ESMERALDA, ET AL. VS. BIGNOR CORPORATION BEXAR CTY., J. DIST. COURT | | 5/13/83 | 5/24/83 | C 07 REFINING/MARKETING UNIT |
| CAUSE: PLAINTIFF SEEKS DAMAGES FOR PERSONAL INJURIES AND PROPERTY DAMAGE SUSTAINED IN AUTO ACCIDENT. (SUIT FILE 1096) **** | | | | |
| BENNETT, JIM INC. VS. MARTIN DRECHSEN (INCL. DSC MORE CTY., J. DIST. COURT | | 5/08/85 | 0/00/00 | D 07 REFINING/MARKETING UNIT |
| CAUSE: PLAINTIFF IS SUING DEFENDANT DRECHSEN FOR FAILURE TO PAY ON ACCOUNT. PLTF. IS CROSS CLAIMING AGAINST DIAMOND SHAMROCK CORPORATION DUE TO THE FACT THAT THE DEFENDANT (DRECHSEN) CLAIMS THE PURCHASED PRODUCT WAS DEFECTIVE. (SUIT FILE 1229) **** | | | | |
| BILLIOT, ADAM VS. BIGNOR CORPORATION | LOUISIANA, J. DIST. COURT | 9/02/83 | 0/00/00 | D 07 REFINING/MARKETING UNIT |
| CAUSE: PLAINTIFF SEEKS DAMAGES FOR PERSONAL INJURIES SUSTAINED IN A FALL AT BIGNOR #613 IN HOUMA, LOUISIANA. (SUIT FILE 1136) **** | | | | |
| BOLTON, HALENE VS. CLYDE AUSTIN AND BIGNOR CORP. | HARRIS CTY., J. DIST. COURT | 7/11/84 | 8/01/84 | C 07 REFINING/MARKETING UNIT |
| CAUSE: PLAINTIFF SEES FOR INJURIES AND PROPERTY DAMAGE SUSTAINED IN AUTO ACCIDENT. (SUIT FILE 1193) | | | | |
| BOURGEOIS, CURTIS A. VS. BIGNOR CORPORATION | BATON ROUGE, J. DIST. COURT | 9/28/79 | 0/00/00 | C 07 REFINING/MARKETING UNIT |
| CAUSE: PLAINTIFF SEEKS DAMAGES FOR PERSONAL INJURIES SUSTAINED IN A FALL AT BIGNOR # 985 IN BATON ROUGE, LOUISIANA. (SUIT FILE 1025) **** | | | | |
| BOUSKA, CHARLES W. VS. INS. CO. OF PENNSYLVANIA | HARRIS CTY., J. DIST. COURT | 8/13/81 | 0/00/00 | C 07 REFINING/MARKETING UNIT |
| CAUSE: SUIT FOR PAYMENT OF WORKER'S COMPENSATION BENEFITS FOR ALLEGED ON THE JOB INJURY. (SUIT FILE 1026) **** | | | | |

OCC033419

Confidential

```
                                    LITIGATION SUMMARY LISTING                                    LSU200
                                    LITIGATION TRACKING SYSTEM                                    PAGE  3
                                    DIAMOND SHAMROCK CORPORATION

DATE:  9/01/86

CASE NAME                                          ORIGIN                          FILE DT   SERVE DT  DIS  COMPANY

BREEDEN, CANDACE VS. DIAMOND SHAMROCK CORPORATION  JEFFERSON CTY., J. DIST. CRT.   10/26/83  0/00/00   0   07 REFINING/MARKETING UNIT
  CAUSE: PLAINTIFF SEEKS DAMAGES FOR PERSONAL INJURIES SUSTAINED IN A FALL AT BIGNOR @
         242 IN ORANGE, TEXAS. (SUIT FILE 1146) ****

BULL, JAMES VS. FILL-EM FAST, ET AL                SUPERIOR COURT OF CA.           11/01/83  0/00/00   C   07 REFINING/MARKETING UNIT
  CAUSE: PLAINTIFF SEEKS DAMAGES FOR INJURIES SUSTAINED AT SERVICE STATION. (SUIT FILE
         1155)

CAMP, RALPH W. ET AL VS. WARREN PETROLEUM & DSMC   CHAMBERS CTY., J. DIST. COURT   1/17/86   3/04/86   0   07 REFINING/MARKETING UNIT
  CAUSE: PLAINTIFF ALLEGE DEFENDANT'S NEGLIGENCE IN OPERATING MONT BELVIEU SALT DOME
         IN SUCH A MANNER AS TO ALLOW THE INTRODUCTION OF NOXIOUS GASES INTO THE AIR.
         (THIS LAWSUIT IS RELATED TO VARIOUS OTHER LAWSUITS FILED AGAINST DIAMOND SHAM-
         ROCK IN CONNECTION WITH THE MONT BELVIEU FACILITIES.) (SUIT FILE 1241) ****

CASTRO, GILBERT & ADELINE VS. BIGNOR NUMBER 25,INC J.D. DIST. CTY., BEXAR CTY, TX  5/23/84   6/02/86   0   07 REFINING/MARKETING UNIT
  CAUSE: PLAINTIFF SEEKS DAMAGES FOR PERSONAL INJURIES AND PROPERTY DAMAGE SUSTAINED
         AT BIGNOR #25, IN SAN ANTONIO, TEXAS. (SUIT FILE 1276) ****

CHWPA, ADOLF R., JR. VS. BIGNOR CORPORATION        TARRANT CTY., J. DIST. COURT    12/15/82  0/00/00   C   07 REFINING/MARKETING UNIT
  CAUSE: FRAUD. (SUIT FILE 1105)

CHATHAM, DORIS VS. BIGMORE-SHAMROCK STATION #108   HARRIS CTY., J. DIST. COURT     11/26/84  0/00/00   0   07 REFINING/MARKETING UNIT
  CAUSE: PLAINTIFF SEEKS DAMAGES FOR PERSONAL INJURIES SUSTAINED WHEN A GAS HOSE MAL-
         FUNCTIONED AND SPRAYED HER WITH GASOLINE AT BIGNOR #108 IN HIGHLANDS, TEXAS.
         (SUIT FILE 1212) ****

CHAVEZ, CESAR E. VS. TURNER BROADCASTING CORP.     BEXAR CTY., J. DIST. COURT      1/11/80   0/00/00   0   07 REFINING/MARKETING UNIT
  CAUSE: PLAINTIFF ALLEGES THAT HE HAS SUFFERED LOSS OF REPUTATION, SHAME,
         MORTIFICATION, ETC. DUE TO STATEMENTS MADE BY DEFENDANTS ON RADIO STATION
         KRUC. (SUIT FILE 1080) ****

COHEN, MAX E. VS. DIAMOND SHAMROCK CORP.           DEWITT CTY., J. DIST. COURT     4/19/85   0/00/00   0   07 REFINING/MARKETING UNIT
  CAUSE: PLAINTIFF SEEKS DAMAGES FOR PERSONAL INJURIES SUSTAINED IN A FALL AT BIGNOR #
         166 IN CUERO, TEXAS. (SUIT FILE 1234) ****

COLLARD, ALICE VS. MICHAEL CRANK AND DSC           GALVESTON CTY., J. DIST. COURT  10/02/85  10/15/85  0   07 REFINING/MARKETING UNIT
  CAUSE: PLAINTIFF SEEKS DAMAGES FOR PERSONAL INJURIES AND PROPERTY DAMAGE SUSTAINED IN
         AUTO ACCIDENT. (SUIT FILE 1249) ****
```

OCC033420

Confidential

DATE: 9/01/86

LITIGATION SUMMARY LISTING
LITIGATION TRACKING SYSTEM
DIAMOND SHAMROCK CORPORATION

L02200
PAGE: 1

| CASE NAME | ISSUE | FILE DT | SERVE DT | BIG COMPANY |
|---|---|---|---|---|
| COON, DARLENE L. VS. DIAMOND SHAMROCK CORP. | | | | |
| CAUSE: PLAINTIFF SEEKS DAMAGES FOR PERSONAL INJURIES AND PROPERTY DAMAGE SUSTAINED IN AUTO ACCIDENT. (SUIT FILE 1298) **** | MARICOPA CTY, ARZ, SUPERIOR CT | 4/12/85 | 0/00/00 | 07 REFINING/MARKETING UNIT |
| CORLEY, MARY FRANCIS VS. SIGMOR CORPORATION | | | | |
| CAUSE: PLAINTIFF SEEKS DAMAGE FOR PERSONAL INJURY SUSTAINED DURING ALTERCATION WITH STATION EMPLOYEE AT SIGMOR #770 IN TERRELL, TEXAS. (SUIT FILE 1033) **** | KAUFMAN CTY., J. DIST. COURT | 11/12/82 | 0/00/00 | 07 REFINING/MARKETING UNIT |
| CROUCH, LOUISE VS. DIAMOND SHAMROCK CORPORATION | | | | |
| CAUSE: PLAINTIFF SEEKS DAMAGES FOR PERSONAL INJURIES SUSTAINED IN A FALL AT SIGMOR # 812 IN SAN ANTONIO, TEXAS. (SUIT FILE 1277) **** | BEXAR COUNTY, 37TH J. DIST CRT | 5/16/86 | 6/04/86 | 07 REFINING/MARKETING UNIT |
| DAVIDSON, WALTER VS. SIGMOR SHAMROCK SERVICE STA. | | | | |
| CAUSE: PLAINTIFF SEEKS DAMAGES FOR PERSONAL INJURIES SUSTAINED IN A FALL AT SIGMOR # 703 IN HOUSTON, TEXAS. (SUIT FILE 1034) | HARRIS CITY, J. DIST. COURT | 12/14/82 | 12/27/82 | 07 REFINING/MARKETING UNIT |
| DE PALMA, SALLY VS. DIAMOND SHAMROCK R&M COMPANY | | | | |
| CAUSE: PLAINTIFF SEEKS FOR DAMAGES REGARDING SLANDER AND WRONGFUL TERMINATION OF EMPLOYEE AT A SIGMOR STATION IN HOUSTON, TEXAS. (SUIT FILE 1282) **** | GALVESTON CITY, J.J.DIST. CT. | 4/16/86 | 7/02/86 | 07 REFINING/MARKETING UNIT |
| DIAMOND SHAMROCK R & M CO. VS. STANDARD OIL | | | | |
| CAUSE: PLAINTIFF SUES FOR RECOVERY OF CRUDE AND D. D. E. OVERCHARGES. (SUIT FILE 1203) | OHIO, U. S. DIST. COURT | 7/31/84 | 0/00/00 | 07 REFINING/MARKETING UNIT |
| DIAMOND SHAMROCK R & M CO. VS. TRANS-PAN GATHERING POTTER CTY., J. DIST. COURT | | | | |
| CAUSE: NOTICE OF LIEN AGAINST AND CLAIM FOR PAYMENT OF THE PROCEEDS FROM PROCESSING AND PURCHASE OF 1041, FILED BY PAGE PETROLEUM. (SUIT FILE 1236) | | 6/25/85 | 0/00/00 | 07 REFINING/MARKETING UNIT |
| DIAMOND SHAMROCK R&M CO. VS. TEXAS NORTH WEST, RR MOORE COUNTY, DIST. COURT | | | | |
| CAUSE: PLAINTIFF SEEKS FOR DECLARATORY AND INJUNCTIVE RELIEF RELATIVE TO CERTAIN TRACKAGE RIGHT OF WAY. (SUIT FILE 1233) | | 8/07/85 | 0/00/00 | 07 REFINING/MARKETING UNIT |
| DIAMOND SHAMROCK R&M VS. DANIEL J. ROBERTS | | | | |
| CAUSE: PLAINTIFF SEEKS JUDGMENT AGAINST THE DEFENDANT IN THE AMOUNT OF $193,743.47 FOR REFUSAL OF PAYMENT OF GOODS PROVIDED. (SUIT FILE 1273) | U.S. DIST CT, DIST. OF KANSAS | 5/05/86 | 5/06/86 | 07 REFINING/MARKETING UNIT |

OCC033421

Confidential

DATE: 9/01/86

LITIGATION SUMMARY LISTING
LITIGATION TRACKING SYSTEM
DIAMOND SHAMROCK CORPORATION

PAGE: 5
L00200

| CASE NAME | FORUM | FILE DT | SERVE DT | STS | COMPANY |
|---|---|---|---|---|---|
| DOWNING SERVICES, INC. VS. DIAMOND SHAMROCK | STATE COURT, FULTON CITY, GA. | 8/05/85 | 8/07/85 | 07 | REFINING/MARKETING UNIT |
| CASE: PLAINTIFF SEEKS JUDGMENT FOR DEFENDANT'S BREACH OF CONTRACT. (SUIT FILE 1240) | | | | | |
| DRUMMOND, MARTIN B. VS. SIGMOR CORPORATION | NECES COUNTY, J. DIST. COURT | 4/26/81 | 0/00/00 | 07 | REFINING/MARKETING UNIT |
| CASE: PLAINTIFF SEEKS DAMAGES FOR PERSONAL INJURY SUSTAINED DURING ELECTRICAL EXPLOSION AT THREE RIVERS REFINERY. (SUIT FILE 1003) | | | | | |
| ELIE, JAMES R. VS. SIGMOR #414, INC. | LOUISIANA, J. DISTRICT COURT | 2/20/80 | 0/00/00 | 07 | REFINING/MARKETING UNIT |
| CASE: PLAINTIFF SEEKS DAMAGES FOR PERSONAL INJURIES SUSTAINED WHEN GAS HOSE MAL-FUNCTIONED AND SPRAYED HIM WITH GASOLINE AT SIGMOR #414 IN ALEXANDRIA, LOUISIANA. (SUIT FILE 1221) | | | | | |
| ESMAY, SHARON A. VS. AUTOTRONIC SYSTEMS, INC. | ORANGE CITY., J. DIST. COURT | 6/05/85 | 8/14/85 | 07 | REFINING/MARKETING UNIT |
| CASE: PLAINTIFF SUING FOR WORKER'S COMPENSATION BENEFITS IN THE STATE OF CALIFORNIA. (SUIT FILE 1243) | | | | | |
| EVANS, JOYCE L. VS. DIAMOND SHAMROCK CHEM. CO. | LOUISIANA J. DIST. COURT | 2/09/84 | 0/00/00 | 07 | REFINING/MARKETING UNIT |
| CASE: PLAINTIFF SEEKS DAMAGES FOR TRESPASS/FALSE ARREST AND HUMILIATION WHEN FALSELY ARRES-TED FOR STEALING AT SIGMOR #454 IN THIBODAUX, LOUISIANA. (SUIT FILE 1147) | | | | | |
| FRANCY, RITA VS. DIAMOND SHAMROCK CORPORATION | HARRIS CITY., J. DIST COURT | 8/13/85 | 9/05/85 | 07 | REFINING/MARKETING UNIT |
| CASE: PLAINTIFF SEEKS DAMAGES FOR PERSONAL INJURIES SUSTAINED IN A FALL AT SIGMOR # 919 IN HOUSTON, TEXAS. (SUIT FILE 1246) | | | | | |
| FRISONE, DOMINIC VS. AUTOTRONIC SYSTEMS, INC. | SANTA CLARA CITY., J. DIST. CT. | 4/22/81 | 0/00/00 | 07 | REFINING/MARKETING UNIT |
| CASE: PLAINTIFF SUED FOR DAMAGE TO PROPERTY BY ASI STATION. (SUIT FILE 111B) | | | | | |
| GANDY, DOROTHY M. VS. SIGMOR CORPORATION | HARRIS CITY., J. DIST. COURT | 12/17/80 | 1/26/80 | 07 | REFINING/MARKETING UNIT |
| CASE: PLAINTIFF SEEKS DAMAGES FOR PHYSICAL PAIN, MENTAL ANGUISH, ETC. ARISING OUT OF ALLEGED FALSE ARREST AND MALICIOUS PROSECUTION AT SIGMOR #701 IN JACINTO CITY, TEXAS. (SUIT FILE 1055) | | | | | |
| GARBER, ARLINE VS. AUTOTRONIC SYSTEMS, INC. | SUPERIOR COURT, CA.,L.A. CITY | 10/28/81 | 10/28/83 | 07 | REFINING/MARKETING UNIT |
| CASE: PLAINTIFF SEEKS DAMAGES FOR INJURIES SUSTAINED IN ALLEGED SLIP AND FALL AT STATION. (SUIT FILE 1145) | | | | | |

OCC033422

Confidential

DATE: 9/01/86

LITIGATION SUMMARY LISTING
LITIGATION TRACKING SYSTEM
DIAMOND SHAMROCK CORPORATION

L00200
PAGE 6

| CASE NAME | FORUM | FILE DT | SERVE DT | RES COMPANY |
|---|---|---|---|---|
| GARCIA, JOHN VS. DIAMOND SHAMROCK | NUECES CTY., J. DIST. COURT | 4/20/85 | 0/00/00 | 07 REFINING/MARKETING UNIT |
| CAUSE: PLAINTIFF SEEKS DAMAGES FOR HUMILIATION WHEN HE WAS FALSLY DETAINED AND INTER-OGATED AT SIGMOR #142 IN CORPUS CHRISTI, TEXAS. (SUIT FILE 1232) **** | | | | |
| GARCIA, SALLY ANN VS. DIAMOND SHAMROCK R&M COMPANY CALHOUN CTY., J. DIST. COURT | | 10/25/85 | 11/04/85 | 07 REFINING/MARKETING UNIT |
| CAUSE: PLAINTIFF IS EX-EMPLOYEE AND ALLEGES THAT DEFENDANT WRONGLY ACCUSED HER OF STEALING MONEY FROM SIGMOR #418 WHERE SHE WORKED. SHE IS CLAIMING SLANDER, LIBEL AND MALICIOUS PROSECUTION AGAINST DIAMOND SHAMROCK REFINING AND MARKET-ING COMPANY. (SUIT FILE 1251) **** | | | | |
| GEORGE WEST TRUCK STOP VS. MISSION TRANSPORT CO. LIVE OAK CTY., J. DIST. COURT | | 7/17/84 | 7/19/84 | 07 REFINING/MARKETING UNIT |
| CAUSE: PLAINTIFF ALLEGES THAT DEFENDANT'S EMPLOYEE LEFT COVER OFF OF GAS TANKS, CAUSING WATER TO GET INTO TANKS AND CONTAMINATE FUEL. (SUIT FILE 1194) **** | | | | |
| GONZALEZ, ELIAN VS. DIAMOND SHAMROCK CORPORATION BEXAR CTY., J. DIST. COURT | | 4/01/84 | 0/00/00 | 07 REFINING/MARKETING UNIT |
| CAUSE: PLAINTIFF SUED TO RECOVER $5,495.45 PLUS INTEREST AND EXEMPLARY DAMAGES FOR FRAUD. (SUIT FILE 1107) **** | | | | |
| GONZALEZ, GLORIA VS. SIGMOR CORP., D&C & DSRMC BEXAR CTY., J. DIST. COURT | | 8/17/84 | 8/20/84 | 07 REFINING/MARKETING UNIT |
| CAUSE: PLAINTIFF SUES FOR DAMAGE DUE TO SLIP AND FALL AS SIGMOR STATION. (SUIT FILE 1197) | | | | |
| GUZMAN, PANAGIOTA VS. INDUSTRIAL LUBRICANTS CO. NUECES CTY., COUNTY COURT #2 | | 5/07/85 | 0/00/00 | 07 REFINING/MARKETING UNIT |
| CAUSE: PLAINTIFF SEEKS DAMAGES FOR PERSONAL INJURIES AND PROPERTY DAMAGE SUSTAINED IN AUTO ACCIDENT. (SUIT FILE 1227) | | | | |
| HARKER, WILLIAM DALE ET UX VS. DB CHEMICAL CO. U S DIST. COURT, AMARILLO | | 12/01/83 | 12/09/83 | 07 REFINING/MARKETING UNIT |
| CAUSE: PLAINTIFF SUING FOR DAMAGES TO HIS LAND DUE TO LEAKAGE OF OIL FROM DEFENDANT'S PIPELINE. (SUIT FILE 1154) | | | | |
| HARKER, WILLIAM DALE VS. DIAMOND SHAMROCK INC. LIPSCOMB CTY., J. DIST. COURT | | 3/03/83 | 0/00/00 | 07 REFINING/MARKETING UNIT |
| CAUSE: PLAINTIFF ALLEGES HIS LAND WAS DAMAGED BY DEFENDANT AND SUES TO COLLECT DAMAGES. (SUIT FILE 1088) | | | | |
| HARKER, WILLIAM DALE VS. THE SHAMROCK PIPELINE CO. LIPSCOMB CTY., J. DIST. COURT | | 1/23/85 | 0/00/00 | 07 REFINING/MARKETING UNIT |
| CAUSE: PLAINTIFF SUES FOR DAMAGES RESULTING FROM LEAKAGE ONTO PLAINTIFF'S PROPERTY. | | | | |

OCC033423

Confidential

OCCNJ0026866

ALCD-PUBCOM_0002744

DATE: 9/01/86

LITIGATION SUMMARY LISTING
LITIGATION TRACKING SYSTEM
DIAMOND SHAMROCK CORPORATION

L00200
PAGE: 7

| CASE NAME | FORUM | FILE DT | SERVE DT | BIB | COMPANY |
|---|---|---|---|---|---|
| HEINTZ, F. & VS. DSC AND VIRGIL MAYES | MONTGOMERY CTY., J. DIST. CRT | 1/23/84 | 0/00/00 | 0 | 07 REFINING/MARKETING UNIT |
| CAUSE: PLAINTIFF SEEKS DAMAGE FOR PERSONAL INJURIES SUSTAINED IN AN AUTO ACCIDENT. (SUIT FILE 1164) **** | | | | | |
| HINES, BRENDA LEE VS. DIAMOND SHAMROCK R & M CO. | BEXAR CTY., JUD. DIST CT., TX | 4/14/84 4/17/84 | | 0 | 07 REFINING/MARKETING UNIT |
| CAUSE: PLAINTIFF SEEKS DAMAGES FOR PERSONAL INJURIES SUSTAINED IN AN ACCIDENT AT A SIGNOR STATION IN SAN ANTONIO, TEXAS. (SUIT FILE 1221) **** | | | | | |
| HODGES, ALBERT JR. & BR. VS. SHAMROCK PIPELINE | J.D. DIST. CT., BEAVER CTY. OK | 5/15/84 5/19/84 | | 0 | 07 REFINING/MARKETING UNIT |
| CAUSE: PLAINTIFF PRAYS FOR JUDGMENT DUE TO THE ALLEGED PROPERTY DAMAGE AND TRESPASSING FOR DRILLING PURPOSES WITHOUT PERMISSION OF THE PLAINTIFFS. (SUIT FILE 1275) | | | | | |
| INDUSTRIAL LUB. CO. VS. JENSEN DRIVE AUTO SUPPLY | HARRIS CTY., J. DIST. COURT | 12/01/83 | 0/00/00 | 0 | 07 REFINING/MARKETING UNIT |
| CAUSE: ACTION TO RECOVER DEBT. (SUIT FILE 1170) | | | | | |
| INSURANCE COMPANY OF STATE OF PA. VS. RONNIE GISLER | LIVE OAK CTY., J. DIST. COURT | 2/01/83 | 0/00/00 | 0 | 07 REFINING/MARKETING UNIT |
| CAUSE: PLAINTIFF IS SUING TO SET ASIDE INDUSTRIAL ACCIDENT BOARD AWARD. (SUIT FILE 1040) **** | | | | | |
| INSURANCE COMPANY OF STATE OF PENN. VS. LARRY FAIR | TARRANT CTY., J. DIST. COURT | 2/06/84 | 0/00/00 | 0 | 07 REFINING/MARKETING UNIT |
| CAUSE: PLAINTIFF IS SUING TO SET ASIDE INDUSTRIAL ACCIDENT BOARD AWARD. (SUIT FILE 1205) **** | | | | | |
| JAMES, SMITH JR. VS. DIAMOND SHAMROCK CORP., ET AL | HARRIS CTY., J. DIST. COURT | 11/02/83 | 0/00/00 | 0 | 07 REFINING/MARKETING UNIT |
| CAUSE: PLAINTIFF IS SUING FOR DAMAGE DUE TO SLIP AND FALL AT STATION. (SUIT FILE 1158) | | | | | |
| JANDA, ANNA JEAN VS. DIAMOND SHAMROCK CORP., ET AL | POTTER CTY., J. DIST. COURT | 9/19/85 10/14/85 | | 0 | 07 REFINING/MARKETING UNIT |
| CAUSE: PLAINTIFF SEEKS DAMAGES IN AN UNSTATED AMOUNT FOR THE WRONGFUL DEATH OF HER HUSBAND DUE TO EXPOSURE TO ASBESTOS PRODUCTS MANUFACTURED BY DEFENDANTS. (SUIT FILE 1290) **** | | | | | |
| JEFFREY, NAYLOR P. VS. DIAMOND SHAM-CHEM.CO., ET AL | LOUISIANA J. DIST. COURT | 10/10/84 | 0/00/00 | C | 07 REFINING/MARKETING UNIT |
| CAUSE: PLAINTIFF SEEKING DAMAGES FOR PERSONAL INJURIES SUSTAINED WHILE ATTEMPTING TO PURCHASE GAS AT SIGNOR 4614 IN THIBODAUX, LOUISIANA. | | | | | |

OCC033424

Confidential

OCCNJ0026867

ALCD-PUBCOM_0002745

DATE: 9/01/86

LITIGATION SUMMARY LISTING
LITIGATION TRACKING SYSTEM
DIAMOND SHAMROCK CORPORATION

L00200
PAGE B

| CASE NAME | FORUM | FILE DT | SERVE DT | BIG | COMPANY |
|---|---|---|---|---|---|
| JERKING, HENRY VS. DIAMOND SHAMROCK CORPORATION<br>CAUSE: PLAINTIFF SEEKS DAMAGE FOR PERSONAL INJURIES SUSTAINED IN A FALL AT BIGNOR # 818 IN HOUSTON, TEXAS. (SUIT FILE 1173) **** | HARRIS CITY., J. DIST. COURT | 3/14/84 | 0/00/00 | 0 | 07 REFINING/MARKETING UNIT |
| JERDZEW., PATRICIA VS. MISSION PETROLEUM CARRIERS<br>CAUSE: PLAINTIFF SEEKS DAMAGE FOR PERSONAL INJURY AND PROPERTY DAMAGE SUSTAINED IN AUTO ACCIDENT WITH MISSION PETROLEUM CARRIER'S VEHICLE. (SUIT FILE 1050) **** | HARRIS CITY., J. DIST. COURT | 1/14/82 | 1/20/82 | C | 07 REFINING/MARKETING UNIT |
| JIMENEZ, ALEX VS. DIAMOND SHAMROCK CORP.<br>CAUSE: PLAINTIFF SUES FOR DAMAGE CLAIMING DEFENDANT RUINED HIS REPUTATION BY HAVING HIM ARRESTED FOR STEALING. (SUIT FILE 1172) **** | CAMERON CITY., J. DIST. COURT | 7/26/84 | 8/14/84 | 0 | 07 REFINING/MARKETING UNIT |
| JOHNSON, LEROY VS. BIGNOR CORPORATION, ET AL.<br>CAUSE: PLAINTIFF SEEKS DAMAGE FOR PERSONAL INJURIES SUSTAINED IN A FALL AT BIGNOR #614 IN THIBIDEAUX, LOUISIANA. (SUIT FILE 1252) **** | LOUISIANA, J. DIST. COURT | 10/24/85 | 11/06/85 | 0 | 07 REFINING/MARKETING UNIT |
| JORDAN., J. L. VS. DIANNE TORRED AND OGC<br>CAUSE: (SUIT SEEKING RECOVERY OF DAMAGE DUE TO PERSONAL INJURY SUSTAINED BY PLTF. WHILE ON DEFENDANTS PREMISES ALLEGEDLY RESULTING FROM NEGLIGENCE OF DEFT. IN AN UNSTATED AMOUNT. (SUIT FILE 1202) | JUD.DIST.CT.NECES CNTY.TX 117 | 10/10/84 | 10/15/84 | 0 | 07 REFINING/MARKETING UNIT |
| KEMP, RUTH A. VS. THE INS. CO. OF THE STATE OF PA.<br>CAUSE: SUIT FOR PAYMENT OF WORKER'S COMPENSATION BENEFITS FOR ALLEGED ON THE JOB INJURY. (SUIT FILE 1028) | TARRANT CITY., J. DIST. COURT | 4/08/81 | 0/00/00 | C | 07 REFINING/MARKETING UNIT |
| KINDRED, CHRISTINE C. VS. DIAMOND SHAMROCK CORP.<br>CAUSE: PLAINTIFF SEEKS DAMAGE FOR PERSONAL INJURIES SUSTAINED IN A FALL AT GAS STATION IN SAN ANTONIO, TEXAS. (SUIT FILE 1269) | BEXAR CITY. J.D. CT. OF TEXAS | 3/04/86 | 3/17/86 | 0 | 07 REFINING/MARKETING UNIT |
| KING, MICHAEL ARTHUR VS. DIAMOND SHAMROCK CORP.<br>CAUSE: PLAINTIFF SEEKS DAMAGE FOR PERSONAL INJURIES SUSTAINED IN A FALL AT BIGNOR #910 IN HOUSTON, TEXAS. (SUIT FILE 1166) **** | HARRIS CITY., J. DIST. COURT | 2/08/84 | 0/00/00 | 0 | 07 REFINING/MARKETING UNIT |
| KRUSE, CATHERINE W. VS. CHEYENNE FERT & OG CHEM.<br>CAUSE: PLAINTIFF ALLEGES DIAMOND'S NEGLIGENCE IN RE LP GAS RESULTED IN INJURIES AND DEATH TO SPOUSE. (SUIT FILE 1244) | COLORADO DIST., U.S. DIST. CT. | 8/23/85 | 8/27/85 | 0 | 07 REFINING/MARKETING UNIT |

OCC033425

Confidential

DATE: 9/01/84

LITIGATION SUMMARY LISTING
LITIGATION TRACKING SYSTEM
DIAMOND SHAMROCK CORPORATION

PAGE: 9
LDG200

| CASE NAME | FORUM | FILE DT | SERVE DT | BIG COMPANY |
|---|---|---|---|---|
| LAMADINI, LYDIA VS. DIAMOND SHAMROCK CORP. | HARRIS CTY., J. DIST. COURT | 1/28/85 | 2/01/85 | C   07 REFINING/MARKETING UNIT |
| CAUSE: PLAINTIFF SEEKS DAMAGES FOR PERSONAL INJURIES SUSTAINED IN A FALL AT SIGMOR #413 IN HOUSTON, TEXAS. (SUIT FILE 1222) **** | | | | |
| LAIRD PETROLEUM CORP. VS. DIAMOND SHAMROCK CHEM CH. | COLORADO, DISTRICT COURT | 11/20/84 | 0/00/00 | C   07 REFINING/MARKETING UNIT |
| CAUSE: PLAINTIFF ALLEGES DEFENDANT BREACH OF CONTRACT AND FAILURE TO PAY FOR OIL ROYALTIES RESULTING IN DAMAGES. (SUIT FILE 1211) | | | | |
| LATHROP, DIEANNE VS. DIAMOND SHAMROCK CORP. | HARRIS CTY., J. DIST. COURT | 10/16/84 | 10/22/84 | 0   07 REFINING/MARKETING UNIT |
| CAUSE: PLAINTIFF SEEKS DAMAGES FOR PERSONAL INJURIES SUSTAINED IN A FALL AT A JOBBER STATION IN HOUSTON, TEXAS. (SUIT FILE 1206) **** | | | | |
| LONGHORN TRUCK & EQUIP. CO. VS. IND. LUB. CO. | HARRIS CTY., J. DIST. COURT | 9/29/83 | 0/00/00 | 0   07 REFINING/MARKETING UNIT |
| CAUSE: PLAINTIFF IS SUING UNDER TEXAS DECEPTIVE TRADE PRACTICES ACT DUE TO ALLEGED DEFECTIVE OIL SOLD BY INDUSTRIAL LUBRICANTS TO PLAINTIFF. (SUIT FILE 1143) ** | | | | |
| MARKS, GLENDA VS. DIAMOND SHAMROCK CORPORATION | DALLAS CTY., CT., TEXAS | 4/24/84 | 7/01/84 | C   07 REFINING/MARKETING UNIT |
| CAUSE: PLAINTIFF SEEKS DAMAGES FOR PERSONAL INJURIES SUSTAINED IN A FALL AT SIGMOR STATION #621 IN DALLAS, TEXAS. (SUIT FILE 1203) **** | | | | |
| MARTINEZ, ALFRED VS. BENJAMIN MOORE INCL. DEC | CAMERON CTY., J. DIST. COURT | 10/15/84 | 10/17/84 | 0   07 REFINING/MARKETING UNIT |
| CAUSE: SUIT SEEKING $2,500,000 PLUS FURTHER RELIEF, FOR INJURY SUSTAINED TO PLTF'S RESPIRATORY SYSTEM AND CENTRAL NERVOUS SYSTEM DUE TO EXPOSURE TO PETROLEUM PRODUCTS WHILE PLAINTIFF WAS A PAINTER. ALLEGES PETROLEUM PRODUCTS DANGEROUS AND ALLEGES BREACH OF WARRANTIES BY DEFENDANTS AS MANUFACTURERS OF THE PAINT. (SUIT FILE 1205) **** | | | | |
| MASSEY, LYNN RAY, ET AL VS. DIAMOND SHAMROCK CORP | KAUFMAN CTY. J.D. CT., TEXAS | 3/12/84 | 3/23/84 | 07 REFINING/MARKETING UNIT |
| CAUSE: PLAINTIFF SEEKS DAMAGES FOR THE WRONGFUL DEATH OF PATRICIA MASSEY AT SIGMOR STATION. (SUIT FILE 1249) **** | | | | |
| MATHIS, NORMA E. VS. SIGMOR CORPORATION | BEXAR CTY., J. DIST. COURT | 2/25/81 | 3/02/81 | 07 REFINING/MARKETING UNIT |
| CAUSE: PLAINTIFF SEEKS DAMAGES FOR PERSONAL INJURIES AND PROPERTY DAMAGE SUSTAINED IN AUTO ACCIDENT. (SUIT FILE 1020) **** | | | | |

OCC033426

Confidential
OCCNJ0026869
ALCD-PUBCOM_0002747

DATE: 9/01/86
LITIGATION SUMMARY LISTING
LITIGATION TRACKING SYSTEM
DIAMOND SHAMROCK CORPORATION

LSD200
PAGE: 10

| CASE: NAME | FORUM | FILE DT | SERVE DT | | BIS COMPANY |
|---|---|---|---|---|---|

MCKANE, JACKQUELINE A. VS. DIAMOND SHAMROCK
CAUSE: PLAINTIFF SEEKS DAMAGES FOR PERSONAL INJURIES SUSTAINED IN A FALL AT BIGNOR #931 IN SAN ANTONIO, TEXAS. ****
BEXAR CTY., J. DIST. COURT  8/20/85  9/04/85  0  07 REFINING/MARKETING UNIT

MERCHWITZ, JUDY ANN ET AL VS. DIAMOND SHAMROCK COR
CAUSE: PLAINTIFFS SEEK DAMAGES FOR PERSONAL INJURIES SUSTAINED IN AN INCIDENT WHICH OCCURRED AT BIGNOR #713 IN HOUSTON, TEXAS. (SUIT FILE 1241) ****
HARRIS CTY., J. DIST. COURT  11/11/85 12/13/85  0  07 REFINING/MARKETING UNIT

HILLER, RITA BIRNBAUM VS. MISSION PETROLEUM CARR.
CAUSE: PLAINTIFF SEEKS DAMAGES FOR PERSONAL INJURIES AND PROPERTY DAMAGE SUSTAINED IN AUTO ACCIDENT. (SUIT FILE 1146) ****
HARRIS CTY., J. DIST. COURT  10/20/83  0/00/00  0  07 REFINING/MARKETING UNIT

MUNOZ, CHRISTINA ET AL VS. DIAMOND SHAMROCK CORP.
CAUSE: PLAINTIFFS SUE TO COLLECT DAMAGES RESULTING FROM DEATH OF FATHER IN AUTO ACCIDENT. (SUIT FILE 1136) ****
BEXAR CTY., J. DIST. COURT  12/29/83  0/00/00  0  07 REFINING/MARKETING UNIT

NEFF, EARL VS. DIAMOND SHAMROCK CORPORATION
CAUSE: PLAINTIFF SEEKS DAMAGES FOR PERSONAL INJURIES SUSTAINED IN A FALL AT BIGNOR STATION #111 IN AUSTIN, TEXAS. (SUIT FILE 1253) ****
TRAVIS CTY., J. DIST. COURT  10/18/85 11/08/85  0  07 REFINING/MARKETING UNIT

NEW MEXICO WATER CONTROL COMM. VS. EMERALD CORP.
CAUSE: COMPLAINT FOR CIVIL PENALTIES AND INJUNCTIVE RELIEF RESULTING FROM FAILURE TO TAKE APPROPRIATE STEPS TO CONTAIN AND REMOVE THE DISCHARGE OF GASOLINE FROM THE DIAMOND SHAMROCK STATION LOCATED AT #07 CALIFORNIA AVE., SOCORRO, N.M. (SUIT FILE 1241) ****
SOCORRO CTY., N.M., J. DIST. CRT.  8/01/85  8/12/85  0  07 REFINING/MARKETING UNIT

NELMKTRK, KATHRINE VS. DIAMOND SHAMROCK
CAUSE: PLAINTIFF ALLEGES FALSE ARREST CHARGE OF TWO COUNTS OF CREDIT CARD ABUSE.
GALVESTON CITY., J. DIST. CRT.  6/17/85  0/00/00  0  07 REFINING/MARKETING UNIT

NONEY, INC. VS. BIGNOR REFINING COMPANY
CAUSE: FAILURE OF DEFENDANT TO PAY BACK ADVANCED SUMS OF MONEY FOR THE PURCHASE OF PETROLEUM PRODUCTS TO PLAINTIFF. (SUIT FILE 1138)
HARRIS CITY., J. DIST. COURT  9/27/83  0/00/00  0  07 REFINING/MARKETING UNIT

OFFER, ROBERT D. VS. BIGNOR NUMBER 247, INC.
CAUSE: PLAINTIFF SEEKS DAMAGES FOR PERSONAL INJURIES SUSTAINED IN A FALL AT BIGNOR 247 IN SAN ANTONIO, TEXAS. (SUIT FILE 1008)
BEXAR CTY., J. DIST. COURT  12/18/81 12/21/81  0  07 REFINING/MARKETING UNIT ♦

OCC033427

Confidential

OCCNJ0026870

ALCD-PUBCOM_0002748

LITIGATION SUMMARY LISTING
LITIGATION TRACKING SYSTEM
DIAMOND SHAMROCK CORPORATION

L00200
PAGE: 11

| CASE NAME | FORUM | FILE DT | SERVE DT | BIG COMPANY |
|---|---|---|---|---|
| ORTIZ, REYNALDO E. VS. DIAMOND SHAMROCK CORP.,ILC | CAMERON CITY., J. DIST. COURT | 5/16/84 | 5/25/84 | 0  07 REFINING/MARKETING UNIT |
| CASE: SUES FOR DAMAGES; CLAIMING DEFENDANT RUINED HIS REPUTATION BY HAVING HIM ARRESTED FOR STEALING. (SUIT FILE 1181) **** | | | | |
| PARKER, LOUIS VS. BAVA METHANOL, AGT. FOR BGC | GUADALUPE CNTY.,TX 25TH JUD.DIS | 11/16/84 | 11/19/84 | 0  07 REFINING/MARKETING UNIT |
| CASE: SUIT SEEKING UNSPECIFIED AMOUNT OF DAMAGES AS A RESULT OF DEFENDANT BGRA MERANO REFUSING TO ACCEPT PLAINTIFF'S CREDIT CARD TO PAY FOR GAS AND CIGARET- TER WHILE AT DEFENDANTS STORE AT WEST COURT ST. IN SEGUIN,TX. (SUIT FILE 1208) **** | | | | |
| PATTON, GEORGE E. VS. SIGNOR CORPORATION | MIDLAND CITY., J. DIST. COURT | 9/06/83 | 0/00/00 | 0  07 REFINING/MARKETING UNIT |
| CASE: PLAINTIFF SUE TO COLLECT DAMAGES FOR INJURIES SUSTAINED IN AUTO ACCIDENT. (SUIT FILE 1136) | | | | |
| PAUL, FRANCIS E., JR. VS. DIAMOND SHAMROCK RXM CO. LOUISIANA, J. DIST. COURT | | 11/12/85 | 12/04/85 | 0  07 REFINING/MARKETING UNIT |
| CASE: PLAINTIFF SEEKS DAMAGES FOR PERSONAL INJURIES SUSTAINED IN AN ACCIDENT AT BIG- MGR 6401 IN NEW IBERIA, LOUISIANA. (SUIT FILE 1256) | | | | |
| PERITTI, LUIS J. VS. SIGNOR CORP., DSC, ET AL. | MARDIN CITY., J. DIST. COURT | 1/07/84 | 0/00/00 | 0  07 REFINING/MARKETING UNIT |
| CASE: PLAINTIFF SEEKS DAMAGES FOR PROPERTY DAMAGE TO VEHICLE WHICH OCCURRED AT SIGNO R #325 IN BILGEE, TEXAS. (SUIT FILE 1399) **** | | | | |
| PETERSON, BETTY LOU VS. INS. CO. OF STATE OF PA. | MARDIN CITY., J. DIST. COURT | 5/29/84 | 0/00/00 | 0  07 REFINING/MARKETING UNIT |
| CASE: SUIT FOR WORKER'S COMPENSATION BENEFITS. (SUIT FILE 1189) **** | | | | |
| PETERSON, HAYNARD VS. DIAMOND SHAMROCK RXM COMPANY EL PASO CITY, COLO, DIST. COURT 12/30/85 1/03/84 | | | | 0  07 REFINING/MARKETING UNIT |
| CASE: PLAINTIFF SEEKS DAMAGES FOR PERSONAL INJURIES SUSTAINED IN PROPANE EXPLOSION ALLEGEDLY CAUSED BY DEFENDANT'S NEGLIGENCE IN FAILING TO PROPERLY ODORIZE THE PROPANE. (SUIT FILE 1189) **** | | | | |
| PLACETTE, STEPHEN A. VS. MISSION PETROLEUM CARRIER JEFFERSON CITY., J. DIST. COURT 9/29/83 | | | | 0  07 REFINING/MARKETING UNIT |
| CASE: PLAINTIFF SUES TO RECOVER DAMAGES DUE TO INJURIES SUSTAINED AT LOADING RACK WHILE DEFENDANT WAS UNLOADING ASPHALT. (SUIT FILE 1142) | | | | |
| POLLARD, ANGIE ADAMS VS. DIAMOND SHAMROCK CORP. | HARRIS CITY., J. DIST. COURT | 4/01/82 | 4/15/82 | 0  07 REFINING/MARKETING UNIT |
| CASE: PLAINTIFFS SEEK DAMAGES FOR ALLEGED INJURIES SUSTAINED WHEN THEY WERE ACCUSED OF STEALING AT SIGNOR #225 IN DEER PARK, TEXAS. (SUIT FILE 820) | | | | |

OCC033428

Confidential

DATE: 9/01/86

LITIGATION SUMMARY LISTING
LITIGATION TRACKING SYSTEM
DIAMOND SHAMROCK CORPORATION

LOG200
PAGE: 12

| CASE NAME | CLAIM | FILE DT | SERVE DT | BIG COMPANY |
|---|---|---|---|---|
| PORCHE, ALBERT VS. DIAMOND SHAMROCK CORP., ET AL CASE: PLAINTIFF SEEKS DAMAGES FOR PERSONAL INJURIES SUSTAINED IN A FALL AT HUMA STATION IN HOUMA, LOUISIANA. (SUIT FILE 1270) **** | TERREBONNE PARISH DIST CT., LA | 3/27/86 | 4/08/86 | C | 07 REFINING/MARKETING UNIT |
| RAMIREZ, GRACIE VS. SIGNOR CORP., ET AL CASE: PLAINTIFF SEEKS DAMAGE FOR PERSONAL INJURIES SUSTAINED IN A FALL AT SIGNOR #6 818 IN HOUSTON, TEXAS. (SUIT FILE 1237) **** | HARRIS CITY., J. DIST. COURT | 5/03/85 | 0/00/00 | C | 07 REFINING/MARKETING UNIT |
| RAMSEY, WILLIAM LESTER VS. SIGNOR NO. 5007, INC. CASE: PLAINTIFF SEEKS DAMAGE FOR PERSONAL INJURIES AND PROPERTY DAMAGE SUSTAINED IN AUTO ACCIDENT. (SUIT FILE 1103) **** | HARRIS CITY., J. DIST. COURT | 4/08/83 | 0/00/00 | C | 07 REFINING/MARKETING UNIT |
| RANTZ, HILBERT VS. DIAMOND SHAMROCK CHEMICAL CO. CASE: PLAINTIFF ALLEGES HE WAS FIRED DUE TO HIS AGE AND SEEKS DAMAGE FOR LOSS OF INCOME. (SUIT FILE 178) **** | LUBBOCK, U. S. DISTRICT COURT | 5/09/84 | 5/11/84 | C | 07 REFINING/MARKETING UNIT |
| RICHARD, LARRY DON VS. DIAMOND SHAMROCK CORP. CASE: PLAINTIFF SEEKS DAMAGE FOR PERSONAL INJURIES SUSTAINED IN A FALL AT SIGNOR #203 IN HOUSTON, TEXAS. (SUIT FILE 1274) **** | HARRIS CITY., J.D. CT., TEXAS | 4/29/86 | 5/09/86 | C | 07 REFINING/MARKETING UNIT |
| RIOJAS, AMELIA VS. INDUSTRIAL LUBRICANTS COMPANY CASE: PLAINTIFF SEEKS DAMAGE FOR PERSONAL INJURIES AND PROPERTY DAMAGE SUSTAINED IN AUTO ACCIDENT. (SUIT FILE 1242) **** | NUECES CITY., J. DIST. COURT | 8/14/85 | 8/20/85 | C | 07 REFINING/MARKETING UNIT |
| RODRIGUEZ, SUSANNA VS. ROBERT EZELL & SIGNOR CORP., HARRIS CITY., J. DIST. COURT CASE: PLAINTIFF SEEKS DAMAGE FOR PERSONAL INJURIES AND PROPERTY DAMAGE SUSTAINED IN AUTO ACCIDENT. (SUIT FILE 1002) **** | HARRIS CITY., J. DIST. COURT | 7/06/81 | 8/24/81 | C | 07 REFINING/MARKETING UNIT |
| ROGE, PAMELA LOU VS. MISSION PETROLEUM CARRIERS CASE: PLAINTIFF SEEKS DAMAGE FOR PERSONAL INJURIES AND PROPERTY DAMAGE SUSTAINED IN AUTO ACCIDENT. (SUIT FILE 1022) **** | NAVARRO CITY., J. DIST. COURT | 5/14/84 | 5/23/84 | C | 07 REFINING/MARKETING UNIT |
| RUBALCAVA, JOSE JESUS VS. DIAMOND SHAMROCK R & M CASE: PLAINTIFF SUED FOR DAMAGE FOR BURNER IN AN INCIDENT OCCURRING AT SIGNOR 0842 IN EL PASO, TEXAS. (SUIT FILE 1281) **** | EL PASO CITY., DIST. CT. TEXAS | 6/25/86 | 7/03/86 | O | 07 REFINING/MARKETING UNIT |

OCC033429

LITIGATION SUMMARY LISTING
LITIGATION TRACKING SYSTEM
DIAMOND SHAMROCK CORPORATION

LSD0200
PAGE: 13

| CASE NAME | EXPLN | FILE DT SERVE DT DISP COMPANY |
|---|---|---|
| BERUDS, BRUCE J. VS. DONALD WATKINS (INCL. DGCC) CASE: PLAINTIFF ALLEGES UNDERGROUND STORAGE TANK LEAKED AND DAMAGED HIS PROPERTY. (SUIT FILE 1184) | MEDOS CTY., OKLAHOMA DIST. CT. 5/25/84 0/00/00 0 07 REFINING/MARKETING UNIT | |
| SHAH, RODNEY RAY VS. BISMOR NUMBER 611, INC. CASE: PLAINTIFF SEEKS DAMAGES FOR PERSONAL INJURIES SUSTAINED IN A FALL AT BISMOR # 611 IN LAFAYETTE, LOUISIANA. (SUIT FILE 1244) | LAFAYETTE, LA.,15TH J. DIST CT 1/09/84 2/27/84 0 07 REFINING/MARKETING UNIT | |
| SHITHEN, MARY LOU VS. AUTOTRONIC SYSTEMS, INC. CASE: PLAINTIFF SUED FOR RESTRAINING ORDER FOR CONSTRUCTION OF AUTOTRONIC STATION. (SUIT FILE 1210) | TRAVIS CTY., J. DIST. COURT 11/21/84 0/00/00 0 07 REFINING/MARKETING UNIT | |
| BIGNOR REFINING CO. VS. MILLCO TRUCKING, INC. CASE: DELINQUENT PROMISSORY NOTE. (SUIT FILE 1126) | TRAVIS CTY., J. DIST. COURT 5/01/82 0/00/00 0 07 REFINING/MARKETING UNIT | |
| BILVA, ROBERTO VS. DIAMOND SHAMROCK CORP. CASE: PLAINTIFF SEEKS DAMAGES FOR PERSONAL INJURIES SUSTAINED IN A FALL AT BISMOR # 861 IN EL PASO, TEXAS. (SUIT FILE 1231) | EL PASO CTY., COUNTY COURT 6/05/85 0/00/00 0 07 REFINING/MARKETING UNIT | |
| SMITH, CRYSTAL VS. MISSION PETROLEM CARRIERS CASE: PLAINTIFF SEEKS DAMAGES FOR PERSONAL INJURIES AND PROPERTY DAMAGE SUSTAINED IN AUTO ACCIDENT. (SUIT FILE 1040) | BALMERTON CTY., J. DIST. COURT 4/01/82 5/24/82 0 07 REFINING/MARKETING UNIT | |
| SMITH, HENRY E. VS. BISMOR CORP., MFG., ET AL CASE: PLAINTIFF SEEKS DAMAGES FOR PERSONAL INJURIES AND PROPERTY DAMAGE SUSTAINED IN AUTO ACCIDENT. (SUIT FILE 1031) | HARRIS CTY.,J. DIST. COURT 12/01/81 0/00/00 0 07 REFINING/MARKETING UNIT | |
| SNOUDEN, W.H. VS. DIAMOND SHAMROCK CORPORATION CASE: PLAINTIFF SEEKS DAMAGES FOR PERSONAL INJURIES AND PROPERTY DAMAGE SUSTAINED IN AUTO ACCIDENT. (SUIT FILE 1243) | NECES CTY., J. DIST. COURT 1/06/84 2/21/84 0 07 REFINING/MARKETING UNIT | |
| SOTO, GLORIA R. VS. DIAMOND SHAMROCK CHEM. CO. CASE: PLAINTIFF SEEKS DAMAGES FOR PERSONAL INJURIES SUSTAINED AT AGE #43-04 IN WHITT IER, CALIFORNIA. (SUIT FILE 1213) | LOS ANGELES, SUPERIOR COURT 12/05/84 12/12/84 0 07 REFINING/MARKETING UNIT | |

OCC033430

LITIGATION SUMMARY LISTING
LITIGATION TRACKING SYSTEM
DIAMOND SHAMROCK CORPORATION

DATE: 9/01/86

LGU200
PAGE 14

| CASE NAME | FORUM | FILE DT | SERVE DT | SETT | COMPANY |
|---|---|---|---|---|---|
| SOUTHWESTERN BELL TELEPHONE CO. VS. DIAMOND SHAMRO DALLAS CTY., J. DIST. COURT | | 11/07/85 | 11/19/85 | D | 07 REFINING/MARKETING UNIT |
| CAUSE: PLAINTIFF SEEKS DAMAGES DUE TO DAMAGE SUSTAINED BY UNDERGROUND CABLES ALLEGEN. Y CAUSED BY A GASOLINE LEAK AT SIGNOR #225 IN ARLINGTON, TEXAS. (SUIT FILE 1254) **** | | | | | |
| SOUTHWESTERN BELL TELEPHONE VS. SIGNOR CORP. TARRANT CTY., J. DIST. COURT | | 11/23/82 | 12/17/82 | D | 07 REFINING/MARKETING UNIT |
| CAUSE: PLAINTIFF SEEKS DAMAGES FOR PROPERTY DAMAGE DUE TO UNDERGROUND UTILITIES DUE TO AL. LEGED LEAK AT SIGNOR #940 IN ARLINGTON, TEXAS. (SUIT FILE 1000) **** | | | | | |
| SOUTHWESTERN BELL VS. VALLEY PETROLEUM CAMERON CTY., J. DIST. COURT | | 8/02/83 | 8/05/83 | D | 07 REFINING/MARKETING UNIT |
| CAUSE: PLAINTIFF SEEKS DAMAGES FOR PROPERTY DAMAGE TO UNDERGROUND UTILITIES DUE TO AL. LEGED LEAK AT SIGNOR STATION IN BROWNSVILLE, TEXAS. (SUIT FILE 1111) **** | | | | | |
| STEELE, DEBRA J. VS. DIAMOND SHAMROCK R&M CO. NEZ PERCE JD CTY, IDAHO | | 4/17/86 | 4/22/86 | C | 07 REFINING/MARKETING UNIT |
| CAUSE: PLAINTIFF SEEKS PAYMENT OF MATERNITY BENEFITS. (SUIT FILE 1272 ****) | | | | | |
| STROUD, THOMAS C., ET UX VS. TEXACO (INCL. DSC) HUTCHINSON CTY., J. DIST. DRT | | 4/05/84 | 0/00/00 | C | 07 REFINING/MARKETING UNIT |
| CAUSE: PLAINTIFF SEEKS DAMAGES FOR DAMAGE DUE TO LUNG CANCER HE CONTRACTED AND ALLEGES WAS CAUSED BY CHEMICALS MANUFACTURED AND PRODUCED BY DEFENDANTS. (SUIT FILE 1174) **** | | | | | |
| TENI TANK, INC. VS. BURTON AUTO SUPPLY AND TLC HIDALGO CTY, TX JUD DIST CT | | 2/07/86 | 2/25/86 | C | 07 REFINING/MARKETING UNIT |
| CAUSE: PLAINTIFF SEEKS DAMAGES FOR CONTAMINATED OIL PURCHASED FROM BURTON OIL AND CAUSED BY INDUSTRIAL LUBRICANTS CO. (SUIT FILE 1242) **** | | | | | |
| TEXAS NORTH WESTERN RR CO. VS. DSC & SANTA FE RR ILLINOIS, U. S. DISTRICT COURT | | 7/03/85 | 0/00/00 | C | 07 REFINING/MARKETING UNIT |
| CAUSE: PLAINTIFF SUES FOR DECLARATORY AND INJUNCTIVE RELIEF RELATIVE TO CERTAIN TRACKAGE RIGHT OF WAY. (SUIT FILE 1235) | | | | | |
| THAYER, THOMAS VS. DSC, JANA JACOBS, DAVID JACOBS HARRIS CTY., J. DIST. COURT | | 3/13/84 | 0/00/00 | C | 07 REFINING/MARKETING UNIT |
| CAUSE: PLAINTIFF SEEKS DAMAGES FOR PROPERTY DAMAGE TO VEHICLE WHICH OCCURRED AT SIGNO R #910 IN HOUSTON, TEXAS. (SUIT FILE 1209) **** | | | | | |
| TOM-MAC, INC. VS. HIBBION PETROLEUM CARRIERS, INC. HARRIS CTY., J. DIST. COURT | | 3/07/84 | 0/00/00 | C | 07 REFINING/MARKETING UNIT |
| CAUSE: PLAINTIFF SUES FOR PROPERTY DAMAGE AND FOR THE PERMANENT LOSS OF ONE VALUED EMPLOYEE AND THE TEMPORARY LOSS OF ANOTHER. (SUIT FILE 1165) | | | | | |

OCC033431

Confidential

OCCNJ0026874
ALCD-PUBCOM_0002752

DATE:  9/01/86

LITIGATION SUMMARY LISTING
LITIGATION TRACKING SYSTEM
DIAMOND SHAMROCK CORPORATION

L00200
PAGE: 15

| CASE NAME | ERRUN | FILE DT SERVE DT BIS COMPANY |
|---|---|---|

TRICKELAND, PATRICIA ANN VS. DB EXPLORATION CO.
CASE:  PLAINTIFF SUED TO RECOVER ROYALTIES HELD IN SUSPENSE BY DEFENDANTS. (SUIT FILE 1239)
LIPSCOMB CITY., J. DIST. COURT    7/29/85   7/30/85   C   07 REFINING/MARKETING UNIT

TURNER, NEVELYNN VS. SIGNOR CORPORATION
CASE:  PLAINTIFF SEEKS DAMAGES FOR PERSONAL INJURIES SUSTAINED IN A FALL AT SIGNOR ♦
930 IN DALLAS, TEXAS. (SUIT FILE 1240)  ****
DALLAS CITY., J. DIST. COURT   9/18/85  10/02/85   C   07 REFINING/MARKETING UNIT

UNIVERSAL RESOURCES CORP. VS. DIAMOND SHAMROCK
CASE:  PLAINTIFF SEEKS DECLARATORY JUDGMENT AND ACTUAL DAMAGE IN AN UNSPECIFIED
AMOUNT ALLEGING DEFENDANTS BREACH OF AGREEMENTS REGARDING PRICE FOR GAS.(SUIT
FILE 1228)
DALLAS CITY., J. DIST. COURT   6/00/00   6/00/00   D   07 REFINING/MARKETING UNIT

VAN HOOSE, JAMES WILLARD VS. DIAMOND SHAMROCK CORP COLORADO, DISTRICT COURT
CASE:  ALLEGED DAMAGES FOR PERSONAL INJURIES RESULTING FROM ALLEGED LEAK AND
EXPLOSION OF NONHOCATED LP GAS. (SUIT FILE 527)
4/18/74   4/18/74   C   07 REFINING/MARKETING UNIT

VARGAS, LUIS O. VS. DIAMOND SHAMROCK
CASE:  PLAINTIFF ALLEGES THAT HIS DAUGHTER (STATION EMPLOYEE AT SIGNOR ♦ 47 IN CORPUS
CHRISTI, TEXAS) WAS KILLED DUE TO DEFENDANT'S NEGLIGENCE.  (SUIT FILE 1201)
NUECES CITY., J. DIST. COURT   8/24/84   9/11/84   D   07 REFINING/MARKETING UNIT
****

VILLAGRAN, LUIS H. VS. SIGNOR NO. 3, INC. ET AL
CASE:  PLAINTIFF SEEKS DAMAGES FOR PERSONAL INJURIES SUSTAINED IN A FALL AT SIGNOR
NUMBER 3 IN SAN ANTONIO, TEXAS. (SUIT FILE 1204)
IND. DIST. CT., BEXAR CITY., TX  7/14/86  7/18/86   D   07 REFINING/MARKETING UNIT

VU, HANG VS. MISSION PETROLEUM CARRIERS, INC.
CASE:  PLAINTIFFS SEEK DAMAGES FOR PERSONAL INJURIES AND PROPERTY DAMAGE SUSTAINED IN
AUTO ACCIDENT.  (SUIT FILE 1041)  ****
HARRIS CITY., J. DIST. COURT   4/05/82   4/25/82   C   07 REFINING/MARKETING UNIT

WALKER, WILLIAM VS. SIGNOR OIL COMPANY, ET AL
CASE:  PLAINTIFF SEEKS DAMAGES FOR PERSONAL INJURIES AND PROPERTY DAMAGE SUSTAINED IN
AUTO ACCIDENT.  (SUIT FILE 1007)
HARRIS CITY., J. DIST. COURT   6/26/81   7/07/81   C   07 REFINING/MARKETING UNIT

WALTON, JOHN E. VS. DIAMOND SHAMROCK CORP ET AL
CASE:  PLAINTIFF SEEKS DAMAGES FOR PERSONAL INJURIES SUSTAINED IN A FALL AT JOBBER
STATION IN MAGNOLIA, TEXAS. (SUIT FILE 1240)
MONTGOMERY CITY., TX J DIST CRT  12/23/86  1/26/86   C   07 REFINING/MARKETING UNIT

OCC033432

Confidential

DATE: 9/01/86

LITIGATION SUMMARY LISTING
LITIGATION TRACKING SYSTEM
DIAMOND SHAMROCK CORPORATION

L00200
PAGE: 16

CASE NAME                                                    FIRM                        FILE_DT  SERVE_DT  BIS COMPANY

WASHINGTON STATE DEPT. OF TRANS. VS. ABI             SKF CRI WASHINGTON KING CNTY  4/01/85  4/04/85  C  07 REFINING/MARKETING UNIT
   CAUSE: ON JULY 15, 1981, GASOLINE SEEPED INTO A TRENCH WHERE PLTF WAS DOING ROAD
          CONSTRUCTION ALONG PACIFIC HWY B., CAUSING WORK TO STOP BECAUSE OF THE HIGH
          EXPLOSIVE LEVELS IN THE TRENCH.  (SUIT FILE 1224)

WASHINGTON, MOZELLE VS MISSION PETROLEUM CARRIERS    HARRIS CTY., J. DIST. COURT   10/26/81  0/00/00  C  07 REFINING/MARKETING UNIT
   CAUSE: PLAINTIFF SEEKS DAMAGE FOR PERSONAL INJURIES AND PROPERTY DAMAGE SUSTAINED IN
          AUTO ACCIDENT.  (SUIT FILE 955)  ****

YORK, ELDRED L., VS. MISSION PETROLEUM CARRIERS,INC  BEXAR CTY., J. DIST. COURT    6/15/82  0/00/00  C  07 REFINING/MARKETING UNIT
   CAUSE: PLAINTIFF SEEKS DAMAGE FOR ALLEGED WRONGFUL DISCHARGE BY DEFENDANT.  (SUIT
          FILE 1060)  ****

TOTAL # OF CASES:  137

OCC033433

Confidential

SCHEDULE 2.07 (g)


Agreement,
Dated September 4, 1986 (the "Agreement"),
By and Among
Diamond Shamrock Corporation,
Occidental Petroleum Corporation,
Occidental Chemical Holding Corporation
and
Oxy-Diamond Alkali Corporation


SUPERFUND SITES


OCC033434

**Confidential**

OCCNJ0026877
ALCD-PUBCOM_0002755

Sites Included in the National Priority
List Effective July 10, 1986

1. Arlington Blending & Galloway Pit (#638),
   Memphis, Tennessee
2. Bayou Sorrel (#513), Louisiana
3. Big D Campground (#639), Ohio
4. Blosenski Landfill (#645), Philadelphia,
   Pennsylvania
5. Chem Dyne (#82), Ohio
6. Cortese Landfill (#592), Narrowsberg, New York
7. Delaware Sand & Gravel (#227), Delaware
8. Fields Brook (#255), Ashtabula, Ohio
9. Kin-Buc Landfill (#164), Edison, New Jersey
10. Lone Pine Landfill (#15), Freehold, New Jersey
11. Motco (#27), LaMarque, Texas
12. French Ltd. (#22) and Sikes Pit (#30), Crosby,
    Texas
13. Jadco-Hughes Site (#332), North Carolina
14. Tybouts Corners (#2), Delaware City, Delaware
15. Diamond Alkali (#488), Newark, New Jersey

Inactive Sites Subject to Proceedings
Under Environmental Laws Similar to CERCLA

All sites set forth on Schedule 9.03(a)(iv)

8671G

OCC033435

Confidential

OCCNJ0026878
ALCD-PUBCOM_0002756

SCHEDULE 2.08

Agreement,
Dated September 4, 1986 (the "Agreement"),
By and Among
Diamond Shamrock Corporation,
Occidental Petroleum Corporation,
Occidental Chemical Holding Corporation
and
Oxy-Diamond Alkali Corporation

FINANCIAL STATEMENTS

8715G

OCC033436

**Confidential**

OCCNJ0026879
ALCD-PUBCOM_0002757

*Price Waterhouse* 

September 1, 1986

To the Stockholder and Board of Directors of
 Diamond Shamrock Chemicals Company

The sale of the Diamond Shamrock Chemicals Company to
Occidental Petroleum Corporation described in Note 2 to
the pro forma financial statements has not been consum-
mated at September 1, 1986.  When it has been consummated,
we will be in a position to furnish the following report:

> "In our opinion, the accompanying pro forma con-
> solidated balance sheets and the related pro
> forma consolidated statements of income and of
> changes in financial position present fairly the
> pro forma financial position of Diamond Shamrock
> Chemicals Company and certain of its subsidiaries
> at December 31, 1985 and 1984, and the results of
> their pro forma operations and the changes in
> their pro forma financial position for the year
> ended December 31, 1985, in conformity with
> generally accepted accounting principles con-
> sistently applied.  Our examinations of these
> statements were made in accordance with generally
> accepted auditing standards and accordingly
> included such tests of the accounting records and
> such other auditing procedures as we considered
> necessary in the circumstances."

*Price Waterhouse*

OCC033437

Confidential

*Price Waterhouse*    

September 1, 1986, except as to the sale of Diamond Shamrock
Chemicals Company referred to in Note 2 which is as of
September 4, 1986

To the Stockholder and Board of Directors of
Diamond Shamrock Chemicals Company

In our opinion, the accompanying pro forma consolidated
balance sheets and the related pro forma consolidated state-
ments of income and of changes in financial position present
fairly the pro forma financial position of Diamond Shamrock
Chemicals Company and certain of its subsidiaries at
December 31, 1985 and 1984, and the results of their pro
forma operations and the changes in their pro forma financial
position for the year ended December 31, 1985, in conformity
with generally accepted accounting principles consistently
applied. Our examinations of these statements were made in
accordance with generally accepted auditing standards and
accordingly included such tests of the accounting records and
such other auditing procedures as we considered necessary in
the circumstances.

*Price Waterhouse*

OCC033438

**Confidential**

**OCCNJ0026881**
ALCD-PUBCOM_0002759

# DIAMOND SHAMROCK CHEMICALS COMPANY
(A Wholly-owned Subsidiary of Diamond Shamrock Corporation)

## PRO FORMA CONSOLIDATED BALANCE SHEET

| ASSETS | December 31, 1985 | 1984 |
|---|---|---|
|  | (dollars in thousands) | |
| **Current Assets** | | |
| Cash and temporary cash investments | $   9,243 | $   8,890 |
| Receivables, less doubtful receivables | 117,044 | 112,748 |
| Inventories | 102,566 | 90,492 |
| Prepaids and other current assets | 4,688 | 2,334 |
| Total Current Assets | 233,541 | 214,464 |
| Properties and Equipment, less depreciation | 498,355 | 483,020 |
| Investments and Long-Term Receivables | 22,067 | 22,456 |
| Intangible Assets, less amortization | 14,496 | 16,916 |
| Deferred Charges | 22,003 | (1,096) |
| Intercompany Receivable – Diamond Shamrock Corporation | 61,431 | 75,424 |
|  | $ 851,893 | $ 811,184 |

## LIABILITIES AND STOCKHOLDER'S EQUITY

| | 1985 | 1984 |
|---|---|---|
| **Current Liabilities** | | |
| Notes payable | $   6,165 | $   6,029 |
| Long-term debt and capital lease obligations payable within one year | 5,087 | 3,226 |
| Accounts payable | 65,786 | 38,088 |
| Foreign income taxes | 2,159 | 2,819 |
| Taxes other than income taxes | 15,983 | 8,101 |
| Accrued liabilities | 24,810 | 12,242 |
| Total Current Liabilities | 119,990 | 70,505 |
| Long-Term Debt and Capital Lease Obligations | 105,286 | 52,357 |
| Other Liabilities and Deferred Credits | 15,000 | – |
| **Stockholder's Equity** | | |
| Common Stock, $1.00 par value 1,000 shares authorized, issued and outstanding | 1 | 1 |
| Paid-in capital | 583,445 | 583,445 |
| Retained earnings | 32,891 | 110,987 |
| Cumulative translation adjustment | (4,720) | (6,111) |
| Total Stockholder's Equity | 611,617 | 688,322 |
|  | $ 851,893 | $ 811,184 |

See "Note 18 – Commitments and Contingencies"

The accompanying notes are an integral part of this and related Pro Forma Consolidated Financial Statements.

OCC033439

Confidential

# DIAMOND SHAMROCK CHEMICALS COMPANY
(A Wholly-owned Subsidiary of Diamond Shamrock Corporation)

## PRO FORMA CONSOLIDATED STATEMENT OF INCOME

|  | Year Ended December 31, 1985 (dollars in thousands) |
|---|---|
| **Revenues** | |
| Sales and operating revenues | $ 653,698 |
| Other revenues, net | 46,349 |
|  | 700,047 |
|  | |
| **Costs and Expenses** | |
| Cost of products sold | 516,143 |
| Selling and administrative | 82,584 |
| Research and development | 4,206 |
| Interest | 15,768 |
|  | 618,701 |
|  | |
| Income Before Tax Provision | 81,346 |
|  | |
| **Provision For Income Taxes** | |
| Current | 20,353 |
| Deferred | 14,089 |
|  | 34,442 |
|  | |
| Net Income | 46,904 |
|  | |
| Retained Earnings at Beginning of Year | 110,987 |
| Dividend | (125,000) |
|  | |
| Retained Earnings at End of Year | $ 32,891 |

The accompanying notes are an integral part of this and related Pro Forma Consolidated Financial Statements.

OCC033440

**Confidential**

DIAMOND SHAMROCK CHEMICALS COMPANY

(A Wholly-owned Subsidiary of Diamond Shamrock Corporation)

PRO FORMA CONSOLIDATED STATEMENT OF CHANGES IN FINANCIAL POSITION

|  | Year Ended December 31, 1985 (dollars in thousands) |
|---|---|
| **Cash Provided** | |
| Operations | |
| Net income | $  46,904 |
| Add – Income charges not requiring cash | |
| Depreciation and amortization | 46,910 |
| Deferred income taxes | 14,089 |
| Other, net | 2,726 |
| Operations | 110,629 |
| **Working Capital** | |
| (Increase) in receivables | (4,296) |
| (Increase) in inventories | (12,074) |
| (Increase) in prepaids and other current assets | (2,354) |
| Increase in notes payable | 136 |
| Increase in long-term debt and capital lease obligations payable within one year | 1,861 |
| Increase in accounts payable | 27,698 |
| (Decrease) in foreign income taxes | (660) |
| Increase in taxes other than income taxes | 7,882 |
| Increase in accrued liabilities | 12,568 |
| Working Capital | 30,761 |
| **Financing and Other Sources** | |
| Increase in long-term debt and capital lease obligations | 58,329 |
| Deposit on long-term supply agreement | 15,000 |
| Proceeds from sales of investments and facilities | 1,175 |
| Financing and Other Sources | 74,504 |
| Total Cash Provided | 215,894 |
| **Cash Used** | |
| Expenditures for properties and equipment and investments | 64,844 |
| Dividend | 125,000 |
| Reduction of long-term debt and capital lease obligations | 5,400 |
| Increase in deferred charges resulting from acquired tax benefits | 19,284 |
| Other, net | 1,013 |
| Total Cash Used | 215,541 |
| Increase in cash and temporary cash investments | $     353 |

The accompanying notes are an integral part of this and related Pro Forma Consolidated Financial Statements.

OCC033441

Confidential

DRAFT 9/2/86

# DIAMOND SHAMROCK CHEMICALS COMPANY

(A Wholly-Owned Subsidiary of Diamond Shamrock Corporation)

## NOTES TO PRO FORMA CONSOLIDATED FINANCIAL STATEMENTS
(dollars in thousands)

### Note 1 – Significant Accounting Policies

#### Basis of Presentation

It is contemplated that all of the common stock of Diamond Shamrock Chemicals Company ("Chemicals"), a wholly-owned subsidiary of Diamond Shamrock Corporation ("Diamond Shamrock"), will be sold to an indirect wholly-owned subsidiary of Occidental Petroleum Corporation ("Occidental") pursuant to a Stock Purchase Agreement (See Note 2 – Sale of Chemicals). The accompanying Pro Forma Consolidated Financial Statements include the accounts of the Chemicals Business, as defined in the Stock Purchase Agreement, except that Chemicals' interests in DIAPAR - Diamond Shamrock Empreendimentos e Participacoes Ltda, Carbocloro S.A. Industrias Químicas, Korea Potassium Chemical Co., Ltd., San Nopco Limited, Nopco Industrial S.A. de C.V., Diamond Shamrock Italia S.p.A., Nopco Colombiana S.A. and deposits of the mineral trona are excluded. Immediately prior to or at the time of closing of the sale of Chemicals, certain other of its assets and operations will have been sold (See Note 3 – Sale of Cogeneration Business Unit).

Chemicals uses the equity method to account for its investments in affiliates and joint ventures ("associated companies"). Under the equity method, Chemicals recognizes its proportionate share of the net income or loss of associated companies currently, rather than when realized through dividends or disposal.

All significant intercompany accounts and transactions have been eliminated. Foreign subsidiaries and associated companies are included principally on the basis of fiscal years ending November 30.

1

OCC033442

Confidential

OCCNJ0026885

ALCD-PUBCOM_0002763

## Translation Of Foreign Currencies

The financial statements of Chemicals' foreign subsidiaries and associated companies, not having the United States dollar as their functional currency, are translated into United States dollars as follows: asset and liability accounts at the prevailing year-end exchange rates; income and expense items at the average monthly exchange rates in effect during the year. Translation gains and losses are included as a component of stockholder's equity.

Gains and losses resulting from the remeasurement of the financial statements of the Chemicals' foreign subsidiaries having the United States dollar as their functional currency and gains and losses from foreign currency transactions are included in earnings.

## Inventory Valuation

Inventories are valued at the lower of cost or market. Cost for domestic finished, in-process and raw materials is determined principally by the last-in, first-out ("LIFO") method. Supplies and foreign inventories are valued at average cost.

## Properties And Equipment

Properties and equipment are carried at cost. Major additions are capitalized; expenditures for repairs and maintenance are charged against earnings.

## Interest

Chemicals capitalizes the interest cost associated with major property additions while in progress, such amounts being amortized over the useful lives of the related assets.

2

OCC033443

**Confidential**

**OCCNJ0026886**
ALCD-PUBCOM_0002764

Depreciation And Amortization

Properties and equipment are depreciated generally on the straight-line basis over their estimated useful lives. Intangible assets are amortized on a straight-line basis over their legal or estimated useful lives, not to exceed 40 years.

Pensions

Chemicals has a number of trusteed pension plans, both contributory and noncontributory, covering substantially all full-time employees. Pension cost is comprised of current service cost and amortization of past service cost over 10 years. Pension cost is accrued based upon actuarial valuations and funded at an amount in excess of the minimum required by the Employee Retirement Income Security Act.

Income Taxes

Income taxes are provided during the year in which transactions affect the determination of financial statement income, regardless of when they are recognized for tax purposes. Deferred income taxes are provided for timing differences. Investment tax credits are accounted for using the flow-through method.

Chemicals receives a charge or credit from Diamond Shamrock equivalent to its income taxes (other than foreign income taxes) computed on a separate return basis. Such current and prior year tax charges and credits are included as components of the intercompany receivable in the accompanying Pro Forma Consolidated Balance Sheet.

Note 2 - Sale of Chemicals

In May 1986, Diamond Shamrock and Occidental executed a letter of intent pursuant to which Occidental would acquire Chemicals from Diamond Shamrock subject to various conditions. The sale will be consummated in the third quarter of 1986.

In conjunction with the sale of Chemicals, Diamond Shamrock has committed that, as of the closing, Diamond Shamrock and Chemicals will settle intercompany accounts by netting intercompany receivable and payable accounts and closing the net amount to

3

OCC033444

Confidential

OCCNJ0026887

ALCD-PUBCOM_0002765

the equity account.

## Note 3 – Sale of Cogeneration Business Unit

Chemicals expects to consummate the sale of its Cogeneration Business Unit (as defined in the Stock Purchase Agreement) immediately prior to or at the time of closing of the sale of Chemicals (See Note 2 – Sale of Chemicals). The Cogeneration Business Unit's income from operations included in other revenues in the accompanying Pro Forma Consolidated State of Income was $36,915.

## Note 4 – Acquisition

In November 1985, Chemicals acquired a chlorine, caustic soda and ethylene dichloride manufacturing complex located in Convent, Louisiana principally by the assumption of industrial revenue bonds having a market value of $58,301.

## Note 5 – Related Party Transactions

In addition to incurring the costs and expenses associated with its operations, Chemicals is allocated certain administrative costs by Diamond Shamrock. Allocation percentages are generally determined from studies of time devoted to specific services and the relationship of Chemicals' capital employed to Diamond Shamrock's consolidated capital employed. Such charges amounted to $7,118 in 1985.

Interest is also allocated to Chemicals based on the relationship of debt required for the capital employed by Chemicals to Diamond Shamrock's consolidated debt.

4

OCC033445

**Confidential**

OCCNJ0026888

ALCD-PUBCOM_0002766

In addition, Chemicals sells caustic soda and various other products to and purchases salt from Diamond Shamrock at fair market value. Such sales and purchases amounted to $537 and $2,234 in 1985, respectively.

Note 6 - Taxes

Chemicals' income before tax provision for 1985 was comprised of earnings from:

| | |
|---|---|
| United States | $ 71,012 |
| Foreign | 10,334 |
| | $ 81,346 |

Chemicals' 1985 provision for income taxes was comprised of the following:

| | |
|---|---|
| Current | |
| Federal | $ 13,626 |
| State and local | 2,430 |
| Foreign | 4,297 |
| | 20,353 |
| Deferred | |
| Federal | 12,624 |
| State and local | 1,465 |
| | 14,089 |
| | $ 34,442 |

The principal reasons for the difference between the statutory federal income tax rate and Chemicals' 1985 provision for income taxes were:

| | |
|---|---|
| Tax provision at statutory federal rate (46%) | $ 37,419 |
| Increase (reduction) resulting from | |
| Investment tax credits | (4,055) |
| Other, net | 1,078 |
| | $ 34,442 |

The 1985 provision for deferred income taxes was comprised of the tax effects of timing differences as follows:

| | |
|---|---|
| Accelerated depreciation | $ 12,754 |
| Capitalized interest | 1,335 |
| | $ 14,089 |

5

OCC033446

Confidential

OCCNJ0026889

ALCD-PUBCOM_0002767

For federal income tax purposes at December 31, 1985, Chemicals had approximately $14,000 of unused investment tax credits which expire between 1997 and 2000, and in addition, had $43,180 of capital loss carryovers which expire in 1990.

At December 31, 1985, there were accumulated undistributed earnings after applicable local taxes of foreign subsidiaries of $8,499 for which no provision was necessary for foreign withholding or other income taxes because that amount had been reinvested in properties and equipment and working capital.

Note 7 - Foreign Currency

Foreign currency transaction and remeasurement gains and losses reflected in 1985 earnings amounted to a loss of $49.

An analysis of the cumulative translation adjustment account included in the stockholder's equity section of the Pro Forma Consolidated Balance Sheet is as follows:

| | |
|---|---|
| December 31, 1984 | $ (6,111) |
| Translation adjustments | 1,391 |
| December 31, 1985 | $ (4,720) |

Note 8 - Pensions and Other Postretirement Benefits

The charge against earnings for pensions was $3,468 in 1985, of which approximately 73% related to United States employees.

A comparison of accumulated plan benefits and plan net assets as of the latest valuation date (December 31, 1985) for Chemicals' United States pension plans was as follows:

6

OCC033447

Confidential

OCCNJ0026890
ALCD-PUBCOM_0002768

| | Retirement Income Plan | Hourly Plans |
|---|---|---|
| Assumed rate of return | 9.5% | 9.5% |
| Actuarial present value of accumulated plan benefits | | |
| Vested | $ 63,456 | $ 18,188 |
| Nonvested | 1,409 | 38 |
| | $ 64,865 | $ 18,226 |
| Net assets available for benefits | $ 76,255 | $ 28,258 |

Chemicals' foreign pension plans are not required to report to agencies of the United States government pursuant to the Employee Retirement Income Security Act and do not otherwise determine the actuarial present value of accumulated plan benefits. For the foreign plans, it is estimated that the value of vested benefits was substantially equal to the assets of the plans.

In addition to providing pension benefits, Chemicals provides certain medical and life insurance benefits to eligible retired employees. Chemicals recognizes the cost of providing these benefits by charging against earnings the retirees' medical benefit claims and life insurance premiums paid, which amounted to $1,421 in 1985.

In conjunction with the sale of Chemicals (See Note 2 - Sale of Chemicals) Diamond Shamrock has agreed that, at the date of closing, it will continue and amend the Retirement Income Plan for Chemicals' employees to provide that service by eligible participating Chemicals' employees with Occidental after the date of closing will be recognized for purposes of vesting, qualification for early retirement income and qualification for pre-benefit commencement death benefit to spouse.

With respect to the Hourly Plans, Occidental has agreed to adopt, effective as of the date of closing, new plans identical to the Hourly Plans and assume liability for all accrued benefits under the Hourly Plans as well as assume an equivalent amount of the Hourly Plans' assets.

Diamond Shamrock has also agreed to continue to pay the cost of medical and life insurance benefits of retired Chemicals' employees.

7

OCC033448

Note 9 - Performance Incentive Plan

Chemicals participates in Diamond Shamrock's Performance Incentive Plan, administered by the Compensation Committee of Diamond Shamrock's Board of Directors, which provides for incentive payments to officers and key employees based on an annually approved formula related to the achievement of company and individual performance objectives. Incentive awards of $806 were made in 1985.

Chemicals also has an incentive plan for personnel with "critical skills". Awards under this Plan, which are paid over several years, amounted to $163 in 1985.

Note 10 - Employee Shareholding and Investment Plan

Chemicals participates in Diamond Shamrock's Employee Shareholding and Investment Plan which allows eligible participating Chemicals' employees to contribute up to 6% of their salaries to a trust for investment on an after-tax basis ("Regular Savings" option), before-tax basis ("Premier Savings" option) or a combination of both.

Chemicals' employees electing the Regular Savings option can invest in either a Diamond Shamrock stock fund, government securities fund or a combination of both. Chemicals contributes an amount equal to 50% of the participant's monthly contribution; Chemicals' contribution is invested in the Diamond Shamrock stock fund.

Employees electing the Premier Savings option can invest in four different funds, including a Diamond Shamrock stock fund. Chemicals contributes an amount equal to 100% of the participant's monthly contribution; Chemicals' contribution is invested in the Diamond Shamrock stock fund.

Participants are at all times fully vested in their contributions; Chemicals contributions become fully vested to the participant after three years of continued employment. In conjunction with the sale of Chemicals (See Note 2 –

8

OCC033449

Confidential

OCCNJ0026892

ALCD-PUBCOM_0002770

Sale of Chemicals) Diamond Shamrock has agreed that, at the date of closing, the account balances of each participating Chemicals' employee will be fully vested.

Chemicals' contributions to the Plan amounted to $3,689 in 1985.

Note 11 - Receivables

|  | December 31, | |
| --- | --- | --- |
|  | 1985 | 1984 |
| Notes and accounts receivable | $117,637 | $113,607 |
| Less - Allowance for doubtful receivables | 593 | 859 |
|  | $117,044 | $112,748 |

Note 12 - Inventories

|  | December 31, | |
| --- | --- | --- |
|  | 1985 | 1984 |
| Finished and in-process | $ 57,055 | $ 50,927 |
| Raw materials | 23,388 | 20,069 |
| Supplies | 22,123 | 19,496 |
|  | $102,566 | $ 90,492 |

The current cost of inventories valued under the LIFO cost method (approximately 72% of total inventories at December 31, 1985 and 1984) exceeded their LIFO carrying values by $22,213 and $33,879 at December 31, 1985 and 1984, respectively.

OCC033450

Confidential

OCCNJ0026893

ALCD-PUBCOM_0002771

Note 13 - Properties and Equipment

|  | December 31, | |
|---|---|---|
|  | 1985 | 1984 |
| Land | $ 26,157 | $ 22,462 |
| Buildings and land improvements | 112,733 | 108,187 |
| Machinery and equipment | 710,724 | 661,868 |
| Leasehold improvements | 3,816 | 1,410 |
| Furniture and fixtures | 7,551 | 6,825 |
| Construction-in-progress | 20,607 | 30,022 |
|  | 881,588 | 830,774 |
| Less - Accumulated depreciation | 383,233 | 347,754 |
|  | $498,355 | $483,020 |

Authorized expenditures under approved appropriations for additions to properties and equipment over the next several years were $17,573 at December 31, 1985, after deducting expenditures through that date.

The 1985 provision for depreciation of $45,043 was computed in accordance with the following rates:

| Buildings and land improvements | 2% to 3% |
| Machinery and equipment | 4% to 20% |
| Leasehold Improvements | Lease terms |
| Furniture and fixtures - mechanical | 15% |
| Furniture and fixtures - non-mechanical | 6% to 7% |

The charge against earnings for maintenance and repairs was $49,954 in 1985.

OCC033451

Confidential

OCCNJ0026894

ALCD-PUBCOM_0002772

Note 14 - Investments and Long-Term Receivables

|  | December 31, | |
|  | 1985 | 1984 |
|---|---|---|
| Investments and advances to associated companies, at equity | $ 4,954 | $ 4,133 |
| Investments, at cost, and long-term receivables | 17,113 | 18,323 |
|  | $ 22,067 | $ 22,456 |

Note 15 - Intangible Assets

|  | December 31, | |
|  | 1985 | 1984 |
|---|---|---|
| Intangibles resulting from acquisitions - excess of cost over fair value of net assets acquired | $ 15,219 | $ 15,648 |
| Patents, trademarks, formulae, processes, etc. | 4,431 | 4,935 |
|  | 19,650 | 20,583 |
| Less - Accumulated amortization | 5,154 | 3,667 |
|  | $ 14,496 | $ 16,916 |

The provision for amortization was $ 1,867 in 1985.

Note 16 - Long-Term Debt and Capital Lease Obligations

|  | December 31, | |
|  | 1985 | 1984 |
|---|---|---|
| Pollution control/Industrial revenue financings (6.75% to 14.50%) | $ 94,135 | $ 36,341 |
| Other loans (variable rate) | 5,643 | 6,868 |
| Capital lease obligations (5.25% to 13.51%) | 10,595 | 12,374 |
|  | 110,373 | 55,583 |
| Less - Due within one year | | |
| Long-term debt | 2,983 | 1,430 |
| Capital lease obligations | 2,104 | 1,796 |
|  | $105,286 | $ 52,357 |

OCC033452

Confidential

OCCNJ0026895

ALCD-PUBCOM_0002773

The aggregate maturities of long-term debt outstanding at December 31, 1985 for the next five years were as follows:  1986 - $5,087; 1987 - $4,742; 1988 - $1,462; 1989 - $1,381; 1990 - $1,135.

Total interest costs incurred in 1985 were as follows:

| | |
|---|---:|
| Chemicals' interest | $ 15,237 |
| Allocated Diamond Shamrock interest | 3,132 |
| | 18,369 |
| Less - Capitalized interest | 2,601 |
| | $ 15,768 |

Note 17 - Lease Commitments

Chemicals leases certain machinery and equipment, transportation and marketing facilities, and office space under cancellable and non-cancellable leases, most of which expire within 20 years and may be renewed.  Chemicals' properties and equipment under capital lease were as follows:

| | December 31, | |
|---|---:|---:|
| | 1985 | 1984 |
| Machinery and equipment | $ 21,461 | $ 21,239 |
| Leasehold improvements | 2,041 | 1,900 |
| | 23,502 | 23,139 |
| Less - Accumulated depreciation | 17,128 | 16,208 |
| | $ 6,374 | $ 6,931 |

Included in the provision for depreciation was depreciation applicable to assets under capital lease of $1,053 in 1985.

OCC033453

Confidential

OCCNJ0026896

ALCD-PUBCOM_0002774

Minimum annual rentals at December 31, 1985 were as follows:

|  | Capital Leases | Operating Leases |
|---|---|---|
| 1986 | $  3,179 | $ 19,800 |
| 1987 | 3,177 | 13,734 |
| 1988 | 1,975 | 12,139 |
| 1989 | 1,796 | 10,938 |
| 1990 | 1,331 | 9,766 |
| 1991  and thereafter | 5,527 | 37,751 |
|  | 16,985 | $104,128 |
| Less – Interest equivalents | 6,390 |  |
| Present value | 10,595 |  |
| Less – Current portion | 2,104 |  |
| Long-term capital lease obligations | $  8,491 |  |

Rental expense for operating leases in 1985 was as follows:

| Total rentals | $ 17,982 |
|---|---|
| Less – Sublease rental income | 599 |
| Rental expense | $ 17,383 |

Note 18 – Commitments and Contingencies

Chemicals is a party to a number of pending lawsuits, but in connection with the sale of Chemicals to Occidental, Diamond Shamrock has agreed to indemnify Chemicals for all losses and expenses incurred in connection therewith (See Note 2 – Sale of Chemicals).

13

OCC033454

Confidential

OCCNJ0026897

ALCD-PUBCOM_0002775

# DIAMOND SHAMROCK CHEMICALS COMPANY
(A Wholly-owned Subsidiary of Diamond Shamrock Corporation)

## PRO FORMA CONSOLIDATED BALANCE SHEET (Unaudited)

|  | March 31, 1986 | June 30, 1986 |
|---|---|---|
|  | (dollars in thousands) | |
| **ASSETS** | | |
| Current Assets | | |
| Cash and temporary cash investments | $  13,432 | $  13,267 |
| Receivables, less doubtful receivables | 119,774 | 124,865 |
| Inventories | 103,343 | 91,806 |
| Prepaids and other current assets | 10,588 | 9,550 |
| Total Current Assets | 247,137 | 239,488 |
| Properties and Equipment, less depreciation | 492,502 | 484,329 |
| Investments and Long-Term Receivables | 21,836 | 22,716 |
| Intangible Assets, less amortization | 15,805 | 16,090 |
| Deferred Charges | 19,220 | 14,105 |
| Intercompany Receivable – Diamond Shamrock Corporation | 67,484 | 98,538 |
|  | $ 863,984 | $ 875,266 |
| **LIABILITIES AND STOCKHOLDER'S EQUITY** | | |
| Current Liabilities | | |
| Notes payable | $   4,416 | $   4,984 |
| Long-term debt and capital lease obligations payable within one year | 4,847 | 4,422 |
| Accounts payable | 65,111 | 63,272 |
| Foreign income taxes | 2,801 | 1,549 |
| Taxes other than income taxes | 13,719 | 15,498 |
| Accrued liabilities | 25,764 | 24,912 |
| Total Current Liabilities | 116,658 | 114,637 |
| Long-Term Debt and Capital Lease Obligations | 105,490 | 104,939 |
| Other Liabilities and Deferred Credits | 15,888 | 17,234 |
| Stockholder's Equity | | |
| Common Stock, $1.00 par value | | |
| 1,000 shares authorized, issued and outstanding | 1 | 1 |
| Paid-in capital | 583,445 | 583,445 |
| Retained earnings | 46,216 | 59,321 |
| Cumulative translation adjustment | (3,714) | (4,311) |
| Total Stockholder's Equity | 625,948 | 638,456 |
|  | $ 863,984 | $ 875,266 |

See "Note 13 – Commitments and Contingencies"

The accompanying notes are an integral part of this and related Pro Forma Consolidated Financial Statements.

OCC033455

**Confidential**

### DIAMOND SHAMROCK CHEMICALS COMPANY
(A Wholly-owned Subsidiary of Diamond Shamrock Corporation)

PRO FORMA CONSOLIDATED STATEMENT OF INCOME (Unaudited)

| | Three Months Ended | | Year-to-Date |
| --- | --- | --- | --- |
| | March 31, 1986 | June 30, 1986 | June 30, 1986 |
| | (dollars in thousands) | | |
| **Revenues** | | | |
| Sales and operating revenues | $181,264 | $182,942 | $364,206 |
| Other revenues, net | 10,493 | 11,814 | 22,307 |
| | 191,757 | 194,756 | 386,513 |
| **Costs and Expenses** | | | |
| Cost of products sold | 142,073 | 141,219 | 283,292 |
| Selling and administrative | 20,616 | 22,036 | 42,652 |
| Research and development | 936 | 971 | 1,907 |
| Interest | 5,905 | 6,188 | 12,093 |
| | 169,530 | 170,414 | 339,944 |
| Income Before Tax Provision | 22,227 | 24,342 | 46,569 |
| **Provision For Income Taxes** | | | |
| Current | 7,797 | 9,270 | 17,067 |
| Deferred | 1,105 | 1,967 | 3,072 |
| | 8,902 | 11,237 | 20,139 |
| Net Income | 13,325 | 13,105 | 26,430 |
| Retained Earnings at Beginning of Period | 32,891 | 46,216 | 32,891 |
| Retained Earnings at End of Period | $ 46,216 | $ 59,321 | $ 59,321 |

The accompanying notes are an integral part of this and related Pro Forma Consolidated
Financial Statements.

OCC033456

Confidential

**DIAMOND SHAMROCK CHEMICALS COMPANY**
(A Wholly-owned Subsidiary of Diamond Shamrock Corporation)

## PRO FORMA CONSOLIDATED STATEMENT OF CHANGES IN FINANCIAL POSITION (Unaudited)

| | Three Months Ended March 31, 1986 | Six Months Ended June 30, 1986 |
|---|---|---|
| | (dollars in thousands) | |
| **Cash Provided** | | |
| **Operations** | | |
| Net income | $ 13,325 | $ 26,430 |
| Add - Income charges not requiring cash | | |
| Depreciation and amortization | 12,386 | 24,793 |
| Deferred income taxes | 1,105 | 3,072 |
| Other, net | 143 | 1,011 |
| Operations | 26,959 | 55,306 |
| **Working Capital** | | |
| (Increase) in receivables | (2,730) | (7,821) |
| (Increase) decrease in inventories | (777) | 10,760 |
| (Increase) in prepaids and other current assets | (5,900) | (4,862) |
| (Decrease) in notes payable | (1,749) | (1,181) |
| (Decrease) in long-term debt and capital lease obligations payable within one year | (240) | (665) |
| (Decrease) in accounts payable | (675) | (2,514) |
| Increase (decrease) in foreign income taxes | 642 | (610) |
| (Decrease) in taxes other than income taxes | (2,255) | (485) |
| Increase in accrued liabilities | 945 | 102 |
| Working Capital | (12,739) | (7,276) |
| **Financing and Other Sources** | | |
| Increase in long-term debt and capital lease obligations | 408 | 408 |
| Increase in other liabilities and deferred credits | 888 | 2,234 |
| Proceeds from sales of investments and facilities | 41 | 41 |
| Decrease in deferred charges | 2,783 | 7,898 |
| Financing and Other Sources | 4,120 | 10,581 |
| Total Cash Provided | 18,340 | 58,611 |
| **Cash Used** | | |
| Expenditures for properties and equipment and investments | 5,872 | 12,990 |
| Reduction of long-term debt and capital lease obligations | 204 | 754 |
| Increase in intercompany receivable | 7,158 | 40,179 |
| Other, net | 917 | 694 |
| Total Cash Used | 14,151 | 54,587 |
| Increase in cash and temporary cash investments | $ 4,189 | $ 4,024 |

The accompanying notes are an integral part of this and related Pro Forma Consolidated Financial Statements.

OCC033457

Confidential

DRAFT 9/2/86

## DIAMOND SHAMROCK CHEMICALS COMPANY
(A Wholly-Owned Subsidiary of Diamond Shamrock Corporation)

NOTES TO PRO FORMA CONSOLIDATED FINANCIAL STATEMENTS (Unaudited)
(dollars in thousands)

### Note 1 – Significant Accounting Policies

#### Basis of Presentation

It is contemplated that all of the common stock of Diamond Shamrock Chemicals Company ("Chemicals"), a wholly-owned subsidiary of Diamond Shamrock Corporation ("Diamond Shamrock"), will be sold to an indirect wholly-owned subsidiary of Occidental Petroleum Corporation ("Occidental") pursuant to a Stock Purchase Agreement (See Note 2 – Sale of Chemicals). The accompanying Pro Forma Consolidated Financial Statements include the accounts of the Chemicals Business, as defined in the Stock Purchase Agreement, except that Chemicals' interests in DIAPAR - Diamond Shamrock Empreendimentos e Participacoes Ltda, Carbocloro S.A. Industrias Quimicas, Korea Potassium Chemical Co., Ltd., San Nopco Limited, Nopco Industrial S.A. de C.V., Diamond Shamrock Italia S.p.A., Nopco Colombiana S.A. and deposits of the mineral trona are excluded. Immediately prior to or at the time of closing of the sale of Chemicals, certain other of its assets and operations will have been sold (See Note 3 – Sale of Cogeneration Business Unit).

Chemicals uses the equity method to account for its investments in affiliates and joint ventures ("associated companies"). Under the equity method, Chemicals recognizes its proportionate share of the net income or loss of associated companies currently, rather than when realized through dividends or disposal.

All significant intercompany accounts and transactions have been eliminated.

1

OCC033458

Translation Of Foreign Currencies

The financial statements of Chemicals' foreign subsidiaries and associated companies, not having the United States dollar as their functional currency, are translated into United States dollars as follows: asset and liability accounts at the prevailing year-end exchange rates; income and expense items at the average monthly exchange rates in effect during the year. Translation gains and losses are included as a component of stockholder's equity.

Gains and losses resulting from the remeasurement of the financial statements of the Chemicals' foreign subsidiaries having the United States dollar as their functional currency and gains and losses from foreign currency transactions are included in earnings.

Inventory Valuation

Inventories are valued at the lower of cost or market. Cost for domestic finished, in-process and raw materials is determined principally by the last-in, first-out ("LIFO") method. Supplies and foreign inventories are valued at average cost.

Properties And Equipment

Properties and equipment are carried at cost. Major additions are capitalized; expenditures for repairs and maintenance are charged against earnings.

Interest

Chemicals capitalizes the interest cost associated with major property additions while in progress, such amounts being amortized over the useful lives of the related assets.

Depreciation And Amortization

Properties and equipment are depreciated generally on the straight-line basis over their estimated useful lives. Intangible assets are amortized on a straight-line basis over their legal or estimated useful lives, not to exceed 40 years.

2

OCC033459

Confidential

OCCNJ0026902

ALCD-PUBCOM_0002780

Pensions

Chemicals has a number of trusteed pension plans, both contributory and noncontributory, covering substantially all full-time employees. Pension cost is comprised of current service cost and amortization of past service cost over 10 years. Pension cost is accrued based upon actuarial valuations and funded at an amount in excess of the minimum required by the Employee Retirement Income Security Act.

Income Taxes

Income taxes are provided during the period in which transactions affect the determination of financial statement income, regardless of when they are recognized for tax purposes. Deferred income taxes are provided for timing differences. Investment tax credits are accounted for using the flow-through method.

Chemicals receives a charge or credit from Diamond Shamrock equivalent to its income taxes (other than foreign income taxes) computed on a separate return basis. Such current and prior year charges and credits are included as components of the intercompany receivable in the accompanying Pro Forma Consolidated Balance Sheet.

Note 2 – Sale of Chemicals

In May 1986, Diamond Shamrock and Occidental executed a letter of intent pursuant to which Occidental would acquire Chemicals from Diamond Shamrock subject to various conditions. The sale will be consummated in the third quarter of 1986.

In conjunction with the sale of Chemicals, Diamond Shamrock has committed that, as of the closing, Diamond Shamrock and Chemicals will settle intercompany accounts by netting intercompany receivable and payable accounts and closing the net amount to

3

OCC033460

Confidential

OCCNJ0026903

ALCD-PUBCOM_0002781

the equity account.

## Note 3 - Sale of Cogeneration Business Unit

Chemicals expects to consummate the sale of its Cogeneration Business Unit (as defined in the Stock Purchase Agreement) immediately prior to or at the time of closing of the sale of Chemicals (See Note 2 - Sale of Chemicals). The Cogeneration Business Unit's income from operations included in other revenues in the accompanying Pro Forma Consolidated State of Income was $9,870 for the three months ended March 31, 1986, and $11,253 for the three months ended June 30, 1986.

## Note 4 - Related Party Transactions

In addition to incurring the costs and expenses associated with its operations, Chemicals is allocated certain administrative costs by Diamond Shamrock. Allocation percentages are generally determined from studies of time devoted to specific services and the relationship of Chemicals' capital employed to Diamond Shamrock's consolidated capital employed. Such charges amounted to $1,611 and $1,651 for the three months ended March 31, and June 30, 1986, respectively.

Interest is also allocated to Chemicals based on the relationship of debt required for the capital employed by Chemicals to Diamond Shamrock's consolidated debt.

In addition, Chemicals sells caustic soda and various other products to and purchases salt from Diamond Shamrock. Such sales and purchases amounted to $121 and $602 for the three months ended March 31, 1986, respectively, and $63 and $658 for the three months ended June 30, 1986, respectively.

## Note 5 - Foreign Currency

Foreign currency transaction and remeasurement gains and losses reflected in earnings amounted to gains of $86 and $150 for the three months ended March 31, and June 30, 1986, respectively.

4

OCC033461

Confidential

At June 30, 1986, there were accumulated undistributed earnings after applicable local taxes of foreign subsidiaries of $7,595 for which no provision was necessary for foreign withholding or other income taxes because that amount had been reinvested in properties and equipment and working capital.

Note 6 - Receivables

|  | March 31, 1986 | June 30, 1986 |
|---|---|---|
| Notes and accounts receivable | $120,713 | $125,896 |
| Less - Allowance for doubtful receivables | 939 | 1,031 |
|  | $119,774 | $124,865 |

Note 7 - Inventories

|  | March 31, 1986 | June 30, 1986 |
|---|---|---|
| Finished and in-process | $ 57,415 | $ 47,234 |
| Raw materials | 24,392 | 22,942 |
| Supplies | 21,536 | 21,630 |
|  | $103,343 | $ 91,806 |

The current cost of inventories valued under the LIFO cost method (approximately 72% of total inventories at March 31, and June 30, 1986) exceeded their LIFO carrying values by $22,204 and $21,104 at March 31, and June 30, 1986, respectively.

Note 8 - Properties and Equipment

|  | March 31, 1986 | June 30, 1986 |
|---|---|---|
| Land | $ 26,377 | $ 29,738 |
| Buildings and land improvements | 113,476 | 114,078 |
| Machinery and equipment | 718,424 | 723,380 |
| Leasehold improvements | 3,832 | 3,814 |
| Furniture and fixtures | 7,731 | 7,684 |
| Construction-in-progress | 20,476 | 12,836 |
|  | 890,316 | 891,530 |
| Less - Accumulated depreciation | 397,814 | 407,201 |
|  | $492,502 | $484,329 |

5

OCC033462

Confidential

Authorized expenditures under approved appropriations for additions to properties and equipment over the next several years were $11,189 at June 30, 1986, after deducting expenditures through that date.

The provision for depreciation for the three months ended March 31, and June 30, 1986 of $11,945 and $11,889, respectively, was computed in accordance with the following rates:

| | |
|---|---|
| Buildings and land improvements | 2% to 3% |
| Machinery and equipment | 4% to 20% |
| Leasehold Improvements | Lease terms |
| Furniture and fixtures – mechanical | 15% |
| Furniture and fixtures – non-mechanical | 6% to 7% |

Note 9 – Investments and Long-Term Receivables

| | March 31, 1986 | June 30, 1986 |
|---|---|---|
| Investments and advances to associated companies, at equity | $ 4,932 | $ 5,157 |
| Investments, at cost, and long-term receivables | 16,904 | 17,559 |
| | $ 21,836 | $ 22,716 |

Note 10 – Intangible Assets

| | March 31, 1986 | June 30, 1986 |
|---|---|---|
| Intangibles resulting from acquisitions – excess of cost over fair value of net assets acquired | $ 15,519 | $ 15,519 |
| Patents, trademarks, formulae, processes, etc. | 5,867 | 6,670 |
| | 21,386 | 22,189 |
| Less – Accumulated amortization | 5,581 | 6,099 |
| | $ 15,805 | $ 16,090 |

The provision for amortization for the three months ended March 31, and June 30, 1986 was $441 and $518, respectively.

6

OCC033463

OCCNJ0026906

ALCD-PUBCOM_0002784

Note 11 - Long-Term Debt and Capital Lease Obligations

|  | March 31, 1986 | June 30, 1986 |
|---|---|---|
| Pollution control/Industrial revenue financings (6.75% to 14.50%) | $ 94,012 | $ 93,776 |
| Other loans (variable rate) | 5,675 | 5,568 |
| Capital lease obligations (5.25% to 13.51%) | 10,650 | 10,017 |
|  | 110,337 | 109,361 |
| Less - Due within one year | | |
| Long-term debt | 2,895 | 2,939 |
| Capital lease obligations | 1,952 | 1,483 |
|  | $105,490 | $104,939 |

Total interest costs incurred were as follows:

|  | Three Months Ended | |
|---|---|---|
|  | March 31, 1986 | June 30, 1986 |
| Chemicals' interest | $ 3,056 | $ 3,099 |
| Allocated Diamond Shamrock interest | 3,096 | 3,246 |
|  | 6,152 | 6,345 |
| Less - Capitalized interest | 247 | 157 |
|  | $ 5,905 | $ 6,188 |

Note 12 - Lease Commitments

Chemicals leases certain machinery and equipment, transportation and marketing facilities, and office space under cancellable and non-cancellable leases, most of which expire within 20 years and may be renewed. Chemicals' properties and equipment under capital lease were as follows:

7

OCC033464

Confidential

OCCNJ0026907

ALCD-PUBCOM_0002785

|  | March 31, 1986 | June 30, 1986 |
|---|---|---|
| Machinery and equipment | $ 2,120 | $ 2,064 |
| Leasehold improvements | 21,611 | 21,320 |
|  | 23,731 | 23,384 |
| Less – Accumulated depreciation | 17,393 | 17,340 |
|  | $ 6,338 | $ 6,044 |

Included in the provision for depreciation for the three months ended March 31, and June 30, 1986, was depreciation applicable to assets under capital lease of $234 and $231, respectively.

Rental expense for operating leases was as follows:

|  | Three Months Ended | |
|---|---|---|
|  | March 31, 1986 | June 30, 1986 |
| Total rentals | $ 5,452 | $ 5,533 |
| Less – Sublease rental income | 213 | 196 |
| Rental expense | $ 5,239 | $ 5,337 |

## Note 13 – Commitments and Contingencies

Chemicals is a party to a number of pending lawsuits, but in connection with the sale of Chemicals to Occidental, Diamond Shamrock has agreed to indemnify Chemicals for all losses and expenses incurred in connection therewith (See Note 2 – Sale of Chemicals).

8

OCC033465

**Confidential**

<u>SCHEDULE 2.09</u>

Agreement,
Dated September 4, 1986 (the "Agreement"),
By and Among
Diamond Shamrock Corporation,
Occidental Petroleum Corporation,
Occidental Chemical Corporation
and
<u>Oxy-Diamond Alkali Corporation</u>

<u>CONDUCT OF BUSINESS</u>

1. ADC explosion at the Ashtabula plant on January 17, 1986

2. Purchase of a certain portion of the business of Economics Laboratory, Inc. (including Soilax product line for pulp and paper products)

3. Sale of all of the business of Lankro Chemicals Limited, a U.K. corporation, and its subsidiary companies

4. Agreement to sell certain real estate associated with the Richmond plant

5. Organization of Diatecnica Comercio E Participacoes Ltda., a Brazilian corporation ("DIATECNICA"); transfer of the interest held in Herbitecnica Defensivos Agricolas Ltda., a Brazilian corporation to DIATECNICA; transfer of DIATECNICA from Diamond Shamrock Chemicals Company to Diamond Shamrock Corporate Company

6. Purchase of certain real estate by Diamond Shamrock France, S.A., a French corporation

7. Sale of a portion of the real estate associated with the Harrison plant

8. Internal restructuring between Diamond Shamrock Far East Ltd. and Diamond Shamrock China

OCC033466

**Confidential**

OCCNJ0026909
ALCD-PUBCOM_0002787

9. Reorganization of U.K. Companies, including:

   - transfer of all of the shares of Diamond Shamrock
     Process Chemicals Ltd., a U.K. corporation, to Diamond
     Shamrock Chemicals Company

   - transfer of all of the shares of Diamond Shamrock
     Europe Ltd., a U.K. corporation, and all of its
     subsidiaries to Diamond Shamrock Corporate Company and
     DSC Acquisitions, Inc.

   - repayment of various Diamond Shamrock Investments
     S.A., a Swiss corporation, funds and capitalization of
     certain intercompany advances

10. Transfer of all of the shares of Diamond Shamrock (Africa)
    Pty. Ltd., a South African corporation, owned by Diamond
    Shamrock Chemicals Company to Diamond Shamrock Corporate
    Company

11. Purchase of two notes of Diamond Shamrock France, S.A. in
    the principal amounts of FF 4,000,000 and FF 5,000,000
    from Diamond Shamrock Investments S.A. to Diamond Shamrock
    Chemicals Company

12. Transfer of Hamada Agricultural Company Limited, a
    Nigerian corporation, Agricultural and Industrials
    Chemicals (Nigeria) Ltd., a Nigerian corporation, and
    DICHEM Limited, a British Virgin Islands corporation, to
    Diamond Shamrock Corporate Company

13. Transfer of the promissory note from Agro-Allied
    Development Limited, a Nigerian corporation, to Diamond
    Shamrock Corporate Company

14. Transfer of Duolite International, Inc., a Delaware
    corporation and Sirotherm, Inc., a Delaware corporation,
    to Diamond Shamrock Corporate Company

15. Transfer of all rights of Diamond Shamrock Chemicals
    Company under the Loan Agreement, dated October 1, 1981,
    with C. Conradty Nurnberg GmbH & Co. KG to Diamond
    Shamrock Corporate Company

16. Transfer of Metal Coatings International Inc., a Delaware
    corporation, to Diamond Shamrock Corporate Company,
    including partial assignment of a services agreement

-2-

OCC033467

Confidential

OCCNJ0026910

ALCD-PUBCOM_0002788

17. Transfer of Diamond Shamrock International Corporation, a Delaware corporation, Diamond Shamrock Venezolana, S.A., a Venezuelan corporation, Insulating Aggregates, Inc., a Louisiana corporation, to Diamond Shamrock Corporate Company

18. Assignment of the DACAMOX Technology Sale Agreement with Rhone-Poulenc to Diamond Shamrock Corporate Company

19. Transfer of certain assets and contracts associated with COHESS System to Diamond Shamrock Chemicals Company

20. Transfer of the properties located in or about Princeton, New Jersey to Diamond Shamrock Corporate Company

21. Transfer of all real properties, located in Lake and Geauga Counties, Ohio and the mortgage with Lake Underground Storage unassociated with the Chemicals Business to Diamond Shamrock Corporate Company and Diamond Shamrock Chemical Land Holdings Inc.

22. Transfer of all gas wells and gas gathering systems in Ohio together with associated oil and gas leases and mineral estates, except for the gas well at the Ashtabula plant to Diamond Shamrock Exploration Company.

23. Transfer of all properties associated with the Kearney plant site in New Jersey to Diamond Shamrock Chemical Land Holdings Inc.

24. Redemption of share owned by Diamond Shamrock Canada Ltd., an Ontario corporation, in Diamond Shamrock Exploration of Canada Ltd., a Canadian corporation

25. Transfer of properties and other rights in Chambers County, Texas to Diamond Shamrock Refining and Marketing Company, including the assignment of certain contracts

26. Transfer of properties located at 80 Lister Avenue and 120 Lister Avenue, Newark, New Jersey, to Diamond Shamrock Chemical Land Holdings Inc.

27. Transfer of the medical technology business to BioSpecific Technologies, Inc., a Delaware corporation

28. Transfer of BioSpecific Technologies, Inc., a Delaware corporation, to Diamond Shamrock Corporate Company

-3-

OCC033468

**Confidential**

OCCNJ0026911

ALCD-PUBCOM_0002789

29. Transfer of Concord, Ohio properties and leases to Diamond Shamrock Corporate Company and Diamond Shamrock Chemical Land Holdings Inc., including:

   - contracts related to the Concord, Ohio facility

   - various lease improvements

30. Transfer of the lease and other contracts associated with Ocean Systems from Diamond Shamrock Chemicals Company to Diamond Shamrock Corporate Company

31. Transfer of Chemnor note from FINT Corporation, a Delaware corporation, to Diamond Shamrock Chemicals Company

32. Rescission of transfer of Falcon 20 Lease from Diamond Shamrock Aviation Company to Diamond Shamrock Chemicals Company

33. Perfection of transfer of 1984 transfer of Texas Stadium Box

34. Transfer of land in Hamilton County, Texas

35. Services Agreement between Diamond Shamrock Chemicals Company and Diamond Shamrock Corporate Company

36. Transfer of interest in Muenzing Chemie GmbH to Diamond Shamrock Corporation

37. Assignment by Diamond Shamrock Chemicals Company to Diamond Shamrock Corporate Company to effect the transfers of the Excluded Assets

38. Consent of The Chase Manhattan Bank relating to transfer under the Loan Agreement with Korea Potassium Chemical Company.

39. Consent of The First National Bank of Boston regarding the Eurodollar Credit Agreement with Diamond Shamrock de Chile S.A.I.

40. Consent of Citibank, N.A. and others with respect to the Credit Agreement with Carbocloro

2806g

OCC033469

**Confidential**                    OCCNJ0026912

ALCD-PUBCOM_0002790

<u>SCHEDULE 2.11</u>

Agreement,
Dated September 4, 1986 (the "Agreement"),
By and Among
Diamond Shamrock Corporation,
Occidental Petroleum Corporation,
Occidental Chemical Holding Corporation
and
<u>Oxy-Diamond Alkali Corporation</u>

<u>REAL PROPERTY INTERESTS</u>

Certain short-term or terminable warehouse, warehouse service, and terminal storage agreements which may contain features of lease agreements are disclosed as Contracts on Schedule 2.16.

2846g

OCC033470

Confidential

OWNED REAL PROPERTY

Description of Property                    Liens

Plant site located in
Belle, West Virginia

Plant site located in
Castle Hayne, North Carolina
including noncontiguous
parcels owned by DSCC

Plant site located in
Jersey City, New Jersey

Plant site located in
Chicago, Illinois

Plant site located in
Cincinnati, Ohio

Plant site located in                    Act of Mortgage dated
Convent, Louisiana                          2/21/86 among DSCC, The
                                            B. F. Goodrich Company
                                            and Convent Chemical
                                            Corporation

Plant site located in
Dallas, Texas

Headquarters for DSCC
located in Irving, Texas
generally known as
351 Phelps Court Road

OCC033471

**Confidential**                                    **OCCNJ0026914**
                                             ALCD-PUBCOM_0002792

| Description of Property | Liens |
|---|---|
| Plant site located in Lockport, New York | Liens created under Indenture executed and delivered in connection with the Industrial Revenue Bonds, Series 1981, issued by the Niagara County Industrial Development Agency |
| Plant site located in Delaware City, Delaware | Liens created under Indenture executed in connnection with the First Mortgage Revenue Bonds - Series 1966 - by the Delaware Industrial Building Commission |
| Plant site located in Ashtabula, Ohio | |
| Plant site located in Mobile, Alabama | Easement created by Deed executed and delivered in connection with the Pollution Control Facilities Revenue Bonds, Series 1971, issued by the West Alabama Environmental Improvement Authority Bonds |
| Plant site located in Muscle Shoals, Alabama | Liens created under Indenture executed and delivered with the Pollution Control Facilities Revenue Bonds, Series 1971, issued by the North Alabama Environmental Improvement Authority Bonds |

-2-

OCC033472

Confidential

OCCNJ0026915
ALCD-PUBCOM_0002793

| <u>Description of Property</u> | <u>Liens</u> |
|---|---|
| | Liens created under Indenture executed and delivered in connection with the Industrial and Pollution Control Revenue Bonds, Series 1974, and Revenue Bonds, Series 1974, issued by the Industrial Development Board of the City of Muscle Shoals |
| Plant site located in Deer Park, Texas | Ground lease dated 12/31/81 between DSC and DSPC |
| Plant site located in LaPorte, Texas (Battleground Plant) including noncontiguous parcels owned by DSCC | |
| An approximately 1-1/2 mile pipeline connecting the Deer Park and Battleground Plants, in which DSCC has an interest acquired by permit or easement | |
| An approximately 17 mile pipeline corridor connecting property located in Barbers Hill (Mont Belvieu), Texas with the Battleground Plant, primarily owned by DSCC in fee simple | |
| Oil, gas, salt and other mineral interests at Mont Belvieu and Barbers Hill | |

-3-

OCC033473

Confidential

OCCNJ0026916

ALCD-PUBCOM_0002794

| Description of Property | Liens |
|---|---|
| Land located in North Dayton, Texas | |
| An approximately 23 mile pipeline connecting North Dayton with a point near Barbers Hill primarily acquired by assignable R.O.W.s | Certain portion of pipeline subject to dispute |
| Plant site located in Carlstadt, New Jersey | |
| Plant site located in Cedartown, Georgia | Liens created under Indenture executed and delivered in connection with the Pollution Control Revenue Bonds, Series 1972-DS, issued by the Development Authority of Polk County |
| Plant site located in Charlotte, North Carolina | |
| Plant site located in Harrison, New Jersey | |
| Plant site located in Richmond, California [Agreement signed for the sale of approximately 3.5 acres] | |
| Plant site located in Oxnard, California | |

-4-

OCC033474

**Confidential**

OCCNJ0026917

ALCD-PUBCOM_0002795

| Description of Property | Liens |
|---|---|
| Plant site located in Broadmeadows, Victoria Australia (Diamond Shamrock (Australia) Pty. Limited) | |
| Plant site located in Hamilton, Ontario Canada | Present use does not conform with the current municipal zoning regulations and operates as a legally established non-conforming use |
| Plant site located in Talcahuano, Chile [Agreements to sell approximately 67,700 square meters of land to Shell Chile and approximately 26,000 square meters of land to Dinamic Oil] (Diamond Shamrock de Chile S.A.I.) | |
| Office building located in Santiago, Chile (Diamond Shamrock de Chile S.A.I.) | |
| Plant site located in Terrassa, Spain (Diamond Shamrock Eytesa S.A.) | |
| Apartment located in Zona Industrial de La Urbanizacion Can Parrellada, Spain [Proposal to lease all or a portion of this apartment is under consideration] (Diamond Shamrock Eytesa S.A.) | |

–5–

OCC033475

Confidential

OCCNJ0026918

ALCD-PUBCOM_0002796

<u>Description of Property</u>                <u>Liens</u>

Plant site located in
Courtenay, France
(Diamond Shamrock France
S.A.)


Plant site located in
Leeds, England
(Diamond Shamrock Process
Chemicals Limited)


Plant site located in
Chung Li, Taipei, Taiwan
(Diamond Shamrock
Taiwan Ltd.)


Plant site located in          Land mortgage with
Bangkok, Thailand (Thai         Nakoruthorn Bank
Diamond Shamrock Chrome
Limited)


Plant site located in
Cubatao, Brazil
(Carbocloro S.A.
Industrias Quimicas)


Office located in
Sao Paulo, Brazil
(Carbocloro S.A.
Industrias Quimicas)


Plant site located at          Mortgage with Chase
Inchon, Korea (KPPC)            Manhattan Bank


8308G

–6–

OCC033476

Confidential

OCCNJ0026919

ALCD-PUBCOM_0002797

## LEASED REAL PROPERTY

[9.1.1300]   1.   Office Park Space Lease, dated December 27, 1982, between Site 19 Ltd. and Diamond Shamrock Corporation

-     Annual Payment:  $103,950.00
-     Certain Other Financial Obligations of Lessee:
-         Certain insurance costs; certain operating expenses
-     Expiration Date:  January 31, 1988
-     Renewal Options:  None
-     Location:  Atlanta, Georgia (Atlanta Sales Office)

[9.1.1303]   2.   Lease Agreement, dated November 17, 1985, as amended, between Crow-Williams-Henry #1 and Diamond Shamrock Chemicals Company.

-     Annual Payment:  $209,664.00
-     Certain Other Financial Obligations of Lessee:
-         Certain utility costs; certain operating expenses; certain taxes; certain insurance costs
-     Expiration Date:  February 28, 1991
-     Renewal Options:  Renewable for one additional term of five years
-     Location:  Irving, Texas (Las Colinas Customer Service Center)

[9.1.1304]   3.   Lease Agreement, dated October 30, 1984, as amended, between Century Centre I and Diamond Shamrock Chemicals Company

-     Annual Payment:  $113,160.00
-     Certain Other Financial Obligations of Lessee:
-         Certain additional charges (§ 3(b)); certain operating expenses; certain utility costs; certain maintenance costs; certain insurance costs
-     Expiration Date:  January 31, 1990

OCC033477

**Confidential**

- Renewal Options:  Option to renew for
  one five-year period; "Hold Over"
  option of three months as defined in
  Section 16 and Rider Section 16
- Location:  San Mateo, California
  (California Sales Office)

4.  Commercial Lease Agreement, dated October 20,
    1980, between McFadden & Miller Construction
    Company and/or Assigns and Diamond Shamrock
    Corporation

    - Annual Payment:  years 4-6:  $ 92,832.00
                       7-10: $114,420.00
    - Expiration Date:  10 years after
      Completion Date (7-1-91)
    - Certain Other Financial Obligations of
      Lessee:
      - Pro rata share of insurance and
        operating expenses
    - Location:  Dallas, Texas (Dallas TCI)

[9.1.1311]  5.  Lease Agreement, dated January 1, 1977,
                between Golden Bear Muirfield, Inc. and
                Diamond Shamrock Corporation

    - Annual Payment:  Dollar amount determined
      pursuant to Ground Rent provisions set
      forth in § 3
    - Certain Other Financial Obligations of
      Lessee:
      - Certain insurance costs; certain
        maintenance costs; certain utility
        costs; certain construction and
        furnishing costs
    - Expiration Date:  December 31, 2006
    - Renewal Option:  None
    - Location:  Dublin, Ohio (Golf Condo)

[9.1.1312]  6.  Lease, dated April 23, 1980, between Carlyle
                Real Estate Limited Partnership-75 and Diamond
                Shamrock Corporation

    - Annual Payment:  May 1, 1986 - April 30,
      1991 : $729,951.00
    - Certain Other Financial Obligations of
      Lessee:

-2-

OCC033478

Confidential

OCCNJ0026921

ALCD-PUBCOM_0002799

-     Certain taxes; certain insurance costs; certain utility costs; certain maintenance costs
- Expiration Date:  April 30, 1991
- Renewal Options:  Two 5-year renewal options
- Location:  Pasadena, Texas (Pasadena Operations)

[9.1.1313b]  7.  Sublease, dated February 1, 1983, between Diamond Shamrock Corporation and Ventech Investment Company

-     Annual Payment:
        $400,000 (base rental) (plus $10.00 per square foot per year for certain additional space)
        [Annual payments include:  Base Rental, Base Rental Escalation and Additional Rent as described in Sections 4(a), 4(b) and 4(c)]
- Certain Other Financial Obligations of Lessor:
  -     Certain utility costs; certain maintenance costs; certain insurance costs
- Expiration Date:  April 30, 1991
- Renewal Options:  None
- Location:  Pasadena, Texas

8.  Lease, dated September 2, 1977, between Diamond Shamrock Corporation and Mack Properties Co. No. 4

-     Annual Payment:  $594,996
- Certain other financial obligations of Lessee:
  -     Certain taxes; certain utility costs; certain insurance costs; certain repair costs
- Expiration Date:  September 1, 1992
- Renewal Options:  5 year renewal option per Article XXVI
- Location:  Morristown, New Jersey (Process Chemicals Headquarters)

9.  Lease Agreement, dated July 23, 1976, as amended, between Diamond Shamrock France S.A.

-3-
          OCC033479

**Confidential**

and Societe Lyonnaise Immobiliere Pour
L'Industrie et le Commerce - Sliminco
("Sliminco")

- Annual Payment: _____
- Certain Other Financial Obligations of
  Lessee:
  -
- Commencement Date: _____
- Expiration Date: _____
- Location: Ponthierry, France (Diamond
  Shamrock France S.A.)

10. Office Lease Agreement, dated March 31, 1978,
    as amended, between Diamond Shamrock Pacific
    Limited and Aoi Kigyo K.K.

    - Annual Payment:  Y 21,110,520 (allocated
      D.S. Pacific Y 12,953,507 and MDS
      Y 8, 157,013)
    - Certain Other Financial Obligations of
      Lessee:
      -    Certain utility costs; certain
           maintenance costs
    - Expiration Date:  March 31, 1988
    - Renewal Options:  Yes
    - Location:  Tokyo, Japan (Diamond
      Shamrock Pacific

11. Lease Agreement, dated October 14, 1982,
    between Diamond Shamrock Scandinavia A/S and
    Senko A/S

    - Annual Payment:  N.Kr. 1,313,993 (for
      1981, multiplied by Stormbull's
      index for adjustment in subsequent
      years)
    - Certain Other Financial Obligations of
      Lessee:
      -    Certain taxes; certain insurance
           costs; certain costs incurred by
           Lessor
    - Expiration Date:  April 30, 1994
    - Renewal Options:  Three 5 year renewal
      options
    - Location:  Drammen, Norway (Diamond
      Shamrock Scandinavia A/S)

-4-                      OCC033480

**Confidential**

12. Instrumento Particular de Contracto de
Locacao, Que Entre Si Celebram, dated
August 22, 1985, between Carbocloro S.A.
Industrias Quimicas and Jodlpar Sociedade
Civil Limitada

- Annual Payment: _____
- Certain Other Financial Obligations of
  Lessee:
  -
- Commencement Date: _____
- Expiration Date: _____
- Renewal Options: _____
- Location: _____, Brazil

B. Leases executed in connection with Industrial
Revenue Bonds or Pollution Control Bonds of Diamond
Shamrock Corporation

13. Lease, dated as of September 1, 1966, between
Delaware Industrial Building Commission and
Diamond Shamrock Corporation (formerly Diamond
Alkali Company) executed and delivered in
connection with the $17,000,000 Delaware
Industrial Building Commission First Mortgage
Revenue Bonds, Series 1966 (the "Bonds")

- Semiannual payments to meet principal
  and interest payments on Bonds, with
  principal payments of $1,185,000 for the
  year 1986 and ending with $1,240,000 for
  the year 1987.
- Expiration Date - September 1, 1987 or
  until Bonds are paid in full
- Location - Red Lion Hundred, New Castle
  County, Delaware

14. Lease Agreement, dated as of December 1, 1974,
between the Industrial Development Board of
Muscle Shoals and Diamond Shamrock Corporation
executed and delivered in connection with the
$1,000,000 Industrial Development Board of the
City of Muscle Shoals Revenue Bonds, Series
1974 (the "Bonds")

- Semiannual payments to meet principal
  and interest payments on Bonds,
  beginning with principal payments of

-5-

OCC033481

OCCNJ0026924
ALCD-PUBCOM_0002802

$75,000 for 1985-1987, $100,000 for 1988-1991, and ending with $125,000 from 1991 to 1994
- Expiration Date - December 1, 1994 or until Bonds are fully paid
- Options to purchase project in certain circumstances; obligation to purchase Project upon completion
- Location - Muscle Shoals; Colbert County, Alabama

15. Lease Agreement, dated as of December 1, 1974, between the Industrial Development Board of the City of Muscle Shoals and Diamond Shamrock Corporation executed and delivered in connection with the $2,300,000 Industrial Development Board of the City of Muscle Shoals Pollution Control Revenue Bonds, Series 1974 (the "Bonds")

- Semiannual payments to meet payments on Bonds, beginning with principal payments of $100,000 for 1985-1988, $150,000 for 1989-1991, $175,000 for 1992-1997 and ending with $200,000 for 1998-1999
- Expiration Date - December 1, 1999 or until Bonds are fully paid
- Options to purchase Project in certain circumstances; obligations to purchase Project upon its completion
- Location - Muscle Shoals, Colbert County, Alabama

16. Lease Agreement, dated as of October 1, 1971, between North Alabama Environmental Improvement Authority and Diamond Shamrock Corporation (lease of easement) executed and delivered in connection with the $1,800,000 North Alabama Environmental Improvement Authority Pollution Control Facilities Revenue Bonds Series 1971-DS (the "Bonds") for lease of an easement described therein

- Semiannual payments to meet principal and interest payments on Bonds, beginning with principal payments of $110,000 for 1986, $120,000 for 1987, $130,000 for 1988, $140,000 for 1989, $150,000 for 1990 and $160,000 for 1991

-6-

OCC033482

Confidential

- Expiration Date - September 30, 1991 or until Bonds are fully paid
- Options to purchase Project in certain circumstances; Obligation to purchase Project upon completion
- Location - Muscle Shoals, Colbert County, Alabama

17. Lease Agreement, dated as of October 1, 1971, between West Alabama Environmental Improvement Authority and Diamond Shamrock Corporation executed and delivered in connection with the $950,000 West Alabama Environmental Improvement Authority Pollution Control Facilities Revenue Bonds, Series 1971-DS (the "Bonds") for the lease of an easement described therein

- Semiannual payments to meet principal and interest payments on Bonds which principal payments are less than $100,000
- Expiration Date - September 30, 1991 or until Bonds are fully paid
- Options to purchase Project in certain circumstances; obligation to purchase Project upon completion
- Location - Mobile, Mobile County, Alabama

18. Lease Agreement, dated as of October 1, 1972, between Development Authority of Polk County and Diamond Shamrock Corporation executed and delivered in connection with the $1,350,000 Development Authority of Polk County Pollution Control Revenue Bonds, Series 1972-DS (the "Bonds")

- Semiannual payments to meet principal and interest payments on Bonds which are less than $100,000 until 1992 at which time principal payments are $110,000
- Expiration Date - October 1, 1992
- Options to purchase Project in certain circumstances; obligation to purchase Project upon completion
- Location - Cedartown, Polk County, Georgia

-7-

OCC033483

Confidential

19.  Lease Agreement, dated December 1, 1981,
     between Parish of St. James, State of
     Louisiana and Convent Chemical Corporation
     ("Convent") executed and delivered in
     connection with $19,500,000 Parish of
     St. James, State of Louisiana Pollution
     Control Revenue Bonds Series 1981 (the "Bonds")

     -    Semiannual payments to meet interest and
          principal on Bonds, with principal
          payments beginning on December, 1996
          with respect to certain of the Bonds
          which mature on December 1, 2001 with
          payments in 1996 being $910,000, in 1997
          $1,040,000, in 1998 $1,185,000, in 1999
          $1,355,000, in 2000 $1,545,000 and with
          principal payments beginning on
          December 1, 2002 with respect to certain
          of the Bonds which mature on December 1,
          2011 with principal payments being
          $590,000 in 2002, $675,000 in 2003,
          $775,000 in 2004, $885,000 in 2005,
          $1,015,000 in 2006, $1,160,000 in 2007,
          $1,330,000 in 2008, $1,525,000 in 2009
          and $1,745,000 in 2010
     -    Expiration Date - December 1, 2011
     -    Options to Purchase Project in certain
          circumstances
     -    Location - Convent, Louisiana

20.  Lease Agreement, dated December 1, 1981,
     between South Louisiana Port Commission and
     Convent executed and delivered in connection
     with $27,000,000 South Louisiana Port
     Commission Port Facilities Revenue Bonds,
     Series 1981 (the "Bonds")

     -    Semiannual payments to meet interest and
          principal on Bonds, with principal
          payments beginning on December 1, 1996
          with respect to certain of the Bonds
          which mature on December 1, 2001 with
          payments in 1996 being $470,000, in 1977
          $535,000, 1998 $610,000, 1999 $700,000
          and 2000 $800,000 and with principal
          payments beginning on December 1, 2002,
          with respect to those Bonds which mature
          on December 1, 2011 with payments in

-8-

OCC033484

Confidential

2002 being $1,160,000, in 2003
$1,325,000, in 2004 $1,520,000, in 2005
$1,740,000, in 2006 $1,995,000, in 2007
$2,280,000, in 2008 $2,615,000, in 2009
$2,990,000 and in 2010 $3,425,000

- Expiration Date – December 1, 2011
- Options to purchase Project in certain circumstances
- Location – Convent, Louisiana

21. Lease Agreement, dated as of March 1, 1982,
between Parish of St. James, State of
Louisiana and Convent executed and delivered
in connection with $1,000,000 Parish of
St. James, State of Louisiana Industrial
Revenue Bonds, Series 1982 (the "Bonds")

- Semiannual payments to meet principal
and interest payments on Bonds, with
principal payments to begin in
December 1, 2002 through December 1,
2006 of less than $100,000 and beginning
December 1, 2008 $115,000, 2009 $130,000
and 2010 $150,000
- Expiration Date – December 1, 2011
- Options to purchase Project in certain circumstances
- Location – Convent, Louisiana

8646G

-9-

OCC033485

Confidential

OCCNJ0026928

ALCD-PUBCOM_0002806

SCHEDULE 2.12

Agreement,
Dated September 4, 1986 (the "Agreement"),
By and Among
Diamond Shamrock Corporation,
Occidental Petroleum Corporation,
Occidental Chemical Holding Corporation
and
Oxy-Diamond Alkali Corporation

LEASES OF PERSONAL PROPERTY

2846g

OCC033486

**Confidential**

OCCNJ0026929

ALCD-PUBCOM_0002807

## LEASES OF PERSONAL PROPERTY

1.  Car Leasing Agreement, dated February 1, 1984, as amended, between Diamond Shamrock Chemicals Company and General Electric Railcar Services Corporation

2.  Car Service Contract, dated November 1, 1983, as amended, between Diamond Shamrock Chemicals Company and General American Transportation Corporation

3.  Participation Agreement, dated January 5, 1981, among The B. F. Goodrich Company, Valley Bank Leasing, Inc., Bankers Commercial Corporation, Modern Woodmen of America and Valley Bankers Leasing 81-1 Partnership

4.  Equipment Lease, dated January 5, 1981, between The B. F. Goodrich Company and Valley Bankers Leasing 81-1 Partnership

5.  Equipment Lease, dated April 1, 1978, between Diamond Shamrock Corporation and Trust Company for USL, Inc.

6.  Car Lease Agreement, dated June 1, 1985, between Diamond Shamrock Chemicals Company and Allied Corporation

7.  Agreement, dated August 1, 1984, between Diamond Shamrock Chemicals Company and Union Tank Car Company

8.  Car Sub-lease Agreement, dated December 22, 1981, between Diamond Shamrock Corporation and Union Tank Car Company

9.  Master Car Service Contract No. 2-9823, dated July 13, 1973, as amended, between Diamond Shamrock Corporation and ACF Industries

10. Master Car Service Contract No. 2-8584, dated April 26, 1971, between Diamond Shamrock Corporation and ACF Industries, Incorporated

11. Master Car Service Contract No. 2-8586, dated April 28, 1971, as amended, between Diamond Shamrock Corporation and ACF Industries, Incorporated

OCC033487

OCC033487

12.   Master Car Service Contract No. 2-8587, dated
April 28, 1971, as amended, between Diamond Shamrock
Corporation and ACF Industries, Incorporated

13.   Master Service Contract No. MSC2-0999, dated
January 20, 1976, as amended, between Diamond Shamrock
Corporation, Process Division, and ACF Industries,
Incorporated

14.   Master Service Contract No. 4-2439, dated October 14,
1980, as amended, between Diamond Shamrock Corporation
and ACF Industries, Incorporated

15.   Master Car Service Contract No. 2-8585, dated
April 26, 1971, as amended, between Diamond Shamrock
Chemical Company and ACF Industries, Inc.

16.   Barge Charter, dated November 27, 1985, between
Diamond Shamrock Chemicals Company and The BF Goodrich
Company

17.   Agreement to Acquire and Charter, dated _____
, 1974, between Diamond Shamrock Corporation, the
Chase Manhattan Bank and Mercantile-Safe Deposit &
Trust Company

18.   Bareboat Charter Party, dated _____, 1974,
between Diamond Shamrock Corporation and Mercantile -
Safe Deposit and Trust Company

19.   Agreement and Assignment, dated April 26, 1973, of
Bareboat Charter/Lease Agreement, dated September 1,
1973, between GATX Leasing Company and GATX Aircraft
Corporation.

20.   Bareboat Charter/Lease Agreement, dated as of
April 26, 1973, between GATX Leasing Corporation and
Lone Star Barge Company, Inc.

21.   Letter Agreement, dated January 30, 1986, between
Diamond Shamrock Chemicals Company and Spanier Marine
Corporation

22.   Voyage Charter Party, dated May 29, 1986, between
Diamond Shamrock Chemicals Company and Diamond
Shamrock Corporate Company

23.   Bareboat Charter/Lease Agreement, dated as of
April 26, 1973, as amended, between Loan Star Barge
Company, Inc. and Diamond Shamrock Corporation

-2-

OCC033488

Confidential

24. Locomotive Lease Agreement, as amended, dated November 17, 1983, between Diamond Shamrock Corporation and Inman Service Co., Inc.

25. Rail Car Sublease, dated _____ __, 198__, between Diamond Shamrock Corporation and The B.F. Goodrich Company

26. Rail Car Lease, dated April 24, 1985, between Diamond Shamrock Chemicals Company and Chemtech Industries, Inc.

27. Rail Car Lease, dated February 12, 1986, between Diamond Shamrock Chemicals Company and Transportation Equipment, Inc.

28. Rail Tank Car Sublease Agreement, dated March 21, 1986, between Diamond Shamrock Chemicals Company and Zip Transportation Company, Inc.

29. Lease of Railroad Equipment, dated July 15, 1978, between Diamond Shamrock Corporation and Exchange National Bank of Chicago

30. Vehicle Lease Agreement, as amended, dated September 19, 1972, between Diamond Shamrock Corporation and Leaseway System Corporation

31. Railcar Sublease, dated November 27, 1984, between Diamond Shamrock Corporation and United States Rail Services, Inc.

32. Participation Agreement, dated July 15, 1978, between Diamond Shamrock Corporation, Security Pacific Equipment Leasing, Inc., Exchange National Bank of Chicago (as Owner-Trustee), First Pennsylvania Bank N.A. (as Agent), and Purchasers

33. Anode Lease Agreement, dated August 17, 1977, as amended, between Electrode Corporation and The B.F. Goodrich Company

34. Locomotive Lease #135, dated November 17, 1983, as amended, between Diamond Shamrock and Inman Service Co., Inc.

35. Locomotive Lease #177, dated November 17, 1983, as amended, between Diamond Shamrock Corporation and Inman Service Co., Inc.

-3-

OCC033489

Confidential

OCCNJ0026932

ALCD-PUBCOM_0002810

36.   Private Car Lease Agreement, dated January 16, 1984, between Diamond Shamrock Chemicals Company and Tenneco Minerals Company

37.   Master Lease, dated October 12, 1984, between Diamond Shamrock Chemicals Company and Comdisco, Inc.

38.   Car Service Agreement, dated August 1, 1984, between Union Tank Car Company and Diamond Shamrock Chemicals Company

39.   Barge Charter Agreement, dated November 27, 1985, between The B.F. Goodrich Company and Diamond Shamrock Chemicals Company whereby The B.F. Goodrich Company agreed to charter three barges to Diamond Shamrock Chemicals Company

40.   Rail Car Lease, dated November 27, 1985, between The B.F. Goodrich Company and Diamond Shamrock Chemicals Company

41.   Bareboat Charter Agreement, dated November 27, 1985, between Diamond Shamrock Chemicals Company and Convent Chemical Corporation

42.   Assignment, Assumption and Consent Agreement, dated November 27, 1985, between Diamond Shamrock Chemicals Company, Convent Chemical Corporation, The Aetna Casualty and Surety Company, The Aetna Life Insurance Company, Exchange National Bank of Chicago, General Electric Credit Corporation and Continental Illinois National Bank and Trust Company of Chicago, whereby Convent Chemical Corporation assigned to Diamond Shamrock Chemicals Company its rights and obligations under a Charter Agreement dated September 15, 1980

43.   Assignment and Assumption Agreement, dated November 27, 1985, between Diamond Shamrock Chemicals Company and Convent Chemical Corporation

44.   Assignment, Assumption and Consent Agreement, dated November 27, 1985, between Diamond Shamrock Chemicals Company, The B.F. Goodrich Company, Valley Bankers Leasing 81-1 Partnership and Valley Bank Leasing

45.   Assignment, Assumption and Consent Agreement, dated November 27, 1985, between Diamond Shamrock Chemicals Company, The B. F. Goodrich Company and Bankers Commercial Corporation, with respect to 57 railcars

-4-                               OCC033490

Confidential                               OCCNJ0026933

ALCD-PUBCOM_0002811

54.  Lease Agreement, dated as of December 1, 1979, between
County Commissioner of Kanawha County and Diamond
Shamrock Corporation executed in connection with
$1,000,000 County Commission of Kanawha County, West
Virginia Environmental Improvement Revenue Bonds
Series 1979 for lease of equipment described in the
Lease Agreement

55.  Lease Agreement, dated as of December 1, 1981, between
South Louisiana Port Commission and Covent Chemical
Corporation executed in connection with $27,000,000
Port Facilit s Revenue Bonds (BF Goodrich Guarantor)
Series 1981 for lease of facilities described in Lease
Agreement

56.  Lease Agreement, dated as of December 1, 1981, between
Parish of St. James, State of Louisiana and Convent
Chemical Corporation executed in connection with
$19,500,000 Pollution Control Revenue Bonds (BF
Goodrich Guarantor) Series 1981 for lease of
facilities described in Lease Agreement)

57.  Lease Agreement, dated as of March 1, 1982, between
Parish of St. James, State of Louisiana and Convent
Chemical Corporation executed in connection with
$1,000,000 Industrial Revenue Bonds (BF Goodrich
Guarantor) Series 1982 for lease of facilities
described in Lease Agreement)

2702g

-6-

OCC033491

Confidential

OCCNJ0026934
ALCD-PUBCOM_0002812

SCHEDULE 2.13

Agreement,
Dated September 4, 1986 (the "Agreement"),
By and Among
Diamond Shamrock Corporation,
Occidental Petroleum Corporation,
Occidental Chemical Holding Corporation
and
Oxy-Diamond Alkali Corporation

BANK ACCOUNTS

2846g

OCC033492

**Confidential**

**OCCNJ0026935**
ALCD-PUBCOM_0002813

## General/Lockbox Accounts

| Account Number | Bank and Type of Account | Authorized Signatures |
|---|---|---|
| 80005-8053 | AmeriTrust Company<br>Cleveland, Ohio<br>General | J. W. McConnell<br>L. R. Domenici<br>D. C. Mielke<br>S. D. Palmentera (W/T)<br>T. J. Joyce<br>C. L. Perkins (W/T) |
| 322-022215 | Chemical Bank<br>New York, New York<br>General | J. W. McConnell<br>L. R. Domenici<br>D. C. Mielke<br>S. D. Palmentera (W/T)<br>T. J. Joyce<br>C. L. Perkins (W/T) |
| 040-43-030 | Citizens & Southern National<br>Atlanta, Georgia<br>General/Lockbox | J. W. McConnell<br>L. R. Domenici<br>D. C. Mielke<br>S. D. Palmentera (W/T)<br>T. J. Joyce<br>C. L. Perkins (W/T) |
| 72-54911 | Continental Illinois National<br>Chicago, IL<br>General/ Lockbox | J. W. McConnell<br>L. R. Domenici<br>D. C. Mielke<br>S. D. Palmentera (W/T)<br>T. J. Joyce<br>C. L. Perkins (W/T) |
| 060-090963 | Crocker National<br>San Francisco<br>General/Lockbox | J. W. McConnell<br>L. R. Domenici<br>D. C. Mielke<br>S. D. Palmentera (W/T)<br>T. J. Joyce<br>C. L. Perkins (W/T) |
| 02-1261-3 | Interfirst- Las Colinas<br>Irving, Texas<br>General | J. W. McConnell<br>L. R. Domenici<br>D. C. Mielke<br>S. D. Palmentera (W/T)<br>T. J. Joyce<br>C. L. Perkins (W/T) |

OCC033493

**Confidential**

| 123-1142 | Mellon Bank N. A.<br>Pittsburgh, Pennsylvania<br>General | J. W. McConnell<br>L. R. Domenici<br>D. C. Mielke<br>S. D. Palmentera (W/T)<br>T. J. Joyce<br>C. L. Perkins (W/T) |
| 51-5-4815-4 | Midlantic National Bank<br>Edison New Jersey<br>General/ Lockbox | J. W. McConnell<br>L. R. Domenici<br>D. C. Mielke<br>S. D. Palmentera (W/T)<br>T. J. Joyce<br>C. L. Perkins (W/T) |
| 00-0-5928 | National City<br>Cleveland, Ohio<br>General/ Lockbox | J. W. McConnell<br>L. R. Domenici<br>D. C. Mielke<br>S. D. Palmentera (W/T)<br>T. J. Joyce<br>C. L. Perkins (W/T) |
| 050-9977 | Society National<br>Cleveland, Ohio<br>General/International Lockbox | J. W. McConnell<br>L. R. Domenici<br>D. C. Mielke<br>S. D. Palmentera (W/T)<br>T. J. Joyce<br>C. L. Perkins (W/T) |
| 046-0527 | Texas Commerce<br>Houston, Texas<br>General/ Lockbox | J. W. McConnell<br>L. R. Domenici<br>D. C. Mielke<br>S. D. Palmentera (W/T)<br>T. J. Joyce<br>C. L. Perkins (W/T) |
| 1861055172 | Wachovia Bank & Trust Company, N.A.<br>Charlotte, North Carolina<br>General/ Lockbox | J. W. McConnell<br>L. R. Domenici<br>D. C. Mielke<br>S. D. Palmentera (W/T)<br>T. J. Joyce<br>C. L. Perkins (W/T) |

OCC033494

Confidential

11 Locations on "Pool" Payroll Account

<u>As of June 30, 1986</u>

| | |
|---|---|
| 13 | Baltimore TCI |
| 16 | Dallas Silicate |
| 18 | Delaware Plant |
| 21 | Castle Hayne |
| 22 | Chicago Silicate |
| 29 | TCI Franklin Park |
| 30 | Jersey City Silicate |
| 34 | Lockport Silicate |
| 38 | Mobile Plant |
| 69 | Oxnard Plant |
| 80 | Ashtabula |

OCC033495

**Confidential**

**OCCNJ0026938**
ALCD-PUBCOM_0002816

Pooled Payroll Account 167-8761
Mellon Bank
Pittsburgh, Pennsylvania

| Plant or Office Locations | Authorized Signatures |
|---|---|
| Ashtabula Semi-Works Plant (80) | F. C. Leitert (M & F) |
| | D. J. Wainio |
| Baltimore TCI Plant (13) | J. Bloom |
| | P. L. Bowman, Jr. |
| Castle Hayne Plant (21) | R. P. Farver (M & F) |
| | J. Moon |
| | W. E. Hines |
| Chicago Silicate Plant (22) | G. T. Renzaglia |
| | M. W. (Kelly) Dworaczyk |
| | J. A. Salvo |
| Dallas Silicate Plant (16) | P. E. Johnson |
| | D. T. Wingfield |
| | L. W. Woody |
| | C. W. Evans |
| Delaware City Plant (18) | W. A. Fertig, Jr. (M & F) |
| | I. F. Polasek |
| Franklin Park TCI (29) | C. L. Monroy |
| | M. L. Clemmons |
| Jersey City Plant (30) | P. Malone |
| | J. A. Kasmer |
| Lockport Plant (34) | G. Ernst |
| | R. J. Schmidt |
| Mobile Plant (38) | W. T. Arnold |
| | R. Perkinson |
| | C. Spence |
| | A. L. Imler |
| Oxnard Plant (69) | F. R. Newton |
| | R. G. Wofford |

OCC033496

Confidential

35 DSCC Locations on Mellon Working Fund Account

As of June 30, 1986

| 11 | Atlanta Sales | 33 | Irving |
|----|----------------|----|--------|
| 13 | Baltimore Plant TCI | 34 | Lockport Silicate |
| 14 | Beachwood Sales | 35 | Harrison |
| 15 | Charlotte | 37 | Morristown |
| 16 | Dallas Silicate | 38 | Mobile Plant |
| 18 | Delaware Plant | 40 | Muscle Shoals Plant |
| 19 | Battleground | 42 | Cedartown |
| 21 | Castle Hayne | 43 | Richmond |
| 22 | Chicago Silicate | 44 | New York Sales |
| 23 | Belle Plant | 46 | Philadelphia Sales |
| 24 | Chicago Sales | 48 | TCI Dallas |
| 25 | Deer Park | 50 | Tech Center |
| 26 | Irving Payroll | 55 | Customer Service – Las Colinas |
| 27 | Cincinnati Silicate | 62 | Convent |
| 28 | Houston Sales | 65 | Western Region |
| 29 | TCI Franklin Park | 69 | Oxnard Plant |
| 30 | Jersey City Silicate | 80 | Ashtabula |
| 31 | Carlstadt | | |

OCC033497

**Confidential**

**OCCNJ0026940**
ALCD-PUBCOM_0002818

Working Fund Account 175-2669
Mellon Bank
Pittsburgh, Pennsylvania

| Plant of Office Location | Authorized Signatures |
|---|---|
| Ashtabula Semi-Works Plant (80) | F. C. Leitert<br>D. J. Wainio |
| Atlanta Sales (11) | K. E. Armbruster<br>P. J. Huber<br>D. Thomas<br>R. Yelverton<br>S. K Fletcher |
| Baltimore TCI Plant (13) | J. Bloom<br>P. L. Bowman, Jr. |
| Battleground Plant (19) | T. H. Morrow<br>H. D. Howell<br>B. A. Morrison |
| Beachwood Sales (14) | D. Thomas<br>C. J. Krivacek<br>R. J. Brill, Jr.<br>W. E. Downey<br>J. D. Fleming |
| Belle Plant (23) | C. E. Painter<br>L. H. Hurn<br>L. T. Walker |
| Carlstadt Plant (31) | A. M. Hauser<br>R. L. Chonoles |
| Castle Hayne Plant (21) | R. P. Farver<br>J. Moon<br>W. E. Hines<br>R. P. Farver (M & F) |
| Cedartown Plant (42) | R. W. Adam<br>W. Ruppert (M & F) |
| Charlotte Plant (15) | B. W. Sears<br>S. B. Riedel |
| Chicago Sales (24) | D. Thomas<br>B. Wilson<br>T. R. Crawshaw<br>M. S. Dye |
| Chicago Silicate Plant (22) | G. F. Renzaglia<br>W. Troy<br>J. A. Salvo |

OCC033498

Confidential



| | |
|---|---|
| Cincinnati Plant (27) | T. E. Amon |
| | J. Poloha |
| | K. R. Koehler |
| Convent Plant (62) | Joel Ridenour |
| | J. D. Carona |
| | T. E. Smith |
| Dallas Silicate Plant (16) | P. E. Johnson |
| | L. W. Woody |
| | C. W. Evans |
| | D. T. Wingfield |
| Dallas TCI Plant (48) | H. E. Diamond |
| | R. A. Blomfield |
| Deer Park Plant (25) | T. M. Clayton |
| | T. R. Lipscomb |
| Delaware City Plant (18) | W. A. Fertig, Jr. (M & F) |
| | L. F. Polasek |
| Franklin Park TCI Plant (29) | C. L. Monroy |
| | M. L. Clemmons |
| Harrison Plant (35) | R. F. Novak (M & F) |
| | J. D. Gibbons |
| Houston Sales (28) | W. N. Simer |
| | J. E. Chinners |
| | T. L. Warning |
| | D. Thomas |
| Irving Payroll Dept (26) | E. P. Spence |
| | L. R. Keeter |
| | C. K. Tanski |
| Jersey City Plant (30) | J. A. Kasmer |
| | P. Malone |
| Las Colinas Office (33) | S. D. Palmentera |
| | T. J. Joyce |
| | E. P. Spence |
| Customer Service Center (55) | D. Thomas |
| | L. G. Lawrence |
| | J. P. Mavsar |
| | K. D. Dreibelbis |
| | J. E. Whalen |
| Lockport Plant (34) | G. Ernst |
| | R. T. Schmidt |

OCC033499

Confidential



| | |
|---|---|
| Mobile Plant (38) | W. T. Arnold |
| | R. Perkinson |
| | A. L. Imler |
| | C. Spence |
| Morristown (37) | A. M. Sarcich |
| | L. J. Franz |
| | P. R. Mahaney |
| Muscle Shoals Plant (40) | N. R. Crisler |
| | W. P. McGee (M & F) |
| New York Sales (44) | D. Thomas |
| | J. H. Wilbert |
| | V. R. Hayden |
| | J. S. Zolnier |
| Oxnard Plant (69) | F. R. Newton |
| | F. G. Wofford |
| Philadelphia Sales (46) | W. O. Fox |
| | D. Thomas |
| | C. A. Lehman |
| | D. C. Rhodes |
| Richmond Plant (43) | J. Waid |
| | D. Yamashita |
| Technical Center (50) | B. Schenker |
| | D. R. Pulver |
| Western Region (65) | D. Thomas |
| | B. J. Sturges |
| | J. J. Leinweber |
| | R. L. Bower |

OCC033500

**Confidential**

## Controlled Disbursement Accounts

| Account Number | Bank and Type of Acccount | Authorized Signatures |
|---|---|---|
| 15-0160-7 | Texas Commerce Bank<br>Odessa, Texas | J. W. McConnell<br>L. R. Domenici<br>D. C. Mielke<br>T. J. Joyce<br>S. D. Palmentera (W/T)<br>C. L. Perkins (W/T) |
| 702092 | Texas Commerce Bank<br>Conroe, Texas | J. W. McConnell<br>L. R. Domenici<br>D. C. Mielke<br>T. J. Joyce<br>S. D. Palmentera (W/T)<br>C. L. Perkins (W/T) |

OCC033501

Confidential

OCCNJ0026944

ALCD-PUBCOM_0002822

Zero Balance Accounts

| Account Number | Bank and Type of Account | Authorized Signatures |
| --- | --- | --- |
| 167-8761 | Mellon Bank N.A.<br>Pittsburgh, Pennsylvania<br>Pooled Payroll | (See Individual Locations)<br>J. W. McConnell<br>L. R. Domenici<br>D. C. Mielke<br>T. J. Joyce |
| 175-2669 | Mellon Bank N.A.<br>Pittsburgh, Pennsylvania<br>Working Fund | (See Individual Locations)<br>J. W. McConnell<br>L. R. Domenici<br>D. C. Mielke<br>T. J. Joyce |
| 123-1062 | Mellon Bank<br>Concentration | D. C. Mielke<br>R. C. Becker |

OCC033502

**Confidential**

**OCCNJ0026945**

ALCD-PUBCOM_0002823

Courtesy Accounts

| Account Number | Bank and Type of Account | Authorized Signatures |
|---|---|---|
| 101-313-0 | First Jersey National Bank<br>Jersey City, New Jersey | J. W. McConnell<br>L. R. Domenici<br>D. C. Mielke<br>J. A. Kasmer<br>P. Malone<br>T. J. Joyce |
| 18-572-8 | Northern Trust Bank/Naperville<br>Naperville, Illinois | J. W. McConnell<br>L. R. Domenici<br>D. C. Mielke<br>B. Wilson<br>T. R. Crawshaw<br>T. J. Joyce |
| 18-1197-5 | Texas Commerce Bank<br>Las Colinas<br>Irving, Texas | J. W. McConnell<br>L. R. Domenici<br>D. C. Mielke<br>D. Thomas<br>L. G. Lawrence<br>T. J. Joyce |
| 2231-1565 | Wilmington Trust<br>Wilmington, Delaware | J. W. McConnell<br>L. R. Domenici<br>D. C. Mielke<br>T. J. Joyce |

OCC033503

Payroll Accounts

| Account Number | Bank and Type of Account | Authorized Signatures |
|---|---|---|
| 060-0240-4 | Central Bank of the South<br>Sheffield, Alabama<br>Hourly Payroll | J. W. McConnell<br>L. R. Domenici<br>D. C. Mielke<br>W. P. McGee (M & F)<br>N. R. Crisler<br>T. J. Joyce |
| 724-01612 | The Fifth Third Bank<br>Cincinnati, Ohio<br>Hourly Payroll | J. W. McConnell<br>L. R. Domenici<br>D. C. Mielke<br>T. E. Amon<br>J. Poloha<br>K. R. Koehler<br>T. J. Joyce |
| 12-400-1 | Kanawha Banking & Trust<br>Charleston, West Virginia<br>Hourly Payroll | J. W. McConnell<br>L. R. Domenici<br>D. C. Mielke<br>L. T. Walker<br>C. E. Painter<br>T. J. Joyce |
| 000-1321 | MBank<br>Pasadena, Texas<br>Hourly Payroll | J. W. McConnell (M & F)<br>L. R. Domenici<br>D. C. Mielke<br>B. A. Morrison<br>T. M. Clayton (M & F)<br>T. R. Lipscomb<br>T. J. Joyce |
| 484-459-9 | Republic Bank<br>Dallas, Texas<br>Salary Payroll | J. W. McConnell (M & F)<br>L. R. Domenici<br>C. K. Tanski (Stop Payments)<br>M. L. Rush (Stop Payments)<br>L. Organ (W/T 50,000.00 Max) |
| 02-6443-1 | St. James Bank & Trust<br>Convent, Louisiana<br>Hourly Payroll | J. W. McConnell<br>L. R. Domenici<br>D. C. Mielke<br>J. Ridenour (M & F)<br>T. J. Joyce |

OCC033504

**Confidential**

OCCNJ0026947

ALCD-PUBCOM_0002825

Miscellaneous Account

| Account Number | Bank and Type of Account | Authorized Signatures |
|---|---|---|
| 02-2582-1 | Interfirst - Las Colinas<br>Irving, Texas<br>Bond Account | J. W. McConnell<br>L. R. Domenici<br>D. C. Mielke<br>C. K. Tanski<br>M. L. Rush<br>E. P. Spence (Excl W/T)<br>T. J. Joyce |
| 02-1442-9 | Irving, Texas<br>Interfirst - Las Colinas<br>D.S. Recreation Assoc. | L. Pack<br>C. Perkins |
| 000-5674-2 | South Trust Bank<br>Mobile, Alabama<br>D.S. Recreation Assoc. | C. Spence<br>K. Corley |

OCC033505

**Confidential**

## DIAMOND SHAMROCK PROCESS CHEMICALS

| Account Number | Bank and Type of Account | Authorized Signatures |
|---|---|---|
| 011-022-450-8 | Horizon Bank, N.A.<br>225 South Street<br>Morristown, N.J.<br>International Transactions | L. J. Franz<br>P. R. Mahaney |
| 011-026-609-5 | Horizon Bank, N.A.<br>225 South Street<br>Morristown, N.J.<br>Savings Bonds | L. J. Franz<br>P. R. Mahaney |
| 615-504035 | Chemical Bank<br>New York, NY<br>Controlled Disbursements | L. J. Franz<br>P. R. Mahaney<br>D. C. Mielke (M & F) |
| 001-4751-6 | Midlantic Bank<br>Headquarters Plaza<br>Morristown, N.J.<br>Hourly Payroll | L. J. Franz<br>P. R. Mahaney<br>D. C. Mielke (M & F)<br>(See Individual<br>Locations) |

OCC033506

**Confidential**

**OCCNJ0026949**

ALCD-PUBCOM_0002827

DIAMOND SHAMROCK PROCESS CHEMICALS

Plant of Office Location                              Authorized Signatures

Carlstadt Plant                                      R. N. Chonoles
                                                     A. M. Hauser


Harrison Plant                                       Jerome D. Gibbons
                                                     R. F. Novak


Morristown Plant                                     F. Molle


Cedartown Plant                                      R. W. Adam
                                                     W. Ruppert


Charlotte Plant                                      Susan Riedel
                                                     Michael Pawlyk
                                                     B. W. Sears

OCC033507

Confidential

OCCNJ0026950
ALCD-PUBCOM_0002828

D. S. (AUSTRALIA) PTY. LIMITED

| Account Number | Bank and Type of Account | Authorized Signatures |
|---|---|---|
| 97-94863 | Australia & New Zealand Banking Group Limited 9 Dargie Court, Broadmeadows, Vic. 3047 Australia General Working Account Overdraft Facility $450,000 Other Facilities: - 1. Bills Negotiated not under credit - limit A$50,000, 2. Documentary Credit Overseas - limit A$50,000 | (any two of) J. H. Matthews F. B. Martin P. E. Peterson S. Cipriani |
| 320759 | Westpac Banking Corporation 126 Church Street South Parramatta, N.S.W. 2150 Imprest Account (Float A$2,500) for urgent needs Sydney Office | (any one of) J. S. Cummins J. E. Tucker B. D. Parker |
| | Australia & New Zealand Banking Group Limited 9 Dargie Court Broadmeadows, Vic. 3047 Australia Safe Deposit Box | J. H. Matthews P. E. Peterson S. Cipriani |

OCC033508

Confidential

OCCNJ0026951
ALCD-PUBCOM_0002829

## DIAMOND SHAMROCK CHEMICALS – CANADA LTD.

| Account Number | Bank and Type of Account | Authorized Signatures |
| --- | --- | --- |
| 1309-648 | Chemical Bank of Canada<br>50 King Street West<br>Toronto, Ontario, Canada<br>Overnight Investment | N/A |
| 0466046 | Toronto Dominion Bank<br>100 King Street West<br>Hamilton, Ontario, Canada<br>General | K. T. Burgoine<br>J. Foglietta<br>D. Haasner<br>M. Reynolds |

OCC033509

**Confidential**

**OCCNJ0026952**
ALCD-PUBCOM_0002830

## DIAMOND SHAMROCK De CHILE S.A.I.

| Account Number | Bank and Type of Account | Authorized Signatures |
|---|---|---|
| 13-298745-7 | Banco del Trabajo – Providencia Branch<br>Avda. Providencia 1995<br>Working fund<br>(Expressed in Chilean pesos) | First signature (either or)<br>B. Palau<br>H. J. Martinez<br>A. Montoya<br><br>Second signature (either or)<br>G. Gomez<br>E. Pizarro<br>R. Morales |
| 13-298746-5 | Banco del Trabajo – Providencia Branch<br>Avda. Providencia 1995<br>Payroll<br>(Expressed in Chilean pesos)<br>(Payroll account only used for Santiago<br>employees and confidential payroll<br>(Santiago executives and Plant managers).<br>Balance of employees paid in cash at<br>Plant). | First signature (either or)<br>B. Palau<br>H. J. Martinez<br>A. Montoya<br><br>Second signature (either or)<br>G. Gomes<br>E. Pizarro<br>R. Morales |
| 810-672 | Banco de A. Edwards - Santiago<br>Nueva Los Leones 085<br>Working fund<br>(Expressed in Chilean pesos) | First signature (either or)<br>B. Palau<br>H. J. Martinez<br>A. Montoya<br><br>Second signature (either or)<br>G. Gomez<br>E. Pizarro<br>R. Morales |
| 100033-003 | Citibank N.A. - Santiago<br>Morande 223<br>Working fund<br>(expressed in Chilean Pesos) | First signature<br>B. Palau<br>C. Larrain<br>J. M. Eyzaguirre<br>H. J. Martinez<br><br>Second signature (either or)<br>G. Gomez<br>E. Pizarro |

OCC033510

**Confidential**

| 0200-01313-1 | Banco Morgan Finansa – Santiago<br>Pedro de Valdivia 28<br>Working fund<br>(expressed in Chilean pesos) | First signature (either or)<br>B. Palau<br>H. J. Martinez<br>A. Montoya<br><br>Second signature (either or)<br>G. Gomez<br>E. Pizarro<br>R. Morales |
|---|---|---|
| 0101-01002-3 | Banco Morgan Finansa – Santiago<br>Pedro de Valdivia 28<br>Exports fund<br>(expressed in US dollars) | First signature (either or)<br>B. Palau<br>H. J. Martinez<br>A. Montoya<br><br>Second signature (either or)<br>G. Gomez<br>E. Pizarro<br>R. Morales |
| 0404126-7 | Banco de Santiago – Santiago<br>Providencia 2267<br>Working funds<br>(expressed in Chilean pesos) | First signature (either or)<br>B. Palau<br>H. J. Martinez<br>A. Montoya<br><br>Second signature<br>G. Gomez<br>E. Pizarro<br>R. Morales |
| 01-7059-00 | Banco de Boston – Santiago<br>Pedro de Valdivia 100<br>Working fund<br>(expressed in Chilean pesos)<br>(Account used mainly for US dollar<br>transfers from or to U.S.A., for<br>opening letters of credit and<br>channeling payments for imports). | First signature (either or)<br>B. Palau<br>H. J. Martinez<br>A. Montoya<br><br>Second Signature (either or)<br>G. Gomez<br>E. Pizarro<br>R. Morales |
| 8277-5 | Banco del Trabajo – Concepcion Branch<br>Anibal Pinto 398<br>Working fund<br>(expressed in Chilean pesos) | First signature (either or)<br>B. Palau<br>H. J. Martinez<br>A. Montoya<br><br>Second signature<br>G. Gomez<br>E. Senn<br>E. Pizarro<br>R. Morales |

OCC033511

Confidential

| 753-489 | Banco de A. Edwards – Concepcion<br>O'Higgins 501<br>Working fund<br>(expressed in Chilean pesos) | First signature (either or)<br>B. Palau<br>H. J. Martinez<br>A. Montoya<br><br>Second signature (either or)<br>G. Gomez<br>E. Pizarro<br>R. Morales |
| 11-02167-0 | Banco de Santiago – Concepcion<br>Barros Arana 441<br>Working fund<br>(expressed in Chilean pesos) | First signature (either or)<br>B. Palau<br>H. J. Martinez<br>A. Montoya<br><br>Second signature (either or)<br>G. Gomez<br>E. Pizarro<br>R. Morales |
| 6000-01017-9 | Banco Morgan Finansa – Concepcion<br>B. O'Higgins 402<br>Working fund<br>(expressed in Chilean pesos) | First signature (either or)<br>B. Palau<br>H. J. Martinez<br>A. Montoya<br><br>Second signature (either or)<br>G. Gomez<br>E. Pizarro<br>R. Morales |

OCC033512

Confidential

D. S. EYTESA

| Account Number | Bank and Type of Account | Authorized Signatures * |
|---|---|---|
| 5535-01 | Credi Lyonnais<br>Barcelona<br>Commercial Purpose | R. Martinez Roura<br>J. Fernandez Coll<br>S. Rua<br>A. Escura<br>A. Rossello |
| 17.172 | Banco de Bilbao<br>Terressa<br>Commercial Purpose | R. Martinez Roura<br>J. Fernandez Coll<br>S. Rua<br>A. Escura<br>A. Rossello |
| 52056-271 | Banco Espanol De Credito<br>Terressa<br>Commercial Purpose | R. Martinez Roura<br>J. Fernandez Coll<br>S. Rua<br>A. Escura<br>A. Rossello |
| 24030/47 | Banco de Sabadell<br>Terressa<br>Commercial Purpose | R. Martinez Roura<br>J. Fernandez Coll<br>S. Rua<br>A. Escura<br>A. Rossello |
| 4.289 | Banco de Santander<br>Terressa<br>Commercial Purpose | R. Martinez Roura<br>J. Fernandez Coll<br>S. Rua<br>A. Escura<br>A. Rossello |
| 20-14.241-2 | Banco de Londres Y<br>America Del Sur<br>Barcelona<br>Commercial Purpose | R. Martinez Roura<br>J. Fernandez Coll<br>S. Rua<br>A. Escura<br>A. Rossello |
| 603-00-00415 | The Chase Manhattan Bank<br>Barcelona<br>Netting System | R. Martinez Roura<br>J. Fernandez Coll<br>S. Rua<br>A. Escura<br>A. Rossello |

OCC033513

Confidential

| Account Number | Bank and Type of Account | Authorized Signatures |
|---|---|---|
| 030-01276-D | Banco Exterior de Espana<br>Terressa<br>Commercial Purpose | R. Martinez Roura<br>J. Fernandez Coll<br>S. Rua<br>A. Escura<br>A. Rossello |
| 52.056-272 | Banco Espanol de<br>Credito<br>Terressa<br>Warranty Fund | R. Martinez Roura<br>J. Fernandez Coll<br>A. Rossello<br>S. Rua<br>A. Escura |
| 135105-41-83 | Caja Ahorros de Terressa<br>Terressa<br>Payroll Payment | R. Martinez Roura<br>J. Fernandez Coll<br>A. Rossello<br>S. Rua<br>A. Escura |
| 84136166 | Caja Ahorros de Terressa<br>Terressa<br>Payroll Payment | R. Martinez Roura<br>J. Fernandez Coll<br>A. Rossello<br>S. Rua<br>A. Escura |
| 6245-52 | Caja Pensiones de Terressa<br>Terressa<br>Payroll Payment | R. Martinez Roura<br>J. Fernandez Coll<br>A. Rossello<br>S. Rua<br>A. Escura |
| | Banco de Sabadell<br>Terressa<br>Savings Banks | R. Martinez Roura<br>J. Fernandez Coll<br>A. Rossello<br>S. Rua<br>A. Escura |

OCC033514

**Confidential**

**OCCNJ0026957**

ALCD-PUBCOM_0002835



| Account Number | Bank and Type of Account | Authorized Signatures |
|---|---|---|
| 1011-11-95 | Caja Ahorros de Terressa<br>Savings Banks | R. Martinez Roura<br>J. Fernandez Coll<br>A. Rossello<br>S. Rua<br>A. Escura<br>A. Rossello |

\* On all accounts   R. Martinez Roura (sole signatory up to Pras 500,000)
J. Fernandez Coll and A. Rossello (Dual signatories up to Pras 5,000,000)
J. Martinez Roura and A. Escura (Dual signatories from Pras 5,000,000
to 20,000,000)

On all accounts   Authories signatory powers being processed for Mr. Ballin

OCC033515

**Confidential**

OCCNJ0026958
ALCD-PUBCOM_0002836

D. S. FRANCE

| Account Number | Bank and Type of Account | Authorized Signatures |
| --- | --- | --- |
| 04219691000 | Banque Francaise<br>Du Commerce<br>Exterieur<br>Paris<br>Foreign Trade | Noel VH. Bastiens<br>Jean-Luc Blanc<br>Michel Cornet<br>Francois-Xavier Olivera<br>Robert-Louis Olivier |
| 60015C | Credit Lyonnais<br>Evry<br>Home Trade and<br>USD Buying | Noel VH. Bastiens<br>Jean-Luc Blan<br>Michel Cornet<br>Francois-Xavier Olivera<br>Robert-Louis Olivier |
| 121607568 | Lloyds Bank Int.<br>Paris<br>Home Trade<br>Foreign Trade<br>Short Term<br>Financing | Noel VH. Bastiens<br>Jean-Luc Blanc<br>Michel Cornet<br>Francois-Xavier Olivera<br>Robert-Louis Olivier |
| 020226377 | Societe Generale<br>Ponthierry<br>Payroll | Noel VH. Bastiens<br>Jean-Luc Blanc<br>Michel Cornet<br>Francois-Xavier Olivera<br>Robert-Louis Olivier |
| 13052731000 | Credit Agricole<br>Courtenay<br>Local Purchases<br>at Factory | Jean-Luc Blanc<br>Daniel Dufoy<br>Christian Marthet |
| 383 98 T | Cheques Postaux<br>Paris<br>Home Trade | Noel VH. Bastiens<br>Jean-Luc Blanc<br>Michel Cornet<br>Francois-Xavier Olivera<br>Robert-Louis Olivier |
| 06091106739 | Chase Manhattan Bank<br>Paris<br>Netting System | Noel VH. Bastiens<br>Jean-Luc Blanc<br>Michel Cornet<br>Francois-Xavier Olivera<br>Robert-Louis Olivier |

OCC033516

Confidential

D. S. FRANCE / Portugal

| Account Number | Bank and Type of Account | Authorized Signatures |
|---|---|---|
| 30 20 00911 44 | Credit Franco Portugais<br>Avenue Des Aliados<br>Porto<br>Portugal | Mr. Barbosa |
| 5 5055992 | Lloyds Bank<br>Avenue Des Aliados<br>Porto<br>Portugal | Mr. Barbosa |

OCC033517

**Confidential**

**OCCNJ0026960**

ALCD-PUBCOM_0002838

# D. S. TAIWAN

| Account Number | Bank and Type of Account | Authorized Signatures |
|---|---|---|
| #331<br>US Dollar | Hua Nan Commercial Bank Head Office<br>38, Chung King S Rd, Sec. 1,<br>Taipei, Taiwan<br>Export trade | Any two of four<br>Eugene Y Yin<br>Jett Lee<br>Eric Kao<br>Peter Chang |
| #234-3<br>NT Dollar | International Commercial Bank of China<br>Cheng Chung Branch<br>42 Hsu Chang Street<br>Taipei, Taiwan<br>Working fund | Any two of four<br>Eugene Y Yin<br>Jett Lee<br>Eric Kao<br>Peter Chang |
| #20666-018<br>NT Dollar | Bank of America Taipei Branch<br>205, Tun Hua N Rd,<br>Taipei, Taiwan<br>Working fund | Any two of four<br>Eugene Y Yin<br>Jett Lee<br>Eric Kao<br>Peter Chang |
| #763<br>NT Dollar | Irving Trust Co. Taipei Branch<br>10, Chung King S Rd, Sec. 1,<br>Taipei, Taiwan<br>Working fund | Any two of four<br>Eugene Y Yin<br>Jett Lee<br>Eric Kao<br>Peter Chang |
| 2000111079<br>Pass Book<br>NT Dollar | Bank of Taiwan, Chung Shan Branch<br>150, Chung Shan N Rd, Sec. 1,<br>Taipei, Taiwan<br>Duty refund | Any two of four<br>Eugene Y Yin<br>Jett Lee<br>Eric Kao<br>Peter Chang |
| Time deposit | Taiwan First Investment & Trust Co. Ltd.<br>Taipei Trust Dept<br>49-1, Chung Shan N Rd, Sec. 2,<br>Taipei, Taiwan<br>Compensation | Any two of four<br>Eugene Y Yin<br>Jett Lee<br>Eric Kao<br>Peter Chang |
| #139-5<br>NT Dollar | First Commercial Bank<br>Soong Chiang Branch<br>309, Soong Chiang Rd.,<br>Taipei, Taiwan<br>Working fund | Any two of four<br>Eugene Y Yin<br>Jett Lee<br>Eric Kao<br>Peter Chang |

OCC033518

**Confidential**

# CARBOCLORO

| Account Number | Bank and Type of Account | Authorized Signatures |
|---|---|---|
| 100564-1 | Uniao De Bancos Brasileiros S.A.<br>Avenida Paulista, 2023 -<br>Branch 252 | * See Below |
| 00730807 | Citibank, N.A.<br>Avenida Ipiranga, 855 | * See Below |
| 00223-5 | Banco Itau S.A.<br>Avenida Paulista, 1948 -<br>Branch 0912 | * See Below |
| 014-444-4 | Banco Brasileiro De Descontos S.A.<br>Avenida Paulista, 1415 -<br>Branch 0895 | * See Below |
| 78-1-00131-8 | Banco Lar Brasileiro S.A.<br>Rua Augusta, 1849 -<br>Branch 0014 | * See Below |
| 02-8008-9 | Banco Agrimisa S.A.<br>Praca Antonio Prado, 13 -<br>Branch 0016 | * See Below |
| 500015-12 | Banco Noroeste S.A.<br>Avenida Paulista, 1439 -<br>Branch 115 | * See Below |
| 10-713727 | LLoyds Bank International Limited<br>Rua XV de Novembro, 165 | * See Below |
| 007208-3 | Banco Do Estado Do Parana S.A.<br>Avenida Paulista, 2212 -<br>Branch 095 | * See Below |

OCC033519

**Confidential**

| Account Number | Bank and Type of Account | Authorized Signatures |
|---|---|---|
| 13-0028-6 | Banco Do Estado De Sao Paulo S.A.<br>Avenida Paulista, 2086 -<br>Branch 154 | * See Below |
| 13-00008-0 | Banco Do Estado De Sao Paula S.A.<br>Ave. Nove de Abril, 2099 -<br>Cubatao - Branch 123 | * See Below |
| 4031-2 | Banco Do Brasil S.A.<br>Avenida Paulista, 2163 -<br>Branch 0712 | * See Below |

* Two Signatures required:

Alberto Jose Schaefer Jr.
Arthur Cesar Whitaker de Carvalho
Paula Cesar Vidal Pereira Barreto
Valdyr Gabriel
Mario Antonio Carneiro Cilento
Alexandre Stanic Milat
Nivio Machado Rigos
Dante Luiz Gnoatto
Oswaldo Botelho do Amaral
Wilson Dos Santos Furlan
Marcio Barbosa Porto
Neide Afonso
Roberto Dutra

OCC033520

**Confidential**

OCCNJ0026963
ALCD-PUBCOM_0002841

<u>SCHEDULE 2.14</u>

Agreement,
Dated September 4, 1986 (the "Agreement"),
By and Among
Diamond Shamrock Corporation,
Occidental Petroleum Corporation,
Occidental Chemical Holding Corporation
and
<u>Oxy-Diamond Alkali Corporation</u>

CONTESTED TAXES, TAX RETURNS;
<u>OTHER TAX MATTERS</u>

8720G

OCC033521

**Confidential**

OCCNJ0026964
ALCD-PUBCOM_0002842

Taxes which are unpaid and are being contested in good faith by Seller

A.  Federal

    (1)  1979 Income taxes of $1,655,239
    (2)  1982 Investment Credit Recapture of $12,604,167

B.  State

    (1)  Texas Sales and Use Tax for the period October 1, 1979 –
        November 20, 1983 of $3,623,000
    (2)  Kentucky Income and License Tax for the years 1980–1983 of
        $22,000
    (3)  Georgia Income Tax for the years 1979–1981 of $25,000.
    (4)  New Jersey Income Tax for the years 1980 and 1981 in the
        amount of $125,000.

OCC033522

Confidential

Status of Audits

A. Federal

(1) Income tax - 1979, 1980, 1981 settlement pending
(2) Income tax - 1982, 1983, 1984 audit in progress
(3) Windfall Profit Tax - 1981 audit settled, 1982, 1983, 1984 audit in progress
(4) Other Excise Taxes - 1981 audit settled, 1982 Statute of Limitations lapsed and 1983 & 1984 audit in progress

B. State

(1) Income Taxes
(a) Alabama audited 1982.
(b) Arizona audited 1981-1983.
(c) California audited 1981, 1982.
(d) Colorado audited 1981-1983.
(e) Delaware audited 1983, 1984.
(f) District of Colombia audited 1982-1984.
(g) Illinois audited 1982, 1983.
(h) Kansas audited 1981-1984.
(i) Kentucky audited 1981-1983.
(j) Louisiana audited 1982.
(k) New Jersey audited 1980-1981.
(l) New York audited 1982, 1983.
(m) North Carolina audited 1982, 1983.
(n) North Dakota audited 1979, currently 1980-1983 audit in process.
(o) Ohio 1983 audit in process.
(p) Pennsylvania audited 1982, 1983.

(2) Franchise Taxes
(a) Louisiana audited 1983.
(b) New Jersey audited 1980-1981.
(c) North Carolina audited 1982-1983.
(d) Pennsylvania audited 1982-1983.
(e) Texas audited 1983.

OCC033523

**Confidential**

**OCCNJ0026966**

ALCD-PUBCOM_0002844

Waivers of Statutes of Limitation

(A)  Federal

    (1)  Income tax
        1982 waived to February 29, 1988

    (2)  Excise taxes
        January 1, 1983 – September 30, 1983 waived to March 1, 1987
        1982 windfall profits tax waived to March 1, 1987.

(B)  States

### STATUTE OF LIMITATIONS FOR STATE INCOME & FRANCHISE TAX RETURNS

| State | Type | Open Years [1] |
|-------|------|-----------|
| Alabama | Income | 1982-1985 |
| Alabama | Franchise | 1983-1986 |
| Alaska | Income | 1982-1985 |
| Arizona | Income | 1981-1985 |
| Arkansas | Income | 1982-1985 |
| Arkansas | Franchise | All [2] |
| California | Franchise | 1981-1985 |
| Colorado | Income | 1981-1985 |
| Connecticut | Income | 1982-1985 |
| Delaware | Income | 1982-1985 |
| Delaware | Franchise | All [2] |
| District of Columbia | Income | 1982-1985 |
| Florida | Income | 1982-1985 |
| Georgia | Income | 1982-1985 |
| Idaho | Income | 1982-1985 |
| Illinois | Income | 1982-1985 |
| Iowa | Income | 1982-1985 |
| Kansas | Income | 1981-1985 |
| Kentucky | Income | 1981-1985 |
| Louisiana | Income | 1982-1985 |
| Louisiana | Franchise | 1983-1986 |
| Maryland | Income | 1982-1985 |
| Massachusetts | Income | 1982-1985 |
| Minnesota | Income | 1982-1985 |
| Mississippi | Income | 1982-1985 |
| Missouri | Income | 1982-1985 |
| Montana | Income | 1980-1985 |
| Nebraska | Income | 1980-1985 |
| Nevada | N/A | |
| New Jersey | Income | 1980-1985 |
| New Jersey | Franchise | 1980-1985 |

OCC033524

**Confidential**

OCCNJ0026967

ALCD-PUBCOM_0002845

| State | Type | Open Years[1] |
|-------|------|-----------|
| New Mexico | Income | 1982-1985 |
| New Mexico | Franchise | 1982-1985 |
| New York | Income | 1982-1985 |
| North Carolina | Income | 1982-1985 |
| North Carolina | Franchise | 1982-1985 |
| North Dakota | Income | 1979-1985 |
| Ohio | Income | 1983-1986 |
| Oklahoma | Income | 1982-1985 |
| Oklahoma | Franchise | 1983-1986 |
| Oregon | Income | 1982-1985 |
| Pennsylvania | Income | 1982-1985 |
| Pennsylvania | Franchise | 1982-1985 |
| South Carolina | Income | 1982-1985 |
| Tennessee | Income | 1982-1985 |
| Texas | Franchise | 1983-1986 |
| Utah | Income | 1982-1985 |
| Virginia | Income | 1982-1985 |
| Washington | N/A | |
| West Virginia | Income | 1982-1985 |
| West Virginia | Franchise | All[2] |
| Wisconsin | Income | 1981-1985 |
| Wyoming | N/A | 1981-1985 |

[1]   No waivers have been signed in any state to extend the statute.
The statute will expire in September, October or November 1986 for
the earliest year listed.

[2]   No definite statute in the law.

OCC033525

Confidential                                                OCCNJ0026968

ALCD-PUBCOM_0002846

<u>SCHEDULE 2.15</u>

Agreement,
Dated September 4, 1986 (the "Agreement"),
By and Among
Diamond Shamrock Corporation,
Occidental Petroleum Corporation,
Occidental Chemical Holding Corporation
and
<u>Oxy-Diamond Alkali Corporation</u>

<u>EMPLOYEE MATTERS</u>

8717G

OCC033526

**Confidential**

**OCCNJ0026969**
ALCD-PUBCOM_0002847

Schedule 2.15

Employee Matters

A.  INSURANCE PLANS

1.  Group Life Insurance Plan, Policy No. G-55110, sponsored by Diamond Shamrock Corporation and through the Prudential Insurance Company of America (DSC Plan)

2.  Medical Benefit Plan, Policy No. G-59980, sponsored by Diamond Shamrock Corporation and through the Prudential Insurance Company of America (DSC Plan)

3.  Dental Assistance Plan, Contract No. 59975, sponsored by Diamond Shamrock Corporation and through the Prudential Insurance Company of North America (DSC Plan)

4.  Employee Accidental Death and Dismemberment Insurance ("AD&D"), Policy No. OK10044, Sponsored by Diamond Shamrock Corporation through Life Insurance Company of North America (DSC Plan)

5.  Diamond Shamrock Corporation Long Term Disability Plan (DSC Plan)

6.  Voluntary Group Accident Insurance Policy, Policy No. OK 2097, sponsored by Diamond Shamrock Corporation through the Life Insurance Company of North America (DSC Plan)

7.  Travel Accident Policy, Policy No. ABL 613930A, sponsored by Diamond Shamrock Corporation through the Life Insurance Company of North America (DSC Plan)

8.  Master Subscription Contract, between Diamond Shamrock Corporation and CoMED, Inc. (HMO) (DSC Plan)

9.  Health Care Agreement, Agreement No. PHCP 76800, between Diamond Shamrock Corporation and Prudential Health Care Plan, Inc. (HMO) (DSC Plan)

10. Group Health Care Service Agreement, Group Agreement 2916, between Diamond Shamrock Corporation and Cigna Healthplan of Texas, Inc. (HMO) [Houston] (DSC Plan)

OCC033527

OCCNJ0026970
ALCD-PUBCOM_0002848

11.  Group Health Care Service Agreement, Group Agreement
     342-01, between Diamond Shamrock Corporation and Cigna
     Healthplan of Texas, Inc. (HMO) [Dallas] (DSC Plan)

12.  Service Agreement and Group Medical and Hospital
     Service Agreements, Group Nos. 2588-0004, 2588-9004,
     2588-0011, 2588-9011, between Diamond Shamrock
     Corporation and Kaiser Foundation Health Plan of Ohio
     (HMO) (DSC Plan)

13.  Group Service Agreement, Group No. 447, between
     Diamond Shamrock Corporation and Maxicare Texas, Inc.
     (DSC Plan)

14.  Service Agreement and Group Medical Hospital Service
     Agreement, Group Nos. 15043 and 15043-1, between
     Diamond Shamrock Corporation and Kaiser Foundation
     Health Plan, Inc. (DSC Plan)

15.  Service Agreement and Group Medical and Hospital
     Service Agreement, Group No. 0074-0 between Diamond
     Shamrock Corporation and Kaiser Foundation Health Plan
     of North Carolina (DSC Plan)

16.  Service Agreement and Group Medical and Hospital
     Service Agreement, Group Nos. 0190-02, 0190-03,
     between Diamond Shamrock Corporation and Kaiser
     Foundations Health Plan of Texas (HMO) (DSC Plan)

17.  Group Service Agreement, between Diamond Shamrock
     Corporation and Maxicare North Texas Inc. (HMO) (DSC
     Plan)

18.  Blue Cross/Blue Shield (Jersey City union employees)
     (DSCC Plan)

19.  Process Chemicals Temporary Disability Plan (DSC Plan)

B.  PENSION PLANS

1.  Diamond Shamrock Corporation Pension Plan for
    Hourly-Rated Employees (DSC Plan)

2.  Diamond Shamrock Corporation Pension Plan for
    Employees of Process Chemical Division Represented by
    Collective Bargaining Agents (DSC Plan)

-2-

OCC033528

Confidential

OCCNJ0026971

ALCD-PUBCOM_0002849

3. Diamond Shamrock Corporation Retirement Income Plan for Chemical Company Employees (DSC Plan)

4. Central States, Southeast and Southwest Areas Pension Plan ("Central States Plan") (multiemployer plan) (neither a DSC Plan nor a DSCC Plan)

The aggregate withdrawal liability of DSCC computed as if a "complete withdrawal" by DSCC from the Central States Plan had occurred as of July 1, 1986 is $339,412.64. The withdrawal liability was computed by employees of the Central States Plan Fund, and neither Seller nor DSCC makes any representation or warranty with respect to such calculation.

C. INVESTMENT/SAVINGS

1. Diamond Shamrock Corporation Employee Stock Ownership Plan (DSC Plan)

2. Diamond Shamrock Corporation Employee Shareholding and Investment Plan (DSC Plan)

3. Diamond Shamrock Corporation Resource Account Plan (Medical Reimbursement Plan -- Dependent Care Assistance Plan -- Legal Services Plan -- each of which were established in connection with and form a part of the Resource Account Plan) (DSC Plan)

4. Salary Continuation Plan (DSC Plan)

D. INCENTIVE PLANS

1. Diamond Shamrock Corporation Performance Incentive Plan (Plans A and B) (DSC Plan)

2. Diamond Shamrock Chemicals Company Performance Incentive Compensation Plan (Plan C) (DSCC Plan)

3. 21 Level Incentive Program (Industrial Chemical) (DSCC Plan)

4. Process Chemicals Division Sales Incentive Program (1986) (DSCC Plan)

5. TCI Sales Incentive Plan (DSCC Plan)

-3-

OCC033529

Confidential

OCCNJ0026972
ALCD-PUBCOM_0002850

6. Diamond Shamrock Chemicals Company Awards/Gifts Program (Certain plants also provide attendance and/or safety incentive awards, which may or may not be described in a plant handbook. Such awards include certificates, selection of gifts from catalogs, jackets, caps, dinners and cash payments.) (DSCC Plan)

E. COLLECTIVE BARGAINING AGREEMENTS

See Schedule 2.19 for a list of Collective Bargaining Agreements, the terms of which provide certain employee benefits in addition to those described in this Schedule 2.15.

F. OTHER EMPLOYEE BENEFITS

The following employee handbooks and personnel manuals describe certain policies of Diamond Shamrock Chemicals Company which may come within the category of employee benefits, including, overtime pay, shift differential pay, vacation policies, relocation assistance, educational assistance, health screening examinations, policies regarding leaves of absence, funeral pay, recognized holidays, religious observances, service recognition awards, gift matching and other benefits.

1. Diamond Shamrock Employee Benefits Program (1-1-85)*

2. Ashtabula Plant Employee Handbook (9-85)*

3. Battleground Plant -- Employee Benefit Programs and Plant Policies (5-85)*

4. Belle Plant Employee Handbook (11-85)*

5. Charlotte Plant Employee Handbook (7-85)*

6. Dallas Plant Employee Policy Manual*

---

\* Except for the employee benefits described in such handbooks which are specifically designated in this Schedule 2.15 as DSC Plans, the employee benefits so described are DSCC Plans.

-4-

OCC033530

**Confidential**

OCCNJ0026973

ALCD-PUBCOM_0002851

7.    Deer Park Works Employee Handbook (1-76)*

8.    Delaware City Plant Employee Handbook*

9.    Mobile Plant Employee Handbook*

10.    Morristown Plant Employee Handbook*

11.    Muscle Shoals Plant Blue Book*

12.    Human Resources Policies and Administration Guidelines*

G.    LITIGATION

See Schedule 2.19 for a list of certain litigation which involve claims relating to the Seller's Plans.

H.    OTHER

On September 30, 1985 Diamond Shamrock Corporation filed applications (D-6380 and D-6381) with the U.S. Department of Labor for exemptions from the prohibited transaction rules of ERISA and the Internal Revenue Code with respect to units of Diamond Shamrock Offshore Partners Limited Partnership held by the Employee Shareholding and Investment Plan and the Employee Stock Ownership Plan. Review of the applications is still pending.

See the attached Exhibit A to this Schedule 2.15 for a description of an event of the type described in the penultimate sentence of Section 2.15(a) of the Agreement.

---

*    Except for the employee benefits described in such handbooks which are specifically designated in this Schedule 2.15 as DSC Plans, the employee benefits so described are DSCC Plans.

8177G

-5-

OCC033531

Confidential

Exhibit A



**Diamond Shamrock**

HUMAN RESOURCES

June 6, 1986

To All Employees:

Changes in benefits program

Your benefits package is being reassessed in terms of the
difficult operating environment and rising benefits costs.
Diamond Shamrock has maintained a very competitive benefits
package, and will continue to provide you with a quality
program that is competitive with our peers among the domestic
integrated oil and gas companies. The changes proposed are
designed to do exactly that.

Changes are being made in the shareholding and investment
plan, medical and insurance plans and the retirement plan.
Implementation of these changes is expected after October of
this year. If the Coal Company is still part of Diamond
Shamrock at that time, the changes will apply to Coal Company
employees as well. Because of the timing of the divestiture of
the Chemicals Company, employees of that company are not
expected to be included in these changes.

Even though some details have not yet been determined, you
need to be aware of the nature of the changes and understand
the reasons behind them.

Shareholding and Investment Plan

-- Presently, the company matches your pre-tax contributions
in the Premier Savings option dollar for dollar in four
investment options: Diamond Shamrock stock, a government
securities fund, an equity fund and a fixed income contract
fund. Under the amended plan, the company will match your
contributions dollar for dollar only in the Diamond Shamrock
stock investment. For the other investment options, the
company will contribute 50 cents for each dollar you
contribute.

This change is being made in recognition of one of the primary
purposes of the plan: to encourage employee stock ownership.
By sharing ownership in the company, you have a stake in
increasing the value of the company and your interests are
more closely tied to the interests of stockholders. In fact,
the plan name was changed from the Savings Plan to the
Shareholding and Investment Plan a few years ago to emphasize
the shareholding purpose, rather than to simply encourage
savings through payroll deduction.

**Diamond Shamrock**
Human Resources Department, 717 North Harwood Street, Dallas, Texas 75201          OCC033532

**Confidential**          **OCCNJ0026975**

ALCD-PUBCOM_0002853

Page Two

-- The possibility for you to contribute additional
unmatched funds to the shareholding and investment plan is
being studied. Presently, you may only contribute up to 6
percent of your salary. We are considering Page Two

permitting you to contribute an additional 6 percent of
your salary on an unmatched basis to the plan. Some
regulatory issues exist in this area and are being
investigated.

<u>Medical Plan</u>

-- The Optional Medical Plan will be discontinued due to
cost. The costs of coverage have increased dramatically.
In 1985, benefits paid under the Optional Plan were more
than two and a half times benefits paid under the Basic
Plan, or $3,208 compared with $1,218 per employee.

Though your contribution for Optional Plan coverage has
increased if you participate in the plan, your premium
would have to increase to $139.23 per month to support the
Optional Plan in 1987.

-- The Basic Plan, which has not been changed since it
was offered, will become contributory. Contributions will
be in the following range:

      o Employee only              $10 per month
      o Employee + one dependent   $15 per month
      o Family (Employee + two or  $25 per month
        more dependents)

These rates represent approximately 10 percent of Diamond
Shamrock's cost of providing medical coverage. As in the
past, you will be able to use your Resource Account to pay
the insurance premiums, utilizing pre-tax dollars.

Rate structures for HMOs, which represent an alternative
to the Basic Plan, are not yet available. However, we
expect the same 10 percent contributory rate to apply.

-- A small increase in your maximum out-of-pocket expense
in the Basic Plan is planned. There will be an increase
from $800 to $1,000 for an individual, and from $1,600 to
$2,000 for families. This out-of-pocket cost is in
addition to the deductible. This provision is competitive
with the benefits offered by our peers.

-- Greater lifetime maximum benefits will be provided to
cover the costs of a catastrophic illness. Your present
lifetime maximum of $250,000 will be increased to
$500,000.

OCC033533

Confidential

OCCNJ0026976

ALCD-PUBCOM_0002854

Page Three

-- Accidental Death and Dismemberment Insurance, Travel
Accident Insurance and the Dental Assistance Plan
coverages will remain at no cost to you. The rates for the
Voluntary Group Accident Insurance Program are being
reviewed by our carrier and we will communicate any
changes should they occur.

Life Insurance

-- Your company-paid life insurance benefits will be
reduced from 2.5 times your annual base salary to 1.5
times. However, a new option will allow you to purchase
life insurance coverage at group rates, so that Page Three

your total coverage could be up to four to six times your
annual salary (including the company-paid portion).

Retirement Plan

-- The only change in the retirement plan is an adjustment
in the social security benefits taken into account in
determining your benefits under the retirement plan.
Currently, this is the estimated social security benefit
available at age 62. This amendment would change this
amount to the amount available at age 65. This change
would not be retroactive, and in no event will this change
cause a reduction in your retirement benefit accrued as of
the effective date of the amendment.

Implementation of changes

With these changes, we will remain competitive in our
industry, reduce costs and still provide a quality
benefits program in both our capital accumulation plans
and employee welfare plans.

These changes are expected to reduce the cost of benefit
programs by about 16 percent per year, an important
consideration when we are cutting our costs across the
corporation to remain competitive in the present low oil
price environment.

The Board of Directors has authorized changes to the
benefits program in the areas outlined. When all the
changes are finalized, they will be communicated to you in
greater detail. Your entire benefits package has been
examined thoroughly, and no other benefits changes are
expected at this time.

If you have any immediate concerns, please contact your
local Human Resources representative or the corporate
benefits group.

OCC033534

Confidential

OCCNJ0026977

ALCD-PUBCOM_0002855

Exhibit A



**Diamond Shamrock**

HUMAN RESOURCES

June 6, 1986

To All Employees:

<u>Changes in benefits program</u>

Your benefits package is being reassessed in terms of the
difficult operating environment and rising benefits costs.
Diamond Shamrock has maintained a very competitive benefits
package, and will continue to provide you with a quality
program that is competitive with our peers among the domestic
integrated oil and gas companies. The changes proposed are
designed to do exactly that.

Changes are being made in the shareholding and investment
plan, medical and insurance plans and the retirement plan.
Implementation of these changes is expected after October of
this year. If the Coal Company is still part of Diamond
Shamrock at that time, the changes will apply to Coal Company
employees as well. Because of the timing of the divestiture of
the Chemicals Company, employees of that company are not
expected to be included in these changes.

Even though some details have not yet been determined, you
need to be aware of the nature of the changes and understand
the reasons behind them.

<u>Shareholding and Investment Plan</u>

-- Presently, the company matches your pre-tax contributions
in the Premier Savings option dollar for dollar in four
investment options: Diamond Shamrock stock, a government
securities fund, an equity fund and a fixed income contract
fund. Under the amended plan, the company will match your
contributions dollar for dollar only in the Diamond Shamrock
stock investment. For the other investment options, the
company will contribute 50 cents for each dollar you
contribute.

This change is being made in recognition of one of the primary
purposes of the plan: to encourage employee stock ownership.
By sharing ownership in the company, you have a stake in
increasing the value of the company and your interests are
more closely tied to the interests of stockholders. In fact,
the plan name was changed from the Savings Plan to the
Shareholding and Investment Plan a few years ago to emphasize
the shareholding purpose, rather than to simply encourage
savings through payroll deduction.

**Diamond Shamrock**
Human Resources Department, 717 North Harwood Street, Dallas, Texas 75201

OCC033535

Page Two

-- The possibility for you to contribute additional
unmatched funds to the shareholding and investment plan is
being studied. Presently, you may only contribute up to 6
percent of your salary. We are considering Page Two

permitting you to contribute an additional 6 percent of
your salary on an unmatched basis to the plan. Some
regulatory issues exist in this area and are being
investigated.

<u>Medical Plan</u>

-- The Optional Medical Plan will be discontinued due to
cost. The costs of coverage have increased dramatically.
In 1985, benefits paid under the Optional Plan were more
than two and a half times benefits paid under the Basic
Plan, or $3,208 compared with $1,218 per employee.

Though your contribution for Optional Plan coverage has
increased if you participate in the plan, your premium
would have to increase to $139.23 per month to support the
Optional Plan in 1987.

-- The Basic Plan, which has not been changed since it
was offered, will become contributory. Contributions will
be in the following range:

    o Employee only              $10 per month
    o Employee + one dependent   $15 per month
    o Family (Employee + two or  $25 per month
      more dependents)

These rates represent approximately 10 percent of Diamond
Shamrock's cost of providing medical coverage. As in the
past, you will be able to use your Resource Account to pay
the insurance premiums, utilizing pre-tax dollars.

Rate structures for HMOs, which represent an alternative
to the Basic Plan, are not yet available. However, we
expect the same 10 percent contributory rate to apply.

-- A small increase in your maximum out-of-pocket expense
in the Basic Plan is planned. There will be an increase
from $800 to $1,000 for an individual, and from $1,600 to
$2,000 for families. This out-of-pocket cost is in
addition to the deductible. This provision is competitive
with the benefits offered by our peers.

-- Greater lifetime maximum benefits will be provided to
cover the costs of a catastrophic illness. Your present
lifetime maximum of $250,000 will be increased to
$500,000.

OCC033536

**Confidential**

**OCCNJ0026979**

ALCD-PUBCOM_0002857

Page Three

-- Accidental Death and Dismemberment Insurance, Travel
Accident Insurance and the Dental Assistance Plan
coverages will remain at no cost to you. The rates for the
Voluntary Group Accident Insurance Program are being
reviewed by our carrier and we will communicate any
changes should they occur.

Life Insurance

-- Your company-paid life insurance benefits will be
reduced from 2.5 times your annual base salary to 1.5
times. However, a new option will allow you to purchase
life insurance coverage at group rates, so that Page Three

your total coverage could be up to four to six times your
annual salary (including the company-paid portion).

Retirement Plan

-- The only change in the retirement plan is an adjustment
in the social security benefits taken into account in
determining your benefits under the retirement plan.
Currently, this is the estimated social security benefit
available at age 62. This amendment would change this
amount to the amount available at age 65. This change
would not be retroactive, and in no event will this change
cause a reduction in your retirement benefit accrued as of
the effective date of the amendment.

Implementation of changes

With these changes, we will remain competitive in our
industry, reduce costs and still provide a quality
benefits program in both our capital accumulation plans
and employee welfare plans.

These changes are expected to reduce the cost of benefit
programs by about 16 percent per year, an important
consideration when we are cutting our costs across the
corporation to remain competitive in the present low oil
price environment.

The Board of Directors has authorized changes to the
benefits program in the areas outlined. When all the
changes are finalized, they will be communicated to you in
greater detail. Your entire benefits package has been
examined thoroughly, and no other benefits changes are
expected at this time.

If you have any immediate concerns, please contact your
local Human Resources representative or the corporate
benefits group.

OCC033537

Confidential

OCCNJ0026980
ALCD-PUBCOM_0002858

<u>SCHEDULE 2.16</u>

Agreement,
Dated September 4, 1986 (the "Agreement"),
By and Among
Diamond Shamrock Corporation,
Occidental Petroleum Corporation,
Occidental Chemical Holding Corporation
and
<u>Oxy-Diamond Alkali Corporation</u>

<u>CONTRACTS</u>

8718G

OCC033538

**Confidential**

**OCCNJ0026981**

ALCD-PUBCOM_0002859

SCHEDULE 2.16

Agreement,
Dated September 4, 1986 (the "Agreement"),
By and Among
Diamond Shamrock Corporation,
Occidental Petroleum Corporation,
Occidental Chemical Holding Corporation
and
Oxy-Diamond Alkali Company

CONTRACTS

Terms defined in the Agreement are used herein as so defined.

Except as indicated with an asterisk (*) on this Schedule 2.16, (i) all such Contracts listed pursuant to subparagraphs (a), (d), (e) and (f) of Section 2.16 of the Agreement are valid and binding obligations enforceable in accordance with their respective terms, and (ii) all such Contracts listed pursuant to subparagraphs (b) and (c) of Section 2.16 of the Agreement are, to the knowledge of Seller, valid and binding obligations enforceable in accordance with their respective terms, and in the case of clauses (i) and (ii) above, except as enforcement against third parties may be limited by bankruptcy, insolvency or other similar Laws affecting the enforcement of creditors' rights generally and except that the availability of equitable remedies against third parties, including specific performance, is subject to the discretion of the court before which any proceeding therefor may be brought.

OCC033539

Also listed on this Schedule 2.16 are certain short-term or terminable warehouse, warehouse service, and terminal storage agreements which may contain features of lease agreements, but are disclosed on this Schedule as Contracts.

See also Schedules 2.22, 8.09(a) and 8.09(b).

Lease, dated September 1, 1966, between the Delaware Industrial Building Commission and Diamond Alkali Company

Lease Agreement (Industrial), dated December 1, 1974, between the Industrial Development Board of the City of Muscle Shoals and Diamond Shamrock Corporation

Lease Agreement (Pollution Control), dated December 1, 1974, between the Industrial Development Board of the City of Muscle Shoals and Diamond Shamrock Corporation

Lease Agreement, dated October 1, 1971, between North Alabama Environmental Improvement Authority and Diamond Shamrock Corporation

Lease Agreement, dated October 1, 1971, between West Alabama Environmental Improvement Authority and Diamond Shamrock Corporation

Lease Agreement, dated October 1, 1971, between Development Authority of Polk County, Georgia and Diamond Shamrock Corporation

Lease Agreement, dated December 1, 1979, between County Commission of Kanawha County, West Virginia (a Public Corporation under the laws of the State of West Virginia) and Diamond Shamrock Corporation

Bareboat Charter/Lease Agreement, dated April 26, 1973, between Lone Star Barge Co., Inc. and Diamond Shamrock Corporation

Master Lease Agreement, dated October 12, 1984, between Comdisco, Inc. and Diamond Shamrock Chemicals Company

Master Car Service Contract, dated October 25, 1976, between General American Transportation Corporation and Diamond Shamrock Corporation (Rider #38 dated July 2, 1981)

-2-

OCC033540

Confidential

OCCNJ0026983

ALCD-PUBCOM_0002861

Lease Agreement, dated April 13, 1982, between XYOquip, Inc. and Diamond Shamrock Corporation

Equipment Lease Agreement, dated November 18, 1982, between Phillips Information Systems, Inc. and Diamond Shamrock Corporation

Equipment Lease Agreement, dated February 27, 1984, between Diamond Shamrock Corporation and Phillips Information Systems, Inc.

Supplemental Equipment Lease, dated March 15, 1982, between Chancellor Corporation and Diamond Shamrock Corporation

Pollution Control Contract, dated February 1, 1974, as amended, between the Gulf Coast Waste Disposal Authority and Diamond Shamrock Corporation

Installment Sales Agreement, dated April 1, 1975, between Department of Community Affairs and Economic Development of the State of Delaware and Diamond Shamrock Corporation (relating to $2,700,000 Pollution Control Revenue Bonds, Series A)

Installment Sales Agreement, dated April 1, 1975, between Department of Community Affairs and Economic Development of the State of Delaware and Diamond Shamrock Corporation (relating to $1,000,000 Industrial Development Revenue Bonds, Series A)

Air and Water Pollution Control Facilities and Installment Sales Agreement, dated February 1, 1977, between Gulf Coast Waste Disposal Authority and Diamond Shamrock Corporation

Air and Water Pollution Control and Solid Waste Disposal Facilities and Installment Sales Agreement, dated June 1, 1979, between Gulf Coast Waste Disposal Authority and Diamond Shamrock Corporation

Financing Agreement, dated December 1, 1979, between County Commission of Kanawha County, West Virginia (a Public Corporation under the laws of the State of West Virginia) and Diamond Shamrock Corporation

Installment Sales Agreement, dated March 1, 1981, between Niagra County Industrial Development Agency and Diamond Shamrock Corporation

-3-

OCC033541

**Confidential**

OCCNJ0026984

ALCD-PUBCOM_0002862

Air and Water Pollution Control Facilities and Installment Sales Agreement, dated June 1, 1982, between Gulf Coast Waste Disposal Authority and Diamond Shamrock Corporation

Loan Agreement (Industrial Development), dated July 1, 1981, between the New Hanover County Industrial Facilities and Pollution Control Financing Authority and Diamond Shamrock Corporation

Loan Agreement (Pollution Control), dated July 1, 1981, between the New Hanover County Industrial Facilities and Pollution Control Financing Authority and Diamond Shamrock Corporation

Lease Agreement, dated March 1, 1982, between the Parish of St. James, State of Louisiana and Convent Chemical Corporation

Lease Agreement, dated December 1, 1981, between the Parish of St. James, State of Louisiana and Convent Chemical Corporation

Lease Agreement, dated December 1, 1981, between Convent Chemical Corporation and the South Louisiana Port Commission, State of Louisiana

Promissory Note of Diamond Shamrock Corporation, dated April 1, 1977, issued to Lillian Estelle Schaeffer, Nancy M. Schaeffer and Carol Elaine Schaeffer Miller

Promissory Note of Diamond Shamrock Corporation, dated December 1, 1982, issued to Martin Marietta Corporation

Chlorine Supply Agreement, dated November 27, 1985, between B.F. Goodrich, Convent Chemical Corporation and Diamond Shamrock Chemicals Company

Eurodollar Credit Agreement, dated August 28, 1980, between Diamond Shamrock de Chile S.A.I. and the First National Bank of Boston and the related documents

DS France - Ltd. with Groupement des Industries Chimiques

Lease Agreement, dated July 23, 1976, as amended, by and between Societe Lyonnaise Immobiliere pour l'Industrie et le Commerce-Sliminco and Diamond Shamrock France S.A.

Credit Agreement ~~and Cogeneration Agreement~~, dated December 22, 1977 between various banks and Carbocloro and the related documents

-4-

OCC033542

**Confidential**

**OCCNJ0026985**
ALCD-PUBCOM_0002863

Loan Agreement, dated December 15, 1980, between The Chase
Manhattan Bank and KPCC and the related documents

Sales Contract No. 32-82603, dated December 6, 1982, as
amended, between Diamond Shamrock Corporation and Champion
International Corporation

Sales Contract No. 32-86002, dated November 4, 1985, as
amended, between Diamond Shamrock Chemicals Company and
Champion International Corporation

Sales Contract No. 32-86129, dated May 19, 1986, between
Diamond Shamrock Chemicals Company and Champion
International

Sales Contract No. 25-84390, dated October 29, 1984,
between Diamond Shamrock Chemicals Company and Mobay
Chemical Corporation

Sales Contract, dated September 22, 1964, as amended,
between Pioneer Chloramore Corporation, and/or Pioneer
Chemical Works, Incorporated, and Diamond Alkali Company
(including Purchase Order No. 35-86-149)

Sales Contract No. 25-86164, dated January 29, 1986,
between Diamond Shamrock Chemicals Company and SDS Biotech
Corporation

Sales Contract - Chlorine Cell Gas and/or Liquid Chlorine,
dated January 1, 1983, between Diamond Shamrock
Corporation and Standard Chlorine of Delaware, Inc.

Purchase Agreement, dated June 30, 1986, between E.I. du
Pont de Nemours and Company and Diamond Shamrock Chemicals
Company

Chlorine Supply Agreement, dated January 1, 1977, as
amended, between Diamond Shamrock Corporation and Shell
Chemical Company

Sales Contract, effective September 1, 1986, between
Diamond Shamrock Chemicals Company and Stauffer Chemical
Company

-5-

OCC033543

OCCNJ0026986
ALCD-PUBCOM_0002864

Purchase Order No. IB 209001-082, dated
January 28, 1986, between Diamond Shamrock
Chemicals Company and Tennessee Chemical
Company

Purchase Order No. 209000-082, dated
January 28, 1986, between Diamond Shamrock
Chemicals Company and DuPont Company -
Chemicals and Pigment

Sales Contract No. HO-86120, dated
January 1, 1986, between Diamond Shamrock
Chemicals Company and Vista Chemical
Company

* Sales Contract No. HO-86118, dated
January 1, 1986, between Diamond Shamrock
Chemicals Company and Dixie
Petrochemicals, Incorporated

* Sales Contract No. HO-86090, dated
January 1, 1986, between Diamond Shamrock
Chemicals Company and Dresser Industries
Incorporated

* Sales Contract No. HO-86070, dated
January 1, 1986, between Diamond Shamrock
Chemicals Company and Celanese Chemical
Company, Incorporated

* Sales Contract No. HO-86095, dated
January 1, 1986, between Diamond Shamrock
Chemicals Company and Dalco Solvents &
Chemicals Inc.

Purchase Order No. 551708, dated
January 1, 1986, between Diamond Shamrock
Corporation and Pennzoil Sulphur Co., a
division of Pennzoil Company

Purchase Agreement No. CD22119, dated
December 1, 1985, between Diamond Shamrock
Corporation and General Tire

Purchase Agreement No. 286-0002-3-M, dated
December 20, 1985, between Diamond
Shamrock Chemicals Company and Texas
Eastman Company

-6-

OCC033544

**OCCNJ0026987**

ALCD-PUBCOM_0002865

Purchase Order 566-0002-M, dated
January 14, 1986, between Diamond Shamrock
Chemicals Company and Texas Eastman Company

Chlorine Supply Agreement, dated January 1,
1977, as amended, between Diamond Shamrock
Corporation and Shell Chemical Company

Purchase Order No. 12CN00125E31103, dated
January 1, 1986, between Diamond Shamrock
Chemicals Company and Exxon Company, U.S.A.

Change Order, effective January 7, 1986,
between Diamond Shamrock Chemicals Company
and Exxon Chemical Americas

Purchase Order No. 00320-WTL-27045, dated
January 13, 1986, between Diamond Shamrock
Chemicals Company and Exxon Corporation

Sales Contract No. HO-86060, dated
January 3, 1986, between Diamond Shamrock
Chemicals Company and Offshore Mud Movers,
Inc.

Sales Contract No. HO-84284, dated
February 16, 1984, between Diamond
Shamrock Chemicals Company and Arkla
Chemical Company

Purchase Order No. 004070, dated
January 7, 1986, between Diamond Shamrock
Chemicals Company and Vista Chemicals
Company

Change Order, dated January 1, 1985,
between Diamond Shamrock Chemicals Company
and NL Baroid/NL Industries

Purchase Order No. H-8078, dated
January 1, 1986, between Diamond Shamrock
Corporation and NL Baroid/NL Industries,
Inc.

Purchase Order No. EWOP-036, dated
January 6, 1986, between Diamond Shamrock
Chemicals Company and Exxon Chemical
Americas

-7-

OCC033545

Confidential

OCCNJ0026988
ALCD-PUBCOM_0002866

Purchase Order No. 002198A, dated
February 7, 1986, between Diamond Shamrock
Chemicals Company and Milchem

Purchase Order No. 77-168, dated
December 25, 1985, between Diamond
Shamrock Corporation and Atlantic
Richfield Company

Purchase Order No. CT-4823-PIO-F, dated
April 1, 1986, between Diamond Shamrock
Chemicals Company and Dow Chemical U.S.A.

Change Order No. 3364, dated January 9,
1986, between Diamond Shamrock Chemicals
Company and Kerr-McGee Refining Corporation

* Sales Contract No. HO-83360, dated
January 20, 1983, as amended, between
Diamond Shamrock Chemicals Company and The
Upjohn Company

* Distributor Agreement No. HO-85901, dated
November 1, 1985, between Diamond Shamrock
Chemicals Company and Accron Chemical
Distributors of Houston/San Antonio

* Distributor Agreement No. HO-85903, dated
January 1, 1985, between Diamond Shamrock
Chemicals Company and Advance Chemical
Company

* Distributor Agreement No. HO-85917, dated
January 1, 1985, between Diamond Shamrock
Chemicals Company and Dixie Petrochemicals
Inc.

* Distributor Agreement No. HO-85919,
between Diamond Shamrock Chemicals Company
and Hancock Industries, Inc.

* Distributor Agreement No. HO-85902, dated
March 14, 1985, between Diamond Shamrock
Chemicals Company and Accron Chemical
Distributors of Houston/San Antonio

-8-

OCC033546

Confidential

OCCNJ0026989

ALCD-PUBCOM_0002867

\*    Distributor Agreement No. HO-85908, dated
      February 1, 1985, between Diamond Shamrock
      Chemicals Company and Chemical Blending
      Company

\*    Distributor Agreement No. HO-85910, dated
      February 28, 1985, between Diamond
      Shamrock Chemicals Company and Cone
      Solvents, Inc.

      Purchase Order No. 35298, dated
      December 9, 1985, between Diamond Shamrock
      Chemicals Company and Allied Corporation

      Sales Contract, dated May 1, 1985, between
      Diamond Shamrock Chemicals Company and
      Allied Corporation

\*    Procurement Contract No. CCDIA 1286, as
      amended, between Diamond Shamrock
      Corporation and International Paper Company

      Purchase Contract No. W86002, dated
      December 12, 1985, between Diamond
      Shamrock Corporation and Union Camp
      Corporation

      Purchase Order No. 0380-505566, dated
      December 18, 1985, between Diamond
      Shamrock Corporation and Union Carbide
      Corporation

      Purchase Order No. 57757, dated January 3,
      1986, between Westvaco Corporation and
      Diamond Shamrock Corporation

      Purchase Order, dated January 3, 1986,
      between Diamond Shamrock Chemicals Company
      and Westvaco Corporation

      Purchase Order, dated January 2, 1986,
      between Diamond Shamrock Chemicals Company
      and Westvaco Corporation

      Sales Contract, dated January 17, 1983,
      between Diamond Shamrock Corporation and
      Standard Chlorine of Delaware, Inc.

-9-

OCC033547

Confidential

OCCNJ0026990
ALCD-PUBCOM_0002868

\*   Distributor Contract No. 32-86169, dated January 1, 1986, between Diamond Shamrock Chemicals Company and Hubbard Hall Chemical Company

\*   Sales Contract No. 32-86002, dated September 11, 1985, between Diamond Shamrock Chemicals Company and Champion International Corporation

Sales Contract No. 32-86194, dated March 12, 1986, between Diamond Shamrock Chemicals Company and Champion International Corporation

\*   Sales Contract No. 32-86001, dated September 17, 1985, between Diamond Shamrock Chemicals Company and Champion International Corporation

Sales Contract No. 32-86129, dated May 19, 1986, between Diamond Shamrock Chemicals Company and Champion International Corporation

Sales Contract No. 32-82603, dated December 6, 1982, as amended, between Diamond Shamrock Chemicals Company and Champion International Corporation

Sales Contract No. 32-82604, dated December 6, 1982, as amended, between Diamond Shamrock Chemicals Company and Champion International Corporation

Sales Contract No. 32-82601, dated December 6, 1982, as amended, between Diamond Shamrock Chemicals Company and Champion International Corporation

Sales Agreement, dated September 17, 1982, as amended, between Diamond Shamrock Corporation and Pennwalt Corporation

Agreement, dated February 1, 1976, between Diamond Shamrock Corporation and Degussa Alabama, Inc.

-10-

OCC033548

**Confidential**

**OCCNJ0026991**

ALCD-PUBCOM_0002869

Purchase Order No. DR-16542-M, dated
December 19, 1985, between Degussa
Corporation and Diamond Shamrock Chemicals
Company

Sales Contract No. 23-86519, dated July 1,
1986, as amended, between Diamond Shamrock
Chemicals Company and McKesson Chemical
Company

* Addendum to Distributor Agreement No. 50,
  dated November 18, 1985, between Diamond
  Shamrock Chemicals Company and McKesson
  Corporation

* Sales Contract No. 35-79-216, dated
  March 29, 1979, between Diamond Shamrock
  Chemicals Company and E.I. du Pont de
  Nemours & Company

Sales Contract No. HO-84284, dated
February 16, 1984, between Diamond
Shamrock Chemicals Company and Arkla
Chemical Company

Sales Contract No. 32-86002, dated
November 4, 1985, between Diamond Shamrock
Chemicals Company and Champion
International Corporation

Conversion Agreement, dated January 22,
1985, between Diamond Shamrock Chemicals
Company and E.I. du Pont de Nemours and
Company

Sales Contract No. 35-81-242-E, dated
December 23, 1980, between Diamond
Shamrock Corporation and E.I. du Pont de
Nemours and Company

Sales Contract No. 25-86172, dated
January 14, 1986, between Diamond Shamrock
Chemicals Company and Jones Chemicals,
Incorporated

Sales Contract No. 25-85060, dated
February 14, 1985, as amended, between
Diamond Shamrock Chemicals Company and The
Lubrizol Corporation

-11-

OCC033549

**Confidential**

Distributor Agreement No. 25-8550, dated
March 21, 1986, as amended, between
Diamond Shamrock Chemicals Company and
Thompson-Hayward Chemical Company

Agreement for the Supply and Purchase of
Chlorine, dated November 27, 1985, among
Diamond Shamrock Chemicals Company, The
B.F. Goodrich Company and LaPorte
Chemicals Corporation

Ethylene Dichloride (EDC) Toll Conversion
Agreement, dated November 27, 1985, among
Diamond Shamrock Chemicals Company, The
B.F. Goodrich Company and LaPorte
Chemicals Corporation

Purchase Order No. MB-KK-01540, dated
January 22, 1985, and related Sales
Contract Nos. 35-75-488 and 489, between
Diamond Shamrock Chemicals Company and
Scott Paper Company

Sales Contract, dated January 1, 1983,
between Diamond Shamrock Corporation and
Standard Chlorine of Delaware, Inc.

Sales Contract No. 23-86100, dated
January 21, 1986, as amended, between
Diamond Shamrock Chemicals Company and
Great Lakes Chemical Corporation

Chlorine Supply Agreement, dated
January 1, 1977, and Amendment to Chlorine
Supply Agreement, dated July 1, 1985, as
amended, in each case between Diamond
Shamrock Corporation and Shell Chemical
Company

Sales Agreement, dated October 12, 1982,
between Diamond Shamrock Chemicals Company
and Pennwalt Corporation

Sales Contract No. 35-86-128, dated
May 13, 1986, between Diamond Shamrock
Chemicals Company and Pennwalt Corporation

OCC033550

Confidential

OCCNJ0026993

ALCD-PUBCOM_0002871

Sales Contract No. 35-86-127, dated
May 19, 1986, as amended, between Diamond
Shamrock Chemicals Company and FMC
Corporation

Conversion Agreement No. 05082, dated
December 14, 1984, between Diamond
Shamrock Chemicals Company and Dow
Chemical U.S.A.

Conversion Agreement No. 05092, dated
December 14, 1984, between Diamond
Shamrock Chemicals Company and Dow
Chemical U.S.A.

Sales Contract, dated September 6, 1985,
between Diamond Shamrock Chemicals Company
and Ennis Paint Co., Inc.

Hydrogen Supply Agreement, dated April 12,
1979, as amended, between Diamond Shamrock
Corporation and Air Products and
Chemicals, Inc.

Commercial Hydrogen Contract, dated
January 1, 1976, between Diamond Shamrock
Corporation and Air Products and
Chemicals, Inc.

Commercial Hydrogen Contract, dated
April 1, 1962, as amended, between Diamond
Alkali Company and Air Products and
Chemicals, Inc.

Hydrogen Sale Contract, dated May 1, 1985,
between Diamond Shamrock Chemicals Company
and Chloramone Corporation

Purchase Order No. BRW 3947, dated
April 22, 1986, between Diamond Shamrock
Chemicals Company and Kerr-McGee Refining
Corporation

Purchase Order No. 25BF 3944, dated
April 22, 1986, between Diamond Shamrock
Chemicals Company and Kerr-McGee Chemical
Corporation

-13-

OCC033551

**Confidential**

OCCNJ0026994

ALCD-PUBCOM_0002872

Purchase Order No. 15BF 3932, dated
April 22, 1986, between Diamond Shamrock
Chemicals Company and Kerr-McGee Chemical
Corporation

* Distributor Agreement No. HO-85921, for
the period from January 1, 1986 to
December 31, 1986, between Diamond
Shamrock Chemicals Company and Magnolia
Chemical & Solvents

Sales Contract No. HO-86006, dated
March 27, 1986, between Diamond Shamrock
Chemicals Company and Arkla Chemical
Company

Purchase Contract No. 8054, dated July 18,
1985, between Diamond Shamrock Chemicals
Company and Texaco Inc.

Purchase Order No. CD22122, dated
October 26, 1985, between Diamond Shamrock
Corporation and General Tire and Rubber
Company

* Purchase Order No. J/6814Z, dated
October 13, 1983, between Diamond Shamrock
Corporation and E.I. du Pont de Nemours
and Company

Memorandum of Agreement No. CH-255, dated
December 30, 1985, between Diamond
Shamrock Chemicals Company and The Clorox
Company

Purchase Order No. 70019X, dated
September 14, 1982, as supplemented,
between Diamond Shamrock Corporation and
Chevron U.S.A., Incorporated

Sales Contract No. 23-86332, dated
February 4, 1986, between Diamond Shamrock
Chemicals Company and Nalco Chemical
Company

Sales Contract No. 23-86331, dated
February 4, 1986, between Diamond Shamrock
Chemicals Company and Nalco Chemical
Company

-14-

OCC033552

**Confidential**

Sales Contract No. 23-86327, dated
January 3, 1986, between Diamond Shamrock
Chemicals Company and Great Lakes Chemical
Corporation

Sales Contract No. 23-861710, dated
January 3, 1986, between Diamond Shamrock
Chemicals Company and Great Lakes Chemical
Corporation

Distributor Agreement No. 23-8524, dated
December 3, 1985, between Diamond Shamrock
Chemicals Company and Mays Chemical
Company, Incorporated

\*     Distributor Agreement No. 23-8523, dated
December 11, 1985, between Diamond
Shamrock Chemicals Company and Mayday
Chemical Company, Incorporated

\*     Distributor Agreement No. 23-8512, dated
November 1, 1985, between Diamond Shamrock
Chemicals Company and Diversified
Chemical & Propellants

Distributor Agreement No. 23-859, dated
January 1, 1986, between Diamond Shamrock
Chemicals Company and Chemtech Industries,
Incorporated

Sales Contract No. 23-83346, dated
January 31, 1983, between Diamond Shamrock
Chemicals Company and Stepan Chemical
Company

Purchase Order 52-60449-C-MS-000, dated
February 7, 1986, between Diamond Shamrock
Chemicals Company and Velsicol Chemical
Corporation

Sales Contract No. 23-86720, dated
April 17, 1986, between Diamond Shamrock
Chemicals Company and Nalco Chemical
Company

Sales Contract No. 23-86100, dated
January 21, 1986, between Diamond Shamrock
Chemicals Company and Great Lakes Chemical
Corporation

-15-

OCC033553

**Confidential**

Purchase Order No. 200-1-64535, dated
December 10, 1985, between Diamond
Shamrock Corporation and Amoco Oil Company

Sales Contract No. 23-86519, dated
January 1, 1986, between Diamond Shamrock
Chemicals Company and McKesson Chemical
Company

Sales Contract No. 25-85266, dated
November 7, 1985, between Diamond Shamrock
Chemicals Company and Owens-Illinois,
Incorporated

Sales Contract No. 25-85267, dated
November 13, 1985, between Diamond
Shamrock Chemicals Company and Corning
Glass Works

Liquid Caustic Potash Agreement, dated
January 8, 1986, between Diamond Shamrock
Chemicals Company and Monsanto Company

Master Sales Agreement, dated October 22,
1982, between Diamond Shamrock Corporation
and Velsicol Chemical Corporation

Sales Contract No. 25-86187, dated
April 22, 1986, between Diamond Shamrock
Chemicals Company and Diversey Wyandotte
Corporation

Sales Contract No. 25-86149, dated
April 2, 1986, between Diamond Shamrock
Chemicals Company and Eastman Kodak Company

Sales Contract No. 25-86150, dated
April 3, 1986, between Diamond Shamrock
Chemicals Company and Eastman Kodak Company

Consent, dated April 9, 1985, executed by
Diamond Shamrock Chemicals Company and
related Purchase Agreement, dated
March 11, 1985, between Diamond Shamrock
Chemicals Company and Mobil Oil Corporation

-16-

OCC033554

Confidential

OCCNJ0026997
ALCD-PUBCOM_0002875

Sales Contract No. 23-86720, dated
April 17, 1986, between Diamond Shamrock
Chemicals Company and Nalco Chemical
Company

Sales Contract No. 26-85050, dated
December 31, 1984, as amended, between
Diamond Shamrock Chemicals Company and
Tennessee River Pulp & Paper Company

Sales Contract No. 35-78-316, dated
March 22, 1978, between Diamond Shamrock
Corporation and Pennwalt Corporation

Sales Contract No. 35-86-128, dated
November 27, 1985, between Diamond
Shamrock Chemicals Company and Pennwalt
Corporation

Sales Contract No. 35-86-139, dated
March 21, 1986, between Diamond Shamrock
Chemicals Company and Rohm & Haas Delaware
Valley, Inc.

Sales Contract No. 35-86-140, dated
March 21, 1986, between Diamond Shamrock
Chemicals Company and Rohm & Haas Bayport
Inc.

Sales Contract No. 35-86-138, dated
March 21, 1986, between Diamond Shamrock
Chemicals Company and Rohm & Haas Texas
Inc.

Sales Contract No. 35-86-137, dated
March 21, 1986, between Diamond Shamrock
Chemicals Company and Rohm & Haas
Tennessee Inc.

Sales Contract No. 35-86-124, dated
January 10, 1986, between Diamond Shamrock
Chemicals Company and PQ Corporation

Purchase Agreement, dated July 1, 1986,
between Diamond Shamrock Chemicals Company
and Mobil Oil Corporation

-17-

OCC033555

Confidential

OCCNJ0026998

ALCD-PUBCOM_0002876

Purchase Order No. 021-021-85280, dated
March 4, 1986, between Diamond Shamrock
Corporation and Hercules Incorporated

Purchase Order No. 000-073-8803613, dated
January 6, 1986, between Diamond Shamrock
Corporation and Hercules Incorporated

Purchase Order No. 000-873-8803626, dated
January 10, 1986, between Diamond Shamrock
Chemicals Company and Hercules Incorporated

Sales Contract No. 35-86-01, dated
October 4, 1985, between Diamond Shamrock
Chemicals Company and W.R. Grace & Co. and
related Purchase Order, dated January 13,
1986, between Diamond Shamrock Chemicals
Company and W.R. Grace & Co.

Sales Contract No. 35-86-51, dated
January 29, 1986, between Diamond Shamrock
Chemicals Company and W.R. Grace & Co. and
related Purchase Order, dated January 6,
1986, between Diamond Shamrock Chemicals
Company and W.R. Grace & Co.

Purchase Agreement No. PHG-86-13, dated
January 3, 1986, as amended, between
Diamond Shamrock Chemicals Company and
P.H. Glatfelter Company

Purchase Agreement No. PHG-86-12, dated
January 3, 1986, as amended, between
Diamond Shamrock Chemicals Company and
P.H. Glatfelter Company

Sales Contract No. 38-83-247, dated
July 15, 1983, as amended, between Diamond
Shamrock Corporation and FMC Corporation

Purchase Order No. K2-603ORL, dated
January 2, 1986, between Diamond Shamrock
Chemicals Company and FMC Corporation

Sales Contract No. 35-88-127, dated
March 7, 1986, between Diamond Shamrock
Chemicals Company and FMC Corporation

-18-

OCC033556

Confidential

Agreement, dated July 17, 1985, between Diamond Shamrock Chemicals Company and E.I. du Pont de Nemours and Company

Sales Contract No. 35-81-242-E, dated December 23, 1980, between Diamond Shamrock Corporation and E.I. du Pont de Nemours and Company

Sales Agreement, dated December 30, 1985, between Diamond Shamrock Corporation and Betz Laboratories, Inc.

Sales Contract No. 35-84-203, dated February 17, 1984, between Diamond Shamrock Chemicals Company and Avtex Fibers

Sales Contract No. 35-86-105, dated January 14, 1986, between Diamond Shamrock Chemicals Company and Amchem Products, Inc.

Purchase Order No. 06-4486, dated January 17, 1986, between Diamond Shamrock Chemicals Company and Amchem Products, Inc.

Sales Contract No. 25-86003, dated December 13, 1985, between Diamond Shamrock Chemicals Company and Beatrice Foods

Sales Contract, dated January 1, 1986, between Diamond Shamrock Chemicals Company and C.C. Oil and Chemical Corporation

Purchase Order No. 010395, dated September 18, 1985, between Diamond Shamrock Chemicals Company and Drackett

Sales Contract No. 25-86031, dated November 11, 1985, between Diamond Shamrock Chemicals Company and Eastman Kodak Company

Sales Contract No. 25-86174, dated January 17, 1986, between Diamond Shamrock Chemicals Company and Kolene Corporation

OCC033557

Confidential

OCCNJ0027000

ALCD-PUBCOM_0002878

Sales Contract No. 25-85154, dated
January 23, 1985, between Diamond Shamrock
Chemicals Company and The Lubrizol
Corporation

Sales Contract No. 25-86166, dated
January 4, 1986, between Diamond Shamrock
Chemicals Company and Orchem

Purchase Order No. 63867, dated March 4,
1986, between Diamond Shamrock Chemicals
Company and Precision Metalsmiths, Inc.

Sales Contract No. 25-86086, dated
January 9, 1986, between Diamond Shamrock
Chemicals Company and Royal Chemical
Company

Sales Contract No. 25-86172, dated
January 14, 1986, between Diamond Shamrock
Chemicals Company and Jones Chemicals,
Incorporated

Sales Contract No. 25-85060, dated
February 14, 1985, between Diamond
Shamrock Chemicals Company and The
Lubrizol Corporation

Sales Contract No. 25-84390, dated
September 24, 1984, between Diamond
Shamrock Chemicals Company and Mobay
Chemical Corporation

Purchase Order No. 00981, dated
February 24, 1986, between Diamond
Shamrock Corporation and Chi-Vit
Corporation

Sales Contract No. 25-85267, dated
November 13, 1985, between Diamond
Shamrock Chemicals Company and Corning
Glass Works

Sales Contract No. 25-86142, dated
February 3, 1986, between Diamond Shamrock
Chemicals Company and Dow Chemical U.S.A.

-20-

OCC033558

Confidential

OCCNJ0027001
ALCD-PUBCOM_0002879

Sales Contract No. 25-86150, dated
April 3, 1986, between Diamond Shamrock
Chemicals Company and Eastman Kodak Company

Sales Contract No. 25-86037, dated
December 9, 1985, between Diamond Shamrock
Chemicals Company and Fenton Art Glass

Sales Contract No. 25-86084, dated
January 30, 1986, between Diamond Shamrock
Chemicals Company and Ferro Corporation

Sales Contract, dated December 5, 1985,
between Diamond Shamrock Chemicals Company
and Fostoria Glass

Purchase Order No. B52KE007BC, dated
December 20, 1985, between Diamond
Shamrock Chemicals Company and General
Electric

Purchase Order No. 86-583, dated
December 20, 1985, between Diamond
Shamrock Chemicals Company and The
Hilton-Davis Chemical Co.

Sales Contract No. 25-85266, dated
November 7, 1985, between Diamond Shamrock
Chemicals Company and Owens-Illinois,
Incorporated

Purchase Order, dated January 29, 1986,
between Diamond Shamrock Chemicals Company
and Sohio Chemical Company

Purchase Order No. 86-695, dated
December 20, 1985, between Diamond
Shamrock Corporation and The Hilton-Davis
Chemical Co.

Sales Contract No. 25-86138, dated
January 10, 1986, between Diamond Shamrock
Chemicals Company and Kolene Corporation

Sales Contract No. 25-86043, dated
January 9, 1986, between Diamond Shamrock
Chemicals Company and Borg Warner
Chemicals, Inc.

-21-                                    OCC033559

Confidential

Purchase Order No. C-71021, dated
January 6, 1986, between Diamond Shamrock
Chemicals Company and Bristol-Myers Company

Purchase Order No. 11473, between Diamond
Shamrock Chemicals Company and Catalyst
Resources, Inc.

Sales Contract No. 25-86187, dated
April 22, 1986, between Diamond Shamrock
Chemicals Company and Diversey Wyandotte
Corporation

Sales Contract No. 25-86190, dated
February 13, 1986, between Diamond
Shamrock Chemicals Company and DuBois
Chemical Company

Purchase Order No. LD-13-600, dated
January 1, 1986, between Diamond Shamrock
Chemicals Company and The B. F. Goodrich
Chemical Group

Sales Contract No. 25-86149, dated
April 2, 1986, between Diamond Shamrock
Chemicals Company and Eastman Kodak Company

Sales Contract No. 25-86165, dated
March 6, 1986, between Diamond Shamrock
Chemicals Company and Nachurs Plant Food
Company

Sales Contract No. 25-86167, dated
January 4, 1986, between Diamond Shamrock
Chemicals Company and Orchem

Purchase Order No. 18307-32364-8, dated
December 27, 1985, between Diamond
Shamrock Chemicals Company and Ashland
Petroleum Company

Purchase Order No. E 01785, dated
January 9, 1986, between Diamond Shamrock
Chemicals Company and Brush Wellman Inc.

Purchase Order, dated December 17, 1985,
between Diamond Shamrock Chemicals Company
and The Dayton Power and Light Company

OCC033560

Confidential

OCCNJ0027003
ALCD-PUBCOM_0002881

Sales Contract No. 25-86195, dated
April 29, 1986, between Diamond Shamrock
Chemicals Company and Diversey Wyandotte
Corporation

Sales Contract No. 25-86195, dated
January 28, 1986, between Diamond Shamrock
Chemicals Company and Eastman Kodak Company

Purchase Order No. MD-6002, dated
January 1, 1986, between Diamond Shamrock
Chemicals Company and General Refractories
Co.

Purchase Order No. 031-031-25120, dated
December 1, 1985, between Diamond Shamrock
Chemicals Company and Hercules Inc.

Sales Contract No. 25-86171, dated
January 14, 1986, between Diamond Shamrock
Chemicals Company and Jones Chemicals,
Incorporated

Sales Contract No. 25-86173, dated
January 8, 1986, between Diamond Shamrock
Chemicals Company and LaPorte Chemical

Sales Contract No. 25-85061, dated
February 14, 1985, as amended, between
Diamond Shamrock Chemicals Company and The
Lubrizol Corporation

Purchase Order No. 6258, dated
February 24, 1986, between Diamond
Shamrock Chemicals Company and Monarch
Chemicals, Inc.

Purchase Order No. 9211878, dated
December 31, 1985, between Diamond
Shamrock Chemicals Company and Ohio Edison
Company

Purchase Agreement No. 0000920-31, dated
January 1, 1986, between Diamond Shamrock
Chemicals Company and Pennsylvania Glass
Sand Corporation

OCC033561

-23-

Confidential

OCCNJ0027004

ALCD-PUBCOM_0002882

Purchase Order No. PS-774308-00, dated
February 25, 1986, between Diamond
Shamrock Chemicals Company and Philips ECG
Inc.

Purchase Order No. C-45000, dated
November 5, 1985, between Diamond Shamrock
Chemicals Company and St. Joe Resources
Company

Purchase Order No. 81-0009-6232-00, dated
December 19, 1985, between Diamond
Shamrock Chemicals Company and BP Oil Inc.

Purchase Order No. 81-0004-8160-01, dated
October 25, 1985, between Diamond Shamrock
Chemicals Company and The Standard Oil Co.
(Ohio)

Purchase Order No. 716-39634, dated
January 1, 1986, between Diamond Shamrock
Chemicals Company and United States Steel
Corporation

Purchase Order No. MS-97000, dated
September 16, 1986, between Diamond
Shamrock Chemicals Company and Virginia
Electric and Power Company

Purchase Order No. 700-2474, dated
December 21, 1985, between Diamond
Shamrock Chemicals Company and Witco
Corporation

Purchase Order No. 3444, dated
December 27, 1985, between Diamond
Shamrock Chemicals Company and and Grow
Group, Inc.

Sales Contract No. 25-86169, dated
January 4, 1986, between Diamond Shamrock
Chemicals Company and Orchem

Purchase Order No. BSA-3362, dated May 1,
1985, between Diamond Shamrock Chemicals
Company and Southwestern Refining Company,
Inc.

-24-

OCC033562

**Confidential**

**OCCNJ0027005**

ALCD-PUBCOM_0002883

Purchase Order No. 15BF-3359, dated May 1, 1985, between Diamond Shamrock Chemicals Company and Kerr-McGee Chemical Corporation

Purchase Order No. 15BF-3356, dated May 1, 1985, between Diamond Shamrock Chemicals Company and Kerr-McGee Chemical Corporation

Purchase Order No. BRW-3364, dated May 1, 1985, between Diamond Shamrock Chemicals Company and Kerr-McGee Refining Corporation

Sales Contract No. 26-86058, dated December 6, 1985, between Diamond Shamrock Chemicals Company and Courtaulds North America, Inc.

Sales Contract No. 35-86-01, dated October 4, 1985, between Diamond Shamrock Chemicals Company and W.R. Grace & Co.

Sales Contract No. 25-86195, dated April 29, 1986, between Diamond Shamrock Chemicals Company and Diversey Wyandotte Corporation

* Sales Agreement No. 25-85257, dated November 15, 1985, between Diamond Shamrock Chemicals Company and Ashland Chemical Company

Sales Contract No. 35-86-02, dated February 6, 1986, between Diamond Shamrock Chemicals Company and Gowen Chemical Corporation

Purchase Order No. 24-9-271, dated March 25, 1986, between Diamond Shamrock Chemicals Company and Amoco Chemicals Company

Sales Contract No. 32-86001, dated November 4, 1985, between Diamond Shamrock Chemicals Company and Champion International Corporation

-25-

OCC033563

**Confidential**

OCCNJ0027006

ALCD-PUBCOM_0002884

Sales Contract No. 23-86332, dated
December 26, 1985, between Diamond
Shamrock Chemicals Company and Nalco
Chemical Company

Sales Contract No. 23-86331, dated
February 4, 1986, between Diamond Shamrock
Chemicals Company and Nalco Chemical
Company

Sales Contract No. 25-86171, dated
January 14, 1986, between Diamond Shamrock
Chemicals Company and Jones Chemicals,
Incorporated

\* Sales Contract No. 35-81-242-E, dated
December 23, 1980, between Diamond
Shamrock Corporation and E.I. du Pont de
Nemours & Company

Sales Contract No. 35-86-43, dated
November 25, 1985 between Diamond Shamrock
Chemicals Company and J.M. Huber
Corporation

Sales Contract No. 35-86-139, dated
February 13, 1986, between Diamond
Shamrock Chemicals Company and Rohm & Haas
Delaware Valley Inc.

Sales Contract No. 35-86-137, dated
March 3, 1986 between Diamond Shamrock
Chemicals Company and Rohm & Haas
Tennessee, Inc.

Sales Contract No. 35-86-138, dated
March 3, 1986, between Diamond Shamrock
Chemicals Company and Rohm & Haas Texas
Inc.

Assignment and Assumption Agreement, dated November 1,
1983, with Diamond Shamrock Refining and Marketing Company

Assignment and Assumption Agreement, dated November 1,
1983, with Diamond Shamrock Exploration Company

Assignment and Assumption Agreement, dated November 1,
1983, with Diamond Shamrock Coal Company

-26-

OCC033564

**Confidential**

**OCCNJ0027007**

ALCD-PUBCOM_0002885

Assignment and Assumption Agreement, dated January 1, 1984, with Diamond Shamrock Corporate Company, as amended

Assignment and Assumption Agreement, dated January 16, 1984, with Diamond Shamrock Aviation Company, as amended

Assignment and Assumption Agreement, dated July 1, 1986, between Diamond Shamrock Chemicals Company and BioSpecific Technologies, Inc.

       Consulting Agreement, dated April 29, 1982, between Diamond Shamrock Corporation and John P. Hyde

       Consulting Agreement, dated June 1, 1986, between Diamond Shamrock Chemicals Company and Dr. Shu-Jan Liang

       Retirement and Consulting Agreement, dated December 15, 1982, between Diamond Shamrock Corporation and George A. Lawrence

       Consulting Agreement, dated July 1, 1978, between Diamond Shamrock Corporation and Ruben Gianzone

       Blanket Order No. N3151, dated November 1, 1985, between Diamond Shamrock Chemical Company and Smith, Currie & Hancock

       Agreement, dated September 1, 1982, between Diamond Shamrock Corporation and Brian Carr

       Employment Contract between Diamond Shamrock Chemicals Company and
- Yoshiaki Motoyama, President (Diamond Shamrock Pacific)
- Makoto Tsuruoka, Vice President (Diamond Shamrock Pacific)

       Consulting Agreement, dated February 7, 1984, between Diamond Shamrock Chemicals Company and Sergio Goloubeff

       Consulting Agreement, dated January 5, 1978, between Diamond Shamrock Corporation and Jose Alberto de Camargo

OCC033565

Confidential

OCCNJ0027008
ALCD-PUBCOM_0002886

Consulting Agreement, dated May 11, 1979, as amended, between Diamond Shamrock Corporation and Stephen Orzechowski

Consulting Agreement Proposal, dated March 31, 1986, between Diamond Shamrock Chemicals Company and Rolling Ridge Enterprises, Inc.

Employment Agreements, dated March 31, 1986, between Diamond Shamrock China, Ltd. and:

Letter Agreement, dated January 9, 1979, between Diamond Shamrock Corporation and Dr. G. F. Bennett

Agreement, dated April 25, 1986, among various entities, including Diamond Shamrock Chemicals Company pursuant to which Diamond Shamrock Chemicals Company agrees to share the use of the Diamond Shamrock Recreation Park

Oxyhydrochlorination Agreement, dated January 28, 1967, as amended, between Diamond Shamrock Corporation and The B.F. Goodrich Chemical Company

Oil Purchase/Sale Agreement, dated July 12, 1982, between Diamond Shamrock Corporation and Pennzoil Company

Consulting Agreement, dated May 4, 1985, between Diamond Shamrock Chemicals Company and F. Gordon Stewart

Engineering Contractor/Technology Source Agreement, dated February 5, 1981, between Diamond Shamrock Corporation and Zimmer A.G.

Sales Contract No. 26-84522, dated December 5, 1983, between Diamond Shamrock Chemicals Company and Eagle Chemical Company

Sales Contract No. 26-86506, dated January 3, 1986, between Diamond Shamrock Chemicals Company and Sonoco Products Company

-28-

OCC033566

**Confidential**

Sales Contract No. 26-86322, dated
December 20, 1985, between Diamond Shamrock
Chemicals Corporation and La Porte America,
Inc.

\*     Distributor Agreement No. 25-85214, dated
November 15, 1984, between Diamond Shamrock
Chemicals Company and Commercial Chemicals,
Inc.

\*     Distributor Agreement No. 25-85250, dated
December 17, 1984, between Diamond Shamrock
Chemicals Company and Duro Paper Bag
Manufacturing Company

\*     Distributor Agreement No. 25-85253, dated
December 26, 1984, between Diamond Shamrock
Chemicals Company and March Central Labs

\*     Distributor Agreement No. 25-85204, dated
December 7, 1984, between Diamond Shamrock
Chemicals Company and Nolwood Chemical
Corporation

\*     Distributor Agreement No. 25-85218, dated
November 12, 1985, between Diamond Shamrock
Chemicals Company and Slack Chemical Co.

\*     Distributor Agreement No. 25-85251, dated
December 5, 1984, between Diamond Shamrock
Chemicals Company and Bill Young and Company

Distributor Agreement No. HO-85907, dated
March 1, 1985, between Diamond Shamrock
Chemicals Company and Charlotte Chemical
Company

Sales Contract No. 32-85793, dated May 1,
1985, between Diamond Shamrock Chemical
Company and GAF Corporation

Purchase Order No. 22-2-1186, dated
January 3, 1986, between Diamond Shamrock
Corporation and Essex Industrial Chemicals
Co.

-29-

OCC033567

Confidential

OCCNJ0027010

ALCD-PUBCOM_0002888

Purchase Order No. 4-613, dated February 21, 1986, between Diamond Shamrock Corporation and Heubach Inc. with Sales Contract No. 32-85885 attached

Purchase Order No. 071490, dated January 1, 1986, between Diamond Shamrock Chemicals Company and Lever Brothers Company

Purchase Order No. 075160, dated January 7, 1986, to Diamond Shamrock Chemicals Company by Lever Brothers Company

Sales Contract No. HO-86119, dated May 1, 1986, between Diamond Shamrock Chemicals Company and AKZO Chemie America

Sales Contract No. 26-86506, dated January 3, 1986, between Diamond Shamrock Chemicals Company and Sonoco Products Company

Proposal Agreement, dated February 28, 1986, between Diamond Shamrock Chemicals Company and Economic Laboratory, Inc.

Sales Contract No. 23-851934, dated February 20, 1985, between Diamond Shamrock Chemicals Company and De Soto, Incorporated

Sales Contract No. 23-861922, dated January 31, 1986, between Diamond Shamrock Chemicals Company and Nalco Chemical Company

Sales Contract No. 35-81-280-E, dated April 6, 1982, between Diamond Shamrock Chemicals Company and W. R. Grace & Co.

Contract renewal, dated November 27, 1985, between Diamond Shamrock Chemicals Company and Metropolitan Dade County

Purchase Order No. G06105B, dated February 27, 1986, between Diamond Shamrock Chemicals Company and Metropolitan Dade County

Purchase Order No. 07158-C, dated March 24, 1986, between Diamond Shamrock Chemicals Company and Lever Brothers Company, Inc.

-30-

OCC033568

**Confidential**

Purchase Order No. 075159, dated January 20, 1986, between Diamond Shamrock Chemicals Company and Lever Brothers Company, Inc.

Sales Contract No. 25-86192, dated April 29, 1986, between Diamond Shamrock Chemicals Company and Environmental Waste Control, Inc.

Sales Contract No. HO-86121, dated August 7, 1986, between Diamond Shamrock Chemicals Company and AKZO Chemie America

Distributor Agreement No. HO-85929D, dated January 1, 1985, between Diamond Shamrock Chemicals Company and Stinnes Oil & Chemical Company, Inc.

Sales Contract No. 23-861930, dated December 31, 1985, between Diamond Shamrock Chemicals Company and Minnesota Mining & Manufacturing Company

Distributor Agreement No. 23-8550, dated March 21, 1986, between Diamond Shamrock Chemicals Company and Thompson-Hayward Chemical Company

* Sales Contract No. 23-862308, dated March 17, 1986, between Diamond Shamrock Chemicals Company and Pfister-Vogel Tanning Company (Assigned to PVL, Ltd.)

Sales Contract No. 23-842324, dated December 31, 1983, between Diamond Shamrock Chemicals Company and Wayne Chemical Corporation

Sales Contract No. 23-861922, dated January 31, 1986, between Diamond Shamrock Chemicals Company and Nalco Chemical Company

Sales Contract No. 23-851934, dated January 29, 1985, between Diamond Shamrock Chemicals Company and De Soto, Incorporated

Hydrogen Sale Contract, dated May 1, 1985, between Diamond Shamrock Chemicals Company and Chloramone Corporation

-31-

OCC033569

**Confidential**

OCCNJ0027012

ALCD-PUBCOM_0002890

Commercial Hydrogen Contract, dated April 1, 1962, as amended, between Diamond Alkali Company and Air Products and Chemicals, Inc.

Hydrogen Supply Agreement, dated April 12, 1979, as amended, between Diamond Shamrock Corporation and Air Products and Chemicals, Inc.

Purchase Order No. 06-4476, dated January 15, 1986, between Diamond Shamrock Corporation and Amchem Products, Inc.

Purchase Order No. 85B150, dated March 27, 1986, between Diamond Shamrock Chemicals Company and Nicholson Construction Company

Sales Contract No. 25-86186, dated January 1, 1986, between Diamond Shamrock Chemicals Company and Alcan Foil Products

Purchase Order No. 27931, dated December 16, 1985, between Diamond Shamrock Chemicals Company and C-E Basic Refractories

Sales Contract No. 25-86108, dated January 31, 1986, between Diamond Shamrock Chemicals Company and Bluegrass Chemicals, Inc.

Sales Contract No. 25-86109, dated December 9, 1985, between Diamond Shamrock Chemicals Company and Crescent Paper Tube Company

Sales Contract No. 25-86192, dated April 29, 1986, between Diamond Shamrock Chemicals Company and Environmental Waste Control, Inc.

Purchase Order No. 86-0025, dated January 8, 1986, between Diamond Shamrock Chemicals Company and Exolon-Esk Company

Purchase Order No. 8214, dated December 17, 1985, between Diamond Shamrock Chemicals Company and J.H. France Refractories Co.

OCC033570

**Confidential**

**OCCNJ0027013**
ALCD-PUBCOM_0002891

Agreement, dated March 4, 1985, between
Diamond Shamrock Chemicals Company and Metal
Coatings International Inc.

Purchase Order No. BS-6027, dated January 1,
1986, between Diamond Shamrock Chemicals
Company and General Refractories Company

Blanket Order No. 3302J, dated December 2,
1985, between Diamond Shamrock Chemicals
Company and A.P. Green Refractories Co.

Sales Contract No. 25-86030, dated
October 15, 1985, between Diamond Shamrock
Chemicals Company and the Grief Brothers

Sales Contract No. 25-86011, dated
October 15, 1985, between Diamond Shamrock
Chemicals Company and Harshaw/Filtrol
Partnership

Blanket Order No. D24000, dated December 23,
1985, between Diamond Shamrock Chemicals
Company and Lincoln Electric Company

Purchase Order No. 8077, dated March 27,
1986, made to Diamond Shamrock Chemicals
Company by Nicholson Construction Company

Purchase Order No. 0000101, dated January 1,
1986, made to Diamond Shamrock Chemicals
Company by Pennsylvania Glass Sand
Corporation

Steam Supply Agreement, dated January 1,
1986, between Diamond Shamrock Chemicals
Company and E.I. du Pont de Nemours & Company

Agreement, dated June 16, 1986, between
Diamond Shamrock Chemicals Company and
Appalachian Power Company

Blanket Services Order No. AB 183951-B-076,
dated October 1, 1984, as amended, between
Diamond Shamrock Chemicals Company and
Welding, Inc.

-33-

OCC033571

**Confidential**

OCCNJ0027014

ALCD-PUBCOM_0002892

Purchase Order No. IB 210154-082, dated
January 31, 1986, between Diamond Shamrock
Chemicals Company and AGA Gas, Inc.

Blanket Services Order No. AB210326-A-076,
dated June 2, 1986, between Diamond Shamrock
Chemicals Company and Carol Electric, Inc.

Gas Sales Agreement, dated July 1, 1985,
between Diamond Shamrock Chemicals Company
and Roaring Fork Gas Corporation

* Change Order No. BB-10510-B, dated
January 19, 1984, between Diamond Shamrock
Chemicals Company and Nitro Industrial
Coverings, Inc.

Purchase Order No. BB-10673, dated
November 5, 1985, between Diamond Shamrock
Chemicals Company and West Virginia Steel
Corporation

Gas Transportation Agreement, dated July 1,
1985, between Diamond Shamrock Chemicals
Company and Cranberry Pipeline Corporation

* Purchase Order No. GB 9841, dated August 2,
1976, confirming the Painting Services
Agreement, dated July 20, 1976, between
Diamond Shamrock Corporation and E.I.
du Pont de Nemours & Company

Purchase Order BB-10659, dated September 5,
1985, between Diamond Shamrock Chemicals
Company and Jefferds Corporation

Purchase Order No. BB-10654, dated
August 22, 1985, between Diamond Shamrock
Chemicals Company and Virginia Welding
Supply Company

Purchase Order No. BB-10681, dated
January 30, 1986, between Diamond Shamrock
Chemicals Company and Hewlett-Packard Company

Blanket Order No. AB 216455-076, dated
June 17, 1986, between Diamond Shamrock
Chemicals Company and Reliance Electric
Company

-34-

OCC033572

**Confidential**

**OCCNJ0027015**

ALCD-PUBCOM_0002893

Purchase Order No. BB-10651, dated
August 15, 1985, between Diamond Shamrock
Chemicals Company and Varian Instrument
Group Service

Sales Contract No. 25-86127, dated
January 31, 1986, between Diamond Shamrock
Chemicals Company and Bluegrass Chemicals,
Inc.

Sales Contract No. 25-86159, dated
December 30, 1985, between Diamond Shamrock
Chemicals Company and Harshaw/Filtrol
Partnership

Sales Contract No. 25-86182, dated
January 23, 1986, between Diamond Shamrock
Chemicals Company and McGean-Rohco, Inc.

Conversion Agreement, dated July 6, 1984,
between Diamond Shamrock Chemicals Company
and Ciba-Geigy Corporation

Agreement, dated July 17, 1985, between
Diamond Shamrock Chemicals Company and E.I.
du Pont de Nemours and Company

Sales Contract No. 35-84-208, dated
March 14, 1984, as amended, between Diamond
Shamrock Chemicals Company and E.I. du Pont
de Nemours and Company

* Sales Agreement, dated January 1, 1978,
between Diamond Shamrock Corporation and
Essex Chemical Corporation

Sales Contract No. 39-86-620, dated
January 2, 1986, between Diamond Shamrock
Chemicals Company and Georgia-Pacific
Corporation

Sales Contract No. HO-86106, dated
December 12, 1985, between Diamond Shamrock
Chemicals Company and Georgia Pacific
Corporation

* Sales Contract No. 32-85885, dated May 8,
1985, between Diamond Shamrock Chemicals
Company and Heubach, Inc.

-35-

OCC033573

Confidential

Conversion Agreement, dated June 17, 1982, as amended, between Diamond Shamrock Corporation and Koppers Company, Inc.

Sales Contract No. 26-86322, dated December 20, 1985, between Diamond Shamrock Chemicals Company and LaPorte America, Inc.

Sales Contract No. 25-86182, dated January 23, 1986, between Diamond Shamrock Chemicals Company and McGean-Rohco, Inc.

Sales Contract No. 23-852305, dated July 31, 1986, between Diamond Shamrock Chemicals Company and Nalco Chemical Company

Conversion Agreement, dated September 26, 1983, as amended, between Diamond Chemicals Company and Osmose Wood Preserving Co. of America, Inc.

Sales Contract No. 23-862308, dated February 26, 1986, between Diamond Shamrock Chemicals Company and Pfister-Vogel Tanning Company

* Letter Agreement, dated June 11, 1982, between Diamond Shamrock Corporation and Eltech Systems Corporation

* Letter Agreement, dated June 11, 1982, between Diamond Shamrock Corporation and Eltech Systems Corporation

* Letter Agreement, dated June 11, 1982, between Diamond Shamrock Corporation and Eltech Systems Corporation

* Letter Agreement, dated June 11, 1982, between Diamond Shamrock Corporation and Eltech Systems Corporation

* Letter Agreement, dated June 11, 1982, between Diamond Shamrock Corporation and Eltech Systems Corporation

OCC033574

Confidential

OCCNJ0027017
ALCD-PUBCOM_0002895

Written Approval of Assignment, dated
November 27, 1985, among Diamond Shamrock
Corporation, Diamond Shamrock Chemicals
Company, Convent Chemical Corporation and
Louisiana Power & Light Company

Assignment and Assumption Agreement, dated
November 27, 1985, between Diamond Shamrock
Chemicals Company and Convent Chemical
Corporation

Electric Service Agreement, dated March 29,
1979, (with Rider No. 1-4 Agreements
attached), between Convent Chemical
Corporation and Louisiana Power & Light
Company

Performance Agreement, dated July 11, 1979,
between The B.F. Goodrich Company, Convent
Chemical Corporation and Louisiana Power &
Light Company

Shipping Services Contract, dated
February 2, 1986, between Convent Chemical
Corporation and Petroleum Shipping Service
Corporation

Location Sales and Service Agreement, dated
December 31, 1981, among Diamond Shamrock
Corporation, Delaware City Plastics
Corporation and Diamond Shamrock Plastics
Corporation

Supplemental Agreement for Transmission
Voltage Substation, dated January 1, 1982,
among Diamond Shamrock Corporation, La Porte
Chemicals Corporation and Houston Lighting &
Power Company

Gas Transportation Agreement, dated
December 1, 1985, between Diamond Shamrock
Chemicals Company and The Cincinnati Gas &
Electric Company

Off Peak Gas Service Contract, dated
December 9, 1981, between Diamond Shamrock
Corporation and The Cincinnati Gas and
Electric Company

-37-

OCC033575

**Confidential**

OCCNJ0027018

ALCD-PUBCOM_0002896

Industrial Gas Sales Contract, dated
March 28, 1983, as amended, between Diamond
Shamrock Corporation and South Gulf Energy,
Inc.

Nitrogen Sales Contract, dated April 1,
1980, between Convent Chemical Corporation
and Big Three Industries, Inc..

Collateral Agreement, dated March 25, 1980,
between The B.F. Goodrich Company and Big
Three Industries, Inc.

Hydrogen Sale Contract, dated May 1, 1985,
between Diamond Shamrock Chemicals Company
and Chloramone Corporation

Location Sales and Service Agreement, dated
April 15, 1982, as amended, between Diamond
Shamrock Corporation and Ethyl Corporation

Application and Agreement for Electric
Service, dated December 20, 1985, between
Diamond Shamrock Chemicals Company and
Houston Lighting & Power Company

Systems Supply Agreement, dated October 1,
1974, between Diamond Shamrock Corporation
and Gulf Supply Company

Purchase Order No. HB 194377-025, dated
March 13, 1985, between Diamond Shamrock
Chemicals Company on and Gulf Supply
Company, Inc.

Systems Supply Agreement, dated October 1,
1974, between Diamond Shamrock Corporation
and Nunn Electric Supply Company

Systems Supply Agreement, dated October 1,
1974, between Diamond Shamrock Corporation
and Texas Marine and Industrial Supply
Company

Letter, dated April 19, 1985, to Diamond
Shamrock Chemicals Company from Texas
Marine & Industrial Supply Company regarding
certain supply costs

OCC033576

**Confidential**

OCCNJ0027019
ALCD-PUBCOM_0002897

Purchase Order No. HB 194375, dated
March 13, 1985, between Diamond Shamrock
Chemicals Company and Texas Marine & Supply
Company

Purchase Order No. HB211200-025, dated
February 28, 1986, between Diamond Shamrock
Chemicals Company and Nalco Chemical Company

* Sales and Service Agreement, dated
October 11, 1982, between Diamond Shamrock
Corporation and Eltech Systems Corporation

Hydrogen Supply Agreement, acknowledged
April 12, 1979, as amended, between Diamond
Shamrock Corporation and Air Products and
Chemicals, Inc.

Letter Agreement, dated December 20, 1984,
between Diamond Shamrock Corporation,
Brown & Root U.S.A., Inc. and Brown & Root,
Inc.

* Agreement, dated December 10, 1978, as
amended, between Diamond Shamrock
Corporation and Brown & Root, Inc.

Letter Agreement, dated May 7, 1984, between
Diamond Shamrock Chemicals Company and Exxon
Pipeline Company

Application and Agreement for Electrical
Service, dated February 1, 1985, between
Diamond Shamrock Chemicals Company and
Houston Lighting & Power Company

Letter Agreement, dated April 17, 1985,
between Diamond Shamrock Chemicals Company
and Houston Lighting & Power Company

* Terminaling and Storage Agreement, dated
November 8, 1973, between Diamond Shamrock
Corporation and Robertson Terminals, Inc.

Pipeline Nitrogen Agreement, dated
October 26, 1983, between Diamond Chemicals
Company and Union Carbide Corporation

OCC033577

-39-

Confidential

OCCNJ0027020
ALCD-PUBCOM_0002898

\* Letter Agreement, dated August 14, 1979, between Diamond Shamrock Corporation and Union Carbide Corporation

Contract for Industrial Gas Service, dated April 1, 1986, as amended, between Diamond Shamrock Chemicals Company and Lone Star Gas Company

Agreement for Electric Service, dated June 26, 1970, between Diamond Shamrock Chemicals Company and Dallas Power & Light Company

Construction Contract, dated October 27, 1977, as amended, between Diamond Shamrock Corporation and Voss International Corporation

Waste Transportation and Disposal Agreement, dated March 1, 1984, between Diamond Shamrock Chemicals Company and Rollins Environmental Services, Tx. Inc.

Waste Treatment and Disposal Agreement, dated November 4, 1985, between Diamond Shamrock Chemicals Company and Ensco, Inc.

Master Waste Systems Agreement, dated May 12, 1982, between Diamond Shamrock Corporation and Browning-Ferris Industries, Inc.

Water Supply Contract, dated September 3, 1976, as amended, between Diamond Shamrock Corporation and the City of Houston

Conversion Agreement, dated July 6, 1984, between Diamond Shamrock Chemicals Company and CIBA-GEIGY Corporation

Conversion Agreement, dated June 17, 1982, between Diamond Shamrock Corporation and Koppers Company, Inc.

Gas Sales Agreement, dated July 1, 1985, as amended, between Diamond Shamrock Chemicals Company and Roaring Fork Gas Corporation

OCC033578

-40-

Confidential

OCCNJ0027021
ALCD-PUBCOM_0002899

Gas Transportation Agreement, dated July 1, 1985, between Diamond Shamrock Chemicals Company and Cranberry Pipeline Corporation

Gas Transportation Agreement, dated December 1, 1985, between Diamond Shamrock Chemicals Company and The Cincinnati Gas & Electric Company

Gas Sales Contract, dated January 1, 1986, between Diamond Shamrock Chemicals Company and Louisiana State Gas Corporation

Contract for Industrial Gas Service, dated April 1, 1986, between Lone Star Gas Company and Diamond Shamrock Chemicals Company

Agreement, dated September 14, 1967, as amended, between Diamond Alkali Company and Delmarva Power & Light Company

Contract for Industrial and/or Commercial Gas Service, dated May 6, 1986, between Diamond Shamrock Chemicals Company and Mobile Gas Service Corporation

Firm Natural Gas Contract, dated December 1, 1984, between Diamond Shamrock Chemicals Company and North Alabama Gas District

Interruptible Gas Contract, dated December 1, 1984, between Diamond Shamrock Chemicals Company and North Alabama Gas District

Electricity Supply Agreement, dated June 16, 1986, between Diamond Shamrock Corporation and Appalachian Power Company

Steam Supply Agreement, effective January 1, 1986, between Diamond Shamrock Chemicals Company and E.I. du Pont de Nemours and Company

Electricity Supply Contract, dated July 30, 1970, as amended, between Diamond Shamrock Chemicals Company and Carolina Power & Light Company

-41-

OCC033579

Confidential

Electric Service Agreement, dated March 29, 1979, as amended, between Louisiana Power and Light Company and Convent Chemical Corporation

Performance Agreement, dated July 11, 1979, among The B. F. Goodrich Company, Convent Chemical Corporation and Louisiana Power & Light Company

Power Contract, dated June 5, 1980, as amended, between Diamond Shamrock Corporation and Tennessee Valley Authority

Car Leasing Agreement, dated February 1, 1984, as amended, between Diamond Shamrock Chemicals Company and General Electric Railcar Services Corporation

Car Service Contract No. 7994, dated November 1, 1983, as amended, between Diamond Shamrock Chemicals Company and General American Transportation Corporation

Equipment Lease, dated January 5, 1981, between The B. F. Goodrich Company and Valley Bankers Leasing 81-1 Partnership

Security Agreement, dated January 5, 1981, from Valley Bankers Leasing 81-1 Partnership to Modern Woodmen of America

* Equipment Lease, dated April 1, 1978, between Diamond Shamrock Corporation and Trust Company for USL, Inc.

Security Agreement, dated April 1, 1978, between Trust Company for USL, Inc. and Union Mutual Life Insurance Company

Trust Agreement, dated as of April 1, 1978, among Trust Company for USL, Inc., United States Lease Financing, Inc. and Chemical Bank

Tank Leasing Purchase Order No. IR-125822, dated February 9, 1978, between Diamond Shamrock Corporation and Tank Lining Corporation

-42-

OCC033580

**Confidential**

Car Lease Agreement, dated June 1, 1985, between Diamond Shamrock Chemicals Company and Allied Corporation

Car Service Agreement, dated August 1, 1984, as amended, between Diamond Shamrock Chemicals Company and Union Tank Car Company

Master Car Service Contract No. 2-9823, dated July 13, 1973, as amended, between Diamond Shamrock Corporation and ACF Industries

Master Car Service Contract No. 2-8584, dated April 26, 1971, between Diamond Shamrock Corporation and ACF Industries, Incorporated

Master Car Service Contract No. 2-8586, dated April 28, 1971, as amended, between Diamond Shamrock Corporation and ACF Industries, Incorporated

Master Car Service Contract No. 2-8587, dated April 28, 1971, as amended, between Diamond Shamrock Corporation and ACF Industries, Incorporated

Master Service Contract No. MSC2-0999, dated January 20, 1976, as amended, between Diamond Shamrock Corporation, Process Division, and ACF Industries, Incorporated

Master Service Contract No. 4-2439, dated October 14, 1980, as amended, between Diamond Shamrock Corporation and ACF Industries, Incorporated

Merchandise Warehouse Agreement, dated June 21, 1985, between Diamond Shamrock Chemicals Company and Buffalo Merchandise Distribution Center Inc.

Warehouse Service Agreement, effective June 1, 1983, between Diamond Shamrock Chemicals Company and Haslett Company

-43-

OCC033581

Confidential

OCCNJ0027024

ALCD-PUBCOM_0002902

Warehouse Lease, dated January 26, 1977, as
amended, between Diamond Shamrock
Corporation and Linden Warehouse &
Distribution Co., Inc.

Merchandise Warehouse Agreement, effective
June 11, 1984, between Diamond Shamrock
Chemicals Company and Mallet's Gateway
Terminal No. 2, Inc.

Warehouse Service Agreement, effective
July 1, 1983, as amended, between Diamond
Shamrock Chemicals Company and Pacific Coast
Warehouse Corporation

Warehouse Service Agreement, effective
July 1, 1982, between Diamond Shamrock
Corporation and Trans Am Distribution
Services, Inc.

Solvents Terminal Services Agreement, dated
March 1, 1980, as amended, between Diamond
Shamrock Corporation and P.D. Oil and
Chemical Storage, Inc.

Terminal Services Agreement, dated April 1,
1983, as amended, between Diamond Shamrock
Corporation and Powell Duffryn Terminals,
Inc.

Terminal Services Agreement, dated
January 1, 1978, as amended, between Diamond
Shamrock Corporation and Gordon Terminal
Service Co.

* Operating Agreement, dated August 1, 1976,
as amended, between Diamond Shamrock
Corporation and Gordon Terminal Service Co.

Terminal Services Agreement, dated
January 14, 1976, as amended, between
Diamond Shamrock Corporation and Chattanooga
Warehouse and Cold Storage Co.

Terminalling and Storage Agreement, dated
October 15, 1976, between Diamond Shamrock
Corporation and Paktank Florida, Inc.

-44-

OCC033582

Confidential

OCCNJ0027025
ALCD-PUBCOM_0002903

Terminal Services Agreement, dated May 1, 1979, as amended, between Diamond Shamrock Corporation and Essex Chemical Corporation

Terminal Facilities Agreement, dated April 1, 1977, between Diamond Shamrock Corporation and Chemtech Terminals, Inc.

Terminal Services Agreement, dated February 1, 1983, between Diamond Shamrock Corporation and Southside River Rail Corporation

Terminal Facilities Agreement, dated August 1, 1981, between Diamond Shamrock Corporation and Great Western Chemical Company

Terminal Services Agreement, dated January 1, 1986, between Diamond Shamrock Chemicals Company and Chemply, a division of United Chemicals, Inc.

Terminal Agreement, dated February 4, 1977, as amended, between Diamond Shamrock Corporation and Wilmington Liquid Bulk Terminals, Inc.

Terminal Services Agreement, dated April 1, 1983, as amended, between Diamond Shamrock Corporation and Powell Duffryn Terminals, Inc.

Terminal Service Agreement, dated December 18, 1973, as amended, between Diamond Shamrock Corporation and Ocean Terminals, Inc.

Terminal Services Agreement, dated January 20, 1975, as amended, between Diamond Shamrock Corporation and El Dorado Terminals Corporation

Terminal Agreement, dated October 11, 1976, as amended, between Diamond Shamrock Corporation and Almont Shipping Co., Inc.

-45-

OCC033583

**Confidential**

Contract No. P/L-1059, dated August 19,
1974, as amended, between Diamond Shamrock
Corporation and Paktank Gulf Coast, Inc.

Terminal Service Agreement No. 290, dated
May 25, 1979, as amended, between Diamond
Shamrock Corporation and Intercontinental
Terminals Company

Terminal Service Agreement No. 299, dated
August 22, 1979, as amended, between
Intercontinental Terminals Company and
Convent Chemicals Company

Consent to Security Assignment, dated
August 22, 1979, executed by International
Terminals Company for the benefit of The
First National Bank of Boston, as Trustee

Barge Towing Contract, dated March 16, 1982,
between Diamond Shamrock Corporation and
Tennessee Valley Towing, Inc.

Barge Towing Contract, dated December 1,
1974, between Diamond Shamrock Corporation
and Walker Towing Corporation

Barge Towing Contract, dated September 15,
1974, between Diamond Shamrock Corporation
and Igert, Inc.

Barge Towing Contract, dated May 1, 1978,
between Diamond Shamrock Corporation and
Scott Chotin, Inc.

Tank Barge Management Contract, dated
September 1, 1983, between Diamond Shamrock
Corporation and O'Daniels and Associates.

Fleeting and Towing Contract, dated October
21, 1983, between Diamond Shamrock Chemicals
Company and Inter-Bay Towing Company, Inc.

Barge Charter, dated November 27, 1985,
between Diamond Shamrock Chemicals Company
and The BF Goodrich Company

-46-                    OCC033584

**Confidential**

Barge Purchase Agreement, dated October 2,
1973, between Diamond Shamrock Corporation
and Dravo Corporation

Agreement and Assignment, dated April 26,
1973, of Bareboat Charter/Lease Agreement,
dated September 1, 1973, between GATX
Leasing Company and GATX Aircraft Corporation

Letter Agreement, dated January 30, 1986,
between Diamond Shamrock Chemicals Company
and Spanier Marine Corporation

Voyage Charter Party, dated May 29, 1986,
between Diamond Shamrock Chemicals Company
and Diamond Shamrock Corporate Company

Service Agreement, dated July 1, 1984, as
amended, between Diamond Shamrock Chemicals
Company and Elkhorn Coal & Coke, Inc.

Track Agreement, dated August 1, 1977, among
Diamond Shamrock Corporation, Port of
Houston Authority and Port Terminal Railroad
Association

Agreement, dated March 29, 1978, between
Diamond Shamrock Corporation and Port of
Houston Authority

Track Agreement, dated February 1, 1977,
among Diamond Shamrock Chemicals Company,
Port of Houston Authority and Port Terminal
Railroad Association

Industrial Track Agreement, dated May 1,
1978, between Diamond Shamrock Corporation
and Southern Pacific Transportation Company

Agreement, dated July 21, 1978, among
Diamond Shamrock Corporation, Port of
Houston Authority, Port Terminal Railroad
Association and Southern Pacific
Transportation Company

Agreement, dated October 3, 1956, among
Harris County - Houston Ship Channel
Navigation District; Texas and New Orleans

OCC033585

Confidential

OCCNJ0027028
ALCD-PUBCOM_0002906

Railroad Company; Chicago, Rock Island and
Pacific Railroad Company; Fort Worth and
Denver Railway Company; Gulf, Colorado and
Santa Fe Railway Company; Houston Belt and
Terminal Railway Company;
Missouri-Kansas-Texas Railroad Company of
Texas; and Missouri Pacific Railroad Company

Locomotive Lease Agreement, as amended,
dated November 17, 1983, between Diamond
Shamrock Corporation and Inman Service Co.,
Inc.

EDI NET Communications Services Agreement,
dated April 10, 1986, between Diamond
Shamrock Chemicals Company and McDonnell
Douglas Corporation

Agreement, dated January 26, 1970, between
Diamond Shamrock Corporation and Western
Weighing and Inspection Bureau

Agreement, dated August 20, 1980, between
Diamond Shamrock Corporation and Western
Weighing and Inspection Bureau

Agreement, dated April 4, 1981, between
Diamond Shamrock Corporation and Western
Weighing and Inspection Bureau

Agreement, dated March 5, 1986, between
Diamond Shamrock Chemicals Company and
Western Weighing and Inspection Bureau

Rail Car Lease, dated April 24, 1985,
between Diamond Shamrock Chemicals Company
and Chemtech Industries, Inc.

Rail Car Lease, dated February 12, 1986,
between Diamond Shamrock Chemicals Company
and Transportation Equipment, Inc.

*   Minor Repair Track Agreement, dated
    September 16, 1977, between Diamond Shamrock
    Corporation and General American
    Transportation Corporation (amendment
    pending)

-48-

OCC033586

**Confidential**

OCCNJ0027029

ALCD-PUBCOM_0002907

\* Minor Repair Track Agreement, dated June 28, 1979, between Diamond Shamrock Corporation and General American Transportation Corporation (amendment pending)

Rail Tank Car Sublease Agreement, dated March 21, 1986, between Diamond Shamrock Chemicals Company and Zip Transportation Company, Inc.

Equipment Lease Agreement, dated January 22, 1986, between Diamond Shamrock Chemicals Company and TriContinental Leasing Corporation

Participation Agreement, dated July 15, 1978, between Diamond Shamrock Corporation, Security Pacific Equipment Leasing, Inc., Exchange National Bank of Chicago (as Owner-Trustee), First Pennsylvania Bank N.A. (as Agent), and Purchasers

Lease of Railroad Equipment, dated July 15, 1978, between Diamond Shamrock Corporation, and Exchange National Bank of Chicago (as Owner-Trustee)

Security Agreement, dated July 15, 1978, between Exchange National Bank of Chicago and First Pennsylvania Bank N.A.

Trust Agreement, dated July 15, 1978, between Security Pacific Equipment Leasing, Inc. and Exchange National Bank of Chicago

Chrome Solution Conversion Agreement, dated January 1, 1985, between Diamond Shamrock Chemicals Company and Allied Corporation

Agreement, May 1, 1985, between Diamond Shamrock Chemicals Company and Allied Company

Sales Agreement, dated August 17, 1977, as amended, between Diamond Shamrock Corporation and The B.F. Goodrich Company

Memorandum of Agreement, dated April 5, 1982, as amended, between Diamond Shamrock Corporation and Almet, Inc.

-49-

OCC033587

Confidential

OCCNJ0027030
ALCD-PUBCOM_0002908

Purchase Order No. IB 209580-043, dated
May 30, 1986, between Diamond Shamrock
Chemicals Company and Ashland Chemical Co.

Purchase Order No. IB 209489-043, dated
March 31, 1986, between Diamond Shamrock
Chemicals Company and Bayer AG

Purchase Order No. IB 209585-043, dated
May 29, 1986, between Diamond Shamrock
Chemicals Company and Bemis Co., Inc.

Purchase Order No. IB 200639-082, dated
October 7, 1985, as amended, between Diamond
Shamrock Chemicals Company and Chevron
Chemical Co.

Purchase Order No. IB 208861-082, dated
February 7, 1986, between Diamond Shamrock
Chemicals Company and Domtar Industries, Inc.

Purchase Order No. IB 208999-A-082, dated
January 23, 1986, as amended, between
Diamond Shamrock Chemicals Company and Exxon
Chemical Americas

Sales Agreement, dated December 2, 1983, as
amended, between Diamond Shamrock Chemicals
Company and Exxon Company, U.S.A.

Contract for Sale, dated November 12, 1982,
as amended, between Diamond Shamrock
Corporation and FMC Corporation

Purchase Order No. IB 207304-082, dated
December 13, 1985, between Diamond Shamrock
Chemicals Company and Koch Sulfer Products

Purchase Order No. IB 209486-043, dated
March 26, 1986, between Diamond Shamrock
Chemicals Company and Lundberg Industries
Ltd.

Salt Sales Agreement, dated May 1, 1986,
between Diamond Shamrock Chemicals Company
and Morton Bahamas Limited

OCC033588

Confidential

OCCNJ0027031

ALCD-PUBCOM_0002909

Purchase Order No. IB 208862-082, dated February 7, 1986, between Diamond Shamrock Chemicals Company and Morton Salt Company

Contract No. 1023A, dated September 30, 1981, as amended, between Diamond Shamrock Corporation, Almet, Inc. and Outokumpu Oy

Purchase Order No. IB 209501-043, dated March 25, 1986, as amended, between Diamond Shamrock Chemicals Company and Potash Company of America Inc.

Purchase Agreement, dated July 31, 1986, between Diamond Shamrock Chemicals Company and Potash Corporation of Saskatchewan Sales Limited

Chemical Products Contract, dated April 26, 1976, between Diamond Shamrock Corporation and Shell Chemical Company, as amended

Soda Ash Contract, dated April 4, 1984, between Diamond Shamrock Chemicals Company and Tenneco Minerals Company

Private Car Lease Agreement, dated January 16, 1984, between Diamond Shamrock Chemicals Company and Tenneco Minerals Company

Purchase Order No. IB 207305-082, dated December 13, 1985, between Diamond Shamrock Chemicals Company and Tennessee Chemical Co.

Amended and Restated Brine Production and Delivery Agreement, dated November 20, 1980, between Convent Chemical Corporation and Texas Brine Corporation

Partial Assignment of Salt and Underground Storage Lease, dated November 25, 1980, between Convent Chemical Corporation and Texas Brine Corporation

Supply Agreement, dated February 19, 1981, between Diamond Shamrock Corporation and Union Carbide Corporation

-51-

OCC033589

**Confidential**



Purchase Order No. IB 207306-082, dated
December 13, 1985, between Diamond Shamrock
Chemicals Company and Wright Chemical Company

Purchase Order No. 00200647, dated
January 2, 1986, between Diamond Shamrock
Chemicals Company and Stauffer Chemical
Company

Purchase Order No. IB 200646-082, dated
January 2, 1986, between Diamond Shamrock
Chemicals Company and Du Pont Company -
Chemicals & Pigment

Purchase Order No. 207916, dated
November 25, 1985, between Diamond Shamrock
Chemicals Company and Boswell Oil Company

Purchase Order No. IB 207997-006, dated
January 3, 1986, between Diamond Shamrock
Chemicals Company and Allied Chemical
Corporation

* Purchase Order No. IB 207996-A-006, dated
January 3, 1986, between Diamaond Shamrock
Chemicals Company and FMC Corporation

Purchase Order No. IB 212666-043, dated
April 25, 1986, between Diamond Shamrock
Chemicals Company and The Morie Co., Inc.

Purchase Order No. IB 212664-043, dated
April 25, 1986, between Diamond Shamrock
Chemicals Company and Ottawa Silica Company

Change Order No. IB 212665-A-043, dated
April 25, 1986, between Diamond Shamrock
Chemicals Company and Unimin Corporation

Purchase Order No. IB 212665-043, dated
April 25, 1986, between Diamond Shamrock
Chemicals Company and Unimin Corporation

Purchase Order No. IB 213580-043, dated
July 25, 1986, between Diamond Shamrock
Chemicals Company and Astro Container Co.

-52-

OCC033590

**Confidential**

Contract, dated October 11, 1963, between
Diamond Alkali Company and Water Works Board
of the City of Mobile

Agreement, dated April 30, 1963, between
Diamond Alkali Company and Water Works and
Sewer Board of the City of Prichard

Painting Service Contract, dated December 6,
1983, between Diamond Shamrock Chemicals
Company and E.I. du Pont de Nemours and
Company Inc.

Contract for Industrial and/or Commercial
Gas Service, dated May 6, 1986, between
Diamond Shamrock Chemicals Company and
Mobile Gas Service Corporation

Purchase Order No. IB 208218-043, dated
January 17, 1986, between Diamond Shamrock
Chemicals Company and Jesse S. Morie & Son,
Inc.

Purchase Order No. IB 208217-043, dated
January 17, 1986, between Diamond Shamrock
Chemicals Company and Louisiana Industrial
Sand Co.

Purchase Order No. IB 209499-043, dated
March 28, 1986, between Diamond Shamrock
Chemicals Company and Kalium Chemicals

Purchase Order No. IB 210165-082, dated
April 2, 1986, between Diamond Shamrock
Chemicals Company and Industrial Chemicals,
Inc.

Purchase Order No. IB 208034-A-006, dated
January 1, 1986, between Diamond Shamrock
Chemicals Company and FMC Corporation

Purchase Order No. IB 210164-A-082, dated
April 1, 1986, between Diamond Shamrock
Chemicals Company and American Cyanamid Co.

Purchase Order No. IB 208033-A-006, dated
January 1, 1986, between Diamond Shamrock
Chemicals Company and Allied Chemical
Corporation

-53-

OCC033591

Confidential

OCCNJ0027034
ALCD-PUBCOM_0002912

Purchase Order No. IB 209500-043, dated
March 26, 1986, between Diamond Shamrock
Chemicals Company and Potash Company of
Saskatchewan

Purchase Order No. IB 210177-082, dated
April 28, 1986, between Diamond Shamrock
Chemicals Company and Reagent Chemical &
Research

Purchase Order No. IB 210178-082, dated
April 25, 1986, between Diamond Shamrock
Chemicals Company and Vulcan Materials Co.

Power Contract, dated June 15, 1980, as
amended, between Diamond Shamrock
Corporation and Tennessee Valley Authority

Firm Natural Gas Contract, dated December 1,
1984, between Diamond Shamrock Chemicals
Company and North Alabama Gas District

Agreement, dated September 8, 1983, between
Diamond Shamrock Chemicals Company and
Domtar Industries Inc.

* Potash Sales Contract, dated January 1,
1983, between Diamond Chemicals Company and
International Minerals & Chemical Corporation

Exchange Agreement (and coordinating
Pipeline Agreement), dated May 7, 1986,
between Diamond Shamrock Chemicals Company
and E.I. du Pont de Nemours and Company

Agreement, dated July 2, 1986, between
Diamond Shamrock Chemicals Company,
Bearings, Inc., Dixie Bearings, Inc. and
Bruening Bearings, Inc.

Steam Supply Agreement, dated January 1,
1986, between Diamond Shamrock Chemicals
Company and E.I. du Pont de Nemours & Company

Purchase Contract No. IB 208225-A-043, dated
January 17, 1986, between Diamond Shamrock
Chemicals Company and Unimin Corporation

-54-

OCC033592

**Confidential**

**OCCNJ0027035**

ALCD-PUBCOM_0002913

Purchase Contract No. IB 208226-A-043, dated
January 1, 1986, between Diamond Shamrock
Chemicals Company and Pennsylvania Glass
Sand Corp.

Purchase Contract No. IB 207988-006 (and
Change Order) - (effective March 27, 1986)
between Diamond Shamrock Chemicals Company
and Kerr-McGee Chemical Corp.

Purchase Contract No. IB 207990-A-006, dated
January 3, 1986, between Diamond Shamrock
Chemicals Company and FMC Corporation

Purchase Contract No. IB 207989-006, dated
January 3, 1986, between Diamond Shamrock
Chemicals Company and Allied Chemical
Corporation

Purchase Contract No. 182312, dated
March 20, 1985, between Diamond Shamrock
Chemicals Company and Belcher New Jersey,
Inc.

Purchase Contract No. 182327, dated
October 18, 1985, between Diamond Shamrock
Chemicals Company and Mitchell Supreme Fuel
Company

Purchase Contract AB 211682-096, dated
March 20, 1986, between Diamond Shamrock
Chemicals Company and SCA Chemical Services
Company

Purchase Contract AB 216372-095, dated
August 6, 1986, between Diamond Shamrock
Chemicals Company and SCA Chemical Services
Company

Purchase Contract No. AB 211683-096, dated
March 25, 1986, between Diamond Shamrock
Chemicals Company and Envirite Corporation

Technical Services Agreement, dated
February 1, 1986, between Diamond Shamrock
Corporation and Bowshot, Cooper &
O'Donnell - Engineers, as supplemented

-55-

OCC033593

Confidential

OCCNJ0027036

ALCD-PUBCOM_0002914

Services Agreement, dated April 16, 1986,
between Diamond Shamrock Chemicals Company
and Columbia Data Services Corporation

Thermal Investigation Master Agreement,
dated July 16, 1980, between Diamond
Shamrock Corporation, Process Chemicals
Division, and Columbia Data Services
Corporation

Service Agreement No. MS-2-84-016, dated
December 12, 1984, between Diamond Shamrock
Chemicals Company and Amdahl Corporation

Maintenance Service Agreement No.
MM-2-4-012, dated December 12, 1984, between
DSCC and Amdahl Corporation

Vehicle Lease Agreement, as amended, dated
September 19, 1972, between Diamond Shamrock
Corporation and Leaseway System Corp., and
related documents

Warehouse Operations Service Agreement,
dated November 25, 1980, as amended, between
Diamond Shamrock Corporation and American
Distribution Co.

Warehouse Operations Service Agreement,
dated June 1, 1979, as amended, between
Diamond Shamrock Corporation and Broadway
Warehouses, Inc.

Warehouse Lease Agreement, dated January 26,
1977, as amended, between Diamond Shamrock
Corporation and Lindin Warehouse &
Distribution Co., Inc.

Warehouse Operations Service Agreement,
dated January 1, 1980, as amended, between
Diamond Shamrock Corporation and Robert
Meador Warehouse & Distribution, Inc.

Warehouse Service Agreement, dated June 30,
1983, as amended, between Diamond Shamrock
Corporation and Pacific Coast Warehouse
Corporation

-56-

OCC033594

**Confidential**

OCCNJ0027037
ALCD-PUBCOM_0002915

Warehouse Service Agreement, dated July 1,
1983, as amended, between Diamond Shamrock
Corporation and Trammell Crow Distribution
Corporation of Atlanta

Terminal Facilities Agreement, dated
April 16, 1982, between Diamond Shamrock
Corporation and Hawkins Chemical, Inc.

Master Service Contract No. MSC 2-0999,
dated January 20, 1976, as amended, between
Diamond Shamrock Corporation and ACF
Industries, Inc.

*   Foreign Investment Agreement, dated
    September 11, 1978, among Diamond Shamrock
    Corporation, Diamond Shamrock Atlantic
    Corporation, Diamond Shamrock de Chile,
    S.A.I. and the Republic of Chile

Electricity Purchase Contract, dated June 1,
1978, as amended, between Diamond Shamrock
de Chile, S.A.I. and Empresa Nacional de
Electricidad S.A.

Sales Contract No. S-108-86, dated April 29,
1986, between Diamond Shamrock Chemicals
Company and Boise Cascade Corporation

Sales Contract No. S-101, dated August 22,
1985, and letter agreement of the same date
amending the same, between Diamond Shamrock
Chemicals Company and Champion International
Corporation

Purchase and Sales Agreement No. 0026, dated
February 14, 1986, between Diamond Shamrock
Chemicals Company and Weyerhaeuser Paper
Company

Purchase Agreement, dated February 13, 1986,
between Diamond Shamrock Chemicals Company
and Cathay Chemical Works Inc.

Agreement, dated February 7, 1986, between
Diamond Shamrock Chemicals Company and
Allied-Signal Inc.

-57-

OCC033595

**Confidential**

Sales Contract No. 86-2-01, dated
December 15, 1985, between Diamond Shamrock
Chemicals Company and Celanese Chemical
Company, Inc., as amended

Purchase Contract, dated January 9, 1986,
between Process Chemicals Division of
Diamond Shamrock Corporation and Allied
Corporation

Agreement, dated November 26, 1984, as
amended, between Diamond Shamrock Chemicals
Company and American Hoechst Corporation

Maintenance and General Services Agreement,
dated March 3, 1980, between Diamond
Shamrock Corporation and Daniel
International Corporation

Chromic Anhydride Repackaging Agreement,
dated January 11, 1985, between Diamond
Shamrock Pacific Ltd. and Japan Metal
Finishing Co., Ltd.

Distributorship Agreement, dated January 1,
1980, among Diamond Shamrock Taiwan Ltd. and
Fair Enterprises Corporation, and Brook Lin
and Gin York Co. Ltd.

Distributorship Agreement, dated January 1,
1980, among Diamond Shamrock Taiwan Ltd. and
Fair Enterprises Corporation, and Tye Han
Trading Co., Ltd.

Distributorship Agreement, dated January 1,
1980, among Diamond Shamrock Taiwan Ltd. and
Fair Enterprises Corporation, and David
Juang, Jintex Corporation Ltd. and Li Phone
Co. Ltd.

Distributorship Agreement, dated April 1,
1983, among Diamond Shamrock Trading Corp.,
Diamond Shamrock Taiwan Ltd., and Forehand
Enterprise Co., Ltd.

* Diamond Shamrock Taiwan Ltd., Chung-Li
Plant, Elevator Service Agreement

-58-

OCC033596

**Confidential**

* Diamond Shamrock Taiwan Ltd. Office Lease
  Agreement

Exclusive Sales Representative and
Distributorship Agreement, dated January 1,
1981, between Diamond Shamrock France and
Diamond Shamrock Deutschland GmbH

Representation Agreement, dated December 1,
1985, between Diamond Shamrock France S.A.
and Croftshaw (Solvents) Limited

Consignment Stock Agreement, dated
December 1, 1985, between Diamond Shamrock
France S.A. and Croftshaw (Solvents) Limited

Distributorship Agreement, dated
December 27, 1985, between Diamond Shamrock
France S.A. and Union Carbide France S.A.

Silicon Contract, dated August 16, 1984,
between Diamond Shamrock France S.A. and
Union Carbide France S.A.

Distribution Agreement, dated October 1,
1984, as amended, between Diamond Shamrock
France S.A. and Marcel Quarre and Cie

Distribution Agreement, dated July 1, 1984,
between Diamond Shamrock France S.A. and
Ausiliari Tessili Reattivi

Distributor Agreement, dated May 1, 1984, as
amended, between Diamond Shamrock France
S.A. and Mr. Brodsky

Distributor Agreement, dated July 25, 1985,
between Diamond Shamrock France S.A. and
P.C.B. Machines S.A.

Distributor Agreement, dated November 10,
1985, between Diamond Shamrock France S.A.
and Impianti Trattamenti Finitura

Waste Disposal Contract between Diamond
Shamrock France S.A. and L'Agence Financiere
de Bassin Seine Normandie

OCC033597

Confidential
OCCNJ0027040
ALCD-PUBCOM_0002918

* Electrician Contract of Diamond Shamrock Taiwan Ltd.

* Sales Agency Agreement, dated October 1, 1982, between Diamond Shamrock Chemicals Canada Inc. and L.H. Lincoln & Son [Expected to terminate on 8-28-86]

  Gas Sales Contract, dated January 1, 1985, between Diamond Shamrock Canada Ltd. and Union Gas Limited

Consulting Agreements, as amended, dated April 29, 1982, between Diamond Shamrock Corporation and Robert S. Cook

Consulting Agreement, dated September 1, 1985, between Diamond Shamrock Energy Services Limited and MacGregor Crowe Limited

Agreement between Diamond Shamrock Chemicals Company and Allied Corporation dated May 1, 1985

Agreement between Diamond Shamrock Chemicals Company and E.I. du Pont de Nemours and Company dated July 17, 1985

Conversion Agreement, dated December 14, 1984, between Diamond Shamrock Chemicals Company and Dow Chemical U.S.A.

Conversion Agreement, dated July 31, 1975, between Phillips Petroleum Company and Diamond Shamrock Corporation

Conversion Agreement, dated February 18, 1983, between Diamond Shamrock Corporation and Shell Chemical Corporation

Distributor Agreement, dated January 3, 1983, among Diamond Shamrock Corporation, Diamond Shamrock Pacific Ltd., and Sale Tiley, as amended by Distributor Agreement, dated February 1, 1985, among Diamond Shamrock Chemicals, Diamond Shamrock Pacific, Ltd., San Nopco Ltd. and ACI JAPAN (formerly Sale Tiley)

OCC033598

Confidential

OCCNJ0027041
ALCD-PUBCOM_0002919

Distributor and Sales Agency Agreement dated
January 1, 1986, between Diamond Shamrock Chemicals
Company and Andesud S.A.

Distributor and Sales Agency Agreement, dated May 23,
1986, between Diamond Shamrock Chemicals Company and
Lankro Italiana S.p.A.

Agreement, dated June 19, 1983, as amended, between
Diamond Shamrock Company and Dow Chemical USA

Liquid Gas Service Agreement, dated March 1, 1984,
between Diamond Shamrock Chemicals Company and AGA
Gas, Inc.

Sales Agreement No. 83 86103, dated July 1, 1983,
between Diamond Shamrock Chemicals Company and Exxon
Company, U.S.A.

Agreement, dated June 17, 1986, between Diamond
Shamrock Chemicals Company and Kalium Chemicals

Agreement, dated July 31, 1986, between Diamond
Shamrock Chemicals Company and Potash Corporation of
S.S.L.

Purchase Agreement, dated July 1, 1986, between Diamond
Shamrock Chemicals Company and E.I. du Pont de Nemours
and Company

Chlorine Supply Contract, dated January 1, 1977,
between Diamond Shamrock Corporation and Shell
Chemical Company

Sales Contract for Chlorine Cell Gas and/or Liquid
Chlorine, dated January 1, 1983, between Diamond
Shamrock Corporation and Standard Chlorine of
Delaware, Inc.

Purchase Agreement No. 8054, dated April 1, 1985,
between Diamond Shamrock Chemicals Company and Texaco
Inc.

Wastewater Treatment Agreement, dated December 31,
1981, as amended, between Diamond Shamrock Corporation
and LaPorte Chemicals Corp.

-61-

OCC033599

**Confidential**

Industrial Water Treatment Agreement, dated July 1, 1984, between Diamond Shamrock Chemicals Company and Cosden Oil and Chemical Company

Wastewater Disposal Contract Tank Truck Shipments Agreement, dated March 15, 1985, between E.I. du Pont de Nemours & Company, Inc. and Diamond Shamrock Chemicals Company

8726G

OCC033600

Confidential

OCCNJ0027043

ALCD-PUBCOM_0002921

## CONVENT CONTRACTS

1. Chlorine Supply Agreement, dated November 27, 1985, among Diamond Shamrock Chemicals Company, The B.F. Goodrich Company and LaPorte Chemicals Corp

2. Consent and Indemnification Agreement, dated November 27, 1985, by and among International Business Machine Corporation, Convent Chemical Corporation, The B.F. Goodrich Company, Diamond Shamrock Chemicals Company and Diamond Shamrock Corporation relating to the Tax Agreement, dated November 9, 1981, between Convent Chemical Corporation and International Business Machine Corporation

3. LaPorte Agreement, dated November 27, 1985, by and among Diamond Shamrock Chemicals Company, LaPorte Chemicals Corp. and The B.F. Goodrich Company

4. Written Approval of Assignment, dated November 27, 1985, among Convent Chemical Corporation, Diamond Shamrock Corporation, Diamond Shamrock Chemicals Company and Louisiana Power & Light Company

5. Assignment of Amended and Restated Brine Production and Delivery Agreement and Assignment of Partial Assignment of Salt and Underground Storage Lease, dated November 27, 1985, between Convent Chemical Corporation and Diamond Shamrock Chemicals Company

6. Rail Car Lease, dated November 27, 1985, between The B.F. Goodrich Corporation and Diamond Shamrock Chemicals Company

7. EDC Toll Conversion Agreement, dated November 27, 1985, between Diamond Shamrock Chemicals Company, The B.F. Goodrich Corporation and LaPorte Chemicals Corp.

8. Act of Mortgage, dated February 21, 1986, by Diamond Shamrock Chemicals Company

9. Assumption Agreement, dated November 27, 1985, between Diamond Shamrock Corporation and General Electric Credit Corporation

10. Successor Guarantee, dated November 27, 1985, between Diamond Shamrock Corporation, Exchange National Bank of Chicago and General Electric Credit Corporation

OCC033601

**Confidential**

11. Assignment and Assumption Agreement, dated November 27, 1985, between Diamond Shamrock Chemicals Company and Convent Chemical Corporation

12. Assignment and Assumption Agreement, dated November 27, 1985, between Diamond Shamrock Chemicals Company and The B.F. Goodrich Corporation, Valley Bankers Leasing 81-1 Partnership and Valley Bank Leasing

13. Assignment, Assumption and Consent Agreement, dated November 27, 1985, between Diamond Shamrock Chemicals Company, The B.F. Goodrich Corporation

14. Assignment, Assumption and Consent Agreement, dated November 27, 1985, between Diamond Shamrock Chemicals Company, The B.F. Goodrich Company and Modern Woodmen of America

15. Assignment, Assumption and Consent Agreement, dated November 27, 1985, between Diamond Shamrock Chemicals Company, The B.F. Goodrich Company and Bankers Commercial Corporation

16. Assignment and Assumption Agreement, dated November 27, 1985, between Diamond Shamrock Chemicals Company and The B.F. Goodrich Company

17. Assignment and Assumption Agreement, dated November 27, 1985, between Diamond Shamrock Chemicals Company and Convent Chemical Corporation, relating to Support Terminals, Inc.

18. Assignment and Assumption Agreement, dated November 27, 1985, between Diamond Shamrock Chemicals Company and Convent Chemical Corporation, relating to Big Three Industries, Inc.

19. Assignment and Assumption Agreement, dated November 27, 1985, between Diamond Shamrock Chemicals Company and Convent Chemical Corporation, relating to Big Three Industries, Inc.

20. Assignment and Assumption Agreement, dated November 27, 1985, between Diamond Shamrock Chemicals Company and The B.F. Goodrich Company, relating to Electrode Corporation

OCC033602

9005G

Confidential

OCCNJ0027045

ALCD-PUBCOM_0002923

SCHEDULE 2.17


Agreement,
Dated September 4, 1986 (the "Agreement"),
By and Among
Diamond Shamrock Corporation,
Occidental Petroleum Corporation,
Occidental Chemical Holding Corporation
and
Oxy-Diamond Alkali Corporation


INTELLECTUAL PROPERTY


8719G

OCC033603

**Confidential**

**OCCNJ0027046**
ALCD-PUBCOM_0002924

A.  Trademarks, Trade Names, Licenses, Service Marks,
    Copyrights, Patents, Patent Applications and Certain
    Infringement Claims

    Copy attached

B.  Settlement Agreements, License Agreements and Miscellaneous
    Agreements

    1.  Settlement Agreement, dated February 6, 1961,
        between Diamond Alkali Company and Abbott
        Laboratories

    2.  Settlement Agreement, dated June 28, 1979, between
        Diamond Shamrock (Solvents Division) and Beecham
        Group Limited

    3.  Settlement Agreement, dated September 8, 1959,
        between Diamond Alkali Company and California Spray
        Chemical Corporation

    4.  Settlement Agreement, dated October 26, 1962,
        between Diamond Alkali Company and Dearborn Chemical
        Company

    5.  Restriction and Prior Rights Declaration, dated
        May 21, 1984, between Diamond Shamrock Chemicals
        Company and Deutsche Pharmacia GmbH

    6.  Settlement Agreement, dated January 10, 1975,
        between Diamond Shamrock Corporation and Dixo
        Company, Inc.

    7.  Trademark Agreement, dated December 10, 1957,
        between Diamond Alkali Company and Dow Chemical
        Company

    8.  Settlement Agreement, dated December 18, 1957,
        between Diamond Alkali Company and General Mills,
        Inc.

    9.  Settlement Agreement, dated July 25, 1951, between
        Diamond Alkali Company and Harshaw Chemical Company

    10. Settlement Agreement, dated November 8, 1963,
        between Diamond Alkali Company and Interchemical
        Corporation

OCC033604

Confidential

11.  Settlement Agreement, dated June 15, 1965, between
     Diamond Alkali Company and Kawel Shale Products
     Company

12.  Settlement Agreement, dated November 8, 1979, among
     Diamond Shamrock Corporation, Lankro Chemicals
     Limited and Lord Corporation

13.  Settlement Agreement, dated January 3, 1973, between
     Diamond Shamrock Corporation and Martens Chemical
     Corporation

14.  Settlement Agreement, dated February 9, 1950,
     between Diamond Alkali Company and Salem
     Commodities, Inc.

15.  Settlement Agreement, dated October 2, 1961, between
     Diamond Alkali Company and Patek & Company

16.  Settlement Agreement, dated March 25, 1976, between
     Diamond Shamrock Corporation and Pennwalt Corporation

17.  License Agreement, dated January 6, 1977, between
     Diamond Shamrock Corporation and Pfizer, Inc.

18.  Settlement Agreement, dated February 10, 1976,
     between Diamond Shamrock Corporation and Plough, Inc.

19.  Settlement Agreement, dated February 29, 1954,
     between Diamond Alkali Company and Proctor & Gamble
     Company

20.  Settlement Agreement, dated April 30, 1968, among
     Diamond Shamrock Corporation, Progressive Products
     Company and Patek Company

21.  Settlement Agreement, dated January 15, 1980,
     between Diamond Alkali Company and Todd Chemical
     Industries

22.  Settlement Agreement, dated December 27, 1977,
     between Diamond Shamrock Corporation and George H.
     Wetherill d/b/a Ream Ophthalmic Solutions

23.  Counterdeclaration, dated March 18, 1981, between
     Diamond Shamrock Corporation and A-Betong AB

24.  Counterdeclaration, dated March 27, 1981, between
     Diamond Shamrock Corporation and Aluminum Company of
     Canada, Limited

-2-

OCC033605

Confidential

OCCNJ0027048

ALCD-PUBCOM_0002926

25. Declaration, dated April 12, 1976, between Diamond Shamrock France and Asta-Werke AG

26. Declaration, dated July 6, 1982, between Diamond Shamrock Process Chemicals Chemical Unit and BASF Aktiengesellschaft

27. Settlement Agreement, dated December 28, 1972, between Diamond Shamrock and Badische Anilin and Soda-Fabrik Aktiengesellschaft

28. Settlement Agreement, dated May 1, 1974, between Diamond Shamrock and BASF Aktiengesellschaft

29. Declaration and Undertaking, dated December 14, 1976, between Diamond Shamrock France and Berol Kemi AB

30. Declaration, dated June 12, 1968, between Nopco Chemical Company and Brauns Anilinfarbenfabrik

31. Undertaking, dated August 25, 1969, between Diamond Shamrock Corporation and British Oxygen Company, Ltd.

32. Pre-right Declaration, dated May 3, 1983, between Diamond Shamrock Corporation and Celcommerz

33. Counterdeclaration, dated September 16, 1971, between Diamond Shamrock Corporation and Coalite and Chemical Products Limited

34. Counterdeclaration, dated September 5, 1980, between Diamond Shamrock Corporation and Colgate-Palmolive Company

35. Settlement Agreement, dated January 24, 1952, between Diamond Alkali Company and Ciba Limited

36. Declaration, dated November 18, 1965, between Nopco Chemical Company and Denso-Chemie GmbH

37. Declaration, dated August 5, 1964, between Nopco Chemical Company and Dreiring-Werke Kommanditgesellschaft

38. Counterdeclaration, dated March 4, 1976, between Diamond Shamrock France and Enka Glanzstoff B.V. - Arnhem

-3-

OCC033606

Confidential

OCCNJ0027049

ALCD-PUBCOM_0002927

39.   Declaration, dated April 27, 1976, between Diamond Shamrock France and ESSO (Switzerland)

40.   Counterdeclaration, dated July 31, 1981, between Diamond Shamrock Corporation and Food Industries, Ltd.

41.   Declaration, dated July 9, 1978, between Diamond Shamrock and Foracom S.A.

42.   Settlement Agreement, dated September 28, 1984, between Diamond Shamrock Chemicals Company and Fosroc A.G. (Switzerland)

43.   Settlement Agreement, dated January 24, 1983, between Diamond Shamrock Corporation and Fosroc International Ltd. (England)

44.   Trademark Consent Agreement, dated November 3, 1975, between Diamond Shamrock Corporation and GAF Corporation

45.   Counterdeclaration, dated March 24, 1983, between Diamond Shamrock Corporation and Geo Produkter HB

46.   Declaration, dated September 6, 1963, between Nopco Chemical Company and Henkel & Cie. GmbH

47.   Declaration of prior right, dated May 25, 1976, between Diamond Shamrock France and Henkel and Cie., GmbH

48.   Declaration, dated March 20, 1976, between Diamond Shamrock France and Henkel & Cie. GmbH

49.   Declaration, dated August 5, 1964, between Nopco Chemical Company and Henkel & Cie. GmbH

50.   Prior right declaration, dated November 30, 1977, between Diamond Shamrock Corporation and Henkel & Cie. GmbH

51.   Declaration, dated August 6, 1964, between Nopco Chemical Company and Henkel & Cie. GmbH

52.   Declaration, dated June 23, 1983, between Diamond Shamrock Corporation and Henkel & Cie. GmbH [Foreign language]

OCC033607

Confidential

OCCNJ0027050
ALCD-PUBCOM_0002928

53.     Prior right declaration, dated July 5, 1983, between
        Diamond Shamrock Corporation and Henkel KGaA

54.     Prior Rights Declaration, dated November 4, 1975,
        between Diamond Shamrock France and Hoechst
        Aktiengesellschaft

55.     Letter Agreement, dated February 16, 1965, between
        Nopco Chemical Company and Hoffman-La Roche, Inc.

56.     Letter Agreement, dated October 19, 1978, between
        Diamond Shamrock DO Brasil and Inco Research &
        Development Center

57.     Declaration, dated March 11, 1977, between Diamond
        Shamrock France and Istituto Sieroterapico e
        Vaccinogene Toscano "SCLAVO" S.p.A.

58.     Letter Agreement, dated August 15, 1983, between
        Diamond Shamrock Corporation and Lord Corporation

59.     Declaration of prior right, dated July 21, 1976,
        between Diamond Shamrock France and Mankiewica
        Gebr. & Company

60.     Prior right declaration, dated August 2, 1983,
        between Diamond Shamrock Corporation and E. Merck

61.     Settlement Agreement, dated September 3, 1965,
        between Nopco Chemical Company and E. Merck A.G.

62.     Declaration, dated March 18, 1981, between Diamond
        Shamrock and Merck & Company, Inc.

63.     Declaration, dated March 29, 1976, between Diamond
        Shamrock France and Merck & Company, Inc.

64.     Settlement Agreement, dated April 17, 1978, between
        Diamond Shamrock Corporation and Miles Kali-Chemie
        GmbH & Company KG

65.     Letter Agreement, dated July 8, 1976, between
        Diamond Shamrock and Molnlycke AB

66.     Letter, dated March 18, 1981, between Diamond
        Shamrock Corporation and Molnlycke

67.     Settlement Agreement, dated March 18, 1960, between
        Nopco Chemical Company and Nalco Chemical Company

OCC033608

**Confidential**                              **OCCNJ0027051**
                                       ALCD-PUBCOM_0002929

68.     Settlement Agreement, dated January 12, 1973, as
        amended, between Diamond Shamrock Corporation and
        Nalco Chemical Company

69.     Letter Agreement, dated April 9, 1962, between Nopco
        Chemical Company and Napko Corporation

70.     Settlement Agreement, dated April 14, 1965, between
        Nopco Chemical Company and Nicco-Werk GmbH

71.*    Settlement Agreement, dated August 3, 1972, among
        Diamond Shamrock Corporation, Diamond Shamrock
        Canada, Ltd. and Noco Drugs Ltd. (Abstract)

72.     Prior right declaration, dated November 20, 1978,
        between Diamond Shamrock Corporation and Nordpolar
        Lackfabrik Christian Sommer KG

73.     Settlement Agreement, dated July 1, 1975, between
        Diamond Shamrock and Pasco, Inc.

74.     Declaration, dated September 9, 1964, between Nopco
        Chemical Company and Reiss, Rudolf Chemische Werke

75.·    Declaration, dated December 3, 1964, between Nopco
        Chemical Company and Rohm & Haas GmbH

76.     Declaration, dated September 5, 1975, between
        Diamond Shamrock France and Sandoz S.A.

77.     Letter Agreement, dated May 5, 1970, between Diamond
        Shamrock Corporation and Schering AG

78.     Settlement Agreement, dated November 4, 1982,
        between Diamond Shamrock France and Societe Anonyme
        Enterprise Moderne Pour La Diffusion Emuldo

79.     Settlement Agreement, dated November 14, 1972,
        between Diamond Shamrock Corporation and Chas. S.
        Tanner Co.

80.     Declaration, dated August 24, 1964, between Nopco
        Chemical Company and Thompson-Werke GmbH

81.     Letter Agreement, dated June 1, 1976, between
        Diamond Shamrock Corporation and Viruly, B.V.

OCC033609

Confidential

OCCNJ0027052
ALCD-PUBCOM_0002930

82.    License and Technical Assistance Agreement, dated
       September 8, 1967, as amended, between Nopco Chimie
       S.A. and Eng Joo Hung Company, Limited

83.    Use of Materials Agreement, dated August 28, 1985,
       between Diamond Shamrock Chemicals Company and Ethyl
       Corporation

84.    Custom Polymer Development and Synthesis Agreement,
       dated September 30, 1982, as amended, between
       Diamond Shamrock Corporation and W.L. Gore &
       Associates, Inc.

85.    Formulation Agreement, dated September 5, 1972,
       between Nopco Chemical Division of Diamond Shamrock
       Corporation and Henkel, Inc.

86.    License and Technical Assistance Agreement, dated
       October 6, 1965, as amended, between Diamond
       Shamrock Chemicals Company and Diamond Shamrock India

87.    License Agreement, dated April 2, 1984, as amended,
       between Diamond Shamrock Chemicals Company and
       Kyoritsu Yuki Company Limited (Royalty based on
       sales)

88.    Agreement, dated March 22, 1982, between Diamond
       Shamrock Corporation and ADC Resins; assigned to ADC
       Resins, by an Assignment, dated December 8, 1982
       (Royalty based on sales)

89.    Purchase and Resale Agreement, dated October 13,
       1972, between Nopco Chemical Division of Diamond
       Shamrock Chemical Company and Alco Chemical
       Corporation

90.    Letter Agreement, dated September 13, 1985, between
       Diamond Shamrock Chemicals Company and Allied
       Corporation

91.    Indemnification Agreement, dated February 13, 1975,
       between Diamond Shamrock Chemicals Company and
       American Cyanamid Company

92.    Trademark License, dated April 1, 1986, between
       Diamond Shamrock Chemicals Company and Andesud S.A.

OCC033610

Confidential

OCCNJ0027053

ALCD-PUBCOM_0002931

93.    License and Technical Assistance Agreement, dated
       April 1, 1986, between Diamond Shamrock Chemicals
       Company and Andesud S.A.

94.    License Agreement, effective December 31, 1985,
       between Diamond Shamrock Chemicals Company and ARCO
       Chemical Company

95.    Trademark License Agreement, dated February 1, 1985,
       between Diamond Shamrock Chemicals Company and
       Diamond Shamrock Do Brasil Industria e Comercio Ltda.

96.    License and Technical Assistance Agreement, dated
       February 1, 1985, between Diamond Shamrock Chemicals
       Company and Diamond Shamrock Do Brasil Industria e
       Comercio Ltda.

97.    License and Technical Assistance Agreement, dated
       November 15, 1984, between Diamond Shamrock
       Chemicals Company and CA Quimica Integracta

98.    Trademark License Agreement, dated November 15,
       1984, between Diamond Shamrock Chemicals Company and
       CA Quimica Integrada

99.    License Agreement, dated September 1, 1982, between
       Diamond Shamrock Corporation and Brian Carr (Royalty
       based on sales)

100.   Agreement, dated January 17, 1979, as amended,
       between Diamond Shamrock Corporation and Brian Carr
       (Royalty based on sales)

101.   License and Technical Assistance Agreement, dated
       July 1, 1972, between Diamond Shamrock Corporation
       and Chemical Services Pty. Limited

102.   License and Technical Assistance Agreement, dated
       October 22, 1979, between Diamond Shamrock
       (Australia) Pty. Limited and Colour and Synthetics
       Limited (Chemby Chemicals Ltd.)

103.   Resale Agreement, dated July 7, 1960, between
       Diamond Shamrock Corporation and G. Devineaul S.A.

104.   License and Technical Assistance Agreement, dated
       October 1, 1973, as amended, between Diamond
       Shamrock Corporation and Diamond Shamrock (Africa)
       (Proprietary) Ltd.

-8-

OCC033611

Confidential

OCCNJ0027054
ALCD-PUBCOM_0002932

105.    Trademark License Agreement, dated October 1, 1973,
        as amended, between Diamond Shamrock Corporation and
        Diamond Shamrock (Africa) (Proprietary) Limited

106.    License and Technical Assistance Agreement, dated
        February 6, 1980, as amended, between Diamond
        Shamrock Corporation and Diamond Shamrock France S.A.

107.    Technical Assistance Agreement, dated January 30,
        1976, between Diamond Shamrock Chemicals (U.K.)
        Limited and Diamond Shamrock France (Fee based on
        sales)

108.    Trademark License Agreement, dated January 30, 1976,
        between Diamond Shamrock France and Diamond Shamrock
        Chemicals (U.K.) Limited

109.    Technical Assistance Agreement, dated December 18,
        1975, between Diamond Shamrock France and
        Nopco-Senko A/S (Fee based on sales)

110.    Trademark License Agreement, dated December 18,
        1975, between Diamond Shamrock France and
        Nopco-Senko A/S

111.    Technical Assistance Agreement, dated July 12, 1976,
        between Diamond Shamrock France and Muenzing Diamond
        Shamrock G.m.b.H. (Fee based on sales)

112.    Trademark License Agreement, dated July 23, 1976,
        between Diamond Shamrock France and Muenzing Diamond
        Shamrock Chemie G.m.b.H.

113.    Technical Assistance Agreement, dated July 5, 1976,
        between Diamond Shamrock France and Nopco Italiana
        (Fee based on sales)

114.    Trademark License Agreement, dated July 5, 1976,
        between Diamond Shamrock France and Nopco Italiana

115.    License and Technical Assistance Agreement, dated
        January 1, 1986, between Diamond Shamrock Chemicals
        Company and Diamond Shamrock Italia S.p.A.

116.    Trademark Agreement, dated January 1, 1986, between
        Diamond Shamrock Chemicals Company and Diamond
        Shamrock Italia S.p.A.

-9-                         OCC033612

Confidential

117.  Cross-License Agreement, dated April 20, 1960, between Doittau-Sopura S.A. and Nopco Chemical Company (Fee based on sales)

118.  Joint Development and Secrecy Agreement, dated September 26, 1984, between Diamond Shamrock Chemicals Company and E. I. du Pont de Nemours and Company

119.  Tri-Finishing Agreement, dated January 27, 1971, between Diamond Shamrock Chemicals Company and E.I. du Pont de Nemours and Company (Royalty based on

121.  License Agreement, dated January 28, 1986, between Diamond Shamrock Canada Ltd. and Economics Laboratory, Inc.

122.  License Agreement, dated January 28, 1986, between Economics Laboratory, Inc. and Diamond Shamrock Chemicals Company

123.  License Agreement, dated January 28, 1986, between Diamond Shamrock Chemicals Company and Economics Laboratory, Inc.

124.  License Agreement, dated January 28, 1986, between Economics Laboratory Inc. and Diamond Shamrock Canada Ltd.

125.  Purchase and Sale Agreement, dated March 31, 1986, between Diamond Shamrock Scandinavia A/S and Economics Laboratory, Inc.

126.  License Agreement, dated March 31, 1986, between Economics Laboratory, Inc. and Diamond Shamrock Process Chemicals Limited

127.  License Agreement, dated March 31, 1986, between Economics Laboratory, Inc. and Diamond Shamrock Process Chemicals Limited

128.  Purchase and Sale Agreement, dated March 31, 1986, between Economics Laboratory, Inc. and Diamond Shamrock Process Chemicals Limited

-10-

OCC033613

Confidential

129. Assignment of Dedicated Patent Rights, dated April 2, 1986, made by Economics Laboratory, Inc.

130. License Agreement, dated March 31, 1986, between Economics Laboratory, Inc. and Diamond Shamrock Process Chemicals Ltd.

131. License Agreement, dated March 31, 1986, between Economics Laboratory, Inc. and Diamond Shamrock Process Chemicals Limited

132. License Agreement, dated March 31, 1986, between Economics Laboratory, Inc. and Diamond Shamrock Scandinavia A/S

133. Asset Purchase Agreement, dated February 28, 1981, between Diamond Shamrock Corporation and Mallinckrodt, Inc.

134. Technical Information and Assistance Agreement, dated June 13, 1980, as amended, between Diamond Shamrock Corporation and Mathiesen S.A.C.

135. Trademark Agreement, dated June 13, 1980, between Diamond Shamrock Corporation and Mathiesen S.A.C.

136. Agreement, dated January 16, 1972, between Diamond Shamrock Corporation and Mercantile International

137. Agreement, dated December 6, 1977, between Nalco Chemical Company and Diamond Shamrock Corporation

138. License Agreement, dated April 1, 1985, between Nalco Chemical Company and Diamond Shamrock Chemicals Company (Royalty based on sales)

139. Agreement, dated October 22, 1982, between Diamond Shamrock and Nicolet Instrument Corporation

140. Trademark License Agreement, dated July 1, 1969, between Nopco Colombiana, S.A. and Diamond Shamrock Corporation

141. License and Technical Assistance Agreement, dated July 1, 1971, between Nopco Colombiana, S.A. and Diamond Shamrock Corporation

-11-

OCC033614

Confidential

OCCNJ0027057

ALCD-PUBCOM_0002935

142.    License and Technical Assistance Agreement, dated January 1, 1965, as amended, between Nopco Chimie S.A. and Nopco Venezolana S.A.

143.    Assignment, effective July 1, 1971, between Nopco Chimie, S.A. and Diamond Shamrock Corporation

144.    License and Technical Assistance Agreement, dated March 11, 1986, between Diamond Shamrock Chemicals Company and Quimasoc Cia, Ltda.

145.    Trademark License Agreement, dated March 11, 1986, between Diamond Shamrock Chemicals Company and Quimasoc Cia, Ltda.

146.    Trademark Agreement, dated January 1, 1986, between Diamond Shamrock Chemicals Company and San Nopco Limited

147.    License and Technical Assistance Agreement, dated January 1, 1986, between Diamond Shamrock Chemicals Company and San Nopco Limited

148.    Technical Assistance Agreement, dated March 11, 1983, between Diamond Shamrock Corporation and Sanyo Chemical Industries, Ltd. (Royalty based on sales)

149.    Transfer of Copyright, dated March 12, 1980, between Martin Schick, Diamond Shamrock Corporation, and Textile Research Institute

150.    Technical Assistance and Sales Agreement, dated March 17, 1978, between Diamond Shamrock Corporation and S.M.C., Inc.

151.    Transfer of Copyright, dated March 20, 1978, between Mr. Russell Smith, Diamond Shamrock Corporation and The Wire Association International, Inc.

152.    Sales/Patent Assignment, dated July 1, 1985, between Diamond Shamrock Chemicals Company and Sun Chemical Corporation

153.    Trademark Licensing Agreement, dated November 8, 1963, as amended, between Nopco Chemical Company and Tarochem Limited

-12-

OCC033615

Confidential

OCCNJ0027058

ALCD-PUBCOM_0002936

154.   License Agreement, dated March 16, 1985, between Thermo Electron Corporation and Particle Technology Incorporated

155.   License Agreement, dated August 31, 1970, between Diamond Shamrock Corporation and Thiokol Chemical Corporation

156.   License, dated June 7, 1983, between Diamond Shamrock Corporation and U.S. Department of the Navy

157.   Patent Indemnification Agreement, dated November 28, 1984, between Diamond Shamrock Chemicals Company and The Western Company of North America

158.   License Agreement, dated September 1, 1972, between Diamond Shamrock Corporation and Witco Chemical Corporation

159.   Purchase and Sale Agreement, dated March 31, 1986, between Diamond Shamrock Scandinavia A/S and Economics Laboratory, Inc.

160.   License Agreement, dated March 31, 1986, between Diamond Shamrock Scandinavia A/S and Economics Laboratory, Inc.

161.   Agreement and Covenant Not-to-Compete, dated March 31, 1986, between Diamond Shamrock Scandinavia A/S and Economics Laboratory, Inc.

162.   Assignment of Patent Rights, dated April 2, 1986, between Diamond Shamrock Scandinavia A/S and Economics Laboratory, Inc.

163.   License Agreement, dated March 31, 1986, between Diamond Shamrock Scandinavia A/S and Economics Laboratory, Inc.

164.   License Agreement, dated March 31, 1986, between Diamond Shamrock Scandinavia A/S and Economics Laboratory, Inc.

165.   Diamond Shamrock Process Chemicals, Ltd. and Courtland Research

OCC033616

Confidential

OCCNJ0027059

ALCD-PUBCOM_0002937

[9.1.37]     166.     Agreement, dated May 25, 1981, amending the
                      License Agreement dated March 15, 1972,
                      between Diamond Shamrock Corporation and
                      Dynamit Nobel AG

[9.1.37]     167.     Agreement, dated May 25, 1981, amending the
                      License Agreement, dated March 15, 1972,
                      between Diamond Shamrock Corporation and
                      Dynamit Nobel AG

[9.1.37]     168.     License Agreement, dated March 15, 1972,
                      between Diamond Shamrock Corporation and
                      Dynamit Nobel A.G.

[9.1.38]     169.     Amendment, dated August 24, 1973, to the
                      License Agreement dated March 15, 1972,
                      between Diamond Shamrock Corporation and
                      Dynamit Nobel A.G.

[9.1.60]     170.     Supplement to Oxyhydrochlorination
                      Agreement, dated January 23, 1976, between
                      Diamond Shamrock Corporation and The B.F.
                      Goodrich Company

[9.1.60]     171.     Supplement to Oxyhydrochlorination
                      Agreement, dated April 28, 1976, between
                      Diamond Shamrock Corporation and B.F.
                      Goodrich Chemical Company

[9.1.60]     172.     Agreement Regarding Catoxid Process and
                      Other Technology, dated January 23, 1976,
                      between Diamond Shamrock Chemical Company
                      and The B.F. Goodrich Company

[9.1.71]     173.     Letter Agreement, dated January 23, 1976,
                      between Diamond Shamrock Chemical Company
                      and ICI Australia Limited

[9.1.71]     174.     License Agreement, dated February 20, 1976,
                      between Diamond Shamrock Corporation and
                      ICI Australia Limited

[9.1.72]     175.     Trademark License, effective June 1, 1972,
                      between Diamond Shamrock Corporation and
                      IMASA S.A.

[9.1.81]     176.     Letter Agreement, dated April 16, 1969,
                      between Diamond Shamrock Corporation and
                      International Paper Company

-14-

OCC033617

Confidential

OCCNJ0027060

ALCD-PUBCOM_0002938

[9.1.82]    177.    Agreement, dated December 22, 1972, between Diamond Shamrock Corporation and Japan Finishing Co., Ltd.

[9.1.82]    178.    Trademark License, dated December 22, 1972, between Diamond Shamrock Corporation and Japan Metal Finishing Co., Ltd.

[9.1.82]    179.    Letter Agreement, dated August 14, 1969, amending the License Agreement, dated May 7, 1968 between Diamond Shamrock Corporation and Japan Metal Finishing Co.

[9.1.82]    180.    License Agreement, dated May 7, 1968, between Diamond Shamrock Corporation and Japan Metal Finishing Co., Ltd.

[9.1.82]    181.    Trademark License, dated May 7, 1968, between Diamond Shamrock Corporation and Japan Metal Finishing Co., Ltd.

[9.1.100]    182.    Technical Services Agreement, dated January 1, 1982, between Diamond Shamrock Corporation and Davy McKee Corporation

[9.1.104]    183.    Joint Development Agreement, dated December 30, 1982, between Diamond Shamrock Corporation and Millipore Corporation

[9.1.110]    184.    License Agreement, dated July 24, 1973, between Diamond Shamrock Corporation and Oriental Diamond Company, Ltd.

[9.1.113]    185.    Agreement, dated March 20, 1975, between Diamond Shamrock Corporation and Pennwalt Corporation

[9.1.114]    186.    License Agreement, dated January 18, 1973, between Diamond Shamrock Corporation and Pennwalt Corporation; and related option agreement

[9.1.116]    187.    Agreement, dated January 6, 1977, between Diamond Shamrock Corporation and Pfizer Inc.

[9.1.118]    188.    Agreement, dated October 25, 1978, between Diamond Shamrock Corporation and Progressive Research Products, Inc. (Royalty based on sales)

-15-

OCC033618

Confidential

OCCNJ0027061

ALCD-PUBCOM_0002939

[9.1.118]      189.   Amendment, dated July 20, 1978, to the
                      Agreement dated October 25, 1978, between
                      Diamond Shamrock Corporation and
                      Progressive Research Products, Inc.

[9.1.134]      190.   License Agreement, dated July 1, 1977,
                      between Diamond Shamrock Corporation and
                      Societe Sedema S.A.

[9.1.135]      191.   Software License Agreement, dated January
                      1, 1980, between Diamond Shamrock
                      Corporation and Software House

[9.1.137]      192.   Disclosure and License Agreement, dated
                      October 8, 1976, between Diamond Shamrock
                      Corporation and Stauffer Chemical Company

[9.1.144]      193.   Memorandum of Agreement, dated August 3,
                      1984, between Diamond Shamrock Chemicals
                      Company and The Texas Agricultural
                      Experiment Station

[9.1.163]      194.   Engineering Contractor/Technology Service
                      Agreement, dated February 5, 1981, between
                      Diamond Shamrock Corporation and Zimmer A.G.

[9.1.700]      195.   Sales Agency Agreement, dated December 1,
                      1985, between Diamond Shamrock Chemicals
                      Company and AGF InterAmerica, Ltda.

[9.1.802]      196.   Mutual Assistance Agreement, dated June 11,
                      1982, among Chemnor, S.A., Diamond Shamrock
                      Corporation, Eltech Systems Corporation,
                      Etruria Trust Corporation and Nora
                      International Corporation

[9.1.1315]     197.   Sales Agreement, dated August 17, 1977, as
                      amended, between Diamond Shamrock
                      Corporation and The B.F. Goodrich Company

[9.1.1555]     198.   Agreement, dated December 1, 1979, between
                      Diamond Shamrock Corporation and Monsanto
                      Company

[9.1.1556]     199.   License Agreement, dated July 18, 1984,
                      between Diamond Shamrock Chemicals Company
                      and OLI Systems, Inc.

OCC033619

Confidential

OCCNJ0027062

ALCD-PUBCOM_0002940

[3.2.17(2)]    200.   Agreement, dated September 1, 1982, as
                      amended, between Diamond Shamrock
                      Corporation and Brian Carr

[3.3.3]        201.   Saeriavtalefor Diamond Shamrock Scandinavia
                      A/S, dated June 12, 1985, between Diamond
                      Shamrock Scandinavia A/S and De Ansatte I
                      Produksten

               202.   Letter Agreement, dated February 28, 1977
                      between Akzo Zovt Chemie Nederland B.V. and
                      Diamond Shamrock Corporation

               203.   Agreement, dated July 1, 1983, between
                      Diamond Shamrock Corporation and American
                      Colloid Company (Royalty based on use and
                      sales)

               204.   License Agreement, dated August 1, 1977,
                      between Applifarm S.A. and Diamond Shamrock
                      Corporation (Royalty based on sales)

               205.   Letter Agreement, dated March 18, 1974,
                      between Clinton Corn Processing Company and
                      Diamond Shamrock Corporation

               206.   General Exchange, Assignment and Conveyance
                      and Instrument of Assumption, dated
                      December 10, 1980, between Diamond Shamrock
                      Corporation and Diamond Shamrock Plastics
                      Corporation

               207.   Agreement dated March 1, 1977 between
                      Diamond Shamrock Corporation and Diamond
                      Shamrock Chemicals, Ltd. (Royalty based on
                      sales)

               208.   License Agreement (Shared Intangible
                      Assets) dated March 31, 1986 between
                      Economics Laboratory and Diamond Shamrock
                      Scandinavia

               209.   License Agreement (EDC-1 Rights) dated
                      March 31, 1986 between Economics Laboratory
                      and Diamond Shamrock Scandinavia

               210.   License Agreement (Shared Patent Property)
                      dated March 31, 1986 between Economics
                      Laboratory and Diamond Shamrock Scandinavia

-17-

OCC033620

Confidential

OCCNJ0027063

ALCD-PUBCOM_0002941

211. License Agreement, dated April 24, 1979, between Diamond Shamrock Corporation and Electrochemical Industries (Frutarom) Ltd.

212. License Agreement, dated May 23, 1979, between Diamond Shamrock Corporation and Electrochemical Industries (Frutarom) Ltd.

213. Letter Agreement dated April 23, 1986 between Exxon Chemical Company and Diamond Shamrock Process Chemicals, Ltd.

214. Testing Agreement, dated August 5, 1982, between Fujisawa Pharmaceutical Co., Ltd. and Diamond Shamrock Corporation

215. Exclusive License Agreement, dated October 4, 1974, between Merzt Co. KG Chemische Fabrik and MDS Health Group Limited

216. Sub-license and Option Agreement, dated December 5, 1974, between Diamond Shamrock Corporation, MDS Health Group Limited and Merz & Co. KG Chemische Fabrik (Requires annual payments)

217. Exclusive Option and License Agreement, dated October 4, 1974, between Merz & Co. KG Chemische Fabrik and MDS Health Group Limited

218. Testing Agreement, dated November 5, 1980, between Diamond Shamrock Corporation and Milliken

219. License Agreement, dated November 21, 1979, between Diamond Shamrock Corporation and Montedison S.p.A.

220. License Agreement dated November 21, 1979 between Diamond Shamrock Corporation and Montedisan S.p.A.

221. Process Computer Technology Agreement, dated October 28, 1980, between Diamond Shamrock Corporation and Montedison S.p.A.

-18-

OCC033621

Confidential

OCCNJ0027064

ALCD-PUBCOM_0002942

222. Agreement for Provision of Service dated April 1, 1986 between Ricerca, Inc. and Diamond Shamrock Chemical Corporation (Service fees owed based on use)

223. License Agreement, dated July 22, 1976, between Societe Rhone-Poulenc Industries and Diamond Shamrock Corporation (Royalty based on sales)

224. License Agreement, dated October 1, 1976 between Tenneco Chemicals, Inc. and Diamond Shamrock Corporation (Royalty based on sales)

225. License Agreement dated February 22, 1980 between Sanyo Chemical Industries, Ltd. and Diamond Shamrock (Australia) Pty. Ltd. (Royalty based on sales)

226. Agreement Compositions dated December 25, 1978 between K.K. Nippon Dacro Shamrock and Diamond Shamrock (Australia) Pty. Ltd. (Royalty based on sales)

227. Technical Assistance Agreement dated December 1, 1977 between Diamond Shamrock Corporation and Sanyo Chemicals Industries, Ltd. (Royalty based on sales)

228. Investigational Use Agreement, dated December 25, 1979, between Diamond Shamrock Corporation and Dr. Ibrahim R. Shimi

229. License Agreement, dated October 1, 1976, between Diamond Shamrock Corporation and Tenneco Chemicals, Inc.

230. Letter Agreement dated January 14, 1985 between Diamond Shamrock Chemical Corporation and 3-M

231. Letter Agreement dated May 22, 1986 between Diamond Shamrock Chemical Corporation and 3-M

232. License Agreement dated March 31, 1982 between Diamond Shamrock Corporation and Diamond Shamrock (Australia) Pty. Ltd.

-19-

OCC033622

**Confidential**

233. Agreement (Trademark) dated September 10, 1984 between Eltech Systems Corporation and Diamond Shamrock (Australia) Pty. Ltd. Expires September 10, 1986 (Royalty based on sales)

234. Agreement dated October 2, 1961 between Diamond Alkali Company and Patek & Co.

235. Sublicense Agreement dated December 21, 1982 between Diamond Shamrock (Australia) Pty. Ltd. and J.R. Courtenary Ltd.

236. Distributor Agreement dated September 1, 1983 between Diamond Shamrock (Australia) Pty. Ltd. and Robert Mayston, Marjorie Mayston, Robert William Mayston and Margaret Mayston

237. License and Technical Assistance Agreement dated July 1, 1971 between Diamond Shamrock Corporation and NOPCO Colombia, S.A.

238. License and Technical Assistance Agreement dated July 1, 1969 between NOPCO Chimie, S.A. and NOPCO Colombia, S.A.

239. Contract for Licensing and Technical Assistance dated July 1, 1971 between Diamond Shamrock Corporation and NOPCO Colombiana, S.A.

240. Agreement (Trademark) dated October 1, 1963 between NOPCO Chemical Company and NOPCO Munzing G.m.b.H

241. Pre-Right Declaration dated December 8, 1971 between Diamond Shamrock Corporation and Farbenverke Hoechrt Aktiengesellschaft

242. Agreement (Pre-License) dated April 10, 1986 between Diamond Shamrock Chemicals Company and Dr. Kaoru Harada (Possibility of Royalties)

[Misc. #5]    243. License Agreement, dated August 31, 1970, between Diamond Shamrock Corporation and Thiokol Chemical Corporation whereby Diamond grants certain Licenses to Thiokol

-20-

OCC033623

Confidential

[Misc. #7]     244.   License and Technical Assistance Agreement, dated January 1, 1986, between Diamond Shamrock Chemical Company and Diamond Shamrock Italia S.p.A.

[Misc. #9]     245.   License Agreement dated May 23, 1986 between Diamond Shamrock Chemicals Company and Lankro Chemicals Limited

[Misc. #11]    246.   Assignment, undated, between Nopco Chimie S.A. and Diamond Shamrock Corporation whereby Nopco assigns to Diamond all of its interest in and to a License and technical Assistance Agreement, dated January 1, 1969, between Nopco and Oriental Industries, Inc.

[Misc. #13]    247.   Trademark Agreement, dated January 1, 1986, between Diamond Shamrock Chemicals Company and Diamond Shamrock Italia S.p.A.

[Misc. #29]    248.   COHESS License Agreement, dated February 7, 1985, between Diamond Shamrock Corporation and Environmental Health Associates, Inc.

[Misc. #30]    249.   COHESS License Agreement, dated April 14, 1986, between Diamond Shamrock Corporation and IT Corporation, whereby Diamond grants to IT a limited nonexclusive and nontransferable license

[Misc. #38]    250.   Contract for Licensing and Technical Assistance effective from July 1, 1971 between Diamond Shamrock Corporation and Nopco Colombiana, S.A.

[Misc. #40]    251.   Trademark License Agreement, dated as of July 1, 1969, between Diamond Shamrock Corporation and Nopco Colombiana, S.A.

[Misc. #43]    252.   Agreement dated March 20, 1978 between Diamond Shamrock Corporation and Diamond Shamrock S.p.A. (f/k/a Nopco Italiana S.p.A.)

OCC033624

Confidential

OCCNJ0027067

ALCD-PUBCOM_0002945

[Misc. #44]   253.   Distributor and Sales Agency Agreement dated January 1, 1986 between Diamond Shamrock Chemicals Company and Diamond Shamrock Italia S.p.A. including grants of patents and licenses [Notice of change of control to be given with option to terminate]

[Misc. #45]   254.   Trademark Agreement dated January 1, 1986 between Diamond Shamrock Chemicals Company and Diamond Shamrock Italia S.p.A.

[Misc. #46]   255.   License and Technical Assistance Agreement dated January 1, 1986 between Diamond Shamrock Chemicals Company and Diamond Shamrock Italia S.p.A. and associated documents

[Misc. #51a]   256.   Trademark License Agreement, dated October 1, 1960, as amended, between Nopco Chemical Company and Nopco Industrial S.A.

[Misc. #52]   257.   Authorization Agreement, dated April 16, 1973, between Nopco Industrial, S.A. de C.V. and Christianson, S.A. de C.V.

[Misc. #53]   258.   Technical Assistance Agreement, dated January 1, 1971, between Diamond Shamrock Corporation and Christianson, S.A. de C.V.

[Misc. #54]   259.   Trademark License Agreement, dated January 1, 1971, between Diamond Shamrock Corporation and Christianson, S.A. de C.V.

[Misc. #61]   260.   Trademark Agreement, dated January 1, 1986, between Diamond Shamrock Chemicals Company and San Nopco Limited

[Misc. #62]   261.   Sales Representative's Agreement, dated November 1, 1973, between San Nopco Limited and Sam Mi Commercial Company

[Misc. #70]   262.   Letter of Understanding, dated October 1, 1984, between Diamond Shamrock Chemicals Company, Sanyo Chemicals Industries, Ltd. and San Nopco Ltd.

-22-

OCC033625

**Confidential**

**OCCNJ0027068**

ALCD-PUBCOM_0002946

[Misc. #71]      263.   Trademark Agreement dated as of August 1,
                        1986 between Diamond Shamrock Chemicals
                        Company and San Nopco Limited [Unexecuted]

[Misc. #98]      264.   Agreement, dated May 23, 1986, between
                        Lankro Chemicals Limited and Diamond
                        Shamrock Far East Limited

[Misc. #98a]     265.   Service Agreement dated December 1, 1985,
                        between Diamond Shamrock Chemicals Company
                        and Diamond Shamrock Far East Limited

[Misc. #99]      266.   Distributor and Sales Agency Agreement,
                        dated December 1, 1985, between Diamond
                        Shamrock Chemicals Company and Diamond
                        Shamrock Far East Limited

[Misc. #100]     267.   Distributor and Sales Agency Agreement,
                        dated December 1, 1985, between Diamond
                        Shamrock Chemicals Company and Diamond
                        Shamrock Far East Limited

[Misc. #101]     268.   Distributor and Sales Agency Agreement,
                        dated.December 1, 1985, between Diamond
                        Shamrock Chemicals and Diamond Shamrock Far
                        East Limited

[Misc. #108]     269.   Distributor and Sales Agency Agreement,
                        dated December 1, 1985, between Diamond
                        Shamrock Chemicals Company and the Japan
                        branch of Diamond Shamrock Pacific Ltd.

[Misc. #122a]    270.   Agreement dated October 1, 1979 between
                        Diamond Shamrock Corporation and Diamond
                        Shamrock Trading Corporation

[Misc. #123]     271.   Sales Agency Agreement, dated March 9,
                        1982, between Diamond Shamrock China
                        Limited and National Automatic Tool
                        Company, Inc.

[Misc. #154]     271.   License Agreement, dated January 1, 1963,
                        between Nopco Chimie S.A. and Nopco Hess
                        Ltd.

[Misc. #156]     272.   License & Technical Assistance Agreement,
                        not dated, between Diamond Shamrock Chimie,
                        S.A., and Especialidades y Tensioactivos,
                        S.A.

-23-

OCC033626

Confidential

OCCNJ0027069

ALCD-PUBCOM_0002947

[Misc. #160]    273.    License and Service Agreement, dated
July 29, 1958, between Nopco Chemical
Company and Nopco Chimie S.A. (with
schedules)

[Misc. #162]    274.    License and Technical Assistance Agreement,
dated December 17, 1978, between Diamond
Shamrock Corporation and Korea Potassium
Chemical Co., Ltd.

[Misc. #164]    275.    Undertaking, dated June 3, 1980, from
Diamond Shamrock Corporation to China
National Metals & Minerals, Import & Export
Corporation

[Misc. #165]    276.    Undertaking, dated January 23, 1979, from
Diamond Shamrock Corporation to
Pharmaceutical Laboratories

[Misc. #166]    277.    Letter Agreement, dated July 24, 1986,
between Diamond Shamrock Chemicals Company
- Process Chemicals Division and American
Cyanamid Company

[Misc. #167]    278.    Undertaking, dated September 7, 1978, from
Diamond Shamrock Corporation to
Roussel-Uclaf S.A.

[Misc. #168]    279.    Contract de License de Marques de Fabriqui,
dated May 14, 1975, between Diamond
Shamrock France S.A. and Especialidades y
Tensioactivoi, S.A. (Eytesa)

[Misc. #169]    280.    Technical Information and Assistance
Agreement, dated 1977, between Diamond
Shamrock Corporation and Diamond Shamrock
France S.A.

[Misc. #170]    281.    Agreement, dated February 4, 1980, between
Diamond Shamrock Corporation and Damialt
AG, and English translation

[Misc. #171]    282.    Counterdeclaration, dated September 6,
1976, between Diamond Shamrock Corporation
and AB Perplex

[Misc. #172]    283.    Verpflichtungs - und Vorrechtserklarung,
dated July 5, 1983

-24-

OCC033627

**Confidential**



[Misc. #173]    284.    Trademark Agreement, dated December 3, 1981, between American Grease Stick Company and Diamond Shamrock Corporation

[Misc. #174]    285.    Trademark Agreement, dated April 10, 1967, between Diamond Alkali Company and Bristol-Myers Company

[Misc. #175]    286.    Letter Agreement, dated May 2, 1961, between Diamond Alkali Company and Dearborn Chemical Company.

[Misc. #176]    287.    Agreement, dated January 20, 1976, between Diamond Shamrock Corporation and Opticians Association of America

[Misc. #177]    288.    Letter Agreement, dated May 23, 1986, between Diamond Shamrock Europe Limited and Chiocerite Limited

[Misc. #178]    289.    License Agreement Re HRC, dated as of March 1, 1973, between B. F. Goodrich Chemical Company and Diamond Shamrock Chemical Company

[Misc. #179]    290.    License Agreement, dated September 5, 1985, between Diamond Shamrock Chemicals Company and Environmental Research & Technology, Inc.

[Misc. #180]    291.    License Agreement, dated May 9, 1986, between Diamond Shamrock Chemicals Company and Environmental Research & Technology, Inc.

[Misc. #181]    292.    Agreement, dated October 4, 1976, between B. F. Goodrich Chemical Company and Diamond Shamrock Corporation with Letter Agreement amendment

[Misc. #182]    293.    Know-How and Technical Assistance Agreement, dated June 20, 1978, between Diamond Shamrock Corporation and Chlorine Engineers Corporation, with First Amendment to Agreement

-25-

OCC033628

**Confidential**

[Misc. #183]  294.  Manufacturing Agreement, dated August 7, 1981, between Diamond Shamrock (Australia) Pty. Ltd. and Hunter's Products Pty. Ltd.

[Misc. #184]  295.  Preliminary License of Technology, dated November 4, 1976, between Diamond Shamrock France and Diamond Shamrock Corporation

[Misc. #185]  296.  Agreement relating to U. K. Patent Application No. 80.07176 (Publication No. 2046778), dated April 18, 1983, between Ciba-Geigy AG and Diamond Shamrock Europe Limited

[Misc. #186]  297.  License Agreement dated January 12, 1983 between Eltech Systems Corporation and Diamond Shamrock Corporation.

[Misc. #187]  298.  Agreement dated October 11, 1977 between Diamond Shamrock Corporation and Sybron Corporation.

[Misc. #188]  299.  Letter License Agreement dated May 12, 1983 between Akzo Zout Chemie Nederland B.V. and Diamond Shamrock Corporation.

[Misc. #189]  300.  Manufacturing Agreement dated September 18, 1981 between Diamond Shamrock (Australia) Pty. Limited and Agchem Pty. Ltd.

[Misc. #190]  301.  Secrecy Agreement dated October 4, 1978 between Diamond Shamrock Corporation and White Chemical Corporation.

[Misc. #191]  302.  Agreement, dated July 2, 1979, between Diamond Shamrock (Australia) Pty. Limited and Taubmans Proprietary Limited.

[Misc. #192]  303.  Manufacturing Agreement, dated October 22, 1979, between Diamond Shamrock (Australia) Pty. Limited and Berger Paints (Australia) Pty. Limited (as amended).

[Misc. #193]  304.  Agreement, dated September 6, 1977, as amended, between Diamond Shamrock Corporation and Zimmer A.G.

-26-

OCC033629

**OCCNJ0027072**

ALCD-PUBCOM_0002950

[Misc. #220]    305.    Trademark Agreement, dated April 1, 1986, between Diamond Shamrock Chemicals Company and Andesud, S. A.

[Misc. #221]    306.    Non-Disclosure Agreement, dated October 22, 1982, between American Colloid and Diamond Shamrock Corporation.

[Misc. #222]    307.    Letter Agreement, dated March 5, 1986, between Diamond Shamrock Chemical Company and American Cyanamid Company.

[Misc. #223]    308.    Confidential Disclosure Agreement, dated August __, 1985, between Elmendorf Research, Inc. and Diamond Shamrock Chemicals Company.

[Misc. #224]    309.    Secrecy Agreement, dated January 1983, between Foseco, Inc. and Diamond Shamrock Corporation

[Misc. #225]    310.    Secrecy Agreement, dated Aug. 31, 1983, between Diamond Shamrock Corporation and Glassper Associates.

[Misc. #226]    311.    Letter Disclosure Agreement, dated March 23, 1984, between Halliburton Services and Diamond Shamrock Chemicals Company.

[Misc. #227]    312.    Standard Nondisclosure Agreement, dated May 14, 1984, between The Korex Company and Diamond Shamrock.

[Misc. #228]    313.    Agreement to Receive Confidential Littlefuse Information, not dated, between Littlefuse, Inc. and Diamond Shamrock.

[Misc. #229]    314.    Proprietary Information Agreement, dated February 26, 1986, between Diamond Shamrock Chemicals Company and Sievco.

[Misc. #230]    315.    Secrecy Agreement, dated December 2, 1982, between Diamond Shamrock Corporation and Silicon Technology.

[Misc. #231]    316.    Nondisclosure Agreement, dated August 11, 1986, between Colin A. Houston & Associates Inc. and Diamond Shamrock Chemicals Company.

-27-

OCC033630

Confidential

OCCNJ0027073

ALCD-PUBCOM_0002951

[Misc. #232]   317.   Confidentiality letter, dated June 18, 1986, between Hughes Drilling Fluids and Diamond Shamrock Chemicals Company.

[Misc. #233]   319.   Agreement, dated as of March 31, 1986, as amended between Economics Laboratory, Inc. and Diamond Shamrock Chemicals Company, with Exhibits.

[Misc. #243]   320.   Letter dated May 23, 1986 from Lankro Chemicals Limited to Diamond Shamrock Chemicals Company.

[Misc. #244]   321.   Letter dated May 23, 1986 from Diamond Shamrock Chemicals Company to Lankro Chemicals Limited.

[Misc. #245]   322.   Letter dated May 23, 1986 from Lankro Chemicals Limited to Diamond Shamrock Chemicals Company.

[Misc. #246]   323.   Letter dated May 23, 1986 from Diamond Shamrock Chemicals Company to Lankro Chemicals Limited.

[Misc. #247]   324.   Distributor and Sales Agency Agreement, undated, between Diamond Shamrock Chemicals Company and Diamond Shamrock Energy Services [Pending]

[Misc. #248]   325.   Heads of Agreement, dated as of January 2, 1986 between Diamond Shamrock Chemicals Company and Economics Laboratory, Inc.

[Misc. #257]   326.   EDC Technology License, dated November 27, 1985, between The B.F. Goodrich Company and Diamond Shamrock Chemicals Company

[Misc. #258]   327.   License Agreement, dated November 27, 1985, between The B.F. Goodrich Company and Diamond Shamrock Chemicals Company

               328.   Trademark License Agreement, dated November 15, 1984, between Diamond Shamrock Chemicals Company and INTEQUIM

               329.   License and Technical Assistance Agreement, dated November 15, 1984, between Diamond Shamrock Chemicals Company and INTEQUIM

-28-

OCC033631

Confidential

OCCNJ0027074

ALCD-PUBCOM_0002952

330. Sales Agency Agreement, dated May 1, 1986, between Diamond Shamrock Chemicals Company and Heriberto Cisneros Paz

331. License Agreement, dated January 24, 1985, between Diamond Shamrock Chemicals Company and American Petrofina of Texas

332. License and Technical Assistance Agreement, dated April 1, 1986, between Diamond Shamrock Chemicals Company and Andesud S.A.

333. Trademark Agreement, dated April 1, 1986, between Diamond Shamrock Chemicals Company and Andesud S.A.

334. Agreement, dated January 1, 1980, but executed April 21, 1980, between Calgon Corporation and Diamond Shamrock Corporation  [Royalty to be based on sales]

335. Agreement for Supply of Industrial Technology, dated February 1, 1985, between Diamond Shamrock Chemicals Company and Diamond Shamrock do Brazilia E Commercio Ltda.

336. License and Technical Assistance Agreement, dated February 1, 1985, between Diamond Shamrock Chemicals Company and Diamond Shamrock do Brazil Industra E Commercio Ltda.

337. Trademark License Agreement, dated February 1, 1985, between Diamond Shamrock Chemicals Company and Diamond Shamrock do Brazil Industra E Commercio Ltda.

338. Agreement, dated November 27, 1985, between Diamond Shamrock Chemicals Company and The B.F. Goodrich Company

339. EDC Technology License Agreement, dated November 27, 1985, between Diamond Shamrock Chemicals Company and The B.F. Goodrich Company

-29-

OCC033632

Confidential

OCCNJ0027075

ALCD-PUBCOM_0002953

340.  License and Technical Assistance Agreement, dated November 15, 1984, executed November 27, 1985, between Diamond Shamrock Chemicals Company and Ca Quimica Integrada 'Intequim'

341.  Trademark Agreement, dated July 9, 1986, between Diamond Shamrock Chemicals Company and Organik Kimya, Sanayi ve Ticharet A.S.

342.  License Agreement, dated May 23, 1986, between Diamond Shamrock Chemicals Company and Lankro Chemicals Ltd.

343.  License and Technical Assistance Agreement, dated March 11, 1986, between Diamond Shamrock Chemicals Company and Quimasoc Cia. Ltda

344.  License Agreement, dated March 27, 1986, between Diamond Shamrock Chemicals Company and Standard Chlorine of Delaware, Inc.

8714G

OCC033633

Confidential

OCCNJ0027076
ALCD-PUBCOM_0002954

<u>SCHEDULE 2.18</u>

Agreement,
Dated September 4, 1986 (the "Agreement"),
By and Among
Diamond Shamrock Corporation,
Occidental Petroleum Corporation,
Occidental Chemical Holding Corporation
and
<u>Oxy-Diamond Alkali Corporation</u>

<u>INSURANCE</u>

8725G

OCC033767

**Confidential**

OCCNJ0027077

ALCD-PUBCOM_0002955

## SCHEDULE 2.18

## INSURANCE*

| POLICY HOLDER | INSURER | TYPE | POLICY NUMBER** | EXPIRATION/ ANNIVERSARY DATE | LIMIT |
|---|---|---|---|---|---|
| Diamond Shamrock Corporation | Continental Casualty Co. | Adv. Liability | LSP3922666 | 11-19-86 | $1,000,000/occ |
| Diamond Shamrock Corporation | U.S. Aircraft Insurance Group | Aircraft Hull and Liability | 360AC-02985 | 02-19-88 | Hull: Various Ex. Exp. $2,500/day; $225,000/occ Lia. $200M csl Non-owned $200M csl M.P. $1,000 ea. person Hangarkeepers - $50M per airc $50M per occ |
| Diamond Shamrock Corporation | National Union Fire Insurance | Auto Liability (Texas) | GLA 1578763 | 07-01-87 | $1.5M/occ BI/PD |
| Diamond Shamrock Corporation | American Home Assurance Co. | Auto Liability (Canada) | GLA 4688179 | 07-01-87 | $1.5M/occ BI/PD |
| Diamond Shamrock Corporation | National Union Fire of Pittsburgh | Auto Liability (A/O/S) | BA 9199001 | 07-01-87 | $1.5M/occ BI/PD |
| Diamond Shamrock Corporation | Hartford Steam Boiler | Boiler and Machinery | SA7701112-01 | 11-01-87 | $75M w/sublimits |
| Diamond Shamrock Corporation | Greenstone Assurance Ltd. | Crime | 22022 | open | $250,000 xs 250,000 SIR $750,000 agg |
| Diamond Shamrock Corporation | Texas Pacific Ind. Co. | Crime | 8106-48-08 | open | $25M xs 500,000 |
| Diamond Shamrock Corporation | National Union Insurance Co. | Crime | 6347770 | open | $10M xs of 25M |
| Diamond Shamrock Corporation | Habor Insurance Co. | Directors and Officers | H1216840 | 01-31-87 | $5.0M |
| Diamond Shamrock Corporation | National Union Fire Insurance Co. | Directors and Officers | 3521426 | 01-31-87 | $15.0M xs 5M |
| Diamond Shamrock Corporation | Federal Insurance Co. | Directors and Officers | 8108486S8 | 01-31-87 | $10.0M xs 20M |
| Diamond Shamrock Corporation | London Companies | Directors and Officers | DX4145700 | 01-31-87 | $10.0M xs 30M |
| Diamond Shamrock Corporation | Greenstone Assurance Ltd. | Excess Liability | 22048 | 07-01-87 | $20M/occ xs primary - Applies only to Coal, R & M and Chemicals |

* See Part A of Schedule 2.15 for a list of certain additional insurance policies, which policies are incorporated herein by reference.

** These are main policy numbers only and do not include other ancillary policy numbers.

OCC033768

OCCNJ0027078
ALCD-PUBCOM_0002956

| POLICY HOLDER | INSURER | TYPE | POLICY NUMBER | EXPIRATION/ ANNIVERSARY DATE | LIMIT |
|---|---|---|---|---|---|
| Diamond Shamrock Corporation | Greenstone Assurance Ltd. | Excess Liability | 22032 | 07-01-87 | a) $20M/occ xs primary or $250,000 SIR (on oil and gas operations only) b) $25M/occ xs $75M/occ/agg c) $20M/ xs oil pollution cover |
| Diamond Shamrock Corporation | Greenstone Assurance Ltd. | Excess Liability | 22047 | 07-01-87 | $55M/occ xs $20M/occ |
| Diamond Shamrock Corporation | Greenstone Assurance Ltd. | Excess Liability | 22046 | 07-01-87 | $100M xs $100M/occ |
| Diamond Shamrock Corporation | Lloyds and London companies | Fiduciary Liability | 01396900 | 02-01-87 | $5.0M occ/agg |
| Diamond Shamrock Corporation | National Union Fire Insurance Co. | Fiduciary Liability | 1245204 | 02-01-87 | $15.0M xs 5.0M D/A |
| Diamond Shamrock Corporation | Texas Pacific Indemnity Co. | Fiduciary Liability | 8108-39-93 | 02-01-87 | $10.0M xs 20.0M D/A |
| Diamond Shamrock Corporation | Insurance Company of the State of Pennsylvania | Foreign DIC | IF-7524069 | 01-31-87 | various |
| Diamond Shamrock Corporation | Zurich Insurance Co. | Foreign/Gen Liability (DSC-Europe only) | 2,086.944 | 11-30-86 | $5.0M occ/agg |
| Diamond Shamrock Corporation | Zurich Insurance Co. | Foreign/Gen Liability (DSC-Europe only) | 2,091.739 | 11-30-86 | $15.0M xs 5.0M |
| Diamond Shamrock Corporation | Insurance Company of the State of Pennsylvania | Foreign WC/AL/EL/GL | 80-149379/ 83-4447 | 12-01-86 | WC-Statutory EL/AL/GL $1M occ/agg |
| Diamond Shamrock Corporation | Cabinet P.H. Martin | Foreign Cargo (DSC-Europe only) | 400.101 bis | open | various |
| Diamond Shamrock Corporation | National Union Fire Insurance Co. of Pittsburgh | General Liability | GLA 1578763 | 07-01-87 | Gen. & Cont. Liab. $1.5M/occ BI/PD $2.5M agg/PD |
| Diamond Shamrock Corporation | American Home Assurance Co. | General Liability (Canada) | GLA 4688180 | 07-01-87 | Prod. $2.5M/occ BI/PD $5.5M agg *** |

\*\*\* Included within the limits of policy GLA 1578763.

-2-

OCC033769

Confidential

| POLICY HOLDER | INSURER | TYPE | POLICY NUMBER | EXPIRATION/ ANNIVERSARY DATE | LIMIT |
|---|---|---|---|---|---|
| Diamond Shamrock Corporation | Greenstone Assurance Ltd. | Marine Cargo | 22010 | open | various |
| Diamond Shamrock Corporation | U.S. Fire Insurance Co. | Marine Hull and Liability | 349 008078 6 | 04-01-87 | Hull: agreed value LOLL $1M csl Charterer's/Cargo L.L. 1M csl |
| Diamond Shamrock Corporation | Greenstone Assurance Ltd. | Marine Liability | 22036 | 02-20-87 | P & I Unlimited Poll. $300M Tower's - $10M (Charter's - $50M Cargo L.L. $5M) |
| Diamond Shamrock Corporation | Greenstone Assurance Ltd. | Marine Liability | 22036F | 02-20-87 | Foreign P&I-Unltd Foreign Pollu.-$100M |
| Diamond Shamrock Corporation | Arkwright-Boston Insurance | MFP/DIC | 399113 | 05-01-87 | various |
| Diamond Shamrock Corporation | Greenstone Assurance Ltd. | Fire and E.C. | 22020 | 12-31-86 | various |
| Diamond Shamrock Corporation | Greenstone Assurance Ltd. | Political Risk | 22031 | 05-01-87 | $52,702,000 (net asset value) |
| Diamond Shamrock Corporation | Greenstone Assurance Ltd. | Property, Well Control, Pollution | 22024 | 12-31-86 | 9.0M x 1M occ |
| Diamond Shamrock Corporation | Greenstone Assurance Ltd. | Property, Well Control, Pollution | 22023 | 12-31-86 | $150M occx 10M $225M ann agg. |
| Diamond Shamrock Corporation | Arkwright-Boston Insurance | Rolling Stock | 390247 | 11-27-87 | $9M |
| Diamond Shamrock Corporation | Birmingham Fire Insurance Co. of Pennsylvania | WC/EL (AZ, ID, MD, OR) | WC7143660 | 07-01-87 | WC-Statutory; EL-$1M; U.S. L-Statu. Jones Act $1M occ/agg |
| Diamond Shamrock Corporation | National Union Fire Insurance Co. of Pittsburgh | WC/EL (All other states) | WC7143665 | 07-01-87 | WC-Statutory; EL-$1M; U.S. L-Statu. Jones Act $1M occ/agg |
| Carbocloro S.A. Industrias Quimicas | Companhia de Sequoros Alianca da Bahia | Plant, Fire and Explosion | 0.8641145.9 | 02-28-87 | CZ $18,528,575 (buildings and tanks) CZ $1,324,355,384 (mach., furn. & instal.) CZ $35,166,912 (merch. & raw mat.) |

-3-

OCC033770

Confidential

| POLICY HOLDER | INSURER | TYPE | POLICY NUMBER | EXPIRATION/ ANNIVERSARY DATE | LIMIT |
|---|---|---|---|---|---|
| Carbocloro S.A. Industrias Quimicas | Companhia de Sequoros Alianca da Bahia | Loss of Profits | 0.86060535.2 | 02-28-87 | CZ $159,101,000 (fire/lightning) CZ $159,101,000 (electrical damages) CZ $159,101,000 (explosion) |
| Carbocloro S.A. Industrias Quimicas | Companhia de Sequoros Alianca da Bahia | Headquarters Fire | 0.8641463.8 | 12-31-86 | CZ $1,530,000 (office, 8th Fl.) CZ $1,200,000 (office, 9th Fl.) CZ $900,000 (office, 12th Fl.) CZ $1,300,000 (office, 13th Fl.) |
| Carbocloro S.A. Industrias Quimicas | Companhia de Sequoros Alianca da Bahia | Third Party Liability | 0.8604848.5 | 12-31-86 | CZ $105,000,000 |
| Carbocloro S.A. Industrias Quimicas | Companhia de Sequoros Alianca da Bahia | Employee Fidelity | 0.8600327.4 | 12-31-86 | CZ $40,000 |
| Carbocloro S.A. Industrias Quimicas | Companhia de Sequoros Alianca da Bahia | Theft & Robbery - Goods in Transit | 0.8608878.8 | 12-31-86 | CZ $40,000 (plant) CZ $40,000 (office) |
| Carbocloro S.A. Industrias Quimicas | Companhia de Sequoros Alianca da Bahia | Automobile liability | 0.8558236.9 | 12-31-86 | CZ $19,758,400 (civil liability) CZ $1,342,578 (automobiles) |
| Diamond Shamrock (Australia) Pty. Limited | American Home Assurance Company | Industrial Special Risks | PDA 892 | 11-30-86 | various |
| Diamond Shamrock (Australia) Pty. Limited | American International Underwriters (Aust.) Pty. Ltd. | Boiler Explosion | VBMA 1268 | 11-30-86 | Replacement cost |
| Diamond Shamrock (Australia) Pty. Limited | American International Underwriters (Aust.) Pty. Ltd. | Overseas Marine Cargo | 34-11114-56 | open | A $125,000 per conveyance/location |
| Diamond Shamrock (Australia) Pty. Limited | American International Underwriters (Aust.) Pty. Ltd. | Inland Marine Cargo | 34-11113-56 | 11-30-86 | A $125,000 per conveyance/location |
| Diamond Shamrock (Australia) Pty. Limited | Commercial Union Assurance Company of (Aust.) Pty. Ltd. | Fidelity Guarantee | 14A 1299606 00 | 11-30-86 | A $10,000 any one employee A $10,000 all employees |

-4-

OCC033771

Confidential

| POLICY HOLDER | INSURER | TYPE | POLICY NUMBER | EXPIRATION/ ANNIVERSARY DATE | LIMIT |
|---|---|---|---|---|---|
| Diamond Shamrock (Australia) Pty. Limited | American International Underwriters (Aust.) Pty. Ltd. | Motor Vehicle | VA 3884 | 11-30-86 | US $1,000,000 |
| Diamond Shamrock (Australia) Pty. Limited | American International Underwriters (Aust.) Pty. Ltd. | Corporate Personal Accident & Travel | PAA 9443-9 | 11-30-86 | A $100,000/person; A $300,000/occ. |
| Diamond Shamrock (Australia) Pty. Limited | American Home Assurance Company | General and Products Liability | PRA 40025 | 11-30-86 | US $1,000,000 BI/PD |
| Diamond Shamrock (Australia) Pty. Limited | QBE Insurance Limited | Workers' Compensation (Employers Liability) | 35010037 | 11-30-86 | Statutory |
| Diamond Shamrock (Australia) Pty. Limited | American International Underwriters (Aust.) Pty. Ltd. | Workers' Compensation (Employers Liability - Extra Territorial) | WA 4059 | 11-30-86 | Statutory; A $200,000 common law |
| Diamond Shamrock Canada Ltd. | The Canada Life Assurance Company | Group Life | G.27983 | Open | various |
| Diamond Shamrock Canada Ltd. | The Canada Life Assurance Company | Group AD&D and Sickness | H.27983 | Open | various |
| Diamond Shamrock Chile S.A.I. | Compania de Seguros Consorcio Copseguros de Chile S.A. | 3rd Party Premises/Operations | 050224 | 11-01-86 | UF 48550. combined single limit |
| Diamond Shamrock Chile S.A.I. | La Interamericana | Computer All Risk | 1.057 | 10-03-86 | UF 2,625.76. (equip) UF 289.82 (data loss) |
| Diamond Shamrock Chile S.A.I. | La Interamericana | Property Damage | F-52.098 | 06-01-87 | UF 56,800. (buildings) UF 10,000. (mach. & equip) |
| Diamond Shamrock Chile S.A.I. | La Interamericana | Property Damage | F-52.099 | 06-01-87 | UF 552,200. (build & equip.) UF 117,000. (stock-floating) |
| Diamond Shamrock Chile S.A.I. | La Interamericana | Automobile | 12.012 | 06-01-87 | UF 500. BI & PD UF 4,382. collision, fire & theft |
| Diamond Shamrock Chile S.A.I. | La Interamericana | 3rd Party Premises/Operations/Products Liability | 2.566 | 06-01-87 | UF 1,251. combined single limit |
| Diamond Shamrock Chile S.A.I. | La Interamericana | Contractor Equipment All Risk | 1.035 | 06-01-87 | UF 3,000. BI & PD UF 20,235. collision, fire & theft |

-5-

OCC033772

Confidential

| POLICY HOLDER | INSURER | TYPE | POLICY NUMBER | EXPIRATION/ ANNIVERSARY DATE | LIMIT |
|---|---|---|---|---|---|
| Diamond Shamrock Chile S.A.I. | La Interamericana | Fidelity Bond | 10.035 | 07-28-87 | UF 4.890. |
| Diamond Shamrock Chile S.A.I. | La Interamericana | Maritime Transport | 34.593 | 06-01-87 | US $200,000 |
| Diamond Shamrock Chile S.A.I. | Cigna Compania de Seguros de Vida (Chile) S.A. | Group Life | 52.745 | 12-01-86 | life at 1x salary; death by working accident - 2x salary |
| Diamond Shamrock China Ltd. | Sentry Insurance Company (Asia) Limited | Group Deposit Administration (Retirement) | G593-P | open | N/A |
| Diamond Shamrock China Ltd. | Sentry Insurance Company (Asia) Limited | Group Health | 010-025-01 GH | 12-01 | life at 36x B.M.S. (Guar. Issue limit: HK $100,000) ADD at 36x B.M.S. |
| Diamond Shamrock China Ltd. | Sentry Insurance Company (Asia) Limited | Group Life | 010-025-02 GL | 12-01 | various |
| Diamond Shamrock China Ltd./ Diamond Shamrock Far East Ltd. | National Union Fire Insurance Company | Employee Compensation | C53-22560-K | 11-30-86 | Statutory |
| Diamond Shamrock China Ltd./ Diamond Shamrock Far East Ltd. | American International Assurance Company, Limited | Property All Risks | IN-390058-AR | 11-30-86 | HK $1,000,000 |
| Diamond Shamrock China Ltd./ Diamond Shamrock Far East Ltd. | American Home Assurance Company | Private Motor | 64-341586-KA | 11-30-86 | Unlimited BI HK $2.0M PD |
| Diamond Shamrock China Ltd./ Diamond Shamrock Far East Ltd. | National Union Fire Insurance Company | Property Damage/Burglary | NU-F-3822971 | 11-30-86 | HK $200,000 |
| Diamond Shamrock Eytesa, S.A. | Royal Insurance Company Limited | Fire | SF-24.651 | 11-30-86 | Pesetas 122,000,000 |
| Diamond Shamrock Eytesa, S.A. | Royal Insurance Company Limited | Lost Profit | SPL 2.248 | 11-30-86 (initial period) | Pesetas 316,400,000 (1986) Pesetas 340,700,000 (1987) |
| Diamond Shamrock Eytesa, S.A. | Zurich Compania de Seguros | 3rd Party Liability | 8509.12061-7 | 11-30-86 | Pesetas 50,500,000 |
| Diamond Shamrock Eytesa, S.A. | Royal Insurance Company Limited | Computer Damage | SMC 1434 | 12-01-86 | Pesetas 9,082,930 |

-6-

OCC033773

Confidential

OCCNJ0027083

ALCD-PUBCOM_0002961

| POLICY HOLDER | INSURER | TYPE | POLICY NUMBER | EXPIRATION/ ANNIVERSARY DATE | LIMIT |
|---|---|---|---|---|---|
| Diamond Shamrock Eytesa, S.A. | Commercial Union | Theft | 50-04-B006188 | 04-13-87 | Pesetas 200,000 (theft-petty cash) Pesetas 100,000 (theft-money cashed by lorry driver) Pesetas 250,000 (theft of cash in transit from bank to offices) |
| Diamond Shamrock Far East Ltd. | The Great Eastern Life Assurance Company Limited | Group Health | GS 255A | 11-30-86 | various |
| Diamond Shamrock Far East Ltd. | AIU (Singapore) Pte. Ltd. | Liability | 85-154138 | 11-30-86 | US $500,000 |
| Diamond Shamrock Far East Ltd. | American Home Assurance Company | Floater | 8026) | 01-31-87 | S $12,000 |
| Diamond Shamrock France | Societe Suisse | Employee life/Disability (nonexempt employees) | A.936.0012 | open | Life at 2x salary |
| Diamond Shamrock France | Societe Suisse | Employee medical (exempt employees) | A.936.0021 | open | various-medical, dental & disability |
| Diamond Shamrock France | Societe Suisse | Employee medical (nonexempt employees) | A.936.022 | open | various-medical, dental & disability |
| Diamond Shamrock France | Societe Suisse | Employee life/disability (exempt employees) | A.936.0011 | open | Life at 2x salary |
| Diamond Shamrock France | Royal Insurance Company Limited | Commercial-Multi-Risk-Fire | 6.965.281 H | 11-30-86 | FF 3,000,000 |
| Diamond Shamrock France | Royal Insurance Company Limited | Machines & Materials (EDP machines & software) | 070916148 | 11-30-86 | FF 898,000 (materials) FF 160,000 (reconstruction) FF 506,000 (extra expense) |
| Diamond Shamrock France | Societe' Lilloise d'Assurances | Automobile Liability | 7.900.393 | 11-30-86 | unlimited 3rd party liability FF 50,000 property damage |

-7-

OCC033774

Confidential

| POLICY HOLDER | INSURER | TYPE | POLICY NUMBER | EXPIRATION/ ANNIVERSARY DATE | LIMIT |
|---|---|---|---|---|---|
| Diamond Shamrock France | Societe' Lilloise d'Assurances | Automobile 3rd Party Liability, Fire & Theft | 7.882.938 | 11-30-86 | unlimited 3rd party liability PD, Fire & Theft as declared |
| Diamond Shamrock France | Groupe Zurich/France | General Third Party Liability | 1.6.558.957 F | 11-30-86 | FF 300,000 |
| Diamond Shamrock France | Groupe Saltiel | Fire Coverage | 8.002.458 | 11-30-86 | FF 59,000,000 |
| Diamond Shamrock France | Groupe Saltiel | Business Interruption | 8.002.459 | 11-30-86 | FF 120,000,000 |
| Diamond Shamrock France | Assurance Generales de France | Builders Risk--Warranty on Equipment | 250.008.980 | 08-24-95 | FF 6,845,000 |
| Diamond Shamrock France | Assurance Generales de France | Builders Risk--Warranty on addition to lab | 250.009.459 | 12-05-95 | FF 3,313,000 |
| Diamond Shamrock Europe Ltd. on behalf of all companies of Diamond Shamrock Corporation in Europe | Henri Jean et Cie | Stock and Transit | 400.101 bis | open | US $750,000 (in transit) US $8,000,000 (voluntary storage) US $1,000,000 (storage at carrier or customs) |
| Diamond Shamrock Pacific Ltd. | American International Assurance Co., Ltd. | Inland Floater | IF-2246488 | 12-31-86 | Yen 66.0M |
| Diamond Shamrock Pacific Ltd. | The Dai-ichi Mutual Life Insurance Company | Group Life | 08214380002 | 12-31-86 | 2 x salary (Yen 40.0M max.) |
| Diamond Shamrock Pacific Ltd. | American International Assurance Co., Ltd. | Comprehensive General Liability | L-0564429 | 01-01-87 | Yen 100.0M |
| Diamond Shamrock Pacific Ltd. | American International Assurance Co., Ltd. | Excess Workmen's Compensation | L-0564429 | 01-01-87 | various |
| Diamond Shamrock Pacific Ltd. | American International Assurance Co., Ltd. | Employer's Liability | C8221429 | 01-01-87 | Yen 100.0M occ Yen 50.0M per person |
| Diamond Shamrock Pacific Ltd. | Yasuda Fire & Marine Insurance Co., Ltd. | Loss of Income | 00398049 | 01-01-87 | various |

-8-

OCC033775

Confidential

| POLICY HOLDER | INSURER | TYPE | POLICY NUMBER | EXPIRATION/ANNIVERSARY DATE | LIMIT |
|---|---|---|---|---|---|
| Diamond Shamrock Pacific Ltd. | American International Assurance Co., Ltd. | Overseas Travel/Personal Accident | 2126913 | 01-01-87 | various |
| Diamond Shamrock Pacific Ltd. | American International Assurance Co., Ltd. | Money & Securities | BI086214 | 01-01-87 | Yen 700,000 |
| Diamond Shamrock Pacific Ltd. | Yasuda Fire & Marine Insurance Co., Ltd. | Transportation Insurance | 4526805 | 12-31-86 | Yen 1.0b promissory notes; Yen 1.2b checks |
| Diamond Shamrock Pacific Ltd. | American International Assurance Co., Ltd. | Automobile Insurance | 8223858 | 01-01-87 | Unlimited BD Yen 10.0M PD |
| Diamond Shamrock Pacific Ltd. | The British Insurance Group (Japan) | Ocean Marine Cargo | OP/71T/83/472 | open | various |
| Diamond Shamrock Pacific Ltd. | American International Assurance Co., Ltd. | Automobile | 9478705 | 06-16-87 | Unlimited BD Yen 10.0 PD |
| Diamond Shamrock Process Chemicals Ltd. | The Iron Trades Employers' Insurance Association Ltd. | Employers' Liability | EL 15484 | 12-31-86 | Unlimited BI |
| Diamond Shamrock Process Chemicals Ltd. | Zurich Insurance | Public/Product Liability | 1/29/22207350/A/OE | 12-31-86 | L250,000 |
| Diamond Shamrock Process Chemicals Ltd. | Sun Alliance & London Insurance Group | Medical & Emergency Travel Expenses | 931P311307 | 11-30-86 | L51,000 |
| Diamond Shamrock Process Chemicals Ltd. | Royal Insurance Group | Fire and Consequential Loss | Not Available | 11-30-86 | L1,579,225 (plant) L1,894,438 (bldgs.) L1,464,175 (conseq. loss) Declaration (gross profit) |
| Diamond Shamrock Process Chemicals Ltd. | Royal Insurance Group | Comprehensive Insurance--Motor Vehicles | ROD 137913 | 11-30-86 | vehicles--market value; unlimited 3rd party liability; unlimited passenger liability |
| Diamond Shamrock Process Chemicals Ltd. | Royal Insurance Group | Monies | 44-RKF 605605 | 11-29-86 | L25,000 maximum |

-9-

OCC033776

OCCNJ0027086
ALCD-PUBCOM_0002964

| POLICY HOLDER | INSURER | TYPE | POLICY NUMBER | EXPIRATION/ANNIVERSARY DATE | LIMIT |
|---|---|---|---|---|---|
| Diamond Shamrock Process Chemicals Ltd. | Lloyds Underwriters | All Risks—Lab equip. & office mach. | GNNHFX3 | 12-18-86 | various items as declared; total sum L295,930 |
| Diamond Shamrock Process Chemicals Ltd. | Eagle Star Insurance Group | Machinery Policy & Inspection | 41045719 | 01-01-87 | L100,000 any one accident on specified electrical & mechanical plant; L5,000 any one accident on specified items |
| Diamond Shamrock Process Chemicals Ltd. | British Engine Insurance Ltd. | Loss of Damage | Not Available | 11-30-86 | L500,000 any one accident |
| Diamond Shamrock Scandanavia A/S | Forsikrings - Aksjeselskapet Vega | Master Insurance (Transport, Storage and In Process Risks) | 164988 5007213386 | 12-31-86 | NOK 1M (per shipment) NOK 6M (storage) |
| Diamond Shamrock Scandanavia A/S | Forsikrings - Aksjeselskapet Vega | Business Interruption | 749794 | 11-30-86 | NOK 25M |
| Diamond Shamrock Scandanavia A/S | Forsikrings - Aksjeselskapet Vega | Fire | 749795 | 11-30-86 | NOK 19,642,000 |
| Diamond Shamrock Scandanavia A/S | Forsikrings - Aksjeselskapet Vega | Property (Office Equipment) | 07474350 | 11-30-86 | NOK 1,500,000 |
| Diamond Shamrock Scandanavia A/S | Forsikrings - Aksjeselskapet Vega | Property (EDP Equipment) | 07465262 | 11-30-86 | NOK 150,000 |
| Diamond Shamrock Scandanavia A/S | Forsikringsselskapet Zurich | Product Liability & Employee Health Risk | 40210 | 11-30-86 | US $300,000 |
| Diamond Shamrock Scandanavia A/S | Forsikring Norske Folk Norges Brannkasse -- UNI Polise Fosnyelse | Property (Leased EDP Equipment) | 0054 80001 90 | 09-30-87 | NOK 421,600 |
| Diamond Shamrock Scandanavia A/S | Forsikring Norske Folk Norges Brannkasse -- UNI Polise Fosnyelse | Group Life | 8359 | 11-30-86 | 2 × yearly salary |
| Diamond Shamrock Scandanavia A/S | Forsikringsselskapet Norge A/S | Against Embezzlement | 02270242 | 11-30-86 | NOK 200,000 per person |

-10-

OCC033777

Confidential

OCCNJ0027087
ALCD-PUBCOM_0002965

| POLICY HOLDER | INSURER | TYPE | POLICY NUMBER | EXPIRATION/ ANNIVERSARY DATE | LIMIT |
|---|---|---|---|---|---|
| Diamond Shamrock Scandanavia A/S | Forsikringsselkapet Norge A/S | Burglary/Robbery | 04881729 | 03-01-87 | NOK 1M/NOK 10,000 |
| Diamond Shamrock Scandanavia A/S | Forsikringsselkapet Norge A/S | Reactor Breakdown | 04900596 | 11-30-86 | Declaration |
| Diamond Shamrock Scandanavia A/S | Forsikringsselkapet Norge A/S | General Machine | 05017360 | 11-30-86 | NOK 6,475,000 |
| Diamond Shamrock Scandanavia A/S | Forsikringsselkapet Norge A/S | Travel Accident/Illness | 02270960 | 12-31-86 | NOK 300,000/ NOK 500,000 |
| Diamond Shamrock Scandanavia AB | Skandia | Travel Insurance | F 370200-7852-01 | 09-24-86 | SEK 500,000 (approx.) |
| Diamond Shamrock Scandanavia AB | Skandia | Office Equipment | F 307389-6883-01 | 05-23-87 | SEK 10,000 |
| Diamond Shamrock Scandanavia AB | Laensforsakringar | Sales Car Comprehensive | 1370655.2 | 10-01-86 | none expressed |
| Diamond Shamrock Scandanavia AB | Allmena Brand | Sales Car Comprehensive | M.15.831.434 | 06-01-87 | none expressed |
| Diamond Shamrock Taiwan Ltd./ Diamond Shamrock Trading Corp. | The Tai Ping Insurance Co., Ltd. | Industrial - All Risks | 4U-00210 | 11-30-86 | NT $111.0M |
| Diamond Shamrock Taiwan Ltd./ Diamond Shamrock Trading Corp. | The Tai Ping Insurance Co., Ltd. | Property Damage | 4U-00211 | 11-30-86 | NT $1.4M |
| Diamond Shamrock Taiwan Ltd. | The Tai Ping Insurance Co., Ltd. | Boiler | 2234 | 12-01-86 | NT $1.2M per occ |
| Diamond Shamrock Taiwan Ltd./ Diamond Shamrock Trading Corp. | The Tai Ping Insurance Co., Ltd. | Public Liability | PL-2446 | 11-30-86 | BI:NT $500,000 per person, NT $2.0M per accident; PD:NT $500,000 per accident |
| Diamond Shamrock Taiwan Ltd./ Diamond Shamrock Trading Corp. | The Tai Ping Insurance Co., Ltd. | Employer's Liability | EMP-548 | 12-01-86 | NT $1.0M per person NT $4.0M per occ |

-11-

OCC033778

Confidential

OCCNJ0027088
ALCD-PUBCOM_0002966

| POLICY HOLDER | INSURER | TYPE | POLICY NUMBER | EXPIRATION/ ANNIVERSARY DATE | LIMIT |
|---|---|---|---|---|---|
| Diamond Shamrock Taiwan Ltd./ Diamond Shamrock Trading Corp. | The Tai Ping Insurance Co., Ltd. | Money | M-1724 | 11-30-86 | NT $300,000 (per transit, 1x per month) NT $100,000 – Taipei NT $30,000-Chung Li (cash in safe) |
| Diamond Shamrock Taiwan Ltd./ Diamond Shamrock Trading Corp. | The Tai Ping Insurance Co., Ltd. | Blanket Fidelity | FB-74056 | 11-30-86 | NT $2,000,000 |
| Diamond Shamrock Taiwan Ltd./ Diamond Shamrock Trading Corp. | The Tai Ping Insurance Co., Ltd. | Excess Auto Liability | PL-2458 | 12-01-86 | NT $1,800,000 |
| Diamond Shamrock Taiwan Ltd./ Diamond Shamrock Trading Corp. | The Tai Ping Insurance Co., Ltd. | Motor Vehicle | 0300-0103413 | 11-30-86 | various |
| Diamond Shamrock Taiwan Ltd. | The Tai Ping Insurance Co., Ltd. | Inland Transit | 80/135400 | open | NT $750,000 |
| Diamond Shamrock Taiwan Ltd. | The Tai Ping Insurance Co., Ltd. | Marine Cargo | 1064 | open | various |
| Diamond Shamrock Taiwan Ltd./ Diamond Shamrock Trading Corp. | The First Life Insurance Co., Ltd. | Group Life, Medical and AD&D | GI-7022 | open | various |
| DIAPAR Diamond Shamrock (Brazil) | Nacional Companhia de Seguros | Automobile | 1020039184 | 02-13-87 | CZ $282,400 BI CZ $96,800 PD |
| DIAPAR Diamond Shamrock (Brazil) | Companhia de Seguros Alianca Da Bahia | Fire | 0.8540236.0 | 09-08-86 | CZ $150,000 |
| Thai-Diamond Shamrock Chrome, Ltd. | Thai Metropole Insurance & Warehouse Co., Ltd. | Comprehensive Vehicle | 402 | 12-31-86 | Thai Baht 1,000,000 |
| Thai-Diamond Shamrock Chrome, Ltd. | Thai Metropole Insurance & Warehouse Co., Ltd. | Fire and General | U 8529598 | 01-01-87 | Thai Baht 13,870,000 |

-12-

OCC033779

0127G

Confidential

OCCNJ0027089
ALCD-PUBCOM_0002967

| NAME OF PRINCIPAL ON BOND, OBLIGEE, DESCRIPTION | SURETY | BOND NO. | BOND AMOUNT | RENEWAL DATE |
|---|---|---|---|---|
| Diamond Shamrock Corporation State of NC, Sales Tax | St. Paul | 400 GJ 8554 | 1,000.00 | 11-17-86 |
| Diamond Shamrock Corporation USA, Bond of User of Specially Denatured Alcohol or Rum (Dupont Ave., Belle, WV) | St. Paul | 400 FE 5161 | 18,000.00 | 10-12-86 |
| Diamond Shamrock Corporation USA, Bureau of Land Mgmt. Bond Under Lease for Mining Sodium Deposits, Serial #0815F6, Wyoming | St. Paul | 400 EY 3420 | 10,000.00 | 08-01-86 |
| Diamond Shamrock Inc. City of Oxnard, CA, Subdivision Improvement Bond (Parcel Map 77-42) | St. Paul | 400 ES 3476 | 35,000.00 | 12-22-86 |
| Diamond Shamrock Corporation City of Oxnard, CA, Subdivision Improvement Bond (Tract No. 3544) | St. Paul | 400 FV 4370 | 75,000.00 | 12-22-86 |
| Diamond Shamrock Chemicals Company US Dept. of Interior, Sodium Mining Lease Bond, Serial #0309132 | Federal | 8092-30-99 | 10,000.00 | 11-23-86 |
| Diamond Shamrock Chemicals Company US Land Office #086530, Serial #W-086530, Bond Under Lease for Mining Sodium Deposits | Federal | 8100-78-03 | 5,000.00 | 11-11-86 |
| Diamond Shamrock Chemicals Company Lake Underground Storage Corp., et al. Bond on Temporary Restraining Order, Case No. 84 CIV 1441 | CNA | 930-37-48 | 1,000.00 | 03/20/87 |

-13-

OCC033780

Confidential

OCCNJ0027090

ALCD-PUBCOM_0002968

| NAME OF PRINCIPAL ON BOND, OBLIGEE, DESCRIPTION | SURETY | BOND NO. | BOND AMOUNT | RENEWAL DATE |
|---|---|---|---|---|
| Diana S. Limer State of WV, Notary Public Bond | CNA | 922-30-36 | 500.00 | 02-26-95 |
| Diamond Shamrock Canada Ltd. Her Majesty the Queen, Wholesaler's Sales Tax Bond | CNA | 8300894 | 25,000.00 | 11-15-86 |
| Diamond Shamrock Canada Ltd. Her Majesty the Queen, Excise Tax Bond | CNA | 8300895 | 1,000.00 | 11-15-86 |
| Diamond Shamrock Chemicals Company Harris County, TX, Perpetual Bond Covering All Pipeline and/or Main Activity In, Under, Across or Along Harris County Road | St. Paul | 400 DS 4489 | 10,000.00 | 07-10-86 |
| Diamond Shamrock Chemicals Company Harris County, TX, Perpetual Bond Covering All Pipeline and/or Main Activity In, Under, Across or Along Harris County Road | St. Paul | 400 DS 4604 | 15,000.00 | 06-21-86 |
| Diamond Shamrock Corporation (Gulf Coast Region) Harris County, TX, Perpetual Bond Covering All Pipeline and/or Main Activity In, Under, Across or Along Harris County Road | CNA | 930-46-20 | 5,000.00 | 03-18-87 |
| Everett Leo Beenan Harris County Judge, TX, Bond of County Public Weigher or Deputy Public Weigher | CNA | 922-30-25 | 2,500.00 | 01-01-87 |

-14-

OCC033781

Confidential

OCCNJ0027091

ALCD-PUBCOM_0002969

| NAME OF PRINCIPAL ON BOND, OBLIGEE, DESCRIPTION | SURETY | BOND NO. | BOND AMOUNT | RENEWAL DATE |
|---|---|---|---|---|
| Robert Edward McAnaney Harris County Judge, TX, Bond of County Public Weigher or Deputy Public Weigher | CNA | 922-30-26 | 2,500.00 | 01-01-87 |
| Jerry Lee Roop Harris County Judge, TX, Bond of County Public Weigher or Deputy Public Weigher | CNA | 922-30-27 | 2,500.00 | 01-01-87 |
| Willis DeCosta Abrams Harris County Judge, TX, Bond of County Public Weigher or Deputy Public Weigher | CNA | 922-30-28 | 2,500.00 | 01-01-87 |
| Robert Millar Baker Harris County Judge, TX, Bond of County Public Weigher or Deputy Public Weigher | CNA | 922-30-29 | 2,500.00 | 01-01-87 |
| Kendall Lee Brincefield Harris County Judge, TX, Bond of County Public Weigher or Deputy Public Weigher | CNA | 922-30-30 | 2,500.00 | 01-01-87 |
| Dennis Wayne Amos Harris County Judge, TX, Bond of County Public Weigher or Deputy Public Weigher | CNA | 922-30-31 | 2,500.00 | 01-01-87 |
| John Douglas Boulet, Sr. Harris County Judge, TX, Bond of County Public Weigher or Deputy Public Weigher | CNA | 922-30-32 | 2,500.00 | 01-01-87 |

- 15 -

OCC033782

Confidential

OCCNJ0027092

ALCD-PUBCOM_0002970

| NAME OF PRINCIPAL ON BOND, OBLIGEE, DESCRIPTION | SURETY | BOND NO. | BOND AMOUNT | RENEWAL DATE |
|---|---|---|---|---|
| Charles T. Brooks Harris County Judge, TX, Bond of County Public Weigher or Deputy Public Weigher | CNA | 922-42-35 | 2,500.00 | 01-01-87 |
| Rafeal E. Flores Harris County Judge, TX, Bond of County Public Weigher or Deputy Public Weigher | CNA | 922-42-36 | 2,500.00 | 01-01-87 |
| Diamond Shamrock Chemicals Company USA, Bond of User of Specially Denatured Alcohol or Rum, Permit Premises: 725 State Road, Ashtabula, OH | Federal | 8094-28-75 | 100,000.00 | 12-01-86 |
| John R. Ruggirello USA, Bureau of Land Mgmt, Bond Under Lease for Mining Deposits (Serial #018579) | St. Paul | 400 GP 4859 | 10,000.00 | 12-01-86 |
| Diamond Shamrock Chemicals Company USA, Bureau of Land Mgmt, Bond Under Lease for Mining Deposits (Serial #079652) | St. Paul | 400 GP 4864 | 10,000.00 | 11-11-86 |
| John R. Ruggirello US Dept. of Interior, Bureau of Land Mgmt, Sodium Mining Lease (Lease No. 079653) | Federal | 8092-31-00 | 10,000.00 | 11-11-86 |
| Diamond Shamrock Chemicals Company State of IL, Highway Permit, Excessive Weight, Permit No. 6-20256, FA Route 5, Logan County | CNA | 930-45-78 | 10,000.00 | 06-12-86* |

*Proposed to be closed

-16-

OCC033783

OCCNJ0027093

ALCD-PUBCOM_0002971

| NAME OF PRINCIPAL ON BOND, OBLIGEE, DESCRIPTION | SURETY | BOND NO. | BOND AMOUNT | RENEWAL DATE |
|---|---|---|---|---|
| Diamond Shamrock Chemicals Company Passiac Valley Water Commission, Supply Liquid Chlorine Contract #85-B-32 | CNA | 930-46-06 | 348,700.00 | Expires at completion of delivery of chlorine, release needed |
| Diamond Shamrock Chemicals Company State of GA, Certified Public Weigher | CNA | 930-46-18 | 1,000.00 | 02-13-87 |
| Diamond Shamrock Chemicals Company State of OH, Well Plugging Blanket Bond | CNA | 930-46-32 | 15,000.00 | 02-07-87 |
| Diamond Shamrock Chemicals Company US Dept. of Interior, Bureau of Land Mgmt, Lease for Mining Sodium Deposits (Serial #W-77104) | CNA | 930-46-43 | 10,000.00 | 06-20-87 |
| Diamond Shamrock Chemicals Company US Dept. of Interior, Bureau of Land Mgmt, Lease for Mining Sodium Deposits (Serial #W-77103) | CNA | 930-36-44 | 10,000.00 | 06-20-87 |
| Diamond Shamrock Corporation Customs/Import Bond (Diamond Shamrock Corporation is included with all operating companies) | CNA | 922-4229 | 1,800,000.00 | Continuous |

-17-

8412G

OCC033784

Confidential

OCCNJ0027094

ALCD-PUBCOM_0002972

LETTERS OF CREDIT
(Diamond Shamrock Chemicals Company)

| Bank | L/C Number | Beneficiary | Amount | Exp. Date | Plant Location or Job Number |
|------|------------|-------------|--------|-----------|------------------------------|
| InterFirst | 54906 | NJDEP | 4,000,000.00 | 05/02/87 | Newark |
| InterFirst | 52060 | NJDEP | $12,000,000.00 | 04/11/87 | Newark |
| Midlantic | 500087 | NJDEP | 135,949.00 | 06/15/87 | Carlstadt, Harrison, Jersey City, Morristown |
| MidlantiC | 500206 | NJDEP | 367,300.00 | 05/14/87 | Hudson County, NJ |
| NBC, San Antonio | C4160 | Alabama Dept. of Env. Management | 1,590,003.00 | 06/18/87 | Muscle Shoals, Mobile |
| NBC, San Antonio | C4166 | WV Dept. of Natural Resources | 21,437.00 | 06/18/87 | Belle Plant, WV |
| NBC, San Antonio | C4164 | Texas Dept. of Water Resources | 3,390,937.00 | 06/18/87 | La Porte, Deer Park |
| NBC, San Antonio | C4163 | Texas Dept. of Water Resources | 11,100.00 | 06/18/87 | Deer Park |
| NBC, San Antonio | C4161 | Ohio EPA - Div. of Haz. Mat. Mgt. | 112,580.00 | 06/18/87 | Ashtabula, Chardon |
| NBC, San Antonio | C4168 | Delaware Dept. of Natural Res. & Env. Control | 2,777,169.00 | 06/18/87 | Delaware City |

** Diamond Shamrock Process Chemicals has the authority to open letters of credit for $150,000.00 or less. Most are to Cathay Chemical Works Inc. or Toyo Menka Kaisah Ltd.

-18-

OCC033785

Confidential

OCCNJ0027095
ALCD-PUBCOM_0002973

## LETTERS OF CREDIT
(Diamond Shamrock Taiwan Ltd.)

| | | | | | |
|---|---|---|---|---|---|
| Irving Trust Company | 6H1/01117 | Emery Chemicals | $4,341.90 | 8/31/86 | Raw materials import |
| Irving Trust Company | 6H1/01118 | Emery Chemicals | $2,749.50 | 8/15/86 | Raw materials import |

-19-

8433G

OCC033786

Confidential

OCCNJ0027096

ALCD-PUBCOM_0002974

## GUARANTEES

| Borrower | Bank/Creditor/Bondholder | Type of facility | Amount |
|---|---|---|---|
| Diamond Shamrock (Africa) (Pty) Ltd. | Barclays National Bank | Working Capital | 50,000 SAR |
| Diamond Shamrock De Chile S.A.I. | Bank of Boston | Term Loan | 8,000,000 US |
| Diamond Shamrock Pacific | Bank of America<br>Fuji Bank<br>Bank of Tokyo | Working Capital<br>Working Capital<br>Working Capital | 1,230,000 US<br>10,000,000 YEN<br>10,000,000 YEN |
| Diamond Shamrock Scandinavia A/S | Senko Kjemisk | Cancellation Agreement | 3,605,000 NKr |
| Carbocloro S.A. Industrias Quimicas | Citibank (Lead) | Credit Agreement | 50,000,000 US |
| Diamond Shamrock Corporation | Bondholder | Industrial Development Board of City of Muscle Shoals Pollution Control Revenue Bonds, Series 1974 | 2,300,000 US |
| Diamond Shamrock Corporation | Bondholder | Industrial Development Board of the City of Muscle Shoals Revenue Bonds, Series 1974 | 2,000,000 US |
| Diamond Shamrock Corporation | Bondholder | County Commission of Kanawha County West Virginia Environmental Improvement Revenue Bonds, Series 1979 | 1,000,000 US |

-20-

OCC033787

Confidential

OCCNJ0027097
ALCD-PUBCOM_0002975

| Borrower | Bank/Creditor/Bondholder | Type of Facility | Amount |
|---|---|---|---|
| Diamond Shamrock Corporation | Bondholder | Niagara County Industrial Development Agency Industrial Development Revenue Bonds, Series 1981 | 2,800,000 US |
| Diamond Shamrock Chemicals Company | Bondholder | The New Hanover Industrial Facilities and Pollution Control Financing Authority Pollution Control Revenue Bonds, Series 1981 and the Industrial Development Revenue Bonds, Series 1981 | 4,600,000 US 1,000,000 US |
| Diamond Shamrock Chemicals Company | Bondholder | South Louisiana Port Commission Port Facilities Revenue Bonds, Series 1981 | 27,000,000 US |
| Diamond Shamrock Chemicals Company | Bondholder | Parish of St. James, State of Louisiana Pollution Control Revenue Bonds, Series 1981 | 19,000,000 US |
| Diamond Shamrock Chemicals Company | Bondholder | Parish of St. James, State of Louisiana Industrial Revenue Bonds Series 1982 | 1,000,000 US |

Consent and Indemnification Agreement, dated as of November 27, 1985 by and among International Business Machines Corporation, Convent Chemical Corporation, The B. F. Goodrich Company, Diamond Shamrock Chemical Company and Diamond Shamrock Corporation.

-21-

8435G

OCC033788

Confidential

OCCNJ0027098

ALCD-PUBCOM_0002976

<u>SCHEDULE 2.18</u>

<u>Insurance</u>

    Attached hereto is a description of certain policies and binders (other than Current Policies) providing coverage for certain DSCC Companies.

8494G

OCC033789

**Confidential**

OCC033790

Schedule 2.18

Diamond Shamrock Corporation

Structure of Excess Coverage
for Comprehensive General
Liability Insurance Program

revised June 4, 1986

Confidential

OCC033791

# DIAMOND SHAMROCK CORPORATION

## Excess Liability Program
### Pre-1960

[Add information as becomes available]

DIAMOND SHAMROCK CORPORATION

Excess Liability Program
2/14/60 to 2/1/63

| Layer | Layer Limit | Period Covered | Insurer | Policy Number | Layer Percent | Policy Available(?) | Policy Limit |
|---|---|---|---|---|---|---|---|
| 1 | 400,000 xs primary | 2/14/60-2/1/63 2/1/60-2/1/63 | London American Re | 514091 6031-0001 | 95% 5% | N Y | 380,000 20,000 |
| 2 | 600,000 xs 400,000 xs primary | 2/14/60-2/1/63 2/1/60-2/1/63 | London American Re | 514092 6031-0001 | 87.5% 12.5% | N Y | 525,000 75,000 |
| 3 | 2,000,000 xs 1,000,000 xs primary | [2/14/60-2/1/63 | Diamond (Gap) | N/A | 100% | N/A | 2,000,000] |
| 4 | 5,000,000 xs 3,000,000 xs primary | 2/14/60-2/1/63 | London | 514094 | 100% | N | 5,000,000 |

Total all layers
8,000,000

OCC0337192

Confidential

OCCNJ0027102
ALCD-PUBCOM_0002980

DIAMOND SHAMROCK CORPORATION

Excess Liability Program
2/1/63 to 2/1/66

| Layer | Layer Limit | Period Covered | Insurer | Policy Number | Layer Percent | Policy Available(?) | Policy Limit |
|-------|-------------|----------------|---------|---------------|---------------|---------------------|--------------|
| 1 | 3,000,000 xs primary | 2/1/63-66 | American Re | 6031-0002 | 100% | Y | 3,000,000 |
| 2 | 5,000,000 xs 3,000,000 xs primary | 2/1/63-66 | General Re | X-3393 | 100% | Y | 5,000,000 |
| 3 | 2,000,000 xs 8,000,000 xs primary | 2/1/63-66 | American Re | 6031-0003 | 100% | Y | 2,000,000 |

Total all layers
10,000,000

OCC033793

Confidential

DIAMOND SHAMROCK CORPORATION

Excess Liability Program
2/1/66 to 2/1/69

| Layer | Layer Limit | Period Covered | Insurer | Policy Number | Layer Percent | Policy Available(?) | Policy Limit |
|---|---|---|---|---|---|---|---|
| 1 | 3,000,000 xs primary | 2/1/66-69 | American Re | 6031-0004 | 100% | Y | 3,000,000 |
| 2 | 5,000,000 xs 3,000,000 xs primary | 2/1/66-69 | General Re | X-4095 | 100% | Y | 5,000,000 |
| 3 | [2,000,000]xs 8,000,000 xs primary | 2/1/66-69 | American Re | 6031-0005 | [100%] | Y | [2,000,000] |
| | Total all layers [10,000,000] | | | | | | |

[illegible] Limit of liab. set is missing from policy. Assume same limit as 63/66 period [illegible]

OCC033794

**DIAMOND SHAMROCK CORPORATION**

Excess Liability Program
3/1/69 to 3/1/72

| Layer | Layer Limit | Period Covered | Insurer | Policy Number | Layer Percent | Policy Available(?) | Policy Limit |
|---|---|---|---|---|---|---|---|
| 1 | 3,000,000 xs primary | 3/1/69-72 / 3/1/69-72 | North Star / Home | NSX7595 / HEC9304983 | 33.3% / 66.7% | Y / Y | 1,000,000 / 2,000,000 / 3,000,000 |
| 2 | 5,000,000 xs 3,000,000 xs primary | 3/1/69-72 | American Re | C0096213 | 100% | Y | 5,000,000 |
| 3 | 5,000,000 xs 8,000,000 xs primary | 3/1/69-4/1/72 / 3/1/69-72 | Employers' Liab. / American Home | E168172005 / CE355581 | 80% / 20% | Y / Y | 4,000,000 / 1,000,000 / 5,000,000 |
| 4 | 5,000,000 xs 13,000,000 xs primary | [3/1/69-4/8/69 / 4/9/69-4/1/72 / 3/1/69-72 / 3/1/69-72 | Diamond (Gap) / Employers' Liab. / Home / North Star | N/A / E168172007 / HEC9305177 / NSX7596 | 20% / 20% / 40% / 40% | N/A / Y / Y / Y | 1,000,000] / 1,000,000 / 2,000,000 / 2,000,000 / 5,000,000 |
| 5 | 2,000,000 xs 18,000,000 xs primary | 3/5/69-3/1/72 | Fireman's Fund | XLX1027808 | 100% | Y | 2,000,000 |
| 6 | 5,000,000 xs 20,000,000 xs primary | 1/1/70-3/1/72 | London | 56404 | 100% | N | 5,000,000 |

Total all layers
25,000,000

OCC033795

DIAMOND SHAMROCK CORPORATION

Excess Liability Program
3/1/72 to 3/1/75

| Layer | Layer Limit | Period Covered | Insurer | Policy Number | Layer Percent | Policy Available(?) | Policy Limit |
|---|---|---|---|---|---|---|---|
| 1 | 3,000,000 xs primary | 3/1/72-4/1/72<br>3/1/72-4/1/72 | Home<br>North Star | IIEC4165907<br>NSX10561 | 66.7%<br>33.3% | Y<br>Y | 2,000,000<br>1,000,000<br>3,000,000 |
|  |  | 4/1/72-3/1/75 |  |  |  |  |  |
| 2 | 5,000,000 xs 3,000,000 xs primary | 3/1/72-75 | Home | IIEC4165907 | 100% | Y | 3,000,000 |
|  |  |  | American Re | C0716074 | 100% | Y | 5,000,000 |
| 3 | 5,000,000 xs 8,000,000 xs primary | 4/1/72-3/1/75<br>4/1/72-3/1/75<br>3/1/72-75 | Lexington<br>First State<br>American Home | GC403227<br>920506<br>CE2692346 | 40%<br>40%<br>20% | Y<br>Y<br>Y | 2,000,000<br>2,000,000<br>1,000,000<br>5,000,000 |
| 4 | 5,000,000 xs 13,000,000 xs primary | 3/1/72-75<br>4/1/72-3/1/75<br>3/1/72-75 | North Star<br>First State<br>Home | NSX10419<br>920507<br>IIEC4356201 | 40%<br>20%<br>40% | Y<br>Y<br>Y | 2,000,000<br>1,000,000<br>2,000,000<br>5,000,000 |
| 5 | 2,000,000 xs 18,000,000 xs primary | 3/1/72-75 | Fireman's Fund | XLX1027808 | 100% | Y | 2,000,000 |



OCC033796

## 3/1/72 to 3/1/75 (continued)

| Layer | Layer Limit | Period Covered | Insurer | Policy Number | Layer Percent | Policy Available(?) | Policy Limit |
|---|---|---|---|---|---|---|---|
| 6 | 5,000,000 xs | [3/1/72-4/30/72] | Diamond (Gap) | N/A | 100% | N/A | 5,000,000] |
|  | 20,000,000 xs | 5/1/72-3/1/75 | Lexington | GC403227 | 80% | Y | 4,000,000 |
|  | primary | 5/1/72-3/1/75 | North Star | NSX10418 | 20% | Y | 1,000,000 |
|  |  |  |  |  |  |  | 5,000,000. |

Total all layers
25,000,000

OCC033797

Confidential

OCCNJ0027107

ALCD-PUBCOM_0002985

DIAMOND SHAMROCK CORPORATION

Excess Liability Program
3/1/75 to 3/1/76

| Layer | Layer Limit | Period Covered | Insurer | Policy Number | Layer Percent | Policy Available(?) | Policy Limit |
|---|---|---|---|---|---|---|---|
| 1 | 3,000,000 xs primary | 3/1/75-3/8/76 | Aetna | 01XN7055CA | 100% | Y | 3,000,000 |
| 2 | 5,000,000 xs 3,000,000 xs primary | 3/1/75-76 | London | UGL0355 | 100% | Y | 5,000,000 |
| 3 | 5,000,000 xs 8,000,000 xs primary | 3/1/75-76 3/1/75-76 3/1/75-4/1/76 | Lexington First State American Home | GC5504639 921614 CE3452345 | 40% 40% 20% | Y Y Y | 2,000,000 2,000,000 1,000,000 5,000,000 |
| 4 | 5,000,000 xs 13,000,000 primary | 3/1/75-76 | Aetna | 01XN706WCA | 100% | Y | 5,000,000 |
| 5 | 7,000,000 xs 18,000,000 xs primary | 3/1/75-4/1/76 3/1/75-4/1/76 3/1/75-76 | Fireman's Fund North Star Lexington | XLX1051114 NSX128O3 GC5504639 | 28.57% 14.29% 57.14% | Y Y Y | 2,000,000 1,000,000 4,000,000 7,000,000 |
| 6 | 10,000,000 xs 25,000,000 xs primary | 3/13/75-76 3/13/75-76 3/13/75-76 | Aetna Lexington First State | 01XN721WCA GC5504640 921771 | 70% 20% 10% | Y Y Y | 7,000,000 2,000,000 1,000,000 10,000,000 |

OCC033798

3/1/75 to 3/1/76 (continued)

| Layer | Layer Limit | Period Covered | Insurer | Policy Number | Layer Percent | Policy Available(?) | Policy Limit |
|---|---|---|---|---|---|---|---|
| 7 | 15,000,000 xs 35,000,000 xs primary | 3/13/75-76 | Aetna | 01XN722WCA | 53.33% | Y | 8,000,000 |
| | | 3/13/75-76 | North Star | NSX12802 | 13.33% | Y | 2,000,000 |
| | | 3/13/75-76 | First State | 921770 | 6.67% | Y | 1,000,000 |
| | | 3/13/75-76 | Fireman's Fund | XLX1051112 | 26.67% | Y | 4,000,000 |
| | | | | | | | 15,000,000 |
| 8 | 10,000,000 xs 50,000,000 xs primary | [4/21/75-6/18/75] | Diamond (Gap) | N/A | 53% | N/A | 5,300,000] |
| | | 6/19/75-3/1/76 | Aetna | 01XN872WCA | 43% | Y | 4,300,000 |
| | | 4/21/75-3/1/76 | London | UGL0602 | 47% | Y | 4,700,000 |
| | | 6/19/75-3/1/76 | Ranger | EU630328 | 10% | Y | 1,000,000 |
| | | | | | | | 10,000,000 |
| 9 | 15,000,000 xs 60,000,000 xs primary | [4/21/75-6/18/75] | Diamond (Gap) | N/A | 59% | N/A | 8,850,000] |
| | | 6/19/75-3/1/76 | Midland | XL145567 | 45.67% | Y | 6,850,000 |
| | | 6/19/75-4/1/76 | American Home | SCLE8065396 | 13.33% | Y | 2,000,000 |
| | | 4/21/75-4/21/76 | London | UGL0601 | 41% | Y | 6,150,000 |
| | | | | | | | 15,000,000 |

Total all layers
75,000,000

OCC003799

Confidential

OCCNJ0027109
ALCD-PUBCOM_0002987

DIAMOND SHAMROCK CORPORATION

Excess Liability Program
3/1/76 to 3/1/77

| Layer | Layer Limit | Period Covered | Insurer | Policy Number | Layer Percent | Policy Available(?) | Policy Limit |
|---|---|---|---|---|---|---|---|
| 1 | 3,000,000 xs primary | 3/8/76-3/1/77 | Aetna | 01XN985SCA | 60% | Y | 1,800,000 |
|  |  | 3/8/76-3/1/77 | London | UHLO298 | 40% | Y | 1,200,000 |
|  |  |  |  |  |  |  | 3,000,000 |
| 2 | 5,000,000 xs 3,000,000 xs primary | 3/1/76-77 | London | UGLO355 | 100% | Y | 5,000,000 |
| 3 | 5,000,000 xs 8,000,000 xs primary | 4/1/76-3/1/77 | Prudential | DXC901087 | 20% | Y | 1,000,000 |
|  |  | 3/1/76-77 | Lexington | CG5503013 | 40% | Y | 2,000,000 |
|  |  | 3/1/76-77 | First State | 922678 | 40% | Y | 2,000,000 |
|  |  |  |  |  |  |  | 5,000,000 |
| 4 | 5,000,000 xs 13,000,000 xs primary | 3/1/76-77 | Aetna | 01XN706WCA | 100% | Y | 5,000,000 |
| 5 | 7,000,000 xs 18,000,000 xs primary | 3/1/76-77 | Lexington | GC5503013 | 57.14% | Y | 4,000,000 |
|  |  | 4/1/76-3/1/77 | Granite State | SCLE8093019 | 14.29% | Y | 1,000,000 |
|  |  | 4/1/76-3/1/77 | National Union | 1189129 | 14.29% | Y | 1,000,000 |
|  |  | 4/1/76-3/1/77 | Prudential | DXC901088 | 14.29% | Y | 1,000,000 |
|  |  |  |  |  |  |  | 7,000,000 |

OCC033800

Confidential

3/1/76 to 3/1/77 (continued)

| Layer | Layer Limit | Period Covered | Insurer | Policy Number | Layer Percent | Policy Available(?) | Policy Limit |
|---|---|---|---|---|---|---|---|
| 6 | 10,000,000 xs | 3/13/76-77 | First State | 922600 | 10% | Y | 1,000,000 |
| | 25,000,000 xs | 3/13/76-77 | Aetna | 01XN721WCA | 70% | Y | 7,000,000 |
| | | | | | | | 10,000,000 |
| 7 | 15,000,000 xs | 3/13/76-77 | Aetna | 01XN722WCA | 53.33% | Y | 8,000,000 |
| | 35,000,000 xs | 3/13/76-77 | Fireman's Fund | XLX1051112 | 26.67% | Y | 4,000,000 |
| | primary | 3/13/76-77 | First State | 922679 | 6.67% | Y | 1,000,000 |
| | | 3/13/76-77 | North Star | NSX12802 | 13.33% | Y | 2,000,000 |
| | | | | | | | 15,000,000 |
| 8 | 10,000,000 xs | 3/1/76-77 | London | UGL0602 | 47% | Y | 4,700,000 |
| | 50,000,000 xs | 3/1/76-77 | Aetna | 01XN872WCA | 43% | Y | 4,300,000 |
| | primary | 3/1/76-77 | Ranger | EU630328 | 10% | Y | 1,000,000 |
| | | | | | | | 10,000,000 |
| 9 | 15,000,000 xs | 3/1/76-77 | Midland | XL145567 | 45.67% | Y | 6,850,000 |
| | 60,000,000 xs | 4/1/76-3/1/77 | American Home | SCLE8005396 | 6.67% | Y | 1,000,000 |
| | primary | 4/1/76-4/1/77 | Hartford | 10XS100057 | 6.67% | Y | 1,000,000 |
| | | 4/21/76-4/21/77 | London | UGL0601 | 34.3% | Y | 5,150,000 |
| | | 4/21/76-4/21/77 | Hartford | 10XS100056 | 6.67% | Y | 1,000,000 |
| | | | | | | | 15,000,000 |

Total all layers
75,000,000

OCC033801

Confidential

DIAMOND SHAMROCK CORPORATION

Excess Liability Program
3/1/77 to 3/1/78

| Layer | Layer Limit | Period Covered | Insurance | Policy Number | Layer Percent | Policy Available(?) | Policy Limit |
|---|---|---|---|---|---|---|---|
| 1 | 3,000,000 xs primary | 3/1/77-78<br>3/1/77-78 | Aetna<br>London | O1XN1171SCA<br>UJ1O315 | 33.3%<br>66.7% | Y<br>Y | 1,000,000<br>2,000,000<br>3,000,000 |
| 2 | 5,000,000 xs 3,000,000 xs primary | 3/1/77-78 | London | UGLO355 | 100% | Y | 5,000,000 |
| 3 | 5,000,000 xs 8,000,000 xs primary | 3/1/77-78<br>3/1/77-78 | Lexington<br>Prudential | GC5501952<br>DKCDX0159 | 60%<br>40% | Y<br>Y | 3,000,000<br>2,000,000<br>5,000,000 |
| 4 | 5,000,000 xs 13,000,000 xs primary | 3/1/77-78 | Aetna | O1SN706MCA | 100% | Y | 5,000,000 |
| 5 | 7,000,000 xs 18,000,000 xs primary | 3/1/77-78<br>3/1/77-78<br>3/1/77-78<br>3/1/77-78 | Lexington<br>National Union<br>Prudential<br>Granite State | GC5501952<br>1224270<br>DKCDX0160<br>SCLE8094092 | 57.14%<br>14.29%<br>14.29%<br>14.29% | Y<br>Y<br>Y<br>Y | 4,000,000<br>1,000,000<br>1,000,000<br>1,000,000<br>7,000,000 |

OCC033802

Confidential

3/1/77 to 3/1/78 (continued)

| Layer | Layer Limit | Period Covered | Insurer | Policy Number | Layer Percent | Policy Available(?) | Policy Limit |
|---|---|---|---|---|---|---|---|
| 6 | 10,000,000 xs | 3/13/77-78 | Aetna | 01XN721WCA | 70% | Y | 7,000,000 |
|  | 25,000,000 xs | 3/13/77-3/1/78 | Lexington | GC5504640 | 20% | Y | 2,000,000 |
|  | primary | 3/13/77-78 | National Union | 1224269 | 10% | Y | 1,000,000 |
|  |  |  |  |  |  |  | 10,000,000 |
| 7 | 15,000,000 xs | 3/13/77-78 | Aetna | 01XN722WCA | 53.3% | Y | 8,000,000 |
|  | 35,000,000 xs | 3/13/77-78 | Fireman's Fund | XLX1051112 | 26.7% | Y | 4,000,000 |
|  | primary | 3/13/77-78 | North Star | NSX12802 | 13.3% | Y | 2,000,000 |
|  |  | 3/13/77-78 | National Union | 1224275 | 6.7% | Y | 1,000,000 |
|  |  |  |  |  |  |  | 15,000,000 |
| 8 | 10,000,000 xs | 3/1/77-4/21/78 | Aetna | 01XN872WCA | 43% | Y | 4,300,000 |
|  | 50,000,000 xs | 3/1/77-4/21/78 | London | UGL0602 | 47% | Y | 4,700,000 |
|  | primary | 3/1/77-4/21/78 | Ranger | EU630328 | 10% | Y | 1,000,000 |
|  |  |  |  |  |  |  | 10,000,000 |
| 9 | 15,000,000 xs | 3/1/77-4/21/78 | Midland | XL145567 | 45.7% | Y | 6,850,000 |
|  | 60,000,000 xs | 3/1/77-4/21/78 | American Home | SCLE8065396 | 6.7% | Y | 1,000,000 |
|  | primary | 4/1/77-78 | Hartford | 10XS100067 | 6.7% | Y | 1,000,000 |
|  |  | 4/21/77-4/21/78 | London | UGL0601 | 34.3 | Y | 5,150,000 |
|  |  | 4/21/77-78 | Hartford | 10XS100066 | 6.7% | Y | 1,000,000 |
|  |  |  |  |  |  |  | 15,000,000 |

Total all layers
75,000,000

OCC033803

Confidential

DIAMOND SHAMROCK CORPORATION

Excess Liability Program
3/1/78 to 3/1/79

| Layer | Layer Limit | Period Covered | Insurer | Policy Number | Layer Percent | Policy Available(?) | Policy Limit |
|---|---|---|---|---|---|---|---|
| 1 | 5,000,000 xs primary | 3/1/78-79 | London | UKL0553 | 3% | N | 150,000 |
| | | 3/1/78-79 | London | UKL0399 | 67% | Y | 3,350,000 |
| | | 3/1/78-79 | Aetna | 01XN6002SCA | 10% | Y | 500,000 |
| | | 3/1/78-79 | Self-Assumed Ret. | N/A | 20% | N/A | 1,000,000 |
| | | | | | | | 5,000,000 |
| 2 | 5,000,000 xs 5,000,000 primary | 3/1/78-79 | London | UKL0400 | 80% | Y | 4,000,000 |
| | | 3/1/78-79 | Self-Assumed Ret. | N/A | 20% | N/A | 1,000,000 |
| | | | | | | | 5,000,000 |
| 3 | 5,000,000 xs 10,000,000 primary | 3/1/78-79 | Lexington | 5511271 | 60% | Y | 3,000,000 |
| | | 3/1/78-79 | Prudential | DXCDX0794 | 40% | Y | 2,000,000 |
| | | | | | | | 5,000,000 |
| 4 | 10,000,000 xs 15,000,000 primary | 3/1/78-79 | California Union | ZCXOO3096 | 50% | Y | 5,000,000 |
| | | 3/1/78-79 | Lexington | 5511271 | 40% | Y | 4,000,000 |
| | | 3/13/78-3/1/79 | National Union | 1229625 | 10% | Y | 1,000,000 |
| | | | | | | | 10,000,000 |
| 5 | 10,000,000 xs 25,000,000 primary | 3/13/78-3/1/79 | Aetna | 01XN1716WCA | 40% | Y | 4,000,000 |
| | | 3/13/78-3/1/79 | London | UKL0401 | 30% | Y | 3,000,000 |
| | | 3/1/78-79 | Lexington | 5511271 | 20% | Y | 2,000,000 |
| | | 3/13/78-3/1/79 | National Union | 1229625 | 10% | Y | 1,000,000 |
| | | | | | | | 10,000,000 |

OCC033804

Confidential

3/1/78 to 3/1/79 (continued)

| Layer | Layer Limit | Period Covered | Insurer | Policy Number | Layer Percent | Policy Available(?) | Policy Limit |
|---|---|---|---|---|---|---|---|
| 6 | 15,000,000 xs | 3/1/78-3/1/79 | Prudential | DXCDK0795 | 33.3% | Y | 5,000,000 |
|  | 35,000,000 xs | 3/13/78-3/1/79 | Aetna | 01XN1717WCA | 33.3% | Y | 5,000,000 |
|  | primary | 3/13/78-3/1/79 | National Union | 1229625 | 13.3% | Y | 2,000,000 |
|  |  | 3/13/78-3/1/79 | AIU | 75-100090 | 6.7% | Y | 1,000,000 |
|  |  | 3/13/78-3/1/79 | London | UKLO402 | 6.7% | Y | 1,000,000 |
|  |  | 3/13/78-3/1/79 | Fireman's Fund | XLX1199163 | 6.7% | Y | 1,000,000 |
|  |  |  |  |  |  |  | 15,000,000 |
| 7 | 10,000,000 xs | 4/21/78-3/1/79 | Aetna | 01XN1731WCA | 50% | Y | 5,000,000 |
|  | 50,000,000 xs | 3/13/78-3/1/79 | London | UKLO403 | 40% | Y | 4,000,000 |
|  | primary | 4/21/78-3/1/79 | AIU | 75-100092 | 10% | Y | 1,000,000 |
|  |  |  |  |  |  |  | 10,000,000 |
| 8 | 15,000,000 xs | 3/13/78-3/1/79 | London | UKLO404 | 33.33% | Y | 5,000,000 |
|  | 60,000,000 xs | 4/21/78-3/1/79 | Midland | XL148131 | 26.67% | Y | 4,000,000 |
|  | primary | 4/21/78-3/1/79 | Fireman's Fund | XLX1199165 | 20% | Y | 3,000,000 |
|  |  | 4/21/78-3/1/79 | AIU | 75101737 | 6.67% | Y | 1,000,000 |
|  |  | 4/21/78-3/1/79 | Hartford | 10XS100628 | 6.67% | Y | 1,000,000 |
|  |  | 4/1/78-3/1/79 | Hartford | 10XS100627 | 6.67% | Y | 1,000,000 |
|  |  |  |  |  |  |  | 15,000,000 |

Total all layers
75,000,000

OCC033805

16 of 27

DIAMOND SHAMROCK CORPORATION

Excess Liability Program
3/1/79 to 3/1/80

| Layer | Layer Limit | Period Covered | Insurer | Policy Number | Layer Percent | Policy Available(?) | Policy Limit |
|---|---|---|---|---|---|---|---|
| 1 | 5,000,000 xs primary | 3/1/79-80 3/1/79-80 | London Self-Assumed Ret. | UKL0399 N/A | 70% 30% | Y N/A | 3,500,000 1,500,000 5,000,000 |
| 2 | 5,000,000 xs 5,000,000 xs primary | 3/1/79-80 3/1/79-80 | London Self-Assumed Ret. | ULL0397 N/A | 70% 30% | Y N/A | 3,500,000 1,500,000 5,000,000 |
| 3 | 5,000,000 xs 10,000,000 xs primary | 3/1/79-80 3/1/79-80 | Lexington Prudential | 5511422 DKCDK1425 | 60% 40% | Y Y | 3,000,000 2,000,000 5,000,000 |
| 4 | 10,000,000 xs 15,000,000 xs primary | 3/1/79-80 3/1/79-80 3/1/79-80 | California Union Lexington National Union | ZCKOO3547 5511422 1225311 | 50% 40% 10% | Y Y Y | 5,000,000 4,000,000 1,000,000 10,000,000 |
| 5 | 10,000,000 xs 25,000,000 xs primary | 3/1/79-80 3/1/79-80 3/1/79-80 3/1/79-80 | Aetna London Lexington National Union | 01XN2126WCA ULL0398 5511422 1225311 | 40% 30% 20% 10% | Y Y Y Y | 4,000,000 3,000,000 2,000,000 1,000,000 10,000,000 |
| 6 | 15,000,000 xs 35,000,000 xs primary | 3/1/79-80 3/1/79-80 3/1/79-80 3/1/79-80 3/1/79-80 | Prudential Aetna National Union London AIU | DKCDX1426 01XN2127WCA 1225311 ULL0399 75101020 | 33.33% 33.33% 13.33% 13.33% 6.67% | Y Y Y Y Y | 5,000,000 5,000,000 2,000,000 2,000,000 1,000,000 15,000,000 |

OCC033806

**Confidential**

3/1/79 to 3/1/80 (continued)

| Layer | Layer Limit | Period Covered | Insurer | Policy Number | Layer Percent | Policy Available(?) | Policy Limit |
|-------|-------------|----------------|---------|---------------|---------------|---------------------|--------------|
| 7 | 10,000,000 xs | 3/1/79-80 | Aetna | 01XN2120MCA | 50% | Y | 5,000,000 |
| | 50,000,000 xs | 3/1/79-80 | London | ULL0400 | 40% | Y | 4,000,000 |
| | primary | 3/1/79-80 | AIU | 75101021 | 10% | Y | 1,000,000 |
| | | | | | | | 10,000,000 |
| 8 | 15,000,000 xs | 3/1/79-80 | London | ULL0401 | 33.33% | Y | 5,000,000 |
| | 60,000,000 xs | 3/1/79-80 | Midland | XL159043 | 26.67% | Y | 4,000,000 |
| | primary | 3/1/79-80 | Fireman's Fund | XLX1392123 | 20% | Y | 3,000,000 |
| | | 3/1/79-80 | Prudential | DXCDX1432 | 13.33% | Y | 2,000,000 |
| | | 3/1/79-80 | AIU | 75101022 | 6.67% | Y | 1,000,000 |
| | | | | | | | 15,000,000 |
| 9 | 25,000,000 xs | 3/1/79-80 | London | ULL0402 | 40% | Y | 10,000,000 |
| | 75,000,000 xs | 3/1/79-80 | Employers Mutual | MM070662 | 20% | Y | 5,000,000 |
| | primary | 3/1/79-80 | AIU | 75101023 | 20% | Y | 5,000,000 |
| | | 3/1/79-80 | Aetna | 01XN2129MCA | 8% | Y | 2,000,000 |
| | | 3/1/79-80 | National Union | 1225311 | 4% | Y | 1,000,000 |
| | | 3/1/79-80 | Midland | XL159044 | 4% | Y | 1,000,000 |
| | | 3/1/79-80 | Firemans Fund | XLX1392124 | 4% | Y | 1,000,000 |
| | | | | | | | 25,000,000 |

Total all layers
100,000,000

OCC033807

Confidential

DIAMOND SHAMROCK CORPORATION

Excess Liability Program
3/1/80 to 3/1/81

| Layer | Layer Limit | Period Covered | Insurer | Policy Number | Layer Percent | Policy Available(?) | Policy Limit |
|---|---|---|---|---|---|---|---|
| 1 | 5,000,000 xs primary | 3/1/80-81 | London | UMA0165 | 70% | Y | 3,500,000 |
|  |  | 3/1/80-81 | Self-Assumed Ret. | N/A | 30% | N/A | 1,500,000 |
|  |  |  |  |  |  |  | 5,000,000 |
| 2 | 5,000,000 xs 5,000,000 xs primary | 3/1/80-81 | London | UMA0166 | 70% | Y | 3,500,000 |
|  |  | 3/1/80-81 | Self-Assumed Ret. | N/A | 30% | N/A | 1,500,000 |
|  |  |  |  |  |  |  | 5,000,000 |
| 3 | 5,000,000 xs 10,000,000 xs primary | 3/1/80-81 | First State | 928336 | 60% | Y | 3,000,000 |
|  |  | 3/1/80-81 | Gibraltar | GMX00489 | 40% | Y | 2,000,000 |
|  |  |  |  |  |  |  | 5,000,000 |
| 4 | 10,000,000 xs 15,000,000 xs primary | 3/1/80-81 | California Union | ZCX003991 | 50% | Y | 5,000,000 |
|  |  | 3/1/80-81 | U.S. Fire | 522010411 2 | 50% | Y | 5,000,000 |
|  |  |  |  |  |  |  | 10,000,000 |
| 5 | 25,000,000 xs 25,000,000 xs primary | 3/1/80-81 | London | UMA0167 | 40% | Y | 10,000,000 |
|  |  | 3/1/80-81 | First State | 928337 | 20% | Y | 5,000,000 |
|  |  | 3/1/80-81 | National Union | 9782546 | 20% | Y | 5,000,000 |
|  |  | 3/1/80-81 | Am. Centennial | CC001218 | 20% | Y | 5,000,000 |
|  |  |  |  |  |  |  | 25,000,000 |
| 6 | 25,000,000 xs 50,000,000 xs primary | 3/1/80-81 | London | UMA0168 | 40% | Y | 10,000,000 |
|  |  | 3/1/80-81 | Aetna | 01XN2555WCA | 20% | Y | 5,000,000 |
|  |  | 3/1/80-81 | Midland | XL706868 | 20% | Y | 5,000,000 |
|  |  | 3/1/80-81 | Fireman's Fund | XLX1391851 | 12% | Y | 3,000,000 |
|  |  | 3/1/80-81 | AIU | 75101940 | 8% | Y | 2,000,000 |
|  |  |  |  |  |  |  | 25,000,000 |

OCC033808

Confidential

19 of 27

OCC033809

3/1/80 to 3/1/81 (continued)

| Layer | Layer Limit | Period Covered | Insurer | Policy Number | Layer Percent | Policy Available(?) | Policy Limit |
|---|---|---|---|---|---|---|---|
| 7 | 50,000,000 xs | 3/1/80-81 | London | UMA0169 | 30% | Y | 15,000,000 |
|  | 75,000,000 xs | 3/1/80-81 | Aetna | 01XN2556MCA | 30% | Y | 15,000,000 |
|  | primary | 3/1/80-81 | Employers Mutual | MM071305 | 10% | Y | 5,000,000 |
|  |  | 3/1/80-81 | Gibraltar | GMX00490 | 10% | Y | 5,000,000 |
|  |  | 3/1/80-81 | AIU | 75101941 | 20% | Y | 10,000,000 |
|  |  |  |  |  |  |  | 50,000,000 |

Total all layers
150,000,000

DIAMOND SHAMROCK CORPORATION

Excess Liability Program
3/1/81 to 7/1/82

| Layer | Layer Limit | Period Covered | Insurer | Policy Number | Layer Percent | Policy Available(?) | Policy Limit |
|---|---|---|---|---|---|---|---|
| 1 | 5,000,000 xs primary | 3/1/81-7/1/82 3/1/81-7/1/82 3/1/81-7/1/82 | London Self-Assumed Ret. Diamond (GAP) | UNA0113 N/A N/A | 84.78% 15% 0.22% | Y N/A N/A | 4,238,950 750,000 11,050 5,000,000 |
| 2 | 20,000,000 xs 5,000,000 xs primary | 3/1/81-7/1/82 3/1/81-7/1/82 3/1/81-7/1/82 3/1/81-7/1/82 | London Gibraltar First State Self-Assumed Ret. | UNA0114 GMX00967 930773 N/A | 50% 20% 20% 10% | Y Y Y N/A | 10,000,000 4,000,000 4,000,000 2,000,000 20,000,000 |
| 3 | 25,000,000 xs 25,000,000 xs primary | 3/1/81-7/1/82 3/1/81-7/1/82 3/1/81-7/1/82 3/1/81-7/1/82 | London Evanston National Union U.S. Fire | UNA0115 EX10565 9910530 5220108567 | 40% 20% 20% 20% | Y Y Y Y | 10,000,000 5,000,000 5,000,000 5,000,000 25,000,000 |
| 4 | 25,000,000 xs 50,000,000 xs primary | 3/1/81-7/1/82 3/1/81-7/1/82 3/1/81-7/1/82 3/1/81-7/1/82 | London Midland AIU National Union | UNA0116 XL713072 75-102529 9910530 | 40% 20% 36% 4% | Y Y Y Y | 10,000,000 5,000,000 9,000,000 1,000,000 25,000,000 |
| 5 | 25,000,000 xs 75,000,000 xs primary | 3/1/81-7/1/82 3/1/81-7/1/82 3/1/81-7/1/82 | London Midland Gibraltar | UNA0117 XL713073 GMX00968 | 60% 20% 20% | Y Y Y | 15,000,000 5,000,000 5,000,000 25,000,000 |

OCC033810

Confidential

## 3/1/81 to 7/1/82 (continued)

| Layer | Layer Limit | Period Covered | Insurer | Policy Number | Layer Percent | Policy Available(?) | Policy Limit |
|---|---|---|---|---|---|---|---|
| 6 | 50,000,000 xs 100,000,000 xs primary | 3/1/81-7/1/82 | Aetna | OLXN2943WCA | 50% | Y | 25,000,000 |
| | | 3/1/81-7/1/82 | Employers Mutual | MM071736 | 20% | Y | 10,000,000 |
| | | 3/1/81-7/1/82 | AIU | 75102530 | 20% | Y | 10,000,000 |
| | | 3/1/81-7/1/82 | Am. Centennial | CC001458 | 10% | Y | 5,000,000 |
| | | | | | | | 50,000,000 |

Total all layers
150,000,000

OCC033811

DIAMOND SHAMROCK CORPORATION

Excess Liability Program
7/1/82 to 7/1/83

| Layer | Layer Limit | Period Covered | Insurer | Policy Number | Layer Percent | Policy Available(?) | Policy Limit |
|---|---|---|---|---|---|---|---|
| 1 | 5,000,000 xs | 7/1/82-83 | London | UNA0113 | 85% | Y | 4,250,000 |
|  | primary | 7/1/82-83 | Self-Assumed Ret. | N/A | 15% | N/A | 750,000 |
|  |  |  |  |  |  |  | 5,000,000 |
| 2 | 20,000,000 xs | 7/1/82-83 | London | UNA0114 | 50% | Y | 10,000,000 |
|  | 5,000,000 xs | 7/1/82-83 | Gibraltar | GMX01785 | 20% | Y | 4,000,000 |
|  | primary | 7/1/82-83 | First State | 930820 | 20% | Y | 4,000,000 |
|  |  | 7/1/82-83 | Self-Assumed Ret. | N/A | 10% | N/A | 2,000,000 |
|  |  |  |  |  |  |  | 20,000,000 |
| 3 | 50,000,000 xs | 7/1/82-83 | London | UPA0259 | 34% | Y | 17,000,000 |
|  | 25,00,000 xs | 7/1/82-83 | Evanston | EX11023 | 20% | Y | 10,000,000 |
|  | primary | 7/1/82-83 | AIU | 75-102180 | 20% | Y | 10,000,000 |
|  |  | 7/1/82-83 | Midland | XL739559 | 10% | Y | 5,000,000 |
|  |  | 7/1/82-83 | Great S.W. Fire | XL13711 | 10% | Y | 5,000,000 |
|  |  | 7/1/82-83 | Atlanta | XL06066 | 4% | Y | 2,000,000 |
|  |  | 7/1/82-83 | Integrity | XL206342 | 2% | Y | 1,000,000 |
|  |  |  |  |  |  |  | 50,000,000 |
|  | 25,000,000 xs | 7/1/82-83 | London | UPA0260 | 60% | Y | 15,000,000 |
|  | 75,000,000 xs | 7/1/82-83 | Midland | XL739558 | 20% | Y | 5,000,000 |
|  | primary | 7/1/82-83 | Gibralter | GMX01786 | 20% | Y | 5,000,000 |
|  |  |  |  |  |  |  | 25,000,000 |

OCC033812

Confidential

7/1/82 to 7/1/83 (continued)

| Layer | Layer Limit | Period Covered | Insurer | Policy Number | Layer Percent | Policy Available(?) | Policy Limit |
|---|---|---|---|---|---|---|---|
| 5 | 50,000,000 xs 100,000,000 xs primary | 7/1/82-83 | Aetna | 01XN3444WCA | 50% | Y | 25,000,000 |
| | | 7/1/82-83 | Employers Mutual | MMO-73180 | 20% | Y | 10,000,000 |
| | | 7/1/82-83 | AIU | 75-102181 | 20% | Y | 10,000,000 |
| | | 7/1/82-83 | Am. Centennial | CC-00-35-40 | 10% | Y | 5,000,000 |
| | | | | | | | 50,000,000 |
| 6 | 50,000,000 xs 150,000,000 xs primary | 2/1/83-7/1/83 | Gibraltar | GMX-02112 | 10% | Y | 5,000,000 |
| | | 2/1/83-7/1/83 | AIU | 75-102261 | 20% | Y | 10,000,000 |
| | | 2/1/83-7/1/83 | Am. Centennial | CC-01-56-50 | 10% | Y | 5,000,000 |
| | | 2/1/83-7/1/83 | Royal | ED102169 | 10% | Y | 5,000,000 |
| | | 2/1/83-7/1/83 | London Guarantee | LX2107727 | 10% | Y | 5,000,000 |
| | | 2/1/83-7/1/83 | American Excess | EUL5100793 | 10% | Y | 5,000,000 |
| | | 2/1/83-7/1/83 | Pacific Employers | XCC013277 | 10% | Y | 5,000,000 |
| | | 2/1/83-7/1/83 | First State | EU935340 | 20% | Y | 10,000,000 |
| | | | | | | | 50,000,000 |

Total all layers
200,000,000

OCC033813

Confidential

OCCNJ0027123

ALCD-PUBCOM_0003001

DIAMOND SHAMROCK CORPORATION

Excess Liability Program
7/1/83 to 7/1/84

| Layer | Layer Limit | Period Covered | Insurer | Policy Number | Layer Percent | Policy Available(?) | Policy Limit |
|---|---|---|---|---|---|---|---|
| 1 | 5,000,000 xs primary | 7/1/83-84 | London | OQA0196 | 80% | N | 4,000,000 |
| | | 7/1/83-84 | Self-Assumed Ret. | N/A | 20% | N/A | 1,000,000 |
| | | | | | | | 5,000,000 |
| 2 | 20,000,000 xs 5,000,000 primary | 7/1/83-84 | London | UQA0197 | 43.5% | N | 8,700,000 |
| | | 7/1/83-84 | Self-Assumed Ret. | N/A | 5% | N/A | 1,000,000 |
| | | 7/1/83-84 | Gibraltar | GMKO2299 | 10% | Y | 2,000,000 |
| | | 7/1/83-84 | First State | EU935348 | 20% | Y | 4,000,000 |
| | | 7/1/83-84 | Royal | RED102452 | 5% | Y | 1,000,000 |
| | | 7/1/83-84 | Republic | CDE0631 | 5% | Y | 1,000,000 |
| | | 7/1/83-84 | Twin City Fire | TXS103102 | 11.5% | Y | 2,300,000 |
| | | | | | | | 20,000,000 |
| 3 | 50,000,000 xs 25,00,000 primary | 7/1/83-84 | London | UQA0198 | 30.5% | N | 15,250,000 |
| | | 7/1/83-84 | AIU | 75-103060 | 10% | Y | 5,000,000 |
| | | 7/1/83-84 | Great S.W. Fire | XL13773 | 10% | Y | 5,000,000 |
| | | 7/1/83-84 | Atlanta | XL06156 | 4% | Y | 2,000,000 |
| | | 7/1/83-84 | Integrity | XL207367 | 2% | Y | 1,000,000 |
| | | 7/1/83-84 | Midland | XL748956 | 6% | Y | 3,000,000 |
| | | 7/1/83-84 | Royal | RED102451 | 13% | Y | 6,500,000 |
| | | 7/1/83-84 | Transit | PXS960459 | 11% | Y | 5,500,000 |
| | | 7/1/83-84 | Gibraltar | GMKO2300 | 4% | Y | 2,000,000 |
| | | 7/1/83-84 | Twin City Fire | TXS103102 | 9.5% | Y | 4,750,000 |
| | | | | | | | 50,000,000 |
| 4 | 25,000,000 xs 75,000,000 primary | 7/1/83-84 | London | UQA0199 | 60% | N | 15,000,000 |
| | | 7/1/83-84 | Gibraltar | GMKO2301 | 20% | Y | 5,000,000 |
| | | 7/1/83-84 | Midland | XL748957 | 20% | Y | 5,000,000 |
| | | | | | | | 25,000,000 |

OCC033814

Confidential

7/1/83 to 7/1/84 (continued)

| Layer | Layer Limit | Period Covered | Insurer | Policy Number | Layer Percent | Policy Available(?) | Policy Limit |
|---|---|---|---|---|---|---|---|
| 5 | 50,000,000 xs 100,000,000 xs primary | 7/1/83-84 | Aetna | 01XN3811WCA | 40% | Y | 20,000,000 |
| | | 7/1/83-84 | Employers Mutual | MMO-73425 | 20% | N | 10,000,000 |
| | | 7/1/83-84 | AIU | 75-103061 | 22% | Y | 11,000,000 |
| | | 7/1/83-84 | Royal | RED102450 | 5% | Y | 2,500,000 |
| | | 7/1/83-84 | Republic | CDE0631 | 13% | Y | 6,500,000 |
| | | | | | | | 50,000,000 |
| 6 | 50,000,000 xs 150,000,000 xs Primary | 7/1/83-84 | Gibraltar | GMK02302 | 10% | Y | 5,000,000 |
| | | 7/1/83-84 | AIU | 75-103062 | 20% | Y | 10,000,000 |
| | | 7/1/83-84 | Am. Centennial | CC-01-56-93 | 10% | Y | 5,000,000 |
| | | 7/1/83-84 | Royal | ED102190 | 10% | Y | 5,000,000 |
| | | 7/1/83-84 | Pacific Employers | XCC011277 | 10% | Y | 5,000,000 |
| | | 7/1/83-84 | First State | EU935349 | 20% | Y | 10,000,000 |
| | | 7/1/83-84 | Aetna | 01XN3012WCA | 16% | Y | 8,000,000 |
| | | 7/1/83-84 | Atlanta | XL06156 | 4% | Y | 2,000,000 |
| | | | | | | | 50,000,000 |

Total all layers
200,000,000

OCC033815

Confidential

DIAMOND SHAMROCK CORPORATION

Excess Liability Program
7/1/84 to 7/1/85

| Layer | Layer Limit | Period Covered | Insurer | Policy Number | Layer Percent | Policy Available(?) | Policy Limit |
|---|---|---|---|---|---|---|---|
| 1 | 5,000,000 xs primary | 7/1/84-85 | London | UQA0196 | 80% | N | 6,000,000 |
| | | 7/1/84-85 | International | 5220061002 | 10% | Y | 500,000 |
| | | 7/1/84-85 | Self-Assumed Ret. | N/A | 10% | N/A | 500,000 |
| | | | | | | | 5,000,000 |
| 2 | 20,000,000 xs 5,000,000 primary | 7/1/84-85 | London | UQA0197 | 63.5% | N | 8,700,000 |
| | | 7/1/84-85 | Colonial Penn | RU010057 | 25% | Y | 5,000,000 |
| | | 7/1/84-85 | Employers Ins. of Wausau | 5735-00-100818 | 11.5% | Y | 2,300,000 |
| | | 7/1/84-85 | International | 5220061002 | 20% | Y | 4,000,000 |
| | | | | | | | 20,000,000 |
| 3 | 50,000,000 25,000,000 xs primary | 7/1/84-85 | London | UQA0198 | 19.7% | N | 9,850,000 |
| | | 7/1/84-85 | Republic | CDE 0933 | 12% | Y | 6,000,000 |
| | | 7/1/84-85 | Employers Ins. of Wausau | 5735-02-100818 | 5.4% | Y | 2,700,000 |
| | | 7/1/84-85 | Atlanta International | XL 06280 | 2% | Y | 1,000,000 |
| | | 7/1/84-85 | Integrity | XL 208508 | 4% | Y | 2,000,000 |
| | | 7/1/84-85 | Midland | XL 770629 | 4% | Y | 2,000,000 |
| | | 7/1/84-85 | Transit Casualty | SCU 956892 | 11% | Y | 5,500,000 |
| | | 7/1/84-85 | Zurich International | ZIB 71,195-84C | 5% | Y | 2,500,000 |
| | | 7/1/84-85 | Transamerica | USL 1339-7804 | 8% | Y | 4,000,000 |
| | | 7/1/84-85 | INA | XCP 144260 | 2% | Y | 1,000,000 |
| | | 7/1/84-85 | Greenstone | 22028 | 10.25% | Y | 5,125,000 |
| | | 7/1/84-85 | Self-Assumed Ret. | N/A | 16.65% | N/A | 8,325,000 |
| | | | | | | | 50,000,000 |

OCC033816

Confidential

OCCNJ0027126
ALCD-PUBCOM_0003004

7-1-84 to 7-1-85

| Layer | Layer Limit | Period Covered | Insurer | Policy Number | Layer Percent | Policy Available | Policy Limit |
|---|---|---|---|---|---|---|---|
| 4 | 25,000,000 xs 75,000,000 xs Primary | 7-1-84/85 | London | IIQA0199, Cover Note PY249705 | 60.0% | N | $ 15,000,000 |
| | | 7-1-84/85 | Zurich International | ZIB71,196-84C | 10.0% | Y | 2,500,000 |
| | | 7-1-84/85 | Integrity | XL200918 | 16.0% | Y | 4,000,000 |
| | | 7-1-84/85 | Midland | XL770610 | 8.0% | Y | 2,000,000 |
| | | 7-1-84/85 | Harbor | HII178519 | 6.0% | Y | 1,500,000 |
| | | | | | | | $ 25,000,000 |
| 5 | 100,000,000 xs 100,000,000 xs Primary | 7-1-84/85 | Greenstone Assurance Ltd | 22033F | 100.0% | Y | 100,000,000 |
| 6 | 100,000,000 xs 200,000,000 xs Primary | 7-1-84/85 | Aetna | 01XN4412WCA | 25.0% | Y | 25,000,000 |
| | | 7-1-84/85 | Various lead by NY Marine Mgrs. | J&II-JP-255 | 60.0% | Y | 60,000,000 |
| | | 7-1-84/85 | Greenstone Assurance Ltd | 22037F | 15.0% | Y | 15,000,000 |
| | | | | | | | $100,000,000 |

Total all Layers

$300,000,000

OCC033817

Confidential



OCC033818

Excess Liability Program
7-1-85 to 7-1-86

| Layer | Layer Limit | Period Covered | Insurer | Policy Number | Layer Percent | Policy Available | Policy Limit (1986 Addendum P. 20 of 20) |
|---|---|---|---|---|---|---|---|
| 1 | $25,000,000 XS Primary excluding oil & gas operations | 7-1-85/86 | Greenstone Assurance Ltd. | 22048 | 100.0% | Y | $25,000,000 (This is w/in layer #2, but applies only to Coal, R&M and Chemicals) |
| 2 | $150,000,000 XS Primary, however, XS only of $75M for non-oil & gas operations | 7-1-85/86 | Greenstone Assurance Ltd. | 22032 | 100.0% | Y | $150,000,000 (note $50M SIR between $25M & $75M limits for non-oil & gas operations |
| 3 | $50,000,000 XS $150,000,000 XS Primary | 7-1-85/86 | Greenstone Assurance Ltd. | 22033 | 62.7% | Y | $31,350,000 |
|  |  | 7-1-85/86 | U.S. Fire | 05697 | 4.0% | Y | $ 2,000,000 |
|  |  | 7-1-85/86 | Self-Assumed Ret. | N/A | 33.3% | N/A | $16,650,000 |
|  |  |  |  |  |  |  | ---------- |
|  |  |  |  |  |  |  | $50,000,000 |
| 4 | $100,000,000 XS $200,000,000 XS Primary | 7-1-85/86 | N.Y. Marine Managers | JP-85-01-DTX | 20.0% | Y | $20,000,000 |
|  |  |  | Texas Marine |  | 5.0% |  | 5,000,000 |
|  |  |  | Royal Insurance Co. |  | 5.0% |  | 5,000,000 |
|  |  |  | MOAC |  | 10.0% |  | 10,000,000 |
|  |  |  | Am. Marine Ins. Group |  | 5.0% |  | 5,000,000 |
|  |  |  | Talbot Bird & Co. |  | 10.0% |  | 10,000,000 |
|  |  |  | Fireman's Fund |  | 5.0% |  | 5,000,000 |
|  |  |  | Navigator's Group |  | 4.0% |  | 4,000,000 |
|  |  |  | St. Paul Fire & Marine |  | 15.0% |  | 15,000,000 |
|  |  |  | U. S. Fire |  | 1.0% |  | 1,000,000 |
|  |  |  |  |  | ---- |  | ---------- |
|  |  |  |  |  | 80.0% |  | $80,000,000 |
|  |  | 7-1-85/86 | International Marine Underwriters | JP-85-01-DTX | 20.0% |  | 20,000,000 |
|  |  |  |  |  | ---- |  | ---------- |
|  |  |  |  |  | 100.0% |  | $100,000,000 |

Total all layers
$300,000,000
===============

**Confidential**

Schedule 2.18  Page 1 of 2

# DIAMOND SHAMROCK CORPORATION

## Primary Liability Program
## 2/1/60 to 2/1/81

| PERIOD COVERED | POLICY NUMBER | COMPANY | LIMIT OF LIABILITY[1] |
| --- | --- | --- | --- |
| 2/1/60-2/1/63 | 01AL11063SR(Y) | Aetna | unknown  C.S.L. suggests limit of unknown program |
| 2/1/63-2/1/66 | 01AL26657SR | Aetna | unknown |
| 2/1/66-2/1/69 | 01AL042687SR(Y) | Aetna | 100,000/1,000,000 |
| 2/1/69-2/1/71 | 01AL143300SR(Y) | Aetna | 500,000/2,000,000 |
| 2/1/71-2/1/72 | 01AL154645SRA(Y) | Aetna | 500,000/2,000,000 |
| 2/1/72-2/1/73 | 01AL158404SRA(Y) | Aetna | 500,000/2,000,000 |
| 2/1/73-2/1/74 | 01AL163368SCA(Y) | Aetna | 500,000/2,000,000 |
| 2/1/74-2/1/75 | 01AL242750SCA | Aetna | 500,000/2,000,000 |
| 2/1/75-2/1/76 | 01AL248909SCA | Aetna | 1,000,000/2,000,000 |
| 2/1/76-2/1/77 | 01AL256049SCA | Aetna | 1,000,000/2,000,000[2] |
| 2/1/77-2/1/78 | 01AL260027SCA | Aetna | 1,000,000/2,000,000[3] |
| 2/1/78-2/1/79 | 01AL260088SCA | Aetna | 1,000,000/2,000,000 |
| 2/1/79-2/1/80 | 01GL1436SCA | Aetna | 2,000,000/5,000,000 |
| 2/1/80-2/1/81 | 01GL57413SCA | Aetna | 2,000,000/3,750,000 |

Notes appear on next page

OCC033819

Confidential

OCC033820

# DIAMOND SHAMROCK CORPORATION

### Primary Liability Program
### 2-1-81 to 7-1-87

| PERIOD COVERED | POLICY NUMBER | COMPANY | LIMIT OF LIABILITY |
|---|---|---|---|
| 2-1-81/7-1-82 | 01GL57467SCA | AETNA | 2,000,000/5,312,500 |
| 7-1-82/7-1-83 | 01GL248035SCA | AETNA | 2,000,000/3,750,000 |
| 7-1-83/7-1-84 | 01GL408968SCA | AETNA | 2,000,000/3,750,000 |
| 7-1-84/7-1-85 | 01GL460947SCA | AETNA | 2,000,000/3,750,000 |
| 7-1-85/7-1-86 | GLA1578763 | NATIONAL UNION FIRE INS. CO. OF PITTSBURGH, PA | 1,500,000/2,500,000 GEN. & CONTRACTUAL 1,500,000/5,500,000 PRODUCTS |

Note: These are main policy numbers only
and do not include other ancillary policy numbers

Confidential

OCCNJ0027130

ALCD-PUBCOM_0003008

22-May-86  WORKERS' COMPENSATION FOR CHEMICALS COMPANY

Schedule 2.18

| INSURANCE COMPANY | POLICY NUMBER | POLICY PERIOD |
|---|---|---|
| AETNA | 1-C9025SRR | 2-1-58/59 |
| AETNA | 1-C5193RR | 2-1-59/60 |
| AETNA | 1-C17381RR | 2-1-60/61 |
| AETNA | 1-C26733RR | 2-1-61/62 |
| AETNA | 1-C17380RR | 2-1-60/61 |
| AETNA | 1-C47440SR | 2-1-63/66 |
| AETNA | 1-C90210PT | 2-1-58/59 |
| AETNA | 1-C4761PT | 2-1-59/60 |
| AETNA | 1-C17382 | 2-1-60/61 |
| AETNA | 1-C33848PT | 11-1-61/62 |
| AETNA | 1-C26734PT | 2-1-61/62 |
| AETNA | 1-C3543SPT | 2-1-62/63 |
| AETNA | 1-C47439SC | 2-1-63/64 |
| AETNA | 1-C60054SC | 2-1-64/65 |
| AETNA | 01C075263 | 2-1-66/67 |
| AETNA | 01CX9289SCA | 2-1-69/70 |
| AETNA | 01CX97319SCA | 2-1-70/71 |
| AETNA | 01CX101189SCA | 2-1-71/72 |
| AETNA | 01CX105827SCA | 2-1-72/73 |
| AETNA | 01C95113SSS | 2-1-69/71 |
| AETNA | 01CX952097SSS | 2-1-71/72 |
| AETNA | 01CX952491SSS | 2-1-72/73 |
| AETNA | 01CX111083SCA | 2-1-73/74 |
| AETNA | 01C952726SSS | 2-1-73/74 |
| AETNA | 01CH1SSS | 2-1-74/75 |
| AETNA | 01CX116379SCA | 2-1-74/75 |
| AETNA | 01CH50SSS | 2-1-75/76 |
| AETNA | 01CX124139SPA | 2-1-75/76 |
| AETNA | 01CX133523SPA | 2-1-76/77 |
| AETNA | 01CH145SSS | 2-1-76/77 |
| AETNA | 01CX138428SPA | 2-1-76/78 |
| AETNA | 01CH138427SSS | 2-1-77/78 |
| AETNA | 01CH144797SSS | 2-1-78/79 |
| AETNA | 01CX144798SPA | 2-1-78/79 |
| AETNA | 01CH146596SSSS | 2-1-79/80 |
| AETNA | 01CX146597SPA | 2-1-79/80 |
| AETNA | 01CX148214SPA | 2-1-80/81 |
| AETNA | 01CH148213SSS | 2-1-80/81 |
| AETNA | 01CX209334SPA | 2-1-81/82 |
| AETNA | 01CH209333SSS | 2-1-81/82 |
| AETNA | 01CH237880SSS | 7-1-82/83 |
| AETNA | 01C237851SSS | 2-1-82/7-1-82 |
| AETNA | 01C237881SPA | 7-1-82/83 |
| AETNA | 01CH258945SSS | 7-1-83/84 |
| AETNA | 01CX258946SPA | 7-1-83/84 |
| AETNA | 01CH288855SSS | 7-1-84/85 |
| AETNA | 01CH288856SPA | 7-1-84/85 |
| BIRMINGHAM FIRE INS. CO. OF PA | WC112-25-85 | 7-1-85/86 |
| TEIA | 58404A-N | 2-1-69/7-1-83 |
| TEIA | 875489 | 2-1-69/7-1-83 |
| TEIA | 875411 | 2-1-69/7-1-83 |
| T | 92358 | 7-1-84/86 |

PAGE 1

OCC033821

**Confidential**

OCC033822

## Foreign Liability Policies

Schedule 2.18

| TERM | COVERAGE | INSURER | POLICY NUMBER | LIMIT |
|---|---|---|---|---|
| 12-1-85/86 | AL/GL, WC/EL | AIU | 80-149179 / 03-4447 | $1.0M occ/agg |
| 1-1-85 to 12-1-85 | WC/EL/AL/GL | Greenstone Assurance Limited | 22026F | $1.0M occ/agg |
| 1-31-84 to 1-1-85 | AL/GL | AIU | 80-149058 | $1.0M occ/agg |
| 1-31-83/84 | AL/GL | AIU | 80-148585 | $1.0M occ/agg |
| 1-31-82/83 | AL/GL | AIU | 80-103567 | $1.0M occ/agg |
| 1-31-81/82 | AL/GL | AIU | 80-111459 | $1.0M occ/agg |
| 1-31-80/81 | AL/GL | The Fidelity & Casualty Company of New York | L1201300 | $1.0M occ/agg |
| 1-31-78/80 | AL/GL | The Fidelity & Casualty Company of New York | L1409757 | $1.0M occ/agg |
| 1-31-77/78 | AL/GL | The Fidelity & Casualty Company of New York | L1166514 | $1.0M occ/agg |
| 1-31-74/77 | AL/GL | The Continental Insurance Company | 16317200 | $1.0M occ/agg |
| 1-31-73/74 | AL/GL | The Continental Insurance Company | 16296311 | $1.0M occ/agg |
| 1-31-71/73 | AL/GL | The Continental Insurance Company | 16328559 | $1.0M occ/agg |
| 1-1-70/71 | AL/GL | St. Paul Mercury Insurance Company | SM 6717 | $500,000 occ / $1.0M agg |
| 1-1-69/71 | AL/GL | St. Paul Mercury Insurance Company | SM 6606 | $500,000 occ / $1.0M agg |
| 1-1-66/69 | AL/GL | St. Paul Mercury Insurance Company | SM 5910 | $500,000 occ / $1.0M agg |
| 1-1-61/66 | AL/GL | St. Paul Mercury Insurance Company | SM 5778 (I) | $500,000 occ / $1.0M agg |

**Confidential**

| ITEM | COVERAGE | INSURER | POLICY NUMBER | LIMIT |
|---|---|---|---|---|
| 1-1-61/69 | AL/GL | St. Paul Mercury Insurance Company | 1A12442 | $500,000 occ |
| unknown/1-1-61 | AL/GL | St. Paul Mercury Insurance Company | Renewal of 1A5105 (2) | unknown |

Footnotes:

1.  SPL 5778 is not available, but indicated on SPL 5910 as being renewed by SPL 5910.

2.  Policy 1A5105 is not available.

OCC033823

Confidential

OCCNJ0027133

ALCD-PUBCOM_0003011

SCHEDULE 2.19

Agreement,
Dated September 4, 1986 (the "Agreement"),
By and Among
Diamond Shamrock Corporation,
and
Occidental Petroleum Corporation,
Occidental Chemical Holding Corporation
and
Oxy-Diamond Alkali Corporation

LABOR AGREEMENTS

8298G

OCC033824

Confidential

OCCNJ0027134
ALCD-PUBCOM_0003012

SCHEDULE 2.19

Labor Agreements

A.   COLLECTIVE BARGAINING AGREEMENTS

   1.   Working Agreement, between Diamond Shamrock Chemicals
        Company and International Brotherhood of Teamsters,
        Local 560 (Jersey City Plant) (May 22, 1986 to May 22,
        1989)

   2.   Agreement, between Diamond Shamrock Chemicals Company
        and Petroleum, Construction, Tankline Drivers, Yeast,
        Soft Drink Workers and Driver-Salesmen, Amusement and
        Vending Service Men and Allied Workers, Local 311
        (Catonsville Plant) (December 18, 1985 to December 17,
        1988)

   3.   Contract, between Diamond Shamrock Chemicals Company
        and United Steelworkers of America (AFL-CIO-CLC),
        Local 12254 (Cincinnati Plant) (September 24, 1985 to
        September 24, 1988)

   4.   Agreement, between Diamond Shamrock Chemicals Company
        and United Steelworkers of America (AFL-CIO-CLC),
        Local 2608 (formerly Local 13721) (Chicago Silicate
        Plant) (October 28, 1983 to October 27, 1986)

   5.   Agreement, between Diamond Shamrock Chemicals Company,
        Process Chemicals Division and United Food and
        Commercial Workers (AFL-CIO), Local 354 (Cedartown
        Plant) (December 10, 1985 to December 9, 1988)

   6.   Agreement, between Diamond Shamrock Chemicals Company,
        Process Chemicals Division and International Union of
        Electrical, Radio and Machine Workers (AFL-CIO), Local
        427 (Harrison Plant) (February 16, 1985 to
        February 15, 1988)

   7.   Agreement, between Diamond Shamrock Chemicals Company,
        Process Chemicals Division and International Union of
        Operating Engineers, Local 68 (Carlstadt Plant)
        (January 1, 1984 to December 31, 1986)

OCC033825

Confidential

OCCNJ0027135

ALCD-PUBCOM_0003013

8. Agreement, between Diamond Shamrock Chemicals Company, Process Chemicals Division and Automatic Sales, Servicemen and Allied Workers Union, Local 575 affiliated with the International Brotherhood of Teamsters, Chauffers, Warehousemen and Helpers of America (Carlstadt Plant) (November 1, 1983 to October 31, 1986)

B.  PUBLISHED PERSONNEL POLICIES GENERALLY APPLICABLE TO DOMESTIC EMPLOYEES

1. Diamond Shamrock Employee Benefits Program (1-1-85)

2. Ashtabula Plant Employee Handbook (9-85)

3. Battleground Plant -- Employee Benefit Programs and Plant Policies (5-85)

4. Belle Plant Employee Handbook (11-85)

5. Charlotte Plant Employee Handbook (7-85)

6. Dallas Plant Employee Policy Manual

7. Deer Park Works Employee Handbook (1-76)

8. Delaware City Plant Employee Handbook

9. Mobile Plant Employee Handbook

10. Morristown Plant Employee Handbook

11. Muscle Shoals Plant Blue Book

12. Human Resources Policies and Administration Guidelines.

C.  PENDING CHARGES OR COMPLAINTS BEFORE THE NATIONAL LABOR RELATIONS BOARD ("NLRB")

None

D.  PENDING OR THREATENED LABOR STRIKES, ORGANIZED DISPUTES, SLOWDOWNS, OR WORK STOPPAGES

None

-2-

OCC033826

**Confidential**

E.  UNION REPRESENTATION CLAIMS OR PETITIONS PENDING BEFORE
    THE NLRB

        On July 28, 1986, DSCC received a letter from the NLRB
    giving notice that a Petition for Certification of
    Representative had been filed with the NLRB.  The
    Petitioner, Graphic Communications International Union,
    Local 527-S, seeks to represent production, warehouse and
    janitorial employees at DSCC's facility in Charlotte, N.C.
    The union certification election is scheduled to occur on
    September 18 and 19, 1986.

F.  GRIEVANCE OR ARBITRATION PROCEEDINGS ARISING OUT OF
    OR UNDER A COLLECTIVE BARGAINING AGREEMENT

    1.  William Leach and Raymond Spiewar, together with USW,
        Local 2608, Grievance Report No. 4-86 (Chicago
        Silicate Plant)

    2.  Bob Rager, together with USW, Local 2608, Grievance
        Report No. 5-86 (Chicago Silicate Plant)

    3.  IUERMW, Local 427, Grievance filed June 9, 1986
        (Harrison Plant)

    4.  IUERMW, Local 427, Grievance filed March 12, 1986 by
        Willie White, set for arbitration (Harrison Plant)

    5.  IUERMW, Local 427, Grievance filed February 27, 1986
        by Jack Muir and Mel Halpern, set for arbitration
        (Harrison Plant)

    6.  Petroleum, Construction . . . Workers, Local 311,
        Grievance filed August 11, 1986 by Herbert Allen
        (Catonsville Plant)

G.  ORGANIZED WORK STOPPAGES IN EXCESS OF 10 WORKING DAYS
    WITHIN THE PAST 5 YEARS

        None

H.  CHARGES PENDING BEFORE THE EQUAL EMPLOYMENT OPPORTUNITY
    COMMISSION OR ANY STATE OR LOCAL AGENCY

    1.  Warren J. Meister, discrimination claim, filed with
        the EEOC and the Texas Commission on Human Rights (Las
        Colinas)

    2.  Willie White, discrimination claim, filed with the
        EEOC and New Jersey Division on Civil Rights (Harrison
        Plant)

-3-

OCC033827

Confidential

3. Patricia A. Balint, discrimination claim, filed with the EEOC; claim for unemployment benefits, filed with the Ohio Bureau of Employment Services (Astabula Plant)

4. Worker's Compensation Claims (See Schedule 2.07)

I. OTHER LABOR OR EMPLOYMENT RELATED CLAIMS

1. Don F. Rhudy v. Diamond Shamrock Corporation, wrongful discharge claim, filed petition No. 80-13479 in 1980 in the 129th Judicial District Court at Harris County, Texas. (Deer Park Plant)

2. Terry Allen Johnson v. Diamond Shamrock Corporation, wrongful discharge claim, filed petition No. 86-06160 on February 7, 1986, in the 11th Judicial District Court of Harris County, Texas. (Deer Park Plant)

3. Don E. Harriford v. Convent Chemical Corporation, discrimination claim, filed complaint No. 85-5219 on November 15, 1985, in the United States District Court for the Eastern District of Louisiana. (Convent Plant)

4. Taylor v. Diamond Shamrock Chemicals Company, wrongful discharge claim, General Court, Superior Division, New Hanover County, North Carolina (Castle Hayne)

5. Maguire v. W. R. Grace v. Diamond Shamrock Chemicals Company, wrongful discharge, Third Circuit, U.S. Court of Appeals. (Morristown)

6. Turner et al. v. Diamond Shamrock Chemicals Company, severance pay dispute, Civil Action No. 85C-DE-130, Superior Court of the State of Delaware, New Castle County. (Delaware City)

7. Simmons et al. v. Diamond Shamrock Corporation, severance pay dispute and class action, Civil Action No. 86-725c(c), United States District Court, Eastern Division of Missouri, Eastern Division

8. Kreml v. Diamond Shamrock Corporation, life insurance and pension claim, No. 86C 1134, United States District Court, Northern District of Illinois, Eastern Division (Frankfort Plant)

8178G

-4-

OCC033828

<u>SCHEDULE 2.22</u>

Agreement,
Dated September 4, 1986 (the "Agreement"),
By and Among
Diamond Shamrock Corporation,
Occidental Petroleum Corporation,
Occidental Chemical Holding Corporation
and
<u>Oxy-Diamond Alkali Corporation</u>

COGENERATION AGREEMENT; RELATED
<u>COGENERATION CONTRACTS; CERTIFICATES</u>

8548G

OCC033829

**Confidential**

**OCCNJ0027139**
ALCD-PUBCOM_0003017

SCHEDULE 2.22

Cogeneration

I.  Self Qualifying Certificates

1.  Letter, dated February 4, 1985, from Diamond Shamrock Chemicals Company to the Federal Energy Regulatory Commission

2.  Letter, dated April 16, 1982, from Diamond Shamrock Corporation to the Federal Energy Regulatory Commission

3.  Letter, dated August 13, 1982, from Diamond Shamrock Corporation to Houston Lighting and Power Company

4.  Letter, dated January 21, 1982, from Diamond Shamrock Corporation to the Federal Energy Regulatory Commission

5.  Letter, dated January 22, 1982, from Diamond Shamrock Corporation to Houston Lighting & Power Company

II.  Related Cogeneration Contracts

The following agreements listed on this Schedule 2.22 are agreements substantially relating to the Cogeneration Facilities.  Such list, however, does not include contracts, agreements or understandings which provide goods or services to both the Cogeneration Facilities and the other business operations at the Deer Park Plant and/or the Battleground Plant.

1.  Cogeneration Agreement, dated August 6, 1984, as amended, between Diamond Shamrock Chemicals Company and Houston Lighting and Power Company

2.  Industrial Gas Sales Contract, Contract No. 23970, dated November 21, 1979, as amended, by and between United Texas Transmission Company and Diamond Shamrock Corporation

3.  Short Term Industrial Marketing Program Gas Sales Contract, dated June 1, 1986, by and between Amoco Gas Company and Diamond Shamrock Chemicals Company

**OCC033830**

Confidential

4. Gas Sales Contract, dated October 1, 1985, by and between Amoco Production Company and Diamond Shamrock Chemicals Company

5. Gas Transportation and/or Exchange Agreement, dated October 1, 1985, as amended, between Amoco Gas Company and Diamond Shamrock Chemicals Company

6. Industrial Gas Sales Contract, dated March 28, 1983, as amended, by and between South Gulf Energy, Inc. and Diamond Shamrock Corporation

7. Gas Sales Contract, dated October 4, 1985, by and between Amoco Gas Company and Diamond Shamrock Chemicals Company

8. Gas Contract, effective as of January 1, 1985, by and between Amoco Gas Company and Diamond Shamrock Corporation

9. Agreement for Engineering and Procurement Services, dated May 1, 1984, by and between Diamond Shamrock Chemicals Company, Brown & Root, Inc. and Brown & Root U.S.A.

10. Purchase Order, Order No. AA 180001-E-077, dated November 11, 1984, as amended, between Diamond Shamrock Chemicals Company and General Electric Company

11. Purchase Order, dated October 29, 1984, as amended, between Diamond Shamrock Chemicals Company and Henry Vogt Machine Company

8620G

–2–

OCC033831

Confidential

OCCNJ0027141

ALCD-PUBCOM_0003019



**Diamond Shamrock**
Chemicals Company

George E. Knowles
Director of Energy Affairs

Certified Mail No: P 662 942 997
Return Receipt Requested

February 4, 1985

Kenneth L. Plumb
Secretary
Federal Energy Regulatory Commission
825 North Capitol Street, N.E.
Washington, D.C. 20426

Dear Mr. Plumb:

Re: NOTICE OF SELF-QUALIFICATION
    QUALIFYING FACILITY STATUS

Diamond Shamrock Chemicals Company files this letter, together with
14 copies hereof, as its Notice of Self-Qualification for Qualifying
Facility Status pursuant to Title 18, Part 292 of the Code of
Federal Regulations. Necessary details are set forth below:

   Name and address of applicant

      Diamond Shamrock Chemicals Company
      351 Phelps Court
      Irving, Texas 75038

   Location of facility

      Diamond Shamrock Chemicals Company
      Deer Park Plant
      1101 Tidal Road
      Deer Park, Texas 77536

   Telephone number for additional information

      Director of Energy Affairs - (214) 659-7195

   Description of facility

      The cogeneration facility is a combined cycle
      consisting of steam turbines and a combustion
      turbine. One boiler and a heat recovery boiler
      fired by natural gas produce high pressure steam
      which is fed to three steam turbines, each of
      which drives an electric generator and produces

**Diamond Shamrock Chemicals Company** A Subsidiary of Diamond Shamrock
351 Phelps Court, P.O. Box 2300, Irving, Texas 75061-1433 Phone: 214 659-7195

OCC033832

Kenneth L. Plumb, Secretary
Federal Energy Regulatory Commission
February 4, 1985
Page 2

low pressure process steam. A combustion turbine
fired with natural gas drives an electric generator
and produces hot exhaust gases. The exhaust gas
energy is utilized to heat feed water for a
single boiler and the heat recovery boiler.

Primary energy source

Natural gas.

Power production capacity

Approximately 75 megawatts.

Ownership

No electric utility, electric utility holding
company, or any entity owned by either has any
ownership interest in the facility.

Please advise us if you require any additional information.

Yours truly,

George E. Knowles
Director of Energy Affairs

/wg

OCC033833

Confidential

OCCNJ0027143

ALCD-PUBCOM_0003021

Registered Mail -
Return Receipt Requested



**Diamond Shamrock**

George E. Knowles
Director of Energy Affairs

April 16, 1982

Kenneth L. Plumb, Secretary
Federal Energy Regulatory Commission
825 North Capitol Street, N.E.
Washington, D.C. 20426

Dear Mr. Plumb:

By this letter Diamond Shamrock Corporation furnishes notice
required by the Commission's regulation 18CFR 292.207 that
the cogeneration facility described below is a Qualifying
Facility.

1.   Name and address of owner:

        Diamond Shamrock Corporation
        717 North Harwood Street
        Dallas, Texas 75201

     Location of Facility:

        Tidal Road
        Deer Park, Texas

2.   Description of facility:

        The cogeneration facility is a combined cycle con-
        sisting of steam turbines and a combustion turbine.
        Six boilers fired by natural gas produce high
        pressure steam which is fed to three steam turbines,
        each of which drives an electric generator and
        produces low pressure process steam.  A combustion
        turbine fired with natural gas drives an electric
        generator and produces hot exhaust gases.  The
        exhaust gas energy is utilized to heat feed water
        to the six boilers.

3.   The facility will use natural gas as its primary source
     of energy.

4.   The facility has the capacity to produce 35 megawatts.

**Diamond Shamrock Corporation**
351 Phelps Court, P.O. Box 2300, Irving, Texas 75061-1433  Phone: 214 659-7195

OCC033834

Mr. Kenneth F. Plumb
April 16, 1982
Page two.

5.  No electric utility, electric utility holding company,
    or any person owned by either has any ownership interest
    in the facility.

Very truly yours,

G. E. Knowles

wg

OCC033835

**Confidential**

OCCNJ0027145
ALCD-PUBCOM_0003023



**Diamond Shamrock**

George E. Knowles
Director of Energy Affairs

August 13, 1982

Roland F. Hussey
HOUSTON LIGHTING & POWER COMPANY
P. O. Box 1700
Houston, Texas 77001

Subject:  Purchase of Cogeneration Power

Dear Mr. Hussey:

As required by regulations of the Federal Energy Regulatory
Commission at 18 CFR 292.207(c), this letter serves notice
to Houston Lighting & Power Company that Diamond Shamrock
Corporation's cogeneration facility at 1101 Tidal Road,
Deer Park, Texas, is a Qualifying Facility.

Please provide the necessary PPS contracts and metering
for the purchase of 35 megawatts of cogeneration power at
the earliest possible date.

Tom Lipscomb will coordinate the necessary metering and
other physical arrangements necessary at Deer Park.

Very truly yours,

G. E. Knowles

wg

cc:  T. Lipscomb - Deer Park

bcc:  D. G. McMillen
      M. H. Farrar - Pasadena, Tx.

CERTIFIED MAIL

OCC033836

Diamond Shamrock Corporation
351 Phelps Court, P O Box 2300, Irving, Texas  75061-1433  Phone  214 659-7195

**Confidential**

OCCNJ0027146

ALCD-PUBCOM_0003024



**Diamond Shamrock**

George E. Knowles
Director of Energy Affairs

*del'd 1/29/82*
*ret. receipt*
*rec'd*

January 21, 1982

Kenneth F. Plumb, Secretary
Federal Energy Regulatory Commission
825 North Capitol Street, NE
Washington, DC  20426

Dear Mr. Plumb:

By this letter Diamond Shmamrock Corporation furnishes notice
required by the Commission's regulation 18CFR 292.207 that the
cogeneration facility described below is a Qualifying Facility.

1.   Name and address of owner:

         Diamond Shamrock Corporation
         717 North Harwood Street
         Dallas, Texas 75201

     Location of facility:

         Battleground Road and State Highway 134
         La Porte, Texas

2.   Description of facility:

         The facility is a combustion turbine combined cycle
         cogeneration facility comprised of two combustion turbines,
         each of which drives an electric generator and produces
         hot exhaust gases.  Exhaust gas energy is recovered
         in two heat recovery steam generators which produce high
         pressure steam.  The high pressure steam is used by a steam
         turbine to produce process steam and drive an electric
         generator.

3.   The facility will use natural gas as its primary source of
     energy.

4.   The facility has the capacity to produce 200 megawatts.

OCC033837

Diamond Shamrock Corporation

Mr. Kenneth F. Plumb
January 21, 1982
Page Two

5.  No electric utility, electric utility holding company,
    or any person owned by either has any ownership interest
    in the facility.

                              Very truly yours,

                              G. E. Knowles
                              Director of Energy Affairs

al

cc:  G. W. Noce, Battleground
     M. H. Farrar, Pasadena

                                                    OCC033838

**Confidential**



**Diamond Shamrock**

George E. Knowles
Director of Energy Affairs

January 22, 1982

Houston Lighting & Power Co.
711 Walker Street
Houston, TX 77002

Attn: Mr. Roland F. Hussey

Gentlemen:

As required by regulations of the Federal Energy Regulatory
Commission at 18 CFR 292.207(c), this letter serves notice
to Houston Lighting & Power Company that Diamond Shamrock
Corporation's combustion turbine combined cycle cogeneration
facility at Battleground Road and Highway 134, La Porte,
Texas, is a Qualifying Facility.

According to the regulation cited, if the capacity of a
Qualifying Cogeneration Facility is 500 kw or more, notice
of qualifying status must be furnished to the utility to
which the facility is interconnected at least 90 days
prior to the date that the utility is expected to purchase
power from the facility.

Very truly yours,

G. E. Knowles

al

cc: G. W. Noce, Battleground
    M. H. Farrar

CERTIFIED MAIL

Diamond Shamrock Corporation

OCC033839

**Confidential**

OCCNJ0027149
ALCD-PUBCOM_0003027

<u>SCHEDULE 2.23</u>

Agreement,
Dated September 4, 1986 (the "Agreement"),
By and Among
Diamond Shamrock Corporation,
Occidental Petroleum Corporation,
Occidental Chemical Holding Corporation
and
<u>Oxy-Diamond Alkali Corporation</u>


<u>HISTORICAL OBLIGATIONS</u>

8710G

OCC033840

**Confidential**

OCCNJ0027150
ALCD-PUBCOM_0003028

1.  Litigation involving any Diamond Company to the extent not related to the Chemicals Business but involving acts, occurrences or ommissions prior to January 1, 1984, including, without limitation, the following pending Litigation:

      i.  In re Agent Orange Multidistrict Panel Litigation

      ii.  Personal injury actions arising in connection with the Lister Avenue Facility

      iii.  Natomas shareholder and preferred shareholder litigation

      iv.  Superman (Wendt) actions

      v.  Other Litigation for which SDS Biotech is responsible for administering pursuant to a Transfer and Assumption Agreement, dated July 1, 1983.

2.  Operating lease obligations to the extent not used in or related to the Chemicals Business including, without limitation, the following:

    Sublease with Park Leasing Group from Geauga County, Ohio 12/6/74
    Lease of two Falcon 10 Aircraft -- 11/78
    Lease of oil and gas pipelines -- 1/15/80
    Lease of railroad cars from United States Leasing, Inc. -- 4/1/78; from Tiger Leasing Group -- 7/15/78
    Leases of mining equipment to Falcon Coal Company -- 5/1/79; 7/1/79; 4/15/81; 2/20/82; 4/22/83; to Amherst Coal Company -- 11/9/81; jointly to Amherst and Falcon Coal Companies -- 2/15/82; to DSC -- 10/1/81
    Coal mineral sublease (Omar Property) -- 9/16/80
    Gateway mineral sublease -- 10/31/80
    Blue Grass airport hangar lease -- 12/1/82
    Gateway Equipment Leases
    Hawkeye Equipment Leases
    Montco Leases

-2-

OCC033841

Confidential

OCCNJ0027151

ALCD-PUBCOM_0003029

3.  Capital lease obligations to the extent not used in or related to the Chemicals Business including, without limitation, the following:

    Fort Diamond Pipeline Company lease -- 12/21/70
    Marquis Pipeline Company lease -- 7/15/69
    Cuyahoga County hangar lease -- 3/1/75

4.  Other long-term debt not solely related to the Chemicals Business including, without limitation, the following:

    Indenture, dated as of April 1, 1974, between Diamond Shamrock Corporation and Mellon Bank, N.A. ("Mellon") and the First Supplemental Indenture thereto, dated as of January 26, 1984, among Diamond Shamrock Corporation, Diamond Shamrock Chemicals Company and Mellon

    Indenture, dated as of November 15, 1975, between Diamond Shamrock Corporation and Mellon and the First Supplemental Indenture thereto, dated as of January 26, 1984, among Diamond Shamrock Corporation, Diamond Shamrock Chemicals Company and Mellon

    Indenture, dated as of December 15, 1976, between Diamond Shamrock Corporation and Mellon and the First Supplemental Indenture thereto, dated as of January 26, 1984, among Diamond Shamrock Corporation, Diamond Shamrock Chemicals Company and Mellon

    Indenture, dated as of April 1, 1978, between Diamond Shamrock Corporation and Mellon, and the First Supplemental Indenture thereto, dated as of January 26, 1984, among Diamond Shamrock Corporation, Diamond Shamrock Chemicals Company and Mellon

    Indenture, dated as of May 1, 1983, between Diamond Shamrock Corporation and Mellon, and the First Supplemental Indenture thereto, dated as of January 26, 1984, among Diamond Shamrock Corporation, Diamond Shamrock Chemicals Company and Mellon

    Palo Duro River Authority (Texas), Pollution Control Revenue Bonds, Series 1981

    Palo Duro River Authority (Texas), Pollution Control Revenue Bonds, Series 1978

    City of Van Buren, Arkansas, Pollution Control Revenue Bonds, Series 1977

    City of Van Buren, Arkansas, Industrial Development Revenue Bonds, Series 1977

-3-

OCC033842

Confidential

Tuscaloosa Mortgage Revenue Bonds
Tuscaloosa Industrial Development Revenue Bonds
Tuscaloosa Pollution Control Revenue Bonds
Minnesota Mutual Life Insurance Company Notes

6.    Guarantees of indebtedness to the extent not related
to the Chemicals Business including, without limitation, the
following:
Leon Properties
First National Bank of Amarillo
Black Lung

6.    Other obligations reflected on the balance sheet or in
the notes to the financial statements of Seller arising,
accrued or related, directly or indirectly, to acts,
occurrences or ommissions prior to September 1, 1983 and to the
extent not related to the Chemicals Business

7.    All liabilities and obligations assumed by Diamond
Shamrock Refining and Marketing Company in the Assignment and
Assumption Agreement executed as of November 1, 1983, with
Diamond Chemicals Company, or otherwise, or related to the
assets covered by any such assumption and all liabilities and
obligations associated with the petroleum refining and
marketing business as conducted by DSCC or a predecessor in
interest prior thereto

8.    All liabilities and obligations assumed by Diamond
Shamrock Exploration Company in the Assignment and Assumption
Agreement executed as of November 1, 1983, with Diamond
Chemicals Company, or otherwise, or related to the assets
covered by any such assumption and all liabilities and
obligations associated with the hydrocarbons exploration and
production business as conducted by DSCC or a predecessor in
interest prior thereto

9.    All liabilities and obligations assumed by Diamond
Shamrock Coal Company in the Assignment and Assumption
Agreement executed as of November 1, 1983, with Diamond
Chemicals Company, or otherwise, or related to the assets
covered by any such assumption and all liabilities and
obligations associated with the coal business as conducted by
DSCC or a predecessor in interest prior thereto

10.    All liabilities and obligations assumed by Diamond
Shamrock Corporate Company in the Assignment and Assumption
Agreement executed as of January 1, 1984, with Diamond Shamrock

-4-

OCC033843

**Confidential**

Chemicals Company, as amended by the three amendments, each executed as of January 1, 1984, or otherwise, or related to the assets covered by any such assumption

11.  All liabilities and obligations assumed by Diamond Shamrock Aviation Company in the Assignment and Assumption Agreement executed as of January 16, 1984, with Diamond Shamrock Chemicals Company, as amended by the First Amendment thereto executed as of August 1, 1986, or otherwise, or related to the assets covered by any such assumption and all liabilities and obligations associated with the operation or ownership of aircraft as conducted by DSCC or a predecessor in interest prior thereto

12.  All liabilities and obligations associated with the discontinued businesses of DSCC or any predecessor in interest (regardless of whether or not chemical, petroleum or coal related) including, without limitation, all liabilities and obligations associated with any acquisition, disposition and merger agreements relating to such discontinued businesses, including, without limitation to the following:

| | | |
|---|---|---|
| Urethane Foam | Other Plastics | Medical Products |
| Cement | Ag Chem | Eltech |
| Soda Ash | Animal Health | Ion Exchange Resins |
| Polypropylene | Animal Nutrition | Harte & Co. |
| Polyvinyl Chloride | Metal Coatings | Yeast |
| VCM | Polyester Resins | DDT |
| | | Pickands Mather |

13.  All liabilities and obligations associated with DSCC having been a public company prior to January 16, 1984

8 3 2 1 G

-5-

OCC033844

## SCHEDULE 4.03

Agreement,
Dated September 4, 1986 (the "Agreement"),
By and Among
Diamond Shamrock Corporation,
Occidental Petroleum Corporation,
Occidental Chemical Holding Corporation
and
Oxy-Diamond Alkali Corporation

### SAVINGS PLANS

8505G

OCC033845

Confidential

OCCNJ0027155
ALCD-PUBCOM_0003033

**Diamond Shamrock**

Schedule 4.03

Patrick W. McConahy
General Manager
Benefits & Compensation

July 11, 1986

Mr. Daniel M. Hodan
Corporate Manager, Employee Benefits
Occidental Petroleum Corporation
10889 Wilshire Boulevard
Los Angeles, CA    90024

Dear Dan:

The purpose of this letter is to outline the estimated costs involved in the event that Diamond Shamrock retains transferring employees' ESIP accounts at your request beyond the later of 90 days following the closing date or 12/31/86. All estimates are based upon 3,000 Chemical Company plan participants.

1. **Ongoing Monthly Costs**

- AmeriTrust Administration Fees    $ 2,500.00
- AmeriTrust Distribution Costs    ~~16.67~~ (1)    *MW* 166.67 *es*
- Diamond Shamrock Labor Costs    2,730.00 (2)

       Total:    ~~$ 5,246.67~~ /Month

       $ 5,396.67 *MW es*

2. **One-Time Costs** (3)

- AmeriTrust Annual Recordkeeping
  Fee    $30,000.00 (4)
- Prospectus Printing and Mailing
  Costs    $ 6,000.00

       Total:    $36,000.00

(1) Estimate of $2,000/year covers terminations and in-service distributions

(2) Pro-rata portion of plan administrators' salaries and indirect payroll costs (5-30%)

(3) If 90 day period from closing date extends into 1987, these costs would not be chargeable to Occidental

(4) $10.00 per participant

-Continued-

OCC033846

**Diamond Shamrock Corporation**
World Headquarters, 717 North Harwood Street, Dallas, Texas 75201 Phone: 214 922-2051

Confidential

July 11, 1990                                              Page 2

To: Mr. Daniel M. Hodan


    Dan, these costs are our best estimates based on our current experience. They are neither conservative nor worst case.

    If you need further information, please let me or John LaGreca know.

Sincerely,

Patrick W. McConahy
General Manager,
  Benefits & Compensation


PWM:dz
(7051)

cc: John S. LaGreca


OCC033847

**Confidential**

SCHEDULE 6.08

Agreement,
Dated September 4, 1986 (the "Agreement"),
By and Among
Diamond Shamrock Corporation,
Occidental Petroleum Corporation,
Occidental Chemical Holding Corporation
and
Oxy-Diamond Alkali Corporation

CERTAIN EVENTS OF DEFAULT

Defaults under Carbocloro Credit Agreement, Completion Agreement, Guaranty and all amendments, modifications and supplements thereto

Defaults under DS Chile Eurodollar Credit Agreement, Guaranty and all amendments, modifications and supplements thereto

8711G

OCC033848

OCCNJ0027158
ALCD-PUBCOM_0003036

SCHEDULE 8.03

Agreement,
Dated September 4, 1986 (the "Agreement"),
By and Among
Diamond Shamrock Corporation,
Occidental Petroleum Corporation,
Occidental Chemical Holding Corporation
and
Oxy-Diamond Alkali Corporation

INFORMATION WITHHELD

Certain contracts, agreements and understandings relating
to the provision of transportation or transportation
related services to which DSCC or one or more of the DSCC
Companies is a party

8338G

OCC033849

Confidential

OCCNJ0027159
ALCD-PUBCOM_0003037

SCHEDULE 8.04


Agreement,
Dated September 4, 1986 (the "Agreement"),
By and Among
Diamond Shamrock Corporation,
Occidental Petroleum Corporation,
Occidental Chemical Holding Corporation
and
Oxy-Diamond Alkali Corporation


EXCEPTIONS TO PROHIBITED ACTIONS
BY SELLER; 1986 CAPITAL BUDGET


8712G

OCC033850

Confidential

OCCNJ0027160
ALCD-PUBCOM_0003038

## DIAMOND SHAMROCK CHEMICALS COMPANY
## 1986 CAPITAL SPENDING FORECAST
### ($ M)

| PROJECT | PROJECT TOTAL | 12/31/85 SPENDING | 1986 MAR YTD | 1986 APRIL | 1986 MAY | 1986 JUNE | 1986 3RD QUARTER | 1986 4TH QUARTER | 1986 TOTAL | 1987 CARRYOVER |
|---|---|---|---|---|---|---|---|---|---|---|
| **NON-DISCRETIONARY** | | | | | | | | | | |
| **GREATER THAN $500M** | | | | | | | | | | |
| DEER PARK CO-GEN | $41,300 | $39,539 | $863 | $344 | $0 | $0 | $256 | $318 | $1,761 | $0 |
| MUSCLE SHOALS PCB TRANSFORMERS | $3,300 | $2,657 | $223 | $70 | $90 | $90 | $170 | | $643 | $0 |
| DEER PARK CELL ROOM FLOOR | $518 | $488 | $30 | | | | | | $30 | $0 |
| DEER PARK CHLORINE INCINERATOR | $935 | $434 | $45 | | $25 | $25 | $100 | $306 | $501 | $0 |
| DELAWARE CITY CCL4 EMISSION CTL | $800 | PROPOSED | | | | | $100 | $200 | $300 | $500 |
| SUBTOTAL CHLOR-ALKALI | $46,853 | $43,118 | $1,141 | $414 | $115 | $115 | $626 | $824 | $3,235 | $500 |
| CASTLE WAYNE #2, #3 WASTE HEAT | $2,421 | $2,295 | $57 | | $35 | $34 | | | $126 | $700 |
| ASHTABULA ADC | $2,900 | PROPOSED | $0 | | $596 | $1,604 | | | $2,200 | |
| SUBTOTAL SODA PRODUCTS | $5,321 | $2,295 | $57 | $0 | $631 | $1,638 | $0 | $0 | $2,326 | $700 |
| NEW VENTURES-CONCORD BSP | $2,588 | $1,805 | $681 | $102 | | | | | $783 | |
| HARRISON REHABILITATION | $980 | $718 | $0 | $30 | $116 | $116 | | | $262 | |
| ECONOMIC LAB | $2,500 | | $1,730 | $806 | | | | | $2,536 | |
| SUBTOTAL PROCESS CHEMICALS | $3,480 | $718 | $1,730 | $836 | $116 | $116 | $0 | $0 | $2,798 | $0 |
| **LESS THAN $500M** | | | | | | | | | | |
| CHLOR-ALKALI | $14,900 | $4,890 | $1,536 | $70 | $340 | $341 | $1,452 | $4,271 | $8,010 | $2,000 |
| PROCESS CHEMICALS | $4,350 | $1,405 | $697 | $284 | $443 | $442 | $638 | $405 | $2,909 | |
| SODA PRODUCTS | $1,740 | | $413 | $114 | $96 | $96 | $525 | $496 | $1,740 | |
| LANKRO | $1,000 | | $475 | $90 | $42 | $43 | $175 | $175 | $1,000 | |
| NEW VENTURES | $141 | $20 | $50 | $71 | | | | | $121 | |
| UNIT | $691 | $227 | $248 | $140 | $76 | | | | $464 | |
| TOTAL NON-DISCRETIONARY | $81,064 | $54,478 | $7,028 | $2,121 | $1,859 | $2,791 | $3,416 | $6,171 | $23,386 | $3,200 |
| **DISCRETIONARY** | | | | | | | | | | |
| SOUTHWESTERN | $500 | $350 | $0 | $0 | $75 | $75 | | | $150 | $337 |
| VENTURE CAPITAL FUND | $929 | $333 | $0 | $0 | $129 | $130 | $35 | $64 | $259 | $125 |
| SUMMIT VENTURE | $500 | $250 | $0 | $0 | $62 | $63 | $10 | $10 | $125 | |
| NEW VENTURES | $99 | $0 | $0 | $0 | $0 | $0 | | | $99 | |
| UNIT | $20 | | | | | | | | $20 | |
| UV CONSOLIDATION CHARLOTTE | $1,300 | PROPOSED | $0 | $0 | $250 | $250 | $374 | $276 | $650 | $650 |
| PARTICLE TECHNOLOGY | $500 | PROPOSED | | | | | | | $500 | |
| PROCESS CHEMICALS LESS THAN $500M | $412 | PROPOSED | | | $114 | $114 | $184 | | $412 | |
| TOTAL DISCRETIONARY | $4,260 | $933 | $0 | | $630 | $632 | $603 | $350 | $2,215 | $1,112 |
| TOTAL 1986 FORECAST | $85,324 | $55,411 | $7,028 | $2,121 | $2,489 | $3,423 | $4,019 | $6,521 | $25,601 | $4,312 |

OCC033851

Confidential

DIAMOND SHAMROCK CHEMICALS COMPANY
1986 PLAN
1986 CAPITAL INVESTMENT PLAN
(Dollars In Thousands)

| | 1985 SPENDING | Planned 1986 Spending | | | Estimated 1987 CARRYOVER |
| | | 1986 COMMITTED | 1986 PROPOSED | TOTAL | |
|---|---|---|---|---|---|
| **DIVISIONAL BREAKDOWN** | | | | | |
| Chlor-Alkali | $ 47,274 | $ 4,415 | $ 7,330 | $11,745 | $ 3,000 |
| Soda Products | 7,036 | 1,948 | 3,452 | 5,400 | 1,230 |
| Process Chem | 6,567 | 1,010 | 4,008 | 5,018 | 3,000 |
| Lankro | 2,438 | 290 | 1,190 | 1,480 | --- |
| New Ventures | 2,522 | 599 | 1,543 | 2,142 | --- |
| Non-Divisional | 1,003 | 406 | 855 | 1,261 | --- |
| Company Total | $ 66,840 | 8,668 | 18,378 | $27,046 | $ 7,230 |

## MAJOR PROJECTS - 1986

| | STATUS | TOTAL EXPECTED COST | CLASS | 1986 EXPEND. |
|---|---|---|---|---|
| Deer Park Cogeneration Expansion | Approved | $45,000 | Economic | $2,650 |
| Replace PCB Transformer M.S. | Approved | 3,000 | Pollution | 500 |
| Methylate at Delaware City | Proposed | 1,500 | Economic | 500 |
| ADC Project - Ashtabula | Proposed | 1,400 | Economic | 1,000 |
| U.V. Consolidation - Charlotte | Proposed | 1,300 | Economic | 600 |
| BSP | Approved | 2,200 | Economic | 300 |

OCC033852

**Confidential**

OCCNJ0027162
ALCD-PUBCOM_0003040

SCHEDULE 8.09(a)


Agreement,
Dated September 4, 1986 (the "Agreement"),
By and Among
Diamond Shamrock Corporation,
Occidental Petroleum Corporation,
Occidental Chemical Corporation
and
Oxy-Diamond Alkali Corporation


TRANSFER OF ASSETS FROM DSCC

As set forth below, Seller's Designees are:  Diamond Shamrock
Corporate Company, Diamond Shamrock Chemical Land Holdings
Inc., Diamond Shamrock Exploration Company, Diamond Shamrock
Refining and Marketing Company and Seller .

1.  Transfer of all of the shares of Diamond Shamrock Europe
    Ltd., a U.K. corporation, and all of its subsidiaries to
    Diamond Shamrock Corporate Company and DSC Acquisitions,
    Inc.

2.  Transfer of all of the shares of Diamond Shamrock (Africa)
    Pty. Ltd., a South African corporation, owned by Diamond
    Shamrock Chemicals Company to Diamond Shamrock Corporate
    Company

3.  Transfer of Hamada Agricultural Company Limited, a
    Nigerian corporation, Agricultural and Industrials
    Chemicals (Nigeria) Ltd., a Nigerian corporation, and
    DICHEM Limited, a British Virgin Islands corporation, to
    Diamond Shamrock Corporate Company

4.  Transfer of Duolite International, Inc., a Delaware
    corporation and Sirotherm, Inc., a Delaware corporation,
    to Diamond Shamrock Corporate Company .

5.  Transfer of all rights of Diamond Shamrock Chemicals
    Company under the Loan Agreement, dated October 1, 1981,
    with C. Conradty Nurnberg GmbH & Co. KG to Diamond
    Shamrock Corporate Company

6.  Transfer of Metal Coatings International Inc., a Delaware
    corporation, to Diamond Shamrock Corporate Company,
    including partial assignment of a services agreement

OCC033853

**Confidential**

**OCCNJ0027163**
ALCD-PUBCOM_0003041

7.  Transfer of Diamond Shamrock International Corporation, a
    Delaware corporation, Diamond Shamrock Venezolana, S.A., a
    Venezuelan corporation and Insulating Aggregates, Inc., a
    Louisiana corporation, to Diamond Shamrock Corporate
    Company

8.  Transfer of all real properties, located in Lake and
    Geauga Counties, Ohio and the mortgage with Lake
    Underground Storage unassociated with the Chemicals
    Business to Diamond Shamrock Corporate Company and Diamond
    Shamrock Chemical Land Holdings Inc.

9.  Transfer of all gas wells and gas gathering systems in
    Ohio together with associated oil and gas leases and
    mineral estates, except for the gas well at the Ashtabula
    plant to Diamond Shamrock Chemical Land Holdings Inc.

10. Transfer of BioSpecific Technologies, Inc., a Delaware
    corporation, to Diamond Shamrock Corporate Company

11. Transfer of Concord, Ohio properties and leases to Diamond
    Shamrock Corporate Company and Diamond Shamrock Land
    Holdings Inc. including:

    - contracts related to the Concord, Ohio facility

    - various lease improvements

12. Transfer of the lease and other contracts associated with
    Ocean Systems from Diamond Shamrock Chemicals Company to
    Diamond Shamrock Corporate Company

13. Assignment by Diamond Shamrock Chemicals Company to
    Diamond Shamrock Corporate Company to effect the transfers
    of the Excluded Assets

14. Transfer of any interest of DSCC in Diamond Shamrock
    Energy Reserves to Diamond Shamrock Corporate Company

15. Transfer of interest of DSCC in Sanyo Chemical Industries
    Co, Ltd.

16. Transfer of properties and other rights in Chambers
    County, Texas to Diamond Shamrock Refining and Marketing
    Company, including the assignment of certain contracts

4267H

-2-

OCC033854

**Confidential**

**OCCNJ0027164**

ALCD-PUBCOM_0003042

<u>SCHEDULE 8.09(b)</u>

Agreement,
Dated September 4, 1986 (the "Agreement"),
By and Among
Diamond Shamrock Corporation,
and
Occidental Petroleum Corporation,
Occidental Chemical Corporation
and
<u>Oxy-Diamond Alkali Corporation</u>

<u>OTHER ACTIONS</u>

1.  Transfer of all of the shares of Diamond Shamrock Process
    Chemicals Ltd., a U.K. corporation, to Diamond Shamrock
    Chemicals Company

2.  Sublease of property in Concord, Ohio facility

3.  Resolution of financing issues relating to Diamond Shamrock
    de Chile S.A.I.

4.  Resolution of financing issues relating to Carbocloro

5.  Transfer of properties and other rights in Chambers County,
    Texas to Diamond Shamrock Refining and Marketing Company,
    including the assignment of certain contracts

8665G

OCC033855

**Confidential**

**OCCNJ0027165**
ALCD-PUBCOM_0003043

SCHEDULE 8.11

Agreement,
Dated September 4, 1986 (the "Agreement"),
By and Among
Diamond Shamrock Corporation,
and
Occidental Petroleum Corporation,
Occidental Chemical Holding Corporation
and
Oxy-Diamond Alkali Corporation

AUDITED 1985 FINANCIAL STATEMENT QUALIFICATIONS

There are no qualifications to the Audited 1985 Financial
Statements except as set forth in the footnotes thereto.

OCC033856

<u>SCHEDULE 8.15</u>

Agreement,
Dated September 4, 1986 (the "Agreement"),
By and Among
Diamond Shamrock Corporation,
Occidental Petroleum Corporation,
Occidental Chemical Corporation
and
<u>Oxy-Diamond Alkali Corporation</u>

SURETY BONDS; GUARANTIES;
<u>LETTERS OF CREDIT; COMFORT LETTERS</u>

Terms defined in the Agreement are used herein as so defined.

Attached is a list of all outstanding performance and surety bonds, letter of credit obligations, guarantees and comfort letters issued by Seller and relating to the Chemicals Business.

7757G

OCC033857

**Confidential**

## LETTERS OF CREDIT
### (Diamond Shamrock Chemicals Company)

| Bank | L/C Number | Beneficiary | Amount | Exp. Date | Plant Location or Job Number |
|------|-----------|-------------|--------|-----------|------------------------------|
| Midlantic | 500087 | NJDEP | 135,949.00 | 06/15/87 | Carlstadt, Harrison, Jersey City, Morristown |
| NBC, San Antonio | C4160 | Alabama Dept. of Env. Management | 1,590,003.00 | 06/18/87 | Muscle Shoals, Mobile |
| NBC, San Antonio | C4166 | WV Dept. of Natural Resources | 21,437.00 | 06/18/87 | Belle Plant, WV |
| NBC, San Antonio | C4164 | Texas Dept. of Water Resources | 3,190,937.00 | 06/18/87 | La Porte, Deer Park |
| NBC, San Antonio | C4163 | Texas Dept. of Water Resources | 11,544.00 | 06/18/87 | Deer Park |
| NBC, San Antonio | C4161 | OH EPA Haz. Mtls. Mngmt. | 112,580.00 | 06/18/87 | Ashtabula* and Chardon |
| Interfirst | 61066 | NJDEP | 10,500,000.00 | 08/29/87 | Jersey City, Carlstadt, Harrison, Morristown |

** Diamond Shamrock Process Chemicals has the authority to open letters of credit for $150,000.00 or less. Most are to Cathay Chemical Works Inc. or Toyo Menka Kaisah Ltd.

## GUARANTEES

| Borrower | Bank/Creditor/Bondholder | Type of Facility | Amount |
|----------|--------------------------|------------------|--------|
| Diamond Shamrock De Chile S.A.I. (including a Guaranty, dated as of August 28, 1980, an Amendment, dated as of March 1, 1983, a Participation Agreement, dated May 30, 1984, a Participation Agreement, dated as of January 25, 1985 and a letter agreement, dated September 3, 1986) | Bank of Boston | Term Loan | 8,000,000 US |
| Diamond Shamrock Pacific | Fuji Bank Bank of Tokyo | Working Capital Working Capital | 10,000,000 YEN 10,000,000 YEN |

* Only as this letter of credit relates to Ashtabula

OCC033858

Confidential

| Borrower | Bank/Creditor/Bondholder | Type of Facility | Amount |
|---|---|---|---|
| | Citibank (Lead) | Credit Agreement | 22,000,000 US |
| Carboclaro S.A. Industrias Quimicas (including a Guaranty Agreement, dated December 22, 1977, as amended, modified or supplemented by a Letter Agreement, dated December 15, 1980 and a Shareholders' Amendment, dated as of February 11, 1982 and a Completion Agreement, dated December 22, 1977, as amended, modified or supplemented by a Letter Agreement, dated December 15, 1980, a Letter Amendment, dated December 31, 1980, a Shareholders' Amendment, dated as of February 11, 1982, a Letter Agreement, dated as of December 30, 1983, a Letter Agreement, dated as of June 30, 1984, a Letter Waiver and Agreement, dated as of June 30, 1986 and the letter, dated September 2, 1986) | | | |
| Diamond Shamrock Scandinavia A/S | Senko Kjemisk | Cancellation Agreement | 3,605,000 NKr |
| Diamond Shamrock Corporation | Bondholder | Industrial Development Board of City of Muscle Shoals Pollution Control Revenue Bonds, Series 1974 | 2,200,000 US |
| Diamond Shamrock Corporation | Bondholder | Industrial Development Board of the City of Muscle Shoals Revenue Bonds, Series 1974 | 925,000 US |
| Diamond Shamrock Corporation | Bondholder | County Commission of Kanawha County West Virginia Environmental Improvement Revenue Bonds, Series 1979 | 1,000,000 US |

OCC033859

ALCD-PUBCOM_0003047

| Borrower | Bank/Creditor/Bondholder | Type of Facility | Amount |
|---|---|---|---|
| Diamond Shamrock Corporation | Bondholder | Niagara County Industrial Development Agency Industrial Development Revenue Bonds, Series 1981 | 2,600,000 US |
| Diamond Shamrock Chemicals Company | Bondholder | The New Hanover Industrial Facilities and Pollution Control Financing Authority Pollution Control Revenue Bonds, Series 1981 and the Industrial Development Revenue Bonds, Series 1981 | 4,600,000 US 1,000,000 US |
| Diamond Shamrock Chemicals Company | Bondholder | South Louisiana Port Commission Port Facilities Revenue Bonds, Series 1981 | 27,000,000 US |
| Diamond Shamrock Chemicals Company | Bondholder | Parish of St. James, State of Louisiana Pollution Control Revenue Bonds, Series 1981 | 19,500,000 US |
| Diamond Shamrock Chemicals Company | Bondholder | Parish of St. James, State of Louisiana Industrial Revenue Bonds Series 1982 | 1,000,000 US |
| Diamond Shamrock Chemicals Company | Valley Bankers Leasing 81-1 Partnership Valley Bank Leasing Inc. and Modern Woodmen of America | Participation Agreement Lease Agreement | Payments under the Agreements |
| Diamond Shamrock Chemicals Company | Exchange National Bank of Chicago and General Electric Credit Corporation | Charter Agreement Indemnity Agreement | Payments under the Agreements |

Consent and Indemnification Agreement, dated as of November 27, 1985 by and among International Business Machines Corporation, Convent Chemical Corporation, The B. F. Goodrich Company, Diamond Shamrock Chemical Company and Diamond Shamrock Corporation.

Guarantee evidenced by the Assignment of Amended and Restated Brine Production and Delivery Agreement and Assignment of Partial Assignment of Salt and Underground Storage Lease, dated November 27, 1985, by Convent Chemical Corporation in favor of Diamond Shamrock Chemicals Company.

OCC033860

- 3 -

Confidential

OCCNJ0027170

ALCD-PUBCOM_0003048

## COMFORT LETTERS

| Entity | Bank/Creditor | Type Of Facility | Amount |
|---|---|---|---|
| Diamond Shamrock Taiwan Ltd. and Diamond Shamrock Trading Corporation | Irving Trust - Taipei | Working Capital | 1,400,000 US |
| Diamond Shamrock (Australia) Pty. Ltd. | ANZ Banking Group | Overdraft<br>Negotiated Bills<br>Documentary Credits | 450,000 AUS<br>50,000 AUS<br>50,000 AUS |
| | Collector of Customs | Security | 27,000 AUS |
| Diamond Shamrock Pacific Ltd. | Long Term Credit Bank | Working Capital | 10,000,000 YEN |
| Diamond Shamrock Canada Ltd. | Toronto Dominion | Working Capital | 5,000,000 US |
| Diamond Shamrock Chemicals Company | National Bank of Commerce | Environmental L/C's | 5,126,501 US |
| | InterFirst Bank | Environmental L/C's | 10,500,000 US |
| *Korea Potassium Chemical Co., Ltd. | Chase Manhattan Bank | Term Loan<br>Working Capital<br>Working Capital | 2,200,000 US<br>1,500,000 US<br>150,000,000 WON |

### LETTERS OF AWARENESS

| Entity | Bank/Creditor | Type Of Facility | Amount |
|---|---|---|---|
| Thai Diamond Shamrock Chrome Ltd. | Citibank-Bangkok | Current Account<br>Bank Guarantees | 2,000,000 BAHT<br>500,000 BAHT |

---

* Initial Borrowing Amount, current amount outstanding is approximately $800,000 US.

OCC033861

7797G

**Confidential**

**OCCNJ0027171**

ALCD-PUBCOM_0003049

| NAME OF PRINCIPAL ON BOND, OBLIGEE, DESCRIPTION | SURETY | BOND NO. | BOND AMOUNT | RENEWAL DATE |
|---|---|---|---|---|
| Diamond Shamrock Corporation State of NC, Sales Tax | St. Paul | 400 GJ 6554 | 1,000.00 | 11-17-86 |
| Diamond Shamrock Corporation USA, Bond of User of Specially Denatured Alcohol or Rum (Dupont Ave., Belle, WV) | St. Paul | 400 FE 5161 | 18,000.00 | 10-12-86 |
| Diamond Shamrock Corporation USA, Bureau of Land Mgmt., Bond Under Lease for Mining Sodium Deposits, Serial #081576, Wyoming | St. Paul | 400 EY 1420 | 10,000.00 | 08-01-86 |
| Diamond Shamrock Inc. City of Oxnard, CA, Subdivision Improvement Bond (Parcel Map 77-42) | St. Paul | 400 ES 3476 | 35,000.00 | 12-22-86 |
| Diamond Shamrock Corporation City of Oxnard, CA, Subdivision Improvement Bond (Tract No. 3544) | St. Paul | 400 FV 4370 | 75,000.00 | 12-22-86 |
| Diamond Shamrock Chemicals Company US Dept. of Interior, Sodium Mining Lease Bond, Serial #0309132 | Federal | 8092-30-99 | 10,000.00 | 11-23-86 |
| Diamond Shamrock Chemicals Company US Land Office #086530, Serial #W-086530, Bond Under Lease for Mining Sodium Deposits | Federal | 8100-78-03 | 5,000.00 | 11-11-86 |

5

OCC033862

Confidential

OCCNJ0027172

ALCD-PUBCOM_0003050

| NAME OF PRINCIPAL ON BOND, OBLIGEE, DESCRIPTION | SURETY | BOND NO. | BOND AMOUNT | RENEWAL DATE |
|---|---|---|---|---|
| Diana S. Limer State of WV, Notary Public Bond | CNA | 922-30-36 | 500.00 | 02-26-95 |
| Diamond Shamrock Canada Ltd. Her Majesty the Queen, Wholesaler's Sales Tax Bond | CNA | 8300894 | 25,000.00 | 11-15-86 |
| Diamond Shamrock Canada Ltd. Her Majesty the Queen, Excise Tax Bond | CNA | 8300895 | 1,000.00 | 11-15-86 |
| Diamond Shamrock Chemicals Company Harris County, TX, Perpetual Bond Covering All Pipeline and/or Main Activity In, Under, Across or Along Harris County Road | St. Paul | 400 DS 4489 | 10,000.00 | 07-10-86 |
| Diamond Shamrock Chemicals Company Harris County, TX, Perpetual Bond Covering All Pipeline and/or Main Activity In, Under, Across or Along Harris County Road | St. Paul | 400 DS 4604 | 15,000.00 | 06-21-86 |
| Diamond Shamrock Corporation (Gulf Coast Region) Harris County, TX, Perpetual Bond Covering All Pipeline and/or Main Activity In, Under, Across or Along Harris County Road | CNA | 930-46-20 | 5,000.00 | 03-18-87 |
| Everett Leo Beeman Harris County Judge, TX, Bond of County Public Weigher or Deputy Public Weigher | CNA | 922-30-25 | 2,500.00 | 01-01-87 |

OCC033863

6

Confidential

| NAME OF PRINCIPAL ON BOND, OBLIGEE, DESCRIPTION | SURETY | BOND NO. | BOND AMOUNT | RENEWAL DATE |
|---|---|---|---|---|
| Robert Edward McAnaney Harris County Judge, TX, Bond of County Public Weigher or Deputy Public Weigher | CMA | 922-30-26 | 2,500.00 | 01-01-87 |
| Jerry Lee Roop Harris County Judge, TX, Bond of County Public Weigher or Deputy Public Weigher | CMA | 922-30-27 | 2,500.00 | 01-01-87 |
| Willis DeCosta Abrams Harris County Judge, TX, Bond of County Public Weigher or Deputy Public Weigher | CMA | 922-30-28 | 2,500.00 | 01-01-87 |
| Robert Millar Baker Harris County Judge, TX, Bond of County Public Weigher or Deputy Public Weigher | CMA | 922-30-29 | 2,500.00 | 01-01-87 |
| Kendall Lee Brincefield Harris County Judge, TX, Bond of County Public Weigher or Deputy Public Weigher | CMA | 922-30-30 | 2,500.00 | 01-01-87 |
| Dennis Wayne Amos Harris County Judge, TX, Bond of County Public Weigher or Deputy Public Weigher | CMA | 922-30-31 | 2,500.00 | 01-01-87 |
| John Douglas Boulet, Sr. Harris County Judge, TX, Bond of County Public Weigher or Deputy Public Weigher | CMA | 922-30-32 | 2,500.00 | 01-01-87 |

OCC003864

Confidential

OCCNJ0027174

ALCD-PUBCOM_0003052

| NAME OF PRINCIPAL ON BOND, OBLIGEE, DESCRIPTION | SURETY | BOND NO. | BOND AMOUNT | RENEWAL DATE |
|---|---|---|---|---|
| Charles T. Brooks, Harris County Judge, TX, Bond of County Public Weigher or Deputy Public Weigher | CMA | 922-42-35 | 2,500.00 | 01-01-87 |
| Rafael E. Flores, Harris County Judge, TX, Bond of County Public Weigher or Deputy Public Weigher | CMA | 922-42-36 | 2,500.00 | 01-01-87 |
| Diamond Shamrock Chemicals Company USA, Bond of User of Specially Denatured Alcohol or Rum, Permit Premises: 725 State Road, Ashtabula, OH | Federal | 8094-28-75 | 100,000.00 | 12-01-86 |
| John R. Ruggirello USA, Bureau of Land Mgmt. Bond Under Lease for Mining Deposits (Serial #018579) | St. Paul | 400 GP 4859 | 10,000.00 | 12-01-86 |
| Diamond Shamrock Chemicals Company USA, Bureau of Land Mgmt. Bond Under Lease for Mining Deposits (Serial #079652) | St. Paul | 400 GP 4864 | 10,000.00 | 11-11-86 |
| John R. Ruggirello US Dept. of Interior, Bureau of Land Mgmt. Sodium Mining Lease (Lease No. 079651) | Federal | 8092-31-00 | 10,000.00 | 11-11-86 |
| Diamond Shamrock Chemicals Company State of IL, Highway Permit, Excessive Weight, Permit No. 6-20256, FA Route 5, Logan County | CMA | 930-45-78 | 10,000.00 | 06-12-86* |

*Proposed to be closed

OCC033865

Confidential

OCCNJ0027175

ALCD-PUBCOM_0003053

| NAME OF PRINCIPAL ON BOND, OBLIGEE, DESCRIPTION | SURETY | BOND NO. | BOND AMOUNT | RENEWAL DATE |
|---|---|---|---|---|
| Diamond Shamrock Chemicals Company Passaic Valley Water Commission, Supply Liquid Chlorine Contract #85-B-32 | CNA | 930-46-06 | 348,700.00 | Expires at completion of delivery of chlorine, release needed |
| Diamond Shamrock Chemicals Company State of GA, Certified Public Weigher | CNA | 930-46-18 | 1,000.00 | 02-13-87 |
| Diamond Shamrock Chemicals Company State of OH, Well Plugging Blanket Bond | CNA | 930-46-32 | 15,000.00 | 02-07-87 |
| Diamond Shamrock Chemicals Company US Dept. of Interior, Bureau of Land Mgmt, Lease for Mining Sodium Deposits (Serial #W-77104) | CNA | 930-46-43 | 10,000.00 | 06-20-87 |
| Diamond Shamrock Chemicals Company US Dept. of Interior, Bureau of Land Mgmt, Lease for Mining Sodium Deposits (Serial #W-77103) | CNA | 930-36-44 | 10,000.00 | 06-20-87 |

OCC033866

84326

Confidential

OCCNJ0027176

ALCD-PUBCOM_0003054

SCHEDULE 8.16

Agreement,
Dated September 4, 1986 (the "Agreement"),
By and Among
Diamond Shamrock Corporation,
Occidental Petroleum Corporation,
Occidental Chemical Holding Corporation
and
Oxy-Diamond Alkali Corporation

ALLOCATION OF PURCHASE PRICE
STOCK PURCHASE AGREEMENT

8709G

OCC033867

**Confidential**

SCHEDULE 8.16 (1)

ALLOCATION OF PURCHASE PRICE

### Business Lines

| | |
|---|---|
| Chlor-alkali | $259,400,000 |
| Soda Products Other Than Chrome | 33,000,000 |
| Chrome | 38,000,000 |
| Process Chemicals | 38,000,000 |
| Textile Care Industries | 6,600,000 |
| | ------------ |
| | $375,000,000 |
| | |
| Equity Companies | 36,132,672 |
| | ------------ |
| Total | $411,132,672 |
| | ============ |

OCC033868

Confidential

OCCNJ0027178
ALCD-PUBCOM_0003056

SCHEDULE 8.16(2)

CONFIRMATION OF TRANSFEREE'S CONSENT

IBM, Corp.
Armonk, New York  10504

Attention: Treasurer

Gentlemen:

Pursuant to temporary Treasury Regulations Section
5c.168(f)(8)-2(a)(5), Diamond Shamrock Chemicals Corpora-
tion, a Delaware corporation (to be known as _____)
("NEW DSCC") as transferee of the interest of Diamond
Shamrock Chemicals Corporation, a Delaware corporation
("DSCC") in that certain agreement dated as of November
9, 1981 between Convent Chemical Corporation, a New York
corporation ("Convent") and International Business Ma-
chines Corporation, a New York corporation ("IBM"), (the
"Tax Lease") to which DSCC succeeded by virtue of that
certain Consent and Indemnification Agreement dated as of
November 27, 1985 by and among IBM, Convent, The B.F.
Goodrich Company, a New York corporation ("BFG"), DSCC
and Diamond Shamrock Corporation, a Delaware corporation
("Seller") (the "Consent") to the extent such Tax Lease
pertains to assets subject to the Stock Purchase Agree-
ment dated as of _____, 1986 and purchase effective
as of _____, 1986 by and among Seller, Occidental
Petroleum Corporation, a Delaware corporation ("OPC"),
Occidental Chemical Corporation, a New York corporation
("Oxy-Chem"), and Alkali, hereby consents to take such
assets subject to the Tax Lease.

                    DIAMOND SHAMROCK CHEMICALS
                    CORPORATION

              By: _____

OCC033869

**Confidential**

Schedule 8.16(3)

STATEMENT REQUIRED BY
REGULATION SECTION 5c.168(f)(8)-2(a)(5)
WITH REGARD TO SAFE HARBOR LEASES

This information is being supplied with regard to the
requirements of Reg. Sec. 5c.168(f)(8)-2(a)(5)(i)-(iv)
concerning that certain lease dated November 9, 1981
between International Business Machines Corporation as
Lessor and Convent Chemical Corporation as Lessee.

(i) and (ii)

Lessor:

Name:  International Business Machines
Corporation
Address:  Armonk, New York  10504

Taxpayer I.D. Number:

District Director's Office:

Transferee:

Name:  Diamond Shamrock Chemicals
Corporation
Address:

Taxpayer I.D. Number:

District Director's Office:

OCC033870

Confidential

OCCNJ0027180
ALCD-PUBCOM_0003058

Schedule 8.16(4)

A schedule of the assets which listed those assets in-
cluded in the original lease.  See Exhibit A attached
hereto and incorporated herein by this reference.

OCC033871

OCCNJ0027181
ALCD-PUBCOM_0003059

BFGOODRICH, FM 6793, SAFE HARBOR LEASE RETURN, P....., P11-L15-ADCID

DATE 10/20/05     PAGE 1

| STATE | DESCRIPTION | ADJ BASIS | REGULAR IIC | ENERGY IIC | AUR MIDPOINT | RECOVERY CLS | SVC DATE | SEC 40D |
|---|---|---|---|---|---|---|---|---|
| LA | ABSORBER-EDC | 75,005 | 7,501 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | JISCENDER-SULPHER DIOXIDE | 860,075 | 86,000 | 42,404 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | ACCUMULATOR-CRUDE EDC | 27,130 | 2,713 | | 9.5 | 5 YEARS | 6/01 | NO |
| LA | ACCUMULATOR-CRUDE EDC | 27,130 | 2,713 | | 9.5 | 5 YEARS | 6/01 | NO |
| LA | AERATION-SYSTEM F/AEROBIC DIGESTER | 19,417 | 1,942 | | 9.5 | 5 YEARS | 6/01 | NO |
| LA | AFTER-COOLER OXIDIZER BLOWER | 8,700 | 870 | 435 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | AFTERCOOLER CHLORINE COMPRESSOR | 49,475 | 4,940 | | 9.5 | 5 YEARS | 6/01 | NO |
| LA | AGITATOR F/SOLID EQUL FEED TANK | 34,590 | 3,459 | | 9.5 | 5 YEARS | 6/01 | NO |
| LA | AGITATOR FOR 34091 | 13,606 | 1,361 | 600 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | AGITATOR FOR 36091 | 16,794 | 1,679 | 840 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | AGITATOR-ASBESTOS SLURRY | 9,930 | 993 | | 9.5 | 5 YEARS | 6/01 | NO |
| LA | AGITATOR-CAUSTIC COOLING TANK NO.2 | 49,960 | 4,996 | | 9.5 | 5 YEARS | 6/01 | NO |
| LA | AGITATOR-CAUSTIC COOLING TANK NO.2 | 207,270 | 20,727 | | 9.5 | 5 YEARS | 6/01 | NO |
| LA | AGITATOR-CAUSTIC COOLING TANK NO.3 | 207,270 | 20,727 | | 9.5 | 5 YEARS | 6/01 | NO |
| LA | AGITATOR-CAUSTIC COOLING TANK NO.4 | 207,270 | 20,727 | | 9.5 | 5 YEARS | 6/01 | NO |
| LA | AGITATOR-CAUSTIC COOLING TANK NO.5 | 207,270 | 20,727 | | 9.5 | 5 YEARS | 6/01 | NO |
| LA | AGITATOR-CAUSTIC COOLING TANK NO.6 | 207,270 | 20,727 | | 9.5 | 5 YEARS | 6/01 | NO |
| LA | AGITATOR-CAUSTIC COOLING TANK NO.7 | 207,270 | 20,727 | | 9.5 | 5 YEARS | 6/01 | NO |
| LA | AGITATOR-CONTAMINATED WATER TANK | 49,960 | 4,996 | | 9.5 | 5 YEARS | 6/01 | NO |
| LA | AGITATOR-DISCHARGE BASIN | 22,233 | 2,223 | | 9.5 | 5 YEARS | 6/01 | NO |
| LA | AGITATOR-EVAPORATOR FEED TANK | 21,720 | 2,171 | | 9.5 | 5 YEARS | 6/01 | NO |
| LA | AGITATOR-FILTER DECRASH TANK | 207,140 | 20,714 | | 9.5 | 5 YEARS | 6/01 | NO |
| LA | AGITATOR-FILLER FEED TANK | 207,140 | 20,714 | | 9.5 | 5 YEARS | 6/01 | NO |
| LA | AGITATOR-FOR SALT SLURRY TANK | 155,390 | 15,539 | | 9.5 | 5 YEARS | 6/01 | NO |
| LA | AGITATOR-MODIFIER HI-SHEAR | 156,179 | 15,618 | | 9.5 | 5 YEARS | 6/01 | NO |
| LA | AGITATOR-MODIFIER HI-SHEAR | 29,696 | 2,970 | | 9.5 | 5 YEARS | 6/01 | NO |
| LA | AGITATOR-SODIUM SULFITE | 2,237 | 237 | | 9.5 | 5 YEARS | 6/01 | NO |
| LA | AGITATOR-SULFATE LEACHING TANK | 156,220 | 15,622 | | 9.5 | 5 YEARS | 6/01 | NO |
| LA | ALS AUTOMATIC LAB SAMPLER | 3,992 | 399 | | 9.5 | 5 YEARS | 6/01 | NO |
| LA | AMMETER-HESTON AC | 844 | 84 | | 9.5 | 5 YEARS | 6/01 | NO |
| LA | ANALYZER-PORTABLE MODEL 990A | 2,733 | 273 | | 9.5 | 5 YEARS | 6/01 | NO |
| LA | ATOMIC ABSORPTION SPECTROPHOTOMETER | 36,192 | 3,619 | | 9.5 | 5 YEARS | 10/01 | NO |
| LA | AUTOANALYZER-3 CHANNEL TECHNICON II | 43,816 | 4,302 | | 9.5 | 5 YEARS | 6/01 | NO |
| LA | DAG HOUSE | 1,249,300 | 124,993 | 62,469 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | BALANCE-ELECTRIC TOP-LOADING | 1,603 | 169 | | 9.5 | 5 YEARS | 6/01 | NO |
| LA | BATTERY-ELECTRONIC ANALYZER | 5,400 | 501 | | 9.5 | 5 YEARS | 6/01 | NO |
| LA | P24DSAN-HELS | 11,917 | 1,192 | | 9.5 | 5 YEARS | 6/01 | NO |
| LA | DATA CONSTANT TEMP REFRIGERATED | 1,208 | 129 | | 9.5 | 5 YEARS | 6/01 | NO |
| LA | BATTERY SWITCHGEAR-PROCESS AREA | 8,306 | 831 | | 9.5 | 5 YEARS | 6/01 | NO |
| LA | BATTERY SWITCHGEAR-UTILITY AREA | 8,306 | 831 | | 9.5 | 5 YEARS | 6/01 | NO |
| LA | BED-HOSPITAL THIN SIZE | 619 | 642 | | 9.5 | 5 YEARS | 6/01 | NO |
| LA | BIOGER-ENCRPAC | 606 | 69 | | 9.5 | 5 YEARS | 6/01 | NO |
| LA | BIDDLE-DC TEST SET | 5,253 | 525 | | 9.5 | 5 YEARS | 6/01 | NO |
| LA | BIDDLE-WHEATSTONE BRIDGE | 553 | 55 | | 9.5 | 5 YEARS | 6/01 | NO |
| LA | BHUS FOR CELL RENEWAL AREA | 11,615 | 1,162 | | 9.5 | 5 YEARS | 6/01 | NO |
| LA | DIOBREATHER | 170,867 | 17,067 | | 9.5 | 5 YEARS | 6/01 | NO |
| LA | BLOCK VALVES NITROGEN PURGE LINE | 3,104 | 310 | | 9.5 | 5 YEARS | 6/01 | NO |
| LA | BLOXER FOR 30 CO2 | 19,750 | 1,975 | | 9.5 | 5 YEARS | 6/01 | NO |
| LA | BLOXER AERATION | 7,465 | 747 | 373 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | BLOXER ASH VACUUM | 102,510 | 10,251 | 5,126 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | BLOXER ASH VACUUM | 102,510 | 10,251 | 5,126 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | BLOXER OXIDIZER AIR | 97,700 | 9,770 | 4,005 | 9.5 | 5 YEARS | 6/01 | NO |

OCC033872

Confidential

OCCNJ0027182

ALCD-PUBCOM_0003060

BFGOODRICH, FM 6793, SAFE HARBOR LEASE RETURN, PT-L6, P31-L35-ADCED

DATE 10/02/05   PAGE 2

| A SALE | STATE DESCRIPTION | ADJ BASIS | REGULAR ITC | ENERGY ITC | ADR MIDPOINT | RECOVERY CLS | SVC DATE | SEC 40D |
|---|---|---|---|---|---|---|---|---|
| LA | BLOWER OXIDIZER AIR | 97,700 | 9,770 | 4,005 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | BLOWER SOOT FOR 31F01 | 12,592 | 1,259 | 1,259 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | BLOWER SOOT FOR 31F01 | 12,592 | 1,259 | 1,259 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | BLOWER SOOT FOR 31F01 | 12,592 | 1,259 | 1,259 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | BLOWER SOOT FOR 31F01 | 12,592 | 1,259 | 1,259 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | BLOWER SOOT FOR 31F01 | 12,592 | 1,259 | 1,259 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | BLOWER SOOT FOR 31F01 | 12,592 | 1,259 | 1,259 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | BLOWER SOOT FOR 31F01 | 12,592 | 1,259 | 1,259 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | BLOWER SOOT FOR 31F01 | 12,592 | 1,259 | 1,259 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | BLOWER SOOT FOR 31F01 | 12,592 | 1,259 | 1,259 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | BLOWER SOOT FOR 31F01 | 12,592 | 1,259 | 1,259 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | BLOWER-AFTERCOOLER | 33,300 | 3,330 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | BLOWER-AIR SCOUR | 3,674 | 367 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | BLOWER-CHARGE VENT GAS | 16,100 | 1,610 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | BLOWER-CELL PURGE | 6,747 | 675 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | BLOWER-FOR 3DG01 | 19,750 | 1,975 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | BLOWERS-AERATION AIR | 58,095 | 5,810 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | BLOWERS-AERATION AIR | 58,095 | 5,810 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | BOILER STANDBY | 845,476 | 84,540 | 84,540 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | BOILER WASTE GAS | 845,476 | 84,540 | 84,540 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | BOILER-250M LBS/HR COAL FIRED | 4,822,237 | 482,224 | 482,224 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | BOX GLOVE ASBESTOS HANDLING | 4,546 | 455 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | BOX GLOVE ASBESTOS HANDLING | 4,544 | 454 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | BOX GLOVE ASBESTOS HANDLING | 4,544 | 454 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | BREAKER-230KV OIL CIRCUIT | 160,049 | 16,005 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | BREAKER-230KV OIL CIRCUIT | 160,049 | 16,005 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | BRINE PND & LINER-PLANT 1 | 240,220 | 24,020 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | BUPHER FLUE GAS REHEATER W/FAN | 15,042 | 1,504 | 1,504 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | CALIBRATOR DIGITAL-S/N 01147 | 940 | 94 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | CALIBRATOR DIGITAL-S/N 01106 | 940 | 94 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | CALIBRATOR DYHAUIC-S/N 36572 | 703 | 78 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | CALIBRATOR LOOP-S/N 150135 | 596 | 60 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | CALIBRATOA2-PORTABLE PNEUMATIC | 1,247 | 125 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | CALIBRATOR-PORTABLE PNEUMATIC | 1,247 | 125 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | CALIBRATOR-SNAP PACK DIGITAL | 1,373 | 137 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | CAPITALIZED INTEREST-CONVENT CHEM. | 3,533,064 | 353,305 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | CAPITALIZED INTEREST-CONVENT CHEM. | 5,925,205 | 592,529 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | CAPITALIZED INTEREST-CONVENT CHEM. | 517,030 | 51,700 | 25,894 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | CAPITALIZED INTEREST-CONVENT CHEM. | 5,466,152 | 546,615 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | CAPITALIZED INTEREST-CONVENT CHEM. | 110,334 | 11,033 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | CAPITALIZED INTEREST-CONVENT CHEM. | 1,408,473 | 144,047 | 140,847 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | CAROCH ANALYZER SYSTEM - TOTAL | 6,295 | 630 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | CELL RENEWAL TOOLS | 33,200 | 3,320 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | CELL-STANDARD TITRATION - CANCL | 1,098 | 110 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | CENTRIFUGE - DVHAC | 100 | 10 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | CENTRIFUGE SCREEN BOWL NO.1 | 309,337 | 30,934 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | CENTRIFUGE SCREEN BOWL NO.2 | 309,337 | 30,934 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | CENTRIFUGE SOLID BOWL NO.1 | 157,085 | 15,709 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | CENTRIFUGE SOLID BOWL NO.2 | 157,085 | 15,709 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | CENTRIFUGE 8 TUBE-S/N 117139 | 871 | 87 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | CHAIR-LXHI W/HEADREST | 591 | 59 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | CHAMBER FLUE GAS MIXING | 26,932 | 2,693 | 2,693 | 9.5 | 5 YEARS | 6/01 | NO |

OCC033873

OCCNJ0027183

ALCD-PUBCOM_0003061

BFGOODRICH, EN 6793, SAFE HARBOR LEASE RETURN, | P11-LI5-ANEZ3 | DATE 10/28/95 | PAGE 3

| STATE | DESCRIPTION | ADJ BASIS | REGULAR ITC | ENERGY ITC | ADR MIDPOINT | RECOVERY CLS | SVC DATE | SLC 40D |
|---|---|---|---|---|---|---|---|---|
| LA | CHECKER-DAMPING/GEAR VIBRATION | 2,360 | 236 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | CHILLER-ABSORBER FEED | 21,004 | 2,100 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | CHILLER-ADSORBER FEED | 22,424 | 2,242 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | CHILLER-CHLORINE CHANNEL | 6,414 | 641 | 0 | 9.5 | 1Y/MS | 6/01 | 110 |
| LA | CHILLER-CHLORINE CHANNEL | 6,412 | 641 | 0 | 9.5 | 1Y/MS | 6/01 | 110 |
| LA | CHILLER-CHLORIDE-5/II 2045-1 | 136,933 | 13,694 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | CHILLER-CHLORIDE-5/II 2045-2 | 136,987 | 13,699 | 0 | 9.5 | 5 YEARS | 6/01 | 106 |
| LA | CHILLER-EDC SOLVENT | 6,369 | 035 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | CHILLER-EDC SOLVENT | 0,340 | 035 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | CHILLER-REACTOR VENT | 22,664 | 2,266 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | CHILLER-REACTOR VENT | 22,664 | 2,266 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | CHLORINE EMERGENCY KIT C-S/M C-2170 | 756 | 76 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | CHLORINE EMERGENCY KIT C-S/II C2177 | 756 | 76 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | CHROMATOGRAPH-GAS | 8,093 | 809 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | CHUTE-SCREEN EXCH 1 SALT | 9,311 | 931 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | CHUTE-SCREEN EXCH 2 SALT | 9,311 | 931 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | CHUTE-SOLID DUCH 1 SALT | 7,825 | 783 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | CHUTE-SOLID DUCH 2 SALT | 7,145 | 715 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | CLARIFIER-HECHANISH PRIMRY WASTE WTR | 71,280 | 7,129 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | CLARIFIER-HECHANISH SECNDRY WSTE WTR | 71,280 | 7,129 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | CLARIFIER-PRIMARY WASTE WATER | 46,051 | 4,605 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | CLARIFIER-SECONDARY WASTE WATER | 46,053 | 4,605 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | CLEANER ULTRASONIC-S/II 23533 | 502 | 50 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | CLECHANIC INJ RUBBER W/SPINDLE | 1,090 | 109 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | CLECHANIC INJ RUBBER W/SPINDLE | 1,090 | 109 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | CHIPL CEHTR-HOTR 400V LIG UTIL X5CL | 12,026 | 1,203 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | CHIPL CHIR-HOTOR 400V CELL BLDG X7A | 21,003 | 2,100 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | CHIPL CHIR-MOTOR 400V COAL HNDL X6C | 52,894 | 5,289 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | CHIRL CHIR-HOTOR 400V OFFSITE X7D | 16,309 | 1,639 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | CHIRL CHIR-HOTOR 400V RAILROAD 6A | 12,041 | 1,204 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | COAL HANDLING EQUIP FOR 31/01 | 171,145 | 17,115 | 17,115 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | COLLECTOR-PORTABLE DUST | 720 | 72 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | COLUMN-DRYING | 106,040 | 10,604 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | COLUMN-PRODUCT | 270,111 | 27,011 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | COLUMN-SUCTION CHILLER-S/II A-2926 | 167,991 | 16,799 | 0 | 9.5 | 5 YEARS | 6/01 | 103 |
| LA | COLUMN-VACUUM | 100,343 | 10,034 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | COMPRESSOR - PAD AIR | 65,016 | 6,502 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | COMPRESSOR EVACUATION CHLORINE | 20,704 | 2,070 | 0 | 9.5 | 5 YEARS | 6/01 | 103 |
| LA | COMPRESSOR HYDROGEN NO.1 W/MOTOR | 245,604 | 24,560 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | COMPRESSOR HYDROGEN NO.2 W/MOTOR | 246,116 | 24,612 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | COMPRESSOR REFRIGERATION UNIT | 236,136 | 23,614 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | COMPRESSOR REFRIGERATION UNIT | 236,136 | 23,614 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | COMPRESSOR REFRIGERATION UNIT | 236,135 | 23,614 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | COMPRESSOR-BREATHING AIR | 21,598 | 2,160 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | COMPRESSOR-CHLORINE-S/II A000065 | 1,062,296 | 106,230 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | COMPRESSOR-PLANT AND INSTRUHENT AIR | 177,770 | 17,777 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | COMPRESSOR-PLANT AND INSTRUHENT AIR | 179,770 | 17,977 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | COMPRESSOR-VENT GAS | 54,000 | 5,400 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | COMPRESSOR-VENT GAS | 54,000 | 5,400 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | CONDENSER - EDC DARGE VENT | 9,043 | 904 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | CONDENSER BAROHETRIC F/4HH. EVAP. | 19,454 | 1,945 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |

OCC033874

Confidential

OCC033875

ASA

BFGOODRICH, FM 6793, SAFE HARBOR LEASE RETURN: PT-16, PIT-L15-ADC4D

DATE 10/26/05  PAGE 4

| STATE | DESCRIPTION | ADJ BASIS | REGULAR ITC | ENERGY ITC | ADR MIDPOINT | RECOVERY CLS | SVC DATE | SEC 40D |
|---|---|---|---|---|---|---|---|---|
| LA | CONDENSER EVAPORATOR | 25,002 | 2,500 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | CONDENSER STRIPPER FLASH DRUM | 12,165 | 1,217 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | CONDENSER STRIPPER OVERHEAD | 70,531 | 7,053 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | CONDENSER-CRUDE EDC TANK VENT | 10,020 | 1,002 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | CONDENSER-CRUDE EDC TANK VENT | 10,020 | 1,002 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | CONDENSER-DRYING COLUMN | 37,197 | 3,720 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | CONDENSER-DRYING COLUMN VENT | 16,652 | 1,665 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | CONDENSER-EDC STORAGE TANK VENT | 6,125 | 613 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | CONDENSER-EDC STORAGE TANK VENT | 6,125 | 613 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | CONDENSER-EDC STORAGE TANK VENT | 6,123 | 612 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | CONDENSER-EDC STRIPPER OVERHEAD | 14,537 | 1,454 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | CONDENSER-PRODUCT COLUMN | 60,201 | 6,020 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | CONDENSER-REACTOR VENT | 22,107 | 2,211 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | CONDENSER-REACTOR VENT | 22,106 | 2,211 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | CONDENSER-STEAM OUT | 21,192 | 2,199 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | CONDENSER-VACUUM COLUMN | 33,124 | 3,312 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | CONDENSER-HST HIR STRIPPER OVERHEAD | 12,491 | 1,249 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | CONTROL CENTER-MOTOR 400V | 12,631 | 1,263 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | CONTROL CENTER-MOTOR 400V DOCK X9A | 70,850 | 7,085 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | CONTROL CENTER-MOTOR 430V PROCS X1A | 10,341 | 1,034 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | CONTROL CENTER-MOTOR 400V PROCS X1B | 29,045 | 2,905 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | CONTROL CENTER-MOTOR 400V PROCS X1C | 20,663 | 2,066 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | CONTROL CENTER-MOTOR 400V PROCS X2A | 30,799 | 3,000 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | CONTROL CENTER-MOTOR 400V PROCS X2B | 41,664 | 4,166 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | CONTROL CENTER-MOTOR 400V PROCS X2C | 27,190 | 2,720 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | CONTROL CENTER-MOTOR 400V PROCS X3A | 20,903 | 2,090 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | CONTROL CENTER-MOTOR 430V PROCS X3B | 17,070 | 1,707 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | CONTROL CENTER-MOTOR 400V PROCS X4A | 21,215 | 2,122 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | CONTROL CENTER-MOTOR 400V PROCS X4B | 10,643 | 1,064 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | CONTROL CENTER-MOTOR 400V UTLTY X5A | 11,070 | 1,107 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | CONTROL CENTER-MOTOR 400V UTLTY X5B | 25,534 | 2,553 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | CONTROL CENTER-MOTOR 400V UTLTY X5C | 12,200 | 1,220 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | CONTROL CENTER-MOTOR 400V UTLTY X6A | 26,310 | 2,632 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | CONTROL CENTER-MOTOR 480V UTLTY X6D | 9,718 | 972 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | CONTROL CTR-MOTR MCC G 600V OFSITE X7C | 15,216 | 1,522 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | CONTROL CIR-MOTOR MCC G 600V PROC X1CL | 10,642 | 1,064 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | CONVEYOR-CRUSHER FEED 30INX251FT | 455,350 | 45,535 | 45,535 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | CONVEYOR-STACKER FEED 30FTX125FT | 320,120 | 32,012 | 32,012 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | CONVEYOR-UNLOADING DRAG CHAIN | 104,175 | 10,418 | 10,418 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | CONVEYOR-UNLOADING DRAG CHAIN | 28,603 | 2,064 | 2,064 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | COOLANT PUMP FOR SOUTH BEND LATHE | 28,642 | 2,064 | -2,064 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | COOLER BLOWDOWN | 80 | 80 | | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | COOLER CAUSTIC PRODUCT | 12,593 | 1,259 | 1,259 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | COOLER CONDENSATE | 62,972 | 6,297 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | COOLER CONDENSATE | 13,013 | 1,301 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | COOLER FINAL HYDROGEN NO.1 | 21,023 | 2,102 | 2,102 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | COOLER FINAL HYDROGEN NO.2 | 61,425 | 6,143 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | COOLER FLASH CONDENSATE | 61,425 | 6,143 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | COOLER PURIFICATION WASTE | 2,590 | 259 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | COOLER SCRUBBER | 22,471 | 2,247 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | COOLER SCRUBBER CIRCULATING | 19,717 | 1,972 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |

Confidential

B.F.GOODRICH, FM 6793, SAFE HARBOR LEASE RETURN, FI-L6, FI-L15-ADCID   DATE 10/28/05   PAGE 5

| STATE | DESCRIPTION | ADJ BASIS | REGULAR IIC | ENERGY IIC | AMR MIDPOINT | RECOVERY CLS | SVC DATE | SEC 400 |
|---|---|---|---|---|---|---|---|---|
| LA | COOLER-CHLORINE CHANNEL | 8,028 | 803 | 0 | 9.5 | 5 YEARS | 6/01 | HO |
| LA | COOLER-CHLORINE CHANNEL | 8,028 | 803 | 0 | 9.5 | 5 YEARS | 6/01 | HO |
| LA | COOLER-CHLORINE LIQUEFIER | 169,414 | 16,941 | 0 | 9.5 | 5 YEARS | 6/01 | HO |
| LA | COOLER-CHLORINE LIQUEFIER | 169,414 | 16,941 | 0 | 9.5 | 5 YEARS | 6/01 | HO |
| LA | COOLER-CHLORINE-S/N 2044-1 | 130,660 | 13,065 | 0 | 9.5 | 5 YEARS | 6/01 | HO |
| LA | COOLER-CHLORINE-S/N 2044-2 | 130,660 | 13,066 | 0 | 9.5 | 5 YEARS | 6/01 | HO |
| LA | COOLER-EDC DEGEE GAS | 14,700 | 1,470 | 0 | 9.5 | 5 YEARS | 6/01 | HO |
| LA | COOLER-EDC PRODUCT | 25,643 | 2,564 | 0 | 9.5 | 5 YEARS | 6/01 | HO |
| LA | COOLER-EDC STRIPPER EDUCTOR | 13,336 | 1,334 | 0 | 9.5 | 5 YEARS | 6/01 | HO |
| LA | COOLER-EDUCATOR CIRCULATION | 2,456 | 246 | 0 | 9.5 | 5 YEARS | 6/01 | HO |
| LA | COOLER-EVAC EQUIP SULFURIC ACID | 12,669 | 1,267 | 0 | 9.5 | 5 YEARS | 6/01 | HO |
| LA | COOLER-PRODUCT COLUMN BOTTOMS | 14,292 | 1,429 | 0 | 9.5 | 5 YEARS | 6/01 | HO |
| LA | COOLER-PURGE CONDENSATE | 61,709 | 6,177 | 0 | 9.5 | 5 YEARS | 6/01 | HO |
| LA | COOLER-SOLVENT | 10,773 | 1,077 | 0 | 9.5 | 5 YEARS | 6/01 | HO |
| LA | COOLER-SOLVENT | 10,772 | 1,077 | 0 | 9.5 | 5 YEARS | 6/01 | HO |
| LA | COOLER-VENT GAS COMPRESSOR SEAL | 29,552 | 2,955 | 0 | 9.5 | 5 YEARS | 6/01 | HO |
| LA | COOLER-VENT GAS COMPRESSOR SEAL | 29,552 | 2,955 | 0 | 9.5 | 5 YEARS | 6/01 | HO |
| LA | COOLER-WASTE WATER STRIPPER BOTTOMS | 40,772 | 4,077 | 0 | 9.5 | 5 YEARS | 6/01 | HO |
| LA | COOLER-DIGITAL-S/N EQ10646 | 532 | 50 | 0 | 9.5 | 5 YEARS | 6/01 | HO |
| LA | CRANE-FLOOR MOUNTED JIB 5 TON | 61,300 | 6,130 | 0 | 9.5 | 5 YEARS | 6/01 | HO |
| LA | CRANE-OVERHEAD BRIDGE 15 TON | 337,400 | 33,740 | 0 | 9.5 | 5 YEARS | 6/01 | HO |
| LA | CRANE-OVERHEAD BRIDGE | 337,400 | 33,740 | 0 | 9.5 | 5 YEARS | 6/01 | HO |
| LA | CRUSHER | 54,310 | 5,431 | 2,716 | 9.5 | 5 YEARS | 6/01 | HO |
| LA | CRUSHER | 54,310 | 5,431 | 2,716 | 9.5 | 5 YEARS | 6/01 | HO |
| LA | CRUSHER | 54,310 | 5,431 | 2,716 | 9.5 | 5 YEARS | 6/01 | HO |
| LA | CRUSHER | 54,310 | 5,431 | 2,716 | 9.5 | 5 YEARS | 6/01 | HO |
| LA | CRUSHER & CRUSHING TOWER | 533,195 | 53,320 | 53,320 | 9.5 | 5 YEARS | 6/01 | HO |
| LA | CYCLONE LIQUID F/3RD.EFFECT EVAP. | 150,111 | 15,011 | 0 | 9.5 | 5 YEARS | 6/01 | HO |
| LA | CYCLONE RECOVERED SALT-S/N 25712 | 95,559 | 9,556 | 0 | 9.5 | 5 YEARS | 6/01 | HO |
| LA | CYCLONE SALT NO.1-S/N 25739 | 69,901 | 6,990 | 0 | 9.5 | 5 YEARS | 6/01 | HO |
| LA | CYCLONE SALT NO.2-S/N 25740 | 69,901 | 6,990 | 0 | 9.5 | 5 YEARS | 6/01 | HO |
| LA | CYCLONE SALT NO.3-S/N 25741 | 69,901 | 6,990 | 0 | 9.5 | 5 YEARS | 6/01 | HO |
| LA | CYCLONE-LIQUID F/1ST.EFFECT EVAP. | 150,111 | 15,011 | 0 | 9.5 | 5 YEARS | 6/01 | HO |
| LA | DAMPER ISOLATION | 15,173 | 1,517 | 1,517 | 9.5 | 5 YEARS | 6/01 | HO |
| LA | DAMPER ISOLATION | 15,173 | 1,517 | 1,517 | 9.5 | 5 YEARS | 6/01 | HO |
| LA | DAMPER ISOLATION | 15,173 | 1,517 | 1,517 | 9.5 | 5 YEARS | 6/01 | HO |
| LA | DAMPER ISOLATION | 15,173 | 1,517 | 1,517 | 9.5 | 5 YEARS | 6/01 | HO |
| LA | DAMPER ISOLATION | 14,301 | 1,430 | 1,430 | 9.5 | 5 YEARS | 6/01 | HO |
| LA | DAMPER ISOLATION | 15,173 | 1,517 | 1,517 | 9.5 | 5 YEARS | 6/01 | HO |
| LA | DAMPER ISOLATION | 15,173 | 1,517 | 1,517 | 9.5 | 5 YEARS | 6/01 | HO |
| LA | DAMPER ISOLATION | 14,301 | 1,433 | 1,433 | 9.5 | 5 YEARS | 6/01 | HO |
| LA | DEAERATOR | 1,117,171 | 111,717 | 111,717 | 9.5 | 5 YEARS | 6/01 | HO |
| LA | DEIONIZER | 206,324 | 20,632 | 0 | 9.5 | 5 YEARS | 6/01 | HO |
| LA | DEMINERALIZER CU5 | 549 | 55 | 0 | 9.5 | 5 YEARS | 6/01 | HO |
| LA | DETECTOR DIGITAL NITROGEN | 6,035 | 604 | 0 | 9.5 | 5 YEARS | 6/01 | HO |
| LA | DETECTOR METALS | 17,920 | 1,792 | 1,792 | 9.5 | 5 YEARS | 6/01 | HO |
| LA | DETECTOR-GAS LEAK | 763 | 76 | 0 | 9.5 | 5 YEARS | 6/01 | HO |
| LA | DEZONIZER | 712 | 71 | 0 | 9.5 | 5 YEARS | 6/01 | HO |
| LA | DEHUMIFIER | 712 | 71 | 0 | 9.5 | 5 YEARS | 6/01 | HO |
| LA | DEHUMIFIER-ALMOR | 025 | 03 | 0 | 9.5 | 5 YEARS | 6/01 | HO |
| LA | DIGESTER-AEROBIC | 125,070 | 12,507 | 0 | 9.5 | 5 YEARS | 6/01 | HO |

Confidential

OCC033876

OCCNJ0027186

ALCD-PUBCOM_0003064

Case 2:22-cv-07326-MCA-LDW   Document 309-23   Filed 04/01/24   Page 841 of 1022 PageID: 16034

BFGOODRICH, FM 6793, SAFE HARBOR LEASE RETURN, PT-16, PT1-L15-ADCID

DATE 10/20/05   PAGE 6

| STATE | DESCRIPTION | ADJ BASIS | REGULAR ITC | ENERGY ITC | ADR MIDPOINT | RECOVERY CLS | SVC DATE | SEC 40D |
|---|---|---|---|---|---|---|---|---|
| LA | DISPENSARY/FIRST AID EQUIPMENT | 3,743 | 376 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | DISTILLATION APPARATUS 174-714 | 1,315 | 132 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | DISTRIBUTION SULFURIC - 410 VENT 304B | 10,246 | 1,025 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | DOCK-MATERIAL HANDLING PLATFORM | 7,413,900 | 741,390 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | DOLLY GRID PROTECTOR | 3,201 | 320 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | DRUM - CHLORINE EXPANSION | 9,148 | 915 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | DRUM - CHLORINE EXPANSION | 7,943 | 794 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | DRUM - CHLORINE EXPANSION | 15,661 | 1,566 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | DRUM - CHLORINE EXPANSION | 7,703 | 770 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | DRUM ANHYDROUS AMMONIA STORAGE | 143,310 | 14,331 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | DRUM AQUA AMMONIA STORAGE | 37,303 | 3,730 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | DRUM ATMOSPHERIC BLOW DOWN | 12,924 | 1,292 | 1,292 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | DRUM ATMOSPHERIC HIGH DOWN | 13,006 | 1,309 | 1,309 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | DRUM CONDENSATE BLOW DOWN 15 PSIG | 10,630 | 1,063 | 1,063 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | DRUM CONDENSATE FLASH | 8,364 | 836 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | DRUM EVAPORATOR COND-1ST.EFFECT | 11,203 | 1,120 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | DRUM EVAPORATOR COND-2ND.EFFECT | 11,403 | 1,140 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | DRUM EVAPORATOR COND-3RD.EFFECT | 11,413 | 1,141 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | DRUM EVAPORATOR COND-4TH.EFFECT | 11,413 | 1,141 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | DRUM EVAPORATOR CONDENSATE | 9,136 | 914 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | DRUM FLASH CONDENSATE | 14,194 | 1,419 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | DRUM PRIMARY FLASH | 121,166 | 12,117 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | DRUM STRIPPER BOTTOMS FLASH | 22,003 | 2,200 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | DRUM 15 LB FLASH | 23,189 | 2,319 | 2,319 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | DRUM-ABSORBER FEED KNOCK OUT | 12,560 | 1,256 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | DRUM-ABSORBER FEED KNOCK OUT | 12,559 | 1,256 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | DRUM-CATALYST-ADDITION | 15,326 | 1,533 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | DRUM-CATALYST-ADDITION | 15,324 | 1,532 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | DRUM-DECOMPOSER FEED SURGE | 74,405 | 7,441 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | DRUM-DRY VENT CIRCULATION KNOCK OUT | 13,703 | 1,370 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | DRUM-DRYING COLUMN REFLUX | 36,432 | 3,643 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | DRUM-EDUCATOR CIRCULATING | 9,106 | 1,006 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | DRUM-FIRST STAGE ACID | 122,416 | 12,242 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | DRUM-FIRST STAGE CAUSTIC | 122,416 | 12,242 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | DRUM-PRODUCT COLUMN REFLUX | 27,803 | 2,703 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | DRUM-SECOND STAGE ACID | 122,416 | 12,242 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | DRUM-SECOND STAGE CAUSTIC | 122,419 | 12,242 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | DRUM-STEAM OUT SYSTEM COLLECTION | 10,722 | 1,072 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | DRUM-STORAGE SPENT SULFURIC ACID | 100,701 | 10,070 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | DRUM-STORAGE SPENT SULFURIC ACID | 100,699 | 10,070 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | DRUM-STRIPPER INDUCTOR CIRCULATION | 17,410 | 1,742 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | DRUM-SULFUR ACID | 54,050 | 5,400 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | DRUM-SULFURIC ACID DAY | 16,575 | 1,658 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | DRUM-VACUUM COLUMN REFLUX | 18,624 | 1,858 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | DRUM-WASTE WATER STRIPPER OVERHEAD | 17,500 | 1,750 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | DRUM-WATER WASH | 44,763 | 4,477 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | DRUM-WET VENT COLLECTION KNOCK OUT | 12,573 | 1,257 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | DRYER-AIR FOR 37K01A AND 37K01B | 13,910 | 1,391 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | DRYER-AIR FOR 37K01A AND 37K01B | 13,909 | 1,391 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | DRYER-AIR FOR 37K03 | 13,909 | 1,391 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | DRYER-AIR FOR 37K03 | 13,910 | 1,391 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |

OCC033877

ASALE      BFGOODRICH, FM 6793, SAFE HARBOR LEASE RETURN, PT-L6, PTI-L15-ADC1D      DATE 10/20/85      PAGE 7

| STATE | DESCRIPTION | ADJ BASIS | REGULAR ITC | ENERGY ITC | ADR MIDPOINT | RECOVERY CLS | SVC DATE | SEC 4CD |
|---|---|---|---|---|---|---|---|---|
| LA | DRYER-BREATHING AIR COMPRESSOR | 13,400 | 1,340 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | DRYER-BREATHING AIR COMPRESSOR | 13,400 | 1,340 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | DUCT ECONOMIZER OUTLET | 38,965 | 3,895 | 3,895 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | DUCT FAN DISCHARGE 1D | 106,400 | 10,640 | 10,640 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | DUCT FAN INLET 1D | 59,620 | 5,962 | 5,962 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | DUCT FLUE GAS 31F-3 | 14,377 | 1,438 | 1,438 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | DUCT REHEAT | 47,900 | 4,790 | 4,790 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | DUCT 31F-5 FLUE GAS | 44,960 | 4,496 | 4,496 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | DUCT 31F-6 FLUE GAS | 44,960 | 4,496 | 4,496 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | DUCT 502 ABSORBER OUTLET | 97,695 | 9,770 | 9,770 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | DUST COLLECTION SYSTEM | 126,074 | 12,607 | 12,607 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | EDUCTOR BY-PRODUCT TANK | 2,433 | 243 | | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | EDUCTOR-DECGIIFOZER FEED SURGE DRUM | 3,207 | 329 | | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | EDUCTOR-DISCHARGE BASIN MIXER | 737 | 74 | | 9.5 | 5 YEARS | 10/01 | 110 |
| LA | EDUCTOR-STRIPPER | 6,735 | 674 | | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | EJECTOR | 2,790 | 279 | | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | EJECTOR | 2,790 | 279 | | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | EJECTOR-BIOFEED STEAM | 1,476 | 148 | | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | EJECTOR-VACUUM COLUMN | 1,646 | 165 | | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | EPG UNIT FEEDMIXER PORNE EK-8 | 2,299 | 230 | | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | ELGU4-FOR EDC REACTOR-SPARE | 42,587 | 4,259 | | 9.5 | 5 YEARS | 10/01 | 110 |
| LA | ELGU4-FOR EDC REACTOR-SPARE | 42,587 | 4,259 | | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | ELECTRICAL WIRING-C/R & TRUCK LOAD | 776,700 | 77,670 | | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | ELECTRICAL WIRING BOILER PLANT | 472,737 | 47,274 | 23,637 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | ELECTRICAL WIRING BOILER PLANT 31 | 1,590,663 | 159,066 | 159,066 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | ELECTRICAL WIRING PLANT 2 | 6,602,502 | 660,250 | | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | ELECTRICAL WIRING PLANT 3 | 50,490 | 5,050 | | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | ELECTRICAL WIRING PLANT 3 | 963,633 | 96,363 | | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | ELECTRICAL WIRING PLANT 3 | 205,967 | 20,597 | | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | ELECTRICAL WIRING PLANT 5 | 710,500 | 71,050 | | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | ELECTRICAL WIRING PLANT 6 | 2,510,900 | 251,090 | | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | ELECTRICAL WIRING WATER TREATMENT | 990,000 | 99,000 | | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | ELECTRICAL WIRING PLANT 35 | 1,105,500 | 110,550 | | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | ELECTRICAL WIRING-CELL CARBONATION | 79,500 | 7,950 | | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | ELECTRICAL WIRING-PLANT 1 | 1,065,500 | 106,550 | | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | ELECTRICAL WIRING-PLANT 4 | 84,470 | 8,447 | | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | ELECTRICAL WIRING-PLANT 37 AIR | 1,956,400 | 195,640 | | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | ELECTRICAL-WIRING CONTROL ROOM | 5,900 | 590 | | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | ELECTRICAL-WIRING MARINE DOCK | 774,700 | 77,470 | | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | ELECTRICAL-WIRING PLANT 20 TANKS | 1,215,200 | 121,520 | | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | ELECTROMICROMETER 7-103 | 890 | 89 | | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | EQUIPMENT PLATFORMS PLANT 2 | 306,179 | 30,618 | | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | EQUIPMENT PLATFORMS PLANT 5 | 204,100 | 20,419 | | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | EQUIPMENT PLATFORMS PLANT 5 | 80,499 | 0,050 | | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | EQUIPMENT PLATFORMS PLANT 6 | 427,440 | 42,744 | | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | EQUIPMENT PLATFORMS-PLANT 1 | 47,660 | 4,766 | | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | EQUIPMENT PLATFORMS-PLANT 4 | 216,610 | 21,661 | | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | EMALINE METERING STATION | 156,600 | 15,030 | | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | EVAPORATOR-1ST. EFFECT-S/N 167 | 1,408,902 | 140,890 | | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | EVAPORATOR-2ND. EFFECT-S/N 166 | 1,412,173 | 141,217 | | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | EVAPORATOR-3RD. EFFECT-S/N 165 | 1,411,624 | 141,162 | | 9.5 | 5 YEARS | 6/01 | 110 |

OCC033878

Confidential

ASAIE   BFGOODRICH, FH 6795, SAFE HARBOR LEASE RETURN, PI-L6, PI1-L15-ADCID   DATE 10/28/05

| STATE | DESCRIPTION | ADJ BASIS | REGULAR ITC | ENERGY ITC | ADR MIDPOINT | RECOVERY CLS | SVC DATE | PAGE SEC 40D |
|---|---|---|---|---|---|---|---|---|
| LA | EVAPORATOR-4TH. EFFECT-5/H 164 | 1,414,855 | 141,486 | | 9.5 | 5 YEARS | 6/01 | NO |
| LA | EXCHANGER STRIPPER BOTTMS-AQUA FEED | 33,564 | 3,356 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | EXCHANGER-SOLVENT | 10,261 | 1,026 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | EXCHANGER-WASTE HTR STRPP FEED BOTH | 107,105 | 10,711 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | EXHANGER-SOLVENT | 10,261 | 1,026 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | EXHAUSTER-ASBESTOS ROOM CELL BLDG. | 32,053 | 3,205 | | 9.5 | 5 YEARS | 6/01 | NO |
| LA | EXTINGUISHER-FIRE | 1,113 | 111 | | 9.5 | 5 YEARS | 6/01 | NO |
| LA | EXTINGUISHER-FIRE | 1,113 | 111 | | 9.5 | 5 YEARS | 6/01 | NO |
| LA | EXTINGUISHER-FIRE | 1,113 | 111 | | 9.5 | 5 YEARS | 6/01 | NO |
| LA | EXTINGUISHER-FIRE | 1,113 | 111 | | 9.5 | 5 YEARS | 6/01 | NO |
| LA | EXTINGUISHER-FIRE | 1,113 | 111 | | 9.5 | 5 YEARS | 6/01 | NO |
| LA | EXTINGUISHER-FIRE | 1,113 | 111 | | 9.5 | 5 YEARS | 6/01 | NO |
| LA | EXTRACTOR AMMONIA | 1,113 | 111 | | 9.5 | 5 YEARS | 6/01 | NO |
| LA | EXTRACTOR-CELL PUTTY | 5,542 | 554 | | 9.5 | 5 YEARS | 6/01 | NO |
| LA | FAN F D FOR 3IF0S | 87,535 | 8,754 | | 9.5 | 5 YEARS | 6/01 | NO |
| LA | FAN F D FOR 3IF06 | 49,040 | 4,904 | 4,906 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | FAN ID FOR 3IF01 | 49,040 | 4,904 | 4,906 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | FAN OVERFIRE AIR FOR 3IF01 | 273,130 | 27,314 | 27,314 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | FAN REVERSE GAS | 16,465 | 1,647 | 1,647 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | FAN REVERSE GAS BUFFALO FORGE | 25,775 | 2,578 | 1,209 | 9.5 | 5 YE/PS | 6/01 | NO |
| LA | FEEDER ASH | 25,775 | 2,578 | 1,209 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | FEEDER FOR 3IF01 | 42,990 | 4,299 | 2,150 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | FEEDER FOR 3IF01 | 19,327 | 1,933 | 1,933 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | FEEDER FOR 3IF01 | 19,327 | 1,933 | 1,933 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | FEEDER FOR 3IF01 | 19,327 | 1,933 | 1,933 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | FEEDER FOR 3IF01 | 19,327 | 1,933 | 1,933 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | FEEDER FOR 3IF01 | 19,327 | 1,933 | 1,933 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | FEEDER FOR 3IF01 | 19,327 | 1,933 | 1,933 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | FEEDER-VIBRATOR | 27,465 | 2,747 | 2,747 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | FILE-KARDEX IUD | 1,451 | 145 | | 9.5 | 5 YEARS | 6/01 | NO |
| LA | FILE-KARDEX IUD | 1,452 | 145 | 145 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | FILTER - SLUDGE | 290,044 | 29,044 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | FILTER BAG | 0,493 | 049 | | 9.5 | 5 YEARS | 6/01 | NO |
| LA | FILTER INTAKE | 22,500 | 2,250 | 425 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | FILTER ROIA2L C5 | 970 | 97 | 2,250 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | FILTER ROIA2L C5 | 970 | 97 | | 9.5 | 5 YEARS | 6/01 | NO |
| LA | FILTER ROIA2L C5 | 970 | 97 | | 9.5 | 5 YEARS | 6/01 | NO |
| LA | FILTER TANK TREATED BRINE NO.1 | 276,177 | 27,610 | | 9.5 | 5 YEARS | 10/01 | NO |
| LA | FILTER TANK TREATED BRINE NO.2 | 276,177 | 27,610 | | 9.5 | 5 YEARS | 10/01 | NO |
| LA | FILTER TANK TREATED BRINE NO.3 | 276,277 | 27,620 | | 9.5 | 5 YEARS | 10/01 | NO |
| LA | FILTER-CAUSTIC NO.1 | 150,102 | 15,010 | | 9.5 | 5 YEARS | 6/01 | NO |
| LA | FILTER-CAUSTIC NO.2 | 150,102 | 15,010 | | 9.5 | 5 YEARS | 6/01 | NO |
| LA | FILTER-CLEARWATER | 2,424 | 242 | | 9.5 | 5 YEARS | 6/01 | NO |
| LA | FILTER-DHHASAID | 105,966 | 10,597 | | 9.5 | 5 YEARS | 6/01 | NO |
| LA | FILTER-EDC SOLVENT | 4,617 | 462 | | 9.5 | 5 YEARS | 6/01 | NO |
| LA | FILTER-EDC SOLVENT | 4,616 | 462 | | 9.5 | 5 YEARS | 6/01 | NO |
| LA | FILTER-GRAVITY | 129,330 | 12,933 | | 9.5 | 5 YEARS | 6/01 | NO |
| LA | FILTER-GRAVITY | 129,330 | 12,933 | | 9.5 | 5 YEARS | 6/01 | NO |
| LA | FILTER-SPLITTER BOX | 8,625 | | | 9.5 | 5 YEARS | 6/01 | NO |
| LA | FILTER-GRAVITY | 129,330 | 12,933 | | 9.5 | 5 YEARS | 6/01 | NO |
| LA | INLET EXTINGUISHERS AND BOXES | 22,668 | 2,767 | | 9.5 | 5 YEARS | 6/01 | NO |

OCC033879

Confidential

BFGOODRICH, FM 6793, SAFE HARBOR LEASE RETURN, PI-16, PII-LIS-ADC4ID   DATE 10/28/05   PAGE 9

ASAIE

| STATE | DESCRIPTION | ADJ BASIS | REGULAR ITC | ENERGY ITC | AUR MIDPOINT | RECOVERY CLS | SVC DATE | SEC 40D |
|---|---|---|---|---|---|---|---|---|
| LA | FIRE EXTINGUISHERS-ADMIN. BLDG. | 1,162 | 116 | 0 | 9.5 | 5 YEARS | 6/01 | I20 |
| LA | FIREFLY-STAIG | 1,470 | 140 | 0 | 9.5 | 5 YEARS | 6/01 | I20 |
| LA | FIREFLY-STAIG | 1,470 | 140 | 0 | 9.5 | 5 YEARS | 6/01 | I20 |
| LA | FLASH - POINT TESTER | 1,103 | 110 | 0 | 9.5 | 5 YEARS | 6/01 | I20 |
| LA | FORK EXTENSIONS FOR LIFT TRUCK | 1,630 | 163 | 0 | 9.5 | 5 YEARS | 6/01 | I20 |
| LA | FRAME-LIFTING BASE OR CATHODE RIG | 11,727 | 1,173 | 0 | 9.5 | 5 YEARS | 6/01 | I20 |
| LA | FRAME-LIFTING 20 TON CELL ASSY. | 10,957 | 1,096 | 0 | 9.5 | 5 YEARS | 6/01 | I20 |
| LA | FREEZER 19.6 CU.FT.-S/N 503415347 | 505 | 51 | 0 | 9.5 | 5 YEARS | 6/01 | I20 |
| LA | FUME HOOD EXPLOSION-PROOFING | 2,223 | 222 | 0 | 9.5 | 5 YEARS | 6/01 | I20 |
| LA | GAS CHROMATOGRAPH - SIGMA 1B | 27,025 | 2,703 | 0 | 9.5 | 5 YEARS | 6/01 | I20 |
| LA | GAS CHROMATOGRAPH - SIGMA 10B | 10,157 | 1,016 | 0 | 9.5 | 5 YEARS | 6/01 | I20 |
| LA | GAS CHROMATOGRAPH - SIGMA 2B | 11,905 | 1,198 | 0 | 9.5 | 5 YEARS | 6/01 | I20 |
| LA | GAS CHROMATOGRAPH - SIGMA 3D | 6,000 | 600 | 0 | 9.5 | 5 YEARS | 6/01 | I20 |
| LA | GAS CHROMATOGRAPH - SIGMA 3D | 7,225 | 723 | 0 | 9.5 | 5 YEARS | 6/01 | I20 |
| LA | GAS CHROMATOGRAPH - SIGMA 3B | 6,915 | 692 | 0 | 9.5 | 5 YEARS | 6/01 | I20 |
| LA | GAS CHROMATOGRAPH - SIGMA 3B | 6,915 | 692 | 0 | 9.5 | 5 YEARS | 6/01 | I20 |
| LA | GAS CHROMATOGRAPH - SIGMA 3D | 6,915 | 692 | 0 | 9.5 | 5 YEARS | 6/01 | I20 |
| LA | GAS CHROMATOGRAPH SIGMA 3B | 7,225 | 723 | 0 | 9.5 | 5 YEARS | 6/01 | I20 |
| LA | GENERATOR FUNCTION-S/N D049203 | 7,727 | 771 | 0 | 9.5 | 5 YEARS | 6/01 | I20 |
| LA | GRINDER-PEDESTAL SETCO | 743 | 74 | 0 | 9.5 | 5 YEARS | 6/01 | I20 |
| LA | GUN WATER BLASTER W/ASSOC. EQUIP | 2,027 | 203 | 0 | 9.5 | 5 YEARS | 6/01 | I20 |
| LA | GUN-PAYTEK RAISER HEAT | 3,986 | 399 | 0 | 9.5 | 5 YEARS | 6/01 | I20 |
| LA | HEADER CL2 GAS DIST W/SCRUBBER TANK | 1,306 | 131 | 0 | 9.5 | 5 YEARS | 6/01 | I20 |
| LA | HEADER CL2 GAS DIST W/SCRUBBER TANK | 53,090 | 5,310 | 0 | 9.5 | 5 YEARS | 6/01 | I20 |
| LA | HEADER-SULFURIC ACID VENT-SCRUBBER | 53,090 | 5,310 | 0 | 9.5 | 5 YEARS | 6/01 | I20 |
| LA | HEAT EXCHANGER HYDROGEN/BRINE NO.1 | 10,245 | 1,025 | 0 | 9.5 | 5 YEARS | 6/01 | I20 |
| LA | HEAT EXCHANGER HYDROGEN/BRINE NO.2 | 123,322 | 12,332 | 0 | 9.5 | 5 YEARS | 6/01 | I20 |
| LA | HEAT EXCHANGER BRINE/WATER NO.1-S/N 2935-1 | 123,323 | 12,332 | 0 | 9.5 | 5 YEARS | 6/01 | I20 |
| LA | HEAT EXCHANGER BRINE/WATER NO.2-S/N 2935-2 | 45,972 | 4,597 | 0 | 9.5 | 5 YEARS | 6/01 | I20 |
| LA | HEATER FOR 1ST.EFFECT EVAPORATOR | 45,972 | 4,597 | 0 | 9.5 | 5 YEARS | 6/01 | I20 |
| LA | HEATER FOR 2ND.EFFECT EVAPORATOR | 073,211 | 07,321 | 0 | 9.5 | 5 YEARS | 6/01 | I20 |
| LA | HEATER FOR 3RD.EFFECT EVAPORATOR | 072,120 | 07,212 | 0 | 9.5 | 5 YEARS | 6/01 | I20 |
| LA | HEATER FOR 4TH.EFFECT EVAPORATOR | 072,120 | 07,212 | 0 | 9.5 | 5 YEARS | 6/01 | I20 |
| LA | HEATER RESATURATOR/BRINE PREHEATER | 072,120 | 07,212 | 0 | 9.5 | 5 YEARS | 6/01 | I20 |
| LA | HEATER TRIM | 074,320 | 07,432 | 0 | 9.5 | 5 YEARS | 6/01 | I20 |
| LA | HEATER-CAUSTIC STORAGE & LOADING | 62,491 | 6,241 | 0 | 9.5 | 5 YEARS | 6/01 | I20 |
| LA | HEATER-DECOMPOSER FEED PIPELINE | 58,921 | 5,092 | 0 | 9.5 | 5 YEARS | 6/01 | I20 |
| LA | HEATER-ETHYLENE | 34,020 | 3,402 | 0 | 9.5 | 5 YEARS | 6/01 | I20 |
| LA | HEATER-WASTE WTR STRPTR FEED PIPELN | 30,093 | 600 | 0 | 9.5 | 5 YEARS | 6/01 | I20 |
| LA | HIGH PRESSURE BOOSTER SYSTEM | 125,176 | 12,570 | 0 | 9.5 | 5 YEARS | 6/01 | I20 |
| LA | HOIST - CAUSTIC DOCK | 1,678 | 147 | 0 | 9.5 | 5 YEARS | 6/01 | I20 |
| LA | HOIST - CAUSTIC DOCK | 41,604 | 4,160 | 0 | 9.5 | 5 YEARS | 6/01 | I20 |
| LA | HOIST - CHLORINE DOCK | 41,604 | 4,160 | 0 | 9.5 | 5 YEARS | 6/01 | I20 |
| LA | HOIST - HCL DOCK | 39,527 | 3,953 | 0 | 9.5 | 5 YEARS | 6/01 | I20 |
| LA | HOIST-BUMPER W/MONORAIL | 61,605 | 6,161 | 0 | 9.5 | 5 YEARS | 6/01 | I20 |
| LA | HOIST-CRUSHER TOWER W/MONORAIL | 18,062 | 1,636 | 1,806 | 9.5 | 5 YEARS | 6/01 | I20 |
| LA | HOIST-RAIL UNLOADING W/MONORAIL | 18,661 | 1,636 | 1,006 | 9.5 | 5 YEARS | 6/01 | I20 |
| LA | HOIST-RIG CATHODE DEPOSITING ASSY. | 18,661 | 1,636 | 1,006 | 9.5 | 5 YEARS | 6/01 | I20 |
| LA | HOLDING FIXTURE ANODE-GRID | 6,900 | 691 | 0 | 9.5 | 5 YEARS | 6/01 | I20 |
| LA | HOPPER DRY-S/N 0-1 | 24,603 | 2,600 | 0 | 9.5 | 5 YEARS | 6/01 | I20 |
| LA | HOPPER-COAL UNLOADING | 2,150 | 216 | 0 | 9.5 | 5 YEARS | 6/01 | I20 |
| | | 369,066 | 34,907 | 34,907 | | | | |

OCC033880

Confidential
ALCD-PUBCOM_0003068

BFGOODRICH, FM 6793, SAFE HARBOR LEASE RETURN, PT-16, PH-L15-ADDED     DATE 10/20/05     PAGE  10

| ASAME | STATE | DESCRIPTION | ADJ BASIS | REGULAR IIC | ENERGY IIC | AON IIUIVOIUT | RECOVERY CLS | SVC DATE | SLC 40B |
|---|---|---|---|---|---|---|---|---|---|
| LA | | HOPPER-DURCAN ROLL DUMP 1.5 CU.YDS. | 1,687 | 169 | 0 | 9.5 | 5 YEARS | 9/01 | NO |
| LA | | HOPPER-HO.1 SCREEN DQAL | 80,710 | 8,071 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | | HOPPER-HO.1 SCREEN DQAL CENT SOLIDS | 80,710 | 8,071 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | | HOPPER-HO.1 SCREEN DQAL SCREEN WASH | 80,710 | 8,071 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | | HOPPER-HO.2 SCREEN DQAL | 80,710 | 8,071 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | | HOPPER-HO.2 SCREEN DQAL CENT SOLIDS | 80,710 | 8,071 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | | HOPPER-HO.2 SCREEN DQAL SCREEN WASH | 80,710 | 8,071 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | | HOPPER-SOLID DQAL 1 EFFLUENT | 5,145 | 515 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | | HOPPER-SOLID DQAL 1 SOLIDS | 3,101 | 310 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | | HOPPER-SOLID DQAL 2 EFFLUENT | 5,145 | 515 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | | HOPPER-SOLID DQAL 2 SOLID | 3,101 | 310 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | | HOSES-SUCTION AID DISCHARGE | 6,201 | 620 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | | HOSES-TRANSFER | 2,794 | 279 | 0 | 9.5 | 5 YEARS | 10/01 | NO |
| LA | | INJECTOR KIT - 3324001 | 806 | 81 | 0 | 9.5 | 5 YEARS | 10/01 | NO |
| LA | | INJECTOR KIT - 3324001 | 805 | 81 | 0 | 9.5 | 5 YEARS | 10/01 | NO |
| LA | | INSTALL CHECK VALVE IN WATER LINE | 864 | 86 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | | INSTALL 4TH BLOCK VALVE EDC DRYOUT | 1,054 | 105 | 0 | 9.5 | 5 YEARS | 10/01 | NO |
| LA | | INSTRUMENT IHIURFACE UNIT | 1,072 | 107 | 0 | 9.5 | 5 YEARS | 10/01 | NO |
| LA | | INSTRUMENTATION - PLANT 35 | 933,400 | 93,340 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | | INSTRUMENTATION BOILER PLANT | 1,155,700 | 115,570 | 115,570 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | | INSTRUMENTATION FLUE GAS DESUL | 406,100 | 40,610 | 20,305 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | | INSTRUMENTATION PLANT 2 | 434,417 | 43,442 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | | INSTRUMENTATION PLANT 2 | 3,203 | 320 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | | INSTRUMENTATION PLANT 3 | 1,159,145 | 115,915 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | | INSTRUMENTATION PLANT 5 | 247,755 | 24,776 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | | INSTRUMENTATION WATER TREATMENT | 667,145 | 66,715 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | | INSTRUMENTATION-CELL CARBONATION | 440,600 | 44,060 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | | INSTRUMENTATION-COAL HANDLING | 155,600 | 15,560 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | | INSTRUMENTATION-CONTROL ROOM PL10 | 49,310 | 4,931 | 4,931 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | | INSTRUMENTATION-PLANT 35 | 535,200 | 53,520 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | | INSTRUMENTATION-INTERCONNECTING LN3 | 16,214 | 1,621 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | | INSTRUMENTATION-INTERCONNECTING LN5 | 62,048 | 6,205 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | | INSTRUMENTATION-INTERCONNECTING LN5 | 37,028 | 3,703 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | | INSTRUMENTATION-INTERCONNECTING LN5 | 5,399 | 540 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | | INSTRUMENTATION-INTERCONNECTING LN5 | 3,702 | 370 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | | INSTRUMENTATION-INTERCONNECTING LN5 | 7,250 | 725 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | | INSTRUMENTATION-INTERCONNECTING LN5 | 754 | 75 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | | INSTRUMENTATION-MARINE DOCK | 36,205 | 3,621 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | | INSTRUMENTATION-PLANT 1 | 101,600 | 10,160 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | | INSTRUMENTATION-PLANT 20 TANKS | 1,010,700 | 101,070 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | | INSTRUMENTATION-PLANT 37 AIR | 200,600 | 20,060 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | | INSTRUMENTATION-PLANT 4 | 130,600 | 13,060 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | | INSTRUMENTATION-PLANT 6 | 1,617,300 | 161,730 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | | INSTRUMENTATION-TRUCK & CAR LOAD | 3,633,700 | 363,370 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | | INTERCOOLER CHLORINE COMPRESSOR | 403,700 | 40,370 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | | JUMPER-SWITCH GLC GAIN 5/N 2004/00 | 546 | 55 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | | JUMPER-SWITCH GLC GAIN-S/N 2004/00 | 51,013 | 5,101 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | | JUMPER-SWITCH GLC GAIN-S/N 2005/00 | 54,000 | 5,460 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | | KEYSEATER-DAVIS | 54,000 | 5,460 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | | LAB EQUIP-VAC. FILTRATION STRUCTURE | 14,434 | 1,443 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | | | 4,711 | 471 | 0 | 9.5 | 5 YEARS | 6/01 | NO |

OCC033881

ASALE                    BFGOODRICH, FM 6793, SAFE HARBOR LEASE RETURN, PI-16, PI1-L15-ACC10          DATE 10/20/05      PAGE 11

| STATE | DESCRIPTION | ADJ BASIS | REGULAR ITC | ENERGY ITC | ADR MIDPOINT | RECOVERY CLS | SVC DATE | SEC 40B |
|---|---|---|---|---|---|---|---|---|
| LA | LAB FURNITURE-CONTROL BLDG. & LAB | 76,124 | 7,612 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | LAB FURNITURE-UTILITY CONTROL BLDG. | 7,253 | 725 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | LATHE-SOUTHBEND | 27,335 | 2,734 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | LECTRO INFO METER PORTABLE | 655 | 66 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | LIFT-HYDRAULIC SCISSOR | 10,246 | 1,025 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | LOADER IN W/4YD.BUCKET-S/N U002258 | 91,567 | 9,157 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | LOOP STAND | 1,062 | 106 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | LOOP STAND | 1,063 | 106 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | LSC-2 AUTOMATIC LIQUID SAMPLE CONC. | 4,714 | 471 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | LYONS LEVELING | 5,730 | 573 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | MEGGER-MOTOR DRIVEN | 6,269 | 627 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | METER - CONDUCTIVITY | 702 | 70 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | METER - PH | 732 | 73 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | METER - WET TEST GAS | 1,329 | 133 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | METER DIGITAL-S/N 8024112 | 550 | 55 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | METER DIGITAL-S/N 8024344 | 591 | 59 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | METER PH DIGITAL 110/115V | 799 | 80 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | METER PH W/CALOMEL COND.ELECTRODES | 834 | 83 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | METER-AC AMP KEISON | 866 | 87 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | METER-CONDUCTIVITY | 717 | 72 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | METER-MERIX VIBRATION | 576 | 58 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | METER-OXYGEN | 634 | 63 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | METER-THICKNESS GAUGE DM1-3 | 1,978 | 198 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | METER-VIBRATION | 1,339 | 134 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | METTLER BALANCE 4000 GM | 1,091 | 109 | 0 | 9.5 | 5 YEARS | 10/01 | 110 |
| LA | MICROSCOPE 1103 W/CAMERA POLAROID | 3,694 | 369 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | MICROSCOPE 150 INC. BINOCULAR | 847 | 85 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | MISC PIPING FOR METERING STATION | 36,743 | 3,674 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | MISC SAFETY EQUIPMENT & SUPPLIES | 37,630 | 3,763 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | MISC. EQUIPMENT-ENGINEERING SHOPS | 7,045 | 705 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | MISC. EQUIPMENT-ENGINEERING SHOPS | 24,513 | 2,451 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | MISC. EQUIPMENT-ENGINEERING SHOPS | 0,739 | 074 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | MISC. EQUIPMENT-ENGINEERING SHOPS | 1,937 | 194 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | MISC.LAB SUPPLIES INITIAL PURCHASE | 26,311 | 2,631 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | MISCELLANEOUS LAB SUPPLIES | 15,352 | 1,535 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | MIXER EDUCTOR/WHITE DECAY TANK | 2,563 | 256 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | MIXER EDUCTOR/CAUSTIC SUPPLY TANK | 3,666 | 367 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | MIXER EDUCTOR/NYTO DECAY TANK | 2,564 | 256 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | MIXER-COPPER SULFATE SOLUTION | 3,374 | 337 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | MIXER-PRIMARY CLARIFIER FEEDWELL | 1,953 | 195 | 0 | 9.5 | 5 YEARS | 1/01 | 110 |
| LA | MIXER-SECONDARY CLARIFIER FEEDWELL | 1,953 | 195 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | MIXER-SULFITE SOLUTION | 5,312 | 531 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | MIXERS-BIOTREAT EQUAL TANK | 20,622 | 2,062 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | MODIFY DISCHARGE PIPING PLANT 35 | 3,775 | 378 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | MOTOR FOR CUBE 10-10 | 624 | 62 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | MOTOR-20HP ELECTRIC CENTRIFUGE | 20,060 | 2,006 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | MOTOR-20HP ELECTRIC CENTRIFUGE | 20,060 | 2,006 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | MOTOR-SHUTTLE WAGON HAULER | 92,134 | 9,213 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | ONISCRIBE-RECORDER DS116X-4 | 653 | 65 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | ONISCRIBE-RECORDER DS116X-4 | 653 | 65 | 0 | 9.5 | 5 YEARS | 1/01 | 110 |
| LA | ONISCRIBE-RECORDER DS116X-4 | 653 | 65 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | ONISCRIBE-RECORDER DS116X-4 | 653 | 65 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |

OCC033882

OCCNJ0027192

Confidential

ALCD-PUBCOM_0003070

ASALE

BFGOODRICH, FM 6793, SAFE HARBOR LEASE RETURN, PI-16, PI-L15-ADC&D

| STATE | DESCRIPTION | ADJ BASIS | REGULAR ITC | ENERGY ITC | ADR MIDPOINT | RECOVERY CLS | SVC DATE | SEC 40D |
|---|---|---|---|---|---|---|---|---|
| LA | ONISCRIBE-RECORDER 05116X-4 | 653 | 65 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | ONISCRIBE-RECORDER 05116X-4 | 653 | 65 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | ONISCRIBE-RECORDER 05116X-4 | 653 | 65 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | ONISCRIBE-RECORDER 05116X-4 | 653 | 65 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | ONISCRIBE-RECORDER 05116X-4 | 653 | 65 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | ONISCRIBE-RECORDER 05116X-4 | 653 | 65 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | ONISCRIBE-RECORDER 05116X-4 | 653 | 65 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | OSCILLATOR-S/N 100747X6 | 1,240 | 124 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | OSCILLOSCOPE NO.214-5/N D109099 | 3,154 | 315 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | OSCILLOSCOPE-S/N D027312 | 2,047 | 205 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | OSCILLOSCOPE-S/N D027720 | 1,196 | 120 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | OVEN - RADIANT HEAT | 1,140 | 115 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | OVEN - ISOTEMP 300 | 1,140 | 115 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | OVEN - VACUUM | 520 | 57 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | OVEN-CELL DRYING | 91,000 | 9,100 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | OXIDIZER | 434,927 | 43,493 | 21,746 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PACKAGE POLYMER FEED | 32,012 | 3,201 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PACKAGE-COAGULANT FEED | 43,145 | 4,315 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PACKAGE-CORROSION INHIBITOR FEED | 34,520 | 3,452 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PACKAGE-FILTRATE RECEIVER UNIT | 125,379 | 12,530 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PACKAGE-LIME FEED | 34,520 | 3,452 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PACKAGE-SULFITE FEED | 16,354 | 1,635 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PIPING BY-PASS AROUND LV-309 | 2,618 | 262 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PIPING CELL RENEWAL SUMP FILTERING | 5,911 | 591 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PIPING EDC RAILCAR LOADING | 10,394 | 1,034 | 0 | 9.5 | 5 YEARS | 10/01 | 110 |
| LA | PIPING FOR VENT LINE EXTENSIONS | 15,331 | 1,533 | 0 | 9.5 | 5 YEARS | 10/01 | 110 |
| LA | PIPING-COAL HANDLING | 225,300 | 22,530 | 22,530 | 9.5 | 5 YEARS | 10/01 | 110 |
| LA | PIT - TRUCK SCALE | 240,475 | 24,040 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PLANT STREETS-242407 SQ.FT. | 900,990 | 90,099 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PLANT STREETS-27313 SQ.FT. | 110,494 | 11,049 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PLATFORM BRIDGE MODEL 1000-8 | 2,505 | 251 | 0 | 9.5 | 5 YEARS | 10/01 | 110 |
| LA | PLATFORM BRIDGE MODEL 1000-8 | 2,505 | 251 | 0 | 9.5 | 5 YEARS | 10/01 | 110 |
| LA | PLATFORM SCALE BRKR EV/CHINES | 61,210 | 6,121 | 6,121 | 9.5 | 5 YEARS | 10/01 | 110 |
| LA | POLYELECTROLYTE PREP SYSTEM | 126,604 | 12,660 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PORTABLE D O ANALYZER SN-2219 | 1,002 | 100 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PORTABLE HDMIETER 21PE | 819 | 82 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PORTABLE SLUDGE BLANKET DECTOR 570 | 859 | 89 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PORTABLE TDS CONDUCTIVITY ANALYZER | 719 | 72 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | POT SEAL | 2,043 | 206 | 102 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | POT-OVERFLOW | 10,993 | 1,099 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | POT-OVERFLOW | 10,993 | 1,019 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | POT-SEAL OIL STORAGE | 7,700 | 770 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | POWER SPLY UNINTERRUPTED UTIL AREA | 36,363 | 3,636 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | POWER SUPPLY SYSTEM EXIDE CEHRAUS | 10,342 | 1,034 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | POWER SUPPLY UNINTERRUPTD PROCS AREA | 36,363 | 3,636 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PREHEATER AMMONIA FEED | 2,435 | 244 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PREHEATER CAUSTIC FEED | 44,555 | 4,451 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PREHEATER F/1ST-EFFECT EVAPORATOR | 76,272 | 7,627 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PREHEATER F/1ST-EFFECT EVAPORATOR | 76,272 | 7,627 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PREHEATER F/1ST-EFFECT EVAPORATOR | 76,272 | 7,627 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PREHEATER F/1ST-EFFECT EVAPORATOR | 76,272 | 7,627 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PREHEATER F/2ND-EFFECT EVAPORATOR | 76,272 | 7,627 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |

OCC033883

Confidential

ASALE   DFGOODRICH, FM 6795, SAFE HARBOR LEASE RETURN, PI-16, PII-L15-ADC2D   DATE 10/20/05   PAGE 13

| STATE | DESCRIPTION | ADJ BASIS | REGULAR ITC | ENERGY ITC | ADR MIDPOINT | RECOVERY CLS | SVC DATE | SEC 40D |
|---|---|---|---|---|---|---|---|
| LA | PREHEATER F/3RD EFFECT EVAPORATOR | 76,272 | 7,627 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PREHEATER NO.2 F/2ND EFFECT EVAP. | 25,390 | 2,539 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PREHEATER-DECOMPOSER FEED | 25,030 | 2,503 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PREHEATER-DECOMPOSER FEED | 25,031 | 2,503 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PRESATURATOR | 73,225 | 7,323 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PRESS-150T CHERPAC HYDRAULIC | 1,200 | 121 | 3,661 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PRESS-150T FLOOR MODEL | 11,097 | 1,109 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PROCESS PIPING BOILER PLANT | 1,591,200 | 159,120 | 159,120 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PROCESS PIPING FLUE GAS DESUL | 953,100 | 95,310 | 47,655 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PROCESS PIPING INTERCONNECTING LNS | 3,109,076 | 310,908 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PROCESS PIPING PLANT 2 | 3,636,655 | 363,666 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PROCESS PIPING PLANT 2 | 27,466 | 2,747 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PROCESS PIPING PLANT 3 | 2,669,386 | 269,939 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PROCESS PIPING PLANT 5 | 574,028 | 57,403 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PROCESS PIPING PLANT 6 | 1,509,167 | 150,917 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PROCESS PIPING WATER TREATMENT | 302,607 | 30,269 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PROCESS PIPING-PLANT 1 | 875,900 | 87,590 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PROCESS PIPING-PLANT 4 | 3,119,740 | 311,974 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PROCESS-PIPING CELL CARBONATION | 7,212,590 | 721,259 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PROCESS-PIPING CAR & TRUCK LOADING | 1,601,025 | 160,103 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PROCESS-PIPING CELL CARBONATION | 270,600 | 27,060 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PROCESS-PIPING INTERCONNECTING LNS | 3,150,354 | 315,037 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PROCESS-PIPING INTERCONNECTING LNS | 62,960 | 6,297 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PROCESS-PIPING INTERCONNECTING LNS | 605,347 | 60,535 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PROCESS-PIPING INTERCONNECTING LNS | 450,790 | 45,079 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PROCESS-PIPING INTERCONNECTING LNS | 3,500,510 | 350,051 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PROCESS-PIPING INTERCONNECTING LNS | 1,351,002 | 135,100 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PROCESS-PIPING INTERCONNECTING LNS | 309,111 | 30,911 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PROCESS-PIPING MARINE DOCK | 1,500,000 | 150,000 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PROCESS-PIPING PLANT 20 TANKS | 079,300 | 07,930 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PROCESS-PIPING PLANT 35 | 1,973,600 | 197,360 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PROCESS-PIPING PLANT 37 AIR | 1,909,000 | 190,900 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PROCESS-PIPING PLANT 6 | 167,600 | 16,760 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PROCESSING-PIPING PLANT 6 | 8,127,271 | 812,727 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP - ACID FEED | 6,236 | 624 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP - CAUSTIC DOCK SUMP | 0,959 | 096 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP - CAUSTIC LOADING | 24,576 | 2,450 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP - CAUSTIC LOADING | 24,576 | 2,450 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP - CAUSTIC LOADING | 24,576 | 2,450 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP - CAUSTIC TANK AREA SUMP | 24,315 | 2,432 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP - EDC DOCK SUMP | 6,105 | 611 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP - EDC DRYOUT & REWORK | 6,333 | 633 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP - EDC LOADING | 14,353 | 1,435 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP - EDC LOADING | 14,353 | 1,435 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP - EDC SLOP | 4,900 | 490 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP - EDC TANK AREA RAINWATER | 5,619 | 562 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP - FILTER SUMP | 8,401 | 840 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP ACIDIZED CRUDE FEED W/MOTOR | 29,090 | 2,910 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP ACIDIZED CRUDE FEED W/MOTOR | 29,899 | 2,990 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP AMMONIA FEED | 49,101 | 4,910 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP AMMONIA FEED SPARE | 49,162 | 4,910 | 0 | 9.5 | 5 YEARS | 6/01 | NO |

OCC003884

BFGOODRICH, FM 6793, SAFE HARBOR LEASE RETURN, P1-L6, P11-L15-ADCED     DATE 10/20/05     PAGE 14

ASATE

| STATE | DESCRIPTION | ADJ BASIS | REGULAR ITC | ENERGY ITC | AOR HUDPOINT | RECOVERY CLS | SVC DATE | SEC 4ED |
|---|---|---|---|---|---|---|---|---|
| LA | PUMP AQUA-AMMONIA VACUUM | 16,950 | 1,695 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP AQUA-AMMONIA VACUUM SPARE | 16,950 | 1,695 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP BACKWASH RETURN | 2,669 | 267 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP BACKWASH RETURN-SPARE | 2,669 | 267 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP BACKWASH TRANSFER | 5,035 | 504 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP BACKWASH TRANSFER W/MOTOR | 6,530 | 654 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP BFW | 54,751 | 5,475 | 5,475 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP BFW | 54,752 | 5,475 | 5,475 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP BRINE FILTER W/MOTOR | 15,731 | 1,573 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP BRINE FILTER W/MOTOR | 15,731 | 1,573 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP BRINE STORAGE NO.1 W/MOTOR | 10,690 | 1,069 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP BRINE STORAGE NO.2 W/MOTOR | 16,090 | 1,609 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP BRINE STORAGE NO.3 W/MOTOR | 10,891 | 1,089 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP CARBONATE LIQUID FEED W/MOTOR | 9,993 | 1,000 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP CARBONATE LIQUID FEED W/MOTOR | 9,999 | 1,000 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP CAUSTIC FEED | 51,505 | 5,151 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP CAUSTIC FEED SPARE | 51,506 | 5,151 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP CAUSTIC PRODUCT | 7,447 | 745 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP CAUSTIC PRODUCT SPARE | 7,447 | 745 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP CAUSTIC PURIF AREA SUMP SPARE | 11,121 | 1,112 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP CAUSTIC PURIFICATION AREA SUMP | 11,120 | 1,112 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP CLEAN OIL RETURN | 4,473 | 447 | 447 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP CONDENSATE | 17,169 | 1,717 | 1,717 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP CONDENSATE SPARE | 17,175 | 1,718 | 1,718 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP COOLING WATER CIRCULATING | 222,605 | 22,269 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP COOLING WATER CIRCULATING | 222,604 | 22,260 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP COOLING WATER CIRCULATING | 222,604 | 22,260 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP COOLING WATER RETURN W/MOTOR | 13,430 | 1,343 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP COOLING WATER RETURN W/MOTOR | 13,430 | 1,343 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP EVAPORATOR CONDENSATE | 1,030 | 103 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP EVAPORATOR CONDENSATE SPARE | 1,029 | 103 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP FLASH CONDENSATE | 4,944 | 494 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP FLASH CONDENSATE SPARE | 4,945 | 495 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP FUEL OIL | 11,900 | 1,190 | 1,190 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP FUEL OIL UNLOADING | 12,344 | 1,234 | 1,234 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP HCL TRANSFER W/MOTOR | 3,173 | 317 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP HCL TRANSFER W/MOTOR | 6,356 | 636 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP HYDROGEN CONDENSATE W/MOTOR | 3,977 | 398 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP HYDROGEN CONDENSATE W/MOTOR | 3,976 | 398 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP METERING CELL LIQUOR W/MOTOR | 3,710 | 371 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP METERING CELL LIQUOR W/MOTOR | 4,265 | 427 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP METERING S/MOTOR-S/H K5534 | 10,066 | 1,007 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP METERING W/MOTOR-S/H K5503 | 10,066 | 1,007 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP OVERFLOW BRINE W/MOTOR | 4,650 | 465 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP PURGE | 7,495 | 750 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP PURGE SPARE | 7,495 | 750 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP PURIFIED CAUSTIC TRANS SPARE | 5,035 | 504 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP PURIFIED CAUSTIC TRANSFER | 5,035 | 504 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP RAW BRINE W/MOTOR | 20,108 | 2,019 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP RAW BRINE W/MOTOR | 20,100 | 2,019 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP RIVER WATER VERTICAL | 33,741 | 3,374 | 0 | 9.5 | 5 YEARS | 6/01 | NO |

OCC033885

Confidential

ASALE        BFGOODRICH, PN 6793, SAFE HARBOR LEASE RETURN, PI-L6, PI-L15-ADCAID

| STATE | DESCRIPTION | ADJ BASIS | REGULAR IIC | ENERGY IIC | ADR MIDPOINT | RECOVERY CLS | SVC DATE | SEC 40D |
|---|---|---|---|---|---|---|---|---|
| LA | PUMP RIVER WATER VERTICAL | 33,741 | 3,374 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP RIVER WATER VERTICAL | 33,741 | 3,374 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP SALT DISSOLVER W/MOTOR | 8,921 | 892 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP SALT DISSOLVER W/MOTOR | 8,920 | 892 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP SCREEN WASH | 2,710 | 271 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP SCRUBBER CIRCULATING | 5,250 | 525 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP SCRUBBER CIRCULATING SPARE | 5,250 | 525 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP STRIPPER BOTTOMS | 4,736 | 474 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP STRIPPER BOTTOMS SPARE | 4,736 | 474 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP STRIPPER RETURN | 27,595 | 2,760 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP STRIPPER RETURN SPARE | 27,596 | 2,760 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP SUMP BRINE AREA W/MOTOR | 11,609 | 1,161 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP SUMP BRINE AREA W/MOTOR | 11,609 | 1,161 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP SUMP RESERVOIR MONITOR W/MOTOR | 12,064 | 1,206 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP TREATED WATER BOOSTER | 16,079 | 1,608 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP TREATED WATER BOOSTER-SPARE | 16,079 | 1,608 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP TREATED WATER BOOSTER-SPARE | 16,079 | 1,608 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP UTILITY WATER | 20,405 | 2,041 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP UTILITY WATER | 20,405 | 2,041 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP UTILITY WATER-SPARE | 20,405 | 2,041 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP VACUUM W/SEPARATOR | 70,015 | 7,032 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP WASTE LIQUOR TRANSFER | 4,997 | 499 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP WASTE LIQUOR TRANSFER-SPARE | 4,907 | 499 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP WASTE WATER DISCHARGE | 804 | 804 | .804 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP-A SPARE FOR 56601A | 8,039 | 804 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP-ABSORBER BOTTOMS | 76,049 | 7,605 | 3,842 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP-ABSORBER BOTTOMS | 6,156 | 616 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP-ABSORBER RECIRCULATING | 6,157 | 616 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP-ACID CIRCULATING | 76,047 | 7,605 | 3,842 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP-ACID CIRCULATING | 6,173 | 617 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP-ACID CIRCULATING | 7,109 | 711 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP-ACID CIRCULATING | 7,109 | 711 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP-ACID CIRCULATING | 7,109 | 711 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP-ACID CIRCULATING | 7,109 | 711 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP-ACID CIRCULATING | 4,413 | 441 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP-ACID CIRCULATING | 4,413 | 441 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP-ACID FEED | 6,172 | 617 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP-ACID COOLING AREA SUMP | 6,235 | 624 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP-ACID COOLING AREA SUMP | 24,656 | 2,466 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP-DI4 BOILER FEED WATER | 24,655 | 2,466 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP-BOILOUT BLEED-S/N H7969526 | 54,751 | 5,475 | 5,475 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP-BOILOUT RETURN-S/N H2510029 | 6,035 | 604 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP-BOILOUT WATER-S/N H2520318 | 23,052 | 2,305 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP-BY-PRODUCT STORAGE TANK TRANS | 7,069 | 1,094 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP-CARBON TETRACHLORIDE MAKEUP | 7,069 | 707 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP-CARBONATION FEED | 6,591 | 659 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP-CARBONATION FEED | 6,410 | 642 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP-CARBONATION TOWER BOTTOMS | 6,410 | 642 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP-CARBONATION TOWER BOTTOMS | 7,306 | 731 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP-CAUSTIC FEED | 7,309 | 731 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP-CAUSTIC FEED | 5,240 | 525 | 262 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP-CAUSTIC FIELD 17 PER CENT | 10,536 | 1,054 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |

OCC033886

Confidential

BFGOODRICH, FH 6793, SAFE HARBOR LEASE RETURN, PI-L6, PI1-L15-ADCAD     DATE 10/28/85     PAGE 16

| STATE | DESCRIPTION | ADJ BASIS | REGULAR ITC | ENERGY ITC | ADR MIDPOINT | RECOVERY CLS | SVC DATE | SEC 40D |
|---|---|---|---|---|---|---|---|---|
| LA | PUMP-CAUSTIC FEED 17 PER CENT | 10,536 | 1,054 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP-CAUSTIC FILTER FEED | 6,222 | 622 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP-CAUSTIC FILTER FEED | 6,223 | 622 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP-CAUSTIC LIQUOR SUMP-S/II 69048 | 40,568 | 4,057 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP-CAUSTIC LOADING | 24,576 | 2,458 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP-CAUSTIC LOADING | 24,576 | 2,458 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP-CAUSTIC LOADING AREA SUMP | 24,576 | 2,453 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP-CAUSTIC LOADING AREA SUMP | 14,764 | 1,476 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP-CAUSTIC RUNDOWN TANK | 14,763 | 1,476 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP-CAUSTIC RUNDOWN TANK | 7,155 | 716 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP-CAUSTIC TANK AREA SUMP | 7,155 | 716 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP-CCM BOOSTER-S/II H25JD060-1 | 8,315 | 832 | 0 | 9.5 | 5 YEARS | 6/01 | 120 |
| LA | PUMP-CCM BOOSTER-S/II H25JD060-2 | 7,544 | 755 | 0 | 9.5 | 5 YEARS | 6/01 | 120 |
| LA | PUMP-CELL LIQUOR SUMP-S/II T-56440 | 37,020 | 3,702 | 0 | 9.5 | 5 YEARS | 6/01 | 120 |
| LA | PUMP-CELL LIQUOR SUMP-S/II T-56441 | 36,999 | 3,699 | 0 | 9.5 | 5 YEARS | 6/01 | 120 |
| LA | PUMP-CELL LIQUOR SUMP-S/II T-56442 | 25,156 | 2,516 | 0 | 9.5 | 5 YEARS | 6/01 | 120 |
| LA | PUMP-CELL LIQUOR TRANSFER | 16,723 | 1,672 | 0 | 9.5 | 5 YEARS | 6/01 | 120 |
| LA | PUMP-CELL LIQUOR TRANSFER | 16,722 | 1,672 | 0 | 9.5 | 5 YEARS | 6/01 | 120 |
| LA | PUMP-CHILLED WATER BLENDING | 7,301 | 730 | 0 | 9.5 | 5 YEARS | 6/01 | 120 |
| LA | PUMP-CHILLED WATER BLENDING | 7,300 | 730 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP-CHILLED WATER TEMPERING | 5,173 | 517 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP-CHILLED WATER TEMPERING SP | 5,223 | 522 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP-CHILLED WATER-S/II H25JD024-1 | 14,606 | 1,460 | 0 | 9.5 | 5 YEARS | 6/01 | 120 |
| LA | PUMP-CHILLED WATER-S/II H25JD024-2 | 14,605 | 1,460 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP-CHILLED WATER-S/II H25JD024-3 | 14,600 | 1,460 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP-CHLORINE CONDENSATE | 12,532 | 1,253 | 0 | 9.5 | 5 YEARS | 6/01 | 120 |
| LA | PUMP-CHLORINE CONDENSATE | 12,532 | 1,253 | 0 | 9.5 | 5 YEARS | 6/01 | 120 |
| LA | PUMP-CHLORINE DOCK SUMP | 7,035 | 704 | 0 | 9.5 | 5 YEARS | 6/01 | 120 |
| LA | PUMP-CHLORINE TRANSFER-S/II 68170 | 59,956 | 5,996 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP-CHLORINE TRANSFER-S/II 68170-1 | 59,957 | 5,996 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP-CHLORINE TRANSFER-S/II 68170-2 | 59,067 | 5,937 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP-CHLORINE TRANSFER-S/II 68170-3 | 59,067 | 5,907 | 0 | 9.5 | 5 YEARS | 6/01 | 120 |
| LA | PUMP-CIRCULATING F/1ST. EFFECT EVAP | 153,070 | 15,307 | 0 | 9.5 | 5 YEARS | 6/01 | 120 |
| LA | PUMP-CIRCULATING F/1ST. EFFECT LFT | 130,110 | 13,011 | 0 | 9.5 | 5 YEARS | 6/01 | 120 |
| LA | PUMP-CIRCULATING F/2ND. EFFECT EVAP | 172,710 | 17,271 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP-CIRCULATING F/2ND.EFFECT LFT | 47,630 | 4,763 | 0 | 9.5 | 5 YEARS | 6/01 | 120 |
| LA | PUMP-CIRCULATING F/3RD. EFFECT EVAP | 47,630 | 4,763 | 0 | 9.5 | 5 YEARS | 6/01 | 120 |
| LA | PUMP-CIRCULATING F/3RD.EFFECT LFT | 172,710 | 17,271 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP-CIRCULATING F/4TH. EFFECT EVAP | 172,710 | 17,271 | 0 | 9.5 | 5 YEARS | 6/01 | 120 |
| LA | PUMP-CLARIFIER UNDERFLOW | 2,755 | 276 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP-CLARIFIER UNDERFLOW-SPARE | 2,755 | 276 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP-COAL PILE RUNOFF SUMP | 21,700 | 2,170 | 1,085 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP-COAL PILE RUNOFF SUMP | 21,700 | 2,170 | 1,085 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP-COAL UNLOADING PIT SUMP | 25,379 | 2,530 | 2,530 | 9.5 | 5 YEARS | 6/01 | 120 |
| LA | PUMP-COAL UNLOADING PIT SUMP | 25,377 | 2,530 | 2,530 | 9.5 | 5 YEARS | 6/01 | 120 |
| LA | PUMP-CONDENSATE RETURN | 7,145 | 715 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP-CONTAMINATED OIL SAMPLE | 1,493 | 149 | 149 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP-CONTAMINATED WATER | 4,696 | 470 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP-CONTAMINATED WATER | 4,696 | 470 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP-CONTAMINATED WATER SUMP | 7,643 | 764 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |

OCC033887

Confidential

Confidential

ASALE  BFGOODRICH, FM 6795, SAFE HARBOR LEASE RETURN, PT-16, PTI-L15-ADCID  DATE 10/28/05  PAGE 17

| STATE DESCRIPTION | ADJ BASIS | REGULAR ITC | ENERGY ITC | ADR MIDPOINT | RECOVERY CLS | SVC DATE | SEC 48D |
|---|---|---|---|---|---|---|---|
| LA PUMP-CONTAMINATED WATER SUMP | 7,643 | 764 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA PUMP-COOLING SYSTEM DRAIN | 7,069 | 707 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA PUMP-COOLING WATER SUMP CHLORINE | 14,603 | 1,460 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA PUMP-COOLING WATER SUMP CHLORINE | 14,604 | 1,460 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA PUMP-COPPER SULFATE | 2,195 | 220 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA PUMP-COPPER SULFATE | 2,195 | 220 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA PUMP-CRUDE EDC PRODUCT | 7,622 | 762 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA PUMP-CRUDE EDC PRODUCT | 7,622 | 762 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA PUMP-CRUDE EDC TRANSFER | 10,002 | 1,000 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA PUMP-CRUDE EDC TRANSFER | 10,002 | 1,000 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA PUMP-DECANTED WATER | 3,040 | 304 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA PUMP-DECANTED WATER | 3,039 | 334 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA PUMP-DECANTED WATER SUMP-S/N T56443 | 9,264 | 926 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA PUMP-DECANTER FEED | 23,970 | 2,397 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA PUMP-DECANTER FEED | 23,970 | 2,397 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA PUMP-DESUPERHEATER COND. | 3,131 | 313 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA PUMP-DESUPERHEATER COND. | 3,131 | 313 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA PUMP-DILUTE CAUSTIC TRANSFER | 3,314 | 331 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA PUMP-DILUTE CAUSTIC TRANSFER | 3,314 | 331 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA PUMP-DISPOSAL EFFLUENT | 12,670 | 1,260 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA PUMP-DRY REWORK TANK | 7,219 | 722 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA PUMP-DRYING COLUMN BOTTOMS | 8,039 | 804 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA PUMP-DRYING COLUMN BOTTOMS | 8,039 | 804 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA PUMP-DRYING COLUMN REBOILER | 6,855 | 686 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA PUMP-DRYING COLUMN REBOILER | 6,554 | 655 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA PUMP-DRYING COLUMN REFLUX | 6,691 | 669 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA PUMP-DRYING COLUMN REFLUX | 6,691 | 669 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA PUMP-EDC TANK AREA SUMP | 5,041 | 504 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA PUMP-EDC TANK DIKE SUMP | 6,515 | 652 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA PUMP-EDUCTOR CIRCULATING | 7,740 | 775 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA PUMP-EDUCTOR CIRCULATING | 7,740 | 775 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA PUMP-EVAPORATOR DRAIN-S/N H251B031 | 24,702 | 2,470 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA PUMP-FEED SOLID BOWL CENTRIFUGAL | 7,144 | 714 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA PUMP-FEED SOLID BOWL CENTRIFUGAL | 7,144 | 714 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA PUMP-FEED 1ST.EFFECT-S/N H795D510-1 | 17,420 | 1,743 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA PUMP-FEED 1ST.EFFECT-S/N H795D510-2 | 17,429 | 1,743 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA PUMP-FEED 2ND.EFFECT-S/N H251D025-1 | 19,155 | 1,916 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA PUMP-FEED 2ND.EFFECT-S/N H251D025-2 | 19,156 | 1,916 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA PUMP-FEED 3RD.EFFECT-S/N H25ZD132-1 | 10,213 | 1,021 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA PUMP-FEED 3RD.EFFECT-S/N H25ZD132-2 | 10,213 | 1,021 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA PUMP-FEED 4TH.EFFECT-S/N H251D026-1 | 20,536 | 2,054 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA PUMP-FEED 4TH.EFFECT-S/N H251D026-2 | 20,537 | 2,054 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA PUMP-FGD EFFLUENT SETTLING POND | 22,330 | 2,233 | 1,117 | 9.5 | 5 YEARS | 6/01 | NO |
| LA PUMP-FGD EFFLUENT SETTLING POND | 22,331 | 2,233 | 1,117 | 9.5 | 5 YEARS | 6/01 | NO |
| LA PUMP-FILTER BACKWASH-S/N H795D524-1 | 4,126 | 413 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA PUMP-FILTER BACKWASH-S/N H795D524-2 | 4,126 | 413 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA PUMP-FILTER PRECOAT-S/N H795D525-1 | 7,441 | 744 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA PUMP-FILTER PRECOAT-S/N H795D525-2 | 7,441 | 744 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA PUMP-FILTER SLUG LIQUOR BOOSTER | 8,549 | 855 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA PUMP-FILTER SLUG LIQUOR BOOSTER | 8,549 | 855 | 0 | 9.5 | 5 YEARS | 6/01 | NO |

OCC033888

ALCD-PUBCOM_0003076

| STATE | DESCRIPTION | ADJ BASIS | REGULAR ITC | ENERGY ITC | ADR HDR001H | RECOVERY CLS | SVC DATE | SEC 40D |
|---|---|---|---|---|---|---|---|---|
| LA | PUMP-FIRST STAGE ACID CIRCULATING | 15,071 | 1,507 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP-FRESH SULFURIC ACID UNLOADING | 7,398 | 740 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP-FUEL OIL SPARE | 11,901 | 1,190 | 1,190 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP-INTO WASTE FEED | 6,603 | 660 | 334 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP-LINE SLURRY | 2,755 | 276 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP-LINE SLURRY-SPARE | 2,755 | 276 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP-LINE UNLOADING | 2,755 | 276 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP-MURIATIC ACID UNLOADING | 7,097 | 710 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP-OVERFLOW INPURE CAUSTIC | 10,937 | 1,094 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP-PHOSPHORIC ACID FEED | 2,306 | 239 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP-PROCESS CONDENSATE | 5,732 | 573 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP-PROCESS CONDENSATE | 5,732 | 573 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP-PROCESS WATER BOOSTER | 3,002 | 300 | 154 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP-PRODUCT COLUMN BOTTOMS | 6,160 | 617 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP-PRODUCT COLUMN BOTTOMS | 6,169 | 617 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP-PRODUCT COLUMN REBOILER | 6,000 | 600 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP-PRODUCT COLUMN REBOILER | 6,000 | 600 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP-PRODUCT COLUMN REFLUX | 9,002 | 900 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP-PRODUCT COLUMN REFLUX | 9,003 | 900 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP-PURE PROCESS COND. | 2,710 | 271 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP-PURE PROCESS COND. | 12,003 | 1,200 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP-PURE PROCESS COND. | 12,002 | 1,200 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP-REFUSE WATER-S/N H2510030 | 11,956 | 1,196 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP-SALT CYCLONE FEED NO.1 | 7,549 | 755 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP-SALT CYCLONE FEED NO.2 | 7,549 | 755 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP-SALT CYCLONE FEED NO.3 | 7,549 | 755 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP-SALT SLURRY-S/N H795D515-1 | 10,690 | 1,069 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP-SALT SLURRY-S/N H795D515-2 | 10,690 | 1,069 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP-SCREEN BOWL CENTER FEED | 56,229 | 5,623 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP-SCREEN BOWL CENTER FEED | 56,229 | 5,623 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP-SCREEN WASH | 2,710 | 271 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP-SCRUBBER CIRCULATING | 21,602 | 2,160 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP-SCRUBBER CIRCULATING | 21,601 | 2,160 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP-SCRUBBER CIRCULATING | 21,603 | 2,160 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP-SCRUBBER EFFLUENT | 12,265 | 1,227 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP-SEAL OIL SUPPLY | 19,742 | 1,974 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP-SEAL POT SCRUBBER | 61,532 | 6,153 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP-SEAL POT SCRUBBER | 61,532 | 6,153 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP-SEAL WATER CIRCULATING | 3,930 | 390 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP-SEAL WATER CIRCULATING | 3,901 | 390 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP-SEAL WATER SUPPLY | 4,364 | 436 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP-SEAL WATER SUPPLY | 4,364 | 436 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP-SEAL WATER-S/N H795D519-1 | 6,506 | 659 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP-SEAL WATER-S/N H795D519-2 | 4,049 | 405 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP-SEPARATOR FEED-S/N 620605 | 4,049 | 405 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP-SODA ASH TRANSFER | 5,367 | 537 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP-SODIUM SULFITE METERING | 5,547 | 555 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP-SOLVENT CHARGE | 2,938 | 294 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP-SOLVENT CIRCULATING | 11,025 | 1,103 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP-SOLVENT CIRCULATING | 14,225 | 1,423 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP-SOLVENT CIRCULATING | 14,224 | 1,422 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | PUMP-SPARE FOR 35G05A | 5,240 | 525 | 262 | 9.5 | 5 YEARS | 6/01 | 110 |

OCC033889

Confidential

BFGOODRICH, FM 6793, SAFE HARBOR LEASE RETURN, PT-L6, PT1-L15-ADCID          DATE 10/20/05          PAGE 19

| ASATE | STATE DESCRIPTION | ADJ BASIS | REGULAR ITC | ENERGY ITC | ADR MIDPOINT | RECOVERY CLS | SVC DATE | SEC 48D |
|---|---|---|---|---|---|---|---|---|
| LA | PUMP-SPARE FOR 36G06A | 3,082 | 306 | 154 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP-STEAM ACID TRANSFER | 5,231 | 523 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP-STEAM ACID TRANSFER | 5,221 | 522 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP-STEAM SULFURIC ACID LOADING | 10,651 | 1,065 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP-STEAM WATER | 9,475 | 948 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP-STEAM WATER | 9,475 | 948 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP-STRIPPER EDUCTOR | 9,103 | 910 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP-STRIPPER EDUCTOR | 9,103 | 910 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP-STRIPPER OVERHEAD | 14,471 | 1,447 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP-STRIPPER OVERHEAD | 14,471 | 1,447 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP-SULFATE PURGE-S/N H795D516-1 | 4,250 | 425 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP-SULFATE PURGE-S/N H795D516-2 | 4,251 | 425 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP-SULFITE SOLUTION | 7,492 | 749 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP-SULFITE SOLUTION EMERGENCY | 4,371 | 437 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP-SULFITE SOLUTION EMERGENCY | 4,371 | 437 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP-SULFURIC ACID | 4,739 | 474 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP-SULFURIC ACID | 4,740 | 474 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP-SULFURIC ACID FEED | 4,305 | 439 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP-SULFURIC ACID FEED | 4,305 | 439 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP-TRANSFER 1ST.EFFECT | 12,209 | 1,229 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP-TRANSFER 3RD.FLASH EFFECT | 11,592 | 1,159 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP-TRANSFER 3RD.FLASH EFFECT | 11,591 | 1,159 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP-TRUCK SCALE SUMP | 2,710 | 271 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP-VACUUM COLUMN BOTTOMS | 14,531 | 1,453 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP-VACUUM COLUMN BOTTOMS | 14,532 | 1,453 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP-VACUUM COLUMN REBOILER | 6,019 | 602 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP-VACUUM COLUMN REBOILER | 6,019 | 602 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP-VACUUM COLUMN REFLUX | 14,169 | 1,417 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP-VACUUM COLUMN REFLUX | 14,170 | 1,417 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP-VACUUM TANK PIT SUMP W/MOTOR | 11,305 | 1,131 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP-VACUUM 115 VOLTS 60HZ. | 706 | 70 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP-VACUUM 115 VOLTS 60HZ. | 706 | 70 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP-WASH WATER CIRCULATING | 5,070 | 507 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP-WASH WATER CIRCULATING | 5,070 | 507 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP-WASH WATER FEED-S/N 3D5531 | 27,046 | 2,705 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP-WASH WATER-S/N H795D513-1 | 5,043 | 504 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP-WASH WATER-S/N H795D513-2 | 5,043 | 504 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP-WASTE WATER STRIPPER BOTTOMS | 4,331 | 433 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP-WASTE WATER STRIPPER BOTTOMS | 4,331 | 433 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP-WASTE WATER STRIPPER OVERHEAD | 7,403 | 749 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP-WASTE WATER STRIPPER OVERHEAD | 7,460 | 749 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP-WATER BLASTER-S/N 790864501 | 80,024 | 8,002 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP-WEAK LIQUOR SUMP-S/N 156444 | 7,193 | 719 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP-WEAK LIQUOR SUMP-S/N 156445 | 7,194 | 719 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP-WET REWORK TANK | 7,730 | 774 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP-1ND STAGE CAUSTIC CIRCULATING | 15,796 | 1,580 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP-1ST STAGE CAUSTIC CIRCULATING | 22,437 | 2,244 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP-2ND STAGE ACID CIRCULATING | 15,796 | 1,580 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP-2ND STAGE ACID CIRCULATING | 15,796 | 1,580 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP-2ND STAGE CAUSTIC CIRCULATING | 15,797 | 1,580 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP-2ND.EFFECT PREHEATER NO.1 | 6,031 | 603 | 0 | 9.5 | 5 YEARS | 6/01 | NO |

OCC033890

BFGOODRICH, FM 6793, SAFE HARBOR LEASE RETURN, PE-16, PFI-115-ACCID          DATE 10/22/05     PAGE   20

| SCALE | STATE DESCRIPTION | ADJ BASIS | REGULAR ITC | ENERGY ITC | AOR MIDPOINT | RECOVERY CLS | SVC DATE | SEC 46D |
|---|---|---|---|---|---|---|---|---|
| LA | PUMP-2ND.EFFECT PREHEATER NO.1 | 6,031 | 603 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP-3RD.EFFECT PREHEATER | 5,151 | 515 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP-3RD.EFFECT PREHEATER | 5,151 | 515 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP-4G-1 LUBE OIL CIRCULATING | 41,460 | 4,146 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMP-4G-2 LUBE OIL CIRCULATING | 41,460 | 4,146 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMPS-DISLUDGE | 2,036 | 204 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMPS-DISLUDGE | 2,037 | 204 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMPS-DIGHEAT FEED | 6,001 | 600 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMPS-DIGHEAT FEED | 6,001 | 600 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMPS-DISCHARGE WATER | 15,634 | 1,563 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMPS-DISCHARGE WATER | 15,634 | 1,563 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMPS-DISCHARGE WATER | 15,634 | 1,563 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMPS-EFFLUENT TREATED WASTE WATER | 11,771 | 1,177 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMPS-EFFLUENT TREATED WASTE WATER | 11,771 | 1,177 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMPS-FILTER FEED | 5,936 | 594 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMPS-FILTER FEED | 5,936 | 594 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMPS-PRIMARY CLARIFIED LIQUID | 6,091 | 609 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMPS-PRIMARY CLARIFIED LIQUID | 6,091 | 607 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMPS-PRIMARY WASTE WATER CLARIFIER | 5,930 | 593 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | PUMPS-PRIMARY WASTE WATER CLARIFIER | 5,931 | 593 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | RACK-PORTABLE ANODE HOLDING | 6,249 | 625 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | RACK-PORTABLE ANODE HOLDING | 6,249 | 625 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | RAILROAD SIDING-8030 FT. | 1,692,000 | 169,200 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | REACTOR AND CAPACITOR 15KV 9I | 73,219 | 7,322 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | REACTOR AND CAPACITOR 15KV 9K | 73,219 | 7,322 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | REACTOR AND CAPACITOR 15KV 9L | 21,753 | 2,175 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | REACTOR AND CAPACITORS 15KV 9A | 73,219 | 7,322 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | REACTOR AND CAPACITORS 15KV 9B | 21,753 | 2,175 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | REACTOR AND CAPACITORS 15KV 9D | 21,753 | 2,175 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | REACTOR AND CAPACITORS 15KV 9C | 73,219 | 7,322 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | REACTOR AND CAPACITORS 15KV 9F | 21,753 | 2,175 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | REACTOR AND CAPACITORS 15KV 9G | 21,753 | 2,175 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | REACTOR AND CAPACITORS 15KV 9H | 21,753 | 2,175 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | REACTOR AND CAPACITORS 15KV 9J | 73,219 | 7,322 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | REACTOR AND CAPACITORS 15KV 9E | 21,753 | 2,175 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | REACTOR-EOC HITH COOLER 6601A | 74,222 | 7,422 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | REACTOR-EOC HITH COOLER 6601B | 742,956 | 74,296 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | REBOILER-DRYING COLUMN | 59,050 | 5,905 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | REBOILER-DRYING COLUMN | 59,040 | 5,905 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | REBOILER-PRODUCT COLUMN | 134,335 | 13,434 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | REBOILER-PRODUCT COLUMN | 134,338 | 13,434 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | REBOILER-PRODUCT COLUMN | 134,338 | 13,434 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | REBOILER-STRIPPER | 19,706 | 1,979 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | REBOILER-STRIPPER | 19,785 | 1,979 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | RECEIVER-VACUUM COLUMN | 67,564 | 6,756 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | RECEIVER - PAD AIR | 16,797 | 1,680 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | RECEIVER-BREATHING AIR | 17,469 | 1,747 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | RECEIVER-PLANT AND INSTRUMENT AIR | 21,934 | 2,193 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | ELECTODE-PORTABLE HOLDING | 1,565 | 157 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | RECORDER-PORTABLE MINIATURE | 1,793 | 179 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | RECTIFIER AND CONTROL PACKAGE | 356,057 | 35,609 | 0 | 9.5 | 5 YEARS | 6/01 | NO |

OCC033891

Confidential

BEGOODRICH, FH 6793, SAFE HARBOR LEASE RETURN, PI-16, PIT-L15-ADC4D   DATE 10/20/05   PAGE 21

| ASALE STATE | DESCRIPTION | ADJ BASIS | REGULAR ITC | ENERGY ITC | ADR MIDPOINT | RECOVERY CLS | SVC DATE | SEC 40D |
|---|---|---|---|---|---|---|---|---|
| LA | RECTIFIER AND CONTROL PACKAGE | 316,007 | 33,609 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | RECTIFIER AND CONTROL PACKAGE | 316,007 | 33,609 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | RECTIFIER AND CONTROL PACKAGE | 316,007 | 33,609 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | RECTIFIER AND CONTROL PACKAGE | 316,007 | 33,609 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | RECTIFIER AND CONTROL PACKAGE | 316,007 | 33,609 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | REFRIGERATION-UNIT EDC | 67,365 | 6,737 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | REFRIGERATION-UNIT EDC | 67,364 | 6,736 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | REFRIGERATOR W/ICE MAKER | 718 | 72 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | REFRIGERATOR WHITE-S/N 575346 | 626 | 63 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | REFRIGERATOR WHITE-SN 619504 | 718 | 72 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | REFRIGERATOR ADMIN. BLDG. | 562 | 56 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | REFRIGERATOR-EXPLOSION PROOF | 1,531 | 153 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | REFRIGERATOR-GE WHITE-S/N 618181 | 717 | 72 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | REPOUDE DISCHARGE LINES | 8,044 | 834 | 0 | 9.5 | 5 YEARS | 10/01 | NO |
| LA | SALT PAD & LINER-PLANT 1 | 170,141 | 17,014 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | SAMPLER-FILTERED EFFLUENT | 6,272 | 627 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | SAMPLER-TREATED EFFLUENT | 6,272 | 627 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | SAMPLING UNIT-S/N F-0249 | 1,042 | 104 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | SAMPLING UNIT-S/N F-0252 | 1,042 | 104 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | SAMPLING UNIT-S/N 033013 | 561 | 56 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | SAMPLING UNIT-S/N 0700163 | 562 | 56 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | SAMPLING UNIT-S/N 0707179 | 561 | 56 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | SAMPLING UNIT-S/N 12700J | 562 | 56 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | SAMPLING UNIT-S/N 12279164 | 562 | 55 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | SCALE-ACHESIOS WEIGH | 7,625 | 763 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | SCANNING SYSTEM W/HEATED SIPPER | 10,747 | 1,075 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | SCOTT AIR PAK W/EXCON HALL CASE | 938 | 94 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | SCOTT AIR PAK W/EXCON HALL CASE | 938 | 94 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | SCOTT AIR PAK W/EXCON HALL CASE | 938 | 94 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | SCOTT AIR PAK W/EXCON HALL CASE | 938 | 94 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | SCOTT AIR PAK W/EXCON HALL CASE | 938 | 94 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | SCOTT AIR PAK W/EXCON HALL CASE | 938 | 94 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | SCOTT AIR PAK W/EXCON HALL CASE | 938 | 94 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | SCOTT AIR PAK W/EXCON HALL CASE | 935 | 94 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | SCOTT AIR PAK W/EXCON HALL CASE | 935 | 94 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | SCOTT AIR PAK W/EXCON HALL CASE | 938 | 94 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | SCOTT AIR PAK W/EXCON HALL CASE | 938 | 94 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | SCOTT AIR PAK W/EXCON HALL CASE | 938 | 94 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | SCOTT AIR PAK W/EXCON HALL CASE | 938 | 94 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | SCOTT AIR PAK W/EXCON HALL CASE | 930 | 94 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | SCOTT AIR PAK W/EXCON HALL CASE | 930 | 94 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | SCOTT AIR PAK W/EXCON HALL CASE | 930 | 94 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | SCOTT AIR PAK W/EXCON HALL CASE | 930 | 94 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | SCOTT AIR PAK W/EXCON HALL CASE | 935 | 94 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | SCOTT AIR PAK W/EXCON HALL CASE | 930 | 94 | 0 | 9.5 | 5 YEARS | 6/01 | NO |

OCC033892

ASALE

BFGOODRICH, FM 6793, SAFE HARBOR LEASE RETURN, P1..., PJ1-LLS-ADC10          DATE 10/28/85          PAGE 22

| STATE | DESCRIPTION | ADJ BASIS | REGULAR IIC | ENERGY IIC | AOR HUDPOIHF | RECOVERY CLS | SVC DATE | SEC 40D |
|---|---|---|---|---|---|---|---|---|
| LA | SCOTT AIR PAK W/ICHON HALL CASE | 930 | 94 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | SCOTT AIR PAK W/ICHON HALL CASE | 930 | 94 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | SCOTT AIR PAK W/ICHON HALL CASE | 930 | 94 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | SCOTT AIR PAK W/ICHON HALL CASE | 930 | 94 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | SCOTT AIR PAK W/ICHON HALL CASE | 930 | 94 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | SCOTT AIR PAK W/ICHON HALL CASE | 930 | 94 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | SCOTT AIR PAK W/ICHON HALL CASE | 930 | 94 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | SCOTT AIR PAK W/ICHON HALL CASE | 930 | 94 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | SCOTT AIR PAK W/ICHON HALL CASE | 930 | 94 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | SCOTT AIR PAK W/ICHON HALL CASE | 930 | 94 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | SCOTT AIR PAK W/ICHON HALL CASE | 930 | 94 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | SCOTT AIR PAK W/ICHON HALL CASE | 930 | 94 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | SCOTT AIR PAK W/ICHON HALL CASE | 930 | 94 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | SCOTT AIR PAK W/ICHON HALL CASE | 930 | 94 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | SCOTT AIR PAK W/ICHON HALL CASE | 930 | 94 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | SCOTT AIR PAK W/ICHON HALL CASE | 930 | 94 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | SCOTT AIR PAK W/ICHON HALL CASE | 930 | 94 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | SCOTT AIR PAK W/ICHON HALL CASE | 930 | 94 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | SCOTT AIR PAK W/ICHON HALL CASE | 930 | 94 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | SCOTT AIR PAK W/ICHON HALL CASE | 930 | 94 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | SCOTT AIR PAK W/ICHON HALL CASE | 930 | 94 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | SCOTT AIR PAK W/ICHON HALL CASE | 930 | 94 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | SCOTT AIR PAK W/ICHON HALL CASE | 930 | 94 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | SCOTT AIR PAK W/ICHON HALL CASE | 930 | 94 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | SCOTT AIR PAK W/ICHON HALL CASE | 930 | 94 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | SCOTT AIR PAK W/ICHON HALL CASE | 930 | 94 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | SCREENER-SIGHT | 801 | 80 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | SCRUBBER ACIDIFIED FUME W/PACKING | 10,070 | 1,007 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | SCRUBBER AUKDDIIA W/PACKING | 36,107 | 3,610 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | SCRUBBER-CAUSTIC | 154,503 | 15,450 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | SCRUBBER-CAUSTIC | 156,647 | 15,665 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | SEAL POT HYDROGEN FIXED NO.1 | 49,970 | 4,997 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | SEAL POT HYDROGEN FIXED NO.2 | 50,015 | 5,052 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | SEAL POT HYDROGEN VARIABLE NO.1 | 40,575 | 4,058 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | SEAL POT HYDROGEN VARIABLE NO.2 | 39,120 | 3,912 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | SEAL-FOT SCRUBBER HEAD/STACK | 5,106 | 511 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | SEAL-FOT SCRUBBER-S/N 6730-1 | 300,822 | 30,082 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | SEAL-FOT/RECEIVER CHLORINE COND | 45,591 | 4,559 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | SEAL-FOT/RECEIVER CHLORINE COND | 45,993 | 4,599 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | SECURITY FENCES-4551 FT. | 90,160 | 9,016 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | SECURITY FENCES-6327 FT. | 135,240 | 13,524 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | SEPARATOR CYCLONE FIRST STAGE | 9,730 | 973 | 407 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | SEPARATOR CYCLONE SECOND STAGE | 5,600 | 503 | 294 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | SEPARATOR FUEL OIL WATER | 17,955 | 1,796 | 1,796 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | SEPARATOR-VIBRATING SCREEN | 26,428 | 2,643 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | SEPARATOR-HIGH TEC GAS | 16,390 | 1,639 | 1,639 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | SEPARATOR-VEHT GAS COMPRESSOR | 10,575 | 1,058 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | SEPARATOR-VEHT GAS COMPRESSOR | 10,575 | 1,058 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | SET-BEARING PULLER | 552 | 55 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | SHAKER-RAIL CAR | 60,625 | 6,063 | 6,063 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | SHELVING-SCABINETS-ENGR.SHOP-ADDCOST | 6,510 | 652 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | SHODDER-SERVICE MATE TROUBLE | 555 | 56 | 0 | 9.5 | 5 YEARS | 6/01 | NO |

OCC033893

Confidential

BFGOODRICH, FM 6793, SAFE HARBOR LEASE RETURN...PT-16, PFT-L15-ADC10 — DATE 10/28/85 — PAGE 23

| STATE | DESCRIPTION | ADJ BASIS | REGULAR 11C | ENERGY 11C | AOR MIDPOINT | RECOVERY CLS | SVC DATE | SEC 40D |
|---|---|---|---|---|---|---|---|---|
| LA | SHOP EQUIP. & TOOLS-ENGR SHOPS | 6,655 | 666 | | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | SIMULATOR-S/N 307 | 815 | 02 | | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | SKIDDER FOR 6Q-3 | 16,003 | 1,030 | | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | SKIDDER-ICR 6Q-3 | 16,003 | 1,030 | | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | SOFTENER ZEOLITE | 55,248 | 5,525 | | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | SOFTENER ZEOLITE | 55,247 | 5,525 | | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | SPHPOETER-S/N 212 | 6,403 | 640 | | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | STACK FLUE GAS | 615,310 | 61,531 | 61,531 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | STAID ANDE-GRID BASE ASSEMBLY | 3,205 | 325 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | STAND FINAL ASSEMBLY | 3,054 | 305 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | STAND FINAL ASSEMBLY | 3,054 | 305 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | STAND-CATHODE TAPING | 4,591 | 459 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | STEADY REST FOR SOUTH BEND LATHE | 500 | 50 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | STRIPPER AMMONIA W/TRAYS | 130,004 | 13,000 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | STRIPPER-EDC | 80,103 | 8,010 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | STRIPPER-WASTE WATER | 70,119 | 7,012 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | SUB COOLER AMMONIA | 12,645 | 1,265 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | SUBSTATION 230KV MAIN | 2,326,702 | 232,670 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | SURGE-WEAK LIQUOR | 35,920 | 3,692 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | SIMULATOR-PRECISION TRANSDUCER | 837 | 04 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | SWITCHGEAR-INTERRUPTER | 250,805 | 25,039 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | SWITCHGEAR 15KV FUSE PROCS AREA Z1B | 20,704 | 2,078 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | SWITCHGEAR 15KV FUSE PROCS AREA Z2B | 20,704 | 2,078 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | SWITCHGEAR 15KV FUSE Z1F | 20,704 | 2,070 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | SWITCHGEAR 15KV FUSE Z2F | 20,704 | 2,070 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | SWITCHGEAR 15V FUSE OFFSET Z2E | 20,704 | 2,070 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | SWITCHGEAR 400V PROCESS AREA X1-X2 | 166,707 | 16,679 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | SWITCHGEAR-15KV CLASS | 707,050 | 70,706 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | SWITCHGEAR-400V OFFSITE AREA X7 | 104,844 | 10,404 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | SWITCHGEAR-400V OFFSITE AREA X8 | 86,935 | 8,694 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | SWITCHGEAR-430V PROCESS AREA X3-X4 | 132,525 | 13,253 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | SWITCHGEAR-400V UTILITY AREA X5-X6 | 169,957 | 16,996 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | SWITCHG2/HIR CHIL CIR SKV PROC V3-V4 | 321,536 | 32,154 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | SWITCHG2/HIR CHIL CIR SKV ULTY V1-V2 | 321,536 | 32,154 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | SWHHLSIZER EFICIENCY | 514 | 51 | | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | SYSTEM COOLING WATER CHEMICAL TREAT | 30,603 | 3,060 | | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | SYSTEM PHOSPHATE FEED | 16,346 | 1,635 | | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | SYSTEM-BIOIRFIER AERATION | 19,418 | 1,942 | | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | TANK - EDC SLOP | 22,769 | 2,277 | | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | TANK - EDC STORAGE | 750,680 | 75,060 | | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | TANK - EDC STORAGE | 755,960 | 75,596 | | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | TANK - EDC STORAGE | 750,375 | 75,030 | | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | TANK - REGULAR CAUSTIC STORAGE | 702,513 | 70,251 | | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | TANK - REGULAR CAUSTIC STORAGE | 702,513 | 70,251 | | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | TANK - REGULAR CAUSTIC STORAGE | 702,513 | 70,251 | | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | TANK - REGULAR CAUSTIC STORAGE | 702,513 | 70,251 | | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | TANK - REGULAR CAUSTIC STORAGE | 702,513 | 70,251 | | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | TANK DRAINE ACIDIZING | 37,512 | 3,751 | | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | TANK BRINE RESATURATOR | 212,299 | 21,230 | | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | TANK BRINE TENT CELL LIQUOR FEED | 10,471 | 1,047 | | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | TANK CARBONATE LIQUOR FEED | 71,355 | 7,136 | | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | TANK CATCHALL-S/N A-2893 | 21,508 | 2,159 | | 9.5 | 5 YEARS | 6/01 | 110 |

OCC033894

Confidential
OCCNJ0027204
ALCD-PUBCOM_0003082

| STATE DESCRIPTION | ADJ BASIS | REGULAR ITC | ENERGY ITC | AOR MIDPOINT | RECOVERY CLS | SVC DATE | SEC 40D |
|---|---|---|---|---|---|---|---|
| LA TANK CHLORINE CONDENSATE SATURATOR | 152,205 | 15,205 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA TANK CORROSION INHIBITOR STORAGE | 41,070 | 4,107 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA TANK DROP OUT-S/N A-2096 | 62,028 | 6,203 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA TANK FILTER BACKWASH RECEIVER | 161,004 | 16,100 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA TANK HCL NO.1 | 70,070 | 7,007 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA TANK HCL NO.2 | 70,070 | 7,007 | 0 | 9.5 | 5 YEARS | 6/31 | NO |
| LA TANK HOT PROCESS NO.1 | 467,511 | 46,751 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA TANK HOT PROCESS NO.2 | 473,204 | 47,320 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA TANK HYDROGEN CONDENSATE COLLECTION | 9,930 | 994 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA TANK PREMIX-S/N A-2692 | 109,314 | 10,931 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA TANK PURGE HOLD | 21,565 | 2,157 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA TANK PURIFIED CAUSTIC NO.1 | 79,696 | 7,970 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA TANK PURIFIED CAUSTIC NO.2 | 83,467 | 8,347 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA TANK PURIFIED WASTE NO.1 | 66,878 | 6,688 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA TANK PURIFIED WASTE NO.2 | 66,878 | 6,688 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA TANK PURIFIED WASTE NO.3 | 66,878 | 6,688 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA TANK PURIFIED WASTE NO.4 | 66,878 | 6,688 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA TANK SALT DISSOLVING NO.1 | 213,574 | 21,357 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA TANK SALT DISSOLVING NO.2 | 215,489 | 21,549 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA TANK SPLITTER BOX RECOVERED SALT | 6,296 | 630 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA TANK SULFURIC ACID STORAGE | 27,105 | 2,719 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA TANK TREATED BRINE STORAGE NO.1 | 364,243 | 36,424 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA TANK TREATED BRINE STORAGE NO.2 | 360,115 | 36,012 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA TANK TREATED CHEMICAL STORAGE | 17,146 | 1,715 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA TANK TREATED WATER STORAGE | 242,752 | 24,275 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA TANK UTILITY WATER | 347,700 | 34,770 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA TANK VACUUM-S/N A-2095 | 136,504 | 13,650 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA TANK 50 PER CENT CAUSTIC FEED NO.1 | 85,125 | 8,513 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA TANK-ABSORBENT RECYCLE | 73,022 | 7,302 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA TANK-ANHYDRIA REMOVAL | 30,659 | 3,066 | 3,691 | 9.5 | 5 YEARS | 6/01 | NO |
| LA TANK-ASEKSIOS MIXING | 10,056 | 1,006 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA TANK-BIOTREAT EQUALIZATION | 179,235 | 17,924 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA TANK-BOILOUT | 549,022 | 54,902 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA TANK-BY-PRODUCT STORAGE | 103,920 | 10,393 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA TANK-CARBON TETRACHLORIDE STORAGE | 21,669 | 2,167 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA TANK-CATHODE REUSE | 5,536 | 554 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA TANK-CATHODE STORAGE | 16,123 | 1,612 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA TANK-CAUSTIC COOLING NO.1 | 172,590 | 17,259 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA TANK-CAUSTIC COOLING NO.2 | 172,590 | 17,259 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA TANK-CAUSTIC COOLING NO.3 | 172,590 | 17,259 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA TANK-CAUSTIC COOLING NO.4 | 170,220 | 17,022 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA TANK-CAUSTIC COOLING NO.5 | 170,220 | 17,022 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA TANK-CAUSTIC COOLING NO.6 | 170,220 | 17,022 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA TANK-CAUSTIC COOLING NO.7 | 178,770 | 17,877 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA TANK-CAUSTIC LIQUOR SUMP LINER | 178,770 | 17,877 | 0 | 9.5 | 5 YEARS | 6/31 | NO |
| LA TANK-CAUSTIC RUNDOWN 50 PER CENT | 100,140 | 10,014 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA TANK-CELL LIQUOR | 73,330 | 7,333 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA TANK-CELL LIQUOR NO.1 | 10,636 | 1,064 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA TANK-CELL LIQUOR NO.2 | 406,430 | 40,643 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA TANK-CELL LIQUOR SUMP-S/N 13041 | 406,430 | 40,643 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA TANK-CHILLED WATER STORAGE DRUM | 372,603 | 37,259 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| | 62,643 | 6,264 | | | | | |

OCC003895

Confidential

OCCNJ0027205

ALCD-PUBCOM_0003083

BFGOODRICH, FM 6793, SAFE HARBOR LEASE RETURN, PT-L6, PTI-L15-AIIC&D    DATE 10/20/05    PAGE 25

| ASALE STATE | DESCRIPTION | ADJ BASIS | REGULAR IIC | ENERGY IIC | ADR MIDPOINT | RECOVERY CLS | SVC DATE | SEC 43D |
|---|---|---|---|---|---|---|---|---|
| LA | TANK-CHLORINE EMERGENCY SCRUBBER | 151,910 | 15,191 | 0 | 9.5 | 5 YEARS | 6/01 | IIO |
| LA | TANK-CHLORINE EMERGENCY SCRUBBER | 151,910 | 15,191 | 0 | 9.5 | 5 YEARS | 6/01 | IIO |
| LA | TANK-CHLORINE EXPANSION DRUM | 4,366 | 437 | 0 | 9.5 | 5 YEARS | 6/01 | IIO |
| LA | TANK-CHLORINE EXPANSION DRUM | 8,212 | 821 | 0 | 9.5 | 5 YEARS | 6/01 | IIO |
| LA | TANK-CHLORINE EXPANSION DRUM | 8,212 | 821 | 0 | 9.5 | 5 YEARS | 6/01 | IIO |
| LA | TANK-CHLORINE EXPANSION DRUM | 2,386 | 239 | 0 | 9.5 | 5 YEARS | 6/01 | IIO |
| LA | TANK-CHLORINE EXPANSION DRUM | 2,387 | 239 | 0 | 9.5 | 5 YEARS | 6/01 | IIO |
| LA | TANK-CHLORINE STORAGE DRUM | 3,622 | 362 | 0 | 9.5 | 5 YEARS | 6/01 | IIO |
| LA | TANK-CHLORINE STORAGE DRUM | 348,450 | 34,845 | 0 | 9.5 | 5 YEARS | 6/01 | IIO |
| LA | TANK-CHLORINE STORAGE DRUM | 348,450 | 34,845 | 0 | 9.5 | 5 YEARS | 6/01 | IIO |
| LA | TANK-CHLORINE STORAGE DRUM | 348,450 | 34,845 | 0 | 9.5 | 5 YEARS | 6/01 | IIO |
| LA | TANK-CHLORINE STORAGE DRUM | 348,450 | 34,845 | 0 | 9.5 | 5 YEARS | 6/01 | IIO |
| LA | TANK-CHLORINATED WATER | 250,342 | 25,034 | 0 | 9.5 | 5 YEARS | 6/01 | IIO |
| LA | TANK-COPPER SULFATE SOLUTION | 16,913 | 1,691 | 0 | 9.5 | 5 YEARS | 6/01 | IIO |
| LA | TANK-CRUDE EDC | 210,320 | 21,032 | 0 | 9.5 | 5 YEARS | 6/01 | IIO |
| LA | TANK-CRUDE EDC | 210,320 | 21,032 | 0 | 9.5 | 5 YEARS | 6/01 | IIO |
| LA | TANK-DIATHRACII DEPOSITING | 71,015 | 7,102 | 0 | 9.5 | 5 YEARS | 6/01 | IIO |
| LA | TANK-DRY REK33K | 77,520 | 7,752 | 0 | 9.5 | 5 YEARS | 6/01 | IIO |
| LA | TANK-EVACUATION EQUIP SEPARATOR | 9,694 | 939 | 0 | 9.5 | 5 YEARS | 6/01 | IIO |
| LA | TANK-EVACUATION EQUIP SUCT KO DRUM | 8,302 | 830 | 0 | 9.5 | 5 YEARS | 6/01 | IIO |
| LA | TANK-EVAPORATOR FEED | 261,035 | 26,104 | 4,592 | 9.5 | 5 YEARS | 6/01 | IIO |
| LA | TANK-FEED | 91,640 | 9,104 | 0 | 9.5 | 5 YEARS | 6/01 | IIO |
| LA | TANK-FILTER BACKWASH | 129,250 | 12,925 | 0 | 9.5 | 5 YEARS | 6/01 | IIO |
| LA | TANK-FILTER FEED | 162,561 | 16,256 | 0 | 9.5 | 5 YEARS | 6/01 | IIO |
| LA | TANK-HODWELL | 41,160 | 4,116 | 0 | 9.5 | 5 YEARS | 6/01 | IIO |
| LA | TANK-HYDRO DELAY | 134,126 | 13,413 | 0 | 9.5 | 5 YEARS | 6/01 | IIO |
| LA | TANK-HYPO WASTE LIQUOR STORAGE | 55,968 | 5,597 | 2,798 | 9.5 | 5 YEARS | 6/01 | IIO |
| LA | TANK-INFLUE PROCESS CONDENSATE | 87,677 | 8,760 | 0 | 9.5 | 5 YEARS | 6/01 | IIO |
| LA | TANK-LIQUEFACTION KNOCK OUT DRUM | 32,902 | 3,290 | 0 | 9.5 | 5 YEARS | 6/01 | IIO |
| LA | TANK-LIQUOR FLASH-S/H H-7937-1 | 84,217 | 8,422 | 0 | 9.5 | 5 YEARS | 6/01 | IIO |
| LA | TANK-LIQUOR FLASH-S/H H-7937-2 | 86,947 | 8,695 | 0 | 9.5 | 5 YEARS | 6/01 | IIO |
| LA | TANK-LIQUOR FLASH-S/H H-7937-3 | 86,947 | 8,695 | 0 | 9.5 | 5 YEARS | 6/01 | I20 |
| LA | TANK-MODIFIER MIXING | 13,112 | 1,311 | 0 | 9.5 | 5 YEARS | 6/01 | IIO |
| LA | TANK-PRECOAT | 85,794 | 8,579 | 0 | 9.5 | 5 YEARS | 6/01 | IIO |
| LA | TANK-PURE PROCESS CONDENSATE | 77,097 | 7,710 | 0 | 9.5 | 5 YEARS | 6/01 | IIO |
| LA | TANK-PURIFIED CAUSTIC STORAGE | 707,778 | 70,778 | 0 | 9.5 | 5 YEARS | 6/01 | IIO |
| LA | TANK-PURIFIED CAUSTIC STORAGE | 706,810 | 70,601 | 0 | 9.5 | 5 YEARS | 6/01 | IIO |
| LA | TANK-REUSE WATER | 87,677 | 8,760 | 0 | 9.5 | 5 YEARS | 6/01 | IIO |
| LA | TANK-SALT SLURRY | 116,080 | 11,608 | 0 | 9.5 | 5 YEARS | 6/01 | IIO |
| LA | TANK-SEMI PRIMARY CLARIFIER | 10,449 | 1,005 | 0 | 9.5 | 5 YEARS | 6/01 | I20 |
| LA | TANK-SECONDARY CLARIFIER | 17,905 | 1,791 | 0 | 9.5 | 5 YEARS | 6/01 | IIO |
| LA | TANK-SEAL POR SCRUBBER CAUSTIC SUP | 57,267 | 5,727 | 0 | 9.5 | 5 YEARS | 6/01 | I20 |
| LA | TANK-SEAL WATER STORAGE | 15,103 | 1,518 | 0 | 9.5 | 5 YEARS | 6/01 | IIO |
| LA | TANK-SODA ASH BATCH NO.1 | 69,760 | 6,976 | 0 | 9.5 | 5 YEARS | 6/01 | IIO |
| LA | TANK-SODA ASH BATCH NO.2 | 69,760 | 6,976 | 0 | 9.5 | 5 YEARS | 6/01 | IIO |
| LA | TANK-SODIUM SULFIDE | 6,352 | 635 | 0 | 9.5 | 5 YEARS | 6/01 | IIO |
| LA | TANK-SOLID COOL CENTRIFUGE FEED | 217,230 | 21,723 | 0 | 9.5 | 5 YEARS | 6/01 | IIO |
| LA | TANK-SOLVENT | 29,640 | 2,964 | 0 | 9.5 | 5 YEARS | 6/01 | IIO |
| LA | TANK-SPENT ACID DRUM-S/H 3649A | 29,714 | 2,971 | 0 | 9.5 | 5 YEARS | 6/01 | IIO |
| LA | TANK-SPENT ACID DRUM-S/H 3649B | 29,714 | 2,971 | 0 | 9.5 | 5 YEARS | 6/01 | IIO |
| LA | TANK-SUCTION CHILLER BOTTOMS DRUM | 19,039 | 1,904 | 0 | 9.5 | 5 YEARS | 6/01 | IIO |

OCC033896

Confidential

ASALE    BFGOODRICH, FN 6793, SAFE HARBOR LEASE RETURN, PY-L6, PTI-L15-AUCID    DATE 10/20/05

| STATE | DESCRIPTION | ADJ BASIS | REGULAR ITC | ENERGY ITC | AOR MIDPOINT | RECOVERY CLS | SVC DATE | SEC 46D |
|---|---|---|---|---|---|---|---|---|
| LA | TANK-SULFATE LEACHING | 230,518 | 23,052 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | TANK-SULFATE PURGE SETTLER | 40,714 | 4,071 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | TANK-SULFITE SOLUTION | 33,179 | 3,310 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | TANK-SULFURIC ACID STORAGE DRUM | 45,558 | 4,556 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | TANK-SULFURIC ACID STORAGE DRUM | 45,559 | 4,556 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | TANK-WASTE CHLORINE GAS-S/N D-1392 | 32,515 | 3,252 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | TANK-WEAK LIQUOR SUMP LINER | 45,234 | 4,523 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | TANK-WET EDC RLUGGK | 101,655 | 10,166 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | TANK-WET GAS MIST ELIMINATOR | 71,950 | 7,195 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | TANK-WET GAS MIST ELIMINATOR | 71,949 | 7,195 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | TANK-30 BEIHLEY NEVADA | 1,010 | 101 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | TANK-00 BEIHLY NEVADA | 1,354 | 135 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | TAPER ATTACHMENT FOR S.BEND LATHE | 1,665 | 167 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | TERMINAL PACKAGE ACCESSORY | 1,925 | 193 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | TESTER BODY AND GLOVE ASSEMBLY | 17,033 | 1,703 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | TESTER-DEAD WEIGHT | 1,093 | 109 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | TESTER-PORTABLE OIL | 1,456 | 146 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | THREADER-COLLINS PIPE | 2,461 | 246 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | TITRATOR-MOISTURE SN-43510 | 5,087 | 509 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | TOOL HOLDER FOR SOUTH BEND LATHE | 565 | 57 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | TOWER COOLING | 1,450,303 | 145,030 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | TOWER-CARBONATION NO.1 | 182,265 | 18,227 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | TOWER-CARBONATION NO.2 | 105,715 | 10,572 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | TOWER-CHLORINE DRYING | 331,976 | 33,290 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | TOWER-CHLORINE DRYING-S/N 3243-1 | 333,726 | 33,323 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | TRAILER FOR CHLORINE CELLS | 7,400 | 740 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | TRAILER FOR CHLORINE CELLS | 7,400 | 740 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | TRANSFORMER RECTIFIER | 363,406 | 36,341 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | TRANSFORMER RECTIFIER | 363,406 | 36,341 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | TRANSFORMER RECTIFIER | 363,406 | 36,341 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | TRANSFORMER RECTIFIER | 363,406 | 36,341 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | TRANSFORMER RECTIFIER | 363,406 | 36,341 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | TRANSFORMER RECTIFIER | 363,406 | 36,341 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | TRANSFORMER 1000KV AMPS ADMIN X10 | 16,635 | 1,664 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | TRANSFORMER 1000KV AMPS DOCK X9 | 16,767 | 1,677 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | TRANSFORMER 1000KV AMPS RR X11 | 16,635 | 1,664 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | TRANSFORMER 5000KV AMPS PROCESS V2 | 49,136 | 4,914 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | TRANSFORMER-MULTI TAP CURRENT | 50 | 50 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | TRANSFORMER-2000KV AMPS OFFSITE X7 | 20,759 | 2,076 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | TRANSFORMER-2000KV AMPS PROCESS X1 | 20,759 | 2,076 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | TRANSFORMER-2000KV AMPS PROCESS X2 | 20,759 | 2,076 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | TRANSFORMER-2000KV AMPS PROCESS X3 | 20,759 | 2,076 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | TRANSFORMER-2000KV AMPS PROCESS X4 | 20,759 | 2,076 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | TRANSFORMER-2000KV AMPS UTILITY X5 | 20,759 | 2,076 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | TRANSFORMER-2000KV AMPS UTILITY X6 | 20,759 | 2,076 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | TRANSFORMER-230/13.8KV POWER | 791,961 | 79,196 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | TRANSFORMER-230/13.8KV POWER | 791,961 | 79,196 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | TRANSFORMER-5000KV AMPS PROCESS V1 | 49,136 | 4,914 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | TRANSFORMER-5000KV AMPS UTILITY V3 | 49,136 | 4,914 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | TRANSFORMER-5000KV AMPS UTILITY V4 | 49,136 | 4,914 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |
| LA | TRUCK-HYDRAULIC LIFT PALLET | 500 | 50 | 0 | 9.5 | 5 YEARS | 6/01 | 110 |

OCC033897

Confidential

BFGOODRICH, FM 6793, SAFE HARBOR LEASE RETURN, PT-16, PT-L15-ADC1D

DATE 10/20/05    PAGE 27

| ASALE | STATE DESCRIPTION | ADJ BASIS | REGULAR ITC | ENERGY ITC | ADR MIDPOINT | RECOVERY CLS | SVC DATE | SEC 400 |
|---|---|---|---|---|---|---|---|---|
| LA | TUBE-LOWERING | 75,370 | 7,537 | 7,537 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | TURBODRIVER | 827 | 83 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | TURBODRIVER 115/220 VOLTS | 774 | 77 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | UNLOADER ROTARY WET ASH | 42,990 | 4,299 | 2,150 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | VALVE-SLUICE GATE | 10,591 | 1,059 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | VIDEO DISPLAY UNIT | 1,175 | 118 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | VIDEO-INFRARED | 8,425 | 840 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | VOLTMETER-DC MILLIVOLT | 1,169 | 117 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | WASHER CATHODE H/PUMP | 80,318 | 8,032 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | WATER-CLARIFIER | 342,393 | 34,239 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | WIRING TO RUN PH READOUT | 1,966 | 197 | 0 | 9.5 | 5 YEARS | 8/01 | NO |
| LA | WIRING-ELECTRICAL COAL HANDLING | 669,900 | 66,990 | 66,990 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | WIRING-ELECTRICAL-FLUE GAS DESUL | 430,400 | 43,040 | 21,520 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | WORK BENCHES & CABINETS-ENGR.SHOPS | 14,164 | 1,416 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | WRENCH-IMPACT | 1,175 | 118 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | WRENCH-IMPACT | 1,240 | 124 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | WRENCH-IMPACT | 1,175 | 118 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | WRENCH-IMPACT | 1,240 | 124 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | 108-DIAPHRAGM TYPE CHLORINE CELLS | 6,241,392 | 624,139 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | 108-DIAPHRAGM TYPE CHLORINE CELLS | 6,241,393 | 624,139 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | 3-SCREEN STOOLS | 715 | 72 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | 3 JAW CHUCK FOR SOUTH BEND LATHE | 1,464 | 146 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | 3-ORANGE BICYCLES AND 1-RACK | 667 | 67 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | 4 JAW CHUCK FOR SOUTH BEND LATHE | 1,060 | 106 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | 4-BLUE BICYCLES | 968 | 97 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | 41-BICYCLES AND 2 RACKS | 7,032 | 703 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | 5-BICYCLES | 650 | 65 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | 6-BLACK BICYCLES AND 1-RACK | 1,193 | 119 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | 6-BLUE BICYCLES | 985 | 99 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | 8 INCH PIPE STOOL BLOCK VALVE | 610 | 61 | 0 | 9.5 | 5 YEARS | 6/01 | NO |
| LA | 8-ORANGE BICYCLES AND 1-RACK | 1,450 | 145 | 0 | 9.5 | 5 YEARS | 10/01 | NO |
| | TOTAL ADR-MIDPOINT | 220,165,406 | 22,016,613 | 2,260,675 | | | | |
| LA | AUTOMATIC PAGING TERMINAL | 7,016 | 702 | 0 | 10.0 | 5 YEARS | 6/01 | NO |
| LA | BLUEPRINT MACHINE-S/N 1049 | 2,999 | 300 | 0 | 10.0 | 5 YEARS | 6/01 | NO |
| LA | DP/PD-BULLETIN1 | 1,000 | 100 | 0 | 10.0 | 5 YEARS | 6/01 | NO |
| LA | BOARD-SCHEDULING 48 X 96 MAGNETIC | 892 | 89 | 0 | 10.0 | 5 YEARS | 6/01 | NO |
| LA | DP/PD-SCHEDULING 48 X 96 MAGNETIC | 692 | 69 | 0 | 10.0 | 5 YEARS | 6/01 | NO |
| LA | BOARDS BULLETIN-36 X 60 | 1,331 | 133 | 0 | 10.0 | 5 YEARS | 6/01 | NO |
| LA | CADDY RACK W/GUIDES&CARRIER STRIPS | 550 | 55 | 0 | 10.0 | 5 YEARS | 6/01 | NO |
| LA | CADDY RACK W/GUIDES&CARRIER STRIPS | 550 | 55 | 0 | 10.0 | 5 YEARS | 6/01 | NO |
| LA | CADDY RACK W/GUIDES&CARRIER STRIPS | 550 | 55 | 0 | 10.0 | 5 YEARS | 6/01 | NO |
| LA | CADDY RACK W/GUIDES&CARRIER STRIPS | 550 | 55 | 0 | 10.0 | 5 YEARS | 6/01 | NO |
| LA | CAMERA-ID PHOTO | 2,696 | 270 | 0 | 10.0 | 5 YEARS | 6/01 | NO |
| LA | CASE-DIRECTORY DISPLAY | 2,509 | 251 | 0 | 10.0 | 5 YEARS | 6/01 | NO |
| LA | CHARGER-RADIO | 596 | 60 | 0 | 10.0 | 5 YEARS | 6/01 | NO |
| LA | CHECK SIGNER MODEL 150 | 1,092 | 109 | 0 | 10.0 | 5 YEARS | 8/01 | NO |
| LA | COMMUNICATIONS SYSTEMS-INSTALLATION | 10,954 | 1,095 | 0 | 10.0 | 5 YEARS | 6/01 | NO |
| LA | CONTROLLER-S/N DZ-009927-ADD COST | 164 | 16 | 0 | 10.0 | 5 YEARS | 6/01 | NO |
| LA | CRT TERMINAL-S/N VIN-010909 | 1,074 | 107 | 0 | 10.0 | 5 YEARS | 6/01 | NO |

OCC033898

Confidential
OCCNJ0027208
ALCD-PUBCOM_0003086

ASALL BFGOODRICH, FM 6793, SAFE HARBOR LEASE RETURN, FY-L6, PT1-L15-ABCAID

| STATE | DESCRIPTION | ADJ BASIS | REGULAR ITC | ENERGY ITC | ADR MIDYOINT | RECOVERY CLS | SVC DATE | SLC 40D |
|---|---|---|---|---|---|---|---|---|
| LA | CPT TERMINAL-S/N V1H-019008 | 1,074 | 107 | 0 | 10.0 | 5 YEARS | 6/01 | 110 |
| LA | DRAPERIES-CONFERENCE ROOMS | 1,271 | 127 | 0 | 10.0 | 5 YEARS | 6/01 | 110 |
| LA | HAC530 ELECTRONIC CARD ENTRY SYSTEM | 31,171 | 31,117 | 0 | 10.0 | 5 YEARS | 6/01 | 110 |
| LA | MAILING MACHINE-S/N 141562 | 2,439 | 244 | 0 | 10.0 | 5 YEARS | 6/01 | 110 |
| LA | MISC. COMMUNICATIONS EQUIP-ADD COST | 17,164 | 1,716 | 0 | 10.0 | 5 YEARS | 6/01 | 125 |
| LA | MISC. FURNITURE & FIXTURES-ADD COST | 15,047 | 1,505 | 0 | 10.0 | 5 YEARS | 6/01 | 110 |
| LA | MISCELLANEOUS COMMUNICATIONS EQUIP. | 2,259 | 226 | 0 | 10.0 | 5 YEARS | 6/01 | 110 |
| LA | RADIO-TAC 100 PORTABLE | 1,162 | 116 | 0 | 10.0 | 5 YEARS | 6/01 | 110 |
| LA | RADIO-TAC100 PORTABLE | 1,162 | 116 | 0 | 10.0 | 5 YEARS | 6/01 | 110 |
| LA | RADIO-TAC100 PORTABLE | 1,162 | 116 | 0 | 10.0 | 5 YEARS | 6/01 | 125 |
| LA | RADIO-TAC100 PORTABLE | 1,162 | 116 | 0 | 10.0 | 5 YEARS | 6/01 | 129 |
| LA | RADIO-TAC100 PORTABLE | 1,162 | 116 | 0 | 10.0 | 5 YEARS | 6/01 | 110 |
| LA | RADIO-TAC100 PORTABLE | 1,162 | 116 | 0 | 10.0 | 5 YEARS | 6/01 | 110 |
| LA | RADIO-TAC100 PORTABLE | 1,162 | 116 | 0 | 10.0 | 5 YEARS | 6/01 | 110 |
| LA | RADIO-TAC100 PORTABLE | 1,162 | 116 | 0 | 10.0 | 5 YEARS | 6/01 | 110 |
| LA | RADIO-TAC100 PORTABLE | 1,162 | 116 | 0 | 10.0 | 5 YEARS | 6/01 | 110 |
| LA | RADIO-TAC100 PORTABLE | 1,162 | 116 | 0 | 10.0 | 5 YEARS | 6/01 | 125 |
| LA | RADIO-TAC100 PORTABLE | 1,162 | 116 | 0 | 10.0 | 5 YEARS | 6/01 | 143 |
| LA | RADIO-TAC100 PORTABLE | 1,162 | 116 | 0 | 10.0 | 5 YEARS | 6/01 | 110 |
| LA | RADIO-TAC100 PORTABLE | 1,162 | 116 | 0 | 10.0 | 5 YEARS | 6/01 | 110 |
| LA | RADIO-TAC100 PORTABLE | 1,162 | 116 | 0 | 10.0 | 5 YEARS | 6/01 | 110 |
| LA | RADIO-TAC100 PORTABLE | 1,162 | 116 | 0 | 10.0 | 5 YEARS | 6/01 | 110 |
| LA | RADIO-TAC100 PORTABLE | 1,162 | 116 | 0 | 10.0 | 5 YEARS | 6/01 | 110 |
| LA | RADIO-TAC100 PORTABLE | 1,162 | 116 | 0 | 10.0 | 5 YEARS | 6/01 | 110 |
| LA | RADIO-TAC100 PORTABLE | 1,162 | 116 | 0 | 10.0 | 5 YEARS | 6/01 | 110 |
| LA | RADIO-TAC100 PORTABLE | 1,162 | 116 | 0 | 10.0 | 5 YEARS | 6/01 | 110 |
| LA | RADIO-TAC100 PORTABLE | 1,162 | 116 | 0 | 10.0 | 5 YEARS | 6/01 | 125 |
| LA | RADIO-TAC100 PORTABLE | 1,162 | 116 | 0 | 10.0 | 5 YEARS | 6/01 | 110 |
| LA | RADIO-TAC100 PORTABLE | 1,162 | 116 | 0 | 10.0 | 5 YEARS | 6/01 | 109 |
| LA | RADIO-TAC100 PORTABLE | 1,162 | 116 | 0 | 10.0 | 5 YEARS | 6/01 | 125 |
| LA | RADIO-TAC100 PORTABLE | 1,162 | 116 | 0 | 10.0 | 5 YEARS | 6/01 | 110 |
| LA | RADIO-TAC200 BASE-S/N 72209407A | 2,496 | 250 | 0 | 10.0 | 5 YEARS | 6/01 | 110 |
| LA | RADIO-TAC200 BASE-S/N 82009016A | 5,774 | 577 | 0 | 10.0 | 5 YEARS | 6/01 | 110 |
| LA | RADIO-TAC200 BASE-S/N 82009027A | 3,473 | 347 | 0 | 10.0 | 5 YEARS | 6/01 | 110 |
| LA | RADIO-TAC200 BASE-S/N 82009027B | 3,474 | 347 | 0 | 10.0 | 5 YEARS | 6/01 | 110 |
| LA | RADIO-WALKIE TALKIE | 1,652 | 165 | 0 | 10.0 | 5 YEARS | 6/01 | 110 |
| LA | RADIO-WALKIE TALKIE | 1,652 | 165 | 0 | 10.0 | 5 YEARS | 6/01 | 110 |
| LA | RADIO-WALKIE TALKIE | 1,652 | 165 | 0 | 10.0 | 5 YEARS | 6/01 | 110 |
| LA | RADIO-WALKIE TALKIE | 1,652 | 165 | 0 | 10.0 | 5 YEARS | 6/01 | 110 |
| LA | RADIO-WALKIE TALKIE | 1,652 | 165 | 0 | 10.0 | 5 YEARS | 6/01 | 110 |
| LA | RADIO-WALKIE TALKIE | 1,652 | 165 | 0 | 10.0 | 5 YEARS | 6/01 | 110 |
| LA | RADIO-WALKIE TALKIE | 1,652 | 165 | 0 | 10.0 | 5 YEARS | 6/01 | 110 |
| LA | RADIO-WALKIE TALKIE | 1,652 | 165 | 0 | 10.0 | 5 YEARS | 6/01 | 110 |
| LA | RADIO-WALKIE TALKIE | 1,652 | 165 | 0 | 10.0 | 5 YEARS | 6/01 | 110 |
| LA | RADIO-WALKIE TALKIE | 1,652 | 165 | 0 | 10.0 | 5 YEARS | 6/01 | 110 |
| LA | PARENT REGISTER TRANSFER | 3,310 | 331 | 0 | 10.0 | 5 YEARS | 6/01 | 110 |
| LA | REMOTE CONSOLE W/UNIT-S/N 84020604A | 525 | 53 | 0 | 10.0 | 5 YEARS | 6/01 | 110 |

OCC033899

Confidential

DATE 10/20/05   PAGE 29

BFGOODRICH, FH 6793, SAFE HARBOR LEASE RETURN, PH-16, PH-L15-ARC4D

| STATE DESCRIPTION | ADJ BASIS | REGULAR ITC | ENERGY ITC | ADR MIDPOINT | RECOVERY CLS | SVC DATE | SEC 40D |
|---|---|---|---|---|---|---|---|
| LA RUG-KERMAI ACO 10X13-9 W/PAD | 1,049 | 105 | 0 | 10.0 | 5 YEARS | 6/81 | NO |
| LA RUG-KERMAI ACO 10X13-9 W/PAD | 1,050 | 105 | 0 | 10.0 | 5 YEARS | 6/81 | NO |
| LA RUG-ULTRAIMR 6-7X9 W/PAD | 955 | 96 | 0 | 10.0 | 5 YEARS | 6/01 | NO |
| LA RUG-ULTRAINR 6-7X9 W/PAD | 955 | 96 | 0 | 10.0 | 5 YEARS | 6/01 | NO |
| LA SCALE POSTAGE-S/N 001364 W/PAD | 552 | 55 | 0 | 10.0 | 5 YEARS | 6/01 | NO |
| LA SCREEN-PROJECTION 001364-ADD COST | 874 | 87 | 0 | 10.0 | 5 YEARS | 6/01 | NO |
| LA TABLE H/FOLDING W/BENCHES | 518 | 52 | 0 | 10.0 | 5 YEARS | 6/01 | NO |
| LA TABLE-FOLDING W/BENCHES | 518 | 52 | 0 | 10.0 | 5 YEARS | 6/01 | NO |
| LA TRANSFORMER-VOLTAGE STABILIZING | 3,741 | 374 | 0 | 10.0 | 5 YEARS | 6/01 | NO |
| LA WALKIE-TALKIE INTRINSICALLY SAFE | 1,061 | 106 | 0 | 10.0 | 5 YEARS | 6/01 | NO |
| LA 2-SIDE CHAIRS | 735 | 74 | 0 | 10.0 | 5 YEARS | 6/01 | NO |
| TOTAL ADR-MIDPOINT | 198,626 | 19,055 | 0 | | | | |
| TOTAL STATE | 220,364,032 | 22,036,460 | 2,260,075 | | | | |
| TOTAL GRAND TOTAL | 220,364,032 | 22,036,468 | 2,260,075 | | | | |

READ 393157 RECORDS,EXTRACTED 001436 RECORDS,PRINTED 001436 RECORDS

OCC033900

Confidential

OCCNJ0027210

ALCD-PUBCOM_0003088

SCHEDULE 8.16 (1)

ALLOCATION OF PURCHASE PRICE

Business Lines

| | |
|---|---:|
| Chlor-alkali | $259,400,000 |
| Soda Products Other Than Chrome | 33,000,000 |
| Chrome | 38,000,000 |
| Process Chemicals | 38,000,000 |
| Textile Care Industries | 6,600,000 |
| | ------------ |
| | $375,000,000 |
| | |
| Equity Companies | 36,132,672 |
| | ------------ |
| Total | $411,132,672 |
| | ============ |

OCC033901

OCCNJ0027211
ALCD-PUBCOM_0003089

SCHEDULE 9.01

Agreement,
Dated September 4, 1986 (the "Agreement"),
By and Among
Diamond Shamrock Corporation,
Occidental Petroleum Corporation,
Occidental Chemical Corporation
and
Oxy-Diamond Alkali Corporation

SURVIVAL OF REPRESENTATIONS AND WARRANTIES

OCC033902

Confidential

Schedule 9.01

1. Each of the representations and warranties contained in the following Sections of the Stock Purchase Agreement shall terminate and be of no further force and effect from and after the Closing except for claims made with respect to such representation or warranty prior to such date:

| | | |
|---|---|---|
| 2.07(b) | 2.14(c) | 3.06 |
| 2.07(c) | 2.14(d) | 3.07 |
| 2.07(e) | 2.14(e) | 3.10 |
| 2.14(b) | 3.04 | |

2. Each of the representations and warranties contained in the following Sections of the Stock Purchase Agreement shall terminate and be of no further force and effect from and after the first anniversary of the Closing Date except for claims made with respect to such representation or warranty prior to such date:

2.13          2.19

3. Each of the representations and warranties contained in the following Sections of the Stock Purchase Agreement shall terminate and be of no further force and effect from and after the second anniversary of the Closing Date except for claims made with respect to such representation or warranty prior to such date:

| | | |
|---|---|---|
| 2.07(a) | 2.12 | 2.17 |
| 2.09 | 2.15 | 2.22 |
| 2.11 | 2.16 | 2.24 |

4. Each of the representations and warranties contained in the following Sections of the Stock Purchase Agreement shall terminate and be of no further force and effect from and after the third anniversary of the Closing Date except for claims made with respect to such representation or warranty prior to such date:

2.07(g)
2.18

5. Each of the representations and warranties contained in the following Sections of the Stock Purchase Agreement shall terminate and be of no further force and effect from and after the fifth anniversary of the Closing Date except for claims made with respect to such representation or warranty prior to such date:

| | | | |
|---|---|---|---|
| 2.06 | 2.08 | 3.03 | 2.14(a) |
| 2.07(d) | 2.10 | | |

6. All other representations and warranties contained in the Stock Purchase Agreement shall survive the Closing and remain in full force and effect indefinitely.

OCC033903

**Confidential**

## SCHEDULE 9.03(a)(iv)

Agreement,
Dated September 4, 1986 (the "Agreement"),
By and Among
Diamond Shamrock Corporation,
Occidental Petroleum Corporation,
Occidental Chemical Corporation
and
Oxy-Diamond Alkali Corporation

## INACTIVE SITES

OCC034323

## SCHEDULE 9.03(a)(iv)

## INACTIVE SITES

### Former Chemical Plant Sites

1.  Montgomery, AL
2.  Tuscaloosa, AL
3.  Tuscumbia, AL
4.  Pine Bluff Arsenal, AR
5.  Van Buren, AR
6.  Redwood City, CA
7.  Emeryville, CA
8.  Oxnard, CA (limited to the polyester resins plant purchased by Koppers Corporation from DSCC)
9.  Fresno, CA
10. Los Angeles, CA
11. Greenwich, CT
12. Stratford, CT
13. West Haven, CT
14. Delaware City, DE (limited to the PVC plant and the PVC treatment facilities purchased by Ethyl Corporation)
15. Naples, FL
16. Palm Beach, FL
17. Atlanta, IL
18. Franklin Park, IL
19. Joliet, IL
20. Frankfort, IL
21. Elkhart, IN
22. Evansville, IN
23. Des Moines, IA
24. Louisville, KY
25. Murtis, LA
26. Shiever, LA
27. Baltimore, MD (manganese and yeast plants)
28. Edgewood Arsenal, MD
29. Rodgers City, MI
30. Minneapolis, MN
31. St. Louis, MO
32. Maryland Heights, MO
33. Salsbury, NC
34. Ralston, NE
35. Bayonne, NJ
36. Clifford, NJ

OCC034324

**Confidential**

37. Kearny, NJ
38. Linden, NJ
39. Newark, NJ
40. North Arlington, NJ
41. Plainfield, NJ
42. Princeton, NJ
43. Brooklyn, NY
44. Fairport Harbor, OH
45. Painesville, OH
46. Chardon, OH
47. Spencerville, OH
48. Solon, OH
49. Bessemer, PA
50. Bristol, PA
51. Mountain Top, PA
52. Neville Island, PA
53. Philadelphia, PA
54. Chattanooga, TN
55. Greens Bayou, TX
56. La Porte, TX (limited to vinyl chloride monomer and
    EDC plant (Indpendence Plant) now owned by B. F.
    Goodrich and polypropylene plant owned by Arco)
57. Deer Park, TX (limited to PVC reactors purchased by
    B. F. Goodrich by Agreement dated December 31, 1981)
58. Terlingua, TX
59. Waco, TX
60. Wausau, WI
61. Kingwood, WV

## Commercial Waste Disposal Sites

1. Duane Marine (NJ)
2. Flemington Landfill (NC)
3. Gaess Environmental (NJ)
4. Kingsville Township Dump (OH)
5. Madison (NJ)
6. Modern Transportation (NJ)
7. SCA-Oswego (NY)
8. Scientific Chemical Processing, Inc. - Newark and
   Carlstadt (NJ)
9. Sheridan Site (TX)
10. Strasburg Landfill (PA)
11. Williamsburg (OH)
12. Scientific, Inc. (NJ)
13. Chemical Control (NJ)
14. Chemicals & Minerals Reclamation (OH)
15. Pinewood (SC)
16. Cedartown (Ga) - Old
    municipal landfill

-2-

OCC034325

Confidential

OCCNJ0027216

ALCD-PUBCOM_0003094

<u>SCHEDULE 10.01</u>

Agreement,
Dated September 4, 1986 (the "Agreement"),
By and Among
Diamond Shamrock Corporation,
Occidental Petroleum Corporation,
Occidental Chemical Holding Corporation
and
<u>Oxy-Diamond Alkali Corporation</u>

<u>ACTIVE SITES</u>

2846g

OCC034326

**Confidential**

OCCNJ0027217

ALCD-PUBCOM_0003095

SCHEDULE 10.01


ACTIVE SITES


Chemical Plants

   *Belle, West Virginia
   *Convent, Louisiana
   *Deer Park, Texas (excluding only property on which the PVC
      reactors purchased by BF Goodrich by Agreement dated
      December 31, 1981 are located)
   *Delaware City, Delaware (excluding the PVC plant and PVC
      treatment plant purchased by Ethyl Corporation)
   *Mobile, Alabama
   *LaPorte, Texas (Battleground Plant and all waste disposal
      areas within or contiguous to plant boundaries, but
      excluding Independence Plant now owned by BF Goodrich
      (produces vinyl chloride monomer and ethylene dichloride)
      and the polypropylene plant owned by Arco)
    Mont Belvieu, Texas
    North Dayton, Texas
   *Harrison, New Jersey
   *Richmond, California
   *Carlstadt, New Jersey
   *Ashtabula, Ohio
   *Muscle Shoals, Alabama
   *Chicago, Illinois
   *Cincinnati, Ohio
   *Dallas, Texas
   *Jersey City, New Jersey
   *Lockport, New York
   *Charlotte, North Carolina
   *Oxnard, California (excluding polyester resins plant
      purchased by Koppers Corporation)
   *Castle Hayne, North Carolina
    Duncanville, Texas
    Franklin Park, Illinois
    Catonsville, Maryland
   *Morristown, New Jersey
   *Cedartown, Georgia
   *Terressa, Spain

_____

*    Designated for purposes of Section 2.07(d)


OCC034327

**Confidential**

```
Leeds, England
*Hamilton, Ontario, Canada
 Broadmeadows, Australia
 Aczapotzaleo, Mexico
 Drammen, Norway
*Cubatao, Brazil
 Medellin, Colombia
 Inchon, South Korea
 Tokai City, Japan
 Bangkok, Thailand
 Carmano, Milano, Italy
 Ponthierry, France
*Courtenay, France
*Chung Li, Taiwan
*Talcahuano, Chile
```

---

\*   Designated for purposes of Section 2.07(d)


<u>Sales Offices</u>

```
Atlanta, Georgia
Houston, Texas
Naperville, Illinois
Beachwood, Ohio
Marlton, New Jersey
San Mateo, California
Menlo Park, California
San Leandro, California
Perrysville, Ohio
Pittsburgh, Pennsylvania
Los Angeles, California
Norcross, Georgia
Bedford Park, Illinois
Santiago, Chile
Sydney, Australia
Gothenburg, Sweden
Oporto, Portugal
Hong Kong
Singapore
Helsinki, Finland
Murten-Morat, Switzerland
```

OCC034328

-2-

**Confidential**

OCCNJ0027219

ALCD-PUBCOM_0003097

## Miscellaneous Facilities

Morristown, New Jersey
Irving and Pasadena, Texas
Buffalo, New York
Painesville, Ohio (including only facilities leased or used
  by DSCC at Concord Research Center)
Pipeline corridor between Mont Belvieu and Battleground,
  Texas
Pipeline corridor between Mont Belvieu and North Dayton,
  Texas
Pipeline corridor between Battleground and Deer Park, Texas

## Storage, Warehouse and Distribution Facilities

Alford Refrigerated Whse.
260 McBride Lane
Corpus Christi, TX  78403

Almont Shipping Company, Inc.
U.S. Highway 421 N
Wilmington, NC  28401

American Distribution Co.
2900 Fern Valley Rd.
Louisville, KY  40213

Buffalo Merchandise Dist. Ctr.
261 Breat Arrow Ave.
Buffalo, NY  14207

Bulk Distribution Center
3101 Chestnut Street
Chattanooga, TN  37405

Canton Warehouse Company
Newkirk Street & Kieth Avenue
Baltimore, MD  21224

Cenco Inc.
600 Melynda Rd.
Charlotte, NC  28208

Chattanooga Warehouse
530 Manufactures Road
Chattanooga, TN  37402

-3-                OCC034329

**Confidential**

Chemical Express
Midway Road at I-20
Big Spring, TX  79720

Chemply--Div. United Chemicals
Bunola, PA  15020

Chemtech Industries Inc.
130 East Soper
St. Louis, MO  63111

Chemtech Industries Inc.
6301 N.E. Birmingham Rd.
Kansas City, MO  64117

Comet Distribution
1175 Choctaw
Baton Rouge, LA  70821

Deltex Chemical Company
St. Paul, MN

DSCC (Chicago Branch Whse.)
4201 W. 69th Street
Chicago, IL  60629

DSCC (Cincinnati Branch Whse.)
4701 Paddock Road
Cincinnati, OH  45229

DSCC (Jersey City Branch Whse.)
651 Tonnell Ave.
Jersey City, NJ  07307

DSCC Richmond Plant (Process)
1141 Marina Way South
Richmond, CA  94804

DSI Transports
2221 Irving Blvd.
(Rail—Miller Yd., Dallas)
Dallas, TX  75207

Duckett Transfer Inc.
74 Meadow Rd.
Asheville, NC  28813

-4-

OCC034330

OCCNJ0027221

ALCD-PUBCOM_0003099

Essex Chemical Co.
330 Dormieb Ave.
Newark, NJ  07015

Fidelity Storage Company
910 Pennsylvania Ave.
Charleston, WV  25362

Flex-I-Flo Terminal
1125 County Road
Jersey City, NJ  07307

Flex-I-Flo Terminal
577 E. 152nd Street
Cleveland, OH  44110

Gordon Terminals
Ella St. & Ohio River
McKees Rocks, PA  15136

Gray Truck
Washington Blvd. Track 4
Los Angeles, CA  90023

Great Western Chemical
860 Wharf St.
Richmond, CA  94304

Haslett Company
1345 Doolittle Dr.
San Leandro, CA  94577

Hawkins Chemical Co.
701 Barge Channel Rd.
St. Paul, MN  55107

Hayes Dockside Inc.
141 S. Peters St.
New Orleans, LA  70153

Herbert Verkemp Calvert Chem.
4600 Dues Ave.
Cincinnati, OH  45246

Holman Transfer Company
3250 N.W. Guam Street
Portland, OR  97201

OCC034331

Confidential

OCCNJ0027222

ALCD-PUBCOM_0003100

Intercontinental Chemical Serv.
Terminal & Christina Ave.
Wilmington, DE  19801

Intercontinental Terminals
2626 Tidal Road
Deer Park, TX  77536

Kenan Transport Company
Highway 421 N
Wilmington, NC  24802

Linden Whse. & Dist. Co.
11 Distribution Blvd.
Edison, NJ  08817

Mallets Gateway Terminal
21150 Roswell Drive
Pittsburgh, PA  15205

Master Chemical
501 West Boundry
Perrysburg, OH  43551

North Carolina Dist. Center
802 N. 23rd Street
Wilmington, NC  24802

Pacific Coast Warehouse Corp.
4814 Loma Vista Avenue
Los Angeles, CA  90058

Paktank Florida
Pendola Point Rd.
Tampa, FL  33619

Paktank Gulf Coast
2749 Battleground Rd.
Deer Park, TX  77536

Paktank Philadelphia
Mantua Grove Rd. & Delaware Riv.
Thorofare, NJ  08086

Powell Duffryn Terminals
Hutchinson Island
Savannah, GA  31402

OCC034332

Confidential

OCCNJ0027223

ALCD-PUBCOM_0003101

Powell Duffryn Terminals
Main Street N.E. of Parker Rd.
Lemont, IL  60439

Powell Duffryn Terminals
Commerce Street
Bayonne, NJ  07002

Queen City Terminals
3806 Kellogg Avenue
Cincinnati, OH  45226

Regional Enterprises
410 Water Street
Hopewell, VA  23860

Robert Meador Warehouse
1750 North Craft Highway
Mobile, AL  36610

S. T. Services
800 Lumpkin Blvd.
Columbus, GA  31901

Seatex Corporation
6325 Hurst St.
Houston, TX  77008

Southside River Rail
3415 Southside Avenue
Cincinnati, OH  45204

Storage Specialties
1980 Seneca Road
Eagan, MN  55122

TBS Terminal
177 12th Street
Detroit, MI  48216

TBS Terminal
111 E. 13th Street
Chester, PA  19015

Thoro Products
6611 West 58th Place
Arvada, CO  80002

OCC034333

-7-

**Confidential**

OCCNJ0027224

ALCD-PUBCOM_0003102

Trammell Crow Dist. Corp.
8711 City Park Dr. East
Houston, TX  77029

Trammell Crow Distribution
6485 Crescent Drive
Norcross, GA  30071

Trans Read Warehouse, Inc.
7035 W. 65th Street
Bedford Park, IL  60638

Truck Rail Handling
620 E. Warren Ave.
Fremont, CA  94539

Universal Terminal Warehouse
3310 Quebec Street
Dallas, TX  75247

Unloading Unlimited
12000 S. Doty Ave.
Chicago, IL  60628

Van Waters and Rogers
San Jose, CA

Wilmington Liquid Bulk
401 Canal St.
Wilmington, CA  90748

8565G

OCC034334

-8-

**Confidential**

**OCCNJ0027225**

ALCD-PUBCOM_0003103

# EXHIBIT 48

OxyChem's Comments in Opposition to Proposed Consent Decree,
*United States v. Alden Leeds, Inc., et al.*, Civil Action No. 2:22-cv-07326 (D.N.J.)

ALCD-PUBCOM_0003104



# David C. Batson, Esq.

| PROFESSIONAL EXPERIENCE | Years of Relevant Experience: 40.0<br>Years with TechLaw: 5 |
|---|---|
| EDUCATION | JD, Law, Cumberland School of Law, 1979<br>BA, History, East Carolina University, 1975 |

## BASIC QUALIFICATIONS

Mr. Batson has 40 years of professional experience assisting private and government parties resolve complex hazardous waste and environmental disputes. This includes over 30 years as an ADR neutral and consulting expert with service in 500+ environmental, natural resource, public policy, organization, and business disputes. He has served as an allocation specialist, convening neutral, and mediator at more than 100 hazardous waste sites, including contaminated riverine/estuarine sediment and groundwater sites, landfills, abandoned mines, and commercial/manufacturing facilities.

Over the past three decades, his practice has specialized in assisting PRPs involved in Superfund sites involving remediation of landfills, facility sites, and sediments and groundwater contaminated by diverse sources. His activities in these cases involve mediation and the design and implementation of effective allocation processes including, as requested by the parties, the submittal of an allocation report based upon analysis of relevant evidence that may include no records, only oral testimony, or a vast quantity of records requiring establishment of an interactive document repository. His allocation activities routinely involve determinations of legal and equitable considerations as required to address issues of divisibility of harm pursuant to CERCLA and other authorities, search of public and private records, identification of PRPs, and determination of party nexus regarding comingled waste streams providing little or no basis for association of contamination with individual sources.

As a nationally recognized expert in ADR and allocation practice, Mr. Batson is often called upon to provide testimony and consultation services in support of litigation in federal and state courts. As trial consultant and testimonial expert he has served in litigation regarding the allocation of CERCLA liability between owners of contaminated property, among owners and operators, and involving government entities. His services have involved negotiation strategy, preparation of expert reports, and depositional and trial testimony.

Mr. Batson also has extensive experience facilitating formation and effectiveness of PRP Groups, including mediation of organizational agreements, consultation on negotiation with regulatory agencies, and conduct of PRP searches. In his former position as Senior Counsel with the EPA Office of Enforcement, he dealt with both legal and technical issues arising in the settlement of numerous hazardous waste sites. He also obtained substantial experience in enforcement procedures and policy regarding regulation of pollution of water, air, toxic substances, and solid and hazardous wastes pursuant to RCRA, CWA, SDWA, CAA, EPCRA, FIFRA, and TSCA.



*Business Confidential*

Case 2:22-cv-07326-MCA-LDW    Document 309-23    Filed 04/01/24    Page 882 of 1022
Case 9:18-cv-00131-DWM    Document 16075    Filed 08/06/20    Page 48 of 50

2 | Page                          David Batson                          2019 Resume

## EXPERIENCE

### Allocation / Cost Recovery

➤ EPNG vs United States, Arizona – Served as allocation expert in litigation by mining company regarding equitable responsibility of the United States and private parties for contamination due to historic federal uranium mining program. Provided negotiation strategy consultation, expert report, deposition, and trial testimony.

➤ Diamond Alkali Sediment OU2 Superfund Site, New Jersey – Served as allocator for the design and conduct of a unique allocation process to establish relative responsibility among over 100 PRPs for $1.5 Billion remediation of major urban river settlement site.

➤ San Fernando Valley Groundwater Contamination Site, California – Served as allocation expert in support of litigation and settlement determinations by municipal water supplier for contribution to remedial costs by industrial facilities contaminating major groundwater aquifer. Innovative allocation approach provided basis for determination of equitable allocation despite diverse history of contamination.

➤ Industrial Site Natural Resource Damages, New Jersey – Served as allocation expert in support of litigation between current and former owner of industrial site to establish responsibility for off-site contamination of natural resources. Services included determination of allocation among parties and preparation of testimonial expert report. Efforts lead to favorable pre-trial settlement.

➤ Industrial Site Remediation, Michigan – Served as allocation expert in support of cost recovery litigation between current and former owners and operators of manufacturing facility site to establish responsibility for site remediation costs. Services included determination of allocation among parties and preparation of expert report. Efforts lead to favorable pre-trial settlement.

➤ USOR Landfill Superfund Site, Texas – Served as allocation consultant for waste transportation companies in support of negotiations with members of PRP Group. Efforts resulted in substantial reduction in equitable share of site costs assigned client.

➤ Superior Barrel & Drum Site – Served as allocation expert in support of negotiations among PRPs at major landfill site. Provided expert analysis and organization of site data to establish allocation matrix leading to settlement of all issues.

➤ Tennessee Products Site, Tennessee – Mediated PRP Group organization and funding agreements for landfill site involving multiple corporate, private, municipal, and federal agency PRPs. Designed and conducted allocation of cost recovery claims and future site costs. Mediated RD/RA settlement between PRP Group and EPA resolving all issues.

➤ Upper Trenton Channel GNLPO Site, Michigan – Mediated PRP Group organization and allocation of funding for initial remediation and group costs, and facilitated selection of allocation consultant for sediment site involving heavy metal contamination of Detroit industrial shipping channel subject to Great Lakes Legacy Act.



*Business Confidential*



➢ Tittabawsee River/Saginaw Bay Superfund Site, Michigan – Mediated RD/RA and natural resource damages negotiations for sediment site involving dioxin and metals contamination of river and wildlife refuge. Parties included EPA, Michigan DEQ, Saginaw Chippewa Tribe, Fish & Wildlife Service, NOAA, and Dow Chemical Co.

➢ Portland Harbor Superfund Site, Oregon – Mediated PRP Group organization and funding agreements, including design and implementation of allocation for interim funding, for sediment site involving heavy metals contamination of commercial waterway. Conducted PRP search activities and facilitated selection of allocation consultant.

➢ Lower Passaic River Superfund Site, New Jersey – Mediated PRP Group organization and funding agreements, including design and implementation of allocation for operational funding, for sediment site involving dioxin, PCB and heavy metals contamination of urban waterway. Supported PRP search activities and mediated selection of allocation consultant.

➢ Kalamazoo River Superfund Site, Michigan – Mediated RI/FS and natural resource damages negotiations between EPA, Michigan DEQ, and industrial PRPs for sediment site involving dioxin and heavy metal contamination of river system. Designed and facilitated public meetings regarding selected remedy.

**Mediation**

➢ Midnite Uranium Mine Site – Mediated negotiations between mining companies, Spokane Tribe, and Federal government, and meetings with local community over Record of Decision for inactive former uranium mine encompassing waste rock piles, backfilled pits and ore/protore stockpiles creating air and groundwater contamination.

➢ Metlakatla Reservation Site, Alaska - Mediated agreement on remedy design and performance of RI/FS for abandoned US Air Force airfield site involving disbursed hazardous waste and groundwater contamination from airfield operations, maintenance facilities, and fuel pipeline systems. Parties included Metlakatla Tribe, BIA, EPA and DOD.

➢ Kelly Air Force Base, Texas - Mediated settlement discussions regarding soil and groundwater contamination resulting from historic operations of closed US Air Force Base. Negotiations involving local community leaders, national environmental justice group, EPA, DOD, CDC and state officials resulted in remediation of contamination, provision of health services, and establishment of regional planning process for future redevelopment of base.

➢ Baton Rouge SIP Agreement, Louisiana – Mediated settlement discussions over nonattainment by the City of Baton Rouge of air pollution standards in state implementation plan. Deliberations between EPA, State environmental officials, and Tulane Environmental Law Clinic representing locally impacted communities resulted in compliance with requirements and installation of regional air monitoring to provide otherwise unavailable information to members of public.



*Business Confidential*



ALCD-PUBCOM_0003107

Case 2:22-cv-07326-MCA-LDW    Document 309-23    Filed 04/01/24    Page 884 of 1022
Case 9:18-cv-00131-DWM    Document 16077    Filed 08/06/20    Page 50 of 50

4 | Page                          David Batson                        2019 Resume

## RELATED EXPERIENCE

| EMPLOYMENT | Company | Title | Date Range |
|---|---|---|---|
| | AlterEcho, Inc. | Expert Consultant | 2015 - Present |
| | Georgetown Law School | Adjunct Faculty | 2012 - Present |
| | U.S. EPA Office of General Counsel | Senior Collaboration & ADR Specialist, ADR Counsel | 2002 - 2015 |
| | Center for Environmental Training, University of MD | Adjunct Faculty | 2010 – 2015 |
| | Coastal America Partnership | Deputy Director | 2010 - 2011 |
| | Vermont Law School | Adjunct Faculty | 1990 - 2000 |
| | U.S. EPA Office of the Administrator | Senior ADR Specialist/Deputy Dispute Resolution Specialist | 1987 - 2002 |
| | Office of Enforcement, U.S. EPA | Senior Counsel | 1979 - 1989 |
| | Self-Employed | Owner/Manager of Utility and Residential Construction firms | 1975 - 1986 |

| CERTIFICATIONS | ➢ Licensed to practice law in North Carolina and Maryland<br>➢ Advanced Certifications in ADR and Public Participation |
|---|---|
| MEMBERSHIPS | ➢ Superfund & NRD Litigation Committee, Section on Environment, Energy & Resources, American Bar Association<br>➢ ADR Committee, Section on Environment, Energy & Resources, American Bar Association<br>➢ Dispute Resolution Section, American Bar Association<br>➢ Maryland State Bar Association, ADR Council<br>➢ Environmental & Public Policy Section, Association for Conflict Resolution |



*Business Confidential*



# EXHIBIT 49

OxyChem's Comments in Opposition to Proposed Consent Decree,
*United States v. Alden Leeds, Inc., et al.*, Civil Action No. 2:22-cv-07326 (D.N.J.)

ALCD-PUBCOM_0003109



# David C. Batson, Esq.

| PROFESSIONAL EXPERIENCE | Years of Relevant Experience: 40.0<br>Years with TechLaw: 5 |
|---|---|
| EDUCATION | JD, Law, Cumberland School of Law, 1979<br>BA, History, East Carolina University, 1975 |

## BASIC QUALIFICATIONS

Mr. Batson has 40 years of professional experience assisting private and government parties resolve complex hazardous waste and environmental disputes. This includes over 30 years as an ADR neutral and consulting expert with service in 500+ environmental, natural resource, public policy, organization, and business disputes. He has served as an allocation specialist, convening neutral, and mediator at more than 100 hazardous waste sites, including contaminated riverine/estuarine sediment and groundwater sites, landfills, abandoned mines, and commercial/manufacturing facilities.

Over the past three decades, his practice has specialized in assisting PRPs involved in Superfund sites involving remediation of landfills, facility sites, and sediments and groundwater contaminated by diverse sources. His activities in these cases involve mediation and the design and implementation of effective allocation processes including, as requested by the parties, the submittal of an allocation report based upon analysis of relevant evidence that may include no records, only oral testimony, or a vast quantity of records requiring establishment of an interactive document repository. His allocation activities routinely involve determinations of legal and equitable considerations as required to address issues of divisibility of harm pursuant to CERCLA and other authorities, search of public and private records, identification of PRPs, and determination of party nexus regarding comingled waste streams providing little or no basis for association of contamination with individual sources.

As a nationally recognized expert in ADR and allocation practice, Mr. Batson is often called upon to provide testimony and consultation services in support of litigation in federal and state courts, including several of national significance. His services have involved consulting on negotiation strategy, preparation of expert reports, and depositional and trial testimony.

Mr. Batson also has extensive experience facilitating formation and effectiveness of PRP Groups, including mediation of organizational agreements, consultation on negotiation with regulatory agencies, and conduct of PRP searches. In his former position as Senior Counsel with the EPA Office of Enforcement, he dealt with both legal and technical issues arising in the settlement of numerous hazardous waste sites. He also obtained substantial experience in enforcement procedures and policy regarding regulation of pollution of water, air, toxic substances, and solid and hazardous wastes pursuant to RCRA, CWA, SDWA, CAA, EPCRA, FIFRA, and TSCA.





## SELECTED EXPERIENCE

### Mediation / Allocation

➢ Diamond Alkali Sediment OU2 Superfund Site, New Jersey – Served as mediator for the design and conduct of a unique allocation process to establish relative responsibility among PRPs for $1.5 Billion remediation of major urban river settlement site.

➢ Vermiculite Products Superfund Site, Texas – Served as mediator for successful negotiations among and between insurance companies and insured PRP entities, and between US EPA and PRPs, regarding remediation of asbestos manufacturing facility.

➢ San Fernando Valley Groundwater Contamination Site, California – Served as mediator and allocation expert in support of litigation and negotiations by municipal water supplier for contribution to remedial costs by industrial facilities contaminating major groundwater aquifer. Innovative allocation approach provided basis for determination of equitable allocation despite diverse history of contamination leading to pre-litigation settlements.

➢ USOR Landfill Superfund Site, Texas – Served as mediator and allocation consultant for waste transportation companies in support of negotiations with members of PRP Group. Efforts resulted in substantial reduction in equitable share of site costs assigned client.

➢ Superior Barrel & Drum Site – Served as mediator and allocation expert in support of negotiations among PRPs at major landfill site. Provided expert analysis and organization of site data to establish allocation matrix leading to settlement of all issues.

➢ Tennessee Products Site, Tennessee – Mediated PRP Group organization and funding agreements for landfill site involving multiple corporate, private, municipal, and federal agency PRPs. Designed and conducted allocation of cost recovery claims and future site costs. Mediated RD/RA settlement between PRP Group and EPA resolving all issues.

➢ Yosemite Slough Superfund Site, California – Served as mediator for allocation of interim funding of sediment contamination site involving PCB and heavy metal contamination of San Francisco Bay, primarily from historic municipal sewer system discharges. Mediated PRP Group organization agreement. PRPs included federal government agency, former industrial and drum recycling facilities, and City of San Francisco. Designed final allocation protocol and mediated allocation agreement. Conducted PRP search leading to substantial increase in group membership.

➢ Tittabawsee River/Saginaw Bay Superfund Site, Michigan – Mediated RD/RA and natural resource damages negotiations for sediment site involving dioxin and metals contamination of river and wildlife refuge. Parties included EPA, Michigan DEQ, Saginaw Chippewa Tribe, Fish & Wildlife Service, NOAA, and Dow Chemical Co.

➢ Kalamazoo River Superfund Site, Michigan – Mediated RI/FS and natural resource damages negotiations between EPA, Michigan DEQ, and industrial PRPs for sediment site involving dioxin and heavy metal contamination of river system. Designed and facilitated public meetings regarding selected remedy.



*Business Confidential*



ALCD-PUBCOM_0003111

➢ Metlakatla Reservation Site, Alaska - Mediated agreement on remedy design and performance of RI/FS for abandoned US Air Force airfield site involving disbursed hazardous waste and groundwater contamination from airfield operations, maintenance facilities, and fuel pipeline systems. Parties included Metlakatla Tribe, BIA, EPA and DOD.

➢ Kelly Air Force Base, Texas - Mediated settlement discussions regarding soil and groundwater contamination resulting from historic operations of closed US Air Force Base. Negotiations involving local community leaders, national environmental justice group, EPA, DOD, CDC and state officials resulted in remediation of contamination, provision of health services, and establishment of regional planning process for future redevelopment of base.

➢ Baton Rouge SIP Agreement, Louisiana – Mediated settlement discussions over nonattainment by the City of Baton Rouge of air pollution standards in state implementation plan. Deliberations between EPA, State environmental officials, and Tulane Environmental Law Clinic representing locally impacted communities resulted in compliance with requirements and installation of regional air monitoring to provide otherwise unavailable information to members of public.

➢ Barrick Cortez Mine – Mediated negotiations between EPA and corporation resulting in innovative settlement regarding gold mining operation in violation of RCRA permit and EPCRA notification requirements.

**Testimonial Expert**

➢ EPNG vs United States, Arizona – Served as allocation testimonial expert in support of litigation by mining company regarding equitable responsibility of United States and private parties pursuant to CERCLA for contamination due to historic federal uranium mining program. Provided negotiation strategy consultation, expert report, deposition, and trial testimony.

➢ CFAC v ARCO, Montana – Served as allocation testimonial expert in support of litigation by current owner of aluminum smelting facility regarding equitable responsibility of former owner of facility pursuant to CERCLA for contamination due to historic facility operations. Provided expert and rebuttal reports and deposition testimony (trial testimony pending).

➢ Industrial Site Natural Resource Damages, New Jersey – Served as allocation testimonial expert in support of litigation between current and former owner of industrial site to establish responsibility for off-site contamination of natural resources. Provided negotiation strategy consultation and expert report. Efforts lead to favorable pre-litigation settlement for client.

**Regulatory Compliance Monitor**

➢ Electrolux Corporation – Served as Independent Monitor of corporate compliance with Consent Decree with USEPA resolving noncompliance with TSCA requirements. Six month effort independently confirmed compliance in rework of over 600,000 AC and dehumidification units at multiple facilities throughout Nation.



*Business Confidential*



## RELATED EXPERIENCE

| EMPLOYMENT | Company | Title | Date Range |
|---|---|---|---|
| | AlterEcho, Inc. | Expert Consultant | 2015 - Present |
| | Georgetown Law School | Adjunct Faculty | 2013 - Present |
| | U.S. EPA Office of General Counsel | Senior Collaboration & ADR Specialist, ADR Counsel | 2002 - 2015 |
| | Center for Environmental Training, University of MD | Adjunct Faculty | 2010 – 2015 |
| | Coastal America Partnership | Deputy Director | 2010 - 2011 |
| | Vermont Law School | Adjunct Faculty | 1990 - 2000 |
| | U.S. EPA Office of the Administrator | Senior ADR Specialist/Deputy Dispute Resolution Specialist | 1987 - 2002 |
| | Office of Enforcement, U.S. EPA | Senior Counsel | 1979 - 1989 |
| | Self-Employed | Owner/Manager of Utility and Residential Construction firms | 1975 - 1986 |
| **CERTIFICATIONS** | ➢ Licensed to practice law in North Carolina and Maryland<br>➢ Advanced Certifications in ADR and Public Participation | | |
| **MEMBERSHIPS** | ➢ Vice Chair, Superfund & NRD Litigation Committee, Section on Environment, Energy & Resources, American Bar Association<br>➢ ADR Committee, Section on Environment, Energy & Resources, American Bar Association<br>➢ Dispute Resolution Section, American Bar Association<br>➢ ADR Committee, Maryland State Bar Association<br>➢ Environmental & Public Policy Section, Association for Conflict Resolution | | |





ALCD-PUBCOM_0003113

# EXHIBIT 50

OxyChem's Comments in Opposition to Proposed Consent Decree,
*United States v. Alden Leeds, Inc., et al.*, Civil Action No. 2:22-cv-07326 (D.N.J.)

ALCD-PUBCOM_0003114

Case 2:22-cv-07326-MCA-LDW Document 309-23 Filed 04/01/24 Page 891 of 1022
Case 3:14-cv-08165-DGC Document 193-2 Filed 03/01/19 Page 1 of 132
PageID: 16084

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

El Paso Natural Gas Company, LLC, )
                                   )    No. CV-14-08165-PCT-DGC
          Plaintiff,               )
                                   )
     vs.                           )       Phoenix, Arizona
                                   )       February 21, 2019
United States of America, et al., )        1:02 p.m.
                                   )
          Defendants.              )

BEFORE:  THE HONORABLE DAVID G. CAMPBELL, JUDGE

REPORTER'S TRANSCRIPT OF PROCEEDINGS

TRIAL - DAY 3

(Pages 652 through 783)

Official Court Reporter:
Christine M. Coaly, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 37
Phoenix, Arizona 85003-2151
(602) 322-7248

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

ALCD-PUBCOM_0003115

Case 2:22-cv-07326-MCA-LDW Document 309-22 Filed 04/01/24 Page 892 of 1022
Case 3:14-cv-08165-DGC Document 198-2 Filed 03/01/19 Page 2 of 132
PageID: 16085

653

```
 1                    A P P E A R A N C E S

 2    For the Plaintiff:

 3    GREENBERG TRAURIG, LLP
      By:  Mr. Christopher J. Neumann
 4         Mr. John Voorhees
           1200 17th Street, Suite 2400
 5         Denver, Colorado 80202
      GREENBERG TRAURIG, LLP
 6    By:  Ms. Pamela M. Overton
           2375 East Camelback Road, Suite 700
 7         Phoenix, Arizona 85016
      KINDER MORGAN, INCORPORATED
 8    By:  Mr. Daniel Joshua Schnee
           2 N Nevada Avenue
 9         Colorado Springs, Colorado 80903

10    For the Defendants:

11    US DEPARTMENT OF JUSTICE
      ENVIRONMENT AND NATURAL RESOURCE DIVISION
12    By:  Mr. Michael Charles Augustini
           P.O. Box 23986
13         Washington, D.C. 20026-3986
      US DEPARTMENT OF JUSTICE
14    ENVIRONMENTAL DEFENSE SECTION
      By:  Mr. Michael C. Martinez
15         P.O. Box 7611
           Washington, D.C. 20044-7611
16    US DEPARTMENT OF JUSTICE
      By:  Ms. Sydney Alexandra Menees
17         601 D Street NW, Suite 8000
           Washington, D.C. 20004
18    US DEPARTMENT OF JUSTICE
      By:  Ms. Samara Michelle Spence
19         601 D Street NW
           Washington, D.C. 20011
20    US DEPARTMENT OF ENERGY
      By:  Ms. Bettina Mumme
21         FORS, Room 6H-065
           1000 Independence Avenue, SW
22         Washington, D.C. 20585

23

24

25
```

ALCD-PUBCOM_0003116

Case 2:22-cv-07326-MCA-LDW   Document 309-22   Filed 04/01/24   Page 893 of 1022
Case 3:14-cv-08165-DGC   Document 181-2   Filed 03/01/19   Page 5 of 132
PageID: 16086

654

```
 1                        I N D E X

 2   WITNESSES FOR THE           DIRECT    CROSS    REDIRECT

 3   PLAINTIFF:

 4

 5   MR. ANDREW WERTH                      655      706

 6   MR. DAVID BATSON            709       755

 7

 8                        E X H I B I T S

 9   NO.                    DESCRIPTION                REC'D

10   257        Letter from C. Tenley to D.L. Foshee   661

11   280        Memo from Drew Werth                   672

12   5 D        Page from Expert Report of Mr. Beahm   697

13   9 A        Page from Expert Report of Mr. Batson  721

14

15

16

17

18

19

20

21

22

23

24

25
```

ALCD-PUBCOM_0003117

Case 2:22-cv-07326-MCA-LDW   Document 309-23   Filed 04/01/24   Page 894 of 1022
Case 3:11-cv-08165-DGC   Document 192-2   Filed 03/01/19   Page 4 of 132
PageID: 16087
655

1                    P R O C E E D I N G S

2          THE COURT:  You may proceed, Mr. Martinez.

3          MR. MARTINEZ:  Good afternoon, Your Honor.

4                    CROSS-EXAMINATION

5    BY MR. MARTINEZ:

6    Q.  Hello, Mr. Werth.  I'm Michael Martinez for the United

7    States.

8          Mr. Werth, to start off, you didn't submit a Rule 26

9    expert report for this case, right?

10   A.  Correct.

11   Q.  So earlier you testified about only things that you've seen

12   personally out on the mine sites?

13   A.  Correct.

14   Q.  And not on your specialized knowledge, right?

15   A.  Correct.

16   Q.  Now, Arcadis is El Paso's primary consultant out at the

17   mine site, right?

18   A.  Correct.

19   Q.  And I just want to go through some of the steps.  We've

20   heard a lot of different acronyms today, so can you put them in

21   order for us?

22          First, you would start with an RSE; is that right?

23   A.  What are you referring to, like, since the inception of the

24   2013 --

25   Q.  Yeah, let's hear from the start of the project to an EPA

Case 2:22-cv-07326-MCA-LDW   Document 309-23   Filed 04/01/24   Page 895 of 1022
Case 3:14-cv-08165-DGC   Document 192-23   Filed 03/01/19   Page 5 of 132
PageID: 16088

656

1   final remedy.  What are the different steps there?

2   A.   Okay.  Much more general question, but yeah.

3            So the general process for a time critical or non-time

4   critical removal action is to start with a first inspection or

5   site inspection.  We did not do that.  That was presumed to be

6   done by EPA.

7            Then after that comes a removal site evaluation, then

8   comes an EE/CA report, Engineering Evaluation/Cost Analysis,

9   and then public comment, and a final action memo by EPA.

10  Q.   Okay.  So Arcadis drafts reports that go to EPA?

11  A.   Say it again.

12  Q.   Arcadis drafts reports that go to EPA?

13  A.   Correct.

14  Q.   And you drafted some of these documents?

15  A.   Correct.

16  Q.   Does El Paso have input on what is submitted to EPA?

17  A.   Yes.  We would review that with our client before submittal

18  to EPA.

19  Q.   And, in your experience, who at El Paso reviews and

20  comments?

21  A.   A number of folks.  Specifically, Doug Stavinoha is the

22  project manager for El Paso.  His direct supervisor is Brian

23  Kelman.  Beyond that, I am not sure how high it goes up in the

24  management chain.

25  Q.   Any lawyers?

ALCD-PUBCOM_0003119

Case 2:22-cv-07326-MCA-LDW   Document 309-23   Filed 04/01/24   Page 896 of 1022
Case 3:14-cv-08165-DGC   Document 192-2   Filed 03/01/19   Page 6 of 132
PageID: 16089
657

```
1    A.  On occasion, yes.

2    Q.  Who would those be?

3    A.  Daniel Schnee.

4    Q.  And Mr. Schnee is El Paso's in-house counsel?

5    A.  As I understand, yep.

6    Q.  Any others?

7    A.  We also work with some other consultants that El Paso has

8    retained.

9    Q.  I'm sorry, my question, any other lawyers?

10   A.  Oh, any other lawyers?  No, not to my knowledge.

11   Q.  What types of comments does Mr. Schnee provide for your

12   drafts that go to EPA?

13   A.  As far as comments, I mean, I've been working with

14   Mr. Schnee for five or six years now.  They range from

15   technical questions, to grammatical corrections.  They can

16   range if he were to review a report.

17   Q.  It's not Arcadis's task to attribute causation of any

18   mining activity to any entity, right?

19   A.  Correct.  Yeah, we specifically tend to not refer to any

20   entities.  It's just disturbance features out at the sites.

21   Q.  And I guess mining activity here, I also want to just make

22   that clear, it includes exploration, rim stripping, bulldozing,

23   anything that could happen out at the mine sites, right?

24   A.  Correct.  Yeah, when I say mining related, it's related to

25   exploration, mining and reclamation, anything in that three
```

1   phases.

2   Q.  So it's not your task at Arcadis to attribute causation,

3   including to the United States, for any of these activities?

4   A.  Correct.

5   Q.  And, for the record, El Paso funds the work Arcadis is

6   doing out in Cameron, right?

7   A.  Absolutely.

8   Q.  Would you agree that Arcadis and El Paso speak to EPA with

9   one voice, meaning Arcadis and El Paso wouldn't present

10   competing positions to EPA, right?

11   A.  Correct.

12   Q.  Now, is it fair to say a corporation, given the choice to

13   pay more or pay less for something, would opt to pay less, just

14   common sense?

15   A.  Given the question, I would say, yes, it would pay less.

16   Q.  Do you know if it is one of El Paso's goals to minimize

17   clean up costs out in Cameron?

18   A.  I haven't spoken to them directly on that because there is

19   a number of contributing factors that go into that.  I would

20   say it ranges from, yes, cost, but stakeholder engagement,

21   reputation, PR.

22         More broadly, I think any client's objectives is to do

23   the work as efficiently as possible at remediation sites to

24   reduce costs.

25   Q.  Now, you're aware that Navajo Nation performed reclamation

Case 2:22-cv-07326-MCA-LDW   Document 309-23   Filed 04/01/24   Page 898 of 1022
Case 3:14-cv-08165-DGC   Document 192-2   Filed 03/01/19   Page 8 of 132
PageID: 16091

659

1    work at the abandoned mines at the Navajo Nation generally,

2    right?

3    A.   Yes.

4    Q.   Is it your understanding that El Paso and its predecessors

5    once operated the mine sites out in Cameron?

6    A.   Correct.

7    Q.   Now, we've heard a lot of dates in the past few days, but

8    will you agree that El Paso stopped mining at the mine sites

9    around 1962, that was kind of the last year they were out

10   there?

11   A.   That's the date range I've seen.

12   Q.   And the Navajo Nation reclaimed the mine sites except for

13   Huskon's 5 and 14 in the 1990s?

14   A.   And into the 2000s, correct.

15   Q.   All right.  So when the Navajo Nation started reclaiming

16   the mine sites, they were already abandoned, right, there was

17   no one working on them?

18   A.   Correct.

19   Q.   And no one operated the mine sites between 1962 and at the

20   time of the reclamation?

21   A.   Not to my knowledge.

22   Q.   Did El Paso know about the reclamation projects at the time

23   they were happening?

24   A.   I started on these sites in 2013.  I'm not sure what was

25   happening in 1990.

ALCD-PUBCOM_0003122

Case 2:22-cv-07326-MCA-LDW   Document 309-23   Filed 04/01/24   Page 899 of 1022
Case 3:14-cv-08165-DGC   Document 193-2   Filed 03/01/19   Page 5 of 132
PageID: 16092

660

1    Q.  Have you reviewed anything that shows you that they were

2    aware of the reclamation?

3    A.  No.

4    Q.  Do you know if El Paso contributed any funds to the

5    reclamation process?

6    A.  I'm not able to answer that.  Not sure.

7    Q.  Do you know if they were involved at all in the reclamation

8    process?

9    A.  No.

10   Q.  You don't know.

11          Would you agree that the levels of radiation present

12   at the reclaim mine sites today are lower than the levels

13   during El Paso's mining activities?

14   A.  At the surface, yes.

15   Q.  And the subsurface is not accessible because there is a cap

16   on most of the reclaimed areas, right?

17   A.  When you say not accessible, what do you mean by that?

18   Q.  It's not actually exposed, there is a cap?

19   A.  Correct.

20   Q.  Would you say that the reclamation reduced radiation

21   exposure to the people living in Cameron around the mine sites?

22   A.  At the surface levels, I want to probably focus on that

23   particularly, it did reduce the surface levels of radiological

24   readings.

25   Q.  So the modern material was actually -- is under a cap,

 1  right, so it's not directly accessible to those living in the

 2  area?

 3  A.  Correct.

 4  Q.  So looking forward to 2012, El Paso received a general

 5  notice letter from EPA regarding the mine sites; is that right?

 6  A.  It sounds right.

 7          MR. MARTINEZ:  I'm going to ask Mr. Hambrick to pull

 8  up on the screen Exhibit 257.

 9          And, Your Honor, I'd like to move this into evidence.

10  I don't believe it's in yet.

11          Your Honor, we'd like to move Exhibit --

12          THE COURT:  Yeah, I heard that.

13          Is there an objection?

14          MR. NEUMANN:  Sorry, Your Honor.  No objection.

15          THE COURT:  All right.  It's admitted.

16  BY MR. MARTINEZ:

17  Q.  This is a document dated May 17th, 2012.  Is this the

18  general notice letter that you reviewed?

19  A.  I've seen this in the past.

20  Q.  Is it your understanding that EPA sends a general notice

21  letter if it finds a potentially responsible party, a PRP,

22  under CERCLA?

23  A.  That's my understanding.

24  Q.  At the bottom of the first paragraph there is some

25  highlighted language.  It says, the purpose of this letter is

ALCD-PUBCOM_0003124

Case 2:22-cv-07326-MCA-LDW   Document 309-23   Filed 04/01/24   Page 901 of 1022
Case 3:14-cv-08165-DOC   Document 193-23   Filed 03/01/19   Page 114 of 132
PageID: 16094

662

1    to inform you that EPA considers El Paso Corporation to be a

2    PRP at the sites.

3            Do you see that?

4    A.  I do.

5    Q.  So we spoke a second ago about 1962 through the reclamation

6    process.  Do you know if between the end of the mining until

7    the general notice letter, did El Paso conduct any

8    environmental investigations at the mine sites?

9    A.  I'm not aware of any, but, again, just to qualify that, my

10   involvement on this project started in 2013.

11   Q.  I mentioned earlier Mr. Stavinoha, Doug Stavinoha.  Is he

12   El Paso's internal project manager?

13   A.  He is.

14   Q.  Are you aware that he was deposed in this case?

15   A.  I am.

16   Q.  We're going to pull up page 30, lines 3 through 7, of his

17   deposition.  Starting with line 3, it says, up until the time

18   El Paso received the general notice letter from EPA in 2012,

19   had El Paso done any environmental investigations at the

20   Cameron sites?  Answer:  Not that I'm aware.

21           Do you have any reason to disagree with that?

22   A.  No.

23   Q.  So El Paso started its environmental investigations in 2012

24   when it was contacted by EPA, right?

25   A.  Well, after the AOC was signed in 2013, that's when they

Case 2:22-cv-07326-MCA-LDW    Document 309-23    Filed 04/01/24    Page 902 of 1022
Case 3:14-cv-06165-DUC    Document 193-23    Filed 03/01/19    Page 12 of 192
PageID: 16095
663

 1   started the investigation.

 2   Q.  Right, so not until at least 2012, so probably 2013?

 3   A.  Right.

 4   Q.  Is that yes?

 5   A.  Correct.

 6   Q.  I want to turn to a document you've seen earlier today,

 7   it's 263.  And if I refer to this as an AOC, you know what I'm

 8   talking about, right?

 9   A.  Yep.

10   Q.  Do you know if the federal agencies in this case were

11   signatories to the AOC?

12   A.  EPA was.

13   Q.  But they're not part of this case, right?

14   A.  Oh, I'm sorry, part of this case, sorry.  Yes, they were a

15   signatory to the AOC.

16   Q.  Okay.  Now, are you aware that El Paso set aside funds,

17   which they called the reserve, to address the clean up of the

18   mine sites?

19   A.  I am.

20   Q.  And do you know what the reserve amount was for the Cameron

21   mine sites at the time of the AOC?

22   A.  I have heard in the range of 30 million.

23   Q.  I'm going to pull up a document, Exhibit 1327.

24          MR. MARTINEZ:  Can you, please, Mr. Hambrick.

25          It's on page 9 is what I'm -- well, let's start it on

Case 2:22-cv-07326-MCA-LDW   Document 309-23   Filed 04/01/24   Page 903 of 1022
PageID: 16096
Case 3:14-cv-06165-DUC   Document 193-23   Filed 09/01/19   Page 13 of 132

664

1   the first page, it's July -- sorry, go back to the first page

2   so I can see the date.

3   BY MR. MARTINEZ:

4   Q.  This is a slide -- a slide from Kinder Morgan.  Is it your

5   understanding that Kinder Morgan is the parent company of El

6   Paso?

7   A.  Correct.

8   Q.  And this slide is dated July 30, 2013, right?

9   A.  Correct.

10  Q.  And we're going to flip to page 9.  In the highlighted

11  section it says, EPNG agrees to perform surface assessments for

12  radioactivity.  And this is under a heading of AOC.

13          Do you see the estimate of one million?

14  A.  I do.

15  Q.  Has the estimate of one million for surface assessment

16  proven correct?  Do you know if that number has been exceeded,

17  that dollar figure?

18  A.  I mean, I'm not sure exactly what they're referring to

19  here, but certainly they've exceeded $1 million since the

20  inception of the AOC in 2013.

21  Q.  So it's fair to say that El Paso underestimated the costs

22  at this time when it was negotiating the AOC for the surface

23  assessment cost?

24  A.  Yeah, I guess I would want to make sure we're on the same

25  page.  The one million talks about surface assessment.  That

Case 2:22-cv-07326-MCA-LDW    Document 309-23    Filed 04/01/24    Page 904 of 1022
Case 3:14-cv-08165-DOC    Document 193-23    Filed 09/01/19    Page 124 of 192
PageID: 16097
665

1    could be one million for scanning the sites, walking around and

2    collecting the gamma data that we have.

3          As far as the totality of the scope that's been

4    completed to date, that's exceeded one million, clearly, but

5    their estimate of less than one million could be appropriate

6    for surface assessment.

7    Q.  While we're on the same slide, it says, efforts continue to

8    obtain financial contribution to offset some of the costs from

9    USDOE, Department of Energy.

10         Do you see that?

11   A.  I do.

12   Q.  Do you know what those efforts were?

13   A.  This is the first time I'm seeing this slide.  I'm not

14   sure.

15   Q.  Aside from the slide, you don't know what that was?

16   A.  No.

17   Q.  I want to turn back to Exhibit 263.  This is the AOC.  And

18   I'm going to point to page 10.  Was the AOC limited only to

19   investigation?

20   A.  Can you repeat that?

21   Q.  Was the AOC limited to just investigation only, site

22   investigation?

23   A.  I guess that we also had fencing and signage, Colter

24   Research Survey, Biological Survey, so I'm not sure if that

25   would be considered an investigation.

1    Q.   That all went under the umbrella of investigation?

2    A.   Sure, if we want to do that.  I think fencing and signage

3    would be more of a removal activity though.

4    Q.   So what I'm getting to is EPA has not selected a final

5    remedy for any of the mine sites at this point, right?

6    A.   Certainly not.

7    Q.   And El Paso has not yet agreed to perform the final remedy

8    that EPA will one day select, right?

9    A.   We're not there yet.

10   Q.   But they haven't agreed to do it, no matter what it is?

11   A.   Not that I am aware of, no.

12   Q.   In the AOC, El Paso did not admit it was liable under

13   CERCLA, right?

14   A.   I believe so.  There was a stipulation somewhere in here.

15   Q.   Let's turn to page 1, paragraph 4, at the bottom.

16        It says that it does not constitute an admission of

17   any liability.

18        Do you see that?

19   A.   I do.

20   Q.   In fact, El Paso retained its rights to challenge EPA's

21   finding that it's even liable, right?  And that goes onto the

22   next page.

23   A.   I'll take your word.

24   Q.   Okay.  Now, towards the end of the AOC, the scope of

25   work --

ALCD-PUBCOM_0003129

Case 2:22-cv-07326-MCA-LDW   Document 309-23   Filed 04/01/24   Page 906 of 1022
Case 3:14-cv-06165-DGC   Document 193-23   Filed 09/01/19   Page 16 of 132
PageID: 16099
667

```
 1              MR. MARTINEZ:  You can flip to page 35, that's the
 2    cover page of the scope of work, but -- let's go to page 37.
 3    BY MR. MARTINEZ:
 4    Q.  El Paso only agreed to conduct lateral scanning of the
 5    disturbed areas, right, and not vertical scanning?
 6    A.  In the original AOC, correct.
 7    Q.  And the AOC does not require El Paso to investigate anyone
 8    else's mines in the Cameron area?
 9    A.  Correct.
10    Q.  And El Paso has not agreed to investigate any other areas
11    in the Cameron besides certain mine site boundaries that it
12    once operated?
13    A.  I guess that's how it was originally written, as you saw
14    earlier --
15    Q.  We'll get to the amendments later.
16    A.  Okay.
17    Q.  Now, turning to paragraph 4.4 in the scope of work, I
18    believe it's page 36.
19              Here it mentions an investigation level of 1.24
20    picocuries per gram above background, right?
21    A.  Correct.
22    Q.  Is that a residential standard?
23    A.  So that's a historical PRG, so preliminary remediation
24    goal, calculation result for residential scenario.  Though if
25    you were to use the current calculator, you couldn't recreate
```

ALCD-PUBCOM_0003130

 1   that number.  I mean, I think it was initially created for

 2   Northeast Church Rock.

 3   Q.  But this 1.24 picocuries per gram has not been determined

 4   to be the final remediation goal for any future response

 5   action, right?

 6   A.  Correct.

 7   Q.  There is still a lot of work that needs to be done to

 8   determine that?

 9   A.  No decisions have been made on that front.

10   Q.  Earlier we looked at Exhibit 268, which is a letter from

11   EPA.  We don't need to get into the actual language, but you

12   remember this letter, it was one where EPA --

13   A.  Yeah, I do remember this.

14   Q.  Discussing certain picocuries per gram?

15   A.  Correct.

16   Q.  Do you know if that discussion was related to investigation

17   levels or was that related to what the final levels will be?

18   A.  So this was related to the original AOC, so it would be

19   related to the investigation that was --

20           THE COURT:  Mr. Martinez, please don't talk when he's

21   talking.  It's very hard for the court reporter.

22           MR. MARTINEZ:  Yes, Your Honor.

23   BY MR. MARTINEZ:

24   Q.  That has to do with the investigation, right?

25   A.  Correct.

1    Q.  Do you agree that uranium is ubiquitous on the Navajo

2    Nation --

3    A.  I guess I can --

4    Q.  -- everywhere?

5    A.  Well, I was going to say specifically to Cameron, it's at

6    the surface.  That's what makes Cameron unique.  Ubiquitous

7    being a depth in places, you know, in New Mexico and others you

8    can find similar formations and similar concentrations.

9    Q.  How does that compare to non Cameron areas?  Is uranium

10   ubiquitous in all soil to certain levels, it's kind of an

11   element in nature?

12   A.  Yeah, it's everywhere.  Cameron, as we saw yesterday with

13   the geological section from Mr. Beahm, it does present itself

14   at the surface though.

15   Q.  But naturally occurring uranium is not the subject of a

16   CERCLA response action here, right?

17   A.  Yeah, naturally occurring is not.

18   Q.  Even if it exceeds the clean up level, right?

19   A.  So it is probably would two ways that I would want to

20   respond to that.  So norm as a whole, if it's never been

21   touched by man, it would not be subject to CERCLA action, so

22   that's where we were drawing the disturbance features in those

23   black lines we snowed earlier.

24   Q.  So just norm would be a naturally occurring uranium?

25   A.  Correct.

ALCD-PUBCOM_0003132

Case 2:22-cv-07326-MCA-LDW   Document 309-23   Filed 04/01/24   Page 909 of 1022
Case 3:14-cv-08165-DUC   Document 193-23   Filed 09/01/19   Page 15 of 132
PageID: 16102

670

1   Q.   And I believe the other term is T norm, technically

2   modified?

3   A.   It is.

4          Just to finish that thought with norm, a background

5   can then ultimately be factored into the final clean up level

6   for EE/CA.

7   Q.   So only disturbed soil above the clean up level would need

8   to be addressed?

9   A.   So I think I mentioned this earlier to Mr. Neumann.   I

10  think we have two primary drivers of these sites.   One is an

11  action level that people do tend to fixate on.   It would make

12  sense, it does subject how much material may need to be

13  addressed to get to a lower level of, presumably, an action

14  level.

15         The other bit though is the erosional piece.   So I

16  think that it's more protecting future land use scenarios, if

17  it's residential, recreate, or whatever it may be, the erosion

18  could be an issue.

19  Q.   But only disturbed soil, though, above a clean up level

20  would actually need to be addressed?   If it's undisturbed

21  natural uranium and it's a hotspot, you wouldn't need to

22  address that?

23  A.   Yes, just -- I agree that undisturbed elevated material

24  would not need to be addressed.

25  Q.   That's my question.

```
 1   A.  Okay.

 2   Q.  Now, has a background level or an exceedance level for the

 3   19 mines yet been determined?

 4   A.  Which one, the background --

 5   Q.  For the first one.

 6   A.  So background, I guess per the RSC work plan that's been

 7   approved by EPA, the BSAs or the datasets that we're using, the

 8   background study areas, and those are being used quantitatively

 9   to establish an investigation level, so we're adding 1.24 on

10   top of that.  No final clean up level, though, has been

11   determined or exceeded.

12   Q.  No final.  No final, right?

13   A.  Correct.

14          THE COURT:  No what?

15          MR. MARTINEZ:  No final.

16   BY MR. MARTINEZ:

17   Q.  And these will be mine-specific, right, so it won't be

18   uniform across the 19 mine sites?

19   A.  I'm not sure.

20   Q.  Is it possible that some of the mines will require remedial

21   action and some may not?

22   A.  Entirely possible.

23   Q.  And remedial actions may differ from mine to mine?

24   A.  They may.

25   Q.  That answers my question.
```

Case 2:22-cv-07326-MCA-LDW   Document 309-23   Filed 04/01/24   Page 911 of 1022
Case 3:14-cv-08165-DOC   Document 193-23   Filed 05/01/19   Page 211 of 181
PageID: 16104
672

```
 1              Like to turn to Exhibit 280.

 2              MR. MARTINEZ:  And I don't believe this is yet in

 3    evidence, Your Honor, so I'm going to move to admit 280.

 4              THE COURT:  Mr. Neumann, any objection?

 5              MR. NEUMANN:  I'm sorry, Your Honor, no objection.

 6              THE COURT:  280 is admitted.

 7    BY MR. MARTINEZ:

 8    Q.  This is a document titled, Draft Background Reference Area

 9    Assessment, and it's from Drew Werth.

10              Do you recognize this document?

11    A.  I do.

12    Q.  It's dated September 22nd, 2016.

13              You've heard a lot over the past few days sitting here

14    in court that whether ADC rim stripped at the mine site is a

15    fact at issue in this case, right?

16    A.  I have.

17    Q.  Now, earlier you testified that Arcadis does not attribute

18    causation to any mining activity -- of any mining activity to

19    any entity, right?

20    A.  Correct.

21    Q.  I'm going to turn to a table on page 9.  And we're going to

22    see if we can zoom in on those highlighted portions.  They're a

23    bit blurry and hard to read.

24              Here at the top we have a couple of columns, AEC

25    disturbance, one in the middle from AEC disturbance outside
```

ALCD-PUBCOM_0003135

Case 2:22-cv-07326-MCA-LDW   Document 309-23   Filed 04/01/24   Page 912 of 1022
Case 3:14-cv-08165-DUC   Document 193-23   Filed 09/01/15   Page 22 of 132
PageID: 16105
673

1  AUM, and over on the right, AEC disturbance again.  And we have
2  two highlighted sections near the middle.  No observable
3  disturbance adjacent to AEC rim stripping, and the same -- a
4  similar comment right below that.
5       My question is why were these -- why were these
6  included, these attributions to AEC?
7  A.  With the geologists in the field and the trained eye,
8  they're able to distinguish what type of equipment may have
9  been used.  And through actually working in 2016, as Mr. Beahm
10  referenced earlier, we did start picking up terms like this,
11  AEC disturbance, what have you.  However, in the more recent
12  documents, you'll probably see that was stricken from any of
13  the documents that we had where we just really referred to it
14  as disturbances.
15  Q.  And this is from 2016, right?
16  A.  September 2016, correct.
17  Q.  So ones from a few months ago, like the RSE draft, would
18  not attribute causation?
19  A.  I think there was one instance in the RSE.
20  Q.  We'll get to that.
21       So you said this was based on equipment that was used
22  and you started using terms like this around that time.  Where
23  did that come from?
24  A.  Where did what come from?
25  Q.  The tie of equipment to attribution?

ALCD-PUBCOM_0003136

Case 2:22-cv-07326-MCA-LDW   Document 309-23   Filed 04/01/24   Page 913 of 1022
Case 3:14-cv-05165-DGC   Document 193-23   Filed 05/01/19   Page 23 of 132
PageID: 16106
674

1   A.   I think probably --

2   Q.   Did that come from Arcadis or from El Paso, do you know?

3   A.   I think it came really from a joint effort in the field.

4   At that time we were supporting El Paso, and then also we had a

5   visitor too with Mr. Beahm, so I think our field team out at

6   the time had adopted similar language, trying to make sure that

7   we were talking about similar disturbances so we didn't look at

8   a figure later on and have a misunderstanding of what that

9   disturbance actually was or wasn't.

10  Q.   So the attribution to AEC comes from a joint effort with --

11  between Arcadis, Mr. Beahm, and El Paso?

12  A.   Early on in 2016, I would say that's a fair assessment.

13  Q.   And what was the need to attribute causation to the AEC?

14  Would that affect the final remedy that EPA will one day

15  choose?

16  A.   No.   I think what was important on our end is trying to

17  understand what those disturbance features were.   So one of the

18  figures that we showed earlier, when talking about exploration

19  features, in particular, we wanted to be able to distinguish

20  between a large dozer cut and a hand tool that could have been

21  a rock broken off by a shovel.

22          So as a way to distinguish those disturbance features,

23  thinking that ultimately that may factor into a final remedy, a

24  decision making how that material is treated, so that's the

25  backstory on why we did distinguish certain features from each

ALCD-PUBCOM_0003137

Case 2:22-cv-07326-MCA-LDW    Document 309-23    Filed 04/01/24    Page 914 of 1022
Case 3:14-cv-08165-DUC    Document 193-23    Filed 09/01/19    Page 24 of 132
PageID: 16107
675

```
 1    other.
 2    Q.  Will El Paso argue to EPA that it shouldn't be responsible
 3    for certain features based on who caused it?
 4    A.  I'm not sure what El Paso's plan is.
 5    Q.  Did EPA accept this background study ultimately?
 6    A.  No.  This was the report I had mentioned in my direct where
 7    we didn't receive any comments on this.  We actually received a
 8    new work plan that was construed as a revised work plan to our
 9    original October 2013 submittal that was directing us to do
10    work inconsistent with this report.
11    Q.  Now, EPA disagreed with the way the background screening
12    was performed here, right?
13    A.  Among a lot of other technical topics, yes.
14    Q.  Looking back to the AOC document, Exhibit 263 on page 40,
15    you have a table at the bottom, table two, and it lists a
16    couple of milestone dates.
17    A.  Uh-huh.
18    Q.  Some 14 days, some 30, some 60.  You testified earlier that
19    Arcadis has never missed a deadline.  My question is did you
20    complete -- did Arcadis complete the work of AOC, all of this
21    within 60 days from the time it received the AOC?
22    A.  Well, to answer the specific question --
23    Q.  Is that yes or no?  Did you complete it by 60 days?
24    A.  That's not what the schedule says, though, but I guess, no,
25    we did not complete it.
```

Case 2:22-cv-07326-MCA-LDW    Document 309-23    Filed 04/01/24    Page 915 of 1022
Case 3:14-cv-08165-DOC    Document 193-3   Filed 09/01/19   Page 25 of 132
PageID: 16108
676

 1    Q.  You did not complete it in 60 days.

 2              Did you request an extension from EPA to complete the

 3    work?

 4    A.  We've submitted a number of extensions, but the real --

 5    Q.  How many extensions have you --

 6              THE COURT:  Please let him finish his answer.

 7              THE WITNESS:  So early on we actually submitted all

 8    the work plans that are called out here.  You can see the top

 9    half of this is AOC plus a certain number of days, so that

10    those fell -- those deliverables fell within September and

11    October of 2013.

12              The phase 1 and 2 work plan was finalized sooner

13    because we received comments sooner from the EPA, but the phase

14    3 and 4 work plan we did not receive comments until January or

15    March of 2015, about a year-and-a-half later, and we're not

16    authorized to go into the field until we have consensus or

17    approval from EPA.

18    BY MR. MARTINEZ:

19    Q.  So just to get back to my question, the work here was not

20    completed in 60 days?  You requested extensions from EPA,

21    right?

22    A.  It was in their court at that time.  All the work plans, we

23    were waiting on comments.

24    Q.  So you requested extensions, right?

25    A.  I don't remember and I don't think it would be obligated

ALCD-PUBCOM_0003139

Case 2:22-cv-07326-MCA-LDW   Document 309-23   Filed 04/01/24   Page 916 of 1022
Case 3:14-cv-08165-DGC   Document 199-23   Filed 09/01/15   Page 268 of 131
PageID: 16109

677

 1   for us to do that if we were waiting on their own comments.

 2   Q.  Investigations under the AOC are not the same as a removal

 3   site evaluation, right, they're different?

 4   A.  They're different, correct.

 5   Q.  Is the purpose of the RSE to investigate the contamination

 6   and risks for mining wastes?

 7   A.  In general, yes, that's what RSE is for.

 8   Q.  And an RSE is mine-specific?

 9   A.  It can be.  It could roll in multiple mine sites.

10   Q.  They are in the RSE we've seen today right, mine-specific?

11   A.  For Charles Huskon Number 12 and 14.

12   Q.  Twelve and 14?

13   A.  Correct.

14   Q.  So to get to a final remedy, will El Paso have to complete

15   RSEs on all 19 mine sites, likely?

16   A.  Yes.

17   Q.  And, to date, El Paso has only agreed to perform RSEs at

18   two of the 19 mine sites, right?

19   A.  Correct.

20   Q.  And that RSE process for the two mine sites is not yet

21   complete; is that right?

22   A.  We are waiting on comments from EPA, correct.

23   Q.  So it's not complete?

24   A.  Correct.

25   Q.  Go ahead and turn to Exhibit 1325.  We saw this earlier

Case 2:22-cv-07326-MCA-LDW   Document 309-23   Filed 04/01/24   Page 917 of 1022
Case 3:14-cv-08165-DUC   Document 193-2   Filed 09/01/19   Page 27 of 132
PageID: 16110

678

1    today.

2         You were one of the drafters of this draft RSE report?

3    A.   I was.

4    Q.   Were you the main drafter?

5    A.   No.

6    Q.   Who was the main drafter here?

7    A.   We have a large team that work on these sites, starting

8    from the folks that work in the field to collect the data, to

9    the office, to the folks that have Ph.D.s in statistics, the

10   geologists, the engineers.  Could go through specific people,

11   but I was just one signature as the project manager.

12   Q.   Let me ask you this.  Did Mr. Schnee comment on this

13   report?

14   A.   Yes, I believe he reviewed it.  I can't remember if he

15   actually provided specific comments or not.

16   Q.   Did any other lawyer comment on this report, that you know

17   of?

18   A.   No.

19   Q.   Did Mr. Doug Beahm comment on the report?

20   A.   No.  This was after Mr. Beahm and Arcadis had worked

21   together.  We really stopped in 2016.

22   Q.   You've heard Mr. Beahm's expert opinions in this case,

23   right?

24   A.   Yes, I've been listening.

25   Q.   Were you familiar with them at the time this report was

Case 2:23-cv-07326-MCA-LDW   Document 309-23   Filed 04/01/24   Page 918 of 1022
Case 3:14-cv-08165-DGC   Document 192-23   Filed 05/01/19   Page 28 of 132
PageID: 16111

679

1   drafted a few months ago?

2   A.   In general, yeah.

3   Q.   Now, you're aware that Mr. Beahm identified mining impacts

4   and calculated soil volumes in his expert report?

5   A.   Yes, I understand that.

6   Q.   And Arcadis did not consult Mr. Beahm when drafting this

7   report, you just said, right?

8   A.   Correct.

9   Q.   So Mr. Beahm's opinions in this litigation do not factor

10  into El Paso's draft RSE position before EPA; is that right?

11  A.   Correct.

12  Q.   On page 22 of this document, under vertical delineation at

13  Charles Huskon 12, it says that the Navajo reclamation data was

14  used to estimate the Huskon 12 pit depth.  My question is did

15  the availability of data that the Navajo gathered during the

16  reclamation period decrease the amount of data that Arcadis had

17  to collect at the mine sites for the draft RSE?  Did it assist

18  you?

19  A.   Did the data they collect help us?

20  Q.   Yes.  You used it, right?

21  A.   We used it.  I'm not sure if I can --

22  Q.   Okay.

23  A.   -- play the hypothetical there.

24  Q.   Turning to page 25.  Huskon 14 was not reclaimed by the

25  Navajo but Huskon 12 was, right?

ALCD-PUBCOM_0003142

Case 2:22-cv-07326-MCA-LDW   Document 309-23   Filed 04/01/24   Page 919 of 1022
Case 3:14-cv-06105-DUC   Document 193-23   Filed 09/01/19   Page 29 of 132 PageID: 16112
680

1  A.  Correct.

2  Q.  So Huskon 12 has a soil cap?

3  A.  Correct.

4  Q.  Now, on this page Arcadis notes that the source of the

5  cover material for Huskon 12 was a clay material which could be

6  reused.  So there is no radiological problem with that source

7  for the cover of Huskon 12, right?

8  A.  I'm sorry, I'm --

9  Q.  At the bottom of this page there is a highlighted section.

10  A.  What was your question?

11  Q.  It says that the source material can be reused.  My

12  question is there is no radiological problem with that source

13  material, right?

14  A.  So you may be confusing two topics.  So the soil cover that

15  is currently on the site is a gray fill that was secured I

16  think across Highway 89 on the east side.

17          This figure that's being referenced here, figure 11,

18  is identifying, I believe, potential other borrow areas that

19  could be used in a final remedy.  That scope was included in

20  the AOC modification, per USEPA, and we went around trying to

21  identify additional areas of borrow.  So this is separate

22  material from the soil cover that's currently on CH 12.

23  Q.  And I guess that type of material is not inherently

24  problematic?

25  A.  We didn't do any sampling.  It was -- if you read the

Case 2:22-cv-07326-MCA-LDW   Document 309-23   Filed 04/01/24   Page 920 of 1022
Case 3:14-cv-06165-DUC   Document 193-23   Filed 05/01/15   Page 304 of 132
PageID: 16113
681

 1    report, it was a qualitative assessment of potential borrow

 2    areas around the area.

 3    Q.  I want to turn to a page 28.  It says -- it's a section

 4    titled, Naturally Occurring Radioactive Materials Assessment

 5    Areas, NAAS, and more acronyms for you.

 6              Here Arcadis is locating representative samples around

 7    the mine sites, right, to determine what the background levels

 8    in the mining areas themselves should be; is that correct?

 9    A.  So the -- I can't use the word background here, because

10    we've used it too many times.  The context around this is we

11    have background study areas and we have norm assessment areas.

12    The background study areas are the areas that EPA was pushing

13    for and were being used in this report.  So later on you can

14    see those are being used to establish investigation levels.

15              The norm assessment areas were included, the data here

16    included as well, but aren't being used at this time.

17    Q.  So we have two numbers here, NAA 1, NAA 2, so I'm going to

18    focus on 2.  And just the highlighted section there, it shows a

19    sample of 11.1 picocuries per gram.

20              Is it Arcadis's position that the clean up standard at

21    Huskon 12 should not be below 11.1 picocuries per gram?

22    A.  We haven't stated a position in this report on that.  This

23    is for the RSE.

24    Q.  Okay.  I'm going to go to page 29.  It's a similar number

25    for Huskon 14 -- not a number, a similar assessment.

ALCD-PUBCOM_0003144

Case 2:22-cv-07326-MCA-LDW    Document 309-23    Filed 04/01/24    Page 921 of 1022
Case 3:14-cv-08165-DUC    Document 193-23    Filed 09/01/19    Page 31 of 132
PageID: 16114

682

```
 1              And here we have NAA 1 with a mean of 4.87 picocuries

 2    per gram.  So it's the same question that whether -- is it

 3    Arcadis's position that the clean up standard for Huskon 14

 4    should not be below 4.87 picocuries per gram?

 5    A.  We haven't stated that.

 6    Q.  Earlier we saw Exhibit 266 when you were being questioned

 7    by Mr. Neumann.

 8              MR. MARTINEZ:  Can you pull up 266, Mr. Hambrick.

 9              We'll go to the next page.

10              Go to the next page.  The page with the table.

11    BY MR. MARTINEZ:

12    Q.  You remember this document, right, from earlier today?

13    A.  I believe so, if we're getting to --

14    Q.  It included a table with a series of different mines.  Do

15    you remember this document?

16    A.  Yeah.  It would be good to actually show it again.

17    Q.  Yeah, I guess my -- my question is more general, so you may

18    not need it.

19    A.  It's the last two pages of the exhibit, if that helps.

20    Q.  Thank you.

21              Now, you testified earlier that those mines, including

22    -- included clean up levels around 2 point -- I believe that's

23    a different page.

24    A.  Go up one if you -- one.  Yeah.  Thank you.

25    Q.  You testified earlier that these mines included a clean up
```

Case 2:22-cv-07326-MCA-LDW   Document 309-23   Filed 04/01/24   Page 922 of 1022
Case 3:14-cv-06165-DGC   Document 193-3   Filed 09/01/15   Page 32 of 132
PageID: 16115

683

1    action level around 2.24 picocuries per gram, some variation

2    between -- among some mines; is that right?

3    A.   Yeah, the four I mentioned on Navajo Nation.

4    Q.   Do you know if these are underground mines or surface

5    mines?

6    A.   I'm not familiar with all of them.

7    Q.   If it was an underground mine, would the background level

8    be lower than a surface mine where the mining is done on the

9    actual surface?

10   A.   I'm not sure.  I think what you could say is if -- if the

11   original area around an underground mine, if a material brought

12   to the surface, the background area around that could be lower

13   than a surface mine where you potentially have naturally

14   exposed outcrops.  That could be a final result.

15   Q.   Earlier you mentioned the uranium is ubiquitous in the

16   Cameron area, it's higher than average, would you say?

17   A.   Over the entire Colorado Plateau.

18   Q.   And something you -- you, Arcadis, have been trying to

19   determine over the past few years is what the appropriate

20   background level is, right?

21   A.   Correct.

22   Q.   Can you compare Cameron's background levels to the

23   background levels from these locations?  You can't, right?

24   A.   What do you mean, just a direct comparison?

25   Q.   Are they the same?

Case 2:22-cv-07326-MCA-LDW   Document 309-23   Filed 04/01/24   Page 923 of 1022
Case 3:14-cv-08165-DOC   Document 193-23   Filed 05/01/19   Page 33 of 132
PageID: 16116
684

1   A.  We haven't finalized a background value, that's why we're

2   currently presenting BSAs ranging up to norm assessment areas,

3   but we're --

4   Q.  You don't know --

5           THE COURT:  Please don't talk at the same time.

6           Please let him finish his answer.

7           THE WITNESS:  So to finish that thought is the BSAs,

8   the background study areas at the low end are the only ones

9   we're using at this time.

10  BY MR. MARTINEZ:

11  Q.  Okay.  On page 33 of the -- sorry, of Document 1325,

12  Arcadis states that there is bulldozer exploration occurring in

13  late 1953.  Do you know where that attribution comes from or

14  where that information comes from?

15  A.  Not specifically.

16  Q.  On number -- paragraph number one, it's titled exploration,

17  in that it lists a couple of activities, including pick and

18  shovel work.  Do you know why pick and shovel work was

19  classified as exploration work?

20  A.  It was easier to distinguish because we wanted to, in our

21  world of the CERCLA world, say that the pick and shovel was a

22  smaller disturbance, so I don't know if there was an actual

23  reason for putting in the exploration.

24  Q.  For the RSE, again, does Arcadis decide whether the

25  disturbances are exploration or mine related or -- does Arcadis

```
 1   decide that?
 2   A.  We've had significant oversight from USEPA, nearly a
 3   hundred percent out of the field, so I would say it's a
 4   collaborative effort.
 5   Q.  Let me refine my question.  Does Arcadis decide whether
 6   activity in its reports are exploration or whether they're
 7   classified as mining?
 8   A.  Yeah, we're the lead author, but there are a number of
 9   stakeholders that are out in the field making and providing
10   input to the decisions.
11   Q.  Does El Paso have input on this is classification, whether
12   something is exploration or mining?
13   A.  For this report, no.  It was, I think, largely agreed to at
14   this point already El Paso had limited comments on this.
15   Q.  But you had conferred years before on some of this
16   terminology, you mentioned; is that right?
17   A.  On some of the terminology.  The pick and shovel stuff was
18   added on later in the investigation when we were really trying
19   to tease apart what was touched and what was not.
20   Q.  Would the distinction between exploration work and mining
21   work have been one of those terms that you discussed earlier?
22   A.  Yeah, that would have been probably established somewhere
23   in the early years and then continued to be refined the past
24   couple of years.
25   Q.  Did those discussions earlier define whether AEC was
```

ALCD-PUBCOM_0003148

1    responsible for exploration work?  Is that where it came from?
2    A.  So, yeah, if you're referring to the other report now in
3    2016, that's where we did have some collaboration in the field
4    with Mr. Beahm, and I assume that's where some of the
5    terminology stemmed from on AEC disturbances.
6    Q.  And that terminology has carried forward in subsequent
7    reports, right?
8    A.  Not necessarily true.  There is, I think, one instance in
9    here where we talk about, potentially, AEC disturbances,
10   because El Paso has a position that, in this report, it is not
11   responsible for that, but as far as other dozer cuts, you don't
12   see any of those labels on any of the figures we reviewed today
13   already.
14   Q.  Do you know if one of the distinguishing factors between
15   exploration work and mining work is the date it occurred?
16   A.  We wouldn't really care on when it occurred, it's more of
17   just if it was touched or not.
18   Q.  So how do you determine whether exploration work is
19   attributed to the AEC or to work done by El Paso?
20   A.  Well, that's reading the literature.  I'm not the folks in
21   the field actually doing the work, but our trained specialists,
22   geologist, scientists out in the field, knowing the history of
23   some of these sites, reading the documents about the radial
24   dozer cuts that the AEC did, the large blades, it is easy to
25   distinguish in the field.

ALCD-PUBCOM_0003149

Case 2:22-cv-07326-MCA-LDW   Document 309-23   Filed 04/01/24   Page 926 of 1022
Case 3:14-cv-08165-DUC   Document 195-13   Filed 05/01/19   Page 36 of 132
PageID: 16119

687

1    Q.   What's the purpose of this attribution if it doesn't matter

2    for the purposes of EPA's final remedy?

3    A.   Well, it does and doesn't.  We're not trying to play the

4    legal game here of who did what on the CERCLA side.  We're

5    trying to understand disturbances.  So if you have an AEC dozer

6    cut, quote, I'll say AEC dozer cut that we know was done with a

7    larger blade, it helps our field team know what potential

8    volume was disturbed there.  Opposed to hand and pick shovel

9    work where that disturbance is much smaller, so it does factor

10   into the cubic yards we estimate in some of these reports.

11   Q.   You can't tell if something is exploration just from the

12   date it occurred, right?

13   A.   Just looking at the date?

14   Q.   Yes.

15   A.   No, that wouldn't -- probably not matter, no.

16   Q.   On page 46 of this document regarding Huskon 14, it says

17   that aerial photography from 1954 shows evidence of rim

18   stripping prior to documented mining dates.

19            Have you -- I guess, did you draft this attribution,

20   do you know?

21   A.   We have this aerial photo, it's in ePrism.  EPrism is just

22   a visualization tool that we provided to EPA so they can view

23   the data that we're collecting in near realtime.  One of the

24   layers in that visualization tool is the 1954 aerial, where at

25   14 it is visible, even to someone who is not trained in aerial

ALCD-PUBCOM_0003150

Case 2:22-cv-07326-MCA-LDW   Document 309-23   Filed 04/01/24   Page 927 of 1022
Case 3:14-cv-06155-DUC   Document 193-3 Filed 09/81/19   Page 37 of 132
PageID: 16120

688

 1   photography, that there are some disturbances on the ground.

 2   And I think that's just probably a reference here to that.  And

 3   then we also have, obviously, Chenoweth referenced here as a

 4   second line of evidence.

 5   Q.  So your attribution here comes from Mr. Chenoweth and from

 6   ePrism?

 7   A.  Correct.

 8   Q.  EPrism is a database under the custody of Arcadis; is that

 9   right?

10   A.  Yeah.  It's in our GIS platform.  It houses all of the

11   spatial data that we're collecting, but ePrism itself, when I

12   say that, is just a visualization tool, no different than the

13   touchscreen we have up here.  It's user friendly and EPA is one

14   of the stakeholders that has access to it.

15   Q.  Does El Paso have access to it?

16   A.  Certainly.

17   Q.  Does it contribute information that you then use to make an

18   assessment about who did what?

19   A.  I guess maybe just to clarify, we don't really care on the

20   CERCLA side who did what.  This is, I think, for, potentially,

21   historical context or -- it doesn't factor into our final

22   decisions, though, in what was disturbed and what was not, it's

23   just disturbed or not.  That's all we care about.

24   Q.  I'm going to turn to the U.S. Demonstrative 16.

25              So you -- the Arcadis report says that there are

ALCD-PUBCOM_0003151

Case 2:22-cv-07326-MCA-LDW    Document 309-23    Filed 04/01/24    Page 928 of 1022
Case 3:14-cv-05105-DUC    Document 193-23    Filed 05/01/19    Page 38 of 132
PageID: 16121
689

 1    certain cuts at 14 that date from 1954.  Is it your

 2    understanding that cuts continued all through that decade into

 3    the '60s, so that now there are more cuts -- sorry, in 1963

 4    there are more cuts than in 1954?

 5    A.  I'm not sure if I've seen the '63 in detail.  We're more

 6    focused on what the current observations.  The historical

 7    aerials are nice to have, but it's really what's disturbed and

 8    can be identified in the field today that matters.

 9    Q.  Do you disagree that there are more cuts on the photo on

10    the right than there are on the left?

11    A.  I guess the way it's presented, in the few seconds I've had

12    to look at this, it looks like there appears to be more lines

13    on the right figure than the left.  I'm not sure who created

14    this.

15    Q.  Going back to 1325, I'm going to turn to page 34.

16          It says that scanning of area of dozing southwest of

17    the boundary is believed to be conducted by the AEC and

18    unrelated to the RIC.  I believe this refers to a figure you

19    saw earlier with the disturbance to the southwest of the Huskon

20    12 mine.  Would that be accurate?

21    A.  Yeah, the disturbance features the southwest of CH 12,

22    correct.

23    Q.  Are you aware that there is a sweat lodge near that feature

24    outside of the mine boundary?

25    A.  I think you're going the other direction, but to the -- oh,

ALCD-PUBCOM_0003152

Case 2:22-cv-07326-MCA-LDW   Document 309-23   Filed 04/01/24   Page 929 of 1022
Case 3:14-cv-06155-DVC   Document 193-23   Filed 09/01/19   Page 39 of 132
PageID: 16122
690

1    excuse me, let's make sure I said that right.  Southwest is the

2    AEC disturbances, southeast is the sweat lodge.

3    Q.   And that's outside of the mine boundary?

4    A.   I'm not sure.  I didn't look at the sweat lodge and the

5    mine boundary or not.  If you could pull it up.

6    Q.   Has EPA asked El Paso or Arcadis to identify work outside

7    of the mine boundaries on any other mines?

8    A.   Could you say that one more time?

9    Q.   Sure.  Has EPA asked Arcadis or El Paso to investigate

10   disturbances outside of its mine boundaries at any other mines?

11   A.   Yes.  So across the board, I don't know specific sites, but

12   remember we have several different boundaries at play here.  We

13   have the AML construction boundary, we have the EPA AUM

14   boundary, and then we have the mine claim.  So in CH 12 we

15   walked through that example specifically where I believe the

16   mine claim boundary was at and stuff is outside that we've

17   investigated.

18            CH 1 is another example I know off the top of my head

19   where actually the EPA AUM boundary as a starting place is

20   already outside of the mine claim boundary.

21   Q.   Is there any disagreement between EPA and El Paso about

22   which boundary should be the one that governs here?

23   A.   We've been working off the EPA AUM boundary, so the answer

24   to that question is no.

25   Q.   Is it Arcadis's position that dozing areas that are not

ALCD-PUBCOM_0003153

Case 2:22-cv-07326-MCA-LDW    Document 309-23    Filed 04/01/24    Page 930 of 1022
Case 3:14-cv-06613-DDC    Document 193-23    Filed 03/01/19    Page 40 of 132
PageID: 16123

691

 1   covered by the RSE -- sorry, that those dozing areas are not

 2   covered by the RSE, the dozing areas that we spoke about next

 3   to Huskon 4 -- sorry, Huskon 12?

 4   A.  Do you mind just trying that question all over again?

 5   Q.  Is it Arcadis's position that the dozing areas near Huskon

 6   12 are not covered by the RSE?

 7   A.  I'm not sure if Arcadis has a position on that.  We

 8   reference here an El Paso document where they agreed to scan

 9   those areas as part of the RSE, but I believe that it was

10   drafted in -- the letter was drafted to say that it wasn't

11   their responsibility.  I don't recall the specifics of the

12   letter.

13   Q.  So it's El Paso's position that those areas are not covered

14   by the RSE, based on your understanding?

15   A.  The letter that we're referencing is El Paso document,

16   yeah.  We just scan the area as part of the RSE.

17   Q.  Are you aware that Mr. Beahm includes these areas in his

18   soil volume analysis?

19   A.  I am now after the testimony.

20   Q.  If disturbances are not part of the draft RSE, they

21   wouldn't be part of the final remedy, right, if EPA adopted

22   your approach?

23   A.  If we were to say that this was approved as it currently

24   stands, your answer -- or the answer to that would be yes.  I

25   think we haven't received comments on this report yet, so I'm

ALCD-PUBCOM_0003154

Case 2:22-cv-07326-MCA-LDW   Document 309-23   Filed 04/01/24   Page 931 of 1022
Case 3:14-cv-08165-DGC   Document 192-23   Filed 09/01/19   Page 41 of 131
PageID: 16124

692

 1   not sure the final decision, and I don't think El Paso ever
 2   heard back from EPA on their 2017 letter that's referenced in
 3   this document.
 4   Q.  So let me ask that again.  So if disturbances are not part
 5   of the draft RSE and are not part of the final remedy, then
 6   they wouldn't be part of the final remedy if EPA accepted your
 7   approach?  I understand there is a comment period afterwards,
 8   but if EPA accepts your approach, the disturbances not part of
 9   the RSE, would not be part of the final remedy, right?
10   A.  I mean, if we're saying that the absolute limits of the
11   figures we have shown are what's subject to remediation, yes.
12   I think there is always in CERCLA an opportunity to revisit
13   those boundaries or what's being addressed.
14   Q.  Let me ask this differently then.
15         If you don't include something in the draft RSE and
16   EPA accepts it, it won't be part of the final remedy, right?
17   You won't be responsible for it?
18   A.  EPA could always comment down on the EE/CA.  So if you read
19   this report, we're very clear that these are preliminary
20   estimates to be further refined in the EE/CA, so I think that
21   there is --
22   Q.  Yeah, I'll get to the comment period in a second.
23         So the final -- the final disturbances, if your
24   approach holds, would be lower than those identified by
25   Mr. Beahm; is that right?

Case 2:22-cv-07326-MCA-LDW   Document 309-23   Filed 04/01/24   Page 932 of 1022
Case 3:14-cv-08165-DGC   Document 193-23   Filed 05/01/19   Page 42 of 132
PageID: 16125
693

```
 1   A.  Visually looking at it, I believe so.  I haven't looked at
 2   the numbers.
 3   Q.  Now, you spoke earlier with Mr. Neumann about washes near
 4   the Huskons 12 and 14; is that right?
 5   A.  Correct.
 6   Q.  Now, in the report -- I don't have the page, but I'll see
 7   if you recall -- does it talk about these washes being there
 8   for a long time before the mining period?
 9   A.  Yeah, absolutely, there are references.
10   Q.  There is reference to maybe 10,000 years of erosion going
11   through these washes?
12   A.  That's what I understand from my geologist.
13   Q.  Did that erosion that naturally occurred for thousands of
14   years increase the picocuries per gram in the washes?
15   A.  Potentially, yeah.
16   Q.  Is it Arcadis's or El Paso's position that that did occur,
17   that natural erosion increased the picocuries per gram in the
18   washes?
19   A.  I don't know if we have made a statement like that or not.
20   There is several contributing factors to washes, so what you're
21   touching on right there is an important one.  Natural erosion
22   has taken place for thousands of years.  It was mentioned
23   earlier that when the mine -- the mining occurred, erosion
24   could have taken place after that.  And then most recently
25   after reclamation we actually see distinct differences in the
```

ALCD-PUBCOM_0003156

```
 1   material that was used and we're able to map those disturbances

 2   that go down the drainages.

 3          So we've got several instance in time that could have

 4   contributed any amount to those drainages and affected those

 5   picocuries per gram.

 6   Q.  But erosion isn't a cause of the reclamation, right, it's a

 7   naturally occurring thing, erosion?

 8   A.  Say that again though.

 9   Q.  Erosion has been naturally occurring there for thousands of

10   years through those washes.  It's not a result of the

11   reclamation, you're just now able to see the path of the soils?

12   A.  I mean, if you're asking if erosion has taken place over

13   tens of thousands of years, yes.  The answer is yes.

14   Q.  Now, are these washes part of the RSE?

15   A.  They are.

16   Q.  Do you know if Mr. Beahm omits these washes from his

17   calculus -- calculations?

18   A.  I believe so.  I haven't seen anything to date saying he

19   included it.

20   Q.  Are these washes -- impacts to washes attributed to mining

21   related activity?

22   A.  When we say mining related, from --

23   Q.  Exploration.

24   A.  -- exploration mining to -- well, it's all of the above.

25   You don't really distinguish at that point.
```

 1  Q.  Do you know if Mr. Beahm attributes impacts to washes as
 2  mine-related activity?
 3  A.  I thought we established he didn't look at the washes.
 4  Q.  In the RSE there are haul roads, right, mapped?
 5  A.  Correct.
 6  Q.  And are impacts to haul roads associated with mining
 7  disturbance?
 8  A.  There has been a number of comments we received from EPA
 9  and Navajo EPA about the potential for haul roads to be an
10  issue.  I believe they're hearing stories from locals of a
11  potential haul truck that breaks down and what have you and
12  leaves its spoils there.  We have not seen that, but that's why
13  bits and pieces of haul roads are mapped in our RSE.
14  Q.  Do you know if Mr. Beahm includes these disturbances to the
15  roads in his report?
16  A.  I don't believe he does.  I can't say for certain.
17  Q.  Now, I think we've touched on this, but just to clarify,
18  the RSE does not include disturbances outside of El Paso's mine
19  boundaries, right?
20  A.  Say it one more time for me.
21  Q.  The RSE does not include disturbances that occurred outside
22  of El Paso's mine boundaries?
23  A.  I think we have to be careful there.  So if we were to put
24  up 12 and 14 with the mine claim boundaries, some of those
25  drainages may extend off.

ALCD-PUBCOM_0003158

1   Q.  All right.  So I guess a better question would be is it El

2   Paso's position that they shouldn't be responsible for activity

3   that's outside of the boundary?

4   A.  I'm only aware of one of the positions that they've taken

5   for the AEC disturbance to the southwest.  I think under CERCLA

6   it's -- the site is where the contamination is or where it's

7   come to be located, so I don't think they'll be pushing on the

8   drainages if it's associated with the mining.

9   Q.  You said you're aware of one position.  What is that

10  position?

11  A.  The one we've already spoken about was the AEC disturbance

12  to the southwest of CH 12, that letter El Paso had written in

13  2017.  That's the position I'm referring to.

14  Q.  And Mr. Beahm does consider disturbed areas outside the

15  mine boundaries in this litigation, right?

16  A.  As I've seen to date, yes.

17  Q.  We're going to turn to some maps to compare a few

18  approaches to Huskon 14, those that are in Arcadis's RSE and

19  those that are in Mr. Beahm's report.  So I'm going to pull up

20  two figures, one from 1325, page 103, and another one from

21  Mr. Beahm's report, it's at Exhibit 5 at page 147.

22       MR. MARTINEZ:  And, Your Honor, we have not moved that

23  into evidence yet.  We would move to move that one page from

24  Mr. Beahm's report into evidence.

25       THE COURT:  We need to have it designated as a

ALCD-PUBCOM_0003159

Case 2:22-cv-07326-MCA-LDW    Document 309-23    Filed 04/01/24    Page 936 of 1022
Case 3:14-cv-08165-DOC    Document 193    Filed 09/01/15    Page 469 of 132
PageID: 16129

697

 1   separate exhibit number.

 2           MR. MARTINEZ:  Yes.  And I believe yesterday we had

 3   quite a few from that one, so I think we're on D or E.

 4           THE COURT:  This is Exhibit 5?

 5           MR. MARTINEZ:  Yes.

 6           COURTROOM DEPUTY:  Your Honor, we're on D, as in dog.

 7           THE COURT:  So what page are you wanting to make

 8   Exhibit 5 D?

 9           MR. MARTINEZ:  We move to make page -- Exhibit 5, page

10   147 as Exhibit 5 D.

11           THE COURT:  Any objection --

12           MR. NEUMANN:  No objection.

13           THE COURT:  -- to that admission?

14           MR. NEUMANN:  No objection.

15           THE COURT:  All right.  5 D will be admitted.

16   BY MR. MARTINEZ:

17   Q.  So, Mr. Werth, these are two images of Huskon 14, right?

18   A.  Correct.

19   Q.  On the left is one included in the RSE; is that right?

20   A.  Correct.

21   Q.  And on the right we have one from Mr. Beahm's reports; is

22   that right?

23   A.  Yeah, I'll take your word.

24   Q.  Now, there are a series of cuts that are in both images; is

25   that right?

ALCD-PUBCOM_0003160

Case 2:22-cv-07326-MCA-LDW   Document 309-23   Filed 04/01/24   Page 937 of 1022
Case 3:14-cv-06165-DWC   Document 192-23   Filed 05/01/19   Page 47 of 132
PageID: 16130
698

```
 1   A.  Yes, interpreted cuts on the right and then ours on the
 2   left.
 3   Q.  The Arcadis RSE has a boundary, as does the one in
 4   Mr. Beahm's report.  And my question is the -- there is a red
 5   boundary on Mr. Beahm's report that extends north of where the
 6   Arcadis one does.  Do you see that?
 7   A.  Yeah, and when we're saying the Arcadis figure, we're
 8   displaying the EPA AUM boundary in our figure on the left.
 9   Q.  So is it Arcadis's position in this RSE that those cuts
10   that are to the northwest not included in the boundary should
11   not be part of the RSE?
12   A.  We haven't received comments from EPA yet to determine if
13   they are going to be included or not.  If you remember -- I'll
14   try and draw on the screen again -- that we scanned this entire
15   area, and we've scanned, in 2016 started in the AUM boundary,
16   we stepped out further in 2017, now we're doing the northwest
17   in 2018.  So I, obviously, don't work for EPA, not sure to know
18   what their determination will ultimately be.
19   Q.  But is it El Paso's position that those should not be
20   included in the RSE?
21   A.  We haven't taken a position.  We have followed the scope
22   that was agreed to in EPA approved work plan, the RSE work
23   plan, and that's -- 150-foot boundary there was included in
24   that.
25   Q.  So if this RSE is approved by EPA, those sections that are
```

ALCD-PUBCOM_0003161

Case 2:22-cv-07326-MCA-LDW   Document 309-23   Filed 04/01/24   Page 938 of 1022
Case 3:14-cv-06165-DOC   Document 193-23   Filed 09/01/19   Page 48 of 132
PageID: 16131
699

1   now within the boundary, those won't be included in the final

2   remedy, right?

3   A.  You're jumping ahead.  So they wouldn't be included in the

4   final RSE, I'm not sure what the final remedy will entail.

5   Q.  Right.  There are multiple steps between the RSE and the

6   final remedy, but if this holds, they won't be part of the

7   final remedy; is that right?

8   A.  Yeah, if you want to play a hypothetical game there, yeah,

9   on the left, if these things hold, clearly, that does not

10  include everything to the northwest.

11  Q.  Now, on page 1325 -- I'm sorry, page 41 of 1325, that is

12  the RSE again.  I'm going to flip back to that.

13          If we could just remove the highlight.  Thank you.

14          I don't have it highlighted, but it says that

15  Arcadis's areas and volume estimates are a conservative

16  starting point.  Am I correct in that interpretation of the

17  language?

18  A.  Where are you?

19  Q.  I may have the wrong page, but is that part of your

20  assessment that the areas and volumes presented in the RSE are

21  a conservative starting point?

22  A.  To be clear, if we have that language in there, we can pull

23  -- I would ask you to pull it up to confirm.

24  Q.  We can come back to that, if you don't recall.

25  A.  So I think when we say conservative, we, when we're mapping

ALCD-PUBCOM_0003162

Case 2:22-cv-07326-MCA-LDW   Document 309-23   Filed 04/01/24   Page 939 of 1022
Case 3:14-cv-08165-DGC   Document 193-23   Filed 09/01/15   Page 49 of 132
PageID: 16132

700

 1    these disturbance features, we are conservative in mapping

 2    them.  So if we have, just hypothetically, a dozer cut that's

 3    25 feet long -- or, excuse me, wide, we would map it on the

 4    outer end, 26, 27, whatever it is, to make sure that we're

 5    being conservative in that disturbance.

 6            That doesn't -- the word conservative does not relate

 7    to the final volume disturbances outside of the mine claim

 8    boundary, all of that, it doesn't include that when we're

 9    referring to conservative.

10    Q.  Mr. Hambrick located the section.  It's the last sentence.

11    It says, these areas and volumes are considered to be a

12    conservative starting point and will be further refined during

13    the development of the streamline risk assessment and EE/CA

14    which will be submitted together under a separate cover.

15            So going back to my question, now that we have it up,

16    the areas and volumes in the RSE are a conservative starting

17    point, right?

18    A.  As I just answered, I would say that's how it stands.  We

19    map these features conservatively.  The exact features to be

20    included or not to include are still to be determined.

21    Q.  So it's possible that the actual areas and volumes for the

22    final remedy will be lower than what you have in the RSE,

23    right?

24    A.  If we want to use the word possibly, sure.

25    Q.  I'm going to compare soil and volumes in the RSE versus

ALCD-PUBCOM_0003163

Case 2:22-cv-07326-MCA-LDW   Document 309-23   Filed 04/01/24   Page 940 of 1022
Case 3:14-cv-06165-DUC   Document 193-23   Filed 09/01/15   Page 50 of 132
PageID: 16133

701

1   those in Mr. Beahm's report, so I'm going to bring up U.S.

2   Demonstrative Number 22.

3           I want to focus only on the gray highlight exploration

4   volume.  There are a couple of columns.  The middle one says,

5   El Paso RSE report quantities, the one on the right says Beahm

6   estimates.

7           The Beahm estimates for exploration volume on Huskon

8   12 are larger than those in the RSE, right?

9   A.  Yeah.  There are a couple differences for why that is, but

10  yes.

11  Q.  And the same is true for the exploration volume for Huskon

12  14, right, the Beahm estimates are larger?

13  A.  And the specific reason I already brought up, the 6,000

14  should be 12,000, but, yeah, the remaining delta is likely

15  attributed to we just didn't include the dozer cuts to the

16  northwest at CH 14 at this time.

17  Q.  We could remove the demonstrative.

18          You did mention, though, that the -- that number is

19  now 12,000 when it was 6,000 in the RSE, and that has to do

20  with the trench depth.  Is that what you mentioned earlier?

21  A.  The assumed average trench depth, yeah.

22  Q.  Have you notified EPA of this discrepancy?

23  A.  Not yet.  We're still waiting on comments that would be

24  included in the revised version back.

25  Q.  Once an RSE for a mine is finalized and approved by EPA,

ALCD-PUBCOM_0003164

Case 2:22-cv-07326-MCA-LDW   Document 309-23   Filed 04/01/24   Page 941 of 1022
Case 3:14-cv-06155-DUC   Document 193-23   Filed 09/01/19   Page 51 of 132
PageID: 16134

702

 1   the next major step I think we referred to as an EE/CA?

 2   A.   Correct.

 3   Q.   The Engineering Evaluation/Cost Analysis?

 4   A.   Correct.

 5   Q.   And the EE/CA presents a range of potential response

 6   actions to EPA, right?

 7   A.   Correct.

 8   Q.   And that's for each mine, it's mine-specific?

 9   A.   Correct.

10   Q.   So must El Paso complete the RSE process before it can

11   complete the EE/CA process?

12   A.   Well, El Paso has been proactive in that they've already

13   submitted an EE/CA work plan trying to get buy off on the

14   approach that we take in the ultimate EE/CA report down the

15   road.  But, yeah, we would have to get consensus on the RSE and

16   the EE/CA work plan before an EE/CA would be completed.

17   Q.   And we don't yet have -- we -- El Paso does not yet have a

18   complete RSE for either Huskon 12 or Huskon 14, right?

19   A.   No.  We have not heard back since our October submittals.

20   Q.   So in 2018 El Paso agreed to perform EE/CAs but only at

21   Huskon 12 and 14, right?

22   A.   August 2018, yeah.  We --

23   Q.   And El Paso has not yet committed to performing EE/CAs at

24   the other 17 mine sites?

25   A.   No.

ALCD-PUBCOM_0003165

1    Q.  I'm going to pull up Exhibit 285, which I believe we've

2    seen earlier today.

3               This should already be admitted into evidence.

4               Do you know how long it will be until there is a final

5    EE/CA for just these two mines?

6    A.  I do not.

7    Q.  When this -- and then this process would be repeated for

8    the rest of the 17 other mine sites, right?

9    A.  Presumably, yep.

10   Q.  So even after the EE/CA process is complete, has El Paso

11   agreed that it will perform the response actions EPA selects?

12   A.  No.  That's quite a bit a ways down the road.

13   Q.  So Arcadis in this document, you mentioned earlier,

14   includes a range of potential response actions to be evaluated,

15   right?

16   A.  Correct.

17   Q.  One of them is a no action, right?

18   A.  Correct.

19   Q.  It also includes options to leave the mine waste where it

20   is and just improve the cap, right?

21   A.  Correct.

22   Q.  And those alternatives will not require excavation of the

23   mining waste, right?

24   A.  Correct.

25   Q.  So it's possible that additional clean cover will be the

ALCD-PUBCOM_0003166

1    appropriate remedy for at least some of the sites?

2    A.   Correct.

3    Q.   If there is no mine excavation, will the mine waste volumes

4    matter or will it just be the area?

5    A.   So we talk about alternatives 2 and 3, the capping options,

6    that would still be some consolidation likely for exceedances

7    surrounding the site, so I think volumes would matter there.

8    As far as if the capping is selected, yeah, acres would just

9    matter for leaving this, the material in place.

10   Q.   So if it is just acreage, then the volume won't matter?

11   A.   If it -- I guess it just -- I would -- I can repeat my

12   answer, but, for the most part, the cap, yes, of course is

13   about acreage.  I think their volumes may come into play when

14   they were talking about exploration features, drainages.

15   Q.   Would you say that the Navajo reclamation was a good thing?

16   A.   Good thing is a matter of opinion.  Could you clarify?

17   Q.   Would it have been better to leave the pits as they were in

18   1962 for the people of the Navajo Nation?

19   A.   To answer your question, the Navajo AML reclamation, as I

20   mentioned earlier, did decrease their radiological levels.  So

21   if the primary concern is radiological levels, it did make

22   things better, quote.

23   Q.   In these alternatives, you mention the no action or the cap

24   alternatives, and those would just build on work that the

25   Navajos have already done, right?

ALCD-PUBCOM_0003167

Case 2:22-cv-07326-MCA-LDW   Document 309-23   Filed 04/01/24   Page 944 of 1022
Case 3:14-cv-06165-DUC   Document 193-23   Filed 09/01/19   Page 549 of 132
PageID: 16137
705

1   A.   Presumably, I guess there -- probably have to be case by

2   case.   CH 1, Charles Huskon Number 1 is one we probably have to

3   look at closer, because what they've done is -- I don't know

4   the exact volumes -- but they've added 100,000 cubic yards on

5   top of the pit that was there originally.   And when you have

6   now created a mountain -- I don't know if you've been to these

7   sites -- 40, 50, 60 feet high, that may need to be addressed in

8   a different way.   You can't just throw more on top of it.

9   Q.   Let me just reask it.

10        The mining waste was exposed in 1962, is no longer

11   exposed, right?   It was buried?

12   A.   Yeah, AML, I think, buried the waste.   I can't speak to

13   every single occurrence of mine waste out there.

14   Q.   Has EPA ever communicated to El Paso or Arcadis that it is

15   not satisfied with the speed at which the work is occurring out

16   in the mine sites?

17   A.   There have been several instances where that's come up.

18   And I think I mentioned that earlier.   We first found out from

19   EPA that they actually, I think, internally had agreed to

20   something much more expedited for the RSEs to be completed by

21   the end of 2018.   And that's when El Paso offered up to

22   actually perform the RSEs in the two priority sites to help EPA

23   meet their commitment to Congress.

24        Since that time I've heard no comments about the speed

25   of play.   We're normally the ones asking for comments and to

Case 2:22-cv-07326-MCA-LDW   Document 309-23   Filed 04/01/24   Page 945 of 1022
Case 3:14-cv-06165-DGC   Document 193-23   Filed 09/01/15   Page 53 of 132
PageID: 16138
706

1   move things faster, like we're in the field right now actually

2   in advance of the other RSEs at the other mines.

3   Q.  Did they communicate any -- did EPA communicate any

4   dissatisfaction with the speed at which the work under the AOC

5   occurred?

6   A.  Same answer I would just give -- had given.

7   Q.  Would it be speculation to guess how much mining waste will

8   need to be addressed and in what fashion at this time?

9   A.  Yes.

10  Q.  And would it require speculation to guess how much money it

11  will take to perform any future response actions at the mine

12  sites?

13  A.  It would be speculative.  We have a range of alternatives

14  that --

15  Q.  At this point, you don't know?

16  A.  At this point, yeah, I clearly don't know the final

17  outcome.

18          MR. MARTINEZ:  That's all I have, Your Honor.

19          THE COURT:  Redirect.

20                   REDIRECT EXAMINATION

21  BY MR. NEUMANN:

22  Q.  Mr. Werth, I just have a few questions.

23          We mentioned the use of the PRG.  Tell us again what

24  that stands for.

25  A.  Preliminary remediation goal.

Case 2:22-cv-07326-MCA-LDW   Document 309-23   Filed 04/01/24   Page 946 of 1022
Case 3:14-cv-06185-DUC   Document 193-23   Filed 05/01/19   Page 56 of 132
PageID: 16139
707

1    Q.  Has that been turned into a clean up standard at any sites?

2    A.  It has, the four sites I mentioned earlier, Northeast

3    Church Rock, Quivira Cove, and Tronox sites.

4    Q.  And we looked at the letter from Ms. Searles at EPA, and

5    she was telling you, focus on correlating data between .75 and

6    5.

7         Do you recall?

8    A.  I do.

9    Q.  And that's because -- why was that?

10   A.  I think the presumption there is the decision will be made

11   within that range, not above it.

12   Q.  And, lastly, I think you described, but I'll have you

13   clarify, the -- we looked at gamma maps for several mine sites

14   and they show the colors.  And I thought you had said that the

15   mine sites reclamation caps range from 2 to 25 picocuries per

16   gram; is that right?

17   A.  Yep, correct.

18   Q.  So at all the mine sites, they're at roughly 2 to 25?

19   A.  Correct.

20   Q.  And so, as Mr. Martinez asked you to assume if that level

21   is picked, does that mean all the materials above the 2 -- if

22   the level 2 is picked, the materials above 2 are addressed in

23   some way by cover or excavation?

24   A.  Yeah, I think it's safe to assume.

25   Q.  And, lastly, although there is some uncertainty around

ALCD-PUBCOM_0003170

Case 2:22-cv-07326-MCA-LDW   Document 309-23   Filed 04/01/24   Page 947 of 1022
Case 3:14-cv-08165-DOC   Document 193-23   Filed 09/01/19   Page 57 of 132
PageID: 16140

708

 1 │ volumes and costs in a particular site, I thought I heard you
 2 │ say earlier that the same unit costs for the earthwork applies
 3 │ to those volumes; is that right?
 4 │ A.  That is correct.  And if I might add just a little bit.
 5 │ When we're talking about no action, we're saying no remedial
 6 │ action at the end of the day.  I think there would still be a
 7 │ substantial amount of work in investigation, risk assessment,
 8 │ and demonstration that no action is needed.  So there is also a
 9 │ unit cost that we could say applies to that alternative as
10 │ well.
11 │ Q.  And spend a minute to explain to us the importance of the
12 │ grading plan you'll need for any reclamation of the site to
13 │ address erosion issues and the footprint that will touch.
14 │ A.  Yeah.  I mean, we could talk about probably 12 or 1 again
15 │ as good examples of that, but significant regrading is going to
16 │ be required in order to create a stable landform at the end of
17 │ the day.  Building a mountain of material is not stable,
18 │ inherently, and so we'll have to probably lessen the slopes,
19 │ rework the actual cap material itself to then create that
20 │ stable landform that will hold up more than the 10, 15,
21 │ 20 years it has.
22 │ Q.  So at 12, if I understand you, we looked at the difference
23 │ between the Navajo and Beahm estimated pit of 3,000, and then
24 │ all the material that had to be dealt with at about 15,000,
25 │ you're saying that's the mound that's eroding?

ALCD-PUBCOM_0003171

Case 2:22-cv-07326-MCA-LDW   Document 309-23   Filed 04/01/24   Page 948 of 1022
Case 3:14-cv-08165-DOC   Document 193-23   Filed 09/01/19   Page 58 of 132
PageID: 16141
709

1    A.  Correct.

2    Q.  And I think I'm hearing you say that can't stay the way it

3    is because it will continue to erode?

4    A.  It would have to be reworked in some fashion.  Clearly,

5    we're not there for designing what a cap may look like, that's

6    correct.

7           MR. NEUMANN:  Your Honor, that's all I have.  Thank

8    you.

9           THE COURT:  All right.  Thank you.  You can step down.

10          THE WITNESS:  Thank you, Your Honor.

11          THE COURT:  Let's call the next witness.

12          MR. VOORHEES:  Your Honor, El Paso calls Mr. David

13   Batson.

14                        DAVID BATSON,

15   called as a witness herein by the plaintiff, having been first

16   duly sworn, was examined and testified as follows:

17          COURTROOM DEPUTY:  State your name for the record and

18   please spell your first and last name.

19          THE WITNESS:  Certainly.  David Batson, that's

20   D-A-V-I-D, B, as in baker, A-T-S-O-N.

21          COURTROOM DEPUTY:  Have a seat up here, sir.

22          THE WITNESS:  Thank you.

23                      DIRECT EXAMINATION

24   BY MR. VOORHEES:

25   Q.  Good afternoon.  Would you state your name for the record.

ALCD-PUBCOM_0003172

Case 2:22-cv-07326-MCA-LDW    Document 309-23    Filed 04/01/24    Page 949 of 1022
Case 3:14-cv-08165-DOC    Document 193-23    Filed 09/01/19    Page 59 of 132
PageID: 16142

710

```
 1   A.  Yes, David Batson, B, as in baker, A-T-S-O-N.

 2   Q.  And what is your occupation?

 3   A.  I am an allocation specialist and mediator focusing on

 4   environmental disputes, primarily hazardous waste.

 5   Q.  And where are you employed?

 6   A.  I am employed at AlterEcho, A-T-L-E-R-E-C-H-O, which is a

 7   subsidiary of TechLaw, Inc., in Northern Virginia.

 8   Q.  And, Mr. Batson, will you tell the Court, what is your

 9   present title?

10   A.  Senior Mediator and Allocation Specialist.

11   Q.  Have you been retained as an expert for the purposes of

12   assisting the Court today in terms of doing an allocation in

13   this case?

14   A.  I have, sir.

15   Q.  And would you tell the Court, what is your area of

16   expertise?

17   A.  The allocation of the costs of remediating Superfund sites

18   amongst jointly and severally liable parties.

19   Q.  Do you provide services to clients?

20   A.  I do -- I do under -- and allocations both under 113 of

21   CERCLA from the standpoint of assertable risks, as well as 107.

22   Q.  And do you also provide services to governments to do the

23   same thing?

24   A.  I do, to the extent that I have parties who are federal

25   PRPs.  I worked for EPA for quite awhile, I have not been for
```

Case 2:22-cv-07326-MCA-LDW   Document 309-23   Filed 04/01/24   Page 950 of 1022
Case 3:14-cv-06183-DGC   Document 193-2   Filed 09/01/15   Page 604 of 132
PageID: 16143

711

```
 1   several years, so I cannot say I was working on behalf of the
 2   agency since then.
 3   Q.   Okay.   Will you tell the Court, what is an allocation in
 4   the Superfund or the CERCLA context.
 5   A.   An allocation, in essence, is a formula, it's a methodology
 6   for how to apply equitable factors and the facts and
 7   circumstances at a particular site to determine what the
 8   relative responsibility of the parties are as you're looking at
 9   the cost of the remediation.
10   Q.   Give us your educational background.
11   A.   Certainly.   I was in high school in Asheboro, North
12   Carolina, Asheboro High School, graduated there in '71.   I was
13   at the University of North Carolina, East Carolina University,
14   graduated there with a BA, history.   In '76 I was at law school
15   at Cumberland School of Law in Birmingham, Alabama.   In 1979,
16   cum laude, and --
17   Q.   And then we'll stop there, because in 1979 did you go to
18   work for the EPA?
19   A.   I did, in the Office of Enforcement.
20   Q.   And how long did you work at EPA?
21   A.   I worked at EPA for a little over 35 years, just left March
22   of 2015.
23   Q.   Would you just briefly describe your work for EPA, perhaps
24   during that period of time from 1970 -- I'm sorry, 1979 to
25   2015, would you just, basically, briefly describe the jobs you
```

ALCD-PUBCOM_0003174

 1    held within the agency during that period of time.
 2    A.  Certainly.  I started out as an enforcement counsel in the
 3    Office of Water, Office of Enforcement.  There I worked on
 4    cases from the Clean Water Act 504 actions through to
 5    litigation on the administrative side.
 6          I also worked at the Offices of Special Litigation
 7    Division at EPA at that point where I was dealing with the
 8    overlay between RCRA, TSCA, FIFRA issues.
 9          I was assigned at that point to start to develop the
10    agency's ADR program.  This was in the mid '80s where we were
11    beginning to bring mediation, facilitation, allocation
12    practices into the agency's standard operating practice.
13          At that point, based on the provisions of the ADR Act
14    of 1990, I was assigned as the dispute resolution specialist by
15    the administrator to oversee the development of that program
16    for about a decade, and then moved on to a position as senior
17    ADR specialist for the agency, originally in the Office of
18    Enforcement, and finally in the Office of General Counsel.
19    Q.  And just to put your career at EPA in context, the statute
20    known as Superfund, or the Comprehensive Environmental Response
21    and Compensation Liability Act, was passed in 1980; is that
22    correct?
23    A.  Yes.
24    Q.  And the SARA amendments were passed in 1986?
25    A.  Yes.

ALCD-PUBCOM_0003175

Case 2:22-cv-07326-MCA-LDW   Document 309-23   Filed 04/01/24   Page 952 of 1022
Case 3:14-cv-05165-DUC   Document 193-23   Filed 09/01/19   Page 624 of 182
PageID: 16145
713

 1   Q.   Does this period of time that you were working at the

 2   agency from 1979 to 2015 coincide with the agency's education

 3   within -- internally with regard to CERCLA?

 4   A.   Yes.  I mean, I -- during that period of time, I was

 5   assigned as the dispute resolution specialist, both to work on

 6   the development of CERCLA internally, but also to reach out to

 7   the private parties, to the PRPs, to Superfund network, to the

 8   various organizations that were developing the use of

 9   allocation as a practice in the private sector to be able to

10   bring that knowledge back into the agency through policies,

11   trainings, consultations with management, so, in fact, the

12   agency could be in a position to support the effectiveness of

13   CERCLA.

14   Q.   Now, outside the agency did you teach law school during

15   this period of time?

16   A.   I did.  I taught at Vermont Law School in the 1990s through

17   the early 2000s.  I taught a course called ADR in the

18   Environment with Professor Harder (phonetic) up there together.

19   He taught a section on administrative dispute resolution, I

20   focused specifically on Superfund practice, negotiations,

21   mediations, and primarily helping people understand the

22   allocation process and how to -- how it functioned and how to

23   serve as a consultant and a counsel when you were at a

24   Superfund site.

25   Q.   Okay.  That was Vermont Law School, now what about another

ALCD-PUBCOM_0003176

Case 2:22-cv-07326-MCA-LDW   Document 309-23   Filed 04/01/24   Page 953 of 1022
Case 3:14-cv-08165-DUC   Document 193-3   Filed 09/01/19   Page 634 of 135
PageID: 16146
714

1   law school?

2   A.  Yes.  And somewhat overlapping the same time, in the first

3   instance I had been teaching a series of negotiation seminars

4   with Georgetown Law School in the D.C. area.  I currently teach

5   an advanced negotiation seminar there each year.

6   Q.  Okay.  Now going back inside the agency.  Would you tell us

7   and describe briefly the primary responsibilities you had with

8   regard to allocation within the agency.  If you could inform

9   the Court as to what work you did within the agency during that

10  period of time.

11  A.  Certainly.  Beginning in the late '80s, moving into the

12  early '90s, I was tasked with developing procedures and

13  guidance for the agency to both educate staff at the agency and

14  the Department of Justice, and other agencies and departments

15  of the government, about allocation, how to appropriately

16  function within an allocation process.

17          That led to the agency's allocation report -- much

18  longer name, actually, but I don't remember the details of the

19  report itself's name -- it was issued in 1994.  During that

20  process, we went out, through my experience and the experience

21  of about a dozen other allocation specialists, documented what

22  the practice of allocation was.  Then I was able to take that

23  information and turn it into a series of trainings that were

24  given at headquarters, given at other agencies, given at our

25  regional offices to help educate all of the enforcement staff

ALCD-PUBCOM_0003177

Case 2:22-cv-07326-MCA-LDW   Document 309-23   Filed 04/01/24   Page 954 of 1022
Case 3:14-cv-08165-DOC   Document 193-23   Filed 09/01/19   Page 949 of 1022
PageID: 16147
715

 1   at that time, later the policy staff, about the Superfund
 2   process and how it worked on the private sector.
 3   Q.  Okay.  Now, in addition to training, did you also perform
 4   services as an agency representative to outside entities such
 5   as PRP groups?  Do you want to describe for the Court what you
 6   did in that regard?
 7   A.  Certainly.  I had a rather unique position within the
 8   agency working under a confidentiality agreement with the
 9   administrator and supported by the confidentiality provisions
10   of the ADR Act of 1990, and subsequently the 1996, which allows
11   for complete confidentiality and exclusion from the FOIA
12   provisions for a federal employee serving as a neutral.

13          I was asked to go out and work with -- and a great
14   majority of my time was spent serving as a convening neutral
15   allocation specialist working with PRP groups as a consultant
16   and allocation specialist.  So I would go out on a government
17   salary, I would be paid by the government, all my other
18   expenses would be paid by the private parties, travel, support
19   services, scientific services, through direct supplying,
20   obviously, of that service, so we didn't have to deal with the
21   wonders of ethics rules.  And I worked with, oh, a large
22   number, scores of different PRP groups as they were organizing
23   as we went through the early stages of allocations, helping
24   them both to understand allocation practice, but also
25   understand how to effectively negotiate that allocation with

ALCD-PUBCOM_0003178

Case 2:22-cv-07326-MCA-LDW   Document 309-23   Filed 04/01/24   Page 955 of 1022
Case 3:14-cv-08165-DUC   Document 193-23   Filed 09/01/15   Page 65 of 135
PageID: 16148
716

1   the government.

2   Q.   And PRP stands for what, sir?

3   A.   Potentially responsible parties.

4   Q.   All right.  Is the field of allocation recognized as a

5   professional area of expertise?

6   A.   Yes, it is.

7   Q.   And are there published books and articles recognizing

8   allocation as an area of expertise?

9   A.   Yes, sir.

10  Q.   Has the field -- has this field of expertise, allocation,

11  been recognized by any professional authorities or government

12  agencies?

13  A.   It's clearly recognized by the EPA's policy on ADR.  It's

14  listed in the -- several of the national statutes, the ADR Act

15  as a specialty within that field.  It's recognized by the ABA

16  dispute resolution section.  We have a committee that focuses

17  in on it within the section of environment, energy, and

18  resources within the ABA.  I would say yes.

19  Q.   Are there professional journals, conferences devoted to

20  this subject?

21  A.   I don't know of any journals that are only about

22  allocation.  I mean, it clearly is a subject of multiple ABA

23  conferences.  There will be a master class this spring focusing

24  on it exclusively that the ABA is putting on.

25  Q.   Are you a member of any professional organizations or

ALCD-PUBCOM_0003179

Case 2:22-cv-07326-MCA-LDW    Document 309-23    Filed 04/01/24    Page 956 of 1022
Case 3:14-cv-08165-DUC    Document 193-23    Filed 05/61/19    Page 664 of 135
PageID: 16149

717

1    associations?

2    A.  I am.  I am a member of the ABA.  I specifically serve as

3    co-chair of the committee on Superfund Natural Resource Damages

4    Litigation, serve as a co-chair of the ADR committee within --

5    both of those within the section of environment, energy, and

6    regulation.  I also serve as a co-chair and work with the ADR

7    committee of the dispute resolution section of the Bar.

8            I am a member of the Environmental committee of the

9    Maryland State Bar Association, formerly served as one of the

10   members of the ADR counsel for the State of Maryland.  Also

11   serve as a committee member of the Ethics Counsel for Dispute

12   Resolution committee of the Bar Association.

13   Q.  Okay.  Have you prepared a report in this case?

14   A.  I have.

15   Q.  And have you prepared a rebuttal report in this case?

16   A.  I have.

17   Q.  Okay.  And would you tell us what materials you used to

18   prepare your reports in this case, both the -- the opening

19   report and the rebuttal report.

20   A.  I used various materials that were obtained from counsel,

21   including the expert reports that we've learned about in this

22   trial so far.

23   Q.  Okay.

24   A.  As well as my own knowledge and background and research in

25   various sundry aspects of allocation practice.

ALCD-PUBCOM_0003180

1    Q.   And I take it you have conducted an allocation in this

2    case?

3    A.   I have.

4    Q.   Okay.  Would you inform the Court, please, of the

5    methodology that you use to conduct the allocation in this

6    case.

7    A.   Certainly.  I use the standard methodology that I would use

8    in designing an allocation for a particular situation.  And

9    with any good allocation design, you start by reviewing the

10   specific facts and circumstances that you approach for that

11   specific Superfund site.  How you have to design an allocation

12   for a landfill site, versus a sediment site, versus a mining

13   site, versus a mining site with 2 versus 100 parties is very

14   different.  It depends on the individual facts to get an

15   equitable distribution of cost amongst the parties in a way

16   which is an appropriate analysis.

17        So the first thing I did in this situation was to talk

18   with counsel, do research and get a sense of what was the

19   action that was creating waste, what was the waste that needed

20   to be remediated, how the two of those related to each other,

21   and what were the facts on the ground that were driving the

22   ultimate outcome, which is how, in fact, do you set up a

23   relationship between the parties that is focused on their

24   impact on the ultimate scope and the cost of a remedy.

25   Q.   Have you used the same methodology in other allocations

1    that you performed?

2    A.   Clearly have used the same principles and approach, yes.

3    Q.   Okay.  And will you tell the Court, how many times have you

4    done an allocation or assisted in allocations in your career?

5    A.   Sixty, 70, I mean, I don't know the exact number.

6    Q.   By the way, do other allocators use the same methodology?

7    A.   Yes.  The approach -- the principles that I'm talking about

8    are the standard that's used across the industry.

9    Q.   We have two in this case, don't we?

10   A.   We do.

11   Q.   And you know Mr. Low who is present in the courtroom?

12   A.   I do.  I do.  We are -- there are not a huge number of

13   allocation specialists and we tend to know each other for

14   years.

15   Q.   Okay.  All right.  Has anyone ever questioned your

16   methodologies or your methods in conducting an allocation?

17   A.   Not until now, no.

18   Q.   And when you say not until now, are you referring to

19   Mr. Low?

20   A.   I am.

21   Q.   I take it it's a small group of allocators, correct?

22   A.   Yes.  Yeah, clearly.

23   Q.   Okay.  Do you believe you've used enough information to

24   perform an allocation in this case?

25   A.   Oh, without a doubt.

Case 2:22-cv-07326-MCA-LDW   Document 309-23   Filed 04/01/24   Page 959 of 1022
Case 3:14-cv-08165-DUC   Document 193-2   Filed 09/01/19   Page 694 of 135
PageID: 16152
720

1    Q.   And have you considered alternative theories and

2    conclusions with regard to your allocation in this case?

3    A.   I have.  I considered several as I was coming up with my

4    own decision as to the approach to take, and I clearly

5    considered Mr. Low's.

6    Q.   Did you reject his -- his -- or any part of his theory of

7    allocation in this case?

8    A.   I did.  I mean, he laid out his theory and his report and

9    we've gone back and forth and responsive briefs.  I am even

10   after that point still do not believe it has value for the

11   Court.

12   Q.   Are your methodologies used outside of court for purposes

13   of conducting allocations?

14   A.   They are used for training seminars, presentations.  I

15   mean, they're a specialized methodology specifically for

16   Superfund, so I don't know if it would be used outside of the

17   Superfund context, necessarily.  But, clearly, it's a subject

18   that is understood, as I said, there are various classes that

19   we focused on them.  Shall we say there is a heavy interest on

20   the part of the PRP counsel community as to how the methodology

21   works and how to effectively advocate within it.

22   Q.   Now, have you ever testified in a federal court for

23   allocation purposes?

24   A.   I have never testified in federal court for any purpose.

25               THE COURT:  Mr. Voorhees, we'll go ahead and break at

ALCD-PUBCOM_0003183

1    this point.

2          MR. VOORHEES:  Thanks, Your Honor.  It's a perfect

3    time.

4          THE COURT:  We will resume at five minutes to the

5    hour.

6          THE WITNESS:  Thank you, sir.

7          (Recess taken, 2:39 p.m. - 2:55 p.m.)

8          THE COURT:  You may continue, Mr. Voorhees.

9          MR. VOORHEES:  Thank you very much, Your Honor.

10         El Paso has an exhibit to offer with regard to this

11   witness.  It's already been premarked as Exhibit Number 9 A,

12   and I believe there is no objection.

13         MR. AUGUSTINI:  No objection.

14         THE COURT:  9 A is admitted.

15   BY MR. VOORHEES:

16   Q.  Mr. Batson, I want to represent to you that Exhibit Number

17   9 A is your resumé.  And I want to just ask you one question

18   about it.  Does your resumé accurately summarize your

19   qualifications as an expert witness to provide the Court with

20   an allocation framework in this cause of action between the

21   parties with regard to the respective shares of responsibility?

22   A.  I believe it does, yes.

23   Q.  Mr. Batson, I want to read into the record a quote from

24   Mr. Low's expert report and ask you a question about it.  In

25   the report dated October 14th, on page 25, Mr. Low says as

ALCD-PUBCOM_0003184

Case 2:22-cv-07326-MCA-LDW   Document 309-23   Filed 04/01/24   Page 961 of 1022
Case 3:14-cv-08165-DUC   Document 192-23   Filed 05/01/19   Page 71 of 131
PageID: 16154

722

```
 1   follows:

 2            In my opinion, a general framework of the type

 3   proffered by Mr. Batson can provide a useful basis for

 4   allocation only if the input data and assumptions are reliable,

 5   end quote.

 6            Do you remember that statement in his report?

 7   A.  I do.

 8   Q.  Okay.  The remainder of my examination, Mr. Batson, is

 9   going to focus in on the allocation framework.  And I want you

10   to first describe to the Court how you went about creating an

11   allocation framework for the purposes of this case.

12   A.  Well, and let me -- let me first say, I agree with his

13   statement.  I mean, it is part of the standard allocation

14   methodology I was referring to earlier, so I -- allocation was

15   based on that principle.

16   Q.  Based on the principle of reliable data?

17   A.  Certainly, reliable data, and beyond that the appropriate

18   application of equitable factors by the court.

19   Q.  Okay.  So tell us all what is -- what is an allocation

20   framework?

21   A.  As I somewhat touched on earlier, I mean, it is a method, a

22   way of analyzing the data that's available from the site and

23   applying the equitable factors that are appropriate for that

24   situation by the Court to be able to, in fact, determine the

25   relative shares of the parties for the cost of remediation that
```

Case 2:22-cv-07326-MCA-LDW   Document 309-23   Filed 04/01/24   Page 962 of 1022
Case 3:14-cv-08165-DOC   Document 193-23   Filed 09/01/19   Page 72 of 135
PageID: 16155

723

1    they have created the need for.

2            In this situation, I think one of the first things I

3    found out from looking at the facts and situations on the

4    ground and relationship between the parties is that on one

5    level it's a relatively simple process, a relatively simple,

6    straightforward allocation, much more than many I've worked on.

7            We have a single contaminant --

8    Q.  Singling contaminant?

9    A.  Contaminant, uranium.  We have, basically, only two PRPs,

10   setting aside some orphans that need to get dealt with in the

11   process.  We have activity actually over three periods of time,

12   but during those periods of time either singular or common

13   activity that are leading to the same risk, so there is no

14   differentiation in the risk.  Therefore, having a single risk

15   that needs to be addressed leads to the outcome that, as was

16   discussed previously by the previous expert, it's highly

17   probable that we will have the same type of remedial action

18   focused on.

19           Given all of that, the concept of what the cost of the

20   remedy is is not a driving factor.  We're able to focus in on

21   the commonality between the parties and their relative

22   relationship in creating that common risk by a common activity,

23   and so it narrows down the focus quite dramatically than a

24   number of the multi-party or multi-contaminant types of

25   disputes that many of the allocation specialists and myself

ALCD-PUBCOM_0003186

Case 2:22-cv-07326-MCA-LDW   Document 309-23   Filed 04/01/24   Page 963 of 1022
PageID: 16156
Case 3:14-cv-08165-DOC   Document 193-2   Filed 09/01/19   Page 73 of 132

724

 1   deal with.

 2   Q.  For the record, Mr. Batson, have you been attending the

 3   entire trial here before Judge Campbell?

 4   A.  I have, very gladly.  I mean, it was --

 5   Q.  So, I take it, you will be able to respond in your answers

 6   to my questions and Mr. Augustini's with information you've

 7   learned during the trial; is that right?

 8   A.  I hope so, yes.

 9   Q.  And directing your attention to your report, what was the

10   date of that report, the initial one?

11   A.  September 16 -- September 12th, I believe, of 19 -- of

12   2016.

13   Q.  Okay.  And with regard to that report, is there anything in

14   the report substantively that you would change between the date

15   that that report was prepared and today's date, other than some

16   revisions to the --

17   A.  Dataset.

18   Q.  -- the numbers?

19   A.  No.  I mean, and one thing that actually I learned today is

20   that, if anything, the dataset that was used to be able to plug

21   into the method and formula that is in this may be

22   conservative.  And this is intended to be a conservative

23   outcome to start with, as we'll talk about as we go through,

24   but there was some potential data that would be associated with

25   the creation of waste that I've heard about over the last few

ALCD-PUBCOM_0003187

```
 1   days that is not included in these calculations.
 2   Q.  Okay.  Would you present to the Court the list of Gore
 3   factors, I'm certain that we're all familiar with them, but,
 4   for the record, would you describe to the Court the Gore
 5   factors that are commonly used in conducting allocations?
 6   A.  Clearly.  There are -- there are six.  I mean, the first
 7   really deals with the distinguishability of your particular
 8   waste amongst the other wastes.  That's the simplicity of this
 9   case, we only have one waste with the same risk, so that is no
10   longer an issue that needs to be dealt with.
11        The amount of the hazardous substance involved in a
12   relative sense between the parties where they have a
13   commonality.
14        The degree of toxicity of the waste, and specifically
15   the differences between the degree of toxicity of different
16   waste.  Again, we don't have to deal with that one here because
17   we have one risk, one waste product, one driver for this
18   remedy, as far as the chemical goes.
19        Degree of involvement of the parties across all
20   different activities and arrangements in the treatment,
21   disposal, storage of that particular hazardous waste.  That's
22   another.
23        The degree of care exercised by the parties in the
24   respect of that hazardous waste, both in how it was created,
25   how it was maintained, how it was handle over the years, and
```

ALCD-PUBCOM_0003188

 1  ultimately how it was cleaned up.

 2        And, lastly, the degree of cooperation of the parties

 3  relative to each other as it relates to the final remediation

 4  of that hazard that's been created by their activities.

 5  Q.  Okay.

 6  A.  Now, I mean, there are other factors, I mean, by -- that

 7  have been created over the years as Superfund has developed and

 8  changed from just a straight landfill program to the more

 9  complex cases we have now, the Torres factors.  A lot of

10  different --

11  Q.  For the record, that's T-O-R-R-E-S.  And is that referring

12  to Judge Ernest Torres, District of Rhode Island, who --

13  A.  It is.  And then there are a number of others.  I mean, one

14  of the things that is clear from the case law is that, for the

15  Court, there is no exhaustive list nor any prescriptive list of

16  allocation factors that are appropriate for any particular

17  case.  It is up to the Court's discretion looking at the

18  situation in the particular Superfund site to apply the

19  appropriate allocation factors.

20        I know that I have, in the context of this allocation,

21  selected through research on the case law, factors that I

22  believe are appropriate for the Court to consider.

23  Q.  Okay.  Let's go to the subject of determining the baseline

24  allocation.  And, again, I believe you've already started a

25  discussion of that, but would you tell the Court what the

1  baseline allocation determination is.  How does that work in an

2  allocation?

3  A.  Well, the baseline allocation is really a starting point.

4  It's somewhat a theoretical starting point upon which then you

5  can apply the various allocation factors.  It's split out by

6  looking at which particular factors you think are appropriate.

7  In this particular case, what I would suggest to the Court,

8  given the focus of the singular remedy and singular risk, is

9  that what's going to be most important is to look at the degree

10  of involvement between the parties and how they have generated

11  and dealt with the waste, the benefits that the parties

12  received from those activities, each of the parties' knowledge

13  of the risk and how it could impact environment and the public

14  safety.

15       Also, the degree of control and care that each of the

16  parties took in respect to that hazardous waste and how it

17  might impact the communities based on its characteristics.

18       And, finally, the degree of cooperation of the

19  parties.  We get to deal with the, really a level of

20  involvement analysis here, a level of care analysis given the

21  circumstances of this case.

22       The first issue you really deal with in determining a

23  baseline is looking at that type of degree of involvement and

24  its various aspects in the case, and then you adjust that

25  baseline over time by using the other equitable factors that I

Case 2:22-cv-07326-MCA-LDW   Document 309-23   Filed 04/01/24   Page 967 of 1022
Case 3:14-cv-08165-DOC   Document 193-2   Filed 03/01/19   Page 77 of 132
PageID: 16160
728

1   had mentioned.

2   Q.   Okay.  So directing your attention to your allocation that

3   you did in this case, you took into consideration relevant --

4   or, I should say, relevant allocation considerations were

5   addressed by you in your allocation; is that correct?

6   A.   Yes.

7   Q.   And would you tell the Court, just briefly, what those were

8   so we can move to the actual numbers here, but starting with

9   those --

10  A.   Sir, I know the --

11  Q.   -- considerations?

12  A.   There is an overriding consideration that plays throughout

13  all the various activities that were involved in the creation

14  of a waste that needs to be remediated here, very unique to

15  uranium cases, very unique to this period of time in American

16  history.  It was touched on by several of our experts earlier

17  in the week.  And that is really the fact that, you know, all

18  activities in the mine sites were conducted in furtherance of

19  the needs of the United States for uranium to support its

20  national security concerns.

21          That plays out in several different ways through the

22  licensing, through the participation and, you know, control of

23  the domestic uranium procurement program, DUPP, as it has been

24  referred to earlier, in the way that the mines were located at,

25  the reason they exist even.  I mean, taking a thought from a

ALCD-PUBCOM_0003191

Case 2:22-cv-07326-MCA-LDW   Document 309-23   Filed 04/01/24   Page 968 of 1022
Case 3:14-cv-05165-DUC   Document 193-23   Filed 05/01/19   Page 78 of 135
PageID: 16161
729

 1   similar fact situation, in Newmont the Court was looking at it,

 2   you know, with the idea that without the direct involvement,

 3   encouragement of the United States, there would be an issue of

 4   whether or not this mine would even exist at this time.  That

 5   type of a, you know, effort is an overriding concern that needs

 6   to be taken into account by the Court.

 7   Q.  Focus for a second on the -- on the assessment of the

 8   contribution of the parties.  Do you -- do you take that into

 9   consideration with regard to allocation?

10   A.  Clearly.  In this particular situation, we have a very

11   unique, one of the not simple things about this case, honestly,

12   despite everything I've said, is that what we have is a series

13   of different types of activities that have created the common

14   risk.  And it was -- as was mentioned earlier by several of the

15   experts, in essence, we have three different activities over

16   time.

17        We start with that period of activity, exploration,

18   prospecting, as it was mentioned earlier, when you are trying

19   to be able to define and find whether or not you have a reason

20   to even think about mining in an area, and then defining that

21   you have an active source.

22        Then you have the period of activity where you are

23   actually exploiting the ore, the mining activity, for

24   simplicity, where you are actually extracting the ore, the

25   uranium ore, dealing with this placement on site, moving it,

ALCD-PUBCOM_0003192

Case 2:22-cv-07326-MCA-LDW   Document 309-23   Filed 04/01/24   Page 969 of 1022
Case 3:14-cv-06115-DWC   Document 192-23   Filed 05/01/15   Page 79 of 132
PageID: 16162
730

```
 1   taking it to the mill, which is terminated at the end of a
 2   lease.
 3            And then you have, as is the case here, uniquely, some
 4   two decades later, another impact on the site reclamation.
 5   Q.  Okay.  So I'm just going to focus your attention,
 6   Mr. Batson, on those three periods.  That's what I'm going to
 7   do.  We'll start with -- we'll do it in chronological order
 8   with the first period, and the period of exploration.
 9   A.  Okay.
10   Q.  Did you take into consideration the parties' roles in
11   exploration?
12   A.  Yes, I did.  And maybe to simplify the overall method that
13   is inherent in this program, I would suggest that given the
14   difference in the relationships between the parties during each
15   of those three time periods, the Court will need to consider
16   what is the appropriate approach for each time period to
17   establish an appropriate allocation and then add them together.
18            There is, for example, in that first phase, the
19   exploration phase, we have a situation from all the evidence
20   that I've seen that we have operators under Superfund, one, the
21   miners, the other the United States through the AEC, who are
22   involved in creating waste through various activities we've
23   heard about here at the trial, drill rigs, which we're putting
24   aside for this particular allocation, so I won't touch on it as
25   a way that waste is generated, because it's not calculated into
```

ALCD-PUBCOM_0003193

Case 2:22-cv-07326-MCA-LDW   Document 309-23   Filed 04/01/24   Page 970 of 1022
Case 3:14-cv-08165-DOC   Document 193-23   Filed 05/01/19   Page 804 of 832
PageID: 16163
731

1   my formula at this point, as of last night, actually.

2   Q.   Right.

3   A.   The rim stripping or the exploration by dozer, as we've

4   heard it, those were conducted at different times by different

5   parties, and, in this situation, by the mine company and the

6   United States with the overly of just the ownership of the

7   land, obviously.

8          During the mining period, we have what is

9   traditionally a mining allocation.  I mean, similar to others

10  that we know of, and we'll hear about more as we move ahead,

11  where you have the owner of the land, the United States, the

12  arranger for the disposal of waste, which I propose is the

13  United States, and the actual operator who is extracting the

14  mine, and there is a relationship that you have to think about

15  for the sake of allocation there.

16         And then in the reclamation phase, there is an

17  operator, one single operator who is involved in the moving and

18  creation of waste through those reclamation activities, as we

19  have heard about, the NAML, as an agent of the United States.

20  Q.   Now, are you interested, as an allocator, in the actual

21  volume of the waste?

22  A.   I am, particularly at this point, because it gives us --

23  the volume or the area, I mean, actually, for the sake of the

24  Court, I have computed it in both ways so that I would be able

25  to provide the algorithm that I've laid out and set of formulas

Case 2:22-cv-07326-MCA-LDW    Document 309-23    Filed 04/01/24    Page 971 of 1022
Case 3:14-cv-06165-DUC    Document 199-23    Filed 09/01/19    Page 81 of 132
PageID: 16164
732

 1   to be able to think about the allocation can be done both based

 2   on volume and based on area of disturbance.  Honestly, for the

 3   sake of the report, I chose volume because it's somewhat more

 4   conservative.

 5   Q.  More conservative in the sense that it reduces the share to

 6   the United States?

 7   A.  Yes.

 8   Q.  And increases the share to El Paso?

 9   A.  Yes.

10   Q.  And you were here yesterday when other conservative

11   measures were taken to eliminate the drilling during the

12   exploration phase as a government share, and shifting that over

13   to the El Paso Company for purposes of allocation.  You were

14   here for that, were you not?

15   A.  Yes.  And after trial last night, I mean, I recalculated

16   the, you know, final outputs of this and will be able to

17   provide it.  Didn't have a chance to print it out just because

18   of the speed today.

19   Q.  At the end of your testimony?

20   A.  Exactly.

21   Q.  And in addition to the exploration drilling shift, we also

22   heard yesterday with regard to the Huskon 5, 6, and 9 mine

23   sites, that they are eliminated by El Paso from -- from the

24   government's share, and actually shifted over from

25   responsibility to the El Paso Company, hence, not changing

ALCD-PUBCOM_0003195

Case 2:22-cv-07326-MCA-LDW    Document 309-23    Filed 04/01/24    Page 972 of 1022
Case 3:14-cv-08165-DWC    Document 193-23    Filed 09/01/19    Page 82 of 132
PageID: 16165

733

1    the -- the actual volume, but rather changing the

2    responsibility.

3            You were here for that, were you not?

4    A.  I was, and I took that into account.  And, specifically,

5    you're talking about the volumes that were associated with the

6    exploration by rim stripping as it was referred to at those

7    three sites.

8    Q.  You were also here, were you not, just to get us on the

9    same page with -- with our colleagues from the Department of

10   Justice, you were also here when Mr. Beahm described the

11   correction that he made to the misidentified Ryan 2 materials

12   from the AML and how that additional volume was attributed now

13   to the calculations and made accurate; is that right?

14   A.  That is correct.  And -- and my open request in putting

15   together the allocation to Mr. Beahm was if you have more

16   accurate data regarding the mine site, give it to me.  I mean,

17   I want the most accurate data possible.  So, actually, I was

18   very glad that he was able to make -- you know, professionally

19   notice and make that change to make it a more accurate data

20   base along the same lines of Mr. Low's statement.

21   Q.  Okay.  Now, let's get to the next step, sir.

22           With regard to the exploration phase, did you evaluate

23   the party-specific activities during exploration?

24           I suppose I should put it more generally.  Did you

25   evaluate the party-specific activity in each phase of these --

1    of the three phases we have in the case?

2    A.   I did.

3    Q.   Okay.  And did you evaluate their responsibility with

4    regard to the total volume of waste so you could do an

5    allocation?

6    A.   I did.  Specifically what I focused on was the activity of

7    creating waste that would need to be remediated.  I looked at

8    the facts to determine who was responsible for the creation of

9    that waste through their activities at different mine sites and

10   then did a compilation of that for each of the time periods.

11   Q.   And I'm going to direct your attention to your original

12   number here with regard to the exploration phase.  It's

13   actually -- it's a fraction how it's portrayed in the report,

14   but on page 15 -- and we are not introducing this report into

15   evidence, it's rather better for you to explain this to the

16   Court.  But because there was an alteration yesterday with

17   regard to the exploration phase, can you -- can you just inform

18   the Court what that -- what that meant in terms of the

19   allocation that you performed updating that last night?

20   A.   Certainly.  Maybe just a bit of background on the basis for

21   how I developed the numbers.  Being able to use the volumes

22   from Mr. Beahm's chart as to the exploration volumes at each of

23   the mine sites, I then looked at who was involved in activities

24   at those mine sites during the periods of time when we had the

25   creation of waste through exploration activities.  Came to the

ALCD-PUBCOM_0003197

Case 2:22-cv-07326-MCA-LDW   Document 309-23   Filed 04/01/24   Page 974 of 1022
Case 3:14-cv-08165-DOC   Document 192-13   Filed 09/01/19   Page 84 of 132
PageID: 16167
735

1    conclusion from looking at those records and looking at the

2    background data and historical information that there was a

3    split between who was responsible between the United States and

4    Rare Metals at that point, as to who should be held responsible

5    equitably for exploration of waste created at each of the mine

6    sites.

7         For 15 of the mine sites, which were -- where the

8    exploration occurred prior to the early 1950s before the mining

9    company had -- had any heavy equipment to be able to do the

10   type of activities that would be required, particularly not

11   having the D7s and primarily focus, as we've heard over the

12   last couple of days, on a small loader and hand equipment, I

13   prescribed the share for each, the volume, rather, of each of

14   those 15 mine sites to the United States.

15        After the 1950s Ramco did, in fact, have -- early

16   1950s, they did have heavy equipment.  I have no information

17   one way or the other as to whether the United States was

18   involved in that area continuing to do exploration activities,

19   rim stripping in this situation.  However, for the sake of

20   equity, I assigned a hundred percent of the volume of those

21   sites all to the mining company, all to Rare Metals.

22   Q.   Okay.

23   A.   And then taking those -- taking those volumes, I did two

24   things.  One, I calculated the entire volume that added --

25   what's added up and associated with the exploration period on

ALCD-PUBCOM_0003198

1    the chart from Mr. Beahm's information.  I then compared that

2    to the overall volume of all waste sites and came up with what

3    the percentage would be for that particular time of activity,

4    and then compared that against the particular volume of each of

5    the parties.

6         The numbers have changed as to the full number of

7    waste that was created during the reclamation -- I mean, the

8    early exploration period, however -- and, actually, in the

9    first calculation the United States, in my formulation, had

10   over 99 percent share for those 15 sites versus the four Ramco

11   sites.  Rare Metals had about a one percent -- had less than a

12   one percent share.

13        Based on the changes that you mentioned, both the

14   correction of the -- and the bolstering of the data record, and

15   the changes made in court yesterday to exclude drilling trails,

16   any drilling activity, to exclude the rim stripping of 5, 6,

17   and 9, the new calculations changed that relationship to the

18   United States being 69.9 percent and Rare Metals being

19   30.1 percent responsible for the waste created during the first

20   phase of activity before the mining operations.

21   Q.  Okay.  Let's move on to the mining phase, Mr. Batson, but

22   we're going to come back to this in the sum up step that we

23   take later on.

24        So let's go to the mining phase now.  And will you

25   tell us what you considered in terms of determining the

ALCD-PUBCOM_0003199

Case 2:22-cv-07326-MCA-LDW   Document 309-23   Filed 04/01/24   Page 976 of 1022
Case 3:14-cv-08165-DVC   Document 199-23   Filed 05/01/19   Page 86 of 132
PageID: 16169
737

1    relative shares of responsibility for the mining phase.
2    A.   Certainly.  As noted earlier, this is where we're looking
3    at the -- what would be more or less a traditional allocation
4    that we would see at mining cases where we have the joint
5    activities of an operator, an owner, an arranger who is
6    involved over -- involved in a joint action, common practice
7    toward allowing that ore extraction to occur.
8         You're primarily looking at a degree of involvement
9    approach, as we talked here, and the various degrees of
10   involvement that have been associated with the various case law
11   over the years, look at several things, one look at involvement
12   and ownership of the land, look at involvement in the actual
13   exploitation or removal of the ore itself, look at involvement
14   in the arranging for the disposal, treatment, or release of
15   that hazardous substance into the environment.
16        So I did an analysis looking at what, in fact, were
17   the facts that supported those three different levels of
18   involvement that the United States and the company were
19   involved in and how my recommendation on what the Court should
20   consider in making that determination.
21   Q.   Okay.  And we're not going to go and repeat the evidence of
22   the case.  That's not -- that's not what we're here for with
23   your testimony.  And we're not also going to repeat the
24   information that you received from the other experts.
25        So I want to move things along with regard to the --

ALCD-PUBCOM_0003200

Case 2:22-cv-07326-MCA-LDW   Document 309-23   Filed 04/01/24   Page 977 of 1022
Case 3:14-cv-06165-DWC   Document 193-23   Filed 09/01/15   Page 874 of 132
PageID: 16170
738

1  determining the actual baseline allocation for the mining phase

2  though.  Will you tell the Court how you -- how you actually

3  accomplished that?

4  A.  Well, I -- I considered what were the facts of the case,

5  what were the relationships between the party that's actually

6  dealt with that involvement of the parties that I just

7  mentioned.  And based on that analysis, I established a

8  relationship to the parties as a starting point for

9  calculations moving forward.  And that baseline was two-thirds

10  to the United States as owner of the land, as landlord --

11  active owner of the land and landlord on which the contaminated

12  activity occurred, and as an arranger for the disposal of the

13  hazardous substances of the mine site, and one-third to the

14  mining companies as operator that conducted the ore

15  exploitation activities.

16  Q.  You said active landlord; is that correct?

17  A.  I did.

18  Q.  Okay.

19  A.  Active owner and landlord.

20  Q.  Would you just describe to the Court what you mean by that?

21  For purposes of this case, how does that consideration weigh in

22  to the allocation that you have prepared for this phase of two-

23  thirds share to the government and one-third share to El Paso?

24  A.  Touched on it briefly earlier in my comments, and that is

25  the role and proactive actions of the United States government

ALCD-PUBCOM_0003201

1    through the AEC on their agencies in running the nuclear

2    program, or uranium program, and being able to oversee the

3    mines and creating the desire for the mining operations, a

4    number of things that have been spoken about by Mr. Herken and

5    others during this trial.

6    Q.  Now, did you consider, shall we say, other factors after

7    you determined the 66 and two-thirds to one-third relationship

8    between the parties, were there other factors that entered your

9    mind with regard to how to appropriately allocate the shares in

10   the mining phase of this case?

11   A.  Clearly.  As noted earlier, this is the time when you

12   really take into account the other equitable factors, as I have

13   identified them, the relative benefits received from the

14   contaminating activity by each party; the degree of knowledge

15   regarding the risks of the contamination and the hazardous

16   waste that is being dealt with and created here; the degree of

17   cooperation between the parties; and the degree and control and

18   care excised by each party in relation to that knowledge that

19   they have regarding the hazard of the particular contaminant.

20   Q.  And let me get to the point here with regard to what is

21   that -- what's the impact of those four additional factors that

22   you just recited for the Court.  What does that do with regard

23   to the -- the relative shares between the government and El

24   Paso?

25   A.  The Court would use those to adjust those shares as

 1   appropriate based on the application of the facts of that
 2   situation, the facts and type of activity of the two parties in
 3   relation to those equitable factors.  It would move them up, it
 4   would move them down, I mean, it would depend on the Court's
 5   discretion on how to apply those factors.
 6   Q.  Okay.  And I can just hear the question that's going to
 7   come on cross-examination.
 8   A.  Go for it.
 9   Q.  You're not double dipping, are you, Mr. Batson, with regard
10   to any of those factors, those adjustments?
11   A.  No.
12   Q.  Will you explain to the Court why that is -- why that's not
13   occurring here?
14   A.  The concept of how an allocation specialist and allocator
15   or the Court would be looking at the equitable factors moves
16   throughout this process.  It is a -- it's a pathway to be able
17   to determine whether or not an activity impacted the way that
18   approach -- an activity was conducted should be weighted more
19   heavily than the other.  In this situation, how do you weigh
20   the history of the uranium program, the fact of its urgency and
21   the desire for uranium, along with the desire of a company to
22   be able to, obviously, make a profit in mining uranium while
23   under the controls of a government program.
24          I, honestly, and I have laid out my thoughts on how
25   that might be conducted, how I would suggest it be conducted,

ALCD-PUBCOM_0003203

1    but I leave that totally to the discretion of the Court to make

2    those calls and determinations.  I just offer a method and a

3    pathway to be able to hopefully ensure that it's done in an

4    appropriate way.

5    Q.  When you did that additional consideration with regard to

6    the mining phase and 66 and two-thirds and the one-third --

7    A.  Certainly.

8    Q.  -- did that result in a -- in a change in those

9    proportions?

10   A.  It did.  I -- I am recommending that the share of the

11   United States be increased by 10 percent, and obviously the

12   share of the company be reduced based on the relative benefits,

13   involvement, care that was involved.

14   Q.  Okay.  And not to steal anyone's thunder, but we are going

15   to hear testimony after in the government's case about the

16   benefit to El Paso.  El Paso got a benefit, didn't it?

17   A.  Clearly.  I mean, they -- they were in business.  They

18   continued to mine through that period.  I assume that means

19   they were at least making enough money to continue in that

20   operation and so they voluntarily came in.

21          The issue is under what restrictions, what controls

22   they were allowed to, in fact, profit in that situation, and

23   whether or not the hazard would have been created but for the

24   program under which they were operating.

25   Q.  Okay.  So did you weigh that benefit to El Paso with the

ALCD-PUBCOM_0003204

Case 2:22-cv-07326-MCA-LDW   Document 309-23   Filed 04/01/24   Page 981 of 1022
Case 3:14-cv-06165-DUC   Document 193-23   Filed 09/01/19   Page 914 of 132
PageID: 16174
742

 1   benefit to the United States of America for obtaining uranium?

 2   A.   Clearly.

 3   Q.   Okay.

 4   A.   In the same way that I weighed my understanding of the

 5   knowledge of the -- the knowledge of the risk that was being

 6   graded that was held by the United States at that time and the

 7   company at that time, the same way that I weighed the other

 8   factors.

 9   Q.   I want to shift to another topic, also in the mining phase,

10   so we can complete the mining phase and go right into

11   reclamation.  But with regard to mining, Mr. Batson, there is

12   the subject called the orphan share.

13          Now, without giving us a legal opinion on the orphan

14   share, will you just briefly describe to the Court what the

15   orphan share is and how did you calculate the responsibility

16   here during the mining phase for the orphan shares that exist

17   in this case?

18   A.   Right.  I mean, orphan share is -- or analysis of orphan

19   share is required just by the practical reality, as is in the

20   situation here, where you may have some PRPs, some parties who

21   were involved in an activity creating the common waste,

22   creating a uranium waste that needed to be cleaned up here as

23   miners that are just no longer in existence.  They are out of

24   business, defunct, bankrupt, and therefore are not available

25   to, in fact, provide funding toward the ultimate remediation

ALCD-PUBCOM_0003205

Case 2:22-cv-07326-MCA-LDW   Document 309-23   Filed 04/01/24   Page 982 of 1022
Case 3:14-cv-08165-DOC   Document 193-23   Filed 09/01/19   Page 92 of 132
PageID: 16175

743

 1   with the group of PRPs.

 2          Here we have a group of five entities that had gone

 3   bankrupt, UTCO -- UTCO Uranium, Cameron Mining, B.C.

 4   Associates, Domino Company, and H.F. Rodgers, R-O-D-G-E-R-S,

 5   that had been involved in mining activity during this same

 6   period of time but are no longer in existence.

 7          The practical thought is how do you best ensure that

 8   that share which cannot be paid by those now defunct companies

 9   is appropriately assigned to the two remaining parties here.

10          The courts take two basic approaches for how to be

11   able to consider that as a concept, or the allocation field has

12   picked up two basic approaches.  One is the assignment to the

13   viable parties in relation to their overall allocation share.

14   For example, if I was looking at that earlier two-thirds, one-

15   third, then the allocation share, whatever it calculated to be,

16   would be split two-thirds, one-third between the parties.

17          The other is to look very specifically and more

18   strategically at the business relationship between the parties.

19   The mining -- in this situation, I would be looking at the

20   mining company and the subsequent mining company to see whether

21   or not there was a relationship between the two that could be

22   used as a basis for the Court or the allocation to say they

23   should be responsible for the subsequent mining.

24          That's the approach I decided to take here, because we

25   do have a business relationship that can be easily identified,

ALCD-PUBCOM_0003206

1   and that is operation under a lease.  There were several of the

2   sites here where, I think it was Rare Metals at the time, I

3   suppose, held the lease.  They decided to hold onto the lease,

4   and, in essence, to get someone else to mine for them under the

5   same lease.  So the activity continued under the same lease

6   held by the mining company.  In that situation, equitably, I

7   think that the -- that additional waste should be assigned back

8   to the leaseholder, the mining company for whom someone is, in

9   essence, doing business under the same lease.

10          On the other hand, where a mining company, as was the

11  case here, terminated their lease, stopped all business

12  relationship under that lease, and another company came in,

13  picked up a new lease and started mining directly with the

14  United States, the relationship is a business relationship, a

15  legal relationship between the company and the United States,

16  and the United States should pick up that portion of the share.

17  Q.  Okay.  So for our orphans here, I take it you allocated how

18  many to the United States and how many to El Paso?

19  A.  The -- there were nine sites in the first category at which

20  Rare Metals ceased operations prior to the ultimate closure of

21  that site, but were picked up under their own permit, their own

22  license, and so Rare Metals continued to hold it, so I assigned

23  nine of the volumes from nine of the mines, rather, to Rare

24  Metals.

25  Q.  Those are volumes from those nine mines to Rare Metals?

ALCD-PUBCOM_0003207

Case 2:22-cv-07326-MCA-LDW   Document 309-23   Filed 04/01/24   Page 984 of 1022
Case 3:14-cv-06155-DVC   Document 193-23   Filed 09/01/19   Page 94 of 132
PageID: 16177
745

1    A.   For the orphan share that would continue to be graded.

2    There were four mines, and this was Huskon 4, 5, 8, and 9,

3    where -- the second category where Rare Metals terminated their

4    lease, their legal relationship with the United States for

5    running the mines, and another company came in and picked up by

6    -- you know, asking for and getting the permission from the

7    United States to mine those sites apart and separate from Rare

8    Metals.

9    Q.   So just to recap, Your Honor, and to keep us going, the

10   allocation that you did on the mining phase between the United

11   States and El Paso, with the equitable adjustment of, I believe

12   you said 10 percent, and the allocation of the 13 mining sites,

13   nine to El Paso and four to the government, that is the

14   volumes?

15   A.   The orphan sites, right.

16   Q.   The orphans.  What do we come out with when we do that

17   second of the three allocations, or the three allocation

18   phases?

19   A.   Clearly there was a calculation of what the total amount

20   was that was orphan created waste that then was split along the

21   lines that I discussed.  In total, that came out to an increase

22   in the share to the United States by 4.41 percent, and

23   obviously a decrease in the mine operators of 4.1 percent when

24   I did that calculation as a percentage of the overall volume.

25   Q.   Okay.

ALCD-PUBCOM_0003208

Case 2:22-cv-07326-MCA-LDW   Document 309-23   Filed 04/01/24   Page 985 of 1022
Case 3:14-cv-06155-DUC   Document 193-23   Filed 09/01/19   Page 95 of 132
PageID: 16178
746

```
 1   A.  But that was trued up to 100 percent.  It came down to
 2   4.4 percent.
 3   Q.  And I think you skipped over the 10 percent up for the
 4   government, 10 percent down for El Paso, but what is that?  Do
 5   you have a figure there that you have in mind for those three?
 6   A.  Well, based on the original baseline allocation share, the
 7   equitable adjustment and the assignment of orphan shares, I
 8   have 8107, just over 81 percent to the United States, and just
 9   under 19 percent to El Paso.
10   Q.  And, for the record, that's -- so we'll be able to see how
11   this is adjusted, 18.93 percent for El Paso?
12   A.  Yes, that's correct, for the mining period.
13   Q.  Okay.  Let's go to reclamation so we complete the three
14   phases of the allocation.  I think you've mentioned that there
15   are three allocations themselves that then get summed up, so
16   we've done two, we're going to the third.
17   A.  This is the simplest from an equitable standpoint.  We only
18   had one operator during the reclamation phase, we have the
19   United States, through its agents, doing the reclamation.  That
20   reclamation, as we have heard, created waste which was added to
21   the volume and area of the original mine sites.  Therefore,
22   100 percent of that volume associated with the reclamation --
23   and I'll get back to that in just a second -- was assigned to
24   the United States as the operator, and as the owner of the land
25   that allowed that material to stay unremedied after the
```

ALCD-PUBCOM_0003209

Case 2:23-cv-07326-MCA-LDW   Document 309-23   Filed 04/01/24   Page 986 of 1022
Case 3:14-cv-08165-DUC   Document 193-23   Filed 03/01/19   Page 986 of 132
PageID: 16179

747

1    termination of the leases for over two decades.

2         The critical part of this particular aspect of the

3    calculation is determined, since the wastes are commingled by

4    the reclamation, how to, in fact, equitably divide what volume

5    of waste should be assigned as a volume that was created during

6    the mining phase, and what volume should be assigned equitably

7    as having been created or added to that volume during the

8    reclamation phase.

9         For equitable purposes, the way I did that was

10   relatively simple.  It was actually -- part of it was put up on

11   a chart earlier by the United States.  That was to accept the

12   volume of waste for reclamation purposes, that was moved, that

13   was contracted for by the -- during the reclamation phase by

14   the NAML.  And I subtracted from that the total volume that was

15   calculated as having been the volume that was in the mine pits

16   taken out, expanded by a percentage to take -- to take care of

17   the fact that it, in fact, is no longer compacted soil, and

18   removed from that any ore that was taken out, i.e., what waste

19   was created by the mining operations.

20        And by doing that, in essence, taking the doughnut

21   hole out of the doughnut, if you look at it from an area

22   standpoint, the doughnut hole itself being that waste that was

23   created during the mining period, I wanted to be sure to

24   equitably not double count and charge either the United States

25   or the mining companies inappropriately for waste that had been

ALCD-PUBCOM_0003210

Case 2:22-cv-07326-MCA-LDW   Document 309-23   Filed 04/01/24   Page 987 of 1022
Case 3:14-cv-08165-DGC   Document 193-2   Filed 05/01/19   Page 97 of 132
PageID: 16180
748

1   commingled.

2   Q.  You heard today some testimony about the relative size of

3   the sites and the reclamation that had been done by the Navajo

4   tribe --

5   A.  Yes.

6   Q.  -- and the expansion of that, the growing larger of the 19

7   mine sites, or some of them.  Did you hear that testimony?

8   A.  I did.  I mean, in two ways, one of which could potentially

9   have an aspect with the allocation, the other which, honestly,

10  is not relevant, that is the migration of some of the waste

11  from on-site to other areas.

12          In this particular allocation, the ultimate

13  determination of the cost of the remedy is not applicable.  If

14  you have the same relationship, with the same risk, with the

15  same contaminant, it doesn't matter exactly what the final

16  remedy is as long as it is common across all the sites, which

17  appears to be the case here to me.  It's just a matter of

18  setting out the relationship between the parties for whatever

19  the ultimate cost might be.

20          The second was information that I had not heard

21  before, which was that there was additional layering of

22  reclamation waste on top of what I calculated as the original

23  reclamation volume from the AML records, that there may be, in

24  other circumstances, additional waste that were brought onto

25  the reclamation lands that I was not aware of that just weren't

ALCD-PUBCOM_0003211

Case 2:22-cv-07326-MCA-LDW  Document 309-23  Filed 04/01/24  Page 988 of 1022
Case 3:14-cv-06115-DOC  Document 192-23  Filed 05/01/19  Page 98 of 132
PageID: 16181

749

```
 1    included in my calculations.  But that's -- I mean, the only
 2    thing that would do is potentially weight the total volume as a
 3    percentage of the reclamation higher than some of the others by
 4    a fraction.  It doesn't sound like it would have a major
 5    impact.
 6              MR. VOORHEES:  Okay.  Let's go to the -- the last
 7    subject matter here, Your Honor, and that is the calculation of
 8    the recommended equitable allocation.  This is a formula.  And
 9    I want to -- I want to go over this somewhat carefully with
10    Mr. Batson so we get this right.
11    BY MR. VOORHEES:
12    Q.  I'm sorry, it's late in the day for this, but we have a
13    mathematical formula here, do we not, Mr. Batson?
14    A.  We do.  And we've had several throughout the entire
15    process.
16    Q.  Okay.  Will you just, as clearly as you can, explain for --
17    for the parties and for the Court, most importantly, what is
18    the actual allocation formula that results in a shared
19    allocation for the case, one part for the El Paso Company, and
20    one part for the United States?
21    A.  For simplicity sake, it, in essence, is determining what an
22    individual share would be trued up to 100 percent for each
23    party for each time frame and then adding the three together.
24              In essence, for example, for the exploitation period,
25    you determine what the share is.  You take the share that you
```

ALCD-PUBCOM_0003212

Case 2:22-cv-07326-MCA-LDW   Document 309-23   Filed 04/01/24   Page 989 of 1022
Case 3:14-cv-06165-DGC   Document 192-23   Filed 09/01/19   Page 93 of 132
PageID: 16182
750

1   have already determined which is associated with each of the

2   parties for that activity, and you multiply it by the share

3   assigned to that party from an equitable standpoint.  You come

4   up with a percentage.  They are added together to come up with

5   a total allocated share for the entire three activity periods.

6           I mean, here the activity periods as a baseline were

7   determined, and this -- this will shift slightly based on

8   changes that have been made, particularly last night that we

9   talked about earlier, but in a relative sense, it's about the

10  pre-ore exploitation phase comes out to be somewhere around 9

11  percent of the overall waste that was created, the ore

12  exploitation phase --

13          THE COURT:  You called that -- you called that, the

14  first phase exploitation.

15          THE WITNESS:  I'm sorry, the pre-ore exploitation is

16  what I had written in the record.  We were going to call it the

17  exploration phase.  I apologize, Your Honor.

18          The exploration phase about 9 percent, the ore

19  exploitation phase, the mining phase, is somewhere around

20  50 percent, and the delta of 30 -- 40 percent, basically, is

21  reclamation.  And I am estimating what the current figures are,

22  I'm sorry.  I will have to provide those with the calculations

23  last evening.

24          Using those then as the multiplier against the share

25  of each party during each period of time, you come up with --

ALCD-PUBCOM_0003213

1    with the formulation for their ultimate share.

2    BY MR. VOORHEES:

3    Q.  And that changed yesterday, right, with the adjustments

4    that we made?

5    A.  It did.

6    Q.  And so I want to -- I just want to get this in the record

7    so we have a clear -- clear record of this, but when we -- when

8    we did this back in September of 2016, your allocation was

9    89.87 percent to the United States and 10.13 to the

10   government -- I'm sorry, to El Paso?

11   A.  That is correct.

12   Q.  And we heard yesterday, with regard to the Ryan 2

13   adjustment based on Mr. Beahm's discovery of the mistaken

14   identification of Ryan 2, that there was -- there was a change

15   then?

16   A.  And that -- that was the -- the bolstered database in June

17   of 2018, if I remember right.  I ran the calculations at that

18   point through the -- through the formula, through the

19   algorithm.  It shifted so that the El Paso share was increased

20   to 11.16 and the United States was reduced to 88.84.

21   Q.  Okay.

22   A.  By that change.

23   Q.  And we did that, I take it, right after that discovery was

24   made and the government was informed of the Ryan 2 mistake, I

25   guess, or the clarification?

Case 2:22-cv-07326-MCA-LDW   Document 309-23   Filed 04/01/24   Page 991 of 1022
Case 3:14-cv-08165-DGC   Document 333-3   Filed 03/01/19   Page 1019 of 1022
PageID: 16184
752

1   A.  Right.

2   Q.  And then yesterday for the further adjustment?

3   A.  Right.

4   Q.  What is the --

5   A.  Last night I took into account, as was mentioned

6   previously, pulling back out of the dataset as a question and

7   placing on the responsibility of the mining company the volumes

8   associated with the drill trails and the rim stripping from

9   mines 5, 6, and 9, I recalculated, and it changed the final

10   outcome again to the El Paso being responsible for

11   13.23 percent and the United States being responsible for

12   86.77 percent.

13           MR. VOORHEES:  Okay.  I have one more matter, thank

14   you, Colleagues, for this.

15   BY MR. VOORHEES:

16   Q.  Now, we have heard that the United States would like a

17   couple of credits in assessing allocation.  And the big one,

18   I'll start with that, is the Tuba City mill.  And in our

19   opening we heard that the government wanted a credit of -- it's

20   on the demonstrative, U.S. Demonstrative 24 -- now, here's the

21   figure $130,858,413, and this is for the money that the

22   government has spent with the prior remediation of the Tuba

23   City mill and the future operations and maintenance of the Tuba

24   City mill, which actually they refer to as future groundwater

25   costs.

ALCD-PUBCOM_0003215

```
 1              And, Mr. Batson, I want you to comment on this so we
 2   can get this out in the open.  Obviously, El Paso is opposing
 3   this.  Would you -- would you inform the Court whether or not
 4   in your experience as an allocator for EPA, and, you know,
 5   since leaving the agency, have you ever had a situation like
 6   this where -- and we'll start with an UMTRCA mill was credited
 7   to the United States government for cleaning up the mill?
 8   A.  No, I have not.
 9   Q.  And is that -- there is probably going to be some legal
10   reasons for that, but I just want to ask you just practically,
11   I don't want you to give an opinion to the Court on the law or
12   anything, but have you ever heard of anything like that?
13   A.  You know, I have not.  And I have a major concern from an
14   allocation practice, as an allocation practitioner and
15   consultant regarding that.  In that, the concept of an
16   allocation, the intent and purpose of an allocation practice,
17   as it has been developed within the Superfund industry and by
18   the courts, is specifically to allow a method to equitably
19   distribute the costs of a remedy at a Superfund site amongst
20   the parties who created that risk.
21              Here we have a clear relationship between the parties
22   that we've been discussing that created a common risk which is
23   going to be remediated at this Superfund site on the Cameron
24   Plateau.
25              The concept of somehow crediting a cost which is not
```

Case 2:22-cv-07326-MCA-LDW    Document 309-23    Filed 04/01/24    Page 993 of 1022
Case 3:14-cv-08165-DGC    Document 533    Filed 05/01/19    Page 103 of 132
PageID: 16186

754

```
 1    associated with the remedy, an activity that's not driving the
 2    remedy, is completely outside the concept of an allocation that
 3    has been developed under Superfund practice and by the courts.
 4    I mean, it's as if we were saying that a -- someone who runs a
 5    well field on the Gulf of Mexico and put it in a pipeline and
 6    took it to New Jersey where the refinery was is somehow
 7    supposed to be responsible under CERCLA for the clean up under
 8    a different statute for the refinery in New Jersey.  I mean, it
 9    just defies logic as we approach it from a straight Superfund
10    allocation method, and so I -- I can't accept that as something
11    that the Court should consider.
12    Q.  Okay.  And another thing, I know it's coming, so I might as
13    well bring it up now, yesterday we were -- we were listening to
14    a cross-examination of Mr. Herken -- I'm sorry, Mr. Beahm,
15    which clearly indicated that the state of Wyoming produced more
16    uranium than Arizona and -- 100 times more.  And would you ever
17    consider the value of 100 times the volume of ore in Wyoming as
18    a factor in determining the benefit, I'm asking about benefits
19    now, to -- to the -- to the parties, would you ever consider
20    that the -- the --
21    A.  No, I wouldn't.  And, in this particular situation,
22    specifically, I would not want to do that or see the Court do
23    that, in that we have the United States clearly seeking
24    uranium, paying a unit price for that uranium across all
25    sectors, receiving that uranium and using it as part of their
```

ALCD-PUBCOM_0003217

Case 2:22-cv-07326-MCA-LDW   Document 309-23   Filed 04/01/24   Page 994 of 1022
Case 3:14-cv-08165-DCC   Document 336-3   Filed 03/01/19   Page 104 of 132
PageID: 16187

755

```
 1    national defense program, regardless of where it's received.

 2            The fact that a higher percentage happens to be

 3    received from a domestic source other than these mines, or

 4    received from a foreign source, is not relevant to the

 5    allocation of the responsibility for the risk that's created by

 6    the activity at this specific site in any way.

 7            MR. VOORHEES:  Okay.  Your Honor, with that, I'll turn

 8    over the witness.

 9            THE COURT:  Cross-examination.

10            MR. AUGUSTINI:  Your Honor, is the plan to go to 4:30

11    today?

12            THE COURT:  Yes.

13            MR. AUGUSTINI:  Thank you.

14                         CROSS-EXAMINATION

15    BY MR. AUGUSTINI:

16    Q.  Good afternoon, Mr. Batson.

17    A.  Good afternoon.

18    Q.  Before I forget, I wanted to start with something that you

19    mentioned on your direct testimony with counsel.  You stated

20    that in your Rule 26 reports you chose to articulate your

21    opinions based on the soil volume methodology, correct?

22    A.  That I chose the soil volume as the exemplar instead of the

23    area because I thought it was more conservative, yes.

24    Q.  More conservative.  And the difference was, with respect to

25    the soil volumes --
```

Case 2:22-cv-07326-MCA-LDW    Document 309-23    Filed 04/01/24    Page 995 of 1022
Case 3:74-cv-08165-DGC    Document 533    Filed 03/01/19    Page 105 of 132
PageID: 16188
756

1    A.   They're very close, very close.  That was one -- actually,

2    one thing that thought -- that allowed me to think that the

3    system I had set together was working very well because they

4    were very close.

5    Q.   Right.  So --

6    A.   A couple hundredths off.

7    Q.   Just let me ask the questions, please, and pause before you

8    answer.

9              So being conservative, the numerical difference

10   between the two approaches, soil volume and area, was 89 to

11   90 percent?

12   A.   Very close.

13   Q.   Yeah.

14   A.   Yeah.

15   Q.   You took the one percent off?

16   A.   I didn't take anything off.  I selected the one that, in

17   fact, was a slightly higher percentage on the side of the

18   United States.  I made no change between them.  They were run

19   independently.

20   Q.   Either way, you're saying El Paso should pay no more than

21   10 percent of the costs, correct?

22   A.   The calculation, as I ran the algorithm, came out with that

23   result, yes.  I leave the discretion to the Court as to how he

24   applies the details of the method.

25   Q.   Okay.  And just to confirm, although you're an attorney,

Case 2:22-cv-07326-MCA-LDW   Document 309-23   Filed 04/01/24   Page 996 of 1022
Case 3:14-cv-03165-DCC   Document 93-3   Filed 03/01/19   Page 106 of 152
PageID: 16189
757

 1    counsel already mentioned, you're not going to offer any legal

 2    opinions or conclusions --

 3    A.   No.

 4    Q.   -- in support of your opinions, correct?

 5    A.   None whatsoever.  Recommendations, suggestions, yes, no

 6    legal opinions.

 7    Q.   The Court's free to disregard your opinions in their

 8    entirety and simply make an equitable determination within the

 9    Court's own discretion, correct?

10    A.   Clearly.

11    Q.   Now, with respect to your experience, Mr. Batson, I'd like

12    to spend a few minutes going through some of the cases that you

13    have listed on your resumé which was marked and admitted as

14    Exhibit 9 A.

15         Turning to the second page, which is marked with the

16    number 0090034, you've listed a number --

17    A.   I'm sorry, in this -- in this book?

18    Q.   I received it as a separate exhibit from El Paso's counsel.

19    A.   Okay.  Thank you.

20    Q.   And is this a copy of your resumé from your Rule 26 report,

21    sir?

22    A.   That it is.

23    Q.   You see on the second page starting with the Tennessee

24    Products Site in Tennessee?

25    A.   Yes.

Case 2:22-cv-07326-MCA-LDW   Document 309-23   Filed 04/01/24   Page 997 of 1022
Case 3:14-cv-06165-DCC   Document 133-3   Filed 03/01/19   Page 107 of 152
PageID: 16190
758

1  Q.  Then there is a matter below that, Yosemite Slough

2  Superfund Site, California?

3  A.  Yes.

4  Q.  In that matter you were a convening neutral, correct?

5  A.  I was convening neutral but assisted the parties with their

6  early issues around designing a process for allocation,

7  assisting them in selecting an allocation neutral that would

8  undertake that design to process, and help them with some of

9  their early allocations just for operating costs, that type of

10  a thing, yes.

11  Q.  Right.  So, to sum up, you assisted the parties in bringing

12  in someone else to perform an allocation, correct?

13  A.  No.  I assisted the parties in designing an allocation

14  process that they used to higher another party that then went

15  on with the parties to conduct that process and helped them

16  with the allocation of their earlier cost issues.

17  Q.  So you did not perform the allocation, someone else did?

18  A.  I performed an allocation, I did not perform the ultimate

19  allocation in that case.  It's not unusual for Superfund sites

20  to have a series of allocations --

21  Q.  Mr. Batson, just answer my questions.  I don't want to

22  interrupt you, but let's stick to what I'm asking.  Okay?

23  A.  Okay.  I will just note where I'm not able to answer then.

24  Q.  Very good.  So with respect to the Lower Passaic River

25  Superfund Site in New Jersey --

Case 2:22-cv-07326-MCA-LDW   Document 309-23   Filed 04/01/24   Page 998 of 1022
Case 3:14-cv-08165-DGC   Document 138-6   Filed 03/01/19   Page 103 of 152
PageID: 16191
759

1   A.   Yes.

2   Q.   -- same situation there, you were involved initially, and

3   then you assisted the parties bringing in someone else to

4   perform allocation steps, correct?

5   A.   At the Passaic River?

6   Q.   Yes.

7   A.   I am currently retained by the PRP group to perform an

8   allocation on their behalf.

9   Q.   And that happened since 2016 then?

10  A.   I am currently doing it.  I've been continuously doing it

11  since 2016.

12  Q.   So you didn't testify at your deposition then that someone

13  else was brought in to do that?

14  A.   At the -- at the Passaic -- there is two phases of the

15  Passaic case.  Actually, there is three phases to the Passaic

16  case.  There was the phase that I was involved in as a

17  convening neutral and someone that provided an allocation for

18  the initial cost for that site, and that was back in, what, 10

19  years ago, 15 years ago.  I forget the exact time.

20        At that point I went in, assisted the parties in

21  dealing with their initial allocation of operating costs,

22  worked with the parties as a convening neutral, assist them in

23  hiring a party that did PRP searches.  Actually, I helped --

24  the agency helped to pay for part of those neutral services for

25  PRP search purposes, and to go on to perform their first

ALCD-PUBCOM_0003222

Case 2:22-cv-07326-MCA-LDW   Document 309-23   Filed 04/01/24   Page 999 of 1022
Case 3:14-cv-08165-DCC   Document 83-23   Filed 03/01/19   Page 109 of 132
PageID: 16192
760

1    allocation.

2              I have been employed since mid 2015 as a full-time

3    neutral working with the now current PRP group to do their

4    final allocation as it relates to the full two billion dollar

5    remediation.

6    Q.  So you haven't issued your opinion yet, correct?

7    A.  I am in the process of working the parties.  As you may

8    know, from the period of time for some of these allocations as

9    complex as Passaic, can be several years.

10   Q.  Now, with respect to the next, which I'm going to refer to

11   as Saginaw Bay Superfund Site, Michigan, again, that was a

12   sediment case, correct?

13   A.  This is the Upper Trenton?

14   Q.  It's called Tittabawsee, if that's how you say it.

15   A.  Tittabawsee/Saginaw, yes.

16              THE COURT:  Would you spell that for the court

17   reporter, please?

18              MR. AUGUSTINI:  Yes, Your Honor.

19   T-I-T-T-A-B-A-W-S-E-E, River, slash, Saginaw Bay.

20   BY MR. AUGUSTINI:

21   Q.  Mr. Batson, that was another sediment case involving

22   dioxin, according to your resumé, correct?

23   A.  It was, yes.

24   Q.  You performed no allocation in that matter, correct?

25   A.  I served as an allocation neutral assisting the parties in

 1  mediating their early disputes and assisting them in finding a

 2  party to continue to assist them as a mediator.

 3  Q.  So that's a no, correct?

 4  A.  I did not conduct an allocation in that case.

 5  Q.  Now, on the Portland Harbor Superfund case, another

 6  sediment case in Portland, Oregon, correct?

 7  A.  Uh-huh, PDX.

 8  Q.  Again, you had some involvement assisting the parties in

 9  the early stages, right?

10  A.  Yes.  I worked as a convening neutral and assisted them in

11  their first allocation of how they were going to cover their

12  costs and bring in another allocation specialist that I assist

13  them in finding, selecting, and hiring.

14  Q.  So the plan with respect to Portland Harbor was also to

15  bring in another person to deal with the allocation issues?

16  A.  After the design of the allocation, yes.

17  Q.  Next matter on your resumé, Exhibit 9 A, Kalamazoo River

18  Superfund Site, Michigan, another sediment dioxin case?

19  A.  Yeah.

20  Q.  I understand from your deposition testimony, similar model

21  there.  You were brought in to assist the parties in the

22  initial stages, and then another mediator was selected for the

23  remedial design, remedial action phase, correct?

24  A.  This goes back to my role when I was at the agency where I

25  was serving as an expert in allocation provided by the agency

ALCD-PUBCOM_0003224

Case 2:22-cv-07326-MCA-LDW   Document 309-23   Filed 04/01/24   Page 1001 of 1022
Case 3:14-cv-06763-DGC   Document 793-23   Filed 05/01/19   Page 115 of 152
PageID: 16194

762

 1   to parties to assist in the designing an allocation process,

 2   and at many of the sites to assist them in designing the

 3   allocation process, using that as the basis of finding,

 4   retaining specialists that would work with them just so I could

 5   go on to work for another site and not spend the, you know, two

 6   or three years to run the actual allocation, yes.

 7   Q.  So the short answer is yes, correct?

 8   A.  Exactly as I described it, yes.

 9   Q.  All right.  Next matter on page 3 of your resumé, maybe an

10   interesting one, it involves a uranium mine, the Midnite Mine.

11   That's the Newmont mining case that's a matter of reported

12   decision, CERCLA context, correct?

13   A.  Right.  There I was serving as a mediator.  I was not

14   involved in the allocation process at all.

15   Q.  So you're not drawing from any experience that you gained

16   with respect to your limited role at that time in the Midnite

17   mine case?

18   A.  I like to think that as an allocation specialist I'm able

19   to draw from a number of different experiences.  I did not

20   conduct an allocation there.

21   Q.  Okay.  I'm going to skip down to the Kelly Air Force Base

22   Texas matter you've listed on your resumé, appears to involve a

23   U.S. Air Force Base in Texas?

24   A.  Yes.  Again, I was serving as a mediator in that case, both

25   -- sort of on two levels, one, mediating the issues between the

ALCD-PUBCOM_0003225

Case 2:22-cv-07326-MCA-LDW   Document 309-23   Filed 04/01/24   Page 1002 of 1022
Case 3:14-cv-06165-DGC   Document 593-23   Filed 09/01/19   Page 1129 of 132
PageID: 16195

763

```
 1   air force base and the local community, but also serving and
 2   assisting the local community and public involvement activities
 3   with the agency.
 4   Q.  Was that a CERCLA case?
 5   A.  No, it was not.
 6   Q.  Underneath that matter, Baton Rouge SIP, capital S-I-P.
 7   A.  That was a water case.  Oh, the SIP, no, that was -- Baton
 8   Rouge was an air case.  It was a dispute between a local
 9   environmental group, city of -- EPA, it had the city of Baton
10   Rouge and the Louisiana State Department involved and
11   Environmental Protection involved.
12   Q.  That's not particularly relevant here as well, correct, air
13   pollution case?
14   A.  I like to think that mediating between state, federal
15   governments and environmental groups is something you can learn
16   from, yes, though it isn't relevant to the allocation, no.
17   Q.  Underneath that you have another reference to a mine, the
18   Barrick, B-A-R-R-I-C-K, Cortez, C-O-R-T-E-Z, mine.  And where
19   was that located, sir?
20   A.  The mediation I was involved in actually occurred in the
21   D.C. area.  I don't remember the actual mine.  I don't know
22   where the location of the mine was, I apologize.  I don't
23   remember.  That was many years ago.
24   Q.  Okay.  That was a gold mining case, or operation, according
25   to your CV?
```

ALCD-PUBCOM_0003226

Case 2:22-cv-07326-MCA-LDW   Document 309-23   Filed 04/01/24   Page 1003 of 1022
Case 3:14-cv-06155-DGC   Document 93-23   Filed 03/01/19   Page 1139 of 192
PageID: 16196

764

1   A.  Yes, it was.

2   Q.  And at your deposition you told me, if I recall, and we can

3   check if we need to, that you performed no allocation there?

4   A.  As is noted here, I served as a mediator of the

5   negotiations between the EPA and corporation.

6   Q.  And there were RCRA and EPCRA?

7   A.  EPCRA.

8   Q.  EPCRA, not CERCLA claims?

9   A.  Correct.

10  Q.  Underneath that the U.S. v. Texas Eastern Gas Pipeline

11  matter.  Does not appear to involve any CERCLA allocation

12  issues, correct?

13  A.  No.  In that particular situation I was actually serving as

14  a negotiator for the agency.

15  Q.  Okay.

16  A.  Same with the last one, I was serving as a negotiator for

17  the agency, the US v. Olin Chemical in Alabama.  I did start my

18  career there.

19  Q.  Now, when you were at EPA, from the enforcement

20  perspective, allocation issues are not normally at the top of

21  EPA's mind due to its enjoyment of joint and several liability;

22  is that correct?

23  A.  Actually, no.  The reason that I existed in the agency and

24  the reason I have the unique position I had, was the agency's

25  interest in ensuring there was effective allocations occurring

Case 2:22-cv-07326-MCA-LDW   Document 309-23   Filed 04/01/24   Page 1004 of 1022
Case 3:14-cv-06156-DGC   Document 993-23   Filed 09/01/19   Page 1149 of 192
PageID: 16197
765

1    in the private sector.

2            The agency was much more interested in having a

3    completely allocated PRP group speaking as one voice when they

4    entered negotiations for RI/FSs for RD/RAs, instead of having

5    to negotiate or litigate against individual parties.  And so I

6    was provided to the private sector specifically to assist them

7    in the allocation efforts.

8    Q.  Sure.  If cooperation occurs between PRP groups, that's in

9    EPA's interest, right?

10   A.  Oh, clearly.  It's in the self-interest of the government

11   just from a litigation efficiency effort and nothing more.

12   Q.  Now, you mentioned during your direct that no one has ever

13   questioned your opinions before, correct?

14   A.  No one has questioned my opinions in a litigation regarding

15   the concept of an allocation proposal.  Clearly -- clearly, any

16   allocation specialist works with parties and shares ideas to

17   create allocations.

18   Q.  Sure.  But the context says this is the first case you've

19   ever submitted a Rule 26 report in on allocation, correct?

20   A.  Clearly.

21   Q.  You expect to be questioned if you submit a Rule 26 report

22   in active litigation, right?

23   A.  I assume there will be a difference of opinion between the

24   parties, yes.

25   Q.  You mentioned as well you never testified in a CERCLA

ALCD-PUBCOM_0003228

Case 2:22-cv-07326-MCA-LDW   Document 309-23   Filed 04/01/24   Page 1005 of 1022
Case 3:14-cv-06165-DGC   Document 593-2   Filed 09/01/19   Page 139 of 192
PageID: 16198

766

 1   allocation case before, either at EPA or up to the present,

 2   right?

 3   A.   Never testified in a case, period, before.

 4   Q.   Before El Paso retained you for this matter, you had never

 5   worked on a CERCLA case involving a site in Arizona; is that

 6   right?

 7   A.   Not in Arizona.

 8   Q.   But you do know that the Cameron area falls within the

 9   jurisdiction of EPA Region 9, right?

10   A.   I do.

11   Q.   And EPA Region 9 is based in San Francisco, California,

12   correct?

13   A.   Yes.

14   Q.   When you were an EPA employee, you sometimes worked with

15   staff from EPA Region 9, right?

16   A.   Worked with staff from all the regions, including the San

17   Francisco office, yes, at various times.

18   Q.   And you understand that here, from the testimony of

19   Mr. Werth and others, that Region 9 is responsible for

20   overseeing El Paso's investigation of the Cameron mines, right?

21   A.   I do not know the details of that arrangement.  In theory I

22   understand that relationship.

23   Q.   Do you know who the current EPA project manager is for the

24   mines?

25   A.   I don't.

ALCD-PUBCOM_0003229

Case 2:22-cv-07326-MCA-LDW   Document 309-23   Filed 04/01/24   Page 1006 of 1022
Case 3:14-cv-06155-DUC   Document 993-23   Filed 05/01/19   Page 1169 of 192
PageID: 16199
767

1  Q.  Do you know the names of any of the project managers that
2  have been in place at EPA or Region 9 dating back to the time
3  of the AOC in 2013?
4  A.  Not that I have a memory of.  I'm bad at names.  I
5  apologize.
6  Q.  You never talked to any of the project management staff in
7  EPA Region 9 in connection with forming your opinions in this
8  case?
9  A.  Not that I have any memory of.
10 Q.  Same question with respect to the potential response
11 actions that may be relevant at the mines, you've never
12 received any information from anyone at EPA about that,
13 correct?
14 A.  I've never discussed with anyone at EPA in any regional or
15 headquarters office my activities under this particular matter.
16 As an allocation specialist, I question whether that would even
17 be appropriate.  I don't know.
18 Q.  It just wasn't something that you even considered doing,
19 correct?
20 A.  I have not spoken with anyone about that, no.
21 Q.  You're aware that El Paso has not agreed to perform any
22 response actions at the mine sites in the future, correct?
23 A.  Again, I don't know the details of that.  That is my
24 understanding from what I've heard here at the trial.
25 Q.  That was the testimony of Mr. Werth from Arcadis, correct?

ALCD-PUBCOM_0003230

```
 1   A.   I honestly don't remember the details of exactly whose
 2   voice I was listening to at the time, but that's the concept I
 3   have received.
 4   Q.   And if El Paso does not perform the response actions,
 5   that's, obviously, going to affect the costs that should be
 6   allocated, yes?
 7   A.   The allocation would be focused on a number of factors, one
 8   of those would be cooperation.  I assume the Court will
 9   undertake that into consideration in how to apply the
10   cooperation factor, yes.
11   Q.   And it would also -- if El Paso is able to extricate itself
12   from the situation, does nothing, all the volumes are zero,
13   correct?
14   A.   If by extricate you mean that there is a ruling by the
15   Court they're not liable under CERCLA, then it's not relevant
16   to the allocation.
17         I'm not exactly sure what you're asking.
18   Q.   Well, you're still allocating some pass costs, correct?
19   A.   Try -- try the question again.  I'm sorry.  I don't exactly
20   know what you're asking me to respond to.
21   Q.   Well, you're relying on soil volume and area impact
22   estimates, correct?
23   A.   As well as the application of equitable factors, yes.
24   Q.   That assumes those areas, or some areas will actually be
25   implicated in a response action?
```

ALCD-PUBCOM_0003231

Case 2:22-cv-07326-MCA-LDW Document 309-23 Filed 04/01/24 Page 1008 of 1022
Case 3:14-cv-06165-DGC Document 593-23 Filed 09/01/15 Page 1008 of 1022
PageID: 16201

769

1    A.  As I mentioned during my testimony, what specific parts of

2    this combination of sites gets remedied and what the ultimate

3    full cost of that remedy is is not relevant to the calculation

4    of the relative share between the United States and the company

5    as it relates to their work together creating waste, singular

6    waste that has a common risk that is going to be having, most

7    probably, a common type of remedy, similar type of remedy.

8    Q.  Sure.  So you're certainly not attempting to predict what

9    response actions will be performed at the sites?

10   A.  No.  I'm just saying it's not relevant.

11   Q.  You don't have any information about what those costs will

12   be, whatever the unit costs may be, correct?

13   A.  I have no information about the cost of the sites.  But,

14   again, the cost is irrelevant, for the sake of the allocation.

15   Q.  To be more specific, you don't know what the costs of the

16   various options are?

17   A.  I have no information about the cost of the options.

18   Again, I believe they are irrelevant to the concept of an

19   allocation in this case.

20   Q.  You testified that the unit costs are the same, so it's all

21   the same to you, but you don't know what those unit costs are,

22   correct?

23   A.  Again, we can keep -- we can keep saying the same

24   questions, I'm just saying that cost -- a unit cost and how

25   that's multiplied into an overall cost is not relevant to

ALCD-PUBCOM_0003232

Case 2:22-cv-07326-MCA-LDW   Document 309-23   Filed 04/01/24   Page 1009 of 1022
Case 3:14-cv-06165-DGC   Document 593-2   Filed 09/01/15   Page 1190 of 132
PageID: 16202

770

 1  whether or not an allocation can be done in this case.

 2  Q.  So whether the unit cost is one dollar or a million

 3  dollars, not important, right?

 4  A.  It's not relevant to whether an allocation can be done in

 5  this case.

 6  Q.  Other than your law degree, I wanted to get at any other

 7  training that you may be bringing to the table here.  You're

 8  not a geologist, correct?

 9  A.  Correct.

10  Q.  Not an engineer, correct?

11  A.  Correct.

12  Q.  No expertise in hard rock mining, correct?

13  A.  Correct.

14  Q.  No expertise in other types of mining, correct?

15  A.  Correct.

16  Q.  You're not an expert on the United States relationship as a

17  matter of the tribal trust with the Navajo Nation, correct?

18  A.  Correct.

19  Q.  In preparing your reports, you relied on a set of documents

20  that was compiled by El Paso's counsel, correct?

21  A.  For the most part, yes.

22  Q.  You reviewed the documents that counsel provided to you?

23  A.  I did.

24  Q.  And like the other El Paso experts, you did not have free

25  access to the complete set of documents both El Paso and the

ALCD-PUBCOM_0003233

```
 1    United States produced, right?

 2    A.   I cannot speak to what access other experts had.   I can --

 3    I'll rephrase your question.

 4    Q.   Fair enough.

 5    A.   I did not, you know, have free access to any documents.   I

 6    did request documents at times.   I did request different types

 7    of information in addition to what I have received initially,

 8    but I have no idea what the full record is.

 9    Q.   Well, you testified at your deposition you did not do

10    independent research into the facts beyond the materials that

11    El Paso provided.   Is that incorrect?

12    A.   I did not do field research and check and run those numbers

13    myself.   I did take the numbers, QC them, make sure that, in

14    fact, they were appropriately calculated, make sure they were

15    appropriately tabulated, did background to make sure that I

16    could rely on the numbers that were provided to me and the

17    method of which they were calculated, yes.

18    Q.   So you're referring specifically to the soil volume and

19    area inputs that came from Mr. Beahm?

20    A.   Yes, I am.

21    Q.   But in terms of the other historical facts that you're

22    relying on as the basis for your equitable opinions, the set of

23    facts that you relied on were provided by El Paso, right?

24    A.   They were.

25    Q.   And that included El Paso's expert reports, correct?
```

ALCD-PUBCOM_0003234

Case 2:22-cv-07326-MCA-LDW   Document 309-23   Filed 04/01/24   Page 1011 of 1022
Case 3:14-cv-06165-DGC   Document 593-23   Filed 09/01/19   Page 1249 of 1321
PageID: 16204
772

```
 1   A.  Clearly.
 2   Q.  But because you've been here at trial, you know that there
 3   are some facts that you didn't know about when you formed your
 4   opinions, correct?
 5   A.  I mentioned a few earlier, yes.
 6   Q.  For example, El Paso never told you about the Neztsosie
 7   lawsuit?
 8   A.  No.
 9   Q.  That El Paso had been sued in a tort litigation by a local
10   Navajo family relating to the open pits in the Cameron area in
11   the 1990s?
12   A.  No.  I have no knowledge of that lawsuit or its details.
13   Q.  You had no knowledge of the deposition testimony by Nancy
14   Prince, El Paso's former environmental project manager, in the
15   1990s?
16   A.  No, I do not.
17   Q.  So you weren't aware of the company's level of knowledge
18   about the potential risks associated with the mine sites in the
19   1990s?
20   A.  19 -- that their knowledge in the 1990s?
21   Q.  Correct.
22   A.  Their knowledge in the 1990s I don't believe is relevant to
23   the basic allocation here.
24   Q.  So it's not relevant that El Paso knew that local Navajo
25   were using the pits for recreational or livestock purposes?
```

ALCD-PUBCOM_0003235

Case 2:22-cv-07326-MCA-LDW   Document 309-23   Filed 04/01/24   Page 1012 of 1022
Case 3:14-cv-06165-DCC   Document 99-23   Filed 09/01/15   Page 1229 of 1312
PageID: 16205
773

```
 1    A.   I believe the knowledge of the hazard created by the risk
 2    during the time of mining was relevant, but not at the time
 3    that they had already terminated the lease, turned over the
 4    land to the United States, could not access the land because it
 5    was United States property.
 6    Q.   So your opinion based on knowledge of the risks does not
 7    include consideration of those facts?
 8    A.   It does not include consideration of the relative risk and
 9    understanding of the risk in the 1990s, that's correct, between
10    the United States and the company.
11    Q.   Now, you also did not speak with El Paso's project manager
12    currently, Mr. Stavinoha?
13    A.   That's correct.
14    Q.   And he's the person on the El Paso side who is managing the
15    investigation, right?
16    A.   I do not know.  It's beyond my knowledge.
17    Q.   You also did not speak to Mr. Werth from Arcadis before you
18    rendered your opinions, correct?
19    A.   That is correct.  Did not speak personally, no.
20    Q.   And you heard his testimony that he's been involved in
21    these projects since 2013/14?
22    A.   I was in the courtroom and listened to his testimony, yes.
23    Q.   Now, at your deposition you testified that El Paso's other
24    retained experts were essentially the primary references that
25    you were using for your understanding of the facts; is that
```

ALCD-PUBCOM_0003236

Case 2:22-cv-07326-MCA-LDW Document 309-23 Filed 04/01/24 Page 1013 of 1022
Case 3:14-cv-06105-DGC Document 393-23 Filed 09/01/15 Page 1239 of 131
PageID: 16206

774

```
 1   correct?
 2   A.   And the -- a number of the background documents upon which
 3   their experts would base which are in the listing of expert
 4   reports that we exchanged.  So I looked at the source documents
 5   that were related to some of their testimony.
 6   Q.   So other than going back and reviewing some of the source
 7   documents, there is no other independent analysis that you
 8   performed to understand the facts, correct?
 9   A.   No additional research other than that, no.
10   Q.   Some of the facts that you assumed have turned out to be
11   incorrect, right?
12   A.   I could not necessarily agree with that.  What specifically
13   are you talking about?  I would be glad --
14   Q.   Exploration drilling?
15   A.   I would be glad to respond to an --
16   Q.   Let me be more specific.
17   A.   Yeah, please.
18   Q.   Exploration drilling.  You assumed based on Mr. Beahm's
19   opinions set forth in his reports that the United States was
20   responsible for all exploration drilling, correct?
21   A.   I believed, in looking at the information that I had, that
22   but for the Ramco sites, the United States was responsible,
23   yes.
24   Q.   So you --
25   A.   Not for all of it.  I mean, the Ramco sites, they had heavy
```

ALCD-PUBCOM_0003237

Case 2:22-cv-07326-MCA-LDW   Document 309-23   Filed 04/01/24   Page 1014 of 1022
Case 3:14-cv-06105-DGC   Document 993-23   Filed 09/01/15   Page 1249 of 1252
PageID: 16207
775

```
 1    equipment.  The exploration and both the drilling versus the

 2    United States was different.

 3    Q.  So you simply accepted Mr. Beahm's statements regarding

 4    that in performing your allocation?

 5    A.  I accepted with -- with, you know, checking out the details

 6    of who I thought Mr. Beahm was and the accuracy of his

 7    information, details and information that was provided by him,

 8    yes.  For, you know, purposes beyond that, and we could go

 9    through each of them, whatever the numbers were for the

10    different activity stages, his approach made sense.

11    Q.  Same with respect to the rim stripping allegations.

12    Mr. Beahm rendered his opinions and you adopted them and

13    incorporated them into your analysis, right?

14    A.  The information and how it was produced was logical and

15    made sense to me.  I adopted that data.

16    Q.  And with respect to the mining waste volume estimates, it

17    never occurred to you to question the volumes that Mr. Beahm

18    estimated in his reports, correct?

19    A.  I re-ran a few of them to make sure they were accurate, and

20    once I had a sample that showed that the methodology seemed to

21    be accurate, I accepted the rest, yes.

22    Q.  Whatever changes he made in between his initial and his

23    rebuttal report, you also accepted all of those changes,

24    correct?

25    A.  I asked for an explanation so I could understand it and
```

ALCD-PUBCOM_0003238

Case 2:22-cv-07326-MCA-LDW   Document 309-23   Filed 04/01/24   Page 1015 of 1022
Case 3:14-cv-06105-DDC   Document 593-2   Filed 09/01/19   Page 1239 of 131
PageID: 16208

776

1    make sure it was appropriate.  Once I understood it, I did

2    accept those changes, yes.

3    Q.  And the 67 percent increase in the mining waste impact that

4    has occurred as a result of the Ramco 20, 22, Ryan 2 error is

5    also being incorporated into your analysis, at least as of

6    yesterday evening?

7    A.  What specifically are you referring to?

8    Q.  Mr. Beahm's testimony that he is -- he had to increase the

9    mining impacts that he estimated in his Rule 26 reports after

10   discovering that he had made a mistake with respect to the

11   Ramco sites, correct?

12   A.  That is correct.  And as was noted, that was the reason,

13   due to that change, that the relationship between the United

14   States changed substantially during that time period.

15   Q.  And other than those changes which have been described in

16   the last few days in court several times, you're still

17   accepting everything else Mr. Beahm has said, correct?

18   A.  For the sake of this allocation, yes, I am.  I will leave

19   it to the Court's discretion what data they should use in

20   putting this information into their own calculations.

21          MR. AUGUSTINI:  Your Honor, I can continue until 4:30

22   or this might be a reasonable break.  Would you like me to

23   continue?

24          THE COURT:  Let's go to 4:30.

25          MR. AUGUSTINI:  Yes, sir.

Case 2:22-cv-07326-MCA-LDW   Document 309-23   Filed 04/01/24   Page 1016 of 1022
Case 3:14-cv-06185-DGC   Document 99-28   Filed 03/01/19   Page 1209 of 191
PageID: 16209

777

 1  BY MR. AUGUSTINI:

 2  Q.  With respect to your opinions regarding the reclamation

 3  impacts --

 4  A.  Yes.

 5  Q.  -- I believe the volumes worked out to be, you didn't have

 6  the current numbers and that's -- that have been revised since

 7  last night, but you said in your direct that the total amount

 8  or volume of disturbance that's now being attributed to the

 9  Navajo reclamation is about 30 to 40 percent of total impacts.

10  Does that sound about right?

11  A.  Approximately.  And I can get the specifics for you so you

12  can have it tomorrow morning.  I actually can put this

13  together, if the Court would like, into a new calculation that

14  could be explained with the methodology used and the outcome

15  numbers.

16  Q.  That's fine for today, Mr. Batson, the approximate ranges

17  to have in mind, but the point about this piece of your opinion

18  is that there is no equitable factors being considered

19  whatsoever, correct?

20  A.  In this -- in that particular piece, given the fact that

21  there was one operator involved, I assigned -- equitably dealt

22  with the division of the waste created and that is the

23  allocation that's being suggested.

24  Q.  So it's 100 percent U.S.?

25  A.  It's 100 percent U.S. for the additional volume that was

ALCD-PUBCOM_0003240

Case 2:22-cv-07326-MCA-LBW   Document 309-23   Filed 04/01/24   Page 1017 of 1022
Case 3:14-cv-06165-DGC   Document 993-23   Filed 05/01/19   Page 1279 of 1321
PageID: 16210
778

```
 1   created by the U.S. during the reclamation period.
 2   Q.  And your testimony was that the United States is an
 3   operator with respect to reclamation?
 4   A.  That is my recommendation, yes.
 5   Q.  So if the Court -- you're not rendering an opinion on
 6   liability, however, correct?
 7   A.  I am not making a legal opinion anymore than I am for any
 8   of the other classifications.
 9   Q.  And if the Court disagrees with that conclusion, that
10   impacts your analysis, correct?
11   A.  I leave it to the Court's discretion to make their own
12   legal determinations, yes.
13   Q.  I believe you mentioned that --
14   A.  And I -- I mean, I would assume, I mean, if the Court
15   decided that the United States was not an operator in some way,
16   that as a matter of allocation practice, then the Court would
17   have to decide how to deal with what, in essence, is an orphan
18   share, given there would have been no one responsible for
19   having created the wastes.
20   Q.  You testified that the Navajo Nation was acting as an agent
21   for the United States.  That's -- that's your opinion, sir,
22   isn't it?
23   A.  That is the basis for the allocation, yes.
24   Q.  So you don't believe that the Navajo Nation was acting in
25   its sovereign capacity consistent with its role to protect the
```

ALCD-PUBCOM_0003241

Case 2:22-cv-07326-MCA-LDW   Document 309-23   Filed 04/01/24   Page 1018 of 1022
Case 3:14-cv-06175-DOC   Document 993-23   Filed 05/01/19   Page 1289 of 1312
PageID: 16211

779

 1   health and people of the Nation?

 2   A.  I'm sure they had many different aspects involved to their

 3   approach and their desire to protect their people.  I'm

 4   suggesting that there was a relationship between the United

 5   States and the Navajo that should be considered as an equitable

 6   fashion to assert the responsibility of the United States in

 7   equity for that share of the waste that was created.

 8   Q.  But by agency do you mean that the United States in the

 9   traditional legal sense control the Navajo Nation's activities?

10   A.  As I said previously, I'm not suggesting a legal

11   determination for the Court.  I am stating the relationship

12   between the United States, the Navajo, as a matter of equity.

13   Q.  Well, the Navajo Nation -- you've heard Mr. Beahm's

14   testimony, correct -- the Navajo Nation performed the risk

15   assessments as part of the process leading up to the

16   reclamation, correct?

17   A.  Correct, under -- yeah, under a SMCRA grant, yes.

18   Q.  Well, the assessments came first; isn't that true?

19   A.  I don't have the details of how the SMCRA process was

20   evaluated or put through.  I'm just looking at the overall

21   relationship.

22   Q.  The Navajo Nation's insignia is on all of the technical

23   specifications for the project, correct?

24   A.  Maybe.  I don't know.

25   Q.  The Navajo Nation applied for grant funding to the United

ALCD-PUBCOM_0003242

Case 2:22-cv-07326-MCA-LDW    Document 309-23    Filed 04/01/24    Page 1019 of 1022
Case 3:14-cv-06165-DGC    Document 293-23    Filed 05/01/19    Page 1239 of 1312
PageID: 16212
780

1   States, right?

2   A.   They were provided a SMCRA grant, yes.

3   Q.   So the agency comes from the fact of funding, is that your

4   opinion?

5   A.   I'm sorry, is that a question?

6   Q.   Yes.

7   A.   Would you repeat, please?

8   Q.   Your opinion that there -- an agency relationship existed

9   between the United States and the Navajo Nation, does that come

10  from the funding of the project?

11  A.   There was, as we heard today, and as I reviewed from both

12  reports and background documents, there clearly was much more

13  of a relationship between the United States, EPA, and all

14  aspects of decisions that were made regarding establishing the

15  final clean up level for the site, how the money would be

16  spent.   Under SMCRA there had to be a determination by the

17  United States that it was appropriate.   I mean, there is many

18  aspects of the relationship between the two beyond just a

19  banker that is providing money to the Navajo.

20  Q.   There is a tribal trust relationship between the United

21  States and the Navajo Nation, correct?

22  A.   I am not saying there is not.   Of course there is.   The

23  courts have looked at that --

24  Q.   Doesn't EPA -- I'm sorry.   I didn't mean to talk over you.

25       Doesn't EPA coordinate with state governments and

ALCD-PUBCOM_0003243

Case 2:22-cv-07326-MCA-LDW   Document 309-23   Filed 04/01/24   Page 1020 of 1022
Case 3:14-cv-06765-DGC   Document 393-25   Filed 09/01/15   Page 138 of 192
PageID: 16213

781

```
 1   tribes all the time on environmental issues?
 2   A.  For many purposes, I'm sure they do.
 3   Q.  With respect to the implementation of the projects, the
 4   Navajo Nation issued the contracting bids, correct?
 5   A.  Beyond my expert knowledge.
 6   Q.  Navajo Nation selected the contractors for the reclamation,
 7   correct?
 8   A.  My general understanding, yes.
 9   Q.  Navajo Nation oversaw all the day-to-day management of the
10   reclamation project at the mine sites, correct?
11   A.  I can't answer yes or no to that because that's outside of
12   my specific knowledge.
13   Q.  No question that the reclamation, per Mr. Beahm's testimony
14   and others, was directly related to the mining disturbance that
15   occurred during El Paso's mining operations, right?
16   A.  Understand that the SMCRA grant was awarded to deal with a
17   physical hazard, yes, that was created by the mine sites.
18   Q.  You take no issue with the way the Navajo Nation performed
19   the reclamation, I take it?
20   A.  I have no opinion on how they performed the reclamation.
21   Q.  And you can't dispute Mr. Beahm's and Mr. Werth's testimony
22   that the reclamation provided a benefit to the public,
23   specifically to the Navajo people, correct?
24   A.  Again, I have no personal opinion on that.  They seem to
25   have experience that I would rely upon, yes, in that regard.
```

ALCD-PUBCOM_0003244

Case 2:22-cv-07326-MCA-LDW   Document 309-23   Filed 04/01/24   Page 1021 of 1022
Case 3:14-cv-06105-DGC   Document 99-29   Filed 05/01/19   Page 1319 of 132
PageID: 16214

782

```
 1              THE COURT:  All right.  We're going to break at this

 2    point.

 3              Mr. Augustini, Counsel, give me just a minute to

 4    calculate time and we'll talk about when we're going to start

 5    tomorrow.

 6              You can step down.

 7              THE WITNESS:  Thank you, sir.

 8              THE COURT:  Mr. Batson.

 9              All right.  Counsel, the time as of the end of the day

10    is El Paso has used ten hours and 58 minutes, the government

11    has used six hours and 42 minutes.

12              You'll recall we need to break at noon tomorrow.  I

13    think we should go ahead and start at nine.  We're about an

14    hour ahead of schedule in terms of our overall timing, so I

15    think that should give us enough time.  So let's be here at

16    nine, we'll break at noon for the day.

17              MR. NEUMANN:  Just a matter of housekeeping, Your

18    Honor, we have one last edit to address on our agreement with

19    the government on our documents to stipulate in.  We'll have

20    that for you tomorrow morning.

21              THE COURT:  Okay.  Fine.  All right.  See you in the

22    morning.

23              (Proceedings concluded at 4:33 p.m.)

24                        *          *          *

25
```

Case 2:22-cv-07326-MCA-LDW   Document 309-23   Filed 04/01/24   Page 1022 of 1022
Case 3:14-cv-06165-DGC   Document 99-23   Filed 03/01/19   Page 132 of 132
PageID: 16215

783

```
 1              C E R T I F I C A T E

 2

 3          I, CHRISTINE M. COALY, do hereby certify that I am

 4    duly appointed and qualified to act as Official Court Reporter

 5    for the United States District Court for the District of

 6    Arizona.

 7          I FURTHER CERTIFY that the foregoing pages constitute

 8    a full, true, and accurate transcript of all of that portion of

 9    the proceedings contained herein, had in the above-entitled

10    cause on the date specified therein, and that said transcript

11    was prepared under my direction and control.

12          DATED at Phoenix, Arizona, this 22nd day of February,

13    2019.

14

15

16

17          /s/ Christine M. Coaly
            Christine M. Coaly, RMR, CRR

18

19

20

21

22

23

24

25
```

ALCD-PUBCOM_0003246