**Tab 9, Part 4**
**Exhibits to OxyChem's March 22, 2023 Public Comments**

**OCC Cmt. Ex.51 - OCC Cmt. Ex.61**

# EXHIBIT 51

OxyChem's Comments in Opposition to Proposed Consent Decree,
*United States v. Alden Leeds, Inc., et al.*, Civil Action No. 2:22-cv-07326 (D.N.J.)

# Kirkpatrick & Lockhart LLP

Formed in the Commonwealth of Pennsylvania

One Newark Center
Tenth Floor
Newark, New Jersey 07102
973.848.4000
973.848.4001 Fax
www.kl.com

VIA ELECTRONIC AND FACSIMILE TRANSMISSION

William H. Hyatt, Jr.
973.848.4045
Fax: 973.848.4001
whyatt@kl.com

February 10, 2004

Mr. Marc A. Matsil
Assistant Commissioner
Natural and Historic Resources
State of New Jersey
Department of Environmental Protection
P.O. Box 404
Trenton, New Jersey 08625

Re:    Lower Passaic River Study Area

Dear Mr. Matsil:

I have received and thank you for your letter of February 5, 2004. I am responding on behalf of the members of the Lower Passaic River Study Area PRP Group to whom the Department's Directive No. 1, *In the Matter of the Lower Passaic River*, dated September 19, 2003, was addressed (the "Directive Recipients").

The Directive Recipients appreciate the opportunity to work cooperatively with the Department to address the Passaic River. As you know, in response to your request, the Directive Recipients offered to negotiate with the Department in good faith to address the Directive. As you also know, the Group has been negotiating in good faith with EPA in an effort to reach agreement under which the Group members who received EPA's notice letter would fund the EPA RI/FS, currently estimated to cost $10 million. In this spirit, the Directive Recipients look forward to the opportunity of working out with the Department the details of how they will address the Directive. In that regard, I would like to meet with you and your colleagues at the Department at your earliest convenience to continue our dialogue.

In specific response to the matters listed in your letter, the Directive Recipients provide the following information:

1.    As you are aware, the Group has already asked David Batson, EPA Alternative Dispute Resolution Liaison, to assist in coalescing the group and in helping it to develop an allocation of responsibility. We anticipate that Mr. Batson will designate an allocation consultant to assist the Group in the near future. Depending upon the scope of work to

NW-44455 v3

BOSTON · DALLAS · HARRISBURG · LOS ANGELES · MIAMI · NEWARK · NEW YORK · PITTSBURGH · SAN FRANCISCO · WASHINGTON

Anthony P. La Rocco, Administrative Partner, New Jersey

LUC001075
ALCD-PUBCOM_0003248

**Kirkpatrick & Lockhart LLP**

Mr. Marc A. Matsil
February 10, 2004
Page 2

be undertaken by the allocation consultant, we would anticipate that the first phase of allocation could well be completed within nine months of the start of the contract work or by December 31, 2004, whichever is sooner. We anticipate that the initial allocation activity will be directed at locating and joining additional parties and the funding needed for the interim activities and studies the Group will be undertaking, leaving the comprehensive allocation process needed for a final settlement until such time as the studies have been completed and the remaining additional parties who should be participating in these efforts, but are not yet members of the Group, have been joined in the Group. We would not anticipate that any allocation process will interfere in any way with the activities of the Directive Recipients in response to the Directive.

2.    The Group has engaged de maximis, inc., a firm with which the Department has had extensive experience, to act as Project Coordinator for the Lower Passaic River Study Area. I would like to meet with the Department as soon as possible to discuss how to coordinate the work described in your letter, with the EPA RI/FS and the ACOE/NJDOT-OMR feasibility study. In our earlier discussions, we have agreed that close coordination between these efforts will be necessary. We believe that the studies should be fully integrated with each other to avoid duplication and to assure that the results of the studies are acceptable to all the stakeholders. I understood from our prior meetings that the Department was developing a scope of work for the natural resource injury assessment, which I understand the Department now wishes the Directive Recipients to prepare. In the absence of such a scope of work, the Directive Recipients cannot determine if the assessment and restoration plan can be completed by April 30, 2005, nor can they predict how the NRDA can best be coordinated with the other studies that will be underway concurrently, but they are committed to work cooperatively with the Department to prepare a scope of work that complements and supplements the EPA RI/FS and ACOE/NJDOT-OMR feasibility study, which can then be used to identify and solicit contractors to perform the work and to accomplish those tasks as expeditiously as possible and in full coordination with EPA and ACOE/NJDOT-OMR. I request the opportunity of meeting with the Department to get this effort underway as quickly as possible.

3.    The Directive Recipients are prepared to commit to reimburse the Department for its costs of overseeing the work of their contractors in response to the Directive. We would like to meet with the Department to discuss the process for the Department to compile and account for its oversight costs and to submit invoices for those costs to the Directive Recipients.

I would like to meet with the Department at your earliest convenience to discuss the above matters and also (a) explore the possibility of one or more short-term demonstration projects that the Directive Recipients might undertake as interim measures, (b) the coordination of various Brownfields projects underway or planned in the vicinity of the Passaic River with the studies of the Passaic River, and (c) the design of a new paradigm for addressing the Passaic

LUC001076
ALCD-PUBCOM_0003249

**Kirkpatrick & Lockhart LLP**

Mr. Marc A. Matsil
February 10, 2004
Page 3

River and other contaminated urban river systems. These are matters that we have discussed in our previous meetings and I look forward to continuing to work with the Department to address these challenges.

Please let me know when the Department would like to meet to address these issues. De maximis and I are available to do so at your convenience. Naturally, as with any proposal to address a pending claim, the Directive Recipients reserve their rights in the unlikely event that agreement cannot be reached with the Department. I look forward to hearing from you in the near future.

Very truly yours,

William H. Hyatt, Jr.
Coordinating Counsel for the
Directive Recipients

cc:     Mr. David Batson
        Directive Recipients

# EXHIBIT 52

OxyChem's Comments in Opposition to Proposed Consent Decree,
*United States v. Alden Leeds, Inc., et al.*, Civil Action No. 2:22-cv-07326 (D.N.J.)

ALCD-PUBCOM_0003251

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**

REGION II
290 BROADWAY
NEW YORK, NEW YORK 10007-1866

MAR 3 0 2017

BY CERTIFIED MAIL,
RETURN RECEIPT REQUESTED & ELECTRONIC MAIL

To: See List of Addressees – Attachment A

Re: Diamond Alkali Superfund Site, Lower 8.3 Miles of Lower Passaic River, Essex and Hudson Counties, New Jersey

Notice regarding Next Steps Including Initial Cash Out Settlement

The United States Environmental Protection Agency ("EPA") has documented the release and threatened release of hazardous substances, pollutants and contaminants at the Diamond Alkali Site ("Site") in Essex, Bergen, Hudson and Passaic Counties, New Jersey. The Site includes the former Diamond Alkali facility at 80-120 Lister Avenue, Newark, New Jersey, the Lower Passaic River Study Area ("LPRSA"), the Newark Bay Study Area, and the areal extent of contamination.

The Site was placed on the National Priorities List ("NPL") in 1984. In 1987, EPA issued a Record of Decision for Operable Unit 1 ("OU1"), the former Diamond Alkali facility at 80-120 Lister Avenue, Newark, New Jersey. On March 3, 2016, EPA issued a ROD for Operable Unit 2 ("OU2"), the lower 8.3 miles of the Lower Passaic River. Currently, remedial investigation/feasibility studies are being conducted for the 17-mile LPRSA and the Newark Bay Study Area.

The OU2 ROD was issued by EPA to address human health and environmental risks posed by contaminated sediments found in the lower 8.3 miles of the Lower Passaic River, an area from the river's confluence with Newark Bay to River Mile 8.3 near the border between the City of Newark and Belleville Township, New Jersey. The OU2 ROD calls for, among other things, the construction of an engineered cap bank to bank over the river bottom of the lower 8.3 miles of the river, dredging of the river bottom prior to placement of the cap, and implementation of institutional controls designed to protect the engineered cap.

On March 31, 2016, EPA notified each Addressee that it may be a potentially responsible party under Section 107(a) of the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended ("CERCLA"), 42 U.S.C. § 9607(a), with respect to OU2 for the Site. That letter also notified the recipients that EPA intended to: a) negotiate a settlement with Occidental Chemical Corporation ("OCC") for OCC's performance of the remedial design
for the remedy selected in the OU2 ROD; b) negotiate a remedial action consent decree under which OCC and other major parties will implement and pay for the remedy selected in the OU2 ROD; and c) identify parties that may be eligible for a cash out settlement with EPA for the lower 8.3 miles of the Lower Passaic River.

On September 30, 2016, EPA and OCC entered into Administrative Settlement Agreement and Order on Consent for Remedial Design, CERCLA Docket No. 02-2016-2021, for OCC's performance of the remedial design selected in the OU2 ROD, under EPA oversight.

**NEXT STEPS**

As of the date of this letter, EPA is notifying 20 parties that EPA has identified them as candidates for early cash out settlements. The 20 parties are listed in the enclosure to this letter. EPA has identified for immediate settlement those parties that are not associated with a disposal or release of any of the contaminants of concern ("COCs") for OU2, as identified in the OU2 ROD.

Parties that are responsible for the release or discharge of dioxins, furans, or polychlorinated biphenyls ("PCBs") into the Lower Passaic River should participate in implementing or funding the remedy selected for the lower 8.3 miles of the Lower Passaic River. EPA will provide notice to those parties shortly, as well as an opportunity to meet with EPA to discuss their status.

For parties that are not one of the 20 early cash out parties and are also not associated with the release of dioxins, furans, or PCBs into the Lower Passaic River, a cash out settlement might be appropriate. This determination requires additional complex settlement analysis. EPA expects to use the services of a third party allocator before extending cash out settlement offers to any such party. In a subsequent letter, EPA will identify the parties that should be part of the allocation process. There will be a future opportunity for OU2 PRPs to offer input on the factors that they think should be considered in the allocation process, and to provide feedback on the overall design of the allocation process.

If you have any questions regarding this letter, you may contact Juan Fajardo via email at fajardo.juan@epa.gov or by phone at (212) 637-3132.

We look forward to working with you.

Sincerely yours,

Eric J. Wilson
Deputy Director for Enforcement and Homeland Security
Emergency and Remedial Response Division

Enclosure:  List of Early Cash Out Parties

cc:  Brian Donohue, Esq., USDOJ
     Mark Barash, Esq., USDOI
     Kate Barfield, Esq., NOAA
     John Dickinson, Esq., New Jersey Attorney General's Office

2

ALCD-PUBCOM_0003253

**Attachment A - List of Addressees**

**Diamond Alkali Superfund Site**
**Lower 8.3 Miles - Passaic River**
**Notice of Next Steps**

| Company | Contact Information | Facility |
|---|---|---|
| A.E. Staley Manufacturing Co., Inc.<br>2200 E. Eldorado Street<br>Decatur, IL 62521-1578<br><br>Now Tate & Lyle Ingredients Americas LLC | John R. Holsinger, Esq.<br>Two University Plaza, Suite 300<br>Hackensack, NJ 07601<br>201-487-9000 (T)<br>johnh@jrholsinger.com<br><br>Heidi R. Balsley, Esquire<br>Corporate Counsel<br>A.E. Staley<br>Manufacturing Co., Inc.<br>2200 E. Eldorado Street<br>Decatur, IL 62521<br>Heidi.Balsley@tateandlyle.com | 320 Schuyler Avenue and 100 Third Avenue<br>Kearny, NJ |
| Alcan Corporation<br>Two Alliance Center<br>3560 Lenox Rd<br>Atlanta, GA 30326<br><br>Now Novelis Corp. | John Tillman, Esq.<br>North American Regional Counsel<br>Novelis Corporation<br>Two Alliance Center<br>3560 Lenox Rd<br>Atlanta, GA 30326<br>404-760-4049 (T)<br>John.tillman@novelis.com | Jacobus Ave.<br>Kearny, NJ |
| Alden Leeds Inc.<br>55 Jacobus Ave.<br>Kearny, NJ 07032 | Mark Epstein, President<br>Alden Leeds Inc.<br>55 Jacobus Ave.<br>Kearny, NJ 07032<br><br>Joseph Fiorenzo, Esq.<br>Sills Cummis & Gross<br>The Legal Center<br>One Riverfront Plaza<br>Newark, NJ 07102<br>973-643-7000 (T)<br>jfiorenzo@sillscummis.com | 2145 McCarter Highway<br>Newark, NJ<br><br>55 Jacobus Avenue<br>Kearny, NJ |
| Alliance Chemical, Inc.<br>Linden Avenue<br>Ridgefield, NJ 07657 | Fredi Pearlmutter, Esq.<br>Lindabury, McCormick, Estabrook & Cooper, P.C.<br>53 Cardinal Drive<br>Box 2369<br>Westfield, NJ 07091<br>908-233-6800 (T)<br>fpearlmutter@lindabury.com | 33 Avenue P<br>Newark, NJ |

| | | |
|---|---|---|
| American Ref-Fuel Co.<br>155 Chestnut Ridge Road<br>Montvale, NJ 07645<br><br>Now Covanta Essex Company | Nancy Tammi, Esq.<br>VP, Associate General Counsel<br>Covanta<br>445 South Street<br>Morristown, NJ 07960<br>862-345-5133<br><br>Barbara Hopkinson Kelly, Esq.<br>Wilson Elser Moskowitz Edelman &<br>Dicker LLP<br>200 Campus Drive<br>Florham Park, NJ 07932-0668<br>973.735.5765 (Direct)<br>609.213.8589 (Cell)<br>973.624.0808 (Fax)<br>barbara.kelly@wilsonelser.com | 183 Raymond Blvd & 66<br>Blanchard St<br>Newark, NJ |
| Arkema Incorporated<br>2000 Market Street<br>Philadelphia, PA 19103-3222 | Paula Martin, Esq.<br>Doug Loutzenhiser<br>Legacy Site Services, LLC<br>468 Thomas Jones Way, Suite 150<br>Exton, PA 19341-2528<br>Paula.martin@total.com | Wallace & Tiernan<br>25 Main Street<br>Belleville, NJ |
| Ashland, Inc.<br>5200 Blazer Parkway<br>Dublin, OH 43017 | Robin E. Lampkin<br>Ashland Inc.<br>5200 Blazer Parkway<br>Dublin, OH 43017<br>Telephone: 614-790-3019<br>realmpkin@ashland.com<br><br>William S. Hatfield, Esq.<br>Gibbons P.C.<br>One Gateway Center<br>Newark, NJ 07102<br>whatfield@gibbonslaw.com | 221 Foundry St.<br>Newark, NJ |
| Atlas Refining, Inc.<br>142 Lockwood Street<br>Newark, NJ 07105<br><br>Now Atlas Refinery, Inc. | Steven Schroeder, Jr., President & CEO<br>Atlas Refinery, Inc.<br>142 Lockwood Street<br>Newark, NJ 07105<br><br>Thomas Ryan, Esq.<br>Laddey, Clark & Ryan LLP<br>60 Blue Heron Road, Suite 300<br>Sparta, NJ 07871<br>973-729-1880(T)<br>tryan@lcrlaw.com | 142 Lockwood St.<br>Newark, NJ |

2

ALCD-PUBCOM_0003255

| | | |
|---|---|---|
| Automatic Electro Plating Corp. 185 Foundry Street, Suite 3 Newark, NJ 07105 | Michael O'Rourke, President Automatic Electro Plating Corp. 1017 Applegate Parkway Waxhaw, NC 28173-6738 Michael.orourke@aol.com | 185 Foundry Street Complex Newark, NJ (Bldgs 19, 21, 22) |
| BASF Catalysts LLC 100 Campus Drive Florham Park, NJ | Karyllan D. Mack, Esq. (see below) | Engelhard Corporation One West Central Avenue East Newark, NJ |
| BASF Corp. 3000 Continental Drive Mount Olive, NJ 07828 | Karyllan D. Mack, Esq. Environmental Counsel BASF Corporation 100 Park Avenue Florham Park, NJ 07932 Karyllan.mack@basf.com<br><br>David Schneider, Esquire Bressler, Amery & Ross Post Office Box 1980 Morristown, NJ 07962 dschneider@bressler.com | 50 Central Ave. Kearny, NJ & 150 Wagaraw Rd Hawthorne, NJ |
| Belleville Industrial Center 681 Main Street Building 43 Belleville, NJ 07109 | Carol Shapiro, President Belleville Industrial Center 681 Main Street, Building 43 Belleville, NJ 07109 973-751-0400 (T) shappyfam@aol.com<br><br>Ryder T. Ulon, Esq. Gary F. Werner, Esq. Schenck, Price, Smith & King, LLP 220 Park Avenue Post Office Box 991 Florham Park, NJ 07932 973-540-7321 (T) rtu@spsk.com gfw@spsk.com | Helion Industries, Inc. 681 Main St. Belleville, NJ |

3

ALCD-PUBCOM_0003256

| | | |
|---|---|---|
| Benjamin Moore & Co.<br>51 Chestnut Ridge Rd.<br>Montvale, NJ 07645 | Mark Boyland, Esq.<br>Paul Sangillo, Esq.<br>Benjamin Moore & Co.<br>101 Paragon Drive<br>Montvale, NJ 07645<br>201.949.6318 (T)<br>Mark.boyland@benjaminmoore.com<br>Paul.sangillo@benjaminmoore.com<br><br>Eric S. Aronson, Esq.<br>David G. Mandelbaum, Esq.<br>GreenbergTraurig<br>500 Campus Drive<br>Suite 400<br>Florham Park, NJ 07932<br>aronsone@gtlaw.com<br>973-360-7935 | 134 Lister Ave.<br>Newark, NJ |
| Berol Corporation<br>c/o Newell Rubbermaid Inc.<br>2707 Butterfield Road, Suite 100<br>Oak Brook, IL 60523 | Andrew Sawula, Esq.<br>Schiff Hardin LLP<br>One Westminster Place, Suite 200<br>Lake Forest, IL 60045<br>847-295-4336 (T)<br>asawula@schiffhardin.com | Faber-Castell Corporation<br>41 Dickerson Street<br>Newark, NJ |
| Campbell Foundry Company<br>800 Bergen Street<br>Harrison, NJ 07029 | Timothy J. Corriston, Esq.<br>Connell Foley LLP<br>85 Livingston Avenue<br>Roseland, NJ 07068<br>973-535-0500 (T)<br>tcorriston@connellfoley.com | 800 Bergen Street<br>Harrison, NJ |
| Canning Gum LLC<br>c/o MacDermid Incorporated<br>1401 Blake Street<br>Denver, CO 80202 | John Cordani, Esq.<br>VP, General Counsel<br>MacDermid Inc.<br>245 Freight Street<br>Waterbury, CT 06702 | Frederick Gumm Chemical Co.<br>538 Forest Street<br>Kearny, NJ |

4

ALCD-PUBCOM_0003257

| | | |
|---|---|---|
| Celanese Ltd.<br>Route 202-206<br>P.O. Box 2500<br>Somerville, NJ 08876<br><br>CNA Holdings LLC<br>participating on behalf of<br>Celanese Ltd | Duke K. McCall, III, Esq.<br>Bingham McCutchen LLP<br>2020 K Street, N.W.<br>Washington, DC 20006-1806<br>202-373-6607 (T)<br>duke.mccall@bingham.com<br><br>James J. Dragna<br>Morgan Lewis<br>300 South Grand Ave., 22nd Floor<br>Los Angeles, CA 90071-3132<br>Jim.dragna@morganlewis.com<br><br>James O'Toole, Esq.<br>Buchanan Ingersoll & Rooney PC<br>Two Liberty Place<br>50 S. 16th Street, Suite 3200<br>Philadelphia, PA 19102-2555<br>James.otoole@blpc.com | 354 Doremus Ave<br>Newark, NJ |
| Chargeurs, Inc.<br>178 Wool Road<br>Jamestown, SC 29453 | James. R. Brendel, Esq.<br>Thorp Reed & Armstrong, LLP<br>One Oxford Centre<br>301 Grant Street, 14th floor<br>Pittsburgh, PA 15219-1425<br>412-394-2373 (T)<br>jbrendel@thorpreed.com | United Piece Dye Works<br>199 and 205 Main Street and<br>42 Arnot Street<br>Lodi, NJ |
| Chevron Texaco Corporation<br>6001 Bollinger Canyon Rd.<br>K-2056<br>San Ramon, CA 94583<br><br>Chevron Environmental<br>Management Company<br>participating for itself, Texaco,<br>Inc. and TRMI-H LLC | Shawn Raymond DeMerse<br>Chevron U.S.A. Inc.<br>Law Department<br>1400 Smith Street, Rm 07090<br>Houston, TX 77002<br>shawndemerse@chevron.com<br><br>Louis M. DeStefano, Esq.<br>Buchanan Ingersoll & Rooney, PC<br>550 Broad Street, Suite 810<br>Newark, NJ 07102-4517<br>973.273.9800 (T)<br>louis.destefano@blpc.com | Getty Newark Terminal<br>86 Doremus Ave.<br>Newark, NJ |
| Coats & Clark, Inc.<br>3420 Toringdon Way, Suite 301<br>Charlotte, NC 28277 | Dan Riesel, Esq.<br>Jeff Gracer, Esq.<br>Sive Paget & Riesel, P.C.<br>460 Park Avenue<br>New York, NY 10022<br>212-421-2150<br>driesel@spr.com | Clark Thread Co.<br>260 Ogden Street<br>Newark NJ<br>900 Passaic Avenue<br>East Newark NJ<br>735 Broad Street<br>Bloomfield NJ |

ALCD-PUBCOM_0003258

| EnPro Holdings LLC as assignee of Coltec Industries Inc.<br><br>5605 Carnegie Boulevard Charlotte, NC 28209 | Tom Price, Esq.<br>EnPro Industries<br>5605 Carnegie Boulevard<br>Charlotte, NC 28209<br>704-731-1525 (T)<br>tom.price@enproindustries.com<br><br>Charles E. Merrill, Esquire<br>Husch Blackwell Sanders LLP<br>190 Carondelet Plaza, Suite 600<br>St. Louis, MO 63105<br>314-480-1952<br>charlie.merrill@huschblackwell.com | Crucible Steel Co.<br>1000 South Fourth St.<br>Harrison, NJ |
| Congoleum Corp.<br>3705 Quakerbridge Road<br>Mercerville, NJ 08619 | Russell Hewit, Esq.<br>Dughi, Hewit & Domolewski, P.C.<br>340 North Avenue<br>Cranford, NJ 07016<br>908-272-0200(T)<br>rhewit@dughihewit.com | 195 Belgrove Drive<br>Kearny, NJ |
| Cooper Industries, Inc.<br>600 Travis Street<br>Houston, TX 77002 | Lisa D. Sutton<br>Vice Present/Chief Counsel – EHS<br>Eaton Corporation<br>1000 Eaton Boulevard<br>Cleveland, OH 44122<br>440-523-4358 (T)<br><br>John F. Cermak<br>Sonja A. Inglin<br>Baker Hostetler<br>11601 Wilshire Boulevard, Ste 1400<br>Los Angeles, CA 90025-0509<br>310-442-8889 (T) (Cermak)<br>310-442-8885 (T) (Inglin)<br>jcermak@bakerlaw.com<br>singlin@bakerlaw.com | J. Wiss & Sons Co<br>7, 13, 26 Bank Street and<br>33 Littleton Avenue (aka 400 West Market Street)<br>Newark, NJ |
| Cooper Industries, LLC<br>600 Travis Street, Suite 5800<br>Houston, TX 77002 | (see above) | Thomas A. Edison, Inc.<br>Belleville Avenue & Sherman Avenue<br>Bloomfield, NJ<br>75 Belmont Avenue<br>Belleville, NJ |
| Croda Inc.<br>300-A Columbus Circle<br>Edison, NJ 08837 | Stephen Swedlow, Esq.<br>Quinn, Emanuel, Urquhart & Sullivan, LLP<br>500 West Madison St., Suite 2450<br>Chicago, IL 60661<br>312-705-7400<br>stephenswedlow@quinnemanuel.com | Hummel Lanolin<br>185 Foundry Street Complex<br>Newark, NJ<br>(Block 5005, Lot 21; Bld 39) |

6

ALCD-PUBCOM_0003259

| | | |
|---|---|---|
| Curtiss-Wright Corp.<br>4 Becker Farm Road<br>Roseland, NJ 07068 | Diana Buongiorno<br>Chiesa Shahinian & Giantomassi, PC<br>One Boland Drive<br>West Orange, NJ 07052<br>973-530-2075(T)<br>dbuongiorno@csglaw.com | 1 Passaic St.<br>Woodridge, NJ |
| Darling International, Inc.<br>251 O'Connor Ridge Boulevard,<br>Suite 300<br>Irving, TX 75038 | Steven Singer, Esq.<br>34 Hillside Avenue<br>Montclair, NJ 07042<br>973-744-6093<br>stsinger@verizon.net | Standard Tallow Corp.<br>61 Blanchard Street,<br>Newark, NJ<br>1215 Harrison Avenue,<br>Kearny, NJ |
| DII Industries, LLC<br>c/o Halliburton<br>2101 City West Blvd.<br>Houston, TX 77042-3021 | Thomas C. Jackson, Esq.<br>Joshua Frank, Esq.<br>Baker Botts LLP<br>1299 Pennsylvania Ave., N.W.<br>Washington, DC 20004-2400<br>202-639-7710 (T)<br>Thomas.Jackson@bakerbotts.com<br>Joshua.frank@bakerbotts.com | Worthington Corp. &<br>Dresser Industries, Inc.<br>401 Worthington Avenue<br>Harrison, NJ |
| DiLorenzo Properties Company<br>c/o 401 East 74th Street<br>New York, NY 10021-3919 | David Kohane, Esq.<br>Cole Schotz, PC<br>PO Box 800<br>25 Main Street<br>Hackensack, NJ 07601-7015<br>DKohane@coleschotz.com<br><br>For estate of Alex DiLorenzo<br>Gary P. Gengel, Esq.<br>Latham & Watkins, LLP<br>885 Third Avenue<br>New York, NY 10022-4834<br>Gary.Gengel@lw.com | American Modern Metals<br>44 Passaic Ave. (a/k/a 25<br>Belgrove Drive)<br>Kearny, NJ |
| Drum Service of Newark, Inc.<br>38 Laurel Drive<br>Wayne, NJ 07470 | Ralph Foglia<br>38 Laurel Drive<br>Wayne, NJ 07470 | Hilton-Davis<br>120 Lister Ave.<br>Newark, NJ |
| Eden Wood Corporation<br>47 Parsippany Road<br>Whippany, NJ 07981 | Warren L. Dean, Jr.<br>Thompson Coburn LLP<br>1909 K Street, N.W.<br>Suite 600<br>Washington, D.C. 20006-1167<br>202.585.6908 (T)<br>wdean@thompsoncoburn.com | Whippany Paper Board<br>1 Ackerman Avenue<br>Clifton, NJ |

7

ALCD-PUBCOM_0003260

| E.I. duPont de Nemours & Co.<br>1007 Market Street<br>Wilmington, DE 19898 | Bernard Reilly, Esq.<br>Chemours Legal Department<br>1007 Market Street<br>Wilmington, DE 19898<br>302-774-5445(T)<br>bernard.j.reilly@usa.dupont.com | Pitt Consol<br>191 Doremus Ave.<br>Newark, NJ |
|---|---|---|
| Elan Chemical Co.<br>268 Doremus Ave.<br>Newark, NJ 07105 | Jocelyn Kapp Manship, CEO<br>Elan Chemical Company Inc.<br>268 Doremus Avenue<br>Newark, NJ 07105<br><br>Randy Schillinger, Esq.<br>Saiber Schlesinger Staz & Goldstein<br>One Gateway Center, 13th Fl<br>Newark, NJ 07102<br>973-622-3333(T)<br>rs@saiber.com | 268 Doremus Ave.<br>Newark, NJ |
| El Paso Tennessee Pipeline Co.<br>1001 Louisania Street<br>Houston, TX 77002<br><br>EPEC Polymers Inc.<br>participating on behalf of itself<br>and EPEC Oil Company<br>Liquidating Trust | Andrea A. Lipuma, Esquire<br>Saul Ewing LLP<br>750 College Road East<br>Suite 100<br>Princeton, NJ 08540-6617<br>Telephone: 609-452-5032<br>alipuma@saul.com | Tenneco, Inc.<br>290 River Drive<br>Garfield, NJ |
| EM Sergeant Pulp & Chemical Co.<br>6 Chelsea Road<br>Clifton, NJ 07012 | Messrs. Scott and Alan Reisch<br>EM Sergeant Pulp & Chemical Co.<br>6 Chelsea Road<br>Clifton, NJ 07012<br><br>Ivo Balabanov<br>qc@sgtnutra.com | 120 Lister Avenue<br>Newark, NJ |
| Essex Chemical Corp.<br>2030 WMDC<br>Midland, MI 48674 | Kenneth Mack, Esq.<br>Linda Mack, Esq.<br>Fox Rothschild LLP<br>Post Office Box 5231<br>Princeton, NJ 08543-5231<br><br>Princeton Pike Corp. Center<br>997 Lenox Drive, Bldg. 3<br>Lawrenceville, NJ 08648<br>609-896-3000(T)<br>kmack@foxrothschild.com | 330 Doremus Ave.<br>Newark, NJ |

ALCD-PUBCOM_0003261

| | | |
|---|---|---|
| Everett Smith Group, Ltd.<br>330 East Kilbourn Avenue, Ste 750<br>Milwaukee, WI 53202 | Sarah A. Slack, Esq.<br>Foley & Lardner, LLP<br>Suite 500<br>150 East Gilman Street<br>Madison, WI 53703-1482<br>608-258-4239<br>sslack@foley.com | Blanchard Bro. & Lane, Inc.<br>40 Bruen Street<br>Newark, NJ |
| Fiske Brothers Refining Co.<br>129 Lockwood Street<br>Newark, NJ | Damon Sedita, Esq.<br>Sedita, Campisano & Campisano, LLC<br>Wayne Plaza 1<br>145 Route 46 West<br>Suite 102<br>Wayne, NJ 07470<br>973-787-0299<br>dsedita@scclegal.com | 129 Lockwood Street<br>Newark, NJ |
| Flexon Industries Corp.<br>One Flexon Plaza<br>366 Frelinghuysen Avenue<br>Newark, NJ 07114 | Tom Spiesman, Esq.<br>Porzio Bromberg & Newman, PC<br>100 Southgate Parkway<br>PO Box 1997<br>Morristown, NJ 07962<br>973-889-4208 (T)<br>tspiesman@pbnlaw.com | 666 Washington Avenue<br>Belleville, NJ |
| Foundry Street Corporation<br>67 Kettle Hole Road 2524<br>Montauk, NY 11954-5084 | Gerald Borriello<br>Foundry Street Corporation<br>67 Kettle Hole Road 2524<br>Montauk, NY 11954-5084<br>geraldborriello@gmail.com | 185 Foundry Street Complex<br>Newark, NJ<br>(Block 5005, Lot 22 – Bldgs 19, 21, 22) |
| Fragrances North America<br>1775 Windsor Road<br>Teaneck, NJ 07666<br><br>Now Givaudan Corp. | Richard Wroblewski, P.G.<br>Environmental Specialist<br>Givaudan Fragrances Corp.<br>300 Waterloo Valley Road<br>Mount Olive, NJ 07828<br>richard.wroblewski@givaudan.com<br><br>William Hatfield, Esq.<br>Gibbons, PC<br>One Gateway Center<br>Newark, NJ 07102-5310<br>973-596-4511 (T)<br>whatfield@gibbonslaw.com | Givaudan Fragrances<br>125 Delawanna Avenue<br>Clifton, NJ |
| Franklin Burlington Plastics, Inc.<br>113 Passaic Ave.<br>Kearny, NJ 07032 | Norman Spindel, Esq.<br>Lowenstein Sandler PC<br>65 Livingston Avenue<br>Roseland, NJ 07068<br>973-597-2514(T)<br>nspindel@lowenstein.com | 113 Passaic Ave.<br>Kearny, NJ |

9

| | | |
|---|---|---|
| Garfield Molding Company, Inc.<br>10 Midland Avenue<br>Wallington, NJ 07057 | Stephen W. Miller, Esq.<br>Ricci Tyrrell Johnson & Grey<br>1515 Market Street, Suite 700<br>Philadelphia, PA 19102<br>215-320-2088 (T)<br>smiller@rtjglaw.com | 10 Midland Avenue<br>Wallington, NJ |
| General Electric Company<br>3135 Easton Turnpike<br>Fairfield, CT 06828-0001 | Roger Florio, Esq.<br>General Electric<br>640 Freedom Business Center<br>King of Prussia, PA 19406<br>Roger.florio@ge.com<br><br>Gary P. Gengel, Esq.<br>Latham & Watkins, LLP<br>One Newark Center, 16th floor<br>Newark, NJ 07101<br>973-639-7287 (T)<br>gary.gengel@lw.com | 415 South 5th Street<br>& 1000 South 2nd Street<br>Harrison, NJ |
| Goodrich Corporation<br>Four Coliseum Centre<br>2730 West Tyvola Road<br>Charlotte, NC 28217 | Earl W. Phillips, Jr., Esq.<br>Robinson & Cole LLP<br>280 Trumbull Street<br>Hartford, CT 06103-3597<br>860-275-8220 (T)<br>ephillips@rc.com | Kalama Chemical<br>290 River Drive<br>Garfield, NJ |
| Harrison Supply Company<br>800 Passaic Avenue<br>East Newark, NJ 07029 | Timothy J. Corriston, Esq.<br>Connell Foley LLP<br>85 Livingston Avenue<br>Roseland, NJ 07068<br>973-535-0500 (T)<br>tcorriston@connellfoley.com | 800 Passaic Avenue<br>East Newark, NJ |
| Hexcel Corp.<br>2 Stamford Plaza<br>Stamford, CT 06901 | Steve Leifer, Esq.<br>Baker Botts LLP<br>1299 Pennsylvania Ave., NW<br>Washington, DC 20004<br>202-639-7723(T)<br>sleifer@bakerbotts.com | 205 Main St.<br>Lodi, NJ |
| Hoffman-La Roche Inc.<br>340 Kingsland Street<br>Nutley, NJ 07110 | John Klock, Esq.<br>Gibbons, PC<br>One Gateway Center<br>Newark, NJ 07102<br>jklock@gibbonslaw.com<br><br>Frederick Kentz, Esq.<br>Vice President and General Counsel<br>Hoffmann-La Roche Inc.<br>150 Clove Road,<br>Little Falls, NJ 07424 | 340 Kingsland Road<br>Nutley, NJ |

10

ALCD-PUBCOM_0003263

| | | |
|---|---|---|
| Honeywell International, Inc.<br>P.O. Box 2245<br>Morristown, NJ 07962 | Jeremy Karpatkin, Esq.<br>Arnold & Porter<br>555 Twelfth Street, NW<br>Washington, DC 20004-1206<br>202-942-5564 (T)<br>Jeremy.karpatkin@apks.com | General Chemical Co.<br>65 Lodi Street/8th Street<br>Passaic, NJ |
| ISP Chemicals, Inc.<br>1361 Alps Road<br>Wayne, NJ 07470<br><br>now ISP Chemicals LLC | Robin E. Lampkin<br>Ashland Inc.<br>5200 Blazer Parkway<br>Dublin, OH 43017<br>614-790-3019 (T)<br>relampkin@ashland.com<br><br>William Hatfield, Esq.<br>Gibbons, PC<br>One Gateway Center<br>Newark, NJ 07102-5310<br>973-596-4511 (T)<br>whatfield@gibbonslaw.com | ISP Van Dyk, Inc.<br>1 Main St./11 William St.<br>Wayne, NJ |
| ITT Industries, Inc.<br>77 River Road<br>Clifton, NJ 07014<br><br>participating as Exelis Inc. for<br>itself and ITT Industries, Inc | Susanne Peticolas, Esq.<br>Gibbons, PC<br>One Gateway Center<br>Newark, NJ 07102-5310<br>973-596-4751 (T)<br>speticolas@gibbonslaw.com | 100 Kingsland Drive<br>Clifton, NJ |
| Kearny Smelting & Refining<br>936 Harrison Ave #5<br>Kearny, NJ 07032 | Ms. Francine Rothschild, President<br>Kearny Smelting & Refining<br>936 Harrison Ave<br>Kearny, NJ 07032<br>201-991-7276 (T)<br><br>Lee D. Henig-Elona, Esq.<br>Gordon & Rees<br>18 Columbia Turnpike, Suite 220<br>Florham Park, NJ 07932<br>973-549-2520(T direct)<br>973-549-2500(T office)<br>lhenig-elona@gordonrees.com | 936 Harrison Ave.<br>Kearny, NJ |

11

ALCD-PUBCOM_0003264

| | | |
|---|---|---|
| Lucent Technologies<br>600 Mountain Avenue<br>Murray Hill, NJ 07974<br><br>now Alcatel-Lucent USA, Inc. | Ralph McMurry, Esq.<br>Ralph L. McMurry Law Office<br>30 Vesey Street, 15th Floor<br>New York, NY 10007<br>212-608-5444/5053 (T)<br>rlmcmurry@earthlink.net<br><br>Gary M. Fisher, Esq.<br>Alcatel-Lucent<br>Environment, Health & Safety Corporate<br>Center<br>600 Mountain Avenue<br>Room 1F-102G<br>Murray Hill, NJ 07974<br>gary.fisher@alcatel-lucent.com | AT&T/Western Electric<br>100 Central Ave.<br>Kearny, NJ |
| Mallinckrodt, Inc.<br>675 McDonnell Blvd.<br>Hazelwood, Missouri<br>63042 | William Hatfield, Esq.<br>Gibbons P.C.<br>One Gateway Center<br>Newark, NJ 07102<br>973-596-4511 (T)<br>whatfield@gibbonslaw.com<br><br>Eric Berry, Esq.<br>Vice President – Environmental Law<br>Mallinckrodt Pharmaceuticals<br>975 McDonnell Blvd<br>Hazelwood, MO 63042<br>Eric.Berry@mallinckrodt.com | 165-167 Main St.<br>Lodi, NJ |
| Monsanto Co.<br>800 North Lindbergh Blvd.<br>St. Louis, Missouri 63167<br><br>Pharmacia Corporation (f/k/a<br>Monsanto Company) | John F. Gullace, Esq.<br>Manko, Gold, Katcher & Fox, LLP<br>401 City Avenue, Suite 500<br>Bala Cynwd, PA 19004<br>484-430-2326(T)<br>jgullace@mgkflaw.com | Monsanto Co.<br>Foot of Pennsylvania Ave.<br>Kearny, NJ |
| National-Standard Company<br>1618 Terminal Road<br>Niles, MI 49120<br><br>Now National-Standard LLC | Susanne Peticolas, Esq.<br>Gibbons, PC<br>One Gateway Center<br>Newark, NJ 07102-5310<br>973-596-4751(T)<br>speticolas@gibbonslaw.com | 714-716 Clifton Avenue<br>Clifton, NJ |
| Newark Morning Ledger<br>1 Star Ledger Plaza<br>Newark, NJ 07102 | Daryl Kessler, Esq.<br>Sabin, Bermant & Gould, LLP<br>One World Trade Center -44th Floor<br>New York, NY 10007-2915<br>212-381-7026<br>dkessler@sabinfirm.com | 1 Star Ledger Plaza<br>Newark, NJ |

12

ALCD-PUBCOM_0003265

| | | |
|---|---|---|
| Newell Rubbermaid, Inc.<br>29 E. Stephenson Street<br>Freeport, IL 60132 | Andrew Sawula, Esq.<br>Schiff Hardin LLP<br>One Westminster Place, Suite 200<br>Lake Forest, IL 60045<br>847-295-4336 (T)<br>asawula@schiffhardin.com | Goody Products<br>969 Newark Turnpike<br>Kearny, NJ |
| News America Inc.<br>767 Fifth Ave., 46th Floor<br>New York, NY 10153<br><br>fka News Publishing Australia,<br>Ltd., now Twenty-First Century<br>Fox America | Peter Simshauer, Esq.<br>Skadden, Arps, Slate, Meagher & Flom LLP<br>500 Boylston Street<br>Boston, MA 02116<br>617-573-4880(T)<br>psimshau@skadden.com | Chris-Craft Inc./Montrose<br>Chemical Co.<br>100 Lister Ave.<br>Newark, NJ |
| Occidental Chemical Corp.<br>Occidental Tower<br>5005 LBJ Freeway<br>Dallas, TX 75244 | Dennis F. Blake<br>Senior Vice President<br>Occidental Chemical Corp.<br>5005 LBJ Freeway<br>Dallas, TX 75244<br><br>Larry Silver, Esq.<br>Langsam Stevens Silver<br>1818 Market Street, Suite 2610<br>Philadelphia, PA 19103-5319<br>215- 239.9023<br>lsilver@lssh-law.com | Diamond Shamrock<br>Chemicals Co.<br>80 and 120 Lister Ave.<br>Newark, NJ |
| The Okonite Company, Inc.<br>102 Hilltop Road<br>Ramsey, New Jersey 07446 | David Brook, Esq.<br>McCullough Ginsberg Montano &<br>Partners LLP<br>55 Bleeker Street<br>Millburn, NJ 07041<br>dbrook@mgpllp.com | Canal and Jefferson Streets<br>Passaic, NJ |
| Otis Elevator Co.<br>North America Operations<br>10 Farm Springs Road<br>Farmington, CT 06032 | Earl W. Phillips, Jr., Esq.<br>Robinson & Cole LLP<br>280 Trumbull Street<br>Hartford, CT 06103-3597<br>860-275-8220(T)<br>ephillips@rc.com | 1000 First St.<br>Harrison, NJ |
| Pabst Brewing Company<br>9014 Heritage Parkway, Suite<br>308<br>Woodridge, IL 60517 | Eugene Kashper, Chairman & CEO<br>Pabst Brewing Company<br>10635 Santa Monica Blvd Ste 350<br>Los Angeles, CA 90025 | 400 Grove Street<br>Newark, NJ |
| Palin Enterprises | Mr. Michael Palin<br>Palin Enterprises<br>235 Park Avenue South, #8<br>New York, NY 10003-1045 | American Modern Metals<br>44 Passaic Ave. (a/k/a 25<br>Belgrove Drive)<br>Kearny, NJ |

13

ALCD-PUBCOM_0003266

| Passaic Pioneer Properties<br>PO Box 327<br>35 Eighth Street<br>Passaic, NJ 07055 | Timothy J. Corriston, Esq.<br>Connell Foley LLP<br>85 Livingston Avenue<br>Roseland, NJ 07068<br>973-535-0500 (T)<br>tcorriston@connellfoley.com | 35 Eighth Street<br>Passaic, NJ |
|---|---|---|
| Pfizer Inc.<br>235 E. 42nd St.<br>New York, NY 10017 | Seth Kerschner, Esq.<br>White & Case LLP 1155 Avenue of the<br>Americas<br>New York, NY 10036-2787<br>212-819-8630(T)<br>212-354-8113(F)<br>Seth.kerschner@whitecase.com | 230 Brighton Road<br>Clifton, NJ |
| PMC, Inc.<br>12243 Branford Street<br>Sun Valley, CA 91352 | Phillip Kamins, President & CEO<br>PMC Global, Inc.<br>12243 Branford St<br>Sun Valley, CA 91352<br>818-896-1101(T) | Kleer Kast<br>450 Schuyler Avenue<br>Kearny, NJ |
| Power Test of New Jersey, Inc.<br>125 Jericho Turnpike<br>Jericho, NY 11753<br><br>now Leemilt's Petroleum, Inc.,<br>successor to Power Test of NJ,<br>Inc. | Christine Fitter, Asst Secretary<br>Leemilt's Petroleum, Inc.<br>125 Jericho Turnpike, Suite 103<br>Jericho, NY 11753<br>cfitter@gettyrealty.com<br><br>Nicole Moshang, Esq.<br>Manko, Gold Katcher & Fox LLP<br>401 City Avenue, Ste. 500<br>Bala Cynwyd, PA 19004<br>484-430-2324 (T)<br>nmoshang@mgkflaw.com | Getty Newark Terminal<br>86 Doremus Ave.<br>Newark, NJ |
| PPG Industries, Inc.<br>One PPG Place<br>Pittsburgh, PA 15272 | Gary P. Gengel, Esq.<br>Latham & Watkins, LLP<br>885 Third Avenue<br>New York, NY 10022-4834<br>gary.gengel@lw.com | 29 Riverside Ave.<br>Newark, NJ |

14

ALCD-PUBCOM_0003267

| | | |
|---|---|---|
| PSE&G Corp.<br>P.O. Box 570<br>Newark, NJ 07101 | John F. Doherty, Esq.<br>Associate General Litigation Counsel<br>PSE&G Services Corporation<br>80 Park Plaza, T5D<br>Post Office Box 570<br>Newark, NJ 07102<br>973-430-6478(T)<br>John.doherty@pseg.com<br><br>Kevin R. Gardner, Esq.<br>Connell Foley<br>85 Livingston Avenue<br>Roseland, NJ 07068<br>973-535-0500(T)<br>kgardner@connellfoley.com | 155 Raymond Blvd.<br>Newark, NJ<br>&<br>4th St.<br>Harrison, NJ |
| Purdue Pharma Technologies, Inc.<br>One Stamford Forum<br>Stamford, CT 06901 | James (Jay) Stewart, Esq.<br>Lowenstein Sandler PC<br>65 Livingston Avenue<br>Roseland, NJ 07068<br>973-597-2522(T)<br>jstewart@lowenstein.com | Napp Technologies<br>199 Main St.<br>Lodi, NJ |
| Quality Distribution, Inc.<br>150 East Pennsylvania Avenue<br>Suite 450<br>Downingtown, PA 19335<br><br>Quality Carriers, Inc. | Bonni Kaufman, Esq.<br>Holland & Knight, LLP<br>800 17th Street N.W. Suite 1100<br>Washington, DC 20006<br>202-419-2547<br>Bonni.kaufman@hklaw.com | Chemical Leaman Tank Lines<br>80 Doremus Avenue<br>Newark, NJ |
| Roman Asphalt Corporation<br>14 Ogden Street<br>Newark, NJ 07104 | Michael La Morgese, President<br>Roman Asphalt Corporation<br>14 Ogden St<br>Newark, NJ 07104<br>973-482-1113(T)<br>Roman@romanasphalt.com | 14 Ogden Street<br>Newark, NJ |
| Royce Associates<br>366 N. Broadway, Ste. 400<br>Jericho, NJ 11753 | A.J.Royce, President<br>Royce Associates, ALP<br>35 Carlton Ave<br>East Rutherford, NJ 07073<br>201-438-5200(T)<br><br>Ronald Bluestein, Esq.<br>Flamm Walton<br>794 Penllyn Pike<br>Blue Bell, PA 19422<br>267-419-1500 (T)<br>rbluestein@flammlaw.com | Royce Chemical Company<br>17 Carlton Avenue<br>East Rutherford, NJ |

15

ALCD-PUBCOM_0003268

| RSR Corp.<br>2777 Stemmons Freeway, Suite 1800<br>Dallas, TX 75207<br><br>now Revere Smelting and Refining Corporation | Jane C. Luxton, Esq.<br>Christopher Clare, Esq.<br>Clark Hill PLC<br>601 Pennsylvania Avenue NW<br>North Building, Suite 1000<br>Washington, DC 20004<br>202-572-8674(T)<br>703-598-3275(M)<br>jluxton@clarkhill.com<br>cclare@clarkhill.com | Revere Smelting & Refining<br>387 Avenue P<br>Newark, NJ |
| RTC Properties, Inc.<br>79 Fifth Avenue<br>New York, NY 10003 | Michael L. Rodburg, Esq.<br>Lowenstein Sandler, PC<br>65 Livingston Avenue<br>Roseland, NJ 07068<br>973-597-2466(T)<br>mrodburg@lowenstein.com | AT&T/Western Electric<br>100 Central Ave.<br>Kearny, NJ |
| S&A Realty Corp.<br>55 Passaic Avenue<br>Kearny, NJ 07032 | Jeffrey Pollock, Esq.<br>Fox Rothschild<br>P.O. Box 5231<br>Princeton, NJ 08543<br>609-896-7660(T)<br>jmpollock@foxrothschild.com | American Modern Metals<br>44 Passaic Ave. (a/k/a 25 Belgrove Drive)<br>Kearny, NJ |
| Safety Kleen Envirosystems Co.<br>1301 Gervais St.<br>Columbia, SC 29201<br><br>McKesson Corporation for itself and for Safety-Kleen Envirosystems, Inc. | John Edgcomb, Esq.<br>Edgcomb Law Group, LLP<br>One Post Street, Suite 2100<br>San Francisco, California 94104-5225<br>415-399-1555 (T)<br>jedgcomb@edgcomb-law.com | 600 Doremus Ave.<br>Newark, NJ |
| Schiffenhaus Packaging Corp.<br>c/o Rock-Tenn Company<br>504 Thrasher Street<br>Norcross, GA 30071 | Camille V. Otero, Esq.<br>Gibbons, PC<br>One Gateway Center<br>Newark, NJ 07102-5310<br>cotero@gibbonslaw.com | 204 Academy Street<br>49 Fourth Street<br>2013 McCarter Highway<br>Newark, NJ |

16

ALCD-PUBCOM_0003269

| | | |
|---|---|---|
| Sequa Corporation<br>200 Park Avenue<br>New York, NY 10166 | Brian L. Buniva, Esq.<br>Senior Counsel & Senior Director<br>Environment, Health & Safety Sequa<br>Corporation<br>707 E. Main Street, Suite 1450<br>Richmond, VA 23219<br>845-230-7374 (Direct)<br>804-873-0610 (Mobile)<br>Brian_Buniva@sequa.com<br><br>Gary P. Gengel, Esq.<br>Kegan A. Brown, Esq.<br>Latham & Watkins, LLP<br>885 Third Avenue<br>New York, NY 10022-4834<br>gary.gengel@lw.com | Sun Chemical Corporation<br>185 Foundry Street<br>Newark, NJ<br>(prior to 1987) |
| Seton Company, Inc.<br>1000 Madison Avenue<br>Norristown, PA 19403\<br><br>now Seton Tanning | Lawrence E. Bradford, Esq.<br>Cole Schotz, PC<br>PO Box 800<br>25 Main Street<br>Hackensack, NJ 07601-7015<br>201-525-6205(T)<br>lbradford@coleschotz.com | Seton Leather Company<br>849 Broadway<br>Newark, NY 07104 |
| SpectraServ, Inc.<br>75 Jacobus Avenue<br>Kearny, NJ 07032 | Diana Buongiorno, Esq.<br>Chiesa Shahinian & Giantomassi, PC<br>One Boland Dr<br>West Orange, NJ 07052<br>973-530-2075(T)<br>dbuongiorno@csglaw.com | 75 Jacobus Ave.<br>Kearny, NJ |
| STWB, Inc.<br>c/o Bayer Corporation<br>100 Bayer Road<br>Pittsburgh, PA 15205 | Timothy I. Duffy, Esq.<br>Coughlin Duffy LLP<br>Post Office Box 1917<br>350 Mount Kemble Avenue<br>Morristown, NJ 07962-1917<br>973-631-6002(T)<br>tduffy@coughlinduffy.com<br>lhall@coughlinduffy.com (Assistant) | Lehn & Fink Products Corp.<br>192-194 Bloomfield Avenue<br>Bloomfield, NJ 07003<br><br>Thomasett Colors/Sterling<br>120 Lister Ave.<br>Newark, NJ |

17

ALCD-PUBCOM_0003270

| | | |
|---|---|---|
| Sun Chemical Corporation<br>35 Waterview Boulevard<br>Parsippany, NJ 07054-1285 | Warren W. Faure, Esq.<br>EH&S Counsel<br>Sun Chemical Corporation<br>35 Waterview Boulevard<br>Parsippany, NJ 07054<br>973-404-6590(T)<br>Warren.faure@sunchemical.com<br><br>Ted Wolff, Esq.<br>Manatt, Phelps & Phillips, LLP<br>7 Times Square<br>New York, NY 10036<br>twolff@manatt.com | Sun Chemical Corporation<br>185 Foundry Street<br>Newark, NJ<br>(1987 to present) |
| Teval Corporation<br>99 Cherry Hill Road, Suite 105<br>Parsippany, NJ 07054 | Lee D. Henig-Elona, Esq.<br>Gordon & Rees<br>18 Columbia Turnpike, Suite 220<br>Florham Park, NJ 07932<br>973-549-2520(T direct)<br>973-549-2500(T office)<br>lhenig-elona@gordonrees.com | Guyon Pipe<br>900-1000 South 4th Street<br>Harrison, NJ |
| Teva Pharmaceuticals USA, Inc.<br>1090 Horsham Road<br>North Wales, PA 19454 | Gail Port, Esq.<br>Proskauer Rose LLP<br>11 Times Square<br>New York, NY 10036-8299<br>212-969-3243(T)<br>gport@proskauer.com | Biocraft Laboratories<br>12 Industrial Park<br>Waldwick, NJ |
| Textron, Inc.<br>40 Westminster Street<br>Providence, RI 02903 | Jamie Schiff, Esq.<br>Textron, Inc.<br>40 Westminster Street<br>Providence, RI 02903<br>401-457-2422 (T)<br>jschiff@textron.com | Spencer Kellogg Division<br>400 Doremus Avenue<br><br>Newark, NJ |
| The Andrew Jergens Co.<br>2535 Spring Grove Ave.<br>Cincinnati, OH 45214<br><br>now KAO U.S.A Inc. | Richard T. La Jeunesse, Esq.<br>Graydon Head & Ritchey LLP<br>1900 Fifth Third Center<br>511 Walnut Street<br>Cincinnati, OH 45202<br>513-629-2702(T)<br>rlajeunesse@graydon.com | 1 Franklin Ave.<br>Belleville, NJ |

ALCD-PUBCOM_0003271

| | | |
|---|---|---|
| The BOC Group, Inc.<br>575 Mountain Avenue<br>Murray Hill, NJ 07974<br><br>now Linde LLC on behalf of<br>The BOC Group, Inc. | James (Jay) Stewart, Esq.<br>Lowenstein Sandler PC<br>65 Livingston Avenue<br>Roseland, NJ 07068<br>973-597-2522(T)<br>jstewart@lowenstein.com | 681 Main Street<br>Belleville, NJ |
| The Hartz Mountain<br>Corporation<br>400 Plaza Drive<br>Secaucus, NJ 07094<br><br>The Hartz Consumer Group,<br>Inc. on behalf of The Hartz<br>Mountain Corporation | Curtis L. Michael, Esq.<br>Horowitz, Rubino & Patton<br>400 Plaza Drive<br>PO Box 2038<br>Secaucus, NJ 07094-2038<br>Curt.michael@hrplaw.com | 600/700 South 4th Street<br>Harrison, NJ |
| The Newark Group, Inc.<br>20 Jackson Drive<br>Cranford, NJ 07016 | David M. Meezan, Esq.<br>Kazmarek Mowrey Cloud Laseter LLP<br>1230 Peachtree Street N.E.<br>Suite 3600<br>Atlanta, GA 30309<br>404-969-0733<br>dmeezan@kmcllaw.com | The Newark Boxboard Co.<br>17 Blanchard Street<br>Newark, NJ |
| The Sherwin Williams Co.<br>101 Prospect Ave., N.W.<br>Cleveland, OH 44115 | Donald McConnell, Esq.<br>The Sherwin Williams Co.<br>101 Prospect Ave, NW<br>Cleveland, OH 44115<br>216-566-3741(T)<br>216-515-4400(F)<br>don.j.mcconnell@sherwin.com<br><br>Herbert (Bart) Bennett, Esq.<br>Sokol, Behot & Fiorenzo<br>229 Nassau Street<br>Princeton, NJ 08542-4601<br>609-279-0900(T)<br>hbbennett@sbflawfirm.com | 60 Lister Ave.<br>Newark, NJ |
| The Stanley Works<br>1000 Stanley Drive<br>New Britain, CT 06053<br><br>now Stanley Black & Decker,<br>Inc. | Andrew Kolesar, Esq.<br>Thompson Hine LLP<br>312 Walnut Street, 14th Floor<br>Cincinnati, OH 45202<br>513-352-6545(T)<br>andrew.kolesar@thompsonhine.com | Stanley Tools<br>140 Chapel St.<br>Newark, NJ |

19

ALCD-PUBCOM_0003272

| | | |
|---|---|---|
| Three County Volkswagen<br>701 Riverside Ave.<br>Lyndhurst, NJ 07071 | Lee D. Henig-Elona, Esq.<br>Gordon & Rees<br>18 Columbia Turnpike, Suite 220<br>Florham Park, NJ 07932<br>973-549-2520(T direct)<br>973-549-2500(T office)<br>lhenig-elona@gordonrees.com | 701 Riverside Ave.<br>Lyndhurst, NJ |
| Tiffany & Co.<br>727 Fifth Avenue<br>New York, NY 10022 | John Klock, Esq.<br>Gibbons, PC<br>One Gateway Center<br>Newark, NJ  07102-5310<br>973-596-4757 (T)<br>jklock@gibbonslaw.com | 820 Highland Avenue<br>Newark, NJ |
| Unilever Bestfoods<br>International Plaza<br>Sylvan Avenue<br>Englewood Cliffs, NJ 07632<br><br>Conopco, Inc., d/b/a Unilever<br>(as successor to CPC/Bestfoods,<br>former parent of the Penick<br>Corporation | Joshua Frank, Esq.<br>Baker Botts<br>1299 Pennsylvania Ave., N.W.<br>Washington, DC  20004-2400<br>202-639-7710 (T)<br>Joshua.frank@bakerbotts.com<br><br>Andrew Shakalis, Esq.<br>Associate General Counsel – Environmental<br>& Safety<br>Unilever<br>700 Sylvan Avenue<br>Englewood Cliffs, NJ  07632<br>201-894-2763 (T)<br>201-894-2727 (F)<br>Andrew.shakalis@unilever.com | Penick Corporation<br>540 New York Avenue<br>Lyndhurst, NJ |
| Viacom Inc.<br>11 Stanwix St.<br>Pittsburgh, PA 15222<br><br>Now CBS Corporation | Jeffrey B. Groy, Esq.<br>VP, Sr. Counsel/ Environmental<br>CBS Corporation<br>333 West Wacker Drive, 27th Floor<br>Chicago, IL  60606<br>312-288-3851(T)<br>312-288-3801(F)<br>Jeff.Groy@cbs.com | Westinghouse Electric<br>95 Orange St.<br>Newark, NJ |

20

ALCD-PUBCOM_0003273

| | | |
|---|---|---|
| Vulcan Materials Co.<br>1200 Urban Center Drive<br>Birmingham, AL 35242<br><br>Now Legacy Vulcan Corp. | Eva Fromm O'Brien, Esq.<br>Fulbright & Jaworski<br>Fulbright Tower<br>1301 McKinney<br>Suite 5100<br>Houston, TX 77010-3095<br>713-651-5321 (T)<br>713-651-5246 (F)<br>eobrien@fulbright.com<br><br>John M. Floyd, Esq.<br>Senior Attorney<br>Vulcan Materials Company<br>1200 Urban Center Drive<br>Birmingham, AL 35242<br>205-298-3745 (Direct)<br>205-492-4219 (Cell)<br>205-298-2960 (F)<br>floydj@vmcmail.com | 600 Doremus Ave.<br>Newark, NJ |
| Wiggins Plastics Inc.<br>186 Kingsland Road<br>Clifton, NJ 07014 | Glenn Tucker, Esq.<br>Sheryl Reba, Esq.<br>Greenberg Dauber<br>One Gateway Center, Suite 600<br>Newark, NJ 07102<br>973-643-3700(T)<br>973-643-1218(F)<br>gtucker@greenbergdauber.com<br>sreba@greenbergdauber.com | 180 Kingsland Road<br>Clifton, NJ |
| Wyeth<br>5 Giralda Farms<br>Madison, NJ 07940 | Ronald J. Schott, Esq.<br>Corporate Counsel<br>Pfizer<br>5 Giralda Farms<br>Madison, NJ 07940<br>973-660-6641(T)<br>973-660-7176(F)<br>ronald.schott@pfizer.com<br><br>Seth Kerschner, Esq.<br>White & Case LLP 1155 Avenue of the<br>Americas<br>New York, NY 10036-2787<br>212-819-8630(T)<br>212-354-8113(F)<br>Seth.kerschner@whitecase.com | Shulton Inc. and<br>American Cyanamid Co.<br>697 Route 46<br>Clifton, NJ |

ALCD-PUBCOM_0003274

| Passaic Valley Sewerage Commission | Gregory A. Tramontozzi, Esq<br>Executive Director<br>Passaic Valley Sewerage Commissioners<br>600 Wilson Avenue<br>Newark, NJ 07105<br><br>Michael Witt, Esq.<br>Chasan Leyner & Lamparello, PC<br>300 Harmon Meadow Blvd.<br>Secaucus, NJ 07094<br>201-801-6093<br>mwitt@chasan.com | |
| City of Newark | Angela Foster, Esq.<br>First Assistant Corporation<br>Counsel<br>City of Newark Department of Law<br>Room 316, City Hall<br>920 Broad Street<br>Newark, NJ 07102<br>973-733-3880<br>fostera@ci.newark.nj.us | |
| Borough of East Newark | Honorable Joseph R. Smith, Mayor<br>Borough of East Newark<br>34 Sherman Avenue<br>East Newark NJ 07029 | |
| Town of Harrison | Honorable James A. Fife, Mayor<br>Town of Harrison<br>318 Harrison Avenue<br>Harrison, New Jersey 07029<br><br>Mr. Paul J. Zarbetski, Esq.<br>Town of Harrison<br>318 Harrison Avenue<br>Harrison, New Jersey 07029 | |
| Town of Kearny | Honorable Alberto G. Santos, Mayor<br>Town of Kearny<br>402 Kearny Avenue<br>Kearny, NJ 07032 | |

22

**Proposed Cash Out Parties**
**Lower 8.3 Miles of the Lower Passaic River**
**Diamond Alkali Superfund Site**

1. Alcan Corporation - now Novelis Corp.

2. Alden Leeds Inc.

3. Belleville Industrial Center

4. DiLorenzo Properties Company

5. EM Sergeant Pulp & Chemical Co.

6. Fiske Brothers Refining Co.

7. Flexon Industries Corp.

8. Harrison Supply Company

9. Mallinckrodt, Inc.

10. Palin Enterprises

11. Pfizer Inc.

12. Roman Asphalt Corporation

13. RTC Properties, Inc.

14. S&A Realty Corp.

15. Teva Pharmaceuticals USA, Inc.

16. The Andrew Jergens Co. - now KAO U.S.A Inc.

17. The BOC Group, Inc. - now Linde LLC on behalf of The BOC Group, Inc.

18. Three County Volkswagen

19. Wiggins Plastics Inc.

20. Wyeth

ALCD-PUBCOM_0003277

# EXHIBIT 53

OxyChem's Comments in Opposition to Proposed Consent Decree,
*United States v. Alden Leeds, Inc., et al.*, Civil Action No. 2:22-cv-07326 (D.N.J.)

ALCD-PUBCOM_0003278

| Contract Work Plan Tasks Timeline | | |
|---|---|---|
| [Time requirements in ( ) from Work Plan] | | |
| | *SOW Issued by EPA* | |
| 8/30/19 | **ERG Team submits Work Plan** | |
| 9/6/19 | *EPA approves Work Plan* | |
| 10/18/19 | *EPA authorizes AlterEcho as subcontractor to conduct work pursuant to Work Plan* | |
| **11/15/19** Held 10/22 | **AlterEcho Kickoff Meeting or Conference Call with EPA** (Within 20 business days of work plan authorization) | |
| **Allocation Data Reports** | | |
| | **Non-ES Party Data Reports** | **ES Party\* Data Reports** |
| 10/25/19 | | *EPA makes ES Decision* |
| 11/25/19 [20 business days] | | *ES PAPs submit Preliminary Factual Statement, 5 page determination, completed Preliminary Questionnaire, with expert reports* |
| 12/12/19 [10 business days[ | | **Allocation Team issues Draft Data Reports to ES PAPs for review** |
| 12/24/19 [10 business days] | | *ES PAPs submit comments on Draft ES Party Facility Data Reports* |
| 1/24/20 [20 business days] | | **Allocation Team submits Final ES Party Facility Data Reports to PAPs** |
| **1/24/20** | **Allocation Team submits Final Non-ES Party Facility Data Reports to PAPs** (Within 40 business days of 10/18/19 work plan authorization = 12/17/19) | |
| 1/31/20 | *PAP's submit executed certification regarding search for documents, to Allocation Team with copies to PAPs* | |
| **Allocation Recommendation Report** | | |
| 2/24/20 | *PAPs submit Position Briefs, with expert report as deemed necessary by the submitting PAP, to Allocation Team and all PAPs* **Allocation Team reviews briefs and holds communications with Allocation Parties as needed regarding Position Briefs** | |

\* - "ES Party" and "ES PAP" refers to those requesting PAPs not offered an early settlement opportunity by EPA

| 4/20/20 | *PAPs submit Responsive Briefs, with expert report as deemed necessary by the submitting PAP, to Allocation Team and all PAPs* |
|---|---|
| 7/7/20 | **Allocation Team submits Draft Allocation Recommendation Report to PAPs**<br>(Within 140 business days after completion of final facility data reports)<br>[With revised date for completion of final data reports = 114 business days] |
| 8/4/20 | **Allocation Team meeting with PAPs regarding Preliminary Allocation Recommendation Report** |
| 9/1/20 | *PAPs submit comments on Preliminary Allocation Recommendation Report to Allocation Team and all PAPs* |
| 10/7/20 | **Allocation Team submits Final Allocation Recommendation Report to Allocation Parties/EPA**<br>(65 business days after completion of draft allocation recommendation report) |
| 10/7/20 | **Completion of Searchable Database / Provide EPA Access to Database**<br>(Upon submission of final allocation recommendation report) |
| **Final Reports** | |
| 10/22/20 | **Allocation Team submits Final Outreach Report to EPA**<br>(10 business days after completion of final allocation recommendation report) |
| **TBD** | **Allocation Team submits Draft Close-Out Report to EPA**<br>(10 business days after EPA acceptance of final allocation recommendation report) |
| **TBD** | **Allocation Team submits Final TO Close-Out Report to EPA**<br>(10 business days after receipt of EPA comments) |

\* - "ES Party" and "ES PAP" refers to those requesting PAPs not offered an early settlement opportunity by EPA

# EXHIBIT 54

OxyChem's Comments in Opposition to Proposed Consent Decree,
*United States v. Alden Leeds, Inc., et al.*, Civil Action No. 2:22-cv-07326 (D.N.J.)

ALCD-PUBCOM_0003281

Case 2:22-cv-07326-MCA-LDW    Document 309-24    Filed 04/01/24    Page 37 of 276
Case 2:18-cv-11273-JLL-JAD   Document 370-5   Filed 10/24/18   Page 1 of 28 PageID: 1628
PageID: 15252

*Public Version*

# Revised Work Plan

## EPA Conflict Prevention and Resolution Services Contract

## Contract # EP-W-14-020

## Work Plan for Task Order #096

## Diamond Alkali-Lower Passaic River Allocation

**Prepared for:**

US Environmental Protection Agency
Washington, DC 20460

EPA Program Office:                           Region 2
EPA Task Order Contracting Officer's
Representative (TOCOR):                        Alice Yeh

CSRA Task Order Manager (TOM):                 Mary Apostolico

Subcontractor Task Manager:                    ~~David Batson~~ Judy Manley
                                               TechLaw / AlterEcho

ALCD-PUBCOM_0003282

Case 2:22-cv-07326-MCA-LDW    Document 309-24    Filed 04/01/24    Page 38 of 276
Case 2:18-cv-11273-JLL-JAD    Document 376-5    Filed 10/24/18    Page 2 of 28 PageID: 1629
PageID: 16253

*Public Version*

This Revised Work Plan describes CSRA's approach for performing the tasks described in the Revised Statement of Work. It includes a description of the activities associated with each task as well as a list of transmittals and deliverables and their due dates. A cost estimate for this Task Order Work Plan is provided as a separate attachment. Revisions to this work plan are presented with strike thru and in bold blue. This modification adds additional documents relevant to the allocation to be submitted by the PRPs (along with associated time to evaluate the documents for relevance), additional time for PRPs to communicate, meet, and exchange information with the allocator, and a step for early identification of PRPs who are similarly situated to the parties that received the first round of cash out settlement offers from EPA for EPA's use in making early settlement determinations.

The Work Plan is organized as follows:

Section 1.0 - Background
Section 2.0 - Assumptions
Section 3.0 - Project Methodology and Approach
Section 4.0 - Work Tasks
Section 5.0 - Reports, Transmittals and Deliverables
Section 6.0 - Staffing Plan
Section 7.0 - Quality Management
Section 8.0 - Conflict of Interest
Section 9.0 - Cyber Security
Section 10.0 - Project Budget
Section 11.0 - Period of Performance

## 1.0    Background

The Diamond Alkali Site (the Site) has a long history, involving over 100 potentially responsible parties (PRPs). Since the late 1800s, the Lower Passaic River has been a highly industrialized waterway, receiving direct and indirect discharges from numerous industrial facilities. Data collected in the Lower Passaic River, and EPA's analyses, show that contaminated sediment in the lower 8.3 miles are a major source of contamination to the rest of the river and Newark Bay and pose an unacceptable risk to human health and the environment due to the presence of a variety of contaminants that stay in the environment for a long time and can build up in fish and shellfish. These contaminants include dioxins and furans, PCBs, mercury, DDT and its primary breakdown products, copper, dieldrin, PAHs, and lead.

On March 4, 2016, EPA issued a record of decision selecting the remedy for the lower 8.3 miles of the Lower Passaic River, which is Operable Unit 2 (OU2) of the Site. Currently, the remedial design (RD) for OU2 is being performed by Occidental Chemical Corporation (OCC) pursuant to an administrative order on consent. The cost of the remedial action (RA), estimated for purposes of remedy selection, is $1.38 billion.

Region 2 has issued a notice of potential liability to approximately 100 parties, informing them of their responsibility for the RD/RA for OU2. The Region has offered a first round of cash-out settlements to a group of approximately 20 PRPs. The Region expects to separately address the liability of municipalities and public entities. For the remaining PRPs, the Region expects to enter into settlement negotiations for performance and funding of the remedy with OCC and other parties (the "Major PRPs") that the Region considers to be major PRPs for OU2. The Region plans another round of cash-out settlements with "Middle Tier PRPs", i.e., not part of the phase 1 cash-out group, but also not Major PRPs. The Region requires the services of a third

---

ALCD-PUBCOM_0003283

Case 2:22-cv-07326-MCA-LDW    Document 309-24    Filed 04/01/24    Page 39 of 276
Case 2:18-cv-11273-JLL-JAD    Document 370-5    Filed 10/24/18    Page 3 of 28 PageID: 1630
PageID: 15254

*Public Version*

party allocator to develop a settlement framework and evaluate the 80 Middle Tier and Major
parties within the framework.

Region 2 understands that the PRP group (the Cooperating Parties Group, or CPG) has made
at least two previous attempts to develop a mutually acceptable allocation of liability to promote
settlement with EPA for costs and work at the Site, however both efforts fell short of agreement.
Region 2 believes that because of these previous efforts, additional information available from
responses to CERCLA 104(e) letters, information available from previous litigation at the state
level and numerous conversations with PRPs over the years, the project will be able to be built
primarily upon existing information and contacts. Some minor augmentation of background,
data and allocation factors may need to occur to develop what is hoped to be an acceptable
settlement proposal and structure. In 2016, the Department of Justice retained a
mediator/allocation specialist, David Batson of TechLaw/AlterEcho, to assist in settlement
analysis. Those discussions and analyses have resulted in this effort.

## 2.0    Assumptions
This work plan and the attached cost estimate are based on the following assumptions, in
addition to Task-specific assumptions noted in Section 4.0 of the Work Plan. All work will be
conducted in accordance with the specific tasks in the Work Plan to the performance metrics
specified therein.
General Assumptions:
- EPA will provide the CSRA Team with a list of parties noticed regarding their
responsibility for the RD/RA for OU2, including:
  - a list of Major and Middle Tier Parties ("OU2 PRPs");
  - a list of Phase 1 cash-out parties; and
  - a list of other OU2 parties, including municipalities and other entities
- Maximum of 80 PRPs will be provided an opportunity to participate in or be evaluated for
the purpose of determining a share of responsibility in the allocation process
- All OU2 PRPs will be provided an opportunity to participate in the design of the
allocation database and process and to provide additional Site-related information for
possible addition to the database, and will be designated a share of responsibility in the
Final Allocation Recommendation Report
- The Final Allocation Recommendation Report will also divide the parties into logical
groupings of similarly-situated PRPs
- EPA will provide the CSRA Team with a listing and contact information for each OU2
PRP; Reference herein to meetings or other forms of communication with the OU2 PRPs
means communication with the identified representatives of such parties
- A maximum of ~~150,000~~ *290,000* pages of documents will *be* reviewed and utilized to
conduct the allocation, including;
  - A maximum of 130,000 pages of documents received from EPA for CSRA Team
review
  - A maximum of ~~20,000~~ *160,000* extra pages of documents received from PRPs
for CSRA review
- All communications by the CSRA Team will be by phone or email unless meeting noted
- *The CSRA Team estimates 8-10 hours of communications per party over the*
*remainder of the project. This time is presented as 2 hours per party in Tasks*
*5.A.1 and 6.A.4; additional meetings (5.A.1, 5.B.1, 9, 10.2); and an undefined*
*number of calls and e-mails allowed for in remaining tasks.*
- Maximum of 4 hours of combined project status/update calls will be held by the CSRA
Team with EPA per month

ALCD-PUBCOM_0003284

Case 2:22-cv-07326-MCA-LDW   Document 309-24   Filed 04/01/24   Page 40 of 276
Case 2:18-cv-11273-JLL-JAD   Document 376-5   Filed 10/24/18   Page 4 of 28 PageID: 1631
PageID: 16253

*Public Version*

- Out-of-DC Area Meetings:
  - ○ 3 6 meetings involving 2 contractor staff
- Out-of-DC area meetings will be held at the EPA Region 2 offices or other location in the greater New York City metropolitan area as determined by EPA, or OU2 PRPs they supply meeting space
- Travel for and timing of out-of-DC area meetings will be scheduled to allow CSRA Team members to travel from Washington, DC and return on the same day
- Meetings will be scheduled and held within noted timeframes
- The allocation database will be designed and organized primarily for purposes of allocation
- Space and equipment for meetings will be provided by EPA or PRPs
- The CSRA Team will provide EPA with a copy of all communications sent to OU2 PRPs regarding the subject, substance, and logistics of OU2 PRP meetings with CSRA Team members
- Any part of a communication, attachment to a communication, presentation, or written material provided to OU2 PRPs by the CSRA Team that involves a description of the Site or EPA actions or activities will be provided to EPA for review and approval prior to submission to the OU2 PRPs
- Unless otherwise noted herein, all allocation related communications by the CSRA Team involving the OU2 PRPs or representatives of EPA or DOJ, individually or in groups, will be held confidential pursuant to the provisions of the ADR Act of 1996, 5 USC 574
- In order to ensure a common expectation of confidentiality, all PRP participants in the allocation process will be required to enter, and EPA will appropriately acknowledge, a confidentiality agreement
- The CSRA Team will provide invoices to EPA at the end of each month in which a task is completed (activity, transmittal, and/or deliverable) identified in Section 4.0 of the Work Plan, with a written Progress Report detailing associated activities accomplished during the reporting period, how such activities meet Task Order performance standards, and associated labor and other direct costs
- "Staffing" referenced in Section 4.0 Work Tasks refers to TechLaw staff.
- This Task Order can be modified to change the statement of work or add funding.

## 3.0   Project Methodology and Approach

The proposed methodology and approach consists of the following:
- To support this Task Order, CSRA selected TechLaw support.
- CSRA and TechLaw (the CSRA Team) will not interpret EPA policy on behalf of the EPA or make decisions on items of policy, regulation or statutes. The CSRA Team also will not take a stand on the merits of substantive items under discussion including, but not limited to, any substantive issues raised by OU2 PRPs. The CSRA Team will not interpret EPA's March 4, 2016, record of decision selecting the remedy for OU2 of the Site.
- In gathering information or performing research with parties outside the EPA, CSRA Team members will identify themselves as contractors to EPA and not as EPA employees.
- CSRA will approach this task in accordance with the basic terms of the contract and according to the established norms and ethical standards of ADR professionals. Except as otherwise noted herein, information provided to the ADR professional by any of the parties, including EPA, communications between parties and the ADR professional, and notes and dispute resolution work product generated by the ADR professional during

ALCD-PUBCOM_0003285

Case 2:22-cv-07326-MCA-LDW    Document 309-24    Filed 04/01/24    Page 41 of 276
Case 2:18-cv-11273-JLL-JAD    Document 376-5    Filed 10/24/18    Page 5 of 28 PageID: 1632
PageID: 16256

*Public Version*

work pursuant to the Task Order will be maintained as confidential by the ADR professional pursuant to the provisions of the ADR Act of 1996 (Public Law 104-320; 5 USC 571 et al.) and applicable federal, state and judicial requirements.
- To enhance the positive substantive, relational, and procedural outcomes from ADR cases, CSRA will direct all ADR professionals providing ADR services under this task order to do the following prior to the mediation or facilitation and throughout the process:
  - o Inquire about whether individual participants have the time, financial, and logistical resources necessary to participate effectively in the process and – where resources are inadequate – assist them in identifying appropriate resources or in making necessary adjustments to the process to accommodate resource constraints;
  - o Assist the participants in identifying the issues that are important to resolving any controversy and solutions that will address the needs shared by the participants;
  - o Conduct the process to promote active engagement from all participants;
  - o Explore with the participants appropriate ways to incorporate high quality and relevant information resources necessary to resolve the issues; and
  - o To support productive dialogue and effective implementation of any agreements reached by the participants, ensure that participants have appropriate authority to make commitments on behalf of their organizations.

As prime contractor, CSRA will support this Task Order through the following activities:
- Provide progress reports at the end of each month in which an activity, transmittal, and/or deliverable identified in Section 5.0 of the Work Plan is completed;
- Communicate and coordinate with the EPA Task Order Contracting Officer's Representative (TOCOR) by phone as needed;
- Coordinate with the subcontractor, TechLaw;
- Incorporate the principles of Quality Management while carrying out this task;
- Provide deliverables in electronic format (as agreed to by the TOCOR) to the EPA TOCOR; and
- NOTIFY THE EPA PROJECT DIRECTOR AND PROGRAM OFFICE CONTACT WHEN 75% OF THE FUNDS PROVIDED HAVE BEEN EXPENDED.

## 4.0   Work Tasks

### Task 0.0   **Task Order Management**

In accordance with proper contract implementation, CSRA and TechLaw will ensure effective management of the resources and deliverables required by EPA.

Specifically, the CSRA Task Order Manager (TOM) for this effort will:
- Ensure that all technical direction received falls into the scope of work prior to initiating any action;
- Ensure completion and maintain copies of all contract transmittals and deliverables;
- Oversee subcontractor activities through regular and periodic conversations with the subcontractor to ensure effective performance;
- Ensure that progress and financial reports accurately clearly articulate the work completed as per the approved work plan, and identify any problems encountered and activities to address them;
- Speak on an as-needed basis with the EPA TOCOR to review the financial and work status of the project;

ALCD-PUBCOM_0003286

Case 2:22-cv-07326-MCA-LDW    Document 309-24    Filed 04/01/24    Page 42 of 276
Case 2:18-cv-11273-JLL-JAD    Document 370-5    Filed 10/24/18    Page 6 of 28 PageID: 1633
PageID: 16257
***Public Version***

- Review the progress report and invoice with the EPA TOCOR; and
- Update the Dashboard task order management tracking system as invoices are submitted.

The CSRA Team developed this Work Plan to provide a detailed explanation of all activities associated with and a proposed approach for completing each of the defined tasks. The CSRA Team identified the transmittals and deliverables and their associated due dates and developed a detailed fixed price budget, including a breakout of labor and travel costs.

| Item | Title | Due No Later Than[†] | Type |
|---|---|---|---|
| 0.1 | Work Plan | Within 10 days* of SOW issuance or as approved by the EPA CO | **Deliverable** |
| *0.1a* | *Revised Work Plan* | *Within 10 days* of SOW issuance or as approved by the EPA CO* | *Deliverable* |
| 0.2 | Progress Reports | Submitted after completion of each task and with submission of invoice | **Deliverable** |

[†] Or as otherwise directed by the TOCOR
* All references to "days" refer to business days

### Task 1    **Preliminary Work** - Complete

| Item | Title | Due No Later Than[†] | Type |
|---|---|---|---|
| 1.1 | Task Order Kick-Off Meeting | Within 20 days* of Task Order approval | Transmittal |

[†] Or as otherwise directed by the TOCOR
* All references to "days" refer to business days

The CSRA Team will prepare for and participate in a meeting with EPA to discuss tasks described in the Task Order, EPA's expectations for the project, and a plan for conducting the outreach to PRPs. Prior to the meeting, the CSRA Team will develop its overall strategy for conduct of the allocation process, including a timeline of tasks and strategy for communications with the OU2 PRPs. During the meeting, the EPA will advise the CSRA Team regarding the identity of the OU2 PRPs and the scope and nature of the selected remedy. Following the meeting, the CSRA Team will send an email summarizing the agreed-upon PRP Outreach Plan for approval of the EPA technical lead in consultation with EPA legal personnel. The developed PRP outreach plan will include a process for contacting and receiving information from PRPs, including for meetings and conference calls with the OU2 PRPs as a group, and individual OU2 PRP contacts via email, letter, or phone, and confidentiality procedures.

This task will require the following efforts on the part of the CSRA Team:
- Development of a plan for conducting outreach to OU2 PRPs that includes an opportunity for all OU2 PRPs to (1) provide feedback on the design of the allocation, including additional data, information or factors which should be considered in design of the database, (2) review their individual PRP data report for accuracy, (3) provide suggestions regarding design of the allocation  process and (4) provide feedback on the allocation report. The plan will also explain how the CSRA Team will update EPA on PRP outreach efforts
- Drafting and submission of an email summarizing the agreed-upon PRP outreach plan for approval of the EPA technical lead
- The CSRA Team will supply two (2) senior staff located in Washington, DC for the meeting

ALCD-PUBCOM_0003287

Case 2:22-cv-07326-MCA-LDW    Document 309-24    Filed 04/01/24    Page 43 of 276
Case 2:18-cv-11273-JLL-JAD    Document 376-5    Filed 10/24/18    Page 7 of 28 PageID: 1634
PageID: 16258

*Public Version*

Tech Law Staffing - Senior Allocation Specialist; Senior Project Manager

*Performance Standards/Metrics:*
- The CSRA Team participates in the Task Order Kick-Off Meeting
- The submitted summary of the PRP Outreach Plan provides a summary of the agreement reached at the Task Order Kick-Off Meeting regarding the plan for communications by the CSRA Team with the OU2 PRPs

### Task 2    **Public Announcement of Project** - Complete

| Item | Title | Due No Later Than† | Type |
|------|-------|--------------------|----|
| 2.1 | EPA Project Public Announcement Meeting | Within 40 days* of Task Order approval | Activity |

† Or as otherwise directed by the TOCOR
* All references to "days" refer to business days

The CSRA Team will participate in a meeting, sponsored by EPA, with the OU2 PRPs to announce and explain the allocation project, including opportunities for participation of the OU2 PRPs in the development of the allocation process. Following the project announcement meeting noted in Task 2, the CSRA Team will work to obtain and record signatures of the OU2 PRPs and acknowledgement of EPA to the Participation Agreement distributed during the project announcement meeting.

This task will require the following efforts on the part of the CSRA Team:
- Preparation of talking points and handout material for participants regarding the allocation process in consultation with the EPA technical lead in consultation with EPA legal personnel
- Preparation of a written Participation Agreement for consideration and execution of the OU2 PRPs, incorporating an explanation of relevant confidentiality protections and requirements associated with the allocation process
- The CSRA Team will supply two (2) senior staff located in Washington, DC to participate in the meeting
- Communication via email, and as required via phone, with the OU2 PRPs as a group regarding execution of and to answer questions regarding the Participation Agreement
- Recording and compilation of executed Participation Agreement signature pages

Conduct of this task is dependent upon EPA's ability to successfully make arrangements for and schedule the meeting, and communicate with OU2 PRPs regarding the meeting, and upon receipt of EPA's final approval of the PRP outreach plan agreed upon during the Task Order Kick-Off Meeting within 10 business days of the meeting.

Staffing - Senior Allocation Specialist, Senior Project Manager

*Performance Standards/Metrics:*
- Talking points and materials prepared for the meeting provide an overview of the project and opportunities for PRP participation noted in the PRP Outreach Plan developed in Task 1
- The CSRA Team participates in the Task Order Kick-Off Meeting
- A majority of the members of the OU2 PRPs execute the Participation Agreement

ALCD-PUBCOM_0003288

Case 2:22-cv-07326-MCA-LDW   Document 309-24   Filed 04/01/24   Page 44 of 276
Case 2:18-cv-11273-JLL-JAD   Document 376-5   Filed 10/24/18   Page 8 of 28 PageID: 1635
PageID: 16259

*Public Version*

**Task 3        Initial Allocation Process and Database Design**

| Item | Title | Due No Later Than[†] | Type |
|------|-------|------------------|------|
| 3.1 | Submit initial allocation process and database design to EPA | Within 100 days* of Task Order approval | Transmittal |

† Or as otherwise directed by the TOCOR
\* All references to "days" refer to business days

The CSRA Team will review documents received from EPA and prepare a written descriptive summary of the initial design for the allocation process, including a design of the allocation database, and submit to EPA for review.

The allocation process will be designed based upon information received during consultations with EPA and OU2 PRPs on the allocation database and using all relevant non-confidential received information, including data, records, and other documents. The initial design will include recommendations for: (1) data sources to be considered for the allocation; (2) applicable allocation factors; and (3) methodology for determination of shares.

The searchable database will be designed to have the capability to contain and organize all of the information and data used in the allocation, including received PRP disclosure statements and nexus documents from third party litigation. No confidential information will be included in the allocation database. Though to be designed for purposes of conducting the allocation, the database will be designed in such a way as to allow access and use by EPA and DOJ staff for their settlement purposes following submission of the Allocation Data Reports in Task 8. The CSRA Team will, as an interim measure, create and provide EPA access to a SharePoint site in which any site documents received from the OU2 PRPs will be maintained.

This task will require the following efforts on the part of the CSRA Team:

- Conduct a preliminary review of Site data on OU2 contaminants of concern as identified in the OU2 ROD to determine appropriate allocation data sets
- Conduct preliminary research, analysis, and determine applicable case law, legal requirements, and equitable considerations for use in conducting allocation
- Conduct initial review and analysis of EPA selected remedy for OU2 to determine method to account for differential impact of contaminants of concern and source location
- Conduct a preliminary review of information received from EPA, including PRP disclosure statements and nexus documents from third party litigation, in order to determine the appropriate design of the database required to support conduct of the allocation process
- Conduct initial coding of data and loading of coded data into database to determine credibility of database design concept
- Establish preliminary recommendations regarding allocation computations appropriate for OU2, procedures for use of data in allocation computations, and appropriate allocation methodology, and the design of a searchable database with capability to contain and organize all of the information and data used in the allocation
- Preparation of a written descriptive summary of the initial design for the allocation process, including (1) a timeline for submission of allocation related documents,

ALCD-PUBCOM_0003289

Case 2:22-cv-07326-MCA-LDW    Document 309-24    Filed 04/01/24    Page 45 of 276
Case 2:18-cv-11273-JLL-JAD    Document 376-5    Filed 10/24/18    Page 9 of 28 PageID: 1636
PageID: 16260

*Public Version*

including PRP position briefs and reply briefs, and (2) a written description of the design of the database with a suggested method for providing OU2 PRPs specific information on the contents of the database, suggestions on methods for resolving data gaps in data regarding OU2 PRPs not identified in documents received from EPA, and if practical, images of anticipated data screens.

- Establish a SharePoint site that provides EPA access to documents received from OU2 PRPs

Conduct of this task is dependent upon; (1) receipt of all allocation documents and information regarding the site remedy from EPA within 20 business days of approval of the Task Order, and (2) receipt of all information from EPA as individual documents in OCR searchable pdf format to allow loading into the allocation database.

Staffing - Senior Allocation Specialist; Senior Project Manager; Database Designer

*Performance Standards/Metrics:*
- The CSRA Team submits a written descriptive summary of the initial design for the allocation process, including a database design, within the noted timeframe
- The submitted written descriptive summary of the initial design for the allocation process includes a summary of the basis of and anticipated conduct the allocation process, including preliminary recommendations on data sources to be considered for the allocation, applicable allocation factors, and methodology for determination of shares
- The submitted initial database design provides a written description of the database, including, suggested method for providing OU2 PRPs specific information on the contents of the database, suggestions on methods for resolving data gaps in data regarding OU2 PRPs not available in documents received from EPA, and if practical, images of anticipated data screens

### Task 4    Conference Call w EPA on Initial Database Design

| Item | Title | Due No Later Than† | Type |
|---|---|---|---|
| 4.1 | Conference Call with EPA on Initial Allocation Process and Database Design | Within 10 days* of submission of initial allocation process and database design | Activity |

† Or as otherwise directed by the TOCOR
* All references to "days" refer to business days

Task 4.1 – The CSRA Team will prepare for and participate in a conference call with EPA regarding the initial allocation process and database design. The purpose of the call will be to advise and consult with EPA regarding the submitted initial allocation process and database design and to discuss and resolve any EPA comments. Following the conference call, the CSRA Team will edit the initial allocation process and database design based on received EPA comments to create a draft design for submission to the OU2 PRPs.

This task will require the following efforts on the part of the CSRA Team:
- The CSRA Team will supply two (2) senior project staff located in Washington, DC to participate in the conference call
- Conference call assumed to be no more than two (2) hours in length

ALCD-PUBCOM_0003290

Case 2:22-cv-07326-MCA-LDW   Document 309-24   Filed 04/01/24   Page 46 of 276
Case 2:18-cv-11273-JLL-JAD   Document 37/05   Filed 10/24/18   Page 10 of 28 PageID: 1637
PageID: 16261

*Public Version*

Staffing – Senior Allocation Specialist; Senior Project Manager

*Performance Standards/Metrics:*
- The CSRA Team participates in the draft Database Design conference call

**Task 5**   **Meeting with PRPs on Draft Allocation Process and /Database Design, and Initiation of early Settlement Process**

| Item | Title | Due No Later Than† | Type |
|------|-------|--------------------|------|
| 5.*A*.1 | Conduct *two* Meeting*s* with PRPs on Draft Allocation Process and Database Design | Within 40 days* of submission of initial allocation process and database design to EPA | Activity |
| 5.*A*.2 | Conference Call with EPA on Meeting*s* with PRPs on Draft Allocation Process and Database Design | Within 10 days* following the Meeting with PRPs on Draft Allocation Process and Database Design | Activity |
| 5.*B*.1 | *Submit guidance on preparation of allocation submissions to EPA and PRPs* | *Within 5 days of Revised Task Order Approval* | *Transmittal* |
| 5.*B*.2 | *Submit recommendation on relevancy of documents provided by OU2 PRPs to EPA and PRPs* | *Within 30 days of Revised Task Order Approval* | *Transmittal* |

† Or as otherwise directed by the TOCOR
* All references to "days" refer to business days

Task  5.*A*.1 - The CSRA Team will plan, schedule, and conduct a meeting *two meetings* with the OU2 PRPs as a group regarding the draft design of the allocation process and database. The purpose of the meeting*s* will be to advise the OU2 PRPs as a group regarding the anticipated conduct of the allocation process and the anticipated organization of data and contents of the database, and to obtain PRP comments regarding the draft allocation process and database design. The CSRA Team will also communicate with the OU2 PRPs individually to obtain the input of OU2 PRPs, including those that did or were unable to attend the outreach meeting*s*, regarding suggestions on the effective design and conduct of the allocation process and database, and to obtain additional records and information, if any, for the allocation  database.  The CSRA Team will establish a deadline of 60 business days following the meeting with PRPs on draft allocation process and database design for the submission by OU2 PRPs of additional data for inclusion in the allocation database.

This task will require the following efforts on the part of the CSRA Team:
- Making arrangements for a meeting in the greater New York City metropolitan area sufficient to accommodate the OU2 PRPs as a group
- Coordination of meeting space and equipment for meetings provided by EPA or  OU2 PRPs
- Communication via email with the OU2 PRPs regarding substance, date/time, and location of meeting

ALCD-PUBCOM_0003291

Case 2:22-cv-07326-MCA-LDW   Document 309-24   Filed 04/01/24   Page 47 of 276
Case 2:18-cv-11273-JLL-JAD   Document 37/cs   Filed 10/24/18   Page 11 of 28 PageID: 1638
PageID: 16262

*Public Version*

- Development of meeting agenda
- Development of participant materials, including a descriptive summary of Site information received from EPA and a description of the draft allocation process and database design
- Travel of two (2) senior staff from Washington, DC to attend meeting
- Communications by Senior Allocation Specialist via phone, email, or other electronic media as required with OU2 PRPs; ~~Communications will be limited to an average of 20 minutes for each OU2 PRP~~
- *Communications will be limited to an average of 2 hours for each OU2 PRP*
- Record PRP comments regarding allocation process and database design and conduct, without attribution to individual OU2 PRP comments

Staffing – Senior Allocation Specialist; Senior Project Manager

*Performance Standards/Metrics:*
- The CSRA Team conducts a meeting with the OU2 PRPs as a group regarding design of the allocation process and database
- A majority of the members of the OU2 PRPs as a group attend the meeting either in person or remotely
- The CSRA Team copies the EPA technical lead on its email communication to the OU2 PRPs regarding substance, date/time, and location of meeting, and provides EPA with a copy of utilized meeting materials

Task 5.*A*.2 - The CSRA Team will schedule and hold, within 10 business days of holding the meeting*s* with the OU2 PRPs on the draft allocation process and database design, a conference call with EPA regarding the findings of the meeting*s*.

This task will require the following efforts on the part of the CSRA Team:
- Scheduling and participating in ~~a~~ *two* conference call*s* with EPA to provide EPA information on the meeting*s*, including a list of participants at the meeting and summary of suggestions received regarding the allocation process and database design
- Conference call assumed to be no more than two (2) hours in length

Timing of this task is dependent upon the availability of assigned EPA staff to participate in a conference call within noted timeframe.

Staffing – Senior Allocation Specialist; Senior Project Manager

*Performance Standards/Metrics:*
- The CSRA Team participates in a conference call with EPA regarding the findings of the meeting following the Database Design Outreach Meeting
- In conducting the post-meeting conference call with EPA, the CSRA Team provides a summary of information and suggestions obtained from the OU2 PRPs without attribution to contributions of individual participants

*Task 5.B.1 - The CSRA Team will prepare a written guide regarding the format and preparation of written submissions by OU2 PRPs pursuant to the allocation process and submit to EPA and the OU2 PRPs*

ALCD-PUBCOM_0003292

Case 2:22-cv-07326-MCA-LDW    Document 309-24    Filed 04/01/24    Page 48 of 276
Case 2:18-cv-11273-JLL-JAD    Document 3/05   Filed 10/24/18    Page 12 of 28 PageID: 1639
PageID: 16263

*Public Version*

*The preparation guide will be designed based upon information received during consultations with EPA and OU2 PRPs on the allocation process. The preparation guide will include the format and content of required allocation documents, including: (1) initial equitable factors brief; (2) preliminary factual submission; (3) document submission certification; and (4) notification of early settlement eligibility.*

*This task will require the following efforts on the part of the CSRA Team:*
- *Conduct a conference call with OU2 PRPs to announce and explain modifications to the allocation project, including opportunities for participation of the OU2 PRPs in the development of the allocation process*
- *Conduct of communications, including a meeting, with OU2 PRPs regarding recommended format and content of above noted required allocation submissions*
- *Preparation of written guide regarding the format and preparation of written submissions by OU2 PRPs pursuant to the allocation process for review by EPA*
- *Preparation of written guide based upon EPA comments and suggestions for review by OU2 PRPs.*
- *Preparation of a final written guide regarding the format and preparation of written submissions by OU2 PRPs pursuant to the allocation process based upon comments and suggestions received from the OU2 PRPS and EPA*

*Staffing - Senior Allocation Specialist; Senior Project Manager*

*Performance Standards/Metrics:*
- *The CSRA Team conducts a call with OU2 PRPs as a group to announce and explain modifications to the allocation project, including opportunities for participation of the OU2 PRPs in the development of the allocation process*
- *The CSRA Team submits a written guide regarding the format and preparation of written submissions by OU2 PRPs pursuant to the allocation process to EPA for review within the noted timeframe.*
- *The CSRA Team submits a written guide to the OU2 PRPs within the noted timeframe*
- *The submitted written guide includes the format and content of required allocation documents, including: (1) initial equitable factors brief; (2) preliminary factual submission; (3) document submission certification; and (4) notification of early settlement eligibility.*

*Task 5.B.2 – The CSRA Team will organize and conduct a review of initial indices of documents proposed for inclusion in the Allocation Document Database by OU2 PRPs to develop a recommendation on the relevancy of proposed documents to the allocation process.*

*This task will require the following efforts on the part of the CSRA Team:*
- *Conduct an analysis of document information contained in indices received from the OU2 parties to determine if the proposed documents meet established relevancy criteria for inclusion in Allocation Document Repository*
- *Drafting of a written recommendation indicating which of the recommended documents are deemed    to meet the established relevancy criteria for inclusion in Allocation Document Repository, with an explanation of the rationale for the exclusion of any recommended document*

*Staffing - Data Analysts; Senior Project Manager; Senior Allocation Specialist*

ALCD-PUBCOM_0003293

Case 2:22-cv-07326-MCA-LDW   Document 309-24   Filed 04/01/24   Page 49 of 276
Case 2:18-cv-11273-JLL-JAD   Document 37/05   Filed 10/24/18   Page 13 of 28 PageID: 1640
PageID: 16264

*Public Version*

*Performance Standards/Metrics*

- *The CSRA Team submits the written recommendation regarding the relevancy of OU2 PRP documents to EPA, with a copy to the OU2 PRPs, within the noted timeframe*
- *The submitted written recommendation indicates which of the documents recommended by OU2 PRPs are deemed to meet the established relevancy criteria for inclusion in Allocation Document Repository, with an explanation of the rationale for the exclusion of any recommended document*

**Task 6**       **Final Allocation Design** *and Early settlement PRP Data Reports*

| Item | Title | Due No Later Than[†] | Type |
|------|-------|----------------------|------|
| 6.*A* 4 | Submit Final Allocation Design to EPA and PRPs | Within 50 days* following the Meeting with PRPs on Draft Allocation Process and Database Design | Transmittal |
| *6.B.1* | *Submit draft PRP Data Reports regarding Early Settlement PRPs to PRPs and EPA* | *Within 10 days* of EPA final decision regarding additional documents for inclusion in repository* | *Transmittal* |
| *6.B.2* | *Submit final PRP Data Reports regarding Early Settlement PRPs to PRPs and EPA* | *Within 15 days of submission of Draft Early Settlement Part Data Reports* | *Transmittal* |

† Or as otherwise directed by the TOCOR
* All references to "days" refer to business days

*Task 6.A. -* The CSRA Team will complete the design of the allocation process based on input received from EPA and PRPs for submission to the OU2 PRPs and EPA.

This task will require the following efforts on the part of the CSRA Team:
- Conduct coding of data and loading of coded data into database
- Communications by Senior Allocation Specialist via phone, email, or other electronic media as required with OU2 PRPs; Communications will be limited to an average of *2 hours* 20 minutes for each OU2 PRP
- *Review of factors statements by OU2 PRPs regarding suggestions on protocol and equitable factors for use in allocation*
- Record, compile, and organize suggestions of OU2 PRPs regarding allocation process design and conduct without attribution to individual comments
- *Conduct a call with EPA to discuss suggestions received from OU2 PRPs regarding allocation process design and conduct without attribution to individual comments*
- Edit draft allocation design based on analysis of received Site data, EPA comments on the draft allocation design, and consideration of input received from OU2 PRPs during meeting and other outreach methods to prepare a written descriptive summary of the final allocation design and submit to EPA and the OU2 PRPs

Staffing - Senior Allocation Specialist; Senior Project Manager

*Performance Standards/Metrics:*

ALCD-PUBCOM_0003294

Case 2:22-cv-07326-MCA-LDW    Document 309-24    Filed 04/01/24    Page 50 of 276
Case 2:18-cv-11273-JLL-JAD    Document 37/65    Filed 10/24/18    Page 14 of 28 PageID: 1641
PageID: 16265

*Public Version*

- The CSRA Team submits a written descriptive summary of the final design for the allocation process within the noted timeframe
- The submitted written descriptive summary of the final design for the allocation process includes a description of the basis of and anticipated conduct of the allocation process, addresses any identified ambiguities in the draft report, and includes a summary of how the comments of EPA and the OU2 PRPs regarding the draft allocation design were, or were not, taken into account in the final allocation design, without attribution.

*Task 6.B.1. - The CSRA Team will organize and conduct a technical and scientific evaluation of data in the allocation database to develop individual data reports for each of the OU2 Early Settlement PRPs. The PRP Data Reports will provide selected information regarding each OU2 Early Settlement PRP's relation to OU2 and OU2 contaminants of concern that will be used in conduct of the allocation. The CSRA Team will establish a deadline of 10 business days from receipt of the data report for submission of corrections or suggestions by the OU2 PRPs for improving the quality of the received OU2 Early Settlement PRP's data report.*

*This task will require the following efforts on the part of the CSRA Team:*
- *Conduct a call with EPA to discuss the Allocation Team recommendation regarding the relevancy to the allocation of documents provided by OU2 Early Settlement PRPs*
- *Conduct coding of data and loading of coded data into database obtained from OU2 Early Settlement PRPs*
- *Review preliminary factual submission by OU2 Early Settlement PRPs*
- *Review Site data loaded into database to determine appropriate organization for allocation*
- *Compile and organize Site data in database to support allocation analysis and share computations*
- *Organize data in allocation database and draft individual OU2 Early Settlement PRP data reports*
- *Provide a copy of the Early Settlement PRP data reports to the OU2 PRPs for review*

*Conduct of this task is dependent upon the following:*
- *Access by the CSRA Team to EPA technical data regarding Site conditions and the selected OU2 remedy*
- *Sufficient data on identified Early Settlement PRPs to allow analysis of associated contaminants of concern and hazardous substance fate and transport at the Site*
- *Successful establishment of the allocation database*
- *Receipt of additional data from OU2 Early Settlement PRPs for inclusion in the allocation database*

*Staffing - Data Analysts; Senior Scientist; Senior Project Manager; Senior Allocation Specialist*

*Performance Standards/Metrics*
- *The CSRA Team submits the PRP Data Reports to the OU2 PRPs within the noted timeframe*

---

ALCD-PUBCOM_0003295

Case 2:22-cv-07326-MCA-LDW   Document 309-24   Filed 04/01/24   Page 51 of 276
Case 2:18-cv-11273-JLL-JAD   Document 37/05   Filed 10/24/18   Page 15 of 28 PageID: 1642
PageID: 16266

*Public Version*

- *The submitted written individual PRP Data Reports include a summary of information in the allocation database that is relevant to a determination regarding the associated OU2 Early Settlement PRP's relation to OU2 and OU2 contaminants of concern for use in conduct of the allocation*
- *The CSRA Team copies the EPA technical lead on the email communications to the OU2 Early Settlement PRPs providing a copy of their data report*

*Task 6.B.2. - The CSRA Team will analyze corrections or suggestions for improving the quality of the data reports received from OU2 PRPs to determine whether modifications of the original data reports are warranted. Based on this analysis, the CSRA Team will modify the data reports, as deemed appropriate. The CSRA Team will then provide a copy of all of the revised data reports to EPA and a revised copy of individual data reports will be uploaded to the document repository for access by all of the OU2 PRPs, with an explanation of how suggested changes were, or were not, incorporated.*

*This task will require the following efforts on the part of the CSRA Team:*
- *Analyze received suggestions and corrections to data reports in relation to existing Site data and the final allocation design in order to determine appropriate modifications*
- *Modify the individual data reports, as warranted based on above analysis*
- *Provide an explanation to the OU2 Early Settlement PRPs regarding whether, and if so how, received suggestions resulting in changes to their individual data report, including a description of why their suggestions and comments were, or were not, taken into account*
- *Upload final OU2 Settlement PRP data reports to allocation document repository*
- *As required, the CSRA Team will conduct communications with individual OU2 Early Settlement PRPs to answer questions regarding their final data report*

*Timing of this task is dependent upon the following:*
- *Receipt of EPA's determination regarding the relevancy to the allocation of documents provided by OU2 Early Settlement PRPs within established timeframe*
- *Receipt of comments from OU2 Early Settlement PRPs regarding their data report within established timeframes*

*Staffing - Data Analysts; Senior Scientist; Senior Project Manager; Senior Allocation Specialist*
*Performance Standards/Metrics*
- *The CSRA Team submits the Final PRP Data Reports to EPA and OU2 Early Settlement PRPs within the noted timeframe, and uploads data reports to document repository*
- *The submitted revised Final PRP Data Reports address any identified ambiguities in the draft reports and includes a summary of how received comments regarding the draft PRP Data Reports were, or were not, taken into account in the final reports*
- *Certifications regarding the completeness of document/data searches conducted by the OU2 Early Settlement PRPs are uploaded to the Allocation Document Repository*
- *The CSRA Team copies the EPA technical lead on the email communications to the OU2 Early Settlement PRPs providing a copy of their individual data report*

---

ALCD-PUBCOM_0003296

Case 2:22-cv-07326-MCA-LDW    Document 309-24    Filed 04/01/24    Page 52 of 276
Case 2:18-cv-11273-JLL-JAD    Document 37/05   Filed 10/24/18   Page 16 of 28 PageID: 1643
PageID: 16267
*Public Version*

**Task 7**     **Draft PRP Data Reports**

| Item | Title | Due No Later Than† | Type |
|------|-------|--------------------|------|
| *7.A.1* | *Submit recommendation on relevancy of documents provided by OU2 PRPs to EPA and PRPs* | *Within 10 days of OU2 Party submission of document indices* | *Submittal* |
| 7.A.2 | Submit Draft PRP Data Reports to PRPs | Within ~~100~~ *75* days* *of EPA final decision regarding additional documents for inclusion in repository* ~~following the Meeting with PRPs on Draft Allocation Process and Database Design~~ | Transmittal |
| *7.B* | *Submit recommendation on eligibility of PRPs for early settlement to EPA* | *Within 20 days of loading of Final Early Settlement Party Data Reports* | *Transmittal* |

† Or as otherwise directed by the TOCOR
* All references to "days" refer to business days

*Task 7.A.1 - The CSRA Team will organize and conduct a review of indices of remaining documents proposed for inclusion in the Allocation Document Database by OU2 PRPs to develop a recommendation on the relevancy of proposed documents to the allocation process.*

*This task will require the following efforts on the part of the CSRA Team:*
- *Conduct an analysis of document information contained in indices received from the OU2 PRPs to determine if the proposed documents meet established relevancy criteria for inclusion in Allocation Document Repository*
- *Drafting of a written recommendation indicating which of the recommended documents are deemed     to meet the established relevancy criteria for inclusion in Allocation Document Repository, with an explanation of the rationale for the exclusion of any recommended document*

*Staffing - Data Analysts; Senior Project Manager; Senior Allocation Specialist*

*Performance Standards/Metrics*
- *The CSRA Team submits the written recommendation regarding the relevancy of remaining OU2 PRP documents to EPA, with a copy to the OU2 PRPs, within the noted timeframe*
- *The submitted written recommendation indicates which of the documents recommended by OU2 PRPs are deemed to meet the established relevancy criteria for inclusion in Allocation Document Repository, with an explanation of the rationale for the exclusion of any recommended document*

*Task 7.A.2* - The CSRA Team will organize and conduct a technical and scientific evaluation of data in the allocation database to develop individual data reports for each of the OU2 PRPs. The PRP Data Reports will provide selected information regarding each OU2 PRP's relation to OU2 and OU2 contaminants of concern that will be used in conduct

ALCD-PUBCOM_0003297

Case 2:22-cv-07326-MCA-LDW   Document 309-24   Filed 04/01/24   Page 53 of 276
Case 2:18-cv-11273-JLL-JAD   Document 37/05   Filed 10/24/18   Page 17 of 28 PageID: 1644
PageID: 16268

*Public Version*

of the allocation. The CSRA Team will establish a deadline of 40 business days from receipt of the data report for submission of corrections or suggestions by the OU2 PRPs for improving the quality of the received OU2 PRP's data report.

This task will require the following efforts on the part of the CSRA Team:
- *Conduct a call with EPA to discuss the Allocation Team recommendation regarding the relevancy to the allocation of documents provided by OU2 PRPs*
- Conduct coding of data and loading of coded data into database obtained from OU2 PRPs
- ~~Review Site data loaded into database to determine appropriate organization for allocation~~
- ~~Compile and organize Site data in database to support allocation analysis and share computations~~
- *Review preliminary factual submission by OU2 PRPs*
- *Review Site data loaded into database to determine appropriate organization for allocation*
- *Compile and organize Site data in database to support allocation analysis and share computations*
- Organize data in allocation database into *and draft* individual *OU2* PRP data reports
- Provide a copy of the PRP data reports to the OU2 PRPs *for review*

*Timing of this task is dependent upon the following:*
- *Receipt of EPA's determination regarding the relevancy to the allocation of documents provided by OU2 PRPs within established timeframe*
- *Receipt of comments from OU2 PRPs regarding their data report within established timeframes*

Conduct of this task is dependent upon the following:
- Access by the CSRA Team to EPA technical data regarding Site conditions and the selected OU2 remedy
- Sufficient data on identified PRPs to allow analysis of associated contaminants of concern and hazardous substance fate and transport at the Site
- Successful establishment of the allocation database
- Receipt of additional data from OU2 PRPs for inclusion in the allocation database *within established timeframes* ~~by 60 business days following the meeting with PRPs on draft allocation process and database design~~

Staffing - Data Analysts; Senior Scientist; Senior Project Manager; Senior Allocation Specialist

*Performance Standards/Metrics*
- The CSRA Team submits the PRP Data Reports to the OU2 PRPs within the noted timeframe
- The submitted written individual PRP Data Reports include a summary of information in the allocation database that is relevant to a determination regarding the associated OU2 PRP's relation to OU2 and OU2 contaminants of concern for use in conduct of the allocation
- The CSRA Team copies the EPA technical lead on the email communications to the OU2 PRPs providing a copy of their data report

ALCD-PUBCOM_0003298

Case 2:22-cv-07326-MCA-LDW    Document 309-24    Filed 04/01/24    Page 54 of 276
Case 2:18-cv-11273-JLL-JAD    Document 37/5    Filed 10/24/18    Page 18 of 28 PageID: 1645
PageID: 16269

*Public Version*

*Task 7.B - The CSRA Team will organize and conduct an analysis of information regarding the relationship of OU2 Early Settlement PRPs to the Site and Site remedy, including relevant documents in the Allocation Document Repository, PRP Data Reports, and Preliminary Submissions, to develop a recommendation on the eligibility of OU2 Early Settlement PRPs for the opportunity to enter negotiations with EPA regarding a cash-out settlement. The recommendation will be based upon eligibility criteria specified by EPA in its May 17, 2017 to OU2 PRPs on the subject; specifically that "(t)he parties that EPA identified as eligible for an early cash out settlement are those that, based on information reviewed by EPA, are not associated with the release or disposal of any of the COCs for OU2, as identified in the ROD, into the Lower Passaic River.*

*This task will require the following efforts on the part of the CSRA Team:*
- *Conducting an analysis of documents and other information submitted by OU2 Early Settlement PRPs and contained in the Allocation Document Repository to determine whether the OU2 Early Settlement PRPs meet the eligibility criteria specified by EPA.*
- *Drafting of a written recommendation indicating which of the OU2 Early Settlement PRPs are deemed to meet the specified eligibility criteria for the opportunity to enter negotiations with EPA regarding a cash-out settlement, with an explanation of the rationale for the exclusion of any OU2 Early Settlement PRP.*

*Staffing - Data Analysts; Senior Scientist; Senior Project Manager; Senior Allocation Specialist*

*Performance Standards/Metrics*
- *The CSRA Team submits the written recommendation on the eligibility of OU2 Early Settlement PRPs for the opportunity to enter negotiations with EPA regarding a cash-out settlement, within the noted timeframe*
- *The submitted written recommendation indicates which of the OU2 Early Settlement PRPs are deemed to meet the specified eligibility criteria for the opportunity to enter negotiations with EPA regarding a cash-out settlement, with an explanation of the rationale for the exclusion of any OU2 Early Settlement PRP*

**Task 8    Final Data Reports**

| Item | Title | Due No Later Than† | Type |
|------|-------|--------------------|------|
| 8.1 | Submit Final PRP Data Reports to EPA and PRPs | Within 40 days* ~~following the~~ *of the* deadline ~~for submission of corrected~~ *OU2 PRPs corrections to* PRP data reports | Transmittal |
| 8.2 | Provide EPA Access to Allocation Database | Upon ~~submission~~ *loading* of corrected PRP data reports | Activity |

† Or as otherwise directed by the TOCOR
* All references to "days" refer to business days

The CSRA Team will analyze corrections or suggestions for improving the quality of the data reports received from OU2 PRPs to determine whether modifications of the original data reports are warranted. Based on this analysis, the CSRA Team will modify the data reports, as deemed appropriate. The CSRA Team will then provide a copy of all of the revised data reports to EPA and a revised copy of their own individual data reports to each

ALCD-PUBCOM_0003299

Case 2:22-cv-07326-MCA-LDW    Document 309-24    Filed 04/01/24    Page 55 of 276
Case 2:18-cv-11273-JLL-JAD    Document 37/05    Filed 10/24/18    Page 19 of 28 PageID: 1646
PageID: 16270

*Public Version*

of the OU2 PRPs, with an explanation of how suggested changes were, or were not, incorporated.

This task will require the following efforts on the part of the CSRA Team:
- Analyze received suggestions and corrections to data reports in relation to existing Site data and the final allocation design in order to determine appropriate modifications
- Modify the individual data reports, as warranted based on above analysis
- Provide an explanation to the OU2 PRPs regarding whether, and if so how, received suggestions resulting in changes to their individual data report, including a description of why their suggestions and comments were, or were not, taken into account. *Upload final OU2 Settlement PRP data reports to allocation document repository*
- As required, the CSRA Team will conduct communications with individual OU2 PRPs to answer questions regarding their final data report

Timing of this task is dependent *upon the following:*
- Receipt of comments from OU2 PRPs regarding their data report within established timeframes

Staffing - Data Analysts; Senior Scientist; Senior Project Manager; Senior Allocation Specialist

*Performance Standards/Metrics*
- The CSRA Team submits the Final PRP Data Reports to EPA and OU2 PRPs within the noted timeframe, *and uploads data reports to document repository*
- The submitted revised Final PRP Data Reports address any identified ambiguities in the draft reports and includes a summary of how received comments regarding the draft PRP Data Reports were, or were not, taken into account in the final reports
- The CSRA Team copies the EPA technical lead on the email communications to the OU2 PRPs providing a copy of their individual data report

ALCD-PUBCOM_0003300

Case 2:18-cv-11273-JLL-JAD Document 370-5 Filed 10/24/18 Page 20 of 28 PageID: 1647



**Task 9** **Draft Allocation Report**

| Item | Title | Due No Later Than† | Type |
|---|---|---|---|
| 9.1 | Submit Draft Allocation Recommendation Report | Within 90 days* following submittal of ***Response Briefs by PRPs*** ~~final PRP Data Reports~~ | Transmittal |

† Or as otherwise directed by the TOCOR
* All references to "days" refer to business days

***Task 9*** - The CSRA Team will prepare a first draft of the allocation recommendation report and submit to the OU2 PRPs and EPA for review. The draft allocation report will designate shares of responsibility among the OU2 PRPs, as appropriate based on the allocation analysis. The draft allocation report will include a recommendation on the possible grouping of the OU2 PRPs into tiers of similar levels of responsibility.

This task will require the following efforts on the part of the CSRA Team:

- ***Conduct of communications, including a conference call, with OU2 PRPs regarding recommendations on and legal/equitable theories pertinent to conduct of the allocation included in Position and Response Briefs received from the OU2 PRPs***
- Review and consideration of input regarding allocation received from the OU2 PRPs and EPA
- Review and understand the basis for EPA's selected remedy for OU2, in consultation with EPA technical and legal personnel
- Review and understand the relative toxicity of identified contaminants of concern relevant to the selection of the OU2 remedy, in consultation with EPA technical and legal personnel
- Analyze the relative toxicity of materials discharged by OU2 PRPs and other differentiating factors, including fate and transport of hazardous substances released by PRPs based on the data contained in the RI/FS, in relation to the selected remedy
- Compilation and analysis of allocation data related to each OU2 PRP, including contaminants of concern, to establish the relative impact of the actions of each OU2 PRP on the conditions that resulted in EPA selecting the OU2 remedy
- Establish appropriate allocation algorithms
- Load compiled PRP data into allocation calculations to determine relative relationships among the OU2 PRPs
- As appropriate, establish appropriate tiers of OU2 PRP responsibility based on calculations and consideration of equitable factors
- Prepare draft allocation recommendation report
- Submission of the draft report to the OU2 PRPs and EPA

Timing of this task is dependent upon receipt of position briefs and reply briefs regarding allocation from OU2 PRPs within established timeframes

Staffing - Senior Allocation Specialist; Senior Project Manager

*Performance Standards/Metrics:*

- The CSRA Team submits the Draft Allocation Recommendation Report within the noted timeframe

Case 2:22-cv-07326-MCA-LDW    Document 309-24    Filed 04/01/24    Page 57 of 276
Case 2:18-cv-11273-JLL-JAD    Document 37 of 5    Filed 10/24/18    Page 21 of 28 PageID: 1648
PageID: 16272
*Public Version*

- The submitted written Draft Allocation Recommendation Report includes an overview of the basis for the determinations of shares among the OU2 PRPs, including a description of the use of data sources and application of allocation factors and methodology utilized, and reason for potential vulnerabilities, if any, in the resulting allocation
- The report identifies and explains the rationale, if applicable, for grouping OU2 PRPs into tiers of similar relative responsibility

**Task 10     Final Allocation Recommendation Report**

| Item | Title | Due No Later Than† | Type |
|------|-------|--------------------|------|
| 10.1 | ~~Conference Call~~ *Meeting* with EPA regarding Draft Allocation Recommendation Report | Within 10 days* of submittal of Draft Allocation Report | Transmittal |
| *10.2* | *Conduct Meeting with PRPs on Draft Allocation Report* | *Within 20 days of submittal of Draft Allocation Report* | *Activity* |
| *10.3* | *Conference Call with EPA on Meeting with PRPs on Draft Allocation Report* | *Within 10 days* following the Meetings with PRPs on Draft Allocation Report* | *Activity* |
| 10.~~2~~*4* | Submit Final Allocation Recommendation Report to OU2 PRPs and EPA | Within 60 days* of submittal of Draft Allocation Report | **Deliverable** |

† Or as otherwise directed by the TOCOR
* All references to "days" refer to business days

Task 10.1 - The CSRA Team will prepare for and participate in a meeting with EPA regarding the submitted draft allocation recommendation report. The purpose of the meeting will be to obtain EPA comments regarding the submitted draft allocation report, including the basis and findings of the draft allocation report and the report format.

This task will require the following efforts on the part of the CSRA Team:

- The CSRA Team will supply one (2) senior staff located in Washington, DC to *attend the meeting* ~~participate in the conference call~~
- ~~Conference call assumed to be no more than two (2) hours in length~~
- *Meeting assumed to be no more than four (4) hours in length*

Staffing - Senior Allocation Specialist; *Senior Project Manager*

Performance Standards/Metrics:

- The CSRA Team participates in the meeting regarding the submitted draft allocation recommendation report

*Task 10.2 – The CSRA Team will plan, schedule, and conduct a meeting with the OU2 PRPs as a group regarding the draft allocation recommendation report. The purpose of the meeting will be to advise the OU2 PRPs as a group regarding the draft allocation recommendation report and to obtain preliminary PRP comments regarding the draft allocation recommendation report. The CSRA Team will also communicate with the OU2 PRPs individually to obtain the input of OU2 PRPs, including those that did or were unable to attend the meeting, regarding draft allocation recommendation report.*

ALCD-PUBCOM_0003302

Case 2:22-cv-07326-MCA-LDW   Document 309-24   Filed 04/01/24   Page 58 of 276
Case 2:18-cv-11273-JLL-JAD   Document 37-05   Filed 10/24/18   Page 22 of 28 PageID: 1649
PageID: 16273

*Public Version*

*This task will require the following efforts on the part of the CSRA Team:*
- *Making arrangements for a meeting in the greater New York City metropolitan area sufficient to accommodate the OU2 PRPs as a group*
- *Coordination of meeting space and equipment for meetings provided by EPA or OU2 PRPs*
- *Communication via email with the OU2 PRPs regarding substance, date/time, and location of meeting*
- *Development of meeting agenda*
- *Development of participant materials, a needed*
- *Travel of two (2) senior staff from Washington, DC to attend meeting*
- *Communications by Senior Allocation Specialist via phone, email, or other electronic media as required with OU2 PRPs*
- *Recording of PRP comments regarding the draft allocation recommendation report, without attribution to individual OU2 PRP comments*

*Staffing – Senior Allocation Specialist; Senior Project Manager*

*Performance Standards/Metrics:*
- *The CSRA Team conducts a meeting with the OU2 PRPs as a group regarding the draft allocation recommendation report*
- *A majority of the members of the OU2 PRPs as a group attend the meeting either in person or remotely*
- *The CSRA Team copies the EPA technical lead on its email communication to the OU2 PRPs regarding substance, date/time, and location of meeting, and provides EPA with a copy of utilized meeting materials*

*Task 10.3 - The CSRA Team will schedule and hold, within 10 business days of holding the meeting with the OU2 PRPs on the draft allocation recommendation report, a conference call with EPA regarding the findings of the meeting.*

*This task will require the following efforts on the part of the CSRA Team:*
- *Scheduling and participating in a conference call with EPA to provide EPA information on the meeting, including a list of participants at the meeting and summary of suggestions received regarding the draft allocation recommendation report*
- *Conference call assumed to be no more than two (2) hours in length*

*Timing of this task is dependent upon the availability of assigned EPA staff to participate in a conference call within noted timeframe.*

*Staffing – Senior Allocation Specialist; Senior Project Manager*

*Performance Standards/Metrics:*
- *The CSRA Team participates in a conference call with EPA regarding the findings of the meeting with PRPs regarding the draft allocation recommendation report*
- *In conducting the post-meeting conference call with EPA, the CSRA Team provides a summary of information and suggestions obtained from the OU2 PRPs without attribution to contributions of individual participants*

ALCD-PUBCOM_0003303

Case 2:22-cv-07326-MCA-LDW   Document 309-24   Filed 04/01/24   Page 59 of 276
Case 2:18-cv-11273-JLL-JAD   Document 370-5   Filed 10/24/18   Page 23 of 28 PageID: 1650
PageID: 16274

*Public Version*

Task 10.4 2 - The CSRA Team will prepare a Final Allocation Recommendation Report. The Final Allocation Recommendation Report will take into consideration comments on the draft allocation recommendation report received during consultation with EPA and during meetings with and received in position and reply briefs from the OU2 PRPs.

This task will require the following efforts on the part of the CSRA Team:
- Review and consider the comments by OU2 PRPs and EPA regarding the draft allocation recommendation report
- Editing of the draft allocation recommendation report to incorporate appropriate modifications based on OU2 and EPA comments to produce the Final Allocation Recommendation Report

Staffing - Senior Allocation Specialist; Senior Project Manager

*Performance Standards/Metrics:*
- The CSRA Team submits a Final Allocation Recommendation Report within the noted timeframe
- The submitted Final Allocation Recommendation Report includes the elements of the Draft Allocation Recommendation Report described in Task 17, addresses any identified ambiguities in the draft report, and provides a summary, without attribution to individual comments, of how comments of the OU2 PRPs and EPA regarding the Draft Allocation Recommendation Report were, or were not, taken into account in the final report, without attribution.

## Task 11    **Final PRP Outreach Report**

| Item | Title | Due No Later Than† | Type |
|------|-------|-------------------|------|
| 11.1 | Submit Final PRP Outreach Report | Within 10 days* of submittal of Final Allocation Report | Activity |

† Or as otherwise directed by the TOCOR
\* All references to "days" refer to business days

The CSRA Team will prepare and provide to EPA a report regarding outreach efforts conducted with the OU2 PRPs, including a list of participants in outreach efforts, a description of topics discussed, and a summary of issues or concerns raised.

This task will require the following efforts on the part of the CSRA Team:
- Review and organize the comments of OU2 PRPs received during conduct of the Task Order, without attribution to individual OU2 PRPs
- Prepare and provide EPA an overview of conducted outreach efforts, including a list of OU2 PRPs that have participated in outreach meetings, conference calls, or individual communications with the CSRA Team and a summary of suggestions received from the OU2 PRPs regarding the allocation process

Staffing - Senior Allocation Specialist; Senior Project Manager

*Performance Standards/Metrics:*
- The CSRA Team submits a written summary of PRP outreach efforts within the noted timeframe
- The Final PRP Outreach Report includes a summary of conducted PRP outreach efforts, including a list of OU2 PRPs that have participated in outreach meetings,

ALCD-PUBCOM_0003304

Case 2:22-cv-07326-MCA-LDW    Document 309-24    Filed 04/01/24    Page 60 of 276
Case 2:18-cv-11273-JLL-JAD    Document 3/0.5    Filed 10/24/18    Page 24 of 28 PageID: 1651
PageID: 16275

*Public Version*

conference calls, or individual communications with the CSRA Team and a summary of suggestions received from the OU2 PRPs regarding the allocation process
• In drafting the Final PRP Outreach Report, the CSRA Team provides a summary of information and suggestions obtained from the OU2 PRPs without attribution to contributions of individual participants

## Task 12    **Task Order Closeout Report**

| Item | Title | Due No Later Than† | Type |
|------|-------|---------------------|------|
| 12.1 | Submit Draft Task Order Closeout Report | Within 10 days* of submittal of Final Allocation Report | Transmittal |
| 12.2 | Final Task Order Closeout Report | Within 10 days* of receipt of EPA's comments on Draft Task Order Closeout Report | **Deliverable** |

† Or as otherwise directed by the TOCOR
* All references to "days" refer to business days

Task 12.1 - The CSRA Team will design and produce the first draft of a report regarding the conduct of tasks pursuant to the Task Order and submit it for review by EPA. The report will not contain any confidential or sensitive information. The contents of the Draft Task Order Close-Out Report will include:
• A half-page description of the project that describes the nature of the project, the parties, the process, and the outcomes
• If appropriate, a short section reflecting on the process and procedural lessons learned and recommendation for improvements and identification of those activities conducted that contributed to the success of the process
• A brief summary of the final costs of the project broken out by percentage of labor hours and other direct costs

This task will require the following efforts on the part of the CSRA Team:
• Review of project activities and compilation of project summary
• Consideration and compilation of thoughts on lessons learned regarding project
• Compilation of project budget costs
• Preparation of the Draft Task Order Close-out Report

Staffing - Senior Allocation Specialist; Senior Project Manager

*Performance Standards/Metrics:*
• The CSRA Team submits a Draft Task Order Closeout Report within the noted timeframe
• The submitted Draft Task Order Closeout Report includes the items noted above as contents of the report

Task 12.2 - The CSRA Team will prepare a Final Task Order Closeout Report and submit to EPA. The Final Task Order Closeout Report will take into consideration comments received from EPA regarding the draft of the Task Order closeout report. CSRA will provide one (1) copy of the Final Task Order Closeout Report to the PO and one (1) copy to the TOCOR in electronic format.

ALCD-PUBCOM_0003305

Case 2:22-cv-07326-MCA-LDW    Document 309-24    Filed 04/01/24    Page 61 of 276
Case 2:18-cv-11273-JLL-JAD    Document 3/05    Filed 10/24/18    Page 25 of 28 PageID: 1652
PageID: 16276

*Public Version*

This task will require the following efforts on the part of the CSRA Team:

- Review and consideration of comments by EPA regarding the draft Task Order Closeout Report
- Editing, and as required redesign, of the closeout report to incorporate modifications based on EPA comments in order to produce the Final Task Order Closeout Report

Staffing - Senior Allocation Specialist; Senior Project Manager

*Performance Standards/Metrics:*

- The CSRA Team submits a Final Task Order Closeout Report within the noted timeframe
- The submitted Final Task Order Closeout Report addresses any identified ambiguities in the draft report and includes a summary of how EPA's comments regarding the Draft Allocation Recommendation Report were, or were not, taken into account in the final report

### 5.0    Reports, Transmittals and Deliverables

CSRA will provide EPA all reports in accordance with the contract. *If EPA responds with a request for additional information, Subcontractor is required to provide information, as requested.*

Copies of all contract deliverables will be sent to both the PO and the TOCOR. If oral briefings are scheduled for EPA staff, the PO will be notified in time to attend.

Schedule

| Item | Title | Due No Later Than[†] | Type |
|------|-------|---------------------|------|
| 1 | Task Order Kick-Off Meeting | Within 20 days* of Task Order approval | Transmittal |
| 2 | EPA Project Public Announcement Meeting | Within 40 days* of Task Order approval | Activity |
| 3 | Submit initial allocation process and database design to EPA | Within 100 days* of Task Order approval | Transmittal |
| 4 | Conference Call with EPA on Initial Allocation Process and Database Design | Within 10 days* of submission of initial allocation process and database design | Activity |
| 5.A.1 | Conduct *two* Meeting*s* with PRPs on Draft Allocation Process and Database Design | Within 40 days* of submission of initial allocation process and database design to EPA | Activity |
| 5.A.2 | Conference Call with EPA on Meeting*s* with PRPs on Draft Allocation Process and Database Design | Within 10 days* following the Meeting with PRPs on Draft Allocation Process and Database Design | Activity |

ALCD-PUBCOM_0003306

Case 2:22-cv-07326-MCA-LDW    Document 309-24    Filed 04/01/24    Page 62 of 276
Case 2:18-cv-11273-JLL-JAD    Document 37/05   Filed 10/24/18   Page 26 of 28 PageID: 1653
PageID: 16277

**Public Version**

| Item | Title | Due No Later Than† | Type |
|------|-------|--------------------|------|
| *5.B.1* | *Submit guidance on preparation of allocation submissions to EPA and PRPs* | *Within 5 days of Revised Task Order Approval* | *Transmittal* |
| *5.B.2* | *Submit recommendation on relevancy of documents provided by OU2 PRPs to EPA and PRPs* | *Within 30 days of Revised Task Order Approval* | *Transmittal* |
| 6.*A* ~~1~~ | Submit Final Allocation Design to EPA and PRPs | Within 50 days* following the Meeting with PRPs on Draft Allocation Process and Database Design | Transmittal |
| *6.B.1* | *Submit draft PRP Data Reports regarding Early Settlement PRPs to PRPs and EPA* | *Within 10 days* of EPA final decision regarding additional documents for inclusion in repository* | *Transmittal* |
| *6.B.2* | *Submit final PRP Data Reports regarding Early Settlement PRPs to PRPs and EPA* | *Within 15 days of submission of Draft Early Settlement Part Data Reports* | *Transmittal* |
| *7.A.1* | *Submit recommendation on relevancy of documents provided by OU2 PRPs to EPA and PRPs* | *Within 10 days of OU2 Party submission of document indices* | *Submittal* |
| 7.*A.2* | Submit Draft PRP Data Reports to PRPs | Within ~~100~~ *75* days* *of EPA final decision regarding additional documents for inclusion in repository* ~~following the Meeting with PRPs on Draft Allocation Process and Database Design~~ | Transmittal |
| *7.B* | *Submit recommendation on eligibility of PRPs for early settlement to EPA* | *Within 20 days of loading of Final Early Settlement Party Data Reports* | *Transmittal* |
| 8.1 | Submit Final PRP Data Reports to EPA and PRPs | Within 40 days* ~~following the~~ *of the* deadline ~~for submission of corrected~~ *OU2 PRPs corrections to* PRP data reports | Transmittal |
| 8.2 | Provide EPA Access to Allocation Database | Upon ~~submission~~ *loading* of corrected PRP data reports | Activity |
| 9.1 | Submit Draft Allocation Recommendation Report | Within 90 days* following submittal of *Response Briefs by PRPs* ~~final PRP Data Reports~~ | Transmittal |
| 10.1 | ~~Conference Call~~ *Meeting* with EPA regarding Draft Allocation Recommendation Report | Within 10 days* of submittal of Draft Allocation Report | Transmittal |

ALCD-PUBCOM_0003307

Case 2:22-cv-07326-MCA-LDW    Document 309-24    Filed 04/01/24    Page 63 of 276
Case 2:18-cv-11273-JLL-JAD    Document 3/05    Filed 10/24/18    Page 27 of 28 PageID: 1654
PageID: 16278

*Public Version*

| Item | Title | Due No Later Than† | Type |
|------|-------|--------------------|------|
| *10.2* | *Conduct Meeting with PRPs on Draft Allocation Report* | *Within 20 days of submittal of Draft Allocation Report* | *Activity* |
| *10.3* | *Conference Call with EPA on Meeting with PRPs on Draft Allocation Report* | *Within 10 days\* following the Meetings with PRPs on Draft Allocation Report* | *Activity* |
| 10.~~4~~2 | Submit Final Allocation Recommendation Report to OU2 PRPs and EPA | Within 60 days\* of submittal of Draft Allocation Report | **Deliverable** |
| | | | |
| 11 | Submit Final PRP Outreach Report | Within 10 days\*  of submittal of Final Allocation Report | Activity |
| 12.1 | Submit Draft Task Order Closeout Report | Within 20 days\*  of submittal of Final Allocation Report | Transmittal |
| 12.2 | Final Task Order Closeout Report | Within 10 days\* of receipt of EPA's comments on Draft Task Order Closeout Report | **Deliverable** |

*\* All references to days in this chart refer to business days*

## 6.0    Staffing Plan

This Task Order will be staffed as follows:

| Team Member Name† | Role in the Project |
|-------------------|---------------------|
| Mary Apostolico CSRA International | Overall Contract Management, Quality Assurance, Task Order Management |
| Jennifer Cutrona CSRA | Dashboard and Financial Tracking |
| David Batson TechLaw | Senior Allocation Specialist |
| Judy Manley TechLaw | Senior Project Manager |
| Travis Kline TechLaw | Senior Toxicologist |
| Erman Evcimen TechLaw | Database Designer |
| Amber Kozacek TechLaw | Researcher |

†Other team members than those listed in the above table may work on this task order to complete the required work.

\*The task order mainly will be managed by the TOM listed in the above table; however, additional team members may conduct task order management activities to ensure coverage during periods when the TOM is unavailable (e.g., vacation, illness, business travel, time constraints).

ALCD-PUBCOM_0003308

Case 2:22-cv-07326-MCA-LDW Document 309-24 Filed 04/01/24 Page 64 of 276
Case 2:18-cv-11273-JLL-JAD Document 37-15 Filed 10/24/18 Page 28 of 28 PageID: 1655
PageID: 16279

*Public Version*

## 7.0    Quality Management

As part of its quality assurance practices, CSRA TOM will:
- Review this Work Plan with the EPA TOCOR, as requested by the TOCOR;
- Meet or hold conference calls as needed with the TOCOR to review progress; and
- Speak regularly with the subcontractor to receive project status updates.

In addition, all work on this Task Order will be performed in accordance with CSRA's strict quality assurance practices, including but not limited to incorporating quality management principles and processes into the development of the required transmittals, deliverables, and the consulting services offered. Although CSRA will ensure the timely delivery of all transmittals and deliverables, CSRA will not perform a review of these documents prepared by the subcontractor.

## 8.0    Conflict of Interest

Based on our review and understanding of the legal requirements of this work, CSRA certifies that no real, apparent, or potential organizational or individual conflict of interest exists with this assignment, based on previous or ongoing work, or other potential conflicts.

## 9.0    Cyber Security

CSRA has interpreted compliance with information assurance / security provisions contained in this contract as a requirement to provide its standard CSRA information system and procedures. CSRA contract pricing does not include or reflect any additional requirements or certification and accreditation for the CSRA information system or procedures, connectivity to the Government system(s), or storage of any Government-provided data or project data, or for stand-alone development or storage environments. Should the Government require increased or specialized information assurance security or other actions beyond those reflected in the standard CSRA information system or procedures, then the Government will notify CSRA and such revisions will be provided in accordance with the "changes" clause of this contract.

## 10.0    Project Budget

The budget for this task is provided as an Attachment.

## 11.0    Period of Performance

The task order period of performance runs through June 15, 2019.

ALCD-PUBCOM_0003309

# EXHIBIT 55

OxyChem's Comments in Opposition to Proposed Consent Decree,
*United States v. Alden Leeds, Inc., et al.*, Civil Action No. 2:22-cv-07326 (D.N.J.)

ALCD-PUBCOM_0003310

PERFORMANCE WORK STATEMENT
CONTRACT # 68HERH19D0033
TASK ORDER # 68HERH19F0406
MODIFICATION: P00006

**TITLE:  Diamond Alkali-Lower Passaic River Allocation**

**MODIFICATION:** This performance work statement (PWS) modification is to add a task for post-final allocation recommendation report support (see Section II.B.9) and to extend the period of performance (POP) [see Sections I and V]. Post-final allocation recommendation report support consists of additional level of effort to answer substantive questions about the report in writing and by conference call, if necessary.

**ABSTRACT:** This task order will provide neutral, unbiased support for development of an allocation for potentially responsible parties (PRPs) at the Diamond Alkali Superfund Site in New Jersey. This allocation will form the basis for final negotiations between the EPA Region 2 and PRPs. This Task Order is funded by EPA Region 2 Superfund program. This Task Order continues the allocation work started under Contract EP-W-14-020, Task Order 96 (referred to below as the previous contract).

## I.    BACKGROUND

The Diamond Alkali Site has a long history, involving over 100 potentially responsible parties (PRPs). Since the late 1800s, the Lower Passaic River has been a highly industrialized waterway, receiving direct and indirect discharges from numerous industrial facilities. Data collected in the Lower Passaic River, and EPA's analyses, show that contaminated sediment in the lower 8.3 miles are a major source of contamination to the rest of the river and Newark Bay and pose an unacceptable risk to human health and the environment due to the presence of a variety of contaminants that stay in the environment for a long time and can build up in fish and shellfish. These contaminants include dioxins and furans, PCBs, mercury, DDT and its primary breakdown products, copper, dieldrin, PAHs, and lead.

On March 4, 2016, EPA issued a record of decision selecting the remedy for the lower 8.3 miles of the Lower Passaic River, which is Operable Unit 2 (OU2) of the Site. Currently, the remedial design (RD) for OU2 is being performed by Occidental Chemical Corporation (OCC) pursuant to an administrative order on consent. The cost of the remedial action (RA), estimated for purposes of remedy selection, is $1.38 billion.

Region 2 has issued a notice of potential liability to approximately 100 parties, informing them of their responsibility for the RD/RA for OU2. The Region has offered a first round of cash-out settlements to a group of approximately 20 PRPs. The Region also expects to separately address the liability of municipalities and public entities. The Region requires the services of a third-party allocator to assign a share of responsibility to the 83 PRPs that are not in the first round of cash-out settlements and that are not municipalities or public entities. Some of the PRPs have multiple facilities in the allocation, so that the total number of facilities to be assigned a share of responsibility will be 97. The Region expects to use the results of the allocation to: 1) enter into settlement agreements with a small group of the PRPs with the largest shares of responsibility to perform the remedial action; and 2) enter into another round of cash-out settlements with the other PRPs with smaller shares of responsibility.

Region 2 understands that a PRP group (the Cooperating Parties Group, or CPG) has made at least two previous attempts to develop a mutually acceptable allocation of liability to promote settlement with EPA for costs and work at the site, however both efforts fell short of agreement.  Region 2 believes that because of these previous efforts, additional information available from responses to CERCLA 104(e)

1

ALCD-PUBCOM_0003311

letters, information available from previous litigation at the state level and numerous conversations with PRPs over the years, the allocation project will be able to build upon existing information and contacts. Some augmentation of background, data and allocation factors may need to occur to develop what is hoped to be an acceptable settlement proposal and structure. In 2016 the Department of Justice retained a mediator, David Batson of Techlaw to assist in settlement analysis. Those discussions and analyses have resulted in this effort.

This work needs to start in August 2019 because of milestones anticipated in site cleanup and is expected to last up to 13 months. The previous PWS amendment extended the expected period of performance from October 30, 2020 to March 31, 2021. **Modification P00006 extends the expected period of performance from March 31, 2021 to September 30, 2021.**

## II.    SCOPE OF WORK – TASKS

### A. Preliminary Work

1. The contractor shall select a team of dispute resolution professionals and support staff in consultation with the Contract Level Contracting Officer's Representative (CL COR) and Task Order Contracting Officer Representative (TOCOR). The lead service provider shall have the following qualifications:
   - Detailed knowledge of a range of Superfund allocation of liability processes.
   - Multiple instances and experience constructing allocation plans consistent with EPA settlement guidelines and legal requirements.
   - Access to staff resources for database design, entry, analysis and manipulation.
   - Understanding of PRP legal and technical issues and concerns in designing allocation processes.

2. The contractor shall be responsible for oversight of deliverables on this Task Order and shall be responsible for transmission of reports and invoices as required by the contract.

### B. Allocation Design and Production Performance Requirement:

The purpose of this project is to provide neutral, unbiased allocation development and negotiation support to establish a reasonable basis for EPA settlement offers to Diamond Alkali OU2 PRPs by developing and implementing an allocation process for the parties that are not in the first round of cash-out settlements and that are not municipalities or public entities. Major deliverables include (1) a searchable database containing documents and data used for the allocation and (2) a written allocation analysis report (i.e., allocation report). Authority to initiate work for each subtask described below will be provided via email by the TOCOR as a need to conduct subtasks is identified.

During the performance of the work described in the subtasks, Region 2 may share information with the contractor that is pre-decisional and deliberative or is considered to be attorney work product in preparation of potential litigation. Such work is privileged to the United States and EPA under the Freedom of Information Act. While the contractor shall conduct the allocation process in a manner transparent to the public to the extent possible, the contractor must consult with EPA before releasing information to the public to ensure confidential information is protected. The contractor shall perform the following negotiation support subtasks:

1. Initial review of information provided by EPA: EPA will provide the contractor with the information, materials and reports generated under the previous contract pertaining to the allocation. The contractor shall review this information.

2

2. PRP Outreach: The contractor shall conduct outreach to OU2 PRPs participating in the allocation to provide them with the opportunity to comment on and correct the draft data reports produced under the previous contract and to provide input on the drafting of the allocation recommendation report.
   a. The PRP outreach performed by the contractor shall be include (1) ensuring that each PRP's data or information used in the allocation is correctly input into the database, (2) soliciting PRP positions on the drafting of the allocation recommendation report, and (3) communicating how their input was or was not taken into consideration in developing the allocation recommendation report.
   b. The contractor shall complete a report regarding outreach efforts conducted with the OU2 PRPs, including a list of participants in outreach efforts, description of topics discussed, and summary of issues or concerns raised.

3. Searchable database: The contractor shall finish developing the searchable database started under the previous contract. The searchable database should contain and organize all of the information and data used in the allocation.
   a. Under the previous contract, the database was designed and initially populated with information received from EPA, including PRP disclosure statements and nexus documents from third party litigation totaling approximately 130,000 pages.
   b. Under the previous contract, the database was also populated with up to 413,895 pages of documents received from PRPs deemed relevant to the allocation by the previous contractor and any other information used in the allocation.
   c. The database shall be designed in such a way as to allow access and use by EPA and DOJ staff for their settlement purposes.
   d. Completion of database: The contractor shall complete the database and provide the completed database to EPA when the final allocation recommendation report, described in paragraph 5, is complete.

4. Final Facility Data Reports:
   a. Draft Facility Data Reports: After reviewing and analyzing relevant information in the database (described in paragraph 3 above) on each PRP facility, the previous contractor developed individual data reports for each facility. The data reports provided the information that will be used to conduct the allocation.
   b. PRP Review of Draft Data Reports: After completing the draft data reports, the previous contractor sent the draft reports to the PRPs participating in the allocation for their review and comment on the accuracy of the information. Note: EPA did not have an opportunity to review the draft data reports.
   c. Final Facility Data Reports: The contractor shall solicit comments from the PRPs participating in the allocation on the accuracy of the information in the draft data reports. The contractor shall finalize the data reports based on the comments received.
   d. Additional documents received: As of June 2020, the contractor had received an additional 48,600 pages of facility data from the PRPs participating in the allocation. The contractor shall review the additional information and incorporate it into the searchable database and allocation recommendation report, as necessary and appropriate.

5. Allocation and Report
   a. Allocation: The contractor shall ensure that each PRP's data or information used in the allocation is correctly input into the database.   Exemption (b)(3)(A) & (7)(A)

3

## Exemption (b)(3)(A) & (7)(A)

The contractor shall solicit from the PRPs participating in the allocation positions on the drafting of the allocation recommendation report (as described in paragraph 2). As of June 2020, the contractor had received an additional 276,851 pages of position briefs, expert reports and supporting information from the PRPs participating in the allocation. From June 2020 through the end of the allocation, the contractor expects to receive up to another 50,000 pages of response briefs, expert reports and supporting information. The contractor shall review the expected total of up to 326,851 pages of additional information and incorporate it into the searchable database and allocation recommendation report, as necessary and appropriate.

b. The contractor shall perform the allocation.

c. Draft allocation recommendation report: The contractor shall provide a draft allocation recommendation report for review and comment by the PRPs participating in the allocation. The contractor shall enforce the page limits and other requirements specified in the Allocation Guide for comments on the draft allocation recommendation report. EPA will not have an opportunity to review the draft allocation recommendation report.

d. Final allocation recommendation report: After considering the PRPs' input, the contractor shall provide a final allocation recommendation report to EPA and the PRPs in the allocation.

6. Meetings or Conference Calls: The contractor shall attend and participate in the following meetings either in-person or by telephone or video conference at EPA's discretion.

a. Progress meetings or conference calls: Contractor shall hold weekly conference calls with EPA, and others as directed or determined by EPA, to discuss progress. The contractor shall ensure that due dates for deliverables are met, and that any potential delays are reported to EPA as soon as possible and mitigated as much and as quickly as possible so that the final allocation recommendation report is not further delayed.

b. Kickoff meeting or conference call with EPA: Contractor shall meet with EPA to discuss tasks described in this task order and EPA's expectations.

c. Draft allocation recommendation report meeting or conference call with PRPs: Contractor shall meet with the PRPs participating in the allocation to discuss their comments on the draft allocation recommendation report.

d. The contractor shall provide meeting facilities, equipment, supplies and support for meetings in cases where EPA or other participant facilities are unavailable or inappropriate.

7. The contractor shall furnish a final allocation recommendation report as described above and a short (2 page) Task Order Closeout Report. The Task Order Close Out Report shall not contain any confidential or sensitive information. The contents shall include:

a. A half page description of the case that describes the nature of the case, the parties, the process and the outcomes.

b. If appropriate, a short section reflecting on the process and procedural lessons learned and recommendation for improvements. The contractor shall identify those activities conducted that contributed to the success of the process.

c. Brief summary of the final costs of the project broken out by labor hours and other direct costs.

4

The CL COR and TOCOR will review the draft Task Order Closeout Report and provide comments and revisions as necessary. The contractor shall prepare the final report incorporating their comments and revisions. The contractor shall provide one copy of the final report to the CL COR and one copy to the TOCOR. The final report may be transmitted in electronic form (Word format), rather than in hard copy if the TOCOR agrees.

8. As directed by the TOCOR, the contractor shall participate in a post-process debriefing with EPA officials, including the CL COR, TOCOR and Technical Point of Contact (POC) and relevant EPA management, to discuss lessons learned and next steps.

9. Post-Final Allocation Recommendation Report Support: Especially since EPA did not participate in the review of the Facility Data Reports and draft allocation recommendation report due to the participating PRPs' confidentiality concern, EPA anticipates having questions about the final allocation recommendation report after it is submitted. While exact questions cannot be formulated until after submittal of the report, following are types of questions that might be asked, based on EPA's experience with the 2018 Early Settlement Recommendation Report developed under the previous allocation contract. The number of questions indicated below is for cost-estimation purposes only.
   a.    Exemption (b)(3)(A) & (7)(A)

   c. EPA expects to submit questions in writing to the contractor on a rolling basis (for cost estimation purposes, assume 10-12 questions per month). EPA expects the contractor to respond in writing, although it occasionally may be necessary to discuss either EPA's questions or the contractor's answers, so three conference calls should be planned during the period of performance.

**C. Reports and Deliverables**
All deliverables and tasks required under this task order must be submitted or completed within the time durations listed in the schedule set forth below. After providing notification and receiving agreement from the EPA team, TOCORs and CL CORs, the contractor shall submit a revised proposed schedule for EPA approval. Upon EPA's approval, the revised schedule will supersede the schedule set forth below.

|   | Description of Deliverable, Transmittal or Activity | ¶ Ref. | Type | Deadline |
|---|---|---|---|---|
| 1 | Kickoff meeting or conference call with EPA | II.B.6.b. | Activity | Within 20 business days of task order issuance |
| 2 | Completion of searchable database | II.B.3.c. & II.B.3.d. | Deliverable | Upon submission of the final allocation recommendation report (5.c.) |
| 3 | Completion of final facility data reports. | II.B.4.c | Transmittal | Within 40 business days of approval of TO award |

5

| 4 | Perform allocation | II.B.5.a. | Activity | 170 business days after completion of final facility data reports (4.c.) |
| 5 | Draft allocation recommendation report | II.B.5.b. | Transmittal | 170 business days after completion of final facility data reports (4.c.) |
| 6 | Draft allocation recommendation report meeting | II.B.6.c. | Transmittal | Within 20 business days of submittal of draft allocation recommendation report (5.b.) |
| 7 | Final allocation recommendation report | II.B.5.c. | Deliverable | 65 business days after completion of draft allocation recommendation report (5.b) |
| 8 | Final PRP outreach report | II.B.2.b. | Transmittal | 10 days after completion of final allocation recommendation report (5.c.) |
| 9 | Draft case closure report | II.B.7 | Transmittal | 10 business days after acceptance of final allocation recommendation report |
| 10 | Final case closure report | II.B.7 | Deliverable | 10 business days after receipt of EPA comments. |
| 11 | **Written answers to post-final allocation recommendation report questions** | **II.B.9.a. & II.B.9.b.** | **Transmittal** | **Within 10 business days after receipt of each set of EPA questions (submitted in writing on a rolling basis)** |
| 12 | **Conference calls to discuss questions or answers on post-final allocation recommendation report** | **II.B.9.c** | **Activity** | **Within 10 business days after EPA request** |

1. Performance Standards:
   a. The contractor shall provide negotiations support using the guidance listed in Attachment B, other applicable guidance, and/or direction provided in an individual task order.
   b. The contractor shall send Region 2 TOCOR all reports in accordance with the contract.

2. Deliverables shall be submitted to EPA by
   a. Written paper text to Task level COR, when requested
   b. Via e-mail to Task level COR
   c. On electronic media (specify disk, CD, etc.) (only upon request and issued through written technical direction from EPA TOCOR)
   d. Posted on a SharePoint server for access by Contract Level COR

## III. WORK APPROACH

A. Alternative Dispute Resolution (ADR) Best Practices:
   The Contractor shall approach this task in accordance with terms of the basic contract and according to the established norms and ethical standards of ADR professionals. Based on EPA's evaluation of a large number of ADR cases, the Agency has determined that the following practices are significantly related to positive substantive, relational, and procedural outcomes from ADR cases. The contractor shall ensure that this direction is provided to ADR professionals providing services under this task order:

   - Prior to the mediation or facilitation and throughout the process, the ADR professional shall inquire about whether individual participants have the time, financial, and logistical resources necessary to participate effectively in the process and -- where resources are inadequate -- assist them in identifying appropriate resources or in making necessary adjustments to the process to accommodate resource constraints.

6

- The ADR professional shall assist the participants in identifying the issues that are important to resolving any controversy and solutions that will address the needs shared by the participants.
- The ADR professional shall conduct the process to promote active engagement from all participants.
- The ADR professional shall explore with the participants appropriate ways to incorporate high quality and relevant information resources necessary to resolve the issues.
- To support productive dialogue and effective implementation of any agreements reached by the participants, the ADR professional shall ensure that participants have appropriate authority to make commitments on behalf of their organizations.

**B.** Ethical Codes of Conduct:
The Contractor shall ensure that ADR professionals serving as neutral third parties under this contract receive information about and perform in accordance with ethical codes applicable to the practice of dispute resolution professionals. Relevant examples of ethical codes include those adopted by the American Arbitration Association, American Bar Association, Association for Conflict Resolution: https://www.americanbar.org/groups/dispute_resolution/resources/Ethics/

**C.** Confidentiality:
All parties to this task order acknowledge that the confidentiality provisions of the Administrative Dispute Resolution Act, 5 U.S.C. Section 574 (ADR Act) shall govern the contractor's alternative dispute resolution activities (if any) under this task order, when activities pursuant to the task order fall within the jurisdiction of the ADR Act.

**D.** Contractor Representation:
In gathering information or performing tasks with parties outside the EPA, the contractor shall identify themselves as a contractor to EPA, not an EPA employee. The Contractor shall provide input or make recommendations based on the information gathered, however, decisions on all substantive issues will be made by EPA. THE CONTRACTOR SHALL NOT INTERPRET EPA POLICY ON BEHALF OF EPA NOR MAKE DECISIONS ON ITEMS OF POLICY, REGULATION OR STATUTE. THE CONTRACTOR SHALL NOT TAKE A STAND ON THE MERITS OF SUBSTANTIVE ITEMS UNDER DISCUSSION.

**E.** Status Notifications:
THE CONTRACTOR SHALL NOTIFY THE EPA CL-COR AND TOCOR WHEN 75% OF THE FUNDS PROVIDED HAVE BEEN EXPENDED OR WHEN FUNDING FOR LESS THAN 6 WEEKS WORK REMAINS. Notifications shall be in writing and cc to the CL-COR.

**F.** Task Order Procedures, Constraints and Disclaimers
If out of town travel is required to accomplish the tasks under this task order, the contractor shall obtain advance approval for that trip and its costs in writing from the TOCOR and/or the CL-COR. To the extent possible, the contractor's per diem costs shall be within allowable limits set by GSA. This task order is not funded by multiple appropriations. This task order does not provide for training of contractor personnel, provision of Government Furnished Property or Accountable Personal Property, leased items or property or IT products or services. The PWS does not include any tasks that are inherently governmental in nature or provide personal services. The PWS does not anticipate transferring or developing Confidential Business Information or Personally Identifiable Information to the contractor. This project will not involve collection of environmental data and so is not subject to needing an EPA Quality Assurance Project Plan. Printing shall be in accordance with limitations of the contract. This project does not involve the service provider

7

conducting surveys, data collection or questionnaires. Development of communications products as a result of activities on this task order will be in compliance with EPA's Policy and Implementation Guide for Communications Product Development and Approval found at HTTP://www.epa.gov/productreview/guide/index.html. The Contractor is directed to conduct Conflict of Interest checks and provide this information for TOCOR review and CO approval.

## IV.    EPA CONTACTS

### A.  EPA Task Order Contracting Officer Representative (TOCOR):
Alice Yeh
Superfund and Emergency Management Division/Region 2
290 Broadway
New York, NY 10007
Phone: 212-637-4427
yeh.alice@epa.gov

### B.  EPA Contract Level Contracting Officer's Representative (CL COR)/CPRC contact:
Terry Fenton
Conflict Prevention and Resolution Center (MC-2388A)
Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, DC  20460
Phone: 202-564-2090    Fax: (202) 501-1715
fenton.terry@epa.gov

### C.  EPA Contracting Officer (CO)
Erin M. Ridder
Cincinnati Acquisition Division
26 West Martin Luther King Drive (Mail Code: W136A)
Cincinnati, OH 45268
Phone: (513)487-2155
Ridder.erin@epa.gov

## V.    PERIOD OF PERFORMANCE

The period of performance of this task order shall be until **September 30, 2021.**

8

# EXHIBIT 56

OxyChem's Comments in Opposition to Proposed Consent Decree,
*United States v. Alden Leeds, Inc., et al.*, Civil Action No. 2:22-cv-07326 (D.N.J.)

ALCD-PUBCOM_0003319



**Occidental Petroleum Corporation**

5 Greenway Plaza, Suite 110, Houston, Texas 77046
Telephone 713.215.7802  Fax 713.985.8934

Marcia E. Backus
Senior Vice President and General Counsel

October 12, 2017

wilson.ericj@epa.gov

Mr. Eric J. Wilson
Deputy Director for Enforcement and Homeland Security
Emergency and Remedial Response Division
United States Environmental Protection Agency
Region 2
290 Broadway
New York, NY 10007-1866

Re:    September 18, 2017 Letter Concerning Proposed Allocation Process
for Operable Unit 2, Diamond Alkali Superfund Site
Essex and Hudson Counties, New Jersey

Dear Mr. Wilson:

I write on behalf of Occidental Chemical Corporation ("OCC") to express its concern regarding the EPA's proposed "Allocation Process," in which it seeks to impose on potentially responsible parties (PRPs) an informal procedure to be used to allocate the costs of implementing the remedy for Operable Unit 2 of the Diamond Alkali Superfund Site. OCC first learned of this process on September 18 when it received a letter inviting OCC and certain other PRPs to attend a meeting on October 13 with EPA's chosen allocator, David Batson. Given OCC's concerns, OCC believes it will be more productive for it to attend by phone and listen quietly, rather than air these issues in an open meeting. We will shortly send Ms. Yeh notice of our attendees and appreciate the opportunity to attend by phone while EPA evaluates these concerns.

For the reasons stated below, OCC believes the proposed allocation process is premature. EPA's process will not (and cannot) offer the "transparency and fairness" that EPA has "consistently stated are of importance to the Agency." Nonetheless, in the spirit of cooperation, OCC will participate in the October 13 meeting as EPA has requested. Cooperation, however, cannot come at the expense of OCC's legal rights to obtain contribution and cost recovery from all responsible PRPs who have contaminated the sediments of the Lower Passaic River. OCC therefore reserves all of its legal rights and its attendance at the meeting does not constitute its consent to EPA's proposed allocation process.



518288

Mr. Eric J. Wilson
October 12, 2017
Page 2

**The proposed allocation process is inconsistent with the Record of Decision.**

EPA's Record of Decision (ROD) clearly and unequivocally identified *eight* chemicals of concern that drove its selection of the remedy for the Lower 8.3 miles of the Passaic River: dioxins, furans, PCBs, mercury, DDT, copper, dieldrin, PAHs, and lead.[1] According to the ROD, the data EPA studied shows that "elevated concentrations of [these] COCs are *ubiquitous* in surface sediments of the lower 8.3 miles, bank to bank."[2]

Ignoring this finding, and the voluminous record that makes clear that the remedy was selected as a result of all eight chemicals of concern, EPA's September 18 Letter indicates EPA intends to allocate the cost of implementing the remedy to parties responsible for only three chemicals: dioxins, furans, and PCBs. Having inexplicably abandoned its own finding concerning the drivers of this costly remedy, EPA's letter goes on to state that it is excluding scores of PRPs from the allocation process because they "are not responsible for the release of dioxins, furans, and/or polychlorinated biphenyls ("PCBs") into the Lower Passaic River." There is no factual record to support this statement. EPA's decision to exclude entities responsible for the discharges of all eight chemicals of concern cannot be reconciled with the ROD or the administrative record. EPA's unilateral decision to exclude key polluters is also inconsistent with EPA's public statements, which have (until now) consistently emphasized that EPA's agreement on "one singular engineering and design approach for the lower 8.3 miles ... doesn't mean that *the other 100 potentially responsible parties aren't on the hook for some of these costs. We will apportion* liability ...*for the whole cleanup project, not just the design.*"[3]

EPA's selected remedy was designed to address not merely the eight chemicals of concern identified in the ROD, but the other contaminants in the Lower Passaic River as well. EPA has no scientific or administrative basis on which it can now abandon the findings of the ROD—after selecting the remedy—in favor of an allocation process that will apportion costs based on only three chemicals of concern, ignoring all other contaminants and PRPs in the process.

**There is not sufficient information to arrive at an equitable allocation of the costs.**

EPA also lacks adequate information from which to derive an equitable allocation of costs. Allocation of costs is a judicial, not an administrative, function under CERCLA. Many PRPs have not provided full responses to discovery concerning the raw materials used in their industrial process, the intermediates created in their operations, or any mass balance analysis to account for all hazardous substances handled, produced or discharged from their facilities. In addition, many PRPs have not produced all relevant documents, or provided testimony from key witnesses. As

---

[1] Lower 8.3 ROD at 15-16.

[2] Lower 8.3 ROD at 17 (emphasis added).

[3] J. Hurdle. "Occidental to Pay $165 Million Toward EPA's Cleanup of Passaic River Pollution." 6 October 2016. NJ Spotlight. (Quoting Judith Enck, EPA Region 2 Administrator) (emphasis added).

Mr. Eric J. Wilson
October 12, 2017
Page 3

explained below, implementing an allocation process now would elevate myth to the stature of facts—but facts are required before an equitable allocation can be achieved.

It is a myth that there exists a complete discovery record in the New Jersey Spill Act litigation filed by the NJDEP. The NJDEP did not join any of the third party PRPs in its state court action. Although Maxus and Tierra added certain PRPs to the case, many PRPs were never made parties to the action by anyone. Obviously, parties not joined provided no discovery at all. Even those PRPs that were joined did not provide complete discovery. Certain PRPs produced some, but not all, of their documents. In addition, as a result of a stay of discovery issued by the New Jersey Special Master, virtually no depositions of other PRPs were taken—either of custodians of records (to ensure document production was complete) or of witnesses with knowledge of production and disposal practices. As this overview makes clear, the NJDEP discovery record is limited and incomplete as it pertains to the actions of many of the PRPs EPA has identified as potentially responsible for the costs of implementing the remedy.

EPA's Administrative Record likewise does not contain sufficient evidence to arrive at an *allocation* of the cost of implementing the remedy. EPA has yet to conduct extensive (or, in some cases, any) sampling of soils at the upland and riparian sites that belong to many PRPs. There is, and can be, no assurance that the available evidence affords an adequate basis from which to assess any PRP's relative share of the cost of the remedy, much less the share to be borne by only some PRPs (and not others, whom EPA has decided to exclude entirely from the process).

**The remedy is still being designed, so its costs and the factors that drive them are not yet known**.

In September of 2016, OCC signed an Administrative Settlement Agreement and Order on Consent under which it agreed to design EPA's remedy for the Lower Passaic River. The AOC affords OCC approximately five years in which to finalize the design.

EPA is fully aware that OCC will need to conduct additional sampling and studies to finalize the design. This sampling is needed, among other things, to design a cap of appropriate thickness (a cost driver) and to identify which contaminated soils might need specialized pre- or post-removal treatment (another cost driver). These studies will also enable OCC and EPA to assess whether particular chemicals might require incineration upon removal, whereas removal and entombment elsewhere might be adequate for others. These are just a few of the significant unknowns and uncertainties that exist concerning how much the remedy will eventually cost and which *chemicals and contaminants* (in what proportions) are driving the costs.

Until the remedy is designed, OCC believes it is premature and inequitable for EPA to attempt to allocate the costs of the remedy to one PRP or another, or one chemical or another, because there is not an adequate factual basis on which EPA or its allocator can do so.

**Premature allocation may create a barrier to later consensual resolutions.**

Careful, evidence-based allocation of the cost of implementing the remedy is essential as a matter of fairness and simple economics. EPA's remedy is the largest and most expensive sediment remediation project EPA has ever directed. EPA estimates it will cost $165 million to design the remedy and another $1.38 billion to implement it. Basic fairness requires that the equitable responsibility for these staggeringly large costs be ascertained carefully and with due process. As a matter of economics, single percentage inaccuracies in the allocation could shift millions of dollars in cost to parties who should not be required to bear them. EPA's selected remedy also has perpetual maintenance obligations. These costs must be borne by the parties responsible for them. They should not be shifted to other parties, simply because they assert their legal rights or decline to accept the mediator's informal attempt to allocate the costs of implementing the remedy before litigation has been filed and before discovery can be conducted.

EPA's attempt to force the early settlement of an allocation for the cost of implementing the remedy at this stage is not merely prejudicial to the PRPs. It also has the potential to impede EPA's ultimate goal of obtaining a consensual resolution on implementation of the remedy itself. Early settlements will reduce the pool of responsible parties available to fund the performance of the remedy. If EPA prejudices the rights of PRPs in this manner, it gives PRPs little reason to step up later and assume responsibility to pay costs that other PRPs would have had to bear, but for EPA's premature decision to settle with certain parties.

**OCC's concerns should be heard and considered.**

Although EPA has acknowledged that "Occidental did not directly discharge pollution into the Passaic River,"[4] OCC has repeatedly demonstrated its commitment to work cooperatively with EPA to address and resolve the legacy issues associated with the former Diamond Alkali plant, which DSCC had ceased operating seventeen years *before* OCC acquired the stock of DSCC in 1986.

Since the surprise bankruptcy of OCC's indemnitor, Maxus Energy Corporation, the U.S. subsidiary of Argentine-controlled oil giant, YPF, S.A., OCC has worked rapidly and directly with EPA to address issues at Diamond Alkali and to stabilize many other contaminated sites around the country. Among other things:

- OCC agreed to an Administrative Order on Consent to design the remedy for the Lower Passaic River at a cost of $165 million.
- OCC worked tirelessly during the Maxus bankruptcy to ensure the safe and orderly transition of *all* of the former DSCC sites, including Diamond Alkali.

[4] EPA Region 2 Press Release, October 5, 2016.

Mr. Eric J. Wilson
October 12, 2017
Page 5

- As a result of OCC's efforts, and its cooperation with EPA and the Natural Resource Trustees, the Maxus Bankruptcy Plan was confirmed.
- The Plan ensures that recoveries from YPF will flow directly to EPA and the Trustees, along with other environmental creditors.
- The Plan also establishes an Environmental Response and Remediation Trust through which future costs can be funded, assuming litigation against the Debtors' former parent companies are successful.

By contrast, while OCC was diligently reaching an agreement with EPA to design the OU2 remedy and stabilize other DSCC environmental sites around the country, YPF was pleading the poverty of its U.S. subsidiary in Delaware bankruptcy court, even as it used the assets it had stripped from those subsidiaries as part of a balance sheet it used to help YPF raise nearly $2B on Wall Street from American investors.

Given this history and OCC's efforts to work cooperatively with EPA at Diamond Alkali and elsewhere, EPA's September 18 Letter came as a surprise to OCC. OCC intends to continue to work cooperatively with EPA on the design of the remedy. OCC also intends to cooperate on performing the remedy, *assuming that* a reasonable design is achieved, appropriate responsible parties are available to participate in performing the remedy (and have not been released prematurely), and satisfactory terms of a consent order to perform the remedy can be agreed.

That desire to cooperate is precisely why OCC has written this letter: OCC is extremely concerned that the process, as outlined thus far, will not (and cannot) arrive at a cost allocation which ensures that *all liable PRPs pay their fair share*. We urge EPA to consider and address these concerns before it attempts to mandate this (or any other) mechanism to allocate the costs of implementing the remedy for OU2.

Very truly yours,

Marcia E. Backus
General Counsel, Occidental Petroleum
Corporation

cc:    Mr. Eric Schaaf (schaaf.eric@epa.gov)
       Ms. Sarah Flanagan (flanagan.sarah@epa.gov)

# EXHIBIT 57

OxyChem's Comments in Opposition to Proposed Consent Decree,
*United States v. Alden Leeds, Inc., et al.*, Civil Action No. 2:22-cv-07326 (D.N.J.)

ALCD-PUBCOM_0003325

# Langsam Stevens Silver & Hollaender LLP

ENVIRONMENTAL, REAL ESTATE, BUSINESS AND INSURANCE LAW

September 29, 2022

Brian Donohue, Esq.
U.S. Department of Justice
Brian.Donohue@usdoj.gov

Laura Rowley, Esq.
U.S. Department of Justice
Laura.Rowley@usdoj.gov

> **Re:** In the Matter of: Operable Units Two and Four of the Diamond Alkali
> Superfund Site; In and About Essex County, New Jersey

Dear Counsel:

This letter is to follow up my September 23, 2022 letter.

OxyChem deposed a corporate representative of The Sherwin-Williams Company ("Sherwin-Williams") on Tuesday, September 27, 2022. For your convenience, the transcript is attached.

The deposition confirmed:

- Sherwin-Williams withheld information and documents that were required to be included in its response to the United States Environmental Protection Agency's (EPA) 1995 Request for Information under §104(e) of CERCLA;

- Sherwin-Williams's Response to EPA's Request was incomplete;

- Sherwin-Williams's Response was materially wrong; and

- Sherwin-Williams failed to amend or supplement its March 3, 1995 response to cure its deficiencies and inaccuracies, despite understanding its obligation to do so and possessing or having access to the required information for decades.

We also learned the following facts, among others:

- Sherwin-Williams' Response to EPA's 1995 Request for Information was not accurate with respect to the presence and use of DDT at the Newark plant. (28:19-29:8; 102:25-104:3). Sherwin-Williams admitted its Newark plant mixed DDT with other ingredients to formulate pesticide products, as well as received shipments of DDT-containing pesticides from other Sherwin-Williams plants. (76:22-77:10; 124:17-125:14).

Larry Silver
Attorney at Law
Member PA, CA, DC Bars
lsilver@lssh-law.com

Philadelphia Office
1818 Market Street, Suite 2430
Philadelphia, PA 19103-5319
T 215.732.3255  F 215.732.3260

New Jersey Office
65 South Main Street, Suite B102
Pennington, NJ 08534
T 856.727.0057  F 856.727.0315

www.lssh-law.com

ALCD-PUBCOM_0003326

Brian Donohue, Esq.
Laura Rowley, Esq.
September 29, 2022
p. 2

- Sherwin-Williams acknowledged that a company record—disclosed for the first time on September 21, 2022—reported that the Newark plant's "factory output" between September 1947 and August 1948 included more than 200,000 pounds or gallons of Pestroy, a pesticide that contained DDT as an active ingredient. (49:21-50:12). Other records show that Sherwin-Williams maintained an inventory of DDT at the Newark plant for that purpose and stored the DDT-containing pesticide products on-site. (33:1-8; 39:2-9).

- Sherwin-Williams also acknowledged the inaccuracy of its representations to NJDEP in the site remediation process and to OxyChem in its CERCLA lawsuit, where Sherwin-Williams represented that *DDT was never utilized at the Newark plant*. (123:23-125:14).

- Sherwin-Williams admitted its company records reflect that, during 1959 through 1963, its Newark plant consumed thousands of pounds of the PCB mixture Aroclor-1254. (142:13-21; 160:18-161:8; 162:2-15).

- Sherwin-Williams also acknowledged the detection of PCBs in soil at the former Newark plant property, including a detection of Aroclor-1254 at a concentration of *140,000 ppb*. (164:7-21).

- Sherwin-Williams acknowledged its 1995 submission to EPA did not identify the use or presence at the Newark plant of any PCBs or Aroclor. (132:6-13)

- Sherwin-Williams admitted its company records reflect the Newark plant's extensive consumption of lead-containing raw materials starting in the earliest days of plant operations and continuing for decades. For example, nearly *1.2 million* pounds of leaded zinc were consumed at the Newark plant during 1959 and 1960. (184:25-185:8). Sherwin-Williams records also reference the Newark plant's manufacture of the pesticide lead arsenate—itself a CERCLA hazardous substance that was not disclosed as required by EPA's 1995 104(e) request. (174:1-10; 177:2-23; 188:7-19).

- Sherwin-Williams acknowledged that its 1995 submission to EPA failed to disclose *any* hazardous substance-containing product or byproduct during the 100-year operation of its Newark plant. (130:1-132:13; 207:22-208:6).

- Sherwin-Williams acknowledged its continuing obligation to promptly notify EPA of additional information or any response that was false, misleading, or misrepresented the truth. (17:13-18:9). Despite that obligation, Sherwin-Williams could not identify any written or oral communication supplementing its inaccurate response to EPA. (121:8-23).

OxyChem can make available to DOJ and/or EPA Sherwin-Williams's recent document

ALCD-PUBCOM_0003327

Brian Donohue, Esq.
Laura Rowley, Esq.
September 29, 2022
p. 3

production, 33,000+ pages, except those few documents upon which   Sherwin-Williams has
retained a "Confidential" designation.  Please let us know if you would like copies.

                                        Sincerely,
                                        **Langsam Stevens Silver & Hollaender LLP**

                                        Larry Silver

cc:

Todd Sunhwae Kim, Esq.
Assistant Attorney General (ENRD)
todd.kim@usdoj.gov

Ms. Lisa Garcia
Administrator, EPA Region 2
Garcia.lisa@epa.gov

Mr. Pat Evangelista
Director, Superfund and Emergency Management Division, EPA Region 2
Evangelista.pat@Epa.gov

Mr. Walter Mugdan
Deputy Regional Administrator, EPA Region 2
Mugdan.Walter@epa.gov

Paul Simon, Esq.
Regional Counsel, EPA Region 2
simon.paul@epa.gov

Ms. Sarah Flanagan
Chief of NJ Superfund Branch, EPA Region 2
Flanagan.Sarah@epa.gov

Juan Fajardo, Esq.
Assistant Regional Counsel, EPA Region 2

Brian Donohue, Esq.
Laura Rowley, Esq.
September 29, 2022
p. 4


Fajardo.juan@Epa.gov

Frances Zizila, Esq.
Assistant Regional Counsel, EPA Region 2
Zizila.Frances@epa.gov

Mr. Barry Breen
Acting Assistant Administrator
Office of Land and Emergency Management
Breen.Barry@epa.gov

Mr. Lawrence Starfield
Acting Assistant Administrator
Office of Enforcement and Compliance Assurance
Starfield.Lawrence@epa.gov

Mr. Larry Douchand
Director, Office of Superfund Remediation and Technology Innovation
douchand.larry@epa.gov

Jeffrey M. Prieto, Esq.
General Counsel
prieto.jeffrey@epa.gov

# EXHIBIT 58

OxyChem's Comments in Opposition to Proposed Consent Decree,
*United States v. Alden Leeds, Inc., et al.*, Civil Action No. 2:22-cv-07326 (D.N.J.)

ALCD-PUBCOM_0003330



ALCD-PUBCOM_0003331



## HDR Congener Analysis
### (2017)

Eugenia Naranjo
Alice Yeh

July 13, 2017

Page 8

Spatial patterns of the calculated background fractional contribution to in-river congener concentrations (Figures 10 and 11) are highest upstream, above the influence of estuarine circulation and decrease to approximately RM 9 to 10. Between RM 9 and RM 7, the fractional contributions increase and then generally decrease downstream of RM 7, but with less variation than in the reach upstream of RM 10.

These spatial patterns are reasonable given the location of the Clifton and Lister Avenue sources. The higher computed Clifton contribution to in-river 2,3,4,6,7,8-HxCDF concentrations (relative to the other hexa-, hepta, and octa-furans) is also reasonable, given the Lister Avenue to Clifton cell concentration ratio of 42 for 2,3,4,6,7,8-HxCDF (compared to ratios for other hexa-, hepta, and octa-furans ranging from 414 to almost 3700). Lastly, the spatial pattern of the computed Clifton contribution to the three marker chemicals is reasonable, with Clifton dominating the HCP and HCX concentrations and having a mean contribution to TCDT of less than 5% at all locations.

### Conclusions

The analysis described in this memorandum indicates that mixtures of fourteen 2,3,7,8-substituted dioxin and furan congeners measured in sediment of the LPR can be determined from blending the concentrations of the same 14 congeners measured in three sources: 1) the Lister Avenue cell of the former Diamond Alkali facility, 2) the Clifton cell of the former Givaudan facility, and background concentrations measured in sediments upstream of Dundee Dam. Concentrations of the 14 congeners predicted by applying Equation (1) to each in-river sediment sample fall reasonably tightly around regressions of computed versus measured concentrations (with the lowest $R^2$ of 0.83 and above 0.9 for

> For example, the Clifton contributions to congeners which represent a higher proportion of the Clifton cell data ...

...in river sediments. For congeners more ...8-PeCDD, 1,2,3,4,7,8-HxCDD) and congeners more prevalent in the Lister Avenue cell (e.g. higher chlorinated furans), the predicted versus measured in-river concentrations form a tight cluster of points near the one-to-one line over four or more orders of magnitude, indicating that the Solver solutions for blending the three sources does well in predicting measured LPR sediment concentrations.

Given t...
sources...

> are highest near the former Clifton facility and decrease gradually moving downstream.

...to a tidal estuary from spatially separated sources of different relative... For example, the Clifton contributions to congeners which represent a higher proportion of the Clifton cell data (e.g. penta- and hexa-dioxins), as compared to

[1] International Boulevard, 10th Floor, Suite 1000, Mahwah, NJ 07495-0027
(201) 205-9305

ALCD-PUBCOM_0003332



ALCD-PUBCOM_0003333



ALCD-PUBCOM_0003334

# 104(e) Response
## (1983)

**Givaudan's Claim re its G-11 Process**

1. Low temperature
2. Acid process
3. *"So that no detectable levels of 2,3,7,8-TCDD contamination are expected to have occurred."*

GIVAUDAN CORPORATION

Mr. Raymond Basso
October 26, 1983
Page 2

For example, Question 1 solicits information regarding formulations or pesticide derivatives of "technical grade" 2,4,5-TCP. One example given is hexachlorophene made from "technical grade" 2,4,5-TCP. Although Givaudan has manufactured hexachlorophene for many years, all the hexachlorophene manufactured and marketed by Givaudan has been produced from "pre-purified" 2,4,5-TCP; none of it has been produced using "technical grade" 2,4,5-

Mr. Raymond Basso
October 26, 1983
Page 2

TCP. Accordingly, Givaudan has answered the questions only with respect to its limited production, in 1948 and 1949, of "technical grade" 2,4,5-TCP and not with respect to its production of hexachlorophene from "pre-purified" 2,4,5-TCP. EPA's proposed dioxin regulations, published on April 4, 1983, correctly recognized the distinction made by the questions on Attachment I between hexachlorophene manufactured using "technical grade" 2,4,5-TCP, in which 2,3,7,8-TCDD contamination might have occurred, on the one hand, and hexachlorophene made with "pre-purified" 2,4,5-TCP, using a reaction which occurs at rather low temperatures and at acid pH, in which 2,3,7,8-TCDD contamination is not expected to occur, on the other. 40 C.F.R. parts 261, 264, 265 and 775, 48 Fed. Reg. 14514 (April 4, 1983), note 7. All hexachlorophene manufactured and marketed by Givaudan has been produced using only "pre-purified" 2,4,5-TCP utilizing a process such as is described in note 7 of the proposed regulations, so that no detectable levels of 2,3,7,8-TCDD contamination are expected to have occurred. Analyses of Givaudan's finished hexachlorophene have verified the accuracy of that expectation.

# 104(e) Supplement
## (2016)



it was highly unlikely that Givaudan's G-11 manufacturing process generated TCDD because it used acidic conditions and low temperatures in its process . . .

. . . TCDD may be produced during use of TCP under alkaline conditions and in temperatures greater than 100 degrees centigrade, which is distinct from the acid process employed at Givaudan

ALCD-PUBCOM_0003336

**Interrogatory
Responses
(2019)**

**The production of HCP (*i.e.* G11) did not create or produce dioxin.**

were only present as a result of impurities in the TCP feed stock. (See March 1, 1984 Waste
Streams from HCP Manufacturing, Radian (GIVA-FED-0000012573 – GIVA-FED-
0000012598); Dioxin – EPA-600, November 1980, pages 106 to 108 (GIVA-FED-
0000011808 – GIVA-FED-0000011414); A Retrospective Job Exposure Matrix for
Estimating Exposure to 2,3,7,8 TCDD – NIOSH March 1999 (GIVA-FED-0000008978 –
GIVA-FED-0000009000); 1991 NIOSH Fingerhut Report; EPA Sponsored Study (GIVA-
FED-0000015591 – GIVA-FED-0000015622)).

Givaudan is not aware of any other designated COC used as a raw material or generated
by the manufacturing operations.

12.    Identify any contracts You had with the Disposal Sites, any operator(s) of the
Disposal Sites, or any party to haul Containers containing Waste Materials to the Disposal
Sites and describe: (a) the chemical composition of the materials You disposed of at the
Disposal Sites; (b) the time period of this disposal; and (c) the amounts of Waste Materials
disposed at the Disposal Sites.

ANSWER:    Defendant objects to this Interrogatory to the extent it is overbroad, as it is unconstrained
in time and as it seeks to encompass information that has no bearing on the issues in this litigation.
Defendant objects to this Interrogatory as vague, as the terms "chemical composition" and "materials" are
undefined. Defendant objects to this Interrogatory to the extent assumes any action or inaction by the
Defendant. Defendant objects to this interrogatory to the extent it is incomprehensible as it refers to "the
unspecified "Disposal Sites." Defendant objects to this Interrogatory to the extent it seeks information
related to trade secret or other confidentiality, or to the extent it seeks information protected by privilege
such as the attorney-client privilege or the work product doctrine.

Subject to and without waiving any objections, Defendant answers as follows.

23



# Administrative Shutdown Order
## (1983)



STATE OF NEW JERSEY
DEPARTMENT OF ENVIRONMENTAL PROTECTION

ADMINISTRATIVE ORDER NO. EO 4CO-1

WHEREAS, Governor Thomas H. Kean has issued Executive Order No. 40 declaring that a state of emergency exists arising from the potential dioxin contamination of the premises at 125 Delawanna Avenue, in the City of Clifton, New Jersey; and

WHEREAS, by said Executive Order the Governor has authorized and directed me to take such emergency measures as I may determine to be necessary in order to fully and adequately protect the health, safety and welfare of the citizens of this State from any actual or potential threat or danger which may exist as a result thereof; and

**WHEREAS, preliminary test results have indicated detectable levels of dioxin present at portions of the site of the Givaudan Corporation at 125 Delawanna Avenue, in the City of Clifton, New Jersey and:**

health, safety and welfare while further information is obtained;

NOW, THEREFORE, pursuant to the powers vested in me by Executive Order No. , I hereby Order and Direct that the Givaudan Corporation immediately implement the following measures, at its expense, under the supervision and direction of this Department and the U. S. Environmental Protection Agency:

(1) All areas where preliminary test results have indicated the presence of dioxin at or in excess of one (1) part per billion shall be closed and secured, with physical access thereto restricted. All such areas should be covered by a permeable ground cover installed by a

**All hexachlorophene production shall be suspended until further notice by the Department.**

further notice by the Department. Those areas of the facility which are associated with the hexachlorophene production process, as determined by the Department, shall be closed and secured with physical access thereto restricted. No hexachlorophene shall be moved into or from those areas Delawanna site.

**6/17/83**
DATED

2006_FOIA00000417

**G-11 Process (1945)**



IMPROVED PROCESS FOR THE MANUFACTURE
OF COMPOUND G-11

The large amounts of sulfuric acid needed in the present process for the manufacture of G-11 and the difficulty of the disposal of the waste sulfuric acid made it desirable to find a method where considerably smaller amounts of sulfuric acid would be applied or where the acid could be reused.

In the first experiments, the 93% sulfuric acid was replaced by 62% and 80% acid which could be filtered off from the reaction product and re-used. However, the results in regard to the quality of the G-11 were inferior.

At present, 715 g. of sulfuric acid 93% are employed for 100 g. of trichlorophenol; it was found that this amount of acid could be cut down to one-third without diminishing the yield or changing the quality of the product.

A much bigger reduction of the amount of sulfuric acid used could only be achieved by carrying out the reaction at a temperature high enough to keep the mixture in a liquid state. Aqueous formaldehyde had to be replaced by trioxane or **the optimum temperature lies between 130° and 140°,** time of reaction should be very short (a few minutes), that oleum 20% which gives slightly better results than 93% sulfuric **reaching about 135° at the end.** (25% above the theoretical amount) must be used in order to re-

-2-

duce unchanged trichlorophenol to a minimum. Iron apparatus is entirely satisfactory.

The modified process is illustrated by the following example:

A mixture of 198 g. of Dowicide #2, purified by vacuum distillation, and of 18.8 g. of paraformaldehyde are heated to 75° and well stirred. 65 g. of oleum 20% is added dropwise and the addition is so regulated that the temperature rises slowly without outside heat, reaching about 135° at the end. The addition of the oleum takes 10 to 15 min. The mixture is stirred for two minutes more and then allowed to run into a solution of 100 g. of caustic soda flakes in 1000 cc of water. The **combined alkaline solutions** lutions are heated to boiling until practically all of the melt has gone into solut **alkaline solution** of alkali-insoluble **added dropwise to the alkaline solution until a pH of 10.3** was reached. The G-11 which was formed is filtered off, and washed with 200 cc of water. It is then suspended in 2 l. of water and acidified with sulfuric acid under stirring until congo red paper turns blue; about 30 g. of 62% sulfuric acid are needed. The G-11 Tech. is filtered, washed with water until acid-free and dried. 170 g. (84% of the theory) of the m.p. 154°-158° are obtained.

GIV_NBC_0664681

GIV_NBC_0664682

ALCD-PUBCOM_0003339



**G-11 Patent**
*(1948)*

One of the features of our process is the reduction in the amount of sulfuric acid used.

The pH of the alkaline solution is then brought down, preferably to about 10.3 to about 11.

the temperature may be permitted to rise to 130° C. or even 150° C. during the reaction. If desired, the entire reaction may be conducted at the higher temperatures.

**Never produced**

ALCD-PUBCOM_0003340



G-11 Process (1941)

G-11 Process (1979)

**G-11 Process**

(Sodium Salt Method)

**G-11® N.P.**

Several pounds of Super-Cel are thrown into the hot alkaline solution.

110 lbs. of caustic soda flakes

The temperature is then raised to the boiling point by an additional amount of live steam

Pot temperature rises rapidly to 125-130°C;

The pH of the hot alkaline solution is reduced to about 10.5

Delawanna, N. J.

November 18, 1941

Date

5/18/79

Produced Mar. 2019

Produced Aug. 2019

ALCD-PUBCOM_0003341

# Givaudan's 104(e) Responses:    Acidic and Cool

Givaudan's G-11 manufacturing process generated TCDD because it used acidic conditions and low temperatures in its process ...

it was highly unlikely that

TCDD may be produced during use of TCP under alkaline conditions and in temperatures greater than 100 degrees centigrade,

# Givaudan's Documents Prove:    Alkaline and Hot

a pH of 10.3

hot alkaline solution

combined alkaline solutions

Pot temperature rises rapidly to 125-130°C,

the optimum temperature lies between 130° and 140°,

the temperature may be permitted to rise to 130° C. or even 150° C. during the reaction. If desired, the entire reaction may be conducted at the higher temperatures.

ALCD-PUBCOM_0003342

# 104(e) Response
### (1983)

GIV_NBC_0455956

GIVAUDAN CORPORATION

Mr. Raymond Basso
October 26, 1983
Page 2

TCP. Accordingly, Givaudan has answered the questions only with
respect to its limited production, in 1948 and 1949, of "technical
grade" 2,4,5-TCP and not with respect to its production of hexa-
chlorophene from "pre-purified" 2,4,5-TCP. EPA's proposed dioxin
regulations, published on April 4, 1983, correctly recognized the
distinction made by the questions on Attachment I between hexa-
chlorophene manufactured using "technical grade" 2,4,5-TCP, in
which 2,3,7,8-TCDD contamination might have occurred, on the one
hand, and hexachlorophene made with "pre-purified" 2,4,5-TCP, us-
ing a reaction which occurs at rather low temperatures and at acid
pH, in which 2,3,7,8-TCDD contamination is not expected to occur,
on the other. 40 C.F.R. parts 261, 264, 265 and 775, 48 Fed.
Reg. 14514 (April 4, 1983), note 7. All hexachlorophene manufac-
tured and marketed by Givaudan has been produced using only "pre-
purified" 2,4,5-TCP utilizing a process such as is described in
note 7 of the proposed regulations, so that no detectable levels
of 2,3,7,8-TCDD contamination are expected to have occurred.
analyses of Givaudan's finished hexachlorophene have verified the
accuracy of that expectation.

The responses are numbered to correspond with the num-
bered questions contained on that Attachment I. Where indicated,
some additional information is submitted on a separate sheet under
a confidentiality claim pursuant to 40 C.F.R. 2.200 et seq.

> **In 1948 and 1949, Givaudan manufactured "technical grade"
> 2,4,5-TCP, which was distilled into "pre-purified" 2,4,5-TCP and
> used in hexachlorophene manufacture. 305,000 pounds of "pre-puri-
> fied" 2,4,5-TCP was produced during that period from "technical
> grade" 2,4,5-TCP.**

ed is believed to have been used or produced
TCP.

b) Givaudan records show the purchase of a small amount
of "technical grade" 2,4,5-TCP from Dow Chemical for experimental
purposes only. Copies of all available 2,3,7,8-TCDD analyses have
already been provided to and are on file with DEP in connection
with their investigation of possible 2,3,7,8-TCDD contamination at
Givaudan's facility.

3. Information responsive to Question 3 has been sub-
mitted on a separate sheet under a confidentiality claim pursuant
to 40 C.F.R. 2.200 et seq.

ALCD-PUBCOM_0003343



**TCP Procedure**
**(1948)**

312 lbs. of caustic soda flakes

As soon as the temperature levels off at 175 to 176°C, the cooling water is turned off.  The temperature is maintained for four hours at 175°C.

the temperature of the batch is quickly brought to 185°C and kept here ten minutes,

**Produced
Feb. 2021**

ALCD-PUBCOM_0003344



Parette et al., Modeling the formation of 2,3,7,8-tetrachlorodibenzo-p-dioxin in the historical manufacture of 2,4,5-trichlorophenol (2017)

ALCD-PUBCOM_0003345



# Storm Sewer Pathway to the Passaic

- Givaudan's 2004 104(e) responses admit and acknowledge that there is a **direct storm sewer link** from their facility to the Passaic River.

- Givaudan's 2016 104(e) responses, however, inexplicably contest that there was any direct sewer link from the Givaudan facility to the Passaic River.

- Maps produced in the CERCLA case, however, show clearly that water **did** travel from the Givaudan facility to the Passaic.

ALCD-PUBCOM_0003347

## 104(e) Response
### (2004)

Givaudan Response to EPA Request for Information

**Floor Drains and Sewers:**

All onsite process areas collected industrial wastewater via floor drains or open concrete lined floor gutters.   Please refer to the response to 5d for a detailed description of onsite sewers.

**Stormwater:**

Rainwater falling onto rooftops and facility surface areas at the site is reported to have generally flowed to the Pond located at the center of the facility.

A stormwater swale collected rainwater from the southeast corner of the facility and directed the rainwater to a stormwater grate located on River Road.  The stormwater grate led to a storm sewer that flowed to the Passaic River.

Based on a 1983 drawing, the storm sewer collected stormwater at the extreme south end of the facility and directed the stormwater via a 24 inch storm sewer under River Road and under Route 21 to discharge into the Passaic River.

from the southwest portion of the facility for discharge onsite.  In 1999, three soil samples were collected the two known points of discharge into the swale from the facility, and analyzed for Target Compound List (TCL) Volatile Organic Compounds (VOCs), TCL Semi-Volatile Compounds (SVOCs), and Target Analyte List Metals.  No VOCs or SVOCs were detected above NJDEP Soil Cleanup Criteria (SCC).  Except for marginal exceedances of lead in one sample and arsenic in another, no metals exceeded NJDEP SCC.  The lead and arsenic may have been related to the offsite operation of the Delaware, Lackawanna & Western Railroad, as discussed in Section 4.6.3 of the April 2000 *Remedial Action Work Plan for Soils* (RAWPS).

**Waste Handling and Disposal Practices:**

Givaudan submitted a Part A notification, indicating they stored hazardous waste onsite for greater than 90 days.  Givaudan obtained a RCRA Hazardous waste generators permit and was classified as a Large Quantity Generator of Hazardous Waste.  The Hazardous Waste EPA ID number was NJD002156354.  The New Jersey Department of Environmental Protection (NJDEP) issued the most recent permit on 21 December 1995 (NJDEP permit number 1602ELHP03).  This permit was terminated on 26 September 1997.

- 26 -

877240031

ALCD-PUBCOM_0003348

# 104(e) Supplement
## (2016)

"No stormwater drainage"

"No drainage swale"

The alleged existence of a possible surface water pathway that could have conveyed storm water flow from the former Clifton property directly to the Passaic River is *not* supported by the historical aerial photo review, or the digital topography analysis completed on the historical photos. There is no evidence of a defined drainage swale either on or off the property to the Passaic River in any of the historical aerial photos.

ALCD-PUBCOM_0003349



ALCD-PUBCOM_0003350



ALCD-PUBCOM_0003351



ALCD-PUBCOM_0003352



**KLL043005
(Never Produced)**

90

96    T-52A

99

LOCATION OF WASTE WATER
STRIPPER FACILITIES

DATE
6-30-70

| No. | BY | DATE | DESCRIPTION | PLT. MGR | PROD | SAFETY |
|---|---|---|---|---|---|---|
| 26 | MKS | 3/19/90 | ADD BLDG. 2 PT 10 BLDG 95 (S.E. CORNER) | | | |
| 25 | MKS | 7/20/89 | UPDATED & ADDED BLDG. 168 | | | |
| 24 | H.M | 3/25/85 | REMOVED EXIST.U.G. STG. TANKS—ADDED NEW VERT. | | | |
| | | | ABOVE GR. STG. TANKS BLDG. 95 & RELOCATED T-52 TO BLDG 7 | | | |
| 23 | H.M. | 8/12/85 | UPDATED | | | |
| 22 | H.M | 12-17-84 | REMOVE TANKS: TU-377, TU-400, TU-406 | | | |
| | | | TU-8386 & BLDG. 70 | | | |
| 21 | CJ | 2-9-83 | MISC. REVISIONS & UPDATING | | | |

**REVISIONS**

THIS DRAWING AND ALL INFORMATION THEREON IS THE PROPERTY OF GIVAUDAN
CORP. AND IS CONFIDENTIAL AND MUST NOT BE MADE PUBLIC OR COPIED UN-
LESS AUTHORIZED BY THEM AND IS SUBJECT TO RETURN UPON DEMAND.

KLL043005

ALCD-PUBCOM_0003353



**KLL043005
(Never Produced)**

DATE
6-30-70

REFERENCE DRAWINGS

| No | BY | DATE | DESCRIPTION |
|---|---|---|---|
| | EH | 31-24-18 | UPDATED |
| 8 | TAC | 2-23-78 | UPDATED |
| 7 | EH | 8-24-78 | UPDATED |
| 6 | EH | 8-16-78 | ADDED 12" REINF. CONC. PIPE (STORM SEWER) |
| 5 | H.M. | 6-15-78 | UPDATED |
| 4 | TAC | 7-12-77 | ADD S.S. LINE C.B. & MANHOLE NEAR BLDG 50 |
| 3 | TAC | 8-3-76 | STORM SEWER PITS & PIPING N. OF BLDGS 20-22 |
| 2 | TAC | 4-31-75 | CHEMICAL SEWER   E. OF BLDG. 26 REMOVED. |
| 1 | H.M | 2-9-73 | BLDG. # 27 ANNEX |
| O | | | |



**KLL043005
(Never Produced)**

DATE
6-30-70

REFERENCE DRAWINGS

| No | BY | DATE | DESCRIPTION |
|----|-----|------|-------------|
| | E H | 3/24/78 | UPDATED |
| 8 | TAC | 2-23-78 | UPDATED |
| 7 | E H | 8-24-78 | UPDATED |
| 6 | E H | 8-16-78 | ADDED 12" RIENF. CONC. PIPE (STORM SEWER) |
| 5 | H.M. | 6-15-78 | UPDATED |
| 4 | TAC | 7-12-77 | ADD S.S LINE C.B. # MANHOLE NEAR BLDG 50 |
| 3 | TAC | 8-3-76 | STORM SEWER PITS # PIPING N. OF BLDGS 20-22 |
| 2 | TAC | 4-21-75 | CHEMICAL SEWER    E. OF BLDG. 26 REMOVED. |
| 1 | H.M | 2-7-73 | BLDG. # 27 ANNEX |
| O | | | |

LOCATION OF WASTE WATER
STRIPPER FACILITIES

ALCD-PUBCOM_0003355
KLL043005



ALCD-PUBCOM_0003356



ALCD-PUBCOM_0003357



**Water Problem Report** (1993)

**Produced Apr. 2021**

ALCD-PUBCOM_0003358



ALCD-PUBCOM_0003359



ALCD-PUBCOM_0003360



**Water Problem Report (1993)**

| POINT NUMBER | PEAK RATE OF RUNOFF, 25 YR STORM | |
| --- | --- | --- |
| | CFS | GPM |
| 1 | .1 | 49 |
| 2 | 4.0 | 1,776 |
| 3 | 1.5 | 655 |
| 4 | 28.3 | 12,701 |
| 5 | 18.6 | 8,356 |
| | 17.5 | 7,846 |
| 6 | 11.8 | 5.292 |

LEGEND

DISCHARGE POINT

EXHIBIT 1

**Produced Apr. 2021**

ALCD-PUBCOM_0003361



**Water Problem Report (1993)**

| POINT NUMBER | PEAK RATE OF RUNOFF, 25 YR STORM | |
|---|---|---|
| | CFS | GPM |
| 1 | .1 | 49 |
| 2 | 4.0 | 1,776 |
| 3 | 1.5 | 655 |
| 4 | 28.3 | 12,701 |
| 5 | 18.6 | 8,356 |
| | 17.5 | 7,846 |
| 6 | 11.8 | 5.292 |

LEGEND

DISCHARGE POINT

EXHIBIT 1

**Produced Apr. 2021**

ALCD-PUBCOM_0003362



ALCD-PUBCOM_0003363



ALCD-PUBCOM_0003364



**HDR Congener Analysis**
**(2017)**

Eugenia Naranjo
Alice Yeh

July 13, 2017

Page 8

Spatial patterns of the calculated background fractional contribution to in-river congener concentrations (Figures 10 and 11) are highest upstream, above the influence of estuarine circulation and decrease to approximately RM 9 to 10. Between RM 9 and RM 7, the fractional contributions increase and then generally decrease downstream of RM 7, but with less variation than in the reach upstream of RM 10.

These spatial patterns are reasonable given the location of the Clifton and Lister Avenue sources. The higher computed Clifton contribution to in-river 2,3,4,6,7,8-HxCDF concentrations (relative to the other hexa-, hepta-, and octa-furans) is also reasonable, given the Lister Avenue to Clifton cell concentration ratio of 42 for 2,3,4,6,7,8-HxCDF (compared to ratios for other hexa-, hepta, and octa-furans ranging from 414 to almost 3700). Lastly, the spatial pattern of the computed Clifton contribution to the three marker chemicals is reasonable, with Clifton dominating the HCP and HCX concentrations and having a mean contribution to TCDT of less than 5% at all locations.

Conclusions

The analysis described in this memorandum indicates that mixtures of fourteen 2,3,7,8-substituted dioxin and furan congeners measured in sediment of the LPR can be determined from blending the concentrations of the same 14 congeners measured in three sources: 1) the Lister Avenue cell of the former Diamond Alkali facility, 2) the Clifton cell of the former Givaudan facility, and background concentrations measured in sediments upstream of Dundee Dam. Concentrations of the 14 congeners predicted by applying Equation (1) to each in-river sediment sample fall reasonably tightly around regressions of computed versus measured concentrations (with the lowest $R^2$ of 0.83 and above 0.9 for

For example, the Clifton contributions to congeners which represent a higher proportion of the Clifton cell data ...

are highest near the former Clifton facility and decrease gradually moving downstream.

Given th sources to a tidal estuary from spatially separated sources of different relative. For example, the Clifton contributions to congeners which represent a higher proportion of the Clifton cell data (e.g. penta- and hexa-dioxins), as compared to

International Boulevard, 10th Floor, Suite 1000, Mahwah, NJ 07498-0027
(201) 205-9000

ALCD-PUBCOM_0003365

**Dioxin in the Passaic River (NJ):
The Case for 2 Dioxin Sources
(Garvey 2011)**

## Conclusions

- Dated sediment cores provide a detailed temporal record of relative contaminant loads to the estuary.

Event circa 2000 is documented across three cores and can be identified as an external dioxin load, with a unique dioxin pattern.

resuspension.

- Pattern observed in 2000 similar to one of 2 patterns observed in 1960s.

- Combined use of Dioxin and DDT ratios uniquely identifies upper reach contamination relative to lower reach in 1960s.

- Ratios in upper and lower reaches converge over time as sediments are mixed by tidal circulation.

- Temporary release circa 2000 has ended and estuary conditions have returned to 1990s levels.

18



*The Louis Berger Group, Inc.* 

ALCD-PUBCOM_0003366



ALCD-PUBCOM_0003367



**Lagoon Closure Plan (1996)**

GIVAUDAN-ROURE

LAGOON CLOSURE PLAN

NJPDES PERMIT NO. NJ088374

1.0  Intro

The Clifton ... is located at
125 Delawan... County, New
Jersey. Th... lty Divison
(plant sout... losure concerns
the Fragrance Specialty Divison site only. The Fragrance
Specialty Divison is bounded by a New Jersey Transit/Conrail
railroad on the west, River Road on the south, a residential area
on the southeast, and Delawanna Avenue on the northeast.

The Clifton Facility is a manufacturing facility producing aroma
and specialty chemicals. Attendant support activities include
quality control, engineering, warehousing, maintenance and
utility services, wastewater pretreatment, and employee services.

The facility consists of multiple buildings separated by paved

Stormwater sewer inlets are located throughout the facility. The stormwater sewers and overland flow discharge to the Clifton stormwater sewer at Delawanna Avenue, a stormwater collection lagoon, the swale beside the railroad, River Road at the Railroad crossing and an inlet at River Road that all discharge through the City of Clifton storm sewer system and, ultimately, into the Passaic River.

This proposal consists of closing the existing lagoon and
directing the stormwater to it's current destination at the
southern portion of the facility through a proposed on-site storm

Currently, the lagoon does capture stormwater runoff from small events. However, it does not have the capacity to retain the

stormwater runoff from a 25 year storm, the design storm required by the City of Clifton. During such a storm, the pond will overtop. The overtopping stormwater will flow to the south and outfall on River Road.

-1-

**Produced Apr. 2021**

GIVENV_PRIV 0033877

GIVA-FED-0000111391

Confidential

ALCD-PUBCOM_0003368

# 104(e) Response
### (2004)



Grimslan Response to EPA Request for Information

Prior to 1961, a roughly rectangular pit with approximate dimensions of 240 feet x 80 feet was located adjacent to the Pond. It was reportedly used as an effluent pit for production waste. It is not clear when this practice began, but this feature is depicted in aerial photos from the 1940s. The investigation of this feature, called the SAP, is described in the RAWPS.

Refer to the response to question 5) for additional details regarding stormwater.

**ii)  If catch basins or lagoons existed, were they lined or unlined?**

The Pond and SAP were unlined.

**iii)  What was stored in the lagoons?**

The Pond is believed to have stored primarily storm water, from storm sewer discharge and sheet runoff. The SAP is believed to have stored production waste.

**iv)  Where was the discharge from any of these structures released during what years? Was this discharge treated before its release and if so, how and during what years? What was the chemical composition of any waste waters released?**

Because the SAP and Pond were unlined, discharges from them would have occurred via vertical infiltration. No known sampling of the SAP was conducted prior to its closure. However, extensive sampling of soils in this area is documented in the RAWPS. Ground water data from this area is pro... *Interim Ground Water Report (IGWR)*. D... During the closure of the Pond in 1999, 135,500 gallons of water were pumped from the Pond ...characterized as non-hazardous and managed appropriately.

**d)  Please supply diagrams of any waste water collection, transport or disposal systems on the property.**

The wastewater and stormwater systems in place at the time of facility closure are depicted on Attachment 10.

- 32 -

877240037

ALCD-PUBCOM_0003369



**HDR Congener Analysis**
**(2017)**

Eugenia Naranjo
Alice Yeh

July 13, 2017

Page 8

Spatial patterns of the calculated background fractional contribution to in-river congener concentrations (Figures 10 and 11) are highest upstream, above the influence of estuarine circulation and decrease to approximately RM 9 to 10. Between RM 9 and RM 7, the fractional contributions increase and then generally decrease downstream of RM 7, but with less variation than in the reach upstream of RM 10.

These spatial patterns are reasonable given the location of the Clifton and Lister Avenue sources. The higher computed Clifton contribution to in-river 2,3,4,6,7,8-HxCDF concentrations (relative to the other hexa-, hepta-, and octa-furans) is also reasonable, given the Lister Avenue to Clifton cell concentration ratio of 42 for 2,3,4,6,7,8-HxCDF (compared to ratios for other hexa-, hepta-, and octa-furans ranging from 414 to almost 3700). Lastly, the spatial pattern of the computed Clifton contribution to the three marker chemicals is reasonable, with Clifton dominating the HCP and HCX concentrations and having a mean contribution to TCDT of less than 5% at all locations.

Conclusions

The analysis described in this memorandum indicates that mixtures of fourteen 2,3,7,8-substituted dioxin and furan congeners measured in sediment of the LPR can be determined from blending the concentrations of the same 14 congeners measured in three sources: 1) the Lister Avenue cell of the former Diamond Alkali facility, 2) the Clifton cell of the former Givaudan facility, and background concentrations measured in sediments upstream of Dundee Dam. Concentrations of the 14 congeners predicted by applying Equation (1) to each in-river sediment sample fall reasonably tightly around regressions of computed versus measured concentrations (with the lowest R² of 0.83 and above 0.9 for

For example, the Clifton contributions to congeners which represent a higher proportion of the Clifton cell data ...

in river sediments. For congeners more ...8-PeCDD, 1,2,3,4,7,8-HxCDD) and congeners more prevalent in the Lister Avenue cell (e.g. higher chlorinated furans), the predicted versus measured in-river concentrations form a tight cluster of points near the one-to-one line over four or more orders of magnitude, indicating that the Solver solutions for blending the three sources does well in predicting measured LPR sediment concentrations.

Given th...
sources ...  are highest near the former Clifton facility and decrease gradually moving downstream.   to a tidal estuary from spatially separated sources of different relative ... For example, the Clifton contributions to congeners which represent a higher proportion of the Clifton cell data (e.g. penta- and hexa-dioxins), as compared to

[1] International Boulevard, 10th Floor, Suite 1000, Mahwah, NJ 07495-0027
(201) 295-8000

ALCD-PUBCOM_0003370



ALCD-PUBCOM_0003371



**Bock et. al (2021)**

The simple model of a single source of dioxins in the lower Passaic River, particularly 2,3,7,8-TCDD, cannot be reconciled with the observed distribution of dioxins and other evidence of several unique dioxin source profiles in surface and buried sediments.



ALCD-PUBCOM_0003373

# EXHIBIT 59

OxyChem's Comments in Opposition to Proposed Consent Decree,
*United States v. Alden Leeds, Inc., et al.*, Civil Action No. 2:22-cv-07326 (D.N.J.)

ALCD-PUBCOM_0003374

00001

1 THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
2    IN AND FOR THE COUNTY OF SAN FRANCISCO
3 -----------------------------------
4 SAFETY-KLEEN ENVIROSYSTEMS           )
5 COMPANY, a corporation,          )
6                          )
7        Plaintiffs,        )
8                      ) CASE NO.
9 V.                 ) 985528
10                      )
11 CONTINENTAL CASUALTY COMPANY,      )
12 et al.,                  )
13          Defendants.      )
14 -----------------------------------)
15
16       DEPOSITION OF BERNARD PARTINGTON
17          WEDNESDAY, JUNE 16, 1999
18          PAGES 1 - 179; VOLUME 1
19
20
21       BEHMKE REPORTING & VIDEO SERVICES
22       BY: MICHELLE DIPIERRO-FAIREY, CSR
23             1320 ADOBE DRIVE
24          PACIFICA, CALIFORNIA 94044
25               (650) 359-3201

00002

1
2 Deposition of BERNARD PARTINGTON, taken on
3 behalf of defendant at THE HYATT REGENCY, 2
4 Albany Road, New Brunswick, New Jersey,
5 commencing at 9:30 a.m., Wednesday, June 16,
6 1999, before MICHELLE DIPIERRO-FAIREY,
7 Certified Shorthand Reporter No. XI01746
8 pursuant to Notice.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

00003



Exhibit
LegacyVulcan_

1  APPEARANCES OF COUNSEL:
2  FOR PLAINTIFF, SAFETY-KLEEN ENVIROSYSTEMS
3  COMPANY:
4    BROBECK, PHLEGER & HARRISON, ESQS.
5    BY: TRACY S. RYNIEC, ATTORNEY AT LAW
6    Spear Street Tower
7    One Market Plaza
8    San Francisco, California 94105
9    Telephone: (415) 442-0900
10 FOR THE DEFENDANT LONDON MARKET INSURERS AND
11 UNITED STATES LIABILITY INSURANCE COMPANY:
12    HANCOCK, ROTHERT & BUNSHOFT, ESQS.
13    BY:  MARY ANDERSON, ATTORNEY AT LAW
14    515 S. Figueroa Street, 17th Floor
15    Los Angeles, California 90071
16    Telephone:  (213) 623-7777
17 FOR THE DEFENDANT ALLSTATE INSURANCE COMPANY
18 AS SUCCESSOR TO NORTHBROOK EXCESS AND SURPLUS
19 LINES INSURANCE COMPANY:
20    LILLICK & CHARLES, LLP
21    BY:  BETH L. APPELBAUM, ATTORNEY AT LAW
22    Two Embarcadero Center
23    San Francisco, California 94111
24    Telephone:  (415) 984-8200
25
00004
1  APPEARANCES OF COUNSEL CONTINUED:
2  FOR THE DEFENDANT FIRST STATE INSURANCE
3  COMPANY, NEW ENGLAND REINSURANCE CORPORATION
4  AND HARTFORD ACCIDENT AND INDEMNITY:
5    LILLICK & CHARLES, LLP
6    BY:  HELEN S. HAYNES, ATTORNEY AT LAW
7    Two Embarcadero Center
8    San Francisco, California 94111
9    Telephone  (415) 984-8200
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
00005
1        I N D E X
2  Wednesday, June 16, 1999

MKSK-FED-0000004178

ALCD-PUBCOM_0003376

3 BERNARD PARTINGTON                Page
4    Examination by Ms. Haynes        6
5 AFTERNOON SESSION
6    Examination by Ms. Haynes        91
7
8
9
10            EXHIBITS
11 Number        Description          Page
12 Partington-1   Resume of Bernard        16
13            Partington.
14 Partington-2   The Austin Company Site  141
15 (Retained by   Plan of Vulcan Materials
16 Counsel)       Company.
17 Partington-3   Overall Site location,   145
18            Bates stamped SKE 244057.
19
20
21
22
23
24
25
00006
1    B E R N A R D   P A R T I N G T O N
2    called as a witness, having been duly
3 sworn, testified as follows:
4 EXAMINATION BY MS. HAYNES:
5    Q.  Will you state your full name for the
6 record, please?
7    A.  Bernard Partington.
8    Q.  Can you spell your last name for us?
9    A.  P-a-r-t-i-n-g-t-o-n.
10    Q.  Thank you, Mr. Partington, and, again,
11 my name is Helen Haynes.  We met before your
12 deposition began.  I'm with the law firm in
13 San Francisco, California by the name of
14 Lillick and Charles and we represent several
15 defendants in this case.  Those defendants are
16 Hartford Accident and Indemnity Company, First
17 State Insurance Company and New England
18 Reinsurance Corporation.  I'll be taking your
19 deposition today.
20    For the record, I'd like to take a moment
21 for us to go around and have counsel introduce
22 themselves and state an appearance for the
23 record.
24    MS. APPELBAUM:  Good morning, Mr.
25    Partington, I'm Beth Appelbaum. I'm from
00007
1    Lillick and Charles San Francisco and I'm
2    here today representing Allstate's
3    successor to Northbrook Excess and Surplus
4    Lines Insurance Company.

MKSK-FED-0000004179

ALCD-PUBCOM_0003377

5        MS. ANDERSON:  Good morning, Mr.
6    Partington.  I'm Molly Anderson from the
7    law firm of Hancock, Rothert and Bunshoft
8    in San Francisco.  I represent London
9    Market insurer and the US Liability
10    Insurance Company.
11        MS. RYNIEC:  Good morning, Mr.
12    Partington.  My name is Tracey Ryniec from
13    Brobeck, Phleger and Harrison in San
14    Francisco.  I'm representing the McKesson
15    Corporation on behalf of Safety-Kleen
16    Envirosystems.
17    Q.  Mr. Partington, are you represented by
18  counsel here today?
19    A.  No.
20    Q.  Have you met with any counsel in
21  preparation for your deposition today?
22    A.  No.
23    Q.  Let me take a moment then to just go
24  over a couple of ground rules for the
25  deposition before we begin.
00008
1        The Court Reporter sitting next to each
2  of us is taking down all of my questions and
3  all of your answers word-for-word.  When we're
4  done with the deposition, she's going to put
5  the questions and answers into a booklet form
6  which you'll have an opportunity to look at if
7  you'd like.  When you see that booklet form,
8  if there are any corrections or changes that
9  you believe are necessary, you're allowed to
10  go ahead and make those changes, but I should
11  caution you, any changes that you would make
12  to your testimony, any counsel in this action
13  could comment upon that at trial.  Do you
14  understand that?
15    A.  Uh-huh.
16    Q.  That brings us to another very
17  important part of the deposition, which is,
18  since the Court Reporter is taking down
19  everything that you and I say, we need to make
20  sure that we give audible responses; yeses and
21  nos.  Shakes of the head, nods of the head,
22  Uh-huh and uh-uh don't come out for the Court
23  Reporter?
24    A.  Dang.
25    Q.  So she was just about to say something
00009
1  to you, but she knew that was my comment that
2  was going to happen next.  We'll try to catch
3  each other on that.
4    A.  Okay.
5    Q.  One other thing I should caution you
6  on, there will be times when I will ask you a

file:///qnapnas/Concordance/Concordance/Cases/03_Mckesson/09_NewarkLand/TRANSCRIPTS/Partington%20Bernard%20Volume%201%20-%20...  4/5/2013  8:54:53 PM

MKSK-FED-0000004180

ALCD-PUBCOM_0003378

7  question and you know the answer before I
8  finish the question, but in order for the
9  written record to be clear, it's helpful if
10  you can let me finish my questions and then
11  begin your answer and I won't start my next
12  question until you've completed an answer.  Is
13  that clear?
14      A.  Yes.
15      Q.  Understand that even though we're in
16  an informal setting in the conference room
17  today, the oath you've taken means that the
18  testimony that you're going to give has the
19  same force and effect as if it was given in a
20  court of law.
21      A.  Yes. I do.
22      Q.  You're required to tell the truth.
23  You understand that?
24      A.  Yes. I do.
25      Q.  We are going to be asking you about
00010
1  events that took place some time ago.  And we
2  don't expect your memory to be perfect so
3  don't feel that you have to know the answer to
4  every single question.  We don't expect that.
5  It is okay for you to say I don't know or I
6  don't remember, but if you have, based on your
7  prior experience, reason to believe
8  information is sufficient to give me an
9  estimate or an answer based on knowledge in
10  past experience, we are entitled to that
11  information if you have it.  Does that make
12  sense to you?
13      A.  Yes, it does.
14      Q.  If I ask you any questions that are
15  unclear, either I've asked you a poorly worded
16  question or you don't understand what it is
17  I'm asking you, just ask me to go ahead and
18  rephrase it.  I'll be glad to do that.
19  Otherwise, if I ask a question and you provide
20  an answer we'll assume you understood my
21  question the way I asked it.  Okay?
22      A.  Okay.
23      Q.  As I said before we started the
24  deposition, at any time if you need to take a
25  break just let me know.  It's not a marathon.
00011
1  So any time you need a break, we can stop at
2  any time.
3      Although we're entitled to the best
4  testimony that you can give us today, I should
5  caution you, we don't want you to guess or
6  speculate and I'll caution you of that in case
7  I think you might be leaning in that
8  direction.  Is there any reason why you can't

MKSK-FED-0000004181

ALCD-PUBCOM_0003379

9 competently provide testimony today? Any
10 medications or any other reason?
11    A. No.
12    Q. Okay. Thank you. Mr. Partington, can
13 you state your date of birth for me?
14    A. 7-9-35.
15    Q. We almost have the same birth date.
16 Your resident address for me?
17    A. 284 Conover Street, C-o-n-o-v-e-r,
18 South Amboy, New Jersey 08879.
19    Q. Mr. Partington, have you had your
20 deposition taken before?
21    A. No. Do you mean have I ever given a
22 deposition?
23    Q. Ever.
24    A. I've had -- given depositions but not
25 relating to anything where I was employed or
00012
1 anything.
2    Q. Okay. How many depositions have you
3 provided?
4    A. One that I know of.
5    Q. And that was not related to your
6 employment?
7    A. It was related to an accident
8 investigation.
9    Q. Was it a car accident?
10    A. No. It was an employment accident,
11 personal.
12    Q. Were you injured?
13    A. Yes, I was.
14    Q. Did you bring a lawsuit?
15    A. No, I did not. It was for the record
16 of what actually happened.
17    Q. Who was your employer at that time?
18    A. Walton Materials Company.
19    Q. Do you know approximately what year
20 that was?
21    A. Somewhere in 1968, 30 years ago.
22    Q. How were you injured?
23    A. There was a mishap -- it was never
24 proven how it happened, but we had an
25 explosion and I was involved.
00013
1    Q. Was your injuries and the situation of
2 your providing deposition testimony, did that
3 resolve to your satisfaction?
4    A. At the time, yes. Was it fair? No.
5    Q. What about it, if you can tell me, was
6 not fair?
7    A. It's 30 -- what, 30 years ago, so
8 what's the sense? It was an equipment failure
9 and it was sort of whitewashed, if you want to
10 put it that way. Some other means was the

MKSK-FED-0000004182

ALCD-PUBCOM_0003380

11  final disposition of what actually transpired.
12      Q.  Were you in the union at that time?
13      A.  I was supervisor.
14      Q.  Supervisor in the union or nonunion?
15      A.  I was part of management.
16      Q.  Well, as we go through your employment
17  history, we may end up coming back to that
18  period of time and that mishap, as you say,
19  with the explosion.  Any other depositions or
20  any other testimony that you've ever given?
21      A.  Not to my knowledge.  I served on jury
22  duties but...
23      Q.  Have you ever testified in court?
24      A.  No.  I've never been a witness, no
25  other, but I was three or four times, four
00014
1  times, I believe, I was on jury duty here in
2  New Brunswick.
3      Q.  Were they all criminal cases?
4      A.  No.  Two accidents, insurance claims,
5  there was no personal injury.  One was -- I
6  don't remember -- no criminal cases, though.
7      Q.  Do you recall the nature of the
8  insurance claim?
9      A.  It was a matter of who we thought was
10  at fault for a particular accident, two people
11  were suing each other, I guess, and we made
12  the determination and we awarded, made the
13  award.
14      Q.  Was it a car accident?
15      A.  Yeah.
16      Q.  Okay.
17      A.  That's about the only one I remember.
18      Q.  Mr. Partington, did you go to high
19  school here in New Jersey?
20      A.  Nope.  No, I didn't.
21      Q.  Is that -- no, I'm sorry, no to high
22  school?  That was a bad question.  It's
23  unclear.  Is it no to high school or into New
24  Jersey?
25      A.  No to New Jersey.
00015
1      Q.  Where did you attend high school?
2      A.  In a little town called West Nanticoke
3  Pennsylvania.  Harter High School.
4      Q.  Did you graduate?
5      A.  Yes.
6      Q.  What year was that?
7      A.  You weren't born yet, 1953.  I'm right
8  too.
9      Q.  You're right, but not as much as you
10  think.
11      A.  Well, mother nature has been awful
12  good to you.

MKSK-FED-0000004183

ALCD-PUBCOM_0003381

13    Q.  Thank you.  And what did you do after
14 you graduated high school in 1953?
15    A.  Well, went to work.
16    Q.  Where did you go to work at?
17    A.  General Motors in Linden, New Jersey.
18    Q.  What did you do for General Motors?
19    A.  I was an assembler, on an assembly
20 line, promoted to line foreman, laid off, went
21 back to Pennsylvania and enjoyed myself for a
22 year.
23    Q.  So let's see, how many years did you
24 work for General Motors?
25    A.  Two, three, four -- three; '55 to '58,
00016
1 I got it in.
2    Q.  Do you have a resume with you?
3    A.  I have, yes, I gave it to the Court
4 Reporter.
5    Q.  Well, you know, we might -- when we
6 take a break we might make a copy of it.  I'll
7 tell you what, I'll take you through this real
8 quickly or we can break now and use the
9 resume?
10    A.  You want to review the resume?
11    Q.  Why don't we take a quick break.
12        (Brief recess.)
13        (Partington-1 marked for
14    identification.)
15    Q.  Go back on the record.  Mr.
16 Partington, I'm going to hand to you a copy
17 of, I believe that's your resume that we've
18 had marked as Exhibit One and I've had it
19 marked as an exhibit, this way it will speed
20 things up a little bit.  We can use it for
21 reference as we go through your work history.
22 There is additional information that I need to
23 ask you about, but it helps to have the
24 outline of your employment on there.  It will
25 help speed us up?
00017
1    A.  Okay.  Fine.
2    Q.  We were talking, before the break,
3 about your work at General Motors which I see
4 is at the bottom of the resume.  First, I
5 should ask you, is this a resume that you
6 created yourself?
7    A.  Yes.
8    Q.  Do you know approximately when you
9 created the resume?
10    A.  Somewhere in 19 -- which is the last
11 '97, '96 or '97.  It's not up-to-date.  It's
12 one of the only ones I had laying around.
13    Q.  Okay?
14    A.  But it is current, I mean, it's not

MKSK-FED-0000004184

ALCD-PUBCOM_0003382

15  current because of -- it lists my experiences
16  to 1996 and this is 1999, I was semi-retired
17  for a year.  I went back to work as a
18  stationary engineer for the year of 1998, part
19  of '99.
20      Q.  Who did you work for as a stationary
21  engineer?
22      A.  For Joule and Company, they're a
23  managerial employment type of agency.
24      Q.  How do you spell the name?
25      A.  J-o-u-l-e, Joule, French.
00018
1       Q.  Are you retired now?
2       A.  Semi.  At the present I am retired,
3   however, I have as I like to say some irons in
4   the fire, I have some things that I've been
5   asked to do and I am contemplating taking one
6   of the positions that are available to me
7   after the summer, of course.
8       Q.  Summers off first.  Right?  Good
9   decision.  Okay.
10      So let's start back on the resume and
11  back with General Motors and move forward.
12  How's that?  We've now covered your most
13  recent employment that's not listed on the
14  resume.  You finished working at General
15  Motors in 1958 and what -- I should ask you
16  first, before we leave General Motors, while
17  you worked at General Motors, did you work
18  with any chemicals or solvents during that
19  time?
20      A.  With General Motors?
21      Q.  Yes.
22      A.  Not directly, just lubricant such as
23  grease, I wouldn't consider that -- well, I
24  guess, it is a chemical.  Yes.
25      Q.  Did you work with any cleaning of
00019
1   metals using solvents, anything of that
2   nature?
3       A.  No.  I was not in the paint department
4   or the -- I was in the assembly division.
5       Q.  Okay, and then when you left General
6   Motors in 1958, next you went to work for
7   Vulcan Materials Company?
8       A.  Well, the date is correct, since
9   Vulcan Materials -- or Frontier Chemical
10  Company it was back in those days, bought
11  Kolker Chemical -- so part of the package was
12  that they recognize all seniority that Kolker
13  Chemical had.  Vulcan was the parent company
14  or Frontier Chemical was a subsidiary of
15  Vulcan Materials Company.  Eventually it
16  became Vulcan Materials Company.

MKSK-FED-0000004185

ALCD-PUBCOM_0003383

17    Q. See --
18    A. So that's the reason for the 1958
19  start.  It was -- I actually worked for Kolker
20  Chemical.
21    Q. In 1958?
22    A. Yes.
23    Q. Okay.
24    A. But to make things easier it all
25  became, for seniority purposes, meant that
00020
1  Vulcan Materials recognized all the time I put
2  in as a Kolker Chemical employee.
3    Q. Back to 1958?
4    A. Right.
5    Q. Okay.  Do you know when -- strike
6  that.  Did Vulcan buy out Kolker?
7    A. No.  As I understand, Frontier
8  Chemical bought Kolker, which I learned later
9  on was Vulcan Materials.  It was a subsidiary
10  of Vulcan Materials.  How that came about, I
11  don't know.
12    Q. Okay.  Do you know when your employer
13  became Vulcan?
14    A. Approximately 1960, now give or -- I'm
15  not -- because it was Frontier Chemical for a
16  short while and then for some reason, I don't
17  know why, it became Vulcan Materials Company,
18  which was a subsidiary of such and such.  But
19  the chemical division of Vulcan Materials
20  Company was Frontier Chemical initially when I
21  was employed there.
22    Q. When you first went to work for
23  Frontier, later Vulcan in 1958, did you work
24  at a particular plant or a particular
25  location?
00021
1    A. Yes, 600 Doremus Avenue in Newark.
2    Q. We'll be referring repeatedly to that
3  particular location, the 600 Doremus Avenue in
4  Newark, New Jersey facility, so if I call that
5  the Newark plant or the Newark site, can we
6  have an understanding we're talking about the
7  same location generally?
8    A. Surely.
9    Q. Okay.  Just to shorthand things a
10  little bit.  What was your job title when you
11  first went to work for Frontier, later Vulcan,
12  in 1958 at the Newark, New Jersey plant?
13    A. Chemical operator.
14    Q. What were your duties as a chemical
15  operator?
16    A. Manufacturer of a product called
17  methyl chloride.
18    Q. Were you involved with the manufacture

MKSK-FED-0000004186

ALCD-PUBCOM_0003384

19  of any other chemicals at that period of time?
20    A.  Oh, yes.
21    Q.  When you were first chemical operator
22  for Frontier?
23    A.  Well, it was Kolker Chemical, they
24  sort of -- when Vulcan -- Vulcan -- Frontier
25  Chemical purchased Kolker Chemical.  They kept
00022
1  the same product lines as Kolker Chemical, so
2  as an employee of Kolker Chemical, I worked on
3  additive products, distillation of making
4  methylene chloride, carbon tetrachloroform, it
5  was all chemical operations.  Benzoic acid was
6  another one.  There were countless methyl
7  bromide -- manufacture of methyl bromide.  It
8  was all in that period.
9    Q.  Okay.  And what were your duties
10  specifically as a chemical operator.  On a
11  day-to-day basis, what were your activities?
12    A.  Simply to produce, it would be to
13  monitor quality, batch operations, make
14  batches, blends, drum; you name it, we did
15  everything back in those days.
16    Q.  Okay.
17    A.  Maintenance, we did some of our own
18  maintenance, pack pumps, you name it.
19    Q.  Chemical operators did some of their
20  own maintenance?
21    A.  Oh, yeah.  Simple piping duties
22  changing pumps, repairing pumps.
23    Q.  When you arrived at the Newark site in
24  1958, do you recall if there was a formal
25  maintenance department?
00023
1    A.  Yes, there was.
2    Q.  Do you know who was in charge of that
3  department when you arrived in 1958?
4    A.  I know his nickname, but I do not know
5  who he was anymore.  We used to call him
6  Whitey, Whitey and Bennie, don't ask me.  It
7  was 40 years ago.  I don't know.
8    Q.  We'll come across a list of names a
9  little bit later, it might ring a bell for
10  you, but we'll see.  I just wanted to see if
11  by any chance you had any recollection on it.
12    A.  And the foreman as I remember, I could
13  be wrong, was Al something -- I forget.
14    Q.  This was the foreman of the
15  maintenance department?
16    A.  Yeah.  Al Bercheski, I don't know, I
17  forget.  It's been a long time.
18    Q.  Like I said, we'll come across a list
19  of names and some might --
20    A.  I'm sure he's in the big chemistry set

MKSK-FED-0000004187

ALCD-PUBCOM_0003385

21 in the sky by now.

22    Q. No longer with us?

23    A. Yes, I'm sure he was middle fifties

24 when I was just a young pup there.

25    Q. How long were you a chemical operator?

00024

1    A. Approximately two years.

2    Q. Did your title change then?

3    A. Yeah.

4    Q. What did you do next?

5    A. They promoted me. They said I had

6 some promise. They made me a shift foreman

7 for $640 a month. And, believe me, that was

8 money back in those days.

9    Q. How did your duties change as shift

10 foreman?

11    A. Well, I was responsible for various

12 units, what they called production units,

13 which they had their own staffing of chemical

14 operators -- one, two, three, it might be

15 three or four people in one particular unit

16 and at that particular time, I had a unit,

17 methyl bromide, methyl chloride, the esters,

18 they used to call it the esters, the power

19 house, boilers, the distillation end of it and

20 the manufacture of methylene chloride. There

21 was about twelve people a shift. I was in

22 charge of these particular people.

23    Q. So approximately, it was approximately

24 twelve people that you supervised as shift

25 foreman?

00025

1    A. Approximately, yes, plus a couple of

2 maintenance mechanics.

3    Q. So you supervised a couple of the

4 maintenance folk as well?

5    A. Yeah. I was responsible for keeping

6 them busy.

7    Q. Would that be the maintenance folks

8 who worked during the shift when you were

9 foreman?

10    A. Yeah, they were shift people also.

11    Q. Was there a particular shift that you

12 worked?

13    A. We worked the seven day stagger shift

14 which was, it consisted of A, B, C and D.

15 There were four rotating shift foremen, which

16 I was one of them.

17    Q. Okay.

18    A. And the employees, the chemical

19 operators and the maintenance people who were

20 assigned to a particular shift rotated the

21 same way as the shift foreman.

22    Q. So various personnel worked shifts as

MKSK-FED-0000004188

ALCD-PUBCOM_0003386

23  if a team together?
24     A.  Yep.
25     Q.  Okay.  Was it a day shift or a night
00026
1  shift or a swing-shift?
2     A.  Twenty-four hours a day, seven days a
3  week, 365 days a year, you was a swing-shift,
4  you had days, afternoon, mids.
5     Q.  Was there a particular shift that you
6  worked?
7     A.  All three of them.  We all rotated.
8     Q.  While you were shift foreman, who did
9  you report to?
10     A.  To a maintenance -- maintenance -- to
11  a production superintendent, back in those
12  days -- let me think, we went through them so
13  fast.  Who did we have that stands out -- oh
14  my goodness.  Must not have been important
15  because I cannot remember who I reported to,
16  but it was a superintendent of production.
17     Q.  Okay.
18     A.  Which there were many, countless.
19     Q.  How about when you were a chemical
20  operator, did you report to a shift foreman?
21     A.  Yes.
22     Q.   Do you remember which shift foreman
23  you reported to?
24     A.  Well, again there were four shift
25  foremen so they sort of rotated the shifts
00027
1  kind of clockwise with the regular rotating
2  employees, philosophy was they wouldn't get
3  too chummy, wouldn't have the same people.  We
4  sort of rotated, to make it easy for you,
5  counter-clockwise, while the regular shifts
6  rotated clockwise, so we would never catch the
7  same shift per se.  We'd catch part of them,
8  maybe once every four cycles, we might catch
9  the shift that we started with, part of it.
10     Q.  So the employees and the manager --
11     A.  They sort of --
12     Q.  To keep it mixed up shifted in
13  opposite type frames?
14     A.  Right.  And the hours were different
15  too.  The salaried people worked eight to
16  four, four to twelve, twelve to eight.  And
17  the pay shift would, I mean, the hourly
18  employees would be seven to three, three to
19  eleven, eleven to seven or whatever, anyway
20  they wanted to do them.
21     Q.  Who was in charge of the entire plant?
22     A.  At that particular time?
23     Q.  When you first started in 1958, do you
24  remember?

MKSK-FED-0000004189

ALCD-PUBCOM_0003387

25    A.  Oh, it was one of the Kolkers, Lee
00028
1  Kolker or Charlie Kolker; one of those.  They
2  were on-site owners and plant managers.  Now
3  there was Al Thomas who was a plant engineer
4  at that time and about that time I became
5  associated with Ray Gilliam, he was a power
6  plant -- or a pilot plant supervisor back in
7  those days.  I think that's when I first met
8  Ray.
9    Q.  In the late fifties?
10    A.  Uh-huh.
11    Q.  Okay.  How long were you shift
12  foreman?
13    A.  About two years.
14    Q.  Then did your title change?
15    A.  Yes.  I became a maintenance foreman.
16  Which was a steady  day job which I opted for,
17  and was accepted.  I felt I was more
18  mechanically inclined than I was chemically
19  inclined, coming from a General Motors
20  background and what have you.
21    Q.  Right.  So let's see, that would put
22  us at about -- you became maintenance foreman
23  in about 1962.  Would I have that right?
24    A.  Somewhere around there, yeah.  Because
25  when Vulcan Materials came there, I got
00029
1  promoted to air production foreman in '64,
2  that was the inorganic department.
3    Q.  That was when Vulcan came in?
4    A.  Yeah.  Vulcan was in the picture then.
5    Q.  That's a production foreman?
6    A.  Yeah.
7    Q.  Okay.  Before we zoom up to that, I
8  want to ask you what were your job
9  responsibilities as maintenance foreman?
10    A.  We had a work order system.  We worked
11  -- I had a day-shift crew which consisted of
12  pipe fitters, millwrights, welders, pump
13  people which you call millwrights.  Okay.
14    Q.  Millwrights or he --
15    A.  Electricians.
16    Q.  Millwrights are pump people?
17    A.  Yeah.  Well, part of the duties are
18  electricians.
19    Q.  Okay.
20    A.  So I had a crew of approximately 20
21  people, let's say.
22    Q.  And the purpose was to maintain the
23  plant facilities?
24    A.  All day-to-day repairs were done by
25  us, anything of a large magnitude was, we
00030

MKSK-FED-0000004190

ALCD-PUBCOM_0003388

1  called, farmed out, was given to some skill
2  that we didn't possess, some expertise we'd
3  hire some engineering firm to do the more
4  technical or the more -- well, things we
5  couldn't handle, very simple. We weren't
6  equipped, we didn't have the knowledge or
7  expertise to perform, these duties was farmed
8  out.
9      Q. Was this -- so, in 1962 when you
10 became maintenance foreman, the plant is owned
11 by Kolker. Is that right?
12     A. Kolker or Vulcan -- Frontier Chemical,
13 one or the other. I don't remember when. You
14 may have that documented someplace else. I
15 don't know the exact year, date.
16     Q. Okay. And when you became maintenance
17 foreman, who did you report to?
18     A. I reported to, oh boy, good point,
19 person -- let me think. Who was it? We had
20 so many maintenance -- it was a maintenance
21 superintendent at the time. Don't ask me his
22 name, it escapes me at the present. I don't
23 know.
24     Q. Okay.
25     A. It may come back, but I doubt it.
00031
1      Q. Now, when you say it was a -- you
2  operated under a work order system?
3      A. Yeah. We tried to organize rather
4  than have -- prior to, I was part of the
5  reorganization of this new plant they had too
6  many emergencies, everything, there was no
7  planning and this is their first attempt at a
8  planned maintenance routine, shall we say, to
9  eliminate the emergencies. The emergencies
10 were killing us, simple things that should
11 have been done routinely, on a scheduled
12 basis, were not being done and this is what we
13 attempted to accomplish and, which we did
14 quite well, by the way, and the work order
15 system was simply that the production people
16 used the manufacturing facilities knew what
17 their particular problems were, so there was a
18 request system in writing to check a pump,
19 check for a leak, replace something or other
20 or some of their particular problems be it
21 mechanical, instrumentation or whatever.
22     Q. When you say this was the first
23 attempt at plant maintenance, non-emergency
24 situation?
25     A. Right.
00032
1      Q. Is that when Frontier took over?
2      A. It could --

MKSK-FED-0000004191

ALCD-PUBCOM_0003389

3    Q.  What prompted the change?
4    A.  Waste I would think.  Down time,
5  nonproductive because of simple things that
6  weren't addressed when they should have been.
7  Breakdowns which were unscheduled, I mean --
8  well, they were breakdowns, they were
9  emergencies because PM maintenance was not
10  being performed.  I would think it was around
11  Frontier's entrance into the picture because
12  prior to that it was helter skelter type of
13  maintenance.  You did it when it broke down.
14    Q.  And before Frontier came in that was
15  Kolker?
16    A.  Kolker.
17    Q.  Okay.  So when Kolker was running the
18  plant day-to-day operations would result in
19  emergency or breakdowns and then folks from
20  the maintenance -- folks from the maintenance
21  department would go in and fix it, but it
22  would have to become an emergency first.  Is
23  that right?
24    A.  It was sort of handled under that
25  basis.
00033
1    Q.  Okay.  When you were maintenance
2  foreman in 1962, did you also perform, or your
3  department perform, routine maintenance at the
4  plant?
5    A.  Yes.
6    Q.  Was the routine maintenance conducted
7  in addition to responding to work order
8  requests?
9    A.  Yes, it was.
10    Q.  Did you have a schedule for your
11  routine maintenance that was conducted at the
12  plant?
13    A.  Yes.
14    Q.  Was it a written schedule?
15    A.  Yes.
16    Q.   Do you recall the activities that
17  were conducted on a routine maintenance
18  schedule?
19    A.  Yes, pumps were addressed -- we had
20  what they call packed pumps, packing, and we
21  were losing a lot of product because of
22  leakage from the glands of pumps, so we had
23  pumps scheduled to be taken out of service and
24  repaired or replaced with stand-by pumps.  We
25  instituted a stand-by system whereby we always
00034
1  had something to rely on and we'd either
2  alternate pumps, make the necessary repairs on
3  the pumps that were in-service, change filters
4  on the air compressors, things of this nature.

MKSK-FED-0000004192

ALCD-PUBCOM_0003390

5  Change oil routinely on compressors and pumps
6  and any other equipment that needed it;
7  electrical checks, clean cast, instrument
8  checks, zeroed in instruments routinely on a
9  monthly or bi-monthly basis.  Regular PM
10  program was instituted and it was humming like
11  a top there for awhile.
12     Q.  When you say PM, what are you --
13  what's that short for?
14     A.  PM, Preventative Maintenance.
15     Q.  Okay.
16     A.  PM.
17     Q.  And you say that things were humming
18  along for a while?
19     A.  Yeah.
20     Q.  What changed?
21     A.  Nothing.  They started to lose money,
22  I guess, because a chlorine process was
23  purchased around there sometime.  They
24  constructed a chlorine plant in 1964.  I was
25  promoted to a production foreman there,
00035
1  somewhere around there.
2     Q.  So a chlorine plant was built?
3     A.  Constructed.
4     Q.  Constructed at the facility in the
5  mid-1960s?
6     A.  No.  This was where you got me.  Now,
7  I can't remember exactly when that chlorine
8  plant was built, it was somewhere in the '60s,
9  prior to '64, I know that, so I am not
10  absolutely sure that it was constructed during
11  Kolker Chemical, or Frontier Chemical or if it
12  was a joint thing.  I do not know.
13     Q.  Okay.
14     A.  But it was in that period between 1959
15  and '62, in there someplace, because I was
16  organic maintenance foreman and there was an
17  inorganic maintenance foreman on the other
18  side of the plant.  So I would say it was in
19  the '60s, '59, '60, somewhere in there; that a
20  chlorine plant was constructed on the property
21  at 600 Doremus Avenue.  The exact year, my
22  memory fails me.  I don't remember.
23     Q.  So were you maintenance foreman for
24  about two years.  Is that right?
25     A.  Double duty.
00036
1     Q.  So would --
2     A.  I was both.  I was not compensated for
3  it, however, I was both.
4     Q.  So when you became a production
5  foreman in 1964, you were also still a
6  maintenance foreman?

MKSK-FED-0000004193

ALCD-PUBCOM_0003391

7    A. As a consultant, on a consultant basis
8 but not -- I didn't have authorization over
9 the crews anymore, but I was a supervisor. I
10 had that authorization, but I didn't assign
11 people to do any particular task. The
12 maintenance people I mean.
13    Q. Right?
14    A. My hands were out of that.
15    Q. Did somebody take over for you?
16    A. I was slapped a few times, yes, there
17 was a couple of people that assumed the
18 position, I don't, off the hand -- they didn't
19 last long. I know that there were maintenance
20 foremen that were hired, maybe three or four,
21 and they stayed for short periods and they
22 left and they went to better and bigger things
23 or whatever. They didn't stay with the
24 company.
25    You're taking me back to my teen-age days
00037
1 for crying-out-loud. Go ahead.
2    Q. You said when you were maintenance
3 foreman you had about 20 people working for
4 you?
5    A. Approximately, give or take, more.
6 Sometimes I had the whole crew, sometimes I
7 had just my crew, but about 20 people.
8    Q. When you say your crew, is that the
9 day crew?
10    A. Yeah.
11    Q. How many folks were on the day crew?
12    A. It could, at one time, be around 30,
13 35, I would think. Something like that. We
14 had approximately a hundred people I think. I
15 forget the exact number of people we had
16 altogether.
17    Q. For the day crew was that a five days
18 a week, 40-hour week?
19    A. Yes.
20    Q. And so then --
21    A. Now, that's something that -- just
22 when I worked for Kolker Chemical and part of
23 Frontier Chemical, up until the time Frontier
24 Chemical came, we had a guaranteed six-day a
25 week operation. In other words, we were
00038
1 guaranteed by Kolker Chemical, 40 plus eight
2 hours overtime every week. That was in the
3 contract and the laborer negotiator seen that,
4 near died. He says, How do you do that?
5    Q. So when you first started with Kolker,
6 so that would be like 1958, '59, somewhere in
7 there, guaranteed six-day operation --
8    A. Everybody. And they were making all

MKSK-FED-0000004194

ALCD-PUBCOM_0003392

9  kinds of goodies.
10     Q.  Did everybody have to work those six
11  days?
12     A.  Yeah, it was mandatory.  So you could
13  get fired.
14     Q.  And the plant itself, though, during
15  that time was in operation seven days a week.
16  Right?
17     A.  Uh-huh.
18     Q.  Okay.  Now, when you were maintenance
19  foreman in 1962, you said you had about 30 to
20  35 people approximately on a day shift?
21     A.  Yeah, but it was not -- I was not in
22  charge of all 35.  There were two maintenance
23  foremen one in the organic and one in the
24  inorganic department.  So I could at times, if
25  I was in charge of a breakdown or turn around
00039
1  wanted to call it.  I could have the whole
2  crew, yes.  I would -- one time -- it was
3  possible to be in charge of the whole
4  maintenance crew.
5     Q.  Which were you in charge of, the
6  organic or inorganic?
7     A.  Organic.
8     Q.  Do you remember who was in charge of
9  the inorganic side as a maintenance foreman?
10     A.  Not originally, but he was a
11  superintendent later on.  Joe Hosey, you might
12  have heard his name before.  I believe he
13  still worked or did work for Vulcan Materials
14  in Wichita, Kansas.  He was transferred out
15  there.  He might still be working for them.
16     Oh, no, he should be retired by now.  He
17  was ten years older than I was.  Unless he
18  found the fountain of youth.
19     Q.  Now, on working on the organic side as
20  maintenance foreman, what chemical
21  manufacturing processes were you specifically
22  involved with as maintenance foreman?
23     A.  Methyl bromide, Ethyl chloride,
24  Benzoic acid, Gulf products.
25     Q.  Gulf?
00040
1     A.  G-u-l-f, Gulf, Mobile, Gulf.
2     Q.  Is there product additives for oil
3  companies?
4     A.  Right.  Methylene chloride,
5  chloroform, carbon tet, and some of the
6  esters.  The esters were solvents and what
7  have you.
8     Q.  And just so I'm clear, what's being
9  manufactured or produced on the inorganic
10  side?

MKSK-FED-0000004195

ALCD-PUBCOM_0003393

11    A. That's the chlorine plant, inorganic
12 is chlorine caustic soda. Hydrogen, bleach,
13 you can see how they're coming together, where
14 it became -- so, we're talking about organic,
15 inorganic time, then chlorine must have been
16 introduced in the '60s, '59 or '60, somewhere
17 in there. I don't know the exact time.
18    Q. Right?
19    A. Probably was not paying that much
20 attention to that part of the plant.
21    Q. That was the other side?
22    A. Uh-huh.
23    Q. Okay. So you became production
24 foreman in 1964?
25    A. Uh-huh.
00041
1    Q. And what were your duties as
2 production foreman for -- by now is it Vulcan?
3    A. Uh-huh. Well, somebody -- Jack
4 Collins was his name, was an advisor that
5 Vulcan had borrowed from their Wichita
6 facility and since Wichita, Kansas and the
7 Newark plant produced chlorine the same way,
8 the Newark facility was in trouble when Vulcan
9 purchased it. Quality-wise on constructions
10 of Hooker Chemical, S-one Cells, that will
11 take me a week to describe that -- but anyhow
12 the process that Vulcan had was the Hooker
13 Chemical, they leased the process from Hooker
14 Chemical, as I understand it, and it was an
15 electrolysis process using little gizmos that
16 we used to call cells. They were concrete
17 constructions consisting of an anode and
18 cathode compartments, with an asbestos
19 diaphragm separating the graphite from the
20 anodes, et cetera, et cetera. If you have an
21 engineer or chemical engineer in your employ
22 he'd probably shed some light on Hooker
23 Chemical's process of manufacturing chlorine.
24    Q. Okay. And the Hooker Chemical process
25 was for the manufacture of chlorine?
00042
1    A. Yes, I understand that a royalty had
2 to be paid, was paid -- now, I actually didn't
3 see the checks being signed, but the
4 understanding was they leased for X amount of
5 moneys the process from Hooker Chemical
6 entitling them to use the process.
7    Q. You said a moment ago that because
8 Vulcan had a Wichita, Kansas facility as well
9 as then purchasing the Newark, New Jersey
10 facility, that they had a quality -- a quality
11 problem. Can you explain what you mean by
12 that? I'm not sure I understand the

MKSK-FED-0000004196

ALCD-PUBCOM_0003394

13 connection.

14  A.  Well, that's the reason for my
15 promotion to a production foreman.  The
16 construction of and the service of the --
17 these particular individual cells was not up
18 to par.  In other words, as I remember it, a
19 cell life, one of these particular individual
20 cells when they are constructed, which we
21 produced ours, should have a life expectancy
22 of some 250 days actual.  In other words,
23 these particular receptacles would stand there
24 and produce chlorine for some 250 days, 220,
25 250 days, average 220 maybe.  Okay?  Prior to
00043
1 Vulcan being there, there was a quality
2 problem with the construction of these cells
3 and they were getting, like, a hundred to 110,
4 150 days.
5  Needless to say, it was becoming not
6 economically feasible to keep it going because
7 the way that was they, you know, they weren't
8 getting the quality out of their constructions
9 and it was a quality problem.
10  Q.  During the Kolker period?
11  A.  Yeah.
12  Q.  So Kolker's creation of the cells for
13 the manufacture of chlorine would not last?
14 The cells would not last as long as they
15 should have?
16  A.  No.  Uh-uh.
17  Q.  That was the quality problem?
18  A.  Right.
19  Q.  And is that -- then Vulcan arrived,
20 did they change the process?
21  A.  In that period, yeah, they sold --
22 now, see, this is where it becomes hazy.
23 Frontier Chemical was there all the while.
24 Now, whether Frontier and Kolker were
25 co-existing as business partners or managers,
00044
1 I don't know.  But Frontier Chemical all of a
2 sudden became Vulcan Materials Company and
3 Vulcan Materials Company -- thus they changed
4 the sign out in front of the plant, says now
5 Vulcan Materials Company, no more Frontier.
6 Now, how that transpired I have no idea, but
7 it did change hands.
8  Q.  And when it changed hands and became
9 Vulcan Materials Company, is that when you
10 were promoted to production foreman?
11  A.  Yeah.
12  Q.  Were you still on the organic side?
13  A.  Yep.  Maintenance foreman, as a
14 maintenance foreman, organic side.

MKSK-FED-0000004197

ALCD-PUBCOM_0003395

15    Q. Oh, okay. When you were production
16 foreman?
17    A. I was promoted.
18    Q. Right, to production foreman?
19    A. But my job was a maintenance foreman
20 on the organic side.
21    Q. Right.
22    A. When the consultant that I mentioned,
23 Jack Collins --
24    Q. Okay.
25    A. -- arrived, he assessed the potential
00045
1 of the people that they now had to deal with.
2 He singled me out as a bright-eyed young man
3 going places with a lot of possibility and did
4 a lot of talking. He talked me out of a good
5 steady day job to give him a helping hand in
6 the organic -- inorganic department and I
7 became a production foreman responsible for
8 the construction of these particular
9 troublesome cells.
10    Q. So you became in charge --
11    A. A hero.
12    Q. So were you production foreman on the
13 inorganic side?
14    A. Uh-huh.
15    Q. Okay.
16    A. So it took two years and I became in
17 charge of the whole inorganic department. How
18 about that?
19    Q. Did your title change again then?
20    A. Pardon me?
21    Q. So did your title change again?
22    A. Yeah, I was department head.
23    Q. In 1966?
24    A. Yep.
25    Q. When you were production foreman in
00046
1 the inorganic side, was somebody else in
2 charge of the maintenance department?
3    A. Yes, Mr. John Doyle, D-o-y-l-e,
4 personally I don't know if he's still alive.
5 He was about fifteen years my senior so he
6 might just be up there in the big chemical
7 plant in the sky. I don't know. I lost track
8 of him.
9    Q. Okay. Once you were promoted to
10 production foreman, did the plant, the routine
11 plant maintenance system that you put in
12 place, did that happen once you were promoted
13 to production foreman?
14    A. Uh-huh.
15    Q. Yes?
16    A. Let's not cloud the picture here. The

MKSK-FED-0000004198

ALCD-PUBCOM_0003396

17 routine maintenance plan that was put in place
18 was part of any good planned maintenance. I
19 didn't invent something. It makes me out as a
20 big hero. I was not. We just instituted it.
21 It's in any good chemical -- maintenance
22 booklet or what have you of -- it's simple
23 maintenance, that's all it is. It was the
24 simple things that weren't being done. I did
25 not in any way invent this procedure.
00047
1    Q. Okay.
2    A. Okay? I just instituted some good
3 ideas and which somebody else, many, many
4 years ago decided this was the proper way to
5 do it. It's like the old Navy adage, by the
6 book, because the person who wrote the book
7 had the experience, time, expertise and what
8 have you, to come up with this particular
9 philosophy or procedure. So I didn't -- I was
10 not the inventor.
11    Q. But in your opinion that routine
12 preventative maintenance is part of any good
13 planned maintenance?
14    A. Oh, yes. I didn't say I didn't have a
15 brain in my head. I just said I did not
16 invent this. I'd be laughed out of the State
17 of New Jersey if I said I did.
18    Q. But there wasn't such a program when
19 you first arrived in 1958. Correct?
20    A. It was organized confusion in my
21 opinion. Now, there might have been -- there
22 might have been some reasons for their
23 madness, I don't know. I didn't know the
24 whole picture but from a maintenance
25 standpoint, sure didn't make sense to me.
00048
1 Something as basic as a PM program,
2 Preventative Maintenance was laughed at,
3 scoffed at, and it could have been for
4 financial reasons. People got a lot of
5 overtime, a lot of breakdowns meant call-ins.
6 Call-ins were time-and-a-half. It was a
7 privately owned organization back in those
8 days.
9    Q. So there could have been some --
10 benefit to --
11    A. Could have been some helter skelter
12 going on around there. Could have been. I
13 don't know. I sure as hell didn't get any of
14 it.
15    Q. For the time that --
16    A. I don't know what their reasoning was
17 outside everybody was happy they were making
18 money. So the employees took it upon

19 themselves to make money too. My opinion. I
20 don't blame them.
21    Q. From the time that you were
22 maintenance foreman, for the entire time that
23 you were at the Newark plant, was there a
24 preventative maintenance program in place that
25 you know of?
00049
1    A. No. Not until -- there was somewhat
2 because of life expectancy of certain
3 equipment, it had to be changed but it just
4 quit, you know what I mean?
5    Q. No. I'm talking about beginning from
6 the time when you were maintenance foreman --
7    A. Yeah.
8    Q. -- until the time you eventually left
9 the Newark site.
10    A. Yeah.
11    Q. Was there preventative maintenance
12 program in place that you know of?
13    A. During my period?
14    Q. Yeah.
15    A. Yes, there was.
16    Q. Okay. And then in 1966, I think you
17 said you became department head?
18    A. Uh-huh.
19    Q. In charge of the entire inorganic
20 department and then how did your job
21 responsibilities change when you went from
22 production foreman to department head?
23    A. Basically it was one of more of an
24 administrative type of duties, quality
25 control, employee safety, employee budget,
00050
1 more budgets, we worked in more of an
2 administrative type responsibility.
3    Q. How many employees did you have
4 reporting to you when you were department head
5 in 1966?
6    A. Well, I didn't, well, if you count --
7 approximately fifty. Approximately, I don't
8 know, could have been more, could have been
9 less.
10    Q. Let me ask you this, do you know
11 approximately what the total number of
12 employees was at the Newark facility when you
13 first arrived in 1958?
14    A. I would say 35, 40 in that range, not
15 much more, but it grew.
16    Q. How about by the time you became
17 maintenance foreman in 1962? About how many
18 total plant employees were there, do you
19 think?
20    A. Oh, 50 to 75.

MKSK-FED-0000004200

ALCD-PUBCOM_0003398

21    Q.  And then in 1966 when you became
22 department head?
23    A.  Seventy-five to a hundred, somewhere
24 around there.  Now, this includes office
25 personnel everybody.
00051
1    Q.  I was envisioning sort of a total
2 employee count, a rough count.
3    A.  I don't believe the facility ever
4 exceeded  125.
5    Q.  Okay.
6    A.  Somewhere, it was a hundred.
7    Q.  As department head, who did you report
8 to?
9    A.  Plant manager.
10    Q.  Who was that in 1966, do you remember?
11    A.  Ed McKillus, have you met Mr.
12 McKillus.
13    Q.  No, the name is not ringing a bell.
14 Do you know how to spell the last name?
15    A.  No, McKillus.  M-c -- I think it was
16 Irish fella -- and Pete -- I forget his last
17 name now.  It will come to me.
18    Q.  Is this somebody else who was also a
19 plant manager?
20    A.  It was a couple, they went through
21 them like -- Newark was the training ground
22 for Wichita, Kansas -- I can't think of his
23 name.  I had it on the tip of my tongue --
24 Fred Alers was another plant manager.
25    A.   Gadis, Pete Gadis, G-a-d-i-s,  my
00052
1 buddy, my hero.
2    Q.  Good friends with Pete?
3    A.  He was the only man in place in the
4 management range as far as I was concerned
5 called an Ace an Ace, a spade a spade.  A
6 straight arrow.  A hell of a guy.
7    Q.  He was another one of the plant
8 managers?
9    A.  Uh-huh.
10    Q.  Do you know what years he was plant
11 manager?
12    A.  Pete?  Somewhere in all this mess,
13 '64, he was foreman, was I -- no, he came in
14 there about '64 he was there.  '64 to '70, I
15 would think somewhere in there, Inland
16 Chemical came in there someplace.  I forget
17 where they came in.
18    Q.  Well, let's see, looking at the resume
19 it looks like you were department head for the
20 inorganic department for about four years?
21    A.  Then after that all hell broke loose.
22 Then Vulcan Materials got out, Inland Chemical

MKSK-FED-0000004201

ALCD-PUBCOM_0003399

23    came in and --
24       Q.  Well, it says on your resume that in
25    1970 you became maintenance superintendent?
00053
1        A.  Here again I don't mention Inland
2    Chemical so what I kept, keep the resume
3    simple, I broke it down in that manner.  In
4    1970, that was already Inland Chemical.
5        Q.  Our information is that Inland came,
6    acquired the Newark site, as an owner anyway
7    if not an operator, in May of 1974.
8        A.  Couldn't have been.  '74?
9        Q.  That's the information we have, but is
10   it --
11       A.  Here again, it's possible, because I
12   list as '79 my experience I went to Woodbridge
13   Suites that was -- I don't know now.
14       Q.  Did you work at the Newark plant?
15       A.  Til '79.
16       Q.  For Inland?  When Inland was there?
17       A.  Oh, yeah.
18       Q.  Okay.  Was it, do you recall, were you
19   maintenance superintendent before Inland took
20   over or do you think you became maintenance
21   superintendent when Inland took over?
22       A.  See, now, I don't remember.  It's not
23   clear, dates are give or take a year.  It's
24   been a long time ago, I know that was a
25   progression of my advancement in that
00054
1    particular location, how long -- '70 -- yeah,
2    see, somewhere in the '70s both -- oh, Vul --
3    Inland came in there because I worked four
4    years for Inland Chemical and left.  I worked
5    a few years for Inland Chemical then McGleason
6    (sic) came in there someplace, McKesson,
7    McKesson came in there somewhere and I was
8    gone.
9        Q.  You were gone?
10       A.  In '79.
11       Q.  You were gone when McKesson came in?
12       A.  No.  I worked with them almost --
13   maybe six months to a year, somewhere like
14   that.  It was all confused back in those days
15   because what had happened, Inland Chemical
16   bought the place, bought the process and
17   immediately within, I don't know, a year or so
18   they started to dismantle, they stopped
19   operation in the inorganic department, the
20   chlorine department, they did away with the
21   facility.
22       Q.  Okay.
23       A.  They stopped manufacturing, let's put
24   it that way, and they sold half or that half

MKSK-FED-0000004202

ALCD-PUBCOM_0003400

25  of the plant to a meat processing outfit, as I
00055
1  remember Van Eiderstein or something got in
2  there.
3    Q. That sounds familiar.
4    A. So it was Inland very shortly after
5  that. You say '74 to '79? It could very well
6  be. It could be because it was a situation at
7  that particular site where some of the old
8  timers, which I was considered an old timer,
9  felt, you know, the place is falling apart.
10  They are selling it out from under us. Where
11  is the future an all of this?
12      They were just, when they came there they
13  were reclaiming chemicals and they made it a
14  junk operation as far as I was concerned. In
15  fact, they didn't last. I don't know how long
16  they lasted. I got out in '79 over that.
17    Q. At the time that Inland took over,
18  were you working on the inorganic or the
19  organic side. Do you remember?
20    A. In that period, I don't know who was
21  in charge. I believe it was Inland Chemical.
22  They decided that they would not manufacture
23  chlorine at the Newark site and they closed
24  the facility down, that particular plant, that
25  particular end of the plant. I was
00056
1  instrumental in phasing it out safely and that
2  was it. Then they sold that particular part
3  of the plant to Van Eiderstein, I believe a
4  meat packing outfit and we had nothing to do
5  with them, or I didn't have anything to do
6  with them.
7      And Inland as I remember, it went back to
8  the organic area of the plant reclaiming
9  chemicals. Methylene chloride, they were
10  interested in that. They manufactured, that
11  process continued. Methylene chloride.
12    Q. And when Inland -- you said you were
13  instrumental in helping phase out the chlorine
14  plant side of the Newark facility for Inland,
15  and then Inland proceeded to use the organic
16  side for reclaiming chemicals?
17    A. Right.
18    Q. What was your job with Inland at that
19  period of time when Inland went to the organic
20  side for reclaiming chemicals?
21    A. This was unique. They downsized to
22  such an extent that I was reduced to a shift
23  foreman again and I was instructed to get my
24  boiler operator's license, which I did, and I
25  ran the boilers while Inland Chemical operated
00057

MKSK-FED-0000004203

ALCD-PUBCOM_0003401

1 the organic department, methylene chloride
2 separate.
3    Q. Okay.
4    A. They also were involved in a process
5 known as DMA, dimethyl aniline, they produced
6 that with part of the plant.
7    Q. Before you went back to being a shift
8 foreman for Inland, were you a maintenance
9 superintendent?
10    A. Very short.
11    Q. Okay.
12    A. Very short. That was during that
13 phase-out period.
14    Q. That's when you were maintenance
15 superintendent?
16    A. Phasing it out, they got rid of
17 everybody else.
18    Q. Did that last about a year?
19    A. No three, six months tops. It was
20 fast. It was -- well, it was planned so it
21 was --
22    Q. Okay. Did you have any other plant
23 maintenance duties other than phasing out the
24 chlorine side of the plant as maintenance
25 superintendent?
00058
1    A. No. That was probably it.
2    Q. Ready for another short break?
3    A. Yeah.
4    (At this time a short recess is taken.)
5    Q. Mr. Partington, based on the
6 information on your resume, it looks like you
7 left Vulcan Materials employment and the
8 Newark, New Jersey site in approximately 1979?
9    A. That is correct.
10    Q. And present there --
11    A. It was not Vulcan, it was Inland
12 Chemical or McKleeson (sic) they were in the
13 transition period during the time I left.
14 Downsizing again and bringing their own people
15 in.
16    Q. Just so you know the information we
17 have indicates that the final transition from
18 Inland over to McKesson was sometime in 1981.
19 Now, whether that transition began sooner we
20 don't know.
21    A. I don't know.
22    Q. Just so you know --
23    A. All I know is the dates on my resume
24 are 99.9 percent accurate, starting and
25 leaving anyhow.
00059
1    Q. So then if you left in 1979, based on
2 the information we have --

MKSK-FED-0000004204

ALCD-PUBCOM_0003402

3    A.  It would be Inland.
4    Q.  That would put it at Inland Chemical
5  owning and operating the Newark site?
6    A.  Yeah, but somehow when I retired, I
7  was going to retire early, my retirement from
8  Inland Chemical was a property of McKesson, so
9  it was part of the -- they picked up the
10  employees activity, don't ask me how because I
11  also had a problem with Vulcan Materials, I
12  put some 21 years in which I was not
13  accredited for because when I left Vulcan
14  employ, I was not 45 years of age and I was
15  not entitled to their retirement benefits
16  after 21 years.  But that's under litigation
17  because I was vested.  I have papers.  This is
18  personal now.  It was personal which isn't
19  part of this, but they disallowed my time
20  claiming that I did not have one of the
21  requirements of their pension plan, which was
22  age of 45.  I was only 44 and a half or I
23  don't know what I was, but anyhow...
24    Q.  Is that a dispute that's going on now
25  or --
00060
1    A.  Yes.  It's  not been resolved and
2  that's under, not labor relations, but the
3  federal, somebody is filing for me.
4    Q.  A government agency is  looking into
5  it for you?
6    A.  Yes.
7    Q.  Then so after you left -- in 1979 when
8  you left the Newark site, which was then under
9  Inland's ownership and operation you went to
10  Woodbridge Suites?
11    A.  Yeah.
12    Q.  There you were assistant chief
13  engineer?
14    A.  Uh-huh.
15    Q.  Was that more of an administrative job
16  at Woodbridge Suites?
17    A.  Hands-on type of an operation.  I --
18  during my tenure there with Vulcan and Inland
19  and what have you, part of the deal there
20  between Vulcan Materials, Inland Chemical when
21  they downsized, when they got rid of the
22  inorganic plant, was that we get our boiler
23  license and refrigeration license which
24  through a special mandate, a special deal, we
25  were offered membership in Local 68, which is
00061
1  an operating engineers local and I, at that
2  time, got my operating license for stationary
3  engineer and refrigeration engineer and I
4  became part of Local 68.  Local 68 was

MKSK-FED-0000004205

ALCD-PUBCOM_0003403

5  responsible to me procuring the job in
6  Woodbridge Suites since they staffed all the
7  engineering positions in New Jersey, most of
8  New Jersey during that period. I don't know
9  how far they extend now, but, also Hercules
10  was also part of Local 68. Moved, I bounced,
11  more money, moved. Merck was a chance to
12  become a supervisor again and which I went
13  there as a shift supervisor.
14    Q. Okay.
15    A. And Port Newark was Local 68. Again,
16  I got tired of the political maneuvering in
17  Merck, I moved on. And that's my whole
18  history.
19     Thank you. Now that should be it.
20    Q. We're going to need a few more
21  details. But that covers --
22    A. That cost extra.
23    Q. -- employment history.
24    A. Now, let's get to the crux of the
25  situation.
00062
1    Q. Let me ask you just real quickly so we
2  can move off the resume -- just real quick.
3    A. Sure.
4    Q. The Hercules, you went there as shift
5  engineer in 1982 to '83. What kind of company
6  was that again, for the record?
7    A. Manufactured nitrocellulose which is
8  used in explosives, gun powder, et cetera. I
9  was in the power house. I was not responsible
10  for any of the manufacturing. I was in the
11  power house operating a boiler. They brought
12  in coal fire furnaces. It was during the oil
13  crunch. Back in those days, when you had to
14  wait in line for oil -- gasoline and all that.
15  And then running a facility on oil was costly,
16  very costly. So they had some old coal fire
17  stoker-type furnaces, which I was familiar
18  with, and they got me off the street and give
19  me X number of dollars and said get them in
20  shape and I did, and lasted a year.
21    Q. Then in '83 you went to Merck in
22  Rahway, New Jersey?
23    A. Yeah. Merck was a fine outfit to work
24  for.
25    Q. What was the nature of their business?
00063
1    A. Merck? Pharmaceutical, one of their
2  finest -- you ever heard of Merck and Company,
3  Merck, Sharp and Doehm?
4    Q. I wasn't sure if it was the same.
5    A. Merck, Sharp and Dohme originally, now
6  they're Merck and somebody else. They merged.

MKSK-FED-0000004206

ALCD-PUBCOM_0003404

7  I forget who lately.

8      Q.  And you were senior supervisor for
9  them?

10     A.  Yes.  On-site services which was
11  comfort service cooling refrigeration.

12     Q.  Then in 1988, you went to work for
13  Port Newark, refrigerated warehouse in Newark,
14  New Jersey, until 1996, and you were in charge
15  of plant maintenance there as chief engineer?

16     A.  Correct.  Then I worked for Joule the
17  year of '98 or -- no, '98.  I think I
18  mentioned that before.

19     Q.  Yeah?

20     A.  Which I was  --

21     Q.  You were stationary engineer for
22  Joule?

23     A.  Right for Shiseido.  They have some
24  line of cosmetics.

25     Q.  Yes, they do.

00064

1      A.  Very, very costly.

2      Q.  Costly and good quality?

3      A.  Very good quality, Japanese outfit.
4  Nice people to work for but...

5      Q.  As a stationary engineer, did you have
6  maintenance duty for them?

7      A.  I sort of -- not -- certain things
8  broke down in the boiler room -- pertaining in
9  the boiler room or refrigeration end of it.  I
10  made minor repairs.  It was only myself so,
11  that was it.

12     Q.  Okay.

13     A.  Good.  You're ever in New Jersey
14  again, call me.

15     Q.  We're not quite there.

16     A.  I figured that.

17     Q.  Let me ask you, when you went to work
18  as a chemical operator in 1958 for Kolker,
19  when you were hired, were you trained in any
20  way?

21     A.  Yeah.  From the fellow employees.

22     Q.  So it was on-the-job training?

23     A.  Yes.

24     Q.  Were you trained how to use the
25  equipment?

00065

1      A.  On-the-job training.

2      Q.  Did the company give you any training
3  on the handling of or use of chemicals?

4      A.  Back in those days if it didn't hurt
5  you, you respected it.  If it burnt you put
6  rubber gloves on, trial and error, I mean, we
7  had no safety program to speak of.

8      Manufacture of methyl bromide was very

MKSK-FED-0000004207

ALCD-PUBCOM_0003405

9 hazardous. It required air apparatus. Air
10 self-contained Scott packs we used to call
11 them, and working with air mask. That was
12 about the only safety training we ever had,
13 but as I can remember out of necessity cover
14 goggles were mandatory for handling acids and
15 alkaline stuff. Rubber gloves were available.
16    Q. Did you have to wear rubber gloves?
17    A. If it required it, yes. If it was
18 injurious to yourself not to, it was very wise
19 to wear them.
20    Q. How did you -- how would you know,
21 come to find out, if certain chemicals would
22 be injurious to your skin or not?
23    A. From practical experience, from using
24 them daily, sulfuric acid and caustics, I
25 guess, from a chemistry course I might have
00066
1 taken in high school. I mean, it was not, you
2 know, foreign to me that there were substances
3 that could injure you, lye and --
4    Q. And did you understand that those
5 chemicals that could injure you weren't toxic?
6    A. Oh, yeah.
7    Q. And that they could also hurt the
8 environment?
9    A. Definitely.
10    Q. The chemicals that you talked about
11 working with when you were a chemical
12 operator, methylene chloride, carbon tet,
13 chloroform, Benzoic acid, methyl bromide, the
14 chemicals that we've talked about so far this
15 morning, back when you were starting to work
16 with those chemicals in the late '50s, did you
17 understand that those chemicals were toxic and
18 harmful to the environment?
19    A. Well, to what degree, no, I didn't
20 understand how bad, is that the right word,
21 they were, but I knew that grass didn't grow
22 where you dumped some of the stuff so that
23 might have told you something. Fish died in
24 the bay where things went out in the bay. Now
25 that would, you know, make any normal
00067
1 individual suspicious that something is wrong,
2 you know. Smell the smell of chlorine, they
3 used chlorine, was objectionable. Now, that's
4 not good for you, you knew that. Methyl
5 bromide the same way. Bromine, they used to
6 manufacture methyl bromide, had a pungent
7 smell and this was toxic, very toxic. Toluene
8 is a solvent that is, I've since learned, you
9 know -- you learn more as you get older and
10 you get more exposed to certain things that

MKSK-FED-0000004208

ALCD-PUBCOM_0003406

11  there was no need to know back in those days.
12  I mean, you didn't have any booklet on unit
13  site of the chemicals that were used and the
14  right to know, there was no such thing.
15      Q.  So you knew generally that the
16  chemicals at the plant --
17      A.  Harmful, yes.
18      Q.  -- were harmful?
19      A.  Oh, yes.
20      Q.  But the degree to which they were
21  harmful was something --
22      A.  To the environment.
23      Q.  -- didn't learn until later?
24      A.  Later on it became obvious.
25      Q.  Do you recall seeing grass at the
00068
1  Newark plant die because of the chemicals
2  being dumped on the ground?
3      A.  Sure.
4      Q.  Do you recall seeing fish dead in the
5  bay as a result --
6      A.  Yes.  We used to change filter screens
7  in the water pumps when I was in maintenance.
8  There were, you could say it happened because
9  they got caught in the filters, but they were
10  dead.  There were dead fish all over the
11  place, killees floating along the dock.
12      Q.  That a kind of fish?
13      A.  We call them killees.  They are
14  little, small, I don't know -- shrimp were
15  there that were dead.
16      Q.  Did you change the filters in the
17  water there right there at the edge of the
18  bay?
19      A.  The baskets were pulled out, they were
20  screen mesh that kept foreign particles being
21  drawn into the suction of the pumps which used
22  to plug up the pumps so the screening was
23  called filters, we call them.  River screens,
24  there was like a lock arrangement where you
25  may have a metal grate go down in front of the
00069
1  screening portion of the filter, catch the
2  larger stuff; logs, twigs, bottles, cans,
3  stuff like this that might be in the river to
4  a small mesh, maybe a quarter-inch holes in a
5  cylinder type of basket which was refined
6  filter before the pumps pumped the water into
7  the process.
8      Q.  So the operations at the Newark
9  facility used water from Newark Bay pumped
10  into -- onto the plant?
11      A.  Oh, yeah.
12      Q.  Was that used in a cooling water

MKSK-FED-0000004209

ALCD-PUBCOM_0003407

13  process?
14     A.  Mostly cooling water and for cleansing
15  purposes.  We'd wash things out with it, it
16  was not potable, it wasn't cross type city
17  water or drinkable water.  It was used for
18  washing floors down, chemical spills, washing
19  out vats, washing out tanks, clean up anything
20  that needed water.
21     Q.  Was the water from Newark Bay used for
22  cooling process and cleaning purposes at the
23  plant when you arrived there in 1958?
24     A.  Oh, yeah.
25     Q.  And did the water from Newark Bay
00070
 1  continue to be used for cooling and cleaning
 2  processes throughout Vulcan's tenure at the
 3  site during the '60s?
 4     A.  To make it easy for you, they all did
 5  the same thing, every outfit that was there.
 6  They incorporated the use of the river water
 7  system.  The procedures were similar if not
 8  the same.
 9     Q.  And that would be -- so that would be
10  Kolker, Vulcan and Inland?
11     A.  Yes, most certainly yes, and Frontier.
12     Q.  Okay.
13     A.  And all effluent was turned to the
14  bay.
15     Q.  So once the water was through being
16  used in the cooling process or through
17  cleaning out tanks or vats, et cetera, that
18  all just went right back into the bay?
19     A.  Plus a lot of waste.
20     Q.  That would be the waste that's being
21  cleaned out during the cleaning process,
22  product, waste product, that sort of thing?
23     A.  Spills, anything.  Anything that
24  didn't evaporate that required cleaning went
25  to the river.
00071
 1     Q.  Anything that didn't evaporate and
 2  required cleaning went to the river?
 3     A.  Yeah.
 4     Q.  And the discharge of effluent back
 5  into the bay, was that the same for all the
 6  entities, again, Kolker, Frontier, Vulcan,
 7  Inland?
 8     A.  They all did the same thing.
 9     Q.  To the extent McKesson came into the
10  picture --
11     A.  I'm not familiar of McKesson,
12  obviously, since there is a discrepancy of
13  when -- to the best of my recognition rather,
14  was that I was in between Inland and McKesson.

MKSK-FED-0000004210

ALCD-PUBCOM_0003408

15 Now you say McKesson didn't finalize 'til '74.
16    Q. McKesson didn't finalize according to
17 our records until '81.
18    A. Well, my documents prove that I was
19 out of there in '79, so -- but I do remember
20 something with McKesson, whether they were in
21 the process, they were -- I don't know.
22    Q. Okay.
23    A. But McKesson, I have no knowledge of
24 what they did there, but Inland I do.
25    Q. But as long as you were there at
00072
1 Newark, the process of pumping bay water to
2 use at the plant for cooling and cleaning and
3 the process of putting all the effluent back
4 to the bay was the same, didn't change while
5 you were there?
6    A. Same.  No.
7    Q. At any time do you know if the
8 effluent that was pumped back into the bay was
9 sampled and/or tested in any way?
10    A. There was environmental people who had
11 sampling points in the effluent return piping
12 somewhere in the late '70s, I would say
13 whenever the environmental people got a little
14 too -- they started to monitor the effluent.
15    Q. Okay.  Do you have any interaction
16 with any of the environmental or governmental
17 folks that came to Newark to check out the
18 property?
19    A. No, other than to show them where the
20 sample points were maybe, that was it.
21    Q. How many effluent discharge points
22 were there from the Newark property into the
23 bay?
24    A. Offhand, I think two that I know of.
25 That's it.  Now, by two, I meant where piping
00073
1 was such that it went to a particular
2 discharge point, the sewers all collected and
3 went on one side of the plant on the organic
4 side and the inorganic had more or less the
5 same thing.  They were piped away from the
6 inlet of the river water pumps, there were two
7 sets of river water pumps.
8    Q. Bringing water onto the plant?
9    A. Right.  So the effluent naturally was
10 either downstream -- in both cases, they were
11 downstream of the inlet of the pumps, how many
12 that -- well, I'm sure we recycled our own
13 waste more than once.
14    Q. But the idea of having the discharge
15 point downstream was to not get --
16    A. Not to contaminate the water.

MKSK-FED-0000004211

ALCD-PUBCOM_0003409

17    Q. That's coming into be used by the
18 plant. Right?
19    A. Because the clarity of the water in
20 Passaic Bay was not the best.
21    Q. Was the effluent into the bay a
22 particular color?
23    A. It could be any color.
24    Q. Any color?
25    A. Yes, it could be white. It could be
00074
 1 oil. It could be charcoal, it could be
 2 whatever they produced the night before. The
 3 standing joke of that plant was when,
 4 especially when they ran the ester units.
 5 Ester units require a lot of washing of
 6 chemical batches. They put it into tanks,
 7 they save the water, water separated from the
 8 product, and if they missed it, it went out to
 9 the save-all tank. The save-all tank was
10 unfortunately Newark Bay. That's where the
11 product went.
12    Q. So the Newark Bay was called the
13 save-all tank?
14    A. That's right. I'm sure that isn't the
15 first time you heard that.
16    Q. So there were two pipe inlets that
17 brought Newark Bay water onto the plant. Is
18 that right?
19    A. There were two sets of river water
20 pumps, yes.
21    Q. River water pumps, did one bay water
22 stream go to the organic side and one to the
23 inorganic side?
24    A. Correct.
25    Q. Then the two discharge points of flow
00075
 1 went back to the bay, one was collecting all
 2 sewer system from the organic side and one was
 3 catching all the sewer systems in the
 4 inorganic side?
 5    A. Now, there was an open trench on the
 6 organic side which spilled into the bay. That
 7 was where the chlorinated wastewater went down
 8 this open trench. Now, I don't remember if
 9 they ever enclosed it or tied it into the main
10 sewer. I don't remember.
11    Q. What was the size of open trench? Do
12 you remember?
13    A. It was approximately at spots four
14 foot wide and then it tapered down, you know,
15 pitched down to a point.
16    Q. You mean there was a --
17    A. Like a trough.
18    Q. The sides came in like a trough?

MKSK-FED-0000004212

ALCD-PUBCOM_0003410

19    A.  Like a trough, all the way down to the
20  bay.
21    Q.  How deep was it, do you know?
22    A.  Depends.  There was nothing going on.
23  It was dry.
24    Q.  That was a bad -- I asked you a bad
25  question.  You caught me.
00076
1      How deep was the trench?
2    A.  I would say approximately two-feet,
3  approximately, it could have been 30-inches.
4  I don't know.  It's a long time ago.  I don't
5  remember.
6    Q.  Was there fluid and effluent running
7  through there on a regular basis?
8    A.  Almost continuously.
9    Q.  And that trench just ended up at the
10  bay and jumped --
11    A.  Leached into the bay.
12    Q.  And is that, the effluent running
13  through the open trench, is that the same as
14  the other effluent, could be any color depends
15  on what they were doing to the plant or since
16  it was inorganic side did it tend to be one
17  color versus another?
18    A.  It was mostly white because they had
19  trouble recovering salt from the caustic plant
20  and the caustic boil out, they used to call
21  them to clean the condensers and steam chest
22  and what have you, that was white.  Caustic
23  was always white.  In fact, there used to be a
24  trail from the chlorine plant out towards the
25  middle of that bay and I think the Coast Guard
00077
1  came up a few times and I think they were
2  cited a few times for pollution.  This was
3  when the environmental people started to get a
4  little more strict on their control of
5  effluent.
6    Q.  Would that probably have been then
7  during the '70s?
8    A.  Probably.
9    Q.  Did you ever see effluent or discharge
10  into the bay that was purple in color?
11    A.  Believe it or not, all the time I put
12  there, it was not one of my pastimes to watch
13  the sewer.  Now I'm only talking at times
14  where I would be interested in it would be
15  like if there was a spill, an oil spill or
16  something, I might out of curiosity take a
17  walk to see how it's mixing with the bay and
18  at that particular time it could be God knows
19  what color.  Who cared about the color.  I was
20  more than concerned about the sheen on top of

MKSK-FED-0000004213

ALCD-PUBCOM_0003411

21  the water, oil floats. I was wondering how it
22  would dissipate or how long it would take to
23  dissipate. Curious, you know, of course, that
24  was during the day light hours. At night, God
25  knows. But the spills and the cleansing from
00078
1   the caustic plant, as I stated, it's not a
2   secret. They were sighted numerous times for
3   white material going down. In fact, I think a
4   couple of the boating enthusiasts in the area
5   had some suits against the company because it
6   ate the paint off the boats.
7        I'll tell you it was a cesspool, I had
8   to say that. That's being recorded. It was
9   polluted. It's unconscionable. The reason I
10  say that, I am an outdoors man, I love
11  hunting, fishing and it used to personally
12  upset me. But...
13       Q. At that time, would it upset you,
14  would you say something to the plant manager
15  or say something to anybody else?
16       A. No. I wanted my job. It was none of
17  my business would be the standard unwritten
18  rule, if you know what I mean. You didn't
19  complain. Why should you?
20       Q. Did you get the feeling that if you
21  complained, it could have cost you your job?
22       A. Could have. It could have.
23       Q. Was the plant management, plant
24  manager specifically fully aware of the
25  effluent going back into the bay?
00079
1        MS. RYNIEC: Objection. Calls for
2   speculation.
3        A. He reads the reports. He got the
4   citations from the coast guard.
5        Q. The plant manager would understand how
6   the plant ran?
7        A. I would hope so.
8        Q. Do you remember if anybody from
9   Inland's head office from Ft. Wayne came out
10  to the site?
11       A. There was various meetings there,
12  Chairman of the Board, I understand, who was
13  one of the speakers -- don't ask me his name.
14  I do not know who he was. But there was some
15  high cotton people -- we used to call them
16  high brass. Yes, there was both of Vulcan and
17  Inland Chemical, what their positions were, we
18  heard they were stockholders. We heard they
19  were owners, I don't know.
20       Q. Do you know if Vulcan or Inland's
21  upper management were meeting at the site to
22  talk about any contamination issues or issues

MKSK-FED-0000004214

ALCD-PUBCOM_0003412

23 regarding effluent into the bay?
24    MS. RYNIEC: Objection.  Calls for
25 speculation.
00080
1    A.  I would not have privilege to that
2 kind of knowledge.  I was not up in that loop.
3    Q.  Let me ask you real quick going back
4 to the trench, the open trench, this was on
5 the inorganic side, was the trench lined with
6 anything?
7    A.  No.
8    Q.  It was just dirt?
9    A.  Uh-huh.
10    Q.  And the pipes from Newark Bay, the
11 pipes inlet which let the water onto the plant
12 facility for use in the cooling and cleaning
13 processes, do you recall what their diameter
14 was?  How big?
15    A.  Fourteen or 16-inch, they were large,
16 hung, maybe 18-inch, I don't know right
17 offhand.
18    Q.  Inch across?
19    A.  Right, in circumference.
20    Q.  Circumference, okay.
21    A.  Eighteen inches.
22    Q.  Was it the same inch pipe for the
23 piping that pumped the effluent back into the
24 bay?
25    A.  I don't know.  This is underground.
00081
1 It could have been larger, could have been 24
2 or at least 18, I don't know.  Don't make
3 sense, what goes in, you got to come out, you
4 know.
5    Q.  Those discharge?
6    A.  What  GPMs it was, I have no idea what
7 the GPMs were.  Maybe it has it in here.  This
8 here is my copy of the procedure of
9 manufacturing chlorine from the Mullen
10 Corporation, has flow sheets, documents.  This
11 is all I have.
12    Q.  I see you have some documents there.
13    MS. HAYNES:  Can we go off the record
14 for just a moment.
15    (At this time there is a discussion
16 off the record.)
17    MS. HAYNES: Back on the record.  While
18 we were off, we talked briefly about some
19 documents that Mr. Partington brought with
20 him.  One of them is a manual of a
21 consultant used by Vulcan, which I do not
22 believe has been produced to the
23 defendants so far in the case.  It's
24 titled Chlorine Handling Process

MKSK-FED-0000004215

ALCD-PUBCOM_0003413

25    Description and Operating Instructions
00082
1    Project, number 6851, prepared for Vulcan
2    Materials, Newark, New Jersey prepared by
3    RPB. MacMullin, M-a-c-M-u-l-l-i-n,
4    Associates in Niagra Falls, New York. It
5    is dated May 7, 1968.
6        We have agreed that at some point
7    today we will send it out and have it
8    copied and produced to defendant and the
9    original returned to Mr. Partington.
10    Q. And other than the manual for Vulcan
11  Associates and the resume, those are all the
12  documents that you have in your possession,
13  Mr. Partington, that are not of a personal
14  nature. Is that correct?
15    A. That's correct.
16    Q. Thank you. Before we took our short
17  break, you had mentioned that on occasion
18  there would we an oil spill and you would go
19  out and sometimes you would go out and watch,
20  look at the effluent that went into the bay.
21      Do you have any specific recollection of
22  oil being spilled at the Newark site while you
23  were there?
24    A. Only during the period Kolker Chemical
25  was -- had a contract with Gulf Oil Company.
00083
1  They were making an additive for motor oil and
2  we had various spills around the unit and
3  mistakes were made and sometimes some of the
4  oil material which was used in the additive,
5  the final product was discharged into the
6  sewer and was out in the bay. During that
7  period is most important, that's what the --
8    Q. Is it correct to say that anything
9  that found its way to the sewer ended up in
10  the bay?
11    A. Correct. Had no settling ponds, there
12  was no reclaiming systems, anything that went
13  down the sewer eventually went to the bay. I
14  might add this was true with all of the
15  particular people after Kolker Chemical. Also
16  it seems that this was an accepted practice.
17  Not until the late '70s was there any
18  monitoring or what have you of the effluent
19  going to the sewer or into the bay.
20    Q. Do you have any specific recollection
21  of how these mistakes that you referred to
22  around the plant, do you have any specific
23  recollection of how those mistakes took place
24  that resulted in additives making its way to
25  the sewer system?
00084

MKSK-FED-0000004216

ALCD-PUBCOM_0003414

1    A.  No.  Operator would make a mistake, a
2  wrong valve might be opened, a tank would not
3  be checked properly and it would be full and
4  then it was overflow, things of this nature.
5  Common operating technique.
6    Q.  So were -- these mistakes were common
7  and part of the day-to-day business operations
8  at the plant?
9    A.  It was accepted.
10    Q.  And was accepted as just part of the
11  process of doing business there?
12    A.  Yes.  There was some discipline taken
13  at times, if something was found to be
14  negligent or somebody not doing their job such
15  as watching a particular phase of the
16  operation, they were not attentive and because
17  of not being attentive, spills happened and
18  then there was some discipline during this --
19  if a particular person was found to be
20  negligent.
21    Q.  Do you have any recollection of
22  disciplining people in that way?
23    A.  Myself?
24    Q.  Uh-huh.
25    A.  No, I personally would not, was not
00085
1  involved.
2    Q.  But as a general rule for Kolker,
3  mistakes that resulted in product or some of
4  the additive getting onto the ground making
5  its way to the sewer system, that was an
6  accepted part of doing business at the plant?
7    A.  Well, no.  Manufacturer considered
8  that a norm because waste is money and these
9  things did happen, leaks did happen, spills
10  did happen, and to consider it normal, I don't
11  know if that's the right word.  It did happen.
12    Q.  Did happen?
13    A.  But, of course, as I explained a spill
14  is money and they are in business to make
15  money.  So intentionally do it, no, I don't
16  believe this was part of their operating
17  technique, anybody's operating technique.
18    Q.  But they would happen?  The mistakes
19  would happen?
20    A.  Mistakes will happen.  The problem was
21  that there was no back-up.  There was no way
22  of ensuring that the material would not
23  eventually end up in the bay, such as a
24  settling pond, dams or things of this nature.
25  There was none of this.  Whatever hit the
00086
1  sewers, hit the bay.  That was --
2    Q.  Would spills, like an oil spill, would

MKSK-FED-0000004217

ALCD-PUBCOM_0003415

3  they be hosed down to the sewer system?
4    A.  Oh, yes.  Using river water 90 percent
5  of the time or city water, whichever was
6  available.
7    Q.  That's, I am speaking specifically
8  about an oil spill, would that be the same
9  with respect to any leak or spill of any
10  product?
11    A.  No.  Not necessarily.  What was done
12  they would put down some sort of absorbant to
13  absorb most of the oil they could because it
14  was very slippery and dangerous.  Sawdust was
15  sometimes used, but oil absorbant wasn't
16  spread on the spill, a particular spill and
17  with brooms and shovels, they clean it, put it
18  out into an open field which would be next to
19  the organic plant, an open field which
20  contained all the contaminants and then they'd
21  go back to the spill and wash down the
22  remainder, whatever was remaining to get it
23  clean would be hosed down to the sewer.  But
24  normal procedure was to put down some sort of
25  an absorbant, Speedy Dry comes to mind,
00087
1  sawdust, anything that would sometimes --
2  reaction, oil absorbant reaction, were used to
3  get the bulk of it up before they washed it
4  down.
5    But also, you know, there were times when
6  it was just hosed down, the sewer too, to be
7  honest with you.  No attempt at all was made
8  of absorbing it or damming it up or
9  reclaiming.  It was out of the question.
10    Q.  When you arrived at the site in 1958,
11  was there any procedure for cleaning up
12  spills, do you know?
13    A.  I was unaware of them.  If there was
14  what?
15    Q.  What about when you became maintenance
16  foreman in 1962, was there anything in place
17  then?
18    A.  Not as a company policy.
19    Q.  Was a company policy instituted while
20  you were maintenance foreman?
21    A.  There was some of that and that was
22  during Vulcan's day or Frontier Chemical's day
23  they brought with them safe practices that
24  they used in Wichita, Kansas, I guess.
25  Somewhere around that period, Inland, Vulcan
00088
1  started on a process of trying to contain
2  spills and there was a procedure, however, I
3  have never seen vacuum trucks or what have you
4  to clean up and dispose of properly.  No, I've

MKSK-FED-0000004218

ALCD-PUBCOM_0003416

5  never seen that at that site.
6      Q.  Did you ever see there when Vulcan had
7  some clean-up procedure, you said, were they
8  written, do you know, or was it word of mouth?
9      A.  There might have been a circular
10  poster and on a sheet of paper or something it
11  might have been in the clean-up procedure
12  written by a particular engineer or production
13  foreman, let's say, how he wanted a particular
14  situation handled.  He might have spelled it
15  out, but nothing that was company policy that
16  I can remember.
17      Q.  Did Inland have a company policy on
18  cleaning up spills, do you know?
19      A.  Inland really, best of my
20  recollection, when they first moved in there
21  they made a chemical recovery plant, they had
22  drums coming from all over the place which sat
23  leaking, leaching into the ground all through
24  that plant on the organic side.  If they had a
25  policy, they sure didn't demonstrate it to me.
00089
1  In fact, what really used to get me, they used
2  to tell solvent by taking the cap off of a
3  drum and have an employee sniff what was in
4  the drums.  Now would that make you kind of
5  leery about their procedure of -- they were
6  just a recovery outfit.  We called them a slop
7  -- they took all the drums and if it was
8  solvent by smelling it, if it smelled like a
9  solvent you put it on one side, if it's an
10  oily base, you put on another side and they
11  dumped into big drums and tanks and tried to
12  reclaim whatever was in it.  Sometimes they
13  didn't know what was in it.
14      Q.  So do you know, did Inland have a
15  spill procedure, that you know of?
16      A.  No, I never seen it.  If they did,
17  it's one of my things I overlooked.  Now, they
18  very well may have.  I don't know.
19      Q.  But based on your work with them and
20  what you saw, you didn't see any spill
21  procedure at Inland?
22      A.  Not really because when they came,
23  wasn't long after as I said sort of
24  mothballed, the inorganic side they shut it
25  down.  They were in the business of selling it
00090
1  to or releasing it whatever they did, to
2  another concern, which was Van Eiderstein, I
3  believe, a meat processing outfit.  You got to
4  remember back in those days they were not as
5  keen on environmental -- it was not, as I
6  remember it, they were not strict is the word

MKSK-FED-0000004219

ALCD-PUBCOM_0003417

7  shall I use.
8     Q.  When you were maintenance foreman in
9  1962, did you have -- was your department, the
10 maintenance department, in charge of cleaning
11 up spills and leaks?
12    A.  No.
13    Q.  Was that the responsibility of whoever
14 happened to be closest?
15    A.  Operational.  Operator did it,
16 operator cleaned.  However, they were big
17 enough that maintenance people were called for
18 yard department or somebody who did the
19 clean-up janitorial work would help.
20    Q.  Do you recall any clean-up jobs big
21 enough that involved you pulling in your
22 maintenance department in the '60s?
23    A.  Not that bad.  We've always assisted.
24 Now, they could have been in the process and
25 maintenance people were usually pretty
00091
1  conscientious people, they would lend a hand
2  without asking, you know.  So they very
3  conceivably could have helped without me
4  without my knowledge, very possible.
5     Q.  They would help out but it wasn't a
6  job responsibility?
7     A.  It was not a job assignment.  No, it
8  was not a job assignment per se.
9        MS. HAYNES:  Now is probably a good
10       time for us to take a lunch break.
11    (Luncheon recess.)
12 AFTERNOON SESSION.
13    Q.  Back on the record.  Mr. Partington,
14 you realize you're still under oath?
15    A.  Yes.
16    Q.  Before we took a lunch break, I was
17 asking you about any safety training or
18 training in the handling and use of chemicals
19 or solvents when you first came to the Newark
20 site in 1958, and the response was no to both
21 of those.  Correct?  No safety training or
22 chemical handling?
23    A.  There was not, no.
24    Q.  I would ask you the same question with
25 respect to Vulcan.  When they took over the
00092
1  plant, was there any safety training?
2     A.  There was a program which they
3  instituted.  I'm not completely familiar.
4  There was not a course, per se, for
5  supervisors or anything like that, but there
6  was a safety program which was new to us at
7  the time.
8     Q.  Was it -- what generally, what areas

MKSK-FED-0000004220

ALCD-PUBCOM_0003418

9 of safety did the program cover?
10    A.  Basically your own do's and don'ts
11 about handling certain types of chemicals and
12 fire, things of this nature, work safely, a
13 lot of motos; walk, don't run type of
14 situations.  Fire training, not actual
15 on-the-job training but some film, I remember
16 going to some film.  That was in Vulcan's day
17 I think.
18    Q.  Were there regular safety meetings
19 when Vulcan had the plant?
20    A.  Towards the end there was.  Initially
21 there wasn't.  But I can remember having to
22 schedule people for safety meetings once a
23 month or something like that.
24    Q.  When you say towards the end, was that
25 towards the end of Vulcan's tenure?
00093
1    A.  Yeah.  Late '70s, I guess.
2    Q.  Well, if it was late '70s, it would be
3 by our calculation, it would be Inland's time?
4    A.  No.
5    Q.  No.  You're thinking Vulcan's time for
6 sure?
7    A.  Yeah.
8    Q.  Okay.  And those monthly safety
9 meetings that you would have people scheduled
10 for, would cover do's  and don'ts of handling
11 chemicals, fire training, general worker
12 safety?
13    A.  First aid, first aid training.
14    Q.  Okay.  Were any of the safety measures
15 for Vulcan put into an employee manual of any
16 kind and passed out?
17    A.  I really can't remember if there were.
18 Certainly, in my tenure, never an individual
19 packet per se, be given to each new employee
20 or what.  I don't recall any of that but there
21 was a safety department.
22    Q.  There was a safety department.  Okay?
23    A.  Yeah, I remember the gentleman who was
24 in charge, he's now deceased, but I'll never
25 forget him.  Del Parr, P-a-r-r, he was sort of
00094
1 like the personal manager, safety director or
2 some title comes to mind, but many years ago
3 so how extensive -- it must have not been that
4 extensive or it would have, you know, hit a
5 bulk.
6    Q.  In your mind now --
7    A.  Yes, it would have, but there was an
8 attempt let's put it that way, there was an
9 attempt.  Now, how much, how frequent they
10 were in compliance, I have no idea at that

MKSK-FED-0000004221

ALCD-PUBCOM_0003419

11  time. I certainly don't remember it being
12  uppermost in the program Vulcan had at that
13  time.
14      In other words, put it another way, it
15  didn't leave any lasting impression on me so I
16  would have been very interested in that sense.
17  I came up through the ranks and I would have
18  recognized something like that and would have
19  insisted the employees participate or make
20  sure they made the meetings or thereabouts.
21  But I do recall vaguely there was some sort of
22  a program started, how it did, I don't -- I
23  can't recall at this time or if they really,
24  you know, a lot of things were
25  tongue-in-cheek, you know? They had, here
00095
1   read this. No. No real participation or what
2   have you.
3       Q. Not a lot of follow through?
4       A. No.
5       Q. In other words --
6       A. No.
7       Q. Okay. Was there a safety department
8   at Kolker when you first started?
9       A. No. You were your own safety
10  department.
11      Q. So you were on your own safety-wise
12  during the Kolker days, in other words?
13      A. Yeah. Daniel Boone days, trial and
14  error.
15      Q. What about during Inland's tenure when
16  they took over the Newark site, do you
17  remember?
18      A. Inland more or less for a short period
19  didn't change much of what they found. I
20  mean, there was -- they didn't come in with
21  any, they were more interested in selling half
22  the place and getting into the reclaim
23  business, they were -- it was my impression at
24  the time and obviously I was right, they got
25  out.
00096
1       Q. Do you recall if Inland maintained
2   the safety department that Vulcan had started
3   at the Newark site?
4       A. If they did I was unaware of it. As I
5   said, they were more interested in downsizing
6   when they got there and moving on. Whatever
7   they did after that, I don't know. They were
8   interested in the methylene chloride
9   operation, and reclaiming chemicals.
10      Q. So when Inland took over at the --
11  took over the Newark facility, is it your
12  understanding that Vulcan ran the plant for

MKSK-FED-0000004222

ALCD-PUBCOM_0003420

13  about a year?
14    A.  Something like that.  They crossed,
15  the transition was real smooth because I think
16  they were both there and Vulcan slowly got
17  from under as I remember.  They -- before you
18  knew it, you were working for Inland Chemical,
19  one of those deals.
20    Q.  And then ultimately, the operations
21  that Inland conducted at the Newark site were
22  different, correct, in that they were
23  reclaiming chemicals?
24    A.  That was their main product, I guess,
25  because they -- they must have had drums of
00097
1  waste material.  They must have been in the
2  waste business way back or something, because
3  I can recall truck loads of waste drums coming
4  in, being stored in stacks in the field and it
5  gave one the assumption that they were in the
6  reclaiming business, so they were chemically
7  trying to redistill and save or whatever,
8  whatever they did.
9    Q.  Okay.
10    A.  We had no -- what do you call it,
11  incinerator.  There was no incinerator there,
12  so they either put it batch-wise reclaimed the
13  solvent and what they did with the waste was
14  here nor there.
15    Q.  Did Inland provide you with any
16  training as to their operations when they took
17  over the Newark plant?
18    A.  Well, here again, as I stated, they
19  were phasing out.  In other words, they were
20  more interested in dismantling the chlorine
21  operation entirely and before you knew it, it
22  was for sale.  That part of the plant was
23  sold, and the other end was the methylene
24  chloride operation which they were interested
25  in the reclaiming of chemicals.
00098
1    Q.  Did that involve new, any new
2  operations?
3    A.  Not really, no.
4    Q.  Okay.
5    A.  They used existing equipment for their
6  purposes.
7    Q.  When Inland came in, did they
8  institute any new procedures for safety that
9  you know of?
10    A.  Not really no.  Because as I stated,
11  my recollection only, that I can remember, to
12  the best of my ability right now, is that they
13  were more interested in downsizing and getting
14  rid of the chlorine plant, especially the

MKSK-FED-0000004223

ALCD-PUBCOM_0003421

15 chlorine operation, that seemed to be the area
16 that was the biggest loser money-wise and they
17 wanted to get rid of it ASAP.
18    Q.  The chlorine side?
19    A.  Yeah.  It was economical because they
20 couldn't afford the price of the raw material
21 coming in.  Rock salt they had to truck in or
22 get in by rail, something, like, 110 gondolas
23 and I don't know what the salt price was
24 during that period, salt prices were
25 astronomical, they couldn't physically -- it
00099
1 was impossible to make any money.
2    Q.  Okay.
3    A.  So they get rid of it.
4    Q.  When Inland came in did they institute
5 any new procedures or guidelines for how to
6 deal with spills or leaks?
7    A.  No.  No.
8    Q.  Any new procedures for maintenance of
9 any kind?
10    A.  No.
11    Q.  Okay.
12    A.  I think one has to look at the overall
13 picture of they are in the business to make
14 money ,and if they were not making money they
15 were going to make any adjustments they needed
16 to show a profit and what was not making
17 money, was not making a profit, was
18 discontinued, dismantled.  They leased or sold
19 part of the property, I don't know which they
20 did, to this meat concern, meat packing or
21 meat -- they made fertilizer, I think they
22 made fertilizer.  I don't know what they did,
23 Van Eiderstein, I believe is the name, and
24 after that they were mostly concentrating on
25 the reclaiming business as I understand it.
00100
1 They had dimethyl aniline, it was a product
2 they were trying to make and that was one of
3 their products.  That was it.
4    Q.  When Inland took over, did they keep
5 on -- keep the Vulcan personnel on or did they
6 bring in all new?
7    A.  No.  No, they kept most, they kept
8 some, but as I said they downsized.
9    Q.  But the folks they kept were Vulcan
10 folks?
11    A.  Oh, yeah.  And some of their own
12 managerial people were brought in, of course,
13 and some of the Vulcan managerial people were
14 given a choice to stay or leave.  During this
15 period is when I became a shift foreman, again
16 boiler license and refrigeration license.  I

MKSK-FED-0000004224

ALCD-PUBCOM_0003422

17 was actually doing managerial work as a member
18 of Local 68 Operating Engineers.
19    Q. Right.
20    A. That's where I became an engineer.
21    Q. Did you ever work at any of Inland's
22 other facilities?
23    A. No.
24    Q. Have you ever --
25    A. Dana Venne comes to mind.
00101
1    Q. As a plant manager?
2    A. Yeah, during Inland's juncture there,
3 I believe he was a plant manager. Didn't
4 personally get along with the -- he had a
5 brother too, Edmund.
6    Q. Did you know Ed?
7    A. Yeah, he came from Puerto Rico, they
8 had a facility in Puerto Rico, same type of
9 operation, reclaim or something. I don't
10 know. Didn't really get involved.
11    Q. So, when you left the Newark facility
12 was Dana Venne the plant manager?
13    A. No. There was another manager after
14 him. It was a Uli Marini.
15    Q. Right.
16    A. And another one after him. I don't
17 know who the last guy was. I forget. I think
18 Dana was there when I left. I think. I don't
19 know. But I was working under strained
20 relations about that time.
21    Q. Okay.
22    A. I did not leave Inland under the best
23 of terms. I was phased out as everybody else
24 was.
25    Q. Phased out? Did they terminate you?
00102
1    A. Oh, yeah. How dare they. No. We all
2 did, we all expected it. It was when they
3 downsized. They downsized. After I left, I
4 understand McKesson took over after that. How
5 long was Inland there? '81? So I had been
6 out of there a couple of years. But they were
7 modernizing, downsizing, getting down to the
8 bare bone.
9    Q. How many employees at the Newark
10 facility when you left?
11    A. Oh, I'd say 35, 40 maybe, but office
12 personnel and all, I think that's all there
13 was.
14    Q. You mentioned a couple of minutes ago
15 that -- I'm sorry. Strike that. You hadn't
16 worked at any other Inland facilities?
17    A. Nope.
18    Q. Let me ask you if you recognize the

MKSK-FED-0000004225

ALCD-PUBCOM_0003423

19 name of a disposal site called Stickney
20 Landfill which is in Toledo, Ohio.  Does that
21 ring a bell?
22     A.  I've seen it listed, that's Strickley,
23 not Stickney.
24     Q.  Stickney, S-t-i-c-k-n-e-y.
25     A.  I thought it was Strickley.
00103
1     Q.  This one is in Toledo, Ohio.
2     A.  I heard of it.
3     Q.  The Stickney Landfill?
4     A.  I think it was -- I don't know what --
5     Q.  How did you come to hear about it, do
6 you know?
7     A.  I read it someplace, I don't remember.
8     Q.  Any idea what you read about it?
9     A.  I think they were cited for contempt
10 or they were fined or something, government
11 action or something.  I read about it.  What
12 struck a bell was in Inland's day?  I believe
13 it was Inland Chemical.  They trucked
14 wastewater to Sandusky, Ohio, and I believe
15 that was the same outfit they got -- I don't
16 know this for a fact, but I heard that there
17 was some violations.
18     Q.  Do you know for a fact that Inland
19 trucked wastewater to Sandusky, Ohio?
20     A.  They trucked it out of the facility at
21 Newark.  What they did with it, I don't know.
22 I thought it went to upstate New York.
23     Q.  So wastewater left Newark?
24     A.  From one of the processes it did.
25     Q.  But you're not sure where it went to?
00104
1     A.  Nope.  I was under the impression it
2 went to New York, somewhere in New York.
3     Q.  Do you know whether Inland disposed
4 of any of its waste at a site in Toledo, Ohio?
5     A.  Sandusky, Ohio rings a bell, I know
6 nothing of Toledo.
7     Q.  I'll give you another name, Tyler
8 Landfill in Toledo, Ohio?  No?
9     A.  Uh-uh.
10     Q.  What about the XX Chem site in Toledo,
11 Ohio, does that ring any bells?
12     A.  No.
13     Q.  What about the name Incorporated
14 Crafts in Toledo, Ohio?  Does that ring any
15 bells?
16     A.  No.
17     Q.  A couple of moments ago you referred
18 to rock salt that had to be brought in by rail
19 car.  I want to take you back to the Kolker
20 days when you first came to the Newark

MKSK-FED-0000004226

ALCD-PUBCOM_0003424

21  facility and ask you how were the chemical
22  components that were going into the
23  manufacturing process, how did the raw
24  products get to the Newark facility in 1958?
25      A.  Either, rail, truck, that was it.
00105
1      Q.  Either rail or truck.  If they came by
2  truck were they in drums or were they in tank
3  truck?
4      A.  Could be either.
5      Q.  Was one more common than the other
6  drums versus tank trucks?
7      A.  Tank trucks, you're talking raw
8  material now.
9      Q.  Uh-huh.
10     A.  Tank trucks.
11     Q.  Were more common?
12     A.  Yes.
13     Q.  And when I say drums, I'm talking
14  about 55-gallon drums?
15     A.  I know what you mean.
16     Q.  Talking about the same thing?
17     A.  We shipped that way.
18     Q.  Shipped out off the facility that way.
19  Okay.  What sorts of material arrived by rail
20  car?  What types of raw materials arrived by
21  rail car?
22     A.  Methylene, toluene, methanol, bromine,
23  chlorine, back in the earlier days,
24  trichloroethylene, oil.
25     Q.  Oil?
00106
1      A.  Number six bunker oil, there's a few
2  times somebody got a bargain on fuel oil,
3  gasoline, regular gasoline, automobile
4  gasoline, nitrogen and box cars came in with
5  containers to be packaged for methyl bromide
6  and also came in by truck.
7      Q.  The first list of raw products we were
8  talking about, the methylene, toluene,
9  methanol, down to -- did those arrive in rail
10  cars in a liquid form or a gas?
11     A.  Liquid.
12     Q.  And then what would happen when a rail
13  car pulled in with product, how did it, was it
14  then stored somewhere at the Newark site?
15     A.  It was commonly used from the tank
16  car.
17     Q.  So used in the manufacturing process
18  right from the rail car?
19     A.  Correct.
20     Q.  Were there occasions  when raw product
21  would be stored in large tanks, storage tanks?
22     A.  Oh, yeah.  I qualified that last

MKSK-FED-0000004227

ALCD-PUBCOM_0003425

23  statement I made because of railroad
24  demurrage, it was more common to store the
25  materials that could be stored, but things
00107
1  such as chlorine and bromine were normally
2  used right out of the tank cars themselves,
3  but the others, toluene, methanol were pumped
4  into storage tanks.  Yes, anything that could
5  be stored on site to reduce the overhead via
6  the demurrage on railroad calls was done.
7  Trichloroethylene was also.  We had a storage
8  tank for it, we had oil storage tanks.  We had
9  gasoline storage tanks.  We had everything, so
10  basically chlorine and bromine were the only
11  two that were commonly used right from the
12  tank car themselves until empty.  Then they
13  were shipped out.  Everything else was stored,
14  we had tank farm tankage for this.
15      Q.  Were you, at any time throughout your
16  tenure at the Newark site, were you ever as
17  any part of your job duties responsible for
18  off-loading -- loading or off-loading rail
19  cars?
20      A.  Yeah.
21      Q.  What job was that part of?
22      A.  It was part of being a chemical
23  operator.
24      Q.  When you were first there in 1958?
25      A.  Yeah. We had tank trucks of muriatic
00108
1  acid coming in and unloaded to storage tanks.
2  That was part of the process.  You're
3  scratching the surface, you're digging up a
4  lot of stuff here that I put away.
5      Q.  Doesn't hurt too bad, does it, I hope?
6      A.  No.
7      Q.  I had a feeling some more might come
8  to you.  Other than during your job and duties
9  as a chemical operator, were there any other
10  job titles that you -- that would have
11  involved being involved actually, in the
12  loading and unloading of rail cars at the
13  Newark facility?
14      A.  No.  Not really.  No.  The only thing
15  I can mention there was the maintaining of, I
16  myself and two other guys -- well, I was the
17  captain of the chlorine emergency team that we
18  had under Vulcan Materials, Vulcan's day, it
19  required the going on customer complaints for
20  leakage and chlorine tank cars that we build,
21  however, belonged to the chlorine institute, I
22  could be called out on anybody's car because I
23  possessed the knowledge of how to repair these
24  cars.

MKSK-FED-0000004228

ALCD-PUBCOM_0003426

25    Q. These are the railroad cars that were
00109
1  equipped to carry the chlorine?
2     A. Railroad or tank truck, tank truck or
3  tank cars.
4     Q. How did you obtain that training?
5     A. Would you believe trial and error.
6  No. It didn't require a lot of training,
7  except I was a very observant person, I
8  knew -- made it my business to know all about
9  the manufacture of chlorine I could for this
10  simple reason; I wanted to save my own skin.
11  The more I knew, the better, and the
12  superintendent by the name of Joe Hosey -- I
13  don't know if you ever heard of him --
14    Q. I think you mentioned him this
15  morning.
16    A. But he and I were instrumental in the
17  start of the emergency team we had there at
18  the site.
19    Q. So the two of you started the chlorine
20  emergency team?
21    A. We didn't start it, we were it. All
22  of a sudden we both had experience with Scott
23  packs, we were both in maintenance, we both
24  knew the construction of the railroad cars,
25  which were liquid, which were gas, how to go
00110
1  about installing emergency kits, and we were
2  both proficient in the use of Scott air packs.
3  They were forced breathing apparatus,
4  something like the firemen wear. We were both
5  pretty good at this. Don't ask me how, was
6  just part of the job, just from word-of-mouth
7  type of training, trial and error, had no
8  formalized training.
9     Q. And the purpose of the emergency team
10  was obviously to deal with any emergencies
11  involving chlorine and the rail cars and the
12  tank trucks?
13    A. Correct.
14    Q. Do you recall any -- specifically any
15  emergencies that you handled that related to
16  chlorine?
17    A. Oh, yeah. Passaic Valley Sewerage, we
18  had a leaky tank car there. We had another
19  one in a generating station, I forget the name
20  of it now, in Jersey City, a leaky chlorine
21  tank car which we canned, which I was present
22  and was instrumental in canning. A chemical
23  outfit by the name of Arden Chemical had a
24  leaky tank truck or tank car -- tank truck, I
25  was right the first time, and we were summoned
00111

MKSK-FED-0000004229

ALCD-PUBCOM_0003427

1  to the location and we had to put on a Solvay
2  C repair kit to stop a leak.  And also leaks
3  in the plant.
4     Q.  The leaks that you were just talking
5  about now that you were listing out, those
6  were all for other companies and not at the
7  Newark site specifically.  Right?
8     A.  Right.
9     Q.  What can you tell me about any
10  emergencies that you can recall handling
11  relating to the chlorine at the Newark
12  facility?
13     A.  We were -- when it came to chlorine,
14  chlorine is a deadly gas.  As you know, it's
15  very objectionable to smell, taste, it was
16  used as a chemical in World War I, kills
17  people, very simple.  So we were tight at
18  Newark as far as chlorine leaks per se.  They
19  were pretty proficient in handling the
20  chlorine product itself.
21     Q.  When the chlorine would come in, in a
22  railroad car, was that a liquid or gas form?
23     A.  Liquid under pressure.  Boils at a
24  minus 28 degrees centigrade or F -- minus 28
25  F, so if there's any leaks in a railroad car
00112
1  where the chlorine liquid inside is under
2  pressure when it leaks, it's going to leak as
3  gas.  That's correct.
4     Q.  So any emergencies that you might
5  handle that related to chlorine and railroad
6  cars was to stop any leaks of gas from a
7  railroad car of chlorine because that could be
8  dangerous?
9     A.  Right, or liquid, it could be liquid.
10  The chlorine car is designed in such a manner
11  that there is two dip pipes that go to the
12  bottom of the car -- four valves on the
13  manway.  There's four individual valves, two
14  are gas valves and two length-wise are liquid
15  lines, we call them, they have dip pipes, they
16  are down to the bottom of the car so it could
17  be either or.  Ninety percent of the time it
18  was gas, ten percent of the time it could be
19  liquid.
20     Now, if you're unloading a liquid line
21  you could unload the liquid out of these cars
22  as long as the pressure was above condensing
23  temperature of the chlorine, not to get
24  technical, it was very simple, if the car was
25  under a hundred PSI pressure, you could
00113
1  off-load this car at X number of pounds per
2  hour to a lesser pressure vessel or container

MKSK-FED-0000004230

ALCD-PUBCOM_0003428

3  at the customer's facility, they got liquid.
4      Q.  Did Inland -- I'm sorry, anybody at
5  the Newark site while you were there store
6  chlorine in liquid form?
7      A.  Yes.  We did.
8      Q.  In tanks?
9      A.  Yeah.
10     Q.  Was is it Kolker, Vulcan and Inland?
11  All of them did?
12     A.  Yeah, until Inland pulled a plug on
13  it.
14     Q.  Of the chlorine until they shut down
15  the chlorine plant operations.  Okay.  Do you
16  have any specific recollection of chlorine gas
17  leaks at the Newark facility?
18     A.  We've had minor upsets which were
19  calming, where there was -- not calming, but
20  common, I guess you would say, necessitated
21  wearing a respirator at least, chlorine would
22  be strong enough in concentration in the
23  building, but normal upsets, normal
24  production.
25     Q.  What's a -- do you have an estimate
00114
1  for a normal size gas leak?  Any idea how much
2  is released?
3      A.  Again, in the manufacture of chlorine
4  you had a whole cell house which was
5  approximately 200 by a hundred feet, 200-feet
6  long by a hundred feet wide, full of these
7  individual cells generating chlorine which is
8  under slight vacuum suck it away and it was
9  very possible to have a leak somewhere in the
10  gas system, small leak, very small, which we
11  used to repair by taping and things of this
12  nature.  But it was part of the process.  In
13  other words, you manufacture chlorine, when
14  you walked into that plant you smelled
15  chlorine, very weak, you know, what bleach
16  smells like, that was about the odor that was
17  predominant.
18     Q.  Were the -- I'm sorry, the operations
19  relating to chlorine, did those all take place
20  inside the cell house or cell houses?
21     A.  Well, that's where the gas was
22  generated in the cell house but once it was
23  liberated inside the cells, it was collected,
24  it was dried, it was purified, it was
25  liquefied and put in storage.  That was just
00115
1  the chlorine side of it.
2      Now, the other side of it was what they
3  call cell liquor which is a like caustic and
4  salt solution.  This all was collected, went

MKSK-FED-0000004231

ALCD-PUBCOM_0003429

5    to storage tanks which was evaporated, the
6    salt was recovered and the caustic was
7    concentrated up to a sellable product, back in
8    those days it was 50 percent. 50 percent
9    caustic which was a product which was stored
10   and loaded when shipped.
11       Q. Do you recall ever responding to a
12   neighbor's complaints about chlorine gas leaks
13   at the Newark facility?
14       A. Not leaks but we've had emissions
15   where probably someone complained, I'm sure it
16   happened. I don't have a particular day or
17   the only day I can remember is when I was
18   involved in one.
19       Q. Was there one that you remember you
20   were involved in?
21       A. Yeah.
22       Q. Was it an odor problem?
23       A. Oh, it was a beauty.
24       Q. Tell me about that.
25       A. That was in '68, just before the air,
00116
1    '68, of the inorganic department. We had a
2    chlorine, what they call a Green Goddess, it
3    was a purification tower, it just meant
4    recycling chlorine to itself and the gas was
5    liquefied and was forced to bubble through the
6    liquid chlorine which purified it. Then after
7    that stage it was liquefied and put out to
8    storage. A reboiler on the bottom of the
9    thing started to leak. We had steam supplied
10   reboilers on the bottom. For some reason this
11   bottom of the particular vessel contained
12   sulfuric acid and residue from the chlorine
13   process itself and we had a leak.
14       Q. So was this a leak of sulfuric acid
15   or --
16       A. It was a leak of chlorine. So in an
17   attempt to depressure the particular vessel so
18   we could find out what was wrong, we were in
19   the process of stopping the production to go
20   through this and debriding it and I opened the
21   bottom valve of the bottom reboiler, it fell
22   apart, right, I was there. Boom, I got acid
23   burns. That's when we had an emission.
24       Now, if there was a complaint then I
25   wouldn't have known, because I spent three
00117
1    weeks in the hospital but that was me
2    relieving the pressure out of the bottom.
3    Saved from catastrophe, I was of the opinion
4    and was so told later on.
5        Q. When you say there was an emission
6    that was a release of chlorine gas into the

MKSK-FED-0000004232

ALCD-PUBCOM_0003430

7  air or the liquid?
8      A.  Gas.  It wouldn't be liquid, it had to
9  be gas, it's a gas, liquid always evaporated
10  it boils at minus 28 degrees, as it hits the
11  atmosphere it flashes instantaneously to gas.
12  So you had a cloud and given enough area the
13  cloud --
14          MS. ANDERSON:  Dissipates?
15      A.  That's what I was looking for.  Thank
16  you.
17      Q.  Did you ever find out why there was a
18  build-up of pressure that had needed to be
19  released?  In other words, what had gone wrong
20  that you needed to release the valve for the
21  pressure?
22      A.  Plugged sparger, s-p-a-r-g-e-r --
23  see, when the waste gas off this chlorine
24  purification tower was not being utilized,
25  right, for the manufacture of bleach or
00118
1  something else, it was diverted to scrubbers.
2  They had two, five-thousand gallon tanks full
3  of 20 percent caustic solution to neutralize
4  the gas which were inadvertently dumped to the
5  river when they got spent.  So one of these
6  plugged and pressure started to build, so
7  somewhere in the process some of the gas was
8  being diverted out to the particular, we call
9  them scrubbers, vent scrubbers and vent
10  scrubber plugged and this meant the pressure
11  was being exceeded over the normal operating
12  procedure of the tower ,and the pressure had
13  to be relieved.  So that was the reason for me
14  opening the bottom of the vessel to relieve
15  the pressure out to the same vent scrubber
16  through a different source, stop going over
17  the top, it was going to come in the bottom
18  and the valve assembly fell apart in my hands
19  when I opened it.  They claim it was the wrong
20  construction of material and all that, but
21  that was neither here nor there, had nothing
22  to do with the problem.  The problem simply
23  was that one the spargers plugged up.
24      Q.  During 1968, you were a production
25  foreman.  Right?
00119
1      A.  Production or just promoted or -- no,
2  I was I was still a production.
3      Q.  Was the vent which became plugged was
4  that one of the items that was on a list for
5  routine maintenance?
6      A.  Well, not really.  They were replaced
7  routinely, like, monthly and I don't remember,
8  they weren't checked per se, they were

MKSK-FED-0000004233

ALCD-PUBCOM_0003431

9 replaced. Whether it was replaced or not, too
10 long ago. I don't know.
11    Q. Okay. Is this the -- well, let me ask
12 you this, if you hadn't released it, what do
13 you think the result would have been?
14    A. Well, we would have had a terrific
15 release when the safety valves went. The
16 safety valves were located 50-feet in the air
17 and it would have inundated the whole area.
18    Q. With chlorine gas?
19    A. Right. So I was trying to get rid of
20 a bomb.
21    Q. Is this the -- your injury with acid
22 burns, did you fully recover from that?
23    A. Uh-huh.
24    Q. Is that the injury that you had in
25 1968, that ended up in your having a
00120
1 deposition taken?
2    A. Uh-huh. Yes, I am sorry. I'm going,
3 "yep, yep."
4    Q. That was the one, I think, where you
5 said the management had decided it was an
6 equipment failure?
7    A. Yep.
8    Q. And your testimony is, it's in your
9 opinion it's not an equipment failure, it
10 was --
11    A. What?
12    Q. What would you call it?
13    A. What did I say? I didn't say it
14 wasn't equipment failure.
15    Q. I didn't mean to misstate your
16 testimony. I thought you had said that at the
17 time you were a supervisor. So, you were
18 management, not union and that other
19 management had made a decision about the cause
20 of the incident but that you disagreed?
21    A. That was the deposition, yes.
22    Q. Right. I'm just trying to figure out
23 what there was the disagreement about?
24    A. I maintained it was a design flaw,
25 poor design. Not only for the reason I got
00121
1 hurt, shouldn't have had a valve located in
2 that location without clear access, what have
3 you. That was my opinion. It was a
4 construction flaw, if anything not an
5 equipment failure.
6    Q. Okay.
7    A. But that would have opened legal doors
8 so you can imagine why I had a deposition on
9 that one.
10    Q. Did you ever see, you said sometimes

MKSK-FED-0000004234

ALCD-PUBCOM_0003432

11 the chlorine gas could leak in a liquid form?
12    A. No. Oh, yeah, it could. But as soon
13 as it hit the atmosphere it was gas.
14    Q. So you never saw it hit the ground?
15    A. No.
16    Q. Couldn't hit the ground, it would
17 evaporate before it hit the ground?
18    A. Pipelines were underground, you might
19 see the water or the area around it became
20 refrigerated but it would be a moisture type,
21 it wouldn't be chlorine. Chlorine turns --
22 it's hard to dilute liquid chlorine, it's so
23 cold it freezes everything so you wouldn't
24 puddle. That's what I'm trying to say. I
25 believe you wanted me to make the distinction
00122
 1 of a puddle of chlorine? No, there is no such
 2 thing. It would dissipate so fast because
 3 it's so cold and it's condensing temperature
 4 is minus 28 C -- or F rather, F , but the
 5 liquid chlorine boils off into a gas state
 6 instantaneously. The only way to keep it
 7 under liquid is to keep it under pressure.
 8    Q. Did I hear correctly that you had said
 9 you didn't recall any neighborhood or
10 neighbors complaints about odors at the Newark
11 facility?
12    A. To me personally? No, not to me.
13    Q. Did you ever hear about any from
14 somebody else?
15    A. Oh, yes. I heard them, but no one had
16 complained to me.
17    Q. The complaints wouldn't route
18 themselves to you in the normal course of
19 your --
20    A. When I was a shift foreman, they
21 would -- I was shift foreman, plant manager,
22 plant nurse, doctor, lawyer, I was everything.
23 I was all by myself. I never recall receiving
24 any calls or any complaints. The police were
25 never called down or something like this that
00123
 1 there was an emission that we were responsible
 2 for. That was in my tenure. I don't know if
 3 other people -- I've heard of other situations
 4 that did happen, but to me personally no, I
 5 was never involved.
 6    Q. The odor complaints that you heard
 7 about, did those take place during the Kolker
 8 years? Can you place them in a decade?
 9    A. All of the above. All of them.
10    Q. Kolker, Vulcan and Inland?
11    A. And McKeeson (sic), had by this time,
12 had a reputation.

MKSK-FED-0000004235
ALCD-PUBCOM_0003433

13    Q.  The plant did?
14    A.  Location did.
15    Q.  In other words, all the businesses
16  down there in that particular area?
17    (The witness nods head in the
18  affirmative.)
19    Q.  They knew where the chlorine was being
20  manufactured?  They knew where the smells were
21  coming from.  Okay.
22    A.  True.  True.
23    Q.  We covered --
24    A.  We covered my whole life.
25    Q.  Oh, no.
00124
1    A.  Is this going to movie form?
2    Q.  We should have captured it on film.
3  We covered pretty thoroughly raw product
4  coming to the Newark facility by rail car in
5  the 1958 time period, and you had also said --
6    A.  Tank trucks, also.
7    Q.  Tank trucks were drums for tankers?
8    A.  Right.
9    Q.  Would also bring raw product to the
10  site?
11    A.  Right.
12    Q.  Was that the same types of raw product
13  that we were talking about in liquid form that
14  came by rail car; methylene, toluene,
15  methanol, bromine et cetera?
16    A.  Being in business you got a better
17  price break by dealing in volume, so
18  naturally, a 55-ton chlorine car was a little
19  cheaper per pound than a 20-pound or 20-ton
20  truck, you know what I'm saying?  So a matter
21  of priority, any business would go the cheap
22  way, buy by volume and it lowers your
23  overhead.  Right?
24    Q.  So it was a matter of economics back
25  in those days?
00125
1    A.  I think it still is.
2    Q.  When you were a chemical operator,
3  were you also responsible for the loading and
4  unloading of the tank trucks?
5    A.  Some of them.
6    Q.  Or if they came in drums on trucks?
7    A.  Yep.  Filled drums, too.
8    Q.  Filled drums when product left?
9    A.  Yeah, for shipment to a customer.
10    Q.  How would the drums that arrived at
11  the site with the raw product, how would that
12  product be transferred to use in operations?
13  Would it go to a storage tank?
14    A.  No.  They would either pump it -- you

MKSK-FED-0000004236

ALCD-PUBCOM_0003434

15 the had little air pumps, air to a storage
16 facility or drum it at times, batch-wise.
17    Q. It would vary?
18    A. Yeah, depending on the usage. Now,
19 drum, we did mostly packaging of the raw
20 material that we made. I mean, product we
21 made was usually packaged in 55-gallon drums
22 or five-gallon buckets or tank trucks, tank
23 car, whatever, depending on the product.
24    Q. So product also left the site in the
25 same three ways that it came to the site?
00126
1    A. Yes.
2    Q. Were the drums with raw product stored
3 anywhere before they were used?
4    A. They had a warehouse, yes, there was a
5 warehouse.
6    Q. Was the warehouse, was it specifically
7 designated for the drums?
8    A. As I remember it part of building --
9 all Building One used to be drum storage for
10 methylene chloride and some solvents and we
11 had a raw material warehouse which had raw
12 materials in it and it was, part of it was
13 used as a staging area that shipped product
14 out by drums. Methylene chloride, chloroform
15 carbo-tet was stored in here in lots and was
16 loaded on trailers, taken out or boxed cars,
17 whatever so, yes, we did have areas that were
18 designated as drum loading, drum unloading, et
19 cetera.
20    Q. Did the tank trucks -- there were
21 specific loading and unloading areas for the
22 tank trucks. Is that correct?
23    A. Yes.
24    Q.  Do you remember in 1958 were those
25 truck loading and unloading areas there at the
00127
1 site?
2    A. There was some. Not in the same
3 location naturally, as they expanded and made
4 the operation larger they moved.
5    Q. The truck loading and unloading area
6 that was there in 1958, do you remember what
7 the surface was like? Was it bare ground?
8 Was it covered with cement?
9    A. No. Macadam, macadam and concrete,
10 blacktop, concrete and there was one area that
11 was just dirt, rock hard surface. So you had
12 all three.
13    Q. What about the area where the drums
14 were stored?
15    A. That was concrete based.
16    Q. In Building One and the raw material

MKSK-FED-0000004237

ALCD-PUBCOM_0003435

17 warehouse?
18   A. Yes.
19   Q. Do you know if in 1958, if the floors
20 in Building One of the raw material warehouse
21 had drains in them?
22   A. To sewer, went right to the sewers.
23 Which was sewer that ran to the rear of the
24 building all the way out to the river.
25   Q. The sewer that went out to the river,
00128
1 that wasn't connected to the city sanitary
2 sewer system, was it?
3   A. Not the sanitary sewer, the sanitary
4 sewer is not located there.
5   Q. That was separate?
6   A. It was separate.
7   Q. What about the truck loading and
8 unloading area, the area that was concrete and
9 blacktop, did it have drains?
10   A. It had, off to the side it had little
11 drains, yes.
12   Q. Was there a reason why part of the
13 loading and unloading area was just dirt, why
14 part of it was not covered with concrete?
15   A. They didn't get around to doing it
16 yet. They --
17   Q. In 1958 anyway?
18   A. Right. They were expanding around
19 that period of time. There was a lot of
20 expansion going on.
21   Q. Later on, did they end up covering
22 that area with concrete?
23   A. Oh, yeah. Everything was either
24 concrete or blacktop or macadam. There was
25 only one area that I remember remained dirt
00129
1 and rock. That was the caustic loading area.
2 That was in the -- in the chlorine plant.
3   Q. Do you know why that caustic loading
4 area remained just dirt and was not covered?
5   A. I would say it was a loop, the station
6 itself was concrete, but the road leading to
7 and leading out was dirt.
8   Q. So just the road in and out was dirt?
9   A. Right. It was the area, I believe, it
10 was a large area.
11   Q. And the storage area was concrete
12 covered?
13   A. Was concrete cover on it.
14   Q. Can you put an estimate, a time frame
15 for me of when you can recall most, if not
16 all, of the site was covered in concrete or
17 asphalt?
18   A. Towards the end, I guess. In the

MKSK-FED-0000004238

ALCD-PUBCOM_0003436

19  beginning it was dirt roads.
20      Q.  How about in the early to mid-60s when
21  Vulcan took over, did they concrete things?
22      A.  Vulcan put some of the road work in
23  but as I remember, I'm trying to recall now,
24  some of the road was blacktop and some wasn't.
25  Now, why?  I don't know, but that's the way it
00130
1  was.
2      Q.  Do you remember an area around the
3  storage tanks as to whether or not the storage
4  tanks had containment areas around them?
5      A.  They were all contained.  They were
6  legal.  They were able to hold anything that
7  spilled inside of it.  The walls were high
8  enough.
9      Q.  So the dikes or containment areas
10  around the tanks were large enough that if
11  there was a leak on the tank inside the
12  containment area it would hold all of it?
13      A.  Right.
14      Q.  Were those dikes there in 1958, do you
15  know?
16      A.  They were built after the tank farms
17  were put up.  Some of those tank farms were
18  new.  The old tank farm was there.  I don't
19  know -- I understand that they are up to code.
20  The old tank farm between Building One and
21  Building Two, it was an old tank farm, had a
22  concrete containing wall and they were legal
23  because they had insurance, you know, I mean
24  it passed, must have, the insurance company
25  would not have insured if they were not up to
00131
1  code.
2      Q.  So there were dikes there for the
3  tanks that were there in 1958?
4      A.  Right.
5      Q.  Do you know in 1958 were those
6  containment areas, were they just dirt or were
7  they lined with anything?
8      A.  No, they were concrete mostly.  One
9  between Building One and Building Two, old
10  Building One and Building Two had a concrete
11  pad with tanks inside with maybe four-foot
12  wall all the way around it.  That's the one I
13  say I think it was up to code --
14      Q.  I'm sorry.  Go ahead.
15      A.  The other tank farm I'm mentioning,
16  I'm thinking about is the new one they put up
17  in front of Building One which was a concrete
18  pad here also with contained walls and they
19  had some dozen or so tanks in there.  I don't
20  remember offhand, maybe 20 tanks in there and

MKSK-FED-0000004239

ALCD-PUBCOM_0003437

21  this was also with retaining walls and this
22  was all --
23      Q.  Did the walls, do you have any
24  recollection of what they were constructed of?
25      A.  Brick.  Brick walls.
00132
1       Q.  Now, as a chemical operator you said
2   you were involved with the loading and
3   unloading of the rail cars?
4       A.  Uh-huh.
5       Q.  Do you ever recall any incidents of
6   loading and unloading the rail cars when any
7   of the product inside the rail cars spilled on
8   the ground?
9       A.  It happens routinely.  Simple as
10  disconnecting the piping, disconnecting the
11  pumping, depends on how you got it out, if you
12  got it out by pressure there was minimum
13  amount of leakage.  But pumping was another
14  story.  You might have it in the lines when
15  you disconnected it from the vessel up to the
16  valve, there'd be leaking on the ground.
17      Q.  That the bare ground?
18      A.  On the bare ground or in the area
19  of -- at some places there was a concrete
20  floor or concrete ditch leading to an open
21  trench leading to who knows.
22      Q.  Is that the ditches leading to the
23  concrete trenches, that the open trench that
24  goes down to the bay?
25      A.  Open trench, which was covered, was an
00133
1   old storm sewer like I described two-foot high
2   by two foot wide it had slabs of steel and
3   stone over some of  it and in some places the
4   trench was underground for trucking purposes,
5   so -- and that went down the entire center of
6   the plant out to the bay.  It was acid lined,
7   by the way, acid brick.
8       Q.  What is acid brick?
9       A.  Acid brick is your normal brick, you
10  have a solvent or acid should be spilled on
11  it, it would tend to disintegrate the brick.
12  So you have a special type of brick which is
13  designed for acid solution and solvent.  It's
14  a chemically lined trench that's the -- that's
15  what it was.  They got tired of the replacing
16  the brick work.
17      Q.  So that when the chemical product --
18  flowed through the trench it would dissolve
19  the brick?
20      A.  Fireplace, same idea, you couldn't put
21  normal brick as fire brick in a fireplace, if
22  you didn't know that, that's the reason.  It's

MKSK-FED-0000004240

ALCD-PUBCOM_0003438

23  not built for that purpose.  It will spawled
24  on you, break apart and fall apart, this is
25  why you have high temperature fire brick in a
00134
1  fire place or in a boiler same thing.
2      That cost ten dollars extra.
3      Q.  The spills that you were just talking
4  about with respect to the loading and
5  unloading of the rail cars, can you estimate
6  for me average quantity?  Would it vary?
7      A.  How do I know?  What's a two-inch pipe
8  line hold?  I don't know.  No idea.  There
9  used to be a procedure to collect it in a
10  bucket, take a bucket and drop it into a drum
11  but it was never followed very well.  Either
12  that or the drum starts leaking.  So the drum
13  is always empty.  It was a big laugh.
14      Q.  Let's see, with respect to your duties
15  as a chemical operator in 1958 --
16      A.  That's 40-years ago, lady, 40-years
17  ago.
18      Q.  You did so good on the rail cars, I
19  just want to ask you the same question about
20  the trucks?
21      A.  Would you believe that back 40 years
22  ago that was an accepted practice and it was
23  accepted by the industry.  There was nothing,
24  dare it sound like oh my God, how can you get
25  away with it?  It was an accepted practice
00135
1  method of operation.  Dupont, anybody else,
2  did the same thing.  So it's not, I mean, it
3  sounds cruel, but it wasn't -- that was a fact
4  of life back in those days.  EPA was not as
5  strict as they are today.  You didn't have
6  environmental people.  You might have had them
7  on paper but they didn't -- they were not as
8  they are today.  There's a difference.  Clean
9  air, there was no Clean Air Act.  It's not far
10  from the horse and buggy  days.  In fact,
11  where I grew up, I grew up on a farm without
12  electricity, so that's how old it was.  It was
13  old.  1935, Pennsylvania was the last to come
14  on line where I lived.  We had kerosene lamps
15  when I was six-years old.  I remember it.
16      Q.  Kind of hard to forget that, I
17  imagine?
18      A.  No.  Best years of my life.  But some
19  of the procedures that were used back in those
20  days was not as outlandish as they sound
21  today.  Even when I tell them some of the --
22  my children, grandchildren -- Poppa, you
23  didn't -- fact of life, you know?  And it was
24  legal.

MKSK-FED-0000004241

ALCD-PUBCOM_0003439

25    Q. I'll tell you what, why don't we take
00136
1  a quick break?
2     A. Aren't we leaving? It's three
3  o'clock.
4        MS. HAYNES: Go off the record.
5        (Brief recess.)
6     Q. Go back on the record. Mr.
7  Partington, right before the break we were
8  talking about the spills that you said that
9  were routine, that were associated with
10  loading and unloading the rail cars while you
11  were a chemical operator?
12    A. And trucks.
13    Q. It was the same?
14    A. Yeah.
15    Q. Were the spills also routine when they
16  were associated with the tank truck loading
17  and unloading?
18    A. Yes, they were.
19    Q. Was it the same with the drums loading
20  and unloading drums?
21    A. There were natural overfills, spills,
22  not considered routine, but it happened.
23  There was discipline measured out back in the
24  Vulcan days. If it was negligence, if it was
25  a proven negligence, people were disciplined
00137
1  for spilling material.
2     Q. And that was because it was wasting
3  money. Right?
4     A. Well, yeah. Well, it was true, no
5  matter who the outfit was, it was true. You
6  know, product, you just said the magic word is
7  money so if there was a large spill, of course
8  that person didn't work there no more. But
9  little dribs and drabs would make -- it was
10  accepted, you know, little bit. How much you
11  lose? Five-gallons. Okay. That type of
12  attitude.
13    Q. Do you have any specific recollection
14  of seeing any of those spills while you were a
15  chemical operator either associated with the
16  rail car process, the truck process or the
17  drum loading and unloading process?
18    A. I certainly have.
19    Q. As you sit here today, do you have any
20  specific recollection of quantity that was
21  released in a spill associated with any of
22  those three processes?
23    A. Nothing of an excessive amount, I
24  would say, requiring corrected discipline, no.
25  I didn't see anything like that. However, I
00138

MKSK-FED-0000004242

ALCD-PUBCOM_0003440

1  am aware that some of them did happen, but I
2  personally did not observe any large loss of
3  any product via -- be it drum filling, truck
4  filling or tank car filling.
5     Q. The spills of product that you had
6  heard about that were of, I think you said
7  they were large spills, do you have any
8  specific recollection of those that would have
9  led to corrective discipline?
10    A. Personally, no.
11    Q. So you don't know when those spills
12 would have taken place?
13    A. As I understand spills that I'm making
14 reference to are still a mystery. They were
15 unaccounted for.
16    Q. So it's unknown who or when --
17    A. Right.
18    Q. -- those spills were associated with?
19    A. Correct. As I understand, they --
20 some investigation was prompted, they did
21 investigate and I never heard any outcome or I
22 don't remember of any employee being
23 disciplined because of a particular large
24 quantity being spilled or dumped or --
25    Q. Do you ever recall whether any drums
00139
1  with liquid waste were poured out onto the
2  ground at the Newark site?
3     A. Yes, in Inland's day they brought
4  drums in that were leaking, they continued to
5  leak until they were empty. It's common.
6     Q. Were they leaking onto the bare
7  ground?
8     A. Onto the ground, onto the concrete,
9  there was a storage area, a field sort of
10 between the organic and inorganic plant which
11 was a field which was a storing area for such
12 drums. In other words good drums, per se,
13 were on the left-hand side, leakers in the
14 back, way in the back on the ground that was
15 SOP as far as I was concerned. That was my
16 instructions anyhow.
17    Q. Your instructions?
18    A. Yeah.
19    Q. SOP being?
20    A. Standard Operating Procedures, leakers
21 in the back.
22    Q. Do you recall who told you that?
23    A. What individual told me that?
24 Probably one of the Venne's, either --
25 probably Ed.
00140
1     Q. Ed Venne?
2     A. Yep.

MKSK-FED-0000004243

ALCD-PUBCOM_0003441

3    Q.  Did you ever -- did you see these
4  drums leak onto the ground?
5    A.  Yeah.  It was common.
6    Q.  Did you ever see anyone pour the
7  content of a drum out on to the soil to empty
8  it out?
9    A.  Yeah.  When they were loading they
10  used to have an outfit come in to pick up
11  empty drums and they get one with a heel -- a
12  heel being part-full, to empty, dump it on the
13  ground 'til it was empty and throw the empty
14  on to the truck.  Oh, yeah that was on -- now,
15  I do not remember whether it was the truck
16  driver and his helper who did that, or if we
17  did it helping him, but it was done.  It was
18  common practice.  Could be rain water, could
19  be product, could have been anything.
20    Q.  Now, would -- is this something that
21  the employees would do on their own or would
22  they be doing it under instruction by
23  management?
24    A.  Management wanted empty drums out of
25  the plant per se, and you were not to load
00141
1  part drums.
2    Q.  So management told personnel to empty
3  out the drums to get them loaded up on the
4  trucks?
5    A.  That's what their procedure was.
6       MS. HAYNES:  Was this -- well, let's
7  see.  Go ahead and mark this next in
8  order.
9       (Partington-2 marked for
10  identification.)
11    Q.  Mr. Partington, I'm going to hand you
12  what we've had marked as Exhibit Two.  It's a
13  map just so that maybe we can start to talk
14  about some locations at the Newark facility
15  that we've been talking about just generally.
16       I'll ask you just to look the map over.
17  It has been photocopied and used several times
18  so it is not the best looking picture, but I
19  want you to just look it over and see if
20  generally you recall this being the layout at
21  the Newark facility during Vulcan Materials
22  ownership of the site and for the record, I'll
23  identify that Exhibit Number Two does not have
24  a Bate stamp but it is entitled Site Plan,
25  Vulcan Materials Company, Newark, New Jersey.
00142
1  It appears to have the date of March 30, 1967
2  created by the Austin Company and it has also
3  been used as Exhibit 29 in Gene Mescher's
4  deposition in this litigation, as well as in

MKSK-FED-0000004244

ALCD-PUBCOM_0003442

5    other depositions.
6       Have you had a chance to review the map?
7       A. Uh-huh.
8       Q. Does that generally --
9       A. Generally.
10      Q. -- fit your recollection of the site
11   during Vulcan's ownership?
12      A. This is Vulcan.
13      Q. You pointed over to the right-hand
14   side?
15      A. Vulcan detinning.
16      Q. Detinning?
17      A. That's where the detinning plant is.
18      Q. On the map it's called Vulcan
19   Metallics, that same area?
20      A. Right now that wasn't part of our
21   facility and the Air Product hydrogen plant
22   wasn't part of our facility either.
23      Q. Vulcan didn't use that either?
24      A. No, Air Product leased or owned that
25   property and we piped hydrogen over the fence
00143
1    to them. So what the -- the new roadway, I
2    don't know what the new roadway is. That
3    wasn't there when I was there. Railroad
4    tracks, the new roadway, that was not there.
5       Q. Oh, the road up the middle off of
6    Wilson Avenue, that looks like it has the
7    title new roadway?
8       A. It says new roadway.
9       Q. That wasn't there when you were there?
10      A. That was not there.
11      Q.  Do you recall the general layout of
12   this map, Exhibit Two, is this the same
13   general physical layout of the plant when you
14   were there in 1958 and it was owned and
15   operated by Kolker?
16      A. Yes, it was.
17      Q. Okay.
18      A. Tank farm B was not there. Is that
19   tank farm B the new one, I call it new.
20      Q. Oh, up right underneath the
21   administrative?
22      A. Yes.
23      Q. Administration building number 4?
24      A. That was not there. That was new
25   added too.
00144
1       Q. I can't tell whether that tank farm B
2    or number symbol. You're saying that was new?
3       A. That was new.
4       Q. When Vulcan put that in?
5       A. Correct. The boiler room is the same,
6    the warehouse, electrical shops are all right.

MKSK-FED-0000004245

ALCD-PUBCOM_0003443

7 Building Three is shift foreman's office, tank
8 farm, oil storage, cooling towers, you got it.
9 The only thing missing here is Building One.
10 Building One is not on here. It should be the
11 rear of Building Two, benzoic acid, that
12 should have been a building there, which they
13 tore down to put in the new methylene chloride
14 unit.
15    Q. So that should have been there just
16 east of Building Two?
17    A. Yep. There was a building there which
18 housed the ester unit back in those days, but
19 it's not there. It shows methylene chloride
20 after expansion, I guess. It's basically all
21 there, though.
22    Q. Let me show you one other map, we'll
23 have marked it's a later generation map, we'll
24 mark it as Exhibit Three first, then I'll hand
25 it to you?
00145
1    A. Yeah. Sure.
2    (Partington-3 marked for identification.)
3    Q. Okay. Now, Mr. Partington, I'm having
4 you look at a document, one-page document
5 we've had marked as Exhibit Three, it bears a
6 Bate stamp at the bottom SKE 244057 and the
7 legend states that it's an Overall Site
8 Location Plan. The name on there is McKesson
9 Envirosystems Company or 600 Doremus Avenue,
10 Newark, New Jersey, environmental compliance.
11 The writing is difficult to read. It's
12 difficult to tell the date, but I'll ask you
13 if this Exhibit Three map fits your
14 recollection of the layout at the Newark site
15 once Inland took over after it sold off part
16 of the Vulcan property?
17    A. Here, again, you -- the map does not
18 show the methylene chloride plant. It's gone.
19    Q. Was that in place during --
20    A. That was there when I was there, yes.
21    Q. When you were there? Okay?
22    A. It does not show the lab. That's
23 gone.
24    Q. There's a lab office boiler room at
25 the northern most part of the property. Is
00146
1 that not the lab you're thinking of?
2    A. No, this lab here.
3    Q. You're looking at the lab on Exhibit
4 Two?
5    A. Yes. That's gone. Building Seven
6 maintenance was not this configuration now. I
7 don't know what has happened. Building Two,
8 process storage and drum storage and area D-5

file:///qnapnas/Concordance/Concordance/Cases/03_Mckesson/09_NewarkLand/TRANSCRIPTS/Partington/Second%20Volume%...4/7/2009 9:54:25 AM

MKSK-FED-0000004246

ALCD-PUBCOM_0003444

9  I'm unfamiliar with.  The lab off this boiler
10  room complex was not the same when I was
11  there.  Area D-6, whatever that is, was not
12  there when I was and the tank farm that's all
13  along that fence is gone.  You got area D-3,
14  D-4 process area was not on -- was not there
15  when I was there.  Now, areas D-1, D-2, D-1A
16  that's all new.  I don't know what the heck
17  that is.  That's not the same as I remember
18  when I was there.
19      Q.  Okay.
20      A.  And I don't know what this enclosure
21  is here.  It's not clear on my map.  It looks
22  like some sort of an enclosure that was not
23  there when I was there.
24      Q.  Why don't we --
25      A.  It's quite a change.
00147
1      Q.  Well, then why don't we put Exhibit
2  Three, that map, off to the side since that
3  will just confuse the issue and your
4  recollection of what was at the site when you
5  were there.
6      A.  This is close to it.  It should be.
7      Q.  Exhibit Two is?  Okay.  And that's the
8  Vulcan 1967 site map?
9      A.  Now, on Exhibit Two the new roadway
10  was not there.  It was either proposed -- it
11  was not there when I was.  In the map a former
12  dirt road location approximately -- that was
13  not there either, this is something that
14  happened after I left or something, or is it
15  proposed.  I don't know.  But the railroad
16  track to the Building Two area is the same.
17  The railroad track over in the chlorine area
18  is the same.
19      With the exception of these two roads,
20  this is more or less what I can recall of my
21  time there at 600 Doremus Avenue.
22  Administrative building is good, tank farm,
23  good, boiler room, okay, the warehouse
24  building, warehouse and shop, that used to be
25  the maintenance shop, that's the same.  The
00148
1  electrical shop and the lunch room, that was
2  there.  Building Three used to be the shift
3  foreman's office, Tank Farm Number Six was the
4  oil storage tanks for the boiler, benzoic acid
5  is the same.  But in Inland Chemical's day,
6  the Benzoic acid was the unit they brought
7  down, they converted that to DMA, dimethyl
8  aniline plant.  Where the Benzoic acid is,
9  that was converted to the DMA plant.
10      Q.  Why don't you do me a favor, just use

MKSK-FED-0000004247

ALCD-PUBCOM_0003445

11  a pen instead of that pencil, just circle the
12  reference to the Benzoic area, Benzoic acid
13  area that you're referring to, put a circle
14  around it.  Now, draw an arrow up into a blank
15  spot, if you can up, high.  Put it where
16  there's no writing, out somewhere where
17  there's no writing.
18      A.  DMA.
19      Q.  Why don't you put Inland in
20  parenthesis after that so we're clear that's
21  during Inland's time when they used that as a
22  DMA processing area.  Okay.  Great.  Thank
23  you.
24      Let's see, let's look at some other
25  spots.  Maybe we can have you mark on the map
00149
 1  so let me let you hang on to my pen for a
 2  minute.
 3      Before we had pulled out the maps to use
 4  as exhibits you had testified that there was a
 5  field area where drums were stored?
 6      A.  Uh-huh.
 7      Q.  Can you use the pen and mark that area
 8  for me?
 9      A.  Yeah, it was right behind Building
10  Seven and the start of the chlorine plant, now
11  where is -- I see tank farm in here and we had
12  no tank farm there.  New -- all right, this
13  area here which was sold off to Van
14  Eiderstein, this area over here is prior to
15  that, this was an open field from this
16  roadway, right in here this was open field.
17      Q.  Okay.
18      A.  This whole area, there was no tank
19  farm there either.
20      Q.  Okay.
21      A.  Drum storage.
22      Q.  And you've, with the pen, you've made
23  a box, a rectangle I should say.
24      A.  A rectangle.
25      Q.  The right side of rectangle falls
00150
 1  right on the line on the map is called base
 2  line?
 3      A.  That's the base line.  Is that the
 4  part that this whole --
 5      Q.  They've just called it base line.  I'm
 6  not sure what it refers to just so the record
 7  has a demarkation in it of where your box is
 8  and we're marking on Exhibit Two and inside
 9  the box you've written drum storage, paren,
10  Inland, closed paren.  That's the field area
11  where you said Inland had drums stored,
12  stacked one on top of the other?

MKSK-FED-0000004248

ALCD-PUBCOM_0003446

13    A.  Correct.
14    Q.  Were they right on the ground or
15  pallets underneath them?
16    A.  On the ground.  There were pallets,
17  they were palletized and then they were
18  stacked -- either palletized or one on top of
19  each, depending.
20    Q.  Okay.
21    A.  They were cardboard type, they were
22  palletized, if they were the metal type they
23  usually went four high.  They had drum pickers
24  and they stacked them on top of a base, as I
25  remember it.
00151
1    Q.  Can you use the pen and mark for me,
2  put an X in the area where you saw people pour
3  the contents of drums out onto the ground to
4  empty out the drums?
5    A.  This would be in the same area.
6    Q.  Within the same drum storage area?
7    A.  In that same area somewhere.  Whenever
8  this -- it would be opposite the methylene
9  chloride plant, so I'm going to go exit right
10  here.  This is where they were loading because
11  this was paved up through here.
12    Q.  Kind of like a roadway at the top
13  there?
14    A.  Yeah.
15    Q.  From that X put an arrow off like up
16  into the blank area somewhere, and let's just
17  mark that as --
18    A.  Now, here again let's be careful.
19  This is an area I remember, however, they
20  loaded any place.
21    Q.  Okay.
22    A.  As the drum storage was deleted,
23  empties were taken, they would come into the
24  whole area.
25    Q.  This is the area that you specifically
00152
1  recall seeing it?
2    A.  Yeah.  It was opposite the methylene
3  plant because coming down the steps, I'm
4  thinking, I remember saying what in the hell
5  are they -- well, never mind.
6    But this is one area that stands out in
7  my mind.
8    Q.  And for the record, you just want to
9  make it clear that that could have happened at
10  any --
11    A.  Any place.
12    Q.  -- point within the drum storage area?
13    A.  Yup.  Drum loading.
14    Q.  And with the -- you have marked drum

MKSK-FED-0000004249

ALCD-PUBCOM_0003447

15  loading with an arrow and the X, the X
16  delineates the area where you saw them pour
17  the drums on the ground.
18      MS. ANDERSON:  If I could interject
19  for the record, he's marked an X just to
20  the north of where the map indicates Tank
21  Farm Number Four.
22      A.  Which I don't have a recollection of.
23      Q.  You have no recollection of Tank Farm
24  Number Four?
25      A.  Whatever that was.  Whatever it is,
00153
1  because that was right opposite the methylene
2  chloride plant as my memory serves me right,
3  that was an open field in my day.  I don't
4  know when they threw that in there.  It was
5  during '68, it was taken down.  I don't
6  remember that.  I don't remember.
7      Q.  Was that -- was that product in the
8  drums that you know of?
9      A.  I didn't sample it.  I didn't have it
10  analyzed.  I don't know what it was but it was
11  material.
12      Q.  Would that material have been dumped
13  like that without --
14      A.  It was not an open top drum.  It was a
15  closed drum with bunks on it.
16      Q.  Did they pour the product right out of
17  the bunk hole?
18      A.  They poured it right out the bunk
19  hole.
20      Q.  Would they have done that without the
21  plant manager knowing what they were doing?
22      MS. RYNIEC: Objection.  Calls for
23  speculation.
24      A.  It's very possible.  I don't know.  I
25  wasn't in charge of that particular phase.  I
00154
1  would say it was not uncommon.  The practice
2  was not uncommon, because as I stated earlier,
3  you were told to load drums.  You didn't load
4  half-full drums, quarter-full drums, you
5  loaded empty drums.  Whether it be the
6  employees of Inland Chemical or the driver and
7  his helper, I couldn't tell you who, but I did
8  see drums being emptied to the ground just off
9  of this paved area, which was all, it was all
10  landfill-type of dirt and rock and what have
11  you.
12      Q.  Where were the empty drums going to,
13  do you know?
14      A.  No idea.  I have no idea.  I heard
15  that it was some outfit -- I heard this now, I
16  don't know this, someplace in Elizabeth was

MKSK-FED-0000004250

ALCD-PUBCOM_0003448

17 taking all that they could send them.
18    Q. Elizabeth, New Jersey?
19    A. Yes. There was a drum recycling
20 center there or something, and I also heard
21 years later that the environmental people
22 closed them down. They got some stiff fines,
23 they had a mess somewhere in Elizabeth. Now,
24 I understand that's where the drums went, some
25 of them. I did not see bill of lading, I was
00155
1 not involved in the shipping, arranging,
2 scheduling or anything.
3    Q. Did you say --
4    A. So there.
5    Q. Did you say anything to anybody when
6 you saw them pouring it out on the ground, the
7 product or material?
8    A. I'm sure I did. Somebody in
9 management?
10    Q. Yeah.
11    A. Who knows. I don't know. I think
12 back in those days when Inland got there the
13 overall morale was bankrupt so, therefore, it
14 didn't matter anymore. Was one of those --
15 one of those type of situations where we could
16 see what was happening. We -- by that I mean,
17 the older people, people that were there for
18 years and sort of didn't agree what was going
19 on, but the paychecks still kept coming in.
20 The whole story.
21    Q. Can you mark on the map for me, I'll
22 hand you the pen back, I don't -- was there
23 more than one loading and unloading area for
24 the railroad cars?
25    A. Well, here again, railroad cars
00156
1 depended on what now -- opposite Building
2 Seven here, which was the warehouse for drums
3 and what have you, there was this warehouse
4 here, there was rear doors on it, track here,
5 double tracks -- there's no double tracks but
6 there was --
7    Q. It looks like there's a set of track
8 here.
9    A. And there were double tracks.
10    Q. Okay.
11    A. So this area was used for loading
12 drums mostly. They came out of this warehouse
13 or even up in here, there were double tracks
14 here, too, up by the methylene chloride plant,
15 so I would say from about here.
16    Q. Go ahead and mark that.
17    A. It was from this area here to -- where
18 am I at, down to methylene chloride, methylene

MKSK-FED-0000004251

ALCD-PUBCOM_0003449

19  chloride was right in here. I'll include
20  that. That was tankers, though, tank cars.
21    Q. I want to do rail cars first, if I
22  can.
23    A. Box cars?
24    Q. Yeah.
25    A. Box cars would have been anywhere up
00157
1  to here, I guess.
2    Q. Tank trucks next?
3    A. Tank cars were also --
4    Q. Tank cars. Okay.
5    A. -- back in this area where the
6  methylene chloride was, there was a double set
7  of tracks to, I believe, there was room for
8  four cars. There was a double set of tracks,
9  it shows -- see it here, one set goes this way
10  and there was another set, there was double
11  tracks approximately 50 to 75-yards from the
12  end of this building back to methylene
13  chloride. Offhand, I don't remember, I think
14  it was enough space for four tank cars, for
15  eight total.
16    Q. So this area would be rail cars,
17  loading and unloading and this would include
18  tank car loading and unloading?
19    A. Right.
20    Q. Let's put an ending point where the
21  rail cars would end.
22    A. Right. This. There.
23    Q. If we called this A and B, rail cars
24  would be loaded and unloaded between, on the
25  tracks between point A and point B, would that
00158
1  be fair?
2    A. Yeah.
3    Q. Why don't we put an A -- an A, B, and
4  a C then, and then we can describe it and it
5  will make sense, we can see it written out.
6    A. Now, see, this here was a hundred
7  thousand gallon methylene storage tank, so
8  this is why the loading was done here. There
9  was, as I stated, as best I can remember,
10  there was storage space for eight cars. I'm
11  pretty sure. I could be wrong, maybe only
12  six, I don't know. But it seems to me there
13  was enough space here to do that.
14    Q. Well, why don't -- so then it's fair
15  to say between -- on the railroad tracks
16  between the line A and line B that was the
17  rail car, railroad car loading and unloading?
18    A. Box cars.
19    Q. Box car loading and unloading, and
20  then between the lines on the railroad track

MKSK-FED-0000004252

ALCD-PUBCOM_0003450

21 marked B and C on that area of track, it's
22 tank cars loading and unloading?
23    A.  Yeah.
24    Q.  Why don't we, since you just
25 identified something else, probably be good to
00159
1 mark on the map, that tank.
2    A.  It is -- that's storage tank.
3    Q.  I think it says Tank Farm Number One
4 it looks like?
5    A.  But that's the methylene chloride
6 storage tank.
7    Q.  Let's mark that, can we put a little
8 area, what was that, a hundred thousand
9 gallons you said, methylene storage tank?
10    A.  Yep, it's the chemical abbreviation.
11    Q.  So for the record  --
12    A.  CH2CL2 storage tank.
13    Q.  Just to the east of the drummed
14 storage area and slightly north is a circle
15 within a square where it says tank farm on the
16 map and we -- Mr. Partington has indicated
17 that that's CH2CL2 storage TK?
18    A.  Tank.
19    Q.  For the methylene chloride storage
20 tank?
21    A.  Uh-huh.
22    Q.  That's a hundred thousand gallons?
23    A.  Right.
24    Q.  Now, if we can do, similarly mark the
25 map with respect to the tank truck or the
00160
1 tractor trailer loading and unloading areas?
2    A.  Well, here again, we shipped chlorine
3 via tank trucks.
4    Q.  Chlorine off -- the finished product
5 off the plant?
6    A.  Right.  That was over here which
7 you're not even concerned with anymore.
8 Chlorine plant is gone, right, Tank Farm B is
9 it the front tank farm, trucks would load on
10 the, what, east-west-north -- this is south, I
11 think.
12    Q.  Up in the upper right-hand corner is
13 north arrow.
14    A.  It would be south, the south end of
15 this tank farm was a truck on loading station.
16 This tank farm here this is how the storage
17 tanks were unloaded, so that's one spot.
18 Another spot could have been east of the
19 Benzoic acid or was a DMA area.  There's an
20 alley here, this used to be an ally.  It's
21 still there.  They used to load and unload
22 here.

MKSK-FED-0000004253

ALCD-PUBCOM_0003451

23    Q. Why don't we mark the first loading
24  and unloading area that you referenced
25  underneath the tank farm?
00161
1    A. What are we going to call it? E?
2    Q. How about L? U-L for loading,
3  unloading?
4    A. L?
5    Q. U-L.
6    A. U-L.
7    Q. Call it number one.
8    A. And this here other area L-2 area.
9    Q. L, U-L number two. How is that?
10    A. Okay.
11    Q. Okay.
12    A. Now, that was only for Inland, that
13  wasn't Benzoic acid no more. It was DMA
14  remember.
15    Q. For the loading and unloading area
16  number two?
17    A. Right. Wastewater used to be loaded
18  out here on this roadway. This is a roadway
19  all the way through here. Now that would be
20  L-V-3.
21    Q. That's another loading/unloading area,
22  I guess? Actually only unloading?
23    A. Loading, loading wastewater into it.
24  You should have a legend, L-1 means solvents
25  and L-2 means raw materials for DMA and
00162
1  production.
2    Q. Okay.
3    A. And L-3 could be the wastewater
4  storage facility. Wastewater was taken out
5  here.
6    Q. Is there -- do you know if wastewater
7  was ever stored at the Newark facility?
8    A. Just in the storage tank, that's all.
9    Q. Do you know where the wastewater
10  storage tank is located?
11    A. No. It doesn't show it here.
12    Q. Do you have a recollection as you
13  look at the map where it would be?
14    A. No, not offhand. There's nothing
15  helpful here.
16    Q. Any other loading truck --
17    A. I don't remember. See, there used to
18  be -- what's got me confused is they penciled
19  in Benzoic acid here as part of this building.
20  Now, in Inland that was true -- back before
21  Inland got there, Inland converted this to a
22  DMA manufacturing area. In fact, in this
23  building is where an employee of McKesson got
24  killed, I believe, in this Benzoic acid or DMA

MKSK-FED-0000004254

ALCD-PUBCOM_0003452

25  area.
00163
1    Q.  Was that after you left the plant?
2    A.  After I left.
3    Q.  Is that the fire and explosion in
4  19 --
5    A.  Uh-huh.  They changed the
6  configuration and I am searching, believe me,
7  my memory -- but as I recall there were tanks
8  here at one time, there were tanks in this
9  area here, there was muriatic acid tanks here.
10  There was sulfuric acid storage, methanol
11  storage and then there was in this particular
12  area here, there was a methyl chloride
13  manufacturing area which has been deleted.
14    Q.  During whose tenure, these tanks that
15  you're just talking about in this area, who?
16  Vulcan?  Inland?  Who was that?
17    A.  Vulcan and Kolker Chemical.
18    Q.  Just so that we don't lose this, for
19  the record, can you box in that storage tank
20  area and processing area that you're talking
21  about is missing on this map?
22    A.  This is missing.  It's similar to
23  this.  Because I'm taking -- these are two
24  storage tanks, I believe that's what they are,
25  the methyl chloride.  Those two little ovens
00164
1  inside the Benzoic acid lines.  They
2  discontinued this when they converted this to
3  a DMA operation.
4    Q.  The Benzoic acid portion?
5    A.  This was methyl chloride, methyl
6  chloride.
7       MS. HAYNES:  Just for the record, the
8       witness has marked a box area just south
9       of the Benzoic acid building reference to
10      the Building Number Two, Benzoic acid, the
11      Benzoic acid to the west of that Building
12      Number Two and just to the right of the
13      loading and unloading area number two and
14      he's marked inside the box --
15    A.  MECL-2.
16    Q.  MECL-2 unit, and that's the methylene
17  chloride unit that was used by Kolker and
18  Vulcan, but you're not seeing it on the map?
19    A.  No, it's not there.  That's my job
20  when I first came.
21    Q.  When you were a chemical operator?
22    A.  Yep.
23    Q.  That's the area you worked the
24  methylene chloride unit?
25    A.  Right.
00165

MKSK-FED-0000004255

ALCD-PUBCOM_0003453

1    Q. Were there any other tank truck
2 loading and unloading areas other than the
3 number one, two and three that you put on the
4 map?
5    A. This is just in this area. Now, over
6 here you want to talk about the chlorine
7 plant? The chlorine plant had its own, it had
8 a truck loading station over here somewhere,
9 there was an HCL tank cars. Where is the
10 bleach plant? Doesn't show the bleach plant.
11 Bleach plant is here, I believe, but this is
12 all these -- it's not a very good description
13 or a clear enough picture to really -- see
14 this.
15    Q. Was it your recollection generally
16 that the southern half of the plant -- this is
17 related to the chlorine?
18    A. This is all chlorine, this is all
19 chlorine, the cell houses were here. Chlorine
20 plant was here, this is the new cell house.
21    Q. New cell block. Right?
22    A. That was the expansion.
23    Q. In the blue and it says chlorine
24 plant?
25    A. Caustic plant.
00166
1    Q. Caustic plant?
2    A. That was the evaporation area, control
3 room, liquid -- this here was the rectifiers,
4 this was the yard, the transfer yard for the
5 power incoming power and there's an office
6 area right here, this was an office area, this
7 here was an office and this was a loading
8 facility, the chlorine storage tanks were
9 here. One, two, three, these are the two
10 sniff scrubbers looks to me.
11    Q. Why don't we mark --
12    A. I'll go crazy here. We'll be here
13 'til nine o'clock.
14    Q. Just circle this area right here.
15    A. Can you get a blow-up of this? It
16 could be more helpful because this is limited
17 here. It's so condensed that it's not
18 legible.
19    Q. I might be able to have a blow-up
20 version tomorrow.
21    A. It's not legible. It's running into
22 one another.
23    Q. This lower half that's referenced as
24 the chlorine plant, that's the half -- that's
25 the production side that Inland shut down when
00167
1 they took over the plant. Right?
2    A. From base line whatever that is over.

MKSK-FED-0000004256

ALCD-PUBCOM_0003454

3  In fact, this new -- if you put the new up
4  against with the old they say Building Seven.
5      Q.  Looking at Exhibit Number Three
6  compared to Exhibit Number Two?
7      A.  I imagine that's the new property
8  line, is it not?
9      Q.  That's my understanding.
10     A.  That's what they cut out from Building
11 Seven, all of this is cut out and that's --
12 and the area has been changed quite a bit
13 because this area no longer, this Building Two
14 is here, but the new area in here has all been
15 changed and across the tracks are gone, this
16 is --
17     Q.  I think these are supposed for the
18 tracks, I don't know that they were used?
19     A.  Terrible draftsman.  The next case you
20 get, do not employ Sullivan Engineering Group.
21 It's pretty difficult to describe what I
22 recall from this print.
23     Q.  From the operations end of things,
24 I'll try not to ask you too many detailed
25 questions based on that.
00168
1      A.  I did damn good considering 40 years
2  ago, but to the best of my recollection this
3  is what we were describing about the drum
4  storage area.  There was an open field here
5  and I believe it is still there,  in fact, it
6  doesn't show anything there, this is probably
7  still open between Building Seven and here it
8  doesn't show anything so probably that field
9  is still there across the street from the
10 methylene chloride plant prior to -- yeah.  Is
11 that all paved now?
12     Q.  I don't know.  Let me pass me Exhibit
13 Number Three just to keep that top map, just
14 to keep that out of the way so we don't
15 confuse things.
16     I want to ask you, did -- we've been
17 talking briefly about drums and drum storage
18 during Inland's time and is it true that
19 Kolker and Vulcan used drums for product as
20 well?
21     A.  Yeah, certainly, but they were not in
22 the reclaim business.  Inland was.
23     Q.  Were there areas where Vulcan and
24 Kolker stored their drums?
25     A.  Vulcan and Kolker kept them mostly
00169
1  inside of Building Number Two and the storage
2  area number two building was methylene
3  chloride drumming facilities there.
4      Q.  Okay.

MKSK-FED-0000004257

ALCD-PUBCOM_0003455

5    A.  And Kolker and Vulcan did the same.
6  They housed their drums or their methylene
7  chloride in that particular, that was mostly
8  the drumming and chloroform and carbon tet,
9  all the solvent was done in that building and
10  stored there under -- well, it wasn't out in
11  the open and some of the process orders or lot
12  numbers that were picked up by truck were
13  stored in the new warehouse which was high, I
14  believe, I don't know how high.  My
15  recollection has it they were neat and
16  orderly.  Clean, I even knew the foreman of
17  the warehouse facility was a meticulous
18  fellow.  His name was Kenneth Adams.  He was a
19  stickler for cleanliness and orderliness.  He
20  was an excellent supervisor.  He was the
21  warehouse foreman at that time and he was
22  about ten years older than I am, so if the
23  good Lord was good to him, he may still be
24  around.  I don't know.
25    Q.  The Building Number Two that you were
00170
1  referring to as the clean drum storage for
2  Kolker and Vulcan, that's just for reference
3  for the record, that's Building Number Two on
4  Exhibit Number Two, the big map that you're
5  pointing to?
6    A.  Right.
7    Q.  The new warehouse that you're  talking
8  about, is that a warehouse that Vulcan put in?
9    A.  It was an addition to the new
10  warehouse behind Building Seven that was built
11  in, Vulcan and Kolker started in, Vulcan
12  finished it.  One or the other.  I forget now.
13    Q.  That's the area on Exhibit Number Two
14  marked Building Number Seven a warehouse?
15    A.  Correct.  It was considered the new
16  warehouse.
17    Q.  Okay.
18    A.  Because memory doesn't serve me right,
19  I don't know if Kolker was in the process of
20  it and Vulcan finished it or it was finished,
21  part of the sale.  I can't remember.  But I do
22  remember the supervisor in charge of the
23  facility and what have you, and he was an
24  excellent type of an individual, orderly,
25  neat, he was one of the better management
00171
1  staff.
2    Q.  Did he stay on when Inland took over
3  the plant?
4    A.  No.  Inland -- he stayed shortly, I
5  believe, and he had a falling out very early
6  with somebody, I don't know what the

MKSK-FED-0000004258

ALCD-PUBCOM_0003456

7 particulars were.
8     Q. I want to ask you again, we've been
9 talking in detail about how product comes into
10 the Newark facility for use in operations by
11 Kolker in 1958. We talked about the rail, the
12 box cars, the rail cars, tank trucks and
13 drums, the procedure for product to come in at
14 the Newark facility. Were the methods and
15 procedures the same when Vulcan took over the
16 Newark facility?
17     A. No.
18     Q. If you can tell me how they were
19 different?
20     A. Vulcan sampled all incoming trucks and
21 had it checked by the lab for content, quality
22 and everything else before it left. Vulcan
23 also did the same while loading a truck for
24 shipment or a tank car. It had to be approved
25 by the lab before the seals were installed on
00172
1 the hatch covers or the valves or whatever,
2 before it was allowed to leave the plant.
3 There was a sense of quality control when
4 Vulcan took over. There was some of this in
5 Kolker's day. In other words, they would not
6 ship contaminated tank car of methylene
7 chloride. There was product checks, but
8 incoming, no, I can't recall or had no
9 dealings with a procedure set up for all raw
10 materials coming into the plant. If I
11 remember correctly, some were and some
12 weren't. The rule was not really enforced as
13 much in Kolker's days but they did have some
14 of it, like fuel oil coming in, it would have
15 to be Bunker Six, the sample would be with
16 them. Whether they sampled methylene or
17 toluene, I don't know. There was some
18 products that came in there that I had no,
19 nothing to do with whatsoever.
20     Q. So, other than the sampling conducted
21 by Vulcan when they took over the Newark
22 plant, is there anything else that you can
23 think of procedurally that was different about
24 the operations conducted when product came
25 into the Newark facility?
00173
1     A. Well, yes. When Inland first arrived
2 on the scene, drums came in of unknown quality
3 and, you know, we didn't know what was in
4 them. One of the employees from the lab would
5 have to sample each individual drum to know
6 what they had. In other words, they accepted
7 whatever was in the drums on the site and then
8 after they were on the site they were then

MKSK-FED-0000004259

ALCD-PUBCOM_0003457

9  sampled and processed via the lab.
10    Q. That the sniff testing you were
11  telling me about?
12    A. Yeah, if it smelled like solvent put
13  it in that pile. If it looked oily, put it
14  over there, and they had no idea. This is
15  when I formed the opinion that this was a slop
16  outfit, you know, just recovering, you know,
17  it was unheard of, I mean. But there was some
18  sort of a deal set up obviously.
19    Q. Anything else --
20    A. No, because.
21    Q. -- that you can think of that's
22  different about the procedure for incoming
23  product?
24    A. Not really.
25    Q. Other than what you describe for the
00174
1  Kolker years?
2    A. No. Kolker did quality checks on
3  their product before it left. Now, however,
4  they weren't that concerned with raw
5  materials. Best of my recollection, I mean, I
6  don't remember them having the same type of
7  quality control that sort of stands out in my
8  mind. Once Vulcan got there, Vulcan wanted to
9  know what they were getting, every ounce,
10  every pint, every crumb. They had, they
11  wouldn't unload the particular tank truck or
12  tank car unless the lab said it was approved.
13  It was of the quality that they had ordered or
14  expected.
15    Q. What about just the general method of
16  product coming into the Newark facility and
17  then being unloaded from rail cars, tank cars,
18  tank trucks or drums, was anything about
19  procedures used by Vulcan or Inland different
20  from what you've already described for Kolker
21  other than Vulcan was stringent about sampling
22  incoming product and Inland got, had drums of
23  product coming into the plant in a way that
24  hadn't been seen before? Anything else about
25  the way the product came in, either the
00175
1  method, the way it came in or the way it was
2  pumped into tanks?
3    A. Not really, vendors are about the
4  same. The only difference in the truckers or
5  haulers was the drum trucks coming in with
6  their flat bed trailers with a load of drums.
7    Q. That was in the Inland period?
8    A. Inland. Right.
9    Q. Were those Inland drivers?
10    A. No. I think they were over the road.

MKSK-FED-0000004260

ALCD-PUBCOM_0003458

11  Some of them might have been, I don't know. I
12  know Inland had their own fleet but...
13     Q.  Okay.  When you were pointing at the
14  map, you had referenced this, there was a
15  wastewater loading area, was that during
16  Vulcan's tenure or Inland?
17     A.  Inland.
18     Q.  And it's loading up into a tank truck?
19     A.  Yeah, they used to truck it to New
20  York someplace, I don't know where, they
21  trucked it to New York.
22     Q.  Do you know if that wastewater was
23  ever put into a storage tank during Inland's
24  tenure?
25     A.  Oh, yeah.  They had a storage tank for
00176
1  it and they loaded, you know, so many tank
2  trucks, or it was from the DMA process as I
3  remember.
4     Q.  Was wastewater from the DMA  process?
5     A.  Yeah.
6     Q.  Do you know during Inland's tenure
7  did they discharge wastewater effluent to the
8  Newark Bay?
9     A.  Personally did I see it?  No.  Did it
10  happen?  Probably.  I don't know.  Nothing
11  stands out in my mind.  Nothing being done
12  deliberately that I can remember.
13     Q.  Before I let you go for the day, I
14  wanted to ask you, are there any former
15  Kolker, Vulcan or Inland employees that you
16  still keep contact with?
17     A.  Yeah.
18     Q.  Who would that be?
19     A.  Steve Kapasky, K-a-p-a-s-k-y.
20     Q.  Who did he work for?
21     A.  Vulcan, Inland, Kolker, management,
22  shift foreman.
23     Q.  Does he live in this area?
24     A.  Yes, he does.
25     Q.  Do you know where he lives?
00177
1     A.  Sure I do.
2     Q.  Where is that?
3     A.  I ain't gonna tell you.  You want him,
4  go find him.  He doesn't want to be bothered.
5  He's retired.  He's enjoying himself.  He was
6  surprised that I was called after all these
7  years.
8     Q.  Did you talk to Mr. Kapasky about
9  giving your deposition?
10     A.  Yes, I did.
11     Q.  And what did you tell him?
12     A.  I told him I don't know what the hell

MKSK-FED-0000004261

ALCD-PUBCOM_0003459

13 it's all about, Steve. After all these years
14 but for some reason they want to know what I
15 know or something. I don't know. He says,
16 "Better you than me." His exact words. Don't
17 you dare tell him where I am. I tell them, I
18 know I am -- he's in the phone book.
19    Q. Is there any other former employee you
20 keep in contact with?
21    A. He's about the only one. Occasionally
22 I might run into the old employees but they
23 are all over the place. I don't socialize
24 outside of Steve. Steve and I go to Atlantic
25 City once in a while.
00178
 1    Q. Are there any employees alumni
 2 associations or anything that you know of?
 3    A. No. I think our experiences with
 4 these people were better forgotten. It
 5 wasn't -- it was a living, I say that.
 6 Brought a family up but...
 7    Q. We are done for today and we will
 8 start back up tomorrow at 11 o'clock in the
 9 morning.
10    A. You said 11:30.
11    Q. No. I said 11 o'clock. It will be
12 here at the hotel and you'll need to check
13 before you leave today -- we'll check and see
14 which room. We're done. We can go ahead and
15 go off the record.
16 (At this time the deposition is adjourned.)
17
18              -----------------
19              Bernard Partington
20
21
22
23
24
25
00179
 1       C E R T I F I C A T E
 2    I, MICHELLE DIPIERRO-FAIREY, a Notary
 3 Public and Certified Shorthand Reporter of the
 4 State of New Jersey, do hereby certify that
 5 prior to the commencement of the examination,
 6 the witness (s) BERNARD PARTINGTON was sworn
 7 by me to testify the truth the whole truth and
 8 nothing but the truth.
 9    I DO FURTHER CERTIFY that the foregoing is
10 a true and accurate transcript of the
11 testimony that was taken stenographically by
12 and before me at the time, place and on the
13 date herein before set forth.
14    I DO FURTHER CERTIFY that I am neither a

MKSK-FED-0000004262

ALCD-PUBCOM_0003460

15 relative nor employee nor attorney nor counsel
16 for either of the parties to this action, and
17 that I am neither a relative nor employee of
18 such attorney or counsel, and that I am not
19 financially interested in the action.
20 _____
21    MICHELLE DIPIERRO-FAIREY, CSR
22    A Notary Public of the State
23       New Jersey
24 My commission expires:
25 July 2000

MKSK-FED-0000004263
ALCD-PUBCOM_0003461

# EXHIBIT 60

OxyChem's Comments in Opposition to Proposed Consent Decree,
*United States v. Alden Leeds, Inc., et al.*, Civil Action No. 2:22-cv-07326 (D.N.J.)

ALCD-PUBCOM_0003462

00509
1   THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
2      IN AND FOR THE COUNTY OF SAN FRANCISCO
3   -----------------------------------
4   SAFETY-KLEEN ENVIROSYSTEMS        )
5   COMPANY, a corporation,           )
6                         )
7           Plaintiffs,       )
8                       ) CASE NO.
9   V.                    ) 985528
10                        )
11  CONTINENTAL CASUALTY COMPANY,     )
12  et al.,                   )
13          Defendants.      )
14  -----------------------------------)
15
16       DEPOSITION OF RAYMOND GILLIAM
17         THURSDAY, JUNE 17, 1999
18         PAGES 509 - 606; VOLUME 3
19
20
21       BEHMKE REPORTING & VIDEO SERVICES
22       BY: MICHELLE DIPIERRO-FAIREY, CSR
23             1320 ADOBE DRIVE
24          PACIFICA, CALIFORNIA  94044
25               (650) 359-3201
00510
1
2
3
4
5
6
7
8   Continuing Videotaped Deposition of RAYMOND
9   GILLIAM, taken on behalf of defendant at THE
10  HYATT REGENCY, 2 Albany Road, New Brunswick,
11  New Jersey, commencing at 9:00 a.m., Thursday,
12  June 17, 1999, before MICHELLE DIPIERRO-FAIREY,
13  Certified Shorthand Reporter No. XI01746
14  pursuant to Notice.
15
16
17
18
19
20
21
22
23
24
25
00511



Exhibit
LegacyVulcan_

MKSK-FED-0000003521

ALCD-PUBCOM_0003463

```
 1  APPEARANCES OF COUNSEL:
 2  FOR PLAINTIFF, SAFETY-KLEEN ENVIROSYSTEMS
 3  COMPANY:
 4     BROBECK, PHLEGER & HARRISON, ESQS.
 5     BY: TRACY S. RYNIEC, ATTORNEY AT LAW
 6     Spear Street Tower
 7     One Market Plaza
 8     San Francisco, California 94105
 9     Telephone: (415) 442-0900
10  FOR THE DEFENDANT LONDON MARKET INSURERS AND
11  UNITED STATES LIABILITY INSURANCE COMPANY:
12     HANCOCK, ROTHERT & BUNSHOFT, ESQS.
13     BY: MARY ANDERSON, ATTORNEY AT LAW
14     515 S. Figueroa Street, 17th Floor
15     Los Angeles, California 90071
16     Telephone: (213) 623-7777
17  FOR THE DEFENDANT ALLSTATE INSURANCE COMPANY
18  AS SUCCESSOR TO NORTHBROOK EXCESS AND SURPLUS
19  LINES INSURANCE COMPANY:
20     LILLICK & CHARLES, LLP
21     BY: BETH L. APPELBAUM, ATTORNEY AT LAW
22     Two Embarcadero Center
23     San Francisco, California 94111
24     Telephone: (415) 984-8200
25
00512
 1  APPEARANCES OF COUNSEL - CONTINUED
 2  FOR THE DEFENDANT FIRST STATE INSURANCE
 3  COMPANY, NEW ENGLAND REINSURANCE CORPORATION
 4  AND HARTFORD ACCIDENT AND INDEMNITY:
 5     LILLICK & CHARLES, LLP
 6     BY: HELEN S. HAYNES, ATTORNEY AT LAW
 7     Two Embarcadero Center
 8     San Francisco, California 94111
 9     Telephone  (415) 984-8200
10
11  FOR THE DEFENDANT CONTINENTAL CASUALTY
12  COMPANY:
13     OLSON, CORTNER & MC NABOE, ESQS.
14     BY: W. HEATHER SOURIAL, ATTORNEY AT LAW
15     Three Embarcadero Center
16     San Francisco, California 94111
17     Telephone: (415) 733-6000
18
19
20
21
22
23
24
25
00513
 1          I N D E X
 2  Thursday, June 17, 1999
```

file:///qnapnas/Concordance/Concordance/Cases/03_Mckesson/09_NewarkLand/TRANSCRIPTS/Gillum%20Exhibit%20Receipt/17%20Page%2056.htm

MKSK-FED-0000003522

ALCD-PUBCOM_0003464

Page

3  RAYMOND GILLIAM, VOLUME 3
4      Examination by Ms. Haynes        516
5      Examination by Ms. Appelbaum        569
6      Examination by Ms. Sourial        581
7      Examination by Ms. Anderson        585
8
9
10              EXHIBITS
11  Number        Description        Page
12  No exhibits marked.
13
14
15
16
17
18
19
20
21
22
23
24
25
00514
1          VIDEOGRAPHER:  Here begins videotape
2      number eight in the deposition of Raymond
3      Gilliam in the matter of Safety-Kleen
4      Envirosystems Company versus Continental
5      Casualty Company, et al, in the Superior
6      Court of the State of California, County
7      of San Francisco, case number 985528.
8          Today's date is June 17, 1999.  The
9      time on the video monitor is 8:44.  The
10      video operator today is Eric Lenz,
11      contracted by Bemhke Reporting and Video
12      Services, 1320 Adobe Drive, Pacifica,
13      California.
14          This video deposition is taking place
15      at Two Albany Street, New Brunswick, New
16      Jersey, and was noticed by Molly Anderson,
17      Attorney at Law of Hancock, Rothert and
18      Bunshoft.
19          Counsel, please voice identify
20      yourself and state whom you represent.
21          MS. HAYNES:  Helen Haynes with the law
22      firm of Lillick and Charles, in San
23      Francisco, California, and I represent
24      defendants Hartford Accident and Indemnity
25      Company, First State Insurance Company and
00515
1      New England Reinsurance Corporation.
2          MS. RYNIEC:  Tracey Ryniec, Brobeck,
3      Phleger and Harrison in San Francisco,
4      representing McKesson Corporation on

MKSK-FED-0000003523

ALCD-PUBCOM_0003465

5    behalf of Safety-Kleen Envirosystems
6    Company and Mr. Gilliam for the purposes
7    of this deposition.
8         VIDEOGRAPHER:  The Court Reporter
9    today is Michelle Fairey, Certified
10   Shorthand Reporter contracted by Behmke
11   Reporting and Video Services.
12        Would all others present please state
13   your name for the record?
14        MS. SOURIAL:  Heather Sourial on
15   behalf of Continental Insurance Company,
16   Continental Casualty Company and Hartford
17   Insurance Company.
18        MS. HAYNES:  Can we break for a
19   moment?
20        VIDEOGRAPHER:  Yes. We will go off the
21   record at 8:45.  We're off the record.
22        (At this time there is a discussion
23   off the record.)
24        VIDEOGRAPHER:  We are back on the
25   record at 8:49.
00516
1         MS. APPELBAUM:  Good morning, Mr.
2    Gilliam.  My name is Beth Appelbaum, and
3    I'm from the law firm of Lillick and
4    Charles and I'm here today representing
5    Allstate as successor in interest to
6    Northbrook Insurance Company, and I'm here
7    for Marcie Keenan who is the same woman
8    who deposed you the last time you were
9    with us.
10        MS. ANDERSON:  Good morning, Mr.
11   Gilliam.  I'm Molly Anderson from the law
12   firm of Hancock, Rothert and Bunshoft
13   representing London Market Insurers and
14   the U. S. Liability Insurance Company, and
15   I'm here following for Yvette Roland who
16   was present at the earlier phase of your
17   record.
18        VIDEOGRAPHER:  Would the reporter
19   please swear the witness.
20        R A Y M O N D   G I L L I A M
21   called as a witness, having been duly
22   sworn, testified as follows:
23   EXAMINATION BY MS. HAYNES:
24        VIDEOGRAPHER:  Please begin.
25   Q.  Good morning, Mr. Gilliam.  As I said
00517
1 before the deposition began today, I'm going
2 to be continuing the follow-up questioning
3 that Louise McCabe began on day two of your
4 deposition, which, according to my copy of the
5 transcript, was on April 7, 1999.
6    During your testimony, you spoke at some

MKSK-FED-0000003524

ALCD-PUBCOM_0003466

7  length with respect to various events at the
8  Newark, New Jersey site.  We're going to
9  continue to refer to 600 Doremus Avenue,
10  Newark, New Jersey that particular facility as
11  the Newark site.  Can we have -- share that
12  understanding?
13      A.  Sure.
14      Q.  Okay.  Great.  And you were asked a
15  number of questions regarding events during
16  Kolker's ownership and Vulcan's ownership and
17  then Inland's ownership, you remember those
18  types of questions?
19      A.  Yes.
20      Q.  So you were employed at the Newark
21  facility through the transition from Kolker to
22  Vulcan.  Correct?
23      A.  That's correct.
24      Q.  And the same with respect to Vulcan
25  transition over to Inland?
00518
1       A.  That's right.
2       Q.  Okay.  I want to ask you to think back
3  during the transition time period between
4  Kolker and Vulcan, and ask you if you recall
5  whether Vulcan personnel came to the site at
6  Newark to inspect it prior to buying the site
7  from Kolker?
8       A.  Yes, they did.
9       Q.  Okay.  Were you there when Vulcan
10  personnel came to inspect the site?
11      A.  Yes, part -- at least part of the
12  time.
13      Q.  Okay.  Were you part of a group of
14  Kolker personnel helping tour Vulcan personnel
15  around the facility?
16      A.  No.
17      Q.  Do you know who at Kolker conducted
18  such a tour, if any?
19      A.  I believe it would have been Lee
20  Kolker or Charles Kolker.
21      Q.  Do you have a recollection as to who
22  it was at Vulcan who came to visit the Newark
23  facility with regard to inspecting the site
24  before the purchase?
25      A.  I believe one of the people was Irv
00519
1  Jordan, I-r-v, I don't know how -- that's an
2  abbreviation, for what I'm not sure, Jordan
3  J-o-r -- J-o-r-d-a-n.
4       Q.  And he was with Vulcan?
5       A.  He was Vulcan.  Right.
6       Q.  Do you know what his title was?
7       A.  He was a process engineer, I believe
8  -- with Vulcan.  They called it Frontier

MKSK-FED-0000003525

ALCD-PUBCOM_0003467

9  Chemical Company at the time.
10    Q.  The Kolker company was called Frontier
11  Chemical at the time?
12    A.  No.  No.  Vulcan had a division called
13  Frontier Chemical.
14    Q.  And it was the Frontier Chemical
15  division that was coming --
16    A.  Of Vulcan.
17    Q.  That was coming to the Newark site to
18  purchase -- okay.
19    A.  Right.
20    Q.  So Mr. Jordan was a process engineer
21  for Frontier Chemical?
22    A.  Right.
23    Q.  Anyone else that you recall either
24  with Vulcan or with Frontier, the subsidiary
25  of Vulcan, who came to the Newark site to
00520
1  inspect it?
2    A.  I'm not sure.  I don't know.
3    Q.  Do you know what Mr. Jordan did at
4  the Newark site as part of his inspection?
5    A.  No.  I don't.  I don't know.
6    Q.  Who do you think would be the person
7  most knowledgeable about Vulcan's inspection
8  of the Newark site or Frontier Chemical's
9  inspection of the site prior to purchase?
10    A.  Well, possibly Irv Jordan's boss was
11  Elbert DeForest.
12    Q.  Elbert?
13    A.  Yes.  E-l-b-e-r-t, D-e-f-o-r-e-s-t.
14  That's a capital F.  Yes.
15    Q.  What was Mr. DeForest's title?
16    A.  He was in charge of research and
17  development.  I don't know the exact title.
18  Might have been a vice president, but I'm not
19  sure.
20    Q.  Do you know what Mr. Jordon was
21  looking at?
22    A.  No, I don't know.
23    Q.  Okay. Do you know how long his
24  inspection of the facility lasted?
25    A.  No, I don't.
00521
1    Q.  Do you know if he made more than one
2  visit to the site?
3    A.  I'm not sure.
4    Q.  And I have the same questions with
5  respect to Inland's purchase of the Newark
6  facility from Vulcan in approximately 1974 --
7    A.  Uh-huh.
8    Q.  -- time frame.  You were working at
9  the facility during the period of time when
10  Inland purchased the Newark site from Vulcan?

MKSK-FED-0000003526

ALCD-PUBCOM_0003468

11    A.  That's correct.
12    Q.  And do you recall if anyone from
13  Inland came to the Newark site to inspect it
14  prior to its purchase from Vulcan?
15    A.  Yes.
16    Q.  Were you part of the inspection
17  process?
18    A.  I don't think so.  I don't recall.
19    Q.  Do you recall who from Inland came to
20  the facility to inspect it prior to purchase?
21    A.  Somebody named Mel Arnold, I believe
22  was involved.
23    Q.  Any other names of folks at Inland
24  that you can recall who had visited the site?
25    A.  The research man, John -- I can't
00522
1  think of his last name right now.
2    Q.  Berger?
3    A.  That's the name, yes.
4    Q.  Do you know, did Mr. Arnold and Mr.
5  Berger visit the site together?
6    A.  I'm not sure, but I remember seeing
7  both of them there.  But I don't think --
8  possibly at different times, possibly the same
9  time.  I'm not sure.
10    Q.  Do you recall anyone else from Inland
11  who might have visited the site prior to its
12  purchase?
13    A.  I know I had met a Mr. Stincker, (sic)
14  but I don't know whether he -- he was the
15  president of Inland -- or the major
16  stockholder, I believe, but I don't know
17  whether he was -- at what time he was there,
18  whether it was afterwards or before they
19  purchased it.
20    Q.  So you met Mr. Skincker, Tom Skincker?
21    A.  That's right.
22    Q.  President of the Inland at the time
23  and you're not sure if at the time that you
24  met him related to a site visit for purchase
25  of the site, or some other reason?
00523
1    A.  No, I don't know.
2    Q.  Do you know how long, number of days
3  or number of hours that Inland folks spent at
4  the Newark facility inspecting it prior to its
5  purchase?
6    A.  I couldn't tell you.  No, I don't
7  know.
8    Q.  Do you know the details of any of the
9  activities that either Mr. Arnold or Mr.
10  Berger conducted in terms of their inspection
11  of the site prior to purchase?
12    A.  I don't know what they did, no.

MKSK-FED-0000003527

ALCD-PUBCOM_0003469

13    Q. And who do you think would be the
14  person most knowledgeable about Inland's
15  inspection of the Newark facility prior to its
16  purchase?
17    A. Well, I believe Mr. Berger would have
18  been most knowledgeable about the facilities
19  themselves.  Mr. Arnold probably with the
20  financing.
21    Q. Do you know if when Mr. Berger came to
22  the site, did he have anyone with him to
23  assist him?
24    A. I don't recall.
25    Q. Okay. I apologize if this was asked of
00524
 1  you before, but did you keep written records
 2  or documents in an office at the Newark
 3  facility?
 4    A. I can't recall but I must have.  I
 5  don't -- I don't remember specific documents.
 6    Q. Okay.  You did have an office at the
 7  Newark facility, didn't you?
 8    A. Yes.
 9    Q. And did you have file cabinets?
10    A. Yes.
11    Q. And would you likely have, if you kept
12  any records you would have kept records in
13  those file cabinets?
14    A. Yes.
15    Q. And you left the Newark facility and
16  Inland's employ at approximately the end of
17  1976.  Is that correct?  Or beginning of 1977?
18    A. I believe that's correct.
19    Q. When you left the Newark facility and
20  Inland's employ, did you take any documents
21  with you?
22    A. I don't think so -- I may have had --
23  I possibly had some things that I had worked
24  on but...
25    Q. Okay.
00525
 1    A. I -- I don't have them anymore.
 2  They're not in my possession anymore.
 3    Q. Do you believe the majority of records
 4  that you had stayed at the site at Newark
 5  after you left?
 6    A. I would think so.
 7    Q. Do you know what would have been done
 8  with them when you left the site?
 9    A. No.
10    Q. Do you know who took over your
11  position when you left in 1976, '77?
12    A. No.
13    Q. Did you ever work with an employee at
14  the Newark site by the name of Vincent

MKSK-FED-0000003528

ALCD-PUBCOM_0003470

15 Bruzgis?
16    A.  Yes.
17    Q.  Was that during the Kolker years or
18 Vulcan years, Inland years or more?
19    A.  I believe he was there during all
20 periods.
21    Q.  Did he report, did he -- I'm sorry.
22 Go ahead.
23    A.  I believe he was there during all the
24 periods.  I'm sorry.
25    Q.  Did he report to you?
00526
1    A.  No.
2    Q.  And what about Bernie Partington or
3 Bernard Partington.  Do you recall an --
4    A.  Yes.
5    Q.  -- employee by that name?
6    A.  Yes.
7    Q.  Did he work with you during the
8 Kolker, Vulcan and/or Inland years?
9    A.  I believe so, yes.
10    Q.  All three you think?
11    A.  I believe, I think so.
12    Q.  Did Mr. Partington report to you?
13    A.  No.
14    Q.  Do you remember who Mr. Partington
15 reported to?
16    A.  In the later years, I believe, he
17 reported to Mr. Marini.
18    Q.  Mr. Marini, Uli Marini?
19    A.  Uli Marini, right.
20    Q.  That was during the time that Mr.
21 Marini was plant manager?
22    A.  That's correct.
23    Q.  Was that during Inland's years?
24    A.  That's right.
25    Q.  Did you have any reason to believe
00527
1 either Mr. Bruzgis or Mr. Partington was
2 anything other than honest and hard working
3 employees at the company?
4    A.  I would say that's correct.
5    Q.  Do you have any personal knowledge of
6 either Mr. Bruzgis or Mr. Partington ever
7 being disciplined or reprimanded for anything
8 related to their work at the facility?
9    A.  I can't recall.
10    Q.  But in any event, they didn't report
11 to you.  Is that correct?
12    A.  I don't remember any time period that
13 they did.  At one time they were, each of them
14 were shop stewards at one time in the union,
15 and they might have had some major
16 disagreements with management at times, but

MKSK-FED-0000003529

ALCD-PUBCOM_0003471

17    that's all I could say.
18    Q.  As part of their general duties as a
19    union steward?
20    A.  I would say that's right.
21    Q.  That's kind of the nature of the job,
22    is it?
23    A.  Right.
24    Q.  Okay.  Do you recollect how material
25    was removed from tanks at the facility, at the
00528
1    Newark facility?
2    A.  If it was in tanks, products would be
3    pumped into tank trucks or railroad cars and
4    shipped out in large quantities usually.
5    Q.  Okay.
6    A.  On occasion it would be -- it would
7    fill 55-gallon drums and ship them out in
8    55-gallon drums.
9    Q.  The pumping the products to railroad
10   cars or tank trucks or into 55-gallon drums,
11   those three methods, were those methods
12   applicable during the years of Kolker, Vulcan
13   and Inland?
14   A.  I think so.  Yes.
15   Q.  The pump that was used to pump
16   products out of the tank, was the pump within
17   the containment area around the tanks?
18   A.  Generally I don't think -- in most
19   cases -- in the earlier days there were no
20   containment areas at all.  And...
21   Q.  Well, when you say in the early days,
22   can you give me a time frame?
23   A.  Under -- I'd say under the Kolkers.
24   Q.  And the Kolker years were early '50s
25   to approximately 1961?
00529
1    A.  That's correct.
2    Q.  Do you know when the containment areas
3    were installed at the site?
4    A.  They were very gradually installed, I
5    believe.  I couldn't say exactly when.  Then I
6    got to go back a little bit.  There were
7    containment areas, some containment areas
8    under the Kolker days.  I'm wrong about that.
9    We had a Tank Farm One and a Tank Farm
10   Number Two at the time, I believe, and it did
11   have at least brick or cinder block walls
12   around them.  How -- whether ther were
13   impervious or not, I don't know.
14   Q.  Okay.  With the -- during the Kolker
15   years, were there just the two tank farms,
16   Tank Farm One and Tank Farm Two?
17   A.  I think that's correct.
18   Q.  Okay.  They had a containment -- a

MKSK-FED-0000003530

ALCD-PUBCOM_0003472

19 containment area with cinder block walls
20 around --
21     A. Cinder block or brick walls, I
22 couldn't say for sure. They could have been
23 cement blocks, also. I don't remember what
24 they were.
25     Q. What about the flooring, the bottom of
00530
1 the containment area, was that concrete or
2 cement?
3     A. It would have been concrete, it was --
4 because the tanks were heavy. It was built on
5 piles and poured concrete on top of that.
6     Q. Were there, these two tank farms that
7 we're talking about, Tank Farm One and Tank
8 Farm Two in the Kolker years, were there
9 drains in the floor of the containment area,
10 do you know?
11     A. I don't know of any drains.
12     Q. Okay.
13     A. I don't believe so.
14     Q. Were the containment areas around Tank
15 Farm One and Tank Farm Two, in the Kolker
16 years, the purpose of the containment areas
17 was to contain any spills or leaks that might
18 occur out of the tanks. Is that correct?
19     A. I think so.
20     Q. Do you recall if you had any role in
21 installing those containment areas?
22     A. Oh, no, I did not.
23     Q. And can you refresh my recollection,
24 when did you first arrive at the Newark
25 facility?
00531
1     A. In 1952. November of 1952.
2     Q. So those containment areas were
3 already at the Newark facility around Tank
4 Farm One and Two when you arrived in November
5 '52?
6     A. I don't believe there were any tanks
7 there at the time.
8     Q. There were no tanks in 1952?
9     A. That's correct.
10     Q. When you arrived?
11     A. If I remember correctly there were no
12 tanks, and whether the -- and I -- I don't
13 remember about the tank farm walls either at
14 the time.
15     Q. But at some point -- at some point in
16 time during Kolker's operations they built
17 Tank Farms One and Two with containment areas
18 around them?
19     A. That's correct.
20     Q. During -- during Vulcan's years at the

file:///qnapnas/Concordance/Concordance/Cases/03_Mckesson/09_NewarkLand/TRANSCRIPTS/Gillum...

MKSK-FED-0000003531

ALCD-PUBCOM_0003473

21 Newark facility were additional tanks added at
22 the site?
23   A. Yes.
24   Q. All right. When I say tanks, I'm
25 including tank farms.
00532
1   A. Yes. I think so.
2   Q. Were the -- do you recall, did those
3 tanks and tank farms have containment areas
4 around them?
5   A. I believe most of them did.
6   Q. Of a similar construction, concrete or
7 cement floor with cinder block or cement block
8 walls?
9   A. Or brick. Some were brick. I'm sure
10 I remember some brick walls.
11   Q. Some brick walls, okay. And again
12 the same purpose around the Vulcan tanks, the
13 tank farms that were added with the
14 containment areas, the purpose being to
15 contain any spills or leaks from the tanks
16 within. Correct?
17   A. I believe so.
18   Q. Do you have any specific recollection
19 of any tanks at the Newark facility that did
20 not have containment area around them?
21   A. Yes.
22   Q. And what tank would that be?
23   A. There were numerous tanks, and I
24 can't -- I do remember some. I believe it was
25 what -- they called it, Tank Farm Number Five
00533
1 and it was an area along a fence next to the
2 3M property, Minnesota Mining and
3 Manufacturing property, I believe that tank
4 farm had no walls around it. And in the
5 methylene chloride production area, we had
6 several tanks that we called run-down tanks.
7 The product from distillation was run into
8 them from the distillation towers, fill those
9 tanks during production, and when the tanks
10 were full and approved by the laboratory, they
11 might -- they were pumped out into the tanks
12 inside the tank farm.
13   Q. And the first tanks that you were
14 talking about were Tank Farm Five?
15   A. Yes.
16   Q. You said they were in an area along
17 the fence?
18   A. Yes.
19   Q. And you said that they had no -- they
20 had walls?
21   A. That's correct.
22   Q. Did -- was Tank Farm Number Five,

MKSK-FED-0000003532

ALCD-PUBCOM_0003474

23  though, on a concrete pad?
24      A.  Yes, it was.
25      Q.  So it had a concrete flooring but it
00534
1  didn't have the walls at the side?
2      A.  I'm almost positive there was no wall
3  around it, yeah.
4      Q.  Okay.  Do you recall seeing any leaks
5  or spills of any material or product directly
6  onto the ground in Tank Farm Number Five?
7      A.  No, I can't recall.
8      Q.  And the same question with respect to
9  the run-down tanks?
10     A.  Yes.
11     Q.  You do recall seeing product directly
12  on the ground, spill or leaked directly on the
13  ground in the run-down tank area, or no?
14     A.  There would -- I can recall on at
15  least one occasion that the tanks had
16  overflowed.
17     Q.  Okay. Why don't you tell me about what
18  you can recall about this one occasion?
19     A.  I don't remember anymore than a tank
20  running over in that area, and when it was
21  found running over, it was shut down, and the
22  product was stopped going into it, and some of
23  it was pumped out to another location.  But I
24  don't remember anymore details.
25     Q.  Was it, do you know if it was shut
00535
1  down immediately after it was found to be
2  overflowing?
3      A.  That's correct.
4      Q.  And do you have any idea how long it
5  had been overflowing before it was stopped?
6      A.  No.  I don't know.
7      Q.  Any idea how much product was
8  released?
9      A.  No.  I don't know.
10     Q.  Do you recall, did you see -- did the
11  overflow make direct contact with the ground
12  or did it hit cement underneath the tanks?
13     A.  I think it hit cement first and then
14  on the ground.  I don't recall exactly.
15     Q.  So you don't recall exactly whether or
16  not product, after it hit the cement
17  overflowed to the direct ground, the direct
18  soil?
19     A.  I don't know.  It probably -- it most
20  likely did, but I can't recall the details.
21     Q.  So, as you sit here today, you don't
22  have a specific recollection of seeing
23  material hit the soil in that tank area for
24  that overflow incident?

MKSK-FED-0000003533

ALCD-PUBCOM_0003475

25    A.  No.  I don't know the details.
00536
1    Q.  Okay.  Going back, I'd started the
2    line of questioning asking you about your
3    testimony that product got to the tanks at the
4    Newark facility by being pumped from railroad
5    trucks -- railroad cars --
6    A.  Uh-huh.
7    Q.  -- tank trucks or 55-gallon drums?
8    A.  We're talking about products leaving
9    the company?
10    Q.  Is that -- was that a correct
11    statement for product coming into the facility
12    or leaving the facility?
13    A.  It was for leaving.
14    Q.  Okay.  And what -- what I was asking
15    is with respect to those three methods of
16    product leaving, was the pump and the pumping
17    process conducted within containment areas
18    near the tanks?
19    A.  I'd say generally, yes, although more
20    likely -- under the Kolker years it probably
21    was less likely.
22    Q.  And why would it be less likely during
23    the Kolker years?
24    A.  'Cuz some products were filled into
25    drums directly out of what we call run-down
00537
1    tanks which had no walls around them.
2    Q.  Do you have any specific recollection
3    of seeing material ever spill or leak and make
4    direct contact with the soil --
5    A.  No, I can't recall, no.
6    Q.  -- when pumped from the run-down tanks
7    to the drums?
8    A.  No.  I can't recall.
9    Q.  And how about when material or product
10    were put into the tanks, was it the same three
11    methods of arrival; the railroad car, the tank
12    truck and drums?
13    A.  I would say the trucks or railroad
14    cars but generally speaking, I don't think we
15    purchased any products in drums or if we did
16    it was very little.
17    Q.  Is that the same with respect to the
18    Kolker, Vulcan and Inland?
19    A.  I would say that's right.
20    Q.  Did it ever change over time?  Did any
21    one of those three entities use product in
22    55-gallon drums more often than in others?
23    A.  I would believe -- I think under the
24    Kolkers there were more drums being handled
25    than under Vulcan or Inland.
00538

MKSK-FED-0000003534

ALCD-PUBCOM_0003476

1   Q.  Okay.  And the pumping of the product
2  from the railroad cars and the tank trucks
3  into the tanks, would the same be true that
4  the pumping generally took place within the
5  containment areas around the tanks?
6   A.  Well, railroad cars were never --
7  there would never be a containment area around
8  the railroad cars, if it was pumped out of a
9  railroad cars.
10   Q.  Right.  Let me say then the hose
11  connection to the tank, where the hose from
12  the railroad car into the tank, that
13  connection is in a containment area, isn't it?
14   A.  It would not be in a containment area.
15  I can't recall it being in a containment area.
16   Q.  Okay.  Do you recall any spills or
17  leaks associated with pumping product from a
18  railroad car into a tank?
19   A.  I don't recall.
20   Q.  And what about same question with
21  respect to pumping product from tank trucks
22  into the larger storage tanks at the facility?
23  Do you have any specific recollection of any
24  spills or leaks of material in that manner?
25   A.  I don't recall.
00539
1   Q.  Do you recall if any of the piping at
2  the Newark facility was underground?
3   A.  I'm sure some was underground, yes.
4   Q.  Do you know what part of the piping
5  was underground at the Newark facility?
6   A.  Of course water lines were
7  underground.
8   Q.  The water lines?
9   A.  Okay.
10   Q.  Is that the sanitary -- sanitary
11  water lines?
12   A.  I think right now city water lines
13  underground, city water supply.  Fuel oil
14  lines were underground between the tank farm
15  and the boiler room.  It -- although part of
16  it, I think part of it was in, like, a covered
17  trench type of thing, but some of it might
18  have just been buried.  I'm not sure.
19   Q.  Do you recall anyone at Kolker, Vulcan
20  or Inland performing any maintenance related
21  to the underground piping?
22   A.  I can't remember specifically, but if
23  it had to be, if it was -- it very, most
24  likely was done but I don't remember a
25  specific instance.
00540
1   Q.  No specific recollection?
2   A.  Oh, I do remember a repair of an

MKSK-FED-0000003535

ALCD-PUBCOM_0003477

3  underground water line and I think I mentioned
4  it in my last deposition.
5     Q. That would be a repair of the city
6  water line?
7     A. That's correct.
8     Q. Do you remember what time period was
9  that? Was that Kolker or Vulcan or do you
10 recall?
11    A. It was in the Vulcan days, I'd say,
12 late '60s, early '70s.
13    Q. Is that something the maintenance
14 department would be in charge of?
15    A. Yes.
16    Q. During your last several sessions of
17 your deposition --
18    A. Uh-huh.
19    Q. -- there was -- there were repeated
20 questions about during various time frames who
21 did you report to.
22    A. Yes.
23    Q. And there was one gentleman whose name
24 you did not recall. You just remembered he
25 was from Hungary?
00541
1     A. Right.
2     Q. Did you ever happen to recall his
3  name?
4     A. I did and now I forgot it again. Let
5  me think about it. I can't think of his name
6  right now again. I've forgotten his name.
7     Q. Okay. If it comes to you later on,
8  let me know.
9     A. Okay.
10    Q. Okay. And I forgot to ask you when we
11 began questioning this morning, have you had
12 an opportunity to speak with your counsel from
13 the last time your deposition concluded in
14 April until today?
15    A. We had breakfast this morning. That's
16 about all.
17    Q. So you had a meeting this morning?
18    A. Short meeting. Right.
19    Q. How long approximately did you meet
20 with Ms. Ryniec?
21    A. I think 30 minutes at most, maybe
22 less.
23    Q. And was that in preparation for the
24 continuation of your deposition today?
25    A. Yes.
00542
1     Q. And did you review any documents in
2  preparation for -- in preparation for your
3  continuation depo?
4     A. No.

MKSK-FED-0000003536

ALCD-PUBCOM_0003478

5    Q. But you have brought with you a copy
6 of the transcript --
7    A. That's correct.
8    Q. -- from day one and day two of your
9 deposition?
10    A. Right, uh-huh.
11    Q. Did you review those in preparation
12 for your deposition today?
13    A. No.
14    Q. Have you reviewed them at all yet?
15    A. I've just looked up a few names, about
16 all I did.
17    Q. Did it refresh your recollection about
18 any names of any people?
19    A. Oh, no. I was just checking to see
20 the names of the people that were interviewing
21 me the last time.
22    Q. Oh, the counsel present. Okay.
23 During the prior sessions of your deposition
24 you talked a little bit about sometimes VIPs
25 during the '60s would visit the site --
00543
1    A. Yes.
2    Q. -- during the Vulcan years and some
3 site clean-up would be done when VIPs were
4 known to be coming to visit?
5    A. That's right.
6    Q. Do you know how often VIPs from Vulcan
7 would come to visit the site?
8    A. I have no idea.
9    Q. Was it a regular thing?
10    A. But at least once a year, possibly
11 more often.
12    Q. Do you know what they were looking for
13 when they came to visit?
14       MS. RYNIEC: Objection calls for
15    speculation.
16    A. No.
17    Q. Do you know how often they would visit
18 during the '70s? Was it about the same time
19 period, what, about once a year or so?
20    A. Yes. Although on occasion we would
21 have visitors every month.
22    Q. Do you know why sometimes there would
23 be occasions when there would be visitors once
24 a month versus once a year?
25    A. I can't recall.
00544
1    Q. The VIP visiting either once a month
2 or once a year, did that continue with respect
3 to Inland's ownership of the facility? Did
4 Inland VIPs come occasionally and visit the
5 site?
6    A. Yes.

MKSK-FED-0000003537

ALCD-PUBCOM_0003479

7    Q. Was it with about the same frequency
8 or a different frequency?
9    A. I couldn't tell you. I'm not sure.
10 If I was to guess, I would say the same but I
11 don't know.
12    Q. I believe you had testified about
13 concrete pads that had -- that were
14 occasionally or when necessary were hosed
15 down. Do you remember that testimony?
16    A. Yes.
17    Q. Would the wash-down water go into the
18 sewer lines and then out to the bay?
19    A. I think so. It depends upon where --
20 what area it was. But, in most cases, it
21 would go out to the bay.
22    Q. At other times if it didn't go into
23 the sewer into the bay, where else would it
24 go. Do you know?
25    A. It would be washed on the ground, if
00545
1 it didn't have -- there'd be no other place
2 for it to go, either on the ground or out to
3 the bay.
4    Q. Okay. Do you personally recall seeing
5 concrete pads or any equipment washed out with
6 the wash water just rinsing off onto the --
7 onto the soil?
8    A. I can't recall specifically.
9    Q. Okay. But do you recall that it would
10 have happened? That it would have occurred as
11 a regular course of washing down the equipment
12 or the concrete pads?
13    A. It might have. I would think -- it
14 might have, but I'm not sure.
15    Q. Okay. If it had occurred, is it --
16 would it have occurred during a particular
17 time period versus another? In other words,
18 did it happen in Kolker, Vulcan and Inland
19 years?
20    A. I think so.
21    Q. You had said that you generated
22 reports to Mr. Marini and Mr. Grish. Do you
23 recall that testimony?
24    A. I don't recall the testimony, but I
25 think that's correct.
00546
1    Q. Okay. Do you recall if you prepared
2 written reports for Mr. Marini and Mr. Grish?
3    A. Yes, I did.
4    Q. What was the nature of those reports,
5 if you can recall?
6    A. I don't know. I'd write a report to
7 -- usually a monthly report to show that I was
8 doing something during the course of the

MKSK-FED-0000003538

ALCD-PUBCOM_0003480

9   month.
10      Q.  So basically would a monthly report be
11  a basic summary of your activities at the
12  site --
13      A.  That's correct.
14      Q.  -- throughout the month?
15      A.  Uh-huh.
16      Q.  Would you note any special occurrences
17  or any accidents or any problems, any
18  exceptions to daily activity in monthly
19  reports?
20      A.  I'd put everything in there that I
21  could think of that I was involved with
22  usually, I would think.
23      Q.  Were those monthly reports prepared
24  and given to both Mr. Marini and Mr. Grish?
25      A.  I don't remember.
00547
1       Q.  Did Mr. Grish work out of the
2   headquarters office in Ft. Wayne?
3       A.  I think that's correct.
4       Q.  He was an Inland man, wasn't he?
5       A.  Yes.
6       Q.  So was Mr. Marini, he was a plant
7   manager during Inland days?
8       A.  Yes, Mr. Marini was with Vulcan and
9   then he was at Inland, I believe, he was moved
10  up to plant manager.
11      Q.  When Vulcan took over the Newark site,
12  did it keep the Kolker employees on?
13      A.  Yes.
14      Q.  And what about when Inland took over
15  Vulcan, did Inland keep the Vulcan employees
16  on?
17      A.  Yes.  Although they -- they might have
18  let some people go in both cases.
19      Q.  But as a general rule they kept the
20  same --
21      A.  Correct.
22      Q.  -- generally the same work force?
23      A.  Right.
24      Q.  With respect to your leaving Inland in
25  early 1977, why did you leave Inland's employ?
00548
1       A.  I felt that the company was going
2   downhill and weren't -- there was no real
3   future there.
4       Q.  Was it your sense that the opinion
5   that you just stated was -- was it generally
6   held opinion of other employees at the Newark
7   site?
8       A.  I don't know what they thought.  If I
9   did, then I don't recall what they thought
10  now.

ALCD-PUBCOM_0003481

11    Q.  Okay.  And so you moved onto Troy
12  Chemical.  Is that correct?
13    A.  Yes.
14    Q.  Okay.  And then you at some point left
15  Troy Chemical to work for Nestle?
16    A.  That's correct.
17    Q.  Do you recall why you left Troy
18  Chemical?
19    A.  I was discharged.
20    Q.  And why were you discharged?
21    A.  I don't remember exactly.  We didn't
22  see eye to eye, the top management and myself,
23  I would say.
24    Q.  Was there anything about the way they
25  operated or did business that you disagreed
00549
 1  with?
 2    A.  Well, yes.  But I don't remember the
 3  exact details.
 4    Q.  Then you went to Nestle and you were
 5  there for a while and then moved onto Arabian
 6  American Oil Company.  Is that correct?
 7    A.  That's right.
 8    Q.  And I'll ask you the same question
 9  with respect to Nestle when you left there,
10  why did you -- why did you switch from Nestle
11  to Arabian American Oil?
12    A.  More money.
13    Q.  Then from Arabian American you moved
14  on to the City of --
15    A.  Vineland.
16    Q.  Vineland, that the way you
17  pronounce --
18    A.  Yes. Uh-huh.
19    Q.  Thanks. And what was the reason for
20  that switch, if you can recall?
21    A.  Well, Nestle, I mean -- excuse me,
22  Arabian American Oil Company is -- had been
23  owned by the Arabia -- American Oil Companies,
24  it was taken over by the Arabian government,
25  it -- and it was their intention to get rid of
00550
 1  Americans and replace them with Arabs, and I
 2  was let go.
 3    Q.  Okay.  And from the City of Vineland
 4  you moved on to Ingersohl-Dresser.  Is that
 5  right?
 6    A.  That's correct.
 7    Q.  Okay.  What was the nature of that
 8  move?
 9    A.  From Vineland to Ingersohl-Dresser?
10    Q.  Uh-huh.
11    A.  Disagreement with people in politics
12  in Vineland.  It was working for the city.

MKSK-FED-0000003540

ALCD-PUBCOM_0003482

13    Q.  Did you disagree with some of the city
14  politics that were involved?
15    A.  Well, we had a lot of
16  misunderstandings, I guess.
17    Q.  And then from Ingersohl-Dresser, you
18  moved on to Rhone --
19    A.  Rhone-Polunc, R-h-o-n-e, P-o-l-u-n-c.
20    Q.  And are you still --
21    A.  I'm still there but they are changing
22  the name to Rhodia, R-h-o-d-i-a.  Rhodia is
23  their chemical division and their spinning it
24  off.  Rhone-Polunc is just going to be a drug
25  company and Rhodia will be a chemical company.
00551
 1    Q.  So you're working for the chemical
 2  side?
 3    A.  That's correct.
 4    Q.  And the reason for your move from
 5  Ingersohl-Dresser to Rhone-Polunc --
 6    A.  The plant was closed.
 7    Q.  Let me ask you with respect to your
 8  discharge from Troy Chemical, did any of the
 9  disagreements with top management have
10  anything to do with the handling or use of
11  chemicals or solvents during their operations?
12    A.  I'm not sure specifically.  I know
13  that we had -- we were not handling chemicals
14  in a very good manner.
15    Q.  At Troy?
16    A.  At Troy, right.  There are a lot of
17  mercury compounds and it was being handled
18  pretty sloppily, people were breathing mercury
19  dust -- mercury oxide dust quite often.  It
20  was not a good place to work health-wise.
21    Q.  And the improper, what you saw as the
22  improper handling of those chemicals?
23    A.  That's correct.
24    Q.  You saw that as a safety issue?
25    A.  Yes.
00552
 1    Q.  And that was one of the reasons --
 2    A.  Well, I was discharged and I can't
 3  remember --  I wasn't very happy there.
 4    Q.  Did you make it --
 5    A.  I think it was wearing between all of
 6  us.
 7    Q.  Do you recall if you mentioned
 8  something to top management at Troy about what
 9  you thought was not good handling?
10    A.  I don't remember.  I don't recall.
11    Q.  Okay.  Do you recall if you took issue
12  or had concerns related to the environment and
13  contamination at Troy Chemical?
14    A.  I know that the state was looking at

MKSK-FED-0000003541

ALCD-PUBCOM_0003483

15  their environmental problems and they did have
16  quite a few.
17      Q.  You --
18      A.  As well as the federal government OSHA
19  was involved also.
20      Q.  Okay.
21      A.  They were both coming down pretty hard
22  on Troy at the time.
23      Q.  Did you observe what you saw to be
24  environmental problems at the Troy Chemical
25  site?
00553
1      A.  Yes, but I don't remember any
2  specifics right now.
3      Q.  And what about with respect to your
4  leaving the City of Vineland and the
5  disagreements with the politics side of
6  anything?
7      A.  Yeah.
8      Q.  Did those disagreement relating to
9  politics and your leaving have anything to do
10  with environmental concerns?
11      A.  Well, there were environmental
12  concerns, and it had to do with what we call
13  PCBs, poly --
14      Q.  Chlorinated bi --
15      A.  Right, and inspections of transformers
16  that contained them.
17      Q.  What were the problems with respect to
18  the PCB transformers?
19      A.  Well, there were no problems really,
20  other than the inspections were not, some of
21  the inspections were not done that the federal
22  government required.
23      Q.  Okay.  Were you -- was part of your
24  job for the City of Vineland to be conducting
25  those inspections of transformers?
00554
1      A.  Yes.
2      Q.  Okay.  What was your title with the
3  city?
4      A.  I was, when I left I was the
5  Superintendent of Electric Generation.
6      Q.  Do you know why those inspections
7  weren't getting done?
8      A.  Well, they were getting done while I
9  was there, but prior to me being there they
10  weren't done.
11      Q.  And did you let somebody at the city
12  know about that?
13      A.  No.  I was told that -- by my boss, I
14  needed inspections for back history.  Go get
15  them for me.  Find them.  And if they are not
16  there, I want them there.  Get them for me.

MKSK-FED-0000003542

ALCD-PUBCOM_0003484

17    Q. Was he asking you to predate them?
18    A. Right.
19    Q. Did that -- did that lead to your
20 deciding to leave the employment with the City
21 of Vineland?
22    A. Yes.
23    Q. Got it. Don't blame you. Your
24 current employment with Rhone, soon to be
25 Rhodia, is that full-time?
00555
1    A. Yes.
2    Q. And, I'm sorry if this was asked
3 before, I've just forgotten. What is your
4 title now with Rhone?
5    A. I'm simply an engineer, stationary
6 engineer.
7    Q. Going back to the -- your observations
8 at the Newark site, did you ever see any of
9 the tanks at Newark rinsed out?
10    A. I'm sure they were. I don't remember
11 specifics.
12    Q. You don't have any specific
13 recollection?
14    A. Oh, yeah. I remember some that were
15 cleaned out.
16    Q. And why would they be cleaned out?
17    A. Different materials were going to be
18 used in them than previous materials.
19    Q. Okay. Do you recall generally what
20 time frame you recall seeing the tanks cleaned
21 out was, that during everybody's tenure?
22    A. I can recall under Vulcan and possibly
23 Inland.
24    Q. And would the tanks be cleaned out
25 with water and a particular cleansing product
00556
1 or how would that work?
2    A. I think usually they would start out
3 steaming the tanks and depending upon what the
4 material was in them, on occasion they would
5 bring in a contractor to -- with a vacuum
6 truck to suck up the liquids.
7    Q. Okay. And when the tanks were steamed
8 out, where did the wash-out water go, do you
9 know?
10    A. It would be collected in the bottom
11 and be sucked out with a vacuum truck.
12    Q. Okay. And where would -- where would
13 the wash water that ends up in the vacuum
14 truck go?
15    A. I don't know, it would be disposed of
16 by the hauler, by the people that owned the
17 truck. Inland and Vulcan or Kolker, none of
18 them owned a vacuum truck.

MKSK-FED-0000003543

ALCD-PUBCOM_0003485

19    Q.  Okay.  The cleaning out of the tanks,
20  do you know was that always done by an outside
21  contractor?
22    A.  No.  It would be done in-house and, at
23  least the start of it and possibly finished up
24  by the outside contractor, at least the
25  disposal was handled by an outside contractor.
00557
1    Q.  The wash-out water and whatever was
2  cleaned out of the tank?
3    A.  Right.  Uh-huh.
4    Q.  Do you know if the wash out water was
5  rinsed out of the tanks when they were
6  cleaned?  Do you know if that water ever made
7  its way to the sewer or out to the Newark Bay?
8    A.  If it did, it would have been an
9  accidental, it wouldn't have been on purpose.
10  I don't think.
11    Q.  So that wasn't part of the procedure
12  to --
13    A.  In the Kolker days it was.
14    Q.  Okay.  Do you have any specific
15  recollection of seeing tanks being washed out
16  or the wash-out water going to the sewer?
17    A.  I don't remember specific instances
18  right now, no.
19    Q.  Did you ever see or hear about
20  chemicals or product being dumped on the bare
21  ground?
22    A.  I'm -- I'm not sure.  Could you be
23  more specific?  Products being dumped on the
24  bare ground?
25    Q.  In other words, do you ever recall
00558
1  seeing anybody take drums, 55-gallon drums?
2    A.  Yeah.
3    Q.  And dump them onto the bare soil?
4    A.  No, I --
5    Q.  Regardless of what was inside of them?
6    A.  No.  I don't think so.
7    Q.  Do you -- the same question with
8  respect to any chemical, whether it was waste
9  product or new product, ever being poured?
10    A.  I don't -- I can recall some solid
11  waste temporarily being stored on the ground
12  and later on being hauled away.
13    Q.  Okay.
14    A.  But, specifically, just throwing it
15  away on the ground, I can't recall right now.
16    Q.  And when you say solid waste, what do
17  you mean by solid waste?
18    A.  These would be solids from a
19  distillation operation that residues from a
20  distillation operation that would be a liquid

MKSK-FED-0000003544

ALCD-PUBCOM_0003486

21  when it was hot, when it cooled off it would
22  be a solid, being dropped into pans and then
23  broken up, the solids broken up and placed on
24  the ground until it could be taken away.
25    Q. Solid without a container around it,
00559
1  just a chunk of something or in the pan?
2    A. I think they were chunks and there
3  would not be a container around it, I don't
4  think to my recollection.
5    Q. Do you have a specific recollection
6  as you sit here today of seeing chunks of
7  distillate on the ground?
8    A. No. I don't remember. That wouldn't
9  be, when you say distillate, distillate would
10  be -- would have been liquid --
11    Q. I'm talking about the solid?
12    A. -- the solid would have been the
13  residues more or less.
14    Q. Same response you don't recall
15  seeing --
16    A. I don't remember. No.
17    Q. Then is it true you wouldn't know how
18  long that solid waste would be on the ground
19  before it would be hauled away?
20    A. No. I don't recall.
21    Q. Then would the same be true you
22  wouldn't know what time period that would have
23  occurred in, '60s or '70s?
24    A. Oh, if that happened it would have
25  been in the Kolker years.
00560
1    Q. The tanks at the Newark facility --
2    A. Yes.
3    Q. -- on top, are they opened or closed
4  on top?
5    A. Oh, they are -- the only -- we did
6  have some tanks that were open on the top, and
7  these were brine -- the storage tanks, brine
8  saturators. In other words, sodium chloride,
9  salt. Those are the only tanks I can think of
10  that were open on the top. All the others
11  were closed to my knowledge. My recollection.
12    Q. Do you ever recall seeing any of the
13  brine tanks overflow?
14    A. No. I don't recall.
15    Q. Do you ever recall hearing about it?
16    A. No, I don't recall.
17    Q. In looking at the site maps, in prior
18  testimony --
19    A. Yes.
20    Q. -- on one of the maps, there was a
21  reference to a company or an entity by the
22  name of Vulcan Metallics?

MKSK-FED-0000003545

ALCD-PUBCOM_0003487

23    A. Yes.
24    Q. And I think in your prior testimony
25 you had said that Vulcan Materials Company and
00561
1 Vulcan Metallics were two different companies
2 or can you explain the relationship between
3 the two of them for me?
4    A. Okay. Vulcan Materials is the -- is
5 the main company, let's say. The chemicals
6 division, I worked for the chemicals division,
7 and metallics was the metallics division, a
8 separate division, but the chemicals and
9 metallics were two different companies but all
10 came under the corporate name of Vulcan
11 Materials.
12    Q. Were operations conducted at Vulcan
13 Metallics during the same time period that
14 Vulcan Materials operated the Newark site?
15    A. Yes.
16    Q. Do you recall the names of any Vulcan
17 employees that worked at the Vulcan Metallics
18 Division?
19    A. No.
20    Q. Do you know the names of any of the
21 solvents or chemicals that were used during
22 the operations at Vulcan Metallics?
23    A. I think they used caustic soda that we
24 supplied to them but I'm not -- I can't be
25 absolutely sure.
00562
1    Q. Who would know more about the nature
2 of operations and the employees at the Vulcan
3 Metallics part of the facility?
4    A. I don't know. I worked for one person
5 named Walter Bradbury, who did transfer to
6 that division later on, but not at that site.
7 He worked in the Pittsburgh area for Vulcan
8 Metallics.
9    Q. Do you know when Inland bought the
10 Newark facility, did that include Vulcan
11 Metallics?
12    A. I don't think so. But I'm not -- I
13 don't remember the specifics.
14    Could we take a break?
15    Q. Oh, absolutely.
16    VIDEOGRAPHER: We'll go off the record
17    at 9:52.
18    (Brief recess.)
19    VIDEOGRAPHER: We are back on the
20    record at 10:02.
21    Q. Okay, Mr. Gilliam, just a few more
22 questions.
23    A. Okay.
24    Q. When there were equipment failures at

MKSK-FED-0000003546

ALCD-PUBCOM_0003488

25  the facility during the Kolker years, who made
00563
1  the repairs?
2      A.  Usually the maintenance crew.
3      Q.  And how about with respect to the
4  Vulcan years?
5      A.  I would say almost all the time we had
6  our own maintenance crew that made repairs
7  unless it was something special that failed,
8  like such as a -- you might have the
9  manufacturer of the equipment come in to make
10  repairs, but that would be unusual I would
11  say.
12      Q.  So as a general rule, repairs were
13  made by the maintenance crew?
14      A.  That's correct.
15      Q.  During the Vulcan and Inland years as
16  well?
17      A.  I think that's right.
18      Q.  During your testimony back in April
19  you referred to something called a pilot
20  plant?
21      A.  Yes.
22      Q.  What is a pilot plant?
23      A.  A pilot plant is a plant, we would
24  make products in experimental stage.  The --
25  in between making them in the laboratory with
00564
1  small quantities like a liter or less, it
2  would be in the lab.  In a pilot plant it
3  might be 20 to 50-gallon size and we'd just be
4  following up what was done in the lab and
5  seeing how it worked in larger quantities
6  prior to going into the plant.
7      Q.  And this was for -- the end goal is
8  manufacturing these chemicals on a larger
9  basis out in the plant?
10      A.  Yeah.  The pilot plant, right, would
11  be intermediate size prior to going out into
12  larger quantities in the plant.  Yes.
13      Q.  And this pilot plant, did that exist
14  at the Newark facility during the Vulcan
15  years?
16      A.  I don't recall but it must have.  I do
17  remember a pilot plant burning down under the
18  Kolker years, and I don't know whether we ever
19  had one -- I don't think we did have one at
20  the Newark facility under Vulcan.  They had a
21  pilot plant in Wichita, Kansas.
22      Q.  Okay.  So you think there was a pilot
23  plant during the Kolker years that burned down
24  and then it was just not replaced?
25      A.  I think that's correct.
00565

MKSK-FED-0000003547

ALCD-PUBCOM_0003489

1    Q.  Do you know if any chemicals were
2  released to the soil or the ground water as a
3  result of the fire during the Kolker years at
4  the pilot plant?
5    A.  Well, anything that was there did go
6  into -- the fire was put out by the Newark
7  Fire Department, there was no containment.
8    Q.  Did the fire department use water to
9  put out the fire?
10    A.  Yes, they did.
11    Q.  And did they just spray the entire
12  building with water?
13    A.  I think that's correct.
14    Q.  Did the wash water from extinguishing
15  the fire soak through to the ground around the
16  plant?
17    A.  I think it did.  I would think so.
18    Q.  Do you recall physically seeing that
19  yourself?
20    A.  No.  We were spending more time
21  looking at the fire, making sure -- not
22  knowing -- not paying any attention where the
23  water went.
24    Q.  Okay.  Was anyone injured in that
25  fire, do you know?
00566
1    A.  I don't think so.
2    Q.  Do you know how long the fire burned?
3    A.  Two or three hours.
4    Q.  Do you have any idea precisely what
5  chemicals were stored in that building at the
6  time of the fire?
7    A.  I think there was sodium and a
8  material called Solv-Esso, it was a product of
9  the Esso Company or Standard Oil of New Jersey
10  which is now Exxon, and a material called
11  methyl isobutyl carbonyl.  And that's all I
12  can recall.
13    Q.  Okay.  Did the fire department scrape
14  away building or any debris that was left once
15  the fire was extinguished?
16    A.  I don't think they did.  They came to
17  put -- they put the fire out and they broke
18  up, used their tools to break up embers, I
19  believe, to make sure the fire was out, but I
20  don't think that they -- they didn't remove
21  anything from the --
22    Q.  Did Kolker employees clean up the
23  burned area once the fire was extinguished?
24    A.  I think so, but I don't remember.  I
25  don't remember how it was cleaned up.
00567
1    Q.  But you recall it was cleaned up?
2    A.  Yes.  It was cleaned up but I don't

MKSK-FED-0000003548

ALCD-PUBCOM_0003490

3   remember how.
4       Q.  Do you have an understanding that the
5   soil at the Newark facility is contaminated,
6   polluted?
7       A.  I've heard that but...
8       Q.  Does it surprise you?
9       A.  I wouldn't think -- I guess not.  I
10  don't think so, no.
11      Q.  What do you think caused, based on
12  your experience at the site, what do you think
13  caused the soil to be contaminated at the
14  Newark site?
15      A.  I don't know.  I believe it was
16  contaminated when we first came there.  I
17  don't know.  It might have been because there
18  was a lead refinery there prior to us being
19  there.
20      Q.  Prior to Kolker getting there?
21      A.  Right.
22      Q.  Do you know if anybody, tenants the
23  prior to Kolker used chemicals or solvents?
24      A.  I don't know what they did, no.
25      Q.  And same questions with respect to the
00568
1   ground water.  Have you heard or do you now
2   have an understanding that ground water at the
3   Newark site is contaminated?
4       A.  I don't know.
5       Q.  If I propose to you that ground water
6   at the Newark site is contaminated, do you
7   know how it would have became contaminated
8   based on your experience at the site?
9       A.  The only thing I could tell you, only
10  thing I could tell you is they put a lot of
11  fill in there from a -- and it was, it was
12  filled with the residue from a chrome oar.
13  From -- I don't know where we  -- Lee Kolker,
14  bought this fill, got it very cheaply, and it
15  came from a chromium manufacturer where it
16  was removing chromium from gravel and there
17  was chrome still in the fill that he got.
18  That's all I can say.
19      Q.  Do you know when Kolker put in that
20  fill?
21      A.  Oh, that was in the early '50s.
22      Q.  Were you there at the site?
23      A.  Yes.
24      Q.  Did you know what the, at the time
25  that the fill had the chromium in it still?
00569
1       A.  Well, it changed color when it -- it
2   would be one color when it was wet and a
3   different color when it was dry.
4       Q.  And you knew that to be based on

MKSK-FED-0000003549

ALCD-PUBCOM_0003491

5 chromium content that was -- that was in the
6 fill?
7    A. Well, I didn't know it, but I think
8 Kolker just happened to mention -- would
9 mention that.
10    Q. Mr. Kolker knew it?
11    A. I think so, yeah.
12    Q. Is that probably why he got it cheap?
13       MS. RYNIEC:  Objection calls for
14    speculation.
15    A. I don't know.
16    Q. Okay.  Mr. Gilliam, that's all the
17 questions I have for you.  I'm going to pass
18 the questioning over to one of co-counsel
19 here.
20 EXAMINATION BY MS. SOURIAL:
21    Q. Good morning, Mr. Gilliam.  Again, I'm
22 Heather Sourial and we represent Continental
23 Insurance Company, Continental Casualty
24 Company and Hartford Insurance Company.
25    I just have a few questions for you.
00570
1 Earlier this morning you stated that when you
2 left Inland Chemical Company you believe that
3 the company was going downhill?
4    A. I'm sorry.  Can you speak a little
5 louder.
6    Q. Certainly.  This morning, I believe
7 you testified that when you left Inland
8 Chemical Company you stated that you believed
9 the company was going downhill?
10    A. Yes.
11    Q. And I was wondering what you meant
12 when you said you felt the company was going
13 downhill?
14    A. One thing -- the main thing that
15 bothered me was it was in the fall and -- of
16 the year and they weren't preparing for winter
17 because it was an outdoor plant that there
18 were so many things that would freeze up
19 during the winter and Len Grish said we
20 couldn't afford to spend the money to fix it,
21 to prepare for the winter weather.  And I said
22 something is wrong here.  If we can't spend
23 the money to fix it, to prepare for winter, I
24 didn't think I was going to stay there much
25 longer.
00571
1    Q. What things needed to be done to
2 prepare for winter?
3    A. Well, repairing of what we call steam
4 tracers and installation on pipes, steam
5 tracers are wrapped around pipes to keep them
6 warm and insulation covers the steam tracers

MKSK-FED-0000003550
ALCD-PUBCOM_0003492

7  and the pipes together.  At least that's what
8  I can remember specifically.
9      Q.  And what was your concern if they
10  didn't properly prepare for the winter?
11      A.  That everything would freeze up as
12  soon as the first cold weather hit us, which
13  has -- had happened earlier in other years
14  when we didn't prepare properly.  Every
15  winter, every fall we had to prepare for cold
16  weather or else it would hit us really bad
17  when cold weather did come.  Steam tracers
18  should -- I mean, they leak, they shut-down
19  and so on, if they're not fixed up in the
20  fall, the winter -- by wintertime everything
21  is frozen solid.
22      Q.  Would that also result in any bursting
23  of pipes?
24      A.  It could.
25      Q.  Had that ever happened in the past?
00572
1      A.  Oh, yeah.
2      Q.  Was there a release of any type of
3  chemical caused by any pipes that burst during
4  the winter?
5      A.  Well, I can't -- I don't recall
6  specifically.  Most of the time the pipes were
7  water lines and steam lines and condensate
8  lines, mostly water, but there are some
9  chemicals that -- but I don't recall which
10  ones they were that would freeze.
11      Q.  And when the company said that they
12  didn't have the money to put in the efforts to
13  prepare for winter, did that concern you about
14  their financial state?
15      A.  Yes, it did.
16      Q.  And what was -- if you could tell me
17  more specifically what was your concern about
18  their financial state?
19      A.  Well, if they can't pay for keeping
20  the place warm, I didn't think they could pay
21  our salaries either is what was my thoughts.
22      Q.  How was the production, chemical
23  production or maybe I'll just say how was
24  their operations at that time in terms of
25  profitability?
00573
1      A.  I have no idea.  At that time we were
2  recovering chemicals for other companies,
3  waste chemicals from some of the drug
4  companies and cleaning them up and sending
5  back some of their products to them.  But I
6  don't know the details of how much they made
7  or lost on the product.  I just don't know.
8      Q.  Had you seen any change in the volume

file:///qnapnas/Concordance/Concordance/Cases/03_Mckesson/09_NewarkLand/TRANSCRIPTS/Gillum...    MKSK-FED-0000003551

ALCD-PUBCOM_0003493

9   of materials that were being used at the site?
10     A. Volume?
11     Q. Yeah. I'm referring now to the period
12  of time, I guess it would be the end of 1976.
13     A. I don't recall. Might have been less
14  or more, but I don't know.
15     Q. At the time that you left the company,
16  was there any other indicators to you that
17  concerned you about the company?
18     A. Well, Mr. Marini had been let go in
19  late '76, and they brought in somebody else
20  who was not nearly as knowledgeable as Mr.
21  Marini to be the plant manager, and I just had
22  my doubts about the company.
23     Q. Who was the new plant manager?
24     A. I don't recall his name. Might have
25  been Brian, first name, but I just don't
00574
1   remember his last name right now.
2      Q. Did you have any concerns at that time
3   about their ability to comply with
4   environmental regulations?
5      A. I didn't -- I don't know. I wasn't
6   thinking about their compliance at the time.
7      Q. Was that plant -- new plant manager
8   Brian Dawson?
9      A. I think that's correct.
10     Q. And why did you feel that he was not
11  as capable as Mr. Marini?
12     A. I don't remember the details, but Mr.
13  Marini was a chemical engineer and I don't
14  think Mr. Dawson was.
15     Q. Just going back to your overall
16  impressions, each company; Kolker, Vulcan and
17  Inland --
18     A. Yes.
19     Q. -- with respect to their housekeeping
20  in terms of chemicals and environmental
21  compliance, what would be your overall
22  impression and I'll just go back to the Kolker
23  years?
24     A. What would be my impression of them as
25  in complying with environmental rules?
00575
1      Q. Yes.
2      A. Well, I don't think we had any rules
3   or there were very few when Kolker had the
4   place other than local Board of Health rules,
5   I would think. There was no EPA at the time
6   and we didn't have many rules to follow and we
7   did whatever was necessary to get the product
8   out and not worry about pollution during the
9   Kolker days. Vulcan gradually changed, they
10  were -- I felt that they -- I feel -- looking

MKSK-FED-0000003552

ALCD-PUBCOM_0003494

11  back that they were not much different than
12  the Kolkers originally, but they changed as
13  time went on, as the laws got more strict they
14  were -- they complied with all the rules and
15  Inland tried to comply with the rules but they
16  would cut corners when they had to, when they
17  felt they had to.  That's what I think.
18      Q.  If you had to go back now and in
19  retrospect identify perhaps the chief problems
20  that stood out in your mind, looking back
21  during each of those periods, what would you
22  identify as being the chief problems during
23  the time that you were with Kolker?  Chief
24  problems I mean in terms of general
25  housekeeping with respect to chemicals or
00576
1  compliance with any environmental --
2      A.  Yeah.  I don't think we worried by in
3  compliance.  To us it was not a problem.  The
4  biggest problem was injuries of -- employee
5  injuries and accidents with the Kolkers, and
6  -- and that's all I could tell you about the
7  Kolkers.
8      When Vulcan came, they put a lot of effort
9  into improve our accident performance rate.
10  We had a lost time injuries, a lot of
11  injuries, a lot of lost time injuries and
12  Vulcan improved on that quite a bit.
13      And the pollution end of it, I don't think
14  anybody really cared about pollution until, I
15  guess, mid '60s, later '60s.  My thoughts, my
16  own thoughts were nobody really cares at all
17  about pollution but the only thing they care
18  about is not being caught polluting, is what I
19  felt about things, my own feelings about it.
20  But then I do remember Leon Speckley saying at
21  one time we got to keep the environment safe
22  for our children and grandchildren.  So he was
23  thinking about pollution.  Leon Speckley was a
24  plant manager and I don't remember the exact
25  time he was plant manager but I think that was
00577
1  in the early '70s, maybe '71, '72.  And we
2  were working hard on pollution improving the
3  pollution situation at that time.
4      Inland came in and John Berger was quite
5  strong on solving our pollution problems or --
6  he didn't want to buy a unit from Vulcan that
7  was polluting the place and he was pretty
8  strict about that.  He wanted Vulcan to -- he
9  wanted to be sure Vulcan was not polluting
10  anymore than it was allowed.  I remember he
11  was looking at all of the paperwork on
12  effluence.  And I don't know how long John was

MKSK-FED-0000003553

ALCD-PUBCOM_0003495

13  -- stayed with the company, whether he was
14  there when I left or not, but I didn't hear
15  much about him after a while.  So I'm not sure
16  whether he was with the company or not at the
17  time I left.  That's all I can tell you.
18      Q.  When you were describing that you felt
19  that there was an overall attitude of not
20  being too concerned about environmental
21  conditions or contamination, but there was
22  more concern of just not being caught; did you
23  mean that during the whole time that you were
24  there at the site or is that during the
25  specific periods --

00578
 1      A.  Well, I would say that would be true
 2  until the late '60s.
 3      Q.  And what changed in the late '60s?
 4      A.  I know that I had a boss named George
 5  Raycos who was telling me how much the company
 6  was concerned about pollution, and I said to
 7  him, George, they're not concerned about
 8  pollution at all, they're just concerned about
 9  being caught polluting.  Joe, that's not true.
10  And we had quite a talk about it.  And that
11  was in the late '60s, and it took me a long
12  time to believe that they were concerned but
13  in the late '70s -- I mean, early '70s, we
14  were working pretty hard to solve all of our
15  pollution problems.
16      Q.  Again, if you could trace back for me,
17  what do you think contributed most
18  significantly to the pollution problems at the
19  site and, again, if you could go back through
20  Kolker and the Vulcan years and the Inland
21  years?
22      MS. RYNIEC:  Objection calls for
23      speculation.
24      A.  I don't think I really know the
25  answer.

00579
 1      Q.  Okay.  And I just have one last
 2  question for you, but it might take a few
 3  questions to get through it.
 4      A.  Okay.
 5      Q.  I wanted to get a clearer picture of
 6  the volume of materials that were being used
 7  at the site during the different stages.
 8      A.  Uh-huh.
 9      Q.  And I do have some notes from the last
10  time that you were here, but if you could,
11  kind of, walk me through the different phases
12  in terms of volume of chemicals that were
13  being produced or reclaimed during the
14  different operations?

MKSK-FED-0000003554

ALCD-PUBCOM_0003496

15    A.  Okay.  Under the Kolker -- during the
16 Kolker years, for instance, I'll just give you
17 methylene chloride.  We were using -- we were
18 producing about, oh, two or three tons of
19 methylene chloride a day in the early days
20 with Kolker.  When Vulcan Materials took over
21 we started producing methylene chloride at the
22 rate of about 25 tons a day and up at the time
23 just before Inland took over, we were
24 producing methylene chloride of about a
25 hundred tons a day.  And about a year after
00580
1 Inland took over, we shut the methylene
2 chloride plant down and we started reclaiming
3 chemicals and things were at a much smaller
4 scale.  A lot of people were laid off and let
5 go, but the company which had maybe a hundred
6 employees was down to maybe about 15 or 20
7 employees.  I'd say that would have been -- I
8 don't know what year that would have been, but
9 '75?  I'm going to guess.  I don't know for
10 sure.
11    Q.  Can you give me an estimate of what
12 the volume was materials during the Inland
13 Chemical time that you were there?
14    A.  The volume of what the reclaimed
15 products?
16    Q.  Yes.
17    A.  I don't remember.  I don't think I was
18 involved with specific numbers at the time and
19 that's why I couldn't tell you, but I'd say we
20 probably were, we were recovering the -- the
21 chloride there from other sources, waste
22 methylene chloride coming from other companies
23 and we were recovering it and I'd say, I'm
24 going to guess in the 15 to 20 tons per day
25 would probably be -- might -- it's just a
00581
1 guess.
2    Q.  I guess, I don't want you to guess.
3 What would you base an estimate of 15 to 20
4 tons upon?  Is there anything that you could
5 base it upon?
6    A.  I just -- the number of trucks coming
7 in and out.  It was just considerably smaller,
8 that's all I could tell you.
9    Q.  All right.  Mr. Gilliam, I thank you
10 for your time and your patience with us and
11 going, and answering all of our questions and
12 at this time I have no further questions.
13    A.  Okay.
14 EXAMINATION BY MS. APPELBAUM:
15    Q.  Good morning, Mr. Gilliam.
16    A.  Hi.

MKSK-FED-0000003555

ALCD-PUBCOM_0003497

17     Q.  Hi, I'm Beth Appelbaum.
18     A.  Hi, Beth.
19     Q.  I just have one quick question for
20  you, maybe two.  Taking you back to the end of
21  Ms. Haynes' question, when you remember the
22  pilot plant burning down during the Kolker
23  years?
24     A.  Yes.
25     Q.  And you testified that anything that
00582
 1  was in the plant would have gone into the
 2  ground, do you remember or can you estimate
 3  the quantity of materials that would have gone
 4  into the ground?
 5     A.  It would have been probably 500
 6  gallons.
 7     Q.  Five hundred gallons total or 500 --
 8  you had testified that sodium --
 9     A.  I would think 500 gallons total,
10  maybe, less than a thousand gallons.
11     Q.  Okay.  And then my last question for
12  you --
13     A.  Yes.
14     Q.  -- you testified that it didn't
15  surprise you that you heard that the soil in
16  Newark was contaminated?
17     A.  Uh-huh.
18     Q.  Why not?
19     A.  As I said before we used the fill,
20  landfill that was contaminated to start with,
21  the chrome oar.  We had things like the
22  fire that took place at the pilot plant and we
23  had steel drums that had materials in them
24  that some of them rusted away, that were out,
25  stored outside.  I can't remember where they
00583
 1  -- the exact locations, but I know we had
 2  rusty drums that fell apart with chemicals in
 3  them.
 4     Q.  Do you have any recollection of what
 5  was inside the steel drums that rusted?
 6     A.  I don't know.  I've forgotten.  It was
 7  chemicals that didn't -- that did not meet
 8  specification and they were stored in hopes of
 9  reclaiming them at a later time, but things
10  like strikes and sale of the company and
11  things of that sort, and the former -- the new
12  owners didn't know what was going on there, I
13  guess, and that type of thing.
14     Q.  These rusty steel drums, was this --
15     A.  Yes.
16     Q.  -- during the Kolker years?
17     A.  Yes.  Uh-huh.  They were put there
18  during the Kolker years.  I think they rusted

MKSK-FED-0000003556

ALCD-PUBCOM_0003498

19 away during the new owners, Vulcan's time.
20 That's my guess but I'm not sure.
21   Q.  Do you remember -- so you do remember
22 these rusty drums during the --
23   A.  Yes.
24   Q.  -- Vulcan's years as well?
25   A.  Well, I think so.  But I -- I'm pretty
00584
1 sure they were there during the Vulcan's
2 years.  Vulcan had to dispose of them.  I
3 think, but I'm not sure.
4   Q.  What about during Inland's time?
5   A.  I think they were gone by the time
6 Inland came.
7   Q.  Okay.  Would you be able to estimate
8 the volume of material that you saw leaking
9 out of these drums?
10   A.  I'm going to say one hundred 55-gallon
11 drums might be a guess.  But it could have
12 been more.  It could have been less.
13   Q.  Did you see any of the material
14 leaking directly into the ground?
15   A.  I don't recall.
16   Q.  And these drums that you were
17 referring to, were they sitting directly on
18 the ground?
19   A.  I think they're probably on a concrete
20 pad, but I don't really know for sure.
21   Q.  Do you think that there were cracks
22 or fissures in the concrete pad that would
23 have allowed them to seep --
24   A.  I don't know but it would have -- it
25 -- there was no dikering around them.
00585
1   Q.  Okay.  All right.  I think that's it
2 for my questions.
3   A.  Okay.
4   Q.  Thank you very much.
5   A.  Uh-huh.
6 EXAMINATION BY MS. ANDERSON:
7   Q.  Hi, Mr. Gilliam.  I'm Molly Anderson.
8   A.  Hi, Molly.
9   Q.  And Yvette and I discussed your
10 previous testimony in detail and she passed on
11 to me a lot of follow-up questions --
12   A.  Okay.
13   Q.  -- that may seem pretty random and out
14 of order.  So I hope you'll just bear with me.
15   A.  Okay.
16   Q.  First of all, I'm wondering if we
17 could get from you your best recollection as
18 to the names of the plant managers during the
19 various years.  I know that you've already
20 given us the name of Jack or John Hurst --

MKSK-FED-0000003557

ALCD-PUBCOM_0003499

21    A. Yes.
22    Q. -- as somebody during the Vulcan --
23    A. That's correct.
24    Q. -- time. Do you recall approximately
25 what years he would have been plant manager?
00586
1    A. I would guess from about -- I'm not
2 sure. I'm going to say 1970 to '72, '73.
3    Q. And what about Mr. Leon Stuckey?
4    A. Steckley.
5    Q. Steckley?
6    A. He would -- I believe he was -- I
7 can't tell you for sure whether he was before
8 or after Hurst, but it was in the -- just
9 before or just after Jack Hurst, but I'm not
10 sure.
11    Q. Now, going way back to the Kolker
12 years, can you remember the names of any the
13 plant managers there?
14    A. Well, there was Charles Kolker was a
15 plant manager from, I'd say, '53 until 1960.
16    Q. Okay.
17    A. In 1960, a man named John Burton took
18 over as plant manager.
19    Q. I had it in my notes that he was at
20 the Lister Avenue plant.
21    A. Oh, yeah, he was at Lister Avenue
22 also.
23    Q. Then he did come to Doremus?
24    A. That's correct.
25    Q. So Mr. Burton was there from 1960
00587
1 to --
2    A. '61, I believe.
3    Q. And after Mr. Burton?
4    A. Well, then Vulcan took over.
5    Q. Uh-huh.
6    A. And the plant manager was named Ed --
7 possibly Edwin McCrillis, M-c-C-r-i-l-l-i-s, I
8 believe, I'm not sure of the exact spelling
9 that was Ed McCrillis. Let me think how long
10 he was there.
11    After McCrillis we had a -- they brought
12 in another fellow from Wichita, Kansas, and I
13 can't think of his name right now.
14    Q. Do you have an approximate year? Do
15 you have a sense of how many years Mr.
16 McCrillis --
17    A. I'd say to '66, let's say, I could be
18 wrong.
19    Q. Okay. And then this person from
20 Wichita took over in approximately 1966?
21    A. I would think so. I could be wrong,
22 but I think he came in in '66, and probably he

MKSK-FED-0000003558

ALCD-PUBCOM_0003500

23 was there until, I'm going to say 1970. I
24 don't -- I can't say for sure anymore.
25    Q. Okay. And then would Mr. Hurst have
00588
1 been after this person from Wichita?
2    A. I'm going -- I think possibly Steckley
3 came in, but I'm not sure and then Hurst.
4    Q. Okay.
5    A. But I've forgotten the details. I
6 just don't remember anymore.
7    Q. And do you recall who was plant
8 manager at the time that Inland purchased the
9 plant, was that Mr. Steckley?
10    A. I don't -- remember I was talking --
11 we were talking about a fellow from Hungary
12 that was a plant --
13    Q. Right.
14    A. -- manager. I think he was the plant
15 manager at the time and I just can't remember
16 his name anymore.
17    Q. All right. And after that person from
18 Hungary was Mr. Marini?
19    A. I think that's right.
20    Q. And then after that Mr. Grish?
21    A. Well, Brian Dawson, I think, took over
22 for -- from Marini.
23    Q. Oh, excuse me. And after Dawson was
24 Grish?
25    A. Well, I left. Grish and Dawson --
00589
1 Grish was not the plant manager. He was a
2 Vice President of Inland but he was -- he was
3 in and out of the plant quite a bit. I think
4 he was helping Dawson on occasion.
5    Q. And you left at the time that Mr.
6 Dawson was the plant manager?
7    A. That's correct.
8    Q. Thank you. All right. Now, we also
9 wonder if you can recall the names of any of
10 the people responsible for maintenance during
11 the Kolker years or the Vulcan years?
12    A. Uh-huh.
13    Q. There was a maintenance department,
14 correct, at all times?
15    A. Yes.
16    Q. Do you have any recollection of who
17 is in charge of maintenance when you first
18 started under the Kolker administration?
19    A. We had a man named Ben Santucci. He
20 was in charge of maintenance there for a long
21 time.
22    Q. Anyone else?
23    A. I remember somebody else after him,
24 but I can't remember his name. He was a

MKSK-FED-0000003559

25  mechanical engineer.  He lived in Matawan

00590
1  area, but I don't know his name.  I remember
2  him, but I don't remember the name right now.
3     Q.  Now, you testified a little earlier
4  today about the phasing out of the methylene
5  chloride production and moving into the
6  methylene or -- excuse me, the solvent
7  reclamation business?
8     A.  Yes.
9     Q.  And that, am I correct in
10  understanding you to say that that happened
11  within the first year that Inland took over
12  the plant?
13     A.  I'd say about a year after Inland took
14  over, but I don't remember the exact details
15  anymore.
16     Q.  So Inland then -- now after this year
17  had passed and the shift had been made, there
18  was no more production of virgin methylene
19  chloride?
20     A.  That's correct.
21     Q.  It was only reclamation?
22     A.  That's right.
23     Q.  If you could think back, Mr. Gilliam,
24  to the time that Inland purchased the plant
25  from Vulcan.

00591
1     A.  Yes.
2     Q.  I wonder if you could give me a
3  description of the conditions of the plant at
4  that time, condition of the equipment, the
5  housekeeping and the grounds of the plant?
6     A.  I'd say it all was very good,
7  appearance-wise was very good.  I'd say it
8  probably was in the best condition as it had
9  been in since I had started there.
10     Q.  Now, you said that you noted that some
11  people from Inland came to inspect the plant
12  Mr. --
13     A.  Yes.
14     Q.  -- Arnold and Mr. Berger at the time
15  of the take-over but that you did not
16  participate in their inspections?
17     A.  That's correct.
18     Q.  At any time before Inland took over,
19  did you accompany anyone or participate in any
20  inspection at the plant by anyone from an
21  environmental agency, state or federal?
22     A.  Well, I had meetings with some state
23  and federal people but I can't specifically
24  remember them.
25     Q.  Do you remember when it was?  Before

00592

MKSK-FED-0000003560

ALCD-PUBCOM_0003502

1   Inland took over or after?
2     A. I'd say before Inland took over.
3     Q. And these were environmental agencies?
4     A. Yes.
5     Q. And what was the nature of those
6   meetings?
7     A. I can't recall. I do recall one
8   meeting where they, an inspector and I think I
9   mentioned it before about an inspector
10   wanted -- wanted to be paid to look the other
11   way.
12     Q. Yes. I did read that. What about with
13   the Coast Guard?
14     A. The Coast Guard had, they had a
15   helicopter and they would fly overhead and
16   notice if there were dis -- looking for oil
17   slicks, discoloration of the bay, et cetera.
18   And they had seen, what they saw from us was
19   not an oil slick but they would see white
20   effluent apparently leaving the plant and if
21   we had a release of caustic soda into the bay,
22   it would turn the calcium and magnesium that's
23   naturally in sea water into a white
24   precipitate like milk of magnesia and it would
25   -- the bay would turn white where -- as, you
00593
1   know, the effluent would come out. We had a
2   flow of 10,000 gallons a minute of river
3   water, of bay water going into the plant used
4   for cooling and leaving the plant.
5     Q. So did the people from the Coast Guard
6   come onto the plant to inspect?
7     A. Yes, they did.
8     Q. And did you accompany them on those
9   inspections?
10     A. At least once.
11     Q. Do you recall about when that was?
12     A. I'd say early '70s.
13     Q. When you were working during the
14   Vulcan years and the methylene chloride was
15   being produced --
16     A. Yes.
17     Q. Did you have an understanding as to
18   whether that was a toxic substance?
19     A. Probably no more than gasoline was my
20   thoughts.
21     Q. Okay. But it was as toxic as
22   gasoline?
23     A. Yes.
24     Q. You couldn't eat it or drink it, in
25   other words?
00594
1     A. That's correct.
2     Q. And what was the basis of your having

MKSK-FED-0000003561

ALCD-PUBCOM_0003503

3  that belief that it was toxic?
4      A.  It was in, I remember seeing it in a
5  book listed 500 parts per million was a -- was
6  a maximum allowable, I believe, and gasoline
7  was 500 parts per million maximum allowable.
8      MS. ANDERSON:  Just a few more
9      minutes.
10      VIDEOGRAPHER:  We're going off the
11      record at 10:51 for ending videotape
12      number eight for a change of video tape.
13      (Brief recess.)
14      VIDEOGRAPHER:  We're back on the
15      record at 10:55 on videotape number nine
16      in this deposition.
17      Q.  Okay.  Mr. Gilliam, let's see, you
18  testified and we've actually heard another
19  witness testify about a drainage sewer at the
20  Newark plant lined with acid brick, and I'm
21  wondering if you could describe that sewer and
22  what its function was and what it was lined
23  with?
24      A.  Okay.  The sewer would be an open
25  trench and it would be originally made with
00595
1  poured concrete with forms, and then it would
2  be lined with a brick which would be called an
3  acid-proof brick.  It would be, I don't know
4  how the brick was made, it was made in a
5  furnace of some sort.  And the brick was
6  installed by brick layers and it would be an
7  acid proof cement between the bricks so that
8  the brick would be impervious and the acid or
9  whatever was in the sewer would not get to the
10  concrete.  The trench would be covered up with
11  a -- either a steel grate or it might be an
12  acid-proof material of a grating so that rain
13  water or anything else would go through into
14  the sewer but you could walk across it, not
15  fall through.  So it was a grating covering
16  it, probably started out steel and the steel
17  would slowly would deteriorate.  If it
18  deteriorated too fast it was changed over into
19  a -- some kind of a fiberglass grating that
20  would withstand both the weight of a person
21  walking on it or equipment being moved across
22  it but would not be destroyed by the acids in
23  the area.
24      You know how these trenches would go into
25  tile pipes under, which would travel
00596
1  underground, and join up with other trench --
2  other sewers from other areas and would go out
3  to Newark Bay.
4      Q.  Okay.

ALCD-PUBCOM_0003504

5     A.  Cooling water, acids, all kinds of
6  waste would be mixed -- would mix together and
7  originally the thought was that an acid in one
8  location and an alkaline in another location
9  would neutralize each other and with all the
10  river water that was going in there between --
11  it would be diluted so that it would go out to
12  Newark Bay and wouldn't cause any problems.
13  Used to be thought that the solution to
14  pollution was dilution they used to say and
15  suddenly people realized it was not the
16  solution and you had to do other things to it
17  to neutralize it, make it suitable to go out
18  into the river water again.
19     Q.  Were this -- were these drains still
20  there at the time you left in late 1976?
21     A.  I think, yes, they never removed them
22  while I was there.
23     Q.  And did the -- was Inland continuing
24  to discharge its waste and cooling water?
25     A.  Well, they didn't have the same waste
00597
1  to discharge.  No.  And the fact is, I don't
2  know of any waste that they were discharging
3  there.  I know they were taking the waste that
4  they generated to a landfill called Kinbuc,
5  K-i-n-b-u-c, I believe.
6     Q.  Now, a little earlier this morning on
7  a slightly related question, you mentioned
8  that Mr. Berger was going over the papers --
9     A.  Uh-huh.
10     Q.  -- having to do with the Vulcan --
11     A.  Yes.
12     Q.  -- effluence.  Can you give me a
13  little more information about that? What
14  papers would Mr. Berger be looking at?
15     A.  We had and analyses of our waste
16  streams that went out to Newark Bay.  They
17  weren't very full analysis.  In other words,
18  we were just checking things like pH, heavy
19  metals, organics, I believe.  And Mr. Berger
20  was quite concerned about the quantities that
21  were going out there and he wanted to be sure
22  that it was all, since Inland was going to buy
23  the place, he didn't want it to be outside of
24  anything, recommended ranges if Inland was
25  going to buy the place.
00598
1     Q.  So he got hold of these papers and
2  reviewed them?
3     A.  Right.
4     Q.  How is it that you knew that he was
5  doing that?
6     A.  He and I sat in a meeting, I sat in a

MKSK-FED-0000003563

ALCD-PUBCOM_0003505

7 meeting, the same meeting as he did, going
8 over them.
9    Q. I see.
10    A. And we were with a vice president of
11 Vulcan Materials as well as the plant manager
12 at the Newark plant, myself and John Berger,
13 if I remember right.
14    Q. Do you recall who the vice president
15 was?
16    A. The vice president was Harvey
17 Campbell.
18    Q. I apologize if this was -- if you gave
19 this testimony earlier, I just -- okay, the
20 vice president, the plant manager --
21    A. The plant manager I think was Leon
22 Steckley at the time.
23    Q. Mr. Berger and you.
24    Now, to jump again to a new topic, you
25 testified in the first day of your previous
00599
1 deposition that on Tank Farm Number Nine there
2 was an occasion on which a toluene valve of
3 was left open. Do you recall testifying about
4 that?
5    A. I think so.
6    Q. And some toluene escaped?
7    A. I -- it seems to me this was
8 deliberate act, but we thought that it was a
9 deliberate act during a strike. Did I say
10 that?
11    Q. You said, "I think possibly Tank Farm
12 Nine was used for toluene storage and there
13 was a time when there was a strike and
14 somebody came into the plant and turned the
15 toluene pump on and pumped some toluene and
16 spilled it."
17    A. Yeah, I think that's right.
18    Q. I just have one question about that.
19 Did you ever learn of any soil or ground water
20 contamination that resulted from that release
21 of toluene?
22    A. No, I don't. But toluene is a -- is
23 volatile solvent, it evaporates about the same
24 rate as gasoline, has the same boiling point
25 as gasoline approximately.
00600
1    Q. Okay. Then you also testified that
2 during the Vulcan years there was a -- there
3 were some spill procedures in effect?
4    A. Uh-huh.
5    Q. Do you recall who prepared those
6 procedures? Were they written?
7    A. I think they were written procedures
8 that was required by, I think, an EPA required

MKSK-FED-0000003564

ALCD-PUBCOM_0003506

9 it. It had to be done by a professional
10 engineer and so it was done outside the
11 company, if I remember right. It might have
12 been done by Straubing, or Straubing and
13 Rubin. I'm not sure.
14    Q. Would that be Art Straubing?
15    A. That's correct.
16    Q. Did he became a consultant?
17    A. Yes.
18    Q.  Do you recall any details about what
19 the procedure said?
20    A. I don't recall them, no. But in
21 general they would be what you did when you
22 found -- when you found a spill or release,
23 who you notified, who you called, action --
24 people to be notified and procedures for
25 clean-up and that type of thing. But it was
00601
1 mostly notification of various people; plant,
2 manager and so on; notification of EPA or
3 state and federal people, even county people
4 to be notified, what order they would be
5 notified in and the action you would take to
6 clean it up, stop the contamination, et
7 cetera.
8    Q. And were employees at the plant
9 trained, given any formal training about these
10 procedures?
11    A. I don't think so. There might have
12 been a few trained but -- the foreman
13 possibly, but, in general, most of the
14 employees would not have knowledge of what to
15 do.
16    Q. During the Vulcan years was there an
17 environmental, was there a person on the
18 Vulcan staff who was in charge of
19 environmental affairs during the Vulcan years?
20    A. I think they tried to put me in charge
21 of it for a while, but I don't remember any --
22 any other persons specifically in charge of
23 it. But I did get that job for a while.
24    Q.  Do you know about what years you
25 would have had that job?
00602
1    A. Late -- early '70s.
2    Q. There were a couple of exhibits in
3 your previous deposition from, letters from
4 Mr. Campbell to Mr. Ply at the EPA?
5    A. Yes.
6    Q. That described lab work that was done?
7    A. Uh-huh.
8    Q. I wonder if you know the company that
9 did the lab work?
10    A. I remember a name of a company called

MKSK-FED-0000003565

ALCD-PUBCOM_0003507

11  Mogul, M-o-g-u-l, and I think that they were
12  taken over by another company. But that's all
13  I can remember, Mogul. Maybe right, maybe
14  wrong.
15     Q. Okay. Of the -- all right. I think,
16  I'm just sure, everyone will be happy to know,
17  I think I just have one more question and that
18  is, you referred to somebody named Anthony
19  Papciak?
20     A. Yes.
21     Q. All right. In other documents we have
22  seen in this case, we've -- I've seen a
23  reference to a Henry Papciak?
24     A. Yes.
25     Q. Are they the same person or are
00603
1  they --
2     A. No, they're brothers.
3     Q. They're brothers. And did you know
4  Henry Papciak?
5     A. Yes.
6     Q. Was he also at the Doremus Street
7  plant?
8     A. Yes.
9     Q. During what years approximately?
10     A. I would say he came there in -- he
11  was -- Henry Papciak worked at the Lister
12  Avenue plant and he went to the Army, and some
13  time -- I think, he was drafted went to Korea
14  or something, probably came back there --
15  after the war, Korean War, he was discharged,
16  I guess he came back, went to the Newark plant
17  about '55, I would guess, on Doremus Avenue.
18     Q. Until?
19     A. I think it was there until, probably
20  was there until I left. But I'm not sure.
21  And he was a maintenance employee.
22     Q. All right. I don't have anything
23  further.
24        MS. RYNIEC: I don't have anything
25     further.
00604
1        MS. HAYNES: Probably put the
2     stipulation. We'll go off the record.
3        VIDEOGRAPHER: We'll go off the record
4     at 11:09.
5     (At this time a short recess is taken.)
6        VIDEOGRAPHER: Back on the record at
7     11:09.
8        MS. HAYNES: Mr. Gilliam, when your
9     deposition first began it was explained
10     that the deposition testimony questions
11     and answers are going to be put in a
12     booklet form and you'll be provided with

file:///qnapnas/Concordance/Concordance/Cases/03_Mckesson/09_NewarkLand/TRANSCRIPTS/Gillum%20Napbind%20Vol.ept/17.20/%20.v.36.htp

MKSK-FED-0000003566

ALCD-PUBCOM_0003508

13    an opportunity to review that booklet and
14    make changes if you deem them necessary.
15         We caution that if you make any
16    changes to the transcript, any of the
17    attorneys in the case can comment on those
18    changes but in the event, all parties have
19    agreed that in the event for some reason
20    if your transcript does not get reviewed
21    and signed, that an unsigned copy of the
22    transcript could still be used after 30
23    days expire from today that the transcript
24    can still be used to the same effect by
25    any of the parties in the case at trial or
00605
1    for any other matter.
2         MS. RYNIEC:  Yes.  We agree.
3         MS. HAYNES:  Great.  Thank you again.
4         VIDEOGRAPHER:  That will conclude this
5    deposition at 11:10.
6         (Witness excused.)
7         (Deposition concluded.)
8
9
10         ------------------------
11         RAYMOND GILLIAM
12
13
14
15
16
17
18
19
20
21
22
23
24
25
00606
1         C E R T I F I C A T E
2         I, MICHELLE DIPIERRO-FAIREY, a Notary
3    Public and Certified Shorthand Reporter of the
4    State of New Jersey, do hereby certify that
5    prior to the commencement of the examination,
6    the witness (s) Raymond Gilliam was sworn by
7    me to testify the truth the whole truth and
8    nothing but the truth.
9         I DO FURTHER CERTIFY that the foregoing is
10    a true and accurate transcript of the
11    testimony that was taken stenographically by
12    and before me at the time, place and on the
13    date herein before set forth.
14         I DO FURTHER CERTIFY that I am neither a

MKSK-FED-0000003567

ALCD-PUBCOM_0003509

15 relative nor employee nor attorney nor counsel
16 for either of the parties to this action, and
17 that I am neither a relative nor employee of
18 such attorney or counsel, and that I am not
19 financially interested in the action.
20 _____
21       MICHELLE DIPIERRO-FAIREY, CSR
22       A Notary Public of the State
23            New Jersey
24 My commission expires:
25 July 2000

MKSK-FED-0000003568

ALCD-PUBCOM_0003510

# EXHIBIT 61

OxyChem's Comments in Opposition to Proposed Consent Decree,
*United States v. Alden Leeds, Inc., et al.*, Civil Action No. 2:22-cv-07326 (D.N.J.)

ALCD-PUBCOM_0003511



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
CINCINNATI ACQUISITIONS DIVISION
CINCINNATI, OHIO 45268**

DATE:        July 28th, 2020

SUBJECT:     Contract #68HERH19D0033_TO 68HERH19F0406, Modification P00004

FROM:        Erin M. Ridder, Contracting Officer

TO:          Kelly Loomis

Attached is request for task order modification for Task Order #68HERH19F0406, Modification
P00004, which was awarded for the project entitled, "Diamond Alkali-Lower Passaic River
Allocation."

The government requests you prepare a revised cost proposal for the task order modification in
accordance with the changes outlined in the attached Performance Work Statement. The proposal
must be submitted to ridder.erin@epa.gov by **August 10th, 2020**. The modification adds the
number of documents the allocation team must review and incorporate into the allocation; adds
level of effort; improves the managerial oversight of the project schedule; and to extend the
period of performance.

The following documents provided for this modification will become part of the Task Order
Award:

- Performance Work Statement

Any questions should be directed to the undersigned within two business days of receipt.

Erin M. Ridder
Contracting Officer

Cc:
Alice Yeh, Task Order Contracting Officer Representative
Terry Fenton, CL-COR
Terry Simpson, Alt CL-COR

**PERFORMANCE WORK STATEMENT**
**Contract 68HERH19D0033**
**TO # 68HERH19F0406**
**Modification: P00004**

**TITLE:  Diamond Alkali-Lower Passaic River Allocation**

**MODIFICATION P00004:** This performance work statement (PWS) modification is to add to
the number of documents that the allocation team must review and incorporate into the allocation
(see Section II.B.4),                   Exemption (b)(3)(A) & (7)(A)

                    to improve the managerial oversight of the project schedule (see Section
II.B.6), and to extend the period of performance (POP) [see Sections I and V].

**ABSTRACT:** This task order will provide neutral, unbiased support for development of an
allocation for potentially responsible parties (PRPs) at the Diamond Alkali Superfund Site in
New Jersey. This allocation will form the basis for final negotiations between the EPA Region 2
and PRPs. This Task Order is funded by EPA Region 2 Superfund program. This Task Order
continues the allocation work started under Contract EP-W-14-020, Task Order 96 (referred to
below as the previous contract).

## I.  BACKGROUND

The Diamond Alkali Site has a long history, involving over 100 potentially responsible parties
(PRPs). Since the late 1800s, the Lower Passaic River has been a highly industrialized waterway,
receiving direct and indirect discharges from numerous industrial facilities. Data collected in the
Lower Passaic River, and EPA's analyses, show that contaminated sediment in the lower 8.3
miles are a major source of contamination to the rest of the river and Newark Bay and pose an
unacceptable risk to human health and the environment due to the presence of a variety of
contaminants that stay in the environment for a long time and can build up in fish and shellfish.
These contaminants include dioxins and furans, PCBs, mercury, DDT and its primary breakdown
products, copper, dieldrin, PAHs, and lead.

On March 4, 2016, EPA issued a record of decision selecting the remedy for the lower 8.3 miles
of the Lower Passaic River, which is Operable Unit 2 (OU2) of the Site. Currently, the remedial
design (RD) for OU2 is being performed by Occidental Chemical Corporation (OCC) pursuant
to an administrative order on consent. The cost of the remedial action (RA), estimated for
purposes of remedy selection, is $1.38 billion.

Region 2 has issued a notice of potential liability to approximately 100 parties, informing them
of their responsibility for the RD/RA for OU2. The Region has offered a first round of cash-out
settlements to a group of approximately 20 PRPs. The Region also expects to separately address
the liability of municipalities and public entities. The Region requires the services of a third-
party allocator to assign a share of responsibility to the 83 PRPs that are not in the first round of
cash-out settlements and that are not municipalities or public entities. Some of the PRPs have

1

multiple facilities in the allocation, so that the total number of facilities to be assigned a share of responsibility will be 97. The Region expects to use the results of the allocation to: 1) enter into settlement agreements with a small group of the PRPs with the largest shares of responsibility to perform the remedial action; and 2) enter into another round of cash-out settlements with the other PRPs with smaller shares of responsibility.

Region 2 understands that a PRP group (the Cooperating Parties Group, or CPG) has made at least two previous attempts to develop a mutually acceptable allocation of liability to promote settlement with EPA for costs and work at the site, however both efforts fell short of agreement. Region 2 believes that because of these previous efforts, additional information available from responses to CERCLA 104(e) letters, information available from previous litigation at the state level and numerous conversations with PRPs over the years, the allocation project will be able to build upon existing information and contacts. Some augmentation of background, data and allocation factors may need to occur to develop what is hoped to be an acceptable settlement proposal and structure. In 2016 the Department of Justice retained a mediator, David Batson of Techlaw to assist in settlement analysis. Those discussions and analyses have resulted in this effort.

This work needs to start in August 2019 because of milestones anticipated in site cleanup and is expected to last up to 13 months. **This PWS amendment extends the expected period of performance from October 30, 2020 to March 31, 2021.**

## II.    SCOPE OF WORK – TASKS
### A. Preliminary Work
1. The contractor shall select a team of dispute resolution professionals and support staff in consultation with the Contract Level Contracting Officer's Representative (CL COR) and Task Order Contracting Officer Representative (TOCOR).  The lead service provider shall have the following qualifications:
   - Detailed knowledge of a range of Superfund allocation of liability processes.
   - Multiple instances and experience constructing allocation plans consistent with EPA settlement guidelines and legal requirements.
   - Access to staff resources for database design, entry, analysis and manipulation.
   - Understanding of PRP legal and technical issues and concerns in designing allocation processes.
2. The contractor shall be responsible for oversight of deliverables on this Task Order and shall be responsible for transmission of reports and invoices as required by the contract.

### B. Allocation Design and Production Performance Requirement:
The purpose of this project is to provide neutral, unbiased allocation development and negotiation support to establish a reasonable basis for EPA settlement offers to Diamond Alkali OU2 PRPs by developing and implementing an allocation process for the parties that are not in the first round of cash-out settlements and that are not municipalities or public entities. Major deliverables include (1) a searchable database containing documents and data used for the allocation and (2) a written allocation analysis report

2

(i.e., allocation report). Authority to initiate work for each subtask described below will be provided via email by the TOCOR as a need to conduct subtasks is identified.

During the performance of the work described in the subtasks, Region 2 may share information with the contractor that is pre-decisional and deliberative or is considered to be attorney work product in preparation of potential litigation. Such work is privileged to the United States and EPA under the Freedom of Information Act. While the contractor shall conduct the allocation process in a manner transparent to the public to the extent possible, the contractor must consult with EPA before releasing information to the public to ensure confidential information is protected. The contractor shall perform the following negotiation support subtasks:

1. <u>Initial review of information provided by EPA</u>: EPA will provide the contractor with the information, materials and reports generated under the previous contract pertaining to the allocation. The contractor shall review this information.

2. <u>PRP Outreach:</u> The contractor shall conduct outreach to OU2 PRPs participating in the allocation to provide them with the opportunity to comment on and correct the draft data reports produced under the previous contract and to provide input on the drafting of the allocation recommendation report.

   a) The PRP outreach performed by the contractor shall be include (1) ensuring that each PRP's data or information used in the allocation is correctly input into the database, (2) soliciting PRP positions on the drafting of the allocation recommendation report, and (3) communicating how their input was or was not taken into consideration in developing the allocation recommendation report.

   b) The contractor shall complete a report regarding outreach efforts conducted with the OU2 PRPs, including a list of participants in outreach efforts, description of topics discussed, and summary of issues or concerns raised.

3. <u>Searchable database:</u> The contractor shall finish developing the searchable database started under the previous contract. The searchable database should contain and organize all of the information and data used in the allocation.

   a) Under the previous contract, the database was designed and initially populated with information received from EPA, including PRP disclosure statements and nexus documents from third party litigation totaling approximately 130,000 pages.

   b) Under the previous contract, the database was also populated with up to **413,895** pages of documents received from PRPs deemed relevant to the allocation by the previous contractor and any other information used in the allocation.

   c) The database shall be designed in such a way as to allow access and use by EPA and DOJ staff for their settlement purposes.

   d) Completion of database: The contractor shall complete the database and provide the completed database to EPA when the final allocation recommendation report, described in paragraph 5, is complete.

4. <u>Final Facility Data Reports:</u>

   a) Draft Facility Data Reports: After reviewing and analyzing relevant information in the database (described in paragraph 3 above) on each PRP facility, the previous

3

contractor developed individual data reports for each facility. The data reports provided the information that will be used to conduct the allocation.

b) PRP Review of Draft Data Reports: After completing the draft data reports, the previous contractor sent the draft reports to the PRPs participating in the allocation for their review and comment on the accuracy of the information. Note: EPA did not have an opportunity to review the draft data reports.

c) Final Facility Data Reports: The contractor shall solicit comments from the PRPs participating in the allocation on the accuracy of the information in the draft data reports. The contractor shall finalize the data reports based on the comments received.

d) Additional documents received: As of June 2020, the contractor had received an additional 48,600 pages of facility data from the PRPs participating in the allocation. The contractor shall review the additional information and incorporate it into the searchable database and allocation recommendation report, as necessary and appropriate.

5. Allocation and Report

a) Allocation: The contractor shall ensure that each PRP's data or information used in the allocation is correctly input into the database. Exemption (b)(3)(A) & (7)(A)


The contractor shall solicit from the PRPs participating in the allocation positions on the drafting of the allocation recommendation report (as described in paragraph 2). **As of June 2020, the contractor had received an additional 276,851 pages of position briefs, expert reports and supporting information from the PRPs participating in the allocation. From June 2020 through the end of the allocation, the contractor expects to receive up to another 50,000 pages of response briefs, expert reports and supporting information. The contractor shall review the expected total of up to 326,851 pages of additional information and incorporate it into the searchable database and allocation recommendation report, as necessary and appropriate.**

b) The contractor shall perform the allocation.

c) Draft allocation recommendation report: The contractor shall provide a draft allocation recommendation report for review and comment by the PRPs participating in the allocation. **The contractor shall enforce the page limits and other requirements specified in the Allocation Guide for comments on the draft allocation recommendation report.** EPA will not have an opportunity to review the draft allocation recommendation report.

d) Final allocation recommendation report: After considering the PRPs' input, the contractor shall provide a final allocation recommendation report to EPA and the PRPs in the allocation.

4

6. <u>Meetings or Conference Calls:</u> The contractor shall attend and participate in the following meetings either in-person or by telephone or video conference at EPA's discretion.
   a) Progress meetings or conference calls: Contractor shall hold weekly conference calls with EPA, and others as directed or determined by EPA, to discuss progress. **The contractor shall ensure that due dates for deliverables are met, and that any potential delays are reported to EPA as soon as possible and mitigated as much and as quickly as possible so that the final allocation recommendation report is not further delayed.**
   b) Kickoff meeting or conference call with EPA: Contractor shall meet with EPA to discuss tasks described in this task order and EPA's expectations.
   c) Draft allocation recommendation report meeting or conference call with PRPs: Contractor shall meet with the PRPs participating in the allocation to discuss their comments on the draft allocation recommendation report.
   d) The contractor shall provide meeting facilities, equipment, supplies and support for meetings in cases where EPA or other participant facilities are unavailable or inappropriate.

7. The contractor shall furnish a final allocation recommendation report as described above and a short (2 page) Task Order Closeout Report. The Task Order Close Out Report shall not contain any confidential or sensitive information. The contents shall include:
   a) A half page description of the case that describes the nature of the case, the parties, the process and the outcomes.
   b) If appropriate, a short section reflecting on the process and procedural lessons learned and recommendation for improvements. The contractor shall identify those activities conducted that contributed to the success of the process.
   c) Brief summary of the final costs of the project broken out by labor hours and other direct costs.
   The CL COR and TOCOR will review the draft Task Order Closeout Report and provide comments and revisions as necessary. The contractor shall prepare the final report incorporating their comments and revisions. The contractor shall provide one copy of the final report to the CL COR and one copy to the TOCOR. The final report may be transmitted in electronic form (Word format), rather than in hard copy if the TOCOR agrees

8. As directed by the TOCOR, the contractor shall participate in a post-process debriefing with EPA officials, including the CL COR, TOCOR and Technical Point of Contact (POC) and relevant EPA management, to discuss lessons learned and next steps.

## C. Reports and Deliverables

All deliverables and tasks required under this task order must be submitted or completed within the time durations listed in the schedule set forth below. After notification to and agreement from the EPA team, TOCORs and CL CORs, the contractor may submit a revised proposed schedule for EPA approval. Upon EPA's approval, the revised schedule will supersede the schedule set forth below.

5

ALCD-PUBCOM_0003517

| | Description of Deliverable, Transmittal or Activity | ¶ Ref. | Type | Deadline |
|---|---|---|---|---|
| 1 | Kickoff meeting or conference call with EPA | II.B.6.b. | Activity | Within 20 business days of task order issuance |
| 2 | Completion of searchable database | II.B.3.c. & II.B.3.d. | Deliverable | Upon submission of the final allocation recommendation report (5.c.) |
| 3 | Completion of final facility data reports. | II.B.4.c | Transmittal | Within 40 business days of approval of TO award |
| 4 | Perform allocation | II.B.5.a. | Activity | **170** business days after completion of final facility data reports (4.c.) |
| 5 | Draft allocation recommendation report | II.B.5.b. | Transmittal | **170** business days after completion of final facility data reports (4.c.) |
| 6 | Draft allocation recommendation report meeting | II.B.6.c. | Transmittal | Within 20 business days of submittal of draft allocation recommendation report (5.b.) |
| 7 | Final allocation recommendation report | II.B.5.c. | Deliverable | 65 business days after completion of draft allocation recommendation report (5.b) |
| 8 | Final PRP outreach report | II.B.2.b. | Transmittal | 10 days after completion of final allocation recommendation report (5.c.) |
| 9 | Draft case closure report | II.B.7 | Transmittal | 10 business days after acceptance of final allocation recommendation report |
| 10 | Final case closure report | II.B.7 | Deliverable | 10 business days after receipt of EPA comments. |

1. Performance Standards:
   a. The contractor shall provide negotiations support using the guidance listed in Attachment B, other applicable guidance, and/or direction provided in an individual task order.
   b. The contractor shall send Region 2 TOCOR all reports in accordance with the contract.
   c. The contractor shall provide a task order proposal plan within the schedule provided in the contract.
2. Deliverables shall be submitted to EPA by
   a. Written paper text to Task level COR, when requested
   b. Via e-mail to Task level COR
   c. On electronic media (specify disk, CD, etc.) (only upon request and issued through written technical direction from EPA TOCOR)
   d. Posted on a SharePoint server for access by Contract Level COR

III.    **WORK APPROACH**

6

A. Alternative Dispute Resolution (ADR) Best Practices:
The Contractor shall approach this task in accordance with terms of the basic contract and according to the established norms and ethical standards of ADR professionals. Based on EPA's evaluation of a large number of ADR cases, the Agency has determined that the following practices are significantly related to positive substantive, relational, and procedural outcomes from ADR cases. The contractor shall ensure that this direction is provided to ADR professionals providing services under this task order:

- Prior to the mediation or facilitation and throughout the process, the ADR professional shall inquire about whether individual participants have the time, financial, and logistical resources necessary to participate effectively in the process and -- where resources are inadequate -- assist them in identifying appropriate resources or in making necessary adjustments to the process to accommodate resource constraints.
- The ADR professional shall assist the participants in identifying the issues that are important to resolving any controversy and solutions that will address the needs shared by the participants.
- The ADR professional shall conduct the process to promote active engagement from all participants.
- The ADR professional shall explore with the participants appropriate ways to incorporate high quality and relevant information resources necessary to resolve the issues.
- To support productive dialogue and effective implementation of any agreements reached by the participants, the ADR professional shall ensure that participants have appropriate authority to make commitments on behalf of their organizations.

B. Ethical Codes of Conduct:
The Contractor shall ensure that ADR professionals serving as neutral third parties under this contract receive information about and perform in accordance with ethical codes applicable to the practice of dispute resolution professionals. Relevant examples of ethical codes include those adopted by the American Arbitration Association, American Bar Association, Association for Conflict Resolution:
https://www.americanbar.org/groups/dispute_resolution/resources/Ethics/

C. Confidentiality:
All parties to this task order acknowledge that the confidentiality provisions of the Administrative Dispute Resolution Act, 5 U.S.C. Section 574 (ADR Act) shall govern the contractor's alternative dispute resolution activities (if any) under this task order, when activities pursuant to the task order fall within the jurisdiction of the ADR Act.

D. Contractor Representation:
In gathering information or performing tasks with parties outside the EPA, the contractor shall identify themselves as a contractor to EPA, not an EPA employee. The Contractor shall provide input or make recommendations based on the information gathered, however, decisions on all substantive issues will be made by EPA. THE CONTRACTOR SHALL NOT INTERPRET EPA POLICY ON BEHALF OF EPA NOR MAKE DECISIONS ON ITEMS OF POLICY, REGULATION OR STATUTE. THE

7

ALCD-PUBCOM_0003519

CONTRACTOR SHALL NOT TAKE A STAND ON THE MERITS OF
SUBSTANTIVE ITEMS UNDER DISCUSSION.

E.  Status Notifications:
THE CONTRACTOR SHALL NOTIFY THE EPA CL COR AND TOCOR WHEN 75%
OF THE FUNDS PROVIDED HAVE BEEN EXPENDED OR WHEN FUNDING FOR
LESS THAN 6 WEEKS WORK REMAINS. Notifications shall be in writing and cc to
the CL COR.

F.  Task Order Procedures, Constraints and Disclaimers
If out of town travel is required to accomplish the tasks under this task order, the
contractor shall obtain advance approval for that trip and its costs in writing from the
TOCOR and/or the CL COR. To the extent possible, the contractor's per diem costs shall
be within allowable limits set by GSA.

This task order is not funded by multiple appropriations. This task order does not provide
for training of contractor personnel, provision of Government Furnished Property or
Accountable Personal Property, leased items or property or IT products or services. The
PWS does not include any tasks that are inherently governmental in nature or provide
personal services. The PWS does not anticipate transferring or developing Confidential
Business Information or Personally Identifiable Information to the contractor. This
project will not involve collection of environmental data and so is not subject to needing
an EPA Quality Assurance Project Plan. Printing shall be in accordance with limitations
of the contract. This project does not involve the service provider conducting surveys,
data collection or questionnaires. Development of communications products as a result
of activities on this task order will be in compliance with EPA's Policy and
Implementation Guide for Communications Product Development and Approval found at
HTTP://www.epa.gov/productreview/guide/index.html.

The Contractor is directed to conduct Conflict of Interest checks and provide this
information for TOCOR review and CO approval.

IV.  **EPA CONTACTS**

A.  EPA Task Order Contracting Officer Representative (TOCOR):
Alice Yeh
290 Broadway, New York, NY 10007
Phone: 212-637-4427
yeh.alice@epa.gov
B.  EPA Contract Level Contracting Officer's Representative (CL COR).
Terry Fenton
Conflict Prevention and Resolution Center (MC-2388A)
Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460

8

Phone: 202-564-2090 Fax: (202) 501-1715
fenton.terry@epa.gov

C. CPRC contact for this task order
Terry Simpson
Conflict Prevention and Resolution Center (MC-2388A)
Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460
Phone: (202) 564-2462 Fax: (202) 501-1715
Email: simpson.terry@epa.gov

D. EPA Contracting Officer (CO)
Erin M. Ridder
Cincinnati Acquisition Division
Environmental Protection Agency
26 West Martin Luther King Drive (Mail Code: W136A)
Cincinnati, OH 45268
Phone: (513)487-2155
Ridder.erin@epa.gov

## V.    PERIOD OF PERFORMANCE

The period of performance of this task order shall be until **March 31, 2021.**

9

ALCD-PUBCOM_0003521